PILLSBURY WINTHROP SHAW
PITTMAN LLP
31 West 52nd Street
New York, NY 10019
Telephone: 212.858.1000
Facsimile: 212.858.1500
John A. Pintarelli
Patrick E. Fitzmaurice
Ari M. Berman
Rahman Connelly
Eugenie Dubin

KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
Telephone: 212.488.1200
Zachary D. Rosenbaum
Rachel K. Warren

CARMEL, MILAZZO & FEIL LLP
55 West 39th Street, 4th Floor
New York, NY 10018
Telephone: 212.658.0458
Andrew Zinman

*Attorneys for Plaintiffs*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>IIG Global Trade Finance Fund Ltd. (in Official Liquidation), *et al.*,<br><br>Debtors. | Case No. 20-10132 (MEW)<br><br>Chapter 15<br><br>Jointly Administered |
| IIG Global Trade Finance Fund Limited (in Official Liquidation), IIG Structured Trade Finance Fund Limited (in Official Liquidation), Christopher Kennedy and Alexander Lawson, as assignees of the creditors of IIG Global Trade Finance Fund Limited (in Official Liquidation) and the creditors of IIG Structured Trade Finance Fund Limited (in Official Liquidation) and Christopher Kennedy and Alexander Lawson in their capacities as Joint Official Liquidators of IIG Global Trade Finance Fund Limited (in Official Liquidation), IIG Structured Trade Finance Fund Limited (in Official Liquidation),<br><br>Plaintiffs, | Adv. Pro. No. __-_____ (MEW)<br><br>**COMPLAINT** |

| | |
|---|---|
| v. | : |
| | : |
| International Investment Group L.L.C., Trade | : |
| Finance Trust, Deutsche Bank Trust Company | : |
| Americas, Assured Investment Management LLC | : |
| (f/k/a BlueMountain Capital Management, LLC), | : |
| Tennenbaum Capital Partners, LLC, KKR Credit | : |
| Advisors (US) LLC, Elanus Capital Management, | : |
| LLC, BlueMountain Foinaven Master Fund L.P., | : |
| BlueMountain Logan Opportunities Master Fund | : |
| L.P., BlueMountain Montenvers Master Fund | : |
| SCA SICAV-SIF, BlueMountain Timberline Ltd., | : |
| BlueMountain Kicking Horse Fund L.P., | : |
| BlueMountain Credit Opportunities Master Fund I | : |
| L.P., Tennenbaum Senior Loan Fund IV-B, LP, | : |
| Tennenbaum Senior Loan Fund II, LP, | : |
| Tennenbaum Senior Loan Operating III, LLC, | : |
| Corporate Capital Trust, Inc., KKR Debt Investors | : |
| II (2006) (Ireland) L.P., KKR TRS Holdings, Ltd., | : |
| KKR-PBPR Capital Partners L.P., Special Value | : |
| Continuation Partners, LP, and Elanus Capital | : |
| Investments Master SP Series 1, John Doe | : |
| Subsequent Transferees 1-10,000, | : |
| | : |
| | : |
| Defendants. | : |

2

# COMPLAINT

Plaintiffs (a) IIG Global Trade Finance Fund Ltd. (in Official Liquidation) ("GTFF") and IIG Structured Trade Finance Fund Ltd. (in Official Liquidation) ("STFF" and together with GTFF, the "Funds" or the "Debtors"), by and through their duly appointed joint official liquidators Christopher Kennedy and Alexander Lawson (the "Liquidators"), (b) the Liquidators, in their individual capacities, as assignees of Aktia Bank PLC, Non-UCITS Fund Aktia Trade Finance (together, "Aktia"), Citco Custody Ltd. – Ref Trade Finance Holding Ltd. (held on behalf of AGC Equity Partners) ("AGC"), LAM Enhanced Trade Finance Fund I L.P. ("LAM" and together with Aktia, and AGC, the "Investor-Assignors"), and (c) the Liquidators in their capacities as Joint Official Liquidators of GTFF and STFF assert three sets of claims: claims brought by the Liquidators, as assignees of the Investor-Assignors (the "Investor-Assignor Claims," counts 1-7), claims brought on behalf of the Debtors (the "Debtor Claims," counts 8-15), and claims that are statutorily vested in the Liquidators as a matter of Cayman law (the "JOL Claims," counts 16-17). In support of those claims, Plaintiffs allege as follows:

# NATURE OF THE ACTION

1.      Plaintiffs are victims of a fraud perpetrated by the Debtors' former investment advisor, the International Investment Group, L.L.C. ("IIG") and its principals, David Hu and Martin Silver, along with the Defendants in this action. Hu and Silver have pled guilty to federal crimes for their role in the scheme.

2.      IIG was a registered investment advisor that purported to specialize in trade finance lending, particularly involving loans to small and medium-sized exporters in Latin America. IIG and its affiliates raised funds to make these loans by selling participation interests to, among others, IIG-affiliated investment funds and later to a collateralized loan obligation, Trade Finance Funding

I Ltd. (the "CLO") and the Debtors.

3.      Unbeknownst to Debtors and their investors, IIG was a fraud and its managers 'sold' the Debtors fictitious loans and overvalued 'real' loans. The proceeds of those sales were used to pay IIG's earlier investors, including the Noteholders, in a ponzi-like fashion.

4.      IIG's principals, David Hu and Martin Silver have admitted that they "intentionally and knowingly participated in a scheme to overvalue distressed loans and IIG funds" and "falsif[y] paperwork" to create a series of "fake loans" in their capacities as investment advisors and were incarcerated for those crimes. IIG, for its part, also acknowledged its role in the fraudulent scheme through a final judgment issued on consent obtained by the Securities and Exchange Commission ("SEC"), which enjoined IIG from violating the antifraud provisions of the federal securities laws and required IIG to pay more than $35 million in disgorgement and prejudgment interest.

5.      While Hu, Silver, and IIG acted together to defraud Plaintiffs, they did not act alone. Indeed, their fraudulent scheme would have ended much sooner, and without harm to the Plaintiffs, without the assistance of the remaining Defendants (DBTCA and the Noteholders[1]), all of whom profited handsomely at Plaintiffs' expense. Plaintiffs, by contrast, have lost their entire investment, totaling more than $190,000,000 in principal amount, due to Defendants' fraudulent misconduct.

6.      DBTCA and the Noteholders received the ill-gotten fruits of this fraud with

---

[1] Each as defined below.

knowledge[2] of material misrepresentations made by IIG about the CLO portfolio. They thus knew, and had to have known, that the proceeds they received were not obtained for anything approximating fair consideration and were therefore not bona fide. The Noteholders nonetheless forced the sale of the portfolio for par plus accrued interest—a result that would not and could not have been accomplished without fraud. DBTCA and the Noteholders knew of red flags concerning fraud and benefitted from that fraud.

7.    The scheme began in 2007 when IIG learned that one of its borrowers had defaulted on a loan it originated and sold to an affiliated fund, IIG Trade Opportunities Fund N.V.  ("TOF NV"). Fearing that existing investors would pull their funds, and that ongoing fundraising efforts would suffer if the loss was disclosed, IIG, through Silver and Hu, decided to conceal the loss and intentionally misvalue the loan at par plus accrued interest on TOF NV's books. When it became untenable to continue carrying that loan as a performing asset due to auditor scrutiny, IIG removed it from TOF NV's holdings and replaced it with fake loans to different borrowers. The purported borrowers were foreign companies that were controlled by IIG, its principals, or a business associate of theirs. Accordingly, the purported borrowers never received anything of value from TOF NV, and there was no expectation they ever would make any payments to TOF NV.

8.    When another sizeable loan defaulted in 2010, IIG, through Hu and Silver, once again hid the loss by first continuing to value the loan at par plus accrued interest and when they could no longer continue to do so, removing the loan from the portfolio and replacing it with

---

[2]  Where this complaint refers to collective knowledge on the part of DBTCA and the Noteholders (or the Noteholders as a group), or those parties engaging in certain action or inaction, that is because they each individually received or had access to the exact same information and/or took a common action or each refrained from action.

3

additional, worthless substitute loans.

9.    Over time, as new losses arose or as the fictitious loans matured, IIG would remove them from the TOF NV portfolio and replace them with additional, valueless substitute loans.

10.    By November 2013, TOF NV had more than $200 million in pending investor redemption requests. Working with its bankers at Deutsche Bank Securities, Inc. ("DBSI"), IIG sought to raise money to refinance TOF NV's portfolio and satisfy pending investor redemption requests through the establishment of the CLO. DBSI underwrote the CLO and served as arranger, distributor, and initial purchaser of the notes issued by the CLO.

11.    Deutsche Bank Trust Company Americas ("DBTCA") was the CLO's trustee and custodian, and was responsible for opening and maintaining trust accounts for the CLO, as well as collection accounts for each of the loans purportedly sold to the CLO. These collection accounts were established with the disclosed intent of holding funds belonging both to the CLO and the borrowers and were a key element of IIG's fraud.

12.    On behalf of the CLO, DBTCA also funded new loans directly to borrowers and otherwise transferred funds to them, or to third-parties on their behalf. DBTCA did this without performing any 'know your customer' or other diligence whatsoever concerning the borrowers and transferred funds to third-parties in a manner that defeated the CLO's security interest in the purported loan, rather than to ensure the perfection of that security interest as it was contractually required to. Indeed, DBTCA personnel instructed IIG on how to open bank accounts in a manner that would avoid 'know your customer' and similar diligence.[3]

---

[3] 'Know Your Customer' or KYC rules are guidelines and regulations that require banks and other financial services firms to verify the identify, suitability, and risks associated with maintaining a business relationship with a customer.

4

13.    DBSI prepared an investor presentation for the CLO which represented to investors that the loans IIG originated had reduced risk, in part, because payments were made by 'offtakers,' that is, by the borrower's customers, pursuant to purchase orders that were purportedly either acquired outright by IIG or pledged to IIG as collateral. The information included in the presentation, among other marketing materials, was provided by IIG and confirmed as accurate by DBSI.

14.    The presentation, dated June 2013, together with a term sheet dated September 2013, the CLO offering circular dated November 11, 2013 and other pre-deal representations (collectively, the "Offering Materials") (and later the Indenture) also confirmed that DBTCA as trustee would receive an assignment of, and have an enforceable security interest in, all of the collateral securing the loans made by IIG and sold to the CLO. Among other things, DBTCA (as custodian) was supposed to receive copies of all underlying loan and security documents concerning those loans.

15.    However, none of this was true. And, by no later than the first half of 2017, DBTCA and the Noteholders knew it.

16.    By this action, Plaintiffs seek: (a) to avoid, as actual or constructive fraudulent transfers, TFT's June, July and August 2017 transfers to DBTCA by which TFT acquired the CLO's loan portfolio for $169,669,713, and to recover the full amount from subsequent transferees; (b) to avoid, as actual or constructive fraudulent transfers, the participation interests IIG caused GTFF and STFF to acquire from TFT which participation purchases funded TFT's acquisitions from the CLO; (c) damages from IIG for common law fraud and for the breach of its fiduciary duties to GTFF and STFF; (d) damages from TFT for breach of its contractual obligation to GTFF and STFF in connection with the Master Participation Agreements (as defined below)

5

and (d) damages from the defendants for the role that each of them played in aiding and abetting IIG's fraud and breaches of fiduciary duty.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157. Venue is proper in this district pursuant to 28 U.S.C. §§ 1409(a) and 1410.

18.     The Court has personal jurisdiction over Defendants pursuant to Bankruptcy Rule 7004 and sections 301 and 302 of the New York Civil Practice Law and Rules. Each of the Defendants is either domiciled in New York or the United States, or otherwise purposely availed itself of the laws of the United States and the State of New York by, among other things, investing in the New York law governed notes issued by the CLO, receiving the transfers that are at issue in this action from a DBTCA account in New York, and, on information and belief, designating bank accounts located in New York to receive these transfers. The Defendants thus accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein. The Defendants should therefore reasonably expect to be subject to jurisdiction in New York and the United States, generally.

19.     This is a core proceeding under 28 U.S.C. §157 (b)(2) and Plaintiffs consent to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## PARTIES

### I.    Plaintiffs

20.    Plaintiff GTFF is an exempted limited company incorporated under the laws of the Cayman Islands that is in official liquidation before the Grand Court of the Cayman Islands (the "Grand Court"). The Liquidators were appointed by the Grand Court to oversee GTFF's liquidation proceedings and are the recognized foreign representatives in GTFF's Chapter 15 case pending in this Court.

21.    Plaintiff STFF is an exempted limited company incorporated under the laws of the Cayman Islands that is in official liquidation before the Grand Court. The Liquidators were appointed by the Grand Court to oversee STFF's liquidation proceedings and are the recognized foreign representatives in STFF's Chapter 15 case pending in this Court.

22.    Plaintiff Christopher Kennedy is one of the two Liquidators and is a resident of the Cayman Islands.

23.    Plaintiff Alexander Lawson is one of the two Liquidators and is a resident of the Cayman Islands.

24.    By an agreement dated as of October 3, 2022, the Investor-Assignors irrevocably assigned, granted, conveyed, and transferred to the Liquidators, and the Liquidators irrevocably acquired from the Investor-Assignors, all of the Investor-Assignors' right, title, and interest, whether legal or equitable, in and to any and all past, present, and future causes of action, suits, debts, and claims of any nature whatsoever, including tort claims, asserted or unasserted, known or unknown, against any person or entity other than the Debtors or the Debtors' estates in relation to the Investor-Assignors' rescission claims based on fraudulent inducement in connection with their respective investments in GTFF and STFF.

7

II.    **Defendants**

25.    Defendant IIG is a limited liability company organized under the laws of New Jersey. At all relevant times, IIG's headquarters and principal place of business was located at 1500 Broadway, 26th Floor, New York, New York 10036. Until recently, IIG was an investment advisor registered with the SEC. IIG served as investment advisor to both GTFF and STFF pursuant to separate but substantially identical investment advisory agreements, which are governed by New York law.

26.    Defendant DBTCA is a business corporation organized under the laws of New York with its principal business address at 1 Columbus Circle, New York, NY 10019. At all relevant times, DBTCA served as the indenture trustee for the Class A Notes, Class B Notes, and Income Notes (each as defined below) issued by the CLO. DBTCA also served as the CLO's custodian, collateral administrator, and cash management bank.

27.    Defendant Assured Investment Management LLC (f/k/a BlueMountain Capital Management, LLC) ("BlueMountain") is, or at all relevant times was, a limited liability company organized under the laws of Delaware. At all relevant times, its principal place of business was 280 Park Avenue, 12th Floor, New York, New York 10017. BlueMountain served as investment manager for and agent of certain investment funds that beneficially owned Class A Notes issued by the CLO. On October 1, 2019, BlueMountain's outstanding equity interests were acquired by Assured Guaranty US Holdings Inc.

28.    On information and belief, Defendant BlueMountain Foinaven Master Fund L.P. is, or at all relevant times was, an exempted limited partnership organized under the laws of the Cayman Islands and was operated through its agent and investment manager, BlueMountain, from BlueMountain's principal place of business at 280 Park Avenue, 12th Floor, New York, New York

8

10017. On information and belief, BlueMountain served as BlueMountain Foinaven Master Fund L.P.'s agent for all purposes and at all relevant times, including with respect to its investment in Class A Notes issued by the CLO. At all relevant times, BlueMountain Foinaven Master Fund L.P. held $3,309,417.00 in principal amount of Class A Notes issued by the CLO.

29.    Defendant BlueMountain Logan Opportunities Master Fund L.P. is, or at all relevant times was, an exempted limited partnership organized under the laws of the Cayman Islands and operated through its agent and investment manager BlueMountain from BlueMountain's principal place of business at 280 Park Avenue, 12th Floor, New York, New York 10017. On information and belief, BlueMountain served as BlueMountain Logan Opportunities Master Fund L.P.'s agent for all purposes and at all relevant times, including with respect to its investment in Class A Notes issued by the CLO. At all relevant times, BlueMountain Logan Opportunities Master Fund L.P. held $1,917,738.00 in principal amount of Class A Notes issued by the CLO.

30.    Defendant BlueMountain Montenvers Master Fund SCA SICAV-SIF is, or was at all relevant times, a investment company with variable share capital organized as a specialized investment fund in the form of a corporate partnership limited by shares under the laws of Luxembourg and operated through its agent and investment manager BlueMountain from BlueMountain's principal place of business at 280 Park Avenue, 12th Floor, New York, New York 10017. On information and belief, BlueMountain served as BlueMountain Montenvers Master Fund SCA SICAV-SIF's agent for all purposes and at all relevant times, including with respect to its investment in Class A Notes issued by the CLO. At all relevant times, it held $41,841,710.00 in principal amount of Class A Notes issued by the CLO.

31.    Defendant BlueMountain Timberline Ltd. is, or at all relevant times was, an

9

exempted limited company organized under the laws of the Cayman Islands and operated through its agent and investment manager BlueMountain from BlueMountain's principal place of business at 280 Park Avenue, 12th Floor, New York, New York 10017. On information and belief, BlueMountain served as BlueMountain Timberline Ltd.'s agent for all purposes and at all relevant times, including with respect to its investment in Class A Notes issued by the CLO. At all relevant times, it held $20,124,908.00 in principal amount of Class A Notes issued by the CLO.

32.    Upon information and belief Defendant BlueMountain Kicking Horse Fund L.P. is, or at all relevant times was, a limited partnership organized under the laws of Delaware and operated through its agent and investment manager BlueMountain from BlueMountain's principal place of business at 280 Park Avenue, 12th Floor, New York, New York 10017. On information and belief, BlueMountain served as Defendant BlueMountain Kicking Horse Fund L.P.'s agent for all purposes and at all times relevant to this litigation, including with respect to its investment in Class A Notes issued by the CLO. At all relevant times, it held $3,093,884.00 in principal amount of Class A Notes issued by the CLO.

33.    Upon information and belief, BlueMountain Credit Opportunities Master Fund I L.P. is, or was at all relevant times, an exempted limited partnership organized under the laws of the Cayman Islands and operated through its agent and investment manager BlueMountain from BlueMountain's principal place of business at 280 Park Avenue, 12th Floor, New York, New York 10017. On information and belief, BlueMountain served as BlueMountain Credit Opportunities Master Fund I L.P.'s agent for all purposes and at all relevant times, including with respect to its investment in Class A Notes issued by the CLO. At all relevant times, it held $39,712,343.00 in principal amount of Class A Notes issued by the CLO. BlueMountain Foinaven Master Fund L.P., BlueMountain Logan Opportunities Master Fund L.P., BlueMountain Timberline Ltd.,

10

BlueMountain Kicking Horse Fund L.P., and BlueMountain Credit Opportunities Master Fund I L.P. shall be referred to collectively as the "Blue Mountain Funds."

34.     Defendant Tennenbaum Capital Partners, LLC ("Tennenbaum") is, or at at all relevant times was, a limited liability company organized under the laws of Delaware with its principal place of business at 2951 28th Street, Suite 1000, Santa Monica, California 90405. Tennenbaum served as investment manager for and agent of investment funds that beneficially owned Class B Notes issued by the CLO.

35.     Defendant Tennenbaum Senior Loan Fund IV-B, LP is, or at all relevant times was, a limited partnership organized under the laws of Delaware and operated through its agent and investment manager Tennenbaum at Tennenbaum's principal place of business at 2951 28th Street, Suite 1000, Santa Monica, California 90405. On information and belief, Tennenbaum served as Tennenbaum Senior Loan Fund IV-B, LP's agent for all purposes and at all relevant times, including with respect to its investment in Class B Notes issued by the CLO. At all relevant times, it held $605,000.00 in principal amount of Class B Notes issued by the CLO.

36.     Defendant Tennenbaum Senior Loan Fund II, LP is, or at all relevant times was, a limited partnership organized under the laws of Delaware and operated through its agent and investment manager Tennenbaum from Tennenbaum's principal place of business at 2951 28th Street, Suite 1000, Santa Monica, California 90405. On information and belief, Tennenbaum served as Tennenbaum Senior Loan Fund II, LP's agent for all purposes and at all relevant times, including with respect to its investment in Class B Notes issued by the CLO. At all relevant times, it held $3,031,000.00 in principal amount of Class B Notes issued by the CLO.

37.     Defendant Tennenbaum Senior Loan Operating III, LLC is, or at all relevant times was, a limited liability company organized under the laws of Delaware and operated through its

11

agent and investment manager Tennenbaum from Tennenbaum's principal place of business at 2951 28th Street, Suite 1000, Santa Monica, California 90405. On information and belief, Tennenbaum served as Tennenbaum Senior Loan Operating III, LLC's agent for all purposes and at all relevant times, including with respect to its investment in Class B Notes issued by the CLO. At all relevant times, it held $1,392,000.00 in principal amount of Class B Notes issued by the CLO.

38.      Upon information and belief, Defendant Special Value Continuation Partners, LP is, or at all relevant times was, a limited partnership organized under the laws of Delaware and operated through its agent and investment manager Tennenbaum from Tennenbaum's principal place of business at 2951 28th Street, Suite 1000, Santa Monica, California 90405. On information and belief, Tennenbaum served as Defendant Special Value Continuation Partners, LP's agent for all purposes and at all relevant times, including with respect to its investment in Class B Notes issued by the CLO. At all relevant times, it held $15,084,000.00 in principal amount of Class B Notes issued by the CLO. Tennenbaum Senior Loan Fund IV-B, LP, Tennenbaum Senior Loan Fund II, LP, Tennenbaum Senior Loan Operating III, LLC, and Special Value Continuation Partners, LP shall be referred to collectively as the "Tennenbaum Funds."

39.      Defendant KKR Credit Advisors (US) LLC ("KKR") is, or at all relevant times was, a limited liability company organized under the laws of Delaware with its principal place of business at 555 California Street, San Francisco, CA 94104. KKR served as the investment manager for and agent of certain investment funds that beneficially owned Class B Notes issued by the CLO.

40.      Upon information and belief, Defendant Corporate Capital Trust, Inc. is, or at all relevant times was, a Maryland corporation and operated through its agent and investment manager

KKR. It maintains, or formerly maintained, a business office in Pennsylvania at 201 Rouse Boulevard, Philadelphia, Pennsylvania 19112. On information and belief, KKR served as Corporate Capital Trust, Inc.'s agent for all purposes and at all relevant times, including with respect to its investment in Class B Notes issued by the CLO. At all relevant times, Corporate Capital Trust, Inc. held $28,221,000 in principal amount of Class B Notes issued by the CLO.

41.    Upon information and belief, Defendant KKR Debt Investors II (2006) (Ireland) L.P. is, or at all relevant times was, a limited partnership organized under the laws of Ireland and operated through its agent and investment manager KKR from KKR's principal place of business in California. On information and belief, KKR served as KKR Debt Investors II (2006) (Ireland) L.P.'s agent for all purposes and at all relevant times, including with respect to its investment in Class B Notes issued by the CLO. At all relevant times, it held $6,744,000.00 in principal amount of Class B Notes issued by the CLO.

42.    Upon information and belief, Defendant KKR TRS Holdings, Ltd. is, or at all relevant times was, an exempted limited company organized under the laws of the Cayman Islands and operated through its agent and investment manager KKR from KKR's principal place of business in California. On information and belief, KKR served as KKR TRS Holdings, Ltd.'s agent for all purposes and at all relevant times, including with respect to its investment in Class B Notes issued by the CLO. At all relevant times, it held $4,613,000.00 in principal amount of Class B Notes issued by the CLO.

43.    Defendant KKR-PBPR Capital Partners L.P. is, or at all relevant times was, a limited partnership organized under the laws of Delaware and operated through its agent and investment manager KKR from KKR's principal place of business in California. On information and belief, KKR served as KKR-PBPR Capital Partners L.P.'s agent for all purposes and at

13

relevant all times, including with respect to its investment in Class B Notes issued by the CLO. At all relevant times, it held $310,000.00 in principal amount of Class B Notes issued by the CLO. Corporate Capital Trust, Inc., KKR Debt Investors II (2006) (Ireland) L.P., KKR TRS Holdings, Ltd., and KKR-PBPR Capital Partners L.P. shall be referred to collectively as the "KKR Funds."

44.    Defendant Elanus Capital Management, LLC ("Elanus") is, or at all relevant times was, a limited liability company organized under the laws of Delaware with its principal place of business at 180 Varick Street, Suite 416, New York, New York 10014. Elanus served as the investment manager for and agent of certain investment funds that beneficially owned Class B Notes issued by the CLO.  Elanus, BlueMountain, KKR, and Tennenbaum shall be referred to collectively as the "Noteholders."

45.    Upon information and belief, Defendant Elanus Capital Investments Master SP Series 1 (the "Elanus Fund") was, at all relevant times, an exempted limited partnership organized under the laws of the Cayman Islands and operated through its agent and investment manager Elanus from Elanus's former principal place of business at 180 Varick Street, Suite 416, New York, New York 10014. On information and belief, Defendant Elanus served as Defendant Elanus Capital Investments Master SP Series 1's agent for all purposes and at all relevant times, including with respect to its investment in Class B Notes issued by the CLO. At all relevant times, Elanus Capital Investments Master SP Series 1 held $17,000,000.00 in principal amount of Class B Notes issued by the CLO.

46.    As detailed herein, Plaintiffs seek to recover the payments listed on Appendices A-C hereto from certain of the Defendants on the basis that such Defendants received those payments as subsequent transferees of a fraudulent transfer.

47.    Defendant Trade Finance Trust ("TFT") is a Delaware statutory trust having its

14

registered office at Deutsche Bank Trust Company Delaware, 111 Continental Drive, Newark, Delaware 19713. TFT was created by Messrs. Hu and Silver as a special purpose vehicle designed to originate and be the lender of record for IIG-originated trade finance loans. In 2017, TFT acquired substantially all of the loans previously held by the CLO. TFT funded the acquisition of those loans by selling participations to the Funds pursuant to separate but substantially identical master participation agreements. TFT was controlled by its administrator, non-party IIG Trade Finance LLC ("IIG Trade Finance"), which was in turn owned by Messrs. Hu and Silver. At all relevant times, IIG Trade Finance was a New York limited liability company with the same principal place of business as IIG. Richard Cadena, a former director of IIG, stated that there was "no difference" between IIG Trade Finance and IIG.

48.    Defendants John Does 1-10,000 are investors of Noteholders that are subsequent transferees of the transfers made to the Noteholders as described herein.

## FACTUAL BACKGROUND

### I.    IIG's Business

49.    David Hu and Martin Silver founded IIG as an SEC-registered investment advisor in 1994. IIG provided advisory services for various private funds and other investment vehicles that it established, controlled, or otherwise operated, including TOF NV, IIG Trade Opportunities Fund B.V. ("TOF BV"), the CLO, and the Debtors. In March 2018, IIG reported to the SEC that it had approximately $373 million in assets under management.

50.    IIG represented itself to be a New York-based trade finance specialist with a focus on the provision of trade finance loans to small and medium-sized businesses based in Latin America. IIG's principal investment advisory strategy involved investments in loan participations for trade finance loans that it or one of the funds under its management originated.

51.     Trade finance loans are used by small and medium-sized companies, typically exporters and importers, to facilitate international trade. IIG's purported expertise was in trade finance loans with a stated focus on "soft commodities," such as coffee, tobacco, frozen beef, and other agricultural products.

52.     IIG purportedly structured and priced the loans to minimize risks associated with its foreign borrowers, many of whom could not otherwise obtain reasonable financing, "based on assessment of different risks identified during the due diligence process."

53.     For example, IIG's trade finance loans were purportedly secured by collateral, such as the underlying traded goods or expected payments by third parties pursuant to executed purchase orders between the third party and the borrowers. And, the loans were represented as being significantly overcollateralized. Additional collateral and risk mitigation was purportedly provided from the loan's repayment mechanism as all of the receivables due to a borrower relating to a financed shipment were required to be paid by the purchaser into an IIG-controlled bank account even though only a portion of the transactions was financed— the loans were purportedly short-term and self-liquidating. After IIG received repayment of what it was owed, the balance would be remitted to the borrower.[4] Where the loan collateral consisted of goods in inventory, IIG told investors that the inventory was stored at IIG-controlled warehouses and monitored by IIG representatives.[5] In either case, IIG's control over the collateral was represented to be a mitigating factor that reduced the risk associated with its loans.

_____

[4] After the loans were sold to the CLO, those collection accounts were maintained at DBTCA and DBTCA, as trustee for the benefit of the Noteholders, had control over those accounts.

[5] Again, for loans that were sold to the CLO, the Indenture required this control to shift to DBTCA as trustee for the benefit of the Noteholders.

54.    IIG's business thus relied on the company's and its funds' access to the banking system in order to fund and receive repayment of loans, but also to hold collateral payments and distribute funds to investors. IIG's banking partners, including DBTCA, were a fundamental tool IIG used to further its fraud.

## II.    The Beginning of IIG's Fraudulent Scheme

55.    Beginning in or about 2007, TOF NV, a fund that IIG had established in 1998, faced significant losses associated with a loan it made to State Street Coffee, which represented approximately 10% of its portfolio balance. IIG, Hu, and Silver feared that disclosure of those losses would increase investor redemptions and harm ongoing fundraising efforts and so decided to conceal TOF NV's losses and intentionally misvalue the loan on TOF NV's books.

56.    IIG's auditors began to question the value of that loan and whether it could, in fact, be accurately carried as a performing asset. IIG responded not by telling the truth, but rather by removing the State Street Coffee loan from TOF NV's books and replacing it with fake loans to different borrowers, many of whom were owned or controlled by IIG's principals. These purported borrowers never received anything of value from TOF NV, and there was no expectation that they would ever make any payments to TOF NV. For many of the fictitious loans, IIG's files contained promissory notes that IIG staff had drafted, but no additional loan documentation or due diligence files. These same files were later turned over to the Noteholders as 'evidence' of the legitimacy of these fictitious loans.

57.    In 2010, another large loan defaulted and, rather than report that fact to investors, IIG once again hid TOF NV's losses, first by continuing to misvalue the loan at par plus accrued interest, and later by removing the loan from the portfolio and replacing it with additional worthless fictitious loans. As TOF NV's losses continued, IIG continued this practice of attempting to prop

17

up the funds' portfolio by misvaluing distressed and defaulted loans as performing, and adding additional fictitious loans.

## III.    IIG's Scheme Continues

### A.    IIG, DBSI, and DBTCA Create the CLO to Raise Liquidity for TOF NV

58.    Between 2008 and 2013, IIG continued to search for a longer-term solution to TOF NV's liquidity problems (caused by its non-performing 'legitimate' loans and balance of fictitious loans) and thus began to explore different capital market opportunities. After a multi-year financing effort led by Stormharbour Securities LP failed, on May 9, 2013, TOF NV engaged DBSI to act as the structuring and placement agent for a new financing transaction that would raise liquidity through the creation of the CLO.

59.    The CLO was formed to acquire trade finance loans that were originated by TOF NV and TOF BV (TOF NV's direct subsidiary). To finance the purchase price, the CLO issued $220 million of notes due in 2018 (the "Notes") pursuant to an Indenture dated as of November 13, 2013 (the "Indenture") by and among the CLO, as issuer, and DBTCA, as indenture trustee. The Notes were issued in three classes: $110 million of Class A Senior Secured Floating Rate Notes ("Class A Notes"), $77 million of Class B Secured Fixed Rate Notes ("Class B Notes"), and $33 million of Income Notes ("Income Notes"). After initially informing IIG that it was unable to underwrite the transaction and would serve only as structuring and placement agent, later correspondence between the parties suggests a change in position and that DBSI underwrote the transaction, which closed in November 2013. Pursuant to a Purchase Agreement, dated November 13, 2013, between the CLO and DBSI, DBSI purchased all of the Class A and Class B Notes before selling them to the Noteholders, representing that it "acquir[ed] its interest in the Notes in the ordinary conduct of its business as an underwriter for the [CLO]." The Income Notes were sold to

18

TFF IN Holdco (Cayman) Ltd., an indirect, wholly owned subsidiary of TOF NV. TFF IN Holdco

(Cayman) Ltd. also owned 100% of the CLO's ordinary shares.

60.     The CLO delegated the day-to-day servicing of its loans to IIG pursuant to a New

York law governed Collateral Management Agreement, dated November 13, 2013. IIG's

responsibilities as Collateral Manager included supervising and directing the CLO's investments,

monitoring the loans in the portfolio, and assisting DBTCA as trustee in preparing reports for the

Noteholders. Subject to the conditions set forth in the Indenture, IIG was also responsible for

recommending new trade finance loans or loan participations for the CLO to acquire subject to

trustee and/or Noteholder approval, all as set forth more fully in the Indenture.

61.     The Indenture provided that during a "Reinvestment Period," IIG had a qualified

right to direct the CLO to invest excess cash in its principal collection bank account, which was

maintained at DBTCA (the "Principal Collection Account"), into new eligible trade finance loans

or loan participations. During the Reinvestment Period, at a minimum, IIG thus had control over

the CLO's assets and was in a position to control the disposition of those assets. As set forth herein,

IIG used that discretion and authority to cause the CLO to purchase fictitious loans and to retain

and not sell distressed and defaulted loans. IIG also used the CLO's accounts at DBTCA to further

its fraudulent scheme by funneling money through those accounts in a manner that breached its

obligations and was otherwise inconsistent with the manner in which the underlying trade finance

loans were supposed to perform.

62.     After the Reinvestment Period, which ended in November 2016, the CLO could no

longer reinvest any principal proceeds. As soon as the Reinvestment Period ended and IIG could

no longer support the CLO with fictitious loans, the CLO's loan portfolio almost immediately went

into monetary default.

19

63.     In fact, the CLO's loan portfolio was consistently in default (due to covenant breaches and failures of concentration limits set out in the Indenture) since the CLO first acquired the portfolio from TOF NV and TOF BV and information concerning these defaults was readily apparent from the monthly reports provided by DBTCA to the Noteholders (the "Trustee Reports"). However, so long as the CLO contained to make payments to them, DBTCA and the Noteholders ignored the red flags they saw so as to continue to reap the benefits of IIG's fraud.

64.     DBTCA also played a key role in the CLO's day-to-day operations. In addition to its responsibilities as indenture trustee, DBTCA was the CLO's document custodian, collateral administrator, and cash management bank. In its capacity as collateral administrator, DBTCA was required to maintain a collateral database of the CLO's trade finance investments and was charged with tracking receipts from and disbursements to the borrowers and preparing and verifying the contents of monthly collection and disbursement reports for the Noteholders. Given that almost none of the loans performed as expected – among other things, payments were generally not made by offtakers to the CLO's accounts but were rather transferred into those accounts from separate IIG accounts at Citibank – DBTCA totally failed in these obligations. Additionally, all of the CLO's banking transactions were processed through DBTCA, and DBTCA maintained a separate loan collection account for each loan.

### B.    DBTCA Serves a Key Role in the Fraudulent Scheme By Permitting the CLO to Fund Fictitious Loans

65.     The Indenture transferred to DBTCA, as trustee, all of the CLO's right, title and interest to the CLO's property including its bank accounts. This grant also gave DBTCA as trustee a lien on those assets held by DBTCA for the benefit of the Noteholders. Thus, although IIG had the right during the "Reinvestment Period" to direct that the CLO invest in new trade finance loans

20

or participations, no new investment could be funded without specific approval and without ensuring that the trustee's lien on each such loan and its collateral was perfected. For loans that were more than $3 million, the Indenture only permitted such loans to be funded if the borrower was specifically approved as an "Eligible Obligor" by a majority of the Noteholders. Where, however, proposed new loans were for $3 million or less, the Indenture provided that IIG could cause the CLO to fund such loans without Noteholder approval.

66.    In either case, the Indenture required IIG to submit a "Borrower Form" to DBTCA, for distribution to the Noteholders, which was to incorporate information including, but not limited to: (i) the borrower's name, (ii) a borrower overview, (iii) a transaction overview, (iv) the collateral package, (v) credit and operational due diligence, (vi) the facility amount, (viii) the initial funding amount, (ix) funding terms and conditions, and (x) a financial snapshot and industry overview for the borrower's industry.

67.    As a regulated financial institution, DBTCA is subject to federal 'know your customer' and anti-money laundering rules and regulations. Among other things, DBTCA is required to have procedures in place to identify and take appropriate action with respect to any of a series of money laundering indicia set forth in the Federal Financial Institutions Examination Council's BSA/AML Examination Manual, including payments unconnected to legitimate contracts or revenue sources and fund transfers containing limited content or related party information.

68.    Notwithstanding those requirements, DBTCA ignored them. For example, DBTCA funded loans to the Panamanian Borrowers (as defined below) without receiving the information required by the Indenture or, in one case, without having opened a collection account for the borrower. It also opened collection accounts for new borrowers having conducted limited to no

21

diligence on these purported trade finance borrowers and received funds from and remitted funds to them without even a basic understanding of whether these purported borrowers were even legitimate business entities or actually borrowed money from the CLO.

69.    DBTCA thereby permitted money on deposit in accounts that it controlled to be used to fund fictitious loans and DBTCA's failures became critical to IIG's fraudulent scheme. Indeed, DBTCA helped IIG misappropriate at least $42 million by knowingly approving funding for at least 14 fictitious $3 million (or less) loans and by transferring the funds for those fictitious loans to a bank account controlled by IIG. The purported borrowers on each of those loans were Panamanian shell companies (the "Panamanian Borrowers") that IIG or one of its designees owned and controlled.[6] The Panamanian Borrowers never received anything of value from the CLO and the 'loans' to the Panamanian Borrowers that the CLO held on its books were entirely worthless.

70.    DBTCA transferred the proceeds of those loans not to the borrowers themselves, but rather to a bank account controlled by IIG. On information and belief, IIG used the proceeds of these fictitious loans to pay off other investors, hide losses on other legitimate but non-performing loans, or otherwise misappropriated them. IIG, Hu, and Silver have all acknowledged that IIG used fictitious loans in this way to hide losses on legitimate loans and defraud investors, including Plaintiffs.

71.    When DBTCA approved funding for purported loans to the Panamanian

---

[6] The Panamanian Borrowers included Alphahill Investments S.A. ("Alphahill"), Cherrylog Investments, S.A. ("Cherrylog"), Compania de Granos Internacional, S.A. ("Compania") Clandort International Inc. ("Clandort"), CTJ International, S.A. ("CTJ"), Danehill Holdings Limited S.A. ("Danehill"), Foxcreek Overseas S.A. ("Foxcreek"), Heyburg International Inc. ("Heyburg"), Merin Investments S.A. ("Merin"), Nacamas, S.A. ("Nacamas"), Nigemix, S.A. ("Nigemix"), Parsons Overseas, S.A. ("Parsons"), Polebrook International Inc. ("Polebrook"), and Tengiz Investments, S.A. ("Tengiz").

Borrowers, it knew that those loans were fictitious and that IIG was misappropriating the proceeds. It had access to an abundance of information making that clear.

72.    First, in each case, IIG requested that funding for the "loans" be wired not to any borrower bank account but rather to an IIG Capital, LLC ("IIG Capital") account at Citibank. DBTCA knew that there was no reference to IIG Capital in the Indenture or any of the other documents governing the CLO. To the contrary, the Indenture made clear that the CLO was supposed to acquire all of its new loan interests from one of two loan originators, TOF NV or Trade Finance Funding I B.V. There was no legitimate reason for IIG to request that funds be wired to anyone else and DBTCA's failure to ensure that the loans were properly funded meant that – even if the loans were legitimate, the CLO's security interest in them (which was later conveyed to TFT and the Plaintiffs) was defective. By nevertheless agreeing to disburse the requested funds to IIG Capital, DBTCA enabled IIG to misappropriate the proceeds. DBTCA thus served a critical role in IIG's fraudulent scheme.

73.    Second, the promissory notes for each of the fictitious loans lacked the hallmarks of legitimate credit arrangements. None of the promissory notes listed a maturity date, a schedule for interest payments, or other payment terms. Without these provisions, it is not clear that the promissory notes even created an enforceable contractual obligation. As a sophisticated financial institution that is frequently involved in commercial lending arrangements, DBTCA knew that the absence of basic repayment terms was both problematic and highly suspicious. Nevertheless, DBTCA did not ask for any additional information and did not otherwise express any concerns to IIG. Instead, it simply did as IIG asked.

74.    Third, although the Panamanian Borrowers were purportedly unaffiliated, the promissory notes for each of them listed the same three street addresses—each, in a high-rise office

building located in Marbella, Panama. A simple Google search shows that those addresses are associated with Panamanian law firms that provide "registered agent" services, which are typically used by special purpose vehicles that do not conduct any actual operating activities and thus do not have a physical place of business.[7] As DBTCA knew, the CLO's borrowers were not supposed to be special purpose entities but rather commodity producers that entered into sales agreements with international offtakers to purchase agricultural and other commodities from the borrowers. The Indenture provided that loans could only be made to manufacturers or commodities producers operating in one of several enumerated "Eligible Sectors," such as grain, frozen beef, or petrochemicals, not to SPVs without any operations. To state the obvious, a holding company without any operations does not sell agricultural commodities to offshore purchasers and therefore cannot provide any of the collateral required by the Indenture.

75.      Fourth, despite seeing the promissory notes listing Panamanian addresses for each of the Panamanian Borrowers, DBTCA falsely reported to the Noteholders that eight of the Panamanian Borrowers—Alphahill, Cherrylog, Compania, Clandort, Foxcreek, Nacamas, Parsons, and Polebrook—were actually located elsewhere (either Peru, Ecuador, Uruguay, Chile, or Brazil). On information and belief, DBTCA did this so that the Noteholders would not know that the CLO was in breach of the Indenture's "Concentration Requirements," which provided that no more than 30% of the CLO's loans could be made to borrowers domiciled in any single jurisdiction. And, IIG's and DBTCA's reporting concerning the Panamanian Borrowers is in direct

---

[7] In fact, all three addresses listed on the promissory notes for the Panamanian Borrowers appeared in the "Panama Papers" leak, which exposed the wide-spread use of Panamanian shell corporations for illicit purposes such as money laundering and tax evasion. Several Deutsche Bank affiliates are also identified in the Panama Papers.

contrast to their treatment of the Vicentin Group.[8] The Trustee Reports treated borrower FRIAR Uruguay as a Uruguay risk because that was its place of incorporation, even though all of its operations were conducted in Argentina. If FRIAR had been treated in the same manner as the Panamanian Borrowers, the CLO would have failed country-specific concentration risk requirements from the first day.

76.    Fifth, DBTCA maintained separate collection accounts for each of the purported borrowers and monitored the activities in those accounts. DBTCA knew that under the terms of the Indenture, borrower-specific collection accounts were supposed to collect principal and interest payments on the loans from the borrowers or their offtakers. However, the statements for the collection accounts show that despite a large number of incoming and outgoing wires, there was not a single payment made to or received from a bank account associated with a borrower or offtaker. Instead, every single payment came from the same IIG Capital Citibank account.

77.    Those payments, which were listed as interest payments in the Trustee Reports issued monthly to the Noteholders and DBSI, were never made on any discernable schedule (e.g., on the first day of each month or fiscal quarter) and the dollar amounts often varied significantly. As just one example, between January and August 2016, the collection account for Panamanian Borrower Compania received payments ranging from as low as $3,340 to as high as $61,789.43.

---

[8] The Vicentin Group is a group of affiliated companies that each borrowed or guaranteed loans originated by IIG or its affiliates, including the CLO. They are Nacadie Commercial S.A., Frigorifico Regional Industrias Alimenticias Reconquista S.A. ("FRIAR"), Frigorifico Regional Industrias Alimenticias Reconquista S.A. Sucursal Uruguay, Algodonera Avellanda S.A., Vicentin S.A.I.C. and Vicentin S.A.I.C. Sucursal Uruguay. Nacadie is a Vicentin Group affiliate yet it was never disclosed as such in the Trustee Reports. Had Nacadie been properly listed as a Vicentin Group affiliate, the CLO's loan pool would have failed several different covenants in the Indenture each month.

If these were legitimate interest payments, the dollar amount would have been the same each time because they would've been calculated as a fixed percentage of the outstanding principal amount. The erratic payment pattern strongly suggested that the payments from IIG Capital were not tied to legitimate lending or contractual arrangements and that IIG was just shuffling money between its many affiliates.

78.    DBTCA had a strong motive to accommodate IIG's demands and to refrain from questioning the many irregularities with the CLO's accounts because its relationship with IIG was highly profitable. From 2013 through early 2018, DBTCA was IIG's principal retail bank. It earned fees for processing hundreds of wire payments ($50 per wire) and maintaining dozens of accounts not only for the CLO, but also for several other IIG-managed funds. The IIG relationship was also profitable for several DBTCA affiliates, including DBSI, which earned a $3.5 million fee for helping to structure the CLO and market it to investors, and Deutsche Bank AG, which earned more than $8 million from an interest rate swap agreement with the CLO. DBTCA knew that if it questioned IIG's conduct or interfered with IIG's use of the bank accounts, IIG could simply take its business to another bank (as it eventually did in 2018).

79.    Unfortunately, this is not the first time that DBTCA permitted money to be laundered through its accounts in the name of profit. Since 2012, DBTCA and its affiliates have paid more than $15 billion in civil penalties, criminal fines, and civil judgments for wide-ranging regulatory and criminal violations—in some cases, on facts that are strikingly similar. For example, in April 2023, a jury awarded $95 million in damages to liquidators representing four Cayman Island companies that had accused several DBTCA affiliates of ignoring a Ponzi scheme and allowing the fraudsters to use Deutsche Bank accounts to misappropriate investor money. Similarly, in 2017, Deutsche Bank paid a $425 million fine to the New York State Department of

Financial Services for violations of New York anti-money laundering laws involving a "mirror trading" scheme that laundered $10 billion out of Russia. The New York State Department of Financial Services conducted an investigation that found that Deutsche Bank had missed numerous opportunities to detect, investigate, and stop the scheme due to extensive compliance failures. In July 2023, the Federal Reserve fined Deutsche Bank $186 million for failing to sufficiently address money laundering control problems and other issues that were previously identified by the Federal Reserve.

80.     As set forth above, DBTCA had actual knowledge of IIG's fraud with respect to the Panamanian Borrowers. However, to the extent that it did not, then IIG's fraudulent intent should be imputed to DBTCA, and to the Noteholders, because IIG, in its capacity as the CLO's collateral manager, was acting on their behalf in 'originating' these fictitious loans and selling them to the CLO and because DBTCA and the Noteholders gave IIG the authority to cause the CLO to buy and sell assets.

81.     As stated, the Indenture required IIG to provide to DBTCA—for further distribution to the Noteholders—certain information concerning pre-approved borrowers, e.g., new borrowers with loans of $3,000,000 or less. But, IIG did not provide any such information to DBTCA and, as a result, the Noteholders never received it either. Still, the Noteholders were aware of these new borrowers because they were identified in the Trustee Reports, which the Noteholders scrutinized. The Noteholders' failure to ensure that they and DBTCA obtained the required information concerning the Panamanian Borrowers demonstrates their actual knowledge of fraud by IIG.

IV.    **The Parties Seek to Offload the CLO's Assets Onto New, Unsuspecting Investors**

A.    **CLO Loan Defaults and Initial Refinancing Efforts**

82.    As noted, part of IIG's fraudulent scheme was to hide losses in its loan portfolios by claiming that a borrower on a defaulted trade finance loan had actually repaid the loan and that the proceeds were reallocated to a new loan. For the CLO, this part of the scheme could only work during the "Reinvestment Period," which ended in November 2016. After that, the Indenture prohibited the CLO from acquiring new trade finance loans and required it to retain principal and interest payments in order to pay down the Notes. The structure was required by BlueMountain as it was expected to result in large principal payments no later than February 2017, which would allow BlueMountain to repay its financing with DBSI without having to come out of pocket.

83.    As of June 2016, the entire CLO loan portfolio was scheduled to mature on or around October 31, 2016. Yet, the October Trustee Report showed that only $600,000 in principal payments had been received against a total outstanding principal balance of more than $210 million. Of that more than $210 million outstanding, the Report shows $110 million in principal amount of loans in payment default with the balance allegedly having their maturity dates extended, though without any supporting documentation.

84.    Certain of those purported maturity extensions were only short term, and on January 31, 2017, approximately 40% in principal amount of the loans in the CLO's portfolio again matured without repayment. On February 24, 2017, IIG received a joint letter from BlueMountain and KKR, which managed funds holding all of the Class A Notes and a majority in principal amount of the Class B Notes, respectively, asserting that "there were Collateral Obligations of fifteen borrowers in the aggregate outstanding amount of $72,606,198 that had a maturity date of January 31, 2017 and that had not paid off," and suggesting that IIG was not fulfilling its

28

obligations as collateral manager and could be liable to the Noteholders for misrepresentations concerning the collateral.

85.     The Noteholders and IIG agreed that the loan defaults would trigger an "Event of Default" under the Indenture if the problem was not solved by March 31, 2017. It was not.

86.     The information in the February 24, 2017 letter is consistent with the information in the February 2017 Trustee Report. At the time, the loans in the CLO's portfolio had a nominal value of approximately $194,050,539.50, meaning approximately 37% of the loan portfolio had matured. The Report also shows that other loans (some real, and as it turns out, some fictitious) had matured but were not reflected in the Report because IIG provided new maturity dates to DBTCA without any documentation—a familiar pattern. For example, loans totaling $14,250,000 for Valle Energy, Inc. ("Valle") matured on October 31, 2016, yet the trustee report reflects a maturity date of October 20, 2017. There was no agreement between IIG and Valle to extend those maturities at that time.

87.     IIG had apparently anticipated that a material number of loans in the portfolio would default after the Reinvestment Period and had thus already engaged Incapital LLC ("Incapital") and BNP Paribas Securities ("BNP") in mid-2016 to explore various refinancing structures, including, but not limited to, a second collateralized loan obligation vehicle—referred to by IIG as "CLO II" or "TFF2"—that would acquire the CLO's loan portfolio. IIG was also working with China Merchants Bank Co. Ltd. on another capital markets solution involving a bridge loan. Together, BNP and Incapital reached out to at least forty potentially interested parties, and China Merchants Bank discussed partnering with several other financial institutions, including Bank Leumi. IIG kept each of the Noteholders closely in the loop on these efforts, typically sending emails at least once a week and frequently hosting conference calls to discuss details. IIG also

29

offered the Noteholders the opportunity to participate in CLO II or its other refinancing efforts; all of them refused, though some of the Noteholders did have several discussions with either or both of China Merchants Bank and BNP concerning their respective financing efforts. But, on information and belief, at no time did the Noteholders share with these prospective financiers—or any other perspective new investor in IIG originated trade finance loan assets—the concerns they had about IIG or the loan portfolio.

88.     Ultimately, however, IIG was unable to make substantial progress towards a refinancing before January 31, 2017. Said differently, IIG was unable to find a mark for its fraudulent scheme. After BNP, Incapital, and China Merchants Bank became aware of the magnitude of defaults in the portfolio, they put their respective efforts on pause. As IIG discovered, fully informed financial institutions had no interest in purchasing or providing financing secured by a portfolio of loans that were largely non-performing. On information and belief, IIG informed DBTCA and each of the Noteholders of the position taken by BNP, Incapital, and China Merchants Bank. As Michael Shore, an executive director of IIG, explained to Martin Silver in a March 2017 email, BNP was "effectively taking the same position as BlueMountain," which was that they "need[ed] to see progress on the past due maturities" before "spend[ing] time on a deal."

**B.     The Noteholders Knew of Serious Problems in the CLO's Loan Portfolio**

89.     The CLO investments were made by the Noteholders in late 2013 because: the credit risk centered entirely on blue-chip offtakers; the underlying loans were self-liquidating with offtaker payments being remitted to controlled accounts; and the manager had a strong track record.  The Offering Materials they received and relied upon also noted an extraordinarily low default rate history in the underlying asset class, even during times of distress.

90.     The Noteholders, however, became aware of numerous red flags early in the deal's

lifecycle. And, by April 2017, they each knew that core representations underlying the deal were materially false, for example: the maturity dates for at least one-third of the portfolio were misrepresented; the collateral for the portfolio assets was misrepresented; and for at least one-third of the portfolio, the offtakers could not have been paying the borrowers. Each of the Noteholders knew that the loans being sold from the portfolio were not worth par—if anything at all.

### i. Red Flags Emerge in 2015

91.    In selling the CLO, IIG represented that default rates in the asset class, from 2005 to 2011, were about one-quarter of one percent (0.026%)—i.e., "fewer than 3,000 defaults across 11.4 million transactions." On information and belief, the Noteholders believed these representations and relied on them in making their decision to acquire the Notes. Yet, overdue loans appearing in the Trustee Reports was a common occurrence from early on in the deal. This is despite the fact that the loans were initially represented to the Noteholders to be short-term financings with a weighted average portfolio duration of 6-8 months. The existence of loans that were over thirty days delinquent signified that the offtakers were not making timely payments, which was necessarily a major red flag as the individual loans were asserted to be made to finance transaction-specific receivables and purchase orders. In other words, these were not working capital loans, but were rather loans that financed specific sales transactions. Any failure of these transactions to pay as described was a clear red flag. As described above, the offtaker structure was a key feature of the deal that was intended to mitigate risk and ensure regular payments on the loans directly to the CLO (rather than having to wait for the borrowers to make payments).

92.    Yet, in March 2015, for example, after receiving the Trustee Report from DBTCA, KKR's lead credit analyst for the investment, Zachary Jarvis, emailed IIG to ask "how the team is feeling about the assets that are almost 60d overdue in the report," and whether "any of the overdue

loans paid off since the report cut off date." These types of emails were sent by Jarvis to IIG on a regular basis. Indeed, in November 2015, Jarvis remarked to one of his colleagues that while he "███████████████████████," "███████████████████."

93.     By this time, KKR and Tennenbaum were already instructing their counsel █ ████████████████████████████████████████████████████████████ These Noteholders were also in discussions with IIG during this period about shortening the CLO's term to obtain an early payoff of the Class B Notes they held.

94.     Moreover, after receiving the January 2015 Trustee Report, KKR emailed DBSI a list of questions, asking if DBSI could ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ BlueMountain had similar concerns with the CLO's performance over time with Brandon Cahill, the BlueMountain employee with responsibility for its investment in the CLO, saying "our frustration was that the information was not matching the trustee report that we were given."

95.     The Noteholders were among the most sophisticated investors in the world and thus closely attuned to potential red flags concerning the CLO, which was informed by pre-transaction diligence they performed and their related discussions with IIG and DBSI.[9] For example, prior to making its investment in the CLO, BlueMountain was unable to verify data IIG provided concerning several aspects of the loans, including advance rates and loan to value calculations.

_____

[9]  Notably, Deutsche Bank, which marketed the CLO to the Noteholders, describes itself as "a bank whose foundations were laid in international trade finance" and touts itself as "17 times your No.1 Trade Finance Bank."

BlueMountain overcame these concerns and relied on the fact that DBSI was financing approximately 70% of its investment in the CLO, together with the fact that there were $77 million in 'B Notes' to support the value of its investment. In a time of effectively zero interest rates, fixed income investments that offered double-digit returns were hard to come by and BlueMountain, and the other Noteholders overlooked any concerns they had about IIG in an effort to try and capture those returns. BlueMountain was additionally comforted by the fact that it had only a relatively small amount of capital at risk (because of DBSI's financing). While they did not have the same level of collateral coverage because of their investments in the Class B Notes, Tennenbaum and Elanus had similar pre-transaction difficulties in confirming the anticipated performance of the CLO's collateral.

96.     Likewise, during this pre-investment period, employees from KKR and Tennenbaum (who had known each other for years) with responsibility for the firms' investment asked each other if they thought ▮▮▮▮▮▮▮▮ was going on with IIG. With these types of concerns being voiced before their respective investments were made, each of the Noteholders were clearly sensitive to potential red flags.

97.     Over the course of the CLO's performance, KKR ▮▮▮▮▮▮▮▮



, concluding that ▮▮▮ ▮▮▮▮▮▮▮▮ At the same time, there were numerous other issues indicating that the proceeds in the portfolio did not ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ and that payments through the waterwall ▮▮▮▮▮▮▮ ▮▮▮▮▮▮

98.     As another significant example, existing accrued interest on the loans was supposed to be paid out of the principal account but instead, the Noteholders found that it was being paid

out of the interest account, which, again, was not how the deal was supposed to work. Instead, this 'purchased accrued interest' (interest that had accrued on the loans at the time they were acquired by the CLO) should have been received and distributed to the Noteholders soon after the CLO's inception (because the trade finance loans were intended to be of short duration, and to be repaid by payments from the offtakers, not the borrowers). Yet, these amounts were not received for years and were the subject of regular communications from the Noteholders to DBTCA and IIG. The failure of purchased accrued interest to be paid out in the ordinary course – and very early in the lifespan of the deal – was a red flag that the transaction was not, in fact, structured or performing in the way that was initially represented to the Noteholders.

99.    Relatedly, the Noteholders learned in 2015 that management fees were effectively being paid out of principal, rather than interest, which was not permitted under the waterfall established in the deal documents. This too was the subject of communications among the Defendants, including the Noteholders, DBTCA, DBSI, and IIG.

100.    For its part, in February 2015, KKR's lead credit analyst reported to the firm's investment committee ████████████████████████████████████████ ████████████████████████████████████, which update noted that ████████████████ ████████████████████████ Each of the other Noteholders was also aware of this issue and subsequent amendments to the Indenture included additional provisions designed to prevent IIG from receiving fees ahead of Noteholder recoveries.

101.    In May 2015, there was yet another instance where the movement of cash flows (and specifically, management fees) reflected in the Trustee Report was different than the Noteholders expected, with Tennenbaum employee Geoff Jones lamenting: ████████████ ████████████████████████████████████████████████████████

102.    Thus, as early as 2015, it was clear to the Noteholders that the deal was not what it was purported to be. KKR's Jarvis, moreover, stated that DBTCA and IIG ████████  ████████████████ as ██████████████████████ ████████████ and ████████████████████████ ████████████████████████, which made it ████████ And given the ████████ of the deal from the outset, KKR and Tennenbaum sought to ████████████████ ████████████████████████████

### ii.    Red Flags Evolve to Actual Knowledge and Willful Misconduct

103.    At the time of the January 31, 2017 defaults, DBTCA and each of the Noteholders intimately knew how the underlying trade finance loans in the CLO's portfolio were supposed to work. The Offering Materials represented that each of the trade finance loans was over-collateralized and that for most of them, credit risk was mitigated by a tripartite payment mechanism. The trade finance borrowers, which were primarily producers engaged in exporting goods to purchasers located abroad, assigned certain accounts receivable from those purchasers to the CLO. In lieu of paying the borrowers for the goods, the purchasers—referred to by IIG as "offtakers"—irrevocably agreed to send all payments directly to an account controlled by IIG which IIG would then apply to reduce the outstanding loan balance. Once a loan was sold to the CLO, the CLO would replace IIG in this structure—payments were to be made to a CLO controlled account and applied to reduce the loan balance held by the CLO.

104.    At a minimum, based on the information provided to them in the Offering Materials, the Noteholders understood that if the borrowers were as represented by IIG, the loans would have been repaid on a periodic basis from accounts receivable—or more broadly, operating cash flow—with such payments being made directly into CLO-controlled accounts. As a result,

35

the loans were referred to as "self-liquidating" because the debt was paid off from the cash flow generated by payments directly from the offtakers, who acquired the assets manufactured or produced with the funds from the loan. The fact that a critical mass of the loans in the CLO portfolio—nearly 40% of its value—were not being repaid reflected a glaring problem. Either the borrowers were not generating accounts receivables (e.g., because they were non-operating shell companies like the Panamanian Borrowers), the offtaker payments were being misappropriated, or IIG had simply lied about the mechanics of the underlying loans.

105.    No later than February 24, 2017, DBTCA and the Noteholders were aware of serious issues with the portfolio and IIG's misrepresentations concerning the loans. Therefore, in their February 24, 2017 letter to IIG, BlueMountain and KKR warned IIG that under section 12 of the Collateral Management Agreement, it could be held liable to the Noteholders for any false statements in the CLO's offering circular regarding the underlying loan collateral. To determine the extent of IIG's misrepresentations, BlueMountain and the other Noteholders accordingly negotiated into a forbearance agreement (detailed below) a provision requiring IIG to provide the Noteholders with diligence information on the collateral supporting the loans in the CLO's portfolio. Among other things, BlueMountain wanted to review these materials to assess whether to pursue foreclosure of the assets pledged to the CLO as collateral for the Notes.

106.    The ensuing diligence review further revealed IIG's fraud and misrepresentations. Despite the clear contractual requirements, DBTCA did not have collateral documents concerning many of the CLO's loans and thus could do nothing to enforce the CLO's purported security interest in those loans. When BlueMountain asked the trustee for this documentation, a DBTCA employee simply responded that the trustee did not have any documents and that BlueMountain should get them from IIG. From its review of these diligence materials and conversations with IIG,

36

BlueMountain knew that foreclosure of the CLO's collateral would at a minimum result in large losses for Noteholders. As the 'A' noteholder, BlueMountain might have been protected from those losses (because initial losses would have been absorbed by the 'B' Notes), but it nevertheless acted to protect the interests of the B Noteholders—KKR, Tennenbaum, and Elanus.

107.    The effort to get documentation from IIG took weeks, itself a red flag, and required numerous requests to IIG employee Brian Thompson, who worked in investor relations and who was the Noteholders' chief contact, for additional substantiation. When Mr. Thompson ultimately provided the information, it was woefully inadequate. For example, Mr. Thompson emailed each of the Noteholders a spreadsheet with a "collateral description" for each of the trade finance loans. For a few of the loans, the spreadsheet referred to traditional forms of collateral such as accounts receivable or inventory. However, for at least sixteen of the loans, including each of the loans to the Panamanian Borrowers, the collateral was described as "promissory note." A promissory note is not collateral for an obligation, it *is* the obligation, and the Noteholders, sophisticated Wall Street financial institutions, knew that Mr. Thompson's spreadsheet made no sense.

108.    The Offering Materials the Noteholders reviewed and relied upon touted that the collateral backing the loans would consist of commodities, purchase orders, receivables, and IIG-controlled collection accounts. The Noteholders understood that if the borrower only provides a promissory note, it is not a secured loan. Thus, as of April 13, 2017 (the date Mr. Thompson sent them his spreadsheet), the Noteholders knew that many of the loans underlying the CLO portfolio were not backed by any collateral—in contradiction to the representations made at the outset of the deal and those being made to potential new investors in refinancing transactions being marketed at this time.

109.    The collateral information Mr. Thompson did provide was even more problematic.

37

For example, by email in early April 2017, Mr. Thompson provided each of the Noteholders with documentation reflecting that collateral that should have been securing loans owned by the CLO was instead pledged to other entities, and receivables that should have been paid to the CLO's accounts were instead being paid to accounts at other IIG entities, none of whom had a relationship with the CLO. As a result, the CLO had no security interest in those funds or accounts. As the bank that held all of the CLO's accounts, DBTCA of course also knew that the CLO's interests in these purportedly pledged accounts were not protected. DBTCA also knew that the offtakers were not making payments on the loans and, in some cases, never had.

110.    BlueMountain noted that many of the loans were past due and, worst of all, that the loan documents IIG provided included loan terms—principal balance, etc.—that were materially different from the information concerning those same loans that had been included in the Trustee Reports.

111.    The information IIG provided also showed that each of the Trustee Reports DBTCA had prepared and distributed to the Noteholders had misrepresented the underlying loans' maturity dates. IIG's spreadsheet and separate communications with the Noteholders revealed that, according to IIG, the borrowers had a materially different understanding of the loans' maturity dates represented to the Noteholders. The borrowers allegedly believed that payments were only due on the maturity of the entire loan facility, as opposed to on the maturity of individual loans made under that facility, as required by the Indenture. Of course, the borrowers' understanding should have been irrelevant to the Noteholders, as the loans should have been repaid by the offtakers from payments made on the shipments they received. At this point, it was and had to have been clear to the Noteholders that the loans were materially misrepresented by IIG.

112.    At the Noteholders' request, on or around April 21, 2017, IIG created a data room

38

so that the Noteholders could review borrower materials such as loan agreements and collateral documents. During that process, the Noteholders discovered a raft of additional problems. None of the loans to the Panamanian Borrowers were evidenced by a loan agreement. Instead, the only documentary evidence for those loans was promissory notes, which did not list maturity dates, interest rates or other standard terms.

113.    Upon its review of the information IIG provided, Elanus complained that the information in the data room was "[not] very useful . . . other than, perhaps, to illustrate . . . how difficult it would be to preserve value in the assets." KKR concurred. Mr. Thompson stated that "Elanus [and the] other [N]oteholders were not confident in the CLO's assets."

114.    In sum, the information in the data room, on information and belief, would have further revealed, *inter alia*, that: (i) the deal had been materially misrepresented; (ii) many of the loans were not backed by collateral, and where they were, the collateral was not what it was supposed to be; (iii) the portfolio was not overcollateralized; and (iv) the offtakers were not making payments.

115.    As explained above, the offtaker structure of the deal was a key risk mitigation feature because it meant that the offtakers (i.e., the borrower's supposed blue-chip customers), rather than the borrowers themselves, would make payments to the CLO in the ordinary course of business as payments became due under the operative purchase order or agreement. If the offtakers were paying, their funds should have been paid directly to a collection account for the benefit of the CLO and over which DBTCA had a perfected security interest for the benefit of the Noteholders.

116.    Under these circumstances, therefore, the borrowers' supposed misunderstanding of the maturity date would have had no bearing on the receipt of payments. If goods were being

shipped, the offtaker would have been making payments on a short-term basis (and in advance of the loan's actual maturity date). IIG's explanation that there was an asset liability mismatch insofar as borrowers believed payments were due at the facility maturity date and not the scheduled maturity date was simply implausible—particularly to highly sophisticated investors.

### C.    The Noteholders Strongarmed IIG's Pivot to a New Investor Solicitation Strategy

117.    Increasingly desperate and facing the failure of its CLO II and other refinancing strategies while also dealing with Noteholder unrest, and concerned about enforcement action by the Noteholders, IIG pivoted to a new refinancing strategy. Instead of refinancing the CLO's loan portfolio through a second collateralized loan obligation vehicle, IIG would seek to solicit investors for one or more new investment funds that would purchase the loans, including those that were in default.

118.    In late February 2017, IIG sent each of the Noteholders and DBSI a "teaser" that it intended to use to solicit investors. The teaser was full of false statements of material fact concerning the loans, the CLO and IIG's business. The teaser indicated that the new vehicle would acquire trade finance loans from the CLO, but it omitted a key detail: that at least $72,606,198 (close to 40% in principal amount) of those loans were in default. Instead, the teaser made the highly misleading claim that the CLO had "strong assets," and "[n]o complete write offs" and that the "[c]redit risk" was mitigated by, among other things, "[r]igorous credit underwriting and control processes," including "frequent monitoring." The Noteholders knew first-hand from their own experience with IIG and the CLO that these statements concerning the CLO's assets were false and misleading. The teaser also stated that the weighted average remaining term of the loans in the portfolio was approximately six months. The Noteholders knew this statement was

40

materially misleading because while the relevant documents may have shown a weighted average six-month term, the Noteholders knew that the CLO's loans were not performing as represented and, in fact, many of the CLO's loans had been outstanding for years.

119.    In particular, the Noteholders knew the teaser's claims to be false or misleading because they (a) knew that nearly 40% in principal amount of the CLO's loans were in default, (b) did not believe that the portfolio was subject to rigorous control processes and monitoring because the February 24th letter from KKR and BlueMountain had accused IIG of failing to satisfy its monitoring duties, and (c) knew that the representation that the loans in the portfolio had an average remaining term of six months was contradicted by the fact that approximately 40% of the loans were in fact past maturity and the statements IIG had made to them about the borrowers' understanding of when payments were to be made.

120.    When the Noteholders received draft presentation materials concerning the potential CLO II, Jarvis' initial impression, as shared with Tennenbaum, was that it was █████████ █████████ and the two joked that █████████████████████████ As the conversation continued, Mr. Jones of Tennenbaum said █████████████████████████████████ █████████████████████ Another KKR credit analyst remarked about the teaser, "Can't believe [IIG] asked us if we want in."

121.    The CLO II presentation notably did not disclose that roughly 40% of the value of the portfolio was in default. And, it touted the same deal structure highlights that the Noteholders now knew to be false. Indeed, the Noteholders did not believe the representation made in the teaser presentation for TFF2 that IIG had a stellar track record as a collateral manager. For example, the internal KKR view as early as February 2017 was that IIG was █████████████ as KKR believed ███████████████████████████████████████████████████

41

122.     At this point, the Noteholders knew that declaring an Event of Default under the Indenture as of March 31, 2017 would force a bona fide liquidation that would eliminate or significantly reduce any chance of offloading the loan portfolio onto new investors at par, which, for the Noteholders, was the desired outcome.

123.     Indeed, the Noteholders knew, from the due diligence they had conducted, that the value (and even existence) of the collateral securing the trade finance loans could not support the amount due and that liquidating the collateral would thus guaranty losses for them. As Elanus explained in a series of April 2017 emails to IIG, "the best odds for refinancing come with running room" and "anger over being put in a bad situation shouldn't trump self-interest." Michael Shore, who was a senior director at IIG at the time, stated that "Elanus and the other [N]oteholders wanted to make sure they got their money out of the CLO and got taken out by new investors." While the Noteholders may have wanted this, they also knew that no fully-informed investor would purchase the CLO's assets at par value and take out the Noteholders' investment.

124.     Thus, instead of exposing the material misrepresentations they had learned of, each of the Noteholders and DBSI responded to the "teaser" by forcing IIG to proceed with the solicitation of potential new investors. On information and belief, various Noteholders offered suggestions, guidance, and direction on how IIG should go about approaching potential investors. Finally, the Noteholders entered into a series of forbearance agreements in which they agreed not to notice an Event of Default under the Indenture to give IIG time to either obtain repayment of the defaulted loans from the borrowers, refinance the loan portfolio, or sell the defaulted loans to new investors—albeit, subject to the condition that any such sales would be consummated at par. The initial forbearance expired on April 15, 2017, but it was subsequently extended three times until May 4, 2017, May 16, 2017, and June 1, 2017, respectively.

42

125.    Although the forbearance agreements gave IIG three options, its refinancing efforts had already failed, and it had almost no success in obtaining repayment of the defaulted loans. Of the more than $72 million of loans that matured on January 31, 2017, IIG collected less than $6 million in principal payments during the forbearance period. Thus, IIG put substantially all of its efforts into finding new investors that would purchase the defaulted loans from the CLO.

### D.    IIG Implements Its New Solicitation Strategy

126.    Shortly after receiving feedback on the original "teaser" from the Noteholders and DBSI, IIG began to disseminate a modified "teaser," which it created to solicit investors in a to-be-created IIG-managed investment vehicle. IIG sent this "teaser" to dozens of potential investors, including the Investor-Assignors, between March and May of 2017. IIG also sent the teaser to GSC, which was acting as an agent for Shinhan Investment Corp. ("Shinhan") and LAM. GSC forwarded the materials that it received from IIG to Shinhan and LAM. In 2019, LAM acquired all of Shinhan's right, title and interest in and to its investment in GTFF and STFF, including any claims relating thereto.

127.    The modified teaser repeated many of the same false statements of fact as the original teaser. Like the original teaser, the new teaser did not indicate that the portfolio would consist of a material number of trade finance loans that were past due and in default but instead represented that the loans would have "a maximum maturity of up to 36 months." Similarly, IIG continued to represent that risk would be mitigated by "strict and comprehensive ongoing monitoring effected by IIG's New York team" and that IIG-managed trade finance loans had a "[p]roven strength of credit and operational processes and controls." These statements were materially false and misleading.

128.    The new teaser also differed from the original teaser in at least one important way.

Unlike the original teaser, which had indicated that the purpose of the new vehicle would be to acquire the CLO's assets, the new teaser did not even mention the CLO. Instead, it implied that the new vehicle would source new loan transactions, asserting that it would "initially focus on agricultural-related trade finance transactions." Thus, whereas BNP, Incapital, China Merchants Bank, and other potential investors in "CLO II" knew that the value of their investments would be tied to the quality of the CLO's assets and thus directed their diligence efforts towards the CLO, investors that received the modified "teaser" did not know where to focus their diligence efforts. Instead of seeking information on the CLO's loan portfolio specifically, diligence requests from the Investor-Assignors were focused on obtaining high level information on the historical performance of all IIG-managed funds. They never became aware that the proceeds of the investments they were contemplating would be used to acquire defaulted loans from the CLO.

129.    The new solicitation strategy paid off. On or around May 4, 2017, IIG informed the Noteholders that it had identified three potential investors that expressed interest in investing in two to-be-created IIG-managed investment funds and that the new IIG-managed investment funds would acquire the CLO's assets. IIG explained that the investors would make an initial investment of up to $70 million (subsequently increased to $80 million) by June 1st, which would be used to acquire the loans that had matured on January 31, 2017 but were not repaid. IIG also explained that the prospective investors would invest additional funds in July and August, which would be used to acquire the remainder of the CLO's loan portfolio.

130.    On the same day, IIG forwarded the Noteholders an agreement between IIG and GSC pursuant to which IIG agreed to appoint GSC as its agent, on an exclusive basis in the South Korean market, to identify investors (including Shinhan and LAM) in GTFF and STFF, IIG's new funds. The agreement, which was governed by New York law, provided that the new funds would

44

be able to accept investments of up to $70 million by June 1, 2017 (which, as the Noteholders knew, was just enough to purchase all of the CLO's remaining defaulted loans), and up to $250 million thereafter. Importantly, although IIG explained to the Noteholders that the new funds would acquire all or substantially all of the CLO's assets, the draft agreement with GSC, like the modified teaser, did not even mention the CLO or indicate that the new funds would acquire trade finance assets from any single source.

131.    On or around May 7, 2017, as Shinhan and LAM were preparing to make a final investment decision, they submitted a questionnaire seeking information not on the CLO specifically, but instead on all IIG-managed funds and historical defaults. IIG's response, which it sent to Shinhan and LAM on May 8, 2017, falsely stated that IIG did not specifically keep track of historical loan delinquencies. IIG also included with its response a schedule of purported loans, which listed the outstanding principal amounts, accrued interest, and maturity dates. These loans were from the CLO's portfolio and for the loans that matured on January 31, 2017, IIG's schedule falsely listed the maturity dates as "8/31/2017," so that the potential investors would not be aware of the existing defaults. IIG prepared a similar list of loans for dissemination to Aktia around the same time. IIG employees prepared these false statements of material fact at the direction of Messrs. Hu and Silver.

132.    Three days later, on May 11, 2017, Shinhan and LAM executed non-binding letters of intent, which contemplated an initial investment of $70 million in GTFF as of June 1, 2017 and a subsequent investment of $100 million on July 1, 2017 to be allocated among GTFF and STFF. Shortly thereafter, on May 16, 2017, Aktia committed to invest $10 million in GTFF by June 1, 2017. AGC later committed to invest $8,000,000 in GTFF by or around July 1, 2017.

133.    IIG apprised DBTCA and the Noteholders of these developments. In an example

of how the Noteholders felt about IIG's veracity during this period, when BlueMountain received

a copy of these letters of intent by email it requested that IIG bring to its office a copy of the LOI

so that it could verify that the LOI actually existed.

134.    After the execution of the letters of intent, the Noteholders extended the forbearance

period once again, until June 1, 2017. However, they noted that if the new fund, GTFF, did not

acquire the CLO's defaulted loans by June 1st, they would not extend the forbearance period again

and would instead declare an Event of Default under the Indenture.

**E.    The Noteholders and DBTCA Strongarm IIG into Selling the CLO's Assets
to GTFF and STFF**

135.    Preparing for the sale required IIG to complete several important steps, which

DBTCA and the Noteholders facilitated.

136.    First, the parties had to amend provisions in the Indenture that prohibited sales of

the CLO's assets on the contemplated terms. In early to mid-May, BlueMountain and its lawyers

at Shearman & Sterling in New York took the lead in drafting a supplemental indenture (the

"Fourth Supplemental Indenture") to amend the relevant Indenture provisions to permit any and

all sales of the CLO's loan assets only if the sale "is in an amount not less than the par value of

such sold Assets." DBTCA and the remaining Noteholders reviewed and edited the Fourth

Supplemental Indenture between May 16 and May 29, 2017. The Fourth Supplemental Indenture,

which has a New York governing law clause, was finalized and signed by DBTCA and consented

to by each of the Noteholders in June 2017.

137.    Second, IIG had to finalize the subscription documents for GTFF and STFF, so that

they would be funded in time to purchase the CLO's defaulted loans by early June. In or around

early May, IIG drafted an offering memorandum for GTFF and disseminated drafts to DBTCA.

In June, IIG disseminated a substantially similar draft offering memorandum for STFF to DBTCA. As with the investor solicitation materials that preceded them, the offering memoranda for GTFF and STFF contained false statements of material fact. The offering memoranda did not indicate that the funds would acquire their investments from the CLO or that the first acquisition would consist solely of loans that were in default. Instead, the offering memoranda provided that:

> The Fund will acquire investments based upon anticipated income and appreciation potential. However, it is expected that the Fund's portfolio will consist primarily of investments in relation to structured Facilities supported by numerous underlying transactions. Per the Fund's investment guidelines, at least fifty percent of these underlying transactions are expected to mature within twelve months from inception with a maximum term of 36 months.

138.    At the time, DBTCA knew that GTFF's and STFF's purpose was to acquire the CLO's portfolio and that the initial purchase would consist solely of defaulted loans. However, on information and belief, DBTCA did not raise any concerns with the offering memoranda to IIG.

139.    On May 16, 2017, IIG sent subscription agreements and the offering memoranda to Shinhan, LAM, and Aktia. They each returned completed subscription forms for GTFF on or around the same day. AGC received the same materials and executed the subscription agreements a few weeks later. Shinhan, which wound up being the only investor in STFF, returned completed subscription forms in July 2017. The subscription agreements incorporated the offering memoranda's terms by reference and by signing them, the investors were relying on the truth of the offering memoranda's factual statements.

140.    Finally, DBTCA provided IIG with the infrastructure necessary to complete the sales on the contemplated structures. DBTCA opened operating and collection bank accounts in New York for GTFF and STFF, which were used, *inter alia*, to (a) receive subscription payments from the Investor-Assignors and disburse them to purchase participation interests in the CLO's

47

loans, and (b) collect interest and principal payments on the underlying trade finance loans that

GTFF and STFF acquired. DBTCA helped IIG structure the accounts so as to avoid "know your

customer/anti-money laundering" and similar diligence.  Specifically, DBTCA told IIG that if it

structured the collection accounts as subaccounts for TFT, which had passed DBTCA's customary

know your customer/anti-money laundering diligence, DBTCA's internal protocols would not

require it to conduct know your customer/anti-money laundering diligence on the borrowers.  On

information and belief, conducting such diligence on the borrowers would have revealed that many

of them were shell companies or were otherwise owned by IIG.  DBTCA's affiliate, Deutsche

Bank Trust Company Delaware, also agreed to serve as the Delaware statutory trustee for TFT,

which, as detailed below, was created to serve as an intermediary for the CLO sales. Without

DBTCA's assistance and cooperation, IIG could not have completed the CLO sales on the

contemplated terms.

## V.     The Sale to GTFF and STFF

### A.     Structure of the Sale

141.    Instead of selling the CLO's portfolio to GTFF and STFF directly, IIG came up

with a more complex structure. TFT, a Delaware statutory trust, was formed by IIG to acquire

legal ownership of the portfolio for which it paid par, in cash, for outstanding principal plus

accrued interest of each loan. To fund the purchase, TFT sold 100% participation interests in the

assets that it acquired to GTFF and STFF pursuant to separate but substantially identical New-

York law governed Master Participation Agreements, dated as of May 31, 2017 and June 30, 2017,

respectively (the "Master Participation Agreements"). GTFF and STFF funded the full amount of

TFT's purchase from the CLO. Thus, although TFT was the nominal purchaser of the CLO's loan

assets, the purchase price was paid by GTFF and STFF. GTFF and STFF raised the funds by selling

48

subscription interests to the Investor-Assignors.

142.    The sale of the CLO's portfolio was effectuated in three separate transactions, which closed on June 6, 2017, July 3, 2017, and August 1, 2017. Each of the three sales were consummated pursuant to purchase and sale agreements governed by New York law and involved the transfer of funds between bank accounts located in New York. The total purchase price was $169,669,713, which was equal to par plus accrued interest on the loans that TFT acquired.

### B.    The June Sale Transaction

143.    On June 6, 2017, TFT acquired eighteen loans from the CLO for a purchase price of $79,228,449, consisting of $77,846,820 in outstanding principal and $1,381,629 of accrued but unpaid interest (the "June Sale Transaction"). TFT raised the funds it used to complete the purchase by selling 100% participation interests in each of the loans to GTFF (the "June Participation Purchase"), and GTFF, in turn, obtained the funds it paid to TFT by selling subscription interests to the Investor-Assignors.

144.    On or around June 1, 2017, Shinhan and Aktia wired a total of $80,000,000 of subscription payments (less $50 of wire fees) to GTFF's operating account maintained at DBTCA in New York. GTFF, in turn, in a series of three transfers on June 1, June 3 and June 6, wired $80,204,609 to TFT's account at DBTCA in New York (collectively, the "GTFF June Initial Transfer"). On June 1, 3, and 6, 2017, TFT paid $79,204,609.15 to DBTCA as consideration for the loans that it acquired from the CLO that day (the "June DBTCA Transfer").

145.    Subsequently, on or around June 13, 2017 the proceeds of the June DBTCA Transfer were disbursed to (a) holders of the Class A Notes and the Class B Notes on account of outstanding principal and interest in the amounts set forth on Appendix A, (b) DBTCA for its fees as collateral administrator and indenture trustee and as expense reimbursement for its outside

counsel fees, and (c) IIG for its fees as collateral manager (the "June  Subsequent Transfers").

146.    As a result of these transactions, TFT acquired eighteen (18) loans from the CLO. Each of these loans was in default, and thirteen (13) of them were fictitious. At the time of this sale, DBTCA and the Noteholders knew that each of these loans was in default; indeed, the Noteholders specifically directed the sale of these defaulted loans as a condition to their continued forbearance. DBTCA and the Noteholders also knew or reasonably should have known from diligence materials made available to them in the data room prepared by IIG that the loans to the Panamanian Borrowers were rife with red flags concerning their legitimacy.

147.    For example, the funding requests IIG submitted for the Panamanian Borrowers directed that loan proceeds be paid not to the borrowers themselves, but rather to an IIG Capital bank account at Citibank. And, the purported payments the CLO received on account of those loans also came from the same Citibank account. IIG Capital had no role whatsoever in relation to the CLO such that DBTCA knew or was willfully and blindly ignorant of the fact that in breach of the Indenture, the CLO did not have a security interest in every aspect of these loans. And, IIG failed to provide DBTCA with any documentation identifying the collateral for these loans, or even establishing that any collateral existed. Such information was required to also be provided to the Noteholders, but they never received it or even asked for it.

148.    Further, in the June sale TFT acquired $36,376,198 in principal balance of loans made to members of the Vicentin Group and at the time of that sale, DBTCA knew that the value and legitimacy of those loans was disputed by the borrowers.

149.    DBTCA's knowledge of IIG's fraud concerning the Panamanian Borrowers should be imputed to the Noteholders because DBTCA was acting on the Noteholders' behalf when it approved and funded the purported 'loans' IIG sought to have the CLO extend to those borrowers.

50

DBTCA's knowledge concerning the disputed and distressed nature of the Vicentin Group loans should similarly be imputed to the Noteholders because DBTCA acquired that knowledge in its capacity as the Noteholders' agent with respect to the CLO. In the alternative, IIG's knowledge of its own fraud should be imputed to DBTCA and the Noteholders because IIG had investment authority over the CLO and could cause the CLO to acquire or sell loans

### C.    Neither TFT Nor GTFF Received Fair Consideration

150.    TFT did not receive fair consideration in connection with the June Sale Transaction because the amount that it paid for the loans far exceeded the fair value of those loans. Likewise, GTFF did not receive fair consideration because the amount that it paid for its participation interests in those loans well exceeded the fair value of those participation interests. Each of the loans that were included in the June Sale Transaction were non-performing and were subject to material collection risks. Indeed, as of the date hereof, the full principal amount has not been collected on any of the loans. As such, the fair value of those loans was significantly less than par.

151.    The problems associated with these loans were known to IIG, DBTCA, and the Noteholders at the time of the sale. At least fourteen of the loans (which accounted for more than 84% of total purchase price) had matured on January 31, 2017 and were thus more than four months past due. Moreover, at least eleven of the loans (which accounted for approximately $32.67 million of the total purchase price) were made to Panamanian Borrowers and were completely fictitious. The Panamanian Borrowers were shell entities largely under IIG's control that never received the proceeds from any purported loans and have never had any assets that could be used to repay those purported loans. Thus, those loans, and the participation interests that GTFF acquired, were worthless.

152.    Finally, the validity of at least three of the loans—made to Algodonera Avellaneda

S.A., FRIAR, and Nacadie Comercial S.A.—were disputed by the borrowers at the time of the

June sale. In fact, those borrowers initiated legal proceedings in which they contended that their

payment obligations had been fully satisfied. DBTCA was aware of those proceedings at the time

of the sale, because IIG had asked DBTCA, in its capacity as the CLO's custodian, to deliver

original promissory notes to IIG for use in those proceedings.

> **D.    GTFF Was Insolvent at the Time of the GTFF June Initial Transfer or was
> Rendered Insolvent by the GTFF June Initial Transfer**

153.    The GTFF June Initial Transfer left GTFF insolvent, as the present fair salable

value of its assets was less than the amount that would be required to be paid on its probable

liability on its existing debts as they became absolute and matured. Following the transaction,

GTFF's only assets included cash on hand of approximately $295,374.24, and participation

interests in the eighteen loans that TFT acquired from the CLO. In light of the material collection

risk associated with each of those loans, as described above, the fair salable value of GTFF's

participation interests was far less than the $80,204,609 it had paid for them. Indeed,

approximately $32.67 million, or more than 40%, of the total purchase price was paid for fictitious

loans to Panamanian Borrowers, which were worthless.

154.    GTFF's liabilities, on the other hand, totaled no less than $80,000,000. Each of the

Investor-Assignors were fraudulently induced into purchasing subscription interests in GTFF by,

among other things, the false factual representations set forth in the offering memorandum and the

other investor solicitation materials prepared by IIG and the misrepresentations regarding the loan

maturity dates set forth in IIG's May 8th diligence responses to the Investor-Assignors. Thus,

immediately as of their investment in GTFF, those investors had rescission claims equal to the full

amount of their $80,000,000 investments. Those rescission claims have been allowed by the

Liquidators in GTFF's proceedings in the Grand Court and accrued when the investors wired their

subscription funds to GTFF. GTFF was rendered insolvent by the GTFF June Initial Transfer.

     **E.**     **TFT Was Insolvent at the Time of the June Transaction or Was Rendered
Insolvent by that Transaction**

     155.     The June transaction rendered TFT insolvent, as the present fair salable value of its

assets was less than the amount that would be required to be paid on its probable liability on its

existing debts as they became absolute and matured. TFT was essentially a shell company and did

not maintain significant cash on its balance sheet. On information and belief, TFT's only notable

assets were the legal interests in the loans it had acquired from the CLO. Those loans were subject

to material collection risks and, in any event, TFT did not retain any economic interest in them.

Rather, by selling 100% participation interests to GTFF, TFT became obligated to turn over any

principal and interest payments it received on the loans to GTFF. In other words, any receivable

owing to TFT on the loans was offset by a corresponding payment obligation to GTFF.

     156.     On the other hand, TFT had at least one significant liability. As detailed below, as

soon as the June transaction closed, GTFF had a matured claim against TFT for breach of its Master

Participation Agreement with TFT. In Count 8 below, GTFF seeks recovery for breach of contract

damages against TFT in an amount to be determined at trial. Although there may be a few

alternative ways to calculate damages, GTFF is entitled, at minimum, to the benefit of the bargain

– that is, the difference between the actual value of the participation interests it acquired and what

the value would have been had TFT's factual representations been true. The magnitude of GTFF's

damages roughly approximates the magnitude of the Investor-Assignors' rescission claims and

unquestionably exceeded the fair value of TFT's assets.

### F.    The July Sale Transaction

157.    On July 3, 2017, TFT acquired eleven loans from the CLO for a purchase price of $69,682,597, consisting of $67,340,614 in outstanding principal and $2,341,983 of accrued but unpaid interest (the "July Sale Transaction"). TFT raised the funds that it used to complete the purchase by selling participation interests in the loans to GTFF and STFF. Together, GTFF and STFF acquired 100% of the participation interests in the loans (the "July Participation Purchase").

158.    GTFF paid $7,668,094 for the participation interests that it acquired in connection with the July Participation Purchase when IIG caused a wire transfer from GTFF's account at DBTCA in New York to be made to TFT's settlement account at DBTCA in New York (the "GTFF July Initial Transfer"). It obtained those funds by selling additional subscription interests to the Investor-Assignors, including AGC.

159.    STFF paid $62,999,950 for the participation interests that it acquired in connection with the July Sale Transaction by wiring the funds from a Bank of New York account belonging to its administrator to TFT's settlement account at DBTCA in New York (the "STFF July Initial Transfer" and together with the GTFF July Initial Transfer, the "July Initial Transfers"). It obtained those funds by selling subscription interests to Shinhan.

160.    Upon receipt of the July Initial Transfers, TFT paid $69,647,987 of the funds from its New York bank account at DBTCA to a separate DBTCA New York bank account to purchase the loans it acquired in the July 2017 Sale Transaction (the "July DBTCA Transfer"). Subsequently, on or around July 13, 2017, DBTCA disbursed the proceeds to (a) holders of the Class B Notes on account of outstanding principal and interest, each in the amounts set forth on Appendix B, (b) DBTCA for its fees as collateral administrator and indenture trustee, and (c) IIG for its fees as collateral manager (the "July Subsequent Transfers").

54

161.    As a result of these transactions, TFT acquired eleven loans from the CLO in July 2017. Each of these loans was in default, and four of them were fictitious. All of this was known to IIG, DBTCA, and the Noteholders at the time of the sale or they were willfully blind to the facts concerning these loans.

### G.    Neither TFT Nor the Debtors Received Fair Consideration

162.    TFT did not receive fair consideration in connection with the July Sale Transaction, and GTFF and STFF did not receive fair consideration for the participation interests they acquired in the loans TFT purchased. The amount that TFT paid for legal ownership of the loans, and the amount that GTFF and STFF paid for their respective corresponding participation interests materially exceeded the actual fair value of those interests. Each of the eleven loans included in the July Sale Transaction was subject to significant collection risks and thus was not worth the amount paid by GTFF and STFF. As of the date hereof, none of the eleven loans have been fully repaid.

163.    At the time, the validity of at least two of the loans, each made to Algodonera, were disputed by the borrower, who had initiated legal proceedings in which it contended that its payment obligations had been fully satisfied. DBTCA was aware of these legal proceedings from communications it had with IIG. Those loans were nevertheless sold for par plus accrued interest, a price materially higher than the loans' actual value considering the dispute concerning the amount owed. IIG ultimately settled its claims against the Vicentin Group for less than 45% of the asserted principal amount of the loans, with participants receiving less than 30% after legal and other fees paid in connection with the dispute.

164.    The other loans TFT acquired in July 2017 were subject to similar collection risks that were known to IIG at the time. For example, the largest loan included in the sale, which was

55

a $18,688,647 loan to Sancor Cooperativas Unidas Ltda., had been restructured on numerous occasions in the past because the borrower claimed that it was not generating sufficient cash flow from its operations to make payment. Many of the other loans in the portfolio were subject to similar workouts and were also non-performing. Yet, these loans were sold for full principal plus accrued interests as if they were performing loans. The purpose of these gross overpayments was to ensure that the Noteholders would receive full payment of what was owed to them under the Notes.

### H.    GTFF Was Insolvent at the Time of the GTFF July Initial Transfer or Was Rendered Insolvent by the GTFF July Initial Transfer

165.    GTFF was insolvent at the time of the GTFF July Initial Transfer or was rendered insolvent by it, as the present fair salable value of its assets was less than the amount that would be required to be paid on its probable liability on its existing debts as they became absolute and matured. Following the transaction, GTFF's only material assets included cash on hand of approximately $727,152.95, and participation interests in certain of the loans that were subject to the June Participation Purchase and the July Participation Purchase. Considering the material collection risk associated with each of those loans, as described above, the fair salable value of GTFF's participation interests was far less than the $87,872,703 million it had paid for them. As noted, approximately $38.67 million of the total purchase price at that point was paid for fictitious loans to Panamanian Borrowers, which were worthless.

166.    On July 3, 2017, GTFF's liabilities exceeded the value of its assets. As of that date, GTFF had received a total of $88,000,000 in subscriptions from the Investor-Assignors, including an $8 million subscription from AGC on or around July 3, 2017. As noted, each of the Investor-Assignors was fraudulently induced into purchasing its subscription interests in GTFF by, among

56

other things, the false factual representations contained in the offering memorandum and the other investor solicitation materials and communications prepared by IIG as discussed more fully above. Thus, the Investor-Assignors had rescission claims equal to the full amount of their $88,000,000 investments. Those rescission claims, which have been allowed by the Liquidators in GTFF's proceedings in the Grand Court accrued when the investors wired their subscription funds to GTFF. Thus, GTFF was insolvent when it made the GTFF July Initial Transfer or was rendered insolvent by the GTFF July Initial Transfer.

I.    **STFF Was Insolvent at the Time of the STFF July Initial Transfer or Was Rendered Insolvent by the STFF July Initial Transfer**

167.    STFF was insolvent at the time of the STFF July Initial Transfer or was rendered insolvent by it, as the present fair salable value of its assets was less than the amount that would be required to be paid on its probable liability on its existing debts as they became absolute and matured. Following the transaction, STFF's only assets included *de minimis* cash on hand, and participation interests in the loans that were subject to the July Participation Purchase. In light of the material collection risk associated with each of those loans described above, the fair salable value of STFF's participation interests in those loans was far less than the $62,999,950 it had paid for them.

168.    On July 3, 2017, STFF's liabilities exceeded the value of its assets. As of that date, STFF had received a total of $63,000,000 from its investor, Shinhan. Shinhan was fraudulently induced into purchasing subscription interests in STFF by, among other things, the false factual representations set forth in the offering memorandum and the other investor solicitation materials and communications prepared by IIG as discussed more fully above. Thus, Shinhan had a rescission claim equal to the full amount of its $63,000,000 investment. That rescission claim was

assigned to LAM in 2019 and has been allowed by the Liquidators in STFF's proceedings in the Grand Court. It accrued when Shinhan completed its investment and was thus a liability of STFF as of the consummation of the July Participation Purchase. STFF was accordingly insolvent when it made the STFF July Initial Transfer.

**J.      TFT Was Insolvent at the Time of the July Sale Transaction or Was Rendered Insolvent by the July Sale Transaction**

169.      TFT was insolvent at the time of the July 3rd transaction or was rendered insolvent by it, as the present fair salable value of its assets was less than the amount that would be required to be paid on its probable liability on its existing debts as they became absolute and matured. Its only notable assets were legal interests in loans it had acquired from the CLO but, as noted above, it sold 100% of the economic interests in those loans to GTFF and STFF.

170.      On the other hand, TFT incurred additional breach of contract liabilities as a result of the July Sale Transaction to the extent that it sold GTFF additional participation interests in loans that were in default or otherwise not in full force and effect. TFT also incurred breach of contract damages to STFF because of its breaches of the Master Participation Agreement between TFT and STFF. The value of those damages claims, which were fully matured as of the consummation of the July Sale Transaction, exceeded the fair value of TFT's *de minimis* assets.

**K.      The August Sale Transaction**

171.      On August 1, 2017, TFT acquired seven loans from the CLO for a purchase price of $20,758,667, consisting of $20,700,000 in outstanding principal and $58,667 of accrued interest (the "August Sale Transaction"). TFT raised the funds it used to complete the purchase by 100% participation interests in all seven of the loans to STFF (the "August Participation Purchase," together with the June Participation Purchase and the July Participation Purchase, the

58

"Participation Purchases").

172.    On August 1, 2017, STFF transferred $27,588,916.64 from its DBTCA account in New York to TFT's DBTCA account in New York (the "STFF August Initial Transfer"). TFT immediately paid $20,758,667 of the proceeds of the STFF August Initial Transfer to DBTCA to purchase the loans that it acquired in the August 1st transaction (the "August DBTCA Transfer;" together with the June DBTCA Transfer and the July DBTCA Transfer, the "DBTCA Transfers"). Of the remaining proceeds, $6,080,250.00 was transferred in connection with TFT's acquisition of an interest in a loan to Valle and a separate loan to Tabacos Marasca S.A., a Brazilian tobacco company. STFF is still owed the entire remaining principal amount of the Valle 2015 Loan.

173.    Subsequently, on or around August 14, 2017, the proceeds of the August 1st DBTCA Transfer were disbursed in the following amounts: (a) $8,926,377.21 to holders of the Class B Notes for outstanding principal and accrued interest as set forth on Appendix C, (b) $9,154,265.38 to TFF IN Holdco (Cayman) Ltd. on account of the Income Notes, (c) $5,125.33 to DBTCA for its fees as indenture trustee and collateral administrator, and (d) $2,714,707.55 to IIG for its fees as collateral manager (the "August Subsequent Transfers;" together with the June Subsequent Transfers and the July Subsequent Transfers, the "Subsequent Transfers").

174.    As a result of these transactions, TFT acquired seven loans from the CLO in August 2017. Each of these loans was in default, and one of them was fictitious. All of this was known to IIG, DBTCA, and the Noteholders at the time of the sale or they were willfully blind to the facts concerning these loans.

###    L.    Neither TFT Nor STFF Received Fair Consideration

175.    Neither TFT nor STFF received fair consideration in exchange for the payments they made in connection with the August Sale Transaction. Of the seven loans that were included

in the transaction, (a) one was made to a Panamanian Borrower and was thus worthless, (b) four were made to Algodonera and, like the other Algodonera loans, were disputed in pending legal proceedings and were ultimately settled for a small fraction of the total face amount, and (c) two were made to a financially distressed borrower that eventually initiated insolvency proceedings in Argentina.

     **M.**     **STFF Was Insolvent at the Time of the STFF August Initial Transfer or Was Rendered Insolvent by the STFF August Initial Transfer**

     176.     STFF was insolvent at the time of the STFF August Initial Transfer or was rendered insolvent by it, as the present fair salable value of its assets was less than the amount that would be required to be paid on its probable liability on its existing debts as they became absolute and matured. Following the transaction, STFF's only assets included cash on hand of approximately $9,745,714.55, and participation interests in the loans TFT acquired in July and August 2017. In light of the material collection risk associated with each of those loans, as described above, the fair salable value of STFF's participation interests was far less than the $90,588,866.64 it had paid for them.

     177.     Even if STFF's loan participations could be properly valued at their full face amount (which, for the reasons stated herein, they cannot), STFF would still have been insolvent as of August 1, 2017.  STFF's liabilities totaled no less than $100 million, which is the total amount in subscriptions it had received from Shinhan, its investor, as of August 1st. Shinhan was fraudulently induced into purchasing subscription interests in STFF by, among other things, the false factual representations set forth in the offering memorandum and the other investor solicitation materials prepared by IIG. Thus, as of August 1st, Shinhan had a rescission claim equal to the full $100 million that it invested. Shinhan assigned that claim to LAM in 2019 and the claims

has been allowed by the Liquidators in STFF's proceedings in the Grand Court.

**N.      TFT Was Insolvent at the Time of the August Sale Transaction or Was Rendered Insolvent by the August Sale Transaction**

178.    TFT was insolvent at the time of the August DBTCA transfer or was rendered insolvent by it. As noted, TFT never maintained any material assets on its balance sheet, but it had incurred significant breach of contract liabilities to GTFF and STFF following the June and July sales. Those liabilities only grew after the August 2017 sale because, as detailed above, several of the loans that were included violated the terms of STFF's Master Participation Agreement.

**O.      Post-CLO Sale Transactions**

179.    Unfortunately for the Plaintiffs, IIG's scheme to defraud them did not end with TFT's acquisition of the CLO's loan portfolio. Instead, using its discretionary investment authority over GTFF and STFF, IIG caused the Funds to finance TFT's acquisition of additional trade finance loans (such loans, the "Post-CLO Loans") through their purchase of participation interests in those loans. These subsequently purchased loans were non-performing or fictitious, yet they were acquired for full par value plus accrued interest.

180.    IIG defrauded the Funds, and their investors, into funding their respective participation interests in the Post-CLO Loans and also breached its fiduciary duties as investment advisor to the Funds through those purchases. DBTCA aided and abetted those breaches by IIG by allowing IIG to use its bank accounts at DBTCA in connection with those transactions.

181.    DBTCA failed to conduct any KYC or anti-money laundering diligence concerning the accounts IIG opened for the borrowers relating to the Post-CLO Loans and thereby allowed IIG to use those accounts to continue its scheme to defraud the Funds and their investors.

182.    In connection with the Post-CLO Loans, TFT sold the Funds at least an additional

$40,000,000 in participation interests to the Funds, for which the Funds have made only minimal recoveries.

**P.    IIG and TFT Defrauded GTFF, STFF, and Their Investors**

183.    Pursuant to separate but substantially identical New York-law governed investment advisory agreements, GTFF and STFF each appointed IIG to act as their investment advisor. They each gave IIG full discretionary authority with respect to the investment and management of their assets. While the Funds each had independent directors, IIG was authorized to invest each of their assets without consulting or even notifying them in advance. IIG was the Funds' agent with respect to all investment decisions.

184.    IIG knew that it had solicited the Investor-Assignors to invest in the Funds on the basis of false statements of material fact contained in the offering memorandum and other investor communications. IIG knew that many of the loans in which the Funds were acquiring participations were fictitious and that the Panamanian Borrowers were shell entities that were never expected to repay, and never had the means to repay, the purported loans made to them. IIG also knew that the other loans in which the Funds acquired participation interests were not worth their par amount because the loans' validity was disputed by the underlying borrower or the loans were otherwise subject to material collection risks, as set forth above. IIG's intent was not to make legitimate investments in performing assets but rather to continue a fraudulent scheme that IIG began in 2007.

185.    Because IIG had directed the Funds' investment in the subject loans – it had discretionary investment authority over the Funds' investment – its fraudulent intent should be imputed to the Funds for purposes of the Investor-Assignor's claims to avoid certain transfers by the Funds.

186.    TFT, through its administrator IIG Trade Finance, a non-party that was owned by

Messrs. Hu and Silver, acted with intent to hinder, delay, and defraud its creditors when it transferred funds to DBTCA in connection with the purchase of trade finance loans from the CLO in June, July, and August of 2017. Messrs. Hu and Silver created TFT as an intermediary between the trade finance borrowers and GTFF and STFF. In each Master Participation Agreement, TFT falsely represented and warranted that it had "no actual knowledge" that the underlying trade finance loan agreements were "not in full force and effect, or that any default or event of default ha[d] occurred and [was] then continuing." The Master Participation Agreements were executed by IIG Trade Finance, as administrator and agent of TFT. TFT, through IIG Trade Finance, knew that many of the underlying loans were not in full force and effect (e.g., because they were fictitious or were in default).

187.    The Funds' investment into TFT, and the Investor-Assignors' investments in the Funds, were infected with several 'badges of fraud.'

188.    First, there was a lack of consideration for each of the purchases of participation interests by GTFF and STFF, as well as the purchase of trade finance loans by TFT from the CLO. Each of the loans at issue were either fictitious, defaulted, disputed, or otherwise distressed. None of them were worth their full par amount, never mind the full par amount plus accrued interest that GTFF and STFF ultimately paid.

189.    Second, there was a close relationship between the Funds and TFT on the one hand, and TFT and the CLO on the other hand. Each of them was advised by and/or under the control of IIG (or IIG affiliates) and Messrs. Hu and Silver. IIG stood on every side of the transaction. In addition to it acting as each Funds' investment advisor, it was the CLO's collateral manager and had authority to act on the CLO's behalf including by causing the CLO to acquire or sell trade finance loans. All of this was known by DBTCA and the Noteholders at the time of the CLO's

63

sales to TFT. IIG's affiliate, IIG Trade Finance, was also controlled by Messrs. Silver and Hu and appears to have been an IIG alter ego, and was TFT's administrator and served as its agent for purposes of all trade finance transactions.

190.    Third, contemporaneous communications at the time of the transactions, which show that IIG, Hu and Silver needed to 'offload' the trade finance loans on other parties, given the Noteholders expressed concerns regarding defaults in the loan portfolio also support an inference of fraud.

191.    Fourth, the course of conduct of IIG, Hu and Silver demonstrate that fraud occurred given the various other parties that were defrauded by IIG, Hu and Silver, as well as their respective guilty pleas in criminal proceedings and the securities fraud action by the SEC.

192.    Fifth, the chronology of transactions also supports an inference of fraud, including the communications from the Noteholders regarding defaults and their growing concerns, followed by the sale of the trade finance loans for par value to TFT, and the sale of participation interests to the Funds. Each of these 'badges' support an inference of actual fraudulent intent.

## VI.    The Noteholders Received the Proceeds with Knowledge that the Funds Were Tainted

193.    By 2017, it became clear to the Noteholders that it wasn't that IIG did not understand the deal, but rather that the deal did not in fact operate as advertised. Instead, IIG made a multitude of material, key misrepresentations regarding how the deal was supposed to work in the Offering Materials, which were important considerations the Noteholders relied upon in making their investment decision. These same misrepresentations were being touted in IIG's marketing of a refinancing deal to new investors—a fact the Noteholders were well aware of because IIG had provide them with copies of those marketing materials. In other words, by no later

than the Spring of 2017, the Noteholders knew that IIG had defrauded them into investing into the

CLO and also knew that IIG was making those very same fraudulent misrepresentations to the

Funds, investment vehicles raised and managed by IIG for the express purpose of paying off the

Noteholders.

194.    By the first quarter of 2017, it was clear to all that the CLO was significantly in

distress. By January 31, 2017, there was approximately $72 million of defaulted loans,

representing roughly 40% of the total value of the portfolio and on February 24, BlueMountain

and KKR sent their letter to IIG warning it, among other things, of its potential liability to

Noteholders for misrepresentations.

195.    At this stage, the Noteholders all began forcing an exit. For its part, KKR's

████████████████████████████████████████ and ████████████████████████ KKR

therefore focused its efforts on ensuring ████████████████████████████████

████████████████████████████████████████████████████—the

stated ████████ for KKR. Elanus was similarly focused on finding the exit for its CLO

investment and noted in a series of April 2017 communications to IIG that the Noteholders had

been put in a bad position but needed to understand that their respective self-interest was on trying

to find a collective solution by giving IIG the time to sell the loan portfolio. On that front, after

applying significant pressure on IIG for status updates vis-à-vis its refinancing efforts, KKR

received (the other Noteholders also received a copy) a draft presentation that was prepared to

market a new successor refinancing deal, TFF2, to investors.

196.    The presentation, as described above, notably did not disclose that roughly 40% of

the value of the portfolio was in default. And it touted the same deal structure highlights that the

Noteholders now knew to be false. Indeed, the Noteholders did not believe the representation made

in the teaser presentation for TFF2 that IIG had a stellar track record as a collateral manager.

197.    At the same time, BlueMountain was exploring the possibility of liquidating the CLO's collateral but was concerned that the poor, or in some cases non-existent collateral would potentially limit recoveries and thus focused its energies—as did the other Noteholders—on pressuring IIG to sell the CLO portfolio.

198.    Between the spreadsheet showing the difference between the scheduled maturity dates and facility maturity dates (as the illogical explanation for the defaulted loans), the collateral value package showing that a host of the underlying loans were not backed by any collateral (where "promissory notes" are listed as the collateral source), and being given access to IIG's data room, the Noteholders had to have known as of April 2017 that the CLO's portfolio was being misrepresented because it was worthless and that the Investor-Assignors were being defrauded by purchasing the loans at par value plus accrued interest. The Noteholders also knew—because IIG told them—that the CLO's portfolio was being sold to a related fund managed by IIG.

199.    Ultimately, as a result of BlueMountain's and KKR's steadfast efforts to push a refinancing deal through, knowing that what was being advertised to investors, including Plaintiffs, was false and/or misleading and the underlying loans were worth substantially less than par, the Noteholders received not only a return of their entire principal, but also a substantial return on their investment.

200.    As stated, at the time the Noteholders received the payments from DBTCA, they also knew that the initial transfer of funds was between IIG insiders. The Noteholders obviously knew that IIG had originated the loans through its fund, TOF NV and that it had served as the CLO's collateral manager, but they also knew that IIG sponsored and served as investment advisor for GTFF and STFF, the entities that paid the funds the Noteholders ultimately received.

66

201.    The Noteholders also knew that this was a transaction made outside the ordinary course of business, as it was precipitated by the dire condition of the CLO portfolio and the Noteholders' continued pressure on IIG to refinance.

202.    The Noteholders further knew that following the initial transfer, the funds obtained from Plaintiffs would be used to pay off the Noteholders, and Plaintiffs would be left holding an empty bag.

## VII.    GTFF and STFF Commence Liquidation Proceedings

203.    Due to the many problems with the loan assets acquired by the Debtors, they were unable to sustain their operations for long. In June 2018, approximately one year after the Debtors began to acquire participation interests in loans that were purchased from TFT, the SEC initiated an inquiry into IIG's policies, fund assets, and the valuation of assets in the funds that it managed, including the Debtors.

204.    Shortly thereafter, in November 2018, the Debtors wrote a letter to their respective investors indicating that they had determined to suspend the redemption of investor shares. The letter asserted that because of the SEC inquiry and market conditions, it was not possible for them to accurately place a value on the Debtors' assets and that the Debtors accordingly could not ascribe a value to investor shares for purposes of permitting redemptions. The letter also asserted that the Debtors intended to "wind down" and that they had engaged a qualified independent consultant for that purpose.

205.    In August 2019 and December 2019, respectively, a creditor for each of the Debtors' filed a petition in the Grand Court asking the Grand Court to place the Debtors into official liquidation and appointing Christopher Kennedy and Alexander Lawson as the joint official liquidators. The Grand Court granted the GTFF petition on October 23, 2019. It granted

the STFF petition on January 31, 2020.

206.    This Court subsequently entered an order recognizing GTFF's Cayman liquidation proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code on February 19, 2020. It entered an order recognizing STFF's Cayman liquidation proceeding as a foreign main proceeding on June 19, 2020. The chapter 15 cases of GTFF and STFF are being jointly administered under Case No. 20-10132 (MEW).

**VIII.    IIG and Messrs. Silver and Hu Plead Guilty to Multiple Counts of Fraud**

207.    The SEC filed a complaint against IIG in the U.S. District Court for the Southern District of New York (the "District Court") on November 21, 2019. The complaint charged IIG with an array of violations of the Investment Advisers Act of 1940, the Securities Exchange Act of 1934, and the Securities Act of 1933. The SEC filed similar complaints against David Hu and Martin Silver in the same court on July 17, 2020 and April 13, 2021, respectively. On the same dates, the U.S. Department of Justice indicted Messrs. Hu and Silver for securities fraud, wire fraud, and conspiracy to commit investment advisor fraud, securities fraud, and wire fraud.

208.    The SEC and Department of Justice accused IIG, through Messrs. Hu and Silver, of operating a Ponzi-like scheme. The pleadings alleged that IIG and Messrs. Hu and Silver defrauded investors in IIG-managed funds by overvaluing loans, falsifying paperwork to create a series of fake loans that were falsely classified as positively performing loans, transferring the overvalued and fake loans between IIG-managed funds, including to GTFF and STFF, and using the proceeds from those fraudulent sales to generate proceeds to repay earlier investors. The government also specifically alleged that Messrs. Hu and Silver caused GTFF and STFF to spend more than $100 million dollars to purchase fictitious loans and distressed or defaulted loans from the CLO without disclosing the true nature of those loans to the investors.

68

209.    The District Court entered consent judgments against IIG and Messrs. Hu and Silver, which enjoined them from further violations of the federal securities laws and ordered them to disgorge millions of dollars in ill-gotten gains. Additionally, Messrs. Hu and Silver each pled guilty to all three counts in the Department of Justice's indictments. In his guilty plea, Mr. Silver admitted that he and Mr. Hu "intentionally and knowingly participated in a scheme to overvalue distressed loans and IIG funds and falsify paperwork to create a series of fake loans" and that "the scheme concealed the true value of IIG funds from investors, and transferred fake and overvalued loans between funds for which IIG provided investment advisory services, at the same time receiving management and performance fees."

## IX.    NOTICE OF INTENT TO RAISE ISSUES UNDER FOREIGN LAW

210.    Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure (to the extent that it is incorporated by Rule 9017 of the Federal Rules of Bankruptcy Procedure), the Plaintiffs hereby give notice of their intent to raise issues under Cayman Islands law, including but not limited to, the counts that are identified as arising under Cayman Islands law below. The Plaintiffs intend to offer expert testimony, documents, and other relevant material or sources to the Court to determine the foreign law at issue.

### INVESTOR-ASSIGNOR CLAIMS

### COUNT 1
**Avoidance of the Debtor Initial Transfers**
**(NY DCL §§ 273-275, 278) TFT as Initial Transferee**

211.    The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

212.    Pursuant to the GTFF June Initial Transfer, GTFF transferred $80,204,609 to TFT.

213.    In connection with the GTFF July Initial Transfer, GTFF transferred $7,668,094

69

GTFF to TFT and in connection with the STFF July Initial Transfer, STFF transferred $62,999,950 to TFT.

214.    In connection with the STFF August Initial Transfer (and together with the GTFF June Initial Transfer and the July Initial Transfers, the "Debtor Initial Transfers") STFF transferred $27,588,916.64 to TFT.

215.    The Debtors did not receive fair consideration for the Debtor Initial Transfers.

216.    The Debtors were insolvent at the time of each of the Debtor Initial Transfers or were rendered insolvent by the Debtor Initial Transfers. The Debtor Initial Transfers also left each of the Debtors with unreasonably small capital, and the Debtors—through their investment advisor, IIG— each believed that they would incur or intended to incur debts beyond their ability to pay as they matured and became absolute and IIG's belief in this regard should be imputed to the Debtors.

217.    As of the date of each of the Debtor Initial Transfers, the Investor-Assignors were creditors with matured claims against the Debtors.

218.    The Debtor Initial Transfers are avoidable as constructive fraudulent transfers pursuant to sections 273-275 of the New York Debtor & Creditor Law.

219.    Of the funds paid to TFT in the Debtor Initial Transfers, the following amounts were subsequently transferred to DBTCA in the DBTCA Transfers:

    a.      June DBTCA Transfer: $79,204,609

    b.      July DBTCA Transfer: $69,647,987

    c.      August DBTCA Transfer: $20,758,667

220.    DBTCA had full dominion and control over the funds that were transferred to it in connection with the DBTCA Transfers. The DBTCA Transfers can thus be recovered from

70

DBTCA pursuant to section 278 of the New York Debtor & Creditor Law on the basis that DBTCA was a subsequent transferee of the Debtor Initial Transfers.

221.    On or around June 13, 2017, DBTCA made the June Subsequent Transfer pursuant to which it transferred a portion of the proceeds of the June DBTCA Transfer to IIG and investment funds managed by Defendants BlueMountain, KKR, Tennenbaum, and Elanus (collectively, the "Noteholder Subsequent Transferees") in the amounts set forth on Appendix A hereto.

222.    On or around July 13, 2017, DBTCA made the July Subsequent Transfer, pursuant to which it transferred a portion of the proceeds of the July DBTCA Transfer to the Noteholder Subsequent Transferees in the amounts set forth on Appendix B hereto.

223.    On or around August 13, 2017, DBTCA made the August Subsequent Transfer, pursuant to which it transferred a portion of the proceeds of the August DBTCA Transfer to the Noteholder Subsequent Transferees in the amounts set forth on Appendix C hereto.

224.    The Noteholder Subsequent Transferees are subsequent transferees of the Debtor Initial Transfers. The Debtor Initial Transfers can thus be recovered from the Noteholder Subsequent Transferees in the amounts specified on Appendices A-C hereto pursuant to section 278 of the New York Debtor & Creditor Law.

## COUNT 2
### Avoidance of the Debtor Initial Transfers as Actual Fraudulent Transfers
### (NY DCL §§ 276, 278) TFT as Initial Transferee

225.    The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

226.    As of the date of each of the Debtor Initial Transfers, the Investor-Assignors were creditors with matured claims against the Debtors.

227.    The Debtor Initial Transfers were made with the actual intent to hinder, delay,

71

and/or defraud the Debtors' creditors, including the Investor-Assignors, to the detriment and harm of those creditors.

228.    The Debtor Initial Transfers are avoidable as actual fraudulent transfers pursuant to section 276 of the New York Debtor & Creditor Law.

229.    DBTCA had full dominion and control over the funds that were transferred to it in connection with the DBTCA Transfers. The DBTCA Transfers can thus be recovered from DBTCA pursuant to section 278 of the New York Debtor & Creditor Law on the basis that DBTCA was a subsequent transferee of the Debtor Initial Transfers.

230.    After its receipt of the DBTCA Transfers, DBTCA subsequently transferred a portion of those funds to the Noteholder Subsequent Transferees and in the amounts set forth on Appendices A-C hereto (the "Noteholder Subsequent Transfers").

231.    The Noteholder Subsequent Transferees are subsequent transferees of the Debtor Initial Transfers. The Debtor Initial Transfers can thus be recovered from the Noteholder Subsequent Transferees in the amounts specified on Appendices A-C hereto pursuant to section 278 of the New York Debtor & Creditor Law.

**COUNT 3**
**Common Law Fraud Against IIG**

232.    The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

233.    IIG solicited the Investor-Assignors to invest in the Funds by disseminating investment teasers, offering memoranda, email communications, and other solicitation materials (collectively, "Solicitation Materials") to them.

234.    The Solicitation Materials contained false representations of material fact

72

concerning, among other things, the nature and quality of the loans in which the Funds would be acquiring participation interests. The Solicitation Materials also contained material omissions regarding, among other things, the fact that many of the loans in which the Funds would be acquiring participation interests were past due and in default or were fictitious loans made to the Panamanian Borrowers.

235.    When IIG disseminated the Solicitation Materials to the Investor-Assignors, IIG knew that they contained false statements of material fact and material omissions. IIG made those false statements and material omissions for the purpose of inducing the Investor-Assignors to invest in the Funds.

236.    The Investor-Assignors reasonably and justifiably relied on the false statements of material fact and the material omissions set forth in the Solicitation Materials in deciding to invest in the Funds.

237.    The Investor-Assignors have been injured as a direct and proximate result of IIG's fraudulent misrepresentations and omissions and have suffered damages in an amount to be determined at trial.

238.    Because of the intentional, deliberate, and malicious nature of IIG's acts, as set forth herein, Plaintiffs are entitled to punitive damages.

## **COUNT 4**
### **Aiding and Abetting Common Law Fraud**
### **Against the Noteholders**

239.    The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

240.    IIG defrauded the Investor-Assignors by soliciting them to invest in the Funds on the basis of false statements of fact and material omissions.

241.    IIG's business was a fraud. IIG told its investors that it would invest their money in high-quality, low-risk trade finance loans that were structured so that the credit risk centered entirely on blue-chip offtakers. IIG told its investors that the loans were self-liquidating with offtaker payments being remitted to accounts IIG controlled and/or that IIG controlled any borrower inventory that served as collateral.

242.    These statements were false and the Noteholders knew it.

243.    The Noteholders knew that there were serious problems with the loans in the CLO's portfolio. They knew that prior representations by IIG regarding the collateral securing those loans were materially false and that some of the loans may have been fictitious. They also knew that IIG was soliciting new investors on the basis of false statements of material fact and material omissions. For example, they knew that IIG had not disclosed to potential investors that it was soliciting that approximately 40% of the loan interests that were being sold were more than four months past their maturities and in default. They also knew that IIG had not disclosed that the loans were, in fact, not collateralized, or that any collateral had been pledged to third-parties.

244.    The Noteholders each provided substantial assistance to IIG in the commission of its fraud by, among other things (a) strongarming IIG into soliciting potential new investors notwithstanding that they knew that IIG's solicitation materials contained false statements and material omissions, (b) offering suggestions, guidance, and direction on how IIG should go about approaching potential investors, (c) forbearing from calling an Event of Default under the Indenture to give IIG time to solicit potential investors, and (d) drafting the Fourth Supplemental Indenture so as to permit IIG to sell the CLO's loans to the Funds at par plus accrued interest.

245.    The Noteholders did so with actual knowledge of numerous red flags, including a litany of material misrepresentations that had been made by IIG regarding the CLO portfolio and,

74

hence, that the portfolio was worth materially less than the value it was being sold for by IIG in mid-2017, if anything at all, at the behest and force of such Noteholders for their own benefit.

246.    As a direct and proximate result, the Investor-Assignors were damaged in an amount to be determined at trial.

### COUNT 5
**Aiding and Abetting Common Law Fraud**
**Against DBTCA**

247.    The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

248.    IIG defrauded the Investor-Assignors by soliciting them to invest in the Funds on the basis of false statements of fact and material omissions, including those set forth in the offering memoranda.

249.    DBTCA had actual knowledge of IIG's fraud. DBTCA knew that it funded, at the direction of IIG, non-collateralized loans to fictitious borrowers with no actual operations and into accounts over which it did not have a security interested in violation of the terms of the Indenture. From the hundreds of wires it processed through the CLO's accounts—at a significant profit— DBTCA knew that no principal or interest payment was ever received directly from a borrower or offtaker, and that the amounts received were not reflective of legitimate lending or contractual arrangements because they were never made on any discernable schedule and often varied significantly in amount. Among other material omissions, DBTCA knew that neither the offering memoranda nor any of IIG's other communications with potential investors disclosed that approximately 40% of the loan interests that were being sold were more than four months past their maturities and in default.

250.    DBTCA provided substantial assistance to IIG by, among other things, reviewing

material sent to potential investors before they were disseminated to the Investor-Assignors. Had the offering memoranda been truthful, the Investor-Assignors would not have agreed to invest in the Funds. DBTCA also substantially assisted IIG in the consummation of its fraud by executing money transfers that were necessary for the operation of IIG's fraud, including the funding of fictitious loans to the Panamanian Borrowers, helping IIG avoid KYC and anti-money laundering reviews that would have hindered or stopped the fraud and instead allowing IIG to open and use numerous accounts, through which huge sums flowed without any diligence, and by serving as cash management bank for the Funds and processing the bank transfers by which the Funds purchased the loan participations.

251.    As a direct and proximate result of DBTCA's substantial assistance, the Investor-Assignors were damaged in an amount to be determined at trial.

**COUNT 6**
**Fraudulent Disposition – Cayman Fraudulent Dispositions Act s. 4(1)**
**Against DBTCA and the Noteholders**

252.    The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

253.    Section 4(1) of the Fraudulent Dispositions Act (1996 Revision) in the Cayman Islands provides:

> 4. (1) Subject to this Law, every disposition of property made with an intent to defraud and at an undervalue shall be voidable at the instance of a creditor thereby prejudiced.

254.    As set out above, the Debtor Initial Transfers are dispositions of the Debtors' property at undervalue made with intent to defraud the Debtors' creditors, namely the Investor-Assignors. The dispositions include and extend to the DBTCA Transfers and the Noteholder Subsequent Transfers.

76

255.    As of the date of each of the Debtor Initial Transfers, the Investor-Assignors were creditors with matured claims for rescission and damages against the Debtors arising from the fraudulent misrepresentations made by the Debtors in their offering memoranda that induced the Investor-Assignors to invest in GTFF and STFF.

256.    The Debtors, acting at the direction of IIG, knowingly induced the Investor-Assignors to invest in the Debtors on the basis of fraudulent misrepresentations in the Debtors' offering memoranda. The Debtors therefore had notice of the Investor-Assignors' claims.

257.    As set out above, DBTCA and the Noteholders are successors in title to the funds transferred to TFT by the Debtors in the Debtor Initial Transfers and, in receiving the DBTCA Transfers and the Noteholder Subsequent Transfers, DBTCA and the Noteholders acted in bad faith.

258.    As a result, the Debtor Initial Transfers are liable to be set aside and voided under s. 4(1) of Fraudulent Dispositions Act. Further, the DBTCA Transfers and the Noteholder Subsequent Transfers are also liable to be set aside and voided as a series of transactions that together constitute dispositions of each Debtors' property made with intent to defraud the Debtors' creditors.

### COUNT 7
**Conspiracy to Injure the Investor-Assignors by Unlawful Means
Against All Defendants**

259.    The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

260.    At common law in the Cayman Islands, the tort of conspiracy to injure by unlawful means is established where two or more persons combine and take action which is unlawful in itself with the intention of causing damage to a third party who does incur the intended damage.

261.    IIG, TFT, DBTCA, and the Noteholders conspired to cause loss to the Investor-Assignors by unlawful means.

262.    It was understood and agreed by IIG, TFT, DBTCA, and the Noteholders that the Investor-Assignors would invest in the Debtors and the funds raised by such investments would be used by Debtors to purchase interests in the CLO's loans.

263.    As set out above, IIG, TFT, DBTCA, and the Noteholders actively facilitated the raising of capital by the Debtors from the Investor-Assignors and the sale of the CLO's assets to the Debtors.

264.    IIG, TFT, DBTCA, and the Noteholders intended to cause loss to the Investor-Assignors. They intended that the funds invested in the Debtors by the Investors-Assignors would be used by the Debtors to acquire the assets, or the economic interest in the assets, of the CLO at par value. However, it was known to IIG, TFT, DBTCA, and the Noteholders that the loans acquired by TFT from the CLO, and participated to the Debtors, were in many cases defaulted or fictitious. It was or should have been obvious to IIG, TFT, DBTCA, and the Noteholders that the Investor-Assignors would suffer severe, if not total, losses on their investments in the Debtors when the Debtors acquired participation interests in the CLO's loans at par value.

265.    The Debtors purchased their interests in the CLO's loans by means of the Debtor Initial Transfers.

266.    The Debtor Initial Transfers were unlawful. As set out above, they were fraudulent conveyances under New York law and fraudulent dispositions under Cayman law.

267.    The Debtor Initial Transfers were indeed the means by which the Investor-Assignors suffered loss. As a result of the Debtor Initial Transfers, the Debtors became insolvent and the Investor-Assignors' investments were rendered effectively worthless. The Investor-

78

Assignors were therefore damages in an amount to be determined at trial.

## THE DEBTOR CLAIMS

### COUNT 8
### Breach of Contract Against TFT

268.    The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

269.    Pursuant to the Master Participation Agreements between TFT and each of the Debtors, TFT agreed that upon the sale of any and all participation interests, it would be deemed to represent and warrant that it had "no actual knowledge" that the underlying trade finance loans for which it was selling participation interests were "not in full force and effect, or that any default or event of default thereunder ha[d] occurred and [was] continuing."

270.    At all times relevant to this litigation, that representation and warranty was false. Pursuant to the Participation Purchases, TFT sold the Funds participation interests in at least ten loans that were not in full force and effect because they were fictitious loans made to Panamanian Borrowers. TFT also sold the Funds participation interests in several loans for which the validity was disputed by the borrowers. Finally, TFT sold the Funds participation interests in at least fourteen loans that were in default because they had matured on January 31, 2017 but were not repaid.

271.    As of the dates of the relevant participation purchases, TFT knew that it was selling participation interests in loans that were either fictitious or defaulted. IIG Trade Finance served as TFT's agent for purposes of each of these transactions. IIG Trade Finance, in turn, was controlled by Messrs. Hu and Silver, who were its sole owners and managing partners. Messrs. Hu and Silver orchestrated IIG's fraudulent scheme and were thus fully aware that TFT was selling participation

interests in fictitious and defaulted loans. IIG Trade Finance was essentially an alter ego of IIG.

TFT thus knew, through imputation principles, that the representations and warranties set forth in

the Master Participation Agreements were false.

272.    As a direct and proximate result of TFT's breaches, the Funds were damaged in an

amount to be determined at trial.

### COUNT 9
### Avoidance of the DBTCA Transfers as Constructive Fraudulent Transfers
### (NY DCL §§ 273-275, 278) DBTCA as Initial Transferee

273.    The Plaintiffs repeat and reallege each and every allegation contained in the

preceding paragraphs above as if fully set forth herein.

274.    Pursuant to the DBTCA Transfers, TFT transferred the following abouts to

DBTCA:

      a.      June DBTCA Transfer: $79,204,609

      b.      July DBTCA Transfer: $69,647,987

      c.      August DBTCA Transfer: $20,758,667

275.    The DBTCA Transfers were not made for fair consideration. Additionally, TFT

was insolvent at the time of each of the DBTCA Transfers or was rendered insolvent as a result of

the DBTCA Transfers. The DBTCA Transfers also left TFT with unreasonably small capital, and

TFT believed that it would incur or intended to incur debts beyond TFT's ability to pay as they

matured and became absolute.

276.    The Debtors were creditors with matured claims against TFT as of the date of each

of the DBTCA Transfers based on TFT's breaches of the Master Participation Agreements.

277.    The DBTCA Transfers are thus avoidable as constructive fraudulent transfers

pursuant to sections 273-275 of the New York Debtor & Creditor Law.

278.    DBTCA had full dominion and control over the funds that it received in the DBTCA Transfers. Thus, the DBTCA Transfers can be recovered from DBTCA pursuant to section 278 of the New York Debtor & Creditor Law on the basis that DBTCA was an initial transferee of the DBTCA Transfers.

279.    After receiving the DBTCA Transfers, DBTCA subsequently transferred a portion of the proceeds to the Noteholder Subsequent Transferees and in the amounts set forth on Appendices A-C.

280.    The Noteholder Subsequent Transferees are subsequent transferees of the DBTCA Transfers. The DBTCA Transfers can thus be recovered from the Noteholder Subsequent Transferees in the amounts specified on Appendices A-C pursuant to section 278 of the New York Debtor & Creditor Law.

## COUNT 10
### Avoidance of the DBTCA Transfers as Actual Fraudulent Transfers
### (NY DCL §§ 276, 278) DBTCA as Initial Transferee

281.    The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

282.    The Debtors were creditors with matured claims against TFT as of the date of each of the DBTCA Transfers based on TFT's breaches of the Master Participation Agreements.

283.    The DBTCA Transfers were made with the actual intent to hinder, delay, and/or defraud TFT's creditors, including the Debtors, to the detriment and harm of those creditors.

284.    The DBTCA Transfers are thus avoidable as actual fraudulent transfers pursuant to section 276 of the New York Debtor & Creditor Law.

285.    The DBTCA Transfers were made to DBTCA, which had full dominion and control over the funds. Thus, DBTCA Transfers can be recovered from DBTCA pursuant to section 278

81

of the New York Debtor & Creditor Law on the basis that DBTCA was an initial transferee.

286.    After receiving each of the DBTCA Transfers, DBTCA subsequently transferred a portion of the proceeds to the Noteholder Subsequent Transferees in the amounts set forth on Appendices A-C hereto.

287.    The Noteholder Subsequent Transferees are subsequent transferees of the DBTCA Transfers. The DBTCA Transfers can thus be recovered from the Noteholder Subsequent Transferees in the amounts specified on Appendices A-C hereto pursuant to section 278 of the New York Debtor & Creditor Law.

## <u>COUNT 11</u>
### Breach of Fiduciary Duty Against IIG

288.    The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

289.    By separate but substantially identical New York-law governed investment advisory agreements, each of the Funds appointed IIG to act as its investment advisor. By granting IIG full discretionary authority over their assets, the Funds placed their trust and confidence in IIG. IIG thus owed fiduciary duties to the Debtors.

290.    IIG breached its duty to disclose complete and accurate information about the investments in which it caused the Debtors to invest by failing to disclose that a large proportion of the loans in which the Funds invested were in default or were fictitious, and by affirmatively misrepresenting the nature and quality of the loan assets in the Solicitation Materials, each as described herein.

291.    IIG breached its duty of loyalty to the Debtors by causing them to enter into transactions in which IIG was conflicted and which were not entirely fair to the Debtors.

Specifically, IIG caused the Debtors to purchase participation interests in loan assets that were being sold by the CLO, another entity for which IIG served as investment advisor. Many of those loans were in default, were distressed, or were completely fictitious. Nevertheless, IIG caused the Debtors to pay par plus accrued interest for those loan assets, a price materially higher than their fair value.

292.   As a direct and proximate result of IIG's breaches of its fiduciary duties, the Debtors were damaged in an amount to be determined at trial.

**COUNT 12**
**Aiding and Abetting a Breach of Fiduciary Duty**
**Against the Noteholders**

293.   The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

294.   As set forth herein, IIG breached its fiduciary duties of disclosure and loyalty to the Debtors. The Noteholders had actual knowledge of IIG's breaches because they knew that (a) IIG was soliciting potential investors for the Funds on the basis of false statements of material fact and material omissions, and (b) IIG stood on both sides of the ultimate sale transactions and caused the Funds to overpay for their loan participations. Thus, the Noteholders knew that such solicitations and sale transactions were fundamentally in conflict with IIG's fiduciary duties.

295.   The Noteholders induced or participated in IIG's breach of fiduciary duty. The Noteholders each provided substantial assistance to IIG, among other things (a) encouraging IIG to proceed with the loan sales and insisting that the sales only proceed if the Funds paid par plus accrued interest, (b) offering suggestions, guidance, and direction on how IIG should go about approaching potential investors for the Funds, (c) forbearing from calling an Event of Default under the Indenture to give IIG time to solicit potential investors for the Funds, and (d) drafting

the Fourth Supplemental Indenture so as to permit IIG to sell the CLO's loans to the Funds at par.

296.     The Noteholders did so with actual knowledge of numerous red flags, including a litany of material misrepresentations that had been made by IIG regarding the CLO portfolio and, hence, that the portfolio was worth materially less than the value it was being sold for by IIG in mid-2017, if anything at all, at the behest and force of such Noteholders for their own benefit.

297.     As a direct and proximate result of the Noteholders' knowing participation in and inducement of IIG's breaches, the Debtors were damaged in an amount to be determined at trial.

**COUNT 13**
**Aiding and Abetting a Breach of Fiduciary Duty**
**Against DBTCA**

298.     The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

299.     As set forth herein, IIG breached its fiduciary duties of disclosure and loyalty to the Debtors. DBTCA had actual knowledge of IIG's breaches because it knew that (a) IIG was soliciting potential investors for the Funds on the basis of false statements of material fact and material omissions, including those set forth in the offering memoranda for the Funds, and (b) IIG stood on both sides of the ultimate sale transactions and caused the Funds to overpay for their loan participations. Thus, DBTCA knew that such solicitations and sale transactions were fundamentally in conflict with IIG's fiduciary duties.

300.     DBTCA induced or participated in IIG's breach of fiduciary duty. DBTCA provided substantial assistance to IIG by, among other things, (a) reviewing material sent to potential investors, (b) executing money transfers that were necessary for the operation of IIG's fraud, including the funding of fictitious loans to the Panamanian Borrowers, (c) helping IIG avoid KYC and anti-money laundering reviews that would have hindered or stopped the fraud and

84

instead allowing IIG to open and use numerous accounts, through which huge sums flowed without any diligence, and (d) drafting the Fourth Supplemental Indenture so as to permit IIG to sell the CLO's loans to the Funds at par. DBTCA also substantially assisted IIG by serving as cash management bank for the Funds and processing the bank transfers by which the Funds purchased the loan participations.

301.    As a direct and proximate result of DBTCA's knowing participation in or inducement of IIG's breaches, the Debtors were damaged in an amount to be determined at trial.

## COUNT 14
### Fraudulent Disposition – Cayman Fraudulent Disposition Act s.4(1)
### Against DBTCA and the Noteholders

302.    The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

303.    The DBTCA Transfers are dispositions of TFT's property at undervalue made with intent to defraud TFT's creditors, including the Debtors. The dispositions include and extend to the Noteholder Subsequent Transfers.

304.    The DBTCA Transfers were dispositions at undervalue because the fair value of the loans acquired by TFT from the CLO was significantly less than the monies paid for the loans by TFT.

305.    As set out above, the Debtors were creditors with matured claims against TFT as of the date of each of the DBTCA Transfers based on TFT's breaches of the Master Participation Agreements.

306.    The DBTCA Transfers were made by TFT with intent to willfully defeat the obligations owed by TFT to its creditors, including the Debtors. As of the dates of the relevant Participation Purchases, TFT knew that it was selling participation interests in loans that were

85

either fictitious or defaulted. IIG Trade Finance served as TFT's agent for the purposes of each of these transactions. IIG Trade Finance, in turn, was controlled by Messrs. Hu and Silver, who were its sole owners and managing partners. Messrs. Hu and Silver orchestrated IIG's fraudulent scheme and were thus fully aware that TFT was selling participation interests in fictitious and defaulted loans. IIG Trade Finance was essentially an alter ego of IIG.

307.   TFT had notice of the Debtors' claims against TFT because TFT knew that it was selling to the Debtors participation interests in loans that were either fictitious or defaulted.

308.   As set out above, the Noteholders are successors in title to the funds transferred by TFT in the DBTCA Transfers.

309.   As a result, the DBTCA Transfers are liable to be set aside and voided under s. 4(1) of Fraudulent Dispositions Act. Further, the Noteholder Subsequent Transfers are also liable to be set aside and voided as a series of transactions that together constitute dispositions of each Debtors' property made with intent to defraud the Debtors' creditors.

**COUNT 15**
**Conspiracy to Injure the Debtors by Unlawful Means**
**Against All Defendants**

310.   The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

311.   IIG, TFT, DBTCA, and the Noteholders conspired to cause loss to the Debtors by unlawful means.

312.   It was understood and agreed by IIG, TFT, DBTCA, and the Noteholders that the Debtors would purchase interests in the CLO's loans.

313.   As set out above, IIG, TFT, DBTCA, and the Noteholders actively facilitated the sale of the CLO's assets to the Debtors.

86

314.    IIG, TFT, DBTCA, and the Noteholders intended to cause loss to the Debtors. They intended that the Debtors would acquire participation interests in the CLO's loans at par value. It was known to IIG, TFT, DBTCA, and the Noteholders that the loans acquired by TFT from the CLO, and participated to the Debtors, were in many cases defaulted or fictitious. It was or should have been obvious to IIG, TFT, DBTCA, and the Noteholders that the Debtors would suffer severe losses if TFT acquired defaulted or fictious loans from the CLO and participated these loans to the Debtors.

315.    The DBTCA Transfers were unlawful. As set out above, they were fraudulent conveyances under New York law and fraudulent dispositions under Cayman law.

316.    The Debtors suffered losses as a result of the DBTCA Transfers. The DBTCA Transfers were made by TFT to acquire loans from the CLO that were in effect worthless, which it then participated to the Debtors pursuant to the Master Participation Agreements.

317.    The DBTCA Transfers were indeed the means by which the Debtors suffered losses. As a result of the DBTCA Transfers, TFT acquired fictitious and defaulted loans from the CLO that it participated to the Debtors at par value, pursuant to the Master Participation Agreements. In reality, as set out above, the loans acquired by TFT and participated to the Debtors were effectively worthless.

318.    As a direct and proximate result of this misconduct by the Defendants, the Debtors have been damaged in an amount to be determined at trial.

## THE JOLS STATUTORY CLAIMS

### COUNT 16
**Disposition at Undervalue - Cayman Companies Act s. 146
Against TFT, DBTCA, and the Noteholders**

319.    The Plaintiffs repeat and reallege each and every allegation contained in the

87

preceding paragraphs above as if fully set forth herein.

320.    Section 146 of the Cayman Companies Act provides, in relevant part, as follows:

> (2) Every disposition of property made at an undervalue by or on behalf of a company with intent to defraud its creditors shall be voidable at the instance of its official liquidator.
> . . .
> (5) In the event that any disposition is set aside under this section, then if the Court is satisfied that the transferee has not acted in bad faith—
>> (a) the transferee shall have a first and paramount charge over the property, the subject of the disposition, of an amount equal to the entire costs properly incurred by the transferee in the defence of the action or proceedings; and
>> (b) the relevant disposition shall be set aside subject to the proper fees, costs, pre-existing rights, claims and interests of the transferee (and of any predecessor transferee who has not acted in bad faith).

321.    As of the date of each of the Debtor Initial Transfers, the Debtors owed existing obligations to the Investor-Assignors. In particular, and as set out above, the Investor-Assignors had claims for rescission and damages against the Debtors arising from the fraudulent misrepresentations made by the Debtors in their offering memoranda that induced the Investor-Assignors to invest in GTFF and STFF.

322.    The Debtor Initial Transfers were dispositions of property, namely the Debtors' cash, made by the Debtors with intent to defraud the Debtors' creditors, namely the Investor-Assignors. These dispositions of the Debtors' property include and extend to the subsequent transfer of the same funds as part of the DBTCA Transfers and the Noteholder Subsequent Transfers, which, together with the Debtor Initial Transfers, form a series of transactions planned by IIG from the outset to defraud the Debtors' creditors, i.e., the Investor-Assignors.

323.    The Debtor Initial Transfers were dispositions at undervalue because the fair value of the participation interests acquired by the Debtors was significantly less than the monies paid

for the participation interests by the Debtors.

324.    The Debtors willfully intended that the Debtor Initial Transfers would defeat the obligations owed by the Debtors to their creditors, including the Investor-Assignors. Mr. Hu and Mr. Silver's knowledge of IIG's fraudulent scheme is attributable to the Debtors: the Debtors made the Debtor Initial Transfers on the advice and at the direction of their investment advisor, IIG, which itself was controlled by Mr. Hu and Mr. Silver.

325.    The funds paid to TFT in respect of the Debtor Initial Transfers were then paid by TFT to DBTCA in a series of transactions described above as the DBCTA Transfers. DBTCA then paid the same funds to the Noteholders in the Noteholder Subsequent Transfers. DBTCA and the Noteholders are each successors in title to the monies paid out in the Debtor Initial Transfers, and thus "transferees" within the meaning of ss. 146(1) of the Cayman Companies Act. As set out above, in receiving the DBTCA Transfers and the Noteholder Subsequent Transfers, DBTCA and the Noteholders acted in bad faith.

326.    As a result, the Debtor Initial Transfers are liable to be set aside and voided under ss. 146(2) of the Cayman Companies Act. Further, the DBTCA Transfers and the Noteholder Subsequent Transfers are also liable to be set aside and voided as a series of transactions that together constitute dispositions of each Debtors' property at undervalue made with intent to defraud the Debtors' creditors.

### COUNT 17
### Fraudulent Trading - Cayman Companies Act s. 147
### Against IIG, TFT, DBTCA, and the Noteholders

327.    The Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

328.    Section 147 of the Cayman Companies Act provides as follows:

(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.

(2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.

329.    The business of the Debtors has been carried out with intent to defraud the Debtors' creditors, namely the Investors-Assignors. As set out above, the Debtors' investment advisor, IIG, solicited the Investor-Assignors to invest US $ 220 million in the Debtors. These investments were induced by fraudulent misrepresentations in the Debtors' offering memoranda. The Debtors, acting on the advice of and at the direction of IIG, used the funds acquired from the Investor-Assignors to make the Participation Purchases by which the Debtors acquired participation in loans that were effectively worthless. The Debtors became insolvent as a result of the Participation Purchases.

330.    IIG, as the Debtors' investment advisor, was knowingly party to the business of the Debtors by which the Debtors defrauded the Investor-Assignors. IIG conceived and orchestrated the fraudulent scheme. It solicited the investments from the Investors-Assignors and advised the Debtors to make the Participation Purchases.

331.    TFT was knowingly party to the business of the Debtors by which the Debtors defrauded the Investor-Assignors. TFT sold participation interests to the Debtors knowing the true value of those interests was not their par value, and that they were, in effect, worthless. As of the dates of the relevant participation purchases, TFT knew that it was selling participation interests in loans that were either fictitious or defaulted. IIG Trade Finance served as TFT's agent for purposes of each of these transactions. IIG Trade Finance, in turn, was controlled by Messrs. Hu

90

and Silver, who were its sole owners and managing partners. Messrs. Hu and Silver orchestrated IIG's fraudulent scheme and were thus fully aware that TFT was selling participation interests in fictitious and defaulted loans. IIG Trade Finance was essentially an alter ego of IIG.

332.    DBTCA participated in IIG's fraudulent scheme and was knowingly party to the business of the Debtors by which the Debtors defrauded the Investor-Assignors. Among other material omissions, DBTCA knew that neither the Debtors' offering memoranda nor any of IIG's other communications with potential investors disclosed that approximately 40% of the loan interests that were being sold were more than four months past their maturities and in default.

333.    Further, DBTCA amended the Indenture to permit the CLO to sell its loans at par value. DBTCA subsequently received the DBTCA Transfers from TFT, which represented the proceeds of the Debtor Initial Transfers. DBTCA also provided substantial assistance to IIG by, among other things, having its outside counsel review and comment on the offering memoranda before they were disseminated to the Investor-Assignors. Had the offering memoranda been truthful, the Investor-Assignors would not have agreed to invest in the Funds. DBTCA also substantially assisted IIG in the consummation of its fraud by serving as cash management bank for the Funds and processing the bank transfers by which the Funds purchased the loan participations.

334.    The Noteholders participated in IIG's fraudulent scheme and were knowingly party to the business of the Debtors by which the Debtors defrauded the Investor-Assignors. The Noteholders received the proceeds of the DBTCA Transfers. However, the Noteholders knew, from the diligence they had conducted, that there were serious problems with the loans in the CLO's portfolio. They knew that some of IIG's prior representations regarding the collateral securing those loans were false and that some of the loans may have been fictitious. They also

knew that IIG was soliciting new investors on the basis of false statements of material fact and material omissions. For example, they knew that IIG had not disclosed to potential investors that it was soliciting that approximately 40% of the loan interests that were being sold were more than four months past their maturities and in default.

335.    The Noteholders not only received the proceeds of the DBTCA Transfers, but each provided substantial assistance to IIG in the commission of its fraud by, among other things (a) encouraging IIG to proceed with the solicitation of potential new investors notwithstanding that they knew that IIG's solicitation materials contained false statements and material omissions, (b) offering suggestions, guidance, and direction on how IIG should go about approaching potential investors, (c) forbearing from calling an Event of Default under the Indenture to give IIG time to solicit potential investors, and (d) drafting the Fourth Supplemental Indenture so as to permit IIG to sell the CLO's loans to GTFF and STFF at par plus accrued interest.

336.    As a result of this misconduct by IIG, TFT, DBTCA and the Noteholders, the Liquidators are entitled to an award of damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, by reason of the foregoing, Plaintiffs request that judgment be entered in their favor as follows:

1.    on Counts 1-2:

   a.    finding that the Debtor Initial Transfers were fraudulent as to the Investor-Assignors pursuant to New York Debtor & Creditor Law;

   b.    finding that DBTCA and the Noteholder Subsequent Transferees are subsequent transferees of the Debtor Initial Transfers;

   c.    avoiding, disregarding, and nullifying the Debtor Initial Transfers to the extent necessary to satisfy the claims of the Investor-Assignors;

d.   entering judgment against DBTCA and the Noteholder Subsequent Transferees in an amount equal to the portion of the Debtor Initial Transfers that they each received plus prejudgment interest and allowing Plaintiffs to levy execution against them;

e.   Pursuant to New York Debtor & Creditor Law 276-a, awarding Plaintiffs their reasonable attorneys' fees, costs, and expenses incurred in this action; and

f.   providing for such other relief as justice and equity may require;

2.   on Count 3, finding that IIG is liable for common law fraud and granting and entering judgment against IIG in an amount to be determined at trial;

3.   on Counts 4-5, finding that each of BlueMountain, KKR, Tennenbaum, Elanus, and DBTCA, aided and abetted IIG's fraud and entering a judgment against them in an amount to be determined at trial;

4.   on Count 6:

a.   finding that the Debtor Initial Transfers were dispositions of property at undervalue made with the intent to defraud Debtors' creditors pursuant to s. 4(1) of the Cayman Fraudulent Dispositions Act; and

b.   avoiding, disregarding, and nullifying the Debtor Initial Transfers to the extent necessary to satisfy the rescission claims of the Investor-Assignors;

5.   on Count 7, finding that each of BlueMountain, KKR, Tennenbaum, Elanus, DBTCA, and TFT, conspired to injure Investor-Assignors by unlawful means and entering a judgment against them in an amount to be determined at trial;

6.   on Count 8, finding that TFT breached the Master Participation Agreements and entering judgment against it in an amount to be determined at trial;

7.   on Counts 9-10:

a.   finding that the DBTCA Transfers were fraudulent as to the Debtors, as creditors of TFT, pursuant to New York Debtor & Creditor Law;

b.   finding that DBTCA is an initial transferee of the DBTCA Transfers;

c.   finding that the Noteholder Subsequent Transferees are subsequent transferees of the DBTCA Transfers;

d.   avoiding, disregarding, and nullifying the DBTCA Transfers to the extent necessary to satisfy the Debtors' breach of contract claims against TFT;

e.   entering judgment against DBTCA and the Noteholder Subsequent

Transferees in an amount equal to the portion of the DBTCA Transfers that they each received plus prejudgment interest, and allowing Plaintiffs to levy execution against them;

    f.    Pursuant to New York Debtor & Creditor Law 276-a, awarding Plaintiffs their reasonable attorneys' fees, costs, and expenses incurred in this action; and

    g.    providing for such other relief as justice and equity may require;

8.    on Count 11, finding that IIG breached its fiduciary duties to GTFF and STFF and entering judgment against IIG in an amount to be determined at trial;

9.    on Counts 12-13, finding that each of BlueMountain, KKR, Tennenbaum, Elanus, and DBTCA aided and abetted IIG's fiduciary duty breaches and entering a judgment against them in an amount to be determined at trial;

10.    on Count 14:

    a.    finding that the DBTCA Transfers were dispositions of property at undervalue made with the intent to defraud TFT's creditors pursuant to s. 4(1) of the Cayman Fraudulent Dispositions Act; and

    b.    avoiding, disregarding, and nullifying the DBTCA Transfers to the extent necessary to satisfy the Debtors' breach of contract claims;

11.    on Count 15, finding that each of BlueMountain, KKR, Tennenbaum, Elanus, DBTCA, and TFT conspired to injure Debtors by unlawful means and entering a judgment against them in an amount to be determined at trial;

12.    on Count 16:

    a.    finding that the Debtor Initial Transfers were dispositions of property of the Debtors made at an undervalue with intent to defraud the Debtors' creditors and are thus voidable pursuant to section 146 of the Cayman Companies Act;

    b.    finding that TFT, DBTCA, and the Noteholder Subsequent Transferees are each a "transferee" within the meaning of the Cayman Companies Act; and

    c.    entering judgment against TFT, DBTCA, and the Noteholder Subsequent Transferees in the amount of the portion of the Debtor Initial Transfers received by them or for their benefit, plus interest;

13.    on Count 17:

    a.    finding that the business of Debtors was being carried out with the intent to defraud the Debtors' creditors;

94

b.    finding that each of IIG, TFT, DBTCA, BlueMountain, KKR, Tennenbaum, and Elanus were knowingly parties to the fraudulent carrying on of Debtors' business; and

c.    entering judgment against each of IIG, TFT, DBTCA, BlueMountain, KKR, Tennenbaum, and Elanus holding them liable for contributions to the Debtors' assets as the Court thinks proper;

14.    awarding Plaintiffs prejudgment interest under New York law;

15.    awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

16.    granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: August 31, 2023
New York, New York

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By: _/s/ John A. Pintarelli_____
John A. Pintarelli
Patrick E. Fitzmaurice
Ari M. Berman
Rahman Connelly
Eugenie Dubin
31 West 52nd Street
New York, NY 10019
Telephone: 212.858.1000
Facsimile: 212.858.1500
john.pintarelli@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
ari.berman@pillsburylaw.com
rahman.connelly@pillsburylaw.com
eugenie.dubin@pillsburylaw.com

*Co-counsel for Plaintiffs as relates to their claims against IIG, TFT, the BlueMountain Defendants, Tennenbaum Defendants, Elanus and the John Doe Subsequent Transferees*

**KOBRE & KIM LLP**

By: _/s/ Zachary D. Rosenbaum_
Zachary D. Rosenbaum

95

Rachel K. Warren
800 Third Avenue
New York, NY 10022
Telephone: 212.488.1200
Zachary.Rosenbaum@kobrekim.com
Rachel.warren@kobrekim.com

*Co-counsel for Plaintiffs as relates to their claims against the KKR Defendants and the John Doe Subsequent Transferees*

**CARMEL, MILAZZO & FEIL LLP**

By: */s/ Andrew Zinman*
Andrew Zinman
55 West 39th Street, 4th Floor
New York, NY 10018
Telephone: 212.658.0458
azinman@cmfllp.com

*Co-counsel for Plaintiffs as relates to their claims against DBTCA*