UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:<br><br>IIG Global Trade Finance Fund Ltd. (in Official Liquidation), *et al.*,<br><br><br>Debtors. | Case No. 20-10132 (MEW)<br><br>Chapter 15<br><br>Jointly Administered |
| IIG Global Trade Finance Fund Limited (in Official Liquidation), *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>International Investment Group L.L.C., *et al.*,<br><br>Defendants. | Adv. Pro. No. 23-01165 (MEW) |

**DEFENDANT DEUTSCHE BANK TRUST COMPANY AMERICAS'
MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
COUNTS 1, 2, 5-7, 9, 10, AND 13-17 OF THE COMPLAINT**

## Table of Contents

TABLE OF AUTHORITIES ...................................................................................... III

PRELIMINARY STATEMENT ................................................................................... 1

RELEVANT ALLEGATIONS AND DOCUMENTS .................................................. 4

A.  IIG'S FRAUD SCHEME BEGAN IN 2007, YEARS BEFORE THE TRADE FINANCE CLO
    WAS CREATED ................................................................................................. 4

B.  IIG'S FRAUD SCHEME CONTINUED BETWEEN 2013 AND 2017 .......................... 4

C.  THE INDENTURE ............................................................................................... 5

D.  DEUTSCHE BANK'S LIMITED ROLE AS INDENTURE TRUSTEE, CUSTODIAN, AND
    COLLATERAL ADMINISTRATOR ........................................................................ 6

E.  IIG EXPLORED REFINANCING BEGINNING IN MID-2016 WITHOUT DEUTSCHE BANK ....... 7

F.  IIG'S NEW INVESTORS AND THE FOURTH SUPPLEMENTAL INDENTURE ........... 8

G.  IIG'S CO-FOUNDERS WERE SENT TO PRISON .................................................. 11

LEGAL ARGUMENT ................................................................................................ 11

I.  THE NEW YORK DEBTOR & CREDITOR LAW CLAIMS (COUNTS 1, 2, 9
    & 10) FAIL BECAUSE THE LIQUIDATORS CANNOT ALLEGE THAT
    DEUTSCHE BANK HAD "DOMINION AND CONTROL" OF THE
    TRANSFERRED ASSETS ................................................................................. 13

A.  THE LIQUIDATORS FAIL TO ALLEGE THAT DEUTSCHE BANK WAS A TRANSFEREE
    WITH "DOMINION AND CONTROL" OF THE TRANSFERRED ASSETS. ................ 13

B.  KEY ALLEGATIONS ARE CONTRADICTED BY THE TRANSACTION DOCUMENTS THAT
    THE LIQUIDATORS HAVE ATTEMPTED TO CONCEAL FROM THIS COURT. ......... 16

II.  THE SECONDARY NEW YORK LAW CLAIMS (COUNTS 5, 13) SHOULD
     BE DISMISSED BECAUSE THE LIQUIDATORS CANNOT ALLEGE
     DEUTSCHE BANK AIDED OR ABETTED IIG ............................................... 21

A.  COUNT 5 FOR AIDING AND ABETTING FRAUD FAILS BECAUSE THERE ARE NO
    WELL-PLEADED ALLEGATIONS CONCERNING DEUTSCHE BANK'S ACTUAL
    KNOWLEDGE OF IIG'S FRAUD OR DEUTSCHE BANK'S SUBSTANTIAL PARTICIPATION
    IN SUCH FRAUD. .............................................................................................. 22

    i.  The Complaint Fails to Plead Deutsche Bank's "Actual Knowledge" of IIG's
        Fraud. ...................................................................................................... 22

    ii. The Complaint Fails to Allege that Deutsche Bank Provided "Substantial
        Assistance" To IIG. ................................................................................. 24

B.  COUNT 13 SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO ALLEGE
    THAT DEUTSCHE BANK "KNOWINGLY PARTICIPATED" IN A BREACH OF FIDUCIARY
    DUTY. .............................................................................................................. 26

III.    **THE CAYMAN ISLANDS LAW CLAIMS (COUNTS 6-7, 14-17) FAIL
        BECAUSE NEW YORK LAW APPLIES TO THIS ADVERSARY
        PROCEEDING.** ...................................................................................................**28**

    A.    NEW YORK LAW APPLIES TO THIS DISPUTE BECAUSE NEW YORK HAS THE
          GREATEST CONCERN WITH THE SPECIFIC ISSUES RAISED BY THE COMPLAINT...............28

    B.    THE LIQUIDATORS SHOULD NOT BE PERMITTED TO ASSERT CONSPIRACY CLAIMS
          UNDER CAYMAN ISLANDS LAW TO AVOID FATAL PLEADING DEFECTS UNDER NEW
          YORK COMMON LAW. ...................................................................................................32

**CONCLUSION** ...........................................................................................................**34**

## Table of Authorities

| Cases | Page(s) |
|---|---|

*Amidax Trading Group v. S.W.I.F.T. SCRL*,
    671 F.3d 140 (2d Cir. 2011)..................................................................................11, 16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..........................................................................................11, 16

*Aviles v. S & P Global, Inc.*,
    No. 17-cv-2987(JPO), 2020 WL 1689405 (S.D.N.Y. Apr. 6, 2020)..................................29, 31

*In re B.C.I. Finances Pty Ltd.*,
    583 B.R. 288 (Bankr. S.D.N.Y. 2018)......................................................................................29

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................................11

*Berdeaux v. OneCoin Ltd.*,
    561 F. Supp. 3d 379 (S.D.N.Y. 2021)................................................................22, 24, 26, 27

*Cahen-Vorburger v. Vorburger*,
    838 N.Y.S.2d 543 (1st Dep't 2007) ......................................................................................14

*In re Cassandra Grp.*,
    312 B.R. 491 (Bankr. S.D.N.Y. 2004)......................................................................................15

*Christy v. Alexander & Alexander of New York (In re Finley, Kumble, Wagner,
    Heine, Underberg, Manley, Myerson & Casey)*,
    130 F.3d 52 (2d Cir. 1997)............................................................................................14, 16

*Cromer Finance Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)......................................................................................27

*Curley v. AMR Corp.*,
    153 F.3d 5 (2d Cir. 1998)........................................................................................................28

*FDIC v. Porco*,
    75 N.Y.2d 840 (1990) ........................................................................................................13

*FIA Leveraged Fund Ltd. v. Grant Thornton LLP*,
    36 N.Y.S.3d 47, 2016 WL 350932 (N.Y. Sup. Ct. Jan. 19, 2016) ..................................29, 30

*Franco v. English,*
   620 N.Y.S.2d 156 (3d Dep't 1994) ......................................................................22

*In re Gaston & Snow,*
   243 F.3d 599 (2d Cir. 2001) .................................................................................29

*Green Star Energy Sols., LLC v. Edison Props., LLC,*
   No. 21-cv-2682(LJL), 2022 WL 16540835 (S.D.N.Y. Oct. 28, 2022) ................21

*In re ICP Strategic Income Fund, Ltd.,*
   730 Fed. Appx. 78 (2d Cir. 2018) ........................................................................29

*J. Aron & Co. v. Chown,*
   231 A.D.2d 426 (1st Dep't 1996) .........................................................................29

*Jalpert v. Gryaznova (In re BICOM NY, LLC),*
   619 B.R. 795, 799 (Bankr. S.D.N.Y. 2020) ....................................................14, 15

*JP Morgan Chase Bank v. Winnick,*
   406 F. Supp. 2d 247 (S.D.N.Y. 2005) ..................................................................21

*Kaufman v. Cohen,*
   760 N.Y.S.2d 157, 169 (1st Dep't 2003) ..............................................................27

*Kolbeck v. Lit Am., Inc.,*
   939 F. Supp. 240 (S.D.N.Y. 1996) .......................................................................27

*Krys v. Pigott,*
   749 F.3d 117 (2d Cir. 2014) .................................................................................21

*Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.,*
   179 F. Supp. 2d 118 (S.D.N.Y. 2000) ..................................................................22

*Lerner v. Fleet Bank, N.A.,*
   459 F.3d 273 (2d Cir. 2006) .....................................................................23, 25, 27

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,*
   672 F.3d 155 (2d Cir. 2012) .................................................................................32

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
   No. 12-cv-3723(RJS), 2016 WL 5719749 (S.D.N.Y. Sept. 29, 2016) .................33

*Matsumura v. Benihana Nat'l Corp.,*
   542 F. Supp.2d 245 (S.D.N.Y. 2008) ...................................................................11

*McCormack Family Charitable Found. v. Fidelity Brokerage Servs., LLC,*
   150 N.Y.S.3d 60 (1st Dep't 2021) ...............................................................13, 14, 15

*Meoli v. The Huntington Nat'l Bank*,
    848 F.3d 716 (6th Cir. 2017) ..................................................................20

*In re Pareteum Sec. Litig.*,
    No. 19-cv-10460(AKH), 2020 WL 3448526 (S.D.N.Y. June 23, 2020) ...................................4

*Pennecom B.V. v. Merrill Lynch & Co.*,
    No. 02-cv-5355(DC), 2005 WL 2044948 (S.D.N.Y. Aug. 25, 2005) ......................................31

*Pergament v. Brooklyn Law Sch.*,
    595 B.R. 6 (E.D.N.Y. 2019) .....................................................................15

*Renner v. Chase Manhattan Bank*,
    No. 98-cv-926 (CSH), 2000 WL 781081 (S.D.N.Y. June 16, 2000)......................................27

*In re Runnymede Capital Mgmt., Inc.*
    616 B.R. 67 (Bankr. W.D. Va. 2020) ..........................................................21

*In re Sharp Int'l Corp.*,
    403 F. 3d 43 (2d Cir. 2005)......................................................................26

*In re Shefner v. De La Beraudiere*,
    5 N.Y.S.3d 100 (1st Dep't 2015) ..............................................................13

*State Farm Mut. Auto. Ins. Co. v. Grafman*,
    No. 04-cv-2609, 2017 WL 4217122 (E.D.N.Y. Sept. 21, 2017) ................................14, 15, 16

*In re Stillwater Asset Backed Offshore Fund Ltd.*,
    559 B.R. 563 (Bankr. S.D.N.Y. 2016) ..........................................................32

*Wechsler v. Bowman*,
    285 N.Y. 284 (1941) ............................................................................26

*Whitney v. Citibank, N.A.*,
    782 F.2d 1106 (2d Cir. 1986)..................................................................27

**Statutes**

11 U.S.C. § 550(a)(1)..............................................................................14

Fed. R. Bankr. P. 7008 ...............................................................................1

Fed. R. Bankr. P. 7009 ...........................................................................1, 11

Fed. R. Bankr. P. 7012 ...........................................................................1, 35

Fed. R. Civ. P. 8(a) ..................................................................................1

Fed. R. Civ. P. 8(d) ..................................................................................4

Fed. R. Civ. P. 9(b) ..........................................................................1, 11, 21

Fed. R. Civ. P. 12(b)(6)..........................................................................1, 35

Deutsche Bank Trust Company Americas ("Deutsche Bank") respectfully submits this memorandum of law in support of its motion to dismiss Counts 1, 2, 5-7, 9, 10, and 13-17 of the complaint filed by plaintiffs (the "Liquidators"), pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, made applicable by Rules 7008, 7009, and 7012 of the Federal Rules of Bankruptcy Procedure, and states:

## PRELIMINARY STATEMENT

This adversary proceeding arises from a $220 million collateralized loan obligation brought to market (the "Trade Finance CLO") nearly a decade ago in November 2013. The Trade Finance CLO's assets were trade finance loans to small and medium-sized Latin American commodity companies that were originated by the Trade Finance CLO's collateral manager, defendant International Investment Group L.L.C. ("IIG"). It turns out that many, but not all, of those trade finance loans were fictitious or intentionally overvalued by IIG.

The Liquidators allege that Deutsche Bank—the trustee, custodian payment agent, and cash manager for the Trade Finance CLO—obtained knowledge in either 2015 or 2017 that IIG was using the Trade Finance CLO in furtherance of a Ponzi-like scheme and knowingly continued to provide routine banking services to IIG. (Cmplt. ¶ 15.) The Liquidators ultimately allege that the two investment funds that the Liquidators represent, plaintiffs IIG Global Trade Finance Fund Ltd. (the "Global Fund") and IIG Structured Trade Finance Fund Ltd. (the "Structured Fund"), were damaged in summer 2017 when Deutsche Bank followed instructions to transfer the assets held by the Trade Finance CLO to another IIG-related trust (defendant Trade Finance Trust), as Deutsche Bank was required to do pursuant to the express terms of the transaction documents. According to the Liquidators, Deutsche Bank should now be obligated to pay tens of millions of dollars of its own funds solely because, as a practical matter, IIG's scheme involved misuse of Deutsche Bank

1

accounts.  This argument is without merit.  When the Liquidators' conclusory, immaterial and implausible allegations are set aside, as they must be, the complaint falls short of stating a claim on which relief can be granted, much less 12 claims, against Deutsche Bank.

What the complaint has in quantity—23 defendants, 17 counts and 336 paragraphs—it lacks in substance, plausibility and the particularity required of valid fraud claims.  These fatal defects are all the more remarkable because the Liquidators have conducted substantial Rule 2004 discovery and had access to Debtors' documents and principals for three years.  As set forth more fully herein, all of the claims against Deutsche Bank fail at the pleadings stage for three reasons and should be dismissed.

*First*, the Liquidators' four fraudulent conveyance claims under New York Debtor & Creditor Law (Counts 1-2 and 9-10) fail both because the debtor claims are barred by the safe harbor under section 546(e) of the Bankruptcy Code and because Deutsche Bank did not have "dominion and control" over the funds generated by the sale of the Trade Finance CLO's assets in 2017.  Rather than being a transferee, as required for liability under New York law, Deutsche Bank was nothing more than a "mere conduit" and had no discretion or control over those funds.  To hold otherwise would subject every indenture trustee, every escrow agent, and potentially every financial institution to great liability far beyond the modest payments earned for performing routine banking transactions.  The Liquidators' claims push legal fictions to extremes that make no sense.  Equally important, the fraudulent conveyance claims are inconsistent with New York and Second Circuit law, with roots in equity, that distinguishes a transferee from a mere conduit.

*Second*, the two aiding and abetting claims under New York law (Counts 5 and 13) fail because the Liquidators have not alleged, and cannot allege, that Deutsche Bank had "actual knowledge" of IIG's scheme or that Deutsche Bank "substantially" assisted IIG with its fraud.

2

New York law requires that the allegations against Deutsche Bank must give rise to a strong inference of actual knowledge of IIG's fraud, yet the Liquidators can only manufacture a tenuous inference, at most, that Deutsche Bank could have uncovered IIG's fraud on some unspecified date. The Liquidators also fall short of their burden to plausibly allege that Deutsche Bank provided substantial assistance to IIG because providing routine banking services or—in some instances—mere inaction never constitutes "substantial assistance" under New York law. The Liquidators simply fail to set forth a plausible scenario that Deutsche Bank aided, abetted, or otherwise had a reason to conspire with IIG beyond the incredible speculation that Deutsche Bank was motivated to receive $50 wire transfer fees.

*Third*, the six Cayman Islands claims (Counts 6-7 and 14-17) should be dismissed because New York law, not Cayman Islands law, applies to the claims against Deutsche Bank. For conduct-regulating claims of the type brought by the Liquidators, the law of the state where the conduct occurred typically applies. Here, there is no exception to the general rule and none of Deutsche Bank's conduct is alleged to have occurred in the Cayman Islands. The Liquidators' decision to commence a Chapter 15 proceeding in the United States does not trump general choice-of-law principles, as Chapter 15 was simply not designed to permit parties to mix and match two countries' laws, picking and choosing which has the most favorable provisions for interest, attorneys' fees, or surviving a motion to dismiss. Because Cayman Islands law does not apply, the foreign law claims should be dismissed for failure to state a claim.

3

## RELEVANT ALLEGATIONS AND DOCUMENTS[1]

**A.    IIG's Fraud Scheme Began in 2007,
Years Before the Trade Finance CLO Was Created**

Defendant IIG, an SEC-registered investment advisor, was a "New York-based trade finance specialist" that provided trade finance loans to small and medium-sized Latin American importers and exporters of coffee, tobacco, and other agricultural products. (Cmplt. at ¶¶ 25, 50-51.) The market for trade finance loans existed because IIG's borrowers in Latin America were unable to obtain traditional financing. (*Id.* at ¶ 52.) The loans originated by IIG were repaid directly to an "IIG-controlled bank account" by the customers of IIG's Latin American borrowers. (*Id.* at ¶ 53.) From those repayments, IIG took its fee and remitted the balance to its borrowers. (*Id.*)

IIG's scheme began in 2007 when its main fund began experiencing significant losses related to one loan. (*Id.* at ¶¶ 7, 55-57.) IIG hid the losses by creating fake loans to fictitious borrowers, (*id.* at ¶ 56,) and by misvaluing distressed and defaulted loans as performing. (*Id.* at ¶ 57.)

**B.    IIG's Fraud Scheme Continued Between 2013 and 2017**

In November 2013, IIG formed the Trade Finance CLO to continue its fraud. (*Id.* at ¶¶ 58-59.) To finance the acquisition of the existing loans—many of which were allegedly fictitious or in default—the Trade Finance CLO issued $220 million of notes due in 2018 pursuant to an indenture. (*Id.* at ¶ 59.)

---

[1] Contrary to Rule 8(d)'s instruction that "[e]ach allegation must be simple, concise, and direct," the complaint often combines numerous sentences into one numbered allegation, making it unnecessarily difficult to determine which factual allegations are material. *See, e.g.*, Cmplt. at ¶ 111 (five sentences); *id.* at ¶ 118 (seven sentences). So, too, each of the 17 counts of the complaint adopts all of the preceding allegations in a manner that requires each defendant to sift through a morass of irrelevant facts and conclusions spread across 336 paragraphs to piece together claims. *See, e.g., In re Pareteum Sec. Litig.*, No. 19-cv-10460(AKH), 2020 WL 3448526, *2 (S.D.N.Y. June 23, 2020) (dismissing "puzzle pleading" that imposes a "Sisyphean task" upon defendants).

4

IIG was the collateral manager of the Trade Finance CLO and responsible for the day-to-day loan servicing. (*Id.* at ¶¶ 60, 80.) IIG was also responsible for recommending new trade finance loans, controlled the Trade Finance CLO's assets, and "was in position to control the disposition of those assets." (*Id.* at ¶¶ 60-61.) There is no allegation that IIG disclosed to Deutsche Bank or the four defendant noteholders (the "Noteholders") that IIG had been perpetrating a fraud since 2007. There is no allegation that Deutsche Bank was aware of IIG's scheme prior to 2015, at the earliest. (*See, e.g.*, *id.* at ¶¶ 91-102.)

C.    **The Indenture**[2]

Deutsche Bank's duties with respect to the Trade Finance CLO were set forth in a controlling document (the "Indenture"). The terms of the Indenture are wholly inconsistent with the Liquidators' allegations suggesting that Deutsche Bank had decision-making authority or control over the Trade Finance CLO's cash, loan portfolio, or proceeds thereof. Pursuant to section 6.6 of the Indenture, "[m]oney held by [Deutsche Bank] hereunder shall be held in trust . . . ." *See also* Decl., Ex. 1 at § 10.1 ("The Trustee shall segregate and hold all such Money and property received by it in trust for the [Noteholders] and shall apply it as provided in this Indenture."). The Trade Finance CLO and its collateral manager (i.e., IIG) controlled the Trade Finance CLO's assets: "the Issuer (or the Collateral Manager on behalf of the Issuer) shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds on deposit in the Collection Account, the Interest Reserve Accounts and the Hedge Counterparty Collateral Account as so directed . . . ." *See id.* § 10.5. Deutsche Bank, like other indenture trustees, had no independent authority beyond following the direction of IIG and the Noteholders as provided for in the Indenture.

---

[2] Relevant transaction documents that have been incorporated by reference into the complaint are attached as exhibits to the accompanying declaration of counsel. References to those exhibits will be made to "Decl., Ex. __ at __."

D.    **Deutsche Bank's Limited Role as Indenture Trustee, Custodian, and Collateral Administrator**

Deutsche Bank served as the indenture trustee for the notes issued by the Trade Finance CLO, as well as the custodian, collateral administrator, and cash management bank. (Complt. at ¶ 26.) In these roles, Deutsche Bank was responsible for opening and maintaining trust accounts and collection accounts. (*Id.* at ¶ 11.) "[A]ll of the [Trade Finance] CLO's banking transactions were processed through [Deutsche Bank]." (*Id.* at ¶ 64.)

Deutsche Bank prepared monthly trustee reports for the Noteholders based upon data received from IIG. (*Id.* at ¶ 63.)[3] Deutsche Bank also provided IIG with routine banking transactions, and "allowed" IIG to open and use operating and collection accounts. (*Id.* at ¶¶ 140, 180.) The Liquidators allege that Deutsche Bank "had a strong motive to accommodate IIG's demands" on the grounds that Deutsche Bank was IIG's principal retail bank, which allowed Deutsche Bank to earn a $50 fee per wire transfer. (*Id.* at ¶ 78.)[4]

Large sections of the complaint expressly exclude Deutsche Bank from knowledge of, and participation in, IIG's scheme. (*Id.* at ¶¶ 89-116) ("B. The Noteholders Knew of Serious Problems in the CLO's Loan Portfolio"); (*id.* at ¶¶ 117-125) ("C. The Noteholders Strongarmed IIG's Pivot to a New Investor Solicitation"). Rather, the Liquidators have characterized Deutsche Bank as a mere "fundamental tool," (*id.* at ¶ 54,) not a knowing participant in IIG's scheme. (*See also id.* at

---

[3] Rather than citing to the terms of the transaction documents, the Liquidators allege that "IIG's responsibilities as Collateral Manager included . . . assisting [Deutsche Bank] as trustee in preparing reports for the Noteholders." (*Id.* at ¶ 60.) That allegation mischaracterizes and minimizes IIG's contractual duties. *See* Decl., Ex. 1 at § 10.6 ("[T]he [Trade Finance CLO] shall compile and make available, or shall cause the Collateral Administrator to compile and make available . . . to the Trustee, the Collateral Manager and the Initial Purchaser . . . a monthly report (each a 'Monthly Report') . . . ."); *Id.* at Ex. 2 at § 2(c) ("[IIG] shall monitor the Assets . . . on an ongoing basis and assist the [Trade Finance CLO] in providing all opinions, reports, schedules and other data that the Issuer is required to prepare, deliver or furnish under the Indenture . . . ."). The Trade Finance CLO appointed Deutsche Bank to "assist the [Trade Finance CLO] and [IIG] in performing certain services and providing to the [Trade Finance CLO] and the Collateral Manager certain reports, schedules and calculations . . . based upon information and data received from the [Trade Finance CLO] or [IIG]." *See id.* at Ex. 6 § 2(a).

[4] The Liquidators characterize the $50 fee as a "significant profit." (*Id.* at ¶ 249.)

¶ 61) ("IIG also *used* the CLO's accounts at [Deutsche Bank] to further *its* fraudulent scheme . . . .") (emphasis added).

There is no allegation that Deutsche Bank had the contractual right, or any other right, to refuse to fund loans recommended by IIG.  (*Id.* at ¶ 60) ("IIG was also responsible for recommending new trade finance loans or loan participations . . . subject to trustee and/or Noteholder approval, all as set forth more fully in the Indenture.")  Nonetheless, the Liquidators argue that Deutsche Bank served a "key role" by "permitting" IIG to fund fictitious loans.  (*Id.* at ¶¶ 65-81.)

The Liquidators further allege—without any particular facts—that Deutsche Bank "helped IIG structure" bank accounts to avoid customary "Know Your Customer" diligence.  (*Id.* at ¶ 140.)  While the complaint includes a few general allegations about "Know Your Customer" due diligence, (*see* Cmplt. at ¶¶ 12, 67-68, 181, 250, 300,) there is no allegation that Deutsche Bank (or any other financial institution) is required to conduct "Know Your Customer" diligence on "borrowers" of customers (in this case, on IIG's customers, the Latin American borrowers).  Notably, the Liquidators do not allege that Deutsche Bank failed to perform "Know Your Customer" due diligence on its customer, the Trade Finance CLO or IIG.

### E.    IIG Explored Refinancing Beginning in Mid-2016 without Deutsche Bank

In mid-2016, IIG began exploring various refinancing structures with non-parties (*i.e.*, BNP Paribas Securities and Incapital LLC) without Deutsche Bank.  (*Id.* at ¶ 87.)  In February 2017, after reviewing the monthly trustee report received from Deutsche Bank, two of the Noteholders allegedly sent IIG a letter accusing IIG of not fulfilling its obligations as collateral manager and suggesting that IIG could be liable for misrepresentations.  (*Id.* at ¶¶ 84, 86.)  After allegedly receiving feedback from the Noteholders and a Deutsche Bank affiliate, "IIG began to disseminate a modified 'teaser,' which [IIG] created to solicit investors" in spring 2017.  (*Id.* at

7

¶ 126.)  In May 2017, IIG allegedly informed the Noteholders (but not Deutsche Bank) that IIG

had identified potential investors interested in two new funds, the Global Fund and the Structured

Fund.  (*Id.* at ¶ 129.)  IIG allegedly forwarded the Noteholders (but not Deutsche Bank) an

exclusive agency agreement to identify investors in the South Korean market.  (*Id.* at ¶ 130.)

The Liquidators allege that IIG informed Deutsche Bank and the Noteholders that IIG had

executed non-binding letters of intent with potential investors.  (*Id.* at ¶¶ 132-33.)  The Noteholders

and Deutsche Bank then amended the Indenture to allow sales of the Trade Finance CLO's assets

only at or above par.  (*Id.* at ¶ 136.)  IIG drafted the offering memoranda for the Global Fund and

the Structured Fund and distributed drafts to Deutsche Bank and the Noteholders.  (*Id.* at ¶¶ 137-

38.)  The Liquidators do not allege that Deutsche Bank read, edited, or commented on the offering

memoranda; rather, the Liquidators allege only that Deutsche Bank "did not raise any concerns

with the offering memoranda to IIG."  (*Id.* at ¶ 138.)

**F.    IIG's New Investors and the Fourth Supplemental Indenture**

In June 2017, the Noteholders consented to the Fourth Supplemental Indenture.  (*Id.* at

¶ 136.)[5]  The Fourth Supplemental Indenture directed that the funds comprising the "DBTCA

Transfers" flow through Trade Finance CLO's collection account to the Noteholders and IIG.  *See*

Decl., Ex. 3 at §§ 1.2, 1.9.  Additionally, the Fourth Supplemental Indenture specifically required

that the "June DBTCA Transfers" be deposited by the "Issuer" (*i.e.*, the Trade Finance CLO) in

the collection account and distributed by Deutsche Bank one week later.  *See id.* § 1.9 (amending

section 12.1(a) of the Indenture); *see also id.* at 2.4(b) ("As a result of the amendments to the

---

[5] *See* Decl., Ex. 3 at Recitals (noting that the Noteholders and IIG "have (a) consented to the execution and delivery
by the [Trade Finance CLO] and the Trustee of this Fourth Supplemental Indenture . . . in that certain Consent,
Direction and Waiver, dated as of the date hereof (the 'Consent, Direction and Waiver')"); *see also id.* at Ex. 2 § 1.1
("Each of the Consenting Noteholders hereby irrevocably . . . authorizes and directs the Trustee to execute and deliver
to the [Trade Finance CLO] the Fourth Supplemental Indenture."); *id.* at Ex. 3 § 2.5(b) ("The [Trade Finance CLO]
hereby directs the Trustee to enter into this Fourth Supplemental Indenture . . . .").

Indenture contained in Section 1.9 of this Fourth Supplemental Indenture, on the Payment Date of

June 13, 2017, all of the cash proceeds from the sale of Assets made during the period from June

1, 2017 to and including June 6, 2017 will be distributed and applied solely to the Aggregate

Outstanding Amount of the Class A Notes."). The Fourth Supplemental Indenture contained other

provisions that confirmed IIG's continuing control over the Trade Finance CLO's assets:

> Notwithstanding anything contained in this Article XII to the
> contrary, the Issuer shall have the right to effect (or cause the Dutch
> Fund to effect) any sale of any Collateral Obligations or other Asset
> or the purchase of any Collateral Obligation . . . .

*Id.* § 1.8; *see also id.* § 1.3.

IIG completed the sale of the Trade Finance CLO's assets in a series of transactions in

June, July, and August 2017. (Cmplt. at ¶¶ 141-149, 157-161, 171-174.) The three sales were

consummated pursuant to purchase and sale agreements governed by New York law and involved

the transfer of funds between bank accounts located in New York. (*Id.* at ¶ 142.) Although the

Liquidators acknowledge that funds flowed through the accounts of other IIG-controlled entities,

and the complaint repeatedly references "the CLO's accounts" at Deutsche Bank (*see, e.g.*, Cmplt.

¶¶ 61, 78, 109), the Liquidators mischaracterize such transfers as being made directly "to"

Deutsche Bank when referencing the Trade Finance CLO's accounts. (*See, e.g.*, Cmplt. ¶ 144)

(investors wired $80 million, less $50 of wire fees, "*to GTFF's operating account maintained at*

DBTCA in New York. GTFF, in turn, in a series of three transfers on June 1, June 3 and June 6,

wired $80,204,609 *to TFT's account* at DBTCA in New York . . . . TFT paid $79,204,609.15 *to*

*DBTCA* as consideration for the loans that it acquired from the CLO that day . . . .") (emphasis added).[6]

The Liquidators acknowledge that of approximately $170 million in "DBTCA Transfers," paid to the Trade Finance CLO in June, July, and August 2017, only a small amount was subsequently transferred to Deutsche Bank "for its fees as indenture trustee and collateral administrator and expense reimbursement." (*See* Cmplt. at ¶¶ 145(b), 160(b), 173(c).)[7] The remainder flowed through the Trade Finance CLO's account to the Noteholders, IIG, and another entity. (*See, e.g.*, Cmplt. at ¶ 173, App'x A-C) (reflecting that of approximately $170 million in "DBTCA Transfers" at least $156 million was paid to the Noteholders, $9.2 million was paid to TFF IN Holdco (Cayman) Ltd. "on account of the Income Notes," and $2.7 million was paid to IIG).

The Liquidators allege that this part of IIG's fraud scheme was accomplished without Deutsche Bank's direction or control. (*Id.* at ¶ 6) ("The Noteholders nonetheless forced the sale of the portfolio . . . ."); (*id.* at ¶ 195) ("[T]he Noteholders all began forcing an exit."); (*id.* at ¶ 199) ("Ultimately, as a result of BlueMountain's and KKR's steadfast efforts to push a refinancing deal through, . . . the Noteholders received not only a return of their entire principal, but also a substantial return on their investment.")

---

[6] The Liquidators' attempt to suggest Deutsche Bank received funds in a capacity other than as directed by the Indenture is contradicted by the complaint and the express terms of the transaction documents. *Cf.* Cmplt. at App'x A, B (identifying transfers from TFT "to DBTCA as Trustee for the CLO"). Under the Indenture, certain of the Trade Finance CLO's accounts were to be established for the benefit of the Noteholders in the name of "the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties." *See, e.g.*, Decl., Ex. 1, § 10.2. However, pursuant to the Securities Account Control Agreement dated contemporaneously with the Indenture, the Trade Finance CLO directed Deutsche Bank to establish those accounts in the name of "Trade Finance Funding I, Ltd., subject to the lien of Deutsche Bank Trust Company Americas, as Trustee, for the benefit of the Secured Parties." *See id.* at Ex. 5 § 1(a). In any event, it is incontrovertible that the "DBTCA Transfers" were not actually "paid to" Deutsche Bank in its individual capacity but rather to the Trade Finance CLO.

[7] Of the $20.7 million designated by the Liquidators as the "August DBTCA Transaction," only $5,125.33 was "disbursed" to Deutsche Bank for its fees as indenture trustee and collateral administrator. (Cmplt. at ¶ 173(c).) The Liquidators fail to allege with particularity how little was received by Deutsche Bank in June and July.

### G.    IIG's Co-Founders Were Sent to Prison

In June 2018, the Securities and Exchange Commission (the "SEC") initiated an inquiry into IIG. (*Id.* at ¶ 203.) In November 2018, the Global Fund and the Structured Fund advised their investors of the SEC investigation and their intent to "wind down." (*Id.* at ¶ 204.) Within months, both the Global Fund and the Structured Fund were placed into official liquidation. (*Id.* at ¶ 205.) In November 2019, the SEC filed a complaint accusing IIG and its principals—but not Deutsche Bank or the Noteholders—of operating a Ponzi-like scheme. (*Id.* at ¶¶ 207-08.) In 2022, IIG's principals pled guilty to federal crimes. (*Id.* at ¶¶ 1, 207-09.)

**LEGAL ARGUMENT**

To survive Deutsche Bank's motion to dismiss, the Liquidators must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[P]leadings that . . . are no more than [legal] conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). When considering a motion to dismiss, the court may consider documents "attached to the complaint" or "incorporated into [it] by reference," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). "[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam).

Because their claims against Deutsche Bank sound in fraud, the Liquidators must also meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), made applicable by Rule 7009 of the Federal Rules of Bankruptcy Procedure, which requires that a plaintiff "must state with particularity the circumstances constituting fraud . . . ." *See* Fed. R. Civ. P. 9(b); *see also Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp.2d 245, 251 (S.D.N.Y. 2008) (granting

11

motion to dismiss). The Liquidators' claims against Deutsche Bank fail to meet the standards of plausibility and particularity.

It is implausible that a heavily regulated indenture trustee—*i.e.*, Deutsche Bank—was motivated to participate in a $170 million-dollar fraud scheme to collect a few months of $50 wire transfer fees. Moreover, the claims against Deutsche Bank lack any particularity whatsoever. Despite conducting substantial pre-filing discovery for three years and having access to IIG's business records and principals, there is no factual allegation among the 336 paragraphs of the complaint naming a single Deutsche Bank employee who uncovered IIG's fraud, conspired with Mr. Silver or Mr. Hu, or otherwise participated in IIG's scheme. Rather, the complaint includes general allegations that Deutsche Bank failed to uncover a fraud that escaped the SEC for more than a decade. It is not enough to merely allege that Deutsche Bank processed IIG's wire transfers, served as indenture trustee, and processed other routine banking transactions, as did other banks.[8] Particulars (*e.g.*, names and dates) of Deutsche Bank's alleged substantial participation are non-existent. More telling, the Liquidators fail to quote or even cite to a single term of the transaction documents that created (and limited) Deutsche Bank's duties.

As set forth more fully herein, the Liquidators' claims against Deutsche Bank fail for three additional reasons. *First*, the New York Debtor & Creditor Law Claims fail because Deutsche Bank did not have "dominion and control" over the transferred assets. (*See* Section I.) *Second*, the aiding and abetting claims fail because the Liquidators cannot allege the basic elements of an aiding and abetting claim under New York law. (*See* Section II.) *Third*, the Cayman Islands claims fail because Cayman Islands law does not apply to this adversary proceeding. (*See* Section III.)

---

[8] (*See* Cmplt. at ¶ 76) (noting "every single payment came from" an IIG-controlled Citibank account); (*id.* at ¶ 72) ("IIG requested that funding for the 'loans' be wired . . . to an . . . account at Citibank.").

## I. The New York Debtor & Creditor Law Claims (Counts 1, 2, 9 & 10) Fail Because the Liquidators Cannot Allege that Deutsche Bank Had "Dominion and Control" of the Transferred Assets.

The four claims against Deutsche Bank arising under the New York Debtor & Creditor Law ("NY DCL") should be dismissed because they are barred by the safe harbor set forth in section 546(e) of the Bankruptcy Code, as demonstrated in the Noteholders' Memorandum of Law.[9] There are two additional reasons that the four avoidance claims should be dismissed. *First*, the Liquidators have not alleged that Deutsche Bank was anything more than a mere conduit. *Second*, the terms of transaction documents that the Liquidators have omitted from their sprawling allegations foreclose liability. Courts across the country have refused to impose liability on financial institutions—like Deutsche Bank—that merely facilitate the flow of funds through the financial markets in the ordinary course of business.

### A. The Liquidators Fail to Allege that Deutsche Bank was a Transferee with "Dominion And Control" of the Transferred Assets.

The Liquidators have failed to allege a fraudulent conveyance claim against Deutsche Bank because the allegations do not support that Deutsche Bank was a transferee with dominion and control over the transferred assets. *See, e.g., FDIC v. Porco*, 75 N.Y.2d 840, 842 (1990) (stating that NY DCL "cannot fairly be read as creating a remedy against nontransferees who, like defendants here, are not alleged to have dominion or control over those assets or to have benefitted in any way from the conveyance."); *McCormack Family Charitable Found. v. Fidelity Brokerage Servs., LLC*, 150 N.Y.S.3d 60, 62 (1st Dep't 2021) ("A defendant must have dominion and control over transferred assets to be liable as a transferee for a fraudulent conveyance."); *In re Shefner v. De La Beraudiere*, 5 N.Y.S.3d 100, 101 (1st Dep't 2015) ("dominion or control . . . is necessary

---

[9] Deutsche Bank incorporates by reference the legal argument set forth by the Noteholders without duplicating the argument herein.

to state a claim under a fraudulent transfer theory"); *Cahen-Vorburger v. Vorburger*, 838 N.Y.S.2d 543, 544 (1st Dep't 2007) ("Plaintiff failed to set forth a cause of action since there is no fraudulent conveyance claim against non-transferees who merely assist in transferring assets."); *see also State Farm Mut. Auto. Ins. Co. v. Grafman*, No. 04-cv-2609, 2017 WL 4217122, at *3 (E.D.N.Y. Sept. 21, 2017) (recognizing New York courts hold that "dominion or control . . . is necessary to state a claim under a fraudulent transfer theory") (internal quotation marks omitted) (quoting *Shefner*, 5 N.Y.S.3d at 101).

Courts in the Second Circuit have applied analogous principals when determining whether a defendant is an initial transferee under section 550(a)(1) of the Bankruptcy Code; in that context, the hallmark of a transferee, as opposed to a "mere conduit," is the legal right to exercise "dominion or control" over the money or asset at issue, *i.e.*, "the right to put the money to one's own purposes." *See Christy v. Alexander & Alexander of New York (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 57 (2d Cir. 1997); *see also Jalpert v. Gryaznova (In re BICOM NY, LLC)*, 619 B.R. 795, 799 (Bankr. S.D.N.Y. 2020), *aff'd*, No. 20-cv-8022 (JSR), 2021 WL 3173143 (S.D.N.Y. July 26, 2021), *aff'd sub nom. In re Bicom NY, LLC*, No. 21-1821, 2022 WL 1419997 (2d Cir. May 5, 2022) ("The whole point of having a 'dominion and control' test is to ensure that treating someone as a 'transferee' has some grounding in the realities of the underlying transaction."). As the Second Circuit has explained, a party with dominion over funds would be "free to invest the whole [amount] in lottery tickets or uranium stocks." *In re Finley, Kumble*, 130 F.3d at 57 (quoting *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988)).

New York courts often look to "mere conduit" caselaw for guidance. *See, e.g.*, *McCormack*, 150 N.Y.S.3d at 62 (adopting the definition of "dominion and control" set forth in

14

*Finley, Kumble* and *Bonded Financial* and affirming dismissal of a complaint where the recipient of funds "had no discretion over the way in which the funds in the account were deployed"); *see also Grafman*, 2017 WL 4217122 at *3 (dismissing claim under NY DCL § 278 for lack of dominion and control and rejecting argument that the magistrate judge "incorrectly conflated federal bankruptcy law with the New York state law that governs this proceeding").

In *McCormack*, 150 N.Y.S.3d at 62, the plaintiffs were enticed to invest funds with Andrew Casperson, who used their money "to further his gambling addiction by betting against the market with funds held" at two financial institutions. Casperson, of course, lost the invested funds. *Id.* Litigation ensued against the two financial institutions on the theory that Casperson's transfer of funds to brokerage accounts held at the financial institutions constituted fraudulent conveyances. *Id.* The court rejected the argument because "defendants, as financial institutions, cannot be fairly said to be transferees when Casperson retained dominion and control over the assets in his account." *Id.* Explaining that dominion and control requires "the right to put the money to one's own purposes," the court held that the financial institutions were not transferees because they "had no discretion over the way in which the funds in the account were deployed." *Id.*; *see also Pergament v. Brooklyn Law Sch.*, 595 B.R. 6, 11 (E.D.N.Y. 2019) (finding that a university was not a transferee because "retention of the payments was subject to the possibility that the debtor's children would withdraw from school and take the money with them, and thus the schools had insufficient dominion and control at that point to be considered initial transferees."); *In re BICOM*, 619 B.R. at 799-800 (dismissing fraudulent transfer claim against joint account holder because "a party's bare legal ownership of a bank account" is not "sufficient by itself to make the party a 'transferee.'"); *In re Cassandra Grp.*, 312 B.R. 491, 497 (Bankr. S.D.N.Y. 2004) (holding under NY DCL and Bankruptcy Code, an attorney acting as agent and attorney-in-fact for a disclosed

15

principal under a broad power of attorney was not a transferee because the attorney could not put

funds deposited into trust account to personal use); *Grafman,* 2017 WL 4217122, at \*4 (finding a

transfer of funds into a law firm's trust account does not grant dominion and control because the

law firm could not put the funds to its own use). As the Second Circuit has recognized, without

such a safeguard, "every courier, every bank and every escrow agent may be subjected to a great

and unimagined liability." *In re Finley, Kumble*, 130 F.3d at 56; *see also Grafman*, 2017 WL

4217122, at \*3 (stating that "without this exception, anyone who happens to touch the assets is a

transferee . . . ."). The Liquidators have ignored the well-developed law and policy of the courts

of New York and this Circuit in an attempt to impose great and unimagined liability on Deutsche

Bank simply by virtue of a routine commercial banking relationship.

### B. Key Allegations are Contradicted by the Transaction Documents that the Liquidators Have Attempted to Conceal From This Court.

This Court should disregard the allegation that Deutsche Bank "had full dominion and

control over the funds that were transferred to it," (*see* Cmplt. at ¶ 220), because it is a bald legal

conclusion that is contradicted by the terms of the transaction documents that the Liquidators failed

to reference, but are nonetheless incorporated by law. *See ATSI Commc'ns, Inc.*, 493 F.3d at 98;

*Amidax Trading Group*, 671 F.3d at 147. Deutsche Bank did not have "dominion or control" over

the Trade Finance CLO's assets or "the right to put the money to one's own purposes" because all

funds that were transferred to the Trade Finance CLO were held in trust for the benefit of the

Noteholders. *See, e.g.*, Decl., Ex. 1 § 6.6 ("Money held by the Trustee hereunder shall be held in

trust . . . ."); *id.* § 10.1 ("The Trustee shall segregate and hold all such Money and property received

by it in trust for the Holders of the Notes and shall apply it as provided in this Indenture.").

The Indenture, when outlining the flow of funds through the Trade Finance CLO's bank

accounts, requires that "*[a]ll Monies deposited* from time to time *in the Collection Account*

16

pursuant to this Indenture *shall be held by the Trustee as part of the Assets* and shall be applied to

the purposes herein provided." *Id.* § 10.2 (emphasis added).  Moreover, the Trade Finance CLO

and its collateral manager (*i.e.*, IIG), not Deutsche Bank, controlled the Trade Finance CLO's

assets, including cash; Deutsche Bank had to abide by the Indenture's terms. *See, e.g., id.* § 10.5

("[T]he Issuer (or the Collateral Manager on behalf of the Issuer) shall at all times direct the

Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds on deposit in

the Collection Account, the Interest Reserve Accounts and the Hedge Counterparty Collateral

Account as so directed . . . ."); *id.* § 11.1(a) ("The Trustee shall disburse amounts transferred, if

any, from the Collection Account to the Payment Account . . . in accordance with the following

priorities . . . .").

      Recognizing that the transaction documents refute Deutsche Bank's dominion or control,

the Liquidators offer allegations of Deutsche Bank's purported involvement in drafting the Fourth

Supplemental Indenture without, of course, citing to the material language of that document. (*See*

Cmplt. at ¶ 136.)  Deutsche Bank did not, as alleged, "draft[] the Fourth Supplemental Indenture

so as to permit IIG to sell the [Trade Finance] CLO's loans." (*Id.* at ¶ 300(d).)  Rather, the

document itself confirms that Deutsche Bank executed the Fourth Supplemental Indenture at the

instruction of others. *See* Decl., Ex. 3 at Recitals ("the [Noteholders] and [IIG] have (a) consented

to the execution and delivery by the Issuer and the Trustee of this Fourth Supplemental Indenture

and in that certain Consent, Direction and Waiver"); *id.* § 2.5(b) ("The Issuer hereby directs the

Trustee to enter into this Fourth Supplemental Indenture . . . ."); *see also id.* at Ex. 2 § 1.1 ("Each

of the Consenting Noteholders hereby irrevocably . . . authorizes and directs the Trustee to execute

and deliver to the Issuer the Fourth Supplemental Indenture.").  The Fourth Supplemental Indenture

directs that the funds comprising the "DBTCA Transfers" flow through the Trade Finance CLO's

collection account to the Noteholders. *See id.* at Ex. 3 §§ 1.2, 1.9, 2.4. Moreover, the Fourth

Supplemental Indenture specifically required that the "June DBTCA Transfers" be deposited by

"Issuer" (*i.e.*, the Trade Finance CLO) in the Collection Account and distributed by Deutsche Bank

one week later:

> *[a]ll of the cash proceeds* from the sale of Assets made during the
> period from June 1, 2017 to and including June 6, 2017, in
> accordance with the provisions of this Section 12.1(a), *shall be
> deposited into the Collection Account, and* on the Payment Date of
> June 13, 2017, *shall be distributed and applied*, in accordance with
> Priorities of Payment set forth in Sections 11.1(a)(ii)(A) and
> 11.1(a)(i)(D) of the Indenture. . . . The Trustee's lien and security
> interest on all such Assets so sold is hereby deemed to be
> immediately and automatically released and terminated . . . .

*See id.* § 1.9 (amending section 12.1(a) of the Indenture) (emphasis added). Further, the Fourth

Supplemental Indenture authorized the Trade Finance CLO to sell the remainder of its assets and

directed the deposit of those sale proceeds (*i.e.*, the remainder of the "DBTCA Transfers") into the

collection account for distribution to the Noteholders in accordance with the Indenture:

> The Issuer shall not (and shall not permit the Dutch Fund to) from
> and after the Closing Date: (i) sell, transfer, exchange or otherwise
> dispose of, or pledge, or mortgage, hypothecate or otherwise
> encumber (or permit such to occur to suffer such to exist), any part
> of the Collateral Obligations or other Assets, except . . . (y) if the
> sale of any Assets securing the Notes against payment in cash is in
> an amount not less than par value of such sold Assets, provided that,
> in the case of this clause (y), the *cash proceeds received by the
> Issuer in respect of such sale(s) shall be deposited into the
> Collection Account within two (2) Business Days of receipt and will
> be distributed (x) on the Payment Date immediately following the
> deposit of such cash proceeds into the Collection Account* . . . .

*Id.* at Ex. 1 § 7.8(a)(i) (as amended by Section 1.2 of the Fourth Supplemental Indenture) (emphasis

added).

The Fourth Supplemental Indenture also contained other provisions that confirmed the

continuing control of IIG, in its capacity as collateral manager:

> The Collateral Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order, the Trustee shall, pay from Interest Proceeds on deposit in the Interest Collection Account on any Business Day during any Interest Accrual Period any amount required to exercise a warrant held or other right to acquire securities included as part of the Assets . . . . The Collateral Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, pay from amounts on deposit in the Collection Account on any Business Day during any Interest Accrual Period, any Administrative Expenses . . . .
>
> * * *
>
> [T]he Issuer shall have the right to effect . . . any sale of any Collateral Obligations or other Asset or the purchase of any Collateral Obligation . . . .

*Id.* at Ex. 3 §§ 1.3, 1.8. Thus, any allegation that Deutsche Bank exercised dominion and control over the funds described as the "DBTCA Transfers" (or the assets of the Trade Finance CLO generally) is directly contradicted by the express terms of the governing documents and the nature of the parties' relationship.

Even assuming that the Liquidators are attempting to plead dominion and control of the funds constituting the DBTCA Transfers by passing reference to Deutsche Bank in its capacity as "indenture trustee for the Class A Notes, Class B Notes, and Income Notes . . . issued by the CLO," (Cmplt. at ¶ 26), the complaint still does not state a fraudulent conveyance claim against Deutsche Bank.[10]   In *Mervyn's*, 426 B.R. 96 (Bankr. D. Del. 2010), the bankruptcy court dismissed an adversary proceeding against a trustee holding liens and assignment of rents for failure to name a valid transferee.  The court reasoned, "the Committee does not plead in the Second Amended complaint how Bank of America, acting as trustee had 'dominion and control' over the funds.

---

[10] For example, the Liquidators allege that Deutsche Bank had control over certain accounts merely because it served as trustee for the benefit of the Noteholders.  (*See* Cmplt. at ¶ 53 n.4) ("[C]ollection accounts were maintained at DBTCA and DBTCA, as trustee for the benefit of the Noteholders, had control over those accounts.").

Specifically, the Committee fails to plead how Bank of America has legal title to the Notional Rent

funds as opposed to mere physical possession." *See id.* at 103-04. The court further explained

that the financial institution was "no different from a courier or an intermediary on a wire transfer;

it held the Notional Rent funds only for the purpose of fulfilling an instruction to make the funds

available to a third party. There is no allegation . . . that Bank of America used the funds for

another purpose." *Id.* The court held that the trustee was not a "'transferee' for the purposes of

its avoidance actions." *Id.*

Similarly, the Liquidators cannot successfully argue that Deutsche Bank had *de facto*

dominion and control over the Trade Finance CLO's assets because Deutsche Bank was pledged

title and granted a security interest in the Trade Finance CLO's accounts for the benefit of the

Noteholders because that grant of rights does not equate to the necessary dominion and control.

In *Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716, 728 (6th Cir. 2017), the Sixth Circuit

rejected the argument that a security interest in an account gave a secured party dominion and

control over all funds deposited into the account. There, a bank held a security interest on a

debtor's account. *Id.* at 727-28. The Sixth Circuit explained that the bank was not a transferee

because the terms of the security agreement made clear that the debtor could "use its money and

other assets however it wanted." *Id.* at 728.

Similarly, a bankruptcy court recently rejected an argument that a bank gained dominion

and control over an account merely by having a security interest in such account:

> the bank's security interest in the bank account, or ability to use the
> funds in a bank account for its lending operation is not requisite
> "dominion and control" to permit the bank to withdraw all funds
> from the account for its own use or convert the funds to its own use.

*In re Runnymede Capital Mgmt., Inc.* 616 B.R. 67, 72 (Bankr. W.D. Va. 2020). The court also

rejected the argument that the bank's contract requiring the maintenance of a bank account, or the

bank's ability to view account activity, vested the bank with dominion and control. *Id.* Ultimately, the court held that, as a matter of law, the bank was not an initial transferee. *Id.* at 73.

The Liquidators do not and cannot meet their burden to establish that Deutsche Bank had "dominion and control" over the "DBTCA Transfers," as required under the NY DCL. The funds were transferred through the Trade Finance CLO's accounts at IIG's direction to repay the Noteholders. The Liquidators' attempt to impose substantial fraudulent conveyance liability on Deutsche Bank is precisely the draconian result that courts across the country have refused to impose on financial institutions that merely facilitate the flow of funds through the financial markets in the ordinary course of business.

**II.    The Secondary New York Law Claims (Counts 5, 13) Should Be Dismissed Because the Liquidators Cannot Allege Deutsche Bank Aided or Abetted IIG.**

The two secondary New York law claims against Deutsche Bank should be dismissed because both counts fail to provide specific facts required to plausibly allege "aiding and abetting" claims. To survive a motion to dismiss, Federal Rule of Civil Procedure 9(b) requires that a complaint include "specific facts giving rise to a strong inference of actual knowledge regarding the underlying fraud." *See Green Star Energy Sols., LLC v. Edison Props., LLC*, No. 21-cv-2682(LJL), 2022 WL 16540835 at *14 (S.D.N.Y. Oct. 28, 2022) (dismissing aiding and abetting fraud claim) (internal punctuation and citations omitted). Conclusory allegations are not enough. *Krys v. Pigott*, 749 F.3d 117, 130 (2d Cir. 2014) (affirming dismissal of aiding and abetting claims for failure to sufficiently allege actual knowledge of fraud and breach of fiduciary duty).

21

A.    **Count 5 For Aiding And Abetting Fraud Fails Because There Are No Well-Pleaded Allegations Concerning Deutsche Bank's Actual Knowledge of IIG's Fraud or Deutsche Bank's Substantial Participation in Such Fraud.**

To establish liability for aiding and abetting fraud, the plaintiffs must allege: (1) the existence of a fraud;[11] (2) the defendant's actual knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission. *See JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005); *see also Franco v. English*, 620 N.Y.S.2d 156, 159 (3d Dep't 1994) (requiring "nexus between the primary fraud, [defendant's] knowledge of the fraud and what it did with the intention of advancing the fraud's commission.").

i.    **The Complaint Fails to Plead Deutsche Bank's "Actual Knowledge" of IIG's Fraud.**

Aiding and abetting fraud requires "actual knowledge [of the primary violation], not mere notice or unreasonable awareness." *See Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 152 (S.D.N.Y. 2000) (citing *Samuel M. Feinberg Testamentary Trust v. Carter*, 652 F. Supp. 1066, 1082 (S.D.N.Y. 1987)). Pleading "actual knowledge" for an aiding and abetting claim "requires allegations of facts that give rise to a 'strong inference' of actual knowledge." *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 412 (S.D.N.Y. 2021) (citing *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007)). "Allegations that the defendant 'should have known of the conduct' are insufficient to raise an inference of actual knowledge . . . ." *Id.* (citing *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010)). "[A]llegations of a 'bank's negligent failure to identify warning signs of fraudulent activity, . . . even where such signs converge to form a veritable forest of red flags,'" are also insufficient. *Id.* (citing *Heinert v. Bank of Am., N.A.*, 410 F. Supp. 3d 544, 549-50 (W.D.N.Y. 2019)). If a defendant is under no independent duty to act,

---

[11] For purposes of this motion, Deutsche Bank concedes that the Liquidators have alleged IIG's underlying fraud.

allegations that the defendant ignored obvious warning signs of fraud are not sufficient to allege

"actual knowledge." *Id.* (citing *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536,

547 (S.D.N.Y. 2007)). The Liquidators have alleged, at most, that Deutsche Bank could have

suspected that IIG was running a Ponzi-like scheme.

In *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006), the Second Circuit, among

other things, affirmed a lower court dismissal of aiding and abetting fraud claims. Investors sued

three banks, alleging that they aided a lawyer's fraud scheme by failing to report overdrafts on

attorney fiduciary accounts and otherwise actively concealing overdrafts. *Id.* at 281-82. The

allegations of the banks' knowledge are detailed; for example, the plaintiffs alleged that the

primary wrongdoer "had a close business relationship with Leonard Patnoi, then the branch

manager," and that "Patnoi agreed not to report the bounced check to the Lawyers' Fund and to

respond to any inquiries about them by vouching that there were double-digit million-dollar

balances in the accounts." *Id.* The district court dismissed the action. *Id.* at 283. The Second

Circuit held, among other things, that the allegations did not give rise to a strong inference that the

banks had actual knowledge of the attorney's looting of client funds. *Id.* at 292-93. The Second

Circuit explained that overdrawn fiduciary accounts, numerous dishonored checks and even fund

transfers from fiduciary accounts to a personal account were "insufficient to establish a claim for

aiding and abetting fraud because, although they may have put the banks on notice that some

impropriety may have been taking place, those alleged facts do not create a strong inference

of actual knowledge of [the defendant's] outright theft of client funds." *Id.* at 294. Here, there is

not even a weak inference among the voluminous allegations that anyone affiliated with Deutsche

Bank actually knew (or even suspected) what IIG was doing and planning to do. Here, unlike in

*Lerner*, there are no allegations of particular bank personnel having conversations about how to conceal the primary wrongdoer's troubled financial condition.

Nonetheless, the Liquidators ask this Court to infer that Deutsche Bank had actual knowledge of fraud merely because it prepared monthly trustee reports evidencing the Trade Finance CLO's poor performance and IIG's disorganized recordkeeping. (Cmplt. at ¶ 71 (Deutsche Bank "had access to an abundance of information . . . ."); *id.* at ¶ 73 (Deutsche Bank "knew that the absence of basic repayment terms was both problematic and highly suspicious."); *id.* at ¶ 104) ("a critical mass of the loans . . . were not being repaid . . . .").) These allegations are not enough, particularly given that the contractually-defined duties of an indenture trustee do not give rise to a duty to audit or investigate IIG. In fact, the Liquidators effectively concede that the complaint is relying upon allegations of constructive knowledge. (*Id.* at ¶ 146) ("[Deutsche Bank] and the Noteholders also knew or reasonably should have known . . . .").

Other allegations are even more strained. No court could reasonably determine that the fact that Deutsche Bank knew that some borrowers were involved in "legal proceedings" with IIG, (*see id.* at ¶ 152), creates a reasonable inference that Deutsche Bank had actual knowledge of IIG's fraud. There is no reason to infer that every bank that knows a customer is in litigation has "actual knowledge" that its customer is involved in fraud. But, in the absence of facts, these are the weak inferences that the Liquidators have asked this Court to draw.

**ii.      The Complaint Fails to Allege that Deutsche Bank Provided "Substantial Assistance" To IIG.**

The allegations of Deutsche Bank's processing of routine banking transactions and alleged inaction do not rise to the level of "substantial assistance." In *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379 (S.D.N.Y. 2021) (granting motion to dismiss aiding and abetting fraud claim), this court explained that, "[t]o plead substantial assistance, a plaintiff generally must plead facts from

24

which the court can infer that (1) the defendant affirmatively assisted, helped conceal, or failed to act when required to enable the fraud to proceed; and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Id.* at 416 (citing *Rosner v. Bank of China*, No. 06-cv-13562, 2008 WL 5416380, at *12 (S.D.N.Y. Dec. 18, 2008)) (internal quotations omitted). "Inaction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act." *Id.* (quoting *Rosner*, 2008 WL 5416380, at *5). "[I]naction constitutes substantial assistance for purposes of aiding and abetting liability only when the defendant owes a fiduciary duty directly to the plaintiff." *Id.* at 417 (citing *Lerner*, 459 F.3d at 295). Moreover, "[t]he provision of routine banking services to alleged fraudsters, even if it aids in the commission of the fraud, simply does not qualify as substantial assistance." *Id.*

Count 5, where the allegations of substantial assistance should be set forth, alleges that Deutsche Bank "execut[ed] money transfers," "serv[ed] as cash management bank," and "process[ed] the bank transfer." (*See* Cmplt. ¶ 250.) There can be no more routine banking services. There can also be no dispute that these allegations do not amount to "substantial assistance" under New York law.

The allegations beyond routine banking services are speculative and deficient. The Liquidators allege that Deutsche Bank "help[ed] IIG avoid KYC and anti-money laundering reviews," (*see id.* ¶ 250), and speculate that had Deutsche Bank intervened, "that would have hindered or stopped the fraud." (*See id.*) The Liquidators have not—because they cannot— provide reasonably particular facts to tie their conclusory allegations to "substantial participation" or even a relevant duty. The Liquidators cannot explain why Deutsche Bank would conduct

"KYC" due diligence on the Trade Finance CLO's borrowers (who were not Deutsche Bank's customers) or how this alleged inquiry mattered. The Liquidators do not even allege when these KYC failings occurred, presumably because the statute of limitations would bar liability for alleged acts that occurred almost decade ago.

Recognizing the absence of meaningful allegations of assistance, the Liquidators allege that an unnamed Deutsche Bank employee failed to act upon receipt of "material sent to potential investors." (*Id.*) There is no allegation that Deutsche Bank edited, discussed, or even read the "material." There is not even an allegation of what the "material" stated and whether the investors in the Global Fund or the Structured Fund relied upon what Deutsche Bank allegedly saw before IIG distributed copies. Mere inaction is no grounds for liability where, as here, Deutsche Bank is not alleged to have violated a fiduciary or contractual duty. *Berdeaux*, 561 F. Supp. 3d at 416-17. The Liquidators do not allege that Deutsche Bank owed a fiduciary duty, and have not cited to any of Deutsche Bank's contractual duties. In fact, the Liquidators fail to cite to any section of the Indenture or any other agreement. Instead, the Liquidators make immaterial allegations such as "on information and belief, [Deutsche Bank] did not raise any concerns with the offering memoranda" distributed by IIG to the potential investors in the Global Fund or the Structured Fund. (Cmplt. at ¶ 138.) The Liquidators do not—because they cannot—allege that Deutsche Bank commented on, or even read, the offering memoranda. This is precisely the type of mere inaction that does not give rise to liability.

### B.    Count 13 Should Be Dismissed Because the Complaint Fails to Allege that Deutsche Bank "Knowingly Participated" In A Breach Of Fiduciary Duty.

To state a claim for inducing or participating in a breach of fiduciary duty, a plaintiff must allege: (1) a breach by a fiduciary of obligations to another; (2) that the defendant knowingly induced or participated in the breach; and (3) that the plaintiff suffered damage as a result of the

breach. *Kaufman v. Cohen,* 760 N.Y.S.2d 157, 169 (1st Dep't 2003); *accord In re Sharp Int'l Corp.,* 403 F. 3d 43, 49 (2d Cir. 2005); *see also Wechsler v. Bowman,* 285 N.Y. 284, 291 (1941). There is no practical difference between "participation" and "substantial assistance" in the context of aiding and abetting liability. *See Cromer Finance Ltd. v Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) (New York law has defined both "substantial assistance" and "participation" to exist where a defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed") (citations omitted); *see also Kolbeck v Lit Am., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996) (defendant may be held liable for "participating" in another's breach of fiduciary only if the defendant provided "substantial assistance" to the primary violator). Indeed, the Second Circuit noted that a cause of action for "inducing and participating" in a breach of fiduciary duty was "analogous" to one for "aiding and abetting a securities fraud." *Whitney v Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986).

In *Renner v. Chase Manhattan Bank*, No. 98-cv-926 (CSH), 2000 WL 781081, at *21 (S.D.N.Y. June 16, 2000), the court granted a motion to dismiss a claim for aiding and abetting breach of fiduciary duty. The plaintiff argued that the defendant bank had "actual knowledge" of a prime bank guarantee scam because the bank rejected letters of credit due to suspicion that the plaintiff intended to use the letters for fraudulent purposes. *Id.* at *1. The court rejected this argument, concluding that there was "no factual basis for the assertion that Chase officials actually knew that the [suspected] fraud was, in fact, occurring." *Id.* at *12. Here, too, no Deutsche Bank employees are alleged to have had knowledge of IIG's fraud. In fact, lengthy sections of the complaint expressly exclude Deutsche Bank from the particularized allegations of knowledge. (*See* Cmplt. at ¶¶ 89-125.) There are no allegations of emails or other communications involving Deutsche Bank that can be characterized as actual knowledge of fraud. Likewise, *Berdeaux*, 561 F.

27

Supp. 3d 379, and *Lerner*, 459 F.3d 27, support a motion to dismiss Count 13 in the same way that

they support dismissal on Count 5: the Liquidators have failed to allege "actual knowledge."

    The complaint also fails to meet the participation standard. The complaint characterizes

Deutsche Bank as a mere "tool" misused by IIG "to further its fraud." (Cmplt. at ¶ 54.) This Court

should not allow the Liquidators an inference that Deutsche Bank participated in IIG's scheme

when the Liquidators also allege that Deutsche Bank did not even "understand[] the deal" (*id.* at ¶

101) and "totally failed" to perform (*id.* at ¶ 64). Simply stated, the complaint does not and cannot

connect the dots between Deutsche Bank and IIG's scheme because Deutsche Bank did not know

about it and did not participate in it. Therefore, the aiding and abetting a breach of fiduciary duty

claim against Deutsche Bank must be dismissed.

### III.    The Cayman Islands Law Claims (Counts 6-7, 14-17) Fail Because New York Law Applies to This Adversary Proceeding.

    The Liquidators' attempt to bring two common law conspiracy claims under Cayman

Islands law (Counts 7 and 15) as well as four statutory Cayman Islands claims (Counts 6, 14,

16 and 17) fails because New York law applies. There is no reasonable basis to apply Cayman

Islands law in this adversary proceeding. The primary link to the Cayman Islands is the domicile

of the debtors and the Liquidators. (*See* Cmplt. at ¶¶ 20-23.) Under well-settled choice-of-law

principles, that is not enough. Chapter 15 of the Bankruptcy Code was not designed to permit

mixing and matching of multiple countries' laws merely because a plaintiff in an adversary

proceeding prefers certain elements of each country's laws or would otherwise prefer to complicate

dispute resolution. For the following reasons, Cayman Islands law should not be applied.

#### A.    New York Law Applies to this Dispute Because New York Has the Greatest Concern With the Specific Issues Raised by the complaint.

    The first question to resolve in determining whether to undertake a choice of law analysis

is whether there is an actual conflict of law. *See Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.

1998).[12] The Liquidators have apparently taken the position that a conflict exists between Cayman

Islands law and New York law by pleading parallel claims regarding the same allegations under

both laws. As the Liquidators concede in Counts 1 through 5 and 8 through 13, New York law

applies to both their fraudulent conveyance and common law claims. That is not surprising

because New York's conflict of law rules, which this Court must apply, require that New York

law applies to this dispute. In the absence of a significant federal policy, bankruptcy courts should

apply conflict of laws rules from the state in which the bankruptcy court is located. *See In re

Gaston & Snow*, 243 F.3d 599, 605-607 (2d Cir. 2001); *see also In re: B.C.I. Finances Pty Ltd.*,

583 B.R. 288, 296-97 (Bankr. S.D.N.Y. 2018) (applying New York choice-of-law rules). Nothing

in the 336 paragraphs of the prolix complaint even suggests a significant federal policy to the

contrary.

Pursuant to New York law's "interest analysis," courts apply a flexible approach that gives

"controlling effect to the law of the jurisdiction which … has the greatest concern with the specific

issue raised in the litigation." *See In re ICP Strategic Income Fund, Ltd.*, 730 Fed. App'x. 78,

81 (2d Cir. 2018) (*citing Babcock v. Jackson*, 12 N.Y.2d 473, 481 (1963)); *see also Aviles v. S &

P Global, Inc.*, No. 17-cv-2987(JPO), 2020 WL 1689405, *4 (S.D.N.Y. Apr. 6, 2020) (applying

New York law rather than foreign law). Where, as here, laws regulate conduct, courts apply "the

law of the jurisdiction which, because of its relationship or contact with the occurrence or the

parties, has the greatest concern with the specific issue raised in the litigation." *See FIA Leveraged

Fund Ltd. v. Grant Thornton LLP*, 36 N.Y.S.3d 47 (Table) at *5 (N.Y. Sup. Ct. Jan. 19, 2016)

(N.Y. Sup. Ct. Jan. 19, 2016) (*citing Cooney v. Osgood Mach.*, 81 N.Y.2d 66, 72 (1993)). "The

---

[12] In the absence of a conflict, New York law will be applied if New York law is among the relevant choices. *See
J. Aron & Co. v. Chown*, 647 N.Y.S.2d 8, 8 (1st Dep't 1996) ("A choice-of-law analysis is not required, since there is
no conflict between the law of New York and that of [] the proposed foreign forum").

law where the tort occurred 'almost invariably' applies because 'that jurisdiction has the greatest interest in regulating behavior within its borders.'" *Id.* (applying New York law, not Cayman Islands law, to claims for malpractice arising from a fraudulent scheme).

There are plenty of allegations supporting New York's concern. The entity that is alleged to have orchestrated the fraud (defendant IIG) maintained its office in Times Square. (Cmplt. at ¶ 25.) According to the complaint, "IIG represented itself to be a New York-based trade finance specialist," (*id.* at ¶ 50,) and touted "ongoing monitoring effected by IIG's New York team." (*Id.* at ¶ 127.) Moreover, "[e]ach of the Defendants is either domiciled in New York or the United States, or otherwise purposely availed itself of the laws of . . . the State of New York by . . . investing in the New York law governed notes issued by the [Trade Fund] CLO, [and] receiving the transfers that are at issue in this action from a [Deutsche Bank] account in New York . . . ." (*Id.* at ¶ 18.)

IIG's principals, David Hu and Martin Silver, have admitted their fraud and are in prison "through a final judgment issued on consent obtained by the Securities and Exchange Commission . . . ." (*Id.* at ¶ 4.) The criminal proceeding was conducted, as it should have been, in the federal courts of the State of New York by New York-based government attorneys. (*Id.* at ¶¶ 207, 209.)[13] There can be no reasonable dispute that New York has the greatest interest in regulating the behavior of IIG, Deutsche Bank and the Noteholders, all of whom are alleged to have maintained headquarters in Manhattan. Furthermore, the Liquidators have conceded that the contracts that form the foundation of this proceeding are all governed by New York law. (*Id.* at

---

[13] The SEC's investigation was conducted by the New York Regional Office, with the assistance of the U.S. Attorney's Office for the Southern District of New York. *See* https://www.sec.gov/litigation/litreleases/lr-25673 and https://www.sec.gov/litigation/litreleases/lr-25530.

¶ 18.) So, too, Deutsche Bank was required to conduct its duties as indenture trustee pursuant to contracts expressly governed by New York law. (*Id*. at ¶ 142.)

Whatever it is that the defendants allegedly did or did not do, there are no allegations that they did it anywhere but in New York. There is no allegation that Deutsche Bank was ever in the Cayman Islands or participated in efforts to cause harm in the Cayman Islands. There is simply nothing to support a finding that the Cayman Islands has any concern, much less the greatest concern.

Because New York has the greatest interest in the outcome of this litigation, New York law should be applied in this case. Because New York law applies, the Liquidators' foreign law claims—Counts 6, 7, 14, 15, 16, and 17—should be dismissed. Courts in this district have dismissed foreign law claims at the pleading stage for substantially similar reasons. *See Aviles*, 2020 WL 1689405 at *5 (dismissing Argentine and Japanese law claims after determining that New York law applied). In *Aviles*, investors sought relief for losses they suffered after mutual funds transferred the entire portfolio of assets for far less than actual value, resulting in insolvency. *Id.* at *1. The court declined to apply foreign laws because the plaintiffs could not disturb the presumption that the place of the allegedly wrongful conduct provides the governing conduct-regulating rules. *Id.* at *5.

So, too, in *Pennecom B.V. v. Merrill Lynch & Co.*, the court dismissed Polish and Dutch law claims under Rule 12(b)(6) because no alleged facts suggested that either country had the "greatest interest" in the litigation. No. 02-cv-5355(DC), 2005 WL 2044948, at *4 (S.D.N.Y. Aug. 25, 2005) ("Netherlands has little connection to the case other than being the home of [plaintiff], and thus I decline to apply Dutch law.").

31

Likewise, in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155 (2d Cir. 2012), the Second Circuit affirmed the dismissal of tort claims brought under Israeli law by plaintiffs injured in Israel by terrorist attacks. The plaintiffs sued the defendant bank for facilitating its customers' wire transfers that ultimately helped fund the attacks. *See id.* at 156. The Second Circuit held that there was no basis for applying Israeli law where none of the bank's alleged conduct happened in Israel, even though "the plaintiffs' injuries occurred in Israel, and Israel is also the plaintiffs' domicile." *Id.* at 158.

### B.  The Liquidators Should Not be Permitted to Assert Conspiracy Claims Under Cayman Islands Law to Avoid Fatal Pleading Defects Under New York Common Law.

The Liquidators cannot identify any allegations of fact that support applying Cayman Islands law to the implausible claim that an unidentified Deutsche Bank employee reached an agreement with IIG and the Noteholders in New York to cause loss to unknown investors (Counts 7 and 15).[14] The Liquidators have likewise failed to offer a reasonable explanation why New York common law should apply to aiding and abetting claims (Counts 5 and 13), but Cayman Islands common law should apply to three other claims based on nearly identical allegations (Counts 7, 15, and 17). That failure is not surprising because the Liquidators' conspiracy claims would be summarily dismissed under New York law for three reasons.

*First*, "[t]here is no cause of action under New York law . . . for allegedly conspiring to commit a fraudulent transfer." *See In re Stillwater Asset Backed Offshore Fund Ltd.*, 559 B.R. 563, 622 (Bankr. S.D.N.Y. 2016) (granting motion to dismiss conspiracy claim).

---

[14] Count 7 is expressly pled under Cayman Islands law. (*See* Cmplt. at ¶ 260) ("At common law in the Cayman Islands, the tort of conspiracy to injure by unlawful means is established where . . . ."). Count 15 is silent as to which law applies, but incorporates "each and every allegation contained in the preceding paragraphs," (*see id.* at ¶ 310), which presumably includes paragraph 260's allegation about the Cayman Islands common law conspiracy claims.

*Second*, conclusory, formulaic allegations of a conspiracy are entitled to no weight. *See id.* at 621. The Liquidators offer nothing more than insufficient, bare bones allegations. (*See* Cmplt. at ¶¶ 261-62) (alleging the defendants "conspired to cause loss to the Investor-Assignors by unlawful means. It was understood and agreed by [the defendants] that the Investors-Assignors would invest in the Debtors and the funds raised by such investments would be used by Debtors to purchase interests in the [Trade Finance] CLO's loans."). At the same time, the Liquidators allege facts that make the existence of a conspiracy absurd. (*See id.* at ¶ 87 (in mid-2016, without notice to [Deutsche Bank], IIG "explore[d] various refinancing structures" with "several other financial institutions"); *id.* at ¶ 78 (IIG was able to "take its business to another bank (as it eventually did in 2018)").) It is implausible that Deutsche Bank was motivated to conspire with IIG for $50 wire transfer fees, yet also agreed to allow IIG to replace Deutsche Bank with other financial institutions that would receive those fees going forward.

*Third*, under New York law, a plaintiff may not reallege a tort asserted elsewhere in the complaint in the guise of a separate conspiracy claim. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12-cv-3723(RJS), 2016 WL 5719749, at *7-8 (S.D.N.Y. Sept. 29, 2016) (dismissing conspiracy claim as duplicative of aiding and abetting claim). Similarly, the Liquidators should not be permitted to assert a duplicative claim under the Cayman Companies Act § 147 for the exact same conduct that is the subject of a claim under New York law. That is, in Count 17, the Liquidators alleged that Deutsche Bank "was knowingly a party to" the fraud and "participated in IIG's fraudulent scheme" by failing to disclose that "approximately 40% of the loan interests that were being sold were more than four months past their maturities and in default," and otherwise providing "substantial assistance to IIG." (*See* Cmplt. at ¶¶ 332-33.) Count 5

contains nearly identical allegations regarding the default rate and other substantial assistance. (*Id.* at ¶¶ 249-50.)

Accordingly, this Court should dismiss the foreign law claims pursuant to Rule 12(b)(6), made applicable by Rule 7012 of the Federal Rules of Bankruptcy Procedure, because the focus of this dispute should be the numerous other claims arising under New York law.

## **CONCLUSION**

For the foregoing reasons, defendant Deutsche Bank Trust Company Americas respectfully requests that this Court dismiss all counts of the complaint against it (Counts 1, 2, 5-7, 9, 10, and 13-17) and for such other and further relief as the Court deems just.

DATED:  November 6, 2023

Respectfully submitted,

HOLLAND & KNIGHT LLP

Frank Morreale
Frank.Morreale@hklaw.com
Anthony F. Pirraglia
Anthony.Pirraglia@hklaw.com
31 West 52nd Street
New York, NY 10019
(212) 513-3887
(212) 385-1910

*Counsel for Deutsche Bank Trust Company Americas*