UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>IIG Global Trade Finance Fund Ltd. (in Official Liquidation), *et al.*,<br><br>Debtors. | Case No. 20-10132 (MEW)<br><br>Chapter 15<br><br>Jointly Administered |
| IIG Global Trade Finance Fund Limited (in Official Liquidation), IIG Structured Trade Finance Fund Limited (in Official Liquidation), Christopher Kennedy and Alexander Lawson, as assignees of the creditors of IIG Global Trade Finance Fund Limited (in Official Liquidation) and the creditors of IIG Structured Trade Finance Fund Limited (in Official Liquidation) and Christopher Kennedy and Alexander Lawson in their capacities as Joint Official Liquidators of IIG Global Trade Finance Fund Limited (in Official Liquidation), IIG Structured Trade Finance Fund Limited (in Official Liquidation),<br><br>Plaintiffs,<br><br>v.<br><br>International Investment Group L.L.C., Trade Finance Trust, Deutsche Bank Trust Company Americas, Assured Investment Management LLC (f/k/a BlueMountain Capital Management, LLC), Tennenbaum Capital Partners, LLC, KKR Credit Advisors (US) LLC, Elanus Capital Management, LLC, BlueMountain Foinaven Master Fund L.P., BlueMountain Logan Opportunities Master Fund L.P., BlueMountain Montenvers Master Fund SCA SICAV-SIF, BlueMountain Timberline Ltd., BlueMountain Kicking Horse Fund L.P., BlueMountain Credit Opportunities Master Fund I L.P., Tennenbaum Senior Loan Fund IV-B, LP, Tennenbaum Senior Loan Fund II, LP, Tennenbaum Senior Loan Operating III, LLC, Corporate Capital Trust, Inc., KKR Debt | Adv. Pro. No. 23-01165 (MEW)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF THE NOTEHOLDER DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** |

Investors II (2006) (Ireland) L.P., KKR TRS
Holdings, Ltd., KKR-PBPR Capital Partners L.P.,
Special Value Continuation Partners, LP, and
Elanus Capital Investments Master SP Series 1,
John Doe Subsequent Transferees 1-10,000,

Defendants.

Andrew J. Rossman
Deborah J. Newman
Blair A. Adams
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue
22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
andrewrossman@quinnemanuel.com
deborahnewman@quinnemanuel.com
blairadams@quinnemanuel.com

*Attorneys for KKR Credit Advisors (US)
LLC, Corporate Capital Trust, Inc., KKR
Debt Investors II (2006) (Ireland) L.P.,
KKR TRS Holdings, Ltd., and KKR-PBPR
Capital Partners L.P.*

Philip D. Anker
Ross E. Firsenbaum
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8890
philip.anker@wilmerhale.com
ross.firsenbaum@wilmerhale.com

*Attorneys for Tennenbaum Capital
Partners, LLC, Tennenbaum Senior Loan
Fund II, LP, Tennenbaum Senior Loan
Fund III, LP, Tennenbaum Senior Loan
Fund IV-B, LP, and Special Value
Continuation Partners, LLC*

Philippe Z. Selendy
David S. Flugman
Claire O'Brien
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 390-9000
pselendy@selendygay.com
dflugman@selendygay.com
cobrien@selendygay.com

*Attorneys for Assured Investment
Management LLC (f/k/a BlueMountain
Capital Management, LLC and n/k/a Sound
Point Luna LLC), BlueMountain Foinaven
Master Fund L.P., BlueMountain Logan
Opportunities Master Fund L.P.,
BlueMountain Montenvers Master Fund SCA
SICAV-SIF, BlueMountain Timberline Ltd.,
and BlueMountain Kicking Horse Fund L.P.*

Mark A. Weissman
OFFIT KURMAN PA
590 Madison Avenue
6th Floor
New York, New York 10022
Telephone: (212) 545-1900
mark.weissman@offitkurman.com

*Attorneys for Elanus Capital Management
LLC and Elanus Capital Investment Master
SPC on behalf of, and in the name of, Elanus
Capital Investments Master SP Series 1*

## TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................5

    A.    Defendant IIG Is Formed ...........................................................5

    B.    Defendant IIG Creates The CLO Fund And Fraudulently Induces The
Noteholder Funds To Invest In It...............................................................6

    C.    The Noteholder Managers Supposedly Become Aware That The CLO
Fund Is Not Performing As Expected ......................................................7

    D.    IIG Seeks To Refinance The CLO Fund Notes .........................................9

    E.    IIG Orchestrates The Sale Of The CLO Fund's Assets To GTFF And
STFF ........................................................................................................12

    F.    IIG Is Revealed To Be A Criminal Enterprise.........................................13

    G.    GTFF And STFF Commence Liquidation Proceedings .........................14

    H.    The Liquidators Commence This Adversary Proceeding.....................14

LEGAL STANDARD...............................................................................................16

ARGUMENT .........................................................................................................16

I.    THE COURT SHOULD DISMISS THE AVOIDANCE CLAIMS................................16

    A.    The Court Should Dismiss Counts 1, 2, 6, And 16 Because They Are
Barred By The Safe Harbor Set Forth In Section 546(e) Of The
Bankruptcy Code .....................................................................................16

        1.    The Transfers At Issue In Counts 1, 2, 6, And 16 Are Protected By
The Safe Harbor...........................................................................17

            a.    The Relevant Transfers Were From GTFF And STFF,
Through TFT, To DBTCA............................................................18

            b.    The Transfers Were Both Made In Connection With A
Securities Contract And Are Settlement Payments ......................21

            c.    The Transfers Were Made To And For The Benefit Of
Financial Institutions...................................................................25

2.      Because The Safe Harbor Would Bar Counts 1, 2, 6, And 16 In A
        Case Under Chapter 11, Bankruptcy Code Section 561 Mandates
        They Cannot Be Pursued Here .................................................................28

B.      The Court Should Dismiss Counts 9 and 10 Because The Debtors Ratified
        The Relevant Transfers And The Transferred Funds Were Never TFT
        Property .........................................................................................................30

        1.      The Debtors Are Barred From Challenging The Transfers From
                TFT Because They Participated In And Had Full Knowledge Of
                Them ........................................................................................................30

        2.      TFT Never Had Dominion And Control Over The Transfers, And
                Therefore Its Creditors May Not Sue To Recover Them .........................32

C.      The Court Should Dismiss Counts 6, 14, And 16 Because Cayman Islands
        Avoidance Laws Do Not Apply .....................................................................33

        1.      New York Choice of Law Rules Apply ....................................................34

        2.      New York Choice Of Law Rules Require The Application Of New
                York Law .................................................................................................35

II.     THE COURT SHOULD DISMISS THE DAMAGES CLAIMS ....................................37

A.      The Court Should Dismiss Count 4 Because Plaintiffs Fail To State A
        Claim For Aiding And Abetting Fraud .........................................................39

        1.      Plaintiffs Fail To Allege That The Noteholder Managers Had
                Actual Knowledge Of IIG's Fraud ...........................................................39

        2.      Plaintiffs Fail To Allege That The Noteholder Managers
                Substantially Assisted IIG's Fraud ..........................................................46

B.      The Court Should Dismiss Count 12 Because Plaintiffs Fail To State A
        Claim For Aiding And Abetting Breach Of Fiduciary Duty By IIG ...................49

        1.      Plaintiffs Fail To Allege That The Noteholder Managers Had
                Actual Knowledge Of A Breach Of Fiduciary Duty By IIG ...................51

        2.      Plaintiffs Fail To Allege That The Noteholder Managers
                Substantially Assisted A Breach Of Fiduciary Duty By IIG ...................53

C.      The Court Should Dismiss Counts 7, 15, And 17 Because Plaintiffs Fail
        To State A Claim For Damages Under Cayman Islands Law ..............................55

        1.      Cayman Islands Law Does Not Apply To Counts 7, 15, And 17 .............55

2.      Plaintiffs' Damages Claims Fail Even If Cayman Islands Law
        Applies ...................................................................................................58

        a.      Rule 9(b) Applies To Plaintiffs' Cayman Islands Damages
                Claims ..........................................................................................58

        b.      Plaintiffs Fail To Allege Their Cayman Conspiracy Claims
                With Particularity.........................................................................59

        c.      Plaintiffs Fail To Allege Their Cayman Fraudulent Trading
                Claim With Particularity ...............................................................62

III.    THE COURT SHOULD DISMISS THE COMPLAINT WITH PREJUDICE ...............62

CONCLUSION.......................................................................................................63

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Recovery Tr.*,
    634 F.3d 678 (2d Cir. 2011) ..................................................................................31

*AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*,
    11 N.Y.3d 146 (2008) ...................................................................................45, 46

*Anderson Kill P.C. v. Anderson Kill P.C. as Escrowee*,
    46 Misc.3d 1219(A), N.Y. Slip Op. 50120(U) (N.Y. Sup. Ct., N.Y. County
    2015) ......................................................................................................................33

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................................16

*Attestor Value Master Fund v. Republic of Arg.*,
    940 F.3d 825 (2d Cir. 2019) ................................................................................62

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*,
    969 F. Supp. 2d 339 (S.D.N.Y. 2013) .................................................................53

*In re Bankruptcy Estate of Norske Skogindustrier ASA*,
    629 B.R. 717 (Bankr. S.D.N.Y, 2021) ........................................................ *passim*

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................16

*Berdeaux v. OneCoin Ltd.*,
    561 F. Supp. 3d 379 (S.D.N.Y. 2021) ......................................................40, 42, 43

*In re Bernard L. Madoff Inv. Secs. LLC.*,
    721 F.3d 54 (2d Cir. 2013) *cert. denied sub nom. Picard v. HSBC Bank PLC*,
    134 S. Ct. 2895 (2014) .........................................................................................50

*In re Bernard L. Madoff Inv. Secs. LLC*,
    773 F.3d 411 (2d Cir. 2014) ................................................................................22

*Bonded Financial Servs., Inc. v. European Am. Bank*,
    838 F.2d 890 (7th Cir. 1988) ...............................................................................27

*In re Boston Generating LLC*,
    617 B.R. 442 (Bankr. S.D.N.Y. 2020) ................................................19, 21, 22, 25

*In re Caisse*,
    568 B.R. 6 (Bankr. S.D.N.Y. 2017) .....................................................................59

*Chemtex, LLC v. St. Anthony Enters., Inc.*,
    490 F. Supp. 2d 536 (S.D.N.Y. 2007)....................................................................44

*City of Almaty v. Sater*,
    503 F. Supp. 3d 51 (S.D.N.Y. 2020).....................................................................58

*In re Comcoach Corp.*,
    698 F.2d 571 (2d Cir. 1983)................................................................................32

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)...................................................................46

*Demaitre v. City of N.Y.*,
    2020 WL 6048192 (S.D.N.Y. Oct. 11, 2020) .........................................................27

*Emjayco v. Morgan Stanley & Co.*,
    1996 WL 452266 (S.D.N.Y. Aug. 8, 1996), *aff'd*, 125 F.3d 843 (2d Cir. 1997) ...................57

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
    651 F.3d 329 (2d Cir. 2011)................................................................................24

*Fairfield Sentry Ltd. v. Citibank, N.A.*,
    630 F. Supp. 3d 463 (S.D.N.Y. 2022)...............................................................28, 29

*Filler v. Hanvit Bank*,
    2003 WL 22110773 (S.D.N.Y. Sept. 12, 2003)...................................................38, 48

*In re Gaston & Snow*,
    243 F.3d 599 (2d Cir. 2001)................................................................................34

*Graef v. Ricoh, USA, Inc.*,
    2020 WL 950282 (N.D.N.Y. Feb. 27, 2020) .........................................................23

*Guerrand Hermes v. J.P. Morgan & Co. Inc.*,
    2 A.D.3d 235 (1st Dep't 2003) ............................................................................53

*Heinert v. Bank of Am. N.A.*,
    835 F. App'x 627 (2d Cir. 2020) ..........................................................................42

*Holliday v. Credit Suisse Secs.*,
    2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021), *appeal docketed*, No. 21-2543
    (2d Cir. Oct. 8, 2021) ............................................................................... *passim*

*Hongying Zhao v. JPMorgan Chase & Co.*,
    2019 WL 1173010 (S.D.N.Y. Mar. 13, 2019) .......................................................52

*Huang v. Hong Kong & Shanghai Banking Corp. LTD*,
    2022 WL 4123879 (S.D.N.Y. Sept. 9, 2022).......................................................40, 42

*ICD Cap., LLC v. CodeSmart Holdings, Inc.*,
  2020 WL 3961617 (S.D.N.Y. Jul. 13, 2020), *aff'd*, 842 F. App'x 705 (2d Cir.
  2021) ...............................................................................................................................54

*In re ICP Strategic Credit Income Fund Ltd.*,
  2015 WL 5404880 (Bankr. S.D.N.Y. Sept. 15, 2015), *aff'd*, 568 B.R. 596
  (S.D.N.Y. 2017), *aff'd sub nom. In re ICP Strategic Income Fund, Ltd.*, 730 F.
  App'x 78 (2d Cir. 2018)..........................................................................................49, 50

*Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*,
  363 F.3d 137 (2d Cir. 2004).........................................................................................35

*J. Aron Co. v. Chown*,
  231 A.D.2d 426 (1st Dep't 1996) .................................................................................35

*Jacobson v. Peat, Marwick, Mitchell & Co.*,
  445 F. Supp. 518 (S.D.N.Y. 1977) ...............................................................................38

*Jalbert v. Flom*,
  633 B.R. 25 (Bankr. S.D.N.Y. 2021) ............................................................................34

*Kaufman v. Cohen*,
  307 A.D.2d 113 (1st Dep't 2003) ...........................................................................51, 54

*Kirschner v. KPMG LLP*,
  15 N.Y.3d 446 (2010) ...................................................................................................45

*Kramer v. TimeWarner Inc.*,
  937 F.2d 767 (2d Cir. 1991).........................................................................................26

*Krys v. Pigott*,
  749 F.3d 117 (2d Cir. 2014)...........................................................................39, 44, 49

*Lehman Bros. Holdings v. JPMorgan Chase Bank, N.A. (In re Lehman Bros.
  Holdings)*,
  469 B.R. 415 (Bankr. S.D.N.Y. 2012) ....................................................................17, 22

*In re Level 8 Apparel, LLC*,
  2021 WL 279620 (Bankr. S.D.N.Y. Jan. 26, 2021)......................................................47

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  672 F.3d 155 (2d Cir. 2012)..............................................................................33, 35, 36

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  739 F.3d 45 (2d Cir. 2013)...........................................................................................36

*Lyman Com. Sols, Inc. v. Lung*,
  2013 WL 4734898 (S.D.N.Y. Aug. 30, 2013)..............................................................35

*Lyman Com. Sols., Inc. v. Lung*,
  2014 WL 476307 (S.D.N.Y. Feb. 6, 2014) ..................................................................34, 36

*In re Lyondell Chem. Co.*,
  503 B.R. 348 (Bankr. S.D.N.Y. 2014) *abrogated on other grounds* by *In re
  Trib. Co. Fraudulent Conv. Litig.*, 818 F.3d 98, 119 (2d Cir. 2016), *opinion
  vacated and superseded*, 946 F.3d 66 (2d Cir. 2019) ............................................................31

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
  138 S. Ct. 883 (2018) ......................................................................................... *passim*

*Mobil Sales & Supply Corp. v. Xenakis*,
  1980 WL 6688476 (S.D.N.Y. Jan. 15, 1980) ..........................................................................46

*Morin v. Trupin*,
  711 F. Supp. 97 (S.D.N.Y. 1989) ..........................................................................................47

*In re Nat'l Forge Corp.*,
  344 B.R. 340 (W.D. Pa. 2006) ..............................................................................................25

*Nat'l Westminster Bank USA v. Weksel*,
  124 A.D.2d 144 (1st Dep't 1987) ..........................................................................................47

*In re Nine West LBO Secs. Litig.*,
  482 F. Supp. 3d 187 (S.D.N.Y. 2020) ....................................................................................17

*Nw. Mut. Life Ins. Co. v. Bank of Am. Secs. LLC*,
  254 F. Supp. 2d 390 (S.D.N.Y. 2003) ....................................................................................58

*In re Old CarCo LLC*,
  435 B.R. 169 (Bankr. S.D.N.Y. 2010) ..................................................................................63

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  446 F. Supp. 2d 163 (S.D.N.Y. 2006) ....................................................................................54

*In re Quebecor World (USA) Inc.*,
  719 F.3d 94 (2d Cir. 2013), *abrogated on other grounds by Merit Mgmt. Grp.,
  LP v. FTI Consulting*, 138 S. Ct. 883 ....................................................................................23

*In re Refco Inc.*,
  505 F.3d 109 (2d Cir. 2007) ..................................................................................................32

*In re Refco Inc. Sec. Litig.*,
  892 F. Supp. 2d 534 (S.D.N.Y. 2012) ....................................................................................57

*In re Refco, Inc. Secs. Litig.*,
  2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009) *report and recommendation
  adopted by*, 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010) ....................................................31

*Republic of Kazakhstan v. Chapman*,
217 A.D.3d 515 (1st Dep't 2023) .......................................................................56, 57

*Ridge Clearing & Outsourcing Sols., Inc. v. Khashoggi*,
2011 WL 3586455 (S.D.N.Y. Aug. 12, 2011), *aff'd sub nom. Broadridge Sec.
Processing Sols., LLC v. Khashoggi*, 507 F. App'x 57 (2d Cir. 2013)...................45

*In re Schick*,
234 B.R. 337 (Bankr. S.D.N.Y. 1999) ....................................................................33

*In re Sharp Int'l. Corp.*,
403 F.3d 43 (2d Cir. 2005)........................................................................48, 50, 53

*SPV Osus Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018)....................................................................................53

*Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*,
64 A.D.3d 472 (2009) ..............................................................................................56

*In re SunEdison, Inc.*,
620 B.R. 505 (Bankr. S.D.N.Y. 2020) ......................................................19, 20, 21

*In re Toft*,
453 B.R. 186 (Bankr. S.D.N.Y. 2011) ....................................................................34

*In re Tribune Co. Fraudulent Conveyance Litig.*,
2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019), *aff'd in relevant part*, 10 F.4th
147 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1128 (2022) .......................................17

*In re Tribune Co. Fraudulent Conveyance Litig.*,
946 F.3d 66 (2d Cir. 2019)........................................................................... *passim*

*Tronlone v. Lac d'Amiante du Quebec*,
297 A.D.2d 528 (1st Dep't 2002), *aff'd*, 99 N.Y.2d 647 (2003) ...........................35

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*,
479 B.R. 405 (N.D. Tex. 2012).............................................................................31

*In re United Educ. Co.*,
153 F. 169 (2d Cir. 1907)........................................................................................23

**Statutes**

11 U.S.C. § 101 ............................................................................................ *passim*

11 U.S.C. § 546(e) ....................................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) ........................................................................................29

viii

11 U.S.C. § 561(d) ......................................................................................................28

11 U.S.C. § 741 ...............................................................................................22, 23, 24

NYDCL § 270 ............................................................................................................33

NYDCL § 273 ............................................................................................................32

NYDCL § 274 ............................................................................................................32

NYDCL § 275 ......................................................................................................32, 33

NYDCL § 276 ............................................................................................................32

NYDCL § 278 ............................................................................................................32

NYDCL § 279 ............................................................................................................34

**Rules**

Fed. R. Bankr. P. 2004 ...............................................................................................2, 63

Fed. R. Bankr. P. 7009 ..................................................................................................4

Fed. R. Bankr. P. 7012 ................................................................................................16

Fed. R. Civ. P. 9(b) ............................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ...............................................................................................16

Fed. R. Civ. P. 15(a)(2) ...............................................................................................62

Fed. R. Civ. P. 44.1 .....................................................................................................60

Fed. R. Civ. P. 201 ......................................................................................................26

**Other Authorities**

Defendant Deutsche Bank Trust Company Americas' Memorandum Of Law In
   Support Of Motion To Dismiss Counts 1, 2, 5-7, 9, 10, and 13-17 ..........................25

Deutsche Bank Trust Company Americas, BankFind Suite: Institution Details,
   FDIC.gov, https://banks.data.fdic.gov/bankfind-suite/bankfind/details/623 ...........26

Historical Listing of New York State Banks, N.Y.S. Dep't of Fin. Servs.,
   https://www.dfs.ny.gov/system/files/documents/2020/05/inst_hist_list_20200
   520.txt (last visited Nov. 5, 2023) ............................................................................26

Order Auth. Rule 2004 Disc. by Liquidators, *In re IIG Global Trade Finance Fund Ltd. (in Official Liquidation), et al.*, 20-bk-10132-MEW (Bankr. S.D.N.Y. Mar. 25, 2020), ECF No. 14 ...............................................................1, 14

Who We Supervise, N.Y.S. Dep't of Fin. Servs., https://myportal.dfs.ny.gov/web/guest-applications/who-we-supervise (last visited Nov. 5, 2023).............................................................................................26

Assured Investment Management LLC (f/k/a BlueMountain Capital Management, LLC and n/k/a Sound Point Luna LLC) ("BlueMountain"), Tennenbaum Capital Partners, LLC ("Tennenbaum"), KKR Credit Advisors (US) LLC ("KKR"), Elanus Capital Management, LLC ("Elanus," and together with BlueMountain, Tennenbaum, and KKR, the "Noteholder Managers"), and BlueMountain Foinaven Master Fund L.P., BlueMountain Logan Opportunities Master Fund L.P., BlueMountain Montenvers Master Fund SCA SICAV-SIF, BlueMountain Timberline Ltd., BlueMountain Kicking Horse Fund L.P., Tennenbaum Senior Loan Fund IV-B, LP, Tennenbaum Senior Loan Fund II, LP, Tennenbaum Senior Loan Fund III, LP, Corporate Capital Trust, Inc., Special Value Continuation Partners, LLC), KKR Debt Investors II (2006) (Ireland) L.P., KKR TRS Holdings, Ltd., KKR-PBPR Capital Partners L.P., and Elanus Capital Investments Master SP Series 1 (together, the "Noteholder Funds," and together with the Noteholder Managers, the "Noteholder Defendants"), by and through their respective undersigned counsel, respectfully submit this memorandum of law in support of the Noteholder Defendants' Motion To Dismiss The Complaint (the "Motion").

## PRELIMINARY STATEMENT

Over the course of several years, the co-founders and senior executives of the International Investment Group ("IIG") perpetrated a fraud that resulted in guilty pleas in federal criminal proceedings and a securities fraud action by the Securities and Exchange Commission. Certain investors in two IIG-affiliated funds, unable to recover the losses they suffered from unwittingly investing with fraudsters, attempt in this action to point the finger at the Noteholder Defendants, earlier investors who, too, were deceived by IIG's fraud. Wielding the largest of possible brushes, and with blatant disregard for the prohibition against group pleading, these investors attempt to paint the Noteholder Managers collectively as complicit in IIG's fraud. But even after receiving extensive pre-filing document and deposition discovery pursuant to Federal Rule of Bankruptcy

Procedure 2004 ("Rule 2004"), the paucity of any allegations tying any of the Noteholder Managers to IIG's underlying fraud leaves these investors, and the funds and joint liquidators who have sued on their behalf, with nothing but a blank canvas.

The two funds, IIG Global Trade Finance Fund Ltd. ("GTFF") and IIG Structured Trade Finance Fund Ltd. ("STFF," and together with GTFF, the "Debtors,"), and their joint official liquidators (the "Joint Liquidators," and together with the Debtors, "Plaintiffs")—admit in their Complaint that IIG fraudulently induced the GTFF and STFF investors who purportedly assigned their claims related to the Debtors to the Joint Liquidators and on whose behalf the Plaintiffs are acting (together, the "Investor-Assignors"),[1] as well as the Noteholder Funds to invest in debt securities pursuant to IIG's fraudulent scheme.  In 2013, IIG fraudulently induced the Noteholder Funds to purchase notes (the "Notes") issued by an IIG-managed collateralized loan obligation vehicle, Trade Finance Funding I Ltd. (the "CLO Fund"), which had acquired what IIG represented to the Noteholder Funds to be secured trade finance loans.  Unbeknownst to the Noteholder Defendants, some of those loans had defaulted or were fictitious.  Years later, in 2017, IIG created GTFF and STFF, backed by new investors, to acquire the assets from the CLO Fund.  The Complaint does not include a single allegation that the Noteholder Managers were involved in IIG's fraud with respect to its defaulted or fictitious loans.  And, while the Complaint contains general allegations not specific to any Noteholder Defendant that the "Noteholders" collectively reviewed draft offering materials for an offering that never happened (the so-called "CLO II"), it does not allege anywhere that the Noteholder Defendants were involved in reviewing any materials

---

[1] Plaintiffs allege that the Investor-Assignors are Aktia Bank PLX, Non-UCITS Fund Aktia Trade Finance, Citco Custody Ltd. – Ref Trade Financing Holding Ltd. (held on Behalf of AGC Equity Partners), LAM Enhanced Trade Finance Fund I L.P.  *See* Compl. at 1.

provided to the actual new investors in the actual investment vehicles that occurred, GTFF and STFF, or were involved in any other way in the solicitation of those new investors.

Plaintiffs nevertheless advance two theories for why they believe they are entitled to relief against the Noteholder Defendants. *First*, Plaintiffs claim that the Noteholder Funds are subsequent transferees of certain allegedly fraudulent transfers that the Plaintiffs seek to avoid. *Second*, Plaintiffs claim that the Noteholder Managers aided and abetted IIG's fraudulent scheme and thus are liable to Plaintiffs for damages. Plaintiffs generally seek to advance these claims in three capacities: on behalf of the Investor-Assignors, on behalf of the Debtors, and in the name of the Joint Liquidators themselves. Plaintiffs also seek to advance the claims under the laws of both New York and the Cayman Islands. Plaintiffs' attempts to avoid transfers to the Noteholder Funds and to hold the Noteholder Managers liable for IIG's fraud all fail.

This Court should dismiss Counts 1, 2, 6, 9, 10, 14, and 16 (together, the "Avoidance Claims"). Plaintiffs purport to bring a variety of Avoidance Claims, both under New York and Cayman Islands law, regarding the same transfers of funds—from GTFF and STFF (in which the Investor-Assignors invested) to the indenture trustee for the Notes (Deutsche Bank Trust Company Americas, or "DBTCA")—to redeem the Notes. Plaintiffs seek to hold the Noteholder Funds liable for these transfers as subsequent transferees of the transferred funds from DBTCA to the Noteholder Funds to redeem their securities. Counts 1, 2, 6, and 16 seek to avoid as alleged fraudulent conveyances supposed transfers from GTFF and STFF to an intermediary, Trade Finance Trust ("TFT"), through which the funds passed on their way to DBTCA, and to treat DBTCA and the Noteholders as subsequent transferees. But the overarching transfers that Plaintiffs seek to avoid in these claims are the transfers that the funds made to DBTCA to redeem the Notes. These transfers constitute both settlement payments and transfers made in connection

with a securities contract under the Bankruptcy Code, and DBTCA is a financial institution, as the Bankruptcy Code defines that term. Thus, these claims are barred by the safe harbor in Section 546(e) of the Bankruptcy Code. Counts 9 and 10 seek to avoid alleged fraudulent conveyances from the intermediary TFT to DBTCA. These claims fail because the Debtors ratified these transfers, and because TFT lacked dominion and control over the transferred funds, barring the Debtors, as creditors of TFT, from recovering the funds. Counts 6, 14, and 16 assert claims for "Fraudulent Disposition" and "Disposition at Undervalue" under Cayman Islands law to avoid the same supposed transfers. These too should be dismissed because New York law, and not Cayman Islands law, applies under New York's choice of law principles. *See infra* § I.

This Court also should dismiss Counts 4, 5, 12, 15, and 17 (together, the "Damages Claims"). At the outset, each of these claims fails under Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), made applicable here by Federal Rule of Bankruptcy Procedure 7009, because the Complaint engages in impermissible group pleading and lacks the specific allegations directed at each individual defendant that Rule 9(b) requires. These claims fail for other reasons as well. Counts 4 and 12, for aiding and abetting IIG's fraud and breaches of fiduciary duty, respectively, under New York law fail because Plaintiffs have not alleged any specific facts giving rise to a strong inference that any of the Noteholder Managers had actual knowledge of or provided substantial assistance to the underlying fraud. Count 12, which Plaintiffs assert on behalf of the Debtors, also is barred by the doctrine of *in pari delicto* and the *Wagoner* Rule because Plaintiffs concede that the Debtors participated in IIG's fraud. Counts 7 and 15, alleging that the Noteholder Defendants engaged in an "Unlawful Means" fraudulent conspiracy, and Count 17, alleging that the Noteholder Managers engaged in "Fraudulent Trading" all fail because, while they purport to be brought under Cayman Islands law, New York law, and not Cayman Islands law, governs. And

in any event, even if Cayman Islands law did provide the substantive law that applies, Rule 9(b) would still govern the pleading rules for this action in federal court, and Plaintiffs still fail to plead the circumstances of alleged fraud with the particularity required under its heightened pleading standard. *See infra* § II.

For these reasons, for the reasons set forth below, and for the reasons set forth in the accompanying supplemental memoranda of law submitted by the individual groups of Noteholder Defendants, being filed contemporaneously herewith, the Noteholder Defendants respectfully request that the Court dismiss all claims asserted against them in the Complaint with prejudice. *See infra* § III.

## **BACKGROUND**[2]

### A.      **Defendant IIG Is Formed**

In 1994, David Hu and Martin Silver founded IIG as an SEC-registered investment advisor that purported to specialize in trade finance lending, particularly involving loans to small and medium-sized exporters in Latin America.  Compl. ¶¶ 49-50.  IIG was a limited liability company organized under the laws of New Jersey, with its headquarters and principal place of business in New York. *Id.* ¶ 25.

Beginning in or about 2007, TOF NV ("TOF"), a fund that IIG had established in 1998, faced significant losses in connection with a loan to State Street Coffee, which represented approximately 10% of its portfolio balance. *Id.* ¶ 55.  IIG, Hu, and Silver feared that disclosure of these losses would increase investor redemptions and harm ongoing fund-raising efforts, so they decided to conceal TOF's losses and intentionally misvalue the loan on TOF's books. *Id.*  To

---

[2] The following facts are taken from the allegations in the Complaint, which the Noteholder Defendants assume to be true solely for purposes of this Motion.

evade detection by its auditors, IIG removed the State Street Coffee loan from TOF's books and replaced it with worthless, fake loans to different borrowers, many of whom were controlled by IIG's principals. *Id.* ¶ 56. In 2010, another large loan defaulted, and IIG once again hid the loss from TOF's investors, first by misvaluing it at par plus accrued interest, and then by replacing it with additional fictitious, worthless loans. *Id.* ¶ 57. As TOF's losses mounted, IIG continued to prop up the fund's portfolio by misvaluing distressed and defaulted loans as performing and adding additional fictitious loans. *Id.*

The Complaint does not allege that any of the Noteholder Defendants had anything to do with TOF.

**B.    Defendant IIG Creates The CLO Fund And Fraudulently Induces The Noteholder Funds To Invest In It**

In 2013, IIG created the CLO Fund to acquire the trade finance loans held by TOF and its subsidiary. *Id.* ¶¶ 2, 59. To finance the purchase price, the CLO Fund issued $220 million of Notes due in 2018 pursuant to an indenture (the "Indenture") by and among the CLO Fund as issuer and defendant DBTCA, an entity headquartered in and incorporated under the laws of New York, as indenture trustee (the "Indenture Trustee"). *Id.* ¶¶ 26, 59. The Noteholder Managers— all New York or California based entities—served as investment managers for the Noteholder Funds that acquired the Notes. *Id.* ¶¶ 27-44. The Noteholder Funds were fraudulently induced into purchasing the Notes based on misleading representations regarding the CLO Fund's loan portfolio, including that each of the loans was overcollateralized, and that there were fewer than 0.026% defaults among the loan portfolio. *Id.* ¶¶ 91, 103.

The Indenture transferred to DBTCA, as Indenture Trustee, all of the CLO Fund's right, title, and interest to the CLO Fund's property, including its bank accounts. *Id.* ¶ 65. DBTCA also served as the CLO Fund's document custodian, collateral administrator, and cash management

bank. *Id.* ¶ 64.  The CLO Fund delegated day-to-day servicing of its loans to IIG pursuant to a

Collateral Management Agreement, dated November 13, 2013, which is governed by New York

law. *Id*. ¶ 60.

### C.    The Noteholder Managers Supposedly Become Aware That The CLO Fund Is Not Performing As Expected

While IIG had represented to the Noteholder Managers that there were almost no defaults

in the loan portfolio, overdue loans began to appear in Trustee Reports issued to the Noteholder

Managers. *Id.* ¶ 91.  In March 2015, after receiving a Trustee Report from DBTCA, KKR's lead

credit analyst for the investment, Zach Jarvis, emailed IIG to ask, "how the team is feeling about

the assets that are almost 60d overdue in the report," and whether "any of the overdue loans paid

off since the report cut-off date." *Id.* ¶ 92.

After receiving the January 2015 Trustee Report, KKR emailed a list of questions to the

DBTCA affiliate that had underwritten the Notes, asking if it could "'take a look with IIG and the

trustee' at discrepancies between the information in the reports and KKR's own internal

calculations and understanding of how the deal was supposed to work." *Id*. ¶ 94.  Blue Mountain

expressed similar "frustration . . . that the information was not matching the trustee report we were

given.'" *Id*.

The Noteholder Managers also allegedly became aware of instances in which the CLO

Fund was paying accrued interest out of the "interest account" rather than the "principal account,"

as allegedly was supposed to be the case, and that IIG was taking management fees out of principal,

rather than interest, allegedly contrary to the terms of the governing documents. *Id*. ¶¶ 98-99.  In

February 2015, Jarvis reported to KKR's investment committee that DBTCA and IIG "'had

difficulty producing accurate trustee reports,' as 'there were times where numbers wouldn't match

up to previous reports,' and the deal needed several amendments to the underlying documentation in terms of supplemental indentures and waivers, which made it 'bumpy.'" *Id*. ¶ 102.

In May 2015, following an instance in which a Trustee Report allegedly reflected a movement of cash flows regarding management fees that was different than the Noteholders expected, a Tennenbaum employee, Geoff Jones, lamented, "what's frightening is that neither DB or IIG understands the deal to which they signed up just a few months ago!" *Id*. ¶ 101. By November 2015, KKR and Tennenbaum allegedly instructed their counsel to prepare a draft default letter and another letter terminating IIG as collateral manager, although there is no allegation that any such letters were ever sent. *Id*. ¶ 93.

Under the Indenture, IIG had the right to direct the CLO Fund to invest the proceeds of loans that had paid off in new eligible trade finance loans or loan participations. *Id*. ¶ 61. But this right applied only during the "Reinvestment Period," which ended in November 2016. *Id*. ¶ 62. The CLO Fund's loan portfolio was scheduled to mature on or around October 31, 2016. *Id*. ¶ 83. The October 2016 Trustee Report, however, showed that the CLO Fund had received only $600,000 in principal payments against a total outstanding principal balance of more than $210 million. *Id*. The report also showed that loans with a principal balance of $110 million were in default, while the maturity dates for other loans had allegedly been extended, but without evidence of supporting documentation. *Id*.

On January 31, 2017, approximately 40% in principal amount of the loans in the CLO Fund's portfolio again matured without repayment. *Id*. ¶ 84. On February 24, 2017, IIG received a joint letter from Blue Mountain and KKR, asserting that "there were Collateral Obligations of fifteen borrowers in the aggregate outstanding amount of $72,606,198 that had a maturity date of January 31, 2017 and that had not [been] paid off." *Id*. The Noteholder Managers and IIG agreed

that the loan defaults would trigger an "Event of Default" under the Indenture if the problem was not solved by March 31, 2017, and entered into a forbearance agreement that expired on April 15, 2017. *Id*. ¶¶ 85, 124.

The forbearance agreement required IIG to provide the Noteholder Managers with diligence regarding the collateral supporting the CLO Fund's loan portfolio. *Id*. ¶ 105. The effort to get documentation from IIG took weeks. *Id*. ¶ 107. Plaintiffs go on to allege that the information that IIG ultimately provided revealed that for sixteen of the loans, the collateral had been "described" as a "promissory note," that collateral that was supposed to be securing loans held by the CLO Fund had been "pledged to other entities," and that receivables that should have been paid to the CLO Fund's accounts had instead been paid to "other IIG entities, none of whom had a relationship with" the CLO Fund. *Id*. ¶¶ 107-109. The information also showed that the Trustee Reports had misstated the underlying loans' maturity dates. *Id*. ¶ 111.

### D.    IIG Seeks To Refinance The CLO Fund Notes

Although there is no allegation that IIG ever so informed the Noteholder Managers, IIG "apparently anticipated that a material number of loans in the portfolio would default after the Reinvestment Period." *Id*. ¶ 87. Thus, in mid-2016, IIG engaged Incapital LLC and BNP Paribas Securities to explore various refinancing structures for the CLO Fund, including a second collateralized loan obligation vehicle ("CLO II") that would acquire the CLO Fund's loan portfolio. *Id*. IIG sent emails to the Noteholder Managers and hosted conference calls to apprise them of these efforts. *Id*. IIG also worked with China Merchants Bank Co. Ltd. on another potential capital markets solution involving a bridge loan. *Id*.

In late February 2017, IIG sent the Noteholder Managers a "CLO II presentation," or "CLO II teaser" that it intended to use to solicit potential new investors in CLO II. *Id*. ¶ 118. The CLO II teaser indicated the new vehicle would acquire trade finance loans from the CLO Fund but did

not disclose that at least $72 million of those loans were in default. The teaser stated that the "CLO had 'strong assets' and 'no complete write-offs,' and that the 'credit risk' was mitigated by, among other things, 'rigorous credit underwriting and control processes,' including 'frequent monitoring.'" *Id.* The CLO II teaser also stated that IIG had a stellar track record as a collateral manager, and that the weighted average remaining term of the loans in the portfolio was approximately six months. *Id.* ¶¶ 118, 121.

The Complaint alleges that the "Noteholder[ Manager]s" knew that the CLO II teaser was false or misleading because they "(a) knew that nearly 40% in principal amount of the CLO's loans were in default, and (b) did not believe that the portfolio was subject to rigorous control processes and monitoring." *Id.* ¶ 119. But other than this impermissible "group pleading," the Complaint contains no allegations of knowledge specific to any (let alone each) of the Noteholder Managers, instead simply noting that a representative of one Noteholder Manager, KKR's Jarvis, shared with another, Tennenbaum's Jones, that the CLO II teaser "was not the prettiest deck" and that the two joked they should discuss it "'over a beer.'" *Id.* ¶ 120.

The Complaint alleges, "[o]n information and belief, that various Noteholder[ Manager]s offered suggestions, guidance, and direction on how IIG should go about approaching potential investors" for CLO II, but does not provide any detail or specificity regarding which Noteholder Managers allegedly did so, or what suggestions, guidance, or direction they are alleged to have provided. *Id.* ¶ 124. IIG offered the Noteholder Managers the opportunity to participate in CLO II or its other refinancing efforts, but the Noteholder Managers declined. *Id.* ¶ 87.

By March 2017, after "BNP Paribas, Incapital, and China Merchants Bank became aware of the magnitude of defaults in the portfolio, they put their respective efforts on pause." *Id.* ¶ 88. As a result, CLO II never came to fruition. Instead, between March and May 2017, IIG

implemented a new strategy, in which it solicited investors in a to-be-created IIG-managed investment vehicle. *Id*. ¶ 126. In furtherance of this effort, IIG created a "modified 'teaser,'" which it sent to dozens of potential investors for the new investment vehicle. *Id.* Unlike the original CLO II teaser, the "modified teaser" did not disclose that the new vehicle would purchase the CLO Fund's loan portfolio. *Id*. ¶ 128. But the Complaint does not allege that the Noteholder Managers ever saw the modified teaser or participated in any way in its creation or distribution. Nor does the Complaint allege that the Investor-Assignors relied on the modified teaser in deciding to invest.

In or around May 2017, IIG entered into an agreement governed by New York law under which it retained a company referred to in the Complaint as "GSC" to serve as its agent, "on an exclusive basis" in the South Korean market. GSC's job was to identify potential new investors that would acquire the CLO Fund's assets. *Id*. ¶¶ 129-30. The Complaint does not allege that any of the Noteholder Defendants had any involvement in GSC.

IIG allegedly misrepresented to certain of the Investor-Assignors that it did not keep track of loan delinquencies and misstated the maturity dates for certain of the loans so that those Investor-Assignors would not be aware of existing defaults. *Id*. ¶ 131. There is no allegation that any of the Noteholder Managers became aware of this supposed misrepresentation, or that any of the Noteholder Managers were involved in any way in discussions with or the solicitation of any potential new investors, including the Investor-Assignors.

The Noteholder Managers entered into a series of additional forbearance agreements during this period that extended the forbearance period initially until May 4, 2017, then to May 16, 2017, and ultimately to June 1, 2017. *Id.* ¶ 124. The Complaint alleges that "the Noteholder[ Manager]s"—again lumped together collectively in the Complaint—"knew, from the

diligence they had conducted, that the value (and even existence) of the collateral securing the trade finance loans could not support the amount due and that liquidating the collateral would thus guaranty losses for them." *Id.* ¶ 123.  In an email sent to IIG in April 2017, Elanus explained that "'the best odds for refinancing come with running room,' and 'anger over being put in a bad situation shouldn't trump self-interest.'" *Id.*  The Noteholder Managers supposedly informed IIG, however, that if the Debtors did not acquire the CLO Fund's defaulted loans by June 1, 2017, then the Noteholder Managers would not extend the forbearance period again, and would instead declare an Event of Default under the Indenture. *Id.* ¶ 134.

### E.    IIG Orchestrates The Sale Of The CLO Fund's Assets To GTFF And STFF

To facilitate the sale of the CLO Fund's assets and redemption of the Notes, IIG created defendant TFT, a Delaware statutory trust. *Id.* ¶ 141.  IIG "created TFT as an intermediary between the trade finance borrowers and GTFF and STFF." *Id.* ¶¶ 141, 186; *see also id.* ¶ 140 ("TFT … was created to serve as an intermediary for the CLO Sales.").  Although TFT was "the nominal purchaser of the CLO [Fund]'s loan assets, the purchase price was paid by GTFF and STFF[, which] raised the funds by selling subscription interests to the Investor-Assignors." *Id.* ¶ 141.  All of the sales were consummated pursuant to "Master Participation Agreements" governed by New York law and involved the transfer of funds between bank accounts located in New York. *Id.* ¶¶ 141-42.

In each of the sale transactions, the Investor-Assignors wired subscription payments to GTFF's and/or STFF's New York operating accounts at DBTCA; GTFF and/or STFF wired the funds to TFT's New York bank account at DBTCA to acquire participation interests in TFT; and TFT wired the funds to DBTCA in New York. *Id.* ¶¶ 144-45; 158-60; 172-73.  Within days after TFT wired the funds to DBTCA, the funds were disbursed to (i) the Noteholder Funds, as the

holders of the Notes, (ii) DBTCA for its fees as collateral administrator and Indenture Trustee and to reimburse its outside counsel fees, and (iii) IIG for it fees as collateral manager. *Id.*

### F.    IIG Is Revealed To Be A Criminal Enterprise

In November 2019, long after the Noteholder Defendants' involvement in the CLO Fund had ended, the Securities and Exchange Commission filed a complaint against IIG in the U.S. District Court for the Southern District of New York, charging IIG with violations of the Investment Advisers Act of 1940, the Securities Exchange Act of 1934, and the Securities Act of 1933.  Compl. ¶ 207.  Shortly thereafter, the SEC filed complaints against David Hu and Martin Silver, the two most senior executives at IIG, in the same court, and the Department of Justice indicted them.  *Id.*   The complaints charged Hu and Silver, then Chief Investment Officer and Chief Operating Officer of IIG, respectively, with securities fraud, wire fraud, and conspiracy to commit investment advisor fraud, securities fraud, and wire fraud.  *Id.*   The complaints alleged "that IIG and Messrs. Hu and Silver defrauded investors in IIG-managed funds by overvaluing loans, falsifying paperwork to create a series of fake loans that were falsely classified as positively performing loans, transferring the overvalued and fake loans between IIG-managed funds, including GTFF and STFF, and using the proceeds from those fraudulent sales to repay earlier investors." *Id*. ¶ 208.

In consent judgements against IIG, Hu, and Silver, the court enjoined IIG from violating securities laws and ordered IIG to disgorge over $35 million in ill-gotten gains. *Id.* ¶ 4.  Hu and Silver each pled guilty to all three counts in the Department of Justice's indictments. *Id*. ¶ 209.  In his guilty plea, Mr. Silver admitted that he and Mr. Hu "'intentionally and knowingly participated in a scheme to overvalue distressed loans and IIG funds and falsify paperwork to create a series of fake loans,' and that 'the scheme concealed the true value of IIG funds from investors, and

transferred fake and overvalued loans between funds for which IIG provided investment advisory services, at the same time receiving management and performance fees.'" *Id.*

The Complaint does not allege that any civil or criminal charges were brought against any of the Noteholder Defendants.

### G.    GTFF And STFF Commence Liquidation Proceedings

In August and December 2019, a creditor for each of GTFF and STFF, respectively, filed a petition in the Grand Court of the Cayman Islands asking that court to place GTFF and STFF into official liquidation and to appoint Christopher Kennedy and Alexander Lawson as the Joint Liquidators. *Id.* ¶ 205. These petitions were granted for GTFF on October 23, 2019, and STFF on January 31, 2020. *Id.*

This Court subsequently entered an order on February 19, 2020, recognizing GTFF's Cayman liquidation proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code. Compl. ¶ 206. The Court entered an order on June 19, 2020, recognizing STFF's Cayman liquidation proceeding as a foreign main proceeding. *Id.* ¶ 206. On March 25, 2020, approximately three-and-a-half years before Plaintiffs filed this Complaint, the Joint Liquidators sought and the Court entered an order granting the Joint Liquidators' application to obtain discovery pursuant to Bankruptcy Rule 2004. *See* Order Auth. Rule 2004 Disc. by Liquidators, *In re IIG Global Trade Finance Fund Ltd. (in Official Liquidation), et al.*, 20-bk-10132-MEW (Bankr. S.D.N.Y. Mar. 25, 2020), ECF No. 14. The scope of the permitted discovery was broad, allowing Plaintiffs to obtain information from and to examine "persons and entities determined by the Liquidators to have information relevant to the Liquidators' investigation." *Id.* at 1-2.

### H.    The Liquidators Commence This Adversary Proceeding

On August 31, 2023, GTFF and STFF, by and through the Joint Liquidators, and the Joint Liquidators, in their capacities as (i) the assignees of claims held by the Investor-Assignors and

14

(ii) the Joint Liquidators of GTFF and STFF, commenced this adversary proceeding against the

Noteholder Defendants and others by filing the complaint (the "Complaint").  *Id.* at 1.   The

Complaint asserts the following claims against the Noteholder Defendants:

### *Avoidance Claims*

- Counts 1 and 2 assert claims under New York law by the Liquidators, as the assignees of the Investor-Assignors (the "Investor-Assignees"), to avoid the transfers that the Debtors allegedly made to TFT as constructive and intentional fraudulent transfers and to recover what Plaintiffs refer to as subsequent transfers from TFT to DBTCA and from DBTCA to the Noteholder Defendants, Compl. ¶¶ 211-31;

- Count 6 asserts claims by the Liquidators, also as the Investor-Assignees, to avoid the same transfers as in Counts 1 and 2, but under Cayman Fraudulent Dispositions Act s. 4(1) instead of New York law, Compl. ¶¶ 252-58;

- Counts 16 asserts claims by the Liquidators in their capacities as Joint Official Liquidators of GTFF and STFF, to avoid, again, the same transfers as in Counts 1, 2, and 6, but under Cayman Companies Act s. 146, Compl. ¶¶ 319-26;

- Counts 9 and 10 assert claims under New York law by STFF and GTFF, as creditors of TFT, to avoid the transfers that TFT allegedly made to DBTCA (which Plaintiffs characterize as initial transfers for purposes of these Counts) as constructive and intentional fraudulent transfers and to recover the transfers from DBTCA to the Noteholder Defendants as subsequent transfers, Compl. ¶¶ 273-87; and

- Count 14 asserts claims by STFF and GTFF, again as creditors of TFT, to avoid the same transfers as Counts 9 and 10, but under Cayman Fraudulent Dispositions Act s. 4(1) instead of New York law, Compl. ¶¶ 302-09.

### *Damages Claims*

- Count 4 asserts a claim by the Liquidators, in their capacity as the Investor-Assignees, for aiding and abetting common law fraud under New York law, Compl. ¶¶ 239-46;

- Count 12 asserts a claim by GTFF and STFF for aiding and abetting a breach of fiduciary duty under New York law, Compl. ¶¶ 293-97;

- Count 7 asserts a claim by the Liquidators, in their capacity as the Investor-Assignees, for conspiracy to injure the Investor-Assignors by unlawful means under Cayman Islands common law, Compl. ¶¶ 259-67;

- Count 15 asserts a claim by GTFF and STFF for conspiracy to injure the Debtors by unlawful means under Cayman Islands common law, Compl. ¶¶ 310-18; and

- Count 17 asserts a claim by the Liquidators, in their capacities as Joint Official Liquidators of GTFF and STFF, for "fraudulent trading" under Cayman Companies Act s. 147, Compl. ¶¶ 327-36.

## LEGAL STANDARD

Claims survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), made applicable here by Rule 7012 of the Federal Rules of Bankruptcy Procedure, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). In deciding whether a plaintiff has made this showing, a court should disregard "legal conclusions" and "conclusory statements." *Id.*; *see also Twombly*, 550 U.S. at 555 (holding that a plaintiff cannot rely on mere "labels and conclusions") (internal quotation marks omitted). If the plaintiffs' pleadings "have not nudged their claims across the line from conceivable to plausible, the complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## ARGUMENT

## I.     THE COURT SHOULD DISMISS THE AVOIDANCE CLAIMS

### A.     The Court Should Dismiss Counts 1, 2, 6, And 16 Because They Are Barred By The Safe Harbor Set Forth In Section 546(e) Of The Bankruptcy Code

The Court should dismiss Counts 1, 2, 6, and 16 of the Complaint because they are barred by the safe harbor set forth in Section 546(e) of the Bankruptcy Code, made applicable in this case by Section 561(d) of the Bankruptcy Code. "Bankruptcy courts will enforce the safe harbor

provisions of the Bankruptcy Code in appropriate cases by dismissing avoidance actions on the pleadings." *Lehman Bros. Holdings v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings)*, 469 B.R. 415, 434 (Bankr. S.D.N.Y. 2012). Dismissal on Section 546(e) grounds is appropriate where, as here, "[t]he application of Section 546(e) presents a straightforward question of statutory interpretation of the type that is appropriately resolved on the pleadings." *In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 1771786, at \*7 (S.D.N.Y. Apr. 23, 2019), *aff'd in relevant part*, 10 F.4th 147 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1128 (2022); *see also id.* at \*12 (denying leave to amend because proposed amended complaint could not withstand motion to dismiss where Section 546(e) barred fraudulent transfer claim); *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 75 & n.5, 97 (2d Cir. 2019) (affirming grant of motion to dismiss fraudulent transfer claims because Section 546(e) barred the claims).

### 1. The Transfers At Issue In Counts 1, 2, 6, And 16 Are Protected By The Safe Harbor

As relevant here, Section 546(e) of the Bankruptcy Code provides that "[n]otwithstanding [S]ections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a … settlement payment, as defined in [S]ection 101 or 741 of this title, made by or to (or for the benefit of) a … financial institution, … or that is a transfer made by or to (or for the benefit of) a … financial institution … in connection with a securities contract." 11 U.S.C. § 546(e). Courts must address three questions under Section 546(e): (i) what is the transfer to be analyzed; (ii) whether that transfer involved a qualifying transaction, *i.e.* a "settlement payment" or a transfer "made in connection with a securities contract"; and (iii) whether that transfer was made "by or to (or for the benefit of)" a qualifying participant. *See, e.g., Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 888 (2018); *In re Nine West LBO Secs. Litig.*, 482 F. Supp. 3d 187, 197 (S.D.N.Y. 2020). The Complaint's allegations conclusively demonstrate that (i) the relevant

transfers under Counts 1, 2, 6, and 16 were those made by GTFF and STFF, through TFT, to DBTCA; (ii) that those transfers were both "settlement payments" and "transfer[s] made in connection with a securities contract"; and (iii) that those transfers were made to DBTCA (to redeem the Notes), and for the benefit of the CLO Fund (the obligor on the Notes), each of which is a "financial institution." 11 U.S.C. § 546(e).

### a.    The Relevant Transfers Were From GTFF And STFF, Through TFT, To DBTCA

In Counts 1, 2, 6, and 16, Plaintiffs characterize the transfers from GTFF and STFF to TFT as "initial transfers," and the transfers from TFT to DBTCA as "subsequent transfers." But Plaintiffs' legal conclusions are not dispositive; the facts as alleged and controlling law are for purposes of this motion. Those factual allegations and Supreme Court and other legal authority establish that the relevant transfers for purposes of Section 546(e) are the "overarching transfer[s]" from GTFF and STFF, through TFT, to DBTCA.

In *Merit Management Group*, the Supreme Court addressed the question of "how the [Section 546(e)] safe harbor operates in the context of a transfer that was executed via one or more transactions." 138 S. Ct. at 895. The case involved a stock acquisition in which the acquiring entity caused its lending bank to wire the purchase price to a third-party escrow agent, which then disbursed payment to the target entity's shareholders. *Id.* at 891. The defendant argued that the safe harbor applied because the transaction involved qualifying transfers and the lending bank and escrow agent were financial institutions. The Court rejected this defense, holding that "the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions"—there, the transfer from the acquiror to the target entity's shareholders, none of whom were financial institutions or otherwise qualifying participants—as opposed to "any component part of that transfer." *Id.* at 893. The

Court held that a plaintiff "is not free to define the transfer that it seeks to avoid in any way it chooses," and that a defendant may "argue that the [plaintiff] failed to properly identify" the relevant transfer. *Id.*

Relying on *Merit*, two recent decisions from courts in the Southern District of New York rejected attempts—like Plaintiffs' here—to avoid the safe harbor by arguing that an interim step in a multi-step transaction was the initial transfer, so that another transfer that would otherwise fall within the safe harbor would not qualify for its protection. *See Holliday v. Credit Suisse Secs.*, 2021 WL 4150523, at *3 (S.D.N.Y. Sept. 13, 2021), *appeal docketed*, No. 21-2543 (2d Cir. Oct. 8, 2021); *In re SunEdison, Inc.*, 620 B.R. 505, 513-15 (Bankr. S.D.N.Y. 2020).

In *Holliday*, an operating company, BostonGen, and its parent company, EBG, consummated a "Leveraged Recap Transaction" in which EBG made a tender offer for its members' units. 2021 WL 4150523, at *1. The transaction was effectuated in the following steps: First, BostonGen transferred cash it had borrowed to fund the tender offer to EBG. *Id.* at *2. Second, EBG transferred that cash to its account at Bank of New York, which acted as BostonGen's and EBG's agent in effectuating the redemption of the EBG equity units and payment to EBG members. *Id.*; *In re Boston Generating LLC*, 617 B.R. 442, 452 (Bankr. S.D.N.Y. 2020). Five and seven days later, EBG used the funds to pay dividends to and redeem equity units held by its members. *Holliday*, 2021 WL 4150523, at *2.

When BostonGen later filed for bankruptcy, its liquidating trustee sought to recover the transfers made by BostonGen. *Id.* at *2. Seeking to evade the safe harbor, the trustee argued that BostonGen's transfer to EBG was the initial transfer, and that therefore the transfer from EBG to Bank of New York was a subsequent transfer to which the safe harbor did not apply. *Id.* at *3. Affirming Bankruptcy Judge Grossman's decision, the district court rejected this argument. Citing

Second Circuit precedent, the court noted that "an allegedly fraudulent conveyance must be evaluated in context; '[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications.'" *Id.* at \*3 (*citing Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993)). The court continued that BostonGen's transfer to EBG was "an integral transfer" in the Leveraged Recap Transaction, and that "the context of the Leveraged Recap Transaction cannot be ignored." *Id.* at 3. To do so, the court reasoned, "would permit a trustee to circumvent the safe harbor by carving up an integrated securities transaction consisting of multiple component parts," which "would unnecessarily restrict the safe harbor and 'seriously undermine ... markets in which certainty, speed, finality, and stability are necessary to attract capital.'" *Id.* (citing *Tribune*, 946 F.3d 66, 90 (2d Cir. 2019)). The court added that, under *Merit*, it could not confine its inquiry to the transfer from BostonGen to EBG, because the "overarching transfer" for purposes of determining whether Section 546(e) applied was the transfer from BostonGen, through EBG, to Bank of New York. *Id.* at \*2-3.

The bankruptcy court reached a similar conclusion in *In re SunEdison, Inc.*, 620 B.R. 505, 513 (Bankr. S.D.N.Y. 2020). There, SunEdison Holdings transferred Class B stock and units in an affiliated entity to "Seller Note," a special purpose vehicle created in connection with the purchase by SunEdison Holdings' parent of equity units in a company called First Wind. *Id.* at 508-09. Seller Note then pledged the stock and units to Wilmington Trust, the collateral agent for notes issued by Seller Note. *Id.* at 509. When SunEdison Holdings filed for bankruptcy, a litigation trust formed under its plan of reorganization filed an avoidance action to recover the value of the pledged stock and units from Seller Note's noteholders, and the noteholder defendants argued that the claim was barred by Section 546(e) because the challenged transfer was made to a financial institution, Wilmington Trust, in connection with a securities contract. *Id.* at 511. The

plaintiff responded that it sought to avoid only the first transfer to Seller Note, and urged the court to disregard the subsequent pledge to Wilmington Trust for purposes of the safe harbor. *Id.* at 513. Rejecting that argument, the court held that a plaintiff cannot "escape the reach of the safe harbor by seeking to avoid an intermediate transfer between non-qualifying participants and sue the qualifying participants of the true overarching transfer as subsequent transferees." *Id.*

The same conclusion applies here. Although Counts 1, 2, 6, and 16 purport to avoid the "intermediate transfer[s]" that GTFF and STFF made to TFT in order to "escape the reach of the safe harbor," the Complaint makes clear that the "true overarching transfer[s]" that Plaintiffs seek to avoid are the transfers from GTFF and STFF to DBTCA. *Id.* Plaintiffs allege that "TFT was essentially a shell company" and simply "an intermediary" in what the Complaint acknowledges was, in substance, the sale by the "CLO" of its "portfolio to GTFF and STFF." Compl. ¶¶ 141, 155, 186. "[A]lthough TFT was the ***nominal*** purchaser of the CLO Fund's loan assets, the purchase price was paid by ***GTFF and STFF*** ...." *Id.* ¶ 141 (emphasis added); *id.* ¶ 140 ("TFT ... was created to serve as an intermediary for the CLO sales."). Thus, Plaintiffs' own allegations demonstrate the transfers to TFT were simply a "component part" of STFF's and GTFF's overarching transfers to DBTCA. Allowing Plaintiffs "to circumvent the safe harbor by carving up" those overarching transfers into "component part[s]" would "unnecessarily restrict the safe harbor." *Holliday*, 2021 WL 4150523, at *3. Under *Merit*, *Boston Generating*, and *SunEdison*, the relevant transfers for purposes of the Court's analysis of the safe harbor are the "overarching transfers" from GTFF and STFF, through TFT, to DBTCA.

### b.    The Transfers Were Both Made In Connection With A Securities Contract And Are Settlement Payments

While either would suffice, the Transfers were both made in connection with a securities contract and are settlement payments.

_Transfers in Connection with a Securities Contract._   The transfers at issue in Counts 1, 2, 6, and 16 were made "in connection with" a securities contract.   The Second Circuit has held that "[s]ection 741(7) of the Bankruptcy Code, to which § 546(e) refers, defines 'securities contract' with extraordinary breadth," and "expansively includes contracts for the purchase or sale of securities, as well as any agreements that are similar or related to contracts for the purchase or sale of securities." _In re Bernard L. Madoff Inv. Secs. LLC_, 773 F.3d 411, 417-18 (2d Cir. 2014) (emphasis omitted) (citing 11 U.S.C. § 741(7)(A)(i), (vii), (x), (xi)).   "Securities contracts" also include "a contract for ... an option to purchase or sell any such security," and "any repurchase … transaction on any such security."   11 U.S.C. § 741(7)(A)(i); _see also Boston Generating_, 617 B.R. at 486.   "Security," in turn, is defined to include a "note," such as the Notes here.   11 U.S.C. § 101(49)(A)(i).

The Second Circuit has held further that Section 546(e)'s "in connection with" standard "sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided." _In re Madoff,_ 773 F.3d at 422.   A transfer is made "in connection with" a securities contract if it is merely "related to" or "associated with" the contract. _Id_. at 421.   Thus, there is "no required language to connect agreements," and no "temporal or existential requirement" that must link a transfer and an agreement. _In re Lehman Bros. Holdings Inc_., 469 B.R. 415, 439-42 (Bankr. S.D.N.Y. 2012).

The Complaint's own allegations show that the transfers at issue in Counts 1, 2, 6, and 16 were made "in connection with a securities contract."   The Indenture was a securities contract, as it provided holders of the Notes with the option to direct the Issuer to redeem (_i.e._, purchase) the Notes with twenty days' prior written notice, and also included an obligation for the CLO Fund to repurchase the Notes in other specified circumstances. _See_ Declaration Of Claire O'Brien In

Support Of The Noteholder Defendants' Motion To Dismiss (the "O'Brien Decl."), Ex. A
(Indenture), Art. IX.[3]  And the transfers plainly were made "in connection with" that Indenture.
They funded the redemption of the Notes issued under the Indenture.  Compl ¶ 3 ("[T]he proceeds
of those sales were used to pay IIG's earlier investors, including the Noteholder[ Manager]s.");
*see also id.* ¶¶ 134, 145, 160, 173.  And the Indenture governed the process for redemption of the
Notes and the distribution of the proceeds of the transfers to the Noteholder Funds and DBTCA.
*See* O'Brien Decl., Ex. A (Indenture), Art. XI.

The redemptions of the Notes, moreover, were themselves securities contracts, as they were
"repurchase … transaction[s]" on the Notes.  11 U.S.C. § 741(7)(A)(i); *In re Quebecor World
(USA) Inc.*, 719 F.3d 94, 99 (2d Cir. 2013), *abrogated on other grounds by Merit*, 138 S. Ct. 883
("Generally, to redeem is defined as to purchase back; to regain possession by payment of a
stipulated price; to repurchase; to regain, as mortgage property, by paying what is due; to receive
back by paying the obligation.") (citing *In re United Educ. Co.*, 153 F. 169, 171 (2d Cir. 1907));
*Tribune*, 946 F.3d at 81.  The Transfers were made "in connection with" the redemptions of the
Notes, as they were made to complete such redemptions.  *See, e.g.*, Compl. ¶¶ 3, 145, 160, 173; *In
re Quebecor*, 719 F.3d at 98-99 (holding that a contract providing the issuer and its affiliates an
option to repurchase the issuer's notes was a "securities contract" and that affiliate's purchase of
the notes was a safe-harbored transfer "in connection with" such contract); *Tribune*, 946 F.3d at
81 (holding that debtor-issuer's payments to redeem its equity securities were safe-harbored
transfers "in connection with" a "securities contract"; "[t]he term 'redemption,' in the securities

---

[3] Because the Indenture is integral to the Complaint's allegations, *see, e.g.*, Compl. ¶¶ 59, 61, the
Court may take judicial notice of it.  *See, e.g.*, *Graef v. Ricoh, USA, Inc.*, 2020 WL 950282, at *3
(N.D.N.Y. Feb. 27, 2020) ("Judicial notice of contracts is proper when contracts are integral to the
complaint and no party disputes the contract's identity and accuracy.") (internal quotation marks
omitted).

context, means 'repurchase'" and "Section 741(7) defines 'securities contract' capaciously to include … a 'contract for … *any repurchase* … transaction on any … security'" and any "'similar … agreement or transaction …. Thus, we have no trouble concluding … the payments … connected to the redemption of shares[] were 'in connection with a securities contract.'" (quoting 11 U.S.C. § 741(7)(A)(i), (viii)) (emphasis in original)).

*Settlement Payments.* The Bankruptcy Code defines the term "settlement payment" expansively to mean "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 101(49)(A)(i). In turn, the Code defines the term "security," to include a "note," like the Notes here. 11 U.S.C. § 741(8). The Second Circuit has held that transfers such as the ones at issue here, which were made for the purpose of redeeming notes and "completed a transaction in securities," are settlement payments. *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 339 (2d Cir. 2011) ("We find no basis in the Bankruptcy Code or the relevant caselaw to interpret § 741(8) as excluding the redemption of debt securities. Because Enron's redemption payments completed a transaction in securities, we hold that they are settlement payments within the meaning of § 741(8).").

The *Holliday* decision is again instructive. As noted above, the transaction there consisted of the following steps: (i) a transfer from BostonGen, the Debtor, to its corporate parent EBG, followed by (ii) a transfer from EBG to its agent Bank of New York, which was then used to pay dividends to EBG's members and redeem their EBG equity units. *Holliday*, 2021 WL 4150523, at *1. Noting that "the Complaint makes clear that the Leveraged Recap Transaction entailed BostonGen and EBG borrowing funds to complete a Tender Offer," and that "BostonGen did in fact borrow funds and distributed $708 million in accordance with the terms of the Leveraged

Recap Transaction and its credit facility agreements," the court concluded that the transfer from BostonGen, through EBG, to BONY "meets the definition of a settlement payment." *Id.* at *4; *see also Boston Generating*, 617 B.R. at 485 ("The third element is met because the BosGen Transfer was made to EBG to fund the Unit Redemptions, the Warrant Redemption, and the Distribution, *i.e.*, to complete a securities transaction."); *see also In re Nat'l Forge Corp.*, 344 B.R. 340, 346-351, 366 (W.D. Pa. 2006) (concluding that a debtor's transfer of cash to parent to fund parent's purchase of stock from its shareholders was a "settlement payment").

Similarly, here, the Complaint makes clear that the transfers resulted in the redemption of the Notes. *See, e.g.*, Compl. ¶¶ 3, 117, 134, 145, 160, 173. The transfers, therefore, are settlement payments.

### c.    The Transfers Were Made To And For The Benefit Of Financial Institutions

The final requirement for the safe harbor to apply, that the transfers were made "by, to (or for the benefit of)" a qualifying participant, is also readily met in this case. The Bankruptcy Code defines a "financial institution" to include a "trust company" and a "commercial … bank." 11 U.S.C. § 101(22). The "financial institution" definition also includes "when any [trust company] or [commercial bank] is acting as agent or custodian for a customer ... in connection with a securities contract, such customer." *Id.*

The transfers at issue in Counts 1, 2, 6, and 16 were plainly made to a financial institution. The Complaint is unclear as to whether Plaintiffs are alleging that the transfers were made to DBTCA or the CLO Fund. *See, e.g.*, Compl. ¶¶ 144, 160, 172. For its part, DBTCA argues that it is a mere conduit, rather than a transferee of the transfers, *see* Defendant Deutsche Bank Trust Company Americas' Memorandum Of Law In Support Of Motion To Dismiss Counts 1, 2, 5-7, 9, 10, and 13-17 Of The Complaint, such that the transfers should be viewed as being made directly

to the Noteholder Funds. But, in the end, the resolution of this issue does not matter for purposes

of this Motion. Each of DBTCA, the CLO Fund, and the Noteholder Funds themselves were

financial institutions. Thus, the transfers were made to a qualifying participant irrespective of

whether the Court views the initial transferee of the transfers as DBTCA, the CLO Fund, or even

the Noteholder Funds.

DBTCA was both a commercial bank and a trust company, and therefore, a "financial

institution" on two independent bases. *See, e.g.*, O'Brien Decl., Ex. A (Indenture) (stating that

DBTCA is a "New York banking corporation"); Historical Listing of New York State Banks,

N.Y.S.            Dep't            of            Fin.            Servs.,

https://www.dfs.ny.gov/system/files/documents/2020/05/inst_hist_list_20200520.txt (last visited

Nov. 5, 2023) (listing DBTCA as a banking institution chartered in New York state); Who We

Supervise, N.Y.S. Dep't of Fin. Servs., https://myportal.dfs.ny.gov/web/guest-applications/who-

we-supervise (last visited Nov. 5, 2023) (listing DBTCA as a trust company);[4] Deutsche Bank

Trust Company Americas, BankFind Suite: Institution Details, FDIC.gov (last visited Nov. 6,

2023), https://banks.data.fdic.gov/bankfind-suite/bankfind/details/623 (stating that DBTCA's

Bank Charter Class is "State Chartered Banks, member of the Federal Reserve System (FRS)");

Compl. ¶¶ 26, 140, 144, 159-60, 172 (alleging that DBTCA was the CLO's "cash management

bank," that DBTCA "opened … bank accounts" for the Debtors, and that the challenged transfers

---

[4] This Court may consider matters of which judicial notice may be taken under Federal Rule of
Civil Procedure 201. *See Kramer v. TimeWarner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). The
public records provision of this rule, which allows for judicial notice of "a fact that is not subject
to reasonable dispute because it ... can be accurately and readily determined from sources whose
accuracy cannot reasonably be questioned," Fed. R. Civ. P. 201(b)(2), includes government
records.

were wired to "account[s] maintained at DBTCA").[5]    The CLO Fund was also a financial institution, because DBTCA was acting as its paying agent, document custodian, collateral administrator, and cash management bank in connection with the Indenture and the redemption of the Notes, and the CLO Fund was DBTCA's "customer" with respect to those services. *See, e.g.*, 11 U.S.C. § 101(22) (providing that when a financial institution acts as an "agent … for a customer … in connection with a securities contract," then the customer is also a "financial institution.); Compl. ¶ 64; O'Brien Decl., Ex. A (Indenture), Art. VII § 7.2 ("the Issuer hereby appoints the Trustee as Paying Agent for payments on the Notes"); *Tribune*, 946 F.3d at 78-81 (holding that where Tribune retained financial institution Computershare to act as "Depositary" in connection with Tribune's tender offer, Tribune was also a financial institution as a matter of law); *Holliday*, 2021 WL 4150523, at *7 (holding that BostonGen was a financial institution as a matter of law because BostonGen "manifested its assent to US Bank's agency by authorizing the bank to receive funds from the lenders and entrusting it to make the necessary distribution in connection with the Tender Offer").    Thus, if the transfers were made to the CLO Fund, then they were made to a financial institution.

Moreover, if the transfers were made to DBTCA, then not only were they made "to" a financial institution (DBTCA), they were also made "for the benefit of" a financial institution (the CLO Fund).    This is because regardless of whether the CLO Fund ever touched the funds, the transfers satisfied the CLO Fund's obligations on the Notes. *See, e.g.*, Compl. ¶¶ 144, 160, 172; *Bonded Financial Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 895-96 (7th Cir. 1988)

---

[5] The Court may take judicial notice of these public records. *See, e.g.*, *Demaitre v. City of N.Y.*, 2020 WL 6048192, at *2 (S.D.N.Y. Oct. 11, 2020) ("[I]t is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6) ....").

(explaining that where a transfer to one person reduces the debt of another, the transfer was made "for the benefit of" the party whose debt was reduced).

Finally, the Noteholder Funds that received the transfers from DBTCA were themselves financial institutions, as DBTCA also acted as the Noteholder Funds' agent in connection with the Indenture (which, as discussed above, is a securities contract), and the Noteholder Funds were DBTCA's customer.  *See, e.g.*, O'Brien Decl., Ex. A (Indenture), Art. VI § 6.16 ("With respect to the security interest created hereunder, the delivery of any Asset to the Trustee is to the Trustee as representative of the Secured Noteholders and agent for each other Secured Party and the Holder of the Income Notes."); *id.* at Art. IV § 4.2 (providing that all moneys deposited with the Trustee pursuant to Section 4.1 of the Indenture shall be held in trust for the benefit of the secured parties); 11 U.S.C. § 101(22).

The conclusion that the transfers were made to a financial institution is thus inescapable on the face of the Complaint, regardless of whether the initial transferee was DBTCA, the CLO Fund, or the Noteholder Funds.

> **2.    Because The Safe Harbor Would Bar Counts 1, 2, 6, And 16 In A Case Under Chapter 11, Bankruptcy Code Section 561 Mandates They Cannot Be Pursued Here**

"Section 561(d) [of the Bankruptcy Code] provides that [S]ection 546(e) 'shall apply in a case under chapter 15 ... to limit avoidance powers *to the same extent* as in a proceeding under chapter 7 or 11 of this title ....'"  *In re Bankruptcy Estate of Norske Skogindustrier ASA*, 629 B.R. 717, 760 (Bankr. S.D.N.Y, 2021) ("*Norske Skog*") (quoting 11 U.S.C. § 561(d)) (emphasis added in original).  Applying the plain words of the statute, courts have held that a transfer may not be avoided by a foreign representative if it falls within the Section 546(e) safe harbor.  *See id.* at 757 (noting that Section 546(e)'s safe harbors apply equally to foreign representative under Chapter 15 through Section 561(d) of the bankruptcy code); *Fairfield Sentry Ltd. v. Citibank, N.A.*, 630 F.

Supp. 3d 463, 488 (S.D.N.Y. 2022) (similar).   This is the case here with respect to Counts 1, 2, 6, and 16.

As noted above, Plaintiffs assert Counts 1 and 2 under New York fraudulent transfer statutes in their capacity as Investor-Assignees.  *See, e.g.*, Compl. ¶¶ 217, 226, 255.  The Second Circuit has held, however, that individual creditors may not circumvent section 546(e) by pursuing claims that a bankruptcy trustee would itself be barred from bringing.  *See Tribune*, 946 F.3d at 72, 90, 94, 96 (concluding that "the purposes and history of" Section 546(e) "necessarily reflect an intent" to bar "transfers by a debtor in bankruptcy that fall within Section 546(e)'s terms" irrespective of whether the claims are brought by creditors rather than the trustee).  Thus, because the challenged transfers fall within the scope of the safe harbor, Plaintiffs are barred from avoiding them, and cannot escape the safe harbor's reach by pursuing the Avoidance Claims in their capacities as Investor-Assignees.

Count 6, which Plaintiffs assert under Cayman law in their capacity as Investor-Assignees, and Count 16, which Plaintiffs assert under Cayman law in their capacity as GTFF's and STFF's Joint Official Liquidators, are also barred by the safe harbor.  While courts have held that Sections 546(e) and 561(d) do not bar fraudulent transfer claims under foreign law if the claims are analogous to claims asserted under Section 548(a)(1)(A), *see Norske Skog* at 760; *Fairfield Sentry Ltd. (In Liquidation) by & through Krys v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 493 (S.D.N.Y. 2022) ("*Fairfield Sentry II*"), Counts 6 and 16 do not fall within this exception.  Rather, under Section 548(a)(I)(A), the challenged transfer must have been "made ... on or within 2 years before the date of the filing of the petition."  11 U.S.C. § 548(a)(1)(A).  Here, the Transfers were made in 2017, more than two years before the Debtors were placed into insolvency proceedings in the Cayman Islands and these chapter 15 cases were commenced.  *See* Compl. ¶¶ 144, 158-159,

172-173, 205-206.  Counts 6 and 16, therefore, are also barred by the safe harbor, and must be

dismissed.

### B. The Court Should Dismiss Counts 9 and 10 Because The Debtors Ratified The Relevant Transfers And The Transferred Funds Were Never TFT Property

Perhaps because they recognize that their claims to avoid the Debtors' transfers to DBTCA

are barred by section 546(e), Plaintiffs attempt another end-run around the safe harbor through

Counts 9 and 10 of the Complaint.  Counts 9 and 10 seek to avoid the same transfers as Counts 1,

2, 6, and 16, but Plaintiffs assert Counts 9 and 10 on behalf of the Debtors, as creditors of TFT,

and frame the transfers to be avoided as the interim transfers from TFT to DBTCA, rather than the

"overarching transfer" that the Debtors made to DBTCA through TFT.  This attempted end-run

also fails, however, and Counts 9 and 10 must be dismissed as well.  *First*, as the Complaint makes

clear, the Debtors were intimately involved in the transfers and had full knowledge as to how the

transferred proceeds were to be used.  Thus, the Debtors ratified the transfers, and cannot now be

heard to challenge them.  *Second*, as the Complaint effectively acknowledges, TFT never had

dominion and control over the funds that the Debtors transferred to DBTCA, and was merely an

intermediary through which the funds were transferred.  Accordingly, the Debtors, acting in their

capacities as purported creditors of TFT, cannot avoid and recover TFT's purported transfers of

those funds.

### 1. The Debtors Are Barred From Challenging The Transfers From TFT Because They Participated In And Had Full Knowledge Of Them

Counts 9 and 10 should be dismissed because the Complaint alleges that the Debtors

participated in, and had full knowledge of the intended use of, TFT's transfers to DBTCA, and

thus cannot now be heard to challenge those transfers.  In the Second Circuit, "[a] fraudulent

transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from

seeking its avoidance." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 691 (2d Cir. 2011) (citation

omitted). "Creditors who authorized or sanctioned the transaction, or, indeed, participated in it

themselves, can hardly claim to have been defrauded by it, or otherwise to be victims of it." *In re

Lyondell Chem. Co.*, 503 B.R. 348, 383-84 (Bankr. S.D.N.Y. 2014) *abrogated on other grounds

by In re Trib. Co. Fraudulent Conv. Litig.*, 818 F.3d 98, 119 (2d Cir. 2016), *opinion vacated and

superseded*, 946 F.3d 66 (2d Cir. 2019); *see also In re Refco, Inc. Secs. Litig.*, 2009 WL 7242548,

at *11 (S.D.N.Y. Nov. 13, 2009), *report and recommendation adopted by*, 2010 WL 5129072

(S.D.N.Y. Jan. 12, 2010) (dismissing fraudulent transfer claim brought by lender that "was a

material participant in the alleged fraudulent transaction"); *U.S. Bank Nat'l Ass'n v. Verizon

Commc'ns Inc.*, 479 B.R. 405, 411 (N.D. Tex. 2012) ("Because Idearc's lenders and bondholders

had full knowledge of the transfers from Idearc to Verizon, they could not have brought fraudulent

transfer claims at the time Idearc filed for bankruptcy."; "[F]raudulent transfers are not voidable

where the benefit would run to a creditor that ratified the transfer[.]").

The Complaint makes abundantly clear that the Debtors both "authorized [and] sanctioned"

the transfers from TFT to DBTCA, and "indeed, participated in [those transfers] themselves."

*Lyondell*, 503 B.R. at 383-84. The Complaint alleges that "instead of selling the CLO Fund's

portfolio to GTFF and STFF directly, IIG came up with a more complex structure," which entailed

forming TFT, and arranging for "GTFF and STFF [to] fund[] the full amount of TFT's purchase

from the CLO," such that "although TFT was the nominal purchaser of the CLO Fund's loan

assets, the purchase price was paid by GTFF and STFF." Compl. ¶ 141. The Complaint alleges

further that IIG was fully aware of the fraudulent scheme that was implemented through the

transfers; indeed, it paints IIG as the architect of the fraud. And Plaintiffs themselves assert that

IIG's knowledge should be imputed to the Debtors. *See, e.g.*, Compl. ¶¶ 324 ("Mr. Hu and

Mr. Silver's knowledge of IIG's fraudulent scheme is attributable to the Debtors."), 331 ("Messrs. Hu and Silver orchestrated IIG's fraudulent scheme and were thus fully aware that TFT was selling participation interests in fictitious and defaulted loans."); 256 ("The Debtors, acting at the direction of IIG, knowingly induced the Investor-Assignors to invest in the Debtors on the basis of fraudulent misrepresentations in the Debtors' offering memoranda. The Debtors therefore had notice of the Investor-Assignors' claims."). Given these allegations, the Debtors are estopped from seeking to avoid the transfers.[6]

### 2.    TFT Never Had Dominion And Control Over The Transfers, And Therefore Its Creditors May Not Sue To Recover Them

Counts 9 and 10 should be dismissed for the additional and independent reason that TFT never had dominion and control over the funds that passed through it from the Debtors to DBTCA, and thus the Debtors, as TFT's purported creditors, cannot recover the funds as fraudulent transfers made by TFT. The version of New York's Debtor and Creditor Law that was in effect when the alleged transfers occurred provides that a creditor may not avoid a transfer of funds by a debtor unless the funds constituted "property of [the] debtor" before they were transferred. *See* NY DCL

---

[6] That the ***Debtors' creditors*** (the Investor-Assignors) were presumably unaware of the Debtors' scheme does not alter this analysis. The statutes under which Plaintiffs assert Counts 9 and 10 each provide that it is only a ***debtor-transferor's*** (TFT's) ***creditors*** (the Debtors GTFF and STFF) that have standing to challenge the debtor-transferor's transfers as fraudulent transfers. *See,* NYDCL §§ 273-276, 278 (providing that a transfer meeting certain criteria is "fraudulent as to" a "***creditor***") (emphasis added). And it is well-settled that ***creditors of a debtor's creditor***, such as the Investor-Assignees, are not themselves ***creditors of a debtor*** (here, TFT). *See, e.g.*, *In re Comcoach Corp.*, 698 F.2d 571, 573-574 (2d Cir. 1983) (holding that a creditor of a creditor of the debtor is not a creditor of the debtor); *In re Refco Inc.*, 505 F.3d 109, 117, 120 (2d Cir. 2007) (holding that investors in an entity, Sphinx, that had entered into a settlement with the debtor did not have standing to object to the settlement because they could not "claim that they seek to enforce any rights distinct from those of Sphinx as a creditor [of the debtor] and a defendant in an adversary proceeding."). Thus, only the Debtors, in their capacities as purported creditors of TFT, have standing to assert claims to avoid TFT's transfers under New York's avoidance statutes. And as set forth above, the Debtors' participation in and knowledge of those transfers bars any such claims.

§§ 275 (providing that a "transfer is not made until the debtor has acquired rights in the asset transferred"), 270 (defining "asset" as "property of a debtor").  Courts have held in analogous situations that funds constitute "property of a debtor" only if the debtor held "legal title" to the funds and was able to "control" the manner in which they were used.  *See, e.g.*, *In re Schick*, 234 B.R. 337 (Bankr. S.D.N.Y. 1999); *Anderson Kill P.C. v. Anderson Kill P.C. as Escrowee*, 46 Misc.3d 1219(A), N.Y. Slip Op. 50120(U) (N.Y. Sup. Ct., N.Y. County 2015).

Here, the Complaint makes clear that the funds that passed through TFT never became its "property."  Rather, "Messrs. Hu and Silver orchestrated IIG's fraudulent scheme," in which funds raised by the Debtors were always intended to, and did, simply pass through TFT to DBTCA, and TFT had no ability to "control" the way in which the funds were used.  Compl. ¶ 271.  Indeed, the Complaint alleges that TFT was nothing more than an "intermediary."  *Id.* ¶ 186; *see also id.* ¶¶ 155 (alleging that "TFT was essentially a shell company"), 141 (alleging that "although TFT was the nominal purchaser of the CLO Fund's loan assets, the purchase price was paid by GTFF and STFF ..."), 144, 160, 172 (alleging that TFT transferred the funds it received from the Debtors to DBTCA immediately upon receipt).  These funds, therefore, never became property of TFT, and their transfer cannot be avoided by TFT's creditors.

### C.    The Court Should Dismiss Counts 6, 14, And 16 Because Cayman Islands Avoidance Laws Do Not Apply

As discussed above, Counts 6 and 16 are barred by the safe harbor set forth in Section 546(e) of the Bankruptcy Code.  *See supra* § I.A.  But, even if they were not, those Counts, as well as Count 14, would fail in any event.  All three of these counts purport to assert Avoidance Claims under Cayman Islands law.  Those claims should be dismissed because conflict of law principles require the application of the laws of only one jurisdiction—New York—to Plaintiffs' Avoidance Claims.  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012)

("*Licci II*") (holding, in granting a motion to dismiss, that "a threshold question of choice of law" arises where parties assert that laws of different nations govern the same claims); *In re Toft*, 453 B.R. 186, 196 (Bankr. S.D.N.Y. 2011) ("[R]elief should not be granted or denied in a cross-border case where there is a conflict between U.S. and foreign law without a conflict of law analysis— *i.e.*, should U.S. or foreign law be applied to a particular issue based on familiar choice of law principles ....").

### 1.    New York Choice of Law Rules Apply

Where, as here, there is no significant policy that calls for imposing federal choice of law rules, then bankruptcy courts apply the forum state's choice of law rules. *See, e.g.*, *In re Gaston & Snow*, 243 F.3d 599, 607 (2d Cir. 2001). Plaintiffs do not plead any federal law claim, and their Complaint identifies no "significant policy" that requires the application of federal choice of law rules. Accordingly, New York choice of law rules govern. *See id.*

In 2017, the time of the alleged transfers in the Complaint, *see* Compl. ¶ 16, New York courts used common law choice of law principles to determine the operative law. *See Lyman Com. Sols., Inc. v. Lung*, 2014 WL 476307, at *2-3 (S.D.N.Y. Feb. 6, 2014) (applying common law New York choice of law principles to fraudulent conveyance claim).[7] Thus, these common law choice of law principles govern here. *See Jalbert v. Flom*, 633 B.R. 25, 37 (Bankr. S.D.N.Y. 2021) (holding that the relevant choice of law rules in an avoidance action are those that were in effect at the time of the transfer that the plaintiff seeks to avoid).

---

[7] Section 279 of the New York Debtor & Creditor Law that is currently operative provides that a claim thereunder is governed by "the local law of the jurisdiction in which the debtor is located when the transfer is made ...," and that a debtor that is an organization is "located" at its "place of business" if it has "only one place of business," and at its "chief executive office" if it has "more than one place of business." Given that the IIG was "New York-based," Compl. ¶ 50, and that IIG "advised" and "control[led]" the Debtors and TFT, if Section 279 governed the choice of law in this dispute, Compl. ¶ 189, New York law would apply.

### 2.    New York Choice Of Law Rules Require The Application Of New York Law

Under New York choice of law rules, "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Licci II*, 672 F.3d at 157; *Lyman Com. Sols, Inc. v. Lung*, 2013 WL 4734898, at *3 (S.D.N.Y. Aug. 30, 2013). The Joint Official Liquidators must presume there is such a conflict or else there would have been no reason for them to plead claims seeking the same relief, suing in the same capacity, both under New York and Cayman Islands law. But whether there is or is not an actual conflict, New York law governs Plaintiffs' Avoidance Claims.

To the extent that no conflict exists, this Court can and should apply New York law. *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (in the absence of an actual conflict, "a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it."); *Lyman*, 2013 WL 4734898, at *3 ("If no conflict exists, the law of the forum is applied, here New York law."); *J. Aron Co. v. Chown*, 231 A.D.2d 426, 426 (1st Dep't 1996) (affirming application of New York law where there was no actual conflict with the substantive law of Newfoundland); *Tronlone v. Lac d'Amiante du Quebec*, 297 A.D.2d 528, 528 (1st Dep't 2002), *aff'd*, 99 N.Y.2d 647 (2003) (affirming application of New York law where there was "no relevant conflict" between the substantive laws of New York and New Jersey).

New York law also applies if there is an actual conflict. In the event of an actual conflict between the laws of different jurisdictions, "the law of the jurisdiction having the greatest interest in the litigation will be applied." *Norske Skog*, 629 B.R. at 734. "Fraudulent transfer statutes are conduct-regulating laws, for which 'courts generally follow the *lex loci* rule and 'the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest

interest in regulating behavior within its borders.'"  *Id.* (internal citations omitted); *Licci II*, 672 F.3d at 158 (citation omitted) (applying New York law where alleged tortious conduct of defendants occurred in New York, noting that "[a]lthough the plaintiffs' injuries occurred in Israel, and Israel is also the plaintiffs' domicile, those factors do not govern where, as here, the conflict pertains to a conduct-regulating rule."); *see Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 50-51 (2d Cir. 2013) ("*Licci III*") (explaining that in tort cases where the wrong and injury occur in different jurisdictions "it is the place of the allegedly wrongful conduct that generally has superior interests in protecting the reasonable expectations of the parties who relied on [the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future.") (quotation and citations omitted).

"The Second Circuit recently suggested that the choice of law inquiry for avoidance actions should focus on the location of the debtor's transfer." *Norske Skog*, 629 B.R. at 736 (citing *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019)); *see also Lyman Com. Sols.*, 2014 WL 476307, at *3 (holding that it is "well-settled in the fraudulent conveyance context" that "the location of the injury does not control; instead, it is the location of the defendant's conduct that controls," and finding that the laws of New York, in which the account from which the challenged transfers were made, controlled). Courts also consider the location in which other alleged conduct by defendants in connection with the challenged transfers occurred. *Norske Skog,* 629 B.R. at 736.

Here, New York law applies because New York is the jurisdiction with, by far, the most significant contacts to this dispute. *First*, and most importantly, as the Complaint itself recognizes, all the alleged fraudulent transfers occurred in New York.  Compl. ¶¶ 142, 144, 158-160, 172 (alleging that all of the transfers were initiated from New York bank accounts, pursuant to agreements governed by New York law); *id.* ¶ 18 (alleging that Defendants "receiv[ed] the

transfers that are at issue in this action from a DBTCA account in New York, and, on information and belief, designat[ed] bank accounts located in New York to receive these transfers"). *Second*, the parties that allegedly caused the wrongful transfers—IIG and IIG's principals—maintained their principal places of business in New York. *Id.* ¶ 25. DBTCA and two of the four Noteholder Managers were also based in New York, with the other two based in California, not the Cayman Islands. *Id.* ¶¶ 26-27, 34, 39, 44. Thus, all the other conduct regarding the transfers that Plaintiffs seek to avoid occurred in New York. *Third*, the relationships between and among the parties are governed by New York law. For example, New York law governs the contracts pursuant to which (1) IIG served as investment advisor to GTFF and STFF, *id.* ¶¶ 25, 183; (2) the CLO Fund delegated loan servicing responsibilities to IIG, *id.* ¶ 60; (3) IIG appointed GSC as its agent to identify investors in the South Korean market, *id.* ¶ 130; and (4) the terms of any sale of the CLO Fund's loan assets were set, *id.* ¶ 136.

Given these undisputed facts, New York is plainly the jurisdiction with the most significant interest, and its laws, not those of the Cayman Islands, apply. Plaintiffs' Cayman Avoidance Claims therefore fail.

## II.    THE COURT SHOULD DISMISS THE DAMAGES CLAIMS

Plaintiffs also bring several claims for damages against the Noteholder Managers, purportedly under both New York and Cayman Islands law. Each of these claims—for aiding and abetting fraud and aiding and abetting breach of fiduciary duty under New York law (Counts 4 and 12, respectively) and for conspiracy to injure by unlawful means and fraudulent trading under Cayman law (Counts 7, 15, and 17, respectively)—sounds in fraud and is therefore subject to the heightened pleading standards of Rule 9(b). Under that rule, Plaintiffs must "state with particularity the circumstances constituting" the alleged fraud, and thus must "set forth separately the acts complained of as to each defendant" in their alleged claims for relief. Fed. R. Civ. P. 9(b);

*Filler v. Hanvit Bank*, 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003).   Inherent in this particularity requirement is a prohibition against group pleading: a complaint "may not rely upon blanket references to acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which" the defendant "individually stands charged."   *See Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 518, 522 n.7 (S.D.N.Y. 1977).

At the outset, the Court should dismiss the Damages Claims under Rule 9(b) because the Complaint flagrantly violates the prohibition against group pleading.   The Complaint broadly and generally assigns alleged wrongdoing to the "Noteholder[ Manager]s" as a group and states in a footnote that because the Noteholder Managers "each individually received or had access to the exact same information and/or took a common action or refrained from action," Plaintiffs should be permitted to assert "collective knowledge" by the Noteholder Managers as a whole.   Compl. ¶ 6 n.2.   This attempt to end-run Rule 9(b) runs contrary to the fundamental purposes of that rule, and the Court should not permit Plaintiffs to proceed with their Damages Claims against the Noteholder Managers for this reason alone.[8]

Moreover, each of the Damages Claims fails for additional reasons.   The aiding and abetting claims (Counts 4 and 12) each fail because Plaintiffs have not adequately alleged either actual knowledge or substantial assistance, both of which are required elements to state a claim. Plaintiffs are also precluded from recovering on their aiding and abetting breach of fiduciary duty claim (Count 12) brought on behalf of the Debtors under the doctrine of *in pari delicto* and the *Wagoner* Rule.   The Cayman Islands claims (Counts 7, 15, and 17) fail because New York, and

---

[8] Each group of Noteholder Defendants addresses the scant allegations raised specifically about it and why those allegations are insufficient to state a claim for relief in supplemental memoranda of law submitted contemporaneously herewith.

not Cayman, law applies.  And even if the Court were to apply Cayman law, the claims still fail because Plaintiffs have not alleged the purported circumstances of fraud with requisite particularity.

### A.    The Court Should Dismiss Count 4 Because Plaintiffs Fail To State A Claim For Aiding And Abetting Fraud

Plaintiffs allege in Count 4 that the Noteholder Managers aided and abetted IIG's fraud against the Investor-Assignors, which IIG purportedly perpetrated by sending the Investor-Assignors solicitation materials, including "investment teasers, offering memoranda, [and] email communications," that contained material misstatements and omissions.  Compl. ¶¶ 233-35, 240. In particular, Plaintiffs allege that IIG's solicitation materials falsely represented "the nature and quality of the loans in which the Funds would be acquiring participation interests" when in fact "many of the loans in which the Funds would be acquiring participation interest were past due and in default or were fictitious loans made to the Panamanian Borrowers." *Id.* ¶ 234.

To state a claim for aiding and abetting IIG's fraud, Plaintiffs must allege that the Noteholder Managers (1) had actual knowledge of the fraud and (2) provided substantial assistance that advanced the fraud and was the proximate cause of the alleged injury. *Krys v. Pigott*, 749 F.3d 117, 127-28 (2d Cir. 2014).[9]  The Complaint fails to adequately allege either element with the particularity required by Rule 9(b).

### 1.    Plaintiffs Fail To Allege That The Noteholder Managers Had Actual Knowledge Of IIG's Fraud

To satisfy the actual knowledge prong, Plaintiffs must allege with particularity "specific facts that give rise to a strong inference" that the Noteholder Managers had "direct and clear

---

[9] The Noteholder Defendants do not for purposes of this Motion dispute the existence of an underlying fraud by IIG, the third element of aiding and abetting fraud. *Krys*, 749 F.3d at 127-28.

knowledge" of the fraud.  *See Huang v. Hong Kong & Shanghai Banking Corp. LTD*, 2022 WL 4123879, at *4 (S.D.N.Y. Sept. 9, 2022) (internal citations omitted).  Plaintiffs "must plausibly allege actual knowledge of the underlying fraud on the part of the [Noteholder Managers]: constructive knowledge is not sufficient, nor is a lower standard such as recklessness or willful blindness."  *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 412 (S.D.N.Y. 2021) (internal quotation marks and citations omitted).

Plaintiffs claim that the Court should infer that the Noteholder Managers had actual knowledge of IIG's fraud because (1) the Noteholder Managers purportedly contributed to IIG's solicitation materials; (2) the Noteholder Managers were purportedly aware of "red flags" of IIG's fraud raised by adverse developments regarding their investments in the CLO Fund; and (3) the Court should impute IIG's and DBTCA's alleged knowledge of IIG's fraud to the Noteholder Managers through a purported agency relationship with the Noteholder Managers.  None of the allegations comes close to adequately pleading the Noteholder Managers' actual knowledge of fraud under the heightened pleading standards of Rule 9(b).

*First*, Plaintiffs' allegations relating to IIG's solicitation materials fall far short of pleading actual knowledge on the part of the Noteholder Managers.  Plaintiffs do not allege that the Noteholder Managers saw the solicitation materials that IIG sent to the Investor-Assignors, or that the Noteholder Managers participated in any communication between IIG (or its "exclusive" agent, GSC) and potential new investors, including the Investor-Assignors, in GTFF and STFF.  Instead, Plaintiffs allege only that the Noteholder Managers received a draft presentation and teaser regarding a different potential transaction, which would have involved different investors and a different investment vehicle—CLO II—which never came to fruition.  Compl. ¶¶ 120-21.  And while Plaintiffs allege—only on "information and belief," despite having received extensive Rule

2004 discovery—that "various Noteholder[ Manager]s offered suggestions, guidance, and direction on how IIG should go about approaching potential investors" regarding the proposed CLO II transaction, *id.* ¶ 124, Plaintiffs fail to identify which Noteholder Managers purportedly provided such advice to IIG, what the advice was, or how, if at all, it was incorporated into IIG's subsequent efforts to solicit the Investor-Assignors to invest in a different type of fund after IIG abandoned the proposed CLO II transaction.

Indeed, Plaintiffs fail to plead any facts, let alone specific facts, linking the draft investor materials relating to CLO II that the Noteholder Managers allegedly saw to the Investor-Assignors' decision to invest in the Debtors. *See id.* ¶ 117. Plaintiffs do not allege that IIG sent the draft presentation materials for the proposed CLO II transaction to the Investor-Assignors; to the contrary, they concede that IIG sent the Investor-Assignors a different document, a "modified teaser," to solicit investors in a "to-be-created IIG-managed investment vehicle." *Id.* ¶¶ 126, 130. Plaintiffs fail to allege how or by whom the new teaser was "modified," nor do they allege that the Noteholder Managers ever saw this "modified teaser" or any other solicitation materials that IIG sent to the Investor-Assignors. The Complaint's lack of any specific allegation that any of the Noteholder Managers actually knew there was anything fraudulent in IIG's solicitation of potential new investors, including the Investor-Assignors is fatal to their claim.

*Second*, Plaintiffs' attempt to fall back on a claim that the Noteholder Managers were purportedly aware of a series of "red flags" concerning their own investment that would have given them actual knowledge of IIG's fraud regarding the CLO Fund's loan assets likewise fails. *Id.* ¶¶ 84, 91, 94-98, 99-102, 106-07, 110, 112, 118-19, 243. Plaintiffs contend that the Noteholder Managers had actual knowledge of IIG's fraudulent scheme based on the following purported "red flags": (1) prior to investing in the CLO Fund in 2013, some Noteholder Managers allegedly had

difficulty verifying data with IIG and questioned its operations, *id.* ¶¶ 95-96; (2) after investing in the CLO Fund, the Noteholder Managers allegedly learned that IIG was acting inconsistent with the underlying deal documents, *id.* ¶¶ 99-101; (3) after investing in the CLO Fund, the Noteholder Managers allegedly knew their investment was not performing as expected and, by early 2017, the Noteholder Managers allegedly knew that close to 40% of the principal amount of the CLO Fund's loans had matured without repayment, *id.* ¶ 84; (4) DBTCA gave the Noteholder Managers inaccurate trustee reports with information that allegedly conflicted with the underlying deal documents and the Noteholder Managers' internal numbers, *id.* ¶¶ 91, 94, 97, 112, 201; and (5) in Spring 2017, IIG allegedly gave the Noteholder Managers diligence that showed that certain of the CLO Fund's loans were not documented by loan agreements and were past due, and DBTCA supposedly did not have collateral documents for most of the CLO Fund's loans, *id.* ¶¶ 106-07, 110, 112.  Even taking these allegations as true for purposes of this Complaint (which they are not), these allegations do not and cannot establish the Noteholder Managers' actual knowledge of any fraud, let alone of any fraudulent misrepresentations made by IIG to the Investor-Assignors.

"It is well settled in the Second Circuit that … failure to identify warning signs of fraudulent activity, such as atypical transactions—even where such signs converge to form a 'veritable forest of red flags'—is insufficient to impute actual knowledge of ongoing fraud." *Huang*, 2022 WL 4123879, at *5 (internal quotations and citations omitted) (collecting cases); *Heinert v. Bank of Am. N.A.*, 835 F. App'x 627, 631 (2d Cir. 2020) (affirming dismissal for failure to plead actual knowledge when plaintiffs only alleged that defendants flagged underlying tortfeasors' bank accounts for suspicious activity); *Berdeaux*, 561 F. Supp. 3d at 413 (noting that even allegations of "obvious warning signs are insufficient as a matter of law to raise an inference of actual knowledge.").  The purported "red flags" pleaded in the Complaint do not constitute the

kinds of specific facts needed to give rise to a plausible inference that the Noteholder Managers actually knew that IIG was committing fraud.

*Berdeaux* is instructive on this point.  There, the court dismissed a complaint for failure to allege actual knowledge of fraud where the plaintiffs had relied on allegations that the defendants "ignored obvious warning signs of fraud."  561 F. Supp. 3d at 413, 419.  The *Berdeaux* plaintiffs claimed that the defendants—sophisticated investors in a cryptocurrency company that allegedly defrauded the plaintiffs—had actual knowledge of the fraud the company committed because the defendants conducted an internal investigation into their investment in the company's affiliate and concluded that it was a Ponzi scheme.  *Id.* at 394, 413.  The court explained that this type of allegation was not enough to establish actual knowledge of fraud and dismissed the complaint.  *Id.* at 413-14.  This Court should do the same, as Plaintiffs' purported "red flag" allegations here are even weaker than those pleaded in *Berdeaux*.

In an attempt to sidestep this clear law that "red flags" do not equate to actual knowledge, Plaintiffs cite a handful of actions allegedly taken by certain Noteholder Managers in response to the purported "red flags" as supposed confirmatory evidence of the Noteholder Managers' actual knowledge of IIG's fraud.  *See* Compl. ¶¶ 103-16.  Plaintiffs point to a February 27, 2014 letter that BlueMountain and KKR sent to IIG "warn[ing] IIG … [that] it could be held liable to the Noteholder[ Manager]s for any false statements in the CLO Fund's offering circular regarding the underlying collateral."  *See* Compl. ¶ 105.  But the actual letter says no such thing, instead referring only generally to IIG's obligations under the Collateral Management Agreement.[10]  *See* O'Brien Decl., Ex. B (Letter).  Plaintiffs also allege that the Noteholder Managers negotiated a series of

_____

[10] This letter is integral to the Complaint's allegations, *see, e.g.*, Compl. ¶¶ 84, 105, and thus the Court may take judicial notice of it.  *See supra* § I.A.1.b n.3.

forbearance agreements with IIG rather than foreclosing on the collateral underlying the CLO Fund's loans. Compl. ¶¶ 105, 124. These allegations, however, are "consistent with normal, lawful business practices" and do not support "actual knowledge." *Krys*, 749 F.3d at 132. Nor for that matter do they have any connection to IIG's solicitation of the Investor-Assignors, which is the focus of the aiding and abetting fraud claim.

Regardless, none of these purported "red flags," considered individually or collectively, gives rise to a plausible inference that all the Noteholder Managers, let alone any individual Noteholder Manager, had actual knowledge of IIG's subsequent supposed fraud of the Investor-Assignors. And as the Noteholder Managers had no independent duty to the Investor-Assignors, "even alleged ignorance of obvious warning signs of fraud will not suffice to adequately allege 'actual knowledge.'" *See Chemtex, LLC v. St. Anthony Enters., Inc*., 490 F. Supp. 2d 536, 547 (S.D.N.Y. 2007) (citation omitted).

*Third*, Plaintiffs seek to impute IIG's knowledge and/or DBTCA's purported knowledge of IIG's fraud to the Noteholder Managers by alleging supposed agency relationships with the Noteholder Managers. Compl. ¶¶ 80, 149. The Court should reject these arguments. As for IIG, the Complaint suggests—in a single paragraph—two purported bases for imputing IIG's knowledge to the Noteholder Managers: (i) IIG, as the CLO Fund's collateral manager, acted on the Noteholder Managers' behalf in originating and selling loans to the CLO Fund; and (ii) the Noteholder Managers gave IIG the authority to cause the CLO Fund to buy and sell assets. *Id.* ¶ 80. Neither allegation supports a plausible inference of agency between the Noteholder Managers and IIG as Plaintiffs suggest. Rather, as these allegations show, IIG served as an agent only for the CLO Fund. *See id.* ¶ 60 (alleging that under the Collateral Management Agreement, "the CLO delegated day-to-day servicing of its loans to IIG."). Neither the Collateral Agreement

nor the Indenture (neither of which include any Noteholder Defendant as a party) established an agency agreement between IIG and the Noteholder Defendants, or granted any Noteholder Defendant control over IIG's actions as Collateral Manager. *See, e.g.*, *Ridge Clearing & Outsourcing Sols., Inc. v. Khashoggi*, 2011 WL 3586455, at *7 (S.D.N.Y. Aug. 12, 2011), *aff'd sub nom. Broadridge Sec. Processing Sols., LLC v. Khashoggi*, 507 F. App'x 57 (2d Cir. 2013) (noting that an essential element of agency is that "the principal is to be in control of the undertaking"). In any event, the Noteholder Defendants were deceived by IIG's fraud—just like the Investor-Assignors, they were defrauded into investing with IIG—and, therefore, IIG's knowledge of that fraud cannot be imputed to them. *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 467 (2010) (noting that the "presumption that an agent will communicate all material information to the principal" does not apply when the agent is not acting in the principal's interest).

Plaintiffs' claim that DBTCA's purported knowledge should be imputed to the Noteholder Managers because DBTCA acted on the Noteholder Managers' behalf in approving and funding loans and acquired certain knowledge on distressed loans in its capacity as the Noteholder Managers' agent also fails. *See* Compl. ¶ 149. To begin with, as set forth in DBTCA's motion to dismiss, Plaintiffs fail to allege in anything but conclusory fashion that DBTCA was aware of IIG's fraud. *See* Defendant Deutsche Bank Trust Company Americas' Memorandum Of Law In Support Of Motion To Dismiss Counts 1, 2, 5-7, 9, 10, and 13-17 Of The Complaint. But even if Plaintiffs adequately alleged DBTCA's knowledge of fraud, such knowledge could not be imputed to the Noteholder Managers. While the Indenture established a limited agency relationship between DBTCA and the Noteholder Managers, *see, e.g.*, O'Brien Decl., Ex. A (Indenture), Art. VI § 6.16, the Indenture limits DBTCA's responsibility and authority prior to an Event of Default to ministerial functions expressly set forth in the Indenture, *id.* at Art. VI § 6.1(1)(i); *see also AG*

*Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 11 N.Y.3d 146, 157-58 (2008)

(holding that indenture trustee's pre-default duties are limited to performance of "its ministerial

functions with due care").  Any supposed knowledge of fraud by DBTCA would fall outside this

limited pre-default ministerial function.  *See Mobil Sales & Supply Corp. v. Xenakis*, 1980 WL

6688476 (S.D.N.Y. Jan. 15, 1980) ("[t]he mere creation of an agency for some purpose does not

automatically invest the agent with apparent authority to bind the principal without limitation")

(citing *Ford v. Unity Hospital*, 32 N.Y.2d 464, 472-73 (1973) (internal quotations omitted).  And

to the extent DBTCA had obtained actual knowledge of the fraud, Section 6.2 of the Indenture

required DBTCA to notify the Noteholder Managers of an Event of Default.  *See* O'Brien Decl.,

Ex. A (Indenture), Art. VI. § 6.2.  The Plaintiffs do not (and cannot) allege that DBTCA provided

any such notification.  Plaintiffs cannot saddle the Noteholder Managers with responsibility for

DBTCA's undisclosed supposed knowledge.

### 2.  Plaintiffs Fail To Allege That The Noteholder Managers Substantially Assisted IIG's Fraud

Plaintiffs' aiding and abetting fraud claim independently fails because the Complaint fails

to allege that the Noteholder Managers collectively, let alone any of them individually, provided

substantial assistance to IIG in perpetrating its fraud on the Investor-Assignors.  To plead

substantial assistance, a plaintiff must allege with particularity specific facts that (1) the defendant

affirmatively assisted in or helped to conceal the fraud, or by virtue of failing to act when required

to do so enabled the fraud to proceed, and (2) the actions of the alleged aider and abettor

proximately caused the harm on which the primary liability is predicated.  *See, e.g., Cromer Fin.

Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) (citing *Diduck v. Kaszycki & Sons

Contractors, Inc.*, 974 F. 2d 270, 284 (2d Cir. 1992)).

Additionally, where, as here, the alleged aider and abettor owes no affirmative duty to the victim of the alleged fraud, a failure to act cannot constitute substantial assistance as a matter of law. *See In re Level 8 Apparel, LLC*, 2021 WL 279620, at *18 (Bankr. S.D.N.Y. Jan. 26, 2021) ("Mere inaction does not amount to 'substantial assistance' for purposes of fixing aiding and abettor liability, unless the defendant has an independent duty to the plaintiff to act or disclose information") (citation omitted); *Nat'l Westminster Bank USA v. Weksel*, 124 A.D.2d 144, 148 (1st Dep't 1987) ("We know of no case where mere inaction by a defendant has been held sufficient to support aider and abettor liability for fraud."). And as with the actual knowledge element of an aiding and abetting fraud claim, "mere knowledge and approval … does not constitute substantial assistance." *Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 92 (2d Cir. 1983)).

Plaintiffs' substantial assistance allegations rest solely on the claims that the Noteholder Managers "strongarmed" IIG into soliciting potential investors to refinance the CLO Fund's portfolio, offered "suggestions, guidance, and direction on how IIG should go about approaching potential investors," entered into forbearance agreements that delayed foreclosure and gave IIG time to solicit potential investors, and drafted the Fourth Supplemental Indenture to permit IIG to sell the CLO Fund's loans to the Debtors at par plus accrued interest. Compl. ¶ 244.

None of these allegations supports a claim of substantial assistance. To begin with, Plaintiffs do not offer a single detail regarding the "Noteholders" alleged "suggestions, guidance, and assistance," and the Complaint is devoid of any allegation that any Noteholder Manager ever interacted with any potential new investors, including the Investor-Assignors (or GSC, which the Complaint refers to as IIG's "exclusive" agent in connection with the solicitation of investors in

South Korea).  Also absent from the Complaint are any particularized allegations regarding any Noteholder Manager's supposed "strongarming."

Moreover, the Second Circuit has expressly held that even where—unlike here—a plaintiff adequately alleges a lender's knowledge of a borrower's fraud, allegations that the lender demanded to be repaid, refrained from foreclosing, and provided written consent to allow the borrower to incur additional debt to refinance the defendant lender's debt do not plead substantial assistance.  Instead, such allegations "say no more than that [the lender defendant] relied on its own wits and resources to extricate itself from peril, without warning persons it had no duty to warn."  *In re Sharp Int'l. Corp.*, 403 F.3d 43, 52 (2d Cir. 2005).  Indeed, noting that the lender in *Sharp* had a right to foreclose but "did not expect foreclosure to be efficacious, the *Sharp* court held that "the demand for repayment of a bona fide debt is not a corrupt inducement that would create aider and abettor liability." *Id.*  The court held further that *not* foreclosing was inaction and not "substantial assistance," and that although providing written consent could be "characterized as affirmative … it did no more than remove a contractual impediment that was reserved to [the lender] to invoke or not in its own interest" and "did not constitute participation in ... fraud." *Id.* As the Second Circuit held, such conduct constitutes no more than the lawful exercise of one's legal rights, and cannot give rise to aiding and abetting liability. *Id.* at 52-53.

Plaintiffs also fail to allege that the Noteholder Managers' actions were the proximate cause of the Investor-Assignors' alleged injury.  An aider and abettor's substantial assistance to a fraud is the proximate cause of plaintiff's injury only when that injury is "a direct or reasonably foreseeable result of the defendant's conduct."  *Filler*, 2003 WL 22110773, at *2. Plaintiffs therefore must allege a "nexus" between the Investor-Assignors' alleged injury and the Noteholder Managers' purported conduct taken "with the intention of advancing the fraud's commission."

*Krys*, 749 F.3d at 127.  The Complaint pleads no such nexus.  Rather, Plaintiffs allege that IIG's fraud began well before the Noteholder Funds ever invested in the CLO Fund, that IIG fraudulently induced the Noteholder Funds to invest in the CLO Fund in order to conceal and continue its fraud, and that IIG solicited the Investor-Assignors in order to continue to evade detection.  Compl. ¶¶ 2, 55-57. 59, 87, 103.  The proximate cause of the injury suffered by the Investor-Assignors plainly was IIG, not the Noteholder Defendants, with whom the Investor-Assignors are not alleged to have had any contact whatsoever, and who did nothing more than exercise their lawful rights.

### B.    The Court Should Dismiss Count 12 Because Plaintiffs Fail To State A Claim For Aiding And Abetting Breach Of Fiduciary Duty By IIG

Plaintiffs allege in Count 12 that the Noteholder Managers are liable for aiding and abetting a breach of fiduciary duty by IIG.  Compl. ¶¶ 294-97.  Plaintiffs allege that IIG breached its fiduciary duties of disclosure and loyalty to the Debtors by (i) failing to disclose fictitious and defaulted loan information, and (ii) causing the Debtors to enter into transactions in which IIG was conflicted.  *Id.* ¶¶ 290-91.

As a threshold matter, the doctrine of *in pari delicto* and the *Wagoner* Rule—which generally preclude bankruptcy trustees or liquidators from suing third parties for damages where the bankrupt entity was part of the fraud—are dispositive of Plaintiffs' Damages Claim, brought on behalf of the Debtors, for aiding and abetting breach of fiduciary duty (Count 12).  Plaintiffs concede that the Debtors knowingly participated in IIG's fraud, *id.* ¶¶ 255-56, 324, meaning they may not recover damages on behalf of the Debtors for a wrong in which the Debtors participated. *In re ICP Strategic Credit Income Fund Ltd.*, 2015 WL 5404880, at *18 (Bankr. S.D.N.Y. Sept. 15, 2015), *aff'd*, 568 B.R. 596 (S.D.N.Y. 2017), *aff'd sub nom. In re ICP Strategic Income Fund, Ltd.*, 730 F. App'x 78 (2d Cir. 2018) (holding that *in pari delicto* and the *Wagoner* Rule barred liquidators' aiding and abetting breach of fiduciary duty claim because it sought to recover for a

"wrong in which the party participated or is deemed through imputation to have participated.").

New York's *Wagoner* Rule applies at the pleading stage to bar "successors in interest of

wrongdoers, including bankruptcy trustees and foreign liquidators" from proceeding with such

claims. *Id.* (citing *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991));

*In re Bernard L. Madoff Inv. Secs. LLC.*, 721 F.3d 54, 65 (2d Cir. 2013), *cert. denied sub nom.*,

*Picard v. HSBC Bank PLC*, 134 S. Ct. 2895 (2014) ("Early resolution is appropriate where (as

here) the outcome is plain on the face of the pleadings.").

Plaintiffs' aiding and abetting breach of fiduciary duty claim also fails largely for the same

reasons as does their claim for aiding and abetting fraud.  To state a claim for aiding and abetting

breach of fiduciary duty, Plaintiffs must allege that (1) the Noteholder Managers had actual

knowledge of an underlying breach of fiduciary duty by IIG; (2) the Noteholder Managers

knowingly induced or participated in that breach; and (3) Plaintiffs suffered damages as a result of

the breach.  *In re Sharp Int'l Corp.*, 403 F.3d at 49.[11]  To demonstrate the Noteholder Managers'

purported knowing inducement of or participation in the breach, Plaintiffs must allege both that

the Noteholder Managers had actual knowledge of IIG's breach and that the Noteholder Managers

provided substantial assistance to IIG in committing that breach.  *Id.* at 49-50 ("A person

knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial

assistance' to the primary violator.") (citation and internal quotation omitted).  As with their aiding

---

[11] For purposes of this motion, the Noteholder Defendants do not dispute the existence of a breach
of fiduciary duty by IIG or that Plaintiffs suffered damages (although to be clear the Noteholder
Defendants do contest that their alleged conduct was the proximate cause of those alleged
damages, *see infra* § II.B.2).  That said, Count 12 fails even without consideration of the actual
knowledge or substantial assistance elements.  It purports to assert a claim by the Joint Official
Liquidators standing in the shoes of the Debtors, not the Investor-Assignors.  But Count 12 asserts
a harm to the Investor-Assignors and not the Debtors because IIG made misrepresentations to the
Investor-Assignors, causing them to invest in the Debtors.  Compl. ¶ 294.  That cannot constitute
a breach of duty to the Debtors themselves.

and abetting fraud claim, Plaintiffs' claim that the Noteholder Managers aided and abetted IIG's breach fails because the Complaint does not allege with particularity any facts giving rise to an inference that the Noteholder Managers collectively, let alone any Noteholder Manager individually, had actual knowledge of or substantially assisted IIG's breach of fiduciary duty.

       1.       **Plaintiffs Fail To Allege That The Noteholder Managers Had Actual Knowledge Of A Breach Of Fiduciary Duty By IIG**

The Complaint alleges that the Noteholder Managers had actual knowledge of IIG's alleged breaches of fiduciary duty because the Noteholder Managers purportedly knew that IIG had made misrepresentations to investors and that IIG was on both sides of the ultimate sale transactions, thereby causing the Debtors to overpay for the participation interests in the loans. Compl. ¶ 294. Plaintiffs have failed to adequately plead either basis.

*First*, Plaintiffs' allegations regarding the Noteholder Managers' purported knowledge of IIG's representations to the Investor-Assignors and value of the CLO Fund's loan portfolio suffer from the same the fatal flaws discussed above: the purported investor materials that IIG once sent to the Noteholder Managers were in draft form and concerned a potential solicitation to different investors in a different investment vehicle that never came to fruition, and the Complaint fails to allege that any Noteholder Manager had actual knowledge of any fraud by IIG regarding the CLO Fund's loan assets. *See supra* § II.A.1. The Complaint does not allege that the Noteholder Managers saw any solicitation materials sent to the Investor-Assignors relating to GTFF and STFF—the two entities into which the Investor-Assignors invested. Nor does the Complaint allege that any Noteholder Manager was involved in negotiations that may have occurred between IIG or its "exclusive agent" GSC and potential new investors, including the Investor-Assignors. *See, e.g., Kaufman v. Cohen*, 307 A.D.2d 113, 125 (1st Dep't 2003) (holding that "extremely sparse and wholly conclusory" allegation is insufficient to allege actual knowledge of breach of a fiduciary

duty).  In any event, Plaintiffs do not explain with particularity how such alleged knowledge of IIG's purported misrepresentations to the **Investor-Assignors** would give rise to a plausible inference that the Noteholder Managers had actual knowledge of a breach of fiduciary duty by IIG to **the Debtors**.

Plaintiffs' attempt to fall back on the same "red flag" allegations as in their fraud claim, Compl. ¶¶ 92, 94, 296, to suggest that the Noteholder Managers had actual knowledge regarding the value of the CLO Fund's loan portfolio fails here too: purported awareness of "red flags" does not constitute actual knowledge of a fiduciary duty breach, *Hongying Zhao v. JPMorgan Chase & Co.*, 2019 WL 1173010, at *5-6 (S.D.N.Y. Mar. 13, 2019); *see also supra* § II.A.1, and the Noteholder Managers' possible awareness of some "red flags" relating to the CLO Fund's activity says nothing about the fraud that IIG perpetuated when soliciting the Investor-Assignors' investments, *see supra* § II.A.1.

*Second*, Plaintiffs' attempt to plead actual knowledge fares no better with respect to their allegation that IIG appeared on both sides of the transactions wherein GTFF and STFF purportedly purchased participation interests in loans that were being sold by the CLO Fund.  Compl. ¶ 291. In the entire Complaint, Plaintiffs include only two sentences concerning the Noteholder Managers' purported awareness of any connection between IIG and the Debtors, claiming that "[t]he Noteholder[ Manager]s also knew—because IIG told them—that the CLO Fund's portfolio was being sold to a related fund managed by IIG," and that the Noteholder Managers "knew that IIG sponsored and served as investment advisor for GTFF and STFF."  *Id.* ¶¶ 198, 200.  The Complaint fails to allege how any conversation could have put the Noteholder Managers on notice of any breach, as a sale to a related fund is not a *per se* violation of the duty of loyalty, parties can and regularly do waive any conflicts of interest that may arise because the same entity has a role

on both sides of a transaction, *see, e.g., Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 356-57 (S.D.N.Y. 2013); *Guerrand Hermes v. J.P. Morgan & Co. Inc.*, 2 A.D.3d 235, 237, (1st Dep't 2003).

Additionally, the Complaint lacks any detail about the purported conversation between the Noteholder Managers and IIG that presumably gave rise to such knowledge or awareness. The Complaint does not, for example, allege when this conversation happened, who was involved in the conversation, and what transactions were discussed during the conversation. Nor does the Complaint specifically allege what IIG told any Noteholder Manager about these purported relationships.

### 2.    Plaintiffs Fail To Allege That The Noteholder Managers Substantially Assisted A Breach Of Fiduciary Duty By IIG

Plaintiffs also fail to allege that the Noteholder Managers substantially assisted an underlying breach of fiduciary duty by IIG. "A person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator." *In re Sharp Int'l Corp.*, 403 F.3d at 50 (quoting *Kaufman,* 307 A.D.2d at 126.). An alleged aider and abettor must "affirmatively assist[], help[] conceal or fail[] to act when required to do so, thereby enabling the breach to occur." *See id.* Like aiding and abetting fraud, proximate cause is "embedded into the substantial assistance element" for aiding and abetting a breach of fiduciary duty, and it is established only "where a plaintiff's injury was a direct or reasonably foreseeable result of the defendant's conduct." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345-46 (2d Cir. 2018). The Complaint alleges neither affirmative actions taken by any Noteholder Manager (or any failure to act in the face of a legal duty to do so), nor that the Debtors' purported injuries were proximately caused by any such actions.

Plaintiffs allege that the Noteholder Managers collectively provided substantial assistance to IIG by (1) "encouraging IIG to proceed with the loan sales and insisting that the sales only proceed if the Funds paid par plus accrued interest"; (2) offering suggestions, guidance, and direction on how IIG should go about approaching potential investors for the Funds; (3) forbearing from calling an Event of Default under the Indenture to give IIG time to solicit potential investors for the Funds; and (4) drafting the Fourth Supplemental Indenture so as to permit IIG to sell the CLO Fund's loans to the Funds at par." Compl. ¶ 295.  In other words, Plaintiffs rely on the same conduct underlying their aiding and abetting fraud claim to establish their aiding and abetting breach of fiduciary duty claim. *Compare id.* ¶ 244, *with id.* ¶ 295.

These allegations fail to adequately plead knowledge of IIG's fiduciary duty breach for the same reasons discussed above with respect to the aiding and abetting fraud claim: they are ordinary business activities.  *See supra* § II.A.1; *see also Kaufman*, 307 A.D.2d at 126 (finding that routine business activities are not evidence of substantial assistance of fiduciary duty breach).  Business decisions taken by investors to protect their investments and manage risks do not equate to substantial assistance in a breach of fiduciary duty.  *Id.* at 126.

Plaintiffs likewise fail to allege facts to establish that the Noteholder Managers' alleged conduct was the proximate cause—the "direct or reasonably foreseeable result"—of Plaintiffs' alleged injuries from IIG's breach.  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006).  As with their aiding and abetting fraud claim, Plaintiffs merely offer the conclusory statement that "[a]s a direct and proximate result of the Noteholder[ Managers'] knowing participation in … IIG's breaches, the Debtors were damaged." Compl. ¶ 297.  This is a classic legal conclusion that the Court should disregard, especially under Rule 9(b)'s heightened pleading standard.  *See ICD Cap., LLC v. CodeSmart*

*Holdings, Inc.,* 2020 WL 3961617, at *8 (S.D.N.Y. Jul. 13, 2020), *aff'd*, 842 F. App'x 705 (2d

Cir. 2021).

> ### C.    The Court Should Dismiss Counts 7, 15, And 17 Because Plaintiffs Fail To State A Claim For Damages Under Cayman Islands Law

Just as Plaintiffs plead duplicative Avoidance Claims seeking the same relief under both

New York and Cayman Islands law, they do the same with their Damages Claims.  In Count 7, the

Joint Liquidators, in their capacity as Investor-Assignees, assert a claim under "the common law

in the Cayman Islands" for supposedly "conspir[ing]" with IIG (and TFT and DBTCA) to injure

the Investor-Assignors.  Compl. ¶¶ 260-261.  In Count 15, the Joint Liquidators, this time standing

in the shoes of the Debtors, purport to bring a similar "conspiracy" claim, also ostensibly under

Cayman law, but this time for injury to the Debtors themselves, rather than their investors.  *Id.* ¶

311.  And in Count 17, the Joint Liquidators assert a Cayman statutory claim, alleging that "[t]he

Noteholder[ Manager]s participated in IIG's fraudulent scheme and," as such, "were knowingly

part[ies]" to the "fraudulent" operation of the Debtors' business with the "intent to defraud

creditors"—the Investor-Assignors.  *Id.* ¶¶ 328, 331, 334.

These damages claims, purportedly brought under Cayman law, fail for two reasons: *first*,

New York law, and not Cayman law, governs Plaintiffs' theory of relief for damages and thus their

Cayman claims are impermissibly duplicative of Counts 4 and 12 (both of which sound in fraud);

and *second*, even if Cayman law were to govern the substance of Counts 7, 15, and 17, these claims

still fail because Plaintiffs do not plead these claims with the particularity required by Rule 9(b)'s

heightened pleading standard.

> ### 1.    Cayman Islands Law Does Not Apply To Counts 7, 15, And 17

The gravamen of the "conspiracy" and "participation" claims pleaded in Counts 7, 15, and

17 is the same as that of Plaintiffs' aiding and abetting claims under New York law: that the

Noteholder Managers supposedly assisted IIG (and the other alleged wrongdoers) in causing STFF and GTFF to obtain investments from the Investor-Assignors, and to acquire the loans from the CLO Fund, based on misrepresentations.  To be sure, Count 17 is based on a Cayman statute, rather than Cayman common law.  But that makes no difference.  Count 17 is based on the same alleged conduct and seeks the same claimed damages as Plaintiffs' aiding and abetting fraud claims under New York law in Counts 4 and 12.  *Compare Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*, 64 A.D.3d 472, 476 (2009) (requiring "knowledge" and "substantial assistance" to establish claim for aiding and abetting fraud under New York law), *with* Compl. ¶¶ 332-35 (alleging that Defendants "participated in IIG's fraudulent scheme," were "knowingly party to the business of the Debtors," and "provided substantial assistance" to the Debtors).

All three of the Cayman Islands damages claims fail for the same reason that Plaintiffs' duplicative Avoidance Claims under Cayman law also fail:  the law of New York, not the Cayman Islands, applies.

As discussed above, the first step in the choice-of-law analysis is to determine if there is a conflict between New York and Cayman law with respect to the legal claims pleaded.  *See supra* § I.C.2.  Here, there plainly is a conflict.  While Cayman law may recognize a freestanding claim for conspiracy, as Plaintiffs purport to plead in Counts 7 and 15, New York law does not.  *See Republic of Kazakhstan v. Chapman*, 217 A.D.3d 515, 517 (1st Dep't 2023) (finding a conflict between English and New York law because English law recognizes a conspiracy claim without the commission of an underlying tort, while New York law does not).  And, to the extent that Plaintiffs claim that the Cayman Islands statute under which Plaintiffs bring Count 17 could make the Noteholder Managers liable for assisting IIG in its supposed fraud, without a showing that the

Noteholder Managers had actual knowledge of the fraud and took affirmative steps to assist it, a similar conflict exists.[12]

Because a conflict between New York and Cayman law does exist, New York law applies. As discussed above, New York has the most significant interest in the dispute. The damages claims all allege that the same transfers that gave rise to the Avoidance Claims also caused the alleged damages. *See, e.g.,* Compl. ¶¶ 267 (Count 7; the "Debtor Initial Transfers were indeed the means by which the Investor-Assignors suffered loss"); 316 (Count 15; "The Debtors suffered losses as a result of the DBTCA Transfers."); 334 (Count 17; "[T]he Debtors defrauded the Investor-Assignors. The Noteholder[ Manager]s received the proceeds of the DBTCA Transfers.") This matters because tort damages claims, like Avoidance Claims, are conduct-regulating and, therefore, the location of the conduct that gave rise to the claims matters for choice-of-law purposes. *See Emjayco v. Morgan Stanley & Co.*, 1996 WL 452266, at *4 (S.D.N.Y. Aug. 8, 1996), *aff'd*, 125 F.3d 843 (2d Cir. 1997) (fraud and related tort claims are "conduct regulating" and therefore "ordinarily have their 'locus' for [choice of law] purposes in the place where the alleged damage was sustained"); *In re Refco Inc. Sec. Litig.*, 892 F. Supp. 2d 534, 538-39 (S.D.N.Y. 2012) (basing choice of law for claim of aiding and abetting fraud on "conduct regulating" nature of the fraud); *Chapman*, 217 A.D.3d at 517 ("the law of the place where the tort occurs will generally apply" to conspiracy tort claims). Here, all the alleged transfers occurred in New York. *See supra* § I.C.2. Similarly, the relevant actors—IIG, DBTCA, and two of the four Noteholder Managers—maintained their principal places of business in New York; none was

---

[12] In any event, as previously discussed, to the extent there is no conflict, this Court can and should apply New York law. *See supra* § I.C.2.

headquartered in the Cayman Islands. *See supra* § I.C.2. And, as discussed above, the relevant contracts that defined the parties' relationships were governed by New York law. *See id.*

For all these reasons, New York law applies to Plaintiffs' damages claims, just as it applies to Plaintiffs' Avoidance Claims. Accordingly, Counts 7, 15, and 17, pleaded under Cayman Islands law, fail. *See, e.g.*, *City of Almaty v. Sater*, 503 F. Supp. 3d 51, 63 (S.D.N.Y. 2020) (dismissing English law conspiracy claim where "[a]ll of the conduct contemplated by the [unlawful means] conspiracy and the overt acts in furtherance of it occurred in New York" because "the jurisdiction with the greatest interest in regulating conduct is nearly always the jurisdiction where that conduct occurs.").

### 2.     Plaintiffs' Damages Claims Fail Even If Cayman Islands Law Applies

Even if Cayman Islands law is applicable to Counts 7, 15, and 17, the claims still fail because Plaintiffs have not alleged sufficient facts to adequately plead their elements under Rule 9(b)'s heightened standard for claims sounding in fraud.

### a.     Rule 9(b) Applies To Plaintiffs' Cayman Islands Damages Claims

As discussed above, Rule 9(b) imposes a heightened pleading standard on any plaintiff bringing fraud claims in a U.S. federal court. *See supra* § II at 37-39. This is true regardless of the jurisdiction of the substantive law governing those claims. *See, e.g.*, *Norske Skog*, 629 B.R. at 749 (applying Rule 9(b)'s pleading standard to fraudulent transfer claims brought under Norwegian law); *Nw. Mut. Life Ins. Co. v. Bank of Am. Secs. LLC*, 254 F. Supp. 2d 390, 396-97 (S.D.N.Y. 2003) (applying Rule 9(b) to state law fraud claims).

The allegations supporting Counts 7, 15, and 17 squarely place those claims within the ambit of Rule 9(b).[13]  The two conspiracy claims, Counts 7 and 15, clearly "sound in fraud."  These alleged conspiracies were purportedly undertaken through "unlawful means"—namely purported "fraudulent conveyances under New York law and fraudulent dispositions under Cayman law."  Compl. ¶¶ 266, 315.  By invoking allegations of fraud claims in their conspiracy claims, Plaintiffs bring those claims within Rule 9(b)'s ambit.  *See In re Caisse*, 568 B.R. 6, 12 (Bankr. S.D.N.Y. 2017).  Similarly, Count 17 is styled as a claim for "Fraudulent Trading," Compl. at 89, and involves allegations of soliciting investments through purportedly "fraudulent misrepresentations" with "intent to defraud," *id.* ¶ 329.  These express invocations of fraud render these claims subject to Rule 9(b) as well.  *See In re Caisse*, 568 B.R. at 12.[14]

### b.    Plaintiffs Fail To Allege Their Cayman Conspiracy Claims With Particularity

Plaintiffs bring claims against the Noteholder Defendants for unlawful means conspiracy under Cayman Islands law in their capacity as Investor-Assignors (Count 7) and as Debtors (Count 15).  Compl. ¶¶ 259-67, 310-18.  Under Cayman Islands law, conspiracy to injure through unlawful means requires pleading: (1) an agreement or combination between two or more persons to take

---

[13] Cayman Islands law also imposes a heightened pleading standard on fraud claims.  *See* O'Brien Decl., Ex. C (*Ritchie Capital Management LLC v. Lancelot Investors Fund Limited* [2021] (1) CILR 128 [84]-[85]) (noting that fraud claims must be "sufficiently particularized").  Plaintiffs would thus be required to plead with particularity even if Cayman Islands law governed the pleading standard.  *See id.*

[14] As they did with their common law claims pleaded under New York law, Plaintiffs engage in impermissible group pleading in alleging their Cayman Islands damages claims, which is not permitted under Rule 9(b).  *See, e.g.*, Compl. ¶¶ 261-66, 311-16 (asserting the elements of Cayman Islands conspiracy claims using the rolled-up term "Noteholder[ Manager]s"); *see supra* § II at 37-39.  The Court should likewise dismiss Plaintiffs' group pleading claims under Cayman Islands law on this basis alone.

action; (2) intention to cause damage; (3) that action was taken and was unlawful; and (4) the intended damage was caused to the plaintiff. *See* O'Brien Decl., Ex. D (*Raiffeisen International Bank AG v Scully Royalty Limited* [2020] (2) CILR 469 [124]).[15]   Plaintiffs so acknowledge. *See* Compl. ¶ 260 ("At common law in the Cayman Islands, the tort of conspiracy to injure by unlawful means is established when two or more persons combine and take action which is unlawful in itself with the intention of causing damage to a third party who does incur the intended damage."). Plaintiffs fail to plead at least three of these required elements.

*First*, Plaintiffs have not adequately alleged with the particularity required by Rule 9(b) that the Noteholder Defendants reached an agreement among themselves or with other defendants to injure the Investor-Assignors or the Debtors.   The sole allegation pleaded as to any purported agreement is the conclusory assertion that "[i]t was understood and agreed by IIG, TFT, DBTCA, and the Noteholder[ Manager]s that the Investor-Assignors would invest in the Debtors and the funds raised by such investments would be used by Debtors to purchase interests in the CLO's loans."  Compl. ¶ 262; *see also id.* ¶ 312 (alleging the same parties understood and agreed that "the Debtors would purchase interests in the CLO's loans").   Plaintiffs fail to allege anything specific about the alleged agreement or combination, such as when, where, or how the alleged agreement or combination was reached, what actions each party allegedly agreed to undertake, and whether and how each of the Noteholder Defendants agreed or combined with each other or with other parties.   Indeed, the Complaint does not make clear which, if any, of the Noteholder Defendants

---

[15] Under Federal Rule of Civil Procedure 44.1, in determining issues of foreign law "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  Determinations of foreign law are treated as rulings on a question of law. *Id.*  Accordingly, the court can consider decisions from courts of the Cayman Islands and United Kingdom in weighing matters of Cayman Islands law.

were allegedly party to this supposed agreement and contains no allegations specific to each Noteholder Defendant as Rule 9(b) requires. Without knowledge of IIG's underlying fraud, *see supra* §§ II.A.1; II.B.1., the Noteholder Defendants could not have possibly agreed to join an unlawful means conspiracy. *See* O'Brien Decl., Ex. E (*Kuwait Oil Tanker Co. SAK v. Al-Bader* [2000] 2 All E.R. (Comm) 271 [111]).

*Second*, Plaintiffs have failed to allege with particularity that the Noteholder Defendants intended to injure the Investor-Assignors or the Debtors. Plaintiffs do not allege that the Noteholder Defendants had any involvement with the Investor-Assignors or the Debtors whatsoever. In fact, as discussed above, the Complaint is devoid of any allegation that any Noteholder Defendant ever interacted with potential new investors, including the Investor-Assignors. *See* Compl. ¶ 130 (alleging only that IIG and its exclusive agent GSC communicated with certain Investor-Assignors). Nor for that matter have Plaintiffs alleged that the Noteholder Defendants collectively, let alone each Noteholder Defendant specifically, had actual knowledge of any wrongdoing by IIG. *See supra* §§ II.A.1; II.B.1.

*Finally*, Plaintiffs fail to plead that the alleged action taken by the Noteholder Managers was unlawful with sufficient particularity. Plaintiffs attempt to satisfy this element by referring to their claims for fraudulent conveyance under New York law and Cayman Islands law. Compl. ¶¶ 266, 315. The fraudulent conveyance claims seek to hold the Noteholder Funds liable as subsequent transferees of initial voidable transfers, to which they were not a party, not for any affirmative "action" that either the Noteholder Funds or the Noteholder Managers allegedly took. *See* Compl. ¶¶ 223-24, 230-31, 257-58, 279-80, 286-87, 308-09. Moreover, if the Court dismisses Plaintiffs' fraudulent conveyance claims, as it should, then there will be no remaining allegations

of unlawful means through which the purported conspiracy was undertaken, and the Court should

therefore dismiss Plaintiffs' conspiracy claims as well.

**c.     Plaintiffs Fail To Allege Their Cayman Fraudulent Trading
Claim With Particularity**

Plaintiffs' claim for fraudulent trading against the Noteholder Managers under Cayman

law likewise fails under Rule 9(b).  To properly allege a fraudulent trading claim against a third

party not subject to liquidation, a plaintiff must allege:

> (1) that the business of the company in liquidation has been carried on with intent
> to defraud the creditors of the company or for any other fraudulent purpose; (2) that
> the defendant sought to be made liable [] participated in the carrying on of the
> business of the company in that manner; and (3) that it did so knowingly: *i.e.* with
> knowledge that the transactions it was participating in were intended to defraud the
> creditors of the company or were in some other way fraudulent.

*See* O'Brien Decl., Ex. F (*Morris & Ors. v. State Bank of India* [2003] BCC 735 [11]).

Plaintiffs fail to allege the requisite knowledge element on the part of the Noteholder

Managers.  The Complaint alleges only that the "business of the Debtors has been carried out with

the intent to defraud the Debtors' creditors, namely the Investor-Assignors," Compl. ¶ 329, and

that the Noteholder Managers were "knowingly part[ies]" to this business.  Compl. ¶ 334.  Once

again, however, Plaintiffs fail to allege with particularity that the Noteholder Managers had

knowledge of IIG's underlying fraud or intent to defraud the Investor-Assignors.  *See supra*

§§ II.A.1; II.B.1.  They have thus not adequately pleaded the "knowingly" element of their

fraudulent trading claim, and the Court should therefore dismiss this claim.

## III.     THE COURT SHOULD DISMISS THE COMPLAINT WITH PREJUDICE

The Noteholder Defendants respectfully submit that any dismissal should be with

prejudice.  Although Rule 15(a)(2) provides that a court "should freely grant leave [to amend]

where justice so requires," Fed. R. Civ. P. 15(a)(2), leave to amend may be denied where—as

here—amendment would be futile.  *See Attestor Value Master Fund v. Republic of Arg.*, 940 F.3d

825, 833 (2d Cir. 2019). Plaintiffs could never cure the deficiencies described in this Motion by repleading, nor should they be given the opportunity to try again. No matter how artfully they might attempt to draft an amended pleading, Plaintiffs simply could not overcome the fact that their Avoidance Claims are barred as a matter of law by Section 546(e)'s safe harbor provision, nor could Plaintiffs ever deny in a repleading that the Debtors ratified TFT's transfer to DBTCA. And considering Plaintiffs' opportunity to conduct extensive Rule 2004 discovery before filing the Complaint, they certainly could not conjure up additional facts to show the Noteholder Managers aided and abetted IIG's misconduct for purposes of repleading their Damages Claims. *See, e.g.*, *In re Old CarCo LLC*, 435 B.R. 169, 194 (Bankr. S.D.N.Y. 2010) (dismissing fraud-based claims with prejudice where "through the Bankruptcy Rule 2004 discovery, there was an opportunity afforded to investigate the claims presented in this adversary proceeding, prior to filing the Complaint, through the availability of voluminous documents as well as the depositions of relevant parties, yet "[n]evertheless, the [plaintiff] has not presented particularized facts concerning the alleged intentional fraud claim"). Finally, Cayman Islands law will also not apply to either their Avoidance Claims or their Damages Claims, for the reasons stated herein, regardless of how Plaintiffs might replead their case.

## CONCLUSION

For all these reasons, and for those discussed in the supplemental briefs submitted herewith, the Noteholder Defendants respectfully request that the Court dismiss the Complaint with prejudice in its entirety.

Dated:   New York, New York                     Respectfully submitted,
         November 6, 2023

By:    /s/    Deborah J. Newman              By:    /s/    David S. Flugman
      Andrew J. Rossman                             Philippe Z. Selendy
      Deborah J. Newman                             David S. Flugman
      Blair A. Adams                                Claire O'Brien
      QUINN EMANUEL URQUHART &                      SELENDY GAY ELSBERG PLLC
      SULLIVAN, LLP                                 1290 Avenue of the Americas
      51 Madison Avenue                             New York, New York 10104
      22nd Floor                                    Telephone: (212) 390-9000
      New York, New York 10010                      pselendy@selendygay.com
      Telephone: (212) 849-7000                     dflugman@selendygay.com
      andrewrossman@quinnemanuel.com                cobrien@selendygay.com
      deborahnewman@quinnemanuel.com
      blairadams@quinnemanuel.com                   *Attorneys for Assured Investment
                                                    Management LLC (f/k/a BlueMountain
      *Attorneys for KKR Credit Advisors            Capital Management, LLC and n/k/a
      (US) LLC, Corporate Capital Trust,            Sound Point Luna LLC), BlueMountain
      Inc., KKR Debt Investors II (2006)            Foinaven Master Fund L.P.,
      (Ireland) L.P., KKR TRS Holdings,             BlueMountain Logan Opportunities
      Ltd., and KKR-PBPR Capital Partners           Master Fund L.P., BlueMountain
      L.P.*                                         Montenvers Master Fund SCA SICAV-
                                                    SIF, BlueMountain Timberline Ltd., and
                                                    BlueMountain Kicking Horse Fund L.P.*

By:    /s/    Philip D. Anker                 By:    /s/    Mark A. Weissman
      Philip D. Anker                                Mark A. Weissman
      Ross E. Firsenbaum                             OFFIT KURMAN PA
      WILMER CUTLER PICKERING                        590 Madison Avenue
      HALE AND DORR LLP                              6th Floor
      7 World Trade Center                           New York, New York 10022
      250 Greenwich Street                           Telephone: (212) 545-1900
      New York, New York 10007                       mark.weissman@offitkurman.com
      Telephone: (212) 230-8890
      philip.anker@wilmerhale.com                    *Attorneys for Elanus Capital
      ross.firsenbaum@wilmerhale.com                 Management LLC and Elanus Capital
                                                     Investment Master SPC on behalf of,
      *Attorneys for Tennenbaum Capital              and in the name of, Elanus Capital
      Partners, LLC, Tennenbaum Senior               Investments Master SP Series 1*
      Loan Fund II, LP, Tennenbaum Senior
      Loan Fund III, LP, Tennenbaum
      Senior Loan Fund IV-B, LP, and
      Special Value Continuation Partners,
      LLC*