**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IIG Global Trade Finance Fund Limited (in Official Liquidation), IIG Structured Trade Finance Fund Limited (in Official Liquidation), Christopher Kennedy and Alexander Lawson, as assignees of the creditors of IIG Global Trade Finance Fund Limited (in Official Liquidation) and the creditors of IIG Structured Trade Finance Fund Limited (in Official Liquidation) and Christopher Kennedy and Alexander Lawson in their capacities as Joint Official Liquidators of IIG Global Trade Finance Fund Limited (in Official Liquidation), IIG Structured Trade Finance Fund Limited (in Official Liquidation),<br><br>Plaintiffs,<br><br>v.<br><br>Finance Trust, Deutsche Bank Trust Company Americas, Assured Investment Management LLC (f/k/a BlueMountain Capital Management, LLC), Tennenbaum Capital Partners, LLC, KKR Credit Advisors (US) LLC, Elanus Capital Management, LLC, BlueMountain Foinaven Master Fund L.P., BlueMountain Logan Opportunities Master Fund L.P., BlueMountain Montenvers Master Fund SCA SICAV-SIF, BlueMountain Timberline Ltd., BlueMountain Kicking Horse Fund L.P., BlueMountain Credit Opportunities Master Fund I L.P., Tennenbaum Senior Loan Fund IV-B, LP, Tennenbaum Senior Loan Fund II, LP, Tennenbaum Senior Loan Operating III, LLC, Corporate Capital Trust, Inc., KKR Debt Investors II (2006) (Ireland) L.P., KKR TRS Holdings, Ltd., KKR-PBPR Capital Partners L.P., Special Value Continuation Partners, LP, and Elanus Capital Investments Master SP Series 1, John Doe Subsequent Transferees 1-10,000,<br><br>Defendants. | Case No: 20-10132 (MEW)<br><br>Chapter 15<br><br>Jointly Administered |

**DECLARATION OF THOMAS LOWE KC**

1. I am a barrister and King's Counsel. I operate from Wilberforce Chambers in London and from offices in the Cayman Islands. Wilberforce Chambers is a well-known association of barristers who practice in various areas of commercial and private client

law.[1] The primary focus of my work is company and commercial. In the course of my practice I regularly appear in the Courts of the Cayman Islands and British Virgin Islands and have also appeared and advised on matters in Bermuda.

2. I have been instructed by Selendy Gay PLLC, US counsel for Assured Investment Management LLC and certain funds over which it was appointed as investment manager (collectively the "**BlueMountain Defendants**"), in the above-captioned proceeding (the "**Proceeding**") to express my opinion on certain questions of the law of the Cayman Islands, as set out below. I understand this declaration will be submitted in connection with a letter dated 22 March 2024 filed by certain defendants (including the BlueMountain Defendants) in the Proceeding in further support of their Motion to Dismiss the Plaintiffs' Complaint dated 6 November 2024.

3. I consider that I have the requisite qualifications and expertise to express my opinions on the matters that I have been asked to consider under Cayman Islands law, in light of the matters set out below and in my CV, a copy of which is attached as **Exhibit A**. The cases cited in this declaration are also attached as **Exhibit B**.

**Professional qualifications**

4. I am a practicing member of the Bars of the Cayman Islands, and England and Wales and the British Virgin Islands and hold practicing certificates from each of those jurisdictions. I first qualified as a barrister in England and Wales in September 1985.

5. I was appointed as Queen's Counsel of England and Wales in 2008 and am now King's Counsel in all those jurisdictions in which I am admitted to practice.

6. I was first admitted ad hoc to the bar of the Cayman Islands in 1997 and have been generally admitted since 2010. I am a British citizen and a Permanent Resident of the Cayman Islands.

**My academic qualifications**

7. I received a LLB (Honours) in Law from London School of Economics in England in 1984 where I was awarded an Upper Second Class Honours degree. I received a

[1] An association of barristers which is not a legal entity.

Masters of Law (LLM, Honours) from the University of Cambridge (Jesus College) in 1986 where I was awarded a First Class Degree. I completed what was then Part I, a course then known as the Bar Vocational Course, at the Inns of Court School of Law in London in 1985 where I won a number of prizes. I am a member of the Inner Temple from which I received a full scholarship and the Chancery Bar Association.

**My Professional Work Experience**

8. Between October 1985 and March 2010, I practiced full-time as a self-employed barrister at the English Bar in London, specializing in commercial litigation (including litigation involving Cayman Islands law).

9. I was first admitted to the Cayman Islands Bar on an ad hoc basis in 1997 and repeatedly thereafter. I obtained general admission in 2010 and hold a Permanent Resident's Certificate (which enables me to live and work in the Cayman Islands without immigration restrictions or controls). From 2010 to date, I have practiced full-time at the Cayman Islands Bar, while also working regularly in the British Virgin Islands and maintaining my English Bar practicing certificate.

10. I specialize in commercial litigation, company law and contentious insolvency (although I also have a broader practice, extending to all areas of civil and public law). In addition to many unreported and confidential disputes that I have advised and worked on, I have appeared as Counsel in well over 200 cases that have resulted in publicly reported judgments of the courts of the Cayman Islands and Bermuda, a number of which are listed in my CV. I have appeared in over 40 appeals before the Cayman Islands Court of Appeal and in around 10 cases before the Judicial Committee of the Privy Council (the "**Privy Council**").

11. I have previously been asked to provide expert opinion evidence on issues of Cayman Islands law before various US Courts.

**The Questions Addressed**

12. I have been asked to describe the legal system in the Cayman Islands (see Section I below) and express an opinion on the following questions of law:

(1) What are the elements that a liquidator must establish in order for a Court

to determine that a person is liable for fraudulent trading under section 147 of the Companies Act? (see Section II below)

(2) What is the legal test for establishing that persons were "*parties to carrying on of the business*" in a fraudulent manner under section 147 of the Companies Act? (see Section II below)

(3) What is the legal test for establishing that a person was "*knowingly*" a party to carrying on a business in a fraudulent manner under section 147 of the Companies Act? (see Section II below)

(4) What is the standard for pleading claims based on allegations of fraud in the Cayman Islands? (see Section II below)

(5) What is the status of a dissolved company under Cayman law? (see Section III below)

## I. THE LEGAL SYSTEM OF THE CAYMAN ISLANDS

13. The legal system of the Cayman Islands is a separate legal system with its own separate body of legislation and case law, even though there is a considerable degree of overlap and similarity between the English and Cayman legal systems. Indeed, it may be helpful if, as a starting point, I provide some background (by way of summary only) to the law of the Cayman Islands law and its legal system.

**Background**

14. The Cayman Islands is a "British Overseas Territory". As such, it is both a self-governing but dependent territory of the United Kingdom, and is a separate legal jurisdiction from the United Kingdom rather than a "colony" (since the Cayman Islands has its own written Constitution, own legislature, and own independent court systems).

15. In common with other British Overseas Territories and former colonies, English law was introduced to the Cayman Islands at the date when it was settled in 1772. The Cayman Islands was a part of Jamaica until 1962 when it seceded and inherited the Jamaican statute law applicable at the time, but which has now almost entirely been

replaced by Cayman statutes. The reception of English law into the Cayman Islands is set out in section 40 of the Interpretation Act (1995 Revision) which provides that "*all such laws and statutes of England as were prior to commencement of 1 George 1* [i.e. 1772 AD] *esteemed, introduced, used or accepted or received as laws in the Cayman Islands shall continue to be laws in the* [Cayman] *Islands save insofar as any such laws have been or may be repealed or amended by any law of the* [Cayman] *Islands*".

16. The system of law in the Cayman Islands is therefore founded on the English legal system, although there is a distinct body of Caymanian statute law and Caymanian case law. The Cayman case law dates back to the 1960s. Since the 1980s, in particular, there has been an exponential growth in the local jurisprudence, following the growth in international finance and cross-border commercial transactions.

17. The Cayman Islands enact statutes and regulations. English statutes have no general application to the Cayman Islands unless expressly extended to them. The specific sources of Cayman Islands law relevant to this opinion concern the common law as applied in each jurisdiction and the Cayman Island Companies Act (the "**Companies Act**"[2]).

18. Final appeals against decisions of the Cayman Islands Court of Appeal are entertained by the Privy Council which, although based in London in the United Kingdom, is the highest appellate court for the Cayman Islands. The Privy Council is a Court that is ordinarily made up of a five-judge tribunal, usually composed of senior members of the judiciary of the Supreme Court of the United Kingdom (formerly the House of Lords, and the highest appellate court for England and Wales, Scotland, and Northern Ireland), as well as other senior judges from Commonwealth jurisdictions.

**The Common Law Principle of Precedent in the Cayman Islands**

19. Non statutory common law in the Cayman Islands, following English law in this regard, is based upon the principle of precedent. The Courts in the Cayman Islands are both courts of common law and equity.

20. Under the doctrine of precedent, certain judicial decisions are 'binding' on other

[2] The Companies Act was first enacted in 1961 but has been amended and revised over the years. The current version of the Companies Act is the 2023 Revision.

judges, in that their essential reasoning or *'ratio decidendi'*[3] must be followed and applied, unless they are properly capable of being distinguished. In particular:

(a) A judge of the Grand Court of the Cayman Islands (the first instance superior court of record of the Cayman Islands) is bound to follow and apply any relevant decision of the same tier of Court unless it is obviously wrong,[4] any relevant decision of the Cayman Islands Court of Appeal, and any relevant decision of the Privy Council.[5]

(b) The Cayman Islands Court of Appeal, in tum, is bound to follow and apply any relevant decision of the same tier of Court unless it is obviously wrong and any relevant decision of the Privy Council.

(c) Previous relevant decisions of the Privy Council are binding on the Privy Council itself, except in exceptional circumstances. The Privy Council can depart from, or overrule, a previous decision, when, for example, the previous decision is thought to be wrong and impeding the proper development of the law or to have led to results which were unjust or contrary to public policy.[6]

21. Under the doctrine of precedent, certain judicial decisions or parts of judicial decisions (such as *'obiter dicta',* which are judicial comments or findings that do not form part of the essential reasoning), may be treated as persuasive, and, depending on the facts of the case, the seniority and experience of the tribunal, and the quality of their reasoning, should ordinarily be followed and applied, unless they are plainly wrong, were not fully or properly argued or reasoned (or failed to take into account relevant authorities), or are properly capable of being distinguished.

22. Furthermore, the Cayman Islands courts often treat English case law as being highly persuasive, for two principal reasons (subject to the circumstances of any particular case):

(a) Firstly, many Cayman Islands statutes are based upon current or former

---

[3] The *'ratio decidendi'* of a case has been defined as any rule of law expressly or impliedly treated by the Court as a necessary step in reaching its conclusion, having regard to its reasoning.
[4] See e.g., *Re Alibaba.com Limited* [2012] 1 CILR 272 at [63]-[64].
[5] See *Weavering Macro Fixed Income Fund v Ernst & Young* (Unreported, Quin J, 5 May 2015).
[6] *Gibson v The United States of America* [2007] I WLR 2367, per Lord Brown at [22]. I do not propose to exhibit this judgment to my Declaration, but I understand that it can be made available if necessary.

United Kingdom legislation. For example, in the corporate law context, the Companies Act is largely based on the English Companies Act 1862, although there have been a number of provisions omitted, added and amended to meet each jurisdiction's unique circumstances, some of which have been modelled on statutory provisions from other common law jurisdictions[7] or which have been drafted specifically for the jurisdictions after local consultation and legislative debate. As a result, decisions of the Superior Courts of England and Wales with respect to provisions of United Kingdom statute law which are identical to or similar to Caymanian statutory provisions are considered in the Cayman Islands to be highly persuasive authorities, and such decisions are in practice often followed.

(b) Secondly, the decisions of the Supreme Court of the United Kingdom (formerly the House of Lords) on matters of common law and statutory interpretation are extremely persuasive in the Cayman Islands since the Supreme Court of the United Kingdom (formerly the House of Lords), sitting as the highest appellate Court for the United Kingdom, and the Privy Council, sitting as the highest appellate Court for the Cayman Islands, share common membership, in terms of the identities of the judges.[8] The Court of Appeal of the Cayman Islands routinely follows decisions of the Supreme Court of the United Kingdom (formerly the House of Lords) as effectively binding in common law matters. The only circumstance when it would not do so is when there are clear circumstances in which the social and economic conditions of the Cayman Islands justify a departure from English precedent.

23. The common law in the Cayman Islands consists of an ever-growing body of case law relied upon to fill gaps in the law not covered by legislation. Because the jurisprudence of the Cayman Islands is relatively recent (reports of cases before the 1980s are sparse), its courts naturally look to other jurisdictions for persuasive precedent. For this reason, the Courts of the Cayman Islands frequently refer to English case law from the English Court of Appeal or High Court as well as the case law of other jurisdictions

---

[7] By way of example, the statutory provisions relating to the amalgamation of companies, were modelled on Canadian legislation.

[8] See Lord Diplock's speech in *De Lasala v De Lasala* [1980] AC 546, Privy Council at 558. I do not propose to exhibit this judgment to my Declaration, but I understand that it can be made available if necessary.

that follow English common law as persuasive authority (such as Australia, New Zealand, Hong Kong, Bermuda, the British Virgin Islands or Singapore). Given that such case law can be relied upon, the Courts are expected to have regard to the reasoning in those cases and have a basis for not accepting a clear proposition from such case law.

## II. FRAUDULENT TRADING

24. I am instructed that the Complaint filed in the Proceeding by the defendants includes claims against various holders of notes and their investment managers (the "**Noteholder Defendants**") issued by the Trade Finance Funding I Ltd. (the "**CLO Fund**"). The BlueMountain Defendants are a subset of the Noteholder Defendants and include certain funds that held all Class A Notes in the CLO Fund.

25. In the Complaint, the Plaintiffs seek to implicate the Noteholder Defendants in a fraud perpetrated by International Investment Group LLC ("**IIG**"). Relevantly, this includes an allegation that the investment manager entities among the Noteholder Defendants are liable under section 147 of the Companies Act ("**Section 147**") for fraudulent trading. I have been asked to advise on the legal requirements for this claim under Cayman law.

**Question (1) – Elements of a fraudulent trading claim**

26. Section 147 provides:

> *(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.*
>
> *(2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.*

27. Section 147 came into force in March 2009 and is derived from section 213 of the UK Insolvency Act 1986. This provision was originally introduced in England as Section

75 of the Companies Act 1928 and immediately re-enacted by section 275 of the Companies Act 1929.[9] Originally, liability was confined to past and present directors. Section 110(1) of the UK Companies Act 1949 replaced the reference to a director with "*any person*" in what had become section 332 of the Companies Act 1948. For this reason, when Section 147 was introduced in the Cayman Islands, the legislature would be taken to have been aware of the substantial body of case law that had built up in England and other Commonwealth jurisdictions before 2009.

28. The only person with standing under Section 147 to make an application is the liquidator and the claim is not that of the company but a cause of action to which he or she has full title but for which he is accountable to the company. The original provision also gave standing to the "*official receiver, creditors and contributories*" (i.e. members or stockholders).

29. Because it is only the liquidator of a Cayman entity that can bring proceedings, in this case, the Plaintiffs need to demonstrate in accordance with Section 147(1) that the business of the entities over which the Cayman liquidators have been appointed[10] were conducted with the intent to defraud their creditors. Under Section 147(1) the focus of the Court is on the carrying on of fraudulent business of those insolvent entities. Any party sought to be made liable must have been joined on the basis of Section 147(2).

30. I have not identified any Cayman authorities in which Section 147 has been substantively applied. In those circumstances, given that Section 147 is plainly derived from section 213 of the UK Insolvency Act 1986, the Cayman Court will follow the approach of the English Courts for the purposes of interpreting the Cayman legislation unless there is clear reason to consider such decisions to be wrong.

31. The elements of the equivalent English provision, section 213 of the English

---

[9] Section 275 of the Companies Act 1929 provided as follows: *"(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or for any fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory of the Company may, if it thinks proper so to do, declare that any of the directors, whether past or present, of the company who were knowingly parties to the carrying on of the business in manner aforesaid shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the court may direct. (2) Where the court makes any such declaration, it may .... make provision for making the liability of any such director under the declaration a charge on any debt or obligation due from the company to him ...."*

[10] IIG Global Trade Finance Fund Ltd (in official liquidation) and IIG Structured Trade Finance Fund Ltd (in official liquidation).

Insolvency Act 1986, are:

(a) the business of the company in liquidation has been carried on with intent to defraud the creditors of the company or for any other fraudulent purpose;

(b) the defendant sought to be made liable participated in[11] the carrying on of the business of the company in that manner; and

(c) the defendant so participated knowingly: i.e. with knowledge that the transactions it was participating in were intended to defraud the creditors of the company or were in some other way fraudulent.[12]

32. In my opinion, the elements outlined above would apply to any claim under section 147 of the Companies Act.

33. The carrying on of a business with intent to defraud means that the business is a fraudulent enterprise.[13] This is to be distinguished from a fraudulent transaction concluded in the course of a wider business. The latter is not the carrying on of the business with intent to defraud if the wider business is not also fraudulent.[14] That is not to say that a single transaction would not in itself be sufficient to characterize the business as fraudulent.

**(2) "*Parties to*" requirement**

34. A number of cases have confirmed that liability for participation in carrying on a business may be imposed on outsiders to the insolvent company in question and liability is not necessarily limited to those who exercise management or control over the insolvent company.[15]

35. However, I have not identified any civil cases in England in which an outsider has been found to have participated in fraudulent trading after a disputed trial and in most

---

[11] As outlined below, active participation is required for a person to be found to be "party to" the fraudulent trading.

[12] See *Morris v State Bank of India* [2003] BCC 735 at [11].

[13] See *Re Patrick Lyon* [1933] Ch 786.

[14] *Morphitis v Bernasconi* [2003] Ch 552 at [43] citing *Re Murray-Watson Ltd* (Unreported, Oliver J, 6 April 1977).

[15] See the recent consideration of this issue by the Court of Appeal in *Bilta (UK) Ltd (in liquidation) v Tradition Financial Services Ltd* [2023] Ch 343.

of the major decisions, either participation is conceded,[16] or the court has considered the question in the context of a strike out[17] or determination of a preliminary issue.[18]

36. The requirement that the third party be "*party to*" carrying on the business with intent to defraud was considered in *Re Maidstone Buildings Provisions Ltd* [1971] 1 WLR 1085 ("***Maidstone***"), in which a liquidator brought proceedings against Mr Penney, the company secretary, an officer of the insolvent company but not a director, who was also a partner at the firm of the company's auditors. The liquidators alleged that Mr Penney had knowledge that the company was insolvent but failed to take steps to prevent the company from trading fraudulently, arguing that he had a positive duty to do so.

37. Mr Penney sought to strike out the claim on the basis that it contained no reasonable cause of action. For the purposes of the application, it had to be assumed that Mr Penney had knowledge of the fraudulent trading so that the issue whether he was a knowing party to the carrying on of the fraudulent business could be determined by reason of his having taken no steps at board meetings or otherwise to prevent the company ordering goods on credit or incurring debts in these circumstances. This was essentially an allegation of constructive fault arising from an alleged breach of duty to act. No such duty could be imposed on Mr Penney as a non-director simply because of knowledge of the fraudulent business. Since Mr Penney had not actually done anything, Pennycuick VC struck out the claim against the defendant as disclosing no reasonable cause of action:

(a) Pennycuick VC found that in order to establish liability, it was necessary for a plaintiff to demonstrate that a defendant had taken some "positive step":

> *"The expression 'party to the carrying on of a business' is not, I think, a very familiar one but, so far as I can see, the expression 'party to' must on its natural meaning indicate no more than <u>'participates in', 'takes part in' or 'concurs in'. And that, it seems to me, involves some positive steps of some nature</u>. I do not think it can be said that someone is party to carrying on a business if he takes no positive steps at all. So, in order to bring a person within the section, <u>one must show that he is taking some positive steps in the carrying on of the company's business</u>*

---

[16] *Morris v Bank of India* [2004] BCC 404.
[17] *Re Maidstone Buildings Provisions Ltd* [1971] 1 WLR 1085; *Re Gerald Cooper Chemicals Ltd (in liquidation)* [1978] 2 WLR 866.
[18] *In re Bank of Credit and Commerce International SA* [2002] BCC 407.

> *in a fraudulent manner.*"[19] (emphasis added)

(b) Pennycuick VC therefore also found that all that inertia or an omission to take steps was insufficient to found liability:

> "*it seems to me impossible to say that that mere inertia on the part of Mr. Penney, and that is all that is alleged against him, could represent being a party to the carrying on of the business of the company, and if that is right, it is the end of the matter….Whatever duty Mr Penney may have owed to the company, I do not think mere omission to give advice could be regarded as amounting to being a party to carrying on the business of the company.*"[20] (emphasis added)

38. The approach in *Maidstone* has been followed in several subsequent decisions. For instance, in *R v Grantham* [1984] QB 675, where *Maidstone* was cited in argument, the defendant appealed against a direction given to the jury by the trial judge which said, in part: "*As against the individual, the individual defendant, the prosecution have to prove first that he took an active part in carrying on the business. That is the first thing*" (emphasis added).[21] The defendant's appeal was rejected by the English Court of Appeal.

39. Similarly, in *R v Miles* [1992] Crim LR 657 ("***Miles***"), the trial judge had given a jury direction to the effect that the test was "*participating, or taking part or concurring in the actual trade which is involved in the business of the particular company*". The English Court of Appeal, citing *Maidstone*, took a narrower approach and found this was a misdirection, taking exception with the phrase "*concurring*" stating that this phrase: "*could and may very well have had the effect of broadening the scope of the offence charged in the minds of the jury*."[22]

40. The differing approaches in *Maidstone* and *Miles* were considered by the English Court of Appeal in the recent decision of *Bilta (UK) Ltd (in liquidation) v Tradition Financial Services Ltd* [2023] Ch 343 (***Bilta***). Lewison LJ (with whom Stuart-Smith and Falk LJJ agreed) adopted a test of "*active participation*" and confirmed that the Court of Appeal in *Miles* had narrowed the approach in *Maidstone* stating that: "*one can concur in a trade without actively participating in it*." Lewison LJ therefore

---

[19] *Maidstone* at 368.
[20] *Maidstone* at 368.
[21] *R v Grantham* [1984] QB 675 at 681.
[22] *Miles* at 658.

adopted a narrower approach than in *Maidstone*:

(a) Lewison LJ held that:

> *"To that extent, therefore, the Court of Appeal restricted the meaning that the Vice Chancellor had adopted in the Maidstone case. I consider that we can accept that in the context of civil liability as well as criminal liability, concurrence is not enough."*[23] (emphasis added)

(b) Lewison LJ went on to give an example of fraudulent trading by an outsider:

> "*The extent to which a counterparty must be involved in the carrying on of the fraudulent business may depend upon the facts. Suppose that a manufacturer regularly supplies counterfeit designer clothes to a retailing company, knowing that the retailer will pass them off as genuine. It is, in my judgment, no misuse of language to describe the manufacturer as "party to the carrying on" of a fraudulent business, even though he exercises no managerial or controlling role within the retailing company; and the manufacturer may have other business activities that are not fraudulent. The manufacturer knows about the retailer's fraudulent business and is actively participating in it in the sense of furthering and facilitating it. In my judgment, the allegedly odd results are more apparent than real."*[24] (emphasis added)

41. In my opinion the following propositions can be gleaned from the cases regarding the test for outsiders to a company to be liable as parties to fraudulent trading:

(a) The person must have actively participated in the carrying on of the fraudulent business and mere inertia is insufficient.

(b) Concurrence (which means knowledge and approval but is short of active participation) on the part of the outsider as to the running of the business in a fraudulent manner will not be sufficient to establish liability for fraudulent trading.

(c) The participation must rise to the level of furthering or facilitating the fraudulent business.

**(3) "*Knowingly*" party**

42. The requirement that the person be "*knowingly*" party to carrying on the business

[23] *Bilta* at [63].
[24] *Bilta* at [93].

fraudulently must involve actual knowledge of dishonesty, although the English Courts have found that "blind eye knowledge" will suffice for this purpose.[25]

43. The test for blind eye knowledge is set out by Lord Scott in *Manifest Shipping Co Ltd v Uni-Polaris Shipping Co Ltd* [2003] 1 AC 469 at [116] as follows:

> *"In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist. But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that may, at one extreme, be no more than a vague feeling of unease and, at the other extreme, reflect a firm belief in the existence of the relevant facts. In my opinion, in order for there to be blind-eye knowledge, the suspicion must be firmly grounded and targeted on specific facts. The deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to inquire into an untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the basis of a finding of privity."* (emphasis added)

44. When the relevant knowledge is of a corporate body, it is necessary to identify a human person whose knowledge can be attributed to the company.[26] It is a matter of context and, in particular, statutory construction to determine whether knowledge of a corporate body is limited to that of the board of directors or whether for this company the company's knowledge can be identified by reference to other individuals within the company.

45. It is because of the statutory context that the "blind-eye" knowledge of a senior employee of the fraudulent trading can be attributed to a company to make it liable as an accessory under Section 147. This is so even in cases where no member of the board of directors had any knowledge of the fraudulent trading. In *Morris v Bank of India* [2005] BCC 739, the English Court of Appeal (Mummery LJ, with whom Neuberger LJ and Munby J agreed) stated that requiring limiting the provision to apply to only the board or those specifically authorised by the board risked "*emasculating the effect of the provision*".[27]

46. Mummery LJ described the approach to attribution of knowledge as follows:

---

[25] See *Morris v Bank of India* [2005] BCC 739 at [14].
[26] *Meridian Global Funds Ltd v Securities Commission* [1995] AC 500 as followed in the Cayman Islands Court of Appeal in *Autumn Holdings Asset Inc v Renova Resources Private Equity Limited* [2017 (2) CILR 136].
[27] *Morris v Bank of India* [2005] BCC 739 at [129].

> *"it therefore must to some extent depend on the facts of each particular case whether an agent's knowledge should be attributed to the company for the purposes of s.213, where the circumstances are such that there would be no attribution on the application of the primary rules. We are of the view that it must typically depend on factors such as these. The agent's importance or seniority in the hierarchy of the company: the more senior he is, the easier it is to attribute. His significance and freedom to act in the context of the particular transaction: the more it is "his" transaction, and the more he is effectively left to get on with it by the board, the easier it is to attribute. The degree to which the board is informed, and the extent to which it can be said that it was, in the broadest sense, put on inquiry: the greater the grounds for suspicion or even concern or questioning, the easier it is to attribute, if questions were not raised or answers were too easily accepted by the board"* [28] (emphasis added).

47. The observations at first instance in *Bank of India v Morris* [2004] BCC 404 by Patten J (whose judgment was not criticized on these points) had held that to be knowingly party to the fraud, a defendant:

> *"did not have to know every detail of the fraud or the precise mechanics of how it would be carried out, but clearly they did have to know, either from their own observation of what was being done or from what they were told, that BCCI was intent on a fraud. Knowledge, for this purpose, means what it says. There must have been an actual realisation on the part of BOI that BCCI would, or was likely to, engage in false accounting. A failure to recognise the truth of what was going on is not enough, however obvious that may now seem to have been. The relevant knowledge also has to be contemporaneous with the assistance that was given at the time by entering into the various transactions. Subsequent knowledge based on hindsight is not enough, nor is negligence the test of liability."* [29] (emphasis added)

**(4) Pleading fraud claims**

48. In the Cayman Islands, when pleading a claim involving allegations of fraud, allegations must be pleaded in a specific and detailed manner. In *Ritchie Capital Management LLC v Lancelot Investors Fund Limited* [2021 (1) CILR 128] (a case in which I was involved), Parker J held:

> *"[84] I accept ... that the pleading of fraud or deceit is a serious step and should not be based on speculation or guesswork. This is not only because of the reputational significance and effect on individuals and entities against whom fraud is pleaded. Fraud cases can also increase the cost, complexity and 'temperature' of actions. There are necessary hurdles to overcome and allegations of fraud in pleadings should not be 'bandied about'.*

---

[28] *Morris v Bank of India* [2005] BCC 739 at [130].
[29] *Bank of India v Morris* [2004] BCC 404 at [13].

> *[85] I also accept … that a fraud case, which classically relies on inferences, cannot be properly pleaded without some solid foundation in evidence. In addition to the well-known pleadings principles, it must be sufficiently particularised in order for the defendant to understand the case it has to meet and so as to justify any necessary inferences as to the deceit and conspiracy alleged. The fraud case and inferences which would support and justify the plea of fraud must be properly pleaded out with some particularity."*

49. In the decision of *Jafar v Abraaj Holdings (in official liquidation)* (Unreported, 20 December 2021) at [14]-[16], Segal J confirmed that even where a party is subject to an information disparity, this does not excuse vague pleadings where that can reasonably be avoided.

50. In *Enigma Diagnostics Limited (in liquidation) v Boulter* (Unreported, 8 February 2022), Doyle J held:

> *"I entirely accept that it is trite law that fraud must be expressly and specifically pleaded. It is often said that fraud must be distinctly alleged and distinctly proved. Allegations of fraud must always be properly particularised. There must be relevant particulars where the court is being asked to draw an inference, setting out the facts alleged from which the inference can be drawn. Those making serious allegations of fraud cannot proceed on Mr Micawber's optimistic belief that something will turn up. Mr Quest referred the court to paragraphs 183 to 185 of Lord Millett's judgment in Three Rivers and paragraphs 145 to 148 of Mrs Justice Cockerill's judgment in King v Stiefel [2021] EWHC 1045 (Comm). It is right that pleadings of fraud must be subjected to close scrutiny. Fraud and any necessary suggested inferences which justify and support such a plea must be properly pleaded out with some particularity."* (emphasis added)

51. In the absence of a claim for unlawful means conspiracy, the abovementioned principles require a plaintiff to plead the requisite elements of participation and knowledge on the part of each defendant individually.

## III. EFFECT OF DISSOLUTION OF A CAYMAN COMPANY

52. I am instructed that one of the Defendants against whom the Proceeding is brought is an entity named BlueMountain Credit Opportunities Master Fund I L.P. which was dissolved on 20 January 2023. I have been asked to advise whether bringing proceedings against a dissolved entity is permissible in the Cayman Islands.

**(5) Status of dissolved company**

53. Once a Cayman Islands company is dissolved under section 152 of the Companies Act following the completion of the winding up, it no longer exists as a legal person and cannot conduct business or enter into contracts. Effects of dissolution include that:

(a) Its corporate state and powers all cease;[30]

(b) It is removed from the Register of Companies; and

(c) It is no longer able to hold or distribute assets (which must be held on trust for contributories or creditors for one year and thereafter transferred to the Financial Secretary).[31]

54. Following dissolution, a Cayman Islands company is not capable of being restored[32] (other than in the extraordinary circumstances where the dissolution was procured by fraud[33]).

55. A dissolved Cayman Islands company cannot therefore bring or defend proceedings in the Cayman Islands, as a nominal party or otherwise. I have not identified any Cayman case where a company can be a nominal defendant after it is dissolved. For instance, when a company is joined as a nominal party to derivative proceedings those proceedings cannot go ahead once the company is dissolved.[34]

I affirm this __ day of March, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

---

[30] Companies Act, s 118(2).
[31] Companies Act, s 153.
[32] See *Schramm and Hiscox Syndicate 33 v Financial Secretary, Registrar of Companies, Smech Management Limited and Axima Building Services Limited* [2004–05 CILR 39].
[33] *Re Real Estate and Finance Fund* (Unreported, Kawaley J, 24 August 2022).
[34] See *Ryan v HSBC UK Bank Plc* [2023] BCC 768 where the plaintiff had to apply for restoration of the company before it could join it as a nominal claimant to the derivative action.

Dated: March 22, 2024

______________________________

Thomas Lowe KC