# Exhibit B

# *Autumn Holdings Asset Inc v Renova Resources Private Equity Limited* [2017 (2) CILR 136]

[2017 (2) CILR 136]

# AUTUMN HOLDINGS ASSET INC v. RENOVA RESOURCES PRIVATE EQUITY LIMITED (as a shareholder of Pallinghurst (Cayman) General Partner LP (GP) Ltd.), PALLINGHURST (CAYMAN) GENERAL PARTNER LP (GP) LIMITED, PALLINGHURST (CAYMAN) GENERAL PARTNER LP and PALLINGHURST RESOURCES MANAGEMENT LP

# RENOVA RESOURCES PRIVATE EQUITY LIMITED (derivatively on behalf of Pallinghurst (Cayman) General Partner LP (GP) Ltd., Pallinghurst (Cayman) General Partner LP and Pallinghurst Resources Management LP) and OTHERS v. GILBERTSON and AUTUMN HOLDINGS ASSET INC

C.A. (Chadwick, Mottley and Forte, JJ.A.) September 12th, 2017

*Companies — directors — powers and duties — general principle that director of limited company owes fiduciary duties — principal duties to act in company's best interests, avoid conflict of interest and not profit from position — may be varied by company's articles, shareholders' agreement or clear implication from circumstances*

*Trusts — constructive trusts — knowing receipt — liable to account as constructive trustee if disposal of assets in breach of fiduciary duty; beneficial receipt by defendant of traceable assets; and knowledge on defendant's part that assets traceable to breach*

Renova Resources Private Equity Ltd. brought a multiple derivative action in the Grand Court alleging breach of fiduciary duty and knowing receipt.

Renova Resources Private Equity Ltd. ("Renova"), a company incorporated in the Bahamas, was a wholly owned subsidiary of Renova Holding Ltd. They were members of a large Russian group of companies which had a range of major commercial business interests. At the material time, the chairman and principal beneficial owner of the group was Mr. Vekselberg, a Russian billionaire. The Chief Investment Officer of the Renova group was Mr. Kuznetsov.

Between 2004 and 2005, Mr. Gilbertson, an experienced businessman, and Mr. Vekselberg had agreed to set up a new private equity fund as a joint venture. Mr. Gilbertson would manage the fund and it would be financed by Renova, with the profits to be shared between them. From the start, Mr. Gilbertson had identified—and, with his son, Sean Gilbertson, had been actively exploring—the acquisition of the rights to the Fabergé luxury goods brand and business from Unilever plc as a potential investment project. Mr. Vekselberg, as a collector of Fabergé items, was enthusiastic about the project, termed "Project Egg."

In January 2006, the terms of the joint venture were set out in a letter from Renova Holding Ltd. to Mr. Gilbertson, signed by both parties as partners ("the letter agreement"). It confirmed that Renova Holding would establish the investment fund and the fund management vehicle and that Mr. Gilbertson would be responsible for all investment projects; he would be appointed chairman of the investment fund and the fund management vehicle, with his duties being those customary for an executive chairman of a company. The letter agreement provided that approval to proceed with an investment project required the unanimous consent of the investment committee (which comprised Mr. Gilbertson and Mr. Kuznetsov). Further, it provided that the agreement would automatically terminate if the investment fund and fund management vehicle were not operating in a way reasonably satisfactory to each of the partners within 16 months.

The investment structure ("the Pallinghurst structure") was established, which consisted of three Cayman Islands entities: Pallinghurst Resources Management LP ("the master fund"); Pallinghurst (Cayman) General Partner LP ("GPLP"); and Pallinghurst (Cayman) General Partner LP (GP) Ltd. ("the company"). The company was the general partner of GPLP, and GPLP was the general partner of the master fund. Mr. Gilbertson and Mr. Kuznetsov were appointed as the directors of the company, and the trustee of Mr. Gilbertson's family trust ("Fairbairn") and Renova were the two equal shareholders. Long form agreements ("the Pallinghurst agreements") setting out the terms of the partnership between Renova and the Pallinghurst structure were agreed, but not signed.

In May, an offer was made on behalf of the master fund to purchase the Fabergé rights for US$20m., which Unilever declined. Since the maximum bid Mr. Kuznetsov could approve on Renova's behalf (without detailed due diligence, a business assessment and various internal approvals) was US$20m., he suggested that Mr. Vekselberg consider investing his personal funds to acquire the rights. Mr. Vekselberg agreed personally to put forward US$30m. but in August that offer was also declined. It had, by that time, become apparent that Unilever was seeking about US$40m.

On December 1st, Mr. Vekselberg agreed personally to put forward up to US$40m., and a Cayman company called Project Egg Ltd. ("PEL," now "Fabergé Ltd.") was incorporated as a wholly owned subsidiary of the master fund to acquire the rights. By December 15th, a purchase price of US$38m. had been agreed with Unilever and negotiations about completion were taking place. On December 20th, however, it became clear to the

Gilbertsons that in return for his personal investment, Mr. Vekselberg required ownership of the Fabergé brand through the Lamesa group, which comprised his personal companies, on the basis that the management, control and economic benefits of the brand would be licensed to the master fund. The Gilbertsons ostensibly accepted Mr. Vekselberg's requirements for restructuring and, the next day, Sean Gilbertson emailed Mr. Kalberer, the deputy chief legal officer of Renova Management AG ("Renova Management"), a draft "implementation agreement" ("the first draft IA") relating to the implementation of Project Egg in accordance with them.

On December 22nd, the sale and purchase agreement ("SPA") was signed by Unilever and PEL on the basis that Mr. Vekselberg's structure would be pursued (although the precise terms of the restructuring had not been finally agreed). In the following days, Sean Gilbertson sent Mr. Kalberer further draft implementation agreements ("the second draft IA" and "the third draft IA"). The third draft IA provided, *inter alia*, that a Lamesa group company ("BrandCo") would, upon the transfer to it of the Fabergé brand in return for Lamesa Arts Inc. ("Lamesa") procuring payment of the purchase price to Unilever, grant PEL ("OpCo") a licence to use and exploit the Fabergé brand, which would be valid until the winding up of the master fund pursuant to the Pallinghurst agreements, at which time BrandCo could terminate the licence on 90 days' notice.

Over the previous two weeks, however, Mr. Gilbertson had been secretly setting up a consortium of investors consisting of himself, Dr. Jelinek, Mr. Mende and Mr. Kundrun, to purchase the rights without any involvement by Mr. Vekselberg, Lamesa or Renova. On January 1st, 2007, he decided to implement this plan and "then negotiate with [Mr. Vekselberg] from a position of strength"; he therefore proceeded to finalize the arrangements with his consortium, pursuant to which he would contribute 25% of the purchase price from his own money.

While Mr. Gilbertson was communicating with his consortium of investors, the Gilbertsons continued to communicate with Mr. Kalberer about the third draft IA and, on January 2nd, Mr. Kalberer provided the fourth draft IA. This draft did not significantly change the provisions of the third draft IA—but it did insert a new clause which provided that BrandCo could terminate the licence on 60 days' notice without having to pay anything to OpCo if the master fund disposed of OpCo or if the master fund were wound up under the Pallinghurst agreements.

Also on January 2nd, Mr. Gilbertson contacted Mr. Thomas, a director of Fairbairn, to request his contribution to the purchase price (US$9.5m.) from one of his family trusts ("the BPG Settlement"). Mr. Gilbertson reported that he had "bought [himself] a Christmas present" and requested "some money to pay for it," which Mr. Thomas readily approved. Mr. Gilbertson then sent an email to Mr. Vekselberg stating that there was little likelihood of reaching an agreement in respect of the implementation of Project Egg in time to meet the scheduled completion date of January 3rd and that, accordingly, he had "triggered alternative arrangements."

On January 3rd, the SPA was completed by payment of US$38m. by Mr. Mende's and Mr. Kundrun's company, K-M Investment Corp. ("K-MIC"). The same day, a loan to PEL from Autumn Holdings Asset Inc. ("Autumn") (a wholly owned subsidiary of Fairbairn in its capacity as trustee of the Gilbertson family trust), K-MIC and Dr. Jelinek, of US$38m., repayable on seven days' notice plus interest at about 7% compounded monthly, was approved. Additionally, 100 new shares in PEL were issued at par value to the lenders, pro rata to their contribution to the loan, so that the master fund's interest in PEL was reduced from 100% to just under 1% (1/101). The effect of these steps was that, save as to the master fund's 1/101 interest, the economic benefit of the development, exploitation and management of the Fabergé rights passed to Autumn, Dr. Jelinek and K-MIC, outside the Pallinghurst structure. In May, the interest rate on the loan was unilaterally increased by PEL to 25% per annum.

The subsequent negotiations between Mr. Gilbertson and Mr. Vekselberg concerning the rights were not successful and, on May 27th, Renova Holding gave written notice of termination of the letter agreement. Renova then brought the present multiple derivative action on behalf of the company, as ultimate owner and controller of the master fund, for compensation for breach of fiduciary duty by Mr. Gilbertson, and for knowing receipt by Autumn. Mr. Gilbertson defended the claims on various grounds and counterclaimed against the Renova parties. After a contested hearing, the Grand Court (Foster, Ag. J.) gave Renova leave to continue the action pursuant to GCR O.15, r.12A(2) (in proceedings reported at 2009 CILR 268). (Renova had indicated that if it were granted leave to continue the action on behalf of the company it would seek leave (on behalf of the company) to proceed in the name of GPLP, and on behalf of GPLP to proceed in the name of the master fund, but in the event no further applications were made.) At a further contested hearing, Foster, J. dismissed its application for summary judgment against the counterclaim (in proceedings reported at 2010 (1) CILR 344). Renova, the company, GPLP and the master fund were referred to collectively as "the Renova parties" and Mr. Gilbertson and Autumn were referred to as "the Gilbertson parties."

Renova alleged that Mr. Gilbertson had breached his fiduciary duties as a director of the company by diverting away from the master fund, and thus from the company, for his own benefit, the valuable economic benefit of developing, exploiting and managing the Fabergé brand, and then procuring the gratuitous issue of new shares in PEL to his own trust and other investors thereby virtually eliminating the interest of the master fund in PEL. It sought reconstitution of the master fund to the position in which it would have been but for the alleged breach of duty.

Renova's claim against Autumn was for an account of the shares in PEL which it was said Autumn had received gratuitously, and for an account of the interest which Autumn had earned on the loans it had made by way of contribution to the purchase price of the Fabergé rights and for working

capital. It was said that Autumn knew or ought to have known that Mr. Gilbertson was acting in breach of fiduciary duty, alternatively, that Autumn had not paid for the shares and held them as a volunteer.

Mr. Gilbertson and Autumn counterclaimed against Renova, Mr. Vekselberg, Mr. Kuznetsov and Renova Holding on various grounds for damages by way of indemnity for any liability they were found to have in respect of Renova's derivative claims.

At trial, Foster, J. allowed the claims in part and dismissed the counterclaims. He held that Mr. Gilbertson did owe the duties of a fiduciary as director of the company, and that he had breached those duties in acting as he did in late December 2006 and January 2007. However, the judge held that Mr. Gilbertson's breach of fiduciary duty had caused the master fund no significant economic loss. If the master fund were to be put in the position it would have been in but for Mr. Gilbertson's breach of duty, it would be in a significantly negative financial position. The judge therefore dismissed the claim for equitable compensation. The judge further held that Autumn held the 25 PEL shares issued to it in January 2007 on constructive trust for the master fund/GPLP/the company on the basis that it knew or should have known of Mr. Gilbertson's breach of fiduciary duty, and it received the shares as a volunteer and was liable to account for them. He also held that Autumn was liable to account for the interest it received on the loans to PEL. Two of the five counterclaims brought by the Gilbertson parties were abandoned at trial and the remaining counterclaims were dismissed (that decision is reported at 2012 (2) CILR 416).

The judge ordered (1) that Autumn held 25,000 ordinary shares in Fabergé Ltd. (formerly PEL) as constructive trustee for the master fund; (2) that Autumn transfer those shares to the master fund (the 25,000 shares to which the judge referred had been 25 shares in PEL prior to its 2008 sub-division and change of name and did not include any shares in Fabergé Ltd. subsequently acquired by Autumn); (3) that Autumn pay to the master fund the sum of US$2,306,320.35 (inclusive of pre-judgment interest, from January 3rd, 2007 to the date of the order, in the amount of US$507,347.35); (4) that the claim for equitable compensation against Mr. Gilbertson be dismissed; (5) that the counterclaims against the Renova parties be dismissed; and (6) that each party bear its own costs for the proceedings.

Autumn appealed against the order seeking the setting aside of paras. 1–3 and an order that the Renova parties pay its costs of the appeal (as well as its costs from the court below). It submitted that (a) the judge misdirected himself and erred in law in entertaining and granting relief in respect of derivative claims that were not before him; (b) the judge misdirected himself and erred in law and/or in fact in holding that Mr. Gilbertson owed or was in breach of any fiduciary duty in relation to the Fabergé rights and so in holding that there was any substratum on which to found a claim against Autumn; (c) the judge had misdirected himself and erred in law and/or fact in holding that, notwithstanding the rule in

*Nurcombe* v. *Nurcombe*, the conduct of the Renova parties was not such as to disentitle Renova from any relief; (d) the judge misdirected himself and erred in law and/or fact in holding that, having regard to its relationship with Mr. Gilbertson, the property it received, the person from whom it received it and its state of knowledge at the time of receipt, Autumn was liable in knowing receipt; (e) the judge misdirected himself and erred in law and/or fact in holding that Autumn was liable as a volunteer; and (f) the judge misdirected himself and erred in law and/or fact in granting relief against Autumn (i) by way of an account of profits (comprising the interest that Autumn received on its loan to PEL) and (ii) in respect of pre-judgment interest from January 3rd, 2007 on the interest payment which Autumn received from Fabergé Ltd. on September 28th, 2007.

Renova (derivatively on behalf of the company, GPLP and the master fund), as plaintiff in the action, and Mr. Vekselberg, Mr. Kuznetsov, Renova Holding and Renova (on its own account), as defendants to the counterclaim, also appealed against the judge's order. Mr. Gilbertson and Autumn were the respondents to that cross-appeal. The relief sought by the cross-appeal was (a) that so much of the order as dismissed Renova's claim against Mr. Gilbertson for equitable compensation be quashed, and that either judgment be entered for Renova against Mr. Gilbertson in the sum of US$82,582,000 (and interest) or that it be declared that Autumn held a further and additional 16,190,575 ordinary shares in Fabergé Ltd. as constructive trustee for the master fund, and ordered that Autumn should forthwith transfer full legal title in those further shares to the master fund; (b) that Mr. Gilbertson and Autumn pay Renova's costs of the proceedings in the court below on the standard basis; (c) that Mr. Gilbertson and Autumn pay the costs of the defendants to counterclaim in the court below on the indemnity basis; and (d) that Mr. Gilbertson and Autumn pay the cross-appellants' costs of the cross-appeal on the standard basis. The grounds of the cross-appeal were that (a) the judge erred in law and/or in principle and/or misdirected himself as to the evidence in valuing at nil the loss that Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation; (b) alternatively, the judge erred in law and/or in principle and/or misdirected himself as to the evidence in failing to hold that the entirety of Autumn's shareholding in Fabergé Ltd. (and not only the 25,000 shares which represented the 25 shares issued by PEL in January 2007) should be held on constructive trust for (and transferred to) the master fund; and (c) the judge erred in law or exercised his discretion outside the ambit within which reasonable disagreement was possible in making no order as to the costs of the action and counterclaim.

**Held,** ordering as follows:

(1) The judge had been correct to entertain the derivative claims advanced by Renova. In particular, he had been right to hold that, having chosen not to appeal against his order made some 3½ years earlier, it was not open to the Gilbertson parties to challenge, at trial, the standing of

Renova to advance claims in the action on behalf of GPLP and the master fund, including the claim founded on the unpleaded contention that Mr. Gilbertson had acted in breach of the fiduciary duties he owed to the master fund. While it was accepted that Renova, in its summons issued in July 2008, had not sought leave to proceed by way of multiple derivative action on behalf of GPLP and/or the master fund, it was important to note that, first, it had not been required to do so under GCR O.15, r.12A (which did not apply to multiple derivative actions) and, secondly, there had been no other rule of practice that leave was required to bring a multiple derivative action under the general law. It was at least arguable that the cause or causes of action which Renova sought to pursue against Mr. Gilbertson and/or Autumn were vested in the master fund (and not in the company). In those circumstances, it was necessary, in order to determine whether to allow the action as constituted to go forward, for the judge to address whether Renova could bring multiple derivative proceedings for loss said to have been suffered by the master fund. There was no doubt that that question had been properly before the judge in April 2009, and no doubt that he had intended to and did in fact decide it (paras. 26–29; para. 281).

(2) The judge had been correct to hold that Mr. Gilbertson owed and was in breach of fiduciary duties in relation to the Fabergé rights. In particular, he had been correct to hold that, as a director of the company, Mr. Gilbertson owed the duties of a fiduciary to the company (and, more generally, to the master fund and the Pallinghurst structure) throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007. The judge had correctly held that Mr. Gilbertson owed fiduciary duties to the company in relation to Project Egg (*i.e.* the acquisition of the Fabergé rights). There was no challenge in this appeal to the judge's assumption that it was common ground that, until the issue of the additional shares in January 2007, PEL had been a wholly owned subsidiary of the master fund. In those circumstances, it was not open to the present court to question whether the judge had been correct to proceed on that basis. The court was therefore satisfied that whatever fiduciary duties might have been owed by Mr. Gilbertson to the company (or more generally to the Pallinghurst structure) in relation to Project Egg (as an investment project) under the terms of the letter agreement, the judge had been correct to accept, and the Renova parties were correct to submit in this court, that *prima facie* Mr. Gilbertson owed fiduciary duties as a director of the company in relation to the assets of the entities (including the master fund and, from its incorporation on December 1st, 2006, PEL) which it controlled, and that, from the execution of the SPA on December 22nd, 2006, those assets included the contractual interest of PEL as purchaser of the Fabergé rights and, after completion of the purchase under the SPA on January 3rd, 2007, as owner of those rights. The judge had also correctly held that Mr. Gilbertson's fiduciary duties owed to the company in respect of Project Egg had not been modified or attenuated so as to enable him to act

in his own interests notwithstanding that they might conflict with the interests of the company. There was nothing in the letter agreement that enabled Mr. Gilbertson to take for himself a project he had brought to the investment committee. In particular, first, it could not be said that Mr. Kuznetsov (or, more broadly, the Renova parties) had done anything that could be construed as a veto of Project Egg. Secondly, the evidence did not support the contention that what had been said to Mr. Sean Gilbertson on December 20th, 2006, agreed between Mr. Gilbertson and Mr. Vekselberg the following day and reflected in the draft IAs which followed, did not involve the master fund at all but amounted to a new and separate arrangement outside the Pallinghurst structure. Thirdly, the evidence did not support the contention that the effect of the agreement or understanding was that if Mr. Vekselberg walked away from the deal Mr. Gilbertson could take whatever steps he thought fit to acquire the Fabergé rights for his own benefit, nor the contention that, when Mr. Gilbertson acquired the rights for his own benefit, Mr. Vekselberg had walked away from the deal. The judge had been correct to hold that Mr. Gilbertson had acted in breach of the fiduciary duties he owed to the company or the master fund in acting as he did in late December 2006 and January 2007 (paras. 80–125; para. 281).

(3) The judge had been correct to hold that, notwithstanding the so-called rule in *Nurcombe* v. *Nurcombe*, the conduct of the Renova parties was not such as to disentitle Renova from equitable relief in this action. The underlying principle of the so-called *Nurcombe* defence was that, in permitting a derivative action to be brought by a person in whom the cause of action was not vested for the benefit of the "proper" plaintiff, the court was exercising an equitable jurisdiction on the grounds that justice so required. The jurisdiction would not be exercised where to do so would lead to injustice. Circumstances in which the exercise of the jurisdiction would lead to injustice would include those in which the derivative plaintiff would benefit indirectly (*e.g.* as a shareholder of the defendant company) from the successful pursuit of a claim to which, as between that person and the defendant, the defendant would have had an equitable defence on which it would have succeeded if (on the hypothesis that the derivative plaintiff was the proper plaintiff) the action had been brought by the plaintiff in his own right. In the present case, the judge had been correct to reject the contention that these proceedings had not been brought and pursued by Renova for the benefit of the company (or more generally for the benefit of the master fund and the other entities within the Pallinghurst structure) but for the benefit of Mr. Vekselberg personally. There was no evidence to support that contention. None of the matters relied upon by the Gilbertson parties in support of their challenge to the judge's conclusion would have given rise to an equitable defence on which the Gilbertson parties would have succeeded if the action had been brought by Renova in its own right. The judge had correctly considered that there was no reason under this head to refuse Renova the equitable relief it sought in this derivative action. Renova's past failures to comply

with its discovery obligations did not now provide a ground upon which the action should be dismissed (paras. 135–146; para. 281).

(4) The judge had been correct to value at nil the loss that Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation. In particular, he was correct to hold on the evidence before him that the current value (as at the date of trial) of the right to manage and exploit the Fabergé rights as licensee (to which the master fund (through OpCo) would probably have been entitled but for Mr. Gilbertson's breach of fiduciary duty) was less than the costs (other than acquisition costs) and expenses that would have been incurred in funding the development of those rights. The judge had explained that equitable compensation in respect of loss caused by breach of fiduciary duty was assessed as the sum required to put a plaintiff back into the position in which he would have been at the time of the trial if he had not sustained that loss. Renova's claim was for compensation in the sum required to reconstitute the master fund to the position in which it would have been, at the date of judgment, but for Mr. Gilbertson's breach of duty. The court would not interfere with the judge's determination that the undiscounted value of Fabergé Ltd. at the date of the trial was not more, and possibly significantly less, than US$120m. An appellate court must be cautious, where expert witnesses gave oral evidence at trial, before rejecting the trial judge's evaluation of that evidence. There was nothing to suggest that the judge's evaluation should be rejected. The judge had also been entitled to apply a discount of 50% to the value that he placed on Fabergé Ltd. to reflect his finding that, had Mr. Gilbertson not acted in breach of fiduciary duty, the master fund would not have become owner of the Fabergé rights but would have been entitled only to develop, exploit and manage those rights under licence for a limited period on the terms of the fourth draft IA or very similar terms. The judge had also been correct to deduct from the current value of the business the costs and expenses that would have been incurred by the master fund in carrying on that business under licence since that date. The costs and expenses to be deducted included the post-acquisition expenses and future investment incurred in respect of the development, exploitation and management of the Fabergé rights, *i.e.* about US$102m. The judge had therefore correctly considered that he did not need to determine how the acquisition cost of US$38m. should be treated. His conclusion that, after deducting post-acquisition costs of US$102m. from the hypothetical current value of the business which, but for Mr. Gilbertson's breach of duty, it would have carried on since January 2007, the master fund had suffered no loss was the same whether or not the acquisition cost of the Fabergé rights was included as a cost or expense to be deducted. Renova's appeal against the judge's order dismissing its claim to equitable compensation would therefore be dismissed (paras. 179–180; para. 281).

(5) The judge had been correct to hold that Autumn was liable to account as a constructive trustee of the shares issued by PEL in January

2007 because (a) it received those shares as a volunteer, and (b) in any event, it was in "knowing receipt" having regard to its relationship with Mr. Gilbertson, the property which it received, the person from whom it received the property and its state of knowledge at the time of receipt. In particular, the judge had been correct to hold that the value of the single share in PEL held by the master fund before the issue of the 100 new PEL shares could be traced, in part, into the 25 new PEL shares issued to Autumn on that date; that Autumn gave no value for those 25 new shares; and that the knowledge of Mr. Gilbertson (and so far as relevant of Mr. Thomas) as to the circumstances in which those new PEL shares were issued was to be attributed to Autumn. Immediately before the issue of the 100 new shares, PEL was the owner of the Fabergé rights and, as owner of the single share then in issue, the master fund was the owner of 100% of the issued share capital of PEL. The position immediately after the 100 additional shares were issued was that PEL remained the owner of the Fabergé rights but that the issued share capital of PEL was owned as to 100/101 by the members of the consortium and as to 1/101 by the master fund. Substantially the whole of the value of the master fund's interest in PEL and (indirectly through PEL) in the Fabergé rights had been transferred to the members of the consortium as owners of the new shares. The effect of the issue of the new shares was that, *inter alia*, 25/101 of the master fund's ownership of the whole issued share capital of PEL was transferred to Autumn. The value of what was transferred was represented by the new shares held by Autumn and the other members of the consortium and could be traced accordingly. To hold otherwise would be to allow corporate form to defeat commercial substance. The judge had been correct to hold that there was never any doubt that Mr. Thomas would comply with Mr. Gilbertson's wishes in relation to the funding of the acquisition of the Fabergé rights and the receipt of the new PEL shares. In relation to that transaction, Mr. Gilbertson had been the directing mind of Autumn and, accordingly, his knowledge was properly attributed to Autumn in that context. The judge had also been correct to hold that Mr. Thomas knew or should have known that what Mr. Gilbertson was asking him to do on behalf of Autumn in relation to the funding of the acquisition of the Fabergé rights and the receipt of the new PEL shares was, or was likely to be, contrary to the interests of the master fund and in breach of his (Mr. Gilbertson's) fiduciary duties as a director of the company, and that to implement Mr. Gilbertson's request in the circumstances would be inappropriate for a prudent trustee. In so far as Mr. Thomas's own knowledge was relevant, it was not in dispute that it could be attributed to Autumn. If Autumn received the new PEL shares as a purchaser for value, it held those shares as a constructive trustee for the master fund on the basis of "knowing receipt" (paras. 196–225; para. 281).

(6) The judge had been correct to hold that Autumn was not liable to account as constructive trustee for shares (other than the 25,000 shares which represented the 25 shares issued to it by PEL in January 2007) which it held in Fabergé Ltd. at the date of the trial, and so did not have to transfer such additional shares to the master fund. No claim in respect of the additional 16,190,575 shares had been before the court at the trial and the judge could not therefore be criticized for failing to address Renova's arguments in support of the claim in its submissions. The Gilbertson parties had pointed out that the claim had not been pleaded and Renova had not sought leave to amend its pleading so as to introduce it. Nor had the Renova parties appealed against that ruling. It was not now open to Renova to contend that the Gilbertson parties had allowed the claim by failing to raise any objection at the appropriate time. The material before the judge at the trial did not enable him to make the findings of fact which would have been necessary in order to support that claim and the present court was also not in a position to do so (paras. 230–234; para. 281).

(7) The judge had been wrong to hold that Autumn was liable to account (by way of an account of profits) as a constructive trustee for the payment of US$1,798,973 which it received on September 28th, 2007 in respect of interest on the loans which it had made to PEL on January 3rd, 2007. In particular, he had been wrong to hold that the value of any asset held or formerly held by the master fund could be traced into that payment. The loans to PEL on January 3rd, 2007 had not had the effect of diverting the economic opportunity to acquire the Fabergé rights away from PEL; the loans enabled PEL to take advantage of that economic opportunity by using funds lent to it to complete the purchase. Immediately before the loans were made on January 3rd, 2007, the interest of the master fund in the acquisition of the Fabergé rights by PEL was as owner of 100% of the issued capital of PEL. The making of the loans did not alter that position. That position was altered by Mr. Gilbertson's breach of fiduciary duty in procuring the dilution of the master fund's ownership of the share capital of PEL by the issue of the 100 new shares to the members of the consortium. But the terms of the loans had been agreed without regard to the decision to issue the new shares. Therefore, although it could be said that the payment by PEL to Autumn in September 2007 of interest on the loans made in January was a profit derived from the funding of the acquisition of the Fabergé rights and that the economic opportunity to fund the acquisition arose from PEL's rights as contractual purchaser under the SPA, there was no basis on which it could be said that the opportunity to fund the acquisition or PEL's rights as purchaser had been diverted from the Pallinghurst structure by Mr. Gilbertson's breach of fiduciary duty. Properly understood, what had been so diverted was substantially the whole (100/101) of the ownership of PEL (and thus the value of the Fabergé rights after deduction of the cost of acquisition), not the right to receive interest paid by PEL on the loans which enabled it to acquire those rights. It followed that the judge had been wrong, also, to award pre-judgment interest—in the amount of US$507,347.35 or in any

other amount—on an amount equal to that payment. If (contrary to the court's view) the judge had not been wrong to hold that Autumn was liable to account for the payment of US$1,798,973 which it received on September 28th, 2007, he had nevertheless been wrong to include in the sum awarded (US$507,347.35) as pre-judgment interest an amount (US$95,407.18) in respect of interest attributable to the period from January 3rd, 2007 to September 27th, 2007. He had been wrong to do so because, on the material before him, it had not been open to him to hold that Autumn was liable to account for interest on the loans in the amount of US$1,798,973 (or at all) as a "knowing recipient" before the date (September 28th, 2007) on which the relevant cause of action for the purposes of s.34(1) of the Judicature Law (2007 Revision) arose (paras. 235–248; para. 281).

(8) The court would not interfere with the judge's making no order as to the costs of the action or, as between the Gilbertson parties and Renova, in making no order as to the costs of the counterclaim. It could not be said that the judge had exercised his discretion outside the ambit within which reasonable disagreement was possible. Nevertheless, in relation to the costs of the counterclaim, the judge had erred in failing to distinguish between the position of Renova and that of its co-defendants to the counterclaim (namely Mr. Vekselberg, Mr. Kuznetsov and Renova Holding). Had he done so, he would have appreciated the necessity to make a separate order for their costs of the counterclaim. The appropriate order was that the costs of the counterclaim (as between the Gilbertson parties and the three co-defendants other than Renova) should follow the event, assessed on the indemnity basis, to be paid by the Gilbertson parties (paras. 263–281).

(9) Autumn's appeal against paras. 1–2 of the November 6th, 2012 order would be dismissed, but its appeal against para. 3 of that order would be allowed. Renova's cross-appeal against paras. 4 and 6 of the order would be dismissed, as would its appeal against para. 6. The appeals of Mr. Vekselberg, Mr. Kuznetsov and Renova Holdings against para. 6 of the order would be allowed. As between the Gilbertson parties and the three defendants to the counterclaim just mentioned, para. 6 of the order would be varied by setting aside that paragraph in so far as it related to their costs of defending the counterclaims and by adding a direction that the Gilbertson parties pay the costs of the counterclaims incurred by Mr. Vekselberg, Mr. Kuznetsov and Renova Holding (including costs ordered to be costs in the cause), such costs (if not agreed) to be assessed on the indemnity basis. Further consideration of the costs of the appeal and cross-appeal required an application to the court (para. 282).

**Cases cited:**

(1)*Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.*, Grand Ct., November 28th, 2011, unreported, considered.

(2) *Arthur* v. *Att. Gen. (Turks & Caicos Islands)*, [2012] UKPC 30, considered.
(3) *Att. Gen. (Hong Kong)* v. *Reid*, [1994] 1 A.C. 324; [1993] 3 W.L.R. 1143; [1994] 1 All E.R. 1; (1993), 143 N.L.J. 1569, referred to.
(4) *Bank of Credit & Commerce Intl. (Overseas) Ltd.* v. *Akindele*, [2001] Ch. 437; [2000] 3 W.L.R. 1423; [2000] 4 All E.R. 221; [2000] Lloyd's Rep. Bank. 292; [2000] BCC 968; [2000] WTLR 1049; (2000), 2 ITELR 788, referred to.
(5) *Banks* v. *Arch*, 2004–05 CILR 441, referred to.
(6) *Barrett* v. *Duckett*, [1995] BCC 362; [1995] 1 BCLC 243, referred to.
(7) *Belmont Fin. Corp. Ltd.* v. *Williams Furniture Ltd. (No. 2)*, [1980] All E.R. 393, referred to.
(8) *Bhullar* v. *Bhullar*, [2003] EWCA Civ 424; [2003] 2 BCLC 241; [2003] WTLR 1397; *sub nom. Re Bhullar Bros. Ltd.*, [2003] BCC 711, *dicta* of Jonathan Parker, L.J. referred to.
(9) *Boardman* v. *Phipps*, [1967] 2 A.C. 46; [1966] 3 W.L.R. 1009; [1966] 3 All E.R. 721, referred to.
(10) *Bristol & West Bldg. Socy.* v. *Mothew*, [1998] Ch. 1; [1997] 2 W.L.R. 436; [1996] 4 All E.R. 698, referred to.
(11) *Charter plc* v. *City Index Ltd.*, [2007] EWCA Civ 1382; [2008] Ch. 313; [2008] 2 W.L.R. 950; [2008] 3 All E.R. 126; [2008] 2 All E.R. (Comm) 425; [2007] 2 CLC 968; [2008] P.N.L.R. 16; [2008] WTLR 1773, referred to.
(12) *Commonwealth Oil & Gas Co. Ltd.* v. *Baxter*, [2009] CSIH 75; 2010 S.C. 156; 2009 SLT 1123; 2009 S.C.L.R. 898; 2009 G.W.D. 35–592, referred to.
(13) *Competitive Ins. Socy. Co. Ltd.* v. *Davies Invs. Ltd.*, [1975] 1 W.L.R. 1240; [1975] 3 All E.R. 254, referred to.
(14) *Cook* v. *Deeks*, [1916] 1 A.C. 554; (1916), 85 L.J.P.C. 161; 114 L.T. 636; [1916–17] All E.R. Rep. 285, referred to.
(15) *Criterion Properties plc* v. *Stratford UK Properties LLC*, [2004] UKHL 28; [2004] 1 W.L.R. 1846; [2004] BCC 570; [2006] 1 BCLC 729, considered.
(16) *El Ajou* v. *Dollar Land Hldgs. plc*, [1994] 2 All E.R. 685; [1994] BCC 143; [1994] 1 BCLC 464; [1993] N.P.C. 165, considered.
(17) *Foskett* v. *McKeown*, [2001] 1 A.C. 102; [2000] 2 W.L.R. 1299; [2000] 3 All E.R. 97; [2000] Lloyd's Rep. I.R. 627; [2000] 5 LRC 664; [2000] WTLR 667; (2000), 2 ITELR 711, applied.
(18) *Foss* v. *Harbottle* (1843), 2 Hare 461; 67 E.R. 189, referred to.
(19) *G* v. *G (Minors: Custody Appeal)*, [1985] 1 W.L.R. 647; [1985] 2 All E.R. 225; [1985] FLR 894; [1985] Fam. Law 321, referred to.
(20) *Guinness plc* v. *Saunders*, [1990] 2 A.C. 663; [1990] 2 W.L.R. 324; [1990] 1 All E.R. 652; [1990] BCC 205; [1990] BCLC 402, referred to.
(21) *Gwembe Valley Dev. Co. Ltd.* v. *Koshy (No. 3)*, [2003] EWCA Civ 1048; [2004] 1 BCLC 131, *dicta* of Mummery, L.J. referred to.

(22) *Halton Intl. Inc. (Hldgs.) SARL* v. *Guernroy Ltd.*, [2005] EWHC 1968 (Ch); [2006] 1 BCLC 78, *dicta* of Patten, J. referred to.
(23) *Japan Abrasive Materials Pty. Ltd.* v. *Australian Fused Materials Pty. Ltd.*, [1998] WASC 60, referred to.
(24) *Meridian Global Funds Mgmt. Asia Ltd.* v. *Securities Commn.*, [1995] 2 A.C. 500; [1995] 3 W.L.R. 413; [1995] 3 All E.R. 918; [1995] BCC 942; [1995] 2 BCLC 116; [1995] 4 LRC 423; [1994] 2 NZLR 291, referred to.
(25) *National Trust for the Cayman Islands* v. *Planning Appeals Tribunal*, 2002 CILR 59, referred to.
(26) *Neath Rugby Ltd., Re*, [2009] EWCA Civ 291; [2009] 2 BCLC 427; [2010] BCC 597, referred to.
(27) *Nisbet & Potts' Contract, Re*, [1906] 1 Ch. 386; (1906), 75 L.J.Ch. 238; 54 W.R. 286; 94 L.T. 297; 22 T.L.R. 233; [1904–07] All E.R. Rep. 865, referred to.
(28) *Nurcombe* v. *Nurcombe*, [1985] 1 W.L.R. 370; [1985] 1 All E.R. 65; [1984] BCLC 557; (1984), 1 BCC 99269, considered.
(29) *Nurdin & Peacock plc* v. *DB Ramsden & Co. Ltd.*, [1999] 1 EGLR 119; [1998] EGCS 123, considered.
(30) *Pilmer* v. *Duke Group Ltd.*, [2001] HCA 31; (2001), 207 CLR 165; 75 ALJR 1067; 38 ACSR 122; [2001] 2 BCLC 773; [2001] 5 LRC 417, referred to.
(31) *Rolled Steel Products (Hldgs.) Ltd.* v. *British Steel Corp.*, [1986] Ch. 246; [1985] 2 W.L.R. 908; [1985] 3 All E.R. 52; (1984), 1 BCC 99158, referred to.
(32) *Sagicor General Ins. (Cayman) Ltd.* v. *Crawford Adjusters (Cayman) Ltd.*, 2008 CILR 482, referred to.
(33) *Satnam Invs. Ltd.* v. *Dunlop Heywood & Co. Ltd.*, [1999] 3 All E.R. 652; [1999] 1 BCLC 385; [1999] 2 L.S.G. 30; [1998] EGCS 190; [1999] FSR 722, referred to.
(34) *Story* v. *Windsor (Lord)* (1743), 26 E.R. 776; 2 Atk. 630, referred to.
(35) *Target Hldgs. Ltd.* v. *Redferns*, [1996] A.C. 421; [1995] 3 W.L.R. 352; [1995] 3 All E.R. 785; [1995] CLC 1052; [1995] N.P.C. 136; [1995] 3 LRC 162, referred to.
(36) *Texaco Ltd.* v. *Arco Technology Inc.*, Queen's Bench, October 3rd, 1989, unreported, referred to.
(37) *Towers* v. *African Tug Co.*, [1904] 1 Ch. 558; (1904), 73 L.J. Ch. 395; 11 Mans. 198; 52 W.R. 532; 90 L.T. 298; 20 T.L.R. 292; [1904–7] All E.R. Rep. Ext. 1583, referred to.
(38) *Ultraframe (UK) Ltd.* v. *Fielding*, [2005] EWHC 1638 (Ch); [2006] F.S.R. 17; [2007] WTLR 835, referred to.
(39) *Universal Project Mgmt. Servs. Ltd.* v. *Fort Gilkicker Ltd.*, [2013] EWHC 348 (Ch); [2013] Ch. 551; [2013] 3 W.L.R. 164; [2013] 3 All E.R. 546; [2013] BCC 365; (2013), 163 N.L.J. 268, referred to.
(40) *Waddington Ltd.* v. *Chan Chun Hoo Thomas*, [2008] HKCFA 63;

(2008), 11 HKCFAR 370; [2009] 4 HKC 381; [2008] HKCU 1381; [2009] 2 BCLC 82, referred to.

**Legislation construed:**
Grand Court Rules 1995 (Revised), O.15, r.12A: The relevant terms of this rule are set out at para. 23.
O.62, r.4(5): The relevant terms of this paragraph are set out at para. 253.

Judicature Law (2007 Revision), s.34: The relevant terms of this section are set out at para. 246.
*M. Bloch, Q.C.* with *D. Butler* for Autumn Holdings Asset Inc. and Gilbertson;
*R. Millett, Q.C.* with *J. Eldridge* for Renova Resources Private Equity Ltd. and the other respondents/cross-appellants.

1 **CHADWICK, J.A.:** This appeal and cross-appeal are from an order made on November 6th, 2012 by Foster, J. in proceedings brought in the Financial Services Division of the Grand Court by Renova Resources Private Equity Ltd. ("Renova") against Brian Patrick Gilbertson ("Mr. Gilbertson"), Autumn Holdings Asset Inc. ("Autumn") and others.

2 Renova is (or was at the material time) a company incorporated in the Bahamas. It is a wholly owned subsidiary of Renova Holding Ltd. ("Renova Holding"), also a company incorporated in the Bahamas. Renova and Renova Holding are members of the Renova group of companies, described by the judge as "a very large Russian owned conglomerate, consisting of some one hundred or so corporate and other entities, incorporated or established in various jurisdictions" and as having "a range of major commercial business interests, particularly, although not exclusively, in oil and metals in Russia and elsewhere." At the relevant time, the chairman and principal beneficial owner of the Renova group was Mr. Viktor Vekselberg, whom the judge described as "a well-known, very successful and influential Russian billionaire businessman, based in Moscow." The overall management of the Renova group was carried on from Zurich through a Swiss company, Renova Management AG ("Renova Management"). The Chief Investment Officer of the Renova group was Mr. Vladimir Kuznetsov, a Russian national based in Zurich. Mr. Vekselberg, Mr. Kuznetsov and Renova Holding were, with Renova, defendants to the counterclaim in the proceedings.

3 The judge explained that one of Mr. Vekselberg's major interests during the relevant period, held through the Renova group, was a substantial share in a large Russian aluminium producing company, Siberian Urals Aluminium Co. (to which the judge referred as "SUAL"). At the relevant time, Mr. Vekselberg was the chairman of SUAL.

Mr. Gilbertson was Chief Executive Officer of SUAL between 2004 and 2007. The judge went on to say this (at paras. 3.1–3.3 of his judgment):

> "3.1 During the later part of 2004 and 2005 Mr. Gilbertson discussed with Mr. Vekselberg a proposal by Mr. Gilbertson to set up a private equity fund, which Mr. Gilbertson would establish and manage and which would be financed by Renova, with the profits effectively to be shared equally between them. The fund was to invest in assets with potential in the mining sector, and the fund by Mr. Gilbertson was to have responsibility for sourcing and proposing opportunities for investment by the fund. This proposal developed into what was in effect a joint venture in which, as Mr. Vekselberg described it, he and Mr. Gilbertson would be partners.
>
> 3.2 After a lengthy period of negotiation the terms of the arrangement were set out in a letter from Renova Holding to Mr. Gilbertson known as the Letter Agreement. It was signed by Renova Holding on 20th January 2006 and by Mr. Gilbertson on 24th January 2006, although the letter itself was dated 24th November 2005 . . .
>
> 3.3 . . . The Letter Agreement then defined 'Investment Fund' as an investment fund in a jurisdiction and legal form to be agreed between Mr. Gilbertson and Renova Holding. The 'Fund Management Vehicle' was to be the vehicle charged with establishing, marketing and managing the Investment Fund and the 'Initial Capital' meant a founding capital of US$4m in cash at the establishment of the Fund Management Vehicle. The 'Investment Committee' meant a committee comprising Mr. Gilbertson or his nominated representative on the one hand and the CEO of Renova Management or its nominated representative on the other hand. In the event the Investment Committee comprised Mr. Gilbertson and Mr. Kuznetsov . . ."

4 The judge explained in his judgment that the structure established pursuant to the letter agreement comprised three Cayman Islands entities: Pallinghurst Resources Management LP ("the master fund"), a Cayman Islands exempted limited partnership established on May 19th, 2006; Pallinghurst (Cayman) General Partner LP ("GPLP"), a Cayman Islands exempted limited partnership established on March 19th, 2006; and Pallinghurst (Cayman) General Partner LP (GP) Ltd. ("the company"), a company incorporated in the Cayman Islands on March 15th, 2006. The company was the general partner of GPLP, and GPLP was the general partner of the master fund. Together the three entities were known as "the Pallinghurst structure."

5 Renova is (or was at the material time) the owner of 50% of the issued shares in the company. The other 50% of the issued shares in the company were held by Fairbairn Trust Ltd. ("Fairbairn"), a Jersey-based trust company, as trustee of the Brian Patrick Gilbertson Settlement ("the BPG

Settlement"), a settlement established by Mr. Gilbertson. At the material time the two directors of the company were Mr. Gilbertson and Mr. Kuznetsov. These proceedings were brought by Renova as a shareholder of the company, and so are, in form, a derivative action. The company, GPLP and the master fund were joined as co-defendants (with Mr. Gilbertson and Autumn). The judge referred, in his judgment, to Renova, the company, GPLP and the master fund (collectively) as "the Renova parties" and to Mr. Gilbertson and Autumn (collectively) as "the Gilbertson parties": it will be convenient if I adopt those descriptions in this judgment.

6 The background against which these proceedings were brought was explained by the judge (at paras. 1 and 5.1 of his judgment):

> "1 This case concerns the well-known Fabergé brand, renowned for high quality jewellery and originally for the famous Fabergé jewel encrusted eggs made in Imperial Russia. The brand name and associated business have changed hands since then on several occasions and in 1989 the brand and business were acquired by the large English company, Unilever PLC. The brand and business were then sold by Unilever PLC in early January 2007 to a consortium of investors, which included indirectly and which was arranged and set up by Mr. Brian Gilbertson. He is the principal beneficial owner and controller of Pallinghurst Resources Limited, an English company, which is now the largest investor in Fabergé Limited, the owner, developer and manager of the Fabergé brand and business . . ."

> "5.1 Project Egg was the name given to the project for the acquisition of the Fabergé brand and its business from the then owner, Unilever PLC. The evidence of Mr. Gilbertson, which was not disputed in this respect, was that from about 2002, he had identified the Fabergé brand as an asset and business which was not then being exploited to its full potential and which he thought would make a good investment for profitable development and exploitation. Although the Fabergé brand was not obviously an investment project 'in the metal and mining industry' as contemplated by the Letter Agreement, Mr. Gilbertson, after meeting Mr. Vekselberg, correctly thought that it would nonetheless be of considerable interest to him. Mr. Vekselberg was a collector of Fabergé items and had recently acquired a very significant and expensive collection of imperial Fabergé eggs, which had been very well received in Russia. He was very interested in Fabergé and its Russian heritage. Accordingly, Mr. Vekselberg was enthusiastic when Mr. Gilbertson, early on in his proposals with regard to a private equity fund, suggested the Fabergé brand and business as a potential investment for the private equity fund which subsequently became the Master Fund within the Pallinghurst Structure. From the start, therefore, Project Egg was one of a

number of investment opportunities sourced and put forward by Mr. Gilbertson as potential Investment Projects."

7 As I have said, the defendants to Renova's claim in these proceedings included Mr. Gilbertson and Autumn. Autumn, a company incorporated in the British Virgin Islands, was owned by Fairbairn, the trustee of the BPG Settlement (and other Gilbertson family trusts). It was a member of the "consortium of investors" ("the consortium"), to which the judge made reference in para. 1 of his judgment (in the passage which I have set out). Other members of the consortium were Dr. Milan Jelinek, an acquaintance of Mr. Gilbertson, and K-M Investment Corp. ("K-MIC"), the holding company of American Metals and Coal International ("AMCI"), a large coal marketing business owned jointly by Mr. Hans Mende (known to Mr. Gilbertson through their mutual acquaintance, Dr. Jelinek) and Mr. Fritz Kundrun. Dr. Jelinek, K-MIC, Mr. Mende and Mr. Kundrun are not parties to the proceedings.

8 The Fabergé brand and business ("the Fabergé rights") were acquired from Unilever plc ("Unilever") by Project Egg Ltd. ("PEL"), a Cayman Islands company incorporated for that purpose by Mr. Gilbertson on December 1st, 2006, under a sale and purchase agreement ("the SPA") signed on December 22nd, 2006. The acquisition price was US$38m. The acquisition was completed on January 3rd, 2007 with funds provided by way of loan by Autumn, Dr. Jelinek and K-MIC. On the same day, 100 shares were issued by PEL: 25 shares to each of Autumn and Dr. Jelinek and 50 shares to K-MIC. In March 2007, PEL changed its name to Fabergé Ltd.

9 The effect of the acquisition of the Fabergé rights by PEL and the issue by PEL of shares to Autumn, Dr. Jelinek and K-MIC—steps which, it is said, were procured by Mr. Gilbertson—was that (save as to the 1/101 interest which remained in the master fund as the continuing owner of the one share in PEL issued on incorporation) the economic benefit of the development, exploitation and management of those rights passed to Autumn, Dr. Jelinek and K-MIC, all of whom were outside and unrelated to the Pallinghurst structure, and was no longer held by the master fund within the Pallinghurst structure as had been originally intended.

10 In section 6 of his judgment (under the heading "Brief Summary of the Parties' Cases"), the judge explained that Renova's principal claim in the proceedings—a claim which it advanced on behalf of the company, as one of the ultimate owners of the master fund—was for reconstitution of the master fund to the position in which it is said it would have been but for the alleged breach of duty by Mr. Gilbertson as a director of the company. The judge summarized the basis on which that claim was advanced (at paras. 6.2–6.3):

> "6.2 . . . [Renova] claims that Mr. Gilbertson, who was at all material times a director of the Company, acted in breach of his fiduciary duties to the Company by, at the last minute, diverting away from the Master Fund, and thus ultimately from the Company, for his own benefit the valuable economic benefit of developing, exploiting and managing the Fabergé brand, and doing so covertly without the knowledge of his fellow director, Mr. Kuznetsov or of [Renova] as 50% shareholder in the Company or of any of the other Renova Parties. Mr. Gilbertson, it is said, did this by secretly arranging alternative financing of the purchase price of the Rights by his own trust and the other investors to enable the acquisition and ownership of the Rights ultimately for his own personal benefit and that of his fellow investors, rather than for the benefit of the Master Fund. He further procured the gratuitous issue of new shares in PEL, as the acquirer of the Rights, to his own trust and to the other investors, thereby virtually eliminating the interest of the Master Fund in PEL and hence in the economic benefit of developing, exploiting and managing the Fabergé brand.
>
> 6.3 [Renova] contends that as a director of the Company Mr. Gilbertson owed fiduciary duties to the Company, including the duty to act in good faith, in the best interests of the Company, not to place himself in a position where his duties to the Company and his own interests might conflict, to refrain from self-dealing and not to make a secret profit. By his actions he was in breach of those duties to the loss of the Master Fund and thus the Company."

Renova's claim against Autumn—as the judge explained at para. 6.5 of his judgment—was for an account of the shares in PEL which (it was said) Autumn had received gratuitously, and for an account of the interest which Autumn had earned on the loans which it made by way of contribution to the funding of the purchase price of the Fabergé rights and for working capital. Those claims were advanced on the basis that Autumn knew or ought to have known that Mr. Gilbertson was acting in breach of fiduciary duty in procuring the purchase of the Fabergé rights as he did and in procuring the issue of the new shares in PEL. Alternatively, it is said that, in the circumstances that Autumn did not pay for the PEL shares, it received them as a volunteer, and that, on that basis also, Autumn held those shares as a constructive trustee.

11 The judge went on to explain (at para. 6.7 of his judgment) that Mr. Gilbertson and Autumn counterclaimed in the proceedings, not only against Renova but also against Mr. Vekselberg, Mr. Kuznetsov and Renova Holding, on various grounds for damages by way of indemnity for any liability which they were found to have in respect of Renova's derivative claims. As the judge pointed out, the counterclaim was contingent on Renova succeeding on its derivative claims.

12 The judge held (2012 (2) CILR 416, at paras. 57 and 152) that Mr. Gilbertson owed the duties of a fiduciary as a director of the company throughout the relevant period, and that he was in breach of those duties in acting as he did in late December 2006 and January 2007. But he went on to hold that Mr. Gilbertson's breach of fiduciary duty had caused the master fund "no significant economic loss." He said this (*ibid.*, at para. 150):

> "In the circumstances, if the Master Fund were to be put in the position in which it would now be, it would be in a significantly negative financial position. I must therefore conclude that it would be of no benefit to put the Master Fund into the financial position in which it would now have been but for Mr. Gilbertson's breach of fiduciary duty and that no equitable compensation is payable."

Accordingly, the judge dismissed the claim for equitable compensation brought against Mr. Gilbertson.

13 The judge held (2012 (2) CILR 416, at paras. 82, 95 and 153) that Autumn held the 25 PEL shares issued to it in January 2007 on a constructive trust for "the master fund/GPLP/the company"—on the ground that, when it received those shares, it was not a bona fide purchaser for value without notice in that (i) it knew or ought to have known of Mr. Gilbertson's breach of fiduciary duty, and (ii) it received the shares gratuitously, as a volunteer—and was liable to account for them. He held, also (*ibid.*, at para. 153), that Autumn was liable to account for the interest which it had received on the loans which it made to PEL for the purpose of funding the acquisition of the Fabergé rights.

14 As the judge recorded (*ibid.*, at para. 103), two of the five counterclaims brought by the Gilbertson parties—those for lawful means conspiracy and for breach of fiduciary duty by Mr. Kuznetsov—were abandoned during the course of the trial. For the reasons which he gave (*ibid.*, at paras. 105–112), the judge concluded that the remaining specific counterclaims—those for repudiatory breach of the letter agreement, for inducement and/or procurement of breach of the letter agreement and for unlawful means conspiracy—were without merit and should be dismissed.

**The order of November 6th, 2012**

15 By the order which he made on November 6th, 2012 (filed on November 13th, 2012) the judge declared (under para. 1) that Autumn held 25,000 ordinary shares in Fabergé Ltd. (formerly PEL) as constructive trustee for the master fund, and directed (at para. 2) that Autumn should transfer forthwith those shares to the master fund. The reference to "25,000 ordinary shares in Fabergé Limited" gave effect to the judge's intention that the shares in respect of which Autumn was held to be constructive trustee were the 25 shares in PEL issued in January 2007

(which had become 25,000 shares in Fabergé Ltd. following a sub-division in 2008 and the change of name) and did not include any shares in Fabergé Ltd. subsequently acquired by Autumn. At para. 3 of that order, the judge directed that Autumn should pay to the master fund the sum of US$2,306,320.35 (inclusive of pre-judgment interest from January 3rd, 2007 to the date of the order in the amount of US$507,347.35). At paras. 4 and 5, respectively, he dismissed the claim for equitable compensation against Mr. Gilbertson and the counterclaims against the Renova parties. At para. 6, the judge directed that each party should bear its own costs of the proceedings (so far as such costs were not already the subject of orders in favour of one or other of the parties).

**The appeal and cross-appeal**

16 On November 27th, 2012, Autumn filed notice of appeal (Appeal No. 21 of 2012) from the order of November 6th, 2012. The Renova parties are the respondents to that appeal. The relief sought was an order that the appeal be allowed: that paras. 1, 2 and 3 of the order be set aside, and that the Renova parties pay Autumn's costs of the appeal and in the court below. The grounds of that appeal are set out in the memorandum of grounds of appeal filed on behalf of Autumn on February 1st, 2013 under six main heads:

(A) The judge misdirected himself and erred in law in entertaining and granting relief in respect of derivative claims that were not before him.

(B) The judge misdirected himself and erred in law and/or fact in holding that Mr. Gilbertson owed or was in breach of any fiduciary duty in relation to the Fabergé rights and so in holding that there was any substratum on which to found a claim against Autumn.

(C) The judge misdirected himself and erred in law and/or fact in holding that, notwithstanding the rule in *Nurcombe* v. *Nurcombe* (28), the conduct of the Renova parties was not such as to disentitle Renova from any relief.

(D) The judge misdirected himself and erred in law and/or fact in holding that, having regard to its relationship with Mr. Gilbertson, the property which it received, the person from whom it received the property and its state of knowledge at the time of receipt, Autumn was liable in knowing receipt.

(E) The judge misdirected himself and erred law and/or fact in holding that Autumn was liable as a volunteer.

(F) The judge misdirected himself and erred in law and/or fact in granting relief against Autumn (i) by way of an account of profits (comprising the interest which Autumn received on the loan it made to PEL); and (ii) in respect of pre-judgment interest (from January 3rd, 2007)

on the interest payment which Autumn received from Fabergé Ltd. on September 28th, 2007.

17 Also on November 27th, 2012, Renova (derivatively on behalf of the company, GPLP and the master fund), as plaintiff in the action, and Mr. Vekselberg, Mr. Kuznetsov, Renova Holding and Renova (on its own account), as defendants to the counterclaim, filed notice of appeal (Appeal No. 22 of 2012) from the order of November 6th, 2012. Mr. Gilbertson and Autumn are the respondents to that cross-appeal. The relief sought by the cross-appeal was (i) that so much of the order as dismissed Renova's claim against Mr. Gilbertson for equitable compensation be quashed and that either judgment be entered for Renova against Mr. Gilbertson in the sum of US$82,582,000 and interest under statute, or (in the alternative) that it be declared that Autumn holds a further and additional 16,190,575 ordinary shares in Fabergé Ltd. as constructive trustee for the master fund and ordered that Autumn shall forthwith transfer full legal title in those further shares to the master fund; (ii) that Mr. Gilbertson and Autumn pay Renova's costs of the proceedings in the court below on the standard basis; (iii) that Mr. Gilbertson and Autumn pay the costs of the defendants to counterclaim in the court below on the indemnity basis; and (iv) that Mr. Gilbertson and Autumn pay the cross-appellants' costs of the cross-appeal on the standard basis. The grounds of the cross-appeal are set out in the memorandum of grounds of appeal filed on behalf of Renova and the other cross-appellants, also on February 1st, 2013, under three heads:

(A) The judge erred in law and/or in principle and/or misdirected himself as to the evidence in valuing at nil the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation.

(B) Alternatively, the judge erred in law and/or in principle and/or misdirected himself as to the evidence in failing to hold that the entirety of Autumn's shareholding in Fabergé Ltd. (and not only the 25,000 shares which represented the 25 shares issued by PEL in January 2007) should be held on constructive trust for (and transferred to) the master fund.

(C) The judge erred in law or exercised his discretion outside the ambit within which reasonable disagreement is possible in making no order as to the costs of the action and the counterclaim.

18 In those circumstances the questions for determination by this court are these:

(1) Was the judge wrong to entertain (and grant relief in respect of) derivative claims that were not before him?

(2) Was the judge wrong to hold that Mr. Gilbertson owed and was in breach of fiduciary duties in relation to the Fabergé rights?

(3) Was the judge wrong to hold that, notwithstanding the rule in *Nurcombe* v. *Nurcombe* (28), the conduct of the Renova parties was not such as to disentitle Renova from any relief?

(4) Was the judge wrong to value at nil the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation?

(5) Was the judge wrong to hold that Autumn was liable as a constructive trustee of the shares issued by PEL in January 2007 (a) because it was in "knowing receipt" having regard to its relationship with Mr. Gilbertson, the property which it received, the person from whom it received the property and its state of knowledge at the time of receipt, and/or (b) because it received those shares as a volunteer?

(6) Was the judge wrong in failing to hold that the entirety of Autumn's shareholding in Fabergé Ltd. (and not only the 25,000 shares which represented the 25 shares issued by PEL in January 2007) should be held on constructive trust for (and transferred to) the master fund?

(7) Was the judge wrong to grant relief against Autumn by way of an account of profits (comprising the payment which Autumn received on September 28th, 2007 in respect of interest on the loan which it had made to PEL on January 3rd, 2007) and, if not, was the judge wrong to award pre-judgment interest from January 3rd, 2007 (rather than from September 28th, 2007) on the payment which Autumn received?

(8) Did the judge exercise his discretion outside the ambit within which reasonable disagreement is possible in making no order as to the costs of the action and the counterclaim, and, if so, what orders as to costs should be made?

**Whether the judge was wrong to entertain (and grant relief in respect of) derivative claims that were not before him**

19 It is said on behalf of the Gilbertson parties that the judge misdirected himself and erred in law in entertaining a derivative claim or derivative claims on behalf of the GPLP or the master fund notwithstanding that no such claim or claims were contained in the originating process and the only derivative claim for which leave had been granted was a claim brought on behalf of the company, and that, had the judge directed himself properly, he should have refused to grant any relief on the derivative claim brought by Renova on behalf of the company.

20 The judge addressed the availability of derivative relief in his judgment re-dated and re-issued on November 5th, 2012. He said this (2012 (2) CILR 416, at paras. 59–60):

"***Availability of derivative relief***

59 In their pleading and opening submissions, the Gilbertson parties raised again the derivative nature of the plaintiff's claim and contended that the plaintiff was not entitled, on behalf of the company, to claim for alleged loss sustained by the master fund. I say that they raised this issue 'again' because the entitlement of the plaintiff to pursue this action derivatively on behalf of the company (including by way of multiple derivative action also on behalf of GPLP and/or the master fund) in respect of loss sustained by the master fund was addressed in the ruling dated April 14th, 2009 giving leave to the plaintiff to proceed with this action (in proceedings reported at 2009 CILR 268). The question was fully argued at the hearing which resulted in that ruling by reference to the relevant authorities, including and particularly *Waddington Ltd.* v. *Chan Chun Hoo* . . . in the Court of Final Appeal in Hong Kong and the judgment of Lord Millett, N.P.J., as well as the other authorities referred to in the ruling.

60 The uncontroversial facts necessary to enable this court to rule on this issue were before me at that hearing and in my view no facts relevant to this relatively limited legal argument have emerged since. As I have already said, there was no appeal from any part of the ruling, including the decision on this particular issue, which, although made in the context of the plaintiff's application for leave to proceed with this action, is nonetheless, in my view, a conclusive and not a summary ruling on this particular issue. There having been no appeal against the court's decision on this particular issue, in my opinion it was not open to the Gilbertson parties to revisit it at the trial. Accordingly, I reject the Gilbertson parties' submissions in this regard."

The judge's ruling of April 14th, 2009 is reported at 2009 CILR 268. The judgments of the Hong Kong Court of Final Appeal in *Waddington Ltd.* v. *Chan Chun Hoo Thomas* (40), to which the judge referred in his ruling (and in the passage of his judgment of November 5th, 2012 which I have just set out) are reported *inter alia* at [2008] HKCU 1381.

21 These proceedings were commenced by writ of summons issued on May 20th, 2008. The plaintiff was described in that writ as "Renova Resources Private Equity Limited (A company incorporated in the Bahamas suing as shareholder of the Second Defendant, Pallinghurst (Cayman) General Partner LP (GP) Limited)." Pallinghurst (Cayman) General Partner LP (GP) Ltd. (the company), as the party on whose behalf the derivative action was brought, was joined as a defendant to the proceedings, as would be usual in such circumstances. But it is important to have three matters in mind. First, GPLP and the master fund were also joined as

defendants to the proceedings. Secondly, the relationship between the company, GPLP and the master fund was set out at para. 3 of the statement of claim, as filed on May 20th, 2008:

> "3. The Second Defendant (the 'Company') is a company incorporated in the Cayman Islands and is the general partner of a Cayman Islands limited partnership called Pallinghurst (Cayman) General Partner LP (the 'Third Defendant'). The Third Defendant ('GPLP') is in turn the general partner of the Fourth Defendant, a Cayman Islands limited partnership called Pallinghurst Resources Management LP (the 'Master Fund')."

Thirdly, relief was sought in the proceedings for the benefit of the company, GPLP and the master fund collectively or in the alternative. Paragraphs 32 and 33 of the statement of claim, as filed, were in these terms:

> "32. As a result of the matters set out above, the Company, including in its capacity as general partner of GPLP and, in turn, the Master Fund, is entitled to, and the Plaintiff hereby seeks on behalf and in the interests of the Company, the following relief against the First and Fifth Defendants:
>
> 32.1 a declaration that the entry into and/or closing of the Rights Purchase Agreement was effected without the proper and due authority of the Company, or of either GPLP or the Master Fund;
>
> 32.2 a declaration that Autumn holds its PEL shares (i.e. the 25% holding) on constructive trust for the Company and/or GPLP and/or the Master Fund;
>
> 32.3 an order that Mr Gilbertson takes all steps to procure that Autumn deals with its shares in PEL as constructive trustee for the Company and/or GPLP and/or the Master Fund;
>
> 32.4 further or alternatively, an account to the company and/or GPLP and/or the Master Fund of profits received by Mr Gilbertson and/or Autumn and/or by individuals or entities associated with them, namely an account of the value of the 25% PEL shares;
>
> 32.5 further or alternatively, an order for payment by Mr Gilbertson to the Company and/or GPLP and/or the Master Fund of equitable compensation for breach of fiduciary duty arising from Mr Gilbertson's failure to obtain the prior approval of the Board of the Company to the acquisition of the Rights and/or thereafter to agree to the terms of the Third Draft IA or Fourth Draft IA and/or an agreement on substantially

similar terms and/or to continue to negotiate terms in good faith notwithstanding that such terms were reasonable and in the best interests of the Company and/or his actions which led to the dilution of the Company and/or GPLP and/or the master fund's economic interest in PEL;

32.6 further or alternatively, an order for payment by Autumn to the Company and/or GPLP and/or the Master Fund of equitable compensation for knowing receipt of property traceable to a breach of fiduciary duty.

33. Further, the Plaintiff seeks an order that the First and Fifth Defendants pay the Company and/or GPLP and/or the Master Fund interest (including compound interest with yearly rests) on all sums found to be due to it pursuant to section 34 of the Judicature Law and/or the rules of equity for such period and in such amount as the Court considers appropriate."

22 By summons issued on July 29th, 2008, Renova sought leave, pursuant to O.15, r.12A(2) of the Grand Court Rules, to continue the action on behalf of the company. In the skeleton argument filed in support of that application, Renova indicated (at para. 24) that, if such leave were granted, "it will similarly formally be able to procure that the company proceed in the name of the GPLP, which in turn will be able formally to procure that the Master Fund proceed on its own behalf." Leave to continue these proceedings was granted by the judge for the reasons which he set out in his ruling of April 14th, 2009. In the event, Renova did not think it necessary to make any further application (on behalf of the company) for leave to proceed in the name of GPLP or, if such leave were granted, any further application on behalf of GPLP for leave to proceed in the name of the master fund.

23 It is clear from para. 1 of his ruling of April 14th, 2009 that the judge appreciated that the application before him was an application under GCR O.15, r.12A(2) for leave to continue a derivative action brought by Renova on behalf of the company. Paragraphs (1) and (2) of that rule, to which the judge referred (2009 CILR 268, at para. 2), are in these terms:

"(1) This rule applies to every action begun by writ by one or more shareholders of a company where the cause of action is vested in the company and relief is accordingly sought on its behalf (referred to in this rule as a 'derivative action').

(2) Where a defendant in a derivative action has given notice of intention to defend, the plaintiff must apply to the Court for leave to continue the action."

An application by Renova for leave to continue a multi-derivative action on behalf of the master fund (or on behalf of GPLP) would not have been

within the scope of GCR O.15, r.12A for the reason that if (and so far as) the relevant cause of action was vested in the master fund (or in GPLP), it was not vested in a company of which Renova was a shareholder. Nevertheless, the question whether Renova could pursue proceedings in circumstances where (upon a true analysis) the cause of action was vested in the master fund (and not in the company) was in the judge's mind. In identifying the issues which arose for determination, the judge said this (*ibid.*, at para. 3):

> "Thirdly, there is the question whether a derivative action may be brought by a shareholder in the holding company of the company (or in this case the exempted limited partnership) which is its ultimate subsidiary and in which, at least arguably, the cause of action against the defendant(s) is vested. Such an action is usually described as a multiple derivative action. There is also a question as to whether such a shareholder in a holding company may claim for loss or damage which, having arguably been sustained by a subsidiary company, is reflective loss. These are the principal issues arising in this matter but there are other peripheral issues as well."

24 The judge addressed that question in the section of his ruling (paras. 62–66) headed "The multiple derivative action." He explained that it had been argued on behalf of the Gilbertson parties that the relevant exception to the rule in *Foss* v. *Harbottle* (18)—that is to say, the exception on which the power to entertain a derivative action was founded—arose only in the context of loss or damage suffered by the company of which the plaintiff was a shareholder, and that, in the present case, the loss alleged was suffered not by the company but by the master fund, whose shareholding in PEL was diluted as a result of Mr. Gilbertson's actions from 100% to a nominal amount. He referred to the facts in *Waddington Ltd.* v. *Chan Chun Hoo Thomas* (40), in which (as he said) it appeared that the appellant/defendant, who was a director of the ultimate holding company as well as of the subsidiary company and the sub-subsidiary companies, had made the same (or a similar) submission to that which had been advanced on behalf of the Gilbertson parties in this context. He referred to the conclusion of Lord Millett, sitting as a non-permanent judge of the Hong Kong Final Court of Appeal in that case ([2009] 2 BCLC 82, at para. 70), that "the only question is whether the action, which may be brought by a member of the company, may be brought by a member of its parent or ultimate holding company. This is simply a question of locus standi." And he referred to Lord Millett's observations at paras. 74 and 75 of his judgment in *Waddington* (*ibid.*):

> "[74] . . . On a question of standing, the court must ask itself whether the plaintiff has a legitimate interest in the relief claimed sufficient to justify him in bringing proceedings to obtain it. The answer in the case of person wishing to bring a multiple derivative

action is plainly 'Yes'. Any depletion of a subsidiary's assets causes indirect loss to its parent company and its shareholders. In either case the loss is merely reflective loss mirroring the loss directly sustained by the subsidiary and as such it is not recoverable by the parent company or its shareholders for the reasons stated in *Johnson v Gore Wood & Co* [2001] 1 BCLC 313, [2002] 2 AC 1. But this is a matter of legal policy. It is not because the law does not recognise the loss as a real loss; it is because if creditors are not to be prejudiced the loss must be recouped by the subsidiary and not recovered by its shareholders. It is impossible to understand how a person who has sustained a real, albeit reflective, loss which is legally recoverable only by a subsidiary can be said to have no legitimate or sufficient interest to bring proceedings on behalf of the subsidiary.

[75] This is not to allow economic interests to prevail over legal rights. The reflective loss which a shareholder suffers if the assets of his company are depleted is recognised by the law even if it is not directly recoverable by him. In the same way the reflective loss which a shareholder suffers if the assets of his company's subsidiary are depleted is recognised loss even if it is not directly recoverable by him. The very same reasons which justify the single derivative action also justify the multiple derivative action. To put the same point another way, if wrongdoers must not be allowed to defraud a parent company with impunity, they must not be allowed to defraud its subsidiary with impunity."

In his ruling of April 14th, 2009, the judge concluded (2009 CILR 268, at para. 66):

"In my opinion, Lord Millett's analysis and conclusion also represents the law in this country and I can see no reason why, in appropriate circumstances, a multiple derivative action should not be permitted. In the present case, the company is the general partner of and therefore controls the exempted limited partnership, GPLP. GPLP is itself the general partner and therefore controls the master fund. The master fund is, in my view, no different from a sub-subsidiary of the company for these purposes. On the plaintiff's case, the master fund has sustained significant loss as a result of the dilution of its 100% shareholding in PEL, procured by Mr. Gilbertson without the knowledge, still less the consent, of the master fund or GPLP or the company. In the circumstances, a multiple derivative action on behalf of the company in respect of Mr. Gilbertson's actions is not, in my judgment, objectionable."

25 It is said on behalf of the Gilbertson parties that the judge was wrong to hold (2012 (2) CILR 416, at para. 59) that, when giving leave to Renova to proceed with this action, he had addressed the issues whether Renova

was entitled, on behalf of the company, to claim for alleged loss sustained by the master fund and to pursue this action derivatively on behalf of the company (including by way of multiple derivative action also on behalf of GPLP and/or the master fund) in respect of loss sustained by the master fund. In particular, it is said that:

(1) There is "no room for serious dispute" that the issue whether Renova was entitled to pursue this action by way of multiple derivative action on behalf of GPLP and/or the master fund was not before the judge; given that Renova had indicated in the skeleton argument filed in support of its application under GCR O.15, r.12A(2) that, if that application were successful, it would make further applications (i) on behalf of the company for leave to proceed in the name of GPLP, and (ii) on behalf of GPLP for leave to proceed in the name of the master fund. Renova would not have contemplated that there would be a need for it to make such further applications if it had thought that an application for leave to proceed by way of multiple derivative action on behalf of GPLP and/or the master fund was already before the judge.

(2) The persons with an interest in GPLP and the master fund were not the same as those who (as members of the company) had an interest in the company. A consequence of the irregular manner in which the judge dealt with the issue of leave to proceed was that those who were the partners in GPLP and the master fund were deprived of the opportunity to oppose the proceedings. The judge was wrong to take the view (as, it is said, he appears to have done) that the fact that those with an interest in GPLP and the master fund were not the same as the members of the company was a technicality of little or no significance. The unpleaded claim that Mr. Gilbertson owed a fiduciary duty to the master fund was not only an essential ingredient of any claim in an action pursued by the master fund itself, it was also a prerequisite of a multiple derivative action pursued on behalf of the master fund. It is impossible to understand the rights and obligations owed by the parties to one another without understanding the nature and extent of the interests at stake.

In those circumstances, it is said, the judge was wrong to hold that—if, following the order which he made on Renova's application of July 29th, 2008, Autumn wished to object to Renova pursuing this action on behalf of the master fund—it should have appealed from that order. The flaw in the judge's reasoning (it is said) is apparent on its face.

26 I do not find those submissions persuasive. I accept that, in the summons issued on July 29th, 2008 (before the judgments in the Hong Kong Final Court of Appeal in *Waddington* (40) had been delivered), Renova did not seek leave to proceed by way of multiple derivative action on behalf of GPLP and/or the master fund but it is important to have in mind, first, that it was not required to do so under GCR O.15, r.12A

(which, in the restrictive form in which that order had been made, had no application to multiple derivative actions) and, secondly, that there was no other rule of practice which required that leave was required to bring a multiple derivative action under the general law. It is clear, from the judgments in *Waddington* and from the observations of Briggs, J. in *Universal Project Mgmt. Servs. Ltd* v. *Fort Gilkicker Ltd.* (39), that the practice under the general law in relation to the pursuit of derivative claims—which predated the introduction of GCR O.15 r.12A—was abrogated by that rule in relation to single derivative actions but continued to apply (after the introduction of that rule) in relation to multiple derivative actions. As Ribeiro, P.J. pointed out in *Waddington* ([2009] 2 BCLC 82, at paras. 13–14):

> "[13] . . . Procedurally, there is no requirement at common law for a person seeking to sue derivatively first to obtain the leave of the court . . .
>
> [14] The time honoured practice at common law is for the plaintiff to issue proceedings 'on behalf of himself and the other shareholders other than the defendants', naming the company on whose behalf the proceedings are brought as one of the defendants. A challenge to the plaintiff's locus generally takes the form of an application by the relevant defendants to strike out the claim or to have the court determine as a preliminary issue that the plaintiff has no locus to sue on the company's behalf."

27 I accept, also, that it is reasonably clear that, when preparing and filing the skeleton argument in support of Renova's application of July 29th, 2008, its advisers took the view that the appropriate course in the case of a multiple derivative claim was to proceed incrementally by a series of linked single derivative claims. But that view was based on a misunderstanding of the premise underlying the court's willingness to entertain a derivative claim for relief; as explained by Lord Millett, N.P.J. in *Waddington* (40) and by Briggs, J. in *Universal Project Mgmt. Servs. Ltd.* v. *Fort Gilkicker Ltd.* (39). As Briggs, J. put it in the latter case ([2013] Ch. 551, at paras. 26 and 44 of his judgment):

> "26 In my judgment the common law procedural device called the derivative action was . . . clearly sufficiently flexible to accommodate as the legal champion or representative of a company in wrongdoer control a would-be claimant who was either (and usually) a member of that company or (exceptionally) a member of its parent company where that parent company was in the same wrongdoer control. I would not describe that flexibility in terms of separate forms of derivative action, whether headed 'ordinary', 'multiple' or 'double'. Rather it was a single piece of procedural ingenuity designed to serve

> the interests of justice in appropriate cases calling for the identification of an exception to the rule in *Foss v Harbottle.*"
>
> "44 . . . [T]he court could permit a person or persons with the closest sufficient interest to litigate on behalf of a company by seeking for the company relief in respect of a cause of action vested in it. Those persons would usually be a minority of the company's members, but might, if the company was wholly owned by another company, be a minority of the holding company's members. These were not separate derivative actions, but simply examples of the efficient application of the procedural device, designed to avoid injustice, to different factual circumstances."

The judge appreciated—as he said in his ruling of April 14th, 2009 (2009 CILR 268, at para. 3)—that it was, at the least, arguable that the cause or causes of action which Renova sought to pursue against Mr. Gilbertson and/or Autumn were vested in the master fund (and not in the company). In those circumstances it was necessary—in order to determine whether to allow the action, as constituted, to go forward—that he address the question whether Renova could bring multiple derivative proceedings for loss said to have been suffered by the master fund. In my view, there is no doubt that that question was properly before the judge in April 2009, and no doubt that he intended to and did decide it.

28 The judge explained (*ibid.*, at para. 36) that the members of the company (each holding 50% of its shares) were Renova and Fairbairn. Fairbairn (he said) was "effectively controlled by the first defendant, Mr. Brian Gilbertson." He explained (*ibid.*, at para. 37) that the company was the general partner of GPLP, and that GPLP was, in turn, the general partner of the master fund. A diagram of the Pallinghurst structure was attached to the statement of claim which was before him. That diagram showed that Mr. Sean Gilbertson, Mr. (Brian) Gilbertson's son, was the only person (other than the company) with an interest (as limited partner) in GPLP, and that Pallinghurst (Cayman) Founder Partner LP ("the Founder fund") was the only person (other than GPLP) with an interest (also as limited partner) in the master fund. It appeared, also, from that diagram that the general partner of the Founder fund was Pallinghurst Founder GP Ltd. ("Founder GP"), and that Mr. Sean Gilbertson was the sole limited partner of the Founder fund. A more complete analysis of the position under the short form agreements pursuant to which the Pallinghurst structure was established (shown diagrammatically in the appendix to the written submissions of the Gilbertson parties prepared for this appeal) indicates that the persons interested in Founder GP were Renova and Fairbairn (as to 50% each): that is to say, the persons interested in Founder GP were the same persons as those who held the shares in the company. In those circumstances, the Gilbertson parties are correct to point out that the members of the company were not, themselves, the only

persons interested in GPLP and the master fund. In addition to Renova and Fairbairn—which, together, held (in equal shares) indirect interests equivalent to 50% of GPLP (through the company) and 50% of the master fund (as to 25% through GPLP and 25% through Founder GP and the Founder fund)—Mr. Sean Gilbertson held 50% interests in GPLP and the master fund (in the latter case, indirectly through GPLP, as to 25%, and the Founder fund, as to the other 25%). But, as it seems to me, the submission that those who were the partners in GPLP and the master fund were deprived of the opportunity to oppose these proceedings is not well founded. The company, GPLP and the master fund were joined as defendants with Mr. Gilbertson and Autumn (a company of which Fairbairn, a Gilbertson family trust controlled by Mr. Gilbertson, was the owner); the company was the general partner of GPLP and GPLP was the general partner of the master fund; and Mr. Gilbertson and Mr. Kuznetsov were the directors both of the company and of Founder GP. Mr. Sean Gilbertson was closely involved in the circumstances which gave rise to the claims brought on behalf of the master fund: he made a witness statement and gave oral evidence at the trial. In substance this was litigation between Renova interests and Gilbertson interests. Those on the Gilbertson side with an interest in resisting the claims made in the litigation were well able to do so.

29 In my view, the judge was correct to hold (2012 (2) CILR 416, at para. 60) that, having chosen not to appeal from the order which he had made some three and a half years earlier, it was not open to the Gilbertson parties to challenge, at trial, the standing of Renova to advance claims in the action on behalf of GPLP and the master fund including, in particular, a claim founded on the unpleaded contention that Mr. Gilbertson had acted in breach of fiduciary duties which he owed to the master fund.

**Was the judge wrong to hold that Mr. Gilbertson owed and was in breach of fiduciary duties in relation to the Fabergé rights?**

30 As I have said, in section 6 of the judgment issued on November 5th, 2012, the judge explained that Renova's principal claim in the proceedings—advanced on behalf of the company, as one of the ultimate owners of the master fund—was for reconstitution of the master fund to the position in which (it is said) it would have been but for the alleged breach of duty by Mr. Gilbertson as a director of the company. At para. 7.5 of his judgment, the judge observed that the question whether Mr. Gilbertson owed fiduciary duties to the company—and, if so, what fiduciary duties—turned on the particular circumstances. Accordingly, he said, it was necessary to consider—and, in so far as disputed, determine—what those circumstances were. He addressed that task at sections 8, 9 and 10 of his judgment. He made findings of fact by reference to three successive periods: (i) the period up to December 2006 (section 8); (ii) the

period from December 2006 to January 3rd, 2007 (section 9); and (iii) the period after January 3rd, 2007 (section 10). But he observed that "the most significant circumstances arose during the short period between about mid-December 2006 and mid-January 2007."

***The judge's findings of fact***

(i) *The period up to December 2006*

31 At para. 8.1 of his judgment, the judge reminded himself that he had already explained (earlier in that judgment) that, from as early as 2002, Mr. Gilbertson had identified the Fabergé brand as a potentially profitable investment; that, at a relatively early stage in their discussions about a private equity fund, Mr. Gilbertson had suggested to Mr. Vekselberg that the Fabergé brand and business could be an investment project in that context; and that, given his personal interest in Fabergé, Mr. Vekselberg's response to that suggestion had been positive. The judge went on to explain (at para. 8.2) that, during 2005, an initial approach was made to Unilever as to the possibility of purchasing the Fabergé brand; that discussions and negotiations took place in respect of the structure which eventually became the Pallinghurst structure; and that, in the course of those discussions and negotiations various draft documents ("the short form agreements") were produced and exchanged. At para. 8.3 of his judgment he noted that, on October 27th, 2005, Pallinghurst Resources LLP ("Pallinghurst LLP") was established in England by Mr. Gilbertson as an investment management vehicle, and that, on November 24th, 2005, the letter agreement (initialled by Mr. Kuznetsov) was sent to Mr. Gilbertson. At para. 8.4 he explained that, from November 2005, Mr. Sean Gilbertson initiated a number of cancellation actions in respect of various Fabergé trademarks, on the ground of alleged non-use, with a view to reducing the value of the Fabergé brand and so strengthening the negotiating position in relation to the proposed purchase of that brand from Unilever.

32 At para. 8.5 of his judgment, the judge referred to a meeting on January 20th, 2006 of the "Pallinghurst Resources Private Equity Fund" attended by Mr. Gilbertson, Mr. Sean Gilbertson and Mr. Kuznetsov. He noted that the agenda for that meeting included several "investment projects," including the purchase of the Fabergé brand and business (which was described as "Project Egg"), and that a briefing document circulated prior to that meeting by Mr. Sean Gilbertson reported, with regard to Project Egg, that meetings with Unilever had taken place since April 2005 but without success. The judge held (at para. 8.5) that "clearly Project Egg was being explored and pursued as an opportunity and potential Investment Project in accordance with the terms of the Letter Agreement." The judge rejected (at para. 8.6 of his judgment) the

submission, made on behalf of the Gilbertson parties, that (notwithstanding the agenda and briefing document) the meeting on January 20th, 2006 could not be taken to indicate that Project Egg was an approved investment project of the master fund because (it was said) the letter agreement had not been finally signed and the master fund had not been established. The judge said this (*ibid.*):

> "While it is no doubt correct that Project Egg was not at that stage an approved Investment Project of the Master Fund, it seems to me that the commercial reality was that it was by then being treated *de facto* as a potential Investment Project of the equity fund which became the Master Fund. Although the Letter Agreement had not been formally signed, it had been delivered to Mr. Gilbertson on 24th November 2005 and was signed by him only 4 days after that meeting. By the time of the meeting it must have been in final form because it was signed on that day on behalf of Renova Holding. The proposed Investment Projects which were discussed at the meeting were all sourced and put forward by Mr. Gilbertson in accordance with the Letter Agreement as proposed Investment Projects. Mr. Gilbertson himself gave evidence to the effect that at that time they, meaning he and Mr. Kuznetsov, were not concerned with the legal niceties, which the lawyers were working on, but simply wanted to get on with the proposed Investment Projects. While the acquisition of the Fabergé brand was clearly at an early stage, in my view it is equally clear that it was nonetheless being considered as an Investment Project of the proposed Investment Fund, which became the Master Fund."

33 The judge had referred to the terms of the letter agreement earlier in his judgment (at paras. 3.3–3.6). As he had said, the letter agreement defined "Investment Fund" as an investment fund in a jurisdiction and legal form, to be agreed between Mr. Gilbertson and Renova Holding; "Fund Management Vehicle" as the vehicle charged with establishing, marketing and managing the investment fund; and the "Initial Capital" as a founding capital of US$4m. in cash on the establishment of the fund management vehicle. The "Investment Committee" meant a committee comprising Mr. Gilbertson or his nominated representative on the one hand and the CEO of Renova Management or its nominated representative on the other hand. In the event, the investment committee comprised Mr. Gilbertson and Mr. Kuznetsov. Mr. Gilbertson and Renova Holding were defined in the letter as "Partners." The letter agreement provided for Renova Holding to establish the investment fund and the fund management vehicle with the initial capital. It provided that the purpose of the investment fund was "to explore, acquire and develop opportunities in the metals and mining industry (the 'Investment Projects')."

34 The judge had gone on to explain (at para. 3.3 of his judgment) that the letter agreement further provided that the Partners would work together to add value to the investment fund, and that Mr. Gilbertson would "assume responsibility for developing and implementing the strategy for the Investment Fund and for all Investment Projects," including, but not limited to, "searching for and introducing Investment Projects to the Investment Committee," "supervising of the implementation of the approved Investment Projects," and "providing strategic advice on corporate development of the Investment Fund, Fund Management Vehicle and Investment Projects." Clause 2.5 of the letter agreement was in these terms:

> "Any of the Partners may bring a proposed Investment Project for consideration by the Investment Fund and Fund Management Vehicle. Approval to proceed with an Investment Project via the Investment Fund, at an Agreed Value, shall require the unanimous consent of the Investment Committee. It is contemplated by the Partners that each approved Investment Project will be pursued through the most appropriate structure, and that equity or other interests in such Investment Projects may be allocated to other minority partners (including managing partners) as agreed by the Investment Committee on a case by case basis."

And, as the judge explained (at para. 3.6 of his judgment), cl. 8.2 of the letter agreement provided that—

> "this letter and its terms shall automatically terminate and become null and void if the Investment Fund and the Fund Management Vehicle are not established and operating in a way reasonably satisfactory to each of the Partners within 16 months of the last signature to this letter. In this regard, the Partners, using their best endeavours, agree to do (and procure the doing by other parties) of all acts necessary and to refrain (and procure that other parties will refrain) from any acts hindering the successful establishment and operation of the Investment Fund and the Fund Management Vehicle."

35 The judge found (at para. 8.7 of his judgment) that the letter agreement (already signed on behalf of Renova Holding) was given to Mr. Gilbertson on January 20th, 2006 (the day of the meeting to which he had referred), and was countersigned by Mr. Gilbertson on January 24th, 2006. On March 9th, 2006, Mr. Sean Gilbertson sent out to Mr. David Kalberer (the Deputy Chief Legal Officer of Renova Management), Mr. Kuznetsov and Mr. Gilbertson an update on what was referred to as the "Pallinghurst Resources Private Equity Fund," setting out a then current summary ("the March update") of the arrangements, the Pallinghurst structure and the various responsibilities. The March update described Mr. Gilbertson's

duties under the terms of the letter agreement, and contained an express statement that these duties would be owed by Mr. Gilbertson to the company. Shortly thereafter, on March 15th, 2006, Pallinghurst (Cayman) General Partner LP (GP) Ltd. ("the company") was incorporated in the Cayman Islands. As the judge had said, Mr. Gilbertson and Mr. Kuznetsov were the two directors of the company, and its shares were held equally by Renova and Fairbairn.

36 Project Egg was included amongst "Current Investment Projects" referred to in the minutes of meeting of the "Establishment Steering Committee" held on April 24th, 2006 and attended by Mr. Gilbertson, Mr. Sean Gilbertson, Mr. Kuznetsov and Mr. Kalberer. The judge held (at para. 8.10 of his judgment) that steps to acquire the Fabergé brand from Unilever as an investment project continued. On May 17th, 2006, Mr. Sean Gilbertson wrote to UBS (who were, by then, representing Unilever in relation to the sale of the Fabergé rights), informing them that the investment committee of the "Pallinghurst Resources Fund LP" (by which, as the judge said, he must be assumed to mean the master fund) had authorized an offer of US$20m. to purchase those rights, subject to agreeable terms and conditions. That letter was expressly approved by Mr. Kuznetsov on behalf of Renova. As the judge found, US$20m. was the maximum expenditure on a single investment which could be approved by Mr. Kuznetsov without the need for detailed due diligence, a business assessment and various internal approvals. Although that offer was supported (at the request of Unilever) by a comfort letter confirming the prospective purchaser's ability to pay US$20m., the offer was refused. But the fact that it was made led the judge to conclude (at para. 8.11 of his judgment) that—

> "the agreement between Mr. Kuznetsov and Mr. Gilbertson to offer US$20m and the terms of Sean Gilbertson's offer letter of 17th May 2006, indicated that Mr. Gilbertson was actively pursuing Project Egg, with the agreement of Mr. Kuznetsov, as an Investment Project of the Master Fund."

37 A further meeting of the "Establishment Steering Committee," attended by Mr. Gilbertson, Mr. Sean Gilbertson and Mr. Kuznetsov was held on July 25th–26th, 2006. Project Egg was among the several investment projects that were discussed at that meeting. It was recorded in the minutes of that meeting, under the heading "Project Egg—Brand Acquisition," that—

> "after an overview of the present status and reiteration of the recommendation that an offer of US$30m be submitted, VK [Mr. Kuznetsov] noted that the fund could only make an investment decision based on a detailed analysis and business plan. Hence he suggested that VV [Mr. Vekselberg] be approached with a view to

> risking his personal funds as this would not require the usual rigour. It was agreed that the project would still fall within the Pallinghurst structure. VK would revert with VV's view."

The judge found (at para. 8.14 of his judgment) that, following that meeting, Mr. Kuznetsov obtained Mr. Vekselberg's support for an increased offer of US$30m. for the Fabergé brand—which Mr. Vekselberg was willing to pay from his own funds—and that, on that basis, an offer of US$30m. was made to Unilever on August 22nd, 2006, in a letter from Mr. Sean Gilbertson. In particular, the judge held (*ibid.*) that—

> "Mr. Gilbertson was clearly aware sometime between 26th July and 22nd August 2006 that Mr. Vekselberg was willing to pay the purchase price for the Rights himself out of his personal resources rather than Renova doing so . . . I am satisfied that it was understood by the Gilbertsons that such approval was being given on behalf of Mr. Vekselberg personally and not on behalf of Renova . . . The circumstances were, in my opinion, clearly consistent with Mr. Gilbertson being aware and understanding that the offer to Unilever of US$30m had been approved on behalf of Mr. Vekselberg personally and not on behalf of Renova."

The offer of US$30m. was rejected by Unilever. Eventually, at a meeting between Mr. Sean Gilbertson and UBS in November 2006, UBS expressly pressed for a purchase price of US$40m. On November 29th, 2006, Mr. Gilbertson (who had informed Mr. Kuznetsov of this development), sent an email to Mr. Vekselberg asking him whether he was "on board or not, up to the maximum of $40m."

38 In the meantime, on August 8th, 2006, Mr. Kalberer sent to Mr. Sean Gilbertson a series of draft documents relating to the proposed exempted limited partnerships under the Pallinghurst structure ("the long form agreements"), with comments and proposed changes, for his review. The judge found (at para. 8.13 of his judgment) that Mr. Sean Gilbertson expressed some exasperation to his father about the number of those documents and proposed changes involved. Mr. Gilbertson, in an email to Mr. Sean Gilbertson sent later that day, wrote: "Buy the Egg, and I'll pull the plug on 'em." The judge accepted that that remark was made "in the heat of a moment of frustration" generated by the time it was taking to finalize the documentation with Renova but held that, in his assessment (at para. 8.13):

> "Mr. Gilbertson did seem to consider Project Egg as his own idea, which indeed it was, and that it was basically his project to do with as he wished . . . his conduct in early January 2007 . . . is reflective of the attitude he expressed in his brief e-mail of 8th August 2006."

39 The long form agreements had been finalized in mid-September 2006. The judge found (at para. 8.16 of his judgment) that, although those documents were never executed—and therefore never became legally binding on the parties—the parties nonetheless proceeded on the common understanding that the drafts were final and agreed, and that both the Renova parties and Mr. Gilbertson proceeded on the basis that the master fund, and the Pallinghurst structure generally, were operational well before the events of December 2006 and January 2007. He said this (*ibid.*):

> "The meetings, discussions and actions of Mr. Gilbertson and Mr. Kuznetsov in particular even before the execution of the Letter Agreement pursuant to which the Master Fund and the Pallinghurst Structure were subsequently established, including the approval in July 2006 of the Angolan Project and what became known as Project Charlie as Investment Projects of the Master Fund and thereafter, all, in my opinion, clearly show that the Master Fund and the Pallinghurst Structure of which it was part, were being treated by the parties as real and effective."

(ii) *The period from December 2006 to January 3rd, 2007*

40 On December 1st, 2006, Mr. Vekselberg—in response to Mr. Gilbertson's email of November 29th, 2006—agreed in a telephone conversation that Mr. Gilbertson should proceed to acquire the Fabergé brand for a price not exceeding US$40m. Mr. Gilbertson confirmed that understanding in an email, copied to Mr. Kuznetsov, later on that day.

41 On December 6th, 2006, there was a meeting in London attended by Mr. Gilbertson, Mr. Sean Gilbertson, Mr. Kuznetsov, Mr. Mende (a joint owner, with Mr. Kundrun, of AMCI) and representatives of First Reserve (a very large investment fund specializing in energy related projects) to discuss further the possibility (discussed earlier in the year) of AMCI and First Reserve becoming investors in the master fund. The meeting also considered the status of the various projects which were being pursued as investment projects for the master fund, including Project Egg. Mr. Mende/AMCI remained interested—particularly in relation to Project Charlie, a proposal for the acquisition of an Australian manganese mining company—but First Reserve subsequently dropped out.

42 On December 13th, 2006, Mr. Kuznetsov and Mr. Gilbertson met, informally, at the Swissôtel, Moscow. The judge found—resolving a difference of recollection between them—that, although Mr. Kuznetsov was adamant that he had told Mr. Gilbertson at that meeting that Mr. Vekselberg required (as a condition of supporting the bid for the Fabergé rights) that one of his own companies would own the actual title to the Fabergé brand (outside the Pallinghurst structure, but on the basis that the

economic benefit of the business of developing, exploiting and managing the Fabergé brand would remain with the master fund within the Pallinghurst structure), Renova had not established that Mr. Gilbertson did understand and agreed to Mr. Vekselberg's requirements at, or as a result of, that meeting. After reviewing the evidence and surrounding circumstances, the judge said this (at para. 9.10 of his judgment):

> "On balance it is my overall assessment that Mr. Gilbertson first fully understood Mr. Vekselberg's requirements following the telephone conversation between Sean Gilbertson and Mr. Kalberer on 20th December 2006."

It was in the course of that telephone conversation, as the judge explained later in his judgment, that Mr. Sean Gilbertson first learnt of Mr. Vekselberg's requirements. As the judge observed (at para. 9.16):

> "I consider it improbable that, if Mr. Gilbertson was already aware of or understood Mr. Vekselberg's requirements, he would not have passed that information on very quickly to Sean Gilbertson. I therefore conclude that if Sean Gilbertson did not know of Mr. Vekselberg's requirements until Mr. Kalberer told him, which I accept is the case, then Mr. Gilbertson did not know or understand them either until that point."

43 On December 15th, 2006 (two days after the meeting between Mr. Gilbertson and Mr. Kuznetsov in Moscow), Mr. Sean Gilbertson agreed with UBS/Unilever a purchase price of US$38m. for the Fabergé rights. Mr. Gilbertson informed Mr. Kuznetsov that the price had been agreed. Later on that day (December 15th, 2006), Mr. Kuznetsov sent an email to Mr. Gilbertson, with copies to Mr. Sean Gilbertson and Mr. Igor Cheremykin (the Chief Legal Officer of Renova Management, based in Moscow), to congratulate him on reaching agreement as to the purchase price. That email included the sentence: "It is very important that we use the right group company for the purchase so could you please communicate with Igor Cheremykin, the head of our legal and corporate department on this . . ." The judge explained that there was a dispute as to what the Gilbertsons understood, or should have understood, by the reference to "the right group company for the purchase": the Renova parties contending that the Gilbertsons would or should have understood "the right group company" as a reference to a company within the Renova group (or a company within Mr. Vekselberg's family office) and the Gilbertsons contending that they understood "the right group company" to be a reference to a company within the Pallinghurst structure. The judge accepted—on the basis of his finding that, on December 15th, 2006, the Gilbertsons did not know of Mr. Vekselberg's requirement that he would, himself, own the title to the Fabergé rights through one of his personal companies—that they did not understand Mr. Kuznetsov to be referring to

anything other than the Pallinghurst structure. That view, he held, was confirmed by Mr. Sean Gilbertson's response by email to Mr. Cheremykin, with a copy to Mr. Kuznetsov, sent later the same day, in which he informed them that a Cayman Islands company, Project Egg Ltd. (PEL) had been incorporated as a wholly owned subsidiary of the master fund to acquire the Fabergé rights. The judge observed (at para. 9.13 of his judgment) that PEL had been incorporated on December 1st, 2006, with Mr. Sean Gilbertson and Mr. Willis, an employee of Pallinghurst LLP, as its directors, but that "rather surprisingly" the Renova parties were not made aware of that until Mr. Sean Gilbertson's email of December 15th, 2006.

44 On December 18th, 2006, Mr. Sean Gilbertson notified Mr. Kalberer by email that Unilever was insisting on completion of the purchase of the Fabergé rights before the year end. But, on the following day (December 19th, 2006), Unilever indicated (through its solicitors) that, provided that contracts were exchanged before December 31st, 2006, it was content to defer completion until January 3rd, 2007.

45 At para. 9.16 of his judgment, the judge returned to the telephone conversation between Mr. Sean Gilbertson and Mr. Kalberer on December 20th, 2006 to which he had referred earlier. He described that as "an important conversation" in that (as the Gilbertson parties contended and the judge accepted) it was the first time that the Gilbertson parties had been informed of Mr. Vekselberg's requirement that the Fabergé rights would be owned by one of his private companies. Shortly after that telephone conversation, Mr. Kalberer identified the company that was to own the Fabergé rights as Lamesa Arts Inc., a company incorporated in Panama, and provided Mr. Sean Gilbertson with a copy of a power of attorney in his (Mr. Kalberer's) favour executed by that company. On the following day (December 21st, 2016), Mr. Sean Gilbertson responded with an email to Mr. Kalberer, copied to Mr. Kuznetsov, which—after stating that Mr. Gilbertson was waiting for a call from Mr. Kuznetsov—included the following observation:

> "Clearly switching entities in this fashion at the 11th hour is not in the spirit of the arrangements with the Pallinghurst team and it is thus crucial that this call take place so that we might understand what arrangements [Mr. Kuznetsov] has in mind."

He went on to say that that Unilever, UBS and their solicitors were waiting to hear about the signing of the sale and purchase agreement ("the SPA").

46 As I have said, that email was sent by Mr. Sean Gilbertson on December 21st, 2006. The judge found that, on the previous day (December 20th, 2006), Mr. Gilbertson had received an email from Dr. Jelinek. The email was in these terms:

> "I have spoken to Hans [Mr. Mende] and convinced him to express his interest and being ready to cover abt MIL to secure the brand name. He will do it outside AMCI and with my silent contribution either half or one third depending if Kudrun wants to participate . . ."

The judge observed (at para. 9.18 of his judgment) that—

> "clearly Mr. Gilbertson must have spoken to Dr. Jelinek prior to this e-mail about purchasing the Fabergé brand and, in turn, Dr. Jelinek had spoken to Mr. Mende to ascertain whether he would be interested in contributing about US$15m to the purchase price. Dr. Jelinek was saying that he would contribute either half or one third of the price depending on whether Mr. Kundrun wanted to participate. It seems to me that this clearly shows that Mr. Gilbertson was actively setting up a consortium consisting of Dr. Jelinek, Mr. Mende, possibly Mr. Kundrun and, secretly, himself, to purchase the Fabergé brand, without any participation or involvement by Mr. Vekselberg, Lamesa or Renova."

Early on December 21st, 2006, Mr. Gilbertson had responded by email to Dr. Jelinek:

> "Many thanks, Milan. That is very helpful indeed!
>
> I will have my phone conversation with Viktor later today and will keep you informed."

47 The judge found that a number of other relevant events took place on December 21st, 2016:

(1) Later on that day Mr. Sean Gilbertson sent an email to Mr. Kalberer, again copied to Mr. Kuznetsov, to inform him that UBS was eager that the SPA be signed forthwith. That email contained the following paragraph:

> "We are in the meantime preparing a draft of a one page agreement that could be signed by BPG, VK and VV to give comfort that at least 75% of 'Project Egg Limited' will be purchased by VV's vehicle and that the Pallinghurst team's rights will be protected. I will also send the necessary resolution of the 'GP of the GPLP' [the company] authorising that BPG [Mr. Gilbertson] (or VK, if you prefer) sign the sale & purchase agreement on behalf of Pallinghurst Resources Management LP [the master fund] (this is, as discussed with you yesterday, in connection with this vehicle guaranteeing the obligations of Project Egg Limited under the sale and purchase agreement)."

The judge explained that Mr. Sean Gilbertson's reference to discussions between Mr. Kalberer and himself on the previous day concerning Mr. Gilbertson (or Mr. Kuznetsov) signing the SPA on behalf of the master

fund confirmed the parties' agreement that the master fund would be the guarantor of the obligations of PEL and would sign the SPA as such.

(2) Still later on the same day (December 21st, 2006), Mr. Sean Gilbertson sent a further email to Mr. Kalberer, copied to Mr. Kuznetsov and Mr. Vekselberg, attaching a one-page draft "Implementation Agreement" ("the first draft IA"). He wrote:

> "Further to my earlier e-mail, please find attached the proposed one page agreement relating to implementation of Project Egg (allowing Mr. VV to retain at least 75%). UBS are pushing hard to complete signature of the sale and purchase agreement today and your assistance in this regard would be appreciated. I see no reason why we cannot accomplish this, particularly if we sign the attached agreement giving comfort to all parties. BPG confirms that Hans Mende is very enthusiastic to join VV in this initiative and committed earlier today to taking the remaining 25% . . ."

The judge observed that the first draft IA attached to Mr. Sean Gilbertson's email provided that the Fabergé rights would be purchased forthwith by PEL on the terms negotiated between Pallinghurst LLP (the investment management vehicle established in England by Mr. Gilbertson to which he had referred at para. 8.3 of his judgment) and Unilever; that Mr. Kuznetsov and Mr. Gilbertson were to be deemed to have signed an attached resolution enabling the master fund to become a party to the SPA as guarantor of the obligations of PEL; and that an entity nominated by Mr. Vekselberg would pay the purchase price (US$38m.). The first draft IA also provided that a documented transaction—under which not less than 75% of the ownership of PEL would be transferred to an entity nominated by Mr. Vekselberg and 25% of the ownership of PEL would be offered to AMCI (Mr. Mende's company) at a corresponding percentage of the purchase price—would be executed after completion of the SPA. The intended effect, he said, was that the economic benefits in relation to the Fabergé rights and the decision-making rights attributable to the Pallinghurst team and all commercial opportunities arising from them were not to be any less than those contemplated in the long form agreements.

(3) Mr. Kalberer replied by email, sent to Mr. Sean Gilbertson and Mr. Gilbertson with copies to Mr. Kuznetsov and Mr. Vekselberg, in these terms:

> "Following a telephone conversation with VK [Mr. Kuznetsov] of a moment ago I gather the following:
>
> 1 We would agree to the Pallinghurst Team getting the economic benefit of Project Egg as if the Faberge rights were purchased by Pallinghurst Resources Management LP [the master fund] and the

remuneration mechanics set out in the last drafts [of the long form agreements] agreed by Renova were applied.

2 As to Project Egg Ltd. [PEL], we request that 75% of its shares are transferred to Lamesa Arts Inc. within the next 2 business days after signing of the agreement regarding the Fabergé rights or, if ever possible before. Please confirm (i) who controls and (ii) how: (1) the shareholder and (2) the directors of this company.

3 The remaining 25% in Project Egg Ltd can be purchased by AMCI at the corresponding percentage of the purchase price for the Fabergé rights under the following cumulative conditions:

(a) Project Charley [*sic*] is closed within the next 6 months by Renova and AMCI (at a relation of 43% to 50% by Renova and 50% to 57% by AMCI);

(b) Renova obtains a firm commitment from an AMCI vehicle with the respective substance that it will take up, at Renova's discretion, between 50% to 57% in Charley.

If one of the conditions is not met Renova has the right to purchase the 25% in Project Egg Ltd. at USD 0.25. I could not talk to VK regarding the decision making and management issues as the acoustic quality of the call was very bad."

(4) Some two hours later (but still on December 21st, 2006), Mr. Gilbertson sent an email to Mr. Kalberer, copied to Mr. Kuznetsov and Mr. Vekselberg:

"The acoustic quality of your line to VK must have been bad indeed for these proposals to emerge at this late stage.

The Management issue is critical, and VK confirmed in response to my specific question during our telecon earlier this afternoon that the management arrangements, now long-established between Pallinghurst and Viktor, would not be diluted. Even if he had not done so, there are no grounds to seek any change at this late stage.

Regarding item 3: It is not reasonable to now require a new set of negotiations with AMCI in the Egg arrangements. I cannot reasonably do this in the time scale to which we are working. Also, VK made no mention of these conditions in our telecom this afternoon, neither during our meeting last week in the Swisshotel in Moscow. On the contrary, he welcomed the idea of an international investor. How can you seek such changes in the last hours? Just accept that you have a good partner, in a partnership that will to lead to much bigger things in future. If he does not, you lose nothing.

> Regarding item 2: Two days is simply too short, particularly over this time of the year. But we will accept the principle of a rapid transfer against appropriate assurance, in the transfer agreement, on item 2 and on the Management arrangements. In response to your questions in item 2, 100% of the equity in Project Egg Ltd is held by Pallinghurst Resources LP, and the directors are Sean and Andrew Willis, as we have previously advised you.
>
> After 18 months of negotiation by Pallinghurst, the deal is now there for the taking. Let us get on with it!"

(5) Still later the same day, December 21st, 2006, Mr. Gilbertson spoke to Mr. Vekselberg on the telephone. He followed up that conversation with an email to Mr. Vekselberg, with copies to Mr. Kuznetsov and Mr. Kalberer, in these terms:

> "Further to our conversation of 45 minutes ago, I have as yet received no call from Mr Kuznetsov.
>
> As I said to you, the lawyers on the other side are actually sitting in the London office, waiting to sign the documentation that Pallinghurst has painstakingly drafted and negotiated over the past months, and which will secure the Fabergé brand for us. Unilever wish to book the transaction in their 2006 financial year, with payment on 3rd January 2007. If they fail to achieve that, we do not have a deal, and they may re-approach the other parties with whom they have been in negotiation. We have in the last 10 minutes had confirmation that Unilever have signed, and that their lawyers are waiting to exchange documents.
>
> I have just tried to phone you, unsuccessfully; you will find the missed call on your phone. Acting on the assurances that you gave me during this evening's telephone conversation, namely that you want me to buy the brand on the basis of the arrangements that we have established between us over the past many months, I will therefore now trigger the Unilever-Pallinghurst transaction to conclude the deal. Project Egg Ltd, a Pallinghurst company, will be the owner of the Fabergé brand. I confirm that I shall work closely with your team to conclude payment and to achieve a structure that suits your needs, in particular an arrangement whereby there is no Third Party involvement, though the latter will be a little complicated in view of developments since I met with Mr Kuznetsov in the Swisshotel last week, when he believed you would welcome an international partner with a 25% stake. (At some stage soon, you should meet Mr Mende of AMCI: you will like him, and he will be an excellent partner in Charlie, so you should try hard to ensure that he is not offended by being excluded from Fabergé, in which he has already agreed to invest).

> I shall advise you as soon as you are officially the global 'Mr. Fabergé.'"

The judge observed (at para. 9.24 of his judgment) that, in his view—

> "it is clear from all of this that Mr. Gilbertson had not refused to consent to or vetoed Mr. Vekselberg's requirements for re-structuring the way in which the Rights should be pursued as an Investment Project for the Master Fund. Indeed he was proceeding on the basis that Mr. Vekselberg's structure was being pursued."

And he said this (at para. 9.25):

> "The confirmation by Mr. Gilbertson that he would work closely with Mr. Vekselberg 'to achieve a structure that suits your needs' clearly indicates, in my opinion, that Mr. Gilbertson was not refusing to consent to or vetoing the structure which Mr. Vekselberg wished to be pursued in respect of the Rights as an Investment Project. Furthermore, his reference to Mr. Vekselberg as becoming the global 'Mr. Fabergé' can only have been a reference to Mr. Vekselberg's ownership of the title to the Fabergé brand; it clearly was not a reference to ownership of the title to the Fabergé brand by the Master Fund as part of the Pallinghurst Structure. It was, it seems to me, an indication of Mr Gilbertson's acceptance of that."

48 On the following day, December 22nd, 2006, the SPA was signed in London by Unilever and by PEL. The judge observed that Mr. Gilbertson accepted, in the course of his evidence, that when he procured PEL, acting by Mr. Sean Gilbertson, to sign the SPA, he acquired the contractual entitlement to the Fabergé rights for the master fund and entities within the Pallinghurst structure and not for himself personally; he accepted that in no sense was PEL acting as his own nominee or agent in entering into the contract for the Fabergé rights; and he accepted that, following the execution of the SPA, the entitlement to acquire the Fabergé rights was owned by PEL, which was in turn owned by the master fund as part of the Pallinghurst structure. The judge went on to say this (at para. 9.28 of his judgment):

> "It seems to me to follow that, even if the precise terms on which the Master Fund was to hold the economic benefit of the Rights could not be finally agreed with the Renova Parties, Mr. Gilbertson would not in any event be entitled to withhold the Rights for himself."

The judge accepted the submission (made on behalf of Renova) that, in circumstances where the entitlement to the Fabergé rights was wholly owned by PEL, there was no way in which Mr. Gilbertson could acquire title to the Fabergé rights himself without the co-operation of PEL. Furthermore, he said, Mr. Gilbertson accepted that it was PEL that had contracted to purchase the Fabergé rights from Unilever, and that it had

done so on the basis that the acquisition would be funded by Renova money for the benefit of the PEL/master fund/Pallinghurst structure: the acquisition was not a Gilbertson transaction for the Gilbertsons' benefit.

49 On the same day (December 22nd, 2006), Mr. Kalberer sent an email to Mr. Sean Gilbertson, copied to Mr. Kuznetsov and Mr. Gilbertson, in these terms:

> "After a conversation with VK we have to insist and make it a condition precedent that the agreement ('Agreement') regarding the transfer of 100% of the shares in Project Egg Ltd. ('PEL') is finalized and signed prior to the closing of the purchase agreement regarding the Fabergé rights, i.e. the payment of the USD 38m.
>
> For the Agreement we envisage the following provisions:
>
> 1. All of the shares shall be transferred to Lamesa Arts Inc, the details of which I provided you earlier.
> 2. Clear references regarding the preparation and taking of decisions and the ongoing the [*sic*] process of taking decision as to the management of PLE [*sic*] and any other decisions relating to it.
> 3. Clear references and description as to how the various entities of the Pallinghurst structure economically benefit from PEL and its business and how these rights terminate with what consequences.
> 4. That the directors of PEL are nominee directors provided by a service provider, which are instructed by the Executive Committee of the GP and of the GPLP.
>
> To ensure a smooth closing please assure that I get a first draft of the Agreement early next week, I will have to review and discuss with VK . . ."

The judge observed that Mr. Sean Gilbertson had said in evidence that he did not see this email until December 28th, 2006.

50 On December 23rd, 2006, Mr. Gilbertson sent an email to Mr. Vekselberg, copied to Mr. Kuznetsov, Mr. Kalberer and Mr. Sean Gilbertson, in these terms:

> "I am happy to be able to tell you that we have received confirmation from our attorneys, Clifford Chance, that Pallinghurst is now the owner of the Fabergé brand. I hope you will be as pleased about this outcome as I am, for I believe that there is great future potential and value to be realised. *I congratulate you on this entrenchment of your interests in this revered brand name.*

The purchase agreement incorporates a pre-agreed Press Release by Unilever and Pallinghurst, which is quite brief and which your colleagues have seen. I am sure you will wish to make your own personalised Press Release, for the news will almost certainly attract strong international interest, and possibly headlines in major world newspapers, I am happy to draft this for you if you wish, but your own PR machine will no doubt be more aware than I of your requirements.

*Mr. Kuznetsov and I have discussed arrangements to transfer 100% of the ownership of the brand to one of your companies and I confirm to you my willingness to do so against binding commitments that the Pallinghurst team will retain all of the economic benefits and management rights that it would have under Pallinghurst's agreements with Renova.* Payment of the US$38million is due on 3rd January, 2007. I MUST HAVE written confirmation from Messrs Kuznetsov and Kalberer by the middle of next week that this will be done.

If you need any further action or information, please let me know." [Emphasis supplied.]

Also on December 23rd, 2006, Mr. Gilbertson sent an email to Mr. Mende copied to Dr. Jelinek:

"Please see the e-mail below [that is, the email sent to Mr. Vekselberg just set out] which I sent off in the early hours this morning.

You will note that the Fabergé purchase is done, and the trademark is currently owned by Pallinghurst, (subject to payment of the $38million on 3rd January) but Viktor's crowd played hard-ball during the final hours, and there were some tense moments. Along the line, Viktor insisted that 100% of (only) the trade-mark should be owned by one of his companies (though not necessarily its harvesting, exploitation and development) and *I have agreed that I am willing to implement that, but only against binding commitments that the management control and economic benefits should lie with Pallinghurst in accordance with the previously agreed arrangements.* Also recently, Viktor's consigliere [Mr. Kuznetsov], has re-confirmed their willingness to bring you in as a 25% partner, on condition that AMCI joins in the broader initiative, including Charlie. Clearly there is still some boxing that must take place before we have finality, and before Viktor's empire makes payment on the 3rd January. I have told [Mr. Kuznetsov] that unless I have binding assurances, well in advance, that they will pay on time, I will finance the $38million from other sources. I do not think they could live with losing a brand that Viktor now wants so much, so am fairly confident we will get to a good outcome . . ." [Emphasis supplied.]

The judge observed that it was clear that, by the second of those emails, Mr. Gilbertson was informing Mr. Mende and Dr. Jelinek that he had agreed with Mr. Vekselberg (as, indeed he had) that effect would be given to Mr. Vekselberg's requirement that 100% of the Fabergé brand should be owned by one of his companies (although not "its harvesting, exploitation and development"), against a commitment that the management, control and economic benefits should remain with the master fund as part of the Pallinghurst structure in accordance with the previous arrangements.

51 The judge went on to say this (at para. 9.31 of his judgment):

> "Clearly Mr Gilbertson was aware at this time, only a day after Sean Gilbertson's telephone conversation with Mr Kalberer, that under the new structure for the Investment Project required by Mr Vekselberg and the Renova Parties, although title to the Fabergé brand would be held outside the Pallinghurst Structure, the economic benefits of developing, exploiting and managing the Rights would remain with the Master Fund within the Pallinghurst Structure."

And, he observed (at para. 9.32 of his judgment) that—

> "in his e-mail to Mr. Mende Mr. Gilbertson also told Mr. Mende and Dr. Jelinek that he had told Mr. Kuznetsov that unless he had binding assurances that they would pay on time he would finance the $38 million from other sources. That was not strictly true. Mr. Gilbertson had said emphatically in his previous e-mail to Mr. Vekselberg, copied to Mr. Kuznetsov and Mr. Kalberer, that he must have written confirmation by the middle of the following week that payment of the US$38 million would be made on 3rd January 2007 and later that day, 23rd December 2006, Mr. Kalberer e-mailed Mr. Gilbertson, with copies to Mr. Vekselberg, Mr. Kuznetsov and Mr. Gilbertson, confirming that Lamesa Arts had arranged for sufficient funds to pay the purchase price of US$38 million. However, in his evidence Sean Gilbertson asserted that this e-mail was also stuck in his spam filter and not seen by him until 28th December 2006, some 5 days later. At one point, Mr. Gilbertson did however say that he would have to make alternative arrangements if it was not confirmed that the US$38 million would be paid on 3rd January 2007. The overall evidence of the Renova Parties was that Mr Gilbertson did not specify the nature of such alternative arrangements and that they were not made aware that Mr. Gilbertson was arranging and subsequently had arranged to make the payment to Unilever with other investors, including his own trust, until after he had actually done so and the payment had been made. In fact Mr. Kuznetsov said he thought Mr. Gilbertson would seek an extension of time from Unilever. Mr. Gilbertson's statement in his e-mail to Mr. Mende that he had told Mr. Kuznetsov that if he did not receive the assurances he

was seeking he would use finance from other sources to pay US$38m was at least disingenuous if not deceptive."

52 On December 26th, 2006, Mr. Sean Gilbertson, on behalf of his father, sent to Mr. Kuznetsov and Mr. Kalberer, with a copy to Mr. Vekselberg, a further draft implementation agreement ("the second draft IA"). In this draft, PEL (as the entity by which the Fabergé brand had been acquired under the SPA) was referred to as "OpCo," and the company controlled by Mr. Vekselberg (as the entity by which the Fabergé brand was to be owned, but with the economic benefits and decision-making rights remaining with OpCo)—was referred to as "BrandCo." The second draft IA provided:

(1) That BrandCo would pay the purchase moneys payable under the SPA on January 3rd, 2007; that ownership of the Fabergé brand should be transferred to BrandCo as soon as practicable after completion of the purchase for a nominal consideration; and that BrandCo should own and hold the Fabergé brand until the winding up of the master fund pursuant to the Pallinghurst agreements.

(2) That Opco would manage and operate the Fabergé rights as a portfolio company of the master fund pursuant to the Pallinghurst agreements (which, as the judge said, meant the unsigned but agreed long form agreements), and that OpCo would be the beneficiary of all proceeds arising from its right to develop and pursue all commercial opportunities arising from the Fabergé brand.

(3) That there would be a payment by BrandCo on the eventual winding up of the master fund in respect of the enhancement of the value of the Fabergé brand as a result of the successful implementation of the development and pursuit by OpCo of the commercial opportunities arising from and relating to it, and that the parties should use their best endeavours to draw AMCI into the master fund.

(4) That AMCI should have the right to purchase up to 25% of BrandCo, subject to certain conditions relating to its involvement in Project Charlie.

The draft provided for the second implementation agreement to be signed by Mr. Gilbertson and Mr. Kuznetsov on behalf of the company.

53 On December 29th, 2006, Mr. Kalberer sent an email to Mr. Sean Gilbertson, copied to Mr. Kuznetsov and Mr. Gilbertson, attaching a copy of the second draft IA, marked up to show the changes which he proposed. Those proposed changes included the following:

(1) That the master fund, represented by Mr. Kuznetsov and Mr. Gilbertson as members of the "Executive Committee" (which, as the judge said, meant the investment committee) of the company, as the general

partner of GPLP, should be parties to the agreement, as should PEL and a Lamesa group entity.

(2) That BrandCo would be a Lamesa company, and that it would pay to OpCo (PEL) the purchase price due under the SPA on January 3rd, 2007, in order to enable OpCo to pay the purchase price to Unilever on that date.

(3) That payment by BrandCo to OpCo was to be on conditions (i) that OpCo transferred the title to the Fabergé brand to BrandCo or its nominee (which, as the judge said, was to be a Lamesa group company) for nominal consideration; and (ii) that the directors of OpCo be replaced by a director or directors nominated by the master fund and an equal number nominated by BrandCo.

(4) That the new directors of OpCo were to act upon the written instructions of the master fund given through the investment committee of the general partner of GPLP (which, as the judge said, meant the company).

(5) That, upon the transfer of the title to the Fabergé brand to BrandCo, BrandCo would conclude a licence agreement with OpCo for as long as the Fabergé brand was managed and held as an investment of the master fund.

(6) That the terms of the licence were to include, *inter alia*, (i) a provision that OpCo would be responsible for developing and pursuing all the commercial opportunities arising from and relating to the Fabergé brand and should have the benefit of the proceeds so arising, and should be the vehicle "in which all revenues, accruals and expenditures arising from the Fabergé brand shall vest"; (ii) a provision that the Fabergé brand should be owned by Lamesa Arts but should in all respects be treated as if it were an investment of the master fund; and (iii) a provision that, accordingly, Opco would be managed and operated as a portfolio company of the master fund pursuant to the Pallinghurst agreements as agreed.

Later on that day (December 29th, 2006), Mr. Kalberer sent a further email to Mr. Sean Gilbertson in which he wrote that, subject to agreement regarding his proposed changes to the second draft IA, they would prefer to transfer the US$38m. purchase price to Unilever direct, on behalf of PEL.

54 On December 30th, 2006, Mr. Sean Gilbertson sent an email to Mr. Kalberer, copied to Mr. Kuznetsov and Mr. Vekselberg, to which he attached a further draft implementation agreement ("the third draft IA"). The third draft IA provided, *inter alia*:

(1) That BrandCo (a Lamesa group company) would, upon the transfer to it by OpCo of the Fabergé brand (in return for Lamesa Arts procuring payment of the purchase price to Unilever), grant OpCo "a royalty-free,

exclusive, world-wide, sub-licensable, perpetual and irrevocable licence to use and exploit the Fabergé Brand."

(2) That the licence was to be valid until the winding up of the master fund pursuant to the Pallinghurst agreements, at which time BrandCo could terminate the licence on 90 days' notice, and that the parties should negotiate in good faith a written licence agreement to give effect to this and other specified terms.

(3) That OpCo should be managed and operated as a portfolio company of the master fund pursuant to the Pallinghurst agreements and should be the legal and beneficial owner of all revenues, accruals and expenditures arising from the Fabergé brand.

(4) That, although recognizing that the Pallinghurst agreements had not been signed, nonetheless they should apply to the Fabergé brand (albeit that the Fabergé brand itself would be owned by BrandCo).

Mr. Kalberer (who, as the judge said, was on holiday in Brazil at this time) replied, by email sent to Mr. Sean Gilbertson on that evening, stating that he would go through the third draft IA the next day and revert with his comments.

55 The judge noted (at para. 9.38 of his judgment) that it was Mr. Gilbertson's evidence that he awoke on January 1st, 2007 with a realization that agreement was not going to be reached in time to make the payment to Unilever on January 3rd, 2007, and so decided to implement his plan to acquire the Fabergé rights himself with the assistance of his consortium of investors and not through or with Mr. Vekselberg/Lamesa/Renova. He noted, further, that it was Mr. Gilbertson's evidence that he then proceeded, without further delay, to finalize the arrangements which he had already discussed and put in place with Mr. Mende and Dr. Jelinek over the previous weeks. Mr. Gilbertson sent an email to Mr. Mende, copied to Dr. Jelinek, which was in these terms (so far as material):

> "Good Morning Hans, and a happy New Year to you. I would like to phone you today to wish you all the best, and also to brief you on the status of Project Egg. Deal now being pushed by the Russians will seriously sub-optimise for us. *I think you, Milan and I should do it 20:10:10. then negotiate with Russians from a position of strength.* Is there a good time to call you about this?
>
> *Frankly I don't see how we can lose by such a strategy, and could have very much to gain.* Our exposure need be only a few months, as we manoeuvre through the Alrosa negotiations." [Emphasis supplied.]

The judge explained that the reference to "the Alrosa negotiations" was to discussions with a major Russian diamond producer with whom

Mr. Gilbertson hoped to make an agreement in relation to marketing Fabergé diamonds. The judge found that Mr. Mende then emailed his business partner Mr. Kundrun, with a copy to Mr. Gilbertson:

> "Renova/Vechselberg [*sic*] came back at the end and wanted to put some conditions into the agreement that would have limited our rights. Brian feels that it is best to negotiate out of position of strength with Vechselberg and buy the name outright and then deal with him. We would have to close on Wednesday, [January 3rd, 2007] *BG is so convinced he would put up USD Mio [sic] of his own money* and Milan Jelinek also USD 10 Mio and they would you and me do the rest [*sic*], i.e. 20 Mio together. PP is 38 Mio for the brand name from Unilever. *Vechselberg wants the name but we don't have much leverage unless we own it*, that is why BG thinks we need to only bridge finance it for few months before we sell down. I am okay with this provided you join as well. Need to know urgently. Pls call Brian in case you want to hear from him directly as well." [Emphasis supplied.]

On receipt of that email, Mr. Gilbertson sent a further email to Mr. Mende and Mr. Kundrun, copied to Dr. Jelinek and Mr. Sean Gilbertson, in these terms:

> "Thank you Hans. Greatly appreciate your support. *This opportunity could be worth serious money for us after only a few months*: We need those few months—and the brand name—to negotiate with Alrosa, and/or to develop the non diamond-angle, and we would add substantially to the current brand valuation which Unilever has BADLY mis-managed for decades.
>
> *We cannot lose. Viktor will be willing to buy us out at the $38m + at any time. (I told him some months ago that he/we would have to pay $100M for the name: he winced, but said he could live with it. Remember that he paid $120M for the eggs. The brand gives him serious cred in Russia/the Kremlin).*" [Emphasis supplied.]

The judge found (at para. 9.40 of his judgment) that Mr. Mende replied to Mr. Gilbertson, by an email sent that evening (January 1st, 2007), with a copy to Mr. Kundrun, confirming that Mr. Kundrun had agreed to the proposal in principle, and that they could move fast if the funds were needed on January 3rd, 2007.

56 Early on January 2nd, 2007, Mr. Gilbertson responded to Mr. Mende's email of the previous day, with copies to Mr. Kundrun and Dr. Jelinek:

> "You are an absolute star. Many thanks. I await your call.
>
> We need to deliver proof of transfer of funds by noon London time tomorrow, Wednesday. I ask that you pay the full $38 million. The Unilever payaway details appear below. For your comfort, I attach hereto a copy of the Sale and Purchase Agreement between 'Project Egg Limited' and Unilever . . .
>
> *I (and I am sure Milan [Dr. Jelinek]) will refund you promptly $9.5 Million, hopefully tomorrow, but more realistically it will take a few working days (as I have to extract it from a set of Trusts in Jersey), so say by Tuesday at the latest.* Obviously I will refund your loss of interest over those days. Please let me have the appropriate payaway instructions to your account.
>
> *Shortly thereafter, I propose that each of the 4 parties pay an additional $500000 into 'Project Egg Limited' as a loan to give it $2M working capital while we negotiate with Mr. Vekselberg*, and in parallel, with Alrosa.
>
> If you are in agreement with this, I shall draft a simple letter confirming these arrangements, for you to modify as you deem fit." [Emphasis supplied.]

Mr. Mende replied to that email, with copies to Mr. Kundrun and Dr. Jelinek, confirming that they would wire transfer US$38m. to Unilever that day and that Dr. Jelinek and Mr. Gilbertson would repay their share, amounting to US$9.5m. each, within 7 days. He wrote that they understood that Mr. Gilbertson felt confident that he could work out a solution with "the Vekselberg group" which would give the consortium "optimal economic benefits." An hour later, Mr. Gilbertson confirmed his agreement with what Mr. Mende had written.

57 The judge observed (at para. 9.41 of his judgment) that, "while Mr. Gilbertson was communicating in this way with Mr. Mende and copying Mr. Kundrun and Dr. Jelinek about financing the purchase price payable to Unilever and the profit they would make," Mr. Sean Gilbertson was sending to Mr. Kalberer, with a copy to Mr. Kuznetsov, some further comments on the third draft IA in response to a voicemail from Mr. Kalberer on the previous evening; in particular, he observed that, in an email sent on January 1st, 2007, Mr. Sean Gilbertson referred, *inter alia*, to the "Pallinghurst principles as already modified for Project Egg . . ." The judge said that that seemed to him to indicate "that the Gilbertsons were accepting the modification of the structure for Project Egg as an Investment Project, as required by Mr. Vekselberg." He found that, later in the evening of January 1st, 2007, Mr. Gilbertson sent an email to Mr. Kalberer, copied to Mr. Kuznetsov, adding a further comment to those made by Mr. Sean Gilbertson earlier that day on the third draft IA. The

judge explained (at para. 9.44 of his judgment) that the third draft IA was the last draft implementation agreement seen by Mr. Gilbertson before, early on January 1st, 2007, he decided to, and did, finalize the arrangements for the purchase of the Fabergé rights by Mr. Mende, Mr. Kundrun, Dr. Jelinek and himself (the consortium).

58 On January 2nd, 2007, Mr. Kalberer sent an email to Mr. Sean Gilbertson from Brazil, copied to Mr. Gilbertson and Mr. Kuznetsov, attaching his revision of the third IA. The revised draft ("the fourth draft IA") was produced and circulated by Mr. Kalberer before he, Mr. Vekselberg, Lamesa or any of the Renova parties were aware of the steps which Mr. Gilbertson had taken to finalize the arrangements for the funding of the purchase of the Fabergé rights by the consortium. Shortly after that, Mr. Kuznetsov sent an email to Mr. Kalberer, with a copy to Mr. Sean Gilbertson, setting out some brief comments of his own on the fourth draft IA. The judge held that the fourth draft IA made no significant changes to the provisions of the third draft IA with regard to the payment of the purchase price to Unilever by Lamesa Arts, the transfer of the Fabergé brand to BrandCo (Lamesa) for nominal consideration and the change of the directors of OpCo (PEL). It removed the words "perpetual" and "irrevocable" from the licence to be negotiated in good faith between BrandCo and OpCo. And it inserted a new clause (cl. 2e) which provided that BrandCo should have the right to terminate the licence on 60 days notice without having to pay anything to OpCo if the master fund disposed of OpCo or if the master fund were wound up pursuant to the Pallinghurst agreements. The judge observed (at para. 9.44 of his judgment) that—

> "this [the new cl. 2e] clearly an uncommercial provision as far as the Master Fund was concerned and obviously was not going to be acceptable. It was also not consistent with clause 8 which made specific provisions, as in the Third draft IA, for the circumstances contemplated and provided for the payment of a 'value-add' in respect of enhancement of the value of the Fabergé brand by the Master Fund on its termination. Mr. Kalberer's evidence was that he inserted clause 2e by mistake and that its provisions were unintended. He freely accepted that it should not have been in the draft and that he would have agreed to remove it in any future discussions of the terms of the Fourth draft IA. In my opinion, it would have been, and indeed was, obvious to the Gilbertsons that the terms of proposed clause 2e were uncommercial and inconsistent with the rest of the Fourth draft IA and that it could not have been thought through or intended by Mr. Kalberer, as indeed was the case."

59 Also on January 2nd, 2007—and in order to fund his commitment to the other members of the consortium to contribute 25% of the purchase price for the Fabergé rights with his own money—Mr. Gilbertson telephoned Mr. Justin Thomas (the managing director of Fairbairn, the

trustee of the Gilbertson Family Trusts), to request the necessary funds (US$9.5m.) from the BPG settlement. A transcript of that telephone conversation was produced and referred to at the trial. The judge set out (at para. 9.45 of his judgment) those extracts from the transcript which (as he said) seemed to him to be the most relevant and significant:

> "*Brian Gilbertson*: Now, the reason I'm calling you so early in the New Year is I have bought myself a Christmas present.
>
> *Justin Thomas*: Okay.
>
> *Brian Gilbertson*: And I need some money to pay for it.
>
> *Justin Thomas*: [laughter] Okay.
>
> *Brian Gilbertson*: Shall I give you the background?
>
> *Justin Thomas*: Yes please, Brian, fire away. What have you bought yourself?
>
> *Brian Gilbertson*: Um, we have bought from Unilever—all the rights to the Fabergé brand.
>
> . . .
>
> *Brian Gilbertson*: Okay, so we have signed an agreement with them [Unilever] about 10 days ago.
>
> . . .
>
> *Brian Gilbertson*: And it required payment to be made tomorrow.
>
> . . .
>
> *Brian Gilbertson* Payment to be made, be presented tomorrow. Now the original intention up until yesterday, today, was that the payment would be made out of Pallinghurst. Are you familiar with Pallinghurst?
>
> *Justin Thomas*: Yes, I am, yes, yeah.
>
> *Brian Gilbertson*: But a complication came in, and the complica tion is that Victor Vekselberg, the Russian oligarch . . . is really taken by this idea and, rather than do it through Pallinghurst, as was the original intention, he has insisted that, in order for him to pay he wants the brand to be transferred to one of his companies which would then license it on to Pallinghurst to develop.
>
> . . .
>
> *Brian Gilbertson*: And so we will negotiate with him [Mr. Vek selberg] after we have acquired and paid for the brand.
>
> . . .

*Brian Gilbertson*: So that leaves the problem of paying for the brand.

. . .

*Brian Gilbertson*: And the purchase price is 38 million dollars.

. . .

*Brian Gilbertson*: And to that I have added 2 million dollars worth of working capital into the company that has negotiated and signed the agreement.

. . .

*Brian Gilbertson*: And there are a consortium of four of us who will put up that money.

. . .

*Brian Gilbertson*: Um, myself, and then three other relatively wealthy gentlemen who—and one of them will make the full payment tomorrow.

. . .

*Brian Gilbertson*: But I need to refund him very promptly after that with 10 million dollars or . . . 9.5 million dollars.

. . .

*Brian Gilbertson*: I'm not unhappy with it being held by the trust.

*Justin Thomas*: Okay. So we could make this as an investment rather than a distribution, okay.

. . .

*Brian Gilbertson*: Project Egg Limited is a Cayman Islands registered company.

. . .

*Brian Gilbertson*: It's a subsidiary of Pallinghurst.

. . .

*Justin Thomas*: What would Victor Vekselberg's thoughts be if you do this without using Pallinghurst?

*Brian Gilbertson*: He'll be extremely pissed off I would think.

*Justin Thomas*: [laughter]

*Brian Gilbertson*: But we'll come back to the table and we'll negotiate something else.

. . .

*Brian Gilbertson*: But not with a gun to my head, you know.

*Justin Thomas*: No.

*Brian Gilbertson*: Tomorrow's the deadline, if they don't do it we lose the transaction and he can step in and take it, and I'm not going to have that happen."

60 The judge found that, in the afternoon of January 2nd, 2007, Mr. Kalberer spoke to Mr. Sean Gilbertson on the telephone about the fourth draft IA and that, in the course of that conversation, a number of the disputed terms were resolved, but that Mr. Sean Gilbertson said nothing to Mr. Kalberer as to Mr. Gilbertson's plans for alternative funding of the purchase of the Fabergé rights by other investors, including the BPG Settlement.

61 In the evening of the same day (January 2nd, 2007), Mr. Gilbertson sent to Mr. Vekselberg, copied to Mr. Kuznetsov and Mr. Kalberer, what the judge described (at para. 9.47 of his judgment) as "a very significant email":

"I am sure you are aware that I have been trying, ever since Pallinghurst bought the Fabergé Brand on the evening of 21 December, to achieve an agreement with your colleagues, Messrs Kuznetsov and Kalberer that would satisfy the basic understanding that you and I struck that evening. I believe that I have leaned over backwards to accommodate the (extraordinary) requirement from your side that one of your companies should own the brand outside of the Pallinghurst structure that we have so carefully negotiated, over so long a period, but which yet remains unsigned.

This morning I turned on my computer to find 90 odd lines of proposed amendment to the text that we had previously exchanged. [The judge found this to be a reference to the fourth draft IA.] Some of these, 7 in total, were completely unacceptable, with clause 2e being perhaps the most glaring example. In a telephone conversation between Mr Kalberer and Sean this afternoon, less than 22 hours from the payment deadline, a number of the conflict issues were resolved, but late today we are told that a 25%-plus participation of 3rd parties in Pallinghurst Fabergé initiatives (I am NOT referring to your 100% ownership of the brand itself, which we had accepted) was a deal breaker.

The background will explain why it became clear to me today that there was little likelihood that we could reach an agreement in time that would satisfy the requirements of both Parties. I could not take the risk that payment would not be made under Pallinghurst's Sale

and Purchase agreement with Unilever. Accordingly I have triggered alternative arrangements, so that payment has now been made, and Pallinghurst now owns the Fabergé brand.

I reconfirm to you my desire to reach an agreement with your team that will accommodate your wishes as well as mine. I hope that, with the looming payment dead-line removed, and the vacation season soon to end, we will be able to make orderly progress towards such an outcome.

I am available at your convenience to discuss any of the above, or matters arising therefrom, should you or your colleagues so wish . . ."

The judge made two comments on that letter. First, he pointed out that Mr. Gilbertson's statement that it became clear to him that day, January 21st, 2007, "that there was little likelihood of reaching an agreement in time" was "again not strictly correct." The judge said this (at para. 9.47):

"As I have already mentioned, his evidence was that it was when he first awoke the previous day, 1st January 2007, that he decided that agreement would not be reached in time and that he would therefore implement and did implement his strategy of purchasing the Rights himself with his consortium, as he had already been putting in place before then."

Secondly, he pointed out that it could not have been correct that it was the proposals contained in the fourth draft IA, received by Mr. Gilbertson that morning, which caused him to "trigger alternative arrangements," as the judge said (*ibid.*):

"[I]t was, according to his own evidence, early the previous morning, before the Fourth draft IA had been sent out, that he decided to and did proceed with the alternative financing arrangements."

62 The judge found (at para. 9.48 of his judgment) that the purchase of the Fabergé rights from Unilever by PEL was completed on January 3rd, 2007 by payment of US$38m. by K-MIC (the holding company owned by Mr. Mende and Mr. Kundrun). He found, also, that:

(1) The minutes of a PEL board meeting held on January 3rd, 2007 recorded the approval of a loan to PEL of US$38m. from Autumn, K-MIC and Dr. Jelinek, repayable on 7 days' notice either (at the lenders' option) in cash or by the transfer of all PEL's assets to a vehicle nominated by the lenders, with interest at US$ LIBOR + 1.5% compounded monthly.

(2) The minutes also recorded approval of the issuance of 100 new shares in PEL at par value to the lenders, pro rata to their contribution to the loan.

(3) The master fund held one share in PEL. The register of members of PEL showed that the additional 100 new shares were issued to Autumn, K-MIC and Dr. Jelinek on January 3rd, 2007 in accordance with the board approval recorded in the minutes of that date.

(4) The register showed a transfer [*sic*] of 25 shares each on that date to Autumn and Dr. Jelinek and of 50 shares to K-MIC.

(5) The issue of those 100 shares on January 3rd, 2007 was subsequently confirmed in a letter dated February 26th, 2007 from the Gilbertson parties' London solicitors, Clifford Chance.

The judge noted (at para. 9.48 of his judgment) that, notwithstanding the record in the minutes and the register of members, and the confirmatory statement in their solicitors' letter, the Gilbertson parties pleaded in their amended defence that it was not in fact until January 19th, 2007, some two weeks after the date recorded, that the additional 100 shares in PEL were issued. He rejected that contention.

(iii) *The period after January 3rd, 2007*

63 On the evening of the same day, January 3rd, 2007, Mr. Gilbertson had sent an email to Mr. Kuznetsov, copied to Mr. Vekselberg, Ms. Irina Vekselberg (who, the judge explained, was Mr. Vekselberg's daughter and was taking a particular interest in the Fabergé brand) and Mr. Kalberer, with a proposed public announcement about the acquisition of the Fabergé brand. In that email he requested their comment. On January 4th, 2007, in an email sent to Mr. Gilbertson and copied to Mr. Sean Gilbertson and Mr. Kuznetsov, Mr. Kalberer responded to that request. After explaining that, given the developments of the previous two weeks, Renova needed to discuss the Pallinghurst project internally, he asked them not to publish any press releases or to contact the press in relation to Project Egg or any of the Pallinghurst projects in the meantime. Later that day, Mr. Gilbertson confirmed that he had stopped the issue of the press release about acquisition of the Fabergé brand. Mr. Gilbertson and Mr. Vekselberg met in Moscow on January 16th and 17th, 2007 to discuss Project Egg but that meeting was not fruitful. On January 21st, 2007, after further communications, Mr. Sean Gilbertson, on behalf of Mr. Gilbertson, sent an email to Mr. Vekselberg and Mr. Kuznetsov with a proposed omnibus agreement relating not only to the Pallinghurst structure and agreements and the Fabergé rights but also to Project Charlie and to Mr. Gilbertson's employment with SUAL. That draft agreement contained the proposal (made for the first time) that—

> "1. The partnership between Renova and Pallinghurst envisaged by the unsigned Pallinghurst agreements shall be abandoned, and Pallinghurst shall be further developed independently by [Mr. Gilbertson]."

64 From January 21st, 2007 the discussions between the parties departed from the proposals reflected in the draft IAs exchanged prior to January 3rd, 2007. Certain negotiations in relation to the Fabergé rights took place thereafter but without any obvious involvement of the master fund. The judge took the view that the details of those negotiations were of no relevance to Renova's claims in these proceedings, and that it was sufficient to record that the subsequent negotiations and discussions in relation to the Fabergé rights were not successful. Following a meeting in London on May 5th, 2007, between Mr. Gilbertson, Mr. Vekselberg and Mr. Kuznetsov, Renova Holding gave written notice of termination of the letter agreement (under cl. 8) on May 27th, 2007.

***The judge's findings as to the applicable principles of law***

65 At the section beginning at 2012 (2) CILR 416, para. 2, of his judgment, the judge considered the applicable principles of law. He referred to passages in judgments delivered in three cases before the Court of Appeal of England and Wales: first, in the judgment of Millett, L.J. in *Bristol & West Bldg. Socy.* v. *Mothew* (10); secondly, in the judgment of Jonathan Parker, L.J. in *Bhullar* v. *Bhullar* (8); and thirdly, in the judgment of Mummery, L.J. in *Gwembe Valley Dev. Co. Ltd.* v. *Koshy (No. 3)* (21). He referred, also, to observations of Patten, J., sitting in the High Court of England and Wales in *Halton Intl. Inc. (Hldgs.) SARL* v. *Guernroy Ltd.* (22). He went on to say this (2012 (2) CILR 416, at para. 11):

> "The cases make it clear, and leading counsel for the parties did not disagree, that whether or not someone is a fiduciary depends on whether he is acting for or on behalf of another 'in a particular matter in circumstances which give rise to a relationship of trust and confidence': see *Bristol & W. Bldg. Socy.* v. *Mothew* ([1998] Ch. at 18); see also *Boardman* v. *Phipps . . . per* Lord Upjohn, as cited in *Bhullar* v. *Bhullar* . . . The first question therefore is whether, in the particular circumstances of this case, Mr. Gilbertson was in a relationship of trust and confidence with the company, with the core obligation of loyalty to the company and the consequent fiduciary duties as outlined by Lord Millett in the *Bristol & W. Bldg. Socy.* case. In other words, was there an obligation on Mr. Gilbertson to act in the interests of the company in the circumstances? (see *Hospital Prods. Ltd.* v. *United States Surgical Corp.* . . . cited in the *Halton Intl. Inc.* case . . .). If Mr. Gilbertson was subject to such obligations to the company, he was a fiduciary: see the reference to Dr. Finn's *Fiduciary Obligations*, at 2 (1977), referred to in *Bristol & W. Bldg. Socy.*"

***The judge's reasoning and conclusions on the question whether Mr. Gilbertson owed fiduciary duties to the company***

66 At the section starting at 2012 (2) CILR 416, para. 12, the judge addressed the question: "Did Mr. Gilbertson owe fiduciary duties to the company?" He concluded (*ibid.*, at para. 33) that, in the circumstances of the present case, and in relation to an investment opportunity which Mr. Gilbertson had, himself, brought to the investment committee, established pursuant to the letter agreement, the answer to that question was "Yes."

67 The reasoning which led the judge to that conclusion may, I think, be summarized as follows:

(1) The judge explained that Renova's case was that, as a director of the company, Mr. Gilbertson owed fiduciary duties to the company. He said this (*ibid.*, at para. 12):

> "It is a well-established principle of law that a director of a limited company owes fiduciary duties to the company of which he is a director, those duties principally being to act in the best interests of the company and the consequent duties referred to in the cases cited above, such as the duty to avoid a conflict of interest between his own interest and that of the company, not to make a profit for himself from his position as a director (at least without the informed consent of the company) and so on."

It was submitted on behalf of Renova, he said, that Mr. Gilbertson owed these fiduciary duties to the company as a *de jure* director.

(2) The judge went on to observe (*ibid.*, at para. 13) that it was also established that—by a provision in a company's articles of association, by agreement of the shareholders or by clear implication from the particular circumstances of the case—the obligations of a director to the company might be modified so as (for example) to enable the director to act in his own interests or in the interests of another in relation to a particular matter notwithstanding that those interests might not necessarily be the same as the interests of the company in relation to the particular matter. At para. 14, he referred to observations in the judgment in *Japan Abrasive Materials Pty. Ltd.* v. *Australian Fused Materials Pty. Ltd.* (23)—a case before the Supreme Court of Western Australia, on which reliance had been placed in argument on behalf of the Gilbertson parties—and on a passage in the judgment of Burnton, L.J., sitting in the Court of Appeal of England and Wales, in *Re Neath Rugby Ltd.* (26). The judge explained (2012 (2) CILR 416, at para. 19) that it was submitted on behalf of the Gilbertson parties that that principle—that, in appropriate circumstances, it was possible to vary or dispense entirely with a director's fiduciary duties to the company of which he was a director—was applied in the *Japan Abrasive Materials* case, and that, in the present case, the letter

agreement was such an agreement. In particular, it was submitted that the terms of the letter agreement were such as to entitle Mr. Gilbertson to act in his own interest in relation to an investment project which required his consent to pursue—or which, put another way, he was entitled to veto—and not necessarily in the interests of the company.

(3) Nevertheless, as the judge observed (2012 (2) CILR 416, at para. 20), the terms of the shareholders' agreement in the *Japan Abrasive Materials* case, "were entirely different from the terms of the letter agreement and the surrounding circumstances in that case were entirely different from the circumstances in the present case." Renova's case—as the judge explained (*ibid.*, at para. 21)—was that the source of Mr. Gilbertson's fiduciary duties to the company was "the *de jure* role that he occupied as a director of the company"; that the letter agreement was not a shareholders' agreement; that, in any event, the terms of the letter agreement did not have the effect of modifying Mr. Gilbertson's fiduciary duties to the company; and that the only question was whether there was anything in the arrangements between the Renova parties and the Gilbertson parties which did have that effect.

(4) The judge summarized the arguments which had been put to him (*ibid.*, at paras. 21–24):

> "22 . . . The plaintiff contended that there was . . . an obligation of loyalty on Mr. Gilbertson as a director and a duty to act in the interests of the company and, through the company, the master fund. That, it was argued, was the foundation of the fiduciary relationship in the present case, even if it could have been qualified . . .
>
> 23 On the other hand, the case for the Gilbertson parties was that careful consideration of the nature of the company's business and of the provisions of the letter agreement demonstrated that Mr. Gilbertson did not owe the company any fiduciary duties with regard to investment projects which he was free to withhold his consent to or veto in his capacity as a member of the investment committee. Project Egg, they said, fell into that category. Mr. Gilbertson was, they contended, entitled in the circumstances to act as a director of the company in his own interests.
>
> 24 The Gilbertson parties argued that the Pallinghurst structure, including the company, was established pursuant to the letter agreement. They said that the letter agreement reflected a joint venture between Mr. Gilbertson and Renova Holding, although the principles were agreed between Mr. Gilbertson and Mr. Vekselberg, who owns and controls the Renova group. They submitted that the company was of a joint venture character and that the directors, Mr. Gilbertson and Mr. Kuznetsov, were in effect nominated by the partners of the joint venture as defined in the letter agreement, namely Renova,

> through Renova Holding, and Mr. Gilbertson. Similarly, the shareholders were so nominated by the partners in the joint venture. In Mr. Gilbertson's case, he nominated Fairbairn as trustee of the Gilbertson Family Trusts and Renova Holding nominated Renova Resources. They say that, accordingly, any duties Mr. Gilbertson owed as a director of the company are to be derived from the letter agreement, which reflects the joint venture and is the source of the agreement between the joint venturers and the surrounding circumstances."

The judge referred (*ibid.*, at para. 25) to the provision (at cl. 2.5 of the letter agreement) on which, as he said, the Gilbertson parties placed particular reliance: "approval to proceed with an investment project *via* the investment fund at an agreed value, shall require the unanimous consent of the investment committee." He went on to say this (*ibid.*):

> "As I have said, the Gilbertson parties' principal submissions are based upon the terms of the letter agreement. They rely in particular upon the provision in cl. 2.5 of the letter agreement that 'approval to proceed with an investment project *via* the investment fund at an agreed value, shall require the unanimous consent of the investment committee.' They say that that provision relates to the rights of the investment committee, of which Mr. Gilbertson and Mr. Kuznetsov were the two members. It provided each of them with a right effectively to veto proceeding with any investment project. That right, they say, may be exercised by either of them in their own interest, without regard to the interests of the master fund and the company. Accordingly, they contend that it follows that Mr. Gilbertson had no duty to act in the best interests of the company, as opposed to his own personal interest, with respect to any investment project. The letter agreement, they say, constituted the agreement between the partners of the joint venture which, *inter alia*, governed Mr. Gilbertson's rights and obligations with regard to investment opportunities and accordingly governed Mr. Gilbertson's relationship with the company to be. If he was clearly entitled to act in his own interest in relation to investment projects, he clearly had no duty to act in the interests of the company in relation to such investment projects."

(5) The judge rejected (*ibid.*, at paras. 26–28)—as "somewhat artificial in light of the commercial realities of the situation"—the contentions, advanced on behalf of Renova, that the letter agreement (which had been made between Mr. Gilbertson personally and Renova Holding, neither of whom was a member of the company) was not an agreement between the shareholders of the company, was "clearly not akin to a shareholders' agreement of the kind in the *Japan Abrasive Materials* case," and was not to be treated as such. But he accepted that the circumstances in relation to

the directors and the shareholders of the company were not as straightforward as they were in the *Japan Abrasive Materials* (23) case in that, at the time when the letter agreement was entered into, the company did not exist and the Pallinghurst structure of which the company was to become part had not been devised. He said that, accordingly, "the letter agreement did not contain any provisions in relation to the company, or its shareholders' or directors' rights or any terms of the kind contained in the shareholders' agreement in the *Japan Abrasive Materials* case." And he went on to point out that it was clear from the comments of Mummery, L.J. in the *Gwembe Valley Dev.* case (21) that "the mere fact that a company is of a joint venture character is not enough to justify an implication that the directors' fiduciary duties are modified so as to entitle them to act in their own interests rather than in the interests of the company concerned."

(6) The judge emphasized that—having regard to the meaning given to the term "Investment Project" in cl. 2.1 of the letter agreement—it was important to keep in mind that investment projects were opportunities and that the purpose of the investment fund was to explore, acquire and develop such opportunities. An opportunity, he said, could be at the stage of exploration but still constitute an investment project. He went on (2012 (2) CILR 416, at para. 30):

> "30 In these circumstances, it seems to me that the mere fact that approval to proceed with an investment project required the unanimous consent of the investment committee did not mean that Mr. Gilbertson owed no fiduciary duty at all in respect of an opportunity which he had brought for consideration by the investment fund and fund management vehicle and which was being explored. In my view, Mr. Gilbertson had a fiduciary duty as a director of the company in respect of any potential investment project which was being explored by him with the agreement of Mr. Kuznetsov, as the other member of the investment committee, at least until such time as there was clearly no longer unanimous consent to proceed with it or it was actually vetoed. Indeed, in accordance with the authorities referred to earlier, any such veto would have to be on the basis of full information being disclosed by or to Mr. Gilbertson or by or to Mr. Kuznetsov, as the case may be. In my opinion, once an opportunity was in the process of being explored or acquired as an investment project, even if Mr. Gilbertson then vetoed it as a member of the investment committee, nothing less than a fully informed and express consent by the company could possibly permit Mr. Gilbertson to pursue such investment project for himself."

And—after observing that, in his view, it would be contrary to the overall intent, as reflected in the letter agreement, for a party to seek to veto or withdraw consent to an investment project in order to enable him to

pursue that investment project for himself—the judge said this (*ibid.*, at paras. 31–32):

> "The letter agreement expressly provided that the partners would work together to add value to the investment fund, that Mr. Gilbertson would be the chairman of the investment fund and the fund management vehicle and that he would assume responsibility for developing and implementing the strategy for all investment projects. The letter agreement also provided that the duties owed by Mr. Gilbertson to the investment fund and the fund management vehicle (which would subsequently include the company) would be those customary for an executive chairman of a company and would include, *inter alia*, searching for and introducing investment projects to the investment committee and supervising the implementation of approved investment projects. He was also to provide strategic advice on investment projects.
>
> 32 All of this is, in my opinion, consistent with the proposition that once a proposed investment project had been brought by Mr. Gilbertson for consideration by the investment committee and proceeding with it had not been consented to by Mr. Kuznetsov, Mr. Gilbertson as a director of the company was subject to the fundamental principles of loyalty and good faith in relation to that investment project, including not making a profit for himself out of his position, not placing himself in a position where his interest may conflict with that of the company and not acting for his own benefit or exploiting the opportunity for himself, at least without the informed consent of the company, all as explained in the English cases cited above."

The judge went on to say (*ibid.*, at para. 33) that, in his view, it was immaterial whether the correct approach was that advanced on behalf of Renova (that is to say, to start from the premise that Mr. Gilbertson had fiduciary duties to the company as its director as a matter of legal principle, subject to any agreement or implication from the circumstances abrogating or modifying such duties) or that advanced on behalf of the Gilbertson parties (that is to say, to ask if the particular circumstances, including any relevant agreements, were such that Mr. Gilbertson was subject to obligations to the company which were of a fiduciary nature): whichever approach was adopted, the conclusion was the same.

68 In the section beginning at para. 36, the judge addressed the submission, advanced on behalf of the Gilbertson parties at the trial, that, because the investment committee never consented to Project Egg, it never became "an approved Investment Project" in the sense required by the letter agreement. He rejected that submission.

69 In his section beginning at para. 39, the judge addressed the question whether Mr. Vekselberg's requirement that the Fabergé rights should be

owned by a Lamesa company, outside the Pallinghurst structure—which, as he said, represented a change to the structure through which those rights as an investment project would be held—had any effect on the nature or extent of the fiduciary duties which (as he had held, in the section beginning at para. 12) Mr. Gilbertson owed to the company. He concluded, at para. 43, that he could "see no reason why the fiduciary duties to the company which Mr. Gilbertson owed as a director should have been any different after 20th or 21st December 2006 from his fiduciary duties before that time."

***The judge's reasoning and conclusions on the question whether Mr. Gilbertson was in breach of fiduciary duties which he owed to the company***

70 After restating his conclusion that Mr. Gilbertson remained in the same fiduciary relationship with the company after December 20th, 2006 as he did before that date, the judge went on to say this (2012 (2) CILR 416, at para. 57):

> "In such circumstances, it was not open to Mr. Gilbertson to take the rights for himself or to seek thereby to make a profit for himself and the other members of his consortium. In my opinion that was inconsistent with and amounted to a breach of his fiduciary duties. This was exacerbated by the fact that he diverted the rights, including the economic benefit of developing, exploiting and managing the Fabergé brand, from the master fund as part of the Pallinghurst structure to himself covertly without any disclosure to the company until after the event and, even then, it was not full disclosure. In summary, therefore, I am of the opinion that in the circumstances Mr. Gilbertson owed the duties of a fiduciary as a director of the company throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007."

71 In reaching that conclusion the judge had held (i) (*ibid.*, at para. 50), that it was an essential part of Mr. Gilbertson's strategy—that is to say, his strategy to "negotiate with the Russians from a position of strength" after having taken the Fabergé rights out of the Pallinghurst structure—to divert those rights from the master fund by diluting its 100% ownership of PEL by the issue of further shares in PEL to Autumn and the other members of the consortium so as to give them almost 100% ownership of PEL; and (ii) (*ibid.*, at para. 55) that there was no legitimate reason for Mr. Gilbertson not to discuss with Mr. Vekselberg his stated concern about possible failure to pay the purchase price under the SPA on the due date. It was, the judge held, Mr. Gilbertson's duty to seek to resolve that concern with the Renova parties and with Unilever, and not "to secretly take the Rights for himself with a view to making a profit."

***The submissions advanced on behalf of the parties***

72 It is said in the memorandum of grounds of appeal filed on behalf of Autumn on February 1st, 2013, that the judge misdirected himself and erred in law and/or fact in holding that Mr. Gilbertson owed or was in breach of any fiduciary duty in relation to the Fabergé rights or the Brand, and in holding that there was any substratum on which to found a claim against Autumn. More particularly, it is said that the judge misdirected himself: (i) as to whether Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund; (ii) in holding that Mr. Gilbertson owed fiduciary duties to the company which he did not owe; (iii) in such findings as he made that Mr. Gilbertson breached any fiduciary duties; and (iv) in relation to the issue of shares in PEL to members of the consortium. Those submissions were developed in extensive written submissions filed on May 24th, 2013, and in oral submissions at the hearing of the appeal.

73 In response to those submissions it is said on behalf of the Renova parties that, "despite the length and complexity of Autumn's Written Submissions the response to them can be boiled down to [a number of] short propositions." In the present context, the relevant propositions are these:

(1) Mr. Gilbertson was a *de jure* director of the company. The fiduciary duties that he owed to the company extended to protecting its assets and interests, including ensuring that the assets and interests owned or controlled by the entities in the Pallinghurst structure beneath the company (and, principally, the assets and interests of the master fund) were safeguarded and exploited for the ultimate benefit of the company. Those interests included the opportunity to acquire the Fabergé rights, and, once the Fabergé rights were secured by PEL (a Pallinghurst structure company) on December 22nd, 2006, to keep them there.

(2) The content and scope of Mr. Gilbertson's fiduciary duties were never attenuated, in particular either (a) by the terms of the letter agreement, or (b) by the fact that on December 20th, 2006, Renova introduced the requirement that the Fabergé rights be held by a Lamesa company (with the full economic benefit being held within the Pallinghurst structure), or (c) by the nature or proposed terms of (and the parties to) the draft implementation agreements or the fact of their negotiation. Mr. Gilbertson was at all times precluded by his duties of loyalty to the company, and to the GPLP and the master fund, from having regard to his own interests.

(3) Mr. Gilbertson acted in breach of the fiduciary duties which he owed to the company and the master fund by procuring that his consortium (of which Autumn was a 25% member) acquire 99% ownership of PEL. Indeed, it is said that "Autumn all but concedes that, if Mr. Gilbertson owed the company or GPLP or the master fund duties which

precluded him for having regard to his own interests, then he breached those duties."

74 Before addressing the substantive question whether the judge was wrong to hold that Mr. Gilbertson was in breach of fiduciary duties which he owed to the company, it is convenient to consider, first, whether there is any substance in the submissions—numbered (i) and (iv) in the summary of the memorandum of grounds of appeal which I have just set out—that the judge misdirected himself as to whether Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund and in relation to the date on which 100 new shares in PEL were issued to members of the consortium.

***Whether Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund***

75 In support of the submission that the judge was wrong to hold that Mr. Gilbertson owed fiduciary duties to the GPLP and/or to the master fund—and by way of particulars—it is said on behalf of the Gilbertson parties that:

(1) The judge erred in law in failing to address the question whether, on its case as pleaded, it was open to Renova to contend that Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund, and that, had he done so, he ought to have held that there was no, or no properly pleaded, case before him with respect to GPLP and/or the master fund and refused to award either of them any relief.

(2) In so far as the judge held that, or proceeded on the basis that, Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund in relation to the Fabergé rights or the Fabergé brand at any time (and, in particular, at such time as the judge may have held that he was in breach of such duties), the judge misdirected himself and/or erred in law and/or fact in so doing, given Renova's failure to plead any such fiduciary duties properly or at all.

76 In the previous section of this judgment I addressed the question whether the judge was wrong to entertain (and grant relief in respect of) derivative claims that were not before him. I concluded—for the reasons which I set out in that section—that the judge was correct to take the view (2012 (2) CILR 416, at para. 60) that, having chosen not to appeal from the order which he had made some three and a half years earlier (in his ruling of April 14th, 2009), it was not open to the Gilbertson parties to challenge, at trial, the standing of Renova to advance claims in the action on behalf of GPLP and the master fund including, in particular, a claim founded on the unpleaded contention that Mr. Gilbertson had acted in breach of fiduciary duties which he owed to the master fund. In those circumstances it is unnecessary to revisit the question whether—on the basis of the alleged defects in Renova's pleaded case—the judge was

wrong to hold that Mr. Gilbertson owed fiduciary duties to the GPLP and/or to the master fund.

77 In any event, as it seems to me, the judge did not need to hold that Mr. Gilbertson owed fiduciary duties to the GPLP or to the master fund which were independent of the fiduciary duties which (as a director) he owed to the company, and, as I shall explain later in this judgment, on a proper analysis of his judgment of November 5th, 2012 (read with his ruling of April 14th, 2009) he did not do so.

***The issue of shares in PEL to members of the consortium***

78 As I have said, the judge found (at para. 9.48 of his judgment) that the minutes of a PEL board meeting held on January 3rd, 2007 recorded the approval of the issuance of 100 new shares in PEL at par value to Autumn, K-MIC and Dr. Jelinek, that the register of members of PEL showed that those additional shares were issued pursuant to the board approval, and that the issue of those 100 shares on January 3rd, 2007 was subsequently confirmed in a letter dated February 26th, 2007 from the Gilbertson parties' London solicitors, Clifford Chance. He rejected the contention, pleaded by the Gilbertson parties in their amended defence that, as a matter of fact, those additional 100 shares were not issued by PEL until January 19th, 2007, or thereabouts. He did so for the reasons which he set out at para. 9.49 of his judgment. He said this:

> "Section 48 of the Companies Law (2011 Revision) provides that the Register of Members '*shall be prima facie evidence of any matters by this Law directed or authorized to be inserted*'. Accordingly PEL's Register of Members recording that the new shares were issued to the members of the consortium on 3rd January 2007 is *prima facie* evidence of that. That evidence is supported by the Minute of the PEL board meeting on 3rd January 2007 and by the Letter dated 26th February 2007 from Clifford Chance. The evidence of the witnesses in this regard was not particularly satisfactory. Mr. Gilbertson said that the new shares were not issued on 3rd January 2007 but he was unable to say when they were issued. He suggested that the Minute of the PEL board meeting had been backdated, although that would obviously be inappropriate since the Minutes clearly say that the meeting concerned took place on 3rd January 2007. It seems improbable to me that the registered office of PEL, Walkers, Attorneys-at-law, would be party to any backdating of an entry in the Register of Members maintained by them. Unfortunately, Sean Gilbertson, who was a director of PEL at the time, was not cross-examined on this point. On balance, in the circumstances I am not satisfied that the *prima facie* evidence of the Register together with the other supporting evidence has been displaced. In my

judgment the probability is that the new shares in PEL were indeed issued on or with effect from 3rd January 2007 and I so find."

79 In their memorandum of grounds of appeal, the Gilbertson parties challenge the judge's conclusion that the 100 new shares were issued by PEL on January 3rd, 2007. In developing the submission that the judge misdirected himself, it is said on behalf of the Gilbertson parties that:

(1) The judge erred in law, in that (i) he relied on a presumption or rule of evidence that shares in a Cayman Islands company are issued on the date of issue entered in the register of members; and (ii) he held that any such presumption or rule of evidence was not displaced on the evidence before him.

(2) The judge erred in fact in failing to hold that the PEL shares were not issued on January 3rd, 2007 but, on the balance of probabilities, were issued on January 19th, 2007.

In particular, it is said that the judge was wrong in failing to give weight to the unchallenged evidence of Mr. Sean Gilbertson (a director of PEL), said to be supported by contemporaneous documents, that PEL did not issue any shares on January 3rd, 2007.

80 In my view the judge was entitled to reach the conclusion that he did. I reject the submission that he erred in law. He was entitled—indeed, bound—to have regard to the direction, in s.48 of the Companies Law (2011 Revision), that the register of members shall be *prima facie* evidence of the date of issue of the shares, and he was entitled to take the view that the evidence of the register of members was not displaced by the other evidence that was before him. As he said (at para. 9.49 of his judgment) "the evidence of the witnesses in this regard was not particularly satisfactory."

***Whether Mr. Gilbertson owed fiduciary duties to the company in relation to Project Egg***

81 I turn, therefore, to address the substantive question: whether the judge was wrong to hold that Mr. Gilbertson was in breach of fiduciary duties which he owed to the company in relation to the acquisition of the Fabergé rights (Project Egg).

82 In reaching his conclusion that—in the circumstances of the present case and in relation to Project Egg)—Mr. Gilbertson did owe fiduciary duties to the company, the judge said this (at para. 33):

"[I]t seems to me that the company and the master fund, as part of the Pallinghurst structure, were entitled to expect, in relation to such an investment project, the 'single-minded loyalty' of Mr. Gilbertson, whose relationship with the company (and the Pallinghurst structure

generally), was one of trust and confidence in the sense explained in the *Bristol & W. Bldg. Socy.* case . . ."

In that context "the Pallinghurst structure" comprised—as the judge had explained (at para. 4 of his judgment)—the three Cayman Islands entities established pursuant to the letter agreement dated November 24th, 2005 to which he had referred at para. 3.2. "Investment Project" had the meaning given to that expression in the letter agreement, that is to say (as the judge explained (at para. 29)), an opportunity which it was the purpose of the master fund to explore, acquire and develop.

83 The three entities which comprised the Pallinghurst structure were the master fund (Pallinghurst Resources Management LP), GPLP (Pallinghurst (Cayman) General Partner LP) and the company (Pallinghurst (Cayman) General Partner LP (GP) Ltd.). GPLP and the master fund were exempted limited partnerships established under the Exempted Limited Partnership Law (Law 11 of 1991, as amended). Section 4(2) of that Law provided that an exempted limited partnership should consist of one or more persons called general partners and one or more persons called limited partners. General partners were liable, in the event that the assets of the exempted limited partnership were inadequate, for all debts and obligations of the partnership. Section 4(3) required that a general partner "shall act at all times in good faith in the interests of the exempted limited partnership." Section 7(1) required that a limited partner should not take part in the conduct of the business of the exempted limited partnership.

84 It was not in dispute—and, in any event the judge so found—that the company was the sole general partner of GPLP and that GPLP was the sole general partner of the master fund. The judge noted (by reference to the diagram of the Pallinghurst structure which he set out at para. 4.2 of his judgment) that Mr. Sean Gilbertson was a limited partner of GPLP and that the Founder fund (Pallinghurst (Cayman) General Partner LP) was a limited partner of the master fund. But there was no evidence to suggest that existence of those limited partners affected GPLP's power (as the general partner of the master fund) to control the master fund; or which affected the company's power (as the general partner of GPLP) to control GPLP; or which affected the company's power (through GPLP) to control the master fund. Nor was there any evidence to suggest that, in the exercise of their powers in relation to the master fund, GPLP (and, through GPLP, the company), did not owe the duties (imposed by s.4(3) of the Exempted Limited Partnership Law) "to act at all times in good faith in the interests of the exempted limited partnership."

85 As Lord Millett had observed, in his judgment in *Waddington* v. *Chan Chun Hoo Thomas* (40) (to which the judge referred (2012 (2) CILR 416, at para. 59)) "if wrongdoers must not be allowed to defraud a parent company with impunity, they must not be allowed to defraud its subsidiary

with impunity" ([2008] HKCFA 63, at para. 75). The judge held (2009 CILR 268, at para. 66) that, by reason of the company's power to control the master fund, the position of the master fund was analogous to that of a sub-subsidiary. In my view, he was right to reach that conclusion: the submission that the judge needed to hold that Mr. Gilbertson owed fiduciary duties to GPLP or the master fund which were independent of the fiduciary duties which he owed to the company—or that he did so—is not well-founded. If and in so far as the judge was correct to conclude that Mr. Gilbertson owed duties of loyalty and good faith to the company in relation to the pursuit of Project Egg as an investment project, he was correct to hold that such duties entitled GPLP and the master fund to rely upon his loyalty and good faith in relation to that project.

86 As I have said, the judge addressed and rejected (2012 (2) CILR 416, at the section beginning at para. 36) the submission, advanced on behalf of the Gilbertson parties, that Project Egg never became an approved investment project for the purposes of the letter agreement, and so never became a project in relation to which Mr. Gilbertson owed fiduciary duties, whether to the company or, more generally, to the Pallinghurst structure. The Gilbertson parties challenge that conclusion on this appeal. It is said in this court—as it was said below—that the judge was wrong to hold that Project Egg could become an approved investment project in the absence of unanimous consent of the members of the investment committee (Mr. Gilbertson and Mr. Kuznetsov).

87 In rejecting the submission that Project Egg never became an approved investment project for the purposes of the letter agreement, and so never became a project in relation to which Mr. Gilbertson owed fiduciary duties, the judge said this (*ibid.*, at para. 36):

> "It was suggested on behalf of Mr. Gilbertson that the investment committee in fact never did unanimously consent to Project Egg and therefore it was never an approved investment project in the sense required by the letter agreement. Having regard to the terms of the letter agreement and the circumstances generally, I did not find that to be a persuasive argument. The overall evidence clearly indicated to me that the investment committee, that is Mr. Gilbertson and Mr. Kuznetsov, operated in an informal way. They had meetings and discussions and both clearly acted from the start on the basis that Project Egg, which was initially proposed as an investment project by Mr. Gilbertson, should proceed as an opportunity to be explored and then acquired at an agreed price by the master fund. It is clear that, at the outset, Mr. Gilbertson introduced Project Egg and then explored it and implemented the strategy for the acquisition of the rights as an investment project of the master fund. He procured PEL, as a wholly-owned subsidiary of the master fund, and thus a Pallinghurst structure company, to enter into the SPA with Unilever

to acquire the rights, all as an investment project for the master fund, and all as agreed by Mr. Kuznetsov, as the other member of the investment committee. The purchase offers to Unilever made by Sean Gilbertson were made with the knowledge and consent of the investment committee. Agreement was reached on the price for the rights as an investment project. The initial offer of US$20m. by Renova and then the offer of US$30m. and the final offer price of up to US$40m., both to be paid by Mr. Vekselberg, all had the consent of the investment committee. In my view, Mr. Gilbertson would have done or procured none of this to be done if he did not consider that he had the consent of Mr. Kuznetsov and therefore the investment committee. I do not consider it is now open to him, in all the circumstances, to contend that Project Egg was never an approved investment project of the master fund."

88 I am of opinion that, for these reasons which the judge gave, he was entitled to find that, in the events to which he referred, Mr. Gilbertson would not have acted as he did in procuring the acquisition of the Fabergé rights by PEL on December 22nd, 2006 "if he did not consider that he had the consent of Mr. Kuznetsov and therefore the investment committee," and was entitled to hold that, "it is [not] now open to [Mr. Gilbertson], in all the circumstances, to contend that Project Egg was never an approved Investment Project of the Master Fund."

89 I should add that I am also of opinion that, if the judge were correct in his view that, prior to the issue of the additional shares, PEL was "a wholly-owned subsidiary of the Master Fund," the question whether or not Project Egg had become an approved investment project for the purpose of the letter agreement prior to the purchase of the Fabergé rights by PEL from Unilever under the agreement of December 22nd, 2006, was of little importance after that date. If, at the time when PEL became the contractual purchaser of the rights, it was wholly owned by the master fund, then, as it seems to me, whatever fiduciary duties may have been owed by Mr. Gilbertson to the company (or, more generally, to the Pallinghurst structure) in relation to Project Egg (as an investment project) under the terms of the letter agreement had become subsumed in the fiduciary duties which he owed as a director of the company in relation to the assets of the entities (including the master fund) which it controlled. Those assets included PEL and (through PEL) the contractual interest as purchaser of Fabergé rights.

90 As I have said, Project Egg Ltd. (PEL), a Cayman Islands limited company, was incorporated on December 1st, 2006 by Mr. Gilbertson as a special purpose vehicle for the purpose of acquiring the Fabergé rights from Unilever. The directors of PEL were Mr. Sean Gilbertson and Mr. Andrew Willis (an employee of Pallinghurst LLP). In taking the view throughout his judgment—and, in particular, at para. 36 (in the passage

which I have set out)—that, until the issue of the additional shares, PEL was a 100% subsidiary of the master fund, the judge made no reference to the corporate records of PEL itself. He seems to have taken that premise to be common ground between the parties. There was material before him to support that conclusion:

(1) On December 18th, 2006, Mr. Sean Gilbertson sent an email to Mr. Kalberer in the terms set out by the judge at para. 9.14 of his judgment. In that email he wrote:

> "As mentioned we incorporated a Cayman Island based limited company called Project Egg Limited ('SPV') which, based on advice from Clifford Chance, should acquire the portfolio of trademarks . . . The SPV is a 100% subsidiary of our fund 'Pallinghurst Resources Management L.P. . . .'"

It is plain that the judge took the view, understandably if I may say so, that the fund to which Mr. Sean Gilbertson referred as "our fund 'Pallinghurst Resources Management L.P.'" was the master fund: that that was his view can be seen from his addition to the passage of the email set out at para. 9.14 of his judgment, by way of annotation to those words, the comment "[i.e. the Master Fund]."

(2) Paragraph 1 of the first draft IA—sent by Mr. Sean Gilbertson to Mr. Kalberer (with copies to Mr. Kuznetsov and Mr. Vekselberg) on December 21st, 2006—recorded that—

> "the parties agree that the Fabergé brand name and associated rights (the 'Rights') be purchased forthwith by 'Project Egg Limited' (the 'SPV', presently a 100% subsidiary of Pallinghurst Resources Management L.P.) upon terms negotiated between Pallinghurst Resources LLP and Unilever . . ."

(3) The second draft IA—which (as the judge found at para. 9.33 of his judgment) was sent by Mr. Sean Gilbertson, on behalf of Mr. Gilbertson, to Mr. Kuznetsov and Mr. Kalberer (with a copy to Mr. Vekselberg) on December 26th, 2006—referred to PEL (Opco) managing and operating the Fabergé rights "as a portfolio company of the master fund pursuant to the Pallinghurst Agreements."

(4) The intended parties to the third draft IA—sent by Mr. Sean Gilbertson to Mr. Kalberer (with copies to Mr. Kuznetsov and Mr. Vekselberg) on December 30th, 2006—included "Project Egg Ltd. a 100% subsidiary of PRM." PRM was identified as "Pallinghurst Resources Management LP" (the master fund).

(5) The fourth draft IA—sent by Mr. Kalberer to Mr. Sean Gilbertson (with copies to Mr. Gilbertson and Mr. Kuznetsov) on January 2nd,

2007—also identified PEL (an intended party) as a 100% subsidiary of the master fund.

91 Nevertheless, it is, I think, pertinent to note that not all the material before the judge supported his assumption that it was common ground between the parties that, until the issue of the additional shares, PEL was a 100% subsidiary of the master fund. There was also material before him which was difficult to reconcile with that assumption:

(1) If, from the date of its incorporation, PEL were wholly owned by the master fund, it is surprising (i) that—as the judge found at para. 9.13 of his judgment—it was not until receipt of an email sent by Mr. Sean Gilbertson to Mr. Cheremykin (copied to Mr. Kuznetsov) on December 15th, 2006 that the Renova parties first became aware of its incorporation and intended purpose; and (ii) that neither of the directors of PEL (Mr. Sean Gilbertson and Mr. Andrew Willis) were nominees of the Renova parties.

(2) Mr. Sean Gilbertson's description of PEL in his email sent on December 18th, 2006 as a 100% subsidiary of "our fund Pallinghurst Resources Management L.P." is difficult to reconcile with Mr. Gilbertson's response to Mr. Kalberer's request—in an email sent to him (and to Mr. Sean Gilbertson) on December 21st, 2006—for confirmation as to who controlled PEL and how. As the judge recorded (at para. 9.24 of his judgment), Mr. Gilbertson responded to that request on the same day—in an email sent to Mr. Kalberer (and copied to Mr. Kuznetsov and Mr. Vekselberg)—in these terms:

> "In response to your questions in item 2, 100% of the equity in Project Egg Ltd is held by Pallinghurst Resources LP, and the directors are Sean and Andrew Willis, as we have previously advised you."

(3) Mr. Sean Gilbertson's description of PEL as a 100% subsidiary of Pallinghurst Resources Management LP is not easy to reconcile with the description of the party joined as "Guarantor" to the acquisition agreement dated December 22nd, 2006 (the SPA) as "Pallinghurst Resources LLP (Company Number 0C31585) having its registered office at 54 Jermyn Street, London . . ."

92 As to the third of those points, the judge recorded (at para. 9.26 of his judgment) that it had been agreed between Mr. Sean Gilbertson and Mr. Kalberer in the course of a telephone conversation on December 20th, 2006, that the guarantor of PEL's obligations under the SPA would be "Pallinghurst Resources Management LP." The judge addressed (at para. 9.27 of his judgment) the question whether Mr. Sean Gilbertson had, indeed, changed his intention in relation to the identity of the guarantor of PEL's obligations under the SPA, but accepted the explanation, recorded

in a letter from the Gilbertson parties' then solicitors, Clifford Chance, that Pallinghurst LLP had been named as guarantor "as a result of a clerical error." He said this (at para. 9.27):

> "[Mr. Sean Gilbertson] said in evidence that he did not believe that it made any practical difference for Pallinghurst LLP to be the guarantor rather than the Master Fund and that he did not point out the change to Mr. Kalberer or Mr. Kuznetsov at the time because he did not consider it to be a matter of relevance for them. Sean Gilbertson did not appear to recognise that signing the SPA in its incorrect form amounted to a change of intention on his part, namely that Pallinghurst LLP should be the guarantor rather than the Master Fund . . . The impression I got from his evidence was that Sean Gilbertson did not appreciate the significance of this change and the reason why it had been intended and agreed that the Master Fund should be the guarantor rather than a Gilbertson entity."

And he went on (at para. 9.28 of his judgment) to say this:

> "In his evidence, Mr. Gilbertson accepted that when he procured PEL, acting by Sean Gilbertson, to sign the SPA with Unilever on 22nd December 2006 he acquired the contractual entitlement to the Rights for the Master Fund and entities within the Pallinghurst Structure and not for himself personally . . . Furthermore, Mr. Gilbertson accepted that not only was it a subsidiary of the Master Fund (namely PEL) which contracted to purchase the Rights from Unilever but that Unilever must have considered that it was contracting to sell the Rights to PEL, ultimately for Renova money, and not to Mr. Gilbertson for Gilbertson money. Accordingly Unilever still required to see Renova money behind PEL and accordingly to have the Master Fund as guarantor. It was clearly a PEL/Master Fund/Pallinghurst Structure for their benefit; it was not a Gilbertson transaction for the Gilbertsons' benefit."

The judge must, as it seems to me, have treated the statement in Mr. Gilbertson's email of December 21st, 2006, that 100% of the equity in PEL was held "by Pallinghurst Resources LP" as a further example of "the clerical error" which had led to the inclusion of Pallinghurst LP, rather than the master fund, as the guarantor named as party to the SPA.

93 There was, if I may say so, obvious potential for confusion between "Pallinghurst Resources LLP" (the English limited partnership established by Mr. Gilbertson on October 27th, 2005 as an investment management vehicle, to which I have referred earlier in this judgment as "Pallinghurst LLP") and "Pallinghurst Resources Management LP" (the Cayman Islands exempt limited partnership, to which the parties referred as "the master fund"). Be that as it may and whatever the true position, there is no challenge on this appeal to the judge's assumption that it was common

ground that, until the issue of additional shares in January 2007, PEL was a wholly owned subsidiary of the master fund. In those circumstances, as it seems to me, it is not open to this court to question whether the judge was right to proceed on that basis.

94 It follows that I am satisfied that, whatever fiduciary duties may have been owed by Mr. Gilbertson to the company (or, more generally, to the Pallinghurst structure) in relation to Project Egg (as an investment project) under the terms of the letter agreement, the judge was correct to accept—and the Renova parties are correct to submit in this court—that, *prima facie*, Mr. Gilbertson owed fiduciary duties as a director of the company in relation to the assets of the entities (including the master fund and, from and after its incorporation on December 1st, 2006, PEL) which it controlled, and that, from and after the execution of the SPA on December 22nd, 2006, those assets included the contractual interest of PEL as purchaser of the Fabergé rights and, after completion of the purchase under the SPA on January 3rd, 2007, as owner of those rights. The further question for the judge—as he recognized—was whether the fiduciary duties which, *prima facie*, Mr. Gilbertson owed as a director of the company in that context were modified or attenuated so as to enable him to act in his own interests (or in the interests of the consortium) in relation to the master fund's ownership (through PEL) of the rights acquired under the SPA. It is to that question that I now turn.

***Whether, in the events which happened, the fiduciary duties which Mr. Gilbertson owed to the company in relation to Project Egg were modified or attenuated***

95 As I have said, the judge accepted (2012 (2) CILR 416, at para. 13) that the obligations of a director to the company might be modified so as to enable the director to act in his own interests or in the interests of another in relation to a particular matter, notwithstanding that those interests might conflict with the interests of the company in relation to that matter. Such a modification or attenuation, the judge accepted, might be found in the company's articles of association, in an agreement between the shareholders or (by clear implication) in the particular circumstances of the case. In the course of setting out the respective submissions of the parties, he observed (*ibid.*, at para. 25) that the Gilbertson parties relied principally upon the terms of the letter agreement. He held (*ibid.*, at para. 33) that there was nothing in the letter agreement which would entitle Mr. Gilbertson to take for himself a project which he had brought to the investment committee for consideration as an investment project of the master fund, which the investment committee had agreed to pursue, and which was being actively pursued. He went on to say this (*ibid.*, at para. 35):

"Even if Mr. Gilbertson may have been entitled, pursuant to the letter agreement, to withdraw his consent to or to veto proceeding with such an investment project, in my opinion it does not follow that he was entitled to take that investment project for himself without the informed consent of the company, the ultimate owner and controller of the master fund. At the very least, as long as proceeding with such an investment had the unanimous consent of the investment committee, Mr. Gilbertson was subject to the fiduciary duties which I have outlined in respect of that investment project. In my view, those duties on the part of Mr. Gilbertson as a director of the company were not attenuated by anything in the letter agreement or by implication from the surrounding circumstances."

96 The judge's conclusion that there was nothing in the letter agreement, or by implication from the surrounding circumstances, which would entitle Mr. Gilbertson to take for himself a project which he had brought to the investment committee is challenged by the Gilbertson parties in this court. It is said on their behalf that the judge erred in law and/or in fact in failing to hold that, on the evidence of context and circumstances which was before him at trial, Mr. Gilbertson was released from such fiduciary duties (if any) as he did owe to the company (or, more generally, to the Pallinghurst structure) in respect of Project Egg or the Fabergé brand or the Fabergé rights (meaning, respectively, the name Fabergé itself and the rights in that name) before he did anything that might otherwise have constituted a breach of fiduciary duty.

97 The context and circumstances (referred to in the memorandum of grounds of appeal as "the Context and Circumstances") which, it is said, ought to have led the judge to the conclusion Mr. Gilbertson was released from such fiduciary duties (if any) as he did owe to the company in respect of Project Egg included the dealings between the relevant parties in relation to the acquisition and/or exploitation of the Fabergé rights and the Fabergé brand. In particular, the context and circumstances included (i) "the veto by the Renova parties of the acquisition of those Rights for Project Egg as envisaged"; (ii) "the failure of the investment committee to approve pursuit by the master fund of any interest in the Fabergé Brand prior to the conclusion of the implementation agreement in accordance with the terms of the Agreement or Understanding"; and (iii) "the fact that Mr. Gilbertson's consent to Mr. Vekselberg's scheme for the acquisition of the Rights and the exploitation of the Brand was conditional on the parties entering into an implementation agreement and PEL being put in funds to complete the purchase of the rights." For convenience I will refer to those as "the veto point," "the mutual understanding point," and "the failure of condition point." In advancing the veto point, the Gilbertson parties rely upon what is said to be Mr. Vekselberg's refusal to fund the acquisition of the Fabergé rights and/or his insistence that, if he were to fund the

acquisition of those rights, the Fabergé brand would have to be held by one of his privately owned companies (Lamesa Arts Inc.) outside the Pallinghurst structure. The "Agreement or Understanding" was defined in the memorandum of grounds of appeal to mean "an oral agreement or understanding reached between Mr. Gilbertson and Mr. Vekselberg on or about December 21st, 2006, the terms and performance of which became a matter of dispute." In advancing the failure of condition point, the Gilbertson parties rely upon what is said to be "the failure of the Renova parties to honour the Agreement or Understanding."

(i) *The veto point*

98 It is submitted on behalf of the Gilbertson parties that Mr. Gilbertson owed no relevant fiduciary duties to the company (or, more generally, to the Pallinghurst structure) in respect of potential investment projects after December 20th, 2006. In support of that submission it is said, first, that any fiduciary duties that a member of the investment committee may have owed to a fund entity in respect of a potential investment project ceased once the project had been vetoed by the other member of the investment committee, and secondly, that—in the events which happened—Project Egg was the subject of such a veto by or on behalf of Mr. Kuznetsov.

99 In developing the first of those submissions—that such fiduciary duties as a member of the investment committee may have owed to a fund entity in respect of a potential investment project ceased once the project had been vetoed by the other member of the investment committee—it is accepted on behalf of the Gilbertson parties that a member of the investment committee could not divest himself of any fiduciary duty that he might otherwise have owed to a fund entity in respect of a potential investment project by vetoing it himself. But it is submitted that the position is different where the veto is exercised by the other member of the investment committee. There is no express restriction on a party to the letter agreement pursuing a project that has been vetoed by the other party, and there is no reason to read any such restriction into the letter agreement as a matter of business efficacy.

100 In developing the second of those submissions—that, in the events which happened, Project Egg was the subject of such a veto by or on behalf of Mr. Kuznetsov—it is said that Mr. Vekselberg's insistence (on December 20th, 2006 and thereafter) that he should own the Fabergé rights through a Lamesa company did amount to a veto of Project Egg. In particular it is said that, given that the letter agreement did not lay down any formalities in relation to the exercise of a veto, the expression by one member of the investment committee that he is willing to proceed with an investment project if, but only if, the terms can be improved in some way may or may not amount to a veto, and that whether it does amount to a veto turns on whether the project in the modified form proposed falls

within the scope of the potential investment project that the investment committee had agreed to explore.

101 In response to the submission that the judge ought to have held on the evidence that, before Mr. Gilbertson did anything that might otherwise have constituted a breach of such fiduciary duties (if any) as he did owe to the company (or, more generally, to the Pallinghurst structure) in respect of Project Egg and the acquisition of the Fabergé rights, he was released from such fiduciary duties by "the veto by the Renova parties of the acquisition of those Rights for Project Egg as envisaged," it is said on behalf of the Renova parties that the judge was correct to reach the conclusion (2012 (2) CILR 416, at para. 33) that he did. In particular, it is said that Mr. Gilbertson owed fiduciary duties to the company in relation to any potential investment project unless and until it was actually vetoed by Mr. Kuznetsov (on behalf of Renova) on the basis of full disclosure by Mr. Gilbertson. That, it is said, followed from the following propositions which had been advanced by Renova at the trial and which were relied upon in this court:

(1) The members of the investment committee could exercise their right of veto (or, more accurately, their right not to agree to proceed) in their own interests but that self-interest was not unconstrained. They could not exercise the veto for the purposes of allowing them to take, or compete for, the investment project for their own benefit. As I have said, the Gilbertson parties do not dissent from this proposition.

(2) If, before the Fabergé rights had been acquired by the Pallinghurst structure, Project Egg had been actively vetoed by one member of the investment committee (say, Mr. Kuznetsov) after full disclosure by the other member (say, Mr. Gilbertson), that other would have been free to pursue the opportunity to acquire the Fabergé rights in his own interests. But, unless and until Project Egg was actively vetoed, it remained a business opportunity of the Pallinghurst structure and both Mr. Gilbertson and Mr. Kuznetsov, as directors of the company, had a duty to pursue it in the interests of the Pallinghurst structure: neither was free to pursue the acquisition of the Fabergé rights in his own interests.

(3) Once the Fabergé rights had been acquired for the Pallinghurst structure—through any sub-structure under the company that the parties might agree—neither party was free to divert that asset or project or opportunity to himself or exploit it for his own benefit (whether by using the veto or otherwise); the exercise of a "veto" once the Fabergé rights had been acquired was limited to a refusal to agree the manner in which those rights were to be developed and exploited.

The Renova parties point out that, in the course of his oral evidence at trial, Mr. Gilbertson agreed with the second limb of the proposition numbered (2) above—that, unless or until one member of that investment

committee (say, Mr. Kuznetsov) had actively vetoed Project Egg, it remained a business opportunity of the Pallinghurst structure and the other member (say, Mr. Gilbertson) was not free to pursue that opportunity in his own interests.

102 The judge was not persuaded that either Mr. Kuznetsov or Mr. Gilbertson had vetoed Project Egg before January 3rd, 2007. In particular, he held (2012 (2) CILR 416, at para. 49) that—

> "in no sense could the requirements of Mr. Vekselberg be seen as a veto of the opportunity to exploit the economic benefit of the rights as an investment project of the master fund and the evidence is that Mr. Gilbertson did not see it or treat it that way either. There was no rejection of [Mr. Vekselberg's requirement] or refusal to consent to it by Mr. Gilbertson."

The Renova parties submit that the judge was correct to take that view.

103 In support of the submission that—

> "the simple point is that Project Egg was pursued as an investment project of the Pallinghurst structure throughout until Mr. Gilbertson's waking decision on January 1st, 2007 to divert it to himself and try to use it to extract from Mr. Vekselberg in excess of the US$38m. he had procured to be paid for it"—

it is said on behalf of the Renova parties to be clear from the evidence that:

(1) Project Egg was, from the outset, an investment project of the Pallinghurst structure: in May 2006, the investment committee was prepared to, and did, approve the making of a bid of US$20m. to acquire the Fabergé rights.

(2) When the price that Unilever required for the Fabergé rights rose above that which Renova would (or could) fund without a detailed business plan and analysis, it was accepted that Mr. Vekselberg might provide the funding privately but that the opportunity would still fall within the Pallinghurst structure. That possibility was discussed between the parties in July 2006 and it was not suggested that it would have the effect that Project Egg could be treated as vetoed. Indeed, as the judge found (2012 (2) CILR 416, at para. 36), the subsequent offer of US$30m. (to be funded by Mr. Vekselberg) had the approval of the investment committee.

(3) Had Mr. Gilbertson been minded to treat the message given by Mr. Kalberer to Mr. Sean Gilbertson in the course of the telephone conversation on December 20th, 2006 (to which the judge had referred at para. 9.16 of his judgment and which is described by the Gilbertson parties in their written submissions as the "not-pleasurable conversation")—that the

acquisition cost (US$38m.) would be provided by one of Mr. Vekselberg's companies on the basis that the Fabergé rights would be held outside the Pallinghurst structure (but that the economic benefits of those rights would be held within it)—as a veto by the investment committee he would have needed to make it clear to Renova that "the line had been crossed." He did not do so.

(4) After a number of email exchanges and telephone conversations on December 21st, 2006—including a telephone conversation between Mr. Gilbertson and Mr. Vekselberg—(i) Mr. Gilbertson sent an email to Mr. Vekselberg stating that he would trigger the "Unilever-Pallinghurst transaction to conclude the deal" so that PEL, "a Pallinghurst company, would be the owner of the Faberge brand" and that he would advise "as soon as you are officially the global 'Mr. Fabergé'"; and (ii) Mr. Gilbertson did as he had said he would do, in that he procured that PEL execute the SPA the next day.

(5) In an email sent to Mr. Vekselberg on December 23rd, 2006, Mr. Gilbertson wrote: "Pallinghurst is now the owner of the Fabergé brand . . . I congratulate you on this entrenchment of your interests in this revered brand name."

In those circumstances, it is said that it is impossible for Mr. Gilbertson to suggest that he was treating the change of plan on December 20th, 2006 as a veto by Renova, or to treat his own reaction to that change of plan as a veto by himself: on the contrary, he was proceeding, as Mr. Sean Gilbertson described the position to Mr. Kalberer in the email which he sent on January 1st, 2007, on the basis of "the Pallinghurst principles as already modified for Project Egg." If Mr. Gilbertson were free, after the "not-pleasurable conversation" on December 20th, 2006, to pursue the Fabergé rights for himself, then—in procuring PEL to execute the SPA on December 22nd, 2006 on behalf of the Pallinghurst structure (and not for his own personal benefit)—he must be taken to have waived any such right. His email of December 23rd, 2006 was "an unequivocal and outward manifestation" of Mr. Gilbertson's acceptance that, whatever right he might have had as a member of the investment committee to veto, or to treat Renova as having vetoed, Project Egg, he was proceeding on the basis that there had been no such veto and Project Egg remained an investment project.

104 In my view, the judge was correct to reject the veto point. For the reasons which he gave in his judgment—and for the reasons advanced on behalf of the Renova parties in this court—the evidence does not support the contention that Mr. Kuznetsov (or, more broadly, the Renova parties through Mr. Vekselberg or Mr. Kalberer) did anything which could be construed as a veto of Project Egg or that, at the relevant time, Mr. Gilbertson sought to treat anything done as having that effect.

(ii) *The mutual understanding point*

105 The judge referred (2012 (2) CILR 416, at para. 40) to the submission advanced on behalf of the Gilbertson parties that what had been said to Mr. Sean Gilbertson by Mr. Kalberer on December 20th, 2006, agreed (informally) between Mr. Gilbertson and Mr. Vekselberg in their telephone conversation on December 21st, 2006 and reflected in the draft implementation agreements which followed, did not involve the master fund at all but amounted to an entirely new and separate arrangement ("the Lamesa project") outside the Pallinghurst structure. The judge rejected that submission. The Gilbertson parties submit in this court that the judge was wrong to do so.

106 In support of their submission that, in the course of their telephone conversation on December 21st, 2006 (to which the judge referred at para. 9.25 of his judgment), Mr. Gilbertson and Mr. Vekselberg reached a mutual understanding ("the agreement or understanding") as to the acquisition, development and exploitation of the Fabergé rights and the Fabergé brand which constituted a new and separate arrangement outside the Pallinghurst structure (and in relation to which the master fund had no part), it is said on behalf of the Gilbertson parties that:

(1) The telephone conversation on December 21st, 2006 followed the earlier conversation (the "not-pleasurable conversation") between Mr. Gilbertson and Mr. Kalberer on December 20th, 2006 in which, as the judge found (at para. 9.16 of his judgment), the Gilbertson parties had learnt for the first time of Mr. Vekselberg's requirement that the Fabergé rights would be purchased by a Lamesa company.

(2) On learning of the "not-pleasurable conversation," Mr. Gilbertson felt that Mr. Vekselberg was acting unscrupulously. The Renova parties had, as he saw it, changed their position at the eleventh hour. He felt that he was entitled to take Project Egg for himself, but he also felt he had no option but to look to do a deal with Mr. Vekselberg. Reliance is placed on the following passage in his oral evidence at trial:

> "*Q.* Now, he [Mr. Vekselberg] says that his belief, at the time, was that you were negotiating the deal with Unilever, acting in the best interests of the Fund. And that's right. You were, weren't you?
>
> *A.* No, I was negotiating with Mr. Vekselberg directly as the two partners in the Letter Agreement.
>
> *Q.* It may be my fault. Let me ask the question again. You were negotiating this deal with Unilever and, in doing so, acting or purporting to act in the best interests of the Fund.

> *A.* (Pause) The deal with Unilever had reached a certain stage. The lawyers were sitting there ready to sign. It was ongoing. However, the fundamental agreement between me and Viktor Vekselberg was in . . . had been breached. I needed to establish from him that we could go forward. I was discussing with Viktor not as representing a fund or representing anything else; I was discussing with Viktor as the partner against his being a partner in the Letter Agreement. Viktor, we are the counterparties. What are we going to do?"

(3) Evidence of what was said in the conversation on December 21st, 2006 is found in the email—set out by the judge in para. 9.25 of his judgment (and earlier in this judgment)—which Mr. Gilbertson sent to Mr. Vekselberg shortly after it had taken place.

(4) The "deal" between Mr. Vekselberg and Mr. Gilbertson was made between the two of them. Neither will have thought that it was made under the letter agreement; neither will have thought it was made on behalf of the company or the master fund. Both regarded themselves as the real players, and both saw the letter agreement and the Pallinghurst structure from that perspective.

(5) The judge seems to have assumed (as appears from 2012 (2) CILR 416, at para. 45) that the agreement or understanding was to be treated as an act of the investment committee and that, as a result of the agreement or understanding, Mr. Gilbertson is to be taken to have consented to the Lamesa project being treated as a potential investment project of the master fund. Yet none of this will have been dealt with expressly in the conversation between Mr. Gilbertson and Mr. Vekselberg and it is hard to see on what basis it could be implied.

(6) In the circumstances that Unilever was pressing for the SPA to be executed, Mr. Gilbertson had to decide what to do. In his email to Mr. Vekselberg, sent shortly after their telephone conversation on December 21st, 2006, Mr. Gilbertson recorded that he had received an "assurance" from Mr. Vekselberg and that he, Mr. Gilbertson, would work closely with Mr. Vekselberg's team to agree a structure that suited Mr. Vekselberg's purposes, thereby acknowledging that he did not have a binding commitment from Mr. Vekselberg and that he would be flexible about the structure of the deal that remained to be worked out. In effect, he was seeking to reassure Mr. Vekselberg that there was nothing sinister about the use of PEL, and that "we can still agree whatever we want to agree."

It is said that, taking Mr. Gilbertson's evidence as a whole, it is clear that, although after December 21st, 2006 he thought he was entitled to pursue Project Egg for himself, it never occurred to him to do so in that, until January 3rd, 2007, he was seeking to come to an agreement with Mr. Vekselberg.

107 The Gilbertson parties submit that, in reaching the conclusion that he did in relation to the mutual understanding point—that is to say, in rejecting their contention that the agreement and understanding amounted to an entirely new and separate arrangement outside the Pallinghurst structure—the judge erred in that he failed to consider the significance of the difference between Project Egg and the Lamesa project. In particular, it is said the judge failed to appreciate that the effect of the agreement or understanding was that under the Lamesa project, what was described as "the Pallinghurst team" (comprising Mr. Gilbertson, Mr. Sean Gilbertson and the two employees of Pallinghurst LLP, namely Mr. Willis and Mr. Priyank Thapliyal, who Mr. Gilbertson intended would be involved in the actual management of the Fabergé rights)—rather than the Pallinghurst structure—would enjoy the economic benefit of developing, exploiting and managing those rights. It is said that, had the judge appreciated that, under the Lamesa project, the Pallinghurst team—rather than the Pallinghurst structure—was to enjoy the economic benefit of developing, exploiting and managing the Fabergé rights, he would have held that, from and after December 21st, 2006, "the discussions were simply as between Mr. Vekselberg and his people on the one hand and Mr. Gilbertson and his people on the other hand"; that the entities within the Pallinghurst structure had no interest in the Fabergé rights, and that, therefore, Mr. Gilbertson owed those entities no fiduciary duties.

108 In response to the mutual understanding point, it is submitted on behalf of the Renova parties that, properly understood, the agreement or understanding did not have the effect that it was the Pallinghurst team—and not the Pallinghurst structure—that would benefit from the acquisition of the Fabergé rights. It is said that the distinction between "Pallinghurst team" and "Pallinghurst structure"—and the purpose for which it was advanced—was not only a new point introduced at trial but was wholly inconsistent with the evidence as to how Mr. Gilbertson himself saw the position at the time. The Renova parties point out that, although in the email which he sent to Mr. Vekselberg on December 23rd, 2006 (which the judge set out at para. 9.30 of his judgment), Mr. Gilbertson had referred to the Lamesa project in these terms:

> "*Mr Kuznetsov and I have discussed arrangements to transfer 100% of the ownership of the brand to one of your companies, and I confirm to you my willingness to do so against binding commitments that the Pallinghurst team will retain all of the economic benefits and management rights that it would have under Pallinghurst's agreements with Renova …*" [Emphasis in original.]

He accepted in his oral evidence at trial (transcript, May 4th, 2012, p.33, ll. 5–24) that the reference to "the Pallinghurst team" in that context was to the Pallinghurst structure. In that respect, his oral evidence was consistent with his pleaded case and his written evidence, which were to

the effect that his intention at the time of the agreement and understanding was that the Pallinghurst structure would retain the economic benefit of the Fabergé rights. Further, it is said that it was clear that all parties understood that the way that the Pallinghurst team—defined in the draft IAs to mean the Gilbertsons and the individuals who worked for them—would be rewarded was by the economic benefits of the Fabergé rights being held in the Pallinghurst structure: the "Pallinghurst Team" would be rewarded through their limited partnership interest in the GPLP.

109 At section 14 of his judgment, the judge addressed, and rejected, the submission that the effect of the agreement or understanding was that the Pallinghurst team—rather than the Pallinghurst structure—would enjoy the economic benefit of developing, exploiting and managing the Fabergé rights. He observed (2012 (2) CILR 416, at para. 41) that the "purported distinction between the so-called 'Pallinghurst team' and the management under the Pallinghurst structure and letter agreement" had not been raised by the Gilbertson parties in their pleadings, their written evidence or their written opening submissions. He pointed out (*ibid.*, at para. 42) that Mr. Gilbertson, in his affidavit of January 29th, 2009, had sworn that he—

> "managed to secure the contract for the purchase of the rights for the benefit of the master fund; simultaneously however, I continued to explore with Mr. Vekselberg the possibility of an arrangement whereby ownership of the rights might be transferred to one of Mr. Vekselberg's entities outside the Pallinghurst structure, but with *the Pallinghurst structure retaining the economic and management benefits and entitlements that we had hitherto envisaged that it would have*," [Emphasis in original]

and that, in the same affidavit, Mr. Gilbertson, in referring to the ownership of the Fabergé rights by one of Mr. Vekselberg's companies, had added the qualification "provided that the rights of the Pallinghurst Structure (or what was referred to as 'Pallinghurst Team') were protected"; so equating the "Pallinghurst Team" with the Pallinghurst structure. The judge went on to observe that the case that the Pallinghurst team, rather than the Pallinghurst structure, would enjoy the economic benefit of developing, exploiting and managing the Fabergé rights—which, as he said, the Gilbertson parties sought to advance for the first time at trial—was contradicted by the evidence given on behalf of the Renova parties. Mr. Vekselberg (he said) was adamant that his agreement with Mr. Gilbertson was that, while one of his personal companies would own the title to the Fabergé rights, the economic benefit of developing, exploiting and managing those rights would remain with the master fund within the Pallinghurst structure, and the evidence of Mr. Kuznetsov and Mr. Kalberer was to the same effect. There was no intention or suggestion that the economic benefits of managing the Fabergé rights would be outside the Pallinghurst structure or the Pallinghurst agreements; those benefits

23-01165-mew Doc 67-2 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (1) Pg 89 of 125



were to remain with the management team headed by Mr. Gilbertson as provided by the letter agreement and through the Pallinghurst structure pursuant to the Pallinghurst agreements as always intended.

110 The judge found (*ibid.*, at para. 42) that, after December 20th, 2006, Mr. Gilbertson clearly understood that the economic benefits and the management of the Fabergé rights were intended to remain with the master fund (as they would have done under the previous arrangements), and that, in practical terms, the only change to the previous structure which Mr. Vekselberg was requiring was that the title to the Fabergé brand itself would be owned outside the Pallinghurst structure. In those circumstances, the judge concluded (*ibid.*) that "the suggested distinction between the Pallinghust team on the one hand and the Pallinghust structure on the other hand, which was first made during the trial, was not, in my view, justified or valid."

111 In my view, the judge was correct to reject the mutual understanding point. For the reasons which he gave in his judgment—and for the reasons advanced on behalf of the Renova parties in this court—the evidence does not support the contention that what had been said to Mr. Sean Gilbertson by Mr. Kalberer on December 20th, 2006, agreed (informally) between Mr. Gilbertson and Mr. Vekselberg in their telephone conversation on December 21st, 2006, and reflected in the draft implementation agreements which followed, did not involve the master fund at all but amounted to an entirely new and separate arrangement outside the Pallinghurst structure.

(iii) *The failure of condition point*

112 At the section of his judgment starting at 2012 (2) CILR 416, at para. 46, the judge addressed the question whether the fiduciary duties which (as he had held) Mr. Gilbertson owed to the company (and, more generally to the Pallinghurst structure) in relation to Project Egg before the execution of the SPA between PEL and Unilever on December 22nd, 2006 were affected by the agreement and understanding. He recorded (*ibid.*) that Mr. Gilbertson had suggested, in the course of his oral evidence at trial, that—notwithstanding his agreement with Mr. Vekselberg on December 21st, 2006 that PEL would enter into the SPA with Unilever on the following day (and so become the contractual purchaser of the Fabergé rights)—the effect of the understanding or agreement was that if Mr. Vekselberg "walked away from our deal," he (Mr. Gilbertson) could take whatever steps he thought fit to acquire those rights for his own benefit. He went on (*ibid.*, at para. 50) to explain that, on January 1st, 2007, Mr. Gilbertson had decided to proceed to secure the Fabergé brand for himself with the assistance of his consortium and thereafter to "negotiate with the Russians from a position of strength." This, the judge said, meant that the Fabergé brand would be paid for by Mr. Gilbertson and his consortium

and owned by them in all respects and not in any way by the master fund or through the Pallinghurst structure. He pointed out (*ibid.*) that "the consequence of that was that if further negotiations with Mr. Vekselberg then failed, Mr. Gilbertson and his consortium would keep the rights, as indeed happened."

113 The suggestion which Mr. Gilbertson had made in his evidence at trial—that, notwithstanding his agreement with Mr. Vekselberg that PEL would enter into the SPA with Unilever, the effect of the understanding or agreement was that "if Mr. Vekselberg walked away from our deal" he (Mr. Gilbertson) could take whatever steps he thought fit to acquire those rights for his own benefit—was advanced on his behalf as a submission in this court.

114 The response of the Renova parties to that submission is twofold: it is said that (i) the submission as to the effect of the agreement and understanding is not supported by the evidence; and (ii) in any event, at the time that Mr. Gilbertson took the steps that he did to acquire the Fabergé rights for his own benefit, Mr. Vekselberg had not "walked away from the deal."

115 As I have said, the judge found that Mr. Gilbertson decided that PEL would acquire the Fabergé rights from Unilever by entering into the SPA as a result of his telephone conversation with Mr. Vekselberg on December 21st, 2006. The basis upon which he reached that decision appears from the email which he sent to Mr. Vekselberg (with copies to Mr. Kuznetsov and Mr. Kalberer) later on that day. In that email (the terms of which the judge set out at para. 9.25 of his judgment), Mr. Gilbertson wrote:

> "Acting on the assurances that you gave me during this evening's telephone conversation, namely that you want me to buy the brand on the basis of the arrangements that we have established between us over the past many months, I will therefore now trigger the Unilever-Pallinghurst transaction to conclude the deal. Project Egg Ltd, a Pallinghurst company, will be the owner of the Fabergé brand. I confirm that I shall work closely with your team to conclude payment and to achieve a structure that suits your needs . . ."

There is nothing in that email to support the contention that, if it proved impossible "to conclude payment and achieve a structure that suits your needs," the effect of the agreement or understanding (arising out of "the assurances that you gave me during this evening's telephone conversation") was that Mr. Gilbertson would be entitled to take whatever steps he thought fit to acquire the Fabergé rights for his own benefit; *a fortiori*, nothing to support the contention that Mr. Gilbertson would be entitled to procure the issue of shares by PEL to Autumn and the other members of his (then undisclosed) consortium so as to deprive the master fund of its

100% ownership of PEL. Nor was there any other evidence to support those contentions. Further:

(1) Mr. Gilbertson accepted in evidence (as the judge found at para. 9.28 of his judgment) that in "no sense was PEL acting as his own nominee or agent when entering into the contract for the Rights" and that "it was clearly a PEL/Master Fund/Pallinghurst structure for their benefit; it was not a Gilbertson transaction for the Gilbertsons' benefit."

(2) Mr. Gilbertson knew very well (as the judge found at 2012 (2) CILR 416, at para. 55) that what he was doing—in pursuing arrangements for Autumn and the other members of the consortium to fund the purchase of the Fabergé rights through PEL and procuring PEL to issue 100 new shares to them without informing Mr. Vekselberg, Mr. Kuznetsov or Mr. Kalberer—was "inappropriate and wrong," and that Mr. Vekselberg and the Renova parties would justifiably consider it to be contrary to the agreement (the agreement or understanding) that had been reached on December 21st, 2006.

116 Nor was there evidence to support the contention that, at the time that Mr. Gilbertson took the steps that he did to acquire the Fabergé rights for his own benefit, Mr. Vekselberg had "walked away from the deal"; in the sense that he had abandoned the agreement (the agreement or understanding) that had been reached on December 21st, 2006. The agreement or understanding required that Mr. Gilbertson (or Mr. Sean Gilbertson on his behalf) should work with Mr. Kuznetsov and Mr. Kalberer (as members of Mr. Vekselberg's team) "to achieve a structure that suits your [Mr. Vekselberg's] needs." Those needs included the transfer of the Fabergé brand to a Lamesa company on terms that the economic benefits of developing, managing and exploiting the Fabergé rights should be enjoyed by the Pallinghurst structure (through the master fund). In section 9 of his judgment, the judge described the negotiations—and the exchange of the first, second, third and fourth draft IAs—which took place between December 21st, 2006 and January 2nd, 2007. He found nothing to suggest that the negotiations had stalled or that they had identified a "deal breaker." At para. 9.47, the judge set out the terms of the email sent by Mr. Gilbertson to Mr. Vekselberg (with copies to Mr. Kuznetsov and Mr. Kalberer) on January 2nd, 2007 in which—after stating that, although he had been trying, ever since PEL bought the Fabergé brand on the evening of December 21st, "to achieve an agreement . . . that would satisfy the basic understanding that you and I struck that evening," it had become clear to him "today" that there was little likelihood that "we could reach an agreement in time that would satisfy the requirements of both Parties"—Mr. Gilbertson informed Mr. Vekselberg and his team that—

> "I could not take the risk that payment would not be made under Pallinghurst's Sale and Purchase agreement with Unilever. Accordingly I have triggered alternative arrangements, so that payment has now been made, and Pallinghurst now owns the Fabergé brand."

As I have said, the judge observed, first, that Mr. Gilbertson's statement that it became clear to him on that day, January 2nd, 2007, "that there was little likelihood of reaching an agreement in time," was "not strictly correct" in that, as the judge pointed out, Mr. Gilbertson's evidence was that it was when he first awoke the previous day, January 1st, 2007, that he decided that agreement would not be reached in time "and that he would therefore implement and did implement his strategy of purchasing the Rights himself with his consortium, as he had already been putting in place before then." And secondly, that it could not have been correct that (as Mr. Gilbertson had suggested in his email) it was the proposals contained in the fourth draft IA, received by him that morning, that had caused him to "trigger alternative arrangements"—in that Mr. Gilbertson's evidence was that he decided to and did proceed with the alternative financing arrangements "early the previous morning, before the Fourth draft IA had been sent out." Further, the judge recorded (2012 (2) CILR 416, at para. 46) that Mr. Gilbertson's evidence was that it was in mid-January 2007 that Mr. Vekselberg "walked away" from their "deal," and (*ibid.*, at para. 54) that Mr. Kuznetsov's "unchallenged evidence" was that "only one or two more rounds of negotiation following the fourth draft IA would have resulted in agreement." As to the need to complete the purchase of the Fabergé rights on January 3rd, 2007 under the terms of the SPA, the judge said this (*ibid.*):

> "There was no provision in the SPA with Unilever making time of the essence, and before the January 3rd completion date was agreed it was made clear on behalf of Unilever that if that date were not convenient, Sean Gilbertson, who was negotiating with them, should let them know. That was never done . . . Although [Mr. Kuznetsov's] evidence that agreement could have been achieved by the completion date of January 3rd was clearly over-optimistic, it does seem probable that only a few more days would have sufficed. The evidence suggested to me that a request for such a short extension would have been sympathetically considered by Unilever."

117 In my view, the judge was correct to reject the failure of condition point. The evidence supports neither the contention that the effect of the agreement and understanding was that "if Mr. Vekselberg walked away from our deal," Mr. Gilbertson could take whatever steps he thought fit to acquire the Fabergé rights for his own benefit, nor the contention that, at the time that Mr. Gilbertson took the steps that he did to acquire the Fabergé rights for his own benefit, Mr. Vekselberg had "walked away from the deal."

***Whether Mr. Gilbertson acted in breach of the fiduciary duties which (as the judge held) he owed to the company or the master fund***

118 It is submitted on behalf of the Renova parties that, once the contract to purchase the Fabergé rights had been executed on December 22nd, 2006, Project Egg was no longer simply an investment opportunity: for the reasons that have been explained, the effect of the SPA was that the master fund (through its 100% ownership of PEL) became the contractual purchaser of those rights. The fiduciary duties owed by Mr. Gilbertson, as a director of the company, included duties to preserve and exploit that asset for the benefit of the master fund (and, more generally, for the Pallinghurst structure).

119 It is submitted, further, that Mr. Gilbertson accepted, in the course of his oral evidence at trial, that—whatever might have been the position prior to the execution of the SPA by PEL—that asset belonged to the Pallinghurst structure through the master fund's 100% shareholding of PEL: he accepted that the execution of the SPA was "a crossing of the Rubicon" because the Pallinghurst structure had "bought the Egg." The asset did not belong to Mr. Gilbertson: it was not his to do with as he pleased. Any suggestion that, in acquiring the right to purchase the Fabergé rights, PEL was somehow acting as Mr. Gilbertson's agent, trustee or nominee was repeatedly and unequivocally denied by Mr. Gilbertson in his evidence. In those circumstances it is impossible to contend (as Mr. Gilbertson did in his amended defence and counterclaim) that "the company's interest in PEL was of no or no substantial value as long as PEL merely held the legal interest in the [Unilever SPA] subject to Mr. Gilbertson's beneficial interest in it"; at no stage did Mr. Gilbertson have a beneficial interest in the SPA.

120 It is submitted that it is also impossible for the Gilbertson parties to contend that, in the event that the agreement or understanding reached on December 21st, 2006 did not lead to an agreement with Mr. Vekselberg (or with Lamesa), it was open to Mr. Gilbertson to take the benefit of the SPA for himself. On a true analysis, if no implementation agreement could be agreed, the default position was that it would be open to Mr. Gilbertson to attempt to procure that PEL borrowed funds, on terms acceptable to Renova, with which to fund the completion payment. If he could not procure borrowed funds on terms which were acceptable to Renova, then (*prima facie*, at least) PEL would be unable to complete the purchase of the Fabergé rights under the SPA. In those circumstances, if Mr. Gilbertson wished to acquire the Fabergé rights for himself—and could assert that Renova's refusal to permit borrowing was a veto of Project Egg—it would be open to him to seek a new purchase contract from Unilever.

121 It is said on behalf of the Renova parties that, rather than taking that course—which would or might give rise to the risk that he would be in a competition with Mr. Vekselberg for the Fabergé rights, which he would lose—Mr. Gilbertson chose "to stultify Mr. Vekselberg in a fake round of negotiations for two days on and after 1 January 2007 while he raised money from his funding consortium, completed the SPA and had the new shares in PEL issued to the funders, thus achieving his goal of positioning himself to 'negotiate with the Russians from a position of strength.'" But that goal was achieved at the expense of the Pallinghurst structure: it was not a goal which could be pursued bona fide in the best interests of the Pallinghurst structure.

122 In those circumstances, it is said, Mr. Gilbertson acted in breach of the fiduciary duties which he owed to the company and the master fund by procuring that his consortium (of which Autumn was a 25% member) acquire 99% ownership of PEL. Indeed, it is said that "Autumn all but concedes that, if Mr. Gilbertson owed the company or GPLP or the master fund duties which precluded him for having regard to his own interests, then he breached those duties."

123 The judge accepted that, in acting as he did, Mr. Gilbertson was in breach of the fiduciary duties which he owed to the company and the master fund. The Gilbertson parties challenge that conclusion. It is said on their behalf that the judge erred in law in that:

(1) There was no, or no sufficient, evidence that Mr. Gilbertson caused or was party to or was aware of the issue of the PEL shares (whether on January 3rd, 2007 or a later date) and, in particular, the judge ignored the failure of the Renova parties to put to Mr. Gilbertson, at trial, any allegation that he did cause, or was party to, or was aware of the issue of the PEL shares.

(2) The judge assessed Mr. Gilbertson's conduct by reference to a notional set of facts based on his finding that the PEL shares were issued "with effect from" January 3rd, 2007; had he directed himself properly, the judge should have assessed Mr. Gilbertson's conduct by reference to the facts as at the later date (January 19th, 2007) on which the PEL shares were actually issued.

(3) If the judge had assessed Mr. Gilbertson's conduct on the basis that the PEL shares were issued on that later date, he should have found that Mr. Gilbertson was not in breach of any fiduciary duties having regard to the dealings between the parties in the period after January 3rd, 2007 and to the fact that no entity within the Pallinghurst structure was involved in the proposals that the parties were entertaining, in particular (i) he should have had regard to the basis on which the parties were then negotiating, as evidenced by the proposal which Mr. Vekselberg and Mr. Kuznetsov made to Mr. Gilbertson on January 18th, 2007, and (ii) he should have

found on the evidence (a) that the parties were proceeding on the basis that the master fund had no separate interest in Fabergé rights, (b) that Mr. Kuznetsov, in particular, was negotiating on that basis, and (c) that Mr. Gilbertson was entitled to do so also.

124 In my view there is no substance in any of those points. On the facts found by the judge it is, if I may say so, fanciful to suggest that the decision to issue the 100 new PEL shares in January 2007—although implemented by Mr. Sean Gilbertson and Mr. Andrew Willis (as the directors of PEL)—was not a decision taken by Mr. Gilbertson as a necessary element in his scheme to obtain control of the Fabergé rights (by diverting effective ownership of PEL from the master fund to his consortium) in order, thereafter, to "negotiate with the Russians from a position of strength." When Mr. Gilbertson wrote in the email which he sent to Mr. Vekselberg on the evening of January 2nd, 2007 (with copies to Mr. Kuznetsov and Mr. Kalberer)—the terms of which were set out by the judge at para. 9.47 of his judgment—that "I have triggered alternative arrangements . . . and Pallinghurst now owns the Fabergé brand" he was not suggesting that the "alternative arrangements" which he had made had triggered the result that the ownership of Fabergé rights had passed to the master fund as part of the Pallinghurst structure: he was asserting that the ownership of those rights had passed to "Pallinghurst" companies which he controlled. And that could only have occurred because he and the members of his consortium had taken control of PEL. It was the issue of the 100 new PEL shares which had that effect. As I have said, I take the view that the judge was correct to conclude that those shares were issued on January 3rd, 2007 (as recorded in the register of members) but, as the judge appreciated, his conclusion that the new shares were issued on January 3rd, 2007, rather than on January 19th, 2007 (or on some later date) is not of significance in relation to his conclusion that Mr. Gilbertson was in breach of his fiduciary duties. In that context, the significant date is the date on which Mr. Gilbertson took the decision (which the directors of PEL could be relied upon to implement) that the new PEL shares should be issued.

125 For the reasons which I have set out in this section of my judgment, I am satisfied that the judge was correct to hold (2012 (2) CILR 416, at para. 57) that Mr. Gilbertson owed the duties of a fiduciary as a director of the company throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007.

**Was the judge wrong to hold that the conduct of the Renova parties was not such as to disentitle Renova from any relief, having regard to the rule in *Nurcombe* v. *Nurcombe*?**

126 It is said on behalf of the Gilbertson parties that, had the judge directed himself properly, he should have held that the conduct of the

Renova parties rendered it unconscionable to grant Renova the relief sought in these proceedings (or any relief), and that he should have applied the rule in *Nurcombe* v. *Nurcombe* (28) to refuse relief.

127 The so-called rule in *Nurcombe* v. *Nurcombe* derives from a passage in the judgment of Browne-Wilkinson, L.J. in that case. After referring to the earlier decision of the Court of Appeal of England and Wales in *Towers* v. *African Tug Co.* (37), he said this ([1985] 1 W.L.R. at 378–379):

> "In my judgment, that case established that behaviour by the minority shareholder, which, in the eyes of equity, would render it unjust to allow a claim brought by the company at his instance to succeed, provides a defence to a minority shareholder's action. In practice, this means that equitable defences which would have been open to defendants in an action brought by the minority shareholder personally (if the cause of action had been vested in him) would also provide a defence to those defendants in a minority shareholder's action brought by him.
>
> . . . Since the wrong complained of is a wrong to the company, not to the shareholder, in the ordinary way the only competent plaintiff in an action to redress the wrong would be the company itself. But, where such a technicality would lead to manifest injustice, the courts of equity permitted a person interested to bring an action to enforce the company's claim. The case is analogous to that in which equity permits a beneficiary under a trust to sue as plaintiff to enforce a legal right vested in trustees (which right the trustees will not themselves enforce), the trustees being joined as defendants. Since the bringing of such an action requires the exercise of the equitable Jurisdiction of the court on the grounds that the interests of justice require it, the court will not allow such an action to be used in an inequitable manner so as to produce an injustice. The *Towers* case [1904] 1 Ch. 558 shows that 'all personal objections against the individual plaintiff' must be considered. It is for this reason that, in my judgment, a court of equity will not allow a minority shareholder to succeed in a minority shareholder's action where there are equitable defences which, as between the shareholder personally and the defendants, the defendants could properly rely on in equity, eg, the duty to elect between conflicting rights, acquiescence, or laches of the minority shareholders."

Lawton, L.J., who agreed with Browne-Wilkinson, L.J., commented (*ibid.*, at 376) that—

> "since the procedural device has evolved so that justice can be done for the benefit of the company, whoever comes forward to start the proceedings must be doing so for the benefit of the company and not for some other purpose."

And, in *Barrett* v. *Duckett* (6), Peter Gibson, L.J. observed that an action brought for an ulterior purpose would not be allowed to continue.

128 In the course of his ruling on April 14th, 2009, the judge had considered the question whether that principle should lead him to refuse Renova the leave to pursue these derivative proceedings which it had sought by its summons of July 29th, 2008. In a section of that ruling, under the heading "Conduct of the plaintiff," he had said this (2009 CILR 268, at paras. 42–43):

> "42 Mr. Gilbertson also contends that the conduct of the Renova Group renders it inequitable to grant leave to the plaintiff, a member of that group, to continue these proceedings. As explained above, Mr. Gilbertson argues that the position taken by the plaintiff in these proceedings (that Mr. Gilbertson diverted the rights away from the Pallinghurst structure) is inconsistent with the position taken by Renova Holding in 2007, and particularly in its letter of May 25th, 2007. He says that this *volte face* demonstrates that the plaintiff has not brought this action *bona fide* for the benefit of the company or the Pallinghurst structure.
>
> 43 It is said also on behalf of Mr. Gilbertson that the conduct of Mr. Vekselberg as the ultimate principal of the Renova Group and thus of the plaintiff, in seeking to procure the transfer of the ownership of the rights outside the Pallinghurst structure, itself resulted in breaches of duty to the company by Mr. Kuznetsov, Mr. Gilbertson's fellow director. It was contended that it was Mr. Kuznetsov who acted in breach of his fiduciary duties to the company by pursuing Mr. Vekselberg's personal agenda rather than the best interests of the company and the Pallinghurst structure. It was submitted that the Renova Group have been the authors of their own misfortune by insisting that the rights should be owned outside the Pallinghurst structure and that a court of equity should not assist a party who has brought about the very matters complained about."

And, after referring to Browne-Wilkinson, L.J.'s observations in *Nurcombe*, the judge went on (*ibid.*, at paras. 44–47):

> "The defendant argues this conduct by the plaintiff shareholder or those behind it renders it inequitable to allow a claim brought by it on behalf of the company to proceed.
>
> 45 The plaintiff argues that the contentions on behalf of Mr. Gilbertson are a misinterpretation of the facts and that it was always intended by the plaintiff and the Renova Group that the economic benefit and management of the rights should remain within the Pallinghurst structure and that it was the actions of Mr. Gilbertson which diverted that economic benefit and control away from the

Pallinghurst structure, and thus the company, in breach of his duties to the company. What is more, the plaintiff says, the Gilbertsons clearly initially agreed with this proposal and entered into negotiations about the precise terms of a draft agreement giving effect to it. There was no suggestion by them at the time that it was not in the best interests of the Pallinghurst structure or of the company, or that Mr. Gilbertson was somehow released from his duties as a director of the company as a result. Indeed, there was nothing to indicate, until Mr. Gilbertson's email of January 2nd, 2007, that everything was not proceeding on this basis and that the Pallinghurst structure, with the company at its head, would not shortly be the owner of the economic benefit and the manager of the rights.

46 The plaintiff contends that Mr. Gilbertson's real intention from a much earlier stage was to acquire the rights himself and, as he said himself in an email, to 'warehouse' them with a view to then negotiating about the possible return of the rights to the Pallinghurst structure from a position of strength. As far as the letter of May 25th, 2007 is concerned, the plaintiff argued that it is simply not relevant in determining the true position which must be derived from the contemporary communications documentation and actions of the parties and not ex post facto at a time when the Renova Group were negotiating months later to resolve a situation caused by Mr. Gilbertson's breaches of duty. The plaintiff contends that the letter does not provide an equitable defence to Mr. Gilbertson of the kind envisaged in *Nurcombe* . . . and that what matters is the conduct of the parties at the relevant time. The plaintiff says the case it pleads represents its position as it was at the material time.

47 In my view, the letter of May 25th, 2007, and indeed, the comments of Renova Holding in March 2007, while no doubt material for cross-examination if the case were to proceed, do not constitute conduct of a kind which, at least at this stage and for this purpose, sufficiently impacts on the *bona fides* and equity of the plaintiff's case such as to satisfy me that in the light of it the plaintiff should not have leave to continue the action."

129 Nevertheless, as the judge explained (2012 (2) CILR 416, at para. 67) he rejected the submission (advanced on behalf of the Renova parties) that the issue was not open to reconsideration at the trial. He said this (*ibid.*):

". . . I am conscious of the fact that at the leave stage in the present case, while affidavit evidence had been filed and was relied upon, the court had obviously not seen or heard all the evidence, written and oral, of the witnesses at trial. Accordingly, I have considered whether in light of all that evidence the conduct of the plaintiff was such as to

> provide an equitable defence to the action as submitted on behalf of the Gilbertson parties."

130 The judge referred (*ibid.*, at para. 68) to the features listed by counsel for the Gilbertson parties in their written opening submissions which, it was said, would make it unjust for Renova to succeed in this action. But, he said, "most of the matters on which they rely are inevitably based on their own interpretation of particular facts or circumstances before any evidence was heard and much of which, in the event, I did not accept," and that "furthermore, some of the matters on which they relied were not put to the Renova parties' witnesses in cross-examination." He went on to address two further points which had not, I think, been advanced at the 2009 hearing: first, the submission that Renova's claims against the Gilbertson parties were of no commercial benefit to the Renova parties and were motivated solely by malice towards Mr. Gilbertson; and secondly, the submission that, as a result of his broader relationship with Mr. Vekselberg through his employment at SUAL and his financial expectations, both consequent upon that employment and pursuant to the letter agreement, Mr. Gilbertson was under considerable pressure in dealing with Mr. Vekselberg and the Renova parties generally. In relation to the first of those points, the judge said this (*ibid.*, at paras. 70 and 73):

> "70 . . . it was never put to Mr. Vekselberg that the present proceedings were solely motivated by malice on his part. While it was clear to me that Mr. Vekselberg was upset and annoyed and felt he had been wronged by what he described as Mr. Gilbertson's 'violation' of the agreement which he said he had made with him, it does not seem to me that it can therefore inevitably be inferred that Mr. Vekselberg had procured the present proceedings to be brought solely out of malice. No doubt many plaintiffs are aggrieved and motivated by what they see as the wrong done to them by the defendant. It does not follow, in my view, that their motives in bringing court proceedings are therefore necessarily inequitable such that their claims should be refused on that ground. In the present case, the plaintiff has pleaded and put forward a perfectly arguable case on the merits of its claim and also in relation to loss . . .
>
> 73 Although Mr. Vekselberg was annoyed and upset as a result of Mr. Gilbertson's covert actions, it does not follow, in my opinion, that these proceedings were actuated by malice. In fact Mr. Vekselberg is anyway not the plaintiff. Even if the reality is that, as the principal owner and chairman of the group of which the plaintiff is a member, he procured the plaintiff to bring these proceedings, a circumstance which was never put to Mr. Vekselberg in cross-examination, it does not follow that the plaintiff's conduct in this case is inequitable in the *Nurcombe* v. *Nurcombe* . . . sense so as to

provide a defence to the plaintiff's claims. I therefore reject the submissions of the Gilbertson parties in that respect."

And, in relation to the second of those points, the judge said this (*ibid.*, at para. 72):

"Mr. Gilbertson clearly knew Mr. Vekselberg well. He knew what Mr. Vekselberg's expectations were but he nonetheless did not hesitate to act as he did in order to make a profit at Mr. Vekselberg's expense. In my assessment, that is consistent with my overall impression of Mr. Gilbertson as a hardened and ambitious businessman quite capable of looking after his own interests and taking advantage of any opportunity available to him to benefit financially, knowing very well that Mr. Vekselberg, his supposed partner and his employer, would be extremely annoyed. I do not accept the suggestion that Mr. Gilbertson was brow-beaten or pressured into agreeing with Mr. Vekselberg's wishes as he did; my clear impression of Mr. Gilbertson is that he was perfectly capable of refusing to do so had he wished."

***The submissions advanced on behalf of the parties***

131 It is said in the memorandum of grounds of appeal filed on behalf of Autumn on February 1st, 2013, that the judge misdirected himself and erred in law and/or fact in not applying the rule in *Nurcombe* v. *Nurcombe* (28) to refuse Renova relief in that it was unconscionable for Renova to be granted relief, having regard to the following, amongst other (unspecified) matters:

(1) The conduct of Mr. Kuznetsov, in relation to whom it is said that the judge should have found that he was acting at all material times in the interests of Mr. Vekselberg and the Renova group, rather than of the company, the GPLP and/or the master fund.

(2) The crisis caused by the Renova parties and their ultimate veto of the approval of Project Egg as an investment project on December 20th, 2006.

(3) The oppressive terms that the Renova parties sought to impose in the draft implementation agreements prior to January 3rd, 2007.

(4) The attempts of the Renova parties to procure Mr. Gilbertson's agreement to the proposal that the Fabergé rights should be owned outside the Pallinghurst structure and exploited pursuant to an arrangement which did not involve the master fund at all.

(5) The Renova parties' pursuit of their own interests without regard to any interests of the master fund, and, in particular, their appropriation of the shares acquired in connection with Project Charlie.

(6) The conduct of the Renova parties—found by the judge to be "culpable and blameworthy"—in destroying relevant documents; such conduct being inconsistent with the equitable relief sought and the indulgence to pursue derivative proceedings which they had been granted.

Had the judge directed himself properly, it is said, he should have held that the conduct of the Renova parties rendered it unconscionable to grant Renova the relief which it sought.

132 In development or amplification of those submissions it is said on behalf of the Gilbertson parties in their memorandum of grounds of appeal that, although the judge stated (2012 (2) CILR 416, at para. 67) that he had considered "whether in light of all that evidence the conduct of the plaintiff was such as to provide an equitable defence to the action as submitted on behalf of the Gilbertson parties," he failed to make any findings with regard to six matters on which the Gilbertson parties had relied at trial: (i) the complicity of the Renova parties in Mr. Gilbertson's negotiating with them on his own behalf; (ii) the inconsistency between the Renova parties' own conduct with the case which they advanced in these proceedings; (iii) the conduct of the Renova parties in relying on Mr. Gilbertson's appropriation of Project Egg to justify their appropriation of the profits of Project Charlie and, then, resiling from the set-off; (iv) the attempt by the Renova parties to intimidate Mr. Gilbertson; (v) Mr. Vekselberg's conduct in causing SUAL to withhold the bonus which Mr. Gilbertson should have received in connection with the merger with RUSAL and to terminate his employment (notwithstanding that he had made a profit in excess of US$1 bn. for Mr. Vekselberg as a result of that merger); and (vi) the fact that these proceedings were not being pursued for the benefit of the company.

133 In response to those submissions it is said on behalf of the Renova parties that there is no separate *Nurcombe* v. *Nurcombe* defence to Renova's claims. The judge was right to conclude that, although Mr. Vekselberg may have been "upset and annoyed" at Mr. Gilbertson's actions, his irritation does not debar Renova from pursuing those claims on behalf of the company and the master fund, even if the action had been motivated (whether solely or partly) by some personal animus on the part of Mr. Vekselberg—and no such suggestion was put to him at the trial—that would be irrelevant in circumstances where the claims were good claims on the merits, and the same can be said for Renova's unfortunate failures in the discovery process. The points advanced on behalf of the Gilbertson parties in this context were fairly considered and rejected by the judge (*ibid.*, at para. 64). No error in the judge's detailed analysis has been identified.

134 In addressing those submissions it is, I think, important, to keep in mind that—as the judge observed (*ibid.*, at para. 65)—the contention that

the conduct of Renova and those associated with it in relation to the claims made on behalf of the company in these derivative proceedings rendered it inequitable to allow Renova to pursue those claims as plaintiff had already been argued at length at the hearing of Renova's application for leave to continue and had been rejected by the judge in his ruling of April 14th, 2009. There was no appeal from that ruling. In those circumstances, in revisiting that contention at the trial, it was not open to the judge to depart from his earlier ruling unless persuaded that the evidence given by the witnesses at trial provided good reasons for doing so.

135 It is important, also, to keep in mind the basis of the *Nurcombe* v. *Nurcombe* defence as explained in the authorities to which the judge referred. The underlying principle is that, in permitting a derivative action to be brought by a person (say, A) in whom the cause of action is not vested (and who is not the "proper" plaintiff) for the benefit of the person (say, B) in whom the cause of action is vested (and who would be the "proper" plaintiff), the court is exercising an equitable jurisdiction on the ground that justice so requires. Four propositions follow from that underlying principle. First, the jurisdiction is exercised on the application of A only in circumstances where A has an interest (recognized by the law) in the pursuit of the cause of action for B's benefit: such circumstances are likely to exist where, for example, A is a shareholder of B (and so has an interest in the outcome of litigation which, if successful, will benefit B and, indirectly, B's shareholders. Secondly, the need for the exercise of the equitable jurisdiction to avoid injustice arises because the circumstances are such that B is not able to bring the action itself (usually because B is under the control of the wrongdoer who would be the defendant). Thirdly, the jurisdiction is not exercised unless A's purpose in seeking to pursue the cause of action is to benefit B; although, consistently with the second proposition, it is no bar to the exercise of the jurisdiction that A may benefit indirectly (say, for example, as a shareholder of B) if the outcome of the litigation is successful. Fourthly, the jurisdiction will not be exercised where to do so would lead to injustice. Circumstances in which the exercise of the jurisdiction on the application of A would lead to injustice would include those in which A would benefit indirectly (say, as a shareholder of B) from the successful pursuit of a claim to which (as between A and the defendant) the defendant would have had an equitable defence on which he would have succeeded if (on the hypothesis that A had been a proper plaintiff) the action had been brought by A in his own right. As Browne-Wilkinson, L.J. pointed out in the *Nurcombe* case (28), such equitable defences would include A's obligation to elect between conflicting rights, acquiescence or laches.

136 It is convenient to address the submissions advanced on behalf of the parties under two heads, reflecting the third and fourth of the propositions which I have just set out, and to ask, first, whether (on a true

analysis of the position) Renova is not pursuing this derivative action for the benefit of the company (or, more generally, the Pallinghurst structure) but, rather, is pursuing the action for some other—or ulterior—purpose, and secondly, whether the other matters (or any of them) upon which the Gilbertson parties rely in support of their challenge to the judge's conclusion that the conduct of the Renova parties was not such as to disentitle Renova from any relief, having regard to the rule in *Nurcombe* v. *Nurcombe*, would have given rise to an equitable defence on which the Gilbertson parties would have succeeded if the action had been brought by Renova in its own right.

***Ulterior purpose***

137 In developing their submissions under this head it is said on behalf of the Gilbertson parties that the judge failed to make any findings with regard to "(vi) the fact that these proceedings were not being pursued for the benefit of the company" and, further, that these proceedings have been brought and pursued for a collateral purpose in that "this is not the master fund's dispute, let alone the company's . . . it is and always has been Mr. Vekselberg's."

138 The submission that the judge made no finding on the issue whether these proceedings were being pursued for the benefit of the company but for a collateral purpose, might be thought to overlook the judge's observations (*ibid.*, at paras. 70 and 73, to which I have referred earlier in this section of this judgment). But, in relation to the judge's observations (*ibid.*, at para. 70), it is said on behalf of the Gilbertson parties that he was wrong to take the view that malice was of no relevance in the context of the *Nurcombe* defence, save where it was the sole factor driving the proceedings. In the present case, it is said that Mr. Vekselberg was using the proceedings as an indirect means of asserting what he chose to believe to be due to him and "was seeking to enforce in the name of the company an unenforceable agreement made with him personally." Although it is accepted that "this may not necessarily be sufficient to found a *Nurcombe* defence in itself," it is said to be "something that the court should weigh in the balance." Further, it is submitted that the judge was wrong "to overlook the fact that [these proceedings] might have been brought and pursued out of enmity," and wrong to take the view that "it was sufficient to dispose of the issue that Mr. Vekselberg had a genuine sense of grievance."

139 In response, it is said on behalf of the Renova parties that in circumstances that (as the judge held after hearing evidence at the trial) the derivative claims brought by Renova on behalf of the company (or the master fund) were good on their merits, then the fact that Mr. Vekselberg was angered or upset by what Mr. Gilbertson had done was irrelevant to the question whether Renova was an appropriate claimant or, at the least,

not a sufficient reason to conclude that it was not. The judge was plainly correct to take the view (expressed, *ibid.*, at para. 70) that a finding that Mr. Vekselberg was angered and upset by what Mr. Gilbertson had done did not of itself justify a finding that Mr. Vekselberg was acting out of malice. The judge did not overlook the possibility that proceedings might be brought out of enmity: rather, he considered that possibility and rejected it. Further, it is said that the allegation that the action was actuated by malice—which was advanced at trial by counsel on behalf of the Gilbertson parties in the course of his opening submissions—was of such a serious nature (in that it amounted to an allegation that the action had been brought in bad faith and for a collateral purpose) that it was necessary (if it were to be pursued) that it be put to Mr. Vekselberg. As the judge noted (*ibid.*, at para. 70) that allegation was never put to Mr. Vekselberg. And, it is said, the contention that Mr. Vekselberg was seeking, for his own purposes "to enforce in the name of the company an unenforceable agreement with him" cannot be sustained: Mr. Vekselberg is not the derivative plaintiff and is not seeking to enforce any agreement made with him. He was joined in the action as a defendant to counterclaims which were wholly unsuccessful and, in the event, for the most part abandoned.

140 In my view, the judge was entitled to reject the contention that these proceedings were not brought and pursued by Renova for the benefit of the company (or, more generally, for the benefit of the master fund and the other entities within the Pallinghurst structure), but for the benefit of Mr. Vekselberg personally. There was no direct evidence to support that contention. Not only was the contention never put to Mr. Vekselberg himself; it was not put to Mr. Kuznetsov or Mr. Kalberer. There was no indirect evidence from which it could be inferred that Renova had brought, and was pursuing, the action for the benefit of Mr. Vekselberg; rather than for the benefit of the company or the Pallinghurst structure. In particular, the judge was entitled—indeed, in my view, correct—to hold that his conclusion that "Mr. Vekselberg was upset and annoyed and felt that he had been wronged by what he described as [Mr. Gilbertson's] 'violation' of the [agreement and understanding]" was an insufficient basis upon which to infer that Mr. Vekselberg (or others in control of Renova) had caused Renova to bring and pursue this action for an ulterior purpose: that is to say, for a purpose which was not that on the basis of which permission to bring derivative proceedings had been sought and obtained.

### *Equitable defences*

141 I have explained that the jurisdiction to permit a person who is not the "proper" plaintiff (in that he or it is not the person in whom the relevant cause of action is vested) to bring a derivative action for the benefit of the person whose cause of action it is (the "proper" plaintiff)

will not be exercised where to do so would lead to injustice. The purpose of the rule in *Nurcombe* v. *Nurcombe* (28), in this context, is to avoid the injustice which would arise from allowing the derivative plaintiff to benefit from the pursuit of a claim in relation to which his, or its, own conduct has been inequitable or, to put the point another way, to avoid the injustice which would arise if the defendant were to be denied the benefit of an equitable defence which would have been available to him if the claim made against him had been made otherwise than in derivative proceedings.

142 There are, as I have said, six matters in relation to which it is said that the judge misdirected himself and erred in law in failing to have proper regard to what I have described as the fourth proposition which follows from the principle underlying the jurisdiction to permit a person who is not the "proper" plaintiff to bring and pursue a derivative action: that is to say, the proposition that the jurisdiction will not be exercised where to do so would lead to injustice. Three of those matters were elaborated further in the course of the submissions advanced on behalf of the Gilbertson parties:

(1) *The conduct of Mr. Kuznetsov*

It is said that the judge should have found that Mr. Kuznetsov was acting at all material times in the interests of Mr. Vekselberg and the Renova group, rather than of the company, the GPLP and/or the master fund. In advancing the case that they did, it was inconsistent for the Renova parties to ignore the fact that (as the Gilbertson parties had pointed out at the trial), Mr. Kuznetsov recognized no conflict which precluded him from promoting the interests of Mr. Vekselberg and Lamesa where they conflicted with those of the Pallinghurst structure, notwithstanding that he was a member of the investment committee and a director of the company. The judge was wrong to make no finding in relation to that alleged inconsistency.

(5) *The Renova parties' pursuit of their own interests without regard to any interests of the master fund, and, in particular, their appropriation of the shares acquired in connection with Project Charlie*

(i) In developing the first limb of this submission, it is said that, although the Renova parties complain in this action that Mr. Gilbertson was not adhering to the "no-conflict" and "no-profit" rules, they were happy to negotiate with Mr. Gilbertson in relation to the Lamesa project—and did so without making any such complaint at the time—notwithstanding (a) that they had contended in their pleadings and written opening submissions at trial that Mr. Gilbertson was acting in his capacity as a director of the company in his negotiations with them in relation to the Lamesa project and, accordingly, was obliged to get the best deal he

could for the company or, perhaps, the master fund, without regard to his own interests or those of his team; and (b) that Mr. Kuznetsov and Mr. Kalberer knew—as they each acknowledged in the course of their oral evidence—that they were negotiating with Mr. Gilbertson in relation to the Lamesa project on the basis that they would need to come to an agreement which was acceptable to Mr. Gilbertson and his team.

(ii) In developing the second limb of this submission, it is said that, in the events which happened, Project Charlie progressed further than Project Egg in that (a) it was the subject of a formal investment committee minute; (b) shares were purchased on behalf of the master fund; and (c) profits were made on behalf of the master fund. Those profits were, it is said, retained by the Renova parties for their own benefit on the ground that—as Mr. Kuznetsov acknowledged in his oral evidence, although subsequently denied—they were keeping Project Charlie profits because Mr. Gilbertson had kept Project Egg. It is accepted that (a) Project Charlie was not the subject of any detailed consideration at the trial, and that the judge was not asked to rule either on the set-off that the Renova parties purported to exercise or on their entitlement to do so; and (b) "the Renova parties will have no difficulty in presenting a thicket of fine distinctions . . . to explain how the Renova parties might be entitled to keep the profits from Project Charlie and Mr. Gilbertson not be entitled to keep the [Fabergé] Rights." But, it is said that that is not how the Renova parties saw the matter at the time; they treated the two projects as comparable. Notwithstanding that they retain the fruits of the one; they seek, in these proceedings, to recover the fruits of the other. If and insofar as there is any merit in their arguments in relation to the Fabergé rights, the Renova parties come before the court as wrongdoers, and that this court is not precluded, when assessing what may be just between the parties, from taking into account the justice that the parties sought for themselves in relation to the two projects.

(6) *The conduct of the Renova parties . . . in destroying relevant documents*

Although the judge found (2011 (2) CILR 148, at para. 62 of his ruling on the application to strike out the statement of claim) that the destruction of documents by the Renova parties was "blameworthy and culpable," he attached no significance to this finding. The judge failed to have regard (i) to the nature of the prejudice that the destruction of documents on a wholesale scale may have to the judicial process; (ii) to the sense of injustice caused to other litigants; and (iii) to the distortion of the court process that it implies. It is said that the conduct of the Renova parties was inconsistent with the equitable relief sought and the indulgence to pursue derivative proceedings which they had been granted.

In addition to those numbered submissions, the Gilbertson parties submit that the judge failed to make any findings with regard to two other matters on which the Gilbertson parties had relied at trial:

*The attempt by the Renova parties to intimidate Mr. Gilbertson*

There is no challenge to the judge's finding (2012 (2) CILR 416, at paras. 71–72) that "the suggestion that Mr. Gilbertson was brow-beaten or pressured into agreeing with Mr. Vekselberg's wishes as he did" was not made out on the evidence; indeed, it is said that no such suggestion was advanced at the trial. But the Gilbertson parties do rely on Mr. Gilbertson's evidence (in his witness statement) that, during the course of negotiations following the "not-pleasurable conversation," Mr. Kuznetsov had advised him to submit to Mr. Vekselberg's wishes rather than to make an enemy of him, and to Mr. Kuznetsov's evidence, when that statement was put to him in cross-examination that he did no more than offer "friendly advice." It is said that to advise someone to submit to another's demand lest he makes an enemy of him might be seen as a threat, *a fortiori*, in circumstances where that other is a Russian oligarch and, in substance, the employer of the advisee.

*Mr. Vekselberg's conduct in causing SUAL to withhold the bonus which Mr. Gilbertson should have received in connection with the merger with RUSAL and to terminate his employment*

Shortly after Mr. Kuznetsov had offered his "friendly advice," Mr. Gilbertson's employment at SUAL was terminated, and a bonus to which he claimed to have been entitled (having generated profits for Mr. Vekselberg in excess of US$1 bn.) was withheld. Mr. Vekselberg's evidence was that the employment was terminated and the bonus withheld because he was not happy with Mr. Gilbertson's performance. That evidence was described by counsel for the Gilbertson parties as "chilling." The judge was wrong to see the termination of Mr. Gilbertson's employment and the withholding of the bonus "simply as part of the fall out from the breakdown in the relationship between Mr. Gilbertson and Mr. Vekselberg, but otherwise unrelated to it"; he should have recognized that "the mere fact that the break down in the relationship between the two men over the Lamesa project should have led to Mr. Gilbertson being fired as he was" was itself "a harsh illustration of the fact that the operative relationship in all the dealings of Project Egg and the Lamesa project was that between Mr. Gilbertson and Mr. Vekselberg, a personal relationship which both men felt personally." There is no challenge to the judge's observation (2012 (2) CILR 416, at para. 73) that it would have been obvious to Mr. Gilbertson that he would be taking a risk in angering Mr. Vekselberg. But it does not follow that the way in which Mr. Vekselberg

vented his anger in the past is of no relevance to the question whether the court should assist him in doing so in these proceedings.

143 In response to the submissions advanced on behalf of the Gilbertson parties, the Renova parties emphasize the points to which I have already drawn attention: (i) that the judge gave leave to bring this derivative claim in 2009, after a two-day hearing in the course of which the Gilbertson parties deployed many of the arguments now advanced; and (ii) that there was no appeal from his order. The Renova parties accept that, in a case where new evidence emerges during the trial which casts significant doubt on the earlier decision to grant leave, the trial judge may revisit that decision but, it is said, this is not such a case. More particularly—and in response to the numbered submissions to which I have referred in the preceding paragraph of this judgment—it is said on behalf of the Renova parties:

(1) *The conduct of Mr. Kuznetsov*

There is no basis on which the Gilbertson parties can advance a submission that, if Mr. Gilbertson was in breach of his fiduciary duties to the company, so also was Mr. Kuznetsov. The allegation that Mr. Kuznetsov was in breach of his fiduciary duties to the company was pleaded in these proceedings in the context of a counterclaim for contribution against Mr. Kuznetsov, but the counterclaim was not pursued and it was abandoned before closing submissions (as the judge recorded, 2012 (2) CILR 416, at para. 103). The allegation cannot be revived in this court.

(5) *The Renova parties' pursuit of their own interests without regard to any interests of the master fund, and, in particular, their appropriation of the shares acquired in connection with Project Charlie*

(i) Even if Mr. Vekselberg's insistence that—if he were funding the purchase—the Fabergé rights were to be held in Lamesa Arts Inc. represented a departure from the original structure contemplated, that was acceptable to Mr. Gilbertson in principle subject to the negotiation of terms to be set out in an agreed implementation agreement reflecting Pallinghurst principles "modified for Project Egg." The negotiation of terms was proceeding towards a mutually acceptable conclusion when Mr. Gilbertson decided, unilaterally, to bring negotiations to an end by depriving the master fund of its 100% ownership of PEL and to secure the Fabergé rights for himself and his consortium. The process of negotiating mutually acceptable terms upon which Mr. Vekselberg would fund the purchase of the Fabergé rights cannot be treated as justifying Mr. Gilbertson's breach of duty, in unilaterally preferring his own interests to those of the master fund.

(ii) The complaint as to Mr. Vekselberg's retention of the profits of Project Charlie is of no substance. The point "barely feature[d]" at the trial; it was not pleaded as a point which should lead to the refusal to grant relief in this case; and Autumn simply purported to reserve the right of the Fairbairn Trust to bring a derivative claim.

(6) *The conduct of the Renova parties . . . in destroying relevant documents*

The complaint that the judge erred in failing to refuse relief—on *Nurcombe* grounds—on the basis of his criticism of Renova's conduct in relation to discovery is not well founded, in that the judge had already refused to strike out the action on the grounds of Renova's failure to give discovery; holding (at paras. 59–62 of his ruling of August 5th, 2011, reported at 2011 (2) CILR 148) that—notwithstanding that failure—it remained possible to have a fair trial in which, if and so far as necessary, inferences adverse to Renova could be drawn from the absence of documents.

And, in response to the allegation that the judge failed to make findings in relation to the two other matters to which I have referred in the preceding paragraph, it is said:

*Attempt at intimidation*

There is no substance in the complaint as to the "friendly advice": the judge was entitled to have regard to Mr. Kuznetsov's evidence, in which he rejected the suggestion that he had threatened Mr. Gilbertson with reprisals if he did not submit to Mr. Vekselberg's demands. But, in any event, as the judge found, Mr. Gilbertson was tough and exacting and perfectly capable of standing up for himself. There is no basis upon which this court can properly reject that finding by a judge who, having seen Mr. Gilbertson and Mr. Vekselberg in the witness box, was entitled to make that assessment.

*Mr. Vekselberg's conduct in relation to SUAL. The attempt by the Renova parties to intimidate Mr. Gilbertson*

The complaint is "no more than an attempt to paint Mr. Vekselberg as a bully who got no more than he deserved."

144 In my judgment, none of the matters upon which the Gilbertson parties rely in support of their challenge to the judge's conclusion would have given rise to an equitable defence on which the Gilbertson parties would have succeeded if the action had been brought by Renova in its own right. I am satisfied that the judge was correct to take the view that there was no reason, under this head, to refuse Renova the equitable relief which it sought in this derivative action. In rejecting the submissions

which have been advanced on behalf of the Gilbertson parties, I have had regard to the position as it was at the time when the conduct which has led to the conclusion that Mr. Gilbertson acted in breach of fiduciary duty took place and, in particular, to the following factors:

(1) The conclusion that Mr. Gilbertson acted in breach of fiduciary duty is founded on his conduct in causing or procuring the issue by PEL of 100 new shares. Whether or not those shares were issued on January 3rd, 2007 as the judge found (correctly in my view) or some two and a half weeks later (as the Gilbertson parties contend), there is no doubt that they were issued pursuant to the decision taken by Mr. Gilbertson on January 2nd or 3rd, 2007 that he would secure the Fabergé rights for himself (or for the benefit of his consortium) by divesting the master fund of its ownership and control of PEL.

(2) At the time when Mr. Gilbertson took that decision, PEL was the contracting purchaser of the Fabergé rights. The terms of the SPA required payment of the purchase price (US$38m.) to be made on January 3rd, 2007. But time was not of the essence, and there was evidence to suggest that, if payment were not made on January 3rd, 2007, Unilever would not have treated the SPA as having determined forthwith (even if it would have been entitled to do so as a matter of law).

(3) Mr. Gilbertson had caused PEL to enter into the SPA on December 22nd, 2006 in circumstances when (as he knew) neither PEL nor the master fund (which, it appears, was the intended guarantor) had—or had obtained an unconditional commitment from Mr. Vekselberg (or from anyone else) in respect of—the US$38m. which would be needed to complete the purchase on January 3rd, 2007.

(4) The position immediately before PEL entered into the SPA (agreed on December 21st, 2006 between Mr. Gilbertson and Mr. Vekselberg) was that Mr. Vekselberg would provide the funds to complete the purchase provided that title to the Fabergé brand was transferred to a Lamesa company. That was acceptable to Mr. Gilbertson, provided that terms (in the form of an implementation agreement) could be agreed which would provide for the master fund (or some other entity within the Pallinghurst structure) to benefit from the promotion, management and exploitation of the Fabergé rights.

(5) That remained the position from December 21st, 2006 until January 3rd, 2007. In particular, it remained the position at the time when Mr. Gilbertson took the decision to cause or procure PEL to issue the 100 new shares. At the time when that decision was taken, negotiations as to the terms of the intended implementation agreement were continuing, and Mr. Vekselberg was not in breach of any agreement or understanding in relation to the provision of the funds required for the completion of the purchase by PEL of the Fabergé rights.

In those circumstances, as it seems to me, none of the matters relied upon by the Gilbertson parties in support of their challenge under this head—that is to say, the conduct of Mr. Kuznetsov, the "crisis" caused by the Renova parties, the terms that the Renova parties sought to impose in the draft implementation agreements, the attempts of the Renova parties to procure Mr. Gilbertson's agreement to the proposal that the Fabergé rights should be owned outside the Pallinghurst structure, the Renova parties' pursuit of their own interests and their appropriation of the shares acquired in connection with Project Charlie, the conduct of the Renova parties in destroying relevant documents, the attempt by the Renova parties to intimidate Mr. Gilbertson and Mr. Vekselberg's conduct in relation to SUAL—would have provided equitable defences to the claim against Mr. Gilbertson in respect of his breach of fiduciary duty. Put shortly, none of those matters, even if made out on the facts, would have led to the conclusion that it was inequitable for Renova to pursue that claim, had it been able to do so in its own right.

145 In reaching that conclusion I have not overlooked the detailed and extensive submissions advanced on behalf of the Gilbertson parties in support of their contention that the judge erred in failing to hold that the destruction of documents by the Renova parties was a matter which led to the conclusion that it was not in the interests of justice that Renova be permitted to pursue a derivative action. In addition to the submissions to which I have already referred, it was said that he did not consider whether it was right that the Gilbertson parties were obliged to speculate as to what the documents that had been destroyed would show, and he did not consider whether it was right for the court to grant derivative relief on the basis of equity to a claimant who was in culpable disregard of its rules in such a manner. Rather, it is submitted, the judge appears to have taken the view that it was sufficient for him to consider the destruction of documents in the context of the specific findings that he needed to make. But, as it seems to me, those submissions overlook, first, the judge's earlier ruling (not challenged on appeal) that a fair trial of a derivative action was possible notwithstanding that (as he had found) there had been serious failures of document preservation and, secondly, that there was no sensible basis to dismiss the action, after a trial which was not, in the event, unfair on the ground that (by reason of those failures) Renova was not a proper derivative claimant. It is important to have in mind that, in referring to his earlier ruling (2012 (2) CILR 416, at para. 68), the judge said this:

> "As I have already mentioned . . . during the course of this action there have been several contested applications concerning discovery and the destruction of certain back-up tapes, which may have contained relevant emails and other documents, by the Renova parties following a computer crash at their administrative offices in Zurich. In that respect I have made it clear more than once that as a

> result, if appropriate and justified, the court could draw inferences against the Renova parties at the trial in light of their destruction of potentially discoverable documents. However . . . apart from the question of the alleged motivation of the plaintiff in bringing the present claim, which was not clearly put to the Renova parties' witnesses, I was not invited to draw any specific inferences"

If Renova were otherwise a proper person to bring the action on behalf of the company (or, more generally, the master fund and other entities in the Pallinghurst structure), its failure to comply with its discovery obligations might expose it to the court's procedural sanctions, including striking out. But, where the judge—properly, and upon authority—had refused to strike out the action because he considered that a fair trial was possible and was not persuaded that the trial that he had subsequently conducted was unfair, he was correct to recognize that the past failures in relation to discovery provided no ground upon which the action should be dismissed. In particular, he was correct to recognize that the principle underlying the decision in *Nurcombe* v. *Nurcombe* (28) did not lead to a different conclusion in a derivative action.

146 For the reasons which I have set out in this section of my judgment, I am satisfied that the judge was correct to hold that the conduct of the Renova parties was not such as to disentitle Renova from equitable relief in this action on *Nurcombe* grounds.

**Was the judge wrong to value at nil the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation?**

147 In its amended statement of claim, Renova sought an account of the profits received by Mr. Gilbertson as a result of his acquisition of the Fabergé rights in breach of fiduciary duty or, in the alternative, payment to the company (and/or to GPLP and/or to the master fund) of equitable compensation for the loss of those rights. During the course of the trial Renova abandoned its claim for an account of profits and so elected to pursue its claim against Mr. Gilbertson for equitable compensation.

148 The judge explained (2012 (2) CILR 416, at para. 115) that equitable compensation in respect of loss caused by breach of fiduciary duty was to be assessed as the monetary amount required to put a plaintiff back into the position in which he would have been at the time of the trial if he had not sustained that loss. Renova's claim, he said, was for compensation in the amount required to reconstitute the master fund to the position in which it would have been at the date of judgment but for Mr. Gilbertson's breach of fiduciary duty: it was not a claim for compensation in the amount required to put the master fund into the position in which it would have been (but for Mr. Gilbertson's breach of duty in January 2007)

at the time of that breach. The court's task was to determine the monetary value of the loss suffered by the Pallinghurst structure as a result of the diversion from the master fund of the economic benefit of development, exploitation and management of the Fabergé rights. He recorded that the trial proceeded on that basis.

149 The Renova parties contended at trial that the value of the economic benefit of development, exploitation and management of the Fabergé rights was to be treated as equal to the value of full ownership of those rights, and that, accordingly, the equitable compensation payable by Mr. Gilbertson was to be assessed at an amount equal to the whole monetary value of Fabergé Ltd. (formerly PEL)—the sole asset of which was the Fabergé rights—as at the date of assessment. On that basis, Renova initially sought payment to the master fund of US$177m. by way of equitable compensation, that being the value attributed to Fabergé Ltd. as at January 31st, 2012 in the report of Ms. Elizabeth Gutteridge, a partner of Deloitte LLP, London, on whose expert opinion Renova invited the judge to rely.

150 The Gilbertson parties did not accept the value (US$177m.) attributed to Fabergé Ltd. in Ms. Gutteridge's report. They contended that the value to be attributed to Fabergé Ltd. as at February 10th, 2012 was no more than US$120m., a figure based on the first report of Mr. Christopher Osborne, a senior managing director (in the London office) of FTI Consulting Ltd., but which Mr. Osborne himself regarded as "potentially high." As between the figure in Ms. Gutteridge's report (US$177m.) and that in Mr. Osborne's first report (US$120m.), the judge preferred the latter. He said this (2012 (2) CILR 416, at para. 133):

> "While Mr. Osborne accepted that under the DCF valuation method a wide range in value will result from only small changes in assumptions made, I nonetheless found his approach and analysis more persuasive overall in the circumstances than Ms. Gutteridge's. While the valuation of Fabergé Ltd. is clearly a matter of opinion and not of absolute certainty, having regard to all of the factors identified in their reports, including their report of their meeting on May 1st, 2012, which I directed, together with their oral evidence and also that of Mr. Gilbertson and Sean Gilbertson, I found the opinion of value by Mr. Osborne more plausible and probable. I therefore prefer his opinion that the current value of Fabergé Ltd. is not more than US$120m. and possibly significantly less for these purposes."

151 Nevertheless, that conclusion did not lead the judge to assess equitable compensation at an amount equal to the then current value (US$120m.) attributed to Fabergé Ltd. in Mr. Osborne's first report. As the judge explained (*ibid.*, at para. 134), it had been contended on behalf of the Renova parties that, prior to January 3rd, 2007, Mr. Gilbertson had

agreed that, while the actual title to the Fabergé brand itself would be owned by one of Mr. Vekselberg's private companies within the Lamesa group, the full economic benefit of the Fabergé rights—that is to say, the commercial benefit of developing, exploiting and managing the Fabergé business—would remain with the master fund within the Pallinghurst structure. In those circumstances, the judge thought it necessary to ask whether the value of what (absent the change in the ownership of Fabergé Ltd. resulting from Mr. Gilbertson's breach of fiduciary duty) would have accrued to the master fund was properly to be equated with the full ownership of the Fabergé rights; that is to say, to ask whether, in assessing equitable compensation, it was appropriate to apply some discount to the current value of Fabergé Ltd. (as, in the events which happened, the full owner of the brand and the rights) to reflect the separation of the right to develop, exploit and manage the rights from the ownership of the brand which (absent Mr. Gilbertson's breach of duty) was in contemplation. After setting out the arguments advanced on behalf of the parties, the judge concluded (*ibid.*, at para. 141) that—

> "It does appear improbable that any potential purchaser would pay the same amount for a business, the principal income producing asset of which does not actually belong to it and which has a limited life span, as it would pay for a business that actually owns the principal asset and does not have such a limited period of likely profitability. Mr. Osborne's opinion on this aspect of the matter, and as I have said, his evidence on this was not really challenged in cross-examination, was that it is most unlikely that an investor would value a company owning only the full economic benefit of the rights at more than half the value such a potential purchaser would be likely to pay if the business had owned the income-producing asset as well as the right to develop, exploit and manage it. I found that opinion plausible and persuasive. It follows that if, as I have accepted, the current value of Fabergé Ltd. when it does own the entire rights is no more and possibly less than US$120m., the value of the company if it owned only the economic benefit of the rights but not the brand itself would be only approximately US$60m. or possibly less. Having regard to the amount already invested in the company and its business, which the experts both agreed was US$140m. in total, the position is that more has been invested in the company than it may be worth. That of course ignores the further investment which the company obviously requires and has recently been seeking."

152 That, as the judge said, was the first of two issues of principle as to the methodology applicable to the assessment of equitable compensation. He identified the second of those issues (*ibid.*, at para. 142): "whether, in the circumstances, the master fund would in fact anyway have actually obtained the full economic benefit of the rights but for Mr. Gilbertson's

breach of fiduciary duty . . .” In order to answer that question, he said, it was necessary to consider what (on the balance of probability) the position would have been if Mr. Gilbertson had not acquired the Fabergé rights for his consortium (as, in the event, happened), but had continued to negotiate to final agreement with the Renova parties as, until January 2nd, 2007, he had been doing (at least purportedly). After examining the evidence (*ibid.*, at paras. 143–148), the judge concluded (*ibid.*, at paras. 146–148) that “but for the actions of Mr. Gilbertson in late December 2006 and January 2007 the master fund would most probably have had the economic benefit of developing and exploiting the Fabergé brand and the management thereof on the terms of the fourth draft IA or very similar terms,” and that, “accordingly the amount, if any, appropriate to reconstitute the master fund and to put it in the position in which it would now have been would be the present financial value of that.”

153 The judge explained (*ibid.*, at paras. 148–150) that, although the Renova parties had (in opening their claim at trial) sought payment of equitable compensation in an amount equal to the full value of Fabergé Ltd. (which they had put at US$177m.), they did not maintain that position in their closing submissions. Rather, he said, Renova produced a spreadsheet with its closing submissions in which the calculations of the equitable compensation claimed was shown at US$82.38m. That calculation was based on Ms. Gutteridge’s valuation of Fabergé Ltd. at US$177m. but after (i) making allowance for sums invested in Fabergé Ltd. since acquisition—an amount which the two experts agreed at US$140m.—and (ii) adding various other sums, including the US$38m. paid on the acquisition of the Fabergé rights. The judge rejected the claim in that revised amount. He said this (*ibid.*, at paras. 149–150):

> “However, I have found the current value of Fabergé Ltd. to be no more than US$120m. and Mr. Osborne has explained why in his opinion that figure is probably too high and that the value may be as low as US$56m., which I also accept. Furthermore, the plaintiff’s calculations are obviously based also on their contention that the present value to the master fund would not be affected by the fact that the master fund would not own the income-producing asset, the Fabergé brand, itself, but solely the economic benefits and management of it with which I have disagreed. Nor has the plaintiff’s calculation taken account of the fact that the master fund would only be entitled to such economic benefits pursuant to a licence from the owner of the income producing asset and on terms the same or very similar to those in the fourth draft IA as I have determined would probably be the case.
>
> 150 Mr. Osborne’s opinion which, as I have said, I accepted, was that the consequence of only owning the economic benefit would be to reduce the value of the rights (or of Fabergé Ltd.) by half, namely

to US$60m. on his valuation figure. Although no figure was put forward in relation to the consequence of the qualifications to the economic benefit implicit in the licence arrangement and likely other terms, it is in my opinion probable that even if that did not warrant a further specific reduction in value, it would undoubtedly go to substantiate Mr. Osborne's US$60m. assessment. Also, having regard to the fact that Fabergé Ltd. has been a loss-making business from the start and still is at present and clearly requires significant further investment it seems to me that the submission on behalf of the Gilbertson parties that the master fund has in reality sustained no significant economic loss is correct."

In those circumstances, the judge concluded that, but for Mr. Gilbertson's breach of fiduciary duty, the master fund would have been in a significantly negative financial position as at the date of trial; that it would be of no benefit to the master fund to put it into the financial position in which it would have been at the date of the judgment but for Mr. Gilbertson's breach of fiduciary duty; and that, accordingly, no equitable compensation was payable.

***The parties' submissions on the cross-appeal***

154 The Renova parties cross-appeal (Appeal No. 22 of 2012) from so much of the order of November 6th, 2012 as dismissed the claim for equitable compensation. As I have said, it is submitted (in support of that cross-appeal) that the judge erred in law and/or in principle and/or misdirected himself as to the evidence in valuing at nil the loss which Mr. Gilbertson was liable to make good to the master fund. More particularly, it is submitted (i) that the judge was wrong to conclude that the value of Fabergé Ltd. at the date of trial was US$120m., or less, rather than (as Renova had contended) US$177m.; (ii) that the judge was wrong to apply a discount of 50% to the value (US$120m.) which he had placed on Fabergé Ltd. in order to reflect his (incorrect) finding that (had Mr. Gilbertson not acted in breach of fiduciary duty) the master fund would not have become the owner of the Fabergé rights but would have been entitled only to develop, exploit and manage those rights (through OpCo) under licence for a limited period; and (iii) that the judge was wrong in treating US$38m. (the price paid on acquisition of those rights) as a cost that would have been paid by the master fund—given that, had Mr. Gilbertson not acted in breach of fiduciary duty, the acquisition price would have been paid by Lamesa Arts Inc. and not by the master fund—in calculating the total figure to be discounted (if, which is denied, any discount were appropriate).

155 In response to those submissions it is said on behalf of the Gilbertson parties that the judge's approach—and the conclusions which he reached—were correct. It is pointed out that neither the judge's

approach—to assess the value of Fabergé Ltd. (PEL) as at the date of the trial and, having made a finding as to that value, to consider the extent to which it should be discounted—nor the performance figures for the business carried on by Fabergé Ltd. following the acquisition of the Fabergé rights were in dispute. Having described the steps which led the judge to the conclusion which he reached—in substantially the same terms as those in which I have analysed the judge's reasoning but emphasizing, in particular, that the judge's finding that the parties would have concluded their negotiations with an agreement along the lines of the fourth draft IA, excluding cl. 2(e), was consistent with Renova's pleaded case—the Gilbertson parties addressed those submissions under four main heads: (i) assessing the value of Fabergé Ltd.; (ii) the discount that should be applied to reflect the judge's finding that the master fund would not have become the owner of the Fabergé rights; (iii) the allocation of the discount; and (iv) the proper treatment of the acquisition price.

156 For convenience, I will address the submissions advanced on behalf of the parties under the three heads adopted on behalf of the Renova parties—to which I will refer, respectively, as "the undiscounted value point," "the discount point," and "the acquisition and development cost point." Under the third of those heads—the acquisition and development cost point—I will address the questions how (if at all) the development costs and the acquisition price should be taken into account (heads (iii) and (iv) of the analysis adopted on behalf of the Gilbertson parties).

***The undiscounted value point***

157 In developing the first of those submissions—that the judge was wrong to conclude that the value of Fabergé Ltd. at the date of trial was US$120m., or less, rather than (as Renova had contended) US$177m.—it is said on behalf of Renova that:

(1) The judge was wrong to accept the opinion of Mr. Osborne that a DCF methodology was the most appropriate valuation methodology in preference to the opinion of Ms. Gutteridge that a subject company transaction methodology was the most appropriate. The judge ought to have preferred the opinion of Ms. Gutteridge, in that: (i) the subject company transaction basis of valuation of Fabergé Ltd. had been used by the board of that company and by the board and auditors of Pallinghurst Resources Ltd. (which, at the relevant time, held 49% of the shares in Fabergé Ltd.) in their most recent available reports and accounts, expressly in preference to a DCF valuation; (ii) Mr. Osborne had selected the DCF valuation methodology in an unfair and imbalanced way, without conducting a rational and transparent comparison of the available methodologies (as Ms. Gutteridge had done) and without explaining the reasons for his choice of DCF methodology (other than by *a posteriori* reasoning in reliance on the result of that choice); (iii) Mr. Osborne had rejected

Ms. Gutteridge's subject company valuation methodology on the flawed and illogical basis that the results were not compatible with the results of his own chosen DCF methodology; (iv) Mr. Osborne had failed to adopt the approach (which, as was common ground, was consistent with International Financial Reporting Standards) that DCF valuations should be used with caution when valuing unlisted investments, that another methodology (such as a subject company transaction valuation) should be used as a guide to value, and that the result of a DCF approach should be cross-checked against the results of another approach; (v) Mr. Osborne's own evidence was that it is "uniquely difficult" to apply a DCF valuation methodology to a start-up company (such as Fabergé Ltd.) with a limited track record of past performance; (vi) at the time that the trial began (and, if relevant, at all times thereafter), the board of Fabergé Ltd. and the auditors and the board of Pallinghurst Resources Ltd. (of which Mr. Gilbertson himself was chairman) considered that a value of US$88.06 per share (that is to say, US$177m. in aggregate) remained the most appropriate value for Fabergé Ltd. and that Mr. Osborne did not criticize their approach as unreasonable; and (vii) Mr. Osborne's DCF valuation was based on a financial forecast that was, as the Gilbertson parties accepted in their oral evidence, no more than a "back of the envelope calculation" done for a different purpose.

(2) The judge was wrong in failing to take any or any adequate account of the manifest failings of Mr. Osborne as an independent expert witness; in that, in particular, (i) he showed an imbalanced and one-sided approach to his work; and (ii) he did not show all of his workings in a clear and transparent manner.

(3) The judge was wrong in failing to fix the date for valuation of Fabergé Ltd. as the first day of the trial (as he ought to have done) but admitted and gave weight to evidence (which, as a matter of law, he should have ignored) of events purportedly affecting the value of Fabergé Ltd. that had occurred during the trial: that is to say, (i) the failure of the share offer by Fabergé Ltd. to existing shareholders at US$79.50 per share; and (ii) the subsequent offer at US$50 per share ("the April 2012 offers").

(4) Notwithstanding that he had held (correctly; see 2012 (2) CILR 416, at para. 128) that the April 2012 offers were "not of the same evidential value as a share acquisition by an independent non-shareholder investor," the judge was wrong to give that evidence weight equal to or greater than the evidence that underpinned the valuation of Fabergé Ltd. by Ms. Gutteridge, the boards of Fabergé Ltd. and Pallinghurst Resources Ltd. and the auditors of Pallinghurst Resources Ltd., at US$88.06 per share on a subject company transaction basis (which was based on a share acquisition by an independent non-shareholder investor) and, further, was wrong then to rely on the evidence of the April 2012 offers (the prices of which

offers were not market tested but offered only to the 19 existing shareholders) when preferring Mr. Osborne's valuation to that of Ms. Gutteridge notwithstanding that both Mr. Osborne and Ms. Gutteridge agreed that the factors which would affect the decision of an existing shareholder whether or not to buy at a particular price are necessarily different from the factors which govern the decision of an independent non-shareholder.

158 The Gilbertson parties prefaced their submissions in support of the judge's assessment of the value of Fabergé Ltd. by explaining why—as they submitted—the judge was correct to prefer the evidence of Mr. Osborne to that of Ms. Gutteridge. They pointed out that (2012 (2) CILR 416, at para. 131) the judge had observed that he found Ms. Gutteridge "somewhat inflexible and dogmatic in her insistence that the value of [Fabergé Ltd.] should be determined by reference to the single small share transaction in September 2009" and in her unwillingness "to consider any adjustment to her [US$177m.] in light of the factors identified by [Mr. Osborne] . . ." He might also, it is said, have mentioned: (i) the weight which she gave in her oral evidence to "the wholly exceptional sales multiple" at which Hermes' shares trade (on which she relied to support her valuation, notwithstanding the obvious difference between a struggling start up and one of the most established and successful luxury goods brands ever); (ii) her refusal to acknowledge the importance of sales to a business trying to take off; and (iii) her unwillingness to acknowledge "the obvious fact" that a potential new investor would be concerned if asked to pay a higher price for the shares than that at which the existing investors had been prepared to take them. By contrast, they pointed out, the judge had said (*ibid.*, at para. 133) that he found Mr. Osborne's approach and analysis more persuasive overall in the circumstances than that of Ms. Gutteridge, and that the judge had noted (*ibid.*, at para. 125) that Mr. Osborne was not cross-examined to any significant extent on the substance or detail of his valuation or on how and why he had reached the conclusions that he did.

159 After explaining why (it was said) the judge was right to prefer the evidence of Mr. Osborne to that of Ms. Gutteridge, the Gilbertson parties addressed two issues under this head: (i) whether the judge was correct to take the date for assessment of equitable compensation as at the date of the judgment (rather than as at the commencement of the trial) and so take into account the attempts by Fabergé Ltd. to raise funding in April 2012; and (ii) whether the judge was correct to accept Mr. Osborne's valuation of that company, made on the basis of DCF methodology, and to reject the related party valuations made by the boards of both Fabergé Ltd. and its principal shareholder, Pallinghurst Resources Ltd. and by the auditors of Pallinghurst Resources Ltd.

160 In addressing the first of those two issues, it is pointed out on behalf of the Gilbertson parties that Renova itself had submitted (at para. 115(b) of its written opening submissions at trial) that equitable compensation was to be assessed as at the date of judgment (and had relied upon observations in *Target Hldgs. Ltd.* v. *Redferns* (35) ([1996] A.C. at 434, 437, 440) and in *Snell's Principles of Equity* at para. 40–016 in support of that submission), had not opposed the introduction of evidence in relation to the take up of the then pending share offer and had cross-examined Mr. Gilbertson, Mr. Sean Gilbertson and Mr. Osborne on that evidence.

161 In addressing the second of those issues, it was pointed out on behalf of the Gilbertson parties that the judge was presented with two materially different approaches to the valuation exercise: (i) that adopted by Mr. Osborne—described as "a DCF analysis based on the fundamentals of the business"—which, for the reasons that he described in his oral evidence, led him to conclude that the value of Fabergé Ltd. at the relevant date could not exceed US$120m.—and (ii) that adopted by Ms. Gutteridge which—for the reasons which she described, shortly, in her oral evidence—led her to dismiss the DCF analysis as an appropriate methodology in this case and to conclude (on the basis of valuations made by others, described as "related party valuations" or a "subject company analysis") that the value was US$177m. It is submitted that, although Renova had contended that—

> "it would take a serious and fundamental error of approach on the part of the boards of Fabergé Ltd. and PRL and their auditors to justify the Judge's departure from the approach and result used by Fabergé Limited, PRL and their auditors"—

it had cited no authority (nor referred to any academic writing) in support of that proposition; Ms. Gutteridge had not adopted it in her own evidence, in the course of which she had said this:

> "I was forming a view of my own and looking around at the available material to allow me to form that type of view. And when one is aware that other informed people have expressed a view, and that that view has been tested, I considered it reasonable that that was further affirmation and confirmation of my view."

Renova had not put its case so high at the trial, and, in principle, the proposition cannot be correct (given that, although the directors of a company or its principal shareholder may well possess information concerning the company that puts them in a better position than others to value it, they may well have an interest in the outcome). Further, it is said that, as the judge observed (2012 (2) CILR 416, at para. 130), the directors

and auditors were "not carrying out quite the same exercise for the same purpose as the court is required to do": in that the judge was required to determine the value of Fabergé Ltd. on the balance of probability on the basis of the evidence before him, whereas the directors of Fabergé Ltd. and Pallinghurst Resources Ltd. "were required to reiterate the valuation that they had previously placed on the company, unless they considered there was conclusive contradictory evidence to either increase or decrease the value" and the auditors' task was to consider and comment on the reasonableness of the valuations made by the directors. The Gilbertson parties draw attention to Mr. Osborne's evidence that the most recent transaction on which Ms. Gutteridge could base her assessment of value was the issue of shares to the value of US$100,000 to a prospective director of PEL in 2009. They rely on the view expressed at para. 4.2 of his second report, that—

> "in adopting that approach, Ms Gutteridge ought in my opinion to have given greater consideration to two questions in particular than it appears that she has. The first of those is whether any new information since September 2009 argues for a revision to the valuation; and the second is whether the valuation remains plausible, having regard to the current forward projections"—

and, on his answer—rejecting the suggestion that "a fair and open minded valuer of Fabergé Limited, valuing as at today, would take into account the conclusions of the Board and of the auditors of PRL," that—

> "The guidelines require an independent valuer to be concerned about the extent to which the 2009 capital raising continues to be of relevance . . . And the directors have concluded, I think it's fair to say, cautiously that it does. And my own conclusion is that it does not. And I think that's a conclusion that I'm entitled to reach; and it's the conclusion that I have reached."

In reaching that conclusion, Mr. Osborne had expressed the view (at para. 4.6 of his second report) that "the 2009 transaction price on which the recent company valuations are based is, in practice, of diminishing relevance to a current valuation of Fabergé Limited" and, in his oral evidence that "the relevance of the 2009 transaction price has diminished to the point where it cannot be used as the primary valuation approach" and, further, that "there are no plausible assumptions that could be applied to current forward projections in a Discounted Cash Flow sense that would give rise to a valuation of USD 177 million." It is said that the weight to be put on related person valuations in the circumstances of the case was a matter for expert evidence. Both experts addressed the question, and "the judge was entitled and required to form his own view in the light of that evidence."

162 I reject the submission, advanced on behalf of Renova, that the judge erred in principle in failing to fix the date for valuation of Fabergé Ltd. as the first day of the trial. In my view, in reaching his conclusion the judge was entitled (for the reasons advanced on behalf of the Gilbertson parties) to have regard to the April 2012 offers. The assessment of the undiscounted value of Fabergé Ltd. was essentially a matter for the judge to determine on the evidence before him at the trial. In carrying out that task, the judge had to evaluate the opinion evidence of the two expert witnesses, Ms. Gutteridge and Mr. Osborne. For the reasons that he gave, the judge preferred the evidence of Mr. Osborne. In challenging the judge's determination of the undiscounted value of Fabergé Ltd., Renova seeks to persuade this court to take a different view. An appellate court must recognize that where (as in this case) the expert witnesses have given oral evidence at trial, it should be cautious before rejecting the trial judge's evaluation of that evidence, unless satisfied that he failed to take advantage of seeing and hearing the evidence tested under cross-examination. In my view there is nothing to suggest that the judge failed to do so. I reject Renova's challenge to the judge's determination that the undiscounted value of Fabergé Ltd. as at the date of trial was not more, and possibly significantly less, than US$120m.

***The discount point***

163 In developing the second of those submissions—that the judge was wrong to apply a discount of 50% to the value (US$120m.) which he had placed on Fabergé Ltd. (rather than, as Renova had contended, no discount or a nominal discount) in order to reflect his (incorrect) finding that, had Mr. Gilbertson not acted in breach of fiduciary duty, the master fund would not have become the owner of the Fabergé rights but would have been entitled only to develop, exploit and manage those rights under licence for a limited period—it is said on behalf of the Renova parties that the judge erred in law and/or misdirected himself as to the evidence in that: (i) he failed to pay sufficient regard to his earlier finding that the parties intended and agreed that the master fund would end up with the full economic benefit of the Fabergé rights, and not only with a portion of that economic benefit; (ii) he ought to have assumed that, had Mr. Gilbertson acted fairly and honestly and in the best interests of the master fund (and but for his breach of fiduciary duty), the parties would have arrived at a legally binding agreement which enshrined that intention and understanding; (iii) he wrongly assumed, as the basis for his conclusion that the master fund would not have obtained the full economic benefit of those rights, that (contrary to his own earlier findings) the detailed terms of the fourth draft IA would have reflected the final terms on which the master fund would have enjoyed the Fabergé rights; (iv) he ought to have proceeded on the basis that, had Mr. Gilbertson not acted in breach of his fiduciary duty, the fourth draft IA would not have

represented the final agreed terms on which the master fund was to enjoy the economic benefit of the Fabergé rights, but rather (a) that Mr. Gilbertson would, consistently with his fiduciary duties to the Pallinghurst structure (which was the relevant assumption on which the judge was proceeding), have insisted that the terms were those contained in Mr. Sean Gilbertson's amended third draft IA (in that those most closely reflected the basic agreement that the full economic benefit would be enjoyed by the master fund), and/or (b) that the parties would have concluded their discussions with an agreement which gave the master fund the full economic value of the Fabergé rights (or, at the least, allowed for that possibility when assessing the probable terms on which the Fabergé rights would have been held by the master fund); (v) he failed to pay any attention to the fact that it was entirely possible to have a licence arrangement or split between "Brandco" and "Opco" that left the full economic benefit of the Fabergé rights with Opco (that is to say, with the master fund), and that this would have been the likely outcome had Mr. Gilbertson not breached his fiduciary duty; and, in any event (vi) he failed to pay any or any adequate attention to the unchallenged view of Ms. Gutteridge (as expressed in section 5 of her second report) that cl. 8 of the fourth draft IA, on its true construction, would not have created a risk such as to justify any or any significant discount to the value of Opco (even if the fourth draft IA had represented the final terms of the agreement on which the master fund would have enjoyed the Fabergé rights), given that there was no basis for the judge's implicit rejection of Ms. Gutteridge's opinion on that point in the absence of any finding by the judge that cl. 8 was ambiguous (which, it is said for the avoidance of doubt, it was not).

164 In response to those submissions, the Gilbertson parties point out that Mr. Osborne's evidence—which, they say, was not challenged, in that Ms. Gutteridge provided no comparable figure because she was instructed not to consider the issue—was that the appropriate discount to be applied to the assessed value of Fabergé Ltd. in order to reflect the difference between ownership of the Fabergé rights and a terminable licence was 50% or thereabouts. Further, it is said that the Fabergé business had been loss making in each year since acquisition; so that if the licence had been granted at the beginning of 2007, the first 5 years of the contemplated 10-year term would have been loss making and the expectation was that it would continue to make losses for another 3 years. In those circumstances the Renova parties had not, at trial, pressed an argument that there should be no discount, and the argument advanced on their behalf on the appeal—that, as the parties intended the master fund to enjoy the economic benefit of the Fabergé rights, the court should value the master fund on the basis that it owned those rights, since any difference between its value with and without the rights would be contrary to what the parties intended should happen—should be rejected as "sophistry,"

being, it is said, contrary to the Renova parties' pleaded case, contrary to the terms that the parties were actually negotiating and based on the (false) assumption that there was any concluded agreement or understanding between the parties.

165 It is submitted on behalf of the Gilbertson parties that, in the absence of any concluded agreement or understanding between Mr. Gilbertson and Mr. Vekselberg as to the terms on which the master fund would have been entitled to enjoy the economic benefit of the Fabergé rights, the judge had to consider (as he did, 2012 (2) CILR 416, at paras. 153–145) what would have been the likely outcome of the negotiations had they continued. He did so on the basis of implicit assumptions which (it is said) were favourable to the Renova parties, in that (i) he assumed that, although—given Mr. Gilbertson's right to veto the proposed project—it was "far from clear" that the project that was in negotiation would have gone ahead, Mr. Gilbertson would negotiate on the basis that he would choose to close a deal for the benefit of the master fund; (ii) he found (*ibid.*, at paras. 146–148), in favour of the Renova parties, that Lamesa (BrandCo) would have not have pressed for the inclusion of cl. 2(e) in the fourth draft IA and that the parties would have closed a deal in the same or similar terms to the fourth draft IA without cl. 2(e) (notwithstanding Renova's pleaded case that the terms of the fourth draft IA (including cl. 2(e)) were reasonable and that the subsequent implementation agreements discussed between the parties would have excluded the master fund entirely); (iii) he assumed that Lamesa or Renova would have provided the necessary funding to enable the business to carry on without external participation in the form of an investment in the master fund (which would have had the likely effect that the interests of the company and GPLP in the master fund would have become nominal and that the constitution of the master fund would itself change); and (iv) he assumed that Lamesa would have left the project with the master fund and continued to fund it, notwithstanding that it was loss making (an assumption which—given the breakdown in confidence between the Renova parties and the Gilbertson parties that had already taken place, the unwillingness of either side to cede control of the venture to the other and the need (to which it would give rise) for them to agree at every stage if the master fund were to continue to function—might well be considered highly optimistic). Further, it is said that:

(1) Given that the Renova parties were in a position to veto further investments by the master fund, they were in a position to bring the fund to a close whenever they chose. Accordingly, if the project had started to generate profits, the Renova parties would have been able to choose whether profits should (in the future) be applied for the benefit of

the Gilbertson parties or be allocated between Lamesa and Renova as Mr. Vekselberg thought fit.

(2) The Renova parties had contended, at trial, that the Lamesa project should be valued by reference to the value of Fabergé Ltd., and the judge adopted that approach. The argument that the judge was wrong to have regard to the terms of the draft IAs is now advanced on behalf of the Renova parties only because they now recognize that the terms that were actually in the course of negotiation would not have given the master fund the "full economic benefit of the Rights."

(3) Both the ownership of rights themselves and the ownership of a licence to exploit those rights are assets: a discount is appropriate to reflect the difference between the value of ownership of the assets themselves and the value of a business based upon the exploitation of those assets under licence. The application of a discount to the value of the assets in themselves is a tool to measure the gross value of the business as carried on by a rights-licensee; it is not concerned with measuring any investment that he may have made in connection with that business, whether wisely or unwisely. In explaining why a discount was appropriate in principle, Mr. Osborne had said this (at para. 3.15 of his first report):

> "The level of discount applicable to OpCo when compared to the value of an otherwise similar venture holding the Rights themselves cannot be assessed precisely. Increased risk warrants higher discount rates applied to future economic benefits, reducing their perceived present value. Liquidity discounts, which have been subject to much academic research, albeit generally in different contexts, are generally assessed as lying in the range of 20% to 50%. The impact of transaction costs is impossible to assess precisely, but could be substantial. I consider it unlikely on any basis that a rational investor would have valued OpCo at more than half the value otherwise placed on an entity holding the Rights themselves."

166 As the judge appreciated, the court's task was to determine the monetary value of the loss suffered by the Pallinghurst structure as a result of the diversion from the master fund of the economic benefit of development, exploitation and management of the Fabergé rights. He had concluded that, but for the actions of Mr. Gilbertson in late December 2006 and January 2007, the master fund would probably have had the economic benefit of developing and exploiting the Fabergé brand and the management thereof on the terms of the fourth draft IA or on very similar terms. In my view, that was a conclusion that the judge was entitled to reach on the evidence at trial, and I reject Renova's challenge to that conclusion. Accordingly, as the judge held, equitable compensation was to be assessed in an amount equal to that required to put the master fund in the position in which it would have been at trial if