# Exhibit B Cont.

(through OpCo) it had had the economic benefit of developing and exploiting the Fabergé brand and the management thereof on the terms of the fourth draft IA or on very similar terms: the question for his determination was, as he said, what would be the present financial value of that.

167 In order to answer that question, the judge thought it necessary to ask whether the value of what (absent the change in the ownership of Fabergé Ltd. resulting from Mr. Gilbertson's breach of fiduciary duty) would have accrued to the master fund was properly to be equated with the full ownership of the Fabergé rights. In my view, the judge was correct to conclude that the answer to that question was "No." He went on to ask himself whether, in assessing equitable compensation, it was appropriate to apply some discount to the current value of Fabergé Ltd. (as full owner of the brand and the rights) to reflect the separation of the right to develop, exploit and manage the rights from the ownership of the brand which (absent Mr. Gilbertson's breach of duty) was in contemplation. Again, the judge was correct to conclude that some discount from the value of full ownership was appropriate.

168 The only evidence before the judge as to the appropriate discount from the value of full ownership in the circumstances of this case was that of Mr. Osborne. His evidence, at para. 3.15 of his first report (as the Gilbertson parties point out), was that it was unlikely that a rational investor would have valued the master fund (as the holder of a licence to develop, exploit and manage the Fabergé rights) at more than half the value otherwise placed on an entity having full ownership of those rights themselves. On the basis of that evidence, which (again, as the Gilbertson parties point out) was not challenged, the judge was entitled to conclude that a discount of 50% from the value of full ownership was appropriate.

***The acquisition and development cost point***

169 In reaching his conclusion that the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation was nil, the judge took into account (as he said at para. 9.25 of his judgment) that the amount already invested in PEL (Fabergé Ltd.) and its business was US$140m., or thereabouts. Given that, as the judge held, the current value of Fabergé Ltd. (having full ownership of the Fabergé rights) was no more, and possibly less, than US$120m., and that the value of the master fund (if it had owned, through OpCo, only the economic benefit of those rights but not the brand itself) would be only some US$60m., he concluded that the amount invested was more than the relevant value (whichever of those two figures was taken to be the relevant value), so that, on a proper analysis, the master fund had suffered no loss in respect of which it should receive equitable compensation. As the judge said

(*ibid.*) "the position is that more has been invested in the company than it may be worth."

170 The judge went on to explain (2012 (2) CILR 416, at paras. 148–150) that, in the course of his closing submissions, counsel for Renova had produced a spreadsheet in which the calculations of the equitable compensation claimed was shown at US$82.38m. Renova advanced that figure after allowing, as a deduction from Ms. Gutteridge's valuation of Fabergé Ltd. (US$177m., being the amount which it had claimed in opening its case), development expenses—being the US$139.8m. for equity and debt that (as Ms. Gutteridge and Mr. Osborne agreed) had been injected into Fabergé Ltd. since January 2007 less the US$38m. paid on the acquisition of the Fabergé rights—and adding interest or other sums. The position at the end of the trial, therefore, was that Renova accepted that development expenses (but not the acquisition cost of the Fabergé rights) were a proper deduction from the current value of Fabergé Ltd. in determining the amount of the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation.

171 In this court, Renova submits that, even if any discount greater than nominal was justified (which the Renova parties deny), the judge was wrong to deduct from the discounted figure which he treated as representing the value of Fabergé Ltd. the full amount of the debt and equity raised by that company (so arriving at a negative figure), rather than to apply the discount (if any) to a net figure representing the value of Fabergé Ltd. after taking account of the debt and equity raised (and so arriving at a positive figure). It is said that, in adopting the (flawed) approach that he did, the judge erred in principle and misdirected himself as to the evidence in that he failed to apply the discount fairly and equitably across the board to both the value of Fabergé Ltd. and the amount of debt and equity raised, and so failed to apply consistent assumptions about each, and failed to take account of the evidence (a) that, had the master fund acquired the Fabergé rights, the purchase price (US$38m.) would have been provided by Lamesa and would not have been raised by the acquiring party (as it was in the case of the acquisition by PEL (Fabergé Ltd.)); and (b) that the funding of the expenses and future investment incurred in respect of the development, exploitation and management of the Fabergé rights (had they been held by the master fund) would not have been borne by the master fund but by Lamesa (outside the Pallinghurst structure) and repaid by the master fund only on a sale of those rights by the master fund (as contemplated by cl. 8 of the fourth draft IA).

172 That submission raises two issues: (i) in assessing equitable compensation, what (if any) acquisition and development expenses should be deducted from the current value of the asset to which the master fund would have been entitled but for Mr. Gilbertson's breach of fiduciary duty

and, if so, (ii) should the discount (which is appropriate to reflect the difference in the value of full ownership of the Fabergé rights themselves and the value of a business based upon the exploitation of those rights under licence) be applied before or after the deduction of acquisition and development expenses.

173 The first of those issues itself raises two questions: (a) whether the judge was wrong in treating US$38m. (the price paid by PEL on the acquisition of the Fabergé rights) as a cost that (but for Mr. Gilbertson's breach of fiduciary duty) would have been paid by the master fund; and (b) whether the judge was wrong in treating the expenses and future investment incurred in respect of the development, exploitation and management of the Fabergé rights as costs which (had those rights been developed, exploited and managed by the master fund (through OpCo) under licence, as would have occurred but for Mr. Gilbertson's breach of fiduciary duty) would have been funded by the master fund.

174 In relation to the first of those questions—whether the acquisition price was a cost that would have been paid by the master fund—it is said on behalf of the Renova parties that the judge was wrong in failing to give effect to the evidence that, but for Mr. Gilbertson's breach of fiduciary duty, the purchase price for the Fabergé rights would have been paid by Lamesa. Had he given effect to that evidence, it is said, he would have reduced the amount of debt and equity to be deducted from the value of Fabergé Ltd. by US$38m. He was wrong to take the view (2012 (2) CILR 416, at paras. 148–150) that—having concluded that Fabergé Ltd. was worth no more than US$120m. and that he should apply a discount of 50% to that value (with the consequence that the discounted value of Fabergé Ltd. was greatly exceeded by the total amount that had been invested whether or not the cost of acquisition was taken into account)—he did not need to decide the correct treatment of the purchase price paid for the Fabergé rights. In response to that submission it is said on behalf of the Gilbertson parties to be "of academic interest only," in that, unless the discount is applied after (and not before) the deduction of acquisition costs (which, it is said, is wrong in principle), it is immaterial whether the amount of debt and equity to be deducted is US$140m. or US$102m. (that is to say US$140m. less US$38m.).

175 Further, it is said on behalf of the Gilbertson parties, Renova's submission fails to take account of the documents, is contradicted by the evidence of Ms. Gutteridge and cannot be sustained. Clause 8 of the fourth draft IA was in these terms:

> "8. Upon the earlier of: (a) a disposal by PRM [the master fund] of OpCo, or (b) the winding up of PRM pursuant to the Pallinghurst Documents, PRM shall in case of a disposal by PRM of OpCo to a third party receive the respective consideration and in case of a

> transfer to BrandCo or one of its affiliates or the winding up of PRM pursuant to the Pallinghurst Documents a cash sum (the 'Value Add') equivalent to the enhancement of the value of the Fabergé Brand by PRM, exceeding the Purchase Price, as mutually agreed by BrandCo and PRM or, failing agreement, as quantified by a valuation of an assessor mutually agreeable to the parties, or failing agreement, by KPMG United Kingdom, taking into account any reasonable incurred expenses (including but not limited the Purchase Price) related to the Fabergé Brand of BrandCo and its affiliates."

It is said that, since the exercise is concerned to identify the net additional value of the enhanced rights, it would plainly have taken into account the initial value of the rights, and it was no part of the Renova parties' case at the trial that the rights were worth less than what PEL had paid for them. If Lamesa had directly or indirectly funded the acquisition of the Fabergé rights and a master fund entity had exploited those rights (under licence) on the same or similar terms to those of the fourth draft IA (other than cl. 2(e)), then the cost of acquisition would not have appeared as a payable on the master fund's balance sheet (because that cost would not have been a liability of the master fund) but would, nevertheless, have affected the value of the master fund's business (because it would have affected the payment that the fund was to receive under cl. 8 of the fourth draft IA on the termination of the licence or the sale of the business). Ms. Gutteridge confirmed that analysis in her oral evidence, both as to the US$38m. and in relation to any further investments:

> "My reading of the agreement in draft, as it stood, was that the overriding imperative in the introduction was that economic benefits should flow to OpCo, the licensee, if you like, in the analogy; and that the value add provision provided for in clause 8 was such that one was able to consider the increment, the enhanced value at the end of the term, and that that would be divided between the parties in the way that it is provided for within that document, namely, as I understood it, net of the purchase price that we spoke about and of further investments; but that that enhanced value would recognise the efforts and commercial exploitation of getting it to the point at which it was in the positive cash flow situation you've described."

176 In relation to the second of those questions—whether the development costs would have been funded by the master fund—it is said on behalf of the Renova parties that the judge was wrong in failing to give effect to the evidence that, but for Mr. Gilbertson's breach of fiduciary duty, the funding of the expenses and future investment incurred in respect of the development, exploitation and management of the Fabergé rights would have been borne by Lamesa or by Renova (outside the Pallinghurst structure) and repaid by the master fund only on a sale of those rights by

the master fund (as contemplated by cl. 8 of the fourth draft IA), and that "there would have been no need for Fabergé Ltd. to raise any debt or equity because the costs of the future development of the Rights would have come from Lamesa." In response to that submission, it is said on behalf of the Gilbertson parties that the argument that the additional moneys would have come from Lamesa is quite separate from the argument in relation to the US$38m. The argument raised in relation to Lamesa's additional funding was not raised at trial and it was not to be found in the Renova parties' grounds of appeal. If the argument were correct, it would lead to the conclusion that any and all of the additional investment should be ignored, which is not a contention that the Renova parties have hitherto advanced. Even now, the only specific expense incurred by Fabergé Ltd. that Renova suggests the master fund would not have had to incur is the cost of acquiring the Fabergé rights, that is, US$38m.

177 The true position, it is said, was that neither Lamesa nor Renova had committed itself to providing the necessary funding. Mr. Kuznetsov's evidence was that Renova would have been prepared to commit funds, but he also confirmed that there was no understanding between Lamesa and Renova as to how this might have been done, and he failed to explain why Renova should have been willing to provide funds in excess of US$100m. or more when it was unwilling to put up the initial US$38m. In his oral evidence he said this:

> "Let me be very clear. The project, Egg . . . was developing and developed by December 2006, consisted of two parts. One part was ownership—acquisition and ownership of the Rights. And the other part, which was by far more interesting from a business standpoint, was business development related to the Fabergé brand. And whereas Renova, indeed, was not prepared to commit 38 million for acquisition of the brand, and ultimately Lamesa company either committed or at least, through Mr Vekselberg, made it known that they would be prepared to put 38 million for acquisition of the brand, Renova was very happy to commit to inclusion of the business part of the Project Egg or the acquisition of Fabergé brand to the Fund. And, clearly, initial investments into the first part were 38 million. However, subsequent investments in development of the business related to Fabergé were expected to be significantly higher. And this is a part to which Renova was prepared to commit funds, of course based on further investigation and further development of the business case."

And, in answer to a question whether the licence revenues to which he had referred could have justified an investment of many tens of millions of dollars, he replied: "Absolutely not." In those circumstances, it is said on behalf of the Gilbertson parties that, if the additional funding were to have

come from Renova, it would have appeared as a cost of investment to the master fund. If it were to have come from Lamesa, it would have been taken into account under cl. 8 of the fourth draft IA. Moreover, unless it is being suggested that Lamesa was going to invest in excess of US$100m. over the lifetime of the fund's exploitation of the Fabergé rights without seeking any interest, the cost of the investment was bound to be reflected in the books of the master fund in some way. The fact that it is unclear quite how it would have been reflected in the fund's books reflects the fact that it was wholly unclear what arrangements (if any) the parties might have been able to put in place. But as 75% of the master fund was owned by the Gilbertson parties, it is safe to assume that Lamesa would not have provided the funding without demanding participation in the fund (as an investor) or a commercial return on its moneys.

178 In addressing the second issue—should the discount (which is appropriate to reflect the difference between the value of full ownership of the Fabergé rights themselves and the value of a business based upon the exploitation of those rights under licence) be applied before or after the deduction of acquisition and development expenses—it is said on behalf of the Gilbertson parties that the contention that any discount should be applied to the net value of the business (after deducting the expenses incurred in developing it), rather than to the actual current value of the business, was not advanced at trial on behalf of the Renova parties. Renova's submission that, in adopting the approach that he did, the judge erred in principle, in that he failed to apply the discount fairly and equitably across the board to both the value of Fabergé Ltd. and the amount of debt and equity raised, is said to be "manifestly" flawed, in that "there is no basis in law, fact or logic to justify discounting the expenses incurred in developing a business of a rights-licensee simply because the business in which the expenses were incurred is worth less than it might have been as that of a rights-owner."

179 In my view, the judge was correct to adopt the approach that he did. In assessing the loss (if any) which the master fund had suffered by reason of Mr. Gilbertson's breach of fiduciary duty—and in respect of which equitable compensation should be awarded—he was correct, first to apply the appropriate discount to the current value of Fabergé Ltd. (as the full owner of the Fabergé rights) in order to determine the (hypothetical) current value of the business which (but for Mr. Gilbertson's breach of duty) the master fund would have carried on as licensee since January 2007 and, secondly, to deduct from the current value of that business the costs and expenses which would have been incurred by the master fund in carrying on that business under licence since that date. I am satisfied, also, for the reasons advanced on behalf of the Gilbertson parties, that the costs and expenses to be deducted included the post-acquisition expenses and

future investment incurred in respect of the development, exploitation and management of the Fabergé rights: that is to say, an amount of US$102m. or thereabouts. It follows, in my view, that the judge was correct to hold that he did not need to decide how the acquisition cost of the Fabergé rights (US$38m.) should be treated. His conclusion that—after deducting post-acquisition costs of US$102m. from the (hypothetical) current value of the business which (but for Mr. Gilbertson's breach of duty) it would have carried on since January 2007—the master fund had suffered no loss was the same whether or not the acquisition cost of the Fabergé rights was included in the costs and expenses to be deducted.

180 For the reasons set out in this section of my judgment I would uphold the judge's decision that the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation should be valued at nil. It follows that I would dismiss Renova's appeal from the judge's order dismissing its claim to equitable compensation.

**Was the judge wrong to hold that Autumn was liable as a constructive trustee of the shares issued by PEL in January 2007?**

181 The judge explained (2012 (2) CILR 416, at para. 74) that Renova's claim against Autumn was for an order that Autumn account as a constructive trustee for the shares in PEL issued to it in January 2007, or their value, on the ground that Autumn knowingly received those shares as property misapplied or procured to be misapplied by Mr. Gilbertson in breach of his fiduciary duties to the company or, in the alternative, on the ground that it was a volunteer (in that it provided no consideration for the issue of those shares in PEL).

182 The judge recorded (*ibid.*, at para. 75) that there was no dispute between the parties that the elements which needed to be established in order to found a claim based on liability for knowing receipt were set out by Hoffmann, L.J. in *El Ajou* v. *Dollar Land Hldgs.* (16) ([1994] 2 All E.R. at 700):

> ". . . the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; secondly the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty."

Each of those elements was in dispute but the judge was able to approach the claims against Autumn on the basis that, as he had held earlier in his judgment, Mr. Gilbertson had acted in breach of fiduciary duty in procuring the issue to members of the consortium (including Autumn) of PEL shares in January 2nd, 2007, thereby diluting the previous interest of the master fund in PEL (as owner of all of the issued shares) to virtually nil (as owner of less than 1% of the issued shares).

183 The judge addressed the first element—whether the issue of PEL shares to Autumn in January 2007 had been a disposal of assets of the master fund—2012 (2) CILR 416, at para. 76(i)–(v). He explained that the Gilbertson parties disputed Renova's case that the dilution of the previous interest of the master fund in PEL from 100% to less than 1% constituted a disposal of the assets of the master fund. As he said (at sub-para. (ii)) it was their contention that there had been no disposal of any assets of the master fund in that the new shares issued by PEL in January 2007 did not constitute property of PEL (or of anyone else) prior to issue and that, accordingly, the issue of those shares could not constitute a disposal of assets. In support of that contention, the Gilbertson parties had relied (in their written closing submissions) on observations in the judgments of the High Court of Australia in *Pilmer* v. *Duke Group Ltd.* (30), to which the judge referred. The judge rejected that contention. He said this (2012 (2) CILR 416, at para. 76(v)):

> "(v) In my view, the position taken on behalf of the Gilbertson parties, in the circumstances of this case, is unduly restrictive and strict. This is an equitable concept and it does not seem to me that the reference to disposal of assets in Lord Hoffmann's first requirement for liability for knowing receipt in *El Ajou* v. *Dollar Land Holdings* . . . would have been intended to or did restrict the terms 'a disposal of his [the plaintiff's] assets' or 'assets which are traceable as representing the assets of the plaintiff' to mean pre-existing tangible items of property already legally and beneficially owned by the plaintiff. The court must look at the particular circumstances concerned in order to achieve a fair and equitable result. In the present case, in my opinion, the issue of the new PEL shares which had the effect of reducing the master fund's ownership and control of PEL from 100% to just under 1% did amount in the circumstances to disposal of an asset of the master fund (and, derivatively, the company) in the sense required to comply with the first principle in the *El Ajou* case."

184 Having reached that conclusion, the judge was able to address the second of the three elements identified by Hoffmann, L.J. in the *El Ajou* case (16)—whether the issue of shares in January 2007 to Autumn constituted a receipt by Autumn of assets traceable as representing assets of master fund which had been disposed of in breach of fiduciary duty—without further elaboration. He said this (2012 (2) CILR 416, at para. 76(vi)):

> "(vi) It follows, in light of my views above, that the second element identified by Lord Hoffmann, namely that the defendant has beneficially received assets which are traceable as representing assets of the plaintiff, is in principle also made out."

And he went on to explain that he would have been of the same view even if he had been wrong in holding (earlier in his judgment) that the new PEL shares had been issued on January 3rd, 2007 (rather than on a later date—January 19th, 2007—as contended by the Gilbertson parties). He rejected the argument, advanced on behalf of the Gilbertson parties, that the issue of shares on January 19th, 2007 (some 16 days after Mr. Gilbertson's breach of fiduciary duty on January 3rd, 2007, if any)—even if constituting a disposal of the assets of the master fund—could not be said to be the disposal of assets traceable to any breach of fiduciary duty by Mr. Gilbertson. He said this (*ibid.*, at para. 77):

> "[T]hat date [January 19th, 2007] is in my view sufficiently close to January 3rd, 2007 and the share issue sufficiently related to the actions of Mr. Gilbertson at about that time to satisfy me that in the circumstances the assets received by Autumn in the form of the new shares may be said to be traceable to Mr. Gilbertson's breach of fiduciary duty."

In the alternative, he said, Mr. Gilbertson's procurement of the issue of the new PEL shares, even if not effective until January 19th, 2007, was not disclosed and was unknown to the Renova parties and it might be argued that that was simply a perpetuation of Mr. Gilbertson's breach of duty. The judge concluded that the PEL shares issued to Autumn in January 2007 were "traceable as representing assets which ought to properly have belonged to the master fund" and that "the issue of the PEL shares provided Autumn with a gratuitous share of the rights through a shareholding in PEL which belonged to and should have remained with the master fund."

185 The judge then turned to what he described as "the key question": whether Autumn had the requisite knowledge. He addressed that question: 2012 (2) CILR 416, at paras. 79–91. He explained (*ibid.*, at para. 79) that Autumn was an "off-the-shelf" BVI company that had been acquired on January 2nd, 2007 by Fairbairn, as trustee of the BPG Settlement, as a special purpose vehicle through which the BPG Settlement would make a loan by to PEL in order to fund Mr. Gilbertson's share of the purchase price of the Fabergé rights and to hold the new PEL shares which Mr. Gilbertson would procure to be issued to it; that Autumn was wholly owned by Fairbairn and Fairbairn's associated company, Fairbairn Corporate Services Ltd. ("FCSL"); that Mr. Thomas was a director of Fairbairn; that Mr. Thomas became Autumn's sole director; and that Mr. Thomas was also a director of FCSL. He went on to say (*ibid.*, at para. 80) that there were, arguably, two different ways in which Autumn could be said to have the requisite knowledge: (i) by imputation to it of Mr. Gilbertson's actual knowledge, or (ii) through what Mr. Thomas knew or should have known.

186 The judge set out (*ibid.*, at para. 81, in seven numbered sub-paragraphs) the factors on which Renova relied in support of its submission that "Mr. Gilbertson was in reality and in practice the directing mind and will of Autumn which was an entity effectively controlled by Mr. Gilbertson"; that Fairbairn (through Mr. Thomas) "was simply going through the motions in relation to his request for the money but in reality was acting on Mr. Gilbertson's instructions"; and that, accordingly, Mr. Gilbertson's knowledge of all the relevant background and circumstances was to be imputed to Autumn. He explained (*ibid.*, at para. 84) that it was submitted on behalf of the Gilbertson parties that, in order to hold that Mr. Gilbertson was in practical terms the directing mind and will of Autumn, it was necessary to conclude that "Mr. Thomas had failed in his duties in respect of Autumn as a matter of fact"; that (it was said) the evidence of Mr. Thomas demonstrated that he took his duties very seriously; and that there was no basis for the suggestion that he allowed Mr. Gilbertson to override him. The judge rejected that approach. He said this (*ibid.*, at para. 85):

> "From my own assessment of the evidence, I consider that the reality is, as I have already said, that Mr. Gilbertson is a forceful and tough businessman and he is no doubt the source of the funds in all three of the Gilbertson family trusts. He was not, in my view, the kind of man who would readily take no for an answer. Mr. Thomas would not want to upset or disagree with his client. My impression was that he was very ready to comply with Mr. Gilbertson's requirements and to place great reliance upon him in doing so. There was no question of Mr. Gilbertson overriding him; there was little or nothing to override. Mr. Thomas went through the motions but there was never any doubt that he would comply with Mr. Gilbertson's request and Mr. Gilbertson knew and relied upon that."

187 The judge directed himself (*ibid.*, at para. 86 of his judgment) that the answer to the question whether Autumn could be said to have the requisite knowledge as a consequence of what Mr. Thomas knew or should have known turned on whether Mr. Thomas knew, or should have known if he had made appropriate independent enquiries, that the Fabergé rights were being acquired by or for the benefit of Mr. Gilbertson in circumstances which amounted to a breach of his fiduciary duties, and that the "requisite knowledge," in that context, was knowledge that the shares issued by PEL in January 10th, 2007 were traceable to a breach of fiduciary duty by Mr. Gilbertson. He explained (*ibid.*, at para. 87) that Renova's case was that Mr. Thomas knew all about the Pallinghurst structure and knew that Renova had an interest under that structure: as he said, the structure chart (which Mr. Thomas had seen) made that clear. He referred (*ibid.*, at para. 88) to the evidence of the telephone conversation between Mr. Thomas and Mr. Gilbertson on January 2nd, 2007 in the

course of which, he said, Mr. Thomas enquired about the relationship between Pallinghurst and Mr. Vekselberg and received an answer from Mr. Gilbertson which "clearly indicated that Mr. Vekselberg would think Mr. Gilbertson was doing something which he was not entitled to do with regard to Mr. Vekselberg and the duties which Mr. Gilbertson owed in respect of the Pallinghurst structure." That telephone conversation, he said, "should . . . have alerted Mr. Thomas and caused him to at least make further independent enquires" but "he did not do so because he did not feel able or willing to seriously challenge or question what Mr. Gilbertson wanted." He explained (*ibid.*, at para. 89) that it had been submitted on behalf of the Gilbertson parties that there was no evidence that Mr. Thomas knew that Mr. Gilbertson was a director of the company but said that it was hard to believe that he did not, given his familiarity with the Pallinghurst structure and the fact that Fairbairn was a 50% shareholder of the company, and that, in his view, the probability was that Mr. Thomas did know that Mr. Gilbertson was a director of the company. He went on to say this (*ibid.*, at paras. 90–91):

> "90 With regard to the issue of the new shares in PEL to Autumn, Mr. Thomas knew PEL was a Pallinghurst company, wholly owned by the master fund and indirectly owned through the company which was owned 50% by the plaintiff, Renova Resources, and 50% by Fairbairn itself. Mr. Thomas must have realized that the master fund's, and thus indirectly the company's, interest in PEL was going to be diluted as a result of the issue of such shares which would be seriously prejudicial to the master fund and the Pallinghurst structure in which Renova, and so indirectly Mr. Vekselberg, had an interest. Mr. Gilbertson's answer to his question about Mr. Vekselberg's likely reaction to Mr. Gilbertson purchasing the Fabergé brand as a Christmas present for himself should have alerted him to the fact that there would be a problem as a result of what Mr. Gilbertson was doing.
>
> 91 It was argued on behalf of the Gilbertson parties that Mr. Vekselberg would be 'extremely pissed off' because Mr. Vekselberg wanted to acquire the rights for himself. That is, of course, a rather incomplete description of Mr. Vekselberg's position in that he also took the position that the economic benefits and management of the Fabergé brand should remain with the master fund. However, the fact is that that suggestion was anyway not made entirely clear to Mr. Thomas in the telephone conversation. In my view, the only interpretation available to Mr. Thomas of Mr. Vekselberg's likely reaction, in light of his own knowledge of the Pallinghurst structure and what he had otherwise been told by Mr. Gilbertson, was that Mr. Gilbertson was doing or proposing to do something contrary to the interests of the master fund, which was indirectly owned by the company, of which Mr. Gilbertson was a director and Fairbairn was a 50%

> shareholder, as part of the Pallinghurst structure, in which Renova and Mr. Vekselberg had an interest. Mr. Thomas knew, or at least should have known, that he should at least make further enquiries in relation to Mr. Gilbertson's actions or proposed actions. In my view, Mr. Thomas must or ought to have realized that Mr. Gilbertson was or was likely to be in breach of his director's duties and that proceeding to implement Mr. Gilbertson's request in the circumstances without more information and without the knowledge of Renova and/or Mr. Vekselberg would be inappropriate for a prudent trustee."

188 The judge (2012 (2) CILR 416, at paras. 93–95) addressed the question whether Autumn was to be treated as a constructive trustee of the PEL shares issued to it in January 2007 (independently of "knowing receipt") because it received those shares as a volunteer. He explained (*ibid.*, at para. 93) that Autumn never paid for those shares: it received them at the same time as, but not as part of, the loan transaction whereby it lent PEL the sum of US$9.5m. (and then the further sum of US$0.5m.) at interest. He noted that the board resolution of PEL on January 3rd, 2007 described the issue of the shares as being "in addition to the loan," and said that there was no apparent commercial connection between the loan and the issue of the shares. It was apparent, he said, that "the shares were a gift from the start and they were treated as such when the loan was repaid." He rejected (*ibid.*, at para. 94) the submissions advanced on behalf of the Gilbertson parties that "whatever the precise circumstances in which the new shares were issued, such issue was part of the wider commercial transaction and should not be separated from the loan transaction," and that, if (as he held) Autumn did not pay for the PEL shares, "as a result of its acquisition of the shares it is a debtor of Fabergé Ltd. in respect of the shares and accordingly not a volunteer." He rejected each of those contentions on the ground that they did not accord with the evidence or the circumstances. He said this (*ibid.*):

> "The new shares were issued in January 2007, some 5½ years ago, and there is no evidence that any demand for payment in respect of the shares has ever been made nor any indication that Autumn (or for that matter any of the other members of the consortium) is expected to pay for the new shares or is considered a debtor in respect of them. Nor, as far as I am aware, has Autumn or any of the other members of the consortium ever made any offer to pay for the shares. In my opinion, the evidence clearly indicates that Mr. Gilbertson procured PEL (now Fabergé Ltd) to issue the new shares gratuitously for no consideration or expected consideration."

And he went on to say this (*ibid.*, at para. 95):

"Accordingly, the plaintiff argues, Autumn was never a *bona fide* purchaser for value without notice. Equity will not assist a volunteer: see *In re Diplock* . . . ([1947] Ch. at 781–784, *per* Wynn-Parry, J.). Therefore, on this basis also, Autumn holds the shares concerned in Fabergé Ltd. (formerly PEL) on constructive trust for the master fund/GPLP/the company and is liable to account for them. In the circumstances I agree with that submission."

189 The judge gave effect to his conclusion by declaring, at para. 1 of his order of November 6th, 2012, that Autumn held the shares issued to it by PEL in January 2007 (which had become 25,000 ordinary shares in Fabergé Ltd., following a change of name and a sub-division of shares in 2008) as constructive trustee for the master fund, and by directing (at para. 2) that Autumn should forthwith transfer those 25,000 ordinary shares to the master fund.

***The parties' submissions on this appeal***

190 Autumn appeals against that declaration and the order to transfer. The grounds on which that appeal is advanced are that the judge misdirected himself and erred in law and/or fact (i) in relation to the issuance of shares in PEL to members of the consortium; (ii) in holding that Autumn was liable in knowing receipt having regard to its relationship with Mr. Gilbertson, the property which it received, the person from whom it received the property and its state of knowledge at the time of receipt; and (iii) in holding that Autumn was liable as a volunteer. In resisting Autumn's appeal, it is submitted on behalf of Renova that the judge was correct to make the findings of law and of fact that he did.

191 It is said on behalf of Autumn, by way of introduction, that a claim that it holds the PEL shares which it received as a constructive trustee cannot arise unless there was a relevant breach of fiduciary duty by Mr. Gilbertson. But (given the judge's finding that Mr. Gilbertson was in breach of fiduciary duty), it is submitted that it is important to keep in mind that (prior to the issue of the PEL shares) Autumn was not a fiduciary in relation to the master fund, and that, in this context, there is a significant difference between claims against fiduciaries and claims against third parties. A fiduciary may be required to account for an asset or opportunity that it acquires for itself in breach of duty notwithstanding that the beneficiary had no proprietary claim to that asset. A third party can only be required to account as a constructive trustee for an asset to which the beneficiary does have a proprietary claim, although (it is accepted) it is unnecessary for the beneficiary to show that it has suffered loss.

192 It is pointed out that, in the present case, Renova had pleaded a claim against Autumn based on the premise that Autumn was

Mr. Gilbertson's alter ego, on that premise Renova was able to formulate a non-proprietary claim against Autumn for an account of profits. But, it is said, Renova did not pursue its pleaded allegation that Autumn was Mr. Gilbertson's alter ego and, in those circumstances, there was no longer any basis for a non-proprietary claim for an account of profits: in order to obtain the relief which it sought, it was necessary for Renova to advance a proprietary claim against Autumn. The proprietary claims advanced were (i) a claim in knowing receipt; and (ii) a claim for the return of property acquired as a volunteer. The elements of the two proprietary claims are not the same but, it is said, the requirement that Autumn was the recipient of property, or the traceable proceeds of property, of the master fund is common to both.

193 Properly analysed, as it seems to me, the requirement common to both proprietary claims is that Mr. Gilbertson's breach of fiduciary duty to the company (and, more generally, to the master fund and the other entities within the Pallinghurst structure) caused Autumn to receive property of the master fund, or the traceable proceeds of such property. If that condition is satisfied, then Autumn is required to account to the master fund as a constructive trustee for what it received, unless it can rely upon circumstances which lead to the conclusion that such an order would be inequitable. Those circumstances include receipt of the property (or proceeds) as a bona fide purchaser without notice. A claim on the basis of "knowing receipt" is a claim that the recipient knew (or ought to have known) of the breach of fiduciary duty, and so cannot assert that it would be inequitable to require it to account as a constructive trustee.

194 In those circumstances, it is convenient to address the submissions of the parties under four heads: (i) whether the judge was wrong to make the findings of fact that he did in respect of the issue of the new PEL shares in January 2007; (ii) whether, upon the issue of the new PEL shares in January 2007, Autumn was the recipient of property of the master fund, or the traceable proceeds of such property; (iii) whether Autumn received the new PEL shares as a volunteer and not as a purchaser for value and so held those shares as a constructive trustee for the master fund; and (iv) whether, if (and notwithstanding that) Autumn received the new PEL shares as a purchaser for value, it held those shares as a constructive trustee for the master fund on the basis of "knowing receipt."

(i) *Whether the judge was wrong to make the findings of fact that he did in respect of the issue of the new PEL shares in January 2007*

195 It is said on behalf of Autumn that the judge misdirected himself and erred in law and/or in fact in holding:

(1) That the new shares issued by PEL were issued on January 3rd, 2007.

Had the judge directed himself properly, it is said, he should have found (i) that the new shares were issued at a later date (said, on the evidence before the judge, to be January 19th, 2007); and (ii) that, on that basis, Mr. Gilbertson was not in breach of any fiduciary duty he owed to the company, given the evidence as to the dealings between the parties in the period after January 3rd, 2007.

(2) That Autumn had not given value for the new PEL shares.

Although the judge may have been correct to find that neither Autumn nor the other members of the consortium paid for the shares, nevertheless, it is said the issue of the shares served a clear commercial purpose, in that the issue was "clearly calculated to cause the consortium to forbear from demanding repayment" of the moneys lent to fund the acquisition of the Fabergé rights and by way of working capital and such forbearance may be seen as giving value in equity. Further, it is said, the new PEL shares served as a form of alternative security. In all the circumstances, it is said that, far from giving no value, the value Autumn and the other members of the consortium gave was what enabled PEL to survive.

(3) That Mr. Gilbertson had procured the issue of the new PEL shares.

In the circumstances that, it is said, the judge referred to no evidence to support a finding that Mr. Gilbertson procured the issuance of the new PEL shares, he appears to have been content to assume that Mr. Gilbertson must have done so. There was no basis for this assumption.

196 As I have said, earlier in this judgment, the judge found (at para. 9.48 of his judgment) that the register of members of PEL showed that the new shares were issued on January 3rd, 2007, and he rejected the contention, pleaded by the Gilbertson parties in their amended defence, that, as a matter of fact, those additional 100 shares were not issued by PEL until January 19th, 2007, or thereabouts. I have already explained why I take the view that the judge was entitled to reach the conclusion that he did. It is unnecessary to revisit that point under this head. But I should add, for completeness, that I agree with the judge—and I accept the submission advanced on behalf of Renova on this appeal—that, in any event, success on its contention that the new PEL shares were not issued until January 19th, 2007, or thereabouts, would not assist Autumn in the present context. I reach that conclusion for three reasons:

(1) There is no dispute that 100 new PEL shares were issued in January 2007 (whether on January 3rd, 2007, or on a later date), and that 25 of those shares were issued to Autumn: the actual date upon which those shares were issued is irrelevant to the question whether the 25 new PEL shares issued to Autumn in January 2007 could be the subject of a proprietary claim in these proceedings.

(2) As I have explained, Mr. Gilbertson's breach of fiduciary duty occurred when he decided that new PEL shares should be issued to his consortium in order to obtain control of the Fabergé rights for his own benefit (or for the benefit of the consortium): the actual date upon which the shares were issued is irrelevant to the question whether or not there was a breach of fiduciary duty upon which Renova can rely in these proceedings. Even if (which I do not accept) the evidence of events which took place after January 3rd, 2007 would, or should, have led the judge to find that, by January 19th, 2007, the parties were negotiating on the basis that the master fund had no separate interest in the Fabergé rights, there was no evidence to support the view that that finding would, or should, have led to judge to conclude that Mr. Gilbertson took the decision which led to the issue of the new PEL shares later than January 3rd, 2007.

(3) For the reasons which I shall explain in this section of my judgment, Autumn had knowledge of that decision—and knowledge that it gave rise to a breach of duty by Mr. Gilbertson—on, or just before, January 3rd, 2007 when, following the telephone conversation between Mr. Gilbertson and Mr. Thomas on January 2nd, 2007 and the transfer by Fairbairn, as trustee of the BPG Settlement, of US$9.5m. to enable Autumn to reimburse K-MIC in respect of 25% of the US$38m. loan to PEL by means of which the cost of acquiring the Fabergé rights from Unilever was funded: the actual date upon which the new shares were issued by PEL is irrelevant to the question whether or not Autumn had the requisite knowledge in the context of the claim in these proceedings based on knowing receipt (save, perhaps, that—if the new shares were not issued until January 19th, 2007, as Autumn contends—there was all the more reason for Mr. Thomas to make enquiries as to the reason for the time that had elapsed following the acquisition of the Fabergé rights some two and a half weeks earlier).

197 In developing the submission that the judge was wrong to find that the members of the consortium had not given value for the PEL shares that were issued to them in January 2007, it is said on behalf of Autumn that:

(1) The directors of PEL must be taken to have thought that those to whom the new PEL shares were issued were giving value for those shares in that they caused those shares to be entered in the register of members as fully paid. The entry in the register is, it is said, *prima facie* evidence that Autumn paid for the shares. Mr. Thomas was unable to recall one way or the other, and the Renova parties elected not to cross-examine Mr. Sean Gilbertson on the issue.

(2) Mr. Thomas gave evidence to the effect that he had expected Autumn to receive shares by way of security. It is true that the loan documentation simply provided the consortium with a lien over the Fabergé rights by way of security but the loan documentation was "only

part of the story." The moneys to fund the acquisition of the Fabergé rights were raised in a hurry: formal arrangements took time to catch up.

(3) The lien over the Fabergé rights and the issue of the new PEL shares should be seen as complementary: the PEL shares "were no more than Autumn had expected it would have when the transaction was initially put to it." Autumn advanced—and refrained from seeking to recover—US$9.5m. on the basis that its interests were sufficiently protected by its ownership of PEL shares.

198 In response to those submissions it is said on behalf of Renova that:

(1) It is well established that it is for a third party who has acquired property as a result of a breach of trust by a fiduciary—and who seeks to resist a constructive trust claim—to satisfy the court that it was a bona fide purchaser of the property acquired for value and without notice. In support of that proposition reliance is placed on observations of Sir Collins, M.R. and of Cozens-Hardy, L.J. in *Re Nisbet & Potts' Contract* (27) ([1906] 1 Ch. at 403 and 410), and in *Lewin on Trusts* (18th ed., para. 41–114, at 1720, paras. 42–22 – 42–23, at 1743–1744 (2008)). Autumn bears the burden of proving that it gave value for the new PEL shares that were issued to it in January 2007. On the evidence before the judge it cannot discharge that burden.

(2) Autumn appears to accept that the consortium gave no consideration for the new PEL shares in the sense in which the term is used at common law. If it gave no consideration sufficient even to support a contract, then it must follow that it gave no value in the context of the bona fide purchaser defence to a constructive trust claim. In support of that proposition Renova relies on observations of Neuberger, J. in *Nurdin & Peacock plc* v. *DB Ramsden & Co. Ltd.* (29) ([1999] 1 EGLR at 123):

> "Second, it was contended that the payment of £1 under the 1995 transfer constituted sufficient 'value' to render Nurdin a 'purchaser for value'. In the field of contract, it is well established that the court does not inquire into the adequacy of consideration: once it has established that some consideration has moved, that is enough for establishing the essential prerequisite of a contract. However, the doctrine of consideration has been developed in the context of the common law, whereas the concept of a 'purchaser for value' in a case such as this has a very different history, being solidly based on equity. In this connection, it is worth remembering that equity looks at the substance and not at the form. It seems to me that, particularly in the context of an intra-group transfer, the substance of a payment of £1 does not render a transferee a 'purchaser for value.'"

Accordingly, even if, on the basis of the Register of Members, Autumn were presumed to have paid the par value for the new PEL shares issued to

it in January 2007, such a nominal consideration (far below the commercial value of the new shares) does not support a defence of "purchaser for value."

(3) Further, equity requires that value is actually paid. In support of that proposition, Renova relies on the decision in *Story* v. *Windsor (Lord)* (34) and the commentary in Megarry & Wade, *The Law of Real Property*, 7th ed., para. 8.008, at 257 (2008). The evidence given by Mr. Thomas at trial was that he could not recall that Autumn ever paid for the new PEL shares.

(4) The submissions that the new PEL shares were issued as security for the loans or to persuade the lenders not to demand repayment of the loans—advanced on behalf of Autumn in this court—were not advanced at trial and are "manifestly contrary to all the evidence." In particular:

(i) The board resolution of January 3rd, 2007 contains an express statement that the share issue was "in addition to the loan" made to enable PEL to pay Unilever.

(ii) In their evidence at trial, Mr. Gilbertson and Mr. Thomas accepted, without equivocation, that the issue of the new PEL shares was not a term or condition of the loan by Autumn. The draft loan agreement (which post-dated both the making of the loan and the issue of the shares, which was never finalized or executed and which contained a term as to security) made no reference to the issue of the new PEL shares.

(iii) There was no evidence of any discussion that the issue of the shares would be taken to be in substitution of the grant of security, and such a discussion would be inconsistent with the order in which events occurred.

(iv) The consortium did not need security for their loans because the terms of the loans (as recorded in the board minutes of January 3rd, 2007) entitled its members to call for repayment of the loan within seven days either in cash or (at their discretion) by the transfer of all of the assets, contracts and receivables of PEL to a vehicle nominated by them. It was for that reason that cl. 11 of the subsequent draft loan agreement took the form that it did.

(v) In his evidence at trial, Mr. Thomas accepted that he had been wrong to say (in his witness statement) that he had expected to receive shares by way of security.

(5) As all the evidence shows, the loans and the issue of new PEL shares were separate transactions. The new PEL shares were not consideration for the loans: they were simply a gift, "to sweeten the deal for the consortium and to enable Mr. Gilbertson to follow through on his plan to 'negotiate with the Russians from a position of strength.'" The shares were not accepted by the consortium as the price of its forbearing to demanding security for the loan.

199 I reject the submission that the judge was wrong to find that the members of the consortium had not given value for the PEL shares that were issued to them in January 2007. The description in the register of members of the new shares as "fully paid" is no more than a statement that there is no liability on the holders of those shares to pay future calls: it is not a statement that the persons to whom the shares have been issued have paid (or otherwise given value) for those shares. Nor is there any evidence that the new PEL shares were issued by way of security for repayment of the moneys lent by members of the consortium in order to fund the purchase of the Fabergé rights. As the minutes of the directors' meeting held by telephone conference call on January 3rd, 2007 record, the loans were made on terms that the lenders might, at any time, call for repayment within seven days; such repayment to be made either in cash or (in the sole discretion of the lenders) by the transfer of all the assets, contracts and receivables of PEL "to a vehicle nominated by the Lenders." In those circumstances, ownership of the new PEL shares provided no additional security for the repayment of the loan—in that, if the loans were not repaid on demand, those shares would become worthless. Further, there was no provision for the redemption—by cancellation (or re-transfer to PEL)—of the new shares in the event that the loan were repaid.

200 I have addressed, in an earlier section of this judgment, the submission that the judge was wrong to hold that Mr. Gilbertson had procured the issue of the 100 new PEL shares in January 2007. For the reasons that I have already set out, it is fanciful to suggest that the decision to issue those shares—although implemented by Mr. Sean Gilbertson and Mr. Andrew Willis (as the directors of PEL)—was not a decision taken by Mr. Gilbertson as a necessary element in his scheme to obtain control of the Fabergé rights (by diverting effective ownership of PEL from the master fund to his consortium) in order, thereafter, to "negotiate with the Russians from a position of strength." It is unnecessary to revisit that point.

(ii) *Whether, consequent upon the issue of new PEL shares in January 2007, Autumn was the recipient of property, or the traceable proceeds of property, of the master fund*

201 Autumn reminded the court of Hoffmann, L.J.'s observation in *El Ajou* v. *Dollar Land Hldgs. plc* (16) ([1994] 2 All E.R. at 700), and

submitted that "opportunities" must be distinguished from "assets." In support of that distinction, Autumn relied on passages in *Cook* v. *Deeks* (14); *Competitive Ins. Socy. Co. Ltd.* v. *Davies Invs. Ltd.* (13); *Belmont Fin. Corp.* v. *Williams Furniture Ltd. (No. 2)* (7); *Charter plc* v. *City Index Ltd.* (11), and, by contrast, *Satnam Invs. Ltd.* v. *Dunlop Heywood & Co. Ltd.* (33), and *Commonwealth Oil & Gas Co. Ltd.* v. *Baxter* (12).

202 Renova recognizes the distinction between opportunities and assets but submits that what it describes as "the controversial issue about whether corporate opportunities or information are property for the purposes of a proprietary claim" does not arise in the present case. That issue does not arise, it is said, because the assets in respect of which Renova's proprietary claim is advanced are the new PEL shares issued to Autumn in January 2007, and those new shares are "the traceable product of either the Rights, or the contractual right to the Rights under the SPA." This, it is said, differs from the more usual corporate opportunity case—of which *Satnam Invs.* provides an example—in which the asset in respect of which the proprietary claim is advanced was acquired (by the defendant) by the use or exploitation of a commercial opportunity wrongfully diverted from the claimant. Properly understood, the new PEL shares issued to Autumn represented substantially the whole of the value of an asset (the Fabergé rights) which, at the time the shares were issued, was owned by PEL and so, indirectly, owned by the master fund as the owner of 100% of PEL. The Fabergé rights were not a "corporate opportunity"—comparable to the confidential information in the *Satnam* case—they were themselves an asset. So, also, was the master fund's holding (immediately prior to the issue of the new shares) of 100% of the issued share capital of PEL.

203 It is submitted on behalf of Autumn that the master fund had no proprietary interest in the new PEL shares issued in January 2007: in that, until those shares were issued by PEL, they did not exist. In support of that submission, Autumn relies on observations in the judgment of the majority in *Pilmer* v. *Duke Group Ltd.* (30) ([2001] 2 BCLC 773, at para. 20), a decision of the High Court of Australia. It is pointed out that, before the issue of the new PEL shares to members of the consortium in January 2007, the master fund was the owner of one PEL share, and that, after the issue of the new PEL shares to members of the consortium, the master fund remained the owner of that PEL share. What changed was not the identity of the asset owned by the master fund, but the characteristic of that asset in relationship to the ownership of PEL. The effect of the issue of the new shares to members of the consortium was that the proportionate interest in PEL associated with ownership of that one share changed from 100% to less than 1%. Those submissions are, if I may say so, self-evidently correct, and they are not, I think, in dispute. But they provide no

answer to what (as Renova submits) is the relevant question for determination under this head: whether, consequent upon the issue of new PEL shares in January 2007, Autumn was the recipient of the traceable proceeds of property of the master fund.

204 It is accepted on behalf of Autumn that there is a sense in which the master fund may be said to have owned the Fabergé rights, albeit indirectly, and that what was diverted to Autumn (and the other members of the consortium) was that indirect ownership. But, it is said, although "indirect ownership" might be sufficient to describe that in relation to which the master fund may have suffered any loss, "indirect ownership," short of equitable title, does not constitute an asset. Upon acquisition of the Fabergé rights by PEL from Unilever (on completion of the SPA on January 3rd, 2007), PEL became the legal owner of those rights. It is not suggested—and could not be suggested—that PEL held those rights as trustee for the master fund. Again, as it seems to me, those submissions are correct but, again, they provide no answer to the question for determination under this head.

205 As I have said, the question for determination under this head is not (or not limited to) whether assets of the master fund were diverted to Autumn: the question for determination includes whether Autumn was the recipient of the traceable proceeds of property of the master fund: as Autumn accepts, a proprietary claim is not confined to the initial property, since the claimant's interest in the initial property may be traced into other property that the defendant holds in its place. But, it is said correctly, in order to trace into substitute property, it is first necessary to identify the initial property for which the substitute property is to be a substitute. In the present case, as it seems to me, the relevant question in this context is whether the master fund's holding (immediately prior to the issue of the new shares) of 100% of the issued share capital of PEL can be traced into the PEL shares issued to Autumn (and, so far as material, to the other members of the consortium). It is said on behalf of Autumn that the answer to that question must be "No," but it is significant that the reason given by Autumn for that conclusion is not that, at all relevant times, the master fund remained the holder of the single share in PEL (so that it could not be said that that share had been diverted to Autumn, or to any other entity); rather, it is said that the single PEL share owned by the master fund "hardly offers an auspicious starting point for any claim by Renova on behalf of the master fund, since, if Renova had had its way, the Rights would not have been acquired in the name of a Fund entity and the share would have remained of no more than nominal value." If I may say so, that ignores the undisputed fact that, immediately before the 100 new PEL shares were issued, PEL, as contractual purchaser under the SPA (into which it had entered with the knowledge and consent of Renova), had acquired the Fabergé rights from Unilever.

206 It is said on behalf of Renova that the judge was correct, for the reasons which he set out (2012 (2) CILR 416, at paras. 76–77), to conclude that the answer to the question whether the master fund's holding (immediately prior to the issue of the new shares) of 100% of the issued share capital of PEL can be traced into the PEL shares issued to Autumn was "Yes." The short point, it is said, is that "tracing" in equity is concerned with value, not with assets *in specie.* In support of that proposition, Renova submits:

(1) It is common ground in this court that a claim against a non-fiduciary third party for an account as a constructive trustee is a proprietary claim. When Hoffmann, L.J. referred, in the *El Ajou* (16) case ([1994] 2 All E.R. at 700) to "assets traceable as representing the assets of the plaintiff" he chose his words with care. He was referring to the need for the asset in the hands of the defendant to be such as would entitle the plaintiff to trace into it at law or in equity. In other words, the defendant need not be shown to have received *in specie* the actual asset which was previously owned beneficially by the plaintiff; it is enough if what he received was "traceable as representing" that asset. It is plain that Hoffmann, L.J. had equitable tracing in mind.

(2) There is a difference between "following" and "tracing." Tracing is concerned not with locating the asset formerly owned by the plaintiff but with identifying whether there is an asset in the hands of the defendant in which the value of the original asset is now located. That equitable tracing is about tracing value is clear from the speech of Lord Millett in *Foskett* v. *McKeown* (17) ([2001] 1 A.C. at 127–128):

> "The process of ascertaining what happened to the plaintiffs' money involves both tracing and following. These are both exercises in locating assets which are or may be taken to represent an asset belonging to the plaintiffs and to which they assert ownership. The processes of following and tracing are, however, distinct. Following is the process of following the same asset as it moves from hand to hand. Tracing is the process of identifying a new asset as the substitute for the old.
>
> . . .
>
> The claimant claims the new asset because it was acquired in whole or in part with the original asset. What he traces, therefore, is not the physical asset itself but the value inherent in it.
>
> Tracing is thus neither a claim nor a remedy. It is merely the process by which a claimant demonstrates what has happened to his property, identifies its proceeds and the persons who have handled or received them, and justifies his claim that the proceeds can properly be regarded as representing his property."

207 In the present case, it is said:

(1) As at December 22nd, 2006, the master fund owned 100% of the share capital of PEL. It did so by holding the single issued share which it had acquired on December 1st, 2006.

(2) From that date, PEL had a valuable contractual right under the SPA; that is to say, the right to purchase the Fabergé rights from Unilever on payment of US$38m. at completion. It acquired that right with the intention that it, and through it the master fund, would keep the full economic benefit of the Fabergé rights at completion.

(3) On January 3rd, 2007, PEL completed the SPA and acquired the Fabergé rights unconditionally. In order to do so, PEL incurred a loan liability to members of the consortium who had funded the purchase, and a liability for interest on that loan. At that point, the master fund owned 100% of PEL, which held the rights and owed US$38m. Any upside value of the rights over and above US$38m. would accrue for the benefit of the master fund.

(4) Also on January 3rd, 2007, according to its records, 100 new PEL shares were issued to the members of Mr. Gilbertson's consortium; in particular, 25 new PEL shares were issued to Autumn. The master fund's interest in PEL was thereby diluted from 100% to less than 1%. The effect of the share issue was that, although the master fund still owned its single PEL share, the value of its holding in PEL was reduced by over 99%. The value lost to the master fund was transferred to the consortium as the holders of the new shares.

(5) By this means (as was intended) the value of the 100% ownership of PEL (formerly represented by the single share held by the master fund) came to be represented by the 101 shares in PEL which existed post-dilution. Given that only one of those 101 shares was then held by the master fund, in excess of 99% of the value of the ownership of PEL was transferred to the members of the consortium.

In those circumstances, it is said, it is easy to see how the new PEL shares represent virtually the whole of the value of the formerly single PEL share owned by the master fund. It matters neither that the new shares are newly created property nor that the master fund still holds its one share. The value in the single share has moved and can be traced to the new shares in the hands of the recipients: they are in all senses its substitutes in value. The new shares thus represent the single share or, rather, represent the value of the economic and control rights inherent in ownership of the single share. If this analysis were wrong it would enable corporate form to defeat commercial substance. It would be anomalous if equity would (as it would) permit a tracing claim where Mr. Gilbertson procured PEL to transfer the rights (or to assign the SPA) to the consortium, or procured the

master fund to transfer PEL itself to the consortium, each of which transactions which would undoubtedly give rise to a proprietary claim against the consortium, but would not permit a tracing claim if he resorted to the simple expedient of procuring PEL to issue the consortium with 100 new shares in PEL. This anomalous conclusion is avoided if one follows Lord Millett's analysis in *Foskett* v. *McKeown* (17) and treats the tracing exercise as an exercise in the tracing of value and not an exercise in the following of property *in specie*.

208 I accept Renova's submission that the judge was correct to conclude that the value of the master fund's holding (immediately prior to the issue of the new shares) of 100% of the issued share capital of PEL can be traced into the PEL shares issued to Autumn in January 2007. In the events which happened, the position immediately before the issue of the 100 new shares was that PEL was the owner of the Fabergé rights, and as the holder of the single share then in issue, the master fund was the owner of 100% of the issued capital of PEL. The position immediately after the 100 additional shares were issued was that PEL remained the owner of the Fabergé rights but that the issued capital of PEL was owned as to 100/101 by the members of the consortium and as to 1/101 by the master fund; or, to put the point another way, substantially the whole of the value of the master fund's interest in PEL and (indirectly, through PEL) in the Fabergé rights had been transferred to the members of the consortium as owners of the new shares. In those circumstances, as it seems to me, the effect of the issue of the new PEL shares was that 100/101 parts of the master fund's ownership of the whole issued share capital of PEL was transferred to the members of the consortium and, in particular, 25/101 parts of the master fund's ownership of the whole issued share capital of PEL was transferred to Autumn. The value of what was transferred was represented by the new shares held by Autumn and the other members of the consortium, and can be traced accordingly. As Renova points out, to hold otherwise would be to allow corporate form to defeat commercial substance. It cannot be doubted that, had the transaction been carried out (as a matter of corporate form) in a slightly different way—by subdividing the existing single share in PEL into 101 new shares and then causing the master fund (as the owner of those 101 new shares) to transfer 100 of those shares to members of the consortium—the 100 shares so transferred could be followed into the hands of the transferees and could be the subject of a proprietary claim. To deny a proprietary claim in circumstances where what is, as a matter of commercial substance, the same transaction is carried out by the issue of new shares (rather than the creation of new shares by the subdivision of an existing share) would, indeed, be anomalous.

(iii) *Whether Autumn received the new PEL shares as a volunteer and not as a purchaser for value and so held those shares as a constructive trustee for the master fund*

209 As I have said earlier in this section, it is submitted on behalf of Autumn that the judge was wrong to hold that it received the new PEL shares issued in January 2007 as a volunteer and not as a purchaser for value. In particular, it is said that the evidence established (contrary to the judge's finding) that the new PEL shares were issued as security for the repayment of the loan which Autumn made to PEL, and that, had the judge directed himself properly, he should have concluded that Autumn did provide adequate consideration for the issue of the new shares. I have already rejected those submissions.

210 Nonetheless, the submission that the judge was wrong to hold that Autumn was liable to account as a constructive trustee for the PEL shares which it received in January 2007 is pursued on the ground that, even if Autumn (and the other members of the consortium) gave no consideration (in the sense in which that term is generally understood) for the shares that were issued to them, the issue of those shares served a clear commercial purpose—in that it was clearly calculated to cause the consortium to forbear from demanding repayment of the moneys lent—and such forbearance may be seen as giving value in equity. It is said, correctly (i) that PEL required moneys to pay for the acquisition of the Fabergé rights and by way of working capital; (ii) that the consortium lent PEL the moneys required on terms that entitled them to require PEL to transfer the Fabergé rights to them in the event that PEL was unable to repay those moneys within seven days of demand; (iii) that the issue of the new PEL shares had the effect that the consortium had no motive to demand repayment of the moneys within seven days; and, accordingly (iv) that PEL was given the time it required to raise the moneys needed to repay the loans by the issue of further shares. It is said, further, that—had there been a claim by PEL to recover the shares, founded on the allegation that, in causing the new shares to be issued, the directors of PEL had acted in breach of duty—the remedy sought would have been an order setting aside the issue of the new shares and that, in answer to that claim, Autumn would have been able to rely upon "change of position." Autumn would have been able to assert that, by accepting the shares issued in January 2007, it changed its position because it forbore from insisting on the security rights which it was promised under the loan agreement. A defence of change of position ought also to be available in a case brought against Autumn directly by or on behalf of the master fund as a shareholder in PEL.

211 Renova accepts that Autumn did lend money to PEL to assist PEL to pay Unilever, and provided further loan funds (US$0.5m.) for working capital. But, in response to the submission that the new PEL shares were

issued "to cause the consortium to forbear from demanding payment" of the moneys lent, it is said on behalf of Renova that to issue the shares for that purpose would make "no sense at all" because "that would have turned the loan into the price for the shares, which it was clearly not." Further, if the new shares had been issued for that purpose, when the consortium later came to demand repayment in September 2007, "they were doing something they were not entitled to do (and, what is more, in any event they held on to their existing shares)."

212 In my view it is unnecessary, in the circumstances of the present case, to address the question whether, in principle, a change of position defence could have been advanced in response to the claim against Autumn as a volunteer. It is unnecessary to address that question because there was no evidence to support the contention that, in making no call for repayment of the loans, the members of the consortium did change their position. It is clear from the evidence at trial that the members of the consortium were assured by Mr. Gilbertson that the loans were required as short term funding while the terms of an advantageous sale of the Fabergé rights to Mr. Vekselberg (whom, they were assured, was a ready and willing purchaser) were negotiated. There is nothing in the evidence to support the conclusion that the members of the consortium ever considered calling for repayment of the loans or that they forbore from doing so in reliance on a belief that their position as the holders of the PEL shares issued in January 2007 was unchallenged.

213 In those circumstances I reject the submission that the judge was wrong to hold that (whether or not it had knowledge of Mr. Gilbertson's breach of fiduciary duty in relation to the issue of the new PEL shares in January 2007) Autumn was liable to account for those shares as a constructive trustee.

(iv) *Whether, if (and notwithstanding that) Autumn received the new PEL shares as a purchaser for value, it held those shares as a constructive trustee for the master fund on the basis of "knowing receipt"*

214 In developing the second of its grounds of appeal—that the judge was wrong to hold that Autumn was liable as a constructive trustee on the basis of knowing receipt—it is said on behalf of Autumn that the judge was wrong to hold, or to proceed as if he had held, that the master fund had a sufficient proprietary interest in the new PEL shares to found a claim for knowing receipt. It is unnecessary to address that submission under this head. I have already held that the judge was entitled to take the view that the master fund had a sufficient proprietary interest in the new PEL shares to found a claim that Autumn account as a constructive trustee for the shares that were issued to it.

215 It is said, further, that the judge was wrong to hold, or to proceed as if he had held, that the issue of the new PEL shares by the directors of PEL involved a breach of their fiduciary duty such that the transaction could be impugned. Had the judge directed himself properly, it is said, he would have held that Renova had failed to plead any such case, and that any such case would have been hopeless in any event. It is unnecessary to address that submission under this head. Renova's claims in these proceedings (and, in particular, its claim that Autumn account as constructive trustee for the PEL shares issued to it in January 2007) are not founded on an allegation that—in causing those PEL shares to be issued—the directors of PEL (Mr. Sean Gilbertson and Mr. Willis) were in breach of the fiduciary duties which (as directors) they owed to that company; they are founded upon the allegation that—in causing the directors of PEL to give effect to his decision that the new PEL shares be issued—Mr. (Brian) Gilbertson was in breach of the fiduciary duties which he owed (as a director of the company) to the company and (more generally) to the master fund and/or the other entities within the Pallinghurst structure. I have already accepted that the judge was entitled to take the view that that allegation is well-founded.

216 It is also submitted under this head that Autumn lacked the requisite knowledge to make it unconscionable for it to retain the PEL shares issued to it in January 2007. Renova's primary response to that submission is that (as the judge held) Autumn was a volunteer in respect of those PEL shares, and that, as such, its knowledge (or alleged lack of relevant knowledge) of the circumstances in which they were issued is irrelevant. Equity does not aid a volunteer. I have already explained why I take the view that Renova is correct: on a true analysis it is unnecessary to address the issue whether Autumn knew or ought to have known of Mr. Gilbertson's breach of fiduciary duty in relation to the issue of the new PEL shares in January 2007. Nevertheless (although not strictly necessary) it is, I think, appropriate to do so.

217 As the judge found (at para. 2.3 of his judgment), Autumn was a special purpose vehicle set up by the professional trustees of one of Mr. Gilbertson's family trusts to hold the investment in PEL on behalf of a family trust. He held that Autumn had the requisite knowledge of Mr. Gilbertson's breach of fiduciary duty on the basis that there was to be attributed to it (a) Mr. Gilbertson's own knowledge; and/or (b) the knowledge of Mr. Thomas. It is said on behalf of Renova to be common ground that the relevant enquiry was whether Autumn had such knowledge of the circumstances in which the new PEL shares were issued in January 2007 that it would be unconscionable for it to retain those shares. In support of that proposition, Renova relies on observations in *Bank of Credit & Commerce Intl. (Overseas) Ltd.* v. *Akindele* (4). It is submitted

that the judge applied the right test, and that his analysis of the evidence of knowledge (2012 (2) CILR 416, at paras. 79–91) was correct.

(a) *The attribution to Autumn of Mr. Gilbertson's own knowledge*

218 It is, of course, accepted on behalf of Autumn that Mr. Gilbertson possessed the requisite knowledge of his own actions. The judge imputed Mr. Gilbertson's knowledge to Autumn on the basis of a number of factors (*ibid.*, at para. 81)—and concluded (*ibid.*, at para. 85) that Mr. Thomas "was very ready to comply with Mr. Gilbertson's requirements" and that "there was never any doubt that he would comply with Mr. Gilbertson's request and Mr. Gilbertson knew and relied upon that." In effect, it is said, the judge held that Mr. Gilbertson controlled Autumn and was its directing mind and will. It is submitted on behalf of Autumn that that finding was "plainly wrong as a matter of fact and as a matter of law," in that:

(1) As Hoffmann, L.J. observed in the Court of Appeal of England and Wales in *El Ajou* v. *Dollar Land Hldgs. plc* (16) ([1994] 2 All E.R. at 705–707)—and (as Lord Hoffmann) when delivering the opinion of the Judicial Committee of the Privy Council in *Meridian Global Funds Mgmt. Asia Ltd.* v. *Securities Commn.* (24), the answer to the question whether a person is the directing mind and will of a company depends upon the proper application of the rules of attribution in any given case. The directing mind and will of a company is either the person who is given the relevant responsibility by the constitution of the company or one who, by reason of the particular function he carries on within the company or by what he did with the acquiescence of the company, can be said to be the directing mind and will for the purposes.

(2) Mr. Gilbertson was not given any relevant responsibility in relation to Autumn by the constitution of that company; nor did he have such responsibility by reason of any particular function he carried on within that company; nor, given that the loan was not authorized by Mr. Gilbertson, can Autumn be said to have acquiesced in his authorization of it.

(3) In those circumstances, the facts found by the judge would not be sufficient to justify the attribution of Mr. Gilbertson's knowledge to Autumn, even assuming them to be true. It is said that:

(i) It may well have been the case that "Mr. Thomas would not want to upset or disagree with his client"; but "the vast majority of professionals will feel the same way."

(ii) It may well have been the case that Mr. Thomas was "very ready to comply with Mr. Gilbertson's requirements" but, as the settlor and a beneficiary, "Mr. Gilbertson was entitled to

expect Mr. Thomas to have regard to his wishes insofar as it was proper to do so without fettering his discretion."

(iii) It is true that Mr. Thomas was willing "to place great reliance upon [Mr. Gilbertson]" (as he accepted in evidence) but, "on the basis of his past dealings with Mr. Gilbertson Mr. Thomas had the highest regard for him."

(iv) The judge was wrong to hold that there "was little or nothing to override," in that there was unchallenged evidence before the court that Mr. Thomas had refused to make a loan on an interest free basis.

(4) To find that a professional trustee had allowed his will to be suborned to that of a beneficiary to such an extent as to justify treating the acts of the trustee as acts of the beneficiary and thus, attributing the knowledge of the beneficiary to the trust is a serious matter. It implies a degree of impropriety on the part of the professional trustee which the court should not find in the absence of compelling evidence. The judge referred to no such evidence to support his finding and the evidence was in fact to the contrary.

(5) For the court to hold that the independent mind and will of Autumn was defeated in the circumstances of this case would be to impose an unrealistic and unwarranted standard of independence on trustees.

219 In response to those submissions, it is said on behalf of Renova that the judge was right to conclude (2012 (2) CILR 416, at para. 85) that Mr. Gilbertson's knowledge could be imputed to Autumn, in that:

(1) In asking whether Fairbairn (as director of Autumn) and Mr. Thomas (as director of Fairbairn) deferred to Mr. Gilbertson in respect of the relevant decision (whether to accept the new PEL shares issued to the members of the consortium), instead of exercising autonomy, the judge (correctly) applied the principle identified in *Meridian Global Funds Mgmt. Asia Ltd.* v. *Securities Commn.* (24).

(2) There was "a wealth of evidence" to support the judge's conclusion that the answer to that question was "Yes":

(i) Autumn was a special purpose vehicle established solely for the purposes of making the loan to PEL to pay Unilever under the SPA and to receive the new PEL shares. It had no pre-existing business, and no other function. It was established as an immediate consequence of Mr. Gilbertson's demand of the trustees of his family settlement, the BPG Discretionary Settlement, for urgent payment. That was its *raison d'être*.

(ii) This was all Mr. Gilbertson's deal. As he told Mr. Thomas in the telephone conversation on January 2nd, 2007 "I have bought myself a Christmas present . . . and I need some money to pay for it."

(iii) It is plain that Mr. Gilbertson never doubted that the settlement trustees would do as he asked. He told Mr. Mende in his email of January 2nd, 2007 (to which the judge referred at para. 9.42 of his judgment) that he had to "extract it [the payment] from a set of Trusts in Jersey," and, as the judge noted (2012 (2) CILR 416, at para. 81(iii)), he described the role of the trustees as simply "processing paperwork."

(iv) Autumn was described by Clifford Chance (solicitors acting on Mr. Gilbertson's instructions) in a letter dated March 7th, 2007 as "in practice an entity controlled by [Mr. Gilbertson]." Mr. Gilbertson's complete confidence at the time that (as he told Mr. Mende) he would be able to "extract" US$9.5m. from the trust within a few days, and the fact that he did so, bears that out entirely.

(v) As the judge noted, during the time between Mr. Gilbertson's first call to Mr. Thomas on January 2nd, 2007 and his email to Mr. Vekselberg (in which he wrote that he had triggered alternative arrangements and bought the Fabergé rights)—a period of only some eight hours—Mr. Thomas had not got back to him to confirm that he would make the payment. Mr. Gilbertson's confidence that the trustees would do as he asked was such that he felt no need for such confirmation.

(vi) Fairbairn, as the director of Autumn, was content to let Mr. Gilbertson lead the commercial discussions with the other members of the consortium about the loan and the payment to Unilever: at no stage did Fairbairn (or Mr. Thomas) have any direct contact with the other members of the consortium.

(vii) Mr. Thomas was prepared to sanction paying away US$9.5m. of trust money at Mr. Gilbertson's request, without a signed or even finalized loan agreement, and without having carried out even minimal due diligence into the standing of PEL or the value of the Fabergé rights.

(viii) Autumn and Mr. Gilbertson shared a single defence team and a joint defence. Autumn did not produce its own discovery list and did not verify on oath such discovery as it made. Notwithstanding that there was an obvious conflict of

> interest between Mr. Gilbertson and Autumn in relation to the issues in this case—not least in that it was in Autumn's interests to deny all knowledge of any breach and in Mr. Gilbertson's interests to say that he had made full disclosure to Autumn (or the trustees)—Mr. Thomas confirmed in his evidence at trial that Autumn had not taken its own independent legal advice. Not to do so would, he said, be cheaper and would simplify the process of getting the legal advice.

In those circumstances it is hard to see what further evidence Renova needed to adduce or rely upon in order to establish that Mr. Gilbertson was the directing mind and will of Autumn in relation to the loan and the receipt of the new PEL shares. Autumn's suggestion that Mr. Thomas's independence of mind is demonstrated by his refusal to make the loan on an interest-free basis is not well-founded: the evidence is clear that it was Mr. Sean Gilbertson (and not Mr. Thomas) who actually proposed that interest on the loan be paid at the rate of 1.5%—in order to make the loan "look commercial"—and that Mr. Thomas agreed to that proposal.

220 In my view, the submissions advanced in respect of this issue on behalf of Renova are to be preferred to those advanced on behalf of Autumn. I am satisfied that the judge was correct to hold (2012 (2) CILR 416, at para. 85) that there was never any doubt that Mr. Thomas would comply with Mr. Gilbertson's wishes in relation to the funding of the acquisition of the Fabergé rights and the receipt of the new PEL shares. In relation to that transaction Mr. Gilbertson was the directing mind of Autumn, and, accordingly, his knowledge is to be attributed to Autumn in that context.

(b) *The attribution to Autumn of Mr. Thomas's knowledge*

221 In advancing the submission that the judge was wrong to conclude that Autumn could be said to have the requisite knowledge as a consequence of what Mr. Thomas knew or should have known—and, in particular, to hold that Mr. Thomas should have known, if he had made appropriate independent enquiries, that the Fabergé rights were being acquired by Mr. Gilbertson in circumstances which amounted to a breach of his fiduciary duties—Autumn invites the court to have regard to the chronology of events (which it summarized as follows): (i) on January 2nd, 2007, Mr. Gilbertson telephoned Mr. Thomas to request that the trust make an investment of US$9.5m. to acquire the Fabergé rights for PEL plus a further US$0.5m. working capital; (ii) later on that day, Mr. Sean Gilbertson had a conversation with Mr. Thomas in which he explained to Mr. Thomas that the "investment" the trust was being asked to make was a loan; (iii) on January 3rd, 2007, Mr. Thomas approved the loan, indicating that he anticipated that it would be on commercial terms; (iv) on January 4th, 2007, Mr. Sean Gilbertson sent an email to Mr. Thomas indicating

that the loan would not be on commercial terms but would be a one-year interest-free arrangement, secured against the assets and receivables of PEL; (v) later that day, Mr. Sean Gilbertson spoke to Mr. Thomas—and to Mr. Daniel Hawson (a co-director of the corporate trustee)—on the telephone. They agreed a commercial rate of interest; (vi) later, but also on January 4th, 2007, Mr. Thomas committed Autumn to making the loan and instructed that the funds be wired to the K-MIC account, the details of which he had been given; and (vii) on January 5th, 2007, Mr. Thomas informed Mr. Gilbertson that he could "confirm that the USD9.5m. was sent yesterday for value yesterday" and that he had authorized the payment "on the basis that the Loan Agreement will stand as currently drafted (allowing for some minor amendments)." With that chronology in mind, it is said on behalf of Autumn that:

(1) In the course of the telephone conversation on January 4th, 2007 (before authorizing the loan), Mr. Thomas had asked Mr. Sean Gilbertson whether PEL (which, as he observed, had been established as recently as December 1st, 2006) was a "shell company, without anything else in it?" Mr. Sean Gilbertson's response was:

> "That is absolutely correct, it is an absolute fresh start and I can't even remember how many shares were issued, I mean it's probably one or two or something along those lines and there is—it would have been issued to a thing called Pallinghurst Resources Management LP, which is our fund entity."

Mr. Thomas then asked "who's the sort of shareholders behind that?" and was told:

> "Well, there aren't shareholders per se, I mean it's—it's literally a fund entity, so basically it's the fund entity into which the various investors of our fund would come into. At this point in time, there are basically zero investors, because the documentation—you've got all the documentation, Daniel has had the unfortunate task of having to trawl through it all, but the documentation is not signed and there are no technical investors in the fund entity itself. However, um, Brian serves as the chairman of that fund and it's by virtue of all the groundwork that we're doing that we're able to put this transaction into that structure, which obviously makes the fund that much more appetising."

It was not suggested to Mr. Thomas at the trial that he should have disbelieved what he was told by Mr. Sean Gilbertson in that telephone conversation.

(2) In those circumstances, it should not be in dispute that Mr. Thomas had reason to believe (i) that PEL had no substantial shareholders; (ii) that there were no investors in the fund; (iii) that the fund documentation

was yet to be effected; and (iv) that Mr. Sean Gilbertson and his father, Mr. Gilbertson, saw themselves as free to acquire the rights in PEL as an attraction to a potential investor in the fund.

(3) There was nothing complicated or obscure in what Mr. Sean Gilbertson told Mr. Thomas; nothing of which it could sensibly be contended that it was unconscionable of Mr. Thomas not to have enquired further, and the judge was wrong to have ignored that conversation on January 4th, 2007 and to focus his attention on the earlier conversation (on January 2nd, 2007) in which Mr. Gilbertson explained that Mr. Vekselberg would be "pissed off" to discover that Mr. Gilbertson had acquired the rights without doing a deal with him.

(4) The judge was wrong to hold (2012 (2) CILR 416, at para. 91) that Mr. Thomas knew, or could be taken to know, that Mr. Gilbertson was a director of the company or that the company had a place in the Pallinghurst structure, and wrong to hold (implicitly) that Mr. Thomas knew, or could be taken to know, that Mr. Vekselberg represented an interest in the fund and that the explanation for Mr. Vekselberg being "pissed off" was likely to reflect a breach of fiduciary duty to the master fund, rather than any agreement or understanding he may have had with Mr. Gilbertson personally or perhaps, simply the fact that he had not got his own way. None of those propositions could be sustained, in that:

(i) It was quite unrealistic to think that Mr. Thomas would know that Mr. Gilbertson was a director of the company. It was not alleged that Mr. Thomas had been told that Mr. Gilbertson was a director of the company or that he had seen any document which indicated that Mr. Gilbertson was a director of the company.

(ii) It was quite unrealistic to think that Mr. Thomas would have understood the place of the company in the Pallinghurst structure, or that (even if he did understand the company's place in the structure) he would have understood that that place in the structure gave the company an interest in any opportunity which might be exploited by the master fund. Indeed, had Mr. Thomas acquainted himself with the full suite of documentation that Mr. Hewson was sent by Mr. Sean Gilbertson on September 7th, 2006, he would have seen that the company was only to receive US$20,000 per year to cover its administrative expenses and that it was to have an executive committee, the members of which were charged with dealing with restricted matters.

(iii) The judge identified no basis on which he might have found that Mr. Thomas knew anything of significance about Mr. Vekselberg.

(iv) The judge identified no basis on which he might have found that Mr. Thomas knew that the relationship between Mr. Gilbertson and Mr. Vekselberg was governed within the pro forma structure rather than, for example, a separate agreement such as the letter agreement.

(5) The judge's view (expressed, *ibid.*, at para. 91) that Mr. Thomas should have made further enquiries is difficult to reconcile with the fact that the further enquiries that Mr. Thomas did make provided him with the assurance that the judge expected him to seek and obtain. If Mr. Thomas failed to make further enquiries, it was not because he wilfully failed to do so, or closed his eyes to the obvious; rather it was because, in the light of what he had been told by Mr. Sean Gilbertson—which he had no reason not to believe—there was no need for any further enquiries.

(6) Mr. Gilbertson and Mr. Sean Gilbertson considered themselves to be acting perfectly properly. Even if the judge were correct to hold otherwise—it cannot sensibly be said that the matter was so obvious that Mr. Thomas should have dismissed the assurances given to him by Mr. Sean Gilbertson. Indeed, it is unclear what Mr. Thomas might have been expected to do which would have caused him to reject what Mr. Sean Gilbertson told him, short of instructing lawyers to carry out an exhaustive due diligence or demanding to speak directly to Mr. Vekselberg.

(7) The judge appears to have assessed the conduct of Mr. Thomas on the basis of a presumption that had no relevance to his actual state of mind in that the judge found (at para. 9.49 of his judgment) that the new PEL shares were issued on "or with effect from" January 3rd, 2007. The relevant date for assessing the knowledge of Mr. Thomas must be the actual date of receipt of the new PEL shares by Autumn (said to have been on or about January 19th, 2007); for the judge to have assessed Mr. Thomas's knowledge on an earlier (and notional) date of issue was wrong in principle.

(8) Equity operates on the conscience, and that the "mere fact that Mr. Thomas failed to join up the dots as the learned judge would have had him do" does not show him to have acted unconscionably. Mr. Thomas knew Mr. Gilbertson and Mr. Sean Gilbertson well enough to have formed a view of them, and the view that he had formed was favourable. In the circumstances, Mr. Thomas relied upon what they told him, and, it is said, there was nothing so inherently implausible in what they told him that he can fairly be criticized for having done so.

222 In response to those submissions, it is said on behalf of Renova that the judge was right to conclude (*ibid.*, at para. 91) that Mr. Thomas's knowledge was sufficient to support the view that it would be unconscionable for Autumn to retain the PEL shares issued to it in January 2007. In particular:

(1) The judge's conclusion, it is submitted, was consistent with the evidence at trial, in that:

(i) The draft Pallinghurst structure documents had been sent to Mr. Thomas's colleague, Mr. Daniel Hawson, on September 7th, 2006, under cover of a note stating that the Pallinghurst structure entities had all been set up except the feeder fund. Mr. Thomas accepted in evidence that he had discussed the structure of the fund with Mr. Hawson in broad terms, and that he recalled looking at the structure chart and flow of funds. Further (as the judge noted at para. 9.45 of his judgment), when Mr. Thomas was asked by Mr. Gilbertson in the telephone conversation on January 2nd, 2007 whether he was "familiar with Pallinghurst," his answer was unqualified: "I am, yes, yeah."

(ii) Mr. Thomas would have seen from the structure documents that the BPG discretionary settlement had a 50% shareholding in the company. It is probable, given that he had seen all the structure documents, that he knew that Mr. Gilbertson was a director of the company. He was unwilling to accept that in evidence, stating that he could not recall whether he knew that Mr. Gilbertson was a director of the company. In the light of that evidence, the judge was entitled to take the view (*ibid.*, at para. 89) that he found it hard to believe that Mr. Thomas did not know that Mr. Gilbertson was a director of the company and to conclude that he probably did.

(iii) Mr. Thomas could see that the other 50% shareholder of the company was Renova, and so would know that Renova had an interest in the Pallinghurst structure.

(iv) During their telephone conversation on January 2nd, 2007 Mr. Gilbertson told Mr. Thomas—

(a) that the original intention had been to acquire the Fabergé rights "through Pallinghurst," but that Mr. Vekselberg had insisted that (if he were to fund the purchase) he wanted the brand transferred to one of his private companies which would then license it on to "Pallinghurst" to develop;

(b) that the Fabergé rights had been purchased by PEL under the SPA;

(c) that PEL was "a subsidiary of Pallinghurst";

(d) that the reason why Mr. Gilbertson wanted the funds from his trust was to be able to finance part of the completion payment himself as part of a consortium "rather than as Pallinghurst"; and

(e) that it was necessary to establish a corporate vehicle (which became Autumn)—through which to make the investment—because the trust was not being asked simply to lend to PEL/Pallinghurst but to invest in the Fabergé rights *per se*.

It was against that factual background that Mr. Thomas asked Mr. Gilbertson, in the course of the telephone conversation on January 2nd, 2007, what Mr. Vekselberg's thoughts would be "if you do this without using Pallinghurst"; a question to which Mr. Gilbertson's response was "He'll be extremely pissed off I would think."

(2) It is said that it was completely understandable (indeed, that it was positively desirable) in those circumstances that Mr. Thomas would want to know what Mr. Vekselberg's reaction would be to the course proposed by Mr. Gilbertson in that he (Mr. Thomas) knew and understood, at the very least, that Mr. Vekselberg and Mr. Gilbertson were in business together, that the proposed acquisition was contrary to the express wishes of Mr. Vekselberg (in that what Mr. Vekselberg wanted was to take the Fabergé rights into one of his own companies and license them back to the Pallinghurst structure), that Mr. Vekselberg was not aware of what Mr. Gilbertson was proposing to do, and that the acquisition involved third parties. Mr. Thomas asked the question that he did because, as he accepted in evidence, he knew that the original intention had been to buy the Fabergé rights "through the Pallinghurst fund" and that what Mr. Gilbertson was proposing was contrary to that proposal. He knew, or ought to have appreciated, that the effect of what Mr. Gilbertson was proposing was that the Pallinghurst structure, having obtained the benefit of the Fabergé rights as purchaser under the SPA, would end up without any interest (even as licensee) in the value of those rights. It follows that Mr. Thomas knew, or ought to have realized, that the reason why Mr. Vekselberg would be "extremely pissed off" was because Mr. Gilbertson was doing something he was not entitled to do *vis-à-vis* Renova and the Pallinghurst structure and that the Pallinghurst structure would lose out.

(3) In those circumstances, it is submitted, the judge's conclusions (2012 (2) CILR 416, at para. 91) are supported by the evidence as to what Mr. Thomas knew of (i) Mr. Gilbertson's role as director of the company; (ii) Mr. Vekselberg's interest in the Pallinghurst structure; and (iii) the adverse effect of Mr. Gilbertson's proposed course on the interests of the Pallinghurst structure. The judge was right to hold that Mr. Thomas

should, as a minimum, have asked how or why it was thought that the Pallinghurst structure would benefit if the master fund's interest in PEL was to be reduced from 100% ownership to less than 1% ownership.

(4) It is said that Autumn's reliance on what Mr. Thomas was told by Mr. Sean Gilbertson in the course of their telephone conversation on January 4th, 2007 is misplaced. There was nothing in that conversation to explain to Mr. Thomas why Mr. Vekselberg would have been "pissed off" if the purchase from Unilever was completed "without using Pallinghurst," and nothing in that conversation to explain to Mr. Thomas how or why it was thought that the Pallinghurst structure would benefit if the master fund's interest in PEL was to be reduced from 100% ownership to less than 1% ownership. Further (as Mr. Thomas must have realized, because he could see from the structure documents that Renova had a share in the Pallinghurst structure), what Mr. Sean Gilbertson told him in that conversation was inaccurate and incomplete: in that there was no mention of Renova, no mention of the fact that Renova had spent US$3.5m. in setting up the Pallinghurst structure, and no mention of the fact that the Pallinghurst structure entities existed and had already conducted some business (the May 2006 offer for the rights, the Angola deal and Project Charlie).

(5) For Autumn to suggest that the "mere fact that Mr. Thomas failed to join up the dots as the learned judge would have had him do" does not show him to have acted unconscionably is wrong. Properly understood, the criticism of Mr. Thomas's conduct was not that he "failed to join up the dots." The dots, it is said, were joined up for him by what Mr. Gilbertson had told him, and if Mr. Thomas "genuinely did not see the ugly shape made by the dots" then that was sufficiently culpable to constitute unconscionable conduct. *A fortiori* in circumstances where Mr. Thomas was in a position of trust and had a duty to act independently and to make proper inquiry, and where he knew, as he did, that the new shares were in essence a gift. It is no answer for Autumn to suggest, in answer to the criticism that "Mr. Thomas would not want to upset or disagree with his client," that "the vast majority of professionals will feel the same way"; or, in answer to the criticism that Mr. Thomas was "very ready to comply with Mr. Gilbertson's requirements," that (as the settlor and a beneficiary of the BPG settlement), "Mr. Gilbertson was entitled to expect Mr. Thomas to have regard to his wishes insofar as it was proper to do so without fettering his discretion" or, in answer to the criticism that Mr. Thomas was willing "to place great reliance upon [Mr. Gilbertson, that] on the basis of his past dealings with Mr. Gilbertson Mr. Thomas had the highest regard for him."

223 Again, I take the view that the submissions advanced in respect of this issue on behalf of Renova are to be preferred to those advanced on behalf of Autumn. I am satisfied that the judge was correct to hold (2012 (2) CILR 416, at para. 91) that Mr. Thomas knew, or ought to have

realized, that what Mr. Gilbertson was asking him to do on behalf of Autumn in relation to the funding of the acquisition of the Fabergé rights and the receipt of the new PEL shares was, or was likely to be, contrary to the interests of the master fund, and so was likely to be in breach of his (Mr. Gilbertson's) fiduciary duties as a director of the company, and that "proceeding to implement Mr. Gilbertson's request in the circumstances without more information and without the knowledge of Renova and/or Mr. Vekselberg would be inappropriate for a prudent trustee." In so far as Mr. Thomas's own knowledge was of relevance—given the judge's finding (with which I concur) that Mr. Gilbertson was the directing mind of Autumn in this context—it is not, I think, in dispute that his knowledge is to be attributed to Autumn.

224 It follows that if (and notwithstanding that) Autumn received the new PEL shares as a purchaser for value, it held those shares as a constructive trustee for the master fund on the basis of "knowing receipt."

225 More generally, it follows, also, that—for the reasons set out in this section of my judgment—I reject Autumn's contention that the judge was wrong to hold that it was liable to account as a constructive trustee for the PEL shares which it received in January 2007.

**Was the judge wrong in failing to hold that the entirety of Autumn's shareholding in Fabergé Ltd. (and not just the 25,000 shares which represented the 25 shares issued by PEL in January 2007) should be held on constructive trust for (and transferred to) the master fund?**

226 As I have said, the judge gave effect to the conclusion which he had reached (2012 (2) CILR 416, at para. 95) that Autumn held the shares issued to it by PEL in January 2007 (which had become 25,000 ordinary shares in Fabergé Ltd. following a change of name and a sub-division of shares in 2008) as constructive trustee for the master fund—by the declaration which he made in para. 1 of his order of November 6th, 2012 and the direction (in para. 2 of that order) that Autumn transfer those 25,000 shares to the master fund. In a ruling delivered on November 5th, 2012 (following a post-trial hearing held on October 26th, 2012), the judge made it clear that he did not intend to include in that declaration or in that direction any shares in Fabergé Ltd. subsequently acquired by Autumn. The relief sought by the Renova parties in their cross-appeal (Appeal No. 22 of 2012) includes an order that it be declared that Autumn holds a further and additional 16,190,575 ordinary shares in Fabergé Ltd. as constructive trustee for the master fund, and that Autumn shall forthwith transfer full legal title in those further shares to the master fund.

227 It is, I think, common ground between the parties—although not pleaded in Renova's amended statement of claim—that, following the sub-division of the original shares issued to it by PEL in January 2007 and

the change of name, Autumn acquired further shares in Fabergé Ltd. in the amounts and on the various dates between February 13th, 2008 and November 17th, 2010 set out in the table to which Mr. Thomas had referred at para. 25 of his expert report, and that those acquisitions were funded by, or through, Autumn in an amount of US$1,455,466. It is said that the purpose and effect of those acquisitions was to maintain Autumn's proportionate interest in the share capital of Fabergé Ltd. Save that the judge referred (*ibid.*, at para. 122)—albeit, not in this context—to a rights issue in September 2009, he made no findings of fact as to the number of further shares acquired by Autumn, the circumstances in which those further shares were acquired or the cost of acquisition.

228 In advancing their claim that Autumn holds a further and additional 16,190,575 ordinary shares in Fabergé Ltd. as constructive trustee for the master fund, it is said on behalf of the Renova parties that the judge erred in that he failed to pay any or any adequate attention to the fact that Renova had argued in its opening at trial and in its closing written submissions that Autumn's entire holding of shares in Fabergé Ltd. should be the subject of a constructive trust, failed to pay any attention to the fact that Renova's arguments in support of that claim had not been addressed by the Gilbertson parties in their closing submissions, and failed to give any reasons for rejecting Renova's arguments. In particular, it is said that, notwithstanding that the claim was expressly brought to his attention at the post-judgment hearing on October 26th, 2012, following which he made certain changes to the written judgment which he had issued, the judge did not amend that judgment to explain why he was rejecting those arguments.

229 In response to the criticism that the judge failed to address Renova's claim that Autumn's entire holding of shares in Fabergé Ltd. should be the subject of a constructive trust, it is said on behalf of Autumn that the judge was correct to take the view that that claim was not before him. The claim had not been pleaded (as Renova acknowledged at the post-trial hearing on October 26th, 2012), and counsel for the Renova parties expressly disclaimed any intention of applying to amend the pleading in order to raise it; rather, counsel submitted (at that post-trial hearing) that it was sufficient that Renova had raised the issue in its opening skeleton and that the Gilbertson parties allowed the claim into the action by failing to raise any objection to it at that time. But that submission could not be sustained in the circumstances that the Gilbertson parties had noted in their written opening that "Renova had not formulated any claim in respect of [the] later acquired shares" and that Renova did not seek leave to amend to add any such claim, "even though it appreciated that it had no such claim on its pleadings."

230 In summarizing Renova's claim (at para. 6.5 of his judgment and 2012 (2) CILR 416, at para. 74)) the judge had said this:

> "6.5 With regard to Autumn, the Plaintiff claims that it should account for the shares that it was given gratuitously and now holds in Fabergé Limited (formerly PEL) . . ."
>
> "74 The Plaintiff's claim against Autumn is to account as a constructive trustee for the new shares in PEL issued to it or their value, on the ground that it knowingly received them as property misapplied or procured to be misapplied by Mr. Gilbertson in breach of his fiduciary duties to the company. Alternatively, Autumn is said to be liable to account as a constructive trustee on the ground that it was a volunteer, since it did not pay for the new shares in PEL."

He made it clear, at para. 2.4 of the supplemental ruling, which he gave on the same day (following the post-trial hearing on October 26th, 2012), that he took the view that no claim in respect of the additional 16,190,575 ordinary shares in Fabergé Ltd. was before the court at trial. He said this:

> "In the instant case I consider that it is clear from the judgment as a whole that the court was considering, and only considering, the position in relation to the 25 shares in PEL, which it has found were gratuitously procured to be issued to Autumn by Mr. Gilbertson on or with effect from 3rd January 2007. The Court was not considering and did not consider any further or other shares in that company which were subsequently purchased by Autumn. Paragraphs 6.5 and 17.1 of the judgment summarizing the Plaintiff's claim make that clear, as do other paragraphs of the judgment, such as paragraphs 17.3 and 19.30."

In my view, there is no doubt that the question whether a claim in respect of the additional 16,190,575 ordinary shares in Fabergé Ltd. were held by Autumn as constructive trustee for the master fund had been before the court at the trial was an issue at the hearing on October 26th, 2012, and that it is clear that the judge held that the answer to that question was "No." Given that the Gilbertson parties had pointed out in their written opening submissions that the claim had not been pleaded and that, nevertheless, Renova had declined to seek leave to amend its pleading in order to raise it, I find it impossible to see how it could be said that the judge was wrong to reach that conclusion. In any event, the Renova parties have not appealed that ruling. In my view, it is not open to Renova to contend, on this appeal, that the Gilbertson parties allowed the claim in respect of the additional 16,190,575 ordinary shares in Fabergé Ltd. into the action by failing to raise any objection to it at the appropriate time.

231 On the basis that the claim in respect of the additional shares in Fabergé Ltd. was not before the court at the trial, the judge cannot be criticized for failing to address arguments advanced in support of that claim in the course of Renova's opening and closing submissions.

232 Nevertheless—notwithstanding that (understandably in the circumstances) the judge made no relevant findings of fact in respect of Renova's unpleaded claim in respect of the additional 16,190,575 ordinary shares in Fabergé Ltd.—the Renova parties seek to pursue that claim in Appeal No. 22 of 2012. It is said on their behalf that the judge would have been wrong to give Autumn and/or Mr. Gilbertson an allowance in respect of the sums paid by Autumn in order to maintain its proportionate shareholding—in that (it is said), as a matter of law, those sums were spent maintaining the dishonestly diverted property and so neither Mr. Gilbertson nor Autumn was entitled to an allowance in respect of them—and that the judge ought to have held that the additional 16,190,575 ordinary shares in Fabergé Ltd. were simply accretions to the 25,000 shares already held on constructive trust. In developing those submissions it is said on behalf of the Renova parties that:

(1) It is necessary to have in mind that all but US$100,000 of the moneys paid by Autumn in acquiring additional shares in Fabergé Ltd. were paid after the date of the commencement of these proceedings (May 20th, 2008), and so were paid by Autumn at a time when it knew that an adverse claim in relation to its existing holding of Fabergé Ltd. shares was being pursued. Given that Autumn was (as the judge held) a constructive trustee of the PEL shares issued in January 2007—and given, critically, that Autumn could only acquire the additional shares by the exercise of rights attached or incidental to the shares which it held on constructive trust—the additional shares which it acquired should be treated as accretions to the shares which it already held, were themselves property traceable to the original single share in PEL by the master fund and were received by Autumn with the requisite knowledge of Mr. Gilbertson's breach of fiduciary duty. Accordingly, Autumn must hold the entirety of its present shareholding in Fabergé Ltd. on constructive trust for the master fund. In support of that proposition, reliance is placed, by way of analogy, on observations in *Att. Gen. (Hong Kong)* v. *Reid* (3).

(2) The judge failed to appreciate that he had not ordered Autumn to account *in personam* as constructive trustee for the value of the 25 PEL shares issued in January 1st, 2007 but, rather, had declared that Autumn held those shares *in specie* on constructive trust for the master fund. It was on that basis that he made the order for the transfer of the 25,000 Fabergé Ltd. shares to the master fund. That was a proprietary remedy which recognized the master fund's restitutionary rights, and was appropriate, given that a proprietary claim (including a tracing claim) had been clearly

pleaded by Renova in its amended statement of claim. In those circumstances the judge was wrong to make no order for the transfer of the additional 16,190,575 shares in Fabergé Ltd.

(3) Neither Mr. Gilbertson nor Autumn was entitled to an allowance in respect of the costs of acquisition of the additional shares. As a matter of equitable principle there is no allowance to be given by way of compensation for work and effort done by a defaulting fiduciary where the defaulting fiduciary comes to court without clean hands. In support of that proposition, reliance is placed on *Guinness plc* v. *Saunders* (20). Neither Autumn nor Mr. Gilbertson had clean hands.

233 In response to the claim in respect of the additional Fabergé Ltd. shares, it is said on behalf of Autumn that, first, there is no foundation of fact upon which a tracing claim in respect of the additional shares can be advanced on appeal and, secondly, that—even if Renova could demonstrate that the master fund could establish a right to trace in respect of those shares—it would be wrong, as a matter of law, for this court to grant the relief sought save upon terms which required the Renova parties to reimburse to Autumn the moneys (US$1,455,466) which it had expended in acquiring those additional shares. In developing those submissions it is said that:

(1) In seeking to trace into the additional 16,190,575 Fabergé Ltd. shares, the Renova parties are obliged to contend that the right to acquire those shares was a right attached, or incidental, to the PEL shares issued to Autumn in January, 2007, so that the constructive trust to which (as the judge held) the 25,000 Fabergé Ltd. shares were subject extends to the additional shares acquired by the exercise of that right. But Renova failed to plead, or to establish at trial, that any such right was attached, or incidental, to the PEL shares issued in January, 2007; the judge made no finding to that effect; and there is no appeal from his failure to do so. Further, it is said, the fact that Fabergé Ltd. shares carried no pre-emption rights until the articles of association were amended in 2009 suggests that the factual position differed from time to time.

(2) It would have been wrong, as a matter of law, for the judge to order the transfer of the additional 16,190,575 ordinary shares in Fabergé Ltd. to the master fund—or for this court now to do so—save on terms that the master fund reimburse Autumn for the price which Autumn paid for those shares, in that—

(i) an allowance may be given for work and effort done to maintain trust property by an innocent constructive trustee, and moneys properly expended by a constructive trustee (innocent or otherwise) may be allowed as a deduction on the taking of an account; and

(ii) where new property is acquired using trust property and non-trust property, it may be possible for those interested under the trust to claim part of, or an interest in, the new property on a pro rata basis; but it is not possible for them to claim the whole of the new property, *a fortiori*, not possible for them to claim the whole of the new property without giving credit for the non-trust property by the use of which it has (in part) been acquired.

In support of the first of those propositions, Autumn relies on observations in *Boardman* v. *Phipps* (9), and *Ultraframe (UK) Ltd.* v. *Fielding* (38) ([2005] EWHC 1638 (Ch), at paras. 1513–1514) and on the statement in *Snell's Equity*, 32nd ed., para. 7–055, at 226 (2010) that the obligation to account is to account for actual or net profits. In support of the second, Autumn relies on the statement in Underhill & Hayton, *The Law of Trusts and Trustees*, 18th ed., art. 90.1(2), at 1150 (2010)).

(3) The decisions in *Guinness plc* v. *Saunders* (20) and *Att. Gen.* (*Hong Kong)* v. *Reid* (3)—on which the Renova parties seek to rely—provide no support for the propositions advanced. The issue in the *Guinness* case was whether a consultant (Mr. Ward) should receive an allowance against a claim by Guinness plc for repayment of moneys which he had received for services which he had rendered in connection with the takeover of the Distillers' Company plc, by way of compensation for his work and effort in that context. The Renova parties seek to equate compensation for work and effort with reimbursement of moneys paid to acquire property which would not otherwise have become subject to the trust. There is no true analogy. The issue in the *Reid* case was whether moneys acquired by a senior public official (Mr. Reid) by way of a bribe (and so in breach of fiduciary duty) were held on constructive trust for the Crown and traceable into the properties that, it was alleged, Mr. Reid had used those moneys to acquire. There was no evidence that any of the moneys that he invested in those properties had their source otherwise than from the bribe. The *Reid* case, also, affords no true analogy with the present case.

(4) The reason why Renova did not include a claim in respect of the additional 16,190,575 shares in Fabergé Ltd. in the relief sought in these proceedings was that the master fund had no interest in taking those shares on terms that it reimburse Autumn for the price which Autumn had paid for those shares, in that (amongst other considerations) by the time these proceedings were commenced the additional shares were not worth the amount that Autumn had paid for them. It is pertinent to have in mind that the Renova parties did not offer (at trial)—and have not offered (in the context of their cross-appeal)—to accept a transfer of the additional 16,190,575 shares on terms that recognize that Autumn has invested US$1,455,466 of its own moneys in acquiring those shares.

In those circumstances, it is said on behalf of Autumn, that—in the absence of a relevant pleading, appropriate evidence, necessary findings or a willingness to make any allowance for the cost of Autumn's acquiring the additional 16,190,575 Fabergé Ltd. shares—the Renova parties are obliged to contend that it makes no difference whether those shares were acquired by the exercise of a legal right; whether that right (if any) had any value; or whether Autumn acquired those additional shares by payment (and in what amount) out of its own moneys. It is accepted that the claim might be arguable if the Renova parties were willing to recognize the fact that Autumn should be reimbursed for the moneys spent in acquiring the additional Fabergé shares but, as it stands, "it is just frivolous and plain greedy."

234 In my view the judge was correct in refusing to hold that the additional 16,190,575 shares in Fabergé Ltd. acquired by Autumn were held upon constructive trust for (and should be transferred to) the master fund. I agree that the material before him at the trial did not enable the judge to make the findings of fact which would have been necessary in order to support Renova's claim to those additional shares. Nor is this court in a position to do so.

**Was the judge wrong to grant relief against Autumn by way of an account of profits (comprising the payment which Autumn received on September 28th, 2007 in respect of interest on the loan which it had made to PEL on January 3rd, 2007) and, if not, was the judge wrong to award pre-judgment interest from January 3rd, 2007 (rather than from September 28th, 2007) on the payment which Autumn received?**

235 At para. 3 of his order of November 6th, 2012, the judge ordered that Autumn pay to the master fund the sum of US$2,306,320.35. It is stated in the order that that sum included pre-judgment interest of US$507,347.35 from January 3rd, 2007 until the date of the order. The balance (US$1,798,973) represented a payment in respect of interest made by Fabergé Ltd. to Autumn on September 28th, 2007, being interest on loans (amounting in aggregate to US$10m.) which had been made by Autumn to PEL (as Fabergé Ltd. then was) in January 2007, at the time of the acquisition of the Fabergé rights. In its appeal from para. 3 of the order of November 6th, 2012, Autumn challenges each of the elements which make up the sum which it was ordered to pay.

***The payment in respect of interest received by Autumn in September 2007***

236 The judge treated the payment received by Autumn in September 2007 (US$1,798,973) as moneys for which Autumn was liable to account

in respect of profits. Under the heading "The claim for profits," he explained (2012 (2) CILR 416, at para. 96) that—

> "Apart from its gratuitous receipt of the new PEL/Fabergé Ltd. shares, Autumn made profits on the loan to PEL, namely the interest that it was paid. In his witness statement, Mr. Thomas explained that on September 28th, 2007, the sum of US$11,798,973 was paid by Fabergé Ltd. to Autumn, representing the loan of US$9.5m. together with the further loan of US$0.5m. for working capital advanced to PEL/Fabergé Ltd., together with interest on those sums. His evidence was that the initial interest on the loan was US LIBOR plus 1.5% which at the time would have been a total interest rate of about 7%. However, in May 2007 the interest rate on the loans, including Autumn's loan, was unilaterally increased by Fabergé Ltd. to 25% per annum pursuant to a proposed call-option agreement. There was no reasonable explanation by the Gilbertson parties' witnesses for this unusually high rate of interest. The total interest paid on the loans was a profit to Autumn in respect of funding of the acquisition of the rights and the further working capital. The plaintiff's argument is that since the acquisition of the rights was an economic opportunity diverted away from the Pallinghurst structure by Mr. Gilbertson in breach of fiduciary duty, such profit is directly traceable to that breach. Accordingly, the plaintiff contends that Autumn is also liable to account for the amount of that interest."

The judge accepted that argument. Under the heading "Quantum in respect of Autumn," he said this (*ibid.*, at para. 151):

> "As I have already explained, the plaintiff's claim against Autumn is for an account in respect of the interest which Autumn received on the loan which it made to PEL out of the BPG settlement on behalf of Mr. Gilbertson and in respect of the shares which it holds in what is now Fabergé Ltd., which were procured to be gratuitously issued to it by Mr. Gilbertson. For the reasons I have already explained, I consider that such account should be given in each case."

And he said this (*ibid.*, at para. 153):

> "In relation to the plaintiff's claims against Autumn, I have concluded that, in the circumstances, Autumn must account for the shares in PEL (now called Fabergé Ltd.) which Mr. Gilbertson gratuitously caused to be issued by PEL to Autumn in January 2007 and also for the interest it received on the loans it made to PEL on behalf of Mr. Gilbertson."

237 In challenging para. 3 of the judge's order—in so far as it relates to the payment received by Autumn in September 2007 in respect of interest on the loans which it had made to PEL in January 2007—it is submitted

on behalf of Autumn that the judge misdirected himself and erred in law and/or fact in ordering an account of profits comprising that payment. Had the judge directed himself properly, it is said that he should have refused to accede to, or grant any relief in respect of, the claim to the moneys paid to it as interest on the loans. In developing those submissions, it is said on behalf of Autumn that:

(1) Autumn and the Gilbertson parties were entitled to know (from Renova's pleaded case) what claims they had to meet at trial. Once Renova had abandoned its contention that Autumn was Mr. Gilbertson's alter ego, there was no pleaded claim in respect of which relief could be granted in respect of the moneys paid to Autumn in respect of interest on the loans which it had made to PEL. In particular, there was no pleaded claim that the master fund had any proprietary interest in those moneys which could found a claim in knowing receipt. In their written opening submissions at trial (at para. 324), the Gilbertson parties had put the Renova parties and the court on notice of their objection to any such claim (on the grounds that it had not been pleaded) but Renova made no application to amend its pleaded case in the course of the trial. There was no basis on which the judge could fairly disregard the fact that no claim for knowing receipt of the moneys paid as interest on the loans had been pleaded. In support of that submission, reliance was placed on observations in *Rolled Steel Products (Hldgs.) Ltd.* v. *British Steel Corp.* (31) ([1986] Ch. at 309) and *The Supreme Court Practice 1999* vol. 1, para. 18/714, at 314.

(2) Not only was there no pleaded claim that the payment to Autumn had been made out of the assets of the master fund—or that Autumn was in knowing receipt of moneys into which assets of the master fund could be traced—there was no evidence to support such a claim. In those circumstances, the judge ordered an account of profits against a party (Autumn) which was not in knowing receipt of moneys misapplied in breach of trust, and was neither itself a fiduciary nor the alter ego of a fiduciary (Mr. Gilbertson). He was wrong to do so: there was no juridical basis upon which he could properly hold that Autumn was liable to account to the master fund for the moneys which it received as interest on the loans which it had made to PEL.

(3) The judge was wrong to take the view (expressed at 2012 (2) CILR 416, at para. 96) that the acquisition of the Fabergé rights was an economic opportunity of the master fund, and wrong to take the view that there was a sufficient nexus between the acquisition of the Fabergé rights and the receipt of interest on the loans. The master fund had no interest in the economic opportunity of earning interest on loans made to PEL in January 2007 (at a time when, it is important to have in mind, the master fund owned the whole of the issued share capital of PEL and had no funds of its own out of which to make such loans). Although the opportunity to

earn a high rate of interest on a loan could constitute a corporate opportunity—and it may be said that the opportunity to earn the interest would not have arisen unless PEL had taken the US$9.5m. loan in order to fund the acquisition of the Fabergé rights—the applicable test for the purposes of tracing is not a "but for" test; the test is one of nexus and there was no basis on which the judge could find a sufficient nexus in this case.

238 Further (and in the alternative) it is submitted that—even if he were right to find a sufficient nexus between the acquisition of the Fabergé rights and the making of the loans to PEL—the judge erred in holding that Autumn should account for the whole of the interest received on those loans. As there was no evidence that Autumn had acted dishonestly, had the claim been properly pleaded by Renova, Autumn would have claimed an equitable allowance in respect of the costs which it incurred in making the loans. Had the judge directed himself properly, it is said that he should have allowed those costs.

239 In response to the submissions advanced on behalf of Autumn in support of its challenge to the judge's order that it account for the moneys which it received in September 2007 as interest on the loans which it had made to PEL in January 2007, it is said on behalf of Renova that the receipt of those moneys was a profit on funding the acquisition of the Fabergé rights, and that, given that (as the judge held) the acquisition of the Fabergé rights was an opportunity diverted away from the Pallinghurst structure in breach of fiduciary duty, that profit is directly traceable to that breach. It is submitted that, although it may be said that the interest was not paid with the master fund's own moneys, the test is one of nexus, and that it is clear that there was a sufficient nexus between Mr. Gilbertson's breach of fiduciary duty and the receipt of the interest payment. At the least, it is said, there is a sufficient nexus between Mr. Gilbertson's failure to disclose to the company, or to the master fund or GPLP, that the loan (at interest) was to be made by a special purpose vehicle controlled by his family trust. Furthermore, the interest was paid by Fabergé Ltd. out of moneys that could be traced back to the Fabergé rights, in that Fabergé Ltd. had no moneys out of which to pay the interest other than the moneys raised by it in September 2007 by way of a rights issue based on its underlying ownership of the Fabergé rights. Accordingly, it is said, the moneys paid to Autumn by way of interest (at 25%) on its loans are directly traceable to the Fabergé rights and the economic control over them represented by the shares issued by PEL in January 2007.

240 In my view, the judge was wrong to order that Autumn account as a constructive trustee for the payment of US$1,798,973 which it received in September 2007 in respect of interest on the loans made to PEL on January 3rd, 2007.

241 I accept that (as Autumn submits) the juridical basis on which the judge held that an obligation to account arose in respect of that payment is unclear; in particular, I accept that there was no sufficient basis on the pleadings for a claim for such an account. But, in the light of the judge's observations (2012 (2) CILR 416, at paras. 96, 151 and 153, to which I have referred earlier in this section), I think it must be assumed that, in reaching the conclusion that he did, the judge accepted Renova's submission that the payment was a profit derived from the funding of the acquisition of the Fabergé rights which was "directly traceable" to the "economic opportunity" of acquiring those rights which was "diverted away from the Pallinghurst structure by Mr. Gilbertson's breach of fiduciary duty." I am satisfied that he was wrong to do so.

242 At the time when the loans were made (on January 3rd, 2007) the "economic opportunity" of acquiring the Fabergé rights lay with PEL as the contracting purchaser from Unilever plc under the SPA dated December 22nd, 2007. The loans did not have the effect of diverting the economic opportunity of acquiring the Fabergé rights away from PEL; the effect of the loans was that PEL was able to take advantage of that economic opportunity by using the funds lent to it to complete the purchase. Nor did the loans have the effect of diverting the economic opportunity of acquiring the Fabergé rights away from the master fund (or, more generally, away from the Pallinghurst structure). As I have mentioned earlier in this judgment, the judge recorded (at paras. 9.26 and 9.27 of his judgment) that it was the common intention of the Gilbertson parties on the one hand and the Renova parties on the other hand (as had been agreed between Mr. Sean Gilbertson and Mr. Kalberer in the course of a telephone conversation on December 20th, 2006) that the role of the master fund would be as guarantor of PEL's obligations under the SPA; it was not intended (at least, not intended from and after December 20th, 2006) that the master fund would, itself, be the purchaser of the Fabergé rights. The judge did not find that Mr. Gilbertson was in breach of his fiduciary duty in failing to procure that the master fund lent moneys to PEL to fund the completion of the purchase: there was no evidence that the master fund was in a position to do so.

243 Immediately before the loans were made on January 3rd, 2007, the interest of the master fund in the acquisition of the Fabergé rights by PEL was as the owner of 100% of the issued capital of PEL. The making of the loans did not alter that position. What did alter that position was Mr. Gilbertson's breach of fiduciary duty (as the judge found) in procuring the dilution of the master fund's ownership of the share capital of PEL by the issue of 100 new PEL shares to the members of the consortium. But—as the judge found, in the context of addressing the question whether Autumn received the new PEL shares as a volunteer and not as a purchaser—the terms of the loans were agreed without regard to the decision to issue the

PEL new shares. In those circumstances, although it can be said that the payment by PEL to Autumn in September 2007 of interest on the loans made in January of that year was a profit derived from the funding of the acquisition of the Fabergé rights and that the "economic opportunity" to fund the acquisition arose from PEL's rights as contractual purchaser under the SPA, there is no basis on which it can be said that the opportunity to fund the acquisition or PEL's rights as contractual purchaser were "diverted away from the Pallinghurst structure by Mr. Gilbertson's breach of fiduciary duty." Properly understood, what was diverted away from the Pallinghurst structure by Mr. Gilbertson's breach of fiduciary duty was substantially the whole (more precisely, 100/101 parts) of the ownership of PEL (and so, indirectly, substantially the whole of the value of the Fabergé rights after deduction of the cost of acquisition), not the right to receive interest paid by PEL on the loans which enabled it to acquire those rights.

***Pre-judgment interest from January 3rd, 2007***

244 As I have said, Autumn challenges each of the elements which make up the sum which it was ordered to pay under para. 3 of the order of November 6th, 2012. In challenging the second of those elements—pre-judgment interest pursuant to s.34 of the Judicature Law (2007 Revision) on the payment received by Autumn in September 2007—it is submitted, first, that—given that (for the reasons advanced in support of the challenge to the first element) it was not open to the judge to hold that Autumn was liable as a "knowing recipient" of the moneys which it received by way of an interest on the loans—there was no basis on which he could have awarded pre-judgment interest on that sum and, secondly, that—assuming (which is not admitted) that the judge was right to hold that Autumn was liable to account as a "knowing recipient" for those moneys—no claim against Autumn based on "knowing receipt" could arise before the payment was actually received by Autumn and so there was no sensible basis on which the judge could have awarded pre-judgment interest in respect of a period before the date (September 28th, 2007) on which the cause of action accrued.

245 I have explained, in the earlier paragraphs of this section of my judgment, why I take the view that the judge was wrong to hold that Autumn was liable as a "knowing recipient" of the moneys which it received by way of interest on the loans. It follows that I would hold that Autumn is entitled to succeed in its challenge to the order for payment of pre-judgment interest on the first of the grounds advanced: there was no basis on which the judge could have awarded pre-judgment interest on moneys which, although claimed in these proceedings, were not, themselves, either paid or properly the subject of an order for payment. Nevertheless, in case others take a different view, it is necessary that I

address the second of the grounds advanced: that there was no basis on which the judge could have awarded pre-judgment interest in respect of a period before the date on which the cause of action in respect of the moneys in respect of which Autumn was said to be a "knowing recipient" accrued.

246 In developing that second ground, Autumn pointed out that the statutory provision under which the judge purported to award pre-judgment interest—s.34 of the Judicature Law (2007 Revision)—was in these terms (so far as material):

> "(1) Subject to rules of court, in proceedings (whenever instituted) before the Grand Court . . . for the recovery of a debt or damages there may be included in any sum for which judgment is given simple interest at such rate as the court thinks fit, not exceeding the rate prescribed from time to time by rules of court, on all or any part of the debt or damages in respect of which judgment is given or payment is made before judgment, for all or any part of the period between the date when the cause of action arose, and—
>
> (a) in the case of any sum paid before judgment, the date of payment; and
>
> (b) in the case of the sum for which judgment is given, the date of the judgment."

It is said that if—as the judge thought—the amount which he ordered to be paid by Autumn to the master fund on the taking of an account in respect of the moneys received by Autumn in September 2007 by way of interest on the loans made in January 2007 was payable as a "debt or damages in respect of which judgment [was] given" for the purposes of s.34(1) of the Law, the power of the court to award pre-judgment interest under that section was limited to interest in respect of "all or any part of the period between the date when the cause of action arose," and (in this case) "(b) . . . the date of the judgment." Accordingly, it is said, the judge was "plainly wrong" to award pre-judgment interest from January 3rd, 2007, in that:

(1) The cause of action for knowing receipt is predicated upon receipt. As Sir Terence Etherton, C. observed, when delivering the judgment of the Privy Council in *Arthur* v. *Att. Gen. (Turks & Caicos Islands)* (2) ([2012] UKPC 30, at para. 31):

> "A defendant incurs an equitable liability for knowing receipt when he or she acts unconscionably by receiving and retaining trust property with the knowledge that it was transferred in breach of trust. Liability for knowing receipt can also be incurred when property is transferred in breach of a fiduciary duty other than a breach of trust."

(2) As Lord Scott of Foscote made clear in *Criterion Properties plc* v. *Stratford UK Properties LLC* (15) ([2004] 1 W.L.R. 1846, at para. 27), "receipt"—in the context of a claim founded on equitable liability for knowing receipt—is to be distinguished from a contractual right to receive (*ibid.*):

> "The word 'receipt' in the expression 'knowing receipt' refers to the receipt by one person from another of assets. A person who enters into a binding contract acquires contractual rights that are created by the contract. There may be a 'receipt' of assets when the contract is completed and the question whether there is 'knowing receipt' may become a relevant question at that stage. But until then there is simply an executory contract which may or may not be enforceable. The creation by the contract of contractual rights does not constitute a 'receipt' of assets in the sense that a 'knowing receipt' involves a receipt of assets. The question whether an executory contract is enforceable is quite different from the question whether assets of which there has been a 'knowing receipt' are recoverable from the recipient."

(3) The judge held (2012 (2) CILR 416, at para. 96), accepting Mr. Thomas's evidence that Autumn received the payment in respect of interest on the loans on September 28th, 2007. That was the date on which the cause of action arose. There was no power under s.34(1) of the Law to award pre-judgment interest in respect of a period prior to that date. Had the judge directed himself properly, he should have held and ordered that pre-judgment interest (if any) should run from September 28th, 2007.

247 In response to the submission that the judge was "plainly wrong" to award pre-judgment interest from January 3rd, 2007, it is said on behalf of the Renova parties that the judge was entitled and correct to award pre-judgment interest from that date, in that January 3rd, 2007 was the date when the loans were made to PEL and the contractual right to interest on the loans arose. Although Autumn did not receive payment until September 2007, the relevant chose in action—representing the profit for which Autumn was liable to account—accrued on January 3rd, 2007. A secret profit is no less a secret profit if the payer is bound to pay it but has not yet done so: the profit is not earned only upon its conversion to cash. It is said that Autumn's reliance on the observations of Lord Scott in *Criterion Properties plc* v. *Stratford UK Properties LLC* (15)—in support of the proposition that a mere contract cannot be an asset for the purpose of knowing receipt—is misplaced, in that (i) the judge was not shown that case (either at the trial or at the post-trial hearing on October 26th, 2012, when he was asked to amend his judgment) and so never had an opportunity to consider it; and (ii) the decision in the *Criterion* case was on an appeal from an order made on an application for summary judgment and not after a trial. Further, it is said, Lord Scott referred to no authority

to support his view, and it is difficult to accept that executory contracts (for example, cheques, or insurance policies) cannot be assets capable of being traced in equity or received for the purposes of knowing receipt. The Renova parties invite this court to decline to follow Lord Scott's approach or, at the least, to distinguish that approach on the basis that contractual rights as against third parties can form an asset capable of being transferred in breach of trust.

248 If (contrary to my view) the judge was correct to hold that Autumn was liable to account as a "knowing recipient" for the moneys which it received in September 2007, then I am satisfied that, in awarding pre-judgment interest on the amount (US$1,798,973) for which he held Autumn was accountable, he was wrong to include in the sum awarded (US$507,347.35) an amount (said to be US$95,407.18) in respect of interest attributable to the period from January 3rd, 2007 to September 27th, 2007. Even if, as the Renova parties contend, a debt owed to the defendant by a third party can be the subject of a claim for an account in equity on the basis of "knowing receipt," it seems to me impossible to hold (on the facts of this case) that, on January 3rd, 2007, the amount of the interest on the loans for which Autumn was liable to account as a "knowing recipient" was equal to the amount (US$1,798,973) which it received in September 2007. In that context it is relevant to have in mind (i) that the terms of the loan (as recorded in the minutes of the meeting of the directors of PEL held on January 3rd, 2007) provided for interest on the loan at US$ LIBOR plus 1.5%, compounded monthly and payable at repayment of the loan; (ii) that (as the judge recorded at 2012 (2) CILR 416, at para. 96) that rate would have been equivalent to about 7% p.a.; (iii) that, although (as the judge also recorded, *ibid.*) the rate of interest was increased to 25% p.a. in May 2007, there was no evidence that the terms as to the payment of interest on the loan were otherwise altered between January 3rd, 2007 and September 28th, 2007—or that any demand for repayment of the loan was made before September 28th, 2007; and (iv) that, in the events which happened, the accrued interest (US$1,798,973) was paid at the same time as the loans were repaid. In those circumstances, as it seems to me, it was not open to the judge to hold that Autumn was liable to account for interest on the loans in the amount of US$1,798,973 (or at all) as a "knowing recipient" before September 28th, 2007; it was on that date—and not before that date—that the relevant cause of action (if any) for the purposes of s.34(1) of the Judicature Law (2007 Revision) arose.

**Whether, in making no order as to the costs of the action and the counterclaim, the judge exercised his discretion outside the ambit within which reasonable disagreement is possible and, if so, what orders as to cost should be made**

249 Paragraph 6 of the order dated November 6th, 2012 provided that, subject to any earlier orders which required the costs of one party or parties to be paid by another party or other parties, each party should bear its own costs of the proceedings (including any costs which had been ordered to be in the cause). The judge set out the reasons which led him to make an order for costs in those terms, at paras. 3.1–3.12 of the ruling which he delivered on November 5th, 2012, following the post-trial hearing on October 26th, 2012 (that judgment is noted at 2012 (2) CILR *N* [10]).

250 After recording that the Renova parties had contended that the appropriate order should be that the Gilbertson parties pay the costs of the action on the standard basis and the costs of the counterclaim on the indemnity basis and that the Gilbertson parties had contended that they should be awarded their costs of the action (while accepting that the Renova parties should have their costs of the counterclaim but on the standard basis) and reminding himself of the provisions in O.62, r.4(2) and (5), of the Grand Court Rules, the judge said this (at paras. 3.4–3.12):

> "3.4 Accordingly the objective of O.62 is that the successful party should recover its reasonable costs or, to put it as in r.4(5), costs should follow the event. However, both rules contemplate that the Court may order otherwise and that must mean that it may do so in the exercise of the generally accepted discretion which it has in relation to costs having regard to the circumstances of the particular case.
>
> 3.5 The obvious first question therefore in seeking to apply the general objective is to determine which party was the successful one or, as put as in r.4(5) to determine the event which costs should follow. The Renova Parties contend that they succeeded overall and were successful on 'the main issue'. They say that in the end of the day there was a finding of serious wrong-doing by Mr. Gilbertson and a significant award on liability against Autumn. They contend that the overriding objective should be followed and that they are the successful parties and should accordingly be awarded the costs of the proceedings. They relied on *National Trust for the Cayman Island v Planning Appeals Tribunal* [2002] CILR N.24 and *Banks v Arch* [2004–05] CILR N.40. The Renova Parties submit that the onus is on the Gilbertson Parties to show why the Court should depart from the usual order.

3.6 The Gilbertson parties argue that the Renova Parties did not succeed in obtaining any relief against Mr. Gilbertson and that they effectively lost the principal part of the action. They refer to *Texaco Ltd v Arco Technology Inc* (unreported—The Times, 13th October 1989). The Gilbertson Parties also argue that the relief obtained against Autumn is, in the circumstances, nominal and that the Plaintiff has in effect lost the whole action. In the alternative they rely upon GCR O.62 r.4(5) and submit that in the particular circumstances of this case the Court is entitled to depart from the usual rule in its discretion and award costs as it sees fit. As a final alternative they propose that a fair outcome would be for the parties to each bear their own costs.

3.7 The Renova Parties and the Gilbertson parties each submitted detailed skeleton arguments which I have considered and taken into account. They also supplemented these in oral submissions which I have also taken into account.

3.8 I have been the judge assigned to and have dealt with the entirety of these proceedings since they were commenced over four years ago in May 2008, culminating in a four week trial in April and May this year. During the course of the proceedings there have been several hotly contested and significant interlocutory hearings, which have resulted in four substantial written rulings and an ex tempore written ruling. A significant issue has been the Renova Parties' discovery, to which I refer below. The issues argued by both parties at the trial departed in several respects from their respective pleadings.

3.9 There is in my view in this case no one obvious event for costs to follow; there has been no one clearly successful party overall. Each party has had victories and defeats on various claims and issues. The Plaintiff has succeeded in establishing Mr. Gilbertson's breach of fiduciary duty but has failed in establishing any consequential loss, notwithstanding the very substantial claim in respect of equitable compensation which it made. If the reasoning of Phillips J. (as he then was) in the *Texaco* case (*supra*) is adopted, the Plaintiff therefore lost the case. The Plaintiff also abandoned its claim against Mr. Gilbertson to account himself for the profit made by Autumn. Although the Plaintiff has established liability against Autumn to account for the 25 gratuitously issued shares, it seems to me that the net gain to the Plaintiff as a result can fairly be said to be minimal in the context of what was claimed. I also consider that, although legally separate, it is somewhat artificial for these proposes in these proceedings to distinguish between Mr. Gilbertson and Autumn in light of my acceptance in the judgment of the Plaintiff's claim that Mr. Gilbertson was the directing mind and will of Autumn. Of

course, the Gilbertson Parties' own counterclaims were either withdrawn or have been dismissed, although in the end of the day the counterclaims accounted for a very limited part of the trial and earlier in the proceedings I declined to strike them out. I see the counterclaims as part of the ebb and flow of each parties' various successes and defeats.

3.10 In all the circumstances, I am of the view that there has been no clearly overall wholly successful party. I consider that this is a case in which the overriding objective is either not applicable at all or that it should be departed from and some other order made in light of the circumstances of the case.

3.11 Notwithstanding that discovery did not ultimately feature significantly at the trial, I consider that I should at least have some regard in considering the overall costs of the proceedings, to the Renova Parties' failure to comply with their discovery obligations. I expressly found that to be blameworthy and culpable, although in the end of the day I did not consider that it precluded the possibility of a fair trial. Nonetheless, it seems to me that, in exercising my discretion in relation to the costs of the proceedings, blameworthy and culpable conduct of one of the parties in relation to a very important part of the proceedings is at least a factor which I am entitled to take into account, at least to some extent, in reaching my overall decision.

3.12 In my view it would not be fair or appropriate to award the costs of the whole proceedings to either party. On the other hand an issue by issue allocation of costs would, in my opinion, be very difficult to apply in practice in this case and would be likely to result in interminable argument and debate, which would not be desirable. In any event the costs payable by each party on an issue by issue basis would, in this case, probably largely cancel each other out. In all the circumstances, I consider that the fairest approach in light of the conduct of these proceedings over the past four years and their eventual outcome after trial is that each party should bear their own costs of the proceeding, and I so order. That is, of course, subject to all orders for costs in favour of one or other party which have already been made and which shall stand and be complied with."

251 In its notice of appeal in Appeal No. 21 of 2012, Autumn seeks an order that the Renova parties pay Autumn's costs of the proceedings in the Grand Court (including any costs ordered to have been costs in the cause) on the standard basis, to be taxed if not agreed. An order in those terms is sought, also, in para. 41(4) of Autumn's memorandum of grounds of appeal filed on February 1st, 2013, but no grounds for making such an order are advanced in that memorandum. An order in those terms is amongst the relief listed at para. 304 of the written submissions dated May

24th, 2013 served on behalf of Autumn in support of its appeal but, again, the basis upon which that order is sought is not explained. At para. 120 of the written submissions dated June 21st, 2013, served on behalf of the Gilbertson parties in opposition to Renova's cross-appeal (Appeal No. 22 of 2012) it is said that—

> "the Gilbertson parties urged the learned judge to award costs against the Renova parties to reflect, amongst other things, the court's disapproval of the Renova parties' deliberate destruction of documents in the course of the proceedings. But, the learned judge did not go any further than to find it 'a factor which [he was] entitled to take into account, at least to some extent, in reaching [his] overall decision.'"

And, at para. 142 of those written submissions, it is said that "in the circumstances, the learned judge could have quite properly made a costs order in favour of the Gilbertson parties, as the Gilbertson parties urged him to do." In those circumstances, although Autumn has not formally withdrawn its appeal against the judge's order as to costs (made in its notice of appeal in Appeal No. 21 of 2012), this court may, I think, proceed on the basis that it does not seek to challenge the judge's view that the appropriate order is that (subject to any earlier orders which required the costs of one party or parties to be paid by another party or parties), each party should bear its own costs of the proceedings (including any costs which had been ordered to be in the cause). Mr. Gilbertson has not appealed from the judge's order.

252 In Appeal No. 22 of 2012, the Renova parties also seek an order that the judge's order in respect of costs be set aside but they invite this court to substitute an order that the Gilbertson parties pay their costs of the action on the standard basis and their costs of the counterclaims on the indemnity basis that (it is said) being the only just order to make in all the circumstances. It is said that, in making no order as to the costs of the action and the counterclaims, the judge exercised his discretion outside the ambit within which reasonable disagreement is possible, and that, in those circumstances, this court should set aside his order and make the order that the judge should have made. In that context, this court was referred to the well-known observations of Lord Fraser of Tullybelton in *G* v. *G (Minors: Custody Appeal)* (19) ([1985] 1 W.L.R. at 652).

***The costs of the action***

253 The Renova parties draw attention to GCR O.62, r.4(5): "[T]he Court shall order the costs to follow the event, except when it appears to the Court that in the circumstances of the case some other order should be made as to the whole or any part of the costs." They rely in this court (as they did before the judge) on the principle, recognized in this jurisdiction

in *National Trust for the Cayman Islands* v. *Planning Appeals Tribunal* (25) and *Banks* v. *Arch* (5) (to which the judge referred), that the burden lies on the party seeking a departure from the usual order to show why such departure is justified.

254 In developing their submission that, in departing from the usual order that costs should follow the event, the judge exercised his discretion in a way which fell outside the ambit within which reasonable disagreement is possible, it is said on behalf of the Renova parties that the judge was wrong to conclude that there was no clear overall winner and that there was no one obvious event which his order for costs should follow. He ought to have concluded that the relevant event or events to be followed for the purposes of GCR O.62, r.4(5) were the finding against Mr. Gilbertson for dishonest breach of fiduciary duty and the finding that Autumn was liable to account as constructive trustee for the new PEL shares issued to it in January 2007 and for the payment in respect of interest on the loans which it received in September 2007. In particular, it is said that:

(1) The judge should have addressed the position of Autumn separately from that of Mr. Gilbertson.

(2) As between Renova and Autumn, there was no reason why Autumn should not pay the whole of Renova's costs. In that context, the relevant "event," for the purposes of GCR O.62, r.4(5), was the liability of Autumn to account as constructive trustee for the Fabergé Ltd. shares. On that issue there was only one winner: Renova.

(3) The judge was wrong to take account of—or placed too much weight on—the facts (i) that (as he held) Renova had failed to establish any loss as against Mr. Gilbertson, and (ii) that Renova abandoned its claim against Mr. Gilbertson for an account of profits.

255 In advancing the first of those three points—that, in determining what order to make as to costs, the judge should have addressed the position of Autumn separately from that of Mr. Gilbertson—it is said on behalf of the Renova parties that the facts (i) that (as the judge held) Renova had failed to establish any loss as against Mr. Gilbertson, and that (ii) Renova abandoned its claim against Mr. Gilbertson for an account of profits did not provide a basis for failing to make a costs order against Autumn. Autumn and Mr. Gilbertson had argued strongly that it was not permissible to pierce the corporate veil and, indeed, it was in response to (and in recognition of the force of) that argument that Renova had abandoned its attempt to do so and, in consequence, had been led to abandon its claim for an account of profits as against Mr. Gilbertson. If, as the Gilbertson parties contended (and Renova accepted), Mr. Gilbertson and Autumn were to be treated as legally separate and distinct in that

context, they should be treated as separate and distinct in the context of liability for costs.

256 In advancing the second of those three points—that, as between Renova and Autumn, there was no reason why Autumn should not pay the whole of Renova's costs—it is said on behalf of the Renova parties that the judge was wrong to characterize the liability of Autumn to account as "minimal." Even on the judge's own findings, Autumn's liability was substantial: the cash component was US$2.3m. and the shares ordered to be transferred to the master fund were worth a further US$1.5m. or thereabouts (even if Fabergé Ltd. were to be valued, as the judge held, at no more than US$120m.). But, even if recoveries of some US$3.8m. could be described as "minimal" in the context of the claims advanced by Renova in the action, the judge erred in law in treating that factor as a reason for refusing Renova an order for costs. In support of that submission, the Renova parties rely on the observation of Sanderson, J. in *Banks* v. *Arch* (5), that it is no answer to a claim for costs for the defendant to say that the award was only marginal and that therefore the plaintiff should not have his costs.

257 In advancing the third of those three points—that, in failing to make an order for costs against Mr. Gilbertson, the judge placed too much weight on the facts that (as he held) Renova had failed to establish any loss as against Mr. Gilbertson and that Renova abandoned its claim against Mr. Gilbertson for an account of profits—it is said on behalf of the Renova parties that the judge failed to take into account, or gave too little weight to, the following factors: (i) that it was Mr. Gilbertson's dishonest conduct which gave rise to these proceedings; (ii) that the main issue at trial—on which Renova was successful—was whether Mr. Gilbertson had dishonestly diverted the Fabergé rights to Autumn (and others) in breach of his fiduciary duties; (iii) that that issue was common both to the claim against Mr. Gilbertson and to the claim against Autumn; (iv) that success against Mr. Gilbertson on that issue, in relation to a claim for breach of fiduciary duty, was a legitimate end in itself (as Phillips, J. had held in *Texaco Ltd* v. *Arco Technology Inc.* (36)); Autumn was a company in which he had an obvious financial interest; (v) that the only substantive issue which the judge decided against Renova (the quantum of loss in respect of which equitable compensation should be awarded) occupied a relatively small part of the time at trial; (vi) that the claim against Mr. Gilbertson for equitable compensation—although ultimately unsuccessful at trial on the issue of loss—was never unreasonable or lacking a sensible basis; the judge found (2012 (2) CILR 416, at para. 70) that Renova had "put forward a perfectly arguable case on the merits of its claim and also in relation to loss"; (vii) that late evidence on quantum (which was disclosed to Renova only during the trial) formed a significant part of the judge's conclusions on equitable damages (as appears from, *ibid.*, paras.

127–128); and (viii) that the claim against Mr. Gilbertson for an account of profits (which Renova abandoned in the course of the trial) took up little or no time at any stage in the proceedings and added little to the costs of the proceedings in that, had that claim not been advanced, no less evidence (factual and expert) would have been adduced.

258 Further, it is said on behalf of the Renova parties that, in determining what order to make in respect of costs, the judge was wrong to take account of his conclusion, at an earlier stage in the proceedings, that Renova's failure to comply with its discovery obligations was "blameworthy and culpable." That conclusion was irrelevant in relation to the question where the costs of the proceedings should fall, in that: (i) the Gilbertson parties' strike-out application of April 27th, 2011 (founded on the alleged failure by Renova to give discovery) failed on the basis that the matter could be pursued at trial and adverse inferences drawn, if necessary; (ii) at the trial no questions about discovery—nor, indeed, any questions relevant to the allegation as to intention to harm (to which the documents not disclosed by the Renova parties were said to be germane)—were put to any of Renova's witnesses (amongst whom was Mr. Vekselberg); (iii) the Gilbertson parties made no submissions at trial as to deficiencies in Renova's (or any other Renova party's) discovery and did not ask the judge to draw any adverse inferences from the absence of documents; (iv) the judge (correctly) did not draw any adverse inferences against the Renova parties from any failure to give discovery; (v) the Gilbertson parties' application against Mr. Vekselberg for specific discovery of his TNK-BP documents was also rejected by the court at the interlocutory stage; and (vi) the documents that were the subject of the Gilbertson parties' applications based on non-disclosure went solely to the counterclaims, which were barely pursued and were either abandoned or ultimately dismissed. And it is said that, in taking account of his conclusion that Renova's failure to comply with its discovery obligations was "blameworthy and culpable" (as he did), the judge was wrong in failing, also, to take into account the following matters (each of which was a relevant matter which he should have taken into account), that is to say: (a) that he had ordered the costs of the Gilbertson parties' failed strike-out application and the specific discovery application against Mr. Vekselberg to be costs in the cause; (b) that the relevant cause (namely the counterclaims) was, on any view, won by the Renova parties; and (c) that the effect of making no order for costs following the trial was that the Renova parties were unjustly deprived of the (very substantial) costs of resisting those failed applications to which they should have been entitled, given that the Gilbertson parties failed properly to pursue the counterclaims, abandoned some of them late in the day and had the remainder dismissed.

259 For those reasons, it is said on behalf of the Renova parties that the only fair order was that Renova should have its costs of the action;

whether those costs were awarded against both Mr. Gilbertson and Autumn jointly or against Autumn alone.

260 In response to the submissions that, in determining what order to make as to costs, the judge should have addressed the position of Autumn separately from that of Mr. Gilbertson and that the liability of Autumn as constructive trustee could not be seen as "minimal"—it is said on behalf of the Gilbertson parties that each is inconsistent with the position adopted by the Renova parties in the proceedings, in that:

(1) At the hearing on October 26th, 2012—at which the parties made their respective submissions as to costs—the Renova parties urged the judge to treat the Gilbertson parties as one and the same. They cannot now complain that, in addressing the question of costs, the judge failed to treat Mr. Gilbertson and Autumn as separate and distinct.

(2) The Renova parties obtained leave to continue the action on the basis that the company and/or the GPLP and/or the master fund had suffered a substantial loss; which they put at US$82m. The judge found that the true loss should be assessed at nil. Although the Renova parties now complain that the judge did not give weight to the proposition that establishing that Mr. Gilbertson had acted in breach of fiduciary duty was a legitimate end in itself, that was not how the case had been presented to him when the Renova parties sought leave to bring the action at the outset.

261 Further, it is said on behalf of the Gilbertson parties that the judge was entitled to take into account the "blameworthy and culpable" destruction of documents by the Renova parties. The court's attention was directed to the judge's observations, in the course of his ruling on the application to strike out Renova's statement of claim, that the destruction of the documents was deliberate and on a wholesale scale. The judge had said this (at paras. 25 and 60 of that ruling, reported at 2011 (2) CILR 148):

> "25 . . . [I]t is accepted that the Renova I.T. department took a series of very significant decisions in the period January 2008 to December 2010, which has resulted in the effective eradication of all potential sources of any relevant electronic documentation saved on the crashed Zurich server. The evidence of the Gilbertson parties' independent I.T. experts, which is not disputed in this respect by the Renova parties' own independent I.T. experts, is that it would not have been difficult or expensive for the Renova Group to make different decisions at the time which would have ensured that all of the potential sources of data concerned were preserved for expert forensic examination, particularly given that these proceedings were clearly in contemplation at the time of the Zurich computer crash and commenced shortly thereafter, and given also that the Renova Group had already received legal advice prior to the server crash that they

> should preserve all relevant documentation for the purposes of these proceedings. Notwithstanding that advice, the Renova Group took deliberate steps, in most instances after these proceedings had commenced, which destroyed any prospects of recovering for discovery purposes e-mail and other electronic data from any potential sources, apparently without any regard for their discovery obligations and the need to preserve any potentially relevant e-mails and other documents."
>
> "60 . . . My overall impression of the evidence filed by the Renova parties in response to the Gilbertson parties' strike out application is that, notwithstanding the legal advice concerning discovery given to them in January 2007 and again in October 2009 (which itself seems to me to have been surprisingly late in the day), there was a complete disregard by the Renova Group of the need to preserve all relevant documents, including the potential sources of such documents for discovery purposes. The Zurich server crash shortly before these proceedings were commenced was obviously unfortunate. However the steps taken thereafter to destroy over time all the possible alternative sources of e-mail or other electric data, some of which may well have been relevant to these proceedings, to my mind amounts to a complete lack of consideration for and disregard of the need to preserve all potential sources of relevant documents."

It is pointed out that the Renova parties have not challenged those observations. It is said, also, that the Renova parties are wrong to submit that the judge erred in taking their destruction of documents into account in the circumstances that (in the event) the documents which the judge found they had destroyed would have had no relevance to the issues in the proceedings. The submission is wrong, both as a matter of principle—in that the serious nature of the Renova parties' disregard of the court's process is not to be assessed only in the light of its consequences—and as a matter of fact—in that the wholesale nature of the destruction (and the sense of injustice and distortion of the court process which resulted from that destruction) had an impact on the trial which was both far-reaching and regrettable, notwithstanding that there was limited scope to test or pursue those concerns in the course of the trial. A court has jurisdiction to mark, by an appropriate order for costs, its disapproval of conduct that disregards or serves to undermine the integrity of its process. The steps taken by the Renova parties in relation to electronic documents (as described by the judge in the passages cited) were, on any view, a glaring example of such conduct. The contention that the judge should have taken no account of such conduct (on the ground that there is no jurisdiction to do so) is contrary to principle, misconceived and should be rejected.

262 More generally, it is said on behalf of the Gilbertson parties that, in determining whether to make any (and, if so, what) order as to costs, the

judge was entitled to take the view that the action was out of all proportion to the dispute. It is pointed out that the judge queried the purpose of the action at the outset of the trial:

> "Now that the openings have finished, and I, of course, have listened to them carefully, I do consider that a further serious attempt should be made to settle this matter with a view to saving time, cost and court time as well, having regard, in particular, to the overriding objectives of the court rules, which I'm sure you're familiar with. And I would request that you pass that message to your clients . . . with the ability to give instructions how to deal with the matter."

And, it is said, the judge can only have been confirmed in his view as to the disproportionate nature of the proceedings after his determination that the master fund had suffered no loss. Although the judge does not allude to this in his costs decision, it would have been open to him to find the proceedings oppressive and to award, or decline to award, costs accordingly. In particular, it is said that:

(1) The Renova parties should have appreciated (not later than at the time that Renova received Mr. Osborne's report) that there was no realistic prospect that Renova would be awarded equitable compensation in an amount which was proportionate to the costs of the proceedings and the amount of court time that was occupied.

(2) Further, the proceedings were disproportionate having regard to the fact that, on the basis of the short forms, the Renova parties are only entitled to 25% of the relief awarded against Autumn, the other 75% going to Mr. Sean Gilbertson and Fairbairn Trust Ltd. (in its capacity as trustee of a Gilbertson family settlement).

(3) Renova's claim against Mr. Gilbertson was in excess of US$80m. It was calculated to ruin all but those of the most exceptional wealth. It is reasonable for a party that faces such a claim to investigate and even take points that it would not be proportionate to take in other circumstances and, where the enormous claim turns out to have nil value, the court may well consider that the costs were incurred as a result of the extravagance of the claim.

(4) Renova had originally pleaded that the terms of the fourth draft IA were reasonable, and were terms that Mr. Gilbertson should have been prepared to agree. But, in the course of his opening submissions at trial, it was said by counsel that one of the clauses in that draft IA was, in fact, wholly absurd and uncommercial. Renova made an 11th hour change to its pleaded case on equitable compensation, abandoning the claim by reference to the fourth draft IA, thereby recognizing that the long-standing pleaded case, in which it had relied on the fourth draft IA, had always been unsustainable.

(5) There is good reason to think that the judge would never have given leave to continue the action had he appreciated how disproportionate the dispute was likely to prove.

263 In my view there is no proper basis upon which this court can, or should, interfere with the judge's order in relation to the costs of the action. As the judge recognized, correctly, the starting point for his consideration was GCR O.62, r.4(5): costs should follow the event, "except when it appears to the court that in the circumstances of the case some other order should be made as to the whole or any part of the costs." A proper reason for "some other order"—as, again, the judge recognized—was that in the circumstances of this case there was no single "event" which the costs should follow. Although it is said on behalf of the Renova parties that the judge ought to have concluded that the relevant event or events to be followed were the finding against Mr. Gilbertson for dishonest breach of fiduciary duty and the finding that Autumn was liable to account as constructive trustee, that is to overlook the important findings that the master fund suffered no loss in respect of which Mr. Gilbertson should be ordered to pay equitable compensation and that the assets for which Autumn was liable to account as a constructive trustee were substantially less (and very substantially less in value) than Renova had claimed. The judge was plainly entitled to take the view that this was a case in which it was appropriate to depart from the rule that costs should follow the event, and that some other order was required.

264 Renova abandoned its claim against Mr. Gilbertson for an account of profits and failed in its claim against him for equitable compensation: it succeeded in its claim against Autumn, but to an extent which the judge described as minimal. It would have been open to the judge to make an order which differentiated (on the basis of outcome) between the claims against Mr. Gilbertson and the claims against Autumn: in particular, it would have been open to him to order that Renova pay to Mr. Gilbertson the costs attributable to the claim against him for an account of profits and for equitable compensation and that Autumn pay to Renova the costs attributable to the claims against it for an account as constructive trustee on which Renova was successful. But the judge was entitled to take the view that a "differential order" of that nature would not be appropriate: first, for the reason that he gave at para. 3.9 of his ruling of November 5th, 2012 (that it would be artificial to do so in the light of his acceptance of Renova's contention that Mr. Gilbertson was the directing mind and will of Autumn), and, secondly, because there was an important issue (whether Mr. Gilbertson was in breach of fiduciary duty) which was common to both those claims.

265 The judge again correctly recognized (at para. 3.12 of his ruling on costs) that this was a case in which it would be open to him to make an issue-based order: that is to say, an order either that each party pay to the

other the costs attributable to discrete issues (which would require separate, issue-by-issue, assessments of such costs) or an order that one party pay to the other a proportion of the overall costs (such proportion to reflect success on some issues and failure on others). In that context he would have had regard to Renova's success (broadly, at least) on the following issues: (i) whether Mr. Gilbertson owed fiduciary duties of care to the company (and, more generally, to the master fund and the Pallinghurst structure); (ii) whether (in so far as it was in dispute), in procuring the issue of 100 new shares in PEL in January 2007, Mr. Gilbertson was in breach of those duties; (iii) whether Renova should be denied equitable relief on *Nurcombe* v. *Nurcombe* grounds; (iv) whether the 25 PEL shares issued to Autumn in January 2007 were assets into which the master fund was entitled to trace; (v) whether Autumn received those shares as a volunteer; (vi) whether (in so far as relevant) Autumn received those shares with relevant knowledge of Mr. Gilbertson's breach of trust; and (wrongly, as I would hold) (vii) whether the interest payment received by Autumn in September 2007 was also an asset into which the master fund was entitled to trace, and to its failure on the issues; (viii) whether the master fund had suffered loss by reason of Mr. Gilbertson's breach of duty; and (ix) whether the additional shares issued to Autumn after January 2007 were traceable assets. The judge rejected an issue-based order for the reasons which he gave (at para. 3.12): that an issue-by-issue allocation of costs would be very difficult to apply in practice in this case, would be likely to result in interminable argument and debate, which would not be desirable, and in any event the costs payable by each party on an issue-by-issue basis would probably largely cancel each other out. As the judge who (as he observed at para. 3.8 of his ruling) had dealt with the entirety of these proceedings since they were commenced in May 2008—and, in particular, over a four-week trial—the judge was well placed to form that judgment; this court must, I think, respect his view.

266 The judge directed himself (at para. 3.11 of his costs ruling) that he should have some regard, in considering the overall costs of the proceedings, to the failure of the Renova parties to comply with their discovery obligations which, as he said (*ibid.*) he had found blameworthy and culpable. In giving himself that direction, he did not err in principle; but it is difficult to find in his ruling any indication that, having regard to the defects in the compliance with discovery obligations of the Renova parties, led him to make an order for costs after trial which he would not otherwise have made. That is not, in my view, a matter for criticism: in determining the strike-out application made on the basis of culpable non-discovery, the judge had ordered that the costs of that application be costs in the cause: nothing had occurred during the trial which could have led him to vary that order (assuming that, absent an appeal, he

would have had power to do so); there was no need for him to revisit the point.

267 For those reasons, I would reject the submission (advanced on behalf of the Renova parties) that, in making no order as to the costs of the action, the judge exercised his discretion outside the ambit within which reasonable disagreement is possible. I should add that I am not persuaded that the fact that (as I would hold) the judge was wrong to treat the interest payment received by Autumn in September 2007 as an asset into which the master fund was entitled to trace is a sufficient reason for this court, itself, to make a different order in respect of the costs of the action.

***The costs of the counterclaims***

268 It is submitted on behalf of the Renova parties that the judge ought to have awarded the costs of the counterclaims to the Renova parties in any event. It is said that he was wrong to treat the costs of the counterclaims as "part of the ebb and flow of each [party's] successes and defeats", and that, in exercising his discretion, he failed to take the following matters into account: (i) that the counterclaims were not made against, or made only against, Renova but were made against persons who were not parties to the proceedings and had to be joined for that purpose; (ii) that they raised very serious allegations against individuals of intention to harm (and in the case of Mr. Kuznetsov, allegations of disloyalty and "moral guilt"); (iii) that they were advanced in a perfunctory manner in the Gilbertson parties' written opening submissions; (iv) that they were barely mentioned at all in oral openings; (v) that they were not then pursued in cross-examination of any of the witnesses called by the Renova parties; (vi) that, when evidence was closed (and only after being pressed by the Renova parties), the Gilbertson parties expressly abandoned their counterclaims for lawful means conspiracy and breach of fiduciary duty by Mr. Kuznetsov; (vii) that the remaining counterclaims (two of which were for torts of intentional harm) were not pursued with any genuine vigour in the Gilbertson parties' oral submissions or written closing submissions; and (viii) that those remaining counterclaims were dismissed by the judge.

269 It is said, further, that not only should the judge have awarded the costs of the counterclaims to the Renova parties but that he should have done so on the indemnity basis in that they were pursued improperly, unreasonably and negligently within the meaning of GCR O.62, r.11(4) or r.11(2). In support of that submission, it is said that (in addition to the matters mentioned in the immediately preceding paragraph) the judge ought to have taken into account that:

(1) There was no rational explanation for the slow collapse of the counterclaims other than that the Gilbertson parties sought "to hang on to

the counterclaims, good bad or indifferent", in order to maximize the pressure on the Renova parties. In that context it is pertinent to have in mind that the case was opened on behalf of the Gilbertson parties on the basis that the action had been brought out of malice but that this very serious allegation was not then put to Mr. Vekselberg in cross-examination. The Gilbertson parties were "willing to wound and yet afraid to strike." As the judge said (2012 (2) CILR 416, at para. 104):

> ". . . I think it right to say that the overall impression which I gained during the course of the trial was that the counterclaims were pursued on behalf of the Gilbertson parties with increasingly less enthusiasm. Apart from the fact that the specific claims which I have mentioned were expressly dropped, it seemed to me that the detailed basis of the counterclaims changed to some extent from the Gilbertson parties' pleadings as well as varying somewhat also between the Gilbertson parties' written and oral opening submissions on the one hand and their closing submissions on the other hand. Also not all of the alleged facts on which the counterclaims are based were put to the Renova parties' witnesses in cross-examination. In summary, I was left with the distinct impression that counsel for the Gilbertson parties were less than convinced themselves of the merit of the remaining individual counterclaims."

(2) In similar circumstances, in *Sagicor Gen. Ins. Cayman Ltd.* v. *Crawford Adjusters (Cayman) Ltd.* (32), Henderson, J. made an indemnity costs order against plaintiffs who pursued a case of fraud and dishonesty for two years before abandoning it on the eve of the trial. After noting (2008 CILR 482, at para. 2) that "such allegations have a detrimental effect on the reputations of those involved and that such allegations should never be made lightly." Henderson, J. went on to observe (*ibid.*):

> "From the failure of these plaintiffs to prosecute their case, I infer that they have never been in possession of a body of evidence capable of establishing fraud or conspiracy. These few comments, without more, provide ample justification for an award of indemnity costs."

Those comments are in point in the present case in that, although the counterclaims did not allege dishonesty, they did allege conspiracy and other torts involving an intention to harm. Those are serious allegations to make against individuals (Mr. Vekselberg and Mr. Kuznetsov).

(3) The allegations of conspiracy and intention to harm should never have been made—in that there was never evidence to support them—and should not have been maintained once the Gilbertson parties had chosen not to put them to Mr. Vekselberg or to Mr. Kuznetsov in cross-examination. It should be inferred that the counterclaims were only made

in order, improperly, to bring pressure to bear against, in particular, Mr. Vekselberg personally. As Smellie, C.J. said in *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.* (1) (unreported, at para. 21):

> "The institution and maintenance of a patently speculative and weak case merely with the opportunistic intention of embarrassing or compelling an opposite party to comply with a claim will be conduct coming within the embrace of GCR O.62 r.11(4) as being 'improper' and 'unreasonable.'"

270 In response to those submissions, it is said on behalf of the Gilbertson parties that:

(1) The judge's view that the costs of the counterclaims were "part of the ebb and flow of each party's various successes and defeats" was a perfectly proper view for him to take. The counterclaims were all contingent on liability in the main action, and specific counterclaims were contingent on such liability arising in particular ways. The relief sought on behalf of Autumn was by way of contribution or indemnity in respect of any liability in the main action as, in substance, was the relief sought on behalf of Mr. Gilbertson. In those circumstances, it was reasonable for the judge to see the counterclaims as part of the Gilbertson parties' defences.

(2) The Renova parties' complaint that Mr. Vekselberg and Mr. Kuznetsov were joined as parties without proper cause is misconceived. Mr. Vekselberg and Mr. Kuznetsov were witnesses which Renova needed to call in order to establish its case (which, as developed at trial—in particular, in relation to the agreement or understanding and the negotiations of the implementation agreements—depended on the evidence of Mr. Vekselberg and Mr. Kuznetsov). It cannot be suggested that any, or any substantial part, of their evidence went exclusively to the counterclaims.

(3) In his ruling on the strike-out application the judge said this (2011 (2) CILR 148, at para. 28):

> "Mr. Vekselberg has been less than enthusiastic in complying with [his discovery obligations]. I am somewhat cynical about the explanation which he has given for his contention that such e-mails are not within his possession, custody or power."

It is true that, at the subsequent hearing of the specific discovery application, Mr. Vekselberg successfully maintained his contention that the emails of which discovery was sought were not in his possession, custody or power; but the fact that the Renova parties were able to avoid giving any further discovery on behalf of Mr. Vekselberg is not a ground on which they can seek an order for costs in relation to the counterclaims generally, let alone costs on an indemnity basis.

(4) The contention that the counterclaims were hopeless was determined by the judge on the application to strike them out. At para. 19 of his ruling on that application (dated May 5th, 2010, unreported), the judge said this:

> "As I have said above, a consideration of the evidence to which I was referred by both leading counsel does not cause me to believe that the plaintiffs to counterclaim have only a faint possibility of success in the claims which they make. On the contrary, this seems to me to be very much a case which should go to trial in the usual way and is not one in which judgment on any of the respective claims of the parties should be granted summarily. I would, had I considered that I had jurisdiction to consider the applications of the defendants to counterclaim pursuant to GCR O.14, r.12, have refused to grant them summary judgment on the counterclaim or any part thereof. In my opinion, this is undoubtedly a case which should go to trial and the respective claims of the parties determined after full discovery and oral evidence with cross examination in the usual way."

(5) The criticism of the Gilbertson parties for having abandoned some of the counterclaims is misconceived. It is perfectly proper for a party to abandon claims in the event that the course of the evidence makes it appropriate. The Renova parties abandoned their claim for an account of profits against Mr. Gilbertson in the course of oral closing. And this was but one of the ways in respect of which the Renova parties changed their case at trial.

271 In my view, there is force in the submission that the judge ought to have awarded the costs of the counterclaims to the Renova parties (other, perhaps, than to Renova itself). In seeking to justify his decision not to make a separate order for the costs of the counterclaims—for the reasons that (as he said at para. 3.10 of his ruling on November 5th, 2012) (i) the counterclaims accounted for a very limited part of the trial; (ii) he had declined to strike out the counterclaims at an earlier stage in the proceedings; and (iii) he saw the counterclaims "as part of the ebb and flow of each parties' various successes and defeats"—the judge overlooked three important factors: first, that three of the defendants to the counterclaims (Mr. Vekselberg, Mr. Kuznetsov and Renova Holdings) were not claimants in the action; secondly, that (whether or not the counterclaims had occupied time at trial) there had been costs incurred in interim applications to which they were parties; and thirdly, that he had made orders that the costs of those interim applications should be costs in cause.

272 As I have said earlier in this judgment, the judge explained (at para. 6.7 of his judgment) that Mr. Gilbertson and Autumn counterclaimed in the proceedings, not only against Renova, but also against Mr. Vekselberg, Mr. Kuznetsov and Renova Holding, for an indemnity on various grounds

for any liability which they were found to have in respect of Renova's derivative claims. They did so by serving with their defence to Renova's claim a counterclaim (subsequently slightly amended by their amended defence and counterclaim served pursuant to an order made on November 30th, 2011) which included the following paragraph by way of introduction:

> "57. If, contrary to the primary case set out in the Defence, Mr. Gilbertson and Autumn are liable in respect of any of the relief claimed against them in the name of the Company (whether in its own right and/or on behalf of the Master Fund), Mr. Gilbertson and Autumn will counterclaim as set out below."

In the events which happened, Autumn was held liable in respect of relief claimed against it on behalf of the master fund, so the counterclaims (in so far as they had survived to trial) had to be addressed.

273 As the judge explained (2012 (2) CILR 416, at paras. 100–101), the pleaded counterclaims included: (i) at paras. 59–60, a claim for damages against Renova Holding—on the ground that Renova Holding acted in repudiatory breach of the letter agreement; (ii) at paras. 61–63, claims for damages against Mr. Vekselberg and Mr. Kuznetsov—on the ground that they had induced or procured Renova Holding to act in repudiatory breach of the letter agreement; (iii) at paras. 64–65, a claim for damages against Mr. Vekselberg, Mr. Kuznetsov and Renova Holding (and against Renova itself)—on the ground of conspiracy, by both lawful means and unlawful means; and (iv) at para. 66, a claim against Mr. Kuznetsov for indemnity or contribution as a co-director of Mr. Gilbertson for breach of his fiduciary duties to the company. By summons dated September 29th, 2009, the defendants to the counterclaims applied, pursuant to GCR O.14, r.12, for an order that each of the counterclaims should be dismissed and summary judgment entered for them on the ground that the Gilbertson parties, as plaintiffs to the counterclaims, had no prospect of success at trial. They also applied pursuant to GCR O.18, r.19 for orders, *inter alia*, that certain specific paragraphs of the counterclaims should be struck out on the ground that they disclosed no reasonable cause of action. After a three-day hearing in early March 2010 and a further hearing on April 15th, 2010, the judge declined to strike out any part of the counterclaims on a summary basis. It was in that context that he made the observation, on which the Gilbertson parties rely: that this was undoubtedly a case which should go to trial and the respective claims of the parties determined after full discovery and oral evidence with cross-examination in the usual way, and, consistently with that view, he directed that the costs of the application to strike out should be costs in the cause.

274 The judge went on to explain (*ibid.*, at para. 103) that, on May 11th, 2012, during the course of the trial, it was confirmed on behalf of the

Gilbertson parties that they were no longer pursuing the specific counterclaims for damages for lawful means conspiracy and for indemnity and contribution by Mr. Kuznetsov for breach of fiduciary duty, and that, accordingly, they were only pursuing the specific counterclaims for repudiatory breach of the letter agreement, for procuring that breach of the letter agreement and for unlawful means conspiracy. In those circumstances, as the judge observed (*ibid.*), the only counterclaims which he needed to address were (i) the claim for damages against Renova Holding in respect of alleged repudiatory breach of the letter agreement; (ii) the claims for damages against Mr. Vekselberg and Mr. Kuznetsov for allegedly inducing or procuring Renova Holding to act in repudiatory breach of the letter agreement; and (iii) the claim in tort against all the defendants to counterclaim for conspiracy by unlawful means.

275 Before turning to address those counterclaims, the judge made the observations (*ibid.*, at para. 104) on which the Renova parties rely: that his overall impression (gained during the course of the trial) was that the counterclaims were pursued on behalf of the Gilbertson parties with increasingly less enthusiasm; that not all of the alleged facts on which the counterclaims were based were put to the Renova parties' witnesses in cross-examination; and that he was left with the distinct impression that counsel for the Gilbertson parties were less than convinced themselves of the merit of the remaining individual counterclaims.

276 The judge addressed the first of the counterclaims (*ibid.*, at paras. 105–109) that remained outstanding: the claim against Renova Holding for damages in respect of alleged repudiatory breach of the letter agreement. He concluded, in the circumstances which he set out and for the reasons which he gave, that there was "no merit in this particular claim in the counterclaim." He addressed the second of the outstanding counterclaims (*ibid.*, at para. 109): the claim for damages against Mr. Vekselberg and Mr. Kuznetsov for allegedly inducing or procuring Renova Holding to act in repudiatory breach of the letter agreement. He observed (*ibid.*) that it was "a crucial ingredient of the tort that the defendant should have intended that the contract be breached. That was not put to any of the Renova parties' witnesses." In those circumstances, he said, "I am of the view that there is no merit in this claim either." The judge addressed (*ibid.*, at paras. 110–111) the third of the outstanding counterclaims: the claim for damages against all the defendants to counterclaim for conspiracy by unlawful means. He pointed out that the pleaded claim included (at para. 64.2) the allegation that the alleged conspiracy was "to commit unlawful acts against the master fund and hence Mr. Gilbertson." He accepted the submission, advanced on behalf of the Renova parties, that Mr. Gilbertson's economic interest in the master fund was not such as to give him a cause of action. He said this (*ibid.*, at para. 111):

> "Only the master fund (or GPLP or the company) could sue in respect of alleged unlawful acts against the master fund. Mr. Gilbertson has no standing to sue in respect of an alleged conspiracy to commit unlawful acts against the master fund."

In those circumstances the judge concluded (*ibid.*, at para. 113) that "the three remaining specific counterclaims by the Gilbertson parties are not made out and should be dismissed." There has been no appeal against that part of his order.

277 For my part, I am content to accept that the judge was entitled to take the view that the counterclaim made against Renova for damages for conspiracy (by lawful or unlawful means)—which was the only counterclaim made against Renova—could properly be regarded "as part of the ebb and flow" of the "various successes and defeats" of the claims in the action (that is to say, the claims made by Renova against Mr. Gilbertson and Autumn), and that, on that basis, if it was appropriate to make no order for the costs of the action, then it was also appropriate to make no order for costs (as between Renova and the Gilbertson parties) in respect of the costs of that counterclaim. But I am not persuaded that that reasoning can be applied to the costs as between the Gilbertson parties and the other three defendants to the counterclaims). In my view, the judge erred in failing to distinguish between the position of Renova, on the one hand, and the other co-defendants to counterclaim (Mr. Vekselberg, Mr. Kuznetsov and Renova Holding), on the other hand. Had he done so, he would have appreciated that it was necessary, in the circumstances of this case, to make a separate order as to the costs of the counterclaim.

278 In the circumstances that the judge erred in making no separate order as to the costs of the counterclaim, it is necessary for this court to consider what order should be made. In my view, having the provisions of O.62, r.4(5) in mind, the costs of the counterclaims (as between the Gilbertson parties and the three defendants, other than Renova) should follow the event: that is to say, those costs should be paid by the Gilbertson parties. There can be no doubt that, in relation to all the counterclaims against them, Mr. Vekselberg, Mr. Kuznetsov and Renova Holding were the successful parties. The effect of that order will be that they will be entitled to receive not only their costs (if any) of defending the counterclaims at trial (including those that were abandoned) but also costs which they incurred in pursuing or resisting interlocutory applications and in respect of which there are existing orders for costs in cause. In that context, as between the Gilbertson parties and Mr. Kuznetsov and Renova Holding, the relevant "cause" is that brought by the counterclaim.

279 I turn, therefore to consider the basis upon which the costs payable to Mr. Vekselberg, Mr. Kuznetsov and Renova Holding should be assessed: an issue which, given that he made no order for costs, the judge

did not need to (and did not) address. The receiving parties seek an order that such costs should be assessed on an indemnity basis. They rely upon GCR O.62, r.11(4), which enables the court to make such an order where claims have been pursued improperly, unreasonably or negligently. In considering that application, it is pertinent to have in mind not only the submissions which they advance (and, of course, those advanced by the Gilbertson parties in response), but also the judge's observations (2012 (2) CILR 416, at paras. 104 and 112). Reference has already been made to his observations at para. 104. The judge said this (*ibid.*, at para. 112):

> "As I have also mentioned, leading counsel for the Gilbertson parties, as plaintiffs to the counterclaim, cross-examined the Renova parties' witnesses, including Mr. Vekselberg and Mr. Kuznetsov, the first and second defendants to the counterclaim. I accept the submission of leading counsel for the Renova parties that the essential factual elements of the three remaining specific counterclaims were not put to those witnesses. In particular in this context, it was not put to either Mr. Vekselberg or Mr. Kuznetsov that their purpose, whether predominant or otherwise, was to harm the master fund and thereby Mr. Gilbertson. Furthermore, the evidence in the case simply does not support any contention that the intention of Mr. Vekselberg and Mr. Kuznetsov, by their insistence on ownership of the title to the Fabergé brand by one of Mr. Vekselberg's private companies outside the Pallinghurst structure or their alleged refusal to provide funding to the master fund through PEL for the purchase of the rights, was intended to harm Mr. Gilbertson. At most, and on the Gilbertson parties' best case, the intentions of Mr. Vekselberg and Mr. Kuznetsov were to further and protect the interest of Mr. Vekselberg in owning the title to the Fabergé brand."

280 In my view there is force in the submissions made on behalf of the Renova parties that Mr. Vekselberg, Mr. Kuznetsov and Renova Holding were joined as parties without proper cause; that there was no rational explanation for the slow collapse of the counterclaims other than that the Gilbertson parties sought "to hang on to the counterclaims, good bad or indifferent," in order to maximize the pressure on the Renova parties; that the allegations of conspiracy and intention to harm should never have been made—in that there was never evidence to support them—and should not have been maintained once the Gilbertson parties had chosen not to put them to Mr. Vekselberg or to Mr. Kuznetsov in cross-examination; and that it should be inferred that the counterclaims were only made in order, improperly, to bring pressure to bear on Mr. Vekselberg personally. The submission advanced on behalf of the Gilbertson parties—that the complaint that Mr. Vekselberg and Mr. Kuznetsov were joined as parties without proper cause is misconceived, in that Mr. Vekselberg and Mr. Kuznetsov were witnesses which Renova needed to call in order to

establish its case—is, itself, misconceived. If Mr. Vekselberg and Mr. Kuznetsov were witnesses on whose evidence Renova would need to rely in any event, there was no reason why they should be joined as parties to the proceedings so that they could be cross-examined by the Gilbertson parties. In my view, the costs which Mr. Vekselberg, Mr. Kuznetsov and Renova Holding are entitled to receive should be assessed on an indemnity basis.

**Conclusions**

281 For the reasons which I have set out in the preceding sections of this judgment, I take the view that:

(1) The judge was right to entertain the derivative claims advanced by Renova. In particular, he was correct to hold (2012 (2) CILR 416, at para. 60) that, having chosen not to appeal from the order which he had made some three and a half years earlier, it was not open to the Gilbertson parties to challenge, at trial, the standing of Renova to advance claims in the action on behalf of GPLP and the master fund including, in particular, a claim founded on the unpleaded contention that Mr. Gilbertson had acted in breach of fiduciary duties which he owed to the master fund.

(2) The judge was right to hold that Mr. Gilbertson owed and was in breach of fiduciary duties in relation to the Fabergé rights. In particular, he was correct to hold (*ibid.*, at para. 57) that, as a director of the company, Mr. Gilbertson owed the duties of a fiduciary to the company (and, more generally, to the master fund and the Pallinghurst structure) throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007.

(3) The judge was right to hold that, notwithstanding the so-called rule in *Nurcombe* v. *Nurcombe* (28), the conduct of the Renova parties was not such as to disentitle Renova from equitable relief in this action.

(4) The judge was right to value at nil the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation. In particular, he was correct to hold on the evidence before him that the current value (as at the date of trial) of the right to manage and exploit the Fabergé rights as licensee to which the master fund (through OpCo) would probably have been entitled but for Mr. Gilbertson's breach of fiduciary duty was less than the costs (other than acquisition costs) and expenses that would have been incurred in funding the development of those rights.

(5) The judge was right to hold that Autumn was liable to account as a constructive trustee of the shares issued by PEL in January 2007 (i) because it received those shares as a volunteer; and (ii) because, in any event, it was in "knowing receipt" having regard to its relationship with

Mr. Gilbertson, the property which it received, the person from whom it received the property, and its state of knowledge at the time of receipt. In particular, the judge was correct to hold that the value of the single share in PEL held by the master fund before the issue of 100 new PEL shares on January 3rd, 2007 could be traced (in part) into the 25 new PEL shares issued to Autumn on that date; correct to hold that Autumn gave no value for those 25 new PEL shares; and correct to hold that the knowledge of Mr. Gilbertson (and, so far as relevant, the knowledge of Mr. Thomas) as to the circumstances in which those new PEL shares were issued was to be attributed to Autumn.

(6) The judge was right to hold that Autumn was not liable to account as constructive trustee for shares (other than the 25,000 shares which represented the 25 shares issued by PEL in January 2007) which it held in Fabergé Ltd. at the date of the trial, and so did not have to transfer such additional shares to the master fund. In particular, the judge was correct to reject Renova's claims in respect of the additional 16,190,575 shares in Fabergé Ltd., in that the material before him at the trial did not enable the judge to make the findings of fact which would have been necessary in order to support that claim.

(7) The judge was wrong to hold that Autumn was liable to account (by way of an account of profits) for the payment (US$1,798,973) which it received on September 28th, 2007 in respect of interest on the loans which it had made to PEL on January 3rd, 2007. In particular, he was wrong to hold that the value of any asset held or formerly held by the master fund could be traced into that payment. It follows that he was wrong, also, to award pre-judgment interest—in the amount of US$507,347.35 or in any other amount—on an amount equal to that payment. If (contrary to my view) the judge was not wrong to hold that Autumn was liable to account for the payment of US$1,798,973 which it received on September 28th, 2007, he was nevertheless wrong to include in the sum awarded (US$507,347.35) as pre-judgment interest an amount (said to be US$95,407.18) in respect of interest attributable to the period from January 3rd, 2007 to September 27th, 2007. He was wrong to do so because, on the material before him, it was not open to him to hold that Autumn was liable to account for interest on the loans in the amount of US$1,798,973 (or at all) as a "knowing recipient" before the date (September 28th, 2007) on which the relevant cause of action for the purposes of s.34(1) of the Judicature Law (2007 Revision) arose.

(8) It cannot be said that, in making no order as to the costs of the action—or (as between the Gilbertson parties and Renova) in making no order as to the costs of the counterclaim—the judge exercised his discretion outside the ambit within which reasonable disagreement is possible: there is no proper basis upon which this court can, or should, interfere with the judge's order in relation to those costs. Nevertheless, in

relation to the costs of the counterclaims, the judge erred in failing to distinguish between the position of Renova, on the one hand, and the other co-defendants to counterclaim (Mr. Vekselberg, Mr. Kuznetsov and Renova Holding), on the other hand. Had he done so, he would have appreciated that it was necessary, in the circumstances of this case, to make a separate order as to the costs of the counterclaim. In those circumstances it falls to this court to make an appropriate order in respect of the costs incurred by the three other co-defendants to counterclaim. The appropriate order, having the provisions of O.62, r.4(5) in mind, is that the costs of the counterclaims (as between the Gilbertson parties and the three defendants, other than Renova) should follow the event: those costs should be assessed on an indemnity basis (if not agreed) and paid by the Gilbertson parties.

282 It follows from the conclusions which I have reached that I would dismiss Autumn's appeal from paras. 1 and 2 of the order of November 6th, 2012, but would allow its appeal from para. 3 of that order. I would dismiss Renova's cross-appeal from paras. 4 and 6 of that order, and I would dismiss Renova's appeal from para. 6. I would allow the appeals of Mr. Vekselberg, Mr. Kuznetsov and Renova Holding from para. 6 of the order. As between the Gilbertson parties and the three defendants to counterclaim just mentioned, I would vary para. 6 of the order by setting aside that paragraph in so far as (and only in so far as) it relates to their costs of defending the counterclaims and by adding a direction that the Gilbertson parties pay the costs of the counterclaims incurred by Mr. Vekselberg, Mr. Kuznetsov and Renova Holding (including costs ordered to be costs in cause), such costs (if not agreed) to be assessed on the indemnity basis. I would stand over further consideration of the costs of the appeal and cross-appeal for determination on an application made to the Court of Appeal: such application (or applications) to be made in writing within 28 days of the delivery of this judgment and to be supported (if so advised) by short written submissions. I would give liberty to apply to the Court of Appeal for such further directions as may be required.

283 **MOTTLEY, J.A.:** I agree.

284 **FORTE, J.A.:** I agree.

***Order accordingly.***

Attorneys: *Appleby (Cayman) Ltd.* for Autumn Holdings Asset Inc. and Gilbertson; *Maples & Calder* for Renova Resources Private Equity Ltd. and the other respondents/cross-appellants.

# *Bilta (UK) Ltd (in liquidation) v Tradition Financial Services Ltd* [2023] Ch 343

23-01165-mew Doc 67-3 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (2) Pg 78 of 125



A Court of Appeal

# Bilta (UK) Ltd (in liquidation) and others *v* Tradition Financial Services Ltd

## [2023] EWCA Civ 112

B 2023 Jan 26, 27; Feb 10 — Lewison, Stuart-Smith, Falk LJJ

*Insolvency — Winding up — Fraudulent trading — Whether person capable of being party to fraudulent trading in business of company if not having controlling or managerial function within company — Insolvency Act 1986 (c 45), s 213*

C *Company — Register — Restoration to register — Company dissolved but later restored to register — Company unable to pursue claim while dissolved — Whether company's claim time-barred — Whether company's directors at date of dissolution deemed to have remained in office until restoration — Companies Act 2006 (c 46), s 1032*

The claimant companies and their liquidators brought claims against the defendant arising out of the defendant's participation in missing trader D intra-Community fraud in which the companies had become involved. The companies alleged that the defendant's conduct had amounted to dishonest assistance in the breach of fiduciary duty by the directors of those companies. The liquidators alleged that the defendant had been knowingly party to fraudulent trading in the businesses of the companies within section 213 of the Insolvency Act 1986[1]. Pursuant to the terms of a settlement agreement between the parties, the issues on the claims were narrowed. The judge dismissed the companies' claims in E dishonest assistance on the ground that they were time-barred, rejecting their submission that the running of the limitation period should be postponed pursuant to section 32 of the Limitation Act 1980[2]; but held that the liquidators' claims under section 213 of the 1986 Act did not fail as the defendant came within the scope of that section. Two of the companies, which had been dissolved and later restored to the register by court order after the alleged fraud had occurred, appealed against the dismissal of their claims in dishonest assistance, each contending that pursuant to F section 1032 of the Companies Act 2006[3] the directors who had been in office at the date of dissolution were deemed to have remained in office during the period between dissolution and restoration; that since those directors had been involved in the fraud their knowledge of the fraud could not be attributed to the relevant company; and that, accordingly, during the period between dissolution and restoration the company could not have discovered the fraud for the purposes of section 32 of the G 1980 Act. The defendant cross-appealed against the finding that it came within the scope of section 213 of the 1986 Act, contending that it could not fall within that section because it had not exercised a controlling or managerial function within either company.

On the appeal and the cross-appeal—

[1] Insolvency Act 1986, s 213: see post, para 31.

[2] Limitation Act 1980, s 32(1): "where in the case of any action for which a period of H limitation is prescribed by this Act, either— (a) the action is based upon the fraud of the defendant; or (b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or (c) the action is for relief from the consequences of a mistake; the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it . . ."

[3] Companies Act 2006, s 1032: see post, para 125.

© 2023 The Incorporated Council of Law Reporting for England and Wales

*Held*, (1), dismissing the cross-appeal, that, on a true construction of section 213 of the Insolvency Act 1986, the phrase "any persons who were knowingly parties to" the carrying on of the business of a company for any fraudulent purpose was not restricted to persons who exercised management or control over the company in question; that, rather, a person from outside the company who knew that the business he was dealing with was fraudulent would be a "party" to the fraudulent carrying on of that business for the purposes of section 213, although this did not set the outer limit of the scope of the section; that whether an "outsider" could be said to be "party" to the carrying on by that company of a fraudulent business might well be a question of fact and degree which required careful analysis, although that question did not arise in the present case because of the terms of the settlement agreement; and that, accordingly, the judge had been correct to hold that the defendant came within the scope of section 213 (post, paras 106, 108, 114, 118–120, 179, 180, 181).

*In re Gerald Cooper Chemicals Ltd* [1978] Ch 262 and *In re Augustus Barnett & Son Ltd* [1986] BCLC 170 applied.

*Morris v Bank of India* [2005] 2 BCLC 328, CA considered.

(2) Dismissing the appeal, that where a dissolved company was restored to the register by court order, the provision in section 1032(1) of the Companies Act 2006 that the company was deemed to have continued in existence as if it had not been dissolved or struck off the register did not require the assumption that the directors in office at the date of dissolution remained in office throughout the period of enforced non-existence; that any potential injustice in that conclusion was readily capable of being prevented by an application for a direction under section 1032(3) of the 2006 Act, the purpose of which was to place the company and all other persons in the same position (as nearly as might be) as if the company had not been dissolved; that, thus, where a company had been dissolved and later restored to the register, the court had power under section 1032(3) of the 2006 Act to direct an extension of a limitation period under the Limitation Act 1980 in favour of a company which had a potential claim; that on an application for such a direction the court would balance the prejudice to the company in not having been able to begin proceedings and the prejudice to third parties who might be deprived of what would otherwise be a limitation defence; that, however, the power to make such a direction was exercisable only where the dissolution of the company was the real cause of its being barred from pursuing its claim and not where a direction would put the company in a better position than it would have been in if it had not been dissolved; that, in the present case, the companies had not attempted to advance the evidential case that was necessary for such a direction to be made; and that, accordingly, the judge had been correct to hold that the two companies' claims in dishonest assistance were time-barred under the 1980 Act (post, paras 126, 131–132, 142–153, 179, 180, 181).

*Fowler v Revenue and Customs Comrs* [2020] 1 WLR 2227, SC(E) applied.

*Davies v Ford* [2020] EWHC 686 (Ch) approved.

*Hawkes v County Leasing Asset Management Ltd* [2016] 2 BCLC 427, CA and *Davy v Pickering* [2017] Bus LR 1239, CA considered.

Decision of Marcus Smith J [2022] EWHC 723 (Ch); [2022] BCC 833 affirmed.

Decision of Marcus Smith J [2022] EWHC 1431 (Ch) affirmed.

The following cases are referred to in the judgment of Lewison LJ:

*Augustus Barnett & Son Ltd, In re* [1986] BCLC 170
*BCT Software Solutions Ltd v C Brewer & Sons Ltd* [2003] EWCA Civ 939; [2004] FSR 9, CA
*Bank of Credit and Commerce International SA, In re* [2001] 1 BCLC 263
*Barclays Mercantile Business Finance Ltd v Mawson* [2004] UKHL 51; [2005] 1 AC 684; [2004] 3 WLR 1383; [2005] 1 All ER 97, HL(E)
*Barras v Aberdeen Steam Trawling and Fishing Co Ltd* [1933] AC 402, HL(Sc)

© 2023 The Incorporated Council of Law Reporting for England and Wales

A *Bilta (UK) Ltd v NatWest Markets plc* [2020] EWHC 546 (Ch)
*Bilta (UK) Ltd v Nazir (No 2)* [2012] EWHC 2163 (Ch); [2014] Ch 52; [2013] 2 WLR 825; [2013] 1 All ER 375; [2015] UKSC 23; [2016] AC 1; [2015] 2 WLR 1168; [2015] 2 All ER 1083; [2015] 2 All ER (Comm) 281; [2015] 1 BCLC 443, SC(E)
*Bray (trading as The Building Co) v Bishop* [2009] EWCA Civ 768; [2009] TCLR 9, CA
B *Bridgehouse (Bradford No 2) v BAE Systems plc* [2019] EWHC 1768 (Comm); [2020] Bus LR 306
*Bridgehouse (Bradford No 2) Ltd v BAE Systems plc* [2020] EWCA Civ 759; [2020] Bus LR 2025; [2021] 1 All ER (Comm) 442, CA
*Capita (Banstead 2011) Ltd v RFIB Group Ltd* [2017] EWCA Civ 1032; [2017] 4 Costs LR 669, CA
*Colchester Estates (Cardiff) v Carlton Industries plc* [1986] Ch 80; [1984] 3 WLR
C 693; [1984] 2 All ER 601
*Cromptons Leisure Machines Ltd, In re* [2006] EWHC 3583 (Ch); [2007] BCC 214
*Davies v Ford* [2020] EWHC 686 (Ch)
*Davy v Pickering* [2017] EWCA Civ 30; [2017] Bus LR 1239; [2017] 2 BCLC 260, CA
*FSHC Group Holdings Ltd v GLAS Trust Corpn Ltd* [2019] EWCA Civ 1361; [2020] Ch 365; [2020] 2 WLR 429; [2020] 1 All ER 505; [2020] 1 All ER (Comm) 719, CA
D *Fowler v Revenue and Customs Comrs* [2020] UKSC 22; [2020] 1 WLR 2227; [2021] 1 All ER 97, SC(E)
*Gerald Cooper Chemicals Ltd, In re* [1978] Ch 262; [1978] 2 WLR 866; [1978] 2 All ER 49
*Gossage v Bishton* [2012] EWCA Civ 717, CA
*Hardie v Hanson* (1960) 105 CLR 451
*Hawkes v County Leasing Asset Management Ltd* [2015] EWCA Civ 1251; [2016]
E 2 BCLC 427, CA
*Joddrell v Peaktone Ltd* [2012] EWCA Civ 1035; [2013] 1 WLR 784; [2013] 1 All ER 13, CA
*Kupeli v Kıbrıs Türk Hava Yolları Şirketi (trading as Cyprus Turkish Airlines)* [2018] EWCA Civ 1264; [2019] 1 WLR 1235; [2018] 4 All ER 434, CA
*Langer v McKeown* [2021] EWCA Civ 1792; [2022] 1 WLR 1255; [2022] 1 BCLC 471, CA
F *Maidstone Buildings Provisions Ltd, In re* [1971] 1 WLR 1085; [1971] 3 All ER 363
*Manson v Smith* [1997] 2 BCLC 161
*Morphitis v Bernasconi* [2003] EWCA Civ 289; [2003] Ch 552; [2003] 2 WLR 1521; [2003] 2 BCLC 53, CA
*Morris v Bank of India* [2003] EWHC 1868 (Ch); [2004] 2 BCLC 236
*Morris v Bank of India* [2005] EWCA Civ 693; [2005] 2 BCLC 328, CA
*Murray-Watson Ltd, In re* (unreported) 6 April 1977, Oliver J
G *O'Keeffe v Ferris* [1997] 3 IR 463
*Overnight Ltd, In re* [2009] EWHC 601 (Ch); [2009] Bus LR 1141
*Patience v Tanner* [2016] EWCA Civ 158; [2016] 2 Costs LR 311, CA
*Powles v Reeves* [2016] EWCA Civ 1375; [2017] 1 Costs LR 19, CA
*Promar International Ltd v Clarke* [2006] EWCA Civ 332, CA
*R v Cartwright* [2020] EWCA Crim 369; [2020] Lloyd's Rep FC 547, CA
*R v Grantham* [1984] QB 675; [1984] 2 WLR 815; [1984] 3 All ER 166, CA
H *R v Hunter (Peter)* [2021] EWCA Crim 1785; [2023] QB 1; [2022] 3 WLR 485, CA
*R v Kellard* [1995] 2 Cr App R 134
*R v Miles* [1992] Crim LR 657; [1992] Lexis Citation 3932
*R v Schildkamp* [1971] AC 1; [1970] 2 WLR 279; [1969] 3 All ER 1640, HL(E)
*R (Kadhim) v Brent London Borough Council Housing Benefit Review Board* [2001] QB 955; [2001] 2 WLR 1674, CA

© 2023 The Incorporated Council of Law Reporting for England and Wales

*R (M) v Croydon London Borough Council* [2012] EWCA Civ 595; [2012] 1 WLR 2607; [2012] 3 All ER 1237, CA A
*R (Youngsam) v Parole Board* [2019] EWCA Civ 229; [2020] QB 387; [2019] 3 WLR 33; [2019] 3 All ER 954, CA
*Regent Leisuretime Ltd v NatWest Finance Ltd (formerly County Natwest Ltd)* [2003] EWCA Civ 391; [2003] BCC 587, CA
*SCT Finance Ltd v Bolton* [2002] EWCA Civ 56; [2003] 3 All ER 434, CA
*Secretary of State for Transport v Curzon Park Ltd* [2021] EWCA Civ 651; [2021] PTSR 1560, CA B
*Tyman's Ltd v Craven* [1952] 2 QB 100; [1952] 1 All ER 613, CA
*Venture Finance plc v Mead* [2005] EWCA Civ 325; [2006] 3 Costs LR 389, CA
*Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] AC 1189; [2014] 2 WLR 355; [2014] 2 All ER 489, SC(E)

The following additional cases were cited in argument: C

*AEI Rediffusion Music Ltd v Phonographic Performance Ltd* [1999] 1 WLR 1507; [1999] 2 All ER 299, CA
*Ad Valorem Factors Ltd v Ricketts* [2003] EWCA Civ 1706; [2004] 1 All ER 894; [2004] 1 BCLC 1, CA
*Alpha Sim Communications Ltd v Caz Distribution Services Ltd* [2014] EWHC 207 (Ch)
*Brawley v Marczynski (Nos 1 and 2)* [2002] EWCA Civ 756; [2003] 1 WLR 813; [2002] 4 All ER 1060, CA D
*Burnden Holdings (UK) Ltd v Fielding* [2016] EWCA Civ 557; [2017] 1 WLR 39, CA
*F&C Alternative Investments (Holdings) Ltd v Barthelemy (No 3)* [2012] EWCA Civ 843; [2013] 1 WLR 548; [2013] Bus LR 186; [2012] 4 All ER 1096, CA
*Inland Revenue Comrs v Metrolands (Property Finance) Ltd* [1981] 1 WLR 637; [1981] 2 All ER 166
*Jenks v Dickinson* [1997] STC 853 E
*Lowsley v Forbes (trading as LE Design Services)* [1999] 1 AC 329; [1998] 3 WLR 501; [1998] 3 All ER 897, HL(E)
*Piglowska v Piglowski* [1999] 1 WLR 1360; [1999] 3 All ER 632, HL(E)
*R (N) v Lewisham London Borough Council* [2014] UKSC 62; [2015] AC 1259; [2014] 3 WLR 1548; [2015] 1 All ER 783, SC(E)
*R (Quintavalle) v Secretary of State for Health* [2003] UKHL 13; [2003] 2 AC 687; [2003] 2 WLR 692; [2003] 2 All ER 113, HL(E) F
*RG Carter Projects Ltd v CUA Property Ltd* [2020] EWHC 3417 (TCC); [2020] Costs LR 1781
*Test Claimants in the FII Group Litigation v Revenue and Customs Comrs (formerly Inland Revenue Comrs)* [2020] UKSC 47; [2022] AC 1; [2020] 3 WLR 1369; [2021] 1 All ER 1001, SC(E)
*Volpi v Volpi* [2022] EWCA Civ 464; [2022] 4 WLR 48, CA
*White v White* [1983] Fam 54; [1983] 2 WLR 872; [1983] 2 All ER 51, CA G
*Young v Bristol Aeroplane Co Ltd* [1944] KB 718; [1944] 2 All ER 293, CA

The following additional cases, although not cited, were referred to in the skeleton arguments:

*BTI 2014 LLC v Sequana SA* [2022] UKSC 25; [2023] AC 877; [2022] 3 WLR 709; [2022] Bus LR 920; [2023] 1 BCLC 1, SC(E) H
*Barking and Dagenham London Borough Council v Persons Unknown* [2022] EWCA Civ 13; [2023] QB 295; [2022] 2 WLR 946; [2022] 4 All ER 51, CA
*Campbell, Ex p; In re Cathcart* (1870) LR 5 Ch App 703, CA
*Cave v Robinson Jarvis & Rolf* [2002] UKHL 18; [2003] 1 AC 384; [2002] 2 WLR 1107; [2002] 2 All ER 641, HL(E)

© 2023 The Incorporated Council of Law Reporting for England and Wales

*FAGE UK Ltd v Chobani UK Ltd* [2014] EWCA Civ 5; [2014] FSR 29, CA
*Kynaston-Mainwaring v GVE London Ltd* [2022] EWCA Civ 1339; [2023] RTR 17, CA
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500; [1995] 3 WLR 413; [1995] 3 All ER 918, PC
*OT Computers Ltd v Infineon Technologies AG* [2021] EWCA Civ 501; [2021] QB 1183; [2021] 3 WLR 61; [2021] 4 All ER 1095, CA

**APPEAL** and **CROSS-APPEAL** from Marcus Smith J

By claim forms issued on 8 November 2017 the claimants, Bilta (UK) Ltd, Weston Trading UK Ltd, Nathanael Eurl Ltd, Vehement Solutions Ltd and Inline Trading Ltd, brought proceedings against the defendant, Tradition Financial Services Ltd, for dishonestly assisting the directors of the claimant companies to engage in missing trader intra-Community VAT fraud through the trading of carbon credits. By the same facts the liquidators, Kevin Hellard and David Ingram in respect of the first, second, third and fifth claimants and Kevin Hellard and Ian Richardson in respect of the fourth claimant, sought compensation from the defendant under section 213 of the Insolvency Act 1986 as having knowingly participated in the fraudulent trading of the claimant companies. Following a settlement agreement on 22 February 2022 two issues remained for determination.

By a decision dated 31 March 2022 Marcus Smith J [2022] EWHC 723 (Ch); [2022] BCC 833 dismissed the claims in dishonest assistance as time-barred but held that the defendant came within section 213 of the 1986 Act. By a costs decision dated 8 June 2022 Marcus Smith J [2022] EWHC 1431 (Ch) made no order for costs relating to pre-settlement costs.

By an appellant's notice dated 29 June 2022 and with permission of the judge the third and fifth claimants appealed on the following grounds. (1) The judge had erred in law in holding that the deeming provision in section 1032 of the Companies Act 2006: (a) required the court to deem that the third and fifth claimants had directors in place throughout the period between dissolution and restoration; and/or (b) required the court to deem that those directors were not the individuals who held office when the companies were dissolved but hypothetical ordinary, competent and innocent directors. (2) The judge had erred as a matter of law in holding that where a claimant company had been dissolved and then restored to the register it was necessary for a claimant when relying on section 32 of the Limitation Act 1980 specifically to plead such reliance by reference to an ordinarily competent director and on that basis declining to address whether such a director could with reasonable diligence have caused his company to plead a viable claim against the defendant in fraud by 9 November 2011 (or if the judge did, in failing to recognise that such a director was not in the same position as, nor had the same powers as, a liquidator). (3) The judge had erred in the costs order made. The order whereby the successful claimants had to pay more costs to the defendant than it had to pay to the claimants was manifestly unfair, contrary to the overall justice of the case and was arrived at in a manner contrary to authority. It was an order that no judge could reasonably have made.

By an appellant's notice dated 29 June 2022 and with permission of the judge the defendant cross-appealed on the following grounds. (1) The judge had erred in law in deciding that the defendant came within section 213 of

© 2023 The Incorporated Council of Law Reporting for England and Wales

the 1986 Act. (2) The judge should have recognised that the defendant's limitation defence and the claims under section 213 fell outside the scope of the compromise agreement and so should have awarded the defendant its costs of the limitation issue for the whole of the proceedings and not just from post-settlement. A

The facts are stated in the judgment of Lewison LJ, post, paras 3–18.

*David Scorey KC* and *Laurence Emmett KC* (instructed by *Greenberg Traurig LLP*) for the defendant, in relation to the cross-appeal. B

The salient phrase in section 213(2) of the Insolvency Act 1986 ("any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned") has a meaning that is restricted to persons exercising management or control over the company in question.

This follows from the legislative history of provisions relating to fraudulent trading by a company in liquidation. Section 75 of the Companies Act 1928 (18 & 19 Geo 5, c 45) was chiefly concerned with removing the protection of corporate personality—the company itself "carried on business" under the management and control of its directors—and was not intended to (and did not) create a secondary form of accessory liability on third parties. Section 75 was re-enacted, with minor and irrelevant changes, in section 275 of the Companies Act 1929 (19 & 20 Geo 5, c 23). In 1945 the Cohen Committee (Cmd 6659) recommended that section 275 of the 1929 Act should be extended in such a way that it would deal with a case where the company's business was directed, controlled or managed by a criminal mastermind who was the brains behind the fraud and where the directors were merely dupes: see David Foxton QC, "Accessory Liability and Section 213 Insolvency Act 1986" [2018] JBL 324. Section 101 of the Companies Act 1947 (10 & 11 Geo 6, c 47) adopted the recommendation albeit in slightly different terms: "any persons who were knowingly parties to the carrying on of the business in manner aforesaid". By section 332 of the consolidating Companies Act 1948 (11 & 12 Geo 6, c 38) the wording was essentially retained. The Companies Act 1985 then separated the criminal liability and the civil liability into sections 458 and 630 respectively. Further amendments were made by Schedule 6 to the Insolvency Act 1985. The provisions relating to civil liability are now to be found in section 213 of the Insolvency Act 1986 and those relating to criminal liability are in section 993 of the Companies Act 2006. C D E F

The narrow reading of the statutory language is consistent with the purpose of section 213, within the overall scheme created by the companies and insolvency legislation. G

First, section 213 includes the same wording as (now) section 993 of the 2006 Act which creates a criminal liability. One would expect clear words to create such a liability and any ambiguity should be resolved in favour of a narrower rather than a wider reading: see *Bennion, Bailey and Norbury on Statutory Interpretation*, 8th ed (2020), section 26.4 and *Ad Valorem Factors Ltd v Ricketts* [2004] 1 All ER 894. A narrower reading is supported by the authorities on the interpretation of an earlier criminal provision in section 458 of the 1948 Act: see *R v Miles* [1992] Crim LR 657, *R v Kellard* [1995] 2 Cr App R 134 and *R v Grantham* [1984] QB 675, 683 where the reference to "whoever was running this business" casts light on the limits H

© 2023 The Incorporated Council of Law Reporting for England and Wales

A of the offence. [Reference was also made to *In re Maidstone Buildings Provisions Ltd* [1971] 1 WLR 1085.]

Secondly, the mischief against which section 213 is directed is the abuse of the privileges of incorporation, i e separate corporate personality and limited liability. It provides for a form of veil-piercing that takes effect once a company is insolvent. It is not directed at the redress or punishment of fraud at large. (Indeed, there is no power to make a punitive order under
B section 213: see *Morphitis v Bernasconi* [2003] Ch 552.) It is not even directed at the redress of fraud merely because it has resulted in insolvency. For example, there is no equivalent provision to impose liability on persons who have been involved in the carrying on of business for fraudulent purposes by an individual who has been made bankrupt.

Thirdly, like any statutory provision, section 213 should be interpreted so
C as to generate logical and consistent results.

Fourthly, liability under section 213 arises only where as a question of fact the business overall has been carried on for a fraudulent purpose and not just where individual transactions are fraudulent: see *Morphitis v Bernasconi* [2003] Ch 552, para 43, citing *In re Murray-Watson Ltd* (unreported), 6 April 1977 and Patrick Ussher, "Fraudulent Trading" (1984)
D 6 Dublin ULJ 58. Thus, a person is only liable if they have been party to the overall carrying on of the business for a fraudulent purpose. "Party to the carrying on of the business" means "taking part in the carrying on of business". That reading is consistent with what it means to be "party to" a legal arrangement or activity in other contexts.

While the narrow interpretation has a sound basis in authority, the
E authorities supporting the wide interpretation are at best a patchwork. In *In re Bank of Credit and Commerce International SA* [2001] 1 BCLC 263, Neuberger J's reasoning produces odd results. *Morris v Bank of India* [2005] 2 BCLC 328 is not binding authority. *Alpha Sim Communications Ltd v Caz Distribution Services Ltd* [2014] EWHC 207 (Ch) does not assist because in that case the defendants took no point about the scope of section 213. Likewise *Bilta (UK) Ltd v NatWest Markets plc* [2020] EWHC
F 546 (Ch) is of limited effect.

Further, there are several potentially unsatisfactory consequences of adopting the wide interpretation of section 213. First, there is the question of limitation of actions. Under ordinary circumstances, a dishonest assistant in a breach of fiduciary duty is entitled to the benefit of a six-year limitation period, unlike a true fiduciary: see *Williams v Central Bank of Nigeria*
G [2014] AC 1189. There are good policy reasons why true fiduciaries should be liable for fraudulent breaches of trust without limit of time, which do not apply to dishonest assistants. By analogy, there may be good reason why time should not begin to run under section 213 until a company is in the course of winding up as against those who were in control of the company's fraudulent business, but those reasons do not apply to those who were no more than dishonest assistants. Even a fraudster is prima facie entitled to the
H benefit of a limitation period.

Secondly, there is the question of insolvency set-off under rule 14.25 of the Insolvency (England and Wales) Rules 2016 (SI 2016/1024). If a dishonest assistant is sued in equity, he will be entitled to set off any debt due to him by the company incurred before the onset of liquidation. By contrast,

© 2023 The Incorporated Council of Law Reporting for England and Wales

if sued under section 213 no set-off is available both because the liability under section 213 cannot arise until the company goes into liquidation and also because set-off is not available in cases of malfeasance: see *Manson v Smith* [1997] 2 BCLC 161. In addition, the court has power to direct that the pari passu principle is to be disapplied as between the company and the person liable under section 213: see section 215(4). A

*Christopher Parker KC* and *Andrew Westwood KC* (instructed by *Enyo Law LLP*) for the claimants, in relation to the cross-appeal. B

The words in section 213(2) of the Insolvency Act 1986—"any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned"—should be given a wide meaning. The relevant sense of the phrase "party to" is a person who is concerned in an action or affair; a participant; an accessory. C

Neuberger J in *In re Bank of Credit and Commerce International SA* [2001] 1 BCLC 263 rightly rejected a narrower meaning as "unarguable". There could be no good policy reason for interpreting section 213 otherwise: see *Morris v Bank of India* [2005] 2 BCLC 328. Considering the legislative history of section 213, it is significant that section 101 of the Companies Act 1947 changed those who could be liable under the provision from "any of the directors" to "any persons". This change did not result in section 213 looking to directors or shadow directors. Shadow directors had always been caught by the original wording of "directors" introduced by section 75(5) of the Companies Act 1928. D

Neuberger J's construction is consistent with *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262 (concerned with section 332 of the Companies Act 1948 as precursor to section 213) and *In re Augustus Barnett & Son Ltd* [1986] BCLC 170. Neuberger J's reference to *Gerald Cooper* being an authority of long standing is particularly compelling given that the fraudulent trading provision as it had appeared in section 332 of the Companies Act 1948 (which had been reproduced as section 630(2) of the Companies Act 1985) was amended by the Insolvency Act 1985, but the wording of "any persons who were knowingly parties to the carrying on of the business in manner above mentioned" was retained. E F

Applying the principle in *Barras v Aberdeen Steam Trawling and Fishing Co Ltd* [1933] AC 402, the wide interpretation given to section 332 in *Gerald Cooper* is the relevant clear judicial interpretation and the interpretation that Parliament must be taken to have adopted when it repeated those words in the Insolvency Act 1985. [Reference was also made to *Lowsley v Forbes (trading as LE Design Services)* [1999] 1 AC 329 and *R (N) v Lewisham London Borough Council* [2015] AC 1259.] Further, the limited amendments made by the Insolvency Act 1985 can be said to represent an endorsement of *Gerald Cooper*. G

Authorities such as *R v Miles* [1992] Crim LR 657 and *R v Kellard* [1995] 2 Cr App R 134, which are decisions on section 458 of the Companies Act 1948, are not relevant. Likewise, *R v Grantham* [1984] QB 675 does not assist. *Morris v Bank of India* [2005] 2 BCLC 328 makes it clear that such decisions are not a reliable guide to a consideration of the policy behind, and therefore the correct interpretation of, section 213. H

Neuberger J's wide construction was impliedly endorsed by the Court of Appeal in *Morris v Bank of India* and was followed by Snowden J in *Bilta*

© 2023 The Incorporated Council of Law Reporting for England and Wales

A *(UK) Ltd v NatWest Markets plc* [2020] EWHC 546 (Ch) and by the trial judge in the present case. The same interpretation of section 213 was applied in *Alpha Sim Communications Ltd v Caz Distribution Services Ltd* [2014] EWHC 207 (Ch).

The Court of Appeal is bound by the statements of principle in *Morris v Bank of India* that liability under section 213 is not limited to those who B have been involved in the management of the company whose business has been carried on with intent to defraud, but potentially extends to outsiders who simply deal with the company. [Reference to also made to *Young v Bristol Aeroplane Co Ltd* [1944] KB 718 and *R (Youngsam) v Parole Board* [2020] QB 387.]

*Scorey KC* replied in relation to the cross-appeal.

C *Christopher Parker KC* and *Andrew Westwood KC* (instructed by *Enyo Law LLP*) for the claimants, in relation to the appeal.

Where a company has been restored to the register by court order after being dissolved, section 1032(1) of the Companies Act 2006 provides that the company is deemed to have continued in existence as if it had not been dissolved or struck off the register. The judge was wrong to approach the D proper construction of section 1032 of the 2006 Act from the narrow perspective of the effect that he wished it to have in the area of extensions to the limitation period under section 32 of the Limitation Act 1980. The idea that the clear wording of section 1032 should be distorted and a wholly artificial construction placed upon it because of the court's dislike of stale claims is misconceived. The Court of Appeal has rejected any notion that E such considerations are relevant otherwise than as given effect to by the 1980 Act. [Reference was made to *Regent Leisuretime Ltd v Natwest Finance Ltd (formerly County Natwest Ltd)* [2003] BCC 587 and *Hawkes v County Leasing Asset Management Ltd* [2016] 2 BCLC 427.]

The effect of the deeming provision in section 1032(1) of the 2006 Act is that the two companies which were restored to the register in the present F case are deemed to have continued in existence "as you were" or "as never having been dissolved" with the same directors who were in office at the date of dissolution: see *Tyman's Ltd v Craven* [1952] 2 QB 100, *Joddrell v Peaktone Ltd* [2013] 1 WLR 784 and *Bridgehouse (Bradford No 2) Ltd v BAE Systems plc* [2020] Bus LR 2025. [Reference was also made to *Davies v Ford* [2020] EWHC 686 (Ch).] This consequence is not fact-dependent but G is the proper interpretation of the deeming provision. Here, the directors in office at the date of dissolution were the wrongdoing directors, whose knowledge of the wrongdoing for the purposes of section 32 of the 1980 Act could not be attributed to the relevant company: see *Burnden Holdings (UK) Ltd v Fielding* [2017] 1 WLR 39. It follows that during the period between the dissolution and the restoration, the company could not have discovered the fraud.

H In the alternative, section 1032 of the 2006 Act does not require an assumption to be made about the existence or attributes of any director. In consequence the judge should have found that because there was no company in existence and no directors, there was no one who could, with reasonable diligence, have discovered the fraud.

© 2023 The Incorporated Council of Law Reporting for England and Wales

As to the award of costs, the judge made an error of principle in relation to the pre-settlement costs. The outcome of the litigation was that the defendant ended up "writing the cheque", meaning that the claimants were the successful party. Even though the judge might not have been able to decide who would have won on liability if the whole case had gone to trial, nevertheless this was a case where the terms of the settlement agreement contained the answer. [Reference was made to *BCT Software Solutions Ltd v C Brewer & Sons Ltd* [2004] FSR 9, *R (M) v Croydon London Borough Council* [2012] 1 WLR 2607 and *RG Carter Projects Ltd v CUA Property Ltd* [2020] Costs LR 1781.] The general rule is that the unsuccessful party will be ordered to pay the costs of the successful party: see CPR r 44.2(2)(a). This should be applied based on costs following "the issue" rather than "the event" in accordance with *Langer v McKeown* [2022] 1 WLR 1255. Here the action was for the recovery of money, and the claimants recovered a substantial sum. The judge should have been able to tell from the size of the settlement sum how the costs should be borne. It was not necessary (and was an error of principle) for him to have considered who might have won at trial if all the issues had been litigated. The claimants should recover all their costs down to the date of the settlement agreement.

*David Scorey KC* and *Laurence Emmett KC* (instructed by *Greenberg Traurig LLP*) for the defendant, in relation to the appeal.

The modern approach to statutory interpretation is purposive: see *R (Quintavalle) v Secretary of State for Health* [2003] 2 AC 687 and *Test Claimants in the FII Group Litigation v Revenue and Customs Comrs (formerly Inland Revenue Comrs)* [2022] AC 1. [Reference was also made to *Jenks v Dickinson* [1997] STC 853, *Bennion, Bailey and Norbury on Statutory Interpretation*, 8th ed (2020), section 17.8 and *Inland Revenue Comrs v Metrolands (Property Finance) Ltd* [1981] 1 WLR 637.] The Supreme Court authoritatively stated the approach to statutory deeming provisions in *Fowler v Revenue and Customs Comrs* [2020] 1 WLR 2227.

The wording of section 1032(1) of the Companies Act 2006 does not support the claimants' contention that there is a rule of law that the individuals who were directors when the companies were removed from the register must be deemed for the purposes of section 32 of the Limitation Act 1980 to have remained in post. Further such a rule is contrary to authority. The effect of *Davies v Ford* [2020] EWHC 686 (Ch) is that if a company is to be restored on the basis that the former directors, or indeed any other person, should be treated as having remained in post as a director during the period of deemed existence, it is necessary to obtain an order under section 1032(3) of the 2006 Act. This must be right.

The decision as to whether any identifiable individual is to be treated as having been a director while the company was only "deemed" to exist must be made by reference to the facts. Moreover, an order which retrospectively "deemed" a person to have been a company director could have serious adverse consequences for that person. In any event the claimants place too much on the rulings on reinstatement/restoration in *Tyman's Ltd v Craven* [1952] 2 QB 100 and *Bridgehouse (Bradford No 2) Ltd v BAE Systems plc* [2020] Bus LR 2025 that the effect of an order under section 353(6) of the

© 2023 The Incorporated Council of Law Reporting for England and Wales

Companies Act 1948 was to place the company and all parties affected in an "as you were" position. This reads far too much into one phrase.

If it were to be treated as a statement of a general principle applicable to the position of directors of reinstated companies, it would naturally mean that the directors were to be placed back into their posts upon the company's reinstatement, not that they were to be treated as having been in post during the period in which the company was struck off. That has never been suggested and would be clearly wrong. One or more of the directors may have died during the period of "deemed existence"; or they may have become mentally incapacitated; or been made bankrupt and not discharged; or they may have taken other appointments inconsistent with continuing in post as a director—in which case their automatic reinstatement would create unfairness, not only to the directors but the third parties now relying on them in their other posts.

The claimants' interpretation generates a result which is factually unreal and absurd. It opens up the limitation regime to abuse. Even if it were correct, it would not be enough to show what the claimants have to show to succeed under section 32 of the 1980 Act.

As to the costs order, the judge in the present case took his guidance from cases which set out how to apportion costs where the parties have reached a settlement on issues other than costs, in particular *BCT Software Solutions Ltd v C Brewer & Sons Ltd* [2004] FSR 9 and *R (M) v Croydon London Borough Council* [2012] 1 WLR 2607. [Reference was also made to *Brawley v Marczynski (Nos 1 and 2)* [2003] 1 WLR 813.] The claimants' contention that since the ultimate judgment led them to recover a substantial sum they had "clearly succeeded" and therefore should be net recipients rather than net payers runs contrary to the approach for which they otherwise contend based on *Langer v McKeown* [2022] 1 WLR 1255 (i e costs "following the issue" and not "following the event"). There is no rule which says that just because a claimant made a substantial monetary recovery there must be a costs order in its favour: see *Capita (Banstead 2011) Ltd v RFIB Group Ltd* [2017] 4 Costs LR 669. The judge in his discretion decided that the claimants had "only succeeded in part" and made an order accordingly. An appellate court may interfere only if the decision was wrong in principle or is plainly unsustainable: see *AEI Rediffusion Music Ltd v Phonographic Performance Ltd* [1999] 1 WLR 1507, *Piglowska v Piglowski* [1999] 1 WLR 1360, *F&C Alternative Investments (Holdings) Ltd v Barthelemy (No 3)* [2013] 1 WLR 548 and *Volpi v Volpi* [2022] 4 WLR 48. Where the judge has decided the question of costs following a compromise, the appellate court is entitled to approach an appeal with an even greater degree of reluctance than is usually the case and will interfere only if the appellant makes out a case of manifest injustice: see *Venture Finance plc v Mead* [2006] 3 Costs LR 389, *Bray (trading as The Building Co) v Bishop* [2009] TCLR 9 and *Powles v Reeves* [2017] 1 Costs LR 19. Given the number of factors the judge considered, his exercise of discretion is unimpeachable.

*Parker KC* replied in relation to the appeal.

The court took time for consideration.

© 2023 The Incorporated Council of Law Reporting for England and Wales

10 February 2023. The following judgments were handed down. A

**LEWISON LJ**

*Introduction*

1 There are three issues raised on this appeal from Marcus Smith J:

(i) The class of persons liable where the business of a company in B liquidation has been carried on for fraudulent purposes.

(ii) The scope of the deeming provisions that apply when a dissolved company is restored to the register.

(iii) Whether the judge was entitled to make the costs order that he did.

2 The judge's judgment on the substantive issues is at [2022] EWHC 723 (Ch); [2022] BCC 833. His judgment on costs is at [2022] EWHC 1431 (Ch). C

*The facts: an overview*

3 I can take the main underlying facts from the judge's substantive judgment.

4 By a claim form issued on 6 July 2015, the following five claimants (by their liquidators) issued proceedings against various defendants: D

(i) Bilta (UK) Ltd ("Bilta").

(ii) Weston Trading UK Ltd ("Weston").

(iii) Nathanael Eurl Ltd ("Nathanael").

(iv) Vehement Solutions Ltd ("Vehement").

(v) Inline Trading Ltd ("Inline").

5 The liquidators of these companies (Mr Kevin Hellard and Mr David E Ingram in respect of Bilta, Weston, Nathanael and Inline, and Mr Kevin Hellard and Mr Ian Richardson in respect of Vehement) were also named as claimants.

6 The defendants, at that stage, comprised (i) SVS Securities plc ("SVS"), (ii) a former director of SVS (Mr Virk); (iii) a former employee of SVS (Mr Fox); and (iv) Deutsche Bank AG ("Deutsche Bank").

7 The claims against SVS, Mr Virk, Mr Fox and Deutsche Bank all F concerned missing trader intra-community fraud ("MTIC Fraud") which took place in the summer of 2009.

8 MTIC Fraud exploits the fact that imports from one EU country into another are VAT-free. The most basic form of MTIC Fraud involves traders importing goods VAT-free from elsewhere in the EU, selling them within an EU country with VAT added to the sale price and so running up large G liabilities to account for the VAT to national revenue authorities. These importers then default on their liabilities to account for VAT, instead paying their VAT receipts away to third parties and going into insolvent liquidation.

9 MTIC Fraud thus concerns a failure, on the part of the responsible company, to account for its output VAT, which is the VAT that a company must calculate and collect when it supplies goods or services. Output VAT is H calculated both on supplies to other businesses and supplies to ordinary consumers. By contrast, input VAT is the VAT added to the price when goods or services that are liable to VAT are purchased. If the person or business that is buying the goods or services in question is registered for VAT, then

© 2023 The Incorporated Council of Law Reporting for England and Wales

the input VAT may be claimed back from HMRC. Generally speaking, businesses registered for VAT will incur both input and output VAT, and the net amount will be paid to HMRC (in the case of the United Kingdom).

10 Those involved in MTIC Fraud will usually seek to transact in high-value, easily transportable products. Mobile phones, SIM cards and computer chips were popular product vehicles for MTIC Fraud in the early- to mid-2000s. The fraudsters involved tend to transact in high volume and at high speed and frequency, using back-to-back transactions between linked companies set up or acquired for the purpose. The transaction chains may also include companies that are not controlled by the fraudsters. The use of a chain of companies obscures the fraud and complicates the task of investigation.

11 In these proceedings, the MTIC Fraud involved spot trading in carbon credits under the EU Emissions Trading Scheme ("EUAs"). One EUA represents the right to emit one metric tonne of carbon dioxide or other specified gas. EUAs are required by so-called "installations" in energy intensive industries that emit carbon dioxide and are subject to obligations to comply with EU emissions rules. EUAs exist only in electronic form, are fungible, and can be traded almost instantly. Spot trading in EUAs within EU member states attracted VAT in 2009. Those rules changed when the authorities realised that EUAs were being used as the products in MTIC Fraud.

12 As a result of the MTIC Fraud, the claimants were left with enormous VAT liabilities owing to HMRC. In the case of all of the claimants, HMRC were and are the primary creditor.

13 The ordinary limitation period in respect of these claims ended by the summer of 2015. The claims against SVS, Mr Virk, Mr Fox and Deutsche Bank were all issued just within the ordinary limitation period. We are no longer concerned with those claims.

14 On 8 November 2017 the claimants issued a separate claim form against Tradition Financial Services Ltd ("TFS"). The claims against TFS were: (i) claims by the companies themselves alleging TFS's dishonest assistance in the breach of fiduciary duty by the directors of the claimants; and (ii) claims by the liquidators alleging participation by TFS in the fraudulent trading of the businesses of the claimant companies pursuant to section 213 of the Insolvency Act 1986.

15 The dishonest assistance claims alleged that through spot EUA trading carried out between May and July 2009, TFS participated in chains of transactions by which a large MTIC Fraud was perpetrated. That participation amounted to dishonest assistance by TFS in the breaches of fiduciary duty of the directors of the claimants, which those directors owed to those companies.

16 As a consequence of a partial settlement agreement between the claimants and TFS, there were two issues for the judge to decide:

(i) Whether, as TFS alleged, the claims in dishonest assistance were statute-barred;

(ii) Whether TFS were within the scope of section 213 of the Insolvency Act 1986.

17 On this first of those questions, the judge held that the claims against TFS were indeed statute-barred. Although the claimants had relied on

© 2023 The Incorporated Council of Law Reporting for England and Wales

section 32 of the Limitation Act 1980 (which postpones the running of time where, in the case of an action based on the defendant's fraud, the claimant could not have discovered the fraud with reasonable diligence), the judge found against all of the claimants on the facts. On the second of those questions, the judge held that TFS were within the scope of section 213. The claims brought by the liquidators of Nathanael and Inline therefore succeeded under that section; but the claims by the liquidators of the other claimants did not because they were statute-barred. Accordingly, the claims brought by Bilta, Weston and Vehement (and their liquidators) failed completely; and there is no appeal in relation to their claims. The claimants appeal against the first of the judge's conclusions in relation to Nathanael and Inline; and TFS cross-appeals against the second. We heard argument on these two issues in reverse order.

**18** The costs appeal is, to a large extent, contingent on the outcome of the two substantive issues.

*The claim under section 213*

**19** Claims under section 213 of the Insolvency Act 1986 were brought by the liquidators of all five companies.

**20** The judge did not make (and was not asked to make) any findings of fact about TFS's precise role. The question that was placed before him under the terms of a consent order of 21 February 2022 was whether "on the facts pleaded" the claimants were entitled to the declarations claimed under section 213. The "facts pleaded" referred to the facts pleaded by the claimants, even though many of those alleged facts were disputed by TFS. Since the agreed issue referred to "the facts pleaded" (by the claimants), before embarking on a consideration of the law, I should set out the assumed facts.

*The role of TFS on the assumed facts*

**21** In brief the assumed facts were as follows. The five claimant companies all became insolvent owing sums to HMRC in respect of VAT. They were involved in the MTIC Fraud described by the judge, either as defaulters (Nathanael and Inline) or because they took part in deal chains that led to defaulters (i e chains that led to Bilta, Weston or Vehement). SVS bought EUAs on a back-to-back basis for those companies.

**22** TFS brokered deals on behalf of companies (i e its clients) that dealt with SVS on a back-to-back basis. TFS's role in brokering a deal was to find a counterparty and negotiate the terms on which that counterparty was prepared to sell EUAs to or buy EUAs from the client company via SVS. TFS was paid brokerage by volume traded.

**23** TFS participated in sales by SVS in the following ways. First, in the case of some of the deals to which the claim related, TFS introduced SVS to its overseas suppliers and liaised between SVS and the overseas supplier for the purpose of informing buyer and seller of the price and amount in which each was willing to trade. Second, it introduced Nathanael and Inline to SVS. That was a fact relevant to only some of the EUA trades to which the claim related. Third, for those clients introduced to SVS, TFS liaised between those companies and SVS for the purpose of informing SVS of the price at which they were willing to sell and the amount that they wished to

© 2023 The Incorporated Council of Law Reporting for England and Wales

sell. Overall, TFS were involved in a number of the deal chains, but not all of them.

**24** TFS introduced Inline and Nathanael to SVS, knowing that they were unlikely to be legitimate trading concerns, without any belief that they would be engaging in spot trading of EUAs for legitimate purposes and in the knowledge that their purpose was to amass VAT.

**25** TFS offered the suppliers of the EUAs who wanted to sell with VAT the prospect of selling through SVS with an expectation of payment the same day thereby enabling them to buy and sell further EUAs with the monies received. Payment on the same day or even the next day was unusual and limited the number of counterparties to whom SVS could sell, thus depressing the price that could be obtained for the EUAs.

**26** TFS was aware of the likelihood that companies newly applying to trade EUAs from around May 2009 were fronts for individuals wishing to conceal their involvement (or the extent of their involvement) in spot trading of EUAs and the likelihood that there was no legitimate reason for their wishing to do so.

**27** TFS did not perform any genuine "know your client" ("KYC") inquiries of the suppliers aimed at reducing the possibility that the suppliers were involved in any criminal activity before asking SVS to provide a conduit for their EUAs to exporters. TFS's traders knew this, and they also knew that SVS did not perform any genuine KYC inquiries.

**28** TFS was aware that the nature and pattern of the EUA trading in which SVS and TFS were involved was suspicious and such as to call for inquiry as to whether the trading was legitimate; and knew, or did not care whether, such trading was linked to a financial crime (including money laundering) and in particular a VAT fraud. Despite its suspicions, TFS failed to make inquiries with a view to trying to ascertain whether its clients' trading was legitimate and not connected with criminal activity in particular VAT fraud and whether or not to trade (or continue to trade) with such companies if there was reason to think it was.

**29** To the contrary, TFS pretended it had credible explanations for its clients' trading though neither of the explanations relied on were honestly thought to be adequate explanations for the trading.

**30** Bilta was ordered to be wound up on 25 November 2009, and the liquidators were appointed on the same day. Nathanael was ordered to be wound up on 19 March 2012 and the liquidators were appointed on 19 August 2013. Weston was ordered to be wound up on 27 October 2010 and the liquidators were appointed on 13 June 2011. Vehement entered creditors' voluntary liquidation on 23 October 2009 and the liquidators were appointed on 18 March 2010. Inline was ordered to be wound up on 8 June 2015 and the liquidators were appointed on the same day.

*Section 213*

**31** Section 213 of the Insolvency Act 1986 provides:

> "(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.

© 2023 The Incorporated Council of Law Reporting for England and Wales

A "(2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper."

**32** Because the application can only be made in the course of a winding up, and only by the liquidator, it is common ground that the cause of action arises when a winding up order is made, or the company goes into voluntary liquidation. Once the cause of action has arisen, the liquidator then has six years to bring the claim: Limitation Act 1980, section 9; *In re Overnight Ltd* [2009] Bus LR 1141. Since the claim form was issued on 8 November 2017, it follows that in the case of any company where the winding up order was made before 8 November 2011, any cause of action under section 213 is statute-barred. That applies to the claims made by the liquidators of Bilta, Weston and Vehement. B C

*The issue*

**33** The issue on this appeal is the scope of the words "any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned". TFS argued that that phrase was restricted to persons exercising management or control over the company in question. The judge rejected that argument, which TFS resurrects on this appeal. D

**34** In the course of his oral submissions Mr Scorey KC, for TFS, did suggest that even if section 213 was not so limited, nevertheless TFS, on the facts of this case, was not liable under that section. That would involve a detailed evaluation of the facts relating to TFS, which the judge did not carry out; and which was not foreshadowed in the grounds of appeal or the skeleton argument. In my judgment Mr Parker KC was justified in objecting that this appeal is concerned only with the narrow question of law I have identified. E

*Legislative history*

**35** The argument for TFS rests, in part, on a detailed examination of the legislative history of provisions relating to fraudulent trading by a company in liquidation; and a closely reasoned article by Mr David Foxton QC: "Accessory Liability and Section 213 Insolvency Act 1986" [2018] JBL 324. F

**36** There have been provisions enabling the court to set aside transactions effected with intent to defraud creditors as far back as the Fraudulent Conveyances Act 1571 (13 Eliz 1, c 5). But the statutory history of corporate fraudulent trading begins with section 75 of the Companies Act 1928. That section applied if, in the course of a winding up, it appeared that any business of the company had been carried on with intent to defraud creditors or for any other fraudulent purpose. Where that was established, the court was empowered to declare "any of the directors, whether past or present, of the company who were knowingly parties to the carrying on of the business in manner aforesaid" to be personally responsible for the debts of the company. Section 75(5) in effect defined "director" to include what we would now call a shadow director. Section 75(3) imposed a criminal sanction on a director within section 75(1). TFS argues that this was, in effect, a "veil-piercing provision", limited to directors as defined, and was G H

© 2023 The Incorporated Council of Law Reporting for England and Wales

A not intended to (and did not) create a secondary form of accessory liability on third parties. Section 75 was re-enacted, with minor and irrelevant changes, in section 275 of the Companies Act 1929.

37 In 1943 the President of the Board of Trade appointed a committee under the chairmanship of Cohen J to consider what major amendments were desirable in the Companies Act 1929. The Cohen Committee reported B in 1945 (Cmd 6659). Their recommendation in relation to section 275 was:

> "We think that the subsections should be extended so as to apply not only to directors but also to other persons who were knowingly parties to the frauds . . ."

38 Parliament accepted that recommendation; and made the legislative changes by section 101 of the Companies Act 1947, although not in precisely C the same terms as the recommendation. Shortly afterwards, the companies legislation was consolidated in the Companies Act 1948. Section 332 of that Act provided:

> "(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any D fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory of the company, may, if it thinks proper so to do, declare that any persons who were knowingly parties to the carrying on of the business in manner aforesaid shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as E the court may direct."

39 TFS argues, supported by Mr Foxton's article, that the object of the Cohen Committee's recommendation was to deal with a case where the company's business was directed, controlled or managed by a criminal mastermind who was the brains behind the fraud and where the directors were merely dupes. Mr Foxton quotes some of the evidence given to the F committee on that topic. Although it shows that the trigger for the thought process that led to the recommendation was indeed as TFS suggests, the inquiry itself went further. Thus, Mr Foxton quotes Cohen J as asking two distinguished witnesses whether it would be useful for the section to apply "to any other party who was knowingly party to carrying out the fraud". Moreover, the committee's ultimate recommendation was not limited to the G criminal mastermind behind the scenes. We have no way of knowing what deliberations of the committee took place in private before it made its recommendation. It is also to be noted that the recommendation extended to persons who were "knowingly parties to the fraud" not merely those who were involved in the running of the fraudulent business. Since the legislation defined "director" in terms that included what we now call a "shadow director", it must have been the committee's intention to widen the net H beyond those in active control of the business (whether formally directors or not).

40 The next relevant iteration of the legislation was the Companies Act 1985. The principal change effected by that Act (apart from a more modern style of drafting) was to separate the criminal liability and the civil liability

© 2023 The Incorporated Council of Law Reporting for England and Wales

into two sections (sections 458 and 630 respectively). In addition, under section 458 the criminal offence could be committed even if the company was not being wound up; thus departing from what the House of Lords had held in *R v Schildkamp* [1971] AC 1 (this amendment had in fact been made by the Companies Act 1981). In that respect, therefore, criminal liability was more extensive than civil liability. A

**41** Further amendments were made by Schedule 6 to the Insolvency Act 1985. Paragraph 6 of that Schedule inserted a new section 630(2): B

> "The court, on the application of the liquidator, may declare that any persons who were knowingly parties to the carrying on of the business in the manner above mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper."

**42** This amendment thus did two things. First, it narrowed the class of persons who could apply under the section. Whereas previously a creditor or contributory was able to apply, following the amendment the liquidator was the only person empowered to do so. Second, in place of the defendants being personally responsible for the company's debts and liabilities, the court now had power to declare them liable to "make contributions" to the company's assets. C D

**43** The provisions relating to civil liability are now to be found in section 213 of the Insolvency Act 1986 (quoted above) and those relating to criminal liability are in section 993 of the Companies Act 2006. Section 993(1) provides:

> "If any business of a company is carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, every person who is knowingly a party to the carrying on of the business in that manner commits an offence." E

**44** Conviction of the offence may result in a prison sentence of up to ten years or a fine (or both). Section 993(2) provides that the criminal offence may be committed whether or not the company has been or is being wound up. Section 213, on the other hand, only applies to a winding up. F

**45** To bring the legislative history up to date, section 9 of the Fraud Act 2006 created a parallel offence in relation to non-corporate businesses. The Explanatory Notes to that section state that case law establishes that the offence: "can be committed only by persons who exercise some kind of controlling or managerial function within the company."

**46** Provisions equivalent to section 213, but relating to companies in the course of administration, are now to be found in section 246ZA of the Insolvency Act 1986 (introduced by the Small Business, Enterprise and Employment Act 2015, section 117). G

*Case law on fraudulent trading*

**47** In *In re Maidstone Buildings Provisions Ltd* [1971] 1 WLR 1085 the company went into insolvent liquidation. Mr Penney was its company secretary. The allegation against him was that as well as being the company secretary, he was also its financial adviser, was present at board meetings and took no steps to prevent the company from continuing to trade. H

© 2023 The Incorporated Council of Law Reporting for England and Wales

Pennycuick V-C held that Mr Penney was not liable under section 332 of the 1948 Act. He said at p 1092:

"The expression 'parties to the carrying on of the business' is not, I think, a very familiar one, but so far as I can see, the expression 'party to' must on its natural meaning indicate no more than 'participates in', 'takes part in' or 'concurs in'. And that, it seems to me, involves some positive steps of some nature. I do not think it can be said that someone is party to carrying on a business if he takes no positive steps at all. So in order to bring a person within the section you must show that he is taking some positive steps in the carrying on of the company's business in a fraudulent manner.

"So far as the position of a secretary as such is concerned, it is established beyond all question that a secretary, while merely performing the duties appropriate to the office of secretary, is not concerned in the management in the company. Equally I think he is not concerned in carrying on the business of the company. On the other hand, it is equally well established, indeed it is obvious, that a person who holds the office of secretary may in some other capacity be concerned in the management of the company's business."

**48** He added at p 1093:

"Counsel for the liquidator does not, I think, contend that the expression 'party to' covers everyone who has notice that the business of the company is being carried on fraudulently. That contention, if it were right, would lead to impossible results. But what he does say—I think this is the substance of his argument—is that Mr Penney in his position as secretary and financial adviser of the company and also member of the firm of the company's auditors owed a duty to the company to give them certain advice and that his omission to give that advice rendered him a party to carrying on the business of the company.

"I find it impossible to accept that contention. Whatever duty Mr Penney may have owed to the company, I do not think mere omission to give advice could be regarded as amounting to being a party to carrying on the business of the company."

**49** This decision does give some slender support to a narrow interpretation. First, it seems to me that one of the questions for the Vice Chancellor was whether Mr Penney was "concerned in the management in the company". Second, the Vice Chancellor considered that the argument that the section embraced everyone with notice of the fraud would lead to "impossible results". On the other hand, all that the Vice Chancellor actually decided was that active participation was necessary; and that concurrence in the carrying on of the fraudulent business might be enough. By that he meant "taking some positive steps in the carrying on of the company's business in a fraudulent manner". He did not say that those positive steps must amount to management or control.

**50** In *In re Murray-Watson Ltd* (unreported) 6 April 1977 Oliver J said that section 332:

"is aimed at the carrying on of a business . . . and not at the execution of individual transactions in the course of carrying on that business. I do

© 2023 The Incorporated Council of Law Reporting for England and Wales

> not think that the words 'carried on' can be treated as synonymous with 'carried out,' nor can I read the words 'any business' as synonymous with 'any transaction or dealing'. The director of a company dealing in second-hand motor cars who wilfully misrepresents the age and capabilities of a vehicle is, no doubt, a fraudulent rascal, but I do not think that he can be said to be carrying on the company's business for a fraudulent purpose, although no doubt he carries out a particular business transaction in a fraudulent manner."

51 This observation takes a relatively narrow view of what amounts to carrying on a fraudulent business, but it does not, I think, shed much light on who may qualify as being party to the carrying on of that business. Unfortunately, it has not been possible to find a transcript of that case, and all that we have to go on is the quoted extract from the judgment.

52 In *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262 the respondents were a company and its directors who had lent money to the insolvent company. The loan had been repaid out of money raised by purported prepayments for the sale of goods under orders which could not be fulfilled, at a time when the company was already insolvent. Templeman J held that the company was carrying on business with intent to defraud creditors by accepting deposits knowing that they could not supply the goods and were insolvent. He went on to say at p 268:

> "Mr Evans-Lombe submitted in the alternative that the respondents could not knowingly be parties to the carrying on of the business of the Cooper company with intent to defraud creditors of the Cooper company because they had no power of management or control over the carrying on of the business, and did not themselves assist in the carrying on of the business. I agree that a lender who presses for payment is not party to a fraud merely because he knows that no money will be available to pay him if the debtor remains honest. The honest debtor is free to be made bankrupt. But in my judgment a creditor is party to the carrying on of a business with intent to defraud creditors if he accepts money which he knows full well has in fact been procured by carrying on the business with intent to defraud creditors for the very purpose of making the payment. Mr Evans-Lombe said truly that section 332 creates a criminal offence and should be strictly construed. But a man who warms himself with the fire of fraud cannot complain if he is singed."

53 Although the *Maidstone* case was cited to Templeman J he did not mention it; and he seems to me to have taken a broader view of the scope of section 332 than the Vice Chancellor.

54 Mr Scorey placed some reliance on the decision of the Court of Appeal, Criminal Division in *R v Grantham* [1984] QB 675. Mr Grantham registered a company as carrying on the business of importing root crops. He was the sole authorised signatory of the cheques and was the "consultant" in charge of administration and holder of the purse strings. The company traded at a loss. The trial judge directed the jury:

> "As against the individual, the individual defendant, the prosecution have to prove first that he took an active part in carrying on the business.

© 2023 The Incorporated Council of Law Reporting for England and Wales

That is the first thing. They then have to prove that in doing so he had an intention to defraud creditors and thirdly they have to prove that he was acting dishonestly."

55 The trial judge's direction did not require the prosecution to prove that Mr Grantham exercised management or control of the business: merely that he took an active part in carrying it on. The jury decided all three questions in favour of the prosecution. Mr Grantham appealed, but he only appealed on the question whether he had the necessary intent to defraud. He did not appeal on the question whether he had taken an active part in the business, even though his case on the facts was that he had not. For that reason, the Court of Appeal did not consider the trial judge's formulation of the first question. It is fair to say, however, that in the course of his judgment Lord Lane CJ said at p 683:

"In the present case it was open to the jury to find, if not inevitable that they would find, that whoever was running this business was intending to deceive or was actually deceiving Jacob into believing that he would be paid in 28 days or shortly thereafter, when they knew perfectly well that there was no hope of that coming about."

56 I do not read the reference to "whoever was running this business" as casting any real light on the limits of the offence. In those circumstances it does not seem to me to be an authority of any real weight on that question.

57 *In re Augustus Barnett & Son Ltd* [1986] BCLC 170 concerned an attempt to impose liability under section 332 on the parent company of an insolvent company. The parent had subsidised its subsidiary; and had also announced that it would continue to support it financially. But when it withdrew its support the subsidiary went into insolvent liquidation. Citing *Gerald Cooper*, Hoffmann J said at p 173 that the section required:

"a finding that someone has done an act which can be described as carrying on some business of the company and that in doing so he had an intent to defraud. Equally, the words 'any business of the company has been carried on . . . for any fraudulent purpose' must mean that someone carrying on the business had a fraudulent purpose in doing so. Once this condition has been satisfied, the court may impose personal liability on any persons who were knowingly 'parties to' carrying on of the business 'in manner aforesaid'. The words 'persons . . . parties to' may be wide enough to cover outsiders who could not be said to have carried on or even assisted the carrying on of the company's business but who nevertheless in some way participated in the fraudulent acts."

58 Hoffmann J seems to me to have analysed the section as imposing a primary liability on those carrying on a fraudulent business, and an accessory liability on persons who in some way participated in the fraudulent acts. That analysis is consistent with the recommendation of the Cohen Committee, and contradicts TFS's argument.

59 But he went on to say that since no fraudulent intent was alleged against any person who actually carried on the business, there were "no

© 2023 The Incorporated Council of Law Reporting for England and Wales

fraudulent acts to which the outsider can have been a party and his own state of mind seems to me for present purposes irrelevant". He added: A

"The only point with which I am concerned is whether section 332 can form the basis for imposing liability on a parent company otherwise than as accessory to fraudulent trading by the persons who actually carried on the business of the subsidiary. In my judgment it cannot. The language of the section is clear and unambiguous." B

**60** Clearly Hoffmann J envisaged that a person could be liable as an accessory under section 332 even though not actually running the business.

**61** By the time that *R v Miles* [1992] Crim LR 657 came to be decided the criminal offence had been hived off into section 458 of the Companies Act 1985. Mr Miles was charged with an offence under section 458. The Crown's case was that he had been selling worthless shares on behalf of a C company. The Crown also asserted that Mr Miles had a managerial role in the company, whereas he contended that he was merely a salesman acting under orders. The trial judge directed the jury that they had to be sure that Mr Miles was "participating, or taking part or concurring in the actual trade which is involved in the business of the particular company". The Court of Appeal, Criminal Division held that that was a misdirection. But it is D important to understand the submissions made by Mr Barnes QC on behalf of Mr Miles in order to evaluate the court's decision. Watkins LJ summarised them as follows:

"(1) On the proper construction of the words of the statute, some controlling or managerial function is required to bring a defendant within section 458. The jury were never so directed. E

"(2) Once it is conceded that not all those working for a company fall within section 458, if there is an issue as to whether or not a particular defendant comes within the words of the statute, the jury should be given clear, simple guidance as to the meaning of 'party to the carrying on of the business of the company' and how they should approach their decision on the facts of the particular case.

"(3) The case was opened and argued on the basis that the appellant F had a managerial role. The passage in the summing up 'participating, or taking part or concurring in the actual trade which is involved in the business of the particular company' widened the scope of the offence. This could have been avoided if the judge had invited counsel to address him on the law before beginning his summing up. In the event, his departure from the basis upon which the case had been presented was a G material irregularity."

**62** Giving the judgment of the court Watkins LJ said:

"In our view, section 458 is designed to include those who exercise a controlling or managerial function, or who, in Lord Lane's phrase, are 'running the business'. A salesman who is not a manager and who sells shares he knows are worthless can be charged with offences under the H Theft Act or with conspiracy.

"Circumstances will vary infinitely, but we accept the force of Mr Barnes' second proposition that where there is an issue as to whether or not a defendant comes within the ambit of the section, that issue

© 2023 The Incorporated Council of Law Reporting for England and Wales

A should be put to the jury together with clear guidance, appropriate to the facts of the case, as to the meaning of 'party to the carrying on of the business of the company'.

"In this case, which had been presented on the basis that the appellant had a managerial role while he contended that he was merely a salesman acting under orders, the words used in the summing up, particularly B 'concurring in the trade which is involved in the business of the company' could and may very well have had the effect of broadening the scope of the offence charged in the minds of the jury. In the circumstances, we feel that the jury did not receive the guidance to which they were entitled and that given to them may have seriously misled them."

**63** The court referred to the *Maidstone* case in the course of the C judgment but not to *Gerald Cooper*. What is important, however, is that the proposition that the court accepted was not Mr Barnes' first proposition (i e some controlling or managerial function is required) but his second (i e if there is an issue about whether a defendant who is working for the company comes within the section clear, simple guidance should be given). Had Mr Barnes' first proposition been accepted, it is difficult to see what further D clear and simple guidance would have been needed. Moreover, the particular part of the summing up to which the court took exception, particularly in the way that the prosecution had put its case, was the trial judge's direction that it was enough that Mr Miles "concurred" in the trade. The court did not criticise the trial judge's direction that the jury had to be sure that the defendant was "participating, or taking part" in the carrying on of the business. One can concur in a trade without actively participating in E it. To that extent, therefore, the Court of Appeal restricted the meaning that the Vice Chancellor had adopted in the *Maidstone* case. I consider that we can accept that in the context of civil liability as well as criminal liability, concurrence is not enough. Although it is true that the court referred to Lord Lane CJ's dictum in *Grantham*, they did not say that the offence was *limited* to those running the business; merely that it *included* such persons.

F **64** In *R v Kellard* [1995] 2 Cr App R 134 a number of defendants, including Mr Wright, were charged with fraudulent trading. The relevant counts, for present purposes, were counts 14 and 15. Counsel for Mr Wright submitted that the Crown's case on those counts was very weak because Mr Wright was neither a director nor employee of the companies concerned and could not be regarded as exercising a controlling or managing function G or as one who was running the business (referring to *Miles*). Farquharson LJ said in relation to those counts:

"The only question that arises is whether Wright, despite not being a director or employee of either, was in fact assisting in the carrying on of the business. There was clear evidence that in the case of 'UK' he was, viz, (i) in dealing with and on behalf of the company with DCC, (ii) in seeking H further finance for the company and (iii) in persuading a major creditor to postpone legal action against the company which, if proceeded with, would have led to its collapse. If this had happened, neither of its subsidiary companies could have continued trading. Although the case was weaker on counts 14 and 15, when the manner in which the group

© 2023 The Incorporated Council of Law Reporting for England and Wales

operated is looked at, there is little practical distinction between Wright's A
involvement in all three."

**65** The reason why Mr Wright was guilty was because he was acting on behalf of the company in question. The test was formulated, not as running or controlling the business, but "assisting" in carrying it on.

**66** There the matter stood when Parliament enacted section 213. I digress at this point because Mr Parker relies on the *Barras* principle in B
support of his argument in favour of the wider meaning. The *Barras* principle derives from *Barras v Aberdeen Steam Trawling and Fishing Co Ltd* [1933] AC 402, 411 in which Viscount Buckmaster said:

> "It has long been a well-established principle to be applied in the consideration of Acts of Parliament that where a word of doubtful meaning has received a clear judicial interpretation, the subsequent C
> statute which incorporates the same word or the same phrase in a similar context, must be construed so that the word or phrase is interpreted according to the meaning that has previously been assigned to it."

**67** Mr Parker submits that the interpretation given to section 332 in *Gerald Cooper* is the relevant clear judicial interpretation and the interpretation that Parliament must be taken to have adopted. I do not D
agree. In my judgment, the diversity of views expressed in the cases do not engage the *Barras* principle. I do not consider that, taken together, they can be said to amount to a "clear" judicial interpretation. Moreover, *Gerald Cooper* was a case decided by a first instance judge on a strike out application; and it cannot be assumed that Parliament had it in mind when re-enacting section 332 (see the example given by Lord Blanesburgh, E
recounting his experience as a pupil, in *Barras* at pp 433–434). So, I do not feel able to place any reliance on the *Barras* principle. In addition, in *Morphitis v Bernasconi* [2003] Ch 552 (decided after section 213 came into force) Chadwick LJ commented at para 46 that *Gerald Cooper* may have adopted too expansive a view of section 332. Nor do I consider that, as Mr Parker submitted, the limited amendments made by the Insolvency F
Act 1985 can be said to represent an endorsement of *Gerald Cooper*. The most that can be said is that Parliament did not explicitly repudiate the wide construction adopted in *Gerald Cooper*. But given the decision in *Miles*, Parliament might have taken the view that there was no need to do so.

**68** The next case chronologically, and a very influential one, is the decision of Neuberger J in *In re Bank of Credit and Commerce International* G
*SA* [2001] 1 BCLC 263 ("*BCCI*"), although it has been subjected to considerable criticism by Mr Foxton in his article. The liquidators of BCCI alleged that another bank (BAII) had (1) knowingly participated in BCCI's secret and illegal acquisitions and/or financing of shares in an American bank, (2) knowingly participated in BCCI's secret and illegal acquisition and/or financing of the acquisition of an American bank, and (3) knowingly H
participated in BCCI's fraudulent overstatement of assets and earnings by assisting BCCI artificially to service certain non-performing loans in its books thereby avoiding having to make any provision for the loan. The procedural question was whether Neuberger J should determine a

© 2023 The Incorporated Council of Law Reporting for England and Wales

preliminary issue which he reformulated as follows. BAII's contention was that:

> "a person cannot fall within section 213(2) unless he 'exercised a controlling or managerial function within the company concerned, and that as there is no allegation in the points of claim in their original form or as amended that BAII had any managerial function or any control over the business of BCCI within that company the claim is bound to fail'."

**69** Neuberger J held:

> "In my judgment, it is not arguable that these activities, if established, could not result in BAII falling within section 213(2) merely because it was not performing a managerial or controlling function within BCCI."

**70** It is to be noted that what Neuberger J actually decided was not that the claim against BAII would succeed. He merely decided that it was not bound to fail. His decision therefore leaves open the precise limits of the scope of section 213.

**71** Neuberger J gave six reasons for his conclusion. His first reason was that:

> "as a matter of ordinary language, the ambit of section 213(2) is not limited to those who perform a managerial or controlling role within the company concerned. Although I accept that the language of section 213(2) is a little unusual, it appears to me that the concept of being 'parties to the carrying on' by a company of a type of business, or of a business in a certain way, is not limited to the person who actually directs or manages the business concerned. If anything, it is a more natural reference to people who are not employed by the company at all, but who are third parties to the company."

**72** Mr Scorey takes issue with this reason. He argues that to be party to the carrying on of a business, a person must take part in its carrying on. That, he says, is how the word "party" is used in other legal contexts. A party to a contract, for instance, is someone with whom the contract is made, and who has legal rights and obligations under it. A party to legal proceedings is a person who has formally been joined in those proceeding. A party to a marriage is one of the persons who are married to each other.

**73** Mr Parker disputes this. He argues that as a matter of ordinary English a person who knows that the business he is dealing with is fraudulent is a party to the fraudulent carrying on of that business. The relevant sense of the phrase "party to" is that given by the *Oxford English Dictionary* (online edition): "With *to* (formerly also *in*): a person who is concerned in an action or affair; a participant; *an accessory*." (Emphasis added.)

**74** In my judgment, the phrase is capable of bearing either meaning. But even on Mr Scorey's argument it does not, in my judgment, follow that in order to take part in the carrying on of a business one must have a controlling or managerial function in it.

© 2023 The Incorporated Council of Law Reporting for England and Wales

75 Neuberger J's second reason was based on policy. Although he said that it would be wrong to interpret section 213 as so wide as to stultify "normal business transactions": A

> "that that is not a good reason for preventing a liquidator from pursuing a person who actively and dishonestly assisted, and/or benefited from, the company in adopting a dishonest course of conduct, which predictably led to lenders to, or shareholders of, the company being defrauded." B

76 Mr Scorey submits that policy-based reasoning is not appropriate. He accepts that everybody agrees that fraud is "a bad thing" but what constitutes fraud, and the legal remedies available, are questions that should be resolved by legal principles rather than policy.

77 It is no doubt true that questions of interpretation of statutes should not rest wholly on questions of policy, rather than the statutory language, but policy does have a role to play. In *Morris v Bank of India* [2005] 2 BCLC 328, for example, Mummery LJ, giving the judgment of this court said at para 93: C

> "Where, as here, civil and criminal liability are the creation of statute, and knowledge ('knowingly') is an essential ingredient of statutory liability, the starting point must be the language, context and policy of the legislation considered against the background of general legal principles." D

78 The court went on to discuss the policy underlying section 213 at paras 108–112. E

79 Neuberger J's third reason was the contrast in wording between section 213 on the one hand, and sections 212 and 214 on the other. Section 212, however, does not create any liability where none existed before. As Sealy & Milman put it in *The Annotated Guide to the Insolvency Legislation*, 25th ed (2022), vol 1, p 282: "It is well settled that the section creates no new liabilities, but only provides a simpler procedure for the recovery of property or compensation in a winding up." F

80 As far as section 214 is concerned, the impulse behind its enactment was the difficulty of establishing dishonesty under the predecessors of section 213. Nevertheless, the difference in wording is, in my judgment, a legitimate factor to take into account.

81 Neuberger J's fourth reason was the legislative history of section 213. He referred in particular to the recommendation of the Cohen Committee that the section be extended to "other persons who were knowingly parties to the fraud". In his article, Mr Foxton is critical of this reason. He points out that Neuberger J did not refer to the evidence which had prompted the Committee's recommendation. That is true, but for the reasons I have explained, I do not consider that the criticism is a weighty one. G H

82 Neuberger J's fifth reason was that it was consistent with first instance authority; and his sixth reason was that the decisions of the Court of Appeal, Criminal Division, were not directed to the particular point that arose in *BCCI*. It is convenient to take these reasons together. In his article,

© 2023 The Incorporated Council of Law Reporting for England and Wales

A Mr Foxton is particularly critical of Neuberger J's treatment of the latter cases. Dealing with the criminal cases, Neuberger J said of them:

> "The issue before the court in each case was effectively whether there was evidence that, or an effective direction to the jury that there must be a finding to the effect that, the defendant had managed or controlled the business rather than being a mere employee of the business."

B 83 For reasons I have explained, I do not consider that that is what they (and especially *R v Miles*) decided. Neuberger J said:

> "All three cases involve consideration of a defendant who was employed by, or acted for, a company carrying on activities which were caught by the equivalent of section 213(1) . . . I do not consider that these C cases assist BAII's argument because they were concerned each with the position of an employee or consultant of the company."

84 Neuberger J went on to say:

> "In my judgment, just as an employee of the company who was merely carrying out orders does not fall within section 213(2) whereas somebody who orchestrates, organises or can seize [control?] of the D business concerned does fall within the section, so a company or other entity which carries on (so far as it is concerned) a bona fide business with the company, does not fall within section 213(2), but a company which is involved in, and assists and benefits from, the offending business, or the business carried on in an offending way, and does so knowingly and, therefore, dishonestly does fall or at least can fall within section 213(2)."

E 85 I think, with respect, that this does not adequately deal with *Miles*. What, in my judgment, the court held in *Miles* was:

(i) The offence was not restricted to persons who had a controlling or managerial function in the company;

(ii) But the jury needed clear and simple guidance.

86 I do not think that the case turned on the fact that Mr Miles was only F an employee and for that reason could not be guilty of the offence. In my judgment Neuberger J took an unnecessarily narrow view of what *Miles* decided.

87 Mr Foxton writes of this part of Neuberger J's judgment:

> "There are a number of difficulties with this passage. First, an employee who 'sells shares he knows are worthless' is clearly dishonest, G whether acting under direction (as to which there is no reference in *Miles*) or not. It was for that reason that the Court of Appeal in *Miles* stated that Miles could have been charged with an offence under the Theft Act or with conspiracy. The reason why that (ex hypothesi) dishonest individual did not commit the section 458 offence was because he was not engaged in the 'carrying on of the business', something which required the exercise of a managerial function. Secondly, Neuberger J's reasoning makes a H false comparison. In the first part, he contrasts someone who exercises managing responsibility with someone who does not, and in the second, someone with a dishonest state of mind and someone without one. The first part of this judicial equation is concerned, in criminal terms with actus reus and the second with mens rea."

© 2023 The Incorporated Council of Law Reporting for England and Wales

88 As will be appreciated, I do not agree with Mr Foxton's analysis of *Miles* either. Mr Foxton in effect says that the court in *Miles* accepted Mr Barnes' first proposition. It did not. It accepted his second proposition. A

89 Mr Scorey also points to what he says are the odd results of Neuberger J's reasoning. If those managing a company carry on the business in a fraudulent manner and instruct an employee to complete transactions in order to further that purpose, then even if the employee knows about the fraudulent purpose, he will not be liable. B On the other hand, a counterparty to those transactions will be liable even if he has no more than blind-eye knowledge. This submission depends on reading across the decision in *Miles* as regards the criminal offence into the scope of civil liability. It also presupposes that the court in *Miles* accepted Mr Barnes' first proposition, which in my judgment it did not. But in any event *Miles* does not occupy the whole of the field. C Quite apart from the offences to which Mr Foxton referred, the company's employee who knows about the fraudulent intent and furthers that purpose could be charged with aiding and abetting fraudulent trading: *R v Cartwright* [2020] Lloyd's Rep FC 547. In addition, Neuberger J did not purport to define the scope of section 213. He merely said that the claim in that case was not bound to fail.

90 As Mr Scorey also points out, Neuberger J gave another reason for his decision (albeit obiter). D He said:

> ". . . I am by no means convinced that even if Mr Adkins' formulation is correct that that would mean that the claim should be dismissed. It seems to me that the allegations made against BAII are such that it could be said that BAII operated as agent for, or in some other way acted for BCCI, in particular in relation to the matter concerning Independent, in a manner which meant that in the loose sense it had some controlling or managerial function." E

91 Thus, the actual result of the case was that Neuberger J dismissed the application for the trial of a preliminary issue, with the consequence that the action was permitted to go forward to trial.

92 *Morphitis v Bernasconi* [2003] Ch 552 was concerned with what amounts to "the carrying on of a business with intent to defraud", rather than the question who would be "party" to the carrying on of such a business. F Chadwick LJ said at para 46:

> "For my part, I would accept that a business may be found to have been carried on with intent to defraud creditors notwithstanding that only one creditor is shown to have been defrauded, and by a single transaction. The *Cooper Chemicals* case is an example of such a case. G But, if (which I doubt) Templeman J intended to suggest that, whenever a fraud on a creditor is perpetrated in the course of carrying on business, it must necessarily follow that the business is being carried on with intent to defraud creditors, I think he went too far. It is important to keep in mind that the precondition for the exercise of the court's powers under section 332(1) of the 1948 Act—as under section 213 of the 1986 Act—is that it should appear to the court H 'that any business of the company has been carried on with intent to defraud creditors of the company'. Parliament did not provide that the powers under those sections might be exercisable whenever it appeared to the court 'that any creditor of the company has been defrauded in the

© 2023 The Incorporated Council of Law Reporting for England and Wales

A course of carrying on the business of the company'. And, to my mind, there are good reasons why it did not enact the sections in those terms."

93 But this case, together with the decision of Oliver J in *In re Murray-Watson Ltd* (unreported) 6 April 1977 does support the proposition that in order to be liable under section 213 the defendant must have been party to the carrying on of a fraudulent business; and not merely a party to fraud. B I agree with that. What must be established is that the company's business (or a discrete part of that business), taken as a whole, had been carried on fraudulently. Whether that is established in any particular case is a question of fact. Mr Scorey submitted that if the defendant was carrying on his own business, he could not be said to be party to the carrying on of a different business. I do not agree. The extent to which a counterparty must be involved C in the carrying on of the fraudulent business may depend upon the facts. Suppose that a manufacturer regularly supplies counterfeit designer clothes to a retailing company, knowing that the retailer will pass them off as genuine. It is, in my judgment, no misuse of language to describe the manufacturer as "party to the carrying on" of a fraudulent business, even though he exercises no managerial or controlling role within the retailing company; and the manufacturer may have other business activities that are not fraudulent. The D manufacturer knows about the retailer's fraudulent business and is actively participating in it in the sense of furthering and facilitating it. In my judgment, the allegedly odd results are more apparent than real.

94 *Morris v Bank of India* (to which I have already referred) was another case arising out of the collapse of BCCI. BCCI's liquidators brought a claim against the bank alleging that they were knowingly party to the E carrying on by BCCI of a fraudulent business. The real issue in the case was whether the knowledge of a senior manager of the London branch of the Bank of India (referred to as "SBI") could be attributed to that bank. Patten J and this court both answered that question "yes". At first instance [2004] 2 BCLC 236 Patten J said at para 12:

> "Mr Potts also submitted that in order to establish liability under F section 213, it was necessary to prove that SBI, through its officers and agents, was dishonest. This, he submitted, is an essential element of liability under section 213, which stems from the references in the section to the business of the company having been carried on with an intent to defraud. Those words obviously do connote actual dishonesty, and in the case of BCCI this is admitted. But in the case of a secondary party, sought to G be made liable under section 213(2), all that is in terms required is that that party should have knowingly participated in the carrying on of the business with intent to defraud. It is difficult to see how, in practice, a conscious decision to participate in transactions which are known to be fraudulent does not constitute dishonesty, and for that reason I prefer to concentrate on the question whether SBI did in fact know what it was doing."

H 95 In this court [2005] 2 BCLC 328, as Mummery LJ recorded at para 86, the bank accepted that section 213 could apply to a corporate counterparty. This point reappeared at other parts of the judgment:

> "97. Before dealing with the rival arguments on the policy of section 213, we remind ourselves that both civil liability to pay

© 2023 The Incorporated Council of Law Reporting for England and Wales

compensation and criminal sanctions may be imposed on any person who is knowingly a party to fraudulent trading. Both types of liability extend beyond the company which actually carried on its business with intent to defraud creditors and its directors to 'outsiders', meaning individuals and corporate third parties who have knowingly been parties to the fraudulent trading in question." A

"100. It is accepted that 'outsider' companies can be made liable under section 213, provided that it is established they were 'knowingly' parties to the fraudulent trading." B

**96** The court considered the fact that since 1985 criminal liability and civil liability had been split into two different sections. As to that, they said at para 107 that the separation of criminal and civil liability made it easier to isolate and focus on the policy of imposing civil liability. The court discussed the policy underlying section 213, which was the subject of argument. At para 111 the court said: C

"In our judgment Patten J was correct in his analysis of the policy of section 213. Compensation of those who have suffered loss as a result of the fraudulent trading is the paramount purpose of the provisions imposing civil liability to contribute to the loss suffered." D

**97** They added at para 120:

"The application of section 213 requires a special rule of attribution in order to make its self evident policy effective. The policy is to make those who have been parties to fraudulent trading liable to compensate the creditors of the fraudulent company." E

**98** At para 129 the court returned to the inter-relationship between civil and criminal liability. They said:

"the severing of criminal and civil liability for fraudulent trading means that there is no question of any conclusion, in principle or on particular facts, as to civil liability affecting the basis on which criminal liability is assessed." F

**99** The next case to which I should refer is the decision of the Supreme Court in *Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1. The relevant defendants in that case were Jetivia SA (a Swiss company) and a Mr Brunschweiler, its sole director and a resident of France. It was said that they were liable both in conspiracy and dishonest assistance in a breach of fiduciary duty and also under section 213. The allegations against those defendants were not entirely easy to discern from the judgments in the Supreme Court in so far as concerns section 213. But they are set out in more detail in the judgment at first instance of Sir Andrew Morritt C [2014] Ch 52 at para 7. The overall case, like the present one, concerned an MTIC fraud in relation to trading in EUAs. Bilta bought EUAs from Jetivia, free of VAT, and sold them in the UK with VAT at prices net of VAT that were lower than the price they had paid. It was also alleged that the pattern of trading between Jetivia and Bilta was not bona fide or consistent with legitimate commercial trading and that Jetivia knew that its dealings with Bilta were dishonest and part of an MTIC fraud. The particular point raised before the Supreme Court was whether section 213 had extra-territorial effect. The G H

© 2023 The Incorporated Council of Law Reporting for England and Wales

A Supreme Court unanimously held that it did. Most of the case concerned the scope of a defence of illegality. But in their joint judgment Lords Toulson and Hodge JJSC introduced section 213 as follows at para 213:

> “The section provides a remedy against any person who has knowingly become a party to the carrying on of that company’s business with a fraudulent purpose. The persons against whom the provision is directed B are thus (a) parties to a fraud and (b) involved in the carrying on of the now-insolvent company’s business. Many British companies, including Bilta, trade internationally. Modern communications enable people outside the United Kingdom to exercise control over or involve themselves in the business of companies operating in this country. Money and intangible assets can be transferred into and out of a country with ease, as C the occurrence of VAT carousel frauds demonstrates.”

100 They added at para 215:

> “The substance of the section 213 allegation is that the appellants were party to a conspiracy to defraud Bilta in the context of a wider VAT fraud, that they were parties to the conduct of Bilta’s business to that end, and D that Jetivia obtained the proceeds of that fraud. If Bilta’s liquidators establish those allegations after trial, we think it is likely that the court would decide to exercise its jurisdiction under section 213 of IA 1986 against the appellants, their foreign residence notwithstanding.”

101 Although the point does not appear to have been argued, it seems to me that Jetivia’s connection with the MTIC fraud was no more intimate than E that of TFS in the present case.

102 In *Bilta (UK) Ltd v NatWest Markets plc* [2020] EWHC 546 (Ch) Snowden J said at para 186 that the statements of principle in *Morris v Bank of India* were “clear Court of Appeal authority” for the proposition that section 213 is not limited to those who have been involved in the management of the company whose business has been carried on with intent F to defraud, but potentially extends to outsiders who deal with the company.

103 Mr Parker submits that Snowden J was right, and that we are likewise bound by those statements of principle. The judge below took a more nuanced view. He noted at para 76 that the choice between the narrow and the wide construction of section 213 was not argued in this court in *Morris v Bank of India*. He regarded that case as no more than persuasive G authority.

104 In my judgment the judge was correct; and we are not strictly bound by the observations of this court in *Morris v Bank of India*. Whether a subsequent court is bound by a decision of a previous court on a point that was assumed to be correct, but which was not argued, is the subject of comprehensive discussion in *R (Kadhim) v Brent London Borough Council Housing Benefit Review Board* [2001] QB 955. At paras 21 and 22 H Buxton LJ explained that there were several ways in which a proposition of law could become part of the ratio of a case in the sense that it was a necessary step in the court’s reasoning. One such way was by agreement or concession. The important point to note is that Buxton LJ’s subsequent discussion of the authorities is in the context that the proposition of law in

© 2023 The Incorporated Council of Law Reporting for England and Wales

question *is* part of the ratio of the earlier case. After a review of the authorities, Buxton LJ said at para 33:

> "We therefore conclude, not without some hesitation, that there is a principle stated in general terms that a subsequent court is not bound by a proposition of law assumed by an earlier court that was not the subject of argument before or consideration by that court. Since there is no direct Court of Appeal authority to that general effect we should indicate why we think the principle to be justified."

105 He then proceeded to explain the justification for that conclusion. In *R (Youngsam) v Parole Board* [2020] QB 387, to which we were referred, *Kadhim* was cited with approval but only for the method of identifying the ratio of a case. I do not read *Youngsam* as casting any doubt on the proposition stated in *Kadhim* at para 33. Moreover, in the later case of *FSHC Group Holdings Ltd v GLAS Trust Corpn Ltd* [2020] Ch 365 (referring to *Kadhim* among other cases) this court held at para 136:

> "Subsequent authorities have clearly established that the suggestion which attracted the Court of Appeal in *Joscelyne v Nissen* [1970] 2 QB 86 is a correct approach and that a court is not bound by a proposition of law which was not the subject of argument because it was not disputed in an earlier case (even if that proposition formed part of the ratio decidendi of the case)."

106 In my judgment, therefore, there is no authority binding on this court that holds that the wider interpretation of section 213 is correct. As I have said, the judge correctly said that there was no precedent binding on him, but that he should follow decisions of courts of co-ordinate jurisdiction unless persuaded that they were clearly wrong. That is an entirely conventional approach to authority: *Colchester Estates (Cardiff) v Carlton Industries plc* [1986] Ch 80; *In re Cromptons Leisure Machines Ltd* [2007] BCC 214. The judge said at para 79:

> "With that, I turn to Mr Foxton QC's article, which is—unsurprisingly, given the author—compellingly and clearly written. However, despite the critique of the decisions recording a wide approach, I am unpersuaded that that approach is clearly wrong. Indeed, given the fact that a defendant must participate knowingly in order for section 213 to bite, I see the force in Templeman J's dictum that 'a man who warms himself with the fire of fraud cannot complain if he is singed' . . . It seems to me that if this policy is to be unwound, given that it is based on a reading of the section that is a plausible construction (to put it no higher than that), that is something not for me, but for the Court of Appeal. I certainly do not consider the wide reading of the section to be clearly wrong. Rather, it is a perfectly defensible reading of the provision. In the interests of consistency, I therefore conclude that the claim made by the claimants under section 213 is a proper one."

*Approach to interpretation*

107 The modern approach to statutory construction is to have regard to the purpose of a particular provision and interpret its language, so far as

© 2023 The Incorporated Council of Law Reporting for England and Wales

A possible, in a way which best gives effect to that purpose: *Barclays Mercantile Business Finance Ltd v Mawson* [2005] 1 AC 684, para 28. The purpose of section 213 is the compensation of those who have suffered loss as a result of fraudulent trading. It is to make those who have been parties to fraudulent trading liable to compensate the creditors of the fraudulent company: *Morris v Bank of India* [2005] 2 BCLC 328, paras 111 and 120.

B 108 Mr Scorey rightly submits that where contravention of a statutory provision entails both civil and criminal liability, the court should strive to avoid an interpretation which penalises someone where the legislator's intention to do so is doubtful. The difficulty with that submission is this court's conclusion in *Morris v Bank of India* that the statutory severance of criminal and civil liability has had the effect that a decision on the scope of civil liability has no effect on the scope of criminal liability. On the basis that C that conclusion is correct, that leads to the further conclusion that, even if my reading of them is wrong, cases such as *Miles* and *Kellard* do not cut down the scope of civil liability under section 213. Although it might be anomalous for criminal liability to be wider than civil liability, it is not necessarily anomalous for civil liability to be wider than criminal liability, particularly where the statutory provisions are now contained in different D sections and different Acts of Parliament. Moreover, as noted, the criminal offence may be committed even if the company is not in the course of winding up. Quite apart from that, a person with no managerial or controlling role within a company can be convicted of aiding and abetting fraudulent trading. If there is no objection to a person committing a criminal offence by aiding and abetting fraudulent trading, it is hard to see E why there should be any objection to such a person incurring civil liability for the same actions.

109 I am prepared to accept that, as Mr Scorey submitted, at the statutory birth of this form of liability it was seen as principally concerned with removing the protection of corporate personality. It was, as he put it, a form of "veil-piercing" that made company directors liable for the F company's own debts. But I consider that the deliberate widening of the scope of the section following the recommendation of the Cohen Committee, and the substitution of a liability to make contribution to the company's assets in place of a liability for the company's own debts have greatly weakened that link. The purpose of section 213, as it has evolved, is not limited to veil-piercing. It is to secure compensation for those who have G suffered loss as a result of the fraudulent trading. As Dixon CJ explained in the High Court of Australia in *Hardie v Hanson* (1960) 105 CLR 451, 459 (cited by Mr Foxton), the original section:

> "surely must have been to enable the court to remove the protection of the no liability system . . . Now, however, in England the word 'persons' has been substituted for 'directors', a step which doubtless makes such an H explanation of the provision much less cogent, if any longer tenable, in the country of its origin . . ."

110 That explanation has become even less tenable once the Insolvency Act 1986 substituted a liability to make contributions in place of personal responsibility for the company's debts.

© 2023 The Incorporated Council of Law Reporting for England and Wales

111 Mr Scorey referred to an article by Mr Patrick Ussher on the Irish equivalent of section 213: "Fraudulent Trading" (1984) 6 Dublin ULJ 58. He begins by saying that the Irish legislation is "a means by which the cloak of limited liability may be stripped away". But as the author goes on to say:

> "Liability extends to anyone who knew of the fraudulent intent or purpose or part of it; and was party to the acts impugned or any of them. These will commonly be the active directors of the company, but no formal connection with it is in fact necessary."

112 I accept also that, as Mr Scorey submitted, it is a precondition of liability that business has been carried on with fraudulent intent; and that incidental frauds committed in the course of a business are not enough. But it is clear in this case that the claimant companies who orchestrated the MTIC fraud were carrying on business with fraudulent intent. The question is who else can be made liable. As I have noted, the recommendation of the Cohen Committee was that liability should be extended to those who participated "in the fraud". In Mr Ussher's words, liability extends to those who were party to "the acts impugned" (i e the fraud). That does indeed appear to be the position in Ireland. In *O'Keeffe v Ferris* [1997] 3 IR 463 (cited by Mr Foxton) O'Flaherty J (giving the judgment of the Irish Supreme Court) said at p 469:

> "A person cannot be made amenable under the section unless he has actively participated in the management of the company. To impose liability on a shareholder it must be shown that he took part in making management decisions which were intended to defraud creditors. A third party who knowingly participates in an act of fraudulent trading committed by a company's directors (for example, a creditor of the company who accepts payment of his debt out of money which he knows its directors have obtained by fraud) may be compelled personally to restore the money so applied by means of an order under the section: *In re Cooper Chemicals Ltd* [1978] Ch 262."

113 This observation also distinguishes between primary liability and accessory liability. That is the same distinction that, in my view, Hoffmann J drew in *Augustus Barnett*. It is also pertinent to note that the observations of Patten J in *Morris v Bank of India* [2004] 2 BCLC 236 about secondary (or accessory) liability (quoted at para 94 above) were expressly approved by the Court of Appeal (Criminal Division) in *R v Hunter (Peter)* [2023] QB 1, para 128.

114 As I have already said, the phrase "party to" can bear either of the two meanings for which Mr Scorey and Mr Parker respectively contended. It is, in my judgment, more consonant with the purpose of section 213 to interpret that phrase in the wider rather than the narrower sense. It is also more consistent with the line of authority to which I have referred. Any gap between the civil law and the criminal law is filled, in the case of the criminal law, by the offence of aiding and abetting.

115 Mr Scorey emphasised a number of potentially unsatisfactory consequences of adopting the wide interpretation of section 213. First, there

© 2023 The Incorporated Council of Law Reporting for England and Wales

is the question of limitation of actions. Under ordinary circumstances, a dishonest assistant in a breach of fiduciary duty is entitled to the benefit of a six-year limitation period, unlike a true fiduciary: *Williams v Central Bank of Nigeria* [2014] AC 1189. There are good policy reasons, he said, why true fiduciaries should be liable for fraudulent breaches of trust without limit of time, which do not apply to dishonest assistants. By analogy, there may be good reason why time should not begin to run under section 213 until a company is in the course of winding up as against those who were in control of the company's fraudulent business, but those reasons do not apply to those who were no more than dishonest assistants. Even a fraudster is prima facie entitled to the benefit of a limitation period.

**116** Second, there is the question of insolvency set-off under rule 14.25 of the Insolvency (England and Wales) Rules 2016 (SI 2016/1024). If a dishonest assistant is sued in equity, Mr Scorey says that he will be entitled to set off any debt due to him by the company incurred before the onset of liquidation. By contrast, if sued under section 213 no set-off is available both because the liability under section 213 cannot arise until the company goes into liquidation and also because set-off is not available in cases of malfeasance: *Manson v Smith* [1997] 2 BCLC 161. In addition, the court has power to direct that the pari passu principle is to be disapplied as between the company and the person liable under section 213; Insolvency Act section 215(4).

**117** As far as the first of these points is concerned, there is, I think, some force in it. But even on Mr Scorey's formulation of the persons who fall within section 213 there may be some who are not fiduciaries in any real sense. So far as the second is concerned, it will apply to anyone who falls within the scope of section 213 and it does not, in my judgment, provide a basis for adopting a narrow interpretation of that section.

**118** I should make it clear, however, that nothing I say must be taken as setting the outer limits of the scope of section 213. All that we are asked to decide is whether a person cannot fall within the scope of section 213 unless he has a controlling or managerial function within the company. Whether an "outsider" can be said to be party to the carrying on by a company of a fraudulent business may well be a question of fact and degree which requires careful analysis. That question does not arise in this case, because of the settlement agreement.

**119** In concluding his article, Mr Foxton says:

> "In *Hardie v Hanson*, Menzies J described the Australian equivalent of section 213 as 'full of difficulties'. The intervening 60 years have done little to lessen those difficulties, and the extension of section 213 to 'outsiders' as a species of accessory liability has merely served to enhance them. Given the increasing prevalence of cross-border fraud, it is probably unrealistic to expect the judiciary to row back from an interpretation of section 213 which has produced a provision of such protean scope."

**120** I consider that the last sentence is right. I would dismiss this appeal.

© 2023 The Incorporated Council of Law Reporting for England and Wales

*Nathanael and Inline*

**121** Nathanael and Inline differ from the other claimants because there was a substantial period during which both were dissolved before being restored to the register.

**122** In the case of Nathanael, it was struck off and dissolved on 1 February 2011, and restored to the register on the petition of HMRC on 19 March 2012; at which time a winding up order was made. Liquidators were appointed on 19 August 2013.

**123** In the case of Inline it was struck off and dissolved on 7 December 2010 and restored to the register on the petition of HMRC on 8 June 2015; at which time a winding up order was made. Liquidators were appointed on 8 June 2015.

**124** The significance of those facts is potentially two-fold. First, they mean that in the case of those two companies, the liquidator's cause of action did not arise until the company in question was restored to the register and a winding up order made. That is why those claims under section 213 were not statute-barred. But the companies themselves (as opposed to their liquidators) also made claims in dishonest assistance in a breach of fiduciary duty; and, in connection with those claims, relied on section 32 of the Limitation Act 1980 to postpone the running of time. The effect of restoration to the register is relevant to those claims.

**125** Where a company has been restored to the register by court order after being dissolved section 1032 of the Companies Act 2006 provides:

> "(1) The general effect of an order by the court for restoration to the register is that the company is deemed to have continued in existence as if it had not been dissolved or struck off the register.
>
> "(2) The company is not liable to a penalty under section 453 or any corresponding earlier provision (civil penalty for failure to deliver accounts) for a financial year in relation to which the period for filing accounts and reports ended— (a) after the date of dissolution or striking off, and (b) before the restoration of the company to the register.
>
> "(3) The court may give such directions and make such provision as seems just for placing the company and all other persons in the same position (as nearly as may be) as if the company had not been dissolved or struck off the register."

**126** The thrust of the claimants' argument as presented in the skeleton argument is that the effect of section 1032(1) is that the relevant companies are deemed to have continued in existence with the same directors who were in office at the date of dissolution. This consequence was not fact-dependent, but was the proper interpretation of the deeming provision. Applying that interpretation to the facts of this case, the directors in office at the date of dissolution were the wrongdoing directors, whose knowledge of the wrongdoing could not be attributed to the relevant company. It follows that during the period between the dissolution and the restoration, the company could not have discovered the fraud.

**127** But in his oral submissions, Mr Parker submitted in the alternative that no assumption was required to be made about the existence or attributes of any director. In consequence the judge should have found that because, in reality, there was no company in existence and no directors, there

© 2023 The Incorporated Council of Law Reporting for England and Wales

was no one who could, with reasonable diligence, have discovered the fraud. This was, it seems, a point taken before the judge. It was mentioned in the grounds of appeal, but almost disavowed in the skeleton argument. Indeed, TFS prepared its skeleton argument on the basis that this argument had been abandoned. Nevertheless, Mr Scorey did not object to this argument being advanced.

**128** The judge rejected those arguments. He held that it would be contrary to the scheme of the Limitation Act for the time that a restored company spends in enforced non-existence not to count towards the running of time for the purposes of limitation. The only difficulty lay in identifying the person or persons who would have been in control of the company during its enforced non-existence. The judge's answer was that the deeming provision in section 1032 required the assumption that Nathanael and Inline were properly constituted companies during the period of their non-existence and that they had the minimum number of ordinarily competent directors in place. He concluded, therefore, that as in the case of the claims by other claimants, the claims by Nathanael and Inline were also statute-barred.

*Deeming provisions*

**129** The Supreme Court authoritatively stated the approach to statutory deeming provisions in *Fowler v Revenue and Customs Comrs* [2020] 1 WLR 2227, para 27:

> "(1) The extent of the fiction created by a deeming provision is primarily a matter of construction of the statute in which it appears.
>
> "(2) For that purpose the court should ascertain, if it can, the purposes for which and the persons between whom the statutory fiction is to be resorted to, and then apply the deeming provision that far, but not where it would produce effects clearly outside those purposes.
>
> "(3) But those purposes may be difficult to ascertain, and Parliament may not find it easy to prescribe with precision the intended limits of the artificial assumption which the deeming provision requires to be made.
>
> "(4) A deeming provision should not be applied so far as to produce unjust, absurd or anomalous results, unless the court is compelled to do so by clear language.
>
> "(5) But the court should not shrink from applying the fiction created by the deeming provision to the consequences which would inevitably flow from the fiction being real. As Lord Asquith memorably put it in *East End Dwellings Co Ltd v Finsbury Borough Council* [1952] AC 109, 133: 'The statute says that you must imagine a certain state of affairs; it does not say that having done so, you must cause or permit your imagination to boggle when it comes to the inevitable corollaries of that state of affairs.'"

**130** The fifth of these principles deserves some emphasis. Although you must not permit your imagination to boggle at the *inevitable* corollaries of the deemed state of affairs, it does not permit a wide-ranging inquiry into consequences that were merely probable or possible consequences (see, for example, *Secretary of State for Transport v Curzon Park Ltd* [2021] PTSR 1560, para 42).

© 2023 The Incorporated Council of Law Reporting for England and Wales

23-01165-mew Doc 67-3 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (2) Pg 115 of 125



131 That, in my judgment, is the short answer to the claimants' first argument. A
It is not an inevitable consequence of the deeming provision that the directors in office at the date of the dissolution would have remained in office during the whole of the period of what the judge called the companies' enforced period of non-existence if no dissolution had taken place. It is no more than a possible one. In any given case the relevant directors might have died, or become bankrupt, or might have been disqualified from acting as directors. B
Or, if the companies had remained in existence, HMRC might have presented winding up petitions and appointed liquidators earlier than they did. Nor is it an inevitable consequence of the companies' deemed existence that the wrongdoing directors would have persisted in their wrongdoing. Again, it is no more than a possible one. In my judgment, therefore, the conclusion that (irrespective of the facts of any particular case) section 1032(1) requires the assumption that the directors in office at the C
date of dissolution remained in office throughout the period of enforced non-existence is wrong.

132 Equally, I would not subscribe to the judge's view that section 1032(1) required him to assume that there was in place "the minimum number of ordinarily competent directors". That, in my view, is an assumption that the statute does not require, and which is not an D
inevitable consequence of the required assumption.

133 I consider that this approach is consistent with the authorities. But in order to explain them, I need to set out shortly how the statutory framework has developed. A detailed exposition can be found in the judgments of Munby LJ in *Joddrell v Peaktone Ltd* [2013] 1 WLR 784 and Newey LJ in *Bridgehouse (Bradford No 2) Ltd v BAE Systems plc* [2020] E
Bus LR 2025. In *Joddrell* Munby LJ explained:

> "11. The [Companies Act 2006] effected a significant change in the statutory framework. Prior to that, and for many years, successive Companies Acts had distinguished between two different routes to a judicial restoration of a dissolved or struck off company.
>
> "12. The first, which originated in 1900 and thereafter appeared F
> successively in section 242 of the Companies (Consolidation) Act 1908, section 295 of the Companies Act 1929, section 353 of the Companies Act 1948 and section 653 of the Companies Act 1985, conferred on the court a power in defined circumstances, though exercisable for up to 20 years after dissolution, to order the restoration to the register of a company previously struck off by the Registrar of Companies. The effect of such an order was stated as being that the company is 'deemed to have G
> continued in existence as if its name had not been struck off'.
>
> "13. The other, which originated in 1907 and thereafter appeared successively in section 223 of the 1908 Act, section 294 of the 1929 Act, section 352 of the 1948 Act and section 651 of the 1985 Act, conferred on the court a general power, though exercisable only within two years of the date of dissolution of the company, to 'make an order . . . declaring H
> the dissolution to have been void'. The statute provided that 'thereupon such proceedings may be taken as might have been taken if the company had not been dissolved'. Importantly, the 'deeming' provision was not included."

© 2023 The Incorporated Council of Law Reporting for England and Wales

**134** Since the coming into force of the Companies Act 2006, there have been two routes to restoration; namely administrative restoration (sections 1024 to 1028); and restoration by order of the court (sections 1029 to 1032). But importantly the deeming provision on restoration applies in both cases.

*Previous cases*

**135** In *Tyman's Ltd v Craven* [1952] 2 QB 100 a company purported to apply to the county court for the grant of a new tenancy during the period of its dissolution. The hearing was adjourned, and before the resumed hearing the company was restored to the register. This court held by a majority that the effect of the restoration under section 353 of the Companies Act 1948 was that the application was to validate the application retrospectively. The majority (Sir Raymond Evershed MR and Hodson LJ) held that the effect of the restoration was to achieve an "as-you-were position" between the company and third parties. But that, as it seems to me, goes no further than to say that it is a necessary consequence of deeming the continued existence of the company that acts purportedly carried out by the dissolved company during the period of its dissolution must be treated as having been validly done. Jenkins LJ, in the minority, dissented on the ground that it was not a necessary consequence of the statutory hypothesis that the application for the new tenancy be validated, because the company could have continued in existence without making such an application.

**136** In *Joddrell v Peaktone Ltd* [2013] 1 WLR 784 the claimant purported to bring a claim for damages for personal injury against a company which had been dissolved. On learning of the dissolution he applied for the restoration of the company to the register. This court held that the restoration of the company retrospectively validated the action purportedly commenced against the company during the period of its dissolution. As Munby LJ put it at para 29:

> "the effect of the deeming provision was to validate retrospectively what had happened while the company was dissolved, so that once the restoration order was made the company was to be regarded as never having been dissolved."

**137** In essence, the decision in that case was the obverse of that in *Tyman's* case. Acts purportedly carried out (in this case against rather than by the company) were retrospectively validated.

**138** In *Bridgehouse (Bradford No 2) v BAE Systems plc* [2020] Bus LR 306 a company had been struck off and dissolved. During the period of its dissolution a counterparty purported to terminate a contract on the ground that the striking off was an event of default. The company was subsequently restored to the register. Cockerill J held that the termination of the contract was nevertheless valid. As she put it at para 109, the authorities:

> "indicate that the deeming is directed towards the doing or undoing of 'incidents, which if the putative state of affairs had in fact existed, must inevitably have flowed from or accompanied it' or 'consequences which followed from the company having been struck off or dissolved'. It is directed to the direct or automatic effects of the removal from the register."

© 2023 The Incorporated Council of Law Reporting for England and Wales

**139** At para 112 she added: "In my judgment these authorities reflect a line between direct and secondary consequences." A

**140** She concluded:

> "115. Ultimately and despite some discomfort about the position in relation to situations such as automatic forfeiture, I have reached the conclusion that this line between direct and indirect consequences is the line which the statute and the authorities indicate needs to be drawn. B The deeming provision will have very wide application indeed. It will be (as it has been in the authorities) taken to undo the automatic consequences of a removal from the register or dissolution which is later undone in circumstances to which the deeming provision applies.
>
> "116. But there will be situations where consequences arise which are not automatic. A lease will become forfeit not because of the fact of C the dissolution, but because, either consequent on that dissolution or independently of it, the lessee does not pay its rent. A contract will be repudiated for a similar reason and that repudiation will be accepted—as happened in [*Contract Facilities Ltd v Rees* [2002] EWHC 2939 (QB)]. Or, as in this case, a contractual party will have a choice as to whether to terminate a contract simply because of the removal from the register. The termination will not flow from, or be automatically a consequence of D dissolution. It will occur where the party decides to make that decision and takes the step necessary to bring about that termination. Such consequences are, in my view, outwith the deeming provision."

**141** Cockerill J's conclusion reflects my own; and, in particular that it is only the inevitable consequences of restoration that count.

**142** A multiplicity of issues arose in *Davies v Ford* [2020] EWHC 686 E (Ch). One of them was whether the effect of the restoration of a company was that the directors who were in office at the date of the dissolution were deemed to have continued in office during the period of dissolution. Mr Adam Johnson QC (sitting as a deputy High Court judge) held that the answer was "no". He gave a number of reasons for his conclusion:

(i) Directors have separate legal personalities from the company and their F liability is not obviously within the deeming provision: para 387.

(ii) The argument, if correct, would lead to anomalous and unnecessary consequences: para 388.

(iii) The duties of a director are linked to his ability to exercise statutory powers; and it makes little sense to construe the deeming provision in a manner which automatically and retrospectively deems a person to have G been subject to those duties during a period when he was unable to exercise the corresponding powers: para 391.

(iv) Policy requires a person to know, at any given time, whether or not he is subject to onerous fiduciary duties: para 392.

(v) If the circumstances require the deemed effect of restoration to be broadened, that can be achieved by a direction under section 1032(3): para 394. H

**143** I consider that these reasons are compelling. Indeed the crux of the claimants' first argument under this head depends on the proposition that a company and its directors are separate legal persons with the consequence that, on the facts of this case, the knowledge of the wrongdoing directors

© 2023 The Incorporated Council of Law Reporting for England and Wales

cannot be attributed to the companies. But the conclusion that they seek to draw about the effect of the deeming provision in section 1032(1) blurs (or even obliterates) that well-established distinction.

*Direction under section 1032(3)*

**144** In particular, I agree with Mr Johnson QC that any potential injustice in that conclusion is readily capable of being prevented by an application for a direction under section 1032(3). That, to my mind, is clear from the purpose identified in section 1032(3); namely "for placing the company and all other persons in the same position (as nearly as may be) as if the company had not been dissolved". It is through the application of section 1032(3) that questions of limitation are usually addressed: *Hawkes v County Leasing Asset Management Ltd* [2016] 2 BCLC 427, para 3; *Bridgehouse (Bradford No 2) Ltd v BAE Systems plc* [2020] Bus LR 2025 at para 26. It is in this way that the court can balance the prejudice to the company in not having been able to begin proceedings and the prejudice to third parties who might be deprived of what would otherwise be a limitation defence.

**145** The starting point here is that time runs against a dissolved company in the same way as it runs against an extant company: *County Leasing* at para 30. The court has power under section 1032(3) to direct an extension of the limitation period in favour of a company which has a potential claim; but that power is exercisable only where the dissolution of the company was the real cause of its being disabled from pursuing its claim. If the court concludes that it would probably have failed to pursue its claim in time anyway, then the causative prerequisite implied in section 1032(3) is missing: *County Leasing* at para 30. It is not simply a question of putting back the clock to the date of dissolution, but of requiring the court to ask what would have happened thereafter, during the period of dissolution, if dissolution had not occurred: *County Leasing* at para 33.

**146** The answer to that question is not, in my judgment, a matter of speculation or assertion: it is a question of evidence, to be decided by the court on the balance of probabilities: *Davy v Pickering* [2017] Bus LR 1239, paras 60 and 71.

**147** If the company can show that it is probable that, but for the dissolution, it would have begun proceedings in time, the court has a discretion whether to make a direction under section 1032(3). However, considerations of fairness will generally require that the company, like any other claimant faced with a limitation defence, should be left to meet that defence by recourse to the statutory regime in the Limitation Act 1980, rather than by a direction under section 1032(3): *Regent Leisuretime Ltd v NatWest Finance Ltd (formerly County Natwest Ltd)* [2003] BCC 587, para 90.

**148** Equally, as held in *Davy v Pickering*, where the limitation direction is sought by a potential claimant against a restored company, that potential claimant must show a clear causal link between the company's dissolution and his failure to bring proceedings within the applicable limitation period. No distinction is drawn between the company and third parties. The question is whether the claimant has proved, on the balance of probabilities,

© 2023 The Incorporated Council of Law Reporting for England and Wales

that if the company had remained in existence he would have brought his claim in time. That is a question of fact, to be decided on the evidence.

**149** In addition, it is clear that a limitation direction under section 1032(3) should not place a person in a better position than they would have been if there had been no dissolution: *Davy v Pickering* at para 40.

*No directors?*

**150** The alternative way of putting the case is that there were no directors during the period of the company's non-existence. But this, too, seems to me to require a positive assumption to be made which the section does not require. The section requires an assumption to be made about the company, not about the absence or presence of directors. In addition, it must be firmly borne in mind that the context in which the question arises is the postponement of the limitation period under section 32 of the Limitation Act 1980. Where the claimant relies on that section, the burden lies on him to prove on the facts that he could not with reasonable diligence have discovered the fraud. That is a question of fact. The claimants failed to discharge that burden.

**151** In my judgment, the approach of the court in relation to the making of a direction under section 1032(3) should also inform the approach to the interpretation and consequences of section 1032(1). The three particular points are: first the company's dissolution must have been the real cause of the company being unable to pursue its claim (*County Leasing*); second, the company should not be in a better position under section 1032 than it would have been if it had not been dissolved; and third what would have happened if the company had remained in existence is a question of fact (*Davy v Pickering*). These are all questions to be decided on the evidence, and not on legal assumptions.

**152** It does not appear to me that at trial the claimants attempted to advance the evidential case that would have demonstrated what would have happened if the relevant companies had not been dissolved; and that would have discharged the burden of proof. That, to my mind, also disposes of the claimants' secondary complaint under this head. They assert that the judge ought to have considered whether an ordinarily competent director of Nathanael and Inline respectively could have discovered the fraud at the same time as the liquidators could have done. The argument is that such a director did not have the investigatory powers possessed by an office holder. The difficulty with this argument is that the evidential case was not made; and the skeleton argument in relation to this ground of appeal deals with the argument in a single paragraph. The appellant's notice does not ask for a new trial on this point. It would be quite impossible, in my judgment, for this court to make any findings of fact that would be necessary to sustain this argument.

**153** I would dismiss this appeal.

*The costs appeal*

**154** The claim form was issued against TFS on 8 November 2017. The trial was due to begin in January 2021, but it was adjourned because of the illness of a crucial witness. But on 21 February 2022 the parties entered into

© 2023 The Incorporated Council of Law Reporting for England and Wales

a confidential settlement agreement which, among other things, provided for the judge to determine the substantive issues relating to the limitation defence and section 213, and also the costs of the whole proceedings. It is important to note that in the settlement agreement TFS did not admit liability; and that it agreed to pay a proportion of the amount claimed by each claimant if it were established that any of the claims succeeded either on the limitation issue or the section 213 issue. In the event, three claimants (Bilta, Weston and Vehement) failed to establish any valid claim and thus obtained nothing under the settlement agreement. Nathanael and Inline's claim for dishonest assistance in a breach of trust failed on limitation under section 32 of the Limitation Act 1980; but succeeded under section 213.

155 The judge had been the "docketed judge" in relation to the action, and had dealt with various matters of case management. He also, of course, heard the trial of the issues that the settlement agreement did not resolve. The judge approached the question of costs by saying that a bright line needed to be drawn between the costs incurred before the settlement agreement and the costs incurred subsequently. The former constituted the vast bulk of the costs. It is important to note that, as the judge recorded at para 9 of the costs judgment, neither side argued that the usual rule (costs follow the event) should be applied. Each party argued for an issues-based costs order.

156 The judge rejected the claimants' argument that they were the successful parties because they had recovered a substantial amount of money. He considered that it was a case in which he could not form a view about who would have won if the whole case had gone to trial. The payment that TFS agreed to make (without admission of liability) arose by way of settlement, not by a finding of liability and provided no element of vindication or indication of outcome. He concluded in [2022] EWHC 1431 (Ch) at [20]:

> "I cannot possibly proceed on the basis that TFS would have lost at trial. Nor can I say that simply because the settlement contained certain provisions, a consequence of making those concessions was that costs should be paid by TFS."

157 He therefore decided that this was not a case in which costs should follow the event. He then considered whether he should make an issues-based order, by "reading across" the parties' success or failure on the issues which he did decide in his substantive judgment. He considered that it was wrong to allow the issues on which there had been success or failure to inform the issues which could not be assessed one way or the other. In relation to the pre-settlement costs, he concluded at para 28:

> "As regards pre-settlement costs, the proper starting point is that there should be no order as to costs, and that each party should bear their own. That is because I cannot decide who would have won because there was no determination, and the settlement does not assist."

158 He made an adjustment to that, by allowing the claimants 7.5% of their pre-settlement costs to reflect the fact that, at TFS's behest, there had been two adjournments of the trial.

© 2023 The Incorporated Council of Law Reporting for England and Wales

23-01165-mew Doc 67-3 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (2) Pg 121 of 125



**159** As regards the post-settlement costs he made an order that TFS should have its costs of the limitation defence, and the successful claimants should have their costs of the section 213 issue. A

**160** There is no appeal against the judge's decision as regards post-settlement costs. The judge himself gave permission to appeal against his decision on pre-settlement costs.

**161** It goes almost without saying that a first instance judge has a very wide discretion (a) whether to make any order for costs at all and (b) if so, what order to make. An appeal court can only interfere on very limited grounds. As Wilson J (sitting in this court) explained in *SCT Finance Ltd v Bolton* [2003] 3 All ER 434, para 2: B

> "This is an appeal brought with leave of the single Lord Justice from the county court in relation to costs. As such, it is overcast, from start to finish, by the heavy burden faced by any appellant in establishing that the judge's decision falls outside the discretion in relation to costs conferred upon him under CPR r 44.3(1). For reasons of general policy, namely that it is undesirable for further costs to be incurred in arguing about costs, this court discourages such appeals by interpreting such discretion very widely." C

D

**162** The question is not, therefore, whether we would have made the same order for costs as the judge, nor even whether we disagree with it. The question is whether the judge exceeded the wide discretion that the law gives him.

**163** Moreover, where the first instance judge has determined costs in a case in which the parties have settled their dispute (apart from costs) an appeal court is even more reluctant to interfere. E

**164** In a case in which the judge decides costs after settlement it has been said that an appeal court will only interfere if the judge's decision is "manifestly unjust". That test was first proposed by Mummery LJ (with whom Brooke LJ expressly agreed) in *BCT Software Solutions Ltd v C Brewer & Sons Ltd* [2004] FSR 9, para 9. The appeal in that case was dismissed because the judge's order was "not manifestly unjust in all the circumstances": para 20. That test was approved by this court in *Venture Finance plc v Mead* [2006] 3 Costs LR 389, paras 25 and 34; *Promar International Ltd v Clarke* [2006] EWCA Civ 332 at [35] and *Bray (trading as The Building Co) v Bishop* [2009] TCLR 9, para 5. In *Patience v Tanner* [2016] 2 Costs LR 311, para 33 Gross LJ questioned whether the reference to "manifest injustice" imposed a further threshold requirement, but was content to proceed as if it did. But as David Richards LJ pointed out in *Powles v Reeves* [2017] 1 Costs LR 19, para 25 the decisions in *Venture Finance plc v Mead* and *Bray v Bishop* do not appear to have been cited in *Patience v Tanner*. In *Powles v Reeves* David Richards LJ confirmed at para 26: F G

> "However the approach is expressed, I consider that these authorities show that an appellate court will be even more reluctant than in the case of a costs order after a contested hearing to interfere with a costs order made at the request of the parties after they have settled the substantive issues between them." H

© 2023 The Incorporated Council of Law Reporting for England and Wales

**165** The claimants do not criticise the judge for having distinguished so sharply between pre-settlement and post-settlement costs. But they argue that the judge did indeed make an error of principle in relation to the pre-settlement costs. They say that because the outcome of the litigation was that TFS ended up "writing the cheque" the claimants were the successful party. Even though the judge might not have been able to decide who would have won on liability if the whole case had gone to trial, nevertheless this was a case where the terms of the settlement agreement contained the answer.

**166** In the *BCT* case, for example, Mummery LJ said at para 7:

> "The judge has a discretion to decline to do what the parties ask him to do. If, on the one hand, the action is for damages, it will be relatively easy for the judge to tell from the size of the settlement sum and from the litigation history (offers, payments in and so on) how the costs should be borne. As I have already said, it would be relatively unusual for the parties themselves not to agree on the costs of such cases. In more complex cases, however, involving a number of issues and claims for discretionary equitable relief, the costs position is much more difficult for the judge to resolve without actually trying the case."

**167** In *R (M) v Croydon London Borough Council* [2012] 1 WLR 2607 Lord Neuberger of Abbotsbury MR differentiated between cases where the claimant had achieved all the relief that he sought, and cases in which the claimant had achieved part of the relief he sought. In the latter kind of case, he said at para 50:

> "The outcome will normally be different in cases where the consent order does not involve the claimant getting all, or substantively all, the relief which he has claimed. In such cases the court will often decide to make no order for costs, unless it can without much effort decide that one of the parties has clearly won, or has won to a sufficient extent to justify some order for costs in its favour. Thus the fact that the claimant has succeeded in obtaining part of the relief he sought may justify his recovering some of his costs, for instance where the issue on which the claimant succeeded was clearly the most important and/or expensive issue. But in many such cases the court may consider that it cannot fairly award the claimant any costs because, for instance, it is not easy to assess whether the defendants should have their costs of the issue on which the claimant did not succeed, and whether that would wipe out the costs which the claimant might recover in relation to the issue on which he won."

**168** He added at para 62:

> "I would accept the argument that, where the parties have settled the claimant's substantive claims on the basis that he succeeds in part, but only in part, there is often much to be said for concluding that there is no order for costs."

**169** *Gossage v Bishton* [2012] EWCA Civ 717 is another example of a case in which the achievement of partial success in a compromise resulted in no order for costs.

© 2023 The Incorporated Council of Law Reporting for England and Wales

170 Mr Parker also relied strongly on the decision of this court in *Langer v McKeown* [2022] 1 WLR 1255. That was a case of a petition for unfair prejudice brought under section 994 of the Companies Act 2006. There was a split trial of liability which was to be followed by the question of valuation if a buy-out order was made. The judge hearing the trial made an order for costs. The argument raised on appeal was that since the respondent had made a global *Calderbank* offer the judge was wrong not to have deferred the question of costs until after the second trial. This court rejected that argument. Whether to make a costs order was within the discretion of the judge. It is perfectly true that at para 37 Green LJ said that:

> "there is a general 'salutary' rule that costs follow the issue rather than the 'event'. This is because an overly robust application of a principle that costs should follow the final event discourages litigants from being selective as to the points they take in litigation and encourages an approach whereby no stone or pebble, howsoever insignificant or unmeritorious, remains unturned . . ."

171 But that was in the context of a split trial; and the actual decision in that case was that the costs order that the judge in fact made was within the ambit of his discretion. The court did not say that he would have been wrong to have approached the question of costs differently. In my judgment, Mr Parker's reliance on that case seeks to confine a judge's discretion over costs impermissibly.

172 Here, the claimants say, the action was for the recovery of money, and the claimants recovered a substantial sum. The judge should have been able to tell from the size of the settlement sum how the costs should be borne. It was not necessary (and was an error of principle) for him to have considered who might have won at trial if all the issues had been litigated. The claimants therefore argue that they should recover all their costs down to the date of the settlement agreement. Although I consider that there is considerable force in the argument that the terms of the settlement may in some cases provide a good proxy for deciding who is the successful party without having to second guess the result of a contested trial, this is not, in my judgment, a case of complete success, but of partial success. In addition it is, I think, necessary to consider the judge's costs order in the round in order to decide whether it was "manifestly unjust".

173 The result of the claimants' argument would produce the result that three claimants (Bilta, Weston and Vehement) whose claims failed completely would recover the bulk of their costs. That proposition only has to be stated in order to be seen to be unjust. This was not a case in which all costs were common costs. Substantial costs were incurred by TFS on individual claims by the individual companies. In addition, in relation to all the claimants, TFS won on a very substantial issue, namely the limitation defence. That entailed a detailed examination of the facts (unlike the section 213 issue which was a question of law). It could not be right that the claimants should recover their pre-settlement costs of that issue on which they all failed. Mr Parker was willing to accept that the claimants should not

© 2023 The Incorporated Council of Law Reporting for England and Wales

recover the costs of preparing Mr Hellard's witness statement on that issue, but there would no doubt have been other costs incurred in relation to that issue (for example, statements of case, disclosure and inspection of documents). There would also have been costs incurred on the question of quantum which were overtaken by the settlement agreement. If one were to apply the principle that the unsuccessful party pays the successful party's costs, and did not disaggregate the individual claimants, it might well be that TFS would recover three fifths of their costs, and Nathanael and Inline (or their liquidators) would recover all their costs, apart from the costs (both pre-settlement and post-settlement) of the limitation issue. Although the judge did not approach it in quite this way, netting those costs off, one can see how the judge could have arrived at the decision he did.

**174** As Lord Neuberger said in *Croydon*, in cases of partial success it may not be easy to assess whether the defendants should have their costs of the issue on which the claimant did not succeed, and whether that would wipe out the costs which the claimant might recover in relation to the issue on which he won.

**175** It is also worth examining the *BCT* case [2004] FSR 9 a little more closely. *BCT* was a claim for copyright infringement. Shortly after the trial began the parties settled on terms that BCT should recover £10,000. The judge was invited to determine costs. He made a complex costs order to reflect the fact that BCT had radically amended (and narrowed) its claim a month before trial. The only part of his order that was appealed was his decision that BCT should pay 62.5% of Brewer's costs after the amendment. This was, then, a case in which BCT did recover a sum from Brewer. At para 18 Mummery LJ said that if he had been the judge, he could probably have made no order for costs. Chadwick LJ said at para 27 that he agreed with Mummery LJ that the judge could not have been criticised if he had decided to make no order. Accordingly, even where the claimant does recover money from the defendant, a judge is not necessarily wrong in making no order for costs.

**176** The *Venture Finance* case [2006] 3 Costs LR 389 was a claim under a guarantee against two guarantors. The amount claimed was just under £300,000. Shortly before the claim was due to be heard the two guarantors agreed to pay £92,500 each. The judge made an order for costs. Although this court made an order for costs (which differed from the judge's order), Chadwick LJ said at para 12:

> "At first sight the present case was one in which the judge would have been entitled—indeed, I would say well advised—to decline to make any order as to costs. The claimant had obtained judgment (by consent) for less than one third of the amounts which it had been claiming in the application for summary judgment. There was nothing which enabled the judge to decide whether the claimant had been willing to settle at less than the amount claimed because it accepted that it could not prove the amount of funds in use on which the claim was based or because it accepted that the liability of each defendant was capped at the £100,000 limit. It is pertinent to keep in mind that the defendants had accepted, on the pleadings, that they were each liable up to £100,000 to the extent that the claimant could prove loss in that amount. It was impossible—as it

© 2023 The Incorporated Council of Law Reporting for England and Wales

seems to me—to say that one party had obviously won and the other party had obviously lost."

177 *Capita (Banstead 2011) Ltd v RFIB Group Ltd* [2017] 4 Costs LR 669 is another case in which despite the fact that the claimants recovered a substantial sum the judge was entitled to make no order for costs, in view of the fact that they lost on one important issue. Thus even in a case where the claim was for money, and the claimant had recovered a substantial sum, it would not have been an error of principle for the judge to have declined to make an order for costs. The mere fact that one party pays money to another does not necessarily mean that the receiving party is the successful party, particularly in a case of a group of claimants pursuing individual claims, some of whom succeed and some of whom fail: *Kupeli v Kıbrıs Türk Hava Yolları Şirketi (trading as Cyprus Turkish Airlines)* [2019] 1 WLR 1235.

178 In my judgment, the judge's decision on pre-settlement costs did not fall outside the generous ambit of his discretion. I would dismiss this appeal.

*Result*

179 I would dismiss all the appeals.

**STUART-SMITH LJ**

180 I agree.

**FALK LJ**

181 I also agree.

*Appeals dismissed.*
*Cross-appeal dismissed.*

24 July 2023. The Supreme Court (Lord Briggs, Lord Kitchin and Lord Hamblen JJSC) allowed applications by the third and fifth claimants and the defendant for permission to appeal.

ALISON SYLVESTER, Barrister

© 2023 The Incorporated Council of Law Reporting for England and Wales