# Exhibit B Cont.

# *Enigma Diagnostics Limited (in liquidation) v Boulter* (Unreported, 8 February 2022)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 226 OF 2021 (DDJ)**

**IN THE MATTER OF THE COMPANIES ACT (2021 REVISION)**

**AND IN THE MATTER OF PORTON CAPITAL INC AND PORTON CAPITAL LIMITED**

**ENIGMA DIAGNOSTICS LIMITED (IN LIQUIDATION)**

**Petitioner**

**AND**

**HARVEY BOULTER**

**Respondent**

| | |
|---|---|
| **Appearances:** | Charles Samek QC, Peter Hayden and Jonathan Moffatt of Mourant Ozannes (Cayman) LLP for Enigma Diagnostics Limited (in liquidation), the Petitioner<br>David Quest QC, Peter Tyers-Smith and Ilona Groark of Kobre & Kim (Cayman) for Harvey Boulter, the Respondent |
| **Before:** | The Hon. Justice David Doyle |
| **Heard:** | 3 February 2022 |
| **Date Extempore Judgment delivered:** | 3 February 2022 |
| **Draft transcript of Judgment circulated:** | 3 February 2022 |
| **Date transcript of Judgment approved:** | 8 February 2022 |

GRAND COURT
FINANCIAL SERVICES DIVISION
CAYMAN ISLANDS

**HEADNOTE**

*Determination of application to strike out pleadings - application for case management stay and application to strike out affidavit evidence - pleading fraud*

**JUDGMENT**

**Introduction**

1. The Respondent in this case by summons dated 14 December 2021 (the "Summons") applies for orders under Order 18 rule 19 of the Grand Court Rules, alternatively under the inherent jurisdiction of the court, that the Petitioner's pleadings be struck out on the grounds that:

   a. the Petitioner has confirmed that it does not intend to present evidence with a view to proving the existence of fraud in relation to the "Enigma Investment Scheme" referred to in the Petitioner's pleadings;

   b. if the Petitioner is not alleging and/or seeking to prove such fraud, then the Petitioner's pleadings disclose no reasonable cause of action and/or the inclusion of allegations relating to or arising out of the Enigma Investment Scheme is (i) scandalous, frivolous or vexatious; (ii) may prejudice, embarrass or delay the fair trial of the action; and/or (iii) is otherwise an abuse of the process of the court.

2. Alternatively the Respondent requests that the proceedings be stayed until there is a final order in the proceedings commenced in the High Court in England by the Petitioner against the Respondent, DLA Piper UK LLP and Charles Cook (claim number BL-2021-001208).

3. If the proceedings are not struck out or stayed the Respondent in the Summons asks that the Petitioner provides security for the Respondent's costs in the amount of US$1,175,901.50 (paragraph 3a. of the Summons) and that the third affidavit of Paul David Allen sworn on 3 December 2021 be struck out (paragraph 3b. of the Summons). The Respondent no longer seeks an order for security for costs, but there is apparently an argument as to the costs of the security for costs part of the Summons.

**Appearances**

4. David Quest QC and Peter Tyers-Smith and Ilona Groark of Kobre & Kim (Cayman) appeared for the Respondent. Charles Samek QC and Peter Hayden and Jonathan Moffatt of Mourant Ozannes (Cayman) LLP appeared for the Petitioner.

**Submissions**

5. I have considered the concise skeleton argument of the Respondent and the concise written submissions of the Petitioner and the oral submissions presented to the court today. I do not set them all out in detail in this relatively short extempore judgment, but I have full regard to them.

6. Mr Quest's main submissions were as follows:

(1) the court cannot fairly make a finding at trial that Mr Boulter knew that Porton Capital Inc. and Porton Capital Limited (the "Porton Companies") had debts arising out of the so-called Porton Claims without at least some consideration of the merits of those claims. This presents a fundamental problem as the Petitioner's pleadings deliberately seek to avoid engaging with that issue;

(2) the Petitioner's decision to pursue the present proceedings without pursuing the allegations made about the Enigma Investment Scheme and the involvement in it of the Porton Companies and/or Mr Boulter in the English proceedings and before any findings have been made about them, gives rise to a fatal problem. In such circumstances there can be no proper basis for the allegation that Mr Boulter knew that the claims intimated as arising from the scheme constituted debts of the Porton Companies. The court must be satisfied that the claims had at least the requisite degree of substance and were not just unsubstantiated assertions or complaints;

(3) the allegation that the existence of the Porton Claims made the declarations of solvency fraudulent cannot succeed on the current state of the pleadings and nor can the similar allegation about the letters signed by Mr Boulter on the same day;

GRAND COURT FINANCIAL SERVICES DIVISION CAYMAN ISLANDS

(4) the other allegations of fraud should be struck out for the same reasons as each is dependent on the court finding that Mr Boulter knew that the Porton Companies were indebted in relation to the alleged Porton Claims, or that he was reckless as to that;

(5) paragraph 9 of the Amended Particulars of Fraud is defective as there is no allegation that what was said was true or correct or gave rise to any liabilities of the Porton Companies;

(6) paragraph 10 of the Amended Particulars of Fraud was likewise defective because there was a missing step namely whether these gave rise to any liability;

(7) similar arguments are applicable to the other sections of the Amended Particulars of Fraud;

(8) the pleading ignores the issue as to whether the Porton Claims were good claims or had a sufficient degree of merit or substance;

(9) there is an incomplete chain of reasoning in the pleading; and

(10) the Petitioner cannot properly separate the issues in respect of the Enigma Investment Scheme from the issues in respect of the alleged fraud in the liquidation.

**Law and procedure**

7. I record that I also have regard to the relevant law and procedure as outlined by the attorneys appearing for the parties including Order 18 rule 19 of the Grand Court Rules.

**Determination**

8. I dismiss the Summons for the following reasons.

9. The court's power to strike out should only be exercised in a plain and obvious case (*Three Rivers DC and others v Bank of England (No3)* [2003] 2 AC 1 at page 77E). This is not a plain and obvious case. Based on what I have read and heard I am not persuaded that the Petitioner's currently pleaded case cannot succeed. It is far more appropriate to permit these proceedings to proceed to trial in early March and to reach judgment on the claim after having heard relevant evidence and considered detailed submissions.

10. I entirely accept that it is trite law that fraud must be expressly and specifically pleaded. It is often said that fraud must be distinctly alleged and distinctly proved. Allegations of fraud must always be properly particularised. There must be relevant particulars where the court is being asked to draw an inference, setting out the facts alleged from which the inference can be drawn. Those making serious allegations of fraud cannot proceed on Mr Micawber's optimistic belief that something will turn up. Mr Quest referred the court to paragraphs 183 to 185 of Lord Millett's judgment in *Three Rivers* and paragraphs 145 to 148 of Mrs Justice Cockerill's judgment in *King v Stiefel* [2021] EWHC 1045 (Comm). It is right that pleadings of fraud must be subjected to close scrutiny. Fraud and any necessary suggested inferences which justify and support such a plea must be properly pleaded out with some particularity, see Parker J in *Ritchie Capital Management LLC v Lancelot Investors Fund Ltd* (FSD; judgment 15 December 2020) especially at paragraphs 84 and 85.

11. With these principles in mind, as long ago as 10 September 2021, I made an order that the Petitioner file and serve particulars by 17 September 2021 in support of its contention that the proceedings for the voluntary liquidation and dissolution of the Porton Companies are to be set aside for fraud. 9 pages of Particulars of Fraud dated 17 September 2021 were subsequently provided and an 8 page pleaded Response dated 15 October 2021 followed. With leave, the Petitioner produced on 20 January 2022 Amended Particulars of Fraud (some 11 pages) and the Respondent's Amended Response dated 28 January 2022 (some 11 pages) followed. I have considered the pleadings for the purposes of determining the Summons.

12. In my judgment the allegations of fraud are adequately pleaded in the Amended Particulars of Fraud and the Respondent knows the case he has to meet and he can properly continue to prepare for the trial in March. A summary of the Petitioner's case in fraud is contained at

GRAND COURT
FINANCIAL SERVICES DIVISION
CAYMAN ISLANDS

paragraph 5 of the Amended Particulars of Fraud and the details of the Petitioner's case follow in the remaining sections of the pleading.

13. Paragraph 5 of the Amended Particulars of Fraud summarises the Petitioner's position as to why the dissolutions of the Porton Companies are void and/or should in any event be set aside because of the Respondent's fraud in the following way:

(1) The Respondent made fraudulent declarations of solvency and/or fraudulent misrepresentations that the Porton Companies had no contingent liabilities, potential creditors, or unrecognised claims;

(2) The Respondent acted in fraudulent breach of his fiduciary duties owed to the Porton Companies in the course of the process leading up to their dissolutions;

(3) The Respondent made fraudulent misrepresentations to the JVLs during the course of the voluntary liquidations; and/or

(4) The Respondent fraudulently approved the final report and accounts of the Porton Companies.

14. There then follows detailed particulars under various section headings namely:

(1) Fraudulent Declarations of Solvency (some 5 pages);

(2) Fraudulent breach of fiduciary duties owed to the Porton Companies (1 page);

(3) Fraudulent misrepresentations to the JVLs (2 pages); and

(4) Fraudulent approval of the Final Accounts (1 page).

15. It is correct that at paragraph 8 of the Amended Particulars of Fraud the Petitioner does plead that, at the time the Respondent made the declarations and/or representations, claims had been initiated against the Porton Companies arising from the Enigma Investment Scheme (which

GRAND COURT
FINANCIAL SERVICES DIVISION
CAYMAN ISLANDS

scheme is described at paragraphs 14 to 25 of the petition) "as well as from investments in other companies promoted by the Porton Companies" but the Petitioner does not plead that the Enigma Investment Scheme was fraudulent and does not invite the court to make any findings of fraud in respect of the Enigma Investment Scheme. Paul David Allen, one of the joint liquidators of the Petitioner, in his third affidavit sworn on 3 December 2021 at paragraph 8 states:

> "For the avoidance of doubt, this affidavit does not seek to present evidence with a view to proving the existence of fraud in relation to the Enigma Investment Scheme. I understand that this is a separate issue which is the subject of the proceedings in England. This affidavit (and indeed the Petition) is concerned only with the narrow issue of whether Mr Boulter's actions in relation to the liquidations and dissolutions of the Porton Companies amount to a fraud in those liquidations."

16. It is clear that the Petitioner is not asking the court to make any findings that the Enigma Investment Scheme was conducted fraudulently and I am not presently persuaded that its failure to do so means that its pleaded claim gives rise to a "fatal problem" to the extent that the Petitioner's pleadings must be struck out. The Petitioner's case is that it does not need to prove the existence of a fraud in relation to the Enigma Investment Scheme as all it is required to do is to prove that there was a fraud in connection with the voluntary liquidation, full particulars of which it has pleaded.

17. In my judgment, the best place to fairly and properly consider whether the Petitioner has a valid case is at the trial after consideration of the relevant evidence and detailed submissions. This case is not suitable for summary determination by way of a strike out. The hearing of the Summons is not the place for a mini-trial. At the trial I shall consider the pleadings, the evidence, the law, the detailed submissions and come to a conclusion as to whether the Petitioner is entitled to the relief it seeks. This should not be a complicated or unduly protracted process.

18. This case is fit to go to trial. On the basis of what I have read and heard to date I cannot say that it is bound to fail. The allegations of fraud are not unsustainable or inadequately pleaded. At this summary stage it is not plain and obvious to me that the Amended Particulars of Fraud

GRAND COURT
FINANCIAL SERVICES DIVISION
CAYMAN ISLANDS

should be struck out on the basis, as alleged on behalf of the Respondent, that they fail to plead a coherent and sufficient case of fraud against the Respondent.

19. Moreover I have not been persuaded that the Petitioner's pleading insofar as it includes reference to the Enigma Investment Scheme is (a) scandalous, frivolous or vexatious; (b) may prejudice, embarrass or delay the fair trial of the action; and/or (c) is otherwise an abuse of the process of the court, such that it should be struck out.

20. It may be that the Petitioner will be able to persuade the court to grant the relief it seeks. It may be that the Respondent will be successful in his attempts to defeat the petition. The less said about all that at this stage the better. What is clear to me at this pre-trial stage, however, is that this court should not, on a summary determination basis, make orders preventing the trial from going ahead in early March.

21. I do not take the view that to proceed to trial based on the existing pleadings would, in some way, be unfair to the Respondent. The Respondent knows the case he has to meet and can properly prepare in respect of the allegations of fraud as pleaded. Nothing in the arguments so eloquently presented by Mr Quest on the Respondent's behalf persuades me that it would be wrong or somehow unfair to let this case proceed to trial.

22. As to the alternative case management stay relief claimed, I am not persuaded that there is any good reason to stay these proceedings in the Cayman Islands pending the determination of the proceedings in England. The jurisdiction to grant such case management stays is only exercised in rare and compelling circumstances which do not exist in this case. It is well established that such exceptional jurisdiction should be exercised with caution and only for very good reason (*Nanfong International Investments Limited* 2018(2) CILR 321). I have not been persuaded that there is a good reason let alone a very good reason for granting such a stay in the circumstances of this case. I am not persuaded that a case management stay would better serve the interests of justice (*Unwired Planet International Ltd v Huawei Technologies (UK) Co Ltd* [2020] UKSC 37 at paragraph 99). These proceedings in the Cayman Islands should not be unduly delayed and do not need to await the outcome of the proceedings in England. The interests of justice are best served by proceeding to trial in March.

GRAND COURT
FINANCIAL SERVICES DIVISION
CAYMAN ISLANDS

23. Furthermore I am not persuaded that I should strike out the third affidavit of Paul David Allen sworn on 3 December 2021. It contains, on the face of it, some relevant factual information and exhibits documentation that, on the face of them, may well assist the court in the fair and just determination of the issues before it at the hearing in March 2022.

24. The grounds for the application to strike out the third affidavit of Paul David Allen sworn on 3 December 2021 were not specified in the Summons and wisely did not make an appearance in the skeleton argument of the Respondent dated 25 January 2022. Eventually, I found them buried under divider 10 of Volume 1 of the hearing bundle at paragraph 35 of the affidavit of Stephen Richard Dillon Hayes sworn on 14 December 2021. Mr Quest submitted today that Mr Allen's affidavit did not contain any relevant personal knowledge on his behalf and as such was inadmissible. It is somewhat ironic that Mr Hayes, the Respondent's English solicitor, at paragraph 4 of his affidavit refers to the position where facts are not within his own knowledge and yet he and Mr Quest on the Respondent's behalf complain that Mr Allen "has no first-hand knowledge." Mr Hayes also provides his commentary on various matters and yet he goes on to attempt to criticise Mr Allen's third affidavit saying it consists "largely of commentary on the documents".

25. I note that Mr Boulter sensibly does not object to the documents in exhibit PDA-3 being included in the trial bundle.

26. It would have been better if both Mr Hayes and Mr Allen had resisted the temptation of descending into commentary on the documents and trying to argue the case through affidavits. Legal argument is best left out of affidavits. The place for legal argument is in skeleton arguments and oral submissions from attorneys. Having said all that I am not persuaded that the affidavits in this case filed on behalf of the Petitioner and Respondent should be struck out. In fairness Mr Quest rightly did not pursue the relief claimed at paragraph 3b. of the Summons with any great vigour and I do not grant it.

27. I record that by order made on 19 January 2022 the Respondent was given an extended period of time to 3pm on 9 February 2022 to file and serve any responsive evidence. This was the extended period of time requested by his attorney Mr Tyers-Smith if I was not with him on vacating the trial date. It can be seen from my extempore judgment delivered on 19 January

2022 that I did not grant the Respondent's application for the March trial date to be vacated. The Respondent has been given ample opportunities to respond to the Petitioner's evidence.

28. The Summons is devoid of merit and I have no hesitation in dismissing it.

29. I look forward to receipt of the list of issues for determination by the court before 3pm on 25 February 2022 as previously ordered. It would also be helpful if the attorneys could within the same time scale produce an agreed chronology, list of main characters, timetable for trial including time allocations for any concise opening submissions and the identities of the witnesses and the time allocations for their evidence and whether they will be giving evidence in person or whether a video link is proposed.

30. Having heard submissions on costs I make an order that the Respondent pay the Petitioner's costs of the Summons save and except paragraph 3a. of the Summons in respect of which I make no order as to costs.

**THE HON. JUSTICE DAVID DOYLE**
**JUDGE OF THE GRAND COURT**

# *In re Bank of Credit and Commerce International SA* [2002] BCC 407

A

# Re Bank of Credit and Commerce International SA & Anor. Banque Arabe Internationale D'Investissement SA v Morris & Ors.

Chancery Division.
Neuberger J.
B Judgment delivered 18 October 2000.

*Winding up – Fraudulent trading – Application by liquidators for contribution against company for participation in wrongful trading by companies in liquidation – Whether respondent knowingly party to fraudulent trading – Preliminary issue – Whether liability limited to persons who performed a managerial or controlling role within company or its business – Test for whether preliminary issue should be heard – Delay in bringing preliminary issue – Insolvency Act 1986, s. 213.*

C

**This was an application for the determination of a preliminary issue as to whether it was necessary for a person to come within the ambit of a claim for fraudulent trading under s. 213 of the Insolvency Act 1986 for that person to perform a managing on controlling role within the company or its business.**

**The liquidators of certain companies in the insolvent Bank of Credit and Commerce International ('BCCI') group alleged that the business of the companies was effectively D carried on as a single business. They alleged that BCCI was heavily insolvent caused by a poor loan book, concealed acquisitions of other banking businesses, artificial inflation of earnings and other fraudulent and irregular conduct. The liquidators claimed that the respondent to the fraudulent trading claim, 'BAII', had (1) knowingly participated in BCCI's secret and illegal acquisitions and/or financing of shares in an American bank, (2) knowingly participated in BCCI's secret and illegal acquisition and/or financing of the E acquisition of an American bank, and (3) knowingly participated in BCCI's fraudulent overstatement of assets and earnings by assisting BCCI artificially to service certain non-performing loans in its books thereby avoiding having to make any provision for the loan. The liquidators sought a contribution to the assets of BCCI from BAII under s. 213(2) of the Insolvency Act 1986 as persons 'who were knowingly parties to the carrying on of the business' of BCCI with the necessary intent under s. 213(1) to defraud creditors or for any fraudulent purpose. BAII applied for the determination of a preliminary issue as to F whether a person was within the ambit of s. 213(2) if he had participated in the fraudulent act(s) or whether it was necessary that such a person carried on or assisted in the carrying on of the company's business. BAII submitted that the latter interpretation was correct. The issue was reformulated during argument so as to relate to participation in the management function of a company. The liquidators resisted the application on the basis that it was brought too late since 35 months had passed since the liquidators' points of claim were served and the preliminary issue could have been raised at that juncture, that G the issue formulated by BAII could not helpfully be determined at least without findings of fact and as formulated was unlikely to enable the court to determine any useful point and that if the formulation could be improved so as to be useful BAII's argument was wrong in principle and would stand no reasonable chance of success.**

***Held*, refusing the application:**

H **1. The mere fact that the preliminary issue could and should have been raised earlier was of little if any weight on its own. If determination of the point preliminarily could result in a substantial reduction in the length of the eventual hearing, it would require unusual circumstances before it would be right to turn down the opportunity to decide it. However the fact that the issue was raised so late meant that its determination could dislocate the orderly preparation towards trial in accordance with directions already given, and even the projected trial date. The fact that BAII delayed so long before seeking**

**to raise the preliminary issue merely emphasised the need to investigate particularly carefully the question of whether the issue was one which should be determined as a preliminary one.** A

**2. The court would not be prepared to order a preliminary issue as sought by BAII unless it was satisfied that (i) the issue was so formulated that it could be answered without making any significant artificial findings of fact, (ii) it would, if determined one way, enable the court the court to dismiss at least one of the three claims involved, and (iii) as so formulated the preliminary point raised a reasonably arguable issue.** B

**3. As a matter of ordinary language, the ambit of s. 213(2) was not limited to those who performed a managerial or controlling role within the company concerned. The language of s. 213(2) was a little unusual and if anything it was a more natural reference to persons who were not employed by the company at all but were third parties to the company. Although it was obviously wrong to construe s. 213(2) so as to cast its net so wide as to risk stultifying normal business transactions, that was not a good reason for preventing a liquidator from pursuing a person who actively and dishonestly assisted, and/or benefited from, the company in adopting a dishonest course of conduct, which led to lenders or shareholders of the company being defrauded.** C

**4. Although tracing the legislative history of a statutory provision could be a dangerous exercise when considering the meaning of that provision, especially, as here, where the statutory language has changed (by substitution of 'directors' by 'persons'), the legislature appeared to have adopted a recommendation to broaden the ambit of s. 213(2) beyond directors to other persons who were knowingly parties to fraud.** D

**5. Just as an employee of a company who merely carried out orders did not fall within s. 213(2) whereas someone who orchestrated, organised or could seize of the business did fall within the section, so a company or other entity which carried on a bona fide business with the company did not fall within s. 213(2), but a company which was involved in and assisted and benefited from the offending business, and did so knowingly and therefore dishonestly, did or at least could fall within s. 213(2).** E

The following cases were referred to in the judgment:

*Augustus Barnett & Son Ltd, Re* (1986) 2 BCC 98,904.
*Gerald Cooper Chemicals Ltd, Re* [1978] Ch 262.
*Lonrho plc v Fayed* [1991] BCC 641; [1992] 1 AC 448.
*Maidstone Building Provisions Ltd, Re* [1971] 1 WLR 1085. F
*R v Grantham* (1984) 1 BCC 99,075; [1984] QB 675.
*R v Kellard* [1995] 2 Cr App R 134.
*R v Miles* [1992] Crim LR 657.

Richard Adkins QC and Roxanne Ismail (instructed by Travis Smith Braithwaite) for Banque Arabe Internationale D'Investissement SA.

Richard Sheldon QC and Dr Fidelis Oditah (instructed by Lovells) for the liquidators. G

JUDGMENT

**Neuberger J:** This is an application by the respondent, Banque Arabe Internationale D'Investissement SA ('BAII') for the determination of a preliminary point.

The claim against BAII is brought by the liquidators of Bank of Credit and Commerce International SA and Bank of Credit and Commerce International Overseas Limited (together 'BCCI'), both wholly owned subsidiaries of BCCI Holdings (Luxembourg) SA, whose businesses were allegedly carried on effectively as a single business. The claim by the liquidators is for relief against BAII under s. 213 of the *Insolvency Act* 1986. H

BCCI carried on a banking business between about 1979 and 1991. In July 1991 petitions were presented to wind up BCCI on the grounds that it was just and equitable, and winding-up

© 2002 Sweet and Maxwell Ltd

A orders were made in January 1992. The liquidators allege that BCCI was heavily insolvent by July 1991 and that this was caused by a poor loan book, concealed acquisitions of other banking businesses, artificial inflation of earnings, and other fraudulent and irregular conduct of its business.

In summary the liquidators make three claims against BAII, to the effect that it participated in three separate frauds in the carrying on of the business of BCCI. First, it is alleged that in March 1982 BAII knowingly participated in BCCI's secret and illegal acquisition and/or B financing of the acquisition of shares in an American banking company known as First American Bank ('FAB'), deceiving state regulators and the US regulators.

Secondly, it is said that in August 1985 BAII knowingly participated in BCCI's secret and illegal acquisition and/or financing of the acquisition of Independent Bank ('Independent'), deceiving BCCI's regulators and the US regulators.

C Thirdly, between 1985 and 1989, it is pleaded that BAII knowingly participated in BCCI's fraudulent overstatement of assets and earnings by assisting BCCI to service artificially certain non-performing loans in books thereby avoiding having to make any provisions for the loan. BAII does not admit BCCI's business was carried on fraudulently and, if it was, denies any knowledge of the frauds.

The liquidators' claim is for a contribution pursuant to s. 213 of the 1986 Act, which provides:

D '(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud the creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.

(2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court E thinks proper.'

The issue which BAII has formulated as being appropriate for determination of the preliminary issue is this:

'Is a person within the ambit of s. 213(2) of the *Insolvency Act* 1986 if he has participated in the fraudulent acts of the company in liquidation, or is it necessary that such a person carried on or assisted in the carrying on of the company's business?'

F BAII would submit that the latter interpretation is correct. Mr Richard Adkins QC, who appears with Miss Roxanne Ismail for BAII, accepts that the wording of this proposed preliminary issue might be capable of improvement. If it can be improved so as to express an appropriate preliminary issue, then I agree with him that the fact that it needs amending, or could be improved by amending, should certainly not prevent a preliminary issue being ordered.

G Mr Richard Sheldon QC, who appears for the liquidators with Dr Fidelis Oditah, opposes the ordering of such a preliminary issue. First, he points to the lateness of the application. The liquidators' points of claim in their original form were served some 35 months ago and the preliminary point could have been raised at that juncture. We are now at a point where detailed directions have been given and the trial is fixed for some eight to ten weeks starting in some six months time. Secondly, he says that the issue formulated by BAII is one which cannot helpfully be determined at least without findings of fact, and as formulated it is unlikely to enable the H court to determine any useful point, which it would have to consider in any event when deciding whether BAII was liable under s. 213(2). In so far as the formulation can be improved so as to be useful, he contends that BAII's argument would be wrong in principle and would stand no reasonable chance of success and, therefore, no preliminary issue should be ordered.

The determination of a preliminary point can be very valuable. In an ideal case it will determine the outcome of the overall dispute whichever way it is determined. More frequently,

it will determine the outcome of the overall dispute if it is determined one way. Sometimes the A
determination of a point may do no more than cut down the areas of dispute or evidence. Even in such a case it may be worthwhile to order the point to be determined at a preliminary stage. In the *Chancery Guide* one sees this at para. 5.7:

> 'Costs can sometimes be saved by identifying decisive issues or potentially decisive issues and ordering that they are tried first. The decision of one issue, though not itself decisive in law of the whole case, may enable the parties to settle the remainder of the B
> dispute. In such cases a preliminary issue may be appropriate.'

The same point is echoed in the *Commercial Court Guide*, D10(1):

> 'Costs can sometimes be saved by identifying decisive or potentially decisive issues and ordering they be tried first. The decision in one issue may enable the parties to settle the remainder of the dispute.'

However, as has been observed on more than one occasion, the ordering of a preliminary C
issue which may seem sensible at the time can often merely serve to delay, confuse, or increase expense. The court should always take care to ensure that it is not ordering the determination of a point which is only of arid legal interest or which cannot sensibly be assessed without first making at least some findings of fact. As Lord Bridge of Harwich said in *Lonrho plc v Fayed* [1991] BCC 641; [1992] 1 AC 448 at p. 649; 47B–E:

> 'It is important to remember how frequently the House has protested, where parties have D
> agreed the terms of a preliminary question of law, at being required to answer difficult questions of law on hypothetical and disputed facts stated in general terms. … Lord Wilberforce said in Allen v Gulf Oil Refining Ltd [1981] AC 1001 at pp. 1010–1011:
>
> > "My Lords, I and other of your Lordships have often protested against the procedure of bringing, except in clear and simple cases, points of law for preliminary decision. The procedure indeed exists and is sometimes useful. In other cases, and this is E
> > frequently so where they reach this House, they do not serve the cause of justice. The present is such an example … The fact is that the result of the case must depend upon the impact of detailed and complex findings of fact upon principles of law which are themselves flexible. There are too many variables to admit of a clear-cut solution in advance."'

The liquidators' first argument which I shall consider is that it is far too late to raise a F
preliminary point in these proceedings. As a point of principle for rejecting BAII's application I disagree with it. If I were satisfied that the determination of a point of principle, which would take no more than a day at the outside, could result in an eight-week hearing, with its concomitant costs and court effort and court time, being avoided, then the facts would have to be quite exceptional before I rejected the opportunity to determine the point. Even if determination of the point preliminarily could result in a substantial reduction in the length of the eventual hearing, it seems to me that it would require fairly unusual circumstances before I G
would think it right to turn down the opportunity to decide it.

The mere fact that the preliminary point could and should have been raised earlier is of little if any weight on its own, therefore. However, the fact that it is raised so late does mean that its determination could dislocate the orderly preparation towards trial in accordance with the directions already given, and even the projected trial date. This is principally because any determination of a preliminary point could be subject to an appeal. In my judgment in the H
present case, this leads to the conclusion that the fact that BAII have delayed before seeking to raise the preliminary point merely emphasises the need to investigate particularly carefully the question of whether the point is one which should be determined as a preliminary one.

So far as the substance of the matter is concerned I would not be prepared to order a preliminary point as sought by BAII unless the following requirements were satisfied. First,

**© 2002 Sweet and Maxwell Ltd**

A that it was so formulated that it could be answered without making any significant artificial findings of fact i.e. findings of fact which are not agreed and are disputed. Secondly, that it would, if determined one way, enable the court to dismiss at least one of the three claims I have summarised. Thirdly, that as so formulated the preliminary point raises a reasonably arguable issue.

As to the first requirement it seems to me that if it was not satisfied, at least in this case, the determination of the preliminary point would not obviate a fairly full trial. It would therefore be B a waste of time and money and likely to be disruptive if I were to order it. In this connection I agree with Mr Sheldon that, at any rate as formulated, there is a very substantial risk that BAII's proposed preliminary point is not likely to produce a helpful result. The concept of 'assisted in the carrying on of the company's business' could arguably raise the same sort of question as the concept of being 'knowingly parties to the carrying on of the [company's] business'. Accordingly, one may well have to make assumptions of fact for the purpose of C answering the preliminary point as formulated which are not common ground. Similarly, it seems to me that the second requirement would not be satisfied in relation to the preliminary point as formulated for the same reason.

However, as the argument before me developed it became apparent that the issue might well be capable of being reformulated so as to answer these two objections. In effect, Mr Adkins's contention on behalf of BAII is that a person cannot fall within s. 213(2) unless he 'exercised a controlling or managerial function within the company concerned, and that as there is no D allegation in the points of claim in their original form or as amended that BAII had any managerial function or any control over the business of BCCI within that company the claim is bound to fail.'

As I see it, at least on the face of it, that is a contention which satisfies the first two requirements. The point I propose to consider, therefore, is whether it satisfied the third requirement. In this connection it is germane to refer to the allegations against BAII in the E amended points of claim in a little, but only a little, more detail. In relation to Independent, it is not merely alleged that BAII had made loans and documents available for BCCI's benefit, but that BAII knowingly and, effectively, dishonestly acted as a 'front' for BCCI to conceal from the US Federal Deposit Insurance Corporation and the Californian State Banking Department certain illicit activities of BCCI and, indeed, the role of BCCI in connection with the acquisition of Independent.

F In relation to FAB it is contended that BAII knowingly and dishonestly provided funding contrary to representations to FAB shareholders and the US Securities and Exchange Commission ('SEC') and made false representations to the US Federal Reserve Board and to the SEC, all for the benefit of BCCI.

As to the fraudulent trading claims, it is said that BAII dishonestly entered into transactions with BCCI to enable BCCI to reroute funds in an effectively circular way for the purpose of G concealing them from BCCI's auditors, with a view to misrepresenting to a significant extent BCCI's year-end position, and that the transactions concerned had no bona fide commercial basis.

In my judgment, it is not arguable that these activities, if established, could not result in BAII falling within s. 213(2) merely because it was not performing a managerial or controlling function within BCCI. In reaching that conclusion I take into account the following matters.

H First, as a matter of ordinary language, the ambit of s. 213(2) is not limited to those who perform a managerial or controlling role within the company concerned. Although I accept that the language of s. 213(2) is a little unusual, it appears to me that the concept of being 'parties to the carrying on' by a company of a type of business, or of a business in a certain way, is not limited to the person who actually directs or manages the business concerned. If anything it is a more natural reference to people who are not employed by the company at all, but who are third parties to the company.

Secondly, there is a question of policy. It is obviously wrong to construe s. 213(2) so as to A
cast its net so wide as to risk stultifying normal business transactions. It appears to me, however, that that is not a good reason for preventing a liquidator from pursuing a person who actively and dishonestly assisted, and/or benefited from, the company in adopting a dishonest course of conduct, which predictably led to lenders to, or shareholders of, the company being defrauded.

Thirdly, the wording of s. 213(2) can be contrasted with the immediately preceding s. 212 B
and immediately succeeding s. 214. Section 212 is concerned with remedies against people who have misapplied or retained money of a company in liquidation, or who have been guilty of any misfeasance or breach of duty to the company. It extends not only to an officer, a liquidator, an administrator or a receiver, but to a person who 'has been concerned, or has taken part, in the promotion, formation or management of the company'.

Section 214 is, of course, concerned with wrongful trading. It only applies to someone who C
is or has been a director of the company (see s. 214(1)) and who knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation (see s. 214(2)(b)).

As Mr Adkins points out, these two sections have different syntactical and verbal structure and a different legislative history from s. 213. Nonetheless, I think it proper to take into account the way in which they describe persons who fall within their respective ambits, and in
particular the reference in s. 212(1)(c) to persons who have been concerned in the management D
of the company.

In effect, BAII's contention on the preliminary point would amount to the apparently much wider words of s. 213(2) having the same effect as what appear to be the narrower words of s. 212(1)(c).

Fourthly, there is the legislative history of s. 213. Section 275(1) of the *Companies Act* 1929 E
referred to 'directors of the company who were knowingly parties to the carrying on of the business in the relevant manner'. It had a subs. (3) which provided for criminal sanction against such directors. This section was amended by the *Companies Act* 1947 which was then consolidated into the *Companies Act* 1948 (s. 332) so that the word 'directors' was replaced with the word 'persons'. With the advent of the *Companies Act* 1985 and the *Insolvency Act* 1985 and *Insolvency Act* 1986, subs. (3) was effectively detached from the first two
subsections. Subsection (3) is now s. 458 of the *Companies Act* 1985 and subs. (1) and (2) are F
now of course s. 213 of the *Insolvency Act* 1986.

Tracing the legislative history of a statutory provision can be a dangerous exercise when considering the meaning of that provision. If, as here, the statutory language has changed, one can get into arguments about what the legislature had in mind when making the change rather than concentrating on the centrally relevant issue, namely, the meaning of the word of the
present provision in their current context. Nonetheless, in some circumstances as authorities G
show, consideration of statutory predecessors can assist. The replacement of 'directors' in the 1929 Act by 'persons' in the 1947 Act was effectively pursuant to the recommendations of the *Report of the Committee on Company Law Amendment*, the Cohen Committee, in June 1945 (Cmd. 6659). In para. 149 the Committee referred to s. 275, and said this:

> 'We think that the subsections should be extended so as to apply not only to directors but also to other persons who were knowingly parties to the frauds ...' H

In their recommendation, at p. 97, para. X, they suggested that section 275 be amended by the addition of the words 'or any other persons' after the reference to 'directors'.

It seems to me that Mr Sheldon is right to say that the legislature appears to have adopted that recommendation, albeit that its reformulation by simply replacing 'directors' with 'persons' was a simpler solution than the addition suggested by the Cohen Committee.

© 2002 Sweet and Maxwell Ltd

A While it is dangerous to draw too much from that, I believe that Mr Sheldon is justified in saying that the observations of the Cohen Committee do tend to support his contention here.

Fifthly, my conclusion is consistent with such first instance authority as there is. In *Re Gerald Cooper Chemicals Ltd* [1978] Ch 262 the court declined to strike out a claim under s. 332(1) of the 1948 Act which was, of course, identically worded to s. 213(1) of the 1986 Act. In that case the respondent allegedly had accepted as part repayment of a debt owing by the B insolvent companies money which he knew had been obtained by fraud on another creditor. Templeman J said this at p. 268F:

> 'In my judgment a creditor is party to the carrying on of a business with intent to defraud creditors if he accepts money which he knows full well has in fact been procured by carrying on the business with intent to defraud creditors for the very purpose of making the payment. Mr. Evans-Lombe said truly that s. 332 creates a criminal offence and should be strictly construed. But a man who warms himself with the fire of fraud cannot C complain if he is singed.'

The point was also considered in passing by Hoffmann J in *Re Augustus Barnett & Son Ltd* (1986) 2 BCC 98,904, a case which was also brought under s. 332(1) of the 1948 Act. At p. 98,907 Hoffmann J said this:

> 'The words "persons ... parties to" may be wide enough to cover outsiders who could not be said to have carried on or even assisted the carrying on of the company's business D but who nevertheless in some way participated in the fraudulent acts. For an example, see *Re Gerald Cooper Chemicals Ltd* ...'

The first sentence taken on its own, more naturally indicates that, because he did not have to decide it, Hoffmann J was leaving the point open. However, it is capable of meaning that the sort of participation he is contemplating may be caught depending on the facts. In light of his reference to *Cooper* I think that is the right reading.

E Neither of those two decisions, particularly the latter where the point is obiter and (with due respect to Hoffmann J not entirely clear) is binding on me. However, the observations and decision in *Cooper* has stood for over 20 years and did not lead to the legislature amending the wording of the section when it was reenacted in 1985 and 1986.

Sixthly, Mr Adkins argues that these decisions are inconsistent with later decisions of the Court of Appeal (Criminal Division) which are binding on me and which indicate that s. 213 or, F more accurately, s. 458 of the 1985 Act, is to be construed as he contends. I accept, of course, that decisions of the Court of Appeal (Criminal Division) are binding on me. I also accept that decisions as to the meaning of s. 458 of the 1985 Act are to be applied to s. 213 of the 1986 Act. The people to whom those two sections apply and the way in which they are expressed are identical and, as I have indicated, they have the same legislative history.

However, I do not consider that the decisions upon which Mr Adkins relies in this connection assist BAII's contention as to the proper construction of s. 213. The cases in G question are *R v Grantham* (1984) 1 BCC 99,075; [1984] QB 675, *R v Miles* [1992] Crim LR 657, and *R v Kellard* [1995] 2 Cr App R 134. All three cases involve consideration of a defendant who was employed by, or acted for, a company carrying on activities which were caught by the equivalent of s. 213(1).

The issue before the court in each case was effectively whether there was evidence that, or an effective direction to the jury that there must be a finding to the effect that, the defendant had H managed or controlled the business rather than being a mere employee of the business. The point is probably best made by considering para. (i) in the headnote in *Miles* (at p. 658), which accurately reflects the judgment of Tasker Watkins LJ of which I have helpfully been provided a full copy. I read from the headnote:

> 'Section 458 was designed to include those who exercise a controlling or managerial function or who are running the business to use the words of Lord Lane CJ in *Grantham*.

> Circumstances would vary infinitely, but where there was an issue as to whether or not a defendant came within the section that issue should be put to the jury together with clear guidance, appropriate to the facts of the case, as to the meaning of "party to the carrying on of the business of the company". In this case, which had been presented on the basis of the appellant had a managerial role while he contended that he was merely a salesman acting under orders, the words used in the summing up, particularly "concurring in the trade which is involved in the business of the company", may well have had the effect of broadening the scope of the offence charged in the minds of the jury.'

I do not consider that these cases assist BAII's argument because they were concerned each with the position of an employee or consultant of the company. Mr Sheldon understandably draws attention to the word 'include ' at the beginning of the passage in the headnote which reflects the judgment and, to my mind, rightly so. The court's mind was in none of these cases directed to the sort of point raised in the present case.

Further, I do not consider that those decisions of the Court of Appeal (Criminal Division) assist BAII's contention even by analogy. One can well see how a person who is merely an employee of the company, carrying out his functions in the context of a business whose existence or modus operandi is determined by a manager or director, should not as a matter of language or policy fall within s. 213(2), whereas the manager or director should do so. The analogy seems to me to be, if anything, more happily considered by reference to the *Re Maidstone Building Provisions Ltd* [1971] 1 WLR 1085, another first-instance decision cited with apparent approval in *Miles*. In that case Sir John Pennycuick V-C dismissed a claim under s. 332 of the 1948 Act against a company secretary in circumstances where the company's business had allegedly been carried on in a way which fell within s. 213(1). He said this at p. 1092F–H:

> 'The expression "parties to the carrying on of the business" is not, I think, a very familiar one but, so far as I can see, the expression "party to" must on its natural meaning indicate no more than "participates in", "takes part in", or "concurs in ". And that, it seems to me, involves some positive steps of some nature. I do not think it can be said that someone is party to carrying on a business if he takes no positive steps at all. So in order to bring a person within the section you must show that he has taken some positive steps in the carrying on of the company's business in a fraudulent manner. So far as the position of a secretary as such is concerned, it is established beyond all question that a secretary, while merely performing the duties appropriate to the office of secretary, is not concerned in the management of the company. Equally I think he is not concerned in carrying on the business of the company.
>
> On the other hand, it is equally well established, indeed it is obvious, that a person who holds the office of secretary may in some other capacity be concerned in the management of the company's business.'

In so far as those observations could be said in to assist Mr Adkins' argument, it seems to me that once again one has to remind oneself that they were made in the context of someone who was undoubtedly an employee or agent of the company in circumstances where the company was allegedly carrying on a business falling within s. 213. The court was not there concerned with a person who was not employed or agent for the company.

In my judgment, just as an employee of the company who was merely carrying out orders does not fall within s. 213(2) whereas somebody who orchestrates, organises or can seize of the business concerned does fall within the section, so a company or other entity which carries on (so far as it is concerned) a bona fide business with the company, does not fall within s. 213(2), but a company which is involved in, and assists and benefits from, the offending business, or the business carried on in an offending way, and does so knowingly and, therefore, dishonestly does fall or at least can fall within s. 213(2).

© 2002 Sweet and Maxwell Ltd

I have concentrated on the third requirement, but I am by no means convinced that even if Mr Adkins' formulation is correct that that would mean that the claim should be dismissed. It seems to me that the allegations made against BAII are such that it could be said that BAII operated as agent for, or in some other way acted for BCCI, in particular in relation to the matter concerning Independent, in a manner which meant that in the loose sense it had some controlling or managerial function. It seems to me that that is another and quite separate indication of the risk of pursuing a preliminary point of the sort which BAII understandably wishes to raise at this stage.

Having determined the preliminary issue in BAII's favour, which for the reasons I have indicated I would not anticipate doing, one might then have to consider whether on the basis of a reformulation of s. 213(2), which in a sense is what the preliminary issue would involve, BAII's activities could in relation to one or more of the claims actually be said to fall within that reformulation. I believe, that even if I considered that BAII's contention in relation to the preliminary issue was correct, that would still leave open the liquidators' claim and would necessitate, or at least would be likely to necessitate, a hearing to investigate the facts.

Naturally if there is any real possibility of a one-day hearing resulting in the avoidance of an eight-week trial the court should, as I have indicated, be eager to grasp it. In this case, sadly, I have come to the conclusion for the reasons given that that could not be achieved and therefore I propose to dismiss the application for the determination of a preliminary issue.

(*Application dismissed*)

# *Jafar v Abraaj Holdings (in official liquidation)* (Unreported, 20 December 2021)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 203 OF 2020 (NSJ)**

**BETWEEN:**

**ABDULHAMEED DHIA JAFAR**

**Plaintiff**

**and**

**(1) ABRAAJ HOLDINGS**
(in official liquidation)

**(2) GHF GENERAL PARTNER LIMITED**
(in its capacity as general partner of GHF Fund LP (formerly Abraaj Growth Markets Health Fund LP) and GHF Fund (B) LP (formerly Abraaj Growth Markets Health Fund (B) LP))

**(3) THE GHF GROUP LIMITED**
(formerly The Abraaj Healthcare Group Limited)

**(4) ABRAAJ GENERAL PARTNER VIII LIMITED**
(in its capacity as general partner of Neoma Private Equity Fund IV LP (formerly known as Abraaj Private Equity Fund IV LP))

**Defendants**

**IN CHAMBERS**

| | |
|---|---|
| **Appearances:** | **Mr Michael Bloch QC instructed by Nelsons on behalf of the Plaintiff** |
| | **Mr Peter Sherwood of Carey Olsen on behalf of the First Defendant** |
| | **Mr Stephen Atherton QC and Sarah Tresman instructed by Walkers on behalf of the Second and Third Defendants** |
| | **Mr Andrew Ayres QC instructed by Ogier for the Fourth Defendant** |
| **Heard:** | **29-30 November 2021** |
| **Draft judgment circulated:** | **15 December 2021** |
| **Judgment delivered:** | **20 December 2021** |

**JUDGMENT**

**Introduction**

1. This is my judgment dealing with the Plaintiff's application for leave to amend his Statement of Claim in these proceedings.

2. The application was heard on 29 and 30 November 2021. The Second and Third Defendants (the ***GHF Parties***) (represented by Mr Atherton QC) argued that the Plaintiff's application should only be granted on condition that a number of the allegations and averments in the Plaintiff's Amended Statement of Claim were amended, deleted, or better particularised and sought various orders with respect to costs. The Fourth Defendant (represented by Mr Ayres QC) did not object to the Plaintiff's leave application but sought an amendment to or clarification of one paragraph in the Plaintiff's Amended Statement of Claim and also sought various orders with respect to costs. The First Defendant, acting by its joint official liquidators (the ***JOLs***) (represented by Mr Sherwood of Carey Olsen), also did not object to the Plaintiff's leave application but sought various orders with respect to costs. Mr Bloch QC appeared for the Plaintiff.

3. Three issues arise on the Plaintiff's application. First, should leave to amend be granted and should conditions be attached, as the GHF Parties contend? Secondly, if leave to amend is granted, what form should the amendment take (which version of the Amended Statement of Claim put forward by the Plaintiff should be adopted and how should the amendments be shown on the Amended Statement of Claim)? Thirdly, if leave is granted, what is the appropriate costs order? This judgment only deals with the first and second issues. Because directions need to be given as soon as possible for the future conduct of the proceedings, I wish to inform the parties of my decision on the first two issues without further delay. My decision on the costs issues will be dealt with in a further judgment which I shall hand down shortly.

**The leave to amend application**

4. On 3 November 2021, the Plaintiff filed a summons (the ***Original Summons***) seeking leave to amend his Writ of Summons and Statement of Claim filed on 10 September 2020 (the ***SOC***) on

the terms of and in the manner set out in the draft Amended Statement of Claim annexed to the summons (the ***ASOC***) and seeking the necessary consequential directions. The ASOC contained substantial amendments to the SOC and presented the amendments by identifying additions in red and deletions by way of striking through the text.

5. On 19 November 2021, the Plaintiff filed an amended summons (the ***Amended Summons***). The Amended Summons sought leave to amend the SOC either in the terms and by way of (a) an entirely new and substantially slimmed down statement of claim (the ***Concise Statement of Claim***) or (b) the ASOC The Concise Statement of Claim was attached as annex 1 to the Amended Summons while the ASOC was attached as annex 2. The Concise Statement of Claim was an entirely new document with fresh drafting and was presented without showing the amendments made to the SOC. Since the Concise Statement of Claim was, as I have said, an entirely new document, a traditional mark-up of the SOC would show all the text of the SOC as struck through and the whole of the Concise Statement of Claim in red.

**<u>The position of the parties in brief</u>**

6. The Plaintiff's position can be summarised as follows:

(a) the Plaintiff submitted, and noted that the other parties did not contest, that the Court had jurisdiction under GCR O.20, r.5(1) to allow an amendment in whatever form it sees fit. Furthermore, permission to amend should ordinarily be granted where there is a good reason for the amendment, and it serves the Overriding Objective. Permission will ordinarily be granted where the amendment does not come too late in proceedings and where prejudice can properly be met by an award of costs.

(b) he submitted that while the amendments he proposed to make were substantial, the case which he was seeking to advance was not a new one. It was a greatly simplified version of the case he had been advancing. The Plaintiff said that he had offered to pay the Defendants' costs and there were a number of advantages for all parties that would flow from the proposed amendments. As regards costs, the Plaintiff accepted that the other parties were entitled to their costs of and occasioned by his amending his case and which were only referrable to those claims which he no longer wished to pursue (on a standard basis). As regards the advantages flowing from the amendments, the Plaintiff submitted that the principal amendments he was seeking to make should substantially reduce the need

to investigate facts and matters relating to a number of issues and enable the real dispute between the parties to be determined faster and more efficiently. He further submitted that the amendments will enable the case to be made ready for trial more quickly, allow the trial of the case to take up less court time, and save legal and other professional expenses. These amendments, the Plaintiff argued, will simplify his case dramatically and provide the other parties with an opportunity to simplify their cases dramatically too.

(c) the Plaintiff preferred the Concise Statement of Claim since he considered that it set out clearly and directly the Plaintiff's case as now formulated and would be easier for all parties to use going forward, although he accepted that the ASOC adopted a more conventional approach and ultimately it was for the Court to decide what was preferable in the interests of justice and having regard to the Overriding Objective (he argued that the case pleaded in both documents was as a matter of substance the same). The Plaintiff said that he accepted that the amendments needed to be identified and shown in a suitable manner and that this could be done in a number of different ways.

(d) the GHF Parties' objections were not justifiable and did not require further amendments and particulars at this stage. The Plaintiff noted that the GHF Parties had made objections to and criticisms in correspondence of the drafts of the ASOC and Concise Statement of Claim provided to them and that he had already made a number of significant amendments to respond to these objections. A number of the outstanding requests for particulars could not be met sensibly by the Plaintiff prior to discovery. For example, the GHF Parties had asserted that the Plaintiff had failed to give adequate particulars of the falsity of Mr. Naqvi's representations, or Mr. Naqvi's knowledge of the same. However, the Plaintiff did not have complete knowledge of the financial affairs or mismanagement (or misgovernance) of the Defendants and other relevant Abraaj entities or of Mr. Naqvi's knowledge (which was not conveyed to the Plaintiff). Furthermore, there was no need for further particulars where other Defendants had made pertinent admissions and, at least in the period before discovery, where it was clear that the GHF Parties intended to maintain non-admissions (the GHF Parties had made numerous non-admissions to pleadings that are retained in the ASOC and the Concise Statement of Claim). The Plaintiff argued that in a fraud case there often were details of the fraud which the victim of the fraud was unable to particularise prior to discovery and which may not be open to dispute once there has been discovery. He argued that in this case the vast majority of the documents relating to the conduct and financial affairs of the Defendants were held by the First Defendant

(and the JOLs) and therefore the Plaintiff's ability to provide further particulars prior to discovery was seriously limited. It was also likely, he said, that the other parties would not in any event admit the facts and matters averred by the Plaintiff pending discovery, regardless of what further and better particulars he might provide in relation to them at this stage.

7. Mr Atherton QC explained the GHF Parties' position:

(a) he referred to the extensive correspondence (in particular the letter from Walkers, the Cayman Islands attorneys advising the GHF Parties, dated 4 November 2021) in which the GHF Parties had set out their objections to the ASOC and the Concise Statement of Claim. He noted the confusion caused because it was at least initially unclear whether the Plaintiff was intending to rely on and file both the ASOC and the Concise Statement of Claim, and that there were inconsistencies between them.

(b) the GHF Parties did not accept that the case which the Plaintiff was seeking to advance pursuant to his amended pleading was substantially the same as the case advanced in the SOC. In substance, the Plaintiff was proposing to discontinue most of the claims that formed the basis of the SOC, and the ASOC and Concise Statement of Claim discarded almost all of the original factual matrix set out in the SOC and the causes of action that were predicated (and pleaded) upon it.

(c) however, subject to obtaining the order as to costs which they sought and permission to amend being made conditional on the Plaintiff deleting or properly particularising certain allegations and averments made in the ASOC and the Concise Statement of Claim, the GHF Parties were prepared to leave it to the Court to decide whether, if the Court was otherwise satisfied that permission to amend should be granted, the amendments should be made by way of the ASOC or the Concise Statement of Claim.

(d) the GHF Parties vigorously maintained that the ASOC or the Concise Statement of Claim remained, even after the changes made by the Plaintiff in response to the objections raised in correspondence, seriously deficient in certain respects. The GHF Parties identified two categories of proposed amendments to which they objected. First, the category 2 proposed amendments, which were the amended allegations and averments in the ASOC and the Concise Statement of Claim to which the GHF Parties objected on the grounds that they were unjust, doomed to fail or otherwise improper. These, the GHF Parties said, needed to

be amended or deleted. Secondly, the category 3 proposed amendments, which were the amended allegations and averments in the ASOC and the Concise Statement of Claim to which the GHF Parties objected on the ground that they needed to be properly and better particularised. I discuss each of the category 2 amendments and the category 3 amendments in general terms below.

8. Mr Ayres QC explained that the Fourth Defendant, while adopting the submissions made by the GHF Parties as to the nature and impact of the extensive amendments which the Plaintiff sought leave to make, consented to the Plaintiff's application for leave to amend by way of the ASOC and did not object to leave being granted to amend by way of the Concise Statement of Claim subject to the Plaintiff being required to reformulate and clarify the drafting of paragraph 49 of the Concise Statement of Claim (which I discuss below). While the Fourth Defendant sympathised with the position taken by the GHF Parties and considered that a number of the allegations and averments contained in the ASOC and the Concise Statement of Claim were inadequately particularised or poorly drafted, it did not wish to object to the granting of leave to amend on these grounds or to raise these objections at this stage.

If the Court decided to grant leave to amend by permitting the filing of the Concise Statement of Claim, the Fourth Defendant and the GHF Parties, considered that it was important and necessary to ensure that a suitable form of mark-up showing the amendments to the SOC also be filed.

9. Mr Sherwood explained that on the first and second issues, the First Defendant adopted the submissions and approach of the GHF Parties and Fourth Defendant as to the applicable principles but, like the Fourth Defendant, it did not oppose the application for leave to amend and was content to leave it to the Court to decide the form that the amendment should take, provided that the costs orders it sought were granted.

**<u>Discussion and decision</u>**

*Leave to amend and the manner in which the amendments should be shown*

10. In my view, the Plaintiff should be given leave to amend the SOC by adding the Concise Statement of Claim to its pleading in red and by deleting and striking through the SOC (with the Concise Statement of Claim appearing first before the deleted SOC). Granting leave on terms

that provide for the Plaintiff to pay the costs of the Defendants (on the basis to be set out in my judgment dealing with costs) will avoid any injustice to the Defendants and promote the efficient, fair, and cost-effective conduct of the proceedings.

11. Both the ASOC and the Concise Statement of Claim result in the removal and withdrawal of a significant number of the claims and substantially reformulate the other claims contained in the SOC, and the Concise Statement of Claim substitutes a wholly new Statement of Claim. Nonetheless, while the circumstances in which the application for leave to amend is made and the extent of the proposed amendments have significant implications on the orders as to costs to be made upon giving leave to amend, it was not argued that the Court did not have the power to permit such wide-ranging amendments including an amendment by way of a substitution of an entire pleading, pursuant to GCR O.20, r.5 (while the GHF Parties argued that the Plaintiff was in substance starting again and discontinuing most of his claims and that this had cost implications, they did not suggest that the Plaintiff was required to start again by issuing a new Writ and Statement of Claim). It seems to me that the Concise Statement of Claim is to be preferred because it represents the Plaintiff's preferred way of pleading his case and because it pleads the Plaintiff's claims in a clear and direct way that will assist the Defendants in responding to the claims and promote the achievement of the Overriding Objective (although the simplified and reduced format of the Concise Statement of Claim does not mean that the Plaintiff can short-circuit and circumvent the need for proper precision and particulars, and if anything it makes the need to observe such standards even more important). In a case where the Plaintiff has in substance reformulated and redrafted the entirety of his claim, it seems to me to make sense (without prejudice to the Plaintiff's submissions as to the cost implications of his proposed amendments), to use the new document which sets out afresh the revised claim rather than a document based on the old SOC which incorporates very extensive amendments and which as a result becomes difficult to read and follow.

12. GCR O 20, r.13 states that "*In all cases in which a writ, pleading or other document is amended, the amended copy which is filed should make it clear what has been deleted and what has been added or altered so that the Court when reading the amended document shall be able to see at once the exact nature and extent of the amendments made.*" In this case, the best way of giving effect to this rule is to require that the amended version of the Plaintiff's pleading to be filed sets out first and in red the new Concise Statement of Claim followed by the old SOC which should be struck through to show that it has been deleted in its entirety.

*The GHF Parties' objections – general considerations*

13. I now turn to consider the GHF Parties' objections. Having decided that the Plaintiff be given leave to amend by adding and using the Concise Statement of Claim, I shall consider these objections by reference to the Concise Statement of Claim.

14. Before considering the specific allegations and averments in the Concise Statement of Claim to which the GHF Parties objected, I would note that it seems to me that the Plaintiff is right to say that substantial weight is to be given to the fact that prior to discovery he does not have access to many of the documents that relate to the fraud that he alleges and relies on (as I have noted, the Plaintiff referred to not being in possession of the majority of the documents relating to the conduct and financial affairs of the Defendants) so that his ability to provide further particulars prior to discovery is very limited. It is well established that where a party has proper grounds for his claim but can only plead it in a general way because of a justifiable lack of relevant documents, he will be allowed discovery before being ordered to serve or include within his pleading detailed particulars. In this case, all the parties are operating under a disability, as is often the position where fraud is alleged by outsiders against corporate officers and controllers and the companies concerned are subject to an insolvency proceeding and under the control of insolvency officeholders (which is the case for the First Defendant). The Plaintiff as an outsider does not have access to many of the key internal documents produced and held by the corporate Defendants and the insolvency officeholders do not have personal knowledge of what went on before their appointment. In this case, it appears that most of the critical documents relating to Mr Naqvi's conduct and to the management and conduct of the affairs, and the financial condition, of the Defendants and the other related Abraaj entities are held by the First Defendant (and the JOLs) and will need, and are, to be produced by the First Defendant on discovery (a CMC dealing with discovery has been listed for next March).

15. I note, of course, and give due weight to the requirements with respect to the pleading of fraud (in GCR O.18, r.12(1) and r.12(3)), and the critical importance in the Plaintiff's pleading of the allegations concerning Mr Naqvi's knowledge of the falsity of the representations he is said to have made and to his relationship with the Defendants and other related Abraaj entities. But these requirements need to be applied in the relevant procedural context and having regard to the Overriding Objective. I consider and accept the Plaintiff's submission that prior to discovery, there are limitations on the particulars that can be provided in these areas in the Plaintiff's pleading. It is, in my view, inappropriate to apply an unduly strict test to the amended pleading

in these areas at this stage. After discovery and the amendments to all the pleadings that will be needed thereafter, the position can be reviewed, and greater precision and particularity will then be needed and required. As Mr Bloch QC submitted, the Defendants are not placed in serious difficulties at this stage in pleading to the Concise Statement of Claim since they can respond by stating that they do not admit the fact averred or its relevance. This appears to be the view and position also taken by the Fourth Defendant.

16. Having said that, these limitations are not an excuse for vague pleading where that can reasonably be avoided. At this stage, the Plaintiff should give as many particulars and plead material facts with as much precision as he reasonably can (and should avoid pleading such facts too broadly or vaguely where possible) so as to ensure that the Defendants are as well informed as reasonably possible as to the nature of the case they have to meet and can plead to it and so as to facilitate the formulation of the list of issues that will guide the discovery process (significantly, the parties have already made good progress in agreeing the list of issues for discovery in the related proceedings).

17. I discuss and set out below my views on each of the GHF Parties' category 2 objections, taking into account the factors I have referred to above and the points made by Walkers in correspondence, in particular the arguments made in their 4 November 2021 letter. I first set out in italics the relevant objection as formulated by the GHF Parties in their document relating to the Concise Statement of Claim filed during the hearing and then briefly provide my view on each objection. I adopt and use the definitions of the relevant parties as set out in the Concise Statement of Claim. Following my discussion of the category 2 objections, I deal, more briefly, with the category 3 objections.

*The GHF Parties' objections – the category 2 objections*

18. It seems to me that most of the category 2 objections are unjustifiable at this stage. I understand why the GHF Parties consider that the pleading in parts of the Concise Statement of Claim is vague and too broadly expressed but, in my view, with two exceptions, the proportionate approach is to allow the pleading to stand and to review the position after the pleadings have been amended and further particularised to take account of the results of discovery. There is no proper basis for concluding that the deficiencies identified will seriously prejudice the position of the GHF Parties or make it impossible for them to plead their defences or that these deficiencies will materially interfere with settlement of the list of issues for discovery.

19. *Sub-paragraphs 11(3)-(11): [The]allegations are said to form part of the basis of the allegation that Mr Naqvi knew that what he told Mr Jafar, or gave Mr Jafar to understand, by way of the "Overarching Message" was untrue, see paragraph 30(1). However, they are of no relevance to and cannot be supportive of the allegation in paragraph 30(1) and are embarrassing, vexatious and (if permitted as amendments) would prejudice or embarrass the fair trial of the Proceeding and would be liable to be struck out.*

Two points arise:

(a) paragraph 11 of the Concise Statement of Claim appears under the heading "*Arif Naqvi*" and identifies a number of roles held or performed by Mr Naqvi. Paragraph 30(1) states that Mr Naqvi would have been expected to have acquainted himself with certain material in these roles (as well as in those pleaded in paragraph 10), from which the unsound financial position of the First Defendant, the Healthcare Fund and APEF IV would have been apparent.

(b) only some of the sub-paragraphs of paragraph 11 refer to roles and I accept that it is very difficult at this stage to see how the matters pleaded at paragraph 11 (5) – (7) could be relevant to the allegation made in paragraph 30(1). But I do not consider that it is justifiable at this stage to require that these references be deleted. They represent the Plaintiff's view as to the roles and positions held by, and activities of, Mr Naqvi that are relevant to his claim that Mr Naqvi was (or was likely to be) sufficiently well informed and competent to be able to appreciate and be aware of the financial difficulties of AIML, AH, the Healthcare Fund and APEF IV. After discovery, when the full documentary picture is available, the Plaintiff will need to identify with greater precision why the roles and activities referred to are relevant and relate to Mr Naqvi's knowledge, understanding and competences and the documents and information derived from these activities which Mr Naqvi had in his possession or to which he had access. I appreciate that since Mr Naqvi is not a defendant to these proceedings, the Plaintiff does not need to wait for discovery in order to obtain, and discovery will not directly assist the Plaintiff in obtaining, further relevant details as to why and how Mr Naqvi's alleged roles as a contributor to humanitarian causes endorsed by the Pope or as a sponsor of the arts gave him or contributed to his knowledge and understanding of matters related and relevant to the financial affairs and difficulties of the Abraaj entities referred to. But in my view, there is little and certainly not a proportionate benefit in requiring the Plaintiff to provide such further particulars before discovery rather than following when the pleading will need to be reviewed and further particularised, in light of the better view of the case and Mr Naqvi's activities provided by discovery.

20. *The only asserted cash shortfalls in the AGHF [the Healthcare Fund] are those pleaded at paragraphs 30(2) and 32(4)(f) of the [Concise Statement of Claim]. No particulars of the alleged shortfalls have been given. Mr Jafar pleads the alleged reason or purpose for the alleged circular transfers i.e., to conceal the alleged shortfalls, but fails to plead or particularise the fact of and amount of the shortfalls.*

Paragraphs 30(2) and 32(4)(f) of the Concise Statement of Claim appear under the heading "*Knowledge of Falsity*" and follow the averment in the introductory words of paragraph 30 that "*Mr Naqvi knew that what he told Mr Jafar, or gave Mr Jafar to understand, was untrue*." The complaint made by the GHF Parties is that the Concise Statement of Claim fails to plead or particularise "*the fact of and amount of the shortfalls*." In my view, for the reasons I have already given, the Plaintiff cannot be expected to plead the details (including the amount) of the shortfall at this stage and prior to discovery. As regards pleading "*the fact of ... the shortfalls*", the shortfalls are relevant because they are said to have made Mr Naqvi's statements false. They are pleaded as having existed and having done so. Nothing more is needed at this stage.

21. *Paragraph 29 contains the sole allegation of falsity. However, it appears that Mr Jafar [is] in no position to provide particulars to support that assertion beyond reliance on allegations made by a different party in different proceedings. The GHF Parties do not accept that this is an acceptable way to plead a material allegation i.e., falsity. Moreover, Mr Jafar also considers the "precise nature of the unsound financial affairs and misgovernance is not material to Mr. Jafar's understanding or reliance upon what was said in relation to them." Regardless of whether that is right (the GHF Parties take no position on that for present purposes), the particulars of, "the unsound financial affairs and misgovernance" are relevant: (i) to whether or not such unsoundness existed as a matter of fact; and (ii) to what is otherwise a bare assertion of falsity, and no particulars have been provided (other than by reference to allegations made in a different set proceedings).*

Four points arise:

(a). paragraph 29 of the Concise Statement of Claim is in following terms:

> "*The financial affairs and management (and governance) of AIML, AH, the Healthcare Fund and APEF IV from March – December 2017 were not materially sound or proper. It is noted that AH has positively averred that this was the case: in proceedings FSD 150 of 2020, at the Writ of Summons, paragraphs 17-28; and in proceedings FSD 158 of 2020, at the Writ of Summons, paragraphs 12 – 19. The precise nature of the unsound financial affairs and misgovernance is not material to Mr Jafar's understanding or reliance upon what was said in relation to them.*"

(b). there are two complaints. First, that particulars of falsity are provided only by reference to the averments and allegations made by the JOLs in their pleadings in the other related

proceedings and that this is insufficient and impermissible. Secondly, that further particulars must be given of how the financial affairs and management (and governance) of the entities referred to were unsound and improper. The GHF Parties say that the Plaintiff is wrong to assert that details of the problems with the financial affairs and governance of the identified entities are irrelevant to his claim and therefore do not need to be provided ("*The precise nature of the unsound financial affairs and misgovernance is not material*").

(c). the first complaint is unjustified. Particulars are not provided solely by reference to the averments and allegations made by the JOLs in their pleadings in the other related proceedings. There is a prior and independent averment that the statements made and understanding created by Mr Naqvi were untrue because the "*financial affairs and management (and governance) of [the relevant entities] were not materially sound or proper.*" The reference to the averments in the JOLs' pleadings is prefaced by the words "*It is noted that*." This appears to me to be a place holder for the time being to record that the JOLs have also alleged that there were shortfalls in the assets of and urgent funding needs in the relevant Abraaj entities which had resulted from mismanagement and failures of governance and which Mr Naqvi sought to remedy by various fund-raising efforts including borrowing from the Plaintiff. Clearly, following discovery, the Plaintiff will need to identify the material facts and documents that *he* relies on to show that the "*financial affairs and management (and governance) of [the relevant entities] were not materially sound or proper*" and will be unable to rely on the pleaded case of the JOLs (in other proceedings) for this purpose.

(d). as regards the second complaint, while I accept the Plaintiff's submission once again (for the reasons I have already given) that further particulars are not needed before discovery, I do regard the current drafting of the first sentence of paragraph 29 to be unjustifiably vague and imprecise. In my view, even accepting that the Plaintiff needs to see the documents produced on discovery in order to identify the precise financial difficulties and misgovernance to which AIML, AH, the Healthcare Fund and APEF IV were subject in the relevant period, the underlined words in the statement that "*The financial affairs and management (and governance) of [these entities] <u>were not materially sound or proper</u>*" are so vague as to fail, even at this stage, to state the facts alleged in a manner that allows the GHF Parties (and the other Defendants) to understand the case they have to meet. I also

accept the GHF Parties' submission that the Plaintiff cannot simply say that any problems, of an unspecified nature, are enough to falsify what Mr Naqvi said or led the Plaintiff to understand (the Plaintiff appears to be asserting that all he has to show or at least at this stage be required to aver is that the entities' financial affairs were "*unsound*" in some way and to some extent and that there was misgovernance of some kind). At this stage, the Plaintiff needs to identify (and draft the paragraph in a manner which identifies) at least in general terms what he says the problems were which if known to Mr Naqvi, made what Mr Naqvi told the Plaintiff, or gave him to understand, untrue. It appears from the Concise Statement of Claim read as a whole (including paragraph 30) that the Plaintiff is alleging that the management, and those in control, of the identified entities were acting in breach of duty or otherwise failing to protect the interests of the entities and their creditors and that the entities were facing financial difficulties and potential asset shortfalls by reason of such mismanagement or failures of governance, which Mr Naqvi was aware of and sought to conceal. In my view, even before seeing the documents produced on disclosure, and taking into account the difficulty the Plaintiff has in making specific allegations without them, the Plaintiff can and should be clearer about and formulate with greater precision that state of the financial affairs, management, and governance which he avers to have existed and the way in which they were deficient. Drafting which more clearly focusses, even in general terms, on the status, condition and conduct of the affairs of the entities which is said to result in Mr Naqvi's statements being false, is needed in order to give the Defendants a target at which to aim.

22. *The particulars of Mr Naqvi's knowledge in paragraphs 30(1)-(3) are inadequate for the reasons set out in paragraph 25(a)-(c) of the 4 November 2021 Letter. As to paragraph 30(1), and the cross-reference to paragraphs 10 and 11 of the CSOC, paragraph 10 of the CSOC is assertion. As to paragraph 11 of the CSOC, see paragraph 1 above. As to paragraph 30(2), no particulars of Mr Naqvi's procurement of the Air Arabia loans are pleaded in that paragraph (nor in paragraphs 13 or 17 of the CSOC: as to which, see Revised Schedule 3). Finally, the purported particulars said to be contained in/comprise the matters referred to in paragraph 30(3) are particularly obtuse. Paragraph 26 of the 4 November 2021 Letter further explained that the GHF Parties would be unable to plead to the ASOC without first making, and receiving responses to, further RFBPs and that the stated deficiencies ought to be rectified before there can be any question of the GHF Parties acceding to the proposed amendments. Mr Jafar has failed to do this in the CSOC.*

The following points arise:

(a) paragraph 30(1)-(3) is in the following terms (underlining added):

*"30. Mr. Naqvi knew that what he told Mr. Jafar, or gave Mr. Jafar to understand, was untrue.*

***PARTICULARS OF MR. NAQVI'S KNOWLEDGE***

*(1) The unsound financial position of AH, the Healthcare Fund and APEF IV would have been apparent from materials with which Mr. Naqvi would be expected to have acquainted himself in his roles as pleaded in paragraphs 10 and 11 above and it is inferred and averred that Mr. Naqvi did so.*

*(2) Grave shortcomings in the governance of AH, the Healthcare Fund and APEF IV were apparent to Mr. Naqvi as a result of his involvement and directions in them; including his instructions to change APEF IV's year end in June 2017 and his procuring of circular loans from Air Arabia to the Former Healthcare GP in June 2017 and December 2017 to conceal serious cash shortfalls faced by the Healthcare Fund.*

*(3) In or about the period March to December 2017, Mr. Naqvi received information and issued directions concerning the financial affairs and governance of AH, AIML, the Healthcare Fund and APEF IV by emails and other means of messaging. It is inferred and averred that the facts and matters relied on in the Particulars of Falsity are disclosed in those messages."*

(b) the GHF Parties complain that no particulars are provided of "*the materials*"; of what these materials are alleged to have shown; of how the allegedly "*unsound financial position*" of the entities would have been apparent from these materials; the basis on which Mr Naqvi would have been "*expected to have acquainted himself*" with the materials; of Mr Naqvi's "*involvement and directions [given]*"; how the "*grave shortcomings*" were apparent to Mr Naqvi as a result of his involvement and of Mr Naqvi's relevant knowledge.

(c) once again, I can see the force of the concerns expressed by the GHF Parties. The drafting referred to is in need of clarification. But once again, save for one point, in my view the further particulars can wait until after discovery. It seems to me that the GHF Parties (and the other Defendants) are entitled at this stage to have some particulars, even in general terms, of the types of materials referred to in paragraph 30(1). I do not see why the Plaintiff cannot at least say "*materials [including for example] [such as].*" He must have in mind and be referring at least to broad categories of documents. The term "*materials*" is vague and will need to be properly particularised after discovery. It also seems to me that the further details that the GHF Parties seek can also wait until and be provided in a more particularised pleading after discovery.

23. *Paragraphs 48 and 51 should be deleted, they are irrelevant.*

Paragraphs 48 and 51 are in the following terms:

> "*48. Mr. Jafar does not rely on any civilly or criminally wrongful conduct apart from that which is pleaded above.*
>
> *51. Mr. Jafar does not maintain a positive case as to whether or not he has any claims against any Abraaj Group entities beside AH, AHG, the Healthcare Fund and APEF IV."*

The GHF Parties say that these paragraphs add nothing and have no place in the pleading. The Plaintiff argues that they are intended to be of assistance in clarifying his case and do no harm, so that they should be retained. I agree with the Plaintiff.

*The GHF Parties' objections – the category 3 objections*

24. The GHF Parties identified a further ten objections, arguing that the proposed amendments needed to be better particularised.

25. I have reviewed and carefully considered each of the objections and the related pleading and do not propose to identify and discuss each and every one of these. I have concluded that it is inappropriate and disproportionate to require the Plaintiff to provide further particulars at this stage and I accept the Plaintiff's submissions on these objections.

*The Fourth Defendant's objection to paragraph 49 of the Concise Statement of Claim*

26. I have noted above that the Fourth Defendant argued that the Plaintiff should be required to clarify and amend his pleading in paragraph 49 of the Concise Statement of Claim and that if he failed to agree to the amendment required by the Fourth Defendant, leave to amend should only be granted on the condition that the Plaintiff made a suitable amendment. Following the hearing, the Plaintiff and the Fourth Defendant have agreed on the required amendment. Paragraph 49 is to be amended to read as follows:

> *"Mr. Jafar does not maintain a positive case as regards his retention or exercise of any right to rescind the loans he made to AH and AIML on 21 and 27 December 2017. Should any Defendant ask the Court to assume that Mr. Jafar affirmed either or both of those*

> *loans, Mr. Jafar will not dispute that the Court may proceed on that assumption(s) for the purpose of these proceedings."*

*The Draft Order for Directions*

27. On 8 December 2021 the parties filed with the Court a form of order, signed on behalf of all parties, setting out the orders made at the hearing on 29-30 November 2021 both with respect to the Plaintiff's application for leave to amend his SOC and other case management matters. As regards the Plaintiff's application for leave to amend, the following orders were included (in the expectation that my decision on the application would be available at the beginning of this week and would not require the Plaintiff to make any material amendments to the Concise Statement of Claim or the ASOC):

> *"5. If the Court grants leave to do so, Mr Jafar shall file and serve his Amended Statement of Claim in the form directed by the Court by 5pm on Monday, 13 December 2021.*
> *6. The Defendants in the Jafar Proceedings shall file and serve their Amended (or Re-Amended) Defences by 5pm on Friday, 7 January 2022.*
> *7. Mr Jafar shall file and serve his Amended Replies in the Jafar Proceedings by 5pm on Friday, 21 January 2022.*
> *8. Costs of the Amended Summons reserved (pending the Court's determination of the Amended Summons)."*

28. In view of my decision that the Plaintiff does need to make some, albeit minor, amendments to paragraphs 29 and 30(1) of the Concise Statement of Claim, and the fact that this judgment is being handed down after the 13 December 2021 deadline referred to in paragraph 5 of the order, that deadline and the subsequent deadlines in paragraphs 6 and 7 of the order need to be amended. I do not consider that the Plaintiff will need more than a short period to make the necessary amendments but will leave it to the parties to seek to agree appropriate revised deadlines (and to consider whether any consequential amendments are needed to other deadlines) and to prepare and file with the Court a revised form of order for my approval and sealing. If the parties cannot agree such new dates and deadlines by next Wednesday (22 December 2021) they should file with the Court details of the different dates contended for and I shall settle the dates and make an order incorporating the dates I consider to be appropriate. I would also like the parties to defer

filing submissions on the costs order to be made on the Amended Summons until after my costs judgment has been handed down.

______________________________

**Mr Justice Segal**
**Judge of the Grand Court, Cayman Islands**
**20 December 2021**

# *Manifest Shipping Co Ltd v Uni-Polaris Shipping Co Ltd* [2003] 1 AC 469

A House of Lords

# Manifest Shipping Co Ltd *v* Uni-Polaris Insurance Co Ltd and others

## [2001] UKHL 1

B 2000 Oct 9, 10, 11, 12; 2001 Jan 18 — Lord Steyn, Lord Hoffmann, Lord Clyde, Lord Hobhouse of Woodborough and Lord Scott of Foscote

*Insurance — Marine — Unseaworthiness — Total loss of vessel — Insurers not liable if ship sent to sea in unseaworthy state with privity of the assured — "Blind eye knowledge" of unseaworthiness alleged — Obligation to observe utmost good faith — Extent of obligation at claim stage — Whether assured privy to unseaworthiness of Marine Insurance Act 1906 (6 Edw 7, c 41), ss 17, 39(5)* C
*Ships' names — Star Sea*

The assured was one of a group of companies which were controlled by a shipowning family who were beneficial owners of a fleet of over 30 vessels. Following engine room fires two of the vessels became constructive total losses. In each case the captain and crew had failed to use the full flood carbon dioxide (D) ($CO_2$) extinguishing system correctly and the engine room dampers were found to have been faulty so that the engine room could not have been fully sealed meaning that had the $CO_2$ system been discharged correctly it would not have worked effectively. Just over a year later a third vessel in the fleet became a constructive total loss following an engine room fire. Again the engine room dampers were faulty and the captain had not known how to use the $CO_2$ system. The insurers refused to meet the assured's claim for the loss of the third vessel on the grounds that (i) she was E unseaworthy because her captain and crew were incompetent and the engine room dampers were faulty, the owners had been privy to that unseaworthiness by virtue of "blind eye" knowledge and consequently the insurers were not liable for the loss pursuant to section 39(5) of the Marine Insurance Act 1906[1] and (ii) the owners were in breach of their duty to observe the utmost good faith pursuant to section 17 of the Act in that, there had been a failure to disclose material information by, inter alia, claiming legal privilege for reports into one of the earlier fires, failing to disclose them F until privilege was waived on the second day of the trial, and that consequently the insurers were entitled to avoid the contract. The judge rejected the section 17 defence but found that the owners had had blind eye knowledge of the unseaworthiness of the vessel and were entitled to recover only for the loss which would have occurred if the $CO_2$ system had been used and worked effectively. The Court of Appeal upheld the judge's decision on the section 17 defence but allowed the assured to recover the full insured value of the vessel on the ground that although the owners had been negligent they had not had blind eye knowledge of the unseaworthiness.

G On appeal by the insurers—

*Held*, dismissing the appeal (1) that an assured could not be said to be privy to the unseaworthines of his vessel by virtue of blind eye knowledge unless it was shown that he had had a suspicion or belief that the vessel was unseaworthy and had deliberately refrained from making relevant inquiries; that to establish privity it was necessary to show on a subjective basis that the reason why the assured had failed to make investigations was that he had not wanted to know the state of the vessel for H certain, and negligence or gross negligence was insufficient; that the evidence did not sustain a finding of blind eye knowledge; and that, accordingly, privity was not made out against the shipowners (post, paras 1–3, 25, 26, 35–36, 115–117).

[1] Marine Insurance Act 1906, s 17: see post, para 18.
S 39(5), see post, para 15.

A *Cia Maritima San Basilio SA v Oceanus Mutual Underwriting Association (Bermuda) Ltd (The Eurysthenes)* [1977] QB 49, CA applied.

(2) That since there was a distinction between a lack of good faith which was material to the making of an insurance contract and a lack of good faith during the performance of the contract different obligations were involved at pre-contract and post-contract stages; that while in the pre-contract stages there was a positive duty to disclose all information which was material to the risk proposed and the assessment of the premium it would be disproportionate for the insurer to be able to avoid the contract ab initio by reason of the post-contract failure of the assured to reveal all facts which the insurer might have an interest in knowing and which might affect his conduct; that when a claim was being made under the policy the duty was one of honesty and required that the claim was not made fraudulently; and that, accordingly, the shipowners were not in breach of the duty to observe the utmost good faith; that further (per Lord Steyn, Lord Hoffmann, Lord Clyde and Lord Hobhouse of Woodborough) once the parties were engaged in litigation the rationale for the duty of good faith no longer applied because the parties were governed by the Rules of Court and, consequently, the duty was superseded by the rules of litigation (post, paras 1–2, 4, 7, 51–52, 54, 56–57, 72, 75–77, 94–95, 96, 106–111).

*Piermay Shipping Co SA v Chester (The Michael)* [1979] 2 Lloyd's Rep 1, CA considered.

*Black King Shipping Corpn v Massie (The Litsion Pride)* [1985] 1 Lloyd's Rep 437 disapproved.

Decision of the Court of Appeal [1997] 1 Lloyd's Rep 360 affirmed.

The following cases are referred to in their Lordships' opinions:

*Bank of Nova Scotia v Hellenic Mutual War Risks Association (Bermuda) Ltd* [1988] 1 Lloyd's Rep 514
*Banque Keyser Ullmann SA v Skandia (UK) Insurance Co Ltd* [1990] 1 QB 665; [1989] 3 WLR 25; [1989] 2 All ER 952, CA; [1991] 2 AC 249; [1990] 3 WLR 364; [1990] 2 All ER 947, HL(E)
*Bates v Hewitt* (1867) LR 2 QB 595
*Bell v Lever Bros Ltd* [1932] AC 161, HL(E)
*Beresford v Royal Insurance Co Ltd* [1937] 2 KB 197; [1937] 2 All ER 243, CA
*Black King Shipping Corpn v Massie (The Litsion Pride)* [1985] 1 Lloyd's Rep 437
*Boulton v Houlder Bros & Co* [1904] 1 KB 784, CA
*Britton v Royal Insurance Co* (1866) 4 F & F 905
*Cantiere Meccanico Brindisino v Janson* [1912] 3 KB 452, CA
*Carter v Boehm* (1766) 3 Burr 1905
*Chandris v Argo Insurance Co Ltd* [1963] 2 Lloyd's Rep 65
*Cia Maritima San Basilio SA v Oceanus Mutual Underwriting Association (Bermuda) Ltd (The Eurysthenes)* [1977] QB 49; [1976] 3 WLR 265; [1976] 3 All ER 243, CA
*Cia Naviera Vascongada v British & Foreign Marine Insurance Co Ltd (The Gloria)* (1935) 54 Ll L Rep 35
*Cie Financiere et Commerciale du Pacifique v Peruvian Guano Co* (1882) 11 QBD 55, CA
*Colonial Bank v European Grain and Shipping Ltd* [1989] AC 1056; [1989] 2 WLR 440; [1989] 1 All ER 545, HL(E)
*Container Transport International Inc v Oceanus Mutual Underwriting Association (Bermuda) Ltd* [1984] 1 Lloyd's Rep 476, CA
*Cory v Patton* (1872) LR 7 QB 304
*Dalglish v Jarvie* (1850) 2 Mac & G 231
*Galloway v Guardian Royal Exchange (UK) Ltd* [1999] Lloyd's Rep IR 209, CA
*Goldschmidt v Marryat* (1809) 1 Camp 559
*Goulstone v Royal Insurance Co* (1858) 1 F & F 276

*Graham Joint Stock Shipping Co Ltd v Motor Union Insurance Co Ltd* [1922] 1 KB 563, CA
*Henderson v Underwriting and Agency Association Ltd* [1891] 1 QB 557, DC
*Iron Trades Mutual Insurance Co Ltd v Cia De Seguros Imperio* (unreported) 31 July 1990, Hobhouse J
*Jones v Gordon* (1877) 2 App Cas 616, HL(E)
*Lek v Mathews* (1927) 29 Ll L Rep 141, HL(E)
*Leon v Casey* [1932] 2 KB 576, CA
*Liberian Insurance Agency Inc v Mosse* [1977] 2 Lloyd's Rep 560
*Lishman v Northern Maritime Insurance Co* (1875) LR 10 CP 179
*London Assurance v Mansel* (1879) 11 Ch D 363
*Mutual and Federal Insurance Co Ltd v Oudtshoorn Municipality* 1985 (1) SA 419
*NSW Medical Defence Union Ltd v Transport Industries Insurance Co Ltd* (1985) 4 NSWLR 107
*New Hampshire Insurance Co v MGN Ltd* [1997] LRLR 24, CA
*Niger Co Ltd v Guardian Assurance Co Ltd* (1921) 6 Ll L Rep 239, CA; (1922) 13 Ll L Rep 75, HL(E)
*Orakpo v Barclays Insurance Services* [1995] LRLR 443, CA
*Overseas Commodities Ltd v Style* [1958] 1 Lloyd's Rep 546
*Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501; [1994] 3 WLR 677; [1994] 3 All ER 581, HL(E)
*Pawson v Watson* (1778) 2 Cowp 785
*Phoenix General Insurance Co of Greece SA v Halvanon Insurance Co Ltd* [1985] 2 Lloyd's Rep 599
*Piermay Shipping Co SA v Chester (The Michael)* [1979] 2 Lloyd's Rep 1, CA
*Polurrian Steamship Co v Young* (1913) 19 Com Cas 143
*Probatina Shipping Co Ltd v Sun Insurance Office Ltd* [1974] QB 635; [1974] 2 WLR 666; [1974] 2 All ER 478, CA
*Rego v Connecticut Insurance Placement Facility* (1991) 593 A 2d 491
*Reid & Co Ltd v Employers' Accident and Livestock Insurance Co Ltd* (1899) 1 F 1031
*Royal Boskalis Westminster NV v Mountain* [1997] LRLR 523; [1999] QB 674; [1998] 2 WLR 538; [1997] 2 All ER 929, CA
*Sailing Ship Blairmore Co Ltd v Macredie* [1898] AC 593, HL(Sc)
*Standard Oil Co of New York v Clan Line Steamers Ltd* [1924] AC 100, HL(E)
*Standard Steamship Owners' P & I Association (Bermuda) Ltd v Oceanfast Shipping Ltd* (unreported) 6 March 1996, Mance J
*Thomas v Tyne and Wear Steamship Freight Insurance Association* [1917] 1 KB 938
*Twizell v Allen* (1839) 5 M & W 337
*Village Main Reef Gold Mining Co Ltd v Stearns* (1900) 5 Com Cas 246

The following additional cases were cited in argument:

*Anghelatos v Northern Assurance Co Ltd* (1922) 13 Ll L Rep 291, CA
*China Traders' Insurance Co Ltd v Royal Exchange Assurance Corpn* [1898] 2 QB 187, CA
*Gibson v Small* (1853) 4 HL Cas 353, HL(E)
*Grand Champion Tankers Ltd v Norpipe A/S* [1984] AC 563; [1984] 2 WLR 942; [1984] 2 All ER 243, HL(E)
*Harding v Bussell* [1905] 2 KB 83, CA
*Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd* [1989] QB 433; [1988] 2 WLR 615; [1988] 1 All ER 348, CA
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500; [1995] 3 WLR 413; [1995] 3 All ER 918, PC
*SA des Minerais v Grant Trading Inc (The Ert Stefanie)* [1989] 1 Lloyd's Rep 349, CA
*SA d'Intermediaries Luxembourgeois v Farex Gie* [1995] LRLR 116, CA

**APPEAL** from the Court of Appeal A

This was an appeal by the defendant representative insurers, Uni-Polaris Insurance Co Ltd and La Réunion Européenne, with leave of the House of Lords (Lord Lloyd, Lord Nolan and Lord Hoffmann) given on 27 October 1997 from a decision of the Court of Appeal (Leggatt, Henry and Waller LJJ) delivered on 20 December 1996 allowing an appeal by the plaintiff assured, Manifest Shipping Co Ltd, from a decision of Tuckey J delivered on 16 November 1994. B

The facts are stated in the opinions of Lord Hobhouse of Woodborough.

*Gordon Pollock QC* and *David Foxton* for the defendant insurers. The Court of Appeal's approach to the assured's privity to unseaworthiness for the purposes of section 39(5) of the Marine Insurance Act 1906 was unduly narrow in two respects. C First, in failing to allow for a state of mind of recklessness, or indifference, to the issue of seaworthiness which historically underlies the concept of privity in this context. Second, in failing to consider the assured' s state of mind with regard to the adequacy of the systems in operation to ensure the seaworthiness of the fleet.

Although the implied warranty as to seaworthiness does not apply to time policies there have always been limits to an assured's ability to recover from D his insurer under a time policy for damage caused by the accidental incursion of seawater due to unseaworthiness. Those limits had been sketched out only in outline from before the passage of the Act, but they reflected a perception that the insurer could not recover where the proximate cause, or at least a direct cause, of the loss was unseaworthiness in respect of which the shipowner was "culpable". Moreover there was nothing to suggest that E the relevant requirement of culpability could only be satisfied by knowledge: see *Gibson v Small* (1853) 4 HL Cas 353; *Thomas v Tyne and Wear Steamship Freight Insurance Association* [1917] 1 KB 938. Something more than mere negligence as to unseaworthiness is required. However, the issue is not simply one of "knowledge". The essence of the exception is that it applies where the unseaworthy state of the ship has been "connived" at in a F conscious way by the shipowner. This may be because of knowledge, but, recklessness, in the sense of conscious risk taking, will also suffice. There is no real difference in blameworthiness between someone who acts with knowledge of a state of affairs, and someone who acts without caring whether that state of affairs exists or not. A shipowner who sends his ship to sea in circumstances in which he is indifferent to its firefighting capabilities, or who is conscious of a risk that they are or may be inadequate, should be in G no different a position to one who knows of unseaworthiness, or who deliberately closes his eyes to such unseaworthiness. Blind eye knowledge must mean an assured failing to acquire the relevant knowledge deliberately. These are all shades on a continuous spectrum of conscious or wilful conduct, and are far removed from mere negligence. It is no part of the bargain between assured and insurer that the former will be indemnified H against the consequences of such conscious risk taking. Although Roskill LJ in *Cia Maritima San Basilio SA v Oceanus Mutual Underwriting Association (Bermuda) Ltd (The Eurysthenes)* [1977] QB 49 rejected the argument that section 39(5) could be traced back to notions of "wilful misconduct", there is nothing in the judgments in that case to exclude a state

of mind of recklessness or conscious risk running from the concept of "privity". If they do so, they are wrong.

The concept of "privity" within section 39(5) of 1906 Act extends to a shipowner who knows that the system which he operates in his management of his fleet is inadequate to ensure the seaworthiness of his vessels in the relevant respect, but who permits the vessels to sail regardless: see *Grand Champion Tankers Ltd v Norpipe A/S* [1984] AC 563. Such a shipowner consciously runs the risk of unseaworthiness, and "connives in" the unseaworthiness of his vessel. In requiring either knowledge of the relevant facts, or a suspicion as to those matters and a decision not to make further enquiries for fear of having certain knowledge, the Court of Appeal applied an overly narrow concept of privity.

[Submissions were made on the facts].

Unlike sections18 to 20 (which refer only to the assured), section17 of the Marine Insurance Act1906 imposes a mutual duty of good faith. There is no temporal limitation in section 17 to events before the bargain is made. Hence, whilst section 17 can apply pre-contract, there is now a considerable body of authority to support the view that the duty of the utmost good faith which it enshrines will also apply after the contract has been entered into, in particular whenever the assured asks the insurer to make a decision: *Black King Shipping Corpn v Massie (The Litsion Pride)* [1985] 1 Lloyd's Rep 437; *Overseas Commodities Ltd v Style* [1958] 1 Lloyd's Rep 546; *Liberian Insurance Agency Inc v Mosse* [1977] 2 Lloyd's Rep 560; *Phoenix General Insurance Co of Greece SA v Halvanon Insurance Co Ltd* [1985] 2 Lloyd's Rep 599.

It is clear that the basis of the doctrine of the utmost good faith as it operates before the contract is signed cannot be an implied term of the contract of insurance. Rather its juridical basis is a relationship arising as a matter of general law, imposed by a codifying statute—and before that by rules originating in the jurisdiction of courts of equity to prevent impositions: *Banque Keyser Ullmann SA v Skandia (UK) Insurance Co Ltd* [1990] 1 QB 665.

As sections18 to 20 merely exemplify certain spheres of operation of the general relationship in section 17, it would be artificial to suggest that the juridical basis of that relationship differs in the pre- and post-contractual contexts. In each case the relationship exists because of a rule of positive law, now enshrined in statute: see *Bank of Nova Scotia v Hellenic Mutual War Risks Association (Bermuda) Ltd* [1988] 1 Lloyd's Rep 514; *Orakpo v Barclays Insurance Services* [1995] LRLR 443; *The Litsion Pride* [1985] 1 Lloyd's Rep 437.

There is nothing in section17 which supports the Court of Appeal' s view that the only obligation when presenting a claim is to abstain from fraud. The duty of utmost good faith requires much more than simply the absence of bad faith, although where there has been bad faith the duty has been breached. Ex hypothesi the duty can be breached without conduct that is fraudulent. It is simply not possible to define "the utmost good faith" as the absence of the tort of deceit, however much male fides there may have been: *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501; *Container Transport International Inc v Oceanus Mutual Underwriting Association (Bermuda) Ltd* [1984] 1 Lloyd's Rep 476;

*Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd* [1989] QB 433. A

An important feature of a relationship of the utmost good faith which the Court of Appeal's formulation fails to allow for is an obligation of disclosure, a concept which has long been recognised as an incident of contracts of insurance, even at the claims stage: *Banque Keyser Ullmann SA v Skandia (UK) Insurance Co Ltd* [1990] 1 QB 665; *The Litsion Pride* [1985] 1 Lloyd's Rep 437. Such a duty is necessary because, just as at inception, the assured will have a monopoly of knowledge of many matters relevant to the claim and to the underwriter's decision whether or not to pay it and in what amount, and because the utmost good faith nature of the relationship precludes one party from taking advantage of his monopoly of knowledge in his dealings with the other: see *Orakpo v Barclays Insurance Services* [1995] LRLR 443; *Graham Joint Stock Shipping Co Ltd v Motor Union Insurance Co Ltd* [1922] 1 KB 563. It is difficult to reconcile an obligation of disclosure with a requirement only to abstain from fraud. Common law fraud recognises no duty to speak, nor any concept of fraudulent non-disclosure. "Equitable fraud" ventured beyond cases of dishonest misrepresentation to encompass wider concepts of disclosure, fair dealing and equality of bargaining power. Indeed in earlier times, any breach of the doctrine of the utmost good faith in the pre-contractual context was often described as "fraud" in this wider sense: see *Carter v Boehm* (1766) 3 Burr 1905. Consequently, it is not possible to say as a matter of language or law that observing the utmost good faith requires only that a party abstain from fraud. No further definition of the concept of utmost good faith is necessary. However, such a relationship obviously requires fair dealing, and full disclosure, between the parties.

Although the relationship of the utmost good faith continues after a contract has been signed as well as before, and its legal basis does not change, the operation of the relationship is not identical in these contexts. In the pre-contract stage, negligent and even wholly innocent misrepresentation or non-disclosure suffice to breach the duty. This reflects the fact that the duties embodied in sections 18–20 of the 1906 Act are far from any ordinary understanding of lack of good faith: *SA d'Intermediaries Luxembourgeois v Farex Gie* [1995] LRLR 116. However, in the context of presenting and prosecuting a claim, sections 18–20 have no application.

The remedy of avoidance can sometimes be Draconian. It is not, however, a remedy of the insurer's choosing, but one stipulated for by section 17. There is no other remedy. No doubt it is the potentially Draconian nature of the remedy which has led courts to attempt to identify another remedy for breach of the duty at the claims stage, namely the failure of the claim: *The Litsion Pride* [1985] 1 Lloyd's Rep 437; *Reid & Co Ltd v Employers' Accident and Livestock Insurance Co Ltd* (1899) 1 F 1031. The difficulty with such a suggestion is the apparent conflict with the clear provision in section 17. This defence is relied on in the alternative. However, whatever concern there may be at the effects, in certain cases, of the remedy of avoidance, this provides no basis for altering the content of the duty of utmost good faith. If some requirement of "proportionality" is to be introduced, that is a legislative matter.

The obligation of disclosure inherent in a relationship of the utmost good faith is not terminated or supplanted by the commencement of litigation: see

*Royal Boskalis Westminster NV v Mountain* [1997] LRLR 523. In marine insurance, the "ship's papers" cases provide a substantial body of authority for the view that the relationship of insurer and assured continues during litigation, and that as a result those parties should be placed under wider obligations in relation to production of documents than those provided for by the general procedural rules. For the history of the order see *Twizell v Allen* (1839) 5 M & W 337; *Boulton v Houlder Bros & Co* [1904] 1 KB 784; *Goldschmidt v Marryat* (1809) 1 Camp 559; *Henderson v Underwriting and Agency Association Ltd* [1891] 1 QB 557; *Village Main Reef Gold Mining Co Ltd v Stearns* (1900) 5 Com Cas 246. The foundation for the order was the recognition that even during litigation there is a mutual duty of utmost good faith: see *Graham Joint Stock Shipping Co Ltd v Motor Union Insurance Co Ltd* [1922] 1 KB 563; *Anghelatos v Northern Assurance Co Ltd* (1922) 13 LlL Rep 291; *Leon v Casey* [1932] 2 KB 576; *Harding v Bussell* [1905] 2 KB 83; *China Traders' Insurance Co Ltd v Royal Exchange Assurance Corpn* [1898] 2 QB 187. Although the orders were certainly procedural, involving as they did the production and disclosure of documents, the significant fact is that the courts consistently appealed to the substantive characteristics of a contract of marine insurance to justify the procedural order made. No legal mechanism has been suggested by which the relationship can be terminated or supplanted in respect of a rejected or litigated claim, still less one which can reconcile such a state of affairs with the fact that the duty may well continue in respect of other aspects of the assured/ insurer relationship.

The Court of Appeal's suggestion that the obligation of disclosure is supplanted in proceedings by the rules as to discovery confuses two different concepts. The obligation of disclosure which arises by virtue of the utmost good faith is concerned with the communication of material facts to the insurer of which the assured has knowledge, but of which the insurer is ignorant. It is not concerned with the production of documents. If an assured was aware, from an expert's report obtained for the purposes of litigation, that the subject matter of a proposed policy of marine insurance was unseaworthy, he would be required to disclose the fact to the insurer pursuant to his duty of the utmost good faith, regardless of the fact that the document was immune from production whether under rules of discovery or pursuant to a subpoena duces tecum.

If the Court of Appeal is correct, an insured can seek to negate his obligation of disclosure at the claims stage by treating any request by underwriters for information or any failure to respond favourably to a demand for immediate payment as a rejection of the claim, and commencing legal proceedings immediately. Indeed, in the context of a major marine casualty, it is not possible to distinguish the presentation of the claim from litigation of it. The entire process is handled by solicitors, on a footing of imminent or actual litigation, from the outset.

If the utmost good faith has not been observed in the presentation of the claim this should be attributed to the assured for the purposes of both sections 17 and 39(5) by applying the "primary rule of attribution", namely that the acts of a director of the management company who had not been excluded from participation in the relevant aspect of the company's business, fell to be attributed to the company: see *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500 and *SA des*

*Minerais v Grant Trading Inc (The Ert Stefanie)* [1989] 1 Lloyd's Rep 349. A
Further, the conduct of agents to whom an assured has delegated particular matters in dealings with insurers will be attributed to the assured for the purposes of section l7 ( even in circumstances in which the secondary rules of attribution provided for in sections 18(1), 19 and 20(1) do not apply): see *The Litsion Pride* [1985] 1 Lloyd's Rep 437; *Piermay Shipping Co SA v Chester (The Michael)* [1979] 2 Lloyd's Rep 1. B

[Submissions were made on the facts.]

*Jonathan Sumption QC, Stephen Hofmeyr QC* and *Rebecca Sabben-Clare* for the assured. The leading case on what constitutes privity is the decision of the Court of Appeal in *Cia Maritima San Basilio SA v Oceanus Mutual Underwriting Association (Bermuda) Ltd (The Eurysthenes)* [1977] QB 49 in which the earlier authorities were reviewed. It is authority for two C main points: (i) that privity involves either actual knowledge of the unseaworthiness or turning a blind eye to it, not mere negligence; (ii) that it must be the personal privity of the assured, i e of its "head men", not simply that of employees or other agents for whom it may be vicariously liable. As a matter of language, "privity" necessarily involves knowledge of some kind. A person cannot be privy to a state of affairs of which he is ignorant. He is D ignorant of it even if he ought not to have been.

The reason why the law equates turning a blind eye with actual knowledge is that it is the state of mind of a person who deliberately avoids acquiring actual knowledge. Such a person must be actually conscious that the relevant fact may be true before he can be said deliberately to avoid knowing it: see *The Eurysthenes* [1977] QB 49; *Cia Naviera Vascongada v British & Foreign Marine Insurance Co Ltd (The Gloria)* (1935) 54 LlL Rep. E This approach is not only supported by authority. It is fundamental to the value of the cover conferred by a marine policy. Subject to express exceptions and to those imported by the general law, the policy covers loss caused by marine perils notwithstanding that they caused it only by virtue of the unseaworthiness of the vessel. In a time policy there is no implied warranty of seaworthiness at any stage: section 39(1). If the concept of F privity extends beyond actual knowledge and beyond the deliberate avoidance of actual knowledge of suspected facts, then it must extend to cases where the assured is merely negligent in failing to know the facts or appreciate their significance. Yet many marine casualties can be traced to some feature of the vessel's condition at the outset of the relevant voyage, and in most such cases it is possible to say that the exercise of due care to G discover and rectify it would have avoided the loss. If that is enough for the purposes of section 39(5), then there is no cover for a major class of casualty attributable to the assured's personal negligence.

The language of section 39(5) of the Marine Insurance Act 1906 can usefully be contrasted with the language used in section 503(1) of the Merchant Shipping Act 1894, which refers to "actual fault or privity" on the owner's part. Fault and privity are two different things. H

The application of these principles would not enable a shipowner to run his fleet in a manner which is calculated to avoid knowledge. The more the head men of a company distance themselves from its operations, the more likely it is that less senior personnel will be found to have the combination of

A responsibility and autonomy necessary to make them the assured for the purposes of section 39(5).

The notion of what is involved in turning a blind eye to suspected facts is not peculiar to the law of marine insurance. It applies generally in cases where a person's rights or liabilities depend on his knowledge of some fact: see, for example, *Jones v Gordon* (1877) 2 App Cas 616. It has never been held in such cases that negligent ignorance will do, or that a blind eye can be B turned to unsuspected facts.

[Submissions were made on the facts.]

The duty of utmost good faith owed by an assured at the point of making a claim is a duty of honesty and no more. If a claim is honestly made, the insurer is not entitled to avoid the policy on the basis that there were errors or omissions on relevant matters in the information supplied in support of it, C however those errors or omissions may have come about. Although, by virtue of section 18(1), a contract of insurance may be avoided for non-disclosure in the making of the contract, without it being necessary to prove fraud or even culpability, there is no reason to regard it as having the same content at every stage of the life of the contract, and a number of reasons why it should not.

D As applied to the making of the contract, the duty of utmost good faith was first overtly recognised in English law in a series of decisions of Lord Mansfield: see *Carter v Boehm* 3 Burr 1905; *Pawson v Watson* (1778) 2 Cowp 785. It came to be regarded as an incident of limited classes of contract, pre-eminently insurance contracts. As applied to the formation of a contract, the duty is not an implied term as it arises at a time before the contract is made, and it gives rise to no other legal remedy apart from E avoidance: see *Bell v Lever Bros Ltd* [1932] AC 161; *Banque Keyser Ullmann SA v Skandia (UK) Insurance Co Ltd* [1990] 1 QB 665. The most satisfactory view of the juridical basis of the duty as applied to the formation of the contract is that it rests not so much upon a "duty" of the assured properly so called, as on a legal assumption, derived from mercantile practice, about the basis on which a contract of insurance is made, coupled with a recognition that if the facts are materially different from those put F before the underwriter, the basis of the contract has gone and it may be avoided.

The juridical basis for the application of the duty of utmost good faith to the later stages of the life of the contract is rather different and is of comparatively late development. There is even now no general duty on the part of the assured to disclose further facts after the contract has been made: G see *Cory v Patton* (1872) LR 7 QB 304; *Lishman v Northern Maritime Insurance Co* (1875) LR 10 CP 179; *Niger Co Ltd v Guardian Assurance Co Ltd* (1922) 13 Ll L Rep 75; *NSW Medical Defence Union Ltd v Transport Industries Insurance Co Ltd* (1985) 4 NSWLR 107; *New Hampshire Insurance Co v MGN Ltd* [1997] LRLR 24. There is, however, a specific duty of utmost good faith in the making of claims, which the courts have held to be broken by a person who puts forward a claim fraudulently: see H *Britton v Royal Insurance Co* (1866) 4 F & F 905; *Orakpo v Barclays Insurance Services* [1995] LRLR 443; *Galloway v Guardian Royal Exchange (UK) Ltd* [1999] Lloyd's Rep IR 209. See also *Goulstone v Royal Insurance Co* (1858) 1 F & F 276. The duty arising at this stage is satisfactorily analysed as an implied term of the contract: see *Bank of Nova*

*Scotia v Hellenic Mutual War Risks Association (Bermuda) Ltd* [1988] 1 Lloyd's Rep 514; *Orakpo v Barclays Insurance Services* [1995] LRLR 443.

There are strong considerations of commercial convenience and legal policy which suggest that the duty is narrower at the claims stage than it is at the stage when the contract is made. The essential purpose of the extensive disclosure required of the assured when the contract is being made is to put the parties on an equal footing in their ability to assess the risk. In that context there is no reason to distinguish between innocent and fraudulent nondisclosure if the facts not disclosed are material in either case. Pre-contractual investigation by the underwriter is neither normal nor, in most cases, possible. By comparison, when a claim is made, although the facts may be obscure, the underwriter can, and in practice does, appoint specialists and experts to investigate.

The remedy for a breach of the duty, avoidance, is draconian. This may represent substantial justice where the breach consists in the non-disclosure of facts critical to the making of the contract, even if the non-disclosure is wholly innocent. The effect of avoidance in that situation is simply to restore the underwriter to the position he was in before he bound himself on a false basis. The position of an underwriter considering a claim is completely different. His decision is not discretionary, for he is already bound. The claim is either within the scope of the cover or it is not, and if it is, he must pay. If the claim is good, but there has been non-disclosure in its presentation, the effect of avoidance is that he is discharged from an obligation to pay a claim within the scope of the cover. That may be consistent with the mutual duty of utmost good faith in a case where the assured has tried to deceive the underwriter, but not when he has made an honest mistake.

In spite of the breadth of the duty which is owed at the earlier stage, its impact is limited by the need for the underwriter to show both that the facts withheld were objectively material to the assessment of the risk and that their non-disclosure actually induced the particular underwriter to write the risk or to do so on the terms he did: see *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501. By definition, if the underwriter is seeking to avoid the contract on account of a pre-contractual non-disclosure, he has entered into the contract and is presumably saying that he was induced to do so by the non-disclosure. But it is difficult to see what place inducement can have in most cases of non-disclosure at the claims stage. If inducement has no practical role in most cases where a breach of the duty is said to have arisen at the claims stage, then there is everything to be said for the narrower test of materiality, which would require the underwriter to show that the facts withheld would have made the difference between the claim being good or bad. Yet on that basis, the underwriter is sufficiently protected by the consideration that a bad claim will fail: see *Royal Boskalis Westminster NV v Mountain* [1997] LRLR 523.

With the possible exception of *The Litsion Pride* [1985] 1 Lloyd's Rep 437 there is no case in which the courts have held that the duty of utmost good faith requires more than honesty at the claims stage, and no case in which any wider duty has been regarded as appropriate to the requirements of the business. On the contrary there is an impressive consensus of opinion to the effect that nothing less than dishonesty will do: see *Britton v Royal Insurance Co* (1866) 4 F & F 905; *Orakpo v Barclays Insurance Services*

A [1995] LRLR 443; *Galloway v Guardian Royal Exchange (UK) Ltd* [1999] Lloyd's Rep IR 209; *The Michael* [1979] 2 Lloyd's Rep 1; *Royal Boskalis Westminster NV v Mountain* [1997] LRLR 523; *Standard Steamship Owners' P & I Association (Bermuda) Ltd v Oceanfast Shipping Ltd* (unreported) 6 March 1996; *Halsbury's Laws of England*, 4th ed reissue, vol 25 (1994), p 348, paras 492–493; *Welford & Otter-Barry, Fire Insurance*, 4th ed (1948), p 289; *Clarke, Law of Insurance Contracts*, 3rd ed B (1997), pp 746–755; *MacGillivray on Insurance Law*, 9th ed (1997), paras 19–59. That consensus is right in principle and should be endorsed.

There is no support in the authorities for a test based on "culpable" non-disclosure, save possibly *The Litsion Pride* [1985] 1 Lloyd's Rep 437. If culpability is the test it is far from clear what it means. In any event a test of culpability necessarily recognises that the content of the duty of utmost good C faith is different when the contract is made and when claims are made and paid, since at the earlier stage it is well established that even wholly innocent non-disclosure may give rise to a right to avoid.

Whether the duty of utmost good faith in the making of a claim subsists once the underwriter has rejected it and the parties are locked in litigation must depend on exactly the same principles as the existence of such a duty in D the first place i e what is reasonable and necessary between parties dealing honestly and fairly with each other in that situation.

There are many circumstances in which a party may be said to owe a duty of honesty or a wider duty of disclosure in the course of litigation. But any such duty does not exist as an incident of the contract of insurance and, consequently, there can be no right to avoid the contract for breach of it. No duty of utmost good faith arising from the contract of insurance is called for E at all in the course of litigation. The only relevant duties are those imposed on litigants by the rules and by orders of the court, and avoidance is not available for breach of them.

Once litigation has begun, the parties are adversaries, at least in relation to the particular claim. The rules and orders of the court suffice to ensure that sufficient disclosure is made to serve the interests of justice. If F something relevant is not disclosed, it may be because its disclosure is not required in the interests of justice e g because it is privileged. In significant respects the duty contended for would conflict with the rules and practice of the courts. On the face of it, as a contractual duty arising independently of the law relating to the conduct of litigation, it would displace any claim to privilege in relevant material, whether by the assured or by the underwriter. G It would displace any discretion vested in the courts governing the production of material or the consequences of its non-production, since production would become a matter of right and a right of avoidance for non-production would be automatic. It would also give rise to the court in major insurance litigation having to deal not only with the merits of the claim but with disputes as to the manner in which the adversaries and their advisers had conducted it. The courts in Connecticut have taken the view that once H parties are joined they are no longer ruled by the insurance rules: see *Rego v Connecticut Insurance Placement Facility* (1991) 593 A 2d 491.

Although there are cases in which the courts have proceeded on the assumption that there is a duty of utmost good faith applicable even to the conduct of litigation, they have always been careful to limit it to a duty not

to maintain a claim in the absence of an honest belief that it is justified: see, for example, *The Michael* [1979] 2 Lloyd's Rep 1. A

The origins of the underwriters' right to obtain an order for ship's papers before service of their defence are described in *Arnould's Law of Marine Insurance and Average,* 16th ed (1981), vol 2, paras 1347–1350, and in the judgments of Scrutton LJ in *Leon v Casey* [1932] 2 KB 576 and Lord Denning MR in *Probatina Shipping Co Ltd v Sun Insurance Office Ltd* [1974] QB 635, 640–642. The order was a historical anomaly because it is the only example of something akin to discovery being ordered by a court of common law before certain of the powers of courts of equity were conferred on them by statute in the middle of the nineteenth century. This procedure cannot be indicative of a duty of good faith in the making of claims persisting after the commencement of litigation because any duty of good faith must give rise to a substantive right, whereas the right to call for ships' papers was always procedural. An underwriter never could call for ships' papers without an order of the court, the availability of which has since 1936 been discretionary and governed exclusively by rules of court. It has never been available except in marine insurance cases, although the duty of good faith, whatever its content, is common to all insurance. Furthermore, such orders were enforced through the sanctions of the court. It has never been suggested that failure to comply with an order for ships' papers entitled the underwriter to avoid the policy. B C D

Persons whose acts constitute those of the company are (1), under the primary rule of attribution, the board of directors acting as a board and shareholders acting unanimously and (2), under the ordinary rules of agency, agents with regard to the matters with which they are entrusted: see *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500. E

[Submissions were made on the facts.]

*Pollock QC* replied.

Their Lordships took time for consideration. F

18 January 2001. **LORD STEYN**

My Lords,

1 I have had the advantage of reading the speeches of Lord Clyde, Lord Hobhouse of Woodborough and Lord Scott of Foscote. For the reasons they give I would also dismiss the appeal.

**LORD HOFFMANN** G

My Lords,

2 I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Hobhouse of Woodborough and Lord Scott of Foscote, and for the reasons which they give I would dismiss the appeal.

**LORD CLYDE** H

My Lords,

3 Section 39(5) of the Marine Insurance Act 1906 concerns the case where "with the privity of the assured, the ship is sent to sea in an unseaworthy state." The underwriters argue that the assured had "blind-eye

knowledge" of the two particular respects in which the ship was unseaworthy. Blind-eye knowledge in my judgment requires a conscious reason for blinding the eye. There must be at least a suspicion of a truth about which you do not want to know and which you refuse to investigate. The argument on that approach then fails on the facts. I am not able to spell out of the judgment of Tuckey J any finding that the insured, or particularly any of those whose states of mind may be attributed to that of the insured, suspected any incompetence on the part of the master of the *Star Sea*, let alone any suspicion of his incompetence in the particular respect which mattered. That is sufficient to dispose of this part of the case; but in any event there is no finding of a suspicion on the part of the insured of the defective state of the dampers which contributed to the loss.

4 As regards the other chapter in the case I consider that it also fails on the facts. Even if the defendants were correct in requiring fair dealing and disclosure at the stage of the litigation I am not persuaded that the evidence supports the proposition that there was in fact any "culpable non-disclosure", as it was termed, on the part of the insured. As regards the obligations in law of an insured at the stage of a disputed claim I take the view that there is no duty upon the insured to make a full disclosure of his own case to the other side in a litigation. I see no practical justification for such an obligation at that stage. Unlike the initial stage when the insurer may rely very substantially upon the openness of the insured in order to decide whether or not to agree to provide insurance cover, and if so at what level of premium, the insurer has open to him means of discovery of any facts which he requires to know for his defence to the claim. Moreover I have found no precedent to support the defendants' proposition; if anything the authority at least of *MacGillivray on Insurance Law*, 9th ed (1997), para 19–59 points in the opposite direction. The idea of a requirement for full disclosure superseding the procedural controls for discovery in litigation is curious and unattractive, and one which would require to be soundly based in authority or principle.

5 What has caused me greater difficulty is the broad provision in section 17 which appears to be unlimited in its scope. The expression "utmost good faith" appears to derive from the idea of uberrimae fidei, words which indeed appear in the sidenote, but whose origin I have not been able to trace. The concept of uberrima fides does not appear to have derived from civil law and it has been regarded as unnecessary in civilian systems (*Professor T B Smith, A Short Commentary on the Law of Scotland* (1962), p 836, quoting M A Millner "Fraudulent Non-Disclosure" (1957) 76 SALJ 177, pp 188–189). Indeed more recently the suggestion has been advanced in the Court of Appeal in South Africa that the concept should be jettisoned: *Mutual and Federal Insurance Co Ltd v Oudtshoorn Municipality* 1985 (1) SA 419, 433. *Blackstone's Commentaries,* 4th ed (1876), vol II, Chapter 30, pp 412–413 states that the very essence of contracts of marine insurance "consists in observing the purest good faith and integrity", but in *Carter v Boehm* (1766) 3 Burr 1905, 1910, Lord Mansfield refers simply to "good faith".

6 On the face of it the comprehensive degree of disclosure which the phrase implies and the absence of any limitation upon the period over which the obligation is to extend gives some support to the defendants' contention. But if the view which I have preferred is correct and the highest degree of

openness is not required at the stage of a disputed claim, then the superficial meaning of section 17 cannot be correct. One solution is to impose a limit upon the period of the relationship between the parties to which the statutory provision is meant to apply so that it would only apply to pre-contract negotiations. That can be supported by the fact that the section is placed in a group of provisions dealing with disclosure and representation. The special provisions which immediately follow section 17 may embellish the general rule which applies at the period of formation, but not be exhaustive of it. But that solution now appears to be past praying for. In these circumstances the alternative remains available of adopting a flexible construction of the concept of utmost good faith. The latter course was the one which the insured has adopted and which I would accept. A B

7 Since even after the contract is entered into the relationship between the parties should in any event be coloured by considerations of good faith, the point is in some respects academic. But once it is recognised that in a contract of insurance, and indeed in certain other contracts, an element of good faith is to be observed, and that that element may impose certain duties particularly of disclosure between one party and the other, duties which may vary in their content and substance according to the circumstances, then a question may arise as to the utility of the concept of an utmost good faith or an uberrima fides. In my view the idea of good faith in the context of insurance contracts reflects the degrees of openness required of the parties in the various stages of their relationship. It is not an absolute. The substance of the obligation which is entailed can vary according to the context in which the matter comes to be judged. It is reasonable to expect a very high degree of openness at the stage of the formation of the contract, but there is no justification for requiring that degree necessarily to continue once the contract has been made. C D E

8 I agree that the appeal should be dismissed.

**LORD HOBHOUSE OF WOODBOROUGH**

My Lords,

9 On 8 November 1989, brokers acting for the Kollakis group of companies renewed with underwriters the marine hull and machinery cover on the 40 or so vessels in their fleet for a further year. One of the vessels was the Cypriot motor vessel *Star Sea*, built in 1974 and having a gross tonnage of 6,925 tons. She was a dry cargo vessel having her engine room and accommodation amidships and four refrigerated holds suitable for carrying bananas and this was the trade in which she was primarily employed. The trade is seasonal and it was usual for the Kollakis group to lay up their refer vessels during the late summer and autumn. The *Star Sea* was laid up in the Piraeus during which time annual maintenance and repairs were done by local contractors. She sailed on her first voyage following lay-up on 28 November 1989 manned by a Maldivian crew with Greek officers. Before she sailed she was inspected by a class surveyor and her cargo ship safety certificate, covering among other things fire safety, was renewed. The renewed insurance cover had attached on 25 November. Her insured value was US$ 3·2m. The insurance was governed by English law and no specific clauses in the policies have been relied on by either side on this appeal. The provisions of the Marine Insurance Act 1906 apply. Loss by fire is a peril insured against. F G H

10 Between November 1989 and May 1990, no incident occurred relevant to this appeal. There was a minor engine room fire in March but this was simply dealt with using fire extinguishers. In January there was also a question of the efficiency of the emergency fire pump drawing water from the forepeak. A temporary fire pump was provided which satisfied the local surveyor but the suction in the forepeak was left in a condition where it would not draw unless the tank was filled; it was normally empty when the vessel was laden. However nothing now turns on these matters; they did not contribute to what was subsequently to occur.

11 On 27 May 1990 the *Star Sea* sailed from Corinto, Nicaragua bound for Zeebrugge laden with a cargo of bananas, mangoes and coffee. Two days out, on the morning of 29 May, a fire was accidentally started in the engine room workshop where the third engineer was using an oxyacetylene torch and it flashed back to the oxygen gas bottles. Attempts to use extinguishers on the fire were defeated by smoke. After about two and a half hours the master decided to use the $CO_2$ system. The actions then taken were not effective to put out the fire and it continued to burn although for a while the crew thought it had been extinguished.

12 The vessel had sent out distress calls and these were responded to. The first vessel to arrive departed during the afternoon because the crew thought that the fire was out and that they did not need further assistance. During the early evening it became only to obvious that this was not so. The fire spread to the accommodation. A tug arrived during the early hours of the following day and the fire was unsuccessfully fought for the next day using the tug's monitors. The vessel was towed into Balboa arriving on 1 June with the fire still burning. At Balboa the fire was eventually extinguished but the damage was so extensive that the vessel had become a constructive total loss ("CTL").

13 Notice of abandonment was given to underwriters on 12 June. It was not accepted. On 10 July the underwriters agreed to put the assured in the same position as if a writ had been issued. The writ in the action endorsed with points of claim was issued on 3 August and served a month later. The writ named two representative underwriters as defendants.

14 At the trial of the action before Tuckey J [1995] 1 Lloyd's Rep 651, various issues of fact and law were raised by the defendants in response to the claim. Only two are now of relevance.

15 The first is the defence that arises under section 39(5) of the Act. For voyage policies there is an implied warranty (section 39(1)) that at the commencement of the voyage the ship shall be seaworthy, i e, reasonably fit in all respects to encounter the ordinary perils of the seas of the adventure insured (section 39(4)). Such a warranty must be exactly complied with, whether it be material to the risk or not, and if not complied with the insurer is discharged from liability as from the date of the breach of warranty (section 33(3)). The policy in question here is a time policy, not a voyage policy. Section 39(5) provides:

> "In a time policy there is no implied warranty that the ship shall be seaworthy at any stage of the adventure, but where, with the privity of the assured, the ship is sent to sea in an unseaworthy state, the insurer is not liable for any loss attributable to unseaworthiness."

16 There are therefore three elements in this defence. First, there must have been unseaworthiness at the time the vessel was sent to sea. Secondly, the unseaworthiness must have been causative of the relevant loss: *Thomas v Tyne and Wear Steamship Freight Insurance Association* [1917] 1 KB 938. Thirdly, the assured must have been privy to sending the ship to sea in that condition. At the trial it was accepted that this defence could only defeat the claim for the CTL. The vessel had become a CTL under the policy because the fire had not been put out until it had caused such extensive damage to the vessel that the cost of repairing the damage would have exceeded her insured value. But some damage would have been caused by the fire in any event. It was accepted that the occurrence of the original fire was not attributable to any unseaworthiness; accordingly this defence would not bar a recovery for the lesser (but nevertheless substantial) partial loss.

17 Tuckey J found that the vessel had been unseaworthy in two respects which had concurrently caused the vessel to be so severely damaged that she became a constructive total loss. He also found that the assured had been privy to the vessel putting to sea unseaworthy in those respects. Therefore he held that the defence was made out in so far as the CTL claim was concerned.

18 The second defence was said to arise under section 17 of the Act:

> "*Insurance is uberrimae fidei* 17 A contract of marine insurance is a contract based upon the utmost good faith, and, if the utmost good faith be not observed by either party, the contract may be avoided by the other party."

The case of the defendants was that the assured was under a continuing duty of the utmost good faith to disclose to them any information material to the claim and which might affect their decision to pay or defend the claim. The defendants argued that this duty continued notwithstanding that litigation had started and had been broken by the assured's (and their lawyer's) failure to disclose certain facts material to the defence under section 39(5). Accordingly, the defendants said, they were entitled to avoid the whole contract ab initio—with retrospective effect—and therefore had a complete defence to the whole of the claim, both the CTL and the partial loss.

19 Tuckey J held that this defence failed both in law and on the facts. He therefore gave judgment for the assured limited to the partial loss (giving, on his assessment, a recovery of some US$ 1·7m).

20 Both sides appealed to the Court of Appeal. The Court of Appeal (Leggatt, Henry and Waller LJJ) [1997] 1 Lloyd's Rep 360 in a judgment of the court delivered by Leggatt LJ dismissed the appeal of the defendants but allowed the appeal of the assured, reversing certain of the judge's findings of fact in relation to the first defence. The Court of Appeal therefore entered judgment for the assured in respect of their claim for a CTL. It is from this decision that the defendants have with the leave of your Lordships' House brought this appeal. The defendants submit that both defences should have succeeded. Since the utmost good faith defence (section 17) arises in connection with the privity defence (section 39(5)), I will take the privity defence first.

*Section 39(5): the relevant unseaworthiness*

21 The judge found that the vessel was unseaworthy in a number of respects when she set sail from Corinto. These reflected the age of the vessel

and a low standard of maintenance. But he found that the failure to put out the fire on the morning of 29 May was attributable to only two of them. The vessel was equipped with a $CO_2$ fire extinguishing system. This system worked on the principle of discharging a large quantity of $CO_2$ gas into the engine room so as to suffocate and thereby extinguish the fire by depriving it of free oxygen. For the system to be effective a number of conditions have to be observed. It should be used as soon as possible, before the fire has spread to other spaces. The engine room must first have been sealed closing all the vents and other apertures through which $CO_2$ might escape or oxygen enter thus prejudicing the suffocation of the fire. The full amount of $CO_2$ should be discharged at one time into the engine room so as to flood it with the gas and maximise the suffocating effect. The attempt at around noon on 29 May to put out the fire using $CO_2$ was not successful because the attempt had been left until some two hours after the fire had started, the engine room could not be sealed as the funnel dampers were in a defective condition and could not be fully closed, and only half of the $CO_2$ was used for the attempt. The $CO_2$ was kept in a special store outside the engine room holding four banks of bottles. The contents of the bottles could be discharged directly into the engine room by pulling a lever. The wires leading from the lever to two of the banks were broken. The system for discharging the bottles had not been properly maintained. When the lever was pulled only two of the banks were discharged. Had the need to discharge all four banks at the same time been appreciated the other two banks could have been discharged by different means but this need was not appreciated and it was not done at that time.

**22** The judge found that the failure to use the $CO_2$ earlier and the failure to use all four banks of bottles at once was attributable to the incompetence of the master in that he was ignorant of what was required for the successful use of the $CO_2$ system. He held that this disabling lack of knowledge on the part of the master amounted to unseaworthiness: *Standard Oil Co of New York v Clan Line Steamers Ltd* [1924] AC 100. The judge found that the defective condition of the funnel dampers which made it impossible to shut them fully also amounted to unseaworthiness. On the hearing of the appeal these findings were not challenged. The defendants also conceded that, for the purposes of making good the defence under section 39(5), it was necessary for them to establish that the assured was privy to both of these aspects of unseaworthiness. Thus it was conceded that, if the defendants fail to show privity in respect of the master's incompetence, the defendants' defence under section 39(5) fails regardless of what may have been the position about the condition of the dampers: see the Court of Appeal judgment, [1997] 1 Lloyd's Rep 360, 378. The concession was repeated before your Lordships. Whether or not this concession was correctly made has therefore not been the subject of argument before your Lordships: for the purposes of this case, I proceed on the basis of the concession.

*Privity: the law*

**23** It was accepted that the assured (however defined) did not have actual direct knowledge of the relevant unseaworthiness. But it was argued that the assured had a state of mind which was equivalent to knowledge—so-called "blind eye knowledge". This was the type of knowledge which the judge [1995] 1 Lloyd's Rep 651, 664 held had been proved.

**24** The expression was used by Lord Denning MR in *Cia Maritima San Basilio SA v Oceanus Mutual Underwriting Association (Bermuda) Ltd (The Eurysthenes)* [1977] QB 49, 68 in relation to a defence of privity under section 39(5) which had been raised in answer to a claim under a policy of marine insurance: A

> "To disentitle the shipowner, he must, I think, have knowledge not only of the facts constituting the unseaworthiness, but also knowledge that those facts rendered the ship unseaworthy, that is, not reasonably fit to encounter the ordinary perils of the sea. And, when I speak of knowledge, I mean not only positive knowledge, but also the sort of knowledge expressed in the phrase 'turning a blind eye'. If a man, suspicious of the truth, turns a blind eye to it, and refrains from inquiry—so that he should not know it for certain—then he is to be regarded as knowing the truth. This 'turning a blind eye' is far more blameworthy than mere negligence. Negligence in not knowing the truth is not equivalent to knowledge of it." B C

Geoffrey Lane LJ in the same case, at p 81, stressed that privity meant knowledge and consent and was not equivalent to negligence. But he added the word "believed": "I add the word 'believed' to cover the man who deliberately turns a blind eye to what he believes to be true in order to avoid obtaining certain knowledge of the truth." Roskill LJ discussed the point, at p 76. He was prepared to accept the expression "conscious realisation". He agreed with what Lord Denning MR had said. He added: D

> "If the facts amounting to unseaworthiness are there staring the assured in the face so that he must, had he thought of it, have realised their implication upon the seaworthiness of his ship, he cannot escape from being held privy to that unseaworthiness by blindly or blandly ignoring those facts or by refraining from asking relevant questions regarding them in the hope that by his lack of inquiry he will not know for certain that which any inquiry must have made plain beyond possibility of doubt." E

**25** All these formulations reject the suggestion that even gross negligence will suffice. The use of the word "suspicion" and "belief" are indicative of the strength of the suspicion that is required. But perhaps the most helpful guide is to be found in what was said by Roskill and Geoffrey Lane LJJ about the reason for refraining from inquiry—"in the hope that by his lack of inquiry he will not know for certain"—"in order to avoid obtaining certain knowledge of the truth". It is probable that Lord Denning MR was saying the same thing when he used the phrase "so that he should not know it for certain". The illuminating question therefore becomes "why did he not inquire?" If the judge is satisfied that it was because he did not want to know for certain, then a finding of privity should be made. If, on the other hand, he did not inquire because he was too lazy or he was grossly negligent or believed that there was nothing wrong, then privity has not been made out. An ambiguity has arisen from the use by Roskill LJ of the phrase "had he thought of it". This suggests that the test may be objective. If so, that is not correct. The test is subjective: Did the assured have direct knowledge of the unseaworthiness or an actual state of mind which the law treats as equivalent to such knowledge? F G H

A **26** This conclusion is in line with what Branson J had said 40 years earlier in *Cia Naviera Vascongada v British & Foreign Marine Insurance Co Ltd (The Gloria)* (1935) 54 Ll L Rep 35, 58:

> "I think that if it were shown that an owner had reason to believe that his ship was in fact unseaworthy, and deliberately refrained from an examination which would have turned his belief into knowledge, he B might properly be held privy to the unseaworthiness of his ship. But the mere omission to take precautions against the possibility of the ship being unseaworthy cannot, I think, make the owner privy to any unseaworthiness which such precaution might have disclosed."

If the shipowner *deliberately* refrains from examining the ship in order not to gain direct knowledge of what he has reason to believe is her unseaworthy C state, he is privy to the ship putting to sea in that unseaworthy state.

**27** The section refers to the privity of the assured; the privity must be of an individual who is to be identified with the assured. The owners of the *Star Sea* were the Manifest Shipping Co Ltd (the plaintiffs in the action), a Cypriot company beneficially owned by the Kollakis family. The management of the vessel was in fact delegated to an English company based in London, Kappa Maritime Ltd. At the material times the directors of D Kappa were Captain Stefanos Kollakis and his sons Pantelis and George, who were concerned with commercial and operational matters, and Mr Nicholaidis, the technical director. The registered managers were a Greek company, Charterwell Maritime SA, based in the Piraeus. Its directors were Captain Stefanos and a Mr Faraklas (who was also the sole director of Manifest). The role of Mr Faraklas was in fact subordinate to E that of Mr Nicholaidis and the other directors of Kappa. The judge held that Captain Stefanos and his two sons and Mr Faraklas were to be treated as coming within "the assured" for the purposes of section 37(5); the Court of Appeal considered that Mr Nicholaidis did as well. Nothing however turns on this in the present case and I will proceed on the basis that the state of mind of any of these individuals may have been relevant to the question of privity.

F

*Privity: the facts*

**28** The defendants' case on privity was based upon what had happened the previous year to two of the other vessels in the Kollakis fleet. In February 1989 the *Centaurus* was alongside in Wilmington, Delaware, when there was a fire in the engine room. The crew initially did nothing to fight the fire G and simply summoned the local fire brigade who were not able to put out the fire until some 15 hours later. The vessel was fitted with a $CO_2$ system but the Korean officers did not use it as they should because they apparently had the extraordinary belief that its use would in some way damage the engines. They left its use until it was too late for it to be effective to extinguish the fire. It also emerged that the engine room could not be effectively sealed. The vessel was a constructive total loss.

H **29** The other vessel was the *Kastora*. She also had Korean officers and crew. In April 1989 she was at sea in the Carribean. There was an engine room fire which again was not put out and allowed to spread so that the vessel became a constructive total loss. On this occasion the crew did use the $CO_2$ within about half an hour of the start of the fire but it was not effective

because the funnel dampers were not closed. The surveyor instructed by Kappa was a Dr Atherton who inspected the vessel twice. The first time was fairly soon after the fire. He then observed that one of the funnel dampers was sticking in a partially open position but thought that this might be due to its having been distorted in the fire: see his first report dated 22 May 1989. In mid-September he inspected the vessel again and reported that "an examination of the dampers themselves revealed that these were in poor condition and would not have provided an effective seal in the ventilator trunking": see his second report dated 22 September 1989.

30 There was no dispute that relevant individuals for the purpose of section 39(5) were aware of these facts. To lose two ships within the space of two months through engine room fires which should have been capable of being extinguished was remarkable and disturbing. The judge found that the assured's response was "completely inadequate". So far as the crews were concerned, Captain Stefanos and the others concerned in the management of the fleet decided that the Korean crews and officers were not good enough. They were influenced in this not only by their experiences with the *Centaurus* and the *Kastora* but also with the need to have competent and reliable crews for vessels engaged in the carriage of refrigerated cargoes. They changed over to having entirely Greek-officered vessels. This was the reason why the *Star Sea* when she came out of lay-up was given Greek officers. The master appointed to the *Star Sea* had been with the fleet for over 11 years with a good record of service, had been at sea for many years before that and had obtained his master's certificate in 1978. There was no evidence that the managers or any of the relevant persons believed that the captain they had appointed to the *Star Sea* was anything other than competent and experienced. But it was also the case that they took no steps to check his knowledge of the right way to use the $CO_2$ system.

31 So far as the maintenance of the equipment in engine rooms was concerned, the managers of the fleet did not take any special steps. It appears that they continued to rely upon the same maintenance procedures as before. In respect of the *Star Sea*, the managers engaged contractors to carry out necessary repairs and maintenance in the engine room before she returned to service in November 1989. They put her through the required surveys in order to obtain the renewal of her safety certificates. In January 1990 at Zeebrugge, further inspections were carried out. However, neither in relation to the *Star Sea* nor in relation to other vessels did the management specifically require or instruct their superintendents to check the state of the dampers and other engine room sealing components.

32 As is shown by the judge's findings as to the state of seaworthiness of *Star Sea* when she sailed from Corinto, the managers were at fault. The steps that they had taken to prevent any repetition of the disastrous engine room fires were inadequate, as he put it, "completely inadequate". The judge declined to find that there was any actual knowledge on the part of the relevant persons. He continued [1995] 1 Lloyd's Rep 651, 664:

> "However, I do find that there was blind eye knowledge on the part of the assured. The inadequate response to the earlier fires and the state of the *Star Sea* on 27 May [1990], demonstrate in my judgment that the assured did not want to know about her unseaworthiness in the relevant respects. What it comes down to specifically is this. With the message

A staring them in the face, that the $CO_2$ systems on *Centaurus* and *Kastora* had not been used so as to prevent those ships from becoming constructive total losses, the assured took no effective steps to ensure that this would not happen again. The incompetence of the master and the state of the safety equipment for sealing the engine room, essential to the effectiveness of the $CO_2$ system on *Star Sea* show only too clearly how ineffective those steps were and how inadequately equipped she was to B fight a fire effectively. The assured did not want to know about the competence of the master to use the $CO_2$ system effectively. It is not easy to find a reason for this, since it would not have involved much time or money to ensure that the master was competent. The assured did not want to know about the state of the safety equipment. One reason for this is not difficult to find: money. This was an elderly vessel for which, as C I find, there was a tight budget for repairs. A good deal of time and money had been spent on repairing in lay-up and maintaining at sea the reefer machinery which was, of course, essential to its revenue earning ability."

33 Thus he does use the phrases drawn from the previous cases—"the assured did not want to know"—"staring them in the face"—but it is all D postulated upon the inadequacy of the response to the earlier fires not upon any belief that would relate to the *Star Sea* herself. Whatever might be said about a tendency to skimp on repairs, nothing at all (as the judge himself points out) was to be gained by failing to check the master's state of knowledge of using $CO_2$ and taking the simple steps, with no adverse costs implications, necessary to put any deficiency right. This is the point which E was taken up by the Court of Appeal [1997] 1 Lloyd's Rep 360. Leggatt LJ said, at p 377, "an allegation that they ought to have known [is] not an allegation that they suspected or realised but did not make further inquiries". He reviewed the evidence and continued, at p 378:

"Accordingly, on the evidence, it was simply not open to the judge to make a finding that any of the individuals 'suspected' or 'believed' that F the master was incompetent, lacking the basic knowledge on how to utilise $CO_2$. The judge, it is right to say, himself recognised that it was not easy to find a reason why, in making a decision to change the crew, anyone should do so to persons it was 'suspected' or 'believed' would render the ship unseaworthy. Negligence there may have been in failing to ensure that the master was instructed, but 'suspicion' in the minds of any of the relevant individuals that an incompetent master might be being G used was simply not established."

34 The Court of Appeal therefore reversed the finding of the judge. This sufficed (on the concession which had been made) to defeat the defence under section 39(5). They accordingly did not need to deal in detail with the question of privity in relation to the dampers. They pointed out, correctly, that the judge had not made a finding that any of the relevant individuals had H suspected or believed that the *Star Sea* might be unseaworthy because of defects in the dampers. A finding of negligence to a very high degree did not suffice for a finding of privity.

35 There may have been two sources of the difference between the Court of Appeal and the judge on this part of the case. The one was the

confusion which has arisen from one of the phrases used by Roskill LJ in A *The Eurysthenes* [1977] QB 49 upon which I have already commented so as to have led to the use of an objective and not a subjective test. The other is the related point that evidence may provide support for making an inference that a person had a certain state of mind but may also be consistent with different states of mind. Thus the inadequate response to the previous casualties was evidence consistent with a number of states of mind of those concerned with the management of the fleet and does not without more B establish that there was privity in relation to any individual vessel.

36 I agree that the Court of Appeal were right to reverse the judge's findings of fact and to allow the owners' appeal. The evidence did not on the correct view of the law sustain the finding of privity. The defence under section 39(5) therefore fails.

C

*The section 17 defence: the facts*

37 The facts relied upon by the defendants arose from the facts concerning the dampers on the *Kastora* as reported by Dr Atherton to the owners. His first report in May 1989 had noted that they had not been closed but did not criticise their maintenance; his second in September 1989 did. The reports went to Mr Nicholaidis who told the judge that he did not pick up this addition in the second report. Tuckey J disbelieved him and D found further that Mr Nicholaidis had told Mr Faraklas that the dampers on the *Kastora* needed to be overhauled and repaired. In the present litigation the owners did not disclose Dr Atherton's reports, treating them as privileged. Further they did not disclose that he had, on his second visit to that vessel, found the dampers in a defective condition. They served a factual witness statement from Dr Atherton which did not refer to that fact. E The witness statements of the Kollakis brothers also did not refer to Dr Atherton's second report. The defendants also relied upon a brokers' letter written in conjunction with negotiations for the settlement of the action which they said was similarly misleading in relation to the *Kastora* casualty. The defendants thus alleged that there had been a failure to observe the utmost good faith in that there had been a failure to disclose material information and misleading statements had been made. Their F allegations involved also the owners' solicitors who were conducting the litigation on the owners' behalf and included allegations that what was done was done deliberately and that the untruths were reckless.

38 The judge rejected the substance of all these allegations. The various statements were not untrue and should not have misled. The brokers' letter was open to criticism but it was not dishonest, nor was it written recklessly. G The judge however did disbelieve what Mr Nicholaidis had said in his witness statement and in his oral evidence. Mr Nicholaidis was not responsible for the conduct of the litigation or the prosecution of the claim. The solicitors had treated the first Atherton report as privileged as indeed it was. They had been unaware of the existence of the second Atherton report until the second day of the trial as it had been temporarily mislaid amongst the papers for litigation relating to the *Kastora* casualty with which the H solicitors were not concerned. The judge did not make a finding of fraud against the owners.

39 The Court of Appeal upheld the judge's findings. In relation to the question of fraud, the case advanced by the defendants was that the decision

A to claim privilege for the Atherton reports was deliberate in the appreciation that its disclosure would weaken the owners' case. But, as the Court of Appeal pointed out, it was accepted that the reports were protected by legal privilege and it was believed by the solicitors that the owners were not under an obligation to disclose privileged documents unless and until they should choose to put them in evidence or call a witness who would be going to refer B to them. Thus actual fraud was not alleged and it was at no stage alleged that the claim was being put forward fraudulently without an honest belief that it was a claim that the owners were entitled to make. Therefore, if a finding of fraud was necessary for the defendants to succeed on their defence under section 17, they would fail. Neither the judge nor the Court of Appeal made such a finding against the owners.

**40** Before your Lordships the defendants contended that there was a C positive duty of fair dealing and disclosure any breach of which would amount, in effect, to constructive fraud giving rise to the section 17 remedy of an entitlement to avoid the contract. But the defendants also had to contend that the duty extended up to and included the pursuit of any claim in litigation since this was the stage at which the matters upon which they relied had occurred. Thus, the defendants argued that it was a breach of that D duty for the assured to claim privilege for a document which might assist the insurer to resist the claim.

*Section 17: the legal problems*

**41** Section 17 raises many questions. But only two of them are critical to the decision of the present appeal—the fraudulent claim question and the E litigation question. It is however necessary to discuss them in the context of a consideration of the problematic character of section 17 which is overlaid by the historical and pragmatic development of the relevant concept both before and since 1906.

**42** The history of the concept of good faith in relation to the law of insurance is reviewed in the speech of Lord Mustill in *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501 and in a valuable and F well researched article (also containing a penetrating discussion of the conceptual difficulties) "Mapping the doctrine of utmost good faith in insurance contract law" by Howard Bennett [1999] LMCLQ 165. The acknowledged origin is Lord Mansfield's judgment in *Carter v Boehm* 3 Burr 1905. As Lord Mustill points out, Lord Mansfield was at the time attempting to introduce into English commercial law a general principle of G good faith, an attempt which was ultimately unsuccessful and only survived for limited classes of transactions, one of which was insurance. His judgment in *Carter v Boehm* was an application of his general principle to the making of a contract of insurance. It was based upon the inequality of information as between the proposer and the underwriter and the character of insurance as a contract upon a "speculation". He equated non-disclosure H to fraud. He said, at p 1909:

> "The keeping back [in] such circumstances is a fraud, and therefore the policy is void. Although the suppression should happen through mistake, without any fraudulent intention; yet still the underwriter is deceived, and the policy is void."

It thus was not actual fraud as known to the common law but a form of mistake of which the other party was not allowed to take advantage. Twelve years later in *Pawson v Watson* (1778) 2 Cowp 785, 788, he emphasised that the avoidance of the contract was as the result of a rule of law: A

"But as, by the law of merchants, all dealings must be fair and honest, fraud infects and vitiates every mercantile contract. Therefore, if there is fraud in a representation, it will avoid the policy, as a fraud, but not as a part of the agreement." B

43 Echoes of his more universal approach could still be found nearly a century later in a judgment of Lord Cockburn CJ in *Bates v Hewitt* (1867) LR 2 QB 595, 606–607:

"If we were to sanction such [non-disclosure], especially in these days, when parties frequently forget the old rules of mercantile faith and honour which used to distinguish this country from any other, we should be lending ourselves to innovations of a dangerous and monstrous character, which I think we ought not to do." C

44 It was probably the need to distinguish those transactions to which Lord Mansfield's principle still applied which led to the coining of the phrases "utmost" good faith and "uberrimae fidei", phrases not used by Lord Mansfield and which only seem to have become current in the 19th century. Storey used the expression "greatest good faith", *Wharton's Law Lexicon* 14th ed (1938), p 1020 "the most abundant good faith"; a Scottish law dictionary (*Trayner, Latin Maxims and Phrases*, 2nd ed (1876), p 590) used "the most full and copious" good faith; some English judges referred to "perfect" good faith (Willes J in *Britton v Royal Insurance Co* (1866) 4 F & F 905) and Lord Cockburn CJ to "full and perfect faith" (*Bates v Hewitt*, LR 2 QB 595, 606). But "utmost" became the most commonly used epithet and its place was assured by its use in the 1906 Act. The connotation appears to be the most extensive, rather than the greatest, good faith. The Latin phrase was likewise a later introduction. It has been suggested that its use may have been inspired by the use of similar language in Book IV of the *Codex of Justinian* (4.37.3) in relation to the contract of partnership. The best view seems to be that it had been unknown to Roman law and had no equivalent in Roman law: *Mutual and Federal Insurance Co Ltd v Oudtshoorn Municipality* 1985 (1) SA 419, 432 per Joubert JA . The first recorded use of the phrase in the law reports was by Lord Commissioner Rolfe (later Lord Cranworth LC) in *Dalglish v Jarvie* (1850) 2 Mac & G 231, 243 in connection with the duty of disclosure to the court which arises when an ex parte application is made for an injunction; the phrase was however already current by that date as the judgment shows. D E F G

45 Lord Mansfield's universal proposition did not survive. The commercial and mercantile law of England developed in a different direction preferring the benefits of simplicity and certainty which flow from requiring those engaging in commerce to look after their own interests. H

"Ordinarily the failure to disclose a material fact which might influence the mind of a prudent contractor does not give the right to avoid the contract. The principle of caveat emptor applies outside contracts of sale. There are certain contracts expressed by the law to be contracts of

A the utmost good faith, where material facts must be disclosed; if not, the contract is voidable. Apart from special fiduciary relationships, contracts for partnership and contracts of insurance are the leading instances. In such cases the duty does not arise out of contract; the duty of a person proposing an insurance arises before a contract is made, so of an intending partner." Per Lord Atkin in *Bell v Lever Bros Ltd* [1932] AC 161, 227.

B

**46** In relation to insurance Lord Mansfield was specifically addressing "concealments which avoid a policy". This concept of avoidance most obviously applies to the making of the contract and derives, as he said in *Pawson v Watson* 2 Cowp 785 and as confirmed by Lord Atkin, from the application of a rule of law not from the parties' agreement. Later C developments have applied the requirement of disclosure to matters occurring after the making of the contract of insurance, namely, the affidavit of ship's papers and the making of fraudulent claims; I will have to discuss these further. But, apart from some dicta, this has still been as a matter of the application of a principle of law and not through an implied contractual term. Nor was there any case prior to the Act where the principle was used otherwise than as providing a basis for resisting liability; no case was cited D where the principle gave a remedy in damages, as would the tort of deceit or the breach of a contractual term. Whether there was a remedy in damages for a failure to observe good faith was finally and authoritatively considered by the Court of Appeal in *Banque Keyser Ullmann SA v Skandia (UK) Insurance Co Ltd* [1990] 1 QB 665, affirmed by your Lordships' House [1991] 2 AC 249, 280. In order to answer the question, both Steyn J at first E instance ([1990] 1 QB 665, 699 et seq) and the Court of Appeal (p 773 et seq) examined the basis of the requirement that good faith be observed. Having concluded on the authorities that the correct view was that the requirement arose from a principle of law, having the character I have described, the Court of Appeal held that there was no right to damages.

**47** The arguments of counsel in the present case disclosed a certain amount of common ground between them. The principle of utmost good F faith is not confined to marine insurance; it is applicable to all forms of insurance (*London Assurance v Mansel* (1879) 11 Ch D 363, *Cantiere Meccanico Brindisino v Janson* [1912] 3 KB 452) and is mutual as section 17 itself affirms by using the phrase "if the utmost good faith be not observed by *either* party" and as was expressly stated by Lord Mansfield in *Carter v Boehm* 3 Burr 1905.

G **48** Secondly, both counsel submitted that the utmost good faith is a principle of fair dealing which does not come to an end when the contract has been made. A different inference might have been drawn both from the language of section 17 and from its place in the Act—beneath the heading "Disclosure and Representations" and above sections 18 to 21 which expressly relate to matters arising before the making of the contract. But there is a weight of dicta that the principle has a continuing relevance to the H parties' conduct after the contract has been made. Why indeed, it may be asked, should not the parties continue to deal with one another on the basis of good faith after as well as before the making of the contract? In his book upon the Act published in 1907, Sir MacKenzie Chalmers added this note to section 17: "Note: The general principle is stated in this section because the

special sections which follow are not exhaustive." (*The Marine Insurance Act 1906*, 1st ed (1907), p 25.). There are many judicial statements that the duty of good faith can continue after the contract has been entered into. The citations which I make during the course of this speech will demonstrate this. To take just one example for the moment, in *Overseas Commodities Ltd v Style* [1958] 1 Lloyd's Rep 546, 559, McNair J referred to the obligation of good faith towards underwriters being an obligation which rests upon the assured "throughout the currency of the policy". However, as will also become apparent from the citation, the content of the obligation to observe good faith has a different application and content in different situations. The duty of disclosure as defined by sections 18 to 20 only applies until the contract is made. A B

**49** Thirdly, both counsel accept and assert that the conclusion of the Court of Appeal in the *Banque Keyser* case [1990] 1 QB 665 is good law and that there is no remedy in damages for any want of good faith. Counsel also drew this conclusion from the second half of section 17—"may be avoided by the other party". The sole remedy, they submitted, was avoidance. It follows from this that the principle relied upon by the defendants is not an implied term but is a principle of law which is sufficient to support a right to avoid the contract of insurance retrospectively. C

**50** Having a contractual obligation of good faith in the performance of the contract presents no conceptual difficulty in itself. Such an obligation can arise from an implied or inferred contractual term. It is commonly the subject of an express term in certain types of contract such as partnership contracts. Once parties are in a contractual relationship, the source of their obligations the one to the other is the contract (although the contract is not necessarily exclusive and the relationship which comes into existence may of itself give rise to other liabilities, for example liabilities in tort). The primary remedy for breach of contract is damages. But the consequences of breach of contract are not confined to this. The contractual significance of the breach may go further. It may also amount to a breach of a contractual condition which will excuse or suspend the other party's obligation to continue to perform the contract. It may be a repudiatory breach, or evidence a renunciation, which entitles the other party to terminate the contract and sue for damages. However any such release only applies prospectively and does not affect already accrued rights: *Colonial Bank v European Grain and Shipping Ltd* [1989] AC 1056. Ordinarily, the right to the indemnity accrues as soon as the loss has been suffered: *Chandris v Argo Insurance Co Ltd* [1963] 2 Lloyd's Rep 65. D E F

**51** The right to avoid referred to in section 17 is different. It applies retrospectively. It enables the aggrieved party to rescind the contract ab initio. Thus he totally nullifies the contract. Everything done under the contract is liable to be undone. If any adjustment of the parties' financial positions is to take place, it is done under the law of restitution not under the law of contract. This is appropriate where the cause, the want of good faith, has preceded and been material to the making of the contract. But, where the want of good faith first occurs later, it becomes anomalous and disproportionate that it should be so categorised and entitle the aggrieved party to such an outcome. But this will be the effect of accepting the defendants' argument. The result is effectively penal. Where a fully enforceable contract has been entered into insuring the assured, say, for a G H

period of a year, the premium has been paid, a claim for a loss covered by the insurance has arisen and been paid, but later, towards the end of the period, the assured fails in some respect fully to discharge his duty of complete good faith, the insurer is able not only to treat himself as discharged from further liability but can also undo all that has perfectly properly gone before. This cannot be reconciled with principle. No principle of this breadth is supported by any authority whether before or after the Act. It would be possible to draft a contractual term which would have such an effect but it would be an improbable term for the parties to agree to and difficult if not impossible to justify as an implied term. The failure may well be wholly immaterial to anything that has gone before or will happen subsequently.

52 A coherent scheme can be achieved by distinguishing a lack of good faith which is material to the making of the contract itself (or some variation of it) and a lack of good faith during the performance of the contract which may prejudice the other party or cause him loss or destroy the continuing contractual relationship. The former derives from requirements of the law which pre-exist the contract and are not created by it although they only become material because a contract has been entered into. The remedy is the right to elect to avoid the contract. The latter can derive from express or implied terms of the contract; it would be a contractual obligation arising from the contract and the remedies are the contractual remedies provided by the law of contract. This is no doubt why judges have on a number of occasions been led to attribute the post-contract application of the principle of good faith to an implied term.

53 The principle relied on by the defendants is a duty of good faith requiring the disclosure of information to the insurer. They submit that the obligation as stated in section 17 continues throughout the relationship with the same content and consequences. Thus, they argue that any non-disclosure at any stage should be treated as a breach of the duty of good faith: it has the same essential content and gives rise to the same remedy—the right to avoid.

54 In the pre-contract situation it is possible to provide criteria for deciding what information should be disclosed and what need not be. The criterion is materiality to the acceptance of the risk proposed and the assessment of the premium. This is spelled out in the 1906 Act and was the subject of the *Pine Top* case [1995] 1 AC 501. But when it comes to post-contract disclosure the criterion becomes more elusive: to what does the information have to be material? Some instructive responses have been given. Where the contract is being varied, facts must be disclosed which are material to the *additional* risk being accepted by the variation. It is not necessary to disclose facts occurring, or discovered, since the original risk was accepted material to the acceptance and rating of that risk. Logic would suggest that such new information might be valuable to the underwriter. It might affect how hard a bargain he would drive in exchange for agreeing to the variation; it might be relevant to his reinsurance decisions. But it need not be disclosed. In *Lishman v Northern Maritime Insurance Co* (1875) LR 10 CP 179, 182 Blackburn J said:

> "concealment of material facts known to the assured before effecting the insurance will avoid the policy, the principle being that with regard to insurance the utmost good faith must be observed. Suppose the policy

were actually executed, and the parties agreed to add a memorandum afterwards, altering the terms: if the alteration were such as to make the contract more burdensome to the underwriters, and a fact known at that time to the assured were concealed which was material to the alteration, I should say the policy would be vitiated. But if the fact were quite immaterial to the alteration, and only material to the underwriter as being a fact which showed that he had made a bad bargain originally, and such as might tempt him, if it were possible, to get out of it, I should say that there would be no obligation to disclose it."

55 Blackburn J is adopting a similar approach to that which he adopted in the leading case *Cory v Patton* (1872) LR 7 QB 304 which concerned whether there was a duty to disclose adverse facts discovered between the time that the underwriter had accepted the risk by initialling the slip binding in honour only, and the issue of the legally binding policy. Blackburn J said, at pp 308–309, that the underwriter cannot depart "from the terms thus agreed on [in the slip] without a breach of faith"; and the assured need not disclose to the underwriter "information which ought to have no effect on him, but would expose him to a temptation to break his contract . . . he is not bound to lead his neighbour into temptation". The duty of good faith is even-handed and is not to be used by the opposite party as an opportunity for himself acting in bad faith.

56 The decision in *Cory v Patton* was endorsed by the 1906 Act. What Blackburn J said in the *Lishman* case was followed in many subsequent cases, for example, *Niger Co Ltd v Guardian Assurance Co Ltd* (1922) 13 Ll L Rep 75, particularly per Lord Buckmaster, at pp 76–77; *Iron Trades Mutual Insurance Co Ltd v Cia De Seguros Imperio* (unreported) 31 July 1990; *Bank of Nova Scotia v Hellenic Mutual War Risks Association (Bermuda Ltd)* [1988] 1 Lloyd's Rep 514. In the *Niger* case an additional argument was advanced. The policy in that case was one which covered the assured for a number of years but it included a cancellation clause which allowed the insurance company to cancel the policy. The risk turned out to be more onerous than had been expected because there was a tendency for considerable quantities of goods to accumulate in the up-river warehouse from which they were to be dispatched. The insurance company sought to avoid the policy or resist a claim because this post-contract development of which the assured was aware had not then been disclosed by the assured to the insurance company. Obviously the development was of interest to the insurance company and might have led it to exercise its right of cancellation. But the Court of Appeal ((1921) 6 Ll L Rep 239, particularly per Bankes LJ, at p 245) and the House of Lords held that such facts need not be disclosed. (See also *New Hampshire Insurance Co v MGN Ltd* [1997] LRLR 24.) A similar decision has been reached in Australia, *NSW Medical Defence Union Ltd v Transport Industries Insurance Co Ltd* (1985) 4 NSWLR 107.

57 These authorities show that there is a clear distinction to be made between the pre-contract duty of disclosure and any duty of disclosure which may exist after the contract has been made. It is not right to reason, as the defendants submitted that your Lordships should, from the existence of an extensive duty pre-contract positively to disclose all material facts to the conclusion that post-contract there is a similarly extensive obligation to disclose all facts which the insurer has an interest in knowing and which

23-01165-mew Doc 67-5 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (4) Pg 70 of 198



might affect his conduct. The courts have consistently set their face against allowing the assured's duty of good faith to be used by the insurer as an instrument for enabling the insurer himself to act in bad faith. An inevitable consequence in the post-contract situation is that the remedy of avoidance of the contract is in practical terms wholly one-sided. It is a remedy of value to the insurer and, if the defendants' argument is accepted, of disproportionate benefit to him; it enables him to escape retrospectively the liability to indemnify which he has previously and (on this hypothesis) validly undertaken. Save possibly for some types of reinsurance treaty, it is hard to think of circumstances where an assured will stand to benefit from the avoidance of the policy for something that has occurred after the contract has been entered into; the hypothesis of continuing dealings with each other will normally postulate some claim having been made by the assured under the policy.

*Ships' papers*

58 The order for ship's papers was an order made by the common law courts for the disclosure, on affidavit, of all the documentary material which had come into existence in relation to the ship which had suffered the casualty and had any possible relevance to the claim. It was made in actions brought by the assured under contracts of marine assurance and covered wider classes of document than those directly within the possession or power of the plaintiff. The classes of document were set out in the form of order which was by the end of the 19th century in a standard form and was formalised in an appendix to the Rules of the Supreme Court (latterly Ord 72, r 10). The sanction was the stay of the action until the order had been complied with. Compliance with the order was onerous and the sanction left the assured with little choice but to comply or to abandon his claim. The order never extended to non-marine insurance. In the last century, although still formally permitted by the Rules of the Supreme Court in all marine insurance actions, the order was as a matter of judicial policy confined to those cases where the underwriter defendants were prepared to state through counsel that they proposed to plead that the vessel had been wilfully cast away with the privity of the assured (i e scuttling): *Probatina Shipping Co Ltd v Sun Insurance Office Ltd* [1974] QB 635. Within the last 40 years, the order has become obsolete; it has been recognised that it is largely unnecessary even in scuttling cases and had become an instrument of unjust delay (a view expressed by Greer LJ as early as 1932: *Leon v Casey* [1932] 2 KB 576, 588–589).

59 There was throughout a paradox involved in the order. It was an order justified on the basis of the assured's duty of good faith towards the underwriter and accordingly to make full disclosure of all matters which might be material to the claim. But it was never made save in marine insurance cases and the attempt to obtain an order in connection with other types of insurance were rebuffed: *Twizell v Allen* (1839) 5 M & W 337 (claim in general average, no common law discovery), *Henderson v Underwriting and Agency Association Ltd* [1891] 1 QB 557 (insurance of goods carried by post Cadiz to Syria), *Village Main Reef Gold Mining Co Ltd v Stearns* (1900) 5 Com Cas 246 (land transit policy). The order was only made by the court in the exercise of its powers and was not as such a contractual right of the insurer. Neither failure to give that discovery

A without an order nor failure to comply with the order have ever been treated as providing a ground for the insurer to avoid the policy; it merely was the precursor of seeking from the court an order for such discovery or resisting the lifting of the stay. Yet it was repeatedly said by judges that the order was made because of a continuing duty of good faith and disclosure owed by the assured to the insurer: for example, Mathew LJ in *Boulton v Houlder Bros & Co* [1904] 1 KB 784, 791–792:

B

> "It is an essential condition of a policy of insurance that the underwriters shall be treated with good faith, not merely in reference to the inception of the risk, but in the steps taken to carry out the contract. That being the meaning of the contract, effect is given to it by means of the order for discovery of ship's papers, and the affidavit with relation to them."

C

**60** Historically, it seems probable that the original reason for advancing this justification was the need to establish a jurisdiction in the common law courts to make an order for discovery: *Goldschmidt v Marryat* (1809) 1 Camp 559; *Twizell v Allen* 5 M & W 337; *Graham Joint Stock Shipping Co Ltd v Motor Union Insurance Co Ltd* [1922] 1 KB 563. But it must be recognised that these statements of justification continued to be repeated by judges (myself included) long after that need had ceased. But it must also be D recognised that, whatever the continuing duty was, it was of a different character to that which exists pre-contract. Its extent was different. Its enforcement was in the discretion of the court and required an order from the court. Its breach did not give rise to the right to avoid the contract: so, whatever it was, it was not the obligation referred to in section 17 nor was it the subject matter of Lord Mansfield's judgment in *Carter v Boehm* 3 Burr E 1905. Similarly, it can be taken to support the argument of the owners in the present case that the section 17 obligation does not extend into litigation.

*Fraudulent claims*

**61** This question arises upon policies which up to the time of the making of the claim are to be assumed to be valid and enforceable. No right to avoid the contract had arisen. On ordinary contractual principles it would be F expected that any question as to what are the parties' rights in relation to anything which has occurred since the contract was made would be answered by construing the contract in accordance with its terms, both express and implied by law. Indeed, it is commonplace for insurance contracts to include a clause making express provision for when a fraudulent claim has been made. But it is also possible for principles drawn from the G general law to apply to an existing contract—on the better view, frustration is an example of this as is the principle that a party shall not be allowed to take advantage of his own unlawful act. It is such a principle upon which the defendants rely in the present case. As I have previously stated there are contractual remedies for breach of contract and repudiation which act prospectively and upon which the defendants do not rely. The potential is also there for the parties, if they so choose, to provide by their contract for H remedies or consequences which would act retrospectively. All this shows that the courts should be cautious before extending to contractual relations principles of law which the parties could themselves have incorporated into their contract if they had so chosen. The courts should likewise be

prepared to examine the application of any such principle to the particular class of situation to see to what extent its application would reflect principles of public policy or the over-riding needs of justice. Where the application of the proposed principle would simply serve the interests of one party and do so in a disproportionate fashion, it is right to question whether the principle has been correctly formulated or is being correctly applied and it is right to question whether the codifying statute from which the right contended for is said to be drawn is being correctly construed.

**62** Where an insured is found to have made a fraudulent claim upon the insurers, the insurer is obviously not liable for the fraudulent claim. But often there will have been a lesser claim which could properly have been made and which the insured, when found out, seeks to recover. The law is that the insured who has made a fraudulent claim may not recover the claim which could have been honestly made. The principle is well established and has certainly existed since the early 19th century: *Halsbury's Laws of England*, 4th ed reissue, vol 25 (1994), p 284, para 492, *Welford & Otter-Barry, Fire Insurance*, 4th ed (1948), p 289 et seq. This result is not dependant upon the inclusion in the contract of a term having that effect or the type of insurance; it is the consequence of a rule of law. Just as the law will not allow an insured to commit a crime and then use it as a basis for recovering an indemnity (*Beresford v Royal Insurance Co Ltd* [1937] 2 KB 197), so it will not allow an insured who has made a fraudulent claim to recover. The logic is simple. The fraudulent insured must not be allowed to think: if the fraud is successful, then I will gain; if it is unsuccessful, I will lose nothing.

**63** In *Goulstone v Royal Insurance Co* (1858) 1 F & F 276, which concerned a fire policy and a plea that the claim was fraudulently exaggerated, Pollock CB directed the jury, at p 279, that if the claim "was wilfully false in any substantial respect", they should find for the defendant as the plaintiff had in that case "forfeited all benefit under the policy". In *Britton v Royal Insurance Co* 4 F & F 905, also a fire insurance case where it was alleged that the insured took advantage of the fire to make a fraudulent claim, Willes J directed the jury, at p 909:

> "The law upon such a case is in accordance with justice, and also with sound policy. The law is, that a person who has made such a fraudulent claim could not be permitted to recover at all. The contract of insurance is one of perfect good faith on both sides, and it is most important that such good faith should be maintained. It is the common practice to insert in fire policies conditions that they shall be void in the event of a fraudulent claim; and there was such a condition in the present case. Such a condition is only in accord with legal principle and sound policy. It would be most dangerous to permit parties to practise such frauds, and then, notwithstanding their falsehood and fraud, to recover the real value of the goods consumed. And if there is wilful falsehood and fraud in the claim, the insured forfeits all claim whatever upon the policy. This, therefore, was an independent defence; quite distinct from that of arson . . ."

Willes J stressed to the jury, at p 911, that it was of the utmost moment that insurances should be enforced fairly and protected from fraud.

**64** These authorities link the defence to the observation of good faith but are specifically based upon the actual fraud of the insured in making the claim. These judgments do not use the language of avoidance of the policy ab initio but refer to the forfeiture of "all benefit under the policy" or "all claim" upon it. It seems that the language used at the time in express clauses was similar. The textbooks substantially adopt the same approach: see, for example, most recently *Clarke, The Law of Insurance Contracts*, 3rd ed (1997), p 746 et seq.

**65** Modern authorities have not however always adopted this analysis. In *Orakpo v Barclays Insurance Services* [1995] LRLR 443, the insurance covered damage to a building. The insurance contract was in any event voidable since it had been induced by material misrepresentation but the defendant insurance company had also relied upon the defence that the claim was grossly exaggerated and fraudulent. In the Court of Appeal the defence was apparently argued upon the basis of implied term on the assumption that the continuing duty of good faith should be so analysed. The appellant plaintiff was appearing in person. The Court of Appeal dismissed his appeal holding unanimously that there had been a misrepresentation. But, obiter, there was a difference of opinion on the fraudulent claim defence. Staughton LJ, dissenting, was of the opinion that any breach of an implied term or the duty of good faith would not have been so fundamental as to entitle the insurer to be discharged from liability. The majority, Hoffmann LJ and Sir Roger Parker, held that the insurer would on that ground as well have had a defence to the whole of the claim. The decision of Hoffmann LJ was arrived at applying contractual principles: he was concerned with an implied term, at p 451:

> "I think that the insurance company should be able to trust the assured to put forward a claim in good faith. Any fraud in making the claim goes to the root of the contract and entitles the insurer to be discharged. One should naturally not readily infer fraud from the fact that the insured has made a doubtful or even exaggerated claim. In cases where nothing is misrepresented or concealed, and the loss adjuster is in as good a position to form a view of the validity or value of the claim as the insured, it will be a legitimate reason that the assured was merely putting forward a starting figure for negotiation. But in cases in which fraud in the making of the claim has been averred and proved, I think it should discharge the insurer from all liability."

Sir Roger Parker said, at p 452:

> "The appellant submits that the law, in the absence of a specific clause, is that an insured may present a claim which is to his knowledge fraudulent to a very substantial extent, but may yet recover in respect of the part of the claim which cannot be so categorised. To accept this proposition involves holding that, although an insurance contract is one of utmost good faith, an assured may present a positively and substantially fraudulent claim without penalty, save that his claim will to that extent be defeated on the facts . . . I can see . . . every reason why he should not recover at all."

Sir Roger also referred to the question whether, in the absence of an express clause providing that the claim *and* the policy should be avoided, the claim

A only should be forfeit, and a dictum in a Scottish case (*Reid & Co Ltd v Employers' Accident and Livestock Insurance Co Ltd* (1899) 1 F 1031) which, contrary to *Britton's* case 4 F & F 905, would hold that only the excess should be disallowed in the absence of an express clause. Sir Roger concluded:

"In my judgment this is not so. It appears to me that it is contrary to B reason to allow an insurer to avoid a policy for material non-disclosure or misrepresentation on inception, but to say that, if there is subsequently a deliberate attempt by fraud to extract money from the insurer for alleged losses which had never been incurred, it is only the claim which is forfeit."

**66** These dicta do not assist the defendants in the present case on the critical point whether anything less than actual fraud in the making of the C claim brings the principle into play. Counsel have assured your Lordships that in the present case nothing turns upon whether the claim is wholly forfeit or the whole policy is treated as forfeit as well. The authority of *Britton's* case is that the whole claim is forfeit, which was what was material in the *Orakpo* case. As regards the question, academic in the *Orakpo* case and academic in the present case save as a pleading point, whether the making of a fraudulent claim would entitle the insurer to avoid the contract D ab initio, that is a point upon which the judgments in the *Orakpo* case cannot be treated as fully authoritative in view of the contractual analysis there adopted. The language of Hoffmann LJ is fully justified on that contractual analysis: "goes to the root of the contract and entitles the insurer to be discharged". The fraud is fundamentally inconsistent with the bargain and the continuation of the contractual relationship between the insurer and E the assured.

**67** The same subject matter is discussed in two later cases to which I should refer. The first is the decision of the Court of Appeal in *Galloway v Guardian Royal Exchange (UK) Ltd* [1999] Lloyd's Rep IR 209, a case similar to *Orakpo* involving a householder's insurance, a material misrepresentation in the proposal form and a fraudulent claim. The plaintiff's claim under the policy failed on both grounds. As regards the F fraudulent claim defence, the Court of Appeal followed and applied what had been said by Willes J in *Britton's* case. On the point of difference between Staughton LJ and Hoffmann LJ and Sir Roger Parker in the *Orakpo* case, they preferred the view of the latter on the seriousness of any fraud in the making of a claim. Lord Woolf MR referred also to the speech of Viscount Sumner in *Lek v Mathews* (1927) 29 Ll L Rep 141, 145 stressing G the seriousness of any fraudulent claim unless it could be treated as de minimis. "The policy of the law in this area, it seems to me", said Lord Woolf, at p 213, "must be to discourage the making of fraudulent claims". Millett LJ in a short concurring judgment stressed the seriousness of such fraud and the public interest in discouraging it. In that context he expressed himself in terms similar to those of section 17, stating, at p 214, that the court should consider the fraudulent claim itself and then consider whether H "the making of that claim by the insured is sufficiently serious to justify stigmatising it as a breach of his duty of good faith so as to avoid the policy". Whilst this case puts the principle on the basis of a rule of law not an implied term, it did not need to consider, nor is it clear that they were focusing on, the distinction between something which would defeat any claim under the

policy and something which avoided the contract ab initio with all that that A would entail. The case does not support the submission that something less than a fraudulent claim will suffice to give the insurer a defence.

68 The other decision is that of Rix J in *Royal Boskalis Westminster NV v Mountain* [1997] LRLR 523, reversed on grounds which do not affect the value of the judgment of Rix J in relation to the principle of good faith, at p 591 et seq. He powerfully questions whether in relation to claims the right of the insurer to repudiate all liability can extend beyond the making of B a fraudulent claim to an innocent failure to disclose. He points out the difficulties which would arise in relation to the test of materiality and remedy. Again, the judgment underlines the relevance of fraud.

69 Other cases contain dicta which support one or other of the arguments before us but otherwise do not add to the discussion. For example, in the House of Lords in the *Banque Keyser* case [1991] 2 AC 249, C 282, Lord Jauncey of Tullichettle said:

> "There is, in general, no obligation to disclose supervening facts which come to the knowledge of either party after the conclusion of the contract (*Lishman v Northern Maritime Insurance Co* (1875) LR 10 CP 179), subject always to such exceptional cases as a ship entering a war zone or an insured failing to disclose all facts relevant to a claim." D

This puts the obligation in wide terms independent of any question of fraud equivalent to those used in section 18 of the 1906 Act. *Britton's* case 4 F & F 276 although cited was not referred to in any of the judgments not were its implications considered. The relevant question was different, whether a failure to make full disclosure at the time of making the relevant contract could give rise to a claim in damages. E

70 In *Piermay Shipping Co SA v Chester (The Michael)* [1979] 2 Lloyd's Rep 1, 21–22, a barratry case in which the defence was raised of a want of good faith in presenting and persisting in a claim for a loss by perils of the seas, Roskill LJ giving the judgment of the Court of Appeal rejecting the defence said: "The relevant test must be honest belief." The insurers had to prove that a fraudulent claim had been made or maintained by the insured. If it were the law that any non-disclosure would have sufficed to enable the F insurers to avoid the contract ab initio, the case would have had to be approached very differently and the result might have been different.

71 Finally, mention should be made of the judgment of Hirst J in *Black King Shipping Corpn v Massie (The Litsion Pride)* [1985] 1 Lloyd's Rep 437 which has been used in a number of cases to support a general view of the post contract duty of good faith. It was an exceptional case in that it G involved a war risks policy under which the insured shipowners were entitled to send their ship into a highly dangerous war risk zone in the Persian Gulf against an obligation to pay a heavy additional premium calculated on the length of time spent in the zone. The policy, however did not require the shipowner to declare in advance that the ship was entering the zone but permitted declarations after it had done so. As a result the shipowners had a strong motive only to declare the entry if the vessel H suffered a loss and that is what they did. Hirst J held that this practice was not a breach of contract but was done with the fraudulent intent of depriving the insurer of the additional premiums to which it was entitled. He held that the insurer was not liable to pay the claim. There had been a breach of the

A duty of good faith. The remedy was not confined to electing to avoid the policy; the insurer had elected not to avoid it. The insurer was entitled to rely on the breach as giving it a defence to the claim of the mortgagee of the vessel, the only effective plaintiffs in the action. The particular claim was only fraudulent in so far as the broker had not been truthful in dealing with the insurers at that stage. The reasoning adopted by Hirst J has been criticised both by academic writers and by other judges in later cases. B I consider that it should not any longer be treated as a sound statement of the law. In so far as it decouples the obligation of good faith both from section 17 and the remedy of avoidance and from the contractual principles which would apply to a breach of contract it is clearly unsound and cannot survive the Court of Appeal judgment in the *Banque Keyser* case [1990] 1 QB 665, upheld by your Lordships' House [1991] 2 AC 249. In so far as it is C based upon the principle of the irrecoverability of fraudulent claims, the decision is questionable upon the facts since the actual claim made was a valid claim for a loss which had occurred and had been caused by a peril insured against when the vessel was covered by a held covered clause. It is not necessary to examine whether there might or might not have been some other basis upon which the case could be decided in favour of the insurer as one feels it clearly ought to have been. But what is clear is that the judgment D of Hirst J is not a sound basis for the arguments advanced by the defendants in the present case.

72 For the defendants to succeed in their defence under this part of the case the defendants have to show that the claim was made fraudulently. They have failed to obtain a finding of fraud. It is not enough that until part of the way through the trial the owners (without fraudulent intent) failed to E disclose to the defendants all the documents and information which the defendants would have wished to see in order to provide them with some, albeit inadequate, evidential support for their alleged defence under section 39(5). The defence under section 17 fails. It must be added that, on the facts found, had the defendants' defence succeeded it would have produced a wholly disproportionate result. The defence under section 39(5) failed after a full disclosure and investigation of all the material evidence. F The claim was in fact a good one which the owners were, subject to quantum, entitled to recover under the policy. The defendants were liable to pay it. The policy was valid and enforceable. For the defendants successfully to invoke section 17 so as to avoid the policy ab initio and wholly defeat the claim would be totally out of proportion to the failure of which they were complaining. Fraud has a fundamental impact upon the G parties' relationship and raises serious public policy considerations. Remediable mistakes do not have the same character.

*In litigation*

73 The point here is whether the obligation of good faith and disclosure continues to apply unqualified once the parties are engaged in hostile litigation before the courts. There is no authority directly on this point. It H was decided in favour of the owners by both courts below. There are however dicta in cases which show that the judges concerned contemplated that the obligation of good faith could continue to apply during litigation. Thus, by way of example, Viscount Sumner in *Lek v Mathews* 29 Ll L Rep 141, 145 said in relation to an express clause that he was inclined to think

that it would extend to false statements during the course of the trial. It is therefore right to consider what effect the commencement of legal proceedings has upon the relationship of the parties. Similarly some of the judgments in the ship's papers cases treat the order for ship's papers as an application of the obligation of good faith. A

74 Before the litigation starts the parties' relationship is purely contractual subject to the application of the general law. If one party has a right such as that given by section 17 it derives from the contract itself or from the application of the general law to the contractual relationship. These rights continue unimpaired unless one party has exercised a right of avoidance or termination. The insured has or may have a claim against the insurer. The insurer may have accepted the claim or may have rejected it. The insurer may have done so in a manner which evinces an intention not to be bound by the contract or, more probably, may simply be requiring to be satisfied that there is a valid claim covered by the policy. But the insured will either have or not have a cause of action against the insurer. Indeed, in relation to CTL cases, and the present case is such a case, the English doctrine of ademption makes the date of the issue of the writ the determinative date for deciding upon the validity of the notice of abandonment: *Sailing Ship Blairmore Co v Macredie* [1898] AC 593. That is why it is normal for the assured to ask the underwriter to put him in the same position as if a writ had been issued: *Polurrian Steamship Co v Young* (1913) 19 Com Cas 143.

75 When a writ is issued the rights of the parties are crystallised. The function of the litigation is to ascertain what those rights are and grant the appropriate remedy. The submission of the defendants in this case is that, notwithstanding this, one party's *conduct of the litigation* can not only change that party's substantive rights but do so retrospectively avoiding the contract ab initio. It cannot be disputed that there are important changes in the parties' relationship that come about when the litigation starts. There is no longer a community of interest. The parties are in dispute and their interests are opposed. Their relationship and rights are now governed by the rules of procedure and the orders which the court makes on the application of one or other party. The battle lines have been drawn and new remedies are available to the parties. The disclosure of documents and facts are provided for with appropriate sanctions; the orders are discretionary within the parameters laid down by the procedural rules. Certain immunities from disclosure are conferred under the rules of privilege. If a party is not happy with his opponent's response to his requests he can seek an order from the court. If a judgment has been obtained by perjured evidence remedies are available to the aggrieved party. The situation therefore changes significantly. There is no longer the need for the remedy of avoidance under section 17; other more appropriate remedies are available. The same points have been persuasively made by Callahan AJ sitting in the Supreme Court of Connecticut in *Rego v Connecticut Insurance Placement Facility* (1991) 593 A 2d 491, 497.

76 I recognise that it is possible for something to be done in the litigation which may amount to a contractual act; the delivery of pleadings and similar documents are a form of communication. Such communication can have a contractual significance which can and will still be given effect to. Thus it is possible by a pleading to repudiate a contract or accept a

repudiation as terminating the contract. Similarly, a claim or defence may affect the substantive rights of a landlord and tenant inter se. But the acts and omissions of the assured relied upon by the defendants in the present case are not of that character. They are solely relevant as alleged failures to observe good faith under section 17. The section 17 principle is a principle of law and if its rationale no longer applies and if its operation, the conferment of a right of avoidance, ceases to make commercial or legal sense then it should be treated as having been exhausted or at the least superseded by the rules of litigation. It will also very often be the case that by the time the litigation has started the cover has expired or its subject matter has ceased to exist so as to make the continuing relationship of insurer and insured no longer current and the observation of good faith only significant to the litigation.

77 I am therefore strongly of the view that once the parties are in litigation it is the procedural rules which govern the extent of the disclosure which should be given in the litigation, not section 17 as such, though section 17 may influence the court in the exercise of its discretion. The cases upon ship's papers, far from supporting the continuing application of the duty of good faith in truth support the opposite conclusion. As previously discussed, the fact that orders for ship's papers were only made in marine insurance despite the fact that the principle of good faith applies to all insurance and the fact that the order was a matter of discretion not of right shows that it is a procedural remedy not a matter of contract although the principle of good faith clearly influenced the attitude of the court to making such an order. But, most conclusively, the fact that the remedy was to obtain an order from the court and not to avoid the contract shows both the limits of the principle and the change of relationship which comes about when the parties are in hostile litigation.

78 Therefore this point must be decided against the defendants as well.

*Conclusion*

79 I have in the course of this speech referred to some cases from other jurisdictions. It is a striking feature of this branch of the law that other legal systems are increasingly discarding the more extreme features of the English law which allow an insurer to avoid liability on grounds which do not relate to the occurrence of the loss. The most outspoken criticism of the English law of non-disclosure is to be found in the judgment in the South African case to which I have already referred, the *Mutual and Federal Insurance* case 1985 (1) SA 419. There is also evidence that it does not always command complete confidence even in this country: *Container Transport International Inc v Oceanus Mutual Underwriting Association (Bermuda) Ltd* [1984] 1 Lloyd's Rep 476; the *Pine Top* case [1995] 1 AC 501. Such authorities show that suitable caution should be exercised in making any extensions to the existing law of non-disclosure and that the courts should be on their guard against the use of the principle of good faith to achieve results which are only questionably capable of being reconciled with the mutual character of the obligation to observe good faith.

80 My Lords, the judgment of the Court of Appeal should be affirmed and the appeal should be dismissed with costs. Your Lordships were invited by the appellants to make a special order for costs relating to the adjournment of the hearing of this appeal from its previously scheduled date.

Having considered the submissions of the parties I do not consider that it would be appropriate to make the special order asked for. In so far as the respondents may seek to recover any additional costs as a result of the adjournment, that will be a matter to be scrutinised on taxation in the usual way. A

**LORD SCOTT OF FOSCOTE**

My Lords, B

81 There are two issues of some general importance that arise in this appeal. The first point arises under section 17 of the Marine Insurance Act 1906:

> "A contract of marine insurance is a contract based upon the utmost good faith, and, if the utmost good faith be not observed by either party, the contract may be avoided by the other party." C

Sections 18, 19 and 20 of the Act spell out in some detail the content of the duty of disclosure owed by the assured to the insurer before the contract is concluded and the yardstick for assessing whether a representation made by the assured to the insurer is material and is true. It might have been possible at one time to treat section 17 as merely an introduction to sections 18, 19 and 20. But if that were ever possible it is so no longer. The duty of utmost good faith has been held to apply where an assured is obliged under an existing policy to give notice of entry into a war risk zone (*The Litsion Pride* [1985] 1 Lloyd's Rep 437) and to the obligation of an assured to give notice when seeking to take advantage of a "held covered" clause in an existing policy: *Overseas Commodities Ltd v Style* [1958] 1 Lloyd's Rep 546; *Liberian Insurance Agency Inc v Mosse* [1977] 2 Lloyd's Rep 560. It has been held, also, to give rights of inspection under reinsurance treaties: *Phoenix General Insurance Co of Greece SA v Halvanon Insurance Co Ltd* [1985] 2 Lloyd's Rep 599. And the section 17 duty has repeatedly been held to be owing in the context of claims. A dishonest claim constitutes a breach by the assured of section 17 and entitles the insurers to avoid the insurance contract. D E

82 The present case involves a claim. The respondent on this appeal, Manifest Shipping Company Ltd ("Manifest"), made a claim under policies of marine insurance in respect of which the appellant insurers have been sued as representative underwriters. The vessel insured was the *Star Sea*. It was insured against marine perils, including fire, for US$ 3·2m. As a result of a fire in the engine room workshop on 29 May 1990, the *Star Sea* became a constructive total loss. A claim was made and on 3 August 1990 a writ was issued. The writ was served on 4 September 1990. It has not been suggested that the claim was not honestly made nor that the continued prosecution of the claim was or is dishonest. What is complained of is, first, that two accident reports into the causes of a fire on a vessel, the *Kastora*, which, like the *Star Sea*, was part of a fleet of over 30 vessels beneficially owned by the Kollakis family, had not been disclosed to the insurers. Both reports had been made by Dr Atherton, the shipowner's expert. As to the first report, privilege was claimed for it. Privilege would have been claimed for the second report as well, but the second report had been accidentally mislaid and overlooked and was not rediscovered until the second day of the trial. Privilege was eventually, during the trial, waived in respect of both reports. F G H

A The insurers' complaint, however, is that the claim was formally made and persisted in for a considerable period without disclosure of these reports. The failure to disclose them is categorised as a breach of the section 17 duty of utmost good faith and the insurers claim to be entitled, as a consequence, to avoid the insurance contract. The insurers complain, also, that a Mr Nicholaidis, a director of Kappa Maritime Ltd, an English company that managed the Kollakis fleet, gave certain evidence which the trial judge, B Tuckey J disbelieved. Mr Nicholaidis had particular responsibility for technical matters and his giving of the disbelieved evidence is represented as constituting a breach by the assured of its continuing section 17 duty of utmost good faith. The trial judge, Tuckey J, concluded that the section 17 duty owed by the assured came to an end once court proceedings had been commenced. At that point, in his view, court procedures and court C sanctions, embodied in Rules of Court and practice directions, would supersede and replace any statutory obligations under section 17. He said, [1995] 1 Lloyd's Rep 651, 667:

> "I think, as a matter of principle, that the English courts should hold that once insurers have rejected a claim, the duty of utmost good faith in relation to that claim comes to an end. There is a logic to this which was D well summarised by the court in Connecticut."

83 The judge's reference to the Connecticut court is a reference to the judgment of the Supreme Court of Connecticut in *Rego v Connecticut Insurance Placement Facility* 593 A 2d 491. Callahan AJ, in whose opinion the other justices concurred, said, at p 497:

> E "If the insurer denies liability and compels the insured to bring suit, the rights of the parties are fixed as of that time for it is assumed that the insurer, in good faith, then has sound reasons based upon the terms of the policy for denying the claim of the insured. To permit the insurer to await the testimony at trial to create a further ground for escape from its contractual obligation is inconsistent with the function the trial normally serves."

F 84 The Court of Appeal, in the present case [1997] 1 Lloyd's Rep 360, did not endorse Tuckey J's conclusion that the section 17 duty came to an end where court proceedings began, but arrived at the same result via a different route. The Court of Appeal held, at p 371, that at the claim stage, and after the claim had been made, the section 17 duty required no more than that the claim should not be made, or persisted in, fraudulently:

> G "When the assured makes his claim, the duty of utmost good faith requires that it should not be made fraudulently; and we are prepared to contemplate that the duty not to present a fraudulent claim subsumes a duty not to prosecute a claim fraudulently in litigation. There is no need to demand more of the assured than that, if the Draconian remedy is to apply."

H 85 So, on this first point, the issues for your Lordships are, first, the duration of the section 17 duty—does it continue beyond the making of the claim and the issue of court proceedings prosecuting the claim?—and, second, the content of the duty at the claim stage and thereafter—was the Court of Appeal right in confining the duty to a duty to refrain from the

fraudulent presentation or prosecution of a claim and, more particularly, can the matters on which the insurers rely suffice to constitute a breach of the assured's section 17 duty? A

86 The second important point for decision arises under section 39(5) of the 1906 Act:

> "In a time policy there is no implied warranty that the ship shall be seaworthy at any stage of the adventure, but where, with the privity of the assured, the ship is sent to sea in an unseaworthy state, the insurer is not liable for any loss attributable to unseaworthiness." B

87 The policies under which the *Star Sea* was insured were time policies. Tuckey J, at trial, found that the *Star Sea* was unseaworthy in two relevant respects. First, he found that the master was incompetent in not knowing the manner in which the vessel's $CO_2$ fire extinguishing system should properly be used. Secondly, he found that the condition of the port and starboard engine room dampers was such that when operated they did not provide an effective seal, thereby reducing the efficacy of the $CO_2$ system. He found that both these matters were causative in enabling the fire to spread and to render the vessel a constructive total loss. But for the combined effect of these failures, the indemnity to which the assured would have been entitled would have been limited to US$1·7m—as opposed to US$3·2m, the insured value of the vessel. C D

88 The critical issue was whether the assured knew of the two matters in respect of which unseaworthiness was found. This issue required an examination of the concept of "privity". It was not alleged that any of the individuals whose state of mind might be taken to be that of the assured for section 39(5) purposes had actual knowledge that the *Star Sea* was unseaworthy in either of the two respects found. What was said, however, was that there was "blind-eye" knowledge. It was common ground that each of the two Kollakis brothers, Mr Pantelis (Lou) Kollakis and Mr George Kollakis, could be treated as the assured for section 39(5) purposes. Tuckey J concluded that, in addition, a Mr Faraklas should be so treated. Mr Faraklas was one of the two directors of Charterwell Maritime SA, a Greek company based in Piraeus and the registered managers of the *Star Sea*. He was also the sole director of the assured. Tuckey J considered the position of Mr Nicholaidis but concluded he did not qualify for inclusion. On this point, the Court of Appeal disagreed. So there are, in the end, four individuals, namely, the Kollakis brothers, Mr Faraklas and Mr Nicholaidis, whose state of mind has to be considered. Tuckey J, addressing himself to the states of mind of the Kollakis brothers and Mr Faraklas, made a finding of "blind-eye" knowledge on the part of the assured in respect both of the incompetence of the master regarding the $CO_2$ fire-fighting equipment and of the defective state of the *Star Sea's* dampers. He reached this conclusion by the following route. There had, within the period of 15 months or so before the *Star Sea* embarked upon its disastrous voyage, also been a fire leading to a constructive total loss on two other vessels in the Kollakis fleet, namely the *Centaurus* and the *Kastora*. The accident reports that followed these fires had revealed a degree of ignorance on the part of the master of each vessel of the proper use to be made of $CO_2$ firefighting equipment and of the possibility (in the case of the *Centaurus*) and the near certainty (in the case of the *Kastora*) that the faulty state of the vessel's dampers had E F G H

prevented, or would have prevented if the $CO_2$ equipment had been properly used, the effective sealing of the site of the fire. Tuckey J found on the evidence that the accident report relating to the *Centaurus* had come to the attention of the assured. Two reports on the fire on the *Kastora* had been made, both by Dr Atherton. Tuckey J found that the assured, via one or other of the Kollakis brothers or Mr Faraklas, had become aware of the master's excessive delay in ordering the $CO_2$ firefighting equipment to be used and of the defective state of the vessel's dampers.

89 He then posed the question [1995] 1 Lloyd's Rep 651, 663: "So much for what the assured learned from the two earlier fires. What did they do about it?" and answered the question by saying "I am in no doubt that the assured's response to the earlier fires was completely inadequate". In the following passage, at p 664, the judge expressed his conclusion on the critical issue of privity:

> ". . . I do find that there was blind eye knowledge on the part of the assured. The inadequate response to the earlier fires and the state of the *Star Sea* on 27 May [1990], demonstrate in my judgment that the assured did not want to know about her unseaworthiness in the relevant respects."

Tuckey J reduced the assured's recovery from the US$3·2m to US$1·7m. He did so on the footing that the *Star Sea* was, "with the privity of the assured", sent to sea in May 1990 with a master incompetent in the use of $CO_2$ firefighting equipment and with faulty dampers incapable of sealing off the engine room. The Court of Appeal disagreed that the requisite privity had been demonstrated. The court concluded [1997] 1 Lloyd's Rep 360, 377, that the judge's findings relevant to this issue "[come] down simply to a finding of negligence, albeit negligence in a high degree". The court, therefore, allowed the assured to recover the full US$3·2m. Accordingly, the question of principle for your Lordships is what, short of actual knowledge, has to be shown for a section 39(5) finding of "privity" to be made.

90 Before your Lordships the allegations on the back of which a breach of the section 17 duty is sought to be constructed are levelled against Mr Nicholaidis and against the assured's solicitors, Hill Taylor Dickinson, whose partner, Mr Mallin, had charge of the case. As against Mr Nicholaidis, the allegation is that he dishonestly included in his witness statement a passage which to his knowledge was untrue. As against the solicitors, the allegation is that Mr Mallin resorted to underhand and unconscionable, albeit not dishonest, tactics in suppressing the Atherton reports for as long as possible. Mr Jonathan Sumption, for the assured, has taken us through the relevant facts in order to submit that they simply do not sustain the weight that the insurers need them to bear. The importance of the section 17 issue in your Lordships' House relates to law and principle. But charges against Mr Mallin of underhand or unconscionable conduct and against Mr Nicholaidis of dishonesty are, I am sure, of more importance to them than the state of marine insurance law. It would not, in my opinion, be right to decide the section 17 issue in favour of the assured on grounds simply of legal principle. The solicitors and Mr Nicholaidis are entitled, in my opinion, to have your Lordships' view as to whether, on the evidence the serious allegations made against them are sustainable.

91 In my opinion, the allegations are not sustainable. Let me take first the allegations against Mr Mallin. He was, I will assume, responsible for the

decision not to disclose to the insurers the existence of privileged documents, namely, the two Atherton reports until such time as the privilege had been waived. This is not surprising. It was common ground before your Lordships that the reports were privileged. Solicitors do not disclose in litigation documents which are entitled to privilege. They would risk being sued if they did. Mr Gordon Pollock, counsel for the insurers, suggested to your Lordships that Mr Mallin's motive in withholding the first report (the second was missing until the second day of the trial) was to improve the assured's chances of obtaining a favourable settlement before trial. There was, however, no evidence at all to support that suggestion. It had apparently never been put to Mr Mallin that that had been his motive. Mr Pollock explained that his suggestion was based upon an inference that that had been the motive. My Lords, I do not think an imputation of a discreditable motive can be properly so based. Mr Mallin was entitled to have the imputation put to him so that he could deal with it. The inference is neither an obvious one nor an inescapable one. The obvious inference, and the one that in the absence of any other evidence I would myself draw, is that the withholding of a privileged document is no more than the instinctive action of a solicitor experienced in litigation. Mr Pollock drew our attention to the judge's description of passages in Dr Atherton's witness statement as being "disingenuous" in that no reference was made in the statement to the contents of his two reports: see pp 670–671. Mr Pollock invited us to infer that Mr Mallin had asked Dr Atherton to draft his witness statement omitting any reference to his reports. But this, too, was not put to Mr Mallin. Moreover, at p 671, Tuckey J expressly exonerated Mr Mallin from criticism arising out of the contents of Mr Atherton's witness statement.

**92** In my opinion, the evidence in the case does not warrant any imputation of underhand or unconscionable behaviour against Mr Mallin. I am prepared to assume, without deciding, that the conduct of solicitors in conducting litigation can be attributed for section 17 purposes to the assured, their client. The insurers' section 17 case, however, in so far as it is based upon the conduct of Mr Mallin in the conduct of the litigation, is based upon conduct that it is accepted was not dishonest and that cannot, for the reasons I have given, be characterised as underhand and unconscionable.

**93** As to Mr Nicholaidis, it is true that Tuckey J preferred other evidence to that given by Mr Nicholaidis. But in doing so he did not say that he thought Mr Nicholaidis had given dishonest evidence. A charge of giving dishonest evidence made against a witness requires, in my opinion, something more than that the judge has not accepted his evidence and has preferred the evidence of someone else. Leggatt LJ in the Court of Appeal used the word "dishonesty" when referring to Mr Nicholaidis' state of mind: p 367. But in the passage in question, Leggatt LJ was addressing the question whether Mr Nicholaidis' knowledge and state of mind could be taken to be that of the assured for section 17 purposes. He held that it could not. He was not, as I read the judgment, adding a finding of the giving of dishonest evidence to the findings about Mr Nicholaidis that Tuckey J had made.

**94** Leggatt LJ went on to say that Mr Nicholaidis' evidence about what he knew of the defective state of the fire dampers on the *Kastora*—the

evidence that had been disbelieved by the judge—could not be attributed to the assured. I respectfully agree with that conclusion. It follows that Mr Nicholaidis evidence and state of mind does not constitute a route whereby a section 17 breach of duty can be brought home to the assured. I now turn to the section 17 point of principle.

95 It is accepted that the section 17 duty of the utmost good faith continues to apply after the conclusion of the insurance contract. It does not follow, however, that the content is the same after the contract as before. Indeed it cannot be. Sections 18 to 20 prescribe the contents of the pre-contract duty in terms which are inapplicable thereafter. It is very possible for the duty that pre-contract is owed by an assured to be broken by an act or omission which would not in ordinary language be described as a breach of good faith at all. Under section 18(1) the assured is deemed to know, and is therefore under an obligation to disclose, "every circumstance which, in the ordinary course of business, ought to be known by him": see also section 19(a). So an honest failure to disclose something of which the assured was in fact unaware may constitute a breach of duty. Consider also the concept of materiality. The duty to disclose extends to "every material circumstance" known to the assured (section 18(1)) or to the assured's agent (section 19(a)). The test of what is material is an objective one. An honest belief by the assured, or the agent, that a particular circumstance is not material, or an honest oversight of the materiality of a particular circumstance, will not assist the assured if, objectively viewed, the circumstance was material. I need not, perhaps, labour the point that a breach of section 18 or section 19 duty may arise notwithstanding the good faith of the assured. The addition of the adjective "utmost" does not affect the point.

96 It seems to me clear, therefore, that the content of the duty of "utmost good faith" post-contract must be examined afresh and is not coloured by the extent of the duty owed by the assured pre-contract. That this is so is demonstrated also by authority. *Cory v Patton* 7 QB 304 establishes the general proposition that the duty on the assured to disclose a fact material to the risk being undertaken by the insurer does not continue after the insured has become bound by the insurance contract.

97 *Niger Co Ltd v Guardian Assurance Co Ltd* 13 Ll L Rep 75 concerned a continuing policy terminable by three months notice. It was held in your Lordships' House that no duty lay on the assured to disclose to the insurers post-contract facts which, if known, might have induced the insurer to exercise its right to terminate the contract. Lord Sumner said, at p 82:

> "The object of disclosure being to inform the underwriter's mind on matters immediately under his consideration, with reference to the taking or refusing of a risk then offered to him, I think it would be going beyond the principle to say that each and every change in an insurance contract creates an occasion on which a general disclosure becomes obligatory, merely because the altered contract is not the unaltered contract, and therefore the alteration is a transaction as the result of which a new contract of insurance comes into existence. This would turn what is an indispensable shield for the underwriter into an engine of oppression against the assured."

98 In the same case in the Court of Appeal 6 Ll L Rep 239, 245, Bankes LJ had commented: A

> "if people enter into contracts of insurance for long periods, it would be a wise precaution to insert some provision requiring notice to be given them if the nature of the risk does alter or vary appreciably."

99 Plainly enough, neither in the Court of Appeal nor in this House was it regarded as a breach of the section 17 duty for the assured to fail to disclose facts within his knowledge which, if disclosed, might have induced the insurer to terminate the policy. B

100 *Cory v Patton* and *Niger Co Ltd v Guardian Assurance Co Ltd* were followed in New South Wales by Rogers J in *NSW Medical Defence Union Ltd v Transport Industries Insurance Co Ltd* 4 NSWLR 107. Rogers J held that it was not a breach of the continuing duty of good faith for an assured to fail to volunteer to the insurer information material to whether the insured would exercise a right to give notice terminating the contract. C

101 Finally on this point I should refer to *New Hampshire Insurance Co v MGN Ltd* [1997] LRLR 24. Counsel for the insurer had submitted that where under a policy there was continuing cover subject to a right on the insurers to cancel on notice, an obligation of disclosure lay on the assured and extended to facts relevant to a decision by the insurer whether or not to cancel. The Court of Appeal rejected this submission. Potter J, at first instance, described it as "an unwarranted extension of the principle of disclosure" (p 47). D

102 These authorities make clear that the content of the duty of good faith owed by an assured post-contract is not the same as the duty owed in the pre-contract stage. So what is the content of the duty owed at the claim stage? It is, at least, that of honesty in the presentation of a claim. E

103 In *Britton v Royal Insurance Co* 4 F & F 905, 909 Willes J told a jury that:

> "The law is, that a person who has made such a fraudulent claim could not be permitted to recover at all. The contract of insurance is one of perfect good faith on both sides, and it is most important that such good faith should be maintained . . . It would be most dangerous to permit parties to practise such frauds, and then, notwithstanding their falsehood and fraud, to recover the real value of the goods consumed." F

104 Views to the same effect were expressed in *Orakpo v Barclays Insurance Services* [1995] LRLR 443 and in *Galloway v Guardian Royal Exchange (UK) Ltd* [1999] Lloyd's Rep IR 209. *The Michael* [1979] 2 Lloyd's Rep 1 was a case in which a claim under a policy of marine insurance had been presented honestly. But after the claim had been presented the assured became aware, or had grounds to suspect, that the loss of the insured vessel had been caused not, as had been thought, by perils of the seas, but by scuttling. This information had not been passed on to the insurers. The insurers' reliance on this non-disclosure to avoid the policy failed on the facts. The court was not prepared to find or infer that the claim, honestly presented, had subsequently been dishonestly maintained. Roskill LJ dealt with this issue in the following passage, at p 22: G H

> "As to the allegation of subsequently maintaining a fraudulent claim, Piermay and Mr Pierrakos are not to be found guilty of fraud merely because, with the wisdom of hindsight, they had information which might, if appreciated at its true value, have led them to the truth at an earlier date. A plaintiff in litigation is not maintaining a fraudulent claim merely because during interlocutory proceedings he or his solicitors become aware of evidence which may militate against the correctness of the plaintiff's case and its likelihood of ultimate success. The relevant test must be honest belief."

105 *The Michael* [1979] 2 Lloyd's Rep 1 is, in my opinion, a very important case for present purposes. It seems to me that in order to succeed on the section 17 issue Mr Pollock must persuade us that it was wrongly decided. It is true, as Mr Pollock pointed out, that the insurer's case in *The Michael* was presented as one of fraud on the part of the assured. It was not argued that a lower degree of culpability would suffice. There is, however, no hint in Roskill LJ's judgment in *The Michael* that the insurer's were trying to jump a hurdle higher than was necessary.

106 Mr Pollock, in support of the submission that the section 17 duty attending the presentation and prosecution of a claim might be broken by culpable conduct falling short of fraud, relied on remarks made by Hirst J in *The Litsion Pride* [1985] 1 Lloyd's Rep 437. The Litsion Pride was insured against war risks but, in the event of the vessel sailing to certain specified destinations, the insurers could exact an additional premium at their discretion. The time was the Gulf War. Bandar Khomeini in the Persian Gulf was, it was agreed, the most dangerous port in the Gulf. A voyage there would be bound to attract an additional premium at a very high rate. The vessel sailed to Bandar Khomeini without notification being given to the insurers. It came under attack and sank. A letter purporting to pre-date the voyage and to give notice of the vessel's destination was concocted by the assured in order to deceive the insurers into believing that the failure to give notice of the voyage before its commencement was due to an innocent oversight. Hirst J held that the falsely dated letter was a fraud directly connected to the claim and a breach of the section 17 duty of utmost good faith. I do not think anyone would dissent from that conclusion. But Mr Pollock, counsel for the insurers before Hirst J had submitted that a breach of the duty "might be established for instance by proof of deliberate non-disclosure [or] misrepresentation, albeit negligent or even innocent, by either the owners or the broker": see, p 507. Mr Kentridge QC, counsel for the assured, had submitted that, once the contract had been concluded, "the sole duty of the assured was not to act vis-à-vis the underwriter in a fraudulent manner": see p 508. But Hirst J did not accept that the post-contract duty was so confined and held, at p 512, that: "the duty in the claims sphere extends to culpable misrepresentation or non-disclosure". Before us, Mr Pollock has resiled from the contention that, post-contract, merely negligent or innocent misrepresentation or non-disclosure could constitute a breach of the continuing section 17 duty. But he has maintained his submission that fraud or dishonesty is not essential and that conduct which can fairly be described as unconscionable could suffice.

107 Two recent cases in which this issue has been considered merit attention. The first is the judgment of Rix J in *Royal Boskalis Westminster*

*NV v Mountain* [1997] LRLR 523. Rix J, at p 597, was troubled by the notion that the post-contractual duty of good faith could extend beyond fraud to some unspecified degree of culpability. He found, on the facts of the case, at p 601, that "non-fraudulent but culpable and deliberate misrepresentation and non-disclosure have been proved, albeit they were subsequently repented of and remedied". He held that the insurers had failed to establish that the misrepresentations and non-disclosures had been material and that the insurers were not entitled under section 17 to avoid the policy.

108 Mance J in *Standard Steamship Owners' P & I Association (Bermuda) Ltd v Oceanfast Shipping Ltd* (unreported) on 6 March 1996, described as "extravagant . . . [the] proposition that mere negligence in the presentation of a claim could lead to avoidance of the whole contract of insurance".

109 In my opinion, the ambit of the post-contract section 17 duty cannot be considered without account also being taken of the difficulties of materiality that troubled Rix J in *the Royal Boskalis* case. Let it be supposed that Mr Pollock is right and that non-disclosure not involving any dishonesty may entitle an insurer to avoid the policy. Materiality becomes highly relevant. It can only be the non-disclosure of material facts or information that can lead to the Draconian remedy of avoidance. But what is to be the yardstick by which materiality is measured? A decision to disclose or not to disclose would have to be taken at an early stage. Delayed disclosure would expose the assured to similar charges to those being made in the present case where disclosure of the two *Kastora* reports was made in the course of the trial. The assured will often not know where, in the spectrum that runs from "interesting" at one end to "issue determinative" at the other, the facts or information in question should be placed. A similar problem in connection with the discovery of documents led to the rule that "a document, which, it is not unreasonable to suppose, may tend either to advance the case of the party seeking discovery, or to damage the case of his adversary" should be disclosed: *Cie Financiere et Commerciale du Pacifique v Peruvian Guano Co* (1882) 11 QBD 55, 60. If Mr Pollock is right, what other test of materiality is proposed? None has been suggested. In the present case, let it be supposed that nothing in either of the two reports is determinative of any issue in the claim. Nonetheless, it is submitted that a decision not to give early disclosure of them constitutes a section 17 breach and entitles the insurer to avoid the contract. If that were right, an assured would have to be advised to swamp his insurer with a mass of facts and information which might have some conceivable relevance to an issue in the case. This duty of disclosure could not logically be limited to information contained in documents. It would, if Mr Pollock is right, extend also to information imparted orally. A duty that required such massive disclosure at the claim stage lacks any commercial justification or sense.

110 These difficulties make clear, in my opinion, that Mr Pollock's submission cannot be accepted. The presentation of a dishonest or fraudulent claim constitutes a breach of duty that entitles the insurer to repudiate any liability for the claim and, prospectively at least, to avoid any liability under the policy. Whether the presentation of such a claim should be regarded as a breach of a continuing duty under section 17 that entitles the insurer to avoid the policy with retrospective effect, enabling any

A payments made in satisfaction of previous unimpeachable claims to be recovered by the insurer, is more debatable. It is not necessary in the present case to decide that point. Nor is it necessary to decide what the position would be, if a claim that had been honestly begun were dishonestly continued. I have in mind a claim for the loss of goods that, post-claim, were found or otherwise restored to the insured owner. I can see a great deal of force in the argument that the section 17 duty does not apply to conduct in B the prosecution of litigation, as to which the Rules of Court that govern litigation constitute the regulatory code. A decision as to that, too, is best left for a case where the point is critical to the result.

111 I would, however, limit the duty owed by an insured in relation to a claim to a duty of honesty. If the duty derives from section 17, none the less this limitation does not, in my opinion involve a judicial re-writing of C section 17. On the contrary, it would be the creation out of section 17 of a duty that could be broken notwithstanding that the assured had acted throughout in good faith that would constitute a re-writing of the section. Unless the assured has acted in bad faith he cannot, in my opinion, be in breach of a duty of good faith, utmost or otherwise. For these reasons, I agree with Tuckey J and the Court of Appeal in concluding that the insurers' section 17 claim cannot succeed.

D

*The section 39(5) issue*

112 Did the assured have blind-eye knowledge of the unseaworthiness of the *Star Sea*? It is as well to return to the language of the sub-section. What is required is "privity" on the assured's part of the unseaworthiness. "Privity" in its ordinary meaning connotes knowledge. "Blind-eye" E knowledge approximates to knowledge. Nelson at the battle of Copenhagen made a deliberate decision to place the telescope to his blind eye in order to avoid seeing what he knew he would see if he placed it to his good eye. It is, I think, common ground—and if it is not, it should be—that an imputation of blind-eye knowledge requires an amalgam of suspicion that certain facts may exist and a decision to refrain from taking any step to confirm their existence. Lord Blackburn in *Jones v Gordon* (1877) 2 App Cas 616, 629 F distinguished a person who was "honestly blundering and careless" from a person who

> "refrained from asking questions, not because he was an honest blunderer or a stupid man, but because he thought in his own secret mind—I suspect there is something wrong, and if I ask questions and make farther inquiry, it will no longer be my suspecting it, but my G knowing it, and then I shall not be able to recover."

Lord Blackburn added "I think that is dishonesty."

113 In *The Eurysthenes* [1977] 1 QB 49, 68 Lord Denning MR gave the following description of "blind-eye" knowledge: "If a man, suspicious of the truth, turns a blind eye to it, and refrains from inquiry—so that he should not know it for certain—then he is to be regarded as knowing the truth."

H 114 Roskill LJ, in the same case, made clear that "privity" in section 39(5) "must mean that he is privy to the unseaworthiness and not merely that he has knowledge of facts which may ultimately be proved to amount to unseaworthiness" and then turned to "blind-eye" knowledge. He said, at p 76:

A "If the facts amounting to unseaworthiness are there staring the assured in the face so that he must, had he thought of it, have realised their implication upon the unseaworthiness of his ship, he cannot escape from being held privy to that unseaworthiness by blindly or blandly ignoring those facts or by refraining from asking relevant questions regarding them in the hope that by his lack of inquiry he will not know for certain that which any inquiry must have made plain beyond possibility of doubt." B

I have some difficulty with Roskill LJ's inclusion in the cited passage of the qualification "had he thought of it". If the assured had not "thought of it" he would, presumably, not have realised the implications of the facts. His refraining from inquiry would not then have been attributable to the hope that he would not know for certain. I do not, myself, see how a failure to think about the facts, and hence a failure to realise their implications, can afford the basis for a finding of blind-eye knowledge. I respectfully prefer the formulation by Geoffrey Lane LJ, at p 81: C

"Knowledge of what? Again the subsection is clear. It says 'unseaworthiness', not 'facts which in the upshot prove to amount to unseaworthiness'. Accordingly it seems clear to me that if this matter were res integra, the section would mean that the assured only loses his cover if he has consented to or concurred in the ship going to sea when he knew or believed that it was in an unseaworthy condition. I add the word 'believed' to cover the man who deliberately turns a blind eye to what he believes to be true in order to avoid obtaining certain knowledge of the truth." D

E Geoffrey Lane LJ's formulation was very similar to that of Branson J in *The Gloria* 54 Ll L Rep 35, 58:

"I think that if it were shown that an owner had reason to believe that his ship was in fact unseaworthy, and deliberately refrained from an examination which would have turned his belief into knowledge, he might properly be held privy to the unseaworthiness of his ship. But the mere omission to take precautions against the possibility of the ship being unseaworthy cannot, I think, make the owner privy to any unseaworthiness which such precaution might have disclosed." F

Leggatt LJ in the present case, after referring to *The Eurysthenes* and *The Gloria*, concluded [1997] 1 Lloyd's Rep 360, 377:

G "what the defendant underwriters had to establish was a suspicion or realisation in the mind of at least one of the relevant individuals that *Star Sea* was unseaworthy in one of the relevant aspects, and a decision not to check whether that was so for fear of having certain knowledge about it."

115 Save that, having regard to the judge's findings on causation, and the insurers' concession (referred to by my noble and learned friend Lord Hobhouse of Woodborough), the suspicion or realisation of unseaworthiness had to be of both, and not simply of one, of the relevant aspects, I agree with that formulation. There must be a suspicion of the relevant unseaworthiness, and a decision not to check. Unless there is a decision not to check, not to obtain confirmation of what is suspected, there will, in my H

opinion, be no privity, no blind-eye knowledge, however seriously negligent the failure to check may be. It is in this respect that, in agreement with Leggatt LJ, I think Tuckey J was in error. He made no finding of a deliberate decision not to enquire on the part of any of the individuals who, for this purpose, could constitute the assured. Such a finding was, in my view, an essential condition of a conclusion of blind-eye knowledge. It is not acceptable, in my opinion to assume, from the judge's conclusion of blind-eye knowledge that he did find that one or other of the individuals had made a deliberate decision not to enquire.

116 In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist. But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that may, at one extreme, be no more than a vague feeling of unease and, at the other extreme, reflect a firm belief in the existence of the relevant facts. In my opinion, in order for there to be blind-eye knowledge, the suspicion must be firmly grounded and targeted on specific facts. The deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to enquire into an untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the basis of a finding of privity. That, in my opinion, is not warranted by section 39(5).

117 In the present case, on the facts, I can see no sufficient basis for attributing to any of the four individuals blind-eye knowledge of either of the two respects of unseaworthiness. The incompetence of the masters of the *Centaurus* and the *Kastora* did not put the Kollakis brothers, Mr Faraklas or Mr Nicholaidis in a position in which they were bound to inquire into the competence of every other master in the Kollakis fleet. The master of the *Star Sea*, although recently appointed to the *Star Sea*, had been with the fleet for over 11 years and there was no evidence of any previous incompetence on his part. He had held a master's certificate since 1978.

118 As to the dampers, outside contractors had been hired to overhaul the *Star Sea's* fire dampers while the vessel was laying-up in Piraeus before commencing its final voyage. Tuckey J [1995] 1 Lloyd's Rep 651, 663, expressed the opinion that:

> "It was not enough merely to instruct outside contractors to overhaul dampers. The evidence shows that the decision as to what dampers to overhaul was effectively made by the contractors' foreman. In view of the state of the dampers on *Star Sea* after the fire, it is quite clear, I think, that work should have been done to her dampers in lay-up which was not done."

The judge went on to say that some system should have been in place to ensure that the necessary work had been done.

119 These findings go to negligence, perhaps gross negligence, but they are, in my opinion, no basis for a finding of blind-eye knowledge. The judge made no finding against either of the Kollakis brothers or against Mr Faraklas of a suspicion or belief that the dampers were defective. And, as Leggatt LJ in the Court of Appeal pointed out [1997] 1 Lloyd's Rep 360, 378, "there is no reason to suppose that the finding would have been made on this aspect fixing Mr Nicholaidis with a suspicion or belief where others were not". I agree

that the evidence did not justify a finding that these four individuals, whether viewed individually or collectively, sent the *Star Sea* on its voyage in an unseaworthy state believing or suspecting that that might be so.

120 I therefore agree with the Court of Appeal's conclusion that Tuckey J's finding in favour of the insurers on the section 39(5) issue cannot be sustained. For these reasons and those given by Lord Hobhouse of Woodborough in his opinion, which I have had the advantage of reading in draft, I would dismiss the appeal.

*Appeal dismissed with costs.*

*Solicitors: Ince & Co; Hill Taylor Dickinson.*

B L S

---

House of Lords

## Johnson *v* Unisys Ltd

**[2001] UKHL 13**

2001 Feb 5, 6; March 22 — Lord Bingham of Cornhill, Lord Nicholls of Birkenhead, Lord Steyn, Lord Hoffmann and Lord Millett

*Employment — Wrongful dismissal — Damages — Employee awarded compensation for unfair dismissal — Subsequent claim of wrongful dismissal based on manner of dismissal — Whether damages recoverable*

The plaintiff employee was employed by the defendant from 1971 until 1987, when he was made redundant. During that time he was subject to considerable work-related stress and the employer was aware that he had special psychological needs. In 1990 he was re-employed by the employer but was summarily dismissed in 1994 following allegations concerning his conduct. The employee's complaint of unfair dismissal was upheld by an industrial tribunal though he was held to have contributed to his dismissal by 25%. The employee then commenced proceedings against the employer for damages for wrongful dismissal claiming that, because of the manner in which he had been dismissed, he had suffered a mental breakdown and was unable to work. The employee alleged that, in breach of an implied term of his contract of employment that the employer would not, without reasonable and proper cause, conduct itself in a manner calculated and likely to destroy or seriously damage the relationship of trust and confidence, the employer had in the manner of dismissing him harmed his professional development, health, financial welfare and future employment prospects. On the employer's summons, the judge struck out the claim as disclosing no reasonable cause of action. The Court of Appeal upheld that decision.

On appeal by the employee—

*Held*, dismissing the appeal, that (per Lord Bingham of Cornhill, Lord Nicholls of Birkenhead, Lord Hoffmann and Lord Millett) under Part X of the Employment Rights Act 1996 Parliament had provided the employee with a limited remedy for the conduct of which he complained; that, although it was possible to conceive of an

# *Meridian Global Funds Ltd v Securities Commission* [1995] AC 500

[PRIVY COUNCIL] A

MERIDIAN GLOBAL FUNDS MANAGEMENT ASIA LTD. . . . . . . . . . . . APPELLANT

AND

SECURITIES COMMISSION . . . . . . . RESPONDENT

B

[APPEAL FROM THE COURT OF APPEAL OF NEW ZEALAND]

1995 May 9, 10; June 26

Lord Keith of Kinkel, Lord Jauncey of Tullichettle, Lord Mustill, Lord Lloyd of Berwick and Lord Hoffmann

*New Zealand—Company—Knowledge of company—Chief investment officer on behalf of company acquiring substantial security holding in public issuer—Managing director and board unaware of acquisition—Company failing to give prescribed notice—Whether investment officer's knowledge attributable to company—Whether company in breach of duty to give notice—Securities Amendment Act 1988 (No. 234 of 1988), ss. 20(3)(4)(e), 35* C

K., the chief investment officer of an investment management company, and N., its senior portfolio manager, with the company's authority but unknown to the board of directors and managing director, used funds managed by the company to acquire shares in a public issuer. The company thus became for a short period a substantial security holder in that public issuer, but the company did not give notice thereof as required by section 20(3) of the Securities Amendment Act 1988.[1] The Securities Commission instituted proceedings in the High Court of New Zealand against the company for failing to comply with section 20. The judge made a declaration that the company was in breach of its duty to give notice under section 20(3), holding that for the purposes of section 20(4)(*e*) the knowledge of K. and N. should be attributed to the company. The Court of Appeal of New Zealand upheld that decision on the basis that K. was the directing mind and will of the company and so his knowledge was attributable to the company. D E F

On the company's appeal to the Judicial Committee:—

*Held*, dismissing the appeal, (1) that a company's rights and obligations were determined by rules whereby the acts of natural persons were attributed to the company normally to be determined by reference to the primary rules of attribution generally contained in the company's constitution and implied by company law and or general rules of agency; but that, in an exceptional case, where application of those principles would defeat the intended application of a particular provision to companies, it was necessary to devise a special rule of attribution to determine whose act or knowledge or state of mind was for the purpose of that provision to be attributed to the company; that, although the description of such a person as the "directing mind and will" of a company did not have to be apposite in every case, knowledge of an act of a company's duly authorised servant or agent, or the G H

[1] Securities Amendment Act 1988, s. 20(3)(4): see post, p. 504F–G.
S. 35: see post, p. 512B–C.

A state of mind with which it was done, would be attributed to the company only where a true construction of the relevant substantive provision so required (post, pp. 506B–D, F, 507D–F, 511B–C, G–H)

*Tesco Supermarkets Ltd. v. Nattrass* [1972] A.C. 153, H.L.(E.) and *In re Supply of Ready Mixed Concrete (No. 2)* [1995] 1 A.C. 456, H.L.(E.) applied..

*Admiralty v. Owners of the Steamship Divina (The Truculent)*
B [1952] P. 1; *H. L. Bolton (Engineering) Co. Ltd. v. T. J. Graham & Sons Ltd.* [1957] 1 Q.B. 159, C.A. and *The Lady Gwendolen* [1965] P. 294, C.A. considered.

Dictum of Viscount Haldane L.C. in *Lennard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd.* [1915] A.C. 705, 713, H.L.(E.) explained.

(2) That, having regard to the policy of section 20 of the Act
C of 1988, on the true construction of section 20(4)(*e*) the appropriate rule of attribution to be implied was that a corporate security holder knew that it was a substantial security holder in a public issuer when that was known to the person who had acquired the relevant interest with the company's authority, whereupon the company was obliged to give notice under section 20(3); and that, accordingly, K.'s knowledge of the transaction was attributable to the company irrespective of whether he could
D be described in a general sense as its directing mind and will, and so in failing to give notice the company had been in breach of its duty under section 20(3) (post, p. 511E–G).

*Per curiam.* Section 35 of the Securities Amendment Act 1988 would not assist the commission since, although the knowledge of K. and N. would have activated the presumption that the company knew, at the material time, of the existence of a relevant interest in voting securities in a public issuer, the company could
E rebut that presumption if the knowledge of K. and N. were not attributable to the company because the evidence clearly showed that neither the managing director nor the board knew about that relevant interest (post, p. 512D–F).

Decision of the Court of Appeal of New Zealand [1994] 2 N.Z.L.R. 291 affirmed.

The following cases are referred to in the judgment of their Lordships:

F *Admiralty v. Owners of the Steamship Divina (The Truculent)* [1952] P. 1; [1951] 2 All E.R. 968

*Bolton (H. L.) (Engineering) Co. Ltd. v. T. J. Graham & Sons Ltd.* [1957] 1 Q.B. 159; [1956] 3 W.L.R. 804; [1956] 3 All E.R. 624, C.A.

*Lennard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd.* [1915] A.C. 705, H.L.(E.)

*Moore v. I. Bresler Ltd.* [1944] 2 All E.R. 515, D.C.

G *Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd.* [1983] Ch. 258; [1983] 3 W.L.R. 492; [1983] 2 All E.R. 563, C.A.

*Supply of Ready Mixed Concrete (No. 2), In re* [1995] 1 A.C. 456; [1994] 3 W.L.R. 1249; [1995] 1 All E.R. 135, H.L.(E.)

*Tesco Supermarkets Ltd. v. Nattrass* [1972] A.C. 153; [1971] 2 W.L.R. 1166; [1971] 2 All E.R. 127, H.L.(E.)

H *The Lady Gwendolen, The* [1965] P. 294; [1965] 3 W.L.R. 91; [1965] 2 All E.R. 283, C.A.

The following additional cases were cited in argument:

*Canadian Dredge & Dock Co. Ltd. v. The Queen* (1985) 19 C.C.C. (3d) 1

*El Ajou v. Dollar Land Holdings Plc.* [1994] 2 All E.R. 685, C.A.

APPEAL (No. 48 of 1994) with leave of the Court of Appeal of New Zealand by the company, Meridian Global Funds Management Asia Ltd. ("Meridian"), from the judgment of the Court of Appeal of New Zealand [1994] 2 N.Z.L.R. 291 (Cooke P., Hardie Boys J. and Sir Gordon Bisson) given on 17 December 1993 dismissing the company's appeal from the order of Heron J. in the High Court of New Zealand on 23 November 1992, the reasons for which were in judgments delivered on 10 December 1991 and 23 November 1992, whereby in an action brought by the Securities Commission against the company and others he had declared that the company had acquired a relevant interest in Euro-National Corporation Ltd. ("E.N.C.") and should have given notice of such relevant interest, and had ordered the company to pay $50,000 towards the commission's costs and $15,000 towards the costs of a minority shareholder in E.N.C. A B C

The facts are stated in the judgment of their Lordships.

*Michael Beloff Q.C., John Stevenson* (of the New Zealand Bar) and *Andrew Tabachnik* for the company. There was no contravention of section 20(3) of the Securities Amendment Act 1988 by the company. At the material time the company had a "relevant interest" within the meaning of section 5, but it did not know that it had such interest because the knowledge of K., the chief investment officer employed by Meridian, could not be attributed to the company. In order to engage liability under section 20 the commission has to establish acquisition of a relevant interest in a public issuer (section 20(3)), actual or constructive knowledge on the part of the acquirer of the fact that he has acquired a relevant interest (section 20(4)(*e*)), and non-disclosure to the relevant parties. While the existence of a relevant interest has to be established only to the extent of reasonable suspicion, the facts on which the suspicion is founded require proof on a balance of probabilities. D E

The doctrine of identification is conceptually distinct from vicarious liability. The start of any analysis as to whether or not a person is to be identified with a company is in the constitutional instruments of the company, i.e., its memorandum and articles of association, which show where the power to act on behalf of the company is located. Prima facie, the directing mind and will of a company will be found in its managing director and board of directors. In a particular context, however, a single director or other person may be the directing mind and will of the company. But, unless that person enjoys full independence from the board of directors, as distinct from a measure of discretion, he cannot be the company's directing mind and will. [Reference was made to *Lennard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd.* [1915] A.C. 705; *H. L. Bolton (Engineering) Co. Ltd. v. T. J. Graham & Sons Ltd.* [1957] 1 Q.B. 159; *Tesco Supermarkets Ltd. v. Nattrass* [1972] A.C. 153 and *El Ajou v. Dollar Land Holdings Plc.* [1994] 2 All E.R. 685.] F G

The judge's finding that K. performed his duties in the field of investment activity under the managing director was fatal to the conclusion that K. was the company's directing mind and will. If he did not have the ultimate responsibility for the company's investment activities but only some measure of discretion, then the relevant functions of the board had, after the company's restructuring, not been delegated to him. The Court H

of Appeal paid excessive attention to the state of affairs which prevailed prior to the appointment of the new managing director in place of K., and failed to appreciate the change to the company's internal structure which was thereby effected. The judge found that there was no evidence that the company's internal controls were lax, and so the managing director and the board cannot be criticised for failing to detect what K. was doing.

If, however, K. was the directing mind and will of the company and the advance of its moneys towards the scheme by means of fictitious share purchases was within his assigned managerial area, the question arises whether in view of the purposes for which K. acted the case falls outside the proper limits of the doctrine of identification. That doctrine does not apply where the acts sought to be attributed to the company are exclusively for the benefit of the individual concerned and contrary to the interests of the company. The doctrine is applied in civil and criminal law in the same way, and there is no reason to differentiate between its application in relation to the Act of 1988 and elsewhere. [Reference was made to *Canadian Dredge & Dock Co. Ltd. v. The Queen* (1985) 19 C.C.C. (3d) 1.]

The courts below correctly found that K. and N. in advancing the company's funds for the purposes of the scheme were intent on promoting their own interests and not those of the company. The possibility that, if the scheme proceeded towards completion, the company would be left with a notional profit, cannot, in view of (i) the considerable risks with which the company was faced by reason of the advance of its moneys towards the scheme, and (ii) the fact that the sole purpose of leaving a notional profit in the company was to ensure that the scheme would not be discovered at some future point, fairly be treated as a factor which in law makes the acts of K. the acts of the company.

*R. A. Dobson* and *N. F. Miller* (both of the New Zealand Bar), for the commission, were not called upon.

26 June. The judgment of their Lordships was delivered by LORD HOFFMANN.

In 1990 a group of people in New Zealand, Malaysia and Hong Kong tried to gain control of a cash-rich publicly listed New Zealand company, Euro-National Corporation Ltd. ("E.N.C."), and use its assets for their own purposes. The predators included a New Zealand businessman called David Lee Sian Mun, two Hong Kong investment managers called Norman Koo Hai Ching ("Koo") and Norman Ng Wo Sui ("Ng"), who were employed by the appellant company, Meridian Global Funds Management Asia Ltd. ("Meridian"), and members of a Malaysian sharebroking firm called Hwang & Yusoff Securities Sdn. Bhd. ("Hwang & Yusoff"). Their scheme required the purchase, through apparently respectable New Zealand merchant bankers, of a 49 per cent. controlling holding in E.N.C. for N.Z.$18·2m. The intention was to fund this purchase out of E.N.C.'s own assets, but bridging finance was needed to fill the gap between buying the shares and gaining control of the company's money. This was provided by Koo and Ng out of funds managed by Meridian. Meridian is a substantial Hong Kong investment management company, a subsidiary of National Mutual Life Association of Australasia Ltd. Koo was its chief investment officer, Ng a senior portfolio manager. Their

Lordships do not know exactly how they were to receive their share of the spoils. But they funded the scheme by improperly using their authority to buy and sell Asian shares. They contracted on behalf of Meridian, through Hwang & Yusoff, to buy a parcel of shares in Malaysian and Indonesian companies from E.N.C. for $21m. and at the same time to resell the same shares to E.N.C. for a slightly greater price. Payment for the purchase was made to Hwang & Yusoff on 30 October and payment for the resale was to be made by E.N.C. on 19 November. E.N.C. did not own the shares in question and the persons who purported to sell on its behalf had at that stage no authority to do so, but Meridian paid the money and on 9 November Hwang & Yusoff used $18·2m. to buy the shares in E.N.C. But the scheme to pay Meridian back out of E.N.C.'s money on 19 November was frustrated by the independent directors of E.N.C., who imposed conditions on the use of the company's funds with which the predators could not comply. Unable to get their hands on the company's money, they had to unwind the scheme as best they could. It is unnecessary to go into the details of how the participants tried to extricate themselves except to notice two matters. First, that on 10 December 1990 Koo, on behalf of Meridian, agreed to release its rights under the original funding arrangements and accept instead a payment and undertakings from Hwang & Yusoff. Secondly, that the net result was that the funds under Meridian's management suffered a loss, which the Australian parent company had to make good to the beneficial owners of the funds when the affair was discovered some six or seven months later.

Stockmarket regulators have found that one way to help boards and investors to resist such raids is to require immediate disclosure to the target company and the stock exchange of the identity of anyone acquiring a substantial interest of any kind in the company's shares. This enables the board and the investors to know who is behind the respectable nominees. Part II of the New Zealand Securities Amendment Act 1988 was intended, among other things, to introduce such transparency into dealings in publicly quoted securities. The relevant duties of disclosure are contained in section 20(3) and (4):

> "(3) Every person who, after the commencement of this section, becomes a substantial security holder in a public issuer shall give notice that the person is a substantial security holder in the public issuer to—(*a*) the public issuer; and (*b*) any stock exchange on which the securities of the public issuer are listed. (4) Every notice under subsection (3) of this section shall—(*a*) be in the prescribed form; and (*b*) contain the prescribed information; and (*c*) be accompanied by, or have annexed, such documents, certificates, and statements as may be prescribed; and (*d*) be given in the prescribed manner; and (*e*) be given as soon as the person knows, or ought to know, that the person is a substantial security holder in the public issuer."

A "public issuer" means a company listed on the New Zealand Stock Exchange and "substantial security holder" means a person who has a "relevant interest" in five per cent. or more of the voting securities in the public issuer. The definition of "relevant interest" in section 5 is both complicated and comprehensive, but there is no need to examine its terms

A because, although the matter was disputed in the courts below, Meridian
has accepted before their Lordships' Board that the effect of the
transaction was to give Meridian a relevant interest in the 49 per cent.
holding in E.N.C. between 9 November 1990, when its money was used
to buy it, and 10 December 1990 when the scheme was unwound. It gave
no notice under section 20(3).

Section 30 of the Act provides that where there are "reasonable
B grounds to suspect" that a substantial security holder has not complied
with, among other provisions, section 20, the court may, on the application
of the Securities Commission, make one or more of a number of orders
mentioned in section 32. These range from ordering the substantial
security holder to comply with the Act to forfeiting the shares in which he
has an interest. After holding its own inquiry in March 1991, the
C commission applied for orders against various participants in the scheme.
Meridian was not among the original defendants but was joined a few
days before the trial began.

Heron J. held that Meridian knew on 9 November that it was a
"substantial security holder" in E.N.C. for the purposes of section 20(4)(*e*).
He arrived at this conclusion by attributing to Meridian the knowledge of
Koo and Ng, who undoubtedly knew all the relevant facts. He did not go
D into the juridical basis for this attribution in any detail. It seemed obvious
to him that if Koo and Ng had authority to enter into the transaction,
their knowledge that they had done so should be attributed to Meridian.
It had therefore been in breach of its duty to give notice under section
20(3). In view of the fact that its relevant interest had ceased on
10 December 1990 the judge made no order against Meridian except that
E it should pay $50,000 towards the commission's costs and $15,000 towards
the costs of a minority shareholder in E.N.C. The finding that Meridian
was in breach was incorporated in a declaration made by the judge at the
request of Meridian so that it could have an order against which to
appeal. The Court of Appeal [1994] 2 N.Z.L.R. 291 affirmed the decision
of Heron J. on somewhat different grounds. It decided that Koo's
knowledge should be attributed to Meridian because he was the "directing
F mind and will" of the company. The Court of Appeal received some
evidence about how Meridian functioned. The members of the board lived
partly in Hong Kong and partly in Australia and met only once a year,
for the formal business before the annual general meeting. Other matters
which required a board resolution were circulated by post. Koo used to
be managing director but was replaced by a Mr. Armour on 1 August
G 1990. Although Koo thereafter in theory reported to Mr. Armour, in the
matter of buying and selling securities he went on in the same way as
before. The E.N.C. purchases and sales were openly recorded in the books
but Koo did not specifically report them to Mr. Armour, who only found
out about them after Koo had left. Nor did Koo report anything else and
there was no evidence that Mr. Armour or the other members of the
board tried to supervise what he was doing. By leave of the Court of
H Appeal, Meridian now appeals to their Lordships' Board. It says that its
only directing mind and will was that of its board, or possibly of
Mr. Armour, but not Koo, whom the Court of Appeal, at p. 301, correctly
described as "under Mr. Armour" in the corporate hierarchy.

The phrase "directing mind and will" comes of course from the celebrated speech of Viscount Haldane L.C. in *Lennard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd.* [1915] A.C. 705, 713. But their Lordships think that there has been some misunderstanding of the true principle upon which that case was decided. It may be helpful to start by stating the nature of the problem in a case like this and then come back to *Lennard's* case later. A

Any proposition about a company necessarily involves a reference to a set of rules. A company exists because there is a rule (usually in a statute) which says that a persona ficta shall be deemed to exist and to have certain of the powers, rights and duties of a natural person. But there would be little sense in deeming such a persona ficta to exist unless there were also rules to tell one what acts were to count as acts of the company. It is therefore a necessary part of corporate personality that there should be rules by which acts are attributed to the company. These may be called "the rules of attribution." B C

The company's primary rules of attribution will generally be found in its constitution, typically the articles of association, and will say things such as "for the purpose of appointing members of the board, a majority vote of the shareholders shall be a decision of the company" or "the decisions of the board in managing the company's business shall be the decisions of the company." There are also primary rules of attribution which are not expressly stated in the articles but implied by company law, such as D

> "the unanimous decision of all the shareholders in a solvent company about anything which the company under its memorandum of association has power to do shall be the decision of the company:" see *Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd.* [1983] Ch. 258. E

These primary rules of attribution are obviously not enough to enable a company to go out into the world and do business. Not every act on behalf of the company could be expected to be the subject of a resolution of the board or a unanimous decision of the shareholders. The company therefore builds upon the primary rules of attribution by using general rules of attribution which are equally available to natural persons, namely, the principles of agency. It will appoint servants and agents whose acts, by a combination of the general principles of agency and the company's primary rules of attribution, count as the acts of the company. And having done so, it will also make itself subject to the general rules by which liability for the acts of others can be attributed to natural persons, such as estoppel or ostensible authority in contract and vicarious liability in tort. F G

It is worth pausing at this stage to make what may seem an obvious point. Any statement about what a company has or has not done, or can or cannot do, is necessarily a reference to the rules of attribution (primary and general) as they apply to that company. Judges sometimes say that a company "as such" cannot do anything; it must act by servants or agents. This may seem an unexceptionable, even banal remark. And of course the meaning is usually perfectly clear. But a reference to a company "as such" might suggest that there is something out there called the company of H

A which one can meaningfully say that it can or cannot do something. There is in fact no such thing as the company as such, no ding an sich, only the applicable rules. To say that a company cannot do something means only that there is no one whose doing of that act would, under the applicable rules of attribution, count as an act of the company.

The company's primary rules of attribution together with the general principles of agency, vicarious liability and so forth are usually sufficient B to enable one to determine its rights and obligations. In exceptional cases, however, they will not provide an answer. This will be the case when a rule of law, either expressly or by implication, excludes attribution on the basis of the general principles of agency or vicarious liability. For example, a rule may be stated in language primarily applicable to a natural person and require some act or state of mind on the part of that person "himself," C as opposed to his servants or agents. This is generally true of rules of the criminal law, which ordinarily impose liability only for the actus reus and mens rea of the defendant himself. How is such a rule to be applied to a company?

One possibility is that the court may come to the conclusion that the rule was not intended to apply to companies at all; for example, a law which created an offence for which the only penalty was community D service. Another possibility is that the court might interpret the law as meaning that it could apply to a company only on the basis of its primary rules of attribution, i.e. if the act giving rise to liability was specifically authorised by a resolution of the board or an unanimous agreement of the shareholders. But there will be many cases in which neither of these solutions is satisfactory; in which the court considers that the law was E intended to apply to companies and that, although it excludes ordinary vicarious liability, insistence on the primary rules of attribution would in practice defeat that intention. In such a case, the court must fashion a special rule of attribution for the particular substantive rule. This is always a matter of interpretation: given that it was intended to apply to a company, how was it intended to apply? Whose act (or knowledge, or state of mind) was *for this purpose* intended to count as the act etc. of the F company? One finds the answer to this question by applying the usual canons of interpretation, taking into account the language of the rule (if it is a statute) and its content and policy.

The fact that the rule of attribution is a matter of interpretation or construction of the relevant substantive rule is shown by the contrast between two decisions of the House of Lords, *Tesco Supermarkets Ltd.* G *v. Nattrass* [1972] A.C. 153 and *In re Supply of Ready Mixed Concrete (No. 2)* [1995] 1 A.C. 456. In the *Tesco* case [1972] A.C. 153 the question involved the construction of a provision of the Trade Descriptions Act 1968. Tesco were prosecuted under section 11(2) for displaying a notice that goods were being "offered at a price less than that at which they were in fact being offered . . ." Its supermarket in Northwich had advertised that it was selling certain packets of washing powder at the reduced price H of 2s. 11d., but a customer who asked for one was told he would have to pay the normal price of 3s. 11d. This happened because the shop manager had negligently failed to notice that he had run out of the specially marked low-price packets. Section 24(1) provided a defence for a shopowner who

could prove that the commission of the offence was caused by "another person" and that: "He took all reasonable precautions and exercised all due diligence to avoid the commission of such an offence by himself or any person under his control." The company was able to show that it owned hundreds of shops and that the board had instituted systems of supervision and training which amounted, on its part, to taking reasonable precautions and exercising all due diligence to avoid the commission of such offences in its shops. The question was: whose precautions counted as those of the company? If it was the board, then the defence was made out. If they had to include those of the manager, then it failed. A B

The House of Lords held that the precautions taken by the board were sufficient for the purposes of section 24(1) to count as precautions taken by the company and that the manager's negligence was not attributable to the company. It did so by examining the purpose of section 24(1) in providing a defence to what would otherwise have been an absolute offence: it was intended to give effect to "a policy of consumer protection which does have a rational and moral justification:" *per* Lord Diplock, at pp. 194–195. This led to the conclusion that the acts and defaults of the manager were not intended to be attributed to the company. As Lord Diplock said, at p. 203: C

> "It may be a reasonable step for an employer to instruct a superior servant to supervise the activities of inferior servants whose physical acts may in the absence of supervision result in that being done which it is sought to prevent. This is not to delegate the employer's duty to exercise all due diligence; it is to perform it. To treat the duty of an employer to exercise due diligence as unperformed unless due diligence was also exercised by all his servants to whom he had reasonably given all proper instructions and upon whom he could reasonably rely to carry them out, would be to render the defence of due diligence nugatory and so thwart the clear intention of Parliament in providing it." D E

On the other hand, in *In re Supply of Ready Mixed Concrete (No. 2)* [1995] 1 A.C. 456, a restrictive arrangement in breach of an undertaking by a company to the Restrictive Practices Court was made by executives of the company acting within the scope of their employment. The board knew nothing of the arrangement; it had in fact given instructions to the company's employees that they were not to make such arrangements. But the House of Lords held that for the purposes of deciding whether the company was in contempt, the act and state of mind of an employee who entered into an arrangement in the course of his employment should be attributed to the company. This attribution rule was derived from a construction of the undertaking against the background of the Restrictive Trade Practices Act 1976: such undertakings by corporations would be worth little if the company could avoid liability for what its employees had actually done on the ground that the board did not know about it. As Lord Templeman said, at p. 465, an uncritical transposition of the construction in *Tesco Supermarkets Ltd. v. Nattrass* [1972] A.C. 153: F G H

> "would allow a company to enjoy the benefit of restrictions outlawed by Parliament and the benefit of arrangements prohibited by the

A courts provided that the restrictions were accepted and implemented and the arrangements were negotiated by one or more employees who had been forbidden to do so by some superior employee identified in argument as a member of the 'higher management' of the company or by one or more directors of the company identified in argument as 'the guiding will' of the company."

B Against this background of general principle, their Lordships can return to Viscount Haldane L.C. In *Lennard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd.* [1915] A.C. 705 the substantive provision for which an attribution rule had to be devised was section 502 of the Merchant Shipping Act 1894 (57 & 58 Vict. c. 60), which provided a shipowner with a defence to a claim for the loss of cargo put on board his ship if he could show that the casualty happened "without his actual fault or privity." The C cargo had been destroyed by a fire caused by the unseaworthy condition of the ship's boilers. The language of section 502 excludes vicarious liability; it is clear that in the case of an individual owner, only his own fault or privity can defeat the statutory protection. How is this rule to be applied to a company? Viscount Haldane L.C. rejected the possibility that it did not apply to companies at all or (which would have come to the same thing) that it required fault or privity attributable under the D company's primary rules. Instead, guided by the language and purpose of the section, he looked for the person whose functions in the company, in relation to the cause of the casualty, were the same as those to be expected of the individual shipowner to whom the language primarily applied. Who in the company was responsible for monitoring the condition of the ship, receiving the reports of the master and ship's agents, authorising repairs E etc.? This person was Mr. Lennard, whom Viscount Haldane L.C., at pp. 713–714, described as the "directing mind and will" of the company. It was therefore his fault or privity which section 502 attributed to the company.

Because Lennard's Carrying Co. Ltd. does not seem to have done anything except own ships, there was no need to distinguish between the person who fulfilled the function of running the company's business in F general and the person whose functions corresponded, in relation to the cause of the casualty, to those of an individual owner of a ship. They were one and the same person. It was this coincidence which left Viscount Haldane L.C.'s speech open to the interpretation that he was expounding a general metaphysic of companies. In *H. L. Bolton (Engineering) Co. Ltd. v. T. J. Graham & Sons Ltd.* [1957] 1 Q.B. 159 Denning L.J. certainly regarded it as a generalisation about companies "as such" when, in an G equally well known passage, at p. 172, he likened a company to a human body: "It has a brain and nerve centre which controls what it does. It also has hands which hold the tools and act in accordance with directions from the centre."

But this anthropomorphism, by the very power of the image, distracts attention from the purpose for which Viscount Haldane L.C. said, at p. 713, he was using the notion of directing mind and will, namely to H apply the attribution rule derived from section 502 to the particular defendant in the case:

"For if Mr. Lennard was the directing mind of the company, then his action must, unless a corporation is not to be liable at all, have been

> an action which was the action of the company itself *within the meaning of section 502*." (Emphasis supplied.)

The true nature of the exercise became much clearer, however, in later cases on the Merchant Shipping Act 1894. In *Admiralty v. Owners of the Steamship Divina (The Truculent)* [1952] P. 1, an action to limit liability for damage caused by collision under section 503, which also required the owner of the ship which caused the collision to show that the casualty happened without his "actual fault or privity," the offending ship was a Royal Navy submarine. Her collision with a fishing vessel had been caused by the inadequate system of navigation lights then carried by submarines. Willmer J. held that for this purpose the "directing mind and will" of the Crown, which owned the submarine, was the Third Sea Lord, to whom the Board of Admiralty had entrusted the function of supervising such matters as the systems of navigation lights carried by warships. That function was one which an individual owner of a ship would be expected to fulfil. In *The Lady Gwendolen* [1965] P. 294 the owners of the ship were Arthur Guinness, Son & Co. (Dublin) Ltd. The collision occurred because the master, in accordance with his custom, had taken his vessel laden with stout up the Mersey Channel to Liverpool at full speed in dense fog without more than the odd casual glance at his radar. Owning ships was a very subsidiary part of the company's activities. It had a traffic department which managed the ships under the general supervision of a member of the board who was a brewer and took no interest in the safety of their navigation. The manager of the traffic department knew about railways but took equally little interest in ships. The marine superintendent, one beneath him in the hierarchy, failed to observe that the master of *The Lady Gwendolen* was given to dangerous navigation although, as Willmer L.J. said, at p. 338:

> "It would not have required any very detailed examination of the engine room records in order to ascertain that *The Lady Gwendolen* was frequently proceeding at full speed at times when the deck log was recording dense fog."

In applying section 503 of the Merchant Shipping Act 1894, Sellers L.J. said of the company, at p. 333:

> "In their capacity as shipowners they must be judged by the standard of conduct of the ordinary reasonable shipowner in the management and control of a vessel or of a fleet of vessels."

The court found that a reasonable shipowner would have realised what was happening and given the master proper instruction in the use of radar. None of the people in the company's hierarchy had done so.

It is difficult to see how, on any reasonable construction of section 503, these findings would not involve the actual fault or privity of Guinness. So far as anyone in the hierarchy had functions corresponding to those to be expected of an individual owner, his failure to discharge them was attributable to the company. So far as there was no such person, the superior management was at fault in failing to ensure that there was. In either case, the fault was attributable to the company. But the Court of Appeal found it necessary to identify a "directing mind and will" of the

A company and lodged it in the responsible member of the board or (in the case of Willmer L.J.) the railway expert who managed the traffic department.

Some commentators have not been altogether comfortable with the idea of the Third Sea Lord being the directing mind and will of the Crown or the traffic manager being the directing mind and will of Guinness. Their Lordships would agree that the phrase does not fit the facts of *The* B *Truculent* [1952] P. 1 or *The Lady Gwendolen* [1965] P. 294 as happily as it did those of *Lennard's* case [1915] A.C. 705. They think, however, that the difficulty has been caused by concentration on that particular phrase rather than the purpose for which Viscount Haldane L.C. was using it. It will often be the most appropriate description of the person designated by the relevant attribution rule, but it might be better to acknowledge that C not every such rule has to be forced into the same formula.

Once it is appreciated that the question is one of construction rather than metaphysics, the answer in this case seems to their Lordships to be as straightforward as it did to Heron J. The policy of section 20 of the Securities Amendment Act 1988 is to compel, in fast-moving markets, the immediate disclosure of the identity of persons who become substantial security holders in public issuers. Notice must be given as soon as that D person knows that he has become a substantial security holder. In the case of a corporate security holder, what rule should be implied as to the person whose knowledge for this purpose is to count as the knowledge of the company? Surely the person who, with the authority of the company, acquired the relevant interest. Otherwise the policy of the Act would be defeated. Companies would be able to allow employees to acquire interests E on their behalf which made them substantial security holders but would not have to report them until the board or someone else in senior management got to know about it. This would put a premium on the board paying as little attention as possible to what its investment managers were doing. Their Lordships would therefore hold that upon the true construction of section 20(4)(*e*), the company knows that it has become a substantial security holder when that is known to the person who had F authority to do the deal. It is then obliged to give notice under section 20(3). The fact that Koo did the deal for a corrupt purpose and did not give such notice because he did not want his employers to find out cannot in their Lordships' view affect the attribution of knowledge and the consequent duty to notify.

It was therefore not necessary in this case to inquire into whether Koo G could have been described in some more general sense as the "directing mind and will" of the company. But their Lordships would wish to guard themselves against being understood to mean that whenever a servant of a company has authority to do an act on its behalf, knowledge of that act will for all purposes be attributed to the company. It is a question of construction in each case as to whether the particular rule requires that the knowledge that an act has been done, or the state of mind with which H it was done, should be attributed to the company. Sometimes, as in *In re Supply of Ready Mixed Concrete (No. 2)* [1995] 1 A.C. 456 and this case, it will be appropriate. Likewise in a case in which a company was required to make a return for revenue purposes and the statute made it an offence

to make a false return with intent to deceive, the Divisional Court held A
that the mens rea of the servant authorised to discharge the duty to make
the return should be attributed to the company: see *Moore
v. I. Bresler Ltd.* [1944] 2 All E.R. 515. On the other hand, the fact that a
company's employee is authorised to drive a lorry does not in itself lead
to the conclusion that if he kills someone by reckless driving, the company
will be guilty of manslaughter. There is no inconsistency. Each is an
example of an attribution rule for a particular purpose, tailored as it B
always must be to the terms and policies of the substantive rule.

The commission in their printed case put forward an alternative
argument based upon section 35 of the Act of 1988, which creates a
presumption of knowledge:

> "In any proceedings under this Part of this Act, it shall be
> presumed in the absence of proof to the contrary, that a person knew, C
> at a material time, of the existence of a relevant interest in voting
> securities in a public issuer or of a fact or matter concerning the
> existence of a relevant interest in the securities if, at that time, an
> employee or agent of that person knew in his or her capacity as
> employee or agent of the existence of the relevant interest or of a fact
> or matter concerning the existence of it."

D

Their Lordships did not find it necessary to call upon counsel for the
commission on this or any other point and have therefore heard no oral
submissions in support of the commission's alternative argument. But they
find it difficult to see how, on the facts of this case, section 35 can advance
the matter. There is no doubt that the knowledge of Koo and Ng would
have activated the presumption. But the presumption may be rebutted by
"proof to the contrary." Proof of what? Proof, presumably, that in fact E
none of the persons whose knowledge counted as the knowledge of the
company did know about the relevant interest. But the section gives no
guidance as to who those persons are. That is left to the process of
construction of section 20(4)(*e*) which their Lordships have undertaken.
If, as they think, Koo's knowledge was attributable to the company, the
evidence made reliance on the presumption unnecessary. And if only F
the knowledge of Mr. Armour or the board was so attributable, then the
evidence showed clearly that they did not know and the presumption was
rebutted. Either way, it would have had no effect on the outcome of the
case.

Their Lordships will humbly advise Her Majesty that the appeal should
be dismissed. Meridian must pay the costs of the commission before their
Lordships' Board. G

*Solicitors: Bower Cotton & Bower; Alan Taylor & Co.*

S. S.

H

# *Morphitis v Bernasconi* [2003] Ch 552

Court of Appeal A

# Morphitis *v* Bernasconi and others

**[2003] EWCA Civ 289**

2002 Dec 12, 13; Aldous and Chadwick LJJ and Munby J
2003 March 5 B

*Insolvency — Winding up — Fraudulent trading — Company seeking to divest itself of onerous leases — Scheme devised by counsel to transfer business to new company free of leases without infringing company and insolvency law — Landlord deceived as to company's intention to pay rent after certain date — Company wound up — Whether business of company carried on with intent to defraud creditors — Whether deception of single creditor sufficient — Assessment of contribution — Insolvency Act 1986 (c 45), s 213* C

The company was established in 1983 by a director who ran a number of locally incorporated haulage companies throughout continental Europe using the initials TMC. In 1992 the directors of the company wished to continue their trading activities as hauliers using the same initials but to divest themselves lawfully of onerous leases of warehouse premises. They sought the advice of counsel, who devised a scheme which purported to achieve their objectives without infringing the provisions of the Insolvency Act 1986[1], whereby a new company was to be set up to operate the haulage business, the directors were to resign as directors of the company and become directors of the new company, and the company would go into insolvent liquidation after 12 months leaving the landlord as an unpaid creditor. The company ceased trading as hauliers on 31 December 1992. From 1 January 1993 the haulage business was carried on by the new company. It was essential that the trade creditors of the company be paid because the directors would incur criminal liability under section 216 of the 1986 Act if a winding up petition were to be presented within 12 months of the company ceasing to trade as hauliers. The landlord was dissatisfied with the accrual of arrears of rent and other charges during the 12-month period and threatened to issue a winding up petition, but was persuaded by the company's solicitors to accept payment by instalments. A payment was made on 12 November 1993, but the last payment, promised for 23 December 1993, was never made, nor had it ever been the company's intention to make that payment, their objective of putting off the presentation of a winding up petition during the crucial year having been accomplished. The landlord did not serve a statutory demand for the rent due until 18 September 1994, the company was wound up on 20 December 1994 and a liquidator was appointed on 3 March 1995. The liquidator disclaimed the leases and sought, inter alia, a declaration under section 213 of the 1986 Act that the two former directors of the company and a firm of solicitors formerly instructed by the company were knowingly party to the carrying on of the business of the company with intent to defraud creditors and for other fraudulent purposes and that they were liable to make such contributions to the assets of the company as the court thought proper. The liquidator accepted a payment into court of £75,000 made by the solicitors. At trial against the former directors only, the judge held that fraudulent trading had been made out against the directors in that they intended to mislead one creditor, the landlord, from 12 November 1993 by promising to pay the next instalment of rent on 23 December 1993 knowing that they would not pay it. The judge held that they were liable to make a contribution of £35,000 to the assets of the company which included a punitive element of £17,500, but that the liability to make

[1] Insolvency Act 1986, s 213: see post, para 25.
S 216: see post, para 12.

contribution had been satisfied by the liquidator's acceptance of the solicitors' payment into court.

On appeal by the liquidator and cross-appeal by the directors—

*Held*, dismissing the appeal and allowing the cross-appeal, that although a business could be found to have been conducted with intent to defraud creditors notwithstanding that only one creditor had been defrauded by a single transaction, section 213 of the Insolvency Act 1986 was not engaged in every case where an individual creditor of a company had actually been defrauded, but only where that business had been carried on with intent to defraud its creditors; that the business of the company had been carried on throughout 1993 with intent to protect the former directors from the penalties to which they would otherwise be exposed under section 216 of the 1986 Act as directors of the new company rather than with intent to defraud the landlord; that, although the promise to pay another instalment of rent at the end of December 1993 had been intended to mislead the landlord into believing that its best interests were served by not taking proceedings against the company to enforce the debt then owed, it had not had been shown that there was any intent to defraud the landlord by carrying on the business while the landlord was so misled or that the carrying on of the business had defrauded the landlord; and that, accordingly, fraudulent trading within section 213 of the 1986 Act was not established and the directors were not liable to make any contribution to the assets (post, paras 46–49).

*In re Gerald Cooper Chemicals Ltd* [1978] Ch 262 explained.

*In re Cyona Distributors Ltd* [1967] Ch 889, CA distinguished.

*Per curiam.* There must be some nexus between (i) the loss which has been caused to the company's creditors generally by the carrying on of the business with intent to defraud creditors and (ii) the amount of any contribution which the court thinks proper to order persons knowingly party to the carrying on of the business with that intent to make, under section 213(2) of the 1986 Act, to the assets in which the company's creditors will share in the liquidation. There is no power to include a punitive element in the amount of any such contribution. The principle on which that power should be exercised is that the contribution to the assets in which the company's creditors will share in the liquidation should reflect (and compensate for) the loss which has been caused to those creditors by the carrying on of the business in the manner which gives rise to the exercise of the power. There is nothing to suggest either that the deception which the judge found to have been practised on the landlord led to the misapplication or misappropriation of the company's assets, or that the letter of 12 November 1993 led the landlord to make a claim in the liquidation that it would not otherwise have had. There was no material on which the judge could have reached the conclusion that it was correct to order contribution of £17,500, or any other sum (post, paras 53, 55).

Decision of Anthony Elleray QC sitting as a deputy judge of the Chancery Division [2001] 2 BCLC 1 varied.

The following cases are referred to in the judgment of Chadwick LJ:

*Bird, In re, Ex p The Debtor v Inland Revenue Comrs* [1962] 1 WLR 686; [1962] 2 All ER 406, CA
*Cooper (Gerald) Chemicals Ltd, In re* [1978] Ch 262; [1978] 2 WLR 866; [1978] 2 All ER 49
*Cyona Distributors Ltd, In re* [1967] Ch 889; [1967] 2 WLR 369; [1967] 1 All ER 281, CA
*Murray-Watson Ltd, In re* (unreported) 6 April 1977, Oliver J
*Park Air Services plc, In re* [2000] 2 AC 172; [1999] 2 WLR 396; [1999] 1 All ER 673, HL(E)
*Sarflax Ltd, In re* [1979] Ch 592; [1979] 2 WLR 202; [1979] 1 All ER 529
*Theophile v Solicitor General* [1950] AC 186; [1950] 1 All ER 405, HL(E)

The following additional cases were cited in argument: A

*ANC Ltd v Clark Goldring and Page Ltd* The Times, 31 May 2000; Court of Appeal (Civil Division) Transcript No 897 of 2000, CA
*Aktieselskabet Dansk Skibsfinansiering v Brothers* [2001] 2 BCLC 324
*Attorney General v Blake* [2001] 1 AC 268; [2000] 3 WLR 625; [2000] 4 All ER 385, HL(E)
*Broome v Cassell & Co Ltd* [1972] AC 1027; [1972] 2 WLR 645; [1972] 1 All ER 801, HL(E) B
*Company No 001418 of 1988, In re A* [1990] BCC 526
*Continental Assurance Co of London plc, In re* [2001] BPIR 733
*David Yablon Minton v Kenburgh Investments (Northern) Ltd* [2001] BCC 648, CA
*Esal Commodities Ltd, In re; London & Overseas (Sugar) Ltd v Punjab National Bank* [1993] BCLC 872; [1997] 1 BCLC 705, CA
*Kuddus v Chief Constable of Leicestershire Constabulary* [2001] UKHL 29; [2002] 2 AC 122; [2001] 2 WLR 1789; [2001] 3 All ER 193, HL(E) C
*Leitch (William C) Brothers Ltd, In re* [1932] Ch 71
*Oasis Merchandising Services Ltd, In re; Ward v Aitken* [1995] 2 BCLC 493
*Produce Marketing Consortium Ltd, In re* (1989) 5 BCC 569
*R v Ghosh* [1982] QB 1053; [1982] 3 WLR 110; [1982] 2 All ER 689, CA
*Rookes v Barnard* [1964] AC 1129; [1964] 2 WLR 269; [1964] 1 All ER 367, HL(E)
*Simmon Box (Diamonds) Ltd, In re* [2000] BCC 275

D

The following additional cases, although not cited, were referred to in the skeleton arguments:

*Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1997] AC 191; [1996] 3 WLR 87; [1996] 3 All ER 365, HL(E)
*Dickenson v Fletcher* (1873) LR 9 CP 1
*Patrick and Lyon Ltd, In re* [1933] Ch 786
*Purpoint, In re* [1991] BCC 121 E
*White & Osmond Parkstone Ltd* (unreported) 30 June 1960, Buckley J

**APPEAL** from Mr Anthony Elleray QC sitting as a deputy judge of the Chancery Division

By a notice of application dated 1 August 1997 and points of claim dated 11 November 1997 Geoffrey Christopher Anthony Morphitis, the liquidator of TMC Transport (UK) Ltd, sought, inter alia, against two former directors F of the company, Leonardo Bernasconi and Pasqualino Monti, a firm of solicitors acting for the company, Nicholas Bennett & Co, and PPM Trading Ltd, an associated company of TMC Transport (UK) Ltd incorporated in Liechtenstein, (1) a declaration under section 213 of the Insolvency Act 1986 that the directors and the solicitors and/or each of them had been knowingly parties to the carrying on of the business of the company with intent to G defraud its creditors and for other fraudulent purposes, and that they were liable to make such contributions to the assets of the company as the court thought proper with interest; (2) payment to the liquidator by the directors and the solicitors and/or each or any of them of the sum of such contributions or such other sum for which they might be found responsible, with interest for such period as the court thought fit pursuant to section 35A of the Supreme Court Act 1981; (3) a declaration that the payments made by H the company to PPM Trading Ltd during the period commencing September 1993 and ending with the presentation of the winding up petition constituted a preference of PPM Trading Ltd and were voidable accordingly; and (4) an order that PPM Trading Ltd repay the liquidator £60,000 with

interest at such rate and for such a period as the court thought fit pursuant to section 35A of the Supreme Court Act 1981. On 13 September 2000 the liquidator accepted a payment into court of £75,000 made by the solicitors, and thereafter the matter proceeded to trial against the two directors only. By an order dated 18 June 2001 Mr Anthony Elleray QC sitting as a deputy High Court judge, holding that fraudulent trading had been established against the directors, required them to contribute £35,000 to the assets of the company, including a punitive element of £17,500 but determined that that liability had been satisfied by the liquidator's acceptance of the payment into court made by the solicitors.

By an appellant's notice and pursuant to leave granted by Jonathan Parker LJ (limited to grounds 2, 3 and 4) on 11 February 2002 the liquidator appealed on the grounds that (1) having found that the former directors had made false representations to a creditor from 20 May 1993, the judge had been wrong to find that the directors were not party to fraudulent trading from at least that date (and assessed compensation accordingly); (2) having found that the directors were guilty of fraudulent trading from 12 November 1993 the judge had been wrong to assess the contribution (apart from any penal element) payable by the directors as if he were assessing damages for fraudulent misrepresentation: he should have had regard to the wider consequences of the fraudulent trading and the sum necessary to compensate the company for those consequences; (3) having found that the directors were liable to pay £35,000 to the company by way of compensation (£17,500 of which was by way of punitive award) the judge had been wrong to find that liability to have been satisfied by the sum of £75,000 paid into court by the solicitors and taken out by the liquidator on 13 September 2000: he should have found that the punitive element (at the least) should have been paid by the directors to the liquidator; and (4) having found that the assessment of compensation in the sum of £35,000 was appropriate only if the second director was able to procure that a creditor of the company connected with him would not seek to share in any distribution by the liquidator, and, having made such a condition of drawing up the order, the judge should have found that, regardless of whether the directors actually paid any sum to the liquidator, the liquidator had succeeded against the directors and was entitled to the costs of the action.

By a respondent's notice by way of cross-appeal filed on 1 March 2002 and pursuant to leave granted by Jonathan Parker LJ on 1May 2002 (limited to grounds 3, 4, and 5) the directors appealed on the grounds, inter alia, that (1) the judge had erred in imposing a financial penalty because on its proper construction there was no jurisdiction under section 213 of the Insolvency Act 1986 to impose a penalty; (2) alternatively, it had been wrong as a matter of discretion to impose a penalty, or a penalty of £17,5000 was excessive since on the facts found by the judge the misrepresentation was limited to a promise to pay arrears of rent in the much smaller sum of £10,000; (3) the judge had been wrong to find that the misrepresentation on 12 November 1993 that arrears of rent would be paid to the landlord on 23 December 1993 amounted to fraudulent trading within the meaning of section 213 of the Insolvency Act 1986; (4) the judge's findings of primary fact did not support the judge's inference of secondary fact that the misrepresentation had caused the landlord to suffer any loss and consequently he had erred in finding that the landlord had in fact been

defrauded by the impugned conduct; and (5) alternatively, the loss caused to the landlord as a consequence of the misrepresentation was not a relevant loss for the purpose of an application by a liquidator for a contribution to the company's assets since the liquidator's complaint was that the landlord's position as an individual creditor had been prejudiced vis à vis the creditors as a class, and the misrepresentation had not diminished the assets available to the general body of creditors. A

The court granted the parties permission to appeal on those grounds for which permission had been refused by the single judge. B

The facts are stated in the judgment of Chadwick LJ.

[**ALDOUS LJ.** The court will first hear the cross-appeal.]

*Clare Hoffmann* for the directors. It is a precondition for a claim under section 213 of the Insolvency Act 1986 that the company must have suffered a loss. The absence of such loss is fatal to the liquidator's claim. The fraudulent misrepresentation made by the company to the landlord in respect of payment of outstanding rent did not amount to fraudulent trading within section 213. The liquidator's real complaint, that the company preferred all other creditors at the expense of the landlord, does not come within section 213. No alteration in the company's assets or liabilities results from it, although there is an alteration for those with claims: see *In re Sarflax Ltd* [1979] Ch 592. The fraudulent misrepresentation had no causative effect on the loss suffered by the landlord, since the quantum of its claim for unpaid rent arrears remained the same. [Reference was made to *In re Simmon Box (Diamonds) Ltd* [2000] BCC 275.] Under section 213 the company falls to be compensated for the increase in the deficiency that has been caused by the company incurring credit at a time when it could not meet the claim: see *In re Produce Marketing Consortium Ltd* (1989) 5 BCC 568. C D E

Not every fraud or fraudulent misrepresentation perpetrated by a company amounts to fraudulent trading within section 213. There is a distinction between a fraud on a person that gives rise to a claim in damages against the company and the carrying on of the business of the company with intent to defraud: see *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262. For section 213 to be satisfied the person perpetrating the fraud must know at the time of the impugned conduct both that his conduct will give rise to a claim against the company and that the company is or will be unable to pay the claim. The liquidator did not seek to set aside the scheme the directors had entered into on counsel's advice in order lawfully to escape onerous leases, or to challenge any of the transactions in the scheme under the avoidance provisions in the 1986 Act, or to allege that the implementation of the scheme amounted to fraudulent trading. Implementing the scheme could not be fraudulent since the directors, acting on legal advice, would not have the necessary dishonest intent. Thus, the *Ghosh* test of dishonesty was not satisfied: see *R v Ghosh* [1982] QB 1053. F G

The nature of the remedy demonstrates that fraudulent trading is limited to circumstances where the company's deficiency is increased because credit is incurred at a time when the company cannot meet the claim. Neither section 213 of the 1986 Act nor its predecessor, section 332 of the Companies Act 1948, provides for payment to an individual creditor. Section 213 provides in terms that the contribution is to the assets of the H

company. The benefit of a declaration under section 332 of the 1948 Act is also conferred on the company, not on the defrauded creditors: see *In re Esal Commodities Ltd; London & Overseas (Sugar) Ltd v Punjab National Bank* [1993] BCLC 872; [1997] 1 BCLC 705 and *In re Continental Assurance Co of London plc* [2001] BPIR 733.

Even if the fraudulent misrepresentation were fraudulent trading, a claim under section 213 is concerned with the loss suffered by the company, not the loss suffered by a creditor. Only the liquidator has locus to bring the claim. He does not act as a representative claimant on behalf of a creditor who has a cause of action in fraud against the company.

The jurisdiction to order contribution is compensatory: there must be a causal connection between the defrauding and the level of contribution. The quantum of contribution must be limited to the loss suffered by the company, not the loss suffered by the victim: see *In re Continental Assurance Co of London plc* [2001] BPIR 733.

*David Chivers QC* for the liquidator. Acts of dishonesty which particularise or evidence fraudulent trading cannot be looked at in isolation, but must be seen in the context of what the company is doing. Specific misrepresentations were made by the company for a dishonest purpose so that the landlord would not present a winding up petition prior to the end of the 12-month period needed to implement the scheme.

The sole reason for the scheme put forward by counsel was to deprive the landlord of his rent. If the landlord presented a winding up petition within 12 months of the transfer of assets to the new company the directors of the company would incur criminal liability under sections 207 and 216 of the 1986 Act. The fraudulent misrepresentation to the landlord as to the intention to pay arrears of rent, in order to forestall the presentation by the landlord of a petition, was an integral part of the carrying out of the scheme. It allowed the directors to run a phoenix company without incurring criminal liability.

At the time the directors made the misrepresentation to the landlord their state of mind was dishonest. At least from the moment of making that misrepresentation the directors knew that they were carrying on the business fraudulently. The dishonesty is to be tested, not by reference to what an honest director would have done, but by reference to the actual misrepresentation: see *Aktieselskabet Dansk Skibsfinanciering v Brothers* [2001] 2 BCLC 324. There may be fraudulent trading without a diminution of the company's assets: see *In re Sarflax Ltd* [1979] Ch 592. The trading fraud manifested itself at the latest by November 1993, when the directors allowed the landlord as creditor to believe that it would be paid so that there was no need to bring proceedings against the company.

If the court is satisfied that fraudulent trading is established, it should look at the wider consequences in assessing the appropriate level of contribution to the company's assets to be made by the directors under section 213(2). The section gives no guidance. The court has a wide discretion and can look at the whole course of the directors' conduct. It is not limited to making a compensatory payment. Responsibility for the insolvency and the costs of the liquidation should be reflected in the award. A punitive element can be included: see *In re Cyona Distributors Ltd* [1967]

Ch 889, *In re A Company No 001418 of 1988* [1990] BCC 526 and *In re William C Leitch Brothers Ltd* [1932] Ch 71. A

The claim should not be regarded as one for damages against joint defendants. Under section 213 there is no right of contribution between defendants to a claim. There are several claims against each of the directors. They should at least be ordered to pay the punitive element of the contribution. The court should not limit the award to the amount of a payment into court by a third party already accepted by the liquidator: see *David Yablon Minton v Kenburgh Investments (Northern) Ltd* [2001] BCC 648; *Attorney General v Blake* [2001] 1 AC 268 and *Kuddus v Chief Constable of Leicestershire Constabulary* [2002] 2 AC 122. The payment by the third party did not satisfy any obligation of the directors. B

In assessing costs it is wrong in principle to order the company to pay the directors' costs from the date of acceptance of the payment in since the directors made no Part 36 offer at the time of the payment in, and the claims were several against each defendant. C

*Hoffmann* in reply. There is no absolute duty on directors to disclose the truth to creditors either under section 213 or section 214.

There is a history of confusion between the different types of damages: see *Rookes v Barnard* [1964] AC 1129 and *Broome v Cassell & Co Ltd* [1972] 1 AC 1027. Section 213 is unambiguous. It does not provide for a penalty but provides only for a contribution. Where there is uncertainty as to the extent of the defrauding, compensation will be at the top end of the band: see *In re William C Leitch Brothers Ltd* [1932] Ch 71. [Reference was also made to *In re Oasis Merchandising Services Ltd; Ward v Aitken* [1995] 2 BCLC 493 and *ANC Ltd v Clark Goldring and Page Ltd* The Times, 31 May 2000.] The court should take into account the payment into court because it is the compensation necessary for the company which is to be assessed. D E

*Cur adv vult*

5 March 2003. The following judgments were handed down. F

**CHADWICK LJ**

1 TMC Transport (UK) Ltd, a company incorporated under the Companies Acts 1948 and 1981, was ordered to be wound up on 20 December 1994. By these proceedings, commenced by application issued on 1 August 1997, the liquidator sought a declaration, under section 213 of the Insolvency Act 1986, that two former directors of the company and a firm of solicitors formerly instructed by the company were knowingly party to the carrying on of the business of the company with intent to defraud creditors and for other fraudulent purposes and that they were liable to make such contributions to the assets of the company as the court thought proper. On 13 September 2000 the liquidator accepted a payment into court, in the sum of £75,000, made by the solicitors. The claim proceeded to trial only against the two former directors, Mr Leonardo Bernasconi and Mr Pasqualino Monti. G H

2 The matter came on for trial before Mr Anthony Elleray QC, sitting as a deputy judge of the Chancery Division, in November 2000. In February 2001 the judge handed down a lengthy written judgment, in which he held

that that fraudulent trading had been made out against the directors; and declared that they should contribute an amount of £35,000 to the assets of the company. That sum included an element (£17,500) which the judge described as punitive. The judge went on to hold that liability of the directors to make contribution had been satisfied—or, as he put it, extinguished—by the liquidator's acceptance of the payment into court made by the solicitors. He adjourned the matter for further argument in relation to costs.

3 The matter was restored in June 2001; no order having been drawn up following the judgment in February. The judge was asked to reconsider his decision that the whole of the amount of the contribution which the directors would otherwise have been liable to make should be treated as extinguished by the solicitors' payment. It was said that, notwithstanding that payment, the directors should remain liable to contribute an amount equal to the punitive element fixed by the judge. The judge rejected that contention. He went on to consider by whom the costs of the proceedings should be paid. He held (i) that the liquidator should pay 75% of the directors' costs incurred after the date (13 September 2000) on which he accepted the payment into court and (ii) that the directors should pay the liquidator's costs up to that date, but that those costs should include only 50% of the costs of adducing expert evidence. The judge refused permission to appeal.

4 The judge's order is dated 18 June 2001; although it was not agreed by counsel, approved by the judge and entered until February 2002. In the meantime the liquidator had filed an appellant's notice. He sought an order (i) that the directors be liable to make such contribution to the company's assets (in excess of £35,000) as this court might think fit; in the alternative, (ii) that the directors be ordered to pay the punitive element of £17,500 by way of contribution in addition to the £75,000 paid by the solicitors; and (iii) that the directors pay the whole of the costs of the proceedings. Permission to appeal, limited to grounds 2, 3, and 4 in the appellant's notice, was granted by this court (Jonathan Parker LJ) on 11 February 2002. On 1 March 2002 the directors filed a respondents' notice raising issues by way of cross-appeal. Permission to cross-appeal, limited to grounds 3, 4 and 5 in the respondents' notice was granted by Jonathan Parker LJ on 1 May 2002.

5 Accordingly, there were before this court: (i) the liquidator's application for permission to appeal on ground 1 in the appellant's notice (which, although refused by Jonathan Parker LJ on paper, he was given liberty to renew at the hearing of the appeal); (ii) the directors' application for permission to appeal on ground 1 in the respondents' notice (adjourned for hearing at the appeal) and on ground 2 (refused on paper, with liberty to renew); (iii) the liquidator's appeal; and (iv) the directors' cross-appeal. We indicated that we would hear argument on all issues; treating the applications for permission as if they were additional grounds of appeal or cross-appeal.

*The issues raised on these appeals*

6 The issues raised by the appeal and cross-appeal may be summarised as follows.

(1) Whether the judge was correct, on the findings of fact which he made, to hold that the directors had been knowingly party to the carrying on of the

business of the company with intent to defraud creditors or for other fraudulent purposes within the meaning of section 213 of the Insolvency Act 1986—ground 3 in the respondents' notice. A

(2) If so, whether the judge was correct in holding that the directors were not parties to fraudulent trading prior to 12 November 1993 (and, in particular, were not parties to fraudulent trading from, at the latest, 20 May 1993)—ground 1 in the appellant's notice.

(3) Whether any relevant loss was suffered by reason of the directors' participation in fraudulent trading, as found by the judge—grounds 4 and 5 in the respondents' notice. B

(4) If so, whether the judge was correct in assessing the contribution to be made by the directors (exclusive of the punitive element) at £17,500—ground 2 in the appellant's notice.

(5) Whether the judge was entitled (alternatively, whether it was a proper exercise of his discretion) to include a punitive element in the contribution for which he held the directors liable—grounds 1 and 2 in the respondents' notice. C

(6) Whether the judge was correct to hold that the contribution for which he had held the directors liable (alternatively, the punitive element of that contribution) was satisfied by the payment made by the solicitors—ground 3 in the appellant's notice. D

(7) Whether the judge ought to have ordered the directors to pay the costs of the proceedings from 13 September 2000 (as well as the costs before that date)—ground 4 in the appellant's notice.

*The underlying facts*

7 The underlying facts are not now in dispute. I take them from the judgment below. The company was established at the end of 1983 by Mr Monti, who was (and remains) a successful haulier operating throughout continental Europe through a number of locally incorporated companies bearing the initials "TMC" (derived from 'Transmetal Chimica') as part of their name. Until early in 1991 the day to day business of the company was managed by Mr Daniel Murat, who had a 25% share interest. Mr Monti and Mr Murat were the directors. In 1991 Mr Murat was replaced as a director by Mr Bernasconi, an accountant in practice in Switzerland. Mr Monti and Mr Bernasconi ceased, formally, to be directors of the company at the end of 1992—before the events said to constitute fraudulent trading in the present case—but it was not in dispute that Mr Monti continued to control the company to an extent which required him to be treated as a de facto director. E F

8 By the end of the 1980s the company was tenant of warehouse and depot premises on the Sandwich Industrial Estate, in Kent, under four leases; each of which would continue, in accordance with its contractual terms, until 1998 or for some years thereafter. On 28 July 1989 the reversion to those leases was acquired by Ramac Holdings Ltd. The leases were guaranteed by Mr Murat alone. G

9 The company had traded profitably until the beginning of 1991—as appeared from its accounts to 31 December 1990. But, by early 1991 Mr Monti had become concerned at reports of unpaid suppliers and, with the assistance of Mr Bernasconi, had investigated the cause of that concern. That investigation led to the departure of Mr Murat; and to Mr Bernasconi's appointment as a director. To assist the company Mr Monti arranged for H

loan capital to be provided by Accoulis Tours Establishment, a company which (nominally at least) was owned and controlled by Mr Bernasconi but which was amenable to Mr Monti's wishes. The amount invested in 1991 was £135,000. A further £235,000 was lent by Accoulis in 1992; but part of that further loan may have represented unpaid interest due under the earlier loan. Nothing turns on the precise amount of "new money" introduced by Accoulis.

10 The company remained unprofitable during 1992. By June 1992 management accounts showed an excess of liabilities over assets in the sum of £27,275. The company was suffering from a general downturn in the haulage industry; but Mr Monti and Mr Bernasconi identified the company's principal commercial problem as the onerous rental obligations under the leases. The problem was exacerbated by a pending upwards-only rent review. The solution was seen to be a relocation to other premises near Ramsgate. The difficulty in the way of relocation was the inability to find a purchaser for the leases or to agree terms with Ramac upon which they could be surrendered.

11 In July 1992 Mr Monti and Mr Bernasconi instructed solicitors to seek advice from counsel. The matter on which counsel was asked to advise appears from paragraph 3 of the opinion which he gave on 14 July 1992:

> "TMC wishes to preserve its assets (apart from the leases) and its trade [connection], but to free itself from the liability to pay rent under the leases. Those premises no longer suit its needs, and, I infer, there is no market for them at present. What is envisaged is that the non-lease assets will be transferred in some way to another company in the hope that they can be put out of the reach of the landlord. It is an essential ingredient of any such scheme that TMC's trade creditors should be paid."

Counsel pointed out, correctly, that any transfer of non-lease assets to another company, if not made for full value, would be open to attack by a liquidator if the company were to go into insolvent liquidation within two years thereafter: see sections 238 and 240(1)(a) of the Insolvency Act 1986. Even if the transfer were made for full value, the use of the proceeds to pay trade creditors (to the exclusion of the landlord) would be vulnerable to attack as a preference if liquidation occurred within six months: see sections 239 and 240(1)(b) of the Act. Counsel drew attention, also, to the provisions of sections 207 ("transactions in fraud of creditors") and 216 ("restriction on re-use of company names"). He concluded with the following advice:

> "My opinion is that the only lawful way of divesting TMC of its leases and of enabling its business to continue is as follows. TMC should go into voluntary liquidation. Since I infer that no declaration of solvency under section 89 could be made, the liquidation will be a creditors' voluntary liquidation. Upon liquidation, the liquidator could, if he so wished, disclaim the leases, thereby ending TMC's liability under them. Mr Murat's liability would continue, and he could be required by the landlord to take new leases for their unexpired terms, or he could apply for vesting orders under section 181; but that is of no concern to those instructing me. The liquidator would then explore the possibility of the sale of the business of TMC and its tangible assets as a going concern.

Some or all of the present directors would be entitled to negotiate with the liquidator for such a purchase, but, of course, they would not necessarily be successful. Section 216 would restrict their choice of a new trading name." A

12 It is convenient, here, to set out the material provisions of section 216 of the Insolvency Act 1986:

"(1) This section applies to a person where a company ('the liquidating company') has gone into insolvent liquidation on or after the appointed day and he was a director or shadow director of the company at any time in the period of 12 months ending with the day before it went into liquidation. B

"(2) For the purposes of this section a name is a prohibited name in relation to such a person if—(a) it is a name by which the liquidating company was known at any time in that period of 12 months, or (b) it is a name which is so similar to a name falling within paragraph (a) as to suggest an association with that company. C

"(3) Except with leave of the court or in such circumstances as may be prescribed, a person to whom this section applies shall not at any time in the period of five years beginning with the day on which the liquidating company went into liquidation—(a) be a director of any other company that is known by a prohibited name, or (b) in any way, whether directly or indirectly, be concerned or take part in the promotion, formation or management of any such company, or (c) in any way, whether directly or indirectly, be concerned or take part in the carrying on of a business carried on (otherwise than by a company) under a prohibited name. D

"(4) If a person acts in contravention of this section, he is liable to imprisonment or a fine, or both." E

13 Those provisions made the scheme suggested in the final paragraph of counsel's opinion of 14 July 1992 unattractive. Following liquidation, the business could not be sold by the liquidator to a new company in which Mr Monti was involved (as he would be) and carried on under the TMC initials, unless Mr Monti had ceased to be a director or shadow director of the old company on a date which was at least twelve months before the liquidation of the old company. If the business were to be carried on by the old company until liquidation and sale (as it would have to be, if it were to be sold by the liquidator as a going concern) it was impossible to envisage circumstances, in practice, in which Mr Monti would cease to be a shadow director prior to liquidation, even if he resigned his formal appointment. The point was recognised by counsel in a second opinion, dated 28 September 1992. He wrote: F G

"[The] solution [suggested in the opinion of 14 July 1992] is unattractive to the directors for two reasons. First, there would inevitably be an interruption in trading while the liquidator gathered in TMC's assets and considered what to do with them. And, secondly, the goodwill attaching to the name 'TMC' would be lost, because of the restriction imposed by section 216 of the 1986 Act on the former directors of a company which has gone into insolvent liquidation trading, either through a company or otherwise, in the same name as the liquidated company." H

A 14 In his opinion of 28 September 1992—written to confirm advice given in conference a few days earlier—counsel put forward a revised scheme which (as he said) would avoid both of the problems which he had identified. The revised scheme is set out in paragraph 4 of that opinion:

"(1) TMC's holding company (H1 Ltd) sells [its] shares in TMC at a proper valuation to another, independent company, H2 Ltd. First of all, B however, the shares in TMC's subsidiary, TMC (Northern) Limited, which is a warehousing company and which H1 Ltd would wish to retain, are transferred to it by TMC. In other words H2 Ltd will acquire TMC without its subsidiary. As would be usual on a sale of a company to an independent party, the present directors of TMC would resign and H2 Ltd would appoint its own nominated directors.

C "(2) The (now) former directors of TMC incorporate a new company with a suitable name which would enable it to be known as TMC (new TMC). That could be done through H1 Ltd or through another holding company.

"(3) New TMC seeks new premises and prepares to operate as a road haulier. In the meantime TMC carries on its business as usual.

"(4) When new TMC is ready to trade TMC ceases to trade as a road D haulier and becomes, instead, a lessor of trailers, which it leases for 12 months to new TMC. At the same time new TMC buys TMC's goodwill (namely its list of customers) at a fair value.

"(5) Not less than 12 months later, new TMC cancels its leases (which I am instructed it will then no longer require) and makes fresh arrangements for providing the necessary vehicles for its business. TMC is left with its trailers and can either continue to trade or go into E liquidation as it thinks fit. If it were to go into insolvent liquidation at that stage, the original directors of TMC would have committed no offence under section 207, because there would have been no transfer of TMC's property by them. The shares in TMC themselves would have been transferred, by H1 Ltd. Nor could there be an objection to new TMC trading as "TMC" under section 216, because the original directors F of TMC, who will by then be the directors of new TMC, will not have been directors of TMC within 12 months of its liquidation."

15 Mr Monti and Mr Bernasconi decided to adopt the scheme put forward by counsel in his second opinion. On 24 November 1992 the company's shares in TMC Northern were transferred to its holding company, Alca Enterprises AG, at a price which the liquidator has not G challenged. On 22 December 1992 the company's own shares were transferred by Alca to PPM Trading Ltd, a Liechtenstein company incorporated by Mr Bernasconi. Mr Monti and Mr Bernasconi resigned office as directors of the company. The sole director appointed in their place was Mr Augustoni Domenico, Mr Bernasconi's father-in-law. Those steps were (I assume) intended to carry into effect step (1) of counsel's scheme; but it is difficult to think that counsel would have been satisfied that H PPM Trading was an "independent" company in the role of H2 Ltd or that he would have envisaged the appointment of Mr Bernasconi's father in law as the nominated director of the old company.

16 Steps (2), (3) and (4) of counsel's scheme were carried into effect by the incorporation of a new company, Trans Montana Carriers Ltd, which

could use the initials "TMC"; the transfer of goodwill from the old company to the new company at a price of £1,000; the execution of a leasing contract for the lease by the old company to the new of the 34 trailers which the old company then owned at a rent of £125,000 per annum; and the acquisition by the new company of leasehold premises in Ramsgate from which it could trade. The old company ceased trading as hauliers on 31 December 1992; and the haulage business was thereafter (with effect from 1 January 1993) carried on by the new company. For convenience I shall refer to the old company as "the company" and to the new company as "Newco".

17 The financial statements in respect of the company, for the year to 31 December 1992, show fixed and current assets of £843,409 and liabilities of £903,704. The fixed assets were shown at a book value of £206,251; and current assets, principally trade debtors, at a book value of £637,158. Liabilities comprised trade creditors (£428,849), a loan creditor (Accoulis—£370,000), accrued expenses of £100,000 or thereabouts, and Crown debts of about £7,000. The trade creditors included the landlord of the Sandwich premises, Ramac.

18 During 1993 the company collected its trade debts and received from Newco the rents payable under the trailer lease. By the year end the company had sold its remaining trailers to an associated Belgian company, ICTS, for about £195,000. That sale has not been challenged by the liquidator. The company paid off nearly all its trade creditors, much of the current rent under the leases of the Sandwich premises, and part of the Accoulis loan. The financial position of the company as at 31 December 1993—as it appeared from a reconstruction by the joint expert which was not challenged—showed current liabilities of £292,000. Those liabilities included the balance of the Accoulis loan (£240,000) and trade creditors of £43,000—of which £37,000 represented rent due to Ramac. Assets had reduced to £63,000. Net liabilities were £222,000—suggesting a loss during 1993 of some £160,000. The loss was attributable to losses on the sale of fixed assets below book value, depreciation on fixed assets, interest charges on the Accoulis loan and the rent accruing on the Sandwich premises. But, in broad terms, the objective of realising the company's assets and paying its trade creditors (other than its landlord) had been achieved.

19 The sale of the company's trailers to ICTS followed a third opinion from counsel, dated 14 October 1993. Counsel had been asked to advise whether "on the insolvent liquidation of TMC in due course, there would be any contravention of the provisions of the Insolvency Act 1986 if TMC were now to sell its trailers to a third party". He wrote:

> "The purpose of introducing 12-month [trailer] leases into the scheme mentioned in paragraph 4 of my further opinion of the 28 September 1992 was to enable TMC to continue trading and to generate an income flow which would enable it to pay its debts (including the rent due under the leases of its properties in Sandwich) for at least that period. In other words it is essential that no creditor (including the landlord) should present a petition to wind up TMC before the expiration of the period of 12 months beginning with its having ceased to trade as a haulier. That is to protect the original directors of TMC (now the directors of the new TMC) from contravention of section 216 of the 1986 Act."

A It seems unlikely that counsel appreciated that Mr Monti and Mr Bernasconi were continuing to act as directors of the company de facto — notwithstanding that they had formally resigned office. If counsel had appreciated that, he would have realised that the objective for which the scheme had been devised—the avoidance of liability under section 216 of the 1986 Act in their role as directors of Newco—could not be achieved in any event.

B 20 Counsel advised that, provided that the cancellation of the trailer leases and the sale of the trailers did not result in the financial position of TMC deteriorating so that it was unable to pay its debts as they fell due, no creditor would be in a position to petition for winding up before the end of the 12-month period; so that there was no reason, on that ground, why the trailers should not be sold. Nevertheless, counsel went on to advise against C that course on other grounds. First, that there was a risk of challenge to the transaction under section 238 of the Act unless the sale (and the surrender of the trailer leases) were each effected at full value; and, second, that there was a risk that the present directors of TMC would be held liable for wrongful trading under section 214 of the Act. As he explained:

> "The basis of such liability would be that, once TMC had sold virtually D all its assets and virtually all its leases had been cancelled, its directors ought to have concluded that there was no reasonable prospect of its avoiding going into insolvent liquidation. In other words it seems to me to be very difficult for the present directors of TMC to adopt the proposed middle course: either TMC ought to continue trading to an extent which generates sufficient income for it to pay its debts as they fall due so that it can plausibly appear to be a going concern, or it ought to cease trading E altogether (in which case a winding up petition is likely to be presented soon afterwards). To wind its activities down in the manner suggested is such a clear preparation for a subsequent liquidation that the directors could well be criticised for not having ceased those activities altogether."

21 It appears from an attendance note made by the solicitors shortly after that opinion had been received that counsel's advice was accepted. The F note, dated 28 October 1993, records:

> "It was, therefore, agreed that Mr [Monti] would go ahead and sell the four trailers which he appeared already to have done a deal and to retain the 22 trailers until on or after 1 January 1994 when they would be sold off, the company would then subsequently be placed into liquidation probably by Ramac Holdings Ltd issuing winding up proceedings."

G The judge found that nearly all of the remaining 22 trailers were sold by the company "as the year ended"—rather than "on or after 1 January 1994"—but nothing turns on that.

22 If counsel's scheme was to secure the objective for which it had been devised, it was necessary to avoid circumstances in which the landlord of the Sandwich premises, Ramac, presented a petition for the winding up of the H company during 1993. This was recognised, expressly, in the opinion of 14 October 1993 to which I have just referred; but it was implicit in counsel's earlier advice. The need was identified in a letter dated 13 May 1993 from Mr David Saunders, the solicitor dealing with the matter on behalf of the company, to the company secretary, Mr Eddie Borgers. After

informing Mr Borgers of a letter from Ramac's solicitors threatening the issue of a writ in respect of unpaid rent, service charges and insurance, Mr Saunders wrote:

> "I am concerned because in the scheme devised to remove from the premises at unit 6 and set up the new TMC it is an essential element that rent and other expenses made payable to the landlord are kept up to date for a period of at least 12 months in order that former directors and company secretary of the old TMC are (a) not criminally liable and (b) to prevent Ramac, as creditors, from seeking to set aside a transaction or pursue new TMC or its directors and company secretary for the outstanding moneys. If these outstanding debts remain outstanding, then I am fearful that the scheme will fail and considerable problems will ensue."

23 It will be necessary to examine, in some detail, the steps which were taken, following that letter, to forestall the issue of a writ, or the presentation of a winding up petition, in respect of the company's debt to Ramac. It is sufficient to note, at this point, that those steps did not extend beyond the end of 1993. On 13 January 1994 Mr Saunders was able to report to Mr Bernasconi that "we have successfully utilised the one year period for the purpose of offloading the premises at Sandwich Industrial Estate." It was not until 18 September 1994 that Ramac served a statutory demand for the amount of the rent then due (£112,478). That was followed by the presentation of a winding up petition on 10 November 1994. As I have said, the company was wound up by the court on 20 December 1994. The liquidator was appointed on 3 March 1995.

24 The liquidator disclaimed the leases of the Sandwich premises—as he was entitled to do under section 178(2) of the Insolvency Act 1986. The effect of the disclaimer was to determine the continuing liabilities of the company in respect of those premises—see section 178(4)(a); but Ramac was entitled to prove as a creditor in the liquidation for the loss which it had suffered: see section 178(6) of the Act and the analysis in *In re Park Air Services plc* [2000] 2 AC 172, 184A–G. The judge was told that a proof by Ramac in the sum of £621,980·41—representing the discounted value of the loss of the right to future rent after giving credit for receipts to be obtained on reletting—had been admitted by the liquidator.

*The liquidator's pleaded case*

25 Section 213 of the Insolvency Act 1986 is in these terms:

> "(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.
>
> "(2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper."

26 The liquidator's case in relation to the allegation of fraudulent trading under section 213 of the Act is pleaded at paragraphs 18–24 of the points of claim dated 11 November 1997. Paragraph 18 contains the

A allegation that, from 16 February 1993, the company was in default of its obligations for rent, service charges and interest charges under the leases. Paragraph 19 alleges that, from 13 May 1993, Ramac (through its solicitors) was demanding payment of the moneys due; and (on particular dates specified) was threatening proceedings to recover those moneys. Paragraphs 20 and 21 are in these terms, so far as material:

B "20. In all instances Nicholas Bennett [the company's solicitors] wrote to Ramac's solicitors, adopted the tactics of either seeking time to pay, or to reschedule payments, or making some small payment on account . . . The purpose of such tactics was to ensure that Ramac did not commence proceedings or present a winding up petition until 12 months from the date when new TMC commenced trading as a haulier, being 23 December C 1993.

"21. By seeking time to make payments due, and/or making the company liable for interest on the outstanding sums, throughout 1993 the respondents caused the company to incur credit at a time when they knew or ought to have known that the company was unable to pay the sums due and/or had no intention of paying the same."

D Paragraph 22 of the points of claim pleads the disposal of the trailers in late 1993. Paragraphs 23 and 24 are in these terms:

"23. The course of trading by the company through the respondents . . . was intended to deceive Ramac into believing that it would be paid the sums due under the leases in due time or within an agreed rescheduling time when at all times the said respondents knew or E intended that no moneys would be paid after 23 December 1993. No moneys were paid after 8 December 1993. As at 23 December 1993 over £35,000 plus interest was owing to Ramac.

"24. In the premises, the respondents . . . have been knowingly parties to the carrying on of the business of the company to defraud creditors of the company and for other fraudulent purposes."

F **27** On 28 July 2000 Arden J directed that a list of issues be served with the skeleton arguments. The list served on behalf of the liquidator included, as issue 6(b): "In any case, did the defendants conduct the business of the company . . . (b) with the purpose of ensuring that the transfer of assets pursuant to the scheme could not be challenged and to avoid personal or criminal liability?" At the trial, counsel for the former directors, Miss Hoffmann, took the point that it had not been alleged by the liquidator G in his pleading that conduct of the business for the purpose identified in issue 6(b) amounted to fraudulent trading for the purposes of section 213 of the 1986 Act. The judge [2001] 2 BCLC 1, 34–35, paras 111–114 upheld that objection. It is, I think, important to note what he said:

"111. Mr Chivers [counsel for the liquidator] summarised the liquidator's claim in opening as a claim that Mr Monti and Mr Bernasconi H dishonestly persuaded Ramac to hold off the commencement of legal proceedings until the 12-month period required by the scheme had elapsed and that their intention was to pay the minimum required to keep Ramac at bay, notwithstanding that nothing further should be paid after December 1993.

"112. Mr Chivers acknowledged on behalf of the liquidator that the present claim would not have arisen if the company had during the 12-month period simply paid the current rent. The liquidator alleges that the trading became fraudulent by reason of lies to Ramac as to intention to pay rent and comply with obligations. Though the particulars of claim at para 20 referred to the tactic of seeking time to pay or reschedule payments as a tactic designed to ensure that Ramac would not commence proceedings or the presentation of a winding up petition during the 12-month period, the deception alleged at paragraph 23 was that the company intended to deceive Ramac into believing that it would be paid sums due under the leases or as rescheduled when it was known or intended that no moneys would be paid after 23 December 1993. It is not understood that the liquidator seeks to allege that the tactic of avoiding proceedings or a petition of itself is fraudulent trading.

"113. The particulars of fraudulent trading do not allege that the transfer of the company's assets or the preference of other creditors at the expense of Ramac's right to future rents etc during the 12-month period were wrongful or a misfeasance, so as to amount to fraudulent trading. I have cited part of paragraph 22 of the particulars, which refers to the sale of vehicles and trailers. Those full particulars had gone on to say that the sums received from the disposal of vehicles and trailers were paid to PPM in discharge of its loan to the company, a particular preference claim. That latter claim was however abandoned. The evidence is that the sales were at or above market value. Though Mr Chivers asked me to note in connection with the particulars the fact of the disposals, he did not allege that they amounted to fraudulent trading.

"114. I summarised at paragraph 62 above expectations of the scheme on the face of counsel's second opinion and the attendance note of 24 September 1992. In determining or purporting to follow the scheme it is obviously correct that Mr Monti and Mr Bernasconi intended the transfer of assets out of the company during the 12-month period. Their expectation should have been, to the extent that the scheme was followed, that such transfers would not be challenged and they would avoid personal liabilities, as those had been identified by counsel. It does appear to me that, as Miss Hoffmann submitted, to allege that causing the company to carry on business for those scheme reasons was fraudulent trading would be to raise a new case. Further, that case would be substantially inconsistent with Mr Chivers's disavowal of any challenge to the implementation of the scheme, in so far as it was followed. Mr Chivers did not seek to make any amendment to the claim. In consequence, I do not understand that bare issue 6(b) purposes would demonstrate fraudulent trading for the purposes of this claim."

At paragraph 140 of his judgment the judge repeated that "it is not the fraudulent trading case of the liquidator that it was dishonest to prefer creditors at the expense of the landlord". He concluded:

"Given the absence of a relevant plea and the *Sarflax* point"—a reference to the decision of Oliver J in *In re Sarflax Ltd* [1979] Ch 529—"I do not consider it would be right to find dishonesty arising from the pursuit of the scheme, in the absence of independent directors."

The judge's reference, there, to "the absence of independent directors" indicated that he had recognised that counsel's scheme had not contemplated the appointment of Mr Bernasconi's father in law as sole director of the company following the resignation of Mr Monti and Mr Bernasconi. Nevertheless—and notwithstanding that departure from the scheme which counsel had advised could safely be pursued—the judge did not allow the liquidator to advance a case based on the submission that conduct of the business for the purpose identified in issue 6(b) amounted to fraudulent trading.

**28** The position, therefore, was that the only conduct upon which the liquidator relied at the trial in support of his claim that the former directors were parties to fraudulent trading was the deception of Ramac "into believing that it would be paid the sums due under the leases in due time or within an agreed rescheduling time when at all times the said respondents knew or intended that no moneys would be paid after 23 December 1993". It is necessary, therefore, to consider what was said to Ramac during 1993.

*The representations made to Ramac during 1993*

**29** As I have said, Ramac (through its solicitors) had demanded payment of outstanding rent and other sums due by letter dated 13 May 1993. Mr Saunders had been concerned that such demand put the implementation of counsel's scheme at risk; and had written to Mr Borgers. Mr Saunders sought instructions from Mr Bernasconi at a meeting on 19 May 1993. His attendance note records:

> ". . . I discussed at some length with Mr Bernasconi the threat made by Ramac Holdings Ltd through their solicitors to issue a writ for unpaid moneys of £33,000. Mr Bernasconi agreed that the only matter in dispute was damage to a wall at unit 6. Apart from this, they had no alternative but to agree the figures outstanding and, after some discussion, it was agreed that the following would be proposed."

**30** Following those instructions, Mr Saunders wrote to Ramac's solicitors on 20 May 1993. His letter included these paragraphs:

> "This [notice of a planning application made by Ramac] is of considerable concern to our clients as they instruct us that they still intend to use the buildings at Sandwich for international freight forwarding, storage and additional warehousing space to include the representation of foreign haulage companies using Port Ramsgate. Negotiations are continuing in this respect and, in the circumstances, they strongly object to any proposed development particularly if it should affect their business . . .
>
> "So far as the outstanding moneys are concerned, our clients reply as follows:
>
> "1. The sum of £2,986.50 said to be in respect of 'repairs to wall' as it relates to building 6 has always been in dispute and, indeed, is the subject of correspondence entered into between ourselves and your clients in the past. These matters are continuing.
>
> "2. The majority of the amount outstanding represents payment of rent and insurance in the future months. Due to our clients' concern with regard to the above, they are quite prepared to pay the balance by

23-01165-mew Doc 67-5 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (4) Pg 125 of 198



> instalments, and quickly, provided that they are made fully aware of what A
> is to happen in the future. As a gesture of good faith and their willingness
> to pay the outstanding amount, we enclose our clients' cheque for
> £7,466·00 in part settlement of the outstanding amount. Please
> acknowledge receipt."

31 Ramac's solicitors were not content with the proposal that the
moneys outstanding would be paid by instalments. They pointed out that, B
under the terms of the leases, rent, service charges and insurance were
payable in advance; and described the letter of 20 May 1993 as "a smoke
screen for payment on a monthly basis". They continued to threaten the
issue of a writ.

32 On 25 May 1993 Mr Saunders wrote to Mr Bernasconi, noting his
instructions "to delay matters for as long as possible". On 28 May 1993 he
was able to put a proposal to Ramac's solicitors for payments of £10,000 in C
June and July, with a final payment of £2,951 in August to clear the
outstanding balance. By early June 1993 that proposal had been accepted.
The instalments were paid in accordance with the proposal.

33 The next quarterly rents (£18,800) fell due on 24 June 1993; but
were not paid. Ramac's solicitors sought payment by letters dated 2 and
26 July 1993. On 12 August 1993 Mr Saunders explained that he was D
awaiting his clients' instructions. He wrote: "They would hope to be able to
put forward some proposals shortly in connection with an instalment
option". No proposals were forthcoming. On 2 September 1993
Mr Saunders wrote to Mr Bernasconi:

> "I have managed to stall Ramac's solicitors for some time now but,
> unfortunately, they are becoming more aggressive. It would be helpful if E
> you could please give me TMC's instructions for payment by instalments
> to include the June and September payments of rent. I am sorry to
> mention this to you but it is urgent."

There was no response to that request. On 14 September 1993 Ramac's
solicitors threatened proceedings. That threat, when relayed to
Mr Bernasconi, prompted payment of £5,000 "on account". A further F
£5,000 was sent on 12 October 1993 "in part satisfaction of the outstanding
debt". By that date, of course, the quarterly rents due at Michaelmas were in
arrears. A statement sent by Ramac's solicitors on 15 October 1993 showed
the amount outstanding to be £36,749·24.

34 Mr Saunders wrote again to Mr Bernasconi. He pointed out that
Ramac was threatening to issue proceedings within the next seven days; and
explained what might follow: G

> "The effect of issuing proceedings will be that you will then have
> 14 days in which to defend the proceedings and/or judgment will be
> entered against you in the sum outstanding less the sum of £2,986·50 with
> regard to the repairs to the wall of building 6 which is, of course,
> disputed. Ramac will then proceed to try and enforce the order either by
> the issue of a winding up petition and, clearly, we do not wish this to be H
> heard before 1 January 1994 in view of the scheme devised by counsel.
> I recommend that we make a relatively substantial further payment and,
> at the same time, arrange a definite date for a meeting in order that these
> matters can be dealt with and to prevent Ramac taking the matter

A through to the next stage. However the alternative would be to leave matters as they are and allow legal proceedings to take their course with the eventual enforcement proceedings resulting from a judgment obtained by Ramac against your company. This may take some time but I cannot guarantee that I can delay matters until after the New Year."

35 By 22 October 1993 Mr Saunders was in a position to promise B Ramac's solicitors that a further £5,000 would be paid by the end of the month. That sum was paid on 1 November 1993. An attendance note of a meeting on 28 October 1993, at which Mr Monti and Mr Bernasconi were present, records that it was agreed that "we would try and stall as long as possible". On 29 October 1993 Mr Saunders was able to write to Mr Bernasconi expressing pleasure that "we have been able to stall Ramac Holdings sufficiently in order that they do not, as yet, appear to be in a C position to wind up TMC Transport (UK) Ltd". As he put it: "In that regard, we have been extremely successful."

36 Two more weeks went by. On 12 November 1993 Ramac's solicitors threatened the issue of a writ by close of business that day unless proposals were forthcoming. The response was a letter from Mr Saunders of the same date. He wrote:

D "We have made a considerable amount of effort to obtain instructions from our client and have, at long last, been able to contact them abroad. Our instructions are as follows. (1) Our clients will make payment of the sum of £5,000 by next Wednesday, that is 17 November 1993. (2) There will be a further payment by way of a second tranche of £5,000 on Wednesday, 8 December 1993. (3) Our clients will make a further E payment of £10,000 on Wednesday, 29 December 1993. (4) They are prepared to meet with your clients at a venue to be appointed on Wednesday, 12 January 1994 when it is anticipated that they will be in a position to either pay the balance owed to your client company or, alternatively, to make proposals to pay the balance. We trust that this is acceptable to your clients and await hearing from you that you are not issuing a writ in respect of these matters. Our clients have instructed us F that if a writ is so issued then they will take a different attitude towards the question of repayment. The structured settlement proposals that they have suggested are arranged in such a way that they hope that they can meet their financial obligations towards your clients."

On 16 November 1993 Mr Saunders was able to report to Mr Bernasconi that (subject to a request that the payments be made by post-dated cheques) G "all appears to be agreed and, once again, we have been able to avoid the issue of a writ". He asked for instructions whether post-dated cheques could be offered; pointing out that "Clearly, the object of the exercise is to make as small a payment as possible prior to the end of the year."

37 The first instalment of £5,000 promised by the letter of 12 November 1993 was paid on 19 November 1993. It was agreed that the date for H payment of the third instalment should be brought forward to 23 December 1993. Mr Saunders explained to Mr Bernasconi that that made no difference to the position. On 25 November 1993 he wrote:

"The mere fact of bringing forward the schedule payment date from 29 to 23 December is not is any practical use [sic] in that, even if

proceedings are issued on that date, judgment could not be obtained until at least 14 days has elapsed from the date of service of the proceedings which would, in effect, take us to 7 January 1994. I am sure that you are pleased by developments . . ." A

38 The second instalment of £5,000 promised by the letter of 12 November 1993 was paid on 8 December 1993. The third instalment—£10,000 on 23 December 1993—was never paid. As I have already noted, B on 13 January 1994 Mr Saunders was able to report to Mr Bernasconi that "we have successfully utilised the one-year period for the purpose of off-loading the premises at Sandwich Industrial Estate".

*The judge's conclusions as to fraudulent trading*

39 I have explained that the liquidator's case at trial was that Ramac C was deceived into a belief that it would be paid the sums due under the leases in due time or within an agreed rescheduling time "when at all times the said respondents knew or intended that no moneys would be paid after 23 December 1993"; and that it was that deception on the part of Mr Bernasconi and Mr Monti (through Mr Saunders)—and that alone—which constituted fraudulent trading. As the judge put it [2001] 2 BCLC 1, D 21, para 69:

"the essence of the particulars of fraudulent trading alleged against Mr Monti and Mr Bernasconi (and the solicitors) has been [the] very stalling of which Mr Saunders was reporting in correspondence . . . in 1993 . . . coupled with the unwarranted incurring of credit and deception as to the intention to pay instalments after 23 December 1993. The E liquidator does not seek to complain that Mr Monti and Mr Bernasconi sought to implement the scheme."

40 The judge accepted that "a purpose of the company's business in 1993 was to carry on for a 12-month period without being wound up". He identified, as the reason underlying that purpose, "Counsel's advice by his second opinion that the survival for 12 months would enable Mr Monti and F Mr Bernasconi to avoid restrictions on the use of the TMC name under section 216 of the 1986 Act." He accepted that "the company, through Mr Saunders at the direction of Mr Bernasconi and Mr Monti, did from May 1993 onwards, represent that Ramac would [be paid] outstanding rent subject to demand by instalments." But he was satisfied that "representations as to the payment of outstanding rentals were true, save in G regard to the final instalment offered on 12 November 1993". In particular, he declined to hold that the representations which were made during 1993 were representations as to the payment of rents falling due in the future. His conclusions are summarised [2001] 2 BCLC 1, 39–40, paras 130–131:

"130. The liquidator's pleaded case may be read as suggesting that misrepresentations were made as to an intention to pay rents after H 23 December 1993. The company was contractually bound to make such payments. None the less, I do not consider that the 1993 representations carried with them at least before the letter of 12 November 1993 and the suggestion of a meeting on 12 January 1994, any representation as to intentions beyond the time of the instalments that were offered.

A "131. In the result, I have come to the conclusion, in regard to false representations in so far as they were given for intention and purpose relevant to section 213, that the liquidator has simply made out relevant intent in regard to the promise of an instalment of £10,000 on 23 December 1993. Mr Monti and Mr Bernasconi did, in my judgment, intend to defraud Ramac in the sense of misleading it as to the company's intention to pay the 23 December 1993 instalment. The B misrepresentation was made on 12 November 1993."

**41** The question for the judge, in the light of his finding that Mr Monti and Mr Bernasconi intended to mislead Ramac on 12 November 1993 (and thereafter) by promising a payment of £10,000 on 23 December 1993 which they knew would not be made, was whether, from 12 November 1993, "any business of the company has been carried on with intent to defraud creditors C of the company or creditors of any other person, or for any fraudulent purpose": see section 213(1) of the 1986 Act. The judge had directed himself, earlier in his judgment, at para 86, that: "the defrauding of a single creditor by a single transaction can properly be described as the carrying on of a business to defraud creditors. Further the carrying on of business can include the collection and distribution of assets in payment of debts." The D second of those propositions is not, I think, in doubt: see *In re Sarflax Ltd* [1979] Ch 592, 599A–C, applying *Theophile v Solicitor General* [1950] AC 186 and *In re Bird, Ex p The Debtor v Inland Revenue Comrs* [1962] 1 WLR 686. The judge found support for the first of those propositions in *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262—to which I shall need to return. His conclusion that the business of the company had been carried on with intent to defraud is expressed [2001] 2 BCLC 1, 40–41, para 134:

E "It follows in my judgment that the liquidator has made out relevant intent or purpose for the purpose of section 213 in regard to the period from 12 November 1993 when Mr Monti and Mr Bernasconi had no intention that the company should pay the final instalment then being suggested to Ramac nor any intention to attend a meeting with it the following January. I am not satisfied that a relevant intent or purpose is F made out prior to that date. The relevant trading continued until the year's end or just into 1994, as the last vehicles were sold off and the company ceased trading."

*The first issue: was the business of the company carried on with intent to defraud?*

G **42** The first issue for decision on this appeal is whether the judge was correct to hold that the business of the company was carried on, from 12 November 1993, with intent to defraud creditors or for other fraudulent purposes within the meaning of section 213 of the Insolvency Act 1986. On the findings of fact which the judge made, the only creditor in relation to whom Mr Monti and Mr Bernasconi could be said to have had an intent to defraud was Ramac; and the only relevant intention in relation to Ramac H was to mislead it by the promise, on 12 November 1993, of a payment which they knew would not be made. It is necessary to keep in mind that, but for the deception which flowed from the promise of payment, the judge would not have held that the business was carried on after 12 November 1993 for any fraudulent purpose. In particular, he did not hold that the carrying on of

the business in the knowledge that Ramac would not be paid moneys which were due to it was, of itself, a fraudulent purpose. It is clear that the liquidator had taken the view that, in the light of the decision in the *Sarflax* case [1979] Ch 592, the case could not be advanced on that basis. A

43 Miss Hoffmann, who appeared for Mr Monti and Mr Bernasconi on this appeal as she did in the court below, pointed out, correctly, that not every fraud or fraudulent misrepresentation perpetrated by a company amounts to fraudulent trading under section 213 of the 1986 Act. That was B made clear by the observations of Oliver J in *In re Murray-Watson Ltd* (unreported) 6 April 1977 which are cited and explained by Templeman J in *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262, 267. In the *Murray-Watson* case Oliver J had said this, of what was then section 332 of the Companies Act 1948 (the statutory predecessor of section 213 of the 1986 Act): C

> "[The section] is aimed at the carrying on of a business . . . and not at the execution of individual transactions in the course of carrying on that business. I do not think that the words 'carried on' can be treated as synonymous with 'carried out', nor can I read the words 'any business' as synonymous with 'any transaction or dealing'. The director of a company dealing in second-hand motor cars who wilfully misrepresents D the age and capabilities of a vehicle is, no doubt, a fraudulent rascal, but I do not think he can be said to be carrying on the company's business for a fraudulent purpose, although no doubt he carries out a particular business transaction in a fraudulent manner."

In the *Cooper Chemicals* case [1978] Ch 262 Templeman J accepted that analysis. He said, at p 267: E

> "In the example given by Oliver J [in *Murray-Watson*'s case] the dealer was carrying on the business of selling motor cars. He did not carry on that business with intent to defraud creditors if he told lies every time he sold a motor car to a customer or only told one lie when he sold one motor car to one single customer. When the dealer told a lie, he perpetrated a fraud on the customer, but he did not intend to defraud a F creditor. It is true that the defrauded customer had a right to sue the dealer for damages, and to the extent of the damages was a contingent creditor, but the dealer did nothing to make it impossible for the customer, once he had become a creditor, to recover the sum due to him as a creditor."

44 Nevertheless, the judge relied on the *Cooper Chemicals* case as G authority for the proposition that the defrauding of a single creditor by a single transaction can properly be described as the carrying on of a business with intent to defraud creditors: see the passage [2001] 2 BCLC 1, 26, para 86 to which I have already referred. It is necessary, therefore, to have the facts of that case in mind. The company, through a subsidiary, was engaged in the production of indigo. It had obtained finance by way of loan, the principal amount of which was repayable on 30 June 1976. The H company was in no position to make that repayment save from forward sales of indigo against pro-forma invoices. It was alleged that the loan creditor and its directors knew that, if moneys paid in advance in respect of forward sales were applied in repayment of the loan rather than for the

23-01165-mew Doc 67-5 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (4) Pg 130 of 198



A purpose of the production of indigo, no indigo would be available to satisfy the customer's order. On 19 August 1976, the company obtained an order from Harrisons (London) Ltd for the delivery of 5,000 kilos of indigo; and, on the following day, received prepayment from Harrisons in respect of that order of an amount in excess of £125,000. Part of those moneys (£110,000) were immediately paid by the company to the loan creditor (Jimlou Ltd). B The company failed to deliver the indigo for which it had been paid; and subsequently went into liquidation. Harrisons brought proceedings under section 332 of the 1948 Act against the loan creditor and its directors for a declaration that they were knowingly party to the carrying on of the company's business with intent to defraud. The respondents sought to strike out those proceedings on the ground that there was no sufficient allegation of fraudulent trading. Templeman J dismissed that application.

C **45** In the course of his judgment in the *Cooper Chemicals* case [1978] Ch 262 Templeman J said, at pp 267–268:

> "In my judgment, when Mr Cooper on behalf of the Cooper companies sought from Harrisons an order for indigo on advance payment terms, Mr Cooper was carrying on the business of the Cooper companies. When D the Cooper companies accepted advance payment of £125,698-odd, Mr Cooper knowing that there was no prospect, or no reasonable prospect or intention of supplying indigo, and no intention of returning the money to Harrisons, the business of the Cooper companies was carried on fraudulently. The subsequent payment to Jimlou of £110,000 made the fraudulent carrying on of the business irremediable and constituted a fraud on the then creditor, Harrisons. The whole E transaction between the Cooper companies and Harrisons constituted the carrying on of the business of the Cooper companies with intent to defraud a creditor of the company. Save that only one creditor was involved, the situation appears to meet the requirements of section 332 set forth by Oliver J in *In re Murray-Watson* to which I have already referred, namely, that the section is contemplating a state of facts in which F the intent of the person carrying on the business is that the consequence of carrying it on (whether because of the way it is carried on or for any other reason) will be that creditors will be defrauded, 'intent', of course, being used in the sense that a man must be taken to intend the natural or foreseen consequences of his act . . . In the present case, the Cooper companies were carrying on the business of selling indigo. In my judgment, they carried on that business with intent to defraud creditors if G they accepted deposits knowing that they could not supply the indigo and were insolvent. They were carrying on business with intent to defraud creditors as soon as they accepted one deposit knowing that they could not supply the indigo and would not repay the deposit. It does not matter for the purposes of section 332 that only one creditor was defrauded, and by one transaction, provided that the transaction can properly be H described as a fraud on a creditor perpetrated in the course of carrying on business. If the Cooper company had fraudulently supplied sub-standard indigo to Harrisons, the Cooper company would have committed a fraud on a customer, but by accepting a deposit knowing that they could not or would not supply indigo, and by using the deposit in a way which made it

impossible for them to repay Harrisons, the Cooper company, in my judgment, committed a fraud on a creditor." A

**46** For my part, I would accept that a business may be found to have been carried on with intent to defraud creditors notwithstanding that only one creditor is shown to have been defrauded, and by a single transaction. The *Cooper Chemicals* case is an example of such a case. But, if (which I doubt) Templeman J intended to suggest that, whenever a fraud on a creditor is perpetrated in the course of carrying on business, it must necessarily follow that the business is being carried on with intent to defraud creditors, I think he went too far. It is important to keep in mind that the precondition for the exercise of the court's powers under section 332(1) of the 1948 Act—as under section 213 of the 1986 Act—is that it should appear to the court "that any business of the company has been carried on with intent to defraud creditors of the company". Parliament did not provide that the powers under those sections might be exercisable whenever it appeared to the court "that any creditor of the company has been defrauded in the course of carrying on the business of the company". And, to my mind, there are good reasons why it did not enact the sections in those terms.

**47** Until the decision of this court in *In re Cyona Distributors Ltd* [1967] Ch 889, it was generally thought that the powers which section 332 of the 1948 Act conferred on the court were exercisable for the benefit of creditors as a class and not for the benefit of individual creditors: see the judgment of Russell LJ, at pp 906–908. In the *Cyona* case the majority in this court (Lord Denning MR and Danckwerts LJ) took a different view—at least in a case where the application under section 332 was made (as it could be under that section) by an individual creditor. But the view of the majority in *Cyona*'s case cannot have survived the enactment of section 213 of the 1986 Act. An application under that section cannot be made by an individual creditor; it can only be made by the liquidator. And the order which the court can now make under section 213 is for contribution to the company's assets: cf the observations of Russell LJ, in the *Cyona* case, at p 907D–E. There is no longer power to declare that persons party to the carrying on of the company's business with intent to defraud shall be personally liable for particular debts, or (as was held in the *Cyona* case) to particular creditors. An individual creditor who is defrauded in the course of the carrying on of the business of the company has his individual remedy under the general law. Section 213 of the 1986 Act is not engaged in every case where an individual creditor has been defrauded. The section is engaged only where the business of the company has been carried on with intent to defraud.

**48** In my view it is impossible to reach the conclusion—on the facts found by the judge in the present case—that the business of the company was carried on after 12 November 1993 (but not before) with intent to defraud creditors—or, in particular, with intent to defraud a single creditor, Ramac. The business of the company was carried on throughout 1993 (as well before as after 12 November) with intent to protect Mr Monti and Mr Bernasconi (as former directors) from the penalties to which they would otherwise be exposed under section 216 of the 1986 Act as directors of Newco. It was inherent in counsel's scheme that, when the company did go

23-01165-mew Doc 67-5 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (4) Pg 132 of 198



into insolvent liquidation (as it was intended that it would at the end of the 12-month period), Ramac would be an unpaid creditor. The liquidator does not suggest that the carrying on of the business of the company with the intent to protect the former directors from penalties under section 216 of the Act—and with the knowledge that, on liquidation, Ramac would be an unpaid creditor—is, of itself, sufficient to engage section 213 of the Act. The only matter relied on is the promise, in the letter of 12 November 1993, that Ramac would be paid an instalment of outstanding rent at the end of December. The promise was intended to mislead; in the sense that it was intended to persuade Ramac that its interests were best served by not taking proceedings (including the presentation of a winding up petition) to enforce the debt which it was then owed. But it has not been shown that, by carrying on of the business of the company during the period that Ramac was so misled, Mr Monti or Mr Bernasconi intended to defraud Ramac; or, indeed, that the carrying on of the business of the company did defraud Ramac—in the sense that Ramac's claim as a creditor in the liquidation was prejudiced by the carrying on of the business between 12 November 1993 (when, but for the misleading promise, Ramac might have presented a petition) and 23 December 1993 (when the promised payment was not forthcoming).

49 For those reasons, I would hold that fraudulent trading within section 213 of the 1986 Act has not been made out in the present case; and would allow the cross-appeal on that ground.

*The remaining issues*

50 It follows that I am of the view that it is unnecessary to decide the remaining issues raised by the appeal and cross-appeal. But, in the circumstances that they were fully argued before us, I think it appropriate to address them. I can do so shortly.

51 The judge declined to hold Mr Monti and Mr Bernasconi party to fraudulent trading prior to 12 November 1993 on the ground that "representations as to the payment of outstanding rentals" made before the letter of 12 November 1993 "were true". As he put it [2001] 2 BCLC 1, 37, para 121:

> "The instructions given to Mr Saunders on 19 May 1993 were that the outstanding rentals should be paid by such instalments as he could negotiate . . . The company, acting at the relevant direction, was seeking to delay payments of the 1993 current rents but was not seeking to avoid those rents, at least at that stage."

As I have said, the judge was not asked to find that it was inherent in the implementation of counsel's scheme that Ramac be deceived as to the business that the company was actually carrying on during 1993; nor as to the company's intentions as to the future. Nevertheless, it is, I think, clear that he did take the view that, in practice, the scheme could not have been implemented without deception: see the observations at pp 18–19, para 64. I agree with that view. But, given that the judge found that Mr Monti and Mr Bernasconi thought that, in implementing the scheme, they were following the advice of counsel and solicitors, he was plainly correct (in the absence of a finding of dishonesty in relation to the representations made before 12 November 1993) to hold that a case of fraudulent trading prior to

that date had not been made out. The liquidator could not have succeeded in this court on the issue raised by ground 1 in his appellant's notice. A

52 In the light of his finding that they had been parties to fraudulent trading after 12 November 1993, the judge assessed the contribution to be made by Mr Monti and Mr Bernasconi at £17,500 (exclusive of the punitive element, also £17,500). He did so on the basis that that was the amount which the company would have had to pay to Ramac "to buy off a writ issued on or shortly after 12 November 1993": [2001] 2 BCLC 1, 42–43, 46, paras 145, 160. That might or might not have been the correct measure of damage in an action brought by Ramac in the tort of deceit—given the judge's view that, but for the deceptive promise made in the letter of 12 November 1993, Ramac would have issued proceedings for outstanding rent, which the company would have then paid—but it is not, in my view, the proper basis on which to assess the amount of contribution to be made under section 213 of the 1986 Act. B C

53 The power under section 213(2) is to order that persons knowingly party to the carrying on of the company's business with intent to defraud make "such contributions (if any) to the company's assets" as the court thinks proper. There must, as it seems to me, be some nexus between (i) the loss which has been caused to the company's creditors generally by the carrying on of the business in the manner which gives rise to the exercise of the power and (ii) the contribution which those knowingly party to the carrying on of the business in that manner should be ordered to make to the assets in which the company's creditors will share in the liquidation. An obvious case for contribution would be where the carrying on of the business with fraudulent intent had led to the misapplication, or misappropriation, of the company's assets. In such a case the appropriate order might be that those knowingly party to such misapplication or misappropriation contribute an amount equal to the value of assets misapplied or misappropriated. Another obvious case would be where the carrying on of the business with fraudulent intent had led to claims against the company by those defrauded. In such a case the appropriate order might be that those knowingly party to the conduct which had given rise to those claims in the liquidation contribute an amount equal to the amount by which the existence of those claims would otherwise diminish the assets available for distribution to creditors generally; that is to say an amount equal to the amount which has to be applied out of the assets available for distribution to satisfy those claims. In the present case there is nothing to suggest either (i) that the deception which the judge found to have been practised on Ramac led to the misapplication or misappropriation of the company's assets, or (ii) that the letter of 12 November 1993 led Ramac to make a claim in the liquidation that it would not otherwise have had. In my view there was no material on which the judge could have reached the conclusion that it was correct to order contribution of £17,500, or any other sum. D E F G

54 The judge added a punitive element to the amount which he would otherwise have regarded as sufficient "simply to reflect the loss I find attributable to Ramac". He did so for the reasons which he expressed [2001] 2 BCLC, 1, 46, para 161: H

> "I could not punish Mr Monti and Mr Bernasconi for matters which are not alleged or not found by me to have amounted to fraudulent

A trading. Nonetheless, the scheme which they purported to follow foreshadowed the due payment of rent during the 12 month period supposedly to preserve the TMC name in Mr Monti's hands. Mr Monti and Mr Bernasconi did not conduct the affairs of the company in that 12-month period to ensure that it had cash in hand promptly to pay rent for the full 12-month period. They could have done so. They preferred to pursue the instalment route and then dishonestly to represent that a B further £10,000 would be paid off arrears on 23 December 1993. To compound the intention to cause the company's assets to escape Ramac's claim to future rent by such dishonesty would merit punishment and I consider Mr Monti and Mr Bernasconi should be liable to pay an additional £17,500 contribution."

C 55 The judge had found that Mr Monti and Mr Bernasconi had been advised that they were entitled "to cause the company's assets to escape Ramac's claim to future rent" by applying those assets in payment of other creditors. They were entitled to think that preferring some creditors to others was not dishonest. The dishonesty lay in promising (in the letter of 12 November 1993) a payment of £10,000 which they did not intend to make. I accept that the dishonesty which the judge found deserved criticism; D but, for my part, I cannot see that it compounded (or was compounded by) dishonesty which the judge did not find to have been made out. Be that as it may, I am not persuaded that there is power to include a punitive element in the amount of any contribution which, in the exercise of the power conferred by section 213(2) of the 1986 Act, a person should be declared liable to make to the assets of the company. As I have said, I think that the principle on which that power should be exercised is that the contribution to E the assets in which the company's creditors will share in the liquidation should reflect (and compensate for) the loss which has been caused to those creditors by the carrying on of the business in the manner which gives rise to the exercise of the power. Punishment of those who have been party to the carrying on of the business in a manner of which the court disapproves—beyond what is inherent in requiring them to make contribution to the assets F of a company with limited liability which they could not otherwise be required to make—seems to me foreign to that principle. Further, the power to punish a person knowingly party to fraudulent trading—formerly contained in section 332(3) of the 1948 Act—has been re-enacted (and preserved) in section 458 of the Companies Act 1985. It could not have been Parliament's intention that the court would use the power to order G contribution under section 213 of the 1986 Act in order to punish the wrongdoer. In my view, had the judge been right to find fraudulent trading in the present case, he would, nevertheless, have been wrong to include a punitive element in the amount of contribution which he ordered.

56 If the punitive element were excluded—as I think it should have been—I can see no basis upon which Mr Monti and Mr Bernasconi could have been required to make a contribution which went beyond that needed H to compensate the creditors of the company (including Ramac) for the loss attributable to the fraudulent trading to which the judge had held that they were knowingly party. On the basis that (on the judge's view) the creditors had already been over-compensated by the payment of £75,000 made by the solicitors, there was no reason to require further payment to be made by

the directors. The judge was right to treat their liability as satisfied by the solicitors' payment. A

57 In my view the judge was right, also, to make no order against Mr Monti and Mr Bernasconi in respect of the costs incurred by the liquidator after the date (13 September 2000) on which the liquidator accepted that payment. It is said that the liquidator was entitled to pursue them for contribution for so long as there was a possibility that Accoulis might claim in the liquidation in competition with Ramac. But there was nothing to suggest that that was ever a real possibility—Accoulis had lodged no proof of debt—and, if that was of concern to the liquidator, he could have raised the point. B

*Conclusion*

58 I would allow the applications for permission to appeal. I would dismiss the liquidator's appeal. I would allow the directors' cross-appeal on ground 3 in their respondents' notice. In those circumstances it is unnecessary to make any order in relation to grounds 1, 2, 4 and 5 of the respondents' notice. C

**MUNBY J**

59 I agree with Chadwick LJ and have nothing to add. D

**ALDOUS LJ**

60 I also agree.

*Appeal dismissed with costs.*
*Cross-appeal allowed with costs.* E

*Solicitors: Steptoe & Johnson; Stephenson Harwood*

S L D

F

G

H

# *Morris v Bank of India* [2004] BCC 404

# Re Bank of Credit and Commerce International SA & Anor
# Morris & Ors v Bank of India

[2004] EWHC 528 (Ch)
Chancery Division (Companies Court).
Patten J.
Judgment delivered March 19, 2004.

*Winding up – Fraudulent trading – Fraudulent banking group – Group companies entered six transactions with third party – Transactions were circular – Group companies intended to conceal bad debts – Third party loan officer told transactions to improve group's balance sheet – After second transaction loan officer should have known transactions not as described – Test for fraudulent trading – Whether third party knowingly participated in carrying on banking group business with intent to defraud creditors or for fraudulent purpose – Whether knowledge of loan officer of third party attributable to third party – Quantification of contribution – Whether contribution to bear interest – Insolvency Act 1986, s.213.*

**This was an application under s.213 of the Insolvency Act 1986 by the liquidators of an insolvent banking group for a contribution to the assets of companies in the group by a separate banking company which had entered into six transactions with the group which had helped it conceal serious bad debts incurred by the group and so, the liquidators alleged, the defendant knowingly participated in the carrying on of the business of the banking group with intent to defraud creditors or for a fraudulent purpose.**

**The six transactions involved the defendant, 'BOI', with companies in the 'BCCI' group between 1981 and 1986. In each of five successive years BCCI approached BOI and requested it to enter into an arrangement under which BCCI would deposit moneys with BOI for a fixed term, usually of three months. With the assistance of the finance provided by these deposits, BOI would then grant to a company nominated by BCCI a loan for the same period. No formal lien was granted in favour of BOI over the deposits, but BCCI provided a guarantee for the repayment of the principal of the loan and accrued interest. No payments of interest were made on either side during the currency of the deposits and the loans. These arrangements came to be referred to in BOI's internal documentation as BCCI's 'usual deal'. They were said by 'S', BOI's loan officer dealing with the matters at its London branch at the time, to be motivated solely by a desire on the part of BCCI to improve what was described as its 'earnings to advances ratio' by recording in its accounts a decrease in the amounts outstanding on loan to borrowers and thereby producing a corresponding increase in the amount of interest received relative to the sums lent as at the year end. This practice was on any view highly artificial and was referred to by BOI, both in contemporaneous documents and at the trial, as a form of 'window-dressing' by BCCI. It was for this reason that in each of the five years in question the arrangements were timed to coincide with BCCI's year end and the preparation of its balance sheet and accounts. In 1984 (the fourth transaction) there was also a similar transaction which coincided with the period in late September when BCCI's auditors were carrying out their circularisation procedures.**

**The business of the BCCI group was closed down by regulators on a world-wide basis in 1991 and the relevant BCCI companies went into liquidation. The liquidators of the relevant companies in England alleged that the above transactions were entered into by the BCCI companies to maintain the concealment of serious bad debts and losses incurred by the group on a number of customer accounts and as a result of metal trading carried out for their own account. This was not disputed and it was common ground that the conduct of the BCCI group was undoubtedly fraudulent. The liquidators further alleged that BOI, by entering into the six transactions, knowingly participated in the**

© 2004 Sweet and Maxwell Ltd

A **carrying on of the business of certain BCCI companies with intent to defraud the creditors of those companies or for a fraudulent purpose and applied for an order under s.213 of the Insolvency Act 1986 for BOI to pay compensation to the liquidators for the losses to creditors which had been sustained. BOI argued that S and others who dealt with the transactions at the time believed that they were assisting BCCI in a legitimate way and had no reason to think or suspect that BCCI was intent on deceiving its auditors in order to produce a positive balance sheet and accounts. BOI claimed that it accepted**
B **BCCI's explanation for the transactions at face value and denied any knowledge of BCCI's deteriorating financial position. It also denied an alternative allegation that even if the purpose of the transactions was that as alleged by BCCI, to improve the apparent ratio of BCCI's earnings to advances, this was known to BOI in the circumstances of the case to be an essentially dishonest practice, because it could only be achieved by the removal of bad debts and the transfer of corresponding liabilities to BOI.**

C **The key issue was whether those at BOI responsible for entering into the transactions in question knew that they were thereby assisting BCCI to perpetrate a fraud on its creditors. It was common ground that this allegation of knowledge levelled against BOI by the liquidators would have to involve a finding of dishonesty.**

*Held*, **making an order against BOI for wrongful trading under s.213:**

**1. To establish liability under s.213 the liquidators had to show that BOI (through its**
D **relevant officers and employees) knew that one or more of the six transactions was being entered into either to defraud the creditors of BCCI or for a fraudulent purpose. They did not have to know every detail of the fraud or the precise mechanics of how it would be carried out, but clearly they did have to know, either from their own observation of what was being done or from what they were told, that BCCI was intent on a fraud. Knowledge, for this purpose, meant what it said: there must have been an actual realisation on the part of BOI that BCCI would, or was likely to, engage in false**
E **accounting. A failure to recognise the truth of what was going on was not enough, however obvious that might now seem to have been. The relevant knowledge also had to be contemporaneous with the assistance that was given at the time by entering into the various transactions. Knowledge, for these purposes, included so-called blind-eye knowledge, which existed when a party shut its eyes to the obvious because of a conscious fear that to enquire further would confirm a suspicion of wrongdoing which already**
F **existed. Dishonesty as such was not in terms a condition for liability under s.213, but if knowledge of the fraud was established it followed that BOI was dishonest.**

**2. What was so striking about the case was the extent to which S was aware of the circular nature of the first transactions he participated in. He knew from the outset that the first transaction had as the only object the improvement of BCCI's balance sheet or accounts. He was told by BOI's head office that the first transaction was to be a one-off**
G **but he felt able to make an enthusiastic recommendation for a second transaction involving a much higher figure a year later. Having seen BCCI's accounts he must by then have realised that an improvement in the earnings to advances ratio could not be achieved by the removal of loans over the year end. The circular nature of the transactions was already apparent to him and the removal of the only suggested justification for them could have left him in no real doubt that he was in all probability dealing with a fraud of some kind. S therefore did have the relevant knowledge.**

H

**3. S had been delegated authority to lend up to £200,000 unsecured without seeking head office approval but sums of £10 million, as in each of these transactions, needed to be referred to the board. From the second transaction board approval was given rapidly and almost as a matter of course. The board of BOI were content to take S's assurances at face value and to leave it to him to satisfy himself that it was proper for BOI to go ahead. Section 213 of the Insolvency Act 1986 was capable of applying to a company in the**

**position of BOI. S's knowledge was to be attributed to BOI, otherwise the policy of the Act would be frustrated if BOI could shelter behind an argument that the only relevant knowledge was that of the board. It would allow banks such as BOI, which chose to rubber-stamp the recommendations of their senior managers without ensuring that all proper and due diligence has been carried out, simply to sidestep liability by relying on their own ineptitude. The board had a real concern about the purpose of the transactions but were content to delegate supervision of the transactions and the decision whether to proceed to S. In those circumstances they could not deny responsibility for S's actions. BOI was liable under s.213 to contribute to the losses to creditors which would have been avoided but for these transactions.**

**4. In quantifying the contribution under s.213 there had to be some nexus between the loss caused to creditors as a result of the fraudulent trading and the contribution that the knowing participator was required to make (Morphitis v Bernasconi [2003] BCC 540). Any award, although essentially compensatory in nature, could only be a reasonable approximation to the damage that BOI's conduct had caused or contributed to. The liquidators claimed that the relevant loss attributable to BOI's knowing assistance included cash dividends of US$331 million declared by BCCI out of its reported profits, but there was no evidence that the payment of dividends caused any loss at all to the creditors of BCCI as the dividends were credited or paid to the BCCI holding company which reversed or matched corresponding transfers back to the BCCI group. In those circumstances it was inappropriate to base any order for contribution on the dividends declared by the companies even if they were ever paid. The back-to-back arrangements enabled BCCI to remain in business until 1991 but to visit BOI with liability for all the losses which occurred in that period would be disproportionate. The liquidators limited the losses claimed for to trading losses in the years 1983–1985 inclusive. Considering the expert accounting evidence and the amount of loss for which BOI should be liable, BOI should pay the sum of $43.231 million. Although s.213 did not refer to any power to award interest in terms, it was open to the court to ensure that any award under s.213 adequately compensated the creditors of the company for the passage of time which had elapsed and the appropriate rate was simple interest at the base rate plus 1 per cent from the date of the liquidation.**

The following cases were referred to in the judgment:

*Aktieselskabet Dansk Skibsfinansiering v Brothers* [2001] 2 BCLC 324.
*B v Chief Constable of Avon & Somerset Constabulary* [2001] 1 WLR 340.
*El Ajou v Dollar Holdings plc* [1994] BCC 143.
*Hampshire Land Co, Re* [1896] 2 Ch 743.
*Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] AC 705.
*McNicholas Construction Co Ltd v Customs and Excise Commissioners* [2000] STC 553.
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] BCC 942; [1995] 2 AC 500.
*Morphitis v Bernasconi* [2003] BCC 540.
*Morris v State Bank of India* [2003] BCC 735; [2003] EWHC 1868 (Ch).
*Produce Marketing Consortium Ltd (No. 2), Re* (1989) 5 BCC 569.
*R (McCann) v Crown Court at Manchester* [2003] 1 AC 787.
*Supply of Ready Mixed Concrete (No. 2), Re* [1995] 1 AC 456.
*Twinsectra v Yardley* [2002] 2 AC 164.

Charles Purle QC, David Eaton Turner and Blair Leahy (instructed by Lovells) for the claimants.

Jonathan Hirst QC and Andrew Lydiard QC (instructed by Penningtons) for the defendant.

JUDGMENT

**Patten J: Introduction**

1. This application is concerned with six transactions involving the Bank of India ('BOI') and BCCI which took place between 1981 and 1986. In each of five successive years BCCI

© 2004 Sweet and Maxwell Ltd

A approached BOI and requested them to enter into an arrangement under which BCCI would deposit moneys with BOI for a fixed term, usually of three months. With the assistance of the finance provided by these deposits, BOI would then grant to a company nominated by BCCI a loan for the same period. No formal lien was granted in favour of BOI over the deposits, but BCCI provided a guarantee for the repayment of the principal of the loan and accrued interest. No payments of interest were made on either side during the currency of the deposits and the loans. These arrangements came to be referred to in BOI's internal documentation as BCCI's
B 'usual deal'. They were said by those dealing with these matters at the London branch of BOI at the time to be motivated solely by a desire on the part of BCCI to improve what was described as its 'earnings to advances ratio' by recording in its accounts a decrease in the amounts outstanding on loan to borrowers and thereby producing a corresponding increase in the amount of interest received relative to the sums lent as at the year end. This practice was on any view highly artificial and was referred to by BOI, both in contemporaneous documents and during the course of the oral evidence, as a form of 'window-dressing' by BCCI. It was for this
C reason that in each of the five years in question the arrangements were timed to coincide with BCCI's year end and the preparation of its balance sheet and accounts. In 1984 (the fourth transaction) there was also a similar transaction which coincided with the period in late September when BCCI's auditors were carrying out their circularisation procedures.

2. The liquidators of Bank of Credit and Commerce International SA ('BCCI SA') and Bank of Credit and Commerce International (Overseas) Ltd ('BCCI Overseas'), who are the
D applicants in these proceedings, allege two things. The first is that each of the transactions was entered into by BCCI SA and BCCI Overseas to assist them and their holding company, BCCI Holdings (Luxembourg) SA ('BCCI Holdings'), to maintain the concealment of serious bad debts and losses incurred by the group on a number of customer accounts and as a result of metal trading carried out for their own account. There is no dispute about this. The conduct of BCCI (by which I refer to the group as a whole) was undoubtedly fraudulent and this is now
E common ground between the parties to this application. The second allegation is that BOI, by entering into these six transactions under review, knowingly participated in the carrying on of the business of BCCI SA and BCCI Overseas with intent to defraud the creditors of those companies or for a fraudulent purpose. If this allegation (which is denied) is made out, then I have jurisdiction under s.213 of the Insolvency Act 1986 to order BOI to pay compensation to the liquidators for the losses to creditors which have been sustained.

3. BOI's case is that those who dealt with these matters at the time believed that they were
F assisting BCCI in a legitimate way and had no reason to think or suspect that the liabilities of the nominated borrower they were taking on for year-end purposes were non-performing or, more fundamentally, that BCCI was intent on deceiving its auditors in order to produce a positive balance sheet and accounts. They deny any knowledge of BCCI's deteriorating financial position. They say that they accepted BCCI's explanation for the transactions at face value. They therefore also deny the alternative allegation that even if the purpose of what has
G been referred to as these 'back-to-back arrangements' had been that allegedly stated by BCCI: *i.e.* the improvement of the apparent ratio of BCCI's earnings to advances, this was known to them in the circumstances of this case (if not always) to be an essentially dishonest practice, because it could only be achieved by the removal of bad debts and the transfer of corresponding liabilities to BOI.

4. Shortly before the trial the claimants obtained permission to introduce a further allegation of knowledge on the part of BOI in relation to the year-end transactions. This was that BOI
H knew that BCCI was involved in the fraudulent manipulation of its accounts, because even if the transactions were intended to have the effect allegedly contended for by BCCI at the time, it would have been apparent to BOI that window-dressing of this kind was dishonest, because by showing a reduction in 'Loans and Allowances' and an increase in 'Due from Banks' BCCI was able to indicate the existence of a lower-risk profile and a greater liquidity than was in reality the case. This is also denied.

5. The key issue on liability which I therefore have to decide is whether those at BOI responsible for entering into the transactions in question knew that they were thereby assisting BCCI to perpetrate a fraud on its creditors. It is common ground that this allegation of knowledge levelled against BOI by the liquidators must, if proved, involve a finding of dishonesty. This has led to argument about the test of knowledge and the standard of proof to be applied, which I will come to prior to setting out my findings of fact.

**Admissions**

6. At the start of the trial BOI made a number of admissions designed to narrow the scope of these proceedings. They relate, for the most part, to the motives and conduct of BCCI in entering into the six transactions. They are based in part upon paras 1–9 of my judgment in *Morris v State Bank of India* [2003] BCC 735; [2003] EWHC 1868 (Ch), and it is convenient for me to set these out in full. In the paragraphs quoted I have left intact the references to the particular facts of that case, although some of them are not directly relevant to the issues in these proceedings. The relevant paragraphs state as follows:

> '1. The BCCI group (which for convenience I shall refer to simply as "BCCI") was established in 1972 with the incorporation and licensing of Bank of Credit and Commerce International SA ("BCCI SA") as a bank under the laws of the Grand Duchy of Luxembourg. This was followed by the incorporation of BCCI Holdings (Luxembourg) SA ("BCCI Holdings") on December 13, 1974, and the incorporation and licensing of Bank of Credit and Commerce International (Overseas) Ltd ("BCCI Overseas") in the Cayman Islands on November 24, 1975. BCCI Holdings became the parent company of BCCI SA and BCCI Overseas, but did not itself carry on any banking business. BCCI SA and BCCI Overseas were the principal operating subsidiaries and are the companies which feature in the transactions with which this action is concerned. Between them these two companies had over 110 operating branches in 41 countries and a further 18 representative offices in 17 countries at the time when BCCI collapsed in July 1991. In the United Kingdom (including the Isle of Man) BCCI SA had 24 branches, with a head office at 100 Leadenhall Street in the City of London. No group company was ever incorporated in any part of the United Kingdom, but BCCI SA carried on business as a licensed deposit-taker subject to the regulatory supervision of the Bank of England under the Banking Act 1979.
>
> 2. At the time of the collapse in July 1991 the deficiency as regards the creditors of BCCI SA and BCCI Overseas was estimated to be in the region of US$10 billion. Since then, however, as a result of the actions of the liquidators, it has been possible to secure dividends of 60 cents in the US dollar for the benefit of creditors, largely funded from recoveries which the liquidators have been able to obtain against third parties. This action is part of that continuing process. The claim, against State Bank of India ("SBI") is that it knowingly participated in a fraudulent scheme devised by BCCI to enable it to manipulate its balance sheet for the year-ended December 1983, so as to present a false account of its assets and liquidity. I shall come to the detail of the scheme later in this judgment, but it can be briefly summarised as follows. In October 1983 SBI received an approach from a Mr Ajay Krishnan Puri, purporting to act on behalf of a company called Notan Trading and Investments Limited ("Notan"). This company was incorporated in Liechtenstein on September 7, 1982, with Liechtenstein-based directors, and had earlier that year opened deposit and current accounts with SBI. Part of SBI's disclosure comprises a certified resolution of Notan dated July 28, 1983, on headed notepaper, with a PO Box in the Sultanate of Oman given as the address of its administrative office. The registered office of the company was another PO Box number in Liechtenstein. The resolution authorised the opening of a bank account for the company with SBI and in terms empowered the bank to act on the joint instructions of Mr Puri and a Mr Ziauddin Akbar for the purpose of honouring cheques or making any other payments into or out of

© 2004 Sweet and Maxwell Ltd

A the account. The resolution was also signed by Mr Akbar as the authorised signatory for the board of directors of Notan, and the SBI standard form of request for banking facilities was signed by Mr Akbar and Mr Puri on the same day. As part of that same process both Mr Akbar and Mr Puri provided a specimen of their signatures for mandate purposes, which, in the case of Mr Akbar, gave an address at 22 Basing Hill, London NW3.

B 3. Mr Akbar was at the time a senior figure in the Central Treasury Division ("CTD") of BCCI in London and, as it subsequently transpired, was personally responsible for many, if not most, of the fraudulent transactions carried out by BCCI to hide its worsening financial position in the early 1980s. He was not a director of Notan and in his subsequent interviews with the Serious Fraud Office he said that Notan had been set up to assist Mr Puri to obtain a work permit. It is, however clear that the primary purpose of establishing Notan was to assist BCCI in carrying out its fraudulent accounting C practices, and the company was controlled by Mr Akbar out of the CTD in London.

4. BCCI was founded with capital from Arab investors in the Gulf states. It achieved rapid growth and, by the end of 1989, employed about 14,000 staff in more than 70 countries. Until 1988 the President and Chief Executive of BCCI was Mr Agha Hasan Abedi. During the same period he had as his deputy Mr Swaleh Naqvi, who took over as Chief Executive Officer when Mr Abedi fell ill in 1988. Having no lender of last resort, D it was necessary for BCCI to maintain a high level of liquidity. By the early 1980s it had incurred significant losses through poor lending (particularly in relation to a number of borrowers in the Gulf and Saudi Arabia) and from unsuccessful metal trading on its own account. One of these borrowers was a Mr Abdul Raouf Khalil, a Saudi Arabian businessman who operated and controlled the Khalil group of companies. They maintained a number of accounts with BCCI which were heavily overdrawn, although it E is right to add that by 1983 some (and perhaps most) of this apparent indebtedness may itself have been due to the manipulation of the accounts by BCCI with the active co-operation of Mr Khalil, as part of the wider fraud I am about to come to.

5. In order to conceal these and other losses and to maintain public confidence in the bank, BCCI embarked on a systematic and wide-scale fraud involving the manipulation of account balances with the twin objective of concealing losses and boosting apparent F profits. The investigations have revealed that this practice was initiated by Mr Abedi and Mr Naqvi and was operated by Mr Akbar through the CTD in London. It was successful in deceiving the auditors and regulations of both BCCI SA and BCCI Overseas, together with their customers and depositors. The evidence of the liquidators based on a report prepared for the Serious Fraud Office, is that BCCI was insolvent from at least 1983. The CTD had been established in 1977 and operated from BCCI SA's offices in Leadenhall Street until about October 1986, when it was moved to Abu Dhabi. G The CTD managed and controlled the surplus funds of BCCI and was managed by BCCI SA under a management agreement with BCCI Overseas. However, the treasury activities were all booked and recorded in the name of BCCI Overseas in Grand Cayman and BCCI SA accounted for its own funds, managed by the CTD, as inter-company debts due from BCCI Overseas.

6. Mr Akbar controlled the CTD and reported direct to Mr Naqvi. He was also the H Account Officer for the Khalil group and controlled the accounting of the Grand Cayman branch of BCCI Overseas. He eventually resigned from BCCI in 1986. On September 28, 1993, he pleaded guilty at the Central Criminal Court to 16 counts of false accounting, contrary to s.17 of the Theft Act 1968 and was sentenced to six years' imprisonment on each count, the sentences to run concurrently. Counts 13 and 14 relate to the two loan transactions with which this action is concerned.

7. Notan had both US dollar and sterling accounts with SBI. Up to the end of October 1983 the combined receipts into its US dollar accounts amounted to some $2.342 million, against which there had been a payment out of just over $1 million. In the same period there had been payments into its sterling accounts (including interest) of some £142,623, and payments out to a variety of payees, including Mr Puri himself, in a total sum of £53,567. Then on October 5, 1983, Mr Puri, without any prior discussion, approached SBI for a loan of US$20 million, which it required for a period of three months on what is described as a spread-over basis. The loan was to be guaranteed by a prime London bank (later identified as BCCI SA) which would also deposit funds in the same amount prior to the drawdown of the loan to Notan, and for a term expiring five days after the Notan loan became repayable. Mr Puri told SBI that no lien was to be marked on the deposited funds and that the loan to Notan would be required urgently by the beginning of November. The transaction, as it eventually emerged, was that SBI agreed to provide Notan with a loan of US$20 million for a term of three months, to be drawn down on November 15, 1983. Under the terms of the facility letter as amended, BCCI SA was to deposit an equivalent sum of US$20 million with SBI for the duration of the loan plus four days, so as to provide the necessary funding for the entire term of the loan. It was also to provide a guarantee, on terms satisfactory to SBI, to repay the loan to Notan in the event that it was not repaid at maturity. Interest on the loan to Notan was to be at a rate of a half per cent per annum above the rate of interest payable by SBI on BCCI's matching deposit. The guarantee provided for under the terms of the facility letter was executed by Mr Akbar and two other BCCI treasury employees on or about October 28, 1983, on behalf of BCCI SA and contained an express right of set-off. In addition, on October 31, 1983, BCCI SA deposited the sum of US$20 million with SBI in its account in New York with Citibank until February 6, 1984, at an interest rate of 9.3125 per cent per annum and accounted for the deposit by debiting the sum to BCCI Overseas' Nostro account at Bank of America in New York. The loan to Notan was drawn down on November 1 by SBI remitting the US$20 million from its account with Citibank to an account of BCCI SA at the Bank of America in New York (No. 48586050).

8. The payment instructions from Notan received by SBI on November 1 were signed by Mr Puri and Mr Akbar, and requested the $20 million to be transferred to BCCI SA's account without specifying any sub-account in the name of Notan. As I shall explain later in this judgment, one of the principal allegations made by the liquidators is that the terms of these payment instructions put SBI on notice that the moneys were being routed back to BCCI for its own use beneficially, rather than being disbursed to BCCI for the credit of Notan. What is known (but is not alleged to have been known by SBI at the time) is that the moneys, when received, were accounted for by BCCI SA as a transfer to the credit of an account (No. 01001279) with BCCI Overseas in the name of Mr Khalil. On December 30, the moneys were then transferred from that account to a metals trading account in the name of BCCI Overseas (No. 90511109) which had been used for speculative purchases of silver and had a negative balance.

9. On December 5, 1983, SBI agreed to lend Notan a further sum of $20 million on almost identical terms. The moneys were disbursed on December 15 and were repayable on February 1, 1984. BCCI SA again provided the funding by prior deposit of a matching sum with SBI and gave a guarantee for the loan, including the contractual right of set-off. Its own deposit was for a period expiring on February 6, 1984. As in the case of the first loan, the moneys, when drawn down, were remitted to BCCI SA's account with the Bank of America and then credited to BCCI Overseas' Nostro account. They were then used by BCCI Overseas to credit the overdrawn Khalil account. As a result of this and other credit transfers from other sources, BCCI was able to convert a debit balance of US$85,280,341 into a credit balance for year-end purposes of US$9,261,646.17. The auditors were prepared on this basis to treat BCCI's exposure to

© 2004 Sweet and Maxwell Ltd

A the Khalil group as fully collectable and made no provision in respect of their borrowings. However, by January 13, 1984 (following the repayment and reversal of most of the credits) the Khalil account No. 01001279 had once again become overdrawn by more than US$155 million. Both the Notan loans were repaid on February 15, 1984, by a transfer from BCCI SA to SBI of the sum of US$40,754,861.12, representing repayment of the sums due plus interest. On February 6 SBI paid US$40,779,147.67 to BCCI SA. The excess of the interest over that payable by Notan to SBI is accounted for by the longer term of the BCCI deposit.'

B

7 The admissions made were as follows:

'1. BOI admits the facts found in paragraphs 1–9 of the judgment of Patten J in Morris & Ors v State Bank of India [2003] EWHC 1868 (Ch.).

C 2. BOI has already admitted by paragraph 13 of its re-amended points of defence that pursuant to section 11 of the Civil Evidence Act 1968 Akbar must be taken to have committed the offences of which he was convicted. Those included the following counts relating to transactions nos 3 and 4

(1) Count 15: on or about the 24th October 1983 he dishonestly and with a view to gain for himself of another or with intent to cause to another concurred in falsifying documents required for an accounting purpose, namely an application to the Bank of India in the name of Maram Trading Company Limited for a loan of $60m which were false in a material particular in that a board resolution and a letter of application purported to be genuine documents signed by AR Khalil on behalf of Maram Trading Company Limited (D1/1/15)

D

(2) Count 16: on or about the 10th September 1984 he dishonestly and with a view to gain for himself of another or with intent to cause to another concurred in falsifying documents required for an accounting purpose, namely an application to the Bank of India in the name of Maram Trading Company Limited for a loan of $75m which were false in a material particular in that a board resolution and a letter of application purported to be genuine documents signed by AR Khalil on behalf of Maram Trading Company Limited (D1/1/16).

E

F 3. BOI further admits the factual basis for those convictions as set out at in the transcript of the proceedings before Scott-Baker J at the Central Criminal Court on 27 September 1993 (D1/2/67):

BCCI makes its own deposit of its own money with the relevant bank. The money is then lent to Maram and used by Akbar for the purposes he had in mind, and the evidence shows that Akbar controlled Maram in effect.

G 4. BOI further admits that substantially the same fraud as those that formed the basis of Counts 15 and 16 was also committed by BCCI in relation to transactions 1, 2 and 6. In particular BOI admits that BCCI forged the signature of Khalil on the following documents:

(1) the board resolution (C1/79) and letter of request (C1/77) relating to transaction no.1

H (2) the board resolution (C1/182) and letter of request (C1/184 relating to transaction no.4

(3) the board resolution (C4/160) and letter of request (C4/159) relating to transaction no.6.

5. BOI further admits that monies that BOI thought it was lending to Maram were used by BCCI for its own purposes.

> 6. BOI further admits that BCCI fraudulently concealed from its auditors and (A) consequently failed to record in its accounts its guarantee liabilities to BOI in respect of the loans to Maram.
>
> 7. The fifth transaction appears to have involved a mutual placement of deposits between BOI and BCCI, with no loan to Maram being involved. BOI admits that BCCI falsely accounted for BOI's placement by not recognising its liability to repay the same and interest thereon. (B)
>
> 8. Accordingly BOI admits that the conduct of BCCI admitted above constituted carrying on of the business of BCCI for fraudulent purposes within the meaning of section 213 of the Insolvency Act 1986.
>
> 9. BOI admits that by its involvement in transactions 1–6 it unknowingly participated in the carrying on of the business of BCCI for fraudulent purposes.
>
> 10. BOI denies that it knowingly participated in any respect in any such fraud. Nothing in this Statement of Admissions is intended to derogate from the generality of that (C) denial.'

8. It is convenient at this stage to say something more about the Central Treasury fraud referred to at the end of para.3 of my earlier judgment. As indicated in that judgment, Mr Khalil and the Khalil group maintained a number of accounts with BCCI which they used for their own trading purposes. Most (if not all) of these accounts were heavily overdrawn in the period from 1981 to 1986 and, if properly and honestly presented to the auditors, would almost (D) certainly have called for some provision to be made. The scale of the indebtedness was increased by the use made of these accounts to conceal losses on BCCI's own metal trading. The evidence contained in the accounting report prepared on behalf of the liquidators indicates that metal trading originated as another method used by Mr Akbar to boost the published profits of BCCI. It was conducted through the CTD, using two accounts: a No. 1 account in the name of BCCI Overseas, used for its own proprietary trading, and a No. 2 trading account purporting to be that of Mr Khalil. (E) This was in truth simply a second trading account of BCCI Overseas, but the device of nominating Mr Khalil as the account holder enabled Mr Akbar to switch loss-making positions from the BCCI Overseas account into the Khalil account. As of October 31, 1983, BCCI (using the Khalil account) held long-term metal positions in LME Silver and Copper valued at US$38.6 million. At the same time, in the last six months of 1983, there was significant trading in these commodities through the No. 1 account, resulting in significant losses. BCCI Overseas had contracted to buy silver and copper at prices in excess of (F) the market prices prevailing at the time when call options it had previously entered into were due to be exercised. When these options failed to be exercised, and lapsed, it was left holding long positions in the metals as at December 31, 1983, which, if resold, would have crystallised into a loss. Absent a sale, the holdings should have been marked down to their market value at the time and the resulting loss carried into the profit and loss account as at December 31. To conceal these losses BCCI Overseas (through Mr Akbar) recorded fictitious sales, at a reduced loss or even a profit, to companies such as Notan, (G) using the Khalil group accounts to fund the purchases. It was then a matter of concealing, in turn, losses on these accounts, which was effected by the injection of funds from three principal sources: the back-to-back transactions with BOI, SBI and other banks; mis-recording deposits with BCCI as payments rather than as liabilities to the depositors; and the misappropriation of funds held on behalf of clients in a portfolio account (No. 20071) with ICIC, a BCCI affiliate.

9. The back-to-back arrangements referred to were made with four Indian banks: BOI, SBI, (H) Syndicate Bank and Punjab National Bank; and with two Swiss Banks: Banque des Échanges Internationaux and Banque de L'Union Européene en Suisse. The result of these transactions was to allow BCCI Overseas in effect to borrow money off balance sheet through companies such as Maram and Notan which were not BCCI subsidiaries or affiliates and whose financial position did not therefore feature in the BCCI group accounts. The liquidators estimate that, out of the US$347 million and £30 million received by BCCI Overseas under these arrangements,

© 2004 Sweet and Maxwell Ltd

A some US$302 million and £30 million were credited to the Khalil group accounts so as to give the false impression that the accounts were being serviced and the indebtedness repaid by the customer. The balance of US$45 million was used to cover the fictitious sales of 630 lots of copper and 160 lots of silver. As appears from my judgment in *Morris v State Bank of India*, the loans made to Notan were facilitated by a matching deposit placed with SBI and were secured by a BCCI guarantee, but not by any formal lien. This is also a feature of the transactions involving BOI. In these and in the case of the other back-to-back transactions with banks, the B guarantees were not disclosed to the auditors and the deposits were treated as free of any liability in respect of the loans.

10. A schedule prepared by Mr Akbar as of October 31, 1983, and used by the liquidators as the basis for much of their calculations of the scale of the Central Treasury fraud shows that some US$100 million was misappropriated from the ICIC portfolio account 20071. Of this some US$30 million was mis-recorded as deposits with ICIC made on behalf of Mr Khalil's C children and the remaining sums as credits to the Khalil group accounts.

11. BCCI, including BCCI Overseas, was almost certainly insolvent by 1983 and in all probability by a date even earlier than that. The period covered by the transactions in this case was therefore one in which Mr Akbar, and the CTD under his control, engaged in what must have been an increasingly desperate attempt to conceal the true financial position of BCCI as a whole by entering into verifiable transactions the real purpose and effect of which were either D hidden or distorted in the books of account and other financial records presented to its auditors. Without the assistance of these transactions it is most unlikely that the pretence of solvency could have been successfully maintained for so long.

**The transactions**

12. I will come to the issue of knowledge shortly, but it may be helpful at this stage to set out the structure and the mechanics of each of the six transactions under review. They can be E summarised as follows:

*The first transaction*

(i) This was arranged in November 1981 and completed on December 2 of that year. BOI received a proposal from BCCI whereby BCCI would deposit with BOI the sum of £10 million for a period of three months. The deposit would bear interest at National Westminster Bank F base rate, which was then 15 per cent per annum. BOI would then lend the same sum to a borrower nominated by BCCI at a rate of 1/8 per cent over the National Westminster Bank base rate from time to time. Under the proposal as originally made, there would have been no documents executed by the borrower, which was not initially identified. Nor were the moneys deposited by BCCI to be formally liened to BOI. The only security for the loan element of the transaction, apart from the borrower's covenant, was to be an irrevocable guarantee by BCCI in respect of the repayment of the loan. The direct negotiations in respect of these arrangements G were conducted between Mr K L Samant, who was then the chief manager of the UK and European branches of BOI and was based in London, and a Mr Mewawalla, then a senior officer of BCCI at its Leadenhall Street office, who had earlier in his career been employed by BOI and had been on friendly terms with Mr Samant for a number of years. Mr Samant, after consultation with a firm of solicitors (Lawrence Jones & Co) in London, recommended approval of the transaction by the board of BOI, and this occurred on or about November 18, 1981. The decision was notified to Mr Samant in London, by telex dated November 19, on the H basis that it would be what was described as 'a one time transaction'. Shortly before then, in circumstances I will come to later, the intended borrower was identified as Maram Trading Co Ltd ('Maram'), a company registered in the Cayman Islands and beneficially owned by Mr Khalil. The transaction was completed on December 2, 1981, when BCCI Overseas transferred £10 million to BCCI SA via its inter-company vostro account 44100172 for onward placement with BOI in London. The transfer was recorded in the books of BCCI Overseas as an

inter-bank term placement at a rate of 15 per cent, maturing on March 2, 1982. BCCI issued a cheque dated December 2, 1981, in the sum of £10 million drawn on its National Westminster Bank ('NW') sterling nostro account, which was sent to BOI in London under cover of a letter dated December 2, referring to the payment as a three-month placement by BCCI Overseas. BOI London in turn on the same date opened a new fixed deposit account in the name of BCCI Overseas, which was credited with the £10 million. On the same date a loan was granted to Maram by BOI London at a loan rate equal to the deposit rate payable on the moneys received from BCCI Overseas plus 0.125 per cent. BOI transferred the £10 million under loan by a payment drawn on its own NW sterling nostro account in favour of BCCI SA for the account of Maram under account no. 01024640. The moneys were received by BCCI SA in its own NW sterling nostro account (no. 41100154) and in turn credited to BCCI Overseas' inter-company vostro account (no. 44100183). In the books of BCCI Overseas the £10 million is shown as credited to a new call deposit account (no. 60064019) in the name of Saudi Development and Commercial Co ('SDCC') in Jeddah, a company controlled by BCCI.

(ii) The first transaction was reversed on March 2, 1982, when funds totalling £10,372,942.22, representing the £10m loan to Maram plus accrued interest, were debited from an SDCC Jeddah deposit account at BCCI Overseas and transferred to BCCI SA London through the inter-company nostro account 44100172. BCCI SA then issued a banker's draft payable in favour of BOI, drawn on its NW sterling nostro account. On the same day funds totalling £10,369,863.02 (representing the £10 million deposit by BCCI Overseas plus accrued interest) were paid to BCCI SA out of the NW sterling nostro account of BOI. These moneys were credited to BCCI SA's own nostro account (41100154) in London and then credited on to the inter-company vostro account (44100183) of BCCI Overseas.

*The second transaction*

(i) The second transaction involved the same structure as the first, but was for £25 million rather than £10 million. On September 22, 1982, BCCI Overseas transferred the £25 million to BCCI SA via its inter-company vostro account for onward placement with BOI in London. The deposit was recorded in the books of BCCI Overseas as an inter-bank term placement at a rate of 11 per cent, maturing on January 24, 1983. The money was forwarded to BOI via BCCI SA, which issued a cheque drawn on its NW sterling nostro account, which was sent to BOI under cover of a letter dated September 22. On the same day BOI granted a loan in the same sum in favour of Maram at a loan rate equal to the NW bank rate from time to time plus 0.125 per cent. The loan moneys were paid by means of a cheque drawn on the BOI NW sterling nostro account, made payable to 'Bank of Credit and Commerce Int. Account 01024640 of Maram Trading Company Limited'. BCCI SA received these funds in its sterling nostro account (41100154) at National Westminster Bank in London and credited the £25 million to the BCCI Overseas inter-company vostro account (441000183). In its own books BCCI Overseas credited the US dollar equivalent of $43.87 million to Mr Khalil's current account (01001279), thereby reducing the recorded overdraft liability to BCCI Overseas by a similar amount. The indebtedness on account 01001279 at the time was some US$187,068,490, but by September 30 this had been reduced to an overdraft balance of US$64,628,559 by the credit of the moneys received from BOI together with two further credits from overseas banks, the first being US$10 million from Punjab National Bank, the other being US$8.525 million from Syndicate Bank. The applicants' evidence is that these credits were treated as *bona fide* receipts from Mr Khalil, when of course they were nothing of the kind.

(ii) The proposal for the second transaction was made by BCCI through Mr Mewawalla as early as July 1982, on the basis that there would be a deposit of £30 million for four months on terms that BOI would make a loan in the same sum to a borrower nominated by BCCI. As in the case of the first transaction, the deposit was not to be under lien, but BCCI Overseas would provide a guarantee for the loan. Maram was eventually identified as the nominated borrower and authority was given for a loan of £30 million by the Board of BOI on August 9, 1982.

© 2004 Sweet and Maxwell Ltd

Shortly before the implementation of the transaction on September 21, 1982, Mr Mewawalla wrote to Mr Samant enclosing various documents (which I will come to later) and referring to the deposit and loan being in a lower sum of £25 million. The arrangements were then effected in this sum. The transaction was reversed in January 1983. Funds totalling £25,826,455.49, which represented the £25 million loan to Maram plus accrued interest were drawn down from a loan account in the name of Maram at BCCI Overseas (No. 11003476) and transferred to BCCI SA in London through the inter-company vostro account (44100183). A further drawdown on the Maram loan account took place on the same day to cover repayment of the Syndicate Bank loan. BCCI SA then issued a banker's draft drawn on its NW sterling nostro account, made payable to BOI. On the same day the sum of £25,816,095.90, representing the £25 million deposit from BCCI Overseas plus accrued interest, was drawn from BOI's NW sterling nostro account in London and paid to BCCI SA's sterling nostro account (41100154). A credit in the same amount was then made to the BCCI Overseas inter-company vostro account (441000183).

*The third transaction*

(i) The third transaction took essentially the same form as the previous two, but involved a loan to Maram of US$60 million, which was disbursed in three tranches of US$20 million each. The three loan advances were made between November 1 and 7, 1983 (although again the name of the borrower was not identified at the outset) and repaid on February 1 and 7, 1984. Each of the advances was accompanied by a contemporaneous deposit of an equal sum by BCCI Overseas with BOI, and in a letter dated October 24, 1983, signed by Mr Akbar and a Mr Mohammed Saghir, BCCI Overseas guaranteed the loan. Again there was no formal lien executed over the deposits. As in the case of the two previous transactions, the immediate contact between BCCI and BOI took place between Mr Samant and Mr Mewawalla. Board approval for the advances to Maram was obtained on October 20, 1983, and on October 24 BOI received a formal letter from Maram requesting the US$60 million loan facility and asking for the moneys to be transferred to their account (No. 01024628) at BCCI in Leadenhall Street. This letter, as in the previous cases, purported to be signed by Mr Khalil.

(ii) The implementation of the third transaction also took a similar form to the earlier two. On November 1, 1983, BCCI Overseas transferred the first tranche of US$20 million to BCCI SA via the inter-company vostro account for placement with BOI. BCCI SA then remitted that sum from its US dollar nostro account (48586050) at Bank of America in New York ('BoA (NY)') to BOI's London nostro account (400016230) at Chemical Bank in New York ('CB (NY)'). On the same day BOI advanced the $20 million to Maram at an interest rate of 0.125 per cent above the rate payable on the funds deposited by BCCI Overseas with BOI. This advance to Maram was made by remitting the US$20 million to the BCCI SA US dollar nostro account (48586050) at BoA (NY), which was then credited to the inter-company vostro account of BCCI Overseas (44100218). BCCI Overseas showed Mr Khalil's current account (01001279) as being credited with this payment. This first tranche of the loan to Maram was to mature on February 1, 1984.

(iii) The second tranche of the loan was paid on November 3 following a deposit of US$20 million by BCCI Overseas, using the inter-company vostro account to transfer the moneys to BCCI SA, which in turn remitted the same sum from its US dollar nostro account at BoA (NY) to BOI's own nostro account at CB (NY). On the same day the second loan to Maram took place at a similar marginal rate of interest. As in the case of the first tranche, the funds were remitted in the first instance to BCCI SA's US dollar nostro account at BoA (NY), which in turn credited the inter-company vostro account at BCCI Overseas with the same sum. This tranche of the loan was also used in the books of BCCI Overseas to credit Mr Khalil's current account.

(iv) The final tranche of the loan was advanced to Maram on November 7, 1983, against a further deposit in the same sum of US$20 million made to BOI in London by BCCI Overseas.

The maturity date for the loan was February 7, 1984, and the same rate of interest applied. As in the case of the first two tranches, the moneys used to fund the Maram loan were remitted to BCCI SA's US dollar nostro account at BoA (NY) and then credited on to the inter-company vostro account at BCCI Overseas. As also with the first two tranches, the third tranche of US$20 million was credited to Mr Khalil's current account. As at November 1, 1983, this had an overdrawn balance of US$85,280,341.22, which by November 11 had been reduced to US$17,287,655.41, partly with the payments received from BOI and partly with the benefit of a further sum of US$20 million obtained from SBI via Notan as a result of loan arrangements which were the subject of the proceedings in the earlier action of *Morris v State Bank of India*. In the same 10-day period to November 11, 1983, there were also substantial credit transfers to the Khalil account from BCCI Luxembourg, BCCI Columbo and BCCI Panama, as well as various debits to cover metal transactions carried out, it would appear, by BCCI for its own account. The net result of all this was that by December 31, 1983, the debit balance on Mr Khalil's account no. 01001279 with BCCI Overseas had been converted to a credit balance of US$9,261,646.17, which was taken into account by the auditors of BCCI when determining the net exposure of BCCI to the Khalil group. They concluded that the loans to Mr Khalil and his companies were performing and that no provision was required to be made in respect of the net exposure. However, by January 16, 1984, following BCCI's year end of December 31, 1983, the Khalil account was again in overdraft to the tune of US$155.9 million, and following the repayment of the three Maram loans to BOI, the debit balance had risen to US$245.9 million.

(v) The third transaction was reversed, as I have indicated, after BCCI's year end. On February 1, 1984, funds totalling US$20,498,333.33, comprising the first tranche of the loan to Maram plus accrued interest, were debited against the Khalil current account at BCCI Overseas and transferred to BCCI SA London through the inter-company vostro account. BCCI SA London, on the instructions of Mr Akbar, remitted this from its nostro account at BoA (NY) to BOI's US dollar nostro account at CB (NY). On the same day BOI remitted to BCCI SA's US dollar nostro account the sum of US$20,491,944.44, which was in turn credited to the vostro account of BCCI Overseas. In a similar way the second and third tranches of the loan, together with the BCCI deposits, were repaid on February 3 and February 7, 1984.

*The fourth transaction*

(i) This was for US$75 million and was implemented on September 18, 1984. The loan to Maram and the corresponding deposit from BCCI were repaid on October 18, 1984. Mr Samant negotiated the arrangements with Mr Mewawalla, which, as I indicated earlier, were described in a note of a telephone call as 'their usual deal'. The original terms proposed in July 1984 were that there would be a deposit and corresponding loan of US$75 million for a period of three to six months, but at a lower differential rate of interest of 1/16 per cent rather than 1/8 per cent. In the end the 1/8 per cent differential in interest was reinstated and the board of BOI approved the transaction on August 9, 1984. As in the case of the earlier three transactions, the BCCI deposit was not to be under lien, but the loan to Maram was to be guaranteed. The guarantee document was provided on September 10, 1984. By then BOI had received a letter of request for the US$75 million loan from Maram, signed by Mr Khalil, asking for it to cover two separate periods, from September 18, 1984, to October 18, 1984, and December 18, 1984, to January 22, 1985. These periods correspond, as I indicated, firstly to the period during which the auditors carried out their audit circularisation procedures and secondly to BCCI's year end. The deposit of the US$75 million by BCCI Overseas was made in the same way as in the case of the earlier transactions. The money was transferred to BCCI SA via the inter-company vostro account and then remitted by BCCI SA from its US dollar nostro account at BoA (NY) to BOI's own nostro account at CB (NY). On the same day the loan to Maram was made at the usual interest rate of 0.125 per cent above the rate payable on the placement by crediting BCCI SA's US dollar nostro account at BoA (NY), with the money then being credited on to the inter-company vostro account of BCCI Overseas. As in the case of the third

© 2004 Sweet and Maxwell Ltd

A transaction, the US$75 million was credited to Mr Khalil's current account with BCCI Overseas. The effect of this was to reduce a debit balance from US$119,798,634.74 to US$44,789,634.74.

(ii) On October 18, 1984, the loan principal plus accrued interest (US$75,734,357) was debited to the Khalil current account at BCCI Overseas and transferred through the inter-company vostro account to BCCI SA. BCCI SA then remitted the money to BOI's US dollar nostro account at CB (NY). On the same day BOI repaid the deposit from BCCI Overseas by B remitting the sum of US$75,726,562.50 to BCCI SA, which paid it on to BCCI Overseas via the inter-company vostro account.

*The fifth transaction*

(i) This was for US$50 million and took place on or about December 18, 1984. It is really the second part of the transaction contemplated in the letter of request dated September 10, 1984, C in which Maram asked for a loan of US$75 million to cover the periods from September 18, 1984, to October 18, 1984, and December 18, 1984, to January 22, 1985. As I have already indicated, the fifth transaction was intended, according to the letter of request and letter of guarantee dated September 10, 1984, to be essentially a repeat of the fourth transaction, in order to cover the period of BCCI's year end. No separate documentation between BOI, BCCI or Maram appears to have been executed in respect of the fifth transaction. However, the transaction as executed did not accord with the September documentation. On December 18, D 1984, BCCI Overseas transferred US$50 million (not $75 million) to BCCI SA via its inter-company vostro account for placement with BOI. BCCI SA then followed the usual procedure of remitting the same sum from its US dollar nostro account at BoA (NY) to BOI London's nostro account at CB (NY). This transfer of funds was recorded in the books of BCCI Overseas as an inter-bank term placement at a rate of 9 per cent, maturing on February 19, 1985. In return, BOI on the same date arranged for US$50 million to be remitted to BCCI SA's London E US dollar nostro account at BoA (NY) and this sum was then credited to the BCCI Overseas inter-company vostro account. This payment was made without reference to Maram and at the same interest rate of 9 per cent as the deposit received from BCCI. The fifth transaction therefore amounted to no more than two matching inter-bank placements in the same sum and at the same rate of interest. However, in the books of BCCI Overseas the US$50 million was shown as credited on December 19, 1984, to the Khalil current account (01001279) which, following the payment, was in credit as at December 31, 1984, by US$74,831,139. The moneys F were not shown as an inter-bank deposit and therefore as an amount due to banks, but rather as a receipt from Mr Khalil to reduce the net indebtedness on his account. As in the case of the earlier payments into that account, this had the effect of artificially reducing the indebtedness in respect of the Khalil group accounts at BCCI Overseas and gave the auditors the impression that these were performing loans.

(ii) In terms of the flow of funds the fifth transaction differed little from the others, in that the moneys drawn down from BCCI Overseas through BCCI SA to BOI were channelled back to G BCCI Overseas and used to improve the balances on the Khalil account. The economic effect was therefore the same. The only difference was that the US$50 million was not advanced in terms as a loan to Maram, nor was it advanced at a differential rate of interest. Consequently when on February 19, 1985, the transaction came to be unwound, a sum of US$50,787,500 was debited to the Khalil current account at BCCI Overseas and transferred to BCCI London for payment to BOI at its US dollar nostro account at CB (NY), and on the same day the identical H amount, representing the placement by BCCI Overseas plus accrued interest at the same rate, was paid by BOI to BCCI Overseas through BCCI SA, using the same accounts.

*The sixth transaction*

(i) This took the same form as the first four transactions and involved the sum of US$50 million. It was first mooted in August 1985, when Mr Samant proposed that there be a loan of

US$100 million backed by a deposit from BCCI, to be advanced in tranches, the first of which would be drawn down by September 10, 1985, and repaid in October of that year, with the arrangements being repeated in November through to January or February 1986. He also suggested that the loan should be disbursed at BOI's Paris branch. The liquidators have suggested that this was to meet a difficulty that had arisen in January 1985, when Mr Samant attended a meeting at the Bank of England during which he was warned that transactions of this kind were neither attractive nor acceptable and were not to take place through London. I shall come to the details and implications of that meeting later in this judgment. In the event, on September 12, 1985, the head office of BOI sanctioned the transaction in the sum not of US$100 million but of US$75 million, subject to the finalisation of certain documentation with BOI's solicitors. Mr J N Raina, BOI's general manager in London, then wrote to Mr Mewawalla confirming that there would be a transaction in that amount. There was then further delay, caused by internal discussion at BOI as to whether it should disburse the loan to Maram from its branches in Singapore, Hong Kong or New York. Again it is said that this is linked to the earlier discussions with the Bank of England. It was not until December 2, 1985, that BCCI Overseas sent to BOI the standard form letter of guarantee in respect of the loan to Maram of US$75 million with interest, together with the request from Maram, signed by Mr Khalil, for the loan.

(ii) The transaction was put into effect on December 11, 1985, when BCCI Overseas transferred US$50 million to BCCI SA via the inter-company vostro account. The moneys were in turn transferred on by BCCI SA, in the case of this transaction to BCCI SA Bahrain via an inter-company vostro account (No. 42100667), and on the same day BCCI SA Bahrain then transferred the same sum back to BCCI SA London via the inter-company vostro account 42100667. There was then an onward transfer of the funds from BCCI SA, using its US dollar nostro account 48586050 at BoA (NY) to the BOI nostro account 400016230 at CB (NY). On the same day BOI remitted the US$50 million from the nostro account at CB (NY) to BOI Grand Cayman via its nostro account 00036633 at Marine Midland Bank in New York. The loan to Maram was then advanced on the same date by BOI Grand Cayman at the usual interest rate of 0.125 per cent above the rate payable on the placement by BCCI Overseas.

(iii) BOI Grand Cayman remitted the US$50 million lent to Maram to the BCCI SA dollar nostro account (48586050) at BoA (NY). It was then credited back to the inter-company vostro account (44100218) at BCCI Overseas. The moneys were used to credit a current account (No. 01004910) in the name of A R Khalil, thereby giving the impression, as in the case of the earlier transactions, that the account was a performing asset. As a result no provision was made in respect of these accounts in the balance sheet of BCCI Overseas as at the 1985 year end.

(iv) The loan and deposit arrangements were due to mature on March 11, 1986, but on or about March 3 BOI requested BCCI (and it was agreed) to roll over the maturity date of the deposit for a maximum of two months, with a corresponding extension of the loan to Maram. These alterations in the arrangements were approved by BOI's chairman on or about March 5, 1986, and were formalised by a request from BCCI Overseas (dated March 10, 1986) for an extension of the loan facility, to be guaranteed in the usual way.

(v) On May 12, 1986, the transactions were reversed. Funds totalling US$50,645,833.33, representing the principal of the loan and accrued interest, were debited to a numbered overdraft account (01006003) at BCCI Overseas and transferred to BCCI SA London through the inter-company vostro account. BCCI SA then remitted this sum from its US dollar nostro account (48586050) at BoA (NY) to the BOI Grand Cayman nostro account at Midland Marine Bank. On the same day funds totalling US$50, 635,069.44, representing the placement by BCCI SA Bahrain plus accrued interest, were repaid to the BCCI SA London US dollar nostro account (48586050) at Bank of America, New York, and credited back to the BCCI SA Bahrain inter-company vostro account (42100667). This account was then debited with the same amount in favour of the BCCI Overseas inter-company vostro account (44100218).

© 2004 Sweet and Maxwell Ltd

A **The test of liability**

13. The liquidators have to show that BOI (through its relevant officers and employees) knew that the six transactions (or one or more of them) were being entered into either to defraud the creditors of BCCI or for a fraudulent purpose. They did not have to know every detail of the fraud or the precise mechanics of how it would be carried out, but clearly they did have to know, either from their own observation of what was being done or from what they were told, B that BCCI was intent on a fraud. Knowledge, for this purpose, means what it says. There must have been an actual realisation on the part of BOI that BCCI would, or was likely to, engage in false accounting. A failure to recognise the truth of what was going on is not enough, however obvious that may now seem to have been. The relevant knowledge also has to be contemporaneous with the assistance that was given at the time by entering into the various transactions. Subsequent knowledge based on hindsight is not enough, nor is negligence the test of liability. Mr Hirst QC emphasised in his closing submissions that it is irrelevant whether C BOI is open to criticism for slackness or negligence, however gross. The only issue is whether it knew at the time that it was participating in a fraud. I agree with that. But both sides accept that knowledge, for these purposes, includes so-called blind-eye knowledge, which exists when the party in question shuts its eyes to the obvious because of a conscious fear that to enquire further will confirm a suspicion of wrongdoing which already exists. Knowledge of this kind is part of the claimants' case, and I dealt with the same point in para.11 of my D judgment in *Morris v State Bank of India*, where I said this:

> 'Knowledge includes deliberately shutting one's eyes to the obvious, provided that the fraudulent nature of the transactions did in fact appear obvious to those who dealt with these matters at SBI at the relevant time. It is well established that it is no defence to say that one declined to ask questions, when the only reason for not doing so was an actual appreciation that the answers to those questions would be likely to disclose the existence of a fraud. But liability in such cases depends upon that stage of consciousness having E been reached. His submission, which I accept, is that one needs to be careful to draw a distinction between a conscious appreciation of the true nature of the business being carried on and a failure, however negligent, to appreciate that fraud was being perpetrated. The case for SBI is that at no time during the course of these transactions did it in fact suspect that anything untoward was going on. The essentials of what is required in order to establish so-called blind-eye knowledge are set out in the speech of F Lord Scott of Foscote in the recent decision of the House of Lords in *Manifest Shipping Co Ltd v Uni-Polaris Co Ltd* [2003] 1 AC 469, where Lord Scott at para.116 says this:
>
> > "In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist. But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that may, at one extreme, be no more than a vague feeling of unease G and, at the other extreme, reflect a firm belief in the existence of the relevant facts. In my opinion, in order for there to be blind-eye knowledge, the suspicion must be firmly grounded and targeted on specific facts. The deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to enquire into an untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the basis of a finding of privity."'

H I intend to adopt the same approach to the evidence in this case.

14. Dishonesty as such is not in terms a condition of liability under s.213. But if knowledge of the fraud in either of the senses indicated above is established, Mr Hirst accepts that it must follow that BOI was dishonest. No evidence has been led to exculpate BOI on the basis that, although the bank through its officers realised what BCCI was doing, they saw nothing wrong in it, and it is not, therefore, necessary for me to consider whether that position, if established,

would constitute a defence to the claim. The only defence relied on is simply a denial of knowledge. In relation, therefore, to the liquidators' primary and original claim that BOI knew that BCCI was falsely misrepresenting the six transactions to its auditors by concealing its own use of the loans made to Maram, by representing the matching deposits with BOI as unencumbered, and by concealing the existence of the guarantees, no problems of defining the test of liability exist. An awareness of the purpose to which the transactions were being put was inescapably dishonest. The same, I think, goes for the alternative plea that BOI must have realised that the improvement of its earnings to advances ratio could only be effected by the transfer of non-performing debt and the consequent improvement in BCCI's profit before tax in each year. It is common ground between all the expert witnesses who gave evidence (both bankers and accountants) that the removal of bad debts would have been impermissible even by the standards of the time, and that the auditors, if notified, would have insisted on the reversal of the transaction in the accounts or the making of suitable provision. The improvement in the ratio could only therefore have been successful if the removal of the bad debts was effectively concealed from the auditors. None of the factual witnesses suggested that they would have regarded this as an honest practice. But in relation to the new plea about window-dressing, different considerations may apply. Paragraphs 93.2 and 96F(i) and (ii) of the re-re-amended particulars of claim ('RRAPOC') allege that even the more limited possibility of switching assets in the balance sheet by converting loans and advances into deposits due from banks would have indicated greater liquidity than was the case and was itself a fraudulent practice. The liquidators' additional case is that, even if BOI was told and believed that the only purpose of the six transactions was to window-dress the accounts in this way, this would still amount to knowing participation in a fraud, because what was contemplated was likely to mislead anyone reading BCCI's accounts and was not a practice which, judged by the standards of honest bankers at the time, operating in the City of London, could have been recognised by BOI as either honest or legitimate.

15. Mr Hirst submits that the liquidators must prove (in relation to this plea) not only that BCCI's explanation of the purpose of the transactions disclosed a scheme which, viewed objectively, was dishonest, but also that this belief was shared by the officers of BOI to whom the explanation was given. It is important to note that this submission is not advanced as part of an argument that s.213 requires proof not only of knowledge, but also of dishonesty. It is based on the terms of the RRAPOC, which at para.96A alleges that BOI knew or believed that the explanation of the improvement in BCCI's earnings to advances ratio (if given and true) disclosed a dishonest scheme on the part of BCCI. This plea therefore depends upon BOI being aware and appreciating at the time that window-dressing of the kind allegedly contemplated by BCCI was dishonest, and therefore requires the court to focus on BOI's views about the appropriateness of what was being done. Therefore in this limited area what needs to be proved is what Lord Hoffmann in *Twinsectra v Yardley* [2002] 2 AC 164 at p.170c described as a dishonest state of mind: *i.e.* a consciousness that one is transgressing ordinary standards of honest behaviour. Clearly that test is inapplicable except by reference to the standards of such behaviour prevailing at the time. I therefore accept Mr Hirst's submission that if liability is to be established on the basis of this new plea, conscious dishonesty in the sense I have described is an issue and must be proved.

**Evidence and standard of proof**

16. This case concerns events which took place 20 years ago. Those involved are now for the most part retired and some are elderly and unwell. None of these factors is an objection to the court doing justice on the applications before it, but they are relevant to a consideration of the evidence upon which any decision must be based. I therefore accept that due allowance has to be made for the passage of time and the effect which that must inevitably have on the ability of witnesses to recall with any precision, or at all, conversations and events which occurred two decades or more ago. That makes all the more surprising the claims of some witnesses to have

© 2004 Sweet and Maxwell Ltd

an almost perfect recall of these events, and I have approached some of the oral evidence which either contradicts or is unsupported by contemporaneous documents with necessary caution. I have also taken into account (as I did in the case against SBI) the institutional factor in all of this: *i.e.* a natural inclination which may exist on the part of some of the witnesses to be defensive of their own conduct and that of the bank they served. Failure to give a credible explanation of events may be due to factors of this kind rather than a perceived need to deny involvement with a fraud. I dealt with these considerations in paras 17 and 18 of my judgment in *Morris v State Bank of India* and I take the same approach in this case.

17. Mr Hirst submits that I should apply the criminal standard of proof to the determination of the key issues of knowledge. These are, he says and I agree, allegations of great seriousness for the individuals concerned and for the reputation of BOI. It would be wrong to make adverse findings of that kind simply on the basis of the balance of probabilities. The civil standard of proof is a flexible one and recent authorities confirm that it can be adapted to meet the seriousness of what has to be proved: see, for example, *B v Chief Constable of Avon & Somerset Constabulary* [2002] 1 WLR 340.

18. In *R (McCann) v Crown Court at Manchester* [2003] 1 AC 787 (a case concerned with the making by magistrates of anti-social behaviour orders under s.1 of the Crime and Disorder Act 1998) Lord Hope of Craighead at paras 82 and 83 said this:

> ‘82. . . . it is not an invariable rule that the lower standard of proof must be applied in civil proceedings. I think that there are good reasons, in the interests of fairness, for applying the higher standard when allegations are made of criminal or quasi-criminal conduct which, if proved, would have serious consequences for the person against whom they are made.
>
> 83. . . . There is now a substantial body of opinion that, if the case for an order such as a banning order or a sex offender order is to be made out, account should be taken of the seriousness of the matters to be proved and the implications of proving them. It has also been recognised that if this is done the civil standard of proof will for all practical purposes be indistinguishable from the criminal standard: see *B v. Chief Constable of Avon & Somerset Constabulary* [2001] 1 WLR 340, 354, para 31, per Lord Bingham of Cornhill CJ; *Gough v. Chief Constable of the Derbyshire Constabulary* [2002] QB 1213, 1242–1243, para 90, per Lord Phillips of Worth Matravers MR. As Mr Crow pointed out, the condition in section 1(1)(b) of the Crime and Disorder Act 1998 that a prohibition order is necessary to protect persons in the local government area from further anti-social acts raises a question which is a matter for evaluation and assessment. But the condition in section 1(1)(a) that the defendant has acted in an anti-social manner raises serious questions of fact, and the implications for him of proving that he has acted in this way are also serious. I would hold that the standard of proof that ought to be applied in these cases to allegations about the defendant’s conduct is the criminal standard.’

Mr Purle QC resists the importation of the criminal standard of proof *simpliciter* into applications under s.213. Cases like *McCann* are, he says, explicable on a pragmatic basis as attempts to give sensible and straightforward directions to Magistrates’ Courts, which have to impose restraint orders in a quasi-criminal context. He says that I should prefer the approach of Lord Hoffmann in *Aktieselskabet Dansk Skibsfinansiering v Brothers* [2001] 2 BCLC 324. This was a decision of the Court of Final Appeal in Hong Kong in a case of fraudulent trading. At p.329d–h Lord Hoffmann said this:

> ‘Until the recent case of *Re H (Minors)* [1996] AC 563 the leading English case on the standard of proof in civil cases in which serious allegations of misconduct such as fraud were in issue was *Hornal v Neuberger Products Ltd* [1957] 1 QB 247. In a passage (at 266) often quoted in later cases, Morris LJ approved the dictum of Denning LJ in *Bater v Bater* [1951] P 35 at 37 that there must be a “degree of probability which is

> proportionate to the subject-matter". Lord Denning repeated the same formula in the House of Lords in *Blyth v Blyth* [1966] AC 643 at 669. In *R v Home Secretary, ex p Khawaja* [1984] AC 74 at 114 Lord Scarman examined all the previous cases and said the same: "A preponderance of probability suffices but the degree of probability must be such that the court is satisfied."
>
> The judge followed this line of authority. He said (at para 5.3.1) that the civil standard of a balance of probabilities was appropriate but that "the degree of probability must be commensurate with the occasion and proportionate to the subject matter". He commented that in a case of fraud, this meant that in effect the standard was no different from "beyond reasonable doubt".
>
> In *Re H (Minors)* [1996] AC 563 at 586–587 Lord Nicholls of Birkenhead pointed out that if proof is required on a preponderance of probabilities (ie, a probability of 0.5 on a scale from 0 (impossibility) to 1 (certainty)), it is inconsistent to require a "degree of probability commensurate with the occasion". This suggests some other degree of probability, higher than 0.5, somewhere between the civil standard and the criminal standard, which the courts have wisely never attempted to define as a point on the probability scale. The correct analysis is that the court is not looking for a higher degree of probability. It is only that the more inherently improbable the act in question, the more compelling will be the evidence needed to satisfy the court on a preponderance of probability.'

My own preference is for this approach, but I am conscious of the danger of over-analysis. It seems to me that although one can begin an assessment of the likelihood of Mr Samant and the other officers of BOI having been knowing parties to a fraud on the creditors of BCCI by reference to generalisations such as the improbability of bank officers becoming involved in dishonesty, the absence of any profit motive and the general standing and reputation of BOI, these factors become secondary considerations of less weight, when one comes to consider the oral testimony of the individuals concerned and to compare their explanations of what occurred, and their thinking at the time, with what is evident from the documents they actually produced and signed. Having heard this evidence, I have to decide whether it is credible, and that in large part depends upon my assessment of the witnesses themselves.

**The liquidators' case on knowledge**

19. The liquidators' primary case is set out in paras 96–97 of the RRAPOC. The six transactions were, they say, obviously artificial and served no *bona fide* commercial purpose. Their actual purpose was the fraudulent manipulation of BCCI's published results, which was achieved by suppressing the guarantees relating to the loans from BOI to Maram, thereby concealing any potential or actual liability on the part of BCCI for the repayment of the loans, and by using Maram to keep off the balance sheet what was in substance the circulation of BCCI's own money, to assist it in massaging the balance on the Khalil accounts. This enabled it to conceal the non-performing nature of those liabilities and in turn the additional indebtedness created by BCCI's own adventures on the London Metal Exchange. Even if the legal form of the transactions is respected, BCCI was able in effect to borrow off balance sheet from BOI by using the loans granted ostensibly to Maram in reduction of the Khalil debts.

20. BOI's knowledge is said to have extended to at least three of the essential features of the scheme. They knew that the real purpose of the transactions was to be for BCCI's own purposes and not those of Maram. At the very least, BOI knew that the existing loans made to an initially unspecified borrower would be transferred temporarily from its accounts over BCCI's year end and replaced by new loans from BOI, made with the benefit of the finance supplied by the BCCI deposits. Maram (even when identified) was also known to be a nominee of BCCI and all contact between BOI and Maram was made through BCCI. BOI also knew that the loans to Maram could only be repaid by BCCI reinstating its original loans.

© 2004 Sweet and Maxwell Ltd

A Notwithstanding this, BCCI's liability to repay the loans to Maram was not revealed in its accounts, even as guarantor, and had the guarantee liability been revealed, full provision would have had to have been made. The liquidators also allege that BOI knew that BCCI intended to account for the deposits as free unencumbered placements and that BCCI would conceal from its auditors the existence of the guarantees.

21. In these circumstances the liquidators contend that BOI knew that the purpose of the
B transactions was not that of improving BCCI's earnings to advances ratio, not least because this explanation (even if given) was implausible and untrue. The explanation of improving the earnings to advances ratio was only consistent with a dishonest scheme, because it could only be achieved by removing a bad or doubtful debt, for which provision would have to be made, from its profit and loss account. As I have said, both banking experts were agreed that this would have been a wholly unacceptable practice, even judging by the perhaps laxer standards of the 1980s. No honest bank behaved in this way. The fact that the stated purpose could only
C be achieved by the removal of bad debts would also have indicated, at the very least, that Maram was not a viable commercial entity of the kind portrayed in the documentation eventually produced for submission to the Head Office of BOI.

22. It is important to recognise that the liquidators' pleaded case on knowledge (particularly in relation to the earnings to advances ratio point) is intended to deal with BOI's position on the basis of what are really two competing hypotheses. We know in fact that although Maram
D existed as a company and was beneficially owned by Mr Khalil, it was in effect put at the disposal of BCCI by Khalil and used by BCCI (through Mr Akbar) to perpetrate the fraud on creditors with which these proceedings are concerned. The evidence of Mr Dyson, the forensic accountant who has been involved in the investigation of these matters on behalf of the liquidators, which is unchallenged on this point and is corroborated by a witness statement from Mr Naqvi, is that Maram was at all material times controlled by Mr Akbar and that the company's share certificates, seal and company formation documents were found at
E Mr Akbar's home address when it was raided by the City of London police on November 27, 1991. Mr Dyson also says that Mr Khalil has stated that he never authorised Maram to borrow any moneys from either BOI or BCCI, and this is consistent with what we now know of Mr Akbar's *modus operandi* and the evidence of the use to which the BOI loans were put. This confirms that at the time of the six transactions Maram (although undoubtedly 'nominated' by BCCI) was not an existing borrower in any relevant or real sense. The transactions did not
F therefore involve the transfer of any existing liability from BCCI to BOI. They were (even if regarded as loans at all) new loans to Maram from BOI, which were then used to reduce the indebtedness on the Khalil accounts at BCCI.

23. The actual fraud was therefore the use of moneys circulated via the deposits with BOI to reduce the Khalil bad debts, including BCCI's own losses from metal trading. The concealment of the guarantee and BCCI's refusal to grant any formal lien over the deposits
G gave BCCI the additional benefit of being able to classify the deposits as sums due from banks with no corresponding liabilities. But this was in reality a bonus. The greater concern about the guarantee is likely to have been that, if disclosed to the auditors, it might prompt an inquiry into the nature of the liability under guarantee and lead to a connection being made between the payments to Maram and the reduction of the Khalil indebtedness. It would then have become clear that the Khalil accounts were (even on the face of things) being reduced only by further borrowing and provision would have had to have been made.

H
24. If BOI knew that the purpose of the back-to-back arrangements, and in particular its loans to Maram, was to remove or alleviate the Khalil bad debts and so avoid provision being made, then I can see no answer to the liquidators' claim for compensation and I believe Mr Hirst accepts that. It seems to me that the same conclusion follows even if BOI knew only that Maram was a mere nominee and that the loans which it was making were for the use of BCCI and would be repaid by BCCI. This would have put BOI on notice that the whole

arrangement was an elaborate fiction which can only have been designed to deceive its creditors by boosting its liquidity without revealing its corresponding indebtedness. The liquidators' additional pleading in relation to its primary case, which concentrates and is based on the hypothesis of the alleged explanation given for the arrangements (*i.e.* the improvement of the earnings to assets or earnings to advances ratio), is advanced to meet the defence that this justified what on any view was a quite extraordinary banking transaction and satisfied BOI that no fraud was involved. The liquidators' position is that no such explanation was in fact given and that this is just an invention by Mr Samant to conceal the fraud. But they say that even if this explanation was given, it was patently implausible and untrue and, if taken at face value, disclosed a dishonest scheme. This is because, as both banking experts and a number of the factual witnesses accepted, the earnings to assets ratio of BCCI could not be improved by transactions which would do no more than to move the amount of the loan shown in the balance sheet from 'loans and advances' to sums 'due from banks'. The asset position would remain the same and BCCI's earnings would be reduced, because it would earn only LIBOR rate on the deposits and would lose interest at a rate of LIBOR plus 2 per cent on the loans that were being refinanced.

25. If the justification was the so-called earnings to advances ratio (rather than the earnings to assets ratio), the position would be no different. Any meaningful comparison of the amounts earned relative to the sums advanced would have to be based on figures averaged over the whole year and not on a snapshot of the position as disclosed in each set of year end accounts. The information contained in the year-end financial statements would not allow this to be done, because the earnings shown are derived from all sources over the year, and the comparison with the single category of asset in the form of advances at the balance sheet date could not provide an average figure. Neither BCCI nor any other banks disclosed details in their accounts which distinguished between and identified the sources of earnings or details of average balances for different categories of assets during the year. For these reasons (as both experts acknowledged) an earnings to advances ratio calculated from year-end financial statements was unknown as a measure of performance for banks at the time. It cannot therefore have been, and was not, say the liquidators, something which BCCI was concerned to improve by the transactions it entered into with BOI. This is confirmed by the fact that no earnings to advances ratio appears in any of the published accounts of BCCI SA or BCCI Overseas for the five years in question or at all.

**The evidence of knowledge**

*(a) The first transaction*

26. As already indicated, this took place over the end of 1981. No compensation is sought in respect of this transaction because the liquidators have been unable to identify what use the loans from BOI were ultimately put to. However, the transaction is important because it was the first of the six back-to-back arrangements under review and therefore the first occasion when BOI was asked to assist BCCI in this way. It therefore sets the scene and to some extent defines what was to follow. At the time in question Mr Samant was the chief manager of the UK and European branches of BOI, based at Telegraph Street in London. He was subsequently promoted to the position of assistant general manager and deputy general manager in charge of BOI's branches in the UK and Europe. He remained with BOI until November 1985, when he resigned and handed his position over to Mr J Raina, who had been in effective charge since June of that year whilst Mr Samant took up some accumulated leave. He is now a director of AMAM, which I believe provides financial consultancy services of some kind.

27. It is, I think, important to note that Mr Samant was from 1980 until 1985 (as he says in his witness statement) the most senior BOI officer in the UK and Europe. He was a banker of considerable experience and is clearly a highly intelligent man. The other introductory matter worth noting, which is important as background to this case, is that during the 1980s it was the policy of BOI (and I think many other Indian banks) to mobilise at its year end as many

© 2004 Sweet and Maxwell Ltd

deposits as possible for inclusion in its balance sheet. The practice was for Mr Samant and all branch managers to contact customers and other banks as the year end approached in November and December, in order to secure as many deposits as possible. According to internal documentation the head office of BOI continuously monitored the growth of and fluctuation in deposits, and the existence of large-scale deposits was obviously seen as a measure of the bank's success. This practice of boosting deposits at the year end was highly artificial, because it meant that the level of deposits recorded in the accounts was attributable more to the customers' willingness to respond to the managers' campaign for funds than any independent recognition of the bank's reputation and worth in the preceding year. But the practice was well-established by 1981 and produced what can fairly be described almost as a culture, involving what was clearly a form of window-dressing in relation to the accounts. BOI is not, of course, on trial in respect of that practice, but it is difficult to regard it as either straightforward or desirable. Looked at objectively today, it would not, in my view, be regarded as acceptable. It is clear that even 20 years ago not everyone at BOI was happy about it. Mr Narayanan Vaghul, who was the chairman and managing director of BOI from 1981 until January 1984, and therefore the most senior executive at the bank during that period, said that he personally disapproved of the policy of mobilising deposits at BOI's year end and did his best to discourage it. But it was well-established by the 1980s because it was used by the Indian Government (which controlled BOI) to measure the bank's performance. This had produced what he described as an obsessive and undue emphasis on deposit mobilisation which was deeply rooted in the culture of the bank. It was put to him that the practice was apt to mislead and he accepted that in relation to the figures for deposit growth. It did not, however, distort the profit and loss account or the balance sheet. Disapproval of the mobilisation of deposits was also expressed by Mr S K Mitra, then one of the chief managers in the International Department of BOI at its head office in Bombay, but he thought better of this evidence overnight and somewhat unconvincingly attempted to change his position the following day.

28. Mr Purle put to Mr Vaghul the rather wider question of whether this practice could have encouraged managers to enter into unrepresentative transactions at the year end in order to flatter the balance sheet. I think that Mr Vaghul accepted that as a possibility, but countered that he would have questioned the branch managers if he suspected anything untoward was involved. He gave, as an example of a transaction which would not be approved of, the case of a manager who used credit on an overdraft facility to make deposits in another account. But he refused to accept that the transactions with BCCI with which I am concerned were circular because, he said, they involved genuine deposits and a genuine loan to Maram. This was a common theme amongst most of the bank's witnesses, who were keen to emphasise the legal form of the transactions, including the absence of a lien over the deposits and the absence of any other express right of recourse to the deposits as security for the guarantees and the loans. They were largely unwilling to become involved in any real analysis of the substance of the transactions, involving as they did the use of finance from BCCI to provide the loans to Maram in the first place and the absence of any known source of repayment for the loans other than their refinancing by BCCI. Reliance on legal form is not in any way impermissible or wrong, provided that the commercial realities of the transactions are also scrutinised. The assessment of risk is, after all, a prerequisite to any banking decision. The insistence by the factual witnesses that they relied on the legal form of the arrangements also has the consequence that their conduct can fairly be assessed on the basis that they were entering into an arms-length transaction with an unconnected party in respect of whom one would expect all the usual searches and enquiries to be made. But the evidence discloses that nothing of the sort in fact occurred.

29. Mr Samant said in evidence that the origin of the first transaction was in a call he made to Mr Mewawalla in the autumn of 1981 to see if BCCI was willing to place some year-end deposits with BOI. As I mentioned earlier, the two had been colleagues at BOI in India, and

when Mr Samant was the chief officer at BOI in Singapore and Mr Mewawalla was in charge of BOI Tokyo. They had known each other well for a number of years and Mr Samant described Mr Mewawalla as a close acquaintance. Mr Samant said that most of his communications with BCCI in relation to the six transactions were with Mr Mewawalla, although he may have spoken to Mr Akbar when Mr Mewawalla was away. Mr Mewawalla was not called as a witness by either party, although he is said to be alive and well. At the time of these transactions he worked in the International Department of BCCI. Mr Dyson said that he had made substantial claims in the liquidation and during his cross-examination also stated that he did not allege that Mr Mewawalla was dishonest in relation to the transactions with BOI. Later, however, in re-examination, he said that what he meant by this was that although the liquidators believed that Mr Mewawalla was involved in the fraud, it was not possible to produce clear evidence to prove it. Mr Purle has invited me to infer that Mr Mewawalla was involved in the fraud, and I shall proceed on the basis that that is the liquidators' position.

30. There does not appear to have been any immediate response to Mr Samant's request for a deposit, but by November 12, 1981, Mr Mewawalla had come back with a proposal. The terms of this are set out in a telex from Mr Samant to Mr G S R K Rao, who was then the departmental head of the International Department in Bombay. It records that BCCI was willing to place a deposit 'not under lien' of £10 million for three months at a rate of 15 per cent per annum, on terms that BOI was required to lend this same amount to a borrower nominated by BCCI at 15+1/8 per cent. There were to be no documents executed by the borrower and the only security was to be an irrevocable letter of guarantee by BCCI, the proposed terms of which are then set out in the telex as follows:

> 'As per our recent telephone conversation we have pleasure in introducing the abovementioned customer to whom you have agreed to allow the following facilities on the terms and conditions mentioned below:

| | |
|---|---|
| Name of borrower: | |
| Name of facility: | Loan |
| Period: | Three months from date of loan |
| Amount: | Stg pnds 10,000,000 (sterling pounds 10 million) |

> In consideration of your allowing the abovementioned facilities we hereby irrevocably guarantee the repayment on the due date of the principal amount together with interest at 1/8% over National Westminster Bank base rate.
>
> The borrower will have option to repay the loan before the due date by giving one month's notice.
>
> We thank you for accommodating the above client and look forward to the opportunity of doing business of mutual interest with you in the future. Unquote'

Mr Samant goes on in the telex to recommend the proposal to Mr Rao because it would be what is described as a 'pure' deposit and BOI would earn 1/8 per cent per annum without any outlay of funds. The reference to it being a 'pure' deposit is a reference to the categorisation of deposits by the head office of BOI for reporting purposes. In fact a deposit from BCCI would not have been (as Mr Samant accepted) a 'pure' deposit. This was restricted to deposits from customers rather than from other banks. The importance of the reference in the telex is as an indication of the role played by the need to maximise deposits in motivating this transaction. The reference to interest being earned without any outlay of funds is also important because it confirms that Mr Samant knew that BOI would be at liberty to utilise the moneys provided by the deposits in order to finance the loans to the nominated borrower, and Mr Samant and the other witnesses from BOI confirmed that without the use of these funds it would not have been possible to enter into the transaction.

© 2004 Sweet and Maxwell Ltd

A 31. There then follows in the telex Mr Samant's explanation for what had been proposed. He said this:

> 'BCCI is doing this obviously to show a good ratio of earnings against their advances. I do not think we should or even could go into detailed legal documentation because in the UK, no bank or licensed deposit taking company can afford to back out of its commitment in the eyes of Bank of England.
>
> B I would have myself gone ahead with this transaction in view of urgency but since there have been some misgivings in the past about BCCI in Head Office, I thought of seeking your prior approval.
>
> I recommend approval without any hesitation. BCCI is a very big, aggressive institution with 45 branches in the UK.'

There is no note of the conversations between Mr Samant and Mr Mewawalla, and we are C therefore dependent upon Mr Samant's evidence and such documents as do exist in order to try to reconstruct what passed between them. What is clear is that, if one looks at the proposals objectively for a moment without regard to what is said to have been discussed, they are on any view extraordinary. BOI, which had no real prior banking relationship with BCCI, at least in London, was being asked to lend £10 million to a borrower which was to be nominated by BCCI but was not identified. There was to be no documentation for the loan (despite its size) and therefore no facility letter or loan agreement. It was to be unsecured by any charge over an D asset of the borrower or the matching deposits which were to provide the funding. The only security was the letter of guarantee, the terms of which were misleading in that they indicated that BCCI had introduced to BOI a customer for a loan, whereas in fact the opposite was the case. The transaction was clearly driven by BCCI's desire to 'show a good ratio of earnings against advances' and not by any decision on the part of the nominated borrower to obtain an offer of finance. Mr Samant says that he was told by Mr Mewawalla or by someone at BOI that E the transaction involved replacing an existing loan to the borrower with a new loan from BOI for no apparent reason other than that BCCI wished to switch the loan to BOI. This was confirmed by the fact that BCCI would be worse off financially in that it would provide the funding for the loan via the deposit, but would earn 1/8 per cent less on the deposit than BOI was to receive from the borrower, whose payments BCCI also guaranteed. The transaction therefore made no economic sense whatsoever and was only explicable in terms of BCCI wishing to produce better year-end figures than could otherwise be achieved.

F 32. I heard expert evidence from two bankers, both with considerable experience. Both Mr Challoner and Mr Wragg were agreed that the transaction outlined in the telex to Mr Rao could not have justified a positive response on the basis of the information revealed. Even if one ignores the obvious artificiality of the proposal and concentrates on the borrower, it was impossible for BOI to form any view about the purpose of the loans or the borrower's standing. Mr Wragg said that it had all the appearance and characteristics of a vehicle. Notwithstanding G this, Maram (as it later turned out to be) was (on what Mr Samant says was his understanding of the arrangements) directly affected by the transaction in that it was, according to Mr Mewawalla's proposal, to terminate its existing loan facilities with BCCI and to enter into a new loan with BOI. This was not therefore a securitisation proposal in which Maram would play no part. The proposed transaction broke every rule of lending in the banker's book and that must have been obvious to Mr Samant, and for that matter to Mr Mewawalla, as experienced bankers. No-one has suggested that BOI conducted its banking business according to different H rules. Neither expert had ever seen or heard of a transaction of this kind in practice, and in a letter to solicitors written the same day Mr Samant himself described the proposals as an 'apparently strange deal'.

33. In these circumstances it must have been obvious to Mr Samant that this was not an ordinary loan transaction of any kind. Unlike in the SBI case, where the bank was approached by a representative of the borrower (Notan) for a loan on the basis that BCCI could not provide

it at the relevant time, in this case it was BCCI which approached BOI and made no pretence of the fact that the transactions were to be put in place solely for its own benefit. The borrower took no part in the discussions with Mr Samant which led to his recommendation of the proposal to head office and was not even identified. There were, therefore, two obvious questions which any honest and competent banker would have asked and would have required to know the answers to. The first was why BCCI required assistance in this way. The second was the status of the borrowing which BOI was being asked to take on.

34. According to the telex to Mr Rao of November 12, BCCI's proposal from Mr Mewawalla was only received that day. Despite the highly unusual nature of what was proposed, Mr Samant was prepared almost immediately to recommend acceptance by BOI. No enquiries were made about the borrower, the purpose or status of the existing loans, or the reasons why there was to be such a singular lack of documentation. The passage quoted from the telex also suggests, by the use of the word 'obviously', that the idea that BCCI wished to improve its earnings to advances ratio was one which Mr Samant came up with as an explanation, rather than one suggested to him by Mr Mewawalla. In an earlier statement of July 7, 1993, made to the police, Mr Samant makes no reference to the earnings to advances ratio point at all, but in his witness statement of January 26, 1998, in these proceedings he says that it was Mr Mewawalla who offered this explanation and sets out his understanding of what it meant. I shall come to this in a moment. When he was cross-examined about his discussions with Mr Mewawalla, he said that he had not immediately understood that the proposal involved the discharge of an existing borrowing. Not surprisingly, he was also puzzled as to why BCCI was prepared to forfeit a 1/8 per cent interest differential to BOI. To use his words, he therefore went a little deeply into it, and it was then that Mr Mewawalla came up with the improvement of the earnings to advances ratio as an explanation. Mr Samant says that he did not take much cognisance of this at the time because he trusted Mr Mewawalla and BCCI as honest, but on returning to the office he consulted his colleagues as to how this could be done, and they told him that the only way was for certain existing advances to be paid off, thereby increasing the earnings on the balance sheet day as a proportion of the advances remaining outstanding. He also said, however, that Mr Mewawalla himself confirmed that the borrower to be nominated by BCCI would be an existing borrower, so that the loan would be used over the year end to reduce that borrower's indebtedness to BCCI. He accepted that the arrangements were not entered into to suit the borrower's purposes as opposed to those of BCCI, but on the basis of the BCCI guarantee BOI was happy to take on what was for it a risk-free and profitable transaction.

35. At one point in the cross-examination the following exchange occurred:

> 'Q. But the reason that the transaction was being suggested by Mr Mewawalla was because it suited BCCI's purposes; it was not for any purpose, that you were aware of, of the borrower itself?
>
> A. No, I was not aware of the borrower then at all.
>
> Q. But you were not aware of any other purpose of the borrower; the only purpose you were aware of was BCCI's purpose of improving its accounts?
>
> A. My own purpose was to improve the deposits and BCCI wanted to reduce their outstandings on this particular borrower, who might have been overdrawn.
>
> Q. But they are not ultimately reducing their outstandings, are they? They are simply entering into a transaction which gives the appearance of reducing them for a few weeks over the year end and then they are to be restored, are they not, and that was your understanding of the situation?
>
> A. Yes, it was going back to the account that it will restore the position, or probably they may have arranged for any other thing that the deposit will go back to BCCI. They may have meanwhile submitted a proposal to the head office to increase the limit of the borrower, because Bank of India has done it fairly often for customers whose drawings

© 2004 Sweet and Maxwell Ltd

A were about the sanction limit. We have requested them to go to another Indian bank but of course we did not give any guarantee for that, that is all.

> Q. Indeed, as you understood it, this was to be a borrowing under which BOI, as the proposal was originally put to you, would have no recourse to the borrower?
>
> A. Yes, I agree with you. In the sense that as long as BCCI guarantee was there, we are not really worried about the borrower at all.'

B It is clear from these answers that, to use a phrase of one of the expert witnesses, Mr Wragg, the borrower added nothing to the credit standing of the transaction. Mr Wragg said that he would not have entered into the transaction on the basis proposed and that what was contemplated was unacceptable in banking terms. It was necessary to know the borrower. It was not appropriate to rely on BCCI's guarantee alone. In particular the reference to improving the earnings to advances ratio was not self-explanatory, nor was it obvious. His own analysis was that an improvement to the ratio (absent the removal of a bad debt) was only achievable if BCCI C retained a flow of income from the borrower as the price of obtaining a BCCI guarantee. This was not a feature of this proposal, but even then the improvement would have been only marginal. This is the response to the proposal I would have expected from an honest and competent banker, and the liquidators are therefore entitled to ask why it was not Mr Samant's response at the time. The answer he gave was in effect that he simply accepted the explanation he was offered, thought it made sense and, because the transaction was almost risk-free and D provided BOI with a £10 million deposit, was prepared to go along with it.

36. Throughout his evidence Mr Samant maintained a denial either that he thought or knew that the debts of Maram which were being transferred to BOI were non-performing or that he had reason more generally to suspect a fraud. In considering this evidence one needs, I think, to begin with the factual position in 1981 as we now know it to have been. Even by the time of the first transaction BCCI was faced with a considerable and significant deficit on the Khalil E accounts and Mr Akbar had embarked on the fraud with which this action is concerned. Unlike in the case of SBI, where steps were taken to give the appearance that the application for a loan was initiated and pursued by Notan, no such pretence was practised in this case. Mr Mewawalla obviously felt able (and it must have been with Mr Akbar's knowledge and consent) to use Mr Samant's request for a deposit as an opportunity to ask for a favour in return. It is not disputed that Mr Mewawalla made it clear to Mr Samant that this was a transaction for the benefit of BCCI, which had as its purpose the improvement of its accounts or F profits at the year end. It was not presented as a request by the borrower for a loan which BCCI could not fulfil, whether for capital adequacy or some other reasons. The borrower had no role of its own in this transaction and was quiescent. Mr Samant raised no objection to this because he was able to obtain the deposits he wanted, together with a modest profit on the transaction for little or no risk. BCCI provided the funding for the loan, a guarantee of repayment and would provide (as Mr Samant knew and accepted) the actual repayment of the loan by refinancing Maram's commitment after the year end. All that Mr Samant had to do was to G agree to take part in the transaction and to be able to persuade head office to allow the transaction to proceed. Mr Samant and the other BOI witnesses were at pains to emphasise that they relied on BCCI's guarantee and therefore were less concerned about the status of the borrower. In a memorable passage in his evidence Mr Samant said this:

> '. . . but the whole point again, look, as far as the London office was concerned and head office was concerned, the whole proposal was on the guarantee of BCCI, and who the H borrower was, was not really of any consequence at all in this transaction.'

But there is a world of difference between a loan to a borrower which, because supported by a bank guarantee, is risk-free and a transaction which, although in form a loan to a nominated borrower, is in reality and substance a loan to the bank itself.

37. It is not possible to be certain whether it was Mr Mewawalla or Mr Samant who came up with the improvement of BCCI's earnings to advances ratio as a reason for the transaction,

and ultimately it may not matter. I do not, however, believe that it came from someone in the A office of BOI in London. I think that Mr Samant's use of the word 'obviously' in the telex to head office of November 12 was designed to emphasise that this was an obvious and plausible explanation. The question is whether Mr Samant thought it was anything of that kind. There are a number of features of the evidence which are relevant to this. In the first place, it is clear that Mr Samant was not entirely at one with the explanation when he proffered it for the first time. Although he referred to BCCI wanting to show a good ratio of earnings to advances in his telex to head office, he wrote on the same day to the bank's solicitors, Lawrence Jones & Co, B stating that the deal was required by BCCI to show increased earnings on their assets. When cross-examined about this, he said that this was a mistake and that he had intended to refer in the letter to advances rather than to assets. Secondly, there is the expert banking evidence I have already referred to, which confirms that the improvement of the earnings to assets ratio could not have been achieved in this way simply by an amendment to the balance sheet and, more importantly, that the ratio of earnings to advances was not in use at the time as a measure of performance. Thirdly, there is the manner in which Mr Samant attempted to deal with this C point in his evidence. I would have expected him to have accepted that the explanation he gave to head office was (as we know) incorrect and to have explained why he came to be taken in by it. But what he in fact tried to do was to justify and support it as a possible explanation, when in fact it was not and could not have been correct.

38. In para.15 of his statement of January 26, 1998, he sets out an example to show what he D understood the earnings to advances ratio meant and how it could be improved by transferred debt prior to the year end. In a later witness statement he reaffirmed this evidence and said that the liquidators were wrong to say that the stated objective could only be achieved by a fraud. Mr Samant was cross-examined about this. When asked whether he was surprised to learn that there was no statement in BCCI's balance sheet or even in its profit and loss account of any earnings referable to advances, and that all that was shown were total earnings from all sources, he went back to saying that there had been no reason for him to look into it and that he relied on E Mr Mewawalla. He accepted whatever Mr Mewawalla said. But during August 1982, when consideration was being given to the request for approval of the second transaction, Mr Samant was asked by head office to send them a copy of BCCI's balance sheet for the year end 1981. On August 3 he telexed to Mr Rege what he described as the salient features of the balance sheet, including deposits, total assets and total income. It is therefore clear that in the run-up to the second transaction he was in possession of the balance sheet for 1981, which on Mr Mewawalla's account of matters had been subject to modification as a result of the first F transaction. He was then asked by Mr Purle to confirm that there were no figures in the 1981 balance sheet from which one could derive any ratio of earnings referable to deposits against the deposits during the year or any figure for earnings referable to advances. He had to accept that the figures in the balance sheet did not provide this information, but said he relied on what Mr Mewawalla had told him. When it was put to him that this could not be right, because he had actually looked at the balance sheet in 1982 and extracted figures such as the profit before G tax, he said that he had only looked at the balance sheet for the purpose giving the salient figures to Mr Rege. He was then asked to look at the statement in the accounts that the operating results expressed profits as a return on average assets. It was put to him that the use of averages over the year as the basis of assessing any profit return was absolutely standard. His response once again was that he simply relied on Mr Mewawalla.

39. Mr Purle then took him to the passage in his witness statement which I have referred to, where he seeks to explain how the ratio of earnings to advances could be improved by what was H done. It was put to him that if one is dealing with average advances over the year, the only way in which the ratio of earnings to advances could be improved was by taking a bad debt off the books of BCCI. Mr Samant strongly denied that anything of the sort had been suggested to him, but accepted (as he had to) that Mr Purle was technically correct. He said that he had proceeded on the assumption that BCCI would not do anything dishonest, because their

© 2004 Sweet and Maxwell Ltd

auditors would review the transaction. He also proceeded on the basis that the ratio would be calculated as at the year end and not by reference to an average over the year. Hence the explanation in his witness statement.

40. I found all of this completely unconvincing. Mr Samant's evidence started on the footing that he understood the improvement of the ratio of earnings to advances to be a plausible explanation for what was being done. At one point in his evidence (on day 4) he said that he thought at the time that this could be the only possible reason for the transaction. When, as I have indicated, it was put to him that it was in fact implausible and did not square with the way in which BCCI's balance sheet and accounts were prepared, he then changed his position and took refuge in saying that he simply accepted what Mr Mewawalla had told him unquestioningly. This is not, however, consistent with the fact that he looked at the 1981 balance sheet and accounts in 1982, at a time when head office was considering the proposal for a second transaction, and was clearly able to see from the way in which the accounts were prepared that Mr Mewawalla's explanation made no sense unless the loans to be removed were non-performing. Mr Samant gave no credible explanation as to why the points put to him and readily accepted by him during cross-examination were not obvious to him in 1982. To say that he simply relied on Mr Mewawalla is not an answer to this point. I do not believe that Mr Samant would not have looked at the 1981 accounts with these questions in his mind, particularly in the light of the questions which head office was raising. As I shall come to later, when I consider the second transaction in more detail, there is evidence that not everyone at head office was happy with the explanation which had been offered. There is an internal head office memorandum on which the executive director of BOI, Mr Shukla, has written a note (dated August 2) to Mr Rege, the general manager in Bombay of the International Division, stating the board 'will require "real" reason for this arrangement'. Mr Rege is incapacitated and we have no evidence from him. But it seems reasonable to assume that the request for the 1981 balance sheet was not unconnected with the board's desire to understand what was going on. Mr Samant said that he did not recall Mr Rege raising the query directly with him, but what he did say was that it was apparent on the figures extracted from the balance sheet that the conversion of even £25 million from an advance to a bank deposit would have no real impact at all on the balance sheet. When it was put to him that the explanation he was offering to the bank did not hang together, he hesitated and merely repeated that this was the reason he had been given by BCCI. There was no attempt to address Mr Purle's question at all.

41. On the same day (November 12) that he sent the telex to head office, Mr Samant also wrote to Lawrence Jones. His letter refers to a telephone conversation the previous day. This letter contains the description of the 'apparently strange deal', but explains it by reference to BCCI's need to show increased earnings on their assets. It is important to note that the solicitors were not asked by Mr Samant or anyone else at BOI to comment on the desirability or correctness of what was proposed. They were asked only to confirm whether the amount of the loan would be recoverable from BCCI on the basis of the terms of the draft letter of guarantee in the event of the borrower not executing any documents. A response was required by the following day. They replied on November 13 in negative terms. They advised that the guarantee should be under seal and that the statutes of BCCI should be examined in order to confirm that the guarantee would not be *ultra vires*. In relation to the absence of documents from the borrower, they said this:

> '3. We note that so far as your Bank is concerned, you would not receive from the Borrower any signed document whatever. We comment it is exceedingly curious, and we would think most unusual, for a Bank to allow a loan facility without receiving in return any document from that Borrower. It seems to us that you would be hard put to recover the loan from the Borrower without any written documentation, and without any acknowledgment of loan. We doubt whether your Bank would be prepared to accede to such an arrangement whether or not there was any satisfactory guarantee backing you, whether from BCCI, or elsewhere.

23-01165-mew Doc 67-5 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (4) Pg 165 of 198



> 4. We note that on the terms proposed the Borrower can repay on one month's notice, but in your turn you do not seem to have the right to repay early BCCI. Thus you might be left with £10M and be unable to place that money at even Natwest Base Rate. A
>
> 5. We note that your Bank would not receive any security from the Borrower, and that the only security offered by BCCI is their guarantee. In regard to that guarantee we think that at the moment there is insufficient rights for your Bank to set-off your Bank's obligation to repay on the due date against that guarantee. B By this we mean that BCCI will call for their funds which may not have been repaid to you by the Borrower and the guarantee, certainly in the form currently suggested, would in our view be ineffective as a "defence" to repayment.'

42. On November 16 Mr Samant replied to Lawrence Jones. He queried the suggestion that the guarantee would not be supported by consideration unless under seal and made the point that BCCI would not appreciate checks being made into its capacity to give a guarantee. On the question of documentation he said this: C

> 'On receipt of your considered opinion, I have discussed the matter with BCCI and they are agreeable to have a letter of request for a loan as well as any other simple security document executed by the borrower. Such borrower is likely to be a corporation (i.e. a limited company).
>
> As regards the period of deposit from BCCI and the period of advance to BCCI's customer, I had already advised BCCI that it will be the same in all respects but I am D sorry I did not mention it in my letter to you. In brief, if the deposit is for three months the advance will also be for three months and there will be no option in favour of BCCI.
>
> In order to ensure there is no outlay of funds from our Bank, I have arranged with BCCI that they will lend us £10 million (which will be a deposit in our books) which in turn will be lent to the nominated customer of BCCI. If this amount is placed under our lien by BCCI, it will be reflected in their Balance Sheet and will not achieve the purpose for which this transaction is undertaken. E I would, therefore, confirm that we certainly *will not* have the right of set off.
>
> I would, therefore, request you to draft for our Bank the minimum possible security documents to be executed by the borrower as well as by the guarantor, BCCI, as you deem fit to ensure the safety of the transaction. However, BCCI will not execute a guarantee under seal.'

F Mr Samant was asked about this request that the solicitor should draft the 'minimum possible' security documents. He accepted that this came from BCCI. When asked why it should be the minimum, he said that this meant only that the documents should be simple. But that is not what his letter said and I regard his explanation as untrue. The real oddity about this is that BCCI should have dictated the form of security to be given by the borrower at all. It simply went to emphasise how artificial this arrangement was and the extent to which BCCI was (and appeared to Mr Samant to be) in control of Maram and the whole transaction. G

43. Mr Samant's telex of November 12 and a copy of his letter of November 16 to Lawrence Jones were sent to Mr G K Rao, the chief manager of the International Department in Bombay. He responded on November 17 to the solicitors' advice that there would be no right of set-off. In the light of this, head office required there to be on record a suitable request from the borrower for the loan, stating that it would be guaranteed by BCCI. The document was to be drafted by Lawrence Jones. The telex set out two other important requirements: H (i) that the borrower was to be approved by BOI, and (ii) that this was to be a one-time transaction and should not be treated as a regular arrangement. It looks from an annotated version of the November 12 telex, on which the comments of head office are typed, that Mr Rao and Mr Mitra recommended the proposal for consideration when it was received, but that queries were then raised. There was a note written by Mr Vaidya (one of the general managers) on November 13, asking whether BOI should do this for 1/8 per cent profit. He was not in favour.

© 2004 Sweet and Maxwell Ltd

A There is also a note from Mr Shukla, the executive director, asking to discuss the matter with the chairman and managing director, Mr Vaghul.

44. Mr Rao's telex was responded to by Mr Samant on the same day. He confirmed that there would be a letter of request and resolution from the borrower company and that BCCI would execute a letter of guarantee, to be drafted by the solicitors. They would also draft a simple security document for execution by the borrower. In relation to the request for the B borrower to be approved Mr Samant said this:

> 'The borrower is a Grand Cayman company of a big Middle Eastern group banking with BCCI. The company (borrower) has only a nominal capital like any other tax haven company and its name will really signify nothing much to us.'

Although the telex does not say this, all the information in this paragraph came from Mr Mewawalla. Mr Samant did not yet even know the name of the borrower and had made no enquiries about it. Mr Purle put it to him that despite head office's request he was not C concerned about this. He said that he was given the information about the borrower by Mr Mewawalla and it was good enough for him and the bank. But head office was not informed that the information had not been independently verified.

45. On November 18 Lawrence Jones confirmed its advice that the BCCI guarantee should be under seal and covered by a certified board resolution. They enclosed a copy of the borrower's letter of request, but no security document. By now Mr Rao had drawn up a D document summarising the points raise by head office in his letter of November 17, together with the responses to the points from Mr Samant. These included the information about the borrower and the statement that the borrower would execute a security document. On the basis of these responses Mr Rege agreed to the transaction on a one-time basis and approval was given by Mr Vaidya, Mr Shukla and Mr Vaghul. Mr Samant was informed of this in terms on November 19. Mr Vaghul said that it was for Mr Samant to identify the borrower and he assumed that this had been done. The security document was never executed, nor was the E guarantee under seal. On November 24 Mr Samant sent a memo to Mr Chatterji, who was responsible for implementing the transaction at the London branch. It asks him to contact Mr Mewawalla to try to secure a guarantee under seal. If BCCI was unwilling to give a guarantee under seal, Mr Chatterji could accept a guarantee without a seal, subject to advice from Lawrence Jones. He was also asked to remind them to prepare the security document, which they appeared to have overlooked. In para.9 of the note he said this:

F

> 'Since the amount involved is large, please consult the solicitors at each stage and enter into the deal only after the documents are executed according to their satisfaction. I understand that 2 or 3 other banks have already completed similar deals with BCCI against a simple letter from BCCI as indicated in my telex of 12th November 1981.'

A copy of this document was sent to head office.

46. On November 26 Mr Chatterji wrote to Lawrence Jones as requested. He had by now G been supplied with a copy of the memorandum and articles of association of Maram and enclosed them, together with a copy of the draft board resolution and the letter of request. He also supplied a copy of the proposed letter of guarantee from BCCI (not under seal). Nowhere in the letter does he raise the question of the borrower's security document, nor was the board resolution of BCCI obtained. Mr Chatterji has produced a medical certificate. He is unwell and was unable to travel to London to give evidence. He did produce a witness statement dated July 1, 2002, based on the documents addressed to or initialled by him, but he says he has no H independent recollection of the first transaction, which was the only one in which he was involved. His evidence is of very little assistance. It does not deal with his failure to obtain the security document, but does say that he would not expect Mr Samant or BOI to get involved in a fraud. None of this really helps me to resolve the issues in this action. Mr Samant accepted that he did not pursue the requirement for the guarantee to be under seal. But he could not explain why Mr Chatterji had not requested a board resolution from BCCI or why he had not

come back to Mr Samant on the point. He would have expected Mr Chatterji to have raised with him any variation in the instructions contained in the November 24 memo. He volunteered, however, that BOI would not have provided such a resolution itself, and I can understand why. It seems to me that it would be most unusual in the case of an inter-bank guarantee for this to be requested or done. In relation to the security document Mr Samant said that he would have expected Mr Chatterji to come back to him if he had any difficulties in getting the document. He does not remember if this occurred. It is clear from Mr Chatterji's letter to Lawrence Jones that he had held discussions with Mr Mewawalla, and this is likely to have resulted in the dropping of the requests for a board resolution and for the guarantee to be under seal. It seems to me also highly probable that the security document was also abandoned as a result of the same discussions. That seems to me much more likely than that Mr Chatterji simply forgot to raise it with the solicitors in his letter of November 26. This is confirmed by the fact that on November 27 Lawrence Jones wrote back to Mr Chatterji confirming that the documentation supplied was in order. Two paragraphs in the letter are important:

> '3. We agree with the Board Resolution as amended by you, assuming you are satisfied that Mr Khalil is a Director of the Company, and that you are satisfied that the Borrower Company remains properly constituted (we understand from our telephone conversation, that you are prepared to rely on BCCI on these points with which we concur).
>
> . . .
>
> 6. With reference to your penultimate paragraph, please refer to paragraph 6 of our letter of the 18th November, pointing out that the Bank of India will have no security from the Borrower Company, although you will of course have the guarantee of BCCI.'

47. It is clear from this that Mr Chatterji had spoken to Mr Mewawalla and had told Lawrence Jones that no further enquiries need be made about the capacity of Maram. Paragraph 6 is confirmation that no mention was made to the solicitors about a security document from the borrower. On the same day Mr Chatterji wrote to Mr Mewawalla, forwarding the approved drafts of the BCCI letter of guarantee and the letter of request and board resolution of Maram. No reference is made in this to any other document. The changes in the documentation expected by head office were not merely matters of administration which Mr Chatterji could be left to deal with on his own. It seems to me inconceivable that Mr Chatterji would not have come back to Mr Samant and informed him that Mr Mewawalla was unwilling to give the guarantee under seal or the resolution. The same goes for the security document. I do not believe that it was left out due to an oversight. The memorandum to Mr Chatterji of November 24 had been copied to head office to provide some assurance that the necessary precautions were being taken in relation to a transaction which had only been approved on the basis of the solicitors' advice about documents being followed. There is no evidence of anyone at head office being consulted about the changes agreed with Mr Mewawalla or even being informed about them.

48. Of those at head office at the time, I heard evidence from Mr Mitra and Mr Rao and also from Mr Vaghul. Mr Vaidya is now deceased and Mr Rege is unwell and has provided no evidence. There is a witness statement from Mr Shukla, which was admitted on the basis that he is overseas in India, but he also produced evidence that he is in poor health and unable at the moment to travel. This medical evidence was challenged by Mr Purle, but it is not possible to take the matter beyond the doctor's confirmation of Mr Shukla's condition. His evidence is therefore contested. There are a number of recurrent themes in this evidence. As I have indicated, all the BOI witnesses were keen to stress that although the BCCI deposits provided the funding for the loans, there were no liens nor any rights of set-off, and BOI therefore relied solely on the guarantee. This evidence was partly directed to rebutting a particular aspect of the liquidators' case, which is that the reality of the transactions was that the loans were made against the deposits and ought not therefore to have been shown or characterised as free

© 2004 Sweet and Maxwell Ltd

A deposits by BCCI. This has echoes of a similar argument raised by the liquidators in the SBI litigation and it has a sequel in this case also, because in 1984 one of the general managers of BOI specifically queried why the bank did not enjoy a banker's right of set-off in relation to the BCCI deposits.

49. It is clear that BCCI was never willing to create a formal lien over its deposits. The experts were agreed that no bank creates charges over its assets, for obvious reasons of commercial credibility. But in this case the argument presented in terms to Lawrence Jones by Mr Samant was that any lien would have to be noted in the accounts and would therefore defeat BCCI's ability to treat its deposits as free placements. This in fact supports the view expressed by Mr Dyson and Mr Preece in the accountants' report they have prepared, that if under lien, the deposits would have to be set-off against the corresponding indebtedness. I shall come back to this point later in this judgment, but I mention it at this stage only to note that it is ultimately a side-issue. The real point to be made about these transactions (which none of BOI's then senior management was prepared to deal with in his evidence in terms) is that in substance, even if not in form, the transactions were circular. They all involved using BOI money to fund loans to Maram which would then be repaid with refinancing from BCCI. This is a bigger and more fundamental point than whether or not there was technically a lien or a right of set-off and therefore security from BCCI. The case against BOI is that the arrangements were, on the basis of what they knew, entirely artificial. They did not involve any real transactions with Maram at all, even though a legally enforceable loan came into existence. To use an analogy from a different branch of the law, the back-to-back transactions were all circular and preordained, and Mr Samant and BOI knew this.

50. I have already examined Mr Samant's explanation as to why, at the time of the first transaction, he believed that the purpose of the arrangements was legitimate and not fraudulent. But what of his superiors? Mr Mitra and Mr Rao put the proposal up for consideration by the executive director and chairman. Their evidence is that they saw no reason to reject it at that stage. Mr Mitra accepted that the bank was entirely dependant on BCCI's guarantee. He knew of no other case in which the borrower was to execute no documents. Nor was it obvious to him that the explanation was the improvement of BCCI's earnings to advances ratio. He said that he gave no real thought to what this meant and simply accepted it. He said that it was a window-dressing transaction. It was not something he was entirely happy about, but it was going on at the time on both sides. However, on the second day of his evidence he said that it was not window-dressing, but rather a deposit with a spread that was attractive to BOI. I regard this further evidence as unrealistic and an attempt to row back from his earlier concession that these were artificial transactions. But I am not persuaded that he had a complete picture of what was going on at the time or considered the implausibility of BCCI's explanation for the transaction. I accept his evidence that he really took what Mr Samant had told him at face value. When Mr Purle took him to BCCI's balance sheet and accounts, he readily conceded that it was not possible to extract a meaningful ratio from the information provided, but this was not an exercise he carried out at the time. As far as he was concerned, it was for others to make the enquiries.

51. Mr Rao also had difficulty about recalling the transactions without reference to the documents. His written evidence is therefore largely a process of reconstruction and says virtually nothing about the issues which have arisen. All that he does is to produce the documents. He does, however, say that back-to-back transactions were normal at the time, and he was asked about this. It emerged that what he was referring to were money-market transactions involving the exchange of deposits, which the experts agreed was a form of window-dressing at the time. Their evidence was that window-dressing did not involve (as in this case) a transaction with a customer. The only example of this known to Mr Wragg involved Japanese banks who did transfer customer loans. But these activities did not take place in London and were not therefore subject to the same regulatory control. Nor was there any suggestion on the part of BOI's witnesses that they were aware of these at the time of the

arrangements with BCCI or were influenced by them into thinking that what BCCI proposed A
was in any sense a normal commercial transaction. The only justification head office was offered was that provided by Mr Samant.

52. Mr Rao was asked by Mr Purle about the requirement of head office that the borrower should be approved. He said that this was for the London branch to carry out. He was also asked about the references to the transactions being intended to improve BCCI's earnings to
advances ratio. He was unable to explain how this could be achieved, and I do not believe he B
gave any real thought to it at the time or formed any view about its plausibility. Like Mr Mitra, it was for others to do that. I accept his evidence on these points.

53. Mr Vaghul was also asked about his understanding of matters at the time of the first transaction. Like Mr Rao, he says in his witness statements that he has no independent recollection of the transactions and most of his evidence consists of reconstruction from the documents and assumptions by him as to what he is likely to have thought or done at the time.
In his most recent witness statement he says that he would have accepted Mr Samant's C
explanation for the first transaction on the basis that it had been checked by senior managers at the bank. He had, he said, no reason to suppose that BCCI was fraudulently manipulating its accounts. He accepts that he gave approval for the first transaction under his delegated powers on November 19, 1981. His oral evidence was that it was likely that Mr Shukla would have been asked to talk to Mr Samant about the transaction prior to November 19 and that it would
then have been discussed with him at board level. He has no recollection of such a discussion. D
He was, however, clear that head office did not accept that the borrower should execute no documents and wanted the borrower to be approved. He and the other senior executives accepted what Mr Samant told them about the borrower and assumed that if BCCI was to guarantee the loan, it was a substantial organisation. Mr Samant was left to work out the details. Of course that is not a real answer to the failure to make status enquiries of the borrower, because BCCI was not only to guarantee the loan, but also to finance its repayment.
Its guarantee was therefore meaningless as a warranty of the creditworthiness of the borrower. E
As Mr Samant knew and Mr Vaghul should have realised, the loan would be repaid regardless of the quality of the borrower's covenant. Mr Vaghul accepted that he knew that the purpose of the transaction was to allow BCCI to take some loans off its balance sheet and to convert its liability into a contingent one under the guarantee. Unless the loan was non-performing, no provision would have to be made in the accounts for the liability, even if it was disclosed, and by the time that the accounts came to be certified the auditors would know that the loan had
been repaid and the guarantee liability extinguished. F

54. Mr Vaghul was pressed by Mr Purle about Mr Samant's explanation for the transaction. He accepted that a meaningful ratio of earnings to advances would need to be based on average figures, but maintained that at the time there was no set formula or method for calculating profit ratios. One possibility was a calculation from year end to year end. Ultimately, however, he and the others acted on what Mr Samant told them. On the basis of this explanation and the security
offered, they were prepared to go ahead. I think that much of Mr Vaghul's attempt to G
rationalise BOI's thinking on this matter is in the nature of an *ex post facto* rationalisation of the decision to go ahead. What he did not address in his evidence was the obvious unease on the part of some officers, such as Mr Vaidya and perhaps Mr Shukla, about what was proposed. I do not accept that this was solely attributable to a longstanding complaint about BCCI poaching BOI staff. I think that there was a genuine concern about the motives behind the transaction and its obviously unorthodox nature. But I do not believe that Mr Vaghul
necessarily thought at this time that the transaction was obviously wrong or in any sense H
dishonest. I think that despite some misgivings head office was prepared on balance to allow the transaction to go ahead on the basis of the conditions set out in Mr Rao's telex and on the footing that the transaction would not be repeated. The latter condition is, I think, significant. For the purpose of the first transaction, therefore, they were prepared to accept Mr Samant's explanation at face value, despite their doubts to the contrary.

© 2004 Sweet and Maxwell Ltd
bcp2004 bcp 265 Mp 436—bcp23075

A 55. As already indicated, the first transaction was completed on December 2, 1981, by the placement of the £10 million with BOI in London, maturing on March 2, 1982. Mr Akbar signed the BCCI letter of guarantee on November 30, referring to its having 'introduced' Maram to BOI. The Maram letter of request (dated December 1) bears the signature of Mr Khalil, with a direction to remit the loan moneys to BCCI in Leadenhall Street 'for credit of our £ Account No 01024640' with them. The BOI cheque of December 2 is made out to this account and was signed by Mr Chatterji and Mr G B Sule, who worked in the Advances B Department as an accountant. On the same day Mr Rao was notified that completion had taken place. The terms of this telex refer to the BCCI deposit and to BOI's 'lending there against'. This was relied on by the liquidators as a recognition that the deposits were, or were regarded as, security for the loan to Maram despite the earlier emphasis on there being no lien. Other internal records are consistent with this. There is an account statement for BCCI Overseas in respect of the first deposit, on which Mr Sule has written 'under lien for loan'. When the loan and the deposit became due for repayment, Mr Samant's secretary noted a telephone C conversation with Mr Mewawalla in which he requested 'both amounts payable by us and by them'. The reference to 'them' is relied on as indicating that the repayment of the loan and the deposit were linked, but it is also some evidence that Mr Mewawalla had no difficulty in referring to BCCI as the effective source of repayment of the loan. Maram Trading was apparently not mentioned. Mr Samant requested the figures from Mr Sule and asked him to give them to Mr Chatterji, who would speak to Mr Mewawalla. There is no record of any D attempt by BOI to request payment of the loan from Maram or even to contact Maram directly in the Cayman Islands. The reversal of the entire transaction was handled in London between BOI and BCCI.

56. After repayment had taken place Mr Samant sent a memorandum to head office advising them that he had 'squared' the transaction between BOI, BCCI and Maram. The memo is headed 'Deposit of £10m loan from BCCI and lending there against'. This same E description reappears in both the second and the third transaction in BOI's own documentation. Mr Samant said that Mr Sule's note about a lien was a mistake (which it clearly was), but there is a more general point to be made in respect of this material. What it shows is that Mr Samant and others at BOI did clearly look at the deposits as a source of repayment, even if technically there was no lien or even a right of set-off. Although Lawrence Jones were concerned about the security for the loan, Mr Samant was well aware that in practice there was no risk (absent perhaps the total collapse of BCCI). These arrangements were put in place to assist BCCI in the F presentation of its financial position. Although a guarantee was given for the loan to Maram, it was inconceivable that BCCI (with or without a guarantee) would not ensure that the loan would be repaid. This had nothing to do with the regulatory consequences of failing to honour a guarantee in the City of London. It was simply that BCCI would not wish to renege on an arrangement of this kind, which was not in any real sense a commercial transaction, but rather a private arrangement designed to assist BCCI in a way which it would not wish to have publicly G scrutinised. As already explained, BCCI was, and was always regarded as, the only source of repayment for the Maram loan, and BOI's own documentation simply recognises this.

*(b) The second transaction*

57. The first document relating to the second transaction is Mr Samant's telex to Mr Rege of July 20, 1982. It refers to recent discussions he had had with BCCI and to a proposal from H BCCI for a deposit of £30 million for four months at 12 per cent per annum, with a corresponding loan to 'the borrower nominated by them' at 12+1/8 per cent. The telex goes on:

> 'There will be a letter of request from the borrower (off-shore company), board resolution etc. The advance will be guaranteed by BCCI. We will ensure that deposit and advance will be for matching period. The entire documentation will be finalised by our solicitors.

> You are aware that last year, Head Office had kindly approved such a deal at my request for pounds ten million. I would recommend pounds thirty million this year because: A
>
> (1) The amount will be "pure" deposits
>
> (2) We get 1/8% interest differential without any outlay of funds.
>
> BCCI is a big, aggressive institution with 45 branches in UK. BCCI is doing this deal obviously to show a good ratio of earnings against their advances. Recommended.' B

In response to this Mr Rege and Mr Mitra prepared a memorandum for the board, which contains the figures extracted from BCCI's balance sheet and accounts for 1981. In para.6 of that memorandum they said this:

> 'The BCCI proposal now under consideration will result, without any outlay of funds on our part, in an income of about £12,500 (Rs. 2 lacs app.). Having regard to the attractive return and risk-free nature of the proposition, we recommend that BCCI offer be accepted.' C

58. The memorandum is dated August 2, but looks to have been circulated to the board on August 9. It contains a summary of BCCI's 1981 results, which Mr Samant had also telexed and air-mailed to head office on August 3. The profit before taxation figure of US$124.7 million is taken from the Consolidated Statement of Earnings in the annual report of BCCI Holdings. It is this document which Mr Purle put to Mr Samant (see para.38 above) and which, under the heading 'Operating Results', states that: D

> 'This profit expressed as a return on average shareholders' equity for the year was 20 per cent, while pre-tax profits produced a return of 2.06% on Average Assets for the year.'

59. The board of BOI met on August 9 and approved the proposal for the loan and matching deposit over the 1982 year end on the terms set out in the memorandum of August 2. Prior to the board meeting Mr Shukla and Mr Vaghul had discussed and agreed to the transaction, but, as already mentioned, Mr Shukla had initially expressed doubts and had told Mr Rege that the board would require to know the real reason for the transaction. This occurred on August 2. Mr Rege then contacted Mr Samant and on the same day he telexed back what he described as the 'salient features' of the accounts. As I have already indicated, I am not persuaded that Mr Samant did not look at the BCCI annual report or that he failed to notice that the explanation given by Mr Mewawalla was inconsistent with the material available in that document. I say this because what prompted his sending the accounts material to head office was clearly the query raised by Mr Shukla. Mr Samant says that he did not discuss the matter directly with Mr Shukla and there is certainly no evidence that he did so. But it seems to me highly probable, and I find, that Mr Rege did raise the point with Mr Samant in their telephone conversation on August 3. This was, after all, the purpose of Mr Rege's call. Head office already had the details of the transaction from Mr Samant's earlier telex and from Mr Rao's memorandum. Mr Samant said that he had no recollection of this. He said that the only explanation for the transaction was the one he had already given to head office. But it was of course this explanation which Mr Shukla had not accepted as real, presumably on the basis of his own consideration of BCCI's year-end figures and the minimal impact which a transfer of even £30 million worth of debt would have on the balance sheet figure for total advances of US$3.133 billion. I consider that Mr Samant certainly did discuss this matter with Mr Rege on the telephone and that, faced with Mr Shukla's query, he was almost certain to have, and did, look at the annual report with those points in mind. E F G H

60. There is no other documentation to explain what happened at the board meeting or in any prior discussions involving Mr Shukla. The board resolution of August 9 makes no mention of this matter, but simply approves the transaction on the basis of the information previously supplied by Mr Samant. During the trial Mr Hirst produced a witness statement

© 2004 Sweet and Maxwell Ltd

from Mr Shukla, made on November 24, 2003, and sought permission to adduce it in evidence. I allowed it in, subject to reserving my decision on what weight, if any, to give to it. It was accompanied by the medical evidence to which I have already referred, stating that Mr Shukla (who is now 76) suffers from hypertension and has been advised not to travel. A suggestion that he should give evidence by video link was also rejected. In his witness statement he denies any dishonesty on his own part. He says that it is extremely difficult to recollect what happened, but that he may be able to reconstruct events from the documents. In para.8 of the statement he refers to Mr Samant's explanation for the transaction (*i.e.* the improvement of the earnings to advances ratio) and says that he cannot recall his understanding of it at the time. He says that he now thinks that it means a transfer of assets from BCCI's books which would reduce the outstanding at the year end, giving a better interest spread against advances. This is the same explanation as Mr Samant gave in his witness statement. He disagrees with the suggestion that the explanation was either implausible or dishonest.

61. In relation specifically to the second transaction and the memorandum of August 2, Mr Shukla says that he cannot now recall why he wrote the reference to the board needing to know the real reason. But he says that the fact that the note is crossed through means that he had obtained a satisfactory answer from Mr Rege. He does not remember what it was. There is therefore no evidence from Mr Shukla of any positive recollection that the point was in fact answered at all, although it is clear from the documents that it was raised. I regard his statement that Mr Samant's explanation was neither implausible nor dishonest as little more than an assertion and it is inconsistent with the fact that at the relevant time Mr Shukla was far from satisfied that the explanation was either plausible or correct. Mr Vaghul, when asked about this on day 12 of the trial, accepted that the removal of even £30 million worth of loans from the balance sheet would not have any serious impact on the apparent earnings from a loan book of US$3.133 billion. But that was not, he said, the central point in the decision-making process:

> '. . . The central point in our decision-making process was not the reason why BCCI was doing this transaction, but the proposal essentially consisted of two sets. One is a loan to be given to a borrower to be guaranteed by BCCI with funds being provided by BCCI, for a matching period, to Bank of India. That proposal was standing on its own merits, regardless of the reasons advanced by the BCCI for doing this transaction. I would submit that on a hypothetical basis, if a proposal had come from Mr Samant making a proposition that: I have received a proposal to this effect, namely BCCI wants us to lend the money to a borrower to be introduced by them, for which they are willing to provide a guarantee and for which they are also willing to fund us for a matching period with an interest differential, we would still have approved of the transaction.
>
> The question of what were the objectives of the BCCI in doing this transaction to my mind are incidental to the transaction and not the central issue in our decision-making process.
>
> Q. But if you were given no reason you would want to know why on earth is BCCI doing this, would you not, to satisfy yourself that you were not getting involved in anything improper?
>
> A. Certainly, sir, we would have, and that satisfaction was provided when Mr Samant had given this explanation, which on a prima facie basis seemed to make sense to us.'

A little later in his evidence, however, he said this:

> '. . . When this reasoning was given we applied a simple arithmetic, namely this is what – I must at this stage say, sir, when we looked at that statement in 1981, we looked at that statement on the basis of a set of knowledge and beliefs which we had at that particular time, compared to the set of knowledge and beliefs which we have today. Today our knowledge and beliefs is based on the fact that BCCI committed one of the most massive frauds in the banking industry. It was hiding certain transactions from their auditors, it was not entirely truthful in whatever they were saying and some of its executives were

> also guilty of fraud. But in 1981, when we did the transaction, we operated on a set of knowledge and beliefs based on the fact that BCCI was a very respectable and responsible bank, based in London, which was considered to be the Mecca of the financial centre of the world, and secondly, it consisted of very competent professionals, some of whom were drawn from the Subcontinent and whom many of my colleagues knew to be very competent. And thirdly, when they make a statement there is no reason for us to believe that a respectable bank managed by responsible officials would like to make a statement which is neither truthful nor factually correct and we, looking at it from the head office, there was no reason for us to subject the statement to such intense scrutiny as is being done today on the basis of knowledge which was gained through a period of two decades.'

62. He was also asked about the discussions prior to the board resolution of August 9. He accepted that Mr Shukla must have had doubts about Mr Samant's explanation and he thought it likely that he had a discussion with Mr Shukla and Mr Rege about it. He could not recall the details of the discussion, but he denied that he would have allowed matters to proceed if there were doubts which could not be resolved. The explanation, if any, given to Mr Shukla therefore remains a mystery. What, however, is clear is that Mr Samant's justification for the transaction was not initially accepted, even though approval was subsequently given. I shall deal later with the allegation made by the liquidators that this indicates that both Mr Shukla and Mr Vaghul were dishonest, because they must have realised that what they were being told by BCCI was untrue, but nonetheless decided to go ahead.

63. When on August 12 Mr Samant learned that the transaction had been approved by BOI, he sent a telex to Mr Mewawalla, who was then in Bombay. It read as follows:

> 'Dear Homi
>
> Reference our … discussion, my bank agreeable up to pounds 30 million (sterling pounds thirty million). Please keep your London office informed.
>
> I read in the press that you are painting the town red. How is Roshan? Our gang misses you both.'

Mr Mewawalla replied:

> 'Many thanks yr tlx 12th Aug. Happy to know that you hv lined up arrangements as discussed. Shall conclude deal in 2nd week of Sept upon my return to Ldn.
>
> Heartiest congratulations on your promotion as DGM.'

I have referred to these simply to note the closeness and familiarity which existed between the two men at the time. Mr Samant then proceeded to contact Lawrence Jones. He wrote to them on September 14, referring to BOI's intention to carry out an 'exactly similar transaction' with BCCI and asking them to check the documents used on the previous occasion. The intention was to complete the transaction in about a week's time. By now Maram had been identified as the borrower. The letter of request and board resolution were prepared in the same form as before by Lawrence Jones and a complete set of the documents was sent by courier to Mr Mewawalla at BCCI. As in the case of the first transaction, he was the only person with whom BOI communicated. There was no direct contact at all with the borrower. The amount of the deposit and the loan changed, however, to £25 million. There is no explanation for this in the papers and it was not referred back to head office. Completion took place on September 22 and both the loan and the deposit were repayable on January 22, 1983.

64. Mr Samant said that he did not know why the figure was reduced from £30 million to £25 million. He was also asked about another curiosity. In BOI's records there is a credit advice prepared and signed by Mr Sule which records a deposit of £25 million from Maram Trading. This is then shown as debited with a loan in the same amount, also to Maram. Mr Samant said that this was a mistake by Mr Sule and I accept that.

© 2004 Sweet and Maxwell Ltd

A *(c) The third transaction*

65. On October 7, 1983, Mr Samant notified head office that he had received a proposal from BCCI for a deposit and matching loan of US$60 million for a period of three to six months. The telex is in essentially the same form as the one sent to Mr Rege on July 20, 1982, including the reference to the 'obvious' reason for the transaction. At the time £25 million equated to about US$43 million. A loan of US$60 million was therefore a significant increase on the previous year. Mr Samant said in evidence that he was still meeting Mr Mewawalla regularly at this time. Maram was likely to be the borrower, but Mr Mewawalla asked him (as on previous occasions) to obtain what Mr Samant described as an omnibus sanction for the loan: *i.e.* one which was not limited to an identified borrower. It would then be possible to change the proposed borrower without needing to obtain further approval from head office. I accept that this was the basis on which Mr Mewawalla and Mr Samant sought sanction for the transactions, but it is a yet further indication of how unrelated lending was to the borrower which BCCI eventually nominated.

66. The other point which was put to Mr Samant in relation to the third transaction was that he was aware by now that the loans to Maram were increasing with every year. This of course continued to be the case. The fourth transaction was for US$75 million and the fifth and sixth transactions were for $50 million, although Mr Samant had sought head office sanction for $100 million and had been given sanction for $75 million. He was asked whether this suggested the existence of a problem with the Maram debt. His answer was that this never struck him or anyone at head office at all, because BCCI was considered to be one of the premier banks. Although it is not possible to find, on the evidence before me, that BCCI had a dubious reputation in the City, it was clearly not in any sense a premier bank. Mr Wragg said that he would not have done business with BCCI at the time. I regard the repeated assertions of Mr Samant on this point as no more than an attempt to raise the reputation and standing of BCCI to a level which it did not enjoy at the time. I reject the suggestion that Mr Samant and BOI thought that they were dealing with an institution which had such a high reputation that no question about the appropriateness of its dealings need ever be asked. It is also clear that Mr Shukla, at least, was not prepared to take BCCI's explanation of the transaction in question at face value. It seems to me that any honest and competent banker would not fail to note the rising amount of debt in each successive year. If the real reason for the transactions was to lift this debt off BCCI's books, it must have been obvious to Mr Samant by the time of the third transaction (and probably by the time of the second) that Maram's indebtedness to BCCI was increasing. There is no suggestion that he asked for an explanation of this or was told that it was due to Maram's increased trading activities being financed at a higher level by BCCI. Mr Samant would have realised that there was a high degree of probability that the loans were not performing and that Maram's financial position had significantly worsened since the last transaction. The fact that none of these enquiries or concerns were raised, either with Mr Mewawalla or more particularly with head office, is, I think, some of the clearest evidence that the 'obvious' explanation for the transactions was not regarded by Mr Samant as either real or relevant. It seems to me much more likely that Mr Samant realised or was told that Maram simply provided BCCI with a means of receiving back its own money to assist it in reorganising its year-end results. This is, I think, confirmed by the way in which Mr Samant answered Mr Purle's questions on this subject. Faced with the suggestion that an ever-increasing amount of debt did not give the appearance of a performing loan, Mr Samant (on day 6 of the trial) gave this explanation:

> 'Q. That does not look like a performing loan?
>
> A. Why not? From the best of accounts at the end of the year, in fact it would be their very good account that they will try to take it out of the balance sheet because they would be confident at the end of the year that money will be given back to them because he is a good customer.'

That answer was of course in complete contradiction to Mr Samant's earlier evidence that he knew, even in relation to the first transaction, that Maram had no means of repaying the loans except with the benefit of re-finance from BCCI. A

67. The transaction was sanctioned by Mr Shukla and Mr Rege as early as October 8. A typed note by Mr Mitra on the head office copy of Mr Samant's telex refers to Mr Vaghul's approval of the two previous transactions and the attractive returns provided by a risk-free proposition. The matter would be reported to the board of BOI for confirmation in due course. B
Mr Vaghul was on leave at this time and was about to leave the bank. He was not involved in the decision to approve this transaction. When the matter was considered by the board on October 26, Mr Shukla chaired the meeting. The board was asked to consider a memorandum from Mr Mitra which summarises the terms of the transaction and refers to the earlier approvals. It also contains what are described as the highlights of BCCI's operating results during 1981 and 1982. Paragraph 6 of the memorandum states:

> 'The BCCI proposal will result, without any outlay of funds on our part, in an income of C
> about US$18,750– to US$37,500– (Rs. 1.87 to 3.75 lacs approximately) depending on the maturity date of the deposit/advance. Having regard to the attractive return and risk-free nature of the proposition and since BCCI wanted our consent to this transaction before 11th October, 1983 this was approved by the Executive Director on 9.10.1983. We now seek the Board's confirmation therefor.'

Mr Shukla in his witness statement of November 24, 2003, also refers to this board meeting, D
but has no recollection of it. In para.15 of the statement he then sets out some comments on the earnings to advances ratio and says that he did not consider this to be an irrelevant quotient at the time. He disagrees with the liquidators' case that no useful analysis of the ratio could be carried out except by reference to an average over the year, by saying that:

> 'The motivation for mobilisation of deposit is spread by giving advances. When the earnings ratio against advances improves it gives a better spread and thereby a better E
> position.'

I find this difficult to follow, but I also do not accept that this is other than an attempt to rationalise the decision taken at the time. As Mr Shukla cannot recall how his doubts about the ratio explanation were resolved in relation to the second transaction, I do not see how he can claim to be better placed in relation to his recollection of the third. I attach no weight to this evidence.

F
68. On October 12 Lawrence Jones were contacted by the new manager of the London branch, Mr Raina. They were not asked for general advice and were told that there was to be an 'exactly similar transaction' with BCCI, except as to amount. They were asked to check the draft documentation, which on this occasion BOI had prepared itself, based on the documents previously used. The enclosures did not reach Lawrence Jones until October 14. Later that day Lawrence Jones telexed back their response to BOI. They again recommended that BCCI's G
guarantee should be covered by a board resolution, but Mr Raina rejected this as unnecessary. Lawrence Jones also stated that BOI should be satisfied about the authority of the persons who would sign on behalf of BCCI and Maram, but again Mr Raina has written on the telex that this was the responsibility of BCCI, who would have the signatures on record. Mr Samant endorsed this approach. The documents signed by the borrower and BCCI took the same form as those used for the earlier transactions, and Mr Raina in his witness statement accurately refers to it as the standard documentation. Mr Raina was also involved in drafting Mr Samant's telex of October 7. He was asked about the reference in it to the improvement of BCCI's earnings to H
advances ratio. Mr Purle asked him why it was the 'obvious' reason for the transaction. He said that he relied on what Mr Samant had said, but on further cross-examination he said that Mr Samant had not explained the matter to him and no detail was gone into. It became clear, as his evidence proceeded, that Mr Raina neither understood what the explanation for the transaction really was nor how it was supposed to work. I do not in fact believe that there was

© 2004 Sweet and Maxwell Ltd

A any real discussion at all between Mr Samant and Mr Raina on this point. Like Mr Chatterji before him, Mr Raina was only really concerned to implement the transaction which Mr Samant had negotiated with Mr Mewawalla. It seems clear to me that he had no input into the thinking behind it and based the October 7 telex, almost word for word, on the documents used for the second transaction.

69. One novel feature, however, of the third transaction was that it was to take place in two B parts or tranches, as they were referred to, of US$30 million each. The first reference to this is in the letter to Lawrence Jones of October 12, although it was not referred to in the memorandum prepared for the board meeting, and the Maram resolution and loan request referred to a single loan of $60 million. However, in a letter from Mr Mewawalla to Mr Raina of October 27 reference is made to BOI's agreement to dispersing (sic) the loan not in two but in three tranches, on November 1, 3 and 7. Mr Raina was asked about this. He said he could not recall why BCCI wanted things done this way, but because they did want it, BOI released the C loan in three tranches of $20 million each. Mr Samant said much the same thing. It seems to me highly likely that BCCI wished to arrange the drawdown of the loan over three days simply to make it less prominent, but the evidence of Mr Samant and Mr Raina on this is further confirmation of the willingness of Mr Samant to accommodate whatever Mr Mewawalla required.

70. The US$60 million was disbursed in three equal tranches on November 1, 3 and 7. There D then followed some correspondence from BOI to Mr Mewawalla, which is relied upon by the liquidators as further evidence of BOI's alleged willingness to accommodate BCCI's desire to conceal the link between the deposits and the loans. On November 8 Mr Raina sent to Mr Mewawalla a letter relating to the $60 million loan to Maram, which set out the dates of release of the three tranches and, underneath that, the details of the three corresponding deposits. We also have copies of another letter of the same date, addressed to Mr Mewawalla, which refers to the three tranches of the loan, but contains no details of, or reference to, the E matching deposits. The letters were to be sent by Mr Raina, but were prepared by Mr Dighe, who worked in the Manager's Department. His evidence was somewhat confused. He said that he thought both letters were sent, but was not sure. In his witness statement he says that the shorter letter was composed first, but in cross-examination he said that he had no actual recollection of that. He then said that both letters had been prepared at more or less the same time. He was then shown a further letter of November 9, also to Mr Mewawalla, which F contains details of the three deposits. He said that that was prepared a day later and, he thought, was sent. When Mr Purle asked him why it was necessary to divide up the longer of the letters of November 8 into two parts, he could give no reason. Mr Raina's evidence was that he does not know which of the letters was sent, but cannot think of a reason to send both types of letter. The most likely sequence of events, and the one I am satisfied did occur, was that the longer letter was drafted first, but, when sent to BCCI, was rejected by Mr Mewawalla because it did forge a link between the loans and the deposits. This is, I think, further evidence that G Mr Mewawalla was a knowing party to BCCI's fraud. He then contacted BOI and arranged for the contents of the letter to be split. Separate letters were then sent, covering the loans and the deposits. Mr Samant said that he did not think it made any difference at all which of the various letters was sent, but it clearly did matter to BCCI.

*(d) The fourth transaction*

H 71. This began with a handwritten memorandum from Mr Samant to Mr Raina dated June 21, 1984, in which Mr Samant says that Mr Mewawalla has telephoned to say that BCCI would be interested in 'their usual deal' for US$60 million from August 15 to November 15, 1984, and again from December 15, 1984 to February 15, 1985. Mr Raina was asked to submit a memorandum to head office for approval. Mr Samant suggested that approval be sought for a sum of $75 million and that:

> 'We do it in small lots every fortnight say $20m or so – this you could discuss with Mr Mewawalla at the appropriate time.'

There is a signed note in manuscript by Mr Raina referring to two options: a loan and deposit from mid-August 1984 to mid-February 1985 or two periods with a break.

72. The terms of the proposal sent to head office were first set out in a draft memorandum from Mr Raina dated July 5. It contemplates a deposit and matching loan for a period of three to six months with the usual turn of 1/8 per cent. Someone has altered this in manuscript to 1/16 per cent and the memorandum was sent to head office on July 26 with this change. In para.5 of the memorandum it is stated:

> 'The loan may be disbursed in 3 or 4 tranches. But it will be ensured that the maturity date of deposit and due date of loan match, so that deposit is not repaid before loan is due and we do not need to borrow funds in the market. Further the loan will be paid on due date only.'

Paragraph 7(ii) states:

> 'BCCI is a vast organisation with a large network in U.K. and it wishes to enter into these deals to show a good ratio of earnings against its advances.'

73. Head office queried the reduction in the differential rate of interest on the loan to 1/16 per cent and BCCI agreed to restore the 1/8 per cent figure. By now it was August 2. Mr Mitra then prepared a memorandum for the board of BOI dated August 3 in similar form to the ones relating to the second and third transactions. Approval was sought for a deposit and advance for a matching period of three to six months. The board was told (as on previous occasions) that the purpose was for BCCI to show a good ratio of earnings against its advances, and reference is made to similar transactions in previous years. On August 9 the board gave its approval and Mr Samant was able to telex Mr Mewawalla on that day, telling him that 'our deal cleared as discussed'. On August 10 Mr Samant received a telex from head office confirming that approval had been given, but emphasising that 'the borrower must be acceptable to you'. There is no suggestion that this led to any further checks in respect of Maram. The telex also requested details of the borrower in the last three transactions 'when established'. Mr Raina asked Mr Dighe to respond to this enquiry and the information was sent that day. At the same time Lawrence Jones were instructed to check the documents for this 'exactly similar transaction' which, as on the last occasion, had been prepared at the London branch, based on previous drafts.

74. On August 22 Mr Mitra submitted to the board of BOI a report on what are described as the legal aspects of the proposed fourth transaction. This report had apparently been requested at the time of the August 9 meeting. The report refers to the role of the solicitors in each transaction and to the fact that before the first transaction in 1981 the solicitors had advised that BOI should obtain a certified copy of a board resolution from Maram and that, apart from BCCI's guarantee, the bank would have no security in relation to the deposit. No mention is made in this memorandum of the failure of the London branch to press for a security document from Maram itself or to obtain a board resolution from BCCI. The report concludes with this paragraph:

> 'As regards the security of repayment, the Chief Manager, UK & European Branches had advised in 1981 that no bank or licensed deposit taking institution in the U.K. could afford to go back on its commitment in the eyes of the Bank of England. For all the past 3 deals BCCI's nominee borrower has been a Grand Cayman Company called Maram Trading Co. Ltd. and in each case the deposit and the corresponding advance were repaid on the common due date.'

75. At this stage Mr H N Vesuvalla, BOI's General Manager (Law), became involved. He had been at the board meeting on August 9 and there is a note in his handwriting requesting the

© 2004 Sweet and Maxwell Ltd

A London branch to supply him with copies of the earlier advice received from Lawrence Jones which were referred to in the report of August 22. On September 8 he wrote to Mr Samant querying Lawrence Jones' advice that BOI would have no right of set-off against the deposits in respect of BCCI's liability under its guarantee. He asked for the matter to be reconsidered. Mr Samant responded on September 27. He had been away in Bombay, but on his return to London on September 22 he asked Mr Raina to refer the matter back to Lawrence Jones. In his reply to Mr Vesuvalla he said this:

B

> 'I could not agree with your views more. BCCI is not prepared to give a letter of set-off because they will not be able to show the amount as a "free" lending to another bank. Hence the deposit is backed by a letter of guarantee. I would entirely agree with you that our Bank would be entitled to set off against the liability of BCCI under its guarantee against the deposit payable by us to BCCI.
>
> C I would certainly make a reference to our Solicitors once again. But I would rather go by your considered opinion than by our Solicitors' opinion in U.K.'

76. Mr Raina referred the matter back to Lawrence Jones on October 2. They replied the following day. They agree that the existence of the guarantee would provide the basis of a right of set-off, but made the practical point that it would be incapable of being exercised if the deposits became due and were repaid before the date for repayment of the loan. It would D therefore be necessary to ensure that the deposits became repayable on a date after the date on which the loans themselves fell to be repaid. Mr Vesuvalla's belief that a right of set-off existed, and Mr Samant's agreement with him, runs contrary, of course, to Mr Samant's insistence during his evidence that BOI had no security over the deposits. He was asked about this in cross-examination and said that he agreed with Mr Vesuvalla out of deference to him. In his witness statement he also says that the letter of September 8 from Mr Vesuvalla was a private and confidential letter written to him on an informal basis. It is quite clear to me that it E was nothing of the sort. Mr Vesuvalla had almost certainly raised a query about this point at the board meeting and the board had directed it to be looked into. It was not (as Mr Samant suggested) a private enquiry, made only out of academic interest. This episode seems to me to be an instance of head office expressing natural concern about their rights in relation to the deposits. Mr Samant readily accepted Mr Vesuvalla's point when it was put to him at the time, and his subsequent insistence in these proceedings that no such rights had existed and that he was simply agreeing out of respect is wholly disingenuous.

F

77. By early September the London branch had been informed by BCCI that instead of a single loan and deposit extending into 1985, there were to be two loans: the first of September 18 to October 18, 1984, and the second from December 18, 1984, to January 18, 1985. This was confirmed in a letter from Maram dated September 10, 1984, purportedly signed by Mr Khalil, which begins with the words 'As per our telephone conversation'. Neither Mr Raina nor Mr Samant ever spoke to Mr Khalil or to anyone else at Maram and the terms of the letter were, G to their knowledge, a fiction. But more important is the fact that, not being spread over BCCI's year end, the justification of improving the earnings to advances ratio, which was referred to as the reason for the transaction in Mr Raina's inter-office memorandum of July 26 and the memorandum before the board of August 3, could not possibly apply. We know that the reason for having the fourth transaction in place in September and October 1984 was to cover the initial audit confirmation period. Mr Samant said that he was not aware of that, but when asked H how the fourth transaction could achieve the purpose stated in the memorandum, he accepted that it could not:

> 'Q. And the usual deal, according to what you said in your evidence before, was calculated on BCCI's part to improve its assets to advances, its earnings to advances ratio?
>
> A. Yes.

Q. The first deal would not do that? A

A. It would not, but the second deal would do and they were prepared to do both the deals, so I presume that if only the first deal is done, they would not have done the second deal in any case, because that is how –

Q. Why do you refer to the first deal as being part of the usual deal; it is not, is it?

A. It is not usual in the sense that is how he mentioned. It only means that: this is the kind of deal, the way that you did it all along, that we will give you a deposit and you give an B advance to our customer. I am not so precise in this handwritten note on the basis of what he mentioned to me. It is not verbatim mentioned, because these are only the points which are mentioned.'

A little later this exchange occurred:

'Q. Did you discuss with Mr Mewawalla the purpose of this transaction?

A. No, I did not, because as far as I was concerned, my purpose was to have the deposit C and his purpose, he had already mentioned that: it will improve my ratio.

Q. What on earth was the purpose of having it two periods, one from August to November and then from December to February?

A. He is straightaway putting the two proposals together, so my purpose is sufficiently served by the second.

Q. Is that really it, Mr Samant, that you thought the second proposal squared with what D had been done previously, so, therefore, you did not have to ask any questions about the first?

A. Yes, there was no reason for me to ask, because as far as Mewawalla was concerned, now, I was sure he was an extremely honest man and BCCI, we never thought would do anything which was not honest and correct.

Q. You have said that on several occasions, Mr Samant, but I suggest to you that you, E certainly by this stage and I would suggest from a very early stage, appreciated that this was a dishonest transaction that BCCI was indulging in.

A. I did not know, nor did anyone from head office, who were always in sort of absolutely in knowledge of most of the banks that they dealt with.'

78. Mr Raina says in his witness statement that the memorandum to head office sent in July would have been approved by Mr Samant. Mr Samant in his own supplementary witness F statement refers to the memorandum of July 26 as describing the transaction in much the same way as previous transactions and repeats by reference his earlier comments on the objective of improving BCCI's earnings to advances ratio. I am afraid that I do not accept or believe the evidence given by Mr Samant in cross-examination. I regard it as no more than an attempt by him to provide an explanation for the fourth transaction once Mr Purle had pointed out the obvious inconsistency between the timing of the transaction and the explanation offered in the memorandum of July 26. That point was, in my judgment, as obvious to Mr Samant then as it is G now and it indicates a willingness to accommodate BCCI without any regard to the supposed justification for the transactions, and indeed in the knowledge that the explanation originally offered could not apply.

*(e) The fifth transaction*

79. This was intended (and was referred to in Mr Samant's note of June 21) as the second part of BCCI's 'usual deal' involving a deposit and matching loan of US$60 million. As H already indicated, the first part of the transaction (the fourth transaction) was implemented on September 18, 1984, and repayment occurred on October 18. In Maram's letter of September 19, 1984, the request was made for a loan of US$75 million for the periods from September 18 to October 18, and from December 18 to January 22, 1985. In the event, however, the fifth transaction took the form of an exchange of deposits in the sum of $50 million between BOI

© 2004 Sweet and Maxwell Ltd

A and BCCI, notwithstanding the loan request of September 10 and a Maram board resolution of the same date, referring to the request for the two loans. As mentioned earlier in this judgment, the transfer of funds to BOI on December 18 was recorded in BCCI's books as an inter-bank placement at a rate of 9 per cent. This sum was then lent back to BCCI at the same rate of interest.

80. There is no internal BOI documentation which explains why the fifth transaction took B this form and why the 'usual' arrangements of a loan and matching deposit were not repeated. In his witness statement of January 26, 1998, Mr Samant says that he has no recollection of the fifth transaction and provides no explanation for what was done. But he says this:

> '[It] would have been carried out for the same purpose, namely, to increase BOI's deposits for balance sheet purposes. What BCCI did with BOI's deposit of US$50m was not something that BOI could enquire about.'

C This of course misses the point. The real question which arises from the fifth transaction concerns BCCI's purpose in carrying it out. Just as the fourth transaction (not being over the year end) could not have improved BCCI's earnings to advances ratio, neither could the fifth transaction. On the face of it no debt was transferred. All that BCCI had to show from the transaction was a loan to BOI. In cross-examination Mr Samant repeated that he had no real recollection of the transaction, although he accepted that he would have been aware at the time of the reasons why things were done in this way. He said he had been away from August 10 D until September 27, but as of September 10 Maram had written requesting a loan in December. Both he and Mr Raina suggested that the absence of a loan was probably due to the borrower not wanting a further advance. But this is nonsense. None of the transactions involving Maram were motivated by any desire on the part of the borrower for a loan. It was the essence of the scheme, as put forward by BCCI, that Maram had an existing loan which was to be transferred temporarily over the year end. Mr Samant (as he accepted) was well aware of this at the time.

E 81. Mr Samant was also asked how the fifth transaction squared with the objective of improving BCCI's earnings to advances ratio. He said that he assumed that BCCI (like BOI) wanted to improve its deposits. He accepted, however, that he had not sought board approval for an exchange of deposits in the sum of $50 million. He regarded what was done as a simple money market transaction for which no further approval was necessary.

82. I find Mr Samant's explanation for this transaction unconvincing. For the reasons already given, I regard his suggestion that there was no loan because Maram did not want one F as no more than an attempt to find some justification for the transaction, however implausible. I do not believe that Mr Samant thought that this was the real reason. At this point in his evidence he was clutching at straws. The past history of these transactions indicates that any significant change in the structure of the dealings would have involved discussion between Mr Mewawalla and Mr Samant, and this would have been no exception. The real reason for the change is difficult to ascertain. The necessary Maram documentation was already largely in G place. One possibility is that by now those at BOI who were dealing with the transactions simply abandoned any pretence that the advances they were making were payments to Maram rather than to BCCI. This was put to Mr Samant, but denied. The importance, however, of the fifth transaction is that those at the London branch felt able to jettison the arrangements, as put to and authorised by the board of BOI, and simply to lend the $50 million deposit money back to BCCI. No explanation appears from the documents to have been sought from Maram or BCCI as to why no debt was to be transferred.

H 83. Mr Samant's explanation that this became a straightforward money market transaction is also inaccurate. As with all the other transactions, BOI utilised the BCCI deposit money in order to make the loan. This was no exception. The $50 million deposit with BCCI was made with the foreign currency which it supplied. The money was simply lent back. On no view was this an ordinary money market transaction and neither banking expert was prepared to treat it as such. The evidence is that banks did in the earlier 1980s conduct window-dressing transactions

in the form of short-term deposits and loans from the money market. But these transactions did not involve exchanges of matching deposits between the same parties. Mr Wragg said that the fifth transaction was not really what he would describe as a form of window-dressing. Most window-dressing designed to improve a bank's liquidity was genuine and economic. It involved deciding what to do with available assets at a year end. Deposits obtained on the money market would usually be placed with another bank and differentials in the interest rates payable on the amount deposited and the amount borrowed could be mitigated by a process of 'mismatching': *i.e.* placing the deposit for longer than the period for which the deposit was taken. BOI could not do this because it never had the necessary resources. It was dependent on using the BCCI deposits. It could therefore only ever lend back to BCCI, or to a nominee of BCCI, on terms which would secure for it a positive return over the same period. The transactions were entirely circular and the fifth transaction is perhaps the most obvious example of this.

*The Bank of England interview*

84. On January 31, 1985, Mr Samant and Mr Raina were called to a meeting at the Bank of England with Mr Atkinson. There is a detailed note of this meeting, taken by the Bank of England, which Mr Samant accepts as accurate. The meeting was called to discuss fluctuations in the balance sheet of BOI and what is described as 'the reciprocal transaction with BCCI'. The note records:

> 'Samant admitted that these transactions were "window dressing", and that they had had such an arrangement with BCCI for the past three years (at HO's instigation, naturally!). JBCA warned B of I that such transactions were neither attractive nor acceptable, saying that whilst many banks indulged in window dressing, there were limits. He told Samant to warn Bombay not to indulge in such practices through London.'

85. Mr Samant said in evidence that the description of 'window dressing' came from Mr Atkinson, but he accepted it. It was put to him that the reciprocal transaction with BCCI referred to in the note must have been the December 1984 exchange of deposits (the fifth transaction) and that the reference to BOI having had 'such an arrangement' with BCCI for the past three years indicated that Mr Samant had told them that the earlier transactions took the same form. Mr Samant denied this. He said that he explained to Mr Atkinson how BCCI provided a deposit and BOI granted a loan to one of their borrowers with the benefit of a BCCI guarantee. When it was put to him that there was no record in the note of any mention of Maram in the previous three years of transactions referred to, he said that he did not necessarily mention Maram by name, but did explain that the transactions involved a nominated borrower.

86. I am not satisfied by this account of the meeting and I do not believe it. The note kept of the January 31 meeting is extremely detailed and indicates a high level of dissatisfaction with a number of aspects of BOI's lending. It seems to me most unlikely that, had Mr Samant in fact explained to Mr Atkinson how the earlier transactions had been structured, this would not have been recorded. The language of the note strongly suggests that Mr Atkinson was led to believe that the earlier transactions with BCCI consisted of mutual exchanges of deposits. It is, I think, significant that Mr Samant did not suggest in evidence that he told Mr Atkinson that the earlier arrangements involved taking an existing loan off BCCI's books or that he told Mr Atkinson the ostensible reason for doing this. I think that the disclosure of those facts would not have gone unrecorded. Mr Raina said that he did not remember Maram being mentioned at all at the meeting. What I believe Mr Samant did was to considerably understate the arrangements between BOI and BCCI and to avoid any mention of the involvement of Maram or the transfer of debt. Some corroboration for this can be found in the fact that he told the Bank of England that the transactions with BCCI were entered into at head office's instigation. This statement was, to Mr Samant's knowledge, untrue. Yet he had no difficulty about attempting to transfer responsibility for his actions to Bombay. He denied saying this and suggested that all that he had told Mr Atkinson was that the transactions had been approved by head office. I do not

© 2004 Sweet and Maxwell Ltd

believe that evidence either. Finally, when he was asked whether he passed Mr Atkinson's warning on to Bombay, he said that he could not remember. There is, however, no documentation to indicate that the warning was passed on and Mr Mitra's evidence was that he had no recollection of being told about it.

*(f) The sixth transaction*

87. This began with a telex from the London branch to head office on August 30, 1985, recommending approval for a deposit from BCCI of US$100 million and a matching loan to a nominated borrower in the same sum at a differential rate of interest of 1/16 per cent. The telex indicated that the loan might be advanced in tranches or as a single sum. The *modus operandi* was to be the same, but the loan might be disbursed at BOI's Paris branch. Mr Samant left BOI on June 30, 1985, and said that he had no personal knowledge of this transaction. Mr Raina took over from him as chief manager of the UK and European branches of BOI from that date. Despite the warning given at the meeting with the Bank of England, he recommended the transaction for approval. It seems to me that there are only two possible conclusions to draw from this. Either the warning given at the meeting was regarded by Mr Raina as limited to mutual exchanges of deposits because this was the only type of transaction discussed at that meeting or Mr Raina simply decided to disregard the warning and recommend approval. Mr Raina gave evidence which suggests that the former is the more likely explanation. He said that he regarded the mutual exchange of deposits as a different sort of transaction from those involving a deposit and matching loan. But this, of course, is further evidence to support my earlier view that Mr Samant did not disclose to the Bank of England the true nature of the earlier transactions with BCCI.

88. The source of the suggestion that the loan should be disbursed in Paris is not clear. Mr Raina said that it came from head office, but I am not persuaded of this. It looks as if the suggestion came out of the London branch, because on the copy of the telex received at head office Mr Rao has written: 'No – because of restrictions' against the reference to the Paris branch. On September 4 head office telexed back to Mr Raina querying the 1/16 per cent differential and asking for the usual 1/8 per cent. More importantly, it also asked Mr Raina to advise on the nature of the business of Maram, its owners, directors, net worth and the purpose of the advance. There is also a manuscript note on the telex written by Mr Mitra, which refers to a previous enquiry from the Reserve Bank of India ('RBI') requesting the same particulars. Mr Raina did not see this note, but he was told about the RBI enquiry in a telephone conversation with Mr Mitra on August 30. Mr Mitra had been telephoned by Mr Sarma of RBI earlier that month and asked for details about Maram. Mr Mitra then passed the request to Mr Raina. These enquiries appear to have been part of RBI's periodical inspection of the London branch rather than a result of any specific concern, but they were regarded by Mr Mitra as important.

89. On the copy of the telex received in London Mr Raina wrote some notes, referring to these enquiries from head office and the RBI. He has referred to the business of Maram as 'investing in property and trading activity in the US and other places' and the purpose of the loan as 'short term trading requirements'. This information was then sent to Mr Mitra at head office on September 5, who said that he passed it on to Mr Sarma. Mr Purle asked Mr Raina where he got the information from. He said that it came from Mr Mewawalla. No other enquiries were made. At the same time Mr Raina couriered to head office copies of statements of the financial position of Mr Khalil and Maram as at December 31, 1980, which had also been supplied by Mr Mewawalla. Mr Rao wrote on them the following comment: 'Too old to gauge the scale of present activities'. What is more, the financial information on Maram nowhere indicates that it was involved in any trading activities at all, or that it could afford to service and repay loans in the order of $100 million. It is shown as a $100 company whose assets comprised three properties in Florida and in London SW7, valued at a cost of US$1.284 million. Mr Raina accepted that BOI was entirely dependent upon the BCCI guarantee.

90. On September 10 Mr Mitra summarised BCCI's latest proposal in a memorandum for the board of BOI. He included what he had been told by Mr Raina about Maram and the purpose of the advance. His recommendation in para.8 of the memorandum was that:

> 'In view of the past satisfactory experience, good relationship with BCCI, a margin of 1/8% without any outlay of funds and safety of advance, the Manager, London Branch who is also the Acting Chief Manager, UK & European Branches has recommended sanction of a limit of USD 100 m. .'

On September 12 the board approved the transaction, but Mr Tiwari, the new chairman of BOI, is recorded as emphasising that the London branch was to ensure that there was compliance with legal formalities and local regulations.

91. What is so striking about the sixth transaction is the circumstances in which it took place. The Bank of England had warned Mr Raina and Mr Samant in unequivocal terms that window-dressing of the kind disclosed by the fifth transaction was not to be repeated in London. RBI had also requested information about Maram and the transactions with BCCI of a kind which BOI itself had never sought or been concerned about. The position of Mr Samant and the other BOI witnesses had been that they relied on the BCCI guarantee to secure repayment of the loan, knew that Maram could only repay by refinancing from BCCI and, most important of all, knew that the only reason for the transaction and the temporary reorganisation of the loan to Maram was BCCI's own need to improve its balance sheet. Both Mr Samant and Mr Raina knew, and Mr Mitra must have realised, that Maram had no purpose as such in seeking the loans and in fact did not seek the loans from BOI in any real sense at all. Everything was arranged by and for the benefit of BCCI. Therefore although it is perfectly understandable why RBI should have sought particulars of the loans to Maram recorded on BOI's books, the information given by Mr Raina was positively misleading. It was unverified and was also untrue. To answer RBI's questions fully and frankly would have necessitated disclosure of the rationale behind the arrangements with BCCI as a whole. But there is nothing to suggest that this was done, any more than it was in relation to the Bank of England earlier that year.

92. The strong impression one gets from the background circumstances to this transaction is that the regulators, both in England and in India, were by now becoming concerned. Mr Atkinson had issued his warning in January and we know from the disclosure in the *State Bank of India* case that in December 1985 RBI had expressed concern in a circular about foreign currency loans being made by Indian banks over the year end to offshore companies connected to a foreign bank which provided matching funds and a guarantee for the loan. RBI was concerned that the Indian banks involved had made no enquiries about the credit status of the borrower nor were aware of the real objectives of the foreign bank in obtaining their participation. Mr Mitra says that he cannot recall any advice being given by RBI and enquiries made of RBI itself have not produced a copy of the circular. But it is clear from the evidence in the SBI case that such a warning was given and equally clear that what prompted it were the transactions with BCCI carried out by BOI, SBI and the other Indian banks I have already mentioned. The RBI warning must have been given to, and received by, BOI late in 1985 or early in 1986, even if Mr Mitra now has no recollection of it.

93. The now increasing concern of the regulators may be the explanation for what followed in relation to the disbursement of the loan. Although approval was sought in the sum of US$100 million, Mr Tiwari limited the sanction to $75 million, adding the reference to the need to comply with local regulations which I have mentioned. Mr Raina said that he told Mr Mewawalla that only $75 million would be available, but this apparently caused no obvious disappointment or concern at any possible interference with Maram's trading plans. At this time Mr Mewawalla and Mr Raina were still in regular contact. There is evidence of a lunch in London at which Mr V C Joshi, the new chief manager, was introduced to BCCI and at which Mr Samant was also present. There was then a series of telexes out of the London branch, exploring the possibility of making the loan to Maram from BOI's branches in Singapore,

© 2004 Sweet and Maxwell Ltd

A Hong Kong and finally New York, using the Grand Cayman branch. When Mr Raina was asked about the reason for this, he said that the instructions came from head office. He did not know why it was done and in any event he handed over the arrangements for the completion of the transaction to Mr Joshi, who was appointed chief manager of the UK and European branches with effect from September 12, 1985. Mr Joshi (against whom no allegation of knowledge or dishonesty is made) said that he was not told of the purpose of the sixth transaction and did not know why suggestions were made to route the loan through the other B overseas branches.

94. Mr Mitra was also asked about the reasons for routing the loan through BOI's branch in the Cayman Islands. He began by saying that he thought it was because Maram was a Cayman company. When asked why all the previous loans had been made through the London branch, he the said that it had something to do with saving tax. I find neither of these explanations at all convincing and Mr Mitra's evidence on this showed every sign of a hurried attempt to find C some justification for using the Grand Cayman office. On December 2, 1985, Mr Joshi sent a telex to Mr Mitra, asking for head office sanction for an amendment to the transaction approved earlier. The transaction was now to be for $50 million and to be disbursed by BOI's New York branch through the branch in Grand Cayman, but with the deposits being made by BCCI in London and then used by BOI to fund the Cayman branch. The 1/8 per cent differential was to be earned by the branch in Grand Cayman. Mr Joshi said in the telex that any delay in sanctioning these proposals might result in the loss of the business.

D 95. Mr Mitra typed a note to Mr Joshi on the telex he received. It stated that head office might agree to the proposal, but that the London branch should arrange with BCCI for at least $20 million–25 million of the deposits to be placed at the Cayman branch. This message was then telexed to London on December 3. The New York branch (unlike the London branch) also required Maram to execute a form of general security agreement for the loans, which was done on December 11. Even allowing for the passage of time and the fading of memory which that E inevitably brings, I would have expected Mr Mitra, in the light of his apparent recollection of other aspects of this transaction, to be able to give some plausible explanation for his request that at least part of the deposit should be placed in Cayman. All that he was able to say was that he noticed that Maram was registered in Grand Cayman and therefore thought that it would be good to obtain deposits from Maram or BCCI at that branch. The cross-examination on this point (on day 11 of the trial) went like this:

F 'Q. What I am asking is why you were suggesting that deposits of at least $20 to £25 million should be place at Cayman Islands branch and I am suggesting to you that that can have no tax purpose behind it, can it?

A. No, sir, it would have maximised our deposit.

Q. But your deposits are maximised whether they are in Cayman Islands or London or elsewhere, are they not?

G A. Yes.

Q. So that does not explain that suggestion?

A. No, actually, since I said I think yesterday I was talking about it, since we are going there, if we can get some deposits from Maram through BCCI, because Maram was also, it is noticed that it is registered at Cayman Islands, so this is the idea, if we can get it is better for us.

H Q. So you are now talking of getting some deposits from Maram; is that what you are saying, not from BCCI, but from Maram?

A. BCCI, Maram, whoever puts it, we would like to use that $20 to $25 million.

Q. Who is it that you are expecting to get deposits from, Maram or BCCI?

A. We have used the word "BCCI" here. BCCI can do it through Maram or BCCI's presence there, they work in all these places, I think, so they could have done it. It is just

a thought coming from the person who prepared it and I agreed with that, and I signed it also. A

Q. When you said that BCCI could do it through Maram, that suggests that BCCI could do with Maram whatever it wants?

A. No, I did not say that. I did not mean that. It came to our mind – first it originated from the person who prepared this note – I cannot find a signature here – it came from him: it is a good idea if we get another $20–$25 million deposit there, which would help us to maximise our deposit. B

Q. But it is part of the arrangement that is here being varied, is it not, that BCCI will place deposits?

A. We said to arrange, that you should arrange. Whether they place it or not, that also I cannot remember now. And it is also in here somewhere, because it is my general manager's handwriting, "if possible".' C

96. I do not accept the truth or accuracy of any of this evidence. If Mr Mitra's position was that he could not recall the reason for his request, he could have said so. As it is, he chose to give a series of inconsistent and wholly implausible reasons for what was done. Even if one takes his explanation at face value, it reveals an appreciation on his behalf that Maram and BCCI were almost interchangeable. Although, at the request of BOI, the loan and matching deposits were extended by two months to May 1986, no further transactions of this kind with BCCI took place. D

**Conclusions on knowledge**

97. The liquidators' allegations on knowledge are made in wide terms against a number of different individuals, and this was the subject of criticism by Mr Hirst. In relation to the first transaction the liquidators say that both Mr Samant and Mr Chatterji knew that they were participating in a fraud. Allegations of dishonesty are also made against Mr Vaghul and Mr Shukla. When one comes to the second transaction, an allegation of dishonesty is also made against Mr Raina (who had by then replaced Mr Chatterji). A case of dishonesty is maintained against Mr Samant, Mr Vaghul and Mr Shukla, but it is not suggested that the other members of the board or the other senior executives of BOI were involved. To this list the liquidators add Mr Mitra, who they say was dishonest in relation to the sixth and last transaction. E

98. In defence of BOI's position Mr Hirst made a number of general submissions which I need to deal with before coming to the specific transactions. Primary amongst these was the obvious but important point that the transactions were well documented both externally and internally. BOI has, for example, preserved the reports and memoranda to the board on which the comments of the senior officers are recorded. This is not, he says, a case involving some kind of secret conspiracy behind the scenes, in which false documents were produced to give the transactions a semblance of legitimacy. Mr Samant's telexes in which he openly discusses BCCI's purpose and aims are, he submits, quite inconsistent with the allegations of dishonesty levelled against senior management and the board or with the suggestion that Mr Samant knew that he was assisting in the perpetration of a fraud. In the same vein he points to the involvement of Lawrence Jones. Mr Samant was in the first transaction quite open about the unusual nature of what was proposed and the solicitors, though concerned about the detail of the arrangements, saw nothing fundamentally wrong with them. F G

99. These factors are plainly important in a consideration of the role of Mr Samant and others at BOI in the transactions, but they are not, in my judgment, conclusive. As I have already indicated, Lawrence Jones were not asked to scrutinise the reasons given for the transaction. Their role was merely to ensure that BOI was properly protected. BCCI could only have perpetrated the fraud on its creditors through what appeared to be legitimate transactions. The *modus operandi* of obtaining loans through a real corporate borrower, but one which was H

© 2004 Sweet and Maxwell Ltd

A manipulated by BCCI, necessarily involved both BCCI and its nominee entering into the back-to-back arrangements which are a feature of this case and of the case involving SBI. It is not the liquidators' case that these transactions were fraudulent shams in which all the parties in concert deliberately set out to deceive BCCI's auditors and creditors. It is not even alleged that BOI was aware that BCCI had actually forged the documents which purported to emanate from Maram or, in the case of SBI, from Notan. But it *is* alleged that the Indian banks knew or suspected that the transactions they were entering into were artificial and circular and were intended to allow BCCI to deceive its auditors and creditors by recycling its own money for its own use and, in the case of the BOI transactions, by removing debts temporarily from its books over its year end.

100. Loan transactions with a regulated bank have to be documented. It would have been impossible for BCCI to have asked the banks it dealt with to produce no documentation whatever, nor could its purposes have been advanced by doing so. In order to satisfy (and to deceive) its auditors about what it had done with the money used to inflate the Khalil accounts, it had to produce documentation evidencing the deposits it had placed with BOI free of any lien. What it did not wish to produce to its auditors was documentation linking those deposits with the moneys used to reduce or eliminate the debit balances on the Khalil accounts. Both accounting experts agree that disclosure of that link would have led the auditors to reverse the transactions and to make provision for the Khalil debts. Some documentation of the loan was, however, inevitable. The objective must have been to reduce it to the minimum.

101. For its part, BOI needed to record the transactions it had entered into. Mr Samant could not approve loans of the size involved in this case without reference to head office. That would have been obvious to Mr Mewawalla, as a former employee of the bank. He would also have known that any reference to head office would be recorded internally by BOI, particularly when a reference was made to the board. That difficulty could have been catered for (as it was in the SBI case) by setting out to deceive the bank into believing that it was entering into a genuine loan to a company, albeit with the support of a BCCI guarantee. That presented the obvious risk that a prudent bank would still require to investigate the creditworthiness of the borrower and the purpose of the loan, but BCCI obviously calculated that this risk could be managed by offering the bank the comfort and security of a BCCI guarantee, and this proved to be correct. Neither BOI nor SBI properly investigated the status of the borrower. Both banks were so attracted by the offer of an essentially risk-free transaction that they failed to carry out any effective investigations into the borrower or the purpose of the loan or, in the case of BOI, any real investigation at all.

102. At this point, however, the similarity between the two cases ends. What is so striking about this case is the extent to which Mr Samant was aware of the circular nature of the transactions he was participating in. He accepted, as I have mentioned, that during the course of the first transaction he knew that its sole purpose was to improve the presentation of BCCI's accounts. It was neither put to him nor believed by him to be a case of a borrower seeking a loan, who could not be accommodated by BCCI. Even at face value, the borrower had an existing loan which BCCI (not the borrower) wished to move to BOI for its own year-end purposes.

103. The real significance, therefore, of the documentation is not that it existed, but rather what it indicates about Mr Samant's own thinking at the time. Mr Hirst's submission is that the references in Mr Samant's telex of November 12, 1981, to what BCCI was 'obviously' intending to achieve, and in his letter to Lawrence Jones of the same date to 'this apparently strange deal', are the best evidence that he was not then privy to a fraud. Many of the indicators of fraud relied on by the liquidators are set out in the telex. It is, he submitted, impossible to conclude that Mr Samant could have referred to the transaction in these terms if he had believed or suspected that it was at all dubious.

104. I accept that Mr Samant's instant reaction to Mr Mewawalla's proposal was to query its purpose. As an experienced banker he was obviously surprised to receive a proposal to lend a substantial sum of money to an unidentified borrower who could provide no security of its own, little or no documentation, and would depend upon BCCI for the finance necessary to repay the loan after the year end. It would have been obvious from the start that this was not an ordinary loan proposal, and Mr Mewawalla's close relationship with Mr Samant would have made it impossible for him not to have given Mr Samant an explanation of what the purpose of the transaction really was. This is why, in my judgment, Mr Samant knew from the outset that the transaction had as its only object the improvement of BCCI's balance sheet or accounts. The wholly uncommercial nature of the transaction, when viewed from BCCI's perspective, merely served to confirm this. The other side of this is that Mr Mewawalla obviously regarded Mr Samant as someone who would respond positively to BCCI's proposals. It is clear from the expert evidence that most banks operating in the City of London at the time would not have entertained them. It is impossible not to notice that most of the banks who participated in these so-called back-to-back arrangements were Indian banks. There may be a number of reasons for this, but in the case of BOI there were two factors which made them an obvious choice as a counter-party. The first is that there were close personal ties at an individual level between the officers of the bank. BCCI had recruited staff from BOI and other Indian banks, and Mr Mewawalla and Mr Samant were close friends. The second is the culture I have referred to, which was endemic at BOI and perhaps at other Indian banks at the time, of taking deposits to boost the bank's performance figures at its year end. It was unlikely that BOI would reject a proposal merely because it had a window-dressing purpose.

105. For the reasons already given, it is not possible to say with certainty whether it was Mr Mewawalla or Mr Samant who attributed the object of the transaction to the improvement of BCCI's earnings to advances ratio. If it was Mr Mewawalla who provided the explanation, it may also be the case that this was something he got from Mr Akbar. However, for reasons which I will come to in a moment, the precise source of the explanation does not matter. I have decided that it is not open to me, on the evidence, to find with the degree of certainty required that there was anything amounting to an outright conspiracy between Mr Mewawalla and Mr Samant from the start, in the sense that Mr Samant was told the full details of BCCI's actual plans, including its intention to suppress the guarantee from its auditors. I am also prepared to accept that in the telex and the letter to Lawrence Jones of November 12, 1981, Mr Samant provided the solicitors and head office with an explanation which had been suggested to him by Mr Mewawalla at their meeting and not critically examined by him at the time. To that extent it was an accurate account of what was proposed. But it has to be realised that any other approach to head office would have been hopeless. However lax the lending practices of the bank may have been, Mr Samant knew that the senior managers at head office would have queried, and would not have accepted, an ostensible loan proposal of this kind. They would have treated it as suspicious, for the very same reasons that Mr Samant would have queried it. It was therefore put to them (as it had to be) as a risk-free window-dressing transaction which had the benefit of increasing the bank's 'pure' deposits and providing a 1/8 per cent return with no outlay of funds.

106. The eagerness of Mr Samant to have this business is apparent throughout the course of all the transactions he was involved in. I have formed the view of him, which is apparent from the documents in evidence I have referred to, that he was primarily concerned with the need to mobilise deposits regardless of the risks involved. I believe that he was an able but ambitious man who probably saw the introduction of the BCCI deposits as proof of his success in the eyes of head office. I have little doubt that both he and Mr Mewawalla had much to gain from the success of these transactions in terms of their careers. There is no suggestion that they received any direct financial benefit. Mr Purle does not suggest otherwise. But Mr Samant was clearly anxious to accommodate BCCI's wishes at every turn, even though this involved dropping a number of the recommendations made by Lawrence Jones and on occasions ignoring or failing to implement the instructions of head office. I have set out the instances on which this occurred

© 2004 Sweet and Maxwell Ltd

in my analysis of the six transactions. But it is a constant feature. It is enough to mention Mr Samant's request to Lawrence Jones in the first transaction to draft the minimum possible security documents, his failure to pursue the request for a guarantee under seal, and his failure to carry out any proper investigation into the borrower, despite head office's request for that to be done. The same approach seems to have infected Mr Chatterji, who did not obtain the security documents requested. For the reasons already indicated, this was almost certainly influenced, directly or indirectly, by Mr Samant's decision to comply with whatever conditions Mr Mewawalla and BCCI chose to impose.

107. I have found Mr Samant to be an unreliable and, I am afraid, untruthful witness, but I am prepared to recognise the existence of some doubt as to whether he had reason to question the improvement of BCCI's earnings to advances ratio as a plausible explanation for the arrangements during the course of the first transaction. My own view is that on the balance of probabilities he must have entertained some cause for concern about it even at that time, if only because head office itself was clearly unhappy. They were only willing to sanction the transaction if the status of the borrower was confirmed and it was to be a one-off transaction. This gives every indication of real unease on their part. For the reasons set out in paras 53 and 54 of this judgment, I have rejected the allegations of dishonesty made against Mr Vaghul and Mr Shukla in relation to the first transaction, but it is clear that they were not persuaded that BOI should repeat the arrangements and that, at the very least, doubts existed about the explanation which Mr Samant and BCCI had offered.

108. However, any doubts that exist as to Mr Samant's state of knowledge are, in my judgment, resolved by the second transaction. Despite having been told by head office that the first transaction was to be one-off, he felt able to make an enthusiastic recommendation in July 1982 for a similar arrangement involving not £10 million but £30 million. Mr Shukla's query about the real reason for the transaction prompted him to produce the 1981 accounts and, as I have already found, I am satisfied so as to be sure that Mr Samant looked at that material and did see and did realise that an improvement in the earnings to advances ratio could not be achieved by the removal of loans over the year end. He also realised that only a transfer of non-performing debt would have any significant effect. I therefore have no real doubt that Mr Samant knew from this time on, even if had not occurred to him before, that the purpose of the transaction was considerably more complicated, and certainly more suspicious, than he may at first have supposed. These suspicions must have been increased by his knowledge that Maram was of no real significance in the transaction and that the loans would be repaid by BCCI. The circular nature of the transactions was already apparent to him, and the removal of the only suggested justification for them can have left him, and I believe did leave him, in no real doubt that he was in all probability dealing with a fraud of some kind. The matter was put really beyond doubt when in 1984 the fourth and fifth transactions occurred at a time and in a form respectively which made it obviously impossible for the alleged purpose to be achieved.

109. My finding that Mr Samant had relevant knowledge at the time of the second transaction is supported by his subsequent handling of the remaining transactions, up until his departure from BOI in 1986. I am prepared to accept that Mr Samant did not raise his suspicions with Mr Mewawalla or seek to have them confirmed. It seems to me much more likely that he chose simply to ignore them and to make no further investigations. Although he had knowledge in the blind-eye sense necessary to find liability on this application, any attempt to pursue serious enquiries about the use which BCCI was making of the arrangements was likely to lead to the loss of the business. It is clear that so keen was he to get in the BCCI deposits that he was prepared to close his eyes to what he knew was staring him in the face and to adopt a completely passive and uncritical role in accommodating BCCI. What Mr Samant did was to treat these transactions as routine. Each year the same proposal was made, although in ever-increasing sums. The proposal was forwarded to head office, using the same format and almost identical language. Lawrence Jones were instructed, but this became no more than a formality. Drafts of the necessary Maram documents were now prepared in-house by the

London office and merely sent out to Lawrence Jones for approval. No time was spent on any enquiries as to why the size of the deposits and loans was increasing. The transactions were processed very quickly and any requirements of BCCI were rapidly complied with. A striking example of this was the revision of the letters in 1983 to separate the details of the loans from the deposits. As I said earlier in this judgment, the explanation for the transactions and the part played by the borrower became irrelevant. It was simply a matter of getting in the BCCI deposits and handing the same money back. Although Mr Samant denied it, the transactions came to be regarded, and really to be dealt with, as little more than an exchange of deposits, and of course in substance they were no different.

110. Perhaps the most striking piece of evidence in this case is the note of the Bank of England interview with Mr Samant and Mr Raina which took place in January 1985. I have taken the view that Mr Samant did not make it clear to the Bank of England precisely what form the earlier transactions took. But whether or not this is the case (and Mr Samant's evidence was that he did mention the loan to a nominated borrower, coupled with the BCCI guarantee), it is clear that the Bank of England officials told Mr Samant and Mr Raina that no further such transactions were to take place in London. Notwithstanding this, there is no evidence to show that Mr Samant did pass this warning on to head office, and Mr Raina in August 1985 proposed a yet further transaction of the same kind. This merely confirms the view I have already formed that Mr Samant and, after his departure, Mr Raina continued with their drive to obtain deposits, regardless of the obvious concerns about what they were entering into.

111. I am therefore satisfied that Mr Samant did have knowledge in the relevant sense, at least from the time of the second transaction. Although I found Mr Raina's evidence unsatisfactory in a number of respects, his role and knowledge is less clear in the case of the first five transactions and I make no adverse findings against him in respect of them. It is, I think, arguable that he continued to deal with the sixth transaction in the same vein, but for the reasons which I will come to later, his precise role and state of knowledge may not matter in assessing whether the sixth transaction was causative of any loss, because of the way in which the claim has been quantified. I do, however, need to deal with the position of the more senior bank officers. By the time of the second transaction Mr Shukla had doubts about the reason given. I have explained my grounds for rejecting the evidence contained in his recent statement, but there is no real other evidence which indicates how his concerns were met. Mr Vaghul (who was not involved after the second transaction) said that the proposals were not subjected to the degree of scrutiny which might be expected today. He believes that Mr Shukla must have been given a satisfactory answer to his query, but does not know what it was.

112. I do have real concerns about the way in which these transactions were handled by BOI's head office, and in relation to the first and second transactions they reflect very badly on Mr Vaghul's management of the bank. There was understandably real unease with the first transaction, but the condition of approval that it should be a once-only transaction seems to have been ignored for no good or apparent reason in subsequent years. Mr Shukla expressed the concerns I have mentioned, but again they did not prevent the second and third transactions from going ahead. There is no evidence, and it is not alleged, that Mr Samant told them a convincing lie in order to gain approval for the transactions, and his evidence is that he did not speak to them. I accept that. It is therefore more likely that they simply allowed their doubts to be overcome by preferring to rely on Mr Samant's judgement in the matter. Although the transactions (except the first) were approved at board level, this was merely to give authority to the London branch to proceed with the transaction. The decision whether to go ahead was then a matter for Mr Samant. No-one suggests that the board of BOI was in any sense dishonest, and I am not satisfied that a case of knowledge and dishonesty is made out, to the requisite standard of proof, against either Mr Shukla or Mr Vaghul. I think that they looked to Mr Samant to scrutinise the proposals and were content to accept his recommendation. Once the first and perhaps second transactions had been completed without any apparent problems, approval by

© 2004 Sweet and Maxwell Ltd

A the board seems to have been obtained very quickly, almost as a matter of routine. It was only in relation to the sixth transaction that problems began to occur, due in all probability to the interest which the regulators had begun to show in the arrangements. But BOI by then had a new chairman (Mr Tiwari) and I know really nothing about his involvement in the decision to approve the sixth transaction. Mr Mitra's evidence about that transaction was clearly unsatisfactory, but the decision to give approval was not his and I am not able, on the evidence, to find that he had the insight necessary to give him the knowledge which Mr Samant himself
B had.

**Attribution**

113. My findings on knowledge give rise to an issue about attribution. Is it enough that Mr Samant, rather than Mr Vaghul, Mr Shukla or the other members of the board of BOI, had knowledge in the requisite sense that the transactions were being entered into for a fraudulent
C purpose? Mr Hirst submits that knowledge on the part of Mr Samant is not sufficient to fix BOI with liability under s.213. It is, he says, necessary to show actual knowledge on the part of at least Mr Vaghul and perhaps even the entire board. The liquidators' case is that under general agency principles the knowledge of Mr Samant is to be attributed to BOI, because it was Mr Samant who was authorised to negotiate the terms of the transactions, to make recommendations to head office, and to give effect to head office approval by entering into the
D transactions. His knowledge acquired in so acting is attributable to the bank.

114. There is a long history to the attempts of the courts to define the circumstances in which a company will become criminally or civilly liable for or through the acts of its agents. Everyone is familiar with the so-called 'directing mind and will' theory, based on a passage in the judgment of Viscount Haldane LC in *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] AC 705 at p.713, where he said this:

E
> 'My Lords, a corporation is an abstraction. It has no mind of its own any more than it has a body of its own; its active and directing will must consequently be sought in the person of somebody who for some purposes may be called an agent, but who is really the directing mind and will of the corporation, the very ego and centre of the personality of the corporation.'

But as the Court of Appeal pointed out in *El Ajou v Dollar Holdings plc* [1994] BCC 143;, the identification of the relevant person does not depend purely on an examination of the
F company's statutes or articles of association or even the formal contractual relationship between the company and its agents or employees. It may also require one to consider how matters were actually arranged and through whom the company's powers were in fact exercised. This may also lead to the result, referred to by Hoffmann LJ in *El Ajou* (at p.159G), that different persons may for different purposes satisfy the requirements of being the company's directing mind and will.

G 115. In relation, however, to certain forms of statutory liability, particularly where a criminal offence is involved, the normal principles of attribution may require to be modified to meet an argument that the imposition of liability is contrary to or inconsistent with the purposes of the statute. Conversely, even where the conventional principles of attribution would not impose liability on the company for the acts of particular agents or employees, the statute may nevertheless do so. Mr Hirst reminds me in this context that regard must be had not only to s.213 of the Insolvency Act 1986 but also to the parallel criminal sanction contained in s.458 of
H the Companies Act 1985. But both he and Mr Purle accepted that the most recent and authoritative statement of principle is that set out by Lord Hoffmann in the judgment of the Privy Council in *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] BCC 942; [1995] 2 AC 500. This case concerned the liability of Meridian, a substantial Hong Kong investment management company, for the actions of its chief investment manager and a senior portfolio manager, who had masterminded between them the takeover of a New

Zealand company, using that company's own assets to fund the purchase. This required bridging finance, and the managers arranged to do this by using funds under Meridian's control in order to acquire the shares.

116. Under the New Zealand Securities Amendment Act 1988 persons who become what is described as a 'substantial security holder in a public issuer' must give notice of that fact to the public issuer and also to the Stock Exchange on which the shares are listed. The purpose of the legislation was to give the boards of target companies notice of an imminent raid. It was conceded that Meridian did become a substantial security holder within the meaning of the 1988 Act and that no such notice had been given. But the company denied liability for the breach of the duty to give notice, on the basis that the board and the managing director were unaware of the use of its funds to acquire the shares in the New Zealand company and that the knowledge of the investment officer and portfolio manager could not be attributed to the company. Both the Privy Council and the Court of Appeal of New Zealand rejected that submission.

117. Lord Hoffmann began his analysis by describing what he called the rules of attribution, under which the acts or omissions of individuals are deemed to be those of the corporate entity they act for or represent. These are usually to be found in the company's articles of association, but extend to include the general principles of agency and vicarious liability. Lord Hoffmann then turned to consider the applicability of these rules to cases of criminal liability. At p.946B–F; 507B–F he said this:

> 'The company's primary rules of attribution together with the general principles of agency, vicarious liability and so forth are usually sufficient to enable one to determine its rights and obligations. In exceptional cases, however, they will not provide an answer. This will be the case when a rule of law, either expressly or by implication, excludes attribution on the basis of the general principles of agency or vicarious liability. For example, a rule may be stated in language primarily applicable to a natural person and require some act or state of mind on the part of that person "himself", as opposed to his servants or agents. This is generally true of rules of the criminal law, which ordinarily impose liability only for the actus reus and mens rea of the defendant himself. How is such a rule to be applied to a company?
>
> One possibility is that the court may come to the conclusion that the rule was not intended to apply to companies at all; for example, a law which created an offence for which the only penalty was community service. Another possibility is that the court might interpret the law as meaning that it could apply to a company only on the basis of its primary rules of attribution, i.e. if the act giving rise to liability was specifically authorised by a resolution of the board or a unanimous agreement of the shareholders. But there will be many cases in which neither of these solutions is satisfactory; in which the court considers that the law was intended to apply to companies and that, although it excludes ordinary vicarious liability, insistence on the primary rules of attribution would in practice defeat that intention. In such a case, the court must fashion a special rule of attribution for the particular substantive rule. This is always a matter of interpretation: given that it was intended to apply to a company, how was it intended to apply? Whose act (or knowledge, or state of mind) was *for this purpose* intended to count as the act etc. of the company? One finds the answer to this question by applying the usual canons of interpretation, taking into account the language of the rule (if it is a statute) and its content and policy.'

Applying these principles to the 1988 statute, Meridian was held to be liable for the acts of its managers, who (albeit without the knowledge of its board) used its funds to acquire the shares:

> 'Once it is appreciated that the question is one of construction rather than metaphysics, the answer in this case seems to their Lordships to be as straightforward as it did to Heron J. The policy of s. 20 of the *Securities Amendment Act* 1988 is to compel, in fast-

© 2004 Sweet and Maxwell Ltd

moving markets, the immediate disclosure of the identity of persons who become substantial security holders in public issuers. Notice must be given as soon as that person knows that he has become a substantial security holder. In the case of a corporate security holder, what rule should be implied as to the person whose knowledge for this purpose is to count as the knowledge of the company? Surely the person who, with the authority of the company, acquired the relevant interest. Otherwise the policy of the Act would be defeated. Companies would be able to allow employees to acquire interests on their behalf which made them substantial security holders but would not have to report them until the board or someone else in senior management got to know about it. This would put a premium on the board paying as little attention as possible to what its investment managers were doing. Their Lordships would therefore hold that upon the true construction of s. 20(4)(e), the company knows that it has become a substantial security holder when that is known to the person who had authority to do the deal. It is then obliged to give notice under s. 20(3). The fact that Koo did the deal for a corrupt purpose and did not give such notice because he did not want his employers to find out cannot in their Lordships' view affect the attribution of knowledge and the consequent duty to notify.

It was therefore not necessary in this case to inquire into whether Koo could have been described in some more general sense as the "directing mind and will" of the company. But their Lordships would wish to guard themselves against being understood to mean that whenever a servant of a company has authority to do an act on its behalf, knowledge of that act will for all purposes be attributed to the company. It is a question of construction in each case as to whether the particular rule requires that the knowledge that an act has been done, or the state of mind with which it was done, should be attributed to the company. Sometimes, as in *Ready Mixed Concrete* and this case, it will be appropriate. Likewise in a case in which a company was required to make a return for revenue purposes and the statute made it an offence to make a false return with intent to deceive, the divisional court held that the mens rea of the servant authorised to discharge the duty to make the return should be attributed to the company: see *Moore v I Bresler Ltd* [1944] 2 All ER 515. On the other hand, the fact that a company's employee is authorised to drive a lorry does not in itself lead to the conclusion that if he kills someone by reckless driving, the company will be guilty of manslaughter. There is no inconsistency. Each is an example of an attribution rule for a particular purpose, tailored as it always must be to the terms and policies of the substantive rule.' (at pp.949E–950C; 511C–512B)

118. Mr Hirst submits that the approach in *Meridian* requires one to identify the person who authorised the transaction in accordance with the system of authorisation operated by the company in question. It would be wrong, he says, to impose liability on BOI, where the person who has the authority to, and does, authorise the deal does not possess the relevant knowledge, but someone more junior does. Viewed from the company's point of view, one can see the attraction of that proposition, but it does not, in my judgment, represent the law. Nor, as I shall explain a little later, does it apply to the facts of this case. As Lord Hoffmann emphasised in *Meridian*, the primary rules of attribution, based on factors such as the scope of the agent's authority, may require to be modified either restrictively or liberally in order to accommodate the statutory purpose of the legislation which imposes the liability. A good example of this is the decision of the House of Lords in *Re Supply of Ready Mixed Concrete (No. 2)* [1995] 1 AC 456, which he referred to. This was a case in which a restrictive arrangement in breach of an undertaking given to the Restrictive Practices Court was entered into by executives of the company, contrary to express instructions given to them by the board of the company that no such arrangements were to be made. Notwithstanding this, the company was held liable for contempt, based upon the actions of its employees. The need to secure compliance with the undertaking was held to override the lack of authority given to those who breached the

undertaking. Similarly, in *McNicholas Construction Co Ltd v Customs and Excise Commissioners* [2000] STC 553 a construction company was held liable for the evasion of VAT caused by claims for input tax relief in respect of payments made for the supply of labour by sub-contractors. It transpired that many of those VAT invoices issued by sub-contractors to the company were for services which had not in fact been supplied and that the company's site managers had been involved in the fraud over a long period. Nevertheless the court held that the site managers' dishonesty was attributable to the company. The dishonest nature of the actions meant that attribution could not be achieved through the more conventional medium of the ordinary rules of agency or vicarious liability. But the need to ensure compliance with the Act overrode that objection. At p.574 Dyson J said this:

> '48. In my view, the tribunal were correct in attributing the acts and knowledge of the site agents to the company. I start with ss 60(1) and 77(4) simply because the tribunal's reasoning is directed to those provisions (see p 10, para 24). The policy of those provisions is to discourage the dishonest evasion of VAT, and to give the commissioners an extended period in which to make assessments where VAT has been lost as a result of the dishonest evasion of VAT. That policy would be frustrated if the acts and knowledge of all those employees who have a part to play in the making and receiving of supplies were not to be attributed to the company for the purposes of ss 60(1) and 77(4). If the only persons whose acts and knowledge may be attributed to a company are those who are responsible for running the affairs of the company as a whole, and those involved in its VAT activities, then the policy to which I have referred would be seriously undermined. As Mr Parker points out, it would encourage those prepared to engage in fraud or turn a blind eye to set up separate VAT accounts departments for that purpose. Moreover, it would discriminate against small companies that do not have separate accounts departments insulated from what happens on site or in contracts departments.
>
> 49. I would hold, therefore, that the acts and knowledge of all those employees of a company who have a part to play in the making and receiving of supplies, as well as those involved in its VAT arrangements, are to be attributed to the employing company for the purposes of ss 60(1) and 77(4).'

119. The judgment in the *McNicholas* case is important because it deals, as part of the analysis, with the argument commonly raised that it would be wrong to visit the company with the consequences of its employees' unlawful conduct, when it is itself a victim of the same dishonesty. This principle is translated in some of the earlier authorities into stating that the employee's or agent's knowledge of his own fraud or breach of duty is not to be imputed to the company: see, *e.g. Re Hampshire Land Co* [1896] 2 Ch 743. It therefore operates as an exception to the general rules of attribution. But it is clear from the decisions in McNicholas and in *Re Supply of Ready Mixed Concrete (No. 2)* that it will not override attribution as a matter of law where the policy of the Act, to be effective, requires liability to be imposed.

120. Mr Samant did have delegated authority to lend up to £200,000 unsecured without seeking head office approval. For sums of the order of £10 million or more, not even the General Manager (International) at head office could give the necessary sanction. The proposal needed to be referred to the board. This was of course the procedure adopted in each of the six transactions under review, although in the case of the first transaction Mr Vaghul seems to have approved it under delegated powers. In the present case, however, the scheme of delegation gives an incomplete picture of what was done. At the time when most (if not all) of the transactions were put up for approval, the borrower had yet to be identified. In the case of the second transaction Mr Vaghul explained that, to avoid putting the matter to the board again, Mr Samant was given what he described as blanket permission to go ahead with a borrower nominated by BCCI. It is also clear from the evidence that the approval of the transactions was no more than that: *i.e.* an authority to Mr Samant to lend to the nominated borrower on the terms he had negotiated and agreed. Approval was often given some time in advance of the

© 2004 Sweet and Maxwell Ltd

completion of the transactions and detailed matters such as the investigation of the borrower's purpose or status and the documentation for the transaction were left to Mr Samant to deal with. Head office or board approval was not an instruction to carry out the transaction. Mr Samant retained an obvious and necessary discretion whether to go ahead. This was the basis of the approval given in the second transaction and, after that, board approval seems to have been given rapidly and almost as a matter of course. It is clear, as I have found, that senior executives and the board were content to take Mr Samant's assurances at face value and to leave it to him to satisfy himself that it was proper for BOI to go ahead. In these circumstances he was, at the time of each of the first five transactions, the person who, in Lord Hoffmann's words, had the authority to do the deal.

121. It is common ground that s.213 is capable of applying to a company in the position of BOI. Although it applies to the same conduct which under s.458 of the Companies Act can lead to the imposition of a criminal penalty, the purpose of s.213 is to enable the liquidator to recover compensation from those who have knowingly assisted the fraudulent conduct of a company's business. I do not, therefore, have to decide what are the precise limits of criminal liability under s.458. The only question I have to decide is whether Mr Samant's knowledge is to be attributed to BOI so as to found liability under s.213. In my judgment, it is. It seems to me that to allow BOI to shelter behind an argument that the only relevant knowledge was that of the board would be to defeat the policy of the Act. It would allow banks such as BOI, which choose to rubber-stamp the recommendations of their senior managers without ensuring that all proper and due diligence has been carried out, simply to sidestep liability by relying on their own ineptitude. The board of BOI had, through Mr Shukla, a real concern about the purpose of these transactions at the time of both the first and the second transactions. But they were content to delegate the supervision of the transaction and the ultimate decision whether to proceed to Mr Samant. Despite their own misgivings they chose to rely on his judgement. I cannot see how in those circumstances they should be entitled to deny responsibility for the decisions which he made. The consequence is that BOI is liable to contribute to the losses to creditors which would have been avoided but for these transactions, and I will so order. Given my primary finding against Mr Samant, it is unnecessary for me to consider the liquidators' new and alternative claim that was introduced by way of amendment. It does not arise.

### Quantum

122. The power of the court under s.213(2) to order a contribution to be made is framed in wide terms, but there has on authority to be some nexus between the loss caused to creditors as a result of the fraudulent trading and the contribution which the knowing party is required to make: see *Morphitis v Bernasconi* [2003] BCC 540. I am not persuaded that the court has jurisdiction to, or should, exercise this power so as to make a punitive award unconnected to and disproportionate to the loss which the respondent can properly be regarded as responsible for. That said, any award, although essentially compensatory in nature, can only be a reasonable approximation to the damage which the respondent's conduct has caused or contributed to. This calculation is not and cannot be a matter of exact science and some elements of it will inevitably be broad-brush. Ultimately it is a matter of judgment whether the end figure represents reasonable compensation proportionate to BOI's role in this matter.

123. The liquidators' case is that, had the true financial position of BCCI SA and BCCI Overseas been disclosed in the audited accounts for any of the years 1982, 1983, 1984 or 1985, then BCCI would have been unable to continue to operate and to take deposits. As it was, BCCI continued to trade until 1991, when it was shut down by the regulators. At the date of its liquidation the deficiency was in the region of US$10 billion and the depositors can only be compensated in full if the whole of that deficiency is made good. BOI's expert contends that the loss actually caused by the five back-to-back transactions is limited to loss of interest by BCCI amounting to US$45,626. These two figures therefore represent the maximum and minimum

amounts of compensation payable, but neither is a realistic assessment of what the amount of contribution should be.

124. The liquidators' pleaded claim is that the relevant loss attributable to BOI's assistance comprises three elements:

(i) cash dividends paid by BCCI Overseas out of its reported profits. These are said to amount to US$65 million in 1982, $75 million in each of 1983 and 1984, $40 million in 1985, $22 million in 1986 and $35 million in 1987. These total US$312 million;

(ii) cash dividends paid by BCCI SA in 1985 and 1986 of US$12 million and $7 million respectively; and

(iii) a proportion of the losses sustained by BCCI Overseas and BCCI SA in the years following the false accounts. The court is invited to order a contribution of at least US$128.95 million or $109.67 million, depending on which of two alternative methods of calculation is used to compute BOI's liability for the losses to depositors.

**Dividends**

125. The position about dividends was further particularised in a letter from Lovells to Penningtons dated November 28, 2003, which Mr Dyson dealt with during his evidence on quantum. In relation to BCCI Overseas, dividends were declared and paid for all five years from 1981 to 1985. In each year at least one interim dividend was paid in addition to the final dividend of the year in question. So for 1981 two interim dividends were paid, the first being US$25 million in June 1981 and the second $15 million in August of that year. A final dividend of $5 million was paid on June 17, 1982. For 1982 there was an interim dividend of $20 million paid in December 1982 and a final dividend of $45 million, which was paid on January 19, 1983. This is the first dividend included in the liquidators' claim. Mr Dyson was challenged by Mr Hirst about the 1982 dividend of $65 million on the basis that no claim is being advanced for losses attributable to the first transaction at the end of 1981. Mr Dyson said that he was prepared to drop the claim for the 1982 dividend. That concession was plainly based on a misunderstanding by Mr Dyson of what the 1982 dividend related to. Although the first part of it was paid on an interim basis in December 1982, it was attributable to the profits in the year ending December 1982, which were affected not by the first transaction but by the second. I am not prepared to accept that concession. Mr Hirst's other preliminary point concerned the claim for the 1987 dividend. This, as Mr Dyson accepted, is not related to any of the six transactions. He said that it was included because the business of BCCI continued after 1985 right through to 1991, and the dividends in those subsequent years had been included in the claim as consequential upon the false accounts in the years up to 1986, which allowed BCCI to remain in business.

126. Mr Hirst reserved his right to submit that these subsequent dividends were based on audited accounts which were not influenced by any arrangements with BOI, but in the end none of this proved to be necessary. The real difficulty about the claim based on dividends is that there is no evidence that they caused any loss at all to the creditors of BCCI. As Lovells made clear in their letter, the documentation available to the liquidators in London and Grand Cayman does not evidence payment of some of the interim dividends of BCCI Overseas or the payment of the two dividends by BCCI SA. But beyond this it is common ground that any dividends paid by the company were paid to BCCI Holdings. What the accounts of BCCI show is that moneys credited to BCCI Holdings as dividends were then reversed or matched by corresponding transfers back to the BCCI group. So, for example, the US$40 million interim dividend paid on October 11, 1983, is matched by two countervailing entries, each of $20 million. A similar pattern emerges in relation to subsequent payments. Sometimes the reverse entries are designated as subscriptions for shares. On other occasions there are transfers to what is described as BCCI Luxembourg. Mr Dyson made the point in evidence that although BCCI Holdings credited the dividends back in the way I have described, the nature of the payments

© 2004 Sweet and Maxwell Ltd

A changed in the process. But he accepted that the net effect of these entries, even assuming that the dividends were ever paid, was that from the creditors' point of view nothing changed. No actual cash left BCCI SA and BCCI Overseas. In these circumstances it seems to me inappropriate to base any order for contribution on the dividends declared by these companies, even assuming that they were ever paid.

**Other loss**

B 127. The back-to-back arrangements entered into between BCCI and the Indian and Swiss banks that I have referred to allowed BCCI to remain in business. That remained the position until 1991. But the liquidators have to concede that to visit BOI with liability for all the losses which occurred in that period would be disproportionate. They have therefore limited the losses claimed for to the trading losses in the financial years 1983 to 1985 inclusive, and they seek by way of contribution a proportion of those losses by reference to a formula which is C designed to limit liability in the three relevant years to losses caused by the treasury frauds (as opposed to other fraudulent activities), taking into account the contribution to those losses by the other banks and by Mr Khalil. The formula is A/B x C, where A is the amount of funding provided to BCCI by BOI via Maram in any particular year; B is either (a) the total amount of back-to-back loans obtained by BCCI from parties whom the liquidators allege had knowledge of the frauds in each year, plus Mr Khalil's deposits, together with a false audit confirmation, or (b) the amount assumed to be needed by BCCI to fund the losses, expenses and fictitious D profits on the Khalil accounts; and C is the further loss incurred in the 12 months following the year end of each relevant back-to-back transaction caused by the treasury frauds. Taking those years as 1983, 1984 and 1985, the calculations are therefore based upon losses sustained as a result of the second, third, fourth and fifth transactions.

128. The calculation of losses due to the treasury frauds has been carried out using what are referred to as the Akbar Schedules. These are records kept by Mr Akbar of the transactions E used to conceal the losses on the Khalil accounts. The calculations made on this basis are set out in Appendices 4–6 of the liquidators' accounting report. Mr Preece and Mr Dyson, the authors of that report, say that they have approached Mr Akbar's schedules with some caution, but other BCCI records have largely corroborated their contents. They consider the Akbar Schedules to be broadly accurate. BOI's expert accounting witness, Mr Kabraji, in his own report, criticises the liquidators' reliance on the Akbar Schedules and says that he is not satisfied about the verification process which Mr Preece and Mr Dyson say they have F undertaken. He was not critical of the sources used, but he complained in evidence that Mr Dyson and the liquidators had not provided him with sufficient information to verify that the way in which they had calculated the losses was correct. This led to an examination of the history of the accounting report which I do not propose to go into. The fact is that Mr Kabraji was supplied with the limited amount of documentation which he wished to see and could have inspected a much wider range of documents, had he chosen to do so. On the material before me G there is nothing to suggest that Mr Preece and Mr Dyson have not analysed the Akbar Schedules and the supporting material in a balanced way, and I reject Mr Kabraji's criticisms of what they have done. It seems to me that the Akbar Schedules, prepared as they were to facilitate the fraud, are likely to be accurate records.

129. That leaves the question of calculation. The liquidators have calculated the losses for which BOI should be held responsible, according to the A/B x C formula, as US$109.674 million, made up of $44,171,638 for the year ending December 31, 1983, $37,927,233 for the H year ending December 31, 1984, and $25,575,072 for the year ending December 31, 1985. In percentage terms, BOI is said to be responsible for 24.3 per cent, 13.9 per cent and 11.3 per cent of the losses in 1983, 1984 and 1985 respectively. Mr Kabraji does not challenge the liquidators' arithmetic, but contends for a number of changes in the components of the formula, assuming (which he does not) that it represents the correct methodology. His view remains that BOI should not be made liable for anything more than the lost interest, unless it

can be shown that it actively conspired with Mr Khalil and the other banks who are said to have A
had knowledge of the fraud. On the basis, however, that the formula is the correct approach, he says that the denominator B should be expanded to include other funds which were used by Mr Akbar to inflate the balances on the Khalil accounts. These were moneys from various Islamic corporations and individuals which I shall refer to for convenience as the Islamic deposits. He has also added in the funds made available from the ICIC portfolio account no. 20071 referred to in the Akbar Schedule of October 31, 1983. Some $100 million of funds were from this account and were used to credit the Khalil accounts. By recalculating denominator B B
in this way, Mr Kabraji has produced denominators of $618.470 million, £907.814 million and $958.395 million for the three years in question, as opposed to the liquidators' denominators of $175.470 million, $430.814 million and $411.395 million for the same years.

130. In relation to the figure for losses (C), Mr Kabraji makes a 50 per cent reduction in the liquidators' figure of $243.43 million for 1985, because (as the liquidators say in their report) the Akbar Schedules do not exist at December 31, 1985, and they have therefore used the line C
item 'Adjustments' as the basis of their calculation. Mr Dyson says that the liquidators have ignored all other line items and that their calculation almost certainly understates the total losses from treasury frauds for that year. When Mr Kabraji was asked to explain the basis for his further reduction of 50 per cent, he accepted that it was an arbitrary figure, designed to reflect what he regards as the unreliable nature of the material used as the basis for calculation. Given the conservative nature of the liquidators' approach to the calculation of losses for 1985, I can see no justification for making this 50 per cent deduction. Mr Kabraji has not carried out D
any detailed work of his own to substantiate such a reduction and it is little more than guesswork.

131. Mr Kabraji also contended for a reduction in the amount of the losses attributable to the treasury frauds by removing losses incurred outside the periods during which the BOI funding was available to Mr Akbar. A particular example of this, relied upon by Mr Kabraji, are the losses incurred in metal trading which were subsequently hidden by fictitious trades with Euro E
Commodities Ltd, a company controlled by Mr Akbar. In the second half of 1983 trading on the LME resulted in BCCI holding a number of loss-making positions which were concealed by trades with Euro Commodities. The bulk of the metal trading losses were incurred between July and October, when BOI funding was not in place, and Mr Kabraji suggests that they ought not to be treated as attributable to the BOI back-to-back loans. It seems to me that this is too narrow an approach. The liquidators' calculation of losses in the years 1983 to 1985 is based upon the premise that, but for the BOI funding, BCCI's insolvency would have been exposed F
and it would not have been able to continue trading at all. Logically, as I have already indicated, this would lead to a claim based on all trading losses in subsequent years, but the restriction of the claim to the three years from 1983 to 1985 is intended to recognise that a multiplier based on all subsequent losses would be excessive. There is, however, in my judgment, no reason to limit the losses within the three selected years to those which are precisely contemporaneous with the availability of the BOI loans. That seems to me to be unrealistic and wrong in G
principle. I do not intend to make any further deductions in the loss figures on that basis.

132. On the basis of the revisions made to the liquidators' calculations which I have referred to, Mr Kabraji assesses BOI's proportionate share of the relevant losses at US$32.678 million. To this he applies a time apportionment calculation which reduces the claim by a further 63 per cent, but Mr Hirst did not seek to support this in his closing submissions and I need say no more about it. For the reasons already given I am not persuaded that it would be correct to reduce the liquidators' calculation of the losses for 1985 or to make any allowance for the H
periods within the three years when the BOI loans were not in existence. I also accept the two basic factual premises on which these calculations are based: *i.e.* that BOI was insolvent by 1983 and that, but for the back-to-back arrangements with BOI and others, it would have been forced to cease to trade. The fact that Mr Akbar conducted the treasury frauds over this period is the clearest evidence of what the consequences were likely to have been, had the true

© 2004 Sweet and Maxwell Ltd

position been disclosed. I therefore accept the figures for losses calculated by the liquidators as the appropriate multiplier in the formula. I am also not persuaded by Mr Kabraji's argument that the A/B x C formula should only be applied if it can be shown that BOI and the other lenders were in some way in collusion with each other. A contribution based simply on the lost interest would come nowhere close to reflecting the true damage which their conduct has caused. The more difficult question is whether some adjustment is called for in the denominator. This comes down to considering whether the Islamic deposits and the ICIC portfolio moneys should be included.

133. The reasoning behind the inclusion in the denominator of the bank loans and the Khalil deposits is that they are treated by the liquidators as payments by persons who had knowledge of the fraud. Following my judgment in the case against SBI the loans by that bank fall to be excluded on this basis unless the liquidators' alternative method of calculating the denominator is used, in which case BOI's share of the losses will remain the same. The Islamic deposits and the ICIC payments have not been included, simply because there is no evidence that those deposits were made by persons who had knowledge of the fraud. That is obviously right, but the issue of principle is whether BOI's contribution to the continued existence of BCCI should be measured by reference only to the other knowing contributors or to all other relevant sources of funds. I prefer the latter approach. It seems to me that to disregard any source of funds other than those from entities with knowledge of the fraud would be to impose a disproportionate burden on BOI in this case. My own calculation, using the liquidators' figures for A and C in the formula, but Mr Kabraji's figures for the denominator B, produces figures for 1983, 1984 and 1985 of $12.532 million, $17.999 million and $12.700 million respectively: a total of $43.231 million.

**Interest**

134. The liquidators also seek interest. Three possible bases for an award of interest are put forward: (i) as part of an order for a contribution under s.213(2); (ii) in equity; and (iii) pursuant to s.35A of the Supreme Court Act 1981. It seems to me that I have jurisdiction to include an element of interest in the contribution which I order under s.213. Although the statute does not refer to any power to award interest in terms, it must be open to the court to ensure that any award under s.213 adequately compensates the creditors of the company for the passage of time which has elapsed. This seems to have been the view of Knox J in relation to an order under s.214 of the 1986 Act (see *Re Produce Marketing Consortium (No. 2)* (1989) 5 BCC 569) and I can see no reason not to apply the same principles under s.213.

135. That leaves the question of the appropriate rate and the period for which interest should run. I think that the appropriate rate is base rate plus 1 per cent. This is the usual rate applied in commercial cases unless it would be unfair to one or other of the parties. I can see no basis on which BOI could object to this rate. That leaves the date from which interest should run. I consider that it should run from the date of liquidation in 1991 and that it should be simple interest. However, as I have heard no detailed submissions on interest, the parties should regard my conclusions on this matter as open to further argument, if they wish, once this judgment has been handed down. In the absence of further dispute, I will award a payment in favour of the liquidators in the sum of US$43.231 million with interest from the date of liquidation at the rate I have specified.

136. I am grateful to counsel and to their solicitors for the assistance I have received.

(*Order accordingly*)