# Exhibit B Cont.

# *Re Alibaba.com* [2012] 1 CILR 272

**[2012 (1) CILR 272]**

# IN THE MATTER OF ALIBABA.COM LIMITED

*Grand Court, Financial Services Division*

(Cresswell, J.)

**1 May 2012**

*Companies—arrangements and reconstructions—confirmation by court—in counting majority in number of members for purposes of Companies Law (2011 Revision), s.86(2), court may direct that custodian, clearing house or nominee of clearing house cast votes in accordance with clients' instructions and specify number on whose instructions votes cast—practical approach and consistent with Practice Direction No. 2/2010—compliance ensures court has all material information to determine whether to sanction scheme*

*Courts—Grand Court—precedent—Grand Court not to depart from previous Grand Court authority unless plainly wrong*

The petitioner company sought an order under s.86 of the Companies Law (2011 Revision), sanctioning a proposed scheme of arrangement between itself and its members.

The company was an exempted limited company incorporated in the Cayman Islands and listed on the Hong Kong Stock Exchange as carrying on business as an investment holding company. The majority shareholder, Alibaba Group Holding Ltd., held approximately 51.2% of the company's issued shares and was the scheme offeror. HKSCC Nominees Ltd. ("HKSCC") held approximately 27.92% of the company's shares as common nominee for securities held in Hong Kong's Central Clearing and Settlement System ("CCASS") depository.

The scheme's objective was to privatize the company so that it would become wholly owned by the offeror, Alibaba Group Treasury Ltd. ("Alibaba Treasury") and Direct Solutions Management Ltd. ("Direct Solutions"), following which the company would apply to the Hong Kong Stock Exchange for the withdrawal of the listing of its shares. The scheme was to be implemented as follows: (i) the scheme shares, *i.e.* shares which were not registered in the respective names of the offeror, Alibaba Treasury and Direct Solutions, would be cancelled; (ii) the company would then immediately increase its share capital to its former amount by the issue of the same number of new shares to the offeror as the number of the company's shares cancelled and extinguished; (iii) the company would apply the credit arising in its books of account as a result of the share capital reduction to pay up in full, at par, the newly-issued shares to the

offeror; and (iv) the offeror would pay or cause to be paid to each scheme shareholder the cancellation price for each scheme share held.

The company issued the present summons seeking the leave and directions of the court to call a meeting of the scheme shareholders, other than parties acting in concert with the offeror as defined by the Hong Kong Takeovers Code, to consider and, if thought fit, approve the scheme by special resolution. The summons raised the question of how to determine whether the majority in number, required by s.86(2) of the Companies Law, has been achieved when scheme shares are registered in the name of one or more custodians or clearing houses.

The company submitted, *inter alia*, that (i) the traditional common law approach to a custodian instructed to vote some of its shares in favour of a scheme and others against, was to treat the custodian for the majority in number test as one vote for the scheme and one vote against; (ii) this approach was consistently applied by the Grand Court until earlier this year when, relying on GCR, O.102, r.20(6)(b)—"the court may direct that .. . [a] custodian or clearing house shall specify the number of votes cast in favour of the scheme and the number of clients or members on whose instructions they are cast and the number of votes cast against the proposed scheme and the number of clients or members on whose instructions they are cast"—the court held that it was appropriate to count the parties from whom the clearing house received instructions; and (iii) the court should decline to follow this decision: it was unprecedented and contrary to the traditional position, which was not raised or argued by the petitioner's counsel; it was inconsistent with the plain language of s.86(2) and the well-established principle that "member" in the Companies Law means "member of record" (see the definition in s.38); r.20(6)(b) was discretionary and must therefore have addressed something other than the mandatory headcount test—its true purpose was to assist the court in the exercise of its general discretion whether or not to sanction a scheme by expressly enabling it to require information as to participants' voting instructions; and there was no use drilling down to one level of beneficial ownership beneath the custodian when the ultimate beneficial owners may have existed many levels below that.

The offeror supported the company's submissions, adding, *inter alia*, that whilst Practice Direction No. 2/2010, para. 4.4—"the majority in number will be calculated on the basis of the number of clients or members giving instructions to the custodian or clearing house"—clearly contemplated that participants should be counted for the headcount test, (i) the true construction of r.20(6)(b), that the court required information to be provided, should prevail to the extent that this paragraph purported to provide a different meaning; (ii) a practice direction was of very limited authority, being directions given without argument; and (iii) it was not open to the court by practice direction to alter well-established common law rules as to how votes should be counted at a scheme meeting.

**Held,** granting the order sought subject to appropriate amendments:

The court would grant leave to call the meeting as proposed, but direct that any custodian, clearing house or nominee of a clearing house could cast votes for and against the scheme in accordance with its clients' instructions and should specify the number of clients on whose instructions they were cast. As a court of co-ordinate jurisdiction, the court would not depart from a previous Grand Court authority unless it was plainly wrong. In the light of the fact that the previous Grand Court authority was consistent with and reflected Practice Direction No. 2/2010, and because the proposed timetable for the scheme required an immediate decision, the court would similarly adopt the practical approach provided by GCR, O.102, r.20(6): compliance with such a direction would enable the court at the hearing of the petition to consider whether a majority of members had been achieved with all the potentially material information before the court (paras. 64–66).

**Cases cited:**

(1) *British Aviation Ins. Co. Ltd., Re*, [2006] 1 BCLC 665; [2006] BCC 14; [2010] Lloyd's Rep. I.R. 254; [2005] All E.R. (D.) 290 (Jul); [2005] EWHC 1621 (Ch), referred to.

(2) *Dorman Long, In re*, [1934] Ch. 635; [1933] All E.R. Rep. 460, considered.

(3) *Equitable Life Assur. Soc., Re*, [2002] 2 BCLC 510; [2002] BCC 319; [2002] All E.R. (D.) 109; [2002] EWHC 140 (Ch), considered.

(4) *Euro Bank Corp., In re*, 2003 CILR 205, considered.

(5) *Little Sheep Group Ltd., In re*, 2012 (1) CILR 34, followed.

(6) *NFU Dev. Trust Ltd., In re*, [1972] 1 W.L.R. 1548; [1973] 1 All E.R. 135, referred to.

(7) *PCCW Ltd., Re*, [2009] 3 HKC 292, considered.

(8) *UDL Argos Engr. & Heavy Indus. Co. Ltd. v. Li Oi Lin* (2001), 4 H.K.C.F.A.R. 358; [2002] 1 HKC 172; [2001] HKCU 1184; [2001] HKCFA 19, referred to.

**Legislation construed:**

Grand Court Rules 1995 (Revised), O.102, r.20(6): The relevant terms of this paragraph are set out at para. 64.

Companies Law (2011 Revision), s.86(1): The relevant terms of this sub-section are set out at para. 16.

s.86(2): "If a majority in number representing seventy-five per cent in value of the creditors or class of creditors, or members or class of members, as the case may be, present and voting either in person or by proxy at the meeting, agree to any compromise or arrangement, the compromise or arrangement shall, if sanctioned by the Court, be binding on all the creditors or the class of creditors, or on the members or class of members, as the case may be, and also on the

company or, where a company is in the course of being wound up, on the liquidator and contributories of the company."

**Practice Direction cited:**

Practice Direction No. 2/2010, Schemes of Arrangement and Compromise Under Section 86 of the Companies Law.

*J. Wood* and *Ms. J. Collett* for the company;

*C.D. McKie* for the offeror.

1. **CRESSWELL, J.:** This is the hearing of a summons issued by Alibaba.com Ltd. ("the company"), seeking the leave and directions of the court to call a meeting of certain of the shareholders of the company under s.86(1) of the Companies Law (2011 Revision) to consider and, if thought fit, to approve by special resolution a scheme of arrangement ("the scheme") between the company and certain of its shareholders ("the scheme shareholders"). The company is represented by Mr. Jayson Wood. This summons raises, among other matters, the question of how to decide whether the "double majority" mandated by s.86 of the Companies Law has been achieved for the purposes of a scheme of arrangement between a company and its shareholders.

2. The evidential material filed in support of the summons comprise: the first affirmation of Ms. Elsa Wong Lai Kin ("Ms. Wong"), made on April 16th, 2012; the second affirmation of Ms. Wong made on April 20th, 2012; letters from the Securities and Futures Commission ("SFC") and the Hong Kong Stock Exchange, both dated April 20th, 2012; and the affirmation of Ms. Teresa Ko made on April 10th, 2012.

3. The company is an exempted limited company incorporated in the Cayman Islands on September 20th, 2006 and listed on the Main Board of the Stock Exchange of Hong Kong Ltd. The company is an investment holding company and, through its subsidiaries, principally carries on business facilitating activities for suppliers and buyers through online marketplaces. The majority shareholder is Alibaba Group Holding Ltd., which holds approximately 51.2% of the issued shares of the company.

**The scheme**

4. The offeror is Alibaba Group Holding Ltd. ("Alibaba Group" or "the offeror") represented by Mr. Colin McKie. The circular in near-final form, containing the terms of the scheme, relevant financial and other information relating to the company, letters from the Independent Board Committee and Independent Financial Advisor, an explanatory memorandum pertaining to the scheme, and the proposed notices relating to the court meeting and the EGM, as cleared by the SFC and the Hong Kong Stock

Exchange, is at Exhibit WLK 8 & 9 to the second affirmation of Ms. Wong.

5. The object of the scheme is for the company to be privatized so that it becomes wholly owned by Alibaba Group, Alibaba Group Treasury Ltd. ("Alibaba Treasury") and Direct Solutions Management Ltd. ("Direct Solutions"), following which the company will apply to the Hong Kong Stock Exchange for the withdrawal of the listing of its shares. The scheme relates to, and if sanctioned will be binding upon, the scheme shareholders (*i.e.* holders of scheme shares being those shares which are not registered in the respective names of Alibaba Group, Alibaba Treasury and Direct Solutions).

6. Under r.2.10 of the Hong Kong Code on Takeovers and Mergers, only independent shareholders, that is shareholders other than the offeror and offeror concert parties, are permitted to vote on the scheme. The offeror concert parties (being parties acting in concert with the offeror according to the definition of "acting in concert" under the Hong Kong Takeovers Code) (collectively "the offeror concert parties") are—

(i) Alibaba Treasury—wholly-owned subsidiary of the offeror, Alibaba Group;

(ii) Direct Solutions—wholly-owned subsidiary of the offeror;

(iii) Mr. Jack Ma Yun—director of the company and the offeror;

(iv) Mr. Joseph Tsai Chung—director of the company and the offeror;

(v) Credit Suisse (Hong Kong) Ltd.—financial adviser to the offeror;

(vi) Deutsche Bank A.G., Hong Kong Branch—financial adviser to the offeror;

(vii) HSBC Group (being HSBC and persons controlling, controlled by or under the same control as HSBC, other than persons holding the status of exempt fund manager or granted under the status of exempt principal trader under HSBC Group)—financial adviser to the company;

(viii) HSBC Trustee (Hong Kong) Ltd.—trustee of the company's share award scheme and prohibited from exercising voting rights attached to shares held by it under the trust deed;

(ix) Softbank Corp.—substantial shareholder in the offeror; and

(x) Yahoo! Inc.—substantial shareholder in the offeror.

7. There is a possibility that there may be additional offeror concert parties after April 16th, 2012 as a result of the syndication of a loan facility. If there are such additional offeror concert parties, the shares held by such additional offeror concert parties will form part of the scheme shares but such shares will not be voted at the court meeting, as such

voting is prohibited by the Hong Kong Takeovers Code. If there is sufficient time, the relevant disclosure of the additional offeror concert parties will be included in the scheme document. Otherwise, the related disclosure will be made by the publication of an announcement on the website of the Hong Kong Stock Exchange. Evidence will be submitted to this court to confirm whether there are such additional offeror concert parties and if there are, the making of the disclosure to the shareholders of the company.

8. In the event that the scheme is sanctioned and becomes effective—

(i) the scheme shares will be cancelled in exchange for the payment by Alibaba Group to each scheme shareholder of HK$13.50 in cash for each scheme share held (the "cancellation price"); and

(ii) Alibaba Group, Alibaba Treasury and Direct Solutions have undertaken to be bound by the terms of the scheme, thereby ensuring the object of the scheme is achieved.

The cancellation price represents—

(iii) a premium of approximately 45.9% over the closing price of HK$9.25 per share as quoted on the Hong Kong Stock Exchange on the last trading day (being February 8th, 2012);

(iv) a premium of approximately 55.3% over the average closing price of approximately HK$8.70 per share based on the daily closing prices as quoted on the Hong Kong Stock Exchange for the 10 trading days up to and including the last trading day;

(v) a premium of approximately 58.8% over the average closing price of approximately HK$8.50 per share based on the daily closing prices as quoted on the Hong Kong Stock Exchange for the 30 trading days up to and including the last trading day;

(vi) a premium of approximately 60.4% over the average closing price of approximately HK$8.42 per share based on the daily closing prices as quoted on the Hong Kong Stock Exchange for the 60 trading days up to and including the last trading day;

(vii) a premium of approximately 61.3% over the average closing price of approximately HK$8.37 per share based on the daily closing prices as quoted on the Hong Kong Stock Exchange for the 120 trading days up to and including the last trading day; and

(viii) a price to earnings ratio of 33.2 times the diluted earnings per share of the company for the year ended December 31st, 2011.

The scheme is proposed to be implemented by—

(ix) the company reducing its share capital by the cancellation and extinguishment of all its issued shares other than those that are registered in the respective names of Alibaba Group, Alibaba Treasury and Direct Solutions;

(x) the company, forthwith upon the share capital reduction taking effect, increasing its share capital to its former amount by the issue of the same number of new shares to Alibaba Group as the number of the company's shares cancelled and extinguished;

(xi) the company applying the credit arising in its books of account as a result of the share capital reduction to pay up in full at par the newly-issued shares to Alibaba Group; and

(xii) the offeror paying or causing to be paid to each scheme shareholder the cancellation price.

**The position of creditors**

9. The purpose of the proposed share capital reduction is to facilitate the implementation of the scheme involving the scheme shareholders receiving the cancellation price and the cancellation and extinguishment of all scheme shares. It follows that the company's issued share capital will be reduced to the extent thereof.

10. However, it is the company's intention, forthwith upon the share capital reduction taking place, to restore its share capital to its former amount. This will be achieved by the company immediately issuing to Alibaba Group the same number of shares as the number of scheme shares that were cancelled and extinguished. In this regard, the company will apply the credit arising in its books of account as a result of the share capital reduction to pay up in full at par the new shares issued, credited as fully paid, and then allot those newly issued shares to Alibaba Group. The purpose of this restoration of share capital is to maintain the company's former level of issued share capital in order to ensure that none of the company's creditors can be in any way prejudiced by the cancellation and extinguishment of the scheme shares and/or the implementation of the scheme.

11. Therefore, the overall effect of the cancellation and extinguishing of the scheme shares followed by the immediate restoration as described in the previous paragraph is that the company's issued share capital will not be reduced at all. Further, the proposed reduction of the company's issued share capital does not involve either the diminution of any liability in respect of unpaid share capital or the payment to any shareholder of any paid-up capital. In addition, it will not alter the underlying assets, business

operations, management or financial position of the company. The position of the company's creditors will therefore not be impacted by the scheme.

**The position of incentive holders dealt with outside the scheme**

12. The company has in issue certain share options, restricted share units and share awards convertible into shares of the company. In addition, Alibaba Group currently has in issue certain share options and restricted share units relating to the shares of the company (collectively "the share incentives"). The common theme to the share incentives is that they entitle holders thereof (the "share incentive holders"), subject to the conditions attached to each respective class of incentive, to acquire shares in the company in the future.

13. The share incentive holders are not members of the company and are not scheme shareholders. Consequently, they do not fall within the ambit of, nor can they be bound by, the proposed scheme. However, given that the object of the scheme is for the company to become wholly owned by Alibaba Group, Alibaba Treasury and Direct Solutions, it is proposed to make an offer by or on behalf of Alibaba Group to purchase the interests of the share incentive holders. That offer is, in essence, that the share incentive holders will be given the same opportunity to sell their interests for the cancellation price (or, in the case of the share options, the cancellation price less the exercise price). Specifically, they may—

(i) accept the offer and be paid out HK$13.50 per "share option," less the exercise price (if any) of the relevant option (provided that the exercise price (if any) is less than HK$13.50). If the exercise price of the relevant share option issued by the company, or share option issued by Alibaba Group, exceeds HK$13.50 (*i.e.* the "see-through" price will be zero), Alibaba Group will pay a nominal amount of HK$0.05 per 500 share options issued by the company or 500 share options issued by Alibaba Group;

(ii) reject or not respond to the offer, in which case (except in the case of holders of restricted share units issued by the company which will automatically cancel) the share incentive holder's interest will continue and will be a matter of subsequent negotiation between Alibaba Group and the holder. Alibaba Group may decide to take steps to ensure that the company remains a wholly-owned subsidiary by, for example, to the extent that it is legally entitled to do so, amending the terms of the schemes of the share incentives and/or amending the terms of the articles of association of the company to ensure that the share incentive holders are not entitled to receive any shares; or

(iii) if the relevant share incentives are or become exercisable, a share incentive holder may choose to become a scheme shareholder (subject to

payment of the exercise price and applicable taxes) by exercising the relevant share incentives prior to the latest options exercise date (being June 8th, 2012).

**The scheme document**

14. The scheme shareholders are required to be provided with an explanatory memorandum or proxy statement with all the information reasonably necessary to enable them to make an informed decision about the merits of the proposed scheme. The scheme document sets out the terms of the scheme, relevant financial and other information relating to the company, letters from the Independent Board Committee and Independent Financial Advisor, an explanatory memorandum pertaining to the scheme, and the proposed notices relating to the court meeting and the EGM.

**Section 86(1), O.102, r.20(3)–(7) and Practice Direction No. 2/2010**

15. The matters to which the court should have regard at the first hearing in respect of a scheme of arrangement are set out in s.86(1) of the Companies Law (2011 Revision), the Grand Court Rules, O.102, r.20(3)–(7) and paras. 3 and 4 of Practice Direction No. 2/2010.

**The Companies Law (2011 Revision)**

16. Section 86(1) of the Companies Law (2011 Revision) provides:

"Where a compromise or arrangement is proposed between a company and its creditors or any class of them, or between the company and its members or any class of them, the Court may, on the application of the company or of any creditor or member of the company, or where a company is being wound up, of the liquidator, order a meeting of the creditors or class of creditors, or of the members of the company or class of members, as the case may be, to be summoned in such manner as the Court directs."

To fall within the ambit of s.86(1), the proposed scheme must constitute "a compromise or arrangement" between a company and its creditors and/or shareholders. In my opinion a takeover scheme in the nature of that proposed by the scheme comprises an arrangement for the purposes of s.86(1).

**The Grand Court Rules 1995 (Revised)**

17. The Grand Court Rules, O.102, r.20(3)–(7) contain specific requirements in relation to the first hearing of a summons. Each of those requirements will be considered in turn.

***GCR, O.102, r.20(3)***

18. The affirmations of Ms. Wong address the purpose and effect of the proposed scheme, the fact that there is only one class of shares, and the information necessary to enable the court to determine whether the proposed time and place for the court meeting and the method of giving notice is appropriate in all the circumstances.

***GCR, O.102, r.20(4)***

19. The second affirmation of Ms. Wong exhibits the draft scheme document and draft proxy forms. A draft notice of the court meeting and a draft explanatory memorandum is included in the scheme document. Voting instructions for the beneficial owners of company shares have been included in the scheme document.

***GCR, O.102, r.20(5)***

20. The first affirmation of Ms. Wong sets out the relevant listing rules and practice of the SFC and the Hong Kong Stock Exchange. The affirmation of Ms. Ko explains the steps required to achieve compliance with such rules and practices. The second affirmation of Ms. Wong deposes to compliance with, or waiver of, all such rules and practices.

***GCR, O.102, r.20(6)***

21. The issue of the voting process for determining the majority in number count for shares held by custodians or clearing houses is addressed below.

***GCR, O.102, r.20(7)***

22. The explanatory memorandum provided with the scheme document contains the timetable setting out all principal events.

**Grand Court Practice Direction No. 2/2010**

23. Practice Direction No. 2/2010 provides certain matters which should be considered by the court.

***Convening of class meetings***

24. For the purposes of s.86(2), para. 3.2 of PD 2/2010 requires the court to consider whether it is appropriate to convene class meetings of shareholders so as to ensure that the rights of the persons attending the meeting(s) are not so dissimilar as to make it impossible for them to consult together with a view to their common interest.

25. In *In re Euro Bank Corp. (4)*, Henderson, J. said (*2003 CILR 205, at paras. 9–13*):

"9. The second question is the definition of the relevant classes. The general rule, as stated in *UDL Argos Engr. & Heavy Indus. Co. Ltd.* v. *Li Oi Lin* ([2001] 4 H.K.C.F.A.R. at 367, *per* Lord Millett) is that—

'the principle upon which the classes of creditors or members are to be constituted is that they should depend upon the similarity or dissimilarity of their rights against the company and the way in which those rights are affected by the Scheme, and not upon the similarity or dissimilarity of their private interests arising from matters extraneous to such rights.'

10. The Hong Kong Court of Final Appeal went on to set out certain principles derived from a "consistent line of authority." The following three principles are pertinent (*ibid.*, at 372, *per* Lord Millett):

'1. Persons whose rights are so dissimilar that they cannot sensibly consult together with a view to their common interest must be given separate meetings. Persons whose rights are sufficiently similar that they can consult together with a view to their common interest should be summoned to a single meeting.

2. The test is based on similarity or dissimilarity of legal rights against the company, not on similarity or dissimilarity of interests not derived from such legal rights. The fact that individuals may hold divergent views based on their private interests not derived from their legal rights against the company is not a ground for calling separate meetings.

3. The question is whether the rights which are to be released or varied under the Scheme or the new rights which the Scheme gives in their place are so different that the Scheme must be treated as a compromise or arrangement with more than one class.'

. . .

11. This court is required to define the relevant classes by O.102, r.21(3)(b) of the Grand Court Rules and Practice Direction No. 1/02, s.3.2. The liquidators propose just two classes: the shareholders and the scheme participants.

12. It is clear that the shareholders constitute a class whose legal rights against the company are sufficiently similar that they can consult together effectively on the scheme for the payment of post-liquidation interest. Their case poses no difficulty.

13. The scheme participants are the depositors and the trade creditors. It must be conceded that there is a certain divergence of interest within this proposed class . . .”

26. In my opinion the shareholders of the company affected by the proposed scheme comprise all of those persons holding ordinary shares of HK$0.0001 each, other than the offeror, Alibaba Treasury and Direct Solutions. All such scheme shareholders have rights and interests sufficiently similar to each other that they can consult together. In my opinion there is no need for separate meetings of different classes of shareholders.

***The court meeting (see PD 2/2010, para. 3.6)***

27. It is proposed to hold the court meeting in Hong Kong. I accept the submission that this is reasonable given that the majority of shareholders of the company are situated in Hong Kong. It is proposed to give notice of the court meeting to shareholders by—

(i) pre-paid surface mail, or courier delivery, to shareholders having registered addresses in Hong Kong, to the address listed on the company’s share register;

(ii) airmail, or international courier delivery, to shareholders having registered addresses outside Hong Kong, to the address listed on the company’s share register; and

(iii) advertisement in the *South China Morning Post* in English and in the *Hong Kong Economic Journal* in Chinese.

In my opinion the proposed method of giving notice of the court meeting is appropriate in the circumstances.

28. The proposed time for convening the court meeting is at least 28 clear days after (i) the scheme document and requisite documents have been dispatched to shareholders by mail/courier; and (ii) the advertisements have been placed. The expected timetable is contained in the scheme document. It is proposed that the scheme document be mailed/couriered to scheme shareholders and advertised on or about April 24th, 2012, and that the court meeting be held on or about May 25th, 2012. This timetable is materially longer than the 21-day period prescribed in the company’s articles of association for convening an EGM for the purpose of passing a special resolution. The scheme itself is not overly complex and involves, effectively, each scheme shareholder deciding whether or not to accept the offer of HK$13.50 per share from Alibaba Group. The relevant financial data and historical share prices are in the scheme document and may also be accessed on the internet since the company’s shares are listed on the Hong Kong Stock Exchange. Further, a concise explanatory memorandum is being provided to each shareholder. In my

opinion, 28 clear days' notice is a reasonable time for scheme shareholders to consider and make an informed decision in relation to the proposed scheme.

***The scheme document (see PD 2/2010, para. 3.7)***

29. The scheme document is finely detailed in relation to the purpose, effect, mechanics, and efficacy of the proposed scheme. Further, it is accompanied by an explanatory memorandum which, it is submitted, leaves the scheme shareholder in no doubt as to the offer being made and the ramifications if that offer is accepted or rejected. In the circumstances, in my opinion, the scheme shareholders will have sufficient information to enable them to make an informed decision about the merits of the proposed scheme.

***Foreign regulatory requirements (see PD 2/2010, para. 3.8)***

30. The affirmation of Ms. Ko addresses the issue of compliance with the regulatory requirements of the SFC and Hong Kong Stock Exchange, and confirms that such requirements have been met.

**The position of the company**

31. As at April 5th, 2012, 1,397,521,826 shares in the company, representing approximately 27.92% of its issued and paid-up share capital, were held in the name of HKSCC Nominees Ltd. ("HKSCC") as common nominee for securities held in Hong Kong's Central Clearing and Settlement System ("CCASS") depository. HKSCC is the only recognized custodian for central clearing in Hong Kong entered on the company's list of shareholders.

32. In relation to voting its shares at the court meeting, it is HKSCC's normal practice at any meeting of shareholders (including court meetings) to:

(i) appoint a number of proxies to attend and vote in person based on instructions it receives from participants (such as clearing houses or nominees) ("participants"); and/or

(ii) appoint such person or persons as it thinks fit to act as its representative(s) to attend and vote at the court meeting according to the instructions it receives from the participants.

Such appointees of HKSCC may be the beneficial owners themselves, or persons specified by the participants, or staff members of HKSCC. The appointee(s) will signify on the voting paper distributed at the court meeting the number of shares voted for the resolution, the number of shares voted against the resolution, and/or the number of shares abstained

from voting according to the instructions they have received from the participants.

33. It is not the standard practice in Hong Kong to require major nominee shareholders (such as HKSCC) to disclose the number of beneficial owners being represented. However, CCASS has indicated that if directed by the court to do so, it will provide information relating to the number of participant votes for and against the scheme. The company's position is that, on balance, it would be inappropriate to depart from the standard practice for the purpose of HKSCC voting at the proposed court meeting.

**The "majority in number" count**

34. Under s.86(2) of the Companies Law (2011 Revision), before a shareholders' scheme of arrangement can be sanctioned by the court, it must be agreed to by a majority in number holding 75% of the class of shareholders subject to the scheme. This "double majority" test is standard in common law jurisdictions whose company statutes are based on the English Companies Acts. The first part of the test, the majority in number test, is sometimes referred to as the "headcount" test. The "majority in number" requirement has the potential to create issues where a custodian is registered on the register of members of a company as the owner of shares.

**The company's submissions**

35. Mr. Wood, for the company, submitted as follows. There are two approaches which have been taken by the court. The traditional approach of the courts in all common law jurisdictions to the position of a custodian, assuming it is instructed to vote some of its shares in favour of the scheme and others against, has been to treat the custodian for the majority in number test as one vote for the scheme, and one vote against the scheme. In the Cayman Islands, the traditional approach to headcount where a custodian is the registered member was consistently applied by the Grand Court until January this year: see, for example, the order made in the scheme of arrangement relating to Ming An (Holdings) Ltd. Other schemes in which the traditional approach was adopted were New World TMT Ltd. (HKSE listed); China Resources Cement Holdings Ltd. (HKSE listed); Seagate Technology (NASDAQ listed); Garmin Ltd. (NASDAQ listed); XL Capital (NYSE listed); Gartmore Group Ltd. (LSE listed); Entertainment One (AIM listed); Noble Group (NYSE listed); TOM Online Inc. (HKSE listed); SIIC Medical Science and Technology (Group) Ltd. (HKSE listed); and the bondholder scheme Castle Holdco 4 Ltd./Countrywide plc (Euroclear and Clearstream). Mr. Wood (and Mr. McKie, who had appeared in many of these cases) accepted that he was not able to produce any Cayman authority where the position of custodians had

been expressly considered (except *In re Little Sheep Group Ltd. (5)* below).

36. Mr. Wood's submissions continued as follows. The traditional Cayman position is reflected in England as shown in the decision in *Re Equitable Life Assur. Soc.* (3). In that case Lloyd, J., in the context of a creditor scheme but expressly by analogy to shareholder schemes, held that a nominee could vote some of its shares for and some against, thereby splitting its vote for the headcount test one vote for and one vote against. He held (as taken from the headnote to the case in the *British Company Cases* ([2002] BCC at 320)) that—

"by analogy with creditors' meetings in insolvency law, it was possible and would be right for the court to direct at Stage 1 that at the creditors' meetings split voting was permissible, particularly by nominee or trustee creditors, so that they might vote both for and against the scheme in relation to different parts of the value of that creditor's claim, and *such person would be on both sides of the head count for the majority in number.* The general wording of s. 425(2) [of the English Companies Act 1985, equivalent to the Cayman Companies Law, s.86(2)] did not prevent this." [Emphasis supplied.]

This approach clearly reflects what the judge regarded as the uncontroversial and orthodox position, that it is the actual/registered holders who are counted for the headcount, not those behind them with a beneficial interest.

37. Similarly in Hong Kong, in the recent decision of the Court of Appeal of the Hong Kong Special Administrative Region in *Re PCCW Ltd.* (7), Barma, J. confirmed the adoption of the traditional approach in Hong Kong ([2009] 3 HKC 292, at para. 197):

"It was also suggested that the requirements of s.166(2) [of the Hong Kong Companies Ordinance, equivalent to the Cayman Companies Law, s.86(2)] had to be considered in the light of the fact that the vast majority of shareholders in publicly listed companies hold their shares through CCASS, and therefore would not be entitled to vote, as they would not be the registered holders of their shares. The effect of this is that CCASS would vote shares registered in its name in accordance with the instructions (if any) received from its market participants. Such market participants generally seek instructions from the beneficial owners of the shares held through them with CCASS. The result is that CCASS will vote a certain number of the .. shares registered in its name in favour of the resolution, and a certain number against it, according to such instructions as it may receive. This does not affect the number of shares voted for and

against the resolution in value terms. However, in terms of *headcount, CCASS will be counted as one vote in favour and one vote against the resolution*, thereby cancelling itself out. This, it is said distorts the position in terms of the desires of the beneficial owners of the shares held by it." [Emphasis supplied.]

38. Because of the inability of the courts in England and Hong Kong to look through the register, there have been many calls for the headcount test to be modified or removed. See for example the Hong Kong Financial Services and Treasury Bureau, *Consultation Paper: Draft Companies Bill First Phase Consultation* (2009), especially at 6.8–6.9 and 6.14–6.16. See also the UK Company Law Review Steering Group, *Modern Company Law for a Competitive Economy: Completing the Structure*, Interim Report, para. 11.34 (2000), and Final Report, para. 13.10 (2001); however, the UK Parliament did not act on this recommendation and the statute retains the headcount test—see s.899(1) of the Companies Act 2006.

**Company's submissions on the *Little Sheep* decision**

39. In January 2012, against what Mr. Wood submits is the longstanding position taken by the courts in the Cayman Islands, England, and Hong Kong in relation to the headcount test, the decision in *In re Little Sheep Group Ltd. (5)* was handed down by Jones, J. In the *Little Sheep* case, the petitioner's counsel argued at the directions hearing, *inter alia*, that for the purposes of the headcount test, a custodian shareholder should be counted as one person having voted either for or against the scheme depending on its net voting position. The traditional approach (where the custodian has votes for and against—to count one vote for and one against) was not argued, nor was the *Re Equitable Life Assur. Soc.* (3) decision referred to by Jones, J. in his judgment.

40. The petitioner's argument was rejected and Jones, J. held (*2012 (1) CILR 34, at para. 17*) that for the purposes of the headcount test, it was appropriate to count the parties from whom the clearing house receives instructions. His Lordship relied heavily on GCR, O.102, r.20(6)(b) which provides that the court *may* direct the custodian to specify the number of votes cast for and against and the number of participants from which instructions were received in relation to the voting. Jones, J. considered (*ibid.*) that a clearing house could be a "multi-headed member," and the number of participants from whom instructions were received (both for and against) would determine the votes attributable to the clearing house for the purpose of the headcount test. The basis for the petitioner's argument was that GCR, O.102, r.20(6)(b) was *ultra vires* because it was tantamount to treating the participants as members. Jones, J. held this was not the case, and considered *ibid.*) that his approach was "simple, practical and well understood by institutions such as CCASS, which have been acting upon it for many years without any difficulty."

41. Mr. Wood accepted that the approach of Jones, J. is consistent with para. 4 of Practice Direction No. 2/2010. Mr. Wood submitted that the approach of Jones, J. in the *Little Sheep* case ought not be followed for the following reasons. First, it is inconsistent with the established position in the Cayman Islands, England, and Hong Kong, and that established position was not raised or argued by the petitioner's counsel. The decision stands on its own without precedent. Secondly, Jones, J.'s approach is inconsistent with the plain language of s.86(2) and the well-established principle that "member" in the context of the Companies Law means "member of record" (see definition of "member" in the Companies Law, s.38). Thirdly, Jones, J.'s heavy reliance on GCR, O.102, r.20(6)(b) was misplaced. Under s.86, the headcount test is mandatory. However, the power of the court to direct a custodian to specify the number of votes cast for and against and the number of participants from which instructions are received is discretionary. GCR, O.102, r.20(6)(b) must therefore speak to something other than the headcount test. The logical answer is that the court may use this power to assist in the exercise of its general discretion whether or not to sanction a scheme (for example, if the court believes that the voting at the meeting to approve the scheme may be manipulated via the headcount requirement by a small number of non-custodian shareholders). Fourthly, as justification for disapplying the traditional approach, Jones, J. stated that the law in Hong Kong is different from the laws of the Cayman Islands. However, he does not explain how or why this should be so when the relevant Hong Kong legislation is materially identical to s.86. Fifthly, there appears to be no utility in simply drilling down to one level of beneficial ownership beneath the custodian when, in reality, the true (*i.e.* ultimate) beneficial owners will lie potentially many levels below that. Not only does this approach ignore the concept of a "member" being the person whose name appears on the register of members, but once that door is opened, other layers of beneficial owners would presumably be entitled to come forward and demand to be counted. Sixthly, the statement (*ibid.*) that "this mechanism is simple, practical and well understood by institutions such as CCASS, which have been acting upon it for many years without any difficulty" is not accurate. CCASS has not been "acting upon it for many years."

42. Mr. Wood, with the assistance of Mr. McKie, helpfully provided three charts headed "Comparison of Headcount Tests" which set out what Mr. Wood and Mr. McKie submit are (i) the position under the orthodox approach; (ii) the position on the *Little Sheep* approach; and (iii) the position counting true beneficial holders. Those charts are annexed to this judgment at 298–299, and I refer to them. In each of the three charts the line of boxes above "COMPANY 100 Shares" denotes "registered shareholders." The middle line of boxes denotes "participants in CCASS" who are all major banks or other financial institutions in Hong Kong. Those banks or other financial institutions may hold shares proprietarily, or as

nominees, or both. The top line of boxes represents beneficial owners who use the nominee services of participants in CCASS. Thus, in Chart 2, middle line of boxes, in the case of the first dark grey (magenta) box and the second pale grey (green) box, the participant in CCASS holds the shares in the first line as nominee. In the case of the first pale grey (green) box, the second dark grey (magenta) box and the third and fourth dark grey (magenta) boxes the participant in CCASS holds the shares proprietarily.

43. Mr. Wood invited the court to decline to follow the headcount test prescribed in the *Little Sheep* case and to make an order following what he described as the traditional approach.

**The offeror's submissions**

44. Mr. McKie, on behalf of the offeror, Alibaba Group, submitted as follows. GCR, O.102, r.21 was brought into force in July 2002. It has since been revoked and replaced by GCR, O.102, r.20. There has been no material change to sub-r. (6). GCR, O.102, r.20(6)(a) expressly enables the court to permit HKSCC to vote both in favour and against the resolution at the court meeting on the instructions of "its" clients. The ability of a nominee to cast a vote either way is consistent with *Re Equitable Life* (3) and *Re PCCW* (7). The only clients or members of HKSCC/CCASS are the participants, being banks and other financial institutions who participate in CCASS.

45. GCR, O.102, r.20(6)(b) enables the court, where possible, to require the custodian (in this case HKSCC) to "specify" the numbers of votes cast by "clients or members on whose instructions they are cast." Although it is not clear what the intended difference between a client of a custodian or clearing house and a member is, in this case the reference must still also be to the participants. The purpose of GCR, O.102, r.20(6)(b) is that at the hearing to sanction the scheme, the court has available to it the fullest possible information as to how the custodian (likely to be the registered holder of the largest shareholding) has in fact been instructed to cast its votes at the court meeting. This information might be relevant to the court's residual discretion to sanction the scheme or require new meetings to be held even if the meeting has been held in accordance with the court's directions and the resolution has been passed by the statutory majorities at the court meeting—in Hong Kong, see *Re PCCW* (7); in England, see *In re NFU Dev. Trust Ltd.* (6) and *Re British Aviation Ins. Co. Ltd.* (1), and for reconvening meetings see *In re Dorman Long* (2). For instance, that information may disclose that a participant has directed HKSCC to vote in respect of an anomalously small proportion of its shares compared with the other participants, which might suggest that the scheme circular had not been transmitted by that participant to the underlying beneficial owners of those shares.

46. The court only has a discretion to make such an order because it may not always be possible and lawful for the custodian or clearing house to provide information from the equivalent of the participants. In this case, CCASS is in fact able to provide this information to the court. The information that is to be provided to the court is necessarily limited to the equivalent of the participants. Where (as will often be the case) they hold their interests in shares as trustees or nominees for others it is likely to be impracticable for the clearing house to obtain the underlying information, not least because the terms of those trust or nominee arrangements are likely to be governed by a variety of laws, not necessarily the law governing the rules of the clearing house. In this case, there is no realistic possibility of the participants providing to CCASS information regarding instructions from underlying interests.

47. The plain wording of GCR, O.102, r.20(6) does not purport to state how the votes of the custodian are to be counted at the court meeting for the purposes of the headcount test. It is submitted that, accordingly, GCR, O.102, r.20(6) leaves the common law rules with respect to the headcount test unchanged. The common law rule has been authoritatively stated in England in *Re Equitable Life* (3) by Lloyd, J. (as he then was), who has very considerable experience in this area (and appearing before him were very distinguished counsel also highly experienced in this area), and in Hong Kong in *Re PCCW* (7) by Rogers, V.-P., Lam and Barma, JJ. (and appearing before them were very distinguished English and Hong Kong counsel highly experienced in this area). There are no other English, Hong Kong, or Irish or Commonwealth decisions touching on this. The leading English textbooks are silent on the subject.

48. *Re Equitable Life* concerned a proposed scheme pursuant to s.425 of the Companies Act 1985 in respect of the petitioner's policyholders, *i.e.* it was a creditors' scheme. The terms of s.425(2) are in all material respects identical to those of s.86(2) of the Companies Law—see ([2002] BCC 319, at para. 27). Nothing turns on the fact that this was a creditors' scheme rather than a members' scheme, and in fact the relevant passages positively state the position to be the same for creditors as well as members. Lloyd, J. permitted creditors who were trustees and nominees holding for others to cast some of their votes for the resolution and others against, and any such trustee or nominee splitting its vote would count once each way on the headcount. See in particular (*ibid.*, at 327):

"However, reviewing [s.425(2) of the Companies Act 1985] in the context of the widespread practice of nomineeship and trusteeship, both for debt, for example bonds, and rights under policies, many of which are held by trustees, for example under group pension schemes and, likewise, in respect of shares, especially in an increasingly paperless securities world, it seems to me that it would be inappropriate to construe these general words as not permitting a

particular *member* or creditor *to cast different parts of* the value of his claim or *his membership rights in different ways.*

That does, in a sense, produce an oddity, because if you had, let us say, in an extremely simple case, ten members, one of whom wished to cast a split vote, you would really have to count that person on the headcount both for and against. So you would have on the face of it 11 members voting. *But since that person would be on both sides of the head count, both in the 'yes' and the 'no' lobbies, that makes no difference to the calculation of the majority in number, whereas it permits an appropriate way to achieve and calculate the true majority in value.*

*For those reasons it seems to me that it is possible and would be right to permit split voting.*" [Emphasis supplied.]

49. *Re PCCW* concerned a proposed takeover scheme of a company incorporated in Hong Kong, whose shares were listed on the HKSE, pursuant to s.166 of the Companies Ordinance. The terms of s.166(2) are in all material respects identical to those of s.86(2) of the Companies Law. See further Barma, J. (with whom Lam, J. agreed) ([2009] 3 HKC 292, at para. 197), quoted above. The Hong Kong Court of Appeal clearly accepted that to count one vote in favour and one against was the correct way to treat the votes of HKSCC/CCASS. Given that the SFC was the appellant in that case, there is no question that the Court of Appeal was not fully informed as to the practices of CCASS.

50. As a matter of comity, this court routinely applies the relevant decisions of the English and Commonwealth courts where the relevant law is the same. Section 86(2) of the Companies Law is in all material respects identical to s.425(2) of the English Companies Act, s.166(2) of the Hong Kong Companies Ordinance and company statutes in many other jurisdictions. In respect of the conduct of scheme meetings it appears that the Commonwealth courts have invariably followed the common law established by the English courts. For instance, in respect of the proper constitution of the class of creditors or members to be convened, the test to be applied under English law is the same as in Hong Kong, Australia (Victoria and New South Wales) and South Africa: see the judgment of Lord Millett (sitting as a non-permanent judge of the Hong Kong Court of Final Appeal) in *UDL Argos Engr. & Heavy Indus. Co. Ltd.* v. *Li Oi Lin* (8) ([2001] 4 H.K.C.F.A.R. 358, at paras. 15–17), and with whom Li, C.J., and Bokhary, Chan and Ribeiro, P.JJ. agreed. Indeed, the Grand Court adopted Lord Millett's formulation of the test—see *In re Euro Bank Corp. (4) (2003 CILR 205, at paras. 9–10)*—and therefore must have taken the view that as a matter of comity Cayman law as to the constitution of the relevant class to be convened should be in conformity with English/Commonwealth law.

51. There being no statutory difference between s.86(2) of the Companies Law and the English and Hong Kong company statutes, and GCR, O.102, r.20 being silent as to how the headcount should be calculated, the Grand Court should be very slow to rely on Practice Direction No. 2/2010 as a basis to depart from the common law as stated in *Re Equitable Life* (3) and *Re PCCW* (7).

**Practice Direction No. 2/2010**

52. Practice Direction No. 1/2002 was issued in July 2002. Practice Direction No. 2/2010 revoked Practice Direction No. 1/2002 but for the purposes of this hearing the relevant terms are the same. The 2002 Practice Direction was issued at the same time as what was then GCR, O.102, r.21 came into force.

53. Paragraph 4 of the 2010 Practice Direction is expressly directed to GCR, O.102, r.20(6): see para. 4.1. The first sentence of para. 4.4 states "custodians and clearing houses may be required to specify both the number of clients or members from whom they have received instructions .." The requirement that CCASS obtain information from the participants (being its clients or members) is not controversial for the reasons stated previously. However, the second sentence of para. 4.4 states "the majority in number will be calculated on the basis of the number of clients or members giving instructions to the custodian or clearing house." In this case, only the participants can give instructions to HKSCC. It is likely that in this case some, perhaps all, of the participants hold their interests in the scheme shares *qua* trustees or nominees for others (who may themselves be trustees or nominees for others, and so on). Those holders of the ultimate beneficial interest in the scheme shares (at whatever degree of removal beyond the participants) will give instructions through a chain of voting instructions which will enable the participants to direct HKSCC as to how it should cast its votes. However, none of those holders are clients or members of HKSCC/CCASS, so the second sentence of para. 4.4 can have no relevance to them.

54. It is conceded that the second sentence of para. 4.4 quoted above clearly contemplates that in this case the participants should be counted for the purposes of the headcount vote. However, it is submitted:

(i) the plain meaning of GCR, O.102, r.20(6)(b) as set out above should prevail to the extent that this second sentence purports to provide a different meaning;

(ii) a practice direction is of very limited authority, being directions given without argument; and

(iii) it is not open to the court by practice direction to alter well-established common law rules as to how votes should be counted at a scheme meeting.

55. See, by analogy, *In re Dorman Long* (2) ([1934] Ch. at 660–662). This was a case concerning the sanction of a scheme of arrangement between a company and its members. This is a seminal case concerning the conduct of scheme meetings and its correctness has not been doubted since. In that case the court had convened the scheme meetings and the petitioners had sent forms of proxy that conformed to Practice Directions [1896] W.N. 56 and [1910] W.N. 154. At the sanction hearing, Maugham, J. held that these practice notes could not preclude a member from making use at the scheme meeting of such other proper form of proxy as he may be advised, and said (*ibid.*, at 661): "It is not open to the Court by practice notes—which have no statutory force and very little judicial force, as they are directions given without argument—to preclude people who are given a statutory right to vote by proxy from so exercising their vote."

**Observations on the *Little Sheep* decision**

56. The arguments above do not appear to have been put to Jones, J. The company had sought a direction that CCASS be counted as one person for the purposes of the headcount vote (presumably to be counted as a vote in favour or a vote against the scheme depending on the weight of shares) (see *2012 (1) CILR 34, at para. 7*). Such a direction is not sought in this case because it would have the obvious effect of disenfranchising the minority underlying investors instructing, directly or indirectly, CCASS for the purposes of the headcount vote. It is unsurprising that Jones, J. found this to be an unattractive submission.

57. The true construction of GCR, O.102, r.20(6)(b), namely that the court requires information to be provided, was not put to Jones, J., but instead counsel for the petitioner submitted that r.20(6) was *ultra vires* (*ibid., at para. 1*; *para. 15*). Properly understood, GCR, O.102, r.20(6) is *intra vires*, and accordingly the judge was right to reject counsel's submission. However, Jones, J. did not specifically consider the terms of the second sentence of para. 4.4 of Practice Direction No. 2/2010, and whether it was consistent with the true meaning and effect of GCR, O.102, r.20(6).

58. With respect to the common law position, the decision in *Re Equitable Life* (3) does not appear to have been before him. Although *Re PCCW* (7) was before the judge (*ibid.*, at *paras. 13–14*) it appears that his attention was not drawn to para. 197 of the judgment of Barma, J. which states the established practice of CCASS that HKSCC, upon splitting its vote, will count as one vote each way. Jones, J. said (*ibid.*, at *para. 17*), as to the practice of CCASS/HKSCC, that the court is—

"entitled to treat it [CCASS, *sic*, but he must have meant HKSCC] as a multi-headed member for the purpose of the [head]count. Rule 20(6)(b) sets out the mechanism for determining the number of heads which will be attributed to CCASS [*sic*]. This mechanism is simple, practical and well understood by institutions *such as CCASS, which have been acting upon it for many years without any difficulty.*" [Emphasis supplied.]

This statement is clearly incompatible with Barma, J.'s clear statement that HKSCC's CCASS split vote is counted as one vote each way.

59. Throughout the judgment, Jones, J. appears to have operated on the assumption that the participants and the "underlying investors" are one and the same, and that therefore directions that would ascertain the participants' voting instructions to HKSCC/CCASS would enable the court to see how the underlying investors were in fact voting (*ibid., at para. 4*; *paras. 6–9*; *para. 14*; *para. 18*). He makes no reference to any evidence that the participants are in fact banks and other financial institutions that often hold their interests in shares as trustees or nominees for others. It follows that the headcount vote of the participants would not, in fact, be the same as the headcount vote of the ultimate beneficial owners. Had Jones, J. had regard to such evidence he would have concluded that there was no practical means by which CCASS could obtain the information with respect to how the ultimate beneficial owners of the shares had instructed (directly, or through a chain of nominees) the participants to instruct HKSCC.

60. Finally, Jones, J. appears to have supported the conclusion by reference to the following analogy. He stated (*ibid.*, at *para. 17*) that—

"when shares are registered in the names of two or more natural persons as joint owners, it is open to the court to treat them as a single head for the purpose of the count. *Similarly*, when shares are registered in the name of a custodian or clearing house such as CCASS [*sic*, he must have meant HKSCC], the court is bound to treat it as a member of the company but it is also entitled to treat it as a multi-headed member for the purpose of the [head]count." [Emphasis supplied.]

Clearly the legal effect of joint ownership of property (where the four unities are present, including unity of interest) is quite different from a nominee or custodian arrangement where the relationship will be one of agency or trusteeship. The analogy is erroneous.

61. For these reasons, Mr. McKie supported the submissions of Mr. Wood.

**Analysis and conclusions**

62. I am here concerned with the first of the two tests in s.86(2) of the Companies Law (2011 Revision), the majority in number test. In his judgment in *Little Sheep*, Jones, J. said (*ibid., at paras. 16–18*):

"16. I remind myself that the basic rule of statutory interpretation is that it is taken to be the legislature's intention that a statute will be construed in accordance with the general guides to legislative intention laid down by law. I must consider s.86(2) in its proper context and seek to avoid an interpretation which produces an unworkable or impractical result, which is inherently unlikely to have been intended by the legislature (see Bennion, *Statutory Interpretation*, 4th ed., s.313, at 832–839 (2002)). The purpose of s.86 is to provide a mechanism whereby rights vested in large numbers of shareholders (or creditors) can be varied in circumstances where it would be impractical to negotiate and reach agreement with each one separately. The mechanism is that the rights of shareholders or classes of shareholders (or creditors) may be varied with majority consent. Because vested contractual rights are being compulsorily varied, an essential part of this mechanism is that the procedure for obtaining majority consent is fixed by the court and the scheme of arrangement (which is a contract) becomes binding upon the parties only if it is sanctioned by the court. The company has no power to summon an extraordinary general meeting for the purposes of considering and, if thought fit, approving a scheme of arrangement. A meeting for this purpose can be convened only by order of the court 'in such manner as the court directs.' These words give the court a wide discretion to give directions about the procedure by which the meeting will be convened and also the mechanisms by which the statutory majorities will be calculated.

17. Mr. Meeson submits, rightly in my view, that the concept of a 'majority in number' implies some form of head-count. However, s.86 does not stipulate any mechanism by which the head-count should be conducted. It is a matter for the court to fix the mechanism in accordance with the Rules, having regard to the circumstances of the case. When shares are registered in the names of two or more natural persons as joint owners, it is open to the court to treat them as a single head for the purpose of the count. Similarly, when shares are registered in the name of a custodian or clearing house such as CCASS, the court is bound to treat it as a member of the company but it is also entitled to treat it as a multi-headed member for the purpose of the count. Rule 20(6)(b) sets out the mechanism for determining the number of heads which will be attributed to CCASS.

This mechanism is simple, practical and well understood by institutions such as CCASS, which have been acting upon it for many years without any difficulty.

**Conclusion**

18. On its true construction, s.86(2) does not mean that each member must necessarily be treated as one head for the purposes of calculating the majority in number, nor does it mean that each member must necessarily cast only one vote for the purpose of calculating the majority in value. For these reasons I made an order that CCASS be permitted to vote for and against the scheme in accordance with the instructions from its participants and that it shall specify the number of votes cast in favour of the scheme and the number of participants on whose instructions they are cast and the number of votes cast against the scheme and the number of participants on whose instructions they are cast. CCASS will be treated as a multi-headed member for the purposes of the head-count. The number of participants from whom it received instructions (both for and against) will determine the number of votes attributable to CCASS for the purpose of determining whether the majority in number has been achieved."

A decision is required from the court today because of the very tight timetable proposed for the scheme.

**Decisions of co-ordinate courts**

63. I refer to 11 *Halsbury's Laws of England*, 5th ed., at para. 98 (2009):

"There is no statute or common law rule by which one court is bound to abide by the decision of another court of co-ordinate jurisdiction. Where, however, a judge of first instance after consideration has come to a definite decision on a matter arising out of a complicated and difficult enactment, the opinion has been expressed that a second judge of first instance of co-ordinate jurisdiction should follow that decision; and the modern practice is that a judge of first instance will as a matter of judicial comity usually follow the decision of another judge of first instance unless he is convinced that that judgment was wrong. Where there are conflicting decisions of courts of co-ordinate jurisdiction the later decision is to be preferred if reached after full consideration of early decisions."

64. Having regard to the principles set out in para. 98 and the cases there cited, I, as a judge of co-ordinate jurisdiction to Jones, J., would be inclined to follow his decision. It should be noted that his decision is consistent with and reflects PD 2/2010. Given the constraints on time and the need for an immediate decision, there is, in my opinion, a practical

answer. I refer to GCR, O.102, r.20 (Schemes of Arrangement) and, in particular, to GCR, O.102, r.20(6) which reads:

"(6) The Court shall give such directions as may be necessary for the purpose of enabling it to determine whether or not the statutory majorities will have been achieved. If all or substantially all of the shares or debt instruments to which the proposed scheme relates are registered in the name of one or more custodians or clearing houses, the Court may direct that—

(a) such custodian or clearing house may cast votes both for and against the proposed scheme in accordance with the instructions of its clients;

(b) such custodian or clearing house shall specify the number of votes cast in favour of the scheme and the number of clients or members on whose instructions they are cast and the number of votes cast against the proposed scheme and the number of clients or members on whose instructions they are cast."

65. I direct that to the extent that the shares to which the proposed scheme relates are registered in the name of one or more custodians or clearing houses [or nominees of clearing houses] (a) such custodian or clearing house [or nominee of clearing houses] may cast votes both for and against the proposed scheme in accordance with the instructions of its clients; and (b) such custodian or clearing house [or nominee of clearing houses] shall specify the number of votes cast in favour of the scheme and the number of clients or members on whose instructions they are cast and the number of votes cast against the proposed scheme and the number of clients or members on whose instructions they are cast. [The words in square brackets were added on April 27th, on Mr. Wood's application in the light of a communication dated April 25th from HKSCC.] This direction is specifically directed to HKSCC/CCASS and is very similar to the direction given by Jones, J. at the same stage in the *Little Sheep case (5)*. Compliance with this direction will enable the court at the hearing of the petition to consider the question whether a majority of members has been achieved with all the potentially material information before the court.

66. In the circumstances set out above, I make an order in the terms of the draft order before the court with appropriate amendments to reflect this ruling.

**Annex**

**Comparison of headcount tests**

Shaded boxes in the three examples represent shareholders counted on each methodology. The voting is the same in each example. All that changes is the headcount methodology

1. *The "orthodox" approach*

Four votes for and two votes against—PASSES.




2. *The "Little Sheep" approach*

Five votes for and five votes against—FAILS.



23-01165-mew Doc 67-6 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (5) Pg 30 of 95


3. *Counting true beneficial holders*

This method is entirely theoretical, and is included for illustrative purposes only. It is not possible to use in practice. While the third level (and levels beyond that) of beneficial interests almost certainly exist, the division of beneficial interests at and beyond these levels is not visible to the company.

Eight votes for and six votes against—PASSES.




*Order accordingly.*

*Appleby* for the company; *Maples & Calder* for the offeror.

# *Re Gerald Cooper Chemicals Ltd (in liquidation)* [1978] 2 WLR 866

extinguished if unregistered under section 1 (2) (*b*) but that they should not even be registrable at all under the provisions of an Act which is A
clearly designed to provide for the registration of common rights generally. For these reasons therefore I am unable to concur in the view of the chief commissioner and I must accordingly allow the appeal.

*Order accordingly.*
*Leave to appeal.* B

Solicitors: *Collyer-Bristow & Co.* for *Lemon Winwood and Trethewy; Salisbury*; *P. Clayden.*

K. N. B.

---

C

## *In re* GERALD COOPER CHEMICALS LTD. (IN LIQUIDATION)

[No. 001027 of 1977]

1977 Nov. 2, 3; 22 Templeman J. D

*Company — Winding up — Fraud — Customer paying company in advance for goods not being produced — Company using moneys advanced to repay loan—Whether business carried on with intent to defraud company's creditors — Company in liquidation — Whether customer entitled to declaration that those accepting repayment of loan personally responsible for* E
*moneys advanced — Companies Act* 1948 (11 & 12 *Geo.* 6, *c.* 38), *s.* 332 (1)

J lent £150,000 to C Ltd. to purchase and instal plant for the production of indigo, the loan to be returned by June 30, 1976, with an additional payment of £1·35 million out of the anticipated profits by March 26, 1977. By July 1976, C Ltd. had become insolvent and never began the production of F
indigo. J agreed to defer the repayment of £150,000 until August 10. On August 19, C Ltd. agreed to deliver to H 5000 kilos of indigo during the next month and received, on August 20, payment in advance from H of £125,698·32. On the same day, C Ltd. paid J £110,000 in part discharge of the £150,000 loan due for repayment on June 30. H claimed a declaration under section 332 of the Companies Act 1948 [1] that J and its directors were knowingly parties to carrying on G
the business of C Ltd. with intent to defraud creditors.

On J's summons to strike out H's points of claim as disclosing no cause of action: —

*Held*, dismissing the summons, that, if C Ltd. had accepted an advance payment from H with no prospect or intention of supplying indigo to H, it was carrying on business fraudulently and the subsequent repayment of part of the loan to

---

H

[Reported by MRS. F. ALLEN MCLEAN, Barrister-at-Law]

[1] Companies Act 1948, s. 332 (1): see post, p. 265A–B.

A J was a fraud on H not merely as a customer but as a creditor of the company; that, if J had known that the part repayment of the debt due to it had been made with moneys obtained by fraud on a creditor, H was entitled to a declaration under section 332 of the Act and, accordingly, since H had established a cause of action, the points of claim would not be struck out.

*In re Murray-Watson Ltd.* (unreported), April 6, 1977, considered.

B The following case is referred to in the judgment:

*Murray-Watson Ltd., In re* (unreported), April 6, 1977.

The following additional cases were cited in argument:

*Cyona Distributors Ltd., In re* [1966] Ch. 462; [1966] 2 W.L.R. 761; [1966] 1 All E.R. 825; [1967] Ch. 889; [1967] 2 W.L.R. 369; [1967] 1 All C E.R. 281, C.A.

*Maidstone Buildings Provisions Ltd., In re* [1971] 1 W.L.R. 1085; [1971] 3 All E.R. 363.

PROCEDURE SUMMONS

Jimlou Ltd., through its directors, William Jerome Gredley and Anthony D James Alexander Helme, lent £150,000 in March 1976 to Gerald Cooper Chemicals Ltd. to set up a factory in Poplar, London, for the production of indigo. By July 1976 the company was insolvent, no payments to Jimlou Ltd. had been made, as promised, from the expected profits and repayment of the initial loan was deferred until August 10, 1976. On August 19, 1976, the company agreed to deliver 5,000 kilos of indigo to the applicants, Harrisons (London) Ltd., who, on August 20, paid in E advance the purchase price of £125,698·32. On August 20 the company paid £110,000 to Jimlou Ltd. in part discharge of the £150,000 owing. The applicants claimed a declaration under section 332 of the Companies Act 1948 against the respondents, Jimlou Ltd. and its two directors, that they were knowingly parties to the company carrying on the business of Gerald Cooper Chemicals Ltd. with intent to defraud creditors and for F other fraudulent purposes and that they and each of them were responsible without any limitation for the sum of £125,698·32 being moneys due from the company to the applicants.

*E. C. Evans-Lombe* for the respondents (applicants in the summons). An analysis of the points of claim shows that the applicants are not alleging that the respondents had been involved, whether directly or indirectly, in any G transaction of the company earlier than the transaction pursuant to which the company contracted with the applicants to sell to them indigo against forward payment. The charge of fraudulent trading is separate and distinct from a charge of fraud, *i.e.*, fraudulent trading involves the carrying on of the business of a company by transactions which may, in themselves, be legal or illegal: *In re Murray-Watson Ltd.* (unreported), April H 6, 1977. There is no direct allegation in the pleadings that the respondents were at any time involved in the carrying on of the business of the company. It is conceded that, on the facts alleged in the points of claim (which are not admitted but are taken for the purpose of the argument

as being established), the applicants would have been able to launch proceedings by writ claiming damages for fraud or, alternatively, claiming that the respondents were constructive trustees for them of the money received from the company. The allegations made against the respondents, however, do not involve any allegation of facts which constitute their being party to the carrying on of the business of the company but merely to having been party to one transaction in the course of that business. It follows that the points of claim do not show the necessary allegations to support a charge of fraudulent trading: *In re Maidstone Buildings Provisions Ltd.* [1971] 1 W.L.R. 1085.

*Peter Crawford Q.C.* and *David J. Richardson* for the applicants (respondents in the summons). " Any business of the company " in section 332 (1) of the Companies Act 1948 is ambiguous in that it may mean (a) " any activity which forms part of the business of the company " or (b) " Any of the several businesses of the company." The former must be correct: see *In re Cyona Distributors Ltd.* [1967] Ch. 889, 902, *per* Lord Denning M.R. Accordingly any activity of the company qualifies, and it need not constitute a separate " business." A single transaction may qualify as business of the company. It is a question of fact and degree. In this case the single transaction concerned was for a large amount of indigo, and involved large sums of money. Further, the transaction was vital to the continued existence of the company, since the purported sale of non-existent indigo was to be the means to raise the cash to pay off the respondents. Accordingly the material transaction was business of the company within section 332.

The facts alleged (namely insistence on payment in advance for a large quantity of indigo which did not exist and had no prospect of being manufactured by the contractual date for delivery or at all, and the use of the greater part of the money so obtained to pay off the respondents) raised an inference that the business had been carried on with intent to defraud the applicants. The facts alleged further justified an inference that the respondents were " knowingly parties to the carrying on of the business in manner aforesaid." Section 332 is a machinery section which provides a mechanism by which fraud coming to light in the course of a winding up may be dealt with. It does not create new substantive rights, or require any special form of participation. The section contemplates the same forms of participation that are known to the criminal law, namely principals in the first and second degrees and counsellors and procurers. The facts alleged were that the respondents knowingly insisted on the business being carried on in the material way, and took the benefit of it, and on these facts they were principals.

*Cur. adv. vult.*

November 22. TEMPLEMAN J. read the following judgment. The applicants, Harrisons (London) Ltd., claim a declaration under section 332 of the Companies Act 1948 against the respondents, Mr. Gredley and Mr. Helme, and Jimlou Ltd. By this summons, the respondents seek to strike out points of claim delivered by Harrisons on the grounds that the points of claim disclose no cause of action or no plausible hope of success.

23-01165-mew Doc 67-6 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (5) Pg 35 of 95



A Section 332 (1) provides, inter alia:

> "If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company . . . or for any fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory of the company, may, if it thinks proper so to do, declare that any persons who were knowingly parties to the carrying
> B on of the business in manner aforesaid shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the court may direct."

Harrisons are creditors of Gerald Cooper Chemicals Ltd., now in liquidation. Harrisons claim that the business of the Cooper company was carried on with intent to defraud creditors and that the respondents were
C knowingly parties to the carrying on of the business of the Cooper company in this fraudulent manner. Harrisons seek a declaration accordingly, and payment by the respondents of the debts and liabilities of the Cooper company, or, at the least, payment of the sum of £125,698·32 to Harrisons.

The points of claim contain 26 paragraphs and make a number of serious allegations which are strenuously denied by the respondents. For
D the purpose of deciding whether the points of claim ought to be struck out, it must be assumed that the allegations can be proved. The tale which I now unfold is, however, only the tale as told by Harrisons and may bear no resemblance to the true history of the Cooper company.

The Cooper company was the brainchild of Mr. Cooper, who was a director and owned all the shares. In March 1976, the respondents agreed with Mr. Cooper to provide the capital sum of £150,000 to enable the
E Cooper company, through its subsidiary, Cooper Medical Products (U.K.) Ltd., to purchase and instal plant for the production of indigo at a factory in Poplar. In return for this initial capital, the Cooper company agreed to pay £150,000 by June 30, 1976, to the respondent, Jimlou Ltd., a company owned by Mr. Gredley, and to pay a further £1·35 million to Jimlou by March 26, 1977. These sums were expected to be available to
F the Cooper company out of profits from the sale of indigo, a commodity then much sought after by the makers of blue jeans.

The capital sum of £150,000 was duly provided by the respondents but proved insufficient to finance the production of indigo. Mr. Cooper raised money to finance production by forward sales of indigo, accepting advance payments by customers against promises of future deliveries of indigo. By the end of July 1976, production of indigo had not started and
G the Cooper companies were insolvent, and would remain so unless further substantial sums became available by way of capital. The respondents, it is said, knew all this. On August 4, 1976, the respondents agreed to the further deferment of the overdue payment of £150,000 which should have been paid on June 30, 1976, to Jimlou. The deferment agreed was until August 10, 1976.

H The respondents, according to the points of claim, well knew that there was no prospect of Mr. Cooper raising the moneys other than by purported forward sales of indigo by proforma invoices, but that, if moneys so paid in advance were applied to the payment of Jimlou's debt rather than for

production purposes, no indigo would be available to satisfy the customer's order. Accordingly, if they pressed for payment of the sum then owing to Jimlou, a fraud would be perpetrated on the customer, or would-be customers, of the Cooper company.

On August 19, 1976, Mr. Cooper, on behalf of the Cooper company, agreed to deliver 5,000 kilos of indigo to Harrisons during September 1976, and on August 20, 1976, Harrisons paid in advance the purchase price amounting to £125,698·32. The points of claim do not allege that the business of the Cooper companies was carried on before August 19, 1976, with intent to defraud creditors. The points of claim do not allege that the respondents knew about the agreement made between the Cooper companies and Harrisons on August 19 and 20. The points of claim gloss over the conduct of Mr. Cooper, but an essential part of Harrisons's case, which will be made clear by amendment, is that when Mr. Cooper agreed with Harrisons, he intended to use their money to pay Jimlou, and knew that if he paid Jimlou he could neither deliver indigo to Harrisons nor repay Harrisons their purchase price.

On the very day when Harrisons made the advance payment to the Cooper company, namely, August 20, 1976, of a sum in excess of £125,000, the Cooper companies paid £110,000 to Jimlou in part discharge of the sum of £150,000 which should have been paid on June 30, 1976. Harrisons allege that the respondents knew that the sum of £110,000 could only be, and was, part of an advance payment by a customer of the Cooper company, and that the respondents knew that the payment to Jimlou effectively and irrevocably rendered the Cooper companies powerless either to deliver the indigo for which the advance had been made, or to return to the customer the cash which the customer had innocently paid for indigo which he was not going to get. Thus, by making payment to Jimlou, the Cooper companies defrauded Harrisons, and by accepting payment with knowledge of all the circumstances, except the name of the defrauded customer, the respondents became parties to the fraud on Harrisons.

Counsel for Harrisons and counsel for the respondents agree that if these allegations are substantiated, Jimlou became a constructive trustee of £110,000 for Harrisons. Alternatively or additionally, though counsel for the respondents was not disposed to agree, the respondents may be liable in damages to Harrisons for fraud. Mr. Crawford, who appeared on behalf of Harrisons, submitted that if the respondents are liable in equity or common law for money which the respondents knew to have been obtained by a fraud perpetrated on a creditor by the Cooper companies in carrying on their business, then Harrisons are entitled to use the machinery of section 332 instead of issuing more conventional proceedings against the respondents as trustees or tortfeasors.

Mr. Evans Lombe, who appeared on behalf of the respondents, submitted in the first place that the points of claim do not establish that the business of the Cooper companies was "carried on with intent to defraud creditors." Mr. Evans Lombe submitted in the alternative that the points of claim do not establish that the respondents were "knowingly parties to the carrying on of the business" of the Cooper companies. The requirements of section 332 are not, therefore, capable of fulfilment, the points of claim must be struck out and Harrisons may, if they please,

A seek by the normal procedure of a writ and statement of claim in the Chancery Division or the Queen's Bench Division for any more appropriate remedy which may be available, if they proceed with regularity and manage to prove their allegations.

Mr. Evans Lombe submitted that one transaction cannot amount to the carrying on of a business with intent to defraud creditors. For this submission he relied on certain observations of Oliver J. in *In re Murray-*
B *Watson Ltd.* (unreported), April 6, 1977. Oliver J. said that section 332:

> "is aimed at the carrying on of a business . . . and not at the execution of individual transactions in the course of carrying on that business. I do not think that the words 'carried on' can be treated as synonymous with 'carried out,' nor can I read the words 'any business' as synonymous with 'any transaction or dealing.' The
> C director of a company dealing in second-hand motor cars who wilfully misrepresents the age and capabilities of a vehicle is, no doubt, a fraudulent rascal, but I do not think that he can be said to be carrying on the company's business for a fraudulent purpose, although no doubt he carries out a particular business transaction in a fraudulent manner."

In my judgment, when Mr. Cooper on behalf of the Cooper companies
D sought from Harrisons an order for indigo on advance payment terms, Mr. Cooper was carrying on the business of the Cooper companies. When the Cooper companies accepted advance payment of £125,698-odd, Mr. Cooper knowing that there was no prospect, or no reasonable prospect or intention of supplying indigo, and no intention of returning the money to Harrisons, the business of the Cooper companies was carried on fraudulently. The subsequent payment to Jimlou of £110,000 made the
E fraudulent carrying on of the business irremediable and constituted a fraud on the then creditor, Harrisons. The whole transaction between the Cooper companies and Harrisons constituted the carrying on of the business of the Cooper companies with intent to defraud a creditor of the company. Save that only one creditor was involved, the situation appears to meet the requirements of section 332 set forth by Oliver J. in *In re Murray-*
F *Watson* to which I have already referred, namely, that the section is contemplating a state of facts in which the intent of the person carrying on the business is that the consequence of carrying it on (whether because of the way it is carried on or for any other reason) will be that creditors will be defrauded, "intent," of course, being used in the sense that a man must be taken to intend the natural or foreseen consequences of his act.

In the example given by Oliver J. the dealer was carrying on the
G business of selling motor cars. He did not carry on that business with intent to defraud creditors if he told lies every time he sold a motor car to a customer or only told one lie when he sold one motor car to one single customer. When the dealer told a lie, he perpetrated a fraud on a customer, but he did not intend to defraud a creditor. It is true that the defrauded customer had a right to sue the dealer for damages, and to the
H extent of the damages was a contingent creditor, but the dealer did nothing to make it impossible for the customer, once he had become a creditor, to recover the sum due to him as a creditor.

In the present case, the Cooper companies were carrying on the business

of selling indigo. In my judgment, they carried on that business with intent to defraud creditors if they accepted deposits knowing that they could not supply the indigo and were insolvent. They were carrying on business with intent to defraud creditors as soon as they accepted one deposit knowing that they could not supply the indigo and would not repay the deposit. It does not matter for the purposes of section 332 that only one creditor was defrauded, and by one transaction, provided that the transaction can properly be described as a fraud on a creditor perpetrated in the course of carrying on business. If the Cooper company had fraudulently supplied sub-standard indigo to Harrisons, the Cooper company would have committed a fraud on a customer, but by accepting a deposit knowing that they could not or would not supply indigo, and by using the deposit in a way which made it impossible for them to repay Harrisons, the Cooper company, in my judgment, committed a fraud on a creditor. If a mail order company advertises goods and solicits deposits with no intention of supplying the goods or of returning the money, and if one hundred customers in response to the advertisement pay over £100,000, the business of the company is plainly being carried on with intent to defraud creditors of the company. If the company, as in the present case, solicits and obtains an advance of £100,000 from one customer, the situation is no different. It follows that if the points of claim are substantiated, the Cooper companies were being carried on with intent to defraud creditors within the meaning of section 332.

Mr. Evans Lombe submitted in the alternative that the respondents could not knowingly be parties to the carrying on of the business of the Cooper company with intent to defraud creditors of the Cooper company because they had no power of management or control over the carrying on of the business, and did not themselves assist in the carrying on of the business. I agree that a lender who presses for payment is not party to a fraud merely because he knows that no money will be available to pay him if the debtor remains honest. The honest debtor is free to be made bankrupt. But in my judgment a creditor is party to the carrying on of a business with intent to defraud creditors if he accepts money which he knows full well has in fact been procured by carrying on the business with intent to defraud creditors for the very purpose of making the payment. Mr. Evans Lombe said truly that section 332 creates a criminal offence and should be strictly construed. But a man who warms himself with the fire of fraud cannot complain if he is singed.

An application by a creditor under section 332 must be carefully regulated if injustice is not to result. The respondents to this summons under section 332 must not be placed in double jeopardy by the possibility of further proceedings under section 332 by the liquidator. Moreover, if an order is to be made under section 332, the court must know whether to order payment to the creditor applicant or to the liquidator. Harrisons should, therefore, ask the liquidator to elect whether to intervene to claim relief under section 332, either based on the transaction with Harrisons or based on any other transactions of the Cooper company which implicate the respondents. The liquidator should also be asked whether he wishes to contend that the whole or any part of any moneys for which the respondents may prove to be liable under section 332 should be paid to

him and not to Harrisons. He should be informed that if he does not choose to intervene now he will not be able successfully to institute section 332 proceedings against the respondents in the future. But it is essential that the liquidator should be advised of the present proceedings. For all I know, the sum of £110,000 paid to Jimlou may have been directly or indirectly derived not simply and solely from Harrisons's money but from advance payment or other sums paid by other creditors in the like position. Of course, if the respondents know nothing of the operations of the Cooper company they will be safe both against Harrisons and against the liquidator.

All I decide now is that the points of claim appear to establish a case which invites investigation under section 332 and at Harrisons's risk as to costs if they fail to establish the liability of one or more of the respondents under that section.

By a separate summons, Harrisons seek the appointment of a receiver of the assets and manager of the business of Jimlou. The grounds of this application are that Jimlou received the £110,000 as constructive trustees for Harrisons, and may part with that sum and dissipate their assets. I do not see how this wide relief could be appropriate when the liability of Jimlou remains at issue, and in any event it appears that Jimlou have already parted with the sum of £110,000. I make no order on this summons.

*Summons dismissed.*
*No order on second summons.*
*Applicants' costs of application.*
*Respondents' costs of second summons.*

Solicitors: *Gumbiner & Co.; Ashurst, Morris, Crisp & Co.*

---

## *In re* TILTWOOD, SUSSEX
## BARRETT *v.* BOND AND OTHERS

[1976 S. No. 10105]

1978 Feb. 1, 2; 14 Foster J.

*Restrictive Covenant — Enforceability — Purchase from common vendor—Owner of benefited land purchasing burdened land—Sale of burdened land—Whether restrictive covenants extinguished*

In June 1951, L, the purchaser of the agricultural land forming part of an estate surrounding a mansion house and grounds, covenanted with the vendor to use the four parcels thereof for agricultural purposes only and not permit the erection of any building thereon. The vendor took the covenant to protect the view to the south of the mansion house. In February 1952 the vendor conveyed to S the mansion house and grounds with the benefit of the covenants as to the four parcels which were contained in the 1951 conveyance. The vendor also

# *Re Maidstone Buildings Provisions Ltd* [1971] 1 WLR 1085

The Weekly Law Reports, July 2, 1971



authorising him to bring an appeal would be entitled to a dispensation because he would say: "I have got my certificate. That shows I have a prima facie case. Also, the legal aid committee have assessed my contribution. That is the end of it. I cannot be made to pay anything more."

That argument would in my judgment be putting the case too high. The question however is where one draws the line, and *In re Cohen, A Bankrupt* [1961] Ch. 246 does not help, because there is nothing in the report of that case to show on what basis the Court of Appeal proceeded, save only that it shows there may be cases in which there ought not to be a dispensation.

In the present case, the evidence in support of the application is very brief. The bankrupt says that payment of such a sum would occasion him "serious hardship." He does not say "Unless I have a dispensation, my case cannot go on at all." Having regard to the authorities that mere inability to pay is not enough, real hardship must be shown.

Mr. Lightman also spoke of the merits of an appeal, but that seems to me to be not a very helpful line of country from his point of view, since as I understand it, there is an authority directly in point against him. There are, I am told, dicta of the Court of Appeal which throw doubt upon it, but they may not be binding on this court. Certainly the position might be different elsewhere, but if one is going to appeal on the merits—apart from a legal aid committee having said that it is a proper case to bring on—that line of approach is not very helpful in these circumstances.

For these reasons, it seems to me that the bankrupt has failed to show that his is a special case within rule 129 of the Bankruptcy Rules 1952, and for my part, I would not dispense with the security for costs of the appeal.

FOSTER J. I agree.

*Order accordingly.*

Solicitors: *Sharpe, Pritchard & Co. for William Bains, Brigg; Solicitor, Department of Trade and Industry.*

K. N. B.

---

[CHANCERY DIVISION]

## * *In re* MAIDSTONE BUILDINGS PROVISIONS LTD.

1971 April 29, 30 — Pennycuick V.-C.

*Company—Winding up—Fraud—Secretary of company—Liquidator's claim for declaration of liability—"Parties to the carrying on of the business"—Whether applicable to company secretary—Companies Act* 1948 (11 & 12 *Geo.* 6, *c.* 38), *s.* 332 (1)

A chartered accountant, who was a partner in the firm which acted as auditors of an incorporated company, was appointed secretary of that company in March 1960. He ceased to be secretary in November 1962 but was reappointed in December 1962. At a meeting of the board of

---

[Reported by MRS. F. ALLEN MCLEAN, Barrister-at-Law]

directors in March 1961 the draft figures which he presented showed a considerable loss. The secretary, or his staff, continued until November 1962 to prepare monthly and quarterly written statements of the company's finances, and advised the board of directors as to the position indicated by those figures. Except for one directors' meeting held in September 1962, the secretary was present or in attendance at all meetings held from March 1961 until he resigned in April 1965. The company's finances were discussed at directors' meetings subsequent to that of March 1961 and resolutions were passed to effect certain economies. However the company continued to trade at a heavy loss, incurring debts without any reasonable prospect of being able to pay them. In June 1965 a resolution was passed at an extraordinary general meeting that the company be wound up voluntarily. The liquidator sought an order against the directors and also against the secretary making them personally liable for the liabilities of the company pursuant to section 332 of the Companies Act 1948.[1]

On an application by the secretary for the proceedings to be dismissed on the grounds that they disclosed no reasonable cause of action:—

*Held*, that the expression "party to" in section 332 of the Companies Act 1948 indicated no more than "participates in," "takes part in" or "concurs in" and involved some positive steps (post, p. 1092F). Mere omission by the secretary to give certain advice to the directors was not being a party to carrying on the business in a fraudulent manner and, accordingly, the proceedings against him would be dismissed.

The following case is referred to in the judgment:

*Leitch (William C.) Bros. Ltd., In re* [1932] 2 Ch. 71.

The following additional cases were cited in argument:

*Barnett* v. *South London Tramways Co.* (1887) 18 Q.B.D. 815, C.A.

*Bradford Third Equitable Benefit Building Society* v. *Borders* [1941] 2 All E.R. 205, H.L.(E.).

*Cross* v. *Earl Howe* (1892) 62 L.J.Ch. 342.

*Cullen* v. *Thomson* (1862) 6 L.T. 870, H.L.(Sc.).

*Joint Stock Discount Co.* v. *Brown* (1869) L.R. 8 Eq. 376.

*Registrar of Restrictive Trading Agreements* v. *W. H. Smith & Son Ltd.* (1969) L.R. 7 R.P. 122; [1969] 1 W.L.R. 1460; [1969] 3 All E.R. 1065, C.A.

SUMMONS

In December 1959 a company was incorporated with the name Merfeels Ltd. for the purpose of carrying on the business of general and manufacturers' agents, producers, manufacturers, importers, exporters and dealers in canned goods of all kinds. It had a share capital of £100. The company's name was later changed to Stock, Dehn and Spear Ltd. and finally to Maidstone Buildings Provisions Ltd. In 1960 the authorised share capital was increased to £10,000, the paid up, or credited paid up, capital being £8,000. The registered holders of the shares were Stuart John Stock, Kurt Otto Dehn and Wilfred John Spear who became directors when trading began in March 1960. Ronald Frederick Penney, a partner in the firm of F. G. Jenkins Wood & Co., the company's auditors, became a director and was appointed secretary. He resigned as director in July 1960 but continued as secretary. A Mr. C. A. Smith

[1] Companies Act 1948, s. 332 (1): see post, p. 1088C–E.

was appointed secretary in November but died shortly afterwards and Mr. Penney consented in December to act as interim secretary until his successor was appointed. The expenses of promoting the company had been heavy and the company traded at very narrow margins. In March 1961 the figures Mr. Penney put before the board of directors showed that the company had been trading at a considerable loss. The board resolved to effect certain economies and to reduce the directors' salaries by £500 each per annum. In November 1962, in view of the serious situation of the company's finances, further economies were agreed on. The company continued to trade at a loss until 1965, obtaining goods on credit, incurring debts for wages, salaries, commissions, rent, heating, advertising, travel and entertainment and otherwise. In June 1965 when it was resolved to go into voluntary liquidation, the company's debts stood at approximately £99,000. The liquidator sought an order against the three directors Messrs. Stock, Dehn and Spear and also against Mr. Penney, making them personally responsible for the liabilities of the company pursuant to section 332 of the Companies Act 1948. It was common ground that the issue raised against Mr. Penney was quite different from that raised against the directors. The contention of the liquidator was that Mr. Penney, in his capacity of secretary and as a chartered accountant, who was a member of the firm acting as the company's auditors, and who acted as a sort of financial adviser, was knowingly a party to the carrying on of the business of the company. He owed a duty to the company to give advice and he should have taken positive steps to ensure that the company ceased fraudulent trading. Whilst section 275 of the Companies Act 1929 applied only to directors, section 332 of the Companies Act 1948 applied to any persons. Mr. Penney contended that, as company secretary, he was a servant and could not be held liable under section 332 unless a clear case of complicity in fraudulent trading was pleaded. He applied for dismissal of the proceedings against him in that the points of claim made by the liquidator disclosed no reasonable cause of action.

*D. M. Burton* for the former company secretary.
*M. K. I. Kennedy* for the liquidator.

PENNYCUICK V.-C. I have before me an application by Mr. Ronald Frederick Penney in a matter entitled In re Maidstone Buildings Provisions Ltd. and In re the Companies Act 1948. That matter is a summons brought pursuant to section 332 of the Companies Act 1948 by the liquidator of the company whereby he seeks an order against certain directors of the company and also against the present applicant, Mr. Penney, making them personally responsible for the liabilities of the company pursuant to the section. Mr. Penney was not at any relevant time a director of the company but was for some time its secretary.

The liquidator has come to terms with one of the director respondents. As regards another, the summons has been stood over with a view to a compromise. I am not sure what the position is as regards the third; it does not matter.

It is not in dispute that the issue raised against Mr. Penney is quite different from that raised against the directors so that there is no reason why the summons should not be dealt with as between the liquidator and Mr. Penney separately from the directors.

The application before me today is one by Mr. Penney that the proceedings issued against him be dismissed on the ground that the points

of claim disclose no reasonable cause of action. I should mention at this stage that the present application has been made at a very late date. The summons has actually been set down for hearing. Moreover, the issues raised by the summons are certainly such as to admit of serious argument. In those circumstances it may well be that there would be insuperable difficulty in making an order upon the present summons to dismiss on the ground that the summons discloses no reasonable cause of action. A

Counsel for the liquidator has, however, very properly accepted that I should deal with this summons on its merits. That is clearly desirable because if my decision goes in favour of Mr. Penney, that puts an end to the whole matter. If I were to refuse to hear the present application or dismiss it because it was too late or because there was an arguable point, the only result would be that there would be further delay and expense, and then the identical point would come before another judge. I say "the identical point" because the point which I have to deal with depends on the construction of section 332 and its application as construed to a certain state of facts as alleged by the liquidator, or as admitted by the respondent. I am not concerned to adjudicate upon any issues of fact. B C

It will be convenient first to read section 332 (1):

> "If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory of the company, may, if it thinks proper so to do, declare that any persons who were knowingly parties to the carrying on of the business in manner aforesaid shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the court may direct. . . ." D E

It is worth pointing out that section 332 reproduces section 275 in the Act of 1929 which is in identical terms except that there the persons who could be made liable were confined to directors whether past or present whereas the present section applies to any person. F

Subsection (3) of the section imposes, apart from the civil liability, a punishment, including imprisonment or fine. There is, therefore, no question but that section 332 is a penal section.

I propose now to read the relevant passages in the pleadings and particulars, making certain comments on them as I go on. The liquidator delivered points of claim to the following effect:

> "(1) The . . . company . . . was incorporated . . . for the purpose of carrying on the business of general and manufacturers' agents, producers manufacturers importers, exporters and dealers in canned goods of all kinds. . . ." G

(2) deals with changes in the company's name; (3) states that the company's authorised share capital was increased in 1960 to £10,000 and the issued capital at £8,000. Then the three named individuals, Dehn, Stock and Spear, are the registered holders of those shares. (4) sets out that at an extraordinary general meeting of the company the company went into voluntary liquidation and that the present liquidator, Mr. Norman Barrington Cork, was appointed the liquidator. H

> "(5) The company is hopelessly insolvent and the deficit on the said winding up is likely to exceed £99,000. (6) The company commenced

A to trade in or about March 1960. On March 25, 1960, the respondent Ronald Frederick Penney became secretary of the company and on July 1, 1960, the respondents Stock, Dehn and Spear became directors of the company. [Then it deals with their salaries.] (7) At the meeting of the board of directors held on March 8, 1961, it was resolved that, as the draft figures showed a considerable loss for the period from the commencement of trading to January 31, 1961, con- B siderable economies be effected. It was further resolved that the respondents drawings as directors be reduced immediately by £500 each per annum. (8) At the meeting of the board of directors held on November 21, 1962, the respondents recognised the seriousness of the company's financial position and agreed to prune overheads wherever possible. [Then there are particulars of the reduction of C the directors' remuneration.] The financial position of the company was further discussed at subsequent meetings of the board of directors. (9) At all times after the said meeting held on March 8, 1961, the respondents knew or ought to have known that the company was trading at a heavy loss and was insolvent. But the respondents regularly caused the company to purchase goods on credit and to incur other debts without any reasonable prospect of being able to pay D for the said goods or to satisfy its other debtors."

Those words are an echo of the judgment of Maugham J. in *In re William C. Leitch Bros. Ltd.* [1932] 2 Ch. 71 a decision under the corresponding section of the earlier Act.

"(10) In the premises the respondents were knowingly parties to E the carrying on of the business of the company with intent to defraud creditors of the company and for other fraudulent purposes."

So that is an almost entirely unparticularised allegation, so far as Mr. Penney is concerned, of fraudulent trading within the terms of section 332. I need not read the rest of the points of claim.

In the points of defence Mr. Penney makes a number of admissions and denials which I need not read. He states in paragraph 3 that he "was F appointed secretary of the company on March 25, 1960, and ceased to be secretary of the company on November 21, 1962; he was reappointed secretary on December 13, 1962." Then paragraph 4

"As to paragraphs 7–10 inclusive of the points of claim (a) this respondent was not concerned with the management of the company or the direction of its policy which was wholly under the control G of the respondents Stock, Dehn and Spear. This respondent advised the said respondents in 1961 and 1962 of the company's actual financial position: but he was not a party to carrying on the business of the company. In particular, this respondent at no time caused the company to purchase goods or incur credit. (b) This respondent admits the proceedings of the meetings of directors on March 8, H and November 21, 1962. On November 21, 1962, the directors resolved that this respondent should be replaced as secretary of the company by one C. A. Smith. The said C. A. Smith died on December 1, 1962, and this respondent was requested by the directors to become secretary of the company on an interim basis until they found a permanent successor to the said C. A. Smith, which he agreed to do and was appointed secretary on December 13, 1962. (c) The function of this respondent was at all times solely to advise

the board of directors of the company and to carry out such duties A
as the board deputed to him. He says he was not knowingly a party to the carrying on of the business of the company with intent to defraud creditors of the company or for other fraudulent purposes and is not liable as alleged or at all."

The liquidator made a request for particulars under paragraph 4 (a) of the advice alleged to have been given by the respondent, Mr. Penney, B
to the respondents Stock, Dehn and Spear stating the nature of such advice and the date or dates on which such advice is alleged to have been given; whether such advice is alleged to have been given to each of the said respondents individually or to them collectively and if advice was given in writing identifying the document or documents.

The answers to the particulars given pursuant to that request were C
as follows:

> "This respondent or his staff from March 25, 1960, to November 1962 prepared monthly and quarterly written statements of the financial position of the company which were submitted to board meetings of the company: and this respondent or Endicott, a member of his staff, at such meetings orally advised the directors present as to the position appearing from such statements. From March 1961 onwards D
> to November 1962 the nature of the advice given was that the company's overheads ought to be reduced and/or that sales should be expanded. After December 1962 this respondent's duties did not include the giving of general financial advice, but he was as auditor of the company consulted on specific occasions to advise: . . ."

In fact, Mr. Penney was not the auditor of the company. He was E
a partner in a firm of accountants who were the auditors of the company. Then he deals with certain particular matters on which he was consulted.

Mr. Penney in turn sought further particulars of the points of claim, the particulars sought under paragraph 9 being as follows:

> "Particularly each and every occasion on which it is alleged that this respondent caused the company to purchase goods on credit F
> and stating the manner in which it is alleged this respondent caused the company to purchase goods on credit and the goods so purchased: Particularly each and every occasion on which it is alleged this respondent caused the company to incur other debts and stating the manner in which it is alleged this respondent caused the company to incur the debts relied on and stating the amount of each such G
> debt and the creditor concerned." And under paragraph 10: "Particularly every fact relied on in support of the allegations of fraud made in this paragraph."

In response to that request he received particulars in these terms:

> "Under paragraph 9 and 10: Such goods were bought on credit after H
> March 8, 1961 (being the date of the meeting of the board of directors referred to in paragraph 7 of the points of claim). Such debts were incurred after the said March 8, 1961, in respect of wages, salaries, commissions, rent, light and heating, advertising, travelling and entertainment expenses, indebtedness to Westminster Bank and C. H. Donner. The only other particulars known to the applicant sufficiently appear from the books of account of the company all of

which have been made available to this respondent upon discovery and upon which the applicant will rely at the trial.

"Save as above the best particulars which the applicant can give of the manner in which this respondent caused the company to purchase such goods on credit and to incur such other debts are that the respondent Penney was at all material times an officer of the company and knowingly a party to the carrying on of the business of the company under the circumstances set out in paragraph 9 of the points of claim and thereby rendering himself liable under the provisions of section 332 of the Companies Act 1948."

Mr. Penney was perhaps not unnaturally not content with those particulars. He sought an order for further particulars and on October 13, 1970, Mr. Registrar Berkeley made an order that the liquidator deliver to the applicant the following further and better particulars under paragraph 9 of the points of claim, namely:

"Whether it is alleged that the respondent Ronald Frederick Penney caused the said company to purchase the goods and incur the debts referred to in the particulars dated July 7, 1970, only by reason of his being the secretary of the company and as such having knowledge of the business of the company or whether it is alleged that he was in any other and if so what way knowingly a party to the purchase of such goods and incurring of such debts and in the latter event giving full particulars of the facts relied on."

Pursuant to that order the liquidator delivered further particulars. It is clear from the form of the particulars which he delivered that he was then quite properly setting out afresh the full particulars upon which he relied in support of his allegation in the points of claim. The particulars run as follows:

"The applicant will rely upon the following facts and matters in support of the allegation that this respondent was knowingly a party to the carrying-on of the business of the company: (a) At all times after March 8, 1961 the respondent knew that the company was trading at a heavy loss and was insolvent."

I break off to observe that counsel for the liquidator states that the words "the respondent knew that the company was insolvent" are intended in the context to mean not only that he knew the company was insolvent, but that he knew there was no reasonable prospect of the company ever being able to pay its debts, and I will proceed on the basis that that is so. To continue:

"(i) This respondent was appointed a director and the secretary of the company on March 25, 1960. On July 1, 1960, he resigned as director." I interpose that it is accepted there was no fraudulent trading up to that date. "On November 21, 1962, he resigned as secretary but was reappointed as secretary on December 13, 1962, and continued in office until his resignation on April 20, 1965.

"(ii) At the first meeting of the directors of the company held on March 25, 1960, Messrs. Jenkins, Wood & Co. were appointed auditors and accountants to the company. This respondent was at all material times a partner in the said firm and assisted in the preparation of the company's accounts for the 18 months ending on December 31, 1961, and for the year ending on December 31, 1962, and draft

The Weekly Law Reports, July 2, 1971



accounts for the six months ending on June 30, 1963. The applicant will rely upon the fact that the following letters concerning the company's accounts . . ." I need not refer to the particulars of those letters. A

"(iii) This respondent was present or in attendance at all meetings of the board of directors (save for the meeting held on September 27, 1962) which were held between March 25, 1960, and his said resignation on April 20, 1965. Such meetings included the meetings of the board of directors held on March 8, 1961, and November 21, 1962, and referred to in paragraphs 7 and 8 of the points of claim, and a meeting of the board of directors held on March 5, 1964, at which the financial position of the company was discussed. B

"(b) Despite such knowledge as aforesaid of the company's insolvency, this respondent took no steps, or alternatively took no effective steps, to prevent the company from purchasing the goods on credit and incurring the other debts, described in paragraph 9 of the points of claim and the particulars thereof. The steps that this respondent should have taken, but did not take, were to advise the respondents Stock, Dehn and Spear at or after the said meeting of the board of directors held on March 8, 1961, that the company was insolvent and should cease to trade." C D

So the effect of those particulars is that it is alleged that Mr. Penney, in addition to being the secretary of the company, acted in some sense as its financial adviser; in that dual capacity, although he knew that the company was insolvent, he omitted to take the steps which he should have taken to prevent the company continuing to trade, the steps being to give certain advice to the directors; and that, it is said, brings him within section 332. E

Counsel for Mr. Penney contends that upon the points of claim particularised in that way there is no cause of action against him. He contends that, assuming all the facts alleged are made out, upon those facts he was not a party to the carrying on of the company's business in manner aforesaid, that is with intent to defraud creditors of the company or for any other fraudulent purpose. F

The expression "parties to the carrying on of the business" is not, I think, a very familiar one, but so far as I can see, the expression "party to" must on its natural meaning indicate no more than "participates in," "takes part in" or "concurs in." And that, it seems to me, involves some positive steps of some nature. I do not think it can be said that someone is party to carrying on a business if he takes no positive steps at all. So in order to bring a person within the section you must show that he is taking some positive steps in the carrying on of the company's business in a fraudulent manner. G

So far as the position of a secretary as such is concerned, it is established beyond all question that a secretary, while merely performing the duties appropriate to the office of secretary, is not concerned in the management in the company. Equally I think he is not concerned in carrying on the business of the company. On the other hand, it is equally well established, indeed it is obvious, that a person who holds the office of secretary may in some other capacity be concerned in the management of the company's business. H

I was referred to certain authorities on these points, but I do not think it would be useful to cite them. There is quite a neat statement of

A the position in *Palmer's Company Law*, 21st ed. (1968), p. 603, where he says:

> "The position of secretary in a company has altered out of recognition during the past 75 years. From being a humble clerk he has become, in most large companies, an officer of the company having important duties and responsibilities and often with considerable influence. He
> B remains, however, in the eyes of the law what he was originally intended to be, namely, an officer in a ministerial and administrative capacity: he has no managerial functions, and it would, normally, be unwise for an outsider to assume that he has any managerial powers, which are, prima facie, vested in the directors and any managing directors. In practice the functions of the secretary often exceed those contemplated by the Acts and he is sometimes given considerable
> C managerial responsibility."

So, says counsel for Mr. Penney, the mere fact that Mr. Penney was the secretary clearly does not bring him within the terms of this section. As secretary he was not a party to the carrying on of the business of the company. Then, he says, although it is alleged that he occupied one other position in relation to the company, in effect, that of financial
D adviser, when one looks at the particulars, no positive action of any kind on his part is alleged. All that is alleged is his omission to take steps to prevent the company trading fraudulently. The steps he omitted to take were to give certain advice to the directors.

It seems to me impossible to say that that mere inertia on the part of Mr. Penney, and that is all that is alleged against him, could represent
E being a party to the carrying on of the business of the company, and if that is right, it is the end of the matter.

Counsel for the liquidator does not, I think, contend that the expression "party to" covers everyone who has notice that the business of the company is being carried on fraudulently. That contention, if it were right, would lead to impossible results. But what he does say—I think this is the substance of his argument—is that Mr. Penney in his position as
F secretary and financial adviser of the company and also member of the firm of the company's auditors owed a duty to the company to give them certain advice and that his omission to give that advice rendered him a party to carrying on the business of the company.

I find it impossible to accept that contention. Whatever duty Mr. Penney may have owed to the company, I do not think mere omission
G to give advice could be regarded as amounting to being a party to carrying on the business of the company.

I would add to avoid misunderstanding that if any given individual does owe a duty to another party to give advice, his omission to give that advice may well represent negligence for which he could be made accountable at the instance of the person to whom he owes the duty. Again there are, I think, circumstances in which a party remaining silent where he
H ought to speak may be held to be implicated in a fraud, but that is not what this section requires. This section requires that the person concerned should be a party to the carrying on of the business in a fraudulent manner. I find it impossible to say, whatever duty to give advice Mr. Penney may have owed to the company, that mere silence and omission to give advice could make him a party to the carrying on of the company's business.

A It is worth while to mention again in this connection that this is a penal section. The principle on which the courts now act as regards penal enactments is stated in *Halsbury's Laws of England*, 3rd ed., vol. 36 (1961), p. 415, para. 631:

> "It is a general rule that penal enactments are to be construed strictly, and not extended beyond their clear meaning. At the present day, this general rule means no more than that if, after the ordinary rules of construction have first been applied, as they must be, there remains any doubt or ambiguity, the person against whom the penalty is sought to be enforced is entitled to the benefit of the doubt." B

I myself do not feel any doubt or ambiguity of the construction of section 332 in the present context. If there were any doubt, it would have to be resolved in favour of the respondent.

C For the reasons which I have given it seems to me that the allegation of fraudulent participation against Mr. Penney as alleged in the points of claim and expanded in the particulars has not been made out even on the footing that every matter of fact raised in the pleadings is decided in favour of the liquidator.

That being the position, the result is that the proceedings issued by the liquidator disclose no reasonable cause of action against Mr. Penney D and that I should make the order sought upon Mr. Penney's application.

*Order accordingly.*

Solicitors: *Chamberlain & Co.; Simmons & Simmons.*

E

---

[QUEEN'S BENCH DIVISION]

## * SECRETARY OF STATE FOR EMPLOYMENT AND PRODUCTIVITY *v.* CLARKE CHAPMAN & CO. LTD.

F

1971 March 24 — Lord Parker C.J., Widgery L.J. and Bean J.

*Revenue—Selective employment tax—Premium—Manufacturers of electrical units—Installation at site separate from main establishment over four- or five-year period—Temporary buildings erected at site—Head office retaining control—Whether separate site "establishment"—Whether employment on site "in, or carried out from" main establishment—Selective Employment Payments Act* 1966 (*c.* 32), *s.* 1 (2) (*a*) G

The employers were electrical engineers engaged in the manufacture and installation of large electrical units. At site F four 500-megawatt generating units were being installed over a period of four or five years. Buildings were erected as general accommodation for the men working on the site, H but they were built with the knowledge that they would be there for a period of only five years and were of a kind which could be removed and used elsewhere. The employers' head office was at G, from where the whole administration of the company was carried out.

---

[Reported by MRS. CELIA FOX, Barrister-at-Law]

# *Re Patrick Lyon* [1933] Ch 786

MAUGHAM J.

1933

March 14, 15.

# *In re* PATRICK AND LYON, LIMITED.

[00704 of 1932.]

*Company—Winding Up—No Trading Profit—Debentures issued to Director—Winding Up just over Six Months later—"Fraud"—"Fraudulent Purpose"—Dishonesty Essential—Companies Act,* 1929 (19 *&* 20 *Geo.* 5, *c.* 23), *s.* 265, *sub-s.* 1; *s.* 266; *s.* 275, *sub-ss.* 1, 2.

By s. 265, sub-s. 1, of the Companies Act, 1929: "Any . . . . act relating to property which would, if made or done by or against an individual, be deemed in his bankruptcy a fraudulent preference, shall, if made or done by or against a company, be deemed, in the event of its being wound up, a fraudulent preference of its creditors, and be invalid accordingly."

By s. 266: "Where a company is being wound up, a floating charge on the undertaking or property of the company created within six months of the commencement of the winding up shall, unless it is proved that the company immediately after the creation of the charge was solvent, be invalid, . . . ."

By s. 275, sub-s. 1: "If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or . . . . for any fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory . . . . may, . . . . declare that any of the directors, . . . . of the company who were knowingly parties to the carrying on of the business in manner aforesaid shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the court may direct."

By sub-s. 2: "Where the court makes any such declaration, it may . . . . make provision for making the liability of any such director under the declaration a charge on any debt or obligation due from the company to him, . . . ."

By sub-s. 6: ". . . . where the declaration under subsection (1) of this section is made in the case of a winding up in England, the declaration shall be deemed to be a final judgment within the meaning of paragraph (*g*) of subsection (1) of section one of the Bankruptcy Act, 1914":—

*Held,* (1.) that in s. 275 the references to "intent to defraud" and to "fraudulent purpose," unlike the words "fraudulent preference" in s. 265, import actual dishonesty;

(2.) that for the purposes of s. 266 a company is not solvent if it is unable to pay its debts as they become due.

*Ex parte Russell* (1882) 19 Ch. D. 588 and *London and Counties Assets Co.* v. *Brighton Grand Concert Hall and Picture Palace, Ld.* [1915] 2 K. B. 493 followed.

MISFEASANCE SUMMONS.

The applicants were creditors of the company, which was in liquidation. The first respondent had been a director of

the company since its incorporation on June 17, 1929, till July 22, 1932, and his wife was also a director. His son was its secretary and became a director after his father's retirement. The company never made a trading profit. In January, 1932, it was indebted to the first respondent and his wife, and it was arranged that the first respondent should advance to the company 400*l.*, out of which the moneys owing should be discharged. On February 3, 1932, the company authorized the issue of a series of debentures of a total amount of 1000*l.* On February 11, 1932, the company drew a cheque in favour of the first respondent for 339*l.* 16*s.* 7*d.*, and another in favour of his wife for 51*l.* 8*s.* 4*d.* On February 12, 1932, the first respondent paid to the company by cheque 400*l.*, and on the same day four debentures of 100*l.* each, constituting a floating charge, were issued to him. On August 13, 1932, he appointed the second respondent to be receiver under the debentures, and on the same day notices were sent to the company's creditors convening a meeting for August 22 to consider a resolution to wind up. The second respondent had been appointed by the shareholders as liquidator, and at the meeting on August 22 the creditors confirmed the appointment. By this summons, which was issued on October 18, 1932, the applicants asked (inter alia): (1.) for a declaration that the first respondent be personally responsible without any limitation of liability for all the debts or other liabilities of the company or for such part thereof as the Court might direct, on the ground that he had been a party to carrying on the company's business with intent to defraud its creditors; (2.) that provision might be made that any such liability be made a charge on any debt or obligation due from the company to the first respondent; and (3.) that the liquidator might be directed to do all such things as might give effect to any order under paragraph (1.) or paragraph (2.) of the summons. The relief was sought under s. 275 of the Companies Act, 1929. The applicants alleged that after July 1, 1931, the results of trading became progressively worse, and that after February 12, 1932, the company's life was continued, not genuinely for trading

purposes, but solely in order to validate the debentures which had been issued to the first respondent, and that the first respondent was a party to the continuance for that purpose. The first respondent denied those allegations. The liquidator submitted to act in all respects as the Court might direct.

*A. Grant K.C.* and *E. Milner Holland* for the applicants. After the debentures had been issued to the first respondent the company was kept alive, as the first respondent well knew and intended, solely in order to validate them. From the point of view of commercial interests and commercial morality, it would be lamentable if the transaction were allowed to go unpunished. The object of it was to prefer the first respondent. All transactions of that kind have been stigmatized by the Legislature in s. 265 of the Companies Act, 1929, as fraudulent preferences.

*J. Norman Daynes K.C.* and *Philip J. Sykes* for the first respondent. The declaration for which s. 275, sub-s. 1, of the Companies Act, 1929, provides is merely a declaration that any director coming within the sub-section shall be personally responsible as therein mentioned. In the argument before Eve J. in *In re William C. Leitch Brothers, Ld.* (*No.* 2) (1), two points were raised by counsel for creditors whose debts were incurred between the earliest date at which the company had no means of paying its debts and the date of the winding up. The first point was that it is not necessary under the section to prove that any particular creditor has been defrauded, and the second, that if the money obtained under the section is not applied in payment of defrauded creditors the director will still be personally liable for the fraud and will continue to be so until the company has paid twenty shillings in the pound. Eve J. did not deal in his judgment with either of those points. The suggestion that the debentures in the present case would be validated by the company's being kept alive for six months after they were issued depends upon the answers to the questions

(1) Ante, p. 261, 263.

whether the company was solvent on February 12, 1932, and whether the debentures were new money within *In re Matthew Ellis, Ld.* (1) It is for the applicants to prove that the debentures required validating, whether on the ground that the company was insolvent when they were issued or on the ground that they were not a payment in cash: *In re Hayman, Christy & Lilly, Ld.* (2) Sect. 275 of the Companies Act, 1929, is directed solely against fraudulent trading, and there is no evidence in the present case that business has been carried on with intent to defraud. The first respondent is not well versed in business affairs, and all he was concerned to do was to obtain an occupation for his son. There is no evidence that he was a party to the carrying on of the business.

*G. P. Coldstream* for the liquidator. The liquidator submits to act as the Court shall direct, and the Court is asked to make provision for his costs.

*A. Grant K.C.* in reply. This is an unusual case. The only inference to be drawn from the facts is that there was a scheme to defraud creditors by unduly prolonging the life of the company at a time when there was no reason for doing so. The company lost money from the beginning, never made a profit, and by the end of 1931 had exhausted its reserves. Before then it had been pressed by the creditors and compelled to promise weekly payments. By January, 1932, it could not carry on without fresh capital. The test imposed by s. 44 of the Bankruptcy Act, 1914, is whether persons can pay their debts as they fall due, and that test is adopted in s. 265 of the Companies Act, 1929. If the company had gone into liquidation in January, 1932, there would not have been twenty shillings in the pound for the creditors. Sect. 275 was purposely framed to give the Court the widest possible powers to deal with transactions that will not bear investigation.

MAUGHAM J. I will begin by stating that s. 275 of the Companies Act, 1929, under which relief is claimed, is a

(1) Ante, p. 458. (2) [1917] 1 Ch. 283.

very remarkable section and one which is by no means easy to construe. I have myself dealt with one aspect of it in *In re William C. Leitch Brothers, Ld.* (1), and my brother Eve has dealt with a second branch of it in *In re William C. Leitch Brothers, Ld. (No.* 2). (2) Without repeating anything which my brother Eve has said or I have said in either of those cases, I will express the opinion that the words "defraud" and "fraudulent purpose," where they appear in the section in question, are words which connote actual dishonesty involving, according to current notions of fair trading among commercial men, real moral blame. No judge, I think, has ever been willing to define "fraud," and I am attempting no definition. I am merely stating what, in my opinion, must be one of the elements of the word as used in this section. In my opinion it is not used in the same sense as that in which the word "fraud" is used in s. 265 of the Act. There, following the example set by s. 44 of the Bankruptcy Act, 1914, and by s. 92 of the Bankruptcy Act, 1869, both of which deal with the avoidance of fraudulent preferences, the Legislature has thought fit to state that certain acts are to be deemed a fraudulent preference and to be invalid accordingly. A fraudulent preference within the meaning of the Companies Act, 1929, or the Bankruptcy Act, 1914, whether in the case of a company or of an individual, possibly may not involve moral blame at all. For example, there may be a discrimination between creditors, irrespective of pressure, on grounds with which most people would sympathize. Again, there is nothing in the language of s. 266 of the Companies Act, 1929 (which enables a floating charge created within six months of a winding up to be attacked in certain circumstances), to indicate that the Legislature took the view that the creation of such a charge when the company is insolvent is fraudulent, however blameworthy it may be. That appears from the fact that the right to attack such a floating charge is limited to cases where the company goes into liquidation within six months of the creation of it. Coming to the present case, I think that in exercising

(1) [1932] 2 Ch. 71. (2) Ante, p. 261.

jurisdiction under s. 275 the Court, however little it may approve of the conduct of the director who is being attacked, is bound to consider whether he has been guilty of a dishonest fraud, and it is hardly necessary for me to point out that the onus is upon the person who seeks to make good the charge, whether he be the official receiver, or the liquidator, or a creditor, or a contributory.

I now turn to the facts. [His Lordship then stated the facts and continued :] A question has been raised as to what "solvent" means in s. 266 of the Companies Act, 1929. It is to be observed that the onus of proving the company's solvency lies upon the debenture holder who is endeavouring to support his floating charge. It is not necessary to say that "solvent" there is limited to one meaning; but in my opinion a company is not solvent within the meaning of s. 266 unless it can pay its debts as they become due. It has been urged that "solvent" means "commercially solvent," and that if, upon balance-sheet figures, a company's assets exceed its liabilities, the company is solvent. I do not accept that view, and in support of my rejection of it I will refer to *Ex parte Russell* (1) and *London and Counties Assets Co.* v. *Brighton Grand Concert Hall and Picture Palace, Ld.* (2) The word "solvent" is used in s. 266 of the Companies Act, 1929, immediately after a section dealing with fraudulent preference, and in construing it the Court has to bear in mind s. 44 of the Bankruptcy Act, 1914, where the preference is defined in relation to a thing done or suffered by a person "unable to pay his debts as they become due from his own money." My opinion, therefore, is that under s. 266 the debentures in the present case might well have been attacked if the liquidation had commenced at a date within the period of six months from their creation, and there is evidence to support the view that, during the latter part of the period in question, the persons in charge of the company's destinies were deliberately delaying sending out notices to wind up the company, in order that the period of six months should so expire. That is, no doubt, not a high-minded course of

(1) 19 Ch. D. 588. (2) [1915] 2 K. B. 493.

action. On the other hand, it is not high-minded for a person who is forming a company to form it with a very small share capital and to cause the company to purchase his stock in trade by an issue of debentures to himself; but that has never yet been held to be fraud, and for some reason which I do not understand it has not been prohibited by the Companies Acts.

The question which I have to determine is whether, within the meaning of s. 275 of the Companies Act, 1929, and construing the reference therein to fraud as I construe it, the business of the company was carried on for a fraudulent purpose. In my opinion, on the whole, I am not justified in coming to such a conclusion. The business of the company, so far as it was carried on during the latter part of its career, was carried on in order to clear up the position by getting in debts and by effecting sales of stock, and not with a view to securing by purchases on credit assets available as security for debentures. I am not clear in my mind that the first respondent was deliberately intending to carry out any fraudulent purpose or to defraud creditors. That is a matter which cannot be left to conjecture. I must be perfectly satisfied that there is enough evidence to justify the charge. To my mind the case has not been made out and I dismiss the summons.

With regard to the costs, I do not accept all the first respondent's answers. He was defending himself, but the precise truth would have been better than rash statements. Further, it was not a proper act on his part to procure payment of his director's fees by an issue of debentures when the company could not pay even small sums to its creditors. Accordingly, it seems to me a case in which the summons should be dismissed as regards him without costs. The applicants, however, must pay the liquidator's costs.

Solicitors: *J. C. Fox, Gamble & Son; Collyer-Bristow & Co., for Forsyth, Bettinson & Co., Birmingham.*

K. R. A. H.

# *Real Estate and Finance Fund* (Unreported, Kawaley K, 24 August 2022)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 135 OF 2022 (IKJ)**

**IN THE MATTER OF THE COMPANIES ACT (2022 REVISION)**

**AND IN THE MATTER OF REAL ESTATE AND FINANCE FUND (DISSOLVED)**

**IN CHAMBERS**

| | |
|---|---|
| **Appearances:** | **Ms Gemma Lardner and Mr Max Galt of Ogier on behalf of the Plaintiff** |
| **Before:** | **The Hon. Justice Kawaley** |
| **Heard:** | **6 July 2022** |
| **Date of decision:** | **6 July 2022** |
| **Draft Reasons circulated:** | **12 August 2022** |
| **Reasons delivered:** | **24 August 2022** |


FSD2022-0135 Page 1 of 36 2022-08-24

## HEADNOTE

*Ex parte application to set aside dissolution of company, continue voluntary liquidation under Court supervision and appoint joint official liquidators-inherent jurisdiction of Court-governing principles-dispensing with service and advertisement of petition-Companies Act (2022 Revision) sections 127, 129(2), 131, 151-Grand Court Act (2015 Revision) section 11(2)-Companies Winding Up Rules 2018 Orders 15, 24-Grand Court Rules Order 9*

## REASONS FOR DECISION

### Introductory

1. The Petition dated June 2, 2022, was sealed on June 14, 2022. Worldwide Opportunities Fund SPC (in Official Liquidation) (the "Petitioner") sought the following principal relief in respect of a dissolved company, Real Estate and Finance Fund ("REFF"/the "Company"):

> "1. *The deemed dissolution of REFF be declared void.*
> 2. *REFF be restored to the Register of Companies.*
> 3. *The liquidation of REFF continues under the supervision of the Court.*
> 4. *REFF be deemed to have continued in existence as if it had not been dissolved;*
> 5. *The property vested in the Minister for Financial Services and Commerce be restored to REFF upon REFF's restoration to the Register of Companies.*
> 6. *Mr Andrew Morrison and Mr David Griffin of FTI Consulting (Cayman) Limited, Suite 3212, 53 Market Street, Camana Bay, PO Box 30613, Grand Cayman, KY1-1203, Cayman Islands and Mr John Batchelor of FTI Consulting (Australia) Pty Ltd of Level 21, Bourke Place, 600 Bourke Street, Melbourne, VIC 3000, Australia be appointed as joint official liquidators of REFF (the '**JOLs**')*."

2. On July 6, 2022, I granted the relief sought by the Petitioner. This appeared to be the first time this Court had set aside a dissolution following a voluntary winding-up. The only previous local decisions relating to similar applications were two cases where this Court refused to set aside the dissolution. These are the reasons for that decision.

**The Petition**

3. The Petition was primarily supported by the First Affidavit of Andrew Morrison and the First Affidavit of John Batchelor, two of the Petitioner's Joint Official Liquidators, who verified its contents. The Petition and the Summons for Directions were listed for hearing on July 6, 2022, and the key directions sought were that (1) the Petitioner should not be required to serve the Petition and (2) the Petitioner should not be required to advertise the Petition. If those directions were granted, the Petitioner invited the Court to grant the substantive relief sought on the Petition without further ado.

4. The Petition alleged as follows. REFF was incorporated in the Cayman Islands as an open-ended mutual investment fund on May 25, 2012. Until 2017, the sole management share was held by Giant Management Corporation Limited, a Hong Kong Corporation, which also served as sole director. From November 2017, the sole director and management shareholder was a Seychelles company with the same name ("Giant Management Seychelles"). The Petitioner, a segregated portfolio company, was wound-up by this Court on May 16, 2019[1]; prior to this it was managed by associates of brothers Alan Sun and Ricky Sun, along with Kimmy Luk, individuals who also controlled REFF (the "Syndicate"). The Petitioner held a segregated portfolio the acronym of which was "HKIF (2)", 88.8% of the participating shares in which were held by AXA China Region Insurance Company (Bermuda) Limited ("AXA"). Between May 2016 and December 2018, the NAV of HKIF (2) fell by more than 93%. The Petitioner alleged that the Syndicate carried out various unauthorised transactions "*whereby REFF's assets were stripped for their own personal benefit and/or the benefit of others, which accounts for the dramatic reduction in HCIF (2)'s NAV*". These transactions are said to give rise to various causes of action for REFF against the Syndicate. In addition, it was averred that in December 2020, "*the Hong Kong Police executed search warrants and arrested 24 persons in respect of the fraudulent misappropriation of REFF's assets, including inter alia Alan Sun, Ricky Sun, Kimmy Luk, Clara Kwok, and Iris Leung*"[2].

---

[1] That Order was made by me at an unopposed *inter partes* hearing. On the papers by Order dated April 12, 2022 in FSD 34 of 2019, I approved a funding agreement on the basis of now sealed materials which alluded to the possibility of the Petitioner pursuing the present application. That application in the Petitioner's liquidation did not address or require me to consider or in any way evaluate the merits of the present application to set aside the dissolution of REFF.
[2] Clara Kwok was described as a former director of Worldwide, together with Ricky Sun. Iris Leung was said to be the wife of Ricky Sun.

5. Against this background the Petition sets out the central allegation that a fraud occurred in the liquidation of REFF. Giant Management Seychelles placed REFF into voluntary liquidation on November 1, 2018, and appointed itself as voluntary liquidator. REFF was dissolved on May 27, 2019. It is alleged, *inter alia*:

> *"26. Pursuant to section 124(1) of the Companies Act a voluntary liquidation shall continue under the supervision of the Court unless, within twenty-eight days of the commencement of the liquidation, the directors have signed a declaration of solvency.*
>
> *27. Pursuant to section 124(2) of the Companies Act a declaration of solvency means a declaration to the effect that a full enquiry into a company's affairs has been made and, to the best of the directors' knowledge and belief, a company will be able to pay its debts in full together with the prescribed rate of interest within twelve months of the commencement of the winding up.*
>
> *28. It is averred that no director, taking into account the matters set out above, could have had reasonable grounds for the opinion that a full enquiry into REFF's affairs had been made and/or that REFF's assets were properly realised for distribution to creditors and/or shareholders.*
>
> *29. It is further averred that the voluntary liquidation was procured by the Syndicate for the purpose of concealing the misappropriation of REFF's assets set out above in circumstances where:*
>
> *(a) Giant Management Seychelles is controlled by Alan Sun, Ricky Sun and Kimmy Luk and paragraph 6 above is repeated;*
>
> *(b) The authorised signatory of Giant Management Seychelles who signed the special resolution placing REFF into voluntary liquidation is an individual who is connected with the Syndicate…"*
>
> *30. By reason of the foregoing:*
>
> *(a) the voluntary liquidation of REFF has been perpetuated by fraud;*

*(b) although REFF appears to have been solvent when it entered voluntary liquidation, upon restoration Giant Management Seychelles could not continue in the position of voluntary liquidator; and*

*(c) the liquidation of REFF under the supervision of this Honourable Court will facilitate a more effective, economic or expeditious liquidation of REFF in the interests of contributories and creditors in circumstances where the powers of an official liquidator will be required for recovery of the assets misappropriated from REFF.*

*31. It is therefore averred that REFF should be restored to the Register of Companies and wound up under the supervision of this Honourable Court.*

**<u>The Petitioner's submissions</u>**

**<u>Directions</u>**

6. Ms Lardner referred the Court to the following evidence in support of the directions sought dispensing with service and advertisement of the Petition. Firstly, the First Affidavit of Jermaine Rasheed Taylor established that on June 20, 2022, the Petition, Summons for Directions and supporting Affidavits were served on (a) the Registry of Companies, (b) the Ministry for Financial Services and (c) the Company's last registered address. Secondly, the Second Affidavit of Batchelor explained that GM Seychelles had, according to searches, itself been dissolved so service on the Voluntary Liquidator was simply not possible. The Petitioner's counsel also indicated that the whereabouts of the members of the Syndicate were unknown.

**<u>Legal principles</u>**

7. In the absence of a statutory remedy for setting aside the dissolution of a company following its winding-up, the Petitioner had to rely on common law remedies. In the Petitioner's Skeleton Argument, Ms Lardner described the jurisdiction and governing principles as follows:

*"24. The Court has recently confirmed In the Matter of Porton Capital Inc. and Porton Capital Ltd (unreported, 24 March 2022, Doyle J) ('Porton'), the inherent jurisdiction to restore dissolved companies where there has been fraud in the voluntary liquidation, and that the applicable burden of proof is the ordinary civil standard.*

*25. While the jurisdiction on which Doyle J relied to make a restoration order in these circumstances is well-settled, it is worth setting out the concise dicta of Lord Justice James In re Pinto Silver Mining Company (1878) 8 Ch. D. 273 at pages 283-284…*

*26. A year later, James L.J again considered a similar application In re London and Caledonian Marine Ins. Co. (1878) 11 Ch. D 140 at page 144 [AB/10/94]:*

*'We thought that was the meaning of "fully winding up", and that being so, we thought there was no power to go behind the dissolution except in the case which I suggested as a possible case – the case of absolute fraud – fraud which the company could be fixed with. If there were a case of that kind, then very likely the whole thing might be set aside…'*

*27. The Court will be cautious to exercise its discretion to restore a dissolved company. On the one hand the Court must consider the policy principle that 'fraud unravels all' and on the other the principles of 'certainty and finality'; noting in particular that the Cayman Islands has elected not to enact a statutory process for applicants to restore dissolved companies (Doyle J at paragraph 17 of Porton ).*

*28. While Doyle J did not ultimately find that the requirements for restoration had been made out in Porton, the Supreme Court of the Bahamas restored a dissolved company In the Matter of Soothsayer Limited and others v the Registrar General and others 2017/CLE/gen/00684. The headnote of that decision at page 2 says:*

*'The Company was voluntary dissolved on 21 May 2015. Four months after its dissolution, the First Plaintiff discovered that there had been fraudulent activity in the management of his accounts held with the Bank including unauthorized purchases of shares, imprudent trading activity and false reporting. An employee of the Bank admitted guilt in a criminal matter before the Swiss Court. In the interim, civil action has commenced against the Bank in the High Court of the Republic of Singapore. The Plaintiffs seeks a restoration of the Company to the Register for the sole purpose of joining in proceedings currently before the High Court of Singapore.'*

*29. In that case, the Honourable Madam Justice Indra H. Charles said at paragraph 43 'In my opinion, there is conclusive evidence to show that a fraud has been perpetrated in*

*respect of the Company that led to its dissolution.' The allegations of fraud in that case are summarised at paragraph 28 of the judgment, but notably do not include a fraudulent misstatement in the declaration of solvency itself. The Court was satisfied that the company had been subject to a fraud by third parties (i.e. an employee at the Bank of Singapore) and that was sufficient basis to exercise its discretion to restore the company."*

8. In her careful oral submissions, Ms Lardner made it clear that the Petitioner's case was not simply based on the fact that it had been a victim of a fraud before the liquidation (as was seemingly considered sufficient to set aside the dissolution in *Soothsayer Limited and others v the Registrar General and others*). The Petitioner was willing to assume the burden of meeting the more stringent test of demonstrating that the liquidation itself had been fraudulent to some material extent, as required by the English authorities considered by Justice David Doyle J in this Court in the recent case of *In the Matter of Porton Capital Inc. and Porton Capital Ltd*, FSD 226/2022 (DDJ), Judgment dated 24 March 2022 (unreported).

**Merits**

9. As regards the application of the governing principles and the merits of the application to set aside the dissolution, the Petitioner submitted as follows:

*"32. A voluntary liquidator owes personal duties to maximise the returns to those with an economic interest in the company. This includes creditors and (where creditors have been paid in full) the company's shareholders in accordance with their respective rights under the company's Articles of Association.*

*33. The Cayman Islands Court of appeal confirmed at paragraph 99 of In the Matter of Asia Private Credit Fund Limited (in voluntary liquidation) [2020] (1) CILR 134 that:*
*'I agree with the view expressed by Kawaley, J. in his judgment (Cause No. FSD 72 of 2019, at paras. 35–36) that the relationship between those holding the management shares in a fund and those holding the participating shares radically changes when the fund is contemplating the cessation of business and a voluntary winding up. The exclusive power conferred on the manager to resolve to wind up the company is conferred not for their benefit but for the benefit of the participating shareholders who, under the articles, have the predominant financial interest in the proposed winding up.'*

*34. In breach of Giant Management Seychelles' duty as voluntary liquidator of REFF to the Petitioner (as the holder of 88.1% of the participating shares) to collect in assets of REFF, it failed to investigate the following fraudulent transactions which have now been identified by the JOLs…*

*35. As a result, it cannot be said that the affairs were "fully wound up" so as to enable Giant Management Seychelles as voluntary liquidator to present a report of the winding up to the company and file it with the Registrar in accordance with section 127(3) of the Companies Act to procure the dissolution of REFF.*

*36. In fact Giant Seychelles Management knew or ought to have known that the Proposed Claims should have been pursued…*

*37. The timing of the commencement of the voluntary liquidation also reveals its true purpose. By the time Giant Management Seychelles resolved to place REFF into voluntary liquidation on 1 November 2018, the series of unauthorised transactions had recently concluded.*

*38. AXA had, since February 2018, been pressing the Petitioner to explain the dramatic decrease in value of the NAV and to provide a full suite of information in relation to the unexplained transactions which appeared to have no commercial rationale. Accordingly, by 1 November 2018, REFF would have been well aware of the concerns of AXA and should have anticipated legal action by the shareholders of REFF to recover the stolen funds and assets.*

*39. The effect of the voluntary liquidation was of course, ultimately, for REFF to be dissolved on 27 May 2019, thereby preventing contributories or creditors from petitioning the Court to wind up REFF so that its affairs could be investigated by an independent insolvency practitioner under the supervision of the Court. This was plainly contrary to the interests of REFF's contributories and creditors.*

*40. In the circumstances referred to above, it is submitted that the dissolution of REFF by way of voluntary liquidation was the final part of the fraud committed against it and was for the purpose of defrauding its contributories and creditors. REFF was drained of its*

*assets and then wound up by its sole director, also being a party related to the Syndicate and without supervision by independent insolvency practitioners or the Court. There are accordingly features of conduct in the liquidation of REFF which are consistent only with dishonesty…*"

10. As regards the ancillary prayers for the liquidation to continue under the supervision of the Court and for the Petitioners' Joint Official Liquidators to be appointed as Joint Official Liquidators of REFF, the following main submissions were advanced:

> "*53. It is overwhelmingly in the interest of the contributories (i.e. the Petitioner for and on behalf of HKIF (2)) for the Court to supervise the conduct the liquidation and for independent insolvency practitioners to be appointed, in circumstances where Giant Management Seychelles previously failed to make a full enquiry into REFF's affairs.*
>
> *54. The choice of which liquidators are to conduct the supervised liquidation is an exercise of discretion and the petitioner's choice of liquidators as the majority if not sole party with an economic interest ought generally to be respected (paragraph 96 of Asia Private Credit).*
>
> *55. The Petitioner asks that the JOLs be appointed as JOLs of REFF. The JOLs have consented to be appointed and meet the requirements of Order 3, rule 4(1) of the Companies Winding Up Rule 201836. The JOLs do not consider that their appoint* [ment] *as JOLs of REFF will present a possible independence issue because the interests of the Petitioner and REFF are entirely aligned; i.e. in seeking successful prosecution of the Proposed Claims. This will ensure an efficient and economic liquidation given the significant work already undertaken by the JOLs of the Petitioner which is clearly in the contributories (and creditors) best interest.*"

11. As regards the Petitioner's duty of full and frank disclosure, the following potentially material points were very properly addressed:

> "**Merits of the fraud claims**

*63. It is possible that the Syndicate or Giant Management Seychelles may have some explanation for some or all of the fraudulent transactions but based on the evidence it is difficult to see how they could.*

***Acquiescence***

*64. Notice of the voluntary liquidation of REFF was published in the Cayman Islands Gazette on 17 December 2018. It may be said that, by this time, AXA had raised concerns in relation to the Petitioner and ought to have either lodged proof of debts in the liquidation of REFF or subsequently objected to its dissolution of REFF which ultimately happened on 27 May 2019.*

*65. However, the JOLs were only appointed over the Petitioner on 16 May 2019, and their investigations were in their infancy by the time REFF was dissolved only two weeks later. Prior to 16 May 2019, the Petitioner was under the control of the Syndicate.*

***Effect of restoration***

*66. It may be said that as the voluntary liquidation of REFF was procured by fraud that it should be restored to the register as active – rather than in voluntary liquidation. If the policy principle "fraud unravels all" is applied strictly then arguably that is the correct outcome. However, this would be highly impractical in the circumstances of this case for the following reasons:*

*(a) The JOLs have been advised by their Hong Kong solicitors, privilege of which is not waived, that the limitation period for some or all of the Proposed Claims to be brought on REFF's behalf may soon expire. The claims must be commenced by no later than the end of July 2022 to preserve the position.*

*(b) If REFF is restored to the Register of Companies as active, the Petitioner would be required to seek leave to wind it up on an alternative basis (for example on the just and equitable grounds) which would be time consuming, expensive, and serve no practical purpose.*

*67. Moreover, the resolution subject to challenge in this instance is not the resolution to place the company into voluntary liquidation (as REFF was indeed solvent) but rather the filing of the return with the Registrar following the "conclusion" of the winding-up.*

***Service***

*68. It may be said that the Court is being asked to make a determination of fraud which is directed at the Syndicate and, in particular, Alan Sun, Ricky Sun and Kimmy Luk, in circumstances where they have not been served with the Petition or been given the chance to make representations to the Court.*

*69. However, there is no requirement for the Court to make any finding of fraud or dishonesty against any particular members of the Syndicate. The evidence shows that there has been a series of unauthorised transactions in relation to REFF which are, on the face of it, fraudulent in nature and which require investigation. While Ricky Sun, Alan Sun, and Kimmy Luk were in control of REFF at all material times when the fraud was committed, the fact and extent of their liability is not an issue for this Court to decide.*

*70. There is an additional safeguard in this matter, which is that should the Court grant the restoration order, REFF will commence proceedings prosecuting the Proposed Claims and, at the trial of that action in Hong Kong, the Syndicate will have the opportunity to represent themselves to the extent they wish to participate in those proceedings.*"

**Findings: Summons for Directions (dispensing with service and advertisement)**

12. I did not lightly dispense with the need to serve the Petition and advertise it. I required the Petitioner's counsel to orally explain the case set out in the materials placed before the Court. The position was, on careful analysis, ultimately simple. On an application to set aside the dissolution of a company following a voluntary liquidation under Cayman Islands law, it will usually be unsurprising that the dissolved company has no active registered office. However, it is reasonable to expect that the persons managing the last registered office might have some means of contacting the dissolved company's former principals. Service on the former registered office was accordingly a reasonable step to take to attempt to bring the Petition to the attention of REFF's former principals; and this step had been taken.

13. The most appropriate party to serve with a petition seeking to set aside a dissolution following a voluntary liquidation is the former voluntary liquidator. One would ordinarily expect that, assuming a suitable voluntary liquidator was appointed by the company's controllers, the voluntary liquidator could be effectively served if proceedings to set aside the dissolution were commenced just over 3 years after the dissolution. Here, the former Voluntary Liquidator, on the face of it unsuitable in light of its lack of independence in the face of AXA's ignored concerns as the main stakeholder in the voluntary liquidation, had been dissolved and could not be served. Moreover, the members of the Syndicate believed to have perpetrated a fraud while controlling REFF could not be located.

14. In these circumstances it was ultimately clear that it was appropriate to dispense with any <u>further</u> service of the Petition and advertisement of the Petition. The Petitioner's stake in REFF was so great (88.8%), and the nature of its relief so urgent (due to the pending expiry of potential limitation periods), that there was no basis for believing that advertisement would confer any material benefit on the proceedings. It was possible that the only other stakeholders were the Syndicate (or interests controlled by them). Such interests were highly unlikely to affect the ultimate disposition of the Petition in any event.

## Findings: governing legal principles on applications to set aside a dissolution at common law

### Introductory

15. In *In the Matter of Porton Capital Inc. and Porton Capital Ltd*, FSD 226/2022 (DDJ), Judgment dated 24 March 2022 (unreported), Doyle J summarised the principles applicable to an application such as that made by the present Petition as follows:

> *"15. It is common ground that this court has jurisdiction to restore a company to the register when it has been dissolved following a voluntary liquidation if an applicant for such relief can prove that there was a fraud in respect of the liquidation (Schramm and Hiscox Syndicate 33 v Financial Secretary 2004-05 CILR 39 Chief Justice Smellie applying Pinto Silver Mining Co. (1878) 8 Ch. D. 273 dicta of James LJ and Cotton LJ and London and Caledonian Marine Ins. Co. (1878) 11 Ch. D 140 dicta of James LJ and on appeal [2004- 05 CILR 104] considering Pinto, London & Caledonian and Russian & English Bank v Baring Brothers & Co Ltd [1936] A.C. 405). I therefore determine that this court*

*has jurisdiction to grant the relief claimed if satisfied that a fraud in the liquidations has been proved.*

*16. It is not a statutory jurisdiction. In his skeleton argument Mr Quest described it as a 'general or inherent jurisdiction' but in his oral submissions stated that it was better described as an equitable jurisdiction rather than a common law jurisdiction. Mr Quest also submitted that it was a discretionary jurisdiction. Mr Samek submitted that it was not a discretionary jurisdiction and seemed to suggest that once fraud was proved the court must set aside the dissolutions. Mr Samek submitted that by 1878 common law and equity had been fused in England so it was wrong to refer to it as an equitable jurisdiction. Mr Samek's fall back position was that if the jurisdiction was discretionary then it should only be in the rarest and most exceptional cases that the discretion would be exercised so as not to visit upon the fraudster the consequences of his fraud.*

*17. However the jurisdiction is described, it is a jurisdiction which a court must exercise with great caution. I note the cases on the policy principle that "fraud unravels all" but attention must also be given to the policy principles of certainty and finality. In other jurisdictions the elected representatives have passed laws which permit applications for companies that have been dissolved to be restored within a limited period (usually 2 years).*

*18. Collett JA sitting in the Court of Appeal in the Cayman Islands in Schramm at paragraph 8 stated:*

*'That decision [not to follow later UK models] must be regarded as a deliberate one on the part of the well-informed local legislature and is readily to be understood as a reaction to the establishment of the formidable array of offshore companies registered in these Islands, which present a scenario unlike that of the United Kingdom, Canada, Australia or other established countries of the Commonwealth: they do not, to anything like the same extent, seek to attract overseas business incorporations. Occasional injustice must be regarded as the price which the local legislature has considered to be worth permitting to occur rather than to introduce the uncertainties which might plague the Law if the more recent English precedents, or indeed those very recently introduced in Australia, were to be adopted here. Indeed, Australia has radically reformed its legislation within the recent past.'"*

16. In a comprehensive and compelling judgment, Smellie CJ in *Schramm and Hiscox Syndicate 33 v Financial Secretary* [2004-05 CILR 39] concluded that there was no express statutory jurisdiction to set aside a dissolution following a voluntary winding-up. He disapproved of an earlier contrary decision in *Campillo-v-Registrar of Companies* [2001 CILR 547], which had held that the jurisdiction to restore struck-off companies to the register could be invoked. The application in *Schramm* was ultimately refused because (a) it was based on the mere fact of an incomplete winding-up and (b) the Act did not confer the same broad discretion on the Court to restore a company dissolved after a winding-up as it explicitly did in the case of a company which had been struck-off the register. The final paragraph of the Chief Justice's judgment is still relevant today as it explains why the jurisdiction to set aside a dissolution following a winding-up should be narrowly construed:

> "*44 In summary, I was compelled to differ from the conclusion reached in the* <u>Campillo</u> *case (2) for the following reasons:*
>
> *(1) As to the construction of s.146 as itself giving power to the court to restore a company whose affairs have not been fully wound up (for example if there is proof simply that a significant asset exists), it would be difficult if not impossible to ascertain the event which rebuts the presumption of dissolution. The discovery of any significant asset could provide the trigger. There would be surprising results. There would be no limitation of time for rebutting the presumption. There would be no need to establish* locus standi*—anyone having an interest however speculative could apply. Section 146 does not say who could apply. Most significant (and unlike the English provisions since 1907 which expressly allow it), there would be no controlling discretion of the court as to the basis for rebutting the presumption of dissolution. It could mean that so long as a significant asset is discovered to exist, even years after the deemed dissolution of the company, a disgruntled creditor could insist upon its recovery, however impracticable. The result could be that the company might never be dissolved and the disruption that would be caused would be the reversal of rights which were deemed to have been settled when the company was wound up.*
>
> *(2) It is striking that when the Cayman legislature passed the Companies Law in 1963 as including s.146, it did not at the same time adopt the provision which had long been*

*in the English legislation (since 1907) which would have enabled it to modify the effect of s.146 so as to restore a company which had been dissolved pursuant to the provisions governing voluntary liquidations.*

*(3) As to the construction of s.178 as giving rise to the power to restore a company deemed dissolved under s.146, it is of fundamental importance that s.178 expressly relates only to companies which have been 'struck off the register in accordance with this Law.' Section 178 comes within the part of the Law dealing with defunct companies. It contemplates the administrative process without notice (*i.e. *under ss. 175 or 176), by which a company's name is struck off the register. The section makes no mention of the word 'dissolution' as the process to be reversed by its application, and so what the court does by order under s.178 is restore the name of the company to the register 'as if it had never been struck off.' An order of the court under s.178 may not operate to restore a company as if it had never been dissolved—a matter, for all the reasons discussed above, with potentially very different and far-reaching consequences.*

*(4) The giving effect to statutory provisions which would permit such fundamental and important consequences is not properly a matter for judicial construction against the background of legislation which could readily have expressly adopted them were that the intention. This is not by any means the only respect in which the local Law, based as it still is on the original Victorian legislation of 1862, has been found to be lagging behind the times. For instance, the Privy Council only recently observed, in* CVC/Opportunity Equity Partners Ltd. *v.* Demarco Almeida *(1), that it contains no specific provisions which deal with the problem of minority oppression. Such legislative shortcomings require legislation to remedy them. It is inappropriate that judicial construction should strain to fill the breach.*"

17. This decision was comprehensively affirmed by the Cayman Islands Court of Appeal in a very short decision with the most pertinent observations of Collett JA ([2004-2005 CILR 104] at paragraph 8) reproduced by Doyle J in paragraph 18 of his Judgment in *In the Matter of Porton Capital Inc. and Porton Capital Ltd* (set out above above).

18. Against this background, in the present case the governing principles fell to be considered for the first time in this jurisdiction in the context of a case where it was being positively asserted that the dissolution should be set aside because the winding-up was vitiated by fraud. In my judgment it is important to distinguish two jurisdictional questions: (1) the Court's jurisdictional competence to set aside a dissolution on non-statutory grounds (i.e. what are the qualifying grounds?) and (2) what are the parameters within which the Court should exercise its jurisdictional competence to set aside a dissolution on non-statutory grounds (e.g. questions of standing, burden and/or standard of proof and delay and/or acquiescence).

19. The only authority placed before me where a dissolution was set aside on common law grounds was *In the Matter of Soothsayer Limited (Dissolved)*, Commonwealth of Bahamas Supreme Court, 2017/CLE/gen/00684, Judgment dated November 7, 2017, Indra Charles J (unreported). In that case Charles J defined the Court's jurisdiction as follows:

> "*[35] It is common ground that the IBC Act 2000 and its subsequent amendment, the IBC (Amendment) Act, 2010 contain no provision for the restoration of a company which has been dissolved and subsequently struck off of the Register.*
>
> *[36] It is also common ground that, under its inherent jurisdiction, the Court may, after considering the circumstances under which an IBC was dissolved, restore that company to the Register once it is satisfied that such dissolution was perpetuated by fraud in respect of the Company. See: In re London and Caledonian Marine Insurance Company, In re Cornish Manures Ltd and In re Pinto Silver Mining Company [supra].*"

20. The key question which arose for consideration in my judgment ought properly to be framed as follows: has a fatal non-compliance with a mandatory statutory provision (the requirement under section 127(1) of the Act that the affairs of a company be "*fully wound up*" before it is dissolved) occurred which completely invalidates the purported conclusion of the voluntary winding-up proceeding? This was the tacit question that James LJ asked (and answered in the negative) in 1878-1879, Smellie CJ asked (and answered in the negative) in 2006, Charles J asked (and answered affirmatively) in 2017 and Doyle J asked (and answered in the negative) in 2022. In my judgment a voluntary winding-up is a form of statutory proceeding which is subject to various procedural requirements including (under sections 127 and 151) steps which a liquidator must take to bring the winding-up proceeding to an end. The requirement that the winding-up process should be

completed is a mandatory requirement which must be substantially complied with in practical terms (not complied with in absolute perfection terms). Because there are clearly an infinite variety of ways in which a winding-up may be completed, one can only infer a fundamental obligation to substantially comply with the objectively reasonable minimum requirements of a 'full' winding-up having regard to the circumstances of each case. The problem of having to discern what Parliament intended the consequences of non-compliance with a statutory provision should be is a familiar one. By the early 21st century the emerging judicial consensus appears to have been that "*the rigid mandatory and directory distinction, and its many artificial refinements, have outlived their usefulness*"[3]. However valuable guidance as to how courts should approach the question of the legal consequences of non-compliance with statutory provisions (and which supports the way in which I construed the statutory scheme in the present case) may still be found in the judgment of Dame Mary Arden LJ (as she then was) in *7 Strathray Gardens Limited-v-Pointstar Shipping and Finance Ultratown Ltd* [2004] EWCA Civ 1669:

> "*43. I have gained most assistance from Burman v Mount Cook Land Ltd [2002] Ch.256 and Petch v Gurney [1994] 3 AER 731. As to the Burman case, I gratefully adopt the summary given by Carnwath LJ in the M25 case cited above:-*
>
> > *'16. ... [Burman v Mount Cook Land Ltd] concerned a requirement under the Leasehold Reform, Housing and Urban Development Act 1993, for the landlord to serve a counter-notice saying whether or not the right to a new lease was admitted and, if so, which of the tenants' proposals were acceptable. The notice in question did not contain such a statement. The judge had upheld the notice on the basis that 'a reasonable tenant' would not have been misled. That decision was reversed in this court. Chadwick LJ, giving the leading judgment said that the answer could only be found by construing the statutory language in the context of the statutory scheme. Having reviewed the complex statutory requirements in detail he concluded that the landlords' counter-notice was 'integral' to the proper working of the statutory scheme, and the failure to comply with the statutory requirements was fatal to its validity.'*
>
> *44. The decision in the Burman case does not turn on the mandatory/directory distinction. However, it is authority for the proposition that the effect of non-compliance with a*

[3] *R-v- Soneji* [2006] 1 AC 340 at paragraph 22 (Per Lord Steyn).

*particular statutory requirement must depend on the particular statutory scheme in point.*

*…*

*47. The second authority which I have found of particular assistance on this appeal is Petch v Gurney, above. In this case Millett LJ, with whom Henry LJ agreed, illuminated the distinction between mandatory and directory requirements by these words:-*

> *'The question whether strict compliance with a statutory requirement is necessary has arisen again and again in the cases. The question is not whether the requirement should be complied with; of course it should: the question is what consequences should attend a failure to comply. The difficulty arises from the common practice of the legislature of stating that something 'shall' be done (which means that it 'must' be done) without stating what are to be the consequences if it is not done. The court has dealt with the problem by devising a distinction between those requirements which are said to be 'mandatory' (or 'imperative' or 'obligatory') and those which are said to be merely 'directory' (a curious use of the word which in this context is taken as equivalent to 'permissive'). Where the requirement is mandatory, it must be strictly complied with; failure to comply invalidates everything that follows. Where it is merely directory, it should still be complied with, and there may be sanctions for disobedience; but failure to comply does not invalidate what follows.*

*The principles upon which this question should be decided are well established. The court must attempt to discern the legislative intention. In Liverpool Borough Bank v Turner (1861) 30 CJ Ch 379 at 380 Lord Campbell LC said:*

> *'No universal rule can be laid down for the construction of statutes, as to whether mandatory enactments shall be considered directory only or obligatory, with an implied nullification for disobedience. It is the duty of courts of justice to try to get at the real intention of the legislature, by carefully attending to the whole scope of the statute to be construed.'*

*In a well-known passage of his judgment in Howard v Bodington (1877) 2 PD 203 at 211 Lord Penzance said:-*

> *'I believe, as far as any rule is concerned, you cannot safely go further than that in each case you must look to the subject-matter; consider the importance of the provision*

*that has been disregarded, and the relation of that provision to the general object intended to be secured by the Act; and upon a review of the case in that aspect decide whether the matter is what is called imperative or only directory.'*

...

*Where statute requires an act to be done in a particular manner, it may be possible to regard the requirement that the act be done as mandatory but the requirement that it be done in a particular manner as merely directory. In such a case the statutory requirement can be treated as substantially complied with if the act is done in a manner which is not less satisfactory having regard to the purpose of the legislature in imposing the requirement.'*

*Petch v Gurney directs me to consider the substance of the statutory requirement and the reasons for it. If Parliament properly regarded the requirement as one that had to be fulfilled in all cases, the court should give it that effect. The court must not substitute its own view.*" [Emphasis added]

**Grounds upon which a dissolution may be set aside following a voluntary liquidation**

21. In my judgment it was ultimately clear that the provisions of section 127 and 151 imposed a mandatory requirement for the affairs of the company to be fully wound-up in the sense that an honest liquidator had taken *bona fide* steps to complete the winding-up process, even if perfection had not been achieved. In the absence of substantial compliance with the statutory requirements, the dissolution would potentially be liable to be declared void on the basis that Parliament cannot have intended a valid and binding dissolution to follow from a fundamentally flawed voluntary liquidation. The foundational cases, cited by the Petitioner's counsel in written submissions (and reproduced above) support this conclusion. In *In re Pinto Silver Mining Company* (1878) 8 Ch. D. 273 at pages 283-284, James LJ opined as follows:

"*Where there has been a de facto winding-up; liquidators appointed; the accounts of the liquidators laid before a meeting, as required by the Companies Act, 1862, s. 142; a return duly made to the Registrar, and the statutory period of three months elapsed, it would need a great deal of argument to satisfy me that the Court can go behind the return. The provisions of the Act as to dissolution would be of very little value if a creditor could, after*

> *that period, come and open the whole matter because, through mistake, some formality has been omitted, some creditor had not come in, or some asset has been left undiscovered. The only case in which it is desirable that what has been done should be undone is where there has been a fraud by which some one is injured. Such a fraud must be the fraud of somebody, and the person guilty of it would be personally liable; but it may be that it would also invalidate the proceedings.*" [Emphasis added]

22. In *In re London and Caledonian Marine Ins. Co.* (1879) 11 Ch. D 140 at page 144, James LJ elaborated upon the English Court of Appeal's earlier decision in *In re Pinto Silver Mining Company:*

> "*We thought that was the meaning of 'fully winding up', and that being so, we thought there was no power to go behind the dissolution except in the case which I suggested as a possible case – the case of absolute fraud – fraud which the company could be fixed with. If there were a case of that kind, then very likely the whole thing might be set aside; that is to say, it might, on proper proceedings being taken, be made clear that the whole winding-up was null and void, and then the company would be restored again to its position, subject to claims of creditors and contributories, or any other persons who might have rights to enforce or equities to be adjusted in relation to the company.*"[Emphasis added]

23. These extracts from two foundational nineteenth century cases, the legal effect of which was repealed by statute in England and Wales long ago, remain instructive for the position under Cayman Islands law today. They make it clear that the jurisdiction to set aside a dissolution not expressly conferred by Parliament fundamentally involves an exercise of statutory construction. When a statutory provision provides for a company to be dissolved following its winding-up without conferring an express power to set aside the dissolution, on what grounds will the courts imply that the requirements of the statute have been not complied with to so great an extent that the winding-up (and subsequent dissolution) should be declared to be a nullity? James LJ intuitively suggested that "*absolute fraud*" might be a "*possible case*", but did not have to consider the point directly because in neither case did anything arise which resulted in the winding-up proceedings being liable to be declared to be "*null and void*". The core principle to be extracted from these cases, therefore, is one of general application. Where a court is invited to declare that anything done under a statutory provision should be set aside on the grounds that a statutory requirement has not been complied with, the relief sought may only logically be granted where either:

(a) the statute contains an express power to set aside the relevant decision or proceeding; or

(b) the statute contains an implied power to set aside the relevant decision or proceeding on grounds of substantial non-compliance.

24. Category (b) is the category of cases into which section 142 of the UK Companies Act 1862[4], referred to by James LJ in the cited 1878 cases, fell. It provided:

> "*142. As soon as the affairs of the company are fully wound up, the liquidators shall make up an account showing the manner in which such winding-up has been conducted, and the property of the company disposed of; and thereupon they shall call a general meeting of the company for the purpose of having the account laid before them and hearing any explanation that may be given by the liquidators: The meeting shall be called by advertisement, specifying the time, place, and object of such meeting; and such advertisement shall be published one month at least previously to the meeting, as respects companies registered in England in the London Gazette, and as respects companies registered in Scotland in the Edinburgh Gazette, and as respects companies registered in Ireland in the Dublin Gazette.*"

25. Section 143 of the same Act provided:

> "*143. The liquidators shall make a return to the registrar of such meeting having been held, and of the date at which the same was held; and on the expiration of three months from the date of the registration of such return the company shall be deemed to be dissolved: If the liquidators make default in making such return to the registrar, they shall incur a penalty not exceeding five pounds for every day during which such default continues.*"

26. The corresponding provisions of the Companies Act (2022 Revision) (the "Act") also fall into category (b) as there is no express power to set aside a dissolution following a voluntary liquidation. Firstly, section 127 provides:

---

[4] The versions of sections 142 and 143 of the 1862 UK Act reproduced here have been taken from www.irishstatutebook.ie.

"***Final meeting prior to dissolution***

*127. (1) As soon as the company's affairs are fully wound up, the liquidator shall make a report and an account of the winding up showing how it has been conducted and how the company's property has been disposed of and thereupon shall call a general meeting of the company for the purpose of laying before it the account and giving an explanation for it.*

*(2) At least twenty-one days before the meeting the liquidator shall send a notice specifying the time, place and object of the meeting to each contributory in any manner authorised by the company's articles of association and published in the Gazette.*

*(3) The liquidator shall, no later than seven days after the meeting, make a return to the Registrar in the prescribed form specifying —*

*(a) the date upon which the meeting was held; and*

*(b) if a quorum was present, particulars of the resolutions, if any, passed at the meeting.*

*(4) A liquidator who fails to call a general meeting of the company as required by subsection (1) or fails to make a return as required by subsection (3) commits an offence and is liable on conviction to a fine of ten thousand dollars.*" [Emphasis added]

27. Section 151 then provides:

"***Dissolution following voluntary winding up***

*151. (1) The Registrar shall, within three days of receiving a liquidator's return under section 127(3), register such return.*

*(2) Upon the expiration of three months from the registration of the return the company is deemed to be dissolved.*

*(3) Notwithstanding subsection (2), the Court may, on the application of the liquidator or any other person who appears to the Court to be interested, make an order deferring the date at which the dissolution of the company is to take effect to such date as the Court thinks fit.*

*(4) An application under this section shall not be made after the company is deemed to have been dissolved.*

*(5) An order of the Court made under this section shall be registered with the Registrar within seven days of the date upon which it was made.*" [Emphasis added]

28. Although the life of a voluntary winding-up may be extended before dissolution is occurred, the right to do so post-dissolution is expressly excluded. In substance therefore, the statutory position under Cayman Islands law post-dissolution is analogous to that under the Companies Act 1862 (UK) as considered in the cases mentioned above. The question remains the same under Cayman Islands law as regards an application for an order setting aside the dissolution of a company which has occurred under sections 127 and 151 of the Act. What forms of non-compliance with the clearly mandatory substantive statutory requirement that the affairs of the company should be "*fully wound up*" should Parliament be deemed to have intended should result in the purported winding-up and consequential dissolution being regarded as a nullity?

29. In my judgment the answer ought not simply to be, reflexively, "fraud", because James LJ posited this as a "*possible case*" in 1878 and 1879 where the applications to set aside the dissolutions were refused. Rather, the answer ought to be that any forms of non-compliance which so undermine the legislative purpose of sections 127 and 151 that the Act may be construed as providing by necessary implication that such circumstances amount to not simply an imperfect winding-up, but rather amount to no winding-up at all. A winding-up that has been conducted fraudulently may, depending upon the nature and extent of the fraud, constitute the most straightforward basis for seeking a declaration that the dissolution should be viewed as a nullity and set aside. However, there may conceivably be other exceptional circumstances, not involving fraud as such, which might justify the same conclusion. After all, James LJ in *In re Pinto Mining* premised his opinions as to the finality of the liquidator's return on the following key assumption:

> "*<u>Where there has been a de facto winding-up</u>; liquidators appointed; the accounts of the liquidators laid before a meeting, as required by the Companies Act, 1862, s. 142; a return duly made to the Registrar, and the statutory period of three months elapsed, it would need a great deal of argument to satisfy me that the Court can go behind the return.*" [Emphasis added]

30. Where there has <u>not</u> been a *de facto* winding-up at all, but the formalities have been purportedly complied with resulting in a company being dissolved, it may perhaps be possible to formulate grounds for setting aside the dissolution without having to establish that the winding-up was vitiated by fraud. Qualifying circumstances would likely have to be strikingly unusual indeed. After all, the dominant legislative purpose of sections 127 and 151 is, as Smellie CJ at first instance and

Collett J in the Court of Appeal both convincingly opined in *Schramm and Hiscox Syndicate 33 v Financial Secretary*, achieving finality and avoiding uncertainty when a company is voluntarily wound-up and dissolved under Cayman Islands law. In other words, these *dicta* suggest, a conscious public policy decision was made in the Cayman Islands to make Cayman Islands companies more user-friendly as investment vehicles by affording investors greater security than in other jurisdictions that upon the conclusion of a solvent voluntary winding-up the investors would not have to linger under the shadow of a statutory right to apply on broad discretionary grounds to set the dissolution aside. This finality feature is buttressed by the flexibility afforded to investors to decide who to appoint as a voluntary liquidator in the solvent liquidation context; there no restrictions imposed in terms of qualifications or residence are far as voluntary liquidators are concerned.

31. However, as Smellie CJ in *Schramm* and Doyle J in *Porton Capital* both tacitly acknowledged, sections 127 and 151 of the Act cannot sensibly be construed as excluding altogether any application to set aside a dissolution. A fraudulent winding-up process is the most obvious ground upon which a purported dissolution may be declared to be void, not simply because "fraud unravels all", but more fundamentally because the statutory scheme cannot sensibly be construed as intended to validate liquidation processes which have not taken place in good faith and/or which have been used as an instrument of fraud. Viewing sections 127 and 151 in the wider context of Part V and the Act as a whole, it is obvious that the legislative policy underpinning the wider statutory scheme seeks to implement higher level public policy imperatives that have a "*yin and yang*" quality to them.

32. The Act seeks to balance the potentially conflicting forces of facilitating the establishment of business-friendly corporate vehicles with putting in place protections for the benefit of persons contracting with such vehicles against corporate abuse. These potentially conflicting policy objectives may be viewed as complementary to the extent that all *bona fide* founders and/or managers, on the one hand, and outside investors and/or creditors, on the other hand, would reasonably expect the statutory scheme to be implemented, whether in the voluntary winding-up context or otherwise, in a fundamentally honest and commercially rational way. The most important statutory precondition for a valid dissolution following a voluntary liquidation is that "*the company's affairs are fully wound up*" (section 127(1)). This is the main substantive precondition for a voluntary liquidator concluding the liquidation process and taking the various formal steps (preparing a final report, convening final general meeting and preparing and filing a final return

with the Registrar) which culminate in the company's dissolution. It can only be sensibly viewed as imposing a mandatory statutory requirement. Substantial compliance must require that reasonable efforts have been made to identify and pay all creditors and ascertain the rights of all contributories and make such distributions to contributories which appear on a good faith analysis to be due to them. Where queries are raised about the extent of any rights, such queries should (subject to costs and proportionality concerns) be investigated. The liquidation process, in short, must have some substance to it and must obviously have been conducted in good faith. This would to my mind meet the requirements of what James LJ in *In re Pinto Silver Mining Company* (1878) 8 Ch. D. 273 at page 283 described as a "*de facto winding up*", taking into account his subsequent views on the meaning of "*fully wound up*" in *In re London and Caledonian Marine Insurance Company* (1879) Ch. D. 140 at 143-144. In the latter case James LJ stated:

> "*We are of the opinion that these words 'as soon as the affairs of the company are fully wound up' …could not mean that if there were a single asset outstanding or a single debt unpaid, the affairs of the company were not to be considered as wound up…We must put some practical and sensible meaning on the words, and in my opinion they mean 'as far as the liquidators can wind them up;' that is, when the liquidator has done all that he can do to wind up the company…and has done all that he can do in winding up the affairs, so that he has completed his business as far as he can, and is functus officio. Then it is his duty to call a meeting, give in his account of the affairs of the company, and to make a return to the Registrar under the Act…*"

33. The manifest purpose of sections 127 and 151 (consistent with the way the foundational 1862 UK provisions were construed by the English Court of Appeal over 140 years ago) is to ensure that solvent companies are so far as is reasonably possible wound-up in a way that gives effect to the legal rights of the stakeholders. The legislative purpose is <u>not</u> to permit voluntary liquidations to be used as an instrument for confiscating stakeholders' rights, and disappointing their reasonable commercial expectations. This interpretative approach finds further support in various elementary canons of construction, including:

- the presumption favouring a purposive construction;
- the presumption favouring construction against evasion; and
- the presumption against absurdity.

**Legal character and source of the remedy**

34. Justice Indra Charles of the Bahamian Supreme Court is the only judge known to have had to positively decide what the source of the jurisdiction is and she confidently concluded (*In the Matter of Soothsayer Limited (Dissolved)*, at paragraph 36*)* that the Court's "*inherent jurisdiction*" could be deployed. This was because in a case which was in other respects contentious, the source of the Court's jurisdiction to grant relief was "*common ground*". In the present case relief was sought on an ex parte basis and so it is more important to be clear that the Court is on sound jurisdictional ground.

35. The source of the jurisdiction to set aside a dissolution following a voluntary winding-up on the grounds of e.g. fraud was seemingly not explicitly discussed in the 19th century English cases which first identified the limited jurisdiction in this regard. Nor was it considered in *Schramm*. This is unsurprising as the jurisdiction was not exercised in any of those cases and there was an understandably confident assumption that a remedy for fraud must be available. The topic was the subject of only limited argument before Justice David Doyle in *In the Matter of Porton Capital Inc. and Porton Capital Ltd*, FSD 226/2022 (DDJ), Judgment dated 24 March 2022 (unreported). It was:

> "*common ground that this court has jurisdiction to restore a company to the register when it has been dissolved following a voluntary liquidation if an applicant for such relief can prove that there was a fraud in respect of the liquidation (Schramm and Hiscox Syndicate 33 v Financial Secretary 2004-05 CILR 39 Chief Justice Smellie applying Pinto Silver Mining Co. (1878) 8 Ch. D. 273 dicta of James LJ and Cotton LJ and London and Caledonian Marine Ins. Co. (1878) 11 Ch. D 140 dicta of James LJ and on appeal [2004-05 CILR 104] considering Pinto, London & Caledonian and Russian & English Bank v Baring Brothers & Co Ltd [1936] A.C. 405). I therefore determine that this court has jurisdiction to grant the relief claimed if satisfied that a fraud in the liquidations has been proved.*"(Paragraph 15)

36. Doyle J only found it necessary to decide, as he ultimately concluded that he should not exercise the jurisdiction, that: "*It is not a statutory jurisdiction…However the jurisdiction is described it is a jurisdiction which a court must exercise with much caution…*" (paragraphs 16-17). Counsel variously described the jurisdiction as "*general or inherent*" and "*equitable*". For the purposes of the present case, the relief sought had the following elements to it. The Petitioner sought:

(a) a declaration that the Company's dissolution was void on the grounds that the statutory winding-up process was vitiated by fraud; and

(b) consequential relief by way of implementation of the declaratory relief pursuant to provisions of the Act applicable to companies in voluntary liquidation.

37. Only the first limb was subject to any potential doubt. In my judgment the most straightforward way of characterising the first limb of this jurisdiction in light of the authorities is as follows. The Court has a statutory 'inherent' jurisdiction to grant a declaration that a dissolution pursuant to sections 127 and 151 of the Act under section 11 (2) of the Grand Court Act (2015 Revision). Section 11 of the Grand Court Act provides:

> "*11. (1)…*
>
> *(2) Without prejudice to subsection (1), the Court shall have and shall be deemed always to have had power to make binding declarations of right in any matter whether any consequential relief is or could be claimed or not.*"

38. In *In the Matter of Polarcus Limited*, FSD 31/ 2022 (IKJ), Judgment dated July 6, 2022 (unreported) this Court found that this statutory jurisdiction was available in relation to companies in liquidation. I considered section 11(2) in *Polarcus* earlier on the same day that I determined the present application. It is perhaps unsurprising that this point was common ground in the only case cited where this jurisdiction was previously actually exercised, *In the Matter of Soothsayer Limited (Dissolved)*, Commonwealth of Bahamas Supreme Court, 2017/CLE/gen/00684, Judgment dated November 7, 2017. Rather than viewing the Court as granting equitable or common law relief for fraud, it is in my judgment more straightforward and legally precise to characterise an application for a declaration that a dissolution is void as being an application for a declaration as to the status of a creature of statute under the statute which created it.

39. An alternative statutory basis for the jurisdiction to grant both limbs of the relief sought by the Petitioner did not form a conscious basis for my decision in the present case and is merely mentioned for future consideration. Admittedly, section 129 is primarily designed to be deployed during the pendency of a voluntary liquidation and it clearly arguable that it ceases to be available after a company has been dissolved. If this section is available, the full breadth of the remedial

jurisdiction conferred by section 129(2) would of course, in the post-dissolution context, only be properly engaged and available once the Court has determined that a purported dissolution is in fact null and void. Nonetheless, section 129 of the Act provides (in relation to voluntary liquidations):

> "***Reference of questions to Court***
>
> *129. (1) The voluntary liquidator or any contributory may apply to the Court to determine any question arising in the voluntary winding up of a company or to exercise, as respects the enforcing of calls or any other matter, all or any of the powers which the Court might exercise if the company were being wound up under the supervision of the Court.*
> *(2) The Court, if satisfied that the determination of the question or the required exercise of power will be just and beneficial, may accede wholly or partly to the application on such terms and conditions as it thinks fit, or make such other order on the application as it thinks just.*
> *(3) The voluntary liquidator shall, within seven days of the making of an order under this section, forward a copy of the order to the Registrar who shall enter it in that person's records relating to the company.*" [Emphasis added]

**Factors relevant to the exercise of the discretion**

40. Ms Lardner's submissions in fulfilment of her client's duty of full and frank disclosure, helped to elucidate factors potentially relevant to the Court's discretionary jurisdiction to grant relief in a case where *prima facie* grounds for granting relief have been established. They include:

(a) the applicant's standing to seek relief;

(b) the merits of the applicant's case for obtaining relief from a reopened liquidation;

(c) whether the applicant has been guilty of acquiescence or delay.

41. As Smellie CJ noted in *Schramm* (at paragraph 44(1)), it is impossible to infer a legislative intent to permit a dissolution to be set aside at the instance of any interested person merely because a new assets has been discovered unconstrained by any standing requirements or limitation period. Those observations were made to support his conclusion that the statute did not confer an unfettered jurisdiction on this Court to set aside a dissolution. In contrast, Justice Indra Charles in the

*Soothsayer Limited* case reached the following findings in relation to standing on an application made by beneficiaries of the trust the assets of which the company formerly held, who complained of fraud:

> "*68… At common law, any person who can show an interest in making the application for restoration can do so. Therefore, it cannot be demurred that the Plaintiffs are interested parties. In addition, the former liquidator of the Company, Bukit Merah Limited, the 3rd Defendant in this application, unequivocally supports the application for restoration. On any view, whether at common law or under the inapplicable IBC Act, 2000 and its subsequent amendment in 2010, the liquidator is a proper party.*"

42. I concur with that flexible approach to standing insofar as a basic standing test is concerned. But the flexibility of the basic standing test does not mean that a qualifying person's ability to obtain substantive relief will not be affected by the nature of their interest in reopening the liquidation. How important standing is will clearly vary from case to case; and since the jurisdiction to set aside a post-voluntary winding-up dissolution (based on substantial non-compliance with the statutory regime) is an exceptional one, an applicant whose standing is doubtful may well face difficulties in obtaining relief. For similar reasons, an applicant must have to show that there is clearly merit to their case that setting aside the dissolution will result in their obtaining practical relief. As the legislative policy of sections 127 and 151 heavily favours finality, or letting sleeping dogs lie, even a victim of fraud must generally demonstrate (a) a strong probability that are indeed a victim of fraud and (b) a realistic prospect that some practical benefit is likely to flow from setting aside the impugned dissolution. According to the Supreme Court Practice 1999 (at paragraph 15/16/2): "*Although the remedy by way of declaration is wide and flexible yet it will not be granted to a plaintiff whose claim is too indirect and insubstantial and would not give him 'relief' in any real sense i.e. relieve him from any liability or disadvantage or difficulty…*"

43. The legislative policy of finality underpinning the voluntary winding-up and dissolution regime also means that acquiescence and/or delay may be important considerations in setting aside a dissolution which is otherwise liable to be set aside. Failure to act promptly before the dissolution has occurred may be fatal where the applicant has been given notice of the fact that the winding-up is at an end and that the dissolution is imminent. After all, the inconvenience and expense to which parties who had 'closed their books' in relation to the dissolved company from having the matter reopened could (in many if not most cases) clearly be very considerable indeed.

**Findings: directions dispensing with service and advertisement**

44. The Petition primarily sought a declaration that REFF's dissolution be declared to be void, and consequential relief in the form of granting a Supervision Order (under section 131 of the Act) and appointing the JOLs. As regards the substantive application, it was appropriate for the proceedings to be commenced by Petition if it was characterised as an originating application under Part V of the Act: Companies Winding Up Rules ("CWR") Order 24. Order 24 provides in salient part as follows:

> "*(1) Every originating application under Part V of the Law shall be made by petition.*
>
> *(2) The general provisions of GCR Order 9, and GCR Order 18, rule 19 and Order 20, rule 7 shall apply to every petition presented under these Rules…*"

45. Order 15 rule 3(4) of the Rules empowers the Court to require and dispense with service and advertisement of section 131 petitions. The Rules do not appear to require service or advertisement of originating applications under Part V of the Act generally. However, GCR Order 9 confers a broad discretion on the Court to give directions in relation to service and to dispense with service. As regards paragraph 1 of the prayer to the Petition, the Court had jurisdiction under GCR Order 9 corresponding to that under Order 15 rule 3 of the CWR as regards the consequential relief sought pursuant to section 131 of the Act. It was only in this latter respect that the need to consider advertisement of the Petition arose at all. The Petitioner's evidence established:

   (a) the appropriate persons to be served with the Petition were the Company's former Voluntary Liquidator and the Registrar of Companies. The Registrar was duly served and the former Voluntary Liquidator, a corporation, could not be served because it had been dissolved;

   (b) in default of serving the former Voluntary Liquidator, the most appropriate persons to bring the Petition to the attention of were the former principals of the Company and the Voluntary Liquidator. The former principals could not easily be found. The Petition was served on the Company's registered office;

(c) the Petitioner was by far the majority stakeholder in the Company whose wishes were likely to trump any opposing minority views. It seemed likely that that any minority stakeholders were the Company's former principals or persons or entities linked to them;

(d) the Petitioner was likely a victim of the Syndicate's fraud, the final limb of which fraud probably included causing REFF to be swiftly wound-up and dissolved, allowing GM Seychelles to be struck-off the register and making the principals of REFF and GM Seychelles difficult to serve with legal process.

46. In these circumstances it was clear that justice required service and advertisement of the Petition to be dispensed with and for the Petitioner to be permitted to seek substantive relief as soon as possible.

**<u>Findings: application for a declaration that the dissolution of REFF was void</u>**

**<u>Findings: standing to seek relief</u>**

47. The Petitioner as an 88.8% participating shareholder of REFF clearly had standing to seek both the substantive and ancillary relief set out in the Petition. The Petitioner's counsel very properly raised the potential argument of acquiescence or delay. In my judgment the Petitioner cannot be criticised for failing to participate in the voluntary liquidation of REFF advertised in December 2018 because:

(a) the Petitioner was at all material times controlled by the Syndicate and AXA (as its main economic stakeholder) had no apparent legal means to cause the Petitioner to prove in the REFF liquidation as AXA was not itself a REFF participating shareholder;

(b) AXA was not 'sleeping on its rights'. It was taking steps gain control over the Petitioner which it succeeded in doing just under two weeks before REFF was dissolved on May 27, 2019;

(c) after the Petitioner's JOLs had fully investigated the suspected fraud and then obtained approval to consummate a litigation funding agreement in April 2022, the JOLs moved swiftly to present the Petition.

48. In all the circumstances, I found no basis existed for declining relief on the grounds of acquiescence or delay on the Petitioner's part.

49. Assuming the Petitioner made out a case for setting aside the dissolution, it might still be open to the Court to decline to grant that relief because it was clear that no practical benefit was likely to flow from granting such relief. Here, officers of this Court had sworn (based on their own investigations and advice) that they believed the Petitioner had viable claims which could be pursued by REFF against its former controllers. It was a matter of record that the Petitioner had received litigation funding support in this regard. I found no basis for declining to relief on what might be described as futility grounds.

**Findings: merits of application to set aside the dissolution of REFF**

50. Having determined under what circumstances it is legally open to this Court to set aside the dissolution of a company which has been purportedly voluntarily wound-up pursuant to sections 127 and 151 of the Act, the merits of the Petitioner's application were remarkably clear in the unusual circumstances of the present case. The Petitioner satisfied me on the balance of probabilities that:

(a) the 90% loss reported to AXA in relation to its investment through the Petitioner in REFF was attributable to its assets being misappropriated by the controllers of REFF and (until May 16, 2019, the Petitioner itself), referred to in the papers as 'the Syndicate';

(b) the impugned transactions included selling a subsidiary at an undervalue on May 11, 2018 to the wife of a Syndicate member and buying the 'SGOCO Note' from a Syndicate member's mother-in-law for an inflated price in July 2018. REFF's Board purportedly approved the fairness of paying US$26.4 million for the Note although a valuation report suggested a value of US$1.72 million;

(c) Giant Management Seychelles, the Management Shareholder also controlled by the Syndicate, placed REFF into voluntary liquidation on November 1, 2018 and appointed itself as REFF's Voluntary Liquidator;

(d) the authorised signatory for the Management Shareholder as regards the winding-up resolution and liquidation notices was the same individual ("Ms Sudjono") who was the sole director of REFF. Ms Sudjono was the REFF signatory in relation to both the sale of the subsidiary at an undervalue and the purchase of the SGOCO Note for an inflated price;

(e) the notice advertising the commencement of the voluntary liquidation of REFF sent to the Cayman Islands Gazette Office and signed by Ms Sudjono on behalf of the Voluntary Liquidator listed Ricky Sun as the "***Contact for Enquiries***";

(f) the Syndicate as controllers of the Petitioner and the Voluntary Liquidator had notice of AXA's concerns about its investment in the Petitioner and the significant drop in net asset value from a letter from Kennedy's dated January 23, 2019;

(g) the Syndicate as controllers of the Petitioner and the Voluntary Liquidator had notice of AXA's concern to investigate the status of its indirect investment in REFF and its desire to liquidate the Petitioner from a Walkers letter dated February 26, 2019 and the fact that AXA presented a winding-up petition against the Petitioner on February 28, 2019;

(h) as the dissolution of REFF took effect by operation of law on May 27, 2022, three months after the registration of the liquidation return, the Voluntary Liquidator must have filed its return on or about February 27, 2022, seemingly shortly after AXA communicated its concern about its indirect investment in REFF;

(i) an independent liquidator acting in good faith with a view to fully winding-up the affairs of REFF would not have closed the liquidation of REFF and caused (or permitted) the Company to be dissolved while winding-up proceedings were pending against its 88.8% majority participating shareholder at the instance of an indirect investor who had expressed concerns about its underlying investment in REFF;

(j) the Voluntary Liquidator was not independent, did not act independently and did not act in good faith and its sole director had in the months preceding the voluntary winding-up an active participant in two impugned transactions and it was controlled by the same parties who perpetrated what appears on the presently available evidence

to have been a blatant pre-liquidation fraud. The affairs of REFF were quite obviously not "*fully wound-up*" when the Voluntary Liquidator purportedly convened the final meeting and filed the requisite return. This was not an incomplete or imperfect process, or one which was carelessly carried out. It was in substance not a winding-up at all. The only reasonable inference was that the Voluntary Liquidator brought the liquidation to a premature end with a view to impeding the investigations which would inevitably follow after the Petitioner was wound-up on May 16, 2019 on the petition of REFF's main ultimate investor.

51. I accordingly accepted the following submission in the Petitioner's Skeleton Argument as to what the evidence established, a point which was emphasised by Ms Lardner in oral argument:

> "*39. The effect of the voluntary liquidation was of course, ultimately, for REFF to be dissolved on 27 May 2019, thereby preventing contributories or creditors from petitioning the Court to wind up REFF so that its affairs could be investigated by an independent insolvency practitioner under the supervision of the Court. This was plainly contrary to the interests of REFF's contributories and creditors.*
>
> *40. In the circumstances referred to above, it is submitted that the dissolution of REFF by way of voluntary liquidation was the final part of the fraud committed against it and was for the purpose of defrauding its contributories and creditors. REFF was drained of its assets and then wound up by its sole director, also being a party related to the Syndicate and without supervision by independent insolvency practitioners or the Court. There are accordingly features of conduct in the liquidation of REFF which are consistent only with dishonesty.*"

52. In my judgment it was ultimately clear that the only rational legal consequences from such a total failure to wind-up the affairs of the Company by the Voluntary Liquidator, before it caused the Company to be dissolved (rather than taking steps to remediate the substantial loss suffered by the holder of the majority ultimate economic interest) was complete invalidity of the dissolution. This extraordinary combination of factual circumstances met the high threshold required for granting a declaration that the Company's dissolution following a voluntary winding-up (which is not ordinarily capable of being impugned if a credible winding-up has occurred) should be declared to be void.

53. The Petitioner satisfied me that it was very strongly probable that the winding-up and dissolution of REFF was carried out in such a fraudulent way as to not amount to a winding-up at all. Prior to the conclusion of the winding-up, AXA had raised queries about the reasons for the dramatic decline in the value of its direct investment in the Petitioner and its indirect investment in REFF. The presently available evidence suggests that the reason for the investment loss was quite simply that the invested assets were stolen. As AXA sought to take remedial action by gaining control of the Petitioner (obtaining a winding-up order on May 16, 2019), the perpetrators of the fraud (having effectively abandoned the Petitioner) caused REFF to be wound-up by a corporate liquidator they also controlled on May 27, 2019 without investigating AXA's concerns.

54. The winding-up process which occurred was seemingly compliant with the formalities of a voluntary winding-up. But that process in substantive fell so far short of what section 127 requires a full winding-up to be (having been misdirected to serve fraudulent ends) that the dissolution which purportedly occurred must be viewed as null and void. Section 127 can only sensibly be construed as providing, by necessary implication, that such a dramatically distorted caricature of what a *bona fide* winding-up should be has the legal consequence of completely invalidating the purported winding-up and dissolution. The legislative purpose underpinning Parliament's decision to promote finality when companies are dissolved following a voluntary winding-up cannot sensibly be construed as a legislative intention to facilitate winding-up processes which are so lacking in substantive credibility and honesty that a company is dissolved (in effect) without its affairs being wound-up at all, let alone "*fully*" as section 127(1) requires.

**<u>Findings: application for Supervision Order and appointment of JOLs</u>**

55. Having decided to grant the primary relief sought setting aside the dissolution of REFF, the consequential relief was all but a formality. The purpose of the declaratory relief was to permit the Petitioner to apply for a Supervision Order and appoint the JOLs to seek to recover the misappropriated sums. It was self-evident that the Voluntary Liquidator must be replaced and straightforward to accept the proposition that the Petitioner's JOLs were the most appropriate candidates to be REFF's joint official liquidators. The best available evidence suggested that no other stakeholders had the right to have their wishes in this regard trump the wishes of the 88.8% participating shareholder in any event. Accordingly, I granted the Supervision Order substantially on the terms sought.

**Conclusion**

56. For the above reasons on July 6, 2022, I granted the Petitioner's application for:

(a) a declaration that the Company's purported dissolution on May 27, 2019 was void; and

(b) appointed the Petitioner's Joint Official Liquidators as JOLs of the Company.



______________________________________________

**THE HONOURABLE MR JUSTICE IAN RC KAWALEY**

**JUDGE OF THE GRAND COURT**



FSD2022-0135 Page 36 of 36 2022-08-24