# Exhibit B Cont.

# *Morris v Bank of India* [2005] BCC 739

# Bank of India v Morris

[2005] EWCA Civ 693
Court of Appeal (Civil Division).
Mummery and Neuberger L.JJ. and Munby J.
Judgment delivered June 22, 2005.

*Winding up – Fraudulent trading – Attribution – Fraudulent banking group – Group company entered transactions with third party bank – Transactions were circular – Group companies intended to conceal bad debts – Third party bank's general manager was told transactions to improve group's balance sheet – After second transaction manager should have known transactions not as described – Test for fraudulent trading – Whether third party knowingly participated in carrying on banking group business with intent to defraud creditors or for fraudulent purpose – Attribution of knowledge of third party – Whether knowledge of general manager of third party attributable to third party company – Appeal – Application to amend pleadings – Insolvency Act 1986, s.213.*

**This was an appeal against an order of Patten J. ([2004] B.C.C. 404) in favour of the liquidators of two companies in an insolvent banking group against a separate bank for its being knowingly a party to fraudulent trading by the insolvent companies under s.213 of the Insolvency Act 1986.**

**The banking group, "BCCI", was established in 1972 and achieved rapid growth throughout the 1980s. By the time it collapsed in July 1991, with a deficiency as regards creditors in the region of US$10 billion, the group had 110 branches in 41 countries and a number of representative offices. One of the companies, "BCCI SA" had 24 branches in this jurisdiction and its head office was in the City of London. BCCI incurred substantial losses through poor lending decisions and unsuccessful metal trading on its own account. The "Khalil" group of companies, which were owned and controlled by a Saudi Arabian businessman, Mr Khalil, were among the borrowers who, by the early 1980s, had a number of heavily overdrawn accounts with BCCI. To conceal these losses BCCI's Central Treasury Division ("CTD") embarked on a systematic and wide-scale fraud involving the manipulation of account balances.**

**In autumn 1981 "S", a senior manager in the London branch of an Indian bank, "BoI", contacted "M", who worked in the International Department at BCCI, to ask whether BCCI would be prepared to place a deposit with BCCI. It was apparently BoI's policy, and that of other Indian banks, to obtain at its year-end as many deposits as possible, as the existence of large-scale deposits was seen as an important measure of a bank's success, and S's approach to M was said to be in accordance with this policy. On November 12, 1981, in response to S's approach, M informed S that BCCI was prepared to place a deposit of £10 million for three months at a rate of 15 per cent per annum on terms that BoI was required to lend this amount to a borrower named by BCCI at 15.125 per cent. The security for the loan was to be an irrevocable letter of guarantee by BCCI. BCCI's alleged reason for this extraordinary transaction was that it improved its earnings to advances ratio; S and the board of BoI were all well aware of what was understood to be BCCI's reason. The transaction went ahead on December 2, 1981, and the borrower nominated by BCCI was "Maram", a company controlled by Mr Khalil. The transaction was effectively reversed at the end of the three-month period on March 2, 1982. A further five transactions of a similar nature were entered into between BoI and BCCI during the next four years. All were conducted between S for BoI and M for BCCI except for the sixth transaction which was entered after S had left BoI in 1985. It was not later disputed that BCCI's CTD used the moneys provided by BoI pursuant to the six transactions to credit heavily overdrawn accounts that Mr Khalil and the Khalil group had with BCCI to give the false impression that those accounts were being serviced and**

**the indebtedness was being repaid, at least to some extent, by the customer. BoI did not dispute that BCCI did not disclose the guarantees to its auditors.**

**After BCCI went into liquidation the liquidators brought a claim against BoI under s.213 of the Insolvency Act 1986 that BoI had been knowingly a party to the carrying on of the business of BCCI with intent to defraud creditors or for any fraudulent purpose and asked the court to order that BoI make such contribution to the assets of BCCI as the court thought proper. The application concerned the six transactions involving BoI and BCCI and the issue was, in summary, whether those at BoI responsible for entering into five of those transactions involving S knew that they were thereby assisting BCCI to perpetrate a fraud on its creditors. It was common ground that this allegation of knowledge must involve a finding of dishonesty. It was not disputed that the relevant knowledge was "blind-eye" knowledge which required a suspicion that the relevant facts existed and a deliberate decision to avoid confirming that they existed.**

**In relation to the first transaction Patten J. found that none of the BoI employees, including S, had the relevant knowledge in relation to what was then thought to be a one-off transaction at the year end. In relation to the second transaction the judge held that S did have the relevant knowledge, as he did in relation to the third, fourth and fifth transactions. Having seen BCCI's accounts he must by the second transaction have realised that an improvement to the advances to earnings ratio could not be achieved by the removal of loans over the year end. The circular nature of the transactions was already apparent to him and the removal of the only justification for them could have left him in no real doubt that he was in all probability dealing with a fraud of some kind. The judge further held that S's knowledge should be attributed to BoI, whose board had been content to take S's assurances in relation to the transactions at face value and left it to him to satisfy himself that it was proper for BoI to go ahead with the transactions, otherwise the policy of the Act would be frustrated if BoI could shelter behind an argument that the only relevant knowledge was that of the board. S resigned from BoI in June 1985 and he was not, therefore, working for BoI at the time when the sixth transaction took place in September 1985 and the judge held that BoI did not have the relevant knowledge in respect of that transaction. The judge quantified the contribution order under s.213(2) at US$82,302,941, with interest and costs. BoI appealed and contended that: (1) in light of the evidence before him, and in light of his assessment of that evidence, the judge could not properly have concluded that S was dishonest in relation to the four transactions in question; (2) even if the judge's findings against S were upheld, S's dishonesty could not and should not be attributed to BoI; and (3) there was, in effect, insufficient connection between the four transactions in question and the defrauding of creditors within BCCI to bring BoI within the ambit of s.213(2). The liquidators cross-appealed that, if BoI's appeal succeeded on the first and second grounds of appeal, the judge ought to have concluded that two of the directors of BoI at the time were guilty of dishonesty effectively in the same way and to the same extent as S. The liquidators also sought to amend their pleadings, if BoI succeeded on the first ground of appeal, so that BoI should be vicariously liable for S's liability under s.213(2).**

*Held*, **dismissing the appeal and cross appeal and refusing the application to amend:**

**1. In the circumstances of having carefully considered all the available evidence, including all testimony from experts, directors of BoI, other employees of BoI, and S himself, the judge reached a conclusion as to S's "blind-eye knowledge" at the time of the second, third, fourth and fifth transactions which, in the light of the primary facts he found, he was fully entitled to reach. In all these circumstances, BoI's appeal against the judge's finding of dishonesty on the part of S must fail.**

**2. It was accepted that "outsider" companies could be made liable under s.213 provided that it was established they were "knowingly" parties to the fraudulent trading.**

© 2005 Sweet and Maxwell Ltd

A **BoI could only be declared to be liable under s.213(2) if it was "knowingly" a party to the carrying on by BCCI of its business with intent to defraud creditors of the company or for any fraudulent purpose. Having decided to uphold Patten J.'s finding that S had blind-eye knowledge of the fraud of the CTD in respect of the second to fifth transactions, the critical issue was BoI's knowledge of BCCI's fraud.**

**3. The attribution of knowledge to a corporate body, such as BoI, turned on the**
B **interpretation of s.213 and its application to the facts found by the judge. There was very little discussion in the authorities of this aspect of s.213 or its predecessors as to in what circumstances the state of knowledge of an individual could be attributed to a corporate body, which in the nature of things could only derive its knowledge from individuals and be treated as having the knowledge that a relevant individual had. S's blind-eye knowledge of BCCI's fraudulent trading could be treated, for the purposes of s.213, as the corporate knowledge of BoI if, as was found by the judge, none of the directors of BoI**
C **had any personal knowledge of BCCI's fraudulent trading.**

**4. The determination of the person possessing the relevant knowledge for the purposes of ascertaining liability under s.213 was not simply a matter of identifying the person who authorised the transaction in accordance with the system of authorisation operated by the company in question. The scheme of delegation of authority might, as in this case,**
D **provide only an incomplete picture of what was done and it might not be sufficient for the purposes of determining whether the company should be treated as possessing the requisite knowledge.**

**5. The paramount purpose of the provisions imposing civil liability in s.213 was to compensate those who had suffered loss as a result of the fraudulent trading. If knowledge were not attributed to an outsider company in cases such as this the purpose of imposing liability upon such a company to pay compensation would be emasculated. The**
E **crucial question was whose knowledge in the company counted, for the purposes of s.213, as corporate knowledge of the outsider company. In most companies of any size there would be a chain of command and delegation of authority and it was likely that the transactions with the fraudulent company would be dealt with at a level in the company below that of the board. It would defeat the effectiveness of the section in practice if liability were limited to those cases in which the board of directors of an "outsider"**
F **company was actually privy to the fraud of the company. The application of s.213 required a special rule of attribution in order to make its self-evident policy effective (Meridian Global Funds Management Asia Ltd v Securities Commission [1995] B.C.C. 942; [1995] 2 A.C. 500 considered). It could be appropriate to attribute knowledge of fraud to a company, even though a person with knowledge of the fraud had acted dishonestly, in breach of his duty to his principal and employer and in circumstances in which he would not have passed on his knowledge to his employer. (McNicholas**
G **Construction Co Ltd v Commissioners of Customs and Excise [2000] S.T.C. 553 applied.)**

**6. The judge was right to hold that on the facts found by him and on the application of the correct interpretation of s.213 BoI could not deny legal responsibility for the actions of S by resisting the attribution of his knowledge to it. S's knowledge of the fraud of the CTD of BCCI was sufficient to fix BoI with liability under s.213. S was a senior manager of BoI whose board relied on his judgment in relation to the transactions. He was given**
H **"blanket permission" to deal with BCCI by negotiating the terms of the transactions. He was allowed by the board to supervise the relevant transactions with BCCI and ultimately to decide to proceed with them on terms negotiated by him. He was in substance the relevant decision maker for BoI in respect of the relevant transactions which made BoI a party to the fraudulent trading of BCCI. As S had a large measure of responsibility within BoI for the transactions within BCCI, the policy of s.213, justice and**

**good sense combined to justify treating S's knowledge as the corporate knowledge of BoI** A
**so as to make it responsible for contributing to the assets of BCCI in the winding up.**

**7. The judge found that the members of the board of BoI personally had no knowledge of the fraud, but they were content to leave the conduct and completion of the negotiations in the hands of S and the attribution of S's knowledge to BoI did no injustice to the members of the board. The question was whether S's knowledge should as a matter of law be attributed to BoI for the purposes of s.213, not whether the directors of BoI** B
**personally knew of the fraud or should have knowledge of the fraud attributed to them so as to make them personally and individually liable for fraudulent trading. It was irrelevant to the attribution of the knowledge of S to BoI that S was acting in breach of his duty to BoI in respect of the transactions with BCCI or that, in a general kind of way, BoI was a "secondary victim" of his wrongdoing and that of BCCI: neither of those factors was a bar to the attribution of knowledge to BoI, any more than was the lack of personal knowledge of the directors of BoI about BCCI'S fraudulent trading. The appeal should** C
**be dismissed.**

**8. In relation to the liquidators' cross-appeal regarding the judge's conclusion that he did not find that two directors of BoI were dishonest, there was no inconsistency between the finding of dishonesty against S and the lack of any such finding against the two directors. Authority and justice indicated that the court should be slow to overturn a judge's finding of dishonesty against a party, particularly when it was justified by the** D
**judge in a full and careful judgment, but the court should be even more reluctant to overturn the same judge's refusal to find dishonesty against another party, unless, of course, the findings were incompatible. There was, therefore, nothing in the cross-appeal which should be dismissed.**

**9. In relation to the liquidators' application to amend the pleadings, it was clear that neither the current pleadings nor the evidence in fact adduced at the trial addressed the additional factual issues involved, issues which were central to the new claim now being** E
**put forward. If all these matters had previously been adequately pleaded BCCI would not now be seeking to amend and the application for permission to amend should be refused.**

The following cases were referred to in the judgment:

*Akerhielm v De Mare* [1959] A.C. 789.
*Arab Bank plc v Zurich Insurance Co; Banque Bruxelles Lambert SA v Zurich Insurance Co* F
[1999] 1 Lloyd's Rep. 262.
*Bank of Credit and Commerce International SA, Re; Banque Arabe Internationale D'Investissement SA v Morris* [2002] B.C.C. 407.
*Bank of Credit and Commerce International SA, Re; Morris v State Bank of India* [2003] B.C.C. 735; [2003] EWHC 1868 (Ch).
*Biogen Inc v Medeva plc* [1997] R.P.C. 1.
*C (A Minor) (Adoption: Parental Agreement: Contact), Re* [1993] 2 F.L.R. 260. G
*D (An Infant) (Adoption: Parent's Consent), Re* [1977] A.C. 602.
*Dubai Aluminium Co Ltd v Salaam* [2002] UKHL 48; [2003] 2 A.C. 366.
*Farmizer (Products) Ltd, Re; Moore v Gadd* [1997] B.C.C. 655.
*Floyd v John Fairhurst & Co* [2004] EWCA Civ 604 [2004] P.N.L.R. 41.
*Laws v Society of Lloyds* [2003] EWCA Civ 1887.
*Lloyds Bank plc v Rogers (No.2)* [1999] 3 E.G.L.R. 83.
*McNicholas Construction Co Ltd v Customs & Excise Commissioners* [2000] S.T.C. 553. H
*Maidstone Building Provisions Ltd, Re* [1971] 1 W.L.R. 1085.
*Manifest Shipping Co Ltd v Uni-Polaris Co Ltd* [2003] 1 A.C. 469.
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] B.C.C. 942; [1995] 2 A.C. 500.
*Morris v Bank of America National Trust* [2000] B.C.C. 1076.

© 2005 Sweet and Maxwell Ltd

*National Justice Compania Naviera SA v Prudential Assurance Co Ltd (The Ikarian Reefer) (No.1)* [1995] 1 Lloyd's Rep. 455.
*Patrick and Lyon Ltd, Re* [1933] Ch. 786.
*Piglowska v Piglowski* [1999] 1 W.L.R. 1360.

Gabriel Moss Q.C. and Hilary Stonefrost (instructed by Penningtons) for the appellant bank.

Charles Purle Q.C., David Eaton Turner and Blair Leahy (instructed by Lovells) for the respondent liquidators.

JUDGMENT OF THE COURT

**Mummery L.J.:**

1. This is the judgment of the court (to which each member of the court has contributed) on an appeal brought by the Bank of India ("BoI") against an order made by Patten J. on March 26, 2004, whereby he gave a judgment in favour of the liquidators ("the liquidators") of BCCI SA and BCCI (Overseas) Ltd (together "BCCI"), in the sum of US$82,302,941, with interest and costs.

2. The liquidators' claim was brought against BoI pursuant to sub-s.(2) of s.213 of the Insolvency Act 1986 ("the 1986 Act"). That section (s.213) relates to liability for fraudulent trading. It provides as follows:

> "(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.
>
> (2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper."

**Factual background**

3. BCCI was established in 1972 and achieved rapid growth during the 1980s. It collapsed in July 1991, with a deficiency as regards creditors in the region of US$10 billion. By that time BCCI had grown to the extent of having 110 branches in 41 countries and a number of representative offices. BCCI SA had 24 branches in this jurisdiction and its head office was in the City of London.

4. Until 1988 the President and Chief Executive of BCCI was Mr Hasan Abedi. His deputy was Mr Naqvi, who took over as Chief Executive when Mr Abedi became ill. Mr Akbar was a senior employee of BCCI's Central Treasury Division (the "CTD") in London. The CTD operated from BCCI SA's offices in London until 1986, but all its activities were booked and recorded in the name of BCCI (Overseas) Ltd ("BCCI Overseas") in the Cayman Islands.

5. BCCI incurred substantial losses through poor lending decisions and unsuccessful metal trading on its own account. The Khalil group of companies, which were owned and controlled by Mr Abdul Raouf Khalil, a Saudi Arabian businessman, were among the borrowers who, by the early 1980s, had a number of heavily overdrawn accounts with BCCI. To conceal these losses the CTD embarked on a systematic and wide-scale fraud involving the manipulation of account balances. This practice was initiated by Messrs Abedi and Naqvi and was operated by Mr Akbar through the CTD. Mr Akbar was the account officer for the Khalil group, and was also the person responsible for many, if not most, of the fraudulent transactions carried out by the CTD to hide BCCI's worsening financial position.

6. Subsequently, Mr Akbar was convicted of offences involving five transactions with BoI concerning the falsification of documents relating to the loan applications of Maram Trading Co Ltd ("Maram"), a company which he controlled.

23-01165-mew Doc 67-7 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (6) Pg 8 of 90



7. The transactions between BoI and BCCI that are in issue in this case are similar in nature to other transactions that BCCI entered into with three other Indian banks, and with two Swiss banks. The liquidators have brought proceedings against two of the banks, BoI and the State Bank of India, but not against the others. Of the total of US$377 million received by BCCI Overseas under the arrangements with these banks, some US$332 million was credited to the Khalil group accounts to give the false impression that the indebtedness was being serviced. A

8. The application before Patten J. concerned six transactions involving BoI and BCCI. The issue was, in summary terms, whether those at BoI responsible for entering into five of those transactions knew that they were thereby assisting BCCI to perpetrate a fraud on its creditors. It was common ground that this allegation of knowledge must involve a finding of dishonesty. B

**The transactions**

9. The first of the six transactions was initiated in the autumn of 1981 when Mr Samant of BoI contacted Mr Mewawalla at BCCI to ask him whether BCCI would be prepared to place a deposit with BoI. It was apparently BoI's policy, and that of other Indian banks, to obtain at its year-end as many deposits as possible, as the existence of large scale deposits was seen as an important measure of a bank's success. Mr Samant's approach to Mr Mewawalla was said to be in accordance with this policy. At the time, Mr Mewawalla, who was not called as a witness, worked in the International Department of BCCI. C

10. In response to the approach from Mr Samant, on November 12, 1981, Mr Mewawalla informed Mr Samant that BCCI was prepared to place a deposit of £10 million for three months at a rate of 15 per cent per annum on terms that BoI was required to lend this amount to a borrower named by BCCI at 15.125 per cent. The security for the loan was to be an irrevocable letter of guarantee by BCCI. D

11. The purpose of this rather extraordinary transaction from BCCI's point of view was said to be to improve its earnings to advances ratio. The judge held ([2004] B.C.C. 404) that he could not say whether it was Mr Mewawalla or Mr Samant who provided this explanation for the transactions, but he said that it was not disputed that Mr Mewawalla made it clear to Mr Samant that the transaction was for the benefit of BCCI in that its purpose was the improvement of its accounts or profits at its year end. In a telex that Mr Samant sent to BoI's head offices on November 12, 1981, he stated that: E

> "BCCI is doing this obviously to show a good ratio of earnings against their advances . . ." F

Therefore Mr Samant and the board of BoI were all well aware of what was understood to be BCCI's reason for the transactions.

12. The first transaction, like each of the subsequent transactions (save for the fifth where there was no loan) had the following features:

(1) It was arranged between Mr Mewawalla for BCCI and Mr Samant for BoI. G

(2) It involved a fixed deposit by BCCI with BoI at a fixed rate.

(3) BoI was required by BCCI to make a fixed-term loan, for the same period as the deposit, to Maram, at a rate of interest 0.125 per cent above the rate on the deposit.

(4) BCCI gave BoI an irrevocable guarantee of the loan.

(5) At the end of the fixed period, BoI repaid the deposit and interest thereon to BCCI and, through BCCI, received repayment of the loan and interest. H

13. BoI did not dispute that BCCI's CTD used the moneys provided by BoI pursuant to the six transactions to credit heavily overdrawn accounts that Mr Khalil and his group of companies held with BCCI. The purpose of this exercise was to give the false impression that these accounts were being serviced and the indebtedness being repaid, at least to some extent, by the customer. BoI also did not, and does not, dispute that BCCI did not disclose the

© 2005 Sweet and Maxwell Ltd

23-01165-mew Doc 67-7 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (6) Pg 9 of 90



guarantees to its auditors. The issue for the judge was what, if anything, BoI knew of the CTD's fraud.

**Knowledge of fraud**

14. There was no dispute about the relevant alleged knowledge in question being "blind-eye" knowledge. It was further agreed that the elements of what was required for this type of knowledge were accurately described in the speech of Lord Scott of Foscote in *Manifest Shipping Co Ltd v Uni-Polaris Co Ltd* [2003] 1 A.C. 469 at para.116, which was quoted by Patten J., at para.13 of the judgment in this case:

> "In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist. But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that may, at one extreme, be no more than a vague feeling of unease and, at the other extreme, reflect a firm belief in the existence of the relevant facts. In my opinion, in order for there to be blind-eye knowledge, the suspicion must be firmly grounded and targeted on specific facts. The deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to enquire into an untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the basis of a finding of privity."

The judge held that (para.14):

> "Dishonesty as such is not in terms a condition of liability under s.213. But if knowledge of the fraud in either of the senses indicated above is established, Mr Hirst [counsel then appearing for BoI] accepts that it must follow that BoI was dishonest."

15. In relation to the first transaction the judge found that none of the BoI employees, including Mr Samant, had the relevant knowledge. In relation to the second transaction the judge held that Mr Samant did have the relevant knowledge, as he did in relation to the third, fourth and fifth transactions. The judge further held that his knowledge should be attributed to BoI. Mr Samant resigned from BoI in June 1985, although his resignation only took effect in November 1985. He was not, therefore, working for BoI at the time when the sixth transaction took place in September 1985 and the judge held that BoI did not have the relevant knowledge in respect of that transaction.

**The appeal and cross-appeal**

16. Three main points are raised by Mr Gabriel Moss Q.C., who appears with Ms Hilary Stonefrost, on behalf of BoI, on the appeal. First, it is contended that, in light of the evidence before him, and in light of his assessment of that evidence, the judge could not properly have concluded that Mr Samant was dishonest in relation to the four transactions in question. Secondly, it is contended that, even if the judge's findings against Mr Samant are upheld, Mr Samant's dishonesty could not and should not be attributed to BoI. Thirdly, it is contended that there was, in effect, insufficient connection between the four transactions in question and the defrauding of creditors within BCCI to bring BoI within the ambit of s.213(2).

17. In their cross-appeal, the liquidators, who appear by Mr Charles Purle Q.C., Mr David Eaton Turner and Ms Blair Leahy, contend that the judge ought to have concluded that two of the directors of BoI at the time, Mr Vaghul and Mr Shukla, were guilty of dishonesty effectively in the same way and to the same extent as Mr Samant. The cross-appeal is only relevant if the appeal succeeds on the first or second ground of appeal. The liquidators also seek to amend their case and to argue that BoI should be vicariously liable for Mr Samant's liability under s.213(2). This argument is only relevant if BoI succeeds on the first ground of appeal.

18. BoI and the liquidators have abandoned their respective appeal and cross-appeal on the issue of quantum.

### The judgment

19. The hearing before Patten J. lasted more than four weeks, in which he heard evidence from, *inter alia*, two experts on banking practice, Mr Samant and Mr Vaghul, as well as from Mr Mitra and Mr Rao, who, like Mr Vaghul, were employed by BoI at its head office. The judgment ([2004] B.C.C. 404) runs to 136 paragraphs (many of which have a number of subparagraphs) over 75 pages. It is appropriate to pay tribute to the full and careful way in which the judge set out and analysed the evidence, and expressed his conclusions as to the consequences of that evidence.

20. The judge set out in some detail the six transactions between BoI and BCCI which form the central subject matter of these proceedings. In relation to those six transactions, BoI expressly admitted that "by its involvement in [those] transactions . . . it . . . participated in the carrying on of the business of BCCI for fraudulent purposes", but it was, of course, BoI's case that its involvement was "unknowing".

### The first transaction

21. We have already described the first transaction, but it is necessary to examine it in a little more detail. It was negotiated between Mr Samant and Mr Mewawalla during November 1981 and completed on December 2, 1981. It involved BCCI transferring £10 million to BoI in London, under cover of a letter which referred to the payment as a three-month placement bearing interest at 15 per cent per annum, while on the same date BoI opened a new fixed deposit account in the name of BCCI which was credited with the £10 million on the same day, BoI London granted Maram a loan at a rate of interest of 15.125 per cent per annum, *i.e.* 0.125 per cent above the rate payable on the moneys received from BCCI. BoI effected this by transferring the £10 million to an account in favour of BCCI for the account of Maram in the books of BCCI, and the £10 million was then credited as a new call deposit account in the name of Saudi Development and Commercial Company ("SDCC"), a Jeddah company controlled by BCCI. This transaction was effectively reversed on March 2, 1982.

### The second transaction

22. The second transaction was negotiated between July and September 1982, and was completed on September 22. As mentioned, it was very similar to the first transaction, although the sum involved was £25 million rather than £10 million, and, when the £25 million arrived back at BCCI, it was credited to Mr Khalil's current account, rather than an account in the name of SDCC. This transaction was reversed in January 1983.

### The third transaction

23. The third transaction was negotiated in October, and completed in November 1983. It was very similar to the first two transactions, save that it involved a total of US$60m which was dispersed in three equal tranches between November 1 and 7, 1983, and each tranche, when it arrived back at BCCI, was credited, like the money in the second transaction, to Mr Khalil's current account. The third transaction was reversed on February 1, 1984.

### The fourth and fifth transactions

24. The next transaction was negotiated between July and September, and was implemented on September 18, 1984. It involved a sum of US$75 million and in many ways was similar to the second and third transactions. However, unlike the first three transactions, BCCI requested

© 2005 Sweet and Maxwell Ltd

A that it be implemented over two disconnected periods, namely from September 18 to October 18, 1984, and from December 18, 1984 to January 22, 1985. Accordingly, the fourth transaction involved US$75 million, and was otherwise subject to a similar arrangement to the funds involved in the second and third transactions, and the money was repaid with interest on October 18, 1984.

25. The so-called fifth transaction was really the second part of the fourth transaction, albeit B that it ultimately involved a smaller sum, namely US$50 million. As the judge explained, it "took the form of an exchange of deposits in the sum of $50 million between BOI and BCCI", and involved BCCI lending the money to BoI at 9 per cent per annum interest, and BoI lending the money back at the same rate. That money was made the subject of the circular loan arrangement on December 18, 1984, which was effectively "undone" on January 22, 1985.

**The sixth transaction**

C 26. The sixth transaction does not play any part in this appeal, because, as explained above, by the time it was implemented, Mr Samant was no longer employed by BoI. In these circumstances, we need say no more about it.

**Patten J.'s findings on the transactions**

D 27. It is now appropriate to set out the essential findings, for the purpose of this appeal, made by the judge in relation to the five transactions which he had to consider.

28. Because the liquidators were not mounting any claims against BoI in relation to the first transaction, its only function in the proceedings, albeit that it was an important function, was as part of the factual background to the second and subsequent transactions. The judge said this, when considering Mr Samant's state of knowledge in relation to the first transaction:

> E "107. I have found Mr Samant to be an unreliable and, I am afraid, untruthful witness, but I am prepared to recognise the existence of some doubt as to whether he had reason to question the improvement of BCCI's earnings to advances ratio as a plausible explanation for the arrangements during the course of the first transaction. My own view is that on the balance of probabilities he must have entertained some cause for concern about it even at that time, if only because head office itself was clearly unhappy."

F 29. After considering the first transaction a little further, the judge then turned to the second and subsequent transactions, and said this:

> "108. However, any doubts that exist as to Mr Samant's state of knowledge are, in my judgment, resolved by the second transaction. Despite having been told by head office that the first transaction was to be one-off, he felt able to make an enthusiastic recommendation in July 1982 for a similar arrangement involving not £10 million but £30 million. Mr Shukla's query about the real reason for the transaction prompted him G to produce the 1981 accounts and, as I have already found, I am satisfied so as to be sure that Mr Samant looked at that material and did see and did realise that an improvement in the earnings to advances ratio could not be achieved by the removal of loans over the year end. He also realised that only a transfer of non-performing debt would have any significant effect. I therefore have no real doubt that Mr Samant knew from this time on, even if [it] had not occurred to him before, that the purpose of the transaction was considerably more complicated, and certainly more suspicious, than he may at first have H supposed. These suspicions must have been increased by his knowledge that Maram was of no real significance in the transaction and that the loans would be repaid by BCCI. The circular nature of the transactions was already apparent to him, and the removal of the only suggested justification for them can have left him, and I believe did leave him, in no real doubt that he was in all probability dealing with a fraud of some kind. The matter was put really beyond doubt when in 1984 the fourth and fifth

> transactions occurred at a time and in a form respectively which made it obviously impossible for the alleged purpose to be achieved."

30. The two other centrally crucial passages for the purpose of the points raised on the appeal and the cross-appeal are in paras 112 and 120 of the judgment. Accordingly, we set them out in full:

> "112. I do have real concerns about the way in which these transactions were handled by BOI's head office, and in relation to the first and second transactions they reflect very badly on Mr Vaghul's management of the bank. There was understandably real unease with the first transaction, but the condition of approval that it should be a once-only transaction seems to have been ignored for no good or apparent reason in subsequent years. Mr Shukla expressed the concerns I have mentioned, but again they did not prevent the second and third transactions from going ahead. There is no evidence, and it is not alleged, that Mr Samant told them a convincing lie in order to gain approval for the transactions, and his evidence is that he did not speak to them. I accept that. It is therefore more likely that they simply allowed their doubts to be overcome by preferring to rely on Mr Samant's judgement in the matter. Although the transactions (except the first) were approved at board level, this was merely to give authority to the London branch to proceed with the transaction. The decision whether to go ahead was then a matter for Mr Samant. No-one suggests that the board of BOI was in any sense dishonest, and I am not satisfied that a case of knowledge and dishonesty is made out, to the requisite standard of proof, against either Mr Shukla or Mr Vaghul. I think that they looked to Mr Samant to scrutinise the proposals and were content to accept his recommendation. Once the first and perhaps second transactions had been completed without any apparent problems, approval by the board seems to have been obtained very quickly, almost as a matter of routine. It was only in relation to the sixth transaction that problems began to occur, due in all probability to the interest which the regulators had begun to show in the arrangements. But BOI by then had a new chairman (Mr Tiwari) and I know really nothing about his involvement in the decision to approve the sixth transaction. Mr Mitra's evidence about that transaction was clearly unsatisfactory, but the decision to give approval was not his and I am not able, on the evidence, to find that he had the insight necessary to give him the knowledge which Mr Samant himself had.
>
> . . .
>
> 120. Mr Samant did have delegated authority to lend up to £200,000 unsecured without seeking head office approval. For sums of the order of £10 million or more, not even the General Manager (International) at head office could give the necessary sanction. The proposal needed to be referred to the board. This was of course the procedure adopted in each of the six transactions under review, although in the case of the first transaction Mr Vaghul seems to have approved it under delegated powers. In the present case, however, the scheme of delegation gives an incomplete picture of what was done. At the time when most (if not all) of the transactions were put up for approval, the borrower had yet to be identified. In the case of the second transaction Mr Vaghul explained that, to avoid putting the matter to the board again, Mr Samant was given what he described as blanket permission to go ahead with a borrower nominated by BCCI. It is also clear from the evidence that the approval of the transactions was no more than that: *i.e.* an authority to Mr Samant to lend to the nominated borrower on the terms he had negotiated and agreed. Approval was often given some time in advance of the completion of the transactions and detailed matters such as the investigation of the borrower's purpose or status and the documentation for the transaction were left to Mr Samant to deal with. Head office or board approval was not an instruction to carry out the transaction. Mr Samant retained an obvious and necessary discretion whether to go ahead. This was the basis of the approval given in the second transaction and, after that, board approval

© 2005 Sweet and Maxwell Ltd
bcp2005 bcp 277 Mp 748—bcp23075

A seems to have been given rapidly and almost as a matter of course. It is clear, as I have found, that senior executives and the board were content to take Mr Samant's assurances at face value and to leave it to him to satisfy himself that it was proper for BOI to go ahead. In these circumstances he was, at the time of each of the first five transactions, the person who, in Lord Hoffmann's words, had the authority to do the deal."

B

**Mr Samant's knowledge of fraud: the judge's findings**

31. Although the first point argued on behalf of BoI was that the judge was wrong to hold that Mr Samant's knowledge was to be attributed to BoI, it is, we think, more logical to begin by considering the second ground of appeal. That ground is that the judge was wrong to conclude that, by the time the second transaction was entered into, Mr Samant was "left . . . in C no real doubt that he was in all probability dealing with a fraud of some kind". This was a conclusion that the judge reached (at para.108), after having carefully considered the substantial documentary evidence put before him, the evidence of a number of witnesses, and in particular Mr Samant, but also Mr Shukla and two expert banking witnesses, one called from each side.

32. Although the documentary evidence was substantial, it is fair to say that there was very D little documentation before the judge which bore, at least directly, on this issue. That appears to have been partly because it is unlikely that there would ever have been much in the way of documentation which was directly helpful on this issue, and partly because it appears that much of the contemporaneous documentation had been lost or destroyed.

33. The judge had a number of reasons for reaching his conclusion as to Mr Samant's dishonesty so far as the second, third, fourth and fifth transactions are concerned. Before E dealing with his reasons in relation to those transactions, it is appropriate to identify his reasons for concern about Mr Samant's honesty in relation to the first transaction. Those reasons may conveniently be expressed as follows.

34. First, even "ignor[ing] the obvious artificiality" of each of the transactions, they "broke every rule of lending in the banker's book and that must have been obvious to Mr Samant, and for that matter to Mr Mewawalla, as experienced bankers", and "[n]either expert had ever seen F or heard of a transaction of this kind in practice". Mr Wragg, one of the two expert witnesses who gave evidence, described the transaction as "unacceptable in banking terms" according to the judge.

35. Secondly, as the judge said in the same paragraph, namely para.32 of his judgment, "it was impossible for BOI to form any view about the purpose of the loans or the borrower's standing". As the judge pointed out, it was necessary for BoI to know the borrower, and it was inappropriate to rely on BCCI's guarantee alone. Further, as the judge said in para.31 of his G judgment, BoI "had no real prior banking relationship with BCCI, at least in London".

36. Thirdly, the judge said in para.33, "it must have been obvious to Mr Samant that [the first transaction] was not an ordinary loan transaction of any kind" especially as he had been approached by BCCI with a view to entering into the transaction. The judge concluded that that there were "two obvious questions which any honest and competent banker would have asked and would have required to know the answer to". Those questions were "why BCCI required H assistance in this way" and "the status of the borrowing which BoI was being asked to take on". Yet neither of those two questions was asked by Mr Samant.

37. Fourthly, "despite the highly unusual nature of what was proposed, Mr Samant was prepared almost immediately to recommend acceptance by BoI" without making any enquiries about the borrower, "the purpose or status of the existing loans, or the reason why there was to be such a singular lack of documentation".

38. Fifthly, according to his evidence to the judge, Mr Samant was concerned about the first transaction when it was proposed to him, and he accordingly “went a little deeply into it”, as a result of which Mr Mewawalla explained that BCCI’s purpose was to improve its “earnings to advances ratio”. It was, however, clear to the judge from the evidence that the improvement in the ratio allegedly desired by BCCI “was only achievable if BCCI retained a flow of income from the borrower as the price of obtaining a BCCI guarantee” but “[t]his was not a feature of this proposal”.

39. Sixthly, in light of the size of BCCI’s lending and borrowing, which Mr Samant clearly knew about, and indeed considered, at the time of the first transaction, he must have appreciated that the effects of the first transaction, and indeed of the subsequent transactions, on BCCI’s ratio would be negligible.

40. Seventhly, as Mr Samant had to accept in cross-examination (because it was logically inevitable) “the only way in which the ratio of earnings to advances could be improved was by taking a bad debt off the books of BCCI”. Although Mr Samant “strongly denied” that it had been suggested to him, or that it had occurred to him, that this would be done, and “that he had proceeded on the assumption that BCCI would not do anything dishonest”, the judge was unconvinced by this evidence.

41. Eighthly, as the judge mentioned in para.107 of his judgment, he found Mr Samant’s explanations at trial “completely unconvincing” (para.40). Mr Samant gave more than one explanation for entering into the first transaction, and each explanation was not only unconvincing, but inconsistent with the others. Bearing in mind the fact that Mr Samant was clearly a clever and experienced banker, and that he looked at BCCI’s published accounts at the time, the judge concluded that the sort of questions about the proposed first transaction which would have occurred to a competent banker must have occurred to Mr Samant, despite his denial, and that either he knew no satisfactory answer would be forthcoming, or he deliberately refrained from asking because he would have expected no satisfactory answer to be forthcoming.

42. Ninthly, the artificiality of the first transaction was underlined by the fact that there was very little documentation, and this was at the request of BCCI, who appear to “have dictated the form of security to be given by the borrower”. The judge described this as a “real oddity” which “emphasise[d] how artificial this arrangement was and the extent to which BCCI was (and appeared to Mr Samant to be) in control of Maram and the whole transaction”.

43. These various factors, which in some cases overlap, caused the judge to conclude that there was a powerful argument for saying that Mr Samant had sufficient knowledge of the fraud in relation to the first transaction, and they all apply at least with equal force to the second transaction. However, there were further factors of relevance, at least in the judge’s view, so far as the second transaction was concerned.

44. First, after the second transaction had been proposed by Mr Samant to the BoI board, two directors, Mr Shukla and Mr Vaghul, discussed the proposal, and instructed Mr Rege at BoI head office to contact Mr Samant to ask him for the “real reason” for the transaction, which he did. Despite his denial, Mr Samant, the judge concluded, went back to look at the BCCI annual report and must have noticed “that the explanation given by Mr Mewawalla was inconsistent with the material available in that document”. When seeking to explain the rationale of the second transaction, to BoI’s head office, Mr Samant’s explanation was one which “was not and could not have been correct”, as the judge put it.

45. Further, the judge concluded at para.40 that, in relation to the second transaction, Mr Samant “gave no credible explanation as to why the points put to him and readily accepted by him during the cross-examination were not obvious to him in 1982. To say that he simply relied on Mr Mewawalla is not an answer to this point.”

46. The judge also thought it was significant that, although BoI’s head office had made it clear to Mr Samant that the first loan was to be, as it were, a “one-off” transaction, which was

© 2005 Sweet and Maxwell Ltd

not to be repeated, he went ahead with the second transaction, and indeed the third, fourth and fifth transactions, without any apparent concern.

47. All the points relevant to the second transaction were at least equally relevant to the third transaction. However, there were additional factors in relation to the third transaction. Mr Mewawalla asked Mr Samant to obtain a sanction from the BoI board for a loan that was not limited to an identified borrower, which the judge described as "a yet further indication of how unrelated lending was to the borrower which BCCI eventually nominated".

48. Further, as the judge pointed out, the negotiations for each successive transaction started with a proposal from BCCI for a loan that was larger than that involved in the immediately preceding transaction. In this connection, the judge concluded that "any honest and competent banker [in the position of Mr Samant] would not fail to note the rising amount of debt in each successive year". The judge said that it therefore "must have been obvious to Mr Samant by the time of the third transaction (and probably by the time of the second) that Maram's indebtedness to BCCI was increasing" and that, accordingly, "there was a high degree of probability that the loans were not performing and that Maram's financial position had significantly worsened since the last transaction". Given that no enquiry was apparently made in that connection, the judge concluded that it was "much more likely that Mr Samant realised or was told that Maram simply provided BCCI with a means of receiving back its own money to assist it in reorganising its year-end results", a view which the judge concluded was supported by some of Mr Samant's evidence.

49. The judge was also impressed by the fact that three copy letters from BoI to BCCI had survived in relation to the third transaction. The first, dated November 8, 1983, set out brief details of the three tranches of the $60 million loan and similar brief details of the three corresponding deposits. On the same day, there was another letter which referred only to the three tranches of the loan, and contained no reference to the matching deposits. The letters were to be sent by Mr Raina of BoI to Mr Mewawalla of BCCI, as was a further letter, dated November 9, 1983, which only contained the details of the three deposits. The judge concluded that the longer letter "was drafted first, but, when sent to BCCI, was rejected by Mr Mewawalla because it did forge a link between the loans and the deposits". The judge considered that Mr Mewawalla "then contacted BoI and arranged for the contents of the letter to be split. Separate letters were then sent, covering the loans and the deposits."

50. As to the fourth transaction, again the factors which gave rise to the judge's conclusion as to Mr Samant's guilty knowledge on the third transaction apply. In addition, although BoI's head office emphasised to him on August 10, 1984, that "the borrower must be acceptable to you", Mr Samant made no "further checks in respect of Maram". Further, the change in BCCI's proposal in relation to the fourth transaction, namely that it involved two disconnected periods, meant that the fourth transaction was not over a period covering BCCI's accounting year end. It therefore cannot have been wanted by BCCI for the only purpose Mr Samant said was given to him by Mr Mewawalla. In fact, the purpose of the fourth transaction was, as the judge explained, "to cover the initial audit confirmation period", but there is no question of that explanation having been given to Mr Samant, at least according to his evidence.

51. Quite apart from this, a letter to BoI on September 10, 1984, purportedly signed by Mr Khalil of Maram confirmed that what was originally to be a loan for a single period was to be a loan for two disconnected periods referring to "our telephone conversation". In fact, as Mr Samant must have well known, neither he nor anyone else in BoI's London office had ever spoken to Mr Khalil.

52. The fifth transaction, which was, as the judge said, really the second part of the fourth transaction, was carried out in a different way from the other transactions as explained above. Although Mr Samant did not specifically recollect the fifth transaction, he said in his evidence that BoI had carried it out for the same purpose as the previous transactions. However, as the judge pointed out, the real additional question which arises from the fifth transaction concerns

"BCCI's purpose in carrying it out", because, as "no debt was transferred", there could be no effect on BCCI's earning to advances ratio. When that was pointed out to Mr Samant at the trial, he said that he assumed that BCCI, like BoI, must have wanted to improve its deposits. However, he had not sought BoI board approval on that basis. A

53. Mr Samant also explained to the judge that the fifth transaction was a straightforward money market transaction. However, as the judge said, "[o]n no view was this an ordinary money market transaction and neither banking expert was prepared to treat it as such". Indeed, Mr Wragg, BoI's own expert, said that the fifth transaction could not really be described as window dressing, because even window dressing which was "designed to improve a bank's liquidity" must involve "genuine and economic" transactions. B

54. More generally, the judge was very unfavourably impressed by Mr Samant's explanation of an account of a meeting he had with a Mr Atkinson of the Bank of England on January 31, 1985. The judge was provided with what he called "a detailed note of this meeting taken by the Bank of England, which Mr Samant accepts as accurate". As the judge also said, the note indicated a high level of dissatisfaction on the part of the Bank of England with a number of aspects of BoI's lending. Mr Samant's explanation as to what happened at the meeting was inconsistent with the note, and the judge simply did not believe him. In particular, he concluded that Mr Samant did not tell Mr Atkinson about "the earlier arrangements involving taking an existing loan off BCCI's books" or BCCI's alleged reason for this. Having read the note of the meeting, the judge concluded that, in his discussions with Mr Atkinson, Mr Samant "considerably understate[d] the arrangements between BOI and BCCI" and avoided any mention of the involvement of Maram. The judge thought it significant that Mr Samant did not reveal anything about the first three transactions to the Bank of England, and also that the warning which the Bank of England gave to him at the end of the meeting was not passed on by him to BoI's board. C D

E

### Attack on judge's findings

55. Although Mr Moss made a sustained (but not immoderate) attack on the judge's conclusion as to Mr Samant's "blind-eye knowledge" at the time of the second, third, fourth and fifth transactions, we are quite satisfied that the judge was fully entitled to reach the conclusion that he did. We do not suggest that none of Mr Moss's points have merit but, even taken together, they do not, in our view, undermine the judge's conclusion and his reasons for it. F

### The approach

56. Before turning to the points raised by Mr Moss in relation to the judge's conclusion as to Mr Samant's state of knowledge, it is perhaps convenient to refer to the approach to be adopted by this court when considering an attack on a finding of primary fact, or an inference of fact made from the primary fact, by a first-instance court. G

57. There was a certain amount of debate before us as to the proper approach an appellate court should adopt, in particular in relation to facts found and inferences drawn by the trial judge. The relevant principles are to be found in the judgment of Arden L.J., with whom Potter and Neuberger L.JJ. agreed, in *Floyd v John Fairhurst & Co* [2004] EWCA Civ 604 [2004] P.N.L.R. 41 at paras 47–59. That contains a near exhaustive analysis of the relevant authorities. We do not propose to add to the jurisprudence. We merely observe, to borrow a phrase used by Steyn and Hoffmann L.JJ. in their joint judgment in *Re C (A Minor) (Adoption: Parental Agreement: Contact)* [1993] 2 F.L.R. 260 at p.273C, that Patten J. was steeped for over a month in the evidence and the personalities of the witnesses. This gave him an immense advantage, for character and personality certainly cannot be judged as well from a transcript of evidence as H

© 2005 Sweet and Maxwell Ltd

by seeing and hearing those involved, *ibid.*, at p.275B (this latter observation is in fact a quotation from Lord Wilberforce in *Re D (An Infant) (Adoption: Parent's Consent)* [1977] A.C. 602 at p.626D).

58. Moreover, as Lord Hoffmann pointed out in *Biogen Inc v Medeva plc* [1997] R.P.C. 1 at p.45:

> "The need for appellate caution in reversing the judge's evaluation of the facts is based upon much more solid grounds than professional courtesy. It is because specific findings of fact, even by the most meticulous judge, are inherently an incomplete statement of the impression which was made upon him by the primary evidence. His expressed findings are always surrounded by a penumbra of imprecision as to emphasis, relative weight, minor qualification and nuance ... of which time and language do not permit exact expression, but which may play an important part in the judge's overall evaluation."

As Lord Hoffmann went on to comment in *Piglowska v Piglowski* [1999] 1 W.L.R. 1360 at p.1373F:

> "The exigencies of daily court room life are such that reasons for judgment will always be capable of having been better expressed. ... An appellate court should resist the temptation to subvert the principle that they should not substitute their own discretion for that of the judge by a narrow textual analysis which enables them to claim that he misdirected himself."

59. Finally, and this, as Mr Moss points out, is important in relation to BCCI's cross–appeal, we bear in mind that "When a party has been acquitted of fraud the decision in his favour should not be displaced except on the clearest grounds": *per* Stuart-Smith L.J. in *National Justice Compania Naviera SA v Prudential Assurance Co Ltd (The Ikarian Reefer) (No.1)* [1995] 1 Lloyd's Rep. 455 at p.459 referring to *Akerhielm v De Mare* [1959] A.C. 789 at p.806.

**BoI's grounds of appeal against findings: discussion and conclusions**

60. With those observations in mind, we turn to the points raised by Mr Moss on behalf of BoI in attacking the judge's conclusion as to Mr Samant's fraudulent knowledge.

61. The first point made by Mr Moss is a general one. He says that the judge did not give any, or at least sufficient, weight to the fact that the recollection of the various witnesses of fact, and in particular Mr Samant, would have been inevitably unclear about events which took place more than 20 years ago, and that one should not draw any adverse inferences from the fact that much of their evidence was inconsistent, unconvincing or plainly wrong. Particularly when the person is giving evidence in relation to his previous conduct, which he may not recall at all clearly, and about which he may feel defensive, it would be unfair, particularly when the conduct concerned took place more than 20 years ago, to draw any adverse inferences from the unsatisfactory nature of his evidence, or of his failure to explain in any satisfactory way what occurred and why it occurred, at least in the absence of very good reasons.

62. While the foundation for this argument is plainly right, we do not think that it is of any assistance to BoI in the present case. First, the judge was only too well aware of the risk of unfairly drawing adverse inferences against persons, and in particular witnesses, in the position of Mr Samant in the present case. He referred to it briefly in para.16 of his judgment, where he said that he had taken into account "a natural inclination which may exist on the part of some of the witnesses to be defensive of their own conduct" and he added that "[f]ailure to give a credible explanation of events may be due to factors of this kind rather than a perceived need to deny involvement with a fraud". However, he went a little further, in that he referred to what he said in paras 17 and 18 of his judgment in an earlier case involving the same sort of issues as those in the present case, namely *Re Bank of Credit and Commerce International SA; Morris v State Bank of India* [2003] B.C.C. 735; [2003] EWHC 1868 (Ch). It is unnecessary, indeed

23-01165-mew Doc 67-7 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (6) Pg 18 of 90



inappropriate, to set out those two paragraphs, but we have been taken to them. They make it very clear that Patten J. was well aware of the sort of factors Mr Moss rightly emphasises.

63. It is, of course, possible for a judge, in one part of his judgment, carefully and fully to warn himself against the risk of making a particular mistake when assessing the evidence, and then, in a later part of the judgment, to make that very mistake. However, it is inherently unlikely. It is particularly unlikely in the present case, given that the warning was so carefully and fully expressed. Further, the exercise which the judge had to carry out in the earlier case to which he referred was very similar to that in the present case, and, for what it is worth, we note that he dismissed the liquidators' claim against the State Bank of India.

64. It seems to us that, in order for Mr Moss's argument to succeed on this point, he would have to show that the judge could not properly have concluded that Mr Samant was fraudulent once one takes into account the problems he, and any other relevant witness, faced when giving evidence about events, all or many aspects of which he may have forgotten, and in respect of some aspects of which he may have felt defensive. In our view, when one takes all the primary facts which the judge found, he was, subject to any other point which Mr Moss may be able to advance, entitled to conclude that Mr Samant must have been fraudulent in relation to the four transactions.

65. The fact that the directly relevant contemporaneous documentary evidence was exiguous, and the fact that there could, at least in theory, have been an innocent explanation of what Mr Samant did, is merely part of the overall picture. Accordingly, it seems to us that, unless there is some specific passage in the judgment when the judge was considering the evidence, in which it could be shown that the judge misdirected himself in the way contended for by Mr Moss's first point, or it could be said that the judge must have misdirected himself in this connection, this argument simply takes matters no further. Either the judge reached the wrong conclusion because he made wrong findings of primary fact or because he reached a conclusion he could not have reached on the primary facts he found, or his conclusion is simply not assailable.

66. Accordingly, the fact that the judge may have based his conclusion as to Mr Samant's honesty in part upon his unconvincing performance in the witness box does not mean that his conclusion is open to attack because of the difficulties which Mr Samant faced in recollecting what happened 20 years ago and the defensive feelings which he may have suffered from. It is true that Mr Samant was faced with those difficulties, but they were difficulties that the judge plainly had well in mind, and allowed for.

67. Mr Moss's second ground of attack is that the judge made inconsistent findings in para.59 of his judgment, where he held, on the one hand, that Mr Shukla had not accepted BCCI's reason for the second transaction because of his consideration of BCCI's year-end figures, but, on the other hand, he found that Mr Samant was "prompted" to send BCCI's accounts showing those year-end figures to BoI's head office as a result of Mr Shukla's query. We do not consider that there is anything in this point.

68. First, even if the apparent inconsistency existed, it could easily be explained by the fact that Mr Samant may not have been aware, at the time, that Mr Shukla had seen the year-end figures. Accordingly, although Mr Shukla may have seen the figures, and indeed those figures may have prompted Mr Shukla's request, that does not mean that Mr Samant appreciated that the request was based on Mr Shukla having seen the figures. Indeed, in the same paragraph of his judgment, the judge referred to Mr Samant's evidence that "he did not discuss the matter directly with Mr Shukla" at the time.

69. Quite apart from this, there is evidence to suggest that, if BCCI's 1981 balance sheet had been sent to the BoI board by Mr Samant, it had been sent "quite some time ago", to quote from a telex from Mr Samant of August 3, 1982. Accordingly, Mr Samant, and indeed Mr Shukla could have forgotten about it. Quite apart from this, all that may have been sent the first time was a summary, whereas what may have been received the second time was a fuller set of figures, even an annual report.

© 2005 Sweet and Maxwell Ltd

70. Mr Moss next submitted that Mr Samant's conduct in relation to looking to BCCI's accounts in connection with the second transaction was susceptible of innocent interpretation, which the judge should have adopted in preference to an interpretation which involved holding Mr Samant fraudulent, particularly in light of the sort of factors which the judge had warned himself against. Before turning to those innocent explanations, it is worth mentioning that it seems to us that this argument suffers from the fact that the judge based his conclusion as to Mr Samant's dishonesty by reference to a number of factors, and not merely by reference to consideration of BCCI's annual report for 1981.

71. In this connection it is also relevant to mention that, although the case against Mr Samant became stronger with each transaction, for the reasons which the judge explained, and we have attempted to summarise above, it would have been perfectly proper, when considering the state of Mr Samant's mind, to look at his conduct as a whole. The fact that he had knowledge of the fraud at the time of the fifth transaction can properly be said to be of some assistance to the conclusion that he had knowledge of the fraud at the time of the fourth transaction, albeit that consideration of his state of mind in relation to each transaction has to be considered separately. We should add that it would require a relatively exceptional case before it could be concluded that, because the judge was satisfied that a person had guilty knowledge at the time of the subsequent transaction, he must, simply on that account, have had guilty knowledge at the time of a previous transaction.

72. In connection with the judge's conclusions relating to Mr Samant's knowledge and belief as a result of looking at BCCI's 1981 accounts, two possible interpretations are put forward by Mr Moss. First, he suggests that Mr Samant may in fact not have looked at the accounts at all, on the basis that the judge only inferred that Mr Samant did so because of Mr Shukla's query which was relayed to him. To put it at its lowest, it appears to us that the judge was entitled to conclude that Mr Samant looked at BCCI's 1981 accounts because of Mr Shukla's query. However, we would go further than that. While we would not go so far as to say that the judge could only have made the inference that he did, it seems to us, in light of the circumstances in which the second transaction was being considered by Mr Samant, and, at least to his knowledge, the BoI board, that it was an inference which we would have expected the judge to have drawn.

73. The second, and alternative, point made in this connection by Mr Moss is that, assuming Mr Samant looked at BCCI's 1981 annual report for the purpose of considering its reason for entering into the second transaction, he could well have been either incompetent or careless, and accordingly did not realise that the only way an improvement in the ratio could be achieved was by the removal of non-performing loans over the year-end. Although the judge's overall impression of the witness is an advantage for a first instance tribunal which is capable of exaggeration in many circumstances, it is of particular value when deciding whether a witness who gave evidence at some length, is more likely to have been incompetent or careless as opposed to intelligent but dishonest. Patten J. was in a particularly good position to form a view as to Mr Samant's mental acuity and banking ability, and we do not understand it to have been suggested that the view he formed was not one that he could have reasonably arrived at.

74. The next point made by Mr Moss is that the members of BoI's board who approved the various transactions had the same information as Mr Samant, and that it was plainly inconsistent of the judge to hold, that on the one hand, Mr Samant was in some way party to the fraud, while concluding, on the other hand, that members of the board, including Mr Shukla and Mr Vaghul, were not. In our view, there is nothing in this point. First, where two persons have precisely the same information, it is perfectly possible to conclude that, on the basis of that information alone, one of them appreciates that something dishonest is going on, whereas the other does not. The difference may be attributable to differences in intelligence, expertise, attention to detail or casualness between the two parties.

75. Further, in the present case, having found that Mr Shukla and Mr Vaghul had doubts about the reason put forward by Mr Samant as to why BCCI wished to enter into the second

transaction, the judge thought it was "more likely that they simply allowed their doubts to be overcome by preferring to rely on Mr Samant's judgment in the matter" – para.112 of the judgment. Indeed, in the same paragraph, the judge recorded that "[n]o-one suggests that the board of BOI was in any sense dishonest." A

76. Furthermore, Mr Samant's role was different from that of the members of the board of BoI. He was the General Manager of the London branch, with direct contact with BCCI, and was personally responsible for proposing the transactions. Further, he was authorised by the board of BoI to investigate and finalise details of the transactions, and, indeed, to enter into them if he saw fit, as the judge pointed out. It would be scarcely surprising, in these circumstances, if the members of the board, including Mr Vaghul and Mr Shukla, had given the whole issue less scrutiny and consideration than did Mr Samant. The mere fact that they questioned the reason put forward for the second transaction does not call that conclusion into question. After all, as already mentioned, when Mr Samant repeated the explanation, they accepted it. There is nothing to suggest that they had any reason to believe that Mr Samant was anything other than the intelligent experienced banker Patten J. described him as. Nor is there anything to suggest that they had any reason to believe at the time that he was dishonest. B C

77. The next point made by Mr Moss is an objection to the finding, in para.70 of the judgment, that Mr Mewawalla was a knowing party to BCCI's fraud. In this connection, Mr Moss relied on the cross-examination of Mr Dyson, a retired partner of Deloitte, who assisted the liquidators. He answered in the negative the question: "Do you allege that Mr Mewawalla was dishonest in relation to the transactions involving the Bank of India?" However, it is fair to say that in re-examination, he also answered in the negative when he was asked whether it was his "case ... that Mr Mewawalla was innocently involved in these transactions" He explained this apparent discrepancy in an answer, the essence of which was: "It does not mean that we do not believe he is not guilty; it is a question of what we can prove." D

78. In our judgment, the mere fact that Mr Dyson, when giving evidence, disclaimed making the allegation that Mr Mewawalla was guilty of fraud cannot, as a matter of principle, prevent the judge coming to the conclusion that Mr Mewawalla was so guilty, unless, of course, that finding could be said to involve procedural unfairness or something of that sort. A conclusion as to whether a person, who was not a party or even a witness in the proceedings, was or was not dishonest is, of course, ultimately one for the judge and not for a witness. E

79. On the basis of the facts so far recited, and indeed on an examination of the more detailed account of the facts in the judgment below, it seems to us to follow almost inexorably that, if Mr Samant was guilty of dishonesty as the judge found, Mr Mewawalla must also have been so guilty. Most of the reasons which, when taken together, led the judge to conclude that Mr Samant was dishonest in relation to the second to fifth transactions, would apply equally, indeed in many cases more so, to Mr Mewawalla. The extraordinary nature of the transactions, the paucity of the paperwork, the November 8/9, 1983, letters, and the complete inadequacy of the explanation of BCCI entering into the transactions, all apply to Mr Mewawalla just as much as they apply to Mr Samant. F G

80. Furthermore, no procedural unfairness would have been involved in reaching this conclusion. On the sixth day of the hearing, BoI sought a ruling from the judge that the liquidators should not be entitled to cross-examine BoI's witnesses on the basis that Mr Mewawalla was dishonest, and that application was refused. Also, in his closing submissions, leading counsel for BoI suggested that it was "pretty unlikely" or "very improbable" that Mr Mewawalla was wholly innocent. In any event, we find it impossible to accept that, even if the judge had found, or been constrained to find that Mr Mewawalla was honest, this would have affected his conclusions as to Mr Samant. H

81. Mr Moss was also critical of the suggestion that Mr Mewawalla may have known of the letters of November 8/9, 1983. In our judgment, the judge was quite entitled to find, as he did in para.70 of his judgment, not merely that the longer letter was drafted first, but that it was sent to

© 2005 Sweet and Maxwell Ltd

BCCI and rejected by Mr Mewawalla because it forged a link between the loans and the deposits, and that it was only because of Mr Mewawalla's rejection of the longer letter that the two shorter letters were prepared and sent.

82. In all these circumstances, BoI's appeal against the judge's finding of dishonesty on the part of Mr Samant must fail. Having carefully considered all the available evidence, including all testimony from experts, directors of BoI, other employees of BoI, and Mr Samant himself, the judge reached a conclusion as to Mr Samant's state of mind at the time of the second, third, fourth and fifth transactions which, in the light of the primary facts he found, he was, to put it at its lowest, entitled to reach.

**Knowledge of Mr Shukla and Mr Vaghul: cross-appeal**

83. It is convenient to deal at this stage with the liquidators' cross-appeal in relation to the judge's conclusion that he did not find that Mr Shukla and Mr Vaghul were dishonest. If it is difficult for BoI to overturn the finding of dishonesty against Mr Samant by the judge in this full and careful judgment, it is even more difficult for the liquidators to overturn the judge's refusal to find dishonesty against Mr Vaghul and Mr Shukla in the same judgment. As we have already explained in relation to BoI's appeal, there is no inconsistency between the finding of dishonesty against Mr Samant and the lack of any such finding against Mr Shukla and Mr Vaghul. Further, authority and justice indicate that the court should be slow to overturn a judge's finding of dishonesty against a party, particularly when it is justified by the judge in a full and careful judgment, but the court should be even more reluctant to overturn the same judge's refusal to find dishonesty against another party, unless, of course, the findings are incompatible. In our view, there is, therefore, nothing in the cross-appeal.

**Attribution of knowledge: summary of rival contentions**

84. Since we have decided to uphold Patten J.'s finding that Mr Samant had knowledge (of the "blind-eye" variety) of the fraud of the CTD in respect of the second to fifth transactions, the critical issue is BoI's knowledge of BCCI's fraud. BoI can only be declared to be liable under s.213(2) if it was "knowingly" a party to the carrying on by BCCI of its business with intent to defraud creditors of the company or for any fraudulent purpose.

85. The attribution of knowledge to a corporate body, such as BoI, turns on the interpretation of s.213 and its application to the facts found by the judge. In what circumstances can the state of knowledge of an individual be attributed, for the purposes of s.213, to a corporate body, which, in the nature of things, can only derive its knowledge from individuals and be treated as having the knowledge that a relevant individual has? More precisely, can Mr Samant's "blind-eye" knowledge of BCCI's fraudulent trading be treated, for the purposes of s.213, as the corporate knowledge of BoI if, as was found by Patten J., none of the directors of BoI had any personal knowledge of BCCI's fraudulent trading? There has been very little discussion of this aspect of s.213 or its predecessors in the authorities. Such discussion as there is has mainly been in the litigation concerning the collapse of BCCI: see *Re Bank of Credit and Commerce International SA; Banque Arabe Internationale D'Investissement SA v Morris* [2002] B.C.C. 407 at p.411–415 and *Morris v Bank of America National Trust* [2000] B.C.C. 1,076 at pp.1,084–1,085.

**Position of BoI**

86. BoI accepted the possibility that s.213 could apply to a corporate counterparty, such as BoI, but contended that it was more difficult to establish liability than in the case, for example, of an individual director of the fraudulent company. It was submitted that Patten J. was wrong to attribute to BoI Mr Samant's knowledge of the fraud to BoI, so as to make it "knowingly" a party to the fraud in the business carried on by BCCI and thus liable to make contribution to the assets of BCCI under s.213. If the judge was right on this point, BoI would be potentially liable

to the liquidators of BCCI for a very substantial sum. Its liability would be to contribute to the losses suffered by the creditors of BCCI, which would have been avoided but for the transactions entered into by BoI with BCCI.

87. BoI's case, in brief, is that the "directing mind and will" of BoI are its directors. It is only their state of knowledge that counts in deciding whether or not BoI was "knowingly" a party to BCCI's fraud. Mr Samant was not a director of BoI. He had no delegated authority or specific board approval to enter into the transactions with BCCI on behalf of BoI. The evidence did not establish that any members of the board had any relevant personal knowledge of BCCI's fraud, of its deteriorating financial position, of its intention to deceive its creditors or of the fraudulent manipulation of its accounts. So far as the members of the board of BoI were concerned, BoI was assisting BCCI in a legitimate way, not helping it to perpetrate a fraud on its creditors. Subjective dishonesty is an essential ingredient of liability under s.213. There was no dishonesty on the part of the directors of BoI. So no "real moral blame" attached to them personally and no such moral blame could be attached, through them, to BoI.

88. It was submitted that it was contrary to the policy of the legislation, to the legal principles laid down in the authorities, to justice and to common sense to attribute Mr Samant's knowledge to BoI, when it was itself a "secondary victim" of Mr Samant's unlawful conduct and of his breaches of duty in respect of the transactions with BCCI.

**Position of the liquidators of BCCI**

89. The liquidators contended that Patten J. reached the only realistic, acceptable and sensible conclusion, both as a matter of law and on the facts. The liability of BoI for participating in BCCI's fraud was in accordance with (a) the self-evident policy of s.213; (b) the proper construction of the legislative language read, of course, in its context; (c) general principles of corporate liability for civil wrongs committed through the acts of individual agents or employees; and (d) plain good sense.

90. The liquidators relied on the essential facts found by the judge about the circumstances in which the relevant transactions between BoI and BCCI were concluded: the board of BoI had allowed Mr Samant to negotiate and supervise the transactions with BCCI and to make the ultimate decision whether to proceed with them; Mr Samant was BoI's Chief Manager of its United Kingdom and European branches, its most senior officer in the United Kingdom and in Europe; the board accepted the recommendations of Mr Samant as to the transactions, relied on his judgment and gave advance approval to the transactions with BCCI, even though they were unusual in banking terms. In those circumstances it was submitted that Patten J. correctly held that BoI should not be allowed to deny legal responsibility to make contribution to the assets of BCCI to compensate for the loss suffered by its creditors as a result of the fraudulent trading of BCCI.

**Patten J. on attribution of knowledge**

91. We begin with Patten J.'s factual and legal conclusions on the attribution issue. They are summarised in two key paragraphs of his judgment.

> "120. Mr Samant did have delegated authority to lend up to £200,000 unsecured without seeking head office approval. For sums of the order of £10 million or more, not even the General Manager (International) at head office could give the necessary sanction. The proposal needed to be referred to the board. This was of course the procedure adopted in each of the six transactions under review, although in the case of the first transaction Mr Vaghul seems to have approved it under delegated powers. In the present case, however, the scheme of delegation gives an incomplete picture of what was done. At the time when most (if not all) of the transactions were put up for approval, the borrower had yet to be identified. In the case of the second transaction Mr Vaghul explained that, to avoid putting the matter to the board again, Mr Samant was given what he described as

© 2005 Sweet and Maxwell Ltd

A blanket permission to go ahead with a borrower nominated by BCCI. It is also clear from the evidence that the approval of the transactions was no more than that: *i.e.* an authority to Mr Samant to lend to the nominated borrower on the terms he had negotiated and agreed. Approval was often given some time in advance of the completion of the transactions and detailed matters such as the investigation of the borrower's purpose or status and the documentation for the transaction were left to Mr Samant to deal with. Head office or board approval was not an instruction to carry out the transaction. B Mr Samant retained an obvious and necessary discretion whether to go ahead. This was the basis of the approval given in the second transaction and, after that, board approval seems to have been given rapidly and almost as a matter of course. It is clear, as I have found, that senior executives and the board were content to take Mr Samant's assurances at face value and to leave it to him to satisfy himself that it was proper for BOI to go ahead. In these circumstances he was, at the time of each of the first five C transactions, the person who, in Lord Hoffmann's words, had the authority to do the deal.

121. It is common ground that s.213 is capable of applying to a company in the position of BOI. Although it applies to the same conduct which under s.458 of the Companies Act can lead to the imposition of a criminal penalty, the purpose of s.213 is to enable the liquidator to recover compensation from those who have knowingly assisted the D fraudulent conduct of a company's business. I do not, therefore, have to decide what are the precise limits of criminal liability under s.458. The only question I have to decide is whether Mr Samant's knowledge is to be attributed to BOI so as to found liability under s.213. In my judgment, it is. It seems to me that to allow BOI to shelter behind an argument that the only relevant knowledge was that of the board would be to defeat the policy of the Act. It would allow banks such as BOI, which choose to rubber-stamp the recommendations of their senior managers without ensuring that all proper and due E diligence has been carried out, simply to sidestep liability by relying on their own ineptitude. The board of BOI had, through Mr Shukla, a real concern about the purpose of these transactions at the time of both the first and the second transactions. But they were content to delegate the supervision of the transaction and the ultimate decision whether to proceed to Mr Samant. Despite their own misgivings they chose to rely on his judgement. I cannot see how in those circumstances they should be entitled to deny F responsibility for the decisions which he made. The consequence is that BOI is liable to contribute to the losses to creditors which would have been avoided but for these transactions, and I will so order. Given my primary finding against Mr Samant, it is unnecessary for me to consider the liquidators' new and alternative claim that was introduced by way of amendment. It does not arise."

G

**Scope of s.213**

92. In view of the criticisms of the judgment by Mr Moss, we need to examine the various strands of paras 120 and 121 of the judgment: the basis of civil and criminal liability for fraudulent trading; the policy promoted by imposing civil liability under s.213; and the circumstances in which an individual's knowledge of fraud may properly be treated as corporate knowledge for the purposes of s.213.

H

**The statutory setting**

93. Where, as here, civil and criminal liability are the creation of statute, and knowledge ("knowingly") is an essential ingredient of statutory liability, the starting point must be the language, context and policy of the legislation considered against the background of general legal principles.

94. The relevant legal principles governing the circumstances in which a company can be held civilly or criminally liable for the acts of individuals and for their state of knowledge were explained by Lord Hoffmann in *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] B.C.C. 942; [1995] 2 A.C. 500, a Privy Council decision cited by Patten J. in paras 115–117 of his judgment.

95. The articles of association of the company, its contractual relations and the ways in which its powers are actually exercised are all relevant to locating the company's "directing mind and will" with regard to the particular acts for which it is sought to be made liable. It is necessary to have regard to the policy and provisions of the relevant legislation. As part of the process of statutory interpretation, and for the purposes of the rule in question, it may be necessary to fashion special rules for the attribution of knowledge to a company. As Lord Hoffmann said at p.946B–F; 507B–F:

> "The company's primary rules of attribution together with the general principles of agency, vicarious liability and so forth are usually sufficient to enable one to determine its rights and obligations. In exceptional cases, however, they will not provide an answer. This will be the case when a rule of law, either expressly or by implication, excludes attribution on the basis of the general principles of agency or vicarious liability. For example, a rule may be stated in language primarily applicable to a natural person and require some act or state of mind on the part of that person 'himself', as opposed to his servants or agents. This is generally true of rules of the criminal law, which ordinarily impose liability only for the actus reus and mens rea of the defendant himself. How is such a rule to be applied to a company?
>
> One possibility is that the court may come to the conclusion that the rule was not intended to apply to companies at all; for example, a law which created an offence for which the only penalty was community service. Another possibility is that the court might interpret the law as meaning that it could apply to a company only on the basis of its primary rules of attribution, i.e. if the act giving rise to liability was specifically authorised by a resolution of the board or a unanimous agreement of the shareholders. But there will be many cases in which neither of these solutions is satisfactory; in which the court considers that the law was intended to apply to companies and that, although it excludes ordinary vicarious liability, insistence on the primary rules of attribution would in practice defeat that intention. In such a case, the court must fashion a special rule of attribution for the particular substantive rule. This is always a matter of interpretation: given that it was intended to apply to a company, how was it intended to apply? Whose act (or knowledge, or state of mind) was *for this purpose* intended to count as the act etc. of the company? One finds the answer to this question by applying the usual canons of interpretation, taking into account the language of the rule (if it is a statute) and its content and policy."

96. We agree with Patten J. (at paras 118 and 119 of his judgment) that, following this approach, the determination of the person possessing the relevant knowledge for the purposes of ascertaining liability under s.213 is not simply a matter of identifying the person who authorised the transaction in accordance with the system of authorisation operated by the company in question. The scheme of delegation of authority might, as in this case, provide only an incomplete picture of what was done. It may not be sufficient for the purposes of determining whether the company should be treated as possessing the requisite knowledge. As Patten J. said (at para.118):

> ". . . the primary rules of attribution, based on factors such as the scope of the agent's authority, may require to be modified either restrictively or liberally in order to accommodate the statutory purpose of the legislation which imposes the liability."

**Scope of civil and criminal liability for fraudulent trading**

97. Before dealing with the rival arguments on the policy of s.213, we remind ourselves that both civil liability to pay compensation and criminal sanctions may be imposed on any person

© 2005 Sweet and Maxwell Ltd

who is knowingly a party to fraudulent trading. Both types of liability extend beyond the company which actually carried on its business with intent to defraud creditors and its directors to "outsiders", meaning individuals and corporate third parties who have knowingly been parties to the fraudulent trading in question.

98. The predecessor provisions of s.213 were s.275 of the Companies Act 1929 and s.332 of the Companies Act 1948. Those sections combined both compensatory and penal provisions. They were naturally regarded as penal legislation and, as such, were strictly construed so as to give the person charged the benefit of the doubt: *Re Maidstone Building Provisions Ltd* [1971] 1 W.L.R. 1085.

99. The position is different under the 1986 Act. Section 213 is not a penal provision. It only covers civil liability to pay compensation in cases where the company which traded fraudulently is being wound up. A "collective" action can be brought by the liquidator of the fraudulent company for contribution to be made to the assets of that company for the benefit of its creditors.

100. It is accepted that "outsider" companies can be made liable under s.213, provided that it is established they were "knowingly" parties to the fraudulent trading. It has been held that the references to "fraudulent" in the legislation connote "actual dishonesty involving, according to current notions of fair trading amongst commercial men, real moral blame": *Re Patrick and Lyon Ltd* [1933] Ch. 786 at p.790 *per* Maugham J. That was a decision on s.275 of the 1929 Act, under which the jurisdiction of the court was confined in civil cases to declaring that past or present directors, including shadow directors, of the company, which had carried on its business with intent to defraud creditors, should be personally responsible for all or any of the debts or other liabilities of the company as the court may direct.

101. Section 332 of the 1948 Act extended liability beyond past or present directors of the company carrying on its business fraudulently to any persons, including other companies, who were knowingly parties to that fraudulent trading. It was still necessary, however, to establish dishonesty to found civil liability. The requirement of dishonesty presents problems of evidence and proof.

102. Following the report of the Cork Committee on *Insolvency Law and Practice* (Cmnd. 8558, 1982) the 1986 Act included new "wrongful trading" provisions in s.214. They were without prejudice to s.213: see s.214(8). Civil liability was imposed only on "insiders", namely company directors (including shadow directors). "Outsiders" were not liable for wrongful trading. As with fraudulent trading, civil liability for "wrongful trading" was made enforceable in a winding up of the company by the liquidator for the benefit of the company's creditors.

103. An important difference was that the basis of liability for wrongful trading was negligence, not dishonesty as was required under s.213. (Both sections have effect notwithstanding that the person concerned may be criminally liable in respect of matters on the grounds of which the declaration under the section is to be made: s.215(5).)

104. Section 214 provided that:

> "(1) . . ., if in the course of the winding up of a company it appears that subsection (2) of this section applies in relation to a person who is or has been a director of the company, the court, on the application of the liquidator, may declare that that person is to be liable to make such contribution (if any) to the company's assets as the court thinks proper.
>
> (2) This subsection applies in relation to a person if–
>
> (a) the company has gone into insolvent liquidation,
>
> (b) at some time before the commencement of the winding up of the company, that person knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation, and
>
> (c) that person was a director of the company at that time;
>
> but the court shall not make a declaration under this section in any case where the time mentioned in paragraph (b) above was before 28th April 1986."

105. As for criminal sanctions for fraudulent trading, the relevant provisions were detached from the civil liability provisions and amended. The criminal provisions in s.332 of the 1948 Act only applied, as did the civil provisions, to cases where the company was being wound up. While that remains the case with civil liability under s.213 and always has been the case with civil liability under s.214 for wrongful trading, where a company has gone into insolvent liquidation, that restriction has been removed in the case of punishment for the criminal offence of fraudulent trading.

106. The provisions for the punishment of fraudulent trading as a crime are contained in s.458 of the Companies Act 1985:

> "If any business of a company is carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, every person who was knowingly a party to the carrying on of the business in that manner is liable to imprisonment or a fine, or both.
>
> This applies whether or not the company has been, or is in the course of being, wound up."

107. The separation of the provisions relating to civil and criminal liability is relevant in identifying the purpose of the provisions. Separation has made it easier to isolate and focus on the policy of imposing civil liability. That affects the application of the provisions to the facts of particular cases. We turn to consider the policy of s.213.

**The policy arguments**

108. The judge expressly considered the purpose of Parliament in imposing civil liability in order to determine who are the persons potentially liable for involvement in the transactions giving rise to the fraud and in what circumstances the knowledge of individuals may properly be treated as corporate knowledge. He concluded, correctly according to the liquidators, that its purpose was to enable the liquidator of a company to recover compensation for the benefit of those who suffered as a result of the fraud from those who had knowingly assisted the fraudulent conduct of the business of the company in liquidation. It would defeat or at least severely emasculate that purpose if a company, such as BoI, could shelter behind an argument that the only relevant knowledge was that of the board and that a company could escape liability by the board delegating decisions to senior managers and accepting their recommendations.

109. BoI disputed that that was a correct or complete analysis of the policy of s.213. It contended that the policy appearing from the earlier authorities was to make liable only those whose conduct involved "real moral blame": see *Re Patrick and Lyon Ltd* (above). The judge had departed from the earlier decisions on this point. Contrary to the policy of the legislation he had attributed knowledge of fraud to BoI when there was no "real moral blame" attaching to it. There was no evidence that BoI or its directors had deliberately organised its affairs in order to avoid the attribution of "blind-eye" knowledge.

110. BoI submitted that the effect of Patten J.'s decision was to make companies such as banks, who were innocently participating in transactions with the fraudulent company, liable for lack of management supervision and negligent failure in management in the absence of a situation of "real moral blame" and of dishonesty. Where Parliament intended to impose liability in the absence of dishonesty, because, for example, of the difficulties of proving dishonesty, it had expressly done so, as in the provisions in the neighbouring s.214 relating to wrongful trading. It was not the policy of Parliament in that section to make "outsider" individuals and companies liable for wrongful trading. This litigation was an attempt to make BoI liable under s.213 for the alleged negligence of the board and in the absence of any solid evidence of real moral blame attaching to BoI.

© 2005 Sweet and Maxwell Ltd

111. In our judgment Patten J. was correct in his analysis of the policy of s.213. Compensation of those who have suffered loss as a result of the fraudulent trading is the paramount purpose of the provisions imposing civil liability to contribute to the loss suffered.

112. If knowledge were not attributed to an outsider company in cases such as this the purpose of imposing liability upon such a company to pay compensation would, in our judgment, be emasculated. The crucial question is whose knowledge in the company counts, for the purposes of s.213, as corporate knowledge of the outsider company. In most companies of any size there will be a chain of command and delegation of authority and it is likely that the transactions with the fraudulent company will be dealt with at a level in the company below that of the board. It would in practice defeat the effectiveness of the section if liability were limited to those cases in which the board of directors was actually a direct privy to the fraud of the company with whom the transactions were entered into. The question is who had authority in BoI to deal with BCCI in respect of the relevant transactions. That requires a consideration of all the circumstances surrounding the transaction. The liquidators submitted that, on the facts found by Patten J., Mr Samant was, in relation to the particular transactions which have caused loss to the creditors of BCCI, a person who was allowed by the board of BoI to act as the "directing mind and will" of BoI. As for the "real moral blame" required for the existence of civil liability, the liquidators submitted that it existed in this case. It was present in the state of knowledge and conduct of Mr Samant. It was his knowledge that was to be attributed to BoI. Within BoI he had been entrusted with responsibility for the deals with BCCI. It was only right and proper that BoI should take legal responsibility for the consequences.

**Vicarious liability for fraud**

113. As will be explained (see paras 132 *et seq.*), an application was made by the liquidators during the course of the appeal for permission to amend the points of claim to plead vicarious liability on the part of BoI for the acts of Mr Samant in knowingly being a party to the fraudulent trading of BCCI. Vicarious liability had not been pleaded and it was not argued or the subject of evidence at the trial. The court refused the application for the reasons given later in this judgment. We only mention it at this point in the judgment as the relevant principles of vicarious liability were relied on by Mr Purle as confirming Patten J.'s conclusions on the attribution of Mr Samant's guilty knowledge to BoI under s.213. In future cases it may well be possible, depending, of course, on the facts, to simplify cases of this kind by pleading and relying on the doctrine of vicarious liability, so that an employee in the position of Mr Samant could be made liable as a party to fraudulent trading and his corporate employer made vicariously liable to contribute to the losses caused by his wrongful acts. Reliance could be placed on the analysis of the doctrine of vicarious liability by the House of Lords in *Dubai Aluminium Co Ltd v Salaam* [2002] UKHL 48; [2003] 2 A.C. 366, particularly in the speeches of Lord Nicholls of Birkenhead and Lord Millett.

**Attribution of fraud: points on the authorities**

114. Clearly there are some circumstances in which an individual's knowledge of fraud cannot and should not be attributed to a company. The classic case is where the company is itself the target of an agent's or employee's dishonesty. In general, it would not be sensible or realistic to attribute knowledge to the company concerned, if attribution had the effect of defeating the right of the company to recover from a dishonest agent or employee or from a third party. Mr Moss argued that there should be no attribution of knowledge as this was a case in which BoI was the "secondary victim" of Mr Samant. His actions were harmful to the interests of BoI, as he had exposed it to the risk of potential liability for fraudulent trading. We have no hesitation in rejecting that submission. If it were correct, it would never be possible to attribute the knowledge of the individual to a company under s.213. That is contrary to the agreed position that a company is capable of being made liable under s.213. Knowledge of fraud may be attributed to a company even though such attribution may expose it to the risk of liability under s.213.

115. BoI criticised the judge for not applying to this case the principle that the knowledge of an agent should not be attributed to the principal when the agent is acting fraudulently or otherwise in breach of duty and in circumstances where it was contrary to common sense to consider that the agent would have passed on his knowledge of the fraud to his principal. It was argued by BoI that it was contrary to common sense to conclude that Mr Samant, who was found to have been dishonest and to have acted in breach of duty in causing BoI to take part in the transactions with BCCI, would have passed on to the directors of BoI his knowledge that BCCI was conducting its business with an intention to defraud its creditors.

116. As appears from the principles laid down in *Meridian* (see above) the terms of the legislation and the circumstances of the case may make it appropriate to attribute knowledge of fraud to the company, even though a person with knowledge of the fraud has acted dishonestly, in breach of his duty to his principal or employer and in circumstances in which he would not have passed on his knowledge to his agent or employer. For example in *McNicholas Construction Co Ltd v Customs & Excise Commissioners* [2000] S.T.C. 553 a site manager was dishonest in relation to the liability of his employer for VAT. It was held that the policy and content of the legislation overrode any principle that knowledge of fraud was not attributable to a company that was itself a victim of fraud. The company was held liable for VAT evasion.

117. It was submitted that Patten J. was wrong to follow *McNicholas*. It was distinguishable from the present case as it was necessary to have attribution of knowledge to the company in that case in order to make the VAT legislation work. That was not, it was contended, the case here. There was no need to discern or fashion a special rule of attribution in order to prevent the policy of the legislation from being frustrated. Section 213 can work perfectly well on the application of the primary rules of corporate responsibility. On the judge's findings the acts of the employee, Mr Samant, were dishonest. His knowledge should not be attributed to BoI as the acts of Mr Samant were aimed at and harmful to its interests and it cannot be inferred that he would have passed on his knowledge of the fraud of BCCI to the board of BoI.

118. We agree with Patten J. on this point. As in *McNicholas*, the acts of Mr Samant were not in fact targeted at BoI. He was acting for, and in what he apparently believed to be the interests of, BoI in seeking to gross up the balance sheet for the purposes of the year end accounts. The potential liability of BoI under s.213 is irrelevant in deciding whether BoI was a victim of Mr Samant and whether his knowledge should be attributed to it for the purposes of s.213.

119. As for *Meridian*, Mr Moss contended that the judge was wrong to apply it to this case. It was clear in *Meridian* that the policy of the relevant New Zealand legislation was to compel the immediate disclosure of prescribed information in fast moving markets and it was necessary to attribute the knowledge of the chief investment manager for the policy of the legislation to be effective. In the case of s.213 it was not necessary to attribute Mr Samant's knowledge to BoI in order to make the section effective.

120. We also agree with Patten J. on this point. The application of s.213 requires a special rule of attribution in order to make its self evident policy effective. The policy is to make those who have been parties to fraudulent trading liable to compensate the creditors of the fraudulent company. In order to make it effective in a case such as this it is necessary to attribute the knowledge of Mr Samant to BoI. It is not a case, as Mr Moss characterised it, of making BoI liable for the negligence or ineptitude of the BoI board; or of making members of the board personally liable for the fraud when there was no personal dishonesty or real moral blame on their part. They are not liable, nor (save for Mr Shukla and Mr Vaghul) was it sought to make them liable. It is a matter of making BoI itself liable by attributing to it the knowledge of the individual in BoI who had the relevant contact and dealings with the CTD of BCCI. Having regard to all the circumstances in which the transactions were entered into, Mr Samant's knowledge was more relevant than that of any member of the board or of anyone else in BoI.

© 2005 Sweet and Maxwell Ltd

121. BoI also contended that Patten J. erred in failing to consider and apply *Arab Bank plc v Zurich Insurance Co* [1999] 1 Lloyd's Rep. 262, despite the submissions made to him on that case at trial. Mr Moss contended that it was a case of "critical relevance" on the question of attribution of knowledge. The judge had wrongly relied on *McNicholas*, which was inconsistent with *Arab Bank*, as well as being distinguishable from this case for the reasons already discussed.

122. In *Arab Bank* the fraud of a director was not attributed to a company, so as to disentitle it from making a claim under an insurance policy. The insurance company had sought to avoid liability to the company under the policy when the company had claims made against it arising out of fraudulent valuations made by the director in the name of the company. The insurance company sought to attribute the fraud of the director to the company. The case was decided in a contractual context, namely the construction of the conditions of the insurance policy, which prevented the insured from making claims if it was a person who knowingly committed a dishonest or fraudulent act. If knowledge was so attributed to the company, the insurers would not be liable to indemnify under a policy, under which the company and the directors were separately insured.

123. Rix J. held that, on the assumed facts, the director was not the directing mind of the company in relation to the valuations and that it was impossible and contrary to common sense to infer that the director's knowledge of his dishonesty should be transferred to the principal company.

124. In our judgment, the facts and the contractual context make *Arab Bank* a different case. It did not lay down a general principle of attribution of knowledge which governs this case of statutory liability to make compensation to victims of fraudulent trading. *Arab Bank* is not, as Mr Moss contended, authority for the proposition that knowledge of fraud can only be attributed to a company if the individual with the relevant knowledge was a director or directing mind of the company, or where it can be inferred from all the circumstances that the individual transferred his knowledge to the company or to its directing mind and will; nor is it authority for the proposition that there can be no attribution of knowledge where the company is a "secondary victim" of the individual's wrongdoing or breach of duty In our judgment, no justifiable criticism can be made of Patten J. for not citing or discussing the case in his judgment.

**Discussion and conclusions on attribution of knowledge**

125. In our judgment, the judge was right to hold that, on the facts found by him and on the application of the correct interpretation of s.213(2), BoI could not deny legal responsibility for the actions of Mr Samant by resisting the attribution of his knowledge to it. Mr Samant's knowledge of the fraud of the CTD of BCCI was sufficient to fix it with liability under s.213.

126. Mr Samant was a senior manager. The board of BoI relied on his judgment in relation to the transactions. He was given a "blanket permission" to deal with BCCI by negotiating the terms of the transactions with borrowers nominated by BCCI, to make recommendations to the board and to give effect to advance approval of head office to enter into the transactions. He was allowed by the board to supervise the relevant transactions with BCCI and ultimately to decide to proceed with them on terms negotiated by him. To use Lord Hoffmann's words in *Meridian*, Mr Samant was the person in BoI who had "authority to deal" with BCCI. He was in substance the relevant decision maker for BoI in respect of the relevant transactions which made BoI a party to the fraudulent trading of BCCI. As Mr Samant had a large measure of responsibility within BoI for the transactions with BCCI, the policy of s.213, justice and good sense combine to justify the treatment of Mr Samant's knowledge as the corporate knowledge of BoI so as to make it responsible for contributing to the assets of BCCI in the winding up.

127. It is true that the judge found that the members of the board of BoI personally had no knowledge of the fraud, but they were content to leave the conduct and completion of the negotiations in the hands of Mr Samant. The attribution of Mr Samant's knowledge to BoI

does no injustice to the members of the board. The question is whether Mr Samant's knowledge should as a matter of law be attributed to BoI for the purposes of s.213, not whether the directors of BoI personally knew of the fraud or should have knowledge of the fraud attributed to them so as to make them personally and individually liable for fraudulent trading (which they are not).

128. None of the cases cited and discussed above prevented Patten J. from reaching and some of them supported him in that conclusion. In our judgment, it is irrelevant to the attribution of the knowledge of Mr Samant to BoI that Mr Samant was acting in breach of his duty to BoI in respect of the transactions with BCCI or that, in a general kind of way, BoI was a "secondary victim" of his wrongdoing and that of BCCI. Neither of those factors is a bar to the attribution of knowledge to BoI, any more than is the lack of personal knowledge of the directors of BoI about BCCI'S fraudulent trading.

**Summary on attribution**

129. We would summarise our conclusions on the issue of attribution as follows. First, the proper approach to the question of attribution in this case turns on the construction and purpose of s.213. Secondly, the severing of criminal and civil liability for fraudulent trading means that there is no question of any conclusion, in principle or on particular facts, as to civil liability affecting the basis on which criminal liability is assessed. Thirdly, the wording of, and policy behind, s.213 indicate that it would be inappropriate, in the case of a company, to limit attribution for its purposes to the board, or those specifically authorised by a resolution of the board. To limit it in such a way would be to ignore reality, and risk emasculating the effect of the provision. In other words, "insistence on the primary rules of attribution would in practice defeat [the legislative] intention", to quote from Lord Hoffmann in *Meridian*. Fourthly, it would be wrong, on the other hand, to attribute to a company the knowledge of any agent irrespective of the particular facts. To do so would risk obvious injustice to a company which had acted not only in good faith, but with scrupulous care; that would not accord with the purpose of s.213.

130. Fifthly, it therefore must to some extent depend on the facts of each particular case whether an agent's knowledge should be attributed to the company for the purposes of s.213, where the circumstances are such that there would be no attribution on the application of the primary rules. We are of the view that it must typically depend on factors such as these. The agent's importance or seniority in the hierarchy of the company: the more senior he is, the easier it is to attribute. His significance and freedom to act in the context of the particular transaction: the more it is "his" transaction, and the more he is effectively left to get on with it by the board, the easier it is to attribute. The degree to which the board is informed, and the extent to which it can be said that it was, in the broadest sense, put on inquiry: the greater the grounds for suspicion or even concern or questioning, the easier it is to attribute, if questions were not raised or answers were too easily accepted by the board.

131. When one considers these factors in the present case, we are of the clear opinion, for the reasons we have given, that this is plainly an appropriate case for attribution. Mr Samant had a very senior position in BoI, he brought the transactions to BoI, he was given a free hand to negotiate them, they were plainly suspicious, there was no questioning, save in relation to the first transaction, and Mr Samant's unconvincing answer was too readily accepted by the board. Further the fact that it was not a "one-off" transaction but a series serves to underline the point.

**Application to amend pleadings and vicarious liability**

132. We turn finally to the liquidators' application for permission to amend the pleadings. Given our decision on the appeal we can take this matter quite shortly, for it is not determinative of the outcome.

© 2005 Sweet and Maxwell Ltd

133. BCCI's re-re-amended points of claim, although lengthy, are in fact comparatively simple and straight-forward. We summarise them, drawing no distinction for this purpose between the various BCCI companies.

134. In para.21 it was alleged that Mr Abedi, Mr Naqvi, Mr Akbar and persons working under their direction fraudulently mis-stated the assets and earnings of BCCI. Lengthy particulars of that allegation were then set out in paras 21–36. In para.37 it was alleged that in the circumstances the business of BCCI was carried on with intent to defraud its creditors and/or for a fraudulent purpose within the meaning of s.213. Paragraph 38 alleged that "BoI participated in the carrying on of the business of [BCCI] in the manner alleged in paragraph 37 above as follows", and lengthy particulars were then set out in paras 39–94. Included, at paras 43A–90, were lengthy particulars of each of the six relevant transactions. In the course of those particulars reference was made to various officers and employees of BoI, including Mr Samant. He is in fact first referred to in para.55. Paragraph 95 alleged that "In the premises, BoI was a party to the carrying on of the business of [BCCI] with intent to defraud [its creditors] and/or for some other fraudulent purposes within the meaning of Section 213". In para.96 it was alleged that "BoI had actual knowledge of, or was deliberately blind or recklessly indifferent to, [certain] facts" including, in particular (para.96.1), that the back-to-back transactions "had no bona fide commercial purpose and had as their sole object the fraudulent manipulation of the published results of BCCI". Particulars of those allegations were set out in paras 96A–96F. Further matters relied upon in support of those allegations of knowledge were set out in para.97. Mr Samant is again referred to, with other officers or employees of BoI, in the course of these particulars. In para.98 it was pleaded that "In the premises, BoI was knowingly a party to the carrying on of the business of [BCCI] with intent to defraud [its creditors] and/or for some other fraudulent purposes within the meaning of Section 213". In para.99 it was pleaded that "By reason of the foregoing, BoI is liable to make such contribution to the assets of [BCCI] as the court thinks fit."

135. We intend no criticism of this pleading, but it is a fact that, except perhaps on a very close and careful reading of it, one would not appreciate the central role which Mr Samant has come to play in the litigation. As we have said, in the pleading he is merely one of a number of BCCI's officers or employees referred to.

136. We need not go through BoI's re-re-amended points of defence in any detail. In large measure they consisted of non-admissions, but paras 38, 96, 98 and 99 of the re-re-amended points of claim were each specifically denied and paras 57–58 of the re-re-amended points of defence contained various specific denials which in effect constituted a denial of para.95 of the re-re-amended points of claim.

137. BCCI now seeks to amend its re-re-amended points of claim by adding a new para.98A which reads as follows:

> "Further or alternatively:
>
> (1) The back to back lending arrangements referred to at paragraphs 25 and 40–90 of the Points of Claim (save for the Sixth Transaction) were negotiated and implemented by Mr Samant in the course of his employment as Chief Manager UK and European branches by BoI in London.
>
> PARTICULARS
>
> (a) The making of advances and the acceptance of deposits were within the ordinary course of BoI's business;
>
> (b) The negotiation and implementation of such advances and deposits was in the ordinary course of Mr Samant's employment;
>
> (c) In negotiating and implementing those advances and deposits Mr Samant also acted pursuant to authorities given:
>
> (i) by the Chairman and Managing Director of BoI on or about 11 November 1981; and

(ii) by the board of BoI on 9 August 1982, 26 October 1983 and 9 August 1984.

(2) Mr Samant was knowingly a party to the carrying on of the business of BCCI as aforesaid and BoI is vicariously liable therefor. Mr Samant knew of BCCI's frauds in the respects found by Patten J in his judgment herein dated 19 March 2004."

138. The critical allegations are that the relevant transactions were "negotiated and implemented" by Mr Samant "in the course of his employment", that he, Mr Samant, was "knowingly" a "party to the [fraudulent] carrying on of the business of BCCI", and that accordingly "BoI is vicariously liable". None of these allegations appears, at least in that form, in the existing pleading.

139. It is common ground that BCCI's application for permission to amend is made after the expiry of the relevant limitation period: see the decision of this court in *Re Farmizer (Products) Ltd; Moore v Gadd* [1997] B.C.C. 655. It is also common ground that the effect of the amendment would be to add a "new claim" within the meaning of s.35(4) of the Supreme Court Act 1981 and CPR, r.17.4(2). Therefore the first question we have to address is whether, within the meaning of s.35(5)(a) and CPR, r.17.4(2), this new claim:

> "arises out of the same facts or substantially the same facts as the [existing] claim".

If it does then we have to decide in the exercise of our discretion whether to allow the amendment; if it does not then we have no power to allow the amendment.

140. The principles which have to be applied are to be found in the decision of this court in *Laws v Society of Lloyds* [2003] EWCA Civ 1887. Put very simply, the question in that case was whether an amendment to plead negligent misrepresentation and/or a claim for misrepresentation under s.2 of the Misrepresentation Act 1967 arose out of the same facts or substantially the same facts as the original claim which was for fraudulent misrepresentation. Cooke J. held that it did not. This court agreed.

141. At para.51 Waller L.J. giving the judgment of the court approved the following statement of principle by Hobhouse L.J. in *Lloyds Bank plc v Rogers (No.2)* [1999] 3 E.G.L.R. 83 at p.86:

> "The policy of the section is that, if factual issues are in any event going to be litigated between the parties, the parties should be able to rely upon any cause of action which substantially arises from those facts."

142. He continued at para.52:

> "It is common ground that there is no authority on what is meant by 'substantially the same facts'. That is no doubt because the words are tolerably clear and the question in each case is a factual one, depending upon the circumstances of the particular case. For example, it seems to us that the answer in a simple case involving one or two defendants may be very different from the answer in a complex case of this kind. These considerations are important because the exercise upon which the judge was engaged involved weighing up the allegations being made and proposed and forming a view whether on balance it could fairly be said that the action for negligent misrepresentation arose out of substantially the same facts as those in issue in the action for fraudulent misrepresentation."

He repeated at para.56 that:

> "whether they arise out of substantially the same facts will depend upon the facts of the particular case."

We draw attention to and emphasise the point that whether or not the statutory test is satisfied will depend upon the facts and circumstances of the particular case.

© 2005 Sweet and Maxwell Ltd

143. Waller L.J. went on to explain at para.61 the nature of the exercise involved under s.35(5):

> "The exercise involved under section 35(5) is to decide first what facts were already in issue in the claim already made, here fraud, and then to decide whether the new cause of action arises out of the same or substantially the same facts. That involves focusing at the second stage, not upon every issue that might arise if the amendment were allowed, but upon the cause of action alleged. It is for that reason that on the facts here it was right to compare the issues in the fraud trial with the allegations of negligence."

144. He had earlier explained at para.60 why in that case this court agreed with the judge:

> "Although the similarities between the underlying facts were stressed in argument on behalf of the Names and we recognise that there were many underlying facts common to the two cases, we have reached the clear conclusion that the judge was right to hold that the facts involved in the new cause of action, which focus on what those at Lloyd's should have done rather than what they knew, were not substantially the same as those which were in issue in the fraud trial, which was all about whether particular individuals knew that the alleged misrepresentations were untrue."

145. Plainly in the present case there are many factual issues common to both the claim as currently pleaded and the proposed new claim, for example, BCCI's fraudulent trading and Mr Samant's alleged knowledge of BCCI's fraud. But the new claim, as it seems to us, equally plainly raises a significant number of new factual issues. Three, in particular, are critical: (i) the allegation that Mr Samant himself was a party to BCCI's fraud, (ii) the allegation that the relevant transactions were negotiated and implemented by Mr Samant, and (iii) the allegation that Mr Samant's acts were in the course of his employment. Each of these allegations, in our judgment, is new. Taken together, in the particular circumstances of this case, they show that it simply cannot be said that the new claim arises out of "the same" or even "substantially the same facts" as the existing claim.

146. As Mr Moss points out, BoI was a party to BCCI's fraud (assuming, contrary to his client's case, that there was such a fraud) because BoI was itself a contracting party to the relevant transactions. But Mr Samant, unlike BoI, was not a contracting party. If, therefore, it is to be said that Mr Samant was nonetheless a party to BCCI's fraud, then other and additional facts – facts going beyond the mere fact that BoI contracted with BCCI – will be required to prove it.

147. At the trial the parties and the court were not necessarily concerned to investigate whether it was Mr Samant who had negotiated and implemented the various transactions. This, after all, is an allegation which does not feature in the current pleadings. Nor does it sit entirely comfortably with the fact that the case as presently pleaded merely identifies Mr Samant as one of a number of BoI's officers and employees involved in the transactions. Moreover, careful analysis of the present pleadings shows that there is *no* reference to Mr Samant in relation to the implementation of the first, third, fourth and fifth transactions and only passing reference to him in relation to the second transaction. The references to Mr Samant in para.97 relate to the issue of knowledge, not to the entirely distinct issues of negotiation and implementation. At trial the evidence, the argument and the court's attention were all directed essentially to Mr Samant's state of mind, not his acts. The new case would require investigation of precisely what it was that Mr Samant did to "negotiate and implement" each of the relevant transactions.

148. Proof of the allegation that Mr Samant was acting in the ordinary course of his employment would, as Mr Moss points out, require evidence of his contract of employment and of BoI's internal rules about the scope of his authority. At trial there was, not surprisingly, no evidence of the former and only limited evidence of the latter. These were not facts that were relevant to the original claim. It would also require an investigation of whether the transactions in question were in the ordinary business of BoI, something which, as Mr Moss points out, is far from obvious given Patten J.'s characterisation of the transactions (in paras 33 and 49 of his judgment) as "not an ordinary loan transaction of any kind" and "entirely artificial".

149. Mr Moss submits, and we agree, that it is clear that neither the current pleadings nor the evidence in fact adduced at the trial addressed these additional factual issues, issues which are central to the new claim now being put forward. As he points out – and we think this is a point of substance, not just a debating point – if all these matters had previously been adequately pleaded BCCI would not now be seeking to amend. A

150. Accordingly, the new claim does not, in our judgment, arise out of the same facts or substantially the same facts as the existing claim. It follows that BCCI's application for permission to amend must be refused. B

151. In the circumstances there is no need for us to consider how we would have exercised our discretion if we had been persuaded that we had jurisdiction. We merely wish to make clear that it should not be assumed that we would have been prepared to exercise our discretion in BCCI's favour.

C

**Result**

152. The appeal and the cross-appeal are dismissed.

(*Appeal and cross-appeal dismissed. Application to amend pleadings refused*)

D

E

F

G

H

© **2005 Sweet and Maxwell Ltd**

# *Morris v State Bank of India* [2003] BCC 735

# Re Bank of Credit and Commerce International SA & Ors Morris & Ors v State Bank of India

[2003] EWHC 1868 (Ch)
Chancery Division.
Patten J.
Judgment delivered July 30, 2003.

*Winding up – Fraudulent trading – Banking group – Group arranged loans for company set up by senior official of bank – Lender unaware of relationship between borrower and banking group – Loans guaranteed by banking group – Banking group also deposited equivalent sums with lender and provided right of set-off – Banking group refused to grant lien because of 'balance sheet constraints' – Lender accepted bank's explanations – Loans formed part of circular transaction to allow banking group to keep liabilities off balance sheet and disguise insolvency – Banking group collapsed several years later – Whether lender liable in fraudulent trading by banking group – Test for liability in fraudulent trading – Insolvency Act 1986, s.213.*

**This was a claim by the liquidators of companies in a collapsed banking group involved in massive fraud against another bank for its involvement with the collapsed group in fraudulent trading under s.213 of the Insolvency Act 1986.**

**The Bank of Credit and Commerce International ('BCCI') group was established in 1972 with capital from Arab investors in the Gulf states. The group achieved rapid growth and by the end of 1989 employed about 14,000 staff in more than 70 countries. The principal operating companies, 'BCCI SA' and 'BCCI Overseas', had over 110 operating branches in 41 countries and a further 18 representative offices in 17 countries at the time the group collapsed in July 1991. At that time BCCI SA and BCCI Overseas had an estimated deficiency for creditors in the region of US$10 billion. As a result of actions by the liquidators making recoveries from third parties, dividends of 60 cents on the US dollar had been secured for the benefit of creditors. The current claim was part of that continuing process. By the 1980s BCCI had incurred significant losses and in order to conceal them it embarked on a wide-scale fraud. As part of one of the frauds a senior member of BCCI had established a company, 'Notan', which in October 1983 approached the defendant bank, 'SBI', for a loan of US$20 million for a period of three months. The loan would be guaranteed by a prime London bank (BCCI SA) which would also deposit funds with SBI prior to drawdown of the loan in the same amount as the loan. Interest on the loan to Notan was to be at a rate of a half per cent p.a. above the rate of interest payable by SBI on BCCI SA's matching deposit. The guarantee contained an express right of set-off. BCCI explained to SBI that it preferred to provide a guarantee rather than a lien because a lien would have to be referred to in BCCI's end of year accounts and that it could not make the loans directly to Notan due to 'balance sheet constraints'. At that time there is no evidence to suggest that BCCI had a dubious reputation in the City of London. The loan to Notan was drawn down on November 1, 1983, and debited to a BCCI Overseas account in New York without any sub-account in the name of Notan being specified. Unknown to SBI, BCCI then utilised the moneys received for its own purposes to manipulate its balance sheet and help make it appear solvent. BCCI concealed from its auditors the existence of the guarantees in favour of SBI as well as the utilisation of the SBI loan moneys in the reduction of overdrawn accounts. An identical process was entered into a few weeks later with a further loan of $20 million by SBI, ostensibly to Notan, on December 15, 1983.**

**BCCI went into liquidation in 1992 and the liquidators claimed against SBI under s.213 Insolvency Act 1986 on the basis that SBI had knowingly participated in the fraudulent scheme devised by BCCI to enable it to present a false account of its assets and liquidity. The liquidators contended that SBI had actual knowledge of, or was**

**deliberately blind or recklessly indifferent to, the fraudulent nature of the transactions. Their evidence was based on a comparative exercise involving an analysis of the way in which SBI had handled the transactions viewed against the standards to be expected of a hypothetical competent and honest bank.**

*Held*, **dismissing the claim:**

**1. Three elements were required to be established for liability under s.213: (1) that the business of the company in liquidation had been carried on with intent to defraud the creditors of the company or for any other fraudulent purpose; (2) that the defendant sought to be made liable (in this case SBI) participated in the carrying on of the business of the company in that manner; and (3) that it did so knowingly, i.e. with knowledge that the transactions it was participating in were intended to defraud the creditors of the company or were in some other way fraudulent. The first two components are admitted: SBI accepted that the transactions it entered into were designed by BCCI to manipulate its balance sheet so as to create a deceptively false picture of its assets and liquidity. The sole issue was whether SBI had knowledge of these facts.**

**2. For this purpose, knowledge included deliberately shutting one's eyes to the obvious, provided that the fraudulent nature of the transactions did in fact appear obvious to those who dealt with these matters at SBI at the relevant time. The case for SBI was that at no time during the course of these transactions did it in fact suspect that anything untoward was going on. Whether SBI had knowledge of the fraud would include blind-eye knowledge, which required a suspicion that the relevant facts did exist and a deliberate decision to avoid confirming that they did exist.**

**3. In the banking world no bank liked creating a charge over its assets and, therefore, the explanation for preferring a guarantee over creating a lien was reasonable and one that SBI had been entitled to accept. Although there had been no real enquiries about the financial standing of Notan or the reasons why it had required the loan, this was because the terms of BCCI's guarantee and set-off meant that SBI would incur no funding risk in the transaction – as far as SBI was concerned, the transaction was virtually risk-free. These factors meant that the credit risk in the transaction was effectively with BCCI and the creditworthiness of the borrower was not looked into. The reference to 'balance sheet constraints' would not have struck anyone at SBI as an incredible explanation for the absence of a direct loan. In relation to the payment instructions, it was unusual for no sub-account in Notan's name to have been specified, but either singly or with other evidence this was not enough to set the alarm bells ringing at SBI.**

**4. It could not be said in all the circumstances that the explanation given to SBI of the reason why BCCI could not lend direct should have alerted SBI to the likelihood that it had been dealing with a fraud.**

**Per Curiam**

**The liquidators' claim relied in evidence very much on the witness statements of a forensic accountant who had been closely involved in the prosecution of the claim. Such evidence was admissible, but it would be preferable in any future case of this kind for the views expressed by somebody in the expert's position to be confirmed by an independent expert called by the claimants. That would remove any possible controversy about the independence and objectivity of the evidence which was being given.**

The following cases were referred to in the judgment:

*Aktieselskabet Dansk Skibsfinansiering v Brothers* [2001] 2 BCLC 324.
*Manifest Shipping Co Ltd v Uni-Polaris Co Ltd* [2003] 1 AC 469.
*Twinsectra Ltd v Yardley* [2002] 2 AC 164.

Charles Purle QC and Blair Leahy (instructed by Lovells) for the claimants.

Robin Potts QC and Lloyd Tamlyn (instructed by Royds RDW) for the defendant.

© 2003 Sweet and Maxwell Ltd

JUDGMENT

**Patten J: Introduction**

1. The BCCI group (which for convenience I shall refer to simply as 'BCCI') was established in 1972 with the incorporation and licensing of Bank of Credit and Commerce International SA ('BCCI SA') as a bank under the laws of the Grand Duchy of Luxembourg. This was followed by the incorporation of BCCI Holdings (Luxembourg) SA ('BCCI Holdings') on December 13, 1974, and the incorporation and licensing of Bank of Credit and Commerce International (Overseas) Ltd ('BCCI Overseas') in the Cayman Islands on November 24, 1975. BCCI Holdings became the parent company of BCCI SA and BCCI Overseas, but did not itself carry on any banking business. BCCI SA and BCCI Overseas were the principal operating subsidiaries and are the companies which feature in the transactions with which this action is concerned. Between them these two companies had over 110 operating branches in 41 countries and a further 18 representative offices in 17 countries at the time when BCCI collapsed in July 1991. In the United Kingdom (including the Isle of Man) BCCI SA had 24 branches, with a head office at 100 Leadenhall Street in the City of London. No group company was ever incorporated in any part of the United Kingdom, but BCCI SA carried on business as a licensed deposit-taker subject to the regulatory supervision of the Bank of England under the Banking Act 1979.

2. At the time of the collapse in July 1991 the deficiency as regards the creditors of BCCI SA and BCCI Overseas was estimated to be in the region of US$10 billion. Since then, however, as a result of the actions of the liquidators, it has been possible to secure dividends of 60 cents in the US dollar for the benefit of creditors, largely funded from recoveries which the liquidators have been able to obtain against third parties. This action is part of that continuing process. The claim, against State Bank of India ('SBI') is that it knowingly participated in a fraudulent scheme devised by BCCI to enable it to manipulate its balance sheet for the year-ended December 1983, so as to present a false account of its assets and liquidity. I shall come to the detail of the scheme later in this judgment, but it can be briefly summarised as follows. In October 1983 SBI received an approach from a Mr Ajay Krishnan Puri, purporting to act on behalf of a company called Notan Trading and Investments Limited ('Notan'). This company was incorporated in Liechtenstein on September 7, 1982, with Liechtenstein-based directors, and had earlier that year opened deposit and current accounts with SBI. Part of SBI's disclosure comprises a certified resolution of Notan dated July 28, 1983, on headed notepaper, with a PO Box in the Sultanate of Oman given as the address of its administrative office. The registered office of the company was another PO Box number in Liechtenstein. The resolution authorised the opening of a bank account for the company with SBI and in terms empowered the bank to act on the joint instructions of Mr Puri and a Mr Ziauddin Akbar for the purpose of honouring cheques or making any other payments into or out of the account. The resolution was also signed by Mr Akbar as the authorised signatory for the board of directors of Notan, and the SBI standard form of request for banking facilities was signed by Mr Akbar and Mr Puri on the same day. As part of that same process both Mr Akbar and Mr Puri provided a specimen of their signatures for mandate purposes, which, in the case of Mr Akbar, gave an address at 22 Basing Hill, London NW3.

3. Mr Akbar was at the time a senior figure in the Central Treasury Division ('CTD') of BCCI in London and, as it subsequently transpired, was personally responsible for many, if not most, of the fraudulent transactions carried out by BCCI to hide its worsening financial position in the early 1980s. He was not a director of Notan and in his subsequent interviews with the Serious Fraud Office he said that Notan had been set up to assist Mr Puri to obtain a work permit. It is, however clear that the primary purpose of establishing Notan was to assist

BCCI in carrying out its fraudulent accounting practices, and the company was controlled by Mr Akbar out of the CTD in London.

4. BCCI was founded with capital from Arab investors in the Gulf states. It achieved rapid growth and, by the end of 1989, employed about 14,000 staff in more than 70 countries. Until 1988 the President and Chief Executive of BCCI was Mr Agha Hasan Abedi. During the same period he had as his deputy Mr Swaleh Naqvi, who took over as Chief Executive Officer when Mr Abedi fell ill in 1988. Having no lender of last resort, it was necessary for BCCI to maintain a high level of liquidity. By the early 1980s it had incurred significant losses through poor lending (particularly in relation to a number of borrowers in the Gulf and Saudi Arabia) and from unsuccessful metal trading on its own account. One of these borrowers was a Mr Abdul Raouf Khalil, a Saudi Arabian businessman who operated and controlled the Khalil group of companies. They maintained a number of accounts with BCCI which were heavily overdrawn, although it is right to add that by 1983 some (and perhaps most) of this apparent indebtedness may itself have been due to the manipulation of the accounts by BCCI with the active co-operation of Mr Khalil, as part of the wider fraud I am about to come to.

5. In order to conceal these and other losses and to maintain public confidence in the bank, BCCI embarked on a systematic and wide-scale fraud involving the manipulation of account balances with the twin objective of concealing losses and boosting apparent profits. The investigations have revealed that this practice was initiated by Mr Abedi and Mr Naqvi and was operated by Mr Akbar through the CTD in London. It was successful in deceiving the auditors and regulations of both BCCI SA and BCCI Overseas, together with their customers and depositors. The evidence of the liquidators based on a report prepared for the Serious Fraud Office, is that BCCI was insolvent from at least 1983. The CTD had been established in 1977 and operated from BCCI SA's offices in Leadenhall Street until about October 1986, when it was moved to Abu Dhabi. The CTD managed and controlled the surplus funds of BCCI and was managed by BCCI SA under a management agreement with BCCI Overseas. However, the treasury activities were all booked and recorded in the name of BCCI Overseas in Grand Cayman and BCCI SA accounted for its own funds, managed by the CTD, as inter-company debts due from BCCI Overseas.

6. Mr Akbar controlled the CTD and reported direct to Mr Naqvi. He was also the Account Officer for the Khalil group and controlled the accounting of the Grand Cayman branch of BCCI Overseas. He eventually resigned from BCCI in 1986. On September 28, 1993, he pleaded guilty at the Central Criminal Court to 16 counts of false accounting, contrary to s.17 of the Theft Act 1968 and was sentenced to six years' imprisonment on each count, the sentences to run concurrently. Counts 13 and 14 relate to the two loan transactions with which this action is concerned.

7. Notan had both US dollar and sterling accounts with SBI. Up to the end of October 1983 the combined receipts into its US dollar accounts amounted to some $2.342 million, against which there had been a payment out of just over $1 million. In the same period there had been payments into its sterling accounts (including interest) of some £142,623, and payments out to a variety of payees, including Mr Puri himself, in a total sum of £53,567. Then on October 5, 1983, Mr Puri, without any prior discussion, approached SBI for a loan of US$20 million, which it required for a period of three months on what is described as a spread-over basis. The loan was to be guaranteed by a prime London bank (later identified as BCCI SA) which would also deposit funds in the same amount prior to the drawdown of the loan to Notan, and for a term expiring five days after the Notan loan became repayable. Mr Puri told SBI that no lien was to be marked on the deposited funds and that the loan to Notan would be required urgently by the beginning of November. The transaction, as it eventually emerged, was that SBI agreed to provide Notan with a loan of US$20 million for a term of three months, to be drawn down on November 15, 1983. Under the terms of the facility letter as amended, BCCI SA was to deposit an equivalent sum of US$20 million with SBI for the duration of the loan plus four days, so as

© 2003 Sweet and Maxwell Ltd

to provide the necessary funding for the entire term of the loan. It was also to provide a guarantee, on terms satisfactory to SBI, to repay the loan to Notan in the event that it was not repaid at maturity. Interest on the loan to Notan was to be at a rate of a half per cent per annum above the rate of interest payable by SBI on BCCI's matching deposit. The guarantee provided for under the terms of the facility letter was executed by Mr Akbar and two other BCCI treasury employees on or about October 28, 1983, on behalf of BCCI SA and contained an express right of set-off. In addition, on October 31, 1983, BCCI SA deposited the sum of US$20 million with SBI in its account in New York with Citibank until February 6, 1984, at an interest rate of 9.3125 per cent per annum and accounted for the deposit by debiting the sum to BCCI Overseas' Nostro account at Bank of America in New York. The loan to Notan was drawn down on 1 November by SBI remitting the US$20 million from its account with Citibank to an account of BCCI SA at the Bank of America in New York (No. 48586050).

8. The payment instructions from Notan received by SBI on November 1 were signed by Mr Puri and Mr Akbar, and requested the $20 million to be transferred to BCCI SA's account without specifying any sub-account in the name of Notan. As I shall explain later in this judgment, one of the principal allegations made by the liquidators is that the terms of these payment instructions put SBI on notice that the moneys were being routed back to BCCI for its own use beneficially, rather than being disbursed to BCCI for the credit of Notan. What is known (but is not alleged to have been known by SBI at the time) is that the moneys, when received, were accounted for by BCCI SA as a transfer to the credit of an account (No. 01001279) with BCCI Overseas in the name of Mr Khalil. On December 30, the moneys were then transferred from that account to a metals trading account in the name of BCCI Overseas (No. 90511109) which had been used for speculative purchases of silver and had a negative balance.

9. On December 5, 1983, SBI agreed to lend Notan a further sum of $20 million on almost identical terms. The moneys were disbursed on December 15 and were repayable on February 1, 1984. BCCI SA again provided the funding by prior deposit of a matching sum with SBI and gave a guarantee for the loan, including the contractual right of set-off. Its own deposit was for a period expiring on February 6, 1984. As in the case of the first loan, the moneys, when drawn down, were remitted to BCCI SA's account with the Bank of America and then credited to BCCI Overseas' Nostro account. They were then used by BCCI Overseas to credit the overdrawn Khalil account. As a result of this and other credit transfers from other sources, BCCI was able to convert a debit balance of US$85,280,341 into a credit balance for year-end purposes of US$9,261,646.17. The auditors were prepared on this basis to treat BCCI's exposure to the Khalil group as fully collectable and made no provision in respect of their borrowings. However, by January 13, 1984 (following the repayment and reversal of most of the credits) the Khalil account No. 01001279 had once again become overdrawn by more than US$155 million. Both the Notan loans were repaid on February 15, 1984, by a transfer from BCCI SA to SBI of the sum of US$40,754,861.12, representing repayment of the sums due plus interest. On February 6 SBI paid US$40,779,147.67 to BCCI SA. The excess of the interest over that payable by Notan to SBI is accounted for by the longer term of the BCCI deposit.

**Fraudulent trading**

10. As a result of the fraudulent practices involving these and other transactions, the audited accounts of BCCI Overseas for the year-ended December 31, 1983, showed pre-tax profits of US$136,340,000, from which BCCI Overseas paid a cash dividend of US$75 million. What the accounts should have shown was a loss before tax of at least US$45,497,000, together with a reduction of US$136,114,000 in the brought forward retained earnings as at January 1, 1983. The audited accounts showed retained earnings of US$23,943,000, when they should have shown a retained loss of US$294,008,000, a reduction of US$317,951,000. The audited accounts of BCCI SA for the same period showed pre-tax profits of US$39,298,000, when they

should have shown a pre-tax loss of at least US$62,722,000. Retained earnings were recorded in the sum of US$10,056,000, when the true position was that there was a retained loss of US$91,964,000. It is common ground between the parties to this action that the two loan transactions with which SBI was concerned assisted BCCI to manipulate its year-end figures in the way I have described, by enabling BCCI to utilise the loans made to Notan in order to eliminate a significant proportion of the indebtedness on the Kahlil and the metal trading accounts. That was undoubtedly the primary purpose of the scheme. But by routing the moneys through SBI rather than by making a direct loan to Notan, BCCI obtained the additional advantage of being able to account for the deposits in the accounts of BCCI Overseas as sums 'Due from Banks'. The liquidators' case (which is not accepted by SBI) is that these deposits should have been accounted for as moneys subject to an encumbrance and should have been shown in the audited accounts as a set-off against the US$40 million loans to Notan. This argument in part depends upon what is the correct accounting treatment of the respective payments and liabilities, but the liquidators' view of that is largely predicated upon a further contention that, although made nominally to Notan, the SBI loans were in substance loans to BCCI and should have been treated as liabilities of BCCI in its audited accounts. What, however, is not in dispute is that BCCI concealed from its auditors the existence of the guarantees in favour of SBI, as well as the utilisation of the SBI loan moneys in the reduction of the overdrawn Khalil and metal trading accounts.

**The test of liability**

11. The liquidators' claim against SBI is brought under s.213 of the Insolvency Act 1986, which provides that:

> '(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.
>
> (2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper.'

There are therefore three elements to be established: (1) that the business of the company in liquidation has been carried on with intent to defraud the creditors of the company or for any other fraudulent purpose; (2) that the defendant sought to be made liable (in this case SBI) participated in the carrying on of the business of the company in that manner; and (3) that it did so knowingly: *i.e.* with knowledge that the transactions it was participating in were intended to defraud the creditors of the company or were in some other way fraudulent. The first two components are admitted. SBI accepts that the transactions it entered into were designed by BCCI to manipulate its balance sheet so as to create a deceptively false picture of its assets and liquidity. The sole issue is whether SBI had knowledge of these facts. The allegation made by the liquidators, as set out in para.58 of the re-amended points of claim, is that SBI had actual knowledge of, or was deliberately blind or recklessly indifferent to, the fraudulent nature of the transactions. Mr Potts QC, on behalf of SBI, accepts that if any of those states of mind is established, then his clients will be liable. Knowledge includes deliberately shutting one's eyes to the obvious, provided that the fraudulent nature of the transactions did in fact appear obvious to those who dealt with these matters at SBI at the relevant time. It is well established that it is no defence to say that one declined to ask questions, when the only reason for not doing so was an actual appreciation that the answers to those questions would be likely to disclose the existence of a fraud. But liability in such cases depends upon that stage of consciousness having been reached. His submission, which I accept, is that one needs to be careful to draw a distinction between a conscious appreciation of the true nature of the business being carried on

© 2003 Sweet and Maxwell Ltd

and a failure, however negligent, to appreciate that fraud was being perpetrated. The case for SBI is that at no time during the course of these transactions did it in fact suspect that anything untoward was going on. The essentials of what is required in order to establish so-called blind-eye knowledge are set out in the speech of Lord Scott of Foscote in the recent decision of the House of Lords in *Manifest Shipping Co Ltd v Uni-Polaris Co Ltd* [2003] 1 AC 469, where Lord Scott at para.116 says this:

> 'In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist. But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that may, at one extreme, be no more than a vague feeling of unease and, at the other extreme, reflect a firm belief in the existence of the relevant facts. In my opinion, in order for there to be blind- eye knowledge, the suspicion must be firmly grounded and targeted on specific facts. The deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to enquire into an untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the basis of a finding of privity.'

12. Mr Potts also submitted that in order to establish liability under s.213, it was necessary to prove that SBI, through its officers and agents, was dishonest. This, he submitted, is an essential element of liability under s.213, which stems from the references in the section to the business of the company having been carried on with an intent to defraud. Those words obviously do connote actual dishonesty, and in the case of BCCI this is admitted. But in the case of a secondary party, sought to be made liable under s.213(2), all that is in terms required is that that party should have knowingly participated in the carrying on of the business with intent to defraud. It is difficult to see how, in practice, a conscious decision to participate in transactions which are known to be fraudulent does not constitute dishonesty, and for that reason I prefer to concentrate on the question whether SBI did in fact know what it was doing. Mr Potts accepts that if knowledge in the sense outlined above is established, then a finding of dishonesty must follow. This is not, after all, a case in which SBI admits that it knew what the true purpose of the two loan transactions was, but took the view that what was being done was not dishonest. The only defence to the claim is that it did not have the knowledge alleged. In the course of their submissions the point was therefore reached when both Mr Purle and Mr Potts accepted that, on the facts of this case, knowledge would establish dishonesty, and that I need not be troubled with the problems involved in defining dishonesty, which were recently considered. by the House of Lords in *Twinsectra Ltd v Yardley* [2002] 2 AC 164.

13. On May 31, 2002, Hart J ordered a separate trial of the issue of whether SBI was knowingly a party to the carrying on of the business of BCCI SA and BCCI Overseas with intent to defraud their creditors, and, if so, whether SBI should be ordered to pay some sum to the liquidators. Issues of quantum were postponed to a later hearing in the event that liability was established. My principal task, therefore, is to deal with the issue of knowledge, but SBI accepts that if I determine that issue against them, there are no other factors which should cause me not to order a payment of some kind. In that event the only remaining issue will be the assessment of how much.

**The allegations**

14. The principal allegations of knowledge are contained in para.58 of the re-re-amended points of claim. It is there alleged that SBI had actual knowledge of, or was deliberately blind or recklessly indifferent to, the fact that:

(i) the two loan transactions, when considered in conjunction with the BCCI deposits, had no bona fide commercial purpose, but had as their sole object the fraudulent

manipulation of the December 31, 1983, published results of BCCI SA and/or BCCI A Overseas;

(ii) the two deposits by BCCI SA with SBI had been falsely and dishonestly mis-described as 'free deposits', when in fact they were intended to fund and/or secure loans of equal amount granted by SBI ostensibly to Notan;

(iii) BCCI Overseas and BCCI SA were not only guarantors of the two loans granted by SBI ostensibly to Notan, but in fact had an actual but off-balance-sheet liability to repay the B same; and

(iv) Notan had been nominated by BCCI as the ostensible borrower in order fraudulently to keep BCCI SA and/or BCCI Overseas' actual liability to repay the two loans outside their respective balance sheets.

15. The allegations of fraud and dishonesty on the part of BCCI, and knowledge of that fraud on the part of SBI, are therefore directed to both stages of the transactions with which this C action is concerned. In relation to the deposits, which, as already indicated, were made to enable SBI to fund the Notan loans without needing to raise the necessary foreign currency on the markets, and also to facilitate the exercise of the right of set-off under the guarantees in the event that the Notan loans were not repaid on time, the allegation is that both BCCI and SBI dishonestly (and therefore knowingly) mis-described the deposits as 'free deposits' in order to conceal their true nature and purpose from BCCI's auditors. It is not, therefore, merely an D allegation that SBI knew that the deposit aspect of the transactions was intended in some way falsely to improve the BCCI balance sheets by including the deposits as sums due from banks in the form of uncharged deposits with no corresponding liabilities. It is in terms an allegation that SBI's internal classification of the deposits as 'free deposits' was intended to achieve the same purpose. However, during the course of the hearing it was accepted by the claimants that none of SBI's internal documentation in relation to the deposits was likely to, or was intended to, form part of the audit trail for BCCI, and the allegation about that internal documentation E seems now to be that the description of 'free deposits' was, to SBI's knowledge, inaccurate and wrong, and was simply adopted consistently with the way in which BCCI wished to characterise the transactions for its own balance sheet purposes. In relation to the second aspect or stage of the loan transactions (*i.e.* the loans from SBI to Notan) the liquidators' case (which is admitted) is that Notan was never anything more than the creature of BCCI and Mr Akbar, and that far from being a genuine commercial borrower for its own purposes, it was simply the conduit by which the $40 million was channelled back to BCCI in order to alter the balances on F the Khalil and the metal trading accounts. A sham is not in terms alleged, but SBI is said to have known that it was not making the loans to Notan for its own use from the part played by Mr Akbar in the obtaining of the loans on behalf of the company, the terms of the payment instructions made out as they were in favour of BCCI as beneficiary with no designated sub-account in favour of Notan, and SBI's complete lack of knowledge of, and failure to enquire into, the purposes for which Notan required such large sums of money. The liquidators G particularly rely on the failure by Notan to give any reasons for subsequently increasing its indebtedness by a further $20 million.

16. It is, however, also important to record at this stage in my judgment, before going on to consider the detailed evidence of the relevant transactions, what the liquidators are alleging against SBI. Mr Purle accepted, during the course of his closing submissions, that the evidence did not support an allegation that SBI, through its relevant officers, had been told by Mr Akbar and Mr Puri precisely what BCCI had in mind and had been invited to participate in the fraud. H That would amount to a conspiracy and none is alleged. The liquidators' case is that, on the facts known to SBI prior to receiving the payment instructions on November 1, 1983, it must have been and was obvious to them that the transaction had been structured by Notan and BCCI so as to give a false impression about the true nature of the deposits, with a view to falsifying its balance sheet and accounts. The terms of the payment instructions simply confirmed that view,

© 2003 Sweet and Maxwell Ltd

A but in turn must have caused SBI to focus not merely on the deposit arrangements and their proper status, but also upon the ultimate destination and use of the funds. It is not alleged that SBI knew precisely what BCCI intended to do with the money, particularly in relation to the Khalil and the metal trading accounts. But it is alleged that SBI knew that the loans, though ostensibly granted to Notan, were in substance and reality the liabilities of BCCI, which intended to shelter behind Notan, thereby concealing its liabilities from the balance sheet and its auditors. SBI of course denies this, but Mr Potts accepts that if I find that SBI, through its B officers and employees, knew that what was intended to be a loan to Notan was in reality simply the return of the money to BCCI for its own use, then SBI, if honest, would not have gone ahead with the transaction. It would have known from that very fact that the loans had been applied for by Mr Puri on a false basis, and that it was dealing with an entirely circular and fictitious transaction for which no honest explanation or justification had been given. The inference that SBI had made itself a party to a fraudulent and dishonest scheme would be C irresistible.

**Some general points on the evidence**

17. Before coming to the detail of the evidence, it is necessary, I think, to make one or two general observations. The events with which this case is concerned took place almost 20 years ago. Although a number of the witnesses called on behalf of SBI claimed to have some D personal recollection of particular aspects of the transactions, most of them accepted that their knowledge and recollection was at best only partial, and that is hardly surprising. It is clear that the witness statements have in large part been constructed around the extant documents, and the witnesses invited to comment on the history of events as recorded in that material. There is nothing inherently wrong in this process, as long as it is recognised for what it is: namely, a reconstruction of events which can be no better than the documents allow. A further aspect and consequence of the passage of time is that a lack of precise recollection is, in my experience, E bolstered by the almost inevitable tendency of witnesses whose reputations and conduct are under attack to interpret, and sometimes re-interpret, events in the way most favourable to their own view of things. There is undoubtedly an element of that in this case, as I shall indicate when I review the evidence. This does not mean that any of the witnesses have set out to give a deliberately false account of events. It is simply to recognise everybody's capacity for self-justification.

F 18. In this case I was particularly conscious of the pressure on all of the SBI witnesses imposed by the serious nature of the allegations which have been made. SBI is the largest commercial bank in India, with a network of over 9,000 branches and a market share in the country of around 20 per cent. In addition, the bank also operates some 51 overseas offices in 31 countries. SBI was created by an Act of Parliament in 1955 to succeed the Imperial Bank of India, which was nationalised. The majority of its shares are held by the Government of India through the Reserve Bank of India, the country's central bank, and SBI acts as agent of the G Reserve Bank of India at a number of locations in the country where the Reserve Bank has no presence. An allegation of this seriousness against a bank of this standing (or indeed any bank) is bound to be a matter of very considerable concern, not least to the individuals who were involved at the time and whose reputations are at stake. In 1983 SBI's General Manager for the UK, with responsibility for the London branch, was Mr Dipankar Basu, who returned to India in the early part of 1985 and later became the Chairman of SBI until his retirement in August 1995. He ceased to be the UK General Manager in January 1984, when he handed over to H Mr N B Iyer, who until then had been the Chief Manager of the London branch. He succeeded Mr Basu for only a few months and himself returned to India in November 1984. He retired from SBI in July 1995, having been previously promoted to the position of Deputy Managing Director. The loans under consideration in 1983 were handled by the Credit Department, or Credit Cell as it was called, within the London branch. In 1983 the post of Manager of the Credit Department was held by Mr D P Roy, who was responsible for three or four other

officers who carried out the work of the department. One of these was a Mr Anil Chaturvedi. Mr Roy still works for SBI and is the Executive Chairman of SBI Capital Markets Ltd in Bombay. Mr Chaturvedi is now the Chief Manager (Credit Support Cell) of SBI at its regional zonal office in Gorakhpur. All of these individuals were called as witnesses and gave evidence. As part of that process, they were subjected to detailed and at times arduous cross-examination by Mr Purle, which examined every aspect of their involvement in the loan transactions. As I shall make clear later in this judgment, by no means all of their evidence was satisfactory. In one case at least (Mr Chaturvedi) I am satisfied that I was given evidence which was made up under pressure of cross-examination and which was untrue. The tendency of witnesses in a case such as this to construe past events in a light favourable to themselves is often readily explicable, when their own character and reputation are under attack and they have been asked to give evidence in defence of an institution they have served throughout their working lives and to which they naturally feel a considerable degree of loyalty. Therefore in considering any reservations which I may have about the quality of their evidence, I have to take these factors into account as possible explanations for their not accepting what I consider to be the true position, just as much as the possibility advanced by Mr Purle that their answers have been concocted in order to cloak a fraud. There is no escaping the fact that if Mr Purle is right, then at least in the case of Mr Roy and Mr Chaturvedi, who dealt most closely with the transactions up to and including the drawdown of the loans, I have been given a wholly false account of their actual involvement in, and knowledge of, BCCI's intentions in these matters.

19. Mr Purle therefore accepted that the outcome of the case is likely to depend on whether, in relation to the material parts of their evidence, I regard Mr Roy and Mr Chaturvedi as truthful witnesses. In order to put the evidence which I am about to come to in context, it is important to bear in mind that the liquidators have not provided evidence from any witness actually involved in the two loan transactions in 1983 who has in terms alleged any form of knowing participation on the part of SBI. There is in evidence a witness statement from Mr Naqvi dated July 31, 1999, which has been admitted as hearsay evidence under s.2 of the Civil Evidence Act 1995. At the time of making the witness statement he was still detained in prison in the United States. He refers at some length to the operations of the CTD under Mr Akbar and to the close relationship between Mr Akbar and Mr Khalil. In the part of his statement dealing with the events of 1983, he confirms that BCCI's financial position had steadily deteriorated to a point in June 1983 when he believed that the group might be technically insolvent. Mr Abedi is said to have instructed him to do what was necessary to keep the bank alive whilst he considered ways of redressing the position, and he was asked to do what was necessary to allow BCCI to produce an acceptable picture of assets, liabilities and profits at the year-end. This led to a discussion with Mr Akbar, as a result of which it was agreed that BCCI needed to source funds that could be paid into the group, but classified and recorded differently in order to show a healthy balance sheet and profit and loss account. One of the proposals put forward by Mr Akbar was that BCCI would deposit moneys with a third party bank, which in turn would be asked to lend to one of the companies controlled by Mr Akbar. The companies in question would then route the money back to BCCI for reclassification as a payment into the overdrawn Khalil accounts. In paras 72 and 73 of his witness statement he says this:

> '72. He (Mr Akbar) told me that the third party banks would be prepared to not show a lien on the funds, therefore allowing BCCI to show the deposit as a "due from bank" in its balance sheet. It was important that the deposit with the third party bank was not subject to a lien or otherwise subject to the set-off, because this would have needed to be recorded in our accounts and therefore would not have assisted the purposes of balance sheet management.
>
> 73. I was aware from discussions with Akbar that Akbar engaged in this type of transaction with a number of banks including State Bank of India and Bank of India. I myself did not have any personal dealings with any of the employees or officers of either of those banks. I believe from my discussions with Mr Akbar that BCCI was able

© 2003 Sweet and Maxwell Ltd

> to reclassify funds through these back-to-back transactions between 1981 and 1986 for the purposes of managing its year-end accounts.'

This evidence therefore falls a long way short (even making allowances for the fact that it is untested) of establishing any knowledge of the fraud on the part of SBI. It is also inconsistent with the way the transaction was in fact structured in this particular case, bearing in mind that the guarantees entered into by BCCI contained in cl.4.3 an express right of set-off. The case for the liquidators therefore depends upon my drawing adverse inferences from what Mr Purle submits are the essentially suspicious features of the transactions themselves and the manner in which the officers of SBI caused the bank to enter into them.

20. In terms of evidence, those suspicions are set out in the witness statements of Mr Howard Dyson made in support of the liquidators' claim. Mr Dyson's role as a witness is somewhat controversial. He is a chartered accountant and a partner in the firm of Deloitte and Touche in England. He specialises in forensic and investigative accountancy and, since July 1991, has been heavily involved in assisting the liquidators of BCCI SA and BCCI Overseas, as well as the liquidators of other companies in the BCCI Group. During that time he has carried out no more than a handful of audits, and the last audit assignment that he carried out was back in 1999. He can obviously give no personal testimony as to the transactions under consideration, and his evidence is therefore an analysis of the documentary and other material, together with a statement of the conclusions which he invites the court to draw from his examination of this case. The allegations in the re-re-amended points of claim are based upon his evidence, much of which inevitably consists of opinions. Shortly before the trial, the liquidators applied to Lewison J for permission to call an accountant to give expert evidence as to the appropriate way of dealing with the deposits and subsequent loans in the audited accounts of BCCI for 1983. SBI had already been given leave to provide a statement on these matters from Mr Martin Foster FCA, who gave evidence before me. The apparent reason for the application was that the liquidators had become aware that an objection might be taken to the admissibility of parts of Mr Dyson's evidence, where he expressed opinions about the correct accountancy treatment of the transactions, on the grounds that he was not independent. Lewison J rejected the application, having been told, as I understand it, by Mr Potts that no objection would be taken to the admissibility of the evidence, but that questions might be raised as to the weight which could be given to the opinions expressed. Mr Purle said that his understanding of what Mr Potts had told the learned Judge was that not even objections of this kind would be taken. I do not intend to try to resolve this dispute, because it is unnecessary to do so. Mr Potts accepts, as he is bound to do in the circumstances, that Mr Dyson's evidence is admissible. But he cautions me against preferring the opinion of an accountant who has been so closely involved in the prosecution of this case over that of an independent expert with no axe to grind. My own view is that it would be preferable in any future case of this kind for the views expressed by somebody in Mr Dyson's position to be confirmed by an independent expert called by the claimants. That would remove any possible controversy about the independence and objectivity of the evidence which is being given. Mr Dyson's evidence is, however, important and useful in the account which it gives to the court of the background to these transactions (most of which is not disputed) and in informing the court of the thought process which lies behind the main allegations levelled against the defendants. In so far as I am called upon to decide between the evidence of Mr Dyson and that of Mr Foster on specific accountancy issues, I have been able to reach a conclusion without taking into account Mr Potts' warning about Mr Dyson's lack of impartiality.

21. For the reasons already indicated, the liquidators' approach to this matter does not depend upon direct evidence of impropriety on the part of SBI made by a former employee of BCCI or any other witness. In general terms it is based on a comparative exercise involving an analysis of the way in which SBI handled the transactions, viewed against the standards to be expected of a hypothetical competent and honest bank placed in the same circumstances. In para.43 of his first witness statement Mr Dyson sets out what he describes as nine unusual

factors which, in his view, would have indicated to an honest banker that the transactions were not normal lending transactions, and would have required such a banker to satisfy himself that no fraud was being practised. These factors, which are considered in more detail later in his witness statement, are: A

(i) BCCI's refusal to allow a lien to be marked on its deposits in order to be able to show them as free placements. It is said that SBI knew that the deposits were not in fact free and should not have been accounted for as free placements at all; B

(ii) SBI's knowledge that the transactions were intended to affect BCCI's accounts;

(iii) the fact that BCCI both funded and guaranteed the two SBI loans to Notan, whilst declining to make a loan directly on account of what are described in the documentation as balance sheet constraints and, in the case of the second loan, overlapping or common ownership interests;

(iv) the fact that the proceeds of the two loans were disbursed to BCCI under the payment instructions which I have already mentioned, rather than to BCCI for the specific credit of a sub-account in the name of Notan; C

(v) Mr Akbar's involvement as an authorised signatory of Notan, as well as an officer in the CTD and an authorised BCCI signatory;

(vi) the failure of SBI to ask for or receive any credit references from Notan's bankers or to receive any management or other accounts from Notan containing some evidence of its business interests; D

(vii) the absence of any established banking relationship between Notan and SBI, coupled with the size of the loans and their proximity to BCCI's year-end;

(viii) SBI's failure to enquire from Notan about the purpose of either loan or to receive any explanation about that; and

(ix) SBI's failure to ask Notan about the source of repayment of either loan. E

Mr Dyson says in para.44 of his witness statement that these nine factors, and perhaps others, would have been sufficient to cause SBI (if honest) to satisfy itself that these were normal lending transactions and that more information was needed before it could be certain that no fraud was being engineered. He then says this:

> 'SBI did not ask for any additional information for it knew that BCCI (rather than Notan) was the intended beneficiary of the loan proceeds. Given that BCCI had also funded and guaranteed the Notan loans, SBI knew, believed or suspected that the back-to-back transactions were merely devices through which BCCI recycled its own money back to itself using Notan as an off balance sheet nominee.' F

22. The conclusions which Mr Dyson invites me to draw from the comparative exercise he has carried out have to be weighed at the conclusion of the trial not only by reference to the documentary and other material he refers to, but also, most importantly, by reference to the live evidence of the SBI witnesses in relation to that material. My view of that evidence will inevitably determine whether or not his conclusions are sustainable. However I do, I think, have to bear in mind, in weighing up the probabilities in relation to that evidence, that an assumption that the employees of SBI would, if honest, have followed the course of conduct to be expected of a model bank will require modification not only in the light of my assessment of their competence and integrity, but also in the light of what else they may have been told by Mr Puri and the others they dealt with. Although the standard of proof remains essentially that of the balance of probabilities, it is clear from the authorities referred to by Lord Hoffmann in the reported decision of the Court of Final Appeal of Hong Kong in *Aktieselskabet Dansk Skibsfinansiering v Brothers* [2001] 2 BCLC 324 that even in civil proceedings the court needs to be more sure about finding serious allegations proved than it might require to be in relation to less serious matters. G H

**© 2003 Sweet and Maxwell Ltd**

A **The loan transactions**

23. I turn, then, to the detail of the original material in evidence in relation to the transactions. As mentioned earlier in this judgment, the first approach made to SBI in respect of the Notan loans seems to have been the visit to the bank by Mr Puri on October 5, 1983. Mr Puri saw Mr T U Patel, who worked at its London main branch in the Customer Services Department. At the time of the meeting he was dealing with deposit mobilisation, which was B part of the Customer Services Department and included attending to customers' general enquiries in relation to their accounts. Requests for loans were not within the remit of this department and were dealt with and sanctioned by the Credit Department. Mr Patel seems to have dealt with Mr Puri on this occasion because he had come to the bank hoping to see the London Branch Manager, Mr Iyer, who was not then available. Mr Patel therefore met him simply in order to find out what he wanted and prepared a note of the meeting to pass to Mr Iyer. Two things are, I think, clear about this meeting. The first is that it was not pre- C arranged. Mr Puri had an account of his own with SBI and visited the bank from time to time. On this occasion he obviously hoped to be able to see Mr Iyer, but had not arranged to do so. The second point is that Mr Patel had no authority and was clearly not concerned to do any more than merely to note the proposals which Mr Puri had put to him and wished to discuss with Mr Iyer. The meeting did not last very long and, after Mr Puri had left, Mr Patel got his note typed up and sent to Mr Iyer. The typed-up note refers to the funds being required by D Notan on September 15. The date is then crossed out and, in handwriting, the November 1 date has been added. Mr Patel said that the reference to September 15 was an error (which it plainly was) and that he deleted that reference and wrote in November 1 before the note was sent to Mr Iyer. Although Mr Patel does not have a clear recollection of the meeting on October 5, it seems from his note that Mr Puri did little more than to set out the structure of the proposed transaction, without giving any explanation as to why, for example, BCCI was unwilling to provide a lien on the deposits rather than a guarantee. Mr Patel would not have been concerned E with details of this kind, which were issues for the Credit Department.

24. Mr Iyer's evidence is that he was not aware of the existence of Notan prior to the two loan transactions with which this action is concerned. This is, I think, consistent with the fact that the Notan accounts had been opened relatively recently and had been trading in credit. Following the receipt of Mr Patel's memorandum, a meeting was arranged between Mr Iyer and Mr Puri, and as part of SBI's disclosure we have a handwritten note by Mr Iyer of that F meeting. At the time in question SBI had its premises in three floors of a building in Milk Street in the City of London. Some of the space was let, but the Credit Department employed between 15 and 20 people and was located on the second floor of the building. Mr Iyer had an office of his own on the first floor. The Foreign Exchange Department was also located on the second floor, with a physically separate dealing room for foreign exchange purchases. Mr Iyer said in cross-examination that when he received Mr Patel's note, he did not call for the customer file, largely, I think, because the purpose of the meeting was merely to find out what the proposed G transaction was about. The evidence about this meeting (which I accept) is that it was intended to be essentially a sifting process, to enable Mr Iyer to decide whether the transaction was of a kind that the bank would be interested in and merited more detailed consideration by the Credit Department. The meeting lasted about 30 minutes. Mr Iyer says that he made no real enquiries about Notan during the meeting, but it is clear from his note that there was obviously some discussion between him and Mr Puri about the company. His note records that Notan was incorporated in Liechtenstein and that its beneficial owners were located in the Middle East. He H was also told that the company had been set up to hold 'metal' and had substantial deposits with BCCI. He was asked by Mr Purle why he had put the word 'metal' in inverted commas, but said that he did not know. He did not think that he had intended in this way to indicate and emphasise that that was what he had been told about its business. I think it is more likely than not that 'metal' was the word used, hence the inverted commas, but there is nothing particularly suspicious about this. According to the note the discussion then seems to have moved on to the

details of the proposed transaction. Mr Iyer already knew the basic structure of what was proposed from Mr Patel's note, and it looks from his own note as if a particular topic of discussion was the term of the proposed BCCI deposit and its extension each side of the term of the proposed loan to Notan. As Mr Iyer explains in his witness statement and confirmed during his oral evidence, SBI would not have been able to fund the Notan loans without the assistance of the BCCI deposits. This was because it did not have the necessary US dollar funds of its own and could not be certain of raising that amount of currency on the foreign exchange markets at a rate which would be acceptable to Notan. The funding of the Notan loans was therefore a major concern for SBI, but it goes hand-in-hand with the question of security. As Mr Iyer accepted in cross-examination, if the BCCI deposits were repaid prior to the Notan loans being repaid, that would have created a very serious foreign exchange problem for SBI. He therefore wanted the BCCI deposits to be in place first, to allow the loan to be disbursed utilising those moneys, and for a period of several days to be added at the end of the term of the Notan loans, so that the BCCI deposits could be repaid using the proceeds of the loans. He also appeared to accept that this same safety margin would enable SBI, if necessary, to exercise any rights of set-off under the BCCI guarantee against the deposits, thereby cancelling out its liability to repay BCCI. He was, however, keen to stress that there were no discussions about the deposits forming part of the bank's security, and that the only security on offer was the guarantee from BCCI.

25. As his note records, because of the guarantee there was therefore to be no lien on the deposits themselves. My own assessment of this meeting, based on Mr Iyer's evidence in cross-examination, is that he was keen to make it clear to Mr Puri that a precondition of SBI's participation in the loan transactions was that the BCCI deposits should be placed on terms which enabled the US dollar funds to be utilised for purposes of the loans on to Notan. Although, as I have indicated, the availability of the deposits to satisfy these funding requirements provided SBI with the additional benefit of being able to exercise its rights of set-off against the deposited funds, that was not, I think, the centre of Mr Iyer's focus at this meeting, and was something which the bank only came to concentrate on when the guarantee was subsequently drawn up by Linklaters & Paines with an express right of set-off inserted into the document. Mr Iyer's concern to establish the position about funding also, I think, explains why his enquiries into Notan and its business were no more than cursory. He wanted to satisfy himself that, by entering into the transaction, SBI would not be exposed to a significant funding risk. Having satisfied himself about that, any analysis of the borrower's creditworthiness or other matters relating to credit risk were left to the Credit Department. The other matter put to Mr Iyer in cross-examination was whether he explored with Mr Puri the reasons why BCCI was unwilling to grant a lien on the deposits. The note of the meeting makes no reference to any such explanation being given, and Mr Iyer's evidence is that this was only a preliminary exploratory meeting. He passed the transaction on to Mr Roy for more detailed analysis. He said that he had no recollection of any discussion about why BCCI was not making the loan direct to Notan itself, and thinks this may have had something to do with the capital adequacy ratios imposed by the Bank of England. He did not, however, enquire into why BCCI wished to structure the transaction in this way, nor did he seek any confirmation of the position from BCCI itself. He stressed, however, that he did not see the transaction explained to him at the meeting as being a device to deceive the regulatory authorities, and I accept that. His assessment of the transaction at the meeting was that it was relatively risk-free from the point of view of SBI and involved no funding difficulties. The half per cent spread was, he said, very attractive and he considered that Mr Puri's proposal was an interesting one which could be given further consideration by the Credit Department. Mr Roy's task would be, in his words, to flesh out the transaction and to make any further necessary enquiries. It would be for Mr Roy to discuss the more detailed mechanics with Mr Puri.

26. Like Mr Iyer, Mr Roy said that he had had no prior dealings with either Mr Puri or Notan, and that his first involvement came when Mr Iyer passed to him his handwritten note of the meeting, together with Mr Patel's note of the earlier meeting of October 5. His role was to examine the proposal and its merits and to take it forward as appropriate. At that time he had

**© 2003 Sweet and Maxwell Ltd**

23-01165-mew Doc 67-7 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (6) Pg 50 of 90



had various dealings with BCCI, involving the confirmation of letters of credit, and he believed them to be an honest and creditworthy bank. It is important, I think, to record at this stage in my judgment that there is no evidence to suggest that BCCI had at this time a dubious reputation in the City of London. Opinions doubtless varied as to whether it merited the description of a prime London bank. One notes from other material gathered by the liquidators that it had expanded rapidly, had acquired a large customer base, particularly among the Asian community, and appeared to be operating profitably. It is not part of the liquidators' case that SBI had any reason to doubt the honesty of BCCI prior to becoming involved in the details of these transactions, and I am satisfied that nothing occurred during the meetings with Mr Puri conducted by Mr Patel and Mr Iyer which caused either of them to take a different view. Early in the trial there was some late disclosure by SBI of documents relating to the financing of transactions involving the Cromwell Hospital. This business was introduced by BCCI, who were part owners of the hospital, and was not dealt with by the witnesses in their statements. But none of the Cromwell Hospital material supports a suggestion that SBI already had reason to believe that BCCI was other than honest It is also, I think, useful to consider the evidence about these and subsequent meetings against the background of what we now know was BCCI's intended purpose in setting up these transactions. The so-called back-to-back transactions with which this action is concerned were devised by Mr Akbar, as I have indicated, as a means of sustaining an appearance of profitability on the part of BCCI. For a bank to conduct a fraud on this scale was, I think, unprecedented and extremely high-risk. It seems to me almost inconceivable that Mr Puri (assuming, as I do, that he was complicit in the scheme) would have wished to approach another bank such as SBI in a way that was likely to arouse suspicion. It seems to me much more probable, as is consistent with the evidence of both Mr Patel and Mr Iyer, that Mr Puri presented the transactions to them in a relatively matter-of-fact way, emphasising the high level of security for the bank in terms of funding and credit risk and the relative profitability of the deal, bearing those factors in mind. Mr Puri and Mr Akbar must have realised that any bank asked to participate in transactions of this kind was bound to ask why BCCI was unable to make the loans directly to Notan, and are likely to have gone equipped with some answers. The two explanations which, over the course of these transactions, appear to have been given were, first, that there were balance sheet constraints inhibiting a direct loan by BCCI and, secondly, that a connection between BCCI and Notan through some element of common ownership added to those difficulties. The evidence of Mr Rex, the banking expert called by SBI, is that both those explanations were at least plausible in that they were relevant to capital adequacy and therefore impacted on the level of lending available to BCCI. The question in this case is whether the individuals at SBI who dealt with this matter continued to see the transactions as a legitimate form of regulatory arbitrage or something much more sinister. But Mr Purle, quite understandably, does not put his case on the basis that Mr Akbar or Mr Puri placed their cards on the table and invited SBI to participate in a fraud. He submits that observable facts known to SBI could have led it to only one conclusion. The corollary, however, to that hypothesis is that I must assume that Mr Akbar and Mr Puri continued to do what they could to maintain the apparent legitimacy of the transactions, rather than do anything which was calculated to give the game away.

27. On receipt of the notes of the earlier meetings, Mr Roy says that he opened a file, in the sense of putting those papers into it. SBI at this time did not operate a conventional credit committee system under which a running file, including comments and notes from the managers handling the account, would be included in a customer's file that would go to the credit committee in the event of an application for a loan being made. The relevant file or files seem to be no more than a collection of documents generated as the transaction proceeded, in much the same way as, for example, a solicitor's file might be composed. We therefore have no commentary on the continuing transaction, beyond what is contained in the contemporaneous notes and letters that were generated Mr Iyer suggested to Mr Roy that he should contact Mr Puri, and Mr Roy said in evidence that he had a number of discussions with Mr Puri about Notan. One obvious question for him to have asked was whether Mr Puri was authorised to act

on behalf of Notan. The answer to this question is contained in the resolution of July 28, 1983, referred to earlier in this judgment. Mr Roy was asked whether that document was on the file which he had opened, but he thought that it was not. It was a document which would have been filed by an account manager in the Customer Services Department such as Mr Patel. He did not know what investigations had been made in relation to the opening of the Notan accounts, and in any event the operation of the deposit and current accounts would not give the Credit Department sufficient information about a credit proposal. His information about Notan was initially limited to what was contained in Mr Iyer's note, but he says that in later discussions with Mr Puri it was confirmed to him that Notan traded in precious metals and diverse commodities. He said that he also thought that BCCI would have done its own due diligence before indicating its willingness to put up the guarantees. During much of this cross-examination Mr Roy appeared to me to be highly defensive, but, as already indicated, this is hardly surprising. I accept that he does not appear to have conducted any investigation of his own into Notan's standing with SBI up to October 5 and that he therefore had only a very limited amount of information about the company, based on the earlier interviews with Mr Patel and Mr Iyer. His witness statement is also incomplete, in the sense that it goes from his receipt of Mr Iyer's note of his meeting with Mr Puri straight to the letter which he received from Linklaters & Paines on October 18. On the files is a note in Mr Roy's handwriting of a meeting with Mr Puri which must have taken place shortly after the meeting with Mr Iyer and prior to Mr Roy asking Linklaters & Paines to assist in the drafting of a facility letter. Mr Roy refers to this document in para.34 of his witness statement, but merely says that he cannot recall when the notes were made. Apart from some telephone numbers, Mr Roy's note contains two significant features. The first is a diagrammatic analysis of the proposed transaction, which shows the US$20 million deposit coming into SBI on October 31, followed by the loan of the same sum to Notan the following day. The diagram also illustrates the repayment arrangements, under which repayment of the Notan loans would precede the repayment of BCCI deposits. The other significant reference is the name of Mr Akbar, together with details of his office in the Treasury Department of BCCI on the third floor of its premises in Leadenhall Street. Mr Roy says that he was given Mr Akbar's name as the point of contact in BCCI, but that it did not occur to him at the time that Mr Akbar was also a signatory for Notan. He had not seen the resolution of July 28. I accept that.

28. There are no other notes for this period of any further meetings between Mr Roy and Mr Puri, although Mr Roy says that further discussions did take place. What, however, is clear is that on the afternoon of October 18 Mr Roy met Mr Johnson-Gilbert of Linklaters & Paines to discuss the transaction. At that meeting Mr Johnson-Gilbert produced drafts of a facility letter, an opinion to be obtained from a Liechtenstein lawyer as to Notan's ability to enter into the transaction, and the form of an appropriate board resolution for Notan to pass in connection with the proposed loan. Mr Johnson-Gilbert said that he must have been instructed by Mr Roy a day or two prior to the meeting, to draw up these documents. It therefore seems likely that by then Mr Roy was sufficiently satisfied with the proposals put to him by Mr Puri to incur the expense of obtaining the assistance of Linklaters & Paines in connection with the transactions. By October 18 matters had progressed to the consideration of points of detail, rather than the more general question of whether SBI was prepared to enter into the transaction at all. If, therefore, there was to be an assessment of the creditworthiness of Notan, it would have been carried out during this time. Mr Roy was asked about this. In fact there were no real enquiries made about either the financial standing of Notan or the reasons why it required this loan. Even if Mr Roy had bothered to look at the existing records held by SBI, he would have seen that Notan had deposits with the bank which were relatively small in relation to the size of the proposed loans. As it was, the amount of these deposits had been noted in Mr Iyer's memorandum and were therefore already known to him, At about the same time the bank also received two credit references from a company called SNW Commodities Ltd in Hatton Garden and S L Wah-Lin Ltd in Old Compton Street, merely confirming that Notan appeared to be trustworthy and satisfactory for the purposes of opening a current account. Mr Patel

**© 2003 Sweet and Maxwell Ltd**

confirmed that these were standard credit enquiries made at the time when the Notan accounts were opened and were unconnected with the specific transactions with which this action is concerned. Neither of them provided any further relevant information about Notan's ability to service loans in the sum of US$20 million. Mr Roy said that he was aware that Notan had owners in the Middle East, although he did not know who they were, and that he was also aware that the ownership of the company was common, in some way, with that of BCCI. But he accepted that he did not make any serious enquiries into the intended use of the funds and, at the time when he approached Linklaters, knew little more about Notan than had been revealed to Mr Iyer and Mr Patel. He was asked why this was. Both banking experts who gave evidence in this case have agreed that the credit enquiries made by Mr Roy and his assistants were wholly inadequate, and that was put to him. His answer was straightforward. The term of BCCI's deposit meant that SBI incurred no funding risk in the transaction and had the additional security of the guarantee. Because of these factors the credit risk was effectively on BCCI and the creditworthiness of the borrower (Notan) was not gone into. SBI looked to the comfort of the guarantee and did not look at the intended end use of the funds. I accept this evidence, which is entirely consistent with the documentation. Mr Basu and Mr Iyer took a similar view. I do not believe that the transaction was ever presented to Mr Iyer or to Mr Roy as anything other than a way of enabling US$20 million to be lent to Notan with the financial assistance of BCCI (its existing bankers) in circumstances in which capital adequacy considerations appeared to make it impossible for BCCI to lend the money direct. Mr Iyer said that SBI was providing a means of helping BCCI to assist Notan at no financial risk to itself. The structure of the transaction had been presented to Mr Patel and Mr Iyer as a package resulting from prior discussions between Notan and BCCI. It was intended to ensure that SBI assumed no funding obligation or risk and could look to BCCI, under its guarantee, in the event that Notan defaulted. It would be inconceivable that a bank operating in the City of London would not honour such a guarantee, and Mr Roy and his superiors, such as Mr Basu, therefore correctly assumed that, except possibly in the circumstances of BCCI's insolvency, the transaction was from SBI's point of view entirely risk-free. I am sure that this is the way it was presented to the bank by Mr Puri, coupled with the need for an urgent response so as to enable the moneys to be drawn down for Notan on November 1. All that Mr Roy therefore had to decide was whether SBI should assist BCCI out of its lending difficulties, and he decided to go ahead. The more important question, therefore, seems to be not so much why Mr Roy failed to make all the usual credit enquiries into Notan, but whether and to what extent he enquired into BCCI's own difficulties, and with what result.

29. One can get some sense of this by looking at Mr Roy's dealings with Mr Johnson-Gilbert and the note which he subsequently prepared and signed, recommending Central Office sanction for the loan. Mr Johnson-Gilbert's note of the meeting held on October 18 indicates that there was a discussion of the general structure of the transaction and the points of detail that needed to be addressed. Mr Johnson-Gilbert drew up, probably prior to the meeting, a list of queries which were then ticked off as they were dealt with. One of the points noted by Mr Johnson-Gilbert was the question of BCCI's authority to enter into the transaction. He said, under cross-examination, that it was normal to seek the authority of a company giving a guarantee, and this was normally provided in the form of a board resolution. This point was never taken forward by SBI and, in a later letter of October 27 to Mr Roy, Mr Johnson-Gilbert noted that SBI was satisfied with the capacity of the signatories for BCCI to commit it to giving the guarantee, and did not wish for any other evidence to be provided of their authority. The guarantee was executed by Mr Akbar and two other officers of BCCI SA and countersigned by Mr Roy. Mr Akbar and the others were authorised signatories for BCCI, and included in SBI's documentation is a copy of the signature book provided by BCCI SA and BCCI Overseas, containing specimens of the signatures of all those authorised to execute instruments on their behalf. Mr Akbar's signature is number 49 in the book. In the light of this it seems to me unsurprising that SBI did not insist upon a board resolution from BCCI, and the evidence of the banking experts indicates to me that it would have been rare in practice for a resolution of that

kind to be asked for. The essential documents for the purposes of the transaction were obviously the facility letter and the guarantee, together with the opinion to be obtained from the Liechtenstein lawyer about the capacity of Notan to enter into the transaction. The facility letter as drafted by Mr Johnson-Gilbert dealt with the question of submission to the jurisdiction on the part of Notan by providing for the irrevocable appointment of an agent for service within the jurisdiction. It looks as if originally SBI contemplated appointing BCCI as the agent for service, but by the October this had changed to Mr Puri. Mr Johnson-Gilbert was asked about the reasons for this change, but said he did not know what they were. The facility letter provided for the loan of US$20 million to be made in one instalment on November 15, 1983. Although repayable on demand, the letter makes it clear that the intention was that the loan would be for a period of three months, with the principal and interest being repayable in one instalment on February 1, 1984. Early repayment would be demanded, however, in the event that the BCCI guarantee ceased to be of effect or if BCCI ceased to maintain the deposit. The loan was made expressly subject to various conditions, including a requirement that not later than October 31, 1983, BCCI should have placed the US$20 million on deposit for a term of three months and four days, and have delivered by the same date a duly executed guarantee in respect of the loan. The facility letter in its final form is dated October 18 and was executed by one of the Liechtenstein-based directors on behalf of the company.

30. Following the signing of the facility letter, Mr Roy prepared a note for submission to the bank's Central Office in India, which was signed by him, Mr Basu, Mr Iyer and Mr Chaturvedi, recommending approval and sanction of the loan. This memorandum is dated October 20 and was prepared before Mr Roy had received from Linklaters & Paines their draft of the proposed form of guarantee to be given by BCCI SA. The note is, I think, important because it represents Mr Roy's summary and understanding of the transaction and his reasons for recommending its approval. Although signed by Mr Basu and Mr Iyer, they had had no direct contact with Mr Puri or BCCI in the meantime and were therefore dependent upon Mr Roy for information and guidance about the proposed transaction. The memorandum for Head Office describes Notan as a company engaged in diverse business activities which is 'owned by private Middle Eastern interests and is managed by their solicitors and agents'. It then goes on to describe the loan proposals, including the terms agreed for the provision of the BCCI guarantee. There is then this passage:

> 'In order to obviate any funding obligation on our part, BCCI have also agreed to place with us a sum of US$ 20 million as free deposit one day before the drawdown of loan. This deposit will not be liened to us but will remain with us for entire 3 month period of loan and shall be withdrawn only 3 days after repayment of loan. The rate of interest to be charged on the loan is proposed to be 1/2% over that payable on the deposit to BCCI.
>
> Though the loan will be guaranteed and funded by BCCI, we are told that on account of balance sheet constraints they are not in a position to give this loan directly to the company. For the same reason they cannot also lien the deposit of US$ 20 million to us, which would have obviated the need for the guarantee.
>
> We have examined this proposal the terms of which are undoubtedly very attractive, without entailing any funding obligation; this short term transaction involving a turn of 1/2 % will result in net earning of about US$ 25,000.00. In addition, we have also stipulated a management fee of US$ 5,000.00 to take care of all our expenses and legal costs. Although this is a new business connection, in view of the availability of BCCI's guarantee we have not attempted an appraisal of the company's requirements of funds. However, in order to eliminate the possibility of any risk or legal complications in dealing with a new company constituted in Liechtenstein, we have consulted our solicitors "Linklaters and Paines" who have drafted the following documents for acceptance/execution by the company to secure this advance.'

© 2003 Sweet and Maxwell Ltd

The note then goes on to specify the documents drafted by Linklaters and also refers to their being in the process of drafting a suitable form of guarantee. These documents, it says, 'will provide us adequate security for this loan'. Finally, the memorandum records that 'in view of the urgent requirements of NTIL we have conveyed our approval in anticipation of Central Office sanction'.

31. This is, I think, the first document in which the phrase 'free deposit' is used. At this point in the transaction Mr Roy and, on his recommendation, Mr Iyer and Mr Basu had already taken it upon themselves (albeit without the consent of Head Office) to approve the loan, and had initialled and sent out the facility letter to Notan several days earlier. Although Linklaters had yet to submit a form of guarantee containing, as it did, an express right of set-off, this was accepted and executed by BCCI SA without demur, and the reality is that by this point in time the terms of the first loan transaction had been settled and agreed. Mr Roy and the Credit Department made no further enquiries into the status of Notan or the purpose of the loan, and it is made clear in the memorandum that the reason for this was the provision of the BCCI guarantee. If the liquidators' claim that SBI had knowledge that the transaction was a fraud, even before receiving the payment instructions from Notan, is to be made out, then I must be satisfied that at the time of writing the October 20 memorandum Mr Roy must already have realised that he was dealing with a dishonest scheme. On the evidence, nothing occurred between October 20 and the receipt of the payment instructions at the end of the month which added materially to his sum of knowledge about the nature of the transaction. Mr Akbar was sent the guarantee for execution on October 24 and it was executed in a slightly amended form on or about October 28. On the same day Mr Akbar sent a letter to Mr Chaturvedi confirming that BCCI SA would be placing the US$20 million deposit with SBI for a period of 96 days from October 31, 1983, to February 4, 1984, in SBI's account with Citibank in New York. The letter from Dr Marxer, the Liechtenstein lawyer, confirming Notan's capacity to enter into the transaction, was received at about the same time. Although obviously important, all of these steps were merely the putting into effect of the arrangements already agreed between Mr Roy and Mr Puri. What, then, was it which put Mr Roy or anyone else at SBI on notice that they were dealing with a fraud? One can, I think, begin by reminding oneself what the liquidators rely upon. Up to the stage immediately prior to the disbursement of the first loan, the principal matters referred to in Mr Dyson's witness statement are:

(i) BCCI's refusal to mark a lien on the deposits and its wish to be able to show them as free placements;

(ii) the existence of what are referred to in the memorandum of October 20 as balance sheet constraints;

(iii) the position of Mr Akbar both as an officer in the CTD and one of the authorised signatories in respect of Notan; and

(iv) the absence of any real information and SBI's failure to enquire into the financial standing of Notan or the purposes of the loan.

As I have already indicated, I do not regard the last of these factors as significant. SBI's assessment of the loan transaction was that it was virtually risk-free. This is made clear in the memorandum of October 20 and in the evidence of Mr Roy, which I accept on this point. It was also clear to the bank, as I have explained, that it was being asked in effect by BCCI, through Notan, to provide loan finance to Notan in circumstances where 'balance sheet constraints' made this an impossibility for BCCI. The same reason was given for BCCI's refusal to grant a lien over the deposit. Mr Roy was asked whether he made enquiries, through Mr Puri or otherwise, into why BCCI was unable on unwilling to provide a lien. The answer he gave was that he asked for and would have preferred a lien, but Mr Puri indicated that that was not an option, because it would have to be registered and referred to in BCCI's year-end accounts. BCCI felt that this would be, to use his words, derogatory, and would adversely affect its credit standing. In the end, faced with this explanation, Mr Roy was content to rely upon the guarantee. As drafted by Mr Johnson-Gilbert, it had at cl.4.03 an express contractual right of

set-off, and in his letter of October 27 to Mr Roy, Mr Johnson-Gilbert explained that the right of set-off would apply to any sums which SBI was holding at the time to the credit of BCCI and would be enforceable even without registration under s.95 of the Companies Act 1948, provided that BCCI was not at the relevant time in liquidation.

32. This obviously offered SBI a very high level of security, short of a formal lien or charge over the deposit. Mr Johnson-Gilbert's advice was that the right of set-off in cl. 4.03 probably did constitute a charge on a book-debt of BCCI so as to be registrable, but he went on in his letter to record his assumption that it was not acceptable for BCCI to have the right of set-off registered as a charge. That was clearly a correct assumption to make, in the light of BCCI's earlier refusal to create a lien over the deposit. It is also entirely consistent with the view of both banking experts, who accepted without protest that no bank ordinarily likes to create a charge over its own assets or to have such a charge registered against it under the Companies Act. Mr Roy, as an experienced banker, readily understood this, and I can see nothing untoward in his acceptance of BCCI's refusal to countenance a charge over the deposit. BCCI's stance on this issue was entirely consistent with established banking practice. I shall come to the significance of Mr Akbar's position a little later in this judgment, when I come to consider the drawdown of the first loan. This therefore leaves the issue of the designation of the BCCI deposit as a 'free deposit'. I am bound to say that I have some difficulty in following this allegation. If the liquidators can make good the allegation that, by virtue of the payment instructions, it must have become clear to SBI that the loans were being made to Notan on behalf of BCCI so as to enable the latter to retain the use of the money, then none of this matters. SBI would in those circumstances have become aware that the whole transaction was entirely circular and little more than a sham. They would then have known that the contractual arrangements counted for nothing and were merely a front for BCCI's fraud. However, so long as SBI believed, as it clearly did as of October 17, 1983, that it was being asked to lend to Notan (not BCCI) and was receiving the BCCI deposit and guarantee as security for that loan, then this becomes nothing more than a dispute about terminology. It is clear from the memorandum of October 20, where the phrase first appears, that the words 'free deposit' mean (as one can see from the sentence which follows) a deposit which is not liened to SBI. One can quibble about the appropriateness of this terminology, but it is clear from that memorandum what SBI intended those words to mean. Mr Purle advanced an interesting argument by way of submission to the effect that the right of set-off did in fact constitute a charge, in the sense of having created a *ius in rem* over the BCCI deposit. I do not intend to get drawn into that. There is nothing in the evidence to suggest that Mr Roy, or for that matter Mr Johnson-Gilbert, conducted that sort of analysis. Mr Roy's understanding, as is apparent from the October 20 memorandum, was (rightly on wrongly) that a lien would have to be referred to in some way in the accounts, whereas a guarantee would not. For reasons which I have already given, any bank, including BCCI, would wish to avoid this. Part of the liquidators' case, as already indicated, on this question of free deposits, seems to be that SBI was content to label them 'free deposits' when it knew that they were not free, but provided security by way of the right of set-off, and that BCCI's treatment of the deposit as a free placement was therefore inappropriate and indeed misleading. This is the point made in answer to request 25(b) of the further and better particulars, where it is said that the description was dishonest because it was designed to enable BCCI to present the two deposits as ordinary placements rather than liened funds, and thereby to increase the apparent size of its balance sheet. I simply do not follow that. In the first place, as already explained, the description was in fact intended to mean no more than that the deposits were not subject to a lien. But more importantly, there is nothing to show, nor is it alleged, that Mr Roy and the other individuals at SBI had any reason to believe at this time that BCCI would not disclose the full details of the transactions to its auditors. Mr Dyson, I think, accepted this. The memorandum of October 20 is, in my judgment, only consistent with a belief on the part of Mr Roy that the deposits, coupled with the guaranteed loans to Notan, rather than a direct loan by BCCI to Notan, would be more beneficial to BCCI from a regulatory point of view, in terms of the capital adequacy ratios involved. This presupposes

© 2003 Sweet and Maxwell Ltd

23-01165-mew Doc 67-7 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (6) Pg 56 of 90



A that the relevant documentation would be shown to both the auditors and the regulatory authorities. The alternative is to assume that Mr Roy not only had knowledge of a potential fraud, but was prepared positively to misrepresent the position to his own Head Office. I am not prepared to make this finding. I believe that the memorandum does corroborate Mr Roy's oral evidence, that the loan transaction was structured in this way simply to accommodate BCCI's lending difficulties, but that he believed there would be disclosure to the auditors and the other authorities of all the relevant material. I do not accept Mr Purle's suggestion that the B memorandum of October 20 itself was designed to misstate BCCI's intentions to the SBI Head Office. That seems to me a far-fetched allegation and is not consistent with the view which I have formed of Mr Roy's evidence.

33. In support of the allegation that the description of the BCCI deposits as 'free deposits' was materially false, each of SBI's principal witnesses was cross-examined at some length with a view to establishing that they accepted (and presumably understood) that the deposits did at the material times form part of the bank's security. Each of them was initially reluctant to C concede this point. Mr Basu, for example, accepted that the security consisted of the guarantee, but said that there was to be no lien oven the deposits and that therefore the deposit was not security in the real sense of the term. It was, at most, collateral security for the guarantee. He accepted that cl. 4.03 of the guarantee had been inserted in order to put SBI in the best possible position to deal with any default by Notan, but emphasised that the deposit as such was not security, because it was not subject to any lien. Mr Iyer also said that the primary security was D the guarantee, not the deposit. Like Mr Basu, he was reluctant to accept that the deposit fell to be treated as security on account of the right of set-off contained in cl. 4.03 of the guarantee. For it to be security there needed, he said, to be a lien or a charge. Mr Roy gave similar evidence on this point. At one point in his cross-examination on Day 6 of the trial, he was asked whether he understood the guarantee to be a lien. He said that he did not, but that he did accept that the guarantee provided the bank with security. He even went so far as to accept, as part of the same exchange, that by virtue of the right of set-off, SBI did have a form of security over the E deposit. He confirmed, however, that the words 'free deposit' were merely used to indicate that there was no lien. The next day, however, he said that he wanted to withdraw the answers about the deposit being security and said that the only purpose of the deposit was to provide funding for the Notan loans.

34. Having got to this position in their evidence, each of these three witnesses had put to them by Mr Purle the transcript of an earlier exchange between Mr Potts and Mr Dyson, in F which Mr Potts put it to Mr Dyson in terms that, by virtue of the right of set-off in the guarantee, the deposits did form part of the security for the loans. Those questions were put, in the context of a successful attempt by Mr Potts to obtain an admission from Mr Dyson that it was no part of the liquidators' case that there was evidence to show that SBI believed that the guarantee would be concealed from BCCI's auditors. They would therefore be able to decide whether the existence of the right of set-off required any provision to be made in the accounts, I had earlier acceded to an application by Mr Purle for the exclusion of the SBI witnesses from G court from the commencement of the defendant's evidence until they came to give their own evidence. Mr Potts' line of cross-examination therefore came as a surprise to them. Both Mr Basu and Mr Iyer proceeded to accept that the deposits were security in that general sense, although not subject to a lien or charge. Mr Roy was more reluctant to make the concession, but agreed that the deposits were security in the qualified sense of giving the bank a night of recourse against them pursuant to the right of set-off contained in cl.4.03. As I have already H indicated, I regard much of this controversy as highly artificial. It seems to me that the witnesses clearly prepared themselves for this trial on the basis that part of the liquidators' case depended upon an attack on the use of the term 'free deposit' and that this somehow required them to justify the use of the term and to explain why the deposits did not form part of the bank's security in any relevant sense. As each of them was ultimately forced to concede, that is a quite unrealistic position to take and one that is contrary to the intentions and advice of Linklaters behind the drafting of cl.4.03. It was also not what they thought at the time. In a letter

to the Head Office of the bank dated February 9, 1984, which was drafted by Mr Roy and signed by Mr Iyer, it is stated:

> 'Not only had we a guarantee of BCCI, but also there was a matching deposit so timed that if a problem arose, the right of set-off could be exercised.'

This was part of the correspondence generated by a complaint from Head Office that the sanction for the two loans had been given without first obtaining the authority of Head Office, as required under the bank's regulations. That letter, amongst other things, indicates what SBI's thinking was at the relevant time, and I regard the reluctance of the witnesses to concede the deposits as being a form of security as little more than a defensive argument about words. What is clear from the contemporaneous evidence I have already mentioned, such as the memorandum of October 20, 1983, is that the words 'free deposit' were simply the internal designation of the deposits as not being subject to a lien. Mr Roy confirmed this in his oral evidence and I accept that. But the terminology is not the real issue The liquidators' real point is that the description of the deposits as free reflected an understanding on the part of Mr Roy and the others that the deposits would receive that kind of treatment when disclosed in the year-end accounts of BCCI: *i.e.* they would be shown as free placements with SBI, not subject to any form of encumbrance. Mr Roy said he did not accept that he knew that BCCI intended to show the deposits in their accounts as free. This is clearly inaccurate. In an earlier response to Head Office also dated February 9, 1984, and again drafted by Mr Roy, there is the following paragraph:

> 'Although BCCI have not categorically advised us on the specific difficulties encountered by them in liening the funds, we feel that this is more because of the cosmetic effect on their year-end balance to be achieved by showing US$ 40 million as a placement rather than liened funds.'

Part of the disclosure in this case includes an earlier draft of that memorandum by Mr Roy, which contains the following passage:

> 'Now that the year-end is over, we are persuading them to offer a formal lien oven the funds for any rollover of the loan to NTIL, in which event of course BCCI's guarantee would have to be dispensed with.'

This is a reference back to the discussions at the time of the second loan, which originally contemplated that the first loan might be renewed and the second granted for a period of up to one year. In the event, the second loan became co-terminous with the first loan.

35. It seems to me that Mr Roy was quite unnecessarily defensive about these matters during cross-examination. It is quite obvious that from the start BCCI was unwilling to grant a lien oven the deposit. It indicated through Mr Puri that a lien oven the funds would need to be recorded, whereas a free placement, even if coupled with a guarantee, would carry no such qualification. Mr Roy obviously understood that, and he and the other managers at SBI were prepared to accept a guarantee rather than a lien, knowing that BCCI obviously believed that that would enable it to show the deposits as untied. But unless they also believed (which is not in terms alleged) that BCCI would conceal the existence of the guarantee, I cannot see why they should have regarded what was proposed by BCCI as being necessarily deceptive. It would be a matter for the auditors to decide whether, contrary to BCCI's assumption, it was appropriate to make a provision in the accounts. The letter of February 9 to Head Office sets out in very clear terms what the London Office believed was intended, and it seems to me quite inconsistent with Mr Roy and the others thinking that they were staring at a fraud. Each of them said that they believed at the time that BCCI was honest and that the guarantee and the other details of the transaction would be disclosed, and I have no reason not to accept that evidence.

36. In para.117 of his first witness statement Mr Dyson deals with the way in which the deposits should have been treated in BCCI's accounts. He says that the BCCI deposits should have been accounted for as money subject to an encumbrance, on the basis that they were subject to a contractual right of set-off or an unregistered charge. They should not have been

**© 2003 Sweet and Maxwell Ltd**

accounted for as unencumbered free ordinary bank placements and therefore shown in the balance sheet as an asset under the line item 'due from'. His view is that deposits subject to a contractual right of set-off were not free and should either have been set off against the liability for which the deposits were held or shown as assets on the face of the balance sheet, with a corresponding entry for the liabilities which they were intended to secure as being liabilities of the bank. Mr Foster, the expert accountant called by the defendant, disagrees with this. He says that the deposits made by BCCI should have been included in the consolidated accounts of BCCI as 'due from banks' and the interest accrued included as a sundry debtor. The guarantees given to SBI in respect of the loans advanced to Notan were, he says, contingent liabilities which should have been included as such in the relevant note to the BCCI accounts and were not actual liabilities. The group accounts of BCCI as at December 31, 1983, show under the heading 'contra accounts' letters of guarantee amounting to some $1.5 billion. The question for the auditors would have been whether any provision was required to be made in respect of the contingent liability relating to the guarantees. Given that, by the time the accounts came to be finalised, the Notan loans had been repaid, there would have been no reason to do this. The auditors would have known that the contingent liability was never going to materialise. Where he and Mr Dyson are largely in agreement is in relation to the correct accounting treatment for the transactions, were BCCI rather than Notan to have been the real borrower. If the responsibility for repaying both loans as debtor lay with BCCI itself, it would have been necessary to record the corresponding liability as an actual rather than contingent liability of BCCI. The accounting treatment therefore depends on whether Notan or BCCI was the true debtor. I have no hesitation in preferring the evidence of Mr Foster over that of Mr Dyson, where their views conflict. In a fourth witness statement made in response to Mr Foster's report, Mr Dyson says that his view of the appropriate accounting treatment of a transaction is that it should be determined by reference to the substance and commercial effect of the transaction rather than merely its legal form. For this he relies on accountancy standard International Accounting Standard 1. But as Mr Foster observed during the course of his evidence, two banks cannot make the same loan, and the auditors would have difficulty in ignoring the fact that SBI would have recorded the loans to Notan in its own books, and BCCI's actual legal liability was as guarantor rather than lender. I think that Mr Foster was right in assuming that the auditors would respect the contractual structure of the transaction and would only be concerned with the question of whether BCCI's contingent liability under its guarantee needed to be provided for.

37. Interesting, however, as all this is, it does, in my judgment, have only marginal significance in relation to the determination of the issues in this case. Mr Foster's view of these matters shows that, had the managers at SBI turned their attention to how BCCI would in fact record these transactions in its books and accounts, then they would very probably have concluded that the placements could be shown without any corresponding provision being made for the guarantee liabilities. Provided that they believed (as I have found that they did) that BCCI would accurately record these matters and would not seek to conceal the guarantee, then the correct accounting treatment was a matter for its auditors and not for SBI to determine. Mr Dyson's views are, I think, largely influenced by his belief that the loans were in substance made to BCCI and not to Notan. On this hypothesis there is no real doubt that a corresponding liability would have had to be recorded in the accounts. But at this point in time nothing supports the view (nor is it alleged) that SBI knew that Notan was a front for BCCI. Objectively the first arguable indicator of this was the form of the payment instructions from Notan in respect of the first loan. The conclusion I have reached is that, in the period prior to the drawdown of the first loan, there is nothing which satisfies me that Mr Roy and the others at SBI had become aware that the transaction they were dealing with was a fraud.

**The drawdown of the first loan**

38. On October 28, 1983, Mr Roy sent a memorandum to the manager of the Foreign Exchange Department giving him instructions as to how to deal with the deposit and the loans

to Notan. This memorandum was drafted by Mr Chaturvedi. It again refers to BCCI placing a free deposit of $20 million with the bank by crediting SBI's Nostro account with Citibank in New York on October 31. The Foreign Exchange Department was requested, on receipt of these funds, to place them in a fixed deposit account for the duration of the placement and to quote an appropriate rate of interest to BCCI for the period up to January 31, 1984, which was the date of repayment for the Notan loans. The rate of interest payable for the remaining three days of the deposit was to be fixed and advised to BCCI at current market rates on February 15, 1984. Mr Roy's instructions included a note that the Credit Cell was to be advised on receipt of the deposit and also prior to any release of the deposit on February 4. So far as the loans to Notan were concerned, the Foreign Exchange Department was asked to open a fixed-term loan account in the name of Notan for a period of 92 days from November 15, 1983, to January 31, 1984, but not to disburse the loan until after receipt of the BCCI deposit. These instructions went to Mr K S Sahota. He was the deputy manager in the Dealing Room of the Foreign Exchange Department at the time and would have been responsible for fixing the rates of interest. One can see his note of the relevant rates in manuscript on one of the copies of the memorandum of October 28. The manager of the Foreign Exchange Department at the time was Mr Peter Guillan. The department was divided into three sections: the Dealing Room, which was concerned with inter-bank borrowing and lending and the conversion of currency; the Bills Department dealing with letters of credit and bills of exchange; and the Dollar Section, where a Mrs Govewalla was the deputy manager at the relevant time. The function of this section was to maintain US dollar accounts for customers and to make remittances from, and receive funds into, such accounts. Neither Mr Guillan nor Mrs Govewalla were called as witnesses at the trial. Much of Mr Sahota's evidence was concerned with details of the mechanics of payment. He accepts that the memorandum of October 28, which was addressed to Mr Guillan, would have been passed to him and would probably not have been seen by the Dollar Section. He would then have contacted BCCI and agreed the interest rates applicable and the commencement and maturity dates for the placement of the BCCI deposit. The Dealing Room would also have arranged to open the fixed-term loan account required for purposes of the loan on to Notan and would have produced a loan slip giving the amount of the loan, its commencement and maturity dates, and the rate of interest. The amount of the loan would then be debited to the loan account and credited to Notan's current account. From this point on, the matter would have been placed into the hands of the Dollar Section. They would have been concerned to give effect to the customer's instructions for the disbursement of the loan. Mr Sahota says in his witness statement that he would never usually see the customer's instructions or be concerned to act upon them. The Dealing Room's function would be over once the funds had been credited to the customer's loan account.

39. On October 31 BCCI placed the US$20 million deposit with SBI's Citibank Nostro account in New York. On the same day Notan, through Mr Puri, wrote to SBI enclosing the relevant documentation for the purposes of the loan, including certified board resolutions accepting the terms of the facility letter and the amendment to it, the letter appointing Mr Puri as Notan's agent for service of any process, together with Mr Puri's letter of consent to act as such, the legal opinion from Dr Marxer, and an accepted copy of the facility letter and its amendment. After listing these items, the letter goes on to refer to the transfer that day of the BCCI deposit. It then says this:

> 'Your requirements for granting the loan now having been complied with, please also find enclosed our instructions for drawdown. Kindly acknowledge receipt and confirm that these instructions will be executed as requested.'

That is clearly a reference to a letter, again on Notan headed notepaper, which is signed by Mr Puri and Mr Akbar, and gives details of the account to which the transfer of the loan moneys should be made. The letter in question is dated October 21, but this is clearly a typing error for October 31. One of the copies of this document contains a stamp indicating that it was received by the Dollar Section of the Foreign Exchange Department at about 3.55pm on

© 2003 Sweet and Maxwell Ltd

A November 1. On the right-hand corner of the letter there are Mrs Govewalla's initials with the November 1 date. The evidence is that documents from Notan were invariably received by hand from Mr Puri rather than by post or courier. It is therefore very likely that the letter of October 31 and the various enclosures, save perhaps those already received, were handed in to SBI by Mr Puri on October 31 and then dispensed as appropriate. The letter of October 31 is not in terms addressed to any particular individual, although it does contain Mr Roy's and Mr Chaturvedi's reference, which was used on earlier correspondence with the Credit
B Department. Mr Roy says that he did not see the contents of this letter, and I am prepared to accept that. Mr Chaturvedi was assisting him in this matter and the transaction had now got to the stage simply of mechanics. But it seems to me almost certain that Mr Chaturvedi would have dealt with the letter, given that the receipt of most of the documents it enclosed were conditions of the loan. It seems to me therefore likely that he also saw the payment instructions signed by Mr Puri and Mr Akbar, even though he was not concerned himself to deal with them. Mr Chaturvedi does not deal in terms with the letter of October 31 in his witness statement, but
C does say in para.23 that he does not recall having seen the misdated letter of October 21 containing the payment instructions. The relevance of this document is that the liquidators rely on it to show that those at SBI who dealt with this matter must have been aware that Mr Akbar was signing on behalf of Notan as one of the authorised signatories. His name is not printed out on the letter, but the signature is of course the same as that which appears on a number of other documents and in the BCCI signature book. Mr Chaturvedi was therefore pressed at some
D length, by reference to these documents, to concede that he was by October 31 familiar with Mr Akbar's signature. When the payment instructions document was put to him, however, he did not content himself with confirming the evidence in his witness statement that he had no recollection of seeing it. He sought to reinforce his alleged ignorance of the document by saying that he remembered that Mr Puri, when delivering these documents by hand under cover of his letter of October 31, said that the payment instructions were not enclosed with the other documents and that he would be giving those instructions directly to the Foreign Exchange
E Department. When asked why he did not include this very important fact in his witness statement, he said that it did not seem very important to him at the time when he prepared the statement.

40. The payment instructions are important for two reasons. The first is the one I have already dealt with: *i.e.* as indicating Mr Akbar's involvement as an authorised signatory of Notan. The second is that the instructions ask SBI to transfer the moneys to an account at the
F Bank of America, New York, not of Notan, but of BCCI SA. They conclude by saying: 'Please note that value date for beneficiary must be 1st November 1983'. Mr Akbar's involvement with Notan and the absence of a nominated sub-account in the name of that company are the principal two matters relied upon by the liquidators as indicating that whatever the position may have been prior to October 31, SBI must have known on receipt of these instructions that it was dealing with a fraud, because the money was in fact being paid to BCCI rather than to Notan. Mr Purle relies upon Mr Chaturvedi's response to his questions about this document as
G confirming that the bank wishes to distance itself from it, because it is a clearly incriminating document. I have to say that I have found this the most difficult aspect of this case. I do not believe Mr Chaturvedi's evidence that he was told by Mr Puri that the payment instructions had been omitted and would be sent direct to the Foreign Exchange Department. One of the reasons for my taking that view is that the bank's disclosure includes at least one copy of the same document without the date and time stamp which Mr Sahota said would have been put on
H by the clerk in the Dollar Section. That seems to me consistent with the document having come into the bank in some other department and having been transferred to Foreign Exchange internally. I also think it is most unlikely that Mr Chaturvedi would not have wanted to scrutinise the payment instructions as part of his general conduct of this transaction, even though it was not his task to give effect to them. However, my principal reason for rejecting his evidence is the impression which it made on me at the time it was given. He was under a considerable amount of pressure from Mr Purle and his account of his conversation with

Mr Puri had, to my mind, all the signs of being made up on the spot as an attempt to escape the thrust of Mr Purle's cross-examination. This therefore requires me to consider the difficult question of whether Mr Chaturvedi's testimony on this point was simply a foolish attempt to get him out of a tight spot or is indicative of something much more sinister. Not without some hesitation I have come to the conclusion that it was the former. In general he did not strike me as a dishonest witness, but, like the other bank officials, was obviously concerned to do what he could to protect the bank. I think that he almost certainly did see, or at least was handed, the payment instructions. It is probable that he also saw and recognised Mr Akbar's signature from having presumably verified it for purposes of confirming the authenticity of the guarantee. In the event he merely passed the instructions on to the Dollar Section, which then raised a payment order giving effect to those instructions. This payment order records that by order of Notan, the $20 million was to be remitted by telegraphic transfer to BCCI's account with the Bank of America 'in favour of yourselves'. This payment order is consistent with the payment instructions which, as I have said, nominate BCCI SA as the beneficiary. But in banking terms this means no more than recipient. It does not of itself mean that BCCI SA was to receive the money for its own use, rather than to receive it and hold it to Notan's order.

41. There are three questions, therefore, which I need to ask. The first is whether the presence of Mr Akbar's signature on the payment instructions, coupled with his known position at BCCI, should have caused SBI to think that something might be amiss. The second is whether the terms of the payment instructions themselves should have added to that concern. Finally, I have to consider whether one or other or both of those factors did, in all probability, cause SBI to suspect a fraud.

42. With the benefit of hindsight, Mr Akbar's dual role is obviously worrying. Even at the time it would, I think, have given cause for an explanation. But that explanation was in fact already in the possession of SBI Had someone asked or bothered to look in the relevant file (and there is no clear evidence one way or the other as to whether they did), they would have discovered Notan's resolution of July 28 authorising Mr Akbar to act on behalf of the company. Although it is now clear why things were arranged in this way, I doubt very much whether in 1983 this would have been regarded as inherently suspicious. SBI had been told that Notan had an existing banking relationship with BCCI and that the company was owned by investors in the Middle East. Even without being told in terms that the ownership was common, one would have expected a bank in SBI's position to assume that a Liechtenstein company was being utilised as a convenient vehicle for the business operations of individuals and entities who did not wish to be named. Consistently with that, it is not altogether surprising that the Liechtenstein directors would have appointed nominees to act for them in this country, and the company's bankers would have been obvious candidates. With the benefit of hindsight, one can see the hand of fraud in all this. But that is only because we have now learned that BCCI was fundamentally dishonest. I am not prepared to assume, merely from Mr Akbar's dual role, that this was a conclusion that SBI would have reached at the time. Similarly in relation to the payment instructions, it was, I think, unusual for no sub-account to be specified. But again I am not persuaded, either singly or in conjunction with Mr Akbar's signature, that this was enough to set the alarm bells ringing. In support of their case that these factors ought to have, and therefore probably did, cause SBI to suspect a fraud, the liquidators called as an expert banking witness Mr Roger Reynolds. Until 1992 he was a director of Hill Samuel and a member of its Credit Committee. Together with Mr Paul Rex, the expert called on behalf of SBI, Mr Reynolds was asked to consider a number of questions designed to identify the steps which would have been normal for a reasonable bank, considering Notan's loan requests, to have taken prior to approving the borrowing. I have already referred to certain aspects of his evidence. He accepted that it was relatively unusual for a bank to be required to provide a board resolution authorising the giving of a guarantee, and that the lending bank would normally be satisfied with sight of the signature book as a confirmation of authority. He also accepted that it would be most unusual for a bank to create a charge over its own assets or to agree to the

© 2003 Sweet and Maxwell Ltd

registration of such security at Companies House. The effect of that would be to cast doubt on its solvency. During his time at Hill Samuel no such charge was ever created. He also considered that it was reasonable for SBI to have assumed that the guarantee would be disclosed and that, if the auditors had been shown the guarantee with its right of set-off, there would be no possibility of their being misled. He was also asked about the payment instructions. He said he thought it was unusual that the payment instructions from Notan did not specify a sub-account. He was concerned that SBI had received instructions to remit the money to BCCI without knowing what it was going to be used for or even the precise destination of the funds. Mr Potts put it to him that, given that BCCI had guaranteed these loans, it was reasonable for SBI to suppose that money remitted to BCCI on the instructions of Notan was not going to be used by BCCI (to use his example) in order to place bets on the horses. It was reasonable to suppose that it would be held to the order of Notan, if necessary in a suspense account, and that BCCI would ensure that it was applied by Notan for some legitimate purpose. That, however, would be the concern of BCCI, not of SBI. Mr Reynolds said that the only explanation that he could think of for payment instructions in this form would be if Notan was using its loan to pay off an existing debt with BCCI, which would explain why the money was being paid directly to that bank. Mr Rex, who was called by SBI, was also slightly equivocal about this point. He said that a banker might or might not act on instructions where no sub-account was specified and that he himself might have done so without seeking further clarification. I suspect that a cautious bank might well have at least sought confirmation that no specified sub-account was intended to form part of the instructions before making the payment. But I am not satisfied, on the evidence of the banking experts, that this was a clear-cut matter of practice, such that no honest bank could possibly have failed to have sought an explanation as to why no sub-account was mentioned and would have regarded the absence of such an account as a badge of fraud. We know that in fact SBI did not seek clarification of the instructions and was content to pay in accordance with them. On the liquidators' case, we have to assume that this was done with knowledge that they were participating in a fraud, *i.e.* that they knew the money was being re-circulated back to BCCI rather than to Notan for its own use. Although some of Mr Chaturvedi's evidence was, as I have indicated, untrue and reprehensible in that regard, looking at the matter more widely I am not prepared to find, on the basis of that testimony, that he and Mr Roy knowingly lent SBI's assistance to what they suspected or believed was a fraud on BCCI's creditors.

**The second loan**

43. Although the funds were disbursed to Notan on November 1, it was not until November 3 that Mr Roy received formal confirmation in a letter from Linklaters & Paines that the documents were in order for SBI to proceed with the disbursement of the loan. Mr Johnson-Gilbert thought on balance that he had not given Mr Roy an earlier oral confirmation and the bank had obviously gone ahead without first receiving that. On November 10 Mr Johnson-Gilbert wrote a further letter to Mr Roy containing advice about cl.4.03 of the guarantee and the status and enforceability of the right of set-off in the event of the liquidation of BCCI. Mr Johnson-Gilbert's opinion seems to have served two purposes. Although it was now early November and the first loan had already been disbursed, SBI had still not sent to Head Office the memorandum of October 20 explaining the nature of the first loan transaction and the reasons why it had been approved before any sanction from Head Office had been obtained. It was not in fact dispatched to Bombay until November 30, under cover of a letter from Mr Basu enclosing Mr Johnson-Gilbert's opinion. Confirmation of the transaction was sought. In his letter Mr Johnson-Gilbert had advised the bank that it would be prudent to require the BCCI guarantee and deposit to be approved by the board of BCCI in the event that SBI intended to repeat the arrangements. It is not clear on the evidence whether he was told prior to writing this letter that there was a possibility of a second loan, but that information was certainly conveyed to him by Mr Roy on December 2, when he wrote saying that SBI were now considering

another loan to Notan on identical terms and conditions, and wanted to protect the bank's interests in the event of BCCI going into liquidation before the maturity of the loan. Mr Roy suggested that this could be catered for by incorporating provisions for the Notan loan to become immediately repayable in the event of the commencement of any winding up of BCCI. The reason for Mr Roy's request was that the second loan that had been applied for was required for the period of one year. This appears from a memorandum signed by Mr Roy and Mr Basu dated November 22, 1983, which was obviously going to be sent to the Head Office of SBI in Bombay, seeking approval of the proposals. The memorandum, after setting out the terms of the proposed second loan, concludes with the following statement:

> 'We understand informally that because of certain common ownership interests BCCI cannot lend to NTIL. On the other hand, on account of repercussion on their balance sheet, BCCI cannot concede a lien on the deposits placed by them.'

44. Before this memorandum could be sent, there were obviously further discussions with Mr Puri, and Mr Roy had made a number of annotations on the document, including one to the effect that after discussions with BCCI and NTIL the maturity of the second loan was to be co-terminous with the existing loan: *i.e.* January 31, 1984. Mr Roy's manuscript note then goes on as follows:

> 'As this will take us beyond the balance sheet date of BCCI, NTIL will arrange with BCCI for liening the funds if they want an extension of the loan thereafter.'

Mr Basu was asked about this and said that he was unwilling to commit SBI to a loan for as long as a year without a formal lien over the deposit. He thinks that Mr Roy then approached BCCI, who repeated that they would not be able to grant a lien over their funds and would therefore settle for a loan that was co-terminous with the first loan. Mr Roy's evidence was that he did not personally discuss the question of a lien for the second loan with BCCI, but that Mr Chaturvedi may have done so. In any event the conclusion of the discussion was that the proposal for a one-year loan was dropped. Mr Purle asked Mr Roy how he was able to reconcile the reference in his manuscript note to BCCI providing a lien over the deposit in the event of a loan beyond the January 1, 1984, date, given that it was unwilling to provide one in respect of a loan up until then. His explanation of his note was simply that, following discussions with Mr Basu, it was clear that SBI as a bank was not prepared to grant a loan for a period of a year without the security of a lien. It was prepared to do so for a limited period of time and understood BCCI's reluctance to grant a lien, which it would have to record in its balance sheet. Once the year-end was over, the immediate problem of disclosure of any such lien in the balance sheet would be postponed. It would then be a matter for BCCI to decide whether it was prepared to provide that kind of security. Mr Roy accepted that there would be difficulties about that, for the reasons I have already referred to, but it would be a matter of choice for Notan and BCCI. I think that this exchange merely confirms what is evident from the documents, which is that BCCI had told SBI that it would not grant a lien the existence of which it would have to disclose in its year-end accounts, and Mr Roy's note about what would have to be the position after January 31, 1984, is simply a reflection of SBI's view of the matter, rather than based on any indication from BCCI that its position about a lien would change once the year-end was over. That is, I think, evident from the fact that the proposal for a one-year loan was dropped when Mr Basu insisted on the grant of a lien.

45. Mr Roy was asked about two other matters arising out of the November 22 memorandum. The first is the reference to the difficulties caused by common ownership. It was put to him by Mr Purle that this was the first reference to such a problem, but Mr Roy thought that it might have been in the minds of SBI as a result of some earlier discussion, although he could not be sure about it. I do not think anything very much turns on this, Mr Purle did not suggest to Mr Roy that it was an invention on his part, and I therefore have to assume that it emerged from discussions at that time either between Mr Puri and himself or between Mr Puri and Mr Chaturvedi. Either way, the information that there were common ownership issues

© 2003 Sweet and Maxwell Ltd

would have been quite consistent with what SBI already knew about the controlling interests in Notan. The second point on which Mr Roy was pressed were the reasons why no proper explanation was asked for or received in relation to the request for the second loan. The note of November 22 gives no indication of the reasons behind the request, nor are any contained in Notan's letter of December 2, 1983, which was sent to Mr Roy to confirm the arrangements that had been agreed in relation to the second loan. Mr Roy's evidence in cross-examination was that he could not recall the details of any explanation and accepted that he really made no enquiries into what the reasons were. He was told that the moneys were required for trading purposes, but nothing more than that. Mr Purle put it to him that the doubling of the loan to US$40 million was a significant increase in Notan's borrowing which called for an explanation. The explanation which Mr Roy gave was that because SBI was to receive a further guarantee from BCCI, coupled with the deposit and the right of set-off, the short-term loan to January 31, 1984, posed no significant credit risk to the bank, and it was no more necessary to enquire into the purposes of the loan than it had been in relation to the first transaction. It goes without saying that neither banking expert was prepared to support that view, but as I have already emphasised, this case is not about whether Mr Roy and SBI measured up to the standards of the reasonably competent banker. It seems to me that Mr Roy's attitude towards the second loan is entirely consistent with his attitude to the first, and I am not satisfied that it is any more probative of knowledge on the part of SBI that it was becoming involved in a fraud.

46. The same also goes for the speed with which the two loans were disbursed. SBI did not wait for Head Office approval, nor even (in the case of the first loan) for Linklaters' confirmation that the documents were in order. This seems to me extremely sloppy and is obviously open to criticism. Mr Roy said that Notan urgently required the money for transactions and that certain oncoming payments had to be made. Mr Chaturvedi seemed less certain of the reason for the first loan to be drawn down by November 1, but that had always been the basis of the arrangements. But again all this has to be considered in the light of Mr Roy's perception that SBI was not at risk, and although it may cast doubt on his competence as a banker, it is not, in my judgment, proof of fraud. He was clearly anxious to assist Notan and BCCI and, by so doing, to make a profit for SBI at no risk to itself. Corners were cut in the process, but I do not regard the only possible explanation for this as an anxiety on SBI's part to assist BCCI in its fraudulent purpose.

47. Linklaters were instructed to act and on December 2 sent to Mr Chaturvedi a draft of the facility letter, together with a draft guarantee to be provided by BCCI. Both documents were in substantially the same form as those used in relation to the first transaction. In the same letter Mr Johnson-Gilbert advised Mr Chaturvedi that it was important that an opinion be obtained from Luxembourg lawyers to the effect that BCCI had the power to enter into the guarantee and had taken all necessary action to authorise its execution. He offered to draft an appropriate form of an opinion which could be given. The only changes to the facility letter and to the guarantee were the incorporation of provisions making the loan to Notan repayable in the event of the presentation of a petition for the winding up of BCCI. The same event would trigger the liability under the guarantee. As Mr Johnson-Gilbert explained in his letter of December 2, these changes were made to ensure that, in the event of liquidation, SBI would have a debt presently due from that bank, so as to be able to rely on its statutory right of set-off under what was then s.31 of the Bankruptcy Act 1914. The guarantee was executed in this form.

48. On December 6, 1983, Mr Basu was able to write to the Head Office of SBI in Bombay advising them that the London Office had granted another loan of US$20 million to Notan, which would be disbursed on December 15. Once again the letter concludes by saying that in view of Notan's urgent requirement for the funds, approval had been given in anticipation of Head Office sanction. On December 14 Mr Akbar sent a telex to Mr Sahota of SBI confirming that the deposit of $20 million in respect of the second loan had been remitted to SBI's Citibank account in New York. On the same day Mr Puri delivered a letter on Notan headed notepaper addressed for the attention of Mr Roy, which enclosed the accepted copy of the facility letter

and the other documents relevant to the transaction, together with a letter of instruction for payment of the second loan. Mr Roy said that he did not see this letter because it would have gone either to a clerk in his department or to Mr Chaturvedi. Mr Chaturvedi accepts that he probably received the letter from Mr Puri with most of the enclosures, except for the letter of instruction in respect of the drawdown of the loan. As in the case of the first loan, he says that this letter was not given to him, but went straight to the Foreign Exchange Department. He had not seen it and therefore did not know that Mr Akbar had signed it. These answers were essentially a continuation of his earlier evidence about the first payment instruction and I give them no more credence. But for the same reasons that I have already given, I am not able to draw the inference that these answers are indicative that Mr Chaturvedi at least was aware that he was staring at a fraud. Similarly the fact that the payment instruction did not designate a sub-account was consistent with what had been done in relation to the earlier drawdown. The funds were remitted to BCCI's account with the Bank of America on December 15 and both loans were repaid from the same source when they fell due on January 31, 1984. One of the matters relied upon by the liquidators is the fact that the source of repayment was the same, but I attach no more importance to that than to the fact that the moneys were paid to the BCCI Bank of America account in the first place. Repayment from that source was entirely consistent with the way that the transaction had been handled at the time of drawdown. Nor does it in fact matter if repayment from the Bank of America account had the effect of converting SBI's view of the transaction from a legitimate one to a fraud. By then the transaction had already taken place and knowledge at that stage would be too late to fix SBI with any liability under s.213.

**Repercussions with head office**

49. Of some considerable interest in this action is the way in which the London branch reacted to what happened when the Head Office of SBI in Bombay discovered that the loans had been sanctioned without its authority. Under the bank's regulations (which I need not go into for purposes of this claim) loans of the size we are dealing with, granted without fixed security, could not be authorised even by Mr Basu under delegated authority. It was necessary for the approval of the Head Office to be obtained. Mr Basu and those under him clearly found this tiresome and considered that SBI's procedures in this respect were archaic and ill-suited to dealing with commercial business in the City of London. He is probably right about that, although it is worth recording that had those procedures been followed, it is unlikely that either of the loans in this case would have been made. The main complaint about having to obtain approval from Bombay was that it took a considerable period of time. The London Office therefore adopted a practice, which was followed in this case, of approving the loans in advance of any sanction from India and seeking to obtain retrospective approval for what had been done. This was not, however, appreciated by Head Office and on December 1 they sent a telex to the London Office stating that even in urgent cases it ought to be possible for Mr Basu to get in touch with them and to obtain clearance over the phone. The letter goes on to refer to Mr Johnson-Gilbert's opinion of November 10, and in particular his recommendation that the approval of the BCCI board should have been obtained for the provision of the guarantee and that the guarantee should have been registered under the Companies Act as a charge. The letter records the view of Head Office that these are important requirements and that SBI's interests would not be adequately protected unless they had been complied with. Head Office asked for confirmation that that had been done. The letter then goes on to deal with the second loan and notes from the London Office's letter of December 6 that this had also been disbursed. The comments made in relation to the first loan are stated to apply equally to the second. They then refer to the London Office's note of November 22 and to the possibility of an extension of the first loan on maturity, subject to a lien being noted on the relevant deposit. The letter concludes with these words:

**© 2003 Sweet and Maxwell Ltd**

> 'We do not quite understand the balance sheet problem BCCI are reportedly having in permitting us to note a lien on the deposit. Please clarify and note that no further exchange should be permitted without our prior approval.'

There was no immediate reply to the questions raised in this letter and the Head Office sent a number of chasers in early January. As they explained in their letter of January 14, they needed to know whether the issues raised by Linklaters & Paines had been dealt with before putting up the two loans to the central board for approval. Further chasers were sent on January 18 and 23 and again on February 2. Mr Basu said that it was a busy time in London and that they had to prioritise their work. He denied deliberately waiting until the Notan loans had been repaid before replying, but it is, I think, significant that very soon after the loans had been repaid, on January 31, a telex was sent to the Head Office in Bombay stating that repayment had been made and that the London Office would be writing a detailed reply to the issues raised in the Head Office telex. It must have been clear to Mr Basu and the others that the Head Office of the bank was extremely concerned about the sanctioning of loans of this size without its prior approval. It was obviously going to be easier to deal with their criticisms once the loans had been repaid.

50. I have already referred to the letter of February 9, 1984, which Mr Basu sent to Head Office dealing with the points of detail raised in their letter. As already explained, this was drafted by Mr Roy and then amended after consultation with Mr Basu and Mr Iyer. By the time this letter was written, the proposal for renewing the loans on maturity had evaporated, and Mr Roy removed from his draft a passage which would have read:

> 'Now that the year-end is over we are persuading them to offer a formal lien over the funds for any rollover of the loan to NTIL, in which event of course BCCI's guarantee would have to be dispensed with.'

Mr Roy was asked whether he had spoken to anybody at BCCI to confirm whether or not they wished to continue either of the loans after maturity. He said that he had not done so and that his only concern at this time was that there should have been repayment of the two existing loans. There is no real evidence that there was any serious discussion about continuing the loans by this time, although it is clear, as I have already indicated, that Mr Basu was not prepared to contemplate a long-term facility without a lien being granted over the deposits.

51. The explanation given in this letter of a number of matters is not entirely satisfactory. On p.3 of the letter Mr Basu states that the loan documents were vetted by officials in the London Office and were also seen by Linklaters & Paines, both of which statements are true. However, it then goes on to say that it was only after receipt of the solicitors' confirmation that the documents were in order that the loan was disbursed, and a copy of Linklaters' letter of November 3 is enclosed. As I have already recorded in this judgment, it is quite clear that the loan moneys were in fact disbursed before Linklaters had confirmed that the documents were in order and no explanation of the reasons for this is given. The real reason, however, for the hasty and somewhat slapdash way in which the loan was disbursed can be found in Mr Roy's response to Head Office's questions about security. He explains on the second page of his letter that BCCI was unwilling to grant a lien over the deposits and for the same reason it would have resisted registration of the right of set-off as a charge. On the same page he also makes the point that Linklaters' advice to obtain a formal board resolution of BCCI authorising the guarantee would have been an unusual step and was not customary amongst banks in the City. This accords with the expert evidence given in this case and it is no surprise that Mr Roy decided that some form of self-certification by BCCI of its authority, coupled with the execution of the guarantee by Mr Akbar and other authorised signatories, was sufficient. I think that the key to his thinking is contained in the first main paragraph of the letter, where he says this:

> 'The loan to NTIL has been deemed to be secured by the guarantee of BCCI and we have stated in our note dated the 22nd November 1983 that an exposure of US$40 million on BCCI could be regarded as a fair banking risk. The matching deposits initially placed with us by BCCI were therefore purely for the purpose of enabling us to fund the asset in

our books. Before disbursing the second tranche of the US$20 million we requested our solicitors to examine whether in the highly unlikely event of BCCI failing to meet its guarantee obligations in case NTIL did not repay the loan, the deposit could be set off against BCCI's liability under the guarantee, i.e. could the deposit supplement and not supplant the guarantee. The second paragraph of the solicitors' letter of 10th November 1983 clearly bears this out. As such the "conditions/reservations" of the solicitors were dealt, bearing in mind that BCCI's guarantee rather than the matching deposits were the security for the loan, for if we had deposits charged to the bank, the guarantee of BCCI would be superfluous and the advance would fall within the financial powers of this office.'

52. As indicated earlier, it seems to me that the real key to SBI's willingness to cut corners, such as the usual enquiries into Notan's creditworthiness or the purposes of the loan, was that the entire credit risk was seen to lie with BCCI and not with SBI. From the very start it was made clear that a lien over the deposits was not an option, but absent the possibility of the liquidation of BCCI (which it is not suggested that SBI should have anticipated) the guarantees provided as much security as SBI could reasonably require, and this was ultimately the view of Linklaters themselves.

53. Having dealt with the points of detail about the loan transactions raised by Head Office, Mr Basu wrote a second letter, also dated February 9, dealing with the reasons why the London Office had gone ahead without prior Head Office sanction. He refers to a practice, extending over a number of years, of the London Office sanctioning and disbursing loans and advances in excess of its discretionary powers, in anticipation of sanction, and says that it had been assumed that this practice has had the blessing of Head Office. It is unnecessary for me to comment on any of that, because it is not directly relevant to the issues which I have to decide. The only significant passage in this letter is the one already quoted earlier in this judgment, which describes the advances to Notan as virtually risk-free in the light of the guarantee of BCCI and the ability to exercise the right of set-off against the matching deposits. On May 7, 1984, Head Office responded, saying that they were not prepared to allow the practice of sanctioning large advances without prior approval, but on May 23 the central board at the bank confirmed the actions of the London branch in respect of the two Notan loans.

**Expert banking evidence**

54. I have already referred to and commented on a number of aspects of this expert evidence, but there is one other aspect of it which I need to mention. The experts were asked to give their views on a series of questions, one of which (question 12) refers to para.84(a) of the points of defence, which refers to SBI having been given, and having accepted, two reasons why BCCI could not lend directly to Notan: *i.e.*

(i) that there were shareholding interests in BCCI SA which overlapped with shareholding interests in Notan; and

(ii) that there were balance sheet constraints affecting BCCI SA.

The experts were asked to comment on these reasons alleged for BCCI SA's inability to lend directly to Notan and SBI's acceptance of that, having regard to the perspective of a bank operating normally and honestly in the City of London in 1983. What I think this question was intended to probe was whether SBI, if honest, would have accepted these as valid for BCCI not being able to make a direct loan. In relation to the overlapping or common shareholdings, Mr Reynolds says that the terms used do not convey a clear and unambiguous meaning and that a bank operating normally would have wished to have known more about what was actually involved. Without such an explanation, a bank operating normally in 1983 would, in his opinion, have declined to consider the proposal further because of the size and complexity of the transactions. In para.12.3 he goes on to say that, in the unusual circumstances of this case, a bank operating normally would also not have assumed that overlapping or common

© 2003 Sweet and Maxwell Ltd

shareholdings was a genuine reason for BCCI not being able to lend direct, and that an explanation in those terms would not have been seen as a legitimate and honest reason for the transactions that in fact were put into place. In relation to 'balance sheet constraints' Mr Reynolds in his report says that this is a generalised term and could have meant one of a number of things. The meaning most likely to come to the mind of a bank operating normally in 1983 would be that BCCI had insufficient capital to permit it to make the loans directly to Notan, either because its capital was already fully deployed or because to do so would risk contravening the capital adequacy guidelines laid down by its regulatory authorities. He therefore accepts that at least the reference to balance sheet constraints was not, on its face, implausible. But he then sets out his view that, when analysed, this reason was not in fact credible. In 1980 the Bank of England had issued a discussion paper entitled 'Measurement of Capital', which set out the framework for calculating what was described as a 'risk asset ratio' as an indication of a bank's capital adequacy. The paper proposed that various classes of assets would be risk-weighted and that a bank's capital would be expressed as a percentage of the bank's risk-weighted assets. In the case of a direct loan, therefore, the risk asset ratio would fluctuate, depending on whether the loan made had a high weighting, as being relatively high-risk (for example to a private sector borrower) or was classified as a lower-risk loan (for example a loan to a local authority). The paper also proposed that the risk-weight of assets should not be limited to loans, but should include guarantees and other contingent liabilities. However, in respect of this type of liability there was a lower weighting, which in 1983 was 50 per cent. The paper also proposed that connected lending should be weighted at 150 per cent and property lending at 200 per cent. The 50 per cent weighting for guarantees was anomalous in regulatory terms, in the sense that (as Mr Rex points out in his report) a bank could, for example, guarantee £200 million worth of loans by other banks to one of its customers, when on the basis of a 100 per cent weighting for direct loans it could only lend £100 million directly. This anomaly was subsequently removed by the Banking Supervision Directive BSD/1988/03, which was issued in October 1988 and included 100 per cent weighting for 'direct credit substitutes' including guarantees. The weightings for connected and property lending were reduced to 100 per cent.

55. Mr Reynolds accepts that in 1983 guarantees had this lower weighting, but expresses the opinion that the concession would not have been available in a case such as the present one, where the bank was not only guaranteeing the loan but also securing the loan with its own matched funding. He believes that, had BCCI discussed the matter with the Bank of England, its liability under the guarantees would have been weighted at 100 per cent. From this he infers that BCCI's reference to balance sheet constraints making a direct loan to Notan impossible would not, to the knowledge of SBI as a normal and honest bank, have been credible. Mr Rex takes a slightly different approach to this matter. His position is that if one assumes that SBI studied the transaction in relation to the capital adequacy guidelines in force at the time, it would have seen that there were obvious advantages, from BCCI's point of view, in structuring the transaction by means of a guarantee rather than by means of a direct loan. Looked at in that way, the explanation given would have been credible. He also says that in his experience there was always a certain amount of regulatory arbitrage by banks nearing their year-end, and gives an example in his recollection that Japanese banks often requested customers to move borrowings to foreign banks which accepted the loans against a guarantee provided by the Japanese banks in substitution for their own lending. However, he makes the additional and important point that the level of understanding of capital adequacy issues varied widely amongst bankers in 1983, and that in his experience some bankers were often reluctant to go deeply into capital adequacy issues with their counterparts, if only out of a reluctance to display their own lack of understanding. There is nothing in the evidence in this case to suggest that Mr Roy or Mr Chaturvedi cross-examined Mr Akbar or anybody else at BCCI as to what their balance sheet problems were. On the contrary, the liquidators' main complaint is that they failed to make any such enquiries. On that basis I am quite unable to accept Mr Reynolds' hypothesis that the reference to connected shareholdings and to balance sheet constraints

would have struck Mr Roy or anybody else at SBI as an incredible explanation for the absence of a direct loan. Nor, in fact, do I accept Mr Reynolds' hypothesis that the concessionary weighting of 50 per cent would not have attached to this transaction in the light of the provision of the matching deposits. In terms of risk, the bank's liability under its guarantee was precisely the same, whether or not it had provided funds which would be exposed to SBI's right of set-off in the event of a default by Notan. Everybody accepts that BCCI would have had no alternative but to have paid under its guarantee in that event, regardless of whether the deposits had been in place. Moreover during the course of his cross-examination by Mr Potts, Mr Reynolds accepted in terms that there was nothing wrong with a bank seeking to structure a transaction in such a way as to give it a 50 per cent rather than a 100 per cent weighting for capital adequacy purposes. I do not therefore see how it can be said, on the facts of this case, that the explanation given to SBI of the reasons why BCCI could not lend direct should have alerted SBI to the likelihood that it was dealing with a fraud.

**Conclusions**

56. For these reasons the claim fails and will be dismissed.

(*Order accordingly*)

**© 2003 Sweet and Maxwell Ltd**

# *R v Grantham* [1984] QB 675

A powers of an arbitrator under clause 35, or its equivalent in other standard forms of contract, will reduce the length of the lists. I say this because our view, if accepted, will virtually give any party a right of veto on any attempt to bypass the arbitration clauses. They will be able to point out that they are thereby being deprived of the benefit of the special powers of the arbitrator under those clauses and they will accordingly have a very strong claim to a stay under section 4 of the Arbitration Act 1950 unless B they voluntarily join in a submission to the official referee as an arbitrator. If this reduction in the length of the lists does not occur or seems unlikely to occur, urgent consideration should be given to conferring upon the official referees a power analogous to that contemplated by section 92 of the County Courts Act 1959 [power of judge to refer to arbitration] to enable the official referees, whether sitting as such or as arbitrators, to refer, or sub-refer, the "nuts and bolts" of the suit to a suitably qualified C arbitrator for inquiry and report. This would result in the official referees becoming, in effect, the construction industry court, having the same relationship to the construction industry as the Commercial Court has to the financial and commercial activities of the City of London. It could decide questions of principle which are of general interest, leaving it to the individual arbitrators to apply those principles to the details of D individual disputes.

For the reasons which I have sought to express, I would dismiss this appeal.

*Appeal dismissed with costs.*
*Leave to appeal refused.*

E *Solicitors: Ingledew Botterell Roche & Pybus, Newcastle-upon-Tyne; McKenna & Co.; Bristows Cooke & Carpmael.*

A. H. B.

F

---

[COURT OF APPEAL]

## REGINA v. GRANTHAM

G

1984 March 19, 20; 23 — Lord Lane C.J., Boreham and Stuart-Smith JJ.

*Company—Fraudulent trading—Intent—Dishonest prejudice to creditors in payment of their debts proved—Whether sufficient to establish intent to defraud—Companies Act 1948 (11 & 12 Geo. 6,* H *c. 38), s. 332(1)(3) (as amended by Companies Act 1980 (c. 22), s. 80, Sch. 2 and Companies Act 1981 (c. 62), s. 96)*

The appellant, who was a consultant in charge of a company's administration and sole authorised signatory of its cheques, was

tried with others on a count of fraudulent trading, contrary to section 332(3) of the Companies Act 1948,[1] as amended. There A
was evidence that whoever was running the business was intending to deceive or was actually deceiving a person supplying potatoes, in compliance with repeated orders, that he would be paid in 28 days or shortly thereafter and that whoever was running the company knew at the time that there was no hope of the supplier being so paid. The jury were directed that they could find dishonesty and intent to defraud if they found that the appellant B
obtained or helped to obtain credit or further credit when he knew that there was no good reason for thinking funds would become available to pay the debt when it became due or shortly thereafter. He was convicted.

On appeal against conviction on the ground that the judge had misdirected the jury in that it was for the prosecution to prove that the appellant knew at the time at which the debts were incurred that there was no reasonable prospect of the creditors C
ever receiving payment of their debts:—

*Held,* dismissing the appeal, that the direction given did not err, for on a prosecution under section 332 of the Companies Act 1948 an intent to defraud was established on proof of an intention dishonestly to prejudice the creditors in receiving payment of their debts (post, pp. 682D, 684C, 686D–E).

*Welham v. Director of Public Prosecutions* [1961] A.C. 103, D
H.L.(E.); *Reg. v. Terry* [1984] A.C. 374, H.L.(E.); *Reg. v. Sinclair* [1968] 1 W.L.R. 1246, C.A. and *Reg. v. Allsop* (1976) 64 Cr.App.R. 29, C.A. applied.

*In re William C. Leitch Bros. Ltd.* [1932] 2 Ch. 71 and *In re Patrick and Lyon Ltd.* [1933] Ch. 786 considered.

*Held,* further that, when a summing up set out evidence to be regarded with care, the direction was not invalidated by an omission expressly to label facts as potentially corroborative; and E
that, the conviction not being rendered otherwise unsafe or unsatisfactory, the appeal failed (post, pp. 684H—685A).

The following cases are referred to in the judgment:

*Leitch (William C.) Bros. Ltd., In re* [1932] 2 Ch. 71
*Patrick and Lyon Ltd., In re* [1933] Ch. 786
*Reg. v. Allsop* (1976) 64 Cr.App.R. 29, C.A. F
*Reg. v. Sinclair* [1968] 1 W.L.R. 1246; [1968] 3 All E.R. 241, C.A.
*Reg. v. Terry* [1984] A.C. 374; [1984] 2 W.L.R. 23; [1984] 1 All E.R. 65, H.L.(E.)
*Reg. v. Welham* [1960] 2 Q.B. 445; [1960] 2 W.L.R. 333; [1960] 1 All E.R. 260, C.C.A.; sub nom. *Welham v. Director of Public Prosecutions* [1961] A.C. 103; [1960] 2 W.L.R. 669; [1960] 1 All E.R. 805, H.L.(E.)
*Sarflax Ltd., In re* [1979] Ch. 592; [1979] 2 W.L.R. 202; [1979] 1 All E.R. 529 G
*White and Osmond (Parkstone) Ltd., In re* (unreported), 30 June 1960

The following additional cases were cited in argument:

*Cooper (Gerald) Chemicals Ltd., In re* [1978] Ch. 262; [1978] 2 W.L.R. 866; [1978] 2 All E.R. 49
*Cyona Distributors Ltd., In re* [1967] Ch. 889; [1967] 2 W.L.R. 369; [1967] 1 All E.R. 281, C.A. H
*Maidstone Buildings Provisions Ltd., In re* [1971] 1 W.L.R 1085; [1971] 3 All E.R. 363

[1] Companies Act 1948, s. 332(1)(3): see post, p. 680E–H.

*Reg. v. Inman* [1967] 1 Q.B. 140; [1966] 3 W.L.R. 567; [1966] 3 All E.R. A 414, C.C.A.
*Reg. v. Schildkamp* [1971] A.C. 1; [1970] 2 W.L.R. 279; [1969] 3 All E.R. 1640, H.L.(E.)

APPEAL against conviction.

The appellant, Paul Reginald George Grantham, on 17 February 1983 at the Crown Court at Northampton (Judge Francis Allen and a jury) was B convicted after a trial occupying 27 days on a count charging fraudulent trading, contrary to section 332 of the Companies Act 1948 as amended in connection with the business of a company called Belexpress Ltd. He was sentenced to 15 months' imprisonment and was made the subject of a criminal bankruptcy order. He appealed against conviction on the ground, inter alia, that the judge erred in directing the jury that they C could be satisfied that the necessary element of intent to defraud in section 332(1) had been established on proof by the prosecution that the appellant was party to the obtaining by the company of credit or further credit when he knew that there was no good reason for thinking that funds would become available to pay the debt when it became due or shortly thereafter, whereas the judge should have directed the jury that it was for the prosecution to prove that the appellant knew at the time at which the D debts were incurred that there was no reasonable prospect of the creditors ever receiving payment. Other grounds of appeal related to matters of fact and corroboration and to the conviction being unsafe and unsatisfactory.

The facts are stated in the judgment.

*Michael Beckman Q.C.* and *Andrew Bright* (assigned by the Registrar E of Criminal Appeals) for the appellant. The direction erred in relation to the intent to defraud and what it is about which the jury has to be satisfied before convicting the appellant under section 332 of the Companies Act 1948. The direction runs contrary to long-standing authorities on the intent necessary within section 332.

There is no distinction between fraudulent trading in the civil and the F criminal contexts under section 332: *per* Lord Hodson in *Reg. v. Schildkamp* [1971] A.C. 1, 12. It would be strange if it were otherwise.

A penal section is to be strictly construed. The fundamental principle is that, if there is room for doubt, that doubt is to be resolved in favour of the accused: *Schildkamp's* case p. 11; *In re Maidstone Buildings Provisions Ltd.* [1971] 1 W.L.R. 1085, 1094.

As to intent see, *In re William C. Leitch Bros. Ltd.* [1932] 2 Ch. 71, G 77, *In re Patrick and Lyon Ltd.* [1933] Ch. 786, 790–791, 792 and also *Pennington, Company Law,* 3rd. ed. (1973), p. 46.

Arrangements made by a company which envisage that creditors may not be paid either on time or shortly thereafter is not fraudulent trading, no matter how immoral others may consider it to be. Fraudulent trading requires that trading must have been carried on with the company known H to be in a state of hopeless insolvency and/or with no intention or hope on the part of those concerned that the company's creditors will ever be paid.

*In re Cyona Distributors Ltd.* [1967] Ch. 889 does not support the contrary view. *In re Gerald Cooper Chemicals Ltd.* [1978] Ch. 262, 267,

268, illustrates that "intent to defraud creditors" in section 332 requires a more specific intent than dishonesty or fraud. There must be a "no hope" situation for the necessary intent to defraud to be established.

*In re Sarflax Ltd.* [1979] Ch. 592, 599, 603, illustrates that the preference of one creditor to the detriment of another is not fraudulent trading.

Perhaps the most powerful exposition of the law on "intent to defraud" in section 332 is *per* Buckley J. in *In re White and Osmond (Parkstone) Ltd.* (unreported but see *Palmer's Company Law*, 23rd. ed. (1982), vol. 1, para. 85–84 p. 1192). There was evidence that the appellant and those concerned with the company's trading did have reason genuinely to believe that the clouds might roll away and the sunshine of prosperity shine upon them and, therefore, the necessary intent was not established.

*Jeremy Roberts Q.C.* and *Robert Glancy* for the Crown. The proper approach to "intent to defraud" in section 332 is the same as that adopted in *Welham v. Director of Public Prosecutions* [1961] A.C. 103, which concerns "intent to defraud" under section 4 of the Forgery Act 1913.

What has to be proved is an intention dishonestly to do some act to the prejudice of another. Where it can be shown that the accused has dishonestly induced the victim by some deception to act to his detriment an intent to defraud is made out: *Reg. v. Sinclair* [1968] 1 W.L.R. 1246, 1249 and *Reg. v. Allsop* (1976) 64 Cr.App.R. 29.

A company which orders goods on, say, four weeks' credit impliedly represents that its financial position is such that it is going to be able to pay in four weeks. If those running the company know (a) that the company is never going to be able to pay, or (b) that the company is not going to be able to pay for a long time after the due date, or (c) that the company does not now have funds to pay and it is a matter of chance whether it ever will, they may properly be found to be guilty of a dishonest deception in ordering the goods.

There was here ample evidence of an intention dishonestly to prejudice the interests of a creditor of the company. On the facts the direction, taken as a whole, is proper and in accordance with the law. [Reference was made to *Reg. v. Inman* [1967] 1 Q.B. 140].

*Beckman Q.C.* replied.

*Cur. adv. vult.*

23 March. LORD LANE C.J. read the following judgment of the court. On 16 February 1983 at the Crown Court at Northampton before Judge Allen and a jury, the appellant was convicted of fraudulent trading under section 332 of the Companies Act 1948. He was sentenced to 15 months' imprisonment and a criminal bankruptcy order was made against him. He now appeals against conviction by leave of the single judge.

There were three others indicted with him: David Williams, who was acquitted of fraudulent trading; Michael Williams, who was convicted of fraudulent trading and also two counts of being a bankrupt taking part in the management of a company; and James Peter Stokes, alias Charrington, who was acquitted of fraudulent trading but convicted of being a bankrupt taking part in the management of a company.

The allegation of fraudulent trading arose out of the activities of a A company called Belexpress Ltd. (hereinafter called "the company"). The period of trading was short, namely from 29 May to 25 June 1980. During that period the company bought 39 loads of potatoes from a supplier in France called Joseph Jacob. The total amount due to Jacob in respect thereof was more than £88,000.

According to the prosecution case the roles played by the various B individuals were as follows. The appellant carried on business as G. H. Roth & Co. at Thrapston, Northamptonshire, as a business consultant. He also ran a telex service called Rothco Telex Services. He bought the company "off the shelf" in 1978. It traded for a time in livestock and sustained a loss of some £2,000. Michael Williams was a bankrupt. He was involved in managing Rushden Hay and Straw Ltd., of which the appellant had been a secretary from 1977 to 1979. Stokes had dealt C unsuccessfully in potatoes and had been adjudged bankrupt in 1980. He was in debt to the tune of £8,000 to £10,000 to Wagstaff (Sandy) & Co. Ltd., importers and exporters which was run by two men, Ellis and Watts.

It was clear from the correspondence that by October 1979 the appellant, Ellis and the Williams brothers were considering dealing in potatoes. The appellant would benefit by charging consultancy fees and D also fees in respect of his telex company, Ellis by selling the potatoes and charging commission and handling charges, and Michael Williams for sundry services in connection with transporting the potatoes. Ellis introduced Stokes to the consortium, and Stokes thenceforward operated under the assumed name of Charrington. Stokes spoke French.

On 11 March 1980 the appellant registered the company as carrying E on the business of importer of root crops under the name of East Midlands Potato Co. The appellant resigned his former position in the company, but he remained the sole authorised signatory of the cheques. He was to be the "consultant" in charge of administration and holder of the purse-strings. Stokes was to do the negotiation and purchasing. The Williams brothers were to do the transportation and Ellis and Watts the onward sales on commission.

F There were two main issues to be decided. First, was this business carried on dishonestly by way of fraud upon a creditor, namely, Joseph Jacob? Secondly, if so, was the appellant party to the dishonesty and fraud?

As to the second issue, the appellant and Stokes were in conflict. Stokes's case was that the appellant had used him as a "front man," that G he had signed documents without knowing their contents or significance, and that he had severed connection with the company as soon as he realised that Jacob was not being paid. The appellant's case on the other hand was that he had no knowledge of the details of the potato dealings of the company; that at all material times he acted as no more than an administrator in accordance with instructions given to him by Stokes, the H managing director; that he remained sole signatory to the company's cheques only because Stokes was difficult to reach and had requested him so to do. He asserted that he did not know that the potatoes were being sold at a loss.

At this point it may be of interest to see the destination of such funds as came into the hands of the company. The prices realised for the potatoes sold by Jacob for £88,000 totalled £68,000. Ellis was consistently selling the potatoes for less than their purchase price and often for less than their true price. He asserted that he had nothing to do with ordering the potatoes and did not know the purchase price. His charges alone amounted to over £15,000. He remitted some £53,000 to East Midlands Potato Co. (i.e, the company). Of this £5,500 went in fees to G. H. Roth & Co. (the appellant), £825 to Rothco Telex (the appellant), over £14,000 to Rushden Hay and Straw Ltd. (Williams), and about £5,500 to the hauliers who carried the potatoes from Williams's farm to the market. Joseph Jacob was not so lucky, he only received £19,668 towards his legitimate entitlement of £88,000.

Much of the trouble was caused by the fact that within a day or two of the commencement of trading the potato market collapsed. This did not deter those who were running the company from continuing to pursue their course of purchases unabated.

There was, in short, ample evidence that the company was being operated dishonestly. Indeed had there been a charge of conspiracy laid against the appellant, it would, questions of jurisdiction apart, probably have succeeded. From the outset no, or no sufficient, capital was available. No overdraft facilities were sought. There was some suggestion in the later stages that the situation might be retrieved by trading in other commodities, or by raising a loan from a merchant bank or by introducing fresh backers, but nothing came of these suggestions.

Mr. Beckman's first complaint is that the judge misdirected the jury as to what it was upon which they had to be satisfied before convicting the appellant under section 332 of the Companies Act 1948 as amended.

Section 332(3) provides:

> "Where any business of a company is carried on with such intent or for such purpose as is mentioned in subsection (1) of this section, every person who was knowingly a party to the carrying on of the business in manner aforesaid, shall be liable on conviction on indictment to imprisonment . . ."

Section 332(1) provides:

> "If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory of the company, may, if it thinks proper so to do, declare that any persons who were knowingly parties to the carrying on of the business in manner aforesaid shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the court may direct."

The passages in the summing up which are relevant to this ground of appeal are as follows:

"As against the individual, the individual defendant, the prosecution have to prove first that he took an active part in carrying on the business. That is the first thing. They then have to prove that in doing so he had an intention to defraud creditors and thirdly they have to prove that he was acting dishonestly. . . . I go on to consider the position on the assumption that in respect of the man you are considering you answer that one in the affirmative, 'He was playing an active part.' The prosecution have then got to prove that he had an intent to defraud creditors and was acting dishonestly. Members of the jury, my direction, as a matter of law, to you with regard to what is meant by intent to defraud is this. A man intends to defraud a creditor either if he intends that the creditor shall never be paid or alternatively if he intends to obtain credit or carry on obtaining credit when the rights and interests of the creditor are being prejudiced in a way which the defendant himself knows is generally regarded as dishonest. . . . Some fraudulent traders intend from the outset never to pay or never to pay more than a fraction of the debt. If that is true in your view in this case then the intent to defraud would be made out but a trader can intend to defraud if he obtains credit when there is a substantial risk of the creditor not getting his money or not getting the whole of his money and the defendant knows that that is the position and knows he is stepping beyond the bounds of what ordinary decent people engaged in business would regard as honest.

"Members of the jury, if a man honestly believes when he obtains credit that although funds are not immediately available he will be able to pay them when the debt becomes due or within a short time thereafter, no doubt you would say that is not dishonest and there is no intent to defraud but if he obtains or helps to obtain credit or further credit when he knows there is no good reason for thinking funds will become available to pay the debt when it becomes due or shortly thereafter then, though it is entirely a matter for you this question of dishonesty, you might well think that is dishonest and there is an intent to defraud."

It is that final passage of which complaint is made. It is submitted that that direction runs counter to authorities which have emanated from the Chancery Division in respect of section 332(1) or predecessors to that section.

The first case of relevance is *In re William C. Leitch Bros. Ltd.* [1932] 2 Ch. 71, 77; Maugham J. had this to say about the corresponding provision of the Companies Act 1929:

"In my opinion I must hold with regard to the meaning of the phrase carrying on business 'with intent to defraud creditors' that, if a company continues to carry on business and to incur debts at a time when there is to the knowledge of the directors no reasonable prospect of the creditors ever receiving payment of those debts, it is, in general, a proper inference that the company is carrying on business with intent to defraud: . . ."

The same judge in the following year, in *In re Patrick and Lyon Ltd.* [1933] 1 Ch. 786, 790 reverted to the topic in the following words:

> ". . . I will express the opinion that the words 'defraud' and 'fraudulent purpose,' where they appear in the section in question, are words which connote actual dishonesty involving, according to current notions of fair trading among commercial men, real moral blame. No judge, I think, has ever been willing to define 'fraud,' and I am attempting no definition. I am merely stating what, in my opinion, must be one of the elements of the word as used in this section." A

B Basing himself principally on these two passages, Mr. Beckman submits that the judge ought to have directed the jury that it was for the prosecution to prove that the appellant knew at the time at which the debts were incurred that there was no reasonable prospect of the creditors *ever* receiving payment of their debts.

It should be noted however, in relation to the two cases just cited, that Maugham J. was expressly disavowing any intention to define "fraud." C Moreover he was not having to direct a jury in general as to the meaning of the section in question.

What the judge in the present case was doing was to direct the jury in the first passages as to the general meaning of the section and, then, in the later passage as to which complaint is made, directing the jury that it was possible for them, if they thought fit, to come to the conclusion that D the appellant was acting dishonestly and fraudulently if he realised at the time when the debts were incurred that there was no reason for thinking that funds would become available to pay the debt when it became due or shortly thereafter. We do not think that the judge was in error in this direction.

Mr. Beckman however relied further upon a passage in *Palmer's Company Law,* 23rd. ed. (1982), vol. 1, para. 85-84, p. 1192 wherein is E to be found a passage from the decision of Buckley J. in *In re White and Osmond (Parkstone) Ltd.* (unreported), 30 June 1960:

> "In my judgment, there is nothing wrong in the fact that directors incur credit at a time when, to their knowledge, the company is not able to meet all its liabilities as they fall due. What is manifestly wrong is if directors allow a company to incur credit at a time when F the business is being carried on in such circumstances that it is clear that the company will *never* be able to satisfy its creditors. However, there is nothing to say that directors who genuinely believe that the clouds will roll away and the sunshine of prosperity will shine upon them again and disperse the fog of their depression are not entitled to incur credit to help them to get over the bad time." G

We have been fortunate enough to run to earth a transcript of the whole of that judgment. The judge eventually decided in favour of the trader on the basis that, although he might have been guilty of insufficient care and supervision of his business, he could not be said, in the words of Maugham J., to have been guilty of real moral blame so as to justify the judge in saying that he ought to be liable for the debts of the company H without limit. In other words, he acquitted the trader of dishonesty—an essential ingredient to liability. In so far as Buckley J. was saying that it is never dishonest or fraudulent for directors to incur credit at a time

when, to their knowledge, the company is not able to meet all its liabilities as they fall due, we would respectfully disagree.

We are fortified in this conclusion by the speeches of their Lordships in *Welham v. Director of Public Prosecutions* [1961] A.C. 103. The case concerned the meaning of the words "intent to defraud" under section 4 of the Forgery Act 1913, but in our judgment their Lordships' observations are equally applicable to the meaning of the similar words in section 332 of the Companies Act 1948.

In *Welham's* case Lord Radcliffe said, at p. 123:

> "Now, I think that there are one or two things that can be said with confidence about the meaning of this word 'defraud.' It requires a person as its object: that is, defrauding involves doing something to someone. Although in the nature of things it is almost invariably associated with the obtaining of an advantage for the person who commits the fraud, it is the effect upon the person who is the object of the fraud that ultimately determines its meaning."

The Common Serjeant's direction in *Welham,* which was approved both by the Court of Criminal Appeal and the House of Lords, was as follows (see [1960] 2 Q.B. 445, 456):

> "They (the prosecution) have got to prove an intent to defraud, and Welham's own case is that the intention here in respect of these bogus documents was to defraud the capital issues committee by deceiving them in not preventing something which it was their duty in law to prevent . . ."

In the present case it was open to the jury to find, if not inevitable that they would find, that whoever was running this business was intending to deceive or was actually deceiving Jacob into believing that he would be paid in 28 days or shortly thereafter, when they knew perfectly well that there was no hope of that coming about. He was plainly induced thereby to deliver further potatoes on credit. The potential or inevitable detriment to him is obvious.

If further authority is required that such actions may amount to an intent to defraud, it is to be found in *Reg. v. Sinclair* [1968] 1 W.L.R. 1246. In that case the trial judge had directed the jury, at p. 1249:

> "It is fraud if it is proved that there was the taking of a risk which there was no right to take which would cause detriment or prejudice to another. . . . you have to be sure that it was deliberate dishonesty . . ."

The Court of Appeal (Criminal Division) approved that direction. In *Reg. v. Allsop* (1976) 64 Cr.App.R. 29, the Court of Appeal (Criminal Division) held that a person is guilty of fraud if he intends by deceit to induce a course of conduct in another which puts that other's economic interests in jeopardy, even though he does not intend that actual loss should ultimately be suffered by that other.

The problem seems to be resolved by the decision in *Reg. v. Terry* [1984] A.C. 374, a case which eluded the researches of counsel. There Lord Fraser of Tullybelton, in a speech with which their Lordships all agreed, said, at pp. 380–381:

23-01165-mew Doc 67-7 Filed 03/22/24 Entered 03/22/24 18:20:04 Exhibit B - Combined Cases (6) Pg 80 of 90



"*Welham* was considered by the Court of Appeal in *Manners-Astley* [1967] 1 W.L.R. 1505, where the appellant had been convicted of fraudulently using an excise licence contrary to section 17(1) of the Act of 1962 by displaying a vehicle licence issued for one vehicle on another vehicle. The Court of Appeal quashed the conviction on two grounds, one of which was that the jury had not been directed to consider whether the appellant had intended to defraud the excise by avoiding payment of the licence fee. The Court of Appeal distinguished the decision in *Welham* as being one limited to cases under the Forgery Act 1913. In taking that limited view of the decision the court were, in my respectful opinion, wrong. The speeches in *Welham* were directed to the meaning of 'intent to defraud' in general and were not limited to its meaning in the Forgery Act." A B

In the light of those considerations we conclude that the judge's directions on intent in the present case are in accordance with the law. C

Reference was made by Mr. Beckman to dicta which properly differentiate between a customer on the one hand and a creditor properly so called on the other. There can be no doubt that Jacob was a creditor and we need not therefore examine these dicta further.

Mr. Beckman further submits that the appellant had done no more than prefer himself, in the shape of Rothco Telex and G. H. Roth & Co., to another creditor, Jacob. This, he submits, on the strength of the decision of Oliver J. in *In re Sarflax Ltd.* [1979] Ch. 592, is not fraud. In that case it was held that it was not per se fraudulent within section 332 where a debtor, knowing or having good grounds to suspect that he has not and will not have sufficient assets to pay all his creditors in full, pays some but not others with the consequence that some creditor is either not paid at all or is paid a lesser proportion of his debt than that which is paid to the other creditors. D E

In the present case, however, there was a great deal more than the bare fact of preferring one creditor to another as was the case in *Sarflax*. Here Jacob was allowed or induced to continue to supply potatoes with no real prospect of being paid at the due date.

The next ground of appeal concerns corroboration. There were three individuals whose activities were sufficiently suspect to warrant some form of warning being given to the jury. First there was Stokes, who was also a defendant. The judge gave the jury an appropriate direction in regard to him, being careful to hold the difficult balance between two co-defendants in these circumstances. Secondly, there were Ellis and Watts. These two were plainly possible participants in any fraud. The judge gave an impeccable accomplice warning in respect of them. F G

The two criticisms made of the judge were these: (1) that the judge failed, having mentioned the desirability of corroboration, to direct the jury as to what might amount to corroboration; and (2) that he failed to warn the jury that one accomplice could not corroborate the other.

As to the first complaint, although the judge did not in terms refer to it as potentially corroborative evidence, he did in fact set out all such evidence in detail immediately after saying: "That is all evidence from sources which I have told you to regard with some considerable care: Mr. H

A Ellis, Mr. Watts and Mr. Charrington (Stokes). That is not, of course, the only evidence that the prosecution invite you to look at in respect of this matter. . . ." We do not take the view that an omission expressly to label the facts which follow as potentially corroborative in any way invalidates his direction.

That leaves the second complaint. In order to understand the appellant's submissions on this point it is necessary to go rather deeper into B one aspect of the facts than would normally be necessary or desirable on a point such as this.

The evidence which Ellis and Watts gave as to the organisation of the company and the roles played by the various dramatis personae added little or nothing to what was contained in the correspondence passing between the appellant and others which was already before the jury. There was only one aspect of the facts as to which their evidence might C possibly have had some effect, and that only indirectly. One of the documents before the jury was a letter dated 17 August 1980, purported to have been sent from Brittany by Stokes to the appellant. This was on the face of it a farewell letter. Stokes said to the police, and in evidence, that that was one of the documents he had been induced to sign by the appellant. The appellant on the contrary said that the letter had arrived D by post at Thrapston and that he believed it to be genuine. Stokes said it was at a meeting at the Waldorf Hotel in London that he had signed the letter at the appellant's request. The appellant said as to that, "there is considerable doubt about that in my opinion." Ellis and Watts said that there had been such a meeting at the Waldorf; that they had been at the hotel with Stokes, though they had no knowledge of what had transpired between Stokes and the appellant, or of the letter. They added nothing E one way or the other to the controversy about the authenticity of the letter.

The question of the meeting at the Waldorf Hotel formed no part of the Crown's case. It was an issue which arose between Stokes and the appellant and depended upon the view which the jury took of their evidence. It is true that in so far as it went, the evidence of Ellis and F Watts tended to support that of Stokes. We do not think, however, that in such a situation it was necessary for the judge to do more than he did in identifying the evidence which supported Stokes's account or to say that one accomplice could not corroborate another. Indeed had he done so, it might well have unfairly weighted the scales against Stokes.

Even if the judge should have warned the jury not to regard the evidence of Ellis and Watts as corroborative of each other or of Stokes, G it could have made no difference to the view which the jury took of the letter of 17 August 1980, or to the outcome of the case. If any irregularity was a material one, we would apply the proviso to section 2(1) of the Criminal Appeal Act 1968.

The final point taken on behalf of the appellant also arises out of the Waldorf incident in the following way. Stokes put no date on the meeting, H save that it was on a day in August in the early afternoon. Both Ellis and Watts put the meeting on 13 August, but in the early evening. The appellant adduced evidence, not disputed, that he could not have been at the Waldorf in the early afternoon on 13 August.

In his final speech to the jury counsel for Stokes suggested, we are told, for the first time that the meeting at the Waldorf might have been not on 13 but on 14 August. The appellant's notice of appeal complains in the following terms of that suggestion by counsel: ". . . of which no evidence had been given and with which the appellant had no opportunity of dealing by way of alibi evidence which it would have been open to him to call." No application was made to adduce such evidence. It does appear from the appellant's diary that he was in fact in London on that date in August. A B

Mr. Beckman now complains that the judge should have warned the jury that there was no evidence that the meeting took place on 14 August. We do not think that the judge was under any such obligation, nor that counsel for Stokes by making the suggestion that he did rendered the conviction unsafe or unsatisfactory.

The appeal is accordingly dismissed. C

*Appeal dismissed.*
*Application for certificate under section 33(2) of the Criminal Appeal Act 1968 adjourned.*
*Leave to appeal refused.* D

26 March. Certificate that a point of law of general public importance was involved in the decision, namely, "In a prosecution under section 332 of the Companies Act 1948 (as amended) is it sufficient to establish an intent to defraud for the prosecution to prove an intention dishonestly to prejudice the interests of creditors in receiving payment of their debts or must the prosecution prove an intention that the creditors should never be paid at all?" E

*Solicitors: Director of Public Prosecutions.*

L. N. W.

F

---

[COURT OF APPEAL]

## REGINA v. CRIPPS, *Ex parte* MULDOON AND OTHERS

G

1984 March 21; April 3 — Sir John Donaldson M.R., Fox and Stephen Brown L.JJ.

*Local Government—Election—Petition—Costs—Petitioners awarded three-quarters of "costs properly incurred" at close of hearing—Court's subsequent direction as to intention—Whether permissible under "slip rule" or otherwise—Whether commissioner functus officio—Representation of the People Act 1949 (12, 13 & 14 Geo. 6, c. 68), ss. 115(6), 125, 137(3)—R.S.C., Ord. 20, r. 11* H

The petitioners presented a local election petition alleging that the respondent, the successful candidate, and his agent had

# *R v Miles* [1992] Crim LR 657

LexisNexis



# R v Miles [1992] Lexis Citation 3932

The Times 15 April 1992, [1992] Crim LR 657

COURT OF APPEAL (CRIMINAL DIVISION)

WATKINS LJ SWINTON THOMAS AND GARLAND JJ

2 APRIL 1992

2 April 1992

Mr Barnes QC for the Appellant; Mr Nash for the Crown

**WATKINS LJ**

This appellant stood trial in the Crown Court at Southwark before His Honour Judge Anwyl Davies QC with two co-defendants called Fogg and Linsdell on 13th February 1989. A fourth defendant, Tregunna, had died in November 1988 after the committal proceedings. There were originally five counts in the indictment, but the trial proceeded on count 2 and count 5, which became count 2: the remaining counts were ordered to lie on the file, all defendants having pleaded not guilty.

Count 1 alleged an offence contrary to section 458 of the Companies Act 1985, fraudulent trading. The particulars alleged that the defendants "between the 1st day of August 1985 and the 5th day of March 1987 were knowingly parties to the carrying on of the business of FMS Financial Management Services Ltd with intent to defraud creditors."

Count 2 alleged an offence under sections 221 and 223 of the 1985 Act. The particulars were that the defendants, between the same dates, "being officers of the company known as FMS Financial Management Services Ltd knowingly and wilfully permitted default to be made by the company in that the company did not cause accounting records to be kept sufficient to show and explain the company's transactions." The prosecution provided voluntary further and better particulars of the allegation of fraudulent trading in count 1. Those numbers 1 to 8 all related to the sale of shares to an enterprise described as "GSS/I-Point" which did not exist. Those numbered 9 to 14 alleged trading with insufficient resources and wrongful use of monies in the client's account. 15 and 16 alleged false representations to FIMBRA (Financial Intermediaries Management and Brokers Regulation Association) and the Department of Trade and Industry. 17 and 18 were allegations of failure to keep proper records.

The trial lasted until 27th April 1989. Linsdell was convicted on both counts and sentenced to three years' imprisonment on each count: he was also disqualified for three years under the provisions of the Company Directors Disqualification Act 1986. Fogg was acquitted. The appellant was convicted on count 1, sentenced to 18

months' imprisonment and disqualified for two years. The jury was discharged from giving a verdict on count 2. He now appeals against conviction by leave of this court and against sentence by leave of the single judge.

Although many witnesses were called and the documentation was extensive, the prosecution case was simply that the four defendants had used the company (which will be referred to as "FMS") for the purpose of selling wholly worthless shares in the non-existent GSS/I-Point. FMS had been acquired as a "shelf" company by Linsdell, but was sold by him to Investment Capital Associations ("ICA"), a Luxembourg company controlled by three dishonest men who never stood trial, Hogeland, Meyer and Quinn. ICA, which controlled a number of other companies, needed a United Kingdom company which could be approved by FIMBRA in order to sell worthless shares in the United Kingdom and the Far East. The GSS/I-Point shares promoted by FMS were alleged to be those of a joint venture between GSS Venture Capital Corporation (incorporated in Utah, USA) and a Swedish company, I-Point, which was developing a device for testing the freshness of food. In fact, although there had been some discussions and negotiations, no company was ever formed and eventually I-Point commenced litigation against GSS in New York.

In the course of the trial, it was eventually conceded by the defendants that there had been fraud. Some £700,000 was taken from upwards of 400 members of the public. There was no evidence of any significant sums finding their way into the pockets of the three defendants, but amounts totalling approximately £800,000 had been withdrawn from FMS client account and apparently used for the purposes of the company. So far as the appellant was concerned, by the time the evidence had been completed, there were two live issues: (1) Was he a party to the carrying on of the business of FMS or was he merely a salesman taking orders from Hogeland and his associates? (2) Was he aware that the shares were worthless?

Mr Barnes QC, on behalf of the appellant, submitted that section 458 required the "person who was knowingly a party to the carrying on of the business" to have some executive or managerial responsibility. The appellant's contention was that he was a mere salesman acting on the orders of others. This, Mr Barnes said, required the judge, apart from explaining the meaning of the section, to analyse the evidence and give guidance to the jury as to what they would have to find in order to bring the appellant within the section or, alternatively, what findings would take him outside it. It was conceded for the purpose of this submission that, if properly directed, the jury could have concluded that the appellant did have some form of managerial role and was therefore "party to the carrying on of the business of FMS". But, it was contended, on the direction in fact given, the jury's verdict could equally have been based on the conclusion that a salesman's role was sufficient to establish that element of the offence and that direction was plainly wrong.

The second ground of appeal was that in a case where credibility was critically in issue, both as to dishonesty and as to the true nature of the appellant's role, the judge's direction on good character was inadequate.

The third ground of appeal arose from his direction as to dishonesty. It was submitted that the direction given was inadequate and misleading. At the very least it might have been sufficient to say, "Dishonesty is at the root of this offence." But it was submitted that the judge should have gone further and given a direction in similar terms to that given by Potter J in R v Kellard and Others where a full Ghosh direction was given.

We were referred to the history of section 458. Section 75 of the Companies Act 1928 provided: "(1) If in the course of a winding-up it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose, the court, . . . may, if it thinks proper so to do, declare that any of the directors, whether past or present, of the company who were knowingly parties to the carrying on of the business in the manner aforesaid shall be personally responsible . . .

"(3) Where any business of a company is carried on with such intent or for such purpose as is mentioned in subsection (1) of this section, every director of the company who is knowingly a party to the carrying on of the business in manner aforesaid, shall be liable on conviction on indictment to imprisonment . . ."

Subsection (5) provided that the expression "director" should "include any person who occupies the position of a director or in accordance with whose directions or instructions the directors of a company have been accustomed to act." Those provisions became section 275(1), (3) and (5) of the Companies Act 1929. By section 101 of the Companies Act 1947, there were substituted in subsection (1) of section 275 of the 1929 Act for the words, "any of the directors past or present of the company", the words "any persons" and correspondingly in subsection (3) "person" was substituted for "director of the company". The new words were consolidated into section 332 of the Companies Act 1948. Section 458 of the 1985 Act provided: "If any business of a company is carried on with intent to defraud creditors of the company or creditors of any person, or for any fraudulent purpose, every person who was knowingly a party to the carrying on of the business in that manner is liable to imprisonment or a fine, or both."

It was argued on behalf of the Crown that once "any person" was substituted for "director", the position was reached where an offence could be committed by anyone whatever their position within the company and, indeed, that the offence would not be confined even to persons within the company itself. During the course of argument, the Crown conceded that there could be many instances where persons within a company could not be said to be "party to the carrying on of the business of the company", and it necessarily follows that once this point is reached a jury will require some guidance as to where the line between being a party and not being a party to the carrying on of the business of a company has to be drawn on the facts of each case. In the course of argument, it was suggested that rather different considerations might apply to a company used from the outset for the purpose of committing fraud than to a bona fide trading company which continues trading in the face of mounting losses and the likelihood that creditors will never be repaid.

Not surprisingly, therefore, it was argued on behalf of the appellant that such variations of circumstance emphasise the necessity for careful direction on the facts of each case as to what, depending on the jury's finding of fact, may or may not amount to being a party to the carrying on of the business.

We were informed there was a remarkable dearth of authority on section 458 and its predecessors. Chronologically, such as there is, begins with Graham v Lewis (1889) 22 QBD 1which involved the construction of section 12 of the Mayor's Court (Extension) Act 1857: "Where the debt or damage claimed in any action shall not exceed £50 no plea to the jursidiction shall be allowed provided the defendant or one of the defendants shall dwell or carry on business within the City of London."

The issue was whether a solicitor's clerk could be said to be "carrying on business" within the section. It was held that he could not and although there was some discussion as to the meaning of that phrase, we do not think Graham v Lewis assists us. Mr Barnes referred to In re Maidstone Buildings Provisions Ltd [1971] 1 WLR 1085, a decision of the Vice-Chancellor in civil proceedings under section 332 of the 1948 Act. The liquidator sought an order against the directors and company secretary of the company making them personally liable for its liabilities. The company secretary applied for the proceedings to be dismissed on the grounds that they disclosed no reasonable cause of action. It was held that the expression "party to" in section 332 of the 1948 Act indicated no more that "participates in", "takes part in" or "concurs in" and involved some positive steps.

The Vice-Chancellor said at page 1092G: "So in order to bring a person within the section you must show that he is taking some positive steps in the carrying on of the company's business in a fraudulent manner.

"So far as the position of a secretary as such is concerned, it is established beyond all question that a secretary, while merely performing the duties appropriate to the office of secretary, is not concerned in the management of the company. Equally I think he is not concerned in carrying on the business of the company. On the other hand, it is well established, indeed it is obvious, that a person who holds the office of secretary may in some other capacity be concerned in the management of the company's business."

At page 1093E, he went on to say: "Counsel for the liquidator does not, I think, contend that the expression 'party to' covers everyone who has notice that the business is being carried on fraudulently. That contention, if it were

right, would lead to impossible results. But what he does say -- I think this is the substance of his argument -- is that Mr Penney in his position as secretary and financial adviser of the company and also member of the firm of the company's auditors owed a duty to the company to give them certain advice and that his omission to give that advice rendered him a party to the carrying on of the business of the company.

"I find it impossible to accept that contention. Whatever duty Mr Penney may have owed to the company, I do not think mere omission to give advice could be regarded as amounting to being a party to carrying on the business of the company."

It was not suggested that Mr Penney exercised any managerial functions and the entire case against him rested on the assertion that as financial adviser to the company, he omitted to take steps to prevent the company trading fraudulently by giving advice to the directors. R v Grantham 79 Cr App Rep 86 was a decision on whether an intent to defraud could properly be inferred on the evidence. However, Mr Barnes invited our attention to a passage at the bottom of page 91 in the judgment of the court given by Lord Lane, CJ: "In the present case it was open to the jury to find, if not inevitable that they would find, that whoever was running this business was intending to deceive or was actually deceiving Jacob into believing he would be paid in 28 days or shortly thereafter, when they knew perfectly well there was no hope of that coming about."

Emphasis is placed on "whoever was running this business".

In re Peake and Hall Ltd [1985] PCC 87 was a decision of the Chancery Division of the Isle of Man High Court based on section 259 of the Companies Act 1931: "If . . . it appears that any business of the company has been carried out with intent to defraud creditors of the company . . . the court . . . may . . . declare that any of the directors . . . who are knowingly parties to the carrying on of the business in the manner aforesaid shall be personally responsible . . . for all or any of the debts . . . of the company . . . ".

That Act further provided that the expression "director" should "include any person in accordance with whose directions or instructions the directors of a company have been accustomed to act".

The respondents were husband, wife and son. The husband and son were directors, but the wife was not. The husband suffered from ill health and took little part in running the business, but his wife took an active role, particularly in regard to the company's financial affairs. She was authorised to sign the company's cheques and also drew on her personal account for the payment of company liabilities. The son took no interest in the financial affairs of the company although he signed cheques and other documents in his capacity as director, but he worked as a salesman and took on such other tasks as needed performing. The question was whether the individual respondents were knowingly parties to the carrying on of the business of the company with intent to defraud creditors. The wife, although not a director, was held to have been a "person in accordance with whose directions and instructions the directors of a company have been accustomed to act", but the son, who was a director, was held on the evidence to have been ignorant of the fact that the company was carrying on business with intent to defraud creditors.

The learned Deemster did not expressly make a finding that the son was not a party to the carrying on of the business of the company, but he said: "He did not, however, shoulder his responsibilities as a director and did not carry out the duties imposed upon him as a director; nevertheless, I have come to the conclusion that in failing to take any interest in the financial affairs of the company he was in fact ignorant of the fact that the company was carrying on business with intent to defraud creditors. Although I do not approve of his conduct as a director, I hold that he has not been guilty of a dishonest fraud and in consequence I cannot hold him responsible personally for any of the debts of the company."

The arguments in the present case, we think, can be reduced to the following propositions:

On behalf of the appellant:

(1) On the proper construction of the words of the statute, some controlling or managerial function is required to bring a defendant within section 458. The jury were never so directed.

(2) Once it is conceded that not all those working for a company fall within section 458, if there is an issue as to whether or not a particular defendant comes within the words of the statute, the jury should be given, clear, simple guidance as to the meaning of "party to the carrying on of the business of the company" and how they should approach their decision on the facts of the particular case.

(3) The case was opened and argued on the basis that the appellant had a managerial role. The passage in the summing-up "participating, or taking part or concurring in the actual trade which is involved in the business of the particular company" widened the scope of the offence. This could have been avoided if the judge had invited counsel to address him on the law before beginning his summing-up. In the event, his departure from the basis upon which the case had been presented was a material irregularity.

For the respondent:

(1) The introduction of the words "any person" must be taken to show an intention to cast the net very wide: had it been otherwise some expression such as "concerned in the management of the company" would have been used.

(2) What amounts to the carrying on of the business must vary greatly in the circumstances of each case, typically, as between an enterprise conceived in fraud and the bona fide trading company which runs into difficulties. The man who sells bogus shares on behalf of a company acquired for the purpose of selling bogus shares is much more obviously a party to the carrying on of the business of the company than a salesman of building materials for a builder's merchant. The appellant and Linsdell could equally have been liable on the basis of a joint enterprise.

(3) The summing-up was not in vacuo, but at the end of a 37-day trial during the course of which it had been conceded that fraud was established and the question was whether any of the defendants were parties to it.

The cases to which we were referred upon the matter offer very little guidance. In our view, section 458 is designed to include those who exercise a controlling or managerial function, or who, in Lord Lane's phrase, are "running the business". A salesman who is not a manager and who sells shares he knows are worthless can be charged with offences under the Theft Act or with conspiracy.

Circumstances will vary infinitely, but we accept the force of Mr Barnes' second proposition that where there is an issue as to whether or not a defendant comes within the ambit of the section, that issue should be put to the jury together with clear guidance, appropriate to the facts of the case, as to the meaning of "party to the carrying on of the business of the company".

In this case, which has been presented on the basis that the appellant had a managerial role which he contended that he was merely a salesman acting under orders, the words used in the summing-up, particularly "concurring the trade which is involved in the business of the company" could and may very well have had the effect of broadening the scope of the offence charged in the minds of the jury. In the circumstances, we feel that the jury did not receive the guidance to which they were entitled and that given to them may have seriously misled them.

As to character, credibility was a crucial issue as has already been stated, not only on the issue of honesty or dishonesty, but also as to whether or not the appellant's account of his subordinate role was, or might be, true. The judge's summing-up on character was as follows: "A word about character. Each one of these three defendants is a person of good character; that is to say, they have never been before the courts before and never had his integrity impugned before the courts.

"How should you deal with that?

"Let us remind ourselves of this: each one of us starts the journey of life with a good character. Some, sad to say, during the course of their journey, lose it. You will give such weight to this factor with regard to each defendant as you think proper."

He added later in the summing-up at page 45E: "Miles is a person of good character. I have addressed you about that."

It was accepted on behalf of the Crown that in the circumstances of this case, a fuller direction would have been desirable. The judge summed up, of course, in April 1989 before the decisions in R v Marr 90 Cr App Rep 154; R v Cohen 91 Cr App Rep 125, and, most particularly, in R v Berrada 91 Cr, App Rep 131 which, although decided in February 1989, was not reported in the Criminal Appeal Reports until the following year. However, for many years and certainly following R v Bryant & Oxley 67 Cr App Rep 157, juries had been directed that good character is primarily relevant to credibility, but they might also take it into account in considering whether it was likely that the defendant would have committed the particular offence, although the second part of the direction was not obligatory and a matter for the discretion of the judge in each particular case.

We have had no hesitation in arriving at the conclusion that the learned judge failed to give an adequate direction on good character: the jury should at the very least have been told that the appellant's good character was relevant to his credibility and it would not have been inappropriate to add the conventional second limb of the directions, albeit this was a matter for the discretion of the judge.

Finally, as to dishonesty, the judge said at page 5E: "What about intent to defraud? Dishonesty is at the root of this offence. To expand on dishonesty I think would be insulting to your intelligence; except to remind oneself that it is probably along the lines of getting an unfair advantage, or prejudicing, or taking the risk of prejudicing another's right, knowing that you have no right to do so."

The judge then went on to direct the jury's attention to the voluntary further and better particulars of count 1. In the circumstances, it was not, in our opinion, necessary for the judge to go beyond saying, "Dishonesty is at the root of this offence." The issue was whether or not the appellant knew that the shares were worthless. He was not contending that what he did might not be regarded as dishonest by others. The judge was not, therefore, called upon to give a direction in accordance with the decision in R v Ghosh [1982] 3 WLR 110. Such a direction may well be appropriate in some cases under section 458 having regard to the precise circumstances in them and our attention was drawing to the direction of Potter J in Kellard and Others where he gave a direction in the following terms:

"(1) Consider whether on the evidence before you the defendant during the period charged acted dishonestly in relation to the trade and professional creditors by the standards of ordinary and decent people. If you consider that position has not been established on the part of a particular defendant, then that is the end of the matter and you should not convict him on the basis of his attitude to the trade or professional creditors. If you consider that he did so act, then,

(2) Consider whether that defendant must himself have realised that what he was doing was by those standards dishonest."

Suffice to say that such a direction was unnecessary here. The words added by the judge after the first sentence were, in our view, not only unnecessary, but confusing when subjected to the useful test: "Were his words clear to ordinary people?" Had this ground stood alone, it may be that this appeal could not have succeeded, but when it is taken in conjunction with the grounds relating to the unacceptably wrong character direction, if not non-direction, and the failure to provide the jury with the guidance to which they were entitled and should have received on the appellant's role and the flawed construction of section 458 allied to the facts, it reinforces our view that there were

material irregularities in the summing-up, the aggregate of which make the appellant's conviction unsafe and unsatisfactory. It must accordingly be quashed.

The appeal is allowed with the observation that it is most unfortunate in such a case as this especially that the judge did not invite counsel to address him upon the legal issues before they addressed the jury finally. If that had been done, the errors in the summing-up, or most of them anyway, would more than likely have been avoided.

Appeal allowed

---

End of Document