**UNITED STATES BANKRUPTCY COURT**                    **FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
In re:                                                                    :
                                                                          :    **Case No. 20-10132 (MEW)**
**IIG Global Trade Finance Fund Ltd. (in Official**                       :
**Liquidation)**, *et al.*,                                                :    **Chapter 15**
                                                                          :
                          Debtors.                                        :    **Jointly Administered**
-----------------------------------------------------------------------x
**IIG Global Trade Finance Fund Limited (in Official**                    :
**Liquidation)**, *et al.*,                                                :
                                                                          :
                          Plaintiffs,                                     :
                                                                          :
                          v.                                              :    **Adv. Pro. No. 23-01165 (MEW)**
                                                                          :
**International Investment Group L.L.C.**, *et al*,                        :
                                                                          :
                          Defendants.                                     :
-----------------------------------------------------------------------x

## DECISION ON DEFENDANTS' MOTIONS TO DISMISS

A P P E A R A N C E S :

PILLSBURY WINTHROP SHAW PITTMAN LLP
New York, New York
*Attorneys for Plaintiffs as to claims against International Investment Group L.L.C,*
*Trade Finance Trust, the BlueMountain Defendants, the Tennenbaum Defendants, the Elanus*
*Defendants and John Doe Subsequent Transferees*
    By: Patrick Fitzmaurice, Esq.
        John A. Pintarelli, Esq.

KOBRE & KIM LLP
New York, New York
*Attorneys for Plaintiffs as to claims against the KKR Defendants and John Doe*
*Subsequent Transferees*
    By: Zachary D. Rosenbaum, Esq.
        Rachel K. Warren, Esq.

SICHENZIA ROSS FERENCE CARMEL LLP
New York, New York
*Attorneys for Plaintiffs as to claims against Deutsche Bank Trust Company Americas*
    By: Andrew Zinman, Esq.

HOLLAND & KNIGHT LLP
New York, New York
*Attorneys for Defendant Deutsche Bank Trust Company Americas*
   By:  Franke Morreale, Esq.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
New York, New York
*Attorneys for Defendants KKR Credit Advisors (US) LLC, Corporate
Capital Trust, Inc., KKR Debt Investors II (2006) (Ireland) L.P., KKR
TRS Holdings, Ltd., and KKR-PBPR Capital Partners L.P.*
   By: Andrew J. Rossman, Esq.
      Deborah J. Newman, Esq.
      Blair A. Adams, Esq.

WILMER CUTLER PICKERING HALE AND DORR LLP
New York, New York
*Attorneys for Defendants Tennenbaum Capital Partners, LLC,
Tennenbaum Senior Loan Fund II, LP, Tennenbaum Senior Loan
Fund III, LP, Tennenbaum Senior Loan Fund IV-B, LP, and
Special Value Continuation Partners, LLC*
   By: Philip D. Anker, Esq.
      Ross E. Firsenbaum, Esq.

SELENDY GAY ELSBERG PLLC
New York, New York
*Attorneys for Assured Investment Management LLC (f/k/a
BlueMountain Capital Management, LLC and n/k/a Sound
Point Luna LLC), BlueMountain Foinaven Master Fund L.P.,
BlueMountain Loan Opportunities Master Fund L.P.,
BlueMountain Montenvers Master Fund SCA SICAV-SIF,
BlueMountain Timberline Ltd., and BlueMountain Kicking
Horse Fund L.P.*
   By: Philippe Z. Selendy, Esq.
      David S. Flugman, Esq.
      Claire O'Brien, Esq.

OFFIT KURMAN PA
New York, New York
*Attorneys for Elanus Capital Management LLC and Elanus
Capital Investment Master SPC on behalf of, and in the
name of, Elanus Capital Investments Master SP Series I*
   By: Mark A. Weissman, Esq.

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

Plaintiffs are the official liquidators of two investment funds organized under Cayman law. They seek to undo transfers that occurred in 2017 and also seek damages for alleged fraud and breaches of fiduciary duty. Defendants include International Investment Group L.L.C. ("**IIG**"), an investment advisor, and the Trade Finance Trust ("**TFT**"), an entity that was formed by IIG and that participated in transactions that are described below. Defendants also include an indenture trustee and certain noteholders (the "**Noteholders**") who were participants in a prior IIG-orchestrated financing that began in 2013 and that was paid off in 2017.[1] The parties have agreed that one of the named Noteholders (BlueMountain Credit Opportunities Master Fund I L.P.) is no longer in existence and that the claims against it may be dismissed.

---

[1]    The Noteholders included investment funds that were managed by four separate advisors:

- Assured Investment Management LLC (formerly known as BlueMountain Capital Management LLC and now apparently known as Sound Point Luna LLC) was investment manager for funds named BlueMountain Foinaven Master Fund L.P., BlueMountain Loan Opportunities Master Fund L.P., BlueMountain Montenvers Master Fund SCA SICAV-SIF, BlueMountain Timberline Ltd., and BlueMountain Kicking Horse Fund L.P. I will refer to this group as the "BlueMountain Group." As noted above, the asserted claims against BlueMountain Credit Opportunities Master Fund I L.P. are not being pursued.

- KKR Credit Advisors (US) LLC was investment manager for funds named Corporate Capital Trust, Inc., KKR Debt Investors II (2006) (Ireland) L.P., KKR TRS Holdings, Ltd., and KKR-PBPR Capital Partners L.P. I will refer to this group as the "KKR Group."

- Tennenbaum Capital Partners, LLC was investment manager for funds named Tennenbaum Senior Loan Fund II, LP, Tennenbaum Senior Loan Fund III, LP, Tennenbaum Senior Loan Fund IV-B, LP, and Special Value Continuation Partners, LLC. I will refer to this group as the "Tennenbaum Group."

- Elanus Capital Management, LLC was investment manager for Elanus Capital Investment Master SPC on behalf of, and in the name of, Elanus Capital Investments Master SP Series I.

The history of the relevant transactions, as described in the Complaint, is as follows.

In 2013, an IIG-related company named Trade Finance Funding I Ltd. ("**TFFI**") purchased a portfolio of "trade finance" loans from other IIG-related entities. TFFI raised funds by selling $220 million of notes (the "**TFFI Notes**") to the Noteholders. Deutsche Bank Securities, Inc. (a non-party) was the underwriter for the sales of the TFFI Notes, and Deutsche Bank Trust Company Americas ("**DBTCA**"), a Defendant in this proceeding, acted as the indenture trustee. TFFI entered into a Collateral Management Agreement with IIG, under which IIG managed TFFI's investments and recommended new loans for TFFI to make or purchase.

Some of the loans that TFFI purchased in 2013 were fictitious. Problems with the loan portfolio increased as time went by, and a growing number of bad loans were replaced by fictitious loans or with other nonperforming loans. By 2017, according to the Complaint, forty percent of the loans that TFFI purportedly held had come due but were in default. Investigations by DBTCA and by certain Noteholders in early 2017 allegedly revealed severe problems regarding the identities of the purported borrowers, the quality and value of the loans, and the lack of collateral that was supposed to secure the loans. These investigations allegedly made clear that IIG had lied about such matters in its prior reports to DBTCA and the Noteholders.

The Complaint alleges that, with the knowledge and substantial assistance of DBTCA and the Noteholders, IIG found new victims for its fraud in 2017. The following things happened:

A. IIG solicited new investors (the "**Investors**") to buy shares in two Cayman Island funds named IIG Global Trade Finance Fund Limited ("**GTFF**") and IIG Structured Trade Finance Fund Limited ("**STFF**"). Complaint at ¶¶ 2, 117, 129-30.

B.  IIG arranged the formation of TFT as a statutory trust under Delaware law.  *Id.* at ¶¶ 47, 140-41.  Deutsche Bank Trust Company Delaware, a non-party affiliate of DBTCA, acted as the statutory trustee.  *Id.*

C.  GTFF and STFF entered into Master Participation Agreements with TFT.  These agreements governed the terms on which GTFF and STFF would purchase "participation interests" in loans owned by TFT.  *Id.*

D.  TFT agreed to buy loans from TFFI at prices equal to the full nominal amounts of the outstanding principal and accrued interest.  *Id.* at ¶¶ 143, 157, 171.  However, many of the loans that TFT acquired were fictitious, or were in default, or were otherwise non-performing or in dispute.  *Id.* at ¶¶ 146-49, 151-52, 161-164, 174-75.

E.  TFT sold participation interests in the acquired loans to GTFF and STFF.  *Id.* at ¶¶ 143-44, 157-59, 171-72.

F.  IIG and TFT did not tell the Investors, GTFF or STFF that TFT had acquired loans from TFFI that were fictitious, and they failed to disclose the other known issues as to the underlying loan quality.  *Id.* at ¶¶ 128, 290.

G.  The Master Participation Agreements included representations by TFT to GTFF and STFF, applicable to each sale of participation interests, that TFT had "no actual knowledge" that the underlying trade finance loans were "not in full force and effect, or that any default or event of default thereunder ha[d] occurred and [was] continuing."  *Id.* at ¶ 269.  Those representations were materially false as to the participation interests that TFT sold to GTFF and STFF in 2017.  *Id.* at ¶¶ 270-71.

H.  Three separate sets of transactions occurred in June, July and August, 2017.  In each instance, GTFF and STFF used money that they had received from the Investors to

5

buy participation interests from TFT, and GTFF and STFF transferred money from their accounts to TFT to pay for those participation interests. *Id.* at ¶¶ 141, 143-44, 157-59, 171-72. Although TFT purchased loans from TFFI, the Complaint alleges that TFT transferred funds directly to DBTCA, and that TFT did so on the same days that it received monies from GTFF and STFF. *Id.* at ¶¶ 144, 160, 172. The exact sequence is not clear, but some or all of the cash transfers to DBTCA may have occurred before TFT completed the formal documentation of its acquisition of the underlying loans from TFFI.

I.    The Complaint also alleges that as part of the initial June-August transactions TFT sold participation interests in one group of loans that TFT had not acquired from TFFI. *Id.* at ¶ 172. The amounts that GTFF and STFF paid for those participation interests were not transferred to DBTCA. *Id.*

J.    DBTCA first used the monies it received to pay its own fees and expenses and the fees and expenses owed to IIG as Collateral Manager. DBTCA then distributed the rest to the Noteholders. *Id.* at ¶¶ 144-45, 160, 172-73.

There were small differences among (i) the amounts that GTFF and STFF paid to TFT for the participation interests they purchased, (ii) the amounts that TFT agreed to pay to TFFI for the underlying loans, and (iii) the amounts that TFT transferred to DBTCA. *See, e.g.*, Compl. at ¶¶ 143-44, 157-60.

The Complaint alleges that IIG engaged in other fraudulent activities in its dealings with GTFF and STFF after August 2017, including the sale of participation interests in additional loans that were non-performing or fictitious. *Id.* at ¶ 179. IIG's fraud allegedly continued until IIG became the subject of an SEC inquiry in 2018, which led to civil and criminal charges against IIG

and its principals in 2019.  *Id.* at ¶¶ 203-4, 207-9.  IIG's principals later pleaded guilty to charges that they had committed fraud.  *Id.* at ¶ 209.

GTFF and STFF are the subjects of liquidation proceedings in the Cayman Islands, and Christopher Kennedy and Alexander Lawson are the Joint Official Liquidators (the "**Liquidators**").  On February 19 and June 19, 2020, this Court entered orders that recognized the Cayman liquidation proceedings for GTFF and STFF as "foreign main proceedings" under chapter 15 of the Bankruptcy Code.

The Complaint in this adversary proceeding alleges 17 causes of action.  However, the Liquidators informed the Court at oral argument that they are not pursuing counts 7 and 15, which asserted tort and conspiracy claims under Cayman law.  The Liquidators have asserted the remaining 15 claims in three different capacities.

First, the Liquidators assert six claims (counts 1 through 6 of the Complaint) that belonged to the Investors and that the Investors have assigned to the Liquidators.  As to these claims the Liquidators stand in the shoes of the Investors.  Two of the assigned claims (counts 1 and 2) allege that the 2017 transfers made by GTFF and STFF (as transferors) to TFT (as transferee) were fraudulent conveyances under the version of the New York Debtor and Creditor Law that was in effect in 2017.  One claim (count 6) alleges that those same transfers were "undervalue" transactions that can be avoided under Cayman law.  Count 3 alleges that the Investors were the victims of a fraud perpetrated by IIG, and counts 4 and 5 allege that the Noteholders and DBTCA aided and abetted that fraud.

Second, the Liquidators have asserted seven claims (counts 8 through 14) that allegedly belong to GTFF and STFF.  As to those claims the Liquidators stand in the shoes of GTFF and STFF.  Count 8 alleges a breach of contract by TFT.  Counts 9 and 10 allege that the 2017 transfers

made by TFT (as transferor) to DBTCA (as transferee) were fraudulent conveyances under New York law, and count 14 alleges that the same transfers were "undervalue" transfers that can be avoided under Cayman law.  Count 11 alleges that IIG breached fiduciary duties that it owed to GTFF and STFF, and counts 12 and 13 allege that DBTCA and the Noteholders aided and abetted those breaches of fiduciary duty.

Third, the Liquidators have asserted two claims (counts 16 and 17) that are statutory causes of action under Cayman law.  As to these two claims the Liquidators contend that they act in their official capacities as liquidators of the GTFF and STFF estates.  Count 16 alleges that the 2017 transfers that GTFF and STFF made to TFT were undervalue transactions made with intent to defraud.  Count 17 alleges that the Defendants were knowing parties to a fraud and are liable under section 147 of the Cayman Companies Act to make such contributions to the company's assets as the Court deems proper.

IIG and TFT have not appeared or filed answers or motions, and no challenge has been posed to the sufficiency of the fraud, breach of contract and breach of fiduciary duty claims that have been filed against them in counts 3, 8 and 11 of the Complaint.  DBTCA or the Noteholders, or both, have moved to dismiss all of the other claims in the Complaint on a variety of theories.

## Pleading Standards

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, which incorporates Federal Rule of Civil Procedure 12(b)(6), permits a bankruptcy court to dismiss an adversary proceeding if a complaint fails to state a claim upon which relief may be granted.  In reviewing a motion to dismiss a court must accept the factual allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).  However, the factual allegations in a complaint must be supported by more than

mere conclusory statements. *Twombly*, 550 U.S. at 555. The allegations must be sufficient "to raise a right to relief above the speculative level" and provide more than a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "show[n] . . . that the pleader is entitled to relief." *Id.* at 679; *see also id.* at 682 (allegations in a complaint are insufficient if there is an "obvious alternative explanation" for the conduct alleged that is more "likely") (internal quotation marks and citation omitted).

If a complaint refers to agreements and other documents, it is proper for the Court to consider the documents as part of the complaint in ruling on a motion to dismiss. *Grant v. Cnty. of Erie*, 542 Fed. Appx. 21, 23 (2d Cir. 2013) ("In its review [of a Rule 12(b)(6) motion to dismiss], the court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents "integral" to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence."); *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d. Cir. 2000) (noting that it is proper to consider documents that are quoted in or attached to the complaint or incorporated in it by reference, or that plaintiffs either possessed or knew about and upon which they relied in bringing

suit); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991)

(noting that it is proper to consider a document upon which allegations are based, whether or not

it is attached to the complaint). If an allegation is belied by the terms of such documents, the

documents are controlling. *Id.*; *see also Alexander v. Bd. of Educ. of City of New York*, 648 Fed.

Appx. 118 (2d Cir. 2016) (summary order) (dismissing complaint where documents contradicted

allegations).

Rule 7009 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 9(b) of

the Federal Rules of Civil Procedure, imposes the additional requirement that allegations of fraud

must be stated "with particularity." Fed. R. Bankr. P. 7009; Fed. R. Civ. P. 9(b). In order to comply

with Rule 9(b) with respect to a common law fraud claim, the complaint must: (1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and

when the statements were made, and (4) explain why the statements were fraudulent. *Lerner v.*

*Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12

F.3d 1170, 1175 (2d Cir. 1993)). Courts have often applied a "more liberal view" when an

intentional fraudulent transfer claim is pleaded by a trustee, "since a trustee is an outsider to the

transaction who must plead fraud from second-hand knowledge." *Picard v. Cohmad Sec. Corp. et*

*al. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011).[2] In

addition, while "the fraud alleged must be stated with particularity . . . the requisite intent of the

alleged [perpetrator] of the fraud need not be alleged with great specificity." *Chill v. Gen. Elec.*

*Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (citations omitted); *see also* Fed. R. Civ. P. 9(b) ("Malice,

---

[2]    Defendants have argued that the Liquidators had access to extensive pre-Complaint
discovery pursuant to subpoenas that were served under Rule 2004 of the Federal Rules of
Bankruptcy Procedure. However, a prior discovery conference before this Court made clear
that some of the named Defendants had not produced documents, and that other document
productions likely were not complete.

intent, knowledge, and other conditions of a person's mind may be alleged generally."). Nevertheless, in order to state a "plausible" claim of fraud a plaintiff "must allege facts that give rise to a strong inference of fraudulent intent." *Lerner*, 459 F.3d at 290 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

As explained below, Defendants seek to dismiss some claims pursuant to section 546(e) of the Bankruptcy Code or based on defenses of "ratification" and "*in pari delicto*." Each of these defenses is an affirmative defense. *See Kirschner v. Robeco Cap. Growth Funds – Robeco BP US Premium Equities (In re Nine West LBO Sec. Litig.)*, 87 F.4th 130, 144 (2d Cir. 2022) (hereafter referred to as "*Nine West*") (holding that defenses based on section 546(e) are affirmative defenses); *Bearing Fund LP v. PricewaterhouseCoopers LLP (In re MF Global Holdings Ltd. Inv. Litig.)*, 611 Fed. Appx. 34, 36 (2d Cir. 2015) (holding that the *in pari delicto* defense is an affirmative defense); *LNC Invs. V. First Fid. Bank, N.A.*, 173 F.3d 454, 463 (2d Cir. 1999) (confirming that "ratification" is an affirmative defense). Defendants bear the burden of demonstrating that any of these affirmative defenses apply, and "[p]laintiffs are under no obligation to plead facts supporting or negating" the affirmative defenses. *Nine West*, 87 F.4th at 144. A motion to dismiss, based on affirmative defenses, can only be granted if facts that establish the defense as a matter of law appear on the face of the complaint or appear in materials that the Court may consider because they have been incorporated into a complaint. *Id.* at 142 (citations omitted); *see also Michael Grecco Prods., Inc. v. RADesign, Inc.*, 2024 U.S. App. LEXIS 20745 at *17–18 (2d Cir. Aug. 16, 2024) (holding it is permissible to consider whether the allegations of a complaint are by themselves sufficient to establish an affirmative defense as a matter of law); *Clark v. Hanley*, 89 F.4th 78, 93–94 (2d Cir. 2023) (same).

## <u>Discussion</u>

I.     **Whether IIG's Knowledge and Intent Are Attributable to GTFF and STFF for Purposes of All of the Claims Asserted in the Complaint and for Purposes of the Defendants' Affirmative Defenses.**

One issue that comes up repeatedly in reviewing the motions to dismiss is the extent to which IIG's alleged fraudulent intent is sufficient to show that the transfers by GTFF and STFF were made with "intent" to defraud and, if IIG's intent suffices for that purpose, whether IIG's knowledge and intent should then also be attributed to GTFF and STFF for purposes of other claims and affirmative defenses. It makes sense to discuss this issue separately before discussing the particular claims that the Liquidators have asserted.

The Complaint alleges that IIG was the investment manager for GTFF and STFF, and in that capacity IIG had discretionary authority over GTFF's and STFF's investments. Compl. at ¶¶ 183, 185. The Liquidators allege that IIG knew that the participation interests that GTFF and STFF bought were not worth what GTFF and STFF paid for them; that IIG intended to defraud the creditors of GTFF and STFF (the Investors); and that IIG's fraudulent intent should be attributed to GTFF and STFF for purposes of the Investors' intentional fraudulent transfer and undervalue claims. *Id.* at ¶ 185. More specifically, paragraph 185 of the Complaint alleges:

> Because IIG had directed the Funds' investment in the subject loans – it had discretionary investment authority over the Funds' investment – its fraudulent intent should be imputed to the Funds *for purposes of the Investor-Assignor's claims to avoid certain transfers by the Funds*.

*Id*. (emphasis added). Paragraph 324 of the Complaint similarly alleges that IIG's wrongful intent should suffice, and should be attributed to GTFF and STFF, for purposes of the Cayman law "undervalue" claim that the Liquidators have asserted in their official capacities as Liquidators. Paragraph 324 states:

> The Debtors willfully intended that the Debtor Initial Transfers would defeat the obligations owed by the Debtors to their creditors, including the Investor-

Assignors.  Mr. Hu and Mr. Silver's knowledge of IIG's fraudulent scheme is attributable to the Debtors: the Debtors made the Debtor Initial Transfers on the advice and at the direction of their investment advisor, IIG, which itself was controlled by Mr. Hu and Mr. Silver.

*Id.*

The Liquidators confirmed at oral argument that the sole basis on which they contend that the transfers of GTFF's and STFF's properties were transferred with an intent to defraud creditors is that IIG had the power to effect the transfers, so that IIG's fraudulent intent was sufficient to make the transfers intentionally fraudulent as to GTFF's and STFF's creditors.  ECF No. 60, Tr. 3/6/2024, at 51:14-20.  That explanation is consistent with the passive voice that the Complaint uses in asserting the intentional fraudulent conveyance and undervalue claims.  The Complaint alleges in counts 2, 6 and 16 that the transfers that GTFF and STFF made to TFT "were made" with the requisite intent to hinder, delay and/or defraud the creditors of GTFF and STFF.  *Id*. at ¶¶ 227, 254, 258, 322, 326; *see also id.* at ¶ 329 (alleging in the passive voice that, for purposes of a Cayman law fraudulent trading claim, the "business of the Debtors has been carried out with intent to defraud the Debtors' creditors . . .").  In other words, the Complaint alleges that transfers and other acts by GTFF and STFF were infected by IIG's wrongdoing and fraudulent intent, but it does not allege that GTFF and STFF shared that wrongful intent.

Throughout the Complaint, the "fraud" that is alleged is consistently described as that of IIG.  *Id.* at ¶¶ 1, 11, 16, 54, 63, 72, 80, 82, 88, 106, 149, 184, 185, 193, 207, 237, 241, 244, 249, 250, 271, 300, 333, 335.  There is no allegation that the directors of GTFF and STFF or other representatives of GTFF and STFF acted with a fraudulent intent, or that GTFF and STFF otherwise joined in or endorsed IIG's behavior.  The Liquidators have argued in response to the motions to dismiss that GTFF and STFF had independent directors and that those independent directors did not know that TFT had acquired loans from TFFI, or that the participation interests

13

were overvalued, or that the funds that TFT received would be transferred to DBTCA and the
Noteholders.  Other claims in the Complaint plainly assert that GTFF and STFF were victims of
IIG's wrongdoing.  Count 11 alleges that IIG breached its fiduciary duties to GTFF and STFF by
"failing to disclose that a large proportion of the loans in which the Funds invested were in
default or were fictitious, and by affirmatively misrepresenting the nature and quality of the loan
assets in the Solicitation Materials, each as described herein."  *Id.* at ¶ 290.  In short, the
Complaint alleges that IIG's "intent" is relevant for purposes of the Investors' and the
Liquidators' challenges to the transfers that GTFF and STFF made, but at the same time it
alleges that GTFF and STFF were victims of IIG's wrongdoing, rather than being willing and
knowing participants in it.  *Id.* at ¶¶ 289-91.

Defendants have argued that these allegations nevertheless should be treated as allegations
that for all purposes GTFF and STFF are chargeable with IIG's knowledge, acts and fraudulent
intent, so that (in the Defendants' view) the Complaint should be treated, for purposes of a motion
to dismiss, as having alleged that GTFF and STFF were knowing participants in a fraud.  As a
result, Defendants argue that many of the claims that the Liquidators have asserted are barred.
Defendants have argued, for example, that as a matter of law GTFF and STFF should be deemed
to have "ratified" TFT's transfers to DBTCA because GTFF and STFF are chargeable with IIG's
knowledge.  *See* Part III(B), below.  Defendants have also alleged that GTFF's and STFF's claims
that the Defendants aided and abetted IIG's breaches of fiduciary duty are barred by the *in pari
delicto* doctrine and the *Wagoner* rule, because IIG's wrongdoing should be attributed to GTFF
and STFF.  *See* Part VII(B), below.  However, the legal issues surrounding the attribution of IIG's
knowledge, conduct, and intent are not nearly so simple as the Defendants' arguments suggest.

The rules regarding the attribution of "intent" for purposes of a fraudulent transfer claim are not well-developed.  However, there is authority for the proposition that the wrongful intent of an agent is sufficient to support the assertion of an intentional fraudulent conveyance claim, so long as the agent was in the position to cause the disposition of a transferor's property.  *See Kirshner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*, 2017 U.S. Dist. LEXIS 3039, at *17-18 (S.D.N.Y. Jan. 6, 2017).  There is also authority for the proposition that an agent's wrongful intent is sufficient to support a fraudulent transfer claim where the agent causes a transaction to occur, even if in the course of obtaining a company's consent the agent deceives the other directors of the company and acts against the company's interest.  *See, e.g., Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litig. Inc.),* 2023 Bankr. LEXIS 2584, at *24 (Bankr. Del. Oct. 19, 2023) (fraudulent intent of a CEO would be imputed to a debtor for purposes of a fraudulent transfer claim even though the CEO lied to a majority of directors and obtained their innocent approval through the CEO's own fraud).  The foregoing decisions support the proposition that the wrongful intent of an agent or employee is sufficient to support the assertion of a claim of intentional fraudulent transfer or intentional fraudulent conveyance if the guilty actor had the power to make the transaction happen.  Defendants have not challenged that proposition in their motions to dismiss.

There is considerable logic in saying that from the perspective of the Investors (whose claims are asserted in counts 1, 2 and 6), and from the perspective of statutory liquidators (who act for creditors and whose claims are asserted in count 16), GTFF and STFF are responsible for their agent's wrongdoing, so that creditors and their representatives should be able to assert intentional fraudulent transfer claims so long as IIG had the power to make the transactions happen and so long as IIG acted with the requisite wrongful intent.  However, the Complaint also alleges that IIG

deceived GTFF and STFF.  It is difficult to understand why the rights of creditors and their representatives to assert an intentional fraudulent transfer claim, based on IIG's wrongful acts and intent, should also bar GTFF and STFF from suing IIG itself for IIG's deceptions and breaches of fiduciary duty.  It is also difficult to understand why the attribution of a deceptive agent's motive for purposes of the Investors' fraudulent conveyance claims against GTFF and STFF should mean that for all other purposes GTFF and STFF automatically should be treated as though they actually possessed all of the knowledge that IIG is alleged to have concealed from them.

Defendants argue, for example, that GTFF and STFF should be treated as having "ratified" the transfers that TFT made to DBTCA and the Noteholders.  "Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding." *In re Adelphia Recovery Tr.*, 634 F.3d 678,691 (2d Cir. 2011).  Here, "ratification" is asserted on the theory that IIG's knowledge should be attributed to GTFF and STFF.  It has long been settled, however, that the knowledge of an agent who defrauds a principal is not attributed to the victimized principal.  *See Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985) ("when an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person, the presumption that knowledge held by the agent was disclosed to the principal fails because he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose"); *Hartford Accident & Indem. Co. v. Walston & Co. Inc.*, 21 N.Y.2d 219, 226 (1967) (company is not charged with the knowledge of an employee who stole its property or otherwise acted in hostility to the company's interests); *Otsego Aviation Serv. v. Glens Falls Ins. Co.*, 277 A.D. 612, 617-19 (N.Y. App. Div. 3d Dept. 1951) (knowledge of insurance agent is not imputed to insurance company where the agent undertakes to act for both parties or otherwise to act in conflict

to the insurance company's interests). As the New York Court of Appeals held in *Benedict v. Arnoux*, 154 N.Y. 715 (1898):

> It affirmatively appears in the case that Booth [the principal] knew nothing of the transaction. It is claimed, however, that the knowledge of his agent is imputable to him. This is true to a limited extent; so long as the agent acts within the scope of his employment in good faith, for the interest of his principal, he is presumed to have disclosed to his principal all the facts that come into his knowledge as agent; but just as soon as the agent forms the purpose of dealing with his principal's property for his own benefit and advantage, or for the benefit and advantage of other persons who are opposed in interest, he ceases, in fact, to be an agent acting in good faith for the interest of his principal, and his action thereafter based upon such purpose is deemed to be in fraud of the rights of his principal, and the presumption that he has disclosed all the facts that have come to his knowledge no longer prevails.

*Id*. at 728.

Defendants also argue that GTFF and STFF are barred, on *in pari delicto* grounds, from contending that the Noteholders and DBTCA aided and abetted IIG's breaches of fiduciary duty. The *in pari delicto* doctrine is designed to bar claims where a plaintiff is of equal or greater fault as a defendant. *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985). A paradigm case in which the *in pari delicto* defense arises is one in which a corporate officer commits accounting fraud or violates a fiduciary duty, and the corporation then seeks to sue a third party who allegedly assisted the officer's wrongdoing. Injured shareholders may be entitled to sue in such a case, but since the corporation can only act through officers and is charged with the officer's conduct, the corporation's suit against the third party may be barred. *See, e.g., Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991); *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 63 (2d Cir. 2013). Even in that paradigm case a complicated issue often arises as to whether the "adverse interest" exception applies based on the officer's abandonment of the interests of the corporation. *See, e.g., Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000); *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d at 784-5.

In this case, however, the relevant fraud and breach of fiduciary duty was allegedly committed by IIG. There is no allegation in the Complaint that any officer, director or employee of GTFF and STFF joined in IIG's fraud. Instead of alleging that GTFF and STFF were participants in IIG's breach of fiduciary duty, the Complaint alleges that GTFF and STFF were the unknowing victims of it.

GTFF and STFF may be responsible to innocent third parties (such as the Investors) for wrongs that IIG committed when it raised funds for GTFF and STFF. However, that hardly means that as a matter of law GTFF and STFF committed the breaches of fiduciary duty that IIG allegedly committed. GTFF and STFF were the victims of those alleged breaches of duty, not the perpetrators. Nor can GTFF and STFF (as the allegedly unknowing victims of IIG's misconduct) be said as a matter of law to be of "equal fault" with the Defendants, who allegedly knew of IIG's misconduct and deceptions and allegedly provided knowing and substantial assistance to IIG in committing those wrongs. If (as Defendants contend) the wrongful intent of a faithless third party investment manager were to be automatically attributed to an innocent client for all purposes, with the effect that the client itself would be deemed to have acted wrongly and to be subject to *in pari delicto* defenses in a suit against the investment manager and the manager's aiders and abettors, then an innocent client would never have any remedy for the intentional wrongs that were committed against it.

The factual and legal nuances discussed above have not been addressed in the motions to dismiss. The determination of whether the *Wagoner* rule and the *in pari delicto* doctrine should apply at all, and of whether "adverse interest" exceptions or other exceptions might apply, cannot be made as a matter of law based solely on the allegations of the Complaint. Ultimately, the Liquidators will need to be legally sound and consistent in whatever allegations they choose to

pursue regarding the extent to which IIG's knowledge, intents or purposes should be attributed to GTFF and STFF. The Liquidators argued that some of their allegations about the attributions of intent merely constituted pleading in the "alternative," although the relevant allegations are not expressly stated to have been made in the alternative. *Id.* at 27:6-11. I will be granting leave to replead as to some claims (as described below), and if the Liquidators desire to make further clarifications of their allegations regarding the attribution of IIG's wrongful intent and knowledge they will be free to do so. At this stage of the proceedings, however, the Complaint cannot be said to include factual allegations that establish – with legal certainty and for purposes of the affirmative defenses that Defendants have asserted – the notion that GTFF and STFF should be treated as wrongdoers for purposes of all of the claims asserted in the Complaint. On the whole, the Complaint plainly alleges that GTFF and STFF were IIG's victims, not its cohorts.

## II.    Section 546(e) Does Not Bar the Liquidators' Assertion of the Investors' Claims (Counts 1 and 2) Alleging that the Transfers from GTFF and STFF to TFT were Fraudulent Conveyances Under New York Law.

Counts 1 and 2 are asserted by the Liquidators in their capacities as assignees of the Investors. They allege that the transfers made by GTFF and STFF to TFT were constructively and intentionally fraudulent and should be avoided under the version of the New York Debtor and Creditor Law that was in effect at the time of the transfers. The Complaint also seeks, in the event the transfers to TFT are avoided, to recover the transfers or their value from TFT or from the subsequent transferees of TFT, including DBTCA and the Noteholders. Defendants have raised no issues as to whether New York law would permit recoveries from "subsequent" transferees in the event the transfers to TFT were avoided.

Defendants contend, however, that counts 1 and 2 are barred by sections 546(e) and 561(d) of the Bankruptcy Code. Section 546(e) provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).  Section 561(d) states that certain provisions of the Code relating to securities contracts are applicable in a case brought under chapter 15 of the Code:

> Any provisions of this title relating to securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements, or master netting agreements shall apply in a case under chapter 15, so that enforcement of contractual provisions of such contracts and agreements in accordance with their terms will not be stayed or otherwise limited by operation of any provision of this title or by order of a court in any case under this title, and to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11 of this title (such enforcement not to be limited based on the presence or absence of assets of the debtor in the United States).

11 U.S.C. § 561(d).

Defendants agreed at oral argument that if GTFF's and STFF's purchases of participation interests from TFT are viewed as stand-alone transactions then those transactions would not be subject to section 546(e).  This is because (i) the purchase of participation interests admittedly did not involve securities or securities contracts, (ii) GTFF's and STFF's payments to TFT were not "margin payments" or "settlement payments," and (iii) the payments to TFT admittedly were not payments to a "financial institution" or to any other person who was a protected party under section 546(e).  Defendants nevertheless contend that TFT was merely a nominal participant in the transactions; that the purpose behind all of the transactions was to enable the redemption of the TFFI Notes; and that as a matter of law the "relevant transfers" for purposes of Counts 1 and 2

were transfers "made by GTFF and STFF, through TFT, to DBTCA."  ECF No. 30, Noteholders'

Mem. at 17–18.  Defendants further argue that if the transfers are regarded as transfers by GTFF

and STFF "to" DBTCA or the Noteholders the transfers are protected by section 546(e).  Finally,

Defendants argue that section 546(e) applies even though claims 1 and 2 belonged to the Investors

and were assigned to the Liquidators.

Defendants' contentions require a careful journey through a host of different arguments

and authorities.  For the reasons set forth below, I disagree with Defendants' contentions regarding

the application of section 546(e) to counts 1 and 2 of the Complaint, and I deny the motions to

dismiss as to those claims.

### A.    The Allegations of the Complaint Do Not Fairly Support the Defendants' Contention that the Relevant Transfers Were Made "By" GTFF and STFF "To" DBTCA and the Noteholders.

The first step in considering Defendants' contentions is to consider just what it is that the

Complaint has alleged.  Defendants argue the Complaint itself alleges that the "relevant transfers"

were made "by" GTFF and STFF "to" DBTCA and that the transfers only passed "through" TFT.

In support of this contention the Defendants have cherry-picked the following four allegations out

of the 336 paragraph, 95-page Complaint:

- an allegation that "although TFT was the nominal purchaser of the CLO's loan assets,

    the purchase price was paid by GTFF and STFF" (ECF No. 1, Compl. at ¶ 141);

- two allegations that TFT was "created to serve as an intermediary" for TFFI's sales of

    loans (*id.* at ¶¶ 140, 186); and

- an allegation that "TFT was essentially a shell company and did not maintain

    significant cash on its balance sheet." *Id.* at ¶ 155.

Based on these allegations, Defendants contend that the Liquidators themselves have alleged that TFT was not a real participant in the underlying transactions, and that as a matter of law I should treat the Complaint as having alleged that GTFF and STFF were actually engaged in a transaction with DBTCA and the Noteholders, such that transfers from GTFF and STFF merely passed "through" TFT on their way to other parties. However, taking the above-cited allegations in isolation, and ignoring all of the other allegations in the Complaint, is not a fair reading of what the Complaint alleges.

The defendants' emphasis on the allegation that TFT was a "nominal" purchaser is taken out of context. Paragraph 141 of the Complaint alleges the following:

> Instead of selling the CLO's portfolio to GTFF and STFF directly, IIG came up with a more complex structure. TFT, a Delaware statutory trust, was formed by IIG to acquire legal ownership of the portfolio for which it paid par, in cash, for outstanding principal plus accrued interest of each loan. To fund the purchase, TFT sold 100% participation interests in the assets that it acquired to GTFF and STFF pursuant to separate but substantially identical New York law governed Master Participation Agreements, dated as of May 31, 2017 and June 30, 2017, respectively (the "Master Participation Agreements"). GTFF and STFF funded the full amount of TFT's purchase from the CLO. Thus, although TFT was the nominal purchaser of the CLO's loan assets, the purchase price was paid by GTFF and STFF. GTFF and STFF raised the funds by selling subscription interests to the Investor-Assignors.

*Id.* at ¶ 141. This description in paragraph 141 of TFT as a "nominal" purchaser was based on the fact that TFT obtained the needed funds from GTFF and STFF, and not from monies it already had. Describing TFT as a "nominal" purchaser in that sense was an odd, and probably a bad, choice of words. Nevertheless, when viewed as a whole the allegations of the Complaint make clear that the Liquidators have alleged that there was actual substance to the separate transactions in which TFT engaged and to the role that TFT played, and that TFT was not merely a "nominal" participant in them.

The Complaint alleges that TFT actually purchased a portfolio of loans from TFFI, and that TFT actually sold participation interests in those loans to GTFF and STFF. *Id.* at ¶¶ 142-43, 146, 148, 153, 157-59, 161-62, 164-65, 171-72, 174-76, 184, 192.   The Master Participation Agreements that governed the sales of the participation interests are referenced in the Complaint and were provided to the Court.   Those agreements make clear – and the Defendants' counsel acknowledged at oral argument – that the participation interests that TFT sold to GTFF and STFF pursuant to those agreements did not represent transfers of any ownership interests in the loans themselves.   The property that TFT purchased from TFFI (the loan portfolio) admittedly was different from the property rights that TFT sold to the Funds (the participation interests).   The prices that GTFF and STFF paid for participation interests also differed slightly from the prices that TFT paid for the loans it bought.   TFT was not merely a pass-through entity.   TFT purchased loans and held them in its own name as a principal; it entered into the Master Participation Agreements in its own name as a principal; it sold participation interests as a principal; and it received payments from GTFF and STFF as a principal.   It even sold participation interests in some loans that it did not acquire from TFFI.

There is no allegation in the Complaint, and there are no terms in the underlying documents that have been referenced in the Complaint, that could fairly be characterized as alleging that GTFF or STFF themselves were engaged in any transaction of any kind with DBTCA or the Noteholders. GTFF and STFF did not owe any debts to DBTCA or the Noteholders; they did not buy any property from DBTCA or the Noteholders; they did not buy loans from TFFI; they did not purchase or redeem the Notes; and they were not parties to any contracts with DBTCA or the Noteholders. The Liquidators (in response to the motion to dismiss) have argued that the independent directors of GTFF and STFF, and the Investors, did not even know that TFT was buying loans from TFFI,

or that the proceeds of GTFF's and STFF's purchases of participation interests were paid to DBTCA and to the Noteholders.

The Complaint therefore cannot fairly be interpreted as alleging that TFT merely acted as an agent for other parties or as merely a "nominal" party to a transaction that was really a deal between GTFF and STFF (on the one hand) and DBTCA and the Noteholders (on the other hand). The Complaint alleges (and the relevant agreements confirm) that TFT engaged in transactions with GTFF and STFF in TFT's own name and on TFT's own behalf. The Complaint consistently treats TFT as a separate entity against which separate claims may properly be asserted, and not just as a "nominal" party.

The Complaint also contains an allegation that TFT was at some point a "shell" company because it did not maintain significant cash balances in its accounts. *Id.* at ¶ 155. Defendants point to that allegation as though it somehow means that TFT was a fictitious entity. However, as explained above the Complaint alleges that TFT engaged (as a principal) in a series of actual transactions. It entered into contracts in its own name, and the properties that it sold to GTFF and STFF (participation interests in loans) were different from the properties that TFT purchased from TFFI. TFT may not have maintained significant cash balances of its own, but that itself does not mean as a matter of law that TFT's existence can or should be ignored, or that as a matter of law I should treat the transactions as though GTFF and STFF had dealt directly with DBTCA and the Noteholders.

Two allegations of the Complaint refer to TFT as an "intermediary." *Id.* at ¶¶ 140, 186. Defendants have latched onto the word "intermediary" as though it constitutes an admission that TFT was a mere conduit or agent. *See., e.g., Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988) (holding that a bank that merely processes a transfer of funds is just a

conduit and is not a "transferee" of funds for purposes of fraudulent transfer law); *Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 57 (2d Cir. 1997) (insurance broker who received premiums from clients and paid them to insurance companies merely performed a service for the clients and was not a "transferee" for fraudulent transfer purposes). However, referring to a party as an "intermediary" does not mean the party is an agent rather than a principal. The Liquidators have identified TFT as the "transferee" of funds that were transferred by GTFF and STFF, and it is quite plain that the Liquidators have not alleged that TFT was merely a "conduit" or an agent. There is no reasonable way that the Complaint can fairly be interpreted as alleging that GTFF's and STFF's with TFT were not stand-alone transactions.

The Complaint does allege that most of the cash that TFT obtained from GTFF and STFF was transferred by TFT to DBTCA, and then by DBTCA to the Noteholders. If so, that just means that DBTCA Noteholders were "subsequent transferees" from whom recoveries may be sought. It does not mean – especially not as a matter of law – that GTFF and STFF themselves engaged in any transactions directly with DBTCA and the Noteholders.

Section 546(e) is an affirmative defense. Defendants' arguments regarding the application of section 546(e) rest on their contentions that as a matter of law I should disregard TFT and should treat the transfers to DBTCA and the Noteholders as though they were the *initial* transfers that were made by GTFF and STFF. The Liquidators had no obligation to plead facts that would negate the applicability of section 546(e), and the defense is available on a motion to dismiss only if the allegations of the Complaint itself (and the contents of documents incorporated into the Complaint) make clear that the defense is available. That is not the case here. The allegations of the Complaint as a whole – and the actual details of the transactions as revealed in the documents that are

incorporated by reference into the Complaint – make clear that GTFF and STFF engaged in separate transactions with TFT and did not engage in any kind of transaction directly with DBTCA and the Noteholders.

> **B.** **Defendants' Contention that *Merit Management* Requires Me to Disregard the Separate Transfers to TFT, and to Collapse All of the Underlying Transactions and to Treat Them as One Transaction, are Misguided.**

Defendants argue that the Supreme Court's decision in *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366 (2018) compels me to treat the ultimate payment of funds to the Noteholders as the "overarching transfer" that the Plaintiffs seek to avoid, and that *Merit Management* further compels me to disregard any of the intervening "component" transactions that occurred.  It is important, in evaluating this contention and in responding to many of the other arguments that Defendants have made, to review the *Merit Management* decision in careful detail.

In *Merit Management*, a company named Valley View Downs, L.P. agreed to buy all of the stock of Bedford Downs Management Corp.  Valley View arranged financing by Credit Suisse and directed Credit Suisse to transfer funds to Citizens Bank of Pennsylvania, which acted as a third-party escrow agent.  The shareholders of Bedford Downs (including Merit Management) deposited their shares with Citizens Bank.  Citizens Bank then distributed the cash to the shareholders and delivered the Bedford Downs shares to Valley View.  Valley View later filed for bankruptcy, and its chapter 11 trustee sued to avoid the purchase of the Bedford Downs stock from the selling shareholders.

Section 546(e) only applies if a trustee or debtor in possession seeks to avoid a payment made by or to a covered financial institution or a financial participant in connection with a securities contract.  The purchase of stock that was at issue in *Merit Management* plainly was a securities transaction.  However, Merit Management was not a financial institution or any of the other types of entities that are protected parties under section 546(e).  Merit Management

nevertheless argued that the transfer of cash from Credit Suisse to Citizens Bank was a transfer "by" a financial institution, that the receipt of the cash by Citizens Bank also was a transfer "to" or "for the benefit of" a financial institution, and that the transfer of cash by Citizens Bank to Merit Management was a transfer "by" a financial institution, and that all of these occurred "in connection with" the securities purchase.  On that theory, Merit Management argued that section 546(e) was applicable.

The Supreme Court held otherwise.  Lower courts had labored with the question of whether Credit Suisse and Citizens Bank had been mere "conduits" in the transaction, but the Supreme Court declined to rule on that question.  Instead, the Supreme Court held that in applying section 546(e) a court should focus on "the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions." *Id.* at 378.  Since the transfer that the trustee actually sought to avoid (the purchase of shares by Valley Bank from Merit Management in exchange for cash) did not involve a transfer by or to a protected entity, section 546(e) did not apply.

The Court began by holding that section 546(e) is merely a limit on the exercise of the avoiding powers that are granted to a trustee under sections 544, 545, 547, and 548(a)(1)(B) of the Bankruptcy Code, and that its scope and meaning has to be interpreted in that context.  *Id.* at 379. The Court explained:

> The very first clause [of section 546(e)] – "Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title" – already begins to answer the question.  It indicates that §546(e) operates as an exception to the avoiding powers afforded to the trustee under the substantive avoidance provisions. See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 126 (2012). ("A dependent phrase that begins with *notwithstanding* indicates that the main clause that it introduced or follows derogates from the provision to which it refers").

*Id.*  Accordingly, the "starting point" in deciding whether section 546(e) applies is "the substantive avoiding power under the provisions expressly listed in the 'notwithstanding' clause and,

27

consequently, the transfer that the trustee seeks to avoid as an exercise of those powers." *Id.*  The

Court held that section 546(e) only offers protection if the transfer that a trustee seeks to avoid is

a transfer that "itself" is a payment to a protected party that is a settlement payment, a margin

payment or a payment in connection with a securities transaction:

> The transfer that the "trustee may not avoid" is specified to be "a transfer that
> *is*" either a "settlement payment" or made "in connection with a securities
> contract."  § 546(e) (emphasis added).  Not a transfer that involves.  Not a
> transfer that comprises.  But a transfer that is a securities transaction covered
> under § 546(e).  The provision explicitly equates the transfer that the trustee
> may otherwise avoid with the transfer that, under the safe harbor, the trustee
> may not avoid.  In other words, to qualify for protection under the securities
> safe harbor, § 546(e) provides that the otherwise avoidable transfer itself be
> a transfer that meets the safe harbor criteria.

*Id.* at 380.  The Court held, on the basis of this analysis, that "the transfer that the trustee seeks to

avoid" is the "relevant transfer for consideration of the § 546(e) safe-harbor criteria."  *Id.* at 381.

Of course, a trustee who challenges a transfer on fraudulent transfer or other avoidance

grounds must "establish to the satisfaction of a court that the transfer it seeks to set aside meets the

characteristics" that permit avoidance of the transfer.  *Id.*  A trustee therefore "is not free to define

the transfer that it seeks to avoid in any way it chooses."  *Id.*  Instead, the transfer that is identified

and challenged must be one that is avoidable under the particular avoidance powers that the trustee

invokes.  *Id.*  But if a trustee has identified a transfer that may be avoided under an applicable

avoidance power, and if that transfer itself is not one to which section 546(e) applies, then the

trustee may proceed:

> Accordingly, after a trustee files an avoidance action identifying the transfer
> it seeks to set aside, a defendant in that action is free to argue that the trustee
> failed to properly identify an avoidable transfer under the Code, including
> any available arguments concerning the role of component parts of the
> transfer.  If the trustee properly identifies an avoidable transfer, however, the
> court has no reason to examine the relevance of component parts when
> considering a limit to the avoiding power . . .

*Id.* at 382.

Finally, the Supreme Court rejected Merit Management's contention that the broad language of section 546(e) evinces a general "purpose" of protecting securities transactions. This purported "purpose," the Court held, was contrary to the plain language of the statute, which protects only securities transactions that are challenged pursuant to enumerated statutory powers and only if they are made by or to, or for the benefit of, certain covered entities. *Id.* at 385. Since the transfer that the trustee sought to avoid in *Merit Management* was "the $16.5 million Valley View-to-Merit transfer," and since the trustee did not seek to avoid "the component transactions by which that overarching transfer was executed," the Court concluded that no financial institution or other covered entity was involved in the transfer that was actually being challenged, and section 546(e) did not apply. *Id.*

Defendants argue that the *Merit Management* decision (and the reference in that decision to the "overarching transfer" that the trustee sought to avoid) compels me to collapse the entire series of transfers that occurred in this case, and compels me to ignore all of the separate sets of transfers that are alleged, in order to decide if section 546(e) applies. That is not a proper reading of *Merit Management*.

In *Merit Management*, Valley View entered into a contract to buy stock from Merit Management, and it was that transaction that the trustee sought to avoid. The trustee did not challenge any of the intervening cash transfers that were made. The words "overarching transfer" were used in *Merit Management* as a way of describing the transfer that the trustee sought to avoid in that particular case. They were not used as a command that separate transactions should always be collapsed into one.

Furthermore, the "overarching transfer" that was at issue in *Merit Management* was the purchase by the debtor (Valley Downs) of stock from Merit Management. Other parties

participated in the intermediate movement of funds at the behest of Valley Downs (Credit Suisse) or held funds and securities as agents for the parties (Citizens Bank), but the "overarching transfer" was a stock purchase to which the debtor (Valley Downs) was itself a party. In that regard, the facts in *Merit Management* differ greatly from the facts in the case before this Court. The Complaint does not allege that GTFF and STFF engaged in any transaction with DBTCA and the Noteholders, or that they were parties to any contracts with DBTCA and the Noteholders. DBTCA and the Noteholders are alleged to be *subsequent* transferees of monies that were transferred to TFT, but the actual transactions in which GTFF and STFF engaged were with TFT. The transactions with TFT were not just "intermediate steps" in some other transaction to which GTFF and STFF themselves were parties.

There is nothing in *Merit Management* that amounts to a command to look at *subsequent* transfers as though they determine the applicability of section 546(e) to the *initial* transfers that a trustee seeks to avoid. Instead, *Merit Management* quite clearly commands that in deciding whether section 546(e) applies I should look at the transfer that the plaintiff seeks to avoid and whether that transfer "itself" was a payment to a protected entity of a kind that invoked the protections of section 546(e). In this case, the Defendants are urging me to do the opposite. They acknowledge that the alleged transfers to TFT would not be subject to section 546(e), but they want me to let the Defendants re-define the transactions in order to try to bring them within the scope of section 546(e). That is exactly what the Supreme Court said in *Merit Management* that I should not do.

Defendants have cited other decisions in support of their arguments, but those cases involved facts that (like *Merit Management*) are very different from the facts in this case.

Defendants rely heavily on decisions by the Bankruptcy Court and the District Court, and a recent non-precedential summary order issued by the Second Circuit Court of Appeals, with respect to fraudulent transfer claims that were asserted in the chapter 11 bankruptcy case of Boston Generating LLC. *See Holliday v. K Road Power Mgmt., LLC (In re Boston Generating LLC)*, 617 B.R. 442 (Bankr. S.D.N.Y. 2020); *Holliday v. Credit Suisse Sec. (USA) LLC, et al.*, No. 20 Civ. 5404, 2021 U.S. Dist. LEXIS 173359 (S.D.N.Y. Sept. 13, 2021); *Holliday v. Credit Suisse Sec. (USA) LLC (In re Bos. Generating, LLC)*, No. 21-2543-br, 2024 U.S. App. LEXIS 23800 (2d Cir. Sept. 19, 2024). In the *Boston Generating* case, a holding company named EBG Holdings LLC ("EBG") and its wholly-owned subsidiary, Boston Generating, agreed to make a tender offer to holders of interests in EBG and to pay a dividend to those interest holders as part of a planned recapitalization. The transactions were financed in part by funds that Boston Generating borrowed and then transferred to EBG. EBG transferred the funds it received from Boston Generating, along with other funds that EBG had borrowed, to Bank of New York ("BONY"), and BONY used the funds to complete the recapitalization and tender offer. *In re Boston Generating*, 617 B.R. at 457.

Boston Generating and EBG later filed bankruptcy petitions. A liquidating trustee filed suit to avoid the payments that BONY had made. Defendants moved to dismiss, partly on grounds that section 546(e) barred the trustee's claims. Later, the trustee (through new counsel) filed a third amended complaint that asserted a new theory. *Id.* at 458. Although the prior versions of the complaint treated the payments that EBG and Boston Generating had made as a single set of transfers to EBG's members, the third amended complaint argued that the transfer from Boston Generating to EBG should be treated as a dividend and as a separate transfer that was subject to avoidance. *Id.* at 458–59.

31

The Bankruptcy Court rejected the new theory.  It first held that *both* EBG and Boston Generating were parties to the "Offer to Purchase" that was the basis of the tender offer.  It found, accordingly, that "the Tender Offer provides that both EBG and [Boston Generating] are offering to purchase EBG member units." *Id.* at 451.  The Bankruptcy Court also held that Bank of New York had been retained to act as a depository and agent "for both [Boston Generating] and EBG" in connection with the Tender Offer. *Id.* at 452.  Accordingly, the Bankruptcy Court found that "both EBG and [Boston Generating] were in an agency relationship with BONY for purposes of transmitting monies to tendering EBG LLC members." *Id.*  Boston Generating and EBG both retained The Bank of New York to act as Depository for shares, and "both [Boston Generating] and DBG, as BONY's customers, manifested their intent for BONY to serve as their agent in connection with a securities contract (the Tender Offer)." *Id.* at 453.  A Confidential Information Memorandum issued in connection with the transaction also stated it had been issued on behalf of both Boston Generating and EBG and that both Boston Generating and EBG were effectuating the proposed transaction. *Id.*

The liquidating trustee contended that transfers of funds by Boston Generating should be treated as "a standalone payment from BosGen to EBG of an LLC distribution" and that this alleged LLC distribution "was an isolated dividend failing outside section 546(e)'s scope, and therefore, the Trustee can avoid the BosGen Transfer." *Id*. at 485.  The Bankruptcy court rejected this contention.  It held that the underlying transaction documents made clear that Boston Generating's own transfer of funds was "a settlement payment and a transfer in connection with a securities contract," namely the tender offer to which Boston Generating was itself a party. *Id*. at 485–86.  It observed:

> The Trustee concedes that the Tender Offer was a securities contract between
> EBG and its members.  . . . However, the Tender Offer was more than a

securities contract between EBG and its members.  The Tender Offer was a contract among [Boston Generating], EBG, and EBG's members.

*Id.* at 486.  The court also held that under those particular facts, the transaction in which Boston Generating itself was actually engaged was the tender offer, and the intermediate movements of funds were just "component parts" of the transaction to which Boston Generating itself was a party. *Id*. at 492.

The foregoing facts in *Boston Generating* are nothing like the facts in this case.  Boston Generating may have been a party to a tender offer contract, but there is no allegation in the Complaint in this case, and no term of the underlying documents that are referenced in the Complaint, that could reasonably be construed as showing that GTFF and STFF were parties to any contract or transaction with DBTCA and the Noteholders.  GTFF and STFF bought participation interests from TFT; they did not buy the underlying loans, they did not purchase or redeem any Notes that TFFI had issued to the Noteholders, they were parties to no agreements with DBTCA or the Noteholders, and they engaged in no transactions with DBTCA and the Noteholders.  In fact, the only basis on which they are even alleged to have knowledge of the transactions that later occurred is the Defendants' contention that they should be charged with the knowledge that IIG had, even though the Complaint alleges that IIG was breaching its fiduciary duties to GTFF and STFF as well as perpetrating a fraud on the Investors.

The trustee in *Boston Generating* appealed to the District Court.  *Holliday*, 2021 U.S. Dist. LEXIS 173359.  The District Court affirmed the decision below, holding that the transactions needed to be viewed in context and that the Boston Generating transfer to EBG was just one component of the overall leveraged recapitalization transaction, so that the leveraged recapitalization – not the transfer from Boston Generating to EBG – should be regarded as the "overarching transfer" that was at issue.  *Id.* at *13.  The Court held that the trustee should not be

allowed to circumvent section 546(e) by "carving up an integrated securities transaction consisting of multiple component parts." *Id.*

The Second Circuit Court of Appeals recently affirmed the dismissal of the fraudulent transfer claims in *Boston Generating* in a summary order. *In re Bos. Generating, LLC*, 2024 U.S. App. LEXIS 23800 (2d Cir. Sept. 19, 2024). A summary order is without precedential effect under Second Circuit rules. *See* Second Circuit Local Rule 32.1.1(a). Nevertheless, the reasoning set forth in the decision deserves careful attention. The Court of Appeals noted (as had the Bankruptcy Court) that Boston Generating was a party to the tender offer contract and therefore was a party to the securities transaction that occurred. *Id.* at *8. It also affirmed the lower courts' holdings that Boston Generating should be treated as a "financial institution" because it used BONY as its agent in completing the recapitalization. *Id.* at *10. Under those circumstances, the courts held that it was proper to treat the leveraged recapitalization and tender offer themselves as the transactions in which Boston Generating actually was engaged, and that the liquidating trustee should not be allowed to treat the intermediate transfer to EBG as a stand-alone transaction that could be attacked as a fraudulent transfer.

I do not know enough about the underlying facts in *Boston Generating* to know whether a realistic contention could or should have been made, under *Merit Management*, that a separate transfer had occurred (either a dividend or an intercompany transfer) from Boston Generating to EBG and whether that properly could have been attacked as a fraudulent transfer. There are points in the various *Boston Generating* decisions that discuss *Merit Management* as though it prohibits courts from focusing on the "component" parts of a transaction, but that is not what *Merit Management* held. The Supreme Court held in *Merit Management* that if a trustee attacks a "component" part of a transaction the trustee must establish that the elements of a fraudulent

transfer are established, but otherwise it held that courts should look no further than the transfer that a trustee seeks to challenge.

I need not rest on this ground, however, because as noted above the facts in *Boston Generating* are far different from the facts alleged in this case. Boston Generating was itself a party to the ultimate recapitalization transaction that was at issue. There was a logical (the courts in *Boston Generating* thought compelling) basis on which to say that the recapitalization was the "real" transfer in which Boston Generating itself was engaged. In that context the *Boston Generating* courts concluded that an intermediate step in the movements of Boston Generating's funds should not be treated as separate transfer. In the case before me, by contrast, the transfers to DBTCA and the Noteholders cannot fairly be characterized as transfers made in connection with contracts or transactions to which GTFF and STFF themselves were parties. Defendants' argument is based on what other parties (IIG, DBTCA and the Noteholders) hoped to do with the funds that TFT raised. That does not mean that the transfers to DBTCA and the Noteholders were the "overarching transfers" in which GTFF and STFF themselves were participants. The Liquidators contend that GTFF and STFF did not even know how TFT intended to use funds.

Defendants also argue that the decision in *SunEdison Litig. Trust v. Seller Note, LLC (In re SunEdison, Inc.)*, 620 B.R. 505 (Bankr. S.D.N.Y. 2020) ("*SunEdison*"), compels me to collapse all of the separate transfers that are alleged in the Complaint in this case, and as a matter of law to treat the transfers that were ultimately made to DBTCA and the Noteholders as the "relevant transfers" that occurred. *SunEdison* involved a transaction by which Sun Edison, Inc. ("SUNE") and its affiliate, Terraform Power, LLC agreed to acquire equity interests in First Wind Holdings, LLC and some of First Wind's affiliates. SUNE intended to fund its portion of the purchase price by causing a newly-formed special purpose vehicle to issue notes. SUNE formed Seller Note,

LLC for that purpose.  A separate subsidiary of SUNE named Sun Edison Holdings Corporation ("Sun Edison Holdings"), which was an intermediate parent company of Seller Note, then transferred shares of Terraform Power, Inc. and Terraform Power Operating LLC to Seller Note, and Seller Note pledged those shares to an indenture trustee as collateral for the notes that Seller Note issued.  It is not clear from the decision as to just how the funds raised from the note issuance were distributed among the Sun Edison companies, but it is plain that the funds were used to complete the purchase of interests in the First Wind companies.  The purchased equity interests were then allocated among the companies in the Sun Edison family.

SUNE and SunEdison Holdings later filed bankruptcy petitions.  A litigation trust that was formed under the confirmed plan of reorganization filed suit to avoid and to recover, as constructively fraudulent, the transfer of securities that SunEdison Holdings had made to Seller Note.  The bankruptcy court dismissed the complaint, holding that the transfer was insulated from attack by section 546(e).  The court concluded that the transfer by SunEdison Holdings to Seller Note was just one step in the actual transaction that the SunEdison companies had contracted to complete, and that the relevant transfer should be considered to be "the January 2015 Transfer of [property] from SunEdison Holdings through Seller Note to Wilmington Trust to secure the repayment of the Exchangeable Notes received by the Defendants."  *Id.* at 514–15.

The facts in *SunEdison*, like the facts in *Boston Generating*, are far different from the facts in this case.  In both *SunEdison* and *Boston Generating*, courts held that various transfers were just intermediate steps in the course of a transaction to which the transferors themselves were parties. Here, as already stated above, there is no allegation in the Complaint that GTFF and STFF themselves were engaged in any transaction with DBTCA and the Noteholders.  The Defendants' arguments in this case are based on what *other* parties hoped to accomplish by their uses of the

funds that GTFF and STFF transferred to TFT.  There is no credible contention, based on the allegations of the Complaint, that GTFF and STFF themselves were parties to any transaction other than their purchases of participation interests from TFT.

I also cannot help but question the conclusion that the court reached in *SunEdison.*  It appears from the decision that it was SUNE (a separate entity) that had contracted to buy stock, but that it was SunEdison Holdings that transferred property to Seller Note.  It further appears that the purchased stock was not delivered to SunEdison Holdings, but was instead distributed to different companies.  It is not at all clear to me why the transfer of SunEdison Holdings' assets to allow other companies to complete a stock purchase should somehow insulate the transfer by SunEdison Holdings from avoidance, when the decision does not indicate that SunEdison Holdings was a party to the purchase agreement or a recipient of any of the purchased assets.

But I need not go that far in order to decide that the *SunEdison* decision does not support (let alone compel) the outcome that the Defendants seek in this case.  In *Merit Management*, as well as in *Boston Generating* and *SunEdison*, the transferors had contracted to buy or transfer stock, and the courts treated those transfers (not intermediate steps) as the relevant transfers for purposes of deciding whether section 546(e) was applicable.  The Complaint in this case does not allege that GTFF and STFF entered into any contracts with DBTCA or the Noteholders, or that GTFF and STFF purchased anything from DBTCA or the Noteholders, or that GTFF and STFF were parties to any transaction at all with DBTCA or the Noteholders.  There may have been a series of separate transfers, but there is no fair reading of the Complaint in this case that could support a contention that as a matter of law the subsequent transfers to DBTCA and the Noteholders were the "overarching" transfers to which GTFF and STFF themselves were parties.

At least two other recent decisions have rejected efforts to use *Merit Management* to protect a transaction from avoidance merely because one or more of the parties contemplated that a separate securities transaction would occur either in advance of, or after, the transfer that was challenged.  *See Halperin v. Morgan Stanley Inv. Mgmt. (In re Tops Holding II Corp.)*, 646 B.R. 617 (Bankr. S.D.N.Y. 2022) ("*Tops*"); *Greektown Litig. Trust v. Papas (In re Greektown Hldg., LLC)*, 621 B.R. 797 (Bankr. E.D. Mich. 2020) ("*Greektown*").

In *Tops*, a group of private equity funds caused a company to issue notes and then to pay the proceeds to shareholders as dividends.  When the dividends were later attacked on fraudulent transfer grounds, the defendants argued that the transfers were protected by section 546(e) because the note offerings involved protected parties and because the dividend payments were funded by, and thereby were "related to" and occurred "in connection with," the note offerings.  *Id.* at 679. Judge Drain rejected the defendants' argument that the dividends "were not standalone transfers" and that the dividends needed to be regarded as "only one element of an integrated transaction" that "started with" a safe-harbored note issuance.  *Id.* at 681.  Judge Drain held that *Merit Management* required him to focus on the transfer(s) that the plaintiff sought to avoid, and held that the challenged dividends in *Tops* did not involve protected parties or securities transactions. The defendants' contentions that the dividends were "related" to the note offerings, or that they arose out of the note offerings, or that they were funded by the note offerings, or that they were integral parts of a series of transactions that included the note offerings, were not enough to bring section 546(e) into play.  *Id.* at 685–86.

In *Greektown*, a debtor agreed to make payments to certain other parties.  The debtor sold notes in order to raise the necessary funds, and Merrill Lynch (as underwriter) purchased the notes. A liquidation trustee in Greektown's bankruptcy case alleged that the payments that the debtor

made with the proceeds of the note issuance were fraudulent transfers. The defendants argued that under *Merit Management* the transactions should be collapsed and that the relevant transfer should be deemed to be a transfer "by" Merrill Lynch to the defendants and that the transfer was "in connection with" the sales of the Notes to a financial institution (Merrill Lynch) because it was related to those sales. The court rejected that contention. It held that "[p]er *Merit Management*, the relevant transfer is the one that is identified by the trustee and is otherwise an avoidable transfer." *Id.* at 820. Since the trustee did not challenge the transaction with Merrill Lynch, and since the payments that the debtor made to other parties did not involve any financial institution, section 546(e) did not apply. *Id.* at 820–21.

The Supreme Court confirmed in *Merit Management* that in challenging a transfer a trustee must identify characteristics of a challenged transfer that actually make it subject to avoidance, and in that sense a trustee is not free to define a "transfer" in any way the trustee chooses. In this case the Complaint alleges all of the necessary elements for the avoidance of the transfers that GTFF and STFF made to TFT, and no Defendant has argued otherwise. All parties have further agreed that the transfers by GTFF and STFF to TFT, standing by themselves, are not subject to section 546(e). *Merit Management* makes clear, under these circumstances, that section 546(e) is not applicable.

### C.   IIG's Alleged "Purposes" Do Not Mean that Transfers By STFF and GTFF to TFT Were Made "For The Benefit Of" DBTCA and/or the Noteholders "In Connection With" Securities Transactions.

In their reply brief (but not in their initial motion papers) the Noteholders argued that Section 546(e) should bar counts 1 and 2 even if the transfers to TFT were regarded as the initial transferee of the transfers that STFF and GTFF made. They contend that section 546(e) applies to the avoidance of any transfer that is made "in connection with" a securities contract and that is made "for the benefit of" protected parties. They urge me, on the strength of those terms, to hold

(1) that the transfers by GTFF and STFF to TFT were "in connection with" a securities contract (even if there was no securities contract between TFT and STFF and GTFF) because IIG intended that the funds would be used in a subsequent securities transaction, and (2) that the transfers that GTFF and STFF made to TFT were "for the benefit of" DBTCA and the Noteholders because the "purpose" of GTFF's and STFF's transactions with TFT was to obtain funds that could be paid to DBTCA and the Noteholders.

Even if I were to agree with the Defendants' legal argument as to the relevance of the "purposes" of the transactions I would still deny their motion to dismiss. The "purposes" that the Defendants seek to ascribe to GTFF and STFF are the "purposes" of IIG itself. As explained above, I cannot hold, for purposes of ruling on an affirmative defense in connection with a motion to dismiss, that as a matter of law all of the "purposes" that IIG sought to accomplish should be treated as the "purposes" that GTFF and STFF themselves sought to accomplish when they purchased participation interests from TFT. GTFF and STFF bought participation interests in loans. They did not engage in transactions with TFFI or the Noteholders. The Liquidators allege that IIG deceived GTFF and STFF about the transactions, and in response to the motion to dismiss the Liquidators have argued that that the Investors and independent directors of GTFF and STFF did not even know that TFT had purchased loans from TFFI, or how TFT intended to use the funds it received.

I also disagree with the Defendants' argument about the legal significance of the "purposes" that allegedly motivated the transactions that are being challenged. A set of hypothetical examples helps to illustrate the problems in the Defendants' interpretation of the statute and how it is contrary to the Supreme Court's holdings in *Merit Management*.

Assume (as a first hypothetical case) that insolvent Party A buys a car from party B. Party A pays $30,000 for the car, but there are many defects in the car and it is actually worth only $20,000. If Party A were to enter into bankruptcy, there is no question but that a bankruptcy trustee could and would challenge the purchase of the car as a constructively fraudulent transfer, because Party A did not receive reasonably fair value for the $30,000 that Party A paid and because the transaction occurred at a time when Party A was insolvent. It is also plain that section 546(e) would not apply, as no protected parties were involved and no securities transaction occurred.

Assume (as a second hypothetical) that the facts are the same as stated above, but that Party B (without the knowledge of Party A) intends to use the proceeds to buy securities from a large brokerage firm. Would that mean, in Defendants' view, that the "overarching" transfer here was the purchase of securities? Alternatively, would it mean that the purchase of the car was "for the benefit of" the brokerage firm who received funds, because that is the "purpose" for which Party B sold the car? Defendants' counsel acknowledged during oral argument that this would not be the case. All parties agreed that the mere existence of Party B's subsequent securities transaction, and Party B's intent to engage in such a transaction, would not be enough to bring section 546(e) into play.

Assume (as a third hypothetical) that Party A knows that party B intends to use the money that he receives to buy securities from a large brokerage firm. After some hesitation, Defendants' attorneys acknowledged during oral argument that this would not be enough. *See* ECF No. 61, Tr., 3/6/24, at 49:9-50:18, 73:10-20, 75:3-10, 76:9-78:17. They acknowledged that Party A's mere knowledge that Party B intended to buy securities would not insulate the sale of the car from avoidance as a fraudulent transfer.

Defendants contended during oral argument, however, that the outcome would be different if the *purpose* of Party A's purchase of the car had been to enable Party B to buy securities. Assume (as a fourth hypothetical) that Party B got a hot stock tip and wanted to make a stock purchase but did not have the cash he needed. Assume that Party A purchased the car from Party B so that Party B would have the cash he needed to buy securities. In Defendants' view, that would change everything. It would mean that a bankruptcy trustee could no longer try to undo Party A's purchase of the car, because the purpose of Party A's purchase of the car was to enable Party B's securities transaction.

Note that under the Defendants' interpretation of the statute the avoidance of the car purchase in the fourth hypothetical would be barred *even if* Party B were perfectly solvent, and *even if* the car purchase could be undone without affecting Party B's subsequent securities transaction at all. It is hard to square this proposed result with the admitted purpose of section 546(e) and other securities safe harbors, which is to protect the financial institutions and financial participants who receive transfers in connection with securities transactions, and to prevent the insolvency of one commodity or securities firm from spreading to another based on the "complex system of accounts and guarantees" that are characteristic of the securities and commodity markets. *See Nine West*, 87 F.4th at 146 ("Interpreting the safe harbor as broadly as defendants suggest would limit the avoidance power even where it would not threaten the financial system – an expansion of the safe harbor provision likely not intended by Congress."); *see also* H.R. Rep. No. 97-420, at 2 (1982); H.R. Rep. No. 101-484, at 2 (1990); H. R. Rep. No. 109-31, pt. 1, at 130–31 (2005); H. R. Rep. No. 109-648, pt. 1, at 2, 5 (2006).

It is also impossible to square the Defendants' arguments with the clear holdings of *Merit Management*. In *Merit Management*, the defendant argued that Citizens Bank (as escrow agent)

was a financial institution that had a beneficial interest in the transferred funds, and that section 546(e) therefore should apply on the ground a transfer had been made "for the benefit" of Citizens Bank.  *Merit Mgmt. Grp. LP*, 583 U.S. 366.  The Court rejected this argument, and held that the reference in section 546(e) to transfers that were made "for the benefit of" a protected party had a different and much more limited meaning.  The Court first noted that many of the avoidance powers in the Bankruptcy Code permit a trustee to avoid transfers that are made "for the benefit of" certain parties.  *See, e.g.,* 11 U.S.C. § 547(b)(1) (defining a preference as including a payment made "to or for the benefit of" a creditor).  The Supreme Court then held that "[b]y adding the same language to the §546(e) safe harbor, Congress ensured that the scope of the safe harbor matched the scope of the avoiding powers."  *Id.* at 383.  Accordingly, if a trustee files suit on the theory that a transfer was made "for the benefit of" a creditor as part of a securities transaction, and if the creditor identified by the trustee is a protected party under section 546(e), then the defense would apply.  The Court held, however, that nothing in the "for the benefit of" language changed the proper focus of the inquiry, which was to look at the terms of the transfer that the trustee sought to avoid and the theory on which the trustee sought avoidance.  *Id.* at 383–84.  The trustee in *Merit Management* did not seek avoidance on the theory that a transfer had been made "for the benefit of" a protected party, and so that particular limitation on the trustee's powers did not apply.  *Id.*

There is no suggestion in *Merit Management* that the motivations of the parties, or the subsequent uses of funds by the parties, make any difference in defining the transfer that occurred or in determining the applicability of section 546(e).  Nor is there any suggestion that an avoidable transfer suddenly can be rendered immune from attack merely because a separate securities transaction was contemplated by one or more of the parties.

The Defendants' arguments also cannot be squared with the statutory language on which they rely.  Defendants contend, for example, that in the fourth hypothetical the purchase of the car should be deemed as having been made "for the benefit of" the financial institution that sold securities to Party B, because the proceeds of the car sale eventually were delivered to that institution.  However, the seller of the securities "benefited" from the car sale in exactly the same way in hypotheticals two and three, yet Defendants acknowledge that section 546(e) would not apply in those cases.  The intent and purposes of the *transferee* (Party B) also was the same in each example: Party B intended to buy securities and intended to pay the proceeds of the car sale to a broker, and that was the only reason why the sale of the car occurred.  Yet Defendants acknowledge that section 546(e) would not be applicable to hypotheticals two and three.

The facts in this case are even further removed from the ones set forth in the foregoing hypotheticals.  Assume, as a fifth hypothetical, that Party A and Party B share an advisor.  Assume that the advisor tells Party A to buy the car (even though the advisor knows that the car is worth less than the purchase price) because the advisor wants to help Party B to get funds for a securities transaction, though the advisor does not tell Party A any of those facts.  Defendants contend that as a matter of law the advisor's purposes in that transaction should be regarded as Party A's own purposes and that the transaction should be insulated from attack by Party A's creditors.  In effect, Party A's status as a victim of the advisor's fraud would be used to insulate a transaction that otherwise would plainly be subject to reversal as a fraudulent transfer.

None of these tortured efforts to invoke the protections of 546(e), based on IIG's "purposes," make sense.  Fraudulent transfer remedies are invoked to protect a debtor's creditors. The facts that made the car purchase fraudulent were the same in each of the five hypothetical situations described above.  If the "benefits" to a financial participant were not enough to invoke

section 546(e) in the second and third hypotheticals above, there is no reason why they should be enough to invoke section 546(e) in the fourth or fifth hypotheticals. I see no logical or statutory reason why the creditors of Party A should lose their right to challenge the constructively fraudulent purchase of the car just because Party A allegedly had a different "purpose" in the fourth hypothetical, or because Party A's advisor allegedly had such an undisclosed and disloyal "purpose" in the fifth hypothetical.

In this case, the upshot of the Defendants' argument is that the transfers that GTFF and STFF made to TFT would be immune from attack *even if* TFT were solvent and *even if* TFT were able to satisfy a judgment against it – all because the alleged "purpose" of IIG, in arranging the initial transfers from GTFF and STFF, was to obtain cash that TFT would then use to buy loans from TFFI and that would then be used to redeem the securities that TFFI had issued. If TFT still had resources, however, I cannot imagine that any party would seriously contend (or that any Court would hold) that TFT was insulated from fraudulent transfer claims based on its sales of participation interests to GTFF and STFF, merely because the funds that TFT obtained were later used in a securities transaction. As it has turned out, TFT does not actually have resources with which to satisfy a potential judgment, and so recoveries likely will have to come from TFT's subsequent transferees. But TFT's resources, and its ability to satisfy a judgment, should not make any difference in defining the "transfer" that occurred and that the Plaintiffs seek to avoid.

In the end, defendants' arguments about IIG's "purposes" are, in reality, just efforts to apply the protections of section 546(e) based on the character of the *subsequent* transfers that occurred. However, Defendants acknowledged at oral argument that section 546(e) is not a defense to a recovery action against a *subsequent* transferee. *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Madoff)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (holding that

section 546(e) does not apply to recovery actions against subsequent transferees). That acknowledged rule would be eviscerated if the Court were to adopt the Defendants' interpretation of the statute.

Defendants have acknowledged that the transfers "to" TFT were not transfers "by" or "to" parties who are protected parties under section 546(e), and the foregoing discussion disposes of the Defendants' contention that the transfers to TFT were transfers "for the benefit of" protected parties. It is therefore not necessary to consider whether the transfers to TFT were "in connection with" securities transactions. I must note, however, that there is also considerable question as to whether that element of section 546(e) would be satisfied here.

Prior decisions in this Circuit have given a broad interpretation to the words "in connection with" as it is used in Section 546(e). *See Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 421 (2d Cir. 2014) (holding that transfers made by BLMIS to its customers were transfers that were made pursuant to "securities contracts" even though Madoff had lied about the existence of the underlying securities, and observing that "[i]n the context of § 546(e), a transfer is 'in connection with' a securities contract if it is 'related to' or 'associated with' the securities contract"); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2013 U.S. Dist. LEXIS 56042 (S.D.N.Y. April 15, 2013) (holding that if an investor in a fund had asked for a redemption, and if that redemption request prompted a request by the fund for a redemption from BLMIS, then the BLMIS distribution was "in connection with" a securities transaction, and that section 546(e) is not limited to securities contracts to which the debtor/transferor was itself a party); *Picard v. Multi-Strategy Fund, Ltd.*, 657 B.R. 325, 332 (S.D.N.Y. 2022) (same). The courts in *Boston Generating* and *SunEdison* continued to cite these prior rulings, and the Second Circuit Court of Appeals recently cited favorably to them in its non-

precedential summary order that affirmed the dismissal of the *Boston Generating* complaint.  *In re Bos. Generating, LLC*, 2024 U.S. App. LEXIS 23800 at *8 n.2.

However, none of the post-*Merit Management* decisions that have continued to follow these prior Second Circuit authorities have discussed whether those authorities are consistent with the *Merit Management* decision.  In *Merit Management*, as noted above, the Supreme Court held that section 546(e) is merely a limit on the particular transfers that a trustee may seek to avoid. The Court held that section 546(e) therefore applies only if the challenged transfer is "itself" a payment to a protected person that "*is*" a settlement payment or a payment under a securities contract.  *Merit Mgmt. Grp., LP*, 583 U.S. at 380 (emphasis in original).  The Supreme Court explained that it is not enough that a transfer "involves" a securities transaction or a securities contract, or that it "comprises" part of a securities transaction or contract.  *Id.*  Instead, in order "to qualify for protection under the securities safe harbor, §546(e) provides that the otherwise avoidable transfer *itself* be a transfer that meets the safe-harbor criteria."  *Id.* at 380–81 (emphasis added).

The gist of the Defendants' argument is that a transfer is made "in connection with" a securities transaction so long as it is "related to" a separate securities transaction or if it is "prompted by" a separate securities transaction, even if the challenged transfer itself is not a securities transaction.  That is a correct description of the holdings of many prior decisions in this Circuit.  Frankly, however, I do not see how they can be squared with the Supreme Court's holding that section 546(e) does not apply unless the challenged transfer is "itself" a transfer to a protected party that "is" a settlement payment or a transfer pursuant to a securities contract.

Regardless of how that issue properly should be resolved, it suffices to say that I cannot hold as a matter of law that the transfers that GTFF and STFF made to TFT were "for the benefit

of" DBTCA and the Noteholders, and so the Defendants' arguments on this score are not grounds

for dismissal of counts 1 and 2.

> **D.      Section 546(e) Also Is Not Applicable Because the Claims Asserted in Counts 1 and 2 are the Investors' Claims and Because Section 546(e) Never Attached to Those Claims**

No matter how the transactions are characterized, section 546(e) is not applicable to the

claims asserted in counts 1 and 2 of the Complaint for an additional reason: namely, those claims

belonged to the Investors and are asserted by the Liquidators as assignees, and the restrictions of

section 546(e) never attached to those claims.

In most bankruptcy cases the trustee or debtor-in-possession has the power to assert

fraudulent transfer claims that could have been filed by creditors under state law.   11 U.S.C.

§ 544(b)(1).   A trustee or debtor-in-possession in a chapter 7, 11 or 13 case also has the power to

challenge fraudulent transfers under section 548 of the Bankruptcy Code.   11 U.S.C. § 548.   With

certain exceptions, section 546(e) limits the rights of a trustee to pursue claims under section

544(b)(1) and 548 if those claims seek to avoid transfers to protected persons in securities

transactions.   However, in these chapter 15 cases the Liquidators have no right to assert claims

under sections 544 and 548.   Counts 1 and 2 are state law fraudulent transfer claims that have been

asserted by the Liquidators in their capacities as assignees of the Investors.   They are not asserted

by reason of sections 544 or 548, or by reason of any other provision of the Bankruptcy Code, or

by reason of any analogous provision of Cayman insolvency law.

In *Merit Management*, the Supreme Court held that the entirety of section 546(e) acts as a

limitation on the powers that a trustee may assert under sections 544, 548 and other sections of the

Bankruptcy Code.   Since the claims asserted in counts 1 and 2 of this case are not asserted pursuant

to sections 544 or 548, it would appear to be clear from the Supreme Court's holding that section

546(e) is not applicable to the claims asserted in counts 1 and 2.   Defendants nevertheless argue

that section 546(e) bars the Liquidators from pursuing the claims, and that the decision by the Second Circuit Court of Appeals in *Deutsche Bank Trust Co. Ams. v. Large Private Ben. Owners (In re Tribune Co. Fraudulent Conveyance Litig.*), 946 F.3d 66 (2d Cir. 2019) ("*Tribune*"), compels this result.

The *Tribune* case arose out of a leveraged buyout that Tribune completed in 2007. In 2008, Tribune filed for bankruptcy. During the bankruptcy case, the debtor in possession had the right to pursue fraudulent transfer claims that creditors otherwise could have pursued. Section 546(a) of the Bankruptcy Code imposed a two-year limit on the estate's right to file such an action. A committee of unsecured creditors (the "Committee") was given the right to pursue such claims on behalf of the debtor's estate, and the Committee filed an action contending that payments made to shareholders pursuant to the LBO constituted intentional fraudulent transfers that were subject to avoidance under section 548(a)(1) of the Bankruptcy Code. *Id.* at 72–73. Section 546(e) does not act as a defense to claims under section 548(a)(1). *See* 11 U.S.C. § 546(e).

The Committee in the *Tribune* case did not file claims alleging that the LBO payments were "constructive" fraudulent transfers, probably because such claims would have been barred by section 546(e). Some individual creditors, however, sought an order from the bankruptcy court declaring that if the debtor and the Committee did not pursue such "constructive" fraudulent transfer claims within the two-year limitation period then the right to pursue such claims would "revert" to Tribune's creditors. The bankruptcy court lifted the automatic stay for the purpose of allowing the creditors to file such fraudulent transfer claims in their own names and capacities, but without ruling on the issue of whether they had the right to do so or as to the potential application of section 546(e). *Id.* at 73. Later, the bankruptcy court confirmed a plan of reorganization that allowed a Litigation Trust to take over and to pursue the section 548(a)(1) claims that the

Committee had filed, and that confirmed that the creditors who had filed the constructive fraudulent transfer claims could continue to pursue those claims. *Id.*

The shareholders who were named as defendants in the constructive fraudulent transfer cases that the individual creditors had filed moved to dismiss those claims. They argued that section 546(e) barred the claims, but the district court denied the motion, holding that section 546(e) only barred actions by a bankruptcy trustee and did not bar state law actions by creditors. *Id.* at 74. The initial decision on appeal from this ruling had to be reconsidered following the *Merit Management* decision, but the Second Circuit Court of Appeals ultimately reversed the District Court's order and directed the dismissal of the individual creditors' claims.

The Court of Appeals first noted that "[o]nce Tribune entered bankruptcy, the creditors' avoidance claims were vested in the federally appointed trustee *et al*." *Id.* at 83. It further held that a disposition of such a claim by a trustee "extinguishes the right of creditors to bring state law, fraudulent conveyance claims." *Id.* The Court held that individual creditors could not be authorized to pursue state law fraudulent transfer claims in their own names except as "a matter of grace granted under federal authority." *Id.* Any such permission, however, had to reflect the balancing of debtors' and creditors' rights that is set forth in the Bankruptcy Code itself. *Id.*

The Court then discussed, at great length, the individual creditors' contentions that their own fraudulent transfer claims "reverted" to them following the expiration of the two-year period during which a trustee could pursue such claims – *i.e.*, that the two-year deadline merely extinguished the trustee's control of such claims, rather than extinguishing the claims themselves. *Id*. at 84–90. The Court noted that the argument that claims "reverted" to creditors "has no basis in the Code's language" and that limitation periods ordinarily exist to limit the assertion of claims, and not merely to change the identities of the persons who can pursue the claims. *Id.* at 86. For

that reason, "[a] decisive part of appellants' legal theory thus has no support in the language of the Code." *Id.* The Court also noted the anomaly in the appellants' contention that the litigation trust could pursue an avoidance action under section 548(a)(1)(A) but that the right to challenge the very same transaction on a related legal theory (as a constructive fraudulent transfer under state law) somehow reverted to individual creditors. It noted that this purported "reversion" could just interfere with the ability of the bankruptcy trustee to negotiate a settlement or other resolution of the trustee's own challenge to a transaction. *Id.* at 87.

The Court also observed that if creditors' claims were the property of the bankruptcy estate, and were subject to section 546(e) when held in that capacity, then it would seem "counterintuitive" to say that the claims could revert to creditors "in an unaltered form" (*i.e.*, without still being subject to section 546(e). *Id.* at 88. The Court stated:

> Even passing these obstacles, the structure of the Code and the relationship of its pertinent sections might have suggested to a contemporaneous reader that altered rights do not revert to creditors unaltered, or to put it another way, a trustee <u>et al.</u> cannot pass on, or "allow" to revert through passivity, a right the trustee <u>et al.</u> does not have.

*Id.* at 90. Ultimately, however, the Court determined that it did not need to resolve issues as to whether claims "reverted" to creditors. Nor did it need to "issue a decision that affects fraudulent conveyance actions brought by creditors whose claims are not subject to Section 546(e)." *Id.* at 90. The Court reviewed the purposes of section 546(e), and held that it would undermine those purposes if a trustee could evade the section 546(e) limit just by letting a two-year period expire and by agreeing that individual creditors could pursue the claims that the trustee had previously owned and that the trustee could not have pursued. "We therefore conclude that Congress intended to protect from constructive fraudulent conveyance avoidance proceedings transfers by a debtor in bankruptcy that fall within Section 546(e)'s terms," and that any claimed right by the individual creditors to pursue their claims was pre-empted by federal law. *Id.* at 94–96.

The Court made clear in *Tribune* that it was not resolving any issues "regarding the rights of creditors to bring state law, fraudulent conveyance claims not limited in the hands of a trustee et al. by Code Section 546(e) . . ." *Id.* at 97; *see also id.* at 90.  In this case, the claims that the Plaintiffs are asserting in counts 1 and 2 of the Complaint are claims that belonged to the Investors. GTFF and STFF are "debtors" in chapter 15 cases, but sections 544 and 548 of the Bankruptcy Code do not apply in chapter 15.  11 U.S.C. § 1521(a)(7).  The right to pursue the Investors' state law claims never vested in the court-appointed liquidators for GTFF and STFF, as they had vested with the bankruptcy estate in *Tribune*.  *Tribune* holds that it would undermine the policies of section 546(e) if a claim that has vested in a trustee, and that has thereby become subject to section 546(e), could be freed from that restriction by a trustee's passivity, but that reasoning does not apply here.

Defendants nevertheless argue that *Tribune* represented a broad holding that as a matter of federal policy no debtor can assert an avoidance claim that would otherwise be barred by section 546(e), even if the right to pursue that claim never vested in a trustee and therefore never actually became subject to section 546(e).  If that had been what the Court intended to hold in *Tribune*, however, the Court would not have stressed (as it did in at least two separate times) that it was making no decision as to the applicability of section 546(e) to claims that had not previously vested in a trustee and that therefore had never become subject to the section 546(e) limitation.

Defendants also urge me to interpret *Tribune* as holding that section 546(e) must be applied to the Investors' claims on general policy grounds and without regard to whether the relevant claim is being asserted by a trustee under the authority of the various provisions of the Code that are mentioned in the opening sentence of section 546(e).  Such an interpretation would put the *Tribune* decision at odds with *Merit Management*, which rejected the use of "policy" arguments to support

an application of section 546(e) to transactions that do not literally fall within its scope.  I will not endorse an interpretation of *Tribune*, or an argument about the policies of section 546(e), that would run afoul of that Supreme Court admonition.

*Tribune* holds that individual creditors' claims are subject to section 546(e) if a bankruptcy trustee previously had the right to pursue them under section 544(b)(1) and if, as a result, the claims were previously subject to section 546(e).  That is not the case here.  The Investors' claims that are asserted in counts 1 and 2 are state law claims (not federal claims).  They are not based on any provisions of the Bankruptcy Code, or on any rights granted to trustees under the Code, and the restrictions of section 546(e) never attached to those claims.  The Liquidators stand in the shoes of the Investors (not the debtors) for purposes of counts 1 and 2.  Accordingly, those claims are not subject to section 546(e).

### III.    Defendants' Motions to Dismiss the New York Law Claims (Counts 9 and 10) Alleging that TFT's Transfers to Other Parties Were Fraudulent Conveyances.

Counts 1 and 2 were asserted on behalf of the Investors as creditors of GTFF and STFF.  The Liquidators have also asserted, in counts 9 and 10 of the Complaint, that TFT made transfers to DBTCA that were fraudulent transfers.  The Complaint does not allege that the Investors were creditors of TFT for this purpose; instead, it alleges that GTFF and STFF were creditors of TFT and that GTFF and STFF are entitled to challenge TFT's transfers under New York law.  The Defendants agree that these claims are not subject to section 546(e) because section 546(e) only applies if the transfer that is being attacked is one that has been made by a "debtor," and the transfers that Plaintiffs seek to avoid in counts 9 and 10 are the transfers that were made by TFT, which is not a debtor in a bankruptcy proceeding and has never been one.  However, the Defendants have challenged these claims on other grounds.

A.    **The Noteholders' Contention That Funds Transferred by TFT Were Never TFT's Property.**

The Noteholders contend that TFT never had "dominion and control" over the funds that "passed through it from the Debtors to DBTCA" and therefore TFT should not be treated as having been a "transferor" for purposes of the assertion of a fraudulent transfer claim. This contention is based on allegations in the Complaint to the effect that TFT was a "nominal" purchaser or an "intermediary," and that at the time of its initial formation TFT was a shell company that did not maintain significant cash balances in its accounts. Compl. at ¶¶ 141, 155, 186, 271. Defendants conclude from this that as a matter of law the allegations of the Complaint show that the funds "never became property of TFT." *See* ECF No. 30, Noteholders' Mem. at 33.

I have already discussed, above, the Defendants' contentions that based on these same allegations TFT should be treated as though it was not even an actual participant in the transfers that occurred. My discussions of those allegations applies with the same force to the Defendants' contention that as a matter of law TFT could not be considered to be a "transferor" for purposes of Counts 9 and 10. When fairly viewed as a whole, the Complaint very clearly alleges that TFT engaged in various transactions as a principal; that the transactions had real substance; that TFT received funds in exchange for participation rights that TFT sold, as a principal to STFF and GTFF; and that TFT used the funds to satisfy its own obligations to pay for loans that TFT bought, as principal. In short, the Complaint fairly (and explicitly) alleges that TFT sold participation interests to GTFF and STFF, received the proceeds of those sales in TFT's own bank accounts, and then used the funds to satisfy TFT's other obligations. The Complaint cannot reasonably be read as alleging that TFT was not a real "transferor," and Defendant's motion to dismiss on this ground is denied.

**B.      The Noteholders' Contention that GTFF and STFF Ratified TFT's Transfers as a Matter of Law.**

The Noteholders contend that as a matter of law GTFF and STFF are barred from pursuing counts 9 and 10 because GTFF and STFF allegedly were intimately involved and had knowledge of how TFT intended to use the transferred proceeds, and thereby ratified the TFT transfers. Noteholders' Mem. at 30.  This argument appears to be based on the theory that all of the words, thoughts and actions of IIG should be treated as though they were the words, thoughts and actions of GTFF and STFF for all purposes.  DBTCA filed a separate motion to dismiss in which it joined in the Noteholders' arguments about the section 546(e) safe harbor, but in which it did not join in this particular part of the Noteholders' motion.  *See* DBTCA Mem., ECF No. 25 at 13 n.9.

As explained in Part I, above, the Trustee's allegation that IIG's wrongful intent is sufficient for purposes of the assertion of the Investors' intentional fraudulent conveyance claims or for purposes of the Liquidators' statutory undervalue claim does not necessarily mean that as a matter of law all of IIG's knowledge, purposes and intent should be attributed to GTFF and STFF for purposes of other claims.  The primary allegation of the Complaint is that IIG was the investment manager for GTFF and STFF and in that capacity IIG had discretionary authority over GTFF's and STFF's investments.  Compl. at ¶¶ 183, 185.  Plaintiffs allege that for this reason IIG's knowledge that the participation interests were not worth the amounts that GTFF and STFF were paying for them, and IIG's intent thereby to defraud the Investors, should be attributed to GTFF and STFF "for purposes of the Investor-Assignor's claims to avoid certain transfers by the Funds." *Id*. at ¶ 185.  The Liquidators have also argued, however, that GTFF and STFF had independent directors and that those independent directors did not know that TFT had acquired loans from TFFI, or that the participation interests were overvalued, or that the funds that TFT received would be transferred to DBTCA and the Noteholders.  The Complaint also alleges that IIG breached its

fiduciary duties to GTFF and STFF by "failing to disclose that a large proportion of the loans in which the Funds invested were in default or were fictitious, and by affirmatively misrepresenting the nature and quality of the loan assets in the Solicitation Materials, each as described herein." Compl. at ¶ 290.

In short, the Complaint alleges that IIG's "intent" is relevant for purposes of the fraudulent transfer claims that are asserted with regard to the transfers that GTFF and STFF made, but it also plainly alleges that GTFF and STFF were victims of IIG's wrongdoing, rather than being willing and knowledgeable participants in it. The Complaint further alleges that IIG deceived GTFF and STFF, and under the authorities cited in Part I, above, an agent is *not* deemed to have revealed, to its principal, the true facts regarding the agent's own wrongdoing. The Complaint therefore cannot be said to include factual allegations that establish, with legal certainty, the notion that GTFF and STFF "ratified" the transfers that TFT made.

## IV.    DBTCA's Motion to Dismiss All of the New York Fraudulent Transfer Claims Against It (Counts 1, 2, 9 and 10) on the Ground that DBTCA Allegedly Did Not Have Dominion and Control Over the Transferred Funds.

Counts 1 and 2, as explained above, are asserted on behalf of the Investors. They allege that the transfers from GTFF and STFF to TFT were fraudulent transfers and that DBTCA was a subsequent transferee. Counts 9 and 10 of the Complaint are asserted on behalf of GTFF and STFF. They allege that TFT made fraudulent transfers to DBTCA in connection with TFT's purchase of a loan portfolio, and that GTFF and STFF (as creditors of TFT) may avoid those transfers under New York law.

While not entirely clear, the Complaint appears to allege that Deutsche Bank, as a "trustee," actually took ownership of the loan portfolio that TFT ultimately purchased. Compl. at ¶ 65 ("The Indenture transferred to DBTCA, as trustee, all of the CLO's right, title and interest to the CLO's property including its bank accounts."). The Indenture is referenced in the Complaint and it is

proper to consider the terms of the Indenture insofar as they bear on this allegation.  It became clear at oral argument that the relevant provision of the Indenture merely gave DBTCA, as indenture trustee, a security interest in the loan portfolio and in TFFI's accounts.  *See* ECF No. 60, Tr. 3/6/2024, at 87:2-24.  To the extent that the Plaintiffs' claims against DBTCA were premised on the theory that DBTCA actually owned the loans that were sold to TFT, that premise is contradicted by the plain language of the Indenture.

Plaintiffs also appear to have alleged that DBTCA received funds as a "trustee" and therefore as a principal rather than as an agent.  The Indenture provided that monies held by DBTCA would be held "in trust" for the Noteholders.  ECF No. 23-2, § 10.1.  A trustee usually is considered to be a principal when the trustee deals with trust property.  *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 691 (7th Cir. 2010) (citations omitted).  But if Plaintiffs believe that DBTCA was a trustee and received payments in that capacity as a "principal," then their proper recourse would be to seek recovery from the corpus of the trust.  *Id*. at 692.  Here, it appears that the Plaintiffs seek recovery from DBTCA itself; the trust apparently ceased to exist long ago.  To the extent that Plaintiffs seek recovery from DBTCA's own assets (not assets of the trust), the Complaint has not identified the basis on which such a recovery is being sought.

On the other hand, this does not mean that as a matter of law no claim has properly been asserted against DBTCA.  The Complaint alleges that DBTCA applied some of the funds that it received to the payment of its own accrued fees.  DBTCA cannot fairly dispute that DBTCA was a "transferee" as to those funds.

DBTCA has separately argued that it had no "dominion and control" over the other funds that it received – regardless of whether it received the funds as a principal or as an agent – because DBTCA did not have unfettered discretion as to how the funds were to be used.  DBTCA's legal

argument in this regard is overstated.  Principals sometimes receive property that is subject to

restricted uses.  However, being limited in one's "discretion" over the use of funds does not by

itself mean that a party is not a transferee.  Assume, for example, that I were to arrange a mortgage

loan to buy a house.  The bank might well agree to make the loan but only on the express condition

that I use the proceeds to buy the house, and that I may not use them for any other purpose.  In that

regard, I would not have any "discretion" as to how the proceeds of the mortgage loan could be

used.  Clearly, though, I would still be the principal in the loan transaction with the bank, and I

would still be the "transferee" of any funds that are advanced to me by the bank.  *See Pergament

v. Brooklyn Law Sch.*, 595 B.R. 6, 13 (E.D.N.Y. 2019) ("an initial transferee is not rendered a mere

conduit simply because it has already pledged to use the transferred funds in a certain way"); *Sec.

Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789, 2023 Bankr. LEXIS 2771,

at *13 (Bankr. S.D.N.Y. Nov. 17, 2023)

While "unfettered discretion" may not be the proper legal standard, however, it is hard to

see from the Complaint itself (and the documents referenced therein) how DBTCA itself (rather

than the trust for which DBTCA was the trustee) could properly be treated as a "transferee" as to

the monies that DBTCA received and then paid to the Noteholders.  I will deny DBTCA's motion

to dismiss counts 1, 2, 9 and 10 insofar as they relate to the funds that DBTCA received and that

it applied towards the payment of its own fees, but I will grant DBTCA's motion to dismiss the

remainder of the claims asserted against DBTCA in counts 1, 2, 9 and 10, with leave to replead

those claims to address the points discussed above.

## V.     The Motions to Dismiss Counts 6, 14, 16 and 17 on Choice of Law Grounds.

The Liquidators have asserted three separate claims alleging that various transactions were

"undervalue" transactions that should be avoided under Cayman law.  Count 6 is asserted on behalf

of the Investors, and it alleges that GTFF's and STFF's transfers to TFT constituted intentional

transfers at an undervalue in violation of section 4(1) of the Cayman Fraudulent Disposition Act. Count 14 is alleged on behalf of GTFF and STFF, and it alleges that TFT's transfers were at an undervalue in violation of that same Cayman statute. Count 16 also alleges that the transfers by GTFF and STFF to TFT were transactions at an undervalue, but in this instance the claim is asserted under section 146 of the Cayman Companies Act, which gives an official liquidator the right to undo any disposition of property that is made at an undervalue with intent to defraud a debtor's creditors.

The Liquidators have also asserted, in count 17, a claim pursuant to section 147 of the Cayman Companies Act, which states that if the business of a debtor "has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose" a court-appointed liquidator may "apply to the Court" for a declaration to that effect, in which case "any persons who were knowingly parties to the carrying on of the business in the manner mentioned" are liable to make such contributions, if any, to the debtor's assets as the Court thinks proper. Compl. at ¶ 328.

Defendants allege that all of the counts of the Complaint that assert claims under Cayman law should be dismissed.

### A.    Counts 6 and 14.

Ordinarily, a conflicts-of-laws analysis is not done if there is no actual conflict between the laws of the different jurisdictions that are involved. *Kashaf v. BNP Paribas SA*, 442 F. Supp. 3d 809, 817 (S.D.N.Y. 2020) (*citing GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006)). It is not entirely clear that there is a conflict between New York law and Cayman law regarding the elements of an intentional fraudulent transfer. Presumably, however,

there is some difference, because otherwise there would be no reason or basis for the Cayman claims to be pleaded in separate counts of the Complaint.

The Cayman law "undervalue" claims asserted in counts 6 and 14 are equivalent to state law fraudulent transfer claims that are asserted by a party's creditors. For choice of law purposes, fraudulent transfer claims are regarded as "conduct-regulating" claims that are akin to tort claims. *Lyman Commerce Solutions, Inc. v. Lung*, No. 12-cv-4398, 2014 U.S. Dist. LEXIS 15282, at *3 (S.D.N.Y. Feb. 6, 2014); *LaMonica v. Harrah's Atl. City Operating Co. (In re JVJ Pharm. Inc.)*, 618 B.R. 408 (Bankr. S.D.N.Y. 2020). The Second Circuit has held that in such cases "the law of the jurisdiction where the [allegedly wrongful conduct] occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Licci v. Lebanese Canadian Bank (Licci II)*, 739 F.3d 45, 49 (2d Cir. 2013) (quoting *Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012) (intermediate citation to Second Circuit authority omitted)).

The Complaint contains no allegation that any of the relevant transactions occurred in the Cayman Islands, or that any of the relevant conduct of the parties occurred in the Cayman Islands. The transfers at issue occurred in New York. The Liquidators acknowledged at oral argument that no act in furtherance of the transfers, or of the other alleged wrongs, occurred in the Cayman Islands. GTFF and STFF were organized under Cayman law, but Plaintiffs have offered no reason why this alone would make Cayman law applicable to the claims asserted in counts 6 and 14. Even if the status of GTFF and STFF as Cayman companies somehow could be interpreted as meaning that an "injury" was experienced in the Cayman Islands, the relevant choice of law inquiry focuses on where the underlying conduct occurred, not where the injury might have been experienced. *Id.*

The Investors, GTFF and STFF engaged in transactions in New York and their rights against the other parties to those transactions are controlled by New York law, not Cayman law. Accordingly, I will dismiss counts 6 and 14 of the Complaint.

### B.    Counts 16 and 17.

Counts 16 and 17 are asserted pursuant to statutes that set forth the rights of the official liquidators under Cayman law.  GTFF and STFF are Cayman entities who are subject to liquidation in the Cayman Islands.  There is no contention that the statutes cited by the Liquidators are not applicable.

Defendants argue that counts 16 and 17 nevertheless must be dismissed because the relevant conduct did not occur in the Cayman Islands.  However, counts 16 and 17 assert claims that are vested in official liquidators by statute.  They are not common law claims.  Since the Liquidators' claims are not common law claims, I do not see how the "choice of law" principles that the defendants have invoked are relevant.  *See Am. Pegasus SPC v. Clear Skies Holding Co., LLC*, 2015 U.S. Dist. LEXIS 189547, at *46–53 (Bankr. N.D. Ga. 2015) (rejecting a contention that "choice of law" rules barred a liquidator from pursuing a statutory "undervalue" claim based on Cayman law, and permitting the Cayman law claim to proceed and a claim under Georgia law to proceed); *see also Tacon v. Petroquest Res. Inc. (In re Condor Ins. Ltd.)*, 601 F.3d 319 (5th Cir. 2010) (holding that foreign law avoidance actions may be asserted in a chapter 15 case).

There may be a separate question as to whether, by their terms, the relevant Cayman statutes apply to conduct that occurred entirely outside the Cayman Islands.  Such issues have arisen with respect to the application of certain provisions of the Bankruptcy Code.  For example, section 547 of the Bankruptcy Code gives trustees the right to undo transfers that were "preferences," and section 548 of the Bankruptcy Code gives trustees the right to undo fraudulent

transfers that occurred during the two-year period that preceded a bankruptcy case.  11 U.S.C. §§ 547, 548.  Courts have sometimes been called on to address the question of whether sections 547 and 548 are applicable to transfers that occur entirely outside the United States.  However, the inquiry in that regard is not a "choice of law" inquiry.  Instead, the inquiry in those cases is whether the relevant statutory terms have extraterritorial application.

The Supreme Court has held that a United States statute is presumed to apply only within the territorial jurisdiction of the United States unless a contrary intent appears in the statute. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010).  Thus, "unless there is the affirmative intention of the Congress clearly expressed" to give a statute extraterritorial effect," a court must presume that the statute only addresses domestic conduct or conditions.  *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).  There are many provisions of the Bankruptcy Code that explicitly apply on a worldwide basis.  However, sections 547 and 548 themselves contain no explicit language to that effect.  Courts have reached different conclusions, but some courts have concluded that sections 547 and 548 do not apply to transfers that occurred entirely outside the United States. *See, e.g., King v. Export Dev. Can. (In re Zetta Jet USA, Inc.)*, 624 B.R. 461, 476 (Bankr. C.D. Cal. 2020); *Spizz v. Goldfarb Seligman & Co. (In re Ampal-American Isr. Corp.)*, 562 B.R. 601, 612-14 (Bankr. S.D.N.Y. 2017).

I do not know whether any similar principles are applicable to the statutory rights that Cayman law confers upon official liquidators.  Defendants have only argued that common law choice of law rules should be applied in deciding whether such claims are available to the Liquidators.  I deny their motion to dismiss counts 16 and 17 on that ground.

### C.      Whether Section 561 Bars the Cayman Undervalue Claim.

Section 561(d) of the Bankruptcy Code states that the provisions of the Code regarding "securities contracts" are applicable in a chapter 15 case and that they "limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11 of this title."  11 U.S.C. § 561(d). Defendants argue that this means that section 546(e) must be applied to the Liquidators' statutory undervalue claim under Cayman law (count 16), which seeks to avoid the transfers that GTFF and STFF made to TFT.  *See Fairfield Sentry Ltd. v. Citibank, N.A.*, 630 F. Supp. 3d 463, 488-89 (S.D.N.Y. 2022) (holding that section 561 makes section 546(e) applicable, in a chapter 15 case, to a statutory avoidance action claim brought by a liquidator pursuant to the laws of the British Virgin Islands).  I agree that section 546(e) would apply to the same extent as it would apply if, in count 16, the Liquidators were making statutory claims under section 544 of the Bankruptcy Code. However, the transfers that are challenged in count 16 of the Complaint are the transfers made by GTFF and STFF to TFT.  Section 546(e) does not apply to those transfers because, as explained in Parts II(A), (B) and (C) of this Decision, the transfers at issue cannot properly be regarded as transfers "by" GTFF and STFF "to" DBTCA and the Noteholders that only traveled "through" TFT, and Defendants have conceded that the transfers "to" TFT, if regarded as separate transfers, are not subject to section 546(e).  I therefore deny this portion of the motion to dismiss Count 16.

## VI.    Claims Alleging that DBTCA and the Noteholders Aided and Abetted Fraud by IIG.

The Liquidators allege that DBTCA and the Noteholders aided and abetted a fraud that was committed by IIG against the Investors (counts 5 and 6).

### A.      Elements of the Claim.

A claim for aiding and abetting common law fraud under New York law requires allegations of (i) the existence of an underlying fraud, (ii) the defendant's knowledge of the fraud, and (iii) the defendant's substantial assistance in advancing the commission of the fraud. *Carbon Inv. Partners,*

*LLC v. Bressler*, No. 20 Civ. 3617, 2021 WL 3913526, at *4 (S.D.N.Y. Sept. 1, 2021); *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005).  "Substantial assistance" exists where a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and such actions proximately cause the harm on which the primary fraud liability is predicated.  *Rosner v. Bank of China*, No. 06 CV 13562, 2008 U.S. Dist. LEXIS 105984 (S.D.N.Y. Dec. 18, 2008), and cases cited therein.

The heightened pleading requirements of Rule 7009(b) apply to claims that a defendant aided and abetted a fraud.  *Armstrong v. McAlpin*, 699 F.2d 79, 92–93 (2d Cir. 1983); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006); *Silvercreek Mgmt., Inc. v Citigroup, Inc.*, 248 F. Supp. 3d 428, 442–43 (S.D.N.Y. 2017).  Allegations that a defendant "knew" of a fraud or that the defendant intended to participate in it may be stated generally, but it is still necessary to allege facts that give rise to a strong inference of the defendant's knowledge or intent.  *Alix v. McKinsey & Co., Inc.*, 23 F.4th 196, 209 (2d Cir. 2022); *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990); *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 412 (S.D.N.Y. 2021). "Actual knowledge" must be alleged; allegations that a defendant "should have known" of a fraud do not suffice.  *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010).

Although Rule 9(b) requires specificity as to certain matters, "it does not elevate the standard of certainty that a pleading must attain beyond the ordinary level of plausibility."  *U.S. ex rel. Taylor v. GMI USA Corp.*, No. 16-CV-7216 (RWL), 2024 WL 307791, at *88 (S.D.N.Y. Jan. 26, 2024).  In addition, a Complaint often cannot be expected to specify the evidentiary details of a claim with the specificity that one might expect in a post-discovery and post-trial statement of proposed factual findings.  A plaintiff who alleges an "aiding and abetting" claim, for example, may be able to point to circumstances showing a strong inference that an institution had knowledge

of an underlying fraud, but may need discovery in order to identity the particular individuals at that institution who had such knowledge.  It would impose too high a burden to require that a Complaint allege facts that are peculiarly within the knowledge of an opposing party. *Wexner*, 902 F.2d at 172.

### B.      Identification of the Relevant Fraud(s).

The aiding and abetting claims require the identification of an underlying fraud. Unfortunately, the Complaint contains many allegations of alleged wrongdoing, and of alleged knowledge or assistance in the commission of that wrongdoing, that seem to go beyond the alleged fraud that is the subject of the aiding and abetting claims.

The fraud claim in Count 3 is asserted by the Liquidators in their capacity as assignees of the Investors.  Count 3 alleges that IIG solicited investments from the Investors by making false representations of material fact regarding the nature and quality of the loans in which GTFF and STFF would be acquiring participation interests, and regarding the fact that many of the loans in which GTFF and STFF would be acquiring participation interests were past due and in default or were fictitious.  Compl. at ¶¶ 233-38.  The Liquidators' counsel confirmed at oral argument that the alleged fraud committed upon the Investors is the fraud that is the subject of the aiding and abetting claims in counts 5 and 6.  ECF No. 61, Tr. 3/6/2024 at 122:8-18.

The Complaint, however, is replete with allegations to the effect that IIG engaged in a long-running fraud (or series of separate frauds) that began in 2007 and that had a series of victims, including the Noteholders. *Id*. at ¶¶ 7-10, 55-57, 61-63.  There are scores of allegations as to how DBTCA and the Noteholders allegedly ignored "red flags" and were not particularly astute in monitoring IIG's performance before 2017, and how DBTCA and its affiliates allegedly failed in

the performance of the obligations that they owed to the Noteholders in the years before 2016.  For example, the Complaint alleges that:

- A non-party affiliate of DBTCA (Deutsche Bank Securities, Inc.) acted as an underwriter for the issuance of the TFFI Notes and "confirmed" misrepresentations that IIG made in 2013 when TFFI issued the TFFI Notes (*id*. at ¶¶ 13-14, 59);

- IIG made misrepresentations to the Noteholders in 2013 about historical default rates that turned out to be inconsistent with the actual default rates that occurred between 2013 and 2017 (*id.* at ¶ 91);

- Some Noteholders (the BlueMountain Group, the KKR Group and the Tennenbaum Group) disregarded their own concerns about the portfolio when they made their initial investments and when various issues arose during the years 2013-2015 (*id*. at ¶¶ 95-102);

- The Noteholders had concerns about how the portfolio was performing in 2015 and discussed a possible termination of IIG as collateral manager (*id*. at ¶¶ 93-94);

- DBTCA allegedly breached its obligation to ensure that the loans and collateral complied with the terms of the underlying indentures (*id*. at ¶¶ 12, 64);

- Defaults in TFFI's loan portfolio were "readily apparent" from reports that DBTCA provided but that Noteholders "ignored the red flags they saw so as to continue to reap the benefits of IIG's fraud" (*id.* at ¶ 63);

- DBTCA allegedly funded purported loans to certain Panamanian borrowers without receiving required information and by remitting funds directly to IIG affiliates rather than to the purported borrowers; (*id.* at ¶¶ 68-77); and

- Noteholders knew that they were not receiving the required information regarding certain borrowers including certain Panamanian borrowers (*id.* at ¶ 81).

The Complaint goes so far as to allege that at the time loans were made to Panamanian borrowers DBTCA allegedly "knew that those loans were fictitious and that IIG was misappropriating the proceeds." *Id.* at ¶¶ 68-71. It also alleges that the Noteholders' knowledge that they were not receiving certain required information allegedly shows that before 2017 the Noteholders had "actual knowledge of fraud by IIG." *Id*. at ¶ 81.

The alleged fraud by IIG is based on its alleged misrepresentations or omissions, in its 2017 dealings with the Investors, as to the quality of the loans in which GTFF and STFF would acquire participation interests. Many of the allegations as to what DBTCA and the Noteholders allegedly knew about the underlying loan portfolio are relevant to the aiding and abetting claims to the extent they are combined with plausible allegations that DBTCA and the Noteholders knew about the misrepresentations being made to the Investors. However, the allegations that DBTCA was negligent in the performance of its duties before 2017, or that DBTCA allegedly helped IIG to evade "know your customer" rules before 2017, or that the Noteholders ignored "red flags" when they made their own initial investments and during the period from 2013 through 2015, or that DBTCA breached duties that it owed to the Noteholders before 2017, seem to be nothing more than rampant fault-finding without any apparent relevance to the claims that have been pleaded.

Some of the allegations as to the pre-2017 events also are not plausible. For example, the Liquidators allege that DBTCA and the Noteholders knowingly allowed the Noteholders' resources to be used to fund new loans that DBTCA knew were fictitious. No credible explanation is offered as to how such conduct would have made any sense at all. There are vague allegations that the Noteholders reaped unspecified "benefits" from their transactions with TFFI, but if

DBTCA and the Noteholders knew there were no actual borrowers, then "loans" to those borrowers could not have provided any benefits at all.  The Complaint also alleges that DBTCA received fees for its work, but not in amounts that would plausibly explain its alleged knowing agreement (in 2016 or earlier) to fund loans that it knew were fictitious.  At most the Complaint alleges, in this regard, that prior to 2017 DBTCA and the Noteholders had actual knowledge of defaults and other problems, and perhaps that they were ignoring "red flags" during that time.  However, as to the periods before late 2016, including periods when DBTCA and the Noteholders actually were funding new loans, the Complaint does not plausibly allege that DBTCA and the Noteholders had actual knowledge that IIG was defrauding them.  In fact, the allegations that DBTCA and the Noteholders had such knowledge before 2017 are belied by other portions of the Complaint, which plainly allege that it was not until 2017 that the Defendants' alleged awareness of various "red flags" matured into actual knowledge of wrongdoing.  Compl. at ¶¶ 103-116.

In considering the sufficiency of the aiding and abetting claims, I will focus on the particular alleged fraud in 2017 that is relevant to those claims.

**C.    Whether IIG's Knowledge Can Be Imputed to DBTCA and the Noteholders.**

The Complaint alleges that DBTCA owned the loan portfolio and that IIG acted as the collateral manager for DBTCA and the Noteholders.  Compl. at ¶¶ 65, 80, 149; ECF No. 47, Liquidators' Mem. at 41, 50–51.  The Liquidators argued as a result that IIG's knowledge of wrongdoing should be attributed to DBTCA and the Noteholders.  It became clear at oral argument, however, that these allegations in the Complaint were based on the mistaken assumption that TFFI made an outright transfer of the loan portfolio to DBTCA, and that IIG had then acted as a collateral manager for DBTCA rather than for TFFI.  Tr. 3/6/2024, at 86–95.  The documents that are referenced in the Complaint, and that have been submitted to the Court, show the following:

- DBTCA merely held a security interest in the loans that TFFI owned. *See* ECF No. 23-2, at 1 (granting clause of Indenture which states that TFFI's interests in the loans and in its rights under other agreements are pledged as "security" for the Holders of the TFFI Notes); *id*. §§ 7.5, 7.6, 7.18 (provisions of Indenture obligating TFFI maintain DBTCA's "security interest" in the assets and setting forth representations and warranties regarding such security interests).

- TFFI (not DBTCA) owned the underlying loans and later sold them to TFT. ECF Nos. 52-3, 52-4 and 52-5 (purchase and sale agreements between TFFI, as seller, and TFT as purchaser).

- IIG acted as collateral manager for TFFI, not for DBTCA. ECF No. 23-3, at 1 (provision in Collateral Management Agreement stating that TFFI, as the Issuer of the TFFI Notes, wished to retain IIG to perform collateral management services "on behalf of the Issuer").

The allegations that IIG's actions and intent should be imputed to DBTCA and the Noteholders, on the theory that DBTCA owned the collateral and that IIG was the collateral manager for DBTCA and the Noteholders, are contrary to the plain terms of the documents that have been referenced and are incorporated into the Complaint.

The Liquidators also have argued that IIG's fraudulent actions and intent should be attributed to the Noteholders because the Indenture for the TFFI Notes required Noteholder approval for certain key investment decisions. *Id.* However, these allegations merely suggest that the Noteholders had a limited veto power over decisions that directly affected them. That does not mean that IIG was an agent for the Noteholders. In the absence of such an agency relationship, or some other properly pleaded allegation that IIG actually took directions from the Noteholders,

there is no identified basis on which the Noteholders should be charged with IIG's actions, knowledge and intent.

**D.      Sufficiency of Allegations of DBTCA's Knowledge of the Alleged Fraud.**

DBTCA argues that the allegations in the Complaint, if taken as true, are insufficient to support a strong inference that DBTCA had actual knowledge of fraud. I disagree. The Complaint alleges:

- DBTCA was not only the Indenture Trustee but also was the "collateral administrator" who was responsible for the preparation and circulation of reports regarding the loans to the Noteholders, based on information provided by IIG. Compl. at ¶¶ 26, 64.

- The entire CLO loan portfolio was scheduled to mature on or around October 31, 2016. However, DBTCA's October 2016 report showed that only $600,000 of principal payments had been received against an outstanding principal balance of more than $210 million, with $110 million of due dates having purportedly been extended. *Id.* at ¶ 83.

- By January 31, 2017, approximately 40% of the CLO loan portfolio had matured without repayment. *Id.* at ¶ 84.

- During the early part of 2017, IGG collected less than $6 million on more than $72 million of defaulted loans that had matured on January 31, 2017. *Id*. at ¶ 125.

- DBTCA knew at all times after mid-January 2017 that a large percentage of loans in the TFFI loan portfolio were in default. *Id.* at ¶¶ 146, 161, 174, 249, 264, 314, 332.

- DBTCA knew, by 2017, that IIG had lied about the nature of the borrowers and the industries in which they would operate. *Id.* at ¶¶ 66, 68, 74.

- DBTCA knew that loans to certain Panamanian borrowers were fictitious. *Id.* at ¶¶ 69-75, 249.

- DBTCA knew that there were ongoing legal proceedings regarding some loans and that those loans were worth far less than their full nominal principal amounts. *Id.* at ¶¶ 152, 163, 174, 249.

- DBTCA knew that it did not have collateral documents for many loans and that some loans were backed only by promissory notes, with none of the promised pledges of commodities, purchase orders, receivables or other security. *Id.* at ¶¶ 106-8, 112.

- Due diligence in early 2017 revealed that as to some loans the terms and maturity dates of outstanding loans were materially different from the information that IIG had given to DBTCA for inclusion in DBTCA's reports to the Noteholders. *Id.* at ¶¶ 110-11.

- By 2017, DBTCA knew that IIG's representations about a key risk mitigation feature of the purported loans – *i.e.*, that "offtakers" would make payments – was not true. *Id.* at ¶¶ 64, 114-16.

- DBTCA knew that IIG planned to solicit new investors to buy interests in the existing loan portfolio as a way of raising funds to pay off the Noteholders. *Id.* at ¶¶ 117-18.

- IIG prepared an offering memorandum for subscriptions to buy shares in STFF and gave drafts of the offering memorandum to DBTCA in June 2017. That offering memorandum failed to disclose that STFF would acquire interests in loans that were already in default. *Id.* at ¶¶ 136-38, 249.[3]

- DBTCA held all of the bank accounts through which (a) the Investors transferred funds to GTFF and STFF, (b) GTFF and STFF transferred funds to TFT, and (c) TFT transferred funds to DBTCA, and actually processed those transfers. *Id.* at ¶¶ 140, 142.

---

[3]    The Complaint alleged that DBTCA also received a copy of the draft offering memorandum for GTFF in May 2017. By letter dated August 28, 2024, Plaintiffs have informed the Court that this allegation was not correct, and so I have disregarded it here.

- At the time of the first sale of 18 loans to TFT in June 2017, DBTCA (a) knew which loans were being sold, (b) knew that 14 of those loans (representing more than 84% of the purchase price) were in default and were not possibly worth their full value, (c) knew that some of the transferred loans were disputed by the borrowers, (d) knew that some of the loans were to purported Panamanian borrowers who had not actually provided any collateral, (e) knew that TFT nevertheless was paying full par value for the loans, (f) knew that TFT was funding its purchases by selling participation interests to GTFF and STFF, and (g) knew that GTFF and STFF had obtained the needed funds from the Investors.  *Id.* at ¶¶ 145-148, 150-52.

- At the time of the second sale of 11 loans in July 2017, DBTCA (a) knew which loans were being sold, (b) knew that 11 of those loans were in default, (c) knew (or was willfully blind to the fact) that four of the loans were fictitious, (d) knew that two of the loans were disputed by the borrowers, (e) knew that the loans were not possibly worth their full par value, (f) knew that TFT nevertheless was paying full par value for the loans, (g) knew that TFT was funding its purchases by selling participation interests to GTFF and STFF, and (h) knew that GTFF and STFF had obtained funds from the Investors.  *Id.* at ¶¶ 157-163.

- At the time of the third sale of seven loans in August 2017, DBTCA (a) knew which loans were being sold, (b) knew that all seven of those loans were in default, (c) knew that the loans were not possibly worth their full par value, (d) knew that TFT nevertheless was paying full par value for the loans, (e) knew that TFT was funding its purchases by selling participation interests to GTFF and STFF, and (f) knew that GTFF and STFF had obtained funds from the Investors.  *Id.* at ¶¶ 152, 163, 172-174.

These allegations are not merely conclusory.  If taken as true, they are sufficient to create a "strong inference" of actual knowledge, by DBTCA, that IIG committed fraud in raising funds from the Investors.  The cited portions of the Complaint allege with particularity that (a) DBTCA actually knew of rampant defaults and other problems in the loan portfolio, (b) DBTCA actually knew that IIG had lied about those facts in the past, (c) DBTCA actually knew that the STFF offering memorandum failed to disclose the true facts regarding the loan portfolio, (d) DBTCA actually knew that the loans were worth only a fraction of their purported values, and (e) DBTCA actually knew that no informed buyer would have purchased participation interests in the loans, and that no reasonable investors would have financed the purchase of such participation interests, if the buyers and investors had been given proper disclosures about the real values of the loans and the rampant problems with those loans.  These allegations suffice to raise a strong inference of actual knowledge, by DBTCA, of the underlying fraud that the Liquidators have alleged.

DBTCA has complained that the Complaint has not identified the particular officers, directors, employees or representatives of DBTCA who allegedly knew of IIG's fraud.  DBTCA Mem. at 12.  However, it is not clear that the Liquidators could reasonably be expected to have that information before discovery has been completed.  The allegations are sufficient to support the contention that DBTCA had knowledge of fraud, and any further specifics are properly to be developed in discovery.

### E.    Sufficiency of Allegations as to the Noteholders' Knowledge of Fraud.

The Complaint often refers to the "Noteholders" generally without naming specific Noteholders, and purports to justify this approach by contending in a footnote to paragraph 6 of the Complaint that every Noteholder had the same knowledge and was responsible for the same conduct:

> Where this complaint refers to collective knowledge on the part of DBTCA
> and the Noteholders (or the Noteholders as a group), or those parties engaging
> in certain action or inaction, that is because they each individually received or
> had access to the exact same information and/or took a common action or each
> refrained from action.

Compl. at ¶ 6 n.2.  In theory, there could have been instances in which a reference to "Noteholders"

as a collective group was warranted.   If, for example, the Noteholders agreed to appoint

representatives to conduct particular investigations or to negotiate particular matters on behalf of

all of them, then a general allegation that all of the "Noteholders" thereby knew about a particular

meeting, investigation or negotiation might suffice.   Similarly, it might make sense to say that

some "Noteholders" could be charged with information that their investment manager had.   It

might also be reasonable to allege that the "Noteholders" had knowledge of specific information

if there were an allegation that the relevant information was sent to all of the Noteholders.

However, the allegations in footnote 2, and in the remainder of the Complaint, are not nearly so

precise.  The Complaint alleges a vast number of separate things that the "Noteholders" allegedly

knew or did over a period spanning more than 10 years.   Alleging that every single act taken by

one Noteholder throughout this extended period of time was taken on behalf of all, and that every

single fact known by one Noteholder throughout this entire period was known by all – based solely

on a one-sentence allegation that each Noteholder allegedly "individually received or had access

to the exact same information and/or took a common action" – is not plausible, and does not satisfy

either ordinary pleading rules or the requirements of Rule 9(b).  *Filler v. Hanvit Bank*, No. 01 Civ.

9510 (MGC), 2003 WL 22110773, at 2-3 (S.D.N.Y. Sept. 12, 2003); *Jacobson v. Peat, Marwick,*

*Mitchell & Co.*, 445 F. Supp. 518, 522 n. 7 (S.D.N.Y. 1977).

The Noteholders also argue that even if a Noteholder had all of the information alleged in

the Complaint that would still not be sufficient to show the Noteholder's "knowledge" that IIG

defrauded the Investors.  I disagree.  The Complaint alleges:

- The entire CLO loan portfolio was scheduled to mature on or around October 31, 2016, but DBTCA's October 2016 report to the Noteholders showed that only $600,000 of principal payments had been received against an outstanding principal balance of more than $210 million, with $110 million of due dates having purportedly been extended. Compl. at ¶ 83.

- By January 31, 2017, approximately 40% of the CLO loan portfolio had matured without repayment (*id.* at ¶ 84), an event that prompted two Noteholders to raise the prospect that IIG could be liable for misrepresentations. *Id.* at ¶ 84.

- IIG attempted to organize a new CLO or to arrange replacement financing for the loan portfolio and "kept each of the Noteholders closely in the loop on these efforts," but the parties that IIG contacted were not interested once they learned of the magnitude of the defaults in the portfolio. *Id.* at ¶¶ 87-88, 195-6.

- In February 2017, IIG sent each of the Noteholders a "teaser" that it intended to use to approach other possible investors. The teaser stated that a new vehicle would acquire loans from TFFI, but it failed to disclose that 40% of the loans were in default. The teaser made false claims that TFFI had strong assets, no complete write-offs and used rigorous credit underwriting and control processes to mitigate credit risk. The teaser also represented that the weighted average remaining term of the loans was approximately 6 months. The Noteholders knew from their own experience with the loan portfolio that these statements were materially false. *Id.* at ¶ 118-19, 121.

- By February 24, 2017, the Noteholders were aware that there were serious issues regarding the loan portfolio. Certain Noteholders negotiated a forbearance agreement

that included a requirement that IIG provide due diligence information about the collateral that supported the loans.  *Id.* at ¶ 105.

- Due diligence in early 2017 revealed that there were no collateral documents for many loans and that some loans were backed only by promissory notes, with no pledge of commodities, purchase orders, receivables or other security.  *Id.* at ¶ 106-8, 112, 198.

- Due diligence in early 2017 further revealed that as to some loans the terms and maturity dates were materially different from the information that IIG had given to DBTCA for inclusion in DBTCA's reports to the Noteholders.  *Id.* at ¶ 110-11.

- Materials provided in a data room in April 2017, and other diligence materials, made clear that representations about a key risk mitigation feature of the purported loans – *i.e.*, that "offtakers" would make payments – was not true.  *Id.* at ¶¶ 114-16.

- By April 2017, the Noteholders knew that the maturity dates for at least one-third of the portfolio had been misrepresented, that the collateral for the portfolio assets had been misrepresented, that "offtakers" could not have been paying monies as had been represented, and that "the loans being sold from the portfolio were not worth par – if anything at all."  *Id.* at ¶ 90.

- The Noteholders hoped that IIG would succeed in finding new investors who would purchase the loans at par value and therefore allow the repayment of the TFFI Notes in full.  To that end, they agreed to a series of forbearance agreements that delayed the notice of an Event of Default in order to give IIG time to arrange a refinancing or sale of the portfolio; and they conditioned their approval of loan sales on a requirement that the sales be consummated at par values, even though the Noteholders knew that the loans were not worth their purported par values.  *Id.* at ¶¶ 123-124, 195.

- During the forbearance period, IIG collected less than $6 million on more than $72 million of defaulted loans that had matured on January 31, 2017.  *Id.* at ¶ 125.

- After getting feedback from the Noteholders, IIG disseminated a modified "teaser" to solicit investors in a new investment vehicle.  The new teaser omitted any reference to the existing loans or to the existing CLO and did not disclose that the problematic loans would be the subject of the proposed financing.  The new teaser also repeated many of the same false statements that had been included in the original teaser, including misrepresentations that the loans would have a maximum maturity of up to 36 months and a misrepresentation that IIG had a proven strength of credit and operational processes and controls.  *Id.* at ¶ 126-28.

- On or about May 4, 2017, IIG informed "the Noteholders" that it had identified three potential investors who were interested in investing in new IIG-managed funds and that the investments would be used to fund the purchase of the loans (including the defaulted loans) in TFFI's loan portfolio.  It also provided the Noteholders with copies of an agreement between IIG and GSC under which GSC would identify investors in Asia.  *Id.* at ¶ 129-30.

- The Investors executed letters of intent in May 2017, and IIG gave copies to the Noteholders.  *Id.* at ¶¶ 132-33.

- IIG's statements to Investors "were false and the Noteholders knew it."  *Id*. at 242-3.

- At the time of the first sale of 18 loans to TFT in June 2017, the Noteholders (a) knew which loans were being sold, (b) knew that 14 of those loans (representing more than 84% of the purchase price) were in default and were not possibly worth their full value, (c) knew that some of the transferred loans were disputed by the borrowers, (d) knew

that some of the loans were to purported Panamanian borrowers who had not actually provided any collateral, (e) knew that TFT nevertheless was paying full par value for those defaulted, disputed and problematic loans, (f) knew that TFT was funding its purchases by selling participation interests to GTFF and STFF, and (g) knew that GTFF and STFF were obtaining funds from the Investors. *Id.* at ¶¶ 90, 145-148, 150-52.

- At the time of the second sale of 11 loans in July 2017, the Noteholders (a) knew which loans were being sold, (b) knew that 11 of those loans were in default, (c) knew (or were willfully blind to the fact) that four of the loans were fictitious, (d) knew that two of the loans were disputed by the borrowers, (e) knew that the loans were not possibly worth their full par value, (f) knew that TFT nevertheless was paying full par value for the loans, (g) knew that TFT was funding its purchases by selling participation interests to GTFF and STFF, and (h) knew that GTFF and STFF had obtained funds from the Investors. *Id.* at ¶¶ 90, 150, 157-163.

- At the time of the third sale of seven loans in August 2017, the Noteholders (a) knew which loans were being sold, (b) knew that all seven of those loans were in default, (c) knew that the loans were not possibly worth their full par value, (d) knew that TFT nevertheless was paying full par value for the loans, (e) knew that TFT was funding its purchases by selling participation interests to GTFF and STFF, and (f) knew that GTFF and STFF had obtained funds from the Investors. *Id.* at ¶¶ 90, 172-174.

- The Noteholders pushed a refinancing deal, knowing that what was being advertised to new investors was false and/or misleading and that the underlying loans were worth substantially less than par, so that the Noteholders would receive not only a return of their entire principal, but also a substantial return on their investment. *Id.* at ¶ 199.

They did so knowing that the new investors "would be left holding an empty bag." *Id*. at 202.

I agree that the allegations of the Complaint need to be more precise as to *which* Noteholders allegedly knew the foregoing things. To the extent that one or more Noteholders are alleged to know the foregoing things, however, the allegations are more than sufficient to support the contention that such Noteholder(s) knew that IIG was committing a fraud. The Complaint alleges with particularity that (a) Noteholders actually knew of rampant defaults and other problems in the loan portfolio, (b) Noteholders actually knew that IIG had lied about those facts in the past, (c) Noteholders actually knew that at least some of the materials given to the Investors failed to disclose the true facts regarding the loan portfolio, (d) Noteholders actually knew that the loans were worth only a fraction of their purported values, and (e) Noteholders actually knew no informed buyer would have purchased participation interests in the loans, and that no reasonable investors would have financed the purchase of such participation interests, if the buyers and investors had been given proper disclosures about the real values of the loans and the rampant problems with those loans. These allegations suffice to raise a strong inference of actual knowledge of the underlying fraud that the Liquidators have alleged.

**F.    Sufficiency of Allegations as to DBTCA's "Substantial Assistance."**

The allegations that DBTCA rendered "substantial assistance" to the fraud are deficient. The Complaint is full of allegations that DBTCA did various things that allowed or facilitated the fraud that IIG and TFFI perpetrated in its prior dealings with the Noteholders, but as noted above the fraud that is the subject of Count 3 (and of the aiding and abetting claims) is a fraud allegedly perpetrated against the Investors in 2017.

The strongest allegation in the Complaint as to DBTCA's alleged substantial assistance to the alleged fraud against the Investors was the allegation that DBTCA received and commented upon the draft offering memoranda and other subscription materials that were given to the Investors.  However, the Liquidators' counsel has informed the Court that the Liquidators wish to retract their prior allegations that DBTCA actually reviewed the GTFF offering memorandum before it was sent to Investors.  In addition, while the Liquidators have adhered to their allegation that DBTCA received a copy of the STFF offering memorandum before it was sent to the Investors, they have withdrawn their allegation that DBTCA actually commented on the memorandum.  The receipt of that offering memorandum may support the allegation that DBTCA had knowledge of fraud, but the mere receipt does not show "substantial assistance" in the commission of the fraud.

The Complaint alleges that DBTCA executed money transfers on behalf of TFFI, including the funding of allegedly fictitious loans, as part of TFFI's fraud upon the Noteholders.  Those allegations may be relevant to allegations about DBTCA's knowledge of problems with the loan portfolio.  However, this particular conduct predated the alleged fraud against the Investors, and it has no apparent connection to the misrepresentations that were allegedly made by IIG in its dealings with the Investors.

DBTCA allegedly provided IIG with the "infrastructure" necessary to complete the sales of the loans by opening bank accounts for GTFF, STFF and TFT, by opening collection accounts through which TFT would collect interest and principal payments from borrowers, and by processing the payments that were made when the loans were sold.  However, the "fraud" claim is asserted on behalf of the Investors, and there is no allegation that DBTCA opened accounts for the Investors.  As a general matter, banks do not owe non-customers a duty to protect them from the intentional torts of the bank's customers.  *Lerner*, 459 F.3d at 286; *Century Bus. Credit Corp. v. N.*

*Fork Bank*, 246 A.D.2d 395, 396 (N.Y. App. Div. 1st Dept. 1998) (". . . to hold that banks owe a

duty to their depositor's creditors to monitor the depositors' financial activities so as to ensure the

creditors' collection of the depositors' debts would be to unreasonably expand banks' orbit of

duty").   Courts in this Circuit also have consistently held that the provision of banking services

through which a fraudster commits a fraud does not constitute "substantial assistance" in the

commission of that fraud.   *See Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 96 (2d Cir.

2012) (holding that it is "well-established" that a fraudster's use of a bank account does not mean

that the bank provided substantial assistance to the commission of a fraud); *Strauss v. Credit

Lyonnais, S.A.*, No. 06-CV-702, 2006 U.S. Dist. LEXIS 72649, at *9 (E.D.N.Y. Oct. 5, 2006) (the

maintenance of a bank account and the receipt and transfer of funds "does not constitute substantial

assistance"); *Rosner v. Bank of China*, 528 F.Supp.2d 419, 427 (S.D.N.Y. 2007) (even if a bank

had actual knowledge of a fraud, the use of the bank's usual banking services by participants in

the fraudulent scheme did not constitute substantial assistance).

The sale of TFFI's loan portfolio would have been prohibited by the Indenture, so DBTCA

allegedly commented on a draft Fourth Supplemental Indenture, and then executed a Fourth

Supplemental Indenture, that permitted a sale to occur so long as the sale was "in an amount not

less than the par value" of the loans being sold.   The sales to TFT allegedly could have not occurred

without this amendment to the Indenture.   Compl. at ¶ 136.   The amendment may have removed a

technical obstacle to the sale of the loans, but there is nothing about the amendment that required

IIG to make any misrepresentation to the Investors or that assisted IIG in making any such

misrepresentation.   *Cf. Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,

403 F.3d 43 (2d Cir. 2005) (hereafter, "*Sharp*") (a consent that merely removed an impediment to

the completion of a transaction did not constitute substantial assistance or participation in a breach of fiduciary duty).

The Complaint alleges that DBTCA put collection accounts in the name of TFT (rather than the names of the borrowers) in order to evade "know your customer" rules that would have required further due diligence and would have revealed that many of the borrowers were shell companies or were otherwise owned by IIG.  Compl. at ¶ 140.  I fail to see the relevance of "know your customer" rules to the particular fraud on the Investors that has been alleged.  I also fail to see why "know your customer" rules would have been applicable at all.  The funds that were being received were payments that were being made by or to TFT, and so there is no particular reason why the accounts had to be in anyone else's name – at least, no reason that appears in the allegations of the Complaint.  Having the accounts in the name of TFT probably simplified the process of perfecting security interests in the accounts.

An affiliate of DBTCA, Deutsche Bank Trust Company Delaware, agreed to act as the Delaware statutory trustee for TFT.  *Id.*  There is nothing about this act that amounts to "substantial assistance" in misrepresentations that allegedly were made to the Investors.

I will dismiss Count 5 of the Complaint, but without prejudice and with leave to replead.

### G.   Sufficiency of Allegations of the Noteholders' Substantial Assistance.

The allegations that the Noteholders provided "substantial assistance" to the fraud also are deficient.

The Complaint alleges that DBTCA's acts in "substantial assistance" of fraud should be imputed to the Noteholders because DBTCA was acting on behalf of the Noteholders when it approved and funded loans that were security for the obligations owed to the Noteholders.  Compl.

at ¶ 149.  However, that is not the "fraud" that the Noteholders (and DBTCA) are accused of aiding and abetting.

The Noteholders allegedly "strongarmed" IIG into soliciting new investors, put "pressure" on IIG to find new investors and "forced" a sale of TFFI's loan portfolio.  Compl. at ¶¶ 124, 195, 197, 201, 244.   However, there is no clarity as to just what conduct amounted to such "strongarming," and so this allegation is too imprecise to satisfy Rule 9.  If the Noteholders just clamored for a timely repayment of the Notes, for example, that would just have been an assertion of their own legal rights.  By itself such demands for payment would not be "substantial assistance" to the commission of a fraud against the Investors.  *Sharp*, 403 F.3d at 51 (demands for payment may have created pressure but that was not "substantial assistance" or a "corrupt inducement" to the commission of a fraud in raising new funds).

The Complaint alleges "on information and belief" that "various" unnamed Noteholders offered unspecified "suggestions, guidance and direction" as to how IIG should approach new investors.  Compl. at ¶ 124.  This allegation is too vague and conclusory to satisfy Rule 9(b).  It does not specifically allege, for example, which Noteholder offered "suggestions," or what those suggestions were, or (most importantly) that any Noteholder actually suggested that misrepresentations be made or that material facts be omitted in IIG's dealings with the Investors.

The Liquidators argue that the Noteholders' forbearance in declaring a default gave IIG the time it needed to commit the fraud on the Investors and thereby amounted to "substantial assistance" to the fraud.  *Id.* at ¶ 244.  These "forbearance" allegations are just allegations that the Noteholders took no action, not that they affirmatively did anything to assist the underlying fraud.  There are no allegations that the Noteholders owed fiduciary or contractual duties to the Investors or that the Noteholders had an affirmative duty to act, and in the absence of such obligations a

mere inaction is not sufficient to show "substantial assistance" in the commission of a fraud. *Sharp*, 403 F.3d at 52.

The Noteholders and IIG (as collateral manager) executed a "Consent, Direction and Waiver" dated June 6, 2017 that was delivered to TFFI and DBTCA and that approved the adoption of a Fourth Supplemental Indenture. Compl. at ¶¶ 136, 244, 295; ECF No. 23-5. The purpose of the Fourth Supplemental Indenture was to permit the sale of TFFI's loan portfolio, which the Indenture did not otherwise permit. The Fourth Supplemental Indenture permitted the sale of loans, but only if the sales occurred "in an amount not less than the par value of such Assets." The Noteholders' consent to this amendment was conditioned upon TFFI's receipt of "no less than $70,000,000 in aggregate cash proceeds from the sale of Assets at a cash purchase price of not less than the par value of such Assets" and the deposit of such proceeds into a Collection Account held by DBTCA "no later than the Determination Date of June 6, 2017 for distribution on the Payment Date of June 13, 2017." Although this act may have removed a technical legal obstacle to the sale of the loans, there is nothing about it that required or assisted any misrepresentation of omission by IIG in the course of IIG's dealings with the Investors. *Sharp*, 403 F.3d at 52.

Essentially, the Complaint alleges that the Noteholders knew a fraud was underway and knew that the monies they received were the proceeds of that fraud, but did nothing to stop it. That is not enough to show "substantial assistance." I will dismiss count 5, but with leave to replead.

## VII.   Claims Alleging that DBTCA and the Noteholders Aided and Abetted Breaches of Fiduciary Duty by IIG.

Count 11 of the Complaint alleges that IIG breached fiduciary duties that it owed to GTFF and STFF. It alleges that IIG was the investment advisor to GTFF and STFF, that IIG owed fiduciary duties to GTFF and STFF in that capacity, and that IIG breached those duties by failing to disclose complete and accurate information about the loans in which GTFF and STFF were

acquiring participation interests and by affirmatively misrepresenting the nature and quality of the loan assets.  Compl. at ¶ 290.  It also alleges that IIG breached its duties of loyalty by causing GTFF and STFF to purchase participation interests in loans that were owned by another entity for which IIG acted as advisor notwithstanding the fact that the loans were in default, were distressed, or were fictitious.  *Id*. at ¶ 291.

Counts 12 and 13 allege that DBTCA and the Noteholders aided and abetted those breaches of fiduciary duty or participated in them.  No challenge has been made as to the sufficiency of the underlying claims that IIG breached fiduciary duties that it owed to GTFF and STFF.  DBTCA and the Noteholders contend, however, that the allegations of the Complaint are deficient as to their "knowledge" of such breaches of duty and as to their alleged inducement or participation in them.

### A.    Elements of the Aiding and Abetting/Participation Claim.

A claim that a defendant has aided and abetted, or participated in, a breach of fiduciary duty requires (1) a breach by a fiduciary of its obligations to another party, (2) the defendant's knowing inducement or participation in such a breach, and (3) damage to the plaintiff as a result of the breach.  *Applied Energetics, Inc. v. Stein Riso Mantel McConough, LLP*, No. 19-cv-1232 (AJN), 2020 WL 2833686 at *4 (S.D.N.Y. 2020).  A defendant "participates" in a breach of fiduciary duty if the defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables a breach of fiduciary duty to proceed.  *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 284 (2d Cir. 1992).  Advice or encouragement to act operate as moral support and have the same effect on liability as participation or physical assistance.  *Id., citing Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983).  Such "advice or encouragement," however, constitutes "participation" in a breach of fiduciary duty only to the extent that the act encouraged "is known to be tortious."  Restatement (2d) of Torts, 876, comment d.

## B.    Whether the Claims are Barred by the *In Pari Delicto* Doctrine.

The Noteholders argue that count 12 should be barred based on the *in pari delicto* doctrine. As discussed in Part I, "*in pari delicto*" means "of equal fault.  The *in pari delicto* defense "has been applied by the courts to deny recovery to a plaintiff whose losses were created by his own fault that is at least equal to or substantially equal to that of the defendant."  *Richardson v. Shearson/American Express Co., Inc.*, 573 F.Supp. 133, 135 (S.D.N.Y. 1983).  It is difficult to understand how this particular defense could be deemed applicable (particularly as a matter of law on a motion to dismiss) to the counts of the Complaint that are based on violations of fiduciary duties.  The Complaint alleges that IIG owed such duties, that IIG violated them by not disclosing facts to GTFF and STFF, and by acting in the interests of another client (TFFI) rather than in the interests of GTFF and STFF.  No facts are alleged that would support the contention that GTFF and STFF, as victims, were of equal fault in IIG's breaches of fiduciary duty.  Similarly, the Complaint alleges that the Noteholders and DBTCA had actual knowledge of IIG's breaches of duty and provided knowing assistance to those breaches.  GTFF and STFF are alleged that have been deceived by IIG, and there is hardly any basis on those particular facts to say that GTFF and STFF (as victims) were of "equal fault" with parties who allegedly provided knowing assistance to the wrongdoer.

The Noteholders nevertheless point to allegations in the Complaint that the transfers of GTFF's and STFF's property were made with "intent" to defraud creditors.  As described above in Part I of this Decision, however, the primary allegation of the Complaint is that IIG had the power to control the disposition of GTFF's and STFF's property and for that reason IIG's bad intent is sufficient for the purpose of asserting a claim that the transfers were made with a fraudulent intent.  That does not necessarily mean that all of IIG's knowledge, or purposes, or wrongdoings also are

attributable to GTFF and STFF for purposes of other claims. The Complaint as a whole alleged that GTFF and STFF were the unknowing victims of deception and breaches of fiduciary duty that were perpetrated by IIG, rather than being participants in IIG's wrongdoing.

The Complaint alleges that IIG's fraudulent intent is sufficient for purposes of the fraudulent conveyance claims because IIG controlled the investments that GTFF and STFF made, but the Complaint also alleges that IIG acted faithlessly and deceived GTFF and STFF in the process. In that context, there is nothing in the allegations of the Complaint itself that should preclude GTFF and STFF from suing the faithless agent for its deceptions and its breaches of duty, or from suing persons who allegedly aided and abetted those deceptions. I cannot hold as a matter of law, based on the current record, that the claims asserting that IIG breached its fiduciary duties are barred by the *in pari delicto* doctrine.

### C.      Allegations of Defendants' Knowledge of Fiduciary Duty Breaches.

Many of the allegations relevant to DBTCA's alleged knowledge of fraud are also relevant to DBTCA's alleged knowledge that IIG breached the fiduciary duties that it owed to GTFF and STFF. I have already summarized above the allegations that DBTCA knew that the loans were in default and subject to numerous problems, that the loans were not possibly worth their stated par values, but that the loans nevertheless were being sold to TFT "at par" and GTFF and STFF nevertheless were purchasing "participation interests" that presumed that the loans were equal to their full par values. The Complaint amply alleges that DBTCA had actual knowledge that the transactions that IIG arranged for GTFF and STFF were unfair to GTFF and STFF, that IIG was representing multiple parties with conflicting interests, and that IIG breached the fiduciary obligations that it owed to GTFF and STFF.

The Complaint also alleges that the "Noteholders" knew that IIG "sponsored and served as investment advisor for GTFF and STFF," Compl. at ¶ 200, and that the "Noteholders" knew that IIG was breaching the fiduciary obligations that it owed to GTFF and STFF. For the reasons stated above, the general allegation that each and every "Noteholder" had the same information, and was responsible for the same conduct, is not reasonable. Some more specificity is required as to what particular Noteholders allegedly "knew" and as to how they allegedly knew it; if there are reasons why Noteholders (or subgroups of them) acted in concert, or are chargeable with knowledge that their representatives and agents had, those need to be spelled out more precisely. However, to the extent that the alleged knowledge of the "Noteholders" is properly tied to particular Noteholders, the allegations that are summarized above in relation to the fraud claims are also sufficient to show that the Noteholders had actual knowledge that IIG had breached the fiduciary duties that it owed to GTFF and STFF. The allegations show that the Noteholders knew that IIG represented parties with different interests; that the loans being sold to TFT were problematic and could not possibly have had the values that were being ascribed to them; and that IIG nevertheless was causing GTFF and STFF to purchase participation interests in those loans as though the loans were worth their full stated par values.

### D.    Allegations as to Defendants' Inducement or Participation in the Alleged Breaches.

The Second Circuit Court of Appeals discussed the types of conduct that constitute "inducement" of a breach of fiduciary duty, or "participation" in such a breach, in its decision in *Sharp*, 403 F.3d 43. In that case, a bankruptcy trustee alleged that State Street had aided and abetted a breach of fiduciary duty by a controlling shareholder when State Street (1) learned of problems with Sharp's accounts and alleged receivables, (2) demanded repayment of State Street's loans, and (3) accepted repayment from the proceeds of new loans from unsuspecting lenders,

without giving warnings of the underlying problems that State Street had discovered. *Id.* at 47–48. The Court held that as a matter of law the alleged conduct by State Street did not constitute "inducement" or "participation" in a breach of fiduciary duty. *Id.* at 49–50. State Street's demand for payment might have created pressure but "cannot be characterized as either participation or substantial assistance," and it was not a "corrupt inducement" that would create aider and abettor liability because the request, without more, did not induced a fraud to occur. *Id.* at 51.

State Street's silence about the problems it had uncovered also allegedly constituted a "participation" in the underlying misconduct, but the Court of Appeals disagreed. The silence did not amount to "substantial assistance" because such silence merely amounted to a failure to act in circumstances under which State Street had no affirmative duty to act. *Id.* at 51–52. The Court held that "a company in a position to thwart or expose a breach of fiduciary duty may protect its interests by doing neither, sitting quiet, and being quiet." *Id.* at 52. "No doubt, State Street was hoping to be replaced by a less cautious lender, and had no intention of precipitating its own loss, but silence and forbearance did not assist the fraud *affirmatively*." *Id.* (emphasis in original).

State Street also had allegedly assisted in the underlying wrongful conduct by providing its contractual consent to the issuance of additional notes, allegedly knowing that the new noteholders were being defrauded. The Court of Appeals held that "State Street's consent was not an inducement; it merely removed an impediment. Nor did the consent conceal the fraud." *Id.* The consent also could not be characterized as "affirmative assistance" in the absence of a duty to speak. The contractual impediment to the sale of the new notes "was reserved to State Street to invoke or not in its own interest. The existence of that right did not entail a duty to consider the interests of anyone else, and State Street's exercise of that right to protect itself rather than its improvident competitors did not constitute participation in the Spitzes' fraud." *Id.*

Some of the conduct upon which Plaintiffs rely in support of their aiding and abetting claims is squarely of the kind that was found deficient in *Sharp.*  Plaintiffs allege that the Noteholders allegedly provided substantial assistance to IIG and "induced" IIG's breaches of fiduciary duty by "encouraging IIG to proceed with the loan sales," by "insisting that the sales only proceed if the Funds paid par plus accrued interest," by "forbearing from calling an Event of Default" so that IIG would have time to solicit new investors, and by approving a modification to the Indenture so as to permit TFFI to sell its loan portfolio.  Compl. at ¶ 295.  The Liquidators similarly allege that DBTCA drafted the modified Indenture "so as to permit IIG to sell the CLO's loans to the Funds at par."  *Id*. at ¶ 300.  Under *Sharp*, however, a lender's desire for repayment and the demand for the same, or its temporary forbearance or silence, or its removal of an obstacle to another financing, are not enough to constitute "substantial assistance" or "inducement" of a breach of fiduciary duty.  *Sharp*, 403 F.3d at 43.

Plaintiffs also allege that the Noteholders "offer[ed] suggestions, guidance, and direction on how IIG should go about approaching potential investors for the Funds."  Compl. at ¶ 295.  An allegation that the Noteholders encouraged IIG to hide the truth, or otherwise to defraud or violate duties that IIG owed to its clients, might well constitute an "inducement" of a breach of fiduciary duty.  However, the allegation in the Complaint is merely that some unspecified Noteholders offered "suggestions" and "guidance" of and unspecified nature.  There is no specific allegation that wrongful conduct was encouraged and solicited.

DBTCA also allegedly provided substantial assistance to the breaches of fiduciary duty by agreeing to open bank accounts, executing money transfers, and serving as a cash management bank for GTFF and STFF.  These allegations differ from the allegations that the opening of bank accounts constituted "substantial assistance" in the commission of a fraud, because some of the

relevant bank accounts were opened in the names of GTFF and STFF (the victims of the alleged breaches of fiduciary duty), whereas Investors (the victims of the alleged fraud) were not customers of DBTCA.   Inaction can constitute "substantial assistance" to a breach of fiduciary duty if a party fails to act when that party has a duty to act.   I therefore raised the question at oral argument as to whether DBTCA owed affirmative duties to its customers (GTFF and STFF) and whether its failures to disclose facts to its own depositors could be considered "substantial assistance" to, or "participation" in, IIG's breaches of fiduciary duty.   The parties addressed this issue in supplemental submissions.

The Liquidators argued in their supplemental submission that DBTCA owed "fiduciary" duties to GTFF and STFF by virtue of opening the bank accounts, and that a fiduciary owes affirmative duties of disclosure.   Under New York law, however, the relationship between a bank and a depositor is not a fiduciary relationship.   *See JPMorgan Chase Bank, N.A. v. Freyberg*, 171 F.Supp.3d 178, 191 (S.D.N.Y. 2016) ("The relationship between a bank and its depositor is that of debtor and creditor, which, without more, is not a fiduciary or special relationship'" (quoting *Kevin Kervene Tung, P.C. v. J.P. Morgan Chase & Co*., 943 N.Y.S.2d 792)); *Bank Leumi Trust Co. of N.Y. v. Block 3102 Corp.*, 180 A.D.2d 588, 589 (N.Y. App. Div. 1st Dept. 1992) ("The legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower or its guarantors.").   A fiduciary may owe affirmative disclosure obligations, but an ordinary creditor does not.   *Ryan v. Hunton & Williams*, No. 99-CV-5938 (JG), 2000 U.S. Dist. LEXIS 13750 (E.D.N.Y. Sept. 20, 2000) (relationship between a bank and its depositor is not a fiduciary one and is only that of a debtor and creditor, and does not give rise to an affirmative disclosure obligation in an aiding and abetting context).

The Liquidators also cited to the decision in *Lerner*, 459 F.3d 273. In *Lerner*, a bank allegedly knew that funds in an attorney's account represented trust funds that the attorney held for the attorney's clients. Banks in New York that administer IOLA accounts are obligated to report overdrafts to the state IOLA fund, but in *Lerner* the plaintiff alleged that the bank agreed not to do so. The Court of Appeals found that the bank had an affirmative duty to safeguard the "trust" funds deposited with them in the face of clear evidence indicating that funds were being misappropriated. *Id.* at 295. The Court of Appeals relied upon the New York state court decision in *Home Savings of Am., FSB v. Amoros*, 233 A.D.2d 35 (N.Y. App. Div. 1st Dept. 1997), in which the Appellate Division held as follows:

> Ordinarily, of course, a depositary bank has no duty to monitor fiduciary accounts maintained at its branches to safeguard the funds in those accounts from fiduciary misappropriation. . . . Notwithstanding the aforecited rule, a depositary bank may still be held answerable for the loss of funds misappropriated from a fiduciary account if the bank, with knowledge of the fiduciary's diversion of trust funds, accepts such funds in payment of a personal obligation owed by the fiduciary to the bank . . . or the bank otherwise has actual knowledge or notice that a diversion is to occur or is ongoing. . . . Facts sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated will trigger a duty of inquiry on the part of a depositary bank . . ., and a bank's failure to conduct a reasonable inquiry when the obligation to do so arises will result in the bank being charged with such knowledge as inquiry would have disclosed . . .

*Id.* at 39 (citations omitted).

The rulings in *Home Savings* and in *Lerner* have consistently been described as exceptions to the general rule that are applicable specifically to accounts that are "trust" or "fiduciary" accounts. *See Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 1999 U.S. Dist. LEXIS 978, at *43 (S.D.N.Y. Feb. 2, 1999) (distinguishing *Home Savings* on the ground that it applies only where a bank owes a fiduciary duty); *Dale v. ALA Acquisitions, Inc.*, No. 3:00CV359TSL-JCS, 2008 U.S. Dist. LEXIS 26905, at *16 (S.D. Miss. Mar. 31, 2008) (holding that *Home Savings* and other cases had just recognized a limited extension of a duty of care for fiduciary accounts). In this case,

however, the Complaint does not allege that the bank accounts that were set up for GTFF and STFF were "trust" accounts or fiduciary accounts.  Furthermore, the limited duty imposed in *Home Savings* and *Lerner* was to take action if the bank knew that a fiduciary was misappropriating funds.  In this case, the Complaint does not allege that the monies in the GTFF and STFF accounts were used for any purposes other than for the completion of the purchase of participation interests that GTFF and STFF had authorized.  There are allegations of an underlying fraud, but there are no allegations that "trust" accounts were used for improper or unauthorized purposes, or that funds were misappropriated, or that funds were transferred out of GTFF's and STFF's accounts to any recipients other than those authorized by GTFF and STFF.

The Liquidators have alleged that DBTCA assisted TFT in allegedly violating "know your customer" rules in setting up accounts, but this allegation does not constitute "substantial assistance" to the commission of a breach of fiduciary duty any more than it allegedly constituted "substantial assistance" to the commission of a fraud.

The Liquidators also alleged that DBTCA provided "substantial assistance" to the alleged breaches of fiduciary duty by reviewing and commenting on draft offering circulars (Compl. at ¶ 300), but as noted above the Liquidators have informed the Court that DBTCA only received one of the two offering circulars, and they have withdrawn their allegations that DBTCA alleged commented on the circular that was received.  DBTCA's mere receipt of a document does not constitute "substantial assistance" in a breach of fiduciary duty.

The Liquidators further argue that unnamed Noteholders provided unspecified "suggestions, guidance, and direction" as to how IIG should approach Investors (Compl. at ¶ 295), but the breach of fiduciary duty claim is asserted on behalf of GTFF and STFF, not on behalf of

the Investors.  In any event, this allegation is too vague to constitute a proper allegation of "substantial assistance."

### Conclusion

For the foregoing reasons:  (a) all claims asserted against BlueMountain Credit Opportunities Master Fund I L.P. are dismissed; (b) the Cayman common law claims (counts 7 and 15) are dismissed, by consent and with prejudice, as to all Defendants; (c) two of the Cayman undervalue claims (counts 6 and 14) are dismissed as to all Defendants, with prejudice; (d) the aiding and abetting claims (counts 4, 5, 12 and 13) are dismissed, but without prejudice and with leave to replead; (e) DBTCA's motion to dismiss counts 1, 2, 9 and 10 against it is DENIED as to amounts that DBTCA applied in payment of its own fees but is GRANTED, as to DBTCA, with respect to other funds that DBTCA received and paid to the Noteholders, but without prejudice and with leave to replead; and (f) Defendants' motions to dismiss are otherwise DENIED insofar as they relate to counts 1, 2, 9, 10, 16 and 17 of the Complaint.  The parties are directed to confer and to agree upon a reasonable schedule for the submission of any amended pleading and are directed to submit an agreed form of order that incorporates that schedule and the rulings set forth in this Decision.

Dated: New York, New York
      November 8, 2024

                                  /s/ **Michael E. Wiles**
                                  Honorable Michael E. Wiles
                                  United States Bankruptcy Judge