UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>IIG Global Trade Finance Fund Ltd. (in Official Liquidation), *et al.*,<br><br>Debtors. | Case No. 20-10132 (MEW)<br><br>Chapter 15<br><br>Jointly Administered |
| IIG Global Trade Finance Fund Limited (in Official Liquidation), *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>International Investment Group L.L.C., *et al.*,<br><br>Defendants. | Adv. Pro. No. 23-01165 (MEW)<br><br>**DECLARATION OF THOMAS LOWE KC** |

## DECLARATION OF THOMAS LOWE KC

1. I am a barrister and King's Counsel. I operate from Wilberforce Chambers in London and from offices in the Cayman Islands.

2. I am the same Thomas Lowe KC who previously swore a declaration in these proceedings on 22 March 2024 (the "**March 2024 Declaration**") (Dkt. No. 67). This declaration is intended to supplement and be read together with the March 2024 Declaration. For the reasons set forth in the March 2024 Declaration and accompanying Exhibit A (Dkt. No. 67-1), I consider that I have the requisite qualifications and expertise to express my opinions on the matters that I have been asked to consider under Cayman Islands law.

3. I have been instructed by Selendy Gay PLLC, U.S. counsel for Assured Investment Management LLC (f/k/a BlueMountain Capital Management, LLC and n/k/a Sound Point Luna LLC), and certain funds over which it was appointed as investment manager (collectively, the "**BlueMountain Defendants**"), in the above-captioned proceeding (the "**Proceeding**") to express my opinion on

certain questions of the law of the Cayman Islands, as set out below. I understand this declaration will be submitted in connection with a Motion to Dismiss dated 23 January 2025 filed by certain defendants (including the BlueMountain Defendants) in the Proceeding in further support of their Motion to Dismiss the Plaintiffs' Amended Complaint dated 6 December 2024 (the "**Amended Complaint**"). The cases cited in this declaration are attached as exhibits hereto.

4. I have been asked to express an opinion on the following questions:

(1) What are the elements that a liquidator must establish in order for a Court to determine that a person is liable for fraudulent trading under section 147 of the Companies Act? (see Section I(1) below)

(2) What are the applicable pleading standards for a claim involving allegations of fraud filed in a Court in the Cayman Islands, and whether such standards apply to fraudulent trading claims under section 147 (see Section I(2) below)

(3) What is the legal test for establishing that persons were "*parties to carrying on of the business*" in a fraudulent manner under section 147 of the Companies Act? (see Section I(3) below)

(4) What is the legal test for establishing that a person was "knowingly" party to fraudulent trading? (see Section I(4) below)

(5) How do the allegations in the Amended Complaint relate to these legal principles:

(a) whether the use of group pleaded allegations may be sufficiently particularised to satisfy Cayman pleading standards, to the extent those standards apply (see Section II(1) below)

(b) whether the pleaded examples of participation rise above "mere inertia" or "concurrence" (see Section II(2) below);

(c) whether particularised allegations regarding the "business of the Debtors" are required (see Section II(3); and

(d) whether particularised allegations regarding the knowledge of a specific individual are required (see Section II(4)

## I. LEGAL REQUIREMENTS FOR FRAUDULENT TRADING CLAIMS

5. I am instructed that the Plaintiffs are the joint liquidators of IIG Global Trade Finance Fund Ltd (in official liquidation) and IIG Structured Trade Finance Fund Ltd (in official liquidation) (together, the "**Debtors**"). In the Amended Complaint, the Plaintiffs bring claims against various holders of notes and their investment managers (the "**Noteholders**")[1] issued by Trade Finance Funding I Ltd. (the "**CLO Fund**").

6. In the Amended Complaint, the Plaintiffs seek to implicate the Noteholders in a fraud allegedly perpetrated by International Investment Group LLC ("**IIG**") and the Debtors against their investors. Relevantly, this includes a claim that the investment manager entities[2] among the Noteholders (the "**Noteholder Managers**")[3] are liable under section 147 of the Companies Act ("**Section 147**") for fraudulent trading. The alleged fraudulent trading relates to the business of the Debtors prior to the appointment of liquidators. I have been asked to advise on the legal requirements for this claim under Cayman law and relate those principles to the allegations in Plaintiffs' complaint.

---

[1] Assured Investment Management LLC, Tennenbaum Capital Partners, LLC, KKR Credit Advisors (US) LLC, Elanus Capital Management, LLC, BlueMountain Foinaven Master Fund L.P., BlueMountain Logan Opportunities Master Fund L.P., BlueMountain Montenvers Master Fund SCA SICAV-SIF, BlueMountain Timberline Ltd., BlueMountain Kicking Horse Fund L.P., Tennenbaum Senior Loan Fund IV-B, LP, Tennenbaum Senior Loan Fund II, LP, Tennenbaum Senior Loan Operating III, LLC, Corporate Capital Trust, Inc., KKR Debt Investors II (2006) (Ireland) L.P., KKR TRS Holdings, Ltd., KKR-PBPR Capital Partners L.P., Special Value Continuation Partners, LP, and Elanus Capital Investments Master SP Series 1 Series 1.

[2] While the full term, "the Noteholders" is used for the relevant allegations, I understand from counsel to the BlueMountain Defendants that Plaintiffs have clarified that the defendants as to this claim are the investment managers entities alone.

[3] The Noteholder Manager entities are Assured Investment Management LLC (f/k/a BlueMountain Capital Management, LLC and n/k/a Sound Point Luna LLC) ("BlueMountain"), Tennenbaum Capital Partners, LLC ("Tennenbaum"), KKR Credit Advisors (US) LLC ("KKR"), Elanus Capital Management, LLC.

**(1) Elements of a fraudulent trading claim**

7. Section 147 provides:

> *(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.*
>
> *(2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.*

8. Section 147 came into force in March 2009 and is derived from section 213 of the UK Insolvency Act 1986. This provision was originally introduced in England as Section 75 of the Companies Act 1928 and immediately re-enacted by section 275 of the Companies Act 1929.[4] Originally, liability was confined to past and present directors. Section 110(1) of the UK Companies Act 1949 replaced the reference to a director with "*any person*" in what had become section 332 of the Companies Act 1948. For this reason, when Section 147 was introduced in the Cayman Islands, the legislature would be taken to have been aware of the substantial body of case law that had built up in England and other Commonwealth jurisdictions before 2009.

9. The Plaintiffs need to demonstrate in accordance with Section 147(1) that the business of the entities over which the Cayman liquidators have been

---

[4] Section 275 of the Companies Act 1929 provided as follows: *"(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or for any fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory of the Company may, if it thinks proper so to do, declare that any of the directors, whether past or present, of the company who were knowingly parties to the carrying on of the business in manner aforesaid shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the court may direct. (2) Where the court makes any such declaration, it may .... make provision for making the liability of any such director under the declaration a charge on any debt or obligation due from the company to him ...."*

appointed[5] was carried on or conducted with the intent to defraud their creditors. Under Section 147(1) the focus of the Court is on the carrying on of fraudulent business of those insolvent entities. Any party sought to be made liable must have been joined on the basis of Section 147(2).

10. I have not identified any Cayman authorities in which Section 147 has been substantively applied. In those circumstances, given that Section 147 is derived from section 213 of the UK Insolvency Act 1986, a Cayman Court would follow the approach of the English Courts for the purposes of interpreting the Cayman legislation unless there is clear reason to consider such decisions to be wrong.

11. The elements of the equivalent English provision, section 213 of the UK Insolvency Act 1986, are:

(a) the business of the company in liquidation has been carried on with intent to defraud the creditors of the company or for any other fraudulent purpose;

(b) the defendant sought to be made liable participated in[6] the carrying on of the business of the company in that manner; and

(c) the defendant so participated knowingly: i.e. with knowledge that the transactions it was participating in were intended to defraud the creditors of the company or were in some other way fraudulent.[7]

12. In my opinion, the elements outlined above would apply to any claim under section 147 of the Companies Act.

13. The carrying on of a business with intent to defraud means that the business is a fraudulent enterprise.[8] This is to be distinguished from a fraudulent transaction concluded in the course of a wider business. The latter is not the

---

[5] IIG Global Trade Finance Fund Ltd (in official liquidation) and IIG Structured Trade Finance Fund Ltd (in official liquidation).
[6] As outlined below, active participation is required for a person to be found to be "party to" the fraudulent trading.
[7] See *Morris v State Bank of India* [2003] BCC 735 at [11].
[8] See *Re Patrick Lyon* [1933] Ch 786.

carrying on of the business with intent to defraud if the wider business is not also fraudulent.[9]

**(2) Pleading fraud claims with particularity**

14. I understand that these proceedings are governed by the pleading rules adopted by this Honourable Court. Nothing I say is intended to apply to those pleading rules and I do not wish to trespass on to that territory. I have nevertheless been asked to explain the pleading rules as they apply to a claim for fraud in the Cayman Islands filed in a Cayman Island Court.

15. A claim for fraudulent trading necessarily requires establishing a fraudulent intent. In the Cayman Islands, when pleading a claim involving allegations of fraud, allegations must be pleaded in a specific and detailed manner and must have some evidential basis. In *Ritchie Capital Management LLC v Lancelot Investors Fund Limited* [2021 (1) CILR 128] (a case in which I was involved), Parker J held:

> *"[84] I accept … that <u>the pleading of fraud or deceit is a serious step and should not be based on speculation or guesswork</u>. This is not only because of the reputational significance and effect on individuals and entities against whom fraud is pleaded. Fraud cases can also increase the cost, complexity and 'temperature' of actions. There are necessary hurdles to overcome and allegations of fraud in pleadings should not be 'bandied about'.*
>
> *[85] I also accept … that a fraud case, which classically relies on inferences, <u>cannot be properly pleaded without some solid foundation in evidence. In addition to the well-known pleadings principles, it must be sufficiently particularised in order for the defendant to understand the case it has to meet and so as to justify any necessary inferences as to the deceit and conspiracy alleged</u>. The fraud case and inferences which would support and justify the plea of fraud must be properly pleaded out with some particularity."*

16. In the decision of *Jafar v Abraaj Holdings (in official liquidation)* (Unreported, 20 December 2021) at [14]-[16], Segal J confirmed that even where a party is subject to an information disparity, this does not excuse vague pleadings where

---

[9] *Morphitis v Bernasconi* [2003] Ch 552 at [43] citing *Re Murray-Watson Ltd* (Unreported, Oliver J, 6 April 1977).

that can reasonably be avoided.

17. In *Enigma Diagnostics Limited (in liquidation) v Boulter* (Unreported, 8 February 2022), Doyle J held:

> *"I entirely accept that it is trite law that fraud must be expressly and specifically pleaded. It is often said that fraud must be distinctly alleged and distinctly proved. Allegations of fraud must always be properly particularised. There must be relevant particulars where the court is being asked to draw an inference, setting out the facts alleged from which the inference can be drawn. Those making serious allegations of fraud cannot proceed on Mr Micawber's optimistic belief that something will turn up. Mr Quest referred the court to paragraphs 183 to 185 of Lord Millett's judgment in Three Rivers and paragraphs 145 to 148 of Mrs Justice Cockerill's judgment in King v Stiefel [2021] EWHC 1045 (Comm). It is right that pleadings of fraud must be subjected to close scrutiny. Fraud and any necessary suggested inferences which justify and support such a plea must be properly pleaded out with some particularity."* (emphasis added)

18. In *Fortunate Drift Limited v Canterbury Securities, Ltd* (Unreported, 30 June 2023), Kawaley J cited the judgment of Lord Millett in *Three Rivers DC v Bank of England (No.3)* [2003] 2 AC 1 as follows:

> *"184. It is well established that fraud or dishonesty (and the same must go for the present tort) must be distinctly alleged and as distinctly proved; that it must be sufficiently particularised; and that it is not sufficiently particularised if the facts pleaded are consistent with innocence: see Kerr on Fraud and Mistake 7th ed (1952), p 644; Davy v Garrett (1878) 7 Ch D 473, 489; Bullivant v Attorney Genera; for Victoria [1901] AC 196; Armitage v Nurse [1998] Ch 241, 256. This means that a plaintiff who alleges dishonesty must plead the facts, matters and circumstances relied on to show that the defendant was dishonest and not merely negligent, and that facts, matters and circumstances which are consistent with negligence do not do so.*
>
> *185. It is important to appreciate that there are two principles in play. The first is a matter of pleading. The function of pleadings is to give the party opposite sufficient notice of the case which is being made against him. If the pleader means 'dishonestly' or 'fraudulently', it may not be enough to say 'wilfully' or 'recklessly'. Such language is equivocal. A similar requirement applies, in my opinion, in a case like the present, but the requirement is satisfied by the present pleadings. It is perfectly clear that the depositors are alleging an intentional tort.*
>
> *186. The second principle, which is quite distinct, is that an allegation of fraud or dishonesty must be sufficiently particularised, and that particulars of facts which are consistent with honesty are not sufficient.*

> *This is only partly a matter of pleading. It is also a matter of substance. As I have said, the defendant is entitled to know the case he has to meet. But since dishonesty is usually a matter of inference from primary facts, this involves knowing not only that he is alleged to have acted dishonestly, but also the primary facts which will be relied upon at trial to justify the inference. At trial the court will not normally allow proof of primary facts which have not been pleaded, and will not do so in a case of fraud. It is not open to the court to infer dishonesty from facts which have not been pleaded, or from facts which have been pleaded but are consistent with honesty. There must be some fact which tilts the balance and justifies an inference of dishonesty, and this fact must be both pleaded and proved.*
>
> *187. In Davy v Garrett 7 Ch D 473, 489 Thesiger LJ in a well known and frequently cited passage stated:*
>
> > *'In the present case facts are alleged from which fraud might be inferred, but they are consistent with innocence. They were innocent acts in themselves, and it is not to be presumed that they were done with a fraudulent intent.'*
>
> *This is a clear statement of the second of the two principles to which I have referred."*

19. The authorities on pleading fraud establish that in a claim which involves allegations of fraud, both the particulars of the fraud itself and the alleged dishonesty and/or knowledge of the fraud by the defendant must be alleged with specificity.

**(3) "*Parties to*" requirement**

20. I have not identified any civil cases in England in which an outsider to the insolvent company in question has been found to have participated in fraudulent trading after a disputed trial. A number of cases appear to confirm that liability for participation in carrying on a business could theoretically be imposed on outsiders and liability is not necessarily limited to those who exercise management or control over the insolvent company. This was the conclusion of the English Court of Appeal in a recent case (see *Bilta (UK) Ltd (in liquidation) v Tradition Financial Services Ltd* [2023] Ch 343 ("***Bilta***")). However, the decision in *Bilta* was appealed by the defendants to the UK Supreme Court[10] (being the UK's highest appellate court which is not binding

[10] *Bilta (UK) Ltd (in liquidation) v Tradition Financial Services Ltd* UKSC/2023/0033

on Cayman Courts but is highly persuasive). This appeal was heard over two days on 11 and 12 December 2024 with the defendants arguing that only those exercising management or control over a company could be implicated for fraudulent trading and outsiders of the company could not. As at the date of this declaration, the UK Supreme Court has not yet handed down its judgment but is expected to do so in 3-4 months. This is the first time that the UK Supreme Court will have substantively considered the scope of the participation requirement. Accordingly, the judgment, once published, is likely to be very influential to the Cayman Court (particularly because section 147 of the Cayman Companies Act is based upon section 213 of the UK Insolvency Act 1986, which is at issue in *Bilta*). Until overruled the law is taken from the Court of Appeal but a Cayman Court is not bound by that.

21. But even if the Court of Appeal decision is affirmed, Section 147 only imposes liability on a defendant if they were "*a party to*" the fraudulent carrying on of the business. What is meant by the requirement that a person must be "*party to*" the carrying on of the fraudulent business was considered in *Re Maidstone Buildings Provisions Ltd* [1971] 1 WLR 1085 ("***Maidstone*****")**, in which a liquidator brought proceedings against Mr Penney, the company secretary, an officer of the insolvent company but not a director, who was also a partner at the firm of the company's auditors.[11] The liquidators alleged that Mr Penney had knowledge that the company was insolvent but failed to take steps to prevent the company from trading fraudulently, arguing that he had a positive duty to do so.

22. Mr Penney sought to strike out (or summarily demur or dismiss) the claim on the basis that it contained no reasonable cause of action. For the purposes of such an application, it had to be assumed from the pleading that Mr Penney had knowledge of the fraudulent trading. The issue was whether he was a *party* to the carrying on of the fraudulent business by reason of his failure to take

[11] Pennycuick VC considered Mr Penney's position as a secretary to be a middle ground between a true insider and an outsider: "*as the position of a secretary as such is concerned, it is established beyond all question that a secretary, while merely performing the duties appropriate to the office of secretary, is not concerned in the management in the company. Equally I think he is not concerned in carrying on the business of the company. On the other hand, it is equally well established, indeed it is obvious, that a person who holds the office of secretary may in some other capacity be concerned in the management of the company's business.*" *Maidstone* at 1092.

steps at board meetings or otherwise to prevent the company from ordering goods on credit or incurring debts in these circumstances. This was essentially a claim of an alleged breach of a duty to act. Pennycuick VC rejected the claim. No such duty could be imposed on Mr Penney as a non-director simply because of knowledge of the fraudulent business. Since Mr Penney had not actually done anything positive but omitted to perform his duty, Pennycuick VC struck out the claim against the defendant as disclosing no reasonable cause of action.

23. Pennycuick VC found that in order to establish liability, it was necessary for a plaintiff to demonstrate that a defendant had taken some "positive step":

> *"The expression 'party to the carrying on of a business' is not, I think, a very familiar one but, so far as I can see, the expression 'party to' must on its natural meaning indicate no more than 'participates in', 'takes part in' or 'concurs in'. And that, it seems to me, involves some positive steps of some nature. I do not think it can be said that someone is party to carrying on a business if he takes no positive steps at all. So, in order to bring a person within the section, one must show that he is taking some positive steps in the carrying on of the company's business in a fraudulent manner."*[12] (emphasis added)

24. Pennycuick VC therefore also found that all that inertia or an omission to take steps was insufficient to found liability:

> *"it seems to me impossible to say that that mere inertia on the part of Mr. Penney, and that is all that is alleged against him, could represent being a party to the carrying on of the business of the company, and if that is right, it is the end of the matter….Whatever duty Mr. Penney may have owed to the company, I do not think mere omission to give advice could be regarded as amounting to being a party to carrying on the business of the company."*[13] (emphasis added)

25. The approach in *Maidstone* has been followed in several subsequent decisions. For instance, in *R v Grantham* [1984] QB 675, where *Maidstone* was cited in argument, the defendant appealed against a direction given to the jury by the trial judge which said, in part: "*As against the individual, the individual defendant, the prosecution have to prove first that he took* ***an active part*** *in carrying on the business.*" (emphasis added).[14] The defendant's appeal was

[12] *Maidstone* at 368.
[13] *Maidstone* at 368.
[14] *R v Grantham* [1984] QB 675 at 681.

rejected by the English Court of Appeal.

26. Similarly, in *R v Miles* [1992] Crim LR 657 ("***Miles***"), the trial judge had given a jury direction to the effect that the test was "*participating, or taking part or concurring in the actual trade which is involved in the business of the particular company*". The English Court of Appeal, citing *Maidstone*, took a narrower approach and found this was a misdirection, taking exception with the phrase "*concurring*" stating that this phrase: "*could and may very well have had the effect of broadening the scope of the offence charged in the minds of the jury*."[15]Taking an <u>*active*</u> part was therefore the minimum suggested in *Re Miles*.

27. The approach in *Miles* was considered and adopted by the English Court of Appeal in *Bilta*. Lewison LJ (with whom Stuart-Smith and Falk LJJ agreed) adopted a test of "*active participation*" and confirmed that the Court of Appeal in *Miles* had narrowed the approach in *Maidstone* stating that: "*one can concur in a trade without actively participating in it*." Lewison LJ therefore adopted a narrower approach than in *Maidstone* and held that:

> *"To that extent, therefore, the Court of Appeal restricted the meaning that the Vice Chancellor had adopted in the Maidstone case. <u>I consider that we can accept that in the context of civil liability as well as criminal liability, concurrence is not enough</u>."*[16] (emphasis added)

28. In my opinion the following propositions can be drawn from the cases regarding the test for outsiders to a company to be liable as parties to fraudulent trading:

 (a) The person must have actively participated in the carrying on of the fraudulent business and mere inertia is insufficient.

 (b) Concurrence (which means knowledge and approval but is short of active participation) on the part of an outsider as to the running of the business in a fraudulent manner will not be sufficient to establish

[15] *Miles* at 658.
[16] *Bilta* at [63].

liability for fraudulent trading.

(c) The participation must rise to the level of furthering or facilitating the fraudulent business.

(d) Though the case law is not settled, the requirements for demonstrating participation by an outsider may be higher than that for an insider.

**(4) "*Knowingly*" party**

29. The requirement that the person be "*knowingly*" party to carrying on the business fraudulently must involve actual or blind-eye knowledge of dishonesty.

30. When the relevant knowledge is of a corporate body, it is necessary to identify a natural person whose knowledge can be attributed to the company.[17] This person need not be a member of the board of directors and, depending on the facts of the specific case, the knowledge of a senior employee may be attributed to a corporate entity, if sufficiently alleged.

31. Mummery LJ described the approach to attribution of knowledge as follows:

> *"it therefore must to some extent depend on the facts of each particular case whether an agent's knowledge should be attributed to the company for the purposes of s.213, where the circumstances are such that there would be no attribution on the application of the primary rules. We are of the view that it must typically depend on factors such as these. The agent's importance or seniority in the hierarchy of the company: the more senior he is, the easier it is to attribute. His significance and freedom to act in the context of the particular transaction: the more it is "his" transaction, and the more he is effectively left to get on with it by the board, the easier it is to attribute. The degree to which the board is informed, and the extent to which it can be said that it was, in the broadest sense, put on inquiry: the greater the grounds for suspicion or even concern or questioning, the easier it is to attribute, if questions were not raised or answers were too easily accepted by the board"* [18] (emphasis added).

32. The observations at first instance in *Bank of India v Morris* [2004] BCC 404

[17] *Meridian Global Funds Ltd v Securities Commission* [1995] AC 500 as followed in the Cayman Islands Court of Appeal in *Autumn Holdings Asset Inc v Renova Resources Private Equity Limited* [2017 (2) CILR 136].
[18] *Morris v Bank of India* [2005] BCC 739 at [130].

by Patten J (whose judgment was not criticized on these points) had held that to be knowingly party to the fraud, a defendant:

> *"did not have to know every detail of the fraud or the precise mechanics of how it would be carried out, but clearly they did have to know, either from their own observation of what was being done or from what they were told, that BCCI was intent on a fraud. Knowledge, for this purpose, means what it says. There must have been an actual realisation on the part of BOI that BCCI would, or was likely to, engage in false accounting. A failure to recognise the truth of what was going on is not enough, however obvious that may now seem to have been. The relevant knowledge also has to be contemporaneous with the assistance that was given at the time by entering into the various transactions. Subsequent knowledge based on hindsight is not enough, nor is negligence the test of liability."*[19] (emphasis added)

33. However, it is important that one single natural person who has the requisite dishonest or blind-eye knowledge is identified. It is impermissible to aggregate the knowledge of multiple individuals for the purposes of attribution. The House of Lords in *Armstrong v Strain* [1952] 1 KB 232 held that it was not possible to aggregate two honest minds to make a dishonest whole. In *Stanford International Bank Ltd (in liquidation) v HSBC Bank plc* [2021] EWCA Civ 535[20], the English Court of Appeal followed *Armstrong* and held:

> *"As the cases show, if dishonesty and blind-eye knowledge is to be alleged against corporations, large or small, it has to be evidenced by the dishonesty of one or more natural persons. The rules that have been laid down as to what amounts to dishonesty for the purposes of dishonest assistance cannot be circumvented. Of course, the court must look at all the facts and all the actual and constructive knowledge of those involved in representing HSBC, but one cannot avoid the subjective dishonesty stage of the test in order to proceed directly to the objectively dishonest stage as Mr. Fenwick seeks to do. The subjective dishonesty that needs to be established, after consideration of all the facts, must either be the dishonesty of a person within the corporation or the blind-eye knowledge of such a person. The latter requires, as I have said and the judge held, that person to have a targeted suspicion (here that there was a Ponzi fraud) and then to decide not to ask questions that might lead to its discovery."*

34. In my opinion the following propositions can be drawn from the cases

---

[19] *Bank of India v Morris* [2004] BCC 404 at [13].

[20] The matter went to the Supreme Court on a different issue and, in any event the Court of Appeal decision was upheld (see *Stanford International Bank Ltd (in liquidation) v HSBC Bank plc* [2022] UKSC 34)

regarding the requirement of knowledge:

(a) When the relevant knowledge is that of a corporate entity, then it is necessary to identify a single natural person whose knowledge may be attributable.

(b) This person need not be a member of the board of directors and, depending on the facts of the specific case, the knowledge of a senior employee may be attributed to a corporate entity, if sufficiently alleged.

(c) The knowledge requirement does not require the relevant person to know all of the details of the fraud or the mechanics of how it would be carried out.

## II. DISCUSSION OF THESE PRINCIPLES WITH RESPECT TO THE AMENDED COMPLAINT

35. This section considers the pleaded allegations in the Amended Complaint by reference to the principles in Section I. However, I do not presume to be applying the law governing the pleading requirements in federal courts in the United States applicable to these proceedings. Accordingly, only because I have been asked to do so and with some diffidence, I am providing a commentary on how a Cayman Court would approach the pleadings:

### (1) Whether the use of group pleaded allegations can be sufficiently particularised to satisfy Cayman standards, to the extent those standards apply

36. As I have said above, a claim for fraudulent trading must be pleaded with sufficiently particularised claims at to the conduct and knowledge of the defendant (see Kawaley J in *Fortunate Drift Limited v Canterbury Securities, Ltd* (Unreported, 30 June 2023)).

37. The Amended Complaint utilizes a composite definition of "the Noteholders" which is comprised of a group of nineteen different noteholder managers and funds. This definition is used throughout the Amended Complaint often

without particularising how each individual entity participated in the fraudulent trading and/or had the requisite knowledge of the fraud.

38. A recent English High Court decision of *Gerko v Seal* [2023] EWHC 63 (KB) provides an example of the Court refusing to entertain generalized allegations of fraud against a group of persons. The case involved a claim for unlawful means conspiracy which involved allegations that the defendants had produced a deceitful and fraudulent certificate of practical completion regarding a property. It was alleged that the property to which the certificate related was seriously defective, unfit for habitation and unmarketable. The claim was grounded in the alleged fraud relating to the certificate, which was the alleged unlawful means relied on for the tortious conspiracy.

39. After setting out the relevant requirements for pleading fraud outlined above, Judge Parfitt outlined issues with the plaintiff's use of a composite definition of "defendants" as a group of persons without alleging which defendant had said or done which acts or had the requisite knowledge in the particulars of claim. His Lordship held:

> *"[102] ... In my view each Defendant is entitled to have set out in the POC what they are alleged to have known, why, and the basis upon which a fraud inference is to be made against them with particulars which give a level of detail which can support the serious allegations made. This has not been done and it is a fatal flaw.*
>
> ……………..
>
> *[106] This level of generality is unfair to the Defendants who are entitled to know the primary facts to be relied on to support the conclusion that they have been deceitful (assuming the deceit allegation is made generally against all of them) or that such an allegation is made against them specifically and the factual basis for it.*
>
> ………

> *[146] In looking at each defendant individually, it would be necessary for there to be pleaded facts which would support a conclusion that such a defendant decided to join or initiate the conspiracy with knowledge of the common objective and what that particular defendant did to further the conspiracy ( ED&F Man Capital Markets Ltd v Come Harvest Holdings Ltd [2022] EWHC 229 (Comm) , Calver J at [524] and the quotation at footnote 85)."* (emphasis added)

**(2) Whether the pleaded examples rise above the level of "mere inertia" or "concurrence"**

40. The Amended Complaint pleads that the Noteholder Managers collectively participated in the Plaintiffs' fraudulent business by engaging in the following conduct:

(a) receiving the proceeds of the investments made by the defrauded investors of the Debtors (the "**DBTCA Transfers**") from Deutsche Bank Trust Company Americas ("**DBTCA**");

(b) supporting IIG's solicitation of potential new investors (including pressure to take out their investment in the CLO Fund);

(c) receiving a teaser without seeking a correction or warning the new investors;

(d) forbearing from calling an Event of Default under the Indenture to give IIG time to solicit potential investors; and

(e) drafting the Fourth Supplemental Indenture so as to permit IIG to sell the CLO Fund's loans to the Debtors at par plus accrued interest.[21]

41. Taken at its highest, at most what is pleaded is that the Noteholder Managers, collectively, knew that the funds they received may have been the proceeds of fraud, but did not take any steps to prevent that fraud from occurring or warn the investors of the fraud which, at most, may be characterized as mere inertia

[21] Amended Complaint at [118]-[125], [284].

or concurrence, which is insufficient.

(a) *Receiving the DBTCA Transfers*

42. The Amended Complaint alleges that certain funds managed by the Noteholder Managers received the proceeds of the DBTCA Transfers after DBTCA received them from Trade Finance Trust. It is alleged that the BlueMountain Defendants, as holders of Class A Notes, were fully paid out for their notes from the proceeds of certain of the DBTCA Transfers on or around 13 June 2017.[22]

43. In my opinion, the mere passive receipt of proceeds by certain funds managed by the Noteholder Managers, without more, would be considered as an example of mere inertia or, at the most, concurrence in the Debtors' fraudulent business by those funds.

*(b) Supporting IIG's solicitation of potential new investors*

44. The Amended Complaint alleges that the Noteholder Managers were "*supporting*" the solicitation of new investors. At most, the allegations suggest that the Noteholder Managers, again collectively and without specificity as to each, put pressure on IIG to find new investors to allow them to exit their investment. It is not clear to me from the pleaded case what each individual Noteholder Manager is alleged to have done in order to put pressure on IIG other than assert their own legal rights for repayment under the notes. However, this allegation does suggest some active and material deed, conduct or act which is capable of being particularized to show active participation by each of the Noteholder Managers, but the Plaintiffs have failed to do so.

*(c) Receiving a Teaser without correcting the same or warning investors*

45. The Noteholder Managers received a teaser which contained allegedly misleading statements and did not make any objection or "*expose the material misrepresentations* they *had learned of*"[23]. However, the teaser that was

[22] Amended Complaint at [144]-[148], Appendix A.
[23] Amended Complaint at [118]-[125].

ultimately sent to the new investors was a different teaser which contained at least one "important" difference. The Plaintiffs have not alleged that the Noteholder Managers even saw this new teaser, nor even interacted with the investors that may have received it.[24]

46. This allegation is not merely bad for lack of particularity. The allegation is little different from passive conduct. It is alleged that the Noteholder Managers passively received a copy of a teaser for a different fund which contained misleading representations. It is not clear how there was knowledge of, or any active participation in, the relevant fraud where it is not even alleged that the Noteholder Managers ever saw the Debtors' teaser that contained the relevant misrepresentations to the investors or interacted with the investors. The Noteholder Managers had no positive duty to warn any investor and owed no fiduciary or contractual duties to the investors. Even if they had a duty, the failure to so warn is not active participation.

*(d) Forbearing from calling an Event of Default under the Indenture*

47. It is alleged that the Noteholder Managers entered into a series of forbearance agreements in which they agreed not to declare an Event of Default under the Indenture to give IIG time to either obtain repayment of the refinance the loan portfolio, or sell the defaulted loans to new investors—albeit, subject to the condition that any such sales would be consummated at par.[25] The initial forbearance expired on 15 April 2017, but it was subsequently extended three times until 4 May 2017, 16 May 2017, and 1 June 2017, respectively.

48. This is, once again, an allegation of not acting or inertia or a failure to comply with a duty which I believe falls short of the level of active participation required. The Noteholder Managers simply agreed to take no action, and it is not alleged that they positively assisted in the fraud.

*(e) Drafting the Fourth Supplemental Indenture*

49. The alleged purpose of the Fourth Supplemental Indenture was to amend

[24] Amended Complaint at [127]-[136].
[25] Amended Complaint at [125].

provisions of the Indenture that prohibited sales of the CLO Fund's assets in order to permit the sale of the CLO Fund's loan portfolio on condition that the sale "*is in an amount not less than the par value of such sold Assets*."[26] It is alleged that the BlueMountain Defendants and its lawyers "*took the lead*" in drafting this document. The document was finalised and signed by DBTCA and consented to by each of the Noteholder Managers in June 2017.

50. It is not specifically pleaded how the preparation of the Fourth Supplemental Indenture affirmatively assisted in the alleged fraudulent business of the Debtors. Execution of the Indenture did not involve the Noteholder Managers actively participating, furthering or facilitating the making of the fraudulent misrepresentations or relevant omissions by IIG when it was dealing with the new investors. Nor are there any allegations relating to the Debtors engaging in conduct by means of the Indenture. Rather, as pleaded, it merely removed an obstacle and permitted (but did not require) sale of the CLO assets.

**(3) Whether particularised allegations regarding the "business of the Debtors" are required**

51. To sustain a claim for fraudulent trading it is necessary to set out and plead the "business" of the Debtors. Given that the fraudulent trading claim involves allegations of fraud, in accordance with the case law outlined above, the Noteholder Managers need to understand the case they have to meet including what business of the Debtors they are alleged to have knowingly and fraudulently participated in (if any such business existed).

52. Additionally, for the same reasons that a "group pleading" of the defendants' conduct would be impermissible, grouping two plaintiffs together runs afoul of particularity requirements. For instance, it is alleged that the BlueMountain Defendants received funds ultimately transferred from one Debtor (GTFF) but not the other (STFF),[27] yet the Amended Complaint seeks to hold the BlueMountain Defendants liable for participating in both businesses.[28] In such cases, under Cayman law, specificity is required as to how each Noteholder

[26] Amended Complaint at [138].
[27] Amended Complaint at [148], [163].
[28] Amended Complaint at [283]-[286].

Manager interacted with each Debtor entity.

**(4) Allegations regarding the knowledge of a specific individual are required**

53. As noted in Section I(4) above, a single natural person to whom knowledge may be attributed must be identified. Accordingly, the pleadings should identify which specific natural person had the requisite knowledge and demonstrate how the knowledge of that individual appointed to the relevant defendant may be attributed to the corporate entity. This includes demonstrating the individual employee was sufficiently senior, in order to properly attribute that specific individual's knowledge to the corporate entity as a whole.

54. The Amended Complaint, however, utilizes the group definition of "Noteholders" where key allegations are made about the knowledge of the Noteholder Managers, including in the following sections:

(a) It is said that the Noteholders believed the claims in the teaser to be false or misleading because they knew: (i) that nearly 40% in principal amount of the CLO's loans were in default; (ii) that the portfolio was not subject to rigorous control processes and monitoring, and (iii) that the representation that the loans in the portfolio had an average remaining term of six months was contradicted by the fact that approximately 40% of the loans were in fact past maturity and the statements IIG had made to them about the borrowers' understanding of when payments were to be made.[29]

(b) The Noteholders are said to have known that declaring an Event of Default under the Indenture would force a bona fide liquidation that would eliminate or significantly reduce any chance of offloading the loan portfolio onto new investors at par, which, for the Noteholder, was the desired outcome.[30]

(c) The Noteholders are said to have known that the loans acquired from

[29] Amended Complaint at [120].
[30] Amended Complaint at [123].

the CLO Fund in July and August 2017 were in default or were fictitious or were willfully blind as to these facts.[31]

(d) The Noteholders are said to have known that there was a close relationship between the Debtors and TFT on one side and TFT and the CLO Fund on the other and that IIG stood on every side of the transaction.[32]

(e) The Noteholders are said to have known that the deal did not operate as advertised to them and that the misrepresentations made to them were now being made to new investors.[33]

55. Additionally, as noted in Section II(1), it is a requirement under Cayman law that Plaintiffs cannot rely on a group pleading of "Defendants" and aggregate knowledge or intention or acts of a group but instead must specify the knowledge (and participation) of each defendant. Accordingly, the allegations as to the knowledge of the "Noteholders" fail to satisfy the requirements of Cayman law for two reasons (a) they fail to particularize how each Noteholder Manager had the requisite knowledge (b) they also fail to allege specific facts showing which individual at each Noteholder Manager had that knowledge.

[*Signature on following page*]

---

[31] Amended Complaint at [164], [177].
[32] Amended Complaint at [192].
[33] Amended Complaint at [196].

Respectfully submitted,

Dated: 23 January 2025

Thomas Lowe KC