# Exhibit B-1

**[2017 (2) CILR 136]**

# AUTUMN HOLDINGS ASSET INC v. RENOVA RESOURCES PRIVATE EQUITY LIMITED (as a shareholder of Pallinghurst (Cayman) General Partner LP (GP) Ltd.), PALLINGHURST (CAYMAN) GENERAL PARTNER LP (GP) LIMITED, PALLINGHURST (CAYMAN) GENERAL PARTNER LP and PALLINGHURST RESOURCES MANAGEMENT LP

# RENOVA RESOURCES PRIVATE EQUITY LIMITED (derivatively on behalf of Pallinghurst (Cayman) General Partner LP (GP) Ltd., Pallinghurst (Cayman) General Partner LP and Pallinghurst Resources Management LP) and OTHERS v. GILBERTSON and AUTUMN HOLDINGS ASSET INC

C.A. (Chadwick, Mottley and Forte, JJ.A.) September 12th, 2017

*Companies — directors — powers and duties — general principle that director of limited company owes fiduciary duties — principal duties to act in company's best interests, avoid conflict of interest and not profit from position — may be varied by company's articles, shareholders' agreement or clear implication from circumstances*

*Trusts — constructive trusts — knowing receipt — liable to account as constructive trustee if disposal of assets in breach of fiduciary duty; beneficial receipt by defendant of traceable assets; and knowledge on defendant's part that assets traceable to breach*

Renova Resources Private Equity Ltd. brought a multiple derivative action in the Grand Court alleging breach of fiduciary duty and knowing receipt.

Renova Resources Private Equity Ltd. ("Renova"), a company incorporated in the Bahamas, was a wholly owned subsidiary of Renova Holding Ltd. They were members of a large Russian group of companies which had a range of major commercial business interests. At the material time, the chairman and principal beneficial owner of the group was Mr. Vekselberg, a Russian billionaire. The Chief Investment Officer of the Renova group was Mr. Kuznetsov.

Between 2004 and 2005, Mr. Gilbertson, an experienced businessman, and Mr. Vekselberg had agreed to set up a new private equity fund as a joint venture. Mr. Gilbertson would manage the fund and it would be financed by Renova, with the profits to be shared between them. From the start, Mr. Gilbertson had identified—and, with his son, Sean Gilbertson, had been actively exploring—the acquisition of the rights to the Fabergé luxury goods brand and business from Unilever plc as a potential investment project. Mr. Vekselberg, as a collector of Fabergé items, was enthusiastic about the project, termed "Project Egg."

In January 2006, the terms of the joint venture were set out in a letter from Renova Holding Ltd. to Mr. Gilbertson, signed by both parties as partners ("the letter agreement"). It confirmed that Renova Holding would establish the investment fund and the fund management vehicle and that Mr. Gilbertson would be responsible for all investment projects; he would be appointed chairman of the investment fund and the fund management vehicle, with his duties being those customary for an executive chairman of a company. The letter agreement provided that approval to proceed with an investment project required the unanimous consent of the investment committee (which comprised Mr. Gilbertson and Mr. Kuznetsov). Further, it provided that the agreement would automatically terminate if the investment fund and fund management vehicle were not operating in a way reasonably satisfactory to each of the partners within 16 months.

The investment structure ("the Pallinghurst structure") was established, which consisted of three Cayman Islands entities: Pallinghurst Resources Management LP ("the master fund"); Pallinghurst (Cayman) General Partner LP ("GPLP"); and Pallinghurst (Cayman) General Partner LP (GP) Ltd. ("the company"). The company was the general partner of GPLP, and GPLP was the general partner of the master fund. Mr. Gilbertson and Mr. Kuznetsov were appointed as the directors of the company, and the trustee of Mr. Gilbertson's family trust ("Fairbairn") and Renova were the two equal shareholders. Long form agreements ("the Pallinghurst agreements") setting out the terms of the partnership between Renova and the Pallinghurst structure were agreed, but not signed.

In May, an offer was made on behalf of the master fund to purchase the Fabergé rights for US$20m., which Unilever declined. Since the maximum bid Mr. Kuznetsov could approve on Renova's behalf (without detailed due diligence, a business assessment and various internal approvals) was US$20m., he suggested that Mr. Vekselberg consider investing his personal funds to acquire the rights. Mr. Vekselberg agreed personally to put forward US$30m. but in August that offer was also declined. It had, by that time, become apparent that Unilever was seeking about US$40m.

On December 1st, Mr. Vekselberg agreed personally to put forward up to US$40m., and a Cayman company called Project Egg Ltd. ("PEL," now "Fabergé Ltd.") was incorporated as a wholly owned subsidiary of the master fund to acquire the rights. By December 15th, a purchase price of US$38m. had been agreed with Unilever and negotiations about completion were taking place. On December 20th, however, it became clear to the

Gilbertsons that in return for his personal investment, Mr. Vekselberg required ownership of the Fabergé brand through the Lamesa group, which comprised his personal companies, on the basis that the management, control and economic benefits of the brand would be licensed to the master fund. The Gilbertsons ostensibly accepted Mr. Vekselberg's requirements for restructuring and, the next day, Sean Gilbertson emailed Mr. Kalberer, the deputy chief legal officer of Renova Management AG ("Renova Management"), a draft "implementation agreement" ("the first draft IA") relating to the implementation of Project Egg in accordance with them.

On December 22nd, the sale and purchase agreement ("SPA") was signed by Unilever and PEL on the basis that Mr. Vekselberg's structure would be pursued (although the precise terms of the restructuring had not been finally agreed). In the following days, Sean Gilbertson sent Mr. Kalberer further draft implementation agreements ("the second draft IA" and "the third draft IA"). The third draft IA provided, *inter alia*, that a Lamesa group company ("BrandCo") would, upon the transfer to it of the Fabergé brand in return for Lamesa Arts Inc. ("Lamesa") procuring payment of the purchase price to Unilever, grant PEL ("OpCo") a licence to use and exploit the Fabergé brand, which would be valid until the winding up of the master fund pursuant to the Pallinghurst agreements, at which time BrandCo could terminate the licence on 90 days' notice.

Over the previous two weeks, however, Mr. Gilbertson had been secretly setting up a consortium of investors consisting of himself, Dr. Jelinek, Mr. Mende and Mr. Kundrun, to purchase the rights without any involvement by Mr. Vekselberg, Lamesa or Renova. On January 1st, 2007, he decided to implement this plan and "then negotiate with [Mr. Vekselberg] from a position of strength"; he therefore proceeded to finalize the arrangements with his consortium, pursuant to which he would contribute 25% of the purchase price from his own money.

While Mr. Gilbertson was communicating with his consortium of investors, the Gilbertsons continued to communicate with Mr. Kalberer about the third draft IA and, on January 2nd, Mr. Kalberer provided the fourth draft IA. This draft did not significantly change the provisions of the third draft IA—but it did insert a new clause which provided that BrandCo could terminate the licence on 60 days' notice without having to pay anything to OpCo if the master fund disposed of OpCo or if the master fund were wound up under the Pallinghurst agreements.

Also on January 2nd, Mr. Gilbertson contacted Mr. Thomas, a director of Fairbairn, to request his contribution to the purchase price (US$9.5m.) from one of his family trusts ("the BPG Settlement"). Mr. Gilbertson reported that he had "bought [himself] a Christmas present" and requested "some money to pay for it," which Mr. Thomas readily approved. Mr. Gilbertson then sent an email to Mr. Vekselberg stating that there was little likelihood of reaching an agreement in respect of the implementation of Project Egg in time to meet the scheduled completion date of January 3rd and that, accordingly, he had "triggered alternative arrangements."

On January 3rd, the SPA was completed by payment of US$38m. by Mr. Mende's and Mr. Kundrun's company, K-M Investment Corp. ("K-MIC"). The same day, a loan to PEL from Autumn Holdings Asset Inc. ("Autumn") (a wholly owned subsidiary of Fairbairn in its capacity as trustee of the Gilbertson family trust), K-MIC and Dr. Jelinek, of US$38m., repayable on seven days' notice plus interest at about 7% compounded monthly, was approved. Additionally, 100 new shares in PEL were issued at par value to the lenders, pro rata to their contribution to the loan, so that the master fund's interest in PEL was reduced from 100% to just under 1% (1/101). The effect of these steps was that, save as to the master fund's 1/101 interest, the economic benefit of the development, exploitation and management of the Fabergé rights passed to Autumn, Dr. Jelinek and K-MIC, outside the Pallinghurst structure. In May, the interest rate on the loan was unilaterally increased by PEL to 25% per annum.

The subsequent negotiations between Mr. Gilbertson and Mr. Vekselberg concerning the rights were not successful and, on May 27th, Renova Holding gave written notice of termination of the letter agreement. Renova then brought the present multiple derivative action on behalf of the company, as ultimate owner and controller of the master fund, for compensation for breach of fiduciary duty by Mr. Gilbertson, and for knowing receipt by Autumn. Mr. Gilbertson defended the claims on various grounds and counterclaimed against the Renova parties. After a contested hearing, the Grand Court (Foster, Ag. J.) gave Renova leave to continue the action pursuant to GCR O.15, r.12A(2) (in proceedings reported at 2009 CILR 268). (Renova had indicated that if it were granted leave to continue the action on behalf of the company it would seek leave (on behalf of the company) to proceed in the name of GPLP, and on behalf of GPLP to proceed in the name of the master fund, but in the event no further applications were made.) At a further contested hearing, Foster, J. dismissed its application for summary judgment against the counterclaim (in proceedings reported at 2010 (1) CILR 344). Renova, the company, GPLP and the master fund were referred to collectively as "the Renova parties" and Mr. Gilbertson and Autumn were referred to as "the Gilbertson parties."

Renova alleged that Mr. Gilbertson had breached his fiduciary duties as a director of the company by diverting away from the master fund, and thus from the company, for his own benefit, the valuable economic benefit of developing, exploiting and managing the Fabergé brand, and then procuring the gratuitous issue of new shares in PEL to his own trust and other investors thereby virtually eliminating the interest of the master fund in PEL. It sought reconstitution of the master fund to the position in which it would have been but for the alleged breach of duty.

Renova's claim against Autumn was for an account of the shares in PEL which it was said Autumn had received gratuitously, and for an account of the interest which Autumn had earned on the loans it had made by way of contribution to the purchase price of the Fabergé rights and for working

capital. It was said that Autumn knew or ought to have known that Mr. Gilbertson was acting in breach of fiduciary duty, alternatively, that Autumn had not paid for the shares and held them as a volunteer.

Mr. Gilbertson and Autumn counterclaimed against Renova, Mr. Vekselberg, Mr. Kuznetsov and Renova Holding on various grounds for damages by way of indemnity for any liability they were found to have in respect of Renova's derivative claims.

At trial, Foster, J. allowed the claims in part and dismissed the counterclaims. He held that Mr. Gilbertson did owe the duties of a fiduciary as director of the company, and that he had breached those duties in acting as he did in late December 2006 and January 2007. However, the judge held that Mr. Gilbertson's breach of fiduciary duty had caused the master fund no significant economic loss. If the master fund were to be put in the position it would have been in but for Mr. Gilbertson's breach of duty, it would be in a significantly negative financial position. The judge therefore dismissed the claim for equitable compensation. The judge further held that Autumn held the 25 PEL shares issued to it in January 2007 on constructive trust for the master fund/GPLP/the company on the basis that it knew or should have known of Mr. Gilbertson's breach of fiduciary duty, and it received the shares as a volunteer and was liable to account for them. He also held that Autumn was liable to account for the interest it received on the loans to PEL. Two of the five counterclaims brought by the Gilbertson parties were abandoned at trial and the remaining counterclaims were dismissed (that decision is reported at 2012 (2) CILR 416).

The judge ordered (1) that Autumn held 25,000 ordinary shares in Fabergé Ltd. (formerly PEL) as constructive trustee for the master fund; (2) that Autumn transfer those shares to the master fund (the 25,000 shares to which the judge referred had been 25 shares in PEL prior to its 2008 sub-division and change of name and did not include any shares in Fabergé Ltd. subsequently acquired by Autumn); (3) that Autumn pay to the master fund the sum of US$2,306,320.35 (inclusive of pre-judgment interest, from January 3rd, 2007 to the date of the order, in the amount of US$507,347.35); (4) that the claim for equitable compensation against Mr. Gilbertson be dismissed; (5) that the counterclaims against the Renova parties be dismissed; and (6) that each party bear its own costs for the proceedings.

Autumn appealed against the order seeking the setting aside of paras. 1–3 and an order that the Renova parties pay its costs of the appeal (as well as its costs from the court below). It submitted that (a) the judge misdirected himself and erred in law in entertaining and granting relief in respect of derivative claims that were not before him; (b) the judge misdirected himself and erred in law and/or in fact in holding that Mr. Gilbertson owed or was in breach of any fiduciary duty in relation to the Fabergé rights and so in holding that there was any substratum on which to found a claim against Autumn; (c) the judge had misdirected himself and erred in law and/or fact in holding that, notwithstanding the rule in

*Nurcombe* v. *Nurcombe*, the conduct of the Renova parties was not such as to disentitle Renova from any relief; (d) the judge misdirected himself and erred in law and/or fact in holding that, having regard to its relationship with Mr. Gilbertson, the property it received, the person from whom it received it and its state of knowledge at the time of receipt, Autumn was liable in knowing receipt; (e) the judge misdirected himself and erred in law and/or fact in holding that Autumn was liable as a volunteer; and (f) the judge misdirected himself and erred in law and/or fact in granting relief against Autumn (i) by way of an account of profits (comprising the interest that Autumn received on its loan to PEL) and (ii) in respect of pre-judgment interest from January 3rd, 2007 on the interest payment which Autumn received from Fabergé Ltd. on September 28th, 2007.

Renova (derivatively on behalf of the company, GPLP and the master fund), as plaintiff in the action, and Mr. Vekselberg, Mr. Kuznetsov, Renova Holding and Renova (on its own account), as defendants to the counterclaim, also appealed against the judge's order. Mr. Gilbertson and Autumn were the respondents to that cross-appeal. The relief sought by the cross-appeal was (a) that so much of the order as dismissed Renova's claim against Mr. Gilbertson for equitable compensation be quashed, and that either judgment be entered for Renova against Mr. Gilbertson in the sum of US$82,582,000 (and interest) or that it be declared that Autumn held a further and additional 16,190,575 ordinary shares in Fabergé Ltd. as constructive trustee for the master fund, and ordered that Autumn should forthwith transfer full legal title in those further shares to the master fund; (b) that Mr. Gilbertson and Autumn pay Renova's costs of the proceedings in the court below on the standard basis; (c) that Mr. Gilbertson and Autumn pay the costs of the defendants to counterclaim in the court below on the indemnity basis; and (d) that Mr. Gilbertson and Autumn pay the cross-appellants' costs of the cross-appeal on the standard basis. The grounds of the cross-appeal were that (a) the judge erred in law and/or in principle and/or misdirected himself as to the evidence in valuing at nil the loss that Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation; (b) alternatively, the judge erred in law and/or in principle and/or misdirected himself as to the evidence in failing to hold that the entirety of Autumn's shareholding in Fabergé Ltd. (and not only the 25,000 shares which represented the 25 shares issued by PEL in January 2007) should be held on constructive trust for (and transferred to) the master fund; and (c) the judge erred in law or exercised his discretion outside the ambit within which reasonable disagreement was possible in making no order as to the costs of the action and counterclaim.

**Held,** ordering as follows:

(1) The judge had been correct to entertain the derivative claims advanced by Renova. In particular, he had been right to hold that, having chosen not to appeal against his order made some 3½ years earlier, it was not open to the Gilbertson parties to challenge, at trial, the standing of

Renova to advance claims in the action on behalf of GPLP and the master fund, including the claim founded on the unpleaded contention that Mr. Gilbertson had acted in breach of the fiduciary duties he owed to the master fund. While it was accepted that Renova, in its summons issued in July 2008, had not sought leave to proceed by way of multiple derivative action on behalf of GPLP and/or the master fund, it was important to note that, first, it had not been required to do so under GCR O.15, r.12A (which did not apply to multiple derivative actions) and, secondly, there had been no other rule of practice that leave was required to bring a multiple derivative action under the general law. It was at least arguable that the cause or causes of action which Renova sought to pursue against Mr. Gilbertson and/or Autumn were vested in the master fund (and not in the company). In those circumstances, it was necessary, in order to determine whether to allow the action as constituted to go forward, for the judge to address whether Renova could bring multiple derivative proceedings for loss said to have been suffered by the master fund. There was no doubt that that question had been properly before the judge in April 2009, and no doubt that he had intended to and did in fact decide it (paras. 26–29; para. 281).

(2) The judge had been correct to hold that Mr. Gilbertson owed and was in breach of fiduciary duties in relation to the Fabergé rights. In particular, he had been correct to hold that, as a director of the company, Mr. Gilbertson owed the duties of a fiduciary to the company (and, more generally, to the master fund and the Pallinghurst structure) throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007. The judge had correctly held that Mr. Gilbertson owed fiduciary duties to the company in relation to Project Egg (*i.e.* the acquisition of the Fabergé rights). There was no challenge in this appeal to the judge's assumption that it was common ground that, until the issue of the additional shares in January 2007, PEL had been a wholly owned subsidiary of the master fund. In those circumstances, it was not open to the present court to question whether the judge had been correct to proceed on that basis. The court was therefore satisfied that whatever fiduciary duties might have been owed by Mr. Gilbertson to the company (or more generally to the Pallinghurst structure) in relation to Project Egg (as an investment project) under the terms of the letter agreement, the judge had been correct to accept, and the Renova parties were correct to submit in this court, that *prima facie* Mr. Gilbertson owed fiduciary duties as a director of the company in relation to the assets of the entities (including the master fund and, from its incorporation on December 1st, 2006, PEL) which it controlled, and that, from the execution of the SPA on December 22nd, 2006, those assets included the contractual interest of PEL as purchaser of the Fabergé rights and, after completion of the purchase under the SPA on January 3rd, 2007, as owner of those rights. The judge had also correctly held that Mr. Gilbertson's fiduciary duties owed to the company in respect of Project Egg had not been modified or attenuated so as to enable him to act

in his own interests notwithstanding that they might conflict with the interests of the company. There was nothing in the letter agreement that enabled Mr. Gilbertson to take for himself a project he had brought to the investment committee. In particular, first, it could not be said that Mr. Kuznetsov (or, more broadly, the Renova parties) had done anything that could be construed as a veto of Project Egg. Secondly, the evidence did not support the contention that what had been said to Mr. Sean Gilbertson on December 20th, 2006, agreed between Mr. Gilbertson and Mr. Vekselberg the following day and reflected in the draft IAs which followed, did not involve the master fund at all but amounted to a new and separate arrangement outside the Pallinghurst structure. Thirdly, the evidence did not support the contention that the effect of the agreement or understanding was that if Mr. Vekselberg walked away from the deal Mr. Gilbertson could take whatever steps he thought fit to acquire the Fabergé rights for his own benefit, nor the contention that, when Mr. Gilbertson acquired the rights for his own benefit, Mr. Vekselberg had walked away from the deal. The judge had been correct to hold that Mr. Gilbertson had acted in breach of the fiduciary duties he owed to the company or the master fund in acting as he did in late December 2006 and January 2007 (paras. 80–125; para. 281).

(3) The judge had been correct to hold that, notwithstanding the so-called rule in *Nurcombe* v. *Nurcombe*, the conduct of the Renova parties was not such as to disentitle Renova from equitable relief in this action. The underlying principle of the so-called *Nurcombe* defence was that, in permitting a derivative action to be brought by a person in whom the cause of action was not vested for the benefit of the "proper" plaintiff, the court was exercising an equitable jurisdiction on the grounds that justice so required. The jurisdiction would not be exercised where to do so would lead to injustice. Circumstances in which the exercise of the jurisdiction would lead to injustice would include those in which the derivative plaintiff would benefit indirectly (*e.g.* as a shareholder of the defendant company) from the successful pursuit of a claim to which, as between that person and the defendant, the defendant would have had an equitable defence on which it would have succeeded if (on the hypothesis that the derivative plaintiff was the proper plaintiff) the action had been brought by the plaintiff in his own right. In the present case, the judge had been correct to reject the contention that these proceedings had not been brought and pursued by Renova for the benefit of the company (or more generally for the benefit of the master fund and the other entities within the Pallinghurst structure) but for the benefit of Mr. Vekselberg personally. There was no evidence to support that contention. None of the matters relied upon by the Gilbertson parties in support of their challenge to the judge's conclusion would have given rise to an equitable defence on which the Gilbertson parties would have succeeded if the action had been brought by Renova in its own right. The judge had correctly considered that there was no reason under this head to refuse Renova the equitable relief it sought in this derivative action. Renova's past failures to comply

with its discovery obligations did not now provide a ground upon which the action should be dismissed (paras. 135–146; para. 281).

(4) The judge had been correct to value at nil the loss that Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation. In particular, he was correct to hold on the evidence before him that the current value (as at the date of trial) of the right to manage and exploit the Fabergé rights as licensee (to which the master fund (through OpCo) would probably have been entitled but for Mr. Gilbertson's breach of fiduciary duty) was less than the costs (other than acquisition costs) and expenses that would have been incurred in funding the development of those rights. The judge had explained that equitable compensation in respect of loss caused by breach of fiduciary duty was assessed as the sum required to put a plaintiff back into the position in which he would have been at the time of the trial if he had not sustained that loss. Renova's claim was for compensation in the sum required to reconstitute the master fund to the position in which it would have been, at the date of judgment, but for Mr. Gilbertson's breach of duty. The court would not interfere with the judge's determination that the undiscounted value of Fabergé Ltd. at the date of the trial was not more, and possibly significantly less, than US$120m. An appellate court must be cautious, where expert witnesses gave oral evidence at trial, before rejecting the trial judge's evaluation of that evidence. There was nothing to suggest that the judge's evaluation should be rejected. The judge had also been entitled to apply a discount of 50% to the value that he placed on Fabergé Ltd. to reflect his finding that, had Mr. Gilbertson not acted in breach of fiduciary duty, the master fund would not have become owner of the Fabergé rights but would have been entitled only to develop, exploit and manage those rights under licence for a limited period on the terms of the fourth draft IA or very similar terms. The judge had also been correct to deduct from the current value of the business the costs and expenses that would have been incurred by the master fund in carrying on that business under licence since that date. The costs and expenses to be deducted included the post-acquisition expenses and future investment incurred in respect of the development, exploitation and management of the Fabergé rights, *i.e.* about US$102m. The judge had therefore correctly considered that he did not need to determine how the acquisition cost of US$38m. should be treated. His conclusion that, after deducting post-acquisition costs of US$102m. from the hypothetical current value of the business which, but for Mr. Gilbertson's breach of duty, it would have carried on since January 2007, the master fund had suffered no loss was the same whether or not the acquisition cost of the Fabergé rights was included as a cost or expense to be deducted. Renova's appeal against the judge's order dismissing its claim to equitable compensation would therefore be dismissed (paras. 179–180; para. 281).

(5) The judge had been correct to hold that Autumn was liable to account as a constructive trustee of the shares issued by PEL in January

2007 because (a) it received those shares as a volunteer, and (b) in any event, it was in "knowing receipt" having regard to its relationship with Mr. Gilbertson, the property which it received, the person from whom it received the property and its state of knowledge at the time of receipt. In particular, the judge had been correct to hold that the value of the single share in PEL held by the master fund before the issue of the 100 new PEL shares could be traced, in part, into the 25 new PEL shares issued to Autumn on that date; that Autumn gave no value for those 25 new shares; and that the knowledge of Mr. Gilbertson (and so far as relevant of Mr. Thomas) as to the circumstances in which those new PEL shares were issued was to be attributed to Autumn. Immediately before the issue of the 100 new shares, PEL was the owner of the Fabergé rights and, as owner of the single share then in issue, the master fund was the owner of 100% of the issued share capital of PEL. The position immediately after the 100 additional shares were issued was that PEL remained the owner of the Fabergé rights but that the issued share capital of PEL was owned as to 100/101 by the members of the consortium and as to 1/101 by the master fund. Substantially the whole of the value of the master fund's interest in PEL and (indirectly through PEL) in the Fabergé rights had been transferred to the members of the consortium as owners of the new shares. The effect of the issue of the new shares was that, *inter alia*, 25/101 of the master fund's ownership of the whole issued share capital of PEL was transferred to Autumn. The value of what was transferred was represented by the new shares held by Autumn and the other members of the consortium and could be traced accordingly. To hold otherwise would be to allow corporate form to defeat commercial substance. The judge had been correct to hold that there was never any doubt that Mr. Thomas would comply with Mr. Gilbertson's wishes in relation to the funding of the acquisition of the Fabergé rights and the receipt of the new PEL shares. In relation to that transaction, Mr. Gilbertson had been the directing mind of Autumn and, accordingly, his knowledge was properly attributed to Autumn in that context. The judge had also been correct to hold that Mr. Thomas knew or should have known that what Mr. Gilbertson was asking him to do on behalf of Autumn in relation to the funding of the acquisition of the Fabergé rights and the receipt of the new PEL shares was, or was likely to be, contrary to the interests of the master fund and in breach of his (Mr. Gilbertson's) fiduciary duties as a director of the company, and that to implement Mr. Gilbertson's request in the circumstances would be inappropriate for a prudent trustee. In so far as Mr. Thomas's own knowledge was relevant, it was not in dispute that it could be attributed to Autumn. If Autumn received the new PEL shares as a purchaser for value, it held those shares as a constructive trustee for the master fund on the basis of "knowing receipt" (paras. 196–225; para. 281).

(6) The judge had been correct to hold that Autumn was not liable to account as constructive trustee for shares (other than the 25,000 shares which represented the 25 shares issued to it by PEL in January 2007) which it held in Fabergé Ltd. at the date of the trial, and so did not have to transfer such additional shares to the master fund. No claim in respect of the additional 16,190,575 shares had been before the court at the trial and the judge could not therefore be criticized for failing to address Renova's arguments in support of the claim in its submissions. The Gilbertson parties had pointed out that the claim had not been pleaded and Renova had not sought leave to amend its pleading so as to introduce it. Nor had the Renova parties appealed against that ruling. It was not now open to Renova to contend that the Gilbertson parties had allowed the claim by failing to raise any objection at the appropriate time. The material before the judge at the trial did not enable him to make the findings of fact which would have been necessary in order to support that claim and the present court was also not in a position to do so (paras. 230–234; para. 281).

(7) The judge had been wrong to hold that Autumn was liable to account (by way of an account of profits) as a constructive trustee for the payment of US$1,798,973 which it received on September 28th, 2007 in respect of interest on the loans which it had made to PEL on January 3rd, 2007. In particular, he had been wrong to hold that the value of any asset held or formerly held by the master fund could be traced into that payment. The loans to PEL on January 3rd, 2007 had not had the effect of diverting the economic opportunity to acquire the Fabergé rights away from PEL; the loans enabled PEL to take advantage of that economic opportunity by using funds lent to it to complete the purchase. Immediately before the loans were made on January 3rd, 2007, the interest of the master fund in the acquisition of the Fabergé rights by PEL was as owner of 100% of the issued capital of PEL. The making of the loans did not alter that position. That position was altered by Mr. Gilbertson's breach of fiduciary duty in procuring the dilution of the master fund's ownership of the share capital of PEL by the issue of the 100 new shares to the members of the consortium. But the terms of the loans had been agreed without regard to the decision to issue the new shares. Therefore, although it could be said that the payment by PEL to Autumn in September 2007 of interest on the loans made in January was a profit derived from the funding of the acquisition of the Fabergé rights and that the economic opportunity to fund the acquisition arose from PEL's rights as contractual purchaser under the SPA, there was no basis on which it could be said that the opportunity to fund the acquisition or PEL's rights as purchaser had been diverted from the Pallinghurst structure by Mr. Gilbertson's breach of fiduciary duty. Properly understood, what had been so diverted was substantially the whole (100/101) of the ownership of PEL (and thus the value of the Fabergé rights after deduction of the cost of acquisition), not the right to receive interest paid by PEL on the loans which enabled it to acquire those rights. It followed that the judge had been wrong, also, to award pre-judgment interest—in the amount of US$507,347.35 or in any

other amount—on an amount equal to that payment. If (contrary to the court's view) the judge had not been wrong to hold that Autumn was liable to account for the payment of US$1,798,973 which it received on September 28th, 2007, he had nevertheless been wrong to include in the sum awarded (US$507,347.35) as pre-judgment interest an amount (US$95,407.18) in respect of interest attributable to the period from January 3rd, 2007 to September 27th, 2007. He had been wrong to do so because, on the material before him, it had not been open to him to hold that Autumn was liable to account for interest on the loans in the amount of US$1,798,973 (or at all) as a "knowing recipient" before the date (September 28th, 2007) on which the relevant cause of action for the purposes of s.34(1) of the Judicature Law (2007 Revision) arose (paras. 235–248; para. 281).

(8) The court would not interfere with the judge's making no order as to the costs of the action or, as between the Gilbertson parties and Renova, in making no order as to the costs of the counterclaim. It could not be said that the judge had exercised his discretion outside the ambit within which reasonable disagreement was possible. Nevertheless, in relation to the costs of the counterclaim, the judge had erred in failing to distinguish between the position of Renova and that of its co-defendants to the counterclaim (namely Mr. Vekselberg, Mr. Kuznetsov and Renova Holding). Had he done so, he would have appreciated the necessity to make a separate order for their costs of the counterclaim. The appropriate order was that the costs of the counterclaim (as between the Gilbertson parties and the three co-defendants other than Renova) should follow the event, assessed on the indemnity basis, to be paid by the Gilbertson parties (paras. 263–281).

(9) Autumn's appeal against paras. 1–2 of the November 6th, 2012 order would be dismissed, but its appeal against para. 3 of that order would be allowed. Renova's cross-appeal against paras. 4 and 6 of the order would be dismissed, as would its appeal against para. 6. The appeals of Mr. Vekselberg, Mr. Kuznetsov and Renova Holdings against para. 6 of the order would be allowed. As between the Gilbertson parties and the three defendants to the counterclaim just mentioned, para. 6 of the order would be varied by setting aside that paragraph in so far as it related to their costs of defending the counterclaims and by adding a direction that the Gilbertson parties pay the costs of the counterclaims incurred by Mr. Vekselberg, Mr. Kuznetsov and Renova Holding (including costs ordered to be costs in the cause), such costs (if not agreed) to be assessed on the indemnity basis. Further consideration of the costs of the appeal and cross-appeal required an application to the court (para. 282).

**Cases cited:**

(1)*Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.*, Grand Ct., November 28th, 2011, unreported, considered.

(2) *Arthur* v. *Att. Gen. (Turks & Caicos Islands)*, [2012] UKPC 30, considered.
(3) *Att. Gen. (Hong Kong)* v. *Reid*, [1994] 1 A.C. 324; [1993] 3 W.L.R. 1143; [1994] 1 All E.R. 1; (1993), 143 N.L.J. 1569, referred to.
(4) *Bank of Credit & Commerce Intl. (Overseas) Ltd.* v. *Akindele*, [2001] Ch. 437; [2000] 3 W.L.R. 1423; [2000] 4 All E.R. 221; [2000] Lloyd's Rep. Bank. 292; [2000] BCC 968; [2000] WTLR 1049; (2000), 2 ITELR 788, referred to.
(5) *Banks* v. *Arch*, 2004–05 CILR 441, referred to.
(6) *Barrett* v. *Duckett*, [1995] BCC 362; [1995] 1 BCLC 243, referred to.
(7) *Belmont Fin. Corp. Ltd.* v. *Williams Furniture Ltd. (No. 2)*, [1980] All E.R. 393, referred to.
(8) *Bhullar* v. *Bhullar*, [2003] EWCA Civ 424; [2003] 2 BCLC 241; [2003] WTLR 1397; *sub nom. Re Bhullar Bros. Ltd.*, [2003] BCC 711, *dicta* of Jonathan Parker, L.J. referred to.
(9) *Boardman* v. *Phipps*, [1967] 2 A.C. 46; [1966] 3 W.L.R. 1009; [1966] 3 All E.R. 721, referred to.
(10) *Bristol & West Bldg. Socy.* v. *Mothew*, [1998] Ch. 1; [1997] 2 W.L.R. 436; [1996] 4 All E.R. 698, referred to.
(11) *Charter plc* v. *City Index Ltd.*, [2007] EWCA Civ 1382; [2008] Ch. 313; [2008] 2 W.L.R. 950; [2008] 3 All E.R. 126; [2008] 2 All E.R. (Comm) 425; [2007] 2 CLC 968; [2008] P.N.L.R. 16; [2008] WTLR 1773, referred to.
(12) *Commonwealth Oil & Gas Co. Ltd.* v. *Baxter*, [2009] CSIH 75; 2010 S.C. 156; 2009 SLT 1123; 2009 S.C.L.R. 898; 2009 G.W.D. 35–592, referred to.
(13) *Competitive Ins. Socy. Co. Ltd.* v. *Davies Invs. Ltd.*, [1975] 1 W.L.R. 1240; [1975] 3 All E.R. 254, referred to.
(14) *Cook* v. *Deeks*, [1916] 1 A.C. 554; (1916), 85 L.J.P.C. 161; 114 L.T. 636; [1916–17] All E.R. Rep. 285, referred to.
(15) *Criterion Properties plc* v. *Stratford UK Properties LLC*, [2004] UKHL 28; [2004] 1 W.L.R. 1846; [2004] BCC 570; [2006] 1 BCLC 729, considered.
(16) *El Ajou* v. *Dollar Land Hldgs. plc*, [1994] 2 All E.R. 685; [1994] BCC 143; [1994] 1 BCLC 464; [1993] N.P.C. 165, considered.
(17) *Foskett* v. *McKeown*, [2001] 1 A.C. 102; [2000] 2 W.L.R. 1299; [2000] 3 All E.R. 97; [2000] Lloyd's Rep. I.R. 627; [2000] 5 LRC 664; [2000] WTLR 667; (2000), 2 ITELR 711, applied.
(18) *Foss* v. *Harbottle* (1843), 2 Hare 461; 67 E.R. 189, referred to.
(19) *G* v. *G (Minors: Custody Appeal)*, [1985] 1 W.L.R. 647; [1985] 2 All E.R. 225; [1985] FLR 894; [1985] Fam. Law 321, referred to.
(20) *Guinness plc* v. *Saunders*, [1990] 2 A.C. 663; [1990] 2 W.L.R. 324; [1990] 1 All E.R. 652; [1990] BCC 205; [1990] BCLC 402, referred to.
(21) *Gwembe Valley Dev. Co. Ltd.* v. *Koshy (No. 3)*, [2003] EWCA Civ 1048; [2004] 1 BCLC 131, *dicta* of Mummery, L.J. referred to.

(22) *Halton Intl. Inc. (Hldgs.) SARL* v. *Guernroy Ltd.*, [2005] EWHC 1968 (Ch); [2006] 1 BCLC 78, *dicta* of Patten, J. referred to.
(23) *Japan Abrasive Materials Pty. Ltd.* v. *Australian Fused Materials Pty. Ltd.*, [1998] WASC 60, referred to.
(24) *Meridian Global Funds Mgmt. Asia Ltd.* v. *Securities Commn.*, [1995] 2 A.C. 500; [1995] 3 W.L.R. 413; [1995] 3 All E.R. 918; [1995] BCC 942; [1995] 2 BCLC 116; [1995] 4 LRC 423; [1994] 2 NZLR 291, referred to.
(25) *National Trust for the Cayman Islands* v. *Planning Appeals Tribunal*, 2002 CILR 59, referred to.
(26) *Neath Rugby Ltd., Re*, [2009] EWCA Civ 291; [2009] 2 BCLC 427; [2010] BCC 597, referred to.
(27) *Nisbet & Potts' Contract, Re*, [1906] 1 Ch. 386; (1906), 75 L.J.Ch. 238; 54 W.R. 286; 94 L.T. 297; 22 T.L.R. 233; [1904–07] All E.R. Rep. 865, referred to.
(28) *Nurcombe* v. *Nurcombe*, [1985] 1 W.L.R. 370; [1985] 1 All E.R. 65; [1984] BCLC 557; (1984), 1 BCC 99269, considered.
(29) *Nurdin & Peacock plc* v. *DB Ramsden & Co. Ltd.*, [1999] 1 EGLR 119; [1998] EGCS 123, considered.
(30) *Pilmer* v. *Duke Group Ltd.*, [2001] HCA 31; (2001), 207 CLR 165; 75 ALJR 1067; 38 ACSR 122; [2001] 2 BCLC 773; [2001] 5 LRC 417, referred to.
(31) *Rolled Steel Products (Hldgs.) Ltd.* v. *British Steel Corp.*, [1986] Ch. 246; [1985] 2 W.L.R. 908; [1985] 3 All E.R. 52; (1984), 1 BCC 99158, referred to.
(32) *Sagicor General Ins. (Cayman) Ltd.* v. *Crawford Adjusters (Cayman) Ltd.*, 2008 CILR 482, referred to.
(33) *Satnam Invs. Ltd.* v. *Dunlop Heywood & Co. Ltd.*, [1999] 3 All E.R. 652; [1999] 1 BCLC 385; [1999] 2 L.S.G. 30; [1998] EGCS 190; [1999] FSR 722, referred to.
(34) *Story* v. *Windsor (Lord)* (1743), 26 E.R. 776; 2 Atk. 630, referred to.
(35) *Target Hldgs. Ltd.* v. *Redferns*, [1996] A.C. 421; [1995] 3 W.L.R. 352; [1995] 3 All E.R. 785; [1995] CLC 1052; [1995] N.P.C. 136; [1995] 3 LRC 162, referred to.
(36) *Texaco Ltd.* v. *Arco Technology Inc.*, Queen's Bench, October 3rd, 1989, unreported, referred to.
(37) *Towers* v. *African Tug Co.*, [1904] 1 Ch. 558; (1904), 73 L.J. Ch. 395; 11 Mans. 198; 52 W.R. 532; 90 L.T. 298; 20 T.L.R. 292; [1904–7] All E.R. Rep. Ext. 1583, referred to.
(38) *Ultraframe (UK) Ltd.* v. *Fielding*, [2005] EWHC 1638 (Ch); [2006] F.S.R. 17; [2007] WTLR 835, referred to.
(39) *Universal Project Mgmt. Servs. Ltd.* v. *Fort Gilkicker Ltd.*, [2013] EWHC 348 (Ch); [2013] Ch. 551; [2013] 3 W.L.R. 164; [2013] 3 All E.R. 546; [2013] BCC 365; (2013), 163 N.L.J. 268, referred to.
(40) *Waddington Ltd.* v. *Chan Chun Hoo Thomas*, [2008] HKCFA 63;

(2008), 11 HKCFAR 370; [2009] 4 HKC 381; [2008] HKCU 1381; [2009] 2 BCLC 82, referred to.

**Legislation construed:**
Grand Court Rules 1995 (Revised), O.15, r.12A: The relevant terms of this rule are set out at para. 23.
O.62, r.4(5): The relevant terms of this paragraph are set out at para. 253.

Judicature Law (2007 Revision), s.34: The relevant terms of this section are set out at para. 246.
*M. Bloch, Q.C.* with *D. Butler* for Autumn Holdings Asset Inc. and Gilbertson;
*R. Millett, Q.C.* with *J. Eldridge* for Renova Resources Private Equity Ltd. and the other respondents/cross-appellants.

1 **CHADWICK, J.A.:** This appeal and cross-appeal are from an order made on November 6th, 2012 by Foster, J. in proceedings brought in the Financial Services Division of the Grand Court by Renova Resources Private Equity Ltd. ("Renova") against Brian Patrick Gilbertson ("Mr. Gilbertson"), Autumn Holdings Asset Inc. ("Autumn") and others.

2 Renova is (or was at the material time) a company incorporated in the Bahamas. It is a wholly owned subsidiary of Renova Holding Ltd. ("Renova Holding"), also a company incorporated in the Bahamas. Renova and Renova Holding are members of the Renova group of companies, described by the judge as "a very large Russian owned conglomerate, consisting of some one hundred or so corporate and other entities, incorporated or established in various jurisdictions" and as having "a range of major commercial business interests, particularly, although not exclusively, in oil and metals in Russia and elsewhere." At the relevant time, the chairman and principal beneficial owner of the Renova group was Mr. Viktor Vekselberg, whom the judge described as "a well-known, very successful and influential Russian billionaire businessman, based in Moscow." The overall management of the Renova group was carried on from Zurich through a Swiss company, Renova Management AG ("Renova Management"). The Chief Investment Officer of the Renova group was Mr. Vladimir Kuznetsov, a Russian national based in Zurich. Mr. Vekselberg, Mr. Kuznetsov and Renova Holding were, with Renova, defendants to the counterclaim in the proceedings.

3 The judge explained that one of Mr. Vekselberg's major interests during the relevant period, held through the Renova group, was a substantial share in a large Russian aluminium producing company, Siberian Urals Aluminium Co. (to which the judge referred as "SUAL"). At the relevant time, Mr. Vekselberg was the chairman of SUAL.

Mr. Gilbertson was Chief Executive Officer of SUAL between 2004 and 2007. The judge went on to say this (at paras. 3.1–3.3 of his judgment):

> "3.1 During the later part of 2004 and 2005 Mr. Gilbertson discussed with Mr. Vekselberg a proposal by Mr. Gilbertson to set up a private equity fund, which Mr. Gilbertson would establish and manage and which would be financed by Renova, with the profits effectively to be shared equally between them. The fund was to invest in assets with potential in the mining sector, and the fund by Mr. Gilbertson was to have responsibility for sourcing and proposing opportunities for investment by the fund. This proposal developed into what was in effect a joint venture in which, as Mr. Vekselberg described it, he and Mr. Gilbertson would be partners.
>
> 3.2 After a lengthy period of negotiation the terms of the arrangement were set out in a letter from Renova Holding to Mr. Gilbertson known as the Letter Agreement. It was signed by Renova Holding on 20th January 2006 and by Mr. Gilbertson on 24th January 2006, although the letter itself was dated 24th November 2005 . . .
>
> 3.3 . . . The Letter Agreement then defined 'Investment Fund' as an investment fund in a jurisdiction and legal form to be agreed between Mr. Gilbertson and Renova Holding. The 'Fund Management Vehicle' was to be the vehicle charged with establishing, marketing and managing the Investment Fund and the 'Initial Capital' meant a founding capital of US$4m in cash at the establishment of the Fund Management Vehicle. The 'Investment Committee' meant a committee comprising Mr. Gilbertson or his nominated representative on the one hand and the CEO of Renova Management or its nominated representative on the other hand. In the event the Investment Committee comprised Mr. Gilbertson and Mr. Kuznetsov . . ."

4 The judge explained in his judgment that the structure established pursuant to the letter agreement comprised three Cayman Islands entities: Pallinghurst Resources Management LP ("the master fund"), a Cayman Islands exempted limited partnership established on May 19th, 2006; Pallinghurst (Cayman) General Partner LP ("GPLP"), a Cayman Islands exempted limited partnership established on March 19th, 2006; and Pallinghurst (Cayman) General Partner LP (GP) Ltd. ("the company"), a company incorporated in the Cayman Islands on March 15th, 2006. The company was the general partner of GPLP, and GPLP was the general partner of the master fund. Together the three entities were known as "the Pallinghurst structure."

5 Renova is (or was at the material time) the owner of 50% of the issued shares in the company. The other 50% of the issued shares in the company were held by Fairbairn Trust Ltd. ("Fairbairn"), a Jersey-based trust company, as trustee of the Brian Patrick Gilbertson Settlement ("the BPG

Settlement"), a settlement established by Mr. Gilbertson. At the material time the two directors of the company were Mr. Gilbertson and Mr. Kuznetsov. These proceedings were brought by Renova as a shareholder of the company, and so are, in form, a derivative action. The company, GPLP and the master fund were joined as co-defendants (with Mr. Gilbertson and Autumn). The judge referred, in his judgment, to Renova, the company, GPLP and the master fund (collectively) as "the Renova parties" and to Mr. Gilbertson and Autumn (collectively) as "the Gilbertson parties": it will be convenient if I adopt those descriptions in this judgment.

6 The background against which these proceedings were brought was explained by the judge (at paras. 1 and 5.1 of his judgment):

> "1 This case concerns the well-known Fabergé brand, renowned for high quality jewellery and originally for the famous Fabergé jewel encrusted eggs made in Imperial Russia. The brand name and associated business have changed hands since then on several occasions and in 1989 the brand and business were acquired by the large English company, Unilever PLC. The brand and business were then sold by Unilever PLC in early January 2007 to a consortium of investors, which included indirectly and which was arranged and set up by Mr. Brian Gilbertson. He is the principal beneficial owner and controller of Pallinghurst Resources Limited, an English company, which is now the largest investor in Fabergé Limited, the owner, developer and manager of the Fabergé brand and business . . ."

> "5.1 Project Egg was the name given to the project for the acquisition of the Fabergé brand and its business from the then owner, Unilever PLC. The evidence of Mr. Gilbertson, which was not disputed in this respect, was that from about 2002, he had identified the Fabergé brand as an asset and business which was not then being exploited to its full potential and which he thought would make a good investment for profitable development and exploitation. Although the Fabergé brand was not obviously an investment project 'in the metal and mining industry' as contemplated by the Letter Agreement, Mr. Gilbertson, after meeting Mr. Vekselberg, correctly thought that it would nonetheless be of considerable interest to him. Mr. Vekselberg was a collector of Fabergé items and had recently acquired a very significant and expensive collection of imperial Fabergé eggs, which had been very well received in Russia. He was very interested in Fabergé and its Russian heritage. Accordingly, Mr. Vekselberg was enthusiastic when Mr. Gilbertson, early on in his proposals with regard to a private equity fund, suggested the Fabergé brand and business as a potential investment for the private equity fund which subsequently became the Master Fund within the Pallinghurst Structure. From the start, therefore, Project Egg was one of a

number of investment opportunities sourced and put forward by Mr. Gilbertson as potential Investment Projects."

7 As I have said, the defendants to Renova's claim in these proceedings included Mr. Gilbertson and Autumn. Autumn, a company incorporated in the British Virgin Islands, was owned by Fairbairn, the trustee of the BPG Settlement (and other Gilbertson family trusts). It was a member of the "consortium of investors" ("the consortium"), to which the judge made reference in para. 1 of his judgment (in the passage which I have set out). Other members of the consortium were Dr. Milan Jelinek, an acquaintance of Mr. Gilbertson, and K-M Investment Corp. ("K-MIC"), the holding company of American Metals and Coal International ("AMCI"), a large coal marketing business owned jointly by Mr. Hans Mende (known to Mr. Gilbertson through their mutual acquaintance, Dr. Jelinek) and Mr. Fritz Kundrun. Dr. Jelinek, K-MIC, Mr. Mende and Mr. Kundrun are not parties to the proceedings.

8 The Fabergé brand and business ("the Fabergé rights") were acquired from Unilever plc ("Unilever") by Project Egg Ltd. ("PEL"), a Cayman Islands company incorporated for that purpose by Mr. Gilbertson on December 1st, 2006, under a sale and purchase agreement ("the SPA") signed on December 22nd, 2006. The acquisition price was US$38m. The acquisition was completed on January 3rd, 2007 with funds provided by way of loan by Autumn, Dr. Jelinek and K-MIC. On the same day, 100 shares were issued by PEL: 25 shares to each of Autumn and Dr. Jelinek and 50 shares to K-MIC. In March 2007, PEL changed its name to Fabergé Ltd.

9 The effect of the acquisition of the Fabergé rights by PEL and the issue by PEL of shares to Autumn, Dr. Jelinek and K-MIC—steps which, it is said, were procured by Mr. Gilbertson—was that (save as to the 1/101 interest which remained in the master fund as the continuing owner of the one share in PEL issued on incorporation) the economic benefit of the development, exploitation and management of those rights passed to Autumn, Dr. Jelinek and K-MIC, all of whom were outside and unrelated to the Pallinghurst structure, and was no longer held by the master fund within the Pallinghurst structure as had been originally intended.

10 In section 6 of his judgment (under the heading "Brief Summary of the Parties' Cases"), the judge explained that Renova's principal claim in the proceedings—a claim which it advanced on behalf of the company, as one of the ultimate owners of the master fund—was for reconstitution of the master fund to the position in which it is said it would have been but for the alleged breach of duty by Mr. Gilbertson as a director of the company. The judge summarized the basis on which that claim was advanced (at paras. 6.2–6.3):

> "6.2 . . . [Renova] claims that Mr. Gilbertson, who was at all material times a director of the Company, acted in breach of his fiduciary duties to the Company by, at the last minute, diverting away from the Master Fund, and thus ultimately from the Company, for his own benefit the valuable economic benefit of developing, exploiting and managing the Fabergé brand, and doing so covertly without the knowledge of his fellow director, Mr. Kuznetsov or of [Renova] as 50% shareholder in the Company or of any of the other Renova Parties. Mr. Gilbertson, it is said, did this by secretly arranging alternative financing of the purchase price of the Rights by his own trust and the other investors to enable the acquisition and ownership of the Rights ultimately for his own personal benefit and that of his fellow investors, rather than for the benefit of the Master Fund. He further procured the gratuitous issue of new shares in PEL, as the acquirer of the Rights, to his own trust and to the other investors, thereby virtually eliminating the interest of the Master Fund in PEL and hence in the economic benefit of developing, exploiting and managing the Fabergé brand.
>
> 6.3 [Renova] contends that as a director of the Company Mr. Gilbertson owed fiduciary duties to the Company, including the duty to act in good faith, in the best interests of the Company, not to place himself in a position where his duties to the Company and his own interests might conflict, to refrain from self-dealing and not to make a secret profit. By his actions he was in breach of those duties to the loss of the Master Fund and thus the Company."

Renova's claim against Autumn—as the judge explained at para. 6.5 of his judgment—was for an account of the shares in PEL which (it was said) Autumn had received gratuitously, and for an account of the interest which Autumn had earned on the loans which it made by way of contribution to the funding of the purchase price of the Fabergé rights and for working capital. Those claims were advanced on the basis that Autumn knew or ought to have known that Mr. Gilbertson was acting in breach of fiduciary duty in procuring the purchase of the Fabergé rights as he did and in procuring the issue of the new shares in PEL. Alternatively, it is said that, in the circumstances that Autumn did not pay for the PEL shares, it received them as a volunteer, and that, on that basis also, Autumn held those shares as a constructive trustee.

11 The judge went on to explain (at para. 6.7 of his judgment) that Mr. Gilbertson and Autumn counterclaimed in the proceedings, not only against Renova but also against Mr. Vekselberg, Mr. Kuznetsov and Renova Holding, on various grounds for damages by way of indemnity for any liability which they were found to have in respect of Renova's derivative claims. As the judge pointed out, the counterclaim was contingent on Renova succeeding on its derivative claims.

12 The judge held (2012 (2) CILR 416, at paras. 57 and 152) that Mr. Gilbertson owed the duties of a fiduciary as a director of the company throughout the relevant period, and that he was in breach of those duties in acting as he did in late December 2006 and January 2007. But he went on to hold that Mr. Gilbertson's breach of fiduciary duty had caused the master fund "no significant economic loss." He said this (*ibid.*, at para. 150):

> "In the circumstances, if the Master Fund were to be put in the position in which it would now be, it would be in a significantly negative financial position. I must therefore conclude that it would be of no benefit to put the Master Fund into the financial position in which it would now have been but for Mr. Gilbertson's breach of fiduciary duty and that no equitable compensation is payable."

Accordingly, the judge dismissed the claim for equitable compensation brought against Mr. Gilbertson.

13 The judge held (2012 (2) CILR 416, at paras. 82, 95 and 153) that Autumn held the 25 PEL shares issued to it in January 2007 on a constructive trust for "the master fund/GPLP/the company"—on the ground that, when it received those shares, it was not a bona fide purchaser for value without notice in that (i) it knew or ought to have known of Mr. Gilbertson's breach of fiduciary duty, and (ii) it received the shares gratuitously, as a volunteer—and was liable to account for them. He held, also (*ibid.*, at para. 153), that Autumn was liable to account for the interest which it had received on the loans which it made to PEL for the purpose of funding the acquisition of the Fabergé rights.

14 As the judge recorded (*ibid.*, at para. 103), two of the five counterclaims brought by the Gilbertson parties—those for lawful means conspiracy and for breach of fiduciary duty by Mr. Kuznetsov—were abandoned during the course of the trial. For the reasons which he gave (*ibid.*, at paras. 105–112), the judge concluded that the remaining specific counterclaims—those for repudiatory breach of the letter agreement, for inducement and/or procurement of breach of the letter agreement and for unlawful means conspiracy—were without merit and should be dismissed.

**The order of November 6th, 2012**

15 By the order which he made on November 6th, 2012 (filed on November 13th, 2012) the judge declared (under para. 1) that Autumn held 25,000 ordinary shares in Fabergé Ltd. (formerly PEL) as constructive trustee for the master fund, and directed (at para. 2) that Autumn should transfer forthwith those shares to the master fund. The reference to "25,000 ordinary shares in Fabergé Limited" gave effect to the judge's intention that the shares in respect of which Autumn was held to be constructive trustee were the 25 shares in PEL issued in January 2007

(which had become 25,000 shares in Fabergé Ltd. following a sub-division in 2008 and the change of name) and did not include any shares in Fabergé Ltd. subsequently acquired by Autumn. At para. 3 of that order, the judge directed that Autumn should pay to the master fund the sum of US$2,306,320.35 (inclusive of pre-judgment interest from January 3rd, 2007 to the date of the order in the amount of US$507,347.35). At paras. 4 and 5, respectively, he dismissed the claim for equitable compensation against Mr. Gilbertson and the counterclaims against the Renova parties. At para. 6, the judge directed that each party should bear its own costs of the proceedings (so far as such costs were not already the subject of orders in favour of one or other of the parties).

**The appeal and cross-appeal**

16 On November 27th, 2012, Autumn filed notice of appeal (Appeal No. 21 of 2012) from the order of November 6th, 2012. The Renova parties are the respondents to that appeal. The relief sought was an order that the appeal be allowed: that paras. 1, 2 and 3 of the order be set aside, and that the Renova parties pay Autumn's costs of the appeal and in the court below. The grounds of that appeal are set out in the memorandum of grounds of appeal filed on behalf of Autumn on February 1st, 2013 under six main heads:

(A) The judge misdirected himself and erred in law in entertaining and granting relief in respect of derivative claims that were not before him.

(B) The judge misdirected himself and erred in law and/or fact in holding that Mr. Gilbertson owed or was in breach of any fiduciary duty in relation to the Fabergé rights and so in holding that there was any substratum on which to found a claim against Autumn.

(C) The judge misdirected himself and erred in law and/or fact in holding that, notwithstanding the rule in *Nurcombe* v. *Nurcombe* (28), the conduct of the Renova parties was not such as to disentitle Renova from any relief.

(D) The judge misdirected himself and erred in law and/or fact in holding that, having regard to its relationship with Mr. Gilbertson, the property which it received, the person from whom it received the property and its state of knowledge at the time of receipt, Autumn was liable in knowing receipt.

(E) The judge misdirected himself and erred law and/or fact in holding that Autumn was liable as a volunteer.

(F) The judge misdirected himself and erred in law and/or fact in granting relief against Autumn (i) by way of an account of profits (comprising the interest which Autumn received on the loan it made to PEL); and (ii) in respect of pre-judgment interest (from January 3rd, 2007)

on the interest payment which Autumn received from Fabergé Ltd. on September 28th, 2007.

17 Also on November 27th, 2012, Renova (derivatively on behalf of the company, GPLP and the master fund), as plaintiff in the action, and Mr. Vekselberg, Mr. Kuznetsov, Renova Holding and Renova (on its own account), as defendants to the counterclaim, filed notice of appeal (Appeal No. 22 of 2012) from the order of November 6th, 2012. Mr. Gilbertson and Autumn are the respondents to that cross-appeal. The relief sought by the cross-appeal was (i) that so much of the order as dismissed Renova's claim against Mr. Gilbertson for equitable compensation be quashed and that either judgment be entered for Renova against Mr. Gilbertson in the sum of US$82,582,000 and interest under statute, or (in the alternative) that it be declared that Autumn holds a further and additional 16,190,575 ordinary shares in Fabergé Ltd. as constructive trustee for the master fund and ordered that Autumn shall forthwith transfer full legal title in those further shares to the master fund; (ii) that Mr. Gilbertson and Autumn pay Renova's costs of the proceedings in the court below on the standard basis; (iii) that Mr. Gilbertson and Autumn pay the costs of the defendants to counterclaim in the court below on the indemnity basis; and (iv) that Mr. Gilbertson and Autumn pay the cross-appellants' costs of the cross-appeal on the standard basis. The grounds of the cross-appeal are set out in the memorandum of grounds of appeal filed on behalf of Renova and the other cross-appellants, also on February 1st, 2013, under three heads:

(A) The judge erred in law and/or in principle and/or misdirected himself as to the evidence in valuing at nil the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation.

(B) Alternatively, the judge erred in law and/or in principle and/or misdirected himself as to the evidence in failing to hold that the entirety of Autumn's shareholding in Fabergé Ltd. (and not only the 25,000 shares which represented the 25 shares issued by PEL in January 2007) should be held on constructive trust for (and transferred to) the master fund.

(C) The judge erred in law or exercised his discretion outside the ambit within which reasonable disagreement is possible in making no order as to the costs of the action and the counterclaim.

18 In those circumstances the questions for determination by this court are these:

(1) Was the judge wrong to entertain (and grant relief in respect of) derivative claims that were not before him?

(2) Was the judge wrong to hold that Mr. Gilbertson owed and was in breach of fiduciary duties in relation to the Fabergé rights?

(3) Was the judge wrong to hold that, notwithstanding the rule in *Nurcombe* v. *Nurcombe* (28), the conduct of the Renova parties was not such as to disentitle Renova from any relief?

(4) Was the judge wrong to value at nil the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation?

(5) Was the judge wrong to hold that Autumn was liable as a constructive trustee of the shares issued by PEL in January 2007 (a) because it was in "knowing receipt" having regard to its relationship with Mr. Gilbertson, the property which it received, the person from whom it received the property and its state of knowledge at the time of receipt, and/or (b) because it received those shares as a volunteer?

(6) Was the judge wrong in failing to hold that the entirety of Autumn's shareholding in Fabergé Ltd. (and not only the 25,000 shares which represented the 25 shares issued by PEL in January 2007) should be held on constructive trust for (and transferred to) the master fund?

(7) Was the judge wrong to grant relief against Autumn by way of an account of profits (comprising the payment which Autumn received on September 28th, 2007 in respect of interest on the loan which it had made to PEL on January 3rd, 2007) and, if not, was the judge wrong to award pre-judgment interest from January 3rd, 2007 (rather than from September 28th, 2007) on the payment which Autumn received?

(8) Did the judge exercise his discretion outside the ambit within which reasonable disagreement is possible in making no order as to the costs of the action and the counterclaim, and, if so, what orders as to costs should be made?

**Whether the judge was wrong to entertain (and grant relief in respect of) derivative claims that were not before him**

19 It is said on behalf of the Gilbertson parties that the judge misdirected himself and erred in law in entertaining a derivative claim or derivative claims on behalf of the GPLP or the master fund notwithstanding that no such claim or claims were contained in the originating process and the only derivative claim for which leave had been granted was a claim brought on behalf of the company, and that, had the judge directed himself properly, he should have refused to grant any relief on the derivative claim brought by Renova on behalf of the company.

20 The judge addressed the availability of derivative relief in his judgment re-dated and re-issued on November 5th, 2012. He said this (2012 (2) CILR 416, at paras. 59–60):

"***Availability of derivative relief***

59 In their pleading and opening submissions, the Gilbertson parties raised again the derivative nature of the plaintiff's claim and contended that the plaintiff was not entitled, on behalf of the company, to claim for alleged loss sustained by the master fund. I say that they raised this issue 'again' because the entitlement of the plaintiff to pursue this action derivatively on behalf of the company (including by way of multiple derivative action also on behalf of GPLP and/or the master fund) in respect of loss sustained by the master fund was addressed in the ruling dated April 14th, 2009 giving leave to the plaintiff to proceed with this action (in proceedings reported at 2009 CILR 268). The question was fully argued at the hearing which resulted in that ruling by reference to the relevant authorities, including and particularly *Waddington Ltd.* v. *Chan Chun Hoo* . . . in the Court of Final Appeal in Hong Kong and the judgment of Lord Millett, N.P.J., as well as the other authorities referred to in the ruling.

60 The uncontroversial facts necessary to enable this court to rule on this issue were before me at that hearing and in my view no facts relevant to this relatively limited legal argument have emerged since. As I have already said, there was no appeal from any part of the ruling, including the decision on this particular issue, which, although made in the context of the plaintiff's application for leave to proceed with this action, is nonetheless, in my view, a conclusive and not a summary ruling on this particular issue. There having been no appeal against the court's decision on this particular issue, in my opinion it was not open to the Gilbertson parties to revisit it at the trial. Accordingly, I reject the Gilbertson parties' submissions in this regard."

The judge's ruling of April 14th, 2009 is reported at 2009 CILR 268. The judgments of the Hong Kong Court of Final Appeal in *Waddington Ltd.* v. *Chan Chun Hoo Thomas* (40), to which the judge referred in his ruling (and in the passage of his judgment of November 5th, 2012 which I have just set out) are reported *inter alia* at [2008] HKCU 1381.

21 These proceedings were commenced by writ of summons issued on May 20th, 2008. The plaintiff was described in that writ as "Renova Resources Private Equity Limited (A company incorporated in the Bahamas suing as shareholder of the Second Defendant, Pallinghurst (Cayman) General Partner LP (GP) Limited)." Pallinghurst (Cayman) General Partner LP (GP) Ltd. (the company), as the party on whose behalf the derivative action was brought, was joined as a defendant to the proceedings, as would be usual in such circumstances. But it is important to have three matters in mind. First, GPLP and the master fund were also joined as

defendants to the proceedings. Secondly, the relationship between the company, GPLP and the master fund was set out at para. 3 of the statement of claim, as filed on May 20th, 2008:

> "3. The Second Defendant (the 'Company') is a company incorporated in the Cayman Islands and is the general partner of a Cayman Islands limited partnership called Pallinghurst (Cayman) General Partner LP (the 'Third Defendant'). The Third Defendant ('GPLP') is in turn the general partner of the Fourth Defendant, a Cayman Islands limited partnership called Pallinghurst Resources Management LP (the 'Master Fund')."

Thirdly, relief was sought in the proceedings for the benefit of the company, GPLP and the master fund collectively or in the alternative. Paragraphs 32 and 33 of the statement of claim, as filed, were in these terms:

> "32. As a result of the matters set out above, the Company, including in its capacity as general partner of GPLP and, in turn, the Master Fund, is entitled to, and the Plaintiff hereby seeks on behalf and in the interests of the Company, the following relief against the First and Fifth Defendants:
>
> 32.1 a declaration that the entry into and/or closing of the Rights Purchase Agreement was effected without the proper and due authority of the Company, or of either GPLP or the Master Fund;
>
> 32.2 a declaration that Autumn holds its PEL shares (i.e. the 25% holding) on constructive trust for the Company and/or GPLP and/or the Master Fund;
>
> 32.3 an order that Mr Gilbertson takes all steps to procure that Autumn deals with its shares in PEL as constructive trustee for the Company and/or GPLP and/or the Master Fund;
>
> 32.4 further or alternatively, an account to the company and/or GPLP and/or the Master Fund of profits received by Mr Gilbertson and/or Autumn and/or by individuals or entities associated with them, namely an account of the value of the 25% PEL shares;
>
> 32.5 further or alternatively, an order for payment by Mr Gilbertson to the Company and/or GPLP and/or the Master Fund of equitable compensation for breach of fiduciary duty arising from Mr Gilbertson's failure to obtain the prior approval of the Board of the Company to the acquisition of the Rights and/or thereafter to agree to the terms of the Third Draft IA or Fourth Draft IA and/or an agreement on substantially

similar terms and/or to continue to negotiate terms in good faith notwithstanding that such terms were reasonable and in the best interests of the Company and/or his actions which led to the dilution of the Company and/or GPLP and/or the master fund's economic interest in PEL;

32.6 further or alternatively, an order for payment by Autumn to the Company and/or GPLP and/or the Master Fund of equitable compensation for knowing receipt of property traceable to a breach of fiduciary duty.

33. Further, the Plaintiff seeks an order that the First and Fifth Defendants pay the Company and/or GPLP and/or the Master Fund interest (including compound interest with yearly rests) on all sums found to be due to it pursuant to section 34 of the Judicature Law and/or the rules of equity for such period and in such amount as the Court considers appropriate."

22 By summons issued on July 29th, 2008, Renova sought leave, pursuant to O.15, r.12A(2) of the Grand Court Rules, to continue the action on behalf of the company. In the skeleton argument filed in support of that application, Renova indicated (at para. 24) that, if such leave were granted, "it will similarly formally be able to procure that the company proceed in the name of the GPLP, which in turn will be able formally to procure that the Master Fund proceed on its own behalf." Leave to continue these proceedings was granted by the judge for the reasons which he set out in his ruling of April 14th, 2009. In the event, Renova did not think it necessary to make any further application (on behalf of the company) for leave to proceed in the name of GPLP or, if such leave were granted, any further application on behalf of GPLP for leave to proceed in the name of the master fund.

23 It is clear from para. 1 of his ruling of April 14th, 2009 that the judge appreciated that the application before him was an application under GCR O.15, r.12A(2) for leave to continue a derivative action brought by Renova on behalf of the company. Paragraphs (1) and (2) of that rule, to which the judge referred (2009 CILR 268, at para. 2), are in these terms:

"(1) This rule applies to every action begun by writ by one or more shareholders of a company where the cause of action is vested in the company and relief is accordingly sought on its behalf (referred to in this rule as a 'derivative action').

(2) Where a defendant in a derivative action has given notice of intention to defend, the plaintiff must apply to the Court for leave to continue the action."

An application by Renova for leave to continue a multi-derivative action on behalf of the master fund (or on behalf of GPLP) would not have been

23-01165-mew Doc 84-2 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit B-1 - Autumn Holdings Asset Inc v Renova Res Private Equity Ltd [2017 (2 Pg 28 of 39



within the scope of GCR O.15, r.12A for the reason that if (and so far as) the relevant cause of action was vested in the master fund (or in GPLP), it was not vested in a company of which Renova was a shareholder. Nevertheless, the question whether Renova could pursue proceedings in circumstances where (upon a true analysis) the cause of action was vested in the master fund (and not in the company) was in the judge's mind. In identifying the issues which arose for determination, the judge said this (*ibid.*, at para. 3):

> "Thirdly, there is the question whether a derivative action may be brought by a shareholder in the holding company of the company (or in this case the exempted limited partnership) which is its ultimate subsidiary and in which, at least arguably, the cause of action against the defendant(s) is vested. Such an action is usually described as a multiple derivative action. There is also a question as to whether such a shareholder in a holding company may claim for loss or damage which, having arguably been sustained by a subsidiary company, is reflective loss. These are the principal issues arising in this matter but there are other peripheral issues as well."

24 The judge addressed that question in the section of his ruling (paras. 62–66) headed "The multiple derivative action." He explained that it had been argued on behalf of the Gilbertson parties that the relevant exception to the rule in *Foss* v. *Harbottle* (18)—that is to say, the exception on which the power to entertain a derivative action was founded—arose only in the context of loss or damage suffered by the company of which the plaintiff was a shareholder, and that, in the present case, the loss alleged was suffered not by the company but by the master fund, whose shareholding in PEL was diluted as a result of Mr. Gilbertson's actions from 100% to a nominal amount. He referred to the facts in *Waddington Ltd.* v. *Chan Chun Hoo Thomas* (40), in which (as he said) it appeared that the appellant/defendant, who was a director of the ultimate holding company as well as of the subsidiary company and the sub-subsidiary companies, had made the same (or a similar) submission to that which had been advanced on behalf of the Gilbertson parties in this context. He referred to the conclusion of Lord Millett, sitting as a non-permanent judge of the Hong Kong Final Court of Appeal in that case ([2009] 2 BCLC 82, at para. 70), that "the only question is whether the action, which may be brought by a member of the company, may be brought by a member of its parent or ultimate holding company. This is simply a question of locus standi." And he referred to Lord Millett's observations at paras. 74 and 75 of his judgment in *Waddington* (*ibid.*):

> "[74] . . . On a question of standing, the court must ask itself whether the plaintiff has a legitimate interest in the relief claimed sufficient to justify him in bringing proceedings to obtain it. The answer in the case of person wishing to bring a multiple derivative

> action is plainly 'Yes'. Any depletion of a subsidiary's assets causes indirect loss to its parent company and its shareholders. In either case the loss is merely reflective loss mirroring the loss directly sustained by the subsidiary and as such it is not recoverable by the parent company or its shareholders for the reasons stated in *Johnson v Gore Wood & Co* [2001] 1 BCLC 313, [2002] 2 AC 1. But this is a matter of legal policy. It is not because the law does not recognise the loss as a real loss; it is because if creditors are not to be prejudiced the loss must be recouped by the subsidiary and not recovered by its shareholders. It is impossible to understand how a person who has sustained a real, albeit reflective, loss which is legally recoverable only by a subsidiary can be said to have no legitimate or sufficient interest to bring proceedings on behalf of the subsidiary.
>
> [75] This is not to allow economic interests to prevail over legal rights. The reflective loss which a shareholder suffers if the assets of his company are depleted is recognised by the law even if it is not directly recoverable by him. In the same way the reflective loss which a shareholder suffers if the assets of his company's subsidiary are depleted is recognised loss even if it is not directly recoverable by him. The very same reasons which justify the single derivative action also justify the multiple derivative action. To put the same point another way, if wrongdoers must not be allowed to defraud a parent company with impunity, they must not be allowed to defraud its subsidiary with impunity."

In his ruling of April 14th, 2009, the judge concluded (2009 CILR 268, at para. 66):

> "In my opinion, Lord Millett's analysis and conclusion also represents the law in this country and I can see no reason why, in appropriate circumstances, a multiple derivative action should not be permitted. In the present case, the company is the general partner of and therefore controls the exempted limited partnership, GPLP. GPLP is itself the general partner and therefore controls the master fund. The master fund is, in my view, no different from a sub-subsidiary of the company for these purposes. On the plaintiff's case, the master fund has sustained significant loss as a result of the dilution of its 100% shareholding in PEL, procured by Mr. Gilbertson without the knowledge, still less the consent, of the master fund or GPLP or the company. In the circumstances, a multiple derivative action on behalf of the company in respect of Mr. Gilbertson's actions is not, in my judgment, objectionable."

25 It is said on behalf of the Gilbertson parties that the judge was wrong to hold (2012 (2) CILR 416, at para. 59) that, when giving leave to Renova to proceed with this action, he had addressed the issues whether Renova

was entitled, on behalf of the company, to claim for alleged loss sustained by the master fund and to pursue this action derivatively on behalf of the company (including by way of multiple derivative action also on behalf of GPLP and/or the master fund) in respect of loss sustained by the master fund. In particular, it is said that:

(1) There is "no room for serious dispute" that the issue whether Renova was entitled to pursue this action by way of multiple derivative action on behalf of GPLP and/or the master fund was not before the judge; given that Renova had indicated in the skeleton argument filed in support of its application under GCR O.15, r.12A(2) that, if that application were successful, it would make further applications (i) on behalf of the company for leave to proceed in the name of GPLP, and (ii) on behalf of GPLP for leave to proceed in the name of the master fund. Renova would not have contemplated that there would be a need for it to make such further applications if it had thought that an application for leave to proceed by way of multiple derivative action on behalf of GPLP and/or the master fund was already before the judge.

(2) The persons with an interest in GPLP and the master fund were not the same as those who (as members of the company) had an interest in the company. A consequence of the irregular manner in which the judge dealt with the issue of leave to proceed was that those who were the partners in GPLP and the master fund were deprived of the opportunity to oppose the proceedings. The judge was wrong to take the view (as, it is said, he appears to have done) that the fact that those with an interest in GPLP and the master fund were not the same as the members of the company was a technicality of little or no significance. The unpleaded claim that Mr. Gilbertson owed a fiduciary duty to the master fund was not only an essential ingredient of any claim in an action pursued by the master fund itself, it was also a prerequisite of a multiple derivative action pursued on behalf of the master fund. It is impossible to understand the rights and obligations owed by the parties to one another without understanding the nature and extent of the interests at stake.

In those circumstances, it is said, the judge was wrong to hold that—if, following the order which he made on Renova's application of July 29th, 2008, Autumn wished to object to Renova pursuing this action on behalf of the master fund—it should have appealed from that order. The flaw in the judge's reasoning (it is said) is apparent on its face.

26 I do not find those submissions persuasive. I accept that, in the summons issued on July 29th, 2008 (before the judgments in the Hong Kong Final Court of Appeal in *Waddington* (40) had been delivered), Renova did not seek leave to proceed by way of multiple derivative action on behalf of GPLP and/or the master fund but it is important to have in mind, first, that it was not required to do so under GCR O.15, r.12A

(which, in the restrictive form in which that order had been made, had no application to multiple derivative actions) and, secondly, that there was no other rule of practice which required that leave was required to bring a multiple derivative action under the general law. It is clear, from the judgments in *Waddington* and from the observations of Briggs, J. in *Universal Project Mgmt. Servs. Ltd* v. *Fort Gilkicker Ltd.* (39), that the practice under the general law in relation to the pursuit of derivative claims—which predated the introduction of GCR O.15 r.12A—was abrogated by that rule in relation to single derivative actions but continued to apply (after the introduction of that rule) in relation to multiple derivative actions. As Ribeiro, P.J. pointed out in *Waddington* ([2009] 2 BCLC 82, at paras. 13–14):

> "[13] . . . Procedurally, there is no requirement at common law for a person seeking to sue derivatively first to obtain the leave of the court . . .
>
> [14] The time honoured practice at common law is for the plaintiff to issue proceedings 'on behalf of himself and the other shareholders other than the defendants', naming the company on whose behalf the proceedings are brought as one of the defendants. A challenge to the plaintiff's locus generally takes the form of an application by the relevant defendants to strike out the claim or to have the court determine as a preliminary issue that the plaintiff has no locus to sue on the company's behalf."

27 I accept, also, that it is reasonably clear that, when preparing and filing the skeleton argument in support of Renova's application of July 29th, 2008, its advisers took the view that the appropriate course in the case of a multiple derivative claim was to proceed incrementally by a series of linked single derivative claims. But that view was based on a misunderstanding of the premise underlying the court's willingness to entertain a derivative claim for relief; as explained by Lord Millett, N.P.J. in *Waddington* (40) and by Briggs, J. in *Universal Project Mgmt. Servs. Ltd.* v. *Fort Gilkicker Ltd.* (39). As Briggs, J. put it in the latter case ([2013] Ch. 551, at paras. 26 and 44 of his judgment):

> "26 In my judgment the common law procedural device called the derivative action was . . . clearly sufficiently flexible to accommodate as the legal champion or representative of a company in wrongdoer control a would-be claimant who was either (and usually) a member of that company or (exceptionally) a member of its parent company where that parent company was in the same wrongdoer control. I would not describe that flexibility in terms of separate forms of derivative action, whether headed 'ordinary', 'multiple' or 'double'. Rather it was a single piece of procedural ingenuity designed to serve

the interests of justice in appropriate cases calling for the identification of an exception to the rule in *Foss v Harbottle.*"

"44 . . . [T]he court could permit a person or persons with the closest sufficient interest to litigate on behalf of a company by seeking for the company relief in respect of a cause of action vested in it. Those persons would usually be a minority of the company's members, but might, if the company was wholly owned by another company, be a minority of the holding company's members. These were not separate derivative actions, but simply examples of the efficient application of the procedural device, designed to avoid injustice, to different factual circumstances."

The judge appreciated—as he said in his ruling of April 14th, 2009 (2009 CILR 268, at para. 3)—that it was, at the least, arguable that the cause or causes of action which Renova sought to pursue against Mr. Gilbertson and/or Autumn were vested in the master fund (and not in the company). In those circumstances it was necessary—in order to determine whether to allow the action, as constituted, to go forward—that he address the question whether Renova could bring multiple derivative proceedings for loss said to have been suffered by the master fund. In my view, there is no doubt that that question was properly before the judge in April 2009, and no doubt that he intended to and did decide it.

28 The judge explained (*ibid.*, at para. 36) that the members of the company (each holding 50% of its shares) were Renova and Fairbairn. Fairbairn (he said) was "effectively controlled by the first defendant, Mr. Brian Gilbertson." He explained (*ibid.*, at para. 37) that the company was the general partner of GPLP, and that GPLP was, in turn, the general partner of the master fund. A diagram of the Pallinghurst structure was attached to the statement of claim which was before him. That diagram showed that Mr. Sean Gilbertson, Mr. (Brian) Gilbertson's son, was the only person (other than the company) with an interest (as limited partner) in GPLP, and that Pallinghurst (Cayman) Founder Partner LP ("the Founder fund") was the only person (other than GPLP) with an interest (also as limited partner) in the master fund. It appeared, also, from that diagram that the general partner of the Founder fund was Pallinghurst Founder GP Ltd. ("Founder GP"), and that Mr. Sean Gilbertson was the sole limited partner of the Founder fund. A more complete analysis of the position under the short form agreements pursuant to which the Pallinghurst structure was established (shown diagrammatically in the appendix to the written submissions of the Gilbertson parties prepared for this appeal) indicates that the persons interested in Founder GP were Renova and Fairbairn (as to 50% each): that is to say, the persons interested in Founder GP were the same persons as those who held the shares in the company. In those circumstances, the Gilbertson parties are correct to point out that the members of the company were not, themselves, the only

persons interested in GPLP and the master fund. In addition to Renova and Fairbairn—which, together, held (in equal shares) indirect interests equivalent to 50% of GPLP (through the company) and 50% of the master fund (as to 25% through GPLP and 25% through Founder GP and the Founder fund)—Mr. Sean Gilbertson held 50% interests in GPLP and the master fund (in the latter case, indirectly through GPLP, as to 25%, and the Founder fund, as to the other 25%). But, as it seems to me, the submission that those who were the partners in GPLP and the master fund were deprived of the opportunity to oppose these proceedings is not well founded. The company, GPLP and the master fund were joined as defendants with Mr. Gilbertson and Autumn (a company of which Fairbairn, a Gilbertson family trust controlled by Mr. Gilbertson, was the owner); the company was the general partner of GPLP and GPLP was the general partner of the master fund; and Mr. Gilbertson and Mr. Kuznetsov were the directors both of the company and of Founder GP. Mr. Sean Gilbertson was closely involved in the circumstances which gave rise to the claims brought on behalf of the master fund: he made a witness statement and gave oral evidence at the trial. In substance this was litigation between Renova interests and Gilbertson interests. Those on the Gilbertson side with an interest in resisting the claims made in the litigation were well able to do so.

29 In my view, the judge was correct to hold (2012 (2) CILR 416, at para. 60) that, having chosen not to appeal from the order which he had made some three and a half years earlier, it was not open to the Gilbertson parties to challenge, at trial, the standing of Renova to advance claims in the action on behalf of GPLP and the master fund including, in particular, a claim founded on the unpleaded contention that Mr. Gilbertson had acted in breach of fiduciary duties which he owed to the master fund.

**Was the judge wrong to hold that Mr. Gilbertson owed and was in breach of fiduciary duties in relation to the Fabergé rights?**

30 As I have said, in section 6 of the judgment issued on November 5th, 2012, the judge explained that Renova's principal claim in the proceedings—advanced on behalf of the company, as one of the ultimate owners of the master fund—was for reconstitution of the master fund to the position in which (it is said) it would have been but for the alleged breach of duty by Mr. Gilbertson as a director of the company. At para. 7.5 of his judgment, the judge observed that the question whether Mr. Gilbertson owed fiduciary duties to the company—and, if so, what fiduciary duties—turned on the particular circumstances. Accordingly, he said, it was necessary to consider—and, in so far as disputed, determine—what those circumstances were. He addressed that task at sections 8, 9 and 10 of his judgment. He made findings of fact by reference to three successive periods: (i) the period up to December 2006 (section 8); (ii) the

23-01165-mew Doc 84-2 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit B-1 - Autumn Holdings Asset Inc v Renova Res Private Equity Ltd [2017 (2 Pg 34 of 39



period from December 2006 to January 3rd, 2007 (section 9); and (iii) the period after January 3rd, 2007 (section 10). But he observed that "the most significant circumstances arose during the short period between about mid-December 2006 and mid-January 2007."

***The judge's findings of fact***

(i) *The period up to December 2006*

31 At para. 8.1 of his judgment, the judge reminded himself that he had already explained (earlier in that judgment) that, from as early as 2002, Mr. Gilbertson had identified the Fabergé brand as a potentially profitable investment; that, at a relatively early stage in their discussions about a private equity fund, Mr. Gilbertson had suggested to Mr. Vekselberg that the Fabergé brand and business could be an investment project in that context; and that, given his personal interest in Fabergé, Mr. Vekselberg's response to that suggestion had been positive. The judge went on to explain (at para. 8.2) that, during 2005, an initial approach was made to Unilever as to the possibility of purchasing the Fabergé brand; that discussions and negotiations took place in respect of the structure which eventually became the Pallinghurst structure; and that, in the course of those discussions and negotiations various draft documents ("the short form agreements") were produced and exchanged. At para. 8.3 of his judgment he noted that, on October 27th, 2005, Pallinghurst Resources LLP ("Pallinghurst LLP") was established in England by Mr. Gilbertson as an investment management vehicle, and that, on November 24th, 2005, the letter agreement (initialled by Mr. Kuznetsov) was sent to Mr. Gilbertson. At para. 8.4 he explained that, from November 2005, Mr. Sean Gilbertson initiated a number of cancellation actions in respect of various Fabergé trademarks, on the ground of alleged non-use, with a view to reducing the value of the Fabergé brand and so strengthening the negotiating position in relation to the proposed purchase of that brand from Unilever.

32 At para. 8.5 of his judgment, the judge referred to a meeting on January 20th, 2006 of the "Pallinghurst Resources Private Equity Fund" attended by Mr. Gilbertson, Mr. Sean Gilbertson and Mr. Kuznetsov. He noted that the agenda for that meeting included several "investment projects," including the purchase of the Fabergé brand and business (which was described as "Project Egg"), and that a briefing document circulated prior to that meeting by Mr. Sean Gilbertson reported, with regard to Project Egg, that meetings with Unilever had taken place since April 2005 but without success. The judge held (at para. 8.5) that "clearly Project Egg was being explored and pursued as an opportunity and potential Investment Project in accordance with the terms of the Letter Agreement." The judge rejected (at para. 8.6 of his judgment) the

submission, made on behalf of the Gilbertson parties, that (notwithstanding the agenda and briefing document) the meeting on January 20th, 2006 could not be taken to indicate that Project Egg was an approved investment project of the master fund because (it was said) the letter agreement had not been finally signed and the master fund had not been established. The judge said this (*ibid.*):

> "While it is no doubt correct that Project Egg was not at that stage an approved Investment Project of the Master Fund, it seems to me that the commercial reality was that it was by then being treated *de facto* as a potential Investment Project of the equity fund which became the Master Fund. Although the Letter Agreement had not been formally signed, it had been delivered to Mr. Gilbertson on 24th November 2005 and was signed by him only 4 days after that meeting. By the time of the meeting it must have been in final form because it was signed on that day on behalf of Renova Holding. The proposed Investment Projects which were discussed at the meeting were all sourced and put forward by Mr. Gilbertson in accordance with the Letter Agreement as proposed Investment Projects. Mr. Gilbertson himself gave evidence to the effect that at that time they, meaning he and Mr. Kuznetsov, were not concerned with the legal niceties, which the lawyers were working on, but simply wanted to get on with the proposed Investment Projects. While the acquisition of the Fabergé brand was clearly at an early stage, in my view it is equally clear that it was nonetheless being considered as an Investment Project of the proposed Investment Fund, which became the Master Fund."

33 The judge had referred to the terms of the letter agreement earlier in his judgment (at paras. 3.3–3.6). As he had said, the letter agreement defined "Investment Fund" as an investment fund in a jurisdiction and legal form, to be agreed between Mr. Gilbertson and Renova Holding; "Fund Management Vehicle" as the vehicle charged with establishing, marketing and managing the investment fund; and the "Initial Capital" as a founding capital of US$4m. in cash on the establishment of the fund management vehicle. The "Investment Committee" meant a committee comprising Mr. Gilbertson or his nominated representative on the one hand and the CEO of Renova Management or its nominated representative on the other hand. In the event, the investment committee comprised Mr. Gilbertson and Mr. Kuznetsov. Mr. Gilbertson and Renova Holding were defined in the letter as "Partners." The letter agreement provided for Renova Holding to establish the investment fund and the fund management vehicle with the initial capital. It provided that the purpose of the investment fund was "to explore, acquire and develop opportunities in the metals and mining industry (the 'Investment Projects')."

34 The judge had gone on to explain (at para. 3.3 of his judgment) that the letter agreement further provided that the Partners would work together to add value to the investment fund, and that Mr. Gilbertson would "assume responsibility for developing and implementing the strategy for the Investment Fund and for all Investment Projects," including, but not limited to, "searching for and introducing Investment Projects to the Investment Committee," "supervising of the implementation of the approved Investment Projects," and "providing strategic advice on corporate development of the Investment Fund, Fund Management Vehicle and Investment Projects." Clause 2.5 of the letter agreement was in these terms:

> "Any of the Partners may bring a proposed Investment Project for consideration by the Investment Fund and Fund Management Vehicle. Approval to proceed with an Investment Project via the Investment Fund, at an Agreed Value, shall require the unanimous consent of the Investment Committee. It is contemplated by the Partners that each approved Investment Project will be pursued through the most appropriate structure, and that equity or other interests in such Investment Projects may be allocated to other minority partners (including managing partners) as agreed by the Investment Committee on a case by case basis."

And, as the judge explained (at para. 3.6 of his judgment), cl. 8.2 of the letter agreement provided that—

> "this letter and its terms shall automatically terminate and become null and void if the Investment Fund and the Fund Management Vehicle are not established and operating in a way reasonably satisfactory to each of the Partners within 16 months of the last signature to this letter. In this regard, the Partners, using their best endeavours, agree to do (and procure the doing by other parties) of all acts necessary and to refrain (and procure that other parties will refrain) from any acts hindering the successful establishment and operation of the Investment Fund and the Fund Management Vehicle."

35 The judge found (at para. 8.7 of his judgment) that the letter agreement (already signed on behalf of Renova Holding) was given to Mr. Gilbertson on January 20th, 2006 (the day of the meeting to which he had referred), and was countersigned by Mr. Gilbertson on January 24th, 2006. On March 9th, 2006, Mr. Sean Gilbertson sent out to Mr. David Kalberer (the Deputy Chief Legal Officer of Renova Management), Mr. Kuznetsov and Mr. Gilbertson an update on what was referred to as the "Pallinghurst Resources Private Equity Fund," setting out a then current summary ("the March update") of the arrangements, the Pallinghurst structure and the various responsibilities. The March update described Mr. Gilbertson's

duties under the terms of the letter agreement, and contained an express statement that these duties would be owed by Mr. Gilbertson to the company. Shortly thereafter, on March 15th, 2006, Pallinghurst (Cayman) General Partner LP (GP) Ltd. ("the company") was incorporated in the Cayman Islands. As the judge had said, Mr. Gilbertson and Mr. Kuznetsov were the two directors of the company, and its shares were held equally by Renova and Fairbairn.

36 Project Egg was included amongst "Current Investment Projects" referred to in the minutes of meeting of the "Establishment Steering Committee" held on April 24th, 2006 and attended by Mr. Gilbertson, Mr. Sean Gilbertson, Mr. Kuznetsov and Mr. Kalberer. The judge held (at para. 8.10 of his judgment) that steps to acquire the Fabergé brand from Unilever as an investment project continued. On May 17th, 2006, Mr. Sean Gilbertson wrote to UBS (who were, by then, representing Unilever in relation to the sale of the Fabergé rights), informing them that the investment committee of the "Pallinghurst Resources Fund LP" (by which, as the judge said, he must be assumed to mean the master fund) had authorized an offer of US$20m. to purchase those rights, subject to agreeable terms and conditions. That letter was expressly approved by Mr. Kuznetsov on behalf of Renova. As the judge found, US$20m. was the maximum expenditure on a single investment which could be approved by Mr. Kuznetsov without the need for detailed due diligence, a business assessment and various internal approvals. Although that offer was supported (at the request of Unilever) by a comfort letter confirming the prospective purchaser's ability to pay US$20m., the offer was refused. But the fact that it was made led the judge to conclude (at para. 8.11 of his judgment) that—

> "the agreement between Mr. Kuznetsov and Mr. Gilbertson to offer US$20m and the terms of Sean Gilbertson's offer letter of 17th May 2006, indicated that Mr. Gilbertson was actively pursuing Project Egg, with the agreement of Mr. Kuznetsov, as an Investment Project of the Master Fund."

37 A further meeting of the "Establishment Steering Committee," attended by Mr. Gilbertson, Mr. Sean Gilbertson and Mr. Kuznetsov was held on July 25th–26th, 2006. Project Egg was among the several investment projects that were discussed at that meeting. It was recorded in the minutes of that meeting, under the heading "Project Egg—Brand Acquisition," that—

> "after an overview of the present status and reiteration of the recommendation that an offer of US$30m be submitted, VK [Mr. Kuznetsov] noted that the fund could only make an investment decision based on a detailed analysis and business plan. Hence he suggested that VV [Mr. Vekselberg] be approached with a view to

> risking his personal funds as this would not require the usual rigour. It was agreed that the project would still fall within the Pallinghurst structure. VK would revert with VV's view."

The judge found (at para. 8.14 of his judgment) that, following that meeting, Mr. Kuznetsov obtained Mr. Vekselberg's support for an increased offer of US$30m. for the Fabergé brand—which Mr. Vekselberg was willing to pay from his own funds—and that, on that basis, an offer of US$30m. was made to Unilever on August 22nd, 2006, in a letter from Mr. Sean Gilbertson. In particular, the judge held (*ibid.*) that—

> "Mr. Gilbertson was clearly aware sometime between 26th July and 22nd August 2006 that Mr. Vekselberg was willing to pay the purchase price for the Rights himself out of his personal resources rather than Renova doing so . . . I am satisfied that it was understood by the Gilbertsons that such approval was being given on behalf of Mr. Vekselberg personally and not on behalf of Renova . . . The circumstances were, in my opinion, clearly consistent with Mr. Gilbertson being aware and understanding that the offer to Unilever of US$30m had been approved on behalf of Mr. Vekselberg personally and not on behalf of Renova."

The offer of US$30m. was rejected by Unilever. Eventually, at a meeting between Mr. Sean Gilbertson and UBS in November 2006, UBS expressly pressed for a purchase price of US$40m. On November 29th, 2006, Mr. Gilbertson (who had informed Mr. Kuznetsov of this development), sent an email to Mr. Vekselberg asking him whether he was "on board or not, up to the maximum of $40m."

38 In the meantime, on August 8th, 2006, Mr. Kalberer sent to Mr. Sean Gilbertson a series of draft documents relating to the proposed exempted limited partnerships under the Pallinghurst structure ("the long form agreements"), with comments and proposed changes, for his review. The judge found (at para. 8.13 of his judgment) that Mr. Sean Gilbertson expressed some exasperation to his father about the number of those documents and proposed changes involved. Mr. Gilbertson, in an email to Mr. Sean Gilbertson sent later that day, wrote: "Buy the Egg, and I'll pull the plug on 'em." The judge accepted that that remark was made "in the heat of a moment of frustration" generated by the time it was taking to finalize the documentation with Renova but held that, in his assessment (at para. 8.13):

> "Mr. Gilbertson did seem to consider Project Egg as his own idea, which indeed it was, and that it was basically his project to do with as he wished . . . his conduct in early January 2007 . . . is reflective of the attitude he expressed in his brief e-mail of 8th August 2006."

39 The long form agreements had been finalized in mid-September 2006. The judge found (at para. 8.16 of his judgment) that, although those documents were never executed—and therefore never became legally binding on the parties—the parties nonetheless proceeded on the common understanding that the drafts were final and agreed, and that both the Renova parties and Mr. Gilbertson proceeded on the basis that the master fund, and the Pallinghurst structure generally, were operational well before the events of December 2006 and January 2007. He said this (*ibid.*):

> "The meetings, discussions and actions of Mr. Gilbertson and Mr. Kuznetsov in particular even before the execution of the Letter Agreement pursuant to which the Master Fund and the Pallinghurst Structure were subsequently established, including the approval in July 2006 of the Angolan Project and what became known as Project Charlie as Investment Projects of the Master Fund and thereafter, all, in my opinion, clearly show that the Master Fund and the Pallinghurst Structure of which it was part, were being treated by the parties as real and effective."

(ii) *The period from December 2006 to January 3rd, 2007*

40 On December 1st, 2006, Mr. Vekselberg—in response to Mr. Gilbertson's email of November 29th, 2006—agreed in a telephone conversation that Mr. Gilbertson should proceed to acquire the Fabergé brand for a price not exceeding US$40m. Mr. Gilbertson confirmed that understanding in an email, copied to Mr. Kuznetsov, later on that day.

41 On December 6th, 2006, there was a meeting in London attended by Mr. Gilbertson, Mr. Sean Gilbertson, Mr. Kuznetsov, Mr. Mende (a joint owner, with Mr. Kundrun, of AMCI) and representatives of First Reserve (a very large investment fund specializing in energy related projects) to discuss further the possibility (discussed earlier in the year) of AMCI and First Reserve becoming investors in the master fund. The meeting also considered the status of the various projects which were being pursued as investment projects for the master fund, including Project Egg. Mr. Mende/AMCI remained interested—particularly in relation to Project Charlie, a proposal for the acquisition of an Australian manganese mining company—but First Reserve subsequently dropped out.

42 On December 13th, 2006, Mr. Kuznetsov and Mr. Gilbertson met, informally, at the Swissôtel, Moscow. The judge found—resolving a difference of recollection between them—that, although Mr. Kuznetsov was adamant that he had told Mr. Gilbertson at that meeting that Mr. Vekselberg required (as a condition of supporting the bid for the Fabergé rights) that one of his own companies would own the actual title to the Fabergé brand (outside the Pallinghurst structure, but on the basis that the