# Exhibit B-2

economic benefit of the business of developing, exploiting and managing the Fabergé brand would remain with the master fund within the Pallinghurst structure), Renova had not established that Mr. Gilbertson did understand and agreed to Mr. Vekselberg's requirements at, or as a result of, that meeting. After reviewing the evidence and surrounding circumstances, the judge said this (at para. 9.10 of his judgment):

> "On balance it is my overall assessment that Mr. Gilbertson first fully understood Mr. Vekselberg's requirements following the telephone conversation between Sean Gilbertson and Mr. Kalberer on 20th December 2006."

It was in the course of that telephone conversation, as the judge explained later in his judgment, that Mr. Sean Gilbertson first learnt of Mr. Vekselberg's requirements. As the judge observed (at para. 9.16):

> "I consider it improbable that, if Mr. Gilbertson was already aware of or understood Mr. Vekselberg's requirements, he would not have passed that information on very quickly to Sean Gilbertson. I therefore conclude that if Sean Gilbertson did not know of Mr. Vekselberg's requirements until Mr. Kalberer told him, which I accept is the case, then Mr. Gilbertson did not know or understand them either until that point."

43 On December 15th, 2006 (two days after the meeting between Mr. Gilbertson and Mr. Kuznetsov in Moscow), Mr. Sean Gilbertson agreed with UBS/Unilever a purchase price of US$38m. for the Fabergé rights. Mr. Gilbertson informed Mr. Kuznetsov that the price had been agreed. Later on that day (December 15th, 2006), Mr. Kuznetsov sent an email to Mr. Gilbertson, with copies to Mr. Sean Gilbertson and Mr. Igor Cheremykin (the Chief Legal Officer of Renova Management, based in Moscow), to congratulate him on reaching agreement as to the purchase price. That email included the sentence: "It is very important that we use the right group company for the purchase so could you please communicate with Igor Cheremykin, the head of our legal and corporate department on this . . ." The judge explained that there was a dispute as to what the Gilbertsons understood, or should have understood, by the reference to "the right group company for the purchase": the Renova parties contending that the Gilbertsons would or should have understood "the right group company" as a reference to a company within the Renova group (or a company within Mr. Vekselberg's family office) and the Gilbertsons contending that they understood "the right group company" to be a reference to a company within the Pallinghurst structure. The judge accepted—on the basis of his finding that, on December 15th, 2006, the Gilbertsons did not know of Mr. Vekselberg's requirement that he would, himself, own the title to the Fabergé rights through one of his personal companies—that they did not understand Mr. Kuznetsov to be referring to

anything other than the Pallinghurst structure. That view, he held, was confirmed by Mr. Sean Gilbertson's response by email to Mr. Cheremykin, with a copy to Mr. Kuznetsov, sent later the same day, in which he informed them that a Cayman Islands company, Project Egg Ltd. (PEL) had been incorporated as a wholly owned subsidiary of the master fund to acquire the Fabergé rights. The judge observed (at para. 9.13 of his judgment) that PEL had been incorporated on December 1st, 2006, with Mr. Sean Gilbertson and Mr. Willis, an employee of Pallinghurst LLP, as its directors, but that "rather surprisingly" the Renova parties were not made aware of that until Mr. Sean Gilbertson's email of December 15th, 2006.

44 On December 18th, 2006, Mr. Sean Gilbertson notified Mr. Kalberer by email that Unilever was insisting on completion of the purchase of the Fabergé rights before the year end. But, on the following day (December 19th, 2006), Unilever indicated (through its solicitors) that, provided that contracts were exchanged before December 31st, 2006, it was content to defer completion until January 3rd, 2007.

45 At para. 9.16 of his judgment, the judge returned to the telephone conversation between Mr. Sean Gilbertson and Mr. Kalberer on December 20th, 2006 to which he had referred earlier. He described that as "an important conversation" in that (as the Gilbertson parties contended and the judge accepted) it was the first time that the Gilbertson parties had been informed of Mr. Vekselberg's requirement that the Fabergé rights would be owned by one of his private companies. Shortly after that telephone conversation, Mr. Kalberer identified the company that was to own the Fabergé rights as Lamesa Arts Inc., a company incorporated in Panama, and provided Mr. Sean Gilbertson with a copy of a power of attorney in his (Mr. Kalberer's) favour executed by that company. On the following day (December 21st, 2016), Mr. Sean Gilbertson responded with an email to Mr. Kalberer, copied to Mr. Kuznetsov, which—after stating that Mr. Gilbertson was waiting for a call from Mr. Kuznetsov—included the following observation:

> "Clearly switching entities in this fashion at the 11th hour is not in the spirit of the arrangements with the Pallinghurst team and it is thus crucial that this call take place so that we might understand what arrangements [Mr. Kuznetsov] has in mind."

He went on to say that that Unilever, UBS and their solicitors were waiting to hear about the signing of the sale and purchase agreement ("the SPA").

46 As I have said, that email was sent by Mr. Sean Gilbertson on December 21st, 2006. The judge found that, on the previous day (December 20th, 2006), Mr. Gilbertson had received an email from Dr. Jelinek. The email was in these terms:

"I have spoken to Hans [Mr. Mende] and convinced him to express his interest and being ready to cover abt MIL to secure the brand name. He will do it outside AMCI and with my silent contribution either half or one third depending if Kudrun wants to participate . . ."

The judge observed (at para. 9.18 of his judgment) that—

"clearly Mr. Gilbertson must have spoken to Dr. Jelinek prior to this e-mail about purchasing the Fabergé brand and, in turn, Dr. Jelinek had spoken to Mr. Mende to ascertain whether he would be interested in contributing about US$15m to the purchase price. Dr. Jelinek was saying that he would contribute either half or one third of the price depending on whether Mr. Kundrun wanted to participate. It seems to me that this clearly shows that Mr. Gilbertson was actively setting up a consortium consisting of Dr. Jelinek, Mr. Mende, possibly Mr. Kundrun and, secretly, himself, to purchase the Fabergé brand, without any participation or involvement by Mr. Vekselberg, Lamesa or Renova."

Early on December 21st, 2006, Mr. Gilbertson had responded by email to Dr. Jelinek:

"Many thanks, Milan. That is very helpful indeed!

I will have my phone conversation with Viktor later today and will keep you informed."

47 The judge found that a number of other relevant events took place on December 21st, 2016:

(1) Later on that day Mr. Sean Gilbertson sent an email to Mr. Kalberer, again copied to Mr. Kuznetsov, to inform him that UBS was eager that the SPA be signed forthwith. That email contained the following paragraph:

"We are in the meantime preparing a draft of a one page agreement that could be signed by BPG, VK and VV to give comfort that at least 75% of 'Project Egg Limited' will be purchased by VV's vehicle and that the Pallinghurst team's rights will be protected. I will also send the necessary resolution of the 'GP of the GPLP' [the company] authorising that BPG [Mr. Gilbertson] (or VK, if you prefer) sign the sale & purchase agreement on behalf of Pallinghurst Resources Management LP [the master fund] (this is, as discussed with you yesterday, in connection with this vehicle guaranteeing the obligations of Project Egg Limited under the sale and purchase agreement)."

The judge explained that Mr. Sean Gilbertson's reference to discussions between Mr. Kalberer and himself on the previous day concerning Mr. Gilbertson (or Mr. Kuznetsov) signing the SPA on behalf of the master

fund confirmed the parties' agreement that the master fund would be the guarantor of the obligations of PEL and would sign the SPA as such.

(2) Still later on the same day (December 21st, 2006), Mr. Sean Gilbertson sent a further email to Mr. Kalberer, copied to Mr. Kuznetsov and Mr. Vekselberg, attaching a one-page draft "Implementation Agreement" ("the first draft IA"). He wrote:

> "Further to my earlier e-mail, please find attached the proposed one page agreement relating to implementation of Project Egg (allowing Mr. VV to retain at least 75%). UBS are pushing hard to complete signature of the sale and purchase agreement today and your assistance in this regard would be appreciated. I see no reason why we cannot accomplish this, particularly if we sign the attached agreement giving comfort to all parties. BPG confirms that Hans Mende is very enthusiastic to join VV in this initiative and committed earlier today to taking the remaining 25% . . ."

The judge observed that the first draft IA attached to Mr. Sean Gilbertson's email provided that the Fabergé rights would be purchased forthwith by PEL on the terms negotiated between Pallinghurst LLP (the investment management vehicle established in England by Mr. Gilbertson to which he had referred at para. 8.3 of his judgment) and Unilever; that Mr. Kuznetsov and Mr. Gilbertson were to be deemed to have signed an attached resolution enabling the master fund to become a party to the SPA as guarantor of the obligations of PEL; and that an entity nominated by Mr. Vekselberg would pay the purchase price (US$38m.). The first draft IA also provided that a documented transaction—under which not less than 75% of the ownership of PEL would be transferred to an entity nominated by Mr. Vekselberg and 25% of the ownership of PEL would be offered to AMCI (Mr. Mende's company) at a corresponding percentage of the purchase price—would be executed after completion of the SPA. The intended effect, he said, was that the economic benefits in relation to the Fabergé rights and the decision-making rights attributable to the Pallinghurst team and all commercial opportunities arising from them were not to be any less than those contemplated in the long form agreements.

(3) Mr. Kalberer replied by email, sent to Mr. Sean Gilbertson and Mr. Gilbertson with copies to Mr. Kuznetsov and Mr. Vekselberg, in these terms:

> "Following a telephone conversation with VK [Mr. Kuznetsov] of a moment ago I gather the following:
>
> 1 We would agree to the Pallinghurst Team getting the economic benefit of Project Egg as if the Faberge rights were purchased by Pallinghurst Resources Management LP [the master fund] and the

remuneration mechanics set out in the last drafts [of the long form agreements] agreed by Renova were applied.

2 As to Project Egg Ltd. [PEL], we request that 75% of its shares are transferred to Lamesa Arts Inc. within the next 2 business days after signing of the agreement regarding the Fabergé rights or, if ever possible before. Please confirm (i) who controls and (ii) how: (1) the shareholder and (2) the directors of this company.

3 The remaining 25% in Project Egg Ltd can be purchased by AMCI at the corresponding percentage of the purchase price for the Fabergé rights under the following cumulative conditions:

(a) Project Charley [*sic*] is closed within the next 6 months by Renova and AMCI (at a relation of 43% to 50% by Renova and 50% to 57% by AMCI);

(b) Renova obtains a firm commitment from an AMCI vehicle with the respective substance that it will take up, at Renova's discretion, between 50% to 57% in Charley.

If one of the conditions is not met Renova has the right to purchase the 25% in Project Egg Ltd. at USD 0.25. I could not talk to VK regarding the decision making and management issues as the acoustic quality of the call was very bad."

(4) Some two hours later (but still on December 21st, 2006), Mr. Gilbertson sent an email to Mr. Kalberer, copied to Mr. Kuznetsov and Mr. Vekselberg:

"The acoustic quality of your line to VK must have been bad indeed for these proposals to emerge at this late stage.

The Management issue is critical, and VK confirmed in response to my specific question during our telecon earlier this afternoon that the management arrangements, now long-established between Pallinghurst and Viktor, would not be diluted. Even if he had not done so, there are no grounds to seek any change at this late stage.

Regarding item 3: It is not reasonable to now require a new set of negotiations with AMCI in the Egg arrangements. I cannot reasonably do this in the time scale to which we are working. Also, VK made no mention of these conditions in our telecom this afternoon, neither during our meeting last week in the Swisshotel in Moscow. On the contrary, he welcomed the idea of an international investor. How can you seek such changes in the last hours? Just accept that you have a good partner, in a partnership that will to lead to much bigger things in future. If he does not, you lose nothing.

Regarding item 2: Two days is simply too short, particularly over this time of the year. But we will accept the principle of a rapid transfer against appropriate assurance, in the transfer agreement, on item 2 and on the Management arrangements. In response to your questions in item 2, 100% of the equity in Project Egg Ltd is held by Pallinghurst Resources LP, and the directors are Sean and Andrew Willis, as we have previously advised you.

After 18 months of negotiation by Pallinghurst, the deal is now there for the taking. Let us get on with it!"

(5) Still later the same day, December 21st, 2006, Mr. Gilbertson spoke to Mr. Vekselberg on the telephone. He followed up that conversation with an email to Mr. Vekselberg, with copies to Mr. Kuznetsov and Mr. Kalberer, in these terms:

"Further to our conversation of 45 minutes ago, I have as yet received no call from Mr Kuznetsov.

As I said to you, the lawyers on the other side are actually sitting in the London office, waiting to sign the documentation that Pallinghurst has painstakingly drafted and negotiated over the past months, and which will secure the Fabergé brand for us. Unilever wish to book the transaction in their 2006 financial year, with payment on 3rd January 2007. If they fail to achieve that, we do not have a deal, and they may re-approach the other parties with whom they have been in negotiation. We have in the last 10 minutes had confirmation that Unilever have signed, and that their lawyers are waiting to exchange documents.

I have just tried to phone you, unsuccessfully; you will find the missed call on your phone. Acting on the assurances that you gave me during this evening's telephone conversation, namely that you want me to buy the brand on the basis of the arrangements that we have established between us over the past many months, I will therefore now trigger the Unilever-Pallinghurst transaction to conclude the deal. Project Egg Ltd, a Pallinghurst company, will be the owner of the Fabergé brand. I confirm that I shall work closely with your team to conclude payment and to achieve a structure that suits your needs, in particular an arrangement whereby there is no Third Party involvement, though the latter will be a little complicated in view of developments since I met with Mr Kuznetsov in the Swisshotel last week, when he believed you would welcome an international partner with a 25% stake. (At some stage soon, you should meet Mr Mende of AMCI: you will like him, and he will be an excellent partner in Charlie, so you should try hard to ensure that he is not offended by being excluded from Fabergé, in which he has already agreed to invest).

> I shall advise you as soon as you are officially the global 'Mr. Fabergé.'"

The judge observed (at para. 9.24 of his judgment) that, in his view—

> "it is clear from all of this that Mr. Gilbertson had not refused to consent to or vetoed Mr. Vekselberg's requirements for re-structuring the way in which the Rights should be pursued as an Investment Project for the Master Fund. Indeed he was proceeding on the basis that Mr. Vekselberg's structure was being pursued."

And he said this (at para. 9.25):

> "The confirmation by Mr. Gilbertson that he would work closely with Mr. Vekselberg 'to achieve a structure that suits your needs' clearly indicates, in my opinion, that Mr. Gilbertson was not refusing to consent to or vetoing the structure which Mr. Vekselberg wished to be pursued in respect of the Rights as an Investment Project. Furthermore, his reference to Mr. Vekselberg as becoming the global 'Mr. Fabergé' can only have been a reference to Mr. Vekselberg's ownership of the title to the Fabergé brand; it clearly was not a reference to ownership of the title to the Fabergé brand by the Master Fund as part of the Pallinghurst Structure. It was, it seems to me, an indication of Mr Gilbertson's acceptance of that."

48 On the following day, December 22nd, 2006, the SPA was signed in London by Unilever and by PEL. The judge observed that Mr. Gilbertson accepted, in the course of his evidence, that when he procured PEL, acting by Mr. Sean Gilbertson, to sign the SPA, he acquired the contractual entitlement to the Fabergé rights for the master fund and entities within the Pallinghurst structure and not for himself personally; he accepted that in no sense was PEL acting as his own nominee or agent in entering into the contract for the Fabergé rights; and he accepted that, following the execution of the SPA, the entitlement to acquire the Fabergé rights was owned by PEL, which was in turn owned by the master fund as part of the Pallinghurst structure. The judge went on to say this (at para. 9.28 of his judgment):

> "It seems to me to follow that, even if the precise terms on which the Master Fund was to hold the economic benefit of the Rights could not be finally agreed with the Renova Parties, Mr. Gilbertson would not in any event be entitled to withhold the Rights for himself."

The judge accepted the submission (made on behalf of Renova) that, in circumstances where the entitlement to the Fabergé rights was wholly owned by PEL, there was no way in which Mr. Gilbertson could acquire title to the Fabergé rights himself without the co-operation of PEL. Furthermore, he said, Mr. Gilbertson accepted that it was PEL that had contracted to purchase the Fabergé rights from Unilever, and that it had

done so on the basis that the acquisition would be funded by Renova money for the benefit of the PEL/master fund/Pallinghurst structure: the acquisition was not a Gilbertson transaction for the Gilbertsons' benefit.

49 On the same day (December 22nd, 2006), Mr. Kalberer sent an email to Mr. Sean Gilbertson, copied to Mr. Kuznetsov and Mr. Gilbertson, in these terms:

> "After a conversation with VK we have to insist and make it a condition precedent that the agreement ('Agreement') regarding the transfer of 100% of the shares in Project Egg Ltd. ('PEL') is finalized and signed prior to the closing of the purchase agreement regarding the Fabergé rights, i.e. the payment of the USD 38m.
>
> For the Agreement we envisage the following provisions:
>
> 1. All of the shares shall be transferred to Lamesa Arts Inc, the details of which I provided you earlier.
> 2. Clear references regarding the preparation and taking of decisions and the ongoing the [*sic*] process of taking decision as to the management of PLE [*sic*] and any other decisions relating to it.
> 3. Clear references and description as to how the various entities of the Pallinghurst structure economically benefit from PEL and its business and how these rights terminate with what consequences.
> 4. That the directors of PEL are nominee directors provided by a service provider, which are instructed by the Executive Committee of the GP and of the GPLP.
>
> To ensure a smooth closing please assure that I get a first draft of the Agreement early next week, I will have to review and discuss with VK . . ."

The judge observed that Mr. Sean Gilbertson had said in evidence that he did not see this email until December 28th, 2006.

50 On December 23rd, 2006, Mr. Gilbertson sent an email to Mr. Vekselberg, copied to Mr. Kuznetsov, Mr. Kalberer and Mr. Sean Gilbertson, in these terms:

> "I am happy to be able to tell you that we have received confirmation from our attorneys, Clifford Chance, that Pallinghurst is now the owner of the Fabergé brand. I hope you will be as pleased about this outcome as I am, for I believe that there is great future potential and value to be realised. *I congratulate you on this entrenchment of your interests in this revered brand name.*

> The purchase agreement incorporates a pre-agreed Press Release by Unilever and Pallinghurst, which is quite brief and which your colleagues have seen. I am sure you will wish to make your own personalised Press Release, for the news will almost certainly attract strong international interest, and possibly headlines in major world newspapers, I am happy to draft this for you if you wish, but your own PR machine will no doubt be more aware than I of your requirements.
>
> *Mr. Kuznetsov and I have discussed arrangements to transfer 100% of the ownership of the brand to one of your companies and I confirm to you my willingness to do so against binding commitments that the Pallinghurst team will retain all of the economic benefits and management rights that it would have under Pallinghurst's agreements with Renova.* Payment of the US$38million is due on 3rd January, 2007. I MUST HAVE written confirmation from Messrs Kuznetsov and Kalberer by the middle of next week that this will be done.
>
> If you need any further action or information, please let me know." [Emphasis supplied.]

Also on December 23rd, 2006, Mr. Gilbertson sent an email to Mr. Mende copied to Dr. Jelinek:

> "Please see the e-mail below [that is, the email sent to Mr. Vekselberg just set out] which I sent off in the early hours this morning.
>
> You will note that the Fabergé purchase is done, and the trademark is currently owned by Pallinghurst, (subject to payment of the $38million on 3rd January) but Viktor's crowd played hard-ball during the final hours, and there were some tense moments. Along the line, Viktor insisted that 100% of (only) the trade-mark should be owned by one of his companies (though not necessarily its harvesting, exploitation and development) and *I have agreed that I am willing to implement that, but only against binding commitments that the management control and economic benefits should lie with Pallinghurst in accordance with the previously agreed arrangements.* Also recently, Viktor's consigliere [Mr. Kuznetsov], has re-confirmed their willingness to bring you in as a 25% partner, on condition that AMCI joins in the broader initiative, including Charlie. Clearly there is still some boxing that must take place before we have finality, and before Viktor's empire makes payment on the 3rd January. I have told [Mr. Kuznetsov] that unless I have binding assurances, well in advance, that they will pay on time, I will finance the $38million from other sources. I do not think they could live with losing a brand that Viktor now wants so much, so am fairly confident we will get to a good outcome . . ." [Emphasis supplied.]

The judge observed that it was clear that, by the second of those emails, Mr. Gilbertson was informing Mr. Mende and Dr. Jelinek that he had agreed with Mr. Vekselberg (as, indeed he had) that effect would be given to Mr. Vekselberg's requirement that 100% of the Fabergé brand should be owned by one of his companies (although not "its harvesting, exploitation and development"), against a commitment that the management, control and economic benefits should remain with the master fund as part of the Pallinghurst structure in accordance with the previous arrangements.

51 The judge went on to say this (at para. 9.31 of his judgment):

> "Clearly Mr Gilbertson was aware at this time, only a day after Sean Gilbertson's telephone conversation with Mr Kalberer, that under the new structure for the Investment Project required by Mr Vekselberg and the Renova Parties, although title to the Fabergé brand would be held outside the Pallinghurst Structure, the economic benefits of developing, exploiting and managing the Rights would remain with the Master Fund within the Pallinghurst Structure."

And, he observed (at para. 9.32 of his judgment) that—

> "in his e-mail to Mr. Mende Mr. Gilbertson also told Mr. Mende and Dr. Jelinek that he had told Mr. Kuznetsov that unless he had binding assurances that they would pay on time he would finance the $38 million from other sources. That was not strictly true. Mr. Gilbertson had said emphatically in his previous e-mail to Mr. Vekselberg, copied to Mr. Kuznetsov and Mr. Kalberer, that he must have written confirmation by the middle of the following week that payment of the US$38 million would be made on 3rd January 2007 and later that day, 23rd December 2006, Mr. Kalberer e-mailed Mr. Gilbertson, with copies to Mr. Vekselberg, Mr. Kuznetsov and Mr. Gilbertson, confirming that Lamesa Arts had arranged for sufficient funds to pay the purchase price of US$38 million. However, in his evidence Sean Gilbertson asserted that this e-mail was also stuck in his spam filter and not seen by him until 28th December 2006, some 5 days later. At one point, Mr. Gilbertson did however say that he would have to make alternative arrangements if it was not confirmed that the US$38 million would be paid on 3rd January 2007. The overall evidence of the Renova Parties was that Mr Gilbertson did not specify the nature of such alternative arrangements and that they were not made aware that Mr. Gilbertson was arranging and subsequently had arranged to make the payment to Unilever with other investors, including his own trust, until after he had actually done so and the payment had been made. In fact Mr. Kuznetsov said he thought Mr. Gilbertson would seek an extension of time from Unilever. Mr. Gilbertson's statement in his e-mail to Mr. Mende that he had told Mr. Kuznetsov that if he did not receive the assurances he

was seeking he would use finance from other sources to pay US$38m was at least disingenuous if not deceptive."

52 On December 26th, 2006, Mr. Sean Gilbertson, on behalf of his father, sent to Mr. Kuznetsov and Mr. Kalberer, with a copy to Mr. Vekselberg, a further draft implementation agreement ("the second draft IA"). In this draft, PEL (as the entity by which the Fabergé brand had been acquired under the SPA) was referred to as "OpCo," and the company controlled by Mr. Vekselberg (as the entity by which the Fabergé brand was to be owned, but with the economic benefits and decision-making rights remaining with OpCo)—was referred to as "BrandCo." The second draft IA provided:

(1) That BrandCo would pay the purchase moneys payable under the SPA on January 3rd, 2007; that ownership of the Fabergé brand should be transferred to BrandCo as soon as practicable after completion of the purchase for a nominal consideration; and that BrandCo should own and hold the Fabergé brand until the winding up of the master fund pursuant to the Pallinghurst agreements.

(2) That Opco would manage and operate the Fabergé rights as a portfolio company of the master fund pursuant to the Pallinghurst agreements (which, as the judge said, meant the unsigned but agreed long form agreements), and that OpCo would be the beneficiary of all proceeds arising from its right to develop and pursue all commercial opportunities arising from the Fabergé brand.

(3) That there would be a payment by BrandCo on the eventual winding up of the master fund in respect of the enhancement of the value of the Fabergé brand as a result of the successful implementation of the development and pursuit by OpCo of the commercial opportunities arising from and relating to it, and that the parties should use their best endeavours to draw AMCI into the master fund.

(4) That AMCI should have the right to purchase up to 25% of BrandCo, subject to certain conditions relating to its involvement in Project Charlie.

The draft provided for the second implementation agreement to be signed by Mr. Gilbertson and Mr. Kuznetsov on behalf of the company.

53 On December 29th, 2006, Mr. Kalberer sent an email to Mr. Sean Gilbertson, copied to Mr. Kuznetsov and Mr. Gilbertson, attaching a copy of the second draft IA, marked up to show the changes which he proposed. Those proposed changes included the following:

(1) That the master fund, represented by Mr. Kuznetsov and Mr. Gilbertson as members of the "Executive Committee" (which, as the judge said, meant the investment committee) of the company, as the general

partner of GPLP, should be parties to the agreement, as should PEL and a Lamesa group entity.

(2) That BrandCo would be a Lamesa company, and that it would pay to OpCo (PEL) the purchase price due under the SPA on January 3rd, 2007, in order to enable OpCo to pay the purchase price to Unilever on that date.

(3) That payment by BrandCo to OpCo was to be on conditions (i) that OpCo transferred the title to the Fabergé brand to BrandCo or its nominee (which, as the judge said, was to be a Lamesa group company) for nominal consideration; and (ii) that the directors of OpCo be replaced by a director or directors nominated by the master fund and an equal number nominated by BrandCo.

(4) That the new directors of OpCo were to act upon the written instructions of the master fund given through the investment committee of the general partner of GPLP (which, as the judge said, meant the company).

(5) That, upon the transfer of the title to the Fabergé brand to BrandCo, BrandCo would conclude a licence agreement with OpCo for as long as the Fabergé brand was managed and held as an investment of the master fund.

(6) That the terms of the licence were to include, *inter alia*, (i) a provision that OpCo would be responsible for developing and pursuing all the commercial opportunities arising from and relating to the Fabergé brand and should have the benefit of the proceeds so arising, and should be the vehicle "in which all revenues, accruals and expenditures arising from the Fabergé brand shall vest"; (ii) a provision that the Fabergé brand should be owned by Lamesa Arts but should in all respects be treated as if it were an investment of the master fund; and (iii) a provision that, accordingly, Opco would be managed and operated as a portfolio company of the master fund pursuant to the Pallinghurst agreements as agreed.

Later on that day (December 29th, 2006), Mr. Kalberer sent a further email to Mr. Sean Gilbertson in which he wrote that, subject to agreement regarding his proposed changes to the second draft IA, they would prefer to transfer the US$38m. purchase price to Unilever direct, on behalf of PEL.

54 On December 30th, 2006, Mr. Sean Gilbertson sent an email to Mr. Kalberer, copied to Mr. Kuznetsov and Mr. Vekselberg, to which he attached a further draft implementation agreement ("the third draft IA"). The third draft IA provided, *inter alia*:

(1) That BrandCo (a Lamesa group company) would, upon the transfer to it by OpCo of the Fabergé brand (in return for Lamesa Arts procuring payment of the purchase price to Unilever), grant OpCo "a royalty-free,

exclusive, world-wide, sub-licensable, perpetual and irrevocable licence to use and exploit the Fabergé Brand."

(2) That the licence was to be valid until the winding up of the master fund pursuant to the Pallinghurst agreements, at which time BrandCo could terminate the licence on 90 days' notice, and that the parties should negotiate in good faith a written licence agreement to give effect to this and other specified terms.

(3) That OpCo should be managed and operated as a portfolio company of the master fund pursuant to the Pallinghurst agreements and should be the legal and beneficial owner of all revenues, accruals and expenditures arising from the Fabergé brand.

(4) That, although recognizing that the Pallinghurst agreements had not been signed, nonetheless they should apply to the Fabergé brand (albeit that the Fabergé brand itself would be owned by BrandCo).

Mr. Kalberer (who, as the judge said, was on holiday in Brazil at this time) replied, by email sent to Mr. Sean Gilbertson on that evening, stating that he would go through the third draft IA the next day and revert with his comments.

55 The judge noted (at para. 9.38 of his judgment) that it was Mr. Gilbertson's evidence that he awoke on January 1st, 2007 with a realization that agreement was not going to be reached in time to make the payment to Unilever on January 3rd, 2007, and so decided to implement his plan to acquire the Fabergé rights himself with the assistance of his consortium of investors and not through or with Mr. Vekselberg/Lamesa/Renova. He noted, further, that it was Mr. Gilbertson's evidence that he then proceeded, without further delay, to finalize the arrangements which he had already discussed and put in place with Mr. Mende and Dr. Jelinek over the previous weeks. Mr. Gilbertson sent an email to Mr. Mende, copied to Dr. Jelinek, which was in these terms (so far as material):

> "Good Morning Hans, and a happy New Year to you. I would like to phone you today to wish you all the best, and also to brief you on the status of Project Egg. Deal now being pushed by the Russians will seriously sub-optimise for us. *I think you, Milan and I should do it 20:10:10. then negotiate with Russians from a position of strength.* Is there a good time to call you about this?
>
> *Frankly I don't see how we can lose by such a strategy, and could have very much to gain.* Our exposure need be only a few months, as we manoeuvre through the Alrosa negotiations." [Emphasis supplied.]

The judge explained that the reference to "the Alrosa negotiations" was to discussions with a major Russian diamond producer with whom

Mr. Gilbertson hoped to make an agreement in relation to marketing Fabergé diamonds. The judge found that Mr. Mende then emailed his business partner Mr. Kundrun, with a copy to Mr. Gilbertson:

> "Renova/Vechselberg [*sic*] came back at the end and wanted to put some conditions into the agreement that would have limited our rights. Brian feels that it is best to negotiate out of position of strength with Vechselberg and buy the name outright and then deal with him. We would have to close on Wednesday, [January 3rd, 2007] *BG is so convinced he would put up USD Mio [sic] of his own money* and Milan Jelinek also USD 10 Mio and they would you and me do the rest [*sic*], i.e. 20 Mio together. PP is 38 Mio for the brand name from Unilever. *Vechselberg wants the name but we don't have much leverage unless we own it*, that is why BG thinks we need to only bridge finance it for few months before we sell down. I am okay with this provided you join as well. Need to know urgently. Pls call Brian in case you want to hear from him directly as well." [Emphasis supplied.]

On receipt of that email, Mr. Gilbertson sent a further email to Mr. Mende and Mr. Kundrun, copied to Dr. Jelinek and Mr. Sean Gilbertson, in these terms:

> "Thank you Hans. Greatly appreciate your support. *This opportunity could be worth serious money for us after only a few months*: We need those few months—and the brand name—to negotiate with Alrosa, and/or to develop the non diamond-angle, and we would add substantially to the current brand valuation which Unilever has BADLY mis-managed for decades.
>
> *We cannot lose. Viktor will be willing to buy us out at the $38m + at any time. (I told him some months ago that he/we would have to pay $100M for the name: he winced, but said he could live with it. Remember that he paid $120M for the eggs. The brand gives him serious cred in Russia/the Kremlin).*" [Emphasis supplied.]

The judge found (at para. 9.40 of his judgment) that Mr. Mende replied to Mr. Gilbertson, by an email sent that evening (January 1st, 2007), with a copy to Mr. Kundrun, confirming that Mr. Kundrun had agreed to the proposal in principle, and that they could move fast if the funds were needed on January 3rd, 2007.

56 Early on January 2nd, 2007, Mr. Gilbertson responded to Mr. Mende's email of the previous day, with copies to Mr. Kundrun and Dr. Jelinek:

23-01165-mew Doc 84-3 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit B-2 - Autumn Holdings Asset Inc v Renova Res Private Equity Ltd [2017 (2 Pg 16 of 42



> "You are an absolute star. Many thanks. I await your call.
>
> We need to deliver proof of transfer of funds by noon London time tomorrow, Wednesday. I ask that you pay the full $38 million. The Unilever payaway details appear below. For your comfort, I attach hereto a copy of the Sale and Purchase Agreement between 'Project Egg Limited' and Unilever . . .
>
> *I (and I am sure Milan [Dr. Jelinek]) will refund you promptly $9.5 Million, hopefully tomorrow, but more realistically it will take a few working days (as I have to extract it from a set of Trusts in Jersey), so say by Tuesday at the latest.* Obviously I will refund your loss of interest over those days. Please let me have the appropriate payaway instructions to your account.
>
> *Shortly thereafter, I propose that each of the 4 parties pay an additional $500000 into 'Project Egg Limited' as a loan to give it $2M working capital while we negotiate with Mr. Vekselberg*, and in parallel, with Alrosa.
>
> If you are in agreement with this, I shall draft a simple letter confirming these arrangements, for you to modify as you deem fit." [Emphasis supplied.]

Mr. Mende replied to that email, with copies to Mr. Kundrun and Dr. Jelinek, confirming that they would wire transfer US$38m. to Unilever that day and that Dr. Jelinek and Mr. Gilbertson would repay their share, amounting to US$9.5m. each, within 7 days. He wrote that they understood that Mr. Gilbertson felt confident that he could work out a solution with "the Vekselberg group" which would give the consortium "optimal economic benefits." An hour later, Mr. Gilbertson confirmed his agreement with what Mr. Mende had written.

57 The judge observed (at para. 9.41 of his judgment) that, "while Mr. Gilbertson was communicating in this way with Mr. Mende and copying Mr. Kundrun and Dr. Jelinek about financing the purchase price payable to Unilever and the profit they would make," Mr. Sean Gilbertson was sending to Mr. Kalberer, with a copy to Mr. Kuznetsov, some further comments on the third draft IA in response to a voicemail from Mr. Kalberer on the previous evening; in particular, he observed that, in an email sent on January 1st, 2007, Mr. Sean Gilbertson referred, *inter alia*, to the "Pallinghurst principles as already modified for Project Egg . . ." The judge said that that seemed to him to indicate "that the Gilbertsons were accepting the modification of the structure for Project Egg as an Investment Project, as required by Mr. Vekselberg." He found that, later in the evening of January 1st, 2007, Mr. Gilbertson sent an email to Mr. Kalberer, copied to Mr. Kuznetsov, adding a further comment to those made by Mr. Sean Gilbertson earlier that day on the third draft IA. The

judge explained (at para. 9.44 of his judgment) that the third draft IA was the last draft implementation agreement seen by Mr. Gilbertson before, early on January 1st, 2007, he decided to, and did, finalize the arrangements for the purchase of the Fabergé rights by Mr. Mende, Mr. Kundrun, Dr. Jelinek and himself (the consortium).

58 On January 2nd, 2007, Mr. Kalberer sent an email to Mr. Sean Gilbertson from Brazil, copied to Mr. Gilbertson and Mr. Kuznetsov, attaching his revision of the third IA. The revised draft ("the fourth draft IA") was produced and circulated by Mr. Kalberer before he, Mr. Vekselberg, Lamesa or any of the Renova parties were aware of the steps which Mr. Gilbertson had taken to finalize the arrangements for the funding of the purchase of the Fabergé rights by the consortium. Shortly after that, Mr. Kuznetsov sent an email to Mr. Kalberer, with a copy to Mr. Sean Gilbertson, setting out some brief comments of his own on the fourth draft IA. The judge held that the fourth draft IA made no significant changes to the provisions of the third draft IA with regard to the payment of the purchase price to Unilever by Lamesa Arts, the transfer of the Fabergé brand to BrandCo (Lamesa) for nominal consideration and the change of the directors of OpCo (PEL). It removed the words "perpetual" and "irrevocable" from the licence to be negotiated in good faith between BrandCo and OpCo. And it inserted a new clause (cl. 2e) which provided that BrandCo should have the right to terminate the licence on 60 days notice without having to pay anything to OpCo if the master fund disposed of OpCo or if the master fund were wound up pursuant to the Pallinghurst agreements. The judge observed (at para. 9.44 of his judgment) that—

> "this [the new cl. 2e] clearly an uncommercial provision as far as the Master Fund was concerned and obviously was not going to be acceptable. It was also not consistent with clause 8 which made specific provisions, as in the Third draft IA, for the circumstances contemplated and provided for the payment of a 'value-add' in respect of enhancement of the value of the Fabergé brand by the Master Fund on its termination. Mr. Kalberer's evidence was that he inserted clause 2e by mistake and that its provisions were unintended. He freely accepted that it should not have been in the draft and that he would have agreed to remove it in any future discussions of the terms of the Fourth draft IA. In my opinion, it would have been, and indeed was, obvious to the Gilbertsons that the terms of proposed clause 2e were uncommercial and inconsistent with the rest of the Fourth draft IA and that it could not have been thought through or intended by Mr. Kalberer, as indeed was the case."

59 Also on January 2nd, 2007—and in order to fund his commitment to the other members of the consortium to contribute 25% of the purchase price for the Fabergé rights with his own money—Mr. Gilbertson telephoned Mr. Justin Thomas (the managing director of Fairbairn, the

trustee of the Gilbertson Family Trusts), to request the necessary funds (US$9.5m.) from the BPG settlement. A transcript of that telephone conversation was produced and referred to at the trial. The judge set out (at para. 9.45 of his judgment) those extracts from the transcript which (as he said) seemed to him to be the most relevant and significant:

"*Brian Gilbertson*: Now, the reason I'm calling you so early in the New Year is I have bought myself a Christmas present.

*Justin Thomas*: Okay.

*Brian Gilbertson*: And I need some money to pay for it.

*Justin Thomas*: [laughter] Okay.

*Brian Gilbertson*: Shall I give you the background?

*Justin Thomas*: Yes please, Brian, fire away. What have you bought yourself?

*Brian Gilbertson*: Um, we have bought from Unilever—all the rights to the Fabergé brand.

. . .

*Brian Gilbertson*: Okay, so we have signed an agreement with them [Unilever] about 10 days ago.

. . .

*Brian Gilbertson*: And it required payment to be made tomorrow.

. . .

*Brian Gilbertson* Payment to be made, be presented tomorrow. Now the original intention up until yesterday, today, was that the payment would be made out of Pallinghurst. Are you familiar with Pallinghurst?

*Justin Thomas*: Yes, I am, yes, yeah.

*Brian Gilbertson*: But a complication came in, and the complica tion is that Victor Vekselberg, the Russian oligarch . . . is really taken by this idea and, rather than do it through Pallinghurst, as was the original intention, he has insisted that, in order for him to pay he wants the brand to be transferred to one of his companies which would then license it on to Pallinghurst to develop.

. . .

*Brian Gilbertson*: And so we will negotiate with him [Mr. Vek selberg] after we have acquired and paid for the brand.

. . .

*Brian Gilbertson*: So that leaves the problem of paying for the brand.

. . .

*Brian Gilbertson*: And the purchase price is 38 million dollars.

. . .

*Brian Gilbertson*: And to that I have added 2 million dollars worth of working capital into the company that has negotiated and signed the agreement.

. . .

*Brian Gilbertson*: And there are a consortium of four of us who will put up that money.

. . .

*Brian Gilbertson*: Um, myself, and then three other relatively wealthy gentlemen who—and one of them will make the full payment tomorrow.

. . .

*Brian Gilbertson*: But I need to refund him very promptly after that with 10 million dollars or . . . 9.5 million dollars.

. . .

*Brian Gilbertson*: I'm not unhappy with it being held by the trust.

*Justin Thomas*: Okay. So we could make this as an investment rather than a distribution, okay.

. . .

*Brian Gilbertson*: Project Egg Limited is a Cayman Islands registered company.

. . .

*Brian Gilbertson*: It's a subsidiary of Pallinghurst.

. . .

*Justin Thomas*: What would Victor Vekselberg's thoughts be if you do this without using Pallinghurst?

*Brian Gilbertson*: He'll be extremely pissed off I would think.

*Justin Thomas*: [laughter]

*Brian Gilbertson*: But we'll come back to the table and we'll negotiate something else.

. . .

*Brian Gilbertson*: But not with a gun to my head, you know.

*Justin Thomas*: No.

*Brian Gilbertson*: Tomorrow's the deadline, if they don't do it we lose the transaction and he can step in and take it, and I'm not going to have that happen."

60 The judge found that, in the afternoon of January 2nd, 2007, Mr. Kalberer spoke to Mr. Sean Gilbertson on the telephone about the fourth draft IA and that, in the course of that conversation, a number of the disputed terms were resolved, but that Mr. Sean Gilbertson said nothing to Mr. Kalberer as to Mr. Gilbertson's plans for alternative funding of the purchase of the Fabergé rights by other investors, including the BPG Settlement.

61 In the evening of the same day (January 2nd, 2007), Mr. Gilbertson sent to Mr. Vekselberg, copied to Mr. Kuznetsov and Mr. Kalberer, what the judge described (at para. 9.47 of his judgment) as "a very significant email":

"I am sure you are aware that I have been trying, ever since Pallinghurst bought the Fabergé Brand on the evening of 21 December, to achieve an agreement with your colleagues, Messrs Kuznetsov and Kalberer that would satisfy the basic understanding that you and I struck that evening. I believe that I have leaned over backwards to accommodate the (extraordinary) requirement from your side that one of your companies should own the brand outside of the Pallinghurst structure that we have so carefully negotiated, over so long a period, but which yet remains unsigned.

This morning I turned on my computer to find 90 odd lines of proposed amendment to the text that we had previously exchanged. [The judge found this to be a reference to the fourth draft IA.] Some of these, 7 in total, were completely unacceptable, with clause 2e being perhaps the most glaring example. In a telephone conversation between Mr Kalberer and Sean this afternoon, less than 22 hours from the payment deadline, a number of the conflict issues were resolved, but late today we are told that a 25%-plus participation of 3rd parties in Pallinghurst Fabergé initiatives (I am NOT referring to your 100% ownership of the brand itself, which we had accepted) was a deal breaker.

The background will explain why it became clear to me today that there was little likelihood that we could reach an agreement in time that would satisfy the requirements of both Parties. I could not take the risk that payment would not be made under Pallinghurst's Sale

> and Purchase agreement with Unilever. Accordingly I have triggered alternative arrangements, so that payment has now been made, and Pallinghurst now owns the Fabergé brand.
>
> I reconfirm to you my desire to reach an agreement with your team that will accommodate your wishes as well as mine. I hope that, with the looming payment dead-line removed, and the vacation season soon to end, we will be able to make orderly progress towards such an outcome.
>
> I am available at your convenience to discuss any of the above, or matters arising therefrom, should you or your colleagues so wish . . ."

The judge made two comments on that letter. First, he pointed out that Mr. Gilbertson's statement that it became clear to him that day, January 21st, 2007, "that there was little likelihood of reaching an agreement in time" was "again not strictly correct." The judge said this (at para. 9.47):

> "As I have already mentioned, his evidence was that it was when he first awoke the previous day, 1st January 2007, that he decided that agreement would not be reached in time and that he would therefore implement and did implement his strategy of purchasing the Rights himself with his consortium, as he had already been putting in place before then."

Secondly, he pointed out that it could not have been correct that it was the proposals contained in the fourth draft IA, received by Mr. Gilbertson that morning, which caused him to "trigger alternative arrangements," as the judge said (*ibid.*):

> "[I]t was, according to his own evidence, early the previous morning, before the Fourth draft IA had been sent out, that he decided to and did proceed with the alternative financing arrangements."

62 The judge found (at para. 9.48 of his judgment) that the purchase of the Fabergé rights from Unilever by PEL was completed on January 3rd, 2007 by payment of US$38m. by K-MIC (the holding company owned by Mr. Mende and Mr. Kundrun). He found, also, that:

(1) The minutes of a PEL board meeting held on January 3rd, 2007 recorded the approval of a loan to PEL of US$38m. from Autumn, K-MIC and Dr. Jelinek, repayable on 7 days' notice either (at the lenders' option) in cash or by the transfer of all PEL's assets to a vehicle nominated by the lenders, with interest at US$ LIBOR + 1.5% compounded monthly.

(2) The minutes also recorded approval of the issuance of 100 new shares in PEL at par value to the lenders, pro rata to their contribution to the loan.

(3) The master fund held one share in PEL. The register of members of PEL showed that the additional 100 new shares were issued to Autumn, K-MIC and Dr. Jelinek on January 3rd, 2007 in accordance with the board approval recorded in the minutes of that date.

(4) The register showed a transfer [*sic*] of 25 shares each on that date to Autumn and Dr. Jelinek and of 50 shares to K-MIC.

(5) The issue of those 100 shares on January 3rd, 2007 was subsequently confirmed in a letter dated February 26th, 2007 from the Gilbertson parties' London solicitors, Clifford Chance.

The judge noted (at para. 9.48 of his judgment) that, notwithstanding the record in the minutes and the register of members, and the confirmatory statement in their solicitors' letter, the Gilbertson parties pleaded in their amended defence that it was not in fact until January 19th, 2007, some two weeks after the date recorded, that the additional 100 shares in PEL were issued. He rejected that contention.

(iii) *The period after January 3rd, 2007*

63 On the evening of the same day, January 3rd, 2007, Mr. Gilbertson had sent an email to Mr. Kuznetsov, copied to Mr. Vekselberg, Ms. Irina Vekselberg (who, the judge explained, was Mr. Vekselberg's daughter and was taking a particular interest in the Fabergé brand) and Mr. Kalberer, with a proposed public announcement about the acquisition of the Fabergé brand. In that email he requested their comment. On January 4th, 2007, in an email sent to Mr. Gilbertson and copied to Mr. Sean Gilbertson and Mr. Kuznetsov, Mr. Kalberer responded to that request. After explaining that, given the developments of the previous two weeks, Renova needed to discuss the Pallinghurst project internally, he asked them not to publish any press releases or to contact the press in relation to Project Egg or any of the Pallinghurst projects in the meantime. Later that day, Mr. Gilbertson confirmed that he had stopped the issue of the press release about acquisition of the Fabergé brand. Mr. Gilbertson and Mr. Vekselberg met in Moscow on January 16th and 17th, 2007 to discuss Project Egg but that meeting was not fruitful. On January 21st, 2007, after further communications, Mr. Sean Gilbertson, on behalf of Mr. Gilbertson, sent an email to Mr. Vekselberg and Mr. Kuznetsov with a proposed omnibus agreement relating not only to the Pallinghurst structure and agreements and the Fabergé rights but also to Project Charlie and to Mr. Gilbertson's employment with SUAL. That draft agreement contained the proposal (made for the first time) that—

> "1. The partnership between Renova and Pallinghurst envisaged by the unsigned Pallinghurst agreements shall be abandoned, and Pallinghurst shall be further developed independently by [Mr. Gilbertson]."

64 From January 21st, 2007 the discussions between the parties departed from the proposals reflected in the draft IAs exchanged prior to January 3rd, 2007. Certain negotiations in relation to the Fabergé rights took place thereafter but without any obvious involvement of the master fund. The judge took the view that the details of those negotiations were of no relevance to Renova's claims in these proceedings, and that it was sufficient to record that the subsequent negotiations and discussions in relation to the Fabergé rights were not successful. Following a meeting in London on May 5th, 2007, between Mr. Gilbertson, Mr. Vekselberg and Mr. Kuznetsov, Renova Holding gave written notice of termination of the letter agreement (under cl. 8) on May 27th, 2007.

***The judge's findings as to the applicable principles of law***

65 At the section beginning at 2012 (2) CILR 416, para. 2, of his judgment, the judge considered the applicable principles of law. He referred to passages in judgments delivered in three cases before the Court of Appeal of England and Wales: first, in the judgment of Millett, L.J. in *Bristol & West Bldg. Socy.* v. *Mothew* (10); secondly, in the judgment of Jonathan Parker, L.J. in *Bhullar* v. *Bhullar* (8); and thirdly, in the judgment of Mummery, L.J. in *Gwembe Valley Dev. Co. Ltd.* v. *Koshy (No. 3)* (21). He referred, also, to observations of Patten, J., sitting in the High Court of England and Wales in *Halton Intl. Inc. (Hldgs.) SARL* v. *Guernroy Ltd.* (22). He went on to say this (2012 (2) CILR 416, at para. 11):

> "The cases make it clear, and leading counsel for the parties did not disagree, that whether or not someone is a fiduciary depends on whether he is acting for or on behalf of another 'in a particular matter in circumstances which give rise to a relationship of trust and confidence': see *Bristol & W. Bldg. Socy.* v. *Mothew* ([1998] Ch. at 18); see also *Boardman* v. *Phipps . . . per* Lord Upjohn, as cited in *Bhullar* v. *Bhullar* . . . The first question therefore is whether, in the particular circumstances of this case, Mr. Gilbertson was in a relationship of trust and confidence with the company, with the core obligation of loyalty to the company and the consequent fiduciary duties as outlined by Lord Millett in the *Bristol & W. Bldg. Socy.* case. In other words, was there an obligation on Mr. Gilbertson to act in the interests of the company in the circumstances? (see *Hospital Prods. Ltd.* v. *United States Surgical Corp.* . . . cited in the *Halton Intl. Inc.* case . . .). If Mr. Gilbertson was subject to such obligations to the company, he was a fiduciary: see the reference to Dr. Finn's *Fiduciary Obligations*, at 2 (1977), referred to in *Bristol & W. Bldg. Socy.*"

***The judge's reasoning and conclusions on the question whether Mr. Gilbertson owed fiduciary duties to the company***

66 At the section starting at 2012 (2) CILR 416, para. 12, the judge addressed the question: "Did Mr. Gilbertson owe fiduciary duties to the company?" He concluded (*ibid.*, at para. 33) that, in the circumstances of the present case, and in relation to an investment opportunity which Mr. Gilbertson had, himself, brought to the investment committee, established pursuant to the letter agreement, the answer to that question was "Yes."

67 The reasoning which led the judge to that conclusion may, I think, be summarized as follows:

(1) The judge explained that Renova's case was that, as a director of the company, Mr. Gilbertson owed fiduciary duties to the company. He said this (*ibid.*, at para. 12):

> "It is a well-established principle of law that a director of a limited company owes fiduciary duties to the company of which he is a director, those duties principally being to act in the best interests of the company and the consequent duties referred to in the cases cited above, such as the duty to avoid a conflict of interest between his own interest and that of the company, not to make a profit for himself from his position as a director (at least without the informed consent of the company) and so on."

It was submitted on behalf of Renova, he said, that Mr. Gilbertson owed these fiduciary duties to the company as a *de jure* director.

(2) The judge went on to observe (*ibid.*, at para. 13) that it was also established that—by a provision in a company's articles of association, by agreement of the shareholders or by clear implication from the particular circumstances of the case—the obligations of a director to the company might be modified so as (for example) to enable the director to act in his own interests or in the interests of another in relation to a particular matter notwithstanding that those interests might not necessarily be the same as the interests of the company in relation to the particular matter. At para. 14, he referred to observations in the judgment in *Japan Abrasive Materials Pty. Ltd.* v. *Australian Fused Materials Pty. Ltd.* (23)—a case before the Supreme Court of Western Australia, on which reliance had been placed in argument on behalf of the Gilbertson parties—and on a passage in the judgment of Burnton, L.J., sitting in the Court of Appeal of England and Wales, in *Re Neath Rugby Ltd.* (26). The judge explained (2012 (2) CILR 416, at para. 19) that it was submitted on behalf of the Gilbertson parties that that principle—that, in appropriate circumstances, it was possible to vary or dispense entirely with a director's fiduciary duties to the company of which he was a director—was applied in the *Japan Abrasive Materials* case, and that, in the present case, the letter

agreement was such an agreement. In particular, it was submitted that the terms of the letter agreement were such as to entitle Mr. Gilbertson to act in his own interest in relation to an investment project which required his consent to pursue—or which, put another way, he was entitled to veto—and not necessarily in the interests of the company.

(3) Nevertheless, as the judge observed (2012 (2) CILR 416, at para. 20), the terms of the shareholders' agreement in the *Japan Abrasive Materials* case, "were entirely different from the terms of the letter agreement and the surrounding circumstances in that case were entirely different from the circumstances in the present case." Renova's case—as the judge explained (*ibid.*, at para. 21)—was that the source of Mr. Gilbertson's fiduciary duties to the company was "the *de jure* role that he occupied as a director of the company"; that the letter agreement was not a shareholders' agreement; that, in any event, the terms of the letter agreement did not have the effect of modifying Mr. Gilbertson's fiduciary duties to the company; and that the only question was whether there was anything in the arrangements between the Renova parties and the Gilbertson parties which did have that effect.

(4) The judge summarized the arguments which had been put to him (*ibid.*, at paras. 21–24):

> "22 . . . The plaintiff contended that there was . . . an obligation of loyalty on Mr. Gilbertson as a director and a duty to act in the interests of the company and, through the company, the master fund. That, it was argued, was the foundation of the fiduciary relationship in the present case, even if it could have been qualified . . .
>
> 23 On the other hand, the case for the Gilbertson parties was that careful consideration of the nature of the company's business and of the provisions of the letter agreement demonstrated that Mr. Gilbertson did not owe the company any fiduciary duties with regard to investment projects which he was free to withhold his consent to or veto in his capacity as a member of the investment committee. Project Egg, they said, fell into that category. Mr. Gilbertson was, they contended, entitled in the circumstances to act as a director of the company in his own interests.
>
> 24 The Gilbertson parties argued that the Pallinghurst structure, including the company, was established pursuant to the letter agreement. They said that the letter agreement reflected a joint venture between Mr. Gilbertson and Renova Holding, although the principles were agreed between Mr. Gilbertson and Mr. Vekselberg, who owns and controls the Renova group. They submitted that the company was of a joint venture character and that the directors, Mr. Gilbertson and Mr. Kuznetsov, were in effect nominated by the partners of the joint venture as defined in the letter agreement, namely Renova,

> through Renova Holding, and Mr. Gilbertson. Similarly, the shareholders were so nominated by the partners in the joint venture. In Mr. Gilbertson's case, he nominated Fairbairn as trustee of the Gilbertson Family Trusts and Renova Holding nominated Renova Resources. They say that, accordingly, any duties Mr. Gilbertson owed as a director of the company are to be derived from the letter agreement, which reflects the joint venture and is the source of the agreement between the joint venturers and the surrounding circumstances."

The judge referred (*ibid.*, at para. 25) to the provision (at cl. 2.5 of the letter agreement) on which, as he said, the Gilbertson parties placed particular reliance: "approval to proceed with an investment project *via* the investment fund at an agreed value, shall require the unanimous consent of the investment committee." He went on to say this (*ibid.*):

> "As I have said, the Gilbertson parties' principal submissions are based upon the terms of the letter agreement. They rely in particular upon the provision in cl. 2.5 of the letter agreement that 'approval to proceed with an investment project *via* the investment fund at an agreed value, shall require the unanimous consent of the investment committee.' They say that that provision relates to the rights of the investment committee, of which Mr. Gilbertson and Mr. Kuznetsov were the two members. It provided each of them with a right effectively to veto proceeding with any investment project. That right, they say, may be exercised by either of them in their own interest, without regard to the interests of the master fund and the company. Accordingly, they contend that it follows that Mr. Gilbertson had no duty to act in the best interests of the company, as opposed to his own personal interest, with respect to any investment project. The letter agreement, they say, constituted the agreement between the partners of the joint venture which, *inter alia*, governed Mr. Gilbertson's rights and obligations with regard to investment opportunities and accordingly governed Mr. Gilbertson's relationship with the company to be. If he was clearly entitled to act in his own interest in relation to investment projects, he clearly had no duty to act in the interests of the company in relation to such investment projects."

(5) The judge rejected (*ibid.*, at paras. 26–28)—as "somewhat artificial in light of the commercial realities of the situation"—the contentions, advanced on behalf of Renova, that the letter agreement (which had been made between Mr. Gilbertson personally and Renova Holding, neither of whom was a member of the company) was not an agreement between the shareholders of the company, was "clearly not akin to a shareholders' agreement of the kind in the *Japan Abrasive Materials* case," and was not to be treated as such. But he accepted that the circumstances in relation to

23-01165-mew Doc 84-3 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit B-2 - Autumn Holdings Asset Inc v Renova Res Private Equity Ltd [2017 (2 Pg 27 of 42



the directors and the shareholders of the company were not as straightforward as they were in the *Japan Abrasive Materials* (23) case in that, at the time when the letter agreement was entered into, the company did not exist and the Pallinghurst structure of which the company was to become part had not been devised. He said that, accordingly, "the letter agreement did not contain any provisions in relation to the company, or its shareholders' or directors' rights or any terms of the kind contained in the shareholders' agreement in the *Japan Abrasive Materials* case." And he went on to point out that it was clear from the comments of Mummery, L.J. in the *Gwembe Valley Dev.* case (21) that "the mere fact that a company is of a joint venture character is not enough to justify an implication that the directors' fiduciary duties are modified so as to entitle them to act in their own interests rather than in the interests of the company concerned."

(6) The judge emphasized that—having regard to the meaning given to the term "Investment Project" in cl. 2.1 of the letter agreement—it was important to keep in mind that investment projects were opportunities and that the purpose of the investment fund was to explore, acquire and develop such opportunities. An opportunity, he said, could be at the stage of exploration but still constitute an investment project. He went on (2012 (2) CILR 416, at para. 30):

> "30 In these circumstances, it seems to me that the mere fact that approval to proceed with an investment project required the unanimous consent of the investment committee did not mean that Mr. Gilbertson owed no fiduciary duty at all in respect of an opportunity which he had brought for consideration by the investment fund and fund management vehicle and which was being explored. In my view, Mr. Gilbertson had a fiduciary duty as a director of the company in respect of any potential investment project which was being explored by him with the agreement of Mr. Kuznetsov, as the other member of the investment committee, at least until such time as there was clearly no longer unanimous consent to proceed with it or it was actually vetoed. Indeed, in accordance with the authorities referred to earlier, any such veto would have to be on the basis of full information being disclosed by or to Mr. Gilbertson or by or to Mr. Kuznetsov, as the case may be. In my opinion, once an opportunity was in the process of being explored or acquired as an investment project, even if Mr. Gilbertson then vetoed it as a member of the investment committee, nothing less than a fully informed and express consent by the company could possibly permit Mr. Gilbertson to pursue such investment project for himself."

And—after observing that, in his view, it would be contrary to the overall intent, as reflected in the letter agreement, for a party to seek to veto or withdraw consent to an investment project in order to enable him to

pursue that investment project for himself—the judge said this (*ibid.*, at paras. 31–32):

> "The letter agreement expressly provided that the partners would work together to add value to the investment fund, that Mr. Gilbertson would be the chairman of the investment fund and the fund management vehicle and that he would assume responsibility for developing and implementing the strategy for all investment projects. The letter agreement also provided that the duties owed by Mr. Gilbertson to the investment fund and the fund management vehicle (which would subsequently include the company) would be those customary for an executive chairman of a company and would include, *inter alia*, searching for and introducing investment projects to the investment committee and supervising the implementation of approved investment projects. He was also to provide strategic advice on investment projects.
>
> 32 All of this is, in my opinion, consistent with the proposition that once a proposed investment project had been brought by Mr. Gilbertson for consideration by the investment committee and proceeding with it had not been consented to by Mr. Kuznetsov, Mr. Gilbertson as a director of the company was subject to the fundamental principles of loyalty and good faith in relation to that investment project, including not making a profit for himself out of his position, not placing himself in a position where his interest may conflict with that of the company and not acting for his own benefit or exploiting the opportunity for himself, at least without the informed consent of the company, all as explained in the English cases cited above."

The judge went on to say (*ibid.*, at para. 33) that, in his view, it was immaterial whether the correct approach was that advanced on behalf of Renova (that is to say, to start from the premise that Mr. Gilbertson had fiduciary duties to the company as its director as a matter of legal principle, subject to any agreement or implication from the circumstances abrogating or modifying such duties) or that advanced on behalf of the Gilbertson parties (that is to say, to ask if the particular circumstances, including any relevant agreements, were such that Mr. Gilbertson was subject to obligations to the company which were of a fiduciary nature): whichever approach was adopted, the conclusion was the same.

68 In the section beginning at para. 36, the judge addressed the submission, advanced on behalf of the Gilbertson parties at the trial, that, because the investment committee never consented to Project Egg, it never became "an approved Investment Project" in the sense required by the letter agreement. He rejected that submission.

69 In his section beginning at para. 39, the judge addressed the question whether Mr. Vekselberg's requirement that the Fabergé rights should be

owned by a Lamesa company, outside the Pallinghurst structure—which, as he said, represented a change to the structure through which those rights as an investment project would be held—had any effect on the nature or extent of the fiduciary duties which (as he had held, in the section beginning at para. 12) Mr. Gilbertson owed to the company. He concluded, at para. 43, that he could "see no reason why the fiduciary duties to the company which Mr. Gilbertson owed as a director should have been any different after 20th or 21st December 2006 from his fiduciary duties before that time."

***The judge's reasoning and conclusions on the question whether Mr. Gilbertson was in breach of fiduciary duties which he owed to the company***

70 After restating his conclusion that Mr. Gilbertson remained in the same fiduciary relationship with the company after December 20th, 2006 as he did before that date, the judge went on to say this (2012 (2) CILR 416, at para. 57):

> "In such circumstances, it was not open to Mr. Gilbertson to take the rights for himself or to seek thereby to make a profit for himself and the other members of his consortium. In my opinion that was inconsistent with and amounted to a breach of his fiduciary duties. This was exacerbated by the fact that he diverted the rights, including the economic benefit of developing, exploiting and managing the Fabergé brand, from the master fund as part of the Pallinghurst structure to himself covertly without any disclosure to the company until after the event and, even then, it was not full disclosure. In summary, therefore, I am of the opinion that in the circumstances Mr. Gilbertson owed the duties of a fiduciary as a director of the company throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007."

71 In reaching that conclusion the judge had held (i) (*ibid.*, at para. 50), that it was an essential part of Mr. Gilbertson's strategy—that is to say, his strategy to "negotiate with the Russians from a position of strength" after having taken the Fabergé rights out of the Pallinghurst structure—to divert those rights from the master fund by diluting its 100% ownership of PEL by the issue of further shares in PEL to Autumn and the other members of the consortium so as to give them almost 100% ownership of PEL; and (ii) (*ibid.*, at para. 55) that there was no legitimate reason for Mr. Gilbertson not to discuss with Mr. Vekselberg his stated concern about possible failure to pay the purchase price under the SPA on the due date. It was, the judge held, Mr. Gilbertson's duty to seek to resolve that concern with the Renova parties and with Unilever, and not "to secretly take the Rights for himself with a view to making a profit."

***The submissions advanced on behalf of the parties***

72 It is said in the memorandum of grounds of appeal filed on behalf of Autumn on February 1st, 2013, that the judge misdirected himself and erred in law and/or fact in holding that Mr. Gilbertson owed or was in breach of any fiduciary duty in relation to the Fabergé rights or the Brand, and in holding that there was any substratum on which to found a claim against Autumn. More particularly, it is said that the judge misdirected himself: (i) as to whether Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund; (ii) in holding that Mr. Gilbertson owed fiduciary duties to the company which he did not owe; (iii) in such findings as he made that Mr. Gilbertson breached any fiduciary duties; and (iv) in relation to the issue of shares in PEL to members of the consortium. Those submissions were developed in extensive written submissions filed on May 24th, 2013, and in oral submissions at the hearing of the appeal.

73 In response to those submissions it is said on behalf of the Renova parties that, "despite the length and complexity of Autumn's Written Submissions the response to them can be boiled down to [a number of] short propositions." In the present context, the relevant propositions are these:

(1) Mr. Gilbertson was a *de jure* director of the company. The fiduciary duties that he owed to the company extended to protecting its assets and interests, including ensuring that the assets and interests owned or controlled by the entities in the Pallinghurst structure beneath the company (and, principally, the assets and interests of the master fund) were safeguarded and exploited for the ultimate benefit of the company. Those interests included the opportunity to acquire the Fabergé rights, and, once the Fabergé rights were secured by PEL (a Pallinghurst structure company) on December 22nd, 2006, to keep them there.

(2) The content and scope of Mr. Gilbertson's fiduciary duties were never attenuated, in particular either (a) by the terms of the letter agreement, or (b) by the fact that on December 20th, 2006, Renova introduced the requirement that the Fabergé rights be held by a Lamesa company (with the full economic benefit being held within the Pallinghurst structure), or (c) by the nature or proposed terms of (and the parties to) the draft implementation agreements or the fact of their negotiation. Mr. Gilbertson was at all times precluded by his duties of loyalty to the company, and to the GPLP and the master fund, from having regard to his own interests.

(3) Mr. Gilbertson acted in breach of the fiduciary duties which he owed to the company and the master fund by procuring that his consortium (of which Autumn was a 25% member) acquire 99% ownership of PEL. Indeed, it is said that "Autumn all but concedes that, if Mr. Gilbertson owed the company or GPLP or the master fund duties which

precluded him for having regard to his own interests, then he breached those duties."

74 Before addressing the substantive question whether the judge was wrong to hold that Mr. Gilbertson was in breach of fiduciary duties which he owed to the company, it is convenient to consider, first, whether there is any substance in the submissions—numbered (i) and (iv) in the summary of the memorandum of grounds of appeal which I have just set out—that the judge misdirected himself as to whether Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund and in relation to the date on which 100 new shares in PEL were issued to members of the consortium.

***Whether Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund***

75 In support of the submission that the judge was wrong to hold that Mr. Gilbertson owed fiduciary duties to the GPLP and/or to the master fund—and by way of particulars—it is said on behalf of the Gilbertson parties that:

(1) The judge erred in law in failing to address the question whether, on its case as pleaded, it was open to Renova to contend that Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund, and that, had he done so, he ought to have held that there was no, or no properly pleaded, case before him with respect to GPLP and/or the master fund and refused to award either of them any relief.

(2) In so far as the judge held that, or proceeded on the basis that, Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund in relation to the Fabergé rights or the Fabergé brand at any time (and, in particular, at such time as the judge may have held that he was in breach of such duties), the judge misdirected himself and/or erred in law and/or fact in so doing, given Renova's failure to plead any such fiduciary duties properly or at all.

76 In the previous section of this judgment I addressed the question whether the judge was wrong to entertain (and grant relief in respect of) derivative claims that were not before him. I concluded—for the reasons which I set out in that section—that the judge was correct to take the view (2012 (2) CILR 416, at para. 60) that, having chosen not to appeal from the order which he had made some three and a half years earlier (in his ruling of April 14th, 2009), it was not open to the Gilbertson parties to challenge, at trial, the standing of Renova to advance claims in the action on behalf of GPLP and the master fund including, in particular, a claim founded on the unpleaded contention that Mr. Gilbertson had acted in breach of fiduciary duties which he owed to the master fund. In those circumstances it is unnecessary to revisit the question whether—on the basis of the alleged defects in Renova's pleaded case—the judge was

wrong to hold that Mr. Gilbertson owed fiduciary duties to the GPLP and/or to the master fund.

77 In any event, as it seems to me, the judge did not need to hold that Mr. Gilbertson owed fiduciary duties to the GPLP or to the master fund which were independent of the fiduciary duties which (as a director) he owed to the company, and, as I shall explain later in this judgment, on a proper analysis of his judgment of November 5th, 2012 (read with his ruling of April 14th, 2009) he did not do so.

### *The issue of shares in PEL to members of the consortium*

78 As I have said, the judge found (at para. 9.48 of his judgment) that the minutes of a PEL board meeting held on January 3rd, 2007 recorded the approval of the issuance of 100 new shares in PEL at par value to Autumn, K-MIC and Dr. Jelinek, that the register of members of PEL showed that those additional shares were issued pursuant to the board approval, and that the issue of those 100 shares on January 3rd, 2007 was subsequently confirmed in a letter dated February 26th, 2007 from the Gilbertson parties' London solicitors, Clifford Chance. He rejected the contention, pleaded by the Gilbertson parties in their amended defence that, as a matter of fact, those additional 100 shares were not issued by PEL until January 19th, 2007, or thereabouts. He did so for the reasons which he set out at para. 9.49 of his judgment. He said this:

> "Section 48 of the Companies Law (2011 Revision) provides that the Register of Members '*shall be prima facie evidence of any matters by this Law directed or authorized to be inserted*'. Accordingly PEL's Register of Members recording that the new shares were issued to the members of the consortium on 3rd January 2007 is *prima facie* evidence of that. That evidence is supported by the Minute of the PEL board meeting on 3rd January 2007 and by the Letter dated 26th February 2007 from Clifford Chance. The evidence of the witnesses in this regard was not particularly satisfactory. Mr. Gilbertson said that the new shares were not issued on 3rd January 2007 but he was unable to say when they were issued. He suggested that the Minute of the PEL board meeting had been backdated, although that would obviously be inappropriate since the Minutes clearly say that the meeting concerned took place on 3rd January 2007. It seems improbable to me that the registered office of PEL, Walkers, Attorneys-at-law, would be party to any backdating of an entry in the Register of Members maintained by them. Unfortunately, Sean Gilbertson, who was a director of PEL at the time, was not cross-examined on this point. On balance, in the circumstances I am not satisfied that the *prima facie* evidence of the Register together with the other supporting evidence has been displaced. In my

23-01165-mew Doc 84-3 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit B-2 - Autumn Holdings Asset Inc v Renova Res Private Equity Ltd [2017 (2 Pg 33 of 42



judgment the probability is that the new shares in PEL were indeed issued on or with effect from 3rd January 2007 and I so find."

79 In their memorandum of grounds of appeal, the Gilbertson parties challenge the judge's conclusion that the 100 new shares were issued by PEL on January 3rd, 2007. In developing the submission that the judge misdirected himself, it is said on behalf of the Gilbertson parties that:

(1) The judge erred in law, in that (i) he relied on a presumption or rule of evidence that shares in a Cayman Islands company are issued on the date of issue entered in the register of members; and (ii) he held that any such presumption or rule of evidence was not displaced on the evidence before him.

(2) The judge erred in fact in failing to hold that the PEL shares were not issued on January 3rd, 2007 but, on the balance of probabilities, were issued on January 19th, 2007.

In particular, it is said that the judge was wrong in failing to give weight to the unchallenged evidence of Mr. Sean Gilbertson (a director of PEL), said to be supported by contemporaneous documents, that PEL did not issue any shares on January 3rd, 2007.

80 In my view the judge was entitled to reach the conclusion that he did. I reject the submission that he erred in law. He was entitled—indeed, bound—to have regard to the direction, in s.48 of the Companies Law (2011 Revision), that the register of members shall be *prima facie* evidence of the date of issue of the shares, and he was entitled to take the view that the evidence of the register of members was not displaced by the other evidence that was before him. As he said (at para. 9.49 of his judgment) "the evidence of the witnesses in this regard was not particularly satisfactory."

***Whether Mr. Gilbertson owed fiduciary duties to the company in relation to Project Egg***

81 I turn, therefore, to address the substantive question: whether the judge was wrong to hold that Mr. Gilbertson was in breach of fiduciary duties which he owed to the company in relation to the acquisition of the Fabergé rights (Project Egg).

82 In reaching his conclusion that—in the circumstances of the present case and in relation to Project Egg)—Mr. Gilbertson did owe fiduciary duties to the company, the judge said this (at para. 33):

"[I]t seems to me that the company and the master fund, as part of the Pallinghurst structure, were entitled to expect, in relation to such an investment project, the 'single-minded loyalty' of Mr. Gilbertson, whose relationship with the company (and the Pallinghurst structure

generally), was one of trust and confidence in the sense explained in the *Bristol & W. Bldg. Socy.* case . . .”

In that context “the Pallinghurst structure” comprised—as the judge had explained (at para. 4 of his judgment)—the three Cayman Islands entities established pursuant to the letter agreement dated November 24th, 2005 to which he had referred at para. 3.2. “Investment Project” had the meaning given to that expression in the letter agreement, that is to say (as the judge explained (at para. 29)), an opportunity which it was the purpose of the master fund to explore, acquire and develop.

83 The three entities which comprised the Pallinghurst structure were the master fund (Pallinghurst Resources Management LP), GPLP (Pallinghurst (Cayman) General Partner LP) and the company (Pallinghurst (Cayman) General Partner LP (GP) Ltd.). GPLP and the master fund were exempted limited partnerships established under the Exempted Limited Partnership Law (Law 11 of 1991, as amended). Section 4(2) of that Law provided that an exempted limited partnership should consist of one or more persons called general partners and one or more persons called limited partners. General partners were liable, in the event that the assets of the exempted limited partnership were inadequate, for all debts and obligations of the partnership. Section 4(3) required that a general partner “shall act at all times in good faith in the interests of the exempted limited partnership.” Section 7(1) required that a limited partner should not take part in the conduct of the business of the exempted limited partnership.

84 It was not in dispute—and, in any event the judge so found—that the company was the sole general partner of GPLP and that GPLP was the sole general partner of the master fund. The judge noted (by reference to the diagram of the Pallinghurst structure which he set out at para. 4.2 of his judgment) that Mr. Sean Gilbertson was a limited partner of GPLP and that the Founder fund (Pallinghurst (Cayman) General Partner LP) was a limited partner of the master fund. But there was no evidence to suggest that existence of those limited partners affected GPLP’s power (as the general partner of the master fund) to control the master fund; or which affected the company’s power (as the general partner of GPLP) to control GPLP; or which affected the company’s power (through GPLP) to control the master fund. Nor was there any evidence to suggest that, in the exercise of their powers in relation to the master fund, GPLP (and, through GPLP, the company), did not owe the duties (imposed by s.4(3) of the Exempted Limited Partnership Law) “to act at all times in good faith in the interests of the exempted limited partnership.”

85 As Lord Millett had observed, in his judgment in *Waddington* v. *Chan Chun Hoo Thomas* (40) (to which the judge referred (2012 (2) CILR 416, at para. 59)) “if wrongdoers must not be allowed to defraud a parent company with impunity, they must not be allowed to defraud its subsidiary

with impunity" ([2008] HKCFA 63, at para. 75). The judge held (2009 CILR 268, at para. 66) that, by reason of the company's power to control the master fund, the position of the master fund was analogous to that of a sub-subsidiary. In my view, he was right to reach that conclusion: the submission that the judge needed to hold that Mr. Gilbertson owed fiduciary duties to GPLP or the master fund which were independent of the fiduciary duties which he owed to the company—or that he did so—is not well-founded. If and in so far as the judge was correct to conclude that Mr. Gilbertson owed duties of loyalty and good faith to the company in relation to the pursuit of Project Egg as an investment project, he was correct to hold that such duties entitled GPLP and the master fund to rely upon his loyalty and good faith in relation to that project.

86 As I have said, the judge addressed and rejected (2012 (2) CILR 416, at the section beginning at para. 36) the submission, advanced on behalf of the Gilbertson parties, that Project Egg never became an approved investment project for the purposes of the letter agreement, and so never became a project in relation to which Mr. Gilbertson owed fiduciary duties, whether to the company or, more generally, to the Pallinghurst structure. The Gilbertson parties challenge that conclusion on this appeal. It is said in this court—as it was said below—that the judge was wrong to hold that Project Egg could become an approved investment project in the absence of unanimous consent of the members of the investment committee (Mr. Gilbertson and Mr. Kuznetsov).

87 In rejecting the submission that Project Egg never became an approved investment project for the purposes of the letter agreement, and so never became a project in relation to which Mr. Gilbertson owed fiduciary duties, the judge said this (*ibid.*, at para. 36):

> "It was suggested on behalf of Mr. Gilbertson that the investment committee in fact never did unanimously consent to Project Egg and therefore it was never an approved investment project in the sense required by the letter agreement. Having regard to the terms of the letter agreement and the circumstances generally, I did not find that to be a persuasive argument. The overall evidence clearly indicated to me that the investment committee, that is Mr. Gilbertson and Mr. Kuznetsov, operated in an informal way. They had meetings and discussions and both clearly acted from the start on the basis that Project Egg, which was initially proposed as an investment project by Mr. Gilbertson, should proceed as an opportunity to be explored and then acquired at an agreed price by the master fund. It is clear that, at the outset, Mr. Gilbertson introduced Project Egg and then explored it and implemented the strategy for the acquisition of the rights as an investment project of the master fund. He procured PEL, as a wholly-owned subsidiary of the master fund, and thus a Pallinghurst structure company, to enter into the SPA with Unilever

to acquire the rights, all as an investment project for the master fund, and all as agreed by Mr. Kuznetsov, as the other member of the investment committee. The purchase offers to Unilever made by Sean Gilbertson were made with the knowledge and consent of the investment committee. Agreement was reached on the price for the rights as an investment project. The initial offer of US$20m. by Renova and then the offer of US$30m. and the final offer price of up to US$40m., both to be paid by Mr. Vekselberg, all had the consent of the investment committee. In my view, Mr. Gilbertson would have done or procured none of this to be done if he did not consider that he had the consent of Mr. Kuznetsov and therefore the investment committee. I do not consider it is now open to him, in all the circumstances, to contend that Project Egg was never an approved investment project of the master fund."

88 I am of opinion that, for these reasons which the judge gave, he was entitled to find that, in the events to which he referred, Mr. Gilbertson would not have acted as he did in procuring the acquisition of the Fabergé rights by PEL on December 22nd, 2006 "if he did not consider that he had the consent of Mr. Kuznetsov and therefore the investment committee," and was entitled to hold that, "it is [not] now open to [Mr. Gilbertson], in all the circumstances, to contend that Project Egg was never an approved Investment Project of the Master Fund."

89 I should add that I am also of opinion that, if the judge were correct in his view that, prior to the issue of the additional shares, PEL was "a wholly-owned subsidiary of the Master Fund," the question whether or not Project Egg had become an approved investment project for the purpose of the letter agreement prior to the purchase of the Fabergé rights by PEL from Unilever under the agreement of December 22nd, 2006, was of little importance after that date. If, at the time when PEL became the contractual purchaser of the rights, it was wholly owned by the master fund, then, as it seems to me, whatever fiduciary duties may have been owed by Mr. Gilbertson to the company (or, more generally, to the Pallinghurst structure) in relation to Project Egg (as an investment project) under the terms of the letter agreement had become subsumed in the fiduciary duties which he owed as a director of the company in relation to the assets of the entities (including the master fund) which it controlled. Those assets included PEL and (through PEL) the contractual interest as purchaser of Fabergé rights.

90 As I have said, Project Egg Ltd. (PEL), a Cayman Islands limited company, was incorporated on December 1st, 2006 by Mr. Gilbertson as a special purpose vehicle for the purpose of acquiring the Fabergé rights from Unilever. The directors of PEL were Mr. Sean Gilbertson and Mr. Andrew Willis (an employee of Pallinghurst LLP). In taking the view throughout his judgment—and, in particular, at para. 36 (in the passage

which I have set out)—that, until the issue of the additional shares, PEL was a 100% subsidiary of the master fund, the judge made no reference to the corporate records of PEL itself. He seems to have taken that premise to be common ground between the parties. There was material before him to support that conclusion:

(1) On December 18th, 2006, Mr. Sean Gilbertson sent an email to Mr. Kalberer in the terms set out by the judge at para. 9.14 of his judgment. In that email he wrote:

> "As mentioned we incorporated a Cayman Island based limited company called Project Egg Limited ('SPV') which, based on advice from Clifford Chance, should acquire the portfolio of trademarks . . . The SPV is a 100% subsidiary of our fund 'Pallinghurst Resources Management L.P. . . .'"

It is plain that the judge took the view, understandably if I may say so, that the fund to which Mr. Sean Gilbertson referred as "our fund 'Pallinghurst Resources Management L.P.'" was the master fund: that that was his view can be seen from his addition to the passage of the email set out at para. 9.14 of his judgment, by way of annotation to those words, the comment "[i.e. the Master Fund]."

(2) Paragraph 1 of the first draft IA—sent by Mr. Sean Gilbertson to Mr. Kalberer (with copies to Mr. Kuznetsov and Mr. Vekselberg) on December 21st, 2006—recorded that—

> "the parties agree that the Fabergé brand name and associated rights (the 'Rights') be purchased forthwith by 'Project Egg Limited' (the 'SPV', presently a 100% subsidiary of Pallinghurst Resources Management L.P.) upon terms negotiated between Pallinghurst Resources LLP and Unilever . . ."

(3) The second draft IA—which (as the judge found at para. 9.33 of his judgment) was sent by Mr. Sean Gilbertson, on behalf of Mr. Gilbertson, to Mr. Kuznetsov and Mr. Kalberer (with a copy to Mr. Vekselberg) on December 26th, 2006—referred to PEL (Opco) managing and operating the Fabergé rights "as a portfolio company of the master fund pursuant to the Pallinghurst Agreements."

(4) The intended parties to the third draft IA—sent by Mr. Sean Gilbertson to Mr. Kalberer (with copies to Mr. Kuznetsov and Mr. Vekselberg) on December 30th, 2006—included "Project Egg Ltd. a 100% subsidiary of PRM." PRM was identified as "Pallinghurst Resources Management LP" (the master fund).

(5) The fourth draft IA—sent by Mr. Kalberer to Mr. Sean Gilbertson (with copies to Mr. Gilbertson and Mr. Kuznetsov) on January 2nd,

2007—also identified PEL (an intended party) as a 100% subsidiary of the master fund.

91 Nevertheless, it is, I think, pertinent to note that not all the material before the judge supported his assumption that it was common ground between the parties that, until the issue of the additional shares, PEL was a 100% subsidiary of the master fund. There was also material before him which was difficult to reconcile with that assumption:

(1) If, from the date of its incorporation, PEL were wholly owned by the master fund, it is surprising (i) that—as the judge found at para. 9.13 of his judgment—it was not until receipt of an email sent by Mr. Sean Gilbertson to Mr. Cheremykin (copied to Mr. Kuznetsov) on December 15th, 2006 that the Renova parties first became aware of its incorporation and intended purpose; and (ii) that neither of the directors of PEL (Mr. Sean Gilbertson and Mr. Andrew Willis) were nominees of the Renova parties.

(2) Mr. Sean Gilbertson's description of PEL in his email sent on December 18th, 2006 as a 100% subsidiary of "our fund Pallinghurst Resources Management L.P." is difficult to reconcile with Mr. Gilbertson's response to Mr. Kalberer's request—in an email sent to him (and to Mr. Sean Gilbertson) on December 21st, 2006—for confirmation as to who controlled PEL and how. As the judge recorded (at para. 9.24 of his judgment), Mr. Gilbertson responded to that request on the same day—in an email sent to Mr. Kalberer (and copied to Mr. Kuznetsov and Mr. Vekselberg)—in these terms:

> "In response to your questions in item 2, 100% of the equity in Project Egg Ltd is held by Pallinghurst Resources LP, and the directors are Sean and Andrew Willis, as we have previously advised you."

(3) Mr. Sean Gilbertson's description of PEL as a 100% subsidiary of Pallinghurst Resources Management LP is not easy to reconcile with the description of the party joined as "Guarantor" to the acquisition agreement dated December 22nd, 2006 (the SPA) as "Pallinghurst Resources LLP (Company Number 0C31585) having its registered office at 54 Jermyn Street, London . . ."

92 As to the third of those points, the judge recorded (at para. 9.26 of his judgment) that it had been agreed between Mr. Sean Gilbertson and Mr. Kalberer in the course of a telephone conversation on December 20th, 2006, that the guarantor of PEL's obligations under the SPA would be "Pallinghurst Resources Management LP." The judge addressed (at para. 9.27 of his judgment) the question whether Mr. Sean Gilbertson had, indeed, changed his intention in relation to the identity of the guarantor of PEL's obligations under the SPA, but accepted the explanation, recorded

in a letter from the Gilbertson parties' then solicitors, Clifford Chance, that Pallinghurst LLP had been named as guarantor "as a result of a clerical error." He said this (at para. 9.27):

> "[Mr. Sean Gilbertson] said in evidence that he did not believe that it made any practical difference for Pallinghurst LLP to be the guarantor rather than the Master Fund and that he did not point out the change to Mr. Kalberer or Mr. Kuznetsov at the time because he did not consider it to be a matter of relevance for them. Sean Gilbertson did not appear to recognise that signing the SPA in its incorrect form amounted to a change of intention on his part, namely that Pallinghurst LLP should be the guarantor rather than the Master Fund . . . The impression I got from his evidence was that Sean Gilbertson did not appreciate the significance of this change and the reason why it had been intended and agreed that the Master Fund should be the guarantor rather than a Gilbertson entity."

And he went on (at para. 9.28 of his judgment) to say this:

> "In his evidence, Mr. Gilbertson accepted that when he procured PEL, acting by Sean Gilbertson, to sign the SPA with Unilever on 22nd December 2006 he acquired the contractual entitlement to the Rights for the Master Fund and entities within the Pallinghurst Structure and not for himself personally . . . Furthermore, Mr. Gilbertson accepted that not only was it a subsidiary of the Master Fund (namely PEL) which contracted to purchase the Rights from Unilever but that Unilever must have considered that it was contracting to sell the Rights to PEL, ultimately for Renova money, and not to Mr. Gilbertson for Gilbertson money. Accordingly Unilever still required to see Renova money behind PEL and accordingly to have the Master Fund as guarantor. It was clearly a PEL/Master Fund/Pallinghurst Structure for their benefit; it was not a Gilbertson transaction for the Gilbertsons' benefit."

The judge must, as it seems to me, have treated the statement in Mr. Gilbertson's email of December 21st, 2006, that 100% of the equity in PEL was held "by Pallinghurst Resources LP" as a further example of "the clerical error" which had led to the inclusion of Pallinghurst LP, rather than the master fund, as the guarantor named as party to the SPA.

93 There was, if I may say so, obvious potential for confusion between "Pallinghurst Resources LLP" (the English limited partnership established by Mr. Gilbertson on October 27th, 2005 as an investment management vehicle, to which I have referred earlier in this judgment as "Pallinghurst LLP") and "Pallinghurst Resources Management LP" (the Cayman Islands exempt limited partnership, to which the parties referred as "the master fund"). Be that as it may and whatever the true position, there is no challenge on this appeal to the judge's assumption that it was common

ground that, until the issue of additional shares in January 2007, PEL was a wholly owned subsidiary of the master fund. In those circumstances, as it seems to me, it is not open to this court to question whether the judge was right to proceed on that basis.

94 It follows that I am satisfied that, whatever fiduciary duties may have been owed by Mr. Gilbertson to the company (or, more generally, to the Pallinghurst structure) in relation to Project Egg (as an investment project) under the terms of the letter agreement, the judge was correct to accept—and the Renova parties are correct to submit in this court—that, *prima facie*, Mr. Gilbertson owed fiduciary duties as a director of the company in relation to the assets of the entities (including the master fund and, from and after its incorporation on December 1st, 2006, PEL) which it controlled, and that, from and after the execution of the SPA on December 22nd, 2006, those assets included the contractual interest of PEL as purchaser of the Fabergé rights and, after completion of the purchase under the SPA on January 3rd, 2007, as owner of those rights. The further question for the judge—as he recognized—was whether the fiduciary duties which, *prima facie*, Mr. Gilbertson owed as a director of the company in that context were modified or attenuated so as to enable him to act in his own interests (or in the interests of the consortium) in relation to the master fund's ownership (through PEL) of the rights acquired under the SPA. It is to that question that I now turn.

***Whether, in the events which happened, the fiduciary duties which Mr. Gilbertson owed to the company in relation to Project Egg were modified or attenuated***

95 As I have said, the judge accepted (2012 (2) CILR 416, at para. 13) that the obligations of a director to the company might be modified so as to enable the director to act in his own interests or in the interests of another in relation to a particular matter, notwithstanding that those interests might conflict with the interests of the company in relation to that matter. Such a modification or attenuation, the judge accepted, might be found in the company's articles of association, in an agreement between the shareholders or (by clear implication) in the particular circumstances of the case. In the course of setting out the respective submissions of the parties, he observed (*ibid.*, at para. 25) that the Gilbertson parties relied principally upon the terms of the letter agreement. He held (*ibid.*, at para. 33) that there was nothing in the letter agreement which would entitle Mr. Gilbertson to take for himself a project which he had brought to the investment committee for consideration as an investment project of the master fund, which the investment committee had agreed to pursue, and which was being actively pursued. He went on to say this (*ibid.*, at para. 35):

"Even if Mr. Gilbertson may have been entitled, pursuant to the letter agreement, to withdraw his consent to or to veto proceeding with such an investment project, in my opinion it does not follow that he was entitled to take that investment project for himself without the informed consent of the company, the ultimate owner and controller of the master fund. At the very least, as long as proceeding with such an investment had the unanimous consent of the investment committee, Mr. Gilbertson was subject to the fiduciary duties which I have outlined in respect of that investment project. In my view, those duties on the part of Mr. Gilbertson as a director of the company were not attenuated by anything in the letter agreement or by implication from the surrounding circumstances."

96 The judge's conclusion that there was nothing in the letter agreement, or by implication from the surrounding circumstances, which would entitle Mr. Gilbertson to take for himself a project which he had brought to the investment committee is challenged by the Gilbertson parties in this court. It is said on their behalf that the judge erred in law and/or in fact in failing to hold that, on the evidence of context and circumstances which was before him at trial, Mr. Gilbertson was released from such fiduciary duties (if any) as he did owe to the company (or, more generally, to the Pallinghurst structure) in respect of Project Egg or the Fabergé brand or the Fabergé rights (meaning, respectively, the name Fabergé itself and the rights in that name) before he did anything that might otherwise have constituted a breach of fiduciary duty.

97 The context and circumstances (referred to in the memorandum of grounds of appeal as "the Context and Circumstances") which, it is said, ought to have led the judge to the conclusion Mr. Gilbertson was released from such fiduciary duties (if any) as he did owe to the company in respect of Project Egg included the dealings between the relevant parties in relation to the acquisition and/or exploitation of the Fabergé rights and the Fabergé brand. In particular, the context and circumstances included (i) "the veto by the Renova parties of the acquisition of those Rights for Project Egg as envisaged"; (ii) "the failure of the investment committee to approve pursuit by the master fund of any interest in the Fabergé Brand prior to the conclusion of the implementation agreement in accordance with the terms of the Agreement or Understanding"; and (iii) "the fact that Mr. Gilbertson's consent to Mr. Vekselberg's scheme for the acquisition of the Rights and the exploitation of the Brand was conditional on the parties entering into an implementation agreement and PEL being put in funds to complete the purchase of the rights." For convenience I will refer to those as "the veto point," "the mutual understanding point," and "the failure of condition point." In advancing the veto point, the Gilbertson parties rely upon what is said to be Mr. Vekselberg's refusal to fund the acquisition of the Fabergé rights and/or his insistence that, if he were to fund the

acquisition of those rights, the Fabergé brand would have to be held by one of his privately owned companies (Lamesa Arts Inc.) outside the Pallinghurst structure. The "Agreement or Understanding" was defined in the memorandum of grounds of appeal to mean "an oral agreement or understanding reached between Mr. Gilbertson and Mr. Vekselberg on or about December 21st, 2006, the terms and performance of which became a matter of dispute." In advancing the failure of condition point, the Gilbertson parties rely upon what is said to be "the failure of the Renova parties to honour the Agreement or Understanding."

(i) *The veto point*

98 It is submitted on behalf of the Gilbertson parties that Mr. Gilbertson owed no relevant fiduciary duties to the company (or, more generally, to the Pallinghurst structure) in respect of potential investment projects after December 20th, 2006. In support of that submission it is said, first, that any fiduciary duties that a member of the investment committee may have owed to a fund entity in respect of a potential investment project ceased once the project had been vetoed by the other member of the investment committee, and secondly, that—in the events which happened—Project Egg was the subject of such a veto by or on behalf of Mr. Kuznetsov.

99 In developing the first of those submissions—that such fiduciary duties as a member of the investment committee may have owed to a fund entity in respect of a potential investment project ceased once the project had been vetoed by the other member of the investment committee—it is accepted on behalf of the Gilbertson parties that a member of the investment committee could not divest himself of any fiduciary duty that he might otherwise have owed to a fund entity in respect of a potential investment project by vetoing it himself. But it is submitted that the position is different where the veto is exercised by the other member of the investment committee. There is no express restriction on a party to the letter agreement pursuing a project that has been vetoed by the other party, and there is no reason to read any such restriction into the letter agreement as a matter of business efficacy.

100 In developing the second of those submissions—that, in the events which happened, Project Egg was the subject of such a veto by or on behalf of Mr. Kuznetsov—it is said that Mr. Vekselberg's insistence (on December 20th, 2006 and thereafter) that he should own the Fabergé rights through a Lamesa company did amount to a veto of Project Egg. In particular it is said that, given that the letter agreement did not lay down any formalities in relation to the exercise of a veto, the expression by one member of the investment committee that he is willing to proceed with an investment project if, but only if, the terms can be improved in some way may or may not amount to a veto, and that whether it does amount to a veto turns on whether the project in the modified form proposed falls