# Exhibit B-3

23-01165-mew Doc 84-4 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit B-3 - Autumn Holdings Asset Inc v Renova Res Private Equity Ltd [2017 (2 Pg 2 of 40



within the scope of the potential investment project that the investment committee had agreed to explore.

101 In response to the submission that the judge ought to have held on the evidence that, before Mr. Gilbertson did anything that might otherwise have constituted a breach of such fiduciary duties (if any) as he did owe to the company (or, more generally, to the Pallinghurst structure) in respect of Project Egg and the acquisition of the Fabergé rights, he was released from such fiduciary duties by "the veto by the Renova parties of the acquisition of those Rights for Project Egg as envisaged," it is said on behalf of the Renova parties that the judge was correct to reach the conclusion (2012 (2) CILR 416, at para. 33) that he did. In particular, it is said that Mr. Gilbertson owed fiduciary duties to the company in relation to any potential investment project unless and until it was actually vetoed by Mr. Kuznetsov (on behalf of Renova) on the basis of full disclosure by Mr. Gilbertson. That, it is said, followed from the following propositions which had been advanced by Renova at the trial and which were relied upon in this court:

(1) The members of the investment committee could exercise their right of veto (or, more accurately, their right not to agree to proceed) in their own interests but that self-interest was not unconstrained. They could not exercise the veto for the purposes of allowing them to take, or compete for, the investment project for their own benefit. As I have said, the Gilbertson parties do not dissent from this proposition.

(2) If, before the Fabergé rights had been acquired by the Pallinghurst structure, Project Egg had been actively vetoed by one member of the investment committee (say, Mr. Kuznetsov) after full disclosure by the other member (say, Mr. Gilbertson), that other would have been free to pursue the opportunity to acquire the Fabergé rights in his own interests. But, unless and until Project Egg was actively vetoed, it remained a business opportunity of the Pallinghurst structure and both Mr. Gilbertson and Mr. Kuznetsov, as directors of the company, had a duty to pursue it in the interests of the Pallinghurst structure: neither was free to pursue the acquisition of the Fabergé rights in his own interests.

(3) Once the Fabergé rights had been acquired for the Pallinghurst structure—through any sub-structure under the company that the parties might agree—neither party was free to divert that asset or project or opportunity to himself or exploit it for his own benefit (whether by using the veto or otherwise); the exercise of a "veto" once the Fabergé rights had been acquired was limited to a refusal to agree the manner in which those rights were to be developed and exploited.

The Renova parties point out that, in the course of his oral evidence at trial, Mr. Gilbertson agreed with the second limb of the proposition numbered (2) above—that, unless or until one member of that investment

committee (say, Mr. Kuznetsov) had actively vetoed Project Egg, it remained a business opportunity of the Pallinghurst structure and the other member (say, Mr. Gilbertson) was not free to pursue that opportunity in his own interests.

102 The judge was not persuaded that either Mr. Kuznetsov or Mr. Gilbertson had vetoed Project Egg before January 3rd, 2007. In particular, he held (2012 (2) CILR 416, at para. 49) that—

> "in no sense could the requirements of Mr. Vekselberg be seen as a veto of the opportunity to exploit the economic benefit of the rights as an investment project of the master fund and the evidence is that Mr. Gilbertson did not see it or treat it that way either. There was no rejection of [Mr. Vekselberg's requirement] or refusal to consent to it by Mr. Gilbertson."

The Renova parties submit that the judge was correct to take that view.

103 In support of the submission that—

> "the simple point is that Project Egg was pursued as an investment project of the Pallinghurst structure throughout until Mr. Gilbertson's waking decision on January 1st, 2007 to divert it to himself and try to use it to extract from Mr. Vekselberg in excess of the US$38m. he had procured to be paid for it"—

it is said on behalf of the Renova parties to be clear from the evidence that:

(1) Project Egg was, from the outset, an investment project of the Pallinghurst structure: in May 2006, the investment committee was prepared to, and did, approve the making of a bid of US$20m. to acquire the Fabergé rights.

(2) When the price that Unilever required for the Fabergé rights rose above that which Renova would (or could) fund without a detailed business plan and analysis, it was accepted that Mr. Vekselberg might provide the funding privately but that the opportunity would still fall within the Pallinghurst structure. That possibility was discussed between the parties in July 2006 and it was not suggested that it would have the effect that Project Egg could be treated as vetoed. Indeed, as the judge found (2012 (2) CILR 416, at para. 36), the subsequent offer of US$30m. (to be funded by Mr. Vekselberg) had the approval of the investment committee.

(3) Had Mr. Gilbertson been minded to treat the message given by Mr. Kalberer to Mr. Sean Gilbertson in the course of the telephone conversation on December 20th, 2006 (to which the judge had referred at para. 9.16 of his judgment and which is described by the Gilbertson parties in their written submissions as the "not-pleasurable conversation")—that the

acquisition cost (US$38m.) would be provided by one of Mr. Vekselberg's companies on the basis that the Fabergé rights would be held outside the Pallinghurst structure (but that the economic benefits of those rights would be held within it)—as a veto by the investment committee he would have needed to make it clear to Renova that "the line had been crossed." He did not do so.

(4) After a number of email exchanges and telephone conversations on December 21st, 2006—including a telephone conversation between Mr. Gilbertson and Mr. Vekselberg—(i) Mr. Gilbertson sent an email to Mr. Vekselberg stating that he would trigger the "Unilever-Pallinghurst transaction to conclude the deal" so that PEL, "a Pallinghurst company, would be the owner of the Faberge brand" and that he would advise "as soon as you are officially the global 'Mr. Fabergé'"; and (ii) Mr. Gilbertson did as he had said he would do, in that he procured that PEL execute the SPA the next day.

(5) In an email sent to Mr. Vekselberg on December 23rd, 2006, Mr. Gilbertson wrote: "Pallinghurst is now the owner of the Fabergé brand . . . I congratulate you on this entrenchment of your interests in this revered brand name."

In those circumstances, it is said that it is impossible for Mr. Gilbertson to suggest that he was treating the change of plan on December 20th, 2006 as a veto by Renova, or to treat his own reaction to that change of plan as a veto by himself: on the contrary, he was proceeding, as Mr. Sean Gilbertson described the position to Mr. Kalberer in the email which he sent on January 1st, 2007, on the basis of "the Pallinghurst principles as already modified for Project Egg." If Mr. Gilbertson were free, after the "not-pleasurable conversation" on December 20th, 2006, to pursue the Fabergé rights for himself, then—in procuring PEL to execute the SPA on December 22nd, 2006 on behalf of the Pallinghurst structure (and not for his own personal benefit)—he must be taken to have waived any such right. His email of December 23rd, 2006 was "an unequivocal and outward manifestation" of Mr. Gilbertson's acceptance that, whatever right he might have had as a member of the investment committee to veto, or to treat Renova as having vetoed, Project Egg, he was proceeding on the basis that there had been no such veto and Project Egg remained an investment project.

104 In my view, the judge was correct to reject the veto point. For the reasons which he gave in his judgment—and for the reasons advanced on behalf of the Renova parties in this court—the evidence does not support the contention that Mr. Kuznetsov (or, more broadly, the Renova parties through Mr. Vekselberg or Mr. Kalberer) did anything which could be construed as a veto of Project Egg or that, at the relevant time, Mr. Gilbertson sought to treat anything done as having that effect.

(ii) *The mutual understanding point*

105 The judge referred (2012 (2) CILR 416, at para. 40) to the submission advanced on behalf of the Gilbertson parties that what had been said to Mr. Sean Gilbertson by Mr. Kalberer on December 20th, 2006, agreed (informally) between Mr. Gilbertson and Mr. Vekselberg in their telephone conversation on December 21st, 2006 and reflected in the draft implementation agreements which followed, did not involve the master fund at all but amounted to an entirely new and separate arrangement ("the Lamesa project") outside the Pallinghurst structure. The judge rejected that submission. The Gilbertson parties submit in this court that the judge was wrong to do so.

106 In support of their submission that, in the course of their telephone conversation on December 21st, 2006 (to which the judge referred at para. 9.25 of his judgment), Mr. Gilbertson and Mr. Vekselberg reached a mutual understanding ("the agreement or understanding") as to the acquisition, development and exploitation of the Fabergé rights and the Fabergé brand which constituted a new and separate arrangement outside the Pallinghurst structure (and in relation to which the master fund had no part), it is said on behalf of the Gilbertson parties that:

(1) The telephone conversation on December 21st, 2006 followed the earlier conversation (the "not-pleasurable conversation") between Mr. Gilbertson and Mr. Kalberer on December 20th, 2006 in which, as the judge found (at para. 9.16 of his judgment), the Gilbertson parties had learnt for the first time of Mr. Vekselberg's requirement that the Fabergé rights would be purchased by a Lamesa company.

(2) On learning of the "not-pleasurable conversation," Mr. Gilbertson felt that Mr. Vekselberg was acting unscrupulously. The Renova parties had, as he saw it, changed their position at the eleventh hour. He felt that he was entitled to take Project Egg for himself, but he also felt he had no option but to look to do a deal with Mr. Vekselberg. Reliance is placed on the following passage in his oral evidence at trial:

> "*Q.* Now, he [Mr. Vekselberg] says that his belief, at the time, was that you were negotiating the deal with Unilever, acting in the best interests of the Fund. And that's right. You were, weren't you?
>
> *A.* No, I was negotiating with Mr. Vekselberg directly as the two partners in the Letter Agreement.
>
> *Q.* It may be my fault. Let me ask the question again. You were negotiating this deal with Unilever and, in doing so, acting or purporting to act in the best interests of the Fund.

*A.* (Pause) The deal with Unilever had reached a certain stage. The lawyers were sitting there ready to sign. It was ongoing. However, the fundamental agreement between me and Viktor Vekselberg was in . . . had been breached. I needed to establish from him that we could go forward. I was discussing with Viktor not as representing a fund or representing anything else; I was discussing with Viktor as the partner against his being a partner in the Letter Agreement. Viktor, we are the counterparties. What are we going to do?"

(3) Evidence of what was said in the conversation on December 21st, 2006 is found in the email—set out by the judge in para. 9.25 of his judgment (and earlier in this judgment)—which Mr. Gilbertson sent to Mr. Vekselberg shortly after it had taken place.

(4) The "deal" between Mr. Vekselberg and Mr. Gilbertson was made between the two of them. Neither will have thought that it was made under the letter agreement; neither will have thought it was made on behalf of the company or the master fund. Both regarded themselves as the real players, and both saw the letter agreement and the Pallinghurst structure from that perspective.

(5) The judge seems to have assumed (as appears from 2012 (2) CILR 416, at para. 45) that the agreement or understanding was to be treated as an act of the investment committee and that, as a result of the agreement or understanding, Mr. Gilbertson is to be taken to have consented to the Lamesa project being treated as a potential investment project of the master fund. Yet none of this will have been dealt with expressly in the conversation between Mr. Gilbertson and Mr. Vekselberg and it is hard to see on what basis it could be implied.

(6) In the circumstances that Unilever was pressing for the SPA to be executed, Mr. Gilbertson had to decide what to do. In his email to Mr. Vekselberg, sent shortly after their telephone conversation on December 21st, 2006, Mr. Gilbertson recorded that he had received an "assurance" from Mr. Vekselberg and that he, Mr. Gilbertson, would work closely with Mr. Vekselberg's team to agree a structure that suited Mr. Vekselberg's purposes, thereby acknowledging that he did not have a binding commitment from Mr. Vekselberg and that he would be flexible about the structure of the deal that remained to be worked out. In effect, he was seeking to reassure Mr. Vekselberg that there was nothing sinister about the use of PEL, and that "we can still agree whatever we want to agree."

It is said that, taking Mr. Gilbertson's evidence as a whole, it is clear that, although after December 21st, 2006 he thought he was entitled to pursue Project Egg for himself, it never occurred to him to do so in that, until January 3rd, 2007, he was seeking to come to an agreement with Mr. Vekselberg.

107 The Gilbertson parties submit that, in reaching the conclusion that he did in relation to the mutual understanding point—that is to say, in rejecting their contention that the agreement and understanding amounted to an entirely new and separate arrangement outside the Pallinghurst structure—the judge erred in that he failed to consider the significance of the difference between Project Egg and the Lamesa project. In particular, it is said the judge failed to appreciate that the effect of the agreement or understanding was that under the Lamesa project, what was described as "the Pallinghurst team" (comprising Mr. Gilbertson, Mr. Sean Gilbertson and the two employees of Pallinghurst LLP, namely Mr. Willis and Mr. Priyank Thapliyal, who Mr. Gilbertson intended would be involved in the actual management of the Fabergé rights)—rather than the Pallinghurst structure—would enjoy the economic benefit of developing, exploiting and managing those rights. It is said that, had the judge appreciated that, under the Lamesa project, the Pallinghurst team—rather than the Pallinghurst structure—was to enjoy the economic benefit of developing, exploiting and managing the Fabergé rights, he would have held that, from and after December 21st, 2006, "the discussions were simply as between Mr. Vekselberg and his people on the one hand and Mr. Gilbertson and his people on the other hand"; that the entities within the Pallinghurst structure had no interest in the Fabergé rights, and that, therefore, Mr. Gilbertson owed those entities no fiduciary duties.

108 In response to the mutual understanding point, it is submitted on behalf of the Renova parties that, properly understood, the agreement or understanding did not have the effect that it was the Pallinghurst team—and not the Pallinghurst structure—that would benefit from the acquisition of the Fabergé rights. It is said that the distinction between "Pallinghurst team" and "Pallinghurst structure"—and the purpose for which it was advanced—was not only a new point introduced at trial but was wholly inconsistent with the evidence as to how Mr. Gilbertson himself saw the position at the time. The Renova parties point out that, although in the email which he sent to Mr. Vekselberg on December 23rd, 2006 (which the judge set out at para. 9.30 of his judgment), Mr. Gilbertson had referred to the Lamesa project in these terms:

> "*Mr Kuznetsov and I have discussed arrangements to transfer 100% of the ownership of the brand to one of your companies, and I confirm to you my willingness to do so against binding commitments that the Pallinghurst team will retain all of the economic benefits and management rights that it would have under Pallinghurst's agreements with Renova ...*" [Emphasis in original.]

He accepted in his oral evidence at trial (transcript, May 4th, 2012, p.33, ll. 5–24) that the reference to "the Pallinghurst team" in that context was to the Pallinghurst structure. In that respect, his oral evidence was consistent with his pleaded case and his written evidence, which were to

the effect that his intention at the time of the agreement and understanding was that the Pallinghurst structure would retain the economic benefit of the Fabergé rights. Further, it is said that it was clear that all parties understood that the way that the Pallinghurst team—defined in the draft IAs to mean the Gilbertsons and the individuals who worked for them—would be rewarded was by the economic benefits of the Fabergé rights being held in the Pallinghurst structure: the "Pallinghurst Team" would be rewarded through their limited partnership interest in the GPLP.

109 At section 14 of his judgment, the judge addressed, and rejected, the submission that the effect of the agreement or understanding was that the Pallinghurst team—rather than the Pallinghurst structure—would enjoy the economic benefit of developing, exploiting and managing the Fabergé rights. He observed (2012 (2) CILR 416, at para. 41) that the "purported distinction between the so-called 'Pallinghurst team' and the management under the Pallinghurst structure and letter agreement" had not been raised by the Gilbertson parties in their pleadings, their written evidence or their written opening submissions. He pointed out (*ibid.*, at para. 42) that Mr. Gilbertson, in his affidavit of January 29th, 2009, had sworn that he—

> "managed to secure the contract for the purchase of the rights for the benefit of the master fund; simultaneously however, I continued to explore with Mr. Vekselberg the possibility of an arrangement whereby ownership of the rights might be transferred to one of Mr. Vekselberg's entities outside the Pallinghurst structure, but with *the Pallinghurst structure retaining the economic and management benefits and entitlements that we had hitherto envisaged that it would have*," [Emphasis in original]

and that, in the same affidavit, Mr. Gilbertson, in referring to the ownership of the Fabergé rights by one of Mr. Vekselberg's companies, had added the qualification "provided that the rights of the Pallinghurst Structure (or what was referred to as 'Pallinghurst Team') were protected"; so equating the "Pallinghurst Team" with the Pallinghurst structure. The judge went on to observe that the case that the Pallinghurst team, rather than the Pallinghurst structure, would enjoy the economic benefit of developing, exploiting and managing the Fabergé rights—which, as he said, the Gilbertson parties sought to advance for the first time at trial—was contradicted by the evidence given on behalf of the Renova parties. Mr. Vekselberg (he said) was adamant that his agreement with Mr. Gilbertson was that, while one of his personal companies would own the title to the Fabergé rights, the economic benefit of developing, exploiting and managing those rights would remain with the master fund within the Pallinghurst structure, and the evidence of Mr. Kuznetsov and Mr. Kalberer was to the same effect. There was no intention or suggestion that the economic benefits of managing the Fabergé rights would be outside the Pallinghurst structure or the Pallinghurst agreements; those benefits

were to remain with the management team headed by Mr. Gilbertson as provided by the letter agreement and through the Pallinghurst structure pursuant to the Pallinghurst agreements as always intended.

110 The judge found (*ibid.*, at para. 42) that, after December 20th, 2006, Mr. Gilbertson clearly understood that the economic benefits and the management of the Fabergé rights were intended to remain with the master fund (as they would have done under the previous arrangements), and that, in practical terms, the only change to the previous structure which Mr. Vekselberg was requiring was that the title to the Fabergé brand itself would be owned outside the Pallinghurst structure. In those circumstances, the judge concluded (*ibid.*) that "the suggested distinction between the Pallinghust team on the one hand and the Pallinghust structure on the other hand, which was first made during the trial, was not, in my view, justified or valid."

111 In my view, the judge was correct to reject the mutual understanding point. For the reasons which he gave in his judgment—and for the reasons advanced on behalf of the Renova parties in this court—the evidence does not support the contention that what had been said to Mr. Sean Gilbertson by Mr. Kalberer on December 20th, 2006, agreed (informally) between Mr. Gilbertson and Mr. Vekselberg in their telephone conversation on December 21st, 2006, and reflected in the draft implementation agreements which followed, did not involve the master fund at all but amounted to an entirely new and separate arrangement outside the Pallinghurst structure.

(iii) *The failure of condition point*

112 At the section of his judgment starting at 2012 (2) CILR 416, at para. 46, the judge addressed the question whether the fiduciary duties which (as he had held) Mr. Gilbertson owed to the company (and, more generally to the Pallinghurst structure) in relation to Project Egg before the execution of the SPA between PEL and Unilever on December 22nd, 2006 were affected by the agreement and understanding. He recorded (*ibid.*) that Mr. Gilbertson had suggested, in the course of his oral evidence at trial, that—notwithstanding his agreement with Mr. Vekselberg on December 21st, 2006 that PEL would enter into the SPA with Unilever on the following day (and so become the contractual purchaser of the Fabergé rights)—the effect of the understanding or agreement was that if Mr. Vekselberg "walked away from our deal," he (Mr. Gilbertson) could take whatever steps he thought fit to acquire those rights for his own benefit. He went on (*ibid.*, at para. 50) to explain that, on January 1st, 2007, Mr. Gilbertson had decided to proceed to secure the Fabergé brand for himself with the assistance of his consortium and thereafter to "negotiate with the Russians from a position of strength." This, the judge said, meant that the Fabergé brand would be paid for by Mr. Gilbertson and his consortium

and owned by them in all respects and not in any way by the master fund or through the Pallinghurst structure. He pointed out (*ibid.*) that "the consequence of that was that if further negotiations with Mr. Vekselberg then failed, Mr. Gilbertson and his consortium would keep the rights, as indeed happened."

113 The suggestion which Mr. Gilbertson had made in his evidence at trial—that, notwithstanding his agreement with Mr. Vekselberg that PEL would enter into the SPA with Unilever, the effect of the understanding or agreement was that "if Mr. Vekselberg walked away from our deal" he (Mr. Gilbertson) could take whatever steps he thought fit to acquire those rights for his own benefit—was advanced on his behalf as a submission in this court.

114 The response of the Renova parties to that submission is twofold: it is said that (i) the submission as to the effect of the agreement and understanding is not supported by the evidence; and (ii) in any event, at the time that Mr. Gilbertson took the steps that he did to acquire the Fabergé rights for his own benefit, Mr. Vekselberg had not "walked away from the deal."

115 As I have said, the judge found that Mr. Gilbertson decided that PEL would acquire the Fabergé rights from Unilever by entering into the SPA as a result of his telephone conversation with Mr. Vekselberg on December 21st, 2006. The basis upon which he reached that decision appears from the email which he sent to Mr. Vekselberg (with copies to Mr. Kuznetsov and Mr. Kalberer) later on that day. In that email (the terms of which the judge set out at para. 9.25 of his judgment), Mr. Gilbertson wrote:

> "Acting on the assurances that you gave me during this evening's telephone conversation, namely that you want me to buy the brand on the basis of the arrangements that we have established between us over the past many months, I will therefore now trigger the Unilever-Pallinghurst transaction to conclude the deal. Project Egg Ltd, a Pallinghurst company, will be the owner of the Fabergé brand. I confirm that I shall work closely with your team to conclude payment and to achieve a structure that suits your needs . . ."

There is nothing in that email to support the contention that, if it proved impossible "to conclude payment and achieve a structure that suits your needs," the effect of the agreement or understanding (arising out of "the assurances that you gave me during this evening's telephone conversation") was that Mr. Gilbertson would be entitled to take whatever steps he thought fit to acquire the Fabergé rights for his own benefit; *a fortiori*, nothing to support the contention that Mr. Gilbertson would be entitled to procure the issue of shares by PEL to Autumn and the other members of his (then undisclosed) consortium so as to deprive the master fund of its

100% ownership of PEL. Nor was there any other evidence to support those contentions. Further:

(1) Mr. Gilbertson accepted in evidence (as the judge found at para. 9.28 of his judgment) that in "no sense was PEL acting as his own nominee or agent when entering into the contract for the Rights" and that "it was clearly a PEL/Master Fund/Pallinghurst structure for their benefit; it was not a Gilbertson transaction for the Gilbertsons' benefit."

(2) Mr. Gilbertson knew very well (as the judge found at 2012 (2) CILR 416, at para. 55) that what he was doing—in pursuing arrangements for Autumn and the other members of the consortium to fund the purchase of the Fabergé rights through PEL and procuring PEL to issue 100 new shares to them without informing Mr. Vekselberg, Mr. Kuznetsov or Mr. Kalberer—was "inappropriate and wrong," and that Mr. Vekselberg and the Renova parties would justifiably consider it to be contrary to the agreement (the agreement or understanding) that had been reached on December 21st, 2006.

116 Nor was there evidence to support the contention that, at the time that Mr. Gilbertson took the steps that he did to acquire the Fabergé rights for his own benefit, Mr. Vekselberg had "walked away from the deal"; in the sense that he had abandoned the agreement (the agreement or understanding) that had been reached on December 21st, 2006. The agreement or understanding required that Mr. Gilbertson (or Mr. Sean Gilbertson on his behalf) should work with Mr. Kuznetsov and Mr. Kalberer (as members of Mr. Vekselberg's team) "to achieve a structure that suits your [Mr. Vekselberg's] needs." Those needs included the transfer of the Fabergé brand to a Lamesa company on terms that the economic benefits of developing, managing and exploiting the Fabergé rights should be enjoyed by the Pallinghurst structure (through the master fund). In section 9 of his judgment, the judge described the negotiations—and the exchange of the first, second, third and fourth draft IAs—which took place between December 21st, 2006 and January 2nd, 2007. He found nothing to suggest that the negotiations had stalled or that they had identified a "deal breaker." At para. 9.47, the judge set out the terms of the email sent by Mr. Gilbertson to Mr. Vekselberg (with copies to Mr. Kuznetsov and Mr. Kalberer) on January 2nd, 2007 in which—after stating that, although he had been trying, ever since PEL bought the Fabergé brand on the evening of December 21st, "to achieve an agreement . . . that would satisfy the basic understanding that you and I struck that evening," it had become clear to him "today" that there was little likelihood that "we could reach an agreement in time that would satisfy the requirements of both Parties"—Mr. Gilbertson informed Mr. Vekselberg and his team that—

> "I could not take the risk that payment would not be made under Pallinghurst's Sale and Purchase agreement with Unilever. Accordingly I have triggered alternative arrangements, so that payment has now been made, and Pallinghurst now owns the Fabergé brand."

As I have said, the judge observed, first, that Mr. Gilbertson's statement that it became clear to him on that day, January 2nd, 2007, "that there was little likelihood of reaching an agreement in time," was "not strictly correct" in that, as the judge pointed out, Mr. Gilbertson's evidence was that it was when he first awoke the previous day, January 1st, 2007, that he decided that agreement would not be reached in time "and that he would therefore implement and did implement his strategy of purchasing the Rights himself with his consortium, as he had already been putting in place before then." And secondly, that it could not have been correct that (as Mr. Gilbertson had suggested in his email) it was the proposals contained in the fourth draft IA, received by him that morning, that had caused him to "trigger alternative arrangements"—in that Mr. Gilbertson's evidence was that he decided to and did proceed with the alternative financing arrangements "early the previous morning, before the Fourth draft IA had been sent out." Further, the judge recorded (2012 (2) CILR 416, at para. 46) that Mr. Gilbertson's evidence was that it was in mid-January 2007 that Mr. Vekselberg "walked away" from their "deal," and (*ibid.*, at para. 54) that Mr. Kuznetsov's "unchallenged evidence" was that "only one or two more rounds of negotiation following the fourth draft IA would have resulted in agreement." As to the need to complete the purchase of the Fabergé rights on January 3rd, 2007 under the terms of the SPA, the judge said this (*ibid.*):

> "There was no provision in the SPA with Unilever making time of the essence, and before the January 3rd completion date was agreed it was made clear on behalf of Unilever that if that date were not convenient, Sean Gilbertson, who was negotiating with them, should let them know. That was never done . . . Although [Mr. Kuznetsov's] evidence that agreement could have been achieved by the completion date of January 3rd was clearly over-optimistic, it does seem probable that only a few more days would have sufficed. The evidence suggested to me that a request for such a short extension would have been sympathetically considered by Unilever."

117 In my view, the judge was correct to reject the failure of condition point. The evidence supports neither the contention that the effect of the agreement and understanding was that "if Mr. Vekselberg walked away from our deal," Mr. Gilbertson could take whatever steps he thought fit to acquire the Fabergé rights for his own benefit, nor the contention that, at the time that Mr. Gilbertson took the steps that he did to acquire the Fabergé rights for his own benefit, Mr. Vekselberg had "walked away from the deal."

***Whether Mr. Gilbertson acted in breach of the fiduciary duties which (as the judge held) he owed to the company or the master fund***

118 It is submitted on behalf of the Renova parties that, once the contract to purchase the Fabergé rights had been executed on December 22nd, 2006, Project Egg was no longer simply an investment opportunity: for the reasons that have been explained, the effect of the SPA was that the master fund (through its 100% ownership of PEL) became the contractual purchaser of those rights. The fiduciary duties owed by Mr. Gilbertson, as a director of the company, included duties to preserve and exploit that asset for the benefit of the master fund (and, more generally, for the Pallinghurst structure).

119 It is submitted, further, that Mr. Gilbertson accepted, in the course of his oral evidence at trial, that—whatever might have been the position prior to the execution of the SPA by PEL—that asset belonged to the Pallinghurst structure through the master fund's 100% shareholding of PEL: he accepted that the execution of the SPA was "a crossing of the Rubicon" because the Pallinghurst structure had "bought the Egg." The asset did not belong to Mr. Gilbertson: it was not his to do with as he pleased. Any suggestion that, in acquiring the right to purchase the Fabergé rights, PEL was somehow acting as Mr. Gilbertson's agent, trustee or nominee was repeatedly and unequivocally denied by Mr. Gilbertson in his evidence. In those circumstances it is impossible to contend (as Mr. Gilbertson did in his amended defence and counterclaim) that "the company's interest in PEL was of no or no substantial value as long as PEL merely held the legal interest in the [Unilever SPA] subject to Mr. Gilbertson's beneficial interest in it"; at no stage did Mr. Gilbertson have a beneficial interest in the SPA.

120 It is submitted that it is also impossible for the Gilbertson parties to contend that, in the event that the agreement or understanding reached on December 21st, 2006 did not lead to an agreement with Mr. Vekselberg (or with Lamesa), it was open to Mr. Gilbertson to take the benefit of the SPA for himself. On a true analysis, if no implementation agreement could be agreed, the default position was that it would be open to Mr. Gilbertson to attempt to procure that PEL borrowed funds, on terms acceptable to Renova, with which to fund the completion payment. If he could not procure borrowed funds on terms which were acceptable to Renova, then (*prima facie*, at least) PEL would be unable to complete the purchase of the Fabergé rights under the SPA. In those circumstances, if Mr. Gilbertson wished to acquire the Fabergé rights for himself—and could assert that Renova's refusal to permit borrowing was a veto of Project Egg—it would be open to him to seek a new purchase contract from Unilever.

23-01165-mew Doc 84-4 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit B-3 - Autumn Holdings Asset Inc v Renova Res Private Equity Ltd [2017 (2 Pg 14 of 40



121 It is said on behalf of the Renova parties that, rather than taking that course—which would or might give rise to the risk that he would be in a competition with Mr. Vekselberg for the Fabergé rights, which he would lose—Mr. Gilbertson chose "to stultify Mr. Vekselberg in a fake round of negotiations for two days on and after 1 January 2007 while he raised money from his funding consortium, completed the SPA and had the new shares in PEL issued to the funders, thus achieving his goal of positioning himself to 'negotiate with the Russians from a position of strength.'" But that goal was achieved at the expense of the Pallinghurst structure: it was not a goal which could be pursued bona fide in the best interests of the Pallinghurst structure.

122 In those circumstances, it is said, Mr. Gilbertson acted in breach of the fiduciary duties which he owed to the company and the master fund by procuring that his consortium (of which Autumn was a 25% member) acquire 99% ownership of PEL. Indeed, it is said that "Autumn all but concedes that, if Mr. Gilbertson owed the company or GPLP or the master fund duties which precluded him for having regard to his own interests, then he breached those duties."

123 The judge accepted that, in acting as he did, Mr. Gilbertson was in breach of the fiduciary duties which he owed to the company and the master fund. The Gilbertson parties challenge that conclusion. It is said on their behalf that the judge erred in law in that:

(1) There was no, or no sufficient, evidence that Mr. Gilbertson caused or was party to or was aware of the issue of the PEL shares (whether on January 3rd, 2007 or a later date) and, in particular, the judge ignored the failure of the Renova parties to put to Mr. Gilbertson, at trial, any allegation that he did cause, or was party to, or was aware of the issue of the PEL shares.

(2) The judge assessed Mr. Gilbertson's conduct by reference to a notional set of facts based on his finding that the PEL shares were issued "with effect from" January 3rd, 2007; had he directed himself properly, the judge should have assessed Mr. Gilbertson's conduct by reference to the facts as at the later date (January 19th, 2007) on which the PEL shares were actually issued.

(3) If the judge had assessed Mr. Gilbertson's conduct on the basis that the PEL shares were issued on that later date, he should have found that Mr. Gilbertson was not in breach of any fiduciary duties having regard to the dealings between the parties in the period after January 3rd, 2007 and to the fact that no entity within the Pallinghurst structure was involved in the proposals that the parties were entertaining, in particular (i) he should have had regard to the basis on which the parties were then negotiating, as evidenced by the proposal which Mr. Vekselberg and Mr. Kuznetsov made to Mr. Gilbertson on January 18th, 2007, and (ii) he should have

found on the evidence (a) that the parties were proceeding on the basis that the master fund had no separate interest in Fabergé rights, (b) that Mr. Kuznetsov, in particular, was negotiating on that basis, and (c) that Mr. Gilbertson was entitled to do so also.

124 In my view there is no substance in any of those points. On the facts found by the judge it is, if I may say so, fanciful to suggest that the decision to issue the 100 new PEL shares in January 2007—although implemented by Mr. Sean Gilbertson and Mr. Andrew Willis (as the directors of PEL)—was not a decision taken by Mr. Gilbertson as a necessary element in his scheme to obtain control of the Fabergé rights (by diverting effective ownership of PEL from the master fund to his consortium) in order, thereafter, to "negotiate with the Russians from a position of strength." When Mr. Gilbertson wrote in the email which he sent to Mr. Vekselberg on the evening of January 2nd, 2007 (with copies to Mr. Kuznetsov and Mr. Kalberer)—the terms of which were set out by the judge at para. 9.47 of his judgment—that "I have triggered alternative arrangements . . . and Pallinghurst now owns the Fabergé brand" he was not suggesting that the "alternative arrangements" which he had made had triggered the result that the ownership of Fabergé rights had passed to the master fund as part of the Pallinghurst structure: he was asserting that the ownership of those rights had passed to "Pallinghurst" companies which he controlled. And that could only have occurred because he and the members of his consortium had taken control of PEL. It was the issue of the 100 new PEL shares which had that effect. As I have said, I take the view that the judge was correct to conclude that those shares were issued on January 3rd, 2007 (as recorded in the register of members) but, as the judge appreciated, his conclusion that the new shares were issued on January 3rd, 2007, rather than on January 19th, 2007 (or on some later date) is not of significance in relation to his conclusion that Mr. Gilbertson was in breach of his fiduciary duties. In that context, the significant date is the date on which Mr. Gilbertson took the decision (which the directors of PEL could be relied upon to implement) that the new PEL shares should be issued.

125 For the reasons which I have set out in this section of my judgment, I am satisfied that the judge was correct to hold (2012 (2) CILR 416, at para. 57) that Mr. Gilbertson owed the duties of a fiduciary as a director of the company throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007.

**Was the judge wrong to hold that the conduct of the Renova parties was not such as to disentitle Renova from any relief, having regard to the rule in *Nurcombe* v. *Nurcombe*?**

126 It is said on behalf of the Gilbertson parties that, had the judge directed himself properly, he should have held that the conduct of the

Renova parties rendered it unconscionable to grant Renova the relief sought in these proceedings (or any relief), and that he should have applied the rule in *Nurcombe* v. *Nurcombe* (28) to refuse relief.

127 The so-called rule in *Nurcombe* v. *Nurcombe* derives from a passage in the judgment of Browne-Wilkinson, L.J. in that case. After referring to the earlier decision of the Court of Appeal of England and Wales in *Towers* v. *African Tug Co.* (37), he said this ([1985] 1 W.L.R. at 378–379):

> "In my judgment, that case established that behaviour by the minority shareholder, which, in the eyes of equity, would render it unjust to allow a claim brought by the company at his instance to succeed, provides a defence to a minority shareholder's action. In practice, this means that equitable defences which would have been open to defendants in an action brought by the minority shareholder personally (if the cause of action had been vested in him) would also provide a defence to those defendants in a minority shareholder's action brought by him.
>
> . . . Since the wrong complained of is a wrong to the company, not to the shareholder, in the ordinary way the only competent plaintiff in an action to redress the wrong would be the company itself. But, where such a technicality would lead to manifest injustice, the courts of equity permitted a person interested to bring an action to enforce the company's claim. The case is analogous to that in which equity permits a beneficiary under a trust to sue as plaintiff to enforce a legal right vested in trustees (which right the trustees will not themselves enforce), the trustees being joined as defendants. Since the bringing of such an action requires the exercise of the equitable Jurisdiction of the court on the grounds that the interests of justice require it, the court will not allow such an action to be used in an inequitable manner so as to produce an injustice. The *Towers* case [1904] 1 Ch. 558 shows that 'all personal objections against the individual plaintiff' must be considered. It is for this reason that, in my judgment, a court of equity will not allow a minority shareholder to succeed in a minority shareholder's action where there are equitable defences which, as between the shareholder personally and the defendants, the defendants could properly rely on in equity, eg, the duty to elect between conflicting rights, acquiescence, or laches of the minority shareholders."

Lawton, L.J., who agreed with Browne-Wilkinson, L.J., commented (*ibid.*, at 376) that—

> "since the procedural device has evolved so that justice can be done for the benefit of the company, whoever comes forward to start the proceedings must be doing so for the benefit of the company and not for some other purpose."

And, in *Barrett* v. *Duckett* (6), Peter Gibson, L.J. observed that an action brought for an ulterior purpose would not be allowed to continue.

128 In the course of his ruling on April 14th, 2009, the judge had considered the question whether that principle should lead him to refuse Renova the leave to pursue these derivative proceedings which it had sought by its summons of July 29th, 2008. In a section of that ruling, under the heading "Conduct of the plaintiff," he had said this (2009 CILR 268, at paras. 42–43):

> "42 Mr. Gilbertson also contends that the conduct of the Renova Group renders it inequitable to grant leave to the plaintiff, a member of that group, to continue these proceedings. As explained above, Mr. Gilbertson argues that the position taken by the plaintiff in these proceedings (that Mr. Gilbertson diverted the rights away from the Pallinghurst structure) is inconsistent with the position taken by Renova Holding in 2007, and particularly in its letter of May 25th, 2007. He says that this *volte face* demonstrates that the plaintiff has not brought this action *bona fide* for the benefit of the company or the Pallinghurst structure.
>
> 43 It is said also on behalf of Mr. Gilbertson that the conduct of Mr. Vekselberg as the ultimate principal of the Renova Group and thus of the plaintiff, in seeking to procure the transfer of the ownership of the rights outside the Pallinghurst structure, itself resulted in breaches of duty to the company by Mr. Kuznetsov, Mr. Gilbertson's fellow director. It was contended that it was Mr. Kuznetsov who acted in breach of his fiduciary duties to the company by pursuing Mr. Vekselberg's personal agenda rather than the best interests of the company and the Pallinghurst structure. It was submitted that the Renova Group have been the authors of their own misfortune by insisting that the rights should be owned outside the Pallinghurst structure and that a court of equity should not assist a party who has brought about the very matters complained about."

And, after referring to Browne-Wilkinson, L.J.'s observations in *Nurcombe*, the judge went on (*ibid.*, at paras. 44–47):

> "The defendant argues this conduct by the plaintiff shareholder or those behind it renders it inequitable to allow a claim brought by it on behalf of the company to proceed.
>
> 45 The plaintiff argues that the contentions on behalf of Mr. Gilbertson are a misinterpretation of the facts and that it was always intended by the plaintiff and the Renova Group that the economic benefit and management of the rights should remain within the Pallinghurst structure and that it was the actions of Mr. Gilbertson which diverted that economic benefit and control away from the

Pallinghurst structure, and thus the company, in breach of his duties to the company. What is more, the plaintiff says, the Gilbertsons clearly initially agreed with this proposal and entered into negotiations about the precise terms of a draft agreement giving effect to it. There was no suggestion by them at the time that it was not in the best interests of the Pallinghurst structure or of the company, or that Mr. Gilbertson was somehow released from his duties as a director of the company as a result. Indeed, there was nothing to indicate, until Mr. Gilbertson's email of January 2nd, 2007, that everything was not proceeding on this basis and that the Pallinghurst structure, with the company at its head, would not shortly be the owner of the economic benefit and the manager of the rights.

46 The plaintiff contends that Mr. Gilbertson's real intention from a much earlier stage was to acquire the rights himself and, as he said himself in an email, to 'warehouse' them with a view to then negotiating about the possible return of the rights to the Pallinghurst structure from a position of strength. As far as the letter of May 25th, 2007 is concerned, the plaintiff argued that it is simply not relevant in determining the true position which must be derived from the contemporary communications documentation and actions of the parties and not ex post facto at a time when the Renova Group were negotiating months later to resolve a situation caused by Mr. Gilbertson's breaches of duty. The plaintiff contends that the letter does not provide an equitable defence to Mr. Gilbertson of the kind envisaged in *Nurcombe* . . . and that what matters is the conduct of the parties at the relevant time. The plaintiff says the case it pleads represents its position as it was at the material time.

47 In my view, the letter of May 25th, 2007, and indeed, the comments of Renova Holding in March 2007, while no doubt material for cross-examination if the case were to proceed, do not constitute conduct of a kind which, at least at this stage and for this purpose, sufficiently impacts on the *bona fides* and equity of the plaintiff's case such as to satisfy me that in the light of it the plaintiff should not have leave to continue the action."

129 Nevertheless, as the judge explained (2012 (2) CILR 416, at para. 67) he rejected the submission (advanced on behalf of the Renova parties) that the issue was not open to reconsideration at the trial. He said this (*ibid.*):

". . . I am conscious of the fact that at the leave stage in the present case, while affidavit evidence had been filed and was relied upon, the court had obviously not seen or heard all the evidence, written and oral, of the witnesses at trial. Accordingly, I have considered whether in light of all that evidence the conduct of the plaintiff was such as to

provide an equitable defence to the action as submitted on behalf of the Gilbertson parties."

130 The judge referred (*ibid.*, at para. 68) to the features listed by counsel for the Gilbertson parties in their written opening submissions which, it was said, would make it unjust for Renova to succeed in this action. But, he said, "most of the matters on which they rely are inevitably based on their own interpretation of particular facts or circumstances before any evidence was heard and much of which, in the event, I did not accept," and that "furthermore, some of the matters on which they relied were not put to the Renova parties' witnesses in cross-examination." He went on to address two further points which had not, I think, been advanced at the 2009 hearing: first, the submission that Renova's claims against the Gilbertson parties were of no commercial benefit to the Renova parties and were motivated solely by malice towards Mr. Gilbertson; and secondly, the submission that, as a result of his broader relationship with Mr. Vekselberg through his employment at SUAL and his financial expectations, both consequent upon that employment and pursuant to the letter agreement, Mr. Gilbertson was under considerable pressure in dealing with Mr. Vekselberg and the Renova parties generally. In relation to the first of those points, the judge said this (*ibid.*, at paras. 70 and 73):

"70 . . . it was never put to Mr. Vekselberg that the present proceedings were solely motivated by malice on his part. While it was clear to me that Mr. Vekselberg was upset and annoyed and felt he had been wronged by what he described as Mr. Gilbertson's 'violation' of the agreement which he said he had made with him, it does not seem to me that it can therefore inevitably be inferred that Mr. Vekselberg had procured the present proceedings to be brought solely out of malice. No doubt many plaintiffs are aggrieved and motivated by what they see as the wrong done to them by the defendant. It does not follow, in my view, that their motives in bringing court proceedings are therefore necessarily inequitable such that their claims should be refused on that ground. In the present case, the plaintiff has pleaded and put forward a perfectly arguable case on the merits of its claim and also in relation to loss . . .

73 Although Mr. Vekselberg was annoyed and upset as a result of Mr. Gilbertson's covert actions, it does not follow, in my opinion, that these proceedings were actuated by malice. In fact Mr. Vekselberg is anyway not the plaintiff. Even if the reality is that, as the principal owner and chairman of the group of which the plaintiff is a member, he procured the plaintiff to bring these proceedings, a circumstance which was never put to Mr. Vekselberg in cross-examination, it does not follow that the plaintiff's conduct in this case is inequitable in the *Nurcombe* v. *Nurcombe* . . . sense so as to

provide a defence to the plaintiff's claims. I therefore reject the submissions of the Gilbertson parties in that respect."

And, in relation to the second of those points, the judge said this (*ibid.*, at para. 72):

"Mr. Gilbertson clearly knew Mr. Vekselberg well. He knew what Mr. Vekselberg's expectations were but he nonetheless did not hesitate to act as he did in order to make a profit at Mr. Vekselberg's expense. In my assessment, that is consistent with my overall impression of Mr. Gilbertson as a hardened and ambitious businessman quite capable of looking after his own interests and taking advantage of any opportunity available to him to benefit financially, knowing very well that Mr. Vekselberg, his supposed partner and his employer, would be extremely annoyed. I do not accept the suggestion that Mr. Gilbertson was brow-beaten or pressured into agreeing with Mr. Vekselberg's wishes as he did; my clear impression of Mr. Gilbertson is that he was perfectly capable of refusing to do so had he wished."

### *The submissions advanced on behalf of the parties*

131 It is said in the memorandum of grounds of appeal filed on behalf of Autumn on February 1st, 2013, that the judge misdirected himself and erred in law and/or fact in not applying the rule in *Nurcombe* v. *Nurcombe* (28) to refuse Renova relief in that it was unconscionable for Renova to be granted relief, having regard to the following, amongst other (unspecified) matters:

(1) The conduct of Mr. Kuznetsov, in relation to whom it is said that the judge should have found that he was acting at all material times in the interests of Mr. Vekselberg and the Renova group, rather than of the company, the GPLP and/or the master fund.

(2) The crisis caused by the Renova parties and their ultimate veto of the approval of Project Egg as an investment project on December 20th, 2006.

(3) The oppressive terms that the Renova parties sought to impose in the draft implementation agreements prior to January 3rd, 2007.

(4) The attempts of the Renova parties to procure Mr. Gilbertson's agreement to the proposal that the Fabergé rights should be owned outside the Pallinghurst structure and exploited pursuant to an arrangement which did not involve the master fund at all.

(5) The Renova parties' pursuit of their own interests without regard to any interests of the master fund, and, in particular, their appropriation of the shares acquired in connection with Project Charlie.

23-01165-mew Doc 84-4 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit B-3 - Autumn Holdings Asset Inc v Renova Res Private Equity Ltd [2017 (2 Pg 21 of 40



(6) The conduct of the Renova parties—found by the judge to be "culpable and blameworthy"—in destroying relevant documents; such conduct being inconsistent with the equitable relief sought and the indulgence to pursue derivative proceedings which they had been granted.

Had the judge directed himself properly, it is said, he should have held that the conduct of the Renova parties rendered it unconscionable to grant Renova the relief which it sought.

132 In development or amplification of those submissions it is said on behalf of the Gilbertson parties in their memorandum of grounds of appeal that, although the judge stated (2012 (2) CILR 416, at para. 67) that he had considered "whether in light of all that evidence the conduct of the plaintiff was such as to provide an equitable defence to the action as submitted on behalf of the Gilbertson parties," he failed to make any findings with regard to six matters on which the Gilbertson parties had relied at trial: (i) the complicity of the Renova parties in Mr. Gilbertson's negotiating with them on his own behalf; (ii) the inconsistency between the Renova parties' own conduct with the case which they advanced in these proceedings; (iii) the conduct of the Renova parties in relying on Mr. Gilbertson's appropriation of Project Egg to justify their appropriation of the profits of Project Charlie and, then, resiling from the set-off; (iv) the attempt by the Renova parties to intimidate Mr. Gilbertson; (v) Mr. Vekselberg's conduct in causing SUAL to withhold the bonus which Mr. Gilbertson should have received in connection with the merger with RUSAL and to terminate his employment (notwithstanding that he had made a profit in excess of US$1 bn. for Mr. Vekselberg as a result of that merger); and (vi) the fact that these proceedings were not being pursued for the benefit of the company.

133 In response to those submissions it is said on behalf of the Renova parties that there is no separate *Nurcombe* v. *Nurcombe* defence to Renova's claims. The judge was right to conclude that, although Mr. Vekselberg may have been "upset and annoyed" at Mr. Gilbertson's actions, his irritation does not debar Renova from pursuing those claims on behalf of the company and the master fund, even if the action had been motivated (whether solely or partly) by some personal animus on the part of Mr. Vekselberg—and no such suggestion was put to him at the trial—that would be irrelevant in circumstances where the claims were good claims on the merits, and the same can be said for Renova's unfortunate failures in the discovery process. The points advanced on behalf of the Gilbertson parties in this context were fairly considered and rejected by the judge (*ibid.*, at para. 64). No error in the judge's detailed analysis has been identified.

134 In addressing those submissions it is, I think, important, to keep in mind that—as the judge observed (*ibid.*, at para. 65)—the contention that

the conduct of Renova and those associated with it in relation to the claims made on behalf of the company in these derivative proceedings rendered it inequitable to allow Renova to pursue those claims as plaintiff had already been argued at length at the hearing of Renova's application for leave to continue and had been rejected by the judge in his ruling of April 14th, 2009. There was no appeal from that ruling. In those circumstances, in revisiting that contention at the trial, it was not open to the judge to depart from his earlier ruling unless persuaded that the evidence given by the witnesses at trial provided good reasons for doing so.

135 It is important, also, to keep in mind the basis of the *Nurcombe* v. *Nurcombe* defence as explained in the authorities to which the judge referred. The underlying principle is that, in permitting a derivative action to be brought by a person (say, A) in whom the cause of action is not vested (and who is not the "proper" plaintiff) for the benefit of the person (say, B) in whom the cause of action is vested (and who would be the "proper" plaintiff), the court is exercising an equitable jurisdiction on the ground that justice so requires. Four propositions follow from that underlying principle. First, the jurisdiction is exercised on the application of A only in circumstances where A has an interest (recognized by the law) in the pursuit of the cause of action for B's benefit: such circumstances are likely to exist where, for example, A is a shareholder of B (and so has an interest in the outcome of litigation which, if successful, will benefit B and, indirectly, B's shareholders. Secondly, the need for the exercise of the equitable jurisdiction to avoid injustice arises because the circumstances are such that B is not able to bring the action itself (usually because B is under the control of the wrongdoer who would be the defendant). Thirdly, the jurisdiction is not exercised unless A's purpose in seeking to pursue the cause of action is to benefit B; although, consistently with the second proposition, it is no bar to the exercise of the jurisdiction that A may benefit indirectly (say, for example, as a shareholder of B) if the outcome of the litigation is successful. Fourthly, the jurisdiction will not be exercised where to do so would lead to injustice. Circumstances in which the exercise of the jurisdiction on the application of A would lead to injustice would include those in which A would benefit indirectly (say, as a shareholder of B) from the successful pursuit of a claim to which (as between A and the defendant) the defendant would have had an equitable defence on which he would have succeeded if (on the hypothesis that A had been a proper plaintiff) the action had been brought by A in his own right. As Browne-Wilkinson, L.J. pointed out in the *Nurcombe* case (28), such equitable defences would include A's obligation to elect between conflicting rights, acquiescence or laches.

136 It is convenient to address the submissions advanced on behalf of the parties under two heads, reflecting the third and fourth of the propositions which I have just set out, and to ask, first, whether (on a true

analysis of the position) Renova is not pursuing this derivative action for the benefit of the company (or, more generally, the Pallinghurst structure) but, rather, is pursuing the action for some other—or ulterior—purpose, and secondly, whether the other matters (or any of them) upon which the Gilbertson parties rely in support of their challenge to the judge's conclusion that the conduct of the Renova parties was not such as to disentitle Renova from any relief, having regard to the rule in *Nurcombe* v. *Nurcombe*, would have given rise to an equitable defence on which the Gilbertson parties would have succeeded if the action had been brought by Renova in its own right.

***Ulterior purpose***

137 In developing their submissions under this head it is said on behalf of the Gilbertson parties that the judge failed to make any findings with regard to "(vi) the fact that these proceedings were not being pursued for the benefit of the company" and, further, that these proceedings have been brought and pursued for a collateral purpose in that "this is not the master fund's dispute, let alone the company's . . . it is and always has been Mr. Vekselberg's."

138 The submission that the judge made no finding on the issue whether these proceedings were being pursued for the benefit of the company but for a collateral purpose, might be thought to overlook the judge's observations (*ibid.*, at paras. 70 and 73, to which I have referred earlier in this section of this judgment). But, in relation to the judge's observations (*ibid.*, at para. 70), it is said on behalf of the Gilbertson parties that he was wrong to take the view that malice was of no relevance in the context of the *Nurcombe* defence, save where it was the sole factor driving the proceedings. In the present case, it is said that Mr. Vekselberg was using the proceedings as an indirect means of asserting what he chose to believe to be due to him and "was seeking to enforce in the name of the company an unenforceable agreement made with him personally." Although it is accepted that "this may not necessarily be sufficient to found a *Nurcombe* defence in itself," it is said to be "something that the court should weigh in the balance." Further, it is submitted that the judge was wrong "to overlook the fact that [these proceedings] might have been brought and pursued out of enmity," and wrong to take the view that "it was sufficient to dispose of the issue that Mr. Vekselberg had a genuine sense of grievance."

139 In response, it is said on behalf of the Renova parties that in circumstances that (as the judge held after hearing evidence at the trial) the derivative claims brought by Renova on behalf of the company (or the master fund) were good on their merits, then the fact that Mr. Vekselberg was angered or upset by what Mr. Gilbertson had done was irrelevant to the question whether Renova was an appropriate claimant or, at the least,

not a sufficient reason to conclude that it was not. The judge was plainly correct to take the view (expressed, *ibid.*, at para. 70) that a finding that Mr. Vekselberg was angered and upset by what Mr. Gilbertson had done did not of itself justify a finding that Mr. Vekselberg was acting out of malice. The judge did not overlook the possibility that proceedings might be brought out of enmity: rather, he considered that possibility and rejected it. Further, it is said that the allegation that the action was actuated by malice—which was advanced at trial by counsel on behalf of the Gilbertson parties in the course of his opening submissions—was of such a serious nature (in that it amounted to an allegation that the action had been brought in bad faith and for a collateral purpose) that it was necessary (if it were to be pursued) that it be put to Mr. Vekselberg. As the judge noted (*ibid.*, at para. 70) that allegation was never put to Mr. Vekselberg. And, it is said, the contention that Mr. Vekselberg was seeking, for his own purposes "to enforce in the name of the company an unenforceable agreement with him" cannot be sustained: Mr. Vekselberg is not the derivative plaintiff and is not seeking to enforce any agreement made with him. He was joined in the action as a defendant to counterclaims which were wholly unsuccessful and, in the event, for the most part abandoned.

140 In my view, the judge was entitled to reject the contention that these proceedings were not brought and pursued by Renova for the benefit of the company (or, more generally, for the benefit of the master fund and the other entities within the Pallinghurst structure), but for the benefit of Mr. Vekselberg personally. There was no direct evidence to support that contention. Not only was the contention never put to Mr. Vekselberg himself; it was not put to Mr. Kuznetsov or Mr. Kalberer. There was no indirect evidence from which it could be inferred that Renova had brought, and was pursuing, the action for the benefit of Mr. Vekselberg; rather than for the benefit of the company or the Pallinghurst structure. In particular, the judge was entitled—indeed, in my view, correct—to hold that his conclusion that "Mr. Vekselberg was upset and annoyed and felt that he had been wronged by what he described as [Mr. Gilbertson's] 'violation' of the [agreement and understanding]" was an insufficient basis upon which to infer that Mr. Vekselberg (or others in control of Renova) had caused Renova to bring and pursue this action for an ulterior purpose: that is to say, for a purpose which was not that on the basis of which permission to bring derivative proceedings had been sought and obtained.

***Equitable defences***

141 I have explained that the jurisdiction to permit a person who is not the "proper" plaintiff (in that he or it is not the person in whom the relevant cause of action is vested) to bring a derivative action for the benefit of the person whose cause of action it is (the "proper" plaintiff)

will not be exercised where to do so would lead to injustice. The purpose of the rule in *Nurcombe* v. *Nurcombe* (28), in this context, is to avoid the injustice which would arise from allowing the derivative plaintiff to benefit from the pursuit of a claim in relation to which his, or its, own conduct has been inequitable or, to put the point another way, to avoid the injustice which would arise if the defendant were to be denied the benefit of an equitable defence which would have been available to him if the claim made against him had been made otherwise than in derivative proceedings.

142 There are, as I have said, six matters in relation to which it is said that the judge misdirected himself and erred in law in failing to have proper regard to what I have described as the fourth proposition which follows from the principle underlying the jurisdiction to permit a person who is not the "proper" plaintiff to bring and pursue a derivative action: that is to say, the proposition that the jurisdiction will not be exercised where to do so would lead to injustice. Three of those matters were elaborated further in the course of the submissions advanced on behalf of the Gilbertson parties:

(1) *The conduct of Mr. Kuznetsov*

It is said that the judge should have found that Mr. Kuznetsov was acting at all material times in the interests of Mr. Vekselberg and the Renova group, rather than of the company, the GPLP and/or the master fund. In advancing the case that they did, it was inconsistent for the Renova parties to ignore the fact that (as the Gilbertson parties had pointed out at the trial), Mr. Kuznetsov recognized no conflict which precluded him from promoting the interests of Mr. Vekselberg and Lamesa where they conflicted with those of the Pallinghurst structure, notwithstanding that he was a member of the investment committee and a director of the company. The judge was wrong to make no finding in relation to that alleged inconsistency.

(5) *The Renova parties' pursuit of their own interests without regard to any interests of the master fund, and, in particular, their appropriation of the shares acquired in connection with Project Charlie*

(i) In developing the first limb of this submission, it is said that, although the Renova parties complain in this action that Mr. Gilbertson was not adhering to the "no-conflict" and "no-profit" rules, they were happy to negotiate with Mr. Gilbertson in relation to the Lamesa project—and did so without making any such complaint at the time—notwithstanding (a) that they had contended in their pleadings and written opening submissions at trial that Mr. Gilbertson was acting in his capacity as a director of the company in his negotiations with them in relation to the Lamesa project and, accordingly, was obliged to get the best deal he

could for the company or, perhaps, the master fund, without regard to his own interests or those of his team; and (b) that Mr. Kuznetsov and Mr. Kalberer knew—as they each acknowledged in the course of their oral evidence—that they were negotiating with Mr. Gilbertson in relation to the Lamesa project on the basis that they would need to come to an agreement which was acceptable to Mr. Gilbertson and his team.

(ii) In developing the second limb of this submission, it is said that, in the events which happened, Project Charlie progressed further than Project Egg in that (a) it was the subject of a formal investment committee minute; (b) shares were purchased on behalf of the master fund; and (c) profits were made on behalf of the master fund. Those profits were, it is said, retained by the Renova parties for their own benefit on the ground that—as Mr. Kuznetsov acknowledged in his oral evidence, although subsequently denied—they were keeping Project Charlie profits because Mr. Gilbertson had kept Project Egg. It is accepted that (a) Project Charlie was not the subject of any detailed consideration at the trial, and that the judge was not asked to rule either on the set-off that the Renova parties purported to exercise or on their entitlement to do so; and (b) "the Renova parties will have no difficulty in presenting a thicket of fine distinctions . . . to explain how the Renova parties might be entitled to keep the profits from Project Charlie and Mr. Gilbertson not be entitled to keep the [Fabergé] Rights." But, it is said that that is not how the Renova parties saw the matter at the time; they treated the two projects as comparable. Notwithstanding that they retain the fruits of the one; they seek, in these proceedings, to recover the fruits of the other. If and insofar as there is any merit in their arguments in relation to the Fabergé rights, the Renova parties come before the court as wrongdoers, and that this court is not precluded, when assessing what may be just between the parties, from taking into account the justice that the parties sought for themselves in relation to the two projects.

(6) *The conduct of the Renova parties . . . in destroying relevant documents*

Although the judge found (2011 (2) CILR 148, at para. 62 of his ruling on the application to strike out the statement of claim) that the destruction of documents by the Renova parties was "blameworthy and culpable," he attached no significance to this finding. The judge failed to have regard (i) to the nature of the prejudice that the destruction of documents on a wholesale scale may have to the judicial process; (ii) to the sense of injustice caused to other litigants; and (iii) to the distortion of the court process that it implies. It is said that the conduct of the Renova parties was inconsistent with the equitable relief sought and the indulgence to pursue derivative proceedings which they had been granted.

In addition to those numbered submissions, the Gilbertson parties submit that the judge failed to make any findings with regard to two other matters on which the Gilbertson parties had relied at trial:

*The attempt by the Renova parties to intimidate Mr. Gilbertson*

There is no challenge to the judge's finding (2012 (2) CILR 416, at paras. 71–72) that "the suggestion that Mr. Gilbertson was brow-beaten or pressured into agreeing with Mr. Vekselberg's wishes as he did" was not made out on the evidence; indeed, it is said that no such suggestion was advanced at the trial. But the Gilbertson parties do rely on Mr. Gilbertson's evidence (in his witness statement) that, during the course of negotiations following the "not-pleasurable conversation," Mr. Kuznetsov had advised him to submit to Mr. Vekselberg's wishes rather than to make an enemy of him, and to Mr. Kuznetsov's evidence, when that statement was put to him in cross-examination that he did no more than offer "friendly advice." It is said that to advise someone to submit to another's demand lest he makes an enemy of him might be seen as a threat, *a fortiori*, in circumstances where that other is a Russian oligarch and, in substance, the employer of the advisee.

*Mr. Vekselberg's conduct in causing SUAL to withhold the bonus which Mr. Gilbertson should have received in connection with the merger with RUSAL and to terminate his employment*

Shortly after Mr. Kuznetsov had offered his "friendly advice," Mr. Gilbertson's employment at SUAL was terminated, and a bonus to which he claimed to have been entitled (having generated profits for Mr. Vekselberg in excess of US$1 bn.) was withheld. Mr. Vekselberg's evidence was that the employment was terminated and the bonus withheld because he was not happy with Mr. Gilbertson's performance. That evidence was described by counsel for the Gilbertson parties as "chilling." The judge was wrong to see the termination of Mr. Gilbertson's employment and the withholding of the bonus "simply as part of the fall out from the breakdown in the relationship between Mr. Gilbertson and Mr. Vekselberg, but otherwise unrelated to it"; he should have recognized that "the mere fact that the break down in the relationship between the two men over the Lamesa project should have led to Mr. Gilbertson being fired as he was" was itself "a harsh illustration of the fact that the operative relationship in all the dealings of Project Egg and the Lamesa project was that between Mr. Gilbertson and Mr. Vekselberg, a personal relationship which both men felt personally." There is no challenge to the judge's observation (2012 (2) CILR 416, at para. 73) that it would have been obvious to Mr. Gilbertson that he would be taking a risk in angering Mr. Vekselberg. But it does not follow that the way in which Mr. Vekselberg

vented his anger in the past is of no relevance to the question whether the court should assist him in doing so in these proceedings.

143 In response to the submissions advanced on behalf of the Gilbertson parties, the Renova parties emphasize the points to which I have already drawn attention: (i) that the judge gave leave to bring this derivative claim in 2009, after a two-day hearing in the course of which the Gilbertson parties deployed many of the arguments now advanced; and (ii) that there was no appeal from his order. The Renova parties accept that, in a case where new evidence emerges during the trial which casts significant doubt on the earlier decision to grant leave, the trial judge may revisit that decision but, it is said, this is not such a case. More particularly—and in response to the numbered submissions to which I have referred in the preceding paragraph of this judgment—it is said on behalf of the Renova parties:

(1) *The conduct of Mr. Kuznetsov*

There is no basis on which the Gilbertson parties can advance a submission that, if Mr. Gilbertson was in breach of his fiduciary duties to the company, so also was Mr. Kuznetsov. The allegation that Mr. Kuznetsov was in breach of his fiduciary duties to the company was pleaded in these proceedings in the context of a counterclaim for contribution against Mr. Kuznetsov, but the counterclaim was not pursued and it was abandoned before closing submissions (as the judge recorded, 2012 (2) CILR 416, at para. 103). The allegation cannot be revived in this court.

(5) *The Renova parties' pursuit of their own interests without regard to any interests of the master fund, and, in particular, their appropriation of the shares acquired in connection with Project Charlie*

(i) Even if Mr. Vekselberg's insistence that—if he were funding the purchase—the Fabergé rights were to be held in Lamesa Arts Inc. represented a departure from the original structure contemplated, that was acceptable to Mr. Gilbertson in principle subject to the negotiation of terms to be set out in an agreed implementation agreement reflecting Pallinghurst principles "modified for Project Egg." The negotiation of terms was proceeding towards a mutually acceptable conclusion when Mr. Gilbertson decided, unilaterally, to bring negotiations to an end by depriving the master fund of its 100% ownership of PEL and to secure the Fabergé rights for himself and his consortium. The process of negotiating mutually acceptable terms upon which Mr. Vekselberg would fund the purchase of the Fabergé rights cannot be treated as justifying Mr. Gilbertson's breach of duty, in unilaterally preferring his own interests to those of the master fund.

(ii) The complaint as to Mr. Vekselberg's retention of the profits of Project Charlie is of no substance. The point "barely feature[d]" at the trial; it was not pleaded as a point which should lead to the refusal to grant relief in this case; and Autumn simply purported to reserve the right of the Fairbairn Trust to bring a derivative claim.

(6) *The conduct of the Renova parties . . . in destroying relevant documents*

The complaint that the judge erred in failing to refuse relief—on *Nurcombe* grounds—on the basis of his criticism of Renova's conduct in relation to discovery is not well founded, in that the judge had already refused to strike out the action on the grounds of Renova's failure to give discovery; holding (at paras. 59–62 of his ruling of August 5th, 2011, reported at 2011 (2) CILR 148) that—notwithstanding that failure—it remained possible to have a fair trial in which, if and so far as necessary, inferences adverse to Renova could be drawn from the absence of documents.

And, in response to the allegation that the judge failed to make findings in relation to the two other matters to which I have referred in the preceding paragraph, it is said:

*Attempt at intimidation*

There is no substance in the complaint as to the "friendly advice": the judge was entitled to have regard to Mr. Kuznetsov's evidence, in which he rejected the suggestion that he had threatened Mr. Gilbertson with reprisals if he did not submit to Mr. Vekselberg's demands. But, in any event, as the judge found, Mr. Gilbertson was tough and exacting and perfectly capable of standing up for himself. There is no basis upon which this court can properly reject that finding by a judge who, having seen Mr. Gilbertson and Mr. Vekselberg in the witness box, was entitled to make that assessment.

*Mr. Vekselberg's conduct in relation to SUAL. The attempt by the Renova parties to intimidate Mr. Gilbertson*

The complaint is "no more than an attempt to paint Mr. Vekselberg as a bully who got no more than he deserved."

144 In my judgment, none of the matters upon which the Gilbertson parties rely in support of their challenge to the judge's conclusion would have given rise to an equitable defence on which the Gilbertson parties would have succeeded if the action had been brought by Renova in its own right. I am satisfied that the judge was correct to take the view that there was no reason, under this head, to refuse Renova the equitable relief which it sought in this derivative action. In rejecting the submissions

which have been advanced on behalf of the Gilbertson parties, I have had regard to the position as it was at the time when the conduct which has led to the conclusion that Mr. Gilbertson acted in breach of fiduciary duty took place and, in particular, to the following factors:

(1) The conclusion that Mr. Gilbertson acted in breach of fiduciary duty is founded on his conduct in causing or procuring the issue by PEL of 100 new shares. Whether or not those shares were issued on January 3rd, 2007 as the judge found (correctly in my view) or some two and a half weeks later (as the Gilbertson parties contend), there is no doubt that they were issued pursuant to the decision taken by Mr. Gilbertson on January 2nd or 3rd, 2007 that he would secure the Fabergé rights for himself (or for the benefit of his consortium) by divesting the master fund of its ownership and control of PEL.

(2) At the time when Mr. Gilbertson took that decision, PEL was the contracting purchaser of the Fabergé rights. The terms of the SPA required payment of the purchase price (US$38m.) to be made on January 3rd, 2007. But time was not of the essence, and there was evidence to suggest that, if payment were not made on January 3rd, 2007, Unilever would not have treated the SPA as having determined forthwith (even if it would have been entitled to do so as a matter of law).

(3) Mr. Gilbertson had caused PEL to enter into the SPA on December 22nd, 2006 in circumstances when (as he knew) neither PEL nor the master fund (which, it appears, was the intended guarantor) had—or had obtained an unconditional commitment from Mr. Vekselberg (or from anyone else) in respect of—the US$38m. which would be needed to complete the purchase on January 3rd, 2007.

(4) The position immediately before PEL entered into the SPA (agreed on December 21st, 2006 between Mr. Gilbertson and Mr. Vekselberg) was that Mr. Vekselberg would provide the funds to complete the purchase provided that title to the Fabergé brand was transferred to a Lamesa company. That was acceptable to Mr. Gilbertson, provided that terms (in the form of an implementation agreement) could be agreed which would provide for the master fund (or some other entity within the Pallinghurst structure) to benefit from the promotion, management and exploitation of the Fabergé rights.

(5) That remained the position from December 21st, 2006 until January 3rd, 2007. In particular, it remained the position at the time when Mr. Gilbertson took the decision to cause or procure PEL to issue the 100 new shares. At the time when that decision was taken, negotiations as to the terms of the intended implementation agreement were continuing, and Mr. Vekselberg was not in breach of any agreement or understanding in relation to the provision of the funds required for the completion of the purchase by PEL of the Fabergé rights.

In those circumstances, as it seems to me, none of the matters relied upon by the Gilbertson parties in support of their challenge under this head—that is to say, the conduct of Mr. Kuznetsov, the "crisis" caused by the Renova parties, the terms that the Renova parties sought to impose in the draft implementation agreements, the attempts of the Renova parties to procure Mr. Gilbertson's agreement to the proposal that the Fabergé rights should be owned outside the Pallinghurst structure, the Renova parties' pursuit of their own interests and their appropriation of the shares acquired in connection with Project Charlie, the conduct of the Renova parties in destroying relevant documents, the attempt by the Renova parties to intimidate Mr. Gilbertson and Mr. Vekselberg's conduct in relation to SUAL—would have provided equitable defences to the claim against Mr. Gilbertson in respect of his breach of fiduciary duty. Put shortly, none of those matters, even if made out on the facts, would have led to the conclusion that it was inequitable for Renova to pursue that claim, had it been able to do so in its own right.

145 In reaching that conclusion I have not overlooked the detailed and extensive submissions advanced on behalf of the Gilbertson parties in support of their contention that the judge erred in failing to hold that the destruction of documents by the Renova parties was a matter which led to the conclusion that it was not in the interests of justice that Renova be permitted to pursue a derivative action. In addition to the submissions to which I have already referred, it was said that he did not consider whether it was right that the Gilbertson parties were obliged to speculate as to what the documents that had been destroyed would show, and he did not consider whether it was right for the court to grant derivative relief on the basis of equity to a claimant who was in culpable disregard of its rules in such a manner. Rather, it is submitted, the judge appears to have taken the view that it was sufficient for him to consider the destruction of documents in the context of the specific findings that he needed to make. But, as it seems to me, those submissions overlook, first, the judge's earlier ruling (not challenged on appeal) that a fair trial of a derivative action was possible notwithstanding that (as he had found) there had been serious failures of document preservation and, secondly, that there was no sensible basis to dismiss the action, after a trial which was not, in the event, unfair on the ground that (by reason of those failures) Renova was not a proper derivative claimant. It is important to have in mind that, in referring to his earlier ruling (2012 (2) CILR 416, at para. 68), the judge said this:

> "As I have already mentioned . . . during the course of this action there have been several contested applications concerning discovery and the destruction of certain back-up tapes, which may have contained relevant emails and other documents, by the Renova parties following a computer crash at their administrative offices in Zurich. In that respect I have made it clear more than once that as a

> result, if appropriate and justified, the court could draw inferences against the Renova parties at the trial in light of their destruction of potentially discoverable documents. However . . . apart from the question of the alleged motivation of the plaintiff in bringing the present claim, which was not clearly put to the Renova parties' witnesses, I was not invited to draw any specific inferences"

If Renova were otherwise a proper person to bring the action on behalf of the company (or, more generally, the master fund and other entities in the Pallinghurst structure), its failure to comply with its discovery obligations might expose it to the court's procedural sanctions, including striking out. But, where the judge—properly, and upon authority—had refused to strike out the action because he considered that a fair trial was possible and was not persuaded that the trial that he had subsequently conducted was unfair, he was correct to recognize that the past failures in relation to discovery provided no ground upon which the action should be dismissed. In particular, he was correct to recognize that the principle underlying the decision in *Nurcombe* v. *Nurcombe* (28) did not lead to a different conclusion in a derivative action.

146 For the reasons which I have set out in this section of my judgment, I am satisfied that the judge was correct to hold that the conduct of the Renova parties was not such as to disentitle Renova from equitable relief in this action on *Nurcombe* grounds.

**Was the judge wrong to value at nil the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation?**

147 In its amended statement of claim, Renova sought an account of the profits received by Mr. Gilbertson as a result of his acquisition of the Fabergé rights in breach of fiduciary duty or, in the alternative, payment to the company (and/or to GPLP and/or to the master fund) of equitable compensation for the loss of those rights. During the course of the trial Renova abandoned its claim for an account of profits and so elected to pursue its claim against Mr. Gilbertson for equitable compensation.

148 The judge explained (2012 (2) CILR 416, at para. 115) that equitable compensation in respect of loss caused by breach of fiduciary duty was to be assessed as the monetary amount required to put a plaintiff back into the position in which he would have been at the time of the trial if he had not sustained that loss. Renova's claim, he said, was for compensation in the amount required to reconstitute the master fund to the position in which it would have been at the date of judgment but for Mr. Gilbertson's breach of fiduciary duty: it was not a claim for compensation in the amount required to put the master fund into the position in which it would have been (but for Mr. Gilbertson's breach of duty in January 2007)

at the time of that breach. The court's task was to determine the monetary value of the loss suffered by the Pallinghurst structure as a result of the diversion from the master fund of the economic benefit of development, exploitation and management of the Fabergé rights. He recorded that the trial proceeded on that basis.

149 The Renova parties contended at trial that the value of the economic benefit of development, exploitation and management of the Fabergé rights was to be treated as equal to the value of full ownership of those rights, and that, accordingly, the equitable compensation payable by Mr. Gilbertson was to be assessed at an amount equal to the whole monetary value of Fabergé Ltd. (formerly PEL)—the sole asset of which was the Fabergé rights—as at the date of assessment. On that basis, Renova initially sought payment to the master fund of US$177m. by way of equitable compensation, that being the value attributed to Fabergé Ltd. as at January 31st, 2012 in the report of Ms. Elizabeth Gutteridge, a partner of Deloitte LLP, London, on whose expert opinion Renova invited the judge to rely.

150 The Gilbertson parties did not accept the value (US$177m.) attributed to Fabergé Ltd. in Ms. Gutteridge's report. They contended that the value to be attributed to Fabergé Ltd. as at February 10th, 2012 was no more than US$120m., a figure based on the first report of Mr. Christopher Osborne, a senior managing director (in the London office) of FTI Consulting Ltd., but which Mr. Osborne himself regarded as "potentially high." As between the figure in Ms. Gutteridge's report (US$177m.) and that in Mr. Osborne's first report (US$120m.), the judge preferred the latter. He said this (2012 (2) CILR 416, at para. 133):

> "While Mr. Osborne accepted that under the DCF valuation method a wide range in value will result from only small changes in assumptions made, I nonetheless found his approach and analysis more persuasive overall in the circumstances than Ms. Gutteridge's. While the valuation of Fabergé Ltd. is clearly a matter of opinion and not of absolute certainty, having regard to all of the factors identified in their reports, including their report of their meeting on May 1st, 2012, which I directed, together with their oral evidence and also that of Mr. Gilbertson and Sean Gilbertson, I found the opinion of value by Mr. Osborne more plausible and probable. I therefore prefer his opinion that the current value of Fabergé Ltd. is not more than US$120m. and possibly significantly less for these purposes."

151 Nevertheless, that conclusion did not lead the judge to assess equitable compensation at an amount equal to the then current value (US$120m.) attributed to Fabergé Ltd. in Mr. Osborne's first report. As the judge explained (*ibid.*, at para. 134), it had been contended on behalf of the Renova parties that, prior to January 3rd, 2007, Mr. Gilbertson had

agreed that, while the actual title to the Fabergé brand itself would be owned by one of Mr. Vekselberg's private companies within the Lamesa group, the full economic benefit of the Fabergé rights—that is to say, the commercial benefit of developing, exploiting and managing the Fabergé business—would remain with the master fund within the Pallinghurst structure. In those circumstances, the judge thought it necessary to ask whether the value of what (absent the change in the ownership of Fabergé Ltd. resulting from Mr. Gilbertson's breach of fiduciary duty) would have accrued to the master fund was properly to be equated with the full ownership of the Fabergé rights; that is to say, to ask whether, in assessing equitable compensation, it was appropriate to apply some discount to the current value of Fabergé Ltd. (as, in the events which happened, the full owner of the brand and the rights) to reflect the separation of the right to develop, exploit and manage the rights from the ownership of the brand which (absent Mr. Gilbertson's breach of duty) was in contemplation. After setting out the arguments advanced on behalf of the parties, the judge concluded (*ibid.*, at para. 141) that—

> "It does appear improbable that any potential purchaser would pay the same amount for a business, the principal income producing asset of which does not actually belong to it and which has a limited life span, as it would pay for a business that actually owns the principal asset and does not have such a limited period of likely profitability. Mr. Osborne's opinion on this aspect of the matter, and as I have said, his evidence on this was not really challenged in cross-examination, was that it is most unlikely that an investor would value a company owning only the full economic benefit of the rights at more than half the value such a potential purchaser would be likely to pay if the business had owned the income-producing asset as well as the right to develop, exploit and manage it. I found that opinion plausible and persuasive. It follows that if, as I have accepted, the current value of Fabergé Ltd. when it does own the entire rights is no more and possibly less than US$120m., the value of the company if it owned only the economic benefit of the rights but not the brand itself would be only approximately US$60m. or possibly less. Having regard to the amount already invested in the company and its business, which the experts both agreed was US$140m. in total, the position is that more has been invested in the company than it may be worth. That of course ignores the further investment which the company obviously requires and has recently been seeking."

152 That, as the judge said, was the first of two issues of principle as to the methodology applicable to the assessment of equitable compensation. He identified the second of those issues (*ibid.*, at para. 142): "whether, in the circumstances, the master fund would in fact anyway have actually obtained the full economic benefit of the rights but for Mr. Gilbertson's

breach of fiduciary duty . . ." In order to answer that question, he said, it was necessary to consider what (on the balance of probability) the position would have been if Mr. Gilbertson had not acquired the Fabergé rights for his consortium (as, in the event, happened), but had continued to negotiate to final agreement with the Renova parties as, until January 2nd, 2007, he had been doing (at least purportedly). After examining the evidence (*ibid.*, at paras. 143–148), the judge concluded (*ibid.*, at paras. 146–148) that "but for the actions of Mr. Gilbertson in late December 2006 and January 2007 the master fund would most probably have had the economic benefit of developing and exploiting the Fabergé brand and the management thereof on the terms of the fourth draft IA or very similar terms," and that, "accordingly the amount, if any, appropriate to reconstitute the master fund and to put it in the position in which it would now have been would be the present financial value of that."

153 The judge explained (*ibid.*, at paras. 148–150) that, although the Renova parties had (in opening their claim at trial) sought payment of equitable compensation in an amount equal to the full value of Fabergé Ltd. (which they had put at US$177m.), they did not maintain that position in their closing submissions. Rather, he said, Renova produced a spreadsheet with its closing submissions in which the calculations of the equitable compensation claimed was shown at US$82.38m. That calculation was based on Ms. Gutteridge's valuation of Fabergé Ltd. at US$177m. but after (i) making allowance for sums invested in Fabergé Ltd. since acquisition—an amount which the two experts agreed at US$140m.—and (ii) adding various other sums, including the US$38m. paid on the acquisition of the Fabergé rights. The judge rejected the claim in that revised amount. He said this (*ibid.*, at paras. 149–150):

> "However, I have found the current value of Fabergé Ltd. to be no more than US$120m. and Mr. Osborne has explained why in his opinion that figure is probably too high and that the value may be as low as US$56m., which I also accept. Furthermore, the plaintiff's calculations are obviously based also on their contention that the present value to the master fund would not be affected by the fact that the master fund would not own the income-producing asset, the Fabergé brand, itself, but solely the economic benefits and management of it with which I have disagreed. Nor has the plaintiff's calculation taken account of the fact that the master fund would only be entitled to such economic benefits pursuant to a licence from the owner of the income producing asset and on terms the same or very similar to those in the fourth draft IA as I have determined would probably be the case.
>
> 150 Mr. Osborne's opinion which, as I have said, I accepted, was that the consequence of only owning the economic benefit would be to reduce the value of the rights (or of Fabergé Ltd.) by half, namely

> to US$60m. on his valuation figure. Although no figure was put forward in relation to the consequence of the qualifications to the economic benefit implicit in the licence arrangement and likely other terms, it is in my opinion probable that even if that did not warrant a further specific reduction in value, it would undoubtedly go to substantiate Mr. Osborne's US$60m. assessment. Also, having regard to the fact that Fabergé Ltd. has been a loss-making business from the start and still is at present and clearly requires significant further investment it seems to me that the submission on behalf of the Gilbertson parties that the master fund has in reality sustained no significant economic loss is correct."

In those circumstances, the judge concluded that, but for Mr. Gilbertson's breach of fiduciary duty, the master fund would have been in a significantly negative financial position as at the date of trial; that it would be of no benefit to the master fund to put it into the financial position in which it would have been at the date of the judgment but for Mr. Gilbertson's breach of fiduciary duty; and that, accordingly, no equitable compensation was payable.

***The parties' submissions on the cross-appeal***

154 The Renova parties cross-appeal (Appeal No. 22 of 2012) from so much of the order of November 6th, 2012 as dismissed the claim for equitable compensation. As I have said, it is submitted (in support of that cross-appeal) that the judge erred in law and/or in principle and/or misdirected himself as to the evidence in valuing at nil the loss which Mr. Gilbertson was liable to make good to the master fund. More particularly, it is submitted (i) that the judge was wrong to conclude that the value of Fabergé Ltd. at the date of trial was US$120m., or less, rather than (as Renova had contended) US$177m.; (ii) that the judge was wrong to apply a discount of 50% to the value (US$120m.) which he had placed on Fabergé Ltd. in order to reflect his (incorrect) finding that (had Mr. Gilbertson not acted in breach of fiduciary duty) the master fund would not have become the owner of the Fabergé rights but would have been entitled only to develop, exploit and manage those rights (through OpCo) under licence for a limited period; and (iii) that the judge was wrong in treating US$38m. (the price paid on acquisition of those rights) as a cost that would have been paid by the master fund—given that, had Mr. Gilbertson not acted in breach of fiduciary duty, the acquisition price would have been paid by Lamesa Arts Inc. and not by the master fund—in calculating the total figure to be discounted (if, which is denied, any discount were appropriate).

155 In response to those submissions it is said on behalf of the Gilbertson parties that the judge's approach—and the conclusions which he reached—were correct. It is pointed out that neither the judge's

approach—to assess the value of Fabergé Ltd. (PEL) as at the date of the trial and, having made a finding as to that value, to consider the extent to which it should be discounted—nor the performance figures for the business carried on by Fabergé Ltd. following the acquisition of the Fabergé rights were in dispute. Having described the steps which led the judge to the conclusion which he reached—in substantially the same terms as those in which I have analysed the judge's reasoning but emphasizing, in particular, that the judge's finding that the parties would have concluded their negotiations with an agreement along the lines of the fourth draft IA, excluding cl. 2(e), was consistent with Renova's pleaded case—the Gilbertson parties addressed those submissions under four main heads: (i) assessing the value of Fabergé Ltd.; (ii) the discount that should be applied to reflect the judge's finding that the master fund would not have become the owner of the Fabergé rights; (iii) the allocation of the discount; and (iv) the proper treatment of the acquisition price.

156 For convenience, I will address the submissions advanced on behalf of the parties under the three heads adopted on behalf of the Renova parties—to which I will refer, respectively, as "the undiscounted value point," "the discount point," and "the acquisition and development cost point." Under the third of those heads—the acquisition and development cost point—I will address the questions how (if at all) the development costs and the acquisition price should be taken into account (heads (iii) and (iv) of the analysis adopted on behalf of the Gilbertson parties).

***The undiscounted value point***

157 In developing the first of those submissions—that the judge was wrong to conclude that the value of Fabergé Ltd. at the date of trial was US$120m., or less, rather than (as Renova had contended) US$177m.—it is said on behalf of Renova that:

(1) The judge was wrong to accept the opinion of Mr. Osborne that a DCF methodology was the most appropriate valuation methodology in preference to the opinion of Ms. Gutteridge that a subject company transaction methodology was the most appropriate. The judge ought to have preferred the opinion of Ms. Gutteridge, in that: (i) the subject company transaction basis of valuation of Fabergé Ltd. had been used by the board of that company and by the board and auditors of Pallinghurst Resources Ltd. (which, at the relevant time, held 49% of the shares in Fabergé Ltd.) in their most recent available reports and accounts, expressly in preference to a DCF valuation; (ii) Mr. Osborne had selected the DCF valuation methodology in an unfair and imbalanced way, without conducting a rational and transparent comparison of the available methodologies (as Ms. Gutteridge had done) and without explaining the reasons for his choice of DCF methodology (other than by *a posteriori* reasoning in reliance on the result of that choice); (iii) Mr. Osborne had rejected

Ms. Gutteridge's subject company valuation methodology on the flawed and illogical basis that the results were not compatible with the results of his own chosen DCF methodology; (iv) Mr. Osborne had failed to adopt the approach (which, as was common ground, was consistent with International Financial Reporting Standards) that DCF valuations should be used with caution when valuing unlisted investments, that another methodology (such as a subject company transaction valuation) should be used as a guide to value, and that the result of a DCF approach should be cross-checked against the results of another approach; (v) Mr. Osborne's own evidence was that it is "uniquely difficult" to apply a DCF valuation methodology to a start-up company (such as Fabergé Ltd.) with a limited track record of past performance; (vi) at the time that the trial began (and, if relevant, at all times thereafter), the board of Fabergé Ltd. and the auditors and the board of Pallinghurst Resources Ltd. (of which Mr. Gilbertson himself was chairman) considered that a value of US$88.06 per share (that is to say, US$177m. in aggregate) remained the most appropriate value for Fabergé Ltd. and that Mr. Osborne did not criticize their approach as unreasonable; and (vii) Mr. Osborne's DCF valuation was based on a financial forecast that was, as the Gilbertson parties accepted in their oral evidence, no more than a "back of the envelope calculation" done for a different purpose.

(2) The judge was wrong in failing to take any or any adequate account of the manifest failings of Mr. Osborne as an independent expert witness; in that, in particular, (i) he showed an imbalanced and one-sided approach to his work; and (ii) he did not show all of his workings in a clear and transparent manner.

(3) The judge was wrong in failing to fix the date for valuation of Fabergé Ltd. as the first day of the trial (as he ought to have done) but admitted and gave weight to evidence (which, as a matter of law, he should have ignored) of events purportedly affecting the value of Fabergé Ltd. that had occurred during the trial: that is to say, (i) the failure of the share offer by Fabergé Ltd. to existing shareholders at US$79.50 per share; and (ii) the subsequent offer at US$50 per share ("the April 2012 offers").

(4) Notwithstanding that he had held (correctly; see 2012 (2) CILR 416, at para. 128) that the April 2012 offers were "not of the same evidential value as a share acquisition by an independent non-shareholder investor," the judge was wrong to give that evidence weight equal to or greater than the evidence that underpinned the valuation of Fabergé Ltd. by Ms. Gutteridge, the boards of Fabergé Ltd. and Pallinghurst Resources Ltd. and the auditors of Pallinghurst Resources Ltd., at US$88.06 per share on a subject company transaction basis (which was based on a share acquisition by an independent non-shareholder investor) and, further, was wrong then to rely on the evidence of the April 2012 offers (the prices of which

offers were not market tested but offered only to the 19 existing shareholders) when preferring Mr. Osborne's valuation to that of Ms. Gutteridge notwithstanding that both Mr. Osborne and Ms. Gutteridge agreed that the factors which would affect the decision of an existing shareholder whether or not to buy at a particular price are necessarily different from the factors which govern the decision of an independent non-shareholder.

158 The Gilbertson parties prefaced their submissions in support of the judge's assessment of the value of Fabergé Ltd. by explaining why—as they submitted—the judge was correct to prefer the evidence of Mr. Osborne to that of Ms. Gutteridge. They pointed out that (2012 (2) CILR 416, at para. 131) the judge had observed that he found Ms. Gutteridge "somewhat inflexible and dogmatic in her insistence that the value of [Fabergé Ltd.] should be determined by reference to the single small share transaction in September 2009" and in her unwillingness "to consider any adjustment to her [US$177m.] in light of the factors identified by [Mr. Osborne] . . ." He might also, it is said, have mentioned: (i) the weight which she gave in her oral evidence to "the wholly exceptional sales multiple" at which Hermes' shares trade (on which she relied to support her valuation, notwithstanding the obvious difference between a struggling start up and one of the most established and successful luxury goods brands ever); (ii) her refusal to acknowledge the importance of sales to a business trying to take off; and (iii) her unwillingness to acknowledge "the obvious fact" that a potential new investor would be concerned if asked to pay a higher price for the shares than that at which the existing investors had been prepared to take them. By contrast, they pointed out, the judge had said (*ibid.*, at para. 133) that he found Mr. Osborne's approach and analysis more persuasive overall in the circumstances than that of Ms. Gutteridge, and that the judge had noted (*ibid.*, at para. 125) that Mr. Osborne was not cross-examined to any significant extent on the substance or detail of his valuation or on how and why he had reached the conclusions that he did.

159 After explaining why (it was said) the judge was right to prefer the evidence of Mr. Osborne to that of Ms. Gutteridge, the Gilbertson parties addressed two issues under this head: (i) whether the judge was correct to take the date for assessment of equitable compensation as at the date of the judgment (rather than as at the commencement of the trial) and so take into account the attempts by Fabergé Ltd. to raise funding in April 2012; and (ii) whether the judge was correct to accept Mr. Osborne's valuation of that company, made on the basis of DCF methodology, and to reject the related party valuations made by the boards of both Fabergé Ltd. and its principal shareholder, Pallinghurst Resources Ltd. and by the auditors of Pallinghurst Resources Ltd.

160 In addressing the first of those two issues, it is pointed out on behalf of the Gilbertson parties that Renova itself had submitted (at para. 115(b) of its written opening submissions at trial) that equitable compensation was to be assessed as at the date of judgment (and had relied upon observations in *Target Hldgs. Ltd.* v. *Redferns* (35) ([1996] A.C. at 434, 437, 440) and in *Snell's Principles of Equity* at para. 40–016 in support of that submission), had not opposed the introduction of evidence in relation to the take up of the then pending share offer and had cross-examined Mr. Gilbertson, Mr. Sean Gilbertson and Mr. Osborne on that evidence.

161 In addressing the second of those issues, it was pointed out on behalf of the Gilbertson parties that the judge was presented with two materially different approaches to the valuation exercise: (i) that adopted by Mr. Osborne—described as "a DCF analysis based on the fundamentals of the business"—which, for the reasons that he described in his oral evidence, led him to conclude that the value of Fabergé Ltd. at the relevant date could not exceed US$120m.—and (ii) that adopted by Ms. Gutteridge which—for the reasons which she described, shortly, in her oral evidence—led her to dismiss the DCF analysis as an appropriate methodology in this case and to conclude (on the basis of valuations made by others, described as "related party valuations" or a "subject company analysis") that the value was US$177m. It is submitted that, although Renova had contended that—

> "it would take a serious and fundamental error of approach on the part of the boards of Fabergé Ltd. and PRL and their auditors to justify the Judge's departure from the approach and result used by Fabergé Limited, PRL and their auditors"—

it had cited no authority (nor referred to any academic writing) in support of that proposition; Ms. Gutteridge had not adopted it in her own evidence, in the course of which she had said this:

> "I was forming a view of my own and looking around at the available material to allow me to form that type of view. And when one is aware that other informed people have expressed a view, and that that view has been tested, I considered it reasonable that that was further affirmation and confirmation of my view."

Renova had not put its case so high at the trial, and, in principle, the proposition cannot be correct (given that, although the directors of a company or its principal shareholder may well possess information concerning the company that puts them in a better position than others to value it, they may well have an interest in the outcome). Further, it is said that, as the judge observed (2012 (2) CILR 416, at para. 130), the directors