# Exhibit B-4

and auditors were "not carrying out quite the same exercise for the same purpose as the court is required to do": in that the judge was required to determine the value of Fabergé Ltd. on the balance of probability on the basis of the evidence before him, whereas the directors of Fabergé Ltd. and Pallinghurst Resources Ltd. "were required to reiterate the valuation that they had previously placed on the company, unless they considered there was conclusive contradictory evidence to either increase or decrease the value" and the auditors' task was to consider and comment on the reasonableness of the valuations made by the directors. The Gilbertson parties draw attention to Mr. Osborne's evidence that the most recent transaction on which Ms. Gutteridge could base her assessment of value was the issue of shares to the value of US$100,000 to a prospective director of PEL in 2009. They rely on the view expressed at para. 4.2 of his second report, that—

> "in adopting that approach, Ms Gutteridge ought in my opinion to have given greater consideration to two questions in particular than it appears that she has. The first of those is whether any new information since September 2009 argues for a revision to the valuation; and the second is whether the valuation remains plausible, having regard to the current forward projections"—

and, on his answer—rejecting the suggestion that "a fair and open minded valuer of Fabergé Limited, valuing as at today, would take into account the conclusions of the Board and of the auditors of PRL," that—

> "The guidelines require an independent valuer to be concerned about the extent to which the 2009 capital raising continues to be of relevance . . . And the directors have concluded, I think it's fair to say, cautiously that it does. And my own conclusion is that it does not. And I think that's a conclusion that I'm entitled to reach; and it's the conclusion that I have reached."

In reaching that conclusion, Mr. Osborne had expressed the view (at para. 4.6 of his second report) that "the 2009 transaction price on which the recent company valuations are based is, in practice, of diminishing relevance to a current valuation of Fabergé Limited" and, in his oral evidence that "the relevance of the 2009 transaction price has diminished to the point where it cannot be used as the primary valuation approach" and, further, that "there are no plausible assumptions that could be applied to current forward projections in a Discounted Cash Flow sense that would give rise to a valuation of USD 177 million." It is said that the weight to be put on related person valuations in the circumstances of the case was a matter for expert evidence. Both experts addressed the question, and "the judge was entitled and required to form his own view in the light of that evidence."

162 I reject the submission, advanced on behalf of Renova, that the judge erred in principle in failing to fix the date for valuation of Fabergé Ltd. as the first day of the trial. In my view, in reaching his conclusion the judge was entitled (for the reasons advanced on behalf of the Gilbertson parties) to have regard to the April 2012 offers. The assessment of the undiscounted value of Fabergé Ltd. was essentially a matter for the judge to determine on the evidence before him at the trial. In carrying out that task, the judge had to evaluate the opinion evidence of the two expert witnesses, Ms. Gutteridge and Mr. Osborne. For the reasons that he gave, the judge preferred the evidence of Mr. Osborne. In challenging the judge's determination of the undiscounted value of Fabergé Ltd., Renova seeks to persuade this court to take a different view. An appellate court must recognize that where (as in this case) the expert witnesses have given oral evidence at trial, it should be cautious before rejecting the trial judge's evaluation of that evidence, unless satisfied that he failed to take advantage of seeing and hearing the evidence tested under cross-examination. In my view there is nothing to suggest that the judge failed to do so. I reject Renova's challenge to the judge's determination that the undiscounted value of Fabergé Ltd. as at the date of trial was not more, and possibly significantly less, than US$120m.

***The discount point***

163 In developing the second of those submissions—that the judge was wrong to apply a discount of 50% to the value (US$120m.) which he had placed on Fabergé Ltd. (rather than, as Renova had contended, no discount or a nominal discount) in order to reflect his (incorrect) finding that, had Mr. Gilbertson not acted in breach of fiduciary duty, the master fund would not have become the owner of the Fabergé rights but would have been entitled only to develop, exploit and manage those rights under licence for a limited period—it is said on behalf of the Renova parties that the judge erred in law and/or misdirected himself as to the evidence in that: (i) he failed to pay sufficient regard to his earlier finding that the parties intended and agreed that the master fund would end up with the full economic benefit of the Fabergé rights, and not only with a portion of that economic benefit; (ii) he ought to have assumed that, had Mr. Gilbertson acted fairly and honestly and in the best interests of the master fund (and but for his breach of fiduciary duty), the parties would have arrived at a legally binding agreement which enshrined that intention and understanding; (iii) he wrongly assumed, as the basis for his conclusion that the master fund would not have obtained the full economic benefit of those rights, that (contrary to his own earlier findings) the detailed terms of the fourth draft IA would have reflected the final terms on which the master fund would have enjoyed the Fabergé rights; (iv) he ought to have proceeded on the basis that, had Mr. Gilbertson not acted in breach of his fiduciary duty, the fourth draft IA would not have

represented the final agreed terms on which the master fund was to enjoy the economic benefit of the Fabergé rights, but rather (a) that Mr. Gilbertson would, consistently with his fiduciary duties to the Pallinghurst structure (which was the relevant assumption on which the judge was proceeding), have insisted that the terms were those contained in Mr. Sean Gilbertson's amended third draft IA (in that those most closely reflected the basic agreement that the full economic benefit would be enjoyed by the master fund), and/or (b) that the parties would have concluded their discussions with an agreement which gave the master fund the full economic value of the Fabergé rights (or, at the least, allowed for that possibility when assessing the probable terms on which the Fabergé rights would have been held by the master fund); (v) he failed to pay any attention to the fact that it was entirely possible to have a licence arrangement or split between "Brandco" and "Opco" that left the full economic benefit of the Fabergé rights with Opco (that is to say, with the master fund), and that this would have been the likely outcome had Mr. Gilbertson not breached his fiduciary duty; and, in any event (vi) he failed to pay any or any adequate attention to the unchallenged view of Ms. Gutteridge (as expressed in section 5 of her second report) that cl. 8 of the fourth draft IA, on its true construction, would not have created a risk such as to justify any or any significant discount to the value of Opco (even if the fourth draft IA had represented the final terms of the agreement on which the master fund would have enjoyed the Fabergé rights), given that there was no basis for the judge's implicit rejection of Ms. Gutteridge's opinion on that point in the absence of any finding by the judge that cl. 8 was ambiguous (which, it is said for the avoidance of doubt, it was not).

164 In response to those submissions, the Gilbertson parties point out that Mr. Osborne's evidence—which, they say, was not challenged, in that Ms. Gutteridge provided no comparable figure because she was instructed not to consider the issue—was that the appropriate discount to be applied to the assessed value of Fabergé Ltd. in order to reflect the difference between ownership of the Fabergé rights and a terminable licence was 50% or thereabouts. Further, it is said that the Fabergé business had been loss making in each year since acquisition; so that if the licence had been granted at the beginning of 2007, the first 5 years of the contemplated 10-year term would have been loss making and the expectation was that it would continue to make losses for another 3 years. In those circumstances the Renova parties had not, at trial, pressed an argument that there should be no discount, and the argument advanced on their behalf on the appeal—that, as the parties intended the master fund to enjoy the economic benefit of the Fabergé rights, the court should value the master fund on the basis that it owned those rights, since any difference between its value with and without the rights would be contrary to what the parties intended should happen—should be rejected as "sophistry,"

being, it is said, contrary to the Renova parties' pleaded case, contrary to the terms that the parties were actually negotiating and based on the (false) assumption that there was any concluded agreement or understanding between the parties.

165 It is submitted on behalf of the Gilbertson parties that, in the absence of any concluded agreement or understanding between Mr. Gilbertson and Mr. Vekselberg as to the terms on which the master fund would have been entitled to enjoy the economic benefit of the Fabergé rights, the judge had to consider (as he did, 2012 (2) CILR 416, at paras. 153–145) what would have been the likely outcome of the negotiations had they continued. He did so on the basis of implicit assumptions which (it is said) were favourable to the Renova parties, in that (i) he assumed that, although—given Mr. Gilbertson's right to veto the proposed project—it was "far from clear" that the project that was in negotiation would have gone ahead, Mr. Gilbertson would negotiate on the basis that he would choose to close a deal for the benefit of the master fund; (ii) he found (*ibid.*, at paras. 146–148), in favour of the Renova parties, that Lamesa (BrandCo) would have not have pressed for the inclusion of cl. 2(e) in the fourth draft IA and that the parties would have closed a deal in the same or similar terms to the fourth draft IA without cl. 2(e) (notwithstanding Renova's pleaded case that the terms of the fourth draft IA (including cl. 2(e)) were reasonable and that the subsequent implementation agreements discussed between the parties would have excluded the master fund entirely); (iii) he assumed that Lamesa or Renova would have provided the necessary funding to enable the business to carry on without external participation in the form of an investment in the master fund (which would have had the likely effect that the interests of the company and GPLP in the master fund would have become nominal and that the constitution of the master fund would itself change); and (iv) he assumed that Lamesa would have left the project with the master fund and continued to fund it, notwithstanding that it was loss making (an assumption which—given the breakdown in confidence between the Renova parties and the Gilbertson parties that had already taken place, the unwillingness of either side to cede control of the venture to the other and the need (to which it would give rise) for them to agree at every stage if the master fund were to continue to function—might well be considered highly optimistic). Further, it is said that:

(1) Given that the Renova parties were in a position to veto further investments by the master fund, they were in a position to bring the fund to a close whenever they chose. Accordingly, if the project had started to generate profits, the Renova parties would have been able to choose whether profits should (in the future) be applied for the benefit of

the Gilbertson parties or be allocated between Lamesa and Renova as Mr. Vekselberg thought fit.

(2) The Renova parties had contended, at trial, that the Lamesa project should be valued by reference to the value of Fabergé Ltd., and the judge adopted that approach. The argument that the judge was wrong to have regard to the terms of the draft IAs is now advanced on behalf of the Renova parties only because they now recognize that the terms that were actually in the course of negotiation would not have given the master fund the "full economic benefit of the Rights."

(3) Both the ownership of rights themselves and the ownership of a licence to exploit those rights are assets: a discount is appropriate to reflect the difference between the value of ownership of the assets themselves and the value of a business based upon the exploitation of those assets under licence. The application of a discount to the value of the assets in themselves is a tool to measure the gross value of the business as carried on by a rights-licensee; it is not concerned with measuring any investment that he may have made in connection with that business, whether wisely or unwisely. In explaining why a discount was appropriate in principle, Mr. Osborne had said this (at para. 3.15 of his first report):

> "The level of discount applicable to OpCo when compared to the value of an otherwise similar venture holding the Rights themselves cannot be assessed precisely. Increased risk warrants higher discount rates applied to future economic benefits, reducing their perceived present value. Liquidity discounts, which have been subject to much academic research, albeit generally in different contexts, are generally assessed as lying in the range of 20% to 50%. The impact of transaction costs is impossible to assess precisely, but could be substantial. I consider it unlikely on any basis that a rational investor would have valued OpCo at more than half the value otherwise placed on an entity holding the Rights themselves."

166 As the judge appreciated, the court's task was to determine the monetary value of the loss suffered by the Pallinghurst structure as a result of the diversion from the master fund of the economic benefit of development, exploitation and management of the Fabergé rights. He had concluded that, but for the actions of Mr. Gilbertson in late December 2006 and January 2007, the master fund would probably have had the economic benefit of developing and exploiting the Fabergé brand and the management thereof on the terms of the fourth draft IA or on very similar terms. In my view, that was a conclusion that the judge was entitled to reach on the evidence at trial, and I reject Renova's challenge to that conclusion. Accordingly, as the judge held, equitable compensation was to be assessed in an amount equal to that required to put the master fund in the position in which it would have been at trial if

(through OpCo) it had had the economic benefit of developing and exploiting the Fabergé brand and the management thereof on the terms of the fourth draft IA or on very similar terms: the question for his determination was, as he said, what would be the present financial value of that.

167 In order to answer that question, the judge thought it necessary to ask whether the value of what (absent the change in the ownership of Fabergé Ltd. resulting from Mr. Gilbertson's breach of fiduciary duty) would have accrued to the master fund was properly to be equated with the full ownership of the Fabergé rights. In my view, the judge was correct to conclude that the answer to that question was "No." He went on to ask himself whether, in assessing equitable compensation, it was appropriate to apply some discount to the current value of Fabergé Ltd. (as full owner of the brand and the rights) to reflect the separation of the right to develop, exploit and manage the rights from the ownership of the brand which (absent Mr. Gilbertson's breach of duty) was in contemplation. Again, the judge was correct to conclude that some discount from the value of full ownership was appropriate.

168 The only evidence before the judge as to the appropriate discount from the value of full ownership in the circumstances of this case was that of Mr. Osborne. His evidence, at para. 3.15 of his first report (as the Gilbertson parties point out), was that it was unlikely that a rational investor would have valued the master fund (as the holder of a licence to develop, exploit and manage the Fabergé rights) at more than half the value otherwise placed on an entity having full ownership of those rights themselves. On the basis of that evidence, which (again, as the Gilbertson parties point out) was not challenged, the judge was entitled to conclude that a discount of 50% from the value of full ownership was appropriate.

***The acquisition and development cost point***

169 In reaching his conclusion that the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation was nil, the judge took into account (as he said at para. 9.25 of his judgment) that the amount already invested in PEL (Fabergé Ltd.) and its business was US$140m., or thereabouts. Given that, as the judge held, the current value of Fabergé Ltd. (having full ownership of the Fabergé rights) was no more, and possibly less, than US$120m., and that the value of the master fund (if it had owned, through OpCo, only the economic benefit of those rights but not the brand itself) would be only some US$60m., he concluded that the amount invested was more than the relevant value (whichever of those two figures was taken to be the relevant value), so that, on a proper analysis, the master fund had suffered no loss in respect of which it should receive equitable compensation. As the judge said

(*ibid.*) "the position is that more has been invested in the company than it may be worth."

170 The judge went on to explain (2012 (2) CILR 416, at paras. 148–150) that, in the course of his closing submissions, counsel for Renova had produced a spreadsheet in which the calculations of the equitable compensation claimed was shown at US$82.38m. Renova advanced that figure after allowing, as a deduction from Ms. Gutteridge's valuation of Fabergé Ltd. (US$177m., being the amount which it had claimed in opening its case), development expenses—being the US$139.8m. for equity and debt that (as Ms. Gutteridge and Mr. Osborne agreed) had been injected into Fabergé Ltd. since January 2007 less the US$38m. paid on the acquisition of the Fabergé rights—and adding interest or other sums. The position at the end of the trial, therefore, was that Renova accepted that development expenses (but not the acquisition cost of the Fabergé rights) were a proper deduction from the current value of Fabergé Ltd. in determining the amount of the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation.

171 In this court, Renova submits that, even if any discount greater than nominal was justified (which the Renova parties deny), the judge was wrong to deduct from the discounted figure which he treated as representing the value of Fabergé Ltd. the full amount of the debt and equity raised by that company (so arriving at a negative figure), rather than to apply the discount (if any) to a net figure representing the value of Fabergé Ltd. after taking account of the debt and equity raised (and so arriving at a positive figure). It is said that, in adopting the (flawed) approach that he did, the judge erred in principle and misdirected himself as to the evidence in that he failed to apply the discount fairly and equitably across the board to both the value of Fabergé Ltd. and the amount of debt and equity raised, and so failed to apply consistent assumptions about each, and failed to take account of the evidence (a) that, had the master fund acquired the Fabergé rights, the purchase price (US$38m.) would have been provided by Lamesa and would not have been raised by the acquiring party (as it was in the case of the acquisition by PEL (Fabergé Ltd.)); and (b) that the funding of the expenses and future investment incurred in respect of the development, exploitation and management of the Fabergé rights (had they been held by the master fund) would not have been borne by the master fund but by Lamesa (outside the Pallinghurst structure) and repaid by the master fund only on a sale of those rights by the master fund (as contemplated by cl. 8 of the fourth draft IA).

172 That submission raises two issues: (i) in assessing equitable compensation, what (if any) acquisition and development expenses should be deducted from the current value of the asset to which the master fund would have been entitled but for Mr. Gilbertson's breach of fiduciary duty

and, if so, (ii) should the discount (which is appropriate to reflect the difference in the value of full ownership of the Fabergé rights themselves and the value of a business based upon the exploitation of those rights under licence) be applied before or after the deduction of acquisition and development expenses.

173 The first of those issues itself raises two questions: (a) whether the judge was wrong in treating US$38m. (the price paid by PEL on the acquisition of the Fabergé rights) as a cost that (but for Mr. Gilbertson's breach of fiduciary duty) would have been paid by the master fund; and (b) whether the judge was wrong in treating the expenses and future investment incurred in respect of the development, exploitation and management of the Fabergé rights as costs which (had those rights been developed, exploited and managed by the master fund (through OpCo) under licence, as would have occurred but for Mr. Gilbertson's breach of fiduciary duty) would have been funded by the master fund.

174 In relation to the first of those questions—whether the acquisition price was a cost that would have been paid by the master fund—it is said on behalf of the Renova parties that the judge was wrong in failing to give effect to the evidence that, but for Mr. Gilbertson's breach of fiduciary duty, the purchase price for the Fabergé rights would have been paid by Lamesa. Had he given effect to that evidence, it is said, he would have reduced the amount of debt and equity to be deducted from the value of Fabergé Ltd. by US$38m. He was wrong to take the view (2012 (2) CILR 416, at paras. 148–150) that—having concluded that Fabergé Ltd. was worth no more than US$120m. and that he should apply a discount of 50% to that value (with the consequence that the discounted value of Fabergé Ltd. was greatly exceeded by the total amount that had been invested whether or not the cost of acquisition was taken into account)—he did not need to decide the correct treatment of the purchase price paid for the Fabergé rights. In response to that submission it is said on behalf of the Gilbertson parties to be "of academic interest only," in that, unless the discount is applied after (and not before) the deduction of acquisition costs (which, it is said, is wrong in principle), it is immaterial whether the amount of debt and equity to be deducted is US$140m. or US$102m. (that is to say US$140m. less US$38m.).

175 Further, it is said on behalf of the Gilbertson parties, Renova's submission fails to take account of the documents, is contradicted by the evidence of Ms. Gutteridge and cannot be sustained. Clause 8 of the fourth draft IA was in these terms:

> "8. Upon the earlier of: (a) a disposal by PRM [the master fund] of OpCo, or (b) the winding up of PRM pursuant to the Pallinghurst Documents, PRM shall in case of a disposal by PRM of OpCo to a third party receive the respective consideration and in case of a

> transfer to BrandCo or one of its affiliates or the winding up of PRM pursuant to the Pallinghurst Documents a cash sum (the 'Value Add') equivalent to the enhancement of the value of the Fabergé Brand by PRM, exceeding the Purchase Price, as mutually agreed by BrandCo and PRM or, failing agreement, as quantified by a valuation of an assessor mutually agreeable to the parties, or failing agreement, by KPMG United Kingdom, taking into account any reasonable incurred expenses (including but not limited the Purchase Price) related to the Fabergé Brand of BrandCo and its affiliates."

It is said that, since the exercise is concerned to identify the net additional value of the enhanced rights, it would plainly have taken into account the initial value of the rights, and it was no part of the Renova parties' case at the trial that the rights were worth less than what PEL had paid for them. If Lamesa had directly or indirectly funded the acquisition of the Fabergé rights and a master fund entity had exploited those rights (under licence) on the same or similar terms to those of the fourth draft IA (other than cl. 2(e)), then the cost of acquisition would not have appeared as a payable on the master fund's balance sheet (because that cost would not have been a liability of the master fund) but would, nevertheless, have affected the value of the master fund's business (because it would have affected the payment that the fund was to receive under cl. 8 of the fourth draft IA on the termination of the licence or the sale of the business). Ms. Gutteridge confirmed that analysis in her oral evidence, both as to the US$38m. and in relation to any further investments:

> "My reading of the agreement in draft, as it stood, was that the overriding imperative in the introduction was that economic benefits should flow to OpCo, the licensee, if you like, in the analogy; and that the value add provision provided for in clause 8 was such that one was able to consider the increment, the enhanced value at the end of the term, and that that would be divided between the parties in the way that it is provided for within that document, namely, as I understood it, net of the purchase price that we spoke about and of further investments; but that that enhanced value would recognise the efforts and commercial exploitation of getting it to the point at which it was in the positive cash flow situation you've described."

176 In relation to the second of those questions—whether the development costs would have been funded by the master fund—it is said on behalf of the Renova parties that the judge was wrong in failing to give effect to the evidence that, but for Mr. Gilbertson's breach of fiduciary duty, the funding of the expenses and future investment incurred in respect of the development, exploitation and management of the Fabergé rights would have been borne by Lamesa or by Renova (outside the Pallinghurst structure) and repaid by the master fund only on a sale of those rights by

the master fund (as contemplated by cl. 8 of the fourth draft IA), and that "there would have been no need for Fabergé Ltd. to raise any debt or equity because the costs of the future development of the Rights would have come from Lamesa." In response to that submission, it is said on behalf of the Gilbertson parties that the argument that the additional moneys would have come from Lamesa is quite separate from the argument in relation to the US$38m. The argument raised in relation to Lamesa's additional funding was not raised at trial and it was not to be found in the Renova parties' grounds of appeal. If the argument were correct, it would lead to the conclusion that any and all of the additional investment should be ignored, which is not a contention that the Renova parties have hitherto advanced. Even now, the only specific expense incurred by Fabergé Ltd. that Renova suggests the master fund would not have had to incur is the cost of acquiring the Fabergé rights, that is, US$38m.

177 The true position, it is said, was that neither Lamesa nor Renova had committed itself to providing the necessary funding. Mr. Kuznetsov's evidence was that Renova would have been prepared to commit funds, but he also confirmed that there was no understanding between Lamesa and Renova as to how this might have been done, and he failed to explain why Renova should have been willing to provide funds in excess of US$100m. or more when it was unwilling to put up the initial US$38m. In his oral evidence he said this:

> "Let me be very clear. The project, Egg . . . was developing and developed by December 2006, consisted of two parts. One part was ownership—acquisition and ownership of the Rights. And the other part, which was by far more interesting from a business standpoint, was business development related to the Fabergé brand. And whereas Renova, indeed, was not prepared to commit 38 million for acquisition of the brand, and ultimately Lamesa company either committed or at least, through Mr Vekselberg, made it known that they would be prepared to put 38 million for acquisition of the brand, Renova was very happy to commit to inclusion of the business part of the Project Egg or the acquisition of Fabergé brand to the Fund. And, clearly, initial investments into the first part were 38 million. However, subsequent investments in development of the business related to Fabergé were expected to be significantly higher. And this is a part to which Renova was prepared to commit funds, of course based on further investigation and further development of the business case."

And, in answer to a question whether the licence revenues to which he had referred could have justified an investment of many tens of millions of dollars, he replied: "Absolutely not." In those circumstances, it is said on behalf of the Gilbertson parties that, if the additional funding were to have

come from Renova, it would have appeared as a cost of investment to the master fund. If it were to have come from Lamesa, it would have been taken into account under cl. 8 of the fourth draft IA. Moreover, unless it is being suggested that Lamesa was going to invest in excess of US$100m. over the lifetime of the fund's exploitation of the Fabergé rights without seeking any interest, the cost of the investment was bound to be reflected in the books of the master fund in some way. The fact that it is unclear quite how it would have been reflected in the fund's books reflects the fact that it was wholly unclear what arrangements (if any) the parties might have been able to put in place. But as 75% of the master fund was owned by the Gilbertson parties, it is safe to assume that Lamesa would not have provided the funding without demanding participation in the fund (as an investor) or a commercial return on its moneys.

178 In addressing the second issue—should the discount (which is appropriate to reflect the difference between the value of full ownership of the Fabergé rights themselves and the value of a business based upon the exploitation of those rights under licence) be applied before or after the deduction of acquisition and development expenses—it is said on behalf of the Gilbertson parties that the contention that any discount should be applied to the net value of the business (after deducting the expenses incurred in developing it), rather than to the actual current value of the business, was not advanced at trial on behalf of the Renova parties. Renova's submission that, in adopting the approach that he did, the judge erred in principle, in that he failed to apply the discount fairly and equitably across the board to both the value of Fabergé Ltd. and the amount of debt and equity raised, is said to be "manifestly" flawed, in that "there is no basis in law, fact or logic to justify discounting the expenses incurred in developing a business of a rights-licensee simply because the business in which the expenses were incurred is worth less than it might have been as that of a rights-owner."

179 In my view, the judge was correct to adopt the approach that he did. In assessing the loss (if any) which the master fund had suffered by reason of Mr. Gilbertson's breach of fiduciary duty—and in respect of which equitable compensation should be awarded—he was correct, first to apply the appropriate discount to the current value of Fabergé Ltd. (as the full owner of the Fabergé rights) in order to determine the (hypothetical) current value of the business which (but for Mr. Gilbertson's breach of duty) the master fund would have carried on as licensee since January 2007 and, secondly, to deduct from the current value of that business the costs and expenses which would have been incurred by the master fund in carrying on that business under licence since that date. I am satisfied, also, for the reasons advanced on behalf of the Gilbertson parties, that the costs and expenses to be deducted included the post-acquisition expenses and

future investment incurred in respect of the development, exploitation and management of the Fabergé rights: that is to say, an amount of US$102m. or thereabouts. It follows, in my view, that the judge was correct to hold that he did not need to decide how the acquisition cost of the Fabergé rights (US$38m.) should be treated. His conclusion that—after deducting post-acquisition costs of US$102m. from the (hypothetical) current value of the business which (but for Mr. Gilbertson's breach of duty) it would have carried on since January 2007—the master fund had suffered no loss was the same whether or not the acquisition cost of the Fabergé rights was included in the costs and expenses to be deducted.

180 For the reasons set out in this section of my judgment I would uphold the judge's decision that the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation should be valued at nil. It follows that I would dismiss Renova's appeal from the judge's order dismissing its claim to equitable compensation.

**Was the judge wrong to hold that Autumn was liable as a constructive trustee of the shares issued by PEL in January 2007?**

181 The judge explained (2012 (2) CILR 416, at para. 74) that Renova's claim against Autumn was for an order that Autumn account as a constructive trustee for the shares in PEL issued to it in January 2007, or their value, on the ground that Autumn knowingly received those shares as property misapplied or procured to be misapplied by Mr. Gilbertson in breach of his fiduciary duties to the company or, in the alternative, on the ground that it was a volunteer (in that it provided no consideration for the issue of those shares in PEL).

182 The judge recorded (*ibid.*, at para. 75) that there was no dispute between the parties that the elements which needed to be established in order to found a claim based on liability for knowing receipt were set out by Hoffmann, L.J. in *El Ajou* v. *Dollar Land Hldgs.* (16) ([1994] 2 All E.R. at 700):

> ". . . the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; secondly the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty."

Each of those elements was in dispute but the judge was able to approach the claims against Autumn on the basis that, as he had held earlier in his judgment, Mr. Gilbertson had acted in breach of fiduciary duty in procuring the issue to members of the consortium (including Autumn) of PEL shares in January 2nd, 2007, thereby diluting the previous interest of the master fund in PEL (as owner of all of the issued shares) to virtually nil (as owner of less than 1% of the issued shares).

183 The judge addressed the first element—whether the issue of PEL shares to Autumn in January 2007 had been a disposal of assets of the master fund—2012 (2) CILR 416, at para. 76(i)–(v). He explained that the Gilbertson parties disputed Renova's case that the dilution of the previous interest of the master fund in PEL from 100% to less than 1% constituted a disposal of the assets of the master fund. As he said (at sub-para. (ii)) it was their contention that there had been no disposal of any assets of the master fund in that the new shares issued by PEL in January 2007 did not constitute property of PEL (or of anyone else) prior to issue and that, accordingly, the issue of those shares could not constitute a disposal of assets. In support of that contention, the Gilbertson parties had relied (in their written closing submissions) on observations in the judgments of the High Court of Australia in *Pilmer* v. *Duke Group Ltd.* (30), to which the judge referred. The judge rejected that contention. He said this (2012 (2) CILR 416, at para. 76(v)):

> "(v) In my view, the position taken on behalf of the Gilbertson parties, in the circumstances of this case, is unduly restrictive and strict. This is an equitable concept and it does not seem to me that the reference to disposal of assets in Lord Hoffmann's first requirement for liability for knowing receipt in *El Ajou* v. *Dollar Land Holdings* . . . would have been intended to or did restrict the terms 'a disposal of his [the plaintiff's] assets' or 'assets which are traceable as representing the assets of the plaintiff' to mean pre-existing tangible items of property already legally and beneficially owned by the plaintiff. The court must look at the particular circumstances concerned in order to achieve a fair and equitable result. In the present case, in my opinion, the issue of the new PEL shares which had the effect of reducing the master fund's ownership and control of PEL from 100% to just under 1% did amount in the circumstances to disposal of an asset of the master fund (and, derivatively, the company) in the sense required to comply with the first principle in the *El Ajou* case."

184 Having reached that conclusion, the judge was able to address the second of the three elements identified by Hoffmann, L.J. in the *El Ajou* case (16)—whether the issue of shares in January 2007 to Autumn constituted a receipt by Autumn of assets traceable as representing assets of master fund which had been disposed of in breach of fiduciary duty—without further elaboration. He said this (2012 (2) CILR 416, at para. 76(vi)):

> "(vi) It follows, in light of my views above, that the second element identified by Lord Hoffmann, namely that the defendant has beneficially received assets which are traceable as representing assets of the plaintiff, is in principle also made out."

And he went on to explain that he would have been of the same view even if he had been wrong in holding (earlier in his judgment) that the new PEL shares had been issued on January 3rd, 2007 (rather than on a later date—January 19th, 2007—as contended by the Gilbertson parties). He rejected the argument, advanced on behalf of the Gilbertson parties, that the issue of shares on January 19th, 2007 (some 16 days after Mr. Gilbertson's breach of fiduciary duty on January 3rd, 2007, if any)—even if constituting a disposal of the assets of the master fund—could not be said to be the disposal of assets traceable to any breach of fiduciary duty by Mr. Gilbertson. He said this (*ibid.*, at para. 77):

> "[T]hat date [January 19th, 2007] is in my view sufficiently close to January 3rd, 2007 and the share issue sufficiently related to the actions of Mr. Gilbertson at about that time to satisfy me that in the circumstances the assets received by Autumn in the form of the new shares may be said to be traceable to Mr. Gilbertson's breach of fiduciary duty."

In the alternative, he said, Mr. Gilbertson's procurement of the issue of the new PEL shares, even if not effective until January 19th, 2007, was not disclosed and was unknown to the Renova parties and it might be argued that that was simply a perpetuation of Mr. Gilbertson's breach of duty. The judge concluded that the PEL shares issued to Autumn in January 2007 were "traceable as representing assets which ought to properly have belonged to the master fund" and that "the issue of the PEL shares provided Autumn with a gratuitous share of the rights through a shareholding in PEL which belonged to and should have remained with the master fund."

185 The judge then turned to what he described as "the key question": whether Autumn had the requisite knowledge. He addressed that question: 2012 (2) CILR 416, at paras. 79–91. He explained (*ibid.*, at para. 79) that Autumn was an "off-the-shelf" BVI company that had been acquired on January 2nd, 2007 by Fairbairn, as trustee of the BPG Settlement, as a special purpose vehicle through which the BPG Settlement would make a loan by to PEL in order to fund Mr. Gilbertson's share of the purchase price of the Fabergé rights and to hold the new PEL shares which Mr. Gilbertson would procure to be issued to it; that Autumn was wholly owned by Fairbairn and Fairbairn's associated company, Fairbairn Corporate Services Ltd. ("FCSL"); that Mr. Thomas was a director of Fairbairn; that Mr. Thomas became Autumn's sole director; and that Mr. Thomas was also a director of FCSL. He went on to say (*ibid.*, at para. 80) that there were, arguably, two different ways in which Autumn could be said to have the requisite knowledge: (i) by imputation to it of Mr. Gilbertson's actual knowledge, or (ii) through what Mr. Thomas knew or should have known.

186 The judge set out (*ibid.*, at para. 81, in seven numbered sub-paragraphs) the factors on which Renova relied in support of its submission that "Mr. Gilbertson was in reality and in practice the directing mind and will of Autumn which was an entity effectively controlled by Mr. Gilbertson"; that Fairbairn (through Mr. Thomas) "was simply going through the motions in relation to his request for the money but in reality was acting on Mr. Gilbertson's instructions"; and that, accordingly, Mr. Gilbertson's knowledge of all the relevant background and circumstances was to be imputed to Autumn. He explained (*ibid.*, at para. 84) that it was submitted on behalf of the Gilbertson parties that, in order to hold that Mr. Gilbertson was in practical terms the directing mind and will of Autumn, it was necessary to conclude that "Mr. Thomas had failed in his duties in respect of Autumn as a matter of fact"; that (it was said) the evidence of Mr. Thomas demonstrated that he took his duties very seriously; and that there was no basis for the suggestion that he allowed Mr. Gilbertson to override him. The judge rejected that approach. He said this (*ibid.*, at para. 85):

> "From my own assessment of the evidence, I consider that the reality is, as I have already said, that Mr. Gilbertson is a forceful and tough businessman and he is no doubt the source of the funds in all three of the Gilbertson family trusts. He was not, in my view, the kind of man who would readily take no for an answer. Mr. Thomas would not want to upset or disagree with his client. My impression was that he was very ready to comply with Mr. Gilbertson's requirements and to place great reliance upon him in doing so. There was no question of Mr. Gilbertson overriding him; there was little or nothing to override. Mr. Thomas went through the motions but there was never any doubt that he would comply with Mr. Gilbertson's request and Mr. Gilbertson knew and relied upon that."

187 The judge directed himself (*ibid.*, at para. 86 of his judgment) that the answer to the question whether Autumn could be said to have the requisite knowledge as a consequence of what Mr. Thomas knew or should have known turned on whether Mr. Thomas knew, or should have known if he had made appropriate independent enquiries, that the Fabergé rights were being acquired by or for the benefit of Mr. Gilbertson in circumstances which amounted to a breach of his fiduciary duties, and that the "requisite knowledge," in that context, was knowledge that the shares issued by PEL in January 10th, 2007 were traceable to a breach of fiduciary duty by Mr. Gilbertson. He explained (*ibid.*, at para. 87) that Renova's case was that Mr. Thomas knew all about the Pallinghurst structure and knew that Renova had an interest under that structure: as he said, the structure chart (which Mr. Thomas had seen) made that clear. He referred (*ibid.*, at para. 88) to the evidence of the telephone conversation between Mr. Thomas and Mr. Gilbertson on January 2nd, 2007 in the

course of which, he said, Mr. Thomas enquired about the relationship between Pallinghurst and Mr. Vekselberg and received an answer from Mr. Gilbertson which "clearly indicated that Mr. Vekselberg would think Mr. Gilbertson was doing something which he was not entitled to do with regard to Mr. Vekselberg and the duties which Mr. Gilbertson owed in respect of the Pallinghurst structure." That telephone conversation, he said, "should . . . have alerted Mr. Thomas and caused him to at least make further independent enquires" but "he did not do so because he did not feel able or willing to seriously challenge or question what Mr. Gilbertson wanted." He explained (*ibid.*, at para. 89) that it had been submitted on behalf of the Gilbertson parties that there was no evidence that Mr. Thomas knew that Mr. Gilbertson was a director of the company but said that it was hard to believe that he did not, given his familiarity with the Pallinghurst structure and the fact that Fairbairn was a 50% shareholder of the company, and that, in his view, the probability was that Mr. Thomas did know that Mr. Gilbertson was a director of the company. He went on to say this (*ibid.*, at paras. 90–91):

"90 With regard to the issue of the new shares in PEL to Autumn, Mr. Thomas knew PEL was a Pallinghurst company, wholly owned by the master fund and indirectly owned through the company which was owned 50% by the plaintiff, Renova Resources, and 50% by Fairbairn itself. Mr. Thomas must have realized that the master fund's, and thus indirectly the company's, interest in PEL was going to be diluted as a result of the issue of such shares which would be seriously prejudicial to the master fund and the Pallinghurst structure in which Renova, and so indirectly Mr. Vekselberg, had an interest. Mr. Gilbertson's answer to his question about Mr. Vekselberg's likely reaction to Mr. Gilbertson purchasing the Fabergé brand as a Christmas present for himself should have alerted him to the fact that there would be a problem as a result of what Mr. Gilbertson was doing.

91 It was argued on behalf of the Gilbertson parties that Mr. Vekselberg would be 'extremely pissed off' because Mr. Vekselberg wanted to acquire the rights for himself. That is, of course, a rather incomplete description of Mr. Vekselberg's position in that he also took the position that the economic benefits and management of the Fabergé brand should remain with the master fund. However, the fact is that that suggestion was anyway not made entirely clear to Mr. Thomas in the telephone conversation. In my view, the only interpretation available to Mr. Thomas of Mr. Vekselberg's likely reaction, in light of his own knowledge of the Pallinghurst structure and what he had otherwise been told by Mr. Gilbertson, was that Mr. Gilbertson was doing or proposing to do something contrary to the interests of the master fund, which was indirectly owned by the company, of which Mr. Gilbertson was a director and Fairbairn was a 50%

shareholder, as part of the Pallinghurst structure, in which Renova and Mr. Vekselberg had an interest. Mr. Thomas knew, or at least should have known, that he should at least make further enquiries in relation to Mr. Gilbertson's actions or proposed actions. In my view, Mr. Thomas must or ought to have realized that Mr. Gilbertson was or was likely to be in breach of his director's duties and that proceeding to implement Mr. Gilbertson's request in the circumstances without more information and without the knowledge of Renova and/or Mr. Vekselberg would be inappropriate for a prudent trustee."

188 The judge (2012 (2) CILR 416, at paras. 93–95) addressed the question whether Autumn was to be treated as a constructive trustee of the PEL shares issued to it in January 2007 (independently of "knowing receipt") because it received those shares as a volunteer. He explained (*ibid.*, at para. 93) that Autumn never paid for those shares: it received them at the same time as, but not as part of, the loan transaction whereby it lent PEL the sum of US$9.5m. (and then the further sum of US$0.5m.) at interest. He noted that the board resolution of PEL on January 3rd, 2007 described the issue of the shares as being "in addition to the loan," and said that there was no apparent commercial connection between the loan and the issue of the shares. It was apparent, he said, that "the shares were a gift from the start and they were treated as such when the loan was repaid." He rejected (*ibid.*, at para. 94) the submissions advanced on behalf of the Gilbertson parties that "whatever the precise circumstances in which the new shares were issued, such issue was part of the wider commercial transaction and should not be separated from the loan transaction," and that, if (as he held) Autumn did not pay for the PEL shares, "as a result of its acquisition of the shares it is a debtor of Fabergé Ltd. in respect of the shares and accordingly not a volunteer." He rejected each of those contentions on the ground that they did not accord with the evidence or the circumstances. He said this (*ibid.*):

"The new shares were issued in January 2007, some 5½ years ago, and there is no evidence that any demand for payment in respect of the shares has ever been made nor any indication that Autumn (or for that matter any of the other members of the consortium) is expected to pay for the new shares or is considered a debtor in respect of them. Nor, as far as I am aware, has Autumn or any of the other members of the consortium ever made any offer to pay for the shares. In my opinion, the evidence clearly indicates that Mr. Gilbertson procured PEL (now Fabergé Ltd) to issue the new shares gratuitously for no consideration or expected consideration."

And he went on to say this (*ibid.*, at para. 95):

23-01165-mew Doc 84-5 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit B-4 - Autumn Holdings Asset Inc v Renova Res Private Equity Ltd [2017 (2 Pg 19 of 40



> "Accordingly, the plaintiff argues, Autumn was never a *bona fide* purchaser for value without notice. Equity will not assist a volunteer: see *In re Diplock* . . . ([1947] Ch. at 781–784, *per* Wynn-Parry, J.). Therefore, on this basis also, Autumn holds the shares concerned in Fabergé Ltd. (formerly PEL) on constructive trust for the master fund/GPLP/the company and is liable to account for them. In the circumstances I agree with that submission."

189 The judge gave effect to his conclusion by declaring, at para. 1 of his order of November 6th, 2012, that Autumn held the shares issued to it by PEL in January 2007 (which had become 25,000 ordinary shares in Fabergé Ltd., following a change of name and a sub-division of shares in 2008) as constructive trustee for the master fund, and by directing (at para. 2) that Autumn should forthwith transfer those 25,000 ordinary shares to the master fund.

***The parties' submissions on this appeal***

190 Autumn appeals against that declaration and the order to transfer. The grounds on which that appeal is advanced are that the judge misdirected himself and erred in law and/or fact (i) in relation to the issuance of shares in PEL to members of the consortium; (ii) in holding that Autumn was liable in knowing receipt having regard to its relationship with Mr. Gilbertson, the property which it received, the person from whom it received the property and its state of knowledge at the time of receipt; and (iii) in holding that Autumn was liable as a volunteer. In resisting Autumn's appeal, it is submitted on behalf of Renova that the judge was correct to make the findings of law and of fact that he did.

191 It is said on behalf of Autumn, by way of introduction, that a claim that it holds the PEL shares which it received as a constructive trustee cannot arise unless there was a relevant breach of fiduciary duty by Mr. Gilbertson. But (given the judge's finding that Mr. Gilbertson was in breach of fiduciary duty), it is submitted that it is important to keep in mind that (prior to the issue of the PEL shares) Autumn was not a fiduciary in relation to the master fund, and that, in this context, there is a significant difference between claims against fiduciaries and claims against third parties. A fiduciary may be required to account for an asset or opportunity that it acquires for itself in breach of duty notwithstanding that the beneficiary had no proprietary claim to that asset. A third party can only be required to account as a constructive trustee for an asset to which the beneficiary does have a proprietary claim, although (it is accepted) it is unnecessary for the beneficiary to show that it has suffered loss.

192 It is pointed out that, in the present case, Renova had pleaded a claim against Autumn based on the premise that Autumn was

Mr. Gilbertson's alter ego, on that premise Renova was able to formulate a non-proprietary claim against Autumn for an account of profits. But, it is said, Renova did not pursue its pleaded allegation that Autumn was Mr. Gilbertson's alter ego and, in those circumstances, there was no longer any basis for a non-proprietary claim for an account of profits: in order to obtain the relief which it sought, it was necessary for Renova to advance a proprietary claim against Autumn. The proprietary claims advanced were (i) a claim in knowing receipt; and (ii) a claim for the return of property acquired as a volunteer. The elements of the two proprietary claims are not the same but, it is said, the requirement that Autumn was the recipient of property, or the traceable proceeds of property, of the master fund is common to both.

193 Properly analysed, as it seems to me, the requirement common to both proprietary claims is that Mr. Gilbertson's breach of fiduciary duty to the company (and, more generally, to the master fund and the other entities within the Pallinghurst structure) caused Autumn to receive property of the master fund, or the traceable proceeds of such property. If that condition is satisfied, then Autumn is required to account to the master fund as a constructive trustee for what it received, unless it can rely upon circumstances which lead to the conclusion that such an order would be inequitable. Those circumstances include receipt of the property (or proceeds) as a bona fide purchaser without notice. A claim on the basis of "knowing receipt" is a claim that the recipient knew (or ought to have known) of the breach of fiduciary duty, and so cannot assert that it would be inequitable to require it to account as a constructive trustee.

194 In those circumstances, it is convenient to address the submissions of the parties under four heads: (i) whether the judge was wrong to make the findings of fact that he did in respect of the issue of the new PEL shares in January 2007; (ii) whether, upon the issue of the new PEL shares in January 2007, Autumn was the recipient of property of the master fund, or the traceable proceeds of such property; (iii) whether Autumn received the new PEL shares as a volunteer and not as a purchaser for value and so held those shares as a constructive trustee for the master fund; and (iv) whether, if (and notwithstanding that) Autumn received the new PEL shares as a purchaser for value, it held those shares as a constructive trustee for the master fund on the basis of "knowing receipt."

(i) *Whether the judge was wrong to make the findings of fact that he did in respect of the issue of the new PEL shares in January 2007*

195 It is said on behalf of Autumn that the judge misdirected himself and erred in law and/or in fact in holding:

(1) That the new shares issued by PEL were issued on January 3rd, 2007.

Had the judge directed himself properly, it is said, he should have found (i) that the new shares were issued at a later date (said, on the evidence before the judge, to be January 19th, 2007); and (ii) that, on that basis, Mr. Gilbertson was not in breach of any fiduciary duty he owed to the company, given the evidence as to the dealings between the parties in the period after January 3rd, 2007.

(2) That Autumn had not given value for the new PEL shares.

Although the judge may have been correct to find that neither Autumn nor the other members of the consortium paid for the shares, nevertheless, it is said the issue of the shares served a clear commercial purpose, in that the issue was "clearly calculated to cause the consortium to forbear from demanding repayment" of the moneys lent to fund the acquisition of the Fabergé rights and by way of working capital and such forbearance may be seen as giving value in equity. Further, it is said, the new PEL shares served as a form of alternative security. In all the circumstances, it is said that, far from giving no value, the value Autumn and the other members of the consortium gave was what enabled PEL to survive.

(3) That Mr. Gilbertson had procured the issue of the new PEL shares.

In the circumstances that, it is said, the judge referred to no evidence to support a finding that Mr. Gilbertson procured the issuance of the new PEL shares, he appears to have been content to assume that Mr. Gilbertson must have done so. There was no basis for this assumption.

196 As I have said, earlier in this judgment, the judge found (at para. 9.48 of his judgment) that the register of members of PEL showed that the new shares were issued on January 3rd, 2007, and he rejected the contention, pleaded by the Gilbertson parties in their amended defence, that, as a matter of fact, those additional 100 shares were not issued by PEL until January 19th, 2007, or thereabouts. I have already explained why I take the view that the judge was entitled to reach the conclusion that he did. It is unnecessary to revisit that point under this head. But I should add, for completeness, that I agree with the judge—and I accept the submission advanced on behalf of Renova on this appeal—that, in any event, success on its contention that the new PEL shares were not issued until January 19th, 2007, or thereabouts, would not assist Autumn in the present context. I reach that conclusion for three reasons:

(1) There is no dispute that 100 new PEL shares were issued in January 2007 (whether on January 3rd, 2007, or on a later date), and that 25 of those shares were issued to Autumn: the actual date upon which those shares were issued is irrelevant to the question whether the 25 new PEL shares issued to Autumn in January 2007 could be the subject of a proprietary claim in these proceedings.

(2) As I have explained, Mr. Gilbertson's breach of fiduciary duty occurred when he decided that new PEL shares should be issued to his consortium in order to obtain control of the Fabergé rights for his own benefit (or for the benefit of the consortium): the actual date upon which the shares were issued is irrelevant to the question whether or not there was a breach of fiduciary duty upon which Renova can rely in these proceedings. Even if (which I do not accept) the evidence of events which took place after January 3rd, 2007 would, or should, have led the judge to find that, by January 19th, 2007, the parties were negotiating on the basis that the master fund had no separate interest in the Fabergé rights, there was no evidence to support the view that that finding would, or should, have led to judge to conclude that Mr. Gilbertson took the decision which led to the issue of the new PEL shares later than January 3rd, 2007.

(3) For the reasons which I shall explain in this section of my judgment, Autumn had knowledge of that decision—and knowledge that it gave rise to a breach of duty by Mr. Gilbertson—on, or just before, January 3rd, 2007 when, following the telephone conversation between Mr. Gilbertson and Mr. Thomas on January 2nd, 2007 and the transfer by Fairbairn, as trustee of the BPG Settlement, of US$9.5m. to enable Autumn to reimburse K-MIC in respect of 25% of the US$38m. loan to PEL by means of which the cost of acquiring the Fabergé rights from Unilever was funded: the actual date upon which the new shares were issued by PEL is irrelevant to the question whether or not Autumn had the requisite knowledge in the context of the claim in these proceedings based on knowing receipt (save, perhaps, that—if the new shares were not issued until January 19th, 2007, as Autumn contends—there was all the more reason for Mr. Thomas to make enquiries as to the reason for the time that had elapsed following the acquisition of the Fabergé rights some two and a half weeks earlier).

197 In developing the submission that the judge was wrong to find that the members of the consortium had not given value for the PEL shares that were issued to them in January 2007, it is said on behalf of Autumn that:

(1) The directors of PEL must be taken to have thought that those to whom the new PEL shares were issued were giving value for those shares in that they caused those shares to be entered in the register of members as fully paid. The entry in the register is, it is said, *prima facie* evidence that Autumn paid for the shares. Mr. Thomas was unable to recall one way or the other, and the Renova parties elected not to cross-examine Mr. Sean Gilbertson on the issue.

(2) Mr. Thomas gave evidence to the effect that he had expected Autumn to receive shares by way of security. It is true that the loan documentation simply provided the consortium with a lien over the Fabergé rights by way of security but the loan documentation was "only

part of the story." The moneys to fund the acquisition of the Fabergé rights were raised in a hurry: formal arrangements took time to catch up.

(3) The lien over the Fabergé rights and the issue of the new PEL shares should be seen as complementary: the PEL shares "were no more than Autumn had expected it would have when the transaction was initially put to it." Autumn advanced—and refrained from seeking to recover—US$9.5m. on the basis that its interests were sufficiently protected by its ownership of PEL shares.

198 In response to those submissions it is said on behalf of Renova that:

(1) It is well established that it is for a third party who has acquired property as a result of a breach of trust by a fiduciary—and who seeks to resist a constructive trust claim—to satisfy the court that it was a bona fide purchaser of the property acquired for value and without notice. In support of that proposition reliance is placed on observations of Sir Collins, M.R. and of Cozens-Hardy, L.J. in *Re Nisbet & Potts' Contract* (27) ([1906] 1 Ch. at 403 and 410), and in *Lewin on Trusts* (18th ed., para. 41–114, at 1720, paras. 42–22 – 42–23, at 1743–1744 (2008)). Autumn bears the burden of proving that it gave value for the new PEL shares that were issued to it in January 2007. On the evidence before the judge it cannot discharge that burden.

(2) Autumn appears to accept that the consortium gave no consideration for the new PEL shares in the sense in which the term is used at common law. If it gave no consideration sufficient even to support a contract, then it must follow that it gave no value in the context of the bona fide purchaser defence to a constructive trust claim. In support of that proposition Renova relies on observations of Neuberger, J. in *Nurdin & Peacock plc* v. *DB Ramsden & Co. Ltd.* (29) ([1999] 1 EGLR at 123):

> "Second, it was contended that the payment of £1 under the 1995 transfer constituted sufficient 'value' to render Nurdin a 'purchaser for value'. In the field of contract, it is well established that the court does not inquire into the adequacy of consideration: once it has established that some consideration has moved, that is enough for establishing the essential prerequisite of a contract. However, the doctrine of consideration has been developed in the context of the common law, whereas the concept of a 'purchaser for value' in a case such as this has a very different history, being solidly based on equity. In this connection, it is worth remembering that equity looks at the substance and not at the form. It seems to me that, particularly in the context of an intra-group transfer, the substance of a payment of £1 does not render a transferee a 'purchaser for value.'"

Accordingly, even if, on the basis of the Register of Members, Autumn were presumed to have paid the par value for the new PEL shares issued to

it in January 2007, such a nominal consideration (far below the commercial value of the new shares) does not support a defence of "purchaser for value."

(3) Further, equity requires that value is actually paid. In support of that proposition, Renova relies on the decision in *Story* v. *Windsor (Lord)* (34) and the commentary in Megarry & Wade, *The Law of Real Property*, 7th ed., para. 8.008, at 257 (2008). The evidence given by Mr. Thomas at trial was that he could not recall that Autumn ever paid for the new PEL shares.

(4) The submissions that the new PEL shares were issued as security for the loans or to persuade the lenders not to demand repayment of the loans—advanced on behalf of Autumn in this court—were not advanced at trial and are "manifestly contrary to all the evidence." In particular:

(i) The board resolution of January 3rd, 2007 contains an express statement that the share issue was "in addition to the loan" made to enable PEL to pay Unilever.

(ii) In their evidence at trial, Mr. Gilbertson and Mr. Thomas accepted, without equivocation, that the issue of the new PEL shares was not a term or condition of the loan by Autumn. The draft loan agreement (which post-dated both the making of the loan and the issue of the shares, which was never finalized or executed and which contained a term as to security) made no reference to the issue of the new PEL shares.

(iii) There was no evidence of any discussion that the issue of the shares would be taken to be in substitution of the grant of security, and such a discussion would be inconsistent with the order in which events occurred.

(iv) The consortium did not need security for their loans because the terms of the loans (as recorded in the board minutes of January 3rd, 2007) entitled its members to call for repayment of the loan within seven days either in cash or (at their discretion) by the transfer of all of the assets, contracts and receivables of PEL to a vehicle nominated by them. It was for that reason that cl. 11 of the subsequent draft loan agreement took the form that it did.

(v) In his evidence at trial, Mr. Thomas accepted that he had been wrong to say (in his witness statement) that he had expected to receive shares by way of security.

(5) As all the evidence shows, the loans and the issue of new PEL shares were separate transactions. The new PEL shares were not consideration for the loans: they were simply a gift, "to sweeten the deal for the consortium and to enable Mr. Gilbertson to follow through on his plan to 'negotiate with the Russians from a position of strength.'" The shares were not accepted by the consortium as the price of its forbearing to demanding security for the loan.

199 I reject the submission that the judge was wrong to find that the members of the consortium had not given value for the PEL shares that were issued to them in January 2007. The description in the register of members of the new shares as "fully paid" is no more than a statement that there is no liability on the holders of those shares to pay future calls: it is not a statement that the persons to whom the shares have been issued have paid (or otherwise given value) for those shares. Nor is there any evidence that the new PEL shares were issued by way of security for repayment of the moneys lent by members of the consortium in order to fund the purchase of the Fabergé rights. As the minutes of the directors' meeting held by telephone conference call on January 3rd, 2007 record, the loans were made on terms that the lenders might, at any time, call for repayment within seven days; such repayment to be made either in cash or (in the sole discretion of the lenders) by the transfer of all the assets, contracts and receivables of PEL "to a vehicle nominated by the Lenders." In those circumstances, ownership of the new PEL shares provided no additional security for the repayment of the loan—in that, if the loans were not repaid on demand, those shares would become worthless. Further, there was no provision for the redemption—by cancellation (or re-transfer to PEL)—of the new shares in the event that the loan were repaid.

200 I have addressed, in an earlier section of this judgment, the submission that the judge was wrong to hold that Mr. Gilbertson had procured the issue of the 100 new PEL shares in January 2007. For the reasons that I have already set out, it is fanciful to suggest that the decision to issue those shares—although implemented by Mr. Sean Gilbertson and Mr. Andrew Willis (as the directors of PEL)—was not a decision taken by Mr. Gilbertson as a necessary element in his scheme to obtain control of the Fabergé rights (by diverting effective ownership of PEL from the master fund to his consortium) in order, thereafter, to "negotiate with the Russians from a position of strength." It is unnecessary to revisit that point.

(ii) *Whether, consequent upon the issue of new PEL shares in January 2007, Autumn was the recipient of property, or the traceable proceeds of property, of the master fund*

201 Autumn reminded the court of Hoffmann, L.J.'s observation in *El Ajou* v. *Dollar Land Hldgs. plc* (16) ([1994] 2 All E.R. at 700), and

submitted that "opportunities" must be distinguished from "assets." In support of that distinction, Autumn relied on passages in *Cook* v. *Deeks* (14); *Competitive Ins. Socy. Co. Ltd.* v. *Davies Invs. Ltd.* (13); *Belmont Fin. Corp.* v. *Williams Furniture Ltd. (No. 2)* (7); *Charter plc* v. *City Index Ltd.* (11), and, by contrast, *Satnam Invs. Ltd.* v. *Dunlop Heywood & Co. Ltd.* (33), and *Commonwealth Oil & Gas Co. Ltd.* v. *Baxter* (12).

202 Renova recognizes the distinction between opportunities and assets but submits that what it describes as "the controversial issue about whether corporate opportunities or information are property for the purposes of a proprietary claim" does not arise in the present case. That issue does not arise, it is said, because the assets in respect of which Renova's proprietary claim is advanced are the new PEL shares issued to Autumn in January 2007, and those new shares are "the traceable product of either the Rights, or the contractual right to the Rights under the SPA." This, it is said, differs from the more usual corporate opportunity case—of which *Satnam Invs.* provides an example—in which the asset in respect of which the proprietary claim is advanced was acquired (by the defendant) by the use or exploitation of a commercial opportunity wrongfully diverted from the claimant. Properly understood, the new PEL shares issued to Autumn represented substantially the whole of the value of an asset (the Fabergé rights) which, at the time the shares were issued, was owned by PEL and so, indirectly, owned by the master fund as the owner of 100% of PEL. The Fabergé rights were not a "corporate opportunity"—comparable to the confidential information in the *Satnam* case—they were themselves an asset. So, also, was the master fund's holding (immediately prior to the issue of the new shares) of 100% of the issued share capital of PEL.

203 It is submitted on behalf of Autumn that the master fund had no proprietary interest in the new PEL shares issued in January 2007: in that, until those shares were issued by PEL, they did not exist. In support of that submission, Autumn relies on observations in the judgment of the majority in *Pilmer* v. *Duke Group Ltd.* (30) ([2001] 2 BCLC 773, at para. 20), a decision of the High Court of Australia. It is pointed out that, before the issue of the new PEL shares to members of the consortium in January 2007, the master fund was the owner of one PEL share, and that, after the issue of the new PEL shares to members of the consortium, the master fund remained the owner of that PEL share. What changed was not the identity of the asset owned by the master fund, but the characteristic of that asset in relationship to the ownership of PEL. The effect of the issue of the new shares to members of the consortium was that the proportionate interest in PEL associated with ownership of that one share changed from 100% to less than 1%. Those submissions are, if I may say so, self-evidently correct, and they are not, I think, in dispute. But they provide no

answer to what (as Renova submits) is the relevant question for determination under this head: whether, consequent upon the issue of new PEL shares in January 2007, Autumn was the recipient of the traceable proceeds of property of the master fund.

204 It is accepted on behalf of Autumn that there is a sense in which the master fund may be said to have owned the Fabergé rights, albeit indirectly, and that what was diverted to Autumn (and the other members of the consortium) was that indirect ownership. But, it is said, although "indirect ownership" might be sufficient to describe that in relation to which the master fund may have suffered any loss, "indirect ownership," short of equitable title, does not constitute an asset. Upon acquisition of the Fabergé rights by PEL from Unilever (on completion of the SPA on January 3rd, 2007), PEL became the legal owner of those rights. It is not suggested—and could not be suggested—that PEL held those rights as trustee for the master fund. Again, as it seems to me, those submissions are correct but, again, they provide no answer to the question for determination under this head.

205 As I have said, the question for determination under this head is not (or not limited to) whether assets of the master fund were diverted to Autumn: the question for determination includes whether Autumn was the recipient of the traceable proceeds of property of the master fund: as Autumn accepts, a proprietary claim is not confined to the initial property, since the claimant's interest in the initial property may be traced into other property that the defendant holds in its place. But, it is said correctly, in order to trace into substitute property, it is first necessary to identify the initial property for which the substitute property is to be a substitute. In the present case, as it seems to me, the relevant question in this context is whether the master fund's holding (immediately prior to the issue of the new shares) of 100% of the issued share capital of PEL can be traced into the PEL shares issued to Autumn (and, so far as material, to the other members of the consortium). It is said on behalf of Autumn that the answer to that question must be "No," but it is significant that the reason given by Autumn for that conclusion is not that, at all relevant times, the master fund remained the holder of the single share in PEL (so that it could not be said that that share had been diverted to Autumn, or to any other entity); rather, it is said that the single PEL share owned by the master fund "hardly offers an auspicious starting point for any claim by Renova on behalf of the master fund, since, if Renova had had its way, the Rights would not have been acquired in the name of a Fund entity and the share would have remained of no more than nominal value." If I may say so, that ignores the undisputed fact that, immediately before the 100 new PEL shares were issued, PEL, as contractual purchaser under the SPA (into which it had entered with the knowledge and consent of Renova), had acquired the Fabergé rights from Unilever.

206 It is said on behalf of Renova that the judge was correct, for the reasons which he set out (2012 (2) CILR 416, at paras. 76–77), to conclude that the answer to the question whether the master fund's holding (immediately prior to the issue of the new shares) of 100% of the issued share capital of PEL can be traced into the PEL shares issued to Autumn was "Yes." The short point, it is said, is that "tracing" in equity is concerned with value, not with assets *in specie*. In support of that proposition, Renova submits:

(1) It is common ground in this court that a claim against a non-fiduciary third party for an account as a constructive trustee is a proprietary claim. When Hoffmann, L.J. referred, in the *El Ajou* (16) case ([1994] 2 All E.R. at 700) to "assets traceable as representing the assets of the plaintiff" he chose his words with care. He was referring to the need for the asset in the hands of the defendant to be such as would entitle the plaintiff to trace into it at law or in equity. In other words, the defendant need not be shown to have received *in specie* the actual asset which was previously owned beneficially by the plaintiff; it is enough if what he received was "traceable as representing" that asset. It is plain that Hoffmann, L.J. had equitable tracing in mind.

(2) There is a difference between "following" and "tracing." Tracing is concerned not with locating the asset formerly owned by the plaintiff but with identifying whether there is an asset in the hands of the defendant in which the value of the original asset is now located. That equitable tracing is about tracing value is clear from the speech of Lord Millett in *Foskett* v. *McKeown* (17) ([2001] 1 A.C. at 127–128):

> "The process of ascertaining what happened to the plaintiffs' money involves both tracing and following. These are both exercises in locating assets which are or may be taken to represent an asset belonging to the plaintiffs and to which they assert ownership. The processes of following and tracing are, however, distinct. Following is the process of following the same asset as it moves from hand to hand. Tracing is the process of identifying a new asset as the substitute for the old.
>
> . . .
>
> The claimant claims the new asset because it was acquired in whole or in part with the original asset. What he traces, therefore, is not the physical asset itself but the value inherent in it.
>
> Tracing is thus neither a claim nor a remedy. It is merely the process by which a claimant demonstrates what has happened to his property, identifies its proceeds and the persons who have handled or received them, and justifies his claim that the proceeds can properly be regarded as representing his property."

207 In the present case, it is said:

(1) As at December 22nd, 2006, the master fund owned 100% of the share capital of PEL. It did so by holding the single issued share which it had acquired on December 1st, 2006.

(2) From that date, PEL had a valuable contractual right under the SPA; that is to say, the right to purchase the Fabergé rights from Unilever on payment of US$38m. at completion. It acquired that right with the intention that it, and through it the master fund, would keep the full economic benefit of the Fabergé rights at completion.

(3) On January 3rd, 2007, PEL completed the SPA and acquired the Fabergé rights unconditionally. In order to do so, PEL incurred a loan liability to members of the consortium who had funded the purchase, and a liability for interest on that loan. At that point, the master fund owned 100% of PEL, which held the rights and owed US$38m. Any upside value of the rights over and above US$38m. would accrue for the benefit of the master fund.

(4) Also on January 3rd, 2007, according to its records, 100 new PEL shares were issued to the members of Mr. Gilbertson's consortium; in particular, 25 new PEL shares were issued to Autumn. The master fund's interest in PEL was thereby diluted from 100% to less than 1%. The effect of the share issue was that, although the master fund still owned its single PEL share, the value of its holding in PEL was reduced by over 99%. The value lost to the master fund was transferred to the consortium as the holders of the new shares.

(5) By this means (as was intended) the value of the 100% ownership of PEL (formerly represented by the single share held by the master fund) came to be represented by the 101 shares in PEL which existed post-dilution. Given that only one of those 101 shares was then held by the master fund, in excess of 99% of the value of the ownership of PEL was transferred to the members of the consortium.

In those circumstances, it is said, it is easy to see how the new PEL shares represent virtually the whole of the value of the formerly single PEL share owned by the master fund. It matters neither that the new shares are newly created property nor that the master fund still holds its one share. The value in the single share has moved and can be traced to the new shares in the hands of the recipients: they are in all senses its substitutes in value. The new shares thus represent the single share or, rather, represent the value of the economic and control rights inherent in ownership of the single share. If this analysis were wrong it would enable corporate form to defeat commercial substance. It would be anomalous if equity would (as it would) permit a tracing claim where Mr. Gilbertson procured PEL to transfer the rights (or to assign the SPA) to the consortium, or procured the

master fund to transfer PEL itself to the consortium, each of which transactions which would undoubtedly give rise to a proprietary claim against the consortium, but would not permit a tracing claim if he resorted to the simple expedient of procuring PEL to issue the consortium with 100 new shares in PEL. This anomalous conclusion is avoided if one follows Lord Millett's analysis in *Foskett* v. *McKeown* (17) and treats the tracing exercise as an exercise in the tracing of value and not an exercise in the following of property *in specie*.

208 I accept Renova's submission that the judge was correct to conclude that the value of the master fund's holding (immediately prior to the issue of the new shares) of 100% of the issued share capital of PEL can be traced into the PEL shares issued to Autumn in January 2007. In the events which happened, the position immediately before the issue of the 100 new shares was that PEL was the owner of the Fabergé rights, and as the holder of the single share then in issue, the master fund was the owner of 100% of the issued capital of PEL. The position immediately after the 100 additional shares were issued was that PEL remained the owner of the Fabergé rights but that the issued capital of PEL was owned as to 100/101 by the members of the consortium and as to 1/101 by the master fund; or, to put the point another way, substantially the whole of the value of the master fund's interest in PEL and (indirectly, through PEL) in the Fabergé rights had been transferred to the members of the consortium as owners of the new shares. In those circumstances, as it seems to me, the effect of the issue of the new PEL shares was that 100/101 parts of the master fund's ownership of the whole issued share capital of PEL was transferred to the members of the consortium and, in particular, 25/101 parts of the master fund's ownership of the whole issued share capital of PEL was transferred to Autumn. The value of what was transferred was represented by the new shares held by Autumn and the other members of the consortium, and can be traced accordingly. As Renova points out, to hold otherwise would be to allow corporate form to defeat commercial substance. It cannot be doubted that, had the transaction been carried out (as a matter of corporate form) in a slightly different way—by subdividing the existing single share in PEL into 101 new shares and then causing the master fund (as the owner of those 101 new shares) to transfer 100 of those shares to members of the consortium—the 100 shares so transferred could be followed into the hands of the transferees and could be the subject of a proprietary claim. To deny a proprietary claim in circumstances where what is, as a matter of commercial substance, the same transaction is carried out by the issue of new shares (rather than the creation of new shares by the subdivision of an existing share) would, indeed, be anomalous.

(iii) *Whether Autumn received the new PEL shares as a volunteer and not as a purchaser for value and so held those shares as a constructive trustee for the master fund*

209 As I have said earlier in this section, it is submitted on behalf of Autumn that the judge was wrong to hold that it received the new PEL shares issued in January 2007 as a volunteer and not as a purchaser for value. In particular, it is said that the evidence established (contrary to the judge's finding) that the new PEL shares were issued as security for the repayment of the loan which Autumn made to PEL, and that, had the judge directed himself properly, he should have concluded that Autumn did provide adequate consideration for the issue of the new shares. I have already rejected those submissions.

210 Nonetheless, the submission that the judge was wrong to hold that Autumn was liable to account as a constructive trustee for the PEL shares which it received in January 2007 is pursued on the ground that, even if Autumn (and the other members of the consortium) gave no consideration (in the sense in which that term is generally understood) for the shares that were issued to them, the issue of those shares served a clear commercial purpose—in that it was clearly calculated to cause the consortium to forbear from demanding repayment of the moneys lent—and such forbearance may be seen as giving value in equity. It is said, correctly (i) that PEL required moneys to pay for the acquisition of the Fabergé rights and by way of working capital; (ii) that the consortium lent PEL the moneys required on terms that entitled them to require PEL to transfer the Fabergé rights to them in the event that PEL was unable to repay those moneys within seven days of demand; (iii) that the issue of the new PEL shares had the effect that the consortium had no motive to demand repayment of the moneys within seven days; and, accordingly (iv) that PEL was given the time it required to raise the moneys needed to repay the loans by the issue of further shares. It is said, further, that—had there been a claim by PEL to recover the shares, founded on the allegation that, in causing the new shares to be issued, the directors of PEL had acted in breach of duty—the remedy sought would have been an order setting aside the issue of the new shares and that, in answer to that claim, Autumn would have been able to rely upon "change of position." Autumn would have been able to assert that, by accepting the shares issued in January 2007, it changed its position because it forbore from insisting on the security rights which it was promised under the loan agreement. A defence of change of position ought also to be available in a case brought against Autumn directly by or on behalf of the master fund as a shareholder in PEL.

211 Renova accepts that Autumn did lend money to PEL to assist PEL to pay Unilever, and provided further loan funds (US$0.5m.) for working capital. But, in response to the submission that the new PEL shares were

issued "to cause the consortium to forbear from demanding payment" of the moneys lent, it is said on behalf of Renova that to issue the shares for that purpose would make "no sense at all" because "that would have turned the loan into the price for the shares, which it was clearly not." Further, if the new shares had been issued for that purpose, when the consortium later came to demand repayment in September 2007, "they were doing something they were not entitled to do (and, what is more, in any event they held on to their existing shares)."

212 In my view it is unnecessary, in the circumstances of the present case, to address the question whether, in principle, a change of position defence could have been advanced in response to the claim against Autumn as a volunteer. It is unnecessary to address that question because there was no evidence to support the contention that, in making no call for repayment of the loans, the members of the consortium did change their position. It is clear from the evidence at trial that the members of the consortium were assured by Mr. Gilbertson that the loans were required as short term funding while the terms of an advantageous sale of the Fabergé rights to Mr. Vekselberg (whom, they were assured, was a ready and willing purchaser) were negotiated. There is nothing in the evidence to support the conclusion that the members of the consortium ever considered calling for repayment of the loans or that they forbore from doing so in reliance on a belief that their position as the holders of the PEL shares issued in January 2007 was unchallenged.

213 In those circumstances I reject the submission that the judge was wrong to hold that (whether or not it had knowledge of Mr. Gilbertson's breach of fiduciary duty in relation to the issue of the new PEL shares in January 2007) Autumn was liable to account for those shares as a constructive trustee.

(iv) *Whether, if (and notwithstanding that) Autumn received the new PEL shares as a purchaser for value, it held those shares as a constructive trustee for the master fund on the basis of "knowing receipt"*

214 In developing the second of its grounds of appeal—that the judge was wrong to hold that Autumn was liable as a constructive trustee on the basis of knowing receipt—it is said on behalf of Autumn that the judge was wrong to hold, or to proceed as if he had held, that the master fund had a sufficient proprietary interest in the new PEL shares to found a claim for knowing receipt. It is unnecessary to address that submission under this head. I have already held that the judge was entitled to take the view that the master fund had a sufficient proprietary interest in the new PEL shares to found a claim that Autumn account as a constructive trustee for the shares that were issued to it.

215 It is said, further, that the judge was wrong to hold, or to proceed as if he had held, that the issue of the new PEL shares by the directors of PEL involved a breach of their fiduciary duty such that the transaction could be impugned. Had the judge directed himself properly, it is said, he would have held that Renova had failed to plead any such case, and that any such case would have been hopeless in any event. It is unnecessary to address that submission under this head. Renova's claims in these proceedings (and, in particular, its claim that Autumn account as constructive trustee for the PEL shares issued to it in January 2007) are not founded on an allegation that—in causing those PEL shares to be issued—the directors of PEL (Mr. Sean Gilbertson and Mr. Willis) were in breach of the fiduciary duties which (as directors) they owed to that company; they are founded upon the allegation that—in causing the directors of PEL to give effect to his decision that the new PEL shares be issued—Mr. (Brian) Gilbertson was in breach of the fiduciary duties which he owed (as a director of the company) to the company and (more generally) to the master fund and/or the other entities within the Pallinghurst structure. I have already accepted that the judge was entitled to take the view that that allegation is well-founded.

216 It is also submitted under this head that Autumn lacked the requisite knowledge to make it unconscionable for it to retain the PEL shares issued to it in January 2007. Renova's primary response to that submission is that (as the judge held) Autumn was a volunteer in respect of those PEL shares, and that, as such, its knowledge (or alleged lack of relevant knowledge) of the circumstances in which they were issued is irrelevant. Equity does not aid a volunteer. I have already explained why I take the view that Renova is correct: on a true analysis it is unnecessary to address the issue whether Autumn knew or ought to have known of Mr. Gilbertson's breach of fiduciary duty in relation to the issue of the new PEL shares in January 2007. Nevertheless (although not strictly necessary) it is, I think, appropriate to do so.

217 As the judge found (at para. 2.3 of his judgment), Autumn was a special purpose vehicle set up by the professional trustees of one of Mr. Gilbertson's family trusts to hold the investment in PEL on behalf of a family trust. He held that Autumn had the requisite knowledge of Mr. Gilbertson's breach of fiduciary duty on the basis that there was to be attributed to it (a) Mr. Gilbertson's own knowledge; and/or (b) the knowledge of Mr. Thomas. It is said on behalf of Renova to be common ground that the relevant enquiry was whether Autumn had such knowledge of the circumstances in which the new PEL shares were issued in January 2007 that it would be unconscionable for it to retain those shares. In support of that proposition, Renova relies on observations in *Bank of Credit & Commerce Intl. (Overseas) Ltd.* v. *Akindele* (4). It is submitted

that the judge applied the right test, and that his analysis of the evidence of knowledge (2012 (2) CILR 416, at paras. 79–91) was correct.

(a) *The attribution to Autumn of Mr. Gilbertson's own knowledge*

218 It is, of course, accepted on behalf of Autumn that Mr. Gilbertson possessed the requisite knowledge of his own actions. The judge imputed Mr. Gilbertson's knowledge to Autumn on the basis of a number of factors (*ibid.*, at para. 81)—and concluded (*ibid.*, at para. 85) that Mr. Thomas "was very ready to comply with Mr. Gilbertson's requirements" and that "there was never any doubt that he would comply with Mr. Gilbertson's request and Mr. Gilbertson knew and relied upon that." In effect, it is said, the judge held that Mr. Gilbertson controlled Autumn and was its directing mind and will. It is submitted on behalf of Autumn that that finding was "plainly wrong as a matter of fact and as a matter of law," in that:

(1) As Hoffmann, L.J. observed in the Court of Appeal of England and Wales in *El Ajou* v. *Dollar Land Hldgs. plc* (16) ([1994] 2 All E.R. at 705–707)—and (as Lord Hoffmann) when delivering the opinion of the Judicial Committee of the Privy Council in *Meridian Global Funds Mgmt. Asia Ltd.* v. *Securities Commn.* (24), the answer to the question whether a person is the directing mind and will of a company depends upon the proper application of the rules of attribution in any given case. The directing mind and will of a company is either the person who is given the relevant responsibility by the constitution of the company or one who, by reason of the particular function he carries on within the company or by what he did with the acquiescence of the company, can be said to be the directing mind and will for the purposes.

(2) Mr. Gilbertson was not given any relevant responsibility in relation to Autumn by the constitution of that company; nor did he have such responsibility by reason of any particular function he carried on within that company; nor, given that the loan was not authorized by Mr. Gilbertson, can Autumn be said to have acquiesced in his authorization of it.

(3) In those circumstances, the facts found by the judge would not be sufficient to justify the attribution of Mr. Gilbertson's knowledge to Autumn, even assuming them to be true. It is said that:

(i) It may well have been the case that "Mr. Thomas would not want to upset or disagree with his client"; but "the vast majority of professionals will feel the same way."

(ii) It may well have been the case that Mr. Thomas was "very ready to comply with Mr. Gilbertson's requirements" but, as the settlor and a beneficiary, "Mr. Gilbertson was entitled to

expect Mr. Thomas to have regard to his wishes insofar as it was proper to do so without fettering his discretion."

(iii) It is true that Mr. Thomas was willing "to place great reliance upon [Mr. Gilbertson]" (as he accepted in evidence) but, "on the basis of his past dealings with Mr. Gilbertson Mr. Thomas had the highest regard for him."

(iv) The judge was wrong to hold that there "was little or nothing to override," in that there was unchallenged evidence before the court that Mr. Thomas had refused to make a loan on an interest free basis.

(4) To find that a professional trustee had allowed his will to be suborned to that of a beneficiary to such an extent as to justify treating the acts of the trustee as acts of the beneficiary and thus, attributing the knowledge of the beneficiary to the trust is a serious matter. It implies a degree of impropriety on the part of the professional trustee which the court should not find in the absence of compelling evidence. The judge referred to no such evidence to support his finding and the evidence was in fact to the contrary.

(5) For the court to hold that the independent mind and will of Autumn was defeated in the circumstances of this case would be to impose an unrealistic and unwarranted standard of independence on trustees.

219 In response to those submissions, it is said on behalf of Renova that the judge was right to conclude (2012 (2) CILR 416, at para. 85) that Mr. Gilbertson's knowledge could be imputed to Autumn, in that:

(1) In asking whether Fairbairn (as director of Autumn) and Mr. Thomas (as director of Fairbairn) deferred to Mr. Gilbertson in respect of the relevant decision (whether to accept the new PEL shares issued to the members of the consortium), instead of exercising autonomy, the judge (correctly) applied the principle identified in *Meridian Global Funds Mgmt. Asia Ltd.* v. *Securities Commn.* (24).

(2) There was "a wealth of evidence" to support the judge's conclusion that the answer to that question was "Yes":

(i) Autumn was a special purpose vehicle established solely for the purposes of making the loan to PEL to pay Unilever under the SPA and to receive the new PEL shares. It had no pre-existing business, and no other function. It was established as an immediate consequence of Mr. Gilbertson's demand of the trustees of his family settlement, the BPG Discretionary Settlement, for urgent payment. That was its *raison d'être*.

(ii) This was all Mr. Gilbertson's deal. As he told Mr. Thomas in the telephone conversation on January 2nd, 2007 "I have bought myself a Christmas present . . . and I need some money to pay for it."

(iii) It is plain that Mr. Gilbertson never doubted that the settlement trustees would do as he asked. He told Mr. Mende in his email of January 2nd, 2007 (to which the judge referred at para. 9.42 of his judgment) that he had to "extract it [the payment] from a set of Trusts in Jersey," and, as the judge noted (2012 (2) CILR 416, at para. 81(iii)), he described the role of the trustees as simply "processing paperwork."

(iv) Autumn was described by Clifford Chance (solicitors acting on Mr. Gilbertson's instructions) in a letter dated March 7th, 2007 as "in practice an entity controlled by [Mr. Gilbertson]." Mr. Gilbertson's complete confidence at the time that (as he told Mr. Mende) he would be able to "extract" US$9.5m. from the trust within a few days, and the fact that he did so, bears that out entirely.

(v) As the judge noted, during the time between Mr. Gilbertson's first call to Mr. Thomas on January 2nd, 2007 and his email to Mr. Vekselberg (in which he wrote that he had triggered alternative arrangements and bought the Fabergé rights)—a period of only some eight hours—Mr. Thomas had not got back to him to confirm that he would make the payment. Mr. Gilbertson's confidence that the trustees would do as he asked was such that he felt no need for such confirmation.

(vi) Fairbairn, as the director of Autumn, was content to let Mr. Gilbertson lead the commercial discussions with the other members of the consortium about the loan and the payment to Unilever: at no stage did Fairbairn (or Mr. Thomas) have any direct contact with the other members of the consortium.

(vii) Mr. Thomas was prepared to sanction paying away US$9.5m. of trust money at Mr. Gilbertson's request, without a signed or even finalized loan agreement, and without having carried out even minimal due diligence into the standing of PEL or the value of the Fabergé rights.

(viii) Autumn and Mr. Gilbertson shared a single defence team and a joint defence. Autumn did not produce its own discovery list and did not verify on oath such discovery as it made. Notwithstanding that there was an obvious conflict of

interest between Mr. Gilbertson and Autumn in relation to the issues in this case—not least in that it was in Autumn's interests to deny all knowledge of any breach and in Mr. Gilbertson's interests to say that he had made full disclosure to Autumn (or the trustees)—Mr. Thomas confirmed in his evidence at trial that Autumn had not taken its own independent legal advice. Not to do so would, he said, be cheaper and would simplify the process of getting the legal advice.

In those circumstances it is hard to see what further evidence Renova needed to adduce or rely upon in order to establish that Mr. Gilbertson was the directing mind and will of Autumn in relation to the loan and the receipt of the new PEL shares. Autumn's suggestion that Mr. Thomas's independence of mind is demonstrated by his refusal to make the loan on an interest-free basis is not well-founded: the evidence is clear that it was Mr. Sean Gilbertson (and not Mr. Thomas) who actually proposed that interest on the loan be paid at the rate of 1.5%—in order to make the loan "look commercial"—and that Mr. Thomas agreed to that proposal.

220 In my view, the submissions advanced in respect of this issue on behalf of Renova are to be preferred to those advanced on behalf of Autumn. I am satisfied that the judge was correct to hold (2012 (2) CILR 416, at para. 85) that there was never any doubt that Mr. Thomas would comply with Mr. Gilbertson's wishes in relation to the funding of the acquisition of the Fabergé rights and the receipt of the new PEL shares. In relation to that transaction Mr. Gilbertson was the directing mind of Autumn, and, accordingly, his knowledge is to be attributed to Autumn in that context.

(b) *The attribution to Autumn of Mr. Thomas's knowledge*

221 In advancing the submission that the judge was wrong to conclude that Autumn could be said to have the requisite knowledge as a consequence of what Mr. Thomas knew or should have known—and, in particular, to hold that Mr. Thomas should have known, if he had made appropriate independent enquiries, that the Fabergé rights were being acquired by Mr. Gilbertson in circumstances which amounted to a breach of his fiduciary duties—Autumn invites the court to have regard to the chronology of events (which it summarized as follows): (i) on January 2nd, 2007, Mr. Gilbertson telephoned Mr. Thomas to request that the trust make an investment of US$9.5m. to acquire the Fabergé rights for PEL plus a further US$0.5m. working capital; (ii) later on that day, Mr. Sean Gilbertson had a conversation with Mr. Thomas in which he explained to Mr. Thomas that the "investment" the trust was being asked to make was a loan; (iii) on January 3rd, 2007, Mr. Thomas approved the loan, indicating that he anticipated that it would be on commercial terms; (iv) on January 4th, 2007, Mr. Sean Gilbertson sent an email to Mr. Thomas indicating

that the loan would not be on commercial terms but would be a one-year interest-free arrangement, secured against the assets and receivables of PEL; (v) later that day, Mr. Sean Gilbertson spoke to Mr. Thomas—and to Mr. Daniel Hawson (a co-director of the corporate trustee)—on the telephone. They agreed a commercial rate of interest; (vi) later, but also on January 4th, 2007, Mr. Thomas committed Autumn to making the loan and instructed that the funds be wired to the K-MIC account, the details of which he had been given; and (vii) on January 5th, 2007, Mr. Thomas informed Mr. Gilbertson that he could "confirm that the USD9.5m. was sent yesterday for value yesterday" and that he had authorized the payment "on the basis that the Loan Agreement will stand as currently drafted (allowing for some minor amendments)." With that chronology in mind, it is said on behalf of Autumn that:

(1) In the course of the telephone conversation on January 4th, 2007 (before authorizing the loan), Mr. Thomas had asked Mr. Sean Gilbertson whether PEL (which, as he observed, had been established as recently as December 1st, 2006) was a "shell company, without anything else in it?" Mr. Sean Gilbertson's response was:

> "That is absolutely correct, it is an absolute fresh start and I can't even remember how many shares were issued, I mean it's probably one or two or something along those lines and there is—it would have been issued to a thing called Pallinghurst Resources Management LP, which is our fund entity."

Mr. Thomas then asked "who's the sort of shareholders behind that?" and was told:

> "Well, there aren't shareholders per se, I mean it's—it's literally a fund entity, so basically it's the fund entity into which the various investors of our fund would come into. At this point in time, there are basically zero investors, because the documentation—you've got all the documentation, Daniel has had the unfortunate task of having to trawl through it all, but the documentation is not signed and there are no technical investors in the fund entity itself. However, um, Brian serves as the chairman of that fund and it's by virtue of all the groundwork that we're doing that we're able to put this transaction into that structure, which obviously makes the fund that much more appetising."

It was not suggested to Mr. Thomas at the trial that he should have disbelieved what he was told by Mr. Sean Gilbertson in that telephone conversation.

(2) In those circumstances, it should not be in dispute that Mr. Thomas had reason to believe (i) that PEL had no substantial shareholders; (ii) that there were no investors in the fund; (iii) that the fund documentation

was yet to be effected; and (iv) that Mr. Sean Gilbertson and his father, Mr. Gilbertson, saw themselves as free to acquire the rights in PEL as an attraction to a potential investor in the fund.

(3) There was nothing complicated or obscure in what Mr. Sean Gilbertson told Mr. Thomas; nothing of which it could sensibly be contended that it was unconscionable of Mr. Thomas not to have enquired further, and the judge was wrong to have ignored that conversation on January 4th, 2007 and to focus his attention on the earlier conversation (on January 2nd, 2007) in which Mr. Gilbertson explained that Mr. Vekselberg would be "pissed off" to discover that Mr. Gilbertson had acquired the rights without doing a deal with him.

(4) The judge was wrong to hold (2012 (2) CILR 416, at para. 91) that Mr. Thomas knew, or could be taken to know, that Mr. Gilbertson was a director of the company or that the company had a place in the Pallinghurst structure, and wrong to hold (implicitly) that Mr. Thomas knew, or could be taken to know, that Mr. Vekselberg represented an interest in the fund and that the explanation for Mr. Vekselberg being "pissed off" was likely to reflect a breach of fiduciary duty to the master fund, rather than any agreement or understanding he may have had with Mr. Gilbertson personally or perhaps, simply the fact that he had not got his own way. None of those propositions could be sustained, in that:

(i) It was quite unrealistic to think that Mr. Thomas would know that Mr. Gilbertson was a director of the company. It was not alleged that Mr. Thomas had been told that Mr. Gilbertson was a director of the company or that he had seen any document which indicated that Mr. Gilbertson was a director of the company.

(ii) It was quite unrealistic to think that Mr. Thomas would have understood the place of the company in the Pallinghurst structure, or that (even if he did understand the company's place in the structure) he would have understood that that place in the structure gave the company an interest in any opportunity which might be exploited by the master fund. Indeed, had Mr. Thomas acquainted himself with the full suite of documentation that Mr. Hewson was sent by Mr. Sean Gilbertson on September 7th, 2006, he would have seen that the company was only to receive US$20,000 per year to cover its administrative expenses and that it was to have an executive committee, the members of which were charged with dealing with restricted matters.

(iii) The judge identified no basis on which he might have found that Mr. Thomas knew anything of significance about Mr. Vekselberg.

(iv) The judge identified no basis on which he might have found that Mr. Thomas knew that the relationship between Mr. Gilbertson and Mr. Vekselberg was governed within the pro forma structure rather than, for example, a separate agreement such as the letter agreement.

(5) The judge's view (expressed, *ibid.*, at para. 91) that Mr. Thomas should have made further enquiries is difficult to reconcile with the fact that the further enquiries that Mr. Thomas did make provided him with the assurance that the judge expected him to seek and obtain. If Mr. Thomas failed to make further enquiries, it was not because he wilfully failed to do so, or closed his eyes to the obvious; rather it was because, in the light of what he had been told by Mr. Sean Gilbertson—which he had no reason not to believe—there was no need for any further enquiries.

(6) Mr. Gilbertson and Mr. Sean Gilbertson considered themselves to be acting perfectly properly. Even if the judge were correct to hold otherwise—it cannot sensibly be said that the matter was so obvious that Mr. Thomas should have dismissed the assurances given to him by Mr. Sean Gilbertson. Indeed, it is unclear what Mr. Thomas might have been expected to do which would have caused him to reject what Mr. Sean Gilbertson told him, short of instructing lawyers to carry out an exhaustive due diligence or demanding to speak directly to Mr. Vekselberg.

(7) The judge appears to have assessed the conduct of Mr. Thomas on the basis of a presumption that had no relevance to his actual state of mind in that the judge found (at para. 9.49 of his judgment) that the new PEL shares were issued on "or with effect from" January 3rd, 2007. The relevant date for assessing the knowledge of Mr. Thomas must be the actual date of receipt of the new PEL shares by Autumn (said to have been on or about January 19th, 2007); for the judge to have assessed Mr. Thomas's knowledge on an earlier (and notional) date of issue was wrong in principle.

(8) Equity operates on the conscience, and that the "mere fact that Mr. Thomas failed to join up the dots as the learned judge would have had him do" does not show him to have acted unconscionably. Mr. Thomas knew Mr. Gilbertson and Mr. Sean Gilbertson well enough to have formed a view of them, and the view that he had formed was favourable. In the circumstances, Mr. Thomas relied upon what they told him, and, it is said, there was nothing so inherently implausible in what they told him that he can fairly be criticized for having done so.

222 In response to those submissions, it is said on behalf of Renova that the judge was right to conclude (*ibid.*, at para. 91) that Mr. Thomas's knowledge was sufficient to support the view that it would be unconscionable for Autumn to retain the PEL shares issued to it in January 2007. In particular: