# Exhibit B-5

(1) The judge's conclusion, it is submitted, was consistent with the evidence at trial, in that:

(i) The draft Pallinghurst structure documents had been sent to Mr. Thomas's colleague, Mr. Daniel Hawson, on September 7th, 2006, under cover of a note stating that the Pallinghurst structure entities had all been set up except the feeder fund. Mr. Thomas accepted in evidence that he had discussed the structure of the fund with Mr. Hawson in broad terms, and that he recalled looking at the structure chart and flow of funds. Further (as the judge noted at para. 9.45 of his judgment), when Mr. Thomas was asked by Mr. Gilbertson in the telephone conversation on January 2nd, 2007 whether he was "familiar with Pallinghurst," his answer was unqualified: "I am, yes, yeah."

(ii) Mr. Thomas would have seen from the structure documents that the BPG discretionary settlement had a 50% shareholding in the company. It is probable, given that he had seen all the structure documents, that he knew that Mr. Gilbertson was a director of the company. He was unwilling to accept that in evidence, stating that he could not recall whether he knew that Mr. Gilbertson was a director of the company. In the light of that evidence, the judge was entitled to take the view (*ibid.*, at para. 89) that he found it hard to believe that Mr. Thomas did not know that Mr. Gilbertson was a director of the company and to conclude that he probably did.

(iii) Mr. Thomas could see that the other 50% shareholder of the company was Renova, and so would know that Renova had an interest in the Pallinghurst structure.

(iv) During their telephone conversation on January 2nd, 2007 Mr. Gilbertson told Mr. Thomas—

(a) that the original intention had been to acquire the Fabergé rights "through Pallinghurst," but that Mr. Vekselberg had insisted that (if he were to fund the purchase) he wanted the brand transferred to one of his private companies which would then license it on to "Pallinghurst" to develop;

(b) that the Fabergé rights had been purchased by PEL under the SPA;

(c) that PEL was "a subsidiary of Pallinghurst";

(d) that the reason why Mr. Gilbertson wanted the funds from his trust was to be able to finance part of the completion payment himself as part of a consortium "rather than as Pallinghurst"; and

(e) that it was necessary to establish a corporate vehicle (which became Autumn)—through which to make the investment—because the trust was not being asked simply to lend to PEL/Pallinghurst but to invest in the Fabergé rights *per se*.

It was against that factual background that Mr. Thomas asked Mr. Gilbertson, in the course of the telephone conversation on January 2nd, 2007, what Mr. Vekselberg's thoughts would be "if you do this without using Pallinghurst"; a question to which Mr. Gilbertson's response was "He'll be extremely pissed off I would think."

(2) It is said that it was completely understandable (indeed, that it was positively desirable) in those circumstances that Mr. Thomas would want to know what Mr. Vekselberg's reaction would be to the course proposed by Mr. Gilbertson in that he (Mr. Thomas) knew and understood, at the very least, that Mr. Vekselberg and Mr. Gilbertson were in business together, that the proposed acquisition was contrary to the express wishes of Mr. Vekselberg (in that what Mr. Vekselberg wanted was to take the Fabergé rights into one of his own companies and license them back to the Pallinghurst structure), that Mr. Vekselberg was not aware of what Mr. Gilbertson was proposing to do, and that the acquisition involved third parties. Mr. Thomas asked the question that he did because, as he accepted in evidence, he knew that the original intention had been to buy the Fabergé rights "through the Pallinghurst fund" and that what Mr. Gilbertson was proposing was contrary to that proposal. He knew, or ought to have appreciated, that the effect of what Mr. Gilbertson was proposing was that the Pallinghurst structure, having obtained the benefit of the Fabergé rights as purchaser under the SPA, would end up without any interest (even as licensee) in the value of those rights. It follows that Mr. Thomas knew, or ought to have realized, that the reason why Mr. Vekselberg would be "extremely pissed off" was because Mr. Gilbertson was doing something he was not entitled to do *vis-à-vis* Renova and the Pallinghurst structure and that the Pallinghurst structure would lose out.

(3) In those circumstances, it is submitted, the judge's conclusions (2012 (2) CILR 416, at para. 91) are supported by the evidence as to what Mr. Thomas knew of (i) Mr. Gilbertson's role as director of the company; (ii) Mr. Vekselberg's interest in the Pallinghurst structure; and (iii) the adverse effect of Mr. Gilbertson's proposed course on the interests of the Pallinghurst structure. The judge was right to hold that Mr. Thomas

should, as a minimum, have asked how or why it was thought that the Pallinghurst structure would benefit if the master fund's interest in PEL was to be reduced from 100% ownership to less than 1% ownership.

(4) It is said that Autumn's reliance on what Mr. Thomas was told by Mr. Sean Gilbertson in the course of their telephone conversation on January 4th, 2007 is misplaced. There was nothing in that conversation to explain to Mr. Thomas why Mr. Vekselberg would have been "pissed off" if the purchase from Unilever was completed "without using Pallinghurst," and nothing in that conversation to explain to Mr. Thomas how or why it was thought that the Pallinghurst structure would benefit if the master fund's interest in PEL was to be reduced from 100% ownership to less than 1% ownership. Further (as Mr. Thomas must have realized, because he could see from the structure documents that Renova had a share in the Pallinghurst structure), what Mr. Sean Gilbertson told him in that conversation was inaccurate and incomplete: in that there was no mention of Renova, no mention of the fact that Renova had spent US$3.5m. in setting up the Pallinghurst structure, and no mention of the fact that the Pallinghurst structure entities existed and had already conducted some business (the May 2006 offer for the rights, the Angola deal and Project Charlie).

(5) For Autumn to suggest that the "mere fact that Mr. Thomas failed to join up the dots as the learned judge would have had him do" does not show him to have acted unconscionably is wrong. Properly understood, the criticism of Mr. Thomas's conduct was not that he "failed to join up the dots." The dots, it is said, were joined up for him by what Mr. Gilbertson had told him, and if Mr. Thomas "genuinely did not see the ugly shape made by the dots" then that was sufficiently culpable to constitute unconscionable conduct. *A fortiori* in circumstances where Mr. Thomas was in a position of trust and had a duty to act independently and to make proper inquiry, and where he knew, as he did, that the new shares were in essence a gift. It is no answer for Autumn to suggest, in answer to the criticism that "Mr. Thomas would not want to upset or disagree with his client," that "the vast majority of professionals will feel the same way"; or, in answer to the criticism that Mr. Thomas was "very ready to comply with Mr. Gilbertson's requirements," that (as the settlor and a beneficiary of the BPG settlement), "Mr. Gilbertson was entitled to expect Mr. Thomas to have regard to his wishes insofar as it was proper to do so without fettering his discretion" or, in answer to the criticism that Mr. Thomas was willing "to place great reliance upon [Mr. Gilbertson, that] on the basis of his past dealings with Mr. Gilbertson Mr. Thomas had the highest regard for him."

223 Again, I take the view that the submissions advanced in respect of this issue on behalf of Renova are to be preferred to those advanced on behalf of Autumn. I am satisfied that the judge was correct to hold (2012 (2) CILR 416, at para. 91) that Mr. Thomas knew, or ought to have

realized, that what Mr. Gilbertson was asking him to do on behalf of Autumn in relation to the funding of the acquisition of the Fabergé rights and the receipt of the new PEL shares was, or was likely to be, contrary to the interests of the master fund, and so was likely to be in breach of his (Mr. Gilbertson's) fiduciary duties as a director of the company, and that "proceeding to implement Mr. Gilbertson's request in the circumstances without more information and without the knowledge of Renova and/or Mr. Vekselberg would be inappropriate for a prudent trustee." In so far as Mr. Thomas's own knowledge was of relevance—given the judge's finding (with which I concur) that Mr. Gilbertson was the directing mind of Autumn in this context—it is not, I think, in dispute that his knowledge is to be attributed to Autumn.

224 It follows that if (and notwithstanding that) Autumn received the new PEL shares as a purchaser for value, it held those shares as a constructive trustee for the master fund on the basis of "knowing receipt."

225 More generally, it follows, also, that—for the reasons set out in this section of my judgment—I reject Autumn's contention that the judge was wrong to hold that it was liable to account as a constructive trustee for the PEL shares which it received in January 2007.

**Was the judge wrong in failing to hold that the entirety of Autumn's shareholding in Fabergé Ltd. (and not just the 25,000 shares which represented the 25 shares issued by PEL in January 2007) should be held on constructive trust for (and transferred to) the master fund?**

226 As I have said, the judge gave effect to the conclusion which he had reached (2012 (2) CILR 416, at para. 95) that Autumn held the shares issued to it by PEL in January 2007 (which had become 25,000 ordinary shares in Fabergé Ltd. following a change of name and a sub-division of shares in 2008) as constructive trustee for the master fund—by the declaration which he made in para. 1 of his order of November 6th, 2012 and the direction (in para. 2 of that order) that Autumn transfer those 25,000 shares to the master fund. In a ruling delivered on November 5th, 2012 (following a post-trial hearing held on October 26th, 2012), the judge made it clear that he did not intend to include in that declaration or in that direction any shares in Fabergé Ltd. subsequently acquired by Autumn. The relief sought by the Renova parties in their cross-appeal (Appeal No. 22 of 2012) includes an order that it be declared that Autumn holds a further and additional 16,190,575 ordinary shares in Fabergé Ltd. as constructive trustee for the master fund, and that Autumn shall forthwith transfer full legal title in those further shares to the master fund.

227 It is, I think, common ground between the parties—although not pleaded in Renova's amended statement of claim—that, following the sub-division of the original shares issued to it by PEL in January 2007 and

the change of name, Autumn acquired further shares in Fabergé Ltd. in the amounts and on the various dates between February 13th, 2008 and November 17th, 2010 set out in the table to which Mr. Thomas had referred at para. 25 of his expert report, and that those acquisitions were funded by, or through, Autumn in an amount of US$1,455,466. It is said that the purpose and effect of those acquisitions was to maintain Autumn's proportionate interest in the share capital of Fabergé Ltd. Save that the judge referred (*ibid.*, at para. 122)—albeit, not in this context—to a rights issue in September 2009, he made no findings of fact as to the number of further shares acquired by Autumn, the circumstances in which those further shares were acquired or the cost of acquisition.

228 In advancing their claim that Autumn holds a further and additional 16,190,575 ordinary shares in Fabergé Ltd. as constructive trustee for the master fund, it is said on behalf of the Renova parties that the judge erred in that he failed to pay any or any adequate attention to the fact that Renova had argued in its opening at trial and in its closing written submissions that Autumn's entire holding of shares in Fabergé Ltd. should be the subject of a constructive trust, failed to pay any attention to the fact that Renova's arguments in support of that claim had not been addressed by the Gilbertson parties in their closing submissions, and failed to give any reasons for rejecting Renova's arguments. In particular, it is said that, notwithstanding that the claim was expressly brought to his attention at the post-judgment hearing on October 26th, 2012, following which he made certain changes to the written judgment which he had issued, the judge did not amend that judgment to explain why he was rejecting those arguments.

229 In response to the criticism that the judge failed to address Renova's claim that Autumn's entire holding of shares in Fabergé Ltd. should be the subject of a constructive trust, it is said on behalf of Autumn that the judge was correct to take the view that that claim was not before him. The claim had not been pleaded (as Renova acknowledged at the post-trial hearing on October 26th, 2012), and counsel for the Renova parties expressly disclaimed any intention of applying to amend the pleading in order to raise it; rather, counsel submitted (at that post-trial hearing) that it was sufficient that Renova had raised the issue in its opening skeleton and that the Gilbertson parties allowed the claim into the action by failing to raise any objection to it at that time. But that submission could not be sustained in the circumstances that the Gilbertson parties had noted in their written opening that "Renova had not formulated any claim in respect of [the] later acquired shares" and that Renova did not seek leave to amend to add any such claim, "even though it appreciated that it had no such claim on its pleadings."

230 In summarizing Renova's claim (at para. 6.5 of his judgment and 2012 (2) CILR 416, at para. 74)) the judge had said this:

> "6.5 With regard to Autumn, the Plaintiff claims that it should account for the shares that it was given gratuitously and now holds in Fabergé Limited (formerly PEL) . . ."

> "74 The Plaintiff's claim against Autumn is to account as a constructive trustee for the new shares in PEL issued to it or their value, on the ground that it knowingly received them as property misapplied or procured to be misapplied by Mr. Gilbertson in breach of his fiduciary duties to the company. Alternatively, Autumn is said to be liable to account as a constructive trustee on the ground that it was a volunteer, since it did not pay for the new shares in PEL."

He made it clear, at para. 2.4 of the supplemental ruling, which he gave on the same day (following the post-trial hearing on October 26th, 2012), that he took the view that no claim in respect of the additional 16,190,575 ordinary shares in Fabergé Ltd. was before the court at trial. He said this:

> "In the instant case I consider that it is clear from the judgment as a whole that the court was considering, and only considering, the position in relation to the 25 shares in PEL, which it has found were gratuitously procured to be issued to Autumn by Mr. Gilbertson on or with effect from 3rd January 2007. The Court was not considering and did not consider any further or other shares in that company which were subsequently purchased by Autumn. Paragraphs 6.5 and 17.1 of the judgment summarizing the Plaintiff's claim make that clear, as do other paragraphs of the judgment, such as paragraphs 17.3 and 19.30."

In my view, there is no doubt that the question whether a claim in respect of the additional 16,190,575 ordinary shares in Fabergé Ltd. were held by Autumn as constructive trustee for the master fund had been before the court at the trial was an issue at the hearing on October 26th, 2012, and that it is clear that the judge held that the answer to that question was "No." Given that the Gilbertson parties had pointed out in their written opening submissions that the claim had not been pleaded and that, nevertheless, Renova had declined to seek leave to amend its pleading in order to raise it, I find it impossible to see how it could be said that the judge was wrong to reach that conclusion. In any event, the Renova parties have not appealed that ruling. In my view, it is not open to Renova to contend, on this appeal, that the Gilbertson parties allowed the claim in respect of the additional 16,190,575 ordinary shares in Fabergé Ltd. into the action by failing to raise any objection to it at the appropriate time.

231 On the basis that the claim in respect of the additional shares in Fabergé Ltd. was not before the court at the trial, the judge cannot be criticized for failing to address arguments advanced in support of that claim in the course of Renova's opening and closing submissions.

232 Nevertheless—notwithstanding that (understandably in the circumstances) the judge made no relevant findings of fact in respect of Renova's unpleaded claim in respect of the additional 16,190,575 ordinary shares in Fabergé Ltd.—the Renova parties seek to pursue that claim in Appeal No. 22 of 2012. It is said on their behalf that the judge would have been wrong to give Autumn and/or Mr. Gilbertson an allowance in respect of the sums paid by Autumn in order to maintain its proportionate shareholding—in that (it is said), as a matter of law, those sums were spent maintaining the dishonestly diverted property and so neither Mr. Gilbertson nor Autumn was entitled to an allowance in respect of them—and that the judge ought to have held that the additional 16,190,575 ordinary shares in Fabergé Ltd. were simply accretions to the 25,000 shares already held on constructive trust. In developing those submissions it is said on behalf of the Renova parties that:

(1) It is necessary to have in mind that all but US$100,000 of the moneys paid by Autumn in acquiring additional shares in Fabergé Ltd. were paid after the date of the commencement of these proceedings (May 20th, 2008), and so were paid by Autumn at a time when it knew that an adverse claim in relation to its existing holding of Fabergé Ltd. shares was being pursued. Given that Autumn was (as the judge held) a constructive trustee of the PEL shares issued in January 2007—and given, critically, that Autumn could only acquire the additional shares by the exercise of rights attached or incidental to the shares which it held on constructive trust—the additional shares which it acquired should be treated as accretions to the shares which it already held, were themselves property traceable to the original single share in PEL by the master fund and were received by Autumn with the requisite knowledge of Mr. Gilbertson's breach of fiduciary duty. Accordingly, Autumn must hold the entirety of its present shareholding in Fabergé Ltd. on constructive trust for the master fund. In support of that proposition, reliance is placed, by way of analogy, on observations in *Att. Gen. (Hong Kong)* v. *Reid* (3).

(2) The judge failed to appreciate that he had not ordered Autumn to account *in personam* as constructive trustee for the value of the 25 PEL shares issued in January 1st, 2007 but, rather, had declared that Autumn held those shares *in specie* on constructive trust for the master fund. It was on that basis that he made the order for the transfer of the 25,000 Fabergé Ltd. shares to the master fund. That was a proprietary remedy which recognized the master fund's restitutionary rights, and was appropriate, given that a proprietary claim (including a tracing claim) had been clearly

pleaded by Renova in its amended statement of claim. In those circumstances the judge was wrong to make no order for the transfer of the additional 16,190,575 shares in Fabergé Ltd.

(3) Neither Mr. Gilbertson nor Autumn was entitled to an allowance in respect of the costs of acquisition of the additional shares. As a matter of equitable principle there is no allowance to be given by way of compensation for work and effort done by a defaulting fiduciary where the defaulting fiduciary comes to court without clean hands. In support of that proposition, reliance is placed on *Guinness plc* v. *Saunders* (20). Neither Autumn nor Mr. Gilbertson had clean hands.

233 In response to the claim in respect of the additional Fabergé Ltd. shares, it is said on behalf of Autumn that, first, there is no foundation of fact upon which a tracing claim in respect of the additional shares can be advanced on appeal and, secondly, that—even if Renova could demonstrate that the master fund could establish a right to trace in respect of those shares—it would be wrong, as a matter of law, for this court to grant the relief sought save upon terms which required the Renova parties to reimburse to Autumn the moneys (US$1,455,466) which it had expended in acquiring those additional shares. In developing those submissions it is said that:

(1) In seeking to trace into the additional 16,190,575 Fabergé Ltd. shares, the Renova parties are obliged to contend that the right to acquire those shares was a right attached, or incidental, to the PEL shares issued to Autumn in January, 2007, so that the constructive trust to which (as the judge held) the 25,000 Fabergé Ltd. shares were subject extends to the additional shares acquired by the exercise of that right. But Renova failed to plead, or to establish at trial, that any such right was attached, or incidental, to the PEL shares issued in January, 2007; the judge made no finding to that effect; and there is no appeal from his failure to do so. Further, it is said, the fact that Fabergé Ltd. shares carried no pre-emption rights until the articles of association were amended in 2009 suggests that the factual position differed from time to time.

(2) It would have been wrong, as a matter of law, for the judge to order the transfer of the additional 16,190,575 ordinary shares in Fabergé Ltd. to the master fund—or for this court now to do so—save on terms that the master fund reimburse Autumn for the price which Autumn paid for those shares, in that—

(i) an allowance may be given for work and effort done to maintain trust property by an innocent constructive trustee, and moneys properly expended by a constructive trustee (innocent or otherwise) may be allowed as a deduction on the taking of an account; and

(ii) where new property is acquired using trust property and non-trust property, it may be possible for those interested under the trust to claim part of, or an interest in, the new property on a pro rata basis; but it is not possible for them to claim the whole of the new property, *a fortiori*, not possible for them to claim the whole of the new property without giving credit for the non-trust property by the use of which it has (in part) been acquired.

In support of the first of those propositions, Autumn relies on observations in *Boardman* v. *Phipps* (9), and *Ultraframe (UK) Ltd.* v. *Fielding* (38) ([2005] EWHC 1638 (Ch), at paras. 1513–1514) and on the statement in *Snell's Equity*, 32nd ed., para. 7–055, at 226 (2010) that the obligation to account is to account for actual or net profits. In support of the second, Autumn relies on the statement in Underhill & Hayton, *The Law of Trusts and Trustees*, 18th ed., art. 90.1(2), at 1150 (2010)).

(3) The decisions in *Guinness plc* v. *Saunders* (20) and *Att. Gen.* (*Hong Kong)* v. *Reid* (3)—on which the Renova parties seek to rely—provide no support for the propositions advanced. The issue in the *Guinness* case was whether a consultant (Mr. Ward) should receive an allowance against a claim by Guinness plc for repayment of moneys which he had received for services which he had rendered in connection with the takeover of the Distillers' Company plc, by way of compensation for his work and effort in that context. The Renova parties seek to equate compensation for work and effort with reimbursement of moneys paid to acquire property which would not otherwise have become subject to the trust. There is no true analogy. The issue in the *Reid* case was whether moneys acquired by a senior public official (Mr. Reid) by way of a bribe (and so in breach of fiduciary duty) were held on constructive trust for the Crown and traceable into the properties that, it was alleged, Mr. Reid had used those moneys to acquire. There was no evidence that any of the moneys that he invested in those properties had their source otherwise than from the bribe. The *Reid* case, also, affords no true analogy with the present case.

(4) The reason why Renova did not include a claim in respect of the additional 16,190,575 shares in Fabergé Ltd. in the relief sought in these proceedings was that the master fund had no interest in taking those shares on terms that it reimburse Autumn for the price which Autumn had paid for those shares, in that (amongst other considerations) by the time these proceedings were commenced the additional shares were not worth the amount that Autumn had paid for them. It is pertinent to have in mind that the Renova parties did not offer (at trial)—and have not offered (in the context of their cross-appeal)—to accept a transfer of the additional 16,190,575 shares on terms that recognize that Autumn has invested US$1,455,466 of its own moneys in acquiring those shares.

In those circumstances, it is said on behalf of Autumn, that—in the absence of a relevant pleading, appropriate evidence, necessary findings or a willingness to make any allowance for the cost of Autumn's acquiring the additional 16,190,575 Fabergé Ltd. shares—the Renova parties are obliged to contend that it makes no difference whether those shares were acquired by the exercise of a legal right; whether that right (if any) had any value; or whether Autumn acquired those additional shares by payment (and in what amount) out of its own moneys. It is accepted that the claim might be arguable if the Renova parties were willing to recognize the fact that Autumn should be reimbursed for the moneys spent in acquiring the additional Fabergé shares but, as it stands, "it is just frivolous and plain greedy."

234 In my view the judge was correct in refusing to hold that the additional 16,190,575 shares in Fabergé Ltd. acquired by Autumn were held upon constructive trust for (and should be transferred to) the master fund. I agree that the material before him at the trial did not enable the judge to make the findings of fact which would have been necessary in order to support Renova's claim to those additional shares. Nor is this court in a position to do so.

**Was the judge wrong to grant relief against Autumn by way of an account of profits (comprising the payment which Autumn received on September 28th, 2007 in respect of interest on the loan which it had made to PEL on January 3rd, 2007) and, if not, was the judge wrong to award pre-judgment interest from January 3rd, 2007 (rather than from September 28th, 2007) on the payment which Autumn received?**

235 At para. 3 of his order of November 6th, 2012, the judge ordered that Autumn pay to the master fund the sum of US$2,306,320.35. It is stated in the order that that sum included pre-judgment interest of US$507,347.35 from January 3rd, 2007 until the date of the order. The balance (US$1,798,973) represented a payment in respect of interest made by Fabergé Ltd. to Autumn on September 28th, 2007, being interest on loans (amounting in aggregate to US$10m.) which had been made by Autumn to PEL (as Fabergé Ltd. then was) in January 2007, at the time of the acquisition of the Fabergé rights. In its appeal from para. 3 of the order of November 6th, 2012, Autumn challenges each of the elements which make up the sum which it was ordered to pay.

***The payment in respect of interest received by Autumn in September 2007***

236 The judge treated the payment received by Autumn in September 2007 (US$1,798,973) as moneys for which Autumn was liable to account

in respect of profits. Under the heading "The claim for profits," he explained (2012 (2) CILR 416, at para. 96) that—

> "Apart from its gratuitous receipt of the new PEL/Fabergé Ltd. shares, Autumn made profits on the loan to PEL, namely the interest that it was paid. In his witness statement, Mr. Thomas explained that on September 28th, 2007, the sum of US$11,798,973 was paid by Fabergé Ltd. to Autumn, representing the loan of US$9.5m. together with the further loan of US$0.5m. for working capital advanced to PEL/Fabergé Ltd., together with interest on those sums. His evidence was that the initial interest on the loan was US LIBOR plus 1.5% which at the time would have been a total interest rate of about 7%. However, in May 2007 the interest rate on the loans, including Autumn's loan, was unilaterally increased by Fabergé Ltd. to 25% per annum pursuant to a proposed call-option agreement. There was no reasonable explanation by the Gilbertson parties' witnesses for this unusually high rate of interest. The total interest paid on the loans was a profit to Autumn in respect of funding of the acquisition of the rights and the further working capital. The plaintiff's argument is that since the acquisition of the rights was an economic opportunity diverted away from the Pallinghurst structure by Mr. Gilbertson in breach of fiduciary duty, such profit is directly traceable to that breach. Accordingly, the plaintiff contends that Autumn is also liable to account for the amount of that interest."

The judge accepted that argument. Under the heading "Quantum in respect of Autumn," he said this (*ibid.*, at para. 151):

> "As I have already explained, the plaintiff's claim against Autumn is for an account in respect of the interest which Autumn received on the loan which it made to PEL out of the BPG settlement on behalf of Mr. Gilbertson and in respect of the shares which it holds in what is now Fabergé Ltd., which were procured to be gratuitously issued to it by Mr. Gilbertson. For the reasons I have already explained, I consider that such account should be given in each case."

And he said this (*ibid.*, at para. 153):

> "In relation to the plaintiff's claims against Autumn, I have concluded that, in the circumstances, Autumn must account for the shares in PEL (now called Fabergé Ltd.) which Mr. Gilbertson gratuitously caused to be issued by PEL to Autumn in January 2007 and also for the interest it received on the loans it made to PEL on behalf of Mr. Gilbertson."

237 In challenging para. 3 of the judge's order—in so far as it relates to the payment received by Autumn in September 2007 in respect of interest on the loans which it had made to PEL in January 2007—it is submitted

on behalf of Autumn that the judge misdirected himself and erred in law and/or fact in ordering an account of profits comprising that payment. Had the judge directed himself properly, it is said that he should have refused to accede to, or grant any relief in respect of, the claim to the moneys paid to it as interest on the loans. In developing those submissions, it is said on behalf of Autumn that:

(1) Autumn and the Gilbertson parties were entitled to know (from Renova's pleaded case) what claims they had to meet at trial. Once Renova had abandoned its contention that Autumn was Mr. Gilbertson's alter ego, there was no pleaded claim in respect of which relief could be granted in respect of the moneys paid to Autumn in respect of interest on the loans which it had made to PEL. In particular, there was no pleaded claim that the master fund had any proprietary interest in those moneys which could found a claim in knowing receipt. In their written opening submissions at trial (at para. 324), the Gilbertson parties had put the Renova parties and the court on notice of their objection to any such claim (on the grounds that it had not been pleaded) but Renova made no application to amend its pleaded case in the course of the trial. There was no basis on which the judge could fairly disregard the fact that no claim for knowing receipt of the moneys paid as interest on the loans had been pleaded. In support of that submission, reliance was placed on observations in *Rolled Steel Products (Hldgs.) Ltd.* v. *British Steel Corp.* (31) ([1986] Ch. at 309) and *The Supreme Court Practice 1999* vol. 1, para. 18/714, at 314.

(2) Not only was there no pleaded claim that the payment to Autumn had been made out of the assets of the master fund—or that Autumn was in knowing receipt of moneys into which assets of the master fund could be traced—there was no evidence to support such a claim. In those circumstances, the judge ordered an account of profits against a party (Autumn) which was not in knowing receipt of moneys misapplied in breach of trust, and was neither itself a fiduciary nor the alter ego of a fiduciary (Mr. Gilbertson). He was wrong to do so: there was no juridical basis upon which he could properly hold that Autumn was liable to account to the master fund for the moneys which it received as interest on the loans which it had made to PEL.

(3) The judge was wrong to take the view (expressed at 2012 (2) CILR 416, at para. 96) that the acquisition of the Fabergé rights was an economic opportunity of the master fund, and wrong to take the view that there was a sufficient nexus between the acquisition of the Fabergé rights and the receipt of interest on the loans. The master fund had no interest in the economic opportunity of earning interest on loans made to PEL in January 2007 (at a time when, it is important to have in mind, the master fund owned the whole of the issued share capital of PEL and had no funds of its own out of which to make such loans). Although the opportunity to

earn a high rate of interest on a loan could constitute a corporate opportunity—and it may be said that the opportunity to earn the interest would not have arisen unless PEL had taken the US$9.5m. loan in order to fund the acquisition of the Fabergé rights—the applicable test for the purposes of tracing is not a "but for" test; the test is one of nexus and there was no basis on which the judge could find a sufficient nexus in this case.

238 Further (and in the alternative) it is submitted that—even if he were right to find a sufficient nexus between the acquisition of the Fabergé rights and the making of the loans to PEL—the judge erred in holding that Autumn should account for the whole of the interest received on those loans. As there was no evidence that Autumn had acted dishonestly, had the claim been properly pleaded by Renova, Autumn would have claimed an equitable allowance in respect of the costs which it incurred in making the loans. Had the judge directed himself properly, it is said that he should have allowed those costs.

239 In response to the submissions advanced on behalf of Autumn in support of its challenge to the judge's order that it account for the moneys which it received in September 2007 as interest on the loans which it had made to PEL in January 2007, it is said on behalf of Renova that the receipt of those moneys was a profit on funding the acquisition of the Fabergé rights, and that, given that (as the judge held) the acquisition of the Fabergé rights was an opportunity diverted away from the Pallinghurst structure in breach of fiduciary duty, that profit is directly traceable to that breach. It is submitted that, although it may be said that the interest was not paid with the master fund's own moneys, the test is one of nexus, and that it is clear that there was a sufficient nexus between Mr. Gilbertson's breach of fiduciary duty and the receipt of the interest payment. At the least, it is said, there is a sufficient nexus between Mr. Gilbertson's failure to disclose to the company, or to the master fund or GPLP, that the loan (at interest) was to be made by a special purpose vehicle controlled by his family trust. Furthermore, the interest was paid by Fabergé Ltd. out of moneys that could be traced back to the Fabergé rights, in that Fabergé Ltd. had no moneys out of which to pay the interest other than the moneys raised by it in September 2007 by way of a rights issue based on its underlying ownership of the Fabergé rights. Accordingly, it is said, the moneys paid to Autumn by way of interest (at 25%) on its loans are directly traceable to the Fabergé rights and the economic control over them represented by the shares issued by PEL in January 2007.

240 In my view, the judge was wrong to order that Autumn account as a constructive trustee for the payment of US$1,798,973 which it received in September 2007 in respect of interest on the loans made to PEL on January 3rd, 2007.

241 I accept that (as Autumn submits) the juridical basis on which the judge held that an obligation to account arose in respect of that payment is unclear; in particular, I accept that there was no sufficient basis on the pleadings for a claim for such an account. But, in the light of the judge's observations (2012 (2) CILR 416, at paras. 96, 151 and 153, to which I have referred earlier in this section), I think it must be assumed that, in reaching the conclusion that he did, the judge accepted Renova's submission that the payment was a profit derived from the funding of the acquisition of the Fabergé rights which was "directly traceable" to the "economic opportunity" of acquiring those rights which was "diverted away from the Pallinghurst structure by Mr. Gilbertson's breach of fiduciary duty." I am satisfied that he was wrong to do so.

242 At the time when the loans were made (on January 3rd, 2007) the "economic opportunity" of acquiring the Fabergé rights lay with PEL as the contracting purchaser from Unilever plc under the SPA dated December 22nd, 2007. The loans did not have the effect of diverting the economic opportunity of acquiring the Fabergé rights away from PEL; the effect of the loans was that PEL was able to take advantage of that economic opportunity by using the funds lent to it to complete the purchase. Nor did the loans have the effect of diverting the economic opportunity of acquiring the Fabergé rights away from the master fund (or, more generally, away from the Pallinghurst structure). As I have mentioned earlier in this judgment, the judge recorded (at paras. 9.26 and 9.27 of his judgment) that it was the common intention of the Gilbertson parties on the one hand and the Renova parties on the other hand (as had been agreed between Mr. Sean Gilbertson and Mr. Kalberer in the course of a telephone conversation on December 20th, 2006) that the role of the master fund would be as guarantor of PEL's obligations under the SPA; it was not intended (at least, not intended from and after December 20th, 2006) that the master fund would, itself, be the purchaser of the Fabergé rights. The judge did not find that Mr. Gilbertson was in breach of his fiduciary duty in failing to procure that the master fund lent moneys to PEL to fund the completion of the purchase: there was no evidence that the master fund was in a position to do so.

243 Immediately before the loans were made on January 3rd, 2007, the interest of the master fund in the acquisition of the Fabergé rights by PEL was as the owner of 100% of the issued capital of PEL. The making of the loans did not alter that position. What did alter that position was Mr. Gilbertson's breach of fiduciary duty (as the judge found) in procuring the dilution of the master fund's ownership of the share capital of PEL by the issue of 100 new PEL shares to the members of the consortium. But—as the judge found, in the context of addressing the question whether Autumn received the new PEL shares as a volunteer and not as a purchaser—the terms of the loans were agreed without regard to the decision to issue the

PEL new shares. In those circumstances, although it can be said that the payment by PEL to Autumn in September 2007 of interest on the loans made in January of that year was a profit derived from the funding of the acquisition of the Fabergé rights and that the "economic opportunity" to fund the acquisition arose from PEL's rights as contractual purchaser under the SPA, there is no basis on which it can be said that the opportunity to fund the acquisition or PEL's rights as contractual purchaser were "diverted away from the Pallinghurst structure by Mr. Gilbertson's breach of fiduciary duty." Properly understood, what was diverted away from the Pallinghurst structure by Mr. Gilbertson's breach of fiduciary duty was substantially the whole (more precisely, 100/101 parts) of the ownership of PEL (and so, indirectly, substantially the whole of the value of the Fabergé rights after deduction of the cost of acquisition), not the right to receive interest paid by PEL on the loans which enabled it to acquire those rights.

***Pre-judgment interest from January 3rd, 2007***

244 As I have said, Autumn challenges each of the elements which make up the sum which it was ordered to pay under para. 3 of the order of November 6th, 2012. In challenging the second of those elements—pre-judgment interest pursuant to s.34 of the Judicature Law (2007 Revision) on the payment received by Autumn in September 2007—it is submitted, first, that—given that (for the reasons advanced in support of the challenge to the first element) it was not open to the judge to hold that Autumn was liable as a "knowing recipient" of the moneys which it received by way of an interest on the loans—there was no basis on which he could have awarded pre-judgment interest on that sum and, secondly, that—assuming (which is not admitted) that the judge was right to hold that Autumn was liable to account as a "knowing recipient" for those moneys—no claim against Autumn based on "knowing receipt" could arise before the payment was actually received by Autumn and so there was no sensible basis on which the judge could have awarded pre-judgment interest in respect of a period before the date (September 28th, 2007) on which the cause of action accrued.

245 I have explained, in the earlier paragraphs of this section of my judgment, why I take the view that the judge was wrong to hold that Autumn was liable as a "knowing recipient" of the moneys which it received by way of interest on the loans. It follows that I would hold that Autumn is entitled to succeed in its challenge to the order for payment of pre-judgment interest on the first of the grounds advanced: there was no basis on which the judge could have awarded pre-judgment interest on moneys which, although claimed in these proceedings, were not, themselves, either paid or properly the subject of an order for payment. Nevertheless, in case others take a different view, it is necessary that I

address the second of the grounds advanced: that there was no basis on which the judge could have awarded pre-judgment interest in respect of a period before the date on which the cause of action in respect of the moneys in respect of which Autumn was said to be a "knowing recipient" accrued.

246 In developing that second ground, Autumn pointed out that the statutory provision under which the judge purported to award pre-judgment interest—s.34 of the Judicature Law (2007 Revision)—was in these terms (so far as material):

> "(1) Subject to rules of court, in proceedings (whenever instituted) before the Grand Court . . . for the recovery of a debt or damages there may be included in any sum for which judgment is given simple interest at such rate as the court thinks fit, not exceeding the rate prescribed from time to time by rules of court, on all or any part of the debt or damages in respect of which judgment is given or payment is made before judgment, for all or any part of the period between the date when the cause of action arose, and—
>
> (a) in the case of any sum paid before judgment, the date of payment; and
>
> (b) in the case of the sum for which judgment is given, the date of the judgment."

It is said that if—as the judge thought—the amount which he ordered to be paid by Autumn to the master fund on the taking of an account in respect of the moneys received by Autumn in September 2007 by way of interest on the loans made in January 2007 was payable as a "debt or damages in respect of which judgment [was] given" for the purposes of s.34(1) of the Law, the power of the court to award pre-judgment interest under that section was limited to interest in respect of "all or any part of the period between the date when the cause of action arose," and (in this case) "(b) . . . the date of the judgment." Accordingly, it is said, the judge was "plainly wrong" to award pre-judgment interest from January 3rd, 2007, in that:

(1) The cause of action for knowing receipt is predicated upon receipt. As Sir Terence Etherton, C. observed, when delivering the judgment of the Privy Council in *Arthur* v. *Att. Gen. (Turks & Caicos Islands)* (2) ([2012] UKPC 30, at para. 31):

> "A defendant incurs an equitable liability for knowing receipt when he or she acts unconscionably by receiving and retaining trust property with the knowledge that it was transferred in breach of trust. Liability for knowing receipt can also be incurred when property is transferred in breach of a fiduciary duty other than a breach of trust."

(2) As Lord Scott of Foscote made clear in *Criterion Properties plc* v. *Stratford UK Properties LLC* (15) ([2004] 1 W.L.R. 1846, at para. 27), "receipt"—in the context of a claim founded on equitable liability for knowing receipt—is to be distinguished from a contractual right to receive (*ibid.*):

> "The word 'receipt' in the expression 'knowing receipt' refers to the receipt by one person from another of assets. A person who enters into a binding contract acquires contractual rights that are created by the contract. There may be a 'receipt' of assets when the contract is completed and the question whether there is 'knowing receipt' may become a relevant question at that stage. But until then there is simply an executory contract which may or may not be enforceable. The creation by the contract of contractual rights does not constitute a 'receipt' of assets in the sense that a 'knowing receipt' involves a receipt of assets. The question whether an executory contract is enforceable is quite different from the question whether assets of which there has been a 'knowing receipt' are recoverable from the recipient."

(3) The judge held (2012 (2) CILR 416, at para. 96), accepting Mr. Thomas's evidence that Autumn received the payment in respect of interest on the loans on September 28th, 2007. That was the date on which the cause of action arose. There was no power under s.34(1) of the Law to award pre-judgment interest in respect of a period prior to that date. Had the judge directed himself properly, he should have held and ordered that pre-judgment interest (if any) should run from September 28th, 2007.

247 In response to the submission that the judge was "plainly wrong" to award pre-judgment interest from January 3rd, 2007, it is said on behalf of the Renova parties that the judge was entitled and correct to award pre-judgment interest from that date, in that January 3rd, 2007 was the date when the loans were made to PEL and the contractual right to interest on the loans arose. Although Autumn did not receive payment until September 2007, the relevant chose in action—representing the profit for which Autumn was liable to account—accrued on January 3rd, 2007. A secret profit is no less a secret profit if the payer is bound to pay it but has not yet done so: the profit is not earned only upon its conversion to cash. It is said that Autumn's reliance on the observations of Lord Scott in *Criterion Properties plc* v. *Stratford UK Properties LLC* (15)—in support of the proposition that a mere contract cannot be an asset for the purpose of knowing receipt—is misplaced, in that (i) the judge was not shown that case (either at the trial or at the post-trial hearing on October 26th, 2012, when he was asked to amend his judgment) and so never had an opportunity to consider it; and (ii) the decision in the *Criterion* case was on an appeal from an order made on an application for summary judgment and not after a trial. Further, it is said, Lord Scott referred to no authority

to support his view, and it is difficult to accept that executory contracts (for example, cheques, or insurance policies) cannot be assets capable of being traced in equity or received for the purposes of knowing receipt. The Renova parties invite this court to decline to follow Lord Scott's approach or, at the least, to distinguish that approach on the basis that contractual rights as against third parties can form an asset capable of being transferred in breach of trust.

248 If (contrary to my view) the judge was correct to hold that Autumn was liable to account as a "knowing recipient" for the moneys which it received in September 2007, then I am satisfied that, in awarding pre-judgment interest on the amount (US$1,798,973) for which he held Autumn was accountable, he was wrong to include in the sum awarded (US$507,347.35) an amount (said to be US$95,407.18) in respect of interest attributable to the period from January 3rd, 2007 to September 27th, 2007. Even if, as the Renova parties contend, a debt owed to the defendant by a third party can be the subject of a claim for an account in equity on the basis of "knowing receipt," it seems to me impossible to hold (on the facts of this case) that, on January 3rd, 2007, the amount of the interest on the loans for which Autumn was liable to account as a "knowing recipient" was equal to the amount (US$1,798,973) which it received in September 2007. In that context it is relevant to have in mind (i) that the terms of the loan (as recorded in the minutes of the meeting of the directors of PEL held on January 3rd, 2007) provided for interest on the loan at US$ LIBOR plus 1.5%, compounded monthly and payable at repayment of the loan; (ii) that (as the judge recorded at 2012 (2) CILR 416, at para. 96) that rate would have been equivalent to about 7% p.a.; (iii) that, although (as the judge also recorded, *ibid.*) the rate of interest was increased to 25% p.a. in May 2007, there was no evidence that the terms as to the payment of interest on the loan were otherwise altered between January 3rd, 2007 and September 28th, 2007—or that any demand for repayment of the loan was made before September 28th, 2007; and (iv) that, in the events which happened, the accrued interest (US$1,798,973) was paid at the same time as the loans were repaid. In those circumstances, as it seems to me, it was not open to the judge to hold that Autumn was liable to account for interest on the loans in the amount of US$1,798,973 (or at all) as a "knowing recipient" before September 28th, 2007; it was on that date—and not before that date—that the relevant cause of action (if any) for the purposes of s.34(1) of the Judicature Law (2007 Revision) arose.

**Whether, in making no order as to the costs of the action and the counterclaim, the judge exercised his discretion outside the ambit within which reasonable disagreement is possible and, if so, what orders as to cost should be made**

249 Paragraph 6 of the order dated November 6th, 2012 provided that, subject to any earlier orders which required the costs of one party or parties to be paid by another party or other parties, each party should bear its own costs of the proceedings (including any costs which had been ordered to be in the cause). The judge set out the reasons which led him to make an order for costs in those terms, at paras. 3.1–3.12 of the ruling which he delivered on November 5th, 2012, following the post-trial hearing on October 26th, 2012 (that judgment is noted at 2012 (2) CILR *N* [10]).

250 After recording that the Renova parties had contended that the appropriate order should be that the Gilbertson parties pay the costs of the action on the standard basis and the costs of the counterclaim on the indemnity basis and that the Gilbertson parties had contended that they should be awarded their costs of the action (while accepting that the Renova parties should have their costs of the counterclaim but on the standard basis) and reminding himself of the provisions in O.62, r.4(2) and (5), of the Grand Court Rules, the judge said this (at paras. 3.4–3.12):

> "3.4 Accordingly the objective of O.62 is that the successful party should recover its reasonable costs or, to put it as in r.4(5), costs should follow the event. However, both rules contemplate that the Court may order otherwise and that must mean that it may do so in the exercise of the generally accepted discretion which it has in relation to costs having regard to the circumstances of the particular case.
>
> 3.5 The obvious first question therefore in seeking to apply the general objective is to determine which party was the successful one or, as put as in r.4(5) to determine the event which costs should follow. The Renova Parties contend that they succeeded overall and were successful on 'the main issue'. They say that in the end of the day there was a finding of serious wrong-doing by Mr. Gilbertson and a significant award on liability against Autumn. They contend that the overriding objective should be followed and that they are the successful parties and should accordingly be awarded the costs of the proceedings. They relied on *National Trust for the Cayman Island v Planning Appeals Tribunal* [2002] CILR N.24 and *Banks v Arch* [2004–05] CILR N.40. The Renova Parties submit that the onus is on the Gilbertson Parties to show why the Court should depart from the usual order.

3.6 The Gilbertson parties argue that the Renova Parties did not succeed in obtaining any relief against Mr. Gilbertson and that they effectively lost the principal part of the action. They refer to *Texaco Ltd v Arco Technology Inc* (unreported—The Times, 13th October 1989). The Gilbertson Parties also argue that the relief obtained against Autumn is, in the circumstances, nominal and that the Plaintiff has in effect lost the whole action. In the alternative they rely upon GCR O.62 r.4(5) and submit that in the particular circumstances of this case the Court is entitled to depart from the usual rule in its discretion and award costs as it sees fit. As a final alternative they propose that a fair outcome would be for the parties to each bear their own costs.

3.7 The Renova Parties and the Gilbertson parties each submitted detailed skeleton arguments which I have considered and taken into account. They also supplemented these in oral submissions which I have also taken into account.

3.8 I have been the judge assigned to and have dealt with the entirety of these proceedings since they were commenced over four years ago in May 2008, culminating in a four week trial in April and May this year. During the course of the proceedings there have been several hotly contested and significant interlocutory hearings, which have resulted in four substantial written rulings and an ex tempore written ruling. A significant issue has been the Renova Parties' discovery, to which I refer below. The issues argued by both parties at the trial departed in several respects from their respective pleadings.

3.9 There is in my view in this case no one obvious event for costs to follow; there has been no one clearly successful party overall. Each party has had victories and defeats on various claims and issues. The Plaintiff has succeeded in establishing Mr. Gilbertson's breach of fiduciary duty but has failed in establishing any consequential loss, notwithstanding the very substantial claim in respect of equitable compensation which it made. If the reasoning of Phillips J. (as he then was) in the *Texaco* case (*supra*) is adopted, the Plaintiff therefore lost the case. The Plaintiff also abandoned its claim against Mr. Gilbertson to account himself for the profit made by Autumn. Although the Plaintiff has established liability against Autumn to account for the 25 gratuitously issued shares, it seems to me that the net gain to the Plaintiff as a result can fairly be said to be minimal in the context of what was claimed. I also consider that, although legally separate, it is somewhat artificial for these proposes in these proceedings to distinguish between Mr. Gilbertson and Autumn in light of my acceptance in the judgment of the Plaintiff's claim that Mr. Gilbertson was the directing mind and will of Autumn. Of

course, the Gilbertson Parties' own counterclaims were either withdrawn or have been dismissed, although in the end of the day the counterclaims accounted for a very limited part of the trial and earlier in the proceedings I declined to strike them out. I see the counterclaims as part of the ebb and flow of each parties' various successes and defeats.

3.10 In all the circumstances, I am of the view that there has been no clearly overall wholly successful party. I consider that this is a case in which the overriding objective is either not applicable at all or that it should be departed from and some other order made in light of the circumstances of the case.

3.11 Notwithstanding that discovery did not ultimately feature significantly at the trial, I consider that I should at least have some regard in considering the overall costs of the proceedings, to the Renova Parties' failure to comply with their discovery obligations. I expressly found that to be blameworthy and culpable, although in the end of the day I did not consider that it precluded the possibility of a fair trial. Nonetheless, it seems to me that, in exercising my discretion in relation to the costs of the proceedings, blameworthy and culpable conduct of one of the parties in relation to a very important part of the proceedings is at least a factor which I am entitled to take into account, at least to some extent, in reaching my overall decision.

3.12 In my view it would not be fair or appropriate to award the costs of the whole proceedings to either party. On the other hand an issue by issue allocation of costs would, in my opinion, be very difficult to apply in practice in this case and would be likely to result in interminable argument and debate, which would not be desirable. In any event the costs payable by each party on an issue by issue basis would, in this case, probably largely cancel each other out. In all the circumstances, I consider that the fairest approach in light of the conduct of these proceedings over the past four years and their eventual outcome after trial is that each party should bear their own costs of the proceeding, and I so order. That is, of course, subject to all orders for costs in favour of one or other party which have already been made and which shall stand and be complied with."

251 In its notice of appeal in Appeal No. 21 of 2012, Autumn seeks an order that the Renova parties pay Autumn's costs of the proceedings in the Grand Court (including any costs ordered to have been costs in the cause) on the standard basis, to be taxed if not agreed. An order in those terms is sought, also, in para. 41(4) of Autumn's memorandum of grounds of appeal filed on February 1st, 2013, but no grounds for making such an order are advanced in that memorandum. An order in those terms is amongst the relief listed at para. 304 of the written submissions dated May

23-01165-mew Doc 84-6 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit B-5 - Autumn Holdings Asset Inc v Renova Res Private Equity Ltd [2017 (2 Pg 23 of 42



24th, 2013 served on behalf of Autumn in support of its appeal but, again, the basis upon which that order is sought is not explained. At para. 120 of the written submissions dated June 21st, 2013, served on behalf of the Gilbertson parties in opposition to Renova's cross-appeal (Appeal No. 22 of 2012) it is said that—

> "the Gilbertson parties urged the learned judge to award costs against the Renova parties to reflect, amongst other things, the court's disapproval of the Renova parties' deliberate destruction of documents in the course of the proceedings. But, the learned judge did not go any further than to find it 'a factor which [he was] entitled to take into account, at least to some extent, in reaching [his] overall decision.'"

And, at para. 142 of those written submissions, it is said that "in the circumstances, the learned judge could have quite properly made a costs order in favour of the Gilbertson parties, as the Gilbertson parties urged him to do." In those circumstances, although Autumn has not formally withdrawn its appeal against the judge's order as to costs (made in its notice of appeal in Appeal No. 21 of 2012), this court may, I think, proceed on the basis that it does not seek to challenge the judge's view that the appropriate order is that (subject to any earlier orders which required the costs of one party or parties to be paid by another party or parties), each party should bear its own costs of the proceedings (including any costs which had been ordered to be in the cause). Mr. Gilbertson has not appealed from the judge's order.

252 In Appeal No. 22 of 2012, the Renova parties also seek an order that the judge's order in respect of costs be set aside but they invite this court to substitute an order that the Gilbertson parties pay their costs of the action on the standard basis and their costs of the counterclaims on the indemnity basis that (it is said) being the only just order to make in all the circumstances. It is said that, in making no order as to the costs of the action and the counterclaims, the judge exercised his discretion outside the ambit within which reasonable disagreement is possible, and that, in those circumstances, this court should set aside his order and make the order that the judge should have made. In that context, this court was referred to the well-known observations of Lord Fraser of Tullybelton in *G* v. *G (Minors: Custody Appeal)* (19) ([1985] 1 W.L.R. at 652).

***The costs of the action***

253 The Renova parties draw attention to GCR O.62, r.4(5): "[T]he Court shall order the costs to follow the event, except when it appears to the Court that in the circumstances of the case some other order should be made as to the whole or any part of the costs." They rely in this court (as they did before the judge) on the principle, recognized in this jurisdiction

in *National Trust for the Cayman Islands* v. *Planning Appeals Tribunal* (25) and *Banks* v. *Arch* (5) (to which the judge referred), that the burden lies on the party seeking a departure from the usual order to show why such departure is justified.

254 In developing their submission that, in departing from the usual order that costs should follow the event, the judge exercised his discretion in a way which fell outside the ambit within which reasonable disagreement is possible, it is said on behalf of the Renova parties that the judge was wrong to conclude that there was no clear overall winner and that there was no one obvious event which his order for costs should follow. He ought to have concluded that the relevant event or events to be followed for the purposes of GCR O.62, r.4(5) were the finding against Mr. Gilbertson for dishonest breach of fiduciary duty and the finding that Autumn was liable to account as constructive trustee for the new PEL shares issued to it in January 2007 and for the payment in respect of interest on the loans which it received in September 2007. In particular, it is said that:

(1) The judge should have addressed the position of Autumn separately from that of Mr. Gilbertson.

(2) As between Renova and Autumn, there was no reason why Autumn should not pay the whole of Renova's costs. In that context, the relevant "event," for the purposes of GCR O.62, r.4(5), was the liability of Autumn to account as constructive trustee for the Fabergé Ltd. shares. On that issue there was only one winner: Renova.

(3) The judge was wrong to take account of—or placed too much weight on—the facts (i) that (as he held) Renova had failed to establish any loss as against Mr. Gilbertson, and (ii) that Renova abandoned its claim against Mr. Gilbertson for an account of profits.

255 In advancing the first of those three points—that, in determining what order to make as to costs, the judge should have addressed the position of Autumn separately from that of Mr. Gilbertson—it is said on behalf of the Renova parties that the facts (i) that (as the judge held) Renova had failed to establish any loss as against Mr. Gilbertson, and that (ii) Renova abandoned its claim against Mr. Gilbertson for an account of profits did not provide a basis for failing to make a costs order against Autumn. Autumn and Mr. Gilbertson had argued strongly that it was not permissible to pierce the corporate veil and, indeed, it was in response to (and in recognition of the force of) that argument that Renova had abandoned its attempt to do so and, in consequence, had been led to abandon its claim for an account of profits as against Mr. Gilbertson. If, as the Gilbertson parties contended (and Renova accepted), Mr. Gilbertson and Autumn were to be treated as legally separate and distinct in that

context, they should be treated as separate and distinct in the context of liability for costs.

256 In advancing the second of those three points—that, as between Renova and Autumn, there was no reason why Autumn should not pay the whole of Renova's costs—it is said on behalf of the Renova parties that the judge was wrong to characterize the liability of Autumn to account as "minimal." Even on the judge's own findings, Autumn's liability was substantial: the cash component was US$2.3m. and the shares ordered to be transferred to the master fund were worth a further US$1.5m. or thereabouts (even if Fabergé Ltd. were to be valued, as the judge held, at no more than US$120m.). But, even if recoveries of some US$3.8m. could be described as "minimal" in the context of the claims advanced by Renova in the action, the judge erred in law in treating that factor as a reason for refusing Renova an order for costs. In support of that submission, the Renova parties rely on the observation of Sanderson, J. in *Banks* v. *Arch* (5), that it is no answer to a claim for costs for the defendant to say that the award was only marginal and that therefore the plaintiff should not have his costs.

257 In advancing the third of those three points—that, in failing to make an order for costs against Mr. Gilbertson, the judge placed too much weight on the facts that (as he held) Renova had failed to establish any loss as against Mr. Gilbertson and that Renova abandoned its claim against Mr. Gilbertson for an account of profits—it is said on behalf of the Renova parties that the judge failed to take into account, or gave too little weight to, the following factors: (i) that it was Mr. Gilbertson's dishonest conduct which gave rise to these proceedings; (ii) that the main issue at trial—on which Renova was successful—was whether Mr. Gilbertson had dishonestly diverted the Fabergé rights to Autumn (and others) in breach of his fiduciary duties; (iii) that that issue was common both to the claim against Mr. Gilbertson and to the claim against Autumn; (iv) that success against Mr. Gilbertson on that issue, in relation to a claim for breach of fiduciary duty, was a legitimate end in itself (as Phillips, J. had held in *Texaco Ltd* v. *Arco Technology Inc.* (36)); Autumn was a company in which he had an obvious financial interest; (v) that the only substantive issue which the judge decided against Renova (the quantum of loss in respect of which equitable compensation should be awarded) occupied a relatively small part of the time at trial; (vi) that the claim against Mr. Gilbertson for equitable compensation—although ultimately unsuccessful at trial on the issue of loss—was never unreasonable or lacking a sensible basis; the judge found (2012 (2) CILR 416, at para. 70) that Renova had "put forward a perfectly arguable case on the merits of its claim and also in relation to loss"; (vii) that late evidence on quantum (which was disclosed to Renova only during the trial) formed a significant part of the judge's conclusions on equitable damages (as appears from, *ibid.*, paras.

127–128); and (viii) that the claim against Mr. Gilbertson for an account of profits (which Renova abandoned in the course of the trial) took up little or no time at any stage in the proceedings and added little to the costs of the proceedings in that, had that claim not been advanced, no less evidence (factual and expert) would have been adduced.

258 Further, it is said on behalf of the Renova parties that, in determining what order to make in respect of costs, the judge was wrong to take account of his conclusion, at an earlier stage in the proceedings, that Renova's failure to comply with its discovery obligations was "blameworthy and culpable." That conclusion was irrelevant in relation to the question where the costs of the proceedings should fall, in that: (i) the Gilbertson parties' strike-out application of April 27th, 2011 (founded on the alleged failure by Renova to give discovery) failed on the basis that the matter could be pursued at trial and adverse inferences drawn, if necessary; (ii) at the trial no questions about discovery—nor, indeed, any questions relevant to the allegation as to intention to harm (to which the documents not disclosed by the Renova parties were said to be germane)—were put to any of Renova's witnesses (amongst whom was Mr. Vekselberg); (iii) the Gilbertson parties made no submissions at trial as to deficiencies in Renova's (or any other Renova party's) discovery and did not ask the judge to draw any adverse inferences from the absence of documents; (iv) the judge (correctly) did not draw any adverse inferences against the Renova parties from any failure to give discovery; (v) the Gilbertson parties' application against Mr. Vekselberg for specific discovery of his TNK-BP documents was also rejected by the court at the interlocutory stage; and (vi) the documents that were the subject of the Gilbertson parties' applications based on non-disclosure went solely to the counterclaims, which were barely pursued and were either abandoned or ultimately dismissed. And it is said that, in taking account of his conclusion that Renova's failure to comply with its discovery obligations was "blameworthy and culpable" (as he did), the judge was wrong in failing, also, to take into account the following matters (each of which was a relevant matter which he should have taken into account), that is to say: (a) that he had ordered the costs of the Gilbertson parties' failed strike-out application and the specific discovery application against Mr. Vekselberg to be costs in the cause; (b) that the relevant cause (namely the counterclaims) was, on any view, won by the Renova parties; and (c) that the effect of making no order for costs following the trial was that the Renova parties were unjustly deprived of the (very substantial) costs of resisting those failed applications to which they should have been entitled, given that the Gilbertson parties failed properly to pursue the counterclaims, abandoned some of them late in the day and had the remainder dismissed.

259 For those reasons, it is said on behalf of the Renova parties that the only fair order was that Renova should have its costs of the action;

23-01165-mew Doc 84-6 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit B-5 - Autumn Holdings Asset Inc v Renova Res Private Equity Ltd [2017 (2 Pg 27 of 42



whether those costs were awarded against both Mr. Gilbertson and Autumn jointly or against Autumn alone.

260 In response to the submissions that, in determining what order to make as to costs, the judge should have addressed the position of Autumn separately from that of Mr. Gilbertson and that the liability of Autumn as constructive trustee could not be seen as "minimal"—it is said on behalf of the Gilbertson parties that each is inconsistent with the position adopted by the Renova parties in the proceedings, in that:

(1) At the hearing on October 26th, 2012—at which the parties made their respective submissions as to costs—the Renova parties urged the judge to treat the Gilbertson parties as one and the same. They cannot now complain that, in addressing the question of costs, the judge failed to treat Mr. Gilbertson and Autumn as separate and distinct.

(2) The Renova parties obtained leave to continue the action on the basis that the company and/or the GPLP and/or the master fund had suffered a substantial loss; which they put at US$82m. The judge found that the true loss should be assessed at nil. Although the Renova parties now complain that the judge did not give weight to the proposition that establishing that Mr. Gilbertson had acted in breach of fiduciary duty was a legitimate end in itself, that was not how the case had been presented to him when the Renova parties sought leave to bring the action at the outset.

261 Further, it is said on behalf of the Gilbertson parties that the judge was entitled to take into account the "blameworthy and culpable" destruction of documents by the Renova parties. The court's attention was directed to the judge's observations, in the course of his ruling on the application to strike out Renova's statement of claim, that the destruction of the documents was deliberate and on a wholesale scale. The judge had said this (at paras. 25 and 60 of that ruling, reported at 2011 (2) CILR 148):

> "25 . . . [I]t is accepted that the Renova I.T. department took a series of very significant decisions in the period January 2008 to December 2010, which has resulted in the effective eradication of all potential sources of any relevant electronic documentation saved on the crashed Zurich server. The evidence of the Gilbertson parties' independent I.T. experts, which is not disputed in this respect by the Renova parties' own independent I.T. experts, is that it would not have been difficult or expensive for the Renova Group to make different decisions at the time which would have ensured that all of the potential sources of data concerned were preserved for expert forensic examination, particularly given that these proceedings were clearly in contemplation at the time of the Zurich computer crash and commenced shortly thereafter, and given also that the Renova Group had already received legal advice prior to the server crash that they

should preserve all relevant documentation for the purposes of these proceedings. Notwithstanding that advice, the Renova Group took deliberate steps, in most instances after these proceedings had commenced, which destroyed any prospects of recovering for discovery purposes e-mail and other electronic data from any potential sources, apparently without any regard for their discovery obligations and the need to preserve any potentially relevant e-mails and other documents."

"60 . . . My overall impression of the evidence filed by the Renova parties in response to the Gilbertson parties' strike out application is that, notwithstanding the legal advice concerning discovery given to them in January 2007 and again in October 2009 (which itself seems to me to have been surprisingly late in the day), there was a complete disregard by the Renova Group of the need to preserve all relevant documents, including the potential sources of such documents for discovery purposes. The Zurich server crash shortly before these proceedings were commenced was obviously unfortunate. However the steps taken thereafter to destroy over time all the possible alternative sources of e-mail or other electric data, some of which may well have been relevant to these proceedings, to my mind amounts to a complete lack of consideration for and disregard of the need to preserve all potential sources of relevant documents."

It is pointed out that the Renova parties have not challenged those observations. It is said, also, that the Renova parties are wrong to submit that the judge erred in taking their destruction of documents into account in the circumstances that (in the event) the documents which the judge found they had destroyed would have had no relevance to the issues in the proceedings. The submission is wrong, both as a matter of principle—in that the serious nature of the Renova parties' disregard of the court's process is not to be assessed only in the light of its consequences—and as a matter of fact—in that the wholesale nature of the destruction (and the sense of injustice and distortion of the court process which resulted from that destruction) had an impact on the trial which was both far-reaching and regrettable, notwithstanding that there was limited scope to test or pursue those concerns in the course of the trial. A court has jurisdiction to mark, by an appropriate order for costs, its disapproval of conduct that disregards or serves to undermine the integrity of its process. The steps taken by the Renova parties in relation to electronic documents (as described by the judge in the passages cited) were, on any view, a glaring example of such conduct. The contention that the judge should have taken no account of such conduct (on the ground that there is no jurisdiction to do so) is contrary to principle, misconceived and should be rejected.

262 More generally, it is said on behalf of the Gilbertson parties that, in determining whether to make any (and, if so, what) order as to costs, the

judge was entitled to take the view that the action was out of all proportion to the dispute. It is pointed out that the judge queried the purpose of the action at the outset of the trial:

> "Now that the openings have finished, and I, of course, have listened to them carefully, I do consider that a further serious attempt should be made to settle this matter with a view to saving time, cost and court time as well, having regard, in particular, to the overriding objectives of the court rules, which I'm sure you're familiar with. And I would request that you pass that message to your clients . . . with the ability to give instructions how to deal with the matter."

And, it is said, the judge can only have been confirmed in his view as to the disproportionate nature of the proceedings after his determination that the master fund had suffered no loss. Although the judge does not allude to this in his costs decision, it would have been open to him to find the proceedings oppressive and to award, or decline to award, costs accordingly. In particular, it is said that:

(1) The Renova parties should have appreciated (not later than at the time that Renova received Mr. Osborne's report) that there was no realistic prospect that Renova would be awarded equitable compensation in an amount which was proportionate to the costs of the proceedings and the amount of court time that was occupied.

(2) Further, the proceedings were disproportionate having regard to the fact that, on the basis of the short forms, the Renova parties are only entitled to 25% of the relief awarded against Autumn, the other 75% going to Mr. Sean Gilbertson and Fairbairn Trust Ltd. (in its capacity as trustee of a Gilbertson family settlement).

(3) Renova's claim against Mr. Gilbertson was in excess of US$80m. It was calculated to ruin all but those of the most exceptional wealth. It is reasonable for a party that faces such a claim to investigate and even take points that it would not be proportionate to take in other circumstances and, where the enormous claim turns out to have nil value, the court may well consider that the costs were incurred as a result of the extravagance of the claim.

(4) Renova had originally pleaded that the terms of the fourth draft IA were reasonable, and were terms that Mr. Gilbertson should have been prepared to agree. But, in the course of his opening submissions at trial, it was said by counsel that one of the clauses in that draft IA was, in fact, wholly absurd and uncommercial. Renova made an 11th hour change to its pleaded case on equitable compensation, abandoning the claim by reference to the fourth draft IA, thereby recognizing that the long-standing pleaded case, in which it had relied on the fourth draft IA, had always been unsustainable.

(5) There is good reason to think that the judge would never have given leave to continue the action had he appreciated how disproportionate the dispute was likely to prove.

263 In my view there is no proper basis upon which this court can, or should, interfere with the judge's order in relation to the costs of the action. As the judge recognized, correctly, the starting point for his consideration was GCR O.62, r.4(5): costs should follow the event, "except when it appears to the court that in the circumstances of the case some other order should be made as to the whole or any part of the costs." A proper reason for "some other order"—as, again, the judge recognized—was that in the circumstances of this case there was no single "event" which the costs should follow. Although it is said on behalf of the Renova parties that the judge ought to have concluded that the relevant event or events to be followed were the finding against Mr. Gilbertson for dishonest breach of fiduciary duty and the finding that Autumn was liable to account as constructive trustee, that is to overlook the important findings that the master fund suffered no loss in respect of which Mr. Gilbertson should be ordered to pay equitable compensation and that the assets for which Autumn was liable to account as a constructive trustee were substantially less (and very substantially less in value) than Renova had claimed. The judge was plainly entitled to take the view that this was a case in which it was appropriate to depart from the rule that costs should follow the event, and that some other order was required.

264 Renova abandoned its claim against Mr. Gilbertson for an account of profits and failed in its claim against him for equitable compensation: it succeeded in its claim against Autumn, but to an extent which the judge described as minimal. It would have been open to the judge to make an order which differentiated (on the basis of outcome) between the claims against Mr. Gilbertson and the claims against Autumn: in particular, it would have been open to him to order that Renova pay to Mr. Gilbertson the costs attributable to the claim against him for an account of profits and for equitable compensation and that Autumn pay to Renova the costs attributable to the claims against it for an account as constructive trustee on which Renova was successful. But the judge was entitled to take the view that a "differential order" of that nature would not be appropriate: first, for the reason that he gave at para. 3.9 of his ruling of November 5th, 2012 (that it would be artificial to do so in the light of his acceptance of Renova's contention that Mr. Gilbertson was the directing mind and will of Autumn), and, secondly, because there was an important issue (whether Mr. Gilbertson was in breach of fiduciary duty) which was common to both those claims.

265 The judge again correctly recognized (at para. 3.12 of his ruling on costs) that this was a case in which it would be open to him to make an issue-based order: that is to say, an order either that each party pay to the

other the costs attributable to discrete issues (which would require separate, issue-by-issue, assessments of such costs) or an order that one party pay to the other a proportion of the overall costs (such proportion to reflect success on some issues and failure on others). In that context he would have had regard to Renova's success (broadly, at least) on the following issues: (i) whether Mr. Gilbertson owed fiduciary duties of care to the company (and, more generally, to the master fund and the Pallinghurst structure); (ii) whether (in so far as it was in dispute), in procuring the issue of 100 new shares in PEL in January 2007, Mr. Gilbertson was in breach of those duties; (iii) whether Renova should be denied equitable relief on *Nurcombe* v. *Nurcombe* grounds; (iv) whether the 25 PEL shares issued to Autumn in January 2007 were assets into which the master fund was entitled to trace; (v) whether Autumn received those shares as a volunteer; (vi) whether (in so far as relevant) Autumn received those shares with relevant knowledge of Mr. Gilbertson's breach of trust; and (wrongly, as I would hold) (vii) whether the interest payment received by Autumn in September 2007 was also an asset into which the master fund was entitled to trace, and to its failure on the issues; (viii) whether the master fund had suffered loss by reason of Mr. Gilbertson's breach of duty; and (ix) whether the additional shares issued to Autumn after January 2007 were traceable assets. The judge rejected an issue-based order for the reasons which he gave (at para. 3.12): that an issue-by-issue allocation of costs would be very difficult to apply in practice in this case, would be likely to result in interminable argument and debate, which would not be desirable, and in any event the costs payable by each party on an issue-by-issue basis would probably largely cancel each other out. As the judge who (as he observed at para. 3.8 of his ruling) had dealt with the entirety of these proceedings since they were commenced in May 2008—and, in particular, over a four-week trial—the judge was well placed to form that judgment; this court must, I think, respect his view.

266 The judge directed himself (at para. 3.11 of his costs ruling) that he should have some regard, in considering the overall costs of the proceedings, to the failure of the Renova parties to comply with their discovery obligations which, as he said (*ibid.*) he had found blameworthy and culpable. In giving himself that direction, he did not err in principle; but it is difficult to find in his ruling any indication that, having regard to the defects in the compliance with discovery obligations of the Renova parties, led him to make an order for costs after trial which he would not otherwise have made. That is not, in my view, a matter for criticism: in determining the strike-out application made on the basis of culpable non-discovery, the judge had ordered that the costs of that application be costs in the cause: nothing had occurred during the trial which could have led him to vary that order (assuming that, absent an appeal, he

would have had power to do so); there was no need for him to revisit the point.

267 For those reasons, I would reject the submission (advanced on behalf of the Renova parties) that, in making no order as to the costs of the action, the judge exercised his discretion outside the ambit within which reasonable disagreement is possible. I should add that I am not persuaded that the fact that (as I would hold) the judge was wrong to treat the interest payment received by Autumn in September 2007 as an asset into which the master fund was entitled to trace is a sufficient reason for this court, itself, to make a different order in respect of the costs of the action.

***The costs of the counterclaims***

268 It is submitted on behalf of the Renova parties that the judge ought to have awarded the costs of the counterclaims to the Renova parties in any event. It is said that he was wrong to treat the costs of the counterclaims as "part of the ebb and flow of each [party's] successes and defeats", and that, in exercising his discretion, he failed to take the following matters into account: (i) that the counterclaims were not made against, or made only against, Renova but were made against persons who were not parties to the proceedings and had to be joined for that purpose; (ii) that they raised very serious allegations against individuals of intention to harm (and in the case of Mr. Kuznetsov, allegations of disloyalty and "moral guilt"); (iii) that they were advanced in a perfunctory manner in the Gilbertson parties' written opening submissions; (iv) that they were barely mentioned at all in oral openings; (v) that they were not then pursued in cross-examination of any of the witnesses called by the Renova parties; (vi) that, when evidence was closed (and only after being pressed by the Renova parties), the Gilbertson parties expressly abandoned their counterclaims for lawful means conspiracy and breach of fiduciary duty by Mr. Kuznetsov; (vii) that the remaining counterclaims (two of which were for torts of intentional harm) were not pursued with any genuine vigour in the Gilbertson parties' oral submissions or written closing submissions; and (viii) that those remaining counterclaims were dismissed by the judge.

269 It is said, further, that not only should the judge have awarded the costs of the counterclaims to the Renova parties but that he should have done so on the indemnity basis in that they were pursued improperly, unreasonably and negligently within the meaning of GCR O.62, r.11(4) or r.11(2). In support of that submission, it is said that (in addition to the matters mentioned in the immediately preceding paragraph) the judge ought to have taken into account that:

(1) There was no rational explanation for the slow collapse of the counterclaims other than that the Gilbertson parties sought "to hang on to

the counterclaims, good bad or indifferent", in order to maximize the pressure on the Renova parties. In that context it is pertinent to have in mind that the case was opened on behalf of the Gilbertson parties on the basis that the action had been brought out of malice but that this very serious allegation was not then put to Mr. Vekselberg in cross-examination. The Gilbertson parties were "willing to wound and yet afraid to strike." As the judge said (2012 (2) CILR 416, at para. 104):

> ". . . I think it right to say that the overall impression which I gained during the course of the trial was that the counterclaims were pursued on behalf of the Gilbertson parties with increasingly less enthusiasm. Apart from the fact that the specific claims which I have mentioned were expressly dropped, it seemed to me that the detailed basis of the counterclaims changed to some extent from the Gilbertson parties' pleadings as well as varying somewhat also between the Gilbertson parties' written and oral opening submissions on the one hand and their closing submissions on the other hand. Also not all of the alleged facts on which the counterclaims are based were put to the Renova parties' witnesses in cross-examination. In summary, I was left with the distinct impression that counsel for the Gilbertson parties were less than convinced themselves of the merit of the remaining individual counterclaims."

(2) In similar circumstances, in *Sagicor Gen. Ins. Cayman Ltd.* v. *Crawford Adjusters (Cayman) Ltd.* (32), Henderson, J. made an indemnity costs order against plaintiffs who pursued a case of fraud and dishonesty for two years before abandoning it on the eve of the trial. After noting (2008 CILR 482, at para. 2) that "such allegations have a detrimental effect on the reputations of those involved and that such allegations should never be made lightly." Henderson, J. went on to observe (*ibid.*):

> "From the failure of these plaintiffs to prosecute their case, I infer that they have never been in possession of a body of evidence capable of establishing fraud or conspiracy. These few comments, without more, provide ample justification for an award of indemnity costs."

Those comments are in point in the present case in that, although the counterclaims did not allege dishonesty, they did allege conspiracy and other torts involving an intention to harm. Those are serious allegations to make against individuals (Mr. Vekselberg and Mr. Kuznetsov).

(3) The allegations of conspiracy and intention to harm should never have been made—in that there was never evidence to support them—and should not have been maintained once the Gilbertson parties had chosen not to put them to Mr. Vekselberg or to Mr. Kuznetsov in cross-examination. It should be inferred that the counterclaims were only made

in order, improperly, to bring pressure to bear against, in particular, Mr. Vekselberg personally. As Smellie, C.J. said in *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.* (1) (unreported, at para. 21):

> "The institution and maintenance of a patently speculative and weak case merely with the opportunistic intention of embarrassing or compelling an opposite party to comply with a claim will be conduct coming within the embrace of GCR O.62 r.11(4) as being 'improper' and 'unreasonable.'"

270 In response to those submissions, it is said on behalf of the Gilbertson parties that:

(1) The judge's view that the costs of the counterclaims were "part of the ebb and flow of each party's various successes and defeats" was a perfectly proper view for him to take. The counterclaims were all contingent on liability in the main action, and specific counterclaims were contingent on such liability arising in particular ways. The relief sought on behalf of Autumn was by way of contribution or indemnity in respect of any liability in the main action as, in substance, was the relief sought on behalf of Mr. Gilbertson. In those circumstances, it was reasonable for the judge to see the counterclaims as part of the Gilbertson parties' defences.

(2) The Renova parties' complaint that Mr. Vekselberg and Mr. Kuznetsov were joined as parties without proper cause is misconceived. Mr. Vekselberg and Mr. Kuznetsov were witnesses which Renova needed to call in order to establish its case (which, as developed at trial—in particular, in relation to the agreement or understanding and the negotiations of the implementation agreements—depended on the evidence of Mr. Vekselberg and Mr. Kuznetsov). It cannot be suggested that any, or any substantial part, of their evidence went exclusively to the counterclaims.

(3) In his ruling on the strike-out application the judge said this (2011 (2) CILR 148, at para. 28):

> "Mr. Vekselberg has been less than enthusiastic in complying with [his discovery obligations]. I am somewhat cynical about the explanation which he has given for his contention that such e-mails are not within his possession, custody or power."

It is true that, at the subsequent hearing of the specific discovery application, Mr. Vekselberg successfully maintained his contention that the emails of which discovery was sought were not in his possession, custody or power; but the fact that the Renova parties were able to avoid giving any further discovery on behalf of Mr. Vekselberg is not a ground on which they can seek an order for costs in relation to the counterclaims generally, let alone costs on an indemnity basis.

(4) The contention that the counterclaims were hopeless was determined by the judge on the application to strike them out. At para. 19 of his ruling on that application (dated May 5th, 2010, unreported), the judge said this:

> "As I have said above, a consideration of the evidence to which I was referred by both leading counsel does not cause me to believe that the plaintiffs to counterclaim have only a faint possibility of success in the claims which they make. On the contrary, this seems to me to be very much a case which should go to trial in the usual way and is not one in which judgment on any of the respective claims of the parties should be granted summarily. I would, had I considered that I had jurisdiction to consider the applications of the defendants to counterclaim pursuant to GCR O.14, r.12, have refused to grant them summary judgment on the counterclaim or any part thereof. In my opinion, this is undoubtedly a case which should go to trial and the respective claims of the parties determined after full discovery and oral evidence with cross examination in the usual way."

(5) The criticism of the Gilbertson parties for having abandoned some of the counterclaims is misconceived. It is perfectly proper for a party to abandon claims in the event that the course of the evidence makes it appropriate. The Renova parties abandoned their claim for an account of profits against Mr. Gilbertson in the course of oral closing. And this was but one of the ways in respect of which the Renova parties changed their case at trial.

271 In my view, there is force in the submission that the judge ought to have awarded the costs of the counterclaims to the Renova parties (other, perhaps, than to Renova itself). In seeking to justify his decision not to make a separate order for the costs of the counterclaims—for the reasons that (as he said at para. 3.10 of his ruling on November 5th, 2012) (i) the counterclaims accounted for a very limited part of the trial; (ii) he had declined to strike out the counterclaims at an earlier stage in the proceedings; and (iii) he saw the counterclaims "as part of the ebb and flow of each parties' various successes and defeats"—the judge overlooked three important factors: first, that three of the defendants to the counterclaims (Mr. Vekselberg, Mr. Kuznetsov and Renova Holdings) were not claimants in the action; secondly, that (whether or not the counterclaims had occupied time at trial) there had been costs incurred in interim applications to which they were parties; and thirdly, that he had made orders that the costs of those interim applications should be costs in cause.

272 As I have said earlier in this judgment, the judge explained (at para. 6.7 of his judgment) that Mr. Gilbertson and Autumn counterclaimed in the proceedings, not only against Renova, but also against Mr. Vekselberg, Mr. Kuznetsov and Renova Holding, for an indemnity on various grounds

for any liability which they were found to have in respect of Renova's derivative claims. They did so by serving with their defence to Renova's claim a counterclaim (subsequently slightly amended by their amended defence and counterclaim served pursuant to an order made on November 30th, 2011) which included the following paragraph by way of introduction:

> "57. If, contrary to the primary case set out in the Defence, Mr. Gilbertson and Autumn are liable in respect of any of the relief claimed against them in the name of the Company (whether in its own right and/or on behalf of the Master Fund), Mr. Gilbertson and Autumn will counterclaim as set out below."

In the events which happened, Autumn was held liable in respect of relief claimed against it on behalf of the master fund, so the counterclaims (in so far as they had survived to trial) had to be addressed.

273 As the judge explained (2012 (2) CILR 416, at paras. 100–101), the pleaded counterclaims included: (i) at paras. 59–60, a claim for damages against Renova Holding—on the ground that Renova Holding acted in repudiatory breach of the letter agreement; (ii) at paras. 61–63, claims for damages against Mr. Vekselberg and Mr. Kuznetsov—on the ground that they had induced or procured Renova Holding to act in repudiatory breach of the letter agreement; (iii) at paras. 64–65, a claim for damages against Mr. Vekselberg, Mr. Kuznetsov and Renova Holding (and against Renova itself)—on the ground of conspiracy, by both lawful means and unlawful means; and (iv) at para. 66, a claim against Mr. Kuznetsov for indemnity or contribution as a co-director of Mr. Gilbertson for breach of his fiduciary duties to the company. By summons dated September 29th, 2009, the defendants to the counterclaims applied, pursuant to GCR O.14, r.12, for an order that each of the counterclaims should be dismissed and summary judgment entered for them on the ground that the Gilbertson parties, as plaintiffs to the counterclaims, had no prospect of success at trial. They also applied pursuant to GCR O.18, r.19 for orders, *inter alia*, that certain specific paragraphs of the counterclaims should be struck out on the ground that they disclosed no reasonable cause of action. After a three-day hearing in early March 2010 and a further hearing on April 15th, 2010, the judge declined to strike out any part of the counterclaims on a summary basis. It was in that context that he made the observation, on which the Gilbertson parties rely: that this was undoubtedly a case which should go to trial and the respective claims of the parties determined after full discovery and oral evidence with cross-examination in the usual way, and, consistently with that view, he directed that the costs of the application to strike out should be costs in the cause.

274 The judge went on to explain (*ibid.*, at para. 103) that, on May 11th, 2012, during the course of the trial, it was confirmed on behalf of the

Gilbertson parties that they were no longer pursuing the specific counterclaims for damages for lawful means conspiracy and for indemnity and contribution by Mr. Kuznetsov for breach of fiduciary duty, and that, accordingly, they were only pursuing the specific counterclaims for repudiatory breach of the letter agreement, for procuring that breach of the letter agreement and for unlawful means conspiracy. In those circumstances, as the judge observed (*ibid.*), the only counterclaims which he needed to address were (i) the claim for damages against Renova Holding in respect of alleged repudiatory breach of the letter agreement; (ii) the claims for damages against Mr. Vekselberg and Mr. Kuznetsov for allegedly inducing or procuring Renova Holding to act in repudiatory breach of the letter agreement; and (iii) the claim in tort against all the defendants to counterclaim for conspiracy by unlawful means.

275 Before turning to address those counterclaims, the judge made the observations (*ibid.*, at para. 104) on which the Renova parties rely: that his overall impression (gained during the course of the trial) was that the counterclaims were pursued on behalf of the Gilbertson parties with increasingly less enthusiasm; that not all of the alleged facts on which the counterclaims were based were put to the Renova parties' witnesses in cross-examination; and that he was left with the distinct impression that counsel for the Gilbertson parties were less than convinced themselves of the merit of the remaining individual counterclaims.

276 The judge addressed the first of the counterclaims (*ibid.*, at paras. 105–109) that remained outstanding: the claim against Renova Holding for damages in respect of alleged repudiatory breach of the letter agreement. He concluded, in the circumstances which he set out and for the reasons which he gave, that there was "no merit in this particular claim in the counterclaim." He addressed the second of the outstanding counterclaims (*ibid.*, at para. 109): the claim for damages against Mr. Vekselberg and Mr. Kuznetsov for allegedly inducing or procuring Renova Holding to act in repudiatory breach of the letter agreement. He observed (*ibid.*) that it was "a crucial ingredient of the tort that the defendant should have intended that the contract be breached. That was not put to any of the Renova parties' witnesses." In those circumstances, he said, "I am of the view that there is no merit in this claim either." The judge addressed (*ibid.*, at paras. 110–111) the third of the outstanding counterclaims: the claim for damages against all the defendants to counterclaim for conspiracy by unlawful means. He pointed out that the pleaded claim included (at para. 64.2) the allegation that the alleged conspiracy was "to commit unlawful acts against the master fund and hence Mr. Gilbertson." He accepted the submission, advanced on behalf of the Renova parties, that Mr. Gilbertson's economic interest in the master fund was not such as to give him a cause of action. He said this (*ibid.*, at para. 111):

> "Only the master fund (or GPLP or the company) could sue in respect of alleged unlawful acts against the master fund. Mr. Gilbertson has no standing to sue in respect of an alleged conspiracy to commit unlawful acts against the master fund."

In those circumstances the judge concluded (*ibid.*, at para. 113) that "the three remaining specific counterclaims by the Gilbertson parties are not made out and should be dismissed." There has been no appeal against that part of his order.

277 For my part, I am content to accept that the judge was entitled to take the view that the counterclaim made against Renova for damages for conspiracy (by lawful or unlawful means)—which was the only counterclaim made against Renova—could properly be regarded "as part of the ebb and flow" of the "various successes and defeats" of the claims in the action (that is to say, the claims made by Renova against Mr. Gilbertson and Autumn), and that, on that basis, if it was appropriate to make no order for the costs of the action, then it was also appropriate to make no order for costs (as between Renova and the Gilbertson parties) in respect of the costs of that counterclaim. But I am not persuaded that that reasoning can be applied to the costs as between the Gilbertson parties and the other three defendants to the counterclaims). In my view, the judge erred in failing to distinguish between the position of Renova, on the one hand, and the other co-defendants to counterclaim (Mr. Vekselberg, Mr. Kuznetsov and Renova Holding), on the other hand. Had he done so, he would have appreciated that it was necessary, in the circumstances of this case, to make a separate order as to the costs of the counterclaim.

278 In the circumstances that the judge erred in making no separate order as to the costs of the counterclaim, it is necessary for this court to consider what order should be made. In my view, having the provisions of O.62, r.4(5) in mind, the costs of the counterclaims (as between the Gilbertson parties and the three defendants, other than Renova) should follow the event: that is to say, those costs should be paid by the Gilbertson parties. There can be no doubt that, in relation to all the counterclaims against them, Mr. Vekselberg, Mr. Kuznetsov and Renova Holding were the successful parties. The effect of that order will be that they will be entitled to receive not only their costs (if any) of defending the counterclaims at trial (including those that were abandoned) but also costs which they incurred in pursuing or resisting interlocutory applications and in respect of which there are existing orders for costs in cause. In that context, as between the Gilbertson parties and Mr. Kuznetsov and Renova Holding, the relevant "cause" is that brought by the counterclaim.

279 I turn, therefore to consider the basis upon which the costs payable to Mr. Vekselberg, Mr. Kuznetsov and Renova Holding should be assessed: an issue which, given that he made no order for costs, the judge

did not need to (and did not) address. The receiving parties seek an order that such costs should be assessed on an indemnity basis. They rely upon GCR O.62, r.11(4), which enables the court to make such an order where claims have been pursued improperly, unreasonably or negligently. In considering that application, it is pertinent to have in mind not only the submissions which they advance (and, of course, those advanced by the Gilbertson parties in response), but also the judge's observations (2012 (2) CILR 416, at paras. 104 and 112). Reference has already been made to his observations at para. 104. The judge said this (*ibid.*, at para. 112):

> "As I have also mentioned, leading counsel for the Gilbertson parties, as plaintiffs to the counterclaim, cross-examined the Renova parties' witnesses, including Mr. Vekselberg and Mr. Kuznetsov, the first and second defendants to the counterclaim. I accept the submission of leading counsel for the Renova parties that the essential factual elements of the three remaining specific counterclaims were not put to those witnesses. In particular in this context, it was not put to either Mr. Vekselberg or Mr. Kuznetsov that their purpose, whether predominant or otherwise, was to harm the master fund and thereby Mr. Gilbertson. Furthermore, the evidence in the case simply does not support any contention that the intention of Mr. Vekselberg and Mr. Kuznetsov, by their insistence on ownership of the title to the Fabergé brand by one of Mr. Vekselberg's private companies outside the Pallinghurst structure or their alleged refusal to provide funding to the master fund through PEL for the purchase of the rights, was intended to harm Mr. Gilbertson. At most, and on the Gilbertson parties' best case, the intentions of Mr. Vekselberg and Mr. Kuznetsov were to further and protect the interest of Mr. Vekselberg in owning the title to the Fabergé brand."

280 In my view there is force in the submissions made on behalf of the Renova parties that Mr. Vekselberg, Mr. Kuznetsov and Renova Holding were joined as parties without proper cause; that there was no rational explanation for the slow collapse of the counterclaims other than that the Gilbertson parties sought "to hang on to the counterclaims, good bad or indifferent," in order to maximize the pressure on the Renova parties; that the allegations of conspiracy and intention to harm should never have been made—in that there was never evidence to support them—and should not have been maintained once the Gilbertson parties had chosen not to put them to Mr. Vekselberg or to Mr. Kuznetsov in cross-examination; and that it should be inferred that the counterclaims were only made in order, improperly, to bring pressure to bear on Mr. Vekselberg personally. The submission advanced on behalf of the Gilbertson parties—that the complaint that Mr. Vekselberg and Mr. Kuznetsov were joined as parties without proper cause is misconceived, in that Mr. Vekselberg and Mr. Kuznetsov were witnesses which Renova needed to call in order to

establish its case—is, itself, misconceived. If Mr. Vekselberg and Mr. Kuznetsov were witnesses on whose evidence Renova would need to rely in any event, there was no reason why they should be joined as parties to the proceedings so that they could be cross-examined by the Gilbertson parties. In my view, the costs which Mr. Vekselberg, Mr. Kuznetsov and Renova Holding are entitled to receive should be assessed on an indemnity basis.

**Conclusions**

281 For the reasons which I have set out in the preceding sections of this judgment, I take the view that:

(1) The judge was right to entertain the derivative claims advanced by Renova. In particular, he was correct to hold (2012 (2) CILR 416, at para. 60) that, having chosen not to appeal from the order which he had made some three and a half years earlier, it was not open to the Gilbertson parties to challenge, at trial, the standing of Renova to advance claims in the action on behalf of GPLP and the master fund including, in particular, a claim founded on the unpleaded contention that Mr. Gilbertson had acted in breach of fiduciary duties which he owed to the master fund.

(2) The judge was right to hold that Mr. Gilbertson owed and was in breach of fiduciary duties in relation to the Fabergé rights. In particular, he was correct to hold (*ibid.*, at para. 57) that, as a director of the company, Mr. Gilbertson owed the duties of a fiduciary to the company (and, more generally, to the master fund and the Pallinghurst structure) throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007.

(3) The judge was right to hold that, notwithstanding the so-called rule in *Nurcombe* v. *Nurcombe* (28), the conduct of the Renova parties was not such as to disentitle Renova from equitable relief in this action.

(4) The judge was right to value at nil the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation. In particular, he was correct to hold on the evidence before him that the current value (as at the date of trial) of the right to manage and exploit the Fabergé rights as licensee to which the master fund (through OpCo) would probably have been entitled but for Mr. Gilbertson's breach of fiduciary duty was less than the costs (other than acquisition costs) and expenses that would have been incurred in funding the development of those rights.

(5) The judge was right to hold that Autumn was liable to account as a constructive trustee of the shares issued by PEL in January 2007 (i) because it received those shares as a volunteer; and (ii) because, in any event, it was in "knowing receipt" having regard to its relationship with

Mr. Gilbertson, the property which it received, the person from whom it received the property, and its state of knowledge at the time of receipt. In particular, the judge was correct to hold that the value of the single share in PEL held by the master fund before the issue of 100 new PEL shares on January 3rd, 2007 could be traced (in part) into the 25 new PEL shares issued to Autumn on that date; correct to hold that Autumn gave no value for those 25 new PEL shares; and correct to hold that the knowledge of Mr. Gilbertson (and, so far as relevant, the knowledge of Mr. Thomas) as to the circumstances in which those new PEL shares were issued was to be attributed to Autumn.

(6) The judge was right to hold that Autumn was not liable to account as constructive trustee for shares (other than the 25,000 shares which represented the 25 shares issued by PEL in January 2007) which it held in Fabergé Ltd. at the date of the trial, and so did not have to transfer such additional shares to the master fund. In particular, the judge was correct to reject Renova's claims in respect of the additional 16,190,575 shares in Fabergé Ltd., in that the material before him at the trial did not enable the judge to make the findings of fact which would have been necessary in order to support that claim.

(7) The judge was wrong to hold that Autumn was liable to account (by way of an account of profits) for the payment (US$1,798,973) which it received on September 28th, 2007 in respect of interest on the loans which it had made to PEL on January 3rd, 2007. In particular, he was wrong to hold that the value of any asset held or formerly held by the master fund could be traced into that payment. It follows that he was wrong, also, to award pre-judgment interest—in the amount of US$507,347.35 or in any other amount—on an amount equal to that payment. If (contrary to my view) the judge was not wrong to hold that Autumn was liable to account for the payment of US$1,798,973 which it received on September 28th, 2007, he was nevertheless wrong to include in the sum awarded (US$507,347.35) as pre-judgment interest an amount (said to be US$95,407.18) in respect of interest attributable to the period from January 3rd, 2007 to September 27th, 2007. He was wrong to do so because, on the material before him, it was not open to him to hold that Autumn was liable to account for interest on the loans in the amount of US$1,798,973 (or at all) as a "knowing recipient" before the date (September 28th, 2007) on which the relevant cause of action for the purposes of s.34(1) of the Judicature Law (2007 Revision) arose.

(8) It cannot be said that, in making no order as to the costs of the action—or (as between the Gilbertson parties and Renova) in making no order as to the costs of the counterclaim—the judge exercised his discretion outside the ambit within which reasonable disagreement is possible: there is no proper basis upon which this court can, or should, interfere with the judge's order in relation to those costs. Nevertheless, in

relation to the costs of the counterclaims, the judge erred in failing to distinguish between the position of Renova, on the one hand, and the other co-defendants to counterclaim (Mr. Vekselberg, Mr. Kuznetsov and Renova Holding), on the other hand. Had he done so, he would have appreciated that it was necessary, in the circumstances of this case, to make a separate order as to the costs of the counterclaim. In those circumstances it falls to this court to make an appropriate order in respect of the costs incurred by the three other co-defendants to counterclaim. The appropriate order, having the provisions of O.62, r.4(5) in mind, is that the costs of the counterclaims (as between the Gilbertson parties and the three defendants, other than Renova) should follow the event: those costs should be assessed on an indemnity basis (if not agreed) and paid by the Gilbertson parties.

282 It follows from the conclusions which I have reached that I would dismiss Autumn's appeal from paras. 1 and 2 of the order of November 6th, 2012, but would allow its appeal from para. 3 of that order. I would dismiss Renova's cross-appeal from paras. 4 and 6 of that order, and I would dismiss Renova's appeal from para. 6. I would allow the appeals of Mr. Vekselberg, Mr. Kuznetsov and Renova Holding from para. 6 of the order. As between the Gilbertson parties and the three defendants to counterclaim just mentioned, I would vary para. 6 of the order by setting aside that paragraph in so far as (and only in so far as) it relates to their costs of defending the counterclaims and by adding a direction that the Gilbertson parties pay the costs of the counterclaims incurred by Mr. Vekselberg, Mr. Kuznetsov and Renova Holding (including costs ordered to be costs in cause), such costs (if not agreed) to be assessed on the indemnity basis. I would stand over further consideration of the costs of the appeal and cross-appeal for determination on an application made to the Court of Appeal: such application (or applications) to be made in writing within 28 days of the delivery of this judgment and to be supported (if so advised) by short written submissions. I would give liberty to apply to the Court of Appeal for such further directions as may be required.

283 **MOTTLEY, J.A.:** I agree.

284 **FORTE, J.A.:** I agree.

***Order accordingly.***

Attorneys: *Appleby (Cayman) Ltd.* for Autumn Holdings Asset Inc. and Gilbertson; *Maples & Calder* for Renova Resources Private Equity Ltd. and the other respondents/cross-appellants.