# Exhibit E

Digitally signed by Advance Performance Exponents
Date: 2023.06.30 15:43:41 -05:00
Reason: Apex Certified
Location: Apex



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 227 OF 2018 (IKJ)**

**BETWEEN:**

**FORTUNATE DRIFT LIMITED**

**<u>Plaintiff</u>**

**AND**

**CANTERBURY SECURITIES, LTD.**

**<u>Defendant</u>**

**IN COURT**

**Appearances:**

Mr Stephen Atherton KC instructed by Ms Katie Pearson, Claritas Legal Limited, for the Plaintiff

Mr Ben Tonner KC and Ms Sally Bowler, McGrath Tonner, for the Defendant

**Before:** The Hon. Justice Kawaley

**Heard:** On the papers

**Draft Ruling Circulated:** 22 June 2023

**Ruling Delivered:** 30 June 2023

## INDEX

*Case management-application for leave to adduce further expert evidence made on eve of trial and renewed at end of trial- pleading requirements for allegations of fraud-need for expert evidence to be adduced to address pleaded case-whether expert evidence actually required-the Overriding Objective and the need for expedition and economy*

## RULING

### Background

1. The present proceedings were commenced by Writ dated 11 December 2018. By Order dated 25 October 2019 I gave full pre-trial directions including the following uncontroversial directions in relation to expert evidence:

> "*11. Each party shall be permitted to adduce expert evidence from one expert in each of the following areas:*
>
> *(i) industry practice in relation to brokerage accounts; and*
>
> (ii) *margin accounts.*"

2. On 2 April 2020, the now Third Amended Counterclaim was re-amended to add what was in effect a new counterclaim which included the allegation that the Plaintiff made fraudulent representations in entering into the Brokerage Agreement which most fundamentally entailed:

   (a) representing that the Plaintiff would not use the account for market manipulation; and

   (b) using the account for the purposes of market manipulation as part of the "Scheme" perpetrated in conjunction with the founders of the company known as "YRIV" to artificially inflate the value of YRIV's shares.

3. The first round of Witness Statements were filed on or about 1 August 2022. The Witness Statements of Ms Erin Winzura, CEO of the Defendant, and Mr Brian Johnston, sole director of PFS, Ltd, an affiliate of the Defendant, both supported the fraud allegations in summary terms. The

Second Witness Statement of Dominic Sin refuted these allegations in equally summary terms. On the face of it, the fraud allegations were apparently not being seriously pursued and were incapable of proof based on the evidence then before the Court.

4. On 1 December 2022 Claritas Legal Limited came onto the record as the Plaintiff's third set of attorneys. On 14 February 2023, McGrath Tonner came onto the record as the Defendant's third set of attorneys. By Summons dated 11 April 2023, the Defendant applied for leave to adduce expert evidence on market manipulation. By Summons dated 2 May 2023, the Plaintiff belatedly applied to strike-out certain portions of the Third Amended Defence and counterclaim. The trial was due to commence on 5 June 2023. Both Summonses were heard on 22 May 2023. I declined to either immediately strike-out the allegations of fraud or to grant the application. Granting the Defendant's application would either have risked losing the trial date or adjourning the trial part-heard because of the addition of further evidence not contemplated when the current trial estimate was prepared.

5. Because of concessions made in the course of the hearing, the Plaintiff's Summons was effectively resolved without the need for full consideration although it was unclear to me what formal Order in relation to the application was required. Arguments advanced about the inadequacy of the pleading of the market manipulation case were effectively deployed for the purposes of opposing expert evidence being belatedly adduced in relation to this issue. At the 22 May 2023 hearing, I found the pleadings and arguments in relation to the market manipulation issue (and the need for expert evidence) somewhat difficult to digest. In these circumstances, it seeming obvious that the expert evidence was at least potentially indispensable to the Defendant's ability to pursue one limb of its Counterclaim, I adjourned both applications to trial.

6. At the end of the trial (which was adjourned on 14 June 2023 to a date to be fixed), I invited counsel to submit supplementary submissions addressing the adjourned Summonses taking into account the state of the evidence after all the factual evidence was before the Court. I now substantively decide the Defendant's 11 April 2023 and the Plaintiff's 2 May 2023 applications. An additional twist, which emerged at the end of the trial, was that the Defendant now sought to rely not just on the already prepared Report of Mr Flemmons, but on a fresh report to be obtained from a new expert.

**Pleading fraud/striking-out: preliminary views**

7. Mr Atherton KC relied on the dissenting judgment of Lord Millett in *Three Rivers DC-v- Bank of England (No.3)*[2003] 2 AC 1 at 291-292 for the principles of pleading fraud. The majority of the House of Lords permitted the plaintiff in that case to amend its pleading; and in considering the prospects of success, Lord Steyn (at paragraph 6) took into account the possibility that, *inter alia*, cross-examination "*might produce significant materials assisting the claimants*". This confirms the propriety, in my judgment, of permitting the Defendant to support the merits of this part of its Counterclaim in reliance on the fruits of cross-examination of the Plaintiff's sole factual witness. Focussing on the principles of pleading however, Lord Millett opined as follows:

> "*183. Having read and re-read the pleadings, I remain of opinion that they are demurrable and could be struck out on this ground. The rules which govern both pleading and proving a case of fraud are very strict. In Jonesco v Beard [1930] AC 298 Lord Buckmaster, with whom the other members of the House concurred, said, at p 300:*
>
> *'It has long been the settled practice of the court that the proper method of impeaching a completed judgment on the ground of fraud is by action in which, as in any other action based on fraud, the particulars of the fraud must be exactly given and the allegation established by the strict proof such a charge requires" (my emphasis).*
>
> *184. It is well established that fraud or dishonesty (and the same must go for the present tort) must be distinctly alleged and as distinctly proved; that it must be sufficiently particularised; and that it is not sufficiently particularised if the facts pleaded are consistent with innocence: see Kerr on Fraud and Mistake 7th ed (1952), p 644; Davy v Garrett (1878) 7 Ch D 473, 489; Bullivant v Attorney Genera; for Victoria [1901] AC 196; Armitage v Nurse [1998] Ch 241, 256. This means that a plaintiff who alleges dishonesty must plead the facts, matters and circumstances relied on to show that the defendant was dishonest and not merely negligent, and that facts, matters and circumstances which are consistent with negligence do not do so.*
>
> *185. It is important to appreciate that there are two principles in play. The first is a matter of pleading. The function of pleadings is to give the party opposite sufficient notice of the case which is being made against him. If the pleader means 'dishonestly' or 'fraudulently', it may not be enough to say 'wilfully' or 'recklessly'. Such language is equivocal. A similar requirement applies, in my opinion, in a case like the present, but the requirement is satisfied by the present pleadings. It is perfectly clear that the depositors are alleging an intentional tort.*
>
> *186. The second principle, which is quite distinct, is that an allegation of fraud or dishonesty must be sufficiently particularised, and that particulars of facts which are consistent with honesty are not sufficient. This is only partly a matter of pleading. It is also a matter of substance. As I have said, the defendant is entitled to know the case he has to meet. But since dishonesty is usually a matter of inference from primary facts, this involves knowing not only that he is alleged to have acted dishonestly, but also the primary facts which will be relied upon at trial to justify the inference. At trial the court will not normally*

*allow proof of primary facts which have not been pleaded, and will not do so in a case of fraud. It is not open to the court to infer dishonesty from facts which have not been pleaded, or from facts which have been pleaded but are consistent with honesty. There must be some fact which tilts the balance and justifies an inference of dishonesty, and this fact must be both pleaded and proved.*

*187. In Davy v Garrett 7 Ch D 473, 489 Thesiger LJ in a well known and frequently cited passage stated:*

*'In the present case facts are alleged from which fraud might be inferred, but they are consistent with innocence. They were innocent acts in themselves, and it is not to be presumed that they were done with a fraudulent intent.'*

*This is a clear statement of the second of the two principles to which I have referred.*"

8. The accuracy of those statements was not challenged. The pleadings appear to aver with sufficient particularity the dishonest conduct relied upon. For instance, paragraph 4A4(d) states:

> "*The representations by FDL in the application for the Brokerage Contract were untrue and were made fraudulently and/or breached clause 11 of the Brokerage Contract (set out in paragraph 5 below) in that it is to be inferred from the matters pleaded above regarding YRIV and FDL's involvement in the Scheme that FDL was a participant in market manipulation, as defined in clause 11, which was prohibited.*"

9. Clause 11 of the Brokerage Contract defines prohibited market manipulation as follows:

> "*Market manipulation is a deliberate attempt to interfere with the free and fair operation of the market and create artificial, false or misleading appearances with respect to the price of, or market for a security…Market manipulation is prohibited in the United States under the Securities Exchange Act of 1934 ('Act'), and in other countries. The Act defines market manipulation as transactions which create an artificial price or maintain an artificial price for a tradable security…*"

10. The Defendant's pleadings rely on the following primary factual averments (which are supported by further detailed uncontroversial averments apparently supported by publicly available information):

> "*3A. In light of the evidence it has now obtained through its ongoing investigations Canterbury believes:*
>
> *a) YRIV has been engaged since about December 2015 in a fraudulent scheme to inflate the price of its publicly traded shares artificially ("the Scheme").*

*b) The Scheme has been driven by certain directors, officers and/or shareholders in YRIV and their respective directors and/or shareholders ("the Scheme Participants"), namely:*

| ***YRIV shareholder*** | ***Director and/or shareholder*** |
|---|---|
| *Best Future Investment LLC* | *James Coleman* |
| *Crestlake Holdings Limited* | *Hu Yan Ling* |
| *FDL* | *Dominic Sin, Chen Linyu and/or He* |
| *Jielin* | |
| *Jasper Lake Holdings Limited* | *Liu Xiangyao* |
| *Majestic Symbol Limited* | *Zhao Long* |
| *Start Well International Limited* | *Dominic Sin* |

*c) Alternatively the individuals identified above are nominees for other principals behind the Scheme.*

*d) In furtherance of the Scheme, YRIV has made material misstatements and omissions regarding YRIV's assets, liabilities, business prospects and financial condition in public statements available to investors and to its United States regulator, the Financial Industry Regulatory Authority ("FINRA"), and the US Securities and Exchange Commission ("the SEC")…*

*e) The result of YRIV's conduct was that the shares in YRIV that were pledged by FDL as security to PFS and deposited into FDL's account with Canterbury had negligible intrinsic value, notwithstanding their apparent trading price at the time of about US $12.00 per share.*

*<u>Reverse Merger and share exchange – YRIV and EML</u>*

*3E. As at 18 December 2015, Kirin International Holding Inc. was a publicly traded company on the OTCBB (over the counter bulletin board), and had 20,596,546 shares issued and outstanding.*

*3F. On 19 December 2015, Kirin International Holding Inc. executed a reverse takeover to acquire EML by way of a share exchange. As part of this transaction…*

*d) Kirin International Holding Inc. changed its name to Yangtze River Development Limited, which in turn subsequently changed its name to Yangtze River Port and Logistics Limited on 8 February 2018…*

*3G. In summary, FDL, which had been incorporated 3 months earlier with a single issued share of US $1.00, acquired a 9.64% ownership interest in YRIV purportedly worth US $166 million for nil or negligible outlay. In the premises, the transactions by which FDL*

*obtained 10 shares in EML and then exchanged them for 16,600,000 shares in YRIV were not arms' length transactions.*

*YRIV's representations about its business operations*

*3H. The reverse takeover and distributions of shares among participants were a precursor to that part of the Scheme involving artificial inflation of YRIV stock price by means of false and misleading representation about its financial condition and prospects. Specifically, YRIV made material misrepresentations about: the existence of certain of its purported land use rights, material undisclosed adverse judgments, its status in China as an 'untrustworthy' debtor, and that as a result it was in no position to borrow the funds it claimed it needed to borrow to implement its business plan.*

*3I. Ultimately, when the market began to discover the true position as a result of press commentary on YRIV – particularly the Hindenburg Report published on 6 December 2018– its shares began a precipitous slide in price. During 2019, FINRA found that YRIV had participated in a scheme to artificially support its stock price; had made false and misleading statements in its press releases and to FINRA; and had failed to make any significant progress towards executing its business plan since its listing more than two years earlier. As a result, FINRA determined to delist YRIV. Further, as YRIV and FDL were both Scheme Participants, FDL knew of and participated in YRIV's misrepresentations…*" [Emphasis added]

11. The pleading then proceeds to particularise various YRIV public statements which are said to be false. It is not averred that the initial organisational machinations in relation to YRIV including, in particular, the reverse merger and the small size of the public float were "badges" of market manipulation or fraud. Accordingly, the first limb of the market manipulation case, which is pleaded with some particularity, is the "*artificial inflation of YRIV stock price by means of false and misleading representation about its financial condition and prospects*".

12. The second limb of the Defendant's pleaded market manipulation case is the "*FINRA investigation and delisting of YRIV*":

"*FINRA investigation and SEC delisting of YRIV*

*3Z. During 2019 the FINRA carried out its own analysis of YRIV and its disclosures and also found*
*YRIV's disclosures to be false and misleading. For this reason, it delisted YRIV from NASDAQ.*

*a) According to its Form 8-K filed with the SEC dated 4 June 2019 ("the 2019 8-K"), YRIV received a delisting notification on 29 May 2019 from NASDAQ indicating that the FINRA Staff had determined to delist YRIV's common stock from NASDAQ pursuant to Rules 5101 and 5250(a).*

*b) As YRIV reported in the 2019 8-K:*

*'[FINRA] made the decision to delist [YRIV's] common stock from NASDAQ based on its determination of the following matters: (i) [FINRA] believes [YRIV] participated in a scheme to artificially support its stock price; (ii) [FINRA] believe that [YRIV] made false and misleading statements in its press releases and to [FINRA]; and (iii) FINRA believes that [YRIV] failed to make any significant progress towards executing its business plan since listing more than two years ago. [FINRA] believes these matters raise public interest concerns warranting delisting in accordance with Listing Rule 5101 and the false and misleading statements made by [YRIV] to [FINRA] constitute a violation of Listing Rule 5250(a).'*

*3AA. YRIV appealed against FINRA's decision to delist it, and its appeal was denied.*

*3BB. Canterbury relies on the conclusions reached by FINRA and the failure of YRIV's appeal against its de-listing to support the inference that YRIV has taken various steps to mislead potential purchasers of shares in YRIV as to the likely value of YRIV's shares.*"

13. The most obvious question raised by the first limb of the market manipulation case is whether or not the pleaded allegations that YRIV made false representations about its financial position are capable of proof based on the admissible evidence before the Court. That is, however, an issue to be addressed by way of closing submissions. As far as adequacy of the pleadings is concerned, it cannot at first blush be clearly concluded that the case is inadequately pleaded. The Plaintiff is said to have been a shareholder acting in concert with other controllers of YRIV in implementing a scheme to artificially inflate the value of YRIV shares by making false statements about its true financial condition. The Plaintiff has not until recently suggested that it was unable to plead to these averments or complained that it needed to know the particularities of the precise legal basis upon which such obviously fraudulent conduct could be considered unlawful.

14. Putting the capable of proof issue to one side, therefore, the second question which arises is whether or not expert evidence is really required to enable this Court to fairly conclude that artificially inflating the value of stock through making false filings about a listed company's financial position is something which is prohibited by the applicable securities regulatory regime. One reason why the Defendant's previous counsel may not have addressed the issue of expert evidence on market

manipulation is that the Plaintiff's Re-Amended Reply and Defence to Counterclaim, filed on 19 June 2020:

(a) only explicitly denied the false representations and FINRA findings relied upon; and

(b) did not explicitly deny that even if the facts and matters relied upon by the Defendant as evidencing market manipulation were established, they would not in law amount to unlawful market manipulation on the basis which was pleaded.

15. In the Defendant's 22 May 2023 hearing Skeleton, Mr Tonner KC advanced the need for expert evidence in the form of the Flemmons Report on the following grounds:

> "*15. The Defendant wishes to adduce expert evidence on market manipulation to prove the allegation of fraud.*
>
> *16. The proposed report of Jason Flemmons provides expert research and analysis capable of explaining why the available evidence is indicative of a fraud to which the Plaintiff and Dominic Sin were party…*
>
> *21. Mr Flemmons' report explains why, contrary to Mr Keysser's opinion, the diminution in YRIV's share price was not representative of actual loss to the Plaintiff, but rather the price fell because the market realised that it might have been defrauded. In this way, expert evidence on market manipulation allows the Defendant to defeat the Plaintiff's claim that the Defendant is responsible for causing financial loss to the Plaintiff. The Plaintiff did not suffer any loss that is recoverable from a court of law. On the contrary, the only harm that the Plaintiff has suffered is that its fraudulent plan to defraud others was discovered and foiled.*"

16. The Defendant does plead in paragraph 48(a) (iv) that it is denied that it caused any loss and avers that the publication of the Hindenburg Report caused any loss when the share price fell. It is not presently averred that the cause of any loss was the market manipulation or the Plaintiff's fraud. There is no discernible justification as to why the Defendant should require a further expert to respond to the Plaintiff's expert evidence adduced by Dr Keysser. Mr Palzer has already filed a responsive report. So, the only relevant question is the need to file expert evidence "*to prove the allegation of fraud*".

17. My preliminary view was, before considering the latest round of submissions, that no expert evidence was required because issue had not been (and could not sensibly be) joined on the question of whether, <u>on the basis of the presently pleaded allegations (assumed to be true)</u>, a legal case of market manipulation had been made out. Such a legal case very arguably would have been made

out if FDL was assumed to have been involved with YRIV insiders in manipulating the YRIV share price through making false filings. The need for expert evidence to substantiate other, unpleaded forms of market manipulation was an entirely different matter.

18. The second limb of the market manipulation case will be considered more fully below.

**The extent to which reliance can be placed on the FINRA findings and/or the 'findings' set out in the Hindenburg Report and/or other reports**

19. Mr Atherton KC in his original submissions argued that the findings of an extra-judicial authority were inadmissible as to the truth of the relevant statements sought to be relied upon. Although he described the principle as the rule in *Hollington-v-Hewthorn* [1943] 1 KB 587, that case concerned the admissibility of criminal convictions in civil proceedings, and he accepted that the specific holding in that case had since been repealed by statute. It was further submitted:

> "*26. The principle is even more clearly established and obviously effective as a bar when the 'findings' on which a party seeks to rely are not the findings of a Court or tribunal but merely findings made extra-curially. In Three Rivers (No. 3) [2003] 2 A.C. 1, the House of Lords considered the admissibility or otherwise of findings forming part of a report by Lord Bingham (the 'Bingham Report') into the collapse of BCCI in proceedings by depositors against the Bank of England (see pp.243ff, paragraphs [28] to [33] per Lord Hope). Despite the eminence of the author of the Bingham Report (who himself sat as a Lord of Appeal in Ordinary), the fact that the author had access to both written and oral evidence from a large number of witnesses and access to many documents, and the fact that the Bingham Report itself was found by Lord Hope to be, 'a masterly and eminently readable account of the entire sequence of events from the establishment of BCCI in 1972 to its closure in July 1991', the House of Lords nevertheless held that neither the Report itself nor any of its findings or conclusions were admissible in the proceedings.*
>
> *27. The rule has been applied several times in the Cayman Islands, including in Kabushiki Kaisha Sigma v Trustcorp (unreported, 19 August 2015), which contains a detailed analysis of the rule and the history of its application in the Cayman Islands with a useful summary of the authorities including the cases of Hollington and Three Rivers. In Sigma the paragraphs in a Defence making reference to criminal convictions in Japan were struck out in their entirety. No reference could be made to them because the Court could be in no position to determine what weight to place on them (at para. [76]).*
>
> *28. The principle was also recently applied in the Cayman Islands Court of Appeal: see AHAB v Saad (unreported, 21 December 2019 at para. [295]).*"

20. Mr Tonner KC sensibly conceded at the 22 May 2023 hearing that neither the FINRA findings nor the assertions made in the other reports were admissible as to the truth of the pleaded factual findings relied upon by the Defendant, although the fact that those conclusions had been reached could be taken into account. The relevant principle does not appear to me to be grounded entirely in the hearsay rule, but also is derived from the principles of *res judicata* and/or issue estoppel. The House of Lords in *Three Rivers (No. 3)* essentially approved the dissenting judgment of Auld LJ in the Court of Appeal. And from his judgment ([2003] AC 1 at 174D-175E) it is clear that the Bingham Report's conclusions were essentially found not to be conclusive of the issues they considered. This was in part because the inquiry was not equivalent to a trial, and in part because the Report did not even purport to make conclusive factual findings.

21. In the present case therefore, my preliminary view was that it is not enough for the Defendant to rely <u>solely</u> on the 'findings' made by FINRA or the Hindenburg and similar reports. However, this provides no proper basis for striking out the relevant averments as the Defendant might still ask the Court to take them into account, without contending that they are conclusive as to the facts in question. It would still be necessary for the Defendant to prove the underlying facts upon which it relies in relation to the second limb of its market manipulation claim.

**The Defendant's further submissions in support of its expert evidence Summons**

22. The Defendant's 'Further Written Submissions-Leave to Adduce Expert Evidence' support the application on the following main grounds:

(a) "*CSL's expert can explain in general how schemes such as the one FDL and YRIV perpetrated are accomplished, which would allow the Court to evaluate the evidence before it in the proper light*" (paragraph 10 *et seq*). It is apparent from subsequent paragraphs that the Defendant proposes on this innocuous basis to adduce expert evidence to support new unpleaded averments relating to why the way YRIV came to be listed (by a reverse merger) and the way FDL conducted business (e.g. by using the shares as collateral) is indicative of market manipulation and (seemingly) to adduce expert evidence to support unpleaded particulars of foreign law supporting these new allegations;

(b) it is proposed to adduce expert evidence to the effect that market manipulators often (1) use companies with illiquid stock, and (2) keep a high proportion of stock in the

hands of insiders (although based in part on Mr Sin's evidence under cross-examination about seeking to control the number of shares actively trading in relation to the America 2030 litigation, these attributes and/or forms of market manipulation are presently unpleaded);

(c) to explain that it is common for market manipulators to create a misleading impression and to demonstrate that breaches of disclosure obligations have occurred (supporting in general terms the existing pleaded case, which of course pivotally requires proof of false and misleading statements based primarily on an assessment of the evidential lay of the land in China where YRIV's underlying business activities were based);

(d) to support the presently un-particularised plea that the YRIV shares "*were probably derived from the proceeds of crime or other unlawful activities*" (paragraph 4A4(c), Third Amended Defence and Counterclaim); and

(e) to assist the Court to understand the import of the FINRA investigation and the NASDAQ delisting (a matter which falls clearly within the ambit of the presently pleaded case but at first blush does not, for legal and factual reasons, materially advance the Defendant's case).

**The Plaintiff's further submissions in opposition to the Defendant's application to adduce expert evidence**

23. The Plaintiff advanced the following main grounds of opposition:

(a) the following important factual elements of the case on market manipulation were not put to Mr Sin:

> "*11.1. That YRIV was involved in fraud;*
>
> *11.2. That FDL was involved in fraud;*
>
> *11.3. That any of his conduct, or the conduct of any person involved with FDL or YRIV was dishonest or unconscionable in any way whatsoever;*
>
> *11.4. That FDL and/or YRIV was involved in any way whatsoever with a 'pump and dump' scheme; and/or*

> *11.5. That FDL and YRIV were, in the words of CSL's leading counsel in opening 'one and the same'* (this was a significant submission, if substantiated, because it potentially undermined the factual foundation for further expert evidence);"

(b) Mr Sin's admissions about YRIV attempting to "*dry up the volume*" in 2018 were made in the context of describing steps taken involving notifying the regulator to prevent a short-seller improperly depreciating YRIV's stock, which was the opposite of 'market manipulation' (this submission appeared to miss the more pertinent point that the only pleaded form of market manipulation did not allege that this type of activity was unlawful market manipulation);

(c) "*Where an expert relies on the existence or non-existence of some fact which is basic to the question on which he is asked to express his view, that fact must be proved by admissible evidence*" (*Hollander (ed) Documentary Evidence* (14th Edn), paragraph 31-06);

(d) fraudulent acts by FDL in relation to market manipulation of YRIV's share price have not been adequately pleaded (this submission appeared to sidestep the clarity of the case on false misrepresentations in relation to YRIV's financial position, and ignored the extent to which the general plea that the Plaintiff was an active participant in the "Scheme" might be adequate particulars in light of the evidence advanced by the Plaintiff through Mr Sin as to who YRIV's founders were and what its true financial condition was);

*(e)* "*115. For matters to be rectified CSL would likely have to do the following as a minimum:*

> *115.1. Plead and adduce evidence of primary facts as to what YRIV is said to have done which amounts to a fraud (and, in all likelihood, YRIV would need to be joined as a party and may contest jurisdiction);*
>
> *115.2. Plead and adduce evidence of the relevant law which YRIV is said to have breached (which presumably must be US law or Chinese law, and YRIV would need permission to adduce expert evidence of foreign law); and*

*115.3. Plead and adduce proper evidence going to the issue as to why it is said FDL is in some way an accomplice to, or accountable for, YRIV's actions with reference to the specific law FDL is said to have breached (given that, like YRIV, FDL is not incorporated in this jurisdiction, nor does it do business in this jurisdiction, the law is presumably foreign law) and the specific act or omission said to have been done or not done by FDL (and the personnel within FDL said to have committed the act, if they can be identified) amounting to a breach of the law*" (this submission appeared to address in an overly abstract and elaborate way the simple point that the Defendant sought to adduce expert evidence to rely on new, unpleaded forms of market manipulation and/or attributes of market manipulation).

**Findings: merits of Defendant's application to adduce expert evidence**

**<u>The Defendant's pleaded case</u>**

24. As foreshadowed above, I find that Third Amended Defence and Counterclaim adequately pleaded the following case on market manipulation:

(a) the Plaintiff as a shareholder of YRIV was an active member along with other shareholders in implementing the "Scheme";

(b) the "Scheme" centrally involved artificially inflating the value of YRIV's shares by making false filings and other public statements about YRIV's true financial position;

(c) the Scheme was fraudulent and constituted unlawful market manipulation as defined in the Brokerage Contract.

25. The complaint that the precise ways in which FDL participated needs to be pleaded is in my judgment a hollow and wholly technical one in the factual matrix of the present case. Not only did the Plaintiff file a responsive pleading years ago without any apparent difficulty. The Defendant, through Mr Sin's evidence, has admitted that the "Founding Investors" of YRIV were all friends and included himself, a FDL director and the <u>registered</u> shareholder (until in or about October 2018) Mr Chen. Mr Sin under cross-examination about the falsity of YRIV's filings appeared to have a firm grasp of YRIV's affairs which was entirely consistent with the allegation that FDL was an active participant in YRIV's affairs. This was said to be an inference from the fact the relationship

between FDL and YRIV was not an arms' length one (Third Amended Defence and Counterclaim, paragraph 3EE).

26. The Plaintiff's former attorneys in their 19 June 2020 Re-Amended Reply and Defence to Counterclaim denied and fulsomely replied to the Defendant's false representations case and never sought further and better particulars of the precise basis on which it was contended that these alleged misrepresentations contravened US securities law. That would have been a futile point to take which simply would have resulted in a wastage of costs in relation to expert evidence on foreign law.

27. The Plaintiff's 2 May 2023 Summons only sought to strike-out those portions of the Defendant's pleading which sought to rely upon the "findings" in the Hindenburg Report and made by FINRA, but for completeness I record here that I reject the broad complaint that the market manipulation case was inadequately pleaded because the allegations of fraud lacked sufficient particularity (which was in substance deployed by way of opposition to the Defendant's expert evidence application). I would make no Order in relation to the Plaintiff's Summons which was essentially resolved by way of concession without any need to strike out the impugned references to Reports and administrative findings arising.

**The Defendant's application for leave to adduce expert evidence in support of its pleaded case**

28. Properly analysed, there is no sufficient case for the Defendant being permitted to adduce expert evidence in support of its pleaded case that artificially inflating the price of YRIV shares through filing false information about its true financial condition and value constitutes unlawful market manipulation. The Plaintiff has not denied that such conduct would in law amount to improper market manipulation. No need for foreign law expert evidence arises. The Plaintiff has merely disputed making the alleged misrepresentations. The Defendant's former attorneys first formally advanced the market manipulation case on 2 April 2020, less than six months after agreeing directions in relation to expert evidence in relation to other matters. Over the following three years they seemingly never even hinted at the notion of seeking to adduce expert evidence on market manipulation. That omission is entirely consistent with the fact that expert evidence is rarely considered to be necessary to prove the falsity of statements made about a company's financial position; this is particularly the case when the misrepresentations relied upon are as crude and simplistic as the allegations here. For instance, it is pivotally alleged:

(a) an alleged lease at Chunfeng Village did not exist;

(b) its disclosure about litigation was materially false and misleading; and

(c) as a result YRIV had no realistic prospect of raising the US$1 billion it needed to progress its business plan.

29. In support of its application as initially advanced in May 2023 before trial, the Defendant relied upon the Expert Report of Jason Flemmons dated 5 May 2023, a forensic accountant. His Report potentially supported the Defendant's pleaded case in the following respects:

(a) he labelled the "Scheme" as a "pump and dump scheme", and described what the indicia of such schemes are;

(b) he identified potentially false and misleading disclosures;

(c) he asserts that YRIV insiders monetized their stock through both sales and raising collateral for loans; and

(d) he comments briefly on the Hindenburg Report and the FINRA and NASDAQ delisting findings, which the Defendant conceded were not admissible to prove their truth.

30. In my judgment this proposed opinion evidence is of limited assistance for two reasons. Firstly because it does not assist the Court to evaluate the truth or falsity of the hotly contested underlying facts in relation to which the Defendant adduced no evidence from a witness with personal knowledge of the relevant facts. In the Plaintiff's Skeleton Argument for the 17 May 2023 hearing, reliance was placed on the following *dicta* of Megarry J in *English Exporters (London) Ltd. v Eldonwall Ltd.* [1973] Ch. 415 at pp.421-422:

> "*The other party to the litigation is entitled to have a witness whom he can cross-examine on oath as to the reliability of the facts deposed to, and not merely as to the witness's opinion as to the reliability of information which was given to him not on oath, and possibly in circumstances tending to inaccuracies and slips. Further, it is often difficult enough for the courts to ascertain the true facts from witnesses giving direct evidence, without the added complication of attempts to evaluate a witness's opinion of the reliability, care and thoroughness of some informant who has supplied the witness with the facts that he is seeking to recount […]*

> *I know of no special rule giving expert valuation witnesses the right to give hearsay evidence of facts: and notwithstanding many pleasant days spent in the Lands Tribunal while I was at the Bar, I can see no compelling reasons of policy why they should be able to do this. Of course, the long-established technique in adducing expert evidence of asking hypothetical questions may also be employed for valuers. It would, I think, be perfectly proper to ask a valuer 'If in May 1972 No. 3, with an area of 2,000 sq. ft., was let for £10,000 a year for seven years on a full repairing lease with no unusual terms, what rent would be appropriate for the premises in dispute?' But I cannot see that it would do much good unless the facts of the hypothesis are established by admissible evidence; and the valuer's statement that someone reputable had told him these facts, or that he had seen them in a reputable periodical, would not in my judgment constitute admissible evidence.*"

31. This point is reinforced by the FSD User's Guide (B.53c) which provides:

> "*Where the evidence of an expert is to be relied upon for the purpose of establishing primary facts, as well as for the purpose of relying on his expertise to express an opinion on any relevant matter, that part of his evidence which is to be relied upon to establish the primary facts is to be treated as factual evidence and must be incorporated into a factual witness statement to be exchanged in accordance with the directions for the exchange of factual witness statements. The purpose of this requirement is to avoid postponement of disclosure of any of a party's factual evidence until service of expert reports.*"

32. The Defendant is not purporting to rely upon the Flemmons Report to assist the Court to establish the primary facts because it has made no attempt to satisfy the procedural requirements for doing so. But putting procedural technicalities aside, in my judgment the Court does not require the assistance of a financial expert to assist it to interpret the Defendant's presently pleaded case, properly understood. That case merely asserts the making of false representations, and whether or not falsity is established does not turn on any analysis of technical contractual terms (such as those in the brokerage agreement), handwriting, valuation or other scientific or technical analysis, nor on any controversial issues of foreign law.

33. In effect the Defendant is seeking to adduce expert evidence to assist to understand that people who artificially inflate share prices through making false statements about the value of the shares often make false statements about the value of the shares. An expert is not required to identify as potentially misleading matters which the pleading says are misleading, nor indeed to understand (for example) why describing an allegedly non-existent lease as an asset of YRIV would be a false misrepresentation. Nor is expert evidence required to explain evidence which demonstrates the

monetizing of YRIV shares (through selling or raising money against them), or to understand the Hindenburg Report and the regulatory "findings", or to support a finding that there was a failure to disclose material litigation. The Hindenburg Report is a commercial form of tabloid journalism; the regulatory reports are written in terms that consumer investors as well as sophisticated investors can readily apprehend.

34. The primary justification for adducing expert evidence is invariably to assist the Court to determine factual issues which because of their technical complexity the Court is unable to fairly evaluate and the experts who testified at trial did so with leave granted on a consensual basis. As Martin JA opined in *In the matter of Qihoo 360 Technology Company Limited* [2017 (2) CILR 585] in the context of a section 238 of the Companies Act valuation case, "*although the task of determining the value is one for the court alone, the court will not usually be equipped to derive a value from the financial information without expert assistance.*" This threshold is simply not met by the present application.

35. In my judgment, even if the proposed expert evidence could potentially assist the Court to some extent, its forensic value is at best of marginal benefit in circumstances where there is such a paucity of direct evidence in relation to the material underlying facts in relation to YRIV's financial position. I am bound to have regard to the impact of granting an inexcusably late application on two important aspects of the parties' respective fair hearing rights: (1) the need for expedition, and (2) the need for economic efficiency in civil litigation. The Overriding Objective requires the Court, *inter alia*, to consider "*whether the likely benefits of taking a particular step will justify the cost of taking it*". The likely benefits of extending the trial by several months and incurring the costs of additional expert evidence of doubtful significance are in my judgment far outweighed by the costs of acceding to the Defendant's application.

36. Taking all these matters into account, I am bound to refuse the application based on the Defendant's presently pleaded case and the proposed expert evidence presently before the Court.

**<u>The Defendant's application to adduce expert evidence to support new unpleaded averments</u>**

37. I am bound to summarily reject the Defendant's application to adduce further expert evidence, from Mr Flemmons and (additionally or alternatively) a further unidentified expert of an uncertain discipline to support new unpleaded allegations, principally:

(a) the way in which YRIV was established is indicative of market manipulation; and

(b) the way in which insiders limited the size of the public float and monetized their own shares, combined to demonstrate an alternative form of prohibited market manipulation.

38. Not only is this new case not pleaded; it is trite law that expert evidence is only potentially admissible in relation to pleaded issues. Not only would the Defendant need to apply for leave to amend; this alternative new case was, understandably, not put to Mr Sin in cross-examination. An application for leave to recall him would also have to be made. Recalling that the scheduled trial of an action commenced almost 5 years ago has concluded with all of the anticipated factual and expert witness evidence completed, it is difficult to see how such applications could credibly be pursued at this stage.

**Conclusion**

39. In summary, the Defendant's Summons seeking leave to adduce further expert evidence in relation to market manipulation is refused on the basis that expert evidence is not required for the just determination of its presently pleaded market manipulation Defence and Counterclaim. Subject to hearing counsel if required on costs, it seems reasonable to assume that costs should follow the event as regards both the Defendant's unsuccessful Summons and the Plaintiff's conceded Summons.

40. I would invite counsel to seek to agree within 7 days whether closing submissions should be in writing or whether a date for oral closings should now be fixed, and to advise the Court accordingly.



**THE HONOURABLE MR JUSTICE IAN RC KAWALEY**
**JUDGE OF THE GRAND COURT**