# Exhibit F

Neutral Citation Number: [2023] EWHC 63 (KB)

Case No: QB-2021-002715

**IN THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 18 January 2023

**Before**:

**HHJ PARFITT**
**(sitting as a Judge of the High Court)**

- - - - - - - - - - - - - - - - - - - -

**Between:**

| | |
|---|---|
| **ALEXANDER GERKO** | **Claimant** |
| **- and -** | |
| **(1) JONATHAN SEAL** | **Defendants** |
| **(2) ROBERT TAYLOR** | |
| **(3) ELSWORTHY SJW LIMITED** | |
| **(4) SUNLEY ESTATES LIMITED** | |
| **(5) RPS CONSULTING LIMITED** | |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**John Wardell KC & Patrick Hennessey** (instructed by **Payne Hicks Beach LLP**) for the **Claimant**
**Max Mallin KC & George Eyre** (instructed by **Rosling King LLP**) for the **First to Fourth Defendants**
**Charles Pimlott** (instructed by **Beale & Co Solicitors LLP**) for the **Fifth Defendant**

Hearing dates: 14 & 15 December 2022

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

Crown Copyright ©

This judgment was handed down remotely at 10.00am on 18 January 2023 by circulation to the parties or their representatives by e-mail and by release to the National Archives

.............................

HHJ PARFITT

**HHJ Parfitt:**

Introduction

1. This judgment is about whether the Claimant has adequately pleaded a claim in unlawful means conspiracy. It decides the Claimant's amendment application dated 9 May 2022 and the First to Fourth Defendants' strike out application dated 15 July 2022.

2. On 4 February 2020 the Claimant purchased 18 Elsworthy Road, NW3 ("the Property") pursuant to a sale contract dated 21 December 2018 between the Claimant and the Third Defendant ("the Sale Contract"). The sale price was £12,000,000 which included a separate property at 15 Elsworthy Rise. The properties were part of a new development being carried out by the Third Defendant and for which the Fourth Defendant was the project manager. The First and Second Defendants were the individuals most involved for those companies. The Fifth Defendant signed a practical completion certificate relating to the Property on 31 October 2019.

3. The Claimant's case is that the Defendants, or at least two of them, conspired against him so that he ended up with a home which he cannot use and cannot insure. He sues them for unspecified damages in unlawful means conspiracy based on what is said to be the Fifth Defendant's deceitful certificate of practical completion.

4. The First to Fourth Defendants, represented by Mr Mallin KC and Mr Eyre, say that the conspiracy allegation is hopeless on its own premises and is hopelessly pleaded, coming nowhere near the level of cogency and particularisation which is required to raise such serious allegations against professionals going about their normal business.

5. Mr Wardell KC and Mr Hennessey, for the Claimant, describe this as a gross mischaracterisation of what is an obvious and clearly set out fraud on the Claimant which cannot be summarily determined.

6. Mr Pimlott appeared for the Fifth Defendant. The Fifth Defendant has not made an application for summary determination of the claim but if the claim is to be struck out, Mr Pimlott says, the case against his client should fall as well. Otherwise, Mr Pimlott had three points of detail about the Claimant's amendment application.

7. This judgment is divided as follows: (i) the relevant background; (ii) the law about pleading fraud, summary judgment and striking out; (iii) the particulars of claim; (iv) the key elements of the conspiracy claim and the strike out (v) the application to amend; (vi) the Fifth Defendant; (vii) conclusion.

8. I should add that by an application notice sent at about 7.30 pm on Friday 9 December 2022, the Claimant sought to add another raft of amendments (including what was described as “the third deception”). The hearing started on Wednesday 14 December. Even ignoring CPR 23.7(1)(b), this gave the Defendants at best two business days to deal with many new proposed paragraphs at a time when they and their lawyers were no doubt fully engaged preparing for the present hearing. It was my view that these new amendments could not be dealt with fairly at the hearing before me and I refused to consider the new application any further. I should add that there is nothing in those amendments that might cure the problems said to exist in the current particulars but rather they seek, in substance, to add a further deceit based on alleged non-existent third party warranties.

9. The new 9 December 2022 iteration of the particulars of claim led to my having a hard copy working version of the pleading which included the original particulars, amendments in red, which were the subject of the 9 May 2022 application, and amendments in green which were the subject of the application dated 9 December 2022. The green amendments often dictate the paragraph numbers. I refer to that document as “the POC” in this judgment. The paragraph numbers I refer to below are to the POC. Where it is material and not otherwise obvious I will identify text as “red” if it relates to the 9 May 2022 amendments. It has not been necessary to refer to the green amendments.

Background

10. Since this is a judgment about whether the POC meets the bare necessities for a claim which should be allowed to trial, I have only sketched out the relevant background (Trafalgar Multi Asset Trading Company Limited v Hadley & Ors [2022] EWCA Civ 1639, Stuart-Smith LJ at [2]: “…bearing in mind at all times that we are dealing with…summary judgment or…strike out where any temptation to engage in a mini-trial was to be avoided…”)

11. The framework for the dispute is provided by the Sale Contract.

12. As is most relevant and filling in definitions as required:

    i) The “Works” were “the construction of the Property in accordance with…[planning…specifications…M&E Requirements]….

    ii) The Third Defendant, as Seller, was obliged to procure that the Works were carried out and completed with due diligence…in accordance with the terms of the Building Contract and…[the Sale Contract]…by…[30 April 2019]

iii) "Building Contract" meant "the building contract or contracts for the carrying out of the Works…to be entered into by the…[Third Defendant]…with the Building Contractor and any other specialist sub-contractors appointed by the Building Contractor…"

iv) "Building Contractor" meant S&T (UK) Limited…or such other contractor or contractors appointed by…[the Third Defendant]…for the purposes of carrying out and completing the Works and notified to the Buyer"

v) "Practical Completion" meant "practical completion of the Works in accordance with the Building Contract as certified by the Employer's Agent

vi) "Employer's Agent" was the Fifth Defendant

vii) The Property would be "deemed to be completed on the issue by the Employer's Agent of the Practical Completion Certificate notwithstanding that any Snagging Items appear in any Snagging List…"

viii) "Practical Completion Certificate" meant a certificate "to be issued by the Employer's Agent on behalf of the Seller as employer stating that practical completion of the Works in accordance with the Building Contract has taken place"

ix) "Snagging Items" meant "minor works or minor defects relating to the Property which taken both individually or together do not render the Property unfit for occupation and use and enjoyment as a high class residential dwelling"

x) The Claimant's obligation to purchase was subject to clause 11 which provided for a right to rescind if the Practical Completion Certificate was not issued by a longstop date of 31 October 2019. The right to rescind would last between 1 November 2019 and 30 December 2019 because if written notice to rescind had not been given by the end date, defined as 31 December 2019, then completion would take place regardless of practical completion of the Works.

13. In the event, the Building Contractor left site many months before completion of the works. The Third Defendant says that by the end of January 2019 the Building Contract was terminated and the Third Defendant took over as employer. The Claimant says that thereafter the Third Defendant employed the sub-contractors and sub-consultants directly to complete the Building Contract Works. For present purposes that comes to much the same thing – it is common ground that there was no operative building contract with the building contractor from early 2019 and the Third Defendant was engaging contractors to get the works done.

14. It is common ground that the works were not completed by 30 April 2019 and common ground that works were still being carried out on 31 October 2019 (the parties dispute the significance of those remaining works).

15. By 31 October 2019 the position under the Sale Contract was that if no practical completion certificate was issued on that day then the Claimant would have a right to rescind.

16. On 31 October at 15.43 Mr Crouch, of the Fifth Defendant, emailed, among others, the First and Second Defendant. The subject of the email was "Practical Completion Notice" and the email attached a number of PDFs. These included a "completion cover letter" ("the Covering Letter"), a practical completion notice, a "PC Checklist" and a combined snag list. The email said "Gents Please find attached the Practical Completion Notice with respect to…[the Property]…If you have any queries, please do let me know".

17. After getting this email, the attachments, apart from the Covering Letter, were combined into a single PDF within which the First Defendant, on behalf of the Third Defendant, had added his signature. This new PDF was emailed at 16.28 on 31 October 2019 by the Third Defendant's solicitor to the Claimant's solicitor. The Third Defendant's solicitor wrote "Please see attached the Certificate of Practical Completion". I will refer below to this document as "the PCC".

18. There is some wordplay in the statements of case as to the exact form of wording describing the certificate. I have not needed to address this and was not addressed on it. My reference to the PCC is intended to refer to that document sent at 16.28 on 31 October 2019 and which was treated by the Claimant and the Third Defendant at the time as being, at least potentially, the document relevant to the non-existence of the Claimant's option to rescind the Sale Contract.

19. On 18 November 2019 the Claimant's solicitors wrote to the Third Defendant's solicitors and said that practical completion had not occurred on 31 October 2019.

20. On 20 November 2019, the Claimant served a notice to complete under condition 6.8 of the Standard Conditions of Sale, which gave the Third Defendant 10 days to complete. Paragraph 63 of the POC says this was done without prejudice to the Claimant's existing right to rescind.

21. After that the Claimant and the Third Defendant came to an agreement. The parties' statements of case use different wording to describe the agreement and I was not taken to any relevant

documents. Using the Claimant's language in the red version of the POC, the Claimant agreed not to exercise the right to rescind on various conditions relating to the Property being free of defects or snagging items and this agreement identified particular items of work which needed to be done in a document called "the Completion Matrix". Paragraph 66A (this wording is from the original particulars of claim) said that the Third Defendant undertook to complete these works "within the next few weeks". I will refer to this agreement involving the Completion Matrix as "the CMA". It is common ground that the CMA was a new agreement not provided for within the Sale Contract. Under the CMA, as I understand it, the Claimant did not have to complete unless he was satisfied that the outstanding works were done.

22. The Third Defendant and the Claimant then completed the sale of the Property on 4 February 2020 and, after having a third party carry out fitting out works, the Claimant and his family moved in on 26 June 2020.

23. The Claimant says it was soon apparent that the Property was seriously defective. The Claimant has had various experts carry out invasive investigations, who say more and more defects have been uncovered. In short, the Claimant says, the Property is unfit for habitation and unmarketable.

<u>The Law: summary judgment / strike out / pleading fraud</u>

24. With one slight exception, the principles were well established and common to both parties' submissions. There are two principles in play. The first is that the court, when considering the merits of pleading issues outside of trial, is concerned not with whether an allegation will be successful on a balance of probabilities but whether there is a realistic prospect of success rather than fanciful hopes but bearing in mind the evidence at trial will be fuller and the court must not at the interim stage conduct a mini-trial. The focus is on prospects not probability. The second is the requirement, in the combined interests of fairness and efficiency, that pleadings should be clear, concise and contain such particulars as the nature of the allegations require.

*Pleading Dishonest Conspiracy*

25. It is worth starting from the basics:

> "30. It should not need repeating that Particulars of Claim *must* include a *concise* statement of the facts on which the Claimant relies: CPR 16.4(1)(a). The "facts on which the Claimant relies" should be no less and no more than the facts which the Claimant must prove in order to succeed in her or his claim. Practice Direction 16PD8.2 mandates that the

Claimant *must* specifically set out any allegation of fraud, details of any misrepresentation, and notice or knowledge of a fact where he wishes to rely upon them in support of his claim. The Queen's Bench Guide provides guidelines which should be followed: they reflect good and proper practice that has been universally known by competent practitioners for decades. They include that "a statement of case must be as brief and concise as possible and confined to setting out the bald facts and not the evidence of them": see 6.7.4(1). A statement of case exceeding 25 pages is regarded as exceptional: experience shows that most cases can be accommodated in well under 25 pages even where the most serious allegations are made. Experience also shows that prolix pleadings normally tend to obfuscate rather than to serve their proper purpose of identifying the material facts and issues that the parties have to address and the Court has to decide" (*Portland Stone v Barclays* [2018] EWHC 2341, Stuart-Smith J)

26. The 2021 version of what is now the King's Bench Guide, the one applicable when the POC was filed, contained similar guidance as to content, including the well known requirements that particulars of claim should be "as brief and concise as possible" and that where particulars need to be given "the allegation…should be stated first and then the particulars or reasons should be listed one by one in separate sub-paragraphs".

27. In *King v Stiefel* [2021] EWHC 1045, Cockerill J, between [145] and [151], drew together various authorities about the purpose and content of statements of case. Since *King* was also a case where the court was considering striking out a claim in unlawful means conspiracy, it is helpful to set out the relevant passages in full:

> "145. A pleading in these courts serves three purposes. The first is the best known – it enables the other side to know the case it has to meet. That purpose, and the second are both expressly referenced in the following citation from the speech of Lord Neuberger MR in *Al Rawi v Security Service* [2010] EWCA Civ 482; [2010] 4 All ER 559, [18]:
>
> "a civil claim should be conducted on the basis that a party is entitled to know, normally through a statement of case, the essentials of its opponent's case in advance, so that the trial can be fairly conducted, and, in particular, the parties can properly prepare their respective evidence and arguments at trial."

146.The second purpose then is to ensure that the parties can properly prepare for trial – and that unnecessary costs are not expended and court time required chasing points which are not in issue or which lead nowhere. That of course ties in with the Overriding Objective, which counts amongst its many limbs "*(d) ensuring that [the case] is dealt with expeditiously and fairly; (e) allotting to it an appropriate share of the court's resources, while taking into account the need to allot resources to other cases…*".

147. This is a point which feeds into the dictum of Teare J in *Towler v Wills* [2010] EWHC 1209 (Comm), at [18]-[21]:

"The purpose of a pleading or statement of case is to inform the other party what the case is that is being brought against him. It is necessary that the other party understands the case which is being brought against him so that he may plead to it in response, disclose those of his documents which are relevant to that case and prepare witness statements which support his defence. If the case which is brought against him is vague or incoherent he will not, or may not, be able to do any of those things. Time and costs will, or may, be wasted if the defendant seeks to respond to a vague and incoherent case. It is also necessary for the Court to understand the case which is brought so that it may fairly and expeditiously decide the case and in a manner which saves unnecessary expense. For these reasons it is necessary that a party's pleaded case is a concise and clear statement of the facts on which he relies."

148.The third purpose for the pleading rules is less well known but no less important. The process of pleading a case operates (or should operate) as a critical audit for the claimant and its legal team that it has a complete cause of action or defence.

149.Particulars of Claim, in particular, should generally aim to set out the essential facts which go to make up each essential element of the cause of action – and thought should be given to whether any more than that is either necessary or appropriate, bearing in mind the functions which

a pleading serves and whether any components of what is pleaded are subject to rules requiring specific particularisation.

150.This is a point which is not infrequently forgotten today. As Christopher Clarke LJ said (in a judgment with which Sharp LJ agreed) in *Hague Plant v Hague* [2014] EWCA Civ 1609, [2015] CP Rep 15, at [76] and [78];

"Particulars of Claim must include a concise statement of the facts on which the claimant relies: CPR 16.4. (1) (a). But they need not, and should not, contain the evidence by which they are to be proved or the opposing party's pleadings or admissions. Whilst it may be appropriate in some circumstances to rely, as proof of dishonesty, on the fact that the defendant's account of his position requires explanation and that he has given several different accounts, all unacceptable, this can and should be done in a concise way, referring to documents (but not necessarily quoting in extenso) which makes clear what is the issue. The pleading cannot be used as the first draft of an opening or a delineation of points for cross examination….

Pleadings are intended to help the Court and the parties. In recent years practitioners have, on occasion, lost sight of that aim. Documents are drafted of interminable length and diffuseness and conspicuous lack of precision, which are often destined never to be referred to at the trial, absent some dispute as to whether a claim or defence is open to a party, being overtaken by the opening submissions. It is time, in this field, to get back to basics."

151.The danger which attends pleadings which neglect to conform to this fairly minimalist approach can be illustrated from the same case, where Briggs LJ described the pleading in issue thus, at [23]:

"So far from being a concise statement of the primary facts relied upon in support of the claim, it comes across as a rambling narrative …, serving no apparent purpose, and obscuring, rather than clarifying, the claimant's own case.""

28. These comments apply across the board, no matter what the cause of action is. There are also particular requirements when a case of fraud is pleaded. The Claimant referred me to *JSC Bank of Moscow v Kekhman* [2015] EWHC 3073 (Comm), Flaux J (as he then was) [15] to [23] which sets out, among others, the following passages from *Three Rivers District Council v Bank of England* [2001] UKHL 16 to which both parties referred me:

> "56…Of course, the allegation of fraud, dishonesty or bad faith must be supported by particulars. The other party is entitled to notice of the particulars on which the allegation is based. If they are not capable of supporting the allegation, the allegation itself may be struck out. But it is not a proper ground for striking out the allegation that the particulars may be found, after trial, to amount not to fraud, dishonesty or bad faith but to negligence" (*Three Rivers*, Lord Hope)
>
> 186. The second principle, which is quite distinct, is that an allegation of fraud or dishonesty must be sufficiently particularised, and that particulars of facts which are consistent with honesty are not sufficient. This is only partly a matter of pleading. It is also a matter of substance. As I have said, the defendant is entitled to know the case he has to meet. But since dishonesty is usually a matter of inference from primary facts, this involves knowing not only that he is alleged to have acted dishonestly, but also the primary facts which will be relied upon at trial to justify the inference. At trial the court will not normally allow proof of primary facts which have not been pleaded, and will not do so in a case of fraud. It is not open to the court to infer dishonesty from facts which have not been pleaded, or from facts which have been pleaded but are consistent with honesty. There must be *some* fact which tilts the balance and justifies an inference of dishonesty, and this fact must be both pleaded and proved." (*Three Rivers*, Lord Millet)
>
> 189… If the particulars of dishonesty are insufficient, the defect cannot be cured by an unequivocal allegation of dishonesty." (*Three Rivers*, Lord Millet)

29. In *Kekhman* the alleged fraudulent party was arguing that the requirement for particulars of fraud would not be met unless the particulars "necessarily" led to fraud rather than negligence (or another not fraudulent explanation). This argument was rejected.

What was required was some fact or facts which tilt the balance and justify an inference of dishonesty:

> “the correct test is whether or not, on the basis of the primary facts pleaded, an inference of dishonesty is more likely than one of innocence or negligence…when the court is considering whether the plea of fraud is a proper one or whether to strike it out, the court is concerned…only with whether facts are pleaded which would justify the plea of fraud.” [20]

30. Mr Mallin illustrated the distinction by reference to an amendment allowed in *Phones 4U v EE & Ors* [2021] EWHC 2816 (Ch), Roth J at [24] to [26]. The issue was possible collusion by mobile phone companies against the Claimant. The minutes of a meeting at which it was said EE decided not to continue to deal with the Claimant were blank under the subject heading “indirect distribution update”. The pleading set out inferences to be drawn from this primary fact. The court found that the amendment supported fraud for pleading purposes as given the primary fact the inferences were reasonably arguable with some degree of conviction, consequently, the pleading test was met and it was a matter for trial.

31. These requirements about pleading fraud also apply to claims, as here, involving dishonest conspiracy. In *ED&F Man Sugar Ltd v T&L Sugars* [2016], Leggatt J (as he then was) said: “…some reasonable basis needs to be pleaded to support an allegation that an individual was involved in such a conspiracy; and where, as here, the conspiracy is said to have involved deception, all the strictures that apply to pleading fraud are directly engaged”.

*Real Prospects of Success*

32. The real prospects test for summary judgment purposes is set out in the often cited *Easyair Ltd v Opal Telecom Ltd* [2009] EWHC 229 (Ch), Lewison J (as he then was) at [15]:

> “The correct approach on applications by defendants is, in my judgment, as follows:
>
> i) The court must consider whether the claimant has a "realistic" as opposed to a "fanciful" prospect of success: *Swain v Hillman* [2001] 2 All ER 91 ;
>
> ii) A "realistic" claim is one that carries some degree of

conviction. This means a claim that is more than merely arguable: *ED & F Man Liquid Products v Patel [2003] EWCA Civ 472* at [8]

iii) In reaching its conclusion the court must not conduct a "mini-trial": *Swain v Hillman*

iv) This does not mean that the court must take at face value and without analysis everything that a claimant says in his statements before the court. In some cases it may be clear that there is no real substance in factual assertions made, particularly if contradicted by contemporaneous documents: *ED & F Man Liquid Products v Patel* at [10]

v) However, in reaching its conclusion the court must take into account not only the evidence actually placed before it on the application for summary judgment, but also the evidence that can reasonably be expected to be available at trial: *Royal Brompton Hospital NHS Trust v Hammond (No 5) [2001] EWCA Civ 550* ;

vi) Although a case may turn out at trial not to be really complicated, it does not follow that it should be decided without the fuller investigation into the facts at trial than is possible or permissible on summary judgment. Thus the court should hesitate about making a final decision without a trial, even where there is no obvious conflict of fact at the time of the application, where reasonable grounds exist for believing that a fuller investigation into the facts of the case would add to or alter the evidence available to a trial judge and so affect the outcome of the case: *Doncaster Pharmaceuticals Group Ltd v Bolton Pharmaceutical Co 100 Ltd* [2007] FSR 3 ;

vii) On the other hand it is not uncommon for an application under Part 24 to give rise to a short point of law or construction and, if the court is satisfied that it has before it all the evidence necessary for the proper determination of the question and that the parties have had an adequate opportunity to address it in argument, it should grasp the nettle and decide it. The reason is quite simple: if the respondent's case is bad in law, he will in truth have no real prospect of

> succeeding on his claim or successfully defending the claim against him, as the case may be. Similarly, if the applicant's case is bad in law, the sooner that is determined, the better. If it is possible to show by evidence that although material in the form of documents or oral evidence that would put the documents in another light is not currently before the court, such material is likely to exist and can be expected to be available at trial, it would be wrong to give summary judgment because there would be a real, as opposed to a fanciful, prospect of success. However, it is not enough simply to argue that the case should be allowed to go to trial because something may turn up which would have a bearing on the question of construction: *ICI Chemicals & Polymers Ltd v TTE Training Ltd [2007] EWCA Civ 725*2."

33. I was also referred to *Kawasaki Kisen Kaisha Ltd v James Kemball Ltd* [2021] EWCA Civ 33, Popplewell LJ at [18] in the context of strike out and amendment, which also helpfully ties in the requirements for a pleading meeting the core procedural necessities with the subject necessity of a case with a real prospect of success:

> "(1) It is not enough that the claim is merely arguable; it must carry some degree of conviction: *ED & F Man Liquid Products Ltd v Patel* [2003] EWCA Civ 472 at paragraph 8; *Global Asset Capital Inc. v Aabar Block SARL* [2017] 4 WLR 164 at paragraph 27(1).
>
> (2) The pleading must be coherent and properly particularised: *Elite Property Holdings Ltd v Barclays Bank Plc* [2019] EWCA Civ 204 at paragraph 42.
>
> (3) The pleading must be supported by evidence which establishes a factual basis which meets the merits test; it is not sufficient simply to plead allegations which if true would establish a claim; there must be evidential material which establishes a sufficiently arguable case that the allegations are correct: *Elite Property Holdings v Barclays Bank Plc* [2018] EWCA at paragraph 41."

34. Paragraphs 41 and 42 of *Elite Property* say:

> "41. For the amendments to be allowed the Appellants need to show that they have a real as opposed to fanciful prospect of success which is one that is more than merely arguable and carries some degree of conviction: *ED&F Man Liquid Products Ltd v Patel* [2003] EWCA Civ 472. A claim does not have such a prospect where (a) it is possible to say with confidence that the factual basis for the claim is fanciful because it is entirely without substance; (b) the claimant does not have material to support at least a *prima facie* case that the allegations are correct; and/or (c) the claim has pleaded insufficient facts in support of their case to entitle the court to draw the necessary inferences.
>
> 42. The court is entitled to reject a version of the facts which is implausible, self-contradictory or not supported by the contemporaneous documents and it is appropriate for the court to consider whether the proposed pleading is coherent and contains the properly particularised elements of the cause of action relied upon."

35. The summary dismissal of fraud cases was referred to by Cockerill J in *King v Stiefel* at [24] to [25]:

> "24.The reality is that while the court will be very cautious about granting summary judgment in fraud cases, it will do so in suitable circumstances, and there are numerous cases of the court doing so. This is particularly the case where there is a point of law; but summary judgment may be granted in a fraud case even on the facts. I have done so in a case heard very close in time to this application: *Foglia v The Family Officer and others* [2021] EWHC 650 (Comm), where at [14] I gave some examples of other cases in which this course was also followed. In other cases, such as *AAI Consulting Ltd v FCA* [2016] EWHC 2812 (Comm) and *Cunningham v Ellis* [2018] EWHC 3188 (Comm) fraud claims were struck out on the basis that the particulars of claim were inadequate in themselves to support the claims being made.
>
> 25.In terms of the approach to summary judgment in fraud claims Primekings commended

to my attention the judgment of Stuart Smith J in *Portland Stone Firms Ltd v Barclays Bank plc* [2018] EWHC 2341 (QB) at [25] – [29], in the context of the approach to be taken when faced with an application to strike out a claim in fraud. In summary:

i) The Court should bear in mind that cogent evidence is required to justify a finding of fraud or other discreditable conduct, reflecting the court's conventional perception that it is generally not likely that people will engage in such conduct.

ii) Pleadings of fraud should be subjected to close scrutiny and it is not possible to infer dishonesty from facts that are equally consistent with honesty.

iii) However, in view of the common feature of fraud claims that the Defendant will, if the underlying allegation is true, have tried to shroud his conduct in secrecy, the Court should adopt a "generous" approach to pleadings."

*The Pleading Test in Summary*

36. Pulling the threads together, the court and the defendants to a pleading of dishonest conspiracy are entitled to expect a clear concise statement of relevant facts, where the key allegations of dishonesty and the acts done in furtherance of the conspiracy are clearly set out with sufficient relevant particulars of primary fact to tip the balance in favour of a potential finding of fraud.

37. Generally, the allegation will be a conclusion that the court will be asked to reach at trial and the particulars of primary fact will be those facts said to justify that conclusion, if proven at trial. If those primary facts are not pleaded or if, taken at face value and in the round, they do not point towards their being a realistic prospect of the stated allegations being made out at trial, then the pleading fails and the interests of justice do not require the claim to proceed any further.

38. A degree of cautious realism is appropriate when considering the striking out of fraud claims. The court must bear in mind the position of the victim and not allow what might be good claims to be prevented from being determined at trial by applying unrealistic technical requirements to a pleading that will often reflect the claimant's relative ignorance about matters that the defendants will have done their best to keep hidden.

The Parties' Submissions in Overview

39. Mr Wardell summarised the Claimant's case as being an unlawful means conspiracy whereby two or more of the Defendants combined or agreed to put forward a practical completion certificate known to be false. It was false because practical completion had not been achieved and known to be false because that was so obvious that anyone would have known it.

40. Mr Mallin's case for the Defendants was that the POC lacked the particularity and cogency that was essential for a case in dishonesty to be allowed to proceed. The approach taken to defects was both inappropriate and unworkable since it was not possible for any of the Defendants to know the facts being alleged against them to justify the allegations being made. Since the case appears to be based on defects then at a minimum a defendant was entitled have set out what the relevant defects were, when and how those were known to the defendant and what representation the defendant was said to have made to the claimant which was contrary to that knowledge. Likewise with the allegations of combination – particulars are required. The POC were unworkable as a basis for such a serious case.

41. Mr Wardell's reply submissions also adopted a broad brush and general approach. Mr Wardell said that the application to strike out relied on a gross mischaracterisation of the POC which had little to do with specific defects at the Property but rather the core assertion that the Defendants quite obviously knew that the practical completion certificate was untrue and dishonest. The details about defects were all a matter for trial and were not the proper subject of a pre-trial determination.

42. The dispute between the parties' two positions is the degree of particularity required and whether the POC set out sufficient facts, at this interim stage, to tip the balance in favour of dishonesty and conspiracy.

The Particulars of Claim

43. In *King v Stiefel*, Cockerill J commented that the particulars of claim in that case, which on any view appear to be an extreme example of a failed pleading, "complicated the applications before me". In my view, the POC, which are not such an extreme example, nevertheless are not clear, do not comply with the basic requirements set out in the King's Bench Guide, and have made these applications more complicated than they should have been.

44. The POC do meet the requirement of stating clearly that allegations of fraud are being made. Indeed, they are littered with pejorative comment directed towards the Defendants. The core of the First to

Fourth Defendants' strike out application is the failure to set out a concise statement of primary facts to support the core fraud allegations.

45. The overall impression, having spent some hours reading and rereading the POC, is of a strong subjective belief on the Claimant's part of having been wronged but I remain unconvinced that such facts as are alleged provide objective justification for the claim made.

46. The POC contain a "section J" headed "conspiracy" which might be expected to set out the essential facts that support this case. However, section J contains at paragraph 70 general words "having regard to the foregoing, and as set out further below" and so the POC leave open the possibility that further relevant facts might be contained elsewhere.

47. The POC has a summary section which, green text aside, contains 23 full paragraphs, and so is hardly summary, but itself contains both primary allegations and further iterations of primary allegations also addressed elsewhere. It is impossible to know whether the section is genuinely a summary, and so could be ignored for the purposes of testing whether a case with a real prospect of success is contained in the substance of the POC, or another potential source of primary fact which it is necessary to bear in mind when deciding if the case is fit to go to trial.

48. I go through the POC below and focus on those parts which cover the main allegations of dishonest conspiracy and the primary facts pleaded in support. The deceit is the "core" allegation, and described as such in the POC, because it is the unlawful means relied on for the tortious combination. The allegation is that the Defendants knew that the PCC was untrue when it was sent to the Claimant's solicitor.

49. The first relevant mention of the PCC is in paragraph 18A(a). This asserts a deception that practical completion had been achieved on 31 October 2019 and that "as explained below" the defects were "so serious and defective" that no agent acting reasonably could have certified practical completion and yet the PCC was issued with the Covering Letter that was hidden from the Claimant. There is express reference to paragraphs 19 to 19C providing further description. With the exception of the reference to the Covering Letter, in red, there are no particulars given in this paragraph.

50. Paragraph 19 starts by referring to "endemic and egregious delays" and "repeated raising of concerns" but gives no facts that might support those conclusions. Paragraph 19 then asserts, as previously in paragraph 18A, that the "extensive defects" were such that no employer's agent acting in good faith could have

certified practical completion. The original pleading did not give any particulars of this but sub-paragraph (e), in red, repeats the assertion that it must have been fraudulent because "so serious and extensive" were the defects.

51. There are further sub-paragraphs in red. These are about the Covering Letter and the Claimant's position in relation to it. These include that although the Claimant did not know about the Covering Letter, the Claimant's belief about the extent and seriousness of the defects at the Property as at 31 October 2019 was "considerably greater than represented by [the Fifth Defendant] in the covering letter".

52. This provides nothing further about what actual defects there were and which of those are said to have been known to which Defendants but it is said that the true extent and seriousness was greater than stated in the PCC and it would be set out below how those defects would have been apparent to the Fifth Defendant. It is said that the Fifth Defendant must have appreciated that "what it described euphemistically as "outstanding matters"…could not possibly be completed within a reasonable timeframe". Again no facts are provided to support these conclusions (e.g. what outstanding matters, even as examples, what a reasonable timeframe might be and why completion was not possible within that time).

53. Sub-paragraph (g) is not about defects but asserts that the Fifth Defendant would have known that the Defendants were going to represent that practical completion had occurred. This is a good plea so far as concerns the Fifth Defendant and the Third Defendant (and/or possibly the First Defendant since he was the relevant director) as it is a reasonable inference that the PCC was sent for the purpose of being forwarded to the Claimant but I cannot follow on what grounds it is said that the Fifth Defendant knew that the Second and Fourth Defendant were going to make that representation. There was nothing in the parties' contractual or other pleaded relationship that would make that a plausible inference.

54. Paragraph 19B, in red, quotes from the correspondence following the sending of the PCC on 31 October 2019. It adds nothing of substance merely pleading a "yes it has" / "no it hasn't" type dispute.

55. Paragraph 19C, in red, relies on the non-disclosure of the Covering Letter as demonstrating that the Third Defendant and the First Defendant had no genuine belief in the PCC. The final sentence looks like it is about something else because it says "For good measure, [the First Defendant] and [the Third Defendant] further mispresented the status of the control systems and the lift in the

face of overwhelming evidence to the contrary and asserted that the Property was ready for occupation and use and any outstanding matters could be rectified quickly and easily". However, Mr Wardell confirmed that this was only a reference to the PCC. But again, no particulars are provided as to the primary facts on which this allegation of misrepresentation is to be based (i.e. the lift was said to be "x", when it was "y" and "y" was known to the relevant defendant because…).

56. 19D, in red, asserts that the Claimant would have rescinded were it not for the fraudulent PCC. It contains no particulars to support the fraud allegation about the PCC. It contains another example of a pleading which begs particulars: "the representations made as to the ease and speed with which outstanding works could be completed…".

57. There is no need to refer to paragraphs 19E to 20A for present purposes. Paragraph 21 does contain a summary: unlawful means conspiracy by issuing the PCC as out in Section G of the POC.

58. In the summary section, the POC relies on two assertions to tip the balance that the PCC was a deceit (i) the nature and extent of the defects and (ii) the Covering Letter. There are no particulars given about the relevant defects nor any of the particular Defendants' knowledge of the defects and consequently there are no primary facts upon which the allegation can be based. Up to a point this is not a problem if those facts are contained and clearly identified elsewhere.

59. Paragraphs 22 to 37 describe the Sale Agreement. Paragraph 38, in the same section, provides a further summary of the unlawful means conspiracy case but does not add any particulars or primary facts to support or justify the general assertions of fraud and knowledge which are set out.

60. Paragraphs 39 to 45 describe the Defendants' respective roles on the building project.

61. Paragraphs 46 to 55 describe events running up to 31 October 2019. For the most part the detail in this section is what the Claimant or his representative knew about the slow speed of the development and those representatives pointing out delays and problems to one or more of the First to Fourth Defendants and telling them that an end of October completion was unlikely.

62. Paragraph 50A, in red, refers to a defect schedule drawn up by the Claimant's representatives, known as the "CADC Defects List". It is inferred that the Fourth and Fifth Defendant agreed to ignore this (the pleading says "appear" but this was clarified in submissions as

meaning "inferred"). The inference is based on a 16 September 2019 email referred to in the Fifth Defendant's defence.

63. Paragraph 51 refers to a "key" meeting. The facts are disputed but focusing only on the POC version, in relation to the difficulties in achieving completion in time and the Claimant's right to rescind, it is said the Second Defendant said "he had no choice but to certify Practical Completion by 31 October 2019 regardless because of the Longstop Date which he described as having "a gun to their head"". I do not think there is any assertion in the POC of what the Second Defendant's role in the certification process might have been. It is not obvious to me from what is pleaded about the Second or Fourth Defendants.

64. Paragraphs 56 to 61 are headed "Purported Practical Completion and Defects".

65. Paragraph 56B says that the Third Defendant issued the PCC expressly misrepresenting it to be a certificate in accordance with the Sale Agreement. No particulars are given but, at best, it is another assertion that the PCC was a false document.

66. Paragraph 57 sets out the primary grounds on which the Claimant challenged the PCC. These were relied on by Mr Wardell in oral submissions as an articulation of the defects said to be present on 31 October 2019. The areas identified are: lift not working or commissioned; damaged condensers being wrongly located on the roof; drain rods in the drainage system and a large number of workmen on site. Actually, what the pleading says is not that these were defects but that these were the defects raised by the Claimant but, for present purposes, I will assume, with Mr Wardell, that this is a list of defects.

67. Paragraph 58 contains an assertion of dishonesty and refers to a large number of photographs taken on site on 31 October 2019 showing that practical completion was not achieved and it is alleged the Fifth Defendant did not attend site on 31 October 2019.

68. Paragraph 58A links the defects referred to in paragraph 57 with the CADC Defects List and repeats the assertion that those were "deliberately ignored". No particulars are given for the allegation but I assume it is the previously mentioned email of 16 September 2019.

69. Paragraph 59 asserts that the evidence for the PCC being dishonest is "overwhelming". A quotation is given from an expert report prepared for the Claimant which concludes that because of the poor workmanship in finishes, decoration, incomplete works and inability to use MED systems that it would have been clear to any developer or contractor that practical completion was not achieved

on 31 October 2019. For pleading purposes what matters are the primary facts not "overwhelming evidence" or expert conclusions. These are more akin to trial submissions and do not meet the requirements of pleading essential facts.

70. Paragraph 60 quotes extensively from another of the Claimant's experts: the lift car did not meet standard EN81-70; the maker of the PCC should have known this; the maker of the PCC must have known this; a lack of commissioning documentation would have been readily apparent to any reasonably experienced contract administrator; the damage to the condenser units was visible and would require major repairs causing disruption; the maker of the PCC must have disregarded such obvious issues; practical completion should have been refused. The relevant primary facts are not pleaded (e.g. what was the design specification for the lift, what decommissioning documents should have been but were not referred to in the PCC, or what documents were referred to when they did not exist, what was the damage to the condenser units and what representations, if any, were made about that in the PCC).

71. Paragraph 60A, in red, identifies more British Standards and/or HSE failings regarding cabling, pipework, fire protection, the lift, and heating tape. There are no particulars tying this to any specific assertions in the PCC, presumably because of the Claimant's position being that the generality is sufficient.

72. Paragraph 60B adds, in red, a different allegation about post-CMA cover up. I return to this paragraph below.

73. Paragraph 60F refers out to an Annex. The Annex is part of the "red" POC. It gives some more details of the nature of defects in the areas of cable, gas and water pipework, fire protection, and lift. It does not add anything to the deceit case for the PCC save to the extent that the Claimant's case is based on a generality that if there are substantial patent defects in a building then any practical completion certificate must have been issued with knowledge of those defects and so dishonestly. I add "patent" here to recognise that a practical completion certificate generally says nothing about latent defects (see the summary in Keating, 11th ed at 21-158).

74. Paragraphs 62 to 68 address events post 31 October 2019.

75. Paragraph 62, in red, states that the Claimant was unaware of "the true nature and extent of the defective and incomplete work". Mr Mallin was critical of the way in which the POC bundled together defects without recognising that the POC was itself creating different categories of defects without acknowledgement or an attempt to make sense in a pleading context of the distinctions necessarily being made. This proposed amended paragraph is a good example. By this point the POC have identified at least the

following general categories which can be described by reference to what the Claimant is alleged to have known:

i) Defects which are covered in the PCC. These were known to the Claimant.

ii) Defects which were referred to in the Covering Letter. These were known to the Claimant.

iii) Defects which were not referred to in the Covering Letter but which were known to the Claimant as at 31 October 2019.

iv) Defects which were not known to the Claimant at that time but which became apparent later.

76. The Claimant knows of these things because he had representatives who were carrying out on-site inspections. The POC allege generally that all of the Defendants knew all of the defects as part of the Claimant's case on dishonesty.

77. The inferences that are relevant are those which are the basis for the allegations of fraud. As Mr Mallin spent some time in oral submissions pointing out, presumably the allegation works on the basis that since the relevant defendant would have known "xyz" defect then it can be inferred that such a defendant would have known that the PCC was fraudulent, if it did not mention that defect or that defect was so fundamental that the PCC could not be issued in the face of it. But the POC make no attempt to give particulars of any of the Defendants' knowledge of any particular defect or type of defect.

78. Paragraph 66A alleges, without particulars, that the Third Defendant undertook, after the CMA "quick-fixes to give the impression that the Property was up to the required standard". Mr Mallin criticised the allegation as being fanciful as well as lacking particulars. By way of red amendment to this paragraph, the Claimant proposes adding an allegation that the First to Fourth Defendants represented throughout the period that all matters in the completion matrix would be resolved and/or concealed the true nature and extent of the defects in order to prevent the Claimant exercising the right to rescind. These new allegations also require particulars but lack any.

79. Paragraph 67 addresses the Claimant completing on the Property, carrying out the fitting out and then discovering, once he started to occupy the Property from June 2020, problems with leaks, sporadic hot water, air-con not working and the lift failing.

80. Paragraph 67A alleges the First to Fourth Defendants failed to ensure planning conditions were satisfied but without particulars (save for a general reference out to the expert reports) and an

allegation about dishonestly providing collateral warranties. There are no particulars of the dishonesty allegation or the allegation of knowledge that the collateral warranties were defective in a manner from which dishonesty could be inferred. The relevant collateral warranties are also not identified. Collateral warranties are the main focus of the green amendments but they are not in issue for the purpose of this judgment.

81. Paragraph 68 sets out an expert's conclusion that the Property was unfit for habitation as of July 2020.

82. Paragraph 69 sets out the legal requirements of a claim in unlawful means conspiracy and paragraph 70 then addresses those elements for the purpose of the Claimant's claim against the Defendants.

83. I am concerned at this point with whether there are adequate particulars or primary facts pleaded to support, at the pleading stage, the allegations of conspiracy and dishonesty regarding the PCC. Paragraph 70 is the place in the POC where it would be expected to find the relevant facts stated (or collected together by cross-reference if they had been stated previously). I consider the relevant paragraphs in some detail:

   i) 70(b) makes the clear statement that deceit is alleged regarding the PCC – "falsely state and certify…knew this to be untrue". No particulars are provided. In red it is sought to add allegations which themselves require the pleading of primary facts: "ignore the CADC Defects Lists when certifying"; concealing from the Claimant "the true nature and extent of the defects at this date"; "falsely represent" that the completion matrix works were done. There are no particulars offered to support the deceit case.

   ii) 70(c) alleges that the purpose of the deception was to induce the Claimant to complete.

   iii) 70(e) in red, repeats the allegation of concealment of defects in the run up to actual completion but again no particulars are given.

84. Paragraph 71 provides a further summary of the conspiracy to certify practical completion on 31 October 2019 "no matter what" and says this is the "inescapable inference" to be drawn from the communications of the Defendants from around August/September 2019 and was confirmed by the "gun to their heads" comment. With the exception of the reference to the "gun to their heads" this paragraph does not provide particulars.

85. Paragraph 72 asserts that the Claimant would have exercised the right to rescind if the PCC had not been issued and/or not agreed to extend the long-stop date.

86. Paragraph 73 does address knowledge regarding the PCC deceit. It says that the Defendants "must have had actual knowledge that the Property was so defective that Practical Completion could not properly be certified…[or]…turned a blind eye" because of the expert reports. It continues that the state of the Property must have been discussed between them (the allegation is that it is inconceivable that it was not but it is only relevant if it is recast into a positive assertion). In red, the paragraph ends with a sentence referencing the "agreement to ignore the CADC Defects List" and the Covering Letter and its being kept from the Claimant.

87. Paragraph 74 asserts that the Fifth Defendant issued the PCC knowing it was false. In red this is maintained regardless of the Covering Letter. The Second Defendant and the Fifth Defendant reported to the First Defendant. The First Defendant countersigned the PCC knowing the Property was not fit for occupation (no particulars of knowledge are given). In red, the First to Fourth Defendants are then alleged to have issued the PCC when it was not genuine and concealed the existence of the Covering Letter and sending the PCC without the Covering Letter was dishonest (no particulars of dishonesty are given beyond the fact of not sending the Covering Letter). No facts are set out which would support the conclusion that the Second and Fourth Defendant issued the PCC.

88. Paragraph 75 is another general summary of the alleged conspiracy.

89. Paragraph 76 addresses the CMA and says that the Claimant agreed not to exercise his right to rescind on the basis that the works would be done by January 2020. It is said this was a further gun to the heads of the First to Fourth Defendants.

90. Paragraph 77 repeats the assertion of dishonesty regarding the PCC and Covering Letter and states that the First to Fourth Defendants continued to misrepresent the true state of the Property thereafter. It is said that "acting in combination they sought to hide and/or gloss over serious defects with a series of quick-fixes and cosmetic works which were intended to, and as a matter of fact did, deceive the Claimant as to the fitness of the Property and induced him to complete the purchase". This second allegation is supported by what look like particulars. The following assertions are made:

    i) That in early November the First to Fourth Defendants suggested that the Property could be delivered by the end of the month. This did not occur and the suggestion was demonstrably false.

ii) A list by number of items from the CADC Defects List is given and it is said by mid-January those things were not completed.

iii) A further list of CADC Defects which were said to have been completed or resolved as at 14 January 2020.

iv) An assertion that neither of those lists were in fact completed and that those stated to have been completed could not have been.

Notwithstanding the details provided there are no particulars of the allegation of quick-fixes or cosmetic works or hiding or glossing over or an intended deception.

91. Paragraphs 77A to 77C, in red, make further general allegations regarding defects which are said to have been uncovered following intrusive investigations. Reference is made to Annex A. It is said that the defects provide “clear evidence that Practical Completion could not and should not have been certified” and that the focus of the latter works was on giving the false impression that the Property was ready.

The Elements of the Dishonest Conspiracy Claim

*Deceit*

92. Since the core of the case set out in the POC is a dishonesty conspiracy to issue the PCC, there is considerable overlap between the allegation of deceit and the allegation of conspiracy. The repetitive generality of the POC, where the conclusion of fraud and dishonesty is repeated but without obvious particulars tied to the allegations when made, encourages this bundled up approach.

93. An alternative, closer to the requirements of the rules and King’s Bench Guide, would have been to identify which defendant or defendants were said to have committed the planned deceit, giving due particulars of that allegation, and then set out the case against the other defendants said to have participated in that plan, giving due particulars of the acts done which amounted to participation with the relevant knowledge, also with particulars.

94. The POC assert a number of times that the PCC was a fraudulent document – i.e. one issued knowing it to be false (or with recklessness about its truth) – there is not one place where the required particulars of knowledge are set out. This is not necessarily a fatal flaw, since it is, for example, permissible to have made various assertions of false statements throughout a pleading which are then collectively relied upon for an allegation of fraud (see *King v Stiefel* [475] to [478] quoting *Blockchain Optimization*),

"…the pleading as a whole has to be taken into account…", but it is not ideal and particulars are still required somewhere.

95. Doing the best I can, the following are the potential assertions of primary fact made in the POC which might justify the inference of fraud: a general assertion about the nature and extent of the defects; the "gun to the head" comment; the photos taken on 31 October 2019; the Fifth Defendant not being on site on 31 October 2019 and the Covering Letter.

96. The starting point for weighing whether these matters "tip the balance" for pleading purposes towards a finding of fraud rather than an innocent explanation is the contractual context within which the parties found themselves. A conspiracy, for example, founded on the wrongful receipt or dealing with monies taken in breach of fiduciary duty becomes more likely because of the lack of any context within which such actions would be innocent. By contrast, the PCC was a document sent within a context where the Fifth Defendant and the Third Defendant were performing contractual functions. The context provides a ready explanation for the actions concerned, including interaction between the various Defendants designed to progress the works towards completion, without any suggestion of fraud. It follows that more is required to tip the balance and make fraud a credible outcome for trial.

97. The primary facts relied on, therefore, in the context of a construction contract as here, need to tip a balance that is already weighted in favour of innocent explanations. There are many practical completion certificates issued for many construction contracts and there are many contracts where certificates are issued but where there are many defects and which give rise to much dispute and litigation but all of that activity goes on without fraudulent intent or with allegations of fraud being made.

98. However, in this case, as stressed by Mr Wardell, the context includes the right to rescind after 31 October 2019 creating a pressure on at least the Third Defendant (and by association the First Defendant) not present in the general context of construction contracts. In short, the Claimant says, there was a pressing need to get the PCC issued regardless of the reality of the state of the building.

99. It is necessary to take a step back and consider the facts alleged in the POC as a whole and to ask whether or not taken in the round there is sufficient to tip the balance in favour of fraud being a realistic outcome at trial. In my view based on what is in the POC there is not.

100. The "gun to the head" comment by the Second Defendant is said to have been made in late September 2019 in the context of a

discussion about extending dates. Assuming it be proven, then the Claimant's position that it was a statement that the Defendant would be forced to lie about completion strikes me as fanciful, even at this stage. If said, in the context described in the POC of seeking time extensions, "gun to the head" was emphasising the benefit of agreeing to remove the pressure around the 31 October 2019 date. I do agree that the comment illustrates the Claimant's context point about the contractual pressure the Third Defendant was under but the alleged comment goes no further.

101. The case on defects is deliberately put on a broad basis. Mr Wardell was explicit that details of the defects relied on is a matter for trial and is not relevant for pleading purposes. This means the Claimant has chosen not to assert that the existence of any particular defect was known to any particular individual at a relevant time which would have led that individual to know the PCC was false or be reckless as to its truth. Rather, the Claimant's approach and the POC assert that because no competent construction professional could have been involved with the issue of a completion certificate given the obvious defects in the Property then all the Defendants agreed to participate in the fraudulent scheme since the defects were patent.

102. The all defects and all defendant approach is unwieldy, but also unfair. There may be many hundreds of potential defects and any one defendant will not know what knowledge they are alleged to have had upon which a fraud inference will be drawn. As a generality, it appears unlikely that any individual will have active knowledge of all defects that might be proven even if that individual was in a position where they might have known because they would have done the work or should have known because they had a contractual obligation as to the quality. Of course, "should have known" will not, of itself, equate to fraud. In my view each Defendant is entitled to have set out in the POC what they are alleged to have known, why, and the basis upon which a fraud inference is to be made against them with particulars which give a level of detail which can support the serious allegations made. This has not been done and it is a fatal flaw.

103. I was not taken through the actual defects in any great detail but the substance of the lift allegations appeared to be that the particular lift used could never be suitable. This appears to be a design issue but no facts are pleaded to tie this to a fraud allegation. There are British Standard complaints that go to fire resistance and these are also not tied to design or build requirements or the certification documents referred to in the PCC and have all the hallmarks of typical breach of contract defect claims. There was an allegation about heating tape not being placed on pipes but this appeared to have been signed off many months before the alleged conspiracy and so would be an unlikely

particular of the conspiracy. A problem with the repositioning of the HVAC system was said to be a breach of planning. Again, a typical example of a defects claim but not something which tips the balance towards fraud.

104. In a similar way, the photographs do not of themselves support the allegation of fraud. The PCC contains lists of defect items. It is unremarkable for there to be defects addressed in the context of a PCC notice. That there may be arguments between the employer and contractor (or here the seller and the buyer) as to whether items are properly categorised as snagging or not or whether other defects should be present in the lists does not mean that a person who has the wrong end of those arguments or who might be shown to be wrong about what was required for a certificate in any particular case is fraudulent.

105. There are no particulars given of specific parts of the information contained in the PCC which are said to have been deceitful: i.e. that the PCC contains on a particular page an assertion x, but x is false, and was known to be false by a particular defendant because of y. On the contrary, the Claimant's approach is at a much higher level of generality: nobody could have been involved in the PCC without fraudulent intent because the PCC asserts generally that the Property was ready, subject to snagging, but it was not.

106. This level of generality is unfair to the Defendants who are entitled to know the primary facts to be relied on to support the conclusion that they have been deceitful (assuming the deceit allegation is made generally against all of them) or that such an allegation is made against them specifically and the factual basis for it.

107. The Fifth Defendant not being on site on 31 October 2019 does not need any further comment. The Fifth Defendant's defence says on-site inspection took place on 30 October 2019 which is not admitted in the reply. No inspection at all might be relevant, no inspection on the day of the PCC is neither here nor there.

108. The Covering Letter is seen by the Claimant as a smoking gun. I understand it was not known by the Claimant and his team until it was referred to by the Fifth Defendant as part of its defence. In the comments below I take on board the inference to be given by the document not having been sent to the Claimant previously (either as part of communications in the run up to completion or in the dispute correspondence which followed).

109. The letter is addressed to the First Defendant on behalf of the Third Defendant and the paragraphs most emphasised in submissions were:

> "To clarify specific matters in relation to completion of this part of the overall development. There are matters which do

> not prevent practical completion of the works, however there remain items which are required to be completed to enable completion of the sale and occupation. We understand there is a minimum ten day period from this date to the sale completion and this may be extended to 15 days or longer by agreement with the purchaser" and
>
> "There is no standard building contract to provide contractual remedies in this case and clearly RPS has no role to check construction compliance or quality. This notice is issued based on the information supplied by the contactor and snagging undertaken by the purchaser and our employer"

110. The Claimant says this makes the fraud and the conspiracy obvious because it was clear from this letter that the PCC could not be asserting completion had occurred for the purpose of the Sale Contract when such completion required the Property to be complete apart from the snagging items as defined in the Sale Contract. The Covering Letter says in terms that there are "items which are required to be completed to enable completion of the sale and occupation".

111. The First to Fourth Defendants argue that substantively there was nothing in the Covering Letter that was not apparent from the PCC and that it was unremarkable for the letter, which was addressed to the Third Defendant, not to be included in the PCC when it was sent to the Claimant.

112. Notwithstanding the weight placed on the Covering Letter by the Claimant, it is fanciful to rely on it as a letter which reveals any fraud or conspiracy on the part of its sender, the Fifth Defendant. On the contrary, on its face it shows the Fifth Defendant telling the Third Defendant that notwithstanding identified and known problems, in the view of the Fifth Defendant, practical completion had occurred: "…which do not prevent practical completion of the works…". This might be wrong but that's not fraud. The Fifth Defendant sets out its position with clarity in the Covering Letter. There is nothing in the letter that would raise an inference that the Fifth Defendant was intending to deceive, was participating in any conspiracy with the First to Fourth Defendants, or any of them, or was presenting the PCC in bad faith. On the face of it, the Covering Letter shows the independence of the Fifth Defendant from the Third Defendant.

113. There is nothing in the POC to gainsay this beyond the mere assertion that despite the Covering Letter, the Claimant alleges the Fifth Defendant was part of the conspiracy. This type of assertion has no role to play in tipping the balance.

114. It is apparent that there may have been contractual arguments as between the Third Defendant and the Claimant about what was required for practical completion as a result of the particular circumstances following the termination of the main building contract. The existence of those potential arguments, whatever they might be and regardless of their likely ultimate validity, is the context within which the likelihood of fraud needs to be assessed.

115. A flavour of the potential arguments can be seen from the definition of "Practical Completion Certificate" in the Sale Contract: "……stating that completion of the Works in accordance with the Building Contract has taken place." As at 31 October 2019 the main contract had been terminated many months before and although the definition in the Sale Contract can extend to other contracts by which the works were done, it is unlikely, in so far as I understand what might have taken place from the parties' statements of case, that any such contracts would themselves provide a mechanism for the issuing of completion certificates. So the JCT defined process of practical completion which was assumed by the Sale Contract was absent at the time the PCC came to be issued. It was obvious, then, that whatever the PCC might have been it was not a certification pursuant to the contract between the employer and builder relevant to the development.

116. It is plain from the POC that this was common knowledge and had been since early 2019.

117. The Claimant's argument for fraud asserts that the Sale Contract required the Property to be "fit for occupation and use and enjoyment as a high class residential dwelling" and since it was obviously not because of the large number of defects then anyone who had reason to know about the large number of defects but nevertheless was associated with the PCC must be party to the conspiracy to issue and/or rely on a fraudulent PCC. The core to this is that the knowledge of the defects precludes a genuine assertion of practical completion.

118. It seems to me that this is fanciful as the basis for a fair inference of fraud in the circumstances pleaded in the POC. The PCC does not maintain there are no defects – it contains two lists which indicate further works were on-going. The completion checklist in the PCC suggests that much of what was being certified was the existence of relevant paperwork in a drop box. The "combined snag list" is referred to, at row 8.02 of the checklist, as "the CADC Snagging list below". The PCC states that the Fifth Defendant "are not providing confirmation of technical compliance of the design or construction of the works".

119. The PCC was on its face a heavily caveated document which only did what it expressly said it was doing, most particularly as set out in the checklist.

120. I can well understand why the Claimant said the PCC was not sufficient to amount to a practical completion certificate for the purpose of the Sale Contract, that being a matter between the Third Defendant and the Claimant, and for present purposes this appears to be a realistic case albeit disputed by the Defendants. But a failure to meet a contractual requirement by the Third Defendant does not give rise to an inference of fraud against any of the Defendants and the potential strength of the contractual case does not give rise to a dishonest conspiracy involving any of them.

121. Standing back and looking at this deceit allegation in the round, bearing in mind the potential commercial pressure caused by the Claimant's imminent right to rescind, putting together the general allegations in respect of defects, photographs, the lack of a site visit on 31 October 2019 and the Covering Letter, I see nothing which is sufficient to tip the balance. I also cannot find a cogent and duly particularised case of fraud against any of the Defendants.

122. For pleading purposes, the Claimant cannot tip the balance by reference to the conclusions of the experts quoted in the POC. These make the same assumptions as I have addressed above: assuming that no reasonable issuer of a practical completion certificate could issue such a certificate where there were so many defects then the very issuing of a certificate must mean that it was done dishonestly. This excludes those innocent explanations, such as getting it wrong for whatever reason, which are inherently more likely within the context of certification and there is nothing to tip the balance towards fraud.

123. This conclusion that there is nothing in what is pleaded to tip the balance in favour of fraud is also consistent with what is pleaded about the Claimant's knowledge of defects, which I assume would have been largely derived from his advisers who had on-going access to the site during the relevant period (i.e. the weeks prior to 31 October 2019). I emphasise that this is not about causation which I address below, but is about the context, drawn solely from that set out in the POC, within which the Claimant is inviting inferences of fraud to be drawn.

124. The assertion of fraud is dependent on a comparison between the seriousness and extent of the defects at a general level and the existence of the PCC. Presumably, the trial court will be asked to hear evidence about the overall nature and extent of the defects and draw conclusions about the general state of the Defendants' knowledge and so infer that the PCC was a dishonest document. So far as what each Defendant knew, all that can be said on the

pleadings is that it will be inferred that each Defendant knew about the nature and extent of those defects. Bearing in mind that none of the Defendants are alleged to have carried out the works, this inference must be largely based on the natural Defendants' knowledge of the works acquired from their attendances on site.

125. The POC assert that the Claimant, through his advisors, had full knowledge of the existence of defects that went beyond those referred to in the Covering Letter (paragraph 19A(d) in red): "as [the Claimant] and his representatives believed at the time, and as subsequent expert investigations have confirmed, the extent and seriousness of the incomplete and defective works at the Property was considerably greater than represented by [the Fifth Defendant] in the covering letter".

126. Because the POC do not condescend to particulars, it is not possible to know if it is alleged that any Defendant had any greater knowledge of defects than that known to the Claimant and his advisors (it would be necessary to identify what those defects were or at least a meaningful sample). The Claimant's construction of the Covering Letter is that it reveals the Fifth Defendant and the Third Defendant knew of more defects than those referred to in the PCC as sent. But this category of defects is necessarily less than what the Claimant believed because the Claimant believed there were "considerably greater defects" than those in the Covering Letter.

127. Two material points arise. First, that the manner by which defects are identified, presumably observation on site, was broadly common as between the Claimant's advisors and at least the Fifth Defendant. Second, that the Claimant's advisors visits to the site had enabled them to identify more defects than the Fifth Defendant had done.

128. So with a belief about defects that was more serious than that which might be attributed to either the Fifth Defendant or the Third Defendant as a result of the Covering Letter, the Claimant and his advisors did not conclude that the PCC was fraudulent or that it would be pointless to take possession of the Property eventually or at least did not act on any such belief or concern.

129. Instead the Claimant entered the CMA which provided further time to get the problems sorted out – much what the Second Defendant must have been asking for during the "gun to the head" discussion.

130. I was told the first reference to fraud in the solicitors' correspondence was some 18 months after completion. Since the idea of the PCC being fraudulent was not part of the Claimant's reality at the time, despite believing the works were seriously incomplete and defective, to an extent greater than might have been revealed to the Third Defendant by the Covering Letter, then

what facts are there upon which an inference of fraud and conspiracy against all the Defendants becomes realistic?

131. Essentially, this generalised case against the Defendants will ask the court to find that one or all of the Defendants, and necessarily the Fifth Defendant (because the conspiracy involved the Fifth Defendant knowingly issuing a false PCC), were dishonest because of their general knowledge of the nature and extent of the defects. But at its highest (i.e. the Covering Letter) all that is said about that general knowledge is that it is less than that believed in at the time by the Claimant and his representatives.

132. A similar point can be made about the Claimant's representative's reassurance just before completion that the Property was "as good as it was going to be". From what was known about the defects and the work done, this was presumably a reasonable assertion not one, as the POC attribute to the Defendants, that could only be made fraudulently. There is nothing in the POC to indicate any of the Defendants would have had any different information and yet, the Claimant intends to invite the court to infer fraud against those Defendants.

133. In my view this additional and illustrative point shows why the general approach to allegations of defects and knowledge does not work in this case. What might tip the balance would be sufficient particulars about a selection of defects, tied to the detail of the representations contained in the PCC, which would, if proven, make fraud just that little bit more likely than negligence. Nothing of that kind is present in the POC.

*Combination*

134. The First to Fourth Defendants' case is that no facts are alleged against any of the Defendants which might support the conclusion that they combined with a view to issuing the fraudulent PCC. Each of the Defendants had different roles within the underlying commercial structure of the development and had different potential motivations regarding their actions (e.g. the Fifth Defendant carrying out its job, the Third Defendant as developer, the First Defendant as a director, the Second Defendant as an employee and so on).

135. Mr Wardell drew my attention to the close contractual nexus between the Defendants, where in different ways they were all working on getting the Property sold to the Claimant, all had access to the site and so the opportunity and/or contractual responsibility to look for and be aware of defects, and all saw the Covering Letter caveat and yet nevertheless went ahead with the assertion that the practical completion certificate requirement was met. It was their overt acts which mattered.

136. In *ED&F v T&L*, Leggatt J struck out the allegation that two individuals were involved in a deception conspiracy because, at [34] – [35], the Claimant had failed to plead facts which would establish that involvement. The key question being what was done by the particular defendant that made that defendant part of the conspiracy? The requirement is to plead the essential facts answering that question so as to adequately plead a fraud case.

137. I agree with Mr Wardell about the importance of overt acts but the POC should contain the details about the overt acts which are said to justify the conclusion of the dishonest combination. I can see no such acts in the POC.

138. The Fifth Defendant had the role of issuing the PCC. I have described the PCC and the Covering Letter above. Of themselves, they do not suggest any agreement or combination to deceive as between the Fifth Defendant and the others. On the contrary, I agree with Mr Mallin that the Covering Letter is inconsistent with any such agreement. It tells the Third Defendant that although the PCC has been issued, there is work to be done before the sale completes. Mr Wardell says this would give rise to an inference that the Fifth Defendant knew that practical completion was not achieved but the plan was to send the PCC anyway.

139. However, the Covering Letter provides no basis for the existence of a common "plan" or such a plan being a dishonest conspiracy. The POC make no attempt to identify the specific inferences to be drawn from the Covering Letter, only saying that the Covering Letter and its non-disclosure demonstrate the fraud. Fairly read, there is nothing in the Covering Letter that would give rise to an inference of dishonest combination.

140. The POC also refer to the Fifth Defendant "contriving" not to meet with the Claimant's representatives but the suggestion of impropriety is not supported by any primary fact beyond the assertion that the Fifth Defendant did not so meet.

141. The POC asserts, in red, the Fifth Defendant and the Fourth Defendant "came to an agreement to ignore the CADC Defects List" which is based on the email of 15 September 2019 referred to in the Fifth Defendant's defence. The conclusion is not supported by the email, which far from showing an agreement to ignore the list, shows the Fifth Defendant telling the Third Defendant that the list "contains some important specifics…which Patrick and the Sherlock team are required to conclude". At most it can be inferred from the email that the list was not going to form part of the completion check list but in itself this does not point to any dishonesty and besides the actual check list appears to make reference to the CADC list at row 8.02. It is another example where

the failure to be specific about defects undermines the general approach.

142. Mr Mallin raised that there was no apparent motive for the Fifth Defendant to involve itself in the alleged conspiracy: it had no interest in whether or not completion occurred. In particular in circumstances where it signed an indemnity in favour of the Claimant in January 2020 (i.e. vouching for the accuracy of its work) and would suffer significant reputational damage if the fraud was uncovered but for no obvious gain if it was not. Mr Wardell pointed out that motive was not a necessary ingredient of the cause of action and so did not need to be pleaded but that the motive of all the conspirators was to stop rescission of the Sale Contract. I agree that motive does not need to be pleaded but potential motives can be taken into account when looking at the cogency and reality of the pleaded case (just as much as the court will take into account evidence which might be available at trial) and the difficulty with establishing motive as against the Fifth Defendant is an obvious problem with the claim, but not fatal of itself so long as the claim was otherwise sustainable.

143. Mr Wardell took exception to the criticism of the conspiracy claim as a circular argument. It is in relation to the requirement to plead facts showing combination that this seems to me a fair criticism. Given the paucity of other primary facts in the POC, what it comes down to is saying that the PCC would not have been issued without there being a conspiracy and so because the PCC was issued there was a conspiracy. This is not persuasive.

144. I conclude that there is no pleaded basis for the Fifth Defendant to be party to any unlawful means conspiracy.

145. The First to Fourth Defendants submitted that if the Fifth Defendant was not party to the conspiracy then the conspiracy as pleaded could not exist. I agree. It is possible to imagine other parties conspiring to bring about a false certificate without the knowledge of the maker of that certificate but that is not the Claimant's case. The Fifth Defendant's involvement is essential to the dishonest conspiracy pleaded.

146. In looking at each defendant individually, it would be necessary for there to be pleaded facts which would support a conclusion that such a defendant decided to join or initiate the conspiracy with knowledge of the common objective and what that particular defendant did to further the conspiracy (*ED&F Man Capital Markets Ltd v Come Harvest Holdings Ltd* [2022] EWHC 229 (Comm), Calver J at [524] and the quotation at footnote 85).

147. I can see no pleaded basis for the First and Third Defendants being party to the conspiracy other than on the basis that there was a

conspiracy to start with. I do not consider the failure to send the Covering Letter to the Claimant questionable. It was addressed to the Third Defendant and was not part of the PCC. The Third Defendant would have been concerned with having a certificate to pass across to the Claimant. There are not sufficient facts pleaded to tip the balance to enable a dishonest conspiracy to be a realistic alternative to innocent, here contractual, explanations: the Fifth Defendant provided the PCC, this is what the Sale Contract requires and all the POC really allege is that it was sent without the covering letter when there was unparticularised general knowledge of wide-ranging defects. In my view, this is not enough.

148. The POC fail to provide any plausible answer to the question what facts did the First Defendant and Third Defendant know that meant sending the PCC was a dishonest act because the substance of the answer offered is that because there were so many defects then they must have known the PCC was dishonest but, again, the dishonest conclusion only arises once the dishonesty of the PCC is assumed.

149. The Second and Fourth Defendant are remote from the alleged act of sending a false PCC. I can see no pleaded basis to establish either combination or knowledge as against the Second and Fourth Defendants. As I have said before, I regard the idea that the “gun to the head” comment was a “gotcha” about 6 weeks before the conspiracy was actioned as fanciful but in any event both Second and Fourth Defendants would have needed to have done something as part of the alleged conspiracy and nothing is pleaded against those defendants.

*Intention to Injure*

150. The First to Fourth Defendants argue that it is necessary to plead and prove that each of the conspiring Defendants had an intention to injure the Claimant. The nature of that intention has been defined as including that being the “end” of the conspiracy or the “means” by which the goal of the conspiracy is achieved. It is not enough for injury to merely be a foreseeable consequence (*Come Harvest* [2022] EWHC 229 (Comm), Calver J at [487]). The written skeleton said “where the relevant Defendant sought to secure its end”. When I refer to intention below I am referring to “means” type intention.

151. The Claimant’s position was that it was sufficient to plead the aim of the conspiracy being to injure the Claimant, here to prevent the right to rescind from arising and so bring about completion, with the consequent payment of £12 million by the Claimant to the Third Defendant in return for a house which not was not worth anything like £12 million and the facts relied on which amount to any

particular defendant joining the conspiracy with knowledge of that aim.

152. I have decided above that the POC do not plead sufficient facts so far as the last point is concerned, but on the intention argument, I prefer the Claimant's submissions so long as it is accepted that in order for the unlawful means conspiracy to exist at all at least one of the defendants must have the "means" intention and the others must know at least generally that is the aim and join in. I have already cited the relevant extract from *Come Harvest* in the section of the judgment dealing with combination.

153. It is not necessary for each Defendant to have the particular ends or means intention to injure the Claimant so long as one of them does (otherwise the conspiracy will lack having the relevant intention to injure) and the others join the conspiracy knowing or turning a blind eye to the goal of the conspiracy: in simple terms they know or choose not to know what they are involved in. At [510] in *Come Harvest*, Calver J agreed with the submission of the Claimant: "…a conspiracy to injure by means of deceit, where the principal fraudsters aim the deceit at a specific victim…who would inevitably suffer a loss.". In such a situation the "minor" fraudsters would join in knowing and sharing the goal of the conspiracy but without it being the means by which they seek to make a gain but rather intending or being reckless that the principal players should make that gain and the victim suffer the necessarily corresponding loss.

154. If the POC set out facts in respect of each relevant defendant which, if proven, might demonstrate that defendant acted to further the conspiracy with knowledge (or being reckless) that the aim of the conspiracy was to use a fraudulent document to prevent the Claimant from rescinding the Sale Contract then a sufficient intention would have been shown for present purposes subject to the arguments about causation which I address below. For the reasons set out above, the POC do not set out such facts.

*Causation*

155. The First to Fourth Defendants make a number of points under this head. In their skeleton argument it was that the Claimant has suffered no loss because the POC say variously that the Claimant (i) believed practical completion had not occurred [62] and (ii) relied on representations made about the ease and speed of completing outstanding works to reach an agreement with the First to Fourth Defendants [19D] and [62]. In both those situations, the PCC was of no practical consequence to the Claimant.

156. A further argument was that the Claimant's assertion in the POC that if he had known about the Covering Letter he would have

rescinded must mean that there was something in the Covering Letter that the Claimant did not know but the POC also say that the Claimant believed that the defects were worse than anything stated in the Covering Letter. In which case the PCC was irrelevant – the Claimant, knowing that the Property was worse than would have been apparent to him, on his case, had he read the Covering Letter nevertheless went ahead.

157. A slightly different argument was that the post 31 October 2019 agreement to complete on the basis that the works in the completion matrix were done overtook any issue regarding the PCC. So when completion came about, it was not because the Claimant did not exercise the clause 11 right to rescind because of the existence of the PCC but because, rightly or wrongly, the Claimant was satisfied under the CMA that it would be appropriate to complete. As his advisor said: it’s as good as you’re going to get.

158. The Claimant’s starting point was to remind the court that it is not necessary in the fraud / deceit context for the Claimant to have believed in the accuracy of the false PCC. It would be enough if he was influenced by it and he was sufficiently influenced for pleading purposes because, the Claimant says in the POC, that he would have rescinded were it not for the PCC. If the Claimant had rescinded then there would be no question of the CMA.

159. It is common ground that the law does not require a deceived claimant to have believed the falsity of the deceit but rather the deceit must have been “intended to, and did induce the representee to act to its detriment” (*Hayward v Zurich Insurance* [2016] UKSC 48, Lord Clarke at [18]. Lord Clarke continued “…if the representee does not believe that the representation is true, he may have serious difficulty in establishing that he was induced to enter into the contract or that he has suffered loss as a result”. But that is for trial.

160. The Claimant also points to what Lord Clarke said at [19]: “[the insurer]…may be strongly of the view that it is not true. However, the question…is what view the court may take in due course.” The Claimant’s case here is that while he had the option of challenging the PCC by the contractual route of expert determination, that was necessarily uncertain and so given the PCC existed and was being relied on by the Third Defendant’s solicitor as complying with the contractual requirement, the Claimant chose to enter the CMA and ultimately to complete on the sale.

161. In addition, throughout the causation arguments, Mr Wardell stressed that these are issues of fact, just as Lord Clark identified in [25] of *Hayward*: “The authorities show that questions of inducement and causation are questions of fact”.

162. Lord Clarke's example of a fraudulent road traffic claim at [45] is instructive. The representee and settlor know that the representation is false because *a fortiori* there was no accident involving them or there was only one person in the car and not the five people making a whiplash claim, but still the representee and settlor may be induced to settle because of the uncertainty of what might happen at trial.

163. In the present case for strike out purposes, I consider the question of inducement is a matter that could only be determined at trial. Even if I assume, as the Claimant says, that he knew there were more problems with the Property then stated in the PCC and Covering Letter combined, still the very existence of the PCC changed the decision landscape because the right to rescind was conditional on a practical completion certificate not having been issued. Once it was issued, the rescission option was *prima facie* off the table. The Claimant could have ignored it and rescinded anyway or have asked an expert to determine the validity of the PCC but in either scenario inducement is a real issue.

164. In oral submissions, Mr Mallin raised how unlikely it would be that this particular Claimant, wealthy enough to pay £12,000,000 for a home in Primrose Hill, with legal and construction advisors at hand throughout and apparently believing the Property to have many defects, would have allowed the last minute issued PCC to impact his choices. I can understand the potential strength of the submission were we at trial, and would add the likely reluctance of someone waiting many months to move in to a bespoke £12,000,000 home to change that plan at the last minute, but in addition to other evidential assumptions, it also involves bringing the character of the Claimant into play in a manner that is impermissible on a pre-trial determination.

165. The point regarding the CMA is different but unpleaded and not flagged up previously by the First to Fourth Defendants. The point assumes that the PCC had some causative effect because no rescission notice was issued / no application was made to set it aside but then says that such causative impact came to an end well before the alleged loss was suffered. The Claimant's damages arise from completion in February 2020 not from not rescinding in November 2019. The February 2020 completion occurred because the Claimant, with the assistance of his advisors, was satisfied that the Third Defendant had fulfilled its part of the CMA such that the Property was "as good as you'll get it".

166. I repeat that I have not been taken to the detail of the CMA but have taken the description of it in the POC as an accurate summary. These include: "while maintaining his contractual right to rescind the Sale Agreement, [the Claimant] agreed to forbear exercising this right on the basis that outstanding defects would be

remedied…" (paragraph 66) and "Subsequently, [the Claimant] agreed not to exercise his right to rescind on the basis that the Works were finally completed…(paragraph 76). It appears then that the right to rescind in the Sale Agreement, which would have expired in any event on 31 December 2019, was replaced by the CMA under which the Claimant had a right to rescind dependent on completion of the works as set out in the CMA.

167. Mr Wardell repeated that causation was a matter for trial and I suspect included this argument in the general criticism of the First to Fourth Defendants' submissions being an army of straw men.

168. I do not think the point can be so easily dismissed. The relevant law was addressed by Cockerill J in *King v Stiefel* at [204] and [205]. I start at the end of that extract: "Of course causation is an issue of fact; and equally of course it will very often be unsuitable for summary determination. However, it cannot be said that this will always be so. The question is whether in this case the Defendants can satisfy me – to the necessary standard for summary judgment – that the Kings' case on causation is defective". The same question arises here.

169. Damage is an essential element of the conspiracy tort – without damage there is no actionable wrong. It must be established, to quote Cockerill J at [200] that "the act complained of and the loss…link up".

170. The gist of the non-red conspiracy claim is in paragraph 70(b) and (c) of the POC: a false PCC to prevent the Claimant from terminating the Sale Agreement and so inducing him to complete.

171. The potential flaw under consideration here is that completion did not take place because of the PCC but because the Claimant was satisfied that "the works were completed to the required standard by January 2020" (POC paragraph 76). Thus the completion mechanism in the Sale Contract was overtaken by the CMA. The parties agreed a bespoke mechanism for protecting the Claimant regarding the works being completed which left the PCC behind. It is put this way in paragraph 66 (in red): "While maintaining his right to rescind…[the Claimant]…agreed to forbear exercising this right on the basis that the outstanding defects would be remedied and the required works would be completed…". It is immediately apparent that this has nothing to do with the PCC but is about remedying outstanding defects and completing required works. All matters that necessarily will be after 31 October 2019.

172. At this point, it can be said with some force that the PCC was an irrelevance – its status as a representation pursuant to the Sale Contract that the Property was complete barring minor defects was not in any way connected to the basis upon which the parties

subsequently agreed to determine completion and then did so complete.

173. The Claimant may well say that this does not matter since these are fraud based damages and the Claimant should be compensated for all losses caused by his not rescinding in November 2019.

174. I understood Mr Mallin to accept that this particular point had not been flagged previously (either in the defence, the helpful grounds for strike out document attached to the 15 July 2022 application or the skeleton argument). This explains why the parties did not come prepared with more substantial arguments about this point.

175. In the circumstances, I will not take the matter any further. I would not have struck out the claim based on this point but would have left it to be raised in an amended defence in due course.

Conclusion on the Strike Out

176. The POC, even allowing, as I have done, for such of the red amendments as are not part of the "second deception" allegation, fail to meet the basic requirements of a viable statement of case in unlawful means conspiracy and must be struck out.

177. The POC are not concise. They do not limit themselves to essential facts. They do not contain the required particulars of core allegations. These problems would be troublesome even if the intended cause of action did not involve dishonesty and fraud.

178. As a pleading of dishonesty and fraud, the POC are neither cogent nor persuasive. Basic particulars are lacking throughout and the POC are neither fair to the Defendants nor will they assist the court to manage or determine the litigation.

179. The claim attempted to be raised in the POC does not have a real prospect of success.

180. There was some discussion in court, albeit limited, as to what would happen if the strike out succeeded. In my view, if having taken on board what I have said, the Claimant wants to bring different proceedings regarding the Property then it is a matter for him but this is not a case where an opportunity should be given to apply to amend the existing particulars of claim to see if defects can be cured. The scale of the problems is too great.

The "Red" Amendment Application: "the Second Deception"

181. As part of the red amendments, the Claimant sought to add an allegation that the First to Fourth Defendants carried out a further deception on the Claimant by ensuring that superficial work was done between 31 October 2019 and completion which did not

rectify the works identified in the completion checklist but made it look like those works had been done, while representing that the works required by the completion checklist could be and would be carried out.

182. These allegations were criticised for lacking any particulars. In answer to that criticism Mr Wardell said particulars were not required because it was only adding further particulars to the conspiracy allegation.

183. I do not need to deal with this point in any detail because it was implicit in the response that if the original claim was to be struck out then the red amendment application would fall as well.

184. The Claimant relied on a rule (if that is what it is) referred to in *Phones 4U v EE & Ors* [2021] EWHC 2816 (Ch), Roth J at [7] to [12] that where a proposed amendment did not introduce a new basis of claim but was only giving further particulars then the real prospect of success test should not apply because the underlying claim was going to trial in any event and assessing whether each particular has a real prospect of success is a matter for trial. I note that Roth J, having agreed with that proposition, then went on to consider if the proposed amendments had a real prospect of success.

185. The Claimant says that the relevant red amendments are only further particulars of the alleged conspiracy and so, if the claim survives the application to strike out, should be allowed in regardless of "real prospect of success".

186. However, briefly, I would not have allowed amendments to plead this "second deception" (the phrase is the Claimant's) because no proper particulars were given. The substance of the amendment was to introduce a new allegation of dishonesty. The possibility that such an allegation could be categorised as part of the same conspiracy does not do away with the predominant obligation when making a plea which raises allegations of deception to provide sufficient particulars.

187. If the rule about additional particulars not having to meet a real prospect test does exist, then it does not apply to the relevant red amendments, which whether or not they are also additional particulars of the alleged conspiracy (this requires the conspiracy, from the beginning, not to be to issue a deceitful PCC but to bring about completion regardless of the condition of the Property) are in substance the introduction of a new allegation of dishonesty to which "all the strictures that apply to pleading fraud are directly engaged".

188. No such particulars are offered in the red amendments. There are references to "representations" which are not identified (who, when and what) and allegations of deception in having superficial works done which would require identifying: what works; who did them and/or instructed them to be done; how were those works deceptive; what primary facts found the allegation of deception against the relevant individual and so on.

189. This is all missing and is essential where, as Mr Mallin stressed, none of the First to Fourth Defendants were doing any work or are alleged to have done any work. So the core idea must be that one or more of them gave explicit instructions to those controlling workers on site, or to those workers on site, that rather than do a good job they should do a bad job and try and cover it up and that those workers and/or their bosses went along with it. This is inherently unlikely and would require setting out cogent facts to justify it. No such facts are contained in the proposed amendments.

190. My slight scepticism about the amendment "rule" regarding particulars can be summarised as follows:

i) The starting point justifying the rule is that generally allowing amendments in which have no real prospect of success would lead to applications to strike out / summary judgment.

ii) I suspect this is only a minor example of a wider reason which is allowing such amendments is contrary to the overriding objective: it is wasteful, time consuming and costly, regardless of any future applications being made for summary determination.

iii) The "no real prospect" test is about substantive causes of action or defences rather than a factual detail within a statement of case.

iv) Such a detail might be strikable or not properly allowed as an amendment because it is irrelevant, scurrilous, privileged or otherwise inappropriate in some way. But such an assertion would not be a proper particular.

v) If it is assumed that a proposed amendment is a proper particular and merely adds a fact to an existing cause of action then the "no real prospect" test is irrelevant because such a particular is not a cause of action.

vi) This suggests that if there is any rule then it has a very limited scope: it will prevent arguments about whether a particular fact, asserted as a particular, can be shown to be fanciful at the permission to amend stage. But even then it is easy to envisage circumstances when the alleged rule should not apply: a document is quoted but it is demonstrated

beyond argument that the quotation cannot be attributed as alleged or that the document is misquoted. No rule of the kind posited should be allowed to prevent the court exercising case management powers in accordance with the overriding objective. At the same time, in most cases, where proper particulars are to be added, those powers will be exercised so as to avoid needing to look into the factual merits of the particular at the pre-trial stage. But this is also an exercise of the court’s case management powers rather than the application of a rule confining those powers.

The Fifth Defendant

191. Mr Pimlott adopted Mr Mallin’s submissions. These included that there was no conspiracy claim against the Fifth Defendant and so the conspiracy claim against all the First to Fourth Defendants must fail with it. I have accepted this submission and likewise the submission that the deceit claim is not adequately pleaded. It follows that the claim against the Fifth Defendant should also be struck out. I do not consider the lack of an application on the Fifth Defendant’s part an obstacle in this respect. Given my findings it would be contrary to the overriding objective and pointless for the claim to be carried on.

192. Mr Pimlott’s other concerns were about a lack of particulars in certain paragraphs of the red amendments. Those paragraphs do lack necessary particulars, as do the red amendments more generally. The Claimant’s case was those were not necessary because they were only further particulars of the conspiracy. I have rejected that.

Consequences

193. The claim must be struck out and the amendment application dismissed. The POC fail to provide a cogent and particularised basis for a claim of unlawful means conspiracy based on deceit. It breaks down because the alleged conspiracy and the alleged deceit lack the necessary degree of conviction to give rise to a sustainable case.

194. I invite counsel to discuss and agree as much as they can regarding the order arising from this judgment.