# Exhibit I

Court of Appeal A

# Morphitis *v* Bernasconi and others

## [2003] EWCA Civ 289

2002 Dec 12, 13; Aldous and Chadwick LJJ and Munby J
2003 March 5 B

*Insolvency — Winding up — Fraudulent trading — Company seeking to divest itself of onerous leases — Scheme devised by counsel to transfer business to new company free of leases without infringing company and insolvency law — Landlord deceived as to company's intention to pay rent after certain date — Company wound up — Whether business of company carried on with intent to defraud creditors — Whether deception of single creditor sufficient —* C *Assessment of contribution — Insolvency Act 1986 (c 45), s 213*

The company was established in 1983 by a director who ran a number of locally incorporated haulage companies throughout continental Europe using the initials TMC. In 1992 the directors of the company wished to continue their trading activities as hauliers using the same initials but to divest themselves lawfully of onerous leases of warehouse premises. They sought the advice of counsel, who D devised a scheme which purported to achieve their objectives without infringing the provisions of the Insolvency Act 1986[1], whereby a new company was to be set up to operate the haulage business, the directors were to resign as directors of the company and become directors of the new company, and the company would go into insolvent liquidation after 12 months leaving the landlord as an unpaid creditor. The company ceased trading as hauliers on 31 December 1992. From 1 January 1993 the haulage business was carried on by the new company. It was essential that the trade creditors of the company be paid because the directors would incur criminal liability under E section 216 of the 1986 Act if a winding up petition were to be presented within 12 months of the company ceasing to trade as hauliers. The landlord was dissatisfied with the accrual of arrears of rent and other charges during the 12-month period and threatened to issue a winding up petition, but was persuaded by the company's solicitors to accept payment by instalments. A payment was made on 12 November 1993, but the last payment, promised for 23 December 1993, was never made, nor had it ever been the company's intention to make that payment, their objective of F putting off the presentation of a winding up petition during the crucial year having been accomplished. The landlord did not serve a statutory demand for the rent due until 18 September 1994, the company was wound up on 20 December 1994 and a liquidator was appointed on 3 March 1995. The liquidator disclaimed the leases and sought, inter alia, a declaration under section 213 of the 1986 Act that the two former directors of the company and a firm of solicitors formerly instructed by the company were knowingly party to the carrying on of the business of the company G with intent to defraud creditors and for other fraudulent purposes and that they were liable to make such contributions to the assets of the company as the court thought proper. The liquidator accepted a payment into court of £75,000 made by the solicitors. At trial against the former directors only, the judge held that fraudulent trading had been made out against the directors in that they intended to mislead one creditor, the landlord, from 12 November 1993 by promising to pay the next instalment of rent on 23 December 1993 knowing that they would not pay it. The H judge held that they were liable to make a contribution of £35,000 to the assets of the company which included a punitive element of £17,500, but that the liability to make

[1] Insolvency Act 1986, s 213: see post, para 25.
S 216: see post, para 12.

A contribution had been satisfied by the liquidator's acceptance of the solicitors' payment into court.

On appeal by the liquidator and cross-appeal by the directors—

*Held*, dismissing the appeal and allowing the cross-appeal, that although a business could be found to have been conducted with intent to defraud creditors notwithstanding that only one creditor had been defrauded by a single transaction, section 213 of the Insolvency Act 1986 was not engaged in every case where an
B individual creditor of a company had actually been defrauded, but only where that business had been carried on with intent to defraud its creditors; that the business of the company had been carried on throughout 1993 with intent to protect the former directors from the penalties to which they would otherwise be exposed under section 216 of the 1986 Act as directors of the new company rather than with intent to defraud the landlord; that, although the promise to pay another instalment of rent at the end of December 1993 had been intended to mislead the landlord into believing
C that its best interests were served by not taking proceedings against the company to enforce the debt then owed, it had not had been shown that there was any intent to defraud the landlord by carrying on the business while the landlord was so misled or that the carrying on of the business had defrauded the landlord; and that, accordingly, fraudulent trading within section 213 of the 1986 Act was not established and the directors were not liable to make any contribution to the assets (post, paras 46–49).

D *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262 explained.

*In re Cyona Distributors Ltd* [1967] Ch 889, CA distinguished.

*Per curiam.* There must be some nexus between (i) the loss which has been caused to the company's creditors generally by the carrying on of the business with intent to defraud creditors and (ii) the amount of any contribution which the court thinks proper to order persons knowingly party to the carrying on of the business with that intent to make, under section 213(2) of the 1986 Act, to the assets in which
E the company's creditors will share in the liquidation. There is no power to include a punitive element in the amount of any such contribution. The principle on which that power should be exercised is that the contribution to the assets in which the company's creditors will share in the liquidation should reflect (and compensate for) the loss which has been caused to those creditors by the carrying on of the business in the manner which gives rise to the exercise of the power. There is nothing to suggest either that the deception which the judge found to have been practised on the
F landlord led to the misapplication or misappropriation of the company's assets, or that the letter of 12 November 1993 led the landlord to make a claim in the liquidation that it would not otherwise have had. There was no material on which the judge could have reached the conclusion that it was correct to order contribution of £17,500, or any other sum (post, paras 53, 55).

Decision of Anthony Elleray QC sitting as a deputy judge of the Chancery Division [2001] 2 BCLC 1 varied.

G

The following cases are referred to in the judgment of Chadwick LJ:

*Bird, In re, Ex p The Debtor v Inland Revenue Comrs* [1962] 1 WLR 686; [1962] 2 All ER 406, CA

*Cooper (Gerald) Chemicals Ltd, In re* [1978] Ch 262; [1978] 2 WLR 866; [1978] 2 All ER 49

*Cyona Distributors Ltd, In re* [1967] Ch 889; [1967] 2 WLR 369; [1967] 1 All
H ER 281, CA

*Murray-Watson Ltd, In re* (unreported) 6 April 1977, Oliver J

*Park Air Services plc, In re* [2000] 2 AC 172; [1999] 2 WLR 396; [1999] 1 All ER 673, HL(E)

*Sarflax Ltd, In re* [1979] Ch 592; [1979] 2 WLR 202; [1979] 1 All ER 529

*Theophile v Solicitor General* [1950] AC 186; [1950] 1 All ER 405, HL(E)

The following additional cases were cited in argument: A

*ANC Ltd v Clark Goldring and Page Ltd* The Times, 31 May 2000; Court of Appeal (Civil Division) Transcript No 897 of 2000, CA
*Aktieselskabet Dansk Skibsfinansiering v Brothers* [2001] 2 BCLC 324
*Attorney General v Blake* [2001] 1 AC 268; [2000] 3 WLR 625; [2000] 4 All ER 385, HL(E)
*Broome v Cassell & Co Ltd* [1972] AC 1027; [1972] 2 WLR 645; [1972] 1 All ER 801, HL(E) B
*Company No 001418 of 1988, In re A* [1990] BCC 526
*Continental Assurance Co of London plc, In re* [2001] BPIR 733
*David Yablon Minton v Kenburgh Investments (Northern) Ltd* [2001] BCC 648, CA
*Esal Commodities Ltd, In re; London & Overseas (Sugar) Ltd v Punjab National Bank* [1993] BCLC 872; [1997] 1 BCLC 705, CA
*Kuddus v Chief Constable of Leicestershire Constabulary* [2001] UKHL 29; [2002] 2 AC 122; [2001] 2 WLR 1789; [2001] 3 All ER 193, HL(E) C
*Leitch (William C) Brothers Ltd, In re* [1932] Ch 71
*Oasis Merchandising Services Ltd, In re; Ward v Aitken* [1995] 2 BCLC 493
*Produce Marketing Consortium Ltd, In re* (1989) 5 BCC 569
*R v Ghosh* [1982] QB 1053; [1982] 3 WLR 110; [1982] 2 All ER 689, CA
*Rookes v Barnard* [1964] AC 1129; [1964] 2 WLR 269; [1964] 1 All ER 367, HL(E)
*Simmon Box (Diamonds) Ltd, In re* [2000] BCC 275

D

The following additional cases, although not cited, were referred to in the skeleton arguments:

*Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1997] AC 191; [1996] 3 WLR 87; [1996] 3 All ER 365, HL(E)
*Dickenson v Fletcher* (1873) LR 9 CP 1
*Patrick and Lyon Ltd, In re* [1933] Ch 786
*Purpoint, In re* [1991] BCC 121 E
*White & Osmond Parkstone Ltd* (unreported) 30 June 1960, Buckley J

**APPEAL** from Mr Anthony Elleray QC sitting as a deputy judge of the Chancery Division

By a notice of application dated 1 August 1997 and points of claim dated 11 November 1997 Geoffrey Christopher Anthony Morphitis, the liquidator of TMC Transport (UK) Ltd, sought, inter alia, against two former directors F of the company, Leonardo Bernasconi and Pasqualino Monti, a firm of solicitors acting for the company, Nicholas Bennett & Co, and PPM Trading Ltd, an associated company of TMC Transport (UK) Ltd incorporated in Liechtenstein, (1) a declaration under section 213 of the Insolvency Act 1986 that the directors and the solicitors and/or each of them had been knowingly parties to the carrying on of the business of the company with intent to G defraud its creditors and for other fraudulent purposes, and that they were liable to make such contributions to the assets of the company as the court thought proper with interest; (2) payment to the liquidator by the directors and the solicitors and/or each or any of them of the sum of such contributions or such other sum for which they might be found responsible, with interest for such period as the court thought fit pursuant to section 35A H of the Supreme Court Act 1981; (3) a declaration that the payments made by the company to PPM Trading Ltd during the period commencing September 1993 and ending with the presentation of the winding up petition constituted a preference of PPM Trading Ltd and were voidable accordingly; and (4) an order that PPM Trading Ltd repay the liquidator £60,000 with

interest at such rate and for such a period as the court thought fit pursuant to section 35A of the Supreme Court Act 1981. On 13 September 2000 the liquidator accepted a payment into court of £75,000 made by the solicitors, and thereafter the matter proceeded to trial against the two directors only. By an order dated 18 June 2001 Mr Anthony Elleray QC sitting as a deputy High Court judge, holding that fraudulent trading had been established against the directors, required them to contribute £35,000 to the assets of the company, including a punitive element of £17,500 but determined that that liability had been satisfied by the liquidator's acceptance of the payment into court made by the solicitors.

By an appellant's notice and pursuant to leave granted by Jonathan Parker LJ (limited to grounds 2, 3 and 4) on 11 February 2002 the liquidator appealed on the grounds that (1) having found that the former directors had made false representations to a creditor from 20 May 1993, the judge had been wrong to find that the directors were not party to fraudulent trading from at least that date (and assessed compensation accordingly); (2) having found that the directors were guilty of fraudulent trading from 12 November 1993 the judge had been wrong to assess the contribution (apart from any penal element) payable by the directors as if he were assessing damages for fraudulent misrepresentation: he should have had regard to the wider consequences of the fraudulent trading and the sum necessary to compensate the company for those consequences; (3) having found that the directors were liable to pay £35,000 to the company by way of compensation (£17,500 of which was by way of punitive award) the judge had been wrong to find that liability to have been satisfied by the sum of £75,000 paid into court by the solicitors and taken out by the liquidator on 13 September 2000: he should have found that the punitive element (at the least) should have been paid by the directors to the liquidator; and (4) having found that the assessment of compensation in the sum of £35,000 was appropriate only if the second director was able to procure that a creditor of the company connected with him would not seek to share in any distribution by the liquidator, and, having made such a condition of drawing up the order, the judge should have found that, regardless of whether the directors actually paid any sum to the liquidator, the liquidator had succeeded against the directors and was entitled to the costs of the action.

By a respondent's notice by way of cross-appeal filed on 1 March 2002 and pursuant to leave granted by Jonathan Parker LJ on 1May 2002 (limited to grounds 3, 4, and 5) the directors appealed on the grounds, inter alia, that (1) the judge had erred in imposing a financial penalty because on its proper construction there was no jurisdiction under section 213 of the Insolvency Act 1986 to impose a penalty; (2) alternatively, it had been wrong as a matter of discretion to impose a penalty, or a penalty of £17,5000 was excessive since on the facts found by the judge the misrepresentation was limited to a promise to pay arrears of rent in the much smaller sum of £10,000; (3) the judge had been wrong to find that the misrepresentation on 12 November 1993 that arrears of rent would be paid to the landlord on 23 December 1993 amounted to fraudulent trading within the meaning of section 213 of the Insolvency Act 1986; (4) the judge's findings of primary fact did not support the judge's inference of secondary fact that the misrepresentation had caused the landlord to suffer any loss and consequently he had erred in finding that the landlord had in fact been

A defrauded by the impugned conduct; and (5) alternatively, the loss caused to the landlord as a consequence of the misrepresentation was not a relevant loss for the purpose of an application by a liquidator for a contribution to the company's assets since the liquidator's complaint was that the landlord's position as an individual creditor had been prejudiced vis à vis the creditors as a class, and the misrepresentation had not diminished the assets available to the general body of creditors.

B The court granted the parties permission to appeal on those grounds for which permission had been refused by the single judge.

The facts are stated in the judgment of Chadwick LJ.

[**ALDOUS LJ.** The court will first hear the cross-appeal.]

C *Clare Hoffmann* for the directors. It is a precondition for a claim under section 213 of the Insolvency Act 1986 that the company must have suffered a loss. The absence of such loss is fatal to the liquidator's claim. The fraudulent misrepresentation made by the company to the landlord in respect of payment of outstanding rent did not amount to fraudulent trading within section 213. The liquidator's real complaint, that the company preferred all other creditors at the expense of the landlord, does not come within section 213. No alteration in the company's assets or liabilities D results from it, although there is an alteration for those with claims: see *In re Sarflax Ltd* [1979] Ch 592. The fraudulent misrepresentation had no causative effect on the loss suffered by the landlord, since the quantum of its claim for unpaid rent arrears remained the same. [Reference was made to *In re Simmon Box (Diamonds) Ltd* [2000] BCC 275.] Under section 213 the company falls to be compensated for the increase in the deficiency that has been caused by the company incurring credit at a time when it could not E meet the claim: see *In re Produce Marketing Consortium Ltd* (1989) 5 BCC 568.

Not every fraud or fraudulent misrepresentation perpetrated by a company amounts to fraudulent trading within section 213. There is a distinction between a fraud on a person that gives rise to a claim in damages against the company and the carrying on of the business of the company F with intent to defraud: see *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262. For section 213 to be satisfied the person perpetrating the fraud must know at the time of the impugned conduct both that his conduct will give rise to a claim against the company and that the company is or will be unable to pay the claim. The liquidator did not seek to set aside the scheme the directors had entered into on counsel's advice in order lawfully to escape onerous leases, or to challenge any of the transactions in the scheme under G the avoidance provisions in the 1986 Act, or to allege that the implementation of the scheme amounted to fraudulent trading. Implementing the scheme could not be fraudulent since the directors, acting on legal advice, would not have the necessary dishonest intent. Thus, the *Ghosh* test of dishonesty was not satisfied: see *R v Ghosh* [1982] QB 1053.

H The nature of the remedy demonstrates that fraudulent trading is limited to circumstances where the company's deficiency is increased because credit is incurred at a time when the company cannot meet the claim. Neither section 213 of the 1986 Act nor its predecessor, section 332 of the Companies Act 1948, provides for payment to an individual creditor. Section 213 provides in terms that the contribution is to the assets of the

A company. The benefit of a declaration under section 332 of the 1948 Act is also conferred on the company, not on the defrauded creditors: see *In re Esal Commodities Ltd; London & Overseas (Sugar) Ltd v Punjab National Bank* [1993] BCLC 872; [1997] 1 BCLC 705 and *In re Continental Assurance Co of London plc* [2001] BPIR 733.

Even if the fraudulent misrepresentation were fraudulent trading, a claim B under section 213 is concerned with the loss suffered by the company, not the loss suffered by a creditor. Only the liquidator has locus to bring the claim. He does not act as a representative claimant on behalf of a creditor who has a cause of action in fraud against the company.

The jurisdiction to order contribution is compensatory: there must be a causal connection between the defrauding and the level of contribution. The quantum of contribution must be limited to the loss suffered by the C company, not the loss suffered by the victim: see *In re Continental Assurance Co of London plc* [2001] BPIR 733.

*David Chivers QC* for the liquidator. Acts of dishonesty which particularise or evidence fraudulent trading cannot be looked at in isolation, but must be seen in the context of what the company is doing. Specific D misrepresentations were made by the company for a dishonest purpose so that the landlord would not present a winding up petition prior to the end of the 12-month period needed to implement the scheme.

The sole reason for the scheme put forward by counsel was to deprive the landlord of his rent. If the landlord presented a winding up petition within 12 months of the transfer of assets to the new company the directors of the company would incur criminal liability under sections 207 and 216 of E the 1986 Act. The fraudulent misrepresentation to the landlord as to the intention to pay arrears of rent, in order to forestall the presentation by the landlord of a petition, was an integral part of the carrying out of the scheme. It allowed the directors to run a phoenix company without incurring criminal liability.

At the time the directors made the misrepresentation to the landlord their F state of mind was dishonest. At least from the moment of making that misrepresentation the directors knew that they were carrying on the business fraudulently. The dishonesty is to be tested, not by reference to what an honest director would have done, but by reference to the actual misrepresentation: see *Aktieselskabet Dansk Skibsfinanciering v Brothers* [2001] 2 BCLC 324. There may be fraudulent trading without a diminution G of the company's assets: see *In re Sarflax Ltd* [1979] Ch 592. The trading fraud manifested itself at the latest by November 1993, when the directors allowed the landlord as creditor to believe that it would be paid so that there was no need to bring proceedings against the company.

If the court is satisfied that fraudulent trading is established, it should look at the wider consequences in assessing the appropriate level of contribution to the company's assets to be made by the directors under H section 213(2). The section gives no guidance. The court has a wide discretion and can look at the whole course of the directors' conduct. It is not limited to making a compensatory payment. Responsibility for the insolvency and the costs of the liquidation should be reflected in the award. A punitive element can be included: see *In re Cyona Distributors Ltd* [1967]

Ch 889, *In re A Company No 001418 of 1988* [1990] BCC 526 and *In re William C Leitch Brothers Ltd* [1932] Ch 71. A

The claim should not be regarded as one for damages against joint defendants. Under section 213 there is no right of contribution between defendants to a claim. There are several claims against each of the directors. They should at least be ordered to pay the punitive element of the contribution. The court should not limit the award to the amount of a payment into court by a third party already accepted by the liquidator: see *David Yablon Minton v Kenburgh Investments (Northern) Ltd* [2001] BCC 648; *Attorney General v Blake* [2001] 1 AC 268 and *Kuddus v Chief Constable of Leicestershire Constabulary* [2002] 2 AC 122. The payment by the third party did not satisfy any obligation of the directors. B

In assessing costs it is wrong in principle to order the company to pay the directors' costs from the date of acceptance of the payment in since the directors made no Part 36 offer at the time of the payment in, and the claims were several against each defendant. C

*Hoffmann* in reply. There is no absolute duty on directors to disclose the truth to creditors either under section 213 or section 214.

There is a history of confusion between the different types of damages: see *Rookes v Barnard* [1964] AC 1129 and *Broome v Cassell & Co Ltd* [1972] 1 AC 1027. Section 213 is unambiguous. It does not provide for a penalty but provides only for a contribution. Where there is uncertainty as to the extent of the defrauding, compensation will be at the top end of the band: see *In re William C Leitch Brothers Ltd* [1932] Ch 71. [Reference was also made to *In re Oasis Merchandising Services Ltd; Ward v Aitken* [1995] 2 BCLC 493 and *ANC Ltd v Clark Goldring and Page Ltd* The Times, 31 May 2000.] The court should take into account the payment into court because it is the compensation necessary for the company which is to be assessed. D E

*Cur adv vult*

5 March 2003. The following judgments were handed down. F

**CHADWICK LJ**

1 TMC Transport (UK) Ltd, a company incorporated under the Companies Acts 1948 and 1981, was ordered to be wound up on 20 December 1994. By these proceedings, commenced by application issued on 1 August 1997, the liquidator sought a declaration, under section 213 of the Insolvency Act 1986, that two former directors of the company and a firm of solicitors formerly instructed by the company were knowingly party to the carrying on of the business of the company with intent to defraud creditors and for other fraudulent purposes and that they were liable to make such contributions to the assets of the company as the court thought proper. On 13 September 2000 the liquidator accepted a payment into court, in the sum of £75,000, made by the solicitors. The claim proceeded to trial only against the two former directors, Mr Leonardo Bernasconi and Mr Pasqualino Monti. G H

2 The matter came on for trial before Mr Anthony Elleray QC, sitting as a deputy judge of the Chancery Division, in November 2000. In February 2001 the judge handed down a lengthy written judgment, in which he held

A that that fraudulent trading had been made out against the directors; and declared that they should contribute an amount of £35,000 to the assets of the company. That sum included an element (£17,500) which the judge described as punitive. The judge went on to hold that liability of the directors to make contribution had been satisfied—or, as he put it, extinguished—by the liquidator's acceptance of the payment into court made by the solicitors. He adjourned the matter for further argument in B relation to costs.

3 The matter was restored in June 2001; no order having been drawn up following the judgment in February. The judge was asked to reconsider his decision that the whole of the amount of the contribution which the directors would otherwise have been liable to make should be treated as extinguished by the solicitors' payment. It was said that, notwithstanding C that payment, the directors should remain liable to contribute an amount equal to the punitive element fixed by the judge. The judge rejected that contention. He went on to consider by whom the costs of the proceedings should be paid. He held (i) that the liquidator should pay 75% of the directors' costs incurred after the date (13 September 2000) on which he accepted the payment into court and (ii) that the directors should pay the liquidator's costs up to that date, but that those costs should include only D 50% of the costs of adducing expert evidence. The judge refused permission to appeal.

4 The judge's order is dated 18 June 2001; although it was not agreed by counsel, approved by the judge and entered until February 2002. In the meantime the liquidator had filed an appellant's notice. He sought an order (i) that the directors be liable to make such contribution to the company's E assets (in excess of £35,000) as this court might think fit; in the alternative, (ii) that the directors be ordered to pay the punitive element of £17,500 by way of contribution in addition to the £75,000 paid by the solicitors; and (iii) that the directors pay the whole of the costs of the proceedings. Permission to appeal, limited to grounds 2, 3, and 4 in the appellant's notice, was granted by this court (Jonathan Parker LJ) on 11 February 2002. On 1 March 2002 the directors filed a respondents' notice raising issues by way F of cross-appeal. Permission to cross-appeal, limited to grounds 3, 4 and 5 in the respondents' notice was granted by Jonathan Parker LJ on 1 May 2002.

5 Accordingly, there were before this court: (i) the liquidator's application for permission to appeal on ground 1 in the appellant's notice (which, although refused by Jonathan Parker LJ on paper, he was given liberty to renew at the hearing of the appeal); (ii) the directors' application G for permission to appeal on ground 1 in the respondents' notice (adjourned for hearing at the appeal) and on ground 2 (refused on paper, with liberty to renew); (iii) the liquidator's appeal; and (iv) the directors' cross-appeal. We indicated that we would hear argument on all issues; treating the applications for permission as if they were additional grounds of appeal or cross-appeal.

H *The issues raised on these appeals*

6 The issues raised by the appeal and cross-appeal may be summarised as follows.

(1) Whether the judge was correct, on the findings of fact which he made, to hold that the directors had been knowingly party to the carrying on of the

business of the company with intent to defraud creditors or for other fraudulent purposes within the meaning of section 213 of the Insolvency Act 1986—ground 3 in the respondents' notice. A

(2) If so, whether the judge was correct in holding that the directors were not parties to fraudulent trading prior to 12 November 1993 (and, in particular, were not parties to fraudulent trading from, at the latest, 20 May 1993)—ground 1 in the appellant's notice.

(3) Whether any relevant loss was suffered by reason of the directors' participation in fraudulent trading, as found by the judge—grounds 4 and 5 in the respondents' notice. B

(4) If so, whether the judge was correct in assessing the contribution to be made by the directors (exclusive of the punitive element) at £17,500—ground 2 in the appellant's notice.

(5) Whether the judge was entitled (alternatively, whether it was a proper exercise of his discretion) to include a punitive element in the contribution for which he held the directors liable—grounds 1 and 2 in the respondents' notice. C

(6) Whether the judge was correct to hold that the contribution for which he had held the directors liable (alternatively, the punitive element of that contribution) was satisfied by the payment made by the solicitors—ground 3 in the appellant's notice. D

(7) Whether the judge ought to have ordered the directors to pay the costs of the proceedings from 13 September 2000 (as well as the costs before that date)—ground 4 in the appellant's notice.

*The underlying facts*

7 The underlying facts are not now in dispute. I take them from the judgment below. The company was established at the end of 1983 by Mr Monti, who was (and remains) a successful haulier operating throughout continental Europe through a number of locally incorporated companies bearing the initials "TMC" (derived from 'Transmetal Chimica') as part of their name. Until early in 1991 the day to day business of the company was managed by Mr Daniel Murat, who had a 25% share interest. Mr Monti and Mr Murat were the directors. In 1991 Mr Murat was replaced as a director by Mr Bernasconi, an accountant in practice in Switzerland. Mr Monti and Mr Bernasconi ceased, formally, to be directors of the company at the end of 1992—before the events said to constitute fraudulent trading in the present case—but it was not in dispute that Mr Monti continued to control the company to an extent which required him to be treated as a de facto director. E F

8 By the end of the 1980s the company was tenant of warehouse and depot premises on the Sandwich Industrial Estate, in Kent, under four leases; each of which would continue, in accordance with its contractual terms, until 1998 or for some years thereafter. On 28 July 1989 the reversion to those leases was acquired by Ramac Holdings Ltd. The leases were guaranteed by Mr Murat alone. G

9 The company had traded profitably until the beginning of 1991—as appeared from its accounts to 31 December 1990. But, by early 1991 Mr Monti had become concerned at reports of unpaid suppliers and, with the assistance of Mr Bernasconi, had investigated the cause of that concern. That investigation led to the departure of Mr Murat; and to Mr Bernasconi's appointment as a director. To assist the company Mr Monti arranged for H

A loan capital to be provided by Accoulis Tours Establishment, a company which (nominally at least) was owned and controlled by Mr Bernasconi but which was amenable to Mr Monti's wishes. The amount invested in 1991 was £135,000. A further £235,000 was lent by Accoulis in 1992; but part of that further loan may have represented unpaid interest due under the earlier loan. Nothing turns on the precise amount of "new money" introduced by Accoulis.

B 10 The company remained unprofitable during 1992. By June 1992 management accounts showed an excess of liabilities over assets in the sum of £27,275. The company was suffering from a general downturn in the haulage industry; but Mr Monti and Mr Bernasconi identified the company's principal commercial problem as the onerous rental obligations under the leases. The problem was exacerbated by a pending upwards-only C rent review. The solution was seen to be a relocation to other premises near Ramsgate. The difficulty in the way of relocation was the inability to find a purchaser for the leases or to agree terms with Ramac upon which they could be surrendered.

11 In July 1992 Mr Monti and Mr Bernasconi instructed solicitors to seek advice from counsel. The matter on which counsel was asked to advise D appears from paragraph 3 of the opinion which he gave on 14 July 1992:

> "TMC wishes to preserve its assets (apart from the leases) and its trade [connection], but to free itself from the liability to pay rent under the leases. Those premises no longer suit its needs, and, I infer, there is no market for them at present. What is envisaged is that the non-lease assets will be transferred in some way to another company in the hope that they E can be put out of the reach of the landlord. It is an essential ingredient of any such scheme that TMC's trade creditors should be paid."

Counsel pointed out, correctly, that any transfer of non-lease assets to another company, if not made for full value, would be open to attack by a liquidator if the company were to go into insolvent liquidation within two years thereafter: see sections 238 and 240(1)(a) of the Insolvency Act 1986. F Even if the transfer were made for full value, the use of the proceeds to pay trade creditors (to the exclusion of the landlord) would be vulnerable to attack as a preference if liquidation occurred within six months: see sections 239 and 240(1)(b) of the Act. Counsel drew attention, also, to the provisions of sections 207 ("transactions in fraud of creditors") and 216 ("restriction on re-use of company names"). He concluded with the following advice:

G

> "My opinion is that the only lawful way of divesting TMC of its leases and of enabling its business to continue is as follows. TMC should go into voluntary liquidation. Since I infer that no declaration of solvency under section 89 could be made, the liquidation will be a creditors' voluntary liquidation. Upon liquidation, the liquidator could, if he so wished, disclaim the leases, thereby ending TMC's liability under them. H Mr Murat's liability would continue, and he could be required by the landlord to take new leases for their unexpired terms, or he could apply for vesting orders under section 181; but that is of no concern to those instructing me. The liquidator would then explore the possibility of the sale of the business of TMC and its tangible assets as a going concern.

Some or all of the present directors would be entitled to negotiate with the liquidator for such a purchase, but, of course, they would not necessarily be successful. Section 216 would restrict their choice of a new trading name." A

12 It is convenient, here, to set out the material provisions of section 216 of the Insolvency Act 1986:

"(1) This section applies to a person where a company ('the liquidating company') has gone into insolvent liquidation on or after the appointed day and he was a director or shadow director of the company at any time in the period of 12 months ending with the day before it went into liquidation. B

"(2) For the purposes of this section a name is a prohibited name in relation to such a person if—(a) it is a name by which the liquidating company was known at any time in that period of 12 months, or (b) it is a name which is so similar to a name falling within paragraph (a) as to suggest an association with that company. C

"(3) Except with leave of the court or in such circumstances as may be prescribed, a person to whom this section applies shall not at any time in the period of five years beginning with the day on which the liquidating company went into liquidation—(a) be a director of any other company that is known by a prohibited name, or (b) in any way, whether directly or indirectly, be concerned or take part in the promotion, formation or management of any such company, or (c) in any way, whether directly or indirectly, be concerned or take part in the carrying on of a business carried on (otherwise than by a company) under a prohibited name. D

"(4) If a person acts in contravention of this section, he is liable to imprisonment or a fine, or both." E

13 Those provisions made the scheme suggested in the final paragraph of counsel's opinion of 14 July 1992 unattractive. Following liquidation, the business could not be sold by the liquidator to a new company in which Mr Monti was involved (as he would be) and carried on under the TMC initials, unless Mr Monti had ceased to be a director or shadow director of the old company on a date which was at least twelve months before the liquidation of the old company. If the business were to be carried on by the old company until liquidation and sale (as it would have to be, if it were to be sold by the liquidator as a going concern) it was impossible to envisage circumstances, in practice, in which Mr Monti would cease to be a shadow director prior to liquidation, even if he resigned his formal appointment. The point was recognised by counsel in a second opinion, dated 28 September 1992. He wrote: F G

"[The] solution [suggested in the opinion of 14 July 1992] is unattractive to the directors for two reasons. First, there would inevitably be an interruption in trading while the liquidator gathered in TMC's assets and considered what to do with them. And, secondly, the goodwill attaching to the name 'TMC' would be lost, because of the restriction imposed by section 216 of the 1986 Act on the former directors of a company which has gone into insolvent liquidation trading, either through a company or otherwise, in the same name as the liquidated company." H

14 In his opinion of 28 September 1992—written to confirm advice given in conference a few days earlier—counsel put forward a revised scheme which (as he said) would avoid both of the problems which he had identified. The revised scheme is set out in paragraph 4 of that opinion:

> "(1) TMC's holding company (H1 Ltd) sells [its] shares in TMC at a proper valuation to another, independent company, H2 Ltd. First of all, however, the shares in TMC's subsidiary, TMC (Northern) Limited, which is a warehousing company and which H1 Ltd would wish to retain, are transferred to it by TMC. In other words H2 Ltd will acquire TMC without its subsidiary. As would be usual on a sale of a company to an independent party, the present directors of TMC would resign and H2 Ltd would appoint its own nominated directors.
>
> "(2) The (now) former directors of TMC incorporate a new company with a suitable name which would enable it to be known as TMC (new TMC). That could be done through H1 Ltd or through another holding company.
>
> "(3) New TMC seeks new premises and prepares to operate as a road haulier. In the meantime TMC carries on its business as usual.
>
> "(4) When new TMC is ready to trade TMC ceases to trade as a road haulier and becomes, instead, a lessor of trailers, which it leases for 12 months to new TMC. At the same time new TMC buys TMC's goodwill (namely its list of customers) at a fair value.
>
> "(5) Not less than 12 months later, new TMC cancels its leases (which I am instructed it will then no longer require) and makes fresh arrangements for providing the necessary vehicles for its business. TMC is left with its trailers and can either continue to trade or go into liquidation as it thinks fit. If it were to go into insolvent liquidation at that stage, the original directors of TMC would have committed no offence under section 207, because there would have been no transfer of TMC's property by them. The shares in TMC themselves would have been transferred, by H1 Ltd. Nor could there be an objection to new TMC trading as "TMC" under section 216, because the original directors of TMC, who will by then be the directors of new TMC, will not have been directors of TMC within 12 months of its liquidation."

15 Mr Monti and Mr Bernasconi decided to adopt the scheme put forward by counsel in his second opinion. On 24 November 1992 the company's shares in TMC Northern were transferred to its holding company, Alca Enterprises AG, at a price which the liquidator has not challenged. On 22 December 1992 the company's own shares were transferred by Alca to PPM Trading Ltd, a Liechtenstein company incorporated by Mr Bernasconi. Mr Monti and Mr Bernasconi resigned office as directors of the company. The sole director appointed in their place was Mr Augustoni Domenico, Mr Bernasconi's father-in-law. Those steps were (I assume) intended to carry into effect step (1) of counsel's scheme; but it is difficult to think that counsel would have been satisfied that PPM Trading was an "independent" company in the role of H2 Ltd or that he would have envisaged the appointment of Mr Bernasconi's father in law as the nominated director of the old company.

16 Steps (2), (3) and (4) of counsel's scheme were carried into effect by the incorporation of a new company, Trans Montana Carriers Ltd, which

could use the initials "TMC"; the transfer of goodwill from the old company to the new company at a price of £1,000; the execution of a leasing contract for the lease by the old company to the new of the 34 trailers which the old company then owned at a rent of £125,000 per annum; and the acquisition by the new company of leasehold premises in Ramsgate from which it could trade. The old company ceased trading as hauliers on 31 December 1992; and the haulage business was thereafter (with effect from 1 January 1993) carried on by the new company. For convenience I shall refer to the old company as "the company" and to the new company as "Newco".

17 The financial statements in respect of the company, for the year to 31 December 1992, show fixed and current assets of £843,409 and liabilities of £903,704. The fixed assets were shown at a book value of £206,251; and current assets, principally trade debtors, at a book value of £637,158. Liabilities comprised trade creditors (£428,849), a loan creditor (Accoulis—£370,000), accrued expenses of £100,000 or thereabouts, and Crown debts of about £7,000. The trade creditors included the landlord of the Sandwich premises, Ramac.

18 During 1993 the company collected its trade debts and received from Newco the rents payable under the trailer lease. By the year end the company had sold its remaining trailers to an associated Belgian company, ICTS, for about £195,000. That sale has not been challenged by the liquidator. The company paid off nearly all its trade creditors, much of the current rent under the leases of the Sandwich premises, and part of the Accoulis loan. The financial position of the company as at 31 December 1993—as it appeared from a reconstruction by the joint expert which was not challenged—showed current liabilities of £292,000. Those liabilities included the balance of the Accoulis loan (£240,000) and trade creditors of £43,000—of which £37,000 represented rent due to Ramac. Assets had reduced to £63,000. Net liabilities were £222,000—suggesting a loss during 1993 of some £160,000. The loss was attributable to losses on the sale of fixed assets below book value, depreciation on fixed assets, interest charges on the Accoulis loan and the rent accruing on the Sandwich premises. But, in broad terms, the objective of realising the company's assets and paying its trade creditors (other than its landlord) had been achieved.

19 The sale of the company's trailers to ICTS followed a third opinion from counsel, dated 14 October 1993. Counsel had been asked to advise whether "on the insolvent liquidation of TMC in due course, there would be any contravention of the provisions of the Insolvency Act 1986 if TMC were now to sell its trailers to a third party". He wrote:

> "The purpose of introducing 12-month [trailer] leases into the scheme mentioned in paragraph 4 of my further opinion of the 28 September 1992 was to enable TMC to continue trading and to generate an income flow which would enable it to pay its debts (including the rent due under the leases of its properties in Sandwich) for at least that period. In other words it is essential that no creditor (including the landlord) should present a petition to wind up TMC before the expiration of the period of 12 months beginning with its having ceased to trade as a haulier. That is to protect the original directors of TMC (now the directors of the new TMC) from contravention of section 216 of the 1986 Act."

It seems unlikely that counsel appreciated that Mr Monti and Mr Bernasconi were continuing to act as directors of the company de facto — notwithstanding that they had formally resigned office. If counsel had appreciated that, he would have realised that the objective for which the scheme had been devised—the avoidance of liability under section 216 of the 1986 Act in their role as directors of Newco—could not be achieved in any event.

20 Counsel advised that, provided that the cancellation of the trailer leases and the sale of the trailers did not result in the financial position of TMC deteriorating so that it was unable to pay its debts as they fell due, no creditor would be in a position to petition for winding up before the end of the 12-month period; so that there was no reason, on that ground, why the trailers should not be sold. Nevertheless, counsel went on to advise against that course on other grounds. First, that there was a risk of challenge to the transaction under section 238 of the Act unless the sale (and the surrender of the trailer leases) were each effected at full value; and, second, that there was a risk that the present directors of TMC would be held liable for wrongful trading under section 214 of the Act. As he explained:

> "The basis of such liability would be that, once TMC had sold virtually all its assets and virtually all its leases had been cancelled, its directors ought to have concluded that there was no reasonable prospect of its avoiding going into insolvent liquidation. In other words it seems to me to be very difficult for the present directors of TMC to adopt the proposed middle course: either TMC ought to continue trading to an extent which generates sufficient income for it to pay its debts as they fall due so that it can plausibly appear to be a going concern, or it ought to cease trading altogether (in which case a winding up petition is likely to be presented soon afterwards). To wind its activities down in the manner suggested is such a clear preparation for a subsequent liquidation that the directors could well be criticised for not having ceased those activities altogether."

21 It appears from an attendance note made by the solicitors shortly after that opinion had been received that counsel's advice was accepted. The note, dated 28 October 1993, records:

> "It was, therefore, agreed that Mr [Monti] would go ahead and sell the four trailers which he appeared already to have done a deal and to retain the 22 trailers until on or after 1 January 1994 when they would be sold off, the company would then subsequently be placed into liquidation probably by Ramac Holdings Ltd issuing winding up proceedings."

The judge found that nearly all of the remaining 22 trailers were sold by the company "as the year ended"—rather than "on or after 1 January 1994"—but nothing turns on that.

22 If counsel's scheme was to secure the objective for which it had been devised, it was necessary to avoid circumstances in which the landlord of the Sandwich premises, Ramac, presented a petition for the winding up of the company during 1993. This was recognised, expressly, in the opinion of 14 October 1993 to which I have just referred; but it was implicit in counsel's earlier advice. The need was identified in a letter dated 13 May 1993 from Mr David Saunders, the solicitor dealing with the matter on behalf of the company, to the company secretary, Mr Eddie Borgers. After

informing Mr Borgers of a letter from Ramac's solicitors threatening the issue of a writ in respect of unpaid rent, service charges and insurance, Mr Saunders wrote:

> "I am concerned because in the scheme devised to remove from the premises at unit 6 and set up the new TMC it is an essential element that rent and other expenses made payable to the landlord are kept up to date for a period of at least 12 months in order that former directors and company secretary of the old TMC are (a) not criminally liable and (b) to prevent Ramac, as creditors, from seeking to set aside a transaction or pursue new TMC or its directors and company secretary for the outstanding moneys. If these outstanding debts remain outstanding, then I am fearful that the scheme will fail and considerable problems will ensue."

**23** It will be necessary to examine, in some detail, the steps which were taken, following that letter, to forestall the issue of a writ, or the presentation of a winding up petition, in respect of the company's debt to Ramac. It is sufficient to note, at this point, that those steps did not extend beyond the end of 1993. On 13 January 1994 Mr Saunders was able to report to Mr Bernasconi that "we have successfully utilised the one year period for the purpose of offloading the premises at Sandwich Industrial Estate." It was not until 18 September 1994 that Ramac served a statutory demand for the amount of the rent then due (£112,478). That was followed by the presentation of a winding up petition on 10 November 1994. As I have said, the company was wound up by the court on 20 December 1994. The liquidator was appointed on 3 March 1995.

**24** The liquidator disclaimed the leases of the Sandwich premises—as he was entitled to do under section 178(2) of the Insolvency Act 1986. The effect of the disclaimer was to determine the continuing liabilities of the company in respect of those premises—see section 178(4)(a); but Ramac was entitled to prove as a creditor in the liquidation for the loss which it had suffered: see section 178(6) of the Act and the analysis in *In re Park Air Services plc* [2000] 2 AC 172, 184A–G. The judge was told that a proof by Ramac in the sum of £621,980·41—representing the discounted value of the loss of the right to future rent after giving credit for receipts to be obtained on reletting—had been admitted by the liquidator.

*The liquidator's pleaded case*

**25** Section 213 of the Insolvency Act 1986 is in these terms:

> "(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.
>
> "(2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper."

**26** The liquidator's case in relation to the allegation of fraudulent trading under section 213 of the Act is pleaded at paragraphs 18–24 of the points of claim dated 11 November 1997. Paragraph 18 contains the

A allegation that, from 16 February 1993, the company was in default of its obligations for rent, service charges and interest charges under the leases. Paragraph 19 alleges that, from 13 May 1993, Ramac (through its solicitors) was demanding payment of the moneys due; and (on particular dates specified) was threatening proceedings to recover those moneys. Paragraphs 20 and 21 are in these terms, so far as material:

B "20. In all instances Nicholas Bennett [the company's solicitors] wrote to Ramac's solicitors, adopted the tactics of either seeking time to pay, or to reschedule payments, or making some small payment on account . . . The purpose of such tactics was to ensure that Ramac did not commence proceedings or present a winding up petition until 12 months from the date when new TMC commenced trading as a haulier, being 23 December
C 1993.

"21. By seeking time to make payments due, and/or making the company liable for interest on the outstanding sums, throughout 1993 the respondents caused the company to incur credit at a time when they knew or ought to have known that the company was unable to pay the sums due and/or had no intention of paying the same."

D Paragraph 22 of the points of claim pleads the disposal of the trailers in late 1993. Paragraphs 23 and 24 are in these terms:

"23. The course of trading by the company through the respondents . . . was intended to deceive Ramac into believing that it would be paid the sums due under the leases in due time or within an agreed rescheduling time when at all times the said respondents knew or
E intended that no moneys would be paid after 23 December 1993. No moneys were paid after 8 December 1993. As at 23 December 1993 over £35,000 plus interest was owing to Ramac.

"24. In the premises, the respondents . . . have been knowingly parties to the carrying on of the business of the company to defraud creditors of the company and for other fraudulent purposes."

F **27** On 28 July 2000 Arden J directed that a list of issues be served with the skeleton arguments. The list served on behalf of the liquidator included, as issue 6(b): "In any case, did the defendants conduct the business of the company . . . (b) with the purpose of ensuring that the transfer of assets pursuant to the scheme could not be challenged and to avoid personal or criminal liability?" At the trial, counsel for the former directors, Miss Hoffmann, took the point that it had not been alleged by the liquidator
G in his pleading that conduct of the business for the purpose identified in issue 6(b) amounted to fraudulent trading for the purposes of section 213 of the 1986 Act. The judge [2001] 2 BCLC 1, 34–35, paras 111–114 upheld that objection. It is, I think, important to note what he said:

"111. Mr Chivers [counsel for the liquidator] summarised the liquidator's claim in opening as a claim that Mr Monti and Mr Bernasconi
H dishonestly persuaded Ramac to hold off the commencement of legal proceedings until the 12-month period required by the scheme had elapsed and that their intention was to pay the minimum required to keep Ramac at bay, notwithstanding that nothing further should be paid after December 1993.

"112. Mr Chivers acknowledged on behalf of the liquidator that the present claim would not have arisen if the company had during the 12-month period simply paid the current rent. The liquidator alleges that the trading became fraudulent by reason of lies to Ramac as to intention to pay rent and comply with obligations. Though the particulars of claim at para 20 referred to the tactic of seeking time to pay or reschedule payments as a tactic designed to ensure that Ramac would not commence proceedings or the presentation of a winding up petition during the 12-month period, the deception alleged at paragraph 23 was that the company intended to deceive Ramac into believing that it would be paid sums due under the leases or as rescheduled when it was known or intended that no moneys would be paid after 23 December 1993. It is not understood that the liquidator seeks to allege that the tactic of avoiding proceedings or a petition of itself is fraudulent trading.

"113. The particulars of fraudulent trading do not allege that the transfer of the company's assets or the preference of other creditors at the expense of Ramac's right to future rents etc during the 12-month period were wrongful or a misfeasance, so as to amount to fraudulent trading. I have cited part of paragraph 22 of the particulars, which refers to the sale of vehicles and trailers. Those full particulars had gone on to say that the sums received from the disposal of vehicles and trailers were paid to PPM in discharge of its loan to the company, a particular preference claim. That latter claim was however abandoned. The evidence is that the sales were at or above market value. Though Mr Chivers asked me to note in connection with the particulars the fact of the disposals, he did not allege that they amounted to fraudulent trading.

"114. I summarised at paragraph 62 above expectations of the scheme on the face of counsel's second opinion and the attendance note of 24 September 1992. In determining or purporting to follow the scheme it is obviously correct that Mr Monti and Mr Bernasconi intended the transfer of assets out of the company during the 12-month period. Their expectation should have been, to the extent that the scheme was followed, that such transfers would not be challenged and they would avoid personal liabilities, as those had been identified by counsel. It does appear to me that, as Miss Hoffmann submitted, to allege that causing the company to carry on business for those scheme reasons was fraudulent trading would be to raise a new case. Further, that case would be substantially inconsistent with Mr Chivers's disavowal of any challenge to the implementation of the scheme, in so far as it was followed. Mr Chivers did not seek to make any amendment to the claim. In consequence, I do not understand that bare issue 6(b) purposes would demonstrate fraudulent trading for the purposes of this claim."

At paragraph 140 of his judgment the judge repeated that "it is not the fraudulent trading case of the liquidator that it was dishonest to prefer creditors at the expense of the landlord". He concluded:

"Given the absence of a relevant plea and the *Sarflax* point"—a reference to the decision of Oliver J in *In re Sarflax Ltd* [1979] Ch 529—"I do not consider it would be right to find dishonesty arising from the pursuit of the scheme, in the absence of independent directors."

The judge's reference, there, to "the absence of independent directors" indicated that he had recognised that counsel's scheme had not contemplated the appointment of Mr Bernasconi's father in law as sole director of the company following the resignation of Mr Monti and Mr Bernasconi. Nevertheless—and notwithstanding that departure from the scheme which counsel had advised could safely be pursued—the judge did not allow the liquidator to advance a case based on the submission that conduct of the business for the purpose identified in issue 6(b) amounted to fraudulent trading.

28 The position, therefore, was that the only conduct upon which the liquidator relied at the trial in support of his claim that the former directors were parties to fraudulent trading was the deception of Ramac "into believing that it would be paid the sums due under the leases in due time or within an agreed rescheduling time when at all times the said respondents knew or intended that no moneys would be paid after 23 December 1993". It is necessary, therefore, to consider what was said to Ramac during 1993.

*The representations made to Ramac during 1993*

29 As I have said, Ramac (through its solicitors) had demanded payment of outstanding rent and other sums due by letter dated 13 May 1993. Mr Saunders had been concerned that such demand put the implementation of counsel's scheme at risk; and had written to Mr Borgers. Mr Saunders sought instructions from Mr Bernasconi at a meeting on 19 May 1993. His attendance note records:

> ". . . I discussed at some length with Mr Bernasconi the threat made by Ramac Holdings Ltd through their solicitors to issue a writ for unpaid moneys of £33,000. Mr Bernasconi agreed that the only matter in dispute was damage to a wall at unit 6. Apart from this, they had no alternative but to agree the figures outstanding and, after some discussion, it was agreed that the following would be proposed."

30 Following those instructions, Mr Saunders wrote to Ramac's solicitors on 20 May 1993. His letter included these paragraphs:

> "This [notice of a planning application made by Ramac] is of considerable concern to our clients as they instruct us that they still intend to use the buildings at Sandwich for international freight forwarding, storage and additional warehousing space to include the representation of foreign haulage companies using Port Ramsgate. Negotiations are continuing in this respect and, in the circumstances, they strongly object to any proposed development particularly if it should affect their business . . .
>
> "So far as the outstanding moneys are concerned, our clients reply as follows:
>
> "1. The sum of £2,986.50 said to be in respect of 'repairs to wall' as it relates to building 6 has always been in dispute and, indeed, is the subject of correspondence entered into between ourselves and your clients in the past. These matters are continuing.
>
> "2. The majority of the amount outstanding represents payment of rent and insurance in the future months. Due to our clients' concern with regard to the above, they are quite prepared to pay the balance by

> instalments, and quickly, provided that they are made fully aware of what is to happen in the future. As a gesture of good faith and their willingness to pay the outstanding amount, we enclose our clients' cheque for £7,466·00 in part settlement of the outstanding amount. Please acknowledge receipt."

31 Ramac's solicitors were not content with the proposal that the moneys outstanding would be paid by instalments. They pointed out that, under the terms of the leases, rent, service charges and insurance were payable in advance; and described the letter of 20 May 1993 as "a smoke screen for payment on a monthly basis". They continued to threaten the issue of a writ.

32 On 25 May 1993 Mr Saunders wrote to Mr Bernasconi, noting his instructions "to delay matters for as long as possible". On 28 May 1993 he was able to put a proposal to Ramac's solicitors for payments of £10,000 in June and July, with a final payment of £2,951 in August to clear the outstanding balance. By early June 1993 that proposal had been accepted. The instalments were paid in accordance with the proposal.

33 The next quarterly rents (£18,800) fell due on 24 June 1993; but were not paid. Ramac's solicitors sought payment by letters dated 2 and 26 July 1993. On 12 August 1993 Mr Saunders explained that he was awaiting his clients' instructions. He wrote: "They would hope to be able to put forward some proposals shortly in connection with an instalment option". No proposals were forthcoming. On 2 September 1993 Mr Saunders wrote to Mr Bernasconi:

> "I have managed to stall Ramac's solicitors for some time now but, unfortunately, they are becoming more aggressive. It would be helpful if you could please give me TMC's instructions for payment by instalments to include the June and September payments of rent. I am sorry to mention this to you but it is urgent."

There was no response to that request. On 14 September 1993 Ramac's solicitors threatened proceedings. That threat, when relayed to Mr Bernasconi, prompted payment of £5,000 "on account". A further £5,000 was sent on 12 October 1993 "in part satisfaction of the outstanding debt". By that date, of course, the quarterly rents due at Michaelmas were in arrears. A statement sent by Ramac's solicitors on 15 October 1993 showed the amount outstanding to be £36,749·24.

34 Mr Saunders wrote again to Mr Bernasconi. He pointed out that Ramac was threatening to issue proceedings within the next seven days; and explained what might follow:

> "The effect of issuing proceedings will be that you will then have 14 days in which to defend the proceedings and/or judgment will be entered against you in the sum outstanding less the sum of £2,986·50 with regard to the repairs to the wall of building 6 which is, of course, disputed. Ramac will then proceed to try and enforce the order either by the issue of a winding up petition and, clearly, we do not wish this to be heard before 1 January 1994 in view of the scheme devised by counsel. I recommend that we make a relatively substantial further payment and, at the same time, arrange a definite date for a meeting in order that these matters can be dealt with and to prevent Ramac taking the matter

A through to the next stage. However the alternative would be to leave matters as they are and allow legal proceedings to take their course with the eventual enforcement proceedings resulting from a judgment obtained by Ramac against your company. This may take some time but I cannot guarantee that I can delay matters until after the New Year."

35 By 22 October 1993 Mr Saunders was in a position to promise B Ramac's solicitors that a further £5,000 would be paid by the end of the month. That sum was paid on 1 November 1993. An attendance note of a meeting on 28 October 1993, at which Mr Monti and Mr Bernasconi were present, records that it was agreed that "we would try and stall as long as possible". On 29 October 1993 Mr Saunders was able to write to Mr Bernasconi expressing pleasure that "we have been able to stall Ramac C Holdings sufficiently in order that they do not, as yet, appear to be in a position to wind up TMC Transport (UK) Ltd". As he put it: "In that regard, we have been extremely successful."

36 Two more weeks went by. On 12 November 1993 Ramac's solicitors threatened the issue of a writ by close of business that day unless proposals were forthcoming. The response was a letter from Mr Saunders of the same date. He wrote:

D "We have made a considerable amount of effort to obtain instructions from our client and have, at long last, been able to contact them abroad. Our instructions are as follows. (1) Our clients will make payment of the sum of £5,000 by next Wednesday, that is 17 November 1993. (2) There will be a further payment by way of a second tranche of £5,000 on Wednesday, 8 December 1993. (3) Our clients will make a further E payment of £10,000 on Wednesday, 29 December 1993. (4) They are prepared to meet with your clients at a venue to be appointed on Wednesday, 12 January 1994 when it is anticipated that they will be in a position to either pay the balance owed to your client company or, alternatively, to make proposals to pay the balance. We trust that this is acceptable to your clients and await hearing from you that you are not F issuing a writ in respect of these matters. Our clients have instructed us that if a writ is so issued then they will take a different attitude towards the question of repayment. The structured settlement proposals that they have suggested are arranged in such a way that they hope that they can meet their financial obligations towards your clients."

On 16 November 1993 Mr Saunders was able to report to Mr Bernasconi G that (subject to a request that the payments be made by post-dated cheques) "all appears to be agreed and, once again, we have been able to avoid the issue of a writ". He asked for instructions whether post-dated cheques could be offered; pointing out that "Clearly, the object of the exercise is to make as small a payment as possible prior to the end of the year."

37 The first instalment of £5,000 promised by the letter of 12 November 1993 was paid on 19 November 1993. It was agreed that the date for H payment of the third instalment should be brought forward to 23 December 1993. Mr Saunders explained to Mr Bernasconi that that made no difference to the position. On 25 November 1993 he wrote:

"The mere fact of bringing forward the schedule payment date from 29 to 23 December is not is any practical use [sic] in that, even if

proceedings are issued on that date, judgment could not be obtained until at least 14 days has elapsed from the date of service of the proceedings which would, in effect, take us to 7 January 1994. I am sure that you are pleased by developments . . ." A

38 The second instalment of £5,000 promised by the letter of 12 November 1993 was paid on 8 December 1993. The third instalment—£10,000 on 23 December 1993—was never paid. As I have already noted, on 13 January 1994 Mr Saunders was able to report to Mr Bernasconi that "we have successfully utilised the one-year period for the purpose of off-loading the premises at Sandwich Industrial Estate". B

*The judge's conclusions as to fraudulent trading*

39 I have explained that the liquidator's case at trial was that Ramac was deceived into a belief that it would be paid the sums due under the leases in due time or within an agreed rescheduling time "when at all times the said respondents knew or intended that no moneys would be paid after 23 December 1993"; and that it was that deception on the part of Mr Bernasconi and Mr Monti (through Mr Saunders)—and that alone—which constituted fraudulent trading. As the judge put it [2001] 2 BCLC 1, 21, para 69: C D

> "the essence of the particulars of fraudulent trading alleged against Mr Monti and Mr Bernasconi (and the solicitors) has been [the] very stalling of which Mr Saunders was reporting in correspondence . . . in 1993 . . . coupled with the unwarranted incurring of credit and deception as to the intention to pay instalments after 23 December 1993. The liquidator does not seek to complain that Mr Monti and Mr Bernasconi sought to implement the scheme." E

40 The judge accepted that "a purpose of the company's business in 1993 was to carry on for a 12-month period without being wound up". He identified, as the reason underlying that purpose, "Counsel's advice by his second opinion that the survival for 12 months would enable Mr Monti and Mr Bernasconi to avoid restrictions on the use of the TMC name under section 216 of the 1986 Act." He accepted that "the company, through Mr Saunders at the direction of Mr Bernasconi and Mr Monti, did from May 1993 onwards, represent that Ramac would [be paid] outstanding rent subject to demand by instalments." But he was satisfied that "representations as to the payment of outstanding rentals were true, save in regard to the final instalment offered on 12 November 1993". In particular, he declined to hold that the representations which were made during 1993 were representations as to the payment of rents falling due in the future. His conclusions are summarised [2001] 2 BCLC 1, 39–40, paras 130–131: F G

> "130. The liquidator's pleaded case may be read as suggesting that misrepresentations were made as to an intention to pay rents after 23 December 1993. The company was contractually bound to make such payments. None the less, I do not consider that the 1993 representations carried with them at least before the letter of 12 November 1993 and the suggestion of a meeting on 12 January 1994, any representation as to intentions beyond the time of the instalments that were offered. H

"131. In the result, I have come to the conclusion, in regard to false representations in so far as they were given for intention and purpose relevant to section 213, that the liquidator has simply made out relevant intent in regard to the promise of an instalment of £10,000 on 23 December 1993. Mr Monti and Mr Bernasconi did, in my judgment, intend to defraud Ramac in the sense of misleading it as to the company's intention to pay the 23 December 1993 instalment. The misrepresentation was made on 12 November 1993."

41 The question for the judge, in the light of his finding that Mr Monti and Mr Bernasconi intended to mislead Ramac on 12 November 1993 (and thereafter) by promising a payment of £10,000 on 23 December 1993 which they knew would not be made, was whether, from 12 November 1993, "any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose": see section 213(1) of the 1986 Act. The judge had directed himself, earlier in his judgment, at para 86, that: "the defrauding of a single creditor by a single transaction can properly be described as the carrying on of a business to defraud creditors. Further the carrying on of business can include the collection and distribution of assets in payment of debts." The second of those propositions is not, I think, in doubt: see *In re Sarflax Ltd* [1979] Ch 592, 599A–C, applying *Theophile v Solicitor General* [1950] AC 186 and *In re Bird, Ex p The Debtor v Inland Revenue Comrs* [1962] 1 WLR 686. The judge found support for the first of those propositions in *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262—to which I shall need to return. His conclusion that the business of the company had been carried on with intent to defraud is expressed [2001] 2 BCLC 1, 40–41, para 134:

"It follows in my judgment that the liquidator has made out relevant intent or purpose for the purpose of section 213 in regard to the period from 12 November 1993 when Mr Monti and Mr Bernasconi had no intention that the company should pay the final instalment then being suggested to Ramac nor any intention to attend a meeting with it the following January. I am not satisfied that a relevant intent or purpose is made out prior to that date. The relevant trading continued until the year's end or just into 1994, as the last vehicles were sold off and the company ceased trading."

*The first issue: was the business of the company carried on with intent to defraud?*

42 The first issue for decision on this appeal is whether the judge was correct to hold that the business of the company was carried on, from 12 November 1993, with intent to defraud creditors or for other fraudulent purposes within the meaning of section 213 of the Insolvency Act 1986. On the findings of fact which the judge made, the only creditor in relation to whom Mr Monti and Mr Bernasconi could be said to have had an intent to defraud was Ramac; and the only relevant intention in relation to Ramac was to mislead it by the promise, on 12 November 1993, of a payment which they knew would not be made. It is necessary to keep in mind that, but for the deception which flowed from the promise of payment, the judge would not have held that the business was carried on after 12 November 1993 for any fraudulent purpose. In particular, he did not hold that the carrying on of

the business in the knowledge that Ramac would not be paid moneys which were due to it was, of itself, a fraudulent purpose. It is clear that the liquidator had taken the view that, in the light of the decision in the *Sarflax* case [1979] Ch 592, the case could not be advanced on that basis. A

43 Miss Hoffmann, who appeared for Mr Monti and Mr Bernasconi on this appeal as she did in the court below, pointed out, correctly, that not every fraud or fraudulent misrepresentation perpetrated by a company amounts to fraudulent trading under section 213 of the 1986 Act. That was made clear by the observations of Oliver J in *In re Murray-Watson Ltd* (unreported) 6 April 1977 which are cited and explained by Templeman J in *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262, 267. In the *Murray-Watson* case Oliver J had said this, of what was then section 332 of the Companies Act 1948 (the statutory predecessor of section 213 of the 1986 Act): B C

> "[The section] is aimed at the carrying on of a business . . . and not at the execution of individual transactions in the course of carrying on that business. I do not think that the words 'carried on' can be treated as synonymous with 'carried out', nor can I read the words 'any business' as synonymous with 'any transaction or dealing'. The director of a company dealing in second-hand motor cars who wilfully misrepresents the age and capabilities of a vehicle is, no doubt, a fraudulent rascal, but I do not think he can be said to be carrying on the company's business for a fraudulent purpose, although no doubt he carries out a particular business transaction in a fraudulent manner." D

In the *Cooper Chemicals* case [1978] Ch 262 Templeman J accepted that analysis. He said, at p 267: E

> "In the example given by Oliver J [in *Murray-Watson*'s case] the dealer was carrying on the business of selling motor cars. He did not carry on that business with intent to defraud creditors if he told lies every time he sold a motor car to a customer or only told one lie when he sold one motor car to one single customer. When the dealer told a lie, he perpetrated a fraud on the customer, but he did not intend to defraud a creditor. It is true that the defrauded customer had a right to sue the dealer for damages, and to the extent of the damages was a contingent creditor, but the dealer did nothing to make it impossible for the customer, once he had become a creditor, to recover the sum due to him as a creditor." F

44 Nevertheless, the judge relied on the *Cooper Chemicals* case as authority for the proposition that the defrauding of a single creditor by a single transaction can properly be described as the carrying on of a business with intent to defraud creditors: see the passage [2001] 2 BCLC 1, 26, para 86 to which I have already referred. It is necessary, therefore, to have the facts of that case in mind. The company, through a subsidiary, was engaged in the production of indigo. It had obtained finance by way of loan, the principal amount of which was repayable on 30 June 1976. The company was in no position to make that repayment save from forward sales of indigo against pro-forma invoices. It was alleged that the loan creditor and its directors knew that, if moneys paid in advance in respect of forward sales were applied in repayment of the loan rather than for the G H

purpose of the production of indigo, no indigo would be available to satisfy the customer's order. On 19 August 1976, the company obtained an order from Harrisons (London) Ltd for the delivery of 5,000 kilos of indigo; and, on the following day, received prepayment from Harrisons in respect of that order of an amount in excess of £125,000. Part of those moneys (£110,000) were immediately paid by the company to the loan creditor (Jimlou Ltd). The company failed to deliver the indigo for which it had been paid; and subsequently went into liquidation. Harrisons brought proceedings under section 332 of the 1948 Act against the loan creditor and its directors for a declaration that they were knowingly party to the carrying on of the company's business with intent to defraud. The respondents sought to strike out those proceedings on the ground that there was no sufficient allegation of fraudulent trading. Templeman J dismissed that application.

45 In the course of his judgment in the *Cooper Chemicals* case [1978] Ch 262 Templeman J said, at pp 267–268:

> "In my judgment, when Mr Cooper on behalf of the Cooper companies sought from Harrisons an order for indigo on advance payment terms, Mr Cooper was carrying on the business of the Cooper companies. When the Cooper companies accepted advance payment of £125,698-odd, Mr Cooper knowing that there was no prospect, or no reasonable prospect or intention of supplying indigo, and no intention of returning the money to Harrisons, the business of the Cooper companies was carried on fraudulently. The subsequent payment to Jimlou of £110,000 made the fraudulent carrying on of the business irremediable and constituted a fraud on the then creditor, Harrisons. The whole transaction between the Cooper companies and Harrisons constituted the carrying on of the business of the Cooper companies with intent to defraud a creditor of the company. Save that only one creditor was involved, the situation appears to meet the requirements of section 332 set forth by Oliver J in *In re Murray-Watson* to which I have already referred, namely, that the section is contemplating a state of facts in which the intent of the person carrying on the business is that the consequence of carrying it on (whether because of the way it is carried on or for any other reason) will be that creditors will be defrauded, 'intent', of course, being used in the sense that a man must be taken to intend the natural or foreseen consequences of his act . . . In the present case, the Cooper companies were carrying on the business of selling indigo. In my judgment, they carried on that business with intent to defraud creditors if they accepted deposits knowing that they could not supply the indigo and were insolvent. They were carrying on business with intent to defraud creditors as soon as they accepted one deposit knowing that they could not supply the indigo and would not repay the deposit. It does not matter for the purposes of section 332 that only one creditor was defrauded, and by one transaction, provided that the transaction can properly be described as a fraud on a creditor perpetrated in the course of carrying on business. If the Cooper company had fraudulently supplied sub-standard indigo to Harrisons, the Cooper company would have committed a fraud on a customer, but by accepting a deposit knowing that they could not or would not supply indigo, and by using the deposit in a way which made it

impossible for them to repay Harrisons, the Cooper company, in my judgment, committed a fraud on a creditor." A

46 For my part, I would accept that a business may be found to have been carried on with intent to defraud creditors notwithstanding that only one creditor is shown to have been defrauded, and by a single transaction. The *Cooper Chemicals* case is an example of such a case. But, if (which I doubt) Templeman J intended to suggest that, whenever a fraud on a B creditor is perpetrated in the course of carrying on business, it must necessarily follow that the business is being carried on with intent to defraud creditors, I think he went too far. It is important to keep in mind that the precondition for the exercise of the court's powers under section 332(1) of the 1948 Act—as under section 213 of the 1986 Act—is that it should appear to the court "that any business of the company has been carried on C with intent to defraud creditors of the company". Parliament did not provide that the powers under those sections might be exercisable whenever it appeared to the court "that any creditor of the company has been defrauded in the course of carrying on the business of the company". And, to my mind, there are good reasons why it did not enact the sections in those terms.

47 Until the decision of this court in *In re Cyona Distributors Ltd* D [1967] Ch 889, it was generally thought that the powers which section 332 of the 1948 Act conferred on the court were exercisable for the benefit of creditors as a class and not for the benefit of individual creditors: see the judgment of Russell LJ, at pp 906–908. In the *Cyona* case the majority in this court (Lord Denning MR and Danckwerts LJ) took a different view—at least in a case where the application under section 332 was made (as it could E be under that section) by an individual creditor. But the view of the majority in *Cyona*'s case cannot have survived the enactment of section 213 of the 1986 Act. An application under that section cannot be made by an individual creditor; it can only be made by the liquidator. And the order which the court can now make under section 213 is for contribution to the company's assets: cf the observations of Russell LJ, in the *Cyona* case, at p 907D–E. There is no longer power to declare that persons party to the F carrying on of the company's business with intent to defraud shall be personally liable for particular debts, or (as was held in the *Cyona* case) to particular creditors. An individual creditor who is defrauded in the course of the carrying on of the business of the company has his individual remedy under the general law. Section 213 of the 1986 Act is not engaged in every case where an individual creditor has been defrauded. The section is G engaged only where the business of the company has been carried on with intent to defraud.

48 In my view it is impossible to reach the conclusion—on the facts found by the judge in the present case—that the business of the company was carried on after 12 November 1993 (but not before) with intent to defraud creditors—or, in particular, with intent to defraud a single creditor, H Ramac. The business of the company was carried on throughout 1993 (as well before as after 12 November) with intent to protect Mr Monti and Mr Bernasconi (as former directors) from the penalties to which they would otherwise be exposed under section 216 of the 1986 Act as directors of Newco. It was inherent in counsel's scheme that, when the company did go

A into insolvent liquidation (as it was intended that it would at the end of the 12-month period), Ramac would be an unpaid creditor. The liquidator does not suggest that the carrying on of the business of the company with the intent to protect the former directors from penalties under section 216 of the Act—and with the knowledge that, on liquidation, Ramac would be an unpaid creditor—is, of itself, sufficient to engage section 213 of the Act. The only matter relied on is the promise, in the letter of 12 November 1993, that B Ramac would be paid an instalment of outstanding rent at the end of December. The promise was intended to mislead; in the sense that it was intended to persuade Ramac that its interests were best served by not taking proceedings (including the presentation of a winding up petition) to enforce the debt which it was then owed. But it has not been shown that, by carrying on of the business of the company during the period that Ramac C was so misled, Mr Monti or Mr Bernasconi intended to defraud Ramac; or, indeed, that the carrying on of the business of the company did defraud Ramac—in the sense that Ramac's claim as a creditor in the liquidation was prejudiced by the carrying on of the business between 12 November 1993 (when, but for the misleading promise, Ramac might have presented a petition) and 23 December 1993 (when the promised payment was not forthcoming).

D 49 For those reasons, I would hold that fraudulent trading within section 213 of the 1986 Act has not been made out in the present case; and would allow the cross-appeal on that ground.

*The remaining issues*

50 It follows that I am of the view that it is unnecessary to decide the E remaining issues raised by the appeal and cross-appeal. But, in the circumstances that they were fully argued before us, I think it appropriate to address them. I can do so shortly.

51 The judge declined to hold Mr Monti and Mr Bernasconi party to fraudulent trading prior to 12 November 1993 on the ground that "representations as to the payment of outstanding rentals" made before the F letter of 12 November 1993 "were true". As he put it [2001] 2 BCLC 1, 37, para 121:

> "The instructions given to Mr Saunders on 19 May 1993 were that the outstanding rentals should be paid by such instalments as he could negotiate . . . The company, acting at the relevant direction, was seeking to delay payments of the 1993 current rents but was not seeking to avoid those rents, at least at that stage."

G

As I have said, the judge was not asked to find that it was inherent in the implementation of counsel's scheme that Ramac be deceived as to the business that the company was actually carrying on during 1993; nor as to the company's intentions as to the future. Nevertheless, it is, I think, clear that he did take the view that, in practice, the scheme could not have been implemented without deception: see the observations at pp 18–19, para 64. H I agree with that view. But, given that the judge found that Mr Monti and Mr Bernasconi thought that, in implementing the scheme, they were following the advice of counsel and solicitors, he was plainly correct (in the absence of a finding of dishonesty in relation to the representations made before 12 November 1993) to hold that a case of fraudulent trading prior to

that date had not been made out. The liquidator could not have succeeded in this court on the issue raised by ground 1 in his appellant's notice. A

52 In the light of his finding that they had been parties to fraudulent trading after 12 November 1993, the judge assessed the contribution to be made by Mr Monti and Mr Bernasconi at £17,500 (exclusive of the punitive element, also £17,500). He did so on the basis that that was the amount which the company would have had to pay to Ramac "to buy off a writ issued on or shortly after 12 November 1993": [2001] 2 BCLC 1, 42–43, 46, paras 145, 160. That might or might not have been the correct measure of damage in an action brought by Ramac in the tort of deceit—given the judge's view that, but for the deceptive promise made in the letter of 12 November 1993, Ramac would have issued proceedings for outstanding rent, which the company would have then paid—but it is not, in my view, the proper basis on which to assess the amount of contribution to be made under section 213 of the 1986 Act. B C

53 The power under section 213(2) is to order that persons knowingly party to the carrying on of the company's business with intent to defraud make "such contributions (if any) to the company's assets" as the court thinks proper. There must, as it seems to me, be some nexus between (i) the loss which has been caused to the company's creditors generally by the carrying on of the business in the manner which gives rise to the exercise of the power and (ii) the contribution which those knowingly party to the carrying on of the business in that manner should be ordered to make to the assets in which the company's creditors will share in the liquidation. An obvious case for contribution would be where the carrying on of the business with fraudulent intent had led to the misapplication, or misappropriation, of the company's assets. In such a case the appropriate order might be that those knowingly party to such misapplication or misappropriation contribute an amount equal to the value of assets misapplied or misappropriated. Another obvious case would be where the carrying on of the business with fraudulent intent had led to claims against the company by those defrauded. In such a case the appropriate order might be that those knowingly party to the conduct which had given rise to those claims in the liquidation contribute an amount equal to the amount by which the existence of those claims would otherwise diminish the assets available for distribution to creditors generally; that is to say an amount equal to the amount which has to be applied out of the assets available for distribution to satisfy those claims. In the present case there is nothing to suggest either (i) that the deception which the judge found to have been practised on Ramac led to the misapplication or misappropriation of the company's assets, or (ii) that the letter of 12 November 1993 led Ramac to make a claim in the liquidation that it would not otherwise have had. In my view there was no material on which the judge could have reached the conclusion that it was correct to order contribution of £17,500, or any other sum. D E F G

54 The judge added a punitive element to the amount which he would otherwise have regarded as sufficient "simply to reflect the loss I find attributable to Ramac". He did so for the reasons which he expressed [2001] 2 BCLC, 1, 46, para 161: H

> "I could not punish Mr Monti and Mr Bernasconi for matters which are not alleged or not found by me to have amounted to fraudulent

trading. Nonetheless, the scheme which they purported to follow foreshadowed the due payment of rent during the 12 month period supposedly to preserve the TMC name in Mr Monti's hands. Mr Monti and Mr Bernasconi did not conduct the affairs of the company in that 12-month period to ensure that it had cash in hand promptly to pay rent for the full 12-month period. They could have done so. They preferred to pursue the instalment route and then dishonestly to represent that a further £10,000 would be paid off arrears on 23 December 1993. To compound the intention to cause the company's assets to escape Ramac's claim to future rent by such dishonesty would merit punishment and I consider Mr Monti and Mr Bernasconi should be liable to pay an additional £17,500 contribution."

55 The judge had found that Mr Monti and Mr Bernasconi had been advised that they were entitled "to cause the company's assets to escape Ramac's claim to future rent" by applying those assets in payment of other creditors. They were entitled to think that preferring some creditors to others was not dishonest. The dishonesty lay in promising (in the letter of 12 November 1993) a payment of £10,000 which they did not intend to make. I accept that the dishonesty which the judge found deserved criticism; but, for my part, I cannot see that it compounded (or was compounded by) dishonesty which the judge did not find to have been made out. Be that as it may, I am not persuaded that there is power to include a punitive element in the amount of any contribution which, in the exercise of the power conferred by section 213(2) of the 1986 Act, a person should be declared liable to make to the assets of the company. As I have said, I think that the principle on which that power should be exercised is that the contribution to the assets in which the company's creditors will share in the liquidation should reflect (and compensate for) the loss which has been caused to those creditors by the carrying on of the business in the manner which gives rise to the exercise of the power. Punishment of those who have been party to the carrying on of the business in a manner of which the court disapproves—beyond what is inherent in requiring them to make contribution to the assets of a company with limited liability which they could not otherwise be required to make—seems to me foreign to that principle. Further, the power to punish a person knowingly party to fraudulent trading—formerly contained in section 332(3) of the 1948 Act—has been re-enacted (and preserved) in section 458 of the Companies Act 1985. It could not have been Parliament's intention that the court would use the power to order contribution under section 213 of the 1986 Act in order to punish the wrongdoer. In my view, had the judge been right to find fraudulent trading in the present case, he would, nevertheless, have been wrong to include a punitive element in the amount of contribution which he ordered.

56 If the punitive element were excluded—as I think it should have been—I can see no basis upon which Mr Monti and Mr Bernasconi could have been required to make a contribution which went beyond that needed to compensate the creditors of the company (including Ramac) for the loss attributable to the fraudulent trading to which the judge had held that they were knowingly party. On the basis that (on the judge's view) the creditors had already been over-compensated by the payment of £75,000 made by the solicitors, there was no reason to require further payment to be made by

the directors. The judge was right to treat their liability as satisfied by the solicitors' payment. A

57 In my view the judge was right, also, to make no order against Mr Monti and Mr Bernasconi in respect of the costs incurred by the liquidator after the date (13 September 2000) on which the liquidator accepted that payment. It is said that the liquidator was entitled to pursue them for contribution for so long as there was a possibility that Accoulis might claim in the liquidation in competition with Ramac. B But there was nothing to suggest that that was ever a real possibility—Accoulis had lodged no proof of debt—and, if that was of concern to the liquidator, he could have raised the point.

*Conclusion*

58 I would allow the applications for permission to appeal. I would C dismiss the liquidator's appeal. I would allow the directors' cross-appeal on ground 3 in their respondents' notice. In those circumstances it is unnecessary to make any order in relation to grounds 1, 2, 4 and 5 of the respondents' notice.

**MUNBY J**

59 I agree with Chadwick LJ and have nothing to add. D

**ALDOUS LJ**

60 I also agree.

*Appeal dismissed with costs.*
*Cross-appeal allowed with costs.* E

*Solicitors: Steptoe & Johnson; Stephenson Harwood*

S L D

F

G

H