# Exhibit K

# Bank of India v Morris

[2005] EWCA Civ 693
Court of Appeal (Civil Division).
Mummery and Neuberger L.JJ. and Munby J.
Judgment delivered June 22, 2005.

*Winding up – Fraudulent trading – Attribution – Fraudulent banking group – Group company entered transactions with third party bank – Transactions were circular – Group companies intended to conceal bad debts – Third party bank's general manager was told transactions to improve group's balance sheet – After second transaction manager should have known transactions not as described – Test for fraudulent trading – Whether third party knowingly participated in carrying on banking group business with intent to defraud creditors or for fraudulent purpose – Attribution of knowledge of third party – Whether knowledge of general manager of third party attributable to third party company – Appeal – Application to amend pleadings – Insolvency Act 1986, s.213.*

**This was an appeal against an order of Patten J. ([2004] B.C.C. 404) in favour of the liquidators of two companies in an insolvent banking group against a separate bank for its being knowingly a party to fraudulent trading by the insolvent companies under s.213 of the Insolvency Act 1986.**

**The banking group, "BCCI", was established in 1972 and achieved rapid growth throughout the 1980s. By the time it collapsed in July 1991, with a deficiency as regards creditors in the region of US$10 billion, the group had 110 branches in 41 countries and a number of representative offices. One of the companies, "BCCI SA" had 24 branches in this jurisdiction and its head office was in the City of London. BCCI incurred substantial losses through poor lending decisions and unsuccessful metal trading on its own account. The "Khalil" group of companies, which were owned and controlled by a Saudi Arabian businessman, Mr Khalil, were among the borrowers who, by the early 1980s, had a number of heavily overdrawn accounts with BCCI. To conceal these losses BCCI's Central Treasury Division ("CTD") embarked on a systematic and wide-scale fraud involving the manipulation of account balances.**

**In autumn 1981 "S", a senior manager in the London branch of an Indian bank, "BoI", contacted "M", who worked in the International Department at BCCI, to ask whether BCCI would be prepared to place a deposit with BCCI. It was apparently BoI's policy, and that of other Indian banks, to obtain at its year-end as many deposits as possible, as the existence of large-scale deposits was seen as an important measure of a bank's success, and S's approach to M was said to be in accordance with this policy. On November 12, 1981, in response to S's approach, M informed S that BCCI was prepared to place a deposit of £10 million for three months at a rate of 15 per cent per annum on terms that BoI was required to lend this amount to a borrower named by BCCI at 15.125 per cent. The security for the loan was to be an irrevocable letter of guarantee by BCCI. BCCI's alleged reason for this extraordinary transaction was that it improved its earnings to advances ratio; S and the board of BoI were all well aware of what was understood to be BCCI's reason. The transaction went ahead on December 2, 1981, and the borrower nominated by BCCI was "Maram", a company controlled by Mr Khalil. The transaction was effectively reversed at the end of the three-month period on March 2, 1982. A further five transactions of a similar nature were entered into between BoI and BCCI during the next four years. All were conducted between S for BoI and M for BCCI except for the sixth transaction which was entered after S had left BoI in 1985. It was not later disputed that BCCI's CTD used the moneys provided by BoI pursuant to the six transactions to credit heavily overdrawn accounts that Mr Khalil and the Khalil group had with BCCI to give the false impression that those accounts were being serviced and**

**the indebtedness was being repaid, at least to some extent, by the customer. BoI did not dispute that BCCI did not disclose the guarantees to its auditors.**

**After BCCI went into liquidation the liquidators brought a claim against BoI under s.213 of the Insolvency Act 1986 that BoI had been knowingly a party to the carrying on of the business of BCCI with intent to defraud creditors or for any fraudulent purpose and asked the court to order that BoI make such contribution to the assets of BCCI as the court thought proper. The application concerned the six transactions involving BoI and BCCI and the issue was, in summary, whether those at BoI responsible for entering into five of those transactions involving S knew that they were thereby assisting BCCI to perpetrate a fraud on its creditors. It was common ground that this allegation of knowledge must involve a finding of dishonesty. It was not disputed that the relevant knowledge was "blind-eye" knowledge which required a suspicion that the relevant facts existed and a deliberate decision to avoid confirming that they existed.**

**In relation to the first transaction Patten J. found that none of the BoI employees, including S, had the relevant knowledge in relation to what was then thought to be a one-off transaction at the year end. In relation to the second transaction the judge held that S did have the relevant knowledge, as he did in relation to the third, fourth and fifth transactions. Having seen BCCI's accounts he must by the second transaction have realised that an improvement to the advances to earnings ratio could not be achieved by the removal of loans over the year end. The circular nature of the transactions was already apparent to him and the removal of the only justification for them could have left him in no real doubt that he was in all probability dealing with a fraud of some kind. The judge further held that S's knowledge should be attributed to BoI, whose board had been content to take S's assurances in relation to the transactions at face value and left it to him to satisfy himself that it was proper for BoI to go ahead with the transactions, otherwise the policy of the Act would be frustrated if BoI could shelter behind an argument that the only relevant knowledge was that of the board. S resigned from BoI in June 1985 and he was not, therefore, working for BoI at the time when the sixth transaction took place in September 1985 and the judge held that BoI did not have the relevant knowledge in respect of that transaction. The judge quantified the contribution order under s.213(2) at US$82,302,941, with interest and costs. BoI appealed and contended that: (1) in light of the evidence before him, and in light of his assessment of that evidence, the judge could not properly have concluded that S was dishonest in relation to the four transactions in question; (2) even if the judge's findings against S were upheld, S's dishonesty could not and should not be attributed to BoI; and (3) there was, in effect, insufficient connection between the four transactions in question and the defrauding of creditors within BCCI to bring BoI within the ambit of s.213(2). The liquidators cross-appealed that, if BoI's appeal succeeded on the first and second grounds of appeal, the judge ought to have concluded that two of the directors of BoI at the time were guilty of dishonesty effectively in the same way and to the same extent as S. The liquidators also sought to amend their pleadings, if BoI succeeded on the first ground of appeal, so that BoI should be vicariously liable for S's liability under s.213(2).**

*Held*, **dismissing the appeal and cross appeal and refusing the application to amend:**

**1. In the circumstances of having carefully considered all the available evidence, including all testimony from experts, directors of BoI, other employees of BoI, and S himself, the judge reached a conclusion as to S's "blind-eye knowledge" at the time of the second, third, fourth and fifth transactions which, in the light of the primary facts he found, he was fully entitled to reach. In all these circumstances, BoI's appeal against the judge's finding of dishonesty on the part of S must fail.**

**2. It was accepted that "outsider" companies could be made liable under s.213 provided that it was established they were "knowingly" parties to the fraudulent trading.**

© 2005 Sweet and Maxwell Ltd

A **BoI could only be declared to be liable under s.213(2) if it was "knowingly" a party to the carrying on by BCCI of its business with intent to defraud creditors of the company or for any fraudulent purpose. Having decided to uphold Patten J.'s finding that S had blind-eye knowledge of the fraud of the CTD in respect of the second to fifth transactions, the critical issue was BoI's knowledge of BCCI's fraud.**

**3. The attribution of knowledge to a corporate body, such as BoI, turned on the** B **interpretation of s.213 and its application to the facts found by the judge. There was very little discussion in the authorities of this aspect of s.213 or its predecessors as to in what circumstances the state of knowledge of an individual could be attributed to a corporate body, which in the nature of things could only derive its knowledge from individuals and be treated as having the knowledge that a relevant individual had. S's blind-eye knowledge of BCCI's fraudulent trading could be treated, for the purposes of s.213, as the corporate knowledge of BoI if, as was found by the judge, none of the directors of BoI** C **had any personal knowledge of BCCI's fraudulent trading.**

**4. The determination of the person possessing the relevant knowledge for the purposes of ascertaining liability under s.213 was not simply a matter of identifying the person who authorised the transaction in accordance with the system of authorisation operated by the company in question. The scheme of delegation of authority might, as in this case, provide only an incomplete picture of what was done and it might not be sufficient for the** D **purposes of determining whether the company should be treated as possessing the requisite knowledge.**

**5. The paramount purpose of the provisions imposing civil liability in s.213 was to compensate those who had suffered loss as a result of the fraudulent trading. If knowledge were not attributed to an outsider company in cases such as this the purpose of imposing liability upon such a company to pay compensation would be emasculated. The** E **crucial question was whose knowledge in the company counted, for the purposes of s.213, as corporate knowledge of the outsider company. In most companies of any size there would be a chain of command and delegation of authority and it was likely that the transactions with the fraudulent company would be dealt with at a level in the company below that of the board. It would defeat the effectiveness of the section in practice if liability were limited to those cases in which the board of directors of an "outsider"** F **company was actually privy to the fraud of the company. The application of s.213 required a special rule of attribution in order to make its self-evident policy effective (Meridian Global Funds Management Asia Ltd v Securities Commission [1995] B.C.C. 942; [1995] 2 A.C. 500 considered). It could be appropriate to attribute knowledge of fraud to a company, even though a person with knowledge of the fraud had acted dishonestly, in breach of his duty to his principal and employer and in circumstances in which he would not have passed on his knowledge to his employer. (McNicholas** G **Construction Co Ltd v Commissioners of Customs and Excise [2000] S.T.C. 553 applied.)**

**6. The judge was right to hold that on the facts found by him and on the application of the correct interpretation of s.213 BoI could not deny legal responsibility for the actions of S by resisting the attribution of his knowledge to it. S's knowledge of the fraud of the CTD of BCCI was sufficient to fix BoI with liability under s.213. S was a senior manager of BoI whose board relied on his judgment in relation to the transactions. He was given** H **"blanket permission" to deal with BCCI by negotiating the terms of the transactions. He was allowed by the board to supervise the relevant transactions with BCCI and ultimately to decide to proceed with them on terms negotiated by him. He was in substance the relevant decision maker for BoI in respect of the relevant transactions which made BoI a party to the fraudulent trading of BCCI. As S had a large measure of responsibility within BoI for the transactions within BCCI, the policy of s.213, justice and**

**good sense combined to justify treating S's knowledge as the corporate knowledge of BoI so as to make it responsible for contributing to the assets of BCCI in the winding up.**

**7. The judge found that the members of the board of BoI personally had no knowledge of the fraud, but they were content to leave the conduct and completion of the negotiations in the hands of S and the attribution of S's knowledge to BoI did no injustice to the members of the board. The question was whether S's knowledge should as a matter of law be attributed to BoI for the purposes of s.213, not whether the directors of BoI personally knew of the fraud or should have knowledge of the fraud attributed to them so as to make them personally and individually liable for fraudulent trading. It was irrelevant to the attribution of the knowledge of S to BoI that S was acting in breach of his duty to BoI in respect of the transactions with BCCI or that, in a general kind of way, BoI was a "secondary victim" of his wrongdoing and that of BCCI: neither of those factors was a bar to the attribution of knowledge to BoI, any more than was the lack of personal knowledge of the directors of BoI about BCCI'S fraudulent trading. The appeal should be dismissed.**

**8. In relation to the liquidators' cross-appeal regarding the judge's conclusion that he did not find that two directors of BoI were dishonest, there was no inconsistency between the finding of dishonesty against S and the lack of any such finding against the two directors. Authority and justice indicated that the court should be slow to overturn a judge's finding of dishonesty against a party, particularly when it was justified by the judge in a full and careful judgment, but the court should be even more reluctant to overturn the same judge's refusal to find dishonesty against another party, unless, of course, the findings were incompatible. There was, therefore, nothing in the cross-appeal which should be dismissed.**

**9. In relation to the liquidators' application to amend the pleadings, it was clear that neither the current pleadings nor the evidence in fact adduced at the trial addressed the additional factual issues involved, issues which were central to the new claim now being put forward. If all these matters had previously been adequately pleaded BCCI would not now be seeking to amend and the application for permission to amend should be refused.**

The following cases were referred to in the judgment:

*Akerhielm v De Mare* [1959] A.C. 789.
*Arab Bank plc v Zurich Insurance Co; Banque Bruxelles Lambert SA v Zurich Insurance Co* [1999] 1 Lloyd's Rep. 262.
*Bank of Credit and Commerce International SA, Re; Banque Arabe Internationale D'Investissement SA v Morris* [2002] B.C.C. 407.
*Bank of Credit and Commerce International SA, Re; Morris v State Bank of India* [2003] B.C.C. 735; [2003] EWHC 1868 (Ch).
*Biogen Inc v Medeva plc* [1997] R.P.C. 1.
*C (A Minor) (Adoption: Parental Agreement: Contact), Re* [1993] 2 F.L.R. 260.
*D (An Infant) (Adoption: Parent's Consent), Re* [1977] A.C. 602.
*Dubai Aluminium Co Ltd v Salaam* [2002] UKHL 48; [2003] 2 A.C. 366.
*Farmizer (Products) Ltd, Re; Moore v Gadd* [1997] B.C.C. 655.
*Floyd v John Fairhurst & Co* [2004] EWCA Civ 604 [2004] P.N.L.R. 41.
*Laws v Society of Lloyds* [2003] EWCA Civ 1887.
*Lloyds Bank plc v Rogers (No.2)* [1999] 3 E.G.L.R. 83.
*McNicholas Construction Co Ltd v Customs & Excise Commissioners* [2000] S.T.C. 553.
*Maidstone Building Provisions Ltd, Re* [1971] 1 W.L.R. 1085.
*Manifest Shipping Co Ltd v Uni-Polaris Co Ltd* [2003] 1 A.C. 469.
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] B.C.C. 942; [1995] 2 A.C. 500.
*Morris v Bank of America National Trust* [2000] B.C.C. 1076.

© 2005 Sweet and Maxwell Ltd

*National Justice Compania Naviera SA v Prudential Assurance Co Ltd (The Ikarian Reefer) (No.1)* [1995] 1 Lloyd's Rep. 455.
*Patrick and Lyon Ltd, Re* [1933] Ch. 786.
*Piglowska v Piglowski* [1999] 1 W.L.R. 1360.

Gabriel Moss Q.C. and Hilary Stonefrost (instructed by Penningtons) for the appellant bank.

Charles Purle Q.C., David Eaton Turner and Blair Leahy (instructed by Lovells) for the respondent liquidators.

JUDGMENT OF THE COURT

**Mummery L.J.:**

1. This is the judgment of the court (to which each member of the court has contributed) on an appeal brought by the Bank of India ("BoI") against an order made by Patten J. on March 26, 2004, whereby he gave a judgment in favour of the liquidators ("the liquidators") of BCCI SA and BCCI (Overseas) Ltd (together "BCCI"), in the sum of US$82,302,941, with interest and costs.

2. The liquidators' claim was brought against BoI pursuant to sub-s.(2) of s.213 of the Insolvency Act 1986 ("the 1986 Act"). That section (s.213) relates to liability for fraudulent trading. It provides as follows:

> "(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.
>
> (2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper."

**Factual background**

3. BCCI was established in 1972 and achieved rapid growth during the 1980s. It collapsed in July 1991, with a deficiency as regards creditors in the region of US$10 billion. By that time BCCI had grown to the extent of having 110 branches in 41 countries and a number of representative offices. BCCI SA had 24 branches in this jurisdiction and its head office was in the City of London.

4. Until 1988 the President and Chief Executive of BCCI was Mr Hasan Abedi. His deputy was Mr Naqvi, who took over as Chief Executive when Mr Abedi became ill. Mr Akbar was a senior employee of BCCI's Central Treasury Division (the "CTD") in London. The CTD operated from BCCI SA's offices in London until 1986, but all its activities were booked and recorded in the name of BCCI (Overseas) Ltd ("BCCI Overseas") in the Cayman Islands.

5. BCCI incurred substantial losses through poor lending decisions and unsuccessful metal trading on its own account. The Khalil group of companies, which were owned and controlled by Mr Abdul Raouf Khalil, a Saudi Arabian businessman, were among the borrowers who, by the early 1980s, had a number of heavily overdrawn accounts with BCCI. To conceal these losses the CTD embarked on a systematic and wide-scale fraud involving the manipulation of account balances. This practice was initiated by Messrs Abedi and Naqvi and was operated by Mr Akbar through the CTD. Mr Akbar was the account officer for the Khalil group, and was also the person responsible for many, if not most, of the fraudulent transactions carried out by the CTD to hide BCCI's worsening financial position.

6. Subsequently, Mr Akbar was convicted of offences involving five transactions with BoI concerning the falsification of documents relating to the loan applications of Maram Trading Co Ltd ("Maram"), a company which he controlled.

7. The transactions between BoI and BCCI that are in issue in this case are similar in nature A
to other transactions that BCCI entered into with three other Indian banks, and with two Swiss banks. The liquidators have brought proceedings against two of the banks, BoI and the State Bank of India, but not against the others. Of the total of US$377 million received by BCCI Overseas under the arrangements with these banks, some US$332 million was credited to the Khalil group accounts to give the false impression that the indebtedness was being serviced.

8. The application before Patten J. concerned six transactions involving BoI and BCCI. The
issue was, in summary terms, whether those at BoI responsible for entering into five of those B
transactions knew that they were thereby assisting BCCI to perpetrate a fraud on its creditors. It was common ground that this allegation of knowledge must involve a finding of dishonesty.

## The transactions

9. The first of the six transactions was initiated in the autumn of 1981 when Mr Samant of
BoI contacted Mr Mewawalla at BCCI to ask him whether BCCI would be prepared to place a C
deposit with BoI. It was apparently BoI's policy, and that of other Indian banks, to obtain at its year-end as many deposits as possible, as the existence of large scale deposits was seen as an important measure of a bank's success. Mr Samant's approach to Mr Mewawalla was said to be in accordance with this policy. At the time, Mr Mewawalla, who was not called as a witness, worked in the International Department of BCCI.

10. In response to the approach from Mr Samant, on November 12, 1981, Mr Mewawalla D
informed Mr Samant that BCCI was prepared to place a deposit of £10 million for three months at a rate of 15 per cent per annum on terms that BoI was required to lend this amount to a borrower named by BCCI at 15.125 per cent. The security for the loan was to be an irrevocable letter of guarantee by BCCI.

11. The purpose of this rather extraordinary transaction from BCCI's point of view was said
to be to improve its earnings to advances ratio. The judge held ([2004] B.C.C. 404) that he E
could not say whether it was Mr Mewawalla or Mr Samant who provided this explanation for the transactions, but he said that it was not disputed that Mr Mewawalla made it clear to Mr Samant that the transaction was for the benefit of BCCI in that its purpose was the improvement of its accounts or profits at its year end. In a telex that Mr Samant sent to BoI's head offices on November 12, 1981, he stated that:

> "BCCI is doing this obviously to show a good ratio of earnings against their advances
> ..." F

Therefore Mr Samant and the board of BoI were all well aware of what was understood to be BCCI's reason for the transactions.

12. The first transaction, like each of the subsequent transactions (save for the fifth where there was no loan) had the following features:

(1) It was arranged between Mr Mewawalla for BCCI and Mr Samant for BoI. G

(2) It involved a fixed deposit by BCCI with BoI at a fixed rate.

(3) BoI was required by BCCI to make a fixed-term loan, for the same period as the deposit, to Maram, at a rate of interest 0.125 per cent above the rate on the deposit.

(4) BCCI gave BoI an irrevocable guarantee of the loan.

(5) At the end of the fixed period, BoI repaid the deposit and interest thereon to BCCI and,
through BCCI, received repayment of the loan and interest. H

13. BoI did not dispute that BCCI's CTD used the moneys provided by BoI pursuant to the six transactions to credit heavily overdrawn accounts that Mr Khalil and his group of companies held with BCCI. The purpose of this exercise was to give the false impression that these accounts were being serviced and the indebtedness being repaid, at least to some extent, by the customer. BoI also did not, and does not, dispute that BCCI did not disclose the

© 2005 Sweet and Maxwell Ltd

A guarantees to its auditors. The issue for the judge was what, if anything, BoI knew of the CTD's fraud.

### Knowledge of fraud

14. There was no dispute about the relevant alleged knowledge in question being "blind-eye" knowledge. It was further agreed that the elements of what was required for this type of B knowledge were accurately described in the speech of Lord Scott of Foscote in *Manifest Shipping Co Ltd v Uni-Polaris Co Ltd* [2003] 1 A.C. 469 at para.116, which was quoted by Patten J., at para.13 of the judgment in this case:

> "In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist. But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that C may, at one extreme, be no more than a vague feeling of unease and, at the other extreme, reflect a firm belief in the existence of the relevant facts. In my opinion, in order for there to be blind-eye knowledge, the suspicion must be firmly grounded and targeted on specific facts. The deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to enquire into an untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the D basis of a finding of privity."

The judge held that (para.14):

> "Dishonesty as such is not in terms a condition of liability under s.213. But if knowledge of the fraud in either of the senses indicated above is established, Mr Hirst [counsel then appearing for BoI] accepts that it must follow that BoI was dishonest."

E 15. In relation to the first transaction the judge found that none of the BoI employees, including Mr Samant, had the relevant knowledge. In relation to the second transaction the judge held that Mr Samant did have the relevant knowledge, as he did in relation to the third, fourth and fifth transactions. The judge further held that his knowledge should be attributed to BoI. Mr Samant resigned from BoI in June 1985, although his resignation only took effect in November 1985. He was not, therefore, working for BoI at the time when the sixth transaction took place in September 1985 and the judge held that BoI did not have the relevant knowledge F in respect of that transaction.

### The appeal and cross-appeal

16. Three main points are raised by Mr Gabriel Moss Q.C., who appears with Ms Hilary Stonefrost, on behalf of BoI, on the appeal. First, it is contended that, in light of the evidence G before him, and in light of his assessment of that evidence, the judge could not properly have concluded that Mr Samant was dishonest in relation to the four transactions in question. Secondly, it is contended that, even if the judge's findings against Mr Samant are upheld, Mr Samant's dishonesty could not and should not be attributed to BoI. Thirdly, it is contended that there was, in effect, insufficient connection between the four transactions in question and the defrauding of creditors within BCCI to bring BoI within the ambit of s.213(2).

H 17. In their cross-appeal, the liquidators, who appear by Mr Charles Purle Q.C., Mr David Eaton Turner and Ms Blair Leahy, contend that the judge ought to have concluded that two of the directors of BoI at the time, Mr Vaghul and Mr Shukla, were guilty of dishonesty effectively in the same way and to the same extent as Mr Samant. The cross-appeal is only relevant if the appeal succeeds on the first or second ground of appeal. The liquidators also seek to amend their case and to argue that BoI should be vicariously liable for Mr Samant's liability under s.213(2). This argument is only relevant if BoI succeeds on the first ground of appeal.

18. BoI and the liquidators have abandoned their respective appeal and cross-appeal on the A
issue of quantum.

## The judgment

19. The hearing before Patten J. lasted more than four weeks, in which he heard evidence
from, *inter alia*, two experts on banking practice, Mr Samant and Mr Vaghul, as well as from
Mr Mitra and Mr Rao, who, like Mr Vaghul, were employed by BoI at its head office. The B
judgment ([2004] B.C.C. 404) runs to 136 paragraphs (many of which have a number of
subparagraphs) over 75 pages. It is appropriate to pay tribute to the full and careful way in
which the judge set out and analysed the evidence, and expressed his conclusions as to the
consequences of that evidence.

20. The judge set out in some detail the six transactions between BoI and BCCI which form
the central subject matter of these proceedings. In relation to those six transactions, BoI
expressly admitted that "by its involvement in [those] transactions . . . it . . . participated in the C
carrying on of the business of BCCI for fraudulent purposes", but it was, of course, BoI's case
that its involvement was "unknowing".

## The first transaction

21. We have already described the first transaction, but it is necessary to examine it in a little D
more detail. It was negotiated between Mr Samant and Mr Mewawalla during November 1981
and completed on December 2, 1981. It involved BCCI transferring £10 million to BoI in
London, under cover of a letter which referred to the payment as a three-month placement
bearing interest at 15 per cent per annum, while on the same date BoI opened a new fixed
deposit account in the name of BCCI which was credited with the £10 million on the same day,
BoI London granted Maram a loan at a rate of interest of 15.125 per cent per annum,
*i.e.* 0.125 per cent above the rate payable on the moneys received from BCCI. BoI effected this E
by transferring the £10 million to an account in favour of BCCI for the account of Maram in the
books of BCCI, and the £10 million was then credited as a new call deposit account in the name
of Saudi Development and Commercial Company ("SDCC"), a Jeddah company controlled by
BCCI. This transaction was effectively reversed on March 2, 1982.

## The second transaction F

22. The second transaction was negotiated between July and September 1982, and was
completed on September 22. As mentioned, it was very similar to the first transaction, although
the sum involved was £25 million rather than £10 million, and, when the £25 million arrived
back at BCCI, it was credited to Mr Khalil's current account, rather than an account in the
name of SDCC. This transaction was reversed in January 1983.

G

## The third transaction

23. The third transaction was negotiated in October, and completed in November 1983. It
was very similar to the first two transactions, save that it involved a total of US$60m which was
dispersed in three equal tranches between November 1 and 7, 1983, and each tranche, when it
arrived back at BCCI, was credited, like the money in the second transaction, to Mr Khalil's
current account. The third transaction was reversed on February 1, 1984. H

## The fourth and fifth transactions

24. The next transaction was negotiated between July and September, and was implemented
on September 18, 1984. It involved a sum of US$75 million and in many ways was similar to
the second and third transactions. However, unlike the first three transactions, BCCI requested

© 2005 Sweet and Maxwell Ltd

that it be implemented over two disconnected periods, namely from September 18 to October 18, 1984, and from December 18, 1984 to January 22, 1985. Accordingly, the fourth transaction involved US$75 million, and was otherwise subject to a similar arrangement to the funds involved in the second and third transactions, and the money was repaid with interest on October 18, 1984.

25. The so-called fifth transaction was really the second part of the fourth transaction, albeit that it ultimately involved a smaller sum, namely US$50 million. As the judge explained, it "took the form of an exchange of deposits in the sum of $50 million between BOI and BCCI", and involved BCCI lending the money to BoI at 9 per cent per annum interest, and BoI lending the money back at the same rate. That money was made the subject of the circular loan arrangement on December 18, 1984, which was effectively "undone" on January 22, 1985.

**The sixth transaction**

26. The sixth transaction does not play any part in this appeal, because, as explained above, by the time it was implemented, Mr Samant was no longer employed by BoI. In these circumstances, we need say no more about it.

**Patten J.'s findings on the transactions**

27. It is now appropriate to set out the essential findings, for the purpose of this appeal, made by the judge in relation to the five transactions which he had to consider.

28. Because the liquidators were not mounting any claims against BoI in relation to the first transaction, its only function in the proceedings, albeit that it was an important function, was as part of the factual background to the second and subsequent transactions. The judge said this, when considering Mr Samant's state of knowledge in relation to the first transaction:

> "107. I have found Mr Samant to be an unreliable and, I am afraid, untruthful witness, but I am prepared to recognise the existence of some doubt as to whether he had reason to question the improvement of BCCI's earnings to advances ratio as a plausible explanation for the arrangements during the course of the first transaction. My own view is that on the balance of probabilities he must have entertained some cause for concern about it even at that time, if only because head office itself was clearly unhappy."

29. After considering the first transaction a little further, the judge then turned to the second and subsequent transactions, and said this:

> "108. However, any doubts that exist as to Mr Samant's state of knowledge are, in my judgment, resolved by the second transaction. Despite having been told by head office that the first transaction was to be one-off, he felt able to make an enthusiastic recommendation in July 1982 for a similar arrangement involving not £10 million but £30 million. Mr Shukla's query about the real reason for the transaction prompted him to produce the 1981 accounts and, as I have already found, I am satisfied so as to be sure that Mr Samant looked at that material and did see and did realise that an improvement in the earnings to advances ratio could not be achieved by the removal of loans over the year end. He also realised that only a transfer of non-performing debt would have any significant effect. I therefore have no real doubt that Mr Samant knew from this time on, even if [it] had not occurred to him before, that the purpose of the transaction was considerably more complicated, and certainly more suspicious, than he may at first have supposed. These suspicions must have been increased by his knowledge that Maram was of no real significance in the transaction and that the loans would be repaid by BCCI. The circular nature of the transactions was already apparent to him, and the removal of the only suggested justification for them can have left him, and I believe did leave him, in no real doubt that he was in all probability dealing with a fraud of some kind. The matter was put really beyond doubt when in 1984 the fourth and fifth

transactions occurred at a time and in a form respectively which made it obviously impossible for the alleged purpose to be achieved."

30. The two other centrally crucial passages for the purpose of the points raised on the appeal and the cross-appeal are in paras 112 and 120 of the judgment. Accordingly, we set them out in full:

> "112. I do have real concerns about the way in which these transactions were handled by BOI's head office, and in relation to the first and second transactions they reflect very badly on Mr Vaghul's management of the bank. There was understandably real unease with the first transaction, but the condition of approval that it should be a once-only transaction seems to have been ignored for no good or apparent reason in subsequent years. Mr Shukla expressed the concerns I have mentioned, but again they did not prevent the second and third transactions from going ahead. There is no evidence, and it is not alleged, that Mr Samant told them a convincing lie in order to gain approval for the transactions, and his evidence is that he did not speak to them. I accept that. It is therefore more likely that they simply allowed their doubts to be overcome by preferring to rely on Mr Samant's judgement in the matter. Although the transactions (except the first) were approved at board level, this was merely to give authority to the London branch to proceed with the transaction. The decision whether to go ahead was then a matter for Mr Samant. No-one suggests that the board of BOI was in any sense dishonest, and I am not satisfied that a case of knowledge and dishonesty is made out, to the requisite standard of proof, against either Mr Shukla or Mr Vaghul. I think that they looked to Mr Samant to scrutinise the proposals and were content to accept his recommendation. Once the first and perhaps second transactions had been completed without any apparent problems, approval by the board seems to have been obtained very quickly, almost as a matter of routine. It was only in relation to the sixth transaction that problems began to occur, due in all probability to the interest which the regulators had begun to show in the arrangements. But BOI by then had a new chairman (Mr Tiwari) and I know really nothing about his involvement in the decision to approve the sixth transaction. Mr Mitra's evidence about that transaction was clearly unsatisfactory, but the decision to give approval was not his and I am not able, on the evidence, to find that he had the insight necessary to give him the knowledge which Mr Samant himself had.
>
> . . .
>
> 120. Mr Samant did have delegated authority to lend up to £200,000 unsecured without seeking head office approval. For sums of the order of £10 million or more, not even the General Manager (International) at head office could give the necessary sanction. The proposal needed to be referred to the board. This was of course the procedure adopted in each of the six transactions under review, although in the case of the first transaction Mr Vaghul seems to have approved it under delegated powers. In the present case, however, the scheme of delegation gives an incomplete picture of what was done. At the time when most (if not all) of the transactions were put up for approval, the borrower had yet to be identified. In the case of the second transaction Mr Vaghul explained that, to avoid putting the matter to the board again, Mr Samant was given what he described as blanket permission to go ahead with a borrower nominated by BCCI. It is also clear from the evidence that the approval of the transactions was no more than that: *i.e.* an authority to Mr Samant to lend to the nominated borrower on the terms he had negotiated and agreed. Approval was often given some time in advance of the completion of the transactions and detailed matters such as the investigation of the borrower's purpose or status and the documentation for the transaction were left to Mr Samant to deal with. Head office or board approval was not an instruction to carry out the transaction. Mr Samant retained an obvious and necessary discretion whether to go ahead. This was the basis of the approval given in the second transaction and, after that, board approval

© 2005 Sweet and Maxwell Ltd

seems to have been given rapidly and almost as a matter of course. It is clear, as I have found, that senior executives and the board were content to take Mr Samant's assurances at face value and to leave it to him to satisfy himself that it was proper for BOI to go ahead. In these circumstances he was, at the time of each of the first five transactions, the person who, in Lord Hoffmann's words, had the authority to do the deal."

**Mr Samant's knowledge of fraud: the judge's findings**

31. Although the first point argued on behalf of BoI was that the judge was wrong to hold that Mr Samant's knowledge was to be attributed to BoI, it is, we think, more logical to begin by considering the second ground of appeal. That ground is that the judge was wrong to conclude that, by the time the second transaction was entered into, Mr Samant was "left . . . in no real doubt that he was in all probability dealing with a fraud of some kind". This was a conclusion that the judge reached (at para.108), after having carefully considered the substantial documentary evidence put before him, the evidence of a number of witnesses, and in particular Mr Samant, but also Mr Shukla and two expert banking witnesses, one called from each side.

32. Although the documentary evidence was substantial, it is fair to say that there was very little documentation before the judge which bore, at least directly, on this issue. That appears to have been partly because it is unlikely that there would ever have been much in the way of documentation which was directly helpful on this issue, and partly because it appears that much of the contemporaneous documentation had been lost or destroyed.

33. The judge had a number of reasons for reaching his conclusion as to Mr Samant's dishonesty so far as the second, third, fourth and fifth transactions are concerned. Before dealing with his reasons in relation to those transactions, it is appropriate to identify his reasons for concern about Mr Samant's honesty in relation to the first transaction. Those reasons may conveniently be expressed as follows.

34. First, even "ignor[ing] the obvious artificiality" of each of the transactions, they "broke every rule of lending in the banker's book and that must have been obvious to Mr Samant, and for that matter to Mr Mewawalla, as experienced bankers", and "[n]either expert had ever seen or heard of a transaction of this kind in practice". Mr Wragg, one of the two expert witnesses who gave evidence, described the transaction as "unacceptable in banking terms" according to the judge.

35. Secondly, as the judge said in the same paragraph, namely para.32 of his judgment, "it was impossible for BOI to form any view about the purpose of the loans or the borrower's standing". As the judge pointed out, it was necessary for BoI to know the borrower, and it was inappropriate to rely on BCCI's guarantee alone. Further, as the judge said in para.31 of his judgment, BoI "had no real prior banking relationship with BCCI, at least in London".

36. Thirdly, the judge said in para.33, "it must have been obvious to Mr Samant that [the first transaction] was not an ordinary loan transaction of any kind" especially as he had been approached by BCCI with a view to entering into the transaction. The judge concluded that that there were "two obvious questions which any honest and competent banker would have asked and would have required to know the answer to". Those questions were "why BCCI required assistance in this way" and "the status of the borrowing which BoI was being asked to take on". Yet neither of those two questions was asked by Mr Samant.

37. Fourthly, "despite the highly unusual nature of what was proposed, Mr Samant was prepared almost immediately to recommend acceptance by BoI" without making any enquiries about the borrower, "the purpose or status of the existing loans, or the reason why there was to be such a singular lack of documentation".

38. Fifthly, according to his evidence to the judge, Mr Samant was concerned about the first transaction when it was proposed to him, and he accordingly "went a little deeply into it", as a result of which Mr Mewawalla explained that BCCI's purpose was to improve its "earnings to advances ratio". It was, however, clear to the judge from the evidence that the improvement in the ratio allegedly desired by BCCI "was only achievable if BCCI retained a flow of income from the borrower as the price of obtaining a BCCI guarantee" but "[t]his was not a feature of this proposal".

39. Sixthly, in light of the size of BCCI's lending and borrowing, which Mr Samant clearly knew about, and indeed considered, at the time of the first transaction, he must have appreciated that the effects of the first transaction, and indeed of the subsequent transactions, on BCCI's ratio would be negligible.

40. Seventhly, as Mr Samant had to accept in cross-examination (because it was logically inevitable) "the only way in which the ratio of earnings to advances could be improved was by taking a bad debt off the books of BCCI". Although Mr Samant "strongly denied" that it had been suggested to him, or that it had occurred to him, that this would be done, and "that he had proceeded on the assumption that BCCI would not do anything dishonest", the judge was unconvinced by this evidence.

41. Eighthly, as the judge mentioned in para.107 of his judgment, he found Mr Samant's explanations at trial "completely unconvincing" (para.40). Mr Samant gave more than one explanation for entering into the first transaction, and each explanation was not only unconvincing, but inconsistent with the others. Bearing in mind the fact that Mr Samant was clearly a clever and experienced banker, and that he looked at BCCI's published accounts at the time, the judge concluded that the sort of questions about the proposed first transaction which would have occurred to a competent banker must have occurred to Mr Samant, despite his denial, and that either he knew no satisfactory answer would be forthcoming, or he deliberately refrained from asking because he would have expected no satisfactory answer to be forthcoming.

42. Ninthly, the artificiality of the first transaction was underlined by the fact that there was very little documentation, and this was at the request of BCCI, who appear to "have dictated the form of security to be given by the borrower". The judge described this as a "real oddity" which "emphasise[d] how artificial this arrangement was and the extent to which BCCI was (and appeared to Mr Samant to be) in control of Maram and the whole transaction".

43. These various factors, which in some cases overlap, caused the judge to conclude that there was a powerful argument for saying that Mr Samant had sufficient knowledge of the fraud in relation to the first transaction, and they all apply at least with equal force to the second transaction. However, there were further factors of relevance, at least in the judge's view, so far as the second transaction was concerned.

44. First, after the second transaction had been proposed by Mr Samant to the BoI board, two directors, Mr Shukla and Mr Vaghul, discussed the proposal, and instructed Mr Rege at BoI head office to contact Mr Samant to ask him for the "real reason" for the transaction, which he did. Despite his denial, Mr Samant, the judge concluded, went back to look at the BCCI annual report and must have noticed "that the explanation given by Mr Mewawalla was inconsistent with the material available in that document". When seeking to explain the rationale of the second transaction, to BoI's head office, Mr Samant's explanation was one which "was not and could not have been correct", as the judge put it.

45. Further, the judge concluded at para.40 that, in relation to the second transaction, Mr Samant "gave no credible explanation as to why the points put to him and readily accepted by him during the cross-examination were not obvious to him in 1982. To say that he simply relied on Mr Mewawalla is not an answer to this point."

46. The judge also thought it was significant that, although BoI's head office had made it clear to Mr Samant that the first loan was to be, as it were, a "one-off" transaction, which was

© 2005 Sweet and Maxwell Ltd

A not to be repeated, he went ahead with the second transaction, and indeed the third, fourth and fifth transactions, without any apparent concern.

47. All the points relevant to the second transaction were at least equally relevant to the third transaction. However, there were additional factors in relation to the third transaction. Mr Mewawalla asked Mr Samant to obtain a sanction from the BoI board for a loan that was not limited to an identified borrower, which the judge described as "a yet further indication of B how unrelated lending was to the borrower which BCCI eventually nominated".

48. Further, as the judge pointed out, the negotiations for each successive transaction started with a proposal from BCCI for a loan that was larger than that involved in the immediately preceding transaction. In this connection, the judge concluded that "any honest and competent banker [in the position of Mr Samant] would not fail to note the rising amount of debt in each successive year". The judge said that it therefore "must have been obvious to Mr Samant by the time of the third transaction (and probably by the time of the second) that Maram's C indebtedness to BCCI was increasing" and that, accordingly, "there was a high degree of probability that the loans were not performing and that Maram's financial position had significantly worsened since the last transaction". Given that no enquiry was apparently made in that connection, the judge concluded that it was "much more likely that Mr Samant realised or was told that Maram simply provided BCCI with a means of receiving back its own money to assist it in reorganising its year-end results", a view which the judge concluded was D supported by some of Mr Samant's evidence.

49. The judge was also impressed by the fact that three copy letters from BoI to BCCI had survived in relation to the third transaction. The first, dated November 8, 1983, set out brief details of the three tranches of the $60 million loan and similar brief details of the three corresponding deposits. On the same day, there was another letter which referred only to the three tranches of the loan, and contained no reference to the matching deposits. The letters were to be sent by Mr Raina of BoI to Mr Mewawalla of BCCI, as was a further letter, dated E November 9, 1983, which only contained the details of the three deposits. The judge concluded that the longer letter "was drafted first, but, when sent to BCCI, was rejected by Mr Mewawalla because it did forge a link between the loans and the deposits". The judge considered that Mr Mewawalla "then contacted BoI and arranged for the contents of the letter to be split. Separate letters were then sent, covering the loans and the deposits."

50. As to the fourth transaction, again the factors which gave rise to the judge's conclusion F as to Mr Samant's guilty knowledge on the third transaction apply. In addition, although BoI's head office emphasised to him on August 10, 1984, that "the borrower must be acceptable to you", Mr Samant made no "further checks in respect of Maram". Further, the change in BCCI's proposal in relation to the fourth transaction, namely that it involved two disconnected periods, meant that the fourth transaction was not over a period covering BCCI's accounting year end. It therefore cannot have been wanted by BCCI for the only purpose Mr Samant said was given to him by Mr Mewawalla. In fact, the purpose of the fourth transaction was, as the G judge explained, "to cover the initial audit confirmation period", but there is no question of that explanation having been given to Mr Samant, at least according to his evidence.

51. Quite apart from this, a letter to BoI on September 10, 1984, purportedly signed by Mr Khalil of Maram confirmed that what was originally to be a loan for a single period was to be a loan for two disconnected periods referring to "our telephone conversation". In fact, as Mr Samant must have well known, neither he nor anyone else in BoI's London office had ever H spoken to Mr Khalil.

52. The fifth transaction, which was, as the judge said, really the second part of the fourth transaction, was carried out in a different way from the other transactions as explained above. Although Mr Samant did not specifically recollect the fifth transaction, he said in his evidence that BoI had carried it out for the same purpose as the previous transactions. However, as the judge pointed out, the real additional question which arises from the fifth transaction concerns

“BCCI’s purpose in carrying it out”, because, as “no debt was transferred”, there could be no A effect on BCCI’s earning to advances ratio. When that was pointed out to Mr Samant at the trial, he said that he assumed that BCCI, like BoI, must have wanted to improve its deposits. However, he had not sought BoI board approval on that basis.

53. Mr Samant also explained to the judge that the fifth transaction was a straightforward money market transaction. However, as the judge said, “[o]n no view was this an ordinary money market transaction and neither banking expert was prepared to treat it as such”. Indeed, B Mr Wragg, BoI’s own expert, said that the fifth transaction could not really be described as window dressing, because even window dressing which was “designed to improve a bank’s liquidity” must involve “genuine and economic” transactions.

54. More generally, the judge was very unfavourably impressed by Mr Samant’s explanation of an account of a meeting he had with a Mr Atkinson of the Bank of England on January 31, 1985. The judge was provided with what he called “a detailed note of this meeting taken by the Bank of England, which Mr Samant accepts as accurate”. C As the judge also said, the note indicated a high level of dissatisfaction on the part of the Bank of England with a number of aspects of BoI’s lending. Mr Samant’s explanation as to what happened at the meeting was inconsistent with the note, and the judge simply did not believe him. In particular, he concluded that Mr Samant did not tell Mr Atkinson about “the earlier arrangements involving taking an existing loan off BCCI’s books” or BCCI’s alleged reason for this. Having read the note of the meeting, the judge concluded that, in his discussions with Mr Atkinson, D Mr Samant “considerably understate[d] the arrangements between BOI and BCCI” and avoided any mention of the involvement of Maram. The judge thought it significant that Mr Samant did not reveal anything about the first three transactions to the Bank of England, and also that the warning which the Bank of England gave to him at the end of the meeting was not passed on by him to BoI’s board.

E

### Attack on judge’s findings

55. Although Mr Moss made a sustained (but not immoderate) attack on the judge’s conclusion as to Mr Samant’s “blind-eye knowledge” at the time of the second, third, fourth and fifth transactions, we are quite satisfied that the judge was fully entitled to reach the conclusion that he did. We do not suggest that none of Mr Moss’s points have merit but, even taken together, they do not, in our view, undermine the judge’s conclusion and his reasons for F it.

### The approach

56. Before turning to the points raised by Mr Moss in relation to the judge’s conclusion as to Mr Samant’s state of knowledge, it is perhaps convenient to refer to the approach to be adopted G by this court when considering an attack on a finding of primary fact, or an inference of fact made from the primary fact, by a first-instance court.

57. There was a certain amount of debate before us as to the proper approach an appellate court should adopt, in particular in relation to facts found and inferences drawn by the trial judge. The relevant principles are to be found in the judgment of Arden L.J., with whom Potter and Neuberger L.JJ. agreed, in *Floyd v John Fairhurst & Co* [2004] EWCA Civ 604 [2004] H P.N.L.R. 41 at paras 47–59. That contains a near exhaustive analysis of the relevant authorities. We do not propose to add to the jurisprudence. We merely observe, to borrow a phrase used by Steyn and Hoffmann L.JJ. in their joint judgment in *Re C (A Minor) (Adoption: Parental Agreement: Contact)* [1993] 2 F.L.R. 260 at p.273C, that Patten J. was steeped for over a month in the evidence and the personalities of the witnesses. This gave him an immense advantage, for character and personality certainly cannot be judged as well from a transcript of evidence as

© 2005 Sweet and Maxwell Ltd

by seeing and hearing those involved, *ibid.*, at p.275B (this latter observation is in fact a quotation from Lord Wilberforce in *Re D (An Infant) (Adoption: Parent's Consent)* [1977] A.C. 602 at p.626D).

58. Moreover, as Lord Hoffmann pointed out in *Biogen Inc v Medeva plc* [1997] R.P.C. 1 at p.45:

> "The need for appellate caution in reversing the judge's evaluation of the facts is based upon much more solid grounds than professional courtesy. It is because specific findings of fact, even by the most meticulous judge, are inherently an incomplete statement of the impression which was made upon him by the primary evidence. His expressed findings are always surrounded by a penumbra of imprecision as to emphasis, relative weight, minor qualification and nuance ... of which time and language do not permit exact expression, but which may play an important part in the judge's overall evaluation."

As Lord Hoffmann went on to comment in *Piglowska v Piglowski* [1999] 1 W.L.R. 1360 at p.1373F:

> "The exigencies of daily court room life are such that reasons for judgment will always be capable of having been better expressed. ... An appellate court should resist the temptation to subvert the principle that they should not substitute their own discretion for that of the judge by a narrow textual analysis which enables them to claim that he misdirected himself."

59. Finally, and this, as Mr Moss points out, is important in relation to BCCI's cross–appeal, we bear in mind that "When a party has been acquitted of fraud the decision in his favour should not be displaced except on the clearest grounds": *per* Stuart-Smith L.J. in *National Justice Compania Naviera SA v Prudential Assurance Co Ltd (The Ikarian Reefer) (No.1)* [1995] 1 Lloyd's Rep. 455 at p.459 referring to *Akerhielm v De Mare* [1959] A.C. 789 at p.806.

### BoI's grounds of appeal against findings: discussion and conclusions

60. With those observations in mind, we turn to the points raised by Mr Moss on behalf of BoI in attacking the judge's conclusion as to Mr Samant's fraudulent knowledge.

61. The first point made by Mr Moss is a general one. He says that the judge did not give any, or at least sufficient, weight to the fact that the recollection of the various witnesses of fact, and in particular Mr Samant, would have been inevitably unclear about events which took place more than 20 years ago, and that one should not draw any adverse inferences from the fact that much of their evidence was inconsistent, unconvincing or plainly wrong. Particularly when the person is giving evidence in relation to his previous conduct, which he may not recall at all clearly, and about which he may feel defensive, it would be unfair, particularly when the conduct concerned took place more than 20 years ago, to draw any adverse inferences from the unsatisfactory nature of his evidence, or of his failure to explain in any satisfactory way what occurred and why it occurred, at least in the absence of very good reasons.

62. While the foundation for this argument is plainly right, we do not think that it is of any assistance to BoI in the present case. First, the judge was only too well aware of the risk of unfairly drawing adverse inferences against persons, and in particular witnesses, in the position of Mr Samant in the present case. He referred to it briefly in para.16 of his judgment, where he said that he had taken into account "a natural inclination which may exist on the part of some of the witnesses to be defensive of their own conduct" and he added that "[f]ailure to give a credible explanation of events may be due to factors of this kind rather than a perceived need to deny involvement with a fraud". However, he went a little further, in that he referred to what he said in paras 17 and 18 of his judgment in an earlier case involving the same sort of issues as those in the present case, namely *Re Bank of Credit and Commerce International SA; Morris v State Bank of India* [2003] B.C.C. 735; [2003] EWHC 1868 (Ch). It is unnecessary, indeed

inappropriate, to set out those two paragraphs, but we have been taken to them. They make it very clear that Patten J. was well aware of the sort of factors Mr Moss rightly emphasises.

63. It is, of course, possible for a judge, in one part of his judgment, carefully and fully to warn himself against the risk of making a particular mistake when assessing the evidence, and then, in a later part of the judgment, to make that very mistake. However, it is inherently unlikely. It is particularly unlikely in the present case, given that the warning was so carefully and fully expressed. Further, the exercise which the judge had to carry out in the earlier case to which he referred was very similar to that in the present case, and, for what it is worth, we note that he dismissed the liquidators' claim against the State Bank of India.

64. It seems to us that, in order for Mr Moss's argument to succeed on this point, he would have to show that the judge could not properly have concluded that Mr Samant was fraudulent once one takes into account the problems he, and any other relevant witness, faced when giving evidence about events, all or many aspects of which he may have forgotten, and in respect of some aspects of which he may have felt defensive. In our view, when one takes all the primary facts which the judge found, he was, subject to any other point which Mr Moss may be able to advance, entitled to conclude that Mr Samant must have been fraudulent in relation to the four transactions.

65. The fact that the directly relevant contemporaneous documentary evidence was exiguous, and the fact that there could, at least in theory, have been an innocent explanation of what Mr Samant did, is merely part of the overall picture. Accordingly, it seems to us that, unless there is some specific passage in the judgment when the judge was considering the evidence, in which it could be shown that the judge misdirected himself in the way contended for by Mr Moss's first point, or it could be said that the judge must have misdirected himself in this connection, this argument simply takes matters no further. Either the judge reached the wrong conclusion because he made wrong findings of primary fact or because he reached a conclusion he could not have reached on the primary facts he found, or his conclusion is simply not assailable.

66. Accordingly, the fact that the judge may have based his conclusion as to Mr Samant's honesty in part upon his unconvincing performance in the witness box does not mean that his conclusion is open to attack because of the difficulties which Mr Samant faced in recollecting what happened 20 years ago and the defensive feelings which he may have suffered from. It is true that Mr Samant was faced with those difficulties, but they were difficulties that the judge plainly had well in mind, and allowed for.

67. Mr Moss's second ground of attack is that the judge made inconsistent findings in para.59 of his judgment, where he held, on the one hand, that Mr Shukla had not accepted BCCI's reason for the second transaction because of his consideration of BCCI's year-end figures, but, on the other hand, he found that Mr Samant was "prompted" to send BCCI's accounts showing those year-end figures to BoI's head office as a result of Mr Shukla's query. We do not consider that there is anything in this point.

68. First, even if the apparent inconsistency existed, it could easily be explained by the fact that Mr Samant may not have been aware, at the time, that Mr Shukla had seen the year-end figures. Accordingly, although Mr Shukla may have seen the figures, and indeed those figures may have prompted Mr Shukla's request, that does not mean that Mr Samant appreciated that the request was based on Mr Shukla having seen the figures. Indeed, in the same paragraph of his judgment, the judge referred to Mr Samant's evidence that "he did not discuss the matter directly with Mr Shukla" at the time.

69. Quite apart from this, there is evidence to suggest that, if BCCI's 1981 balance sheet had been sent to the BoI board by Mr Samant, it had been sent "quite some time ago", to quote from a telex from Mr Samant of August 3, 1982. Accordingly, Mr Samant, and indeed Mr Shukla could have forgotten about it. Quite apart from this, all that may have been sent the first time was a summary, whereas what may have been received the second time was a fuller set of figures, even an annual report.

© 2005 Sweet and Maxwell Ltd

A 70. Mr Moss next submitted that Mr Samant's conduct in relation to looking to BCCI's accounts in connection with the second transaction was susceptible of innocent interpretation, which the judge should have adopted in preference to an interpretation which involved holding Mr Samant fraudulent, particularly in light of the sort of factors which the judge had warned himself against. Before turning to those innocent explanations, it is worth mentioning that it seems to us that this argument suffers from the fact that the judge based his conclusion as to Mr Samant's dishonesty by reference to a number of factors, and not merely by reference to B consideration of BCCI's annual report for 1981.

71. In this connection it is also relevant to mention that, although the case against Mr Samant became stronger with each transaction, for the reasons which the judge explained, and we have attempted to summarise above, it would have been perfectly proper, when considering the state of Mr Samant's mind, to look at his conduct as a whole. The fact that he had knowledge of the fraud at the time of the fifth transaction can properly be said to be of some C assistance to the conclusion that he had knowledge of the fraud at the time of the fourth transaction, albeit that consideration of his state of mind in relation to each transaction has to be considered separately. We should add that it would require a relatively exceptional case before it could be concluded that, because the judge was satisfied that a person had guilty knowledge at the time of the subsequent transaction, he must, simply on that account, have had guilty knowledge at the time of a previous transaction.

D 72. In connection with the judge's conclusions relating to Mr Samant's knowledge and belief as a result of looking at BCCI's 1981 accounts, two possible interpretations are put forward by Mr Moss. First, he suggests that Mr Samant may in fact not have looked at the accounts at all, on the basis that the judge only inferred that Mr Samant did so because of Mr Shukla's query which was relayed to him. To put it at its lowest, it appears to us that the judge was entitled to conclude that Mr Samant looked at BCCI's 1981 accounts because of Mr Shukla's query. However, we would go further than that. While we would not go so far as E to say that the judge could only have made the inference that he did, it seems to us, in light of the circumstances in which the second transaction was being considered by Mr Samant, and, at least to his knowledge, the BoI board, that it was an inference which we would have expected the judge to have drawn.

73. The second, and alternative, point made in this connection by Mr Moss is that, assuming Mr Samant looked at BCCI's 1981 annual report for the purpose of considering its reason for F entering into the second transaction, he could well have been either incompetent or careless, and accordingly did not realise that the only way an improvement in the ratio could be achieved was by the removal of non-performing loans over the year-end. Although the judge's overall impression of the witness is an advantage for a first instance tribunal which is capable of exaggeration in many circumstances, it is of particular value when deciding whether a witness who gave evidence at some length, is more likely to have been incompetent or careless as opposed to intelligent but dishonest. Patten J. was in a particularly good position to form a view G as to Mr Samant's mental acuity and banking ability, and we do not understand it to have been suggested that the view he formed was not one that he could have reasonably arrived at.

74. The next point made by Mr Moss is that the members of BoI's board who approved the various transactions had the same information as Mr Samant, and that it was plainly inconsistent of the judge to hold, that on the one hand, Mr Samant was in some way party to the fraud, while concluding, on the other hand, that members of the board, including Mr Shukla and Mr Vaghul, were not. In our view, there is nothing in this point. First, where two persons H have precisely the same information, it is perfectly possible to conclude that, on the basis of that information alone, one of them appreciates that something dishonest is going on, whereas the other does not. The difference may be attributable to differences in intelligence, expertise, attention to detail or casualness between the two parties.

75. Further, in the present case, having found that Mr Shukla and Mr Vaghul had doubts about the reason put forward by Mr Samant as to why BCCI wished to enter into the second

transaction, the judge thought it was "more likely that they simply allowed their doubts to be overcome by preferring to rely on Mr Samant's judgment in the matter" – para.112 of the judgment. Indeed, in the same paragraph, the judge recorded that "[n]o-one suggests that the board of BOI was in any sense dishonest."

76. Furthermore, Mr Samant's role was different from that of the members of the board of BoI. He was the General Manager of the London branch, with direct contact with BCCI, and was personally responsible for proposing the transactions. Further, he was authorised by the board of BoI to investigate and finalise details of the transactions, and, indeed, to enter into them if he saw fit, as the judge pointed out. It would be scarcely surprising, in these circumstances, if the members of the board, including Mr Vaghul and Mr Shukla, had given the whole issue less scrutiny and consideration than did Mr Samant. The mere fact that they questioned the reason put forward for the second transaction does not call that conclusion into question. After all, as already mentioned, when Mr Samant repeated the explanation, they accepted it. There is nothing to suggest that they had any reason to believe that Mr Samant was anything other than the intelligent experienced banker Patten J. described him as. Nor is there anything to suggest that they had any reason to believe at the time that he was dishonest.

77. The next point made by Mr Moss is an objection to the finding, in para.70 of the judgment, that Mr Mewawalla was a knowing party to BCCI's fraud. In this connection, Mr Moss relied on the cross-examination of Mr Dyson, a retired partner of Deloitte, who assisted the liquidators. He answered in the negative the question: "Do you allege that Mr Mewawalla was dishonest in relation to the transactions involving the Bank of India?" However, it is fair to say that in re-examination, he also answered in the negative when he was asked whether it was his "case ... that Mr Mewawalla was innocently involved in these transactions" He explained this apparent discrepancy in an answer, the essence of which was: "It does not mean that we do not believe he is not guilty; it is a question of what we can prove."

78. In our judgment, the mere fact that Mr Dyson, when giving evidence, disclaimed making the allegation that Mr Mewawalla was guilty of fraud cannot, as a matter of principle, prevent the judge coming to the conclusion that Mr Mewawalla was so guilty, unless, of course, that finding could be said to involve procedural unfairness or something of that sort. A conclusion as to whether a person, who was not a party or even a witness in the proceedings, was or was not dishonest is, of course, ultimately one for the judge and not for a witness.

79. On the basis of the facts so far recited, and indeed on an examination of the more detailed account of the facts in the judgment below, it seems to us to follow almost inexorably that, if Mr Samant was guilty of dishonesty as the judge found, Mr Mewawalla must also have been so guilty. Most of the reasons which, when taken together, led the judge to conclude that Mr Samant was dishonest in relation to the second to fifth transactions, would apply equally, indeed in many cases more so, to Mr Mewawalla. The extraordinary nature of the transactions, the paucity of the paperwork, the November 8/9, 1983, letters, and the complete inadequacy of the explanation of BCCI entering into the transactions, all apply to Mr Mewawalla just as much as they apply to Mr Samant.

80. Furthermore, no procedural unfairness would have been involved in reaching this conclusion. On the sixth day of the hearing, BoI sought a ruling from the judge that the liquidators should not be entitled to cross-examine BoI's witnesses on the basis that Mr Mewawalla was dishonest, and that application was refused. Also, in his closing submissions, leading counsel for BoI suggested that it was "pretty unlikely" or "very improbable" that Mr Mewawalla was wholly innocent. In any event, we find it impossible to accept that, even if the judge had found, or been constrained to find that Mr Mewawalla was honest, this would have affected his conclusions as to Mr Samant.

81. Mr Moss was also critical of the suggestion that Mr Mewawalla may have known of the letters of November 8/9, 1983. In our judgment, the judge was quite entitled to find, as he did in para.70 of his judgment, not merely that the longer letter was drafted first, but that it was sent to

© 2005 Sweet and Maxwell Ltd

BCCI and rejected by Mr Mewawalla because it forged a link between the loans and the deposits, and that it was only because of Mr Mewawalla's rejection of the longer letter that the two shorter letters were prepared and sent.

82. In all these circumstances, BoI's appeal against the judge's finding of dishonesty on the part of Mr Samant must fail. Having carefully considered all the available evidence, including all testimony from experts, directors of BoI, other employees of BoI, and Mr Samant himself, the judge reached a conclusion as to Mr Samant's state of mind at the time of the second, third, fourth and fifth transactions which, in the light of the primary facts he found, he was, to put it at its lowest, entitled to reach.

**Knowledge of Mr Shukla and Mr Vaghul: cross-appeal**

83. It is convenient to deal at this stage with the liquidators' cross-appeal in relation to the judge's conclusion that he did not find that Mr Shukla and Mr Vaghul were dishonest. If it is difficult for BoI to overturn the finding of dishonesty against Mr Samant by the judge in this full and careful judgment, it is even more difficult for the liquidators to overturn the judge's refusal to find dishonesty against Mr Vaghul and Mr Shukla in the same judgment. As we have already explained in relation to BoI's appeal, there is no inconsistency between the finding of dishonesty against Mr Samant and the lack of any such finding against Mr Shukla and Mr Vaghul. Further, authority and justice indicate that the court should be slow to overturn a judge's finding of dishonesty against a party, particularly when it is justified by the judge in a full and careful judgment, but the court should be even more reluctant to overturn the same judge's refusal to find dishonesty against another party, unless, of course, the findings are incompatible. In our view, there is, therefore, nothing in the cross-appeal.

**Attribution of knowledge: summary of rival contentions**

84. Since we have decided to uphold Patten J.'s finding that Mr Samant had knowledge (of the "blind-eye" variety) of the fraud of the CTD in respect of the second to fifth transactions, the critical issue is BoI's knowledge of BCCI's fraud. BoI can only be declared to be liable under s.213(2) if it was "knowingly" a party to the carrying on by BCCI of its business with intent to defraud creditors of the company or for any fraudulent purpose.

85. The attribution of knowledge to a corporate body, such as BoI, turns on the interpretation of s.213 and its application to the facts found by the judge. In what circumstances can the state of knowledge of an individual be attributed, for the purposes of s.213, to a corporate body, which, in the nature of things, can only derive its knowledge from individuals and be treated as having the knowledge that a relevant individual has? More precisely, can Mr Samant's "blind-eye" knowledge of BCCI's fraudulent trading be treated, for the purposes of s.213, as the corporate knowledge of BoI if, as was found by Patten J., none of the directors of BoI had any personal knowledge of BCCI's fraudulent trading? There has been very little discussion of this aspect of s.213 or its predecessors in the authorities. Such discussion as there is has mainly been in the litigation concerning the collapse of BCCI: see *Re Bank of Credit and Commerce International SA; Banque Arabe Internationale D'Investissement SA v Morris* [2002] B.C.C. 407 at p.411–415 and *Morris v Bank of America National Trust* [2000] B.C.C. 1,076 at pp.1,084–1,085.

**Position of BoI**

86. BoI accepted the possibility that s.213 could apply to a corporate counterparty, such as BoI, but contended that it was more difficult to establish liability than in the case, for example, of an individual director of the fraudulent company. It was submitted that Patten J. was wrong to attribute to BoI Mr Samant's knowledge of the fraud to BoI, so as to make it "knowingly" a party to the fraud in the business carried on by BCCI and thus liable to make contribution to the assets of BCCI under s.213. If the judge was right on this point, BoI would be potentially liable

to the liquidators of BCCI for a very substantial sum. Its liability would be to contribute to the losses suffered by the creditors of BCCI, which would have been avoided but for the transactions entered into by BoI with BCCI.

87. BoI's case, in brief, is that the "directing mind and will" of BoI are its directors. It is only their state of knowledge that counts in deciding whether or not BoI was "knowingly" a party to BCCI's fraud. Mr Samant was not a director of BoI. He had no delegated authority or specific board approval to enter into the transactions with BCCI on behalf of BoI. The evidence did not establish that any members of the board had any relevant personal knowledge of BCCI's fraud, of its deteriorating financial position, of its intention to deceive its creditors or of the fraudulent manipulation of its accounts. So far as the members of the board of BoI were concerned, BoI was assisting BCCI in a legitimate way, not helping it to perpetrate a fraud on its creditors. Subjective dishonesty is an essential ingredient of liability under s.213. There was no dishonesty on the part of the directors of BoI. So no "real moral blame" attached to them personally and no such moral blame could be attached, through them, to BoI.

88. It was submitted that it was contrary to the policy of the legislation, to the legal principles laid down in the authorities, to justice and to common sense to attribute Mr Samant's knowledge to BoI, when it was itself a "secondary victim" of Mr Samant's unlawful conduct and of his breaches of duty in respect of the transactions with BCCI.

**Position of the liquidators of BCCI**

89. The liquidators contended that Patten J. reached the only realistic, acceptable and sensible conclusion, both as a matter of law and on the facts. The liability of BoI for participating in BCCI's fraud was in accordance with (a) the self-evident policy of s.213; (b) the proper construction of the legislative language read, of course, in its context; (c) general principles of corporate liability for civil wrongs committed through the acts of individual agents or employees; and (d) plain good sense.

90. The liquidators relied on the essential facts found by the judge about the circumstances in which the relevant transactions between BoI and BCCI were concluded: the board of BoI had allowed Mr Samant to negotiate and supervise the transactions with BCCI and to make the ultimate decision whether to proceed with them; Mr Samant was BoI's Chief Manager of its United Kingdom and European branches, its most senior officer in the United Kingdom and in Europe; the board accepted the recommendations of Mr Samant as to the transactions, relied on his judgment and gave advance approval to the transactions with BCCI, even though they were unusual in banking terms. In those circumstances it was submitted that Patten J. correctly held that BoI should not be allowed to deny legal responsibility to make contribution to the assets of BCCI to compensate for the loss suffered by its creditors as a result of the fraudulent trading of BCCI.

**Patten J. on attribution of knowledge**

91. We begin with Patten J.'s factual and legal conclusions on the attribution issue. They are summarised in two key paragraphs of his judgment.

> "120. Mr Samant did have delegated authority to lend up to £200,000 unsecured without seeking head office approval. For sums of the order of £10 million or more, not even the General Manager (International) at head office could give the necessary sanction. The proposal needed to be referred to the board. This was of course the procedure adopted in each of the six transactions under review, although in the case of the first transaction Mr Vaghul seems to have approved it under delegated powers. In the present case, however, the scheme of delegation gives an incomplete picture of what was done. At the time when most (if not all) of the transactions were put up for approval, the borrower had yet to be identified. In the case of the second transaction Mr Vaghul explained that, to avoid putting the matter to the board again, Mr Samant was given what he described as

© 2005 Sweet and Maxwell Ltd

blanket permission to go ahead with a borrower nominated by BCCI. It is also clear from the evidence that the approval of the transactions was no more than that: *i.e.* an authority to Mr Samant to lend to the nominated borrower on the terms he had negotiated and agreed. Approval was often given some time in advance of the completion of the transactions and detailed matters such as the investigation of the borrower's purpose or status and the documentation for the transaction were left to Mr Samant to deal with. Head office or board approval was not an instruction to carry out the transaction. Mr Samant retained an obvious and necessary discretion whether to go ahead. This was the basis of the approval given in the second transaction and, after that, board approval seems to have been given rapidly and almost as a matter of course. It is clear, as I have found, that senior executives and the board were content to take Mr Samant's assurances at face value and to leave it to him to satisfy himself that it was proper for BOI to go ahead. In these circumstances he was, at the time of each of the first five transactions, the person who, in Lord Hoffmann's words, had the authority to do the deal.

121. It is common ground that s.213 is capable of applying to a company in the position of BOI. Although it applies to the same conduct which under s.458 of the Companies Act can lead to the imposition of a criminal penalty, the purpose of s.213 is to enable the liquidator to recover compensation from those who have knowingly assisted the fraudulent conduct of a company's business. I do not, therefore, have to decide what are the precise limits of criminal liability under s.458. The only question I have to decide is whether Mr Samant's knowledge is to be attributed to BOI so as to found liability under s.213. In my judgment, it is. It seems to me that to allow BOI to shelter behind an argument that the only relevant knowledge was that of the board would be to defeat the policy of the Act. It would allow banks such as BOI, which choose to rubber-stamp the recommendations of their senior managers without ensuring that all proper and due diligence has been carried out, simply to sidestep liability by relying on their own ineptitude. The board of BOI had, through Mr Shukla, a real concern about the purpose of these transactions at the time of both the first and the second transactions. But they were content to delegate the supervision of the transaction and the ultimate decision whether to proceed to Mr Samant. Despite their own misgivings they chose to rely on his judgement. I cannot see how in those circumstances they should be entitled to deny responsibility for the decisions which he made. The consequence is that BOI is liable to contribute to the losses to creditors which would have been avoided but for these transactions, and I will so order. Given my primary finding against Mr Samant, it is unnecessary for me to consider the liquidators' new and alternative claim that was introduced by way of amendment. It does not arise."

### Scope of s.213

92. In view of the criticisms of the judgment by Mr Moss, we need to examine the various strands of paras 120 and 121 of the judgment: the basis of civil and criminal liability for fraudulent trading; the policy promoted by imposing civil liability under s.213; and the circumstances in which an individual's knowledge of fraud may properly be treated as corporate knowledge for the purposes of s.213.

### The statutory setting

93. Where, as here, civil and criminal liability are the creation of statute, and knowledge ("knowingly") is an essential ingredient of statutory liability, the starting point must be the language, context and policy of the legislation considered against the background of general legal principles.

94. The relevant legal principles governing the circumstances in which a company can be A held civilly or criminally liable for the acts of individuals and for their state of knowledge were explained by Lord Hoffmann in *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] B.C.C. 942; [1995] 2 A.C. 500, a Privy Council decision cited by Patten J. in paras 115–117 of his judgment.

95. The articles of association of the company, its contractual relations and the ways in which its powers are actually exercised are all relevant to locating the company's "directing mind and will" with regard to the particular acts for which it is sought to be made liable. It is B necessary to have regard to the policy and provisions of the relevant legislation. As part of the process of statutory interpretation, and for the purposes of the rule in question, it may be necessary to fashion special rules for the attribution of knowledge to a company. As Lord Hoffmann said at p.946B–F; 507B–F:

> "The company's primary rules of attribution together with the general principles of agency, vicarious liability and so forth are usually sufficient to enable one to determine C its rights and obligations. In exceptional cases, however, they will not provide an answer. This will be the case when a rule of law, either expressly or by implication, excludes attribution on the basis of the general principles of agency or vicarious liability. For example, a rule may be stated in language primarily applicable to a natural person and require some act or state of mind on the part of that person 'himself', as opposed to his servants or agents. This is generally true of rules of the criminal law, which ordinarily impose liability only for the actus reus and mens rea of the defendant D himself. How is such a rule to be applied to a company?
>
> One possibility is that the court may come to the conclusion that the rule was not intended to apply to companies at all; for example, a law which created an offence for which the only penalty was community service. Another possibility is that the court might interpret the law as meaning that it could apply to a company only on the basis of its primary rules of attribution, i.e. if the act giving rise to liability was specifically authorised by a resolution of the board or a unanimous agreement of the shareholders. E But there will be many cases in which neither of these solutions is satisfactory; in which the court considers that the law was intended to apply to companies and that, although it excludes ordinary vicarious liability, insistence on the primary rules of attribution would in practice defeat that intention. In such a case, the court must fashion a special rule of attribution for the particular substantive rule. This is always a matter of interpretation: given that it was intended to apply to a company, how was it intended to F apply? Whose act (or knowledge, or state of mind) was *for this purpose* intended to count as the act etc. of the company? One finds the answer to this question by applying the usual canons of interpretation, taking into account the language of the rule (if it is a statute) and its content and policy."

96. We agree with Patten J. (at paras 118 and 119 of his judgment) that, following this approach, the determination of the person possessing the relevant knowledge for the purposes of ascertaining liability under s.213 is not simply a matter of identifying the person who G authorised the transaction in accordance with the system of authorisation operated by the company in question. The scheme of delegation of authority might, as in this case, provide only an incomplete picture of what was done. It may not be sufficient for the purposes of determining whether the company should be treated as possessing the requisite knowledge. As Patten J. said (at para.118):

> "... the primary rules of attribution, based on factors such as the scope of the agent's authority, may require to be modified either restrictively or liberally in order to H accommodate the statutory purpose of the legislation which imposes the liability."

**Scope of civil and criminal liability for fraudulent trading**

97. Before dealing with the rival arguments on the policy of s.213, we remind ourselves that both civil liability to pay compensation and criminal sanctions may be imposed on any person

© 2005 Sweet and Maxwell Ltd

who is knowingly a party to fraudulent trading. Both types of liability extend beyond the company which actually carried on its business with intent to defraud creditors and its directors to "outsiders", meaning individuals and corporate third parties who have knowingly been parties to the fraudulent trading in question.

98. The predecessor provisions of s.213 were s.275 of the Companies Act 1929 and s.332 of the Companies Act 1948. Those sections combined both compensatory and penal provisions. They were naturally regarded as penal legislation and, as such, were strictly construed so as to give the person charged the benefit of the doubt: *Re Maidstone Building Provisions Ltd* [1971] 1 W.L.R. 1085.

99. The position is different under the 1986 Act. Section 213 is not a penal provision. It only covers civil liability to pay compensation in cases where the company which traded fraudulently is being wound up. A "collective" action can be brought by the liquidator of the fraudulent company for contribution to be made to the assets of that company for the benefit of its creditors.

100. It is accepted that "outsider" companies can be made liable under s.213, provided that it is established they were "knowingly" parties to the fraudulent trading. It has been held that the references to "fraudulent" in the legislation connote "actual dishonesty involving, according to current notions of fair trading amongst commercial men, real moral blame": *Re Patrick and Lyon Ltd* [1933] Ch. 786 at p.790 *per* Maugham J. That was a decision on s.275 of the 1929 Act, under which the jurisdiction of the court was confined in civil cases to declaring that past or present directors, including shadow directors, of the company, which had carried on its business with intent to defraud creditors, should be personally responsible for all or any of the debts or other liabilities of the company as the court may direct.

101. Section 332 of the 1948 Act extended liability beyond past or present directors of the company carrying on its business fraudulently to any persons, including other companies, who were knowingly parties to that fraudulent trading. It was still necessary, however, to establish dishonesty to found civil liability. The requirement of dishonesty presents problems of evidence and proof.

102. Following the report of the Cork Committee on *Insolvency Law and Practice* (Cmnd. 8558, 1982) the 1986 Act included new "wrongful trading" provisions in s.214. They were without prejudice to s.213: see s.214(8). Civil liability was imposed only on "insiders", namely company directors (including shadow directors). "Outsiders" were not liable for wrongful trading. As with fraudulent trading, civil liability for "wrongful trading" was made enforceable in a winding up of the company by the liquidator for the benefit of the company's creditors.

103. An important difference was that the basis of liability for wrongful trading was negligence, not dishonesty as was required under s.213. (Both sections have effect notwithstanding that the person concerned may be criminally liable in respect of matters on the grounds of which the declaration under the section is to be made: s.215(5).)

104. Section 214 provided that:

> "(1) . . ., if in the course of the winding up of a company it appears that subsection (2) of this section applies in relation to a person who is or has been a director of the company, the court, on the application of the liquidator, may declare that that person is to be liable to make such contribution (if any) to the company's assets as the court thinks proper.
>
> (2) This subsection applies in relation to a person if–
>
> (a) the company has gone into insolvent liquidation,
>
> (b) at some time before the commencement of the winding up of the company, that person knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation, and
>
> (c) that person was a director of the company at that time;
>
> but the court shall not make a declaration under this section in any case where the time mentioned in paragraph (b) above was before 28th April 1986."

105. As for criminal sanctions for fraudulent trading, the relevant provisions were detached from the civil liability provisions and amended. The criminal provisions in s.332 of the 1948 Act only applied, as did the civil provisions, to cases where the company was being wound up. While that remains the case with civil liability under s.213 and always has been the case with civil liability under s.214 for wrongful trading, where a company has gone into insolvent liquidation, that restriction has been removed in the case of punishment for the criminal offence of fraudulent trading.

106. The provisions for the punishment of fraudulent trading as a crime are contained in s.458 of the Companies Act 1985:

> "If any business of a company is carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, every person who was knowingly a party to the carrying on of the business in that manner is liable to imprisonment or a fine, or both.
>
> This applies whether or not the company has been, or is in the course of being, wound up."

107. The separation of the provisions relating to civil and criminal liability is relevant in identifying the purpose of the provisions. Separation has made it easier to isolate and focus on the policy of imposing civil liability. That affects the application of the provisions to the facts of particular cases. We turn to consider the policy of s.213.

**The policy arguments**

108. The judge expressly considered the purpose of Parliament in imposing civil liability in order to determine who are the persons potentially liable for involvement in the transactions giving rise to the fraud and in what circumstances the knowledge of individuals may properly be treated as corporate knowledge. He concluded, correctly according to the liquidators, that its purpose was to enable the liquidator of a company to recover compensation for the benefit of those who suffered as a result of the fraud from those who had knowingly assisted the fraudulent conduct of the business of the company in liquidation. It would defeat or at least severely emasculate that purpose if a company, such as BoI, could shelter behind an argument that the only relevant knowledge was that of the board and that a company could escape liability by the board delegating decisions to senior managers and accepting their recommendations.

109. BoI disputed that that was a correct or complete analysis of the policy of s.213. It contended that the policy appearing from the earlier authorities was to make liable only those whose conduct involved "real moral blame": see *Re Patrick and Lyon Ltd* (above). The judge had departed from the earlier decisions on this point. Contrary to the policy of the legislation he had attributed knowledge of fraud to BoI when there was no "real moral blame" attaching to it. There was no evidence that BoI or its directors had deliberately organised its affairs in order to avoid the attribution of "blind-eye" knowledge.

110. BoI submitted that the effect of Patten J.'s decision was to make companies such as banks, who were innocently participating in transactions with the fraudulent company, liable for lack of management supervision and negligent failure in management in the absence of a situation of "real moral blame" and of dishonesty. Where Parliament intended to impose liability in the absence of dishonesty, because, for example, of the difficulties of proving dishonesty, it had expressly done so, as in the provisions in the neighbouring s.214 relating to wrongful trading. It was not the policy of Parliament in that section to make "outsider" individuals and companies liable for wrongful trading. This litigation was an attempt to make BoI liable under s.213 for the alleged negligence of the board and in the absence of any solid evidence of real moral blame attaching to BoI.

© 2005 Sweet and Maxwell Ltd

111. In our judgment Patten J. was correct in his analysis of the policy of s.213. Compensation of those who have suffered loss as a result of the fraudulent trading is the paramount purpose of the provisions imposing civil liability to contribute to the loss suffered.

112. If knowledge were not attributed to an outsider company in cases such as this the purpose of imposing liability upon such a company to pay compensation would, in our judgment, be emasculated. The crucial question is whose knowledge in the company counts, for the purposes of s.213, as corporate knowledge of the outsider company. In most companies of any size there will be a chain of command and delegation of authority and it is likely that the transactions with the fraudulent company will be dealt with at a level in the company below that of the board. It would in practice defeat the effectiveness of the section if liability were limited to those cases in which the board of directors was actually a direct privy to the fraud of the company with whom the transactions were entered into. The question is who had authority in BoI to deal with BCCI in respect of the relevant transactions. That requires a consideration of all the circumstances surrounding the transaction. The liquidators submitted that, on the facts found by Patten J., Mr Samant was, in relation to the particular transactions which have caused loss to the creditors of BCCI, a person who was allowed by the board of BoI to act as the "directing mind and will" of BoI. As for the "real moral blame" required for the existence of civil liability, the liquidators submitted that it existed in this case. It was present in the state of knowledge and conduct of Mr Samant. It was his knowledge that was to be attributed to BoI. Within BoI he had been entrusted with responsibility for the deals with BCCI. It was only right and proper that BoI should take legal responsibility for the consequences.

**Vicarious liability for fraud**

113. As will be explained (see paras 132 *et seq.*), an application was made by the liquidators during the course of the appeal for permission to amend the points of claim to plead vicarious liability on the part of BoI for the acts of Mr Samant in knowingly being a party to the fraudulent trading of BCCI. Vicarious liability had not been pleaded and it was not argued or the subject of evidence at the trial. The court refused the application for the reasons given later in this judgment. We only mention it at this point in the judgment as the relevant principles of vicarious liability were relied on by Mr Purle as confirming Patten J.'s conclusions on the attribution of Mr Samant's guilty knowledge to BoI under s.213. In future cases it may well be possible, depending, of course, on the facts, to simplify cases of this kind by pleading and relying on the doctrine of vicarious liability, so that an employee in the position of Mr Samant could be made liable as a party to fraudulent trading and his corporate employer made vicariously liable to contribute to the losses caused by his wrongful acts. Reliance could be placed on the analysis of the doctrine of vicarious liability by the House of Lords in *Dubai Aluminium Co Ltd v Salaam* [2002] UKHL 48; [2003] 2 A.C. 366, particularly in the speeches of Lord Nicholls of Birkenhead and Lord Millett.

**Attribution of fraud: points on the authorities**

114. Clearly there are some circumstances in which an individual's knowledge of fraud cannot and should not be attributed to a company. The classic case is where the company is itself the target of an agent's or employee's dishonesty. In general, it would not be sensible or realistic to attribute knowledge to the company concerned, if attribution had the effect of defeating the right of the company to recover from a dishonest agent or employee or from a third party. Mr Moss argued that there should be no attribution of knowledge as this was a case in which BoI was the "secondary victim" of Mr Samant. His actions were harmful to the interests of BoI, as he had exposed it to the risk of potential liability for fraudulent trading. We have no hesitation in rejecting that submission. If it were correct, it would never be possible to attribute the knowledge of the individual to a company under s.213. That is contrary to the agreed position that a company is capable of being made liable under s.213. Knowledge of fraud may be attributed to a company even though such attribution may expose it to the risk of liability under s.213.

115. BoI criticised the judge for not applying to this case the principle that the knowledge of an agent should not be attributed to the principal when the agent is acting fraudulently or otherwise in breach of duty and in circumstances where it was contrary to common sense to consider that the agent would have passed on his knowledge of the fraud to his principal. It was argued by BoI that it was contrary to common sense to conclude that Mr Samant, who was found to have been dishonest and to have acted in breach of duty in causing BoI to take part in the transactions with BCCI, would have passed on to the directors of BoI his knowledge that BCCI was conducting its business with an intention to defraud its creditors.

116. As appears from the principles laid down in *Meridian* (see above) the terms of the legislation and the circumstances of the case may make it appropriate to attribute knowledge of fraud to the company, even though a person with knowledge of the fraud has acted dishonestly, in breach of his duty to his principal or employer and in circumstances in which he would not have passed on his knowledge to his agent or employer. For example in *McNicholas Construction Co Ltd v Customs & Excise Commissioners* [2000] S.T.C. 553 a site manager was dishonest in relation to the liability of his employer for VAT. It was held that the policy and content of the legislation overrode any principle that knowledge of fraud was not attributable to a company that was itself a victim of fraud. The company was held liable for VAT evasion.

117. It was submitted that Patten J. was wrong to follow *McNicholas*. It was distinguishable from the present case as it was necessary to have attribution of knowledge to the company in that case in order to make the VAT legislation work. That was not, it was contended, the case here. There was no need to discern or fashion a special rule of attribution in order to prevent the policy of the legislation from being frustrated. Section 213 can work perfectly well on the application of the primary rules of corporate responsibility. On the judge's findings the acts of the employee, Mr Samant, were dishonest. His knowledge should not be attributed to BoI as the acts of Mr Samant were aimed at and harmful to its interests and it cannot be inferred that he would have passed on his knowledge of the fraud of BCCI to the board of BoI.

118. We agree with Patten J. on this point. As in *McNicholas*, the acts of Mr Samant were not in fact targeted at BoI. He was acting for, and in what he apparently believed to be the interests of, BoI in seeking to gross up the balance sheet for the purposes of the year end accounts. The potential liability of BoI under s.213 is irrelevant in deciding whether BoI was a victim of Mr Samant and whether his knowledge should be attributed to it for the purposes of s.213.

119. As for *Meridian*, Mr Moss contended that the judge was wrong to apply it to this case. It was clear in *Meridian* that the policy of the relevant New Zealand legislation was to compel the immediate disclosure of prescribed information in fast moving markets and it was necessary to attribute the knowledge of the chief investment manager for the policy of the legislation to be effective. In the case of s.213 it was not necessary to attribute Mr Samant's knowledge to BoI in order to make the section effective.

120. We also agree with Patten J. on this point. The application of s.213 requires a special rule of attribution in order to make its self evident policy effective. The policy is to make those who have been parties to fraudulent trading liable to compensate the creditors of the fraudulent company. In order to make it effective in a case such as this it is necessary to attribute the knowledge of Mr Samant to BoI. It is not a case, as Mr Moss characterised it, of making BoI liable for the negligence or ineptitude of the BoI board; or of making members of the board personally liable for the fraud when there was no personal dishonesty or real moral blame on their part. They are not liable, nor (save for Mr Shukla and Mr Vaghul) was it sought to make them liable. It is a matter of making BoI itself liable by attributing to it the knowledge of the individual in BoI who had the relevant contact and dealings with the CTD of BCCI. Having regard to all the circumstances in which the transactions were entered into, Mr Samant's knowledge was more relevant than that of any member of the board or of anyone else in BoI.

© 2005 Sweet and Maxwell Ltd

121. BoI also contended that Patten J. erred in failing to consider and apply *Arab Bank plc v Zurich Insurance Co* [1999] 1 Lloyd's Rep. 262, despite the submissions made to him on that case at trial. Mr Moss contended that it was a case of "critical relevance" on the question of attribution of knowledge. The judge had wrongly relied on *McNicholas*, which was inconsistent with *Arab Bank*, as well as being distinguishable from this case for the reasons already discussed.

122. In *Arab Bank* the fraud of a director was not attributed to a company, so as to disentitle it from making a claim under an insurance policy. The insurance company had sought to avoid liability to the company under the policy when the company had claims made against it arising out of fraudulent valuations made by the director in the name of the company. The insurance company sought to attribute the fraud of the director to the company. The case was decided in a contractual context, namely the construction of the conditions of the insurance policy, which prevented the insured from making claims if it was a person who knowingly committed a dishonest or fraudulent act. If knowledge was so attributed to the company, the insurers would not be liable to indemnify under a policy, under which the company and the directors were separately insured.

123. Rix J. held that, on the assumed facts, the director was not the directing mind of the company in relation to the valuations and that it was impossible and contrary to common sense to infer that the director's knowledge of his dishonesty should be transferred to the principal company.

124. In our judgment, the facts and the contractual context make *Arab Bank* a different case. It did not lay down a general principle of attribution of knowledge which governs this case of statutory liability to make compensation to victims of fraudulent trading. *Arab Bank* is not, as Mr Moss contended, authority for the proposition that knowledge of fraud can only be attributed to a company if the individual with the relevant knowledge was a director or directing mind of the company, or where it can be inferred from all the circumstances that the individual transferred his knowledge to the company or to its directing mind and will; nor is it authority for the proposition that there can be no attribution of knowledge where the company is a "secondary victim" of the individual's wrongdoing or breach of duty In our judgment, no justifiable criticism can be made of Patten J. for not citing or discussing the case in his judgment.

### Discussion and conclusions on attribution of knowledge

125. In our judgment, the judge was right to hold that, on the facts found by him and on the application of the correct interpretation of s.213(2), BoI could not deny legal responsibility for the actions of Mr Samant by resisting the attribution of his knowledge to it. Mr Samant's knowledge of the fraud of the CTD of BCCI was sufficient to fix it with liability under s.213.

126. Mr Samant was a senior manager. The board of BoI relied on his judgment in relation to the transactions. He was given a "blanket permission" to deal with BCCI by negotiating the terms of the transactions with borrowers nominated by BCCI, to make recommendations to the board and to give effect to advance approval of head office to enter into the transactions. He was allowed by the board to supervise the relevant transactions with BCCI and ultimately to decide to proceed with them on terms negotiated by him. To use Lord Hoffmann's words in *Meridian*, Mr Samant was the person in BoI who had "authority to deal" with BCCI. He was in substance the relevant decision maker for BoI in respect of the relevant transactions which made BoI a party to the fraudulent trading of BCCI. As Mr Samant had a large measure of responsibility within BoI for the transactions with BCCI, the policy of s.213, justice and good sense combine to justify the treatment of Mr Samant's knowledge as the corporate knowledge of BoI so as to make it responsible for contributing to the assets of BCCI in the winding up.

127. It is true that the judge found that the members of the board of BoI personally had no knowledge of the fraud, but they were content to leave the conduct and completion of the negotiations in the hands of Mr Samant. The attribution of Mr Samant's knowledge to BoI

does no injustice to the members of the board. The question is whether Mr Samant's knowledge should as a matter of law be attributed to BoI for the purposes of s.213, not whether the directors of BoI personally knew of the fraud or should have knowledge of the fraud attributed to them so as to make them personally and individually liable for fraudulent trading (which they are not).

128. None of the cases cited and discussed above prevented Patten J. from reaching and some of them supported him in that conclusion. In our judgment, it is irrelevant to the attribution of the knowledge of Mr Samant to BoI that Mr Samant was acting in breach of his duty to BoI in respect of the transactions with BCCI or that, in a general kind of way, BoI was a "secondary victim" of his wrongdoing and that of BCCI. Neither of those factors is a bar to the attribution of knowledge to BoI, any more than is the lack of personal knowledge of the directors of BoI about BCCI'S fraudulent trading.

**Summary on attribution**

129. We would summarise our conclusions on the issue of attribution as follows. First, the proper approach to the question of attribution in this case turns on the construction and purpose of s.213. Secondly, the severing of criminal and civil liability for fraudulent trading means that there is no question of any conclusion, in principle or on particular facts, as to civil liability affecting the basis on which criminal liability is assessed. Thirdly, the wording of, and policy behind, s.213 indicate that it would be inappropriate, in the case of a company, to limit attribution for its purposes to the board, or those specifically authorised by a resolution of the board. To limit it in such a way would be to ignore reality, and risk emasculating the effect of the provision. In other words, "insistence on the primary rules of attribution would in practice defeat [the legislative] intention", to quote from Lord Hoffmann in *Meridian*. Fourthly, it would be wrong, on the other hand, to attribute to a company the knowledge of any agent irrespective of the particular facts. To do so would risk obvious injustice to a company which had acted not only in good faith, but with scrupulous care; that would not accord with the purpose of s.213.

130. Fifthly, it therefore must to some extent depend on the facts of each particular case whether an agent's knowledge should be attributed to the company for the purposes of s.213, where the circumstances are such that there would be no attribution on the application of the primary rules. We are of the view that it must typically depend on factors such as these. The agent's importance or seniority in the hierarchy of the company: the more senior he is, the easier it is to attribute. His significance and freedom to act in the context of the particular transaction: the more it is "his" transaction, and the more he is effectively left to get on with it by the board, the easier it is to attribute. The degree to which the board is informed, and the extent to which it can be said that it was, in the broadest sense, put on inquiry: the greater the grounds for suspicion or even concern or questioning, the easier it is to attribute, if questions were not raised or answers were too easily accepted by the board.

131. When one considers these factors in the present case, we are of the clear opinion, for the reasons we have given, that this is plainly an appropriate case for attribution. Mr Samant had a very senior position in BoI, he brought the transactions to BoI, he was given a free hand to negotiate them, they were plainly suspicious, there was no questioning, save in relation to the first transaction, and Mr Samant's unconvincing answer was too readily accepted by the board. Further the fact that it was not a "one-off" transaction but a series serves to underline the point.

**Application to amend pleadings and vicarious liability**

132. We turn finally to the liquidators' application for permission to amend the pleadings. Given our decision on the appeal we can take this matter quite shortly, for it is not determinative of the outcome.

© 2005 Sweet and Maxwell Ltd

133. BCCI's re-re-amended points of claim, although lengthy, are in fact comparatively simple and straight-forward. We summarise them, drawing no distinction for this purpose between the various BCCI companies.

134. In para.21 it was alleged that Mr Abedi, Mr Naqvi, Mr Akbar and persons working under their direction fraudulently mis-stated the assets and earnings of BCCI. Lengthy particulars of that allegation were then set out in paras 21–36. In para.37 it was alleged that in the circumstances the business of BCCI was carried on with intent to defraud its creditors and/or for a fraudulent purpose within the meaning of s.213. Paragraph 38 alleged that "BoI participated in the carrying on of the business of [BCCI] in the manner alleged in paragraph 37 above as follows", and lengthy particulars were then set out in paras 39–94. Included, at paras 43A–90, were lengthy particulars of each of the six relevant transactions. In the course of those particulars reference was made to various officers and employees of BoI, including Mr Samant. He is in fact first referred to in para.55. Paragraph 95 alleged that "In the premises, BoI was a party to the carrying on of the business of [BCCI] with intent to defraud [its creditors] and/or for some other fraudulent purposes within the meaning of Section 213". In para.96 it was alleged that "BoI had actual knowledge of, or was deliberately blind or recklessly indifferent to, [certain] facts" including, in particular (para.96.1), that the back-to-back transactions "had no bona fide commercial purpose and had as their sole object the fraudulent manipulation of the published results of BCCI". Particulars of those allegations were set out in paras 96A–96F. Further matters relied upon in support of those allegations of knowledge were set out in para.97. Mr Samant is again referred to, with other officers or employees of BoI, in the course of these particulars. In para.98 it was pleaded that "In the premises, BoI was knowingly a party to the carrying on of the business of [BCCI] with intent to defraud [its creditors] and/or for some other fraudulent purposes within the meaning of Section 213". In para.99 it was pleaded that "By reason of the foregoing, BoI is liable to make such contribution to the assets of [BCCI] as the court thinks fit."

135. We intend no criticism of this pleading, but it is a fact that, except perhaps on a very close and careful reading of it, one would not appreciate the central role which Mr Samant has come to play in the litigation. As we have said, in the pleading he is merely one of a number of BCCI's officers or employees referred to.

136. We need not go through BoI's re-re-amended points of defence in any detail. In large measure they consisted of non-admissions, but paras 38, 96, 98 and 99 of the re-re-amended points of claim were each specifically denied and paras 57–58 of the re-re-amended points of defence contained various specific denials which in effect constituted a denial of para.95 of the re-re-amended points of claim.

137. BCCI now seeks to amend its re-re-amended points of claim by adding a new para.98A which reads as follows:

> "Further or alternatively:
>
> (1) The back to back lending arrangements referred to at paragraphs 25 and 40–90 of the Points of Claim (save for the Sixth Transaction) were negotiated and implemented by Mr Samant in the course of his employment as Chief Manager UK and European branches by BoI in London.
>
> PARTICULARS
>
> (a) The making of advances and the acceptance of deposits were within the ordinary course of BoI's business;
>
> (b) The negotiation and implementation of such advances and deposits was in the ordinary course of Mr Samant's employment;
>
> (c) In negotiating and implementing those advances and deposits Mr Samant also acted pursuant to authorities given:
>
> (i) by the Chairman and Managing Director of BoI on or about 11 November 1981; and

(ii) by the board of BoI on 9 August 1982, 26 October 1983 and 9 August 1984.

(2) Mr Samant was knowingly a party to the carrying on of the business of BCCI as aforesaid and BoI is vicariously liable therefor. Mr Samant knew of BCCI's frauds in the respects found by Patten J in his judgment herein dated 19 March 2004."

138. The critical allegations are that the relevant transactions were "negotiated and implemented" by Mr Samant "in the course of his employment", that he, Mr Samant, was "knowingly" a "party to the [fraudulent] carrying on of the business of BCCI", and that accordingly "BoI is vicariously liable". None of these allegations appears, at least in that form, in the existing pleading.

139. It is common ground that BCCI's application for permission to amend is made after the expiry of the relevant limitation period: see the decision of this court in *Re Farmizer (Products) Ltd; Moore v Gadd* [1997] B.C.C. 655. It is also common ground that the effect of the amendment would be to add a "new claim" within the meaning of s.35(4) of the Supreme Court Act 1981 and CPR, r.17.4(2). Therefore the first question we have to address is whether, within the meaning of s.35(5)(a) and CPR, r.17.4(2), this new claim:

> "arises out of the same facts or substantially the same facts as the [existing] claim".

If it does then we have to decide in the exercise of our discretion whether to allow the amendment; if it does not then we have no power to allow the amendment.

140. The principles which have to be applied are to be found in the decision of this court in *Laws v Society of Lloyds* [2003] EWCA Civ 1887. Put very simply, the question in that case was whether an amendment to plead negligent misrepresentation and/or a claim for misrepresentation under s.2 of the Misrepresentation Act 1967 arose out of the same facts or substantially the same facts as the original claim which was for fraudulent misrepresentation. Cooke J. held that it did not. This court agreed.

141. At para.51 Waller L.J. giving the judgment of the court approved the following statement of principle by Hobhouse L.J. in *Lloyds Bank plc v Rogers (No.2)* [1999] 3 E.G.L.R. 83 at p.86:

> "The policy of the section is that, if factual issues are in any event going to be litigated between the parties, the parties should be able to rely upon any cause of action which substantially arises from those facts."

142. He continued at para.52:

> "It is common ground that there is no authority on what is meant by 'substantially the same facts'. That is no doubt because the words are tolerably clear and the question in each case is a factual one, depending upon the circumstances of the particular case. For example, it seems to us that the answer in a simple case involving one or two defendants may be very different from the answer in a complex case of this kind. These considerations are important because the exercise upon which the judge was engaged involved weighing up the allegations being made and proposed and forming a view whether on balance it could fairly be said that the action for negligent misrepresentation arose out of substantially the same facts as those in issue in the action for fraudulent misrepresentation."

He repeated at para.56 that:

> "whether they arise out of substantially the same facts will depend upon the facts of the particular case."

We draw attention to and emphasise the point that whether or not the statutory test is satisfied will depend upon the facts and circumstances of the particular case.

© 2005 Sweet and Maxwell Ltd

143. Waller L.J. went on to explain at para.61 the nature of the exercise involved under s.35(5):

> "The exercise involved under section 35(5) is to decide first what facts were already in issue in the claim already made, here fraud, and then to decide whether the new cause of action arises out of the same or substantially the same facts. That involves focusing at the second stage, not upon every issue that might arise if the amendment were allowed, but upon the cause of action alleged. It is for that reason that on the facts here it was right to compare the issues in the fraud trial with the allegations of negligence."

144. He had earlier explained at para.60 why in that case this court agreed with the judge:

> "Although the similarities between the underlying facts were stressed in argument on behalf of the Names and we recognise that there were many underlying facts common to the two cases, we have reached the clear conclusion that the judge was right to hold that the facts involved in the new cause of action, which focus on what those at Lloyd's should have done rather than what they knew, were not substantially the same as those which were in issue in the fraud trial, which was all about whether particular individuals knew that the alleged misrepresentations were untrue."

145. Plainly in the present case there are many factual issues common to both the claim as currently pleaded and the proposed new claim, for example, BCCI's fraudulent trading and Mr Samant's alleged knowledge of BCCI's fraud. But the new claim, as it seems to us, equally plainly raises a significant number of new factual issues. Three, in particular, are critical: (i) the allegation that Mr Samant himself was a party to BCCI's fraud, (ii) the allegation that the relevant transactions were negotiated and implemented by Mr Samant, and (iii) the allegation that Mr Samant's acts were in the course of his employment. Each of these allegations, in our judgment, is new. Taken together, in the particular circumstances of this case, they show that it simply cannot be said that the new claim arises out of "the same" or even "substantially the same facts" as the existing claim.

146. As Mr Moss points out, BoI was a party to BCCI's fraud (assuming, contrary to his client's case, that there was such a fraud) because BoI was itself a contracting party to the relevant transactions. But Mr Samant, unlike BoI, was not a contracting party. If, therefore, it is to be said that Mr Samant was nonetheless a party to BCCI's fraud, then other and additional facts – facts going beyond the mere fact that BoI contracted with BCCI – will be required to prove it.

147. At the trial the parties and the court were not necessarily concerned to investigate whether it was Mr Samant who had negotiated and implemented the various transactions. This, after all, is an allegation which does not feature in the current pleadings. Nor does it sit entirely comfortably with the fact that the case as presently pleaded merely identifies Mr Samant as one of a number of BoI's officers and employees involved in the transactions. Moreover, careful analysis of the present pleadings shows that there is *no* reference to Mr Samant in relation to the implementation of the first, third, fourth and fifth transactions and only passing reference to him in relation to the second transaction. The references to Mr Samant in para.97 relate to the issue of knowledge, not to the entirely distinct issues of negotiation and implementation. At trial the evidence, the argument and the court's attention were all directed essentially to Mr Samant's state of mind, not his acts. The new case would require investigation of precisely what it was that Mr Samant did to "negotiate and implement" each of the relevant transactions.

148. Proof of the allegation that Mr Samant was acting in the ordinary course of his employment would, as Mr Moss points out, require evidence of his contract of employment and of BoI's internal rules about the scope of his authority. At trial there was, not surprisingly, no evidence of the former and only limited evidence of the latter. These were not facts that were relevant to the original claim. It would also require an investigation of whether the transactions in question were in the ordinary business of BoI, something which, as Mr Moss points out, is far from obvious given Patten J.'s characterisation of the transactions (in paras 33 and 49 of his judgment) as "not an ordinary loan transaction of any kind" and "entirely artificial".

149. Mr Moss submits, and we agree, that it is clear that neither the current pleadings nor the evidence in fact adduced at the trial addressed these additional factual issues, issues which are central to the new claim now being put forward. As he points out – and we think this is a point of substance, not just a debating point – if all these matters had previously been adequately pleaded BCCI would not now be seeking to amend.

150. Accordingly, the new claim does not, in our judgment, arise out of the same facts or substantially the same facts as the existing claim. It follows that BCCI's application for permission to amend must be refused.

151. In the circumstances there is no need for us to consider how we would have exercised our discretion if we had been persuaded that we had jurisdiction. We merely wish to make clear that it should not be assumed that we would have been prepared to exercise our discretion in BCCI's favour.

**Result**

152. The appeal and the cross-appeal are dismissed.

(*Appeal and cross-appeal dismissed. Application to amend pleadings refused*)

© 2005 Sweet and Maxwell Ltd