# Exhibit L

# Re Bank of Credit and Commerce International SA & Ors Morris & Ors v State Bank of India

[2003] EWHC 1868 (Ch)
Chancery Division.
Patten J.
Judgment delivered July 30, 2003.

*Winding up – Fraudulent trading – Banking group – Group arranged loans for company set up by senior official of bank – Lender unaware of relationship between borrower and banking group – Loans guaranteed by banking group – Banking group also deposited equivalent sums with lender and provided right of set-off – Banking group refused to grant lien because of 'balance sheet constraints' – Lender accepted bank's explanations – Loans formed part of circular transaction to allow banking group to keep liabilities off balance sheet and disguise insolvency – Banking group collapsed several years later – Whether lender liable in fraudulent trading by banking group – Test for liability in fraudulent trading – Insolvency Act 1986, s.213.*

**This was a claim by the liquidators of companies in a collapsed banking group involved in massive fraud against another bank for its involvement with the collapsed group in fraudulent trading under s.213 of the Insolvency Act 1986.**

**The Bank of Credit and Commerce International ('BCCI') group was established in 1972 with capital from Arab investors in the Gulf states. The group achieved rapid growth and by the end of 1989 employed about 14,000 staff in more than 70 countries. The principal operating companies, 'BCCI SA' and 'BCCI Overseas', had over 110 operating branches in 41 countries and a further 18 representative offices in 17 countries at the time the group collapsed in July 1991. At that time BCCI SA and BCCI Overseas had an estimated deficiency for creditors in the region of US$10 billion. As a result of actions by the liquidators making recoveries from third parties, dividends of 60 cents on the US dollar had been secured for the benefit of creditors. The current claim was part of that continuing process. By the 1980s BCCI had incurred significant losses and in order to conceal them it embarked on a wide-scale fraud. As part of one of the frauds a senior member of BCCI had established a company, 'Notan', which in October 1983 approached the defendant bank, 'SBI', for a loan of US$20 million for a period of three months. The loan would be guaranteed by a prime London bank (BCCI SA) which would also deposit funds with SBI prior to drawdown of the loan in the same amount as the loan. Interest on the loan to Notan was to be at a rate of a half per cent p.a. above the rate of interest payable by SBI on BCCI SA's matching deposit. The guarantee contained an express right of set-off. BCCI explained to SBI that it preferred to provide a guarantee rather than a lien because a lien would have to be referred to in BCCI's end of year accounts and that it could not make the loans directly to Notan due to 'balance sheet constraints'. At that time there is no evidence to suggest that BCCI had a dubious reputation in the City of London. The loan to Notan was drawn down on November 1, 1983, and debited to a BCCI Overseas account in New York without any sub-account in the name of Notan being specified. Unknown to SBI, BCCI then utilised the moneys received for its own purposes to manipulate its balance sheet and help make it appear solvent. BCCI concealed from its auditors the existence of the guarantees in favour of SBI as well as the utilisation of the SBI loan moneys in the reduction of overdrawn accounts. An identical process was entered into a few weeks later with a further loan of $20 million by SBI, ostensibly to Notan, on December 15, 1983.**

**BCCI went into liquidation in 1992 and the liquidators claimed against SBI under s.213 Insolvency Act 1986 on the basis that SBI had knowingly participated in the fraudulent scheme devised by BCCI to enable it to present a false account of its assets and liquidity. The liquidators contended that SBI had actual knowledge of, or was**

**deliberately blind or recklessly indifferent to, the fraudulent nature of the transactions. A
Their evidence was based on a comparative exercise involving an analysis of the way in
which SBI had handled the transactions viewed against the standards to be expected of a
hypothetical competent and honest bank.**

*Held*, **dismissing the claim:**

**1. Three elements were required to be established for liability under s.213: (1) that the
business of the company in liquidation had been carried on with intent to defraud the B
creditors of the company or for any other fraudulent purpose; (2) that the defendant
sought to be made liable (in this case SBI) participated in the carrying on of the business
of the company in that manner; and (3) that it did so knowingly, i.e. with knowledge that
the transactions it was participating in were intended to defraud the creditors of the
company or were in some other way fraudulent. The first two components are admitted:
SBI accepted that the transactions it entered into were designed by BCCI to manipulate
its balance sheet so as to create a deceptively false picture of its assets and liquidity. The C
sole issue was whether SBI had knowledge of these facts.**

**2. For this purpose, knowledge included deliberately shutting one's eyes to the
obvious, provided that the fraudulent nature of the transactions did in fact appear
obvious to those who dealt with these matters at SBI at the relevant time. The case for SBI
was that at no time during the course of these transactions did it in fact suspect that
anything untoward was going on. Whether SBI had knowledge of the fraud would D
include blind-eye knowledge, which required a suspicion that the relevant facts did exist
and a deliberate decision to avoid confirming that they did exist.**

**3. In the banking world no bank liked creating a charge over its assets and, therefore,
the explanation for preferring a guarantee over creating a lien was reasonable and one
that SBI had been entitled to accept. Although there had been no real enquiries about the
financial standing of Notan or the reasons why it had required the loan, this was because
the terms of BCCI's guarantee and set-off meant that SBI would incur no funding risk in E
the transaction – as far as SBI was concerned, the transaction was virtually risk-free.
These factors meant that the credit risk in the transaction was effectively with BCCI and
the creditworthiness of the borrower was not looked into. The reference to 'balance sheet
constraints' would not have struck anyone at SBI as an incredible explanation for the
absence of a direct loan. In relation to the payment instructions, it was unusual for no
sub-account in Notan's name to have been specified, but either singly or with other F
evidence this was not enough to set the alarm bells ringing at SBI.**

**4. It could not be said in all the circumstances that the explanation given to SBI of the
reason why BCCI could not lend direct should have alerted SBI to the likelihood that it
had been dealing with a fraud.**

**Per Curiam**

**The liquidators' claim relied in evidence very much on the witness statements of a G
forensic accountant who had been closely involved in the prosecution of the claim. Such
evidence was admissible, but it would be preferable in any future case of this kind for the
views expressed by somebody in the expert's position to be confirmed by an independent
expert called by the claimants. That would remove any possible controversy about the
independence and objectivity of the evidence which was being given.**

The following cases were referred to in the judgment: H

*Aktieselskabet Dansk Skibsfinansiering v Brothers* [2001] 2 BCLC 324.
*Manifest Shipping Co Ltd v Uni-Polaris Co Ltd* [2003] 1 AC 469.
*Twinsectra Ltd v Yardley* [2002] 2 AC 164.

Charles Purle QC and Blair Leahy (instructed by Lovells) for the claimants.

Robin Potts QC and Lloyd Tamlyn (instructed by Royds RDW) for the defendant.

© 2003 Sweet and Maxwell Ltd

A JUDGMENT

**Patten J: Introduction**

1. The BCCI group (which for convenience I shall refer to simply as 'BCCI') was established in 1972 with the incorporation and licensing of Bank of Credit and Commerce International SA ('BCCI SA') as a bank under the laws of the Grand Duchy of Luxembourg. This was followed by the incorporation of BCCI Holdings (Luxembourg) SA ('BCCI Holdings') on December 13, 1974, and the incorporation and licensing of Bank of Credit and Commerce International (Overseas) Ltd ('BCCI Overseas') in the Cayman Islands on November 24, 1975. BCCI Holdings became the parent company of BCCI SA and BCCI Overseas, but did not itself carry on any banking business. BCCI SA and BCCI Overseas were the principal operating subsidiaries and are the companies which feature in the transactions with which this action is concerned. Between them these two companies had over 110 operating branches in 41 countries and a further 18 representative offices in 17 countries at the time when BCCI collapsed in July 1991. In the United Kingdom (including the Isle of Man) BCCI SA had 24 branches, with a head office at 100 Leadenhall Street in the City of London. No group company was ever incorporated in any part of the United Kingdom, but BCCI SA carried on business as a licensed deposit-taker subject to the regulatory supervision of the Bank of England under the Banking Act 1979.

2. At the time of the collapse in July 1991 the deficiency as regards the creditors of BCCI SA and BCCI Overseas was estimated to be in the region of US$10 billion. Since then, however, as a result of the actions of the liquidators, it has been possible to secure dividends of 60 cents in the US dollar for the benefit of creditors, largely funded from recoveries which the liquidators have been able to obtain against third parties. This action is part of that continuing process. The claim, against State Bank of India ('SBI') is that it knowingly participated in a fraudulent scheme devised by BCCI to enable it to manipulate its balance sheet for the year-ended December 1983, so as to present a false account of its assets and liquidity. I shall come to the detail of the scheme later in this judgment, but it can be briefly summarised as follows. In October 1983 SBI received an approach from a Mr Ajay Krishnan Puri, purporting to act on behalf of a company called Notan Trading and Investments Limited ('Notan'). This company was incorporated in Liechtenstein on September 7, 1982, with Liechtenstein-based directors, and had earlier that year opened deposit and current accounts with SBI. Part of SBI's disclosure comprises a certified resolution of Notan dated July 28, 1983, on headed notepaper, with a PO Box in the Sultanate of Oman given as the address of its administrative office. The registered office of the company was another PO Box number in Liechtenstein. The resolution authorised the opening of a bank account for the company with SBI and in terms empowered the bank to act on the joint instructions of Mr Puri and a Mr Ziauddin Akbar for the purpose of honouring cheques or making any other payments into or out of the account. The resolution was also signed by Mr Akbar as the authorised signatory for the board of directors of Notan, and the SBI standard form of request for banking facilities was signed by Mr Akbar and Mr Puri on the same day. As part of that same process both Mr Akbar and Mr Puri provided a specimen of their signatures for mandate purposes, which, in the case of Mr Akbar, gave an address at 22 Basing Hill, London NW3.

3. Mr Akbar was at the time a senior figure in the Central Treasury Division ('CTD') of BCCI in London and, as it subsequently transpired, was personally responsible for many, if not most, of the fraudulent transactions carried out by BCCI to hide its worsening financial position in the early 1980s. He was not a director of Notan and in his subsequent interviews with the Serious Fraud Office he said that Notan had been set up to assist Mr Puri to obtain a work permit. It is, however clear that the primary purpose of establishing Notan was to assist

BCCI in carrying out its fraudulent accounting practices, and the company was controlled by Mr Akbar out of the CTD in London. A

4. BCCI was founded with capital from Arab investors in the Gulf states. It achieved rapid growth and, by the end of 1989, employed about 14,000 staff in more than 70 countries. Until 1988 the President and Chief Executive of BCCI was Mr Agha Hasan Abedi. During the same period he had as his deputy Mr Swaleh Naqvi, who took over as Chief Executive Officer when Mr Abedi fell ill in 1988. Having no lender of last resort, it was necessary for BCCI to maintain B a high level of liquidity. By the early 1980s it had incurred significant losses through poor lending (particularly in relation to a number of borrowers in the Gulf and Saudi Arabia) and from unsuccessful metal trading on its own account. One of these borrowers was a Mr Abdul Raouf Khalil, a Saudi Arabian businessman who operated and controlled the Khalil group of companies. They maintained a number of accounts with BCCI which were heavily overdrawn, although it is right to add that by 1983 some (and perhaps most) of this apparent indebtedness may itself have been due to the manipulation of the accounts by BCCI with the active C co-operation of Mr Khalil, as part of the wider fraud I am about to come to.

5. In order to conceal these and other losses and to maintain public confidence in the bank, BCCI embarked on a systematic and wide-scale fraud involving the manipulation of account balances with the twin objective of concealing losses and boosting apparent profits. The investigations have revealed that this practice was initiated by Mr Abedi and Mr Naqvi and was operated by Mr Akbar through the CTD in London. It was successful in deceiving the auditors D and regulations of both BCCI SA and BCCI Overseas, together with their customers and depositors. The evidence of the liquidators based on a report prepared for the Serious Fraud Office, is that BCCI was insolvent from at least 1983. The CTD had been established in 1977 and operated from BCCI SA's offices in Leadenhall Street until about October 1986, when it was moved to Abu Dhabi. The CTD managed and controlled the surplus funds of BCCI and was managed by BCCI SA under a management agreement with BCCI Overseas. However, the treasury activities were all booked and recorded in the name of BCCI Overseas in Grand E Cayman and BCCI SA accounted for its own funds, managed by the CTD, as inter-company debts due from BCCI Overseas.

6. Mr Akbar controlled the CTD and reported direct to Mr Naqvi. He was also the Account Officer for the Khalil group and controlled the accounting of the Grand Cayman branch of BCCI Overseas. He eventually resigned from BCCI in 1986. On September 28, 1993, he pleaded guilty at the Central Criminal Court to 16 counts of false accounting, contrary to s.17 F of the Theft Act 1968 and was sentenced to six years' imprisonment on each count, the sentences to run concurrently. Counts 13 and 14 relate to the two loan transactions with which this action is concerned.

7. Notan had both US dollar and sterling accounts with SBI. Up to the end of October 1983 the combined receipts into its US dollar accounts amounted to some $2.342 million, against which there had been a payment out of just over $1 million. In the same period there had been G payments into its sterling accounts (including interest) of some £142,623, and payments out to a variety of payees, including Mr Puri himself, in a total sum of £53,567. Then on October 5, 1983, Mr Puri, without any prior discussion, approached SBI for a loan of US$20 million, which it required for a period of three months on what is described as a spread-over basis. The loan was to be guaranteed by a prime London bank (later identified as BCCI SA) which would also deposit funds in the same amount prior to the drawdown of the loan to Notan, and for a term expiring five days after the Notan loan became repayable. Mr Puri told SBI that no lien H was to be marked on the deposited funds and that the loan to Notan would be required urgently by the beginning of November. The transaction, as it eventually emerged, was that SBI agreed to provide Notan with a loan of US$20 million for a term of three months, to be drawn down on November 15, 1983. Under the terms of the facility letter as amended, BCCI SA was to deposit an equivalent sum of US$20 million with SBI for the duration of the loan plus four days, so as

**© 2003 Sweet and Maxwell Ltd**

A to provide the necessary funding for the entire term of the loan. It was also to provide a guarantee, on terms satisfactory to SBI, to repay the loan to Notan in the event that it was not repaid at maturity. Interest on the loan to Notan was to be at a rate of a half per cent per annum above the rate of interest payable by SBI on BCCI's matching deposit. The guarantee provided for under the terms of the facility letter was executed by Mr Akbar and two other BCCI treasury employees on or about October 28, 1983, on behalf of BCCI SA and contained an express right of set-off. In addition, on October 31, 1983, BCCI SA deposited the sum of US$20 million with B SBI in its account in New York with Citibank until February 6, 1984, at an interest rate of 9.3125 per cent per annum and accounted for the deposit by debiting the sum to BCCI Overseas' Nostro account at Bank of America in New York. The loan to Notan was drawn down on 1 November by SBI remitting the US$20 million from its account with Citibank to an account of BCCI SA at the Bank of America in New York (No. 48586050).

8. The payment instructions from Notan received by SBI on November 1 were signed by C Mr Puri and Mr Akbar, and requested the $20 million to be transferred to BCCI SA's account without specifying any sub-account in the name of Notan. As I shall explain later in this judgment, one of the principal allegations made by the liquidators is that the terms of these payment instructions put SBI on notice that the moneys were being routed back to BCCI for its own use beneficially, rather than being disbursed to BCCI for the credit of Notan. What is known (but is not alleged to have been known by SBI at the time) is that the moneys, when received, were accounted for by BCCI SA as a transfer to the credit of an account D (No. 01001279) with BCCI Overseas in the name of Mr Khalil. On December 30, the moneys were then transferred from that account to a metals trading account in the name of BCCI Overseas (No. 90511109) which had been used for speculative purchases of silver and had a negative balance.

9. On December 5, 1983, SBI agreed to lend Notan a further sum of $20 million on almost identical terms. The moneys were disbursed on December 15 and were repayable on E February 1, 1984. BCCI SA again provided the funding by prior deposit of a matching sum with SBI and gave a guarantee for the loan, including the contractual right of set-off. Its own deposit was for a period expiring on February 6, 1984. As in the case of the first loan, the moneys, when drawn down, were remitted to BCCI SA's account with the Bank of America and then credited to BCCI Overseas' Nostro account. They were then used by BCCI Overseas to credit the overdrawn Khalil account. As a result of this and other credit transfers from other sources, BCCI was able to convert a debit balance of US$85,280,341 into a credit balance for F year-end purposes of US$9,261,646.17. The auditors were prepared on this basis to treat BCCI's exposure to the Khalil group as fully collectable and made no provision in respect of their borrowings. However, by January 13, 1984 (following the repayment and reversal of most of the credits) the Khalil account No. 01001279 had once again become overdrawn by more than US$155 million. Both the Notan loans were repaid on February 15, 1984, by a transfer from BCCI SA to SBI of the sum of US$40,754,861.12, representing repayment of the sums G due plus interest. On February 6 SBI paid US$40,779,147.67 to BCCI SA. The excess of the interest over that payable by Notan to SBI is accounted for by the longer term of the BCCI deposit.

**Fraudulent trading**

10. As a result of the fraudulent practices involving these and other transactions, the audited accounts of BCCI Overseas for the year-ended December 31, 1983, showed pre-tax profits of H US$136,340,000, from which BCCI Overseas paid a cash dividend of US$75 million. What the accounts should have shown was a loss before tax of at least US$45,497,000, together with a reduction of US$136,114,000 in the brought forward retained earnings as at January 1, 1983. The audited accounts showed retained earnings of US$23,943,000, when they should have shown a retained loss of US$294,008,000, a reduction of US$317,951,000. The audited accounts of BCCI SA for the same period showed pre-tax profits of US$39,298,000, when they

should have shown a pre-tax loss of at least US$62,722,000. Retained earnings were recorded in the sum of US$10,056,000, when the true position was that there was a retained loss of US$91,964,000. It is common ground between the parties to this action that the two loan transactions with which SBI was concerned assisted BCCI to manipulate its year-end figures in the way I have described, by enabling BCCI to utilise the loans made to Notan in order to eliminate a significant proportion of the indebtedness on the Kahlil and the metal trading accounts. That was undoubtedly the primary purpose of the scheme. But by routing the moneys through SBI rather than by making a direct loan to Notan, BCCI obtained the additional advantage of being able to account for the deposits in the accounts of BCCI Overseas as sums 'Due from Banks'. The liquidators' case (which is not accepted by SBI) is that these deposits should have been accounted for as moneys subject to an encumbrance and should have been shown in the audited accounts as a set-off against the US$40 million loans to Notan. This argument in part depends upon what is the correct accounting treatment of the respective payments and liabilities, but the liquidators' view of that is largely predicated upon a further contention that, although made nominally to Notan, the SBI loans were in substance loans to BCCI and should have been treated as liabilities of BCCI in its audited accounts. What, however, is not in dispute is that BCCI concealed from its auditors the existence of the guarantees in favour of SBI, as well as the utilisation of the SBI loan moneys in the reduction of the overdrawn Khalil and metal trading accounts.

A B C D

**The test of liability**

11. The liquidators' claim against SBI is brought under s.213 of the Insolvency Act 1986, which provides that:

> '(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.
>
> (2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper.'

E

There are therefore three elements to be established: (1) that the business of the company in liquidation has been carried on with intent to defraud the creditors of the company or for any other fraudulent purpose; (2) that the defendant sought to be made liable (in this case SBI) participated in the carrying on of the business of the company in that manner; and (3) that it did so knowingly: *i.e.* with knowledge that the transactions it was participating in were intended to defraud the creditors of the company or were in some other way fraudulent. The first two components are admitted. SBI accepts that the transactions it entered into were designed by BCCI to manipulate its balance sheet so as to create a deceptively false picture of its assets and liquidity. The sole issue is whether SBI had knowledge of these facts. The allegation made by the liquidators, as set out in para.58 of the re-amended points of claim, is that SBI had actual knowledge of, or was deliberately blind or recklessly indifferent to, the fraudulent nature of the transactions. Mr Potts QC, on behalf of SBI, accepts that if any of those states of mind is established, then his clients will be liable. Knowledge includes deliberately shutting one's eyes to the obvious, provided that the fraudulent nature of the transactions did in fact appear obvious to those who dealt with these matters at SBI at the relevant time. It is well established that it is no defence to say that one declined to ask questions, when the only reason for not doing so was an actual appreciation that the answers to those questions would be likely to disclose the existence of a fraud. But liability in such cases depends upon that stage of consciousness having been reached. His submission, which I accept, is that one needs to be careful to draw a distinction between a conscious appreciation of the true nature of the business being carried on

F G H

© 2003 Sweet and Maxwell Ltd

A and a failure, however negligent, to appreciate that fraud was being perpetrated. The case for SBI is that at no time during the course of these transactions did it in fact suspect that anything untoward was going on. The essentials of what is required in order to establish so-called blind-eye knowledge are set out in the speech of Lord Scott of Foscote in the recent decision of the House of Lords in *Manifest Shipping Co Ltd v Uni-Polaris Co Ltd* [2003] 1 AC 469, where Lord Scott at para.116 says this:

B > 'In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist. But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that may, at one extreme, be no more than a vague feeling of unease and, at the other extreme, reflect a firm belief in the existence of the relevant facts. In my opinion, in order for there to be blind- eye knowledge, the suspicion must be firmly grounded and targeted on specific facts. The deliberate decision must be a decision to avoid obtaining C confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to enquire into an untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the basis of a finding of privity.'

12. Mr Potts also submitted that in order to establish liability under s.213, it was necessary to prove that SBI, through its officers and agents, was dishonest. This, he submitted, is an D essential element of liability under s.213, which stems from the references in the section to the business of the company having been carried on with an intent to defraud. Those words obviously do connote actual dishonesty, and in the case of BCCI this is admitted. But in the case of a secondary party, sought to be made liable under s.213(2), all that is in terms required is that that party should have knowingly participated in the carrying on of the business with intent to defraud. It is difficult to see how, in practice, a conscious decision to participate in transactions which are known to be fraudulent does not constitute dishonesty, and for that E reason I prefer to concentrate on the question whether SBI did in fact know what it was doing. Mr Potts accepts that if knowledge in the sense outlined above is established, then a finding of dishonesty must follow. This is not, after all, a case in which SBI admits that it knew what the true purpose of the two loan transactions was, but took the view that what was being done was not dishonest. The only defence to the claim is that it did not have the knowledge alleged. In the course of their submissions the point was therefore reached when both Mr Purle and Mr Potts F accepted that, on the facts of this case, knowledge would establish dishonesty, and that I need not be troubled with the problems involved in defining dishonesty, which were recently considered. by the House of Lords in *Twinsectra Ltd v Yardley* [2002] 2 AC 164.

13. On May 31, 2002, Hart J ordered a separate trial of the issue of whether SBI was knowingly a party to the carrying on of the business of BCCI SA and BCCI Overseas with intent to defraud their creditors, and, if so, whether SBI should be ordered to pay some sum to the liquidators. Issues of quantum were postponed to a later hearing in the event that liability G was established. My principal task, therefore, is to deal with the issue of knowledge, but SBI accepts that if I determine that issue against them, there are no other factors which should cause me not to order a payment of some kind. In that event the only remaining issue will be the assessment of how much.

H **The allegations**

14. The principal allegations of knowledge are contained in para.58 of the re-re-amended points of claim. It is there alleged that SBI had actual knowledge of, or was deliberately blind or recklessly indifferent to, the fact that:

(i) the two loan transactions, when considered in conjunction with the BCCI deposits, had no bona fide commercial purpose, but had as their sole object the fraudulent

manipulation of the December 31, 1983, published results of BCCI SA and/or BCCI Overseas; A

(ii) the two deposits by BCCI SA with SBI had been falsely and dishonestly mis-described as 'free deposits', when in fact they were intended to fund and/or secure loans of equal amount granted by SBI ostensibly to Notan;

(iii) BCCI Overseas and BCCI SA were not only guarantors of the two loans granted by SBI ostensibly to Notan, but in fact had an actual but off-balance-sheet liability to repay the same; and B

(iv) Notan had been nominated by BCCI as the ostensible borrower in order fraudulently to keep BCCI SA and/or BCCI Overseas' actual liability to repay the two loans outside their respective balance sheets.

15. The allegations of fraud and dishonesty on the part of BCCI, and knowledge of that fraud on the part of SBI, are therefore directed to both stages of the transactions with which this action is concerned. C In relation to the deposits, which, as already indicated, were made to enable SBI to fund the Notan loans without needing to raise the necessary foreign currency on the markets, and also to facilitate the exercise of the right of set-off under the guarantees in the event that the Notan loans were not repaid on time, the allegation is that both BCCI and SBI dishonestly (and therefore knowingly) mis-described the deposits as 'free deposits' in order to conceal their true nature and purpose from BCCI's auditors. It is not, therefore, merely an D allegation that SBI knew that the deposit aspect of the transactions was intended in some way falsely to improve the BCCI balance sheets by including the deposits as sums due from banks in the form of uncharged deposits with no corresponding liabilities. It is in terms an allegation that SBI's internal classification of the deposits as 'free deposits' was intended to achieve the same purpose. However, during the course of the hearing it was accepted by the claimants that none of SBI's internal documentation in relation to the deposits was likely to, or was intended to, form part of the audit trail for BCCI, and the allegation about that internal documentation E seems now to be that the description of 'free deposits' was, to SBI's knowledge, inaccurate and wrong, and was simply adopted consistently with the way in which BCCI wished to characterise the transactions for its own balance sheet purposes. In relation to the second aspect or stage of the loan transactions (*i.e.* the loans from SBI to Notan) the liquidators' case (which is admitted) is that Notan was never anything more than the creature of BCCI and Mr Akbar, and that far from being a genuine commercial borrower for its own purposes, it was simply the conduit by which the $40 million was channelled back to BCCI in order to alter the balances on F the Khalil and the metal trading accounts. A sham is not in terms alleged, but SBI is said to have known that it was not making the loans to Notan for its own use from the part played by Mr Akbar in the obtaining of the loans on behalf of the company, the terms of the payment instructions made out as they were in favour of BCCI as beneficiary with no designated sub-account in favour of Notan, and SBI's complete lack of knowledge of, and failure to enquire into, the purposes for which Notan required such large sums of money. The liquidators G particularly rely on the failure by Notan to give any reasons for subsequently increasing its indebtedness by a further $20 million.

16. It is, however, also important to record at this stage in my judgment, before going on to consider the detailed evidence of the relevant transactions, what the liquidators are alleging against SBI. Mr Purle accepted, during the course of his closing submissions, that the evidence did not support an allegation that SBI, through its relevant officers, had been told by Mr Akbar H and Mr Puri precisely what BCCI had in mind and had been invited to participate in the fraud. That would amount to a conspiracy and none is alleged. The liquidators' case is that, on the facts known to SBI prior to receiving the payment instructions on November 1, 1983, it must have been and was obvious to them that the transaction had been structured by Notan and BCCI so as to give a false impression about the true nature of the deposits, with a view to falsifying its balance sheet and accounts. The terms of the payment instructions simply confirmed that view,

**© 2003 Sweet and Maxwell Ltd**

A but in turn must have caused SBI to focus not merely on the deposit arrangements and their proper status, but also upon the ultimate destination and use of the funds. It is not alleged that SBI knew precisely what BCCI intended to do with the money, particularly in relation to the Khalil and the metal trading accounts. But it is alleged that SBI knew that the loans, though ostensibly granted to Notan, were in substance and reality the liabilities of BCCI, which intended to shelter behind Notan, thereby concealing its liabilities from the balance sheet and its auditors. SBI of course denies this, but Mr Potts accepts that if I find that SBI, through its B officers and employees, knew that what was intended to be a loan to Notan was in reality simply the return of the money to BCCI for its own use, then SBI, if honest, would not have gone ahead with the transaction. It would have known from that very fact that the loans had been applied for by Mr Puri on a false basis, and that it was dealing with an entirely circular and fictitious transaction for which no honest explanation or justification had been given. The inference that SBI had made itself a party to a fraudulent and dishonest scheme would be C irresistible.

**Some general points on the evidence**

17. Before coming to the detail of the evidence, it is necessary, I think, to make one or two general observations. The events with which this case is concerned took place almost 20 years ago. Although a number of the witnesses called on behalf of SBI claimed to have some D personal recollection of particular aspects of the transactions, most of them accepted that their knowledge and recollection was at best only partial, and that is hardly surprising. It is clear that the witness statements have in large part been constructed around the extant documents, and the witnesses invited to comment on the history of events as recorded in that material. There is nothing inherently wrong in this process, as long as it is recognised for what it is: namely, a reconstruction of events which can be no better than the documents allow. A further aspect and consequence of the passage of time is that a lack of precise recollection is, in my experience, E bolstered by the almost inevitable tendency of witnesses whose reputations and conduct are under attack to interpret, and sometimes re-interpret, events in the way most favourable to their own view of things. There is undoubtedly an element of that in this case, as I shall indicate when I review the evidence. This does not mean that any of the witnesses have set out to give a deliberately false account of events. It is simply to recognise everybody's capacity for self-justification.

F 18. In this case I was particularly conscious of the pressure on all of the SBI witnesses imposed by the serious nature of the allegations which have been made. SBI is the largest commercial bank in India, with a network of over 9,000 branches and a market share in the country of around 20 per cent. In addition, the bank also operates some 51 overseas offices in 31 countries. SBI was created by an Act of Parliament in 1955 to succeed the Imperial Bank of India, which was nationalised. The majority of its shares are held by the Government of India through the Reserve Bank of India, the country's central bank, and SBI acts as agent of the G Reserve Bank of India at a number of locations in the country where the Reserve Bank has no presence. An allegation of this seriousness against a bank of this standing (or indeed any bank) is bound to be a matter of very considerable concern, not least to the individuals who were involved at the time and whose reputations are at stake. In 1983 SBI's General Manager for the UK, with responsibility for the London branch, was Mr Dipankar Basu, who returned to India in the early part of 1985 and later became the Chairman of SBI until his retirement in August 1995. He ceased to be the UK General Manager in January 1984, when he handed over to H Mr N B Iyer, who until then had been the Chief Manager of the London branch. He succeeded Mr Basu for only a few months and himself returned to India in November 1984. He retired from SBI in July 1995, having been previously promoted to the position of Deputy Managing Director. The loans under consideration in 1983 were handled by the Credit Department, or Credit Cell as it was called, within the London branch. In 1983 the post of Manager of the Credit Department was held by Mr D P Roy, who was responsible for three or four other

officers who carried out the work of the department. One of these was a Mr Anil Chaturvedi. Mr Roy still works for SBI and is the Executive Chairman of SBI Capital Markets Ltd in Bombay. Mr Chaturvedi is now the Chief Manager (Credit Support Cell) of SBI at its regional zonal office in Gorakhpur. All of these individuals were called as witnesses and gave evidence. As part of that process, they were subjected to detailed and at times arduous cross-examination by Mr Purle, which examined every aspect of their involvement in the loan transactions. As I shall make clear later in this judgment, by no means all of their evidence was satisfactory. In one case at least (Mr Chaturvedi) I am satisfied that I was given evidence which was made up under pressure of cross-examination and which was untrue. The tendency of witnesses in a case such as this to construe past events in a light favourable to themselves is often readily explicable, when their own character and reputation are under attack and they have been asked to give evidence in defence of an institution they have served throughout their working lives and to which they naturally feel a considerable degree of loyalty. Therefore in considering any reservations which I may have about the quality of their evidence, I have to take these factors into account as possible explanations for their not accepting what I consider to be the true position, just as much as the possibility advanced by Mr Purle that their answers have been concocted in order to cloak a fraud. There is no escaping the fact that if Mr Purle is right, then at least in the case of Mr Roy and Mr Chaturvedi, who dealt most closely with the transactions up to and including the drawdown of the loans, I have been given a wholly false account of their actual involvement in, and knowledge of, BCCI's intentions in these matters.

19. Mr Purle therefore accepted that the outcome of the case is likely to depend on whether, in relation to the material parts of their evidence, I regard Mr Roy and Mr Chaturvedi as truthful witnesses. In order to put the evidence which I am about to come to in context, it is important to bear in mind that the liquidators have not provided evidence from any witness actually involved in the two loan transactions in 1983 who has in terms alleged any form of knowing participation on the part of SBI. There is in evidence a witness statement from Mr Naqvi dated July 31, 1999, which has been admitted as hearsay evidence under s.2 of the Civil Evidence Act 1995. At the time of making the witness statement he was still detained in prison in the United States. He refers at some length to the operations of the CTD under Mr Akbar and to the close relationship between Mr Akbar and Mr Khalil. In the part of his statement dealing with the events of 1983, he confirms that BCCI's financial position had steadily deteriorated to a point in June 1983 when he believed that the group might be technically insolvent. Mr Abedi is said to have instructed him to do what was necessary to keep the bank alive whilst he considered ways of redressing the position, and he was asked to do what was necessary to allow BCCI to produce an acceptable picture of assets, liabilities and profits at the year-end. This led to a discussion with Mr Akbar, as a result of which it was agreed that BCCI needed to source funds that could be paid into the group, but classified and recorded differently in order to show a healthy balance sheet and profit and loss account. One of the proposals put forward by Mr Akbar was that BCCI would deposit moneys with a third party bank, which in turn would be asked to lend to one of the companies controlled by Mr Akbar. The companies in question would then route the money back to BCCI for reclassification as a payment into the overdrawn Khalil accounts. In paras 72 and 73 of his witness statement he says this:

> '72. He (Mr Akbar) told me that the third party banks would be prepared to not show a lien on the funds, therefore allowing BCCI to show the deposit as a "due from bank" in its balance sheet. It was important that the deposit with the third party bank was not subject to a lien or otherwise subject to the set-off, because this would have needed to be recorded in our accounts and therefore would not have assisted the purposes of balance sheet management.
>
> 73. I was aware from discussions with Akbar that Akbar engaged in this type of transaction with a number of banks including State Bank of India and Bank of India. I myself did not have any personal dealings with any of the employees or officers of either of those banks. I believe from my discussions with Mr Akbar that BCCI was able

**© 2003 Sweet and Maxwell Ltd**

A to reclassify funds through these back-to-back transactions between 1981 and 1986 for the purposes of managing its year-end accounts.'

This evidence therefore falls a long way short (even making allowances for the fact that it is untested) of establishing any knowledge of the fraud on the part of SBI. It is also inconsistent with the way the transaction was in fact structured in this particular case, bearing in mind that the guarantees entered into by BCCI contained in cl.4.3 an express right of set-off. The case for B the liquidators therefore depends upon my drawing adverse inferences from what Mr Purle submits are the essentially suspicious features of the transactions themselves and the manner in which the officers of SBI caused the bank to enter into them.

20. In terms of evidence, those suspicions are set out in the witness statements of Mr Howard Dyson made in support of the liquidators' claim. Mr Dyson's role as a witness is somewhat controversial. He is a chartered accountant and a partner in the firm of Deloitte and Touche in England. He specialises in forensic and investigative accountancy and, since July C 1991, has been heavily involved in assisting the liquidators of BCCI SA and BCCI Overseas, as well as the liquidators of other companies in the BCCI Group. During that time he has carried out no more than a handful of audits, and the last audit assignment that he carried out was back in 1999. He can obviously give no personal testimony as to the transactions under consideration, and his evidence is therefore an analysis of the documentary and other material, together with a statement of the conclusions which he invites the court to draw from his D examination of this case. The allegations in the re-re-amended points of claim are based upon his evidence, much of which inevitably consists of opinions. Shortly before the trial, the liquidators applied to Lewison J for permission to call an accountant to give expert evidence as to the appropriate way of dealing with the deposits and subsequent loans in the audited accounts of BCCI for 1983. SBI had already been given leave to provide a statement on these matters from Mr Martin Foster FCA, who gave evidence before me. The apparent reason for the application was that the liquidators had become aware that an objection might be taken to E the admissibility of parts of Mr Dyson's evidence, where he expressed opinions about the correct accountancy treatment of the transactions, on the grounds that he was not independent. Lewison J rejected the application, having been told, as I understand it, by Mr Potts that no objection would be taken to the admissibility of the evidence, but that questions might be raised as to the weight which could be given to the opinions expressed. Mr Purle said that his understanding of what Mr Potts had told the learned Judge was that not even objections of this kind would be taken. I do not intend to try to resolve this dispute, because it is unnecessary to F do so. Mr Potts accepts, as he is bound to do in the circumstances, that Mr Dyson's evidence is admissible. But he cautions me against preferring the opinion of an accountant who has been so closely involved in the prosecution of this case over that of an independent expert with no axe to grind. My own view is that it would be preferable in any future case of this kind for the views expressed by somebody in Mr Dyson's position to be confirmed by an independent expert called by the claimants. That would remove any possible controversy about the independence G and objectivity of the evidence which is being given. Mr Dyson's evidence is, however, important and useful in the account which it gives to the court of the background to these transactions (most of which is not disputed) and in informing the court of the thought process which lies behind the main allegations levelled against the defendants. In so far as I am called upon to decide between the evidence of Mr Dyson and that of Mr Foster on specific accountancy issues, I have been able to reach a conclusion without taking into account Mr Potts' warning about Mr Dyson's lack of impartiality.

H 21. For the reasons already indicated, the liquidators' approach to this matter does not depend upon direct evidence of impropriety on the part of SBI made by a former employee of BCCI or any other witness. In general terms it is based on a comparative exercise involving an analysis of the way in which SBI handled the transactions, viewed against the standards to be expected of a hypothetical competent and honest bank placed in the same circumstances. In para.43 of his first witness statement Mr Dyson sets out what he describes as nine unusual

factors which, in his view, would have indicated to an honest banker that the transactions were not normal lending transactions, and would have required such a banker to satisfy himself that no fraud was being practised. These factors, which are considered in more detail later in his witness statement, are:

(i) BCCI's refusal to allow a lien to be marked on its deposits in order to be able to show them as free placements. It is said that SBI knew that the deposits were not in fact free and should not have been accounted for as free placements at all;

(ii) SBI's knowledge that the transactions were intended to affect BCCI's accounts;

(iii) the fact that BCCI both funded and guaranteed the two SBI loans to Notan, whilst declining to make a loan directly on account of what are described in the documentation as balance sheet constraints and, in the case of the second loan, overlapping or common ownership interests;

(iv) the fact that the proceeds of the two loans were disbursed to BCCI under the payment instructions which I have already mentioned, rather than to BCCI for the specific credit of a sub-account in the name of Notan;

(v) Mr Akbar's involvement as an authorised signatory of Notan, as well as an officer in the CTD and an authorised BCCI signatory;

(vi) the failure of SBI to ask for or receive any credit references from Notan's bankers or to receive any management or other accounts from Notan containing some evidence of its business interests;

(vii) the absence of any established banking relationship between Notan and SBI, coupled with the size of the loans and their proximity to BCCI's year-end;

(viii) SBI's failure to enquire from Notan about the purpose of either loan or to receive any explanation about that; and

(ix) SBI's failure to ask Notan about the source of repayment of either loan.

Mr Dyson says in para.44 of his witness statement that these nine factors, and perhaps others, would have been sufficient to cause SBI (if honest) to satisfy itself that these were normal lending transactions and that more information was needed before it could be certain that no fraud was being engineered. He then says this:

> 'SBI did not ask for any additional information for it knew that BCCI (rather than Notan) was the intended beneficiary of the loan proceeds. Given that BCCI had also funded and guaranteed the Notan loans, SBI knew, believed or suspected that the back-to-back transactions were merely devices through which BCCI recycled its own money back to itself using Notan as an off balance sheet nominee.'

22. The conclusions which Mr Dyson invites me to draw from the comparative exercise he has carried out have to be weighed at the conclusion of the trial not only by reference to the documentary and other material he refers to, but also, most importantly, by reference to the live evidence of the SBI witnesses in relation to that material. My view of that evidence will inevitably determine whether or not his conclusions are sustainable. However I do, I think, have to bear in mind, in weighing up the probabilities in relation to that evidence, that an assumption that the employees of SBI would, if honest, have followed the course of conduct to be expected of a model bank will require modification not only in the light of my assessment of their competence and integrity, but also in the light of what else they may have been told by Mr Puri and the others they dealt with. Although the standard of proof remains essentially that of the balance of probabilities, it is clear from the authorities referred to by Lord Hoffmann in the reported decision of the Court of Final Appeal of Hong Kong in *Aktieselskabet Dansk Skibsfinansiering v Brothers* [2001] 2 BCLC 324 that even in civil proceedings the court needs to be more sure about finding serious allegations proved than it might require to be in relation to less serious matters.

**© 2003 Sweet and Maxwell Ltd**

23-01165-mew Doc 84-16 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit L - Morris v State Bank of India [2003] BCC 735 Pg 14 of 35



**The loan transactions**

23. I turn, then, to the detail of the original material in evidence in relation to the transactions. As mentioned earlier in this judgment, the first approach made to SBI in respect of the Notan loans seems to have been the visit to the bank by Mr Puri on October 5, 1983. Mr Puri saw Mr T U Patel, who worked at its London main branch in the Customer Services Department. At the time of the meeting he was dealing with deposit mobilisation, which was part of the Customer Services Department and included attending to customers' general enquiries in relation to their accounts. Requests for loans were not within the remit of this department and were dealt with and sanctioned by the Credit Department. Mr Patel seems to have dealt with Mr Puri on this occasion because he had come to the bank hoping to see the London Branch Manager, Mr Iyer, who was not then available. Mr Patel therefore met him simply in order to find out what he wanted and prepared a note of the meeting to pass to Mr Iyer. Two things are, I think, clear about this meeting. The first is that it was not pre-arranged. Mr Puri had an account of his own with SBI and visited the bank from time to time. On this occasion he obviously hoped to be able to see Mr Iyer, but had not arranged to do so. The second point is that Mr Patel had no authority and was clearly not concerned to do any more than merely to note the proposals which Mr Puri had put to him and wished to discuss with Mr Iyer. The meeting did not last very long and, after Mr Puri had left, Mr Patel got his note typed up and sent to Mr Iyer. The typed-up note refers to the funds being required by Notan on September 15. The date is then crossed out and, in handwriting, the November 1 date has been added. Mr Patel said that the reference to September 15 was an error (which it plainly was) and that he deleted that reference and wrote in November 1 before the note was sent to Mr Iyer. Although Mr Patel does not have a clear recollection of the meeting on October 5, it seems from his note that Mr Puri did little more than to set out the structure of the proposed transaction, without giving any explanation as to why, for example, BCCI was unwilling to provide a lien on the deposits rather than a guarantee. Mr Patel would not have been concerned with details of this kind, which were issues for the Credit Department.

24. Mr Iyer's evidence is that he was not aware of the existence of Notan prior to the two loan transactions with which this action is concerned. This is, I think, consistent with the fact that the Notan accounts had been opened relatively recently and had been trading in credit. Following the receipt of Mr Patel's memorandum, a meeting was arranged between Mr Iyer and Mr Puri, and as part of SBI's disclosure we have a handwritten note by Mr Iyer of that meeting. At the time in question SBI had its premises in three floors of a building in Milk Street in the City of London. Some of the space was let, but the Credit Department employed between 15 and 20 people and was located on the second floor of the building. Mr Iyer had an office of his own on the first floor. The Foreign Exchange Department was also located on the second floor, with a physically separate dealing room for foreign exchange purchases. Mr Iyer said in cross-examination that when he received Mr Patel's note, he did not call for the customer file, largely, I think, because the purpose of the meeting was merely to find out what the proposed transaction was about. The evidence about this meeting (which I accept) is that it was intended to be essentially a sifting process, to enable Mr Iyer to decide whether the transaction was of a kind that the bank would be interested in and merited more detailed consideration by the Credit Department. The meeting lasted about 30 minutes. Mr Iyer says that he made no real enquiries about Notan during the meeting, but it is clear from his note that there was obviously some discussion between him and Mr Puri about the company. His note records that Notan was incorporated in Liechtenstein and that its beneficial owners were located in the Middle East. He was also told that the company had been set up to hold 'metal' and had substantial deposits with BCCI. He was asked by Mr Purle why he had put the word 'metal' in inverted commas, but said that he did not know. He did not think that he had intended in this way to indicate and emphasise that that was what he had been told about its business. I think it is more likely than not that 'metal' was the word used, hence the inverted commas, but there is nothing particularly suspicious about this. According to the note the discussion then seems to have moved on to the

23-01165-mew Doc 84-16 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit L - Morris v State Bank of India [2003] BCC 735 Pg 15 of 35



details of the proposed transaction. [A] Mr Iyer already knew the basic structure of what was proposed from Mr Patel's note, and it looks from his own note as if a particular topic of discussion was the term of the proposed BCCI deposit and its extension each side of the term of the proposed loan to Notan. As Mr Iyer explains in his witness statement and confirmed during his oral evidence, SBI would not have been able to fund the Notan loans without the assistance of the BCCI deposits. This was because it did not have the necessary US dollar funds of its own and could not be certain of raising that amount of currency on the foreign exchange markets at a rate which would be acceptable to Notan. [B] The funding of the Notan loans was therefore a major concern for SBI, but it goes hand-in-hand with the question of security. As Mr Iyer accepted in cross-examination, if the BCCI deposits were repaid prior to the Notan loans being repaid, that would have created a very serious foreign exchange problem for SBI. He therefore wanted the BCCI deposits to be in place first, to allow the loan to be disbursed utilising those moneys, and for a period of several days to be added at the end of the term of the Notan loans, so that the BCCI deposits could be repaid using the proceeds of the loans. He also appeared to accept that this same safety margin would enable SBI, if necessary, to exercise any rights of set-off under [C] the BCCI guarantee against the deposits, thereby cancelling out its liability to repay BCCI. He was, however, keen to stress that there were no discussions about the deposits forming part of the bank's security, and that the only security on offer was the guarantee from BCCI.

25. As his note records, because of the guarantee there was therefore to be no lien on the deposits themselves. My own assessment of this meeting, based on Mr Iyer's evidence in cross-examination, is that he was keen to make it clear to Mr Puri that a precondition of SBI's [D] participation in the loan transactions was that the BCCI deposits should be placed on terms which enabled the US dollar funds to be utilised for purposes of the loans on to Notan. Although, as I have indicated, the availability of the deposits to satisfy these funding requirements provided SBI with the additional benefit of being able to exercise its rights of set-off against the deposited funds, that was not, I think, the centre of Mr Iyer's focus at this meeting, and was something which the bank only came to concentrate on when the guarantee was subsequently drawn up by Linklaters & Paines with an express right of set-off inserted into [E] the document. Mr Iyer's concern to establish the position about funding also, I think, explains why his enquiries into Notan and its business were no more than cursory. He wanted to satisfy himself that, by entering into the transaction, SBI would not be exposed to a significant funding risk. Having satisfied himself about that, any analysis of the borrower's creditworthiness or other matters relating to credit risk were left to the Credit Department. The other matter put to Mr Iyer in cross-examination was whether he explored with Mr Puri the reasons why BCCI [F] was unwilling to grant a lien on the deposits. The note of the meeting makes no reference to any such explanation being given, and Mr Iyer's evidence is that this was only a preliminary exploratory meeting. He passed the transaction on to Mr Roy for more detailed analysis. He said that he had no recollection of any discussion about why BCCI was not making the loan direct to Notan itself, and thinks this may have had something to do with the capital adequacy ratios imposed by the Bank of England. He did not, however, enquire into why BCCI wished to structure the transaction in this way, nor did he seek any confirmation of the position from [G] BCCI itself. He stressed, however, that he did not see the transaction explained to him at the meeting as being a device to deceive the regulatory authorities, and I accept that. His assessment of the transaction at the meeting was that it was relatively risk-free from the point of view of SBI and involved no funding difficulties. The half per cent spread was, he said, very attractive and he considered that Mr Puri's proposal was an interesting one which could be given further consideration by the Credit Department. Mr Roy's task would be, in his words, to flesh out the transaction and to make any further necessary enquiries. [H] It would be for Mr Roy to discuss the more detailed mechanics with Mr Puri.

26. Like Mr Iyer, Mr Roy said that he had had no prior dealings with either Mr Puri or Notan, and that his first involvement came when Mr Iyer passed to him his handwritten note of the meeting, together with Mr Patel's note of the earlier meeting of October 5. His role was to examine the proposal and its merits and to take it forward as appropriate. At that time he had

**© 2003 Sweet and Maxwell Ltd**

had various dealings with BCCI, involving the confirmation of letters of credit, and he believed them to be an honest and creditworthy bank. It is important, I think, to record at this stage in my judgment that there is no evidence to suggest that BCCI had at this time a dubious reputation in the City of London. Opinions doubtless varied as to whether it merited the description of a prime London bank. One notes from other material gathered by the liquidators that it had expanded rapidly, had acquired a large customer base, particularly among the Asian community, and appeared to be operating profitably. It is not part of the liquidators' case that SBI had any reason to doubt the honesty of BCCI prior to becoming involved in the details of these transactions, and I am satisfied that nothing occurred during the meetings with Mr Puri conducted by Mr Patel and Mr Iyer which caused either of them to take a different view. Early in the trial there was some late disclosure by SBI of documents relating to the financing of transactions involving the Cromwell Hospital. This business was introduced by BCCI, who were part owners of the hospital, and was not dealt with by the witnesses in their statements. But none of the Cromwell Hospital material supports a suggestion that SBI already had reason to believe that BCCI was other than honest It is also, I think, useful to consider the evidence about these and subsequent meetings against the background of what we now know was BCCI's intended purpose in setting up these transactions. The so-called back-to-back transactions with which this action is concerned were devised by Mr Akbar, as I have indicated, as a means of sustaining an appearance of profitability on the part of BCCI. For a bank to conduct a fraud on this scale was, I think, unprecedented and extremely high-risk. It seems to me almost inconceivable that Mr Puri (assuming, as I do, that he was complicit in the scheme) would have wished to approach another bank such as SBI in a way that was likely to arouse suspicion. It seems to me much more probable, as is consistent with the evidence of both Mr Patel and Mr Iyer, that Mr Puri presented the transactions to them in a relatively matter-of-fact way, emphasising the high level of security for the bank in terms of funding and credit risk and the relative profitability of the deal, bearing those factors in mind. Mr Puri and Mr Akbar must have realised that any bank asked to participate in transactions of this kind was bound to ask why BCCI was unable to make the loans directly to Notan, and are likely to have gone equipped with some answers. The two explanations which, over the course of these transactions, appear to have been given were, first, that there were balance sheet constraints inhibiting a direct loan by BCCI and, secondly, that a connection between BCCI and Notan through some element of common ownership added to those difficulties. The evidence of Mr Rex, the banking expert called by SBI, is that both those explanations were at least plausible in that they were relevant to capital adequacy and therefore impacted on the level of lending available to BCCI. The question in this case is whether the individuals at SBI who dealt with this matter continued to see the transactions as a legitimate form of regulatory arbitrage or something much more sinister. But Mr Purle, quite understandably, does not put his case on the basis that Mr Akbar or Mr Puri placed their cards on the table and invited SBI to participate in a fraud. He submits that observable facts known to SBI could have led it to only one conclusion. The corollary, however, to that hypothesis is that I must assume that Mr Akbar and Mr Puri continued to do what they could to maintain the apparent legitimacy of the transactions, rather than do anything which was calculated to give the game away.

27. On receipt of the notes of the earlier meetings, Mr Roy says that he opened a file, in the sense of putting those papers into it. SBI at this time did not operate a conventional credit committee system under which a running file, including comments and notes from the managers handling the account, would be included in a customer's file that would go to the credit committee in the event of an application for a loan being made. The relevant file or files seem to be no more than a collection of documents generated as the transaction proceeded, in much the same way as, for example, a solicitor's file might be composed. We therefore have no commentary on the continuing transaction, beyond what is contained in the contemporaneous notes and letters that were generated Mr Iyer suggested to Mr Roy that he should contact Mr Puri, and Mr Roy said in evidence that he had a number of discussions with Mr Puri about Notan. One obvious question for him to have asked was whether Mr Puri was authorised to act

23-01165-mew Doc 84-16 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit L -
Morris v State Bank of India [2003] BCC 735 Pg 17 of 35



on behalf of Notan. The answer to this question is contained in the resolution of July 28, 1983, A
referred to earlier in this judgment. Mr Roy was asked whether that document was on the file which he had opened, but he thought that it was not. It was a document which would have been filed by an account manager in the Customer Services Department such as Mr Patel. He did not know what investigations had been made in relation to the opening of the Notan accounts, and in any event the operation of the deposit and current accounts would not give the Credit Department sufficient information about a credit proposal. His information about Notan was
initially limited to what was contained in Mr Iyer's note, but he says that in later discussions B
with Mr Puri it was confirmed to him that Notan traded in precious metals and diverse commodities. He said that he also thought that BCCI would have done its own due diligence before indicating its willingness to put up the guarantees. During much of this cross-examination Mr Roy appeared to me to be highly defensive, but, as already indicated, this is hardly surprising. I accept that he does not appear to have conducted any investigation of his own into Notan's standing with SBI up to October 5 and that he therefore had only a very
limited amount of information about the company, based on the earlier interviews with C
Mr Patel and Mr Iyer. His witness statement is also incomplete, in the sense that it goes from his receipt of Mr Iyer's note of his meeting with Mr Puri straight to the letter which he received from Linklaters & Paines on October 18. On the files is a note in Mr Roy's handwriting of a meeting with Mr Puri which must have taken place shortly after the meeting with Mr Iyer and prior to Mr Roy asking Linklaters & Paines to assist in the drafting of a facility letter. Mr Roy
refers to this document in para.34 of his witness statement, but merely says that he cannot recall D
when the notes were made. Apart from some telephone numbers, Mr Roy's note contains two significant features. The first is a diagrammatic analysis of the proposed transaction, which shows the US$20 million deposit coming into SBI on October 31, followed by the loan of the same sum to Notan the following day. The diagram also illustrates the repayment arrangements, under which repayment of the Notan loans would precede the repayment of BCCI deposits. The other significant reference is the name of Mr Akbar, together with details
of his office in the Treasury Department of BCCI on the third floor of its premises in Leadenhall E
Street. Mr Roy says that he was given Mr Akbar's name as the point of contact in BCCI, but that it did not occur to him at the time that Mr Akbar was also a signatory for Notan. He had not seen the resolution of July 28. I accept that.

28. There are no other notes for this period of any further meetings between Mr Roy and Mr Puri, although Mr Roy says that further discussions did take place. What, however, is clear
is that on the afternoon of October 18 Mr Roy met Mr Johnson-Gilbert of Linklaters & Paines F
to discuss the transaction. At that meeting Mr Johnson-Gilbert produced drafts of a facility letter, an opinion to be obtained from a Liechtenstein lawyer as to Notan's ability to enter into the transaction, and the form of an appropriate board resolution for Notan to pass in connection with the proposed loan. Mr Johnson-Gilbert said that he must have been instructed by Mr Roy a day or two prior to the meeting, to draw up these documents. It therefore seems likely that by then Mr Roy was sufficiently satisfied with the proposals put to him by Mr Puri to incur the
expense of obtaining the assistance of Linklaters & Paines in connection with the transactions. G
By October 18 matters had progressed to the consideration of points of detail, rather than the more general question of whether SBI was prepared to enter into the transaction at all. If, therefore, there was to be an assessment of the creditworthiness of Notan, it would have been carried out during this time. Mr Roy was asked about this. In fact there were no real enquiries made about either the financial standing of Notan or the reasons why it required this loan. Even if Mr Roy had bothered to look at the existing records held by SBI, he would have seen that
Notan had deposits with the bank which were relatively small in relation to the size of the H
proposed loans. As it was, the amount of these deposits had been noted in Mr Iyer's memorandum and were therefore already known to him, At about the same time the bank also received two credit references from a company called SNW Commodities Ltd in Hatton Garden and S L Wah-Lin Ltd in Old Compton Street, merely confirming that Notan appeared to be trustworthy and satisfactory for the purposes of opening a current account. Mr Patel

**© 2003 Sweet and Maxwell Ltd**

A confirmed that these were standard credit enquiries made at the time when the Notan accounts were opened and were unconnected with the specific transactions with which this action is concerned. Neither of them provided any further relevant information about Notan's ability to service loans in the sum of US$20 million. Mr Roy said that he was aware that Notan had owners in the Middle East, although he did not know who they were, and that he was also aware that the ownership of the company was common, in some way, with that of BCCI. But he accepted that he did not make any serious enquiries into the intended use of the funds and, at the B time when he approached Linklaters, knew little more about Notan than had been revealed to Mr Iyer and Mr Patel. He was asked why this was. Both banking experts who gave evidence in this case have agreed that the credit enquiries made by Mr Roy and his assistants were wholly inadequate, and that was put to him. His answer was straightforward. The term of BCCI's deposit meant that SBI incurred no funding risk in the transaction and had the additional security of the guarantee. Because of these factors the credit risk was effectively on BCCI and the creditworthiness of the borrower (Notan) was not gone into. SBI looked to the comfort of C the guarantee and did not look at the intended end use of the funds. I accept this evidence, which is entirely consistent with the documentation. Mr Basu and Mr Iyer took a similar view. I do not believe that the transaction was ever presented to Mr Iyer or to Mr Roy as anything other than a way of enabling US$20 million to be lent to Notan with the financial assistance of BCCI (its existing bankers) in circumstances in which capital adequacy considerations appeared to make it impossible for BCCI to lend the money direct. Mr Iyer said that SBI was D providing a means of helping BCCI to assist Notan at no financial risk to itself. The structure of the transaction had been presented to Mr Patel and Mr Iyer as a package resulting from prior discussions between Notan and BCCI. It was intended to ensure that SBI assumed no funding obligation or risk and could look to BCCI, under its guarantee, in the event that Notan defaulted. It would be inconceivable that a bank operating in the City of London would not honour such a guarantee, and Mr Roy and his superiors, such as Mr Basu, therefore correctly assumed that, except possibly in the circumstances of BCCI's insolvency, the transaction was E from SBI's point of view entirely risk-free. I am sure that this is the way it was presented to the bank by Mr Puri, coupled with the need for an urgent response so as to enable the moneys to be drawn down for Notan on November 1. All that Mr Roy therefore had to decide was whether SBI should assist BCCI out of its lending difficulties, and he decided to go ahead. The more important question, therefore, seems to be not so much why Mr Roy failed to make all the usual credit enquiries into Notan, but whether and to what extent he enquired into BCCI's own F difficulties, and with what result.

29. One can get some sense of this by looking at Mr Roy's dealings with Mr Johnson-Gilbert and the note which he subsequently prepared and signed, recommending Central Office sanction for the loan. Mr Johnson-Gilbert's note of the meeting held on October 18 indicates that there was a discussion of the general structure of the transaction and the points of detail that needed to be addressed. Mr Johnson-Gilbert drew up, probably prior to the meeting, a list of queries which were then ticked off as they were dealt with. One of the points noted by G Mr Johnson-Gilbert was the question of BCCI's authority to enter into the transaction. He said, under cross-examination, that it was normal to seek the authority of a company giving a guarantee, and this was normally provided in the form of a board resolution. This point was never taken forward by SBI and, in a later letter of October 27 to Mr Roy, Mr Johnson-Gilbert noted that SBI was satisfied with the capacity of the signatories for BCCI to commit it to giving the guarantee, and did not wish for any other evidence to be provided of their authority. The guarantee was executed by Mr Akbar and two other officers of BCCI SA and countersigned by H Mr Roy. Mr Akbar and the others were authorised signatories for BCCI, and included in SBI's documentation is a copy of the signature book provided by BCCI SA and BCCI Overseas, containing specimens of the signatures of all those authorised to execute instruments on their behalf. Mr Akbar's signature is number 49 in the book. In the light of this it seems to me unsurprising that SBI did not insist upon a board resolution from BCCI, and the evidence of the banking experts indicates to me that it would have been rare in practice for a resolution of that



23-01165-mew Doc 84-16 Filed 01/23/25 Entered 01/23/25 23:21:56 Exhibit L - Morris v State Bank of India [2003] BCC 735 Pg 18 of 35

kind to be asked for. The essential documents for the purposes of the transaction were obviously the facility letter and the guarantee, together with the opinion to be obtained from the Liechtenstein lawyer about the capacity of Notan to enter into the transaction. The facility letter as drafted by Mr Johnson-Gilbert dealt with the question of submission to the jurisdiction on the part of Notan by providing for the irrevocable appointment of an agent for service within the jurisdiction. It looks as if originally SBI contemplated appointing BCCI as the agent for service, but by the October this had changed to Mr Puri. Mr Johnson-Gilbert was asked about the reasons for this change, but said he did not know what they were. The facility letter provided for the loan of US$20 million to be made in one instalment on November 15, 1983. Although repayable on demand, the letter makes it clear that the intention was that the loan would be for a period of three months, with the principal and interest being repayable in one instalment on February 1, 1984. Early repayment would be demanded, however, in the event that the BCCI guarantee ceased to be of effect or if BCCI ceased to maintain the deposit. The loan was made expressly subject to various conditions, including a requirement that not later than October 31, 1983, BCCI should have placed the US$20 million on deposit for a term of three months and four days, and have delivered by the same date a duly executed guarantee in respect of the loan. The facility letter in its final form is dated October 18 and was executed by one of the Liechtenstein-based directors on behalf of the company.

30. Following the signing of the facility letter, Mr Roy prepared a note for submission to the bank's Central Office in India, which was signed by him, Mr Basu, Mr Iyer and Mr Chaturvedi, recommending approval and sanction of the loan. This memorandum is dated October 20 and was prepared before Mr Roy had received from Linklaters & Paines their draft of the proposed form of guarantee to be given by BCCI SA. The note is, I think, important because it represents Mr Roy's summary and understanding of the transaction and his reasons for recommending its approval. Although signed by Mr Basu and Mr Iyer, they had had no direct contact with Mr Puri or BCCI in the meantime and were therefore dependent upon Mr Roy for information and guidance about the proposed transaction. The memorandum for Head Office describes Notan as a company engaged in diverse business activities which is 'owned by private Middle Eastern interests and is managed by their solicitors and agents'. It then goes on to describe the loan proposals, including the terms agreed for the provision of the BCCI guarantee. There is then this passage:

> 'In order to obviate any funding obligation on our part, BCCI have also agreed to place with us a sum of US$ 20 million as free deposit one day before the drawdown of loan. This deposit will not be liened to us but will remain with us for entire 3 month period of loan and shall be withdrawn only 3 days after repayment of loan. The rate of interest to be charged on the loan is proposed to be 1/2% over that payable on the deposit to BCCI.
>
> Though the loan will be guaranteed and funded by BCCI, we are told that on account of balance sheet constraints they are not in a position to give this loan directly to the company. For the same reason they cannot also lien the deposit of US$ 20 million to us, which would have obviated the need for the guarantee.
>
> We have examined this proposal the terms of which are undoubtedly very attractive, without entailing any funding obligation; this short term transaction involving a turn of 1/2 % will result in net earning of about US$ 25,000.00. In addition, we have also stipulated a management fee of US$ 5,000.00 to take care of all our expenses and legal costs. Although this is a new business connection, in view of the availability of BCCI's guarantee we have not attempted an appraisal of the company's requirements of funds. However, in order to eliminate the possibility of any risk or legal complications in dealing with a new company constituted in Liechtenstein, we have consulted our solicitors "Linklaters and Paines" who have drafted the following documents for acceptance/execution by the company to secure this advance.'

© 2003 Sweet and Maxwell Ltd

The note then goes on to specify the documents drafted by Linklaters and also refers to their being in the process of drafting a suitable form of guarantee. These documents, it says, 'will provide us adequate security for this loan'. Finally, the memorandum records that 'in view of the urgent requirements of NTIL we have conveyed our approval in anticipation of Central Office sanction'.

31. This is, I think, the first document in which the phrase 'free deposit' is used. At this point in the transaction Mr Roy and, on his recommendation, Mr Iyer and Mr Basu had already taken it upon themselves (albeit without the consent of Head Office) to approve the loan, and had initialled and sent out the facility letter to Notan several days earlier. Although Linklaters had yet to submit a form of guarantee containing, as it did, an express right of set-off, this was accepted and executed by BCCI SA without demur, and the reality is that by this point in time the terms of the first loan transaction had been settled and agreed. Mr Roy and the Credit Department made no further enquiries into the status of Notan or the purpose of the loan, and it is made clear in the memorandum that the reason for this was the provision of the BCCI guarantee. If the liquidators' claim that SBI had knowledge that the transaction was a fraud, even before receiving the payment instructions from Notan, is to be made out, then I must be satisfied that at the time of writing the October 20 memorandum Mr Roy must already have realised that he was dealing with a dishonest scheme. On the evidence, nothing occurred between October 20 and the receipt of the payment instructions at the end of the month which added materially to his sum of knowledge about the nature of the transaction. Mr Akbar was sent the guarantee for execution on October 24 and it was executed in a slightly amended form on or about October 28. On the same day Mr Akbar sent a letter to Mr Chaturvedi confirming that BCCI SA would be placing the US$20 million deposit with SBI for a period of 96 days from October 31, 1983, to February 4, 1984, in SBI's account with Citibank in New York. The letter from Dr Marxer, the Liechtenstein lawyer, confirming Notan's capacity to enter into the transaction, was received at about the same time. Although obviously important, all of these steps were merely the putting into effect of the arrangements already agreed between Mr Roy and Mr Puri. What, then, was it which put Mr Roy or anyone else at SBI on notice that they were dealing with a fraud? One can, I think, begin by reminding oneself what the liquidators rely upon. Up to the stage immediately prior to the disbursement of the first loan, the principal matters referred to in Mr Dyson's witness statement are:

(i) BCCI's refusal to mark a lien on the deposits and its wish to be able to show them as free placements;

(ii) the existence of what are referred to in the memorandum of October 20 as balance sheet constraints;

(iii) the position of Mr Akbar both as an officer in the CTD and one of the authorised signatories in respect of Notan; and

(iv) the absence of any real information and SBI's failure to enquire into the financial standing of Notan or the purposes of the loan.

As I have already indicated, I do not regard the last of these factors as significant. SBI's assessment of the loan transaction was that it was virtually risk-free. This is made clear in the memorandum of October 20 and in the evidence of Mr Roy, which I accept on this point. It was also clear to the bank, as I have explained, that it was being asked in effect by BCCI, through Notan, to provide loan finance to Notan in circumstances where 'balance sheet constraints' made this an impossibility for BCCI. The same reason was given for BCCI's refusal to grant a lien over the deposit. Mr Roy was asked whether he made enquiries, through Mr Puri or otherwise, into why BCCI was unable on unwilling to provide a lien. The answer he gave was that he asked for and would have preferred a lien, but Mr Puri indicated that that was not an option, because it would have to be registered and referred to in BCCI's year-end accounts. BCCI felt that this would be, to use his words, derogatory, and would adversely affect its credit standing. In the end, faced with this explanation, Mr Roy was content to rely upon the guarantee. As drafted by Mr Johnson-Gilbert, it had at cl.4.03 an express contractual right of

set-off, and in his letter of October 27 to Mr Roy, Mr Johnson-Gilbert explained that the right of set-off would apply to any sums which SBI was holding at the time to the credit of BCCI and would be enforceable even without registration under s.95 of the Companies Act 1948, provided that BCCI was not at the relevant time in liquidation. A

32. This obviously offered SBI a very high level of security, short of a formal lien or charge over the deposit. Mr Johnson-Gilbert's advice was that the right of set-off in cl. 4.03 probably did constitute a charge on a book-debt of BCCI so as to be registrable, but he went on in his letter to record his assumption that it was not acceptable for BCCI to have the right of set-off registered as a charge. B That was clearly a correct assumption to make, in the light of BCCI's earlier refusal to create a lien over the deposit. It is also entirely consistent with the view of both banking experts, who accepted without protest that no bank ordinarily likes to create a charge over its own assets or to have such a charge registered against it under the Companies Act. Mr Roy, as an experienced banker, readily understood this, and I can see nothing untoward in his acceptance of BCCI's refusal to countenance a charge over the deposit. BCCI's stance on this issue was entirely consistent with established banking practice. C I shall come to the significance of Mr Akbar's position a little later in this judgment, when I come to consider the drawdown of the first loan. This therefore leaves the issue of the designation of the BCCI deposit as a 'free deposit'. I am bound to say that I have some difficulty in following this allegation. If the liquidators can make good the allegation that, by virtue of the payment instructions, it must have become clear to SBI that the loans were being made to Notan on behalf of BCCI so as to enable the latter to retain the use of the money, then none of this D matters. SBI would in those circumstances have become aware that the whole transaction was entirely circular and little more than a sham. They would then have known that the contractual arrangements counted for nothing and were merely a front for BCCI's fraud. However, so long as SBI believed, as it clearly did as of October 17, 1983, that it was being asked to lend to Notan (not BCCI) and was receiving the BCCI deposit and guarantee as security for that loan, then this becomes nothing more than a dispute about terminology. It is clear from the memorandum of October 20, where the phrase first appears, that the words 'free deposit' mean (as one can see E from the sentence which follows) a deposit which is not liened to SBI. One can quibble about the appropriateness of this terminology, but it is clear from that memorandum what SBI intended those words to mean. Mr Purle advanced an interesting argument by way of submission to the effect that the right of set-off did in fact constitute a charge, in the sense of having created a *ius in rem* over the BCCI deposit. I do not intend to get drawn into that. There is nothing in the evidence to suggest that Mr Roy, or for that matter Mr Johnson-Gilbert, F conducted that sort of analysis. Mr Roy's understanding, as is apparent from the October 20 memorandum, was (rightly on wrongly) that a lien would have to be referred to in some way in the accounts, whereas a guarantee would not. For reasons which I have already given, any bank, including BCCI, would wish to avoid this. Part of the liquidators' case, as already indicated, on this question of free deposits, seems to be that SBI was content to label them 'free deposits' when it knew that they were not free, but provided security by way of the right of set-off, and that BCCI's treatment of the deposit as a free placement was therefore G inappropriate and indeed misleading. This is the point made in answer to request 25(b) of the further and better particulars, where it is said that the description was dishonest because it was designed to enable BCCI to present the two deposits as ordinary placements rather than liened funds, and thereby to increase the apparent size of its balance sheet. I simply do not follow that. In the first place, as already explained, the description was in fact intended to mean no more than that the deposits were not subject to a lien. But more importantly, there is nothing to show, H nor is it alleged, that Mr Roy and the other individuals at SBI had any reason to believe at this time that BCCI would not disclose the full details of the transactions to its auditors. Mr Dyson, I think, accepted this. The memorandum of October 20 is, in my judgment, only consistent with a belief on the part of Mr Roy that the deposits, coupled with the guaranteed loans to Notan, rather than a direct loan by BCCI to Notan, would be more beneficial to BCCI from a regulatory point of view, in terms of the capital adequacy ratios involved. This presupposes

© 2003 Sweet and Maxwell Ltd

A that the relevant documentation would be shown to both the auditors and the regulatory authorities. The alternative is to assume that Mr Roy not only had knowledge of a potential fraud, but was prepared positively to misrepresent the position to his own Head Office. I am not prepared to make this finding. I believe that the memorandum does corroborate Mr Roy's oral evidence, that the loan transaction was structured in this way simply to accommodate BCCI's lending difficulties, but that he believed there would be disclosure to the auditors and the other authorities of all the relevant material. I do not accept Mr Purle's suggestion that the B memorandum of October 20 itself was designed to misstate BCCI's intentions to the SBI Head Office. That seems to me a far-fetched allegation and is not consistent with the view which I have formed of Mr Roy's evidence.

33. In support of the allegation that the description of the BCCI deposits as 'free deposits' was materially false, each of SBI's principal witnesses was cross-examined at some length with a view to establishing that they accepted (and presumably understood) that the deposits did at the material times form part of the bank's security. Each of them was initially reluctant to C concede this point. Mr Basu, for example, accepted that the security consisted of the guarantee, but said that there was to be no lien oven the deposits and that therefore the deposit was not security in the real sense of the term. It was, at most, collateral security for the guarantee. He accepted that cl. 4.03 of the guarantee had been inserted in order to put SBI in the best possible position to deal with any default by Notan, but emphasised that the deposit as such was not security, because it was not subject to any lien. Mr Iyer also said that the primary security was D the guarantee, not the deposit. Like Mr Basu, he was reluctant to accept that the deposit fell to be treated as security on account of the right of set-off contained in cl. 4.03 of the guarantee. For it to be security there needed, he said, to be a lien or a charge. Mr Roy gave similar evidence on this point. At one point in his cross-examination on Day 6 of the trial, he was asked whether he understood the guarantee to be a lien. He said that he did not, but that he did accept that the guarantee provided the bank with security. He even went so far as to accept, as part of the same exchange, that by virtue of the right of set-off, SBI did have a form of security over the E deposit. He confirmed, however, that the words 'free deposit' were merely used to indicate that there was no lien. The next day, however, he said that he wanted to withdraw the answers about the deposit being security and said that the only purpose of the deposit was to provide funding for the Notan loans.

34. Having got to this position in their evidence, each of these three witnesses had put to them by Mr Purle the transcript of an earlier exchange between Mr Potts and Mr Dyson, in F which Mr Potts put it to Mr Dyson in terms that, by virtue of the right of set-off in the guarantee, the deposits did form part of the security for the loans. Those questions were put, in the context of a successful attempt by Mr Potts to obtain an admission from Mr Dyson that it was no part of the liquidators' case that there was evidence to show that SBI believed that the guarantee would be concealed from BCCI's auditors. They would therefore be able to decide whether the existence of the right of set-off required any provision to be made in the accounts, I had earlier acceded to an application by Mr Purle for the exclusion of the SBI witnesses from G court from the commencement of the defendant's evidence until they came to give their own evidence. Mr Potts' line of cross-examination therefore came as a surprise to them. Both Mr Basu and Mr Iyer proceeded to accept that the deposits were security in that general sense, although not subject to a lien or charge. Mr Roy was more reluctant to make the concession, but agreed that the deposits were security in the qualified sense of giving the bank a night of recourse against them pursuant to the right of set-off contained in cl.4.03. As I have already H indicated, I regard much of this controversy as highly artificial. It seems to me that the witnesses clearly prepared themselves for this trial on the basis that part of the liquidators' case depended upon an attack on the use of the term 'free deposit' and that this somehow required them to justify the use of the term and to explain why the deposits did not form part of the bank's security in any relevant sense. As each of them was ultimately forced to concede, that is a quite unrealistic position to take and one that is contrary to the intentions and advice of Linklaters behind the drafting of cl.4.03. It was also not what they thought at the time. In a letter

to the Head Office of the bank dated February 9, 1984, which was drafted by Mr Roy and signed by Mr Iyer, it is stated:

> 'Not only had we a guarantee of BCCI, but also there was a matching deposit so timed that if a problem arose, the right of set-off could be exercised.'

This was part of the correspondence generated by a complaint from Head Office that the sanction for the two loans had been given without first obtaining the authority of Head Office, as required under the bank's regulations. That letter, amongst other things, indicates what SBI's thinking was at the relevant time, and I regard the reluctance of the witnesses to concede the deposits as being a form of security as little more than a defensive argument about words. What is clear from the contemporaneous evidence I have already mentioned, such as the memorandum of October 20, 1983, is that the words 'free deposit' were simply the internal designation of the deposits as not being subject to a lien. Mr Roy confirmed this in his oral evidence and I accept that. But the terminology is not the real issue The liquidators' real point is that the description of the deposits as free reflected an understanding on the part of Mr Roy and the others that the deposits would receive that kind of treatment when disclosed in the year-end accounts of BCCI: *i.e.* they would be shown as free placements with SBI, not subject to any form of encumbrance. Mr Roy said he did not accept that he knew that BCCI intended to show the deposits in their accounts as free. This is clearly inaccurate. In an earlier response to Head Office also dated February 9, 1984, and again drafted by Mr Roy, there is the following paragraph:

> 'Although BCCI have not categorically advised us on the specific difficulties encountered by them in liening the funds, we feel that this is more because of the cosmetic effect on their year-end balance to be achieved by showing US$ 40 million as a placement rather than liened funds.'

Part of the disclosure in this case includes an earlier draft of that memorandum by Mr Roy, which contains the following passage:

> 'Now that the year-end is over, we are persuading them to offer a formal lien oven the funds for any rollover of the loan to NTIL, in which event of course BCCI's guarantee would have to be dispensed with.'

This is a reference back to the discussions at the time of the second loan, which originally contemplated that the first loan might be renewed and the second granted for a period of up to one year. In the event, the second loan became co-terminous with the first loan.

35. It seems to me that Mr Roy was quite unnecessarily defensive about these matters during cross-examination. It is quite obvious that from the start BCCI was unwilling to grant a lien oven the deposit. It indicated through Mr Puri that a lien oven the funds would need to be recorded, whereas a free placement, even if coupled with a guarantee, would carry no such qualification. Mr Roy obviously understood that, and he and the other managers at SBI were prepared to accept a guarantee rather than a lien, knowing that BCCI obviously believed that that would enable it to show the deposits as untied. But unless they also believed (which is not in terms alleged) that BCCI would conceal the existence of the guarantee, I cannot see why they should have regarded what was proposed by BCCI as being necessarily deceptive. It would be a matter for the auditors to decide whether, contrary to BCCI's assumption, it was appropriate to make a provision in the accounts. The letter of February 9 to Head Office sets out in very clear terms what the London Office believed was intended, and it seems to me quite inconsistent with Mr Roy and the others thinking that they were staring at a fraud. Each of them said that they believed at the time that BCCI was honest and that the guarantee and the other details of the transaction would be disclosed, and I have no reason not to accept that evidence.

36. In para.117 of his first witness statement Mr Dyson deals with the way in which the deposits should have been treated in BCCI's accounts. He says that the BCCI deposits should have been accounted for as money subject to an encumbrance, on the basis that they were subject to a contractual right of set-off or an unregistered charge. They should not have been

**© 2003 Sweet and Maxwell Ltd**

accounted for as unencumbered free ordinary bank placements and therefore shown in the balance sheet as an asset under the line item 'due from'. His view is that deposits subject to a contractual right of set-off were not free and should either have been set off against the liability for which the deposits were held or shown as assets on the face of the balance sheet, with a corresponding entry for the liabilities which they were intended to secure as being liabilities of the bank. Mr Foster, the expert accountant called by the defendant, disagrees with this. He says that the deposits made by BCCI should have been included in the consolidated accounts of BCCI as 'due from banks' and the interest accrued included as a sundry debtor. The guarantees given to SBI in respect of the loans advanced to Notan were, he says, contingent liabilities which should have been included as such in the relevant note to the BCCI accounts and were not actual liabilities. The group accounts of BCCI as at December 31, 1983, show under the heading 'contra accounts' letters of guarantee amounting to some $1.5 billion. The question for the auditors would have been whether any provision was required to be made in respect of the contingent liability relating to the guarantees. Given that, by the time the accounts came to be finalised, the Notan loans had been repaid, there would have been no reason to do this. The auditors would have known that the contingent liability was never going to materialise. Where he and Mr Dyson are largely in agreement is in relation to the correct accounting treatment for the transactions, were BCCI rather than Notan to have been the real borrower. If the responsibility for repaying both loans as debtor lay with BCCI itself, it would have been necessary to record the corresponding liability as an actual rather than contingent liability of BCCI. The accounting treatment therefore depends on whether Notan or BCCI was the true debtor. I have no hesitation in preferring the evidence of Mr Foster over that of Mr Dyson, where their views conflict. In a fourth witness statement made in response to Mr Foster's report, Mr Dyson says that his view of the appropriate accounting treatment of a transaction is that it should be determined by reference to the substance and commercial effect of the transaction rather than merely its legal form. For this he relies on accountancy standard International Accounting Standard 1. But as Mr Foster observed during the course of his evidence, two banks cannot make the same loan, and the auditors would have difficulty in ignoring the fact that SBI would have recorded the loans to Notan in its own books, and BCCI's actual legal liability was as guarantor rather than lender. I think that Mr Foster was right in assuming that the auditors would respect the contractual structure of the transaction and would only be concerned with the question of whether BCCI's contingent liability under its guarantee needed to be provided for.

37. Interesting, however, as all this is, it does, in my judgment, have only marginal significance in relation to the determination of the issues in this case. Mr Foster's view of these matters shows that, had the managers at SBI turned their attention to how BCCI would in fact record these transactions in its books and accounts, then they would very probably have concluded that the placements could be shown without any corresponding provision being made for the guarantee liabilities. Provided that they believed (as I have found that they did) that BCCI would accurately record these matters and would not seek to conceal the guarantee, then the correct accounting treatment was a matter for its auditors and not for SBI to determine. Mr Dyson's views are, I think, largely influenced by his belief that the loans were in substance made to BCCI and not to Notan. On this hypothesis there is no real doubt that a corresponding liability would have had to be recorded in the accounts. But at this point in time nothing supports the view (nor is it alleged) that SBI knew that Notan was a front for BCCI. Objectively the first arguable indicator of this was the form of the payment instructions from Notan in respect of the first loan. The conclusion I have reached is that, in the period prior to the drawdown of the first loan, there is nothing which satisfies me that Mr Roy and the others at SBI had become aware that the transaction they were dealing with was a fraud.

### The drawdown of the first loan

38. On October 28, 1983, Mr Roy sent a memorandum to the manager of the Foreign Exchange Department giving him instructions as to how to deal with the deposit and the loans

to Notan. This memorandum was drafted by Mr Chaturvedi. It again refers to BCCI placing a A
free deposit of $20 million with the bank by crediting SBI's Nostro account with Citibank in New York on October 31. The Foreign Exchange Department was requested, on receipt of these funds, to place them in a fixed deposit account for the duration of the placement and to quote an appropriate rate of interest to BCCI for the period up to January 31, 1984, which was the date of repayment for the Notan loans. The rate of interest payable for the remaining three days of the deposit was to be fixed and advised to BCCI at current market rates on February 15, 1984. Mr Roy's instructions included a note that the Credit Cell was to be advised on receipt of B
the deposit and also prior to any release of the deposit on February 4. So far as the loans to Notan were concerned, the Foreign Exchange Department was asked to open a fixed-term loan account in the name of Notan for a period of 92 days from November 15, 1983, to January 31, 1984, but not to disburse the loan until after receipt of the BCCI deposit. These instructions went to Mr K S Sahota. He was the deputy manager in the Dealing Room of the Foreign Exchange Department at the time and would have been responsible for fixing the rates of interest. One can see his note of the relevant rates in manuscript on one of the copies of the C
memorandum of October 28. The manager of the Foreign Exchange Department at the time was Mr Peter Guillan. The department was divided into three sections: the Dealing Room, which was concerned with inter-bank borrowing and lending and the conversion of currency; the Bills Department dealing with letters of credit and bills of exchange; and the Dollar Section, where a Mrs Govewalla was the deputy manager at the relevant time. The function of this section was to maintain US dollar accounts for customers and to make remittances from, and D
receive funds into, such accounts. Neither Mr Guillan nor Mrs Govewalla were called as witnesses at the trial. Much of Mr Sahota's evidence was concerned with details of the mechanics of payment. He accepts that the memorandum of October 28, which was addressed to Mr Guillan, would have been passed to him and would probably not have been seen by the Dollar Section. He would then have contacted BCCI and agreed the interest rates applicable and the commencement and maturity dates for the placement of the BCCI deposit. The Dealing Room would also have arranged to open the fixed-term loan account required for purposes of E
the loan on to Notan and would have produced a loan slip giving the amount of the loan, its commencement and maturity dates, and the rate of interest. The amount of the loan would then be debited to the loan account and credited to Notan's current account. From this point on, the matter would have been placed into the hands of the Dollar Section. They would have been concerned to give effect to the customer's instructions for the disbursement of the loan. Mr Sahota says in his witness statement that he would never usually see the customer's F
instructions or be concerned to act upon them. The Dealing Room's function would be over once the funds had been credited to the customer's loan account.

39. On October 31 BCCI placed the US$20 million deposit with SBI's Citibank Nostro account in New York. On the same day Notan, through Mr Puri, wrote to SBI enclosing the relevant documentation for the purposes of the loan, including certified board resolutions accepting the terms of the facility letter and the amendment to it, the letter appointing Mr Puri G
as Notan's agent for service of any process, together with Mr Puri's letter of consent to act as such, the legal opinion from Dr Marxer, and an accepted copy of the facility letter and its amendment. After listing these items, the letter goes on to refer to the transfer that day of the BCCI deposit. It then says this:

> 'Your requirements for granting the loan now having been complied with, please also find enclosed our instructions for drawdown. Kindly acknowledge receipt and confirm that these instructions will be executed as requested.' H

That is clearly a reference to a letter, again on Notan headed notepaper, which is signed by Mr Puri and Mr Akbar, and gives details of the account to which the transfer of the loan moneys should be made. The letter in question is dated October 21, but this is clearly a typing error for October 31. One of the copies of this document contains a stamp indicating that it was received by the Dollar Section of the Foreign Exchange Department at about 3.55pm on

**© 2003 Sweet and Maxwell Ltd**

A November 1. On the right-hand corner of the letter there are Mrs Govewalla's initials with the November 1 date. The evidence is that documents from Notan were invariably received by hand from Mr Puri rather than by post or courier. It is therefore very likely that the letter of October 31 and the various enclosures, save perhaps those already received, were handed in to SBI by Mr Puri on October 31 and then dispensed as appropriate. The letter of October 31 is not in terms addressed to any particular individual, although it does contain Mr Roy's and Mr Chaturvedi's reference, which was used on earlier correspondence with the Credit B Department. Mr Roy says that he did not see the contents of this letter, and I am prepared to accept that. Mr Chaturvedi was assisting him in this matter and the transaction had now got to the stage simply of mechanics. But it seems to me almost certain that Mr Chaturvedi would have dealt with the letter, given that the receipt of most of the documents it enclosed were conditions of the loan. It seems to me therefore likely that he also saw the payment instructions signed by Mr Puri and Mr Akbar, even though he was not concerned himself to deal with them. Mr Chaturvedi does not deal in terms with the letter of October 31 in his witness statement, but C does say in para.23 that he does not recall having seen the misdated letter of October 21 containing the payment instructions. The relevance of this document is that the liquidators rely on it to show that those at SBI who dealt with this matter must have been aware that Mr Akbar was signing on behalf of Notan as one of the authorised signatories. His name is not printed out on the letter, but the signature is of course the same as that which appears on a number of other documents and in the BCCI signature book. Mr Chaturvedi was therefore pressed at some D length, by reference to these documents, to concede that he was by October 31 familiar with Mr Akbar's signature. When the payment instructions document was put to him, however, he did not content himself with confirming the evidence in his witness statement that he had no recollection of seeing it. He sought to reinforce his alleged ignorance of the document by saying that he remembered that Mr Puri, when delivering these documents by hand under cover of his letter of October 31, said that the payment instructions were not enclosed with the other documents and that he would be giving those instructions directly to the Foreign Exchange E Department. When asked why he did not include this very important fact in his witness statement, he said that it did not seem very important to him at the time when he prepared the statement.

40. The payment instructions are important for two reasons. The first is the one I have already dealt with: *i.e.* as indicating Mr Akbar's involvement as an authorised signatory of Notan. The second is that the instructions ask SBI to transfer the moneys to an account at the F Bank of America, New York, not of Notan, but of BCCI SA. They conclude by saying: 'Please note that value date for beneficiary must be 1st November 1983'. Mr Akbar's involvement with Notan and the absence of a nominated sub-account in the name of that company are the principal two matters relied upon by the liquidators as indicating that whatever the position may have been prior to October 31, SBI must have known on receipt of these instructions that it was dealing with a fraud, because the money was in fact being paid to BCCI rather than to Notan. Mr Purle relies upon Mr Chaturvedi's response to his questions about this document as G confirming that the bank wishes to distance itself from it, because it is a clearly incriminating document. I have to say that I have found this the most difficult aspect of this case. I do not believe Mr Chaturvedi's evidence that he was told by Mr Puri that the payment instructions had been omitted and would be sent direct to the Foreign Exchange Department. One of the reasons for my taking that view is that the bank's disclosure includes at least one copy of the same document without the date and time stamp which Mr Sahota said would have been put on H by the clerk in the Dollar Section. That seems to me consistent with the document having come into the bank in some other department and having been transferred to Foreign Exchange internally. I also think it is most unlikely that Mr Chaturvedi would not have wanted to scrutinise the payment instructions as part of his general conduct of this transaction, even though it was not his task to give effect to them. However, my principal reason for rejecting his evidence is the impression which it made on me at the time it was given. He was under a considerable amount of pressure from Mr Purle and his account of his conversation with

Mr Puri had, to my mind, all the signs of being made up on the spot as an attempt to escape the thrust of Mr Purle's cross-examination. This therefore requires me to consider the difficult question of whether Mr Chaturvedi's testimony on this point was simply a foolish attempt to get him out of a tight spot or is indicative of something much more sinister. Not without some hesitation I have come to the conclusion that it was the former. In general he did not strike me as a dishonest witness, but, like the other bank officials, was obviously concerned to do what he could to protect the bank. I think that he almost certainly did see, or at least was handed, the payment instructions. It is probable that he also saw and recognised Mr Akbar's signature from having presumably verified it for purposes of confirming the authenticity of the guarantee. In the event he merely passed the instructions on to the Dollar Section, which then raised a payment order giving effect to those instructions. This payment order records that by order of Notan, the $20 million was to be remitted by telegraphic transfer to BCCI's account with the Bank of America 'in favour of yourselves'. This payment order is consistent with the payment instructions which, as I have said, nominate BCCI SA as the beneficiary. But in banking terms this means no more than recipient. It does not of itself mean that BCCI SA was to receive the money for its own use, rather than to receive it and hold it to Notan's order.

41. There are three questions, therefore, which I need to ask. The first is whether the presence of Mr Akbar's signature on the payment instructions, coupled with his known position at BCCI, should have caused SBI to think that something might be amiss. The second is whether the terms of the payment instructions themselves should have added to that concern. Finally, I have to consider whether one or other or both of those factors did, in all probability, cause SBI to suspect a fraud.

42. With the benefit of hindsight, Mr Akbar's dual role is obviously worrying. Even at the time it would, I think, have given cause for an explanation. But that explanation was in fact already in the possession of SBI Had someone asked or bothered to look in the relevant file (and there is no clear evidence one way or the other as to whether they did), they would have discovered Notan's resolution of July 28 authorising Mr Akbar to act on behalf of the company. Although it is now clear why things were arranged in this way, I doubt very much whether in 1983 this would have been regarded as inherently suspicious. SBI had been told that Notan had an existing banking relationship with BCCI and that the company was owned by investors in the Middle East. Even without being told in terms that the ownership was common, one would have expected a bank in SBI's position to assume that a Liechtenstein company was being utilised as a convenient vehicle for the business operations of individuals and entities who did not wish to be named. Consistently with that, it is not altogether surprising that the Liechtenstein directors would have appointed nominees to act for them in this country, and the company's bankers would have been obvious candidates. With the benefit of hindsight, one can see the hand of fraud in all this. But that is only because we have now learned that BCCI was fundamentally dishonest. I am not prepared to assume, merely from Mr Akbar's dual role, that this was a conclusion that SBI would have reached at the time. Similarly in relation to the payment instructions, it was, I think, unusual for no sub-account to be specified. But again I am not persuaded, either singly or in conjunction with Mr Akbar's signature, that this was enough to set the alarm bells ringing. In support of their case that these factors ought to have, and therefore probably did, cause SBI to suspect a fraud, the liquidators called as an expert banking witness Mr Roger Reynolds. Until 1992 he was a director of Hill Samuel and a member of its Credit Committee. Together with Mr Paul Rex, the expert called on behalf of SBI, Mr Reynolds was asked to consider a number of questions designed to identify the steps which would have been normal for a reasonable bank, considering Notan's loan requests, to have taken prior to approving the borrowing. I have already referred to certain aspects of his evidence. He accepted that it was relatively unusual for a bank to be required to provide a board resolution authorising the giving of a guarantee, and that the lending bank would normally be satisfied with sight of the signature book as a confirmation of authority. He also accepted that it would be most unusual for a bank to create a charge over its own assets or to agree to the

© 2003 Sweet and Maxwell Ltd

registration of such security at Companies House. The effect of that would be to cast doubt on its solvency. During his time at Hill Samuel no such charge was ever created. He also considered that it was reasonable for SBI to have assumed that the guarantee would be disclosed and that, if the auditors had been shown the guarantee with its right of set-off, there would be no possibility of their being misled. He was also asked about the payment instructions. He said he thought it was unusual that the payment instructions from Notan did not specify a sub-account. He was concerned that SBI had received instructions to remit the money to BCCI without knowing what it was going to be used for or even the precise destination of the funds. Mr Potts put it to him that, given that BCCI had guaranteed these loans, it was reasonable for SBI to suppose that money remitted to BCCI on the instructions of Notan was not going to be used by BCCI (to use his example) in order to place bets on the horses. It was reasonable to suppose that it would be held to the order of Notan, if necessary in a suspense account, and that BCCI would ensure that it was applied by Notan for some legitimate purpose. That, however, would be the concern of BCCI, not of SBI. Mr Reynolds said that the only explanation that he could think of for payment instructions in this form would be if Notan was using its loan to pay off an existing debt with BCCI, which would explain why the money was being paid directly to that bank. Mr Rex, who was called by SBI, was also slightly equivocal about this point. He said that a banker might or might not act on instructions where no sub-account was specified and that he himself might have done so without seeking further clarification. I suspect that a cautious bank might well have at least sought confirmation that no specified sub-account was intended to form part of the instructions before making the payment. But I am not satisfied, on the evidence of the banking experts, that this was a clear-cut matter of practice, such that no honest bank could possibly have failed to have sought an explanation as to why no sub-account was mentioned and would have regarded the absence of such an account as a badge of fraud. We know that in fact SBI did not seek clarification of the instructions and was content to pay in accordance with them. On the liquidators' case, we have to assume that this was done with knowledge that they were participating in a fraud, *i.e.* that they knew the money was being re-circulated back to BCCI rather than to Notan for its own use. Although some of Mr Chaturvedi's evidence was, as I have indicated, untrue and reprehensible in that regard, looking at the matter more widely I am not prepared to find, on the basis of that testimony, that he and Mr Roy knowingly lent SBI's assistance to what they suspected or believed was a fraud on BCCI's creditors.

**The second loan**

43. Although the funds were disbursed to Notan on November 1, it was not until November 3 that Mr Roy received formal confirmation in a letter from Linklaters & Paines that the documents were in order for SBI to proceed with the disbursement of the loan. Mr Johnson-Gilbert thought on balance that he had not given Mr Roy an earlier oral confirmation and the bank had obviously gone ahead without first receiving that. On November 10 Mr Johnson-Gilbert wrote a further letter to Mr Roy containing advice about cl.4.03 of the guarantee and the status and enforceability of the right of set-off in the event of the liquidation of BCCI. Mr Johnson-Gilbert's opinion seems to have served two purposes. Although it was now early November and the first loan had already been disbursed, SBI had still not sent to Head Office the memorandum of October 20 explaining the nature of the first loan transaction and the reasons why it had been approved before any sanction from Head Office had been obtained. It was not in fact dispatched to Bombay until November 30, under cover of a letter from Mr Basu enclosing Mr Johnson-Gilbert's opinion. Confirmation of the transaction was sought. In his letter Mr Johnson-Gilbert had advised the bank that it would be prudent to require the BCCI guarantee and deposit to be approved by the board of BCCI in the event that SBI intended to repeat the arrangements. It is not clear on the evidence whether he was told prior to writing this letter that there was a possibility of a second loan, but that information was certainly conveyed to him by Mr Roy on December 2, when he wrote saying that SBI were now considering

another loan to Notan on identical terms and conditions, and wanted to protect the bank's interests in the event of BCCI going into liquidation before the maturity of the loan. Mr Roy suggested that this could be catered for by incorporating provisions for the Notan loan to become immediately repayable in the event of the commencement of any winding up of BCCI. The reason for Mr Roy's request was that the second loan that had been applied for was required for the period of one year. This appears from a memorandum signed by Mr Roy and Mr Basu dated November 22, 1983, which was obviously going to be sent to the Head Office of SBI in Bombay, seeking approval of the proposals. The memorandum, after setting out the terms of the proposed second loan, concludes with the following statement:

> 'We understand informally that because of certain common ownership interests BCCI cannot lend to NTIL. On the other hand, on account of repercussion on their balance sheet, BCCI cannot concede a lien on the deposits placed by them.'

44. Before this memorandum could be sent, there were obviously further discussions with Mr Puri, and Mr Roy had made a number of annotations on the document, including one to the effect that after discussions with BCCI and NTIL the maturity of the second loan was to be co-terminous with the existing loan: *i.e.* January 31, 1984. Mr Roy's manuscript note then goes on as follows:

> 'As this will take us beyond the balance sheet date of BCCI, NTIL will arrange with BCCI for liening the funds if they want an extension of the loan thereafter.'

Mr Basu was asked about this and said that he was unwilling to commit SBI to a loan for as long as a year without a formal lien over the deposit. He thinks that Mr Roy then approached BCCI, who repeated that they would not be able to grant a lien over their funds and would therefore settle for a loan that was co-terminous with the first loan. Mr Roy's evidence was that he did not personally discuss the question of a lien for the second loan with BCCI, but that Mr Chaturvedi may have done so. In any event the conclusion of the discussion was that the proposal for a one-year loan was dropped. Mr Purle asked Mr Roy how he was able to reconcile the reference in his manuscript note to BCCI providing a lien over the deposit in the event of a loan beyond the January 1, 1984, date, given that it was unwilling to provide one in respect of a loan up until then. His explanation of his note was simply that, following discussions with Mr Basu, it was clear that SBI as a bank was not prepared to grant a loan for a period of a year without the security of a lien. It was prepared to do so for a limited period of time and understood BCCI's reluctance to grant a lien, which it would have to record in its balance sheet. Once the year-end was over, the immediate problem of disclosure of any such lien in the balance sheet would be postponed. It would then be a matter for BCCI to decide whether it was prepared to provide that kind of security. Mr Roy accepted that there would be difficulties about that, for the reasons I have already referred to, but it would be a matter of choice for Notan and BCCI. I think that this exchange merely confirms what is evident from the documents, which is that BCCI had told SBI that it would not grant a lien the existence of which it would have to disclose in its year-end accounts, and Mr Roy's note about what would have to be the position after January 31, 1984, is simply a reflection of SBI's view of the matter, rather than based on any indication from BCCI that its position about a lien would change once the year-end was over. That is, I think, evident from the fact that the proposal for a one-year loan was dropped when Mr Basu insisted on the grant of a lien.

45. Mr Roy was asked about two other matters arising out of the November 22 memorandum. The first is the reference to the difficulties caused by common ownership. It was put to him by Mr Purle that this was the first reference to such a problem, but Mr Roy thought that it might have been in the minds of SBI as a result of some earlier discussion, although he could not be sure about it. I do not think anything very much turns on this, Mr Purle did not suggest to Mr Roy that it was an invention on his part, and I therefore have to assume that it emerged from discussions at that time either between Mr Puri and himself or between Mr Puri and Mr Chaturvedi. Either way, the information that there were common ownership issues

**© 2003 Sweet and Maxwell Ltd**

A would have been quite consistent with what SBI already knew about the controlling interests in Notan. The second point on which Mr Roy was pressed were the reasons why no proper explanation was asked for or received in relation to the request for the second loan. The note of November 22 gives no indication of the reasons behind the request, nor are any contained in Notan's letter of December 2, 1983, which was sent to Mr Roy to confirm the arrangements that had been agreed in relation to the second loan. Mr Roy's evidence in cross-examination was that he could not recall the details of any explanation and accepted that he really made no B enquiries into what the reasons were. He was told that the moneys were required for trading purposes, but nothing more than that. Mr Purle put it to him that the doubling of the loan to US$40 million was a significant increase in Notan's borrowing which called for an explanation. The explanation which Mr Roy gave was that because SBI was to receive a further guarantee from BCCI, coupled with the deposit and the right of set-off, the short-term loan to January 31, 1984, posed no significant credit risk to the bank, and it was no more necessary to C enquire into the purposes of the loan than it had been in relation to the first transaction. It goes without saying that neither banking expert was prepared to support that view, but as I have already emphasised, this case is not about whether Mr Roy and SBI measured up to the standards of the reasonably competent banker. It seems to me that Mr Roy's attitude towards the second loan is entirely consistent with his attitude to the first, and I am not satisfied that it is any more probative of knowledge on the part of SBI that it was becoming involved in a fraud.

46. The same also goes for the speed with which the two loans were disbursed. SBI did not D wait for Head Office approval, nor even (in the case of the first loan) for Linklaters' confirmation that the documents were in order. This seems to me extremely sloppy and is obviously open to criticism. Mr Roy said that Notan urgently required the money for transactions and that certain oncoming payments had to be made. Mr Chaturvedi seemed less certain of the reason for the first loan to be drawn down by November 1, but that had always been the basis of the arrangements. But again all this has to be considered in the light of E Mr Roy's perception that SBI was not at risk, and although it may cast doubt on his competence as a banker, it is not, in my judgment, proof of fraud. He was clearly anxious to assist Notan and BCCI and, by so doing, to make a profit for SBI at no risk to itself. Corners were cut in the process, but I do not regard the only possible explanation for this as an anxiety on SBI's part to assist BCCI in its fraudulent purpose.

47. Linklaters were instructed to act and on December 2 sent to Mr Chaturvedi a draft of the facility letter, together with a draft guarantee to be provided by BCCI. Both documents were in F substantially the same form as those used in relation to the first transaction. In the same letter Mr Johnson-Gilbert advised Mr Chaturvedi that it was important that an opinion be obtained from Luxembourg lawyers to the effect that BCCI had the power to enter into the guarantee and had taken all necessary action to authorise its execution. He offered to draft an appropriate form of an opinion which could be given. The only changes to the facility letter and to the guarantee were the incorporation of provisions making the loan to Notan repayable in the event of the G presentation of a petition for the winding up of BCCI. The same event would trigger the liability under the guarantee. As Mr Johnson-Gilbert explained in his letter of December 2, these changes were made to ensure that, in the event of liquidation, SBI would have a debt presently due from that bank, so as to be able to rely on its statutory right of set-off under what was then s.31 of the Bankruptcy Act 1914. The guarantee was executed in this form.

48. On December 6, 1983, Mr Basu was able to write to the Head Office of SBI in Bombay advising them that the London Office had granted another loan of US$20 million to Notan, H which would be disbursed on December 15. Once again the letter concludes by saying that in view of Notan's urgent requirement for the funds, approval had been given in anticipation of Head Office sanction. On December 14 Mr Akbar sent a telex to Mr Sahota of SBI confirming that the deposit of $20 million in respect of the second loan had been remitted to SBI's Citibank account in New York. On the same day Mr Puri delivered a letter on Notan headed notepaper addressed for the attention of Mr Roy, which enclosed the accepted copy of the facility letter

and the other documents relevant to the transaction, together with a letter of instruction for payment of the second loan. Mr Roy said that he did not see this letter because it would have gone either to a clerk in his department or to Mr Chaturvedi. Mr Chaturvedi accepts that he probably received the letter from Mr Puri with most of the enclosures, except for the letter of instruction in respect of the drawdown of the loan. As in the case of the first loan, he says that this letter was not given to him, but went straight to the Foreign Exchange Department. He had not seen it and therefore did not know that Mr Akbar had signed it. These answers were essentially a continuation of his earlier evidence about the first payment instruction and I give them no more credence. But for the same reasons that I have already given, I am not able to draw the inference that these answers are indicative that Mr Chaturvedi at least was aware that he was staring at a fraud. Similarly the fact that the payment instruction did not designate a sub-account was consistent with what had been done in relation to the earlier drawdown. The funds were remitted to BCCI's account with the Bank of America on December 15 and both loans were repaid from the same source when they fell due on January 31, 1984. One of the matters relied upon by the liquidators is the fact that the source of repayment was the same, but I attach no more importance to that than to the fact that the moneys were paid to the BCCI Bank of America account in the first place. Repayment from that source was entirely consistent with the way that the transaction had been handled at the time of drawdown. Nor does it in fact matter if repayment from the Bank of America account had the effect of converting SBI's view of the transaction from a legitimate one to a fraud. By then the transaction had already taken place and knowledge at that stage would be too late to fix SBI with any liability under s.213.

**Repercussions with head office**

49. Of some considerable interest in this action is the way in which the London branch reacted to what happened when the Head Office of SBI in Bombay discovered that the loans had been sanctioned without its authority. Under the bank's regulations (which I need not go into for purposes of this claim) loans of the size we are dealing with, granted without fixed security, could not be authorised even by Mr Basu under delegated authority. It was necessary for the approval of the Head Office to be obtained. Mr Basu and those under him clearly found this tiresome and considered that SBI's procedures in this respect were archaic and ill-suited to dealing with commercial business in the City of London. He is probably right about that, although it is worth recording that had those procedures been followed, it is unlikely that either of the loans in this case would have been made. The main complaint about having to obtain approval from Bombay was that it took a considerable period of time. The London Office therefore adopted a practice, which was followed in this case, of approving the loans in advance of any sanction from India and seeking to obtain retrospective approval for what had been done. This was not, however, appreciated by Head Office and on December 1 they sent a telex to the London Office stating that even in urgent cases it ought to be possible for Mr Basu to get in touch with them and to obtain clearance over the phone. The letter goes on to refer to Mr Johnson-Gilbert's opinion of November 10, and in particular his recommendation that the approval of the BCCI board should have been obtained for the provision of the guarantee and that the guarantee should have been registered under the Companies Act as a charge. The letter records the view of Head Office that these are important requirements and that SBI's interests would not be adequately protected unless they had been complied with. Head Office asked for confirmation that that had been done. The letter then goes on to deal with the second loan and notes from the London Office's letter of December 6 that this had also been disbursed. The comments made in relation to the first loan are stated to apply equally to the second. They then refer to the London Office's note of November 22 and to the possibility of an extension of the first loan on maturity, subject to a lien being noted on the relevant deposit. The letter concludes with these words:

© 2003 Sweet and Maxwell Ltd

> 'We do not quite understand the balance sheet problem BCCI are reportedly having in permitting us to note a lien on the deposit. Please clarify and note that no further exchange should be permitted without our prior approval.'

There was no immediate reply to the questions raised in this letter and the Head Office sent a number of chasers in early January. As they explained in their letter of January 14, they needed to know whether the issues raised by Linklaters & Paines had been dealt with before putting up the two loans to the central board for approval. Further chasers were sent on January 18 and 23 and again on February 2. Mr Basu said that it was a busy time in London and that they had to prioritise their work. He denied deliberately waiting until the Notan loans had been repaid before replying, but it is, I think, significant that very soon after the loans had been repaid, on January 31, a telex was sent to the Head Office in Bombay stating that repayment had been made and that the London Office would be writing a detailed reply to the issues raised in the Head Office telex. It must have been clear to Mr Basu and the others that the Head Office of the bank was extremely concerned about the sanctioning of loans of this size without its prior approval. It was obviously going to be easier to deal with their criticisms once the loans had been repaid.

50. I have already referred to the letter of February 9, 1984, which Mr Basu sent to Head Office dealing with the points of detail raised in their letter. As already explained, this was drafted by Mr Roy and then amended after consultation with Mr Basu and Mr Iyer. By the time this letter was written, the proposal for renewing the loans on maturity had evaporated, and Mr Roy removed from his draft a passage which would have read:

> 'Now that the year-end is over we are persuading them to offer a formal lien over the funds for any rollover of the loan to NTIL, in which event of course BCCI's guarantee would have to be dispensed with.'

Mr Roy was asked whether he had spoken to anybody at BCCI to confirm whether or not they wished to continue either of the loans after maturity. He said that he had not done so and that his only concern at this time was that there should have been repayment of the two existing loans. There is no real evidence that there was any serious discussion about continuing the loans by this time, although it is clear, as I have already indicated, that Mr Basu was not prepared to contemplate a long-term facility without a lien being granted over the deposits.

51. The explanation given in this letter of a number of matters is not entirely satisfactory. On p.3 of the letter Mr Basu states that the loan documents were vetted by officials in the London Office and were also seen by Linklaters & Paines, both of which statements are true. However, it then goes on to say that it was only after receipt of the solicitors' confirmation that the documents were in order that the loan was disbursed, and a copy of Linklaters' letter of November 3 is enclosed. As I have already recorded in this judgment, it is quite clear that the loan moneys were in fact disbursed before Linklaters had confirmed that the documents were in order and no explanation of the reasons for this is given. The real reason, however, for the hasty and somewhat slapdash way in which the loan was disbursed can be found in Mr Roy's response to Head Office's questions about security. He explains on the second page of his letter that BCCI was unwilling to grant a lien over the deposits and for the same reason it would have resisted registration of the right of set-off as a charge. On the same page he also makes the point that Linklaters' advice to obtain a formal board resolution of BCCI authorising the guarantee would have been an unusual step and was not customary amongst banks in the City. This accords with the expert evidence given in this case and it is no surprise that Mr Roy decided that some form of self-certification by BCCI of its authority, coupled with the execution of the guarantee by Mr Akbar and other authorised signatories, was sufficient. I think that the key to his thinking is contained in the first main paragraph of the letter, where he says this:

> 'The loan to NTIL has been deemed to be secured by the guarantee of BCCI and we have stated in our note dated the 22nd November 1983 that an exposure of US$40 million on BCCI could be regarded as a fair banking risk. The matching deposits initially placed with us by BCCI were therefore purely for the purpose of enabling us to fund the asset in

> our books. Before disbursing the second tranche of the US$20 million we requested our A solicitors to examine whether in the highly unlikely event of BCCI failing to meet its guarantee obligations in case NTIL did not repay the loan, the deposit could be set off against BCCI's liability under the guarantee, i.e. could the deposit supplement and not supplant the guarantee. The second paragraph of the solicitors' letter of 10th November 1983 clearly bears this out. As such the "conditions/reservations" of the solicitors were dealt, bearing in mind that BCCI's guarantee rather than the matching deposits were the security for the loan, for if we had deposits charged to the bank, the guarantee of BCCI B would be superfluous and the advance would fall within the financial powers of this office.'

52. As indicated earlier, it seems to me that the real key to SBI's willingness to cut corners, such as the usual enquiries into Notan's creditworthiness or the purposes of the loan, was that the entire credit risk was seen to lie with BCCI and not with SBI. From the very start it was made clear that a lien over the deposits was not an option, but absent the possibility of the C liquidation of BCCI (which it is not suggested that SBI should have anticipated) the guarantees provided as much security as SBI could reasonably require, and this was ultimately the view of Linklaters themselves.

53. Having dealt with the points of detail about the loan transactions raised by Head Office, Mr Basu wrote a second letter, also dated February 9, dealing with the reasons why the London Office had gone ahead without prior Head Office sanction. He refers to a practice, extending D over a number of years, of the London Office sanctioning and disbursing loans and advances in excess of its discretionary powers, in anticipation of sanction, and says that it had been assumed that this practice has had the blessing of Head Office. It is unnecessary for me to comment on any of that, because it is not directly relevant to the issues which I have to decide. The only significant passage in this letter is the one already quoted earlier in this judgment, which describes the advances to Notan as virtually risk-free in the light of the guarantee of BCCI and the ability to exercise the right of set-off against the matching deposits. On May 7, E 1984, Head Office responded, saying that they were not prepared to allow the practice of sanctioning large advances without prior approval, but on May 23 the central board at the bank confirmed the actions of the London branch in respect of the two Notan loans.

**Expert banking evidence**

54. I have already referred to and commented on a number of aspects of this expert F evidence, but there is one other aspect of it which I need to mention. The experts were asked to give their views on a series of questions, one of which (question 12) refers to para.84(a) of the points of defence, which refers to SBI having been given, and having accepted, two reasons why BCCI could not lend directly to Notan: *i.e.*

(i) that there were shareholding interests in BCCI SA which overlapped with shareholding interests in Notan; and G

(ii) that there were balance sheet constraints affecting BCCI SA.

The experts were asked to comment on these reasons alleged for BCCI SA's inability to lend directly to Notan and SBI's acceptance of that, having regard to the perspective of a bank operating normally and honestly in the City of London in 1983. What I think this question was intended to probe was whether SBI, if honest, would have accepted these as valid for BCCI not being able to make a direct loan. In relation to the overlapping or common shareholdings, Mr Reynolds says that the terms used do not convey a clear and unambiguous meaning and that H a bank operating normally would have wished to have known more about what was actually involved. Without such an explanation, a bank operating normally in 1983 would, in his opinion, have declined to consider the proposal further because of the size and complexity of the transactions. In para.12.3 he goes on to say that, in the unusual circumstances of this case, a bank operating normally would also not have assumed that overlapping or common

© 2003 Sweet and Maxwell Ltd

A shareholdings was a genuine reason for BCCI not being able to lend direct, and that an explanation in those terms would not have been seen as a legitimate and honest reason for the transactions that in fact were put into place. In relation to 'balance sheet constraints' Mr Reynolds in his report says that this is a generalised term and could have meant one of a number of things. The meaning most likely to come to the mind of a bank operating normally in 1983 would be that BCCI had insufficient capital to permit it to make the loans directly to Notan, either because its capital was already fully deployed or because to do so would risk B contravening the capital adequacy guidelines laid down by its regulatory authorities. He therefore accepts that at least the reference to balance sheet constraints was not, on its face, implausible. But he then sets out his view that, when analysed, this reason was not in fact credible. In 1980 the Bank of England had issued a discussion paper entitled 'Measurement of Capital', which set out the framework for calculating what was described as a 'risk asset ratio' as an indication of a bank's capital adequacy. The paper proposed that various classes of assets would be risk-weighted and that a bank's capital would be expressed as a percentage of the C bank's risk-weighted assets. In the case of a direct loan, therefore, the risk asset ratio would fluctuate, depending on whether the loan made had a high weighting, as being relatively high-risk (for example to a private sector borrower) or was classified as a lower-risk loan (for example a loan to a local authority). The paper also proposed that the risk-weight of assets should not be limited to loans, but should include guarantees and other contingent liabilities. However, in respect of this type of liability there was a lower weighting, which in 1983 was 50 D per cent. The paper also proposed that connected lending should be weighted at 150 per cent and property lending at 200 per cent. The 50 per cent weighting for guarantees was anomalous in regulatory terms, in the sense that (as Mr Rex points out in his report) a bank could, for example, guarantee £200 million worth of loans by other banks to one of its customers, when on the basis of a 100 per cent weighting for direct loans it could only lend £100 million directly. This anomaly was subsequently removed by the Banking Supervision Directive BSD/1988/03, which was issued in October 1988 and included 100 per cent weighting for 'direct credit E substitutes' including guarantees. The weightings for connected and property lending were reduced to 100 per cent.

55. Mr Reynolds accepts that in 1983 guarantees had this lower weighting, but expresses the opinion that the concession would not have been available in a case such as the present one, where the bank was not only guaranteeing the loan but also securing the loan with its own matched funding. He believes that, had BCCI discussed the matter with the Bank of England, F its liability under the guarantees would have been weighted at 100 per cent. From this he infers that BCCI's reference to balance sheet constraints making a direct loan to Notan impossible would not, to the knowledge of SBI as a normal and honest bank, have been credible. Mr Rex takes a slightly different approach to this matter. His position is that if one assumes that SBI studied the transaction in relation to the capital adequacy guidelines in force at the time, it would have seen that there were obvious advantages, from BCCI's point of view, in structuring the transaction by means of a guarantee rather than by means of a direct loan. Looked at in that G way, the explanation given would have been credible. He also says that in his experience there was always a certain amount of regulatory arbitrage by banks nearing their year-end, and gives an example in his recollection that Japanese banks often requested customers to move borrowings to foreign banks which accepted the loans against a guarantee provided by the Japanese banks in substitution for their own lending. However, he makes the additional and important point that the level of understanding of capital adequacy issues varied widely H amongst bankers in 1983, and that in his experience some bankers were often reluctant to go deeply into capital adequacy issues with their counterparts, if only out of a reluctance to display their own lack of understanding. There is nothing in the evidence in this case to suggest that Mr Roy or Mr Chaturvedi cross-examined Mr Akbar or anybody else at BCCI as to what their balance sheet problems were. On the contrary, the liquidators' main complaint is that they failed to make any such enquiries. On that basis I am quite unable to accept Mr Reynolds' hypothesis that the reference to connected shareholdings and to balance sheet constraints

would have struck Mr Roy or anybody else at SBI as an incredible explanation for the absence of a direct loan. Nor, in fact, do I accept Mr Reynolds' hypothesis that the concessionary weighting of 50 per cent would not have attached to this transaction in the light of the provision of the matching deposits. In terms of risk, the bank's liability under its guarantee was precisely the same, whether or not it had provided funds which would be exposed to SBI's right of set-off in the event of a default by Notan. Everybody accepts that BCCI would have had no alternative but to have paid under its guarantee in that event, regardless of whether the deposits had been in place. Moreover during the course of his cross-examination by Mr Potts, Mr Reynolds accepted in terms that there was nothing wrong with a bank seeking to structure a transaction in such a way as to give it a 50 per cent rather than a 100 per cent weighting for capital adequacy purposes. I do not therefore see how it can be said, on the facts of this case, that the explanation given to SBI of the reasons why BCCI could not lend direct should have alerted SBI to the likelihood that it was dealing with a fraud.

**Conclusions**

56. For these reasons the claim fails and will be dismissed.

(*Order accordingly*)

© 2003 Sweet and Maxwell Ltd