# Exhibit Q

[2021 (1) CILR 128]

# RITCHIE CAPITAL MANAGEMENT LLC et al. v. LANCELOT INVESTORS FUND LIMITED and GENERAL ELECTRIC COMPANY

GRAND CT. (Parker, J.) December 15th, 2020

*Civil Procedure — service of process — service out of jurisdiction — order granting permission to serve out of jurisdiction set aside as plaintiff had no realistic prospect of success as claims time-barred — plaintiff also estopped from bringing claims in Cayman Islands as judgment on same issues already given by foreign court*

The plaintiffs applied for leave to serve a writ out of the jurisdiction.

In the late 1990s and early 2000s, Mr. Thomas Petters was a leading businessman in Minnesota. In 2008, his business empire collapsed when it was discovered that he had been operating an investor fraud, which was later revealed to be a US$3.65bn. Ponzi scheme. His arrest, trial and sentencing were widely publicised. He had represented to investors that he was engaged in a business whereby consumer merchandise (such as electronics and white goods) would be acquired by his companies from liquidators and other distressed channels and sold on to "big box" retailers. Investors lent money to Mr. Petters' companies to finance the acquisition of such merchandise. In fact, the companies were not used to buy or sell merchandise. Investors' money was used to make lulling payments to other investors, to pay those who assisted in the fraud and to fund Mr. Petters' lifestyle. Investment in Mr. Petters' business was formally structured by way of collateralized loans made by financing entities and feeder funds. Once merchandise was purchased using finance provided by the lender, it was to be the subject of security arrangements in favour of the lender. The goods would then be sold to the "big box" retailers and the security would continue to attach to the receivables from the retailers buying such goods. A "lockbox account" was to be used to receive payments directly from the retailers and to insulate the investors from misappropriation of the moneys by being completely segregated and closely monitored. Those representations in relation to the lockbox account proved to be false.

The plaintiff ("Ritchie") was a group of funds and investment managers which lost a large amount of money in the Ponzi scheme. It commenced a raft of litigation against a number of third parties in the US courts, almost

all of which were stayed or dismissed because Petters' companies were placed in Chapter 11 Bankruptcy in Minnestoa in October 2008. Of particular relevance to this application, Ritchie commenced proceedings against General Electric Capital Corp. ("GECC") in September 2014 in New York, which were dismissed in 2015.

Ritchie brought the present proceedings, which were commenced on May 21st, 2019, seeking recovery from the defendants. The claim involved deceit and unlawful means conspiracy allegations against both defendants. The first defendant, Lancelot Investors Fund Ltd. ("Lancelot") was a Cayman fund which had been operated by Mr. Gregory Bell as a feeder fund to invest in Mr. Petters' companies. Lancelot had filed for bankruptcy in Illinois in October 2008. (Mr. Bell pleaded guilty to wire fraud in October 2009 and was sentenced to 6 years' imprisonment.) The second defendant, General Electric Co. ("GE"), was a well-known company of which GECC was a subsidiary. GECC had at one time been a lender to two of Mr. Petters' companies. The loan facilities had been repaid in full and closed by March 2001. GE claimed that thereafter it had no commercial dealings with Mr. Petters or his companies.

In relation to its claims against Lancelot, Ritchie alleged that an essential element of its decision to invest was the assurance that there were appropriate and adequate security arrangements in place and that Mr. Bell had allegedly made various representations to Ritchie regarding those security arrangements, the foundation of which was the "lockbox" account. Those representations were false. Ritchie's claim in deceit against Lancelot was that (a) Mr. Bell on its behalf had made a series of fraudulent representations to Ritchie, principally as to the operation of the lockbox account which purportedly secured all investments made by Ritchie in the Lancelot funds, which Mr. Bell knew were false; and (b) Mr. Bell had made fraudulent representations that Lancelot was monitoring Mr. Petters' delivery and payment obligations, which Mr. Bell knew did not in fact take place. It was alleged that Ritchie would not have made any of its investments from 2008 but for those representations. It was also claimed against Lancelot that it had conspired with Mr. Bell, Lancelot Management LLC, Mr. Petters and his companies to use unlawful means to obtain funds from investors, the unlawful means comprising the alleged fraudulent misrepresentations and active concealment of the true facts. It was alleged that in entering into the conspiracy, Lancelot joined a pre-existing conspiracy with GE and Mr. Petters made years earlier, but there was no allegation of direct conspiracy between Lancelot and GE.

In relation to its claims against GE, Ritchie alleged that its subsidiary, GECC, had made a fraudulent misrepresentation in a "to whom it may concern" letter, by way of reference, which endorsed Mr. Petters and on which Ritchie alleged it relied for many years in relation to its subsequent investments. The letter was alleged to have been given to Ritchie by Mr. Bell in early 2002. It was further claimed against GECC that it had embarked on a conspiracy with Mr. Petters and/or one of his companies to use unlawful means to perpetuate the Ponzi scheme, the unlawful means

comprising the alleged deceit and dishonest concealment of the fraud, from which conspiracy GECC never withdrew.

On an *ex parte* application in June 2019, Ritchie obtained leave to serve the proceedings on GE out of the jurisdiction. Ritchie established that its claims against Lancelot as the Cayman anchor defendant raised a real issue that it was reasonable for the Grand Court to try; that GE was a necessary or proper party to those claims against Lancelot; that its claims against GE had a real prospect of success; and that the Cayman Islands was the proper place in which to bring the claims against Lancelot and GE.

GE applied for an order setting aside the order granting leave to serve the proceedings on it out of the jurisdiction.

GE submitted that (a) Ritchie did not have claims against Lancelot with a realistic prospect of success because they were statute-barred, as by the end of 2009 Ritchie knew all it needed to know to bring its claims against Lancelot; (b) Ritchie was bringing the present claim to re-litigate in the Cayman Islands the claim which had been brought against GE in New York which had failed and which could not now be re-litigated elsewhere in the United States, and the claim was precluded by issue estoppel; (c) Ritchie did not appear to intend to make a recovery from Lancelot in the present proceedings as it had filed a proof of debt in Lancelot's Cayman liquidation and had agreed that any recovery in the present proceedings would rank behind the claims of unsubordinated creditors and *pari passu* with those of Lancelot's shareholders; (d) Ritchie did not have claims against GE with a realistic prospect of success because such claims were also statute-barred as Ritchie could have discovered all it needed to advance these claims by the end of 2009—this was highlighted by the fact that it was Ritchie's own case in the proceedings it brought against GE in New York that it could have discovered the facts on which it based its claim by that time; (e) in addition, there was the issue estoppel that arose from the decision of the New York court, dismissing the claims on the basis that Ritchie did not own the causes of action it purported to assert because the claims were the property of a bankruptcy estate; (f) Ritchie could not show that the Cayman Islands was the appropriate forum in which to bring its claims against Lancelot and GE as there was little to tie the claims to the jurisdiction and the clearly more appropriate forum was Illinois (where the relevant offices of Ritchie, GE and Lancelot were based at all material times, where Ritchie had in previous proceedings said it suffered losses and where Lancelot was first and remained subject to insolvency proceedings); and (g) there had been a number of material breaches of Ritchie's obligation of full and frank disclosure at the *ex parte* application which would warrant setting aside the order in any event.

Ritchie requested the court to dismiss GE's application. Ritchie submitted *inter alia* that (a) the claims against Lancelot were not statute-barred as the consequence of Lancelot's winding-up order of the Grand Court in December 2008 was that time ceased to run on all existing liabilities from when the petition was presented; and (b) Ritchie could alternatively rely on s.37 of the Limitation Law (1996 Revision) as Ritchie

had not discovered the fraud in relation to the lockbox arrangements until after May 2013 and could not with reasonable diligence have discovered the fraud before then.

Section 37 of the Limitation Law (1996 Revision) provided:

"(1) Subject to subsection (3), where in the case of any action for which a period of limitation is prescribed by this Law, either—

(a) the action is based upon the fraud of the defendant;

(b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or

(c) the action is for relief from the consequences of a mistake,

the period of limitation does not begin to run until the plaintiff has discovered, or could with reasonable diligence have discovered, the fraud, concealment or mistake. References in this section to the defendant include the defendant's agent, and to any person through whom the defendant claims, and his agent."

**Held, setting aside the order granting leave to serve GE out of the jurisdiction:**

(1) The court would make an order pursuant to GCR, O.12, r.8 that the order granting the plaintiffs leave to serve the writ on GE out of the jurisdiction be discharged (para. 298).

(2) Ritchie had obtained leave to serve GE as a foreign defendant out of the jurisdiction as a necessary and proper party to its claim against Lancelot which had been served in the jurisdiction. The test for service out of the jurisdiction on the basis that a party was a necessary and proper party to a claim was as follows. (a) Ritchie was required to show that the claims against Lancelot in the Cayman Islands involved a real issue to be tried; that it was reasonable for the Cayman court to try that issue; that GE was a necessary and proper party to the claims against Lancelot; that the claims against GE had a real prospect of success; and that the Cayman Islands was the appropriate forum in which to bring the combined claims against Lancelot and GE. (b) Ritchie had to show against Lancelot and GE that it had a realistic as opposed to a fanciful prospect of success. Whether there was a real issue to be tried was in substance equivalent to the test for summary judgment. A realistic claim was one that carried some degree of conviction, which meant that it was more than merely arguable. When determining such applications, the court formed only preliminary views on most of the relevant issues and could not be certain about which issues and what evidence would eventuate should the matter proceed to a trial. The judge hearing such applications should not conduct a mini trial and should avoid being drawn into an attempt to resolve conflicts of fact which were normally resolved by the trial process. However, where a short point of law or construction arose and the court was satisfied that it had before it all the evidence necessary for the proper determination of the question and the parties had an adequate opportunity to address it in argument, the court

should decide the point. In the present case the court was in a position to decide the relevant issues (paras. 38–44).

(3) Ritchie's argument that the limitation period in relation to its claims against Lancelot had ceased to run on presentation of the winding-up petition in relation to Lancelot and the making of the winding-up order was rejected by the court for the following reasons. First, s.2(1) of the Limitation Law (1996 Revision) governed the position in relation to the bringing of an "action," which was defined to include "any proceedings in a court of law." Ritchie's claims were clearly "actions" founded in the torts of deceit and unlawful means conspiracy. They were therefore governed by the ordinary rules under s.3 of the Limitation Law, subject to potential extension under s.37. Neither the Limitation Law nor the Companies Law, or any other Cayman statute to which the court had been referred, provided for the suspension of the running of time for such actions on entry of a defendant company into liquidation. Secondly, the authorities did not support the proposition that the provisions of the Limitation Law should be disregarded in this situation. To accept Ritchie's submission would lead to the strange result that the collective enforcement procedure, which took effect pursuant to a winding-up order, changed the characteristics of the creditor's rights and the nature of the debts which could be enforced by way of action and would be contrary to principle. Lancelot's winding up did not affect the Limitation Law relating to the claims, whether they were commenced before, during or after the winding up procedure. Thirdly, it made no sense for the Limitation Law not to apply to actions brought by way of court proceedings simply because a defendant company had been wound up. To disapply it would be contrary to the policy behind the Limitation Law to commence actions within a reasonable time period for there to be certainty and finality. There was no basis for making an exception to the Limitation Law for the bringing of court actions against companies in liquidation (paras. 51–56; paras. 67–70).

(4) By s.4 of the Limitation Law (1996 Revision), Ritchie's claims against Lancelot (and GE) in conspiracy and deceit expired six years from the date when the cause of action accrued. The alleged fraud from which Ritchie lost money as a matter of fact dated back at least to 2003, but Ritchie did not enter into finance agreements with Lancelot until 2008, which was the year in which the cause of action in these proceedings would have arisen. The incidence of loss and damage was when the loans were made to the fraudulent companies. The primary limitation period therefore expired in 2014, five years before these proceedings were issued. The question therefore arose whether and to what extent Ritchie was able to rely on the extended limitation period prescribed by s.37 of the Limitation Law (paras. 72–73).

(5) In cases of fraud and deliberate concealment, s.37 extended the limitation period so that it did not start in circumstances where the plaintiff could show that knowledge of the facts necessary in order to plead the

claim was not known or could not with reasonable diligence have been discovered. What was important was the discovery of facts which would complete the plaintiff's ability to plead the case. Another way of looking at this was to ask whether there were any facts without which the claim could not be pleaded (this was sometimes called "the statement of claim test"). Knowledge or discovery of facts that there was some unspecified deception or fraud in a general sense was not enough: what must have been discovered or discoverable by the plaintiff before the limitation period began to run was knowledge of the essential facts constituting the alleged fraud. Facts which improved the plaintiff's prospects of success or which went generally to the plaintiff's case were not sufficient. The critical facts necessary to plead a claim carried a narrow interpretation. Since the court was looking at the gist of the cause of action to see if and when the facts were known or with reasonable diligence could have been discovered to plead the cause of action, it was not necessary that the claimant did not know or could not have discovered each and every piece of evidence which it later chose to plead. In the present case, assuming on the evidence that the earliest date Ritchie could have considered a claim in fraud against Lancelot was 2009. Ritchie needed to show that there were further missing facts at least up until May 2013 which it did not know or could not with reasonable diligence have discovered, or which were concealed, which, if pleaded, would have been sufficient to constitute a valid claim and not be liable to be struck out for a want of some essential allegation. Once a plaintiff discovered sufficient facts to enable him properly to plead a claim in fraud which would survive a strike out application, he would have discovered the fraud. It would not matter if the claim at that stage was weak or could only be made good following disclosure. The test did not involve a consideration of the prospects of success (paras. 75–83).

(6) The court accepted Ritchie's submission that the pleading of fraud or deceit was a serious step and should not be based on speculation or guesswork. A fraud case, which classically relied on inferences, could not be properly pleaded without some solid foundation in evidence. In addition to the well-known pleadings principles, it must be sufficiently particularized for the defendant to understand the case it had to meet and to justify any necessary inferences as to the deceit and conspiracy alleged. The test under s.37 should be applied in a broad and common sense way. The court should ask itself, looking at the way the case was pleaded and the matters complained of in broad terms: when did the plaintiff have knowledge of the facts or could with reasonable diligence have discovered the facts on which the complaints were based? In relation to reasonable diligence, Ritchie was to be judged by the standard of how a person carrying on business of the relevant kind would have acted if he had adequate but not unlimited staff and resources and was motivated by a reasonable but not excessive sense of urgency. Ritchie would have to show that it could not with reasonable diligence have discovered the fraud without taking exceptional measures which it could not reasonably have

been expected to take. Reasonable diligence was not an absolute standard and depended on all the circumstances. The particular position of the plaintiff at the relevant time could be taken into account. There was, however, an assumption that the plaintiff desired to discover whether or not there had been a fraud and desired to know more and to investigate (paras. 84–91).

(7) From 2009, Ritchie had enough information to be on notice to investigate but also had enough information to have discovered the fraud in relation to the critical security arrangements for their loans. It could be objectively seen from the proceedings commenced by Ritchie against Mr. Petters and his companies in Illinois in September 2008 that by then Ritchie not only knew that something had gone seriously wrong and that it had suffered substantial losses (US$223m.) but was sufficiently on notice to be investigating and bringing actions on the basis that the loss was caused by a particular fraud involving the way in which Mr. Petters induced lenders and investors to part with their money. Soon after that, Ritchie became involved in the myriad bankruptcy proceedings commenced in October 2008 when a receiver was appointed over Mr. Petters' companies which were then placed into Chapter 11 Bankruptcy. The lockbox arrangements were central to Ritchie's decision to lend. It was inconceivable that this was not a matter which would have been in sharp focus for Ritchie when constructing its case in fraudulent inducement/misrepresentation in relation to the loans it made. The publicly available information from 2009 showed Ritchie to have been objectively on notice of the very fraud which required investigation and which formed the basis of the legal proceedings it had commenced the previous year. Mr. Bell admitted in 2009 the lockbox arrangements had not worked for many years. That admission had been used by Ritchie in the Lancelot insolvency. In addition, Mr. Petters' criminal trial in Minnesota commenced in October 2009 and was followed by Ritchie which had a legal representative present (paras. 98–102; para. 105; paras. 114–118).

(8) In any event, Ritchie could with reasonable diligence have discovered the facts necessary to plead its claim against Lancelot before May 21st, 2013. The events clearly triggered the need for an investigation by Ritchie in 2009, and Ritchie in fact discovered the fraud that year. Even if Ritchie did not have enough knowledge by then (as it submitted but the court did not accept), it was on sufficient enquiry to be assessed as to whether it could with reasonable diligence have discovered the relevant fraud. The court accepted that efforts were made to discover facts in the complex and pressured environment the Ritchie group found itself in between 2008 and 2013. However, the reasonable diligence standard to be applied under the extended period granted under the Limitation Law, although not absolute, was essentially an objective one. It required an examination primarily of the staff and resources available to a fund of comparable size to Ritchie, facing the issues it faced at the time. The court accepted, however, that the personal characteristics and particular situation

of Ritchie were to be taken into account in deciding that diligence it could reasonably have been expected to have shown. Of importance also was the significant sum of US$200m. said to have been lost by Ritchie due to the Petters fraud and those involved in it. There was an urgent and compelling need for a close analysis of what happened to try and obtain a remedy. That involved an investigation of the particular conduct now pleaded against Lancelot concerning the security arrangements that Ritchie claimed it relied on to make its claims. The court acknowledged the difficulties Ritchie faced concerning the fallout of the 2008 financial crisis, the difficulties of unravelling potential claims after the collapse of the Ponzi scheme and the complications of bankruptcy proceedings. However, the legal focus was how a hypothetical fund business of comparable size and situation would act if it had adequate but not unlimited staff and resources and was motivated by a reasonable but not excessive sense of urgency. Ritchie had a business of adequate resource to properly investigate and form views as to the best way to protect its interests and attempt to make recovery. The central fact necessary to be able to plead Ritchie's case against Lancelot, namely Mr. Bell's knowledge of the falsity of the representations he made in relation to the lockbox arrangements, was known or could with reasonable diligence have been discovered well before 2013, irrespective of the other demands and priorities on Ritchie's resources. At the *ex parte* hearing, Ritchie's evidence was that the relevant discovery was Mr. Bell's admission in interview in 2009 that he knew the lockbox account never worked. Ritchie accepted that time ran from 2014 when it obtained a copy of a 2009 interview with Mr. Bell. The court did not accept that it was only from that point that Ritchie had the necessary knowledge. Ritchie could with reasonable diligence have discovered the necessary material with which to plead its case against Mr. Bell and Lancelot much earlier (para. 123; paras. 128–164).

(9) By 2009/10, Ritchie therefore had evidence from which to plead that the representations had been false for some time and could have "discovered the fraud." It did not need to uncover every facet or detail. It had time in which to further investigate to strengthen the case against Lancelot, but from then on it ran the risk of the fraud case against Lancelot becoming time barred if an action was not commenced against Lancelot in the Cayman Islands within six years, *i.e.* by 2016. The court was reinforced in this conclusion by the fact that Ritchie submitted an amended proof of debt in the Lancelot US bankruptcy in September 2013 which contained the core factual allegations that were made against Lancelot in the Cayman proceedings and which were based on documents obtained by Ritchie in 2009. These might well have been unproven allegations, as Ritchie contended, but that did not mean that the documents did not give rise to the necessary facts and inferences to the relevant standard to plead fraud. Ritchie did not need further proof. For the purpose of pleading fraud against Lancelot, it was not relevant whether or not Ritchie knew or could have reasonably discovered the alleged fraudulent conspiracy between GE,

Petters and Lancelot, or GE's role in allegedly "seeding" the Petters Ponzi scheme. That was not the fraud for the purposes of the case against Lancelot which was dependent on Mr. Bell's knowledge of the lockbox security arrangement being a sham when he made representations on behalf of Lancelot. The evidence Ritchie had or could with reasonable diligence have discovered was sufficient to plead fraud against Lancelot in 2009. Ritchie did not require proof of the involvement of Mr. Bell and Lancelot in Mr. Petters' fraud or of facts established by some judicial process. The test was whether a fraud case could properly be made and a plaintiff did not discover a fraud until he had material sufficient to enable him to plead it. Ritchie had not shown that it could not with reasonable diligence have discovered the facts necessary to plead its claim against Lancelot before May 2013. It followed that Ritchie's claim against Lancelot was statute-barred before these proceedings were commenced and that Ritchie could not show that it had a claim with a realistic prospect of success against Lancelot. It followed that the only gateway through which Ritchie sought to bring GE into the Cayman jurisdiction as a necessary and proper party was therefore not available, and the relief sought by GE must be granted. The court nevertheless expressed its findings on the remaining issues (paras. 165–177).

(10) In relation to the Limitation Law, Ritchie had the essential facts it needed, or could with reasonable diligence have discovered them, in order to advance its claims against GE by the end of 2009, and before May 2013, and it was therefore also out of time against GE. The serious fraud by Mr. Petters, which was revealed by the proceedings in 2008 and 2009, and Ritchie's case that it relied on the "to whom it may concern" letter for each of its loans concerning Mr. Petters' companies, would have put Ritchie on sufficient notice to investigate Mr. Petters and his relationship with GE very thoroughly. Ritchie also had further information. Ritchie therefore either had sufficient information or could with reasonable diligence have discovered what was necessary for its case against GE by May 2013. Ritchie had not shown that it did not have or could not with reasonable diligence have discovered the facts necessary to plead the fraud case against GE by May 2013 (paras. 181–193).

(11) Ritchie did not have claims against GE with any realistic prospect of success because it had already been finally decided in the New York proceedings that Ritchie did not own the causes of action it asserted, which could only be brought (if at all) by Mr. Petters' bankruptcy trustee. That decision was a final, conclusive and substantive decision to which preclusive effect must be given. The conditions to be satisfied for a foreign judgment to give rise to an issue estoppel were: (a) the judgment must be by a court of competent jurisdiction, final and conclusive, and on the merits; (b) the parties or their privies must be the same in both sets of proceedings; (c) there must be a clear determination of the issue by the judgment, rather than collateral or *obiter* comment; and (d) the issue in the later action must be the same as the issue decided by the judgment in the

earlier proceedings. On the merits, for these purposes, meant that the foreign court had held that it had jurisdiction to adjudicate on the issue raised in the cause of action and that its judgment was one that could not be varied, reopened or set aside by the court that delivered it or a court of coordinate jurisdiction. The decision must also establish the facts which were proved or not, state the relevant legal principles, and express a conclusion as to the effect of applying those principles to the facts. It was inherent in the doctrine of issue estoppel that the decision of the foreign court would not itself be reviewed, and operated regardless of whether the Cayman court would regard the reasoning as open to criticism (para. 193; paras. 197–198; paras. 200–203).

(12) The judgment of the New York court was one of substance and on the merits because of the nature of the decision that Ritchie had no entitlement to assert a claim which had been found to be the exclusive property of the bankruptcy estate. Applying Cayman law principles, the judgment was a decision "on the merits" although the New York court did not need to address all of the merits of the claim. The relevant courts were courts of competent jurisdiction, the decisions were final and conclusive on the merits, the parties were either the same or privies of those to the New York proceedings, and the decision determined that Ritchie did not own the claims it purported to assert under the US standing rule which the Cayman court would be bound to apply. The matter was *res judicata* and could not be pursued in the Cayman Islands. The order granting leave to serve out of the jurisdiction must be set aside as Ritchie could not arguably advance its conspiracy claims against GE. Ritchie's separate claim in deceit against GE alone would not be sufficient to show that it would be just that GE be joined to Ritchie's proceedings against Lancelot. There was no other connection on the evidence between GE and Lancelot (para. 224; para. 233; paras. 239–244).

(13) In respect of the appropriate forum, the well-known test was to identify the forum in which the case could suitably be tried for the interests of all the parties and for the ends of justice. Ritchie bore the burden to persuade the court that the Cayman Islands was clearly the most appropriate forum and that in all the circumstances the court should exercise its discretion to permit service out. The court examined the connecting factors which included matters of practical convenience and the system of law which would be applied to decide the issues, the place where the wrongful act or omission occurred, and the place where the harm occurred. It was at least a starting point to consider where the substance of an alleged tort was committed and the governing law which would be applied to identify the appropriate forum. The court could take into account the fact that a defendant had been sued as an "anchor defendant" only for the purpose of bringing another defendant into the jurisdiction. On the other hand, the court would also consider the risk of irreconcilable judgments arising from a multiplicity of proceedings (paras. 246–249; paras. 251–252).

(14) In the present case, all the litigation instituted by Ritchie since the Ponzi scheme collapsed had been in the United States. Ritchie had some connections to the Cayman Islands but the first plaintiff, Ritchie Capital Management LLC, was incorporated in Delaware and was only re-registered in the Cayman Islands in 2015. Until recently all of the Ritchie entities carried on business in Illinois. Similarly, although Lancelot was incorporated in the Cayman Islands, its business was operated in Illinois and it was first subject to insolvency proceedings in Illinois, which was the place of the primary insolvency proceedings, notwithstanding its subsequent liquidation in the Cayman Islands. GE had no significant connection to the Cayman Islands. It was incorporated under the laws of New York and had its principal place of business in Massachusetts. None of the alleged wrongdoing took place in the Cayman Islands and the main protagonists were either in Minnesota or Illinois when the facts relevant to the claims took place. Alleged loss and damage would likely have been suffered by Ritchie in Illinois. None of the asserted claims against Lancelot or GE was governed by Cayman law. All of the principal witnesses were likely to be based in the United States and none was identified as living in the Cayman Islands. The vast majority of the documentary material was unlikely to be in the Cayman Islands. It was a reasonable inference that the principal purpose of suing Lancelot in the Cayman Islands where it was in liquidation was in order to found a claim under the necessary and proper gateway against GE. There was no realistic basis to assume that there was a risk of irreconcilable judgments if leave were now set aside. For those reasons, and on the assumption that the case against GE and Lancelot had a realistic prospect of success (contrary to the court's findings), Ritchie had not persuaded the court that the Cayman Islands was clearly the most appropriate forum and the court should exercise its discretion to permit service out. The *ex parte* order would be set aside for this additional reason (paras. 253–258; paras. 261–262; paras. 267–270).

(15) Applicants seeking permission to serve proceedings out of the jurisdiction without notice were required to give full and frank disclosure. That important duty extended to disclosure of all facts which reasonably would or could be taken into account by the judge in deciding whether to grant the application. Such material facts extended beyond those which were actually known to the applicant and included matters which the applicant would have known had it made proper enquiries. The duty was that of the applicant and its legal advisers. The key question was whether the presentation of the application was fair in all material respects. In a complex case such as the present, the task of the judge in making a decision on a without notice basis was a difficult one, and the court relied on the applicant making a fair and even-handed presentation. It was important that the application was balanced. The applicant had a duty to signal and explain the relevant legal tests, defence arguments and relevant evidence in a fair and balanced way, which included pointing out material flaws and difficulties with the applicant's case. The consequence of a finding of

material non-disclosure was to deprive the plaintiff of any advantage derived, *i.e.* the order granting leave would be set aside (paras. 273–274; paras. 276–277; para. 280; paras. 282–284).

(16) In the present case, there had been a breach of the duty to make full and frank disclosure. This was not a case, such as on an application for a freezing order, where there was immediate time pressure on Ritchie. It had years to get its case together and had issued proceedings with an extensive statement of claim against both Lancelot and GE a month before the application was heard. The overall presentation was deficient for the reasons put forward by GE. The court was not persuaded that there had been deliberate non-disclosure or a deliberate attempt to avoid a fair presentation. The court bore in mind, in giving the benefit of the doubt on this to Ritchie, that there was a huge amount of material available to Ritchie and its legal team (paras. 290–297).

**Cases cited:**

(1) *AIC Ltd.* v. *ITS Testing Servs. (UK) Ltd. ("The Kriti Palm")*, [2006] EWCA Civ 1601; [2007] 1 All E.R. (Comm) 667; [2007] 1 Lloyd's Rep. 555; [2007] 2 CLC 223, referred to.
(2) *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.*, 2010 (2) CILR 289, referred to.
(3) *Allison* v. *Horner*, [2014] EWCA Civ 117, referred to.
(4) *Altimo Holdings & Inv. Ltd.* v. *Kyrgyz Mobil Tel Ltd.*, [2011] UKPC 7; [2012] 1 W.L.R. 1804; [2011] 4 All E.R. 1027; [2011] 1 CLC 205, referred to.
(5) *Arcadia Group Brands Ltd.* v. *Visa Inc.*, [2015] EWCA Civ 883, referred to.
(6) *Barnstable Boat Co. Ltd.* v. *Jones*, [2007] EWCA Civ 727; [2008] 1 All E.R. 1124, referred to.
(7) *Brink's Mat Ltd.* v. *Elcombe*, [1988] 1 W.L.R. 1350; [1988] 3 All E.R. 188; [1989] 1 F.S.R. 211, referred to.
(8) *Broadley* v. *Guy Clapham & Co.*, [1994] 4 All E.R. 439, referred to.
(9) *C* v. *Mirror Group Newspapers*, [1997] 1 W.L.R. 131; [1996] 4 All E.R. 511; [1997] 1 F.C.R. 556; [1996] Fam. Law 671; [1996] 2 FLR 532, referred to.
(10) *Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd. (No. 2)*, [1967] 1 A.C. 853; [1966] 3 W.L.R. 125; [1966] 2 All E.R. 536, referred to.
(11) *Cordoba Shipping Co. Ltd.* v. *National State Bank, The Albaforth*, [1984] 2 Lloyd's Rep. 91, referred to.
(12) *Cowan* v. *Equis Special LP*, Cause No. FSD 22 of 2018, Grand Ct., October 3rd, 2019, unreported, referred to.
(13) *Cox* v. *Ergo Versicherung AG*, [2014] UKSC 22; [2014] 1 A.C. 1379; [2014] 2 W.L.R. 948; [2014] 1 CLC 430; [2014] 2 All E.R. 926, referred to.
(14) *Cunningham* v. *Ellis*, [2018] EWHC 3188 (Comm), referred to.

(15) *DSG Retail Ltd.* v. *Mastercard Inc.*, [2020] EWCA Civ 671; [2020] Bus. L.R. 1360, referred to.
(16) *Desert Sun Loan Corp.* v. *Hill* (1996), 5 Bank. L.R. 98; [1996] 2 All E.R. 847; [1996] CLC 1132, referred to.
(17) *Easyair Ltd.* v. *Opal Telecom Ltd.*, [2009] EWHC 339 (Ch), referred to.
(18) *El Ajou* v. *Dollar Land Holdings plc*, [1994] 2 All E.R. 685; [1994] 1 BCLC 464; [1994] BCC 143; [1993] N.P.C. 165, referred to.
(19) *Erste Group Bank AG* v. *JSC "VMZ Red October"*, [2015] EWCA Civ 379; [2015] 1 CLC 706, referred to.
(20) *Federal Deposit Ins. Corp.* v. *Barclays Bank plc*, [2020] EWHC 2001 (Ch), referred to.
(21) *Financial Servs. Compensation Scheme Ltd.* v. *Larnell (Ins.) Ltd.*, [2005] EWCA Civ 1408; [2006] Q.B. 808; [2006] 2 W.L.R. 751, considered.
(22) *Fundo Soberano De Angola* v. *dos Santos*, [2018] EWHC 2199 (Comm), referred to.
(23) *Gelb* v. *Royal Globe Ins.*, 798 F.2d 38 (2d Cir. 1986), referred to.
(24) *General Rolling Stock Co., In re, Joint Stock Discount Co.'s Claim* (1872), L.R. 7 Ch. App. 646; 41 L.J. Ch. 732, considered.
(25) *Global Asset Capital Inc.* v. *Aabar Block SARL*, [2017] EWCA Civ 37; [2017] 4 W.L.R. 163, referred to.
(26) *Golden Ocean Assur. Ltd.* v. *Martin (The Goldean Mariner)*, [1990] 2 Lloyd's Rep. 215, referred to.
(27) *Granville Technology Group Ltd.* v. *Infineon Technologies AG*, [2020] EWHC 415 (Comm), referred to.
(28) *Gresport Finance Ltd.* v. *Battaglia*, [2018] EWCA Civ 540, referred to.
(29) *Kimathi* v. *Foreign & Commonwealth Office*, [2018] EWHC 1169 (QB), referred to.
(30) *Lancelot Investors Fund Ltd., In re*, 2009 CILR 7, referred to.
(31) *Law Socy.* v. *Sephton & Co.*, [2004] EWCA Civ 1627; [2005] Q.B. 1013; [2005] 3 W.L.R. 212, referred to.
(32) *Libyan Investment Auth.* v. *J.P. Morgan Markets Ltd.*, [2019] EWHC 1452 (Comm), referred to.
(33) *Loches Capital Ltd.* v. *Goldman Sachs Intl.*, [2020] EWHC 2327 (Comm), referred to.
(34) *MAD Atelier Intl. BV* v. *Manes*, [2020] EWHC 1014 (Comm); [2020] Q.B. 971; [2020] 1 W.L.R. 4762, referred to.
(35) *MRG (Japan) Ltd.* v. *Engelhard Metals Japan Ltd.*, [2003] EWHC 3418 (Comm); [2004] 1 Lloyd's Rep. 731, referred to.
(36) *Multinational Gas & Petrochemical Co.* v. *Multinational Gas & Petrochemical Servs. Ltd.*, [1983] Ch. 258; [1983] 2 All E.R. 563, referred to.
(37) *Najari* v. *Shelbourne MD*, [2011] EWHC 3298 (QB), referred to.
(38) *Paragon Finance plc* v. *D.B. Thakerar & Co.*, [1999] 1 All E.R. 400, referred to.

(39) *Peconic Ind. Dev. Ltd.* v. *Lau*, [2009] HKCFA 16; [2009] 2 HKLRD 537; (2009), 12 HKCFAR 139; [2009] 5 HKC 135, referred to.
(40) *Playboy Club London Ltd.* v. *Banca Nazionale Del Lavoro SpA*, [2018] EWCA Civ 2025, referred to.
(41) *Primeo Fund* v. *Bank of Bermuda (Cayman) Ltd.*, 2017 (2) CILR 334, referred to.
(42) *Property Alliance Group Ltd.* v. *Royal Bank of Scotland plc*, [2015] EWHC 322 (Ch), referred to.
(43) *Sennar (No. 2), The*, [1985] 1 W.L.R. 490; [1985] 1 Lloyd's Rep. 521, referred to.
(44) *Siporex Trade S.A.* v. *Comdel Commodities Ltd.*, [1986] 2 Lloyd's Rep. 428, referred to.
(45) *Spiliada Maritime Corp.* v. *Cansulex Ltd. ("The Spiliada")*, [1987] A.C. 460; [1986] 3 W.L.R. 972; [1986] 3 All E.R. 843; [1987] 1 Lloyd's Rep. 1, referred to.
(46) *Standard Chartered Bank, In re*, 2013 (2) CILR *N* [11], referred to.
(47) *Taff's Well, In re*, [1992] Ch. 179; [1991] 3 W.L.R. 731; [1992] BCLC 11; [1991] BCC 582, considered.
(48) *Three Rivers D.C.* v. *Bank of England (No. 3)*, [2003] 2 A.C. 1; [2000] 2 W.L.R. 1220; [2000] 3 All E.R. 1; [2000] Lloyd's Rep. Bank. 235; [2000] 3 C.M.L.R. 205, referred to.
(49) *Torchlight GP Ltd.* v. *Millinium Asset Servs. Pty. Ltd.*, 2018 (1) CILR 244, referred to.
(50) *VTB Capital plc* v. *Nutritek Intl. Corp.*, [2013] UKSC 5; [2013] 2 A.C. 337; [2013] 2 W.L.R. 398; [2013] 1 All E.R. 1296; [2013] 1 BCLC 179; [2013] BCC 514; [2013] 1 CLC 153, referred to.
(51) *Vedanta Resources plc* v. *Lungowe*, [2019] UKSC 20; [2020] 1 A.C. 1045; [2019] 2 W.L.R. 1051; [2019] 3 All E.R. 1013; [2019] BCC 520, referred to.
(52) *Wight* v. *Eckhardt Marine G.m.b.H.*, 2003 CILR 211, referred to.

**Legislation construed:**
Limitation Law (1996 Revision), s.2(1): The relevant terms of this subsection are set out at para. 52.
s.37(1): The relevant terms of this subsection are set out at para. 74.
*T. Lowe, Q.C., P. Sherwood* and *A. Dixon* for the plaintiffs;
*A. Beltrami, Q.C., N. Fox* and *L. Burgess-Shannon* for the second defendant.

1 **PARKER, J.:**

**Introduction**

In the late 1990s and early 2000s, Mr. Thomas Petters was a leading businessman in Minnesota, USA. His business interests included, at one time or another, the Polaroid brand, the catalogue and online retailer Fingerhut and Sun Country Airlines. The enterprise was large, the ultimate holding company for his business employed some 3,200 people in 2004.

2 In 2008, Mr. Petters' business empire collapsed when the US authorities discovered from a whistleblower that he had in fact been operating an investor fraud, later revealed to be a US$3.65bn. Ponzi scheme.

3 Mr. Petters represented to investors that he was engaged in a business whereby consumer merchandise (such as electronics and white goods) would be acquired by his companies from liquidators and other distressed channels and sold on to so-called "big box" retailers.

4 In simple terms, investors would lend money to Mr. Petters' companies on the strength of being told that it would be used to finance the acquisition of such merchandise from distressed retailers. They were told the merchandise would then be sold on to the so-called "big box" retailers at a profit.

5 In fact, however, Mr. Petters' companies were used neither to buy nor sell merchandise. The investors' moneys were diverted for other purposes such as making "lulling" payments to other investors or to pay those who assisted in the fraud and the funding of Mr. Petters' lifestyle.[1]

6 The investment in Petters' business was formally structured by way of collateralized loans made by financing entities and by "feeder funds." Once merchandise was purchased by the Petters companies using financing provided by the lender it was to be the subject of security arrangements in favour of the lender. The goods would then be sold to the "big box" retailer and, importantly for the lenders, the security would continue to attach to the receivables from the retailers buying such goods.[2]

7 Mr. Petters was subsequently prosecuted, convicted and imprisoned for 50 years in April 2010 in connection with his Ponzi scheme. His arrest, trial and sentencing were widely publicised.

***General Electric***

8 GE is a well-known company with a substantial presence worldwide in a variety of sectors including aviation, healthcare, power and financial services. General Electric Capital Corp. (GECC) was a subsidiary of GE and its financial services division prior to its merger with and into GE in 2015.

9 GECC was at one time a lender to two of Mr. Petters' companies, Petters Co. Inc. ("PCI") and Red Tag Inc. ("Red Tag"). GECC advanced revolving credit facilities to those companies pursuant to facility letters

dated March 26th, 1998 and December 17th, 1999 ("the PCI facility" and "the Red Tag facility"). The PCI facility of US$50m. was repaid in full and closed by PCI in December 2000. The Red Tag facility of US$55m. was repaid in full and closed by Red Tag in March 2001. Thereafter GECC claims that it had no commercial dealings with Mr. Petters or any of his companies. On its case, its involvement ceased many years before the Ponzi scheme was discovered by the US authorities in 2008.

***Lancelot Investors Fund Ltd. (in official liquidation) ("Lancelot"), Mr. Bell and Mr. Petters***

10 Lancelot was one of three funds operated by Mr. Gregory Bell from Northbrook, Illinois as a "feeder fund" for investment into Mr. Petters' companies from 2002 onwards ("the Lancelot funds"). Lancelot is a Cayman Islands entity. The two other funds, Lancelot Investors Fund LP ("LP1") and Lancelot Investments II LP ("LP2"), are Delaware limited partnerships. The Lancelot funds all filed for bankruptcy in Illinois under Chapter 7 of the United States Bankruptcy Code on October 20th, 2008.

11 On December 10th, 2008, Lancelot was placed into official liquidation in the Cayman Islands.[3]

12 Mr. Bell and Lancelot Management LLC, a Delaware entity which managed the funds, were a few months later the subject of civil proceedings brought by the Securities and Exchange Commission ("the SEC") in the United States District Court for the District of Minnesota on July 7th, 2009. The SEC complaint was in connection with their role in Mr. Petters' Ponzi scheme ("the SEC complaint"). Events moved swiftly and Mr. Bell was arrested on criminal charges and was subsequently indicted and pleaded guilty to wire fraud in October 2009, for which he was sentenced to 6 years' imprisonment the following year.

***Petters' bankruptcy***

13 Following the collapse of the Ponzi scheme, Petters' companies and their related affiliates were placed into Chapter 11 Bankruptcy in Minnesota in October 2008 ("the Petters bankruptcy"), with a bankruptcy trustee appointed to deal with the bankruptcy estates. The bankruptcy trustee commenced proceedings against a large number of individuals and entities, including GECC and Ritchie, in order to recover moneys. GECC settled the claims brought against it by the bankruptcy trustee for US$19m.[4]

1 Repayments to early investors with money provided by later investors to sustain the fraud.

2 Paragraphs 20 and 28 of the statement of claim set out how the security arrangements were said to work. A lockbox account was to be used which was said to receive payments by the retailer and insulate the investor from misappropriation of the moneys.

3 Apparently on the basis that the primary insolvency proceedings would remain in Illinois.

4 Which settlement was approved by the United States Bankruptcy Court for the District of Minnesota on June 25th, 2012.

***Ritchie***

14 Ritchie is a group of funds and investment managers which lost a large amount of money in the Petters Ponzi scheme. As a consequence, it commenced a raft of litigation against a number of third parties in the courts of the US, almost all of which was stayed or dismissed by reason of the Petters bankruptcy.

15 Of particular relevance to this application, Ritchie commenced proceedings against GECC on September 23rd, 2014 in New York. The decision of Judge Engelmayer of August 4th, 2015 ("the Engelmayer decision") dismissing Ritchie's claims, and of the United States Court of Appeals for the Second Circuit has been examined in detail at this hearing as it forms the basis of GE's issue estoppel argument, which if sound would involve a standalone reason to grant this application. The United States Court of Appeals for the Second Circuit upheld Judge Engelmayer and dismissed the case on May 11th, 2016.

***Ritchie's Cayman claim***

16 Ritchie invested indirectly through funds such as Lancelot from October 2002 onwards, and directly from 2008 onwards. It claims to have lost sums in excess of US$200m. as a result of Mr. Petters' Ponzi scheme.

17 It seeks to recover from Lancelot and GE by these Cayman proceedings which it commenced on May 21st, 2019. The claim involves deceit and unlawful means conspiracy allegations against both Lancelot and GE.

***Claims against Lancelot***

18 An essential element of Ritchie's decision to invest was the assurance that there were appropriate and adequate security arrangements in place. Mr. Bell allegedly made various representations to Ritchie about how the security arrangements would work and the foundation of those security arrangements was the "lockbox" account. This was to receive the moneys directly from the retailers, be completely segregated and closely monitored. These representations proved to be entirely false.

19 It is claimed in deceit against Lancelot that:

(a) Mr. Bell on its behalf made a series of fraudulent representations to Ritchie principally as to the operation of a "lockbox" arrangement, which purportedly secured all investments made by Ritchie in the Lancelot funds, but which Mr. Bell knew was being circumvented and which did not in fact operate in the manner represented, as it was part of the Petters fraud; and

(b) Mr. Bell made fraudulent representations that it was monitoring Mr. Petters' delivery and payment obligations, which again Mr. Bell knew did not in fact take place.

20 It is alleged by Ritchie that it would not have made any of its investments from 2008 but for these representations.

21 It is further claimed against Lancelot that it conspired with Mr. Bell, Lancelot Management LLC, Mr. Petters and his companies to use unlawful means to obtain funds from investors, the unlawful means comprising the alleged fraudulent misrepresentations and active concealment of the true facts.

22 It is said that, in entering into the conspiracy, Lancelot joined a pre-existing conspiracy with GE and Petters made years earlier, but there is no allegation of direct conspiring between Lancelot and GE.

23 Ritchie served proceedings on Lancelot at its registered office in the Cayman Islands on May 21st, 2019.

### *Claims against GE*

24 It is claimed in deceit against GE that GECC made a fraudulent misrepresentation in a "to whom it may concern letter" by way of "reference" dated January 4th, 2000[5] addressed to Mr. Petters, which letter constituted a glowing endorsement of Mr. Petters, that was never withdrawn, which Ritchie alleges it relied upon for many years in relation to its subsequent investments. The letter is alleged to have been handed over to Ritchie by Mr. Bell in early 2002.

25 It is further claimed against GECC that it embarked upon a conspiracy with Mr. Petters and/or PCI (one of his companies) to use unlawful means to perpetuate the Ponzi scheme, the unlawful means comprising the alleged deceit and dishonest concealment of the fraud, from which conspiracy GECC never withdrew.

### *The ex parte application*

26 Ritchie established, on an *ex parte* application heard by this court on June 27th, 2019, to obtain leave to serve the proceedings on GE out of the jurisdiction, that its claims against the Cayman "anchor" first defendant (Lancelot) raised a real issue to be tried that it was reasonable for this court to try, that GE was a necessary or proper party to those claims against Lancelot, that its claims against GE had a real prospect of success, and that

the Cayman Islands is the proper place in which to bring the claims against Lancelot and GE.

**Basis of this application**

***Summary***

27 GE now applies by way of summons dated December 13th, 2019 for an order setting aside the order made on June 28th, 2019 which had given Ritchie leave to serve these proceedings on GE out of the jurisdiction.[6]

28 GE argues that Ritchie does not have claims against Lancelot with a realistic prospect of success because they are statute barred. Specifically, by the end of 2009 Ritchie knew all it needed to know to bring the claims it now advances against Lancelot.

29 GE says the reason why the claim against Lancelot is only being brought now is because Ritchie wishes to re-litigate in the Cayman Islands the claim that it brought against GE in the Southern District of New York (SDNY) that failed[7] and which, by reason of that failure, cannot now be re-litigated elsewhere in the United States. GE argues that Ritchie's claim is precluded by an issue estoppel to which this court should give effect.

30 GE further seeks to impugn Ritchie's motives and argues that it does not appear that Ritchie intends to make a recovery from Lancelot in these proceedings. It has also filed a proof of debt in respect of its claims in Lancelot's Cayman liquidation. By para. 2.5 of a settlement agreement with Lancelot's Cayman liquidator dated October 31st, 2018, Ritchie agreed in return for the liquidator's consent to these proceedings being brought that if Ritchie is successful against Lancelot, its claims, including any proprietary claims, are to rank behind the claims of unsubordinated creditors and *pari passu* with those of Lancelot's shareholders.

31 GE further argues that Ritchie does not have claims against GE with a realistic prospect of success because Ritchie's claims against GE are also statute barred. Ritchie could have discovered all it needed to advance its current claims by the end of 2009. This, GE argues, is highlighted by the fact that it was Ritchie's own case in the proceedings it brought against GE in the SDNY that it could have discovered the facts on which it bases its claim by that time.

32 In addition, there is the issue estoppel that arises by virtue of the decision of the SDNY. Those claims were dismissed on the basis that Ritchie did not own the causes of action Ritchie purported to assert because the claims were the property of a bankruptcy estate.

5 From Mr. Menczynski of GECC referring to Mr. Petters being of "a high character and possessing strong moral values." It was based upon a little over two years of personal knowledge.

6 Pursuant to O.11, r.1(1)(c) of the Grand Court Rules ("GCR").

7 The Second Circuit Court of Appeals dismissed the appeal and confirmed Judge Engelmayer's decision on May 11th, 2016.

33 Finally, GE argues that Ritchie cannot show that the Cayman Islands is the appropriate forum in which to bring its claims against Lancelot and GE. There is little to tie these claims to the jurisdiction and the clearly more appropriate forum (and the forum that Ritchie has itself used for related claims against other individuals and entities) is Illinois in the United States. This is where the relevant offices of Ritchie, GE and Lancelot were based at the material times, where Ritchie has in previous proceedings said that it suffered losses, and where Lancelot was first and remains subject to insolvency proceedings.

34 GE developed these submissions through Adrian Beltrami, Q.C. who urged the court to find that there was no proper basis for GE to be served out of the jurisdiction and that the service out order must be set aside.

35 Mr. Beltrami, Q.C. also argued that there were a number of material breaches of Ritchie's obligation of full and frank disclosure at the *ex parte* application which on their own would warrant setting aside of the order in any event.

36 Ritchie, through the submissions of Tom Lowe, Q.C., takes issue with each of these arguments and requests the court to dismiss GE's application.

37 This judgment will first deal with the legal principles to be applied and will then go through each of the issues in turn with my findings.

***The legal test for leave to serve out***

38 Ritchie sought and obtained leave to serve GE as a foreign defendant out of the jurisdiction as a necessary and proper party to its claim against Lancelot which has been served in the jurisdiction.

39 Accordingly, Ritchie was required to meet, and must meet again if it is to retain the service out order, a legal test which is relatively straightforward and should be uncontroversial.

(a) Ritchie is required to show that the claims against Lancelot in Cayman involve a real issue to be tried; that it is reasonable for the Cayman court to try that issue; that GE is a necessary and proper party to the claims against Lancelot; that the claims against GE have a real prospect of success; and that the Cayman Islands is the appropriate forum in which to bring the combined claims against Lancelot and GE.[8]

(b) Ritchie has to show against Lancelot and GE that it has a realistic as opposed to a fanciful prospect of success. Whether there is "a real issue to

be tried" is in substance equivalent to the test for summary judgment.[9] A realistic claim is one that carries some degree of conviction, which means that it is more than merely arguable.[10]

40 When determining such applications, the court forms only preliminary views on most of the relevant issues and cannot be certain about which issues and what evidence will eventuate should the matter proceed to a trial.[11] A number of higher courts hearing appeals from contested jurisdiction applications have expressed the view that the judge hearing such applications should not conduct a mini trial and avoid being drawn into an attempt to resolve conflicts of fact which are normally resolved by the trial process.

41 However, where there are short points of law and construction which arise and the court is satisfied that it has before it all the evidence necessary for the proper determination of the question and that the parties have had an adequate opportunity to address it in argument, the court should "grasp the nettle" and decide the point.[12]

42 Notwithstanding the advices of the higher courts,[13] this application has borne quite some resemblance to a mini trial.

43 The court has been provided with an enormous quantity of written material, detailed analyses of the issues and extensive argument by leading counsel on both sides, lasting six days by way of video link.

44 As a consequence, whilst the court has reservations about whether the matter has been argued in accordance with the proportionality required pursuant to the overriding objective, it nevertheless, no doubt as a consequence of the considerable expenditure of time and resource, is indeed in a position to and must now "grasp the nettle" and decide the relevant issues.

**Are Ritchie's claims against Lancelot statute barred?**

45 This case against Lancelot is a critical issue and can be said to be an important plank upon which leave was granted to serve GE out of the jurisdiction.

8 *Vedanta Resources plc* v. *Lungowe* (51) ([2019] UKSC 20, at para. 20, *per* Lord Briggs); *Cowan* v. *Equis* (12) (Cause No. FSD 22 of 2018, at para. 72 *per* Mangatal, J.); and *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.* (2).

9 *Altimo Holdings & Inv. Ltd.* v. *Kyrgyz Mobil Tel Ltd.* (4) ([2012] 1 W.L.R. 1804, at para. 71, *per* Lord Collins); *Cowan* (12) (Cause No. FSD 22 of 2018, at para. 72); and *Torchlight GP Ltd.* v. *Millinium Asset Servs. Pte. Ltd.* (49) (2018 (1) CILR 244, at para. 34, *per* Kawaley, J.).

10 *Easyair Ltd.* v. *Opal Telecom Ltd.* (17) ([2009] EWHC 339 (Ch), at para. 15, *per* Lewison, J.).

11 *VTB Capital plc* v. *Nutritek Intl. Corp.* (50) ([2013] 2 A.C. 337, at paras. 82–83, *per* Lord Neuberger).

12 *Easyair* (17) ([2009] EWHC 339 (Ch), at para. 15) and *Global Asset Capital Inc.* v. *Aabar Block SARL* (25) ([2017] 4 W.L.R. 163, at para. 27, *per* Hamblen, L.J.).

13 *Lungowe* (51) ([2019] UKSC 20, at para. 9) and *Three Rivers D.C.* v. *Bank of England (No. 3)* (48) ([2003] 2 A.C. 1, at paras. 94–95).

***The consequence of the Cayman liquidation***

46 Mr. Lowe, Q.C. advanced an argument, not advanced at the *ex parte* stage, that the consequence of Lancelot's winding up order in the Grand Court on December 10th, 2008 meant that time ceased to run on all existing liabilities from when the petition was presented. Therefore Ritchie's claims were not time barred against Lancelot.

47 It did not matter whether those claims which gave rise to liabilities arose out of legal causes of action in tort or in contract or were disputed or not. The limitation clock had stopped as soon as the petition was presented. For this rather startling proposition he relied on English authorities starting with *General Rolling Stock* (24).[14]

48 Mr. Lowe, Q.C. submitted that from the moment of its liquidation a company's estate crystallizes and all its assets are made applicable to the payment of all the liabilities existing at the time of the winding up. Creditors are confined to the collective enforcement process of the winding up and they can no longer bring an action, save with leave of the court and do so ordinarily through submission of the proof of debt process. Time did not run during the process in respect of any claim brought against the company.

49 Ritchie's causes of action against Lancelot therefore remained frozen from when the petition was presented and, in giving effect to those rights, the period of limitation ceases to run.[15]

50 On Mr. Lowe, Q.C.'s argument the time period in which to bring the claims against Lancelot was in effect suspended from the end of 2008 and continuing.

51 That would be a most surprising outcome and the court rejects it for the following reasons.

52 First, s.2(1) of the Limitation Law (1996 Revision) governs the position in relation to the bringing of an "action" which is defined to include "any proceedings in a court of law."

53 Ritchie's claims are clearly "actions" brought in this court founded in the torts of deceit and unlawful means conspiracy.

14 *In re General Rolling Stock Co.* (24); *In re Taff's Well* (47) ([1992] Ch. at 191); *Financial Servs. Compensation Scheme Ltd.* v. *Larnell (Ins.) Ltd.* (21); and *Wight* v. *Eckhardt Marine, G.m.b.H.* (52) (2003 CILR 211, at para. 27) (a number of commonwealth authorities were also referred to in argument which it is not necessary to cite).

15 At the *ex parte* hearing, Ritchie's case had been that the primary limitation period for its claim against Lancelot expired in 2014 and that it would therefore need to rely on the extended limitation period provided for under the Limitation Law.

54 They are therefore governed by the ordinary rules under s.3 of the Limitation Law, subject to potential extension under s.37.

55 Neither the Limitation Law nor the Companies Law (2020 Revision or any prior enactment), or indeed any other Cayman statute to which the court has been referred, provides for the suspension of the running of time for such actions upon the entry of a defendant company into liquidation.

56 Second, the authorities beginning with *General Rolling Stock* (24) do not in my view support the proposition that the provisions of the Limitation Law should be disregarded in this situation.

57 In *General Rolling Stock* (L.R. 7 Ch. App. at 649), which can be said to be the foundational case for Mr. Lowe, Q.C.'s argument, the court was dealing specifically with the proof of debt process and the legislative effect of a winding up order in which contributories would need to be settled by the court and the assets of the company collected and applied to discharge liabilities.

58 A proof of debt had been rejected by the Master of the Rolls on the basis that the debt was barred by the Statute of Limitations. On appeal it was held that, pursuant to the Companies Act 1862, the assets are made applicable to the payment of all liabilities of the company subsisting at the date of the winding up order and from that time the Statute of Limitations did not run against the creditors. The claimants were entitled to prove in the liquidation, not disturbing any former dividend. It was a case, properly understood, about the liquidation process.

59 The Court of Appeal effectively held that the Statute of Limitations had nothing to do with when the proof of debt needed to be submitted in the liquidation process which had its own regime.

60 Sir W.M. James, L.J. said (L.R. 7 Ch. App. at 648–649):

> "A duty and a trust are thus imposed upon the Court, to take care that the assets of the company shall be applied in discharge of its liabilities. What liabilities? All the liabilities of the company existing at the time when the winding-up order was made which gives the right."

61 In that regard, the Statute of Limitations was suspended as long as the debt was not statute barred as at the date the company entered into the winding up procedure. In other words, for as long as the assets remained unadministered, creditors were at liberty to prove in the liquidation without disturbing any form of dividend (see, *ibid.*, at 650, *per* Mellish, L.J.).

62 Sir W.M. James, L.J. continued (*ibid.*, at 649):

"In the present case it is not disputed that at the time of the winding-up order the company was liable to the holders of these bills, and the winding-up order enures to the benefit of the holders."

63 This is clearly distinct from and deals with a different regime to the Limitation Law as regards the bringing of causes of action. In my view it is not authority for the proposition that the effect of the insolvency of Lancelot suspends time for the commencement of legal proceedings pursuant to the underlying cause of action, which is governed by the Limitation Law.

64 The decision in *Taff's Well* (47) takes the argument no further as it dealt with the position of claims which were already statute barred at the date of the winding up and so do not form part of the company's liabilities for distribution in the insolvency.[16]

65 *Larnell* (21) did not extend the principle to ordinary actions but confirmed that the proposition that can be derived from *General Rolling Stock* (24) is limited to the position of proofs in a liquidation process ([2006] Q.B. 808, at paras. 13 and 57, *per* Lloyd, L.J.):

"13. … In effect, *so far as the operation of the winding-up is concerned*, limitation periods cease to run at that date, so long as they have not already expired." [Emphasis added.]

"57. … [*General Rolling Stock*] establishes that the rights of a person who seeks to enforce a claim against the assets of the company *in the liquidation* are to be ascertained as at the date of the commencement of the liquidation. It is to the satisfaction of *all* such liabilities that the company's property must be applied and therefore … provided his claim is not time-barred at the date of the winding-up, *the right to prove in the liquidation is not thereafter lost by reason of the operation of the Limitation Act*." [Emphasis added.]

66 The applicable statute in *Larnell*, s.107 of the UK Insolvency Act, was dealing with the situation of a company's liabilities which were not statute barred at the date of the winding up. Section 107 of the UK Insolvency Act did not purport to amend or limit the operation of the Limitation Act 1980 as regards actions brought in tort before or after the date of the winding up and the Court of Appeal did not hold that it did.

67 To accept Mr. Lowe, Q.C.'s submission would lead to the strange result that the collective enforcement procedure, which takes effect pursuant to a winding up order of the court, changes the characteristics of the creditor's rights and the nature of the debts which can be enforced by

way of action in a court of law and would in my view be contrary to principle.[17]

68 In my view, Lancelot's winding up does not affect the Limitation Law relating to these claims, whether they were commenced before, during, or after the winding up procedure.

69 Third, it makes no sense for the Limitation Law not to apply to actions brought by way of court proceedings simply because a defendant company has been wound up. To disapply it would be contrary to the policy behind the Limitation Law to commence actions within a reasonable time period for there to be certainty and finality.

70 I have found no basis for making an exception to the Limitation Law for the bringing of court actions against companies in liquidation. The proof of debt process in an insolvency is a different regime and the authorities make that clear.

***Section 37 of the Limitation Law***

71 These proceedings were issued in the Cayman Islands on May 21st, 2019.

72 By s.4 of the Limitation Law (1996 Revision) ("the Limitation Law"), the claims Ritchie seeks to advance against Lancelot (and GE) in conspiracy and deceit expired six years from the date when the cause of action accrued. The alleged fraud Ritchie lost money from as a matter of fact dates back at least to 2003, but Ritchie did not enter into finance agreements with Lancelot until 2008, which was the year in which the cause of action in these proceedings would have arisen. The incidence of loss and damage was when the loans were made to the fraudulent companies. The primary limitation period therefore expired in 2014, five years before these proceedings were issued.

73 The question which arises is whether and to what extent Ritchie is able to rely on the extended limitation period prescribed by s.37 of the Limitation Law.

74 Section 37 provides as follows:

"(1) Subject to subsection (3), where in the case of any action for which a period of limitation is prescribed by this Law, either—

(a) the action is based upon the fraud of the defendant;

(b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or

16 [1992] Ch. at 192–194, *per* HHJ Baker.
17 See Lord Hoffmann in *Wight* (52) (2003 CILR 211, at para. 27).

(c) the action is for relief from the consequences of a mistake,

the period of limitation does not begin to run until the plaintiff has discovered, or could with reasonable diligence have discovered, the fraud, concealment or mistake. References in this section to the defendant include the defendant's agent, and to any person through whom the defendant claims, and his agent."

***Legal principles under s.37***

75 As noted above, the Limitation Law exists as matter of public policy for there to be finality and certainty as to old claims, that is claims where causes of action occurred many years before the claim is brought.[18] Section 37 extends the time period for cases based upon fraud and deliberate concealment and provides an exception to the strictness of the time bar. The subject matter of the enquiry under s.37(1)(a) is when the plaintiff discovered or could have discovered the fraud. Under s.37(1)(b), it is when the plaintiff discovered or could have discovered any concealed fact relevant to the right of action. Although Mr. Lowe, Q.C. suggested there was a difference, the test in both cases is, in my view, the same.

***Knowledge and discovery of facts***

76 In fraud and deliberate concealment claims, s.37 extends the period so that it does not start in circumstances where the plaintiff can show that knowledge of the facts necessary in order to plead the claim was not known or could not with reasonable diligence have been discovered.

77 The discovery of facts which would complete the plaintiff's ability to plead the case are what is important. Another way of looking at this is to ask whether there are any facts without which the claim could not be pleaded. This is sometimes called "the statement of claim test."

78 Knowledge or discovery of facts that there is some unspecified deception or fraud in a general sense is not enough; what must have been discovered or discoverable by the plaintiff before the limitation period begins to run is knowledge of the essential facts constituting the alleged fraud.[19]

79 Facts which improve the plaintiff's prospects of success or which go generally to the plaintiff's case are not sufficient.[20]

18 *C* v. *Mirror Group Newspapers* (9) ([1997] 1 W.L.R. at 139A).
19 *Cunningham* v. *Ellis* (14) ([2018] EWHC 3188 (Comm), at para. 87, *per* Teare, J.).
20 *Granville Technology Group Ltd.* v. *Infineon Technologies AG* (27) ([2020] EWHC 415 (Comm), at para. 22, *per* Foxton, J.) and *Primeo Fund* v. *Bank of Bermuda (Cayman) Ltd.* (41) (2017 (2) CILR 334, at para. 308, *per* Jones, J.).

80 The critical facts necessary to plead a claim carry a narrow interpretation.[21]

81 Since the court is looking at the gist of the cause of action to see if and when the facts were known or with reasonable diligence could have been discovered to plead the cause of action,[22] it is not necessary that the claimant did not know or could not have discovered each and every piece of evidence which it later chooses to plead.[23]

82 Assuming on the evidence (see below) that the earliest date Ritchie could have considered a claim in fraud against Lancelot was 2009, Ritchie needs to show that there were further missing facts at least up until May 2013 which it did not know or which it could not with reasonable diligence have discovered, or which are said have been concealed, which, if pleaded, would have been sufficient to constitute a valid claim and not be liable to be struck out for a want of some essential allegation.[24]

83 Once the plaintiff has discovered sufficient facts to enable him to properly plead a claim in fraud which would survive a strike out application he will have "discovered the fraud."[25] It does not matter if the claim at that stage is weak or could only be made good following disclosure. The test does not involve a consideration of the prospects of success.[26]

*Pleading fraud*

84 I accept Mr. Lowe, Q.C.'s submission that the pleading of fraud or deceit is a serious step and should not be based on speculation or guesswork. This is not only because of the reputational significance and effect on individuals and entities against whom fraud is pleaded. Fraud cases can also increase the cost, complexity and "temperature" of actions.[27] There are necessary hurdles to overcome and allegations of fraud in pleadings should not be "bandied about."

85 I also accept Mr. Lowe, Q.C.'s submission that a fraud case, which classically relies on inferences, cannot be properly pleaded without some

solid foundation in evidence.[28] In addition to the well-known pleadings principles, it must be sufficiently particularized in order for the defendant to understand the case it has to meet and so as to justify any necessary inferences as to the deceit and conspiracy alleged. The fraud case and inferences which would support and justify the plea of fraud must be properly pleaded out with some particularity.[29]

*Application*

86 The test under s.37 should be applied in a broad and common-sense way. The court should ask itself, looking at the way the case is pleaded and the matters complained of in broad terms: when did the plaintiff have knowledge of the facts or could with reasonable diligence have discovered the facts on which the complaints are based?[30]

87 The relevant question, following the wording of the section, is not one relating to when the plaintiff "ought to" or "should have" discovered the fraud or concealment, but rather whether with reasonable diligence the plaintiff *could* have done so.

88 However, there must first be something to have objectively put the plaintiff on notice of the need to investigate, which needs to be established on the evidence.[31] As I have said, the plaintiffs were, on the evidence (see below), on notice of this in 2009.

*Reasonable diligence*

89 In relation to "reasonable diligence," Ritchie is to be judged by the standard of how a person carrying on business of the relevant kind would act if he had adequate but not unlimited staff and resources and was motivated by a reasonable but not excessive sense of urgency.[32]

90 In this regard, Ritchie would have to show that it could not with reasonable diligence have discovered the fraud without taking exceptional measures which it could not have reasonably been expected to take.[33]

---

21 *AIC Ltd.* v. *ITS Testing Servs. (UK) Ltd. ("The Kriti Palm")* (1) ([2006] EWCA Civ 1601, at para. 323, *per* Rix, L.J.).
22 *The Kriti Palm* (1) ([2006] EWCA Civ 1601, at para. 453, *per* Buxton, L.J.).
23 *Arcadia Group Brands Ltd.* v. *Visa Inc.* (5) ([2015] EWCA Civ 883, at para. 49, *per* Sir Terence Etherton) and *Libyan Investment Auth.* v. *J.P. Morgan Markets Ltd.* (32) ([2019] EWHC 1452 (Comm), at para. 33, *per* Bryan, J.).
24 *Granville* (27) ([2020] EWHC 415 (Comm), at para. 22, *per* Foxton, J.).
25 *Granville* (27) ([2020] EWHC 415 (Comm), at paras. 24–30, *per* Foxton, J.).
26 *Kimathi* v. *Foreign & Commonwealth Office* (29) ([2018] EWHC 1169 (QB), at para. 51, *per* Stewart, J.).
27 See Birss, J. in *Property Alliance Group Ltd.* v. *Royal Bank of Scotland plc* (42) ([2015] EWHC 322 (Ch), at para. 40).
28 See *Federal Deposit Ins. Corp.* v. *Barclays Bank plc* (20) ([2020] EWHC 2001 (Ch), at para. 36, *per* Snowden, J.), quoting Sales, L.J. in *Playboy Club London Ltd.* v. *Banca Nazionale Del Lavoro SpA* (40).
29 See GCR, O.18, r.12(1)(a) and (b) and *Three Rivers* (48) ([2003] 2 A.C. 1, at para. 186, *per* Lord Millett).
30 See *The Kriti Palm* (1) ([2006] EWCA Civ 1601, at para. 459, *per* Buxton, L.J.), quoting Hoffmann, L.J. in *Broadley* v. *Guy Clapham & Co.* (8) ([1994] 4 All E.R. at 448).
31 *DSG Retail Ltd.* v. *Mastercard Inc.* (15) ([2020] EWCA Civ 671, at para. 69, *per* Sir Geoffrey Vos).
32 *Paragon Finance plc* v. *D.B. Thakerar & Co.* (38) ([1999] 1 All E.R. at 418, *per* Millett, L.J.).
33 *Paragon* (38) ([1999] 1 All E.R. at 418, *per* Millett, L.J.).

91 Reasonable diligence is not an absolute standard and depends on all the circumstances. The particular position of the plaintiff at the relevant time can be taken into account. There is, however, an assumption that the plaintiff desires to discover whether or not there has been a fraud and has a desire to know more and indeed to investigate it.[34]

***What are the essential allegations in Ritchie's causes of action against Lancelot in deceit and unlawful means conspiracy?***

92 The essential case in deceit is the making of false representations by Mr. Bell on behalf of Lancelot, principally in relation to the operation of the lockbox, with knowledge of the falsity of those representations or recklessness on his part as to their truth or falsity, and reliance by Ritchie on those representations with resultant loss and damage.

93 GE is *not* alleged to be part of the deceit claim against Lancelot.

94 The essential case in unlawful means conspiracy against Lancelot is a combination or agreement between Lancelot and one or more others (as pleaded, Mr. Bell, Lancelot Management, Mr. Petters and his companies), an intention to injure Ritchie, unlawful acts pursuant to the combination as a means of injuring Ritchie and loss to Ritchie.

95 GE is *not* alleged to be a party to that conspiracy.

**When did Ritchie discover the fraud?**

*The evidence*

96 Mr. Lowe, Q.C. properly accepted that this aspect of his case was "challenging." Mr. Beltrami, Q.C., for his part, characterized it as hopeless.

97 Mr. Petters was arrested and charged in connection with his Ponzi scheme in early October 2008 and asset freeze and forfeiture orders were immediately commenced against him and his companies.

98 The factual trigger point for the realization by Ritchie that there was a fraud by Petters and one which required further investigation can be identified by reference to the proceedings Ritchie commenced in the Illinois Circuit Court for Cook County on September 30th, 2008 against Mr. Petters and his companies.

99 Reference is made in the SEC complaint to the facts that the FBI and the IRS had been conducting a fraud investigation for some time into Petters and his companies; the authorities had evidence that the Petters defendants fraudulently indicated that certain inventory items were their assets when in fact the items did not exist; the defendants defrauded Ritchie

and (as detailed in an affidavit submitted by an agent of the FBI) Petters and his companies had fraudulently obtained sums from investors since the mid-1990s and Petters ordered the creation of false documents. The claim is for breach of contract and fraudulent misrepresentation and inducement in relation to the lending contracts Ritchie entered into.

100 It can be objectively seen from these proceedings that Ritchie not only knew by then that something had gone seriously wrong and it had suffered substantial losses (US$223m.) but was sufficiently on notice to be investigating and bringing actions on the basis that the loss was caused by a particular fraud involving the way in which Petters was able to induce lenders and investors to part with their money.[35]

101 Soon after that, Ritchie became involved in the myriad bankruptcy proceedings commenced in October 2008 when a receiver was appointed over Mr. Petters' companies which were then placed into Chapter 11 Bankruptcy.

102 As I have said, the lockbox arrangements were admittedly central to the decision to lend by Ritchie, were the foundation for all the security arrangements in relation to the loans, and gave comfort because they guarded against any possible misappropriation by Mr. Petters and credit risk. It provided comfort that the relationship with the retailers was working. This remains Ritchie's case in the Cayman proceedings. It is inconceivable that this was not a matter which would have been in sharp focus for Ritchie when constructing its fraudulent inducement/misrepresentation case in relation to the loans it made.

103 Mr. Beltrami, Q.C. relies on the fact that Mr. Ritchie says in his evidence, when describing the "lien" which would attach to the receivables from the retailers buying the goods, that since there were no goods, the security arrangements were "obviously fictitious."

104 Mr. Lowe, Q.C. submitted that he was making this statement with hindsight and as to the legal position, rather than his state of knowledge in 2009.

105 Whether or not that is the case, the publicly available information from 2009 shows Ritchie to have been objectively on notice of the very fraud which required investigation and which formed the basis of the legal proceedings it had commenced the previous year.

106 In July/August 2009, Mr. Bell and Lancelot Management became the subject of civil proceedings brought by the SEC.

107 The press release issued by the SEC stated that the SEC believed that:

34 *Law Socy.* v. *Sephton & Co.* (31) ([2005] Q.B. 1013, at para. 116, *per* Neuberger, L.J.).

35 See, by way of contrast, *Loches Capital Ltd.* v. *Goldman Sachs Intl.* (33).

"Bell and Lancelot Management falsely assured investors that they were taking specific steps to protect investor money and to verify the legitimacy of Petters' financing business, when in fact they did not. Bell and Lancelot Management also failed to inform investors that Petters was previously convicted of multiple crimes involving fraud and deception."

108 The SEC's public website included a link to the SEC complaint of July 7th, 2009 which describes Mr. Petters and Mr. Bell as *two of the leading figures behind a multibillion dollar Ponzi scheme.* The SEC complaint details the Ponzi scheme and seeks to recover the stolen moneys and prevent moneys going overseas. At para. 3 of the SEC complaint it is said that Bell and Lancelot siphoned over US$40m. out of three hedge funds that they managed for members of the investing public just before the scheme collapsed.

109 It goes on to particularize wrongdoing relating to assurances given by Mr. Bell and Lancelot Management with regard to protection of investor money and the legitimacy of Mr. Petters' financing business and in particular that Lancelot would operate the lockbox account (at para. 11):

"... to pay money directly to vendors and that payments into the lockbox would come directly from the retailers. This arrangement protected investors in that their money was not paid to Petters and the role of the retailers ostensibly was verified by the direct, transparent receipt of their payments. In fact, however, many of the payments into the lockbox account came from Petters, not from any retailers. And, later in the scheme, Bell ceased sending money to vendors and instead transferred the investors' funds directly to Petters. Bell did not disclose these material facts to investors in the funds and instead continued to disseminate his false representations about the lockbox account."

110 This was described at para. 97 as a "critical problem":

"Since the payments never came from Retailers, Bell could not independently determine that there were actually any transactions between the Vendors and the Retailers, as promised by Petters."

111 Further by para. 98 of the SEC complaint:

"Bell admitted in investigative testimony before the Commission staff that he learned as early as 2004 that the repayments were being made by Petters Co. and not by any Retailers. Bell asked Petters about the matter and received a feeble explanation."

112 Mr. Lowe, Q.C. maintained that Mr. Bell may well have made representations recklessly because he had not made sure that the lockbox

arrangement was working or monitored the transactions, but this evidence did not show that he was intentionally fraudulent.

113 This submission cannot withstand the scrutiny of a detailed review of the SEC complaint. As can be seen from the relevant sections of the SEC complaint, the evidence goes much further than that.

114 In particular, Mr. Bell admitted the lockbox arrangements had not worked for many years. It followed that the account was not monitored and he either knew or was reckless as to the fact that Petters was not carrying on a legitimate business.

115 The Bell admission was in fact later used by Ritchie in the Lancelot insolvency.[36]

116 There followed the criminal conviction for dishonesty which Mr. Bell received by pleading guilty to wire fraud in September 2009, based upon "round tripping" in 2008. This was conduct not directly related to the lockbox, but was designed to give Lancelot investors the impression that the PCI (a Petters company) notes were being repaid, which was not the case.

117 In addition, more significantly Mr. Petters' criminal trial in Minnesota also commenced in late October 2009 which was followed by Ritchie because it had a legal representative present.

118 For these reasons I am satisfied that Ritchie not only had enough information to be on notice to investigate, but actually had enough information to have discovered the fraud in relation to the critical security arrangements for their loans from 2009.

119 In case I am wrong about that, the next question is: could Ritchie with reasonable diligence have discovered the facts necessary to plead its claim against Lancelot before May 21st, 2013?

120 Mr. Lowe, Q.C. submitted that Mr. Ritchie says that he did not personally read the SEC complaint and the fact that his lawyers did later that year should not be attributed to Ritchie. They were only engaged to draft and file the original proof of debt in the Lancelot bankruptcy in August 2009. I do not accept this submission.

121 The lawyers were clearly acting in the course of a retainer for Ritchie with authority to receive such communications and in such circumstances the communication is to be attributed to the principal.[37]

---

36 The SEC complaint was appended to Ritchie's original proof of debt filed on August 3rd, 2009, as well as to Ritchie's amended proof of debt filed on September 5th, 2013 in the Lancelot insolvency proceedings. It was also cited by Ritchie as being the source of Ritchie's knowledge for the purposes of its amended proof of debt in Lancelot's US bankruptcy.

37 *El Ajou* v. *Dollar Land Holdings plc* (18) ([1994] BCC at 157, *per* Hoffmann, L.J.).

122 Mr. Lowe, Q.C. further submitted that there was not enough information to start the limitation period running in 2009 under s.37.[38] The particular fraud case against Lancelot was not yet sufficiently known to satisfy the legal test to plead fraud. The essential allegations on which the claim based on fraud is made were not known.[39]

123 In my view, the events outlined above clearly triggered the need for an investigation by Ritchie in 2009 and Ritchie in fact discovered the fraud in that year.

124 Even if Ritchie did not have enough knowledge by then as Mr. Lowe, Q.C. submits (which I do not accept), Ritchie was on sufficient enquiry to be assessed as to whether it could with reasonable diligence have discovered "the relevant fraud." That is to say, could sufficient of the facts pleaded in the Cayman proceedings (so as to survive a strike-out application) against Lancelot have been discovered before May 21st, 2013 (six years before the date of the issuing of the Cayman proceedings)?[40]

125 Mr. Lowe, Q.C. emphasized that in assessing what Ritchie could with reasonable diligence have discovered, the court should have regard to the complicated facts of the Ponzi scheme and difficulties with identifying the precise roles of the alleged conspirators. He also pointed to the chaos caused by the financial crisis in 2008 which Ritchie was also dealing with at the time and the effect on Ritchie's business and resources of the collapse of the Petters businesses.

126 In the second affidavit of Mr. Ritchie, dated September 2nd, 2020, at para. 16 he says:

> "a) the Ritchie Group was entirely preoccupied with protecting and preserving their interests which included various lawsuits (both pursuing claims and defending claims) and could not be expected, as GECC alleges, to be aware of every filing or press release in connection with the Petters Ponzi scheme. Furthermore, even if the Ritchie group did have certain documents, the nature of those documents including the context in which they were prepared and the lack of specificity meant that the Ritchie group could not sufficiently make sense of those documents and rely upon them to plead a particularised claim:

38 *Allison* v. *Horner* (3) ([2014] EWCA Civ 117, at para. 14) and *Gresport Finance Ltd.* v. *Battaglia* (28) ([2018] EWCA Civ 540, at para. 49, *per* Henderson, L.J.).

39 *Barnstable Boat Co. Ltd.* v. *Jones* (6) ([2007] EWCA Civ 727, at para. 34, *per* Waller, L.J.).

40 "[A] claimant does not 'discover' a fraud until he has 'material sufficient to enable him to properly plead it'": *Sephton* (31) ([2005] Q.B. 1013, at para. 110, *per* Neuberger, L.J.).

b) the Ritchie Group's ability to make independent enquiries and obtain document discovery to substantiate their allegations or testimony, was very limited and often restricted by law; and

c) even if certain documents were publicly available, the Ritchie Group was not on notice of their existence and had no reason to know of, or make enquiries into, their existence. It would be impossible for the Ritchie group to be monitoring hundreds of cases across 50 states."

127 I accept that efforts were made to discover facts in the pressurized and intense environment the Ritchie group found itself in between 2008 and 2013. I also accept the description Mr. Ritchie provides in relation to the numerous and complex bankruptcy and clawback proceedings.

128 However, the reasonable diligence standard to be applied under the extended period granted under the Limitation Law, although not absolute, is essentially an objective one. It requires an examination primarily of the staff and resources available to a fund of comparable size to Ritchie, facing the issues it faced at the relevant time. There should not be in applying this standard an undue focus on the particular situation of Ritchie. The word "reasonable" denotes an objective standard.

129 I accept however that the personal characteristics and particular situation of Ritchie are to be taken into account in deciding what diligence it could reasonably have been expected to have shown.[41]

130 Of importance is also the significant sum (US$200m.) lost by Ritchie due to the Petters fraud and those involved in it. There was an urgent and compelling need for a close analysis of what happened to try and obtain a remedy. That involved an investigation of the particular conduct now pleaded against Lancelot concerning the security arrangements that Ritchie says it relied on to make its loans.

131 I also acknowledge the difficulties Ritchie faced concerning the fallout of the 2008 financial crisis, the difficulties of unravelling potential claims from the morass left by the collapse of the Petters Ponzi scheme, and the complications of the bankruptcy proceedings. There was no doubt a good deal of intense firefighting going on within the Ritchie group at the relevant time and the need to prioritize resource.

132 However, the legal focus is how the hypothetical fund business of comparable size and situation would act if it had adequate but not unlimited staff and resources and was motivated by a reasonable but not excessive sense of urgency.[42]

41 *DSG Retail Ltd.* v. *Mastercard Inc.* (15) ([2020] EWCA Civ 671, at para. 67, Sir Geoffrey Vos, C. quoting Lord Hoffmann in *Peconic Ind. Dev. Ltd.* v. *Lau* (39) ([2009] HKCFA 16, at para. 30)).

42 *Paragon* (38) ([1999] 1 All E.R. at 418B–D, *per* Millet, L.J.).

133 Ritchie had a business of adequate resource to properly investigate and form views as to the best way to protect its interests and attempt to make recovery. It had a general counsel and well known and leading external law firms advising it. Its capability is demonstrated by the significant number of proceedings it initiated and conducted in the aftermath of the collapse.

134 I have formed the view that the central fact necessary to be able to plead Ritchie's case against Lancelot, namely Mr. Bell's knowledge of the falsity of the representations he made as to the lockbox, was known or could have been discovered with reasonable diligence well before 2013, irrespective of the other demands and priorities on Ritchie's resources.

135 The other obstacles and litigation Ritchie has set out did not in my view hamper its ability to discover the existence of facts necessary to plead its case against Lancelot.

136 Mr. Lowe, Q.C. contended that the lockbox should not be the sole focus. Petters could still have traded his fraudulent Ponzi scheme through the lockbox account. I do not accept this submission.

137 If the lockbox arrangements had actually been in place they would have only permitted investments to be used to purchase real goods and would have ring-fenced the proceeds of sale of those goods which would have denied Mr. Petters sufficient control over the money to have been able to operate the Ponzi scheme.

138 The basis of the lockbox representation was that the funds came from real counterparties rather than fictitious ones and that the lockbox would be monitored so as to ensure compliance with its terms. If Mr. Bell and Lancelot knew that the payments being made into that account were *not* coming direct from retailers, it follows that they knew that the representation was false.

139 If they were not properly monitoring the lockbox they also knew that the representation that they would monitor it was likewise false and/or they were arguably reckless as to the truth or falsity of the representation regarding where the funds came from.

140 In either case, Ritchie had the essential ingredients of a cause of action in fraud and conspiracy against Lancelot with a good foundation.[43]

141 It follows given how important the lockbox arrangements were to Ritchie, as soon as the Petters fraud became known the implication was that the lockbox arrangement (which Bell and Lancelot controlled) could not have been working properly as it was designed to prevent this type of fraud being carried out. It would have been obvious to Ritchie that Bell

must have known this and that his representations were false as to its operation and as to the monitoring of it. Bell even admitted it to the SEC.

142 This analysis is consistent with Ritchie's case at the *ex parte* hearing.

143 Ritchie's evidence at the *ex parte* hearing was that the relevant "discovery" was Mr. Bell's admission in the Bell interview note (taken by the FBI in 2009) that he knew that the lockbox account "never worked in the way [he] told investors it worked" and that from that point onwards Ritchie knew that it had "a claim against Lancelot for Mr Bell's deceit and for conspiring with Mr Petters."

144 Ritchie accepted that time ran from July 2014 when it obtained a copy of an interview of Mr. Bell ("the Bell interview note") carried out by the FBI on September 25th, 2009 when Mr. Bell was in prison.

145 For the reasons set out above, I do not accept that it was only from that point onwards that Ritchie had the necessary knowledge.

146 Ritchie has not shown that it did not discover, or could not with reasonable diligence have discovered those necessary facts by 2013.

147 In fact I have reached the view that Ritchie had a pleadable case as to Mr. Bell's knowledge that the lockbox account did not work in the manner which was represented to investors by August 2009. Ritchie had received the SEC complaint dated July 10th, 2009. A proof of debt submitted in the Illinois bankruptcy of Lancelot on July 31st, 2009 exhibited the SEC complaint.

148 Although the proof of debt was concerned with the "round tripping" by Bell/Lancelot which formed part of the SEC complaint, there was other material in it known to Ritchie to enable it to plead the Lancelot case, which it claims it did not know until 2014.

149 Ritchie was aware at that time of the allegation that Mr. Bell combined with Mr. Petters to conceal the truth from investors and knew that "all payments into the lock box came from PCI, not any retailers, and [he] directed that payments be made from the lockbox to PCI instead of to the vendors."

150 It also knew of the admission by Bell to the SEC:

> "Bell admitted in investigative testimony before the Commission staff that he had learned as early as 2004 that the repayments were being made by Petters Co. and not any retailers. Bell asked Petters about the matter and received a feeble explanation."

151 Mr. Lowe, Q.C. submitted that although the SEC described the explanation as "feeble" this did not mean that Mr. Bell realized or knew it to be a lie at the time.

---

43 *Barnstable* (6) ([2007] EWCA Civ 727, at para. 43, *per* Waller, L.J.).

152 I reject this submission. The basis of the lockbox representation to investors was that it existed, and had a legitimate purpose. Mr. Bell admitted to knowing that was not the case and had not been the case for many prior years. I cannot see how any explanation from Petters could change the irresistible inference that Bell knew of the fraud.

153 The SEC complaint, particularly para. 98, and the criminal conviction of Mr. Bell only a month later in September 2009, strengthened and gave particularity to that case.[44] There was a sound factual basis from then for pleading a claim against Lancelot.

154 The Bell interview note, on Ritchie's case not received until July 2014, may have improved the chances of success of the claim. It did not mean that the claim could not be pleaded earlier and well before May 2013.

155 There was also other evidence from the criminal trial that could reasonably have been investigated, if not in 2009, then in 2010. The trial was open to the public, was widely publicized in the media and at least in part attended by one of Ritchie's attorneys. A website dealing with public access to court electronic records was accessible and transcripts of testimony became available from May 2010.

156 It was admitted by Mr. Bell in his testimony during the course of Mr. Petters' criminal trial in late 2009 that he knew some of his investors thought the lockbox structure was important and that even though he knew it was not in place he did not inform them that that was the case.[45] Ritchie could have discovered that testimony with reasonable diligence.

157 Mr. Lowe, Q.C. urged upon the court that Mr. Bell's testimony at the Petters trial was not about his knowledge at the time and his answers were given in hindsight so that the jury could understand the case against Petters.

158 That submission does not work in light of the testimony given by Mr. Bell that he knew but did not tell investors that the payments were not coming from the retailers and maintained to investors that there was a lockbox account even although he knew this was not the case. I am of the view that a plain reading of the testimony reveals evidence that Mr. Bell knew that the lockbox did not operate as he had represented and that he had admitted that was the case.

44 The SEC complaint resulted in a partial judgment against Mr. Bell and Lancelot on October 5th, 2010 and an order barring Mr. Bell from associating with any investment advisers on November 3rd, 2010. He had been sentenced to imprisonment on September 30th, 2010.

45 "Q to Mr. Bell: Did it ever work that the money went into the lock box? A: No, it did not. Q: In any of those deals did any of the money come back from the retailer? A: No."

159 Ritchie has not demonstrated that it could not with reasonable diligence have obtained the transcript of Mr. Bell's testimony and reviewed it during this time period.

160 This was of course further supported by the SEC complaint where he had also admitted to the SEC that he had learned as early as 2004 that repayments into the lockbox account were being made by the Petters companies and not by the retailers.

161 In addition, in September 2009 Ritchie knew that Mr. Bell had pleaded guilty to wire fraud occurring between February and September 2008. This wire fraud involved Mr. Bell's participation in "round tripping" transactions to conceal the fact that Mr. Petters' companies had not repaid the moneys due to Lancelot from February 2008. Although a different fraud to the one alleged in the Cayman proceedings involving the lockbox it was from that date that Ritchie made substantial investments allegedly in reliance on the lockbox representations made by Bell and Lancelot.

162 From Bell's conviction Ritchie must have appreciated that Bell's participation in Petters' fraud and the matters set out in its proof of debt were established.

163 I accept Mr. Beltrami, Q.C.'s submission that Ritchie did not need the July 2014 FBI interview note to plead its case. It cannot have been the critical piece of the puzzle but for which it could not plead the claim on the basis that Mr. Bell knew that the lockbox was a sham.

164 Ritchie could with reasonable diligence have discovered the necessary material with which to plead its case against Mr. Bell and Lancelot much earlier. There was ample publicly available material, including the SEC complaint and the Petters trial testimony, where Bell himself gave evidence.

***Conclusions on s.37***

165 Ritchie had by 2009/2010 evidence from which to plead that the representations had been false for some time and "discovered the fraud." It did not need to uncover every facet or detail.[46] It had time in which to further investigate to strengthen the case against Lancelot and indeed find out further facts relating to the wider fraud to bolster its case. However, it was from then at the risk of the fraud case against Lancelot becoming time barred by not commencing an action against Lancelot in the Cayman court within six years, *i.e.* by 2016.

166 I am reinforced in this conclusion by the fact that Ritchie also submitted an amended proof of debt in the Lancelot US bankruptcy on

September 5th, 2013 which contains the core factual allegations that are made against Lancelot in the Cayman proceedings[47] and which are based on documents obtained by Ritchie in 2009. These may well have been unproven allegations as Mr. Ritchie contends, but that does not mean the documents did not give rise to the necessary facts and inferences to the relevant standard to plead fraud. Ritchie did not need further proof.

167 Ritchie had sufficient confidence in the information to append the SEC complaint to its proof of debt and make the same allegations which are contained in it in the insolvency proceedings. It follows that it had sufficient information to plead these matters in an action and commence proceedings against Lancelot much earlier. Indeed the amended proof of debt does not contain any new facts from those put forward in 2009. The SEC complaint is exhibited again. The lockbox fraud is set out:

> "But as Bell was aware, all payments into the lockbox came from PCI, not any retailers, and Bell directed the payments be made from the lockbox to PCI instead of to the vendors. Debtors [Lancelot] thus knew that an important protection for their investors—and one that was described in information sent to investors and potential investors—was not being implemented, and no action was taken either to correct that failure or to inform investors of that failure."

168 I have taken note of what Mr. Ritchie personally knew and when, but that is not the relevant exercise the court is engaged in. The court is concerned with what Ritchie as plaintiff in these proceedings knew and could with reasonable diligence have discovered pursuant to the extension in the Limitation Law.

169 Mr. Ritchie says that it was not apparent from Mr. Bell's testimony at Mr. Petters' criminal trial that "Mr Bell had been in league with Mr Petters from the beginning" or that Mr. Bell thought that "the entire operation [of Mr. Petters' business] was bogus."

170 For the purposes of pleading fraud against Lancelot, it is not relevant whether or not Ritchie knew or could have reasonably discovered the alleged fraudulent conspiracy between GE, Petters and Lancelot, or GE's role in allegedly "seeding" the Petters Ponzi scheme, as suggested by Mr. Lowe, Q.C.

171 That is not "the fraud" for the purposes of the case against Lancelot which is dependent upon Mr. Bell's knowledge of the lockbox security arrangement being a sham when he made his representations on behalf of Lancelot.

46 *Arcadia* (5) ([2015] EWCA Civ 883, at para. 49, *per* Sir Terence Etherton).
47 Including that Mr. Bell was aware all payments into the lockbox came from PCI, not any retailers.

172 The evidence Ritchie had or could with reasonable diligence have discovered was in my view sufficient to plead fraud against Lancelot in 2009 as further shown by the amended proof of debt submitted in 2013.

173 Ritchie did not require *proof* of Mr. Bell and Lancelot's involvement in Mr. Petters' fraud or of facts established by some judicial process.

174 The test is whether a fraud case can properly be made[48] and a plaintiff does not discover a fraud until he has "material sufficient to enable him to plead it."[49] Ritchie has not shown that it could not with reasonable diligence have discovered the facts necessary to plead its claim against Lancelot before May 21st, 2013.

175 It follows that Richie's claim against Lancelot was statute barred before these proceedings were commenced and that Ritchie cannot show that it has a claim with a realistic prospect of success against Lancelot.

176 Having found that Richie's claim against Lancelot has no realistic prospect of success, it follows that the only gateway through which Ritchie seeks to bring into the Cayman jurisdiction GE as a necessary and proper party to its claim against Lancelot is no longer available, and the relief GE seeks must be granted.

177 Nevertheless in case it becomes relevant, there follows my findings in relation to the remaining issues: Ritchie's prospects of success against GE; issue estoppel; appropriate forum; and full and frank disclosure.

**Ritchie's claims against GE**

178 Mr. Beltrami, Q.C. pointed to the inherent implausibility and the many evidential difficulties with Ritchie's case against GE, involving as it does the "to whom it may concern letter" written in 2000, many years before "the balloon went up" on the fraud in 2008, reliance by Ritchie on the letter, and the absence of any dealings between Lancelot and GE.

179 Any involvement GE is alleged to have had entirely predated that of Lancelot, GE having been repaid in full in 2001 and before Lancelot was even incorporated. The statement of claim makes no allegation that GE and Lancelot conspired together. The case against GE is that it failed to take steps to correct the position and actively withdraw from the conspiracy of which it allegedly had been a member many years before the US authorities began their investigations.

180 The substantive merits are not a matter for this application. It was forcefully put by Mr. Beltrami, Q.C. that the Cayman claim against GE is inherently implausible especially when considered against the delay in

bringing it and the unsuccessful efforts by Ritchie to recover its losses in the US before it was brought.

***Conclusions on Ritchie's case against GE***

181 In relation to the Limitation Law, the evidence that I have reviewed leads to the conclusion that Ritchie had the essential facts it needed, or could with reasonable diligence have discovered, to advance its claims against GE by the end of 2009, and before May 2013, and is therefore also out of time against GE.

182 The serious fraud by Petters revealed by the proceedings in 2008 and 2009 referred to above and Ritchie's case that it relied on the "to whom it may concern letter" for each of its loans concerning Petters' companies, would have put Ritchie on sufficient notice that it needed to investigate Mr. Petters and his relationship with GE very thoroughly indeed. The character reference allegedly relied on was of a man who had been described as "a man of high character and possessing strong moral values" by Mr. Menczynski of GECC.

183 Ritchie also had the knowledge revealed by the Vail interview note of October 29th, 2012. Mr. Vail interviewed Mr. Bell in prison in order to assist in Ritchie's claim against a law firm, Fredrikson & Byron, which was brought in September 2013 and which set out (at para. 11 of the complaint) the fraud case against GE which has the critical elements of the case against GE in these proceedings.

184 Clear reference is made in the 2012 Vail note to GECC having discovered "that it had been given false information about Petters' dealings with Costco [a big box retailer] in 2000 ..." Reference is also made to Petters issuing worthless checks to GECC totalling approximately US$38m.[50]

185 This evidence is inconsistent with the narrative in Ritchie's evidence that GE were not on its "radar" at the time or that Ritchie assumed GE was another "victim" until 2014.

186 Indeed it was Ritchie's own case in the SDNY proceedings against GE in 2015 that—

> "the actions of GECC in aiding and abetting Petters' fraudulent purchase order financing scheme did not come to light until the GECC and Petters' witnesses testified and exhibits were introduced into evidence at Petters trial. [Ritchie] could not begin to discover the facts and circumstances regarding the GECC's role in Petters' fraud until late October 2009, at the very earliest."

48 *Granville* (27) ([2020] EWHC 415 (Comm), at paras. 24–28, *per* Foxton, J.).
49 *Sephton* (31) ([2005] Q.B. 1013, at para. 110, *per* Neuberger, L.J.).
50 The source of Mr. Vail's information is not revealed or dealt with in the evidence.

187 The plain implication of that argument is that Ritchie was accepting that it could have "at least" begun to discover the facts regarding GECC's role from the testimony given at the Petters criminal trial. That is consistent with the contemporaneous records. From October 2009, Ritchie could have found out more about GE's conduct and knowledge from the publicly available record of the trial in which two GECC employees, Mr. Feehan and Mr. Morrone, testified. The transcripts of their testimony and the media commentary at the time showed that the fraud was discovered by GE in 2000 and the details of the fictitious transactions are set out.

188 In addition, the Petters bankruptcy trustee had made allegations of dishonesty against GE on October 8th, 2010 which are consistent with the 2009 trial testimony and which Ritchie obtained upon request including the settlement of that complaint by June 25th, 2012. It does not assist Ritchie to say that Mr. Ritchie himself or his lawyers did not read this document because they were engaged to do other things. In my view, Ritchie could with reasonable diligence have done so assuming, as I do, that Ritchie first could have discovered more about GECC's role from Petters' criminal trial.

189 Ritchie submits that the allegations made by Mr. Mukumal (as the trustee of two funds) in the amended Palm Beach complaint that Ritchie did not obtain until after August 23rd, 2013, was the first evidence which made it aware of the facts giving rise to its claim against GE[51] and it did not have knowledge of GECC's deceit before then.

190 However, the factual evidence relied on in that complaint consisted mainly of transcripts of the oral evidence given by Mr. Feehan and Mr. Morrone at Mr. Petters' criminal trial in October 2009.[52]

191 For these reasons I have come to the view that Ritchie either had sufficient information or could with reasonable diligence have discovered what was necessary for its case against GE by May 2013.

192 Ritchie has not shown that it did not have or could not with reasonable diligence have discovered the facts necessary to plead the fraud case against GE by May 2013.

**Issue estoppel**

***Conclusions on issue estoppel***

193 I have reached the view that Ritchie does not have claims against GE with any realistic prospect of success because it has already been finally

decided pursuant to Judge Engelmayer's decision in the SDNY case that Ritchie does not own the causes of action it asserts, which could only be brought anywhere and if at all by the Petters trustee.

194 Judge Engelmayer applied a rule that the parties have referred to as "the Standing Rule" or "the New York Rule of Standing" (together "the standing rule"). This rule is principally concerned with the ownership of causes of action.

195 I accept Mr. Beltrami, Q.C.'s submission that Judge Engelmayer dismissed Ritchie's complaint on the merits because it had failed to "state a claim" on which relief could be granted by any court, and was therefore a final, conclusive and substantive decision to which preclusive effect must be given.

196 It is common ground that any claims Ritchie has against GE will be governed by the law of one state or another in the US in which the standing rule will apply, so the decision gives rise to an issue estoppel between the parties.

197 I am of the view that the decision was a decision on the merits. It has a preclusive effect as an issue estoppel because Ritchie does not own the cause of action which it asserts.

198 It follows that Ritchie has no realistic prospect of success on its conspiracy claim against GE which is the only claim which allows Ritchie to contend that it is a necessary and proper party to the alleged overall conspiracy claim which is brought against Lancelot in the Cayman Islands.

199 Before giving reasons for these conclusions it is convenient to briefly set out the legal principles.

***Legal principles***

200 The conditions which must be satisfied for a foreign judgment to give rise to an issue estoppel are:

(a) the judgment must be by a court of competent jurisdiction, final and conclusive, and "on the merits";

(b) the parties (or their privies) must be the same in both sets of proceedings;

(c) there must be a clear determination of the issue by the judgment so that it should not simply be collateral or *obiter* comment which is relied on; and

51 That GE became aware that the representations in the "to whom it may concern letter" were false but covered that up to profit from the Petters transaction.

52 The Palm Beach complaint and amended Palm Beach complaint were filed on September 19th, 2012 and December 21st, 2012 respectively and are publicly available documents.

(d) the issue in the later action must be the same as the issue decided by the judgment in the earlier proceedings.[53]

201 "On the merits," for these purposes, means the foreign court has held that it has jurisdiction to adjudicate upon the issue raised in the cause of action and that its judgment is one that cannot be varied, reopened, or set aside by the court that delivered it or any court of coordinate jurisdiction.[54]

202 The decision needs to establish facts which are proved or not in dispute, state what the relevant principles of law applicable to such facts are, and express a conclusion as to the effect of applying those principles to the facts.[55]

203 It is inherent in the doctrine of issue estoppel that the decision of the foreign court will not itself be reviewed, and operates regardless of whether or not this court would regard the reasoning for the foreign judgment is open to criticism.[56]

204 Whilst regard needs to be had to the character of the decision in the foreign court, the determination of whether the decision was "on the merits" is a matter for this court.[57]

205 Decisions on substantive issues of law will be decisions on the merits where, for example, the issue is determinative of liability and therefore of substance, although procedural decisions can still be decisions on the merits for the purposes of *res judicata* where there was an express submission to the question in the foreign court which was finally decided.[58]

206 A principle which applies to US judgments forming part of a larger federal system is that their finality and conclusiveness in the law district where they were rendered are the only matters relevant to this court. Finality and conclusiveness in other parts of the federal system are not relevant.[59]

207 Both experts agree that if the judgment has *res judicata* effect in New York, it will have that effect across all the states of the USA.

53 *Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd. (No. 2)* (10) ([1967] 1 A.C. at 918B, 927G and 967B, *per* Lords Reid, Hodson and Wilberforce), and *MAD Atelier Intl. BV* v. *Manes* (34) ([2020] EWHC 1014 (Comm), at para. 47, *per* Bryan, J.).
54 *The Sennar (No. 2)* (43) ([1985] 1 W.L.R. at 494, *per* Lord Diplock).
55 *The Sennar* (43) ([1985] 1 W.L.R. at 499, *per* Lord Brandon).
56 *The Sennar* (43) ([1985] 1 W.L.R. at 493, *per* Lord Diplock).
57 *Najari* v. *Shelbourne MD* (37) ([2011] EWHC 3298 (QB), at paras. 129–131, *per* Popplewell, J.).
58 *Desert Sun Loan Corp.* v. *Hill* (16).
59 Dicey & Morris, *The Conflict of Laws*, vol. 1, at para. 14–024.

***Analysis and reasons for decision***

208 Ritchie commenced its claim against GECC in the State Court in New York. The case was moved to the United States District Court for the SDNY. In fact, Ritchie attempted to move the case again back to the State Court. That motion was denied by the SDNY on the grounds that it had jurisdiction to hear the case. This is significant given the arguments made now about the effect of the decision made by the court.

209 GECC applied to dismiss the entire claim on the grounds that Ritchie had failed to state a claim upon which the relief could be granted.[60]

210 There was no application to dismiss on the grounds of lack of subject matter jurisdiction[61] and, having reviewed Judge Engelmayer's decision, it is clear that the court did not deal with the application on that basis.

211 Judge Engelmayer dismissed the claim in negligence on time bar grounds and held that even if there was no statute of limitation problem, GECC owed no duty to Ritchie so that the allegations in the complaint did not "state a claim."

212 The judge applied the standing rule to dismiss the aiding and abetting and conspiracy claims on the basis that the causes of action pleaded were the property of the bankruptcy estate and could only be asserted by the Petters bankruptcy trustee. They were not "owned" by Ritchie, so Ritchie had a lack of standing.

213 The causes of action therefore belonged to the bankruptcy estate alone. That was enough to dispose of all the claims. Having so decided, the judge did not need to consider all of the merits of the causes of action advanced as he had decided that if there was any cause of action, it was not Ritchie's cause of action, but the trustee's.

214 However, the judge also dismissed the claims on the basis that even if the claims in theory belonged to Ritchie, no cause of action was made out on the pleaded facts and should be dismissed *with prejudice* on the basis that the allegations are set out in the complaint did not state a claim.[62]

215 Ritchie did not appeal the entirety of the SDNY decision. An issue not appealed is entitled to preclusive effect.[63] Therefore, the dismissal of Ritchie's negligence claim and the finding that it was time barred because Ritchie said that the earliest it could have discovered GECC's conduct was in late 2009 are also final decisions entitled to preclusive effect.

---

60 Under Federal Rules of Civil Procedure (FRCP), r.12(b)(6).
61 Under FRCP, 12(b)(1).
62 Judge Engelmayer's opinion, at p.23: "the Court also finds that, on the merits, Ritchie's allegations do not state a claim. The Court therefore dismisses on this alternative ground, too."
63 See *Gelb* v. *Royal Globe Ins.* (23).

216 The conclusion on standing of Judge Engelmayer was upheld in full by the Second Circuit Court of Appeals which also found that all of the other arguments advanced by Ritchie were "without merit," which is objectively consistent with the appellate court deciding that the decision on standing was not a ruling on jurisdiction.

217 Having reviewed the extensive expert evidence in this case from two distinguished US judges,[64] it is clear that there are substantial disagreements between them as to the effect of this case.

218 This court needs to prefer one judge's views over another for the purposes of determining this application, without the benefit of their in-person testimony.

219 The conclusion I have reached is that Judge Peck's analysis is clearly to be preferred for the reasons he gives on the following key issues:

(a) The rule of standing as applied by Judge Engelmayer's decision that the claims constituted the property of the estate and not of Ritchie, was made under s.541 of the US Bankruptcy Code.

(b) The decision of the SDNY was on the substance of Ritchie's claims, because it found that Ritchie had no property in the claims and no entitlement to assert them. They were dismissed expressly "with prejudice," which meant that there had been a determination on the merits.

(c) *Res judicata* applies to the decision which would mean it would be given preclusive effect in any jurisdiction in the United States.

220 As to (a), both experts agree that the standing rule precludes creditors such as Ritchie from pursuing causes of action that fall within the definition of the *bankruptcy estate* in s.541 of the United States Bankruptcy Code. This is because, if a cause of action falls within that definition, it constitutes the property of the bankruptcy estate and is vested in the trustee to pursue for the benefit of all creditors.

221 The decision at first instance and upheld in the Second Circuit was to the clear effect that it did fall within the bankruptcy estate.

222 As to (b), a decision as to who owns the cause of action is one which is clearly substantive, that is to say, which goes to whether the cause of action can be brought by the claimant in the first place rather than one which relates to procedure or questions of assessment of quantum.[65]

223 Even if it was not and could be characterized as procedural in some way, the court which made the decision clearly had jurisdiction which

cannot be varied, reopened or set aside. The decision established the facts, stated the principles of law to be applied and expressed a conclusion.[66]

224 The view I have reached is that the judgment is one of substance and on the merits because of the nature of the decision that Ritchie has no entitlement to assert a claim which has been found to be the exclusive property of the bankruptcy estate.

225 Judge Clark has put forward a number of arguments, theories and jurisprudence to reinterpret and avoid the effect of Judge Engelmayer's decision.

226 He has also suggested that the decision was wrongly arrived at.

227 With respect to Judge Clark, this court is not in a position to second guess, relying on untested expert evidence whether the decision, upheld in full by the Second Circuit Court of Appeals, was right or wrong and I have found the analysis of the US jurisprudence on that question unproductive.

228 As to (c), the main theory of Judge Clark is that the decision is not *res judicata* because it comprised a dismissal for lack of subject matter jurisdiction under art. III of the US Constitution and so can be relitigated in the US and anywhere else, including in the Cayman Islands.

229 I accept in this regard that the term "standing" is sometimes used in connection with subject matter jurisdiction in US courts. However, I have not been referred to anything which says that reference to "standing" automatically denotes subject matter jurisdiction under art. III.

230 As identified above, the application was *not* made on that basis (*i.e.* under the express provision dealing with lack of subject matter jurisdiction) but under another provision which is concerned with a failure by a plaintiff to "state a claim" upon which relief can be granted.[67]

231 That was evidently the basis upon which Judge Engelmayer proceeded to decide the case and did decide it. Neither Judge Engelmayer nor the Second Circuit Court of Appeals made any reference to the subject matter provision of art. III.

232 I have, after the conclusion of the hearing, also now reviewed the third affidavit of Judge Clark and his third expert report, of October 27th, 2020, as well as some additional written materials.[68]

64 Judge Peck, a former US bankruptcy judge for the SDNY, and Judge Clark, a former US bankruptcy judge for the Western District of Texas.

65 See *Cox* v. *Ergo Versicherung AG* (13) ([2014] 1 A.C. 1379, at para. 14, *per* Lord Sumption).

66 *The Sennar* (43) ([1985] 1 W.L.R. at 499, *per* Lord Brandon).

67 FRCP 12(b)(1)—subject matter jurisdiction; and FRCP 12(b)(6)—failure to state a claim for valid relief.

68 Which I gave permission to be submitted because of an error in the trial bundle only discovered during the course of the hearing. Written arguments from both sides were also submitted on November 20th and 26th, 2020 which I have also reviewed, as well as a further note dated December 1st, 2020 in reply.

233 Having reviewed the extensive views of the two experts, the US jurisprudence and the actual decisions in the SDNY case of both courts, I am of the clear opinion that the claim was dismissed not for want of jurisdiction in the court but because Ritchie had no property in the claim.

234 The determination that Ritchie did not own the claim is not easily equated with the proposition that it was a determination that the court did not have subject matter jurisdiction.

235 Having reviewed both of the judgments and the views of both experts in detail, it is clear that Judge Engelmayer and the Second Circuit Court of Appeals were deciding the ownership of the claims advanced by Ritchie, not the question of their own jurisdiction.

236 If they had been deciding on the question of their own jurisdiction, it is not clear on what basis they could have gone on to consider, in the case of the SDNY, whether or not Ritchie's negligence claim was statute barred, or whether, in the case of both courts, Ritchie's pleaded claims failed to state a claim on which relief could be granted.

237 They must have decided that they had jurisdiction to do so. Without jurisdiction they would not have had power to adjudicate on the merits or to dismiss the case *with prejudice.* This is supported by the decision of the SDNY that it did have jurisdiction when Ritchie unsuccessfully applied to send the case back to the New York State Court.

238 I accept Mr. Beltrami, Q.C.'s submission that the decision made, with jurisdiction, was that Ritchie had no claim anywhere in the United States on any basis because of the ownership or standing issue, not that the Federal Court lacked jurisdiction under art. III to determine any claim which Ritchie did have.

239 Applying Cayman law principles it was a decision "on the merits" even although Judge Engelmayer did not need to address all of the merits of the claim. It is clear that the Second Circuit Court of Appeals did consider the failure to "state a case" point, even on the theory that Ritchie had standing (which it did not), and dismissed it as without merit.

240 The relevant courts were courts of competent jurisdiction, the decisions were final and conclusive on the merits, it is common ground that the parties are either the same or are privies of those to the SDNY proceedings, and the decision determined that Ritchie did not own the claims it purported to assert under the US standing rule which the Cayman court would be bound to apply.

241 The matter is *res judicata* for the reasons given by Judge Peck and so cannot be pursued in Cayman.

242 It follows that, for this standalone reason, the service out order must be set aside as Ritchie cannot arguably advance its conspiracy claims against GE.

243 In case it is relevant, I also find that Ritchie's separate claim in deceit against GE alone would not be sufficient to show that it would be just that GE be joined to Ritchie's proceedings against Lancelot. It is only by virtue of the alleged common conspiracy between GECC, Lancelot, Mr. Bell, Mr. Petters and his companies, that GE can be said by Ritchie to be a necessary and proper party to its claim against Lancelot.

244 There is no other connection on the evidence between GE and Lancelot.

**Appropriate forum**

245 Ritchie has to show that this court is clearly the appropriate forum for the resolution of the cases against Lancelot and GE on the assumption (contrary to the court's findings) that Ritchie had a realistic prospect of success against each of them.

***Legal principles***

246 The well-known test is to identify the forum in which the case can be suitably tried for the interests of all the parties and for the ends of justice.[69]

247 Ritchie bears the burden to persuade the court that the Cayman Islands is clearly the most appropriate forum and that in all the circumstances the court should exercise its discretion to permit service out.[70]

248 The court examines the connecting factors which include matters of practical convenience and the system of law which will be applied to decide the issues, the place where the wrongful act or omission occurred, and the place where the harm occurred.[71]

249 It is at least a starting point to consider where the substance of an alleged tort is committed and the governing law which would be applied[72] to identify the appropriate forum.

69 GCR, O.11, r.4(2) and *Spiliada Maritime Corp.* v. *Cansulex Ltd.* (*"The Spiliada"*) (45) ([1987] A.C. at 476B, *per* Lord Goff), applied in *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.* (2).

70 *Spiliada* (45) ([1987] A.C. at 481) and *Altimo* (4) ([2012] 1 W.L.R. 1804, at para. 72, *per* Lord Collins).

71 See *Lungowe* (51) ([2020] 1 A.C. 1045, at para. 66, *per* Lord Briggs).

72 *VTB Capital* v. *Nutritek* (50) ([2013] UKSC 5, at para. 10, *per* Lord Mance), and *Cordoba Shipping Co. Ltd.* v. *National State Bank, The Albaforth* (11) ([1984] 2 Lloyd's Rep. at 96, *per* Robert Goff, L.J.).

250 As is well known, the necessary and proper party jurisdictional gateway is an anomaly because, by contrast with other gateways under GCR O.11, it is not founded on any territorial connection between the claims, the subject matter of the action and the jurisdiction of the court. The focus in the surrounding rules on the nature of the cause of action is missing. Therefore, caution is needed and this gateway should not be used as a matter of practice on the basis that the only alternative is to require suit in more than one different jurisdiction.[73]

251 The court can take into account the fact that a defendant is sued on the basis of undoubted jurisdiction, as an "anchor defendant," only for the purpose of bringing another defendant, which is incorporated and has its place of business elsewhere, into the jurisdiction.[74] Motive can be an important factor in the exercise of discretion.[75]

252 So, of course, on the other hand is the risk, where this can be demonstrated, of irreconcilable judgments which would arise from a multiplicity of proceedings.

***Analysis***

*The parties*

253 All the litigation which Ritchie has instituted over the last twelve years since the Petters Ponzi scheme collapsed has been in the US.

254 Ritchie does have some connections to the Cayman Islands. However, the first plaintiff, Ritchie Capital Management LLC, was in fact incorporated in Delaware and was only re-registered in this jurisdiction in 2015. Until recently all of the Ritchie entities carried on business in Illinois.

255 Similarly, although Lancelot was incorporated in the Cayman Islands, its business was operated in the State of Illinois and it was first subject to insolvency proceedings in Illinois, USA, which is the place of the primary insolvency proceedings, notwithstanding its subsequent liquidation in the Cayman Islands.[76]

256 GE has no significant connection to the Cayman Islands, is incorporated under the laws of the State of New York, and has its principal place of business in Boston, Massachusetts.

---

73 See *Altimo* (4) ([2012] 1 W.L.R. 1804, at para. 73), referring to Lloyd, L.J. in *Golden Ocean Assur. Ltd.* v. *Martin (The Goldean Mariner)* (26) ([1990] 2 Lloyd's Rep. at 222).

74 *Multinational Gas & Petrochemical Co.* v. *Multinational Gas & Petrochemical Servs. Ltd.* (36) ([1983] Ch. at 268, *per* Lawton, L.J.).

75 *Altimo* (4) ([2012] 1 W.L.R. 1804, at paras. 76 and 79) and *Erste Group Bank AG* v. *JSC "VMZ Red October"* (19) ([2015] EWCA Civ 379, at para. 150, *per* Gloster, L.J.).

76 See judgment of Quin, J. in *In re Lancelot Investors Fund Ltd.* (30) (2009 CILR 7, at para. 64).

*The claims*

257 Importantly none of the alleged wrongdoing took place in the Cayman Islands and the main protagonists were either in Minnesota or Illinois when the facts relevant to the claims took place. Alleged loss and damage would likely to have been suffered by Ritchie in Illinois.

258 Also importantly none of the claims asserted against either Lancelot or GE are governed by Cayman law.

259 In cases of conspiracy, courts are sometimes persuaded that one forum should hear the case involving multiple parties to *one* overarching design or plan. This is not such a case.

260 Here there are, on analysis, *two* alleged conspiracies with Petters: one involving Lancelot and one involving GE which are not coterminous nor which overlap factually.

*The evidence*

261 All of the principal witnesses are likely to be based in the United States and none have been identified as living in the Cayman Islands, although it is understood that Mr. Ritchie has a residence here.

262 The vast majority of the relevant documentary material is unlikely to be located in the Cayman Islands.

263 I accept Mr. Beltrami, Q.C.'s submissions that, when one examines the parties, the claims and the evidence, one reaches a seriously unpromising factual position from which Ritchie needs to discharge its burden to show that Cayman is clearly the most appropriate forum.

264 Then Mr. Beltrami, Q.C. points to the connections to Illinois which are much more obvious and apparent, both in terms of corporate connections and where the relevant activity took place. I accept his proposition that where the wrongdoing occurred and where the alleged loss and damage was suffered has clear implications for the proper law.

265 Mr. Beltrami, Q.C.'s understanding was that neither Mr. Feehan nor Mr. Moroney is still employed by GE. It would indeed be surprising given the events and the passage of time whether any of the alleged conspirators had employees who were still employed by them.

266 I accept Mr. Beltrami, Q.C.'s further submission that, in terms of relevant witnesses and documentary material, it is clear that the factual enquiry would be more conveniently carried out in Illinois, or at least in the United States and not in Cayman. There may be also issues arising in the United States relating to compulsion and production of evidence in Cayman.

267 As to motive, it is a reasonable inference that the principal purpose of suing Lancelot in the Cayman Islands where it is in liquidation was in order to found a claim under the necessary and proper gateway against GE (and through which Ritchie obtained leave on an *ex parte* basis) and I take that into account in the exercise of discretion.

268 As to the risk of irreconcilable judgments, if leave was now set aside, there is no evidential basis to assume that Ritchie would proceed separately against Lancelot (in liquidation) in Cayman and against GE in Illinois or some other US state (where the matter is *res judicata* because of the standing rule).[77] There is no realistic basis to assume that there is a risk of irreconcilable judgments arising.

269 For these reasons, and on the assumption that the case against GE and Lancelot did have realistic prospects of success (contrary to the court's findings), Ritchie has not persuaded the court that the Cayman Islands are clearly the most appropriate forum and the court should exercise its discretion to permit service out.

270 The *ex parte* order must be set aside for this additional reason.

**Full and frank disclosure**

271 The final argument advanced by GE is that, irrespective of whether or not Ritchie has established a proper case for service of these proceedings on GE out of the jurisdiction, it failed at the *ex parte* application to comply with its duty to give full and frank disclosure and to make a fair presentation, which were sufficiently serious failures to justify setting aside the service out order in any event.

***Legal principles***

272 A court, in order to ensure fairness, usually proceeds by hearing both sides, for obvious reasons. There are well known exceptions relating to urgency and secrecy. One of the procedural exceptions is where leave is sought to serve a foreign defendant out of the jurisdiction.

273 Applicants seeking permission to serve proceedings out of the jurisdiction without notice are required to give full and frank disclosure.[78] This imposes a duty that can be challenging for an applicant, but it is very important that it is complied with. Individuals and entities are brought into the jurisdiction without any opportunity to show why that should not be the case. As has been demonstrated in the present case, they are then exposed

77 GE has accepted that it will not contend that the Illinois court does not have jurisdiction over the claim against it or that it is not the appropriate forum (whilst reserving all other defences).

78 *In re Standard Chartered Bank* (46) (2013 (2) CILR *N* [11], *per* Quin, J.) and *Cowan* v. *Equis* (12) (Cause No. FSD 22 of 2018, at paras. 73–77, *per* Mangatal, J.).

to very considerable resource expenditure and delay to bring forward an application to set jurisdiction aside.

274 Therefore the duty is very important and it is broad. It extends to disclosure of all facts which reasonably would or could be taken into account by the judge in deciding whether to grant the application.[79] Such material facts extend beyond those which are actually known to the applicant and include matters which he would have known had he made proper enquiries.[80] The duty is that of the applicant and its legal advisers.

275 In the context of the application for leave to serve proceedings out of the jurisdiction in this case, whether or not the claims had a realistic prospect of success against Lancelot and GE, whether GE was a necessary and proper party to the claims against Lancelot, issue estoppel and the appropriate forum are all issues pursuant to which the question of materiality is to be judged.[81]

### *Application*

276 The key question is whether the presentation of the application was fair in all material respects.[82]

277 In a complex case such as this, the task of the judge in making a decision on a without notice basis is difficult one, and the court relies on the applicant making a fair and even-handed presentation.

278 It is important that the application is balanced and not presented in a way which taken as a whole is unfairly one-sided, self-serving or misleading. It is not enough, for example, if disclosure is made in some part and the judge is then invited to read other parts in full, if points of defence or difficulty to the applicant are not properly presented and their significance explained to the court.

279 The applicant has a duty to signal and explain the relevant legal tests, defence arguments and relevant evidence in a fair and balanced way. That includes pointing out material flaws and difficulties with the applicant's case.

---

79 *Siporex Trade S.A.* v. *Comdel Commodities Ltd.* (44) ([1986] 2 Lloyd's Rep. at 437, *per* Bingham, J.).
80 *Brink's Mat Ltd.* v. *Elcombe* (7) ([1988] 1 W.L.R. at 1356G, *per* Ralph Gibson, L.J.).
81 *MRG (Japan) Ltd.* v. *Engelhard Metals Japan Ltd.* (35).
82 *Fundo Soberano De Angola* v. *dos Santos* (22) ([2018] EWHC 2199 (Comm), at paras. 50–53, *per* Popplewell, J.).

280 The consequence of a finding of material non-disclosure at a without notice hearing is to deprive the plaintiff of any advantage derived, which means that the order granting leave will be set aside.[83]

281 Mr. Beltrami, Q.C. put forward five breaches of the duty which he described as particularly significant.

(a) Ritchie failed to draw the court's attention to its own case in the SDNY proceedings that it "could have" discovered GECC's wrongdoing in late October 2009 during the course of Mr. Petters' criminal trial. In fact it failed to draw the court's attention to the fact that limitation was an issue at all in its complaint which was dismissed by Judge Engelmayer on three grounds, one of which was limitation, and which ground was not appealed.

(b) Ritchie did not fairly present the arguments GE would be likely to make as to Lancelot's limitation defences and the obvious arguments that GE would make in relation to the SEC complaint and amended proof of debt. Neither was there a presentation of the arguments that GE would make that Mr. Bell's representations as to the lockbox could not have been made other than fraudulently given the essential nature of the Ponzi scheme and the basis upon which Ritchie provided finance.

(c) Ritchie did not fairly present the arguments GE might make as to the appropriate forum for the resolution of the dispute and did not draw the court's attention to the numerous factors pointing towards the United States, and Illinois in particular. Instead emphasis was placed on Lancelot being a Cayman Islands company (in official liquidation in Cayman) which it was said would outweigh any such connections. To give that factor that emphasis was misleading. In addition, the extant insolvency proceedings against Lancelot in the US, which meant that it could be sued as of right in Illinois, were not sufficiently drawn to the court's attention.

(d) Ritchie failed to draw the court's attention to the trustee complaint against GECC of October 8th, 2010 or the settlement of that complaint. These documents were material because they go to the issue of when with reasonable diligence Ritchie could have discovered the existence of its alleged claims against GE. The trustee complaint alleges that GECC had received payments from Petters' companies with knowledge of the fraud but decided to keep quiet about it in order to obtain repayment, which is essentially mirrored in the claims made in these proceedings.

(e) The way in which Ritchie presented the litigation against GECC contained errors and omissions which if they had not been made would have allowed the court to recognize the claims of the kind brought by

83 See *Brink's Mat* (7) ([1988] 1 W.L.R. 1350, *per* Ralph Gibson, L.J.) and Gee, *Commercial Injunctions*, 6th ed., at paras. 9–019 – 9–025 (2016).

Ritchie in connection with Mr. Petters' Ponzi scheme had failed in various forums in the US.

***Analysis***

*Key principles*

282 The key question is, applying the legal principles above, whether the presentation made to the court was fair in all material respects.

283 In this regard, it is important to bear in mind that the presentation will not be fair if it is not balanced. That means that there must be disclosure of a material flaw or difficulty that could be taken against it, even if on the applicant's case it is without merit.

284 Properly alerting the court to the existence of a material counter-argument irrespective of whether the applicant considers it to be well founded is important. The court is typically not in a position to conduct the analysis itself. The applicant should not make the determination based solely upon its own views and should err on the side of caution.

285 Moreover, the issue needs to be properly and fairly explained to the court. The court needs to be given the essentials of the argument that could be taken against it by an applicant and then doing the best it can, the applicant needs to show how it might reasonably be argued if the defendant were present.

286 This is so that the court can make a balanced and fair assessment of the defence case and properly exercise its discretion having considered all material facts relevant to the issues. As I have said the court places significant reliance on the applicant and its legal team to comply with this obligation in the absence of the putative defendant in complex cases.

***Decision***

287 I have now had the benefit of significantly more material and time than I was presented with at the *ex parte* stage with which to consider the matters at issue. This is not unusual on the return date of a contested application when the applicant has its first opportunity to present its arguments and evidence following a much shorter *ex parte* hearing.

288 I do not approach Ritchie's duty to the court to make full and frank disclosure on the basis that it had to put forward the full extent of the submissions and evidence that have now been heard and examined concerning GE's case.

289 However, even without the benefit of hindsight and my findings (after a full examination at a hearing which lasted six days) the issues raised by Mr. Beltrami, Q.C. might fairly be thought to be material to the issues

and indeed weighed against the making of the order for leave to serve out at the *ex parte* hearing.

290 The clear conclusion I have come to is that they were each material and should have been properly disclosed. On their totality there has been a breach of the duty to make full and frank disclosure.

291 This was not a case, such as on an application for a freezing order, where there was immediate time pressure on Ritchie. It had had years to get its case together and had indeed issued proceedings with an extensive statement of claim against both Lancelot and GE a month before the application was heard.

292 I have come to the clear view that the overall presentation was deficient for each of the reasons put forward by Mr. Beltrami, Q.C.

293 The arguments advanced by Mr. Lowe, Q.C. in response and to some extent explanation, do not displace this overall conclusion. I also acknowledge Mr. Ritchie's evidence in this regard and that he has apologized for any inadvertent non-disclosures.

294 As to each of the five points taken by Mr. Beltrami, Q.C.:

(a) It was indeed Ritchie's case that Ritchie "could not begin to discover" the GECC wrongdoing until late October 2009 in the SDNY case. That matter should have been explained and more importantly attention drawn to Judge Engelmayer's finding at p.12 of his decision that the negligence claim was therefore statute barred. The explanation given as to the Ritchie team's views as to the legal merits or otherwise of the point is not relevant. It was a material fact to be fairly disclosed and it was not disclosed, as Mr. Ritchie has accepted.

(b) A fair presentation of the arguments on limitation against Lancelot was not made. Whilst some of the arguments were mentioned, they were not developed sufficiently to make a fair presentation of them as can be seen from the relevant evidence from Mr. Ritchie. The case that Ritchie only found out about the falsity of the lockbox representation when they obtained and read the FBI interview note is not put in the context of the prior material and in particular the admission by Bell in the SEC complaint, which was not adequately explained. The original proof of debt relying on the 2009 evidence was not referred to. The amended proof of debt was referred to, but only as not being a claim in deceit and not about the representations at issue in these proceedings. However the matters relating to the lockbox arrangements and their falsity in the amended proof of debt are, as I have found, mirrored in the pleadings in this action. The court finds that the identifiable arguments that GE would make regarding the SEC complaint and the proofs of debt were not fairly presented. The Lancelot

limitation issue was a critical issue and disclosure was deficient in these respects.

(c) The potential forum arguments were not fairly presented. The close legal and factual connections with Illinois were not properly explained. It may be the case that Ritchie's evidence pointed to insolvency proceedings against Lancelot in the US which meant that it could be sued as of right in Illinois, but Ritchie did not develop the point in connection with *forum conveniens*, or draw to the court's attention that Illinois was where the primary insolvency proceedings were being conducted. It was not properly emphasized that Lancelot could be sued in Illinois, not just in the Cayman Islands and that Ritchie had made a choice as to the latter option.

(d) On the evidence, Ritchie was aware of these proceedings at the latest by June 25th, 2012. The relevance of the trustee complaint against GECC and the settlement is clear in relation to limitation against GE and it was not disclosed without a satisfactory evidential explanation.[84]

(e) This issue ought to have been presented without errors or omissions so as to make full disclosure of the litigation against GECC in the US in relation to the *res judicata* issue. The US jurisprudence is clearly relevant and decisive as I have found. It should have been more carefully and fully disclosed without the errors and omissions identified by Mr. Beltrami, Q.C., which I accept were made, albeit inadvertently.

295 I should add that I have given careful consideration as to whether I could properly conclude that there had been a deliberate non-disclosure at the *ex parte* stage by Ritchie and its legal team.

296 Although the evidence put forward by way of explanation has not in some respects been satisfactory, I have decided that I am not persuaded that there has been deliberate non-disclosure or a deliberate attempt to avoid a fair presentation, despite the forceful points in this regard made by Mr. Beltrami, Q.C.

297 I bear in mind, in giving the benefit of the doubt on this to Ritchie, that there was a huge universe of material available to Ritchie and its legal team which they had to marshal in the context of a potential jurisdiction battle. I have found that they fell short of the standard required to fulfil the duty of presenting it fairly. I have said the duty can be an onerous one in such cases. It is, however, essential that it is complied with to ensure the fairness of the process on these applications.

84 Ritchie 2, para. 124 says it was an inadvertent omission.

**Conclusion**

298 As a consequence, and for all these reasons, the court will make an order pursuant to GCR, O.12, r.8 that the order made on June 28th, 2019 giving the plaintiffs leave to serve the writ on GE out of the jurisdiction be discharged. I would be grateful for a draft order to be prepared by counsel for my consideration.

299 It follows that the plaintiffs should pay the costs of GE occasioned by these proceedings.

300 I will deal with any application in relation to costs by way of written submissions.

***Order set aside.***

Attorneys: *Carey Olsen* for the plaintiffs; *Mourant Ozannes* for the second defendant.