# Exhibit R

Court of Appeal

# *Stanford International Bank Ltd (in liquidation) *v* HSBC Bank plc

**[2021] EWCA Civ 535**

2021 March 23, 24; April 15 — Sir Geoffrey Vos MR, Moylan, Arnold LJJ

*Banking — Duty of care — Execution of payment — Bank making payments out of company's accounts shortly before company entering liquidation — Liquidators claiming bank in breach of duty to refrain from executing payment orders in certain circumstances — Whether company suffering any loss where payments having reduced company's indebtedness to creditors*

*Trusts — Fraudulent breach of trust — Dishonest assistance — Company's liquidators claiming bank dishonestly assisting breaches of trust committed by company's owner — Whether test for dishonesty applying to large corporations differing from that applying to individuals*

The claimant company fell into insolvent liquidation in April 2009 with debts exceeding US$5bn as a result of having been used by its owner, S, as the vehicle for a Ponzi scheme. The claimant's liquidators alleged that between August 2008 and February 2009 the defendant bank, with which the claimant had held four accounts, had paid some £116m out of the claimant's accounts to holders of certificates of deposit issued by the claimant; and that if the bank had frozen those accounts in August 2008, as it ought to have done, at least £80m would have been available to pay the claimant's creditors when insolvency supervened. The liquidators brought two claims against the bank, seeking: (i) damages for breach of the bank's implied contractual and/or tortious duty to refrain from executing a payment order where it had reasonable grounds for believing that the order was an attempt to misappropriate its customer's funds ("the loss claim"); and (ii) an account or equitable compensation in respect of the bank's dishonest and/or reckless assistance in breaches of trust and fiduciary duty undertaken by S ("the dishonest assistance claim"). The bank applied to strike out the claims. The judge refused to strike out the loss claim, holding that the claimant had suffered real loss, but struck out the dishonest assistance claim, holding that the pleadings were insufficient to disclose dishonesty by the bank.

On appeals by the defendant and the claimant—

*Held*, (1), allowing the defendant's appeal, that the claimant had not suffered a loss as a result of some £116m being paid out of its accounts to discharge creditors, namely the holders of certificates of deposit, since those payments had not reduced its net asset position, having reduced its indebtedness pound for pound; that the fact that the claimant had slightly lower liabilities as a result of making those payments was a corresponding benefit to its net asset position even if the claimant had been in a heavily insolvent position at the time; that although it would have been a benefit to the claimant's creditors for the claimant to have had more cash available upon the eventual inception of its insolvency, that would not have been a benefit to the claimant whilst it was still trading; and that, accordingly, the loss claim in respect of the £116m worth of payments made by the bank from the claimant's accounts should have been struck out, since the claimant had not sustained the specific loss that it claimed (post, paras 32–39, 50–51, 52, 53).

*Barclays Bank plc v Quincecare Ltd* [1992] 4 All ER 363 and *Singularis Holdings Ltd v Daiwa Capital Markets Europe Ltd* [2018] 1 WLR 2777, CA applied.

(2) Dismissing the claimant's appeal, that it was not the case that the test of dishonesty, for the purposes of a claim for dishonest assistance, was different when

© 2021 The Incorporated Council of Law Reporting for England and Wales

applied to large corporations than it was when applied to individuals; that if dishonesty or blind-eye knowledge was to be alleged in a claim for dishonest assistance against a corporation, large or small, it had to be evidenced by the dishonesty of one or more individuals; that, therefore, having looked at all the facts and all the actual and constructive knowledge of those involved in representing the corporation, it would be necessary to carry out the subjective stage of the test of dishonesty before proceeding to the objective stage; that the subjective dishonesty that needed to be established, after consideration of all the facts, was either the dishonesty of a person within the corporation or the blind-eye knowledge of such a person; and that, accordingly, the dishonest assistance claim had been rightly struck out, since the claimant could not allege that anyone at the bank had the necessary dishonesty or blind-eye knowledge of S's fraud or of the Ponzi scheme for which the claimant was being used (post, paras 42–51, 52, 53).

*Manifest Shipping & Co Ltd v Uni-Polaris Insurance Co Ltd (The Star Sea)* [2003] 1 AC 469, HL(E) applied.

Decision of Nugee J [2020] EWHC 2232 (Ch) reversed in part.

The following cases are referred to in the judgment of Sir Geoffrey Vos MR:

*Armstrong v Strain* [1952] 1 KB 232; [1952] 1 All ER 139, CA
*Barclays Bank plc v Quincecare Ltd* [1992] 4 All ER 363
*Buchler v Talbot* [2004] UKHL 9; [2004] 2 AC 298; [2004] 2 WLR 582; [2004] 1 All ER 1289, HL(E)
*Greenridge Luton One Ltd v Kempton Investments Ltd* [2016] EWHC 91 (Ch)
*Group Seven Ltd v Nasir* [2019] EWCA Civ 614; [2020] Ch 129; [2019] 3 WLR 1011, CA
*Ivey v Genting Casinos (UK) Ltd (trading as Crockfords Club)* [2017] UKSC 67; [2018] AC 391; [2017] 3 WLR 1212; [2018] 2 All ER 406, SC(E)
*Kinsela v Russell Kinsela Pty Ltd* (1986) 4 NSWLR 722
*Manifest Shipping & Co Ltd v Uni-Polaris Insurance Co Ltd (The Star Sea)* [2001] UKHL 1; [2003] 1 AC 469; [2001] 2 WLR 170; [2001] 1 All ER 743; [2001] 1 All ER (Comm) 193; [2001] 1 Lloyd's Rep 389, HL(E)
*National Employers' Mutual General Insurance Association Ltd v AGF Holdings (UK) Ltd* [1997] 2 BCLC 191
*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; [1995] 3 WLR 64; [1995] 3 All ER 97, PC
*Singularis Holdings Ltd v Daiwa Capital Markets Europe Ltd* [2018] EWCA Civ 84; [2018] 1 WLR 2777; [2018] Bus LR 1115; [2018] 4 All ER 204; [2018] 2 All ER (Comm) 975; [2018] 1 Lloyd's Rep 472; [2018] 2 BCLC 1, CA
*Sofer v Swissindependent Trustees SA* [2020] EWCA Civ 699; [2020] WTLR 1075; [2020] 2 P & CR DG16, CA
*Stanford International Bank Ltd, In re* [2019] UKPC 45; [2020] 1 BCLC 446, PC
*Twinsectra Ltd v Yardley* [2002] UKHL 12; [2002] 2 AC 164; [2002] 2 WLR 802; [2002] 2 All ER 377, HL(E)
*West Mercia Safetywear Ltd (Liquidator of) v Dodd* [1988] BCLC 250, CA

The following additional cases were cited in argument:

*Agip (Africa) Ltd v Jackson* [1990] Ch 265; [1989] 3 WLR 1367; [1992] 4 All ER 385
*Armitage v Nurse* [1998] Ch 241; [1997] 3 WLR 1046; [1997] 2 All ER 705, CA
*Armstrong v Strain* [1951] 1 TLR 856
*Bilta UK Ltd v Natwest Markets plc* [2020] EWHC 546 (Ch)
*Clydesdale Bank plc v Workman* [2016] EWCA Civ 73; [2016] PNLR 18, CA
*Dellal v Dellal* [2015] EWHC 907 (Fam); [2015] WTLR 1137
*GHLM Trading Ltd v Maroo* [2012] EWHC 61 (Ch); [2012] 2 BCLC 369
*HLC Environmental Projects Ltd, In re* [2013] EWHC 2876 (Ch); [2014] BCC 337

© 2021 The Incorporated Council of Law Reporting for England and Wales

*JSC Bank of Moscow v Kekhman* [2015] EWHC 3073 (Comm)
*London County Freehold & Leasehold Properties Ltd v Berkley Property & Investment Co Ltd* [1936] 2 All ER 1039, CA
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500; [1995] 3 WLR 413; [1995] 3 All ER 918, PC
*Northampton Borough Council v Cardoza* [2019] EWHC 26 (Ch); [2020] 2 BCLC 249
*Singularis Holdings Ltd v Daiwa Capital Markets Europe Ltd* [2017] EWHC 257 (Ch); [2017] Bus LR 1386; [2017] 2 All ER (Comm) 445; [2017] 1 Lloyd's Rep 226; [2017] 1 BCLC 625
*Z Ltd v A-Z and AA-LL* [1982] QB 558; [1982] 2 WLR 288; [1982] 1 All ER 556; [1982] 1 Lloyd's Rep 240, CA

**APPEALS** from Nugee J

By a claim issued in the Chancery Division of the High Court in November 2018 the joint liquidators of the claimant, Stanford International Bank Ltd, claimed against the defendant, HSBC Bank plc, for losses suffered as a result of (1) the defendant's breach of its duty of care owed to the claimant and (2) dishonest assistance in relation to breaches of fiduciary duty by the claimant's ultimate beneficial owner, Robert Allen Stanford. By an application dated 9 April 2020 the defendant sought summary judgment and/or to strike out the claims. On 31 July 2020 Nugee J struck out the claim for dishonest assistance but refused to dispose summarily of the claim for loss [2020] EWHC 2232 (Ch), and he granted permission to appeal to both the defendant and the claimant.

By notice of appeal filed on 11 September 2020 the defendant appealed against the judge's refusal to grant summary judgment in respect of the claim for loss on the grounds, inter alia, that (1) the judge erred in law in holding that it was sufficiently arguable that the claimant's insolvency enabled departure from the basic principle that a claim for loss as a result of breach of duty of care was a common law claim for compensation for loss even though the payment of the bulk of the sum of £116m out of the accounts was made to discharge liabilities owed to investors of the claimant. (2) Such net loss out of the accounts had to be determined by reference to the claimant's net asset position, and the relevant loss had to be to the claimant alone and not to its investors or creditors. (3) If the judge's conclusion was correct, breach of the duty of care would differ dramatically according to whether the customer was solvent or insolvent.

By notice of appeal filed on 28 September 2020 the claimant appealed against the judge's dismissal of its claim for dishonest assistance on inter alia the following grounds. (1) The judge fell into error in dismissing the dishonest assistance claim because on the basis of recent Court of Appeal authority he should have allowed the claim to proceed pending full disclosure which had not yet occurred. In circumstances where a party was unable to plead or identify individual knowledge the court should consider the allegations of knowledge as a whole on the assumption that the claimant would in due course be able to identify those who had the requisite dishonest knowledge. And in any event the judge expressly recognised that material might emerge from the disclosure exercise and that a party might not have all such material until the trial. (2) Irrespective of whether the claimant would be able to identify individuals within the defendant bank who had the dishonest knowledge, the claim for dishonest assistance was sufficiently

© 2021 The Incorporated Council of Law Reporting for England and Wales

arguable, and the area of law it encompassed sufficiently complex and developing that it should have been allowed to proceed to trial. (3) The defendant was to be regarded as having corporate knowledge of the relevant matters because it applied in a reckless manner the policies it should have operated and which if properly applied would have allowed it to identify that wrongdoing was occurring in relation to the operation of the accounts; and that recklessness took the form of an ingrained culture and systemic failures rather than a one-off or isolated occurrence, and which might have prevented one individual from having the relevant knowledge. A B

The facts are stated in the judgment of Sir Geoffrey Vos MR, post, paras 1–5.

*Patricia Robertson QC*, *Louise Hutton QC* and *Christopher Langley* (instructed by *Eversheds Sutherland (International) LLP*) for the defendant. C

*Justin Fenwick QC* and *James Knott* (instructed by *Stewarts Law LLP*) for the claimant.

The court took time for consideration.

15 April 2021. The following judgments were handed down. D

**SIR GEOFFREY VOS MR**

*Introduction*

1 Stanford International Bank Ltd ("SIB") was incorporated in Antigua and owned by Robert Allen Stanford ("Mr Stanford") from 1990 until its collapse into insolvent liquidation on 15 April 2009. SIB had debts in excess of US$5bn, arising from its use as the vehicle for one of the largest and most prolonged Ponzi schemes in history. E

2 In this action, the liquidators of SIB (the "liquidators") make two claims against HSBC Bank plc ("HSBC"), with which SIB held separate dollar, sterling, Euro and Swiss Franc accounts, opened between 2003 and 2007.

3 SIB's first claim is for damages for breach of the implied contractual and/or tortious duty owed by a banker to its customer as explained in *Barclays Bank plc v Quincecare Ltd* [1992] 4 All ER 363 ("*Quincecare*"). In *Quincecare*, Steyn J said that "a banker must refrain from executing an order if and for as long as the banker is 'put on inquiry' in the sense that he has reasonable grounds (although not necessarily proof) for believing that the order is an attempt to misappropriate the funds of the company" (p 376). F G

4 SIB's second claim is for an account or equitable compensation in respect of HSBC's alleged dishonest and/or reckless assistance in breaches of trust and fiduciary duty undertaken by Mr Stanford (the "dishonest assistance claim").

5 SIB claims that approximately £118.5m was paid out of SIB's accounts between 1 August 2008 and 17 February 2009 (when HSBC did freeze the accounts), but that HSBC ought to have frozen the accounts by 1 August 2008 at the latest. Had it done so, SIB contends that some £80m, which was in the accounts as at 1 August 2008, would have remained there rather than being paid away to holders of certificates of deposit ("CDs") issued by SIB. H

© 2021 The Incorporated Council of Law Reporting for England and Wales

A 6 HSBC applied to Nugee J for summary judgment or to strike out (a) the claim for losses in respect of payments paid out in discharge of genuine debts by way of interest and capital due to the holders of CDs (the "loss claim"), and (b) the dishonest assistance claim, on the basis that no sufficient case of dishonesty is pleaded against HSBC.

7 The judge [2020] EWHC 2232 (Ch) refused to strike out the loss claim (which included some monies paid to SIB's account with another of its B bankers, Toronto Dominion Bank ("TDB")), but struck out the dishonest assistance claim on the basis that it could "be brought back in if there [were] sufficient material to do so (and if it is appropriate to give [SIB] leave to do so)" after disclosure. HSBC challenges the first decision, and SIB challenges the second. If HSBC were to be successful on both parts of the appeal, the only one of SIB's claims in this action that would survive would be a claim C for some £2.4m in respect of a payment made by HSBC to the English Cricket Board ("ECB"). HSBC accepts that that payment may have caused SIB loss, because there may have been no debt owed by SIB to the ECB, even though it disputes its liability under the *Quincecare* principle.

8 HSBC submits that the judge ought to have struck out the loss claim because it cannot succeed. The sums paid out by HSBC were debts of SIB D properly due to the investors in question, and SIB's balance sheet was unaffected in net terms by their discharge. Moreover, the Privy Council decided in *In re Stanford International Bank Ltd* [2020] 1 BCLC 446, para 66 that holders of the CDs "had a contractual entitlement to receive capital and interest by virtue of the simple terms of the certificates of deposit used by SIB, either upon redemption or by way of early redemption subject to a discount" (per Lord Briggs JSC), and that, under Antiguan law, the E payments could not be vitiated in SIB's insolvency.

9 SIB submits that the judge was right to refuse to strike out the loss claim. As the judge put it at para 34, "if a company is solvent, then paying £100 of its money and discharging £100 of its liabilities" reduces its assets offset by a corresponding benefit to the company by reducing its creditors, "But if the company is insolvent, then paying £100 on the one hand reduces its assets, but that is not offset by a corresponding benefit to the company F and a reduction in its liabilities as it still does not have enough to pay them all and there has not in fact been any increase in its net assets as it still has no net assets at all". SIB argued that, absent HSBC's breach of duty, the £80m in SIB's accounts as at 1 August 2008 would have been available to pay creditors when insolvency supervened.

10 In relation to the dishonesty claim, SIB submits that it should not G have been struck out, first because of the principle to be elicited from *Sofer v Swissindependent Trustees SA* [2020] WTLR 1075, para 32 ("*Sofer*") to the effect that "a mere failure to identify at the outset the directors, officers or employees who had [the relevant state of knowledge does not mean] that such an allegation is liable to be struck out", if such particulars are given as soon as feasible. Secondly, SIB submitted that the test of dishonesty or H recklessness for large corporations, like HSBC, is or should be different to that applicable to individuals. Mr Justin Fenwick QC, leading counsel for SIB, submitted orally that HSBC's senior management dishonestly allowed HSBC to be run in such a way that nobody ever got to the point of realising that SIB was a massive Ponzi scheme. Put another way, human beings must have known that the extensive failures pleaded against HSBC were

© 2021 The Incorporated Council of Law Reporting for England and Wales

recklessly dishonest. SIB may never be able to identify those human beings and, Mr Fenwick submitted, it does not need to do so, because the only relevant question is whether HSBC's conduct was objectively dishonest (see Lord Nicholls of Birkenhead in *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, 390D–391F ("*Royal Brunei*"). The dishonest assistance claim should be allowed to proceed in a developing area of law. A

11 In answer, HSBC submits that the judge was right at para 64, where he said that it was not pleaded that "any individual at HSBC knew that SIB was a Ponzi fraud", so the case had to be that HSBC turned a blind eye to the fact that it was. But blind-eye knowledge requires targeted and firmly grounded suspicion of specific facts (see *Group Seven Ltd v Nasir* [2020] Ch 129, para 60 ("*Group Seven*"), citing Lord Scott of Foscote in *Manifest Shipping & Co Ltd v Uni-Polaris Insurance Co Ltd (The Star Sea)* [2003] 1 AC 469 at para 116 ("*Manifest Shipping*")). As Lord Scott said there, "To allow blind-eye knowledge to be constituted by a decision not to enquire into an untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the basis of a finding of [dishonesty]". Ms Patricia Robertson QC, counsel for HSBC, submitted, after a meticulous examination of SIB's pleadings, that what was, in reality, being alleged here was nothing more than negligence. The law was now well settled, and there was no basis on which the dishonest assistance claim should be allowed to go to trial. B C D

12 Witness statements have not yet been exchanged, but HSBC provided SIB with six detailed witness statements from personnel who played a material role in the HSBC/SIB relationship in response to the liquidators' application under sections 236 and 237 of the Insolvency Act 1986. Since the hearing before the judge, HSBC has also given extensive disclosure, although SIB submits that it is not yet complete. E

13 I will deal now with the judge's judgment and briefly with the pleadings before turning to the two issues that we have to decide, namely (i) whether the judge was right to allow the loss claim to continue, and (ii) whether the judge was right to strike out the dishonest assistance claim.

*The judge's judgment* F

14 The judge began by explaining the facts and deciding at para 17 that the claim in respect of the payment to the ECB could go forward. He then dealt with the loss claim explaining the position as he saw it at para 34 in the way recorded at para 9 above.

15 The judge explained the decision in *National Employers' Mutual General Insurance Association Ltd v AGF Holdings (UK) Ltd* [1997] 2 BCLC 191 ("*NEMGIA*"). There, an insurer with a right to an indemnity for payments to policyholders claimed damages for conspiracy from the indemnifier, which had arranged to pay the policyholders direct in return for an assignment of their claims against the insurer. Lightman J held that the insurer had suffered no loss. Nugee J had no problem with that conclusion since the indemnifier had only arranged to save the insurer from a liability to its policyholders. It was only that liability that the insurer had a claim to be indemnified against, so not receiving the money was the second side of the same coin. G H

16 The judge thought that this case was different from *NEMGIA* because, on the alleged facts here, "SIB would be better off if the balloon had

© 2021 The Incorporated Council of Law Reporting for England and Wales

A gone up on 1 August 2008, as it is said it should have done". It would have had actual assets of £80m and "the fact that it would have had slightly lower liabilities" was not "a corresponding benefit to [SIB] in the heavily and inevitably insolvent position in which it found itself". As the judge saw it: "Had SIB had the £80m, it would have had that money available for the liquidators to pursue such claims as they thought they could usefully pursue B and for distribution to its creditors." That was a real loss.

17 On the dishonest assistance claim, the judge began by noting that SIB had not pleaded that any individual within HSBC had been dishonest, but had pleaded a "case of dishonesty against HSBC collectively". He then said that it was not disputed that: (i) dishonest assistance needs dishonesty (see *Royal Brunei* [1995] 2 AC 378, 392B–C, and *Ivey v Genting Casinos (UK) Ltd (trading as Crockfords Club)* [2018] AC 391, para 62 ("*Ivey v* C *Genting*"), (ii) the court had first to identify the actual subjective state of mind of the defendant and then test that against an objective test of honesty (*Ivey v Genting* at para 74), and (iii) it was not possible to aggregate two innocent minds to make a dishonest whole (see *Armstrong v Strain* [1952] 1 KB 232 ("*Armstrong*") and *Greenridge Luton One Ltd v Kempton Investments Ltd* [2016] EWHC 91 (Ch) per Newey J at paras 77–79 D ("*Greenridge*")). He concluded at para 53 that no case could be made against HSBC that relied on aggregating knowledge held by different people if none of those individuals was alleged to be dishonest.

18 The judge then dealt with SIB's allegation in the particulars of claim at para 178 that corporate recklessness amounted to dishonesty, in that HSBC "neither knew nor cared, and thereby turned a blind eye as to whether E SIB was being run dishonestly". At paras 61–62, the judge said that one could not say that companies which act recklessly in the sense of not knowing and not caring are therefore dishonest. If HSBC had not asked questions because, however foolishly, they did not suspect wrongdoing, they were not dishonest. It did not assist to say they ignored their own policies or developed an ingrained culture of failure to ask questions, because "Simply being very bad at what you should be doing is not dishonesty".

F 19 In the absence of any pleading that any individual at HSBC knew that SIB was a Ponzi fraud, the only case was that HSBC turned a blind eye to that fact, but blind-eye knowledge required targeted suspicion (see Lord Scott in *Manifest Shipping* [2003] 1 AC 469 at para 116)[1*]. It was nowhere pleaded that "HSBC did not investigate SIB's affairs more closely because it had a targeted suspicion that its affairs were fraudulent and did not look G because it did not want to know". The judge did not think that the copious allegations made against HSBC amounted, singularly or cumulatively, to allegations that could properly be characterised as allegations of dishonesty.

20 Finally, the judge accepted what was said in *Sofer* [2020] WTLR 1075 that a pleading might not be amenable to strike out if it alleged dishonesty against a corporate entity without identifying individuals, as long H as it set out the basis for alleging dishonesty against that corporate entity, but he do not think the pleading in this case did set out a viable basis for alleging dishonesty against HSBC.

* *Reporter's note.* The superior figure in the text refers to a note which can be found at the end of the judgment of Sir Geoffrey Vos MR, on p 3520.

© 2021 The Incorporated Council of Law Reporting for England and Wales

*The pleadings as to dishonest assistance* A

**21** I have already described the essential allegations made by SIB against HSBC in the pleadings. SIB's particulars of claim runs to some 85 pages and 185 paragraphs and its reply to a further 72 pages.

**22** The judge struck out paras 5, 6(11) to 6(13) and 172 to 185 of the particulars of claim and paras 2 to 4 of the prayer.

**23** The summary of SIB's claim at para 5 pleads that: B

> "HSBC recklessly allowed systems to develop and a culture to become engrained in its employees which failed to pay any proper heed to the requirements of due diligence in the operation of correspondent banking relationships including in particular with SIB. This allowed warning signs and red flags to be missed and/or ignored and permitted SIB to be operated as a dishonest Ponzi scheme under the umbrella of its correspondent banking relationship with HSBC, whilst HSBC was content to make substantial profits from the use of SIB's funds left on deposit in non-interest bearing accounts in a manner which was wholly incompatible with SIB's asserted investment criteria. It is SIB's case, as explained in Section I, that such conduct amounts to corporate recklessness sufficient to give rise to liability for dishonest assistance." C

D

**24** SIB alleges at para 6(11) that "HSBC dishonestly and/or recklessly assisted . . . [Mr Stanford] in the perpetration of the fraud . . . by providing and continuing to operate the accounts, which were a key mechanism in acting as a conduit for investor funds in furtherance of the fraud on SIB". At para 6(13), SIB notes that it was not "at this point and on the knowledge currently available to SIB, asserted that any one individual employed by HSBC had sufficient actual knowledge to be liable personally, or for HSBC to be liable vicariously, for dishonest assistance in [Mr Stanford's] breaches of trust and/or fiduciary duty". E

**25** The bulk of the body of the particulars of claim concerns the *Quincecare* claim, and all that material is relied upon to support the later plea of dishonesty against HSBC. Paras 172–185 then pleads the detail of the dishonest assistance claim with paras 175–181 particularising HSBC's dishonesty in the form of corporate recklessness. F

**26** I have not set the allegations out in this judgment because their details are not material to what we have to decide. My failure to do so, however, should not be taken as diminishing their scale or detail. It is alleged in short that HSBC was guilty of a wholesale failure of good governance in relation to its dealings with SIB.

**27** SIB pleaded in paras 26 and 89 of its reply as follows (in response to what was pleaded at para 27(2), and what amounted to submissions in para 107, of HSBC's defence): G

(i) "It is alleged that HSBC was reckless in the institution and application of its own policies and procedures to SIB."

(ii) "It is both appropriate and consistent with public policy considerations of fraud prevention to aggregate the knowledge held by individuals if and to the extent that such knowledge taken together is sufficient to amount to dishonesty or recklessness (as is the case in these proceedings). Any other approach would have the necessary consequence of encouraging the deliberate, reckless or careless diffusion and compartmentalisation within financial organisations of knowledge and information which ought— H

© 2021 The Incorporated Council of Law Reporting for England and Wales

A consistently with AML (anti money laundering) and POCA (Proceeds of Crime Act) requirements and—instead to be centralised and held in a form that can be easily and reliably interrogated and kept up to date."

(iii) "SIB does not allege that HSBC operated its procedures, systems and policies not caring whether or not fraud was identified or detected. SIB's allegation is that HSBC's *failure* to institute and/or apply proper policies, B systems and procedures was one element of HSBC's recklessness."

28 HSBC asked questions about SIB's reply in solicitors' correspondence. SIB clarified in that correspondence that it did *not* allege that (i) HSBC was generally dishonest/reckless as an institution in the way it operated AML, (ii) the nature of HSBC's policies and procedures was such that even their perfect implementation would have been reckless, and (iii) HSBC was reckless in the manner in which it applied (or failed to C apply) its own policies and procedures in relation to other customers but not SIB. SIB's solicitors confirmed that SIB's case was based on how HSBC applied its own policies and procedures in its banking relationship with SIB specifically.

*Issue 1: Was the judge right to allow the loss claim to continue?*

D 29 It is important to understand the stark claim that SIB makes in the context of HSBC's argument that the loss claim should be struck out. SIB's sole claim is to the £118.5m that it says would not have been paid out of the accounts after 1 August 2008, had HSBC performed its *Quincecare* duty to SIB. It is, of course, plausible to imagine consequential losses that SIB might have sustained as a result of the failure to freeze the accounts by 1 August E 2008. But no such losses form the subject of this issue.

30 Moreover, and perhaps more importantly, SIB does not claim that its net worth was less overall as at 17 February 2009 (when it did freeze SIB's accounts) than it was as at 1 August 2008 (when SIB says that HSBC ought to have frozen its accounts). It might seem that a company operating a Ponzi scheme would be likely to have greater debts as time progressed, but SIB disavows such an approach in these proceedings. The question then is F simply whether SIB suffered a loss as a result of paying a maximum of some £116.1m (£118.5m less the £2.4m paid to the ECB) between 1 August 2008 and 17 February 2009 to holders of CDs, of which some £36m went via SIB's own account at TDB. It might be thought to be obvious that SIB cannot have sustained a loss by paying itself £36m. HSBC says it is equally obvious that SIB cannot sustain a loss by paying its creditors, and thereby G reducing its indebtedness pound for pound (see *NEGMIA* [1997] 2 BCLC 191 above).

31 SIB argues, however, and the judge held that SIB's state of insolvency makes all the difference because, in effect, cash is crucial to SIB and it would have had (at least) £80m more cash as at 17 February 2009 if HSBC had putatively performed its duty. It would then have been able to pay other H creditors more once its insolvency process began.

32 In my judgment, the problem with this argument is that HSBC did not owe any duty to SIB's creditors. SIB's directors owed a duty to its creditors as soon as it became insolvent (which it had long before 1 August 2008). The classic statement of this proposition emerges from Dillon LJ's judgment in *Liquidator of West Mercia Safetywear Ltd v Dodd* [1988]

© 2021 The Incorporated Council of Law Reporting for England and Wales

BCLC 250, where he cited with approval the following dictum of Street CJ in *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 NSWLR 722, 730: A

> "where a company is insolvent the interests of the creditors intrude. They become prospectively entitled, through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets. It is in a practical sense their assets and not the shareholders' assets that, through the medium of the company, are under the management of the directors pending either liquidation, return to solvency, or the imposition of some alternative administration." B

33 Even though SIB's directors owed a duty to SIB's creditors during the period in question, HSBC did not. Its duty was to SIB alone as was explained in *Singularis Holdings Ltd v Daiwa Capital Markets Europe Ltd* [2018] 1 WLR 2777 ("*Singularis*"): see para 81 in *Singularis* where it was recorded that it had been agreed that the *Quincecare* duty was owed to Singularis (the customer), and not directly to its creditors, even though it was on the verge of insolvency, and see para 86, where I said that "the scope of the *Quincecare* duty [was] narrow and well-defined. It [was] to protect a banker's customer from losing funds held in a bank account with that banker, whilst the circumstances put the banker on inquiry". C D

34 The point here is that SIB itself did not lose anything as a result of the payment of £116.1m to discharge creditors and to another account in its own name. Its net asset position at the end of the period was the same as at the beginning.

35 The error in the judge's reasoning was to confuse the company's position before and after the inception of an insolvency process. Before an insolvency process commences, the company's financial position must take into account all its assets, debtors and creditors. Once winding up commences, the statutory process of collective execution imposed by the insolvency legislation comes into force, and the liquidator has the duty to collect in the assets and distribute those assets in accordance with the statutory regime. The fact that a different dividend will be paid to creditors if an insolvency process commences on one date rather than another is not relevant to an assessment of the company's financial position whilst it is trading, whether it is trading whilst solvent or whilst insolvent. Plainly, if a company is trading whilst insolvent, consequences may follow within the insolvency process for those responsible: see, for example, section 213 and 214 of the Insolvency Act 1986 in respect of fraudulent trading and wrongful trading. E F G

36 As Lord Hoffmann explained in *Buchler v Talbot* [2004] 2 AC 298 at para 28:

> "The winding up of a company is a form of collective execution by all its creditors against all its available assets. The resolution or order for winding up divests the company of the beneficial interest in its assets. They become a fund which the company thereafter holds in trust to discharge its liabilities: *Ayerst v C & K (Construction) Ltd* [1976] AC 167. It is a special kind of trust because neither the creditors nor anyone else have a proprietary beneficial interest in the fund. The creditors have only a right to have the assets administered by the liquidator in accordance with the H

© 2021 The Incorporated Council of Law Reporting for England and Wales

A provisions of the Insolvency Act 1986: see *In re Calgary and Edmonton Land Co Ltd* [1975] 1 WLR 355, 359."

37 Thus, for these purposes, the true distinction is between a company that is trading and a company in respect of which a winding up process has commenced, not between a solvent trading company and an insolvent trading company. In the judge's language, if the company is trading, even B insolvently, then the £100 paid to a creditor reduces its assets, but is offset by a corresponding benefit to the company in reducing its liabilities. The fact that a company has slightly lower liabilities is a corresponding benefit to its net asset position even if the company is in a heavily insolvent position. Having more cash available upon the eventual inception of its insolvency "for the liquidators to pursue such claims as they thought they could usefully C pursue and for distribution to its creditors" is a benefit to creditors but not to the company whilst it is trading.

38 As it seems to me, the result is not unjust to the creditors of SIB in this case, because it is brought about by the specific way that the claim was framed. SIB has disavowed claiming either (a) consequential loss, or (b) making the more general claim that, had HSBC complied with its *Quincecare* duty, SIB's winding up would have occurred sooner and/or SIB's D overall net asset position would have been better at that earlier time or on the eventual winding up.

39 Accordingly, in my judgment, HSBC's appeal must be allowed, and the loss claim in respect of the approximately £116.1m worth of payments made by HSBC from SIB's accounts must be struck out. It cannot succeed as SIB did not sustain the specific loss that it claims.

E

*Issue 2: Was the judge right to strike out the dishonest assistance claim?*

40 It is common ground that the dishonest assistance claim is not affected by the arguments raised by SIB in respect of the loss claimed for breach of the *Quincecare* duty. In other words, the account and equitable compensation claimed for dishonest assistance could, in theory, amount to a substantial claim in excess of the amount of the ECB payment. Accordingly, F if the judge were wrong on this issue, the claim could be pursued for significant sums beyond the £2.4m.

41 It is interesting to note that the basic law of dishonesty does not seem to be in dispute. It has recently been restated in this context in *Group Seven* [2020] Ch 129. As was explained there at paras 58–61, in the light of *Ivey v Genting* [2018] AC 391, it was settled law that the touchstone of accessory G liability for breach of trust or fiduciary duty is indeed dishonesty, as Lord Nicholls so clearly explained in *Royal Brunei* [1995] 2 AC 378. The defendant's actual state of knowledge and belief as to relevant facts forms a crucial part of the first stage of the test of dishonesty. Once the relevant facts have been ascertained, including the defendant's state of knowledge or belief as to the facts, the standard of appraisal which must then be applied to those facts is a purely objective one: namely whether the defendant's conduct was H honest or dishonest according to the standards of ordinary decent people. Moreover, the imputation of blind-eye knowledge requires two conditions to be satisfied: (i) the existence of a suspicion that certain facts may exist, and (ii) a conscious decision to refrain from taking any step to confirm their existence (see Lord Scott at para 112 in *Manifest Shipping* [2003] 1 AC 469).

© 2021 The Incorporated Council of Law Reporting for England and Wales

The suspicion in question must be firmly grounded and targeted on specific facts, and the deliberate decision not to ask questions must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. Blind-eye knowledge cannot be constituted by a decision not to inquire into an untargeted or speculative suspicion (*Manifest Shipping* at para 116). Suspicions falling short of blind-eye knowledge are relevant in that suspicions of all types and degrees of probability may form part of a person's state of mind, and therefore part of the overall picture to which the objective standard of dishonesty is to be applied. We were told that the United Kingdom Supreme Court refused the LLP defendant permission to appeal in *Group Seven* on the grounds that the applications did not raise an arguable point of law in the light of the recent case law in the Supreme Court. A B

42 As it seems to me, the judge correctly stated the applicable principles. What he said is summarised at para 17–20 above, including the principle to be extracted from *Armstrong* [1952] 1 KB 232 and *Greenridge* [2016] EWHC 91 (Ch) to the effect that it was not possible to aggregate two innocent minds to make a dishonest whole. SIB filed supplemental written submissions after the hearing referring to a raft of Commonwealth cases, but none of them, on analysis, supported the proposition that dishonesty can properly be alleged by adding the knowledge of one innocent person to that of another. C D

43 Instead, as I have already recorded, Mr Fenwick argued a rather more elusive case to the effect that:

> "in a case where dishonesty is pleaded against a [large] corporate entity, [one has to look] at all the facts, all the actual and constructive knowledge of those who were involved in representing the company at all stages of the events against which criticism is made. It [is] at that stage that you then take an objective view and [ask]: looked at objectively, is a person or entity with that knowledge to be regarded as dishonest?" E

He submitted in a range of different formulations that the scale of HSBC's alleged neglect of good practice and failure to ask questions amounted to some kind of exception to the general rules I have stated, applicable specifically to large corporations. F

44 In my judgment, SIB's submissions on this issue are affected by three fundamental flaws.

45 First, SIB has disavowed alleging institutional dishonesty in the sense that board members and compliance officers generally did not care whether the bank supported fraudulent customers. SIB's case was based on how HSBC applied its policies and procedures specifically to SIB. Yet, it has been unable thus far (despite having statements from those most closely involved with SIB and significant disclosure) to allege that any specific employee was either dishonest or suspected the Ponzi fraud and made a conscious decision to refrain from asking questions. G

46 Secondly, the reality of SIB's pleading, looked at as a whole, is that it is alleging gross neglect on a grand scale. This is a case that falls squarely within Lord Scott's strictures in *Manifest Shipping*. If a plea of dishonesty were to be permitted in these circumstances, it would be to allow blind-eye knowledge to be constituted by a decision not to inquire into an untargeted or speculative suspicion rather than a targeted and specific one. It would be H

© 2021 The Incorporated Council of Law Reporting for England and Wales

A to allow gross negligence to be the basis for a finding of dishonesty, which can never be the case.

**47** Thirdly, SIB cannot hide behind the fact that HSBC is a large corporation. That makes no difference. As the cases show, if dishonesty and blind-eye knowledge is to be alleged against corporations, large or small, it has to be evidenced by the dishonesty of one or more natural persons. The B rules that have been laid down as to what amounts to dishonesty for the purposes of dishonest assistance cannot be circumvented. Of course, the court must look at all the facts and all the actual and constructive knowledge of those involved in representing HSBC, but one cannot avoid the subjective dishonesty stage of the test in order to proceed directly to the objectively dishonest stage as Mr Fenwick seeks to do. The subjective dishonesty that needs to be established, after consideration of all the facts, must either be the C dishonesty of a person within the corporation or the blind-eye knowledge of such a person. The latter requires, as I have said and the judge held, that person to have a targeted suspicion (here that there was a Ponzi fraud) and then to decide not to ask questions that might lead to its discovery. The use of the epithet "recklessly dishonest" does not help, because the substantive allegation is simply that HSBC's management allowed HSBC to be run in D such a way that "nobody ever got to the point of realising that SIB was a massive Ponzi scheme". That is negligence not dishonesty.

**48** Mr Fenwick also seeks to rely on *Sofer* [2020] WTLR 1075, but that was a very different case. There, a professional trustee company had allowed some 74% of a large trust fund to be paid out purportedly as loans to one beneficiary at his behest without raising any questions. It was quite clear that it was being alleged that the company had behaved fraudulently. The E factual circumstances from which that was to be inferred were clearly stated. Before disclosure, however, the claimant was unable to say which officer or employee of the defendant company had the relevant knowledge. Unlike SIB's position in this case, it was overwhelmingly likely that the person with whom the recipient of the money had been dealing at the trust company would have been revealed on disclosure. At that point, the claimant would F be able to identify the individual or individuals with the relevant knowledge. The situation is very different here, as Mr Fenwick effectively accepted when submitting that he should be allowed to proceed, even if he could never identify any employee or agent of HSBC who was either dishonest or who had blind-eye knowledge of the fraud. That is not a tenable approach for the reasons I have given.

G **49** The principles of law that I have enunciated are not, in reality, developing. They are well settled. The judge was right to strike out the dishonest assistance claim.

*Conclusions*

**50** The judge was wrong to refuse to strike out the loss claim in respect of the £116.1m paid away between 1 August 2018 and 17 February 2019. H He should have struck the loss claim out, because the removal of £116.1m paid to genuine creditors of SIB and to SIB's own bank account at TDB did not reduce its net asset position. The judge was right to strike out SIB's claim for dishonest assistance for the reasons he gave, because SIB cannot allege that anyone at HSBC had the necessary dishonesty or blind-eye

© 2021 The Incorporated Council of Law Reporting for England and Wales

knowledge of Mr Stanford's fraud or of the Ponzi scheme for which SIB was being used. A

51 Accordingly, I would allow HSBC's appeal on the loss claim and dismiss SIB's appeal on the dishonest assistance claim.

*Note*

1. The judge actually suggested in error that Lord Scott had said this in *Twinsectra Ltd v Yardley* [2002] 2 AC 164. B

**MOYLAN LJ**

52 I agree.

**ARNOLD LJ**

53 I also agree. C

*Defendant's appeal allowed.*
*Claimant's appeal dismissed.*

ROBERT RAJARATNAM, Barrister

D

---

Supreme Court

## *Deutsche Bank AG London Branch *v* Receivers Appointed by the Court E

## Central Bank of Venezuela *v* Governor and Company of the Bank of England and others

2021 April 22 Lord Reed PSC, Lord Hodge DPSC, Lord Lloyd-Jones JSC F

**APPLICATION** by the Board of the Central Bank of Venezuela for permission to cross-appeal from the decision of the Court of Appeal [2020] EWCA Civ 1249; [2021] QB 455; [2021] 2 WLR 1

Permission to cross-appeal was given.

G

---

H

© 2021 The Incorporated Council of Law Reporting for England and Wales