UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br>IIG Global Trade Finance Fund Ltd. (in Official Liquidation), et al.,<br><br>Debtors | Case No. 20-10132 (MEW)<br><br>Chapter 15<br><br>Jointly Administered |
| IIG Global Trade Finance Fund Limited (in Official Liquidation), *et al.*,<br><br>Plaintiffs<br><br>*v.*<br><br>International Investment Group L.L.C., *et al.*,<br><br>Defendants | Adv. Pro. No. 23-01165 (MEW)<br><br>DECLARATION OF KUSHAL TUSHAR GANDHI OF CMS CAMERON MCKENNA NABARRO OLSWANG LLP |

DECLARATION OF KUSHAL TUSHAR GANDHI OF CMS CAMERON
MCKENNA NABARRO OLSWANG LLP

I, KUSHAL TUSHAR GANDHI, of CMS Cameron McKenna Nabarro Olswang LLP ("**CMS**"), of Cannon Place, 78 Cannon Street, London, EC4N 6AF, affirm as follows:

UK-710383337.13

1

## INTRODUCTION

1. This declaration is prepared for Deutsche Bank Trust Company Americas ("**DBTCA**") and submitted contemporaneously with DBTCA's Letter Regarding Supplemental Submissions, dated 3 July 2025 and filed in the above-captioned adversary proceeding.

2. The cases and materials referred to in this declaration that I understand are not otherwise before the Court are attached as **Exhibit 1**. In the quotes used in this declaration, any text that is in bold and underlined is emphasis that I have added to the original text to highlight key points of relevance.

## THE DECLARANT

3. CMS is an international law firm, headquartered in London, England. CMS has been retained by DBTCA in respect of certain matters of English law that may be relevant in the above proceedings.

4. I am a Partner in CMS and work predominantly in resolving financial services disputes. I am authorised to practise law in England and Wales since August 2009 by the Solicitors Regulation Authority under SRA No.: 431032. During my career I have been involved in multiple cross-border matters. A copy of my curriculum vitae is attached at **Exhibit 2**.

## SCOPE OF THIS DECLARATION

5. I understand that the Court has been referred to the decisions of the Court of Appeal of England and Wales (the "**Court of Appeal**") in *Tradition Financial Services Ltd v Bilta (UK) Ltd and others* [2023] EWCA Civ 112 and the Supreme Court of the United Kingdom (the "**UK Supreme Court**") in the same matter in *Bilta (UK) Ltd (in liquidation) and others v Tradition Financial Services Ltd* [2025] UKSC 18 (the "**Bilta Supreme Court Judgment**") which addresses whether a third-party can be liable for fraudulent trading under section 213 of the English Insolvency Act 1986 (the "**IA 1986**").

UK-710383337.13

2

6. At paragraph 58 of the Bilta Supreme Court Judgment, their Lordships affirmed that:

   *"we are satisfied that the correct interpretation of section 213(2) of IA 1986 is that third parties/outsiders who **participate in, facilitate or assist** fraudulent transactions by a company when they know that the company's business is being carried on for any fraudulent purpose are within the ambit of that section".*

7. I have been informed that at a status conference in this matter on 9 June 2025 before Judge Wiles of the United States Bankruptcy Court, Southern District of New York (the "**Bankruptcy Court**"), Judge Wiles asked for clarification on what it means for a defendant to *"participate in, facilitate or assist"* in fraudulent activity, as a matter of English and Cayman law.

8. The phrase *"participate in, facilitate or assist"* does not have a fixed and readily identifiable meaning under English law. I have been asked to identify areas of English law where this concept, or similar concepts, exist, focusing on liability of banks and financial institutions for opening or maintaining bank accounts of customers engaged in fraud. To this end, and although I would not ordinarily rely on them to prove the elements of a fraudulent trading claim under section 213 of the IA 1986, I have set out below some aspects of English law concerning tort liability in other contexts that may inform the Bankruptcy Court, being:

   i. breach of the *Quincecare* duty;

   ii. the tort of conspiracy;

   iii. accessory liability; and

   iv. dishonest assistance.

9. I have not covered the Bilta Supreme Court Judgment and the cases referred to therein, as I understand that Judge Wiles has already considered these.

10. I have also not covered the concepts of *de facto* and shadow directorship under English law, as I understand these are not issues in the proceedings.

11. For the avoidance of doubt, this declaration should not be seen as an exhaustive exercise of every instance under English law that may be said to shed light on what it means for a person or company to "*participate in, facilitate or assist*" in fraudulent activity.

12. The matters set out in this declaration reflect the position on the authorities cited as at the date of this declaration.

## BREACH OF THE QUINCECARE DUTY

**The *Quincecare* duty**

13. When focussing on aspects of English law that relate to liability of banks and financial institutions for opening or maintaining bank accounts of customers engaged in fraud, a starting point would be to consider what is known as the *Quincecare* duty that a bank owes to its customer to refrain from acting on a payment instruction if, and for as long as, it is put on inquiry by having reasonable grounds for believing that the instruction is an attempt to misappropriate the funds of the customer.

14. The *Quincecare* duty was established in *Barclays Bank Plc v Quincecare Ltd and another* [1992] 4 All ER 363 (the "**Quincecare Judgment**"). The *Quincecare* duty is summarised at Chapter 37 at 37-273 of Chitty on Contracts,[1] as follows:

> "*Under the Quincecare duty, a bank must refrain from executing a payment instruction where the bank knows it to be dishonestly given, or shuts its eyes to the obvious fact of the dishonesty, or acts recklessly in failing to make such enquires as an honest and*

---

[1] 35th Ed., [2024]

UK-710383337.13

4

*reasonable person would make, or is "**put on inquiry**" by having reasonable grounds for believing that the instruction is an attempt to misappropriate funds".*

15. The leading English law authority on the *Quincecare* duty is the judgment of the UK Supreme Court in *Philipp v Barclays Bank UK Plc* [2023] UKSC 25 (the "**Philipp Judgment**"). Paragraph 97 of the Philipp Judgment sets out the circumstances of when the *Quincecare* duty arises as follows:

    *"In summary, the duty of a bank which has come to be referred to as the "Quincecare duty" is not, as that epithet might suggest, some special or idiosyncratic rule of law. Properly understood, it is simply an application of the general duty of care owed by a bank to interpret, ascertain and act in accordance with its customer's instructions. Where a bank is "**put on inquiry**" in the sense of **having reasonable grounds for believing that a payment instruction given by an agent purportedly on behalf of the customer is an attempt to defraud the customer**, this duty requires the bank to refrain from executing the instruction without first making inquiries to verify that the instruction has actually been authorised by the customer. If the bank executes the instruction without making such inquiries and the instruction proves to have been given without the customer's authority, the bank will be in breach of duty. It will also in making the payment be acting outside the scope of its own authority from the customer and will therefore not be entitled to debit the payment to the customer's account".*

16. At paragraph 52 of the Philipp Judgment it is also recognised that the *Quincecare* duty only applies between the bank and its customer:

    *"In JP SPC 4 v Royal Bank of Scotland International Ltd [2022] UKPC 18, [2023] AC 461, the Privy Council on an appeal from the Isle of Man held that no*

UK-710383337.13

5

*"Quincecare duty" could be owed to a person who was not a customer in a contractual relationship with the bank but was the beneficial owner of funds held in the customer's account".*

17. At paragraph 98 of *Singularis Holdings Limited (in official liquidation) (a company incorporated in the Cayman Islands) v Daiwa Capital Markets Europe Limited* [2018] EWCA Civ 84 the Court of Appeal held that:

    "*<u>it will be a rare situation for a bank to be put on inquiry; there is a high threshold</u>*".

18. There remains limited judicial commentary as to how far banks are expected to go once "*on inquiry*". In this context it has been recognised that banks are not obliged to become "*amateur detectives*".[2] The UK Supreme Court confirmed in the Philipp Judgment that courts would need to recognise the demands of modern-day banking practices such as the vast numbers of transactions processed by banks and the speed at which most banking business is expected to be conducted. Much will depend on the facts of each case, the features of the customer, the bank's knowledge of the agent giving instructions, the amount involved, the need for prompt transfer, the presence of unusual features and the scope and means for making reasonable inquiries.

**Attempts to extend liability of a bank to a third party**

19. Whilst the *Quincecare* duty is owed by a bank to its customer, there have been attempts (particularly in the context of frauds) to establish liability between a bank and a third party affected by a fraud. In this content I set out below the case of *Santander UK Plc v CCP Graduate School Ltd* [2025] EWHC 667 (KB) (the "**Santander Judgment**").

---

[2] Please see paragraph 42 of the Philipp Judgment which cross-refers to an earlier decision in *Lipkin Gorman (a firm) v Karpnale Ltd and another* [1987] 1 W.L.R. 987.

6

UK-710383337.13

20. Between 13 September 2016 and 12 October 2016, CCP Graduate School Ltd ("**CCP**") gave instructions to its bank (NatWest) to make fifteen payments (in aggregate amounting to £415,909.67) from an account held with NatWest to an account held with Santander UK Plc ("**Santander**").

21. The claim against Santander was based on an alleged breach of a so-called "retrieval duty" i.e. it was said that Santander (as the receiving bank in the chain to whom the funds were transferred) owed a duty to CCP to take steps to retrieve the funds once Santander was on notice of the fraud. Such a duty had been recognised (in principle) as between a customer and its own bank by the UK Supreme Court in the Philipp Judgment.

22. At paragraph 25 of the Santander Judgment, the court described the legal basis for the claim against Santander as follows:

> "*The present case essentially turns on a discrete question of law: in circumstances in which a customer of the paying bank has been fraudulently induced to make payments into an account held at the receiving bank (with which the customer otherwise has no relationship), when notice of the fraud is given to the receiving bank, is it under a tortious duty to take reasonable steps to retrieve or recover those payments for the customer of the paying bank?*"

23. In this case the English High Court decided that "<u>*it is hard to see how CCP's claim could ever have been anything more than fanciful*</u>".[3] It was clear from the facts of the case that Santander was not aware of the possible fraud at the time money was removed from the account, and as soon as it became aware, Santander took steps to put a stop on the account.

24. Therefore, whilst an attempt was made by a non-customer to seek to recover their loss from the paying bank, the English court was not prepared to impose a retrieval duty on the paying

---

[3] Please see paragraph 50 of the Santander Judgment.

UK-710383337.13

7

bank in the circumstances of this case. To my mind, the outcome in the above case is illustrative of the judicial approach that where liability under a cause of action in English law attaches based on knowledge or participation, the threshold for establishing liability is usually high and it generally requires some form of active role and/or knowledge.

**TORT OF CONSPIRACY**

25. The tort of conspiracy is summarised in Chapter 23 at 23-101 of Clerk & Lindsell on Torts,[4] where it sets out the following quote:

    *"A conspiracy consists ... in the agreement of two or more to do an unlawful act, or to do a lawful act by unlawful means"*.

26. In essence the tort of conspiracy requires two parties to act in concert, to carry out an unlawful act (unlawful means conspiracy) or a lawful act by unlawful means (lawful means conspiracy). The tort of conspiracy requires some positive action on part of the parties involved, something akin to collusion, whether in deed or thought. A party that is entirely passive, and does not realise that something unlawful is happening, cannot be liable under the tort of conspiracy.

**Unlawful means conspiracy**

27. The circumstances in which unlawful means conspiracy can occur are set out in paragraph 94 of *FM Capital Partners Ltd v Frédéric Marino and others* [2018] EWHC 1768 (Comm) (the "**FM Judgment**"):

    *"The elements of the cause of action are as follows:*

    *i)    A combination, arrangement or understanding between two or more people. It is not necessary for the conspirators all to join the conspiracy at the same time,*

---

[4] 24th Ed., [2024]

UK-710383337.13

8

*but the parties to it must be sufficiently aware of the surrounding circumstances and share the same object for it properly to be said that they were **acting in concert** at the time of the acts complained of: Kuwait Oil Tanker at [111].*

ii) *An intention to injure another individual or separate legal entity, albeit with no need for that to be the sole or predominant intention: Kuwait Oil Tanker at [108]. Moreover:*

   a. *The necessary intent can be inferred, and often will need to be inferred, from the primary facts – see Kuwait Oil Tanker at [120-121], citing Bourgoin SA v Minister of Agriculture [1986] 1 QB: "[i]f an act is done deliberately and with knowledge of the consequences, I do not think that the actor can say that he did not 'intend' the consequences or that the act was not 'aimed' at the person who, it is known, will suffer them".*

   b. *Where conspirators intentionally injure the claimant and use unlawful means to do so, it is no defence for them to show that their primary purpose was to further or protect their own interests: Lonrho Plc v Fayed [1992] 1 AC 448, 465-466; see also OBG v Allan [2008] 1 AC 1 at [164-165].*

   c. *Foresight that his unlawful conduct may or will probably damage the claimant cannot be equated with intention: OBG at [166].*

iii) *In some cases, there may be no specific intent but intention to injure results from the inevitability of loss: see Lord Nicholls at [167] in OBG v Allan, referring to cases where:*

   *"The defendant's gain and the claimant's loss are, to the defendant's knowledge, inseparably linked. The defendant cannot obtain the one without bringing about the other. If the defendant goes ahead in such a case in order to*

9

UK-710383337.13

> *obtain the gain he seeks, his state of mind will satisfy the mental ingredient of the unlawful interference tort."*
>
> iv) **_Concerted action (in the sense of active participation) consequent upon the combination or understanding_**: *McGrath at [7.57].*
>
> v) *Use of unlawful means as part of the concerted action. There is no requirement that the unlawful means themselves are independently actionable: Revenue and Customs Commissioners v Total Network [2008] 1 AC 1174 at [104].*
>
> vi) *Loss being caused to the target of the conspiracy".*

28. The requirement for concerted action as an element of the tort of conspiracy goes back to the decision of the UK House of Lords (now known as the UK Supreme Court) in *Lonrho Ltd and another v Shell Petroleum Co Ltd (No.2) and another* [1982] A.C. 173 at page 188 where it was stated as follows:

> *"My Lords, conspiracy as a criminal offence has a long history. It consists of "the agreement of two or more persons to effect any unlawful purpose, whether as their ultimate aim, or only as a means to it, and the crime is complete if there is such agreement, even though nothing is done in pursuance of it." I cite from Viscount Simon L.C.'s now classic speech in Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch [1942] A.C. 435, 439. Regarded as a civil tort, however, conspiracy is a highly anomalous cause of action. The gist of the cause of action is damage to the plaintiff; so long as it remains unexecuted the agreement, which alone constitutes the crime of conspiracy, causes no damage; it is only acts done in execution of the agreement that are capable of doing that. **So the tort, unlike the crime, consists not of agreement but of concerted action taken pursuant to agreement**".*

**Lawful means conspiracy**

29. The circumstances in which lawful means conspiracy can occur are set out in paragraph 108 of *Kuwait Oil Tanker Co SAK and another v Al-Bader and others* [2000] 2 All ER (Comm) 271 (the "**Kuwait Oil Tanker Judgment**"):

> "*A conspiracy to injure by lawful means is actionable where the claimant proves that he has suffered loss or damage as a result of action taken pursuant to a combination or agreement between the defendant and another person or persons to injure him, where the predominant purpose of the defendant is to injure the claimant*".

## **ACCESSORY LIABILITY**

30. In the tort of conspiracy, the parties act in concert. In summary, under English law three criteria must be satisfied for accessory liability to be established:

    i. the defendant assisted the protagonist in committing the wrongdoing;

    ii. there must be an element of "common design" between the parties; and

    iii. the act committed must be tortious.

31. The test for accessory liability is set out at paragraph 55 of *Sea Shepherd UK v Fish & Fish Limited* [2015] UKSC 10 (the "**Sea Shepherd Judgment**"):

> "*three conditions must be satisfied. First, **the defendant must have assisted the commission of an act by the primary tortfeasor**; secondly, the assistance must have been pursuant to a **common design on the part of the defendant and the primary tortfeasor** that the act be committed; and, thirdly, the act must constitute a tort as against the claimant*".

32. Paragraphs 57 to 60 of the Sea Shepherd Judgment expand on the three conditions, as follows:

    i. First Condition [57]:

UK-710383337.13

11

*"So far as the first condition is concerned, **the assistance provided by the defendant must be substantial, in the sense of not being de minimis or trivial**. However, the defendant should not escape liability simply because his assistance was (i) relatively minor in terms of its contribution to, or influence over, the tortious act when compared with the actions of the primary tortfeasor, or (ii) indirect so far as any consequential damage to the claimant is concerned. Nor does a claimant need to establish that the tort would not have been committed, or even that it would not have been committed in the precise way that it was, without the assistance of the defendant".*

 ii. Second condition [58] – [59]:

*"As to the second condition, **mere assistance by the defendant to the primary tortfeasor, or "facilitation" of the tortious act, will not do**, as explained by Lord Templeman in CBS Songs Ltd v Amstrad Consumer Electronics Plc [1988] AC 1013, 1057B-C, and 1058G-H, and by Hobhouse LJ in Credit Lyonnais Bank Nederland NV v Export Credit Guarantee Department [1998] 1 Lloyd's Rep 19, 46. There must be a common design between the defendant and the primary tortfeasor that the tortious act, that is the act constituting or giving rise to the tort, be carried out, as suggested in Vestergaard Frandsen A/S v Bestnet Europe Ltd [2013] 1 WLR 1556, para 34.*

*A common design will normally be expressly communicated between the defendant and the other person, but it can be inferred, a point which is clear from Lord Mustill's reference to "agreed on common action" and "tacit agreement" in Unilever at p 609".*

 iii. Third condition [60]:

UK-710383337.13

12

> "As to the third condition, it is unnecessary for a claimant to show that the defendant appreciated that the act which he assisted pursuant to a common design constituted, or gave rise to, a tort or that he intended that the claimant be harmed. But the defendant must have assisted in, and been party to a common design to commit, the act that constituted, or gave rise to, the tort. _**It is not enough for a claimant to show merely that the activity, which the defendant assisted and was the subject of the common design, was carried out tortiously if it could also perfectly well be carried out without committing any tort**_. However, the claimant need not go so far as to show that the defendant knew that a specific act harming a specific defendant was intended".

33. In paragraph 136 of _Lifestyle Equities and another v Ahmed and another_ [2024] UKSC 17, it is stated as follows:

    > "There is a further, distinct principle of accessory liability by which a person who assists another to commit a tort is made jointly liable for the tort committed by that person _**if the assistance is more than trivial and is given pursuant to a common design between the parties**_".

34. In summary, the English courts have held that for liability to attach under this cause of action a claimant must show that a defendant acted in some substantial manner (i.e. not trivial or _de minimis_), in concert with another party.

## DISHONEST ASSISTANCE

35. Dishonest assistance is a sub-type of accessory liability, again concerning the level of involvement a party has had in a wrongdoing. To be liable for dishonest assistance, a party must have acted dishonestly in procuring a tortious act. It is described by the Privy Council

UK-710383337.13

13

in *Royal Brunei Airlines SDN. BHD. v Philip Tan Kok Ming* [1995] 2 A.C. 378 at 392, as follows:

*"...dishonesty is a necessary ingredient of accessory liability. It is also a sufficient ingredient. A liability in equity to make good resulting loss attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation. It is not necessary that, in addition, the trustee or fiduciary was acting dishonestly, although this will usually be so where the third party who is assisting him is acting dishonestly".*

36. Dishonest assistance is also described at paragraph 147 of the UK Supreme Court's judgment in *Byers and others v Saudi National Bank* [2023] UKSC 51 (the "**Byers Judgment**") as follows:

*"Dishonest assistance – more fully, dishonestly procuring or assisting a breach of trust (or other fiduciary duty) which, it is now accepted, need not be dishonest or fraudulent breach of trust (or fiduciary duty) – is an accessory equitable wrong. It corresponds to accessory liability in the law of tort".*

37. In order for a claimant to establish a cause of action in dishonest assistance, it must show:

    i. a breach of fiduciary duty;

    ii. assisted by the defendant;

    iii. dishonestly.[5]

38. In relation to the assistance ingredient it is stated at paragraph 351 in *Madoff Securities International Limited v Steven Raven and others* [2013] EWHC 3147 (Comm) (the "**Madoff Judgment**"):

---

[5] Please see paragraph 339 of *Madoff Securities International Limited v Steven Raven and others* [2013] EWHC 3147 (Comm).

14

UK-710383337.13

*"what is required, or at least is sufficient, for the ingredient of assistance, is simply <u>**conduct which in fact assists**</u> the fiduciary to commit the act which constitutes the breach of trust or fiduciary duty. A dishonest participant in a transaction takes the risk that it turns out to be a breach of trust or fiduciary duty. It is not necessary for the assistant to know, or even suspect, that the transaction is a breach of trust, or the facts which make it a breach of trust, or even what a trust means; <u>**it is sufficient if he knows or suspects that the transaction is such as to render his participation dishonest**</u>"*.

Executed on 3 July 2025

*[signature]*

Kushal Tushar Gandhi
Of CMS Cameron McKenna Nabarro Olswang LLP
Cannon Place
78 Cannon Street
London
EC4N 6AF
England

15

UK-710383337.13