UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | |
| IIG Global Trade Finance Fund Ltd. (in Official Liquidation), *et al.*, | Case No. 20-10132 (MEW) |
| | Chapter 15 |
| Debtors. | Jointly Administered |
| IIG Global Trade Finance Fund Limited (in Official Liquidation), *et al.*, | Adv. Pro. No. 23-01165 (MEW) |
| Plaintiffs, | |
| v. | |
| International Investment Group L.L.C., *et al.*, | |
| Defendants. | |

## SUPPLEMENTAL DECLARATION OF THOMAS LOWE KC

1.    I am the same Thomas Lowe KC who previously swore declarations in these proceedings on 22 March 2024 ("**March 2024 Declaration**") (ECF No. 67), 23 January 2025 ("**January 2025 Declaration**") (ECF No. 84) and 10 March 2025 ("**March 2025 Declaration**") (ECF No. 94).

2.    I have been asked to prepare this declaration to supplement my previous declarations to address certain questions raised by the Honourable Judge Michael E. Wiles at a status conference on 9 June 2025 in the light of the recent decision in *Bilta (UK) Ltd (in liquidation) v Tradition Financial Services Ltd* [2025] UKSC 18 ("***Bilta Supreme Court***"). This declaration provides further detail to the Court on the following matters of Cayman and English law:

    (a)    In Section I, I summarise the UK Supreme Court's decision in *Bilta Supreme Court*.

(b)  In Section II, I address the level of participation required for liability in the various fraudulent trading cases discussed in *Bilta Supreme Court*.

(c)  In Section III, I discuss how English and Cayman courts would interpret the phrase "*facilitating, assisting or participating*," as used in *Bilta Supreme Court*.

(d)  In Section IV, I consider (a) accessory liability in tort through common design; and (b) liability in equity for dishonest assistance of a breach of fiduciary duty.

## I.    THE UK SUPREME COURT DECISION IN *BILTA*

3.  On 7 May 2025, the UK Supreme Court handed down its judgment in *Bilta Supreme Court*. This was an appeal from the English Court of Appeal decision in *Bilta (UK) Ltd (in liquidation) v Tradition Financial Services Ltd* [2023] Ch 343 ("*Bilta CoA*").

4.  As noted in the March 2025 Declaration, Plaintiffs' Cayman Island law expert, Tom Smith KC, and I both agreed that, at the time of that declaration, *Bilta CoA* was the leading case on the participation element of fraudulent trading claims.[1] Accordingly, the decision in *Bilta Supreme Court* is now the leading case and is likely to be given substantial weight by the courts of the Cayman Islands.

5.  As noted in the March 2025 Declaration, the question before the Supreme Court in *Bilta Supreme Court* was what I described as the "**Insider/Outsider Question**".[2] The Supreme Court largely followed the reasoning of the English Court of Appeal in *Bilta CoA* in concluding that, in relation to the Insider/Outsider Question, the ambit of section 213 was broad enough to apply to those who are outsiders to the company and is not limited to those exercising

---

[1] March 2025 Declaration at [10].

[2] March 2025 Declaration at [7].

management or control.[3] The Court thus clarified that liability under Section 213 attaches to parties that "*participate in, facilitate or assist*" the fraudulent transaction at issue.

6.     In the course of so deciding, the Supreme Court also considered the application of the "party to" requirement to outsiders, even though this broader question of what types of conduct render an outsider a "party to" fraudulent trading was not the subject of any appeal. The Supreme Court expressed clear reservations about Templeman J's reasoning in the case of *Re Gerald Cooper Chemicals Ltd (in liquidation)* [1978] Ch 262 ("**Gerald Cooper**") and expressed a clear preference for the approach applied in *In re Maidstone Buildings Provisions Ltd* [1971] 1 WLR 1085 ("**Maidstone**") and *R v Miles* [1992] Crim LR 657 ("**Miles**") over the approach applied in *Gerald Cooper*.[4]

7.     I relied on the cases of *Maidstone, Miles* and *Bilta CoA* in my January 2025 Declaration in support of the proposition that participation requires active participation in the fraudulent business and that such participation necessarily must amount to more than mere inertia or concurrence.[5] The Supreme Court cited all of these with approval.

   (a)     It addressed *Maidstone* and *Miles* in the context of how to interpret section 213 as follows:

             "*First, the person to incur liability must be a party to the carrying on by the company of a fraudulent business and not merely involved in a one-off fraudulent transaction, unless the fraud is sufficient evidence on its own of the carrying on of a fraudulent business: In re Murray-Watson Ltd (unreported) 6 April 1977, Oliver J; Morphitis v Bernasconi [2003] EWCA Civ 289; [2003] Ch 552, Chadwick LJ para 46. Secondly, being party to the <u>carrying on by the company of a fraudulent business does not extend to a mere failure to advise</u>: see In re Maidstone*

---

[3] *Bilta Supreme Court* at [19].

[4] *Bilta Supreme Court* at [57].

[5] January 2025 Declaration at [28].

> *Buildings Provisions Ltd [1971] 1 WLR 1085, in which Pennycuick V-C held that the failure of a company secretary to give advice to the company's directors did not bring him within the ambit of section 332 of the Companies Act 1948, a predecessor of section 213 the IA 1986: p 1092. Thirdly, the person liable must have had an active involvement in the carrying on of the fraudulent business by the company: In re Maidstone (above); R v Miles [1992] Crim LR 657."*[6] (emphasis added)

(b)    The Supreme Court also expressly agreed with the approach in *Bilta CoA*—which in paragraph [93] gives the example of a manufacturer preparing counterfeit clothes to a retailing company knowing that the retailer was passing on the merchandise as genuine—and said that participation occurs when the manufacturer "*further[s] and facilitat[es]*" the fraud. Thus, the Supreme Court endorsed the notion that participation requires conduct that affirmatively and actively "*furthers and facilitates*" the fraudulent business.[7]

8.    The Supreme Court then observed that *Maidstone* and *Miles* were "*consistent with the conclusions which we have reached.*"[8] The Supreme Court did so on the basis of the discussion of active participation since those cases did not specifically address the Insider/Outsider Question. The Supreme Court's views on the types of conduct that render an outsider a party to fraudulent trading as suggested by *Maidstone* and *Miles*, in my view, formed part of the *ratio decidendi* and was not merely *obiter dicta*.

9.    *Gerald Cooper* was relied on by Plaintiffs in the Declaration of Tom Smith KC dated 20 February 2025 (the "**Smith Declaration**"). In *Gerald Cooper* Templeman J found that a passive receipt of funds could render the creditor

---

[6] *Bilta Supreme Court* at [25].

[7] This further rebuts the incorrect assertion in the Smith Declaration that *"[t]here is no support in the authorities for the suggestion at Paragraph 28(c) of the Lowe Declaration that the participation 'must rise to the level of furthering or facilitating the fraudulent business'"*: Smith Declaration at [72].

[8] *Bilta Supreme Court* at [44].

liable: "*a creditor is party to the carrying on of a business with intent to defraud creditors if he accepts money which he knows full well has in fact been procured by carrying on the business with intent to defraud creditors for the very purpose of making the payment*". This was relied on by the Smith Declaration for the proposition that "*the threshold for 'participation' is a low one.*"[9] As I explained in my March 2025 Declaration, that proposition is incorrect, a position with which *Bilta Supreme Court* appears to have agreed.[10] In contrast to the positive views expressed on *Maidstone* and *Miles*, in relation to *Gerald Cooper*, the Supreme Court's observation was "*[t]here may be an argument that this formulation is too broad as mere awareness of the source of the funds may not amount to facilitating, assisting or participating in the fraudulent activity; but it is not necessary to decide that matter on this appeal.*"[11]

10.     If the highest court goes out of its way to express a doubt about a decision, I would not expect that decision to be followed by any Court in the UK because Supreme Court dicta is sufficient to convince a first instance judge that the earlier decision is wrong.[12] In addition, obiter dicta of the Supreme Court justifies the Court of Appeal from departing from earlier precedent.[13] In the Cayman Islands, *Gerald Cooper* was only ever persuasive and no Court was obliged to follow it. However, it is now highly unlikely that any Cayman Court would follow it. In contrast, the approaches taken in *Maidstone* and *Miles* would be treated as having been endorsed by *Bilta Supreme Court*.

---

[9] Smith Declaration at [52].

[10] March 2025 Declaration at [11].

[11] *Bilta Supreme Court* at [44].

[12] In *Colchester Estates (Cardiff) v Carlton Industries plc* [1986] 1 Ch 80 at 85 Nourse J held that where a Court feels compelled to depart from an earlier decision after full consideration of that decision, that is a strong reason for departing from that earlier decision.

[13] In *R v Barton* [2020] EWCA Crim 575, the Court of Appeal found that the Supreme Court had expressed a preference that an earlier decision of the Court of Appeal was wrong (despite these views being *obiter dicta*). The Court of Appeal therefore refused to follow its own earlier decision and followed the dicta of the Supreme Court. The Court of Appeal said at [104]: "*We conclude that where the Supreme Court itself directs that an otherwise binding decision of the Court of Appeal should no longer be followed and proposes an alternative test that it says must be adopted, the Court of Appeal is bound to follow what amounts to a direction from the Supreme Court even though it is strictly obiter. To that limited extent the ordinary rules of precedent (or stare decisis) have been modified.*"

11.     Additionally, *Bilta Supreme Court* rejected the argument that the potential for criminal liability under the predecessor statute to section 213 impacted the scope of section 213 itself.[14] This contradicts the claim in the Smith Declaration that *Maidstone* should be given less weight because it involved the predecessor statute, which contained criminal penalties, and not section 213 itself. *Bilta Supreme Court* found that the presence of these criminal penalties was immaterial.[15]

12.     In my view, *Bilta Supreme Court* has confirmed the analysis outlined in my previous declarations, that the participation element of a fraudulent trading claim requires active participation in the fraudulent business constituting more than mere inertia or concurrence. The Supreme Court's suggestion that *Gerald Cooper* is too broad, its rejection of *Gerald Cooper* in construing section 213 and its reliance on *Maidstone* and *Miles* reinforce that the broader approach proposed in the Smith Declaration at paragraphs 49 to 72 on the question of the level of participation required for a person to be a "party to" fraudulent trading is incorrect. *Bilta Supreme Court* further rebuts Mr Smith's contention that the standard for liability is a "low one"[16] and confirms that passive receipt of funds is not enough to impose liability under a fraudulent trading claim.

13.     The Supreme Court's decision also supports my conclusion that *Gerald Cooper* is an "*outlier*" case,[17] as the Supreme Court clearly preferred the approach in *Maidstone* and *Miles* while going out of its way to assert that the approach taken in *Gerald Cooper* is "too broad." Therefore, I believe that a Cayman or lower English court, neither of which would be bound to follow *Gerald Cooper*, would likely utilize the approach adopted in *Maidstone* and *Miles*,[18] particularly in light of the Supreme Court's comments in *Bilta Supreme Court*.

---

[14] *Bilta Supreme Court* at [37]-[43].

[15] Smith Declaration at [68].

[16] Smith Declaration at [52].

[17] March 2025 Declaration at [11].

[18] A Cayman Court would also follow decisions of higher authority such as *Miles* which is an English Court of Appeal decision: March 2025 Declaration at [11].

## II.    LEVEL OF PARTICIPATION REQUIRED FOR LIABILITY

14.    This section considers the level of participation alleged in each of the key cases cited in *Bilta Supreme Court* and the findings of the relevant court. With the exception of *Gerald Cooper*, which, as explained above, is an outlier and was disapproved of by the Supreme Court in *Bilta Supreme Court*, these 10 cases demonstrate that a party can only be held liable if it affirmatively participates in misconduct, and not if it merely concurred in such.[19] The cases are presented in chronological order to show the progression in the law:

(a)    The first key case is the 1971 decision of *Maidstone*.[20] This case involved Mr Penney who was a company secretary and financial advisor to a company which went into liquidation (and was therefore not an outsider). The liquidators alleged that Mr Penney was often present at board meetings but took no steps to prevent the company from trading despite owing a duty to the company to give certain advice and that his omission to do so rendered him a party to the carrying on of the fraudulent business. Pennycuick VC struck out the claim against Mr Penney and concluded that: "*I do not think mere omission to give advice could be regarded as amounting to being a party to carrying on the business of the company*." Consistent with *Maidstone*, for the reasons identified in my January 2025 Declaration,[21] the allegations of inaction by the Noteholder Managers (passive receipt of funds, receipt of a teaser without seeking a correction, and forbearance) would in my view be seen as insufficient for participation by a Cayman court.

(b)    As I have said the *Bilta Supreme Court* considered the 1978 case of *Gerald Cooper*, a case of a creditor and outsider to the company who lent money to an insolvent company who was repaid out of money raised by purported prepayments for the sale of goods under orders

---

[19] March 2025 Declaration at [28].

[20] March 2025 Declaration at [21]-[24].

[21] January 2025 Declaration at [40]-[50].

which could not be fulfilled and who knew this to be the case. Templeman J held that a person is party to fraudulent trading if he accepts money in such circumstances. For reasons set out above, in my view, the Supreme Court in *Bilta Supreme Court* found *Gerald Cooper*'s interpretation of participation too broad, consistent with this Court's expressed concern that this approach would permit a creditor to ask for repayment of a loan but hold the creditor liable for actually accepting repayment.[22] An approach of this breadth would be illogical.

(c)     In *R v Grantham* [1984] QB 675 ("**Grantham**"),[23] Mr Grantham was a consultant who was in charge of the company's administration, was the sole authorized signatory of the company's cheques and controlled its expenditures (and, therefore, was a company insider). There was evidence that the business was intending to deceive persons supplying potatoes to the business by stating that the suppliers would be paid within 28 days when there was no basis for that statement. The trial judge directed the jury that the prosecution had to prove that the defendant "*took an active part in carrying on the business.*" The jury decided all three elements of the charge in favour of the prosecution. On appeal, the direction regarding the level of participation required was not the subject of any challenge. The party being held liable in *R v. Grantham* was actually involved in the management of the primary fraudster, including controlling its finances, whereas here the Noteholder Managers are not alleged to have exercised any control over IIG.

(d)     In *In re Augustus Barnett & Son Ltd* [1986] BCC 98,904 ("**Augustus**") the company was only able to trade because it was given letters of comfort from its parent entity. After the subsidiary company went into liquidation, the liquidators commenced proceedings against the parent company on the basis that it had induced the board of the subsidiary to continue to trade. The claim against the parent company failed

---

[22] March 9, 2025 Tr. at 28:3-11.

[23] January 2025 Declaration at [25].

because it was not alleged that anyone other than the board of the subsidiary carried on the business of the company and no allegation of intent to defraud was made against the board. Hoffman J held that: "*there are no fraudulent acts to which the outsider can have been a party and his own state of mind seems to me for present purposes irrelevant.*" Similarly here, there are no allegations that the Noteholder Managers were directing the actions of the Debtors, and no allegations that they even had an ability to do so.

(e)     The next case is *Miles,* which is another criminal case handed down in 1992.[24] The Crown alleged that Mr Miles had been selling worthless shares on behalf of the company and had a managerial role. By contrast, Mr Miles argued that he was merely a salesman acting under orders of the company. Following *Maidstone*, the trial judge directed the jury that they had to be sure that Mr Miles was "*participating, or taking part or concurring in the actual trade which is involved in the business of the particular company.*" The Court of Appeal said that the direction that participation could involve "*concurring in the trade which is involved in the business of the company*" could and may very well have had the effect of improperly broadening the scope of the offence charged in the minds of the jury—*e.g.*, diluting the level of activity necessary to satisfy the participation element. The Court of Appeal therefore further narrowed the approach to participation adopted in *Maidstone*. Moreover, in contrast to the Noteholder Managers, Mr Miles had an insider managerial role at the company undertaking the fraud and thus had a higher level of participation than what is alleged against the Noteholder Managers.

(f)     In *R v Kellard* [1995] 2 Cr App R 134, another criminal case, it was alleged that Mr Wright was liable for fraudulent trading, despite not being a director or employee. The Court found that there was evidence that he was involved in dealing on behalf of the company, seeking financing for the company and persuading a major creditor to postpone

---

[24] January 2025 Declaration at [26].

legal action. As such, the Court said Mr Wright "*assisted*" in the carrying on of the business, which meant he fell within the provision and was not a true outsider to the company. By contrast, none of the actions purportedly undertaken by the Noteholder Managers, including forbearing from declaring an Event of Default, were taken on behalf of IIG. The Noteholder Managers are only alleged to have acted on behalf of themselves. Moreover, the conduct of Mr Wright is distinguishable from the conduct of the Noteholder Managers as Mr Wright dealt directly with the creditors whereas the Noteholder Managers never had any contact with the Investor-Assignors.

(g)   *O'Keeffe v Farris* [1997] 3 IR 463, a case of the Irish Supreme Court, involved a liquidator commencing an action against a director of the insolvent company (*i.e.*, a company insider). The director instituted proceedings seeking a declaration that section 297 (an Irish law with similarities to section 147) was unconstitutional as it amounted to a trial of a criminal offence without the usual due processes afforded in a criminal trial. The Irish Supreme Court therefore focused on the question of the constitutionality of section 297 and not the level of participation required for fraudulent trading. However, O'Flaherty J cited *Gerald Cooper* at 469 for the proposition that: "[a] *third party who knowingly participates in an act of fraudulent trading committed by a company's directors (for example, a creditor of the company who accepts payment of his debt out of money which he knows its directors have obtained by fraud) may be compelled personally to restore the money so applied by means of an order under the section*". I believe that the Irish Supreme Court referenced *Gerald Cooper* because this was the only case at the time imposing liability on a company outsider. Moreover, this obiter dicta was mere repetition of what was said in *Gerald Cooper* and was not supported by any additional reasoning. In these circumstances the dicta from the Irish Courts would command almost no weight in the Cayman Courts when tested against the UK Supreme Court's recent decision in *Bilta*.

(h)     The next case of *In re Bank of Credit and Commerce International SA*
[2002] BCC 407 involved the liquidators of Bank of Credit and
Commerce International ("**BCCI**") alleging that another bank had
knowingly participated in BCCI's secret and illegal acquisitions of
shares in an American bank and BCCI's fraudulent overstatement of
assets and earnings by assisting the insolvent bank to artificially
service certain non-performing loans in its books. This case was
concerned with a preliminary issue of whether a person could fall
outside the provision if they did not exercise a management or control
function, as the defendant was an outsider to BCCI (*i.e.*, the
Insider/Outsider Question). Neuberger J concluded that such a claim
was not bound to fail (although he stopped short of finding that the
claim would succeed, which he was not required to do). Though the
BCCI court did not reach the merits of the question of participation,
there are no allegations against the Noteholder Managers that they had
part in overstating the value of the Debtors' loans, unlike the conduct
at issue in BCCI.

(i)     The case of *Morphitis v Bernasconi* [2003] Ch 552 involved a
company which devised a scheme to transfer all of its assets into a new
company which was free of certain leases. The liquidator issued
proceedings against the directors (*i.e.*, insiders to the company) and
argued that they engaged in fraudulent trading despite there only being
a single transaction defrauding one creditor (the landlord). The Court
of Appeal found that the directors were not liable as the landlord was
not defrauded in the carrying on of the company's business.

(j)     In *Morris v Bank of India* [2004] EWHC 528 (Ch),[25] another case
involving the collapse of BCCI, the liquidators alleged that another
bank (Bank of India) had entered into six transactions which had
helped it conceal bad debts and losses incurred by the group from its

---

[25] The decision of *Morris v State Bank of India* [2003] BCC 735, an earlier decision in the BCCI litigation,
was also cited in *Bilta Supreme Court*, although this decision contains a consideration of the knowledge
element and no consideration of the 'party to' requirement.

auditors. Under the transactions, BCCI would deposit moneys with BOI for a fixed term, usually of three months. With the assistance of the finance provided by these deposits, BOI would then grant to a company nominated by BCCI a loan for the same period. BOI admitted that it participated in the carrying on of the business of BCCI but did not admit it did so knowingly, which was the issue before the Court. The Court found that the employees at BOI did have the relevant knowledge (which finding was upheld on appeal in *Bank of India v Morris* [2005] EWCA Civ 693). Although BOI could be characterised as an outsider, its direct (and conceded) involvement in repeated transactions (six) over an extended time frame far exceeds the alleged acts of the Noteholder Managers.

15.    None of the above cases—and no other cases of which I am aware—involve facts which are directly analogous to the facts in the present case. I understand that Plaintiffs argue *Gerald Cooper* contains similar facts as the present case, but as noted above, the authority of this case is subject to doubt. Nevertheless, in the cases in which a party was held liable, such as *Miles* and *R v Kellard*, the party actively helped the fraudster commit fraud—unlike the Noteholder Managers here, who allegedly failed to act to prevent a fraud and allegedly removed an obstacle to fraud.

## III.    INTERPRETING THE MEANING OF THE PHRASE "FACILITATING, ASSISTING OR PARTICIPATING"

16.    In *Bilta Supreme Court*, the Supreme Court suggested that for a person to be "party to" fraudulent conduct, they must "*participate in, facilitate or assist*" the fraudulent activity of the company.[26] I understand the Court in this matter invited the parties to explain the meaning of the these terms as used in *Bilta Supreme Court*, including whether "*they are supposed to be interpreted as three separate things, and if they are, just what it means to facilitate or assist*

---

[26] *Bilta Supreme Court* at [44], [58].

*as opposed to participate in the fraudulent transaction*."[27]

17.     The phrase "*participate in, facilitate or assist*" is a judge-made interpretation of the statutory expression "party to". The starting point when construing legislation or judicial statements is to consider the ordinary English meaning of the term.[28] My reading of "*participate in, facilitate or assist*" is that these are not entirely separate concepts but rather overlapping ways of expressing the same concept. Despite the use of the word "or", the three terms are best understood as non-exclusionary alternatives (colloquially expressed as "and/or").[29] They operate as a cross-check on each other. As such, although theoretically a person could be "party to" fraudulent trading if their conduct rises to the level of any the three words, I would anticipate that a Cayman Court would be uncomfortable with that conclusion unless it could show another of the three words also covered the conduct.

18.     Regardless, all three words support my opinion that a party can only be held liable if it affirmatively participates in misconduct, and not if it merely fails to prevent misconduct. In other words, there is nothing to support the notion that "facilitate," "assist," or "participate" would permit liability for mere inertia or concurrence, or that there is a low threshold for participation.

(a)     The term "*participation*" has been used by the authorities since the earliest case of *Maidstone*, which says that the expression "party to" means "'*participates in', 'takes part in' or 'concurs in'*" and requires "*positive steps of some nature*".[30] "*Participate*" remains the most often used term—more common than "*facilitate*" or "*assist*"—in many of the subsequent authorities.[31]

(b)     The term "*assisted*" has been used more sparingly:

---

[27] June 9, 2025 Hearing Tr. at 8:25-9:8.

[28] *See Bilta CoA* at [73] which relies on the Oxford Dictionary definition of "*party to.*"

[29] *See Grimes v The Trustees of the Essex Farmers & Union Hunt* [2017] EWCA Civ 361 at [29].

[30] *Maidstone* at 1092.

[31] *See, e.g., Maidstone* at 1092; *Miles*; *In re Bank of Credit and Commerce International SA* [2002] BCC 407 at 413.

(i)     It appears to have been first used in this context by Hoffman J in *Augustus*, which suggested that "assistance" connotes actually being involved in carrying on the business of the company whereas participation is broader and applies to outsiders. As such, conduct which does not satisfy the definition of participation is unlikely to satisfy the definition of assisted, and outsiders such as the Noteholder Managers are unlikely to be found to have "assisted" the fraud. Hoffman J said:

> "The words 'persons ... party to' <u>may be wide enough to cover outsiders who could not be said to have carried on or even assisted the carrying on of the company's business but who nevertheless in some way participated in the fraudulent acts</u>."[32]

(ii)    The term "assistance" was subsequently used in *R v Kellard* [1995] 2 Cr App R 134. As noted above, the defendant in that case was acting on behalf of the company despite not being formally appointed as a director or employee and was found to be liable given that he "*assisted in the carrying on of the business of the company*." As noted above, this is different from the facts in the present case as there is no allegation that the Noteholder Managers actually assisted in the carrying on of the business of the Debtors.

(iii)   Further, "assistance" is used at common law as noted in paragraphs 30 to 33 below. In the specific context of claims for dishonest assistance of a breach of fiduciary duty, the courts have found that "assistance" in a breach of duty requires a causal link between the conduct and the breach of duty. However, some of the cases on dishonest assistance use the

---

[32] *Augustus* at 98,907. Hoffman J relied on *Gerald Cooper* for this proposition but that was only because it was the only case at the time involving an outsider to the company being found liable.

terms "*assistance*" and "*participation*" interchangeably.[33]

(c)    The term "*facilitation*" does not appear to have been used in any related cases until *Bilta CoA* where the Court found that a person participates in a fraudulent business if they "*further or facilitate it*." The defendant in *Bilta CoA* repeatedly brokered fraudulent transactions knowing that they were unlikely to be legitimate.[34] This goes far beyond the level of participation alleged against the Noteholder Managers. I have not identified any other English authorities which give a definition to the term facilitation in an analogous context.[35]

## IV.   LIABILITY AS AN ACCESSORY IN TORT AND DISHONEST ASSISTANCE

19.    I also understand that the Court has asked "*whether there are analogues in the regular tort context*" under English or Cayman Islands law to being a "party to" a fraudulent trading claim under Section 147 and what conduct is required to make an entity a party "*to the commission of another tort*."[36]

20.    The circumstances under which accessory liability will be imposed under English and Cayman law are relatively circumscribed and accessory liability is generally applied narrowly. In my view, there are two forms of accessory liability that may be considered instructive by English and Cayman courts: (i) joint liability in tort through common design, and (ii) dishonest assistance in equity of a breach of fiduciary duty.

21.    However, I caution that that these causes of action are not a perfect analogue. The Supreme Court remarked as much in *Bilta Supreme Court* when it referred

---

[33] *See e.g.*, *Madoff Securities International v Raven* [2013] EWHC 3147 (Comm) at [351].

[34] *See Bilta CoA* at [21]-[30].

[35] There have been interpretations of the statutory phrase "*facilitating*," such as in *R v Karemera* [2018] EWCA Crim 1432, which is a criminal case involving human trafficking. That case involved accusations of active conduct (a positive instruction by the defendants to drug couriers to go to a certain place).

[36] *See* June 9, 2025 Hearing Tr. at 12:4-8.

to *Augustus*[37] but added:

> *"We agree, <u>subject to the qualification that we would not speak of accessory liability but rather of liability arising from participation in the fraudulent acts of those carrying on the business of the company</u>."*[38]
> (emphasis added)

22.    I consider that this means that the test for participation in fraudulent trading is stricter than the tests for the conduct required for accessory liability under tort and equity (which, as set out below, are already strict and also require more than passive conduct). I am not aware of any English cases which have considered the above causes of action when construing section 213 and I do not believe that a Cayman Court would look to these causes of action when construing section 147. Nevertheless, even for these potentially instructive causes of action, more than passive conduct—something closer to active participation in the wrongful behaviour—is required to establish liability.

23.    I understand that at the 9 June 2025 status conference, Judge Wiles briefly mentioned the tort of conspiracy.[39] I note the following for completeness:

(a)    An unlawful conspiracy claim requires proof of the following:

(i)    a combination, arrangement or understanding between two or more persons;

(ii)    an intention to injure another individual or entity,

(iii)    concerted action consequent upon the agreement, combination or understanding;

(iv)    unlawful action; and

---

[37] Hoffman J described liability for parties to fraudulent trading as a form of accessory liability in *Augustus*, stating: "*The only point with which I am concerned is whether section 332 can form the basis for imposing liability on a parent company otherwise than <u>as accessory to fraudulent trading by the persons who actually carried on the business of the subsidiary</u>. In my judgment it cannot. The language of the section is clear and unambiguous.*" (emphasis added)

[38] *Bilta Supreme Court* at [45].

[39] June 9, 2025 Hearing Tr. at 10:2-9.

(v)    damage caused to the plaintiff.[40]

(b)    A lawful means conspiracy occurs where the underlying action was lawful but the predominant purpose of the combination or agreement was to injure the plaintiff.[41]

(c)    The tort of conspiracy requires all of the participants to have engaged in concerted action in the form of active participation in the conspiracy.[42]

(d)    Conspiracy is not a form of accessory liability as each of the co-conspirators' liability is not secondary to primary wrongdoing (as are claims against third parties for fraudulent trading by the company). Participation in an actionable conspiracy is itself a form of primary wrongdoing.[43]

<u>What makes a party liable as an accessory to a tort through common design?</u>

24.    There is no tort of fraud in Cayman or English law so accessory liability under tort is an imperfect analogy to the present facts. Under English and Cayman tort law, a person is only liable as an accessory to the commission of a tort by the primary wrongdoer if they: (a) procure or instigate the commission of a tort;[44] or (b) act in furtherance of a common design. In addition, to be liable as

---

[40] *FM Capital Partners Ltd v Marino* [2018] EWHC1768 (Comm) at [94]. The approach in the Cayman Islands is the same. In *AHAB v Saad Investments Company Limited* [2018 (3) CILR 1], Smellie CJ described a conspiracy claim as follows: "*Under Cayman (and English) law, it is well established that the tort of conspiracy turns on an agreement (which need not be a contractually binding agreement), a combination, a common intention, a common understanding or a concert of two or more people to do an unlawful act (or a lawful act by unlawful means) which causes damage to the claimant.*"

[41] *Kuwait Oil Tanker Company SAK v Al-Bader (No. 3)* [2000] All E.R. (Comm) 271 at [108].

[42] *FM Capital Partners Ltd v Marino* [2018] EWHC 1768 (Comm) at [94]. The claim for conspiracy was dismissed and that decision was not appealed on this point: *FM Capital Partners Ltd v Marino* [2021] QB 1. However, *FM Capital Partners* has been subsequently followed on this point: *Lakatamia Shipping v Tseng* [2023] EWHC 3023 (Comm) at [18].

[43] *Clerk & Lindsell on Torts* (24th Ed, 2022) at [23-103].

[44] In order to establish accessory liability in tort by procurement, the claimant must establish that the defendant did something which "*amounted to some direction, or procuring, or direct request, or direct encouragement*" of the wrongful act and that the wrongful act was tortious: *Davidson v Chief Constable of North Wales* [1994] 2 All ER 597 at 604-605. Given that there are no allegations that the Noteholder Managers directed or procured the fraud of the Debtors, I do not consider this form of accessory liability relevant on the present facts.

an accessory in either case, a person must know the essential facts which make the relevant act wrongful.

25.    Common design accessory liability was considered by the UK Supreme Court in *Sea Shepherd UK v Fish & Fish* [2015] UKSC 10. In that case, Lord Neuberger noted at [55] that in order to be liable as an accessory under common design liability, three conditions must be satisfied:

> *"First, the defendant must have assisted the commission of an act by the primary tortfeasor; secondly, the assistance must have been pursuant to a common design on the part of the defendant and the primary tortfeasor that the act be committed; and, thirdly, the act must constitute a tort as against the claimant."*[45]

26.    In relation to each of these three conditions, Lord Neuberger noted the following:

> *"[57] So far as the first condition is concerned, <u>the assistance provided by the defendant must be substantial, in the sense of not being de minimis or trivial</u>. ...*
>
> *[58] As to the second condition, <u>mere assistance by the defendant to the primary tortfeasor, or '"facilitation"' of the tortious act, will not do</u>, as explained by Lord Templeman in CBS Songs Ltd v Amstrad Consumer Electronics Plc [1988] AC 1013, 1057B-C, and 1058G-H, and by Hobhouse LJ in Credit Lyonnais Bank Nederland NV v Export Credit Guarantee Department [1998] 1 Lloyd's Rep 19, 46. <u>There must be a common design between the defendant and the primary tortfeasor that the tortious act, that is the act constituting or giving rise to the tort, be carried out</u>, as suggested in Vestergaard Frandsen A/S v Bestnet Europe Ltd [2013] 1 WLR 1556, para 34.*
>
> *59. A common design <u>will normally be expressly communicated between the defendant and the other person</u>, but it can be inferred, a*

---

[45] These elements were affirmed in the more recent Supreme Court case of *Lifestyle Equities CV v Ahmed* [2024] UKSC 17 at [117].

*point which is clear from Lord Mustill's reference to 'agreed on common action' and 'tacit agreement' in Unilever at p 609....*

*[60] As to the third condition, it is unnecessary for a claimant to show that the defendant appreciated that the act which he assisted pursuant to a common design constituted, or gave rise to, a tort or that he intended that the claimant be harmed. But the defendant must have assisted in, and been party to a common design to commit, the act that constituted, or gave rise to, the tort."* (emphasis added)

27.     Similarly, Lord Toulson held at [21]:

*"To establish accessory liability in tort <u>it is not enough to show that D did acts which facilitated P's commission of the tort</u>. D will be jointly liable with P if they combined to do or secure the doing of acts which constituted a tort. This requires proof of two elements. <u>D must have acted in a way which furthered the commission of the tort by P; and D must have done so in pursuance of a common design to do or secure the doing of the acts which constituted the tort.</u> I do not consider it necessary or desirable to gloss the principle further."* (emphasis added)

28.     Accordingly, it is clear from the above leading Supreme Court case that what is required for accessory liability for common design is strict and narrow.

<u>What constitutes assistance for a claim of dishonest assistance in equity</u>

29.     As set out by Williams J in *Ritter v Butterfield Bank (Cayman) Limited* [2018 (1) CILR 529] at [176], there are three elements to a claim for dishonest assistance of a breach of fiduciary duty which must be proved:

*"The first is that there has been a disposal of assets in breach of a trust or fiduciary duty. The second is that the defendant assisted in that breach or disposal. The third...is that the defendant assisted the breach of trust dishonestly."*

30.     A majority of the English case law in this area is focused on the dishonesty

requirement. The test for what constitutes "*assistance*" is not usually the main issue in the cases. The starting point as explained by Peter Gibson J in *Baden v Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France SA* [1993] 1 WLR 509 at [246] is that whether an action is assistance is a "*simple question of fact*" although the act "*must not be of minimal importance.*" Similarly, in *Madoff Securities International v Raven* [2013] EWHC 3147 (Comm) at [351] the Court said that assistance is "*simply conduct which in fact assists the fiduciary to commit the act which constitutes the breach of trust or fiduciary duty.*"

31.    The cases do give examples of specific behaviour which amounts to assistance. In *Bilta (UK) Limited (In Liquidation) v Natwest Markets Plc* [2020] EWHC 546 (Ch) at [164], Snowden J gave examples of "conventional" forms of assistance:

> "*More conventionally, the defendant to a dishonest assistance claim is a person who provides false documentation to facilitate a fraud (Madoff Securities International v Raven [2013] EWHC 3147), who authorises or administers the payment away of trust monies (Barlow Clowes International v Eurotrust International [2006] 1 WLR) or who assists in covering up the fraud by laundering the money (Twinsectra v Yardley [2002] 2 AC 164 at [107])*"

32.    The authorities have found that "assistance" requires showing a causal link between the alleged assistance and the breach of fiduciary duty. As explained by Morritt LJ in *Brown v Bennett* [1999] BCC 525 at 533 if there is no causative effect "*I cannot see that the requirements of conscience require any remedy at all.*"

33.    Other authorities on dishonest assistance confirm that allegations like Plaintiffs', which amount to mere acquiescence or omission to act, do not amount to assistance:

(a)    In *Brinks Ltd v Abu-Saleh (No 3)* [1996] CLC 133, the plaintiff alleged that a wife accompanied her husband on long car trips for the purpose of committing a breach of trust by laundering the proceeds of a

robbery. The alleged purpose of her accompanying her husband was to cloak what she knew to be an illegal operation with the apparent innocence of a family holiday. However, Rimer J found that mere acquiescence did not amount to assistance and said:

> *"for reasons which effectively follow from my findings of fact in relation to the claim against Mrs Elcombe as an accessory to a breach of trust, I find that she provided no encouragement to her husband and provided no material assistance or played any material part in its execution. <u>I do not consider that it is sufficient to fix her with participation in the alleged conspiracy that she knew the essence of what her husband was doing and acquiesced in it by accompanying him on four of the trips he made</u>"* (emphasis added).

(b)    *Nightingale Finance Ltd v Scott* (Unreported, Ch D, 18 November 1997) involved the plaintiff investing in a lending scheme under which the plaintiff set up a company, which in turn lent money to small borrowers at a high rate of interest. Under the scheme, the plaintiff's company was managed by a fraudster and his own separate company. As part of the scheme, the fraudster's company informally guaranteed that any "bad" mortgages given by the plaintiff's company to borrowers would be made good by the fraudster's company. The plaintiff transferred that money into the plaintiff's company's accounts, which the fraudster controlled. Carnwath J observed that for a third party to become liable "*they must be an active participant in the breach of trust*" by "*actually participating in the fraudulent conduct*" (citing Barnes v Addy (1874) LR Ch App 244). The defendant financier advanced money to the plaintiff for re-lending, however, the fraudster dissipated the plaintiff's money in breach of trust through transactions with small borrowers which required the financier's consent to what were valueless charges on each property. Ultimately, the fraudster's company went into liquidation and the fraudster was convicted of fraudulent trading. The plaintiff sued the

financier, alleging that it had assisted in the fraudster's breach of duty by consenting without any verification of the documents, conduct which Carnworth J said found "*fell well below the standards expected of a substantial institution*." Carnwath J held that "*assistance*" was not established and said:

> "*Even accepting that Nightingale, in consenting to the second charges, had the requisite knowledge, it does not seem to me that this was the kind of participation that Lord Selborne [in Barnes v Addy] had in mind. <u>The action of Nightingale was simply designed to protect their own interest. No doubt in so doing they were removing an obstacle to Mr Wharton's breach of trust, but they were not direct participants in that breach</u>.*"

(emphasis added)

(c) In *Goose v Wilson Sandford & Co (No 2)* (Unreported, Ch D, 25 January 1999), Rimer J doubted that someone can assist by not disclosing matters which should have been disclosed by the fiduciary. There, the primary wrong was a failure by the fiduciary to disclose certain matters relating to the sale of goods to the plaintiff. The plaintiff alleged that the third party, a firm of accountants, knew the real value of the goods and failed to warn him of that. For Rimer J, all that mattered was that the fiduciary, and only the fiduciary, failed to disclose those matters. The fiduciary did not need or receive any assistance from the third party in doing so.

(d) In *Banque Nationale de Paris v Hew Keong Chan Gary* [2000] SGHC 239 the plaintiff was a bank which sued its employee for breach of fiduciary duty along with his wife and brother for, *inter alia*, knowing assistance in breach of fiduciary duty. The employee entered into speculative forex transactions in the name of the wife and brother without their authorisation causing significant loss to the plaintiff. The plaintiff relied on four acts to allege assistance by the wife and brother: (i) permitting the employee to conduct forex transactions in their name; (ii) permitting the employee to receive and remit funds from

other accounts; (iii) failing to inform the plaintiff that the employee entered into the transactions without their authority and (iv) attempting to evade liability on the ground that the employee had not been authorised by them. The Singapore High Court found all four acts to be insufficient to establish that the wife and brother were liable.

34. I understand that this Court specifically asked whether Plaintiffs' allegations regarding obstacles removed by "forbearance agreements" and "amendments to indentures" would be sufficient for participation.[46] I do not believe that removal of such obstacles renders someone a "party" for purposes of a fraudulent trading claim. Such conduct is not participation, assistance, or facilitation sufficient to create liability.

Relevance of accessory liability under tort and equity to fraudulent trading analysis

35. Although it is, in theory, open to a Cayman or English Court to consider as instructive the authorities in these comparable contexts of accessory liability under tort and equity, when considering the forms of sufficient conduct, on balance, I do not believe that a Court would find these instructive when assessing the level of participation required for a person to be a party to fraudulent trading under section 147.

36. For the reasons articulated in my prior declarations, and for these further reasons, I believe a Cayman court would not find Plaintiffs' allegations to be adequate to establish the participation element of their claim for fraudulent trading.

[*Signature on following page*]

---

[46] June 9, 2025 Hearing Tr. at 14:3-12.

Respectfully submitted,

Dated: July 3, 2025

_____
Thomas Lowe KC