**AHAB Saad Investments Company Limited**
**[2018] (3) CILR 1**

# Exhibit 1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 54 OF 2009 (ASCJ)**

**BETWEEN AHMAD HAMAD ALGOSAIBI AND BROTHERS COMPANY ("AHAB") PLAINTIFF**

**AND (1) SAAD INVESTMENTS COMPANY LIMITED (IN OFFICIAL LIQUIDATION) ("SICL") AND OTHERS**

**(2) MAAN AL SANEA**

**(8) SINGULARIS HOLDINGS LIMITED (IN OFFICIAL LIQUIDATION) ("SHL") AND**

**(14) AWAL FINANCE COMPANY LIMITED (IN OFFICIAL LIQUIDATION) ("AFCL")**

**(34) SAAD INVESTMENTS FINANCE COMPANY (NO. 5) LIMITED (IN OFFICIAL LIQUIDATION) ("SIFCO 5")**

**AND OTHERS DEFENDANTS**

**IN OPEN COURT**
**BEFORE THE HON. ANTHONY SMELLIE, CHIEF JUSTICE**

**REPRESENTATIONS:** Mr. David Quest QC and Ms. Emily Gillett instructed by Mr. Peter Hayden, Mr. Nicholas Fox, Ms. Delia McMahon and Mr. Charles Moore of Mourant Ozannes for the Plaintiff.

Mr. Michael Crystal QC, Mr. Mark Phillips QC, and Mr. Marcus Haywood instructed by Mrs. Colette Wilkins and Ms. Shelley White of Walkers for the 1st, 8th, 30th to 33rd, and 35th to 37th Defendants (the "GTDs").

Mr. Marcus Smith QC, Ms. Bridget Lucas, Ms. Harriet Fear Davies and Mr. James Hart instructed by Mr. Ian Lambert, Mr. William Helfrecht, and Mr. Mark Russell of HSM Chambers for the 13th to 18th Defendants (the "AwalCos").

Mr. Thomas Lowe QC and Mr. Jack Watson instructed by Mr. William Peake, Mr. Marc Kish, Ms. Gráinne King, and Mr. James Elliott of Harney Westwood & Riegels for the 34th Defendant ("SIFCO 5").

# JUDGMENT

1. The trial of these claims brought by AHAB and counterclaims brought by SICL and SHL took place over 129 days in court over the course of a year, ending on 27 July 2017 when judgment was reserved.

2. This is the judgment on both the claims and counterclaims. For the reasons which follow, the claims and counterclaims are dismissed.

3. By its re-re-re-amended statement of claim ("RASOC"), AHAB pleaded a number of distinct heads of claim against the 2nd Defendant Mr. Maan Al Sanea ("Al Sanea") and the corporate Defendants which are in liquidation and are among 42 companies established by Al Sanea in this jurisdiction. The corporate Defendants will also be referred to by acronyms according to their groupings (the "AwalCos", the "GTDs" and "SIFCO 5") as they have been referred to at trial and to reflect the fact that they are under the control of different liquidators. They will however generally be referred to collectively as "the Defendants".[1]

4. In essence, AHAB's claims are for fraudulent breaches of fiduciary duties allegedly committed by Al Sanea and restitution, damages and compensation from the Defendants; on the basis of their conspiracy with Al Sanea, their knowing assistance in his alleged fraud upon AHAB and ultimately, their knowing receipt of the massive proceeds of that fraud. AHAB also brings proprietary claims against the Defendants on the basis that their

---

[1] The Second Defendant, Al Sanea did not file a notice of intention to defend and on the 7th day of November 2011, judgment in default of Defence was entered against him in favour of AHAB for damages for conspiracy and breach of fiduciary duty {**B/29/1-2**}. On the 12th day of June 2012, an interim payment on account of damages was awarded on the basis of the default judgment against him in favour of AHAB {**B/33/1-2**}. The outcome of the trial does not affect the default judgment or the award of damages against him.

assets represent AHAB’s property – the proceeds of the fraud – which AHAB could trace into their bank accounts or other assets.

5. AHAB’s claims are massive in amount: initially for US$9.2bn, subsequently by amendment reduced to US$6bn. This massive sum is claimed as representing the proceeds of the alleged fraud as at the end of May 2009 when it was said to have been discovered, plus interest accruing since then.

6. The counterclaims of SICL and SHL are equally massive. They were filed by the liquidators of the GTDs ("GTJOLs"), instigated in large part by promissory notes presented to them by Al Sanea as representing security for debts owed to SICL and SHL by AHAB and signed and delivered to him by Suleiman Algosaibi ("Suleiman"), acting as chairman and on behalf of AHAB. They also contained other claims amounting to more than US$1bn which were based primarily upon liabilities recorded in the accounts of SICL and SHL as due from AHAB. The SICL and SHL promissory notes purported together to secure the repayment of US$6.7bn. Ultimately, the counterclaims were however, reduced to a total of US$5.9bn when reliance upon the SICL promissory notes was disavowed.

7. AHAB’s allegations of fraud against Al Sanea relate to his management of AHAB’s Money Exchange branch ("Money Exchange").

8. Having become a member of the Algosaibi family by marriage to Sana'a Algosaibi ("Sana'a"), the daughter of Abdulaziz Algosaibi ("Abdulaziz"), Al Sanea came to enjoy a very close relationship with Abdulaziz, described like that of a favoured son.

9. As will be examined in some detail in this judgment, that relationship came to instill a level of mutual trust such that Al Sanea was appointed Managing Director of the Money

Exchange when it was re-launched in July 1981, with more ambitious objectives than had defined its earlier existence as a mere bureau de change. While the reasons for the re-launch of the Money Exchange and the reasons for Al Sanea's involvement were matters of debate at the trial, it is common ground that the Money Exchange expanded rapidly as a financial institution under Al Sanea's management, as it pursued its campaign of borrowing from the banks. While it was also a matter of deep contention, what became of the massive sums obtained from the banks, it became incontrovertible that very large amounts were used for the acquisition of investments in AHAB's name and very large amounts were applied to the funding of Al Sanea's interests. Indeed, it is also common ground that the massive inflow of borrowed funds allowed Al Sanea to borrow from the Money Exchange to fund his own enterprises. This allowed Al Sanea in a startlingly short period of time to become noticed as one of the richest men in the Middle East, standing in his own right nearly if not on equal financial footing with the AHAB Partners themselves.

10. The campaign of borrowing was also aggressively pursued through other Financial Businesses established in Bahrain in AHAB's name. It was however, a matter of deep contention whether this was known to AHAB and whether the Partners were aware of the use to which this "offshore" borrowing was being put by Al Sanea.

11. Following Abdulaziz's incapacitation, on 30 September 2000, it is alleged by AHAB that Suleiman imposed restrictions upon the level of borrowing and that by his "New for Old" policy, Al Sanea was instructed to incur no further indebtedness through the Money Exchange. However, between the time of the imposition of Suleiman's putative "New for Old" policy and the collapse of the Money Exchange and other Financial Businesses in

May 2009, the staggeringly large amount of US$330bn in further borrowing from more than 100 of the world's leading banks had been obtained.

12. When the collapse occurred in May 2009, some US$9.2bn was outstanding to the banks and this became the sum of AHAB's initial claim.

13. At the heart of AHAB's claims lay the allegations that Al Sanea fraudulently without their knowledge and authority evaded Suleiman's "New for Old" policy and that he did so by the implementation of a program of forgery "*on an industrial scale*".

14. The essence of the Defendants' defences is that this is not true, that Suleiman had imposed no such curtailment upon Al Sanea's borrowing. Instead that AHAB, having become trapped in its own vortex of debt from which it could not escape without revealing its fraud upon the banks, was bound to allow Al Sanea to continue to borrow for his own purposes as well as to keep AHAB itself from collapse. Thus, the crucial and pivotal issue in the case became whether the AHAB Partners knew about and authorised Al Sanea's activities at the Money Exchange and other Financial Businesses. This crucial and pivotal issue is that which is first examined in this judgment. Other important issues, including the allegations of forgery against Al Sanea will also be examined in turn.

**Introduction of the *dramatis personae*, historical and factual background to the action[2]**

15. AHAB has its origins in a business begun by Hamad Algosaibi ("Hamad") in the 1940s. That business was based and, although exponentially expanded, still is based in the

2 Purely for the sake of convenience and without intending disrespect, references to individuals will often be made throughout this judgment by first names. Much of this introduction is taken from 'The Detailed Narrative' prepared by the GTDs which gives a chronological description of runs of events based upon the evidence and which I accept and regard as a helpful and accurate summary of the evidence of events leading down to the commencement of these proceedings: {**E2/1/1- 406**}.

Eastern Province of Saudi Arabia (the "Eastern Province"), with its headquarters in Al Khobar.

16. The Eastern Province is the largest province of Saudi Arabia. It is located in the east of the country on the Arabian Gulf coast, and it has land borders with Kuwait, Qatar, the United Arab Emirates, Oman and Yemen. In addition, it is linked to neighbouring Bahrain through the King Fahd Causeway. The four principal cities of the Eastern Province are Al Khobar, Dammam, Jubail and Dhahran. Dhahran is the base for the Saudi state-owned oil producing company, ARAMCO.

17. Hamad died in 1969. He was succeeded by his three sons, namely, Ahmad, Abdulaziz and Suleiman. Following their father's death, the AHAB business was incorporated as a general partnership (sharikat al-tadamun) in 1969, by Ahmad, Abdulaziz and Suleiman.

18. Ahmad was Chairman of AHAB from 1970 to his death in 1990. Abdulaziz succeeded Ahmad as Chairman from 25 September 1990 until his death on 12 May 2003. Suleiman succeeded Abdulaziz as Chairman from 24 May 2003 until his death on 22 February 2009. Yousef Algosaibi ("Yousef"), Ahmad's eldest son, became Chairman of AHAB on 26 February 2009. Yousef remains AHAB's Chairman. Saud Algosaibi ("Saud") succeeded his father Abdulaziz to partnership in AHAB in May 2003 although, as the evidence shows, Saud was actively involved in the affairs of AHAB and the Money Exchange from the time of Abdulaziz's incapacitation on 30 September 2000. Dawood Algosaibi ("Dawood") succeeded his father Suleiman to partnership in AHAB upon Suleiman's passing on 22 February 2009.

19. It is understood and generally accepted that, as Yousef confirmed in testimony, the three brothers, Ahmad, Abdulaziz and Suleiman were very close. As Yousef also accepted in cross-examination, the three brothers made their business decisions jointly:[3]

> *"Q. Your uncles and your father made business decisions jointly? You have told me that it was they jointly who set up stevedoring and canning in the 1970s and so on: correct?*
>
> *A. Yes."*

**BEGINNINGS**

20. The early commercial activities of the Algosaibis included money exchange for ARAMCO's local payroll and other trading activities closely related to ARAMCO. These other trading activities included the establishment of the first bonded warehouse dedicated to ARAMCO. The AHAB "Golden Jubilee Brochure" produced in around 1990 (referred to by AHAB in re-examination of Saud) records as follows in this regard:

> *"The early beginnings of Ahmad Hamad Algosaibi & Bros was in 1940 under the name of Hamad Ahmad Algosaibi and Sons. Intrigued by the enterprising spirit of their late father, the three co-owners, Ahmad, Abdulaziz and Suleiman expanded the trading and money exchange business.*
>
> *Now, Ahmad Hamad Algosaibi & Bros. is known to have established the first bonded warehouse dedicated solely to ARAMCO (now Saudi ARAMCO) business in the Kingdom. The Company also supplied ARAMCO's first spot purchase order for steel pipes (a ship-load carried on the M.V. "SALINA"), the first tugboat purchased locally (from Hellenic Shipyard, Greece) and the first order tires. Furthermore, it established the first "Public Pipe Terminal" exclusively for ARAMCO oil-well casing and tubing business.*
>
> *Success over the years in domestic and international trade provided the start-up capital for other enterprises. Ahmad Hamad Algosaibi & Bros' name is now associated with numerous entrepreneurial activities in the*

---

3 {**Day30/28:24**}.

> *various sectors of the economy such as banking, manufacturing, services, trading, agriculture etc. ..."*

21. Other trading activities established by AHAB in the period prior to 1980 included: (i) NBC, an AHAB Group division that was established in 1956 to manufacture, package and distribute Pepsi products in the Eastern Province; (ii) Continental Can of Saudi Arabia Limited, a joint venture formed to produce and sell aluminium cans to soft drink manufacturers, both in Saudi Arabia and abroad; (iii) the Algosaibi Hotel, a five-star hotel built on the coast of Al Khobar which opened in 1973; and (iv) a shipping division established in the 1940s based in Dammam.[4]

22. The AHAB H.O. is located on the third floor (the "Third Floor") of a dedicated four-storey AHAB building in Al Khobar. The AHAB businesses were supervised and administered from the Third Floor, where the AHAB Partners had offices.

23. Meetings between AHAB Partners that took place on the Third Floor were often informal, held over a cup of coffee[5] during what has been described as the "*night shift*". The "*night shift*" was explained by Yousef as follows:[6]

> *"CHIEF JUSTICE:*
> *Q. Could Mr. Algosaibi explain for me in his words what he means by "the night shift"?*
>
> *A. (In English) Night shift is that when we -- we work two shifts, in the morning and in the afternoon. I would stay there, sometimes I stay until 9 o'clock in the evening.*
>
> *CHIEF JUSTICE:*
> *Q. So the night shift is when you work until 9 o'clock?*

---

4 A description of AHAB's non-financial services related businesses is set out in the GTDs' Written Opening Submissions at paragraphs 46 to 56, {**U/3/17**} to {**U/3/19**}.

5 Yousef xx: {**Day30/19:18**}.

6 Yousef xx: {**Day29/54:17**}.

*A. (In English) Sometimes, yes.*

*MR. LOWE:*
*Q. You were all on the third floor of the office in Al Khobar, weren't you?*

*A. (In English) Yes.*

*Q. Your rooms were all fairly close together?*

*A. (In English) Yes.*

*Q. So if you want to speak to each other, you just walk into the other person's room?*

*A. (In English) Yes.*

*Q. And you can have conversations quite easily?*

*A. (In English) Yes.*

*Q. Because they are your family, you don't make formal appointments to do that?*

*A. (In English) No."*

<u>A Change of Direction</u>

24. In the period from the 1980s onwards, AHAB (at the direction of Ahmad, Abdulaziz and Suleiman) made a concerted strategic expansion into financial services and other related businesses. This was at the same time as AHAB's traditional businesses were in "*stagnation*".[7]

25. AHAB's net asset value at the time was reported at some SAR 900m (US$240 m).[8]

While this asset value represented a very substantial enterprise at the time, the book value

---

7 See in this regard, the letter dated 20 December 1990 from Abdulaziz in Arabic to the "*members of the board of directors of* [AHAB]", referred to in further detail below, and which refers to "*the stagnation of companies' operations in Al-Dammam and other places"* and "*the period of stagnation beginning in early 1985*". See also **{G1359} {G1361}**

8 {**F3/3**} – Audit Report as at June 1982.

of AHAB itself soon paled in comparison to the book value of the AHAB financial businesses as audited by El Ayouty.[9]

26. As explained by Yousef in cross-examination, "*the brothers* [i.e. Ahmad, Abdulaziz and Suleiman] *together had a strategy which involved acquiring interests in financial institutions, banks, in Saudi Arabia mainly*":[10]

> *"Q. You told us this earlier today, that the brothers together had a strategy which involved acquiring interests in financial institutions, banks, in Saudi Arabia mainly.*
>
> *A. Yes, that's correct."*

27. This was to be a new kind of business for AHAB.[11] The Money Exchange was established in order to pursue that strategy.[12]

28. Other aspects of the expansion included the establishment in 1979 of Ifabanque by AHAB and its Partners in conjunction with, amongst others, Robert Fleming & Co. Limited and Worms & Cie. Each of Yousef, Abdulaziz, Al Sanea and the Money Exchange were shareholders of Ifabanque.[13] Abdulaziz acted as a director and Vice Chairman (or Vice President) of Ifabanque. Yousef acted as a director of Ifabanque. Suleiman and Dawood acted as Censors of Ifabanque. Al Sanea also acted as a director of Ifabanque.

---

9 See further below on El Ayouty.
10 Yousef xx: {**Day30/97:20**}.
11 Yousef xx: {**Day31/20:20**}.
12 Yousef xx: {**Day31/97:17**} and {**Day31/37:24**}-{**Day31/38:2**}.
13 As at 25 March 1987 {**G/1114.1**}.

29. The Money Exchange was established by a resolution of the Board of Directors of AHAB dated 27 July 1981 (the "27 July 1981 Resolution"), as an unincorporated division of AHAB. Paragraph 1 of the 27 July 1981 Resolution provided as follows:[14]

> "1. *To approve the establishment of a new activity for Ahmad Hamad Algosaibi and Brothers under the name of 'Ahmad Hamad Algosaibi and Brothers – Exchange and Commission Branch'* [i.e. the Money Exchange]. *..."*

30. A manuscript annotation on the 27 July 1981 Resolution (a copy of which is contained within the N Files)[15] reads as follows: "*Signed by all the partners and the original is with Omar Saad Hamda*".

31. By paragraph 7 of the 27 July 1981 Resolution, Al Sanea was appointed as the Managing Director of the Money Exchange.

32. Al Sanea and Sana'a were married in 1980. Ahmad and Suleiman were Abdulaziz's brothers and thus were Sana'a's uncles. Sana'a is also a Partner of AHAB.

33. There had been marriages between Al Sanea's' family and the Algosaibis previously. Al Sanea's cousin on his mother's side (whose family name was Daughaiter) was married to Hamad. Abdulaziz's sister was married to another cousin of Al Sanea on his mother's side.[16]

34. As mentioned before, the relationship between Abdulaziz and Al Sanea was close. In the words of Mr. Fakhri, Al Sanea was "*like a son* [to Abdulaziz] *because he's the husband*

---

14 {**N/1001/1**} (Arabic), {**N/1002/1**} (translation).
15 {**N/1001/1**} (Arabic), {**N/1002/1**} (translation).
16 Yousef xx: {**Day31/14:10 - 25**}.

*of his daughter*".[17] It was no doubt, in part, for that reason that Al Sanea became a Partner of the Money Exchange and was appointed its Managing Director.

35. At the time the Money Exchange was established in 1981, Al Sanea was about 25,[18] Yousef was about 35,[19] Suleiman was about 54,[20] Abdulaziz was about 60,[21] and Ahmad was about 80.[22] Al Sanea was, therefore, very much the younger and less experienced of these individuals (amongst a family and a tradition where great respect is paid to elders).[23]

36. The 27 July 1981 Resolution further provided as follows:

> "3. *As our son Yousef Ahmad Algosaibi showed interest in performing his duties towards the Ahmad Hamad Algosaibi and Brothers Company as a member of the Board as well as his wish to be a partner in the share capital of the Exchange and Commission Branch;*
>
> 6. *This Branch (Activity) shall have a Board of Directors formed of the partners, and the Board of Directors of Ahmad Hamad Algosaibi and Brothers may add to the Board of Directors of the Branch any individuals they deem fit to enhance the development and regularization of work.*
>
> 7. *To approve the appointment of* [Al Sanea] *as the Managing Director of the Branch and the Board authorizes Sheikh Abdulaziz Hamad Algosaibi - Managing Director of the Ahmad Hamad Algosaibi and Brothers to assign the powers and responsibilities of Mr. Al Sanea.*
>
> 8. *The Board decided that the General Financial Manager and the Chief Accountant of the Head Office of Ahmad Hamad Algosaibi and Brothers shall be in charge of following up and monitoring the Branch's activities and that a detailed financial statement*

---

17 Fakhri xx: {**Day87/124:1**}.
18 Yousef xx: {**Day29/38:10 - 11**}.
19 Yousef xx: {**Day29/37:17 - 19**}.
20 Yousef xx: {**Day29/37:20 - 22**}.
21 Yousef xx: {**Day29/37:23 - 25**}.
22 Yousef xx: {**Day29/38:1 - 3**}.
23 Yousef xx: {**Day34/82:4**}. "*Well, I always -- we always had -- have respect for the elders.*"

> *should be prepared every three months and all the divisions of the Branch must extend all possible support to these officials to enable them to perform their tasks.*
>
> *9. The Board agreed that M/S El Ayouti and Co. will be the external auditors for the Branch and the Board has authorized Sheikh Abdulaziz Algosaibi to look into the issue of appointing a second external auditor alongside El Ayouti if that is necessary to enhance the progress and organization of work.*"

37. As to the appointment of El Ayouty as auditor of the Money Exchange by resolution 9 of the 27 July 1981 Resolution, El Ayouty had previously been appointed as auditors of the financial statements of AHAB H.O.[24] As was explained by Yousef in cross-examination:[25]

> "*Q. Just as El Ayouty had been appointed as auditors of all the other AHAB businesses, here they are being appointed the auditors of the Money Exchange; correct?*
>
> *A. Correct*
>
> *Q. You knew that that was the case because you signed these minutes.*
>
> *A. Probably, yes.*
>
> *Q. You would have known, wouldn't you, that if you wanted financial information, the source of that information would be the El Ayouty accounts -- the source?*
>
> *A. That's true.*
>
> *Q. All you had to do was to get Abdulaziz, Saud, Dr Sami or somebody to explain them to you?*
>
> *A. (Witness nods)*
>
> *CHIEF JUSTICE:*
> *Q. He nodded. Was that yes?*

---

24 See paragraphs 96 to 107 of the GTDs' Written Opening Submissions for a description of the financial statements of AHAB audited by Ayouty, {**U/3/29**} to {**U/3/31**}.

25 Yousef xx: {**Day31/57:3**}.

> *A.* *Yes. ...*
>
> *Q.* *So this 10 per cent interest in the Money Exchange which was going to buy banking shares was for you an important asset, correct?*
>
> *A.* *Well, yes.*
>
> *Q.* *In 1981?*
>
> *A.* *Yes.*
>
> *Q.* *If you had wanted to know how that asset was doing, all you had to do was get somebody to explain the El Ayouty statements to you?*
>
> *A.* *Yes.*
>
> *Q.* *And you knew that?*
>
> *A.* *Yes."*

38. The note of the interview conducted by, amongst others, Mr. Charlton of Abdul Moniem Farag and Rajab Hassan ("Hassan") of El Ayouty on 25 March 2010 (disclosed during the course of the cross-examination of Mr. Charlton) (the "March 2010 El Ayouty Interview Note") records that:[26]

> "*MF/RH indicated that El Ayouti had been auditors for the Algosaibis since the 1960s, having first been retained by Sheikh Hamad Algosaibi, and have audited AHAB ever since. They stated that there was a formal engagement agreement with Sheikh Abdulaziz Algosaibi and that after his death the AHAB Board would issue resolutions from time to time that referenced this agreement.*"

39. This interview note is discussed in further detail in Section 2 of this judgment.

---

26 {**C4/8/1**}.

40. Omar Saad described the long-standing and close relationship between El Ayouty and AHAB in cross-examination as follows:[27]

> *"Q. How long have you known the firm El Ayouty?*
>
> *A. Since they started to prepare the balance sheets for Algosaibi, a long time ago, since first we started working with them. Long time ago.*
>
> *Q. 1960s, 1970s?*
>
> *A. Yes, exactly.*
>
> *Q. Did you meet on occasion Saleh El Ayouty?*
>
> *A. Each time he visited us, we meet him, he ask for a balance sheet and we give it to him.*
>
> *Q. He knew the partners, didn't he? He knew Suleiman, Ahmad and Abdulaziz?*
>
> *A. Yes, he knew them.*
>
> *Q. When did Rajab first start coming to AHAB's offices?*
>
> *A. Since we started there was Saleh El Ayouty and after him Rajab.*
>
> *Q. How old is Rajab?*
>
> *A. An old man.*
>
> *Q. In his 70s?*
>
> *A. Yes, almost the same age as me. Has been a long time he has worked for Algosaibi.*
>
> *Q. Did you have any role in giving the trial balances to El Ayouty?*
>
> *A. We showed the accountings and we submitted them to him.*

27 Omar Saad xx: {**Day88/70:10**}; {**Day88/74:17**}; {**Day88/75:1**}; and {**Day90/31:3**}.

*Q.* *Did you look at the trial balances before they were submitted to El Ayouty?*

*A.* *Yes, these records –*

*Q.* *Your role in making the final arrangements was simply, once you had reviewed the accounts, to get them to Abdulaziz before he made the arrangement for a meeting?*

*A.* *Yes.*

*Q.* *You must have, over the years, got to know Rajab very well?*

*A.* *Yes, I know him."*

41. Saleh El Ayouty was the partner of El Ayouty responsible for the audit of the Money Exchange. He was also the partner responsible for the audit of other AHAB businesses (including, AHAB H.O.). Saud had Saleh El Ayouty on speed dial.[28]

42. The evidence of Mr. Charlton, on AHAB's ex parte application for the WFO on 24 July 2009, was that "*El Ayouty knew everything about the Money Exchange for which they had been accountants since inception and to which they had unfettered access*".[29]

43. Al Sanea was also made a partner of the Money Exchange by the Internal Partners Agreement ("IPA") dated 27 July 1981.[30] The other partners in the Money Exchange were AHAB and Yousef.[31] Under the IPA the Money Exchange was owned in the following proportions:

---

28 {**X4/3/2**}. Saud xx: {**Day61/93:10**}.

29 Charlton 1A, paragraph 52, {**L1/16/21**}.

30 {**H29/15/1**} (Arabic), {**H29/15.1/1**} (translation).

31 As Mallat explains in paragraphs 109 to 114 of Mallat 1R, under the law of Saudi Arabia the Money Exchange is best described as an '*inan* partnership with Al Sanea in the additional position of *mudarib*. The *mudaraba* is one of the most common legal arrangements for partnerships in classical Saudi law, and is mentioned often in modern Saudi court decisions. In its simplest forms, it consists of an investor partner, *rabb al-mal* (or, more rarely used, *mudarab*), who invests his capital in a joint venture, by way of a partner who is the *mudarib*. Al Sanea here is the *mudarib*, partner/agent for the Money Exchange, working for the other two partners, AHAB and Yousef, as investors. {**K1/2/24**} and {**K1/2/25**}.

65% by AHAB;

25% by Al Sanea; and

10% by Yousef.

44. Following its establishment, each of Ahmad, Abdulaziz, Suleiman, Yousef and Al Sanea became authorised signatories in respect of the Money Exchange. Their signatures were identified in the Signature Book for the Money Exchange dated 20 June 1982.[32] The covering letter in respect of that Signature Book is signed by Ahmad.[33] Yousef accepted in cross-examination that in order for his father to send out this document he must have asked Yousef to put his signature on it and Yousef must have provided it.[34] The Signature Book of the Money Exchange was updated and circulated periodically to the relationship banks of the Money Exchange.[35] Mr. Hayley, the General Manager of the Money Exchange from 1998, explained the purpose of the Signature Books of the Money Exchange as follows in cross-examination:[36]

> *"Q. What was the purpose of these signature books?*
>
> *A. The signature books were, um, disseminated to banks so that they could ensure that documents signed on behalf of the company were correctly signed.*
>
> *Q. When you say "correctly signed" what do you mean?*
>
> *A. Within the authority of the signature book.*
>
> *Q. So a bank gets a document from the Money Exchange signed by A or A and B?*

---

32 {**G/956/1**}.

33 {**G/956/3**}.

34 Yousef xx: {**Day30/52:3**}.

35 {**G/1077/1**}; {**G/1380/1**}; {**G/1732/1**}; {**G/2206/1**}; {**G/3538/1**}; {**G/4713/1**}; {**G/4714/1**}; {**G/5296/1**}; {**G/5298/1**}; and {**G/6618/1**}.

36 Hayley xx: {**Day22/60:10**}.

*A.* *Yes.*

*Q.* *It then can compare those signatures against the latest signature book that the bank has?*

*A.* *Yes.*"

45. Partners of AHAB acted as Chairman and/or other members of the Board of the Money Exchange. The minutes (in Arabic) of a meeting of the Board of Directors of AHAB on 23 June 1984 record as follows in this regard:[37]

> "*Sheikh Abdulaziz Hamad AlGosaibi, Managing Director, presented a memorandum to approve the formation of a separate Board of Directors for Ahmad Hamad Algosaibi & Brothers Co. Money Exchange, Commission and Investment. The Board would be made up of partners as follows:*

| | |
|---|---|
| *Sheikh Ahmad Hamad Algosaibi* | *Chairman of the Board* |
| *Sheikh Abdulaziz Hamad Algosaibi* | *Managing Director of AHAB Co.* |
| *Sheikh Suleiman Hamad Algosaibi* | *Board member* |
| *Sheikh Yousef Ahmad Algosaibi* | *Board member* |
| *Mr. Maan Abdelwahid Al Sanea* | *Managing Director of AHAB Co. Exchange, Commission and Investment*" |

46. Following its establishment, the Money Exchange occupied the entirety of the first floor of the same office building as AHAB H.O.

47. From 1982 to around 1990, Al Sanea worked at the Money Exchange. However, from in or around 1990, Al Sanea worked from the offices of the Saad Group in Al Khobar.[38] This change of arrangements was, of course, known to the AHAB Partners. This marked the expansion of Al Sanea's interest from his 25% shareholding in the Money Exchange

---

[37] A copy of which was in Saud's safe in his villa {**H29/60/3**} (Arabic), {**H29/60.1/3**} (translation).

[38] GTDs' Re-Re-Amended Defence and Counterclaim, paragraph 29 {**A1/9/11**}; AHAB's Re-Re-Re-Amended Reply and Defence to Counterclaim, paragraph 29 {**A1/15.1/9**}.

into the establishment of his Saad Group of Companies headquartered elsewhere in Al Khobar.

48. In about 1984, the Money Exchange changed its name from "Ahmad Hamad Algosaibi & Bros Co Money Exchange Bureau" to "Ahmad Hamad Algosaibi & Bros Co Money Exchange, Commission and Investment Division". In 2006, it changed its name again to "Ahmad Hamad Algosaibi & Bros Co Finance, Development and Investment".[39]

<u>The Investments Held by the Money Exchange</u>

49. The primary purposes of the Money Exchange were threefold:

(a) First, to hold AHAB's investments in shares in financial and other institutions, including substantial holdings in a number of Saudi Arabian banks, viz. The Saudi British Bank, Arab National Bank, Riyadh Bank, United Saudi Bank, Saudi Commercial Bank, Saudi American Bank ("SAMBA", now Samba Financial Group) and in land in Saudi Arabia.

(b) Secondly, to provide benefits (including loans) to partners of the Money Exchange or entities related to them, including loans to Abdulaziz, Al Sanea and Yousef.[40]

(c) Thirdly, to raise bank financing for the purposes of (a) and (b) above.

50. As to the first of these purposes, AHAB's stake in SAMBA was the "*jewel in the crown*" of these investments. SAMBA is a public company which was incorporated in Saudi Arabia in 1980 to take over the then existing branches of Citibank, N.A. ("Citibank") in

---

[39] The reasons for this change in the name of the Money Exchange were explained by Mr. Hayley in cross-examination: Hayley xx: {**Day68/129:9**}.

[40] This was the case since inception. The Arabic financial statements of the Money Exchange for the year ended 31 December 1981 record that Yousef Ahmad AlGosaibi Establishment, amongst others, was a debtor of the Money Exchange in the sum of SAR372,488.81: {**F/1/6**} (Arabic), {**F/2/6**} (translation).

Riyadh and Jeddah pursuant to a Royal Decree dated 12 February 1980. SAMBA was formed in accordance with a program adopted by the Kingdom of Saudi Arabia in the mid-1970s under which all foreign banks were required to sell majority equity interests to Saudi nationals. SAMBA commenced business on 12 July 1980.[41] On 3 July 1999, SAMBA merged with United Saudi Bank.[42]

51. AHAB was one of the founding shareholders of SAMBA. This was a source of great prestige and influence for AHAB.[43] As a consequence of AHAB's shareholding in SAMBA, Abdulaziz became the Chairman of the Board of Directors of SAMBA in 1984.[44] Following his father's death, Saud acted as a director of SAMBA from 2004[45] until his removal in about July 2009. From 2007, Saud was the Chairman of the Board of Directors of SAMBA.

52. SAMBA's shares are listed on the Tadawul,[46] the Saudi Arabian stock exchange. It carries on business as an international bank. In addition to its operations in Saudi Arabia, it has operations in the United Kingdom, the United Arab Emirates and Pakistan.

53. A letter dated 17 December 1985 from Abdulaziz and Al Sanea to John Reed, the then Chairman of Citibank records the prestige and influence afforded to AHAB as a consequence of its stake in SAMBA as well as the special position of trust and favour Al Sanea occupied with Abdulaziz:

> "*Thank you so much for your very kind telex congratulating me on my appointment to the Board of Samba - I feel very gratified that you should*

---

41 Annual Report of SAMBA for 2002 {**Q/539/4**}.
42 Annual Report for SAMBA for 2001 {**Q/538/4**}.
43 Yousef xx: {**Day30/33:8**}.
44 Yousef xx: {**Day30/33:14**}.
45 {**G/3747/1**}.
46 As to which see further discussion under "Benefits" in section 2 below.

*have taken the trouble to send me this personal message and I am very glad to have the chance to tell you that I share both your pride in Samba's present position and your hopes for its future. In particular may I emphasise that it is our intention as the major Saudi shareholder to work as closely as possible with you as a partner for the development of SAMBA.*

*More personally, I am looking forward greatly to meeting you. I understand that you plan to visit the Kingdom in 1986 and very much hope that you will be able to find time in your schedule to visit us in the Eastern Province, ask you to set aside at least a full day so that we can host a formal reception to introduce you to Prince Mohamed the Governor of the Eastern Province, as well as a private dinner and a visit to Hofuf so that you will see something of the Eastern Province. ...*
*If meanwhile I may immediately turn to business, having recently spent a few days with Samba in Riyadh I feel confident that there are great opportunities ahead, particularly now that the Board reflects the shareholdings. ...*

*You will see that this letter is signed jointly by myself and my nephew and son-in-law Maan Al-Sanea. He has full powers to act on my behalf in all matters and has for some time had responsibility for the overall international relationship between Algosaibi and Citibank, in addition to sole direct responsibility for SAMBA. He was personally in complete charge and control of all aspects of the recent developments.*

*He will be passing through New York in mid-January on his way to the Business International Chief Executives Conference in Phoenix Arizona, and he would very much like to call on you to introduce himself."*

54. As well as being a major shareholder in SAMBA, AHAB also borrowed large sums from SAMBA over the years. As a consequence of Article 9 of the Saudi Arabian Banking Control Law, SAMBA was required whilst a Partner of AHAB was on the board of SAMBA to hold security in respect of the loans it had provided to AHAB.[47] AHAB's relationship with SAMBA as a lender and the AHAB Partners' knowledge of that borrowing is considered further in Section 2 of the judgment.

---

[47] A copy of "Article 9" is at {**H22/50/1**}.

55. Apart from the foregoing, very little else about this complex and lengthy case was non-contentious. I turn next to the enquiry into the crucial and pivotal issue of the knowledge and authority of the AHAB Partners.

# SECTION 1

## KNOWLEDGE OF THE AHAB PARTNERS OF THE FRAUD UPON THE BANKS AND OF THE EXTENT OF THE BANK BORROWINGS, INCLUDING THE AL SANEA INDEBTEDNESS

## KNOWLEDGE OF THE AHAB PARTNERS OF THE FRAUD UPON THE BANKS AND OF THE EXTENT OF THE BANK BORROWINGS, INCLUDING THE AL SANEA INDEBTEDNESS

1. The pivotal issue in this case is whether the AHAB Partners knew of and expressly or implicitly authorized, the enormous borrowings from banks which were obtained by fraudulent means through the Money Exchange and the Bahrain Financial Businesses.[48]

2. The resolution of this pivotal issue will be heavily influenced by the findings as to the extent of the Partners' knowledge of and involvement with the means by which the Money Exchange perpetrated the fraud against the banks; namely, by the dissemination to the banks of falsified financial statements. The methodology used for the falsification of the financial statements was elaborate and sophisticated and, over the course of several years, became institutionalized within the Money Exchange.

3. From near the time of the re-establishment of the Money Exchange in July 1981 until its collapse in May 2009, the financial statements deliberately and grossly understated the extent of the borrowings and so, the true extent of AHAB's indebtedness to the banks and its status as a borrower. By presenting them to the banks, the false financial statements became the central instrumentality of the fraud.

4. The resolution of this pivotal issue of knowledge will also depend upon the extent to which it can be shown, amidst allegations of widespread forgery of their signatures and manipulation of documents, that the Partners were involved directly with the borrowing transactions, whether they were involved in the execution of loan documentation.

---

48 Following the meaning assigned by the Defendants in closing submissions at **{E1/17/1}**, to include Algosaibi Investment Holdings EC ("AIH"); Algosaibi Trading Services ("ATS") (formerly Algosaibi Investment Services Co. or Algosaibi Company for Investment Services,"AIS") and The International Banking Corporation ("TIBC") but not the Money Exchange.

5. AHAB’s originally pleaded case was that all borrowing through the Money Exchange and the Financial Businesses was undertaken by Al Sanea without the knowledge and authority of the AHAB Partners and by way of a fraud not only upon the lending banks but upon the Partners as well.

6. As will be explained immediately below[49] this changed very significantly after the collapse of AHAB’s defence to proceedings in London.

7. AHAB’s pleaded case on knowledge and authority ultimately became that while there was involvement by the Partners with the falsified financial statements and knowledge to some extent of the borrowings, this developed and operated only until circa 30 September 2000, when Abdulaziz suffered his stroke. Thereafter, the practice of false accounting which Abdulaziz had put in place (without admission by AHAB of fraudulent intent), and allowed Al Sanea to implement, had ceased. That so far as successive Partners were aware, the extent of the borrowings had been curtailed, by means of what came to be described as the “New for Old” policy – the policy said to have been imposed upon Al Sanea by Suleiman. The purported aim of the “New for Old” policy was to ensure that the borrowings did not increase beyond SAR 7.8bn (USD 2.3bn). As will be discussed further below, especially in relation to Saud Algosaibi’s involvement, this was the already massive amount of borrowing known no later than around mid-2002 to exist and that which roughly reflected the amount of borrowing already in place at the time the putative “New for Old” policy was introduced in or around late 2000.

---

49 And in more detail under the heading “New for Old” in a separate section of this Judgment.

8. It is surely beyond argument as the evidence in the case has revealed, that if "New for Old" was ever implemented, it failed spectacularly to curtail further borrowing.

9. As AHAB itself acknowledged through the evidence of Mr. Charlton[50] – over the years following the alleged implementation of the policy until the collapse of the Money Exchange in May 2009, some US$126bn was raised by the Money Exchange (including through the Bahraini Financial Businesses) by way of fraudulent borrowing, from at least 118 different banks around the world. From January 2000 to May 2009, the total flow of cash through the Money Exchange was over US$ 330bn.

10. The total amount of the unrepaid borrowings at the time of the collapse, as at the end of May 2009, was SAR 34.6bn (US$9.2bn) and this became the sum of AHAB's original claim in this action.

11. The evidence reveals that the Money Exchange (orchestrated in conjunction with the Bahraini Financial Businesses) had been used to perpetrate one of the largest Ponzi schemes in history, with later borrowing used to repay earlier borrowing, while also providing funds for the ever-increasing indebtedness of the Money Exchange.[51] The extent to which this increasing indebtedness was allocated as between the interests of the Algosaibis and those of Al Sanea became another important issue in the case. In the end, as AHAB's key witness Mr. Hayley is recorded as having observed from his management of the Money Exchange in rough general terms, there was found to be a near even

---

50 Charlton 1W, **paragraph 38**: **{C1/5/11}**.
51 **Ibid, paragraph 40**: **{L1/25/14}**.

allocation of the borrowings,[52] the exact breakdown to be more closely examined elsewhere in this judgment under the heading "*Benefits Received*."

12. Its spectacular failure aside, the fact that "New for Old" had not been AHAB's pleaded case from the outset became also of pivotal importance in the trial.

13. Indeed, "New for Old" was a radical change of position and one which came about in circumstances which themselves became of significance.

14. AHAB's position at the outset of its pleaded case was one of complete ignorance and non-authorization of the fraudulent borrowing of the Money Exchange. Its position[53] was that Al Sanea, while managing to keep the AHAB Partners completely in the dark about the operations of the Money Exchange and the Bahraini Financial Businesses, caused a very large number of loan agreements and other related documentation to be executed in the name of AHAB, with the many and various banks.

15. In its originally pleaded case at paragraph 99, AHAB referred to "***all such borrowing***" taken up to May 2009 as "***unauthorized borrowing***" (my emphasis).

16. At paragraph 100 of its Statement of Claim,[54] AHAB pleaded (and still pleads) that:

> "*Mr. Al Sanea obtained the unauthorized borrowing by forging or causing to be forged the signatures of the chairman of AHAB (Abdulaziz Algosaibi until May 2003 and thereafter Suleiman Algosaibi until February 2009) on the loan documentation.*"

17. At paragraph 101,[55] AHAB had originally pleaded that:

> "*Mr. Al Sanea instructed Money Exchange employees that when loan documentation required approval or signature on behalf of AHAB, as it almost invariably did, it should be delivered to his office at the Saad*

[52] Hayley 1W, **paragraph 304: {C1/9/61}**.
[53] As pleaded originally at Section F paragraphs 97-99 of the Statement of Claim: **{A1/2.2/37}**.
[54] **{A1/2.3/42}**
[55] **{A1/2.3/42}**

> *Group (in a different building from the Money Exchange) and not to the AHAB partners or directors (whose offices were on a different floor in the same building)….No loan documentation was sent to the AHAB partners or directors and there was no correspondence concerning the unauthorized borrowing with them*."

18. In its changed pleadings, this averment was struck and replaced with the allegation that in some cases, Al Sanea would send the loan documentation to AHAB's H. O. for signature in purported compliance with the "New for Old" policy, including "*a small number of [such] cases*" where the signature on the counterpart returned to the lender was forged by Al Sanea.[56]

19. Thus, AHAB's case changed from one of total lack of knowledge and involvement on the part of the AHAB Partners in the borrowing of the Financial Business and the Financial Businesses, to one of limited involvement after "New for Old" was allegedly implemented. Thereafter AHAB alleges that widespread forgery and manipulation of documents became Al Sanea's means of evading the policy.

20. AHAB's case thus came to focus upon borrowing taken after "New for Old" was said to have been implemented, viz: between October 2000 and May 2009. During this period alone, there was however, borrowing involving some 54,000 transactions[57] and that fact by itself raised questions about the existence of the policy and helped to set the context for the enquiry into the allegations of forgery.

21. The radical changes to AHAB's pleaded case are graphically shown by the pleadings themselves, in particular in the relevant passages of AHAB's Re-Re-Re-Amended

---

[56] **Paragraph 101** of the Re-Re-ReAmended Statement of Claim: {**A1/2.2/42**}.

[57] Per Charlton London 1W, **paragraph 24**: {**L1/25/9**}. Each transaction would have involved several different documents each in turn requiring several signatures, most controversially, those of Suleiman. It is estimated conservatively that this would have required Suleiman to apply his signature at least 100 times each day.

Statement of Claim, which will be excerpted below. But it is important that before doing so, I explain the circumstances under which the changes came about.

**<u>The London Proceedings and the disclosure of the N Files</u>**

22. AHAB's asserted original position of total ignorance and non-authorization of the fraudulent borrowings was maintained by AHAB, not only in this action but also in other actions brought by lending banks against AHAB in London. Indeed, this was so in other contexts as well, such as before the Royal Committee established by the King of Saudi Arabia at the AHAB Partners' instigation, to inquire into AHAB's allegation of Al Sanea's fraud against the banks and against AHAB itself.

23. In its defence to the London proceedings, AHAB's case, in effect, was that it had had no knowledge of and had not authorized any of the loans obtained by the Money Exchange from the plaintiff banks, all of which the Partners asserted had been orchestrated by Al Sanea without their knowledge or authority, either actual or implied. Thus, AHAB would accept no liability to the banks for those borrowings.

24. The London Proceedings got to trial and there came a point in time in April 2011 when the plaintiff banks expressed their suspicions and concerns that AHAB had failed to meet its obligations of full and frank disclosure. This led the trial judge, Justice Flaux, to make very firm and pointed orders for further investigation and discovery at AHAB's offices in Al Khobar, with his orders placing the obligation squarely upon AHAB's legal advisors to ensure that the duty of full and frank disclosure was fulfilled. This led to the further search of the AHAB offices or other places where records might have been kept.

25. This further search having been undertaken, the upshot was that in May 2011, AHAB's Investigation Team found a substantial number of highly relevant documents in a

cupboard in Saud Algosaibi's office at the AHAB Head Offices ("AHAB H.O."). This happened although the Investigation Team had reported as having searched Saud's office before. These documents came to be labeled the "N Files", so called as disclosed and labelled in the London Proceedings.

26. In cross-examination,[58] Simon Charlton, the head of the AHAB Investigation Team, describes the N Files as having been "*eerily stacked*" in Saud's cupboard, found as they were in conspicuous isolation from the other many hundreds of thousands of documents kept at AHAB H.O. – documents which, if not yet by then disclosed, would be later disclosed by AHAB as being potentially relevant in these proceedings. Unsurprisingly and for reasons to be further explained below, the disclosure of the N Files led to the collapse of AHAB's defence to the London Proceedings. It was plain from the circumstances that someone had deliberately sought to conceal the existence of the N Files and to prevent their disclosure in the London Proceedings.

27. The failure to disclose the N Files was also of immediate consequence in these proceedings where AHAB had managed to persuade this court to issue a freezing order carrying worldwide effect (the "WFO"),[59] based on its case of lack of knowledge and authority as pleaded originally.

28. The impact of the N Files upon the London Proceedings was fundamental as they disclosed the knowledge of the AHAB Partners, especially Saud's and Suleiman's knowledge, of a very substantial amount of the borrowing of the Money Exchange and of

---

58 {Day83/157:4}
59 Granted by Henderson J. on 24 July 2009: **{B/1/1}**.

Al Sanea's indebtedness to the Money Exchange, incurred by way of the allocation to his accounts within the Money Exchange of very large amounts of the borrowed funds.

29. Beyond the collapse of the London Proceedings, the inevitable result was the discharge of the WFO in these proceedings. There was also an application by the Defendants to strike out the entirety of AHAB's claim, based as it then was upon AHAB's pleaded total ignorance of the borrowings and of Al Sanea's fraudulent activities conducted through the Money Exchange.

30. It was in its resistance to that strike out application that AHAB's "New for Old" case first emerged. AHAB then sought and was granted leave to amend its Statement of Case to plead, for the first time, that Abdulaziz, and Suleiman after him, had had knowledge of substantial borrowings obtained by Al Sanea through the Money Exchange but that Suleiman came to impose the "New for Old" policy in around late 2000 after Abdulaziz's stroke, to curtail further borrowings. Inherent in the "New for Old" case was the proposition also that Abdulaziz's incapacitation afforded Suleiman the opportunity to impose controls which hitherto had not been possible under the close collaboration which existed between Al Sanea and Abdulaziz – the latter very much portrayed on AHAB's case as having been Al Sanea's protector, benefactor and exclusive collaborator in the operations of the Money Exchange until the time of his incapacitating stroke in September 2000.

31. By a still later iteration of its case which emanated from Saud Algosaibi in cross-examination only well after this trial began,[60] AHAB came to accept in light of the clear evidence which had emerged, that Suleiman must also have had knowledge of and

---

60 {Day59/9:1-22}

allowed further borrowings beyond the levels incurred during Abdulaziz's time. However, this acceptance was on the qualified basis – presented also for the first time during Saud's cross-examination – that this must have been allowed by Suleiman only to cover amounts of interest being incurred upon then known borrowings, interest which AHAB admitted it had not been repaying from its own resources.

32. AHAB's case thus came to rest finally upon the proposition that all borrowings over and above that which existed at the time "New for Old" was implemented plus "*a bit more to cover interest*" (per Saud[61]), were borrowings by Al Sanea which were unknown to and unauthorized by AHAB.

33. As the proposition thus emerged in support of AHAB's differently pleaded case, the question of the extent of the AHAB Partners' knowledge of the fraudulent practices of the Money Exchange and of the borrowings procured by those means, became of fundamental importance in the trial.

34. AHAB's case had made the seismic shift away from one of total ignorance and absence of authority on its part, to one of knowledge and authority up until about the time of Abdulaziz's stroke and thereafter, the purported curtailment of borrowings to the levels reached at the time of his stroke plus "*a bit more to cover interest*."

35. And so, if the AHAB Partners are shown beyond the year 2000 to have been aware of and to have authorized – including by deliberately turning a blind eye – Al Sanea's procurement of the ever-increasing fraudulent borrowings, then AHAB's case against the Defendants in these proceedings must fail. AHAB's primary proprietary and receipt based claims against the Defendants, developed on the basis of Al Sanea's alleged fraud

---

[61] {Day59/9:1-22}

against AHAB, can be no better than AHAB's proprietary claim against Al Sanea himself. AHAB's case would therefore be unsustainable if the AHAB Partners are shown to have been aware of and authorized his fraudulent activities against the lending banks, and were aware of his indebtedness to the Money Exchange incurred by the allocation of much of the borrowings for his own purposes. In short, AHAB's case, which depends fundamentally upon AHAB's lack of knowledge and authorization, will have disintegrated.

36. Against this background, it is important to emphasize that no clear or convincing explanation has been given for the late disclosure of the N Files. It follows that no clear or convincing explanation has been given of the late disclosure of the fact – so far as revealed in them – of knowledge and authority on the part of AHAB Partners.

37. Instead, much in this regard is left to inference or speculation against the background of evidence of the ransacking of the records of the AHAB H.O. and the Money Exchange at the time of the collapse in May 2009 and the removal of unknown quantities of those records to Saud's villa.

38. The explanation such as it is,[62] is to the effect that the N Files must have been compiled from among those records which were removed from the AHAB H.O.[63] and/or the Money Exchange offices at the AHAB H.O. building in Al Khobar, on Saud's instructions to "*certain younger members of my family*" in the throes of the collapse of the Money Exchange in around May 2009.

---

62 Given in Saud's Second Affirmation in the London Proceedings: **{L1/8/9} - {L1/8/11}**, **paragraphs 31-37**.

63 Including files which must have come from Saud's Office having been kept for him by secretaries Messrs Basha John and Khaled Fawzi, some from the safe in Abdulaziz's office and some from Badr's office.

39. As to this turn of events, Saud admitted in his witness statements (and more guardedly in cross-examination)[64] to having instructed the younger members of the Algosaibi family in May 2009 to go into the AHAB H.O. and the Money Exchange to search for and remove to his villa at nearby Al Aziziyah beach, documents which appeared to have any bearing on the demands for repayment which the banks were then making on AHAB. His reason[65] for doing this he said was that "*before I had a grasp on the true scope and nature of the difficulties AHAB faced, I attempted to understand and (if I could) solve AHAB's problems without extensive outside assistance*." This exercise directed by Saud to be done by the "*Younger Algosaibis*" as they came to be called, will be the subject of further examination in this Judgment.

40. For present purposes, what appears from Saud's evidence to be his position on the N Files, is that they must have comprised and/or been compiled from among the documents taken to his villa by the Younger Algosaibis. For that reason they were not to be found in his office at the AHAB H.O. building when the Investigation Team inspected it in September/October 2009. Nor were the N Files to be found at his villa by the Investigation Team when his villa was inspected in September/October 2010 for the purposes of making disclosure in the London Proceedings. Saud therefore surmises that (albeit it must have been on his instructions) in a manner and at a precise time unrecalled by him between September/October 2009 and September/October 2010, the N Files made their way back to the cupboard in his office at AHAB H.O. where they came to be discovered in May 2011.

---

64 **{C1/2/75}, paragraph 363**.

65 As explained at **{L1/8/7}, paragraph 22**.

41. While the N Files contained many relevant and revealing documents, they did not contain a full set of any of the very important El Ayouty Audit Packs which invariably included Attachments 8 and 9, respectively setting out over each successive year the Money Exchange's total borrowings and the Al Sanea total indebtedness to the Money Exchange. However, the N Files did contain certain documents, including what by inference must have been information extracted from the Audit Pack for 2001, that revealed Saud's precise knowledge of substantial borrowings at the Money Exchange, including what was already by then the massive amount of the Al Sanea indebtedness. It was these documents that most directly caused the collapse of the London Proceedings and compelled the discharge of the WFO in these proceedings.

42. These telling and important documents revealed in the N Files recorded Saud's manuscript calculations on a few pieces of note paper **{N/744}** **{N/745}** ("Saud's Calculations") together with the associated Attachment 8 **{N/782}** **{N/783}** and Attachment 9 from the Audit Pack for 2001 **{N/781.1}** **{P/145/12}**.

43. Saud's Calculations are revealed in the evidence to have been done in or about April/May 2002 by reference to information which could only have come from Attachments 8 and 9 of the Audit Pack for 2001. They recorded precisely – at SAR 7,810,900,000[66] – the amount of the total bank loans taken by the Money Exchange as at 31 June 2001. They also recorded the actual total of Al Sanea indebtedness at that time of SAR 4,128,113,411 and – after showing deduction of Al Sanea's recorded deposits with the Money Exchange – his net indebtedness to the Money Exchange of SAR 3,682,786,589. By that same process of deduction, Saud's Calculations also showed the net indebtedness of AHAB

---

66 At then prevailing rates of exchange: US$2.31bn approx.

itself; i.e.: the indebtedness incurred by the Money Exchange after deduction of the Al Sanea indebtedness amounting to SAR 4,442,594,632.[67]

44. There are further implications of Saud's Calculations to be examined below but for the present purposes of setting the context for AHAB's amended case, they showed what was already by May 2002, knowledge on the part of the Partners through Saud (and by association, Suleiman) of a very substantial amount of borrowings by the Money Exchange (US$2.31bn) and massive indebtedness (US$1.08bn) for Al Sanea and US$1.3bn for AHAB itself.

45. While in his evidence in cross-examination Saud sought to explain that he had undertaken his calculations at Suleiman's request and based on information which others at AHAB H.O. must have provided to him (rather than having had sight himself of the Audit Pack, including Attachments 8 and 9 for 2001), for the purposes of AHAB's amended case as it came to be pleaded post the N Files disclosure, Saud's Calculations carried obvious and far-reaching implications which had to be addressed in the pleadings. This was obviously because the evidence would no longer support a pleading of total ignorance and total lack of authority in respect of the Money Exchange borrowings and the Al Sanea indebtedness.

46. The amended pleadings also needed to address other evidence that had come to light revealing of the AHAB Partners' knowledge of the fraudulent accounting practices. This is evidence which had been disclosed from AHAB H.O. or Money Exchange records and which showed that by the 1990s at latest, El Ayouty had been advising the AHAB Partners (at that time Abdulaziz, Suleiman and Yousef), in pointed and at times even

---

67 US$1.08bn, approx.

shrill terms, against the fraudulent accounting practices at the Money Exchange and about the increasing size of the Al Sanea indebtedness. Indeed, this evidence in the form of the limited correspondence disclosed, shows El Ayouty speaking in terms of the risk of bankruptcy for AHAB presented by the already massive borrowings, of the need to sell the Money Exchange to Al Sanea, as had been earlier proposed and El Ayouty giving advice to liquidate assets to meet the bank indebtedness. This and other episodes of engagement between the AHAB Partners and El Ayouty will be examined in more detail below but reference is made here to the El Ayouty correspondence in order to set the proper context for AHAB's finally amended case which I will now set out.

47. The relevant excerpts from the pleadings, dealing with the important issues of knowledge and authority, are as follows from paragraph 97 of the Re-Re-Re Amended Statement of Claim, showing in red the changes resulting from the amendments:

*"**F. Unauthorised borrowing in the name of AHAB***

F.1 Overview

*97. In order to fund the misappropriations pleaded above, Mr. Al Sanea caused a large number of loan agreements and other related documentation, including guarantees, to be executed in the name of AHAB with various banks and financial institutions. The borrowing was vastly in excess of what the Money Exchange or the AHAB group as a whole required for its genuine business. Mr. Al Sanea also caused ATS, AIH and TIBC to borrow large amounts which were then transferred to the Money Exchange and/or misappropriated by him.*

*98. In total, Mr. Al Sanea arranged borrowing from at least 118 different lenders. The balance of that borrowing, including accrued interest, was about SAR 34,600m (US$ 9,200m) as at the end of May 2009; the amount is likely to rise as further interest accrues. Details of the total ~~unauthorised~~ borrowing by the Financial Businesses are given in schedule 6.*

99. *AHAB refers to all ~~such~~ borrowing which was, as set out in more detail below, arranged by Mr. Al Sanea without the actual or implied authority of AHAB as "**unauthorised borrowing**". Nothing in this Statement of Claim is intended by AHAB as a ratification of any purported agreement with any lender or as an admission or concession that AHAB, ATS, AIH or TIBC has any liability to any lender in respect of any of the unauthorised borrowing*[68] *or otherwise in respect of the conduct of Mr. Al Sanea. AHAB fully reserves its rights and position as against the lenders.*

[A new section "F.1bis" was inserted which alleges that the Money Exchange was set up and operated primarily for Al Sanea's benefit and then dealt with "New for Old" as follows]:

F.1bis Extent of AHAB's knowledge and authorisation of borrowing

99A. *The Money Exchange was set up initially by Abdulaziz Algosaibi, then the chairman of AHAB, in order to give Mr. Al Sanea an income and position in the Algosaibi family business. From about the mid-1980s until 30 September 2000, Mr. Al Sanea reported directly and exclusively to Abdulaziz in respect of the management of the Money Exchange.*

99B. *From about the late 1980s, other senior members of the Algosaibi family, including Suleiman and Yousef, became unhappy about Mr. Al Sanea's role at the Money Exchange. Abdulaziz was initially resistant to their position but eventually agreed that steps should be taken to close the Money Exchange. By a letter dated 28 March 1992, Suleiman and Yousef wrote to Abdulaziz authorising him and Mr. Al Sanea to work together to liquidate the Money Exchange.*

99C. *In the event, Abdulaziz did not implement the agreement to close the Money Exchange.*

---

68 Or that AHAB has any liability for the obligations of ATS, AIH or TIBC.

*99D. On 19 May 1994, El Ayouty, the auditors of the Money Exchange wrote to Abdulaziz reporting that Mr. Al Sanea had numerous accounts in debit with the Money Exchange with a total balance of SAR 1,442m. El Ayouty copied their letter to Mr. Al Sanea, saying that he should set up a programme for repaying that balance, which was equal almost to the balance of money borrowed by the Money Exchange. El Ayouty expressed further concerns about the Money Exchange in letters to Abdulaziz in January 1996 and April 1997. Those concerns were not communicated to other members of the Algosaibi family at the time.*

*99E. In 1999, El Ayouty approached Yousef directly to inform him of their concerns about Mr. Al Sanea's withdrawals from the Money Exchange, which had by then increased to about SAR 2.3bn (US$ 0.6bn). Yousef raised the matter with Abdulaziz. Abdulaziz told Yousef that he would take care of the problem and shortly afterwards provided Yousef and Suleiman with a written acknowledgment of Mr. Al Sanea's debts to the Money Exchange dated in or about March 2000, confirmation that he was holding security in respect of the debts and an undertaking to guarantee the debts.*

*99F. On 30 September 2000, Abdulaziz suffered a massive stroke from which he never recovered. Immediate responsibility for dealing with the proposed liquidation or disposal of the Money Exchange at that point passed principally to Suleiman and, to a lesser extent, Saud, neither of whom had had any significant previous involvement with the Money Exchange and were not familiar with its history or operations….*

*99G. On assuming responsibility from Abdulaziz, Suleiman decided that until the Money Exchange could be closed or sold, borrowing through the Money Exchange should be curtailed and that such borrowing should not materially increase beyond the level that he understood to have been approved or known about by Abdulaziz before his stroke.*

*He also took steps to reduce the outstanding borrowing from banks and to compel Mr. Al Sanea to repay the moneys he had withdrawn from the Money Exchange. For example, in May 2001, Suleiman obtained Mr. Al Sanea's agreement to repay SAR 400m by the end of 2001 (although Mr. Al Sanea did not in the event honour that agreement). Suleiman and Saud's understanding was that moneys repaid by Mr. Al Sanea would go to reduce the Money Exchange's overall borrowing.*

*....*

*99K. In or around ~~late~~ 2002 or early 2003, and prior to Abdulaziz' death, Suleiman instructed Mr. Al Sanea that if Mr. Al Sanea wished to renew or replace any existing borrowing of the Money Exchange then he had to establish that the proposed new borrowing was not an increase on the expiring facility. Suleiman thereafter indicated that he was adopting the practice of signing new facility agreements or facility renewals only when such facilities were rollovers of existing facilities.*

*....*

*99O. AHAB's case on authority is as follows:*

*(a) AHAB does not positively allege in these proceedings, because it has insufficient information to do so, that borrowing arranged by Mr. Al Sanea before 30 September 2000 was unauthorised; however, for the avoidance of doubt, it does not admit that all such borrowing was authorised and reserves the right to contend otherwise in any future proceedings.*

*(b) After 30 September 2000, Mr. Al Sanea was authorised to maintain the level of borrowing by arranging the renewal or replacement of existing facilities but was not otherwise authorised to borrow through the Money Exchange or in the name or against the credit of AHAB.*

....

(d) *Any facility agreements signed by Suleiman (or executed under his signed authority) after 30 September 2000, were signed in the belief and on the understanding, as Mr. Al Sanea was aware, that moneys advanced would be used for the benefit of the Money Exchange, and would simply replace or refinance (without increase) the already existing borrowing of the Money Exchange. If and to the extent that the advance was used for that purpose then AHAB accepts for the purpose of these proceedings that Mr. Al Sanea was authorised to arrange the facility. If, however, the advance was used for some other purpose, and in particular if it was used to fund misappropriations to Mr. Al Sanea, then Mr. Al Sanea was not authorised to arrange the facility. No agent has actual authority to act in fraud of his principal.*

(e) *Further or alternatively, to the extent that the balance of borrowing by the Money Exchange exceeded SAR 4.4bn after mid 2003, that part of the borrowing was in any event unauthorised because Mr. Al Sanea had no authority to increase the level of the Money Exchange's total borrowing.*

(f) *Further, AHAB did not authorise any borrowing by or through TIBC and ATS.*"

48. That being the nature of AHAB's pleaded case on knowledge and authority of the borrowings as it came to rest at the end – the acceptance through Saud in cross-examination on Day 59[69] and following that there would also have been authorization for "*a bit more for interest*" never having made its way into the formal pleadings – the context is set for the detailed consideration

---

69 **{Day59/9:1-22}**

of the evidence presented at trial relating to the Partners' knowledge and authority, both collective and individual.

49. Further extensive pleadings in AHAB's case on other matters of importance relating to the Partners' knowledge (such as whether there was pervasive forgery of Suleiman's signature by Al Sanea on "*an industrial scale*"; whether and the extent to which the Financial Businesses (TIBC, AIH and ATS) were used by Al Sanea unknown to the Partners to acquire massive borrowings; and whether Al Sanea acted in collusion with El Ayouty, the staff of the Money Exchange and the Financial Businesses, to manipulate the financial statements of the Money Exchange so as to conceal the fraud from the AHAB Partners); are all matters which are also to be addressed in the course of the examination of the very extensive evidence given during the course of the trial.

50. AHAB, in its Closing Submissions[70] emphasizes that when considering the issue of AHAB's knowledge and what the evidence reveals in that regard, the Court should ask itself these two overarching questions:

(1) If the AHAB Partners knew of the extent of the borrowing incurred by the Money Exchange, the full extent of the Money Exchange's assets and the full extent of the Al Sanea indebtedness to the Money Exchange, why would the AHAB Partners have allowed him to continue to act as he did for years and not put a stop to it?

(2) If the AHAB Partners knew and approved of all the borrowing incurred by the Money Exchange, why was it necessary to forge (whether by hand or mechanical application) the signatures of Abdulaziz, Suleiman, Saud and Yousef?

---

70 AHAB's Closing Submissions, **Section 4.12 {D/4/5}**.

51. These are indeed questions which will be borne in mind throughout my examination of the evidence. The first will, as far as possible, be addressed in the chronological discussion of the evidence as it unfolded and later in the context of "*benefit*." The second will be discussed in detail in Section 4: The Forgery Allegations.

52. I now turn, after setting the legal stage for the exercise, to consider the evidence on the issue of knowledge and authority and in so doing, acknowledge with gratitude, the very careful and extensive treatment this issue received (as indeed did all the important issues) from counsel on all sides but most especially from counsel for the Defence. Indeed, my discussion of this issue follows the pattern of the detailed written submissions of the Defendants, incorporating my findings and referencing AHAB's written submissions which I also address simultaneously.

**General probabilities or improbabilities**

53. I begin by adopting some introductory observations of the Defendants on the subject of the approach to be taken especially to the assessment of the evidence in a case such as this, one so heavily burdened with allegations of fraud on all sides and where everything will depend on what the Court makes of the evidence of the knowledge, recollections, truthfulness or untruthfulness of witnesses.

54. As matters transpired, in this case the only witnesses of fact were those called by AHAB. The Defendants adduced evidence only from independent experts or professionals employed by the Liquidators' firms.

55. The result is that questions of credibility arise in this case especially in relation to the AHAB witnesses, and most especially in relation to the evidence of some AHAB

Partners; viz: Yousef, Saud and Dawood, each of whom testified on the important matter of the state of his own knowledge at the relevant times.

56. It is important that as a preliminary matter, I should record that I accept that in assessing the Partners' knowledge (particularly given that Abdulaziz and Suleiman, whose involvements were of crucial importance, are deceased and so were not available to testify to their own involvement), it is clear that I will have to be guided chiefly by the proven documentary evidence, especially where that evidence does not accord with the stated recollection of any witness. In light of the evidence – and in particular in light of the consistency or inconsistency of a witness's evidence with his previous evidence or with undisputed background facts or documents – I must also have regard to the inherent probabilities or improbabilities of AHAB's claim.

57. Indeed, the same approach will carry through to my assessment of SICL's and Singularis' counter-claim against AHAB. There, the most important witness of fact, Al Sanea himself, while providing the SICL and Singularis Liquidators with documents upon which they rely to support the counter-claim, absented himself completely from the proceedings, leaving the counter-claim to be examined essentially in the context of the documentary evidence in the case.

58. The importance of documentary evidence and of the inherent probabilities and improbabilities discerned as arising from the objective facts as established from the contemporary documents in fraud cases, has been emphasised repeatedly by the Courts.

The most widely cited dictum is that from Lord Justice Goff (as he then was) in **Armagas Ltd v Mundogas S.A. (The "Ocean Frost") [1985] 1 LL R 1** at **page: 57**[71]

> "*Speaking from my own experience, I have found it essential in cases of fraud, when considering the credibility of witnesses, always to test their veracity by reference to the objective facts proved independently of their testimony, in particular by reference to the documents in the case, and also to pay particular regard to their motives and to the overall probabilities. It is frequently very difficult to tell whether a witness is telling the truth or not; and where there is a conflict of evidence such as there was in the present case, reference to the objective facts and documents, to the witnesses' motives, and to the overall probabilities, can be of very great assistance to a Judge in ascertaining the truth.*"

59. Lord Goff came later to adopt and apply those observations again in the Privy Council in **Grace Shipping v Sharp & Co** [**1987**] **1 LL.R 207** at page 215-6[72] and they were repeated even more recently by the Privy Council in **Villeneuve v Gaillard [2011] UKPC 1** at [67].[73]

60. Lord Bingham, in his paper: **The Judge as Juror: the Judicial Determination of Factual Issues [1985]**, emphasised the importance of reliance upon objective measures of reliability over subjective measures such as the demeanour and individual recollection of witnesses. He quoted extensively (at pp3-5[74]) from Lord Pearce's dissenting speech in the House of Lords in **Onassis et al v Vergottis [1968] 2 LLR 403** at page 431[75] in terms which I think are apposite to the task of evidential assessment presented in this case:

> "*It is a truism, often used in accident cases, that with every day that passes the memory becomes fainter and the imagination becomes more active.*

---

71 **{R1/13.5/57}**

72 **{R1/14.1/9}**
73 **{R1/41.2/29}**
74 **{R2/9/4-6}**
75 **{R1/8.2/29}**

> *For that reason a witness, however honest, rarely persuades a Judge that his present recollection is preferable to that which was taken down in writing immediately after the accident occurred. Therefore, contemporary documents are always of the utmost importance. And lastly, although the honest witness believes he heard or saw this or that, is it so improbable that it is on balance more likely that he was mistaken? On this point it is essential that the balance of probability is put correctly into the scales in weighing the credibility of a witness. And motive is one aspect of probability. All these problems compendiously are entailed when a Judge assesses the credibility of a witness; they are all part of one judicial process. And in the process contemporary documents and admitted or incontrovertible facts and probabilities play their proper part.*"

61. A more modern exposition of the reasoning appears in **Gestmin SGPS v Credit Suisse (UK) Ltd [2013] EHC 3560 Comm** at paragraphs 15 to 22[76] where Leggatt J (who seems to have studied relevant research material for this purpose) explained why little weight can be given to evidence for recollection in any commercial case and why oral factual testimony is often of such limited value. Among his conclusions were the following:

(1) The process of civil litigation itself subjects the memories of witnesses to powerful biases, the effect of which is to alter the witness's memory of events so as to reflect the witness statements and other materials shown to the witness, whether they be true or false, rather than the original experience of the events:

(i) The nature of litigation is such that witnesses often have a stake in a particular version of events or ties of loyalty or even simply a desire to assist the party calling them;

---

76 **{R1/44.4/5-7}**

(ii) Considerable bias is introduced by the process of drafting witness statements, often long after events, normally by lawyers conscious of the significance of what a witness does or does not say, referring to documents such as pleadings which they have never seen or "refreshing" memory of things long forgotten.

(2) Above all, it is important to avoid the fallacy of supposing that, because a witness has confidence in his or her recollection and is honest, evidence based on that recollection provides any reliable guide to the truth.

62. It is submitted by the Defendants therefore that the Court should adopt a robust skepticism to many of the self-serving assertions made by AHAB's witnesses. It is one thing to remember a fact that goes against AHAB's interests (indeed the fact that the witness does have such a recollection means it is more likely to be true), it is quite another to remember matters which assist AHAB's case but run contrary to the contemporaneous documentation and which are only recalled many years later (having been forgotten in the interim).

63. In this massive and complex case of pervasive fraud, where self-serving and even dishonest motives – rather than mere honest but mistaken recollections – might hold sway with a witness's testimony, the advice to rely upon the contemporary documents becomes highly relevant and persuasive. It is advice which I accept and will heed assiduously as I examine the crucially important question of the state of the AHAB Partners' knowledge and authority given by them at the relevant times.

64. AHAB's oral Opening Submissions in this trial have been heard against the background of the revelation of the N Files and its consequences and in the context of the amended

pleading of AHAB's case as shown above. There was however, no explicit statement from AHAB as to the admitted extent of the Partners' knowledge at any time. I was therefore invited by the Defendants to require of AHAB a written response to certain questions posed in this regard.

65. This was directed on 22 August 2016 and on 26 August 2016 AHAB responded to each of the questions.

66. These questions and answers form a very important and convenient starting point for the examination of the crucial issue of the state of the Partners' knowledge, especially during Abdulaziz's time. I set them out fully below:[77]

"1. ***Is it common ground that, from inception, AHAB's Money Exchange was involved in a fraud on banks from whom it borrowed by:***

***(1) Dishonestly manipulating its financial statements so as to overstate the Money Exchange's assets and understate its liabilities;***

***and***

**(2)** ***Dishonestly providing those financial statements to Banks so as to induce them to lend or to renew or extend such lending?***

***Answer:*** *It is common ground that the Money Exchange was involved in a fraud on banks from whom it borrowed by:*

*1. Dishonestly manipulating its financial statements so as to understate the Money Exchange's assets and understate its liabilities (liabilities and assets were understated to the extent that both liabilities and assets were allocated to ledger 3 which was not reported in the financial statements provided to banks*[78]*); and*

77 As taken from Bundle **{X2/8}**.

78 As more fully explained at Section 6 of this Judgment, Ledger 3 was the ledger within the accounting records of the Money Exchange where the Al Sanea indebtedness, although meticulously, completely and accurately recorded, was not included in the version (in English) of the El Ayouty Audit Reports which were presented to the banks. The information from Ledger 3 was however, included as Attachment 9 to the Arabic version of the El Ayouty Reports and along with Attachment 8 (which revealed the full extent of the Money Exchange's borrowings from the banks), are said by El Ayouty to have been provided to the AHAB Partners as part of their Reports each year up until and including the Report for 2008. Whether this in fact happened became a very important issue in the trial and its resolution of fundamental importance to the outcome.

2. *Dishonestly providing those financial statements to banks so as to induce them to lend or to renew or extend such lending.*

*AHAB admits that the fraud was operating by 1998 when Mark Hayley joined the Money Exchange and had been operating for some years before then, but AHAB does not know when the accounts were first manipulated for a dishonest purpose, and so makes no admission.*

**2. *Is it common ground that this fraud continued until AHAB's default in May 2009?***

***Answer:*** *It is common ground that until May 2009, the Money Exchange continued to be involved in a fraud on banks from whom it borrowed by:*

*(1) Dishonestly manipulating its financial statements so as to understate the Money Exchange's assets and understate its liabilities; and*

*(2) Dishonestly providing those financial statements to banks so as to induce them to lend or to renew of (sic)*[79] *extend such lending.*

**2A. *If not was there a point in time when AHAB says it was discontinued*[80]*?***

***Answer:*** *As noted above, the fraud continued until May 2009. Until 30 September 2000, both Abdulaziz and Maan Al Sanea were aware of how the financial statements were prepared and of the provision of the English language financial statements to the banks (but that is not an admission that Abdulaziz "participated in the fraud"; see further the answer to 3 below). After Abdulaziz's stroke, only Mr. Al Sanea was aware of the fraud on the banks.*

**3. *Is it common ground that the following persons participated in that fraud:***

***(1) AHAB;***
***(2) Ahmad;***
***(3) Abdulaziz;***
***(4) Suleiman;***
***(5) Yousef;***
***(6) Saud; and/or***

---

79 This phrase is taken to mean "or extend…"

80 This question was separately added by the Court to the other three points raised by the AwalCos during submissions by Mr. Smith on 22 August 2016.

***(7) Maan?***

***Answer:*** *It is common ground that Maan Al Sanea participated in the fraud. It is AHAB's case that Mr. Al Sanea was the architect of and was responsible for the execution of the fraud on the banks. Subsequent to Abdulaziz's stroke, Mr. Al Sanea was the only person named above with knowledge of the fraud on the banks. He was also responsible for the fraud on AHAB, which is the subject of AHAB's claim.*

*It is common ground that Abdulaziz knew about and authorized the issue of the financial statements to the banks prior to his stroke. AHAB cannot say whether Abdulaziz knew this was dishonest and, as such, AHAB does not admit that Abdulaziz participated in the fraud on the banks (or any fraud).*

*It is common ground that until 30 September 2000, AHAB (through Abdulaziz) knew how the financial statements were prepared and that the English language financial statements were provided to the banks. It is not admitted that AHAB knowingly participated in a fraud prior to Abdulaziz's stroke and AHAB denies that it knowingly participated in a fraud after 30 September 2000.*

*It is not common ground that Ahmad, Suleiman, Yousef or Saud participated in the fraud on the banks.*"

67. Thus, AHAB's position became that while through Abdulaziz, it "*knew about and authorized the issue of financial statements understating the assets and liabilities and the provision of the English language statements to the banks prior to his stroke*" and "*knew how the financial statements were prepared and that the English language financial statements were provided to the banks*", AHAB does not admit that Abdulaziz (and therefore through him, AHAB itself) knew that this was dishonest. Moreover, AHAB steadfastly maintains that whatever may have been the state of Abdulaziz's knowledge, Suleiman, Yousef and Saud did not know of the fraud on the banks perpetrated by way of the dissemination of the falsified financial statements.

68. Given as we have seen,[81] that by the falsification and issuance of the accounts to the banks, some SAR 7.8bn (US$2.3bn) in fraudulent borrowings had been procured by June 2001, a very large part of those borrowings would have been procured under Abdulaziz's watch.

69. But in the absence of AHAB's admission that such behavior was plainly dishonest, much of the time taken in the trial had to be dedicated to an inquiry into how and why the financial statements came to be falsified and into what the Partners, during Abdulaziz's time and subsequently, must have understood to have been the purpose of the falsification.

70. The inquiry involved a detailed examination of the minutes and resolutions of the meetings of the Board of the Money Exchange and of accounting records of the Money Exchange itself which reveal the falsification process, as well as correspondence addressed as between El Ayouty and the AHAB Partners. It proved to be very revealing.

71. The inquiry leaves me in no doubt that each of Abdulaziz, Suleiman, Yousef and Saud knew of and expressly authorized the issuance of fraudulent financial statements and knew of the fraud on AHAB's lending banks. On the basis of his late involvement at the final stages of the crisis leading to the collapse of the Money Exchange, the evidence of Dawood's involvement is also revealing of his state of knowledge and this will be addressed also after the necessarily much wider examination of the evidence relating to Abdulaziz's, Suleiman's, Yousef's and Saud's knowledge.

---

[81] As recorded especially in Saud's Calculations and as revealed in Attachment 8 to the 2001 Audit Pack.

72. I will explain the reasons for these pivotally important conclusions by a necessarily detailed analysis of the evidence. Following the very helpful submission of the Defendants, I decided that the exercise is best undertaken in five parts:

(i) Firstly, by having regard to the inherent probabilities and improbabilities – looking at the re-establishment of the Money Exchange and the commencement of the fraud during Abdulaziz's time in the 1980s and 1990s and its unbroken continuity thereafter – discerning what knowledge must reasonably and fairly be attributed to Abdulaziz and to his Partners, generally.

(ii) Secondly, by an examination of the state of Suleiman's knowledge from 30 September 2000 when he assumed the mantle, de facto, of AHAB's chairmanship following Abdulaziz's stroke and the subsequent state of his knowledge, during his chairmanship until he died in February 2009.

(iii) Thirdly, an examination of the state of Yousef's knowledge acquired after his appointment to the Board of the Money Exchange from its inception in 1981, and after he succeeded his father Ahmad to the AHAB Board in 1990 and more particularly, after 1999, when he is shown to have received directly from El Ayouty at least two Audit Packs, and up until the collapse of the Money Exchange in May 2009.

(iv) Fourthly, by an examination of Saud's involvement with the Money Exchange from 30 September 2000 onwards, including his succession to his father Abdulaziz's place on the Board no later than when Abdulaziz died in May 2003, and more especially, of what was the state of Saud's knowledge from 30 September 2000 onwards. Fifthly, and much narrower in scope because of his

short tenure as a member of the AHAB and Money Exchange boards, having succeeded to his father Suleiman's position only upon his death in February 2009 – what was the state of Dawood's knowledge, especially when executing bank documents for loans in the order of some SAR 10bn shortly before the collapse in May 2009.

73. The nature of the relationship between Al Sanea and each of Suleiman, Yousef and Saud by the time of Abdulaziz's stroke, is a factor not to be overlooked when considering the inherent probabilities or improbabilities of events as they are said to have occurred after that time and the state of the Partners' knowledge as time went by.

74. Yousef was adamant in his evidence that Al Sanea was neither liked nor trusted by Suleiman. Yousef himself had an early falling out with Al Sanea over the latter's treatment of Yousef's accounts at the Money Exchange.[82] Yousef claimed to have then realized that Al Sanea was not a man of his word and said that thereafter he no longer trusted him. He said that every single member of the family regarded Al Sanea as "*difficult*" and "*out of control*".[83]

75. Saud said that "*many family members disliked Mr Al Sanea and did not want to have much to do with him*" and, apart from by Abdulaziz, Al Sanea was not fully trusted within the family.[84]

76. Despite this history, Suleiman and Yousef both knew, from as early as 1999, of Al Sanea's already massive indebtedness to the Money Exchange. This is plain from a letter written by Yousef to Abdulaziz on 26 December 1999, a letter which Yousef also

---

82 **{Day34/32:10} – {Day34/33:10}**
83 **{Day31/15:22} – {Day31/16:22}**
84 Saud 1W, **paragraph 17-18 {C1/2/5}.**

admitted he would have discussed with Suleiman.[85] In that letter,[86] the Al Sanea indebtedness, revealed in the Audit Pack for year end 1998 as standing at SAR 2.3bn, was pointedly discussed. It formed the basis of Yousef's firm complaint to Abdulaziz, expressed as follows:

> "*I wish to notify you that I previously asked your Excellency for the annual report for the Exchange (branch) submitted to Messrs Al-Ayouti and, in view of the fact that Your Excellency does not have it as I learned from you, I asked Mr. Salah Al-Ayouti to provide me with a copy of the latest report available for the Exchange branch. In reviewing it, I noted some observations:*
>
> 1. *The increase in the net indebtedness of Mr. Ma'an to reach 2.3 billion riyals on 31/12/1998 and, despite this, the reasons for this in this way and why no end has been put [to] the increase annually are not obvious to me knowing that you are cautious for the withdrawals of any partner not to increase.*"

77. Also, as already mentioned, it is apparent from Saud's Calculations that Saud and Suleiman knew from circa. May 2002 that the Money Exchange had enormous borrowings (SAR 7.8bn) and that by then the Al Sanea net indebtedness had increased even further from the 1999 amount, to some SAR 3.6bn.

78. This was already indebtedness of such magnitude that Suleiman, Saud and Yousef were bound to have been concerned that it placed at risk their personal fortunes, the financial security of their families and the very future of AHAB itself.

79. This is all part of the important background against which I must assess the inherent probabilities or improbabilities upon which AHAB's case depends, in particular its case

---

[85] **{Day29/74:18} – {Day29/75:19}.**
[86] **{G/2020/1}; {G/2025/1}**

to the effect that after about 30 September 2000, when Abdulaziz suffered his stroke and the putative implementation of the "New for Old" policy, Al Sanea was left very much to himself in the running of the Money Exchange. So much so, that he was able to circumvent the crucial "New for Old" policy by forgery and manipulation and use the Money Exchange, without the knowledge or authority of the AHAB Partners, to incur and misappropriate debt of such overwhelming magnitude as to bring AHAB to the verge of bankruptcy.

80. The obvious inherent improbability that the AHAB Partners, successful and sophisticated men of business, would have allowed affairs to have developed in that way dictates a cautious and skeptical approach to their evidence, an approach that more than justifies in this case, primary reliance upon the contemporaneous documents in the search for the truth.

**THE RE-ESTABLISHMENT OF THE MONEY EXCHANGE,**

**THE COMMENCEMENT OF THE FRAUD WITH THE GENERAL KNOWLEDGE OF THE AHAB PARTNERS DURING THE 1980s AND 1990s: "ABDULAZIZ'S TIME"**

81. It will have been noted from paragraph 99A of AHAB's pleaded case excerpted above,[87] the assertion that the "*Money Exchange was set up initially by Abdulaziz Algosaibi, then the chairman of AHAB, in order to give Mr. Al Sanea an income and position in the Algosaibi family business.*"

82. Against the background of Al Sanea's marriage to Abdulaziz's daughter Sana'a, this pleading, as Mr. Lowe came to describe it, is tantamount to an allegation that the Money Exchange was set up "*as a form of dowry*". But as the evidence revealed, the true *raison*

---

[87] At p 37.

*d'etre* of the Money Exchange was no such thing. Nor was it to continue the modest activities of a bureau de change which characterized the Money Exchange's earlier existence.

83. Instead, AHAB's purpose in re-establishing the Money Exchange was, I am satisfied, to access funds on a scale never before available to it, to reduce the cost of financing for AHAB's businesses, to finance its investments and to revitalize and diversify AHAB's business interests, which had been stagnating from in the 1980s.

84. This is all apparent from such contemporary documents as were disclosed by AHAB.

85. Item 1 of the AHAB Board resolution of 27July 1981 by which the Money Exchange was re-established[88] stated that "*The Board unanimously agreed…to approve the establishment of a new activity for (AHAB) under the name of "Ahmad Hamad Algosaibi and Brothers – Exchange and Commission Branch.*"

86. Item 4 recorded the shareholdings as intended to be 65% AHAB, 25% Al Sanea and 10% Yousef, the latter because (as item 3 explained) he "*wished to be a partner in the capital of the Exchange and Commission branch.*" This wish was to be granted no doubt because Yousef, the eldest of his generation, is also the son of Ahmad who was then, along with Abdulaziz and Suleiman, an equal partner in AHAB.

87. Item 2 recorded the approval of a "*share capital of twenty million riyals*, "*for now.*"" This was later resolved to be increased to SAR 200m although it was never actually paid up by the Partners, as El Ayouty more than once recorded in their Reports and advised should be rectified. Indeed, Yousef admitted in cross-examination to never having paid his subscribed portion of the capital. This was although he and the other Partners signed

---

88 **{G/885/1}**

the partnership deed which recorded their agreement to pay SAR 200m. Yousef also admitted to being aware that the other Partners had not paid their shares either:[89]

> "*Q. You knew that your partnership agreement in 1984 identified the SAR 200 million capital that was required, so you can't say you didn't know about it?*
>
> *A. No, I said."*
>
> ...
>
> *"Q. When did you pay that [*your 10% share*] SAR 20 million?*
>
> *A. I didn't."*
>
> ....
>
> *"Q. You personally had no idea that anybody had paid any capital into the Money Exchange?*
>
> *A. No.*
>
> *Q. Because you didn't.?*
>
> *A. I didn't.*"

88. The AHAB Partners also knew that the Money Exchange was making representations to third parties that the SAR 200m capital had been paid, not only in its financial statements, but also in its correspondence to the banks, including those conveying annually its financial statements. Thus, its letterhead blazenly conveyed the misrepresentation which became permanent throughout the life of the Money Exchange: "*(PAID UP CAPITAL SR 200 MILLION).*"[90]

89. Yousef also acknowledged that he knew of this misrepresentation:

---

89 **{Day31/79:7-10}; {Day31/68:10-11}; {Day31/73:14-18}**
90 See for instance **{H23/43}**.

"*Q. So you would have understood that the financial statements of the Money Exchange would show the capital as being SAR 200 million?*

*A: Okay.*

*Q. Not "Okay". You would have understood that?*

*A. Yes.*

*Q. "Yes" or "No"?*

*A. Yes.*

*Q. Notwithstanding the fact that you didn't pay your share and you didn't know whether anybody else had paid their share? Is that right?*

*A. Well, because I .. as I said before, I don't…I. There are so many meetings about the board that I don't attend. Although I signed it, yes."*

*"Q. Of course. And you hadn't paid your share. Did you have any reason to believe anybody else had paid their shares?*

*A. No.*

*Q. Nevertheless, the financial statements of the company would have shown the capital as being SAR 200 million, wouldn't they?*

*A. Well, it's just that .. I don't know whether ... nobody asked me to pay my share. So I don't know about… that's why…*

*Q. Did you offer? You realized when you signed in 1984, when you signed up on the amended partnership deed, that that was your responsibility, why didn't you offer to pay? Why didn't you write another cheque?*

*A. Nobody asked me.*

*Q. You couldn't have written another cheque, could you.*

*A. Yes.*

*Q. ...for SAR 20 million?*

*A. Yes, yes.*

*Q. You could?*

*A. No.*

*Q. You didn't have the SAR 20 million?*

*A. No.*"

"*Q. You must have realized that AHAB Money Exchange was advertising to the world that its capital was SAR 200 million, in correspondence and financial statements?*

*A. Yes.*

*Q. And you must have realized that that was not true? Correct?*

*A. Probably.*"[91]

90. As no more than an initial ten percent of the capital (SAR 20m) was ever paid up by the Partners, there were repeated remonstrations from El Ayouty about the on-going failure to pay the "*declared capital*" of the Money Exchange.

91. For instance, on 3 May 1990, El Ayouty wrote to "*Mr. Managing Director*" of the Money Exchange[92] stating that:

> "*The company is suffering from a shortage of equity funds, and has done ever since it started its activity and right up until the present time, as 90%*

---

[91] **{Day31/79:15} – {Day31/80:3}; {Day31/81:6} – {Day31/82:3}; {Day31/87:24} – {Day31/88:6}.**
[92] **{G/1304.2}; {G/1304.3}**

> *of the declared capital is still unpaid and furthermore those resources comprise real estate funded from external sources, namely funds borrowed from the banks, which increases the speculative nature of the ownership of them*."

92. El Ayouty therefore recommended that "*the equity resources of the Money Exchange branch should be separated by paying up the unpaid part of the declared capital*."

93. Despite the Partners each year no later than from 1993 onward, unfailingly declaring and paying themselves "*dividends*" through the Money Exchange in the order of SAR 36m to SAR 75m each year,[93] this prudent advice to pay up the minimal capitalization of the Money Exchange was never heeded.[94]

94. It thus became plain that the Money Exchange was never funded or intended to be funded in any significant way by AHAB. Its real purpose, at least from the Partners' point of view, was to raise borrowings by the use of AHAB's name, in order to fund its operations and the acquisition of investments. There was very early evidence of this intention, as appears from a Board resolution dated 3 April 1983[95] by which it was resolved by Ahmad, Abdulaziz and Suleiman, to arrange a short term loan in the amount of US$45m from a syndicate of international banks: "*for general working capital and expansion purposes of the Algosaibi Group. The Money Exchange Bureau, as a Division of our Company, is, as a matter of policy, authorized to act as the central treasury for the Algosaibi Group and is therefore arranging the loan. The loan agreement will be signed*

---

[93] For example, Resolution R/10 dated 3 March 1993 (which is referred to at **{N/1005/2}** paragraph 13 and seemingly decided by R/39 on 4 April 1994 **{G/1523}; {G/1523.1}** to be retained); R/62 of 27 February 2000 **{G/2085.1/1}**; R/78 of 2 September 2001 **{G/2544/2}**; R/120 of 29 March 2004 **{N/1024/1}**.

[94] While allowing themselves to become complicit in AHAB's dissemination of the fraudulent financial information (as will be more fully discussed), El Ayouty was in the early stages very critical of the approach adopted by the Partners in the manipulation of the financial statements and more of their criticisms will be examined here and in a separate segment of this Judgment.

[95] **{G/965/1}**

*on our behalf by Mr. Maan Abdulwahid Alsanea later this month, which is consistent with the authority delegated to him in the list of authorized signatures of our Money Exchange Bureau.*"

95. A letter written by Abdulaziz on 20 December 1990,[96] in his capacities as Chairman and Managing Director of the Money Exchange to the Partners stated, among other things, as follows:

> "*When we decided to re-activate the Exchange business in the second half of 1981, our decision at that time was based on the aim of reducing our direct dealings with banks and directing the greatest part of our dealings to (the) Exchange branch so that, by this means, it would be able to provide a large part of the commission[97] which the banks used to receive from the head office. As a result of this transfer, the office's debtor balance was transferred from the banks to the Exchange branch and in return the bank's balances started to fall as the majority of our dealings take place via our Exchange branch.*"

96. Thus, Abdulaziz recorded and described the activities of the re-launched Money Exchange as a central borrowing and financing hub for all of AHAB, with one early benefit being the saving of "commission" (interest) that AHAB would otherwise have to pay to the banks.

97. He went on in this letter to recall that due to AHAB's "debtor balance" having reached SAR 300m at year end 1990, it had been decided to repatriate funds from abroad to Saudi Arabia: "*which would enable us to pay the Exchange balance on the one hand and to liquidate the blocked accounts in our records, which have been stopped for many years and which resulted from the stagnation of our companies' operations in Al-Damam and*

---

96 **{G/1359}; {G/1361}**
97 It became common ground in the trial that "commission" refers to interest.

*others as well as the commissions added to their balances throughout the period of stagnation which began at the start of 1985 AD.*"[98]

98. This plan was not however, put into immediate effect. As the letter went on to explain:

> "*However, after exhaustive discussion, we found that there were many considerations preventing us from implementing this decision, amongst which were:-*
>
> *(a) The circumstances at the start of 1990 were indicative of improvement and good to come in general, perhaps through the revenue achieved by our factories during 1990 and 1991 AD, which could act towards reducing our balance at the Exchange branch.*
>
> *(b) Elsewhere we were very hopeful of an increase in the capital of the American-Saudi bank at the meeting, which was held in London in August.*
>
> *(c) Some of the deposits abroad were surety for some of the funds the Exchange branch is using and there were commercial ties between the Exchange branch and the banks which held our deposits at that time.*"

99. This excerpt gives insight into two attitudes in particular which came to be emblematic of AHAB's approach to financing through the Money Exchange: a lack of aversion to the risks of excessive leveraging and a willingness to rely upon the increased value of investments (here, for instance, the shares in American-Saudi bank "SAMBA") as a hedge against the rising costs of borrowing.

100. As Abdulaziz went on in this letter to explain, the plan to repatriate funds from abroad did not become an urgent reality requiring the return of amounts totaling some SAR 289m until when, "*...after the invasion of Kuwait… requests from the owners of the*

98 **{G/1359}**; **{G/1361}**

*deposits at the Exchange branch rained down on us… We studied the matter and decided to withdraw the deposits from banks abroad…By this we were able, thanks be to God, to preserve our commercial reputation locally and internationally…*"[99]

101. AHAB's strategy behind the re-establishment of the Money Exchange was also the subject of evidence given by Yousef under cross-examination. By reference to paragraph 38 of his witness statement,[100] he accepted that the Money Exchange was set up as an investment vehicle for AHAB and that his own motivation for becoming a Partner was to obtain an interest in the financial business to be undertaken. This was to be an important asset for him:[101]

> "*Q. You accept that you wanted to become a partner in the Money Exchange?*
>
> *A. Yes, I did.*
>
> …
>
> *Q. Let me suggest to you why you were interested. This company was set up to pursue the plan to buy shares in banks.*
>
> *A. Yes, that's correct.*
>
> *Q. And by being a partner in this business, you were going to have your own share in that business?*
>
> *A. Of course.*
>
> *Q. You were going to get a 10 percent interest in that business?*
>
> *A. Yes.*"

102. Against that background of the re-establishment of the Money Exchange, it augured not at all well that an entity established for the purpose of raising borrowings for the

---

99 **{G/1361/2}**

100 **{C1/3/9}** put to Yousef on **{Day 31/36:22} – {Day 31/38:8}** by Mr. Lowe in cross-examination.

101 **{Day31/36:23} – {Day31/37:38:8}**.

acquisition of investments and for the large scale funding of the business and personal activities of the Algosaibis, should begin with the abject failure of the Partners to pay up their capital pledges. From the beginning, this meant that there was virtually no equity investment by AHAB in the Money Exchange. No assets of any existing trading business was transferred to the Money Exchange and the Algosaibis did nothing to fund the development of the proposed investment business.

103. It follows from the fact that there was virtually no equity injected, that AHAB's contention that the Money Exchange was set up as "*a kind of dowry*" for Al Sanea, is unfounded. There was no equity portfolio to be given to him. The acquisition of the investments came later by the application of borrowed funds. Moreover, the capital pledged but unpaid was proportionate to each Partner's interest in the Money Exchange and this was reflected in AHAB's retention of 65% even while Al Sanea was given 25% and Yousef allocated 10% – it seems simply because he is the son of Ahmad, then the Chairman of AHAB.

104. In reality therefore, what the Algosaibis contributed to the Money Exchange was not capital but primarily the use of their well-established name for borrowing – the so-called "name lending" which characterized the very large number of transactions entered into by the Money Exchange.[102]

105. It is fair to infer from all the foregoing that anyone with knowledge of the business model intended for the re-establishment of the Money Exchange and of its lack of capitalization would have appreciated that the model could only operate by means of continuous and

[102] And as described by Simon Charlton: Charlton 1W, **paragraph 38 {C1/5/11}**: "Almost all of that lending to (the Money Exchange) was made in reliance by the banks only on the purported personal covenants of the AHAB partners provided in the form of signatures on facility documents or guarantees – what is termed in the Middle East "name lending.""

increasing borrowing. In particular - and of central importance to an examination of the state of knowledge of the AHAB Partners - all of the investments made by the Money Exchange (and most significantly the shares held in SAMBA), were made using borrowed funds.

106. Moreover, as appears from Abdulaziz's reflections cited above, once the investments were acquired, holding and retaining rather than trading them became AHAB's long term strategy. And, as already mentioned, the evidence also revealed, as will be shown further below, that on the annual basis, the Partners almost invariably resolved to have the Money Exchange declare and distribute as dividends the income produced from the share portfolio, rather than use it to capitalize the Money Exchange or pay down the cost of the borrowing used for the acquisition of the shares. This necessarily all meant that the Partners must have appreciated the need for ever-increasing bank borrowing.

107. Even while this all became apparent from the documentary evidence, it was also acknowledged by Yousef in cross-examination:[103]

> "*Q. Holding those bank shares was a long-term plan, wasn't it? It was part of a drive to become interested in banks?*
>
> *A. Yes.*
>
> *Q. So it wasn't going to be traded, and we know…*
>
> *A. No, no, no.*
>
> *Q. --- the portfolio was kept for a long time. So how was an investment return going to be calculated on a portfolio of shares that was never traded?*

103 **{Day31/45:9-19}**; **{Day33/103:8-13}**; **{Day36/50:5-9}**; **{Day31/90:7-12}**; **{Day31/93:9-16}**.

*A. I don't know how to explain that.*"

"*Q. You must have been aware of it. You might have forgotten but you must have been aware of it: that this was the source of their prestige.*

*A. Probably, yes.*

*Q. They weren't going to sell the shares.*

*A. Probably, yes.*"

"*Q. It is certainly the case that, not so much you, I think, but Abdulaziz and Suleiman were therefore very reluctant to dispose of the portfolio of bank shares. (Question interpreted).*

*A: (Through interpreter) Correct.*"

"*Q. Looking back on it, you appreciate, don't you, that without any capital and with no accumulated profit, the investments could only have been purchased with bank borrowings? You know that now, don't you? It's obvious, isn't it?*

*A. Yes.*"

"*Q. I am suggesting to you that you would have understood perfectly well that the only way in which the Money Exchange could finance the acquisition of investments was through borrowing. Is that not the case?*

*A. Probably, yes.*

*Q. You would have understood that, probably?*

*A. Yes, yes.*"

108. This understanding of the business model to be adopted by the Money Exchange was clearly not confined to Yousef. The context examined above reveals its adoption also by

the other Partners - Abdulaziz especially - and the further understanding that Al Sanea was to be their instrument of its implementation.

109. This early understanding of the proposed business model is of fundamental importance as it sets the stage for the crucial enquiry into what it was that the Partners could have believed was going on with the Money Exchange in later years.

110. Contrary to the picture one sees already emerging by the late 1980s, the Partners' reputed aversion to borrowing is relied upon by AHAB as a basis for its case of lack of knowledge and authorization on the part of the Partners. The notion is expressed most pointedly, albeit only in hearsay terms, by their key witness Mr. Hayley:[104]

> "*I was told that leverage and borrowing were anathema to Abdulaziz Algosaibi, who came from a culture of using cash flow to fund expenditure. By contrast Mr. Al Sanea used leverage as the means of business expansion.*"

111. The documentary evidence and the Partners' understanding of it even in the early days already belied that reputation, as it revealed the different long term strategy of borrowing for the acquisition of investments.

112. Yet, despite that strategy for the long term use of the Money Exchange for borrowing and his relatively young age of only 25[105] at the time in 1981,[106] the day-to-day management and control of the Money Exchange was, in fact, given over to Al Sanea – as indeed, was the responsibility for the management of the investment strategy. It appears that he was expected to forgo all other business activities to dedicate himself to the Money Exchange

---

104 Hayley 1W, **paragraph 31** {**C1/9/9**}.

105 Ahmed was about 80, Abdulaziz about 60, Suleiman about 54 and Yousef about 35: {**Day29/38:1-3**};{**Day29/37:23-25**}; {**Day29/37:18-22**};{**Day29/37:17-19**}.

106 Per Yousef {**Day29/38:11**}.

and that his abilities and efforts in this regard were to be especially appreciated and rewarded.

113. This appears from the recital to the Internal Partnership contract dated 28 July 1981,[107] which referred to Al Sanea's role in managing the "*equity*" business and provided him with a one-off incentive in the event of a sale of the investments:

> "*Whereas Mr. Maan Abdul Wahed Al Sanea ceased all his private business and investment activities ( ...) which he was carrying out for his own personal account .... and he has put in the increased effort required particularly relating to the equity business which needs effort due to its conditions and specific nature and likewise all his investments are now transacted in the name of the company's Money Exchange and Commission branch…*
>
> *It has therefore been agreed that Mr. Maan Abdul Wahed Al-Sanea shall receive 15% (fifteen per cent) of the net income from investments in the Branch either when they are credited to the company's account or re-sold, that is, once only. He shall not be entitled to this percentage again when they are resold or disposed of in the future.*"

114. As will be seen below,[108] Al Sanea's right to 15% would later cause disagreement from Suleiman, Saud and Yousef, in proposals which emerged for the liquidation of the Money Exchange.

115. But Al Sanea's management role was never in question. It was confirmed by a power of attorney executed in his favour on 20 August 1981 signed by Abdulaziz[109] and was later superseded by a power of attorney dated 16 August 1983 signed by Abdulaziz[110] which appointed him jointly with Yousef to manage the Money Exchange. Al Sanea's position

---

107 **{G/850}**; **{G/851}**.
108 When looking in detail especially at the state of Yousef's knowledge at Section 1, paragraph 352 of this Section et seq of this Judgment.
109 **{G/923}**; **{G/924}**
110 **{G/986}**; **{G/987}**

was reaffirmed from time to time in a series of Board resolutions. For example, a resolution of the Board of the Money Exchange dated 16 October 1986, signed by Abdulaziz, Suleiman, Ahmad and Al Sanea[111] stated:

> "*Reference to the Board of Directors resolution number T/3678 dated 212/1982G and the Management decision dated 12/2/1983G, the delegated board member of the Company is Ma'an Abdul Wahed Al Sane'e, who has the full authority in relation to the management of the Company such as for example the employees matters, the banking facilities in all respects, such that Mr. Ma'an would be responsible for the systems and policies of the Company as he deems appropriate.*"

116. While Al Sanea appears to have maintained most of the management responsibilities required to conduct the business of the Money Exchange, the evidence shows that this, from the outset, was not without checks and balances put in place to vouchsafe AHAB's interests. After all, Al Sanea, in addition to his relatively young age, was never himself an AHAB Partner. Moreover, the Money Exchange became, as intended, an extremely important area of AHAB's operations. Not only did it come to hold the investments which were the key to AHAB's banking ambitions through its ownership of the SAMBA shares, it was also the means by which AHAB would obtain funding for its other businesses and for the Partners' personal expenses.

117. The AHAB Partners appear to have adopted different levels of supervision as may be gleaned from the AHAB Board Resolution by which the Money Exchange was re-established and by which it was resolved to appoint Al Sanea as Managing Director.[112]

---

111 {**G/1096**}; {**G/1097**}. Further resolutions in similar vein were passed, see for example the resolution dated 30 June 1987 signed by Abdulaziz: {**G/1128**}; {**G/1129**}.

112 **{G/884}; {G/885}**

118. Four primary methods of supervision were contemplated and, although persistently denied by both Yousef and Saud,[113] appear to have been carried on in various practical forms throughout the existence of the Money Exchange, right up until its collapse in May 2009.

119. First, there was to be direct supervision by one of the Partners:

(i) At item 3 of the Resolution it was resolved to accept Yousef as a partner with a share of 10% of the capital and that:

> "*Yousef will work with Mr. Maan Al Sanea and must be present at all times in the branch so that one of them is always present in case the other is travelling and the branch is never left without the management of one of them regardless of the reason*."

(ii) In this regard, Yousef accepted that his appointment was "*to look after AHAB's interest*" in light of AHAB's "*significant interest in the Money Exchange*":[114]

> *"Q. What this looks like to us is that you were being appointed by AHAB to look after AHAB's interest in the Money Exchange, just as Suleiman was appointed to the cement factory as a director and Abdulaziz to SAMBA?*
>
> *A. Yes.*
>
> *Q. That was the real reason why AHAB was interested in making sure that you were a director because it was going to have a significant interest in the Money Exchange; correct?*
>
> *Chief Justice: I didn't hear the answer.*
>
> *A. Yes, of course.*"

---

113 Yousef 1W, **paragraph 32 {C1/3/8-9}**; Saud 1W, **paragraph 96 {C1/2/20}**.
114 {Day31/40:3-13}

120. The evidence also shows that Saud was later appointed as director of the Money Exchange, although Saud steadfastly denied knowledge of his appointment,[115] a denial which itself became of significance in the trial as will be examined in more detail later on.

121. Secondly, while Al Sanea was appointed Managing Director, he was to work under the close and direct supervision of Abdulaziz. As item 7 stated, the Board resolved:

> "*To approve the appointment of Maan Abdul Wahed Al Sanea as the Managing Director of the Branch and the Board authorizes Sheikh Abdulaziz Hamad Algosaibi – Managing Director of the Ahmad Hamad Algosaibi and Brothers – to assign the powers and responsibilities of Mr. Al Sanea.*"

122. It would presumably have been by the exercise of the authority vested by this resolution that Abdulaziz granted to Al Sanea, the powers of attorney mentioned above.

123. Thirdly, it was resolved at item 8, that AHAB's financial controller, at the time Dr. Mahmoud Sami Mustafa ("Dr. Sami"), would also have oversight and would prepare the financial statements of the Money Exchange:

> "*The board decided that the general financial manager and chief accountant of the head office of Ahmad Hamad Algosaibi Brothers Co. shall be in charge of following up and monitoring the branch's activities and that a detailed financial statement should be prepared every three months…*"

124. As will be seen below, the fraudulent systems of capitalization of interest and the creation of adjustment schedules to falsify the accounts, were implemented by Dr Sami on the instructions of the Partners and remained in place throughout the life of the Money Exchange.

---

115 For example: **{Day 44/62:1-5}**

125. Fourthly, at item 9, the Board resolved that AHAB's own longstanding auditors, El Ayouty, would be the external auditors for the Money Exchange, even while authorizing Abdulaziz "*to look into the issue of appointing a second external auditor alongside El Ayouty if that is necessary to enhance the progress and organization of work.*"

126. As will also become clearer below, the role of El Ayouty in the grant of audit approval to the financial records of the Money Exchange was pivotal to the use of the Money Exchange for bank borrowing. El Ayouty's involvement was arranged and insisted upon by the Partners.

127. It is manifest from these detailed resolutions that the Partners intended to keep a close watch over and tight control of the business to be conducted by the Money Exchange. The fact that AHAB intended to have such control is only consistent with the intention that the Money Exchange would become AHAB's financial hub and would need to use AHAB's name for borrowing from the banks. AHAB's reputation would be at stake.

128. Indeed, as the evidence came to reveal, in no other business that AHAB operated was there a similar high degree of direct oversight and control by the AHAB Partners. The other subsidiaries all had their own separate boards of directors, accounting systems and external auditors. Their minutes were not required to be signed by all the AHAB Partners themselves and the AHAB Board (through its Chairman) did not demand to receive detailed Audit Packs for those other businesses, as the evidence revealed was the case with the Money Exchange and the El Ayouty Audit Packs.

129. The context of the early re-establishment of the Money Exchange became an important back drop against which to examine AHAB's case, as epitomized by the constant personal refrains of Yousef and Saud in particular, that Al Sanea was left to "*manage*" or

"*run*" the Money Exchange on his own – that the Money Exchange was "*Maan's thing*."[116]

130. Given the context, the unavoidable and obvious question became: what business was it that Al Sanea was being left to run?

131. It was clear from the outset that the only activity was to be that of borrowing and this was largely aimed at acquiring and retaining the strategic share portfolio. As the borrowing increased, it would have remained clearly understood that the purpose of the Money Exchange would be to service the increasing indebtedness and the withdrawals by the Partners and, to the extent the Partners were aware, by Al Sanea himself. As the borrowing grew, it must also have been understood that an increasingly large and sophisticated operation was required. It must therefore be regarded as inherently improbable, that although the Partners left the management of the day to day operation to Al Sanea, this also meant that they were unaware of the fact that the Money Exchange was being increasingly used for the acquisition of fraudulent loans.

**A more detailed examination of the knowledge of the AHAB Partners**

132. It is against that general background that I now turn to examine in detail, the knowledge of the Partners of the manipulation of the financial statements of the Money Exchange, beginning during Abdulaziz's time.

133. As shown above, it became common ground during the trial that the financial statements procured during Abdulaziz's time were misleading. As the Board minutes reveal, "capitalization" of interest can be traced back to as early as 1986.

---

116 Per Yousef: **{Day33/104:5}**; per Saud: **{Day46/67:6-7}**.

134. Given AHAB's decision continuously to borrow in order to acquire and retain its investments without ever intending to pay down that borrowing from its own income, the Money Exchange was faced with a dilemma from inception. If it revealed to the lending banks its true indebtedness relative to its real net worth, the banks would not have continued to lend and AHAB would have been forced to sell the investments to repay the indebtedness. As will be seen,[117] except for short periods of time, the market value of the share portfolio was significantly less than the bank debt of the Money Exchange. If not forced into bankruptcy, at the very least AHAB's good name and creditworthiness would have been damaged if the true state of affairs was revealed to the banks.

135. Rather than accept and face that reality, the evidence reveals that AHAB decided that the financial statements which would be published to the banks had to be manipulated so as to understate the liabilities of the Money Exchange to present a misleading position to the lending banks. The obvious and most telling information to be eliminated from the financial statements were the true amounts of the indebtedness and the net losses which flowed from the high interest burden, estimated to have averaged approximately 8% per annum throughout the life of the Money Exchange.[118]

136. As revealed in the minutes of the Board meetings of the Money Exchange, the process of manipulation of the financial statements was repeatedly approved and signed off by the

---

117 To be examined in some detail when considering the El Ayouty Audit Packs (below) and when considering "Benfits" in section 2.

118 The estimate of the SIFCO5 expert accountant Mr. Theo Bullmore in his calculations of the total costs of the borrowings. There was no fundamental disagreement between the experts as to the use of this rate of interest. Indeed, there is contemporaneous evidence of this being the applicable interest rate from the El Ayouty Audit Reports. See for example **{G/1642/3}** – the Report for 1995.

AHAB Partners from 1986 onwards. Important extracts from the minutes will be examined in some detail below.

137. Not all of the minutes approving of the financial statements for each year have been disclosed. However, it can be seen from those which have been disclosed, that the resolutions approving of the manipulations or other significant decisions relating to the financial statements were invariably approved by the Partners, including in cases where a single partner (e.g.: Abdulaziz or Suleiman) signed off on behalf of himself as well as the others. Moreover, on a number of important occasions when changes in fraudulent accounting practices were being recorded, it was AHAB's practice to ensure that every AHAB Partner signed even when plainly not necessary for them to do so.

138. The reason for this was the subject of some hypothesizing by the Defendants, on whose behalf Mr. Lowe submitted that it would have been at the insistence of El Ayouty, as a condition of their grant of audit approval for the financial statements, that all the Partners were recorded as having approved of the fraudulent accounting practices.

139. As will become apparent from the examination to come below of the fraught exchanges between El Ayouty and the Partners on this subject, this is a reasonable inference to draw.

140. From these exchanges, it may be inferred that the Partners' approval was regarded by El Ayouty as an assurance that AHAB could not later sue them for having certified the fraudulent accounts. By their signatures, the Partners were thus required to manifest their assumption of responsibility for the fraudulent practices.

141. The resolutions in question were not simply blanket approvals of the financial statements. They expressly and specifically endorsed the two most significant fraudulent practices:

the "capitalization" of interest and the elimination of balances by measures to "reduce", "transfer" or otherwise make "adjustments" to the accounts.

142. Early examples are seen in a summary (dated 27 December 1986) of resolutions made during 1986,[119] signed by Abdulaziz and Suleiman (with their signatures attached also at Resolution 4 as if to mark its special significance). Here they recorded their approval of a further purchase of shares by the Money Exchange and the following decisions about the methods of accounting:

> "*4. To approve the balance and report of the auditors for the year 1985 and also to separate the Exchange balance from Investment for the 1985 financial year… [signatures of Abdulaziz and Suleiman]…..*
>
> *7. To capitalize the interest deriving from the investments as on 31 December 1986 and to consider them an indivisible part of the cost of these investments.*
>
> ….
>
> *10. To reduce the advances and loans and accounts in debit within the bounds of 200 million Riyals from the loans and deposits belonging to the main centre, in line with the need to reduce the size of the budget.*
>
> *11. To reduce the investment point as on 31 December 1986 within the bounds of the sum of 160 million riyals and to do so from the deposits and loans of the main center in line with the need to lower the size of the budget to be in keeping with the year 1985.*
>
> *12. To commission the Exchange management to make any transfers between the points of the budget as on 31 December 1986 such that the numbering matches the numbers of 1985 and to display them well, in a way suitable for the next stage, and sign the necessary records for this.*"

119 **{G/1104}**; **{G/1105}**

143. And so it appears virtually from the outset, that both Abdulaziz and Suleiman were aware and had approved that the interest due on the borrowings for investments and which was not being paid by AHAB from income, was to be "capitalized" and so treated as adding to the "cost" (i.e.: the capital value) of the investments. Moreover, it appears that they were also aware and approved of adjustments to the loans and profit figures in the financial statements "*such that the numbering (for the following year) matches the numbers of (the previous year)*" and must have appreciated that these would have been misleading and deceiving of the Money Exchange's bankers.

144. Despite AHAB's refusal to admit to what must have been Abdulaziz's and Suleiman's (and later Yousef's and Saud's) certain knowledge and appreciation of the fraudulent nature of these practices, it cannot be doubted that that must have been their state of mind when approving of them.

145. These men were never to be regarded as uneducated or unsophisticated street merchants. Each in his own right was or is a knowledgeable and experienced man of business, responsible in turn not only for the Money Exchange but for other very substantial and sophisticated areas of operation of AHAB's widespread business interests.

146. The manifestation of their knowledge of and their intentions behind the fraudulent practices, only became more explicit as time went by.

147. A "summary" of Board Resolutions taken during 1987, dated 16 March 1988[120] and signed by Abdulaziz, Suleiman and Yousef, recorded that:

> "*At the management board meeting on 16/3/1988 a summary of the resolutions for 1987 was passed with details as follows:*

[120] **{G/1167}; {G/1169}**

> *Firstly:* ***to continue to capitalize interest*** *realized of the investment branch as at 31 December 1987 and to consider it an indivisible part of the investments' cost and this is in implementation of the resolutions of the management board in previous years.*
>
> …
>
> *Fourthly:* ***To commission the management of the Exchange [branch] with making the necessary change to the financial statements in the accounts of 31/12/1987****.*
>
> ***This is so that the balance of the accounts appear in the right form to others and these changes will be done by reducing the size of the budget to fit in and (sic) the comparison figures for previous years.***
>
> *Fifthly:* ***To accredit the balance, profits and loss for the Exchange branch as of 31 December 1987 after making the changes referred to in the previous paragraph.***
>
> *Sixthly:* ***To accredit the separation of Exchange from Investment in the books with effect from the first of January 1988.****"* (Emphasis added.)

148. The process was again signed off in 1988 by the AHAB Partners in Resolution R/73 of 14 November 1988,[121] in terms which were reproduced in successive resolutions passed each year until at least 1992.

149. Dr. Sami, who passed away in 1992, was said by Omar Saad[122] to have been the likely draftsman of these minutes.

150. The false accounting practices (capitalization of interest and elimination of debt balances, i.e.: "*cutting adjustments*") were by now fully institutionalized:

> "***First****: the issuance of a consolidated balance sheet for Exchange & Investment Divisions, as has been the practice in previous years.*

---

121 **{G/1203}; {G/1204}**
122 **{Day90/74:7-10}**

> ***Second:*** *to continue in the* ***capitalization of interest*** *due on the Investment Division as at December 31, 1988 and to be considered as an integral part of the investments cost in accordance with previous decisions passed by the Board of Directors in this regard.*
>
> ***Third****: To delegate the Exchange Department (Abdul Aziz Hamad Al-gosaibi and Maan Abdulwahed Al Sanea)* ***to make necessary adjustments to both sides of the assets and liabilities in order to show the budget [accounts] in an appropriate manner to others and to adopt these amendments to suit the comparative figures for previous years***" (Emphasis added.)

151. As if to underscore its significance, this resolution R/73 of 14 November 1988 was signed off by all three Partners, Ahmad, Abdulaziz and Suleiman (i.e.: every AHAB Partner at the time) as well as by Yousef - the latter no doubt in his capacity as a director of the Money Exchange. He is shown to have signed off over successive years to minutes recording in similar terms the same practices.

152. The original of Resolution R/73 was of course, in Arabic and so it must be assumed that Yousef (although also competent and testified mostly in English) would have read and understood it. He admitted that he would read documents before signing them.[123] He also admitted to seeking the explanation for financial matters which he could not himself decipher, explanations which, at this time, would have been readily provided by Abdulaziz or Dr. Sami.[124]

153. And so, although throughout his testimony protesting his incompetence in financial matters, I am compelled to find that Yousef, who remained on the AHAB Board throughout from his succession to his father Ahmad in 1990, must have understood the

---

123 **{Day30/83:21} - {Day30/84:7}**

124 As he admitted **{Day34/17:21-25}** and as Omar Saad later confirmed **{Day88/38:19-22}**.

meaning of these resolutions in R/73 and the similar resolutions which he approved in subsequent years.

154. In particular, the two fraudulent accounting practices endorsed by Resolution R/73 in November 1988 (capitalization of interest and adjustments to the balance sheet) were repeated every year up to 1992:

(1) By resolution dated 6 December 1989;[125]

(2) By resolution taken at a meeting on 3 December 1990 (as appears from a Summary of resolutions passed during the year 1990) (R/17/2);[126]

(3) By further resolution entitled "*Summary of Resolutions of the Board of Directors Passed During 1991, dated 8 January 1992 (M5/76)*";[127]

(4) A Board Resolution in Arabic (R/55) dated 9 February 1992;[128]

155. Thus, there is clear and compelling evidence that every year throughout the period 1986 to 1992, the AHAB Partners resolved to capitalize interest (i.e.: treat interest as part of the cost of the shares and remove the liability to pay interest from the profit and loss account, treating it instead in the balance sheet as accretion to capital) and remove large amounts of liabilities for debts from the balance sheet - all in order to present a false picture to their bankers of the financial position of the Money Exchange.

156. Each of the Partners during those years signed up to these fraudulent practices and there is no evidence, and so no basis in my view, for concluding that they did not know what they were doing.

---

125 **{G/1264}; {G/1265}**
126 **{G/1278.3}; {G/1278.4}**
127 **{G/1425.1}; {G/1425.2}**
128 **{G/1426.1}; {G/1426.2}**

## The Adjustment Schedules

157. The fraudulent manipulation of the financial statements was implemented by way of calculations set out in a series of "adjustment schedules" entitled "*The Amendments Performed on the Book Figures to Show the Financial Date as of 31 December*" of each year "(*in English*)" - the last phrase in parenthesis being a reflection of the intention that these would find their way into the statements to be published to the banks only in English.

158. Each schedule began with a repetition verbatim of the text of Resolution R/73, the 14 November 1988 resolution, thus:[129]

> "*In implementation of Board of Directors decision No.R/73 dated 14 November 1988, which provides for* "*commissioning the money exchange administration (Abdulaziz Hamad AlGosaibi and Maan Abdulwahed Al Sanea) with implementing the amendments required to lessen [cut off] the assets and liabilities, in order to present the budget appropriately to outside parties, and to accredit those amendments so that they match with the comparison figures from the previous years.*""

159. The actual methodology is graphically apparent from the adjustment schedules themselves. They had been seen by and were routinely signed by the Partners. As set out in Section C1 of the Defendants' Closing Submissions[130] and as was ably demonstrated in submissions by Mr. Lowe and as I accept, the balances produced by each schedule can be traced into the financial statements of the Money Exchange. In other words, those statements reflect the result of adjustments to the Money Exchange's ledger balances and cannot otherwise be reconciled to the books and records. In particular:

---

129 See **{H25/32.1/1}**.
130 At Section **{E1/3}**.

(1) The 1987 Schedule was handwritten and showed adjustments to the loan (and related investment) balances reducing the loan balances from SAR 1,299,568,382 to SAR 586,641,395; i.e: adjustments involving SAR 848,302,440.

(2) The 1988 Schedule was signed by Al Sanea and Abdulaziz and showed a "*Total Record*" of adjustments involving SAR 1,150,178,932.50.[131]

(3) The 1989 Schedule was signed by Al Sanea and Abdulaziz and showed adjustments involving SAR 1,478,690,714.92.[132]

(4) The 1990 Schedule was signed by Suleiman and Abdulaziz and showed adjustments involving SAR 1,662,503,384.75.[133]

(5) The 1991 Schedule was signed by Suleiman, Abdulaziz and Al Sanea and showed adjustments involving SAR 1,735,224,104.92.

160. As the stated purpose of the Schedules was to misrepresent the true state of the Money Exchange's finances and so to mislead "*outside parties*" [i.e. the banks], a number of inescapable inferences arise:

(1) Fraudulent financial statements were prepared so as to eliminate losses from the Money Exchange's balance sheet by way of the capitalization of the costs of borrowing. This commenced practically from the time of inception (certainly, as shown above from the available resolutions or Schedules no later than 1986) and carried through until the collapse in May 2009.

131 **{H25/32}; {H25/32.1}**
132 **{H25/37}; {H25/38}**
133 **{H25/1}; {H25/2}**

(2) The methodology was standardized as shown above until 1992 when the Money Exchange was split into two "Divisions" - the Exchange and Investment Division and the Finance Division and the financial statements thereafter prepared separately for each Division, with the true ledger account balances that had to be reduced each year being placed in the accounts of the Finance Division. I will return to examine these developments – the separation of the finances of the Money Exchange into "Divisions", in some detail below.

(3) The Partners in charge of the Money Exchange throughout the 1980s and early 1990s – Ahmad, Abdulaziz, Suleiman and Yousef (as well as Al Sanea qua director) – had deliberately and knowingly approved of these fraudulent accounting practices.

(4) In so doing, it would have become known to Abdulaziz, Suleiman, Yousef and Al Sanea that significant amounts of the Al Sanea indebtedness to the Money Exchange were excluded (along with much of AHAB's own indebtedness) from the financial statements issued to the banks.

(5) As the fraudulent accounting practices had thus become institutionalized with their approval, Abdulaziz, Suleiman and Yousef would have known that they themselves could not rely upon the financial statements issued to the banks for accurate information about the state of borrowings or about the amount of the Al Sanea indebtedness. Instead, they would have to get that information from the consolidated internal accounts or from the auditors, El Ayouty.

161. Importantly, having regard to AHAB's amended case (in effect asserting that the knowledge of the fraudulent practices passed with Abdulaziz), Suleiman's knowledge of

these matters is plain from his signatures on the documents. In the absence of evidence from him or anyone else as to his state of mind at the relevant times, there is simply no basis for concluding otherwise than that he must have known that the fraudulent practices meant that the Money Exchange was concealing the true state of its indebtedness and its losses, as well the withdrawals by the family, including the Al Sanea indebtedness.

162. While Yousef protested his ignorance of financial matters and lack of understanding of the accounting of the Money Exchange, it is simply inconceivable that he would not have understood the implications of the practices to which he as well so readily and consistently subscribed.

**Further communications with El Ayouty: 1990 to 1994**

163. The context of El Ayouty's criticisms over the years is very significant. Notwithstanding their repeated and enduring criticisms of the fraudulent accounting practices, they did sign off on clean audit opinions throughout the life of the Money Exchange from 1981 to 2009. The conclusion is therefore unavoidable that El Ayouty allowed themselves to become complicitous in the fraud upon the banks. As the Defendants propose, the fact that they have not been sued by AHAB for negligence can therefore be attributed to El Ayouty's repeated and recorded criticisms over the years of the fraudulent practices.

164. Indeed, it is fair to say that El Ayouty were fully aware and very critical of the practices adopted by the Partners. This can be seen clearly from so much of the correspondence as has been disclosed in the trial[134] and which reveals that El Ayouty provided regular and

[134] It was established during the trial that a file of correspondence between AHAB and El Ayouty although recovered by the Deloitte Investigation Team from AHAB H.O. and listed for disclosure, subsequently went missing and was never disclosed.

explicit advice to AHAB about the activities of the Money Exchange, if only – it might be inferred – to ensure that they could not be sued at a later stage by AHAB for negligence.

165. The correspondence at this stage was addressed primarily to Abdulaziz as the AHAB Chairman or as Managing Director of the Money Exchange. There is however, no basis for finding, as AHAB contends, that he would have kept these letters to himself and so not discuss them with his Partners at the time, Suleiman and Yousef. The natural inference to draw is that he would have discussed El Ayouty's concerns with them.

166. I begin with further reference to the letter of 3 May 1990[135] where El Ayouty set out a "*number of comments which were already included in our previous reports*" – presumably a reference to their Audit Pack Reports and so recording the continuity of their concerns.

167. El Ayouty made pointed criticism of the fraudulent accounting practices.

168. At item 6 they criticize the adjustments to the balance sheets thus:

> "*Further to a resolution of the partners, the company has made some adjustments to the figures on the balance sheet at the end of each year so as to match them to the previous year (**without any clear basis for doing so**), by reducing an important part of the bank loans granted to the company directly or those granted to the parent company and deposited in the Money Exchange branch as deposits against the partners' shareholding in the Lombard Bank, such that the shareholding is represented as a loan granted to them for that purpose. This is as well as a reduction in the customers' accounts for those balances associated with the parent company and also the partners' account and with the value of the commissions capitalized against the financial securities portfolio*"(Emphasis added.)

135 **{G/1304.2}**; **{G/1304.3}**, already referred to above on the subject of the declared capital of the Money Exchange.

169. They go on to explain the fraudulent and far-reaching consequences of the practice of capitalization of interest ("*commission*") instead of paying down the debt incurred for the acquisition of the share portfolio:

> ".. *The company's annual results* have *been dependent on what has been taken annually from the capitalisation of commissions on the financial securities portfolio, since* ***without that capitalisation the company's results would be negative.*** " (Emphasis added).

170. El Ayouty then goes on to make a number of recommendations, including:

(i) Payment up by the Partners of the outstanding capital (one of their ongoing concerns already mentioned above);

(ii) Repayment of the Partners' balances, implicitly scolding the Partners for failure even to pay the interest on their personal debts:

> "*...the parent company, the subsidiary companies and the partners should repay some of their indebtedness, or even make a start in paying those commissions calculated on their balances*.";

(iii) Liquidating part of the real estate portfolio (already mentioned above):

> "*Speedy action should be taken to dispose of part of the financial securities portfolio* [the shares] *by selling off part to cover part of the borrowing and by reducing part of the loans which are financing that portfolio…*";

(iv) That an "*end should be put to the granting of new facilities, whether to the parent company, the subsidiary companies or the partners and to adhere to sound banking practice by accepting the importance of declaring the cost of the borrowed funds …*"

171. This was obviously sound advice which, if heeded, may well have avoided the vortex of indebtedness that the Money Exchange became, from the sheer gravitational pull of which there would be no escape. But, as already mentioned, [and as events are shown to have transpired later in this Judgment], apart from a very narrow window of opportunity

when the share portfolio could have been liquidated at a profit, heeding the El Ayouty advice would have been financially disastrous for the AHAB Partners and certainly would not have allowed the family through Abdulaziz, Saud and Al Sanea to retain the prestigious positions they occupied on the Board of SAMBA[136] and which came with the ownership of the SAMBA shares.

172. These El Ayouty criticisms were therefore not heeded in 1990 nor in subsequent years when they resurfaced, as shown in the Audit Packs, which were eventually disclosed and which will be examined below. The advice was also most probably the subject of direct discussions between El Ayouty and Abdulaziz on the occasions of the annual visits leading up to the formal delivery of the Audit Packs and subsequently, after Abdulaziz's death, when El Ayouty delivered the Audit Packs to his successors. This is to be gleaned, in particular, from the evidence of Omar Saad.[137] He was the Chief Accountant of AHAB H.O., a long-standing employee[138] and a close confidante and assistant to Abdulaziz, having served, in effect, as his confidential secretary - a relationship which he developed with no other AHAB Partner:

> "*Q. I just want you to recall the discussion we had about the process of finalizing the accounts. You said yesterday that El Ayouty would send the accounts once they were finalized with a letter to Abdulaziz before he signed them. Do you remember that? A draft of the balance sheet.*
>
> *Q. Exactly, with the letter. You told us yesterday.*
>
> *A. There must be a letter.*

---

136 **{C1/2/16}**
137 **{Day89/3:9-25} - {Day89/4:6}; {Day89/5:4} – {Day89/5:22}.**
138 Since the mid-1950s.

*Q. Do you remember whether this was delivered by hand or by post?*

*A. By hand. He used to bring it by himself and go to Sheikh Abdulaziz's office and deliver it to him.*

*Q. Who is "he", Saleh El Ayouty?*

*A. Yes, Saleh*

*Q. So, after Abdulaziz –*

*A. No, it was Rajab. First it was Saleh and after him it was Rajab.*

*Q. What would Abdulaziz do? Would he give a copy to you, Mr Saad?*

*A. No, he would have kept it for him and after that he would sign it and resend it to El Ayouty. After his approval. Sometimes he would have asked us about some things.*"

"*Q. El Ayouty signed the audit report, presumably , after Abdulaziz signed the accounts, is that right?...*

*A. No, after Abdulaziz reviewed the draft, they will send him the balance sheet, an official balance sheet, stamped and signed*

*Q. Then you would file that away somewhere in the appropriate place?*

*A. Yes.*"

173. Much turned in the trial upon whether the Partners, after Abdulaziz's time, continued to interact with El Ayouty and so would have been aware of the criticisms and concerns raised by El Ayouty in their audit reports on the Money Exchange. Saud in particular denied his own involvement in this regard, notwithstanding his succession to Abdulaziz's

place on the Board and despite the fact that much of the correspondence between Abdulaziz and El Ayouty was found in Saud's villa or in his villa safe and had most likely come from Abdulaziz's office safe.[139] The evidence of Omar Saad in this regard also is conveniently reported here:[140]

> "*Q.* *You have always said that the trial balances for the head office were given to El Ayouti and to Saud in his capacity as general manager: that has always been your position, hasn't it?* [Here being questioned in the context of his witness statement as translated from his native Arabic being shown not to have fully recorded his evidence].
>
> *A.* *Yes.*
>
> *Q.* *Right at the beginning of the process, Saud is given copies of the trial balances. That's what happens, is it?*
>
> *A.* *Yes, after the death of his father, the trial balances were submitted to him, to Saud.*
>
> *Q.* *Before the death of his father, were they submitted to Abdulaziz?*
>
> *A.* *Yes, yes.*
>
> *Q.* *Do you know whether after Abdulaziz passed away, Saud was involved in the rest of the correspondence and the dealings with El Ayouty to finalise the audit?*
>
> *A.* *More than Suleiman.*
>
> *Q.* *He was more involved than Suleiman?*
>
> *A.* *He has an accounting background more than Suleiman.*

139 See further discussion below of the significance of document locations and the Defendants' written submissions on this subject at **{E1/15}**.

140 **{Day89/6:15}** – **{Day89/8:7}**.

*Q. So he would explain presumably, what was going on to Suleiman , as chairman?*

*A. I have no idea, I don't know anything about it.*

*Q. Presumably, after Rajab delivered the draft, he would give it to Saud personally, would he?*

*A. After Abdulaziz passed away, I didn't know anything about these balances, whether or not he gave to Saud. But sure, he would have given it to Saud.*

*Q. Saud would have got Suleiman to sign off on these statements, wouldn't he?*

*A. I don't know about it, but surely he would have signed it. He is his uncle and he must tell him.*

*Q. We have, for example, accounts for 2003 and 2004 signed by Suleiman. Mr Saad, you are saying that you did not procure Suleiman's signature on those accounts; is that right?....*

*A. Yes, it was Saud who did that.*"

174. It is partially against the background of that evidence (being Omar Saad's noticeably guarded responses) that I must come to a conclusion on the extent of the Partners' knowledge of the concerns and criticism of El Ayouty about the fraudulent accounting practices.

175. A significant response from AHAB can be found in a letter from Abdulaziz to El Ayouty dated 7 April 1991 concerning the financial statements of the Money Exchange for the year ending 31 December 1990:[141]

---

141 **{G/1385}**;**{G/1388.2}**

> "*As a follow up to our message dated 2 April 1991 on the financial statements for the Exchange Division and the main headquarters (in English) for the year ending 31 December 1990, we hope that they will be finished prior to 10 April 1991 and that you will discuss any inquiries or explanations regarding this data with Mr. Maan Al Sanea later on, once the financial statements are issued in English for the Exchange Division and the main headquarters….*
>
> *It is also known that there are conflicts between the balances of the record books received from the local and foreign banks and the (book) balance as of 31 December 1990 for the current and loan debit accounts, as well as other accounts. It is natural for such a conflict to arise, as it is the result of the implementation of the Board of Directors decision number R/73 dated 14 November 1988. In summary, it involves implementing a decrease on the assets and liabilities side in order to show the budget in an appropriate manner toward outside parties (in English). Meanwhile, you can review the decision of the board of directors on the amendments made to the financial data for the year ending 31 December 1990.*
>
> *In light of the confidential nature of your inquiries into the financial data, we reiterate and emphasise to you that you must refrain from making inquiries or remarks about the financial data of the money exchange department and the main headquarters to anyone except Mr. Maan Al-Sanea, who will take on the task of responding to those remarks and enquiries.*
>
> *As far as the policy of the company and capitalizing interest is concerned, it is still in effect as per the Board of Directors decision, a copy of which has been provided to you…*"

176. Thus, Abdulaziz confirmed that he (speaking on behalf of AHAB and so implicitly with the knowledge of his other partners, Suleiman and Yousef) knew of the false accounting practices, including the capitalization of interest and had resolved to continue them despite El Ayouty's concerns and advice. It is also clear that the Partners had chosen to make Al Sanea their instrument of the conduct and concealment of the fraud.

177. Also to be noted, there was the dismissive response to El Ayouty's advice to liquidate assets in order to pay down bank debt.[142]

178. Abdulaziz and Al Sanea responded in a jointly signed letter on this point on 10 May 1990, further rejecting El Ayouty's concerns. In relation to the viability of the long term investment strategy, they set out their assessments of the current values and marketability of the different share portfolios (including the most valuable SAMBA shares) under the heading "*Expansion in forming a portfolio of financial papers of the large size with miniscule returns*" and noted:[143]

> "*The strategy of the company in this regard is to look toward the future regarding the value of these investments. I believe that the positive indicators of this policy have started to become clear* [referencing the then current market values].
>
> ...
>
> *It has also been noted that the profits achieved from the shares, for example, cover the loans that have been invested in all the shares, plus the interest on the loans. This has prompted the company administration to retain the shares for a longer period of time while shouldering the financial expenses on the funds that have been invested, not out of an expectation of annual profits to be distributed on the shares.*"

179. In light of the evidence which showed that the dividends from the shares were almost invariably declared as income and paid out from the Money Exchange to the Partners each year, it is doubtful that this policy of using them to cover the loans was ever intended to be adopted as declared in this letter.

---

142 As set out above from **{G/1304.2}**; **{G/1304.3}**, recommendations 7 and 8.

143 **{G/1288.1}; {G/1288.2}**

180. But leaving that now as an issue to be further addressed, it must be noted here that El Ayouty, not discouraged by that response, sent a further letter in or around early 1991[144] entitled "*The most important observations on the audit of the accounts of* [the Money Exchange] *for the year ending 31 December 1990 AD.*"[145]

181. Again, El Ayouty set out a number of criticisms of the accounting policies and of the finances of the Money Exchange and concluded that:[146]

> "*What has previously become clear is that the company is still suffering from a shortfall in its own income, not to mention keeping a great volume of investment in the financial portfolio with very tiny returns, at a time when the company has started the operation of organizing the necessary finance for the main centre and the companies belonging to it. This has put the company in a state of continual borrowing and increase the size of its indebtedness vis-à-vis the banks, affecting the current and future results of the company…*"

182. Far from heeding El Ayouty's advice to return to prudent and honest financial management, the evidence reveals that the Partners resolved to institutionalize the fraudulent practices even further.

**The creation of separate financial statements for separate "Divisions" of the Money Exchange**

183. I turn next to examine the creation by the AHAB Partners of separate financial statements for the Money Exchange circa 1992/1993, in effect dividing its book-keeping under two Divisions - the Finance Division and the Exchange & Investment Division - with the placement of the "adjusted" ledger balances into the Finance Division. The

---

144 While undated, the rough dating is to be inferred from the fact that the letter conveyed El Ayouty's comments on the audit for the last year (1990) which would have been concluded as usual around April/May of the ensuing year (1991).

145 **{G/1366}; {G/1367}**

146 **{G/1367/13}**

Partners thereby created a "*bad silo*"[147] into which the true state of the indebtedness could be hidden. I will also examine the ongoing criticisms of El Ayouty in regard to the falsification of accounts in this latest manifestation and the further implications this all carried for the knowledge of the fraud on the part of the Partners.

184. The decision to create a Finance Division was recorded in a Money Exchange Board Resolution titled R/5 and dated 3 December 1992,[148] signed by Abdulaziz, Suleiman and Al Sanea. There are different translations to similar effect of this document. That at **{G/1457}** provides:

> "*The board discussed resolution Ref 72*[149] *dated 14/11/1988* [the 14 November 1988 Resolution] *which includes an entry to reduce Assets and Liabilities annually to be reflected on the records in the end of each fiscal year to be acceptable to others (especially in English) in order to avoid such entry [i.e.: taking such action every year*[150]*], (it has) been decided as follows:*
>
> *1st To establish new division named Finance & Property Investment* [Division] *with the objective of following finance volume* [i.e.: the size of the finance] *(from internal & external) and property investments, with a capital of SR 10 Millions, to be provided from brought forward benefits* [i.e.: from retained earnings].
>
> *All Debits accounts either under adjustment or document shall be transferred to the books of such division, as well as all property investments and its related accounts, capitalized commissions and its counter parts credit accounts (loans & deposits of other credit accounts) either from Money Exchange Division or Stock Investment Division effective fiscal year ended 31/12/1992.*

147 Aptly so described by the Defendants in their Written Closing Submissions **{E1/11/41}**.
148 Referencing a meeting held on 2 December 1992 – **{G/1454/1}**; **{G/1456}**; **{G/1457}**.
149 **Sic**, but referring to R/74.
150 See translation at **{G/1454/1}**.

*2nd As this division is recently established, all entries and transfers among the three divisions (Money Exchange, Stock Investments, Finance & Property Investments) through (accounts) shall be separated for each division.*

*3rd As a result of the above, annual financial statements for Ahmad Hamad Algosaibi & Bros Company for Money Exchange, Commission & Investment shall be as follows:*

1. *Financial Statements for Money Exchange Division*

2. *Financial Statements for Stock* [Equity] *Investments Division*

   *N.B. – Total of financial statements (1 Year) shall represent financial statements issued in English for previous years, on the same principles, without the entry applied in previous years.*

3. *Financial statements for Finance and Property Investments (which represent the entry applied in previous years).*

4. *Consolidated Balance Sheet of the following divisions:*
   *-Money Exchange*
   *- Stock Investments*
   *- Finance & Property Investments*

*which in total represent the actual records of Ahmad Hamad Algosaibi & Bros Company for Money Exchange, Commission & Investment.*"

185. It is apparent from the note to items 1 and 2 when read in the context of the 14 November 1988 Resolution "R/72" as directed by the opening paragraph, that "English language" statements would be prepared for the Exchange and Investment Division, while Arabic statements would be prepared for both Divisions, as well as for the Consolidated Balance Sheet (i.e.: for the Money Exchange as a whole).

186. The Finance Division would record the ledger balances for accumulating "*capitalization*"; i.e.: the unpaid interest or other capital costs of the borrowing and the

bad debts of the Money Exchange (such as the Al Oumi Trading Centre[151]), as well as most of Al Sanea's debt balances.[152]

187. The effect of this became the partial automation (i.e.: giving effect to the resolution in terms: "*in order to avoid taking such action every year*") of the fraudulent "*capitalization*" and balance sheet adjustment practices carried on manually in standard form since at least 1988, all as discussed above.

188. It is important to note that not only Abdulaziz but also Suleiman (as well as Al Sanea) signed resolution R/5 and there is no basis for thinking that Suleiman was anything other than fully cognizant of its implications. As already noted above, he had Abdulaziz (to whom he was close) as well as AHAB's accounting staff to explain the meaning of the resolutions to him if he needed assistance. There is therefore no reason to think that going forward into the era of his chairmanship, Suleiman would have been anything but fully aware of the ongoing accounting practices and their consequences.

189. Resolution R/5 was confirmed on 5 December 1992 in a Summary of Board Resolutions (R/6).[153] As this Summary explained:

- At note 1, a combined set of Financial Statements would be produced for the Exchange and Investment Division (as was done in the previous years);
- At notes 2 and 5, that capitalization of interest was to continue; and
- At note 13, that Resolution R/5 would be confirmed.

---

151 A large loan (approx. SAR 180m) granted by Abdulaziz to a family friend Al Oumi, for the development of the Centre which was never repaid and which was a cause of ongoing criticism from El Ayouty.

152 Which became the subject of Ledger 3 within the internal accounting system of the Money Exchange.

153 **{G/1458.1}**; **{G/1458.2}**

190. This 1992 Summary was signed by Yousef, as well as Suleiman, Abdulaziz and Al Sanea.

191. Again, having signed these documents, Suleiman and Yousef – who would continue the practices after Abdulaziz – must clearly have been aware of their meaning.

192. There were obvious implications for the contemplated separation of the accounts:

(i) The English language statements, shorn of the balances which were to be hidden in the "*bad silo*" of the Finance Division, were those to be issued to the banks and so were designed to defraud the banks;

(ii) The Arabic statements were clearly meant privately to inform the AHAB Partners (and the now complicit El Ayouty), all of whose first language was Arabic; and

(iii) A consolidated view of the statements of both the Finance Division and the Exchange & Investment Division (also as set out in the El Ayouty Audit Packs) would inform them fully of what was really going on.

193. While it appears that the 1992 statements were manipulated as before in keeping with the 14 November 1988 Resolution,[154] it is clear from the records that from 1993 the split into accounting divisions was implemented so that separate Arabic statements were prepared for the Finance Division[155] and for the Exchange & Investment Division.[156]

194. As the only reasonable inference is that this must have been done for the private use and information of the Partners, it must also be inferred that they would have regarded this arrangement as a very important family secret, one to be closely kept and memorialised.

---

[154] **{F/39}** - the financial statements and audit report as at 31 December 1992.

[155] **{F/46}** - which is the Arabic along with the English translations for both Divisions, eventually issued by El Ayouty on 21 July 1994. See also **{F/47}** for an English translation of the Auditor's Report for the Finance Division for 1993.

[156] **{F/45}** is the English translation.

Hardly therefore, a secret, the continuity of which would have been broken by the passing of Abdulaziz.

195. From the very outset of the separation of the accounts in 1992/1993, some very telling numbers and comments appear in the Audit Reports.

196. While in the Financial Statements and Audit Report 31 December 1993[157] for the Exchange and Investment Division, "Loans from Banks" is reported at SAR 770,846,687; the comparable year end 1993 Report for the Finance Division records that important figure as SAR 1,938,000,000 – more than two and a half times as much.

197. This form of suppression of the truth on a most crucial item of the accounts continued throughout the life of the Money Exchange, even as the level of borrowing increased exponentially.

198. The comments by El Ayouty in their notes to the 1993 Report on the Finance Division, were also revealing of the Partners' understanding of the separation of the accounts and the die which they had cast for the future:[158]

- At Note 1.2: "*The primary activity of the* [Money Exchange] *Division is limited to procuring funds for the Company, its partners and their companies and to buy and sell shares and lands.*"
- At Note 1.3: "*These financial statements include the activities of the Finance Division only (aside from the financial statements of the Exchange and Investment Division which were issued separately) and includes the Division's transactions*

157 **{F/46}; {F/45}** or **{F/43}** - the original in English (as distinct from the translation).
158 **{N/466/4}**

*with the Company and affiliates through the Head Office account and where no specific share capital was allocated.*"

- At Note 3 under the heading "*Investments*", a graphic explanation is given of the impact of capitalization of interest on the accounts not only of the Finance Division itself but also of the Exchange and Investment Division, illustrating how the loss is to be hidden in the bad silo of the Finance Division:

"*Costs of loans capitalized annually are shown as Investment registered in the name of the Exchange and Investment as follows:*

| *Riyal* | |
|---|---|
| *980,610,269* | *Capitalized loan interest (balance as on 1/1/1993) includes a revaluation conducted during the previous year on shares without distinction except for the amount of 78,850 217 riyals representing the revaluation of the (SAMBA), United Commercial, Saudi British Bank and Arab National Bank shares.* |
| *184,000,000* | |
| *1,164,610,269* | *includes the net loss of the Investment Division capitalized and added to cost of investment for 1993.* |
| *127,073,012* | |
| *1,291,683,281* | |

*The investment portfolio recorded at cost in the Exchange and Investment Division and the cost of holding them recorded in the Finance Division according to the above note includes the following."*

[Then follows a breakdown of the costs of holding each group of shares as named above, including of course the most expensive SAMBA shares].

At Note 4, under the heading "<u>*Current Accounts*</u>", the debts owed to the Money Exchange and which are to be fully revealed nowhere but within the accounts of the Finance Division, were discussed pointedly by El Ayouty as follows:

"*Riyal*
*1,168,547,723* – *credit accounts for Mr. Maan Al Sanea*

| | | |
|---|---|---|
| *175,625,577* | – | *Al Oumi Accounts (doubtful debt)* |
| *20,527,030* | – | *Client accounts (doubtful debt)* |
| *180,000,000* | – | *Unpaid Share Capital Accounts* [the capital which the partners never paid] |
| *18,750,000* | – | *Algosaibi Investment Co. Account* [the first Bahraini Business] |
| *2,000,000* | – | *Yousef Algosaibi Account* [towards the building of his house]. |
| *1,565, 450, 903* | | |

*Mr. Maan Al Sanea's accounts are too many to count and some of them do not accrue interest and some are in the name of his companies. Till date, no decision has been made regarding this debt.*

*Commission recorded on Al Oumi account is more than one hundred million riyals and this is not in line with banking practices and this debt has not been settled despite the company taking possession of the property guaranteeing that debt.*

*Other doubtful debts are considered as bad debts as it is not possible to collect any of them.*

*Commission of this portion of unpaid capital reached 299 million* [interest accumulated over the years on the unpaid capital] *and was previously entered into the account of the Company's head office. In order to calculate returns of the Division, the amount was later re-entered into the Division accounts to be settled.*"

199. Most significant to note are the observations on the Al Sanea indebtedness shown here at end 1993 to have already exceeded SAR 1.1bn (US$320m). El Ayouty were clearly warning the Partners about the proliferation of his accounts (including some being taken in the names of "his companies"); the fact that some do not accrue interest and that no decision had yet been made about the indebtedness - it seems either as to limits to be imposed or the terms of repayment.

200. These were early warnings for the Partners, warnings which it is fair to conclude were never forgotten as they were raised again by Yousef in 1999 [as we will see],[159] and by Saud in Saud's Calculations in 2002.

201. Not only was it apparent that Al Sanea was granting to himself exceptionally favoured treatment (the cause of Yousef's complaint in 1992), it was also already clear from the 1993 Audit Report that he was using the Money Exchange to fund expansionist ambitions through "*his companies*". While at the time this was no doubt allowed because of the special relationship he enjoyed with Abdulaziz, equally there can be no doubt that Al Sanea's increasing unpaid indebtedness – like the increasing and ongoing capitalization of the AHAB indebtedness itself – happened with the knowledge of the Partners.

202. And so, in addition to automating the separation of balances by creating the Finance Division, it was still necessary for the Money Exchange each year to capitalize the current year's interest on borrowings so that it would be removed from the statement of income before calculating the "profit". Otherwise, the interest charge would have resulted in a loss being recorded for the relevant year. As shown above from Note 3 to the 1993 Audit Report for the Finance Division, once capitalized, the sum had to be moved to a ledger account of the Finance Division.

203. The Summary of Board Resolutions 1993 (R/22, dated 11 November 1993)[160] plainly reveals that these consequences were known to and approved by the Partners. They

159 See paragraph [400 et seq.] below

160 **{G/1502}**; **{G/1503}**; **{G/1504}**

record the accounting practices of capitalization and "amendments" and noted that the Board had resolved:

> "*1. To issue consolidated balance sheet for the Money Exchange and Investment Division as previous years, as at 31.12.1993.*
>
> *2. **To continue capitalization of investment division interest due as at 31.12.1993** as an integral part of investment cost, in line with previous Board Resolutions.*
>
> *3. ...*
>
> *4. ...*
>
> *5. To continue working in accordance with Board Resolutions N R/55 dated 09.02.1992 which confirms **continuity of interest capitalization**.*
>
> *6. **To confirm authorization** of (Abdulaziz Hamad Algosaibi (sic) and Maan Abdulwaheed Al Sanea to manage the Money Exchange division jointly and severally **to amend as necessary the books and signatories in order to issue the balance sheet and profit and loss account (in English) as at 31.12.1993 acceptable to others and approve such amendments in order that the figures of this fiscal year match the figures of previous years."*** (Emphasis added.)

204. Thus, the Board resolutions show that throughout the 1990s, the AHAB Partners continued to affirm the separation in the financial statements between the Finance and the Exchange & Investment Divisions. As the Defendants argued extensively in their Closing Submissions, it is to be inferred that the reason for the continued need for formal resolutions was to placate El Ayouty by explicitly recording that the Partners were aware of and approved of what was undeniably a fraud. Indeed, why else, it may be asked rhetorically, would the Partners so consistently have recorded proof of their knowledge of the fraud?

205. I will come below to examine further the concerns which El Ayouty continued to express and steps taken by AHAB which can only sensibly be regarded as intended to provide further comfort to El Ayouty.

206. AHAB has provided no explanation for this series of resolutions taken throughout the 1990s. Given that Abdulaziz signed many of them on behalf of himself, Suleiman and Yousef, it is to be inferred that he did so with their knowledge and permission. In any event, having themselves signed the false accounting resolutions in R/5 and R/6, (both as above) Suleiman and Yousef plainly knew about it and were content for it to continue.

207. El Ayouty continued nonetheless to express of their concerns. It appears that their primary concern when dealing with the Finance Division, was to ensure that the Partners were aware of the purpose of its existence and the nature of its operations.

208. An upshot was that before signing off on the first audit of the Finance Division – that for year end 1993 discussed above - there was between April and May 1994, a near impasse recorded in the correspondence between Abdulaziz and El Ayouty, with El Ayouty refusing to sign off on the audit until satisfied that the Partners had recorded their awareness of the activities of the Money Exchange.

209. This exchange of correspondence is significant also because it reveals at this early stage what became a continual refrain from El Ayouty, criticizing not only the fraudulent practices of the Money Exchange but also the increasing withdrawals of Al Sanea from the Money Exchange.

210. The chronology for this period begins[161] with a Resolution of the Board of Directors of the Money Exchange dated 4 April 1994 (R/39), signed by Abdulaziz and Al Sanea.[162] It dealt with the first financial statements of the Finance Division, those for the year end 1993, the issuance of which to the banks ("the requesters") had become a matter of urgency, as appears from the text. It recorded (among other things) the following as having been resolved:

> *"1. Approval of the financial statements for the fiscal year ending on the 31st of December 1993 for the Exchange and remain on the issuance of the balance sheet for the Exchange and shares and issuing it in English.*
>
> *2. ....*
> *3. ....*
>
> *4. **Empower the Chairman of the Board** and the Managing Director of the Exchange **to do the necessary amendments on the financial statements issued in English in order to be consistent with the comparison numbers** and discuss the report presented from the Auditors dated 30/3/1994 for the financial statements for the year ending on 31 December 1993 and approval of the same.*
>
> *5. **Follow up with [El Ayouty] for the issuance of the financial statements (in English)** for the year ending on 31 December 1993G **in order to send them as soon as possible to the requesters by the dates agreed upon, as this is very important.***
>
> ***Empower the Managing Director on behalf of the Shareholders** to review, discuss, amend, **approve and sign the consolidated balance sheet and financial statements in Arabic** for the year ending on 31 December 1993 after completion of the above step, **since the consolidated balance sheet relates to the Company and does not require a report from the Auditors so that no one view[s] it for personal reasons**"* (emphasis added).

---

161 To the extent that it can be discerned from the available documentation and bearing in mind that some correspondence in the chronology has not been disclosed, as appears from that which is available.

162 **{G/1523}**; **{G/1523.1}**

211. Following this resolution, Abdulaziz wrote on 25 April 1994 to Salah El Ayouty further, it appears, to a telephone conversation between the two:[163]

> "*Brother Salah Al Ayouti*
> *Riyadh*
>
> *Greetings,*
>
> *Further to our telephone conversation regarding your remarks on the Exchange's Financial Statements for the year 1993:*
> *First, we wish to thank you for your sincere efforts in helping us plan the handling of our financial obligations and wish to inform you of the following:*
>
> *The balance sheet in English includes:*
>
> *1- The Exchange Balance sheet*
> *2- The Investment Balance sheet (shares).*
>
> *These are the ones sent to our correspondents, and in order for us to honor our commitment to them, please have them signed so we can send them to the banks on the agreed time.*
>
> *The Finance Balance Sheet and Consolidated Exchange Balance Sheet (including the Exchange, Investment (Shares) and Finance), these are internal balance sheets for the partners and are not provided to any other party.*"

212. From this it is clear that neither Abdulaziz nor El Ayouty could have been in any doubt as to the purpose of the financial statements to be issued in English. The letter makes it perfectly plain that they were the financial statements to be issued to the Money Exchange's banks, while the financial statements of the Finance Division were to be concealed from third parties.

213. In this letter, Abdulaziz also confirms a plan approved by the Board[164] pursuant to earlier El Ayouty advice, to set off Al Sanea's indebtedness against his credit account balances

163 **{G/1530}**; **{G/1531}**

164 Resolution R/42 dated 12 April 1994: **{G/1526}**; **{G/1527}**.

and a further plan to liquidate the share portfolio (save for the SAMBA shares) and real estate assets, in order to pay down the bank indebtedness, with anticipated cash liquidity resulting to the Money Exchange of some SAR 2.434bn. In this regard he qualified the plan to liquidate in terms that made it dependent on ideal market conditions which were never to be realized:[165]

> "*The above amount is sufficient as cash liquidity to cover the company's obligations. As you are aware, liquidating assets is not an easy task within a short time frame and will be conducted within the medium term to achieve the best prices for these assets which will reflect positively on the amount of liquidity to be provided to meet the obligations.*"

214. The letter concluded:

> "*We hope the above presentation covers your remarks which will also be discussed with you during your visit when we can listen to more of your sincere directions.*"

215. It is clear from this that Abdulaziz expected to meet with El Ayouty and was already offering assurances about the regularization of the Money Exchange's affairs with its banks.

216. That meeting appears to have taken place and following on from it, Saleh Al Ayouty wrote strictly "*Private and Personal*" to Abdulaziz on 3 May 1994,[166] requesting a number of documents including earlier Board resolutions covering the practice of capitalization of interests and documents recording the accounting for that practice. The letter also referenced the level of bank borrowing and recorded:

> "*It should be noted that it has become clear the bank loans are more or less considered drawn down with the knowledge of the partners and are*

---

165 Save perhaps for a brief period in 2000 when the Saudi share market (the Tadawul) opened 60% higher than it had in 1996: see Hatton, **paragraph 11.29(iii) {I/1/69}**.

166 **{G/1533}; {G/1534}**

> *not utilized for the purposes of the branch, and at the end of 1993 the balances were approximately as follows:*
> *<u>Riyals</u>*
>
> | | |
> |---|---|
> | *SAR 1420m* | *Mr. Ma'an al-Sania and his companies.* |
> | *SAR 480m* | *capital not paid and commission registered on it.* |
> | *SAR 140m* | *companies belonging to al-Gosaibi and Yosuf al Gosaibi."*[167] |

217. El Ayouty went on to record that notwithstanding the fact that, for convenience, they had been dealing with Al Sanea:

> "*We regret that we decided, so that the papers do not get mixed up, that our one source was Mr. Ma'an al-Sania in this department at the highest level, and we performed our work within its boundaries as per written orders from you.* ***It is assumed that all these bad financial circumstances were known to you and known to all the partners.***
>
> *Once the final concluding drafts of the accounts* ***signed by all the partners in person is finished****, please note that the final accounts will include all the balances belonging to the department under any name, whether Exchange, Investment or Finance, and will be in the Arabic language as a basis, it then will be translated into English containing all explanations which we have put on the accounts."*[168](Emphasis added.)

218. El Ayouty's concerns were clearly expressed in this letter, but their intervention and delay in signing off the financial statements nonetheless evoked an immediate reaction as the financial statements had not become available for presentation to the banks. In this regard, Al Sanea wrote to Abdulaziz on 5 May 1994 expressing his concerns:[169]

> "*Attached please find a letter that we propose to send to Messrs Al-Youty, while notifying you that the renewal of the loans agreements in the Kingdom and abroad depends on the financial statement of 1993 issued in English.*

167 **{G/1533/2}**
168 **{G/1533/3}**
169 **{G/1536};{G/1538}**

> *We have a commitment with the Banks to send the mentioned financial statements by the end of April 1994, hoping that you would issue them to prevent any embarrassment with these banks.*
>
> *That, and as agreed, the Balance Sheet as on 6/30/1994 will be issued to clarify all matters.*"

219. Following this, AHAB responded to El Ayouty by two letters dated 11 May 1994. The first letter written on behalf of AHAB responded to El Ayouty's of 3 May 1994 confirming that certain changes to the accounting records of the Money Exchange had been made.[170]

220. The second letter written by Abdulaziz and Al Sanea, responded in detail to the points raised by El Ayouty in theirs of 2 May 1994 (i.e.: re the missing equity capital, capitalization of interest, manipulation of profits and the Al Sanea increasing indebtedness).[171] In this letter it is expressly stated in a number of passages that the Partners knew of El Ayouty's concerns and that Abdulaziz would share the Audit Report for 1993 with them:

> "***With regard to the bank loans being withdrawn with the knowledge of the partners, nobody denies that this is the case***. *In his capacity as a partner, Mr. Ma'an Al-Sanea has previously liquidated his indebtedness from the deposits and his receivables, as well as his share from the profits*"[172]

221. Abdulaziz went on to state that:

> "… ***speaking for myself and on behalf of the partners***, *I assume responsibility for this matter.* ***This is particularly the case given that the interests of the partners are the same as my own interest. At a later date, I will be providing them with full copies of the consolidated financial statements and the detailed report submitted for those financial statements for the year 1993***.

---

170 **{G/1539.5}**; **{G/1539.6}**
171 **{G/1539.3}**; **{G/1539.4}**
172 **{G/1539.4/3}**

> *I will also be informing them of the comments that have been indicated in them, as well as the financial position as of 30 June 1994. A decision has been issued in this regard and I have delivered a copy thereof to your agent.*"[173] (Emphasis added.)

222. Thus, Abdulaziz, speaking on behalf of all the Partners, undertook to provide the financial statements and the 1993 Audit Report to the Partners when received. It is therefore to be assumed that this occurred as Abdulaziz had undertaken and as the Partners would have been entitled.

223. On 12 May 1994, El Ayouty wrote to the Money Exchange c/o Jawdi Jamjoum[174] to request further information regarding Al Sanea's indebtedness[175] to which Al Sanea responded on the same day.[176]

224. In these exchanges El Ayouty remonstrated over the interest rates paid by the Money Exchange on Al Sanea's deposits not having been reduced by 50% as earlier resolved by the Board[177] but still being higher than the deposits one can earn from the banks and when the deposits are meant to lessen the burden imposed upon the Money Exchange by the borrowings which funded the deposits in the first place.

225. In his response, Al Sanea acknowledges (speaking peculiarly in the third person) that the "*reference resolution has not been enforced as of this date*", and that "*As far as the different rate granted to (Al Sanea's) deposits, when he found out that the individual responsible…link(ed) those deposits with rates that exceed the current rates on the date*

---

173 **{G/1539.4/5}**

174 Described in AHAB's pleadings as then (i.e.: before the arrival of Mark Hayley as General Manager in 1998) the Head of Operations at the Money Exchange.

175 **{G/1542}; {G/1543}**

176 **{G/1543.1}; {G/1543.2}**

177 Referring to Board Resolution No.42 dated 12 April 1994.

*they are linked as a courtesy to him; Mr. Al Sanea issued a resolution to terminate his services in March 1994 and issued instructions to calculate and return the difference.*"

226. Not being assured that this and the other irregularities were being addressed, on 19 May 1994, El Ayouty sent a letter "*To the attention of all Shareholders*."[178] The title to the letter was "*The Discussion by His Excellency Sheikh Abdel Aziz Al-Gosaibi – Chairman of the Board of Directors*."

227. The letter opened with reference to the 1993 Audit Pack:[179]

> "*We would like to inform you that* ***we have sent you our audit report*** *dated 30 March, 1994G so that you would amend the financial statements per the comments in the report,* ***the likes of which we have mentioned in our annual reports that were presented to you every year*** *as of the establishment of the branch in August 1981, but they have greatly aggravated this year.*" (Emphasis added.)

228. Thus, El Ayouty confirmed that they sent their Audit Report for 1993 (i.e. the Audit Pack) to the shareholders (as foreshadowed in Abdulaziz's previous letter of 11 May) and that they had presented the final Audit Reports to them every year. From this, it can be inferred that the Partners (in particular Suleiman and Yousef), received the Audit Packs and subsequent related Audit Reports.

229. In this extensive letter, El Ayouty raised a number of by then familiar concerns in relation to the audit of the Money Exchange; e.g.: capitalization of interest, the lack of clarity about title to SAMBA shares owned by the Money Exchange but which had been

---

178 **{G/1547}**; **{G/1548}**

179 An "Audit Pack" is the description given to the bundle of material submitted by El Ayouty with their questions and comments upon the financial statements for responses by the Partners before El Ayouty finally signed off on the formal audits each year.

allowed to be held in Al Sanea's name,[180] Al Sanea's deposits and indebtedness and the unpaid Partners' capital contributions.

230. Of particular significance, El Ayouty claimed that their concerns were "*greatly aggravated*" by the separation of the Exchange and Investment Division:[181]

> "*You are aware that every year you used to separate some balances as only allocated to the Exchange Department and from it to branch accounts for the mentioned department in English and not mentioned accredited account for the entire branch considering you are a private company with a promise to study our work on its settlement. Regretfully you have followed the same procedure this year by also sending us partial accounts for approval which we returned to you (to the attention of the Chairman Sheikh Abdulaziz Algosaibi) attached to our letter dated May 3, 1994G, in which we mentioned points as an example… that should be taken into account, studied and settled completely. Not doing this will harm the interests of the Partners and endanger the company, its creditors and the reciprocal rights with the parent company and affiliate companies, which cannot be ignored or issue any accounts regardless of …*[what] *they are called.*"

231. Rather than heed this firm advice, including the concerns expressed in this letter about the increasing Al Sanea indebtedness; Abdulaziz is recorded in a letter dated 28 May 1994 as having spoken to Salah El Ayouty by telephone to defend Al Sanea. The tone of the letter foreshadows a breakdown in relationships because Salah fears that the goodwill developed with AHAB over many years is now threatened by Al Sanea's behavior and the Partners' apparent inability to control him. Salah expresses "*deepest concern*" about the situation Abdulaziz was facing and warned of "*disaster*", making it clear that the audit for 1993 will not be issued unless "*the points I raised .. are responded to*":[182]

---

180 **{G/1523.1/3}** is a record (in Board Minutes of 4 April 1994), of Al Sanea's acknowledgement that 1,803,017 shares in SAMBA are held by him "*for AHAB …such shares were always owned by the Company.*"

181 **{G/1549/1}**

182 **{G/1552}; {G/1552.1}**

> "*.. In reference to our phone conversation in Paris on Saturday, attached please find our letter dated 19/05/1994 regarding the money exchange branch.*
>
> *I reiterate my deepest concern regarding your passive position to deal with this situation which we fear will turn into a disaster if you don't deal with it with some firmness and resolution. I personally was surprised by your stance, whether in Al Khobar or Riyadh, before Brother Maan Al Sanea when I confronted him. You made me look like I was falsely accusing him and doubting his goodwill. I am not saying that Brother Maan has the intention to sabotage, but at the very least he is acting with money that does not belong to anyone. I will not be careful with your money any more than you are. The shock and the feeling of regret is due to the fact that the good faith with which we handled this situation in previous years is no longer valid.*
>
> *The conclusion Abu Saud … if the matter is no longer in your hands, I think it is something that needs to be put in front of all partners so they can all take action.*
>
> *There will not be a budget before all the points I raised in our letter are responded to. Most important now is to secure a way by which Brother Maan can return the two billion riyals in his possession. What are the guarantees to accomplish that? Who is responsible for delaying and hiding all that appeared in our reports for the past years regarding these action…?*"

232. El Ayouty's adamant resolve not to sign off on the audit without the information and assurances sought of the Partners was now explicit. It appears that having been told by Abdulaziz that Al Sanea was the source of the problem, Salah El Ayouty wrote to Al Sanea on 28 May 1994[183] enclosing a copy of the letter of 19 May 1994 and stating "*I am sending you a copy of the letter… which was sent to Abu Saud* [Abdulaziz] *as he asked to provide you with a copy of it.*"

233. While making it clear to Al Sanea that El Ayouty would not be signing off on the financial statements without assurances of the state of the Partners' knowledge, this letter

---

183 **{G/1556.3}; {G/1556.4}**

- which requires of being set out in full - goes on in compelling and revealing terms to reflect upon what must have been not only El Ayouty's views at the time about Al Sanea's dealings within the Money Exchange, but also that of Abdulaziz and the other Partners as well:

> "*The issue, Brother Maan, is not the letter and responding to it. The issue is how we face and prevent a disaster from happening, regardless of what my personal opinion is, and how do we give everyone their own rights without any oppression or injustice. You know very well that all those points* [raised in the letter] *were presented to you on an annual basis but unfortunately it is clear now that the partners didn't know anything as they claim.*
>
> *So in conclusion, if there is a willingness to reach a safe place, our herein attached letter must be replied to with clear answers and accompanied by a correction of the accounts as I have requested. No budgets will be issued on any dates without complying with what has been requested, answering all our inquiries that are included in our letter, and providing all the requested assurances so we can issue all the accurate statements along with the clarifications noted on them.*
>
> *The second step that immediately follows is that you personally set a schedule to repay the loans that you owe, which equals to the amount of the loans borrowed from the banks after generating what must have been recorded as commissions and generating what must have been recorded for you as interest and deposits. We hope that there will be adequate assurances, cash flow and assets that guarantee all that…*"

234. No doubt with the large Al Sanea indebtedness and the transfer of the SAMBA shares to him in mind,[184] the letter concluded in avuncular terms such as might be expected of a longstanding and trusted advisor cautioning a young and reckless client against sailing too close to the wind:

> "*One day you will realize that I am an honest advisor to you and that this like painful surgery needed to save the patient from dying. May God help*

---

[184] Two of the issues of greatest concern raised year on year by El Ayouty and in the letter of 19 May 1994 addressed "*To attention of all Shareholders*": {**G/1457**}; {**G/1458**}.

> *you return rights that are owed to others. I am convinced that you did not intend to take it – God forbid – by fraudulent means, but it was just effort on your behalf.*"

235. Given the urgency and breadth of El Ayouty's concerns, a letter of response dated 28 June 1994 was sent by the Partners - signed by Abdulaziz, Suleiman, Yousef and Al Sanea[185] - responding seriatim and in detail to the 13 points of greatest concern, raised by El Ayouty in the Audit Pack dated 30 March 1994; in El Ayouty's letter of 3 May 1994 and at "*our meetings in Khobar and Riyadh on 14 May 1994.*"

236. As evidence of the Partners' understanding of what was by 1994 the perilous position of the Money Exchange caused by its wanton borrowing and expenditure, this is a very important letter. It begins by noting the Partners' perception of the urgent "*need to provide the correspondents* [i.e.: the banks] *with the Exchange's financial statements.. since they have been greatly delayed and* [we] *are getting enquiries as to the reasons for this delay (attached is proof of the same).*"

237. The letter continues by revealing the Partners' apparent understanding of the consequences that, if El Ayouty: "*insists on entering all the amendments* [to the financial statements] *as on 31 December 1993, this means that the company will be forced to go into liquidation at this inappropriate time which could be detrimental to the company and the partners. Therefore, we find more appropriate to take your remarks into consideration in two stages so that we may benefit from a voluntary liquidation and gain*

---

185 **{G/1563}**; **{G/1562}**- Only a draft of this letter was disclosed by AHAB but there can be no sensible dispute that it must have been sent. AHAB does not contend otherwise and in light of the suppression of El Ayouty correspondence by way of the missing files (and the subject of detailed inquiry and persuasive submissions by the Defendants at section **{E/7}** of their Closing Submissions), the onus remained throughout upon AHAB to prove otherwise.

*the best possible value for the company's assets which will be liquidated to fulfill obligations and your remarks will be considered in two stages as follows.*

*<u>Stage one:</u> There will be the necessary entries and adjustments to the Exchange's financial statements as on 31 December 1993 will be made and the statements issued thereafter.*

*<u>Stage Two"</u>*

238. Under "Stage Two", the Partners respond in detail to El Ayouty's points of concern, explaining how they intend, through Abdulaziz, to address them over the ensuing *months.*

239. The letter then concludes with the following ultimate assurance, the bona fides of which, in light of subsequent events, must be viewed with scepticism:

> "*Furthermore, the partners have all authorized Mr. Abdul Aziz Algosaibi to respond to all your written and oral requests and inquiries related to the financial position of the Exchange in general …*
> *…To that end, he may compose a comprehensive plan to fulfill the company's obligations either by liquidating all or part of its assets and work to acquire its due payments from others whether clients or partners and settle creditors' accounts under collateral in form of property or others. He is authorized on our behalf pursuant to power of attorney executed at the Khobar Notary Public no. 2/147…and number 2/148… to buy or sell our share (copy attached) and in undertaking the final settlement of Mr. Maan Al Sanea's debt and all his rights and due payments and sign on our behalf any relevant documents. To that end, he may appoint a liquidator to be agreed with Mr. Maan Al Sanea and determine his fees and how the liquidation is to be conducted and the appropriate timing for the liquidation of assets after 30 September 1994.*"

240. Notwithstanding these assurances, as matters transpired, El Ayouty did not sign off on the 1993 Audit until 21 July 1994.[186] This suggests that they delayed - as they said they would - signing off until they received the answers and assurances in the terms they required.

---

[186] See above and **{F/43}**; **{F/44}**; **{F/45}**.

241. Subsequently, although El Ayouty continued to make broadly similar criticisms of the accounting practices and management of the Money Exchange, it is notable that they seemed not to have found the need to press Abdulaziz again for disclosure to be made to the other Partners. The inference to be drawn from this is that they had secured the necessary assurances for themselves that all the Partners were "on board"; whatever the consequences might become for unsuspecting third parties.

242. But this did not mean that El Ayouty no longer warned the AHAB Partners about the dangers of their fiscal profligacy.

243. The Audit Report for year ending 31 December 1994[187] begins with the explanation for the audit being conducted as, among other things, "*because the financial statements for both Divisions have not been consolidated together, particularly since the Finance Division has been granted specific bank loans, as set out in the ledgers of some of the banks, to finance the accounts of the partners and their affiliated companies, as well as the costs of financing the purchase of investments which are being capitalized, whilst investments are recorded at cost at the Exchange and Investment Division.*"

244. The notes to the Report are as stridently critical as ever. In the Audit Report for the Finance Division under the heading "Investments"[188] the following comments appear:

> "*The investment balance is represented in what is capitalized annually on the investments recorded in the name of the company at the Exchange and Investment Division. The increase in that balance annually is attributed primarily to the company's following a policy that would capitalize the losses of that Division annually. The reading of the figures and follow-up ..shows that the management had greatly expanded on this policy, that it*

---

187 Written in Arabic, containing the audits for the two Divisions and sent "*For attention of all partners*" to Abdulaziz by letter dated 15 May 1995. A copy of this Report was found in Saud's safe but not otherwise disclosed: **{H29/141}** (Arabic); **{H29/141.1/1-70}** (English translation).

188 At page 31: **{H29/141.1/34}**.

> *even became the hallstand on which all the negatives are hung, not only those resulting from the formation of an investment portfolio with short-term banking funds (borrowed) while owning and retaining them for several years, exceeding ten years without disposing of them through sale, especially as we had previously proposed to the management to dispose of part of them when the share prices were high compared to what they are now. In addition to the great withdrawals by the partners without repayment of what is withdrawn or the commissions payable on them, in addition to the accumulation of debit balances with some customers that are very doubtful to collect, making them more like bad debts than doubtful debts.*"

245. Thus, the capitalization of interest on borrowed money - rather than any attempt to sell the shares to pay down the Money Exchange's increasing indebtedness - had become the "hallstand" on which the fraudulent practices "(were) hung."

246. As regards the ever increasing Al Sanea indebtedness, at page 32,[189] El Ayouty note that it had increased over the past year alone by SAR 40.5m from SAR 1.1685bn to SAR 1.2bn. Further, that no commission (interest) was being charged on most of his loan accounts (only on 9 of 22) even "*while he receives commissions on his company deposits that reach around 8%, paid by cheques, this debt is guaranteed by Sheik Abdul Aziz Al-Gosaibi.*"[190]

247. There can be no doubt that the Partners were aware of El Ayouty's ongoing criticisms. They had approved of the financial statements for 1994 because three days after the date of El Ayouty's Report of 15 May 1995[191] (i.e.: 18 May 1995), minutes of a meeting of

---

189 **{H29/141.1/35}**

190 A turn of events that came about when Yousef on behalf of the Partners pressed Abdulaziz to require Al Sanea to pay down his indebtedness; to be considered in more detail below. Here it can be noted that Abdulaziz did acknowledge in his capacity as Chairman of AHAB and as recorded in Board Minutes of 4 April 1994, that he is joint guarantor of Al Sanea's debts as well as those of Al Sanea's establishments and companies and that he retains deeds of title to Al Sanea's real estate: **{G/1523.1/4}**. As shown above, this was the same meeting at which Al Sanea was required to acknowledge AHAB's ownership of the SAMBA shares held by him: {G/1523.1/3}.

191 **{H29/141.1/3}**

that date recorded that the Partners had done so.[192] The minutes were signed by Abdulaziz (in his own name and on behalf of Suleiman and Yousef) and Al Sanea; and having recorded the purpose of the meeting as "*to analyze the financial statements for the Money Exchange as of 31 December 1995*"[193] resolved, among other things, to confirm the split between the Finance Division and the Exchange and Investment Division, the continuation of capitalization of interest and the parking of most of the bank debt in the Finance Division.

248. Moreover, while Yousef and Suleiman did not actually sign this resolution, the fact that a copy of it was found in the N Files,[194] strongly suggests that the Partners always had access to it and that it (and the attachment to which it refers in clause 3 as containing the "*redistribution*" of the loan costs between the two Divisions) were used as reference material by Saud when he came in the 2000s to monitor the Al Sanea indebtedness (as shown, for instance, by Saud's Calculations and as will be discussed further when examining the state of Saud's knowledge of the activities of the Money Exchange).

249. The separation of the two Divisions having by the end of 1994 become entrenched, despite El Ayouty's concerns and criticisms of the way in which AHAB continued to produce misleading financial statements and to operate the Money Exchange in an increasingly unsustainable manner, it appears that El Ayouty required ongoing assurances (apart from written expressions of the Partners' knowledge) before signing off the annual audits.

---

192 **{N/509}; {G/1606}; {G/1606.1}**

193 The English translation reads "31 December 1995" and is even more confusingly dated "18/05/1996" but this must be an error because the financial statements for 1995 would not have been available for a meeting on 18 May 1995. The minutes are therefore regarded as referring to the financial statements for year-end 1994.

194 **{N/509}{G/1606.1/1}.**

250. In order to provide these further assurances, it appears that throughout the 1990s, AHAB produced a number of specific documents:

(1) Each Audit Pack was presented with a Representation Letter which had to be signed by the Chairman of the Board setting out the Board's representations as to the contents of the financial statements and their instructions for the conduct of the audit.[195] It is to be noted that one of the representations required was that "*We have presented to you all meeting minutes from Board of Directors meetings, General Assembly meetings and Executive Committee meetings*";[196]

(2) Each year, a signed board resolution was produced confirming AHAB's intention to continue producing misleading financial statements.;[197]

(3) Following on from that first provided by him in 1994;[198] for each year until his death, a signed guarantee of Al Sanea's debts appears to have been produced by Abdulaziz. It was updated in 2000. Reference is made to the guarantee by El Ayouty in the Reports.[199]

(4) A signed document from Al Sanea acknowledging the "*sale and assignment*" of the SAMBA shares held by him on behalf of the Money Exchange was produced

---

195 See for example for each year at: 1999 **{G/240.35.2/1}**; **{G/240.35.3/1}**; **{G/240.35.3A/1}**; **2000** **{G/240.35/1}**; **{G/240.35.1/1}**; **{G/240.35.1A/1}**; **2003** **{G/240.33/1}**; **{G/240.34/1}**; **2006** **{G/240.32.3/1}**; **{G/240.32.4/1}**; **{G/240.32.4A/1}.** Representation Letters have also been disclosed for 2001, 2002, 2004, 2005 and 2008 but none for 2007. See, in this regard, the Defendants' Closing Submissions at {E1/12/13} at foot notes 2 and 3, where they also make the cogent point that the fact that Representation Letters have been disclosed for the period 1999-2003 (referencing Money Exchange URNs) in circumstances where no accompanying Audit Pack (or final audit report) has been disclosed, strongly suggests that the Audit Packs were among the documents removed from the Money Exchange by the Younger Algosaibis, about which more below.

196 See, for instance for 2001 **{G/240.34.2A/2}** at item 4.

197 In addition to those examined above, see for example: **{G/1707}**; **{G/1728/1}** **-** Board Resolutions issued on 5 June 1997 and **{G/1458.2/1}** **{G/1458.1/1}** in respect of the financial statements for year-end 1992.

198 **{G/1523.1/4}**: the Board Minutes of it (above).

199 See for instance: **{F/69/19}** - the 1996 Report.

(although these shares were never in fact transferred to the Money Exchange). El Ayouty made repeated reference to this assignment in the Audit Reports;[200]

(5) Deeds of assignment over his real properties and deposits had been required of Al Sanea to offset his debts owed to the Money Exchange. These too were regularly cited by El Ayouty in their reports;[201] and

251. It can be inferred that as such assurances were in place, El Ayouty remained complicit, even though their criticisms remained constant.

252. On 27 January 1996 they sent by letter, their initial report on the 1995 accounts to "*All Partners*" but "*Handed to*" Abdulaziz.[202]

253. This letter contained in succinct terms, El Ayouty's by now perennial refrain:

> "*It is perhaps appropriate before stating the most important comments to indicate that there has not been any amendment or correction by the administration regarding the comments mentioned in our reports since 1981G to the last report dated May 15, 1995G regarding the error resulting primarily from the financing of purchasing and maintaining investments (for a period close to almost fifteen years without selling them to regain what has been paid with a profit that would cover the costs of retaining them) using short-term expensive banking loans, in addition to financing of the withdrawals by the partners and their affiliate companies with the same types of loans. The two previous factors had obvious effect on the increased banking commitments, as shown by the data, against the company, as well as other negative effects as will be mentioned in turn…*"

254. El Ayouty then proceeded in their Report to rehearse the familiar criticisms but this year the numbers were especially startling. The Al Sanea indebtedness[203] had increased by SAR 239m during the year to over SAR 2.1bn. Total capitalization of interest had

---

200 See for instance: {**F/69/13**} - the 1996 Report.
201 See again for instance: **{F/69/19}**.
202 **{N/480}**; **{G/1642}**; **{G/1638.1/1}**; ({**G/1638.1/1**} translation states that it was *"Handed to Sheikh/ Abdulaziz."*).
203 Which, along with other headline subjects they had, since at least 1994, started to set out in specific attachments to the Report: the Al Sanea net indebtedness being graphically set out in Attachment 9, the total bank borrowings in Attachment 8 and the current market value of the share portfolio in Attachment 3.

exceeded SAR 1bn and bank loans had increased from SAR 2.9bn to SAR 3.3bn. Obligations of the Money Exchange had increased by some SAR 591m to reach SAR 5.287bn by the end of 1995, compared to SAR 4.687bn at the end of 1994.

255. At the same time, El Ayouty reported that in relation to the valuation of the share portfolio on 31 December 1995:[204]

> "…[T]*hey have reached around SR 1883 million at market price (market price reached around SR 2021 million on December 31, 1994G) compared to SR 1914 million (its book value in addition to its financing cost), meaning with a decrease of around SR 31 million. It is worth noting that an allocation was assigned to the drop in prices that reached around SR 71 million last year.*"

256. This alarming disparity between the mounting indebtedness of the Money Exchange and the volatile and inadequate state of its most important assets, led El Ayouty to conclude that further borrowing from the banks would "*not* [be] *possible*", as was already clear "*where some of them have not yet decided to renew facilities, and those who have, did not approve the increase desired by the* [Money Exchange]."[205]

257. El Ayouty therefore concluded the Report for 1995 by advising that the Money Exchange might have to cease operations and cautioned that they may no longer be able to issue audit opinions "*especially as the administration accepts the aforementioned* [criticisms] *quietly without taking any effective action that would stop the bleeding of resources…*"[206]

---

204 **{G/1642/2}**.
205 **{G/1642/4}**
206 **{G/1642/4}**

258. While this letter was apparently delivered by hand to Abdulaziz, it was addressed to "*All Partners*" and there was no plausible reason explained by AHAB why Abdulaziz would not have shared it with the others.

259. I am therefore compelled to conclude that he did so and that Suleiman and Yousef would have read and understood the concerns and criticism of El Ayouty expressed in this letter. Indeed, such criticisms were not new to them, as the review of the evidence already shows.

260. No response to this letter has been disclosed in evidence. Instead, the evidence reveals that the impugned fiscal and accounting practices were continued, with the resultant ever-increasing indebtedness.

261. Next in the available chronology of events, we see a letter dated 25 June 1996 from Abdulaziz to El Ayouty regarding the "*Financial Statements for the Money Exchange for 1996*."[207] Its contents are surprising as, given the nature of the concerns hitherto expressed by El Ayouty, we see antithetical proposals from AHAB to consolidate the debts of the Money Exchange within the "*bad silo*" of the Finance Division, with its walls now to be further fortified instead of weakened. It begins:

> "*In reference to the topic above and based on your instructions and recommendations, we agree to take the measures below before 30/06/1996*
>
> *1- Transfer the accounts of the Head Office, the sister companies*[208] *and Mr. Maan Al Sanea, whether debit or credit accounts to the Financing Division and only keep the current account, whether these accounts*

---

207 **{G/1652.2/1} ;{G/1655.1/1}** (translation includes the date).

208 Taken to be a reference to the Bahraini Businesses given the manner of the treatment of their accounts with the Money Exchange in the Audit Reports. An early such treatment is to be found in the 1994 Audit Report where Algosaibi Investment Services Co ("AIS") in Bahrain is recorded as a major source of deposits held by the Money Exchange and at page 7 **{H29/141.1/9}** it is described (along with Saad Investments Co.) as companies which belong to the Partners and operate in Bahrain. AIS was later renamed Algosaibi Trading Services ("ATS").

*were opened at the Money Exchange Branch in Al Dammam, Al Khobar or the Money Exchange Main Office.*

2- *Transfer all accounts of clients, whether closed or current, to the account of the Financing Division.*

3- *Keep the accounts of the local banks only, whether debit accounts (deposits at local banks) or other loans, facilitations or other credit accounts, at the Money Exchange Division.*

4- *Anything else not mentioned above should be presented to the management of Money Exchange to make appropriate decision in that regard.*

*We hope that this will avoid any financial settlement measures at the end of the fiscal year.*

*Please accept our thanks and sincere appreciation.*"

262. Thus, it appears that El Ayouty had relented in their advice (at least temporarily) and with their renewed complicity, the inevitable day of reckoning was postponed. But given its significance and implications, the reasonable inference is that Abdulaziz would have discussed the contents of this letter with his partners Suleiman and Yousef, before sending it.

263. The correspondence over the 1996 Financial Statements reveals, however, that El Ayouty certainly had not finally resiled from their criticisms.

264. On 3 March 1997, Abdulaziz wrote to El Ayouty enclosing the draft financial statements for 1996 and reaffirming (as in the past three years), that those of the Exchange & Investment Division had not been consolidated with those of the Finance Division and that the capitalization of interest continued as before.[209]

[209] **{G/1693.1}; {G/1693.2}**

265. He concludes by asking El Ayouty to prepare their report and to note that:

> "*…it has been decided that a meeting for the partners will take place at a later date to take all the necessary steps to avoid the deficit shown in financial statements by liquidating all of Maan Abdulwahed Alsanea (sic) accounts as a client of the Money Exchange & Investment branch and Financing branch by the end of 1997.*"

266. El Ayouty would not be placated by this facile promise of steps to be taken because of advice which had only been ignored before. They replied on 1 April 1997[210] "*To the Attention of All Partners…*" setting out in detail damning criticisms of the way the Money Exchange was being operated. The letter further shows how determined El Ayouty were to ensure that the Partners were fully informed. After setting out specific comments on the draft financial statements, the many telling observations were set out under eight headings, each of which was by now all too familiar and virtually self-explanatory:

> "*(1)* *"**Weak Capital:**"*
>
> [here lamenting the failure of the Partners to pay up the declared capital and noting that the amount owed had itself generated interest which had not been paid but instead capitalized along with all other interest owed].
>
> *(2)* ***"Resorting to banks to borrow to face the expansion in purchasing shares**."*
>
> *(3)* ***"The branch has become the main financier for the withdrawals by the parent company, the partners, and the affiliated companies**."*
>
> *(4)* **…**[see comments below]**.**

210 **{G/1697/1}; {G/1698/1}**

(5) ***“Expansion, at the beginning of the activity in granting credit to others.”***

(6) ***“The branch did not achieve any positive results since the beginning of the branch’s activity.”***

(7) ***“The branch has come to suffer from a permanent shortage in liquidity.”***

(8) ***“Raise the cost of employment:”***

[This was a new criticism but one which should have alerted the Partners to Al Sanea’s true expansionist ambitions to be fulfilled by use of the resources of the Money Exchange]*:* “*The cost of employment is still high without justification, as it is completely inappropriate with the activity of the branch… This may be attributed primarily to the transfer of some of the employees to companies affiliated with partners (Saad Company), they are working at Saad Company and receive their accruals from the branch.*”

267. Even more revealing comments at item 4 were bound to have caused renewed alarm: they told of the gamble the Partners had taken and were still taking and, in light of subsequent events, were nothing less than perspicacious:

“*(4).* ***Retaining the shares without selling them***

*Although the shares were funded by borrowed funds, and it seemed from the reading of the numbers that the branch was hoping to purchase these shares with borrowed money then sell them, achieving two goals, the repayment of the borrowed money and realizing a return after which it could launch towards more transactions and speculations, buying and selling shares. However, what happened is that it stopped at buying only, although the opportunity was available in the years 1992 and 1993G, but the decisions*

> *were taken on paper and not acted on.(Attachment no. 3*[211] *shows the extent of the deterioration in book value from one year to the other compared to the market values because of the capitalization method followed).*"

268. There, in unmistakable terms, El Ayouty described AHAB's misconceived and reckless approach of borrowing to buy investments, the value of which had no real hope of keeping pace with the costs of borrowing.

269. This was the perilous journey upon which AHAB had embarked under Abdulaziz's watch but with the knowing involvement of his Partners Suleiman and Yousef.

**2000: ABDULAZIZ'S FINAL BOARD MEETINGS AND CONTINUITY INTO SULEIMAN'S TIME**

270. In the chronology of events in the life of the Money Exchange, the year 2000 was, by any measure, an important year. The strong controlling hand of Abdulaziz upon the affairs of AHAB was removed when he suffered his stroke on 30 September and was replaced by that of Suleiman.

271. Suleiman - if Yousef and Saud are to be believed - should be regarded as much less forceful and competent a manager, entirely reliant upon others for the understanding of financial matters, and someone very prone to being misled by the deceptive Al Sanea with the connivance of Badr, the hitherto trusted AHAB employee upon whom Suleiman is said to have relied for the enforcement of the "New for Old" policy.

272. AHAB's case is therefore dependent upon this Court accepting that, with Abdulaziz's departure, Suleiman, by the implementation of "New for Old", sought to redeem the Money Exchange from its hitherto fraudulent and ruinous behavior but that he failed in

[211] That is: Attachment 3 to the Audit Report (as with the one commented on above).

this objective because of Al Sanea's complex and ingenious program of deception, forgery and manipulation of documents.

273. AHAB therefore says that it deserves to have this Court regard late 2000 as a distinct watershed in the affairs of the Money Exchange, as a time when AHAB, but for Al Sanea's fraudulent behavior, would have reverted to moral and fiscal probity. "New for Old" should therefore be regarded as AHAB's *locus poenitentiae*.[212]

274. I will deal more fully elsewhere in this judgment with the factual and legal implications of that aspect of AHAB's case. But here it is important to note a very important premise of the AHAB argument: it depends crucially upon the Court accepting that Suleiman could truly have believed that "New for Old", if faithfully implemented and followed by Al Sanea, would have put an end to AHAB's fraudulent and fiscally profligate behavior - behavior which had become entrenched at the Money Exchange for nearly two decades by September 2000.

275. Much therefore depends, for AHAB's case, upon the Court accepting that Suleiman was not himself party to the historical fraud or, at least, that there was a Damascene conversion such that he thereafter genuinely believed that he had put an end to it and had managed to contain further fraudulent borrowing by Al Sanea through the Money Exchange.

276. Given all that has already been seen of Suleiman's involvement in the affairs of the Money Exchange - in particular his participation in the resolutions for the adoption and institutionalization of the fraudulent accounting practices and his awareness of the El

---

212 A matter of potential importance when considering the equitable proprietary nature of AHAB's claim in light of the recent restatement of the law on illegality by the UK Supreme Court in **Patel v Mirza [2016] 3 WLR 399; [2016] UKSC 42 {R1/55}**.

Ayouty criticisms and advice which went unheeded – it is impossible to find that he, along with Abdulaziz and Al Sanea, was not a party to the fraud during Abdulaziz's time.

277. If AHAB's case had any hope of success, it therefore depended upon an acceptance by this Court of Suleiman's conversion.

278. In the absence of testimony from him - Suleiman having passed in February 2009 - it is fitting that I should again here note the importance of the documentary evidence which speaks to events also during Suleiman's time. Neither Yousef's nor Saud's testimony as to the state of Suleiman's knowledge - both being highly self-interested and personally implicated - can be regarded as any reliable substitute for the evidence gleaned from the documents disclosed in the case.

279. Indeed, given their standing as AHAB Partners and members of the Money Exchange Board, knowledge of and participation in the fraud by Yousef and Saud (or either of them) would be sufficient to bind AHAB to the fraud and justify AHAB's condemnation for its consequences. For that reason, the participation of each requires of further close examination and this will also follow below.

280. But here, for the moment, I continue to examine the chronology in 2000, leading up to Abdulaziz's stroke and the transition to Suleiman's time. In this context, the documentary evidence proves no less revealing and compelling than before.

281. The last detailed accounting resolution signed by Abdulaziz was a Summary of Board Resolutions Passed in 1999, numbered R/2 ("Resolution R/2 of 1999") and dated 28

February 2000. It was signed by Abdulaziz apparently on behalf of all the Partners and the copies disclosed by AHAB were found either in the N Files[213] or in Saud's villa.[214]

282. It records the continuation of the dishonest practices throughout 1999 and into 2000 – the capitalization of interest, treating it as an integral part of the cost of investments and confirmation of authority to "*conduct the necessary adjustments to book entries and sign records to show the balance sheet and profits (in English) as on 31 December 1999 appropriately to others and affirm these adjustments to match figures of the financial year with comparative figures of previous years.*"

283. This was clearly an important set of resolutions and so apparently regarded by Saud in particular: not only were these minutes found within the N Files, they were also found in Saud's villa. The inference to be drawn is that although not yet at the time a partner he, like the Partners on whose behalf Abdulaziz signed these minutes, was aware of the continuation of the fraudulent practices over into 2000.

284. Further, on 2 March 2000, Abdulaziz, again on behalf of the AHAB Partners, signed a further Board Resolution, similar in terms to those earlier executed by the Board[215] confirming the separation of the accounts into Divisions:

> "*At a Board meeting of (AHAB Money Exchange) in Alkhobar, dated 02/03/2000 to review the financial statements for (the) Money Exchange as at 31/12/1999, we resolved as follows:*[216]
>
> *1) To approve transactions between Money Exchange & Investment Division and Financial Division (as per attached entries).*

---

213 **{N/206}; {N/207}**

214 **{H30/25.1/1}; {H30/25/1}** although presumably merely a function of the different translations, this version speaks of the "capitalization of profits" where that found in the N Files (above) speaks consistently to the "capitalization of interest."

215 Such as on 5 June 1997: **{G/1707}; {G/1728}** (see above).

216 **{G/2095}; {G/2102}** - the text set out here is taken from the translation at **{G/2102.1}.**

2) *To continue non consolidation of the two divisions' financial statements as the Finance Division has been allocated specific bank loans as shown in the records of some banks (mainly foreign banks) mostly to finance accounts of partners and their subsidiaries*."

285. This resolution is extremely important and revealing. It was the last resolution signed by Abdulaziz (on behalf also of the other Partners Suleiman and Yousef) and its contents – confirming the continuation of the fraudulent separation of the Money Exchange Divisions – would be repeatedly affirmed by the AHAB Partners right up to 2009. As will be shown below, its contents were obviously available to Suleiman, Yousef and Saud when subsequent minutes were prepared.

286. As the result of this resolution, the Money Exchange and El Ayouty proceeded to issue the fraudulent financial statements for 1999 on 25 March 2000.[217]

287. In fulfillment of their purpose, the misleading English statements were shortly afterwards sent to the banks by Abdulaziz on 24 April 2000.[218]

288. AHAB's responses[219] to the telling revelations of the many foregoing resolutions and items of correspondence can only properly be described as facile. It amounts to little more than a recitation of Yousef's denial of the obvious knowledge with which he would otherwise be affixed by his involvement as a member of the Money Exchange and AHAB Boards as revealed by the documents. AHAB's response in relation to Saud's

---

217 **{F/90}**; **{F/91}** (for the Exchange & Investment Division); **{F/92}**; **{F/93}** (for the Finance Division).

218 **{G/2128}**; **{G/2129}**; **{G/2130}**; **{G/2131}**; **{G/2132}**; **{G/2133}**; **{G/2134}**; **{G/2135}** (this last being a memorandum from Al Sanea to Glenn Stewart at AIS, dated 25 April 2000 and enclosing copies of the letters "*forwarded to the banks as finalized by Mark Hayley and signed by Uncle Abdulaziz Algosaibi*" instructing Stewart to "*follow up with the concerned banks and keep me updated*".

219 In AHAB's written Closing Submissions, **Sections 4.14-4.25** and **Sections 6.33 – 6.110 {D/4/-12}**; **{D/4/14-49}**.

state of mind[220] is to the effect that although these and other telling documents from Abdulaziz's safe were found in Saud's villa, this does not mean that he must have read, understood and approved them so as to fix him with knowledge of the fraudulent practices carried over from Abdulaziz's time.

289. This too is a facile response in the face of the real import of the documentation which shows that the fraudulent practices had become institutionalized for the running of the Money Exchange. The evidence examined above shows that while Abdulaziz was at the helm when the practices were being adopted and implemented, Suleiman and Yousef were also fully on board and readily approved of the resolutions which directed the implementation of the practices. The evidence, as further examined below, also shows that Saud in turn came to adopt the practices and supported Suleiman in carrying them forward after Abdulaziz's stroke, when he became a member of the Money Exchange Board.

**<u>Continuation of and knowledge of the Fraud after Abdulaziz's stroke: Resolution R/66</u>**

290. Following Abdulaziz's stroke on 30 September 2000, Suleiman assumed the responsibilities as Chairman of AHAB and when Abdulaziz died in March 2003, Suleiman was formally appointed as Chairman. At that same time Saud, who (along with his mother and sisters) had inherited his father's shares, became a Partner and was appointed Managing Director of AHAB.[221]

291. Suleiman remained Chairman of AHAB until his death in February 2009.

---

220 For instance, AHAB's written Closing Submissions, **Section 6.39 {D/6/18}**.

221 Saud 1W, **paragraphs 57 and 58 {C1/2/13}.**

292. According to Saud,[222] although he, Saud, was named Managing Director, throughout Suleiman's chairmanship, ultimate control and decision-making authority rested with Suleiman, as head of the family and as the sole surviving Founding Partner and holder of the largest share in AHAB.

293. As regards Suleiman's chairmanship, Yousef's asserted perception was similar - that he carried on in much the same way as did Abdulaziz before:[223]

> "*Q. There was no substantial change to the power of chairman when Abdulaziz passed away, was there? His [Suleiman's] role remained very much the same?*
>
> *A. The same, yes.*"

294. With the AHAB Board so positioned to carry on as before, its resolutions can be viewed appropriately in the context of the preceding history.

295. As evidence of the continuation of the fraudulent practices after Abdulaziz's stroke, I accept, as the Defendants argued[224] that the most significant resolution is that numbered R/66, taken on 26 November 2000 ("Resolution R/66").[225] As will be shown below, a minute in the form of Resolution R/66 was executed by the Partners every year until 2009.

296. Resolution R/66 was signed by Suleiman, Yousef and Saud (as well as Al Sanea) and provided:

---

222 Op cit, **ibid.**

223 **{Day30/15:19-22}**

224 Through Mr. Lowe at **{E1/11/68}**.

225 Found in the N Files at: **{N/204}**; **{N/205}** and **{N/171}** – the last in a file entitled "*File No. 3/03…Board Resolutions Money Exchange*" giving rise to the inference that beyond signing Resolution R/66, Saud would have been paying particular attention to its contents. Significantly also, Resolution R/66 was found next to Resolution R/2 in the N Files **{N/206}**; **{N/207}** – further supporting the inference that at least Saud (and perhaps all the Partners) would have read Resolution R/2 when executing Resolution R/66.

> "*During the board of directors meeting of [AHAB Money Exchange] held on 25/11/2000 at the company's offices in Al Khobar, the following was decided:*
>
> ***First**: Enforcement of Board of Directors resolution No. R/2[of 1999] dated 28/02/2000 signed by Sheikh Abdulaziz Algosaibi under the same conditions and points stated therein.*
>
> ***Second**: Approval of all previous decisions relating to the issuance of an English language accounts and confirmation of its amendments, and to assign Al Ayouti to issue this budget.*
>
> ***Third**: To coordinate between Al Ayouti and Mr. Omar Saad Hamda to produce the English accounts for the headquarters under the same method as the previous year.*"

297. It must be inferred that all the signatories to Resolution R/66 fully understood its meaning. They plainly were concerned to ensure the continuity of the accounting practices which had been institutionalized by Abdulaziz, to retain El Ayouty's services for those purposes and to ensure, in particular, that the English language versions of the accounts would be available for issuance to the banks. The trusted and faithful Omar Saad of AHAB H.O., (rather than any designate of Al Sanea's from the Money Exchange), would be responsible for coordination with El Ayouty to ensure the adoption of the previous year's accounting methods which were clearly fraudulent.

298. Given the specific wording of Resolution R/66, it can also reasonably be inferred that, at this time of transition, it was taken and recorded to provide renewed comfort to El Ayouty rather than for the edification of the Partners themselves. The words speak of matters already known: in the first resolution, of "*enforcement*" of R/2 "*signed by Abdulaziz*"; in the second, of "*all previous decisions relating*" to the "*English*" language accounts aimed at the banks and the "amendments" here mentioned, appears to be a reference to the

"adjustments" authorized by earlier resolutions; and – as already noted – in the third resolution, speaks of adopting "*the same method as the previous year*".

299. Beyond sensible debate, it is clear that Resolution R/66 was executed to record the Partners' collective intention and desire to continue with Abdulaziz's practices. And Yousef acknowledged as much in cross-examination:[226]

> "*Q. Essentially, I am suggesting to you, you come back after Uncle Abdulaziz had had his stroke, and this is the four of you resolving to continue with the policies for accounting that had been decided during the time when he was fully in charge. So what happens is these are all resolutions that relate to accounting, made not by Abdulaziz but by the rest of you, and I suggest to you this occurred at a time when you were trying to continue and follow on with his policies. Does that make sense to you?*
>
> *A. Probably, yes.*"

300. This reaffirmation of the practices of the Abdulaziz years was antithetical to any notion of departure from the fraudulent behaviour of the past. Had the AHAB Partners resolved under Suleiman's new leadership to adopt honest practices, the sad occasion of Abdulaziz's stroke would have provided an opportunity for doing so. It is regrettable that the opportunity appears not to have been taken but this may already - by September 2000 - have been too late, from the Partners' perspective, for fear of the dire consequences. I will come to examine this issue further in this Judgment.

301. It is notable that at the time Resolution R/66 was executed, Saud was not yet a Partner of either AHAB or the Money Exchange, nor had he yet been appointed Managing Director of AHAB. When asked why then did he sign up to these resolutions, he offered no

226 **{Day36/8:4-14}**

sensible explanation, simply suggesting (as was often his recourse during his testimony) that his uncle Suleiman asked him to."[227]

302. This response made no sense because it was inconsistent with the strict manner in which the Board appeared to have observed the individual authority reposed in its Partners. A more likely reason is that on 26 November 2000, a month after Abdulaziz's stroke, Saud, his son was already regarded as his *de facto* successor and was asked to sign so that each and every branch of the AHAB family was recorded as acknowledging and approving these important resolutions. Moreover, as will be discussed below from the evidence of Omar Saad,[228] Saud was seen as the member of the family to whom the Partners turned on matters relating to accounting and finance and so it may be inferred that it was important to the others that he acknowledged his involvement in the ongoing process of falsification of the accounts.

303. And so the evidence reveals that the resolutions in R/66 were reproduced each year from 2002 and repeatedly signed off by the Partners as part of the approval process of the financial statements of the Money Exchange.

304. A Resolution R/90 dated 16 March 2002, was signed by Suleiman (for himself and Abdulaziz) and by Yousef. This resolution, found in the N Files,[229] not only provided for the payment of SAR 36m dividends to the Partners but also contained in resolutions 2, 3 and 4 the false accounting resolutions and the express affirmation of Resolution R/66.

305. The wording then became standardized with the result that each year the Partners resolved:

---

227 For instance, **{Day62/80:11} - {Day62/81:5}.**
228 See paras 462 et seq below at pp186-187
229 **{N/190}; {N/191}.**

(1) That there would be payment of a dividend to the Partners of the Money Exchange;

(2) Affirming Resolutions R/66 and R/2;

(3) Referring to and reaffirming previous resolutions with respect to English language financial statements, approving amendments (adjustments) to those financial statements and authorizing El Ayouty to issue them;

(4) Tasking Omar Saad and El Ayouty to issue the financial statements in the same form as the previous year.

306. These were signed off in formal resolutions each year:

(1) Dated 18 March 2003, by Suleiman (on behalf of himself, Abdulaziz and Yousef) and by Al Sanea: R/116;[230]

(2) Dated 28 June 2003, by Al Sanea, Suleiman, Saud and Yousef: R/118;[231]

(3) Dated 29 March 2004 by Suleiman, (on behalf of himself and Yousef), Saud and Al Sanea: R/120;[232]

(4) Dated 26 August 2004, by Suleiman, Saud and Al Sanea: R/122;[233]

(5) Dated 29 March 2005, by Suleiman (on behalf of himself and Yousef) and by Saud and Al Sanea (unnumbered);[234]

(6) Dated 10 May 2006, by Suleiman, Yousef, Saud and Al Sanea: R/124/1;[235]

(7) Dated 21 March 2007, by Suleiman (for himself and Yousef) and by Saud and Al Sanea: R/125;[236] and

---

230 **{N/189}; {N/193}**
231 **{P/75/19}**; **{P/75/20}** (exhibited to Al Sanea's witness statement in the London Proceedings).
232 **{N/187}**; **{G/3996.1}**; **{G/3983}**; **{G/3985}**.
233 **{G/4308}**; **{G/4309}**
234 **{N/172}**; **{N/201}**
235 **{G/5219}**; **{G/5218}**

(8) Dated 28 May 2008, by Suleiman (for himself and Yousef) and by Saud and Al Sanea: R/126.[237]

307. The declaration of dividends had become standardized in amounts of SAR 36m or SAR 75m each year although that bore no relationship to the reality of the Money Exchange as a business that made no profits. Dividends were declared and paid simply by correlation to the payment of dividends by SAMBA (and the other equity holdings).

308. It is also common ground that these resolutions were signed by the Partners and affirmed the false accounting. In its pleadings, AHAB admits that its Partners signed these resolutions: see for example, AHAB's Re-Re-Re-Amended Reply to Defence and Counterclaim of the GT Defendants, paragraph 50.2.[238]

309. Equally, in his Opening, Mr. Quest accepted on behalf of AHAB that:[239]

> "*My Lord, these board resolutions were rolled out every year, and your Lordship sees that each year they have an adoption, as we see here, of a series of previous board decisions, going back to 2000. I will show your Lordship those in a moment, but* ***it is right that when you look at those resolutions and look back to the yet earlier resolutions that those resolutions refer to, you see there is a formal adoption of the accounting practices, going all the way back to the 1990s, about capitalization of interest and the separation of the divisions of the Money Exchange***" (Emphasis added.)

310. Notwithstanding the reasonable inference to be drawn that by agreeing to and signing off on these resolutions each year, the signatories must have understood their meaning and effect, no such concession was here being made by Mr. Quest.

---

236 **{G/5731}**; **{G/5733}**
237 **{G/6684}**;**{G/6685}**
238 **{A1/15.1/18}**
239 **{Day5/48:17} - {Day5/49:2}**

311. As he went on to explain, the thrust of AHAB's case as to the Partners' understanding of what they were doing rests upon the proposition that these were but "formal adoption(s)" of the resolutions from Abdulaziz's time. As he went on to submit:[240]

> "*But just so your Lordship understands, in case this is a point that is made against us, it cannot plausibly be suggested that by signing off on these board of directors' resolutions, which the partners understood were necessary in order to distribute the dividends, they must be taken in some way in 2007, let's say, when they signed that, to have approved or consented to everything that Al Sanea was doing during the 2000s, both in terms of withdrawing billions of dollars from the Money Exchange, and in terms of conducting what we have seen is a quite extraordinary campaign of dishonesty against the banks for the purpose of raising billions of dollars of finance.*
>
> *The partners did not know what Al Sanea was doing with respect to the banks, and did not know what Al Sanea was doing with respect to his withdrawals.*"

312. This suggestion – given evidential expression by Yousef and Saud[241] – that the Partners were signing off on these resolutions simply as a formality for obtaining their dividends, must be rejected as a facile attempt to get the Court to ignore the obvious implications of all the evidence examined above:

(1) In the first place, these repeated resolutions on their face speak to much more than the payment of dividends. They also direct, in plain terms, the fraudulent accounting practices which by the year 2000, had become institutionalized. The subsequent resolutions each year until those of 2008 (R/126) were plainly meant to ensure the continuity of the practices.

240 **{Day5/50:14}- {Day5/51:4}**
241 In their witness statements: Yousef at **{C1/3/27}**; Saud in his first witness statement at **{C1/2/28}**.

(2) Secondly, as Yousef acknowledged,[242] it was not the case that Al Sanea "forced" the Partners to sign up to the other resolutions as well as those for payment of dividends, in order to get the dividends. Indeed, it was then recognized and admitted by Yousef that (as the record shows), there had been many instances of dividends having been paid on the basis of resolutions which dealt only with that subject.

(3) At all events, the notion of the Partners being required to sign the false accounting resolutions as a *quid pro quo* for obtaining dividends, may not exonerate the Partners once the meaning and effect of those resolutions were understood.

(4) So, the issue remains whether or not they did so and there simply is no evidence to support AHAB's proposition that they did not. On the contrary, from all the evidence examined above in relation to the fraudulent accounting practices, its historical development and the extent to which those practices enabled the Money Exchange to borrow from the banks; the only reasonable inference to draw is that the Partners, both collectively and individually, understood the meaning and effect of the resolutions.

313. Given the great scope of the enquiry into this issue at the trial and the industry of the Defendants in their analysis of it, I think I should repay some more of that effort by looking a bit more closely at the individual knowledge of the Partners after Abdulaziz's time, starting with Suleiman.

---

242 **{Day76/49:18-21}**

314. Before turning to that exercise, I should also specifically emphasize my finding that not only was Abdulaziz responsible as Chairman for the adoption of the fraudulent accounting practices, he also was fully aware of their meaning and effect, as is abundantly clear especially from the many exchanges he had with El Ayouty on the subject.

**Suleiman's knowledge: his Chairmanship, both de facto and formal – September 2000 – February 2009**

315. In seeking to discern the state of Suleiman's knowledge, it is of fundamental importance that he was *de facto* Chairman of AHAB from the time of Abdulaziz's stroke on 30 September 2000 and following Abdulaziz's death in May 2003, he was Chairman until his own death, in February 2009.

316. In the absence of direct evidence of Suleiman's dealings with Al Sanea in relation to the Money Exchange to the contrary, it must follow that it is to be inferred that Suleiman would have insisted upon being kept informed, especially of the extent of the borrowing and of the Al Sanea indebtedness.

317. AHAB must therefore assume the burden of proving the contrary and it is in this regard, that AHAB relies primarily upon the allegations of forgery and manipulation of documents, postulating per Mr. Quest, the rhetorical: why would Al Sanea have needed to engage in widespread forgery of Suleiman's signature and manipulation of documents, if Suleiman knew of the borrowings and consented to them?

318. And further, as Saud expressed AHAB's case at paragraphs 394 and 395 of his first witness statement:[243]

> "*394. I note that the widespread forgery of my family's and my signature is inconsistent with the argument put forward by the Defendants:*

---

243 **{C1/2/82}**

> *that the borrowing of the Money Exchange was authorised by the AHAB Partners. Certainly, we did not authorize Mr. Al Sanea to apply our signature by means of a mechanical device or computer. I am told that Mr. Al Sanea does not suggest that we did.*
>
> *395. It is not clear to me why Mr. Al Sanea would need to cause the widespread forgery of AHAB partner signatures, if AHAB Partners had authorized the borrowing. If we were aware of Mr. Al Sanea's borrowing and had authorised it, he could simply have asked for our signature. Indeed, that was the protocol for the "new for old" borrowing.*"

319. Whether this proposition is sound in and of itself will be the subject of separate consideration[244] but here it is important to note its evidential importance for AHAB's case as a basis for overcoming the cumulative effect of the documentary evidence, which shows Suleiman's involvement in, and knowledge of, the fraudulent accounting practices. As discussed above, this was through his subscription to the minutes of the Board resolutions which directed those practices, his demonstrated knowledge of the El Ayouty Audit Packs and Reports (with some of them addressed specifically to him as Chairman) and his direct involvement with Yousef in the 1990s, in pressing Abdulaziz for the closure of the Money Exchange out of concern especially, about the increasing Al Sanea indebtedness (an issue to be further examined below in looking at Yousef's involvement).[245]

320. All of that evidence must be considered also with the further evidence that: (i) Saud's Calculations in 2002 were done for the edification of Suleiman and as "*a specific assignment*" from Suleiman:[246] (ii) Yousef's evidence that Suleiman regarded Al Sanea as

---

244 When looking in detail at the benefits respectively obtained through the Money Exchange, by the AHAB Partners on the one hand and Al Sanea on the other.

245 In the context of examining Yousef's knowledge below at [paragraph 352 et seq of this Section]

246 **{Day65/9:9} - {Day65/10:3}**

being untrustworthy and "*out of control*";[247] (iii) Saud's evidence that in addition to the "great tension" between Yousef and Al Sanea, Suleiman "*never appeared as being at ease with Maan*";[248] and (iv) Yousef's evidence[249] that Suleiman was cautious in his approach to business:

> "*When it came to making important decisions relating to business, his approach was to arrive at his decisions by consultation and consensus view, and it was usual for him to discuss important business matters extensively with senior managers and partners (usually me and/or my cousin Saud) before he came to a conclusion.*"

321. Indeed, it was in part because of the notorious mistrust of Al Sanea, that Suleiman, together with Yousef, had pressed Abdulaziz, starting in the early 1990s,[250] for the closure of the Money Exchange.

322. Despite the import of all that evidence, it is AHAB's remarkably counter-intuitive case – also as postulated by Saud – that Al Sanea was able to abuse the Money Exchange, deceive and defraud the Partners, and Suleiman especially, because of their trust in him which they now, only by hindsight, regard as having been misplaced:[251]

> "*Our lack of diligence was, no doubt, a function of a certain measure of trust and a desire for preserving the peace that is common in family businesses, especially businesses in our part of the world. Mr. Al Sanea is married to my sister and there is no doubt that I did not question his motives or actions in the way that I would a non-family member.*
>
> *Also, our lack of involvement in the Money Exchange stemmed in part from the animosity that grew between members of the family (on the one hand) and Mr. Al Sanea (on the other). Although many family members disliked Mr. Al Sanea and did not want to have much to do with him, it did*

247 Yousef in cross-examination:**{Day31/16:17–22}**.
248 **{Day67/14:20}**; **{Day15/15:13}**
249 Yousef 1W, **{C1/3/6}**, **paragraph 24**.
250 As appears from a letter written to Abdulaziz on 28 March 1992: **{G/1432/1}**; **{G/1429/1}**; **{G/1435/1}** to be further discussed below in the context of examining Yousef's knowledge.
251 Saud 1W **{C1/2/5}**, **paragraphs 16 -17**.

> *not mean that he was mistrusted to the extent that we thought him capable of acting against the family's interests. In hindsight, our trust was entirely misplaced.*"

323. And so, as one approaches the task of discerning the state especially of Suleiman's knowledge, one observes an internal tension within AHAB's case: for while Suleiman was cautious by nature and would have already been on notice of Al Sanea's excessive borrowing and regarded him as "out of control" and untrustworthy; having put in place the "New for Old" policy, Suleiman was nonetheless content to rely upon Al Sanea to comply and trusted him to do so, simply because he was a member of the family and because Suleiman was not himself a sophisticated businessman, and could not have conceived of or anticipated Al Sanea's machinations.

324. One only has to state that hypothesis of AHAB's case to recognize its inherent implausibility when viewed in the context of the documented evidence of Suleiman's knowledge of the borrowings and of his own involvement in institutionalizing the fraud upon the banks.

325. I am therefore obliged to take a robust scepticism to AHAB's case that Suleiman, having merely mandated "New for Old" after Abdulaziz's stroke, allowed Al Sanea a free hand and took no active or concerted steps to monitor his indebtedness or the extent of the borrowing of the Money Exchange.

326. Apart from the allegations of forgery and manipulation of documents, all that AHAB relies upon to rebut the inference of Suleiman's knowledge as it naturally arises from the documentary evidence are speculative assertions from Saud that it is "*simply inconceivable*" that Suleiman would have authorized Al Sanea's fraudulent activities at

the Money Exchange, ATS and TIBC.[252] Saud goes on to give his explanation for this view:[253]

> "*Suleiman was not a natural businessman, and he did not have the commercial energy or acumen of my father. I believe that he was aware of his limitations in this regard and it made him notably cautious in business. It would have been entirely out of character for him to have engaged in financial activity of the magnitude that took place at the Money Exchange, ATS and TIBC. If he had been involved in such activity, I have no doubt at all that he would have wanted to consult me and other AHAB partners and members of the AHAB head office staff about it regularly – whereas in fact he never once mentioned it to me.*"

327. I repeat: the assertion that "*Suleiman was not a natural businessman*" does not provide a plausible answer to the clear contemporaneous evidence of his deliberate involvement.

328. I have already referenced the evidence of Saud's discussions with Suleiman over Saud's Calculations. This is but one instance of AHAB's case being contradicted by the contemporaneous documents from the N Files as explained by Saud himself.

329. In addition, Saud's own evidence in cross-examination stands in stark contradiction to his opinion of Suleiman's unknowing involvement. On Day 45, in asserting his own lack of authority over the Money Exchange in his constant refrain that "*I had nothing to do with the Money Exchange*", he confirmed that everyone at AHAB reported to Suleiman once he assumed the role as Chairman:[254]

> "*Q. Are you saying, MrAlgosaibi, that as far as you are aware, everything that was of importance was reported to your Uncle Suleiman while he was the chairman of AHAB between 2003 and 2009? Is that what you are saying?*

---

252 See for instance Saud 1W, **paragraph 37 {C1/2/9}**; see also Dawood 1W, **paragraph 35 {C1/1/10}**: and adopted generally in paragraph 101 of AHAB's opening Written Submissions: **{U/1/44}**.

253 **Ibid**.

254 **{Day45/45:11-19}**

A. *I am saying we all reported to my uncle, all of the company reported to the chairman.*

Q. *All the divisions reported to the chairman, did they?*

A. *We – yes, we – Mr Hindi, we all... each one in charge of his own business*"

330. On Day 46, Saud stated that while Al Sanea would sometimes ask him for help, he, Al Sanea, would normally report to Suleiman. This was in the context where Al Sanea had written to Badr,[255] asking him to arrange to obtain the signatures of Suleiman on a bank facilities document, after having it reviewed by Saud:[256]

"*Q. Mr. Al Sanea is suggesting that because you have previously been aware of these facilities, as we have just seen, you should have a look at the paperwork and then the signatures can be obtained from Uncle Suleiman.*
*Do you see that?*

*A. Yes, I see that.*

*Q. That's perfectly normal, natural thing for Mr. Al Sanea to do. That's right, isn't it?*

*A. No, it's not right, Sir. The practice is that each one reports his own divisions, sometimes I – I see – you know, Maan asks for help; they don't come very often, but he does. And – and as I do with all of the companies; Badr here wants to go to Uncle Suleiman, then they go to Uncle Suleiman.*

*As for review, I – I do not get involved with the Money Exchange matter nor reviews. If Maan wants to get me involved here, aside from the practice of the company, I will normally just ignore it. Because it's – he reports to Uncle. I mean each one, I have my own responsibility, he has (his own). He wants my assistance, talk to Badr to take papers to Uncle. It's Uncle…"*

255 The relevant correspondence is at **{G/3526.1/1}**;**{G/2854.1/1}**.
256 **{Day46/41:18} – {Day46/42:13}**

331. On Day 56,[257] Saud, while again describing his own junior position within AHAB and his then preoccupation with tending to his father in hospital in Dallas, U.S.A., insisted that as the Managing Director, Al Sanea reported to Suleiman:

> "*I'm a junior guy. I had my own responsibility and at that time I was managing my father's case. And I had nothing to do with the – the Exchange is Maan Al Sanea. Again, Maan Al Sanea, he's the managing director, reporting to – as we all do, to the – ultimately our uncle*"

332. Again, on Day 65,[258] Saud once more confirmed that Al Sanea reported to Suleiman:

> *"Q. I thought you said that Maan reported to the Chairman.*
>
> *A. I mean, yes, this is-- we all report to the Chairman, yes.*"

333. There are obvious inferences to be drawn in respect of Suleiman's knowledge from this evidence of Saud's. For while we do not have the evidence of communications between Al Sanea and Suleiman, one cannot report to a superior without communicating in one form or another. In the absence of evidence of those direct communications between Al Sanea and Suleiman, AHAB cannot be entitled – contrary to its own position as articulated just above by Saud – to say that Suleiman was not kept informed of what was happening at the Money Exchange or was too unsophisticated to appreciate what was going on.

334. The correct inference to draw from the fact that Al Sanea reported to Suleiman is that Suleiman was indeed kept informed about the activities at the Money Exchange. This inference is bolstered also by three factors in particular which do not support the proposition that Suleiman could have been misled by Al Sanea:

---

257 **{Day56/31:3-6}**
258 **{Day65/10:4-6}**

(1) Suleiman's proven involvement as a member of the Money Exchange Board – from inception and throughout Abdulaziz's time – in the institutionalization of the false accounting practices and the taking of the resolutions which directed them.

(2) Suleiman's proven involvement with the signing off of the El Ayouty Audit Packs in which those practices were discussed in detail and condemned by El Ayouty; and Suleiman's knowledge of the investments acquired by means of the fraudulent borrowing, as well as of the increasing Al Sanea indebtedness, also as discussed by El Ayouty.

(3) In reality, Suleiman had at least two independent sources of information from which to verify whatever Al Sanea would have reported to him about the Money Exchange, namely:

(i) El Ayouty themselves. It is important in this regard to bear in mind El Ayouty's statements to the Chairman of the Bureau of Investigations and Public Prosecution in Saudi Arabia ("the Saudi Prosecutor") and to the Deloitte Investigation team[259] in which they insisted that they reported on the activities of the Money Exchange to the Partners (including Suleiman) through their Audit Packs, through correspondence, and directly in meetings. As already discussed above and to be further discussed below, the Audit Packs were therefore always addressed to the Chairman of AHAB for the attention of the Partners.[260] After Suleiman

---

259 Both the subject of Hearsay Notices **{C4/5/2}** and **{C4/8/1}** together with **{C4/7/1}**. And see **{M/41/2}** for El Ayouty's letter of 29 May 2010 to the Chairman of the Bureau of Investigation and Public Prosecution in Saudi Arabia.

260 See again for instance: **{F/55/1}**; **{F/56/1}**;**{ F/68/1}**; **{F/69/1}**.

became Chairman, they were naturally addressed to "*to be delivered*" to him, in that capacity.[261]

In their letter of 29 May 2010 to the Saudi Prosecutor, El Ayouty, (while acknowledging that Al Sanea had been fully in charge of the day-to-day operations of the Money Exchange) stated that:

> "*…**the partners reviewed and approved all the branch's financial statements until 2007** as we have shown in previous evidences, and we are unaware of what has happened to the financial statements for the year 2008 since we have handed them to both sides, after the whole incident occurred.[262] Therefore, the partners' claim that they did not know is unacceptable…*" (Emphasis added.)

(ii) On 25 March 2010, Abdul Moniem M. Farag and Rajab Hassan of El Ayouty met with Mr. Charlton, and other members of the Deloitte Investigation team and Mohammed Algosaibi. A note of the meeting was disclosed in the course of Mr. Charlton's evidence[263] and sections of it were made the subject of the aforementioned hearsay notices.

In the note, El Ayouty are noted as saying that their principal points of contact at AHAB included Suleiman and Saud:

> "*The principal points of contact for Ayouti at Head Office over the years have been Omer Saad, Abdulaziz Algosaibi*

---

261 **{F/137/1}**; **{F/138/1}**; **{F/171/1}**; **{F/172/1}**; **{F/196/1}**; **{F/197/1}**; **{F/229/1}**; **{F/230/1}**. That for 2008 (the last) was addressed to be delivered to Yousef as Chairman: **{F/259/1}**;**{ F/260/1}**.

262 A reference here to AHAB's assertion that the AHAB Partners had not seen the 2008 Audit Pack. It became clear from other evidence in the case (per Mr. Tariq Ali) that AHAB must indeed have received it as a copy was produced to him from within the Money Exchange in May 2009 when he was appointed to advise AHAB on the state of the Money Exchange. As will be discussed further below, it is to be inferred that this could only have happened on the directions of Saud who was responsible for Mr. Ali's engagement.

263 **{C4/8/1}**

> *until his illness, Suleiman Algosaibi until his death, and Saud Algosaibi.*"[264]

(iii) El Ayouty is noted as explaining further that they would send the Audit Packs to Suleiman with the last (for 2008) sent to Saud in May 2009:

> "*The Ayouti people did not present the financial statements in person to a meeting of the partnership. Rather, they sent a "report" in the form of a letter enclosing the financial statements ....*"
>
> "*... the report to management would be in the form of a letter. The report would address AHAB partnership and the ME and Investments ledger [Ledger 03] financial statements…*"
>
> "*... MF/RH [Mr. Farag and Mr. Hassan] believe that the report would be distributed to all the partners. [I]t would go to the "head" of the board who would then distribute it…*" [265]

335. El Ayouty also stated that the Audit Packs (the reports to management in the form of a letter) were sent directly to the AHAB Partners even while copies were sent separately to Al Sanea, leaving no room for the suggestion that Al Sanea could have withheld them from the Partners:

> "*The most recent report was sent to Mohammed Al Hindi* [No date was indicated]. *A bit later in the interview they stated that the report would be sent to MAS* ***as well as the partnership.***" [266] (Emphasis added.)

336. They also stated that the latest report was sent to Saud in May 2009:

> "…[T]*he latest report and financial statements* [for 2008] *were sent to Maan and to Saud in May 2009*"[267]

---

264 **{C4/8/2}**
265 **{C4/8/3}; {C4/8/4}.**
266 **{C4/8/5}**
267 **{C4/8/5}**

337. While Saud denied receiving this report and all other El Ayouty Reports (and so knowledge of their contents revealing the financial state of the Money Exchange), a copy of this 2008 Report must have been available within AHAB no later than 9 May 2009 when, according to Tariq Ali, it was given to him by Mr. Hindi.

338. Further, in addition to sending the Audit Packs to the Partners, El Ayouty also made clear that they had addressed Al Sanea's withdrawals with Suleiman directly:

> "*MF/RH* [Mr. Farag and Mr. Hassan] *stated that they did address the increasing balance with Suleiman.*
>
> ...[A] *meeting* [took place] *"before Suleiman died" in which Suleiman became very upset to learn that the debt had risen.*"[268]

339. This evidence which AHAB failed to disclose until very late in the day,[269] is very detrimental to its case. It reveals that El Ayouty had asserted to the Deloitte Investigation team from as early as 25 March 2010, that their dealings with AHAB were contrary to AHAB's plea of ignorance of the Audit Packs and Audit Reports and that Suleiman was unaware of Al Sanea's indebtedness.

340. This evidence also suggests that El Ayouty were not called as witnesses by AHAB (as one might have expected, given the importance of their involvement over the years) because their evidence would have been detrimental to AHAB's case. Indeed, I am compelled to draw the inferences from AHAB's failure to call El Ayouty that, had evidence been adduced from them, it would have supported the contents of their previous

---

268 **{C4/8/5}**

269 In the course of Mr. Charlton's evidence and only after AHAB initially sought to claim privilege over its contents, a claim which it later waived when the point came to be decided by the Court.

statements to the Saudi Prosecutor and those noted in the interviews with Deloitte, both of which are the subjects of the Hearsay Notices.[270]

341. El Ayouty's statements describe their dealings with AHAB in terms which are fully consistent with their practice already revealed through the documents – that of raising concerns about the Money Exchange and Al Sanea's indebtedness directly with the Partners – all as shown by their communications with Abdulaziz in the 1990s. And this can be seen also from Yousef's admitted discussions with Saleh El Ayouty in 1999.[271]

342. This is all evidence which I accept and which reveals that El Ayouty brought to the attention of the Partners (and of Suleiman in particular) through the Audit Packs and their other communications with them, the activities of the Money Exchange and the Al Sanea indebtedness.

343. There simply is no cogent evidence to refute the obvious inference that Suleiman received and read the Audit Packs (even if with the assistance of others more versed in financial matters, such as Saud, after he became a Partner, or Mr. Hindi before him).

344. In this regard, it must also be noted that Suleiman, like Abdulaziz before him, must also have received the draft Representation Letters from El Ayouty (alongside the Audit Packs) requiring that they be signed and returned by the Chairman and the Managing Director of the Money Exchange.[272] In these letters, the Chairman acknowledges the split between the Finance Division and the Exchange and Investment Division and affirms the Partners' understanding of the Audit Packs (including its attachments). An especially

---

270 **{C4/5/1}** and **{C4/7/1}** (partially excerpted above).

271 As explained by Yousef in his letter of 26 December 1999 to Abdulaziz **{G/2020/1}**; **{G/2025/1}** - to be further discussed below in looking more closely at Yousef's knowledge.

272 Some of these have been cited at fn 149 above.

telling passage from the typical Representation Letter states the reason for parking the debts in the "*bad silo*", in terms which could not have escaped the understanding of a competent chairman reading and signing it:

> "*Instead of consolidating the financial statements for the two divisions together especially the Financing Division has been allocated with certain bank loans as it is shown on the statements from some banks to finance the partners and the subsidiary companies' accounts and also to finance the cost of purchasing investments and keeping them, which will be capitalized in the Finance Division while the investments are listed with their cost in the Money Exchange and Investment Division…*"

345. Suleiman's other source of verification was Saud himself. Based on Saud's own evidence that everything he did in relation to the Money Exchange was done on Suleiman's instructions (as cited above and further below), the only reasonable inference is that Suleiman regarded Saud as a source of information to verify whatever he may have been told by Al Sanea about the activities of the Money Exchange.

346. Throughout his evidence, Saud was adamant that everything he did in relation to the Money Exchange was done on the instructions of his Uncle Suleiman. This was of course, consistent with his account examined above,[273] that "*we all reported to my uncle, all of the Company reported to the Chairman.*"

347. As Saud insisted:[274]

> "*Q.* *Just so we follow the last answer, you are saying, are you, that anything that you did in relation to the affairs of the Money Exchange during the period between your father's stroke and his death, you were doing on the instructions of Uncle Suleiman; is that right?*
>
> *A.* *Correct, sir.*"

---

273 See paragraph [329], above.
274 **{Day43/15:20-25}**

348. From these exchanges in Saud's evidence, it is safe to conclude that matters of importance coming to Saud's knowledge about the Money Exchange would have been reported to Suleiman. This is an inference that is only strengthened by the asserted distrust or at least disquiet, among the AHAB Partners, in relation to Al Sanea.

349. For such reasons as these, when I come to examine in detail the nature and extent of Saud's knowledge about the affairs of the Money Exchange, it must be correct to assume that important matters coming to Saud's attention would have been brought to Suleiman's attention by him.

350. In summary, there is clear evidence of Suleiman's knowledge of the fraud being perpetrated through the Money Exchange. In light of the risks which this presented for AHAB and Suleiman's mistrust of (or at least misgivings about) Al Sanea, the only reasonable inference to draw is that Suleiman would have sought to monitor the activities of the Money Exchange and the state of the Al Sanea indebtedness.

351. AHAB's reliance on Suleiman's attempt to curtail Al Sanea's borrowing through the Money Exchange by way of the putative "New for Old" policy, will be a matter for further examination below under the heading "New for Old".

**YOUSEF'S KNOWLEDGE**

352. Yousef became Chairman of AHAB when Suleiman died in February 2009, a position which he occupied for but only a few months before the collapse of the Money Exchange in May 2009.[275]

---

275 AHAB, by the time of the trial, had come to be managed on a day-to-day basis by an Executive Management Team comprising Mr. Simon Charlton (Acting Chief Executive Officer and Chief Reconstructing Officer), Mr. Raef El Hassan (Chief Operating Officer) and Mr. Brett Walter (General Counsel).

353. While in his evidence,[276] Yousef questioned the very existence of the Money Exchange Board of Directors, as a founding member he was, as has been seen, intimately involved in its affairs throughout Abdulaziz's time. He certainly was involved in approving the minutes and came to admit, in his witness statement, knowledge of them but only of those which recorded the resolutions for the distributions of dividends. His statements are peculiarly silent about those which record the fraudulent accounting practices. This is although, as has been shown above, the minutes of resolutions often dealt with both issues together.

354. He speaks of his departure from his "*limited involvement*" in the operations of the Money Exchange in the 1980s, after a falling out with Al Sanea whom he describes as "*a bullying, controlling and selfish individual*" who appeared determined "*that he should not be required to share the management of the Money Exchange with me, or anyone other than Abdulaziz*."[277]

355. This turn of events, his own main involvement in running the AHAB Shipping Division,[278] as well as having to dedicate time to his own businesses,[279] became the basis for his evidence that he was not involved with the Money Exchange and knew nothing about its activities.

356. Yousef also points to his semi-retirement since suffering a stroke in 1998, as a further reason for his disengagement, not only from the Money Exchange but also increasingly from the wider affairs of AHAB itself. Indeed, as became apparent during his testimony,

---

276 Yousef 1W, **paragraph 41{C1/3/10}**.
277 Op. cit., **paragraph 44**.
278 Operating out of Dammam and so away from Al Khobar where the Money Exchange occupies the ground floor of the AHAB H.O. building.
279 Yousef Ahmad Algosaibi & Partners, ("YAG") described at Yousef 1W, **paragraph 29{C1/3/7}**.

this has unfortunately affected his health and powers of recollection, a state of affairs which he readily himself acknowledged from time to time during his testimony.[280]

357. While Yousef often stressed his inability to recall documents or events and all but admitted that his witness statements had been written for him in words which were unfamiliar and not his own,[281] a reliable sense of the state of his knowledge can be obtained from the documentation in the case and it is here, again, that recourse must be taken.

358. The documentation clearly reveals that Yousef had knowledge of the fraudulent accounting practices and an intimate understanding of the El Ayouty Audit Packs and their significance. In this regard, his early attempts with Suleiman's support to close the Money Exchange are especially revealing.

359. But before turning to look at the relevant documents for further discerning the state of Yousef's knowledge and understanding of the affairs of the Money Exchange, it is important to emphasize his distrust of Al Sanea – that which Saud also described as characterizing every Partner's (except perhaps Abdulaziz's) relationship with Al Sanea.

360. In Yousef's case, the genesis of the loss of faith appears to have been a disagreement in late 1988 over the rates of interest being charged by the Money Exchange on Yousef's loans.[282]

361. Yousef complained about this in a letter of 22 December 1988 to the Money Exchange, citing a verbal agreement he had reached with Al Sanea about the applicable interest

---

280 Out of concerns for his well-being, his cross-examination was adjourned and was eventually discontinued after medical reports from his doctor advising against its resumption.

281 So much so that the Defendants questioned the authenticity of the narrative of his witness statements. See section D3 of the Defendants Closing Submissions at **{E1/6}**.

282 Either in his name personally or in the name of YAG.

rates.[283] It appears Al Sanea reneged on that agreement and that became for Yousef the "*breaking point*"; as revealed in the following exchanges in his cross-examination:[284]

> "*Q.* *...The reason you fell out with him, did you think he was an honest person?*
>
> *A.* *He's not honest, no.*
>
> *Q.* *You yourself.. it's quite obvious that you of all people had a dislike for him from about 1990. You just couldn't get on with him?*
>
> *A.* *That's true, yes.*
>
> *Q.* *And you wouldn't have trusted him as far as you could throw him.*
>
> *A.* *Not at all"*
>
> *"Q.* *One of the reasons I suggest you lost complete trust and faith in Mr. Al Sanea—and this was the breaking point – was because he was denying something that you knew to be true* [referencing the letter of 22 December 1988]?
>
> *A.* *Of course.*
>
> *Q.* *After that, you simply couldn't trust him anymore.*
>
> *A.* *In so many ways, similar actions. Of course. One of the things"*
>
> …
>
> "*Q.* *I'm suggesting to you that it was in 1988 that you finally decided that you couldn't trust him anymore.*
>
> *A.* *That's true, yes.*
>
> "*Q.* *At the end of 1988. It was a result of your disagreement about the existence of the agreement.*
>
> *A.* *Probably, yes.*
>
> *Q.* *Because he was a denying something that you would have yourself known to be true.*

---

283 **{G/1208.3}**; **{G/1208.4}**
284 **{Day31/15:12-21}**; **{Day 34/33:3-10}**; **{Day34/34:8-23}**; **{Day 31/15:22-25}**.

*A.* *That's true, yes.*

*Q.* *I think you agreed with me*[285] *that there came a point where you really felt you couldn't trust him as far as you could throw him.*

*A.* *Exactly.*

*Q.* *And that was the case, you thought, for everybody else too?*

*A.* *Exactly.*"

362. Indeed, Yousef went further and explained that in fact "*every single*" member of the family distrusted Al Sanea and thought that he was both "*difficult*" and "*out of control*"[286]

*"Q.* ***Was that true of other members of your family?***

***A.*** ***All of them.***

***Q.*** ***All of them? Everyone distrusted him?***

***A.*** ***All of them --every single – yes.***

..

*Q.* *...I am asking you for your honest opinion, Mr Algosaibi.*
*A.* *Yes. Exactly.*

*Q.* *And what you think other people thought of him.*

*A.* *Exactly the same.*

***Q.*** ***You all thought he was not straightforward, not honest?***

***A*** ***Yes.***

***Q.*** ***And difficult, and clearly out of control?***

***A.*** ***Exactly**."* (Emphasis added.)

---

285 On **Day 31,** see above.
286 **{Day31/15:22} - {Day31/16:22}**

363. Easily among the most implausible propositions arising from this remarkable case, is that of AHAB's that the mistrusted and "*out of control*" Al Sanea, would have been allowed virtually free reign (subject only to the edicts of "New for Old")[287] to incur, practically without supervision, the kind of crippling indebtedness which was acquired in AHAB's name through the Money Exchange. The notion seems even more implausible when requiring as it does, acceptance that Al Sanea, entirely unknown to and unchecked by the Partners, was able to make personal withdrawals in the order of billions of dollars. By 2000, as revealed in the El Ayouty Audit Packs, the borrowing of the Money Exchange had already outstripped AHAB's assets. Abdulaziz had issued guarantees to banks, secured not only against his personal assets but those also of the Partnership in general. All of the Partners were therefore liable for the debts to the full extent of their wealth. It therefore defies belief that the Partners would have been anything but very keen to monitor Al Sanea's use of the Money Exchange for the protection of their own interests and that must be the perspective to be taken to the examination, not only of Yousef but also of the evidence of Saud and Dawood, in turn.

364. Yousef's proven knowledge of the existence of and the reason for the fraudulent accounting practices is an important starting point.

365. In this regard, it is significant that he admitted knowing of the need for the Money Exchange to continuously borrow money.[288] The following exchanges come in his cross-

287 Which themselves suffered from a pronounced lack of clarity, as will be examined below.
288 **{Day 33/97:4-20}**

examination by Mr. Lowe on the El Ayouty Audit Report for 1987 and their comments on the profit and loss accounts for the Money Exchange for that year:[289]

> "*Q.* *The point the accountants are making on the previous page, in that sentence I showed you and that you understood, is through this magic trick* [capitalization of interest]*, the loss that is actually the result for the year is turned into profit. The important point to note is that the actual result for each year is a net loss. You see in 1985, 1986, 1987 that is the figure that is calculated if you take income and deduct the true expenses. For 1985 onwards, the Money Exchange was not making a profit and couldn't service all its debts because it was not making a profit, it was making a loss.*
>
> *A.* *Okay.*
>
> ***Q.*** ***In order to finance that loss every year, what did the Money Exchange have to do? It had to borrow more money, didn't it?***
>
> ***A.*** ***Of course**"* (Emphasis added.)

366. Yousef was also cross-examined about the fraudulent accounting practices, including about some of the board resolutions which directed and institutionalized the practices.[290] He did not outright deny knowledge of these, instead resorting to loss of memory:[291]

> *"Mr. Lowe: The impression we got when we read your witness statement is that you had only signed board minutes that included a provision for a payment of dividends to you,*
>
> *Q.* *Which year is that? Sorry. The dividend, I mean?*
>
> *Q.* *We will have a look at those minutes tomorrow, Mr Algosaibi.*
>
> *A.* *Okay.*
>
> *Q.* *The question really is this: nowhere in your witness statement do you give or attempt to give any explanation for your participation and joining in minutes in which you approved a process of capitalization. That is correct, isn't it?*

---

289 **{F/18/26}; {F/19/26}**

290 His cross-examination on this and other issues was however, never completed because of the discontinuation of his testimony because of illness.

291 **{Day34/102:15} - {Day34/103:19}**

*A.* *Yes.*

*Q.* *You don't even mention that you signed those minutes in your witness statement. That's correct?*

*A.* *As it says here, probably some of them , some I didn't.*

*Q.* *You signed the ones you have identified to us as having been signed by you, didn't you?*

*A.* *Okay. Yes.*

*Q.* *But those are minutes that have nothing to do with dividends but have everything to do with the manipulation of accounts. Nowhere in your witness statement do you explain that you sign up to this, but just don't remember.*

*A.* *I can't remember.*

*Q.* ***Nowhere in your witness statement do you even address the fact that the accounts of the Money Exchange were manipulated by your uncles, your father, all with their approval, and with your apparent approval?***

*A.* ***I can't remember that at all…"*** (Emphasis added.)

367. Yousef was questioned further about the Partners' approval of the false accounting. When presented with the Summary of Resolutions passed in the year 1990[292] which expressly (at item 2) included the capitalization of interest, he accepted that the practice was misleading but offered no explanation for it:[293]

"*Mr. Lowe: Again, it looks like the board resolved in the year 1990 to continue the accounting trick of capitalizing interest. Correct?*

*A.* *Correct.*

*Q.* *Do you know of any reason why in 1990 it would have been appropriate to capitalize interest in the way that is there being resolved?*

---

292 **{G/1278.3/3}**; **{G/1278.4/1} -** signed by Abdulaziz and Suleiman (including on behalf of the heirs of Ahmad) and by Al Sanea.

293 **{Day34/87:7-21}**

A. *Sorry, I—I can't – I can't give an answer. I don't know.*

Q. *You can't think of any reason that would have been appropriate?*

A. *Yes. No.*

Q. *So you have got no explanation of why the board did that in 1990?*

A. *No.*"

368. Yousef was then further cross-examined[294] about resolutions directing the false accounting practices (including the capitalization of interest) taken by the board in 1991, 1993 and 1999, and in which he had joined as signatory but in respect of which he responded to the same effect:

"*I am sorry, I have no explanation for that.*"

369. The issue was then put squarely to him:[295]

"*Q. We see a series of resolutions, right up until Abdulaziz's stroke, in which the board, including you, your father, Suleiman and Abdulaziz, have all endorsed and approved the process of applying capitalization to the accounts; correct?*

A. *That's what it says. Yes.*

Q. *Where you sit now, you can't give us any explanation as to why that would have been an appropriate way of calculating the value of investments in the books of the Money Exchange?*

A. *Not at all.*"

370. Nonetheless, Yousef clearly acknowledged his involvement in the taking of the resolutions and that at the time he signed resolutions or minutes, he would have read them, leaving no room for conjecture that he did not also understand them:[296]

---

294 **{Day34/91:6-13}; {Day34/96:5-11}; {Day34/100:10}**
295 **{Day34/101:13-23}**

" *Q.* *You would have looked at the minutes and checked them to make sure that they accorded with what you thought was decided, wouldn't you?*

*A.* *I am sure it's been checked and approved by everybody.*

*Q.* *I see, including you?*

*A.* *Well, usually it's – if it's been read by my uncles and Mardi – I would say I agree with whatever has been said, and I will sign it, yes.*

***Q.*** ***But you would read it before you signed it, wouldn't you?***

*A.* ***Yes, of course, yes****"* (Emphasis added.)

371. Contrary to AHAB's assertion of Yousef's lack of understanding, even while claiming not to recall the specifics and not accepting that the accounts were misleading, Yousef did acknowledge that the sending of misleading accounts to the banks would have been dishonest and unacceptable.[297] He also acknowledged that the practice of capitalization of interest was wrong: in response to Mr. Lowe's suggestion that "*treating interest as a profit or as capital is completely bizarre*", he accepted that it "*doesn't make sense*."[298]

372. And by way of specific reference to an early example, he was referred to the 35 page extract of the El Ayouty Audit Report[299] and the Money Exchange Statements[300] for 1987. There, the value of investments was shown to have been misrepresented by SAR 182m for that year alone (SAR 569m instead of SAR 387m), by adding the interest cost of financing them to the capital value of the shares. Yousef's response was to acknowledge that according to the lesser figure shown finally in the Audit Report, the swollen figure of SAR 569m [that which would have been shown to the banks] was wrong and misleading.[301]

---

296 **{Day30/83:21} - {Day30/84:7}**
297 **{Day36/26:22} - {Day36/27:12}; {Day34/67:8-22}**
298 **{Day34/67:8-22}**
299 **{F/19.1/19-21}**
300 **{F/22/12}**
301 **{Day34/72:17-24}**

373. These exchanges with counsel in cross-examination provide a clear demonstration of Yousef's ability to understand now, the meaning and effect of the fraudulent accounting practices. It would be illogical to conclude other than this would have been even more so during the times of his active participation in the affairs of the Money Exchange.

## Yousef's and Suleiman's attempts to liquidate the Money Exchange

374. There was extensive and revealing cross-examination of Yousef about his efforts, beginning as early as 1990, to liquidate the Money Exchange.

375. Clearly, the trenchant and damning advice of El Ayouty about the consequences of fiscal profligacy, although not implemented, had not gone unnoticed.

376. At least so far as Yousef and Suleiman were concerned, the Money Exchange's precarious financial position had been recognized as the threat it posed to the entire family's and their financial security. And given Yousef's and Suleiman's wariness of Al Sanea and concerns about his increasing indebtedness which the Partners guaranteed, the point had been reached for an urgent parting of the ways.

377. On 28 March 1992, Yousef and Suleiman wrote to Abdulaziz about their concerns:[302]

> "*Dear Brother*
>
> *It has been a long time since me and Yousef Ahmad have spoken to you regarding The Money Exchange, we informed you (Abu-Saud) that the time has come to end the partnership. Particularly since The Money Exchange generated good income for us and Mr. Ma'an Al-Sanea. It is now a good opportunity to bring this matter to an end. You promised us that this situation will come to an end, however days and months have passed with no reply.*
>
> *Today we put this matter in your hands again to put things right so that everyone can take responsibility for this issue with an open mind, and to protect our rights and the rights of our son-in-law- Ma'an.*

---

302 **{G/1429/1}**; **{G/1432/1}**; **{G/1435/1}**.

*For that reason we are giving you and Ma'an the authority to work together towards the liquidation of The Money Exchange and end the partnership between us and Ma'an….*

*This is an authorization from us to you, and we ask you to end this matter gradually at the best of time, without any inconvenience caused so that we can protect our responsibilities towards the banks and clients in order to make sure that our name, and Ma'an's, is kept intact…*".

378. Yousef was cross-examined about his state of mind when writing this letter:[303]

> *Q. "In your letter in the third paragraph, you make particular reference to the need to "protect our obligations before the banks and clients". That is because you knew that the function of this liquidation was to discharge the obligations you had before the banks, correct?*
>
> A. *Probably, yes. Correct".*

379. He later accepted[304] that he had also established the amount of the Al Sanea indebtedness in that by 1992, he was aware that Al Sanea owed a great deal of money to the Money Exchange:

> Q. "*When you wrote your letter…the letter at {G/1435/1} that we looked at yesterday, written in March 1992, you must have taken steps before you wrote that letter, in the context of discussions you had had earlier with Abdulaziz which we saw from board minutes yesterday, to quantify Al Sanea's net debt Do you accept that before you wrote this letter, you would have had some idea of Al Sanea's net debt?*
>
> *A. I have been told about it. Yes.*
>
> *Q. You would have been told about it. Because it doesn't make sense that you would have embarked on this process from 1990 and not tried to establish what his position was.*
>
> *A. Correct.*
>
> …
>
> *Q. The most important thing to have worked out for a liquidation in relation to the partners' debts was not your debt, it was Al Sanea's debt, wasn't it?*
>
> *A. Yes.*

303 **{Day37/45:3-9}**
304 **{Day38/21:11-25}; {Day38/24:4-7}; {Day38/39:12-17}; {Day38/39:25} -{Day38/40:1}**. See comment

...

*Q.* *Mr. Lowe: I'm coming back to that, my Lord. You would have known in 1992 that his debt – it might not have been quite SAR 1.063 billion – was of that order, of that order of magnitude? Yes?*

*A.* *I wouldn't know exactly the amount but I know he had a debt, a lot of money, that's all I know…"*

…

*Q.* *That's what I believe, yes.*

*A.* *Thank you, that's very helpful.*

380. Several months later, on 9 November 1992, Yousef wrote again to Abdulaziz on a related concern over the unduly favourable position in which Al Sanea had been placed, despite the fact that he was already dedicating his time to his own other business activities rather than solely to the Money Exchange. It appears that before writing this letter which he copied to Suleiman,[305] Yousef had obtained a statement from Badr on the share investment portfolio held by the Money Exchange:

> *"… I have asked Bader Al-Din to provide me with a statement of the shares we own in the Exchange for information purposes, and he provided me with the attached statement. I was surprised at the method of calculation as the statement shows a calculation of 15% profit in return for the management of Mr. Ma'en Al Sane', and I am surprised at the calculation of such a rate as he is entitled, according to the company's contract, to receive such a percentage if he works as a fulltime manager. Given that he was not dedicated to work at any time and that he continued to do his private work alongside the work of the department and did not stop his private work at all throughout the time, this rate was not merited by him and this paragraph shall be considered void from the agreement...*"

305 **{G/1452/1}; {G/1450/2}.**

381. This "*agreement*" and the "*company's contract*" to which Yousef refers is, of course, the Internal Partnership Agreement for the re-establishment of the Money Exchange executed on 28 July 1981.[306]

382. By clause 5, ("*Fifthly*"), as we have seen, Al Sanea would have been entitled to 15% "*of the net income from investments in the Branch..,*" in the event of them being "*re-sold*" in an event such as upon liquidation of the Money Exchange. That concession was however, predicated, as the clause also explained, upon Al Sanea having "*ceased all his private business and investment activities*" and dedicated his time and investment activities for the advancement of the interests of the Money Exchange.

383. The complications of their proposal for liquidation of the Money Exchange had obviously been brought home to Yousef and Suleiman, even while the need to do so must have seemed ever more urgent.

384. Al Sanea's personal expansionist ambitions through his companies were already openly apparent, as was the fact that he was going about this with money borrowed in AHAB's name through the Money Exchange. This indebtedness was already, per Yousef, "*a lot of money*".[307]

385. Allowing Al Sanea 15% of the liquidated income from the shares would therefore have been a very galling proposition, no doubt exacerbated from Yousef's point of view by the fact that at the then current market prices, the shares would have yielded less than the amount of the bank indebtedness.

---

306 **{G/915/1}; {G/851/1}.**

307 **{Day38/39:25} - {Day38/40:1}**. From the 1994 Audit Pack **{H29/141.1/35}**, it appears that by 1993 the Al Sanea indebtedness stood at SAR 1.168bn, nearly equal to the value of the investments at SAR 1.2bn and represented nearly two thirds of the bank indebtedness which, in 1993, is shown as SAR 1.938bn.

386. The liquidation of the Money Exchange and a clean break with Al Sanea were therefore not readily attainable objectives.

387. But Yousef did not give up on the idea. He (and the other Partners) had personally guaranteed the Money Exchange's borrowing, including the Al Sanea indebtedness. And so, in light of the increasingly profound difficulties facing the Money Exchange, the Partners appear to have continued to press Abdulaziz for the closure of the Money Exchange, as appears from a surprisingly supplicatory letter, written by Abdulaziz to Al Sanea on 24 November 1997.[308] The tone suggests that Al Sanea had already become a force to be reckoned with, even for Abdulaziz:

> *"We refer to the letter submitted to me previously from the partners Brother Suleiman and al-Walad [ditto] Yusuf and Brothers dated 28/3/1992 AD about the liquidation of the Exchange and Commission [department/branch], since that time we have reconsidered the subject with you and that was on the promise that the situation would improve in all aspects. The most important was the shares in the banks. We also spoke with you at the end of last year and matters are being prepared for the liquidating of the partnership in 1997AD.*
> *Now, praise be to God, the situation has improved from what it was before. This is a position we anticipated during our repeated meetings with you to discuss matters especially those connected with the shares. The Cairo Bank has joined the United Commercial Saudi Bank and we, praise be to God, have more than a million shares. We hope that the national budget this year will be a good one, as we have heard, as the date of its publication is near.*
> *As you know the partners are still repeatedly talking about the subject of the liquidation and for it to be done as quickly as possible as they are continually referring me to the letter delivered to me previously in '92 AD. I have promised this to them often from time to time and their patience and mine has been used up. Now there is no longer any excuse for me and for you to delay the liquidation. As you know I have delayed informing some of the partners of the balance and the statements of the main centre because I was hoping for the end of the Exchange [branch] so that I can show them everything at once.*

308 **{G/1759/1}**; **{G/1761/1}**.

> …
> *I am writing my letter to you and hope that you will respond positively about liquidating the partnership at a date set by you which will make that easy for you especially as the prices are now improving and the domestic shares can be sold and their proceeds kept in one of the banks until the final liquidation with the foreign banks.*
>
> *I also request that I am not embarrassed with my brother Suleiman and the rest of the partners and we also request that you provide us with the Exchange statements for 31/10/1997 AD audited by the auditor so as to make it easy for us and you to begin on the liquidation measures during the first three months of the coming year, 1998 AD, God willing."*

388. It appears from this letter that not only were Abdulaziz and Al Sanea aware of the predicament of the Money Exchange, so were Suleiman and Yousef. They had continually pressed for it to be closed. From this it is to be inferred also, that they had kept themselves sufficiently informed to be able to assess the financial position of the Money Exchange. This is information they could have obtained only from the Money Exchange itself or from the El Ayouty Audit Packs or Audit Reports.

389. Given all that has already been seen from the exchanges with El Ayouty about the falsification of the accounts, good sense would have dictated placing more confidence in the El Ayouty Audit Packs. As events transpired, this appears to have been the recourse taken by Yousef, as will be discussed below.

390. At all events, it does not appear that any steps were taken to close the Money Exchange. Clearly, already by November 1997,[309] much depended on Al Sanea's willingness to co-operate towards that end and it was already also clear that the "*liquidation measures*" contemplated by Abdulaziz's letter to him depended upon realizing the sale of the "*domestic shares*" and using the proceeds to liquidate bank indebtedness.

---

[309] **{G/1759/1}; {G/1761/2}.**

391. Without doubt, so long as this was not achieved, that correlation between the shares and the bank debt would surely have remained at the front and center of the Partners' concern. Their own liability by way of guarantee for Al Sanea's ever-increasing portion of the bank debt, could only have exacerbated their concerns.

392. It is not surprising therefore that Yousef was not content to leave matters as they stood.

393. Accordingly, on 19 December 1999 he wrote to Abdulaziz asking him again to cancel the 15% of the proceeds which Al Sanea would get from the liquidation of the investments.[310]

394. After referring to the recitals to the Internal Partnership Agreement for the setting up of the Money Exchange as if to mark its importance, he continued:

> "*I would like to inform you that the mentioned percentage was decided at the time for partner Maan in exchange for his full-time dedication to the work of the company, which is a percentage conditioned by that dedication. Whereas this dedication was not given, as you know, since the establishment of the company to date, I therefore ask to cancel this article of the joint venture contract and reverse any registration done under it in favour of the company".*

395. Yousef's resentment was understandable in light not only of Al Sanea's increasing indebtedness to the Money Exchange but also as he complained, because his "*dedication was not given... since the establishment of the company*", a fact which he remarks, was known also to Abdulaziz.

396. In fact by the time of this letter at the end of 1999, Al Sanea's dedication to his own enterprises would have been long apparent to the Partners. His Saad Group of companies had been operating for a number of years and he no longer worked from the AHAB H.O. building where the Money Exchange, with its large staff, was located.

---

310 **{G/2012/1}; {G/2014/1}.**

397. AHAB's witness, Mr. Hayley confirms that:[311]

> "*From the time I commenced my role as General Manager on 1 January 1998, Mr. Al Sanea never worked at the Money Exchange offices but instead worked from his office at STCC and issued instructions remotely.*"

398. At the same time, Al Sanea's use of the AHAB name for borrowing to finance his own enterprises, was observed by Mr. Hayley to have continued unabated:[312]

> "*After approximately six months as General Manager, I became aware that rather than generating operating revenue, Mr. Al Sanea wanted to use the Algosaibi name in order to borrow through the Money Exchange for the purpose of funding the Saad Group which at that time was not sufficiently credit-worthy. The borrowings of the Money Exchange were also used to service its existing debt. I soon discovered that the Money Exchange had borrowing to the extent of US$1 billion*".

**<u>Yousef's next move: investigate for himself</u>**

399. In arriving at a fair and reliable conclusion as to the state of the Partners' knowledge of the activities of the Money Exchange, an examination of Yousef's actions at this stage is revealing.

400. In the event, as it transpired, that Abdulaziz took no action to close the Money Exchange, it appears that Yousef determined to investigate the position of the Money Exchange himself. To that end, he obtained the Audit Pack for 1998 directly from Saleh El Ayouty and having read and understood its contents, he wrote again to Abdulaziz on 26 December 1999.[313] He noted the increase in Al Sanea's indebtedness to 2.3bn Riyals (the precise figure set out in Attachment 9 in that regard as the figure for 1998) and questioned the commission rate applied to Al Sanea's accounts compared to AHAB's

---

311 At **paragraph 61** of his witness statement: {**C1/9/15**}.
312 **Op cit.**, at **paragraph 33 {C1/9/9}**.
313 **{G/2020/1}**; **{G/2025/1}**.

accounts and his own, and noted also that the SAMBA shares (which should have been re-transferred by Al Sanea into AHAB's name) were still outstanding:

> "*I wish to notify you that I previously asked Your Excellency for the annual report for the Exchange (branch) submitted by Messrs al-Youty and, in view of the fact that Your Excellency does not have it as I learned from you, I asked Mr. Salah al-Youty to provide me with a copy of the latest report available for the Exchange branch. In reviewing it, I noted some observations:*
>
> *1-* *The increase in the net indebtedness of Mr. Ma'an to reach 2.3 billion riyals on 31/12/1998 and, despite this, the reasons for this increase in this way and why no end has been put to the increase annually are not obvious to me knowing that you are cautious for the withdrawals of any partner not to increase.*
>
> *2-* *We notice the increased indebtedness with regard to myself at a time when it is possible to avoid the increased indebtedness if I had received the statements for my accounts one by one.*
>
> *3-* *With regard to the commission rate calculated on the accounts of* [AHAB] *and also my private accounts, the high rate is noticeable in comparison to the rates calculated on the accounts of Mr. Ma'an al-Sania.*
>
> *4-* *The accumulation of profits annually is noticeable; meanwhile profits have been distributed for '92 and '93. Knowing that I have not received any notification of an addition to my account as my expectations were that my indebtedness would reduce by the amount distributed from the profits.*
>
> 5- *It was noticeable that the ownership of the shares of the American-Saudi Bank registered in the name of Ma'an al –Sania has not been transferred to the name of the al-Gosaibi Company for Exchange*".

401. It is plain from this letter that Yousef had attained, from his own examination of the El Ayouty Audit Pack for 1998, an accurate understanding of the size of the Al Sanea indebtedness, the stated profits of the Money Exchange and the issue relating to the

ownership of the shares. It follows also that he must have known that the Audit Pack was an available and reliable source of such information.

402. But acknowledging this would be contrary to AHAB's case of ignorance on the part of the Partners[314] and contrary to Yousef's professed ignorance of the state of the finances of the Money Exchange, a position which he maintained throughout his evidence.[315]

403. This obvious contradiction was not lost on AHAB or Yousef and so one sees in paragraphs 88 to 91 of his witness statement,[316] an account that suggests that rather than Yousef having called for and examined the 1998 Audit Pack himself as his letter to Abdulaziz clearly states, the information relied upon in his letter was provided to him when Saleh El Ayouty had approached him out of concern over the extent of Al Sanea's borrowing through the Money Exchange:

> "*88. …in 1999 Salah El Ayouty approached me with a concern. El Ayouty was in the process of preparing accounts for the Money Exchange, and Salah wanted me to know that Mr. Al Sanea had been taking substantial amounts of money (by our standards) out of the Money Exchange for his own use. I was astonished to hear this. I asked my Uncle Abdulaziz to provide me with the latest annual report of the Money Exchange, which had been prepared by El Ayouty so that I could look into it, but in the end I obtained the relevant information directly from two individuals from El Ayouty who Salah sent to me.*
>
> *89. they showed me financial information and explained to me that Mr. Al Sanea had borrowed approximately SAR 2.3 billion (about US$600 million) from the Money Exchange. I can't recall exactly what it was that they showed me .. I don't remember how much of it I read. I did not see information like this again.*

---

314 As maintained throughout and argued in closing, see again AHAB's Closing Submissions, **Sections 4.14 - 4.25 {D/4/6}** and **6.29-6.110 {D/6/12}**.

315 See as the starting point, Yousef 1W, **paragraph 48{C1/3/12}**.

316 Yousef 1W: **{C1/3/19}**.

> *90. After I received this information, I wrote to my Uncle Abdulaziz on 26 December 1999 expressing my concern….*
>
> *91. Otherwise, as far as I can recall I did not see any financial statements relating to the Money Exchange at any point prior to May 2009…".*

404. This is a transparently thin attempt to explain away and avoid the implications of Yousef's plain acknowledgement in his letter to Abdulaziz, that it was by his own initiative that he had obtained the 1998 Audit Pack and had read and understood its contents.

405. The suggestion that it was Saleh El Ayouty who approached him with the subject of "*concern*" is also flatly contradicted by the fact that Yousef claimed in his letter to Abdulaziz to have made a previous request of Abdulaziz for the annual report – indicating that he knew that there was an annual report and was bent on seeing it, as well as that it would be the source of the answers to the questions of concern.

406. The implications are obvious and are not to be avoided by Yousef's apparently contrived account in his witness statement, in preference to what is plain from his letter to Abdulaziz written contemporaneously with events then unfolding.

407. From his letter to Abdulaziz, it is plain that Yousef knew that El Ayouty produced the Audit Packs (described by him as *"the annual report for the Exchange (branch) submitted by Messrs al-Youty"*) and that it would contain the crucial information he needed.

408. From his letter to Abdulaziz, it is also obvious that Yousef had no difficulty in obtaining an Audit Pack directly from El Ayouty. This is what one would expect when the request

came from a Partner and is not at all in keeping with AHAB's pleaded case that El Ayouty colluded with Al Sanea to deceive and defraud the Partners.[317]

409. The 1998 Audit Pack (typically of all Audit Packs and the Reports in Arabic) sets out in full detail the withdrawals of Al Sanea to date, the Money Exchange's borrowing (then at SAR 5bn) and the fraudulent accounting practices of the Money Exchange. As has been seen, these are the very matters of concern about which El Ayouty had so assiduously engaged the Partners over the years. The allegation of collusion is repugnant to that history, as well as to the fact that here at the end of 1999,[318] with Al Sanea's withdrawals already exceeding SAR 2.3bn (US$600m),[319] El Ayouty are shown to be entirely open and forthcoming with Yousef (on his account in his witness statement, even sending two members of staff to explain the information to him).

410. At all events, from his scrutiny of the 1998 Audit Pack, it must follow that thereafter Yousef (and by natural association Suleiman - his fellow protagonist for the closure of the Money Exchange) would have been aware of the existence of the Audit Packs and of their availability from El Ayouty. Yet nowhere does Yousef explain why he and Suleiman did not simply call for and review the Audit Pack each subsequent year in order to understand and monitor Al Sanea's indebtedness and the borrowing of the Money Exchange.

411. Instead, one sees at paragraph 95[320] of his witness statement the vague suggestion that Yousef "*may have discussed*" what he had learnt about Al Sanea's borrowings with Suleiman and in cross-examination, the admission that he told Suleiman and Saud about

---

317 At its Re-Re-Re-Amended Statement of Claim, **paragraphs 146 to 149 {A1/2.2/61}**.
318 26 December 1999 - the date of his letter to Abdulaziz.
319 As per the Attachment 9 to the 1998 Audit Pack: **{H30/18.1/1}**.
320 **{C1/3/21}**

his discussions with El Ayouty over the 1998 Audit Pack but crucially, he fails to say what the outcome of those discussions was:[321]

*Q.* “*Were you the only person there? Was Saud there?*

*A.* *No.*

*Q.* *Did you tell Saud what El Ayouty had told you?*

*A.* *Yes.*

*Q.* *Did you write to Al Sanea after you were told this by El Ayouty*

*A.* *Yes, I believe so.*

*Q.* *So we should be able to find a letter from you, should we, where you tell Al Sanea that you found out that he’s continued to borrow*

*A.* *Probably, yes. I don’t remember that, any…*

*Q* *Do you remember taking any action as a result of what El Ayouty told you?*

*A.* *No, I just told my Uncle Suleiman and Saud.*

*Q.* *You told Uncle Suleiman?*

*A.* *And Saud.*

*Q.* *What did Uncle Suleiman do?*

*A.* *Well, it would be—they discussed that so that we have to do something about it…*

*Q.* *You can’t give us a date for this conversation?*

*A.* *No, I am sorry, really, I don’t.*

*Q.* *But it must have been after 2003* [referencing Abdulaziz’s death] *and before 2009 when Uncle Suleiman passed away?*

---

[321] **{Day29/74:18} - {Day29/75:19}.**

*A. Yes, probably that".*

412. As the Defendants submit,[322] there are logically only two possibilities, both of which are damaging to AHAB's case:

(i) The first is that by 26 December 1999, Yousef, Suleiman and Saud did not already know the extent of the Al Sanea withdrawals and would have been shocked to learn; in which case it is implausible that Yousef and Suleiman (who both mistrusted Al Sanea) and Saud (by late 2000 already involved and by 2003 the newly installed Partner), permitted Al Sanea to continue running the Money Exchange without strict oversight and without, at the very least, keeping track of the borrowing and withdrawals by reviewing the Audit Packs which they knew were available.

(ii) The second possibility is that Yousef, Suleiman and Saud already knew the position of the Money Exchange, in which case it is more than probable that they had already seen the Audit Packs (or, given Suleiman's alleged limitations, had them explained to him) and so were already very painfully aware that there was no way of ending the borrowing (and so discontinuing the fraud upon the banks) without causing chaos and financial collapse for AHAB and therefore were content to allow it to continue.

413. Given that Suleiman does not appear to have joined with Yousef for the closure of the Money Exchange in 1999 (unlike earlier in 1992), I accept the Defendants' Closing

---

322 **{E1/13/25}**

Submission that the latter possibility is the more likely. This view is bolstered also by the fact that while the Audit Pack for 1999 has not been disclosed by AHAB and no explanation offered for that failure, the Attachment 9 for that year was found in Saud's villa.[323] Given Saud's involvement and Yousef's account of having discussed the findings from the 1998 Audit Pack with him, this is not surprising. Rather, it reveals the concern which the Partners must have had about Al Sanea's indebtedness and the extent of the Money Exchange's borrowing at that time. This was not a concern of which they could thereafter have simply absolved themselves.

414. The only conclusion, despite AHAB's unrelenting and even disingenuous[324] efforts to evade it, is that Suleiman, Yousef and Saud (bearing in mind also his later use of the Audit Pack for 2001 for Saud's Calculations) were aware of and did receive Audit Packs, a key purpose of which for them, would have been to monitor Al Sanea's activities at the Money Exchange.

**<u>Yousef's purported withdrawal from the Money Exchange</u>**

415. Despite Yousef's campaign for its closure, the Money Exchange continued its operations. It appears from a letter sent by Abdulaziz to El Ayouty on 29 January 2000[325] that a different tack was proposed, that of requiring Al Sanea to redeem his indebtedness. In his letter, Abdulaziz attached the 1999 financial statements, asking El Ayouty to present the

---

323 As explained by Brett Walter, AHAB's General Counsel, in Walter 1A**, paragraph 14.5** and **22** to **24{L2/27/5}**; **{L2/27/7}.**

324 See, in this regard, the Defendants' criticisms at **{E1/13/26-27}** that Yousef, Suleiman and Saud dishonestly sought to conceal the fact of their knowledge of the Audit Packs from this Court. The basis of that criticism is only strengthened by the fact that despite the obvious gaps in AHAB's disclosure of the correspondence with El Ayouty (including the missing files with "El Ayouty Correspondence") and of their reports, El Ayouty were not asked by AHAB to provide disclosure until after this Court made the compulsory Order for those purposes on 24 April 2015, six years after the institution of these Proceedings. This is apart from a letter sent by Yousef to El Ayouty in 2012 requesting certain documents but which themselves were not disclosed until in response to the Order of 24 April 2015. See again, Walter 1A, **paragraph 57{L2/27/15}**.

325 **{G/2067.2/1}; {G/2067.1/1}.**

Audit Reports. He also acknowledges the treatment of the Al Sanea indebtedness differently and peculiarly within the two Divisions of the Money Exchange:

> "*We kindly request that you prepare and issue your reports on the financial statements.* ***Please note that a meeting of the partners has been scheduled for a later date*** *to take measures to avoid a deficit in the financial statement by* ***liquidating the accounts of Mr. Maan Abdul Wahed Al Sanea as a client of the Money Exchange and Investment Division and the Financing Division*** *by the end of 2000*." (Emphasis added.)

416. While no record of the proposed meeting has been disclosed, given the importance of the subject matter, it is to be inferred that it did take place and that the attendees received and considered the Audit Reports requested of El Ayouty. The realities confronting them would have been even more troubling than earlier revealed by the 1998 Audit Pack: the El Ayouty Report for the Financing Division[326] revealed that the true liabilities had risen by SAR 500m to over SAR 5.53bn, while the value of the investments, at less than half that amount, stood at SAR 2.50bn. The Al Sanea net indebtedness had already risen to SAR 2.31bn by year end 1998.[327]

417. It would also have been apparent to the Partners that, even with the full recovery of the Al Sanea indebtedness and liquidation of the investments, the Money Exchange would have experienced a shortfall of nearly SAR 1bn if closed at that time. Short of making a clean breast of the situation with the banks (suffering the inevitable loss of good will and prestige), Abdulaziz's plan, to first recover the Al Sanea indebtedness and hope for a great improvement in the market, would have appeared to be the only viable option.

---

326 **{F/93/1}. At {E1/13/29}**, the Defendants cite different figures relying on documents from the N Files: **{N/782/1}; {N/783/1}** and from the exhibits to Brett Walter's affidavit:**{P/145/11} and {P/145/12}** but these show the figures for year end 2000 and 2001; not year end 1999.

327 As shown at **{H30/18.1/1},** the Attachment 9 to the 1998 Audit Pack found in Saud's villa.

418. However, by 22 July 2000, Yousef, apparently frustrated by the apparent lack of progress, decided on a different tack and wrote to Abdulaziz seeking to exempt himself from the activities of the Money Exchange:[328]

> "*Twelve years ago we decided, as you know, to liquidate the activities of the Company and you were so kind as to send a letter to Mr. Ma'an al-Sani'a informing him of that. Everybody agreed to liquidating the activities. However, up until now no steps have been taking (sic) with regard to this matter despite your assurances to us about that.*
>
> *Therefore I request that, should you wish these activities to continue as they are, to be so good as to accept my exemption from continuing to take part in these activities with effect from 31/12/2000. I leave it to Your Excellency to take whatever measures you deem in our interests in this matter.*"

419. While having earlier in 2000 accepted his distribution of annual dividends as he had in 1999,[329] Yousef appears to have come to regard the Money Exchange differently, if not yet as a sinking ship, certainly as listing dangerously off-keel. Hitherto, he had been adamant that Al Sanea's entitlement be cancelled and the Money Exchange liquidated. But by the time of this letter in July 2000, he was pressing simply to be released – willing, it seems, effectively to abandon his 10% of a business that on paper owned a very valuable portfolio of shares and which over many years had provided him with loans and large, regular amounts of dividends.

420. The most obvious impetus for Yousef's change of heart would have been sight of the Audit Pack for year end 1999 which must have been sent by El Ayouty in response to Abdulaziz's request. Sight of it would have enabled Yousef to realize that the position of

---

328 **{G/2181/1}; {G/2185/1}.**

329 See respectively, Resolutions R/62 of 27 February 2000 **{H30/24.1/1}** and Summary of Resolutions for 1999, R/2 of 28 February 2000**{H30/25.1/3}**, recording the distribution of SAR 75m in dividends for each year.

the Money Exchange was worsening rapidly and that realization explains his purported withdrawal.

421. It is not surprising, however, that Abdulaziz does not appear to have taken any further action to close the Money Exchange or even to acknowledge Yousef's gambit.

422. The Partners were inextricably bound by their guarantees of the bank indebtedness which now far outstripped their assets and Abdulaziz had no power to release Yousef, as one of the Partners, from those obligations.

423. On 30 September 2000, Abdulaziz suffered the massive stroke from which he never recovered and it is therefore not surprising that nothing further appears to have happened to address Yousef's concerns.

424. But being still plainly concerned about his liability as a Partner, on 19 December 2000 Yousef wrote, this time of course to Suleiman as *de facto* chairman, asking what had been done "*regarding excusing myself from continued participation in Exchange activities as of 12/31/2000...*"[330]

425. No response from Suleiman has been disclosed and Yousef claims in his witness statement[331] that he cannot recall what response he received from him, while acknowledging that the Money Exchange was never closed.

426. It is however, clear that Yousef took no further steps to close the Money Exchange despite the known predicament. This obviously called for explanation and Yousef (or

---

330 **{G/2319/1}; {G/2320/1}.**
331 Yousef 1W, **paragraph 101 {C1/3/22}.**

those advising him) must have recognized this and so he proffered one which can only fairly be described as implausible:[332]

> "*After my letter to Abdulaziz in 1999 and his stroke in 2000, I continued to be concerned about the Money Exchange but it is not the case that I monitored it. I did not want to argue with my uncle and I made it clear to him that I had washed my hands of the Money Exchange and wanted no further part in it. The fact that I held 10% of the shareholding did not concern me. Abdulaziz told me he had the situation under control*".

427. As an explanation for why it was that Yousef no longer took an active part in monitoring the activities of the Money Exchange and the Al Sanea indebtedness in particular, I regard this as an affront to common sense.

428. Yousef (along with all his fellow Partners) were still "*on the hook*" for the crippling indebtedness. This liability could only have continued to increase, given the historic failure even to attempt to pay it down by means of such income as the Money Exchange obtained from the investments. Nor could Yousef have been placated by Abdulaziz's assurances – Abdulaziz was no longer able to monitor Al Sanea's activities and obviously did not have "*the situation under control*" because he was in a coma.

429. So too must be regarded as unacceptable Yousef's professed loss of interest - that he took no further action for the next eight years but was content instead to rely upon his certainty that "*Uncle Suleiman would not indulge Mr. Al Sanea*".[333] This, even while contradicting himself: "*it is my recollection that, between my Uncle Abdulaziz's stroke (in 2000) and May 2009, I had several conversations with my Uncle Suleiman and my*

---

332 Yousef 1W, **paragraph 102{C1/3/23}.**

333 Yousef 1W, **paragraph 108:{C1/3/24}.**

*cousin, Saud, regarding the need to close the Money Exchange or for Mr. Al Sanea to purchase it,…*"[334]

430. I find that it is simply incredible that Yousef would not have continued to monitor the state of the bank borrowing and the Al Sanea indebtedness, even while being engaged in ongoing discussions about that critically important matter. And there is, indeed, clear evidence that such discussions did take place during December 2002 to January 2003 and that he was involved. This is a subject he addresses in his witness statement,[335] referring to various minutes of such meetings which show his attendance and various drafts of an agreement[336] to sell the Money Exchange to Al Sanea. Again, however, even while implausibly denying knowledge or involvement:[337]

> "*Some of the documents appear to reflect that I allegedly attended a meeting on this subject; I do not believe that I did.*
>
> *I was not aware of the described meeting in December2002/January 2003 at the time or at any time thereafter until AHAB's advisors showed me these documents.*"

**Yousef's continued involvement**

431. There is as well, and despite his denial of this, direct evidence of Yousef's ongoing knowledge and oversight of the activities of the Money Exchange after Abdulaziz's stroke and even after his death in 2003.

432. In cross-examination[338] Yousef accepted that he had probably been kept informed by "*someone".*

---

334 Yousef 1W, **paragraph 103: {C1/3/23}.**
335 Yousef 1W, **paragraph 104: {C1/3/23}.**
336 All recovered only from the N Files.
337 Yousef 1W, **paragraphs 104 -105 {C1/3/23-24}.**
338 **{Day38/70:1-4}**

433. When pressed,[339] he acknowledged that it was El Ayouty who provided this information to him after Abdulaziz's death, a circumstance that further contradicts AHAB's allegation against El Ayouty of collusion with Al Sanea:

> Q. *You personally had no knowledge that after your uncle died, Al Sanea was borrowing any money through the Money Exchange?*
>
> A. *No, I believe—I believe he was borrowing.*
>
> Q. *You believed he was?*
>
> A. *Yes.*
>
> Q. *When? When did you believe that?*
>
> A. *I can't recall that, to tell the truth, I don't know. I can't answer that.*
>
> Chief Justice: *Mr Algosaibi, the question is whether after your Uncle Abdulaziz died you had any knowledge that Mr. Al Sanea was borrowing money after he died. Did you have knowledge –*
>
> A. *Mr. – sorry.*
>
> Chief Justice: *Did you have knowledge of that?*
>
> A. *I believe that Mr. El Ayouty told us.*
>
> ...
>
> Q. *When you saw El Ayouty, El Ayouty told you about the borrowing, is that right?*
>
> A. *Yes.*
>
> Q. *You told us a minute ago that was the SAR 2.3 billion that you refer to in paragraph 19 [of your witness statement].*
>
> A. *That's correct.*
>
> Q. *In 2003 and afterwards, you say that Al Sanea borrowed more money; correct?*

---

339 **{Day29/72:7-23}; {Day29/73:2-25}.**

A. *I believe so.*

Q. *You say that El Ayouty told you that?*

A. *Yes.*

Q. *When did they tell you that?*

A. *I can't remember the date. Sorry.*

Q. *But it must have been after 2003.*

A. *Probably.*

Q. *No, but that's what you say.*

A. *Yes.*

Q. *You just told us that you didn't discover that Al Sanea continued to borrow money after Uncle Abdulaziz passed away in 2003 until El Ayouty told you about it.*

A. *That's what it says, yes.*

Q. *I am asking you, when did they tell you?*

A. *That's what it says. I can't remember. I'm sorry".*

434. Yousef also admitted,[340] when cross-examined on his letter of complaint to Abdulaziz of 9 November 1992,[341] that he would, "*once a year*" discuss the value of the Money Exchange shareholdings with Badr:

" Q. *How did you know that you could contact Badr, who was upstairs in the head office, for details of the Money Exchange's shareholdings?*

A. *I do once a year, I ask Badr.*

...

Q. *You asked Badr "to provide me with a statement of the shares we own in the Exchange for information purposes"*

---

340 **{Day38/1:23} -{Day38/2:17}.**
341 **{G/1452/1}; {G/1450/1}.**

*A.* *Yes.*

*Q.* *Your evidence is that you do that every year, or you did it every year?*

*A.* *I would say so, yes…".*

435. Both Yousef and Badr[342] were silent in their witness statements as to these discussions although they clearly took place and Badr then provided Yousef with information about a critically important component of the Money Exchange's balance sheet.

436. Having previously shown a keen interest in both the bank borrowing and Al Sanea's indebtedness, the value of the share portfolio would have been the other key factor necessary for monitoring the state of the Partners' net exposure to the banks in respect of the Money Exchange. Looking at the value of the shares by itself would have made little sense and it is therefore not surprising that Yousef was also being kept up to date by El Ayouty, as he guardedly admitted in the following exchanges in cross-examination:[343]

"*Q.* *Until 2002 you received those audit papers, those reports from El Ayouty?*

A. *Yes, but I don't – I don't read them or look at them.*

*INTERPRETER: Review?*

*A.* *(In English) Review them, sorry, yes.*

*Mr. Lowe:* *You have other people who can help you do that, don't you?*

*A.* *(In English) They do that, yes.*

*Q.* *So you can show them the document and say, "What does it say?"*

---

342 From whom a statement was not provided until near the end of the trial (under cover of a Hearsay Notice dated 8 March 2017), Badr 1W **{C1/40}**. This is a fact which itself became the cause of misgivings to be examined when looking more closely at the alleged "New for Old" policy.

343 **{Day29/77:3} - {Day29/79:18}** and **{Day38/61:23} - {Day38/64:4}**.

A. *(In English) No, that was Saud's job, not me.*

Q. *Whose job?*

A. *(In English) Saud, he was looking after the Money Exchange, on behalf of AHAB…*

Q. *Before Uncle Abdulaziz died, Saud was not in charge of the Money Exchange, was he?*

A. *(In English) After Uncle Abdulaziz died?*

Q. *Before he died?*

A. *(In English) Before? No, no.*

Q. *What you are saying in the sentence that we have looked at on the right-hand side of the page appears to suggest that until Uncle Abdulaziz died, you did receive the audit materials from El Ayouty, even if you didn't review them?*

A. *(In English) That's true, but usually it – I handed it to Saud, he take care of that after.*

Q. *Even before Abdulaziz died?*

A. *No, no, not before. After.*

…

Q. *After 2002—if I just follow what you said correctly—you received the audit materials but you gave them to Saud?*

…

Q. *After 2002, you received audit materials from El Ayouty and you passed them to Saud?*

A. *(In English) Yes".*

437. In conflict with this evidence from Yousef (but in keeping with AHAB's claimed lack of knowledge of the fraud until the time of the actual collapse of the Money Exchange in May 2009), Saud came to deny any such direct involvement with the El Ayouty Reports

and the affairs of the Money Exchange. I will come next to examine Saud's state of knowledge.

438. Here, it is also important to note that Yousef accepted that he would have received and passed on to Saud a copy of the Audit Pack for each year after Abdulaziz's death until end 31 December 2008.[344] This last Audit Pack would have been that dated 6 April 2009, which Saud came to deny having seen, despite El Ayouty's assertion that a copy was sent to him in May 2009.[345]

439. In keeping with El Ayouty's asserted position,[346] the Audit Pack which was in the form of a letter, was addressed to the "*head*" of the board and so as "*to be delivered to Sheikh Yousef…*".

440. The following were Yousef's further responses about it:[347]

> *"Q. At {F/260/2} and {F/259/2} we see this document was delivered to you on 6 April 2009. It is {F/259/3} in the Arabic. What did you do when you received this document on 6 April 2009?*
>
> *A. I'm sorry, I can't remember.*
>
> *Q. I'm not sure that's good enough, Mr Algosaibi. This is a document that was produced to you by the auditors a month before you say you became aware of the fraud that you allege at AHAB.*
>
> *A. Well, probably I passed it to the – the accounting people. But to me, I can't remember that at all.*
>
> *Q. Which person? Who is "the accounting people"? Who are you referring to?*
>
> *A. Probably Omar Saad.*
>
> *Q. Would you have discussed this matter with Saud?*

---

344 **{F/259/3}; {F/260.1/3}.**
345 As stated in their interview to the Investigation team: **{C4/8/5}.**
346 **Ibid**.
347 **{Day38/61:23} - {Day38/64:4}**.

*A.* *With Saud?*

...

*Q.* *This is obviously when you were chairman of the board. What would you do with an important document like this?*

*A.* *That's what I'm saying. I passed it to somebody, either Saud or Omar Saad.*

*Q.* *According to your evidence, this is the first time that you had ever seen an audit report. Yes?*

*A.* *Yes.*

*Q.* *It's a 70-page document and it relates to the Money Exchange, of which you are still a director and partner.*

*A.* *Because I – I don't understand it, that's why I passed it to the responsible man, the right man.*

*Q.* *I know you can't read numbers but you can read writing, can't you?*

*A.* *Yes. But what's the use? I have to pass it to someone who knows the details of that.*

*Q.* *You passed it to Omar Saad, and what did he do with it?*

*A.* *After that, I can't remember, sorry.*

*Q.* *Did you pass it to someone who can read numbers?*

*A.* *Well, Omar Saad can read numbers.*

*Q.* *When you gave it to Omar Saad, what did you tell him to do with the document?*

*A.* *He had to read it and discuss it with the rest of the accounts people.*

*Q.* *Didn't he come back to you a day later and say, "Dear Mr. Algosaibi, please look at page 74 and 73"or whatever it was ? "Look at the enormous amount of money that Al Sanea owes to the Money Exchange"?*

*A.* *I can't remember that.*

*Q. You can't remember that?*

*A. No.*

*Q. You would have been absolutely – you would have fallen off your chair, if you didn't know about this already.*

*A. I'm sorry, that's my answer."*

441. The inconsistency between Yousef's professed inability to understand financial matters[348] and his obvious ability to understand the 1998 El Ayouty Report when writing to Abdulaziz on 26 December 1999, is worth noting here again. Here though it is even more transparently contrived, as he suggests that even after passing on the 2008 Report to Omar Saad who could advise him, he did not require him to do so but instead merely told him to "*discuss it with the rest of the accounts people*."

442. That proposition is rejected in and of itself for being patently untrue. However one examines Yousef's evidence on the state of his knowledge continuing after Abdulaziz's time, during Suleiman's time and right up until he became Chairman, there is no ambiguity in the evidence. His evidence is clear that he continued to receive at least annually from Omar Saad, updates on the value of the share portfolio. That he continued to receive after 2003, reports from El Ayouty about Al Sanea's increasing indebtedness. And, as shown finally above, that he continued to receive the El Ayouty Audit Packs even after Abdulaziz died, including that for 2008. While, according to him, he would pass these on to Saud because "*Saud…was looking after the Money Exchange, on behalf*

348 To which he resorted when questioned about his letter of 26 December 1999 to Abdulaziz (above): {**G/2021/1**}; {**G/2025/1**}.

*of AHAB*",[349] it is simply incredible that he managed to remain willfully ignorant of what they revealed about the activities of the Money Exchange.

443. Another stark irony arising here from Yousef's evidence – as will be more apparent when looking below at Saud's evidence and revealing of AHAB's dissonant case – is that Saud himself denies having had any responsibility for the Money Exchange.

**<u>Conclusions on Yousef's knowledge</u>**

444. From the foregoing examination of the evidence, it is impossible to accept that Yousef was unaware of the activities of the Money Exchange and of the extent of the borrowing and of the Al Sanea indebtedness, in particular. I reject AHAB's Submissions in closing which are to that effect.[350]

445. It is clear, in particular, that Yousef received and understood in 1999 the ramifications of the Audit Pack for 1998, which prompted his complaint to Abdulaziz. In light of his mistrust of Al Sanea, it is inconceivable that he thereafter took no steps to monitor the state of that indebtedness for which, along with that of the Money Exchange itself as a whole, he was personally liable.

446. The documentary evidence reveals that he was party to, and so was aware of, the adoption of the fraudulent accounting practices and the issuance of the misleading financial statements to the banks.

447. By his own admission, Yousef received updates after 2003 from El Ayouty regarding the Al Sanea indebtedness and the Money Exchange borrowing; and from Omar Saad, regarding the value of the shareholdings. He must have been aware, therefore, that the

---

349 **{Day29/77:16}**
350 Especially throughout AHAB's Closing Submissions, Section 6 **{D/6/1}.**

Money Exchange had woefully insufficient capital and generated no income with which to redeem the bank loans.

448. Despite knowing these things, apart from his personally motivated agitations with Abdulaziz and Suleiman before December 2000, Yousef took no steps to restrain the activities of the Money Exchange. He must therefore be regarded as knowing and approving of (or at least acquiescing in) those activities.

**SAUD'S KNOWLEDGE AND INVOLVEMENT**

449. During Abdulaziz's time up until his stroke on 30 September 2000, Saud is shown to have had only very limited involvement with the Money Exchange. This was as would have been expected. As Abdulaziz's son, Saud would have had no standing in his own right to participate. Upon returning from college in the United States, he had been assigned to work under Mr. Hindi's supervision at certain different AHAB subsidiaries.[351]

450. But in addition to the foregoing insights into Saud's knowledge of and involvement with the affairs of the Money Exchange gleaned from the minutes of Board Meetings and from Yousef's evidence, there are many further aspects of the evidence which confirm his knowledge and involvement after Abdulaziz's stroke up until the collapse in May 2009.

451. This is contrary to Saud's denial of such knowledge and involvement and his constant refrain that he had nothing to do with the Money Exchange which was Al Sanea's "*domain.*"[352] That his only involvement was when he was tasked by Suleiman to carry

---

351 Saud 1W {**C1/2:11-12**}.
352 For instance: **{Day48/84:8} - {Day48/85:20}.**

out a specific investigation in "*about 2001 or 2002*", in order to deal with the edict from SAMA on the merger of all money transfer businesses.[353]

452. So clear is the proof of Saud's knowledge and involvement, that I do not see the need to discuss every aspect of the evidence that reveals it. I will however, following below, deal with some of the most significant and telling aspects as have been helpfully identified by the Defendants in their Closing Submissions and as I find to be proven.

**Saud's involvement with false accounting resolutions and his review of El Ayouty Audit Packs**

453. As shown above, along with Suleiman and Yousef, Saud signed Resolution R/66 in November 2000 confirming the false accounting practices and consistently thereafter signed off on resolutions affirming Resolution R/66.

454. This resolution was not, as Saud contended,[354] simply a minute to enable the declaration of dividends. It was plainly a minute to confirm the continuity of the fraudulent accounting policies of the Money Exchange put in place during Abdulaziz's time.

455. The fact that Saud signed this minute at a time when he was not yet managing director or Partner of AHAB or a Partner or director of the Money Exchange, suggests that he did so to record his personal agreement to what was being decided as the representative of his branch of the family, his father and AHAB Partner, Abdulaziz, having become incapacitated.

456. There is, moreover, ample evidence of Saud's involvement throughout the ensuing years, with the procurement of resolutions confirming, among others, Resolution R/66 for the

---

353 Saud 1 W **{C1/2:57}.**
354 **{Day62/33:5}; {Day62/34:6}; {Day62/87:14-25}.**

continuation of the false accounting practices, such that it is implausible to think that Saud would not have understood their meaning and implications.

457. A significant example occurred on 13 March 2002 when Saud sent to Al Sanea, under cover of a typed note of that date, two proposals for the text of minutes of the Board of the Money Exchange. The first, a draft minute dealing purely with the payment of dividend by the Money Exchange for 2001, along with Saud's typed note, came from AHAB Discovery.[355] The second came from Saud's villa safe: a copy of the previous year's Resolution R/82 dated 29 November 2001 with Saud's manuscript note to Al Sanea written on it: *"Brother Abu Saad: So that we can complete the balance sheet as stated in this decision, the previous matters should be completed. Find herewith a copy of the two resolutions as a reminder.*"[356]

458. The wording of Resolution R/82 adopts Resolution R/2 dated 28 February 2000 and R/78 dated 02 September 2001 which together enforced "*all the decisions previously signed by Sheik Abdul Aziz Algosaibi*." It also adopts the language of Resolution R/66 for "*the issuance of an English language version of the balance sheet, adoption of amendments thereto and to assign El Ayouti Office to prepare the balance sheet*". And for "*co-ordination between El Ayouti Office and Mr. Omar Saad Hamdah for the issuance of the English Language version of the balance sheet for the head office*[357] *adopting the same system that has been implemented in the past year.*"

---

355 **{G/2773.1}; {G/2773.2}; {G/240.31/15}; {G/240.31/13}.**

356 **{H29/181.1}**

357 There were exchanges between counsel and Saud on Day 62 over whether this was a reference to AHAB H.O. or to the head office of the Money Exchange **{Day62/24:21} - {Day62/30:23}**. Rather incoherently, Saud sought to assert that it was the former instead of the latter. I am satisfied that it is the latter; these resolutions clearly relate to the business of the Money Exchange.

459. Following this exchange between Saud and Al Sanea, we see three days later on 16 March 2002,[358] the passage of Resolution R/90 resolving in terms; first: for the distribution of dividends in the amount of SAR 36m ; second: for the *"Enforcement of Resolution R/66… under the same conditions and points stated therein*"; third: approving of all previous decisions relating to the issuance of an English language budget and confirmation of its amendments, and to assign El Ayouty to issue it; and fourth: to co-ordinate between El Ayouty and Omar Saad to produce under the same method as the previous year.

460. Thus, as the result of these exchanges between Saud and Al Sanea, initiated by Saud, we see the adoption of the previous resolutions and continuation of the fraudulent practices which had been institutionalized.

461. It is difficult to imagine clearer evidence of collaboration to bring about a desired state of affairs for the running of the Money Exchange.

**More on Omar Saad**

462. I pause here in the narrative on Saud's involvement, to address specifically an aspect of AHAB's Closing Submissions on Omar Saad's involvement.[359]

463. Here AHAB addresses the subject of the knowledge of the practices of capitalization of interest and adjustments to the Money Exchange's financial statements among AHAB's H.O. staff.

464. During his testimony[360] Omar Saad seemed to have acknowledged both an awareness of the practice of capitalization of interest and an understanding that it was an acceptable

---

358 Hard copy N Files: N-445 **{N/173/1}** and N-446 **{N/173/1}**.
359 At **{D/6:73} – {D/6:81}**

accounting practice. He however, quite plausibly, disavowed any responsibility for the practices particularly within the Money Exchange's accounts, having earlier in testimony referenced the fact that Dr Sami was the person with overall responsibility for the implementation and oversight of the accounting practices.

465. Nonetheless, his evidence became the basis for the following submissions from AHAB:[361]

> "*This is significant evidence. It shows that amongst AHAB's Head Office accounting staff there was an understanding that there was nothing impermissible, unlawful or fraudulent about the capitalisation of interest [in the Money Exchange's accounts]. It lends support to our submissions earlier in this section about Abdulaziz's [unwitting or innocent] state of mind in endorsing the capitalisation of interest in the Money Exchange's accounts*".

466. I reject this contention for obvious reasons. Firstly, while Omar Saad was a valued and loyal employee whom Abdulaziz relied upon and trusted, he clearly was not at the level of seniority to have been let into AHAB's inner circle when decisions on the most sensitive and far-reaching issues were being taken. The crucial meetings of the Money Exchange Board at which the pivotal decisions on the manipulation of accounts were taken were attended by Dr Sami. Omar Saad would not have been privy to the purpose or reason for the manipulation of the accounts. The same would hold true, for that matter, in relation to Mr. Naim Fakhri.

467. Secondly, Omar Saad explained that he provided only clerical services in relation to the provision of the El Ayouty Reports, sending information to El Ayouty and receiving the reports which he was then instructed to pass on immediately to Abdulaziz and later on to

---

360 **{Day90/81:13} -{Day90/84:18}**
361 AHAB's Closing Submissions, **Paragraph 6.159 {D/6:75}.**

Saud. He was not privy to discussions at meetings between El Ayouty and the Chairmen which followed upon receipt of the reports, although he was aware that such meetings did take place.

468. From the Reports themselves and from such correspondence surrounding them as AHAB has disclosed, it is abundantly clear that El Ayouty warned about the inappropriateness of the fraudulent practices, as we have seen, time and time again advising that they should be discontinued. Given that state of affairs, it is simply ludicrous for AHAB to argue that there could be a kind of assimilation between Abdulaziz's state of mind and that of his trusted but relatively subordinate members of staff.

469. Further, the following day[362] Omar Saad confirmed that from the time of Abdulaziz's incapacity, it was Saud who gave him instructions to perform adjustments to the ledgers.

470. Here again, AHAB seeks to place an unacceptable and misleading gloss upon the evidence:[363]

> "…*However, again, a careful assessment of this evidence does not reveal anything about the Algosaibis' intention to produce misleading financial statements. One cannot automatically assume that adjustments to which Mr. Saad referred were instructed to be carried out with a fraudulent intention in mind or that they resulted in any one being misled. We have no detail of the adjustments to which Mr. Saad referred and which could well have been implemented for well-established, bona fide accounting reasons. We respectfully submit that the Court does not have sufficient material to make a finding of fraud against the Algosaibis based on this (or any other) evidence*".

471. In the face of it being common ground at the trial that the accounts were false and misleading,[364] AHAB's admission that the practices of manipulation was instituted by

---

362 **{Day91/5:9-13.**
363 AHAB's Closing Submissions, **Paragraph 6.162 {D/6/77}.**

Abdulaziz[365] and the irrefutable evidence that it was resolved to be continued during Suleiman's time and to Saud's certain knowledge as well (*inter alia*, per Omar Saad); these very bold submissions are plainly unacceptable.

**Back to Saud's involvement**

472. There are other examples of Saud having initiated contact with Al Sanea over the implementation of Money Exchange board resolutions and which undeniably prove Saud's involvement in its financial affairs.

473. For instance, on 12 September 2004, among other things, we see Saud instructing Al Sanea in writing:[366]

> *"Attached is a copy of the signed Board Resolution relating to profits. Please arrange to send relevant journal vouchers to enable us to sign the same."*

474. The next year, 2005, when it again became necessary for the Money Exchange Board to resolve for the distribution of dividends and reconfirm the enforcement of the false accounting resolutions including R/66, we see exactly that happening but this time with the minute bearing only Saud's signature,[367] suggesting that he was the first of the Board members to sign. The fully signed document (signed by Saud and twice by Suleiman for himself and Yousef and by Al Sanea), was also found in the N Files[368] but bearing a different signature of Saud, suggesting that he signed at least two copies of the document.

---

364 See Joint Statement of Humphry Hatton and Theo Bullmore: **{I/13/3}**.
365 **{X2/8/1}**
366 **{N/211}**; **{N/212}**.
367 **{N/200}**; **{N/201}** (translation), dated 29 March 2005 (found in Saud's office cupboard in hard copy N-494; N-495).
368 **{N/172}**

475. As already touched upon above when examining Yousef's involvement, Saud's involvement as revealed by these documents cannot be explained by the suggestion that he was simply seeking to procure the payment of the dividends and so resolved as shown or signed off on these minutes to meet Al Sanea's requirements. As Yousef confirmed in cross-examination, the passing of these resolutions and execution of the related minutes, was not necessary in order to secure payment of the dividends.[369]

476. Further clear indication of Saud's involvement with the affairs of the Money Exchange and his knowledge and understanding of its accounts comes from the evidence of his study of the El Ayouty Audit Packs.

477. First in this regard, it is significant that Saud had a copy of the 1994 Audit Pack in his villa safe.[370] Despite the many indications in the evidence that El Ayouty provided them annually (such as the evidence we have seen showing that Yousef must have received an Audit pack for 1998 directly from El Ayouty); that for 1994 was the only complete Audit Pack recovered by the Deloitte Investigation Team from among AHAB records.[371] As set out below, the 1994 Audit Pack having been found in Saud's villa safe, it must be assumed that he knew of it and read it, despite his denial of this in cross-examination suggesting that "*someone*" must have brought it to his home after May 2009.[372] And despite his account in his Supplementary Witness Statement filed in the London proceedings[373] to the effect that although the contents of Abdulaziz's safe must have been

369 **{Day76/49:18-21}.**
370 **{H29/141}; {H29/141.1}.**
371 As will be discussed below in relation to "*Saud's List*", it is significant that a copy of the 1996 Audit Pack was eventually disclosed as coming from the Money Exchange itself.
372 **{Day60/60:18} - {Day60/61:2}.**
373 **{L1/7/5-6}**

taken to his villa when the safe was opened on the instructions of the Younger Algosaibis, he had no recollection of having seen the contents.

478. When pressed about this and the many other very significant documents found at his villa, including many which predated Abdulaziz's stroke and must have come from Abdulaziz's safe in his office at AHAB H.O., Saud even went so far as to suggest that the safe at his villa was his wife's and that she must have put these documents in that safe. I state here that I reject entirely Saud's evidence on this issue.

479. Among other reasons carefully explained in the Defendants' Submissions[374] and which I adopt, I note here especially Omar Saad's evidence that it was Saud who removed the documents from Abdulaziz's office safe. I also note in passing in this context that Omar Saad served as Abdulaziz's personal assistant and testified that during the many years that he worked for him, he had placed carefully labeled envelopes with documents, including El Ayouty Reports, in the safe on Abdulaziz's instructions:[375]

> *"Q. After Abdulaziz died, Saud got the contents of the safe. Is that correct?*
>
> *A: Yes, yes, it was Saud who took it…*
>
> *Mr. Lowe: Yes. Abdulaziz might have asked you to put it in the safe, correct?*
>
> *A: You can ask Saud about the papers related to his father in the safe, not me*
>
> *Q. After his stroke, you don't know what documents Saud took out of the safe or put into the safe, is that right?*
>
> *A. Saud took papers and documents but I don't know them".*

---

374 At **{E1/7/57-69}**

375 **{Day88/68:25} - {Day88/69:2}; {Day89/84:3-7}; {Day90/33:25} - {Day90/34:3}.**

480. The significance of the 1994 Audit Pack is of course, the information it would have imparted to anyone reading it. Among other things at page 1[376] it explained that the accounts had not been consolidated, instead, in unmistakably clear terms, that the Exchange and Investment Division presented the sanitized version of the accounts while the Finance Division was being used as the bad silo for recording the bank loans taken "*to finance the accounts of the partners their affiliated companies, as well as the costs of financing the purchase of investments which are being capitalized, while investments are recorded at cost at the Exchange and Investment Division*".

481. On page 29,[377] the Audit Pack contains a balance sheet for the Finance Division showing loans from banks of SAR 1.863bn at Year End 1994, followed by detailed criticism of the accounting practices of the Division in the following pages. These included at page 31, El Ayouty's note as regards the policy of capitalization of interest (then amounting to SAR 1.257bn) that "*the management had greatly expanded in this policy, that it even became the hallstand on which all the negatives are hung".* They go on to criticize the *"great withdrawals by the Partners without repayment of what is withdrawn or the commission* [interest] *on them…*".

482. Attachment 8 to the 1994 Audit Pack is a consolidated balance sheet for both the Exchange and Investment and Finance Divisions showing that at Year End 1994, the Money Exchange's assets were exceeded by its liabilities by some SAR 1.77bn.[378]

376 **{H29/141/4}**; **{H29/141.1/4}**.
377 **{H29/141/32}; {H29/141.1/32}.**
378 **{H29/141/64}; {H29/141.1/64}.**

483. And further of note, Attachments 9 and 14 show, respectively, the extent of the Al Sanea net indebtedness (SAR 1.064bn year end 1993 and SAR 0.948bn year end 1994)[379] and the bank borrowing (SAR 2.9bn year end 1994).

484. Absent any other credible explanation, the natural inference is that the Audit Pack was found in Saud's safe because he placed it there and his denial of this is itself only consistent with his realization of the significance of its contents. I have no doubt that Saud had read and understood the 1994 Audit Pack. It is very likely that he had obtained it among the documents he removed from Abdulaziz's safe – documents which he would naturally have wished to study in order to assume Abdulaziz's responsibilities following his stroke.

**<u>Saud's List</u>**

485. On 16 April 2001 Saud wrote to Al Sanea: [380] "*Based on our last meeting*" and setting out a list of 17 matters relating to the Money Exchange's accounts ("Saud's List"):

> "*Please find attached a list of some notes which have been repeated over the years in the balance sheets, and which should be addressed. Please advise as soon as the required steps have been taken to remedy these matters*."

486. Given the nature of the list, it is of obvious significance in at least two ways. First, it shows Saud's familiarity with and understanding of the accounts of the Money Exchange as reported on in the Audit Packs. As Saud's letter explains, the matters listed were taken from "*notes*", "*repeated*" over the years "*in the balance sheets*."

487. This, as the Defendants submit, can only be a reference to the notes and balance sheets as set out in Audit Packs over a number of years. Many of the items listed, while not to be

---

379 **{H29/141/70}; {H29/141.1/65}.**

380 **{N/292/1}**; **{N/293/1}**; a slightly different translation is at **{G/2430.1/1}**; **{G/2430.2/1}**.

found in the financial statements themselves, are almost completely identifiable as matters of note from the Audit Packs.

488. From an exercise carried out by him, Mr. Badrul Hasan (a consultant working on behalf of the Defendant SIFCO 5), explains[381] that having conducted an analysis of Saud's List and comparing it to the 1996 Audit Pack (being the latest disclosed by AHAB as having been found in the Money Exchange),[382] he was able to identify in the 1996 Audit Pack nearly all of the 17 matters, all expressed in relatable wording as raised in Saud's List.

489. While Saud's List itself betrays a good understanding of the accounts, notably, by way of illustration, among the 17 listed, is item number 12 which Saud said needed to be remedied by *"specifying personal accounts of Mr. Maan Al Sanea and his subsidiaries."* This, Mr. Hasan was able to relate to a note on page 16 of the 1996 Audit Pack in which El Ayouty comment: *"In relation to the accounts of Mr. Maan, which amount in the Division to 22 accounts, and maybe more if others exist under any other name that is unclear to us (Annex5/2),…".*[383]

490. A second obvious significance of Saud's List is that he is here shown to be directing Al Sanea on the conduct of the affairs of the Money Exchange. This is only consistent with Saud's superior position as Partner of AHAB having oversight responsibility for the Money Exchange as Yousef revealed, but very inconsistent with Saud's own disclaimer of any such responsibility.

---

381 Hasan 1W **{C4/4}**.

382 Later Audit Packs for 2004 - 2008 were obtained from El Ayouty following the Order from this Court requiring AHAB to request them.

383 **{C4/4/8}**

491. I agree with the Defendants that the compelling and reasonable inference to draw from Saud's List, is that he had indeed reviewed and understood the Audit Packs "*over a number of years*", in order to produce the list.[384]

492. There is further clear and compelling evidence of Saud's involvement with El Ayouty and of his knowledge of the Audit Packs.

493. On 17 April 2001, Al Sanea wrote to Saud.[385] The letter deals with the preparation of 6 months of Money Exchange accounts which Saud had proposed should be obtained from El Ayouty to be given to SAMA (defined in the letter as "the Agency"). In his letter, Al Sanea suggested:

> *"Concerning our proposed letter to Mr. Salah Al Ayouti, we request to postpone it pending completion of the financial statements on 31/12/2000, and separation of the exchange from investment and preparation of its statements and establishing exchange division separately from the investment and finance division.*
>
> *We will issue the balance sheet on 31/6/2000 through KPMG or one of the big five, as requested by the Agency."*

494. Al Sanea's letter thus appears to have assumed that Saud knew about the accounting structure of the Money Exchange and about the existence of the Finance Division in particular. The letter addresses the need to have El Ayouty prepare the financial statements for SAMA's consumption, to reflect the separation of the Divisions of the Money Exchange but proposes that KPMG would issue the balance sheet, presumably to provide an impression of independent audit oversight over and above what SAMA might have been prepare to attribute to El Ayouty (presumably because of their longstanding

384 The Defendants' written Closing Submissions **{E1/14/36}**.
385 **{N/277}**; **{N/276}**, the English translation mistakenly dated 17 April 2011.

relationship with AHAB which would have been well known in commercial circles in Saudi Arabia).

495. Saud's response which he wrote in manuscript on Al Sanea's letter of 17 April 2001[386] was as follows:

> "*Brother Abu Saad*
>
> * ***We can not do that because we appointed Al Ayouti to perform that****;*
>
> * *The said comments are easy to deal with and easy to amend;*
>
> * *We have to start the arrangements because this will be in the public interest- as delay will have several impacts that would be difficult to control in the future*
>
> * *Separation of the two divisions will be easier if we reduced the comments and accelerated submission to the Agency*
>
> * ***The financial statements for the last 5 years have the same comments****."* (emphasis added).

496. Significantly, Saud pointedly did not ask "*what is the Finance Division*?" Rather, Saud displayed familiarity with the Finance Division and the need for its separation for the purposes of the presentation to SAMA.

497. From his manuscript, it can also be seen that Saud had clearly read and taken the time to analyse a number of Audit Packs from El Ayouty which, as they must have been within AHAB's possession when he did so, should have been, but have never been disclosed:

386 **{N/277}**; **{N/276}**.

(1) "*Financial statements for the last 5 years have the same comments*" must be a reference to El Ayouty Audit Packs in which (as we have seen) they made regular annual criticisms of the Money Exchange;

(2) He cannot have meant the Audit Reports attached to the accounts because these did not contain any such comments;

(3) The "*same comments*" may well have been a reference to the list of 17 in Saud's List[387] just discussed above and other telling criticisms from El Ayouty (also discussed above) *"which have been repeated over the years in the balance sheets"*.

498. In April 2001, "*5 Years*" of reports must have meant that Saud had reviewed Audit Packs between 1995 or 1996 and 2000. This is exactly what Saud would have been expected to do when his father had been taken ill. Saud had evidently had little involvement before his father's stroke. But after that trying event, one would have expected him to seek to rise to the occasion. He would have familiarized himself with this most difficult of projects run by Abdulaziz – the Money Exchange. And it is to be remembered that Omar Saad testified to having given Saud the relevant files from Abdulaziz's safe which contained El Ayouty's annual reports.

499. Only the 1996 Audit Pack was disclosed by AHAB. None of the documents which Saud actually reviewed were disclosed and all such evidence was omitted from Saud's witness statements to comport with his story of having had no involvement with the Money Exchange. Nevertheless, given the contents of this letter to Al Sanea and the clear

---

387 **{G/2430.1/1}**; **{G/2430.2/1}**.

evidence of suppression of documents by AHAB, especially the Audit Packs, it is an inescapable inference that, by April 2001, Saud was fully conversant with the El Ayouty Audit Packs and Reports, with the comments or criticisms they contained and that his evidence to the contrary was dishonest.

500. Saud's response also demonstrates that he had no difficulty conversing with Al Sanea about the financial statements of the Money Exchange and that he felt able to converse directly with El Ayouty about them. Saud responded "*we appointed Al Ayouti to perform that*", suggesting on his part, both a strong involvement with the Money Exchange and that he was in contact with El Ayouty (though that correspondence also has not been disclosed).

<u>El Ayouty reporting to Saud more than to Suleiman after Abdulaziz's time</u>

501. It is apparent from the evidence of Omar Saad (himself a longstanding and trusted member of AHAB's accounts department) and of Mr. Fakhri (another equally longstanding and trusted AHAB's senior employee), that AHAB kept meticulous records and had a well-established chain of reporting. Their evidence points clearly to a system whereby operational, as well as financial reports, were regularly provided to Abdulaziz, Suleiman and Saud.

502. Badr was responsible for operational reporting relating to the Money Exchange. This is apparent from the documentary evidence. But apart from a very late witness statement designed to reinforce the "New for Old" case produced after all the witnesses had been

cross-examined, AHAB did not call Badr to testify in person nor explain by persuasive evidence why he was not called.[388]

503. Mr. Fakhri's and Omar Saad's evidence as to the reporting practices is therefore the only credible evidence as to what happened in that regard. In the absence of any evidence to suggest otherwise, it is the natural inference that Badr adopted a similar practice to that described by Naim Fakhri in cross-examination:[389]

> *"Q. You would report straight away the results to the owners when you got them?*
>
> *A. Yes. But ...*
>
> *Q. When you say "the owners", the reports were given, you say in your statement, to the chairman, the successive chairmen of AHAB, and the managing director?*
>
> *A. Especially to Sheikh Abdulaziz and Mr Hindi. Sheikh Abdulaziz, he was the chairman and Mr Hindi was the deputy chairman.*
>
> *Q But later on you say that when you received the reports you gave them to, first of all -- after Abdulaziz had his stroke, then you started giving them to Suleiman and to Saud. Is that correct?*
>
> *A. That's correct. That's correct.*
>
> *Q They were obviously the owners to whom you had to report these things, weren't they?*
>
> *A. Yes."*

504. It stands to reason that Badr would originally have reported to Abdulaziz (as Chairman) and thereafter to Suleiman and Saud on operational matters pertaining to the Money

---

388 Mr. Charlton's evidence of agents tracking Badr down in Egypt does not explain why steps had not been taken to obtain a witness statement from him in 2009 while he was still working at AHAB. According to Saud at **paragraph 31** of his supplementary witness statement filed in the London proceedings, **{L1/7/9}** Badr had remained with AHAB until he resigned in 2010 "*in the course of our enquiries into Mr. Al Sanea's fraud and whilst under suspicion that he had been involved in the fraud and remained in communication with Mr. Al Sanea.*"

389 **{Day87/75:3-19}**.

Exchange. It is clear that Badr maintained several files for the Money Exchange and, on AHAB's case, acted as go-between for Suleiman and Al Sanea (as indeed might be expected of him given that AHAB placed him in the position of supervising the operations of the Money Exchange alongside Mr. Fakhri).

505. Omar Saad's evidence[390] was that El Ayouty would report the financial results and audit to Abdulaziz. Their report would be in the form of balance sheets together with a covering explanatory letter (in other words the format of the Audit Packs). Those reports were provided to Abdulaziz during his lifetime:

> *"Q. ...the process of finalising the accounts. You said yesterday that El Ayouty would send the accounts once they were finalised with a letter to Abdulaziz before he signed them. Do you remember that?*
>
> *A. A draft of the balance sheet.*
>
> *Q. Exactly, with the letter. You told us yesterday.*
>
> *A. There must be a letter.*
>
> *Q. Do you remember whether this was delivered by hand or by post?*
>
> *A. By hand. He used to bring it by himself and go to Sheikh Abdulaziz's office and deliver it to him.*
>
> *Q. Who is "he", Saleh El Ayouty?*
>
> *A. Yes, Saleh.*
>
> *Q. So, after Abdulaziz –*
>
> *A. No, it was Rajab. First it was Saleh and after him it was Rajab."*

[390] **{Day89/3:10-25}**

506. Omar Saad, having explained how Abdulaziz had veted drafts of the accounts and then signed them, was asked what happened after Abdulaziz had his stroke:[391]

> *"Q. Presumably, after Abdulaziz had his stroke and was no longer working, Rajab did the same exercise with Suleiman?*
>
> *A. With Saud.*
>
> *Q. So Saud became the person who was involved in the processing of the accounts; is that correct?*
>
> *A. Yes".*

He developed this explanation in more detail:[392]

> *"Q. Right at the beginning of the process, Saud is given copies of the trial balances. That's what happens, is it?*
>
> *A. Yes, after the death of his father, the trial balances were submitted to him, to Saud.*
>
> *Q. Before the death of his father, were they submitted to Abdulaziz?*
>
> *A. Yes, yes.*
>
> *Q. Do you know whether after Abdulaziz passed away, Saud was involved in the rest of the correspondence and the dealings with El Ayouty to finalise the audit?*
>
> *A. More than Suleiman.*
>
> *Q. He was more involved than Suleiman?*
>
> *A. He has an accounting background more than Suleiman".*

507. Quite apart from this exchange in cross-examination, when correctly translated, Omar Saad had in fact said at paragraph 12 of his witness statement,[393] in the first sentence that,

---

391 **{Day 89/5:16-22}**
392 **{Day89/6:20} -{Day89/7:8}.**

for the preparation of the Audit Reports, he provided trial balances to El Ayouty and Saud. I regret to have to note, that in the English version of his statement the reference to Saud had been omitted,[394] without any admissible explanation.[395]

508. Omar Saad also confirmed[396] that it was Saud who reviewed documents sent by the accountants and Saud who procured Suleiman's signature on those documents.

509. Omar Saad's evidence also shows that Saud took over dealing with El Ayouty after Abdulaziz had his stroke, both for AHAB H.O. and the Money Exchange. Omar Saad said in cross-examination that such contact was "*common*" and that he would bring El Ayouty documents to Saud's villa on Saud's request:[397]

> *"Q. But you do remember being in Saud's villa after the trouble started and bringing El Ayouty to his villa? That you do remember; you have told us that.*
>
> *A. Saud used to ask me to bring El Ayouty with me.*
>
> *Q. Do you remember that Saud asked you to bring El Ayouty to his villa after the trouble started? On a Friday, so it was an unusual day to bring them.*
>
> *A. It was common at any time, he can ask me to bring El Ayouty. Even in the ordinary days.*
>
> *…*
>
> *MR. LOWE:*
>
> *Q. A moment ago you said it was common to bring El Ayouty to Saud's villa. That was throughout the time when Saud was general manager, was it?*
>
> *A. Yes, after the death of his father, if he wants to ask about anything, he can do it, the same as now.*
>
> *Q. So, on those occasions, you would bring El Ayouty, if he wanted them, to his villa; is that correct?*

---

393 **{C1/11/4}**- the Arabic original.

394 **{C1/11/13}** - the English translation.

395 This is of particular concern given that, as Mr. Hayley confirmed in cross-examination, a similar piece of evidence was also excluded from the final paragraph of his witness statement in which he relays his conversation at a meeting with El Ayouty about their reporting to the AHAB Partners. See **{C1/9/64-65}** and **{Day21/177:19} - {Day/21/179:25}**.

396 **{Day89/7:17} - {Day89/8:7}**.

397 **{Day91/20:15} – {Day91/21:18}**.

*A. Yes."*

510. Similarly, Saud had Salah El Ayouty on speed dial.[398]

511. It therefore stands to reason and I accept that this is yet further evidence that Audit Packs from El Ayouty (setting out the detailed financial position of the Money Exchange as the business with AHAB's largest liability and which it is common ground were sent to Abdulaziz) must have gone to Saud after his father's stroke.[399]

**<u>Contrasting Saud's Inconsistent Evidence</u>**

512. Saud's evidence as to his lack of knowledge of Al Sanea's indebtedness and the borrowing of the Money Exchange has been presented by AHAB as critical to their claim. That evidence, however, I am compelled to find, was plainly untrue. In fact it has been a picture of inconsistency throughout the litigation both here and in London.

<u>The Evidence in London</u>

513. Prior to the discovery of the N Files, Saud claimed to have known little to nothing of the borrowing of the Money Exchange or of Al Sanea's indebtedness.

514. At paragraphs 55 and 56 of Saud London 2W[400] this is what he stated:

> "*55. I now know that a few months before my father suffered his stroke, my cousin Yousef learned from Salah El Ayouty that Mr. Al Sanea had borrowed approximately SAR 2.3 billion from the Money Exchange, that Yousef wrote to my father about this to express his concern, and that my father subsequently acknowledged the debt and said that he would guarantee it and had taken security for it.*
>
> *56. I was not aware of any of these exchanges at that time, but I did hear (I cannot now remember who from) that Mr. Al Sanea had borrowed from the Money Exchange. **I never knew the amount of the borrowing**, but I recall a conversation with Mr. Al Sanea at*

398 See Saud's mobile phone record: **{X4/3/2}** and Saud in Cross-Examination: **{Day61/93:10-19}**.
399 Indeed, this is what El Ayouty told Mr Hayley **{Day21/176:15} - {Day21/180/1}**.
400 **{L1/6/15}**.

> *about this time in which he acknowledged that he had borrowings from the Money Exchange and said that he would repay the money "soon". Shortly after wards, Sana'a*[401] *came to see me and told me that there would be a delay before the money could be repaid. Mr. Al Sanea subsequently told me (as I recall, some time before my father died) that he had repaid this borrowing"* (Emphasis added.)

515. He then repeated the assertion of lack of knowledge at paragraphs 94 and 20, respectively of Saud London 3W[402] in which he stated:

> "*I have no recollection of ever knowing the amount of Mr. Al Sanea's borrowing.*"
>
> "*…I also became aware in about the early 2000s of concerns about Mr. Al Sanea's borrowing from the Money Exchange but I understood this to have been dealt with by the time of my father's death.*"

516. Thus, in the London Proceedings, Saud's firm recollection was that at no stage had he known how much Al Sanea's indebtedness was.

517. This evidence was abandoned after the discovery of the N Files. There were a number of incriminating documents in the N Files but none more so than Saud's Calculations in his own handwriting which exposed his denial of knowledge as an obvious falsehood. In particular, as they reveal[403] Saud's Calculations demonstrated that he knew, in 2002,[404] that:

(1) The borrowing of the Money Exchange was SAR 7.8bn; and,

(2) Mr. Al Sanea's gross indebtedness was SAR 4.128bn (with a net indebtedness of SAR 3.368bn).

---

401 Saud Algosaibi's sister, Al Sanea's wife and a Partner in AHAB in her own right following Abdulaziz's death.

402 **{L1/7/24}**; **{L1/7/6}**.

403 See Attachment 8 to the 2001 Audit Pack **{N/783/1}**

404 As explained above and set out below, it is apparent that this calculation was performed by reference to the Audit Pack for year-end 2001, and undertaken in 2002 sometime after June of that year.

518. As already mentioned, so destructive was it of AHAB's case of lack of knowledge of the Money Exchange's borrowing and the Al Sanea indebtedness, that this document caused the collapse of AHAB's defence to the London Proceedings.

Evidence of Saud's knowledge of Al Sanea's Indebtedness: Saud's Calculations

519. Following the disclosure and translation of the N Files, Saud's original account was no longer sustainable and as already explained, AHAB's case changed and was eventually amended to plead as it now stands. Saud's explanation for his actions in relation to his calculations became that he had undertaken "*a project for Uncle Suleiman*".

520. Saud's repeated refrain was that, in general, he had no involvement with the Money Exchange. His only involvement was when he had been tasked by uncle Suleiman to carry out a specific investigation in "*about 2001 or 2002*" in order to deal with the SAMA merger edict.[405]

521. In the course of this task, Saud claims he had to establish what liabilities the Money Exchange had to lenders, Al Sanea's borrowing and the Money Exchange's share and land portfolios.[406]

522. In fact when one comes to look at the detail of Saud's involvement in the affairs of the Money Exchange (largely through the documents disclosed in the N Files), it is hard to escape the conclusion that, far from undertaking a discrete assignment, Saud's Calculations were simply a part of his ongoing engagement with the Money Exchange.

523. Nonetheless, in his witness statement in these proceedings,[407] Saud needed to explain the meaning of Saud's Calculations to comport with the newly pleaded case of limited

---

405 **{C1/2/57}**
406 See Saud 2A, **paragraph 42 {L1/8/12}**.

knowledge of the borrowings as revealed by the Calculations. Accordingly, he is shown to have altered his account to claim that he simply confused the currencies:[408]

> "*As to Mr. Al Sanea's borrowing from the Money Exchange, I must accept that at least in 2001/2002 I was aware of the amount, and that I believed it to be in the region of SAR 4 billion (gross), albeit that I subsequently forgot this (i.e. that the amount was somewhat in excess of US$ 1 billion, not SAR 1 billion)*."

524. It appears first from Saud's supplementary witness statement filed in the London Proceedings[409] that he claims to have learnt of the Al Sanea indebtedness standing at SAR 1bn in the course of dealing with the correspondence for SAMA in the context of the exchanges with Al Sanea about repayment as discussed above. But while he says he believes that this information was gleaned from documents from Mr. Fawzi's computer,[410] this provides no plausible explanation for confusing the amounts.

525. Saud's assertion as quoted last above, that he simply "*forgot*" that he had been aware of over SAR 4bn of indebtedness is also wholly implausible. His calculations were not mistaken. When related to documents from which they were sourced[411] they are shown to be exactly correct. Nor does Saud's explanation deal with the monumental bank borrowing figure in his calculation (SAR 7.8bn). If it were true that he remembered being told of SAR 1bn and that it had been "*dealt with by the time of my father's death*" (as per paragraph 20 of Saud's supplementary witness statement in the London Proceedings),[412] then his reaction in 2002 to the figures in Saud Calculations would have been one of

---

407 **{C1/2/58}**
408 **Ibid.** Saud 1W, **paragraph** 277.
409 **Paragraph 94 {L1/7/24}.**
410 In particular a draft letter from Saud to Al Sanea dated 4 April 2002 referring to the settlement of his liabilities to the Money Exchange **{N/326}; {N/327},** where the yet much smaller sum of SAR 400m is mentioned.
411 The Attachments 8 and 9 to the 2001 Audit pack.
412 **{L1/7/6}**

extreme alarm. There is no evidence that this happened. Rather, the calculations themselves reflect Saud's belief that the combined value of the share portfolio and of the Al Sanea indebtedness (seen as a receivable and regarded as collateralized or secured) provided a cushion over the gross indebtedness. This will be expanded upon below.

526. Saud's explanation becomes all the more implausible when one comes to examine his story about the repayment of Al Sanea's debt.

527. As mentioned above, at paragraphs 55- 56 of Saud London 2W,[413] Saud claimed that he had a conversation with Al Sanea about the repayment of his indebtedness such as to have assured Saud that the repayment had occurred "*some time before my father died*".

528. This explanation was, however, inconsistent with the draft letter found on Mr Fawzi's computer dated 4 April 2002[414] which referred to setting off SAR 400m of Al Sanea's indebtedness against his deposits (i.e "*carry* [ing] *out the necessary accounting entries*") within all Money Exchange and Investment accounts.

529. In order to try and overcome this inconsistency (having failed to mention the document in Saud London 2W), in Saud London 3W (paragraph 96),[415] Saud suggested that Al Sanea's assurance that he repaid his indebtedness must have been given after this letter was drafted. Accordingly, on Saud's evidence, this conversation must have taken place between 2nd April 2002 (the date of the draft letter) and May 2003 (the date of Abdulaziz's death).

---

413 From **{L1/6/15}**
414 See above:**{N/326}**;**{N/327}**.
415 **{L1/7:24-25}**

530. However, in his affirmation in these proceedings made in response to the N Files disclosure in September 2011, at paragraph 58[416] Saud simply stated that as he had been so assured by Al Sanea and Badr impliedly circa early 2003 that Al Sanea "*had made repayments*", his belief at this time was that the indebtedness was "*coming down*". Thus, he referred to Al Sanea having made "*repayments*" (plural) of his indebtedness (suggesting multiple payments having been made).

531. Saud then changed his account significantly in his first witness statement in these proceedings.[417] He now claimed that:

> "*Mr. Al Sanea subsequently told me (as I recall, sometime before my father died in 2003) that he had repaid his borrowing. I recall that Badr showed Suleiman a receipt to confirm that Mr. Al Sanea had paid money in to a Money Exchange account at SAMBA, repaying his debt. Uncle Suleiman then told Badr to take the receipt and show me, which he did*".

532. Gone was the reference to Sana'a having told Saud that there could be no repayment and the account of having been merely reassured by Al Sanea and separately by Badr, but in its place, Saud's patent invention of a story that Badr had shown him a "*receipt*" for the repayment.

533. Moreover, Saud's evidence on the receipt changed again when challenged in cross-examination:[418]

> *A.* *"If Maan repaid, yani, it would be -- I don't -- yani, he showed me -- he had a paper in his hand, I don't know what it was exactly, it looked like a receipt or something, huh, and he said, you know, that Maan repaid and this, so I -- later I went to uncle and he*

416 **{L1/8/17}**
417 Saud 1 W, **paragraph 278{C1/2/58/}.**
418 **{Day65/35:16-23}**

> *confirmed it. And this is what I -- I summarised earlier in the first half, when I was asked, I -- I did a small summary of all of this".*

534. So here it was suggested that Badr showed Saud "*a receipt or something*" but then told Saud that Al Sanea had repaid his indebtedness which Saud then confirmed directly with his uncle (an allegation that had never been mentioned before).

535. Inexplicably, this receipt:

   (i) was never mentioned in any previous witness statement by Saud (or by anyone else for that matter);

   (ii) is not mentioned by Badr in his statement; indeed, Badr's Witness Statement does not refer to the alleged repayment by Al Sanea of his debt at all;

   (iii) was never mentioned by AHAB in its pleadings or any other document; and

   (iv) has not been disclosed to the Defendants, nor has any explanation or purported explanation been given for its non-disclosure.

536. In such circumstances it is obvious to my mind, that the reason the receipt has never been mentioned or produced is that it never existed. Had it ever existed, it is inconceivable that a document of such importance to AHAB's case, and one, being a SAMBA receipt, presumably so capable of being obtained from SAMBA records, has not been produced.

537. Equally, it was also at this juncture that Saud first mentioned the fact (which, again, had never been mentioned before in his witness statements or affidavits) that Suleiman told him that Al Sanea had repaid his debts.

538. However, he was unable to provide any detail as to when this conversation took place:[419]

> *"Q. Can you recall when it was that he told you that Maan had repaid his debt?*
>
> *A. After -- after that time period, maybe it was 2002/2003, something like this. That's my recollection. Because there was a big discussion regarding Maan -- I mean, my uncle wanted to get Maan debt down, and he asked me to go and -- and, yani, I did go to Maan and -- and talk about it. Huh? And there was a deal to pay some amount of money, and my understanding that not only that, that he paid it all according to my uncle, and according to Maan later, which basically confirmed what my uncle told me. Er, er –*
>
> *CHIEF JUSTICE:*
> *Q. This, you say, you were told by your uncle in 2002/2003?*
>
> *A. I don't remember the time period, my Lord, at which that happened, yani, now -- but I remembered at some point, yani, after my father's stroke, as we -- it was around that period when my father was ill, er, er, after he passed away, that time period…".*

539. These garbled and incoherent responses on the witness stand are incapable of belief. They are rejected.

Saud's Changing Evidence on the borrowing of the Money Exchange

540. Following the disclosure of Saud's Calculations, Saud's account of his knowledge of the borrowing of the Money Exchange also underwent a radical transformation.

541. At paragraph 64 of Saud London 2W,[420] Saud stated that he had "*learned from my father*" in the late 1990s or in 2000 that the borrowing of the Money Exchange was in the region of SAR 1bn (and that this was the case as late as 2004 or possibly 2005, per paragraph 66). He understood that this was *"long term borrowing successively renewed"*

---

419 **{Day65/18:13} – {Day65/19:6}**
420 See **{L1/6/17}** and also **paragraphs 26 and 27** of Saud 1A**{L1/4/6}**.

and largely associated with funding the acquisition of the share portfolio. This was obviously untrue.[421]

542. Saud was completely unable to explain why he had got the figure for borrowing so badly wrong:

(i) At paragraph 276 to 281 of Saud 1W in these Proceedings,[422] Saud gives a garbled and implausible justification for his understanding of Al Sanea's indebtedness and the extent of the Money Exchange borrowing asserting his "*mistaken recollection of something I heard my father say,*"[423] but significantly provides no explanation whatsoever of his inability to recall his knowledge as revealed by his Calculations of SAR 7.8bn of borrowing by the Money Exchange.

(ii) After marked hesitancy and what might fairly be described as some prompting from his counsel[424] Saud appeared to suggest that this error may also have been as a result of his having confused currencies - dollars for riyals - and having assumed it was a "*net*" figure after taking account of Al Sanea's alleged repayments. However, even if this was true (which I do not accept), it would not explain his error, as US$1bn would convert to SAR 3.75bn, i.e. less than half the bank indebtedness of SAR 7.8bn that Saud had noted in his Calculations. Nor why in the first place, he could ever have forgotten the much larger amount of borrowing.

---

421 In addition to Saud's Calculations, in 2002 showing borrowing of SAR 7.8bn, Saud had signed documents noting that the borrowing from SAMBA alone was SAR 1bn. See in this regard, Saud 1A, **paragraphs 65-66{L1/617}**.

422 **{C1/2/58-59}**

423 A reference to his account first given of this conversation at Saud 1A, **paragraph 26 {L1/4/6}.**

424 **{Day58/58:11}**

His own discomfort at being confronted with the inherent implausibility was revealed in further cross – examination:[425]

> *"Q. Back to {L1/8/13}. What I am suggesting to you Mr Algosaibi, is that when you did these calculations in 2001 and 2002, it can't have been a great shock to you to have seen the figure of SAR 7.8 billion indebtedness, otherwise you would have remembered it and put it in your very first statement to this court. Do you agree? 1. A. I -- I don't know what you're talking about. Huh? Shock, not shock? This is -- yani, emotions. You are talking about do I know my emotions yesterday. Do you [remember] your emotion yesterday? Was I upset yesterday, angry, hungry? Huh? You are describing emotional state, not something that some people would remember.*
>
> *CHIEF JUSTICE:*
> *Q. Are you suggesting that rather than having relied on what he said was his recollection of what his father had told him, he would have put then what he had seen by reference to his calculations?*
>
> *MR. SMITH: My Lord, that is exactly right. What I'm suggesting is that had the figure of SAR 7.8 billion been a great shock to him, he would have remembered. I'm suggesting that because he says he didn't remember, it wasn't a great shock.*
>
> *CHIEF JUSTICE:*
> *Q. Do you follow, Mr Algosaibi?*
>
> *A. Yes. I disagree with his assertion, my Lord".*

543. In reality, Saud's suggestion that Abdulaziz had told him that the debt was either US$1bn or SAR 1bn must be untrue:

(i) Again, had this been a genuine belief at any time, the figures given to him in 2002 and recorded in his handwriting in his Calculations as SAR 4.128bn, would have come as quite a shock and his reaction to them would have been one of alarm. There is no evidence of such a reaction. Rather, on his own account, he merely

---

[425] **{Day58/64:21} -{Day58/65:17}.**

relayed the information to his uncle Suleiman who he claims had charged him with the task of simply ascertaining the figures.

(ii) Neither US$1bn nor SAR 1bn accords with or reconciles to any actual figure. Al Sanea's gross debt of SAR4.128bn greatly exceeded the purported borrowing figure; this would mean that if he was to repay as Saud claimed to have expected, that situation would have left the Money Exchange with hundreds of millions of dollars of surplus liquidity. That never happened and so there was no factual context for Saud's purported belief that the debt had been repaid.

(iii) Abdulaziz would never have given SAR 1bn or US$1bn as a net figure (i.e. taking into account a proposed repayment by Al Sanea). He knew that Al Sanea had not repaid his indebtedness and as the exchanges with El Ayouty revealed, would not do so because it was guaranteed and was secured in large part, at least, by the share portfolio.

544. The suggestion that Saud simply forgot an extra SAR 6.8bn (or even taking the debt as US$1bn instead of SAR1bn, an extra SAR 4.1bn) of borrowing for which he and his family were personally liable cannot be believed. These figures demonstrated that the finances of the Money Exchange had become an existential crisis for AHAB (which is presumably why Saud's Calculations were made):

(1) For the year-end 2001, AHAB's total assets were SAR 2.174bn,[426] thus even from Saud's Calculations:

[426] **{F/108/4}** – the AHAB Audit Report for 2001, the balance sheet at page 2.

(i) Al Sanea's net debt (of SAR 3.368bn) was more than one and a half times AHAB's net assets;

(ii) His gross debt was twice AHAB's net assets;

(iii) The borrowings of the Money Exchange at SAR7.8bn, were more than three and a half times AHAB's net assets.

545. Therefore, it must have been apparent to Saud that if the Money Exchange had been consolidated with AHAB H.O., the financial statements would have shown AHAB to be insolvent, even if Al Sanea paid his debt.

546. Even by the end of 2008, AHAB's assets were a mere SAR 5.066 bn,[427] a figure which was dwarfed by the borrowings of the Money Exchange alone which, as revealed in Attachment 8 to the 2008 Audit Pack,[428] then stood at SAR33.506bn.

547. Moreover, Saud was able to provide no explanation as to why AHAB initially sought to deny knowledge of all of the borrowing, seeking instead to blame his lawyers:[429]

> *"Q. What I was asking you about, Mr Algosaibi, is why it is that in the original claim it was possible to assert that the borrowing was all unauthorised and that the qualification that only portions were authorised and other portions unauthorised was made later. Surely this is something that you have known all along and have told your investigation team?*
>
> *A. Why did this or that? I don't know, I -- you know.* ***They did -- you know, they are lawyers, you know? They are writing the case; that's their job.*** *And my – my role here is when you ask me a question, I respond to that as -- as best as I can. And, you know, I – and I was sworn by the Koran for that. Now you ask me what other people, er -- what other people wrote and why they wrote this or they did not write this. You ask them*".

---

427 **{F/268/4}** – AHAB Audit Report for 2008, the balance sheet at page 1.
428 **{F/260/72}**
429 **{Day58/69:8-22}**

(Emphasis added.)

548. The conclusion to which I am driven is that Saud had lied about his knowledge of the borrowings and the Al Sanea indebtedness: (a) in his statement in the London Proceedings in order to present a false impression of the state of his knowledge of the Money Exchange's indebtedness; and (b) in his witness statements and evidence in this Court in attempting to explain his evidence in the London proceedings and especially, the crucial revelations of Saud's Calculations.

Saud's relationship with Al Sanea

549. Despite having disclaimed in his early witness statements any hostility between them,[430] Saud went to great pains, throughout his testimony, to demonstrate that he did not have a good relationship with Al Sanea. In particular, Saud mentioned during cross-examination,[431] that not only Yousef but that he too had had an ongoing feud with Al Sanea during Abdulaziz's time, relating to the building of a house and Al Sanea's failure to provide the money:

> *"Q. Just to be clear, can you explain what were the feuds that you were referring to in your answer?*
>
> *A. When Maan Al Sanea had, er, problems, issues with my cousins, er, er, Yousef mainly, and, er, when I was in -- around the time when I was in the States, and Khaled, they had issues between them. Myself, I had another problem with Maan regarding some, the house, my house, which I was supposed to build by -- my father at the time sold this property -- my father told me that he sold it to Maan and that I would get the money to build the house and Maan never gave me the money, and my uncle knew that. So there are -- I didn't feel at ease with Maan and I tried to stay away from him. So -- to avoid touch-ups."*

430 See for instance Saud London 2W, **paragraph 50 {L/614}**.
431 **{Day67/13:24} -{Day67/14:19}**.

> *Q.* *Over what period were those feuds continuing? Were they ` resolved or did they continue?*
>
> *A.* *Er, er, mine was during my father's time, of course. And I think -- it continued on. I just tried to stay away from -- I mean from Maan. He's -- I didn't -- yani, his character is not like ours, er, er, he's different. So I -- I just try to stay away from him".*

550. Thus Saud's evidence, much like that of Yousef and that relating to Suleiman, was that he did not trust Al Sanea. Accepting this at face value despite Saud's earlier expressed indifference towards Al Sanea, again, it is implausible therefore that Saud would have allowed Al Sanea to run up billions of riyals of borrowing without any supervision. I am compelled to treat the central implications of AHAB's case to the contrary as implausible.

**SAUD'S KNOWLEDGE – OCTOBER 2000 TO APRIL 2003**

551. Following Abdulaziz's stroke on 30 September 2000, Saud took over the supervision of AHAB's interest in the Money Exchange on behalf of the Partners.

552. While, as touched upon above in relation to the Audit Packs and various items of correspondence, it is clear that important documents have not been disclosed by AHAB, a much fuller analysis in this failure of discovery on AHAB's part is set out at Section **{E1/7}** of the Defendants' Written Submissions.[432] Although I accept that analysis, the result is that while many of the documents relating to AHAB's supervision and Saud's role in particular have been removed and lost/concealed, a number of important pieces of paper survived. I am convinced that when properly understood, these pieces of paper (such as the 2002 manuscript calculations and the correspondence examined above which mentions his review of successive Audit Packs and discuss Saud's List) demonstrate, in and of themselves, that Saud was as fully aware of Al Sanea's activities and the borrowing of the Money Exchange, as he needed to have become, in order to have intervened to put an end to those activities. Saud's and AHAB's failure to intervene lead to the unavoidable conclusion that they connived in Al Sanea's continued use of the Money Exchange to obtain fraudulent lending from the banks.

553. Saud's Calculations warrant their own further detailed consideration and I continue with this next below. However, when the other material from this period – that time when Abdulaziz was in hospital – is assembled together, (albeit materially incomplete), it

---

[432] **{E1/7}**

paints a compelling picture of Saud's detailed knowledge of the critical figures and the financial position of the Money Exchange.

Saud's attempts to address Al Sanea's Indebtedness

554. Following Abdulaziz's stroke, Saud attempted to address Al Sanea's indebtedness. The way in which he did so demonstrates (as do Saud's Calculations) that Saud clearly knew and understood what that debt was. Accurate information about that debt could only have come from El Ayouty by way of the Audit Packs.

Agreement to net off SAR 450m or SAR 400m.

555. Saud's List dated April 2001[433] noted that one of the matters that needed to be resolved was the identification and resolution of Al Sanea's accounts (which, as set out extensively above, were the subject of repeated comment by El Ayouty).[434]

556. At that stage the first step was obviously to establish and then net off Al Sanea's debits and credits and then to work out how to deal with the balance. This was an important matter to resolve because, as El Ayouty had warned, Al Sanea was earning high interest on his deposits but not, it seems, paying much interest on his debt. Accordingly, even the process of netting off debits and credits was to prove challenging.

557. A draft board minute dated 14 May 2001 was therefore prepared numbered R/77.[435] The minute would read that it was resolved "*after reaching mutual consent*". The initial plan

---

433 See above and **{N/292}**; **{N/293}**.

434 Saud continued to work on the list. A further list appears to have been prepared by Saud at **{H28/37/1}** **{H28/36/1}** (found at the Money Exchange) which crucially removed the reference to specifying Al Sanea's accounts and added in a requirement at item 4 that Al Sanea "*classify and separate the facilities pertaining to Exchange from the facilities pertaining to Finance and Investment*", an item clearly relevant to the plan of separating the Exchange Division for meeting the requirements of the merger proposed by SAMA. This list headed "*Maan 12*" includes administrative directives such as at item 19, "*Work on reducing general and administrative expenses and staff-related expenses;*" suggesting close involvement by Saud in the oversight of the Money Exchange.

435 **{N/202}**; **{N/203}**; **{G/2457/1}** **{G2455/1}**.

was that Al Sanea would "repay" SAR 450m by the end of the year in order to pay down some local bank debt:

> *"(1) The balances of Mr. Maan Abdulwahed Al Sanea and his companies shown on the records of the Exchange as on 31/5/2001 shall be lowered by decreasing his credit balance by 450 million riyals or its equivalent in foreign currency before the end of the year.*
>
> *(2) These amounts will be settled on a monthly basis giving priority to local banks then to foreign banks including Bahrain branch.*
>
> *(3) These amounts will be deducted from the credit balances of Mr. Al Sanea entered in the records of the Exchange and **the facilities provided to the Exchange from local banks will be transferred to the name of "Ahmad Hamad Algosaibi and Bros. - Head Office"** once they are settled.*" (Emphasis added.)

558. Some form of negotiation between either Saud and/or Suleiman on the one hand and Al Sanea on the other, must have taken place. A subsequent version of the same minute (again headed R/77 and dated 14 May 2001)[436] provided for a reduction in the debt of SAR 400m (rather than SAR 450m) and was signed by Al Sanea and by Suleiman.

559. It is important to note that the mechanism for the reduction in Al Sanea's balances was not a cash repayment. Instead the balances were to be reduced by netting off his liabilities against amounts due to him, i.e.: "*by reducing his receivable balances by an amount of 400 million ... rials*". There was thus to be a reduction both ways in his loans and deposits accounts.

560. Equally, it is important that the third resolution referred to AHAB H.O. agreeing to take over the remaining local bank debt. It must follow from this agreement that Suleiman and Saud knew that there was a relevant distinction between local bank debt and non-local,

---

436 **{G/2460} {G/2458}**.

i.e. foreign bank debt and presumably had some understanding of what the local and non-local banks debts were. I note in this context, the reference in resolution 2 to borrowings through the Bahrain branch. None of this can be consistent either with ignorance of the Bahraini Financial Businesses or with the "New for Old" policy then being in place and insisted upon by Suleiman for the containment of borrowing.

561. The Money Exchange's local bank debt, as Suleiman and Saud must have known, was particularly significant to AHAB. Because local banks had access to SAMA's borrowing and lending statistics for each bank and its customers, they would take the Money Exchange's local debt into consideration in deciding what facilities to make available to AHAB. Thus the Money Exchange's local debt affected AHAB's ability to borrow. This was, as Saud had earlier acknowledged in his exchanges with Al Sanea, the reason for AHAB not wanting to borrow more from local banks to fund further share acquisitions.[437]

<u>Further attempt to quantify Al Sanea's indebtedness</u>

562. These discussions and the attempt to quantify Al Sanea's accounts, at least in the context of meeting the SAMA requirements for merger, seem to have continued. Thus a letter from El Ayouty to Al Sanea dated 20 June 2001[438] referred to a meeting of 18 June 2001, Al Sanea's request to see the audited financial position of the Money Exchange as at 30 June 2001 and, significantly:

> "*...the letter delivered to us from Mr. Saud Abdulaziz AlGosaibi on 13 June 2001 regarding the matter previously referenced (attached is a copy thereof)*".

---

[437] **{N/675}; {N/676}.**
[438] **{G/2497.3}; {G/2497.4}.**

563. Regrettably, no copy of that letter from Saud was disclosed by AHAB. Nor has any explanation been given for its non-disclosure.

564. Nevertheless, it is clear from El Ayouty's letter that Saud had written to them to try to ascertain the financial position of the Money Exchange. Not only does such communication contradict Saud's evidence that he rarely contacted El Ayouty, it also demonstrates that Saud was active in seeking, independently of Al Sanea, to verify the position of the Money Exchange.

565. AHAB has also failed to disclose El Ayouty's response to Saud. The most likely scenario, given Saud's request, is that they provided him with the information that he requested.

566. Saud's knowledge of Al Sanea's gross and net indebtedness is evident also from discussions which took place a full two months before the audited accounts for year end 2001 from which Saud must have obtained the figures for his Calculations later in 2002.

567. Saud's involvement before year end 2001 is revealed from Suleiman's writing to Al Sanea on 16 October 2001[439] stating:

> "*I write with reference to the resolution of the Board of Directors concerning the drawing-up of the Money Exchange and Investment accounts as of 30/06/2001.* ***After consultation with Ibn Saud****, I would like you to submit a statement to Messrs Ayouty & Co. setting out and clarifying your accounts. Please find attached herewith a draft version of a resolution of the Board of Directors concerning the regulation of the relationship between Money Exchange and Finance and the branches, and the withdrawals and deposits of the partners*." (eEmphasis added.)

568. No resolution appears to have been signed.

---

439 **{G/2592.1}**; **{G/2592.2}**.

Saud tries in 2002 to deal with failure to reduce Al Sanea's balances by netting off in 2001

569. By 2002, Saud must have realised that the netting off of Al Sanea's balances had not occurred. Saud drafted a letter dated 4 April 2002 to Al Sanea on this issue (that which is already mentioned above). Saud could not remember whether it was ever finalised or sent; however, the terms of the letter are clear. And so is the tone – Saud is obviously exercising a supervisory accounting role, not the casual or passing intervenor of the kind he said he occasionally exercised at Suleiman's request. A number of working drafts of this letter appear in the Trial Bundle which, at the very least, show Saud's thought process at the time.

570. An early draft appears dated 4 April 2002[440] in which Saud stated that "*I have previously discussed the issue of your personal accounts and we had agreed to settle these accounts on 30th June 2002"* and asked Al Sanea to sign *"the enclosed board of director's resolution to carry out the necessary accounting entries"* to settle the accounts by 30 June 2002.

571. This version was superseded by a further draft[441] which removed the date of 30 June 2002 and instead stated that "*A decision was signed for you to settle the amount of SAR 400 million before 31/12/2001 however, payment has not been made as of this date but we hope you will fulfill your promise soon*" and asked Al Sanea to sign the enclosed Board of Directors' Resolution.

440 **{N/316}; {N/317}.**
441 **{N/326}; {N/327}.**

572. The accompanying draft resolution No. 91 dated 4 April 2002[442] provided that "*1. Closure of the debit and credit balances of Mr. Maan Abdulwahid Al Sanea and his companies at (the Money Exchange) so that their deposits will be used to close their loans and any residual balance will be shown. 2. A 6% interest rate will be applied to the residual balance.*"

573. The significance of this draft is that it was obvious from the foregoing that by April 2002:

(1) Saud was fully aware that Al Sanea had previously agreed only to settle SAR 400m of his indebtedness (with the suggestion of setting off liabilities against outstanding credits); and

(2) Saud was fully aware that Al Sanea had not made that adjustment or repayment, i.e. that his indebtedness had not reduced.

574. As will be further explored below, the only way that Saud could have known the state of Al Sanea's indebtedness and that he had not repaid SAR 400m as promised the year before, was by looking at an Attachment 9 or by asking El Ayouty. Indeed, given that El Ayouty completed its 2001 audit of the Money Exchange at the end of April 2002,[443] it is most likely that El Ayouty had provided Saud with a copy of Attachment 9 of an Audit Pack although that for 2001 has never been disclosed.

575. While Saud initially claimed not to remember where he had learned this information,[444] he seemed to agree that it was likely to have come from El Ayouty.[445] It could not really have come from anywhere else and, as his correspondence in April 2001 demonstrated

---

442 **{G/2817}; {G/2818/1}.**
443 El Ayouty's Report to the Partners, sent under cover of their letter dated 25 April 2002**{F/109}**; **{F/109.1}**.
444 **{Day65/71:11} - {Day65/72:8}**.
445 **{Day65/72:22} - {Day65/77:11}**.

(as revealed above), he had no difficulty in obtaining information about the Money Exchange from El Ayouty.

576. Moreover, it is significant that Saud was not proposing to ask Al Sanea to repay all of his indebtedness. He appears to have thought very carefully about how to go about obtaining repayment of a fraction; it is implausible therefore that Al Sanea would have told him a matter of months later that he had repaid all of his indebtedness, as Saud is shown above to have alleged.

577. Saud's Calculations carry yet further implications and significance for the outcome of this action. I will now turn to look at their fuller implications.

**<u>Saud's Calculations and the 2001 Audit Pack</u>**

578. Saud has been steadfast in his account of having only a vague recollection of his Calculations and of his reason for having undertaken them. His account is summarised in his first witness statement[446] as follows:

> "*In the course of Uncle Suleiman's attempts to get up to speed with the various and diverse businesses of AHAB, I believe that he asked me to look into the Money Exchange, which I (and, to my knowledge, he) had previously had almost nothing do with. I have no specific recollection of being asked to undertake this work, or of doing it, but the file in the N bundles labelled "File No: 2/03...Working Papers I Algosaibi Money Exchange" contains worksheets, some of which have my handwriting on them, which show that in about 2001 or 2002 I sought to establish what liabilities the Money Exchange had to lenders, what it was owed by Mr. AI Sanea and what assets it had in the form of land and shareholdings.*
>
> *I believe that I did this work at Uncle's request. He took over ultimate responsibility for the Money Exchange when my father suffered his stroke, and it was his practice at the time to rely on me to complete various projects for him during the relatively brief times that I was in Saudi*

446 Saud 1W, **paragraphs 273-274 {C1/2/57}**.

> *Arabia and not with my father during his two years in hospital in Texas following his stroke*".

579. Whatever one makes of Saud's assertion of only passing involvement, it is clear from his account here that this "*work at Uncle's request*" was intended to be an important exercise. Even on this account, Suleiman needed to be brought up to date on the financial affairs of the Money Exchange in the aftermath of Abdulaziz's stroke and Saud "*sought to establish what liabilities the Money Exchange had to lenders, what it was owed by Mr. Al Sanea and what assets it had in the form of land and shareholdings*".

580. AHAB's case is to the effect that notwithstanding the results of Saud's Calculations, the Partners remained disengaged from the affairs of the Money Exchange and apart from Suleiman's imposition of the *"*New for Old*"* policy, allowed Al Sanea free reign such that he was able, unknown to them, to continue to borrow and to defraud AHAB and the banks. The inherent implausibility of this proposition is exposed by a detailed examination of Saud's Calculations.

581. In his Calculations[447] Saud betrayed a precise knowledge of enormous bank debts of the Money Exchange and an astonishingly large debit balance receivable from Al Sanea. As already mentioned, this emerged at a time in the London Proceedings when AHAB had disclaimed any knowledge of the liabilities of the Money Exchange and of Al Sanea's indebtedness.

582. As the Defendants submitted and I accept, what was not appreciated in London and only emerged very late in these Proceedings, was that the source of this information could

---

[447] **{N/744}**; **{N/745}** (**N1379- N1388** in Vol 6 of the hard copy N Files).

only have been the Audit Pack produced by El Ayouty for the year ended 31 December 2001, and presented by El Ayouty some time in April 2002.

<u>Source of the figures</u>

583. Saud's Calculations contain five figures in Section A and seven figures in Section B (two of which also appear exactly in Section A).[448] Of these, the figures for the Money Exchange's Net Indebtedness and interest on the loans in Section A together with the three figures for interest on Al Sanea's debts in Section B are arithmetical calculations.

584. However, there are four figures (reproduced in both Section A and Section B) which must have come from other sources, not identified in the document:

(1) The total bank loans as of 31/6/2001 figure of SAR 7,810,900,000;

(2) The figure for "*Total Maan al-Sani accounts*" of SAR 4,128,113,411;

(3) The net figure *"(on the basis of transfers and deposits)*" for Al Sanea's indebtedness of SAR 3,368,205,268; and

(4) The total dividend from "*Domestic shares returns for 2002*" of SAR 229,482,010.

<u>Bank Loans Figure</u>

585. The only known source of the SAR 7.8bn figure was Attachment 8 to the 2001 Audit Pack. This figure did not come from the English financial statements of the Money Exchange; those for 2001 recorded bank borrowing in the much lesser amount of SAR 2,865,013,000.[449]

---

448 Saud's Calculations actually covered 1.5 pages of manuscript on the second page of which there are 5 further figures including the entry: "*Share dividend on the basis of 2002 assumption – SAR 229,482,016*" and which explains that the share dividend figure calculated in 2002 was a projection (see hard copy N Files Vol 6 pages N/1381, N/ 1382).

449 **{F/109/5}; {F/109.1/4}**

586. Saud claimed to be unable to explain where the figure of SAR 7.8bn had come from or why he had gone somewhere other than the 2001 financial statements for his information. Saud's evidence was that while admitting authorship because of his handwriting, he had no recollection of the document containing his Calculations. He suggested that the figures must have been given to him by Badr or Omar Saad.[450] This was Saud's speculative response:

*MR. LOWE:*

*Q. "Just as we saw from the correspondence I showed you that your expectation was to get the accounts and the comments on the accounts, I'm suggesting that's exactly what happened: you got the audit review pack. That is where you got this figure from. Do you accept that?*

*A. No, because I -- I don't think I looked at the audit pack to begin with or seen it. Huh?*

*Q. If we look at –*

*CHIEF JUSTICE:*

*Q. Where would you have thought that whoever it was got this figure from?*

*A. Huh?*

*CHIEF JUSTICE:*

*Q. Where would you have thought whoever it was got this figure from?*

*A. Probably either like I would have asked Badr or some -- or -- or which -- he's the one who was dealing with the Money Exchange or -- or Omar Saad.*

*CHIEF JUSTICE:*

*Q. Where would he have gotten the figure from so that you could rely on it?*

450 **{Day63/124:21} - {Day63/125:21}** and **{Day64/1:12} - {Day/64/9:25}.**

> *A.* *I -- I don't know, my Lord. Remember, this is 2001, I wasn't really in -- in charge of anything. Huh? And, and -- and if I wouldn't even, yani, ask who -- I don't have authority. So I would depend on the staff members at the head office to collect some of these numbers, so I can answer, if asked, my uncle, like I think this is the case here."*

587. It must be noted, given the obvious importance of Saud's Calculations, that neither Badr nor Omar Saad speaks to the subject in their evidence, as might have been expected had there been any basis for Saud's speculative answers. At all events, what is clear is that in order to produce this document, Saud did not rely on the 2001 financial statements as they did not contain the four crucially informative sets of figures. As those financial statements were available, it is reasonable to infer that Saud knew that they were misleading, were of no assistance in arriving at the true figures and that the source of the true figures were the Audit Packs.

588. In particular, this borrowing of SAR 7.8bn (which consolidates both of the "*Divisions*" of the Money Exchange) and the breakdown figure is only to be found in Attachment 8 to the 2001 Audit Pack.[451] The figure could not be found in the financial statements that were produced.

589. This Attachment 8 was also found in the N Files, in practically close proximity to Saud's Calculations.[452] The reasonable inference is that Saud looked at this copy of Attachment 8 in order to produce his Calculations.

590. Furthermore, a document which set out the consolidated values of bank borrowings in the form of the document at {N/782} – {N/783}, also labelled *"Annex No 2/8"* (i.e.

---

451 **{N/782};{N/783}.**
452 **{N/782}; {N/783}** - only some 20 pages separated from Saud's Calculations.

Attachment 8.2) had been an attachment which formed part of previous Audit Packs.[453] No free-standing "*Annex No 2/8*" has ever been produced.

591. Accordingly, I conclude that Saud had Attachment 8 (as well as Attachment 9) because he had access to the 2001 Audit Pack of which they formed part. Although the Audit Pack for 2001 was never disclosed, this explains why these attachments were loose in AHAB's files in Saud's office cupboard.

592. This Attachment 8 also breaks down the Money Exchange's debt at end 2001 to include an entry for "*Loans through AIS Bahrain*" of SAR 2.493bn. This demonstrates clearly that Saud did not believe AIS to be a "*small representative presence*" as he asserted in evidence[454] but in fact knew it was a substantial borrowing operation, linked to the Money Exchange.

Al Sanea's Gross and Net Indebtedness

593. Likewise, the only known source of the figures for Al Sanea's indebtedness in Saud's Calculation (SAR 4.1bn gross and SAR 3.368bn net) was Attachment 9 to the 2001 Audit Pack.

594. This document sets out clearly Al Sanea's net and gross indebtedness together with the deposits to be credited to him, all as required in order to derive the net indebtedness (SAR 3,368,205,3 68) from the gross indebtedness ("*Total Maan Al-Sanea accounts*" of 4,128,113,411). Saud used both numbers in his Calculations.

---

453 See for example in 1994: **{H29/141.1/64}** and in 1996 :**{F/69/66}.**

454 His first witness statement in these Proceedings: Saud 1W**{C1/2/62}.**

595. The relevant figures are in fact highlighted[455] on the document.[456] The obvious inference is that these figures were important to the person who separated this document from the Audit Pack.

596. Again, it could not have been by mere coincidence that this document was found in close proximity to Saud's Calculation in the N Files.

597. The 2001 Attachment 9[457] would have formed part of the 2001 Audit Pack. A document in that form setting out the values of Al Sanea's net and gross indebtedness labelled "*Attachment 9*" had typically accompanied the Audit Packs.[458] No free-standing "*Attachment 9*" has ever been produced.

598. Saud, it is to be inferred, had Attachment 9 (as well as Attachment 8) because he had access to the 2001 Audit Pack, of which it formed part, before it was copied or separated.

Dividend Figures

599. The only disclosed document which provides the figure for dividends used in Saud's calculations (SAR 229,482,010), is the document entitled "*Statement of Investments in Shares of Companies and Banks, Money Exchange Division, as of 06/07/2002*". This appears to be an internally produced document.[459]

---

455 While this highlighting appears to have been left off the scanned copy of the N File documents, it does appear on a colour copy in the hard copy files: **{N/1417}**.

456 **{N/781.1}**; **{P/145/12}** - the latter being the copy of this document produced by Mr. Brett Walter in Walter 1A as having been found either in Saud's villa or at the Money Exchange: **{L2/27}**.

457 **{N/781.1}**; **{P/145/12}**.

458 See again for instance the Audit Packs for 1994 and 1996, cited above: {**H29/141.1/65**} and **{F/69/67}**.

459 **{N/109}**; **{G/2912}**- also found at Vol 6 hardcopy N Files **[N1389]**; **[N1390]** is a copy of another Statement dated 06 July 2002 showing the same list of securities but a much lesser dividend yield of SAR 130,630,010.

600. Neither a list of this kind nor these figures appear from any Audit Pack.[460] That is logical as the figures for investments were held at AHAB H.O. and Saud would have wanted the most up to date figures on projected dividends for his calculations, figures which he could get from the Audit Packs which were retrospective.

**Implications of Saud's Calculations**

601. Saud's Calculations demonstrate that consistent with El Ayouty's insistence on having provided the Audit Packs to the AHAB Partners but inconsistent with AHAB's denial of this, the Partners had access to the 2001 Audit Pack and, in particular, to Attachments 8 and 9 of that report:[461]

(1) Possession of the Audit Packs must mean[462] that the Partners knew of the Money Exchange borrowing and of Al Sanea's indebtedness or withdrawals at the respective points in time.

(2) It also means that Saud, in keeping with his role in the continuation of the fraudulent accounting practices after Abdulaziz's time,[463] would have appreciated that the Money Exchange's English accounts were misleading and understood that the true size of the liabilities to the banks and Al Sanea's indebtedness were being hidden in the Finance Division.

(3) The 2001 Audit Report[464] is also significant because for the entire 2001 financial year Abdulaziz had been wholly uninvolved. The continuity with previous

460 Although Attachment 4 to the Audit Packs showed revenues from shares for the previous year and received during the year under review. See for example: **{G/3160.1}**; **{G/3160.2}** and **{F/69/57}**.

461 The 2001 Audit Pack has never been disclosed.

462 Following Mr. Hatton and Mr. Bullmore's joint evidence that a reader of the Audit Packs would have been aware that the financial statements were misleading, that the Money Exchange was in fact loss making, and that Al Sanea was heavily indebted to the Money Exchange **{I/13/3}**.

463 Note here again his subscription to the continuation of Resolution R/66.

464 **{F/109}**; **{F/109.1}**.

financial years was achieved entirely without his help. Far from this being handled by Al Sanea alone, as discussed above, Saud was very clearly involved in dealing with El Ayouty in respect of the audit. It was therefore entirely fitting that Saud would have received a copy of the Audit Pack.

602. Saud's Calculations, at the very least, demonstrate knowledge of Al Sanea's indebtedness (circa SAR 3.37 bn net) and of the Money Exchange's Bank Borrowing (circa SAR 8bn). That is in itself highly significant:

(1) Had Saud's Calculations been a new discovery, the already colossal liability to the banks which it revealed as well as the total of Al Sanea's withdrawals and indebtedness should have shocked and frightened the AHAB Partners;

(2) They could not thereafter have been in a state of disengagement while the Money Exchange remained open and while Al Sanea had the keys;

(3) The only reason therefore that Saud's Calculations would not have spurred the Partners to take over direct control, was if the Partners already knew about these figures and had seen the spiraling trajectory of the Money Exchange indebtedness over the past years.

(4) It follows that as Al Sanea remained fully in control at least from the perspective of his subordinates at the Money Exchange and the outside world, he must have been allowed by the Partners to do so, the Partners being fully aware of the perilous state of the Money Exchange's affairs.

No Support for AHAB's "New For Old" case to be found in Saud's Calculations

603. A detailed analysis of Saud's Calculations[465] undermines AHAB's "New for Old" case.

604. In opening, AHAB through Mr. Quest, argued that while Saud's Calculations showed that the Money Exchange had significant borrowings, Saud, it was said, could have taken comfort from the figures that he had obtained because they showed that the dividends from the Money Exchange's share portfolio covered the interest it was paying[466]. This proposition was adopted by Saud in cross-examination who claimed[467]:

> *"Q. The borrowings to which you had referred had grown and grown and they were never repaid.*
>
> *A. You mentioned "grown and grown", like multiplied three times; we understood that the total borrowing did not grow as much because the -- it was -- there was enough dividends to pay for the interest. This is our – this is my belief at the time.*
>
> *Q. Who is "we"?*
>
> *A. I said: this is my belief at the time."*

605. This evidence is rejected.

606. Saud deliberately misconstrues the document[468]. As the Defendants show in their written submissions[469]:

(1) The interest figure in Section A of SAR 220,967,195 (which is lower than the dividend figure of SAR 229,482,010) is the interest figure that would be paid on

465 **{N/744}**; **{N/745}**
466 **{Day3/26:14}**
467 **{Day42/81:8-16}**
468 **{N/744}**; **{N/745}** and see attachment.
469 **{E1/14/64-65}**

*Maan Al Sanea's net indebtedness* rather than on the Money Exchange's bank borrowing.[470]

(2) The interest figure in Section B is SAR 266,561,678 (which is the interest figure on the Money Exchange's bank borrowings assuming full repayment of Maan Al Sanea's debt)[471] and is higher than the dividend figure.

(3) In fact the total interest figure on the borrowing would have been SAR 468,654,000[472]; that is, more than twice the amount coming in by way of dividends. Thus the dividend would not pay for the carrying cost of the borrowing.

(4) As discussed above, Saud knew that Al Sanea had not repaid his net debt.

(5) Equally, Saud knew that the SAMBA dividends were not used to pay down borrowing but were in fact paid out to the Partners as dividends. He cannot therefore have thought in 2001-2002 or at any later time, that it would also be used to pay the interest.

607. Equally, Saud cannot claim to remember taking such comfort from his Calculations because to do so would be inconsistent with his claims not to remember anything else about his Calculations. Moreover, there has never previously been any mention in any witness statement of the suggestion that, instead of alarm or shock, the AHAB Partners breathed a sigh of relief on seeing Saud's Calculations. Saud's evidence about his

---

470 6% of 3,682,786,589 is 220,967,195.

471 6% of 4,442,694,632 is 266,561,678. The net Money Exchange borrowing figure is arrived at by subtracting 3,368,205,368 (Al Sanea's net indebtedness) from the total borrowing figure of 7,810,900,000.

472 Which is 6% of the SAR 7.8bn figure. Also of note, SIFCO 5's accounting expert, Mr. Bullmore's unchallenged evidence was that the interest figure was likely to have been much higher than 6% **{I/12/4}**; **{I/12/10}**.

Calculations has the hallmarks of contrived *ex post facto* rationalization and so I reject it entirely.

608. Saud's Calculations are instead what they appear upon their face to be, the results of his accurately informed enquiry into the true state of the Money Exchange's indebtedness to the banks and Al Sanea's indebtedness to the Money Exchange, as at year end 2001.

609. It appears that this exercise had been undertaken by Saud to advise the AHAB Partners of the likely outcome of the contemporaneous proposal that Al Sanea should pay down his indebtedness and that this should be done by internal transfer of his assets, with interest to be paid by him at 6% on the balance of the debt. It would have been clear that even had that happened, the Money Exchange's exposure to the banks would remain at more than SAR 4.5bn plus interest at the then prevailing rates going forward. That indebtedness (let alone the entirety of the actual debt of circa SAR 8bn without the Al Sanea repayment), would have been an overwhelmingly unattainable financial position for the AHAB Partners to contemplate. Absent an immediate liquidation including the sale of all investments to repay the debt, the spiraling cycle of borrowing to repay debt was the inevitable consequence. The Partners would surely have understood the implications.

**SAUD's CONTINUING INVOLVEMENT WITH THE AFFAIRS OF THE MONEY EXCHANGE AFTER SAUD's CALCULATIONS, UNTIL THE COLLAPSE IN 2009**

610. AHAB'S case is that Saud had little involvement with the Money Exchange after 2003. As set out above, this is wholly implausible given the danger that the Money Exchange posed for the entire Algosaibi family, the mistrust they had for Al Sanea and the ease with which they would have been able to obtain information showing the increasing indebtedness.

611. Analysis of the contemporaneous documentation demonstrates that after 2003, Saud continued to be involved in the production, amendment and finalization of the financial statements of the Money Exchange. It is therefore important to examine his involvement in each year after 2003 to demonstrate that involvement, leading to the unavoidable conclusions that:

(1) Saud was involved in the process of creating consolidated financials for 2003 and 2004 and the KPMG financial statements thereafter;

(2) Between 2003 and 2009, Saud was involved in the process of creating the financial statements for the Money Exchange for the years 2002-2008;

(3) Saud read and understood from those financial statements that:

(a) The borrowing of the Money Exchange was increasing; and

(b) The financial statements were materially misleading.

(4) Each year Saud signed up to and participated in the fraud on the banks through the dissemination of fraudulent financial statements;

(5) Saud knew that Al Sanea's indebtedness was increasing in this period.

Manipulation of the Financial Statements for 2004

612. As already examined above, the culture of false accounting at AHAB was one in which Saud was heavily involved. Of significance in this context, was the fact that false accounting affected the Money Exchange's consolidated accounts. In falsifying AHAB's accounts, Saud also falsified consolidated accounts which included the Money Exchange.

613. On or around 8 April 2004, Al Sanea wrote to Saud[473] referring to adjustments to the balance sheet and attaching:

> "*With reference to your letter regarding the proposed face adjustments to the balance sheet like last year without actually entering them in the books so that the consolidated English balance sheet will appear consistent with the figures of last year, we hereby attach the following:*
>
> *1- Book data according to the consolidated balance sheet by Al Ayouti 2003*
>
> *2- Adjustment records to be made to the face of the balance sheet so that the consolidated financial statements for the year ending on 31 December 2003 will appear consistent with the figures from last year. We hope to receive them signed from you soon so that we may conclude matter with M/S Al Ayouti.*
>
> *3- A schedule showing the book data and the amendments and final balance to the balance sheet in English.*
>
> *4- Draft balance sheet in English after making the adjustments mentioned in (2) above.*
>
> *5- The Exchange budget signed by me hoping that you will have it signed by Uncle Suleiman in order to complete the procedure and issue the final version*."

614. The attachments to Al Sanea's letter of 8 April 2004 have not been disclosed by AHAB and I am, not unreasonably, invited by the Defendants to infer that they were destroyed.

615. Nonetheless, it appears overwhelmingly likely that the balance sheet sent by Al Sanea to Saud was the same balance sheet that appears either in the 2004 KPMG Cairo Financial "*Review*" Statements[474] or the 2004 KPMG Jeddah Financial "*Review*" Statements.[475]

---

473 **{N/603}**; **{N/604}**: on the Arabic original appears a manuscript note in brackets above the first line of the text "*(I did not send this)*" with an arrow pointing to underlined words in the first line, suggesting that Saud had noted that he had not sent the letter cited by Al Sanea in this letter.

474 **{F/128/3}**

475 **{F/120/3}**: both of these financial statements will be discussed further below.

616. This letter, like a number before it including those discussed above, demonstrates that Saud received a substantial amount of accounting information relating to the Money Exchange directly from Al Sanea.

617. Given that consolidation was not fully settled, it is not surprising that Al Sanea became involved in the finalization of AHAB's accounts. It was necessary to send an adjustment schedule to Saud in order that he could make the figures for the Money Exchange to "*appear consistent with figures from last year*."

618. Indeed, one cannot help but note that this is in effect the same wording that the Partners had chosen to adopt when signing off the Money Exchange's false accounting in item 7 of Resolution R2 of 2000[476] (demonstrating Saud's close involvement with that process).

619. The signed adjustments to the balance sheet totaling SAR 1.247bn[477] were returned to El Ayouty by Saud directly on 19 April 2004 confirming that the "*adjustment and classification records attached hereto which were entered into the books of the consolidated balance sheet represent a private current account of the partners that were added to the book statements for the year ending 31 December 2003 both in the credit and debit sides according to the shown items and the supporting documents of the same are held with the partners."*[478] This adjustment schedule was headed as follows:

> "*The proposed adjustment and classification records on the Financial Statements ending 31 December 2003, in order to display these statements in English in a compatible way with last year's figures.*"

---

476 **{H30/25}**; **{H30/25.1}**; **{N/206}**; **{N/207}**: these minutes also notably record the resolution at item 12 which authorised Al Sanea and Abdulaziz to sell "*part or all of the shares of the companies and banks to settle the company's liabilities*", a crucially important event which never happened.

477 {**N/601**}; {**N/602**}.

478 {**N/599**}; {**N/600**}

620. Saud accepted that his signature was on the document.[479] While he denied being involved in signing off on manipulations (notwithstanding such clear documentary evidence to the contrary), his evidence was that he did not remember this document:

> *"Q. You sign off this schedule and you realised that that will result in alterations to the financial statements of AHAB or consolidated financial statements, if that's what's being produced. Do you accept that?*
>
> *A. No, because I don't have recollection of this nor I was in charge of the Money Exchange; Maan Al Sanea is in charge of the Money Exchange. And I told you I have no recollection of this, no.*
>
> *Q. From the time when you became a director of the Money Exchange, you were continuously involved in signing off adjustment schedules that altered the financial statements of the Money Exchange. Do you accept that?*
>
> *A. The last word, what?*
>
> *Q. You were constantly involved in signing off schedules like this that altered the financial statements of the Money Exchange. Do you accept that?*
>
> *A. No.*"

621. A further "*adjustment schedule*" for the year ended 31 December 2002 was also signed by Saud.[480] That schedule contains the same heading as that for the year ended 31 December 2003. However, in cross-examination, Saud offered no explanation for his signature on this document:[481]

> *"Q. If you look at another schedule that you signed, at {G/240.31/20}, and the translation is at {G/240.31/21}, this should*

---

479 **{Day66/110:25} – {Day66/112:4-20}**

480 **{G/240.31/20}**; **{G/240.31/21}** (not found by me in the Magnum database but presented in hard copy by Ms. Shelley White of Walkers on my request for the assistance of the parties sent by email).

481 **{Day66/112:21} – {Day66/113:11}**.

*be for 2002, the previous year. Is that your signature on the left-hand side of the screen, {G/240.31/20}? Is it your signature?*

*A.* *Yes, yes, it looks like my signature.*

*Q.* *You see here that you have signed off an adjustments schedule, and you can see the heading is the same as the heading I just read to you for 2003.*

*A.* *Yes.*

*Q.* *What do you think it means at the top, that the purpose of the adjustments is to show "the financial statements in English language in a form matching the last year figures"? What do you suppose the purpose of doing that is?*

*A.* *I -- I don't know."*

622. Saud's denial of involvement in or of memory of manipulating these financial statements is implausible. Al Sanea's letter was very clear that adjustments were to be signed off by Saud and the adjustment schedules show just that. Saud's own letter to El Ayouty was explicit as to the purpose of the adjustments involving in 2003 alone, over SAR 1.4bn. Thus, it is undeniably clear that Saud was involved in the manipulation of the consolidated financial statements of the Money Exchange and AHAB.

Consolidated Financial Statements – Revaluation of Investments

623. Given the apparent incomplete disclosure of documents by AHAB in this case,[482] the identification and description of a complete chronology of events has been an exceedingly difficult exercise. A great deal of effort went into the development of the

482 This is the subject of extensive and searching analysis in section {**E1/7/1**} of the Defendants' Written Closing Submissions, which I again here note that I accept in general as being accurate and correct, including the inferences invited about the role of the "Younger Algosaibis".

Detailed Narrative by the Defendants[483], an invaluable exercise which was managed by reference to the events revealed to have taken place by the evidence adduced at trial.

624. One such event of significance, appears to have been the requirement of AHAB by the Saudi lending banks circa 2003, that AHAB provided consolidated financial statements which combined the activities of the Money Exchange with those of AHAB itself.

625. On 17 January 2003, Al Sanea forwarded to Saud a draft set of consolidated financial statements for the Money Exchange and AHAB.H.O.:[484]

> "*Dear Saud*
>
> *Re: Combined financial statement for 2002 of Ahmad Hamad Algosaibi Bros. Co.*
>
> *Please find attached a draft of the combined financial statements of (AHAB), activities of Money Exchange and Head Office, for the year 2002.*
>
> *As per the requirements of various banks, the company would be required to prepare the combined financial statements for the year 2003 after adopting the equity basis for accounting for investments.*
>
> *This is for your kind information.*
>
> *With kind regard,*
>
> *Maan Al Sanea*
>
> *(PS: See Note 7)*" (Emphasis added.)

626. In another letter of the same date to Saud, Al Sanea explained a change in the accounting standards for investments, issued by SOCPA.[485]

---

483 **{E2/1}**
484 **{N/73}**
485 The "*Saudi Organization for Certified Public Accountants*": **{G/3118}**; **{N/671}**.

627. The first letter stated "*PS see Note 7.*" This is a reference to the auditors' notes on "*Investments*" and drawing Saud's attention to those notes at page 9 of the draft combined financial statements,[486] which identified the possible effect of revaluing the securities investments at market value rather than at cost. This would have been attractive both to Saud and to Al Sanea because a revaluation at market values then prevailing would mean that there would be an unrealized net gain on the investments of circa SAR 3.5bn.

628. Saud accepted in cross-examination that in the second letter[487] Al Sanea was providing him with an explanation about an accounting convention and explained that he understood from the letter that there was a new rule/regulation changing accounting methodology referring to changes in relation to the value of investments **{Day43/99:1-11}**.

629. On 14 April 2003, El Ayouty sent AHAB c/o Saud, drafts of a number of financial statements for the year ending 31 December 2002,[488] including "*Head Office-Khobar (Consolidated)*," which must have been a reference to an updated draft of the combined financial statements that Saud had previously been sent by Al Sanea.[489]

630. All of this was to be expected and it is not by mere coincidence that these documents were found in the N Files. By April 2003, Saud was the Managing Director of AHAB and was also the Partner on the Board who, having a degree in Business Finance, was most competent to deal with it. It was around the same time when SAMA had imposed a

---

486 {**N/73/11**}
487 {**G/3118**}; {**N/671**}
488 {**N/648**}; {**N/649**}
489 As set out above, Saud, having seen the Attachments 8 and 9 from the 2001 Audit Pack, also must have known that these financial statements, insofar as they incorporated the financial statements of the Money Exchange, were misleading.

deadline for the submission of papers in respect of the merger of money remittance businesses and (as discussed in the next section of this Judgment below) the Bahraini Monetary Authority was considering a licence for AHAB to open a bank in Bahrain (i.e. TIBC).

631. No response from Saud to any of these letters has been disclosed by AHAB. There is no suggestion that Saud objected to the production of draft consolidated accounts. More fundamentally, however, if Saud "*had nothing to do with the Money Exchange*", one is forced to ask why would Al Sanea have bothered sending him consolidated financial statements and an explanatory letter? The reality is that Al Sanea must have done so because Saud was intimately involved in the preparation of the financial statements of the Money Exchange.

632. Upon seeing these financial statements, Saud would have known that they were misleading: the balance sheet for these financial statements showed a figure for bank borrowing of SAR 3.05bn, which was less than half of the true figure that Saud had addressed in Saud's Calculation in 2002, a position which could not have improved in the following year because there had been no payments down on the debt.

Saud Receives the 2002 Audit Pack

633. Another distal piece of paper, an Attachment 9 headed "*Mr. Maan Al Sanea's Net Indebtedness on December 31, 2002*" was found in Saud's Villa.[490] At the top of the document there is written in English "*Saud received full report*", the obvious inference being that Saud received the full report to which this attachment was attached, i.e. he received the full Audit Pack.

---

[490] **{H30/46}; {H30/46.1}**

634. Having failed to mention this document in his previous statements, Saud noted in Saud 1W that he may have seen the Attachment 9 for that year (at paragraph 187).[491] He then purported not to recall whether he saw the full report (paragraph 188).[492] But this is inconsistent with reality: Saud would have had a continuing burning interest in monitoring Al Sanea's net indebtedness and this explains why he would have singled out Attachment 9 for retention.

635. It is submitted by the Defendants, and I accept, that Saud clearly did see the "*full*" Audit Pack and took out the Attachment 9 which was found in his villa. His suggestions to the contrary are unacceptable:

(1) The starting point is that there is clear evidence, in the form of the contemporaneous annotation, that he did receive it. The obvious reason for someone writing "*Saud received full report*" at the top of the attachment was that Saud had indeed received the full report.

(2) It appears that the Attachment was part of a fax from El Ayouty dated 17 March 2003 as appears from the Attachment 4.[493] The most likely explanation therefore is that El Ayouty, following a request from Saud, faxed the report to him or to AHAB H.O. for his attention, on that date.

(3) As with the 2001 Attachment 9 used in Saud's Calculations, the 2002 Attachment 9[494] was plainly produced as part of a full Audit Pack.

(4) AHAB has not explained:

---

491 **{C1/2/40}**
492 **{C1/2/41}**
493 **{G/3160.1}**; **{G/3160.2}**. Headed "*Revenues for Shares (estimated) for Fiscal Year Ended 31 December 2002 received during the year 2003*" and bearing the El Ayouty fax number for their Khobar office and dated 17 March 2003 and transmission time 10:37hrs.
494 {**H30/46**};{**H30/46.1**}

(i) Who had the 2002 Audit Pack, if it was not Saud;

(ii) What happened to it; or,

(iii) How the Attachment 9 came to be loose in Saud's villa.

(5) This was plainly something that can and should have been addressed in evidence if the explanation was that Saud had not seen it, but was not.

636. Moreover, in any event, Saud cannot deny and has implicitly acknowledged that in 2003, he saw this document showing Al Sanea to have an indebtedness of SAR 5.6bn and that the indebtedness, far from decreasing, had actually risen by circa SAR 1.5bn since year end 2001, as per Saud's Calculations.

637. It is therefore inconceivable that Saud would have believed, as he persisted in his evidence, that Al Sanea had repaid or was in the process of repaying his indebtedness.

Money Exchange Financial Statements for 2002

638. On 18 March 2003, Suleiman signed (also on behalf of Saud and Yousef) resolution R/116,[495] which was in the same form as previous resolutions:

(1) Distributing SAR 36m by way of dividend to AHAB, Al Sanea and Yousef;

(2) Affirming Resolution R/66 and the false accounting of the Money Exchange;

(3) Approving decisions relating to an English language set of financial statements; and

(4) Tasking Omar Saad to coordinate with El Ayouty over the AHAB H.O. financial statements.

---

495 **{N/192}**; **{N/193}**. It is noticeable that a great many of these resolutions are together in the N Files, suggesting that at some point a complete compilation must have been attempted or kept for Saud.

639. The obvious inference therefore is that, having received the relevant documents from El Ayouty, Saud, Suleiman and Yousef discussed the matter and proceeded to affirm AHAB's false accounting practices.

640. The financial statements for the Exchange and Investment Division of the Money Exchange were produced on or around 22 April 2003[496] and were signed by Suleiman.[497] Again, given Saud's involvement in the financial affairs of AHAB and his status as Managing Director, it is to be inferred that he saw these financial statements. Suleiman's statement as Chairman reports, among other things, that Saud "*has joined the Money Exchange Board, of which I serve as chairman*."

641. If Suleiman or Saud read these financial statements they would have been aware (by comparing Saud's Calculations to the balance sheet) that:

(1) The figure in the balance sheet[498] for loans and advances of SAR 2.57bn (allegedly made up according to Note 4,[499] primarily of loans to related parties of SAR 1.92bn) was wrong because as at the end of 2001, Al Sanea's indebtedness alone was SAR 4.1bn gross and SAR 3.368bn net;

(2) The overall bank borrowing figure of SAR 3.04bn was also wrong and each of them knew that the true borrowing figure had been SAR 7.8bn at the end of 2001 as per Saud's Calculations;

(3) The capital for the Money Exchange branch – shown as paid up at SAR 200 million – had never in fact been paid; and

---

496 Regrettably no copy of the financial statements for the Finance Division has been disclosed, but it is to be assumed that they were produced at the same time.

497 **{F/115/2}**

498 **{F/115/5}**

499 **{F/115/10}**

(4) The retained earnings figure of SAR 1.114bn was entirely fictitious because the Money Exchange, whose "*revenue*" was generated solely from bank borrowings (apart from the share dividends), had no source of profit.

642. Since, as his dealings with the 2002 Attachment 9 show,[500] Saud had access to the Audit Pack,[501] he would have known that the true figure for loans and advances for the year end 2002 was over SAR 9bn as shown in Attachment 8[502] – more than three times the figure disclosed in the financial statements.

643. From Attachment 9 for 2002, Saud and Suleiman also clearly knew that Al Sanea's gross debt had increased by SAR 1.5bn in a single year to SAR 5.637bn and that his net debt had increased by SAR 0.7bn in the same period to SAR 4.1bn. Comparing Al Sanea's gross indebtedness to the accounts, it would have struck Saud that Al Sanea's gross debt was:

(1) Double the borrowing disclosed in the financial statements;

(2) Nearly four times the value of the investments; and

(3) Nearly three times the amount of the related party loans disclosed in the financial statements which must therefore have been wrong.

644. Both Saud and Suleiman (and presumably Yousef) must therefore have been keenly aware that, if any of this information got out, no bankers would continue to lend to the Money Exchange. The continuation of the fraudulent accounting practices remained their chosen recourse.

---

500 As is suggested by the fact that not only was Attachment 9 found in Saud's villa: see **{H30/46}**; **{P/145/13};** and Walter 1A **{L2/27/9}**, Saud was recorded in the manuscript note on it as having received the full report **{H30/46} {H30/46.1}**.

501 Which has not been disclosed.

502 **{F/138/76}**

645. Moreover, despite not having personally signed Resolution R/116, (which Suleiman signed for them) Saud and Yousef did sign a further resolution R/118 on 28 June 2003,[503] confirming the distribution of the dividend of SAR 36m on 30 September 2003 in accordance with Resolution R/116 and confirming the continued application of Resolutions R/2 and R/66 (thereby confirming their knowledge and approval of the false accounting for 2003).

Letter to Al Sanea regarding repayment

646. It is little coincidence that, at the same time as these financial statements were finalised (and when Attachments 8 and 9 had clearly shown a huge increase both in bank borrowing and Al Sanea's indebtedness) Saud sought to press Al Sanea about the repayment that he had agreed to.

647. Even while still accepting the distribution of dividends which the Money Exchange clearly could not afford to pay, Saud must have realised that all of AHAB's fortunes were bound up with those of the Money Exchange and that the growing indebtedness posed an increasing danger to AHAB. He therefore prepared a letter dated 15 April 2003 to Al Sanea[504] in which he referred to a phone call (during which they had presumably discussed Al Sanea's indebtedness) and stated:

> "*Reference to our phone call regarding what was agreed upon with me and Uncle Suleiman and my cousin, Yousef, a few months ago, please find enclosed a draft proposal of this agreement.*
>
> *I hope we can finalize this issue soon because it has been pending for several months pending the end of the Iraqi crisis/war since you expressed concerns about executing this during that period.*

503 **{N/194}**; **{N/195}**
504 **{N/302}**; **{N/303}**

> *And as mentioned earlier, Riyadh is not a part of this and it is your decision should you wish to transform the Money Exchange into a bank or anything similar after signing the agreement.*"

648. Saud was here pressing Al Sanea to make repayments that they had agreed upon a few months previously i.e. the SAR 400m. However, this was still a long way off clearing Al Sanea's indebtedness.

649. It therefore appears from this letter that Saud had more confidence in an alternative exit plan: namely to turn over the Money Exchange to Al Sanea to be turned into a bank, noting that that would be Al Sanea's decision, the reference to "*Riyadh*" implying that SAMA would be further engaged only if they agreed to progress this plan.

650. While Saud claimed in his first witness statement that he was unable to remember sending the letter,[505] he clearly spent some considerable time drafting it, through a number of iterations. See previous drafts in Arabic and as translated at **{N/223}**; **{N/224}**; **{G/3223.2}**; **{G/3223.1}**.

651. Nevertheless, it is clear from this letter that Saud appreciated that the netting off of Al Sanea's indebtedness had not occurred, i.e.: "*concerning what was previously agreed upon…*" This letter also confirms that Saud also clearly knew about the banking licence application involving SAMA, further illustrating his ongoing involvement with the affairs of the Money Exchange.

<u>Group Profile and Other Documents forwarded to Saud in August 2003</u>

652. As set out below in relation to my discussion of Saud's involvement with TIBC, on 26 August 2003, Al Sanea forwarded a number of documents to Saud under the cover of a

---

505 Saud 1W, {**C1/2/51}** at **paragraph 243.**

letter which upon receipt was marked by Saud "*M.E. files*" and expressed by Al Sanea as, "*for your information.*"[506] The most significant documents were: (1) Group Profile; and (2) "*Copies of KPMG Al Fozan Bannaga Reviewed 3 years projections for Head Office and Money Exchange*" ("*the KPMG 3 Year Projections*").[507]

653. As the Defendants submitted, Saud must be taken to have reviewed and understood these documents. The Group Profile and KPMG 3 Year Projections contained obviously false information about the bank borrowing of the Money Exchange as Saud should have known, if from no other source, from Saud's Calculations the previous year based upon the 2001 Audit Pack. In fact, Saud had even more up-to-date borrowing figures as discussed above by reference to the 2002 Audit Pack. For an instance of the gross inaccuracy of this information, the KPMG 3 Year Projections show bank borrowings for the Money Exchange standing at only SAR 3.04bn for the year 2002, projected to SAR 3.39bn for the year 2003.[508]

654. In the section entitled "*Component divisions and companies of the Algosaibi Group*,"[509] the Group Profile described the Money Exchange as AHAB's central treasury. It stated:

> "*Ahmad Hamad Algosaibi & Brothers Company - Money Exchange, Commission and Investment, Alkhobar ("Algosaibi Money Exchange") was the origin of the present day Group and is a division of the Algosaibi Partnership.*
>
> *Additionally, the Money Exchange is the central treasury for the Algosaibi Group, providing funding, hedge management, and foreign exchange services*."

506 **{N/589}**
507 **{N/800}**; **{N/801}**
508 **{N/800/3}**
509 **{G/3773/10}**; **{G/3773/22}**.

655. Most significantly for present purposes, in the section entitled "*Money Exchange, Commission and Investment Division Financial Statements*",[510] the Group Profile sets out an "Actuals" and "Projections" balance sheet for the period 1998 to 2007:

(1) The "actual" balance sheet showed a continuing increase in borrowing by the Money Exchange (from SAR 1,861bn for the year ending 1998 to SAR 3,040bn for the year ending 2002). Saud must have known that the 2002 figure was misleading given that it was less than half of the SAR 7.8bn of borrowing at the end of 2001, as recorded in Saud's Calculation.

(2) The borrowings were then in the Group Profile[511] projected to *increase* every year from 2003 to 2007 (from SAR 3.14bn for the year ending 2003 to SAR 3.74bn for the year ending 2007). No explanation is given by Saud for the projected increase or as to how this could possibly be consistent with the "New for Old" procedure. (Albeit that this projected increase of SAR 0.6bn was tiny compared to the increases which actually occurred).

656. As for the KPMG 3 Year Projections, these projections comprised two documents, one for the Money Exchange[512] and one for AHAB H.O.,[513] both dated 24 July 2003. The following further features of the projected balance sheet for the Money Exchange up to 2005[514] are worth noting:

(1) Not only did the "actual" balance sheet show a continuing increase in borrowing by the Money Exchange (from SAR 2.176bn for the year ending 1999 to SAR

510 **{G/3773/77}**
511 **Ibid.**
512 **{N/800}**
513 **{N/801}**
514 **{N/803}**

3,040bn for the year ending 2002), but Saud must have known that the 2002 figure was misleading given that it was less than half of the SAR 7.8bn of borrowing recorded in Saud's Calculations as being the position at the end of 2001.

(2) Those amounts were then projected to *increase* every year from 2003 to 2007 (from SAR 3.14bn for the year ending 2003 to SAR 3.390bn for the year ending 2005). In addition, assumption 16[515] headed "*bank borrowings*" recorded that "*Bank borrowings are estimated to increase by SR 350 million, 300 million and SR 250 million in 2003, 2004 and 2005 respectively, net of repayments*."

(3) Again, no explanation is given by Saud for the projected increases (albeit themselves tiny in comparison to the actualities) or as to how this could possibly be consistent with the purported "New for Old" policy.

657. These documents were plainly important documents, indeed this was, after marked hesitation, accepted by Saud. Despite acknowledging from his manuscript note on the letter of 23 August 2003 that he must have seen the letter and protesting that he had no recollection of it or the enclosed documents, Saud not only accepted that these documents were important but also accepted that they contained important information about AHAB and the Money Exchange which Al Sanea was openly sharing with him.[516] This is how he concluded in cross-examination on the question of the importance of the documents:

> "*Q. Mr Algosaibi, it is absolutely obvious, isn't it, from looking at the documents that we have looked at over the last day that they*

515 **{N/800/9}**
516 **{Day46/22:5}** – **{Day46/30:14}**

*contain important information about head office and about the Money Exchange. That's right, isn't it?*

*A. Yes, there was information about the Algosaibi and the Money Exchange, yes.*

*Q. Mr. Al Sanea was not keeping this information to himself, was he? He was sending it to you?*

*A. I -- my understanding that the -- the SAMA regulation applied to the Money Exchange. So if there was an exercise done to include the head office, I wasn't aware of. The only thing I was aware of, that Maan – there was SAMA regulations and Maan took care of it.*

*Q. And he –*

*A. Now, and so we saw documents, you showed me documents yesterday that I've just seen. I have no memory of it, nor you say whether Maan reported this or not reported that. Maan doesn't report to me, sir, he doesn't.*

*Q. And he was sending this information to you so that you 1 should be informed, wasn't he?*

*A. As I said, my best -- my best guess actually is -- is --is that he was sending me just this to tell me that, "I have" -- "I have done the work." And maybe this is why I didn't pay attention to all of this, because the -- the matter was finished, Maan told me it's finished and it's finished.*"

658. There is nothing inherently odd about the Managing Director of AHAB being sent such documents to review. In fact, one would expect Saud to have received them. The conclusion to be drawn from the fact that Saud received them is that he read and was aware of their contents.

659. The further conclusion to be drawn from the fact that Al Sanea willingly sent them to Saud is here again, that Al Sanea reported to Saud on matters of importance for the running of the Money Exchange.

660. Even if (which is not accepted), Saud did not read them, the contents of those documents were plainly not *concealed* from Saud. As will be further discussed below but marked here for present purposes, it is therefore untenable for AHAB to argue that TIBC was concealed from AHAB when Al Sanea clearly sent documents referring to and describing TIBC directly to Saud.

*2004 and the False Financial Statements for 2003*

Consolidation

661. The issue of consolidation of the accounts of the Money Exchange and AHAB as a requirement of the Saudi lending banks was not settled in 2003. In early 2004, Saud (who appears to have been reviewing some suggestions from Ernst &Young ("EY")) wrote to Al Sanea "*Reference to the suggestions made by Ernest & Young*",[517] noting that the "*equity method of accounting*" for investments was something that he was familiar with, having practiced it at AHAB H.O. He then went on to say that:

> "*However, as you might already know, the path we are proceeding with will require us in 2005 for M.E. to have its own financial statements or a consolidated one with SAAD. I would recommend keeping things as they are as my father had done until we come to a resolution regarding M.E.*"

662. While Saud professed in his witness statement[518] not to remember drafting this letter or whether it was ever sent , the natural interpretation of the passage is that, "*the path that we are proceeding with*" in light of Al Sanea's increasing balances, implies that consolidation of the Money Exchange with Al Sanea's Saad Group was essential for AHAB. Consolidation of the Money Exchange with AHAB would pose an existential threat to AHAB. Saud's recommendation "*keeping things as they are as my father had*

---

517 **{N/54}**
518 Saud 1W, {**C1/2/37**} at **paragraph 169.3**.

*done until we come to a resolution regarding the M.E.*", is to my mind a reference to a continuation of the accounting practices established during Abdulaziz's time, including the acquisition cost method of valuation of the securities, until such time as the proposed divestment of the Money Exchange to Al Sanea was resolved.

<u>More on the KPMG Financial Statements for 2003</u>

663. As touched upon above, consolidated financial statements were produced to and reported on or "*reviewed*" by KPMG Jeddah on 18 April 2004 and by KPMG Cairo[519] on 22 April 2004. This was three days after Saud returned the adjustment schedules to El Ayouty on 19 April 2004 as discussed above. However, KPMG made clear that, rather than auditing the 2003 financial statements, they had merely reviewed the financial statements produced by El Ayouty, explaining that "*A review is limited primarily to inquiries of company personnel and analytical procedures applied to financial data and thus provides less assurance than an audit. We have not performed an audit and, and, accordingly, we do not express an audit opinion.*"[520]

664. Given his close involvement in that process and the fact that he knew of KPMG's involvement from being sent the KPMG 3 Year Projections which were found in the N Files,[521] Saud is bound to have seen a copy of these financial statements and, as set out above, it is to be inferred from Al Sanea's letter of 8 April 2004, that Saud had already seen the balance sheet reported on by KPMG based on their review.

---

519 **{F/120}**; **{F/128}**
520 **{F/128/2}**
521 **{N/800}**; **{N/801}**

665. Saud would have known, if not from the up-to-date information, then at least from Saud's Calculations in 2002, that the balance sheet he had reviewed was misleading in that it understated:

(1) bank borrowing, which the KPMG Cairo Financial Statements showed to be SAR 3.678bn[522] (whereas Saud's Calculations in 2002 showed bank borrowing at the end of 2001 of SAR 7.8bn);

(2) loans and advances, which the KPMG Cairo Financial Statements showed to be SAR 2.821bn[523] (whereas in 2002 Saud's Calculations showed that Al Sanea's net debt alone was SAR 3.368bn).[524]

666. KPMG's report also overstated the capital at SAR 1.2[525] (which was in any event never paid) and the retained earnings (which Saud knew to be fictional).

667. For completeness, it seems that the principal difference between the KPMG Cairo Financial Statements and the KPMG Jeddah Financial Statements was set out in a memo by Mr. Hayley to Al Sanea dated 31 August 2003,[526] in which they agreed that (along with copies of the Group Profile) the KPMG Cairo Financial Statements were to go to one set of Saudi Banks (NCB, SIB, Al Rajhi and Riyad) and that the KPMG Jeddah Financial Statements were to go to a different set of Saudi banks (SAMBA, Hollandi, ANB and Jazira).

---

522 **{F/128/3}**
523 **Ibid.**
524 Of course, in reality, Saud knew by this stage that Al Sanea's debt was over SAR 5bn having received the 2002 Attachment 9 **{P/145/13}**.
525 **{F/128/3}** and Note 12 at **{F/128/17}**.
526 **{G/3534}**

668. Having signed off on, and been involved in, the production of these financial statements, it is accepted as the Defendants submit that Saud must have reviewed them and known of their misleading nature and purpose.

The 2003 Money Exchange Financial Statements

669. At the same time, it is clear that Saud was also involved in the production of El Ayouty's financial statements for 2003 for the Money Exchange alone.

670. As AHAB identifies in its closing submissions,[527] there are two versions of the statement of the Board of Directors for these financial statements which for produced by El Ayouty on 20 April 2004: one version at **{F/127/1}** which is signed by Saud and Suleiman and part of a full report containing the financial breakdown of the Money Exchange and is said to have been found in the Money Exchange. The other version at **{G/3788}**, is said to have been found in AHAB H.O. by itself without the rest of the financial report and bears different signatures of Suleiman and Saud and is initialed by Al Sanea.

671. Against the background of agreement between Dr. Giles and Mr. Handy that the Suleiman signature on the statement to the full report **{F/127/3}** matches Source Signature (45)[528] and Saud's evidence to the effect that he was unable to recollect signing this document; I am invited by AHAB to conclude that his signature on it (as well as Suleiman's) was forged by Al Sanea. The further proposition would follow that Al Sanea concealed the full report from Saud and Suleiman and therefore that neither would have seen it or understood the implications of the information it conveyed.

672. For the reasons which follow, I reject those propositions.

---

527 **Paragraph 4.227**.
528 Item No. 74 on the Scott Schedule dated 4 April 2017 **{A2/23.1/3}**.

673. On 29 March 2004, Saud wrote to Al Sanea[529] stating:

> *"Kindly find enclosed a draft of the board resolution re dividend. Kindly apply the necessary amendments for all members of the board to sign.* ***Also enclosed is a draft of the financial statements****.*" (Emphasis added.)

674. This letter is significant because it shows that:

(1) Saud must have reviewed and appreciated the significance of the resolution which accompanied the letter and which he later signed.[530] Equally the fact that Saud was involved in the drafting process of the resolution and the financial statements strongly suggests that once the resolution came back to him from Al Sanea, he would have read and understood its contents; and

(2) El Ayouty must first have sent the financial statements to Saud, who forwarded them to Al Sanea together with his letter. There can therefore be no suggestion that they were "*concealed*" from the AHAB Partners.

675. It is to be inferred that the reason why Saud would have received the financial statements before Al Sanea did was because Suleiman would have received them from El Ayouty and reviewed them with Saud and signed the representation letter attached to the Audit Pack. A draft representation letter appears to have been presented to Suleiman.[531] As discussed above, representation letters were required by El Ayouty to allay their own concerns from being aware of the Partners' knowledge of the false accounting practices and the ever increasing Al Sanea indebtedness. No signed copy of this letter has been disclosed, however, the clear inference is that Suleiman would have signed and returned the document.

---

529 **{G/3971}**; **{G/3980}**.
530 This became Resolution R/120. See Minutes of the Board: **{N/196}**; **{N/197}** and further, below.
531 **{G/240.33}**; **{G/240.34A}**; **{G/240.34}**.

676. Al Sanea is shown to have signed the draft resolution R/120 dated 29 March 2004. A complete minute was signed by him, Yousef, Saud and Suleiman,[532] in the same form as previous resolutions:

(1) Distributing SAR 36m by way of dividend to AHAB, Al Sanea and Yousef;

(2) Affirming Resolution No. R/66 and the false accounting of the Money Exchange;

(3) Approving decisions relating to an English language set of financial statements; and

(4) Tasking Omar Saad to coordinate with El Ayouty over the AHAB H.O. financial statements.

677. Saud's involvement in preparing the 2003 financial statements is further confirmed by the fact that he must have signed at least the version of the 2003 English financial statements found at AHAB H.O. and it is implausible that he would not have wished to see the full report:[533]

678. The 2003 financial statements therefore demonstrate that Saud must have known of the existence and operation of TIBC. Directly above Saud's signature on both versions, the Chairman's statement records:

> "*In May 2003, a new banking venture named The International Banking Corporation was established in Bahrain under an offshore banking license as a 93% subsidiary of the Money Exchange division. Aside from revaluation gains on equities sold to TIBC by the Algosaibi Money Exchange, our new banking venture achieved profitability in its first period of operation and promises to be an important part of the Group's financial services business in the future.*"

---

532 **{N/196}**; **{N/197}**.

533 **{F/127/3}** While Suleiman's signature here is alleged by AHAB to have been mechanically applied, the same is not suggested in respect of Saud's signature even on this version. While at first saying he did not think that he did **{Day57/54:10} – {Day57/55:14}**, Saud eventually merely said that he had no memory of signing the document **{Day64/90:8} – {Day64/91:15}**.

679. At page 8 of the document[534] it notes that SAR 350m was contributed to TIBC by way of capital. However, given that Saud knew that the Money Exchange's only source of revenue was bank borrowing, he must have known that any such funds, if contributed, must have come from borrowing.

680. In addition, the balance sheet in the English financial statements showed bank borrowing of SAR 3.107bn,[535] which Saud must have known to be lower than the figure he had calculated in 2002 of SAR 7.8bn. In point of fact, the 2003 figure was SAR 9.483bn,[536] a fact of which Saud (as a recipient of the Audit Packs) must also have been aware.

681. The balance sheet also showed loans and advances of SAR 2.653bn[537](which included loans to related parties implicitly including Al Sanea indebtedness of SAR 1.753bn[538]). Again, Saud knew that this figure was false:

(i) It was lower than the figure for 2001 of SAR 4.128bn (gross) and SAR 3.368bn (net), both of which he had included in Saud's Calculations;

(ii) It was lower than the figure of SAR 5.637bn (gross) and SAR 4.1bn (net) which he had seen in the Attachment 9 for 2002 (which recorded that "*Saud received full report*";[539]

(iii) It was also lower than the actual figure for 2003 (which Saud, it is to be inferred, must have seen as part of the Audit Pack for that year) of SAR 6.042bn (gross) and SAR 4.119bn (net).[540]

---

534 **{F/127/12}**
535 **{F/127/6}**
536 As shown for 2003 in Attachment 8 to the 2004 Audit Pack: **{F/137/76}**; **{F/138.1/76}**.
537 **{F/127/6}**
538 **{F/127/11}**
539 **{H30/46}**; **{H30/46.1}**

682. Moreover, Saud would also have known that the figures for the capital of the Money Exchange of SAR 200m[541] (which had never been paid) and for retained earnings[542] (which, in the case of the Money Exchange, were fictional) were misleading.

683. It is obvious that, having signed them and sent them to Al Sanea, Saud must have read the financial statements.

684. No copy of the financial statements for the Finance Division for 2003 has been disclosed, nor has a copy of the 2003 Audit Pack. Nevertheless, given that Saud saw the Exchange and Investment Division financial statements, it is to be inferred that he would have received the 2003 Finance Division financial statements as well and the 2003 Audit Pack.

2004 Autumn Dividends

685. Following the production of the financial statements for 2003, it appears that Saud made a further demand for the payment of dividends from the Money Exchange beyond that mandated by Resolution R/120 on 29 March 2004. By a letter to Al Sanea dated 25 August 2004,[543] Saud stated:

> "*Would like to have a dividend distribution resolution as we have done last year. Once received, I will be sending the resolution to my Uncle Suleiman in Lebanon for signature. Date of distribution to be end of the month of October*."

686. Following this letter, a resolution of the Board of Directors of the Money Exchange was produced dated 26 August 2004, signed by Suleiman, Saud and Al Sanea.[544] In addition to providing for the payment of a dividend of SAR 36 m, the resolution also affirmed and

---

540 As shown for 2003 in Attachment 9 to the 2004 Audit Pack: {**F/137/77**}; {**F/138.1/77**}.
541 {**F127/6**} and {**F/127/15**}
542 **Ibid**.
543 {**N/28**}
544 {**N/1025**}; {**N/1026**}

ratified Resolutions R/66 and R/2 (i.e. affirming the continuation of the fraudulent accounting policies):

> "*Second: Enforcement of all the decisions and ratifications*[545] *resolved in the signed and approved Partners and Board of Directors Resolutions No. R/66 dated 26/11/2000 and Resolution No R/2 dated 28/2/2000*."

Conclusion on Saud's involvement with the 2003 Financial Statements

687. Saud's involvement with the KPMG Reviews and the 2003 Money Exchange financial statements is instructive. The documents show that:

(1) He received a large quantity of financial information from Al Sanea;

(2) He received the Money Exchange's financial statements as seen by El Ayouty before Al Sanea did and signed off on them before sending them on;

(3) The same is true for the consolidated financial statements of AHAB and the Money Exchange;

(4) He was the individual responsible for adjustments to the balance sheet of the consolidated financial statements, as shown by his involvement with the adjustment schedules;

(5) Not only did he sign the resolutions supporting the false accounting and the payment of dividends, he appears to have instigated their creation and asked Al Sanea to sign them.

688. In summary, Saud appears to have performed precisely the role that one would expect the Managing Director of AHAB to have taken. What is more, he appears on numerous occasions to have exercised seniority over Al Sanea, directing him to sign minutes and to pay dividends.

---

545 i.e. *musadaqa*.

689. This picture is entirely at odds with the picture that Saud sought to paint of himself as a naïve younger member of the family doing his father's and later Suleiman's bidding and simply complying with Al Sanea's requests. The reality, as submitted by the Defendants and as I accept, is that he knew full well what was going on at the Money Exchange and positively endorsed it.

*2005 and the False Financial Statements for 2004*

Money Exchange Financial Statements for 2004

690. Here again, there was a general denial of knowledge and involvement by Saud in the preparation of the financial statements of the Money Exchange. The evidence reveals however, that Saud was involved in the production of the 2004 Money Exchange financial statements in much the same way as he was involved in the production of the 2003 financial statements.

691. On 3 April 2005, Saud wrote to Al Sanea stating:

> "*Attached is the Board resolution regarding profit distribution, as standard practice each year, signed by us.*
>
> *Kindly sign it and attach all the necessary documents and records so that we may obtain the signature of uncle Suleiman upon his return.*"[546]

692. On 29 March 2005, Suleiman (on behalf of Yousef and himself) and Saud, together with Al Sanea, signed the by now usual, resolution: (i) affirming the payment of the dividend to AHAB; (ii) affirming Resolution R/66 and the false accounting; (iii) affirming the

546 **{N/215}**; **{N/216}**. The Arabic original letter contains a manuscript annotation in English directing "*File Board of directors resolutions.*"

issuance of an English language set of financial statements; and (iv) tasking Omar Saad to liaise with El Ayouty about preparation of the financial statements.[547]

693. Subsequently, having produced the Audit Pack on 21 April 2005,[548] on 25 April 2005, El Ayouty produced the English language financial statements for the Money Exchange for the year 2004.[549] The statements of the Board to these financial reports bear signatures of Suleiman and Saud, although Saud only hesitatingly acknowledged his after being told that the documents were found at AHAB H.O.,[550] rather than at the Money Exchange.[551]

694. Saud stated at paragraph 164.2 of Saud 1W[552] that he did not recall seeing or signing the El Ayouty English language financial statements for 2004. While this obviously is not the same as him denying having signed it, there is no evidence of these signatures being forged and, given his ongoing involvement at the time, it is difficult to imagine that he could genuinely be in doubt about the authenticity of his signature here.

695. As discussed above,[553] Saud was closely involved with Al Sanea in discussions about the financial statements for 2004 and the decision as to whether or not to present investments at cost or market value. The final version of the statement of the Board of Directors

---

547 **{N/172}**; **{N/201}**. In fact it appears that Saud signed the resolution first **{N/200}** and then circulated it to be signed. The strong inference therefore is that it was his role to prepare the resolution.

548 **{F/137}**; **{F/138}**

549 **{F/148/1}**; **{F/148/2}**

550 A copy of the English financial statements for the Money Exchange (without the Statement of the Board of Directors and El Ayouty's covering letter but initialed by Al Sanea) was also found on AHAB H.O. files: **{H22/180}**; together with the Consolidated Head Office and Money Exchange financial statements produced by KPMG for that year: **{H22/178}**. But a copy of this latter document, which also includes a statement of the Board of Directors signed by Saud and Suleiman, was also the first document in the N Files: **{N/1}**. A copy of a much longer Board of Directors Statement signed by all of Al Sanea, Saud and Suleiman to convey the Audit Report for year ended 31 December 2004 was also found at the AHAB H.O.: **{H22/177}**. This was not the version used for the final Audit Report but that at **{F/148/2}**, bearing Saud's and Suleiman's signatures. I note here that the subject of document locations and the inferences to be drawn from this is the subject of detailed and helpful discussion in the Defendants' written Closing Submissions: **{E1/15/1}**, where at **paragraph 64** it is explained that the Magnum folders **H21**, **H22** and **H28** all contain documents from AHAB H.O.

551 **{Day66/16:3} – {Day66/17:18}**

552 **{C1/2/34}**, where he refers to the document by the AHAB disclosure reference **[CAY AHAB 0000006737]**.

553 Under the heading "**2004 and the false financial statements for 2003. (i) Consolidation**." And see **{N/54}**.

bearing Saud's and Suleiman's signatures and issued with the El Ayouty Audit Report addressed to the Partners,[554] states that during the year 2004, the management decided upon the change of policy to present the value of investment securities "marked-to-market", resulting in a fair value surplus of SAR 6.39bn. In light of the earlier exchanges between Saud and Al Sanea on this very issue and my finding that the El Ayouty reports were indeed submitted to AHAB, it is highly improbable that Saud would not have known of this change of policy.

696. A copy of the statement of the Board of Directors of AHAB Partnership to the Partnerships' financials for 2004 was found in Saud's villa.[555] This statement was also signed by Saud and Suleiman and at first when questioned about his signature on it,[556] Saud was willing to acknowledge the signature. However, when it was pointed out to him that in paragraph two, the statement made reference to the financial statements of the Money Exchange being presented separately and (by implication) by the same Partners acting as the Board of the Money Exchange, he sought to distance himself from the document, claiming:[557]

> "*I don't recall signing, you know, like these sort of papers. You know, I'm surprised to see my signatures on them… I have no recollection at all of signing anything relating to financials of the Money Exchange let alone this – er, this board of directors report*."

697. AHAB submits[558] that the foregoing evidence of Saud's involvement, including the presence of his signatures on the statements of the Board, should be ignored for mainly

---

554 **{F/148/2}**
555 **{H30/48.2}** – as was a copy of the KPMG Consolidated Financial Report for 2004 found in the N Files: **{N/1}** discussed further below.
556 **{Day 66/12:13}**
557 **{Day66/15:8-20}**
558 AHAB's Closing Submissions, Section 4.231-234 **{D/4/137}**.

two reasons. First, because the pervasive presence of Suleiman Source signatures identified by Dr Giles in the case makes not only Suleiman's signatures invariably questionable but Saud's as well, even where their signatures do not appear on the Forgery Schedule, as in these instances. Second, because even if Saud were found to have signed the Directors' Statements, that would not mean he must have seen the misleading contents of the financial reports themselves and so it is not open to me to draw the inference that he did. I reject this argument and find that in light of the clear evidence discussed above showing Saud's involvement with Al Sanea in the procurement of the financial reports, Saud signed these statements and received the final El Ayouty Report containing the final version of the statement signed by him and Suleiman. Moreover, upon seeing these financial statements, Saud would immediately have known that the balance sheet[559] was misleading:

(1) The loans and advances of SAR 2.949bn (SAR 1.587bn of which were stated at Note 5 to be loans to related parties) was lower than (a) the figure for 2001 of SAR 4.128bn (gross) and SAR 3.368bn (net) that Saud had included in Saud's Calculations; (b) the figure of SAR 5.637bn (gross) and SAR 4.1bn (net) which Saud had seen in the Attachment 9 for 2002 (which recorded that he had seen the "*full report;*"[560] and the actual figure for 2003 (which Saud must have seen as part of the Audit Pack for that year) of SAR 7.335bn (gross) and SAR 4.89bn (net).[561]

(2) The borrowing figure of SAR 4.261bn was still very much lower than the SAR 7.8bn calculated in Saud's Calculations and the actual figure for 2004 of SAR

559 **{F/148/5}**
560 **{H30/46}**; **{H30/46.1}**
561 **{F/137/77}**; **{F/138.1/77}**

10.508bn as shown in the Audit Pack for that year (which Saud would have received).[562]

698. These financial statements also made reference to TIBC in the last paragraph of the Statement of the Board of Directors[563] and at Note 7 on page 12.[564]

699. Here again, no copy of the financial statements for the Finance Division for 2004 has been disclosed. Nevertheless, given that Saud:

(1) Saw the Exchange and Investment Division financial statements;

(2) Had seen previous Audit Packs and must have seen that for 2004 addressed to Suleiman on 21 April 2005;

(3) Was aware of the separation of the financial statements; and

(4) Was heavily involved each year in the production of such statements;

it is accepted that he would have received the 2004 Finance Division financial statements and was aware of the misleading nature of the 2004 Exchange and Investment Division financial statement.

KPMG Consolidated Financial Statements

700. By 2005, it appears to have been decided that KPMG would produce consolidated financial statements for AHAB and for the Money Exchange. In contrast to previous years, these financial statements were not simply reviewed by KPMG but audited by them.[565]

562 **{F/137/76}**; **{F/138.1/76}**
563 **{F/148/2}**
564 **{F/148/16}**
565 However, AHAB has made no attempt to explain on the basis of what conditions or assurances from the AHAB Partners KPMG agreed to carry out this audit.

701. On 10 May 2004, KPMG signed off on consolidated financial statements for AHAB and the Money Exchange for the year ending 31 December 2004.[566] These financial statements were signed by Suleiman and Saud[567] and, as noted above, were found as part of the N Files.

702. Remarkably, despite having been shown to have been involved with the KPMG engagement and to have signed the document and the document having appeared in his files, Saud has steadfastly refused to admit that he knew of its contents. Saud says at paragraph 166 of Saud 1W[568] that he is "*as certain as I can be*" that he had not seen these documents before 2011. He goes on to speculate that the documents may have been taken from the Money Exchange by the Younger Algosaibisand became mixed up in the N Files and that his signature may be a forgery, noting that Suleiman's signature on it was found by Dr Giles to be from a Source Signature (or further that he could have signed the document because he thought that his uncle Suleiman did).

703. This evidence is rejected. Saud's previous involvement with the accounts meant that it was only natural that he would also see these documents. Al Sanea had previously both: (i) discussed with him the need for one of the big five auditors to perform such an audit; and (ii) forwarded documents produced by KPMG dealing with the financial position of the Money Exchange. There is no evidence of Saud's signature having been forged. The fact that the documents were found in the N Files points squarely to their having been in his possession.

---

566 **{N/1}**
567 **{N/1/3}**
568 **{C1/2/35-6}**

704. The reasonable conclusion from the face of the documents is that Saud in fact received, read and understood them.

705. This conclusion further undermines AHAB's case. Again, above Saud's signature, the document recorded that:

> "*The financial services business of the Algosaibi Group performed most satisfactorily in 2004. The standing of the Algosaibi Money Exchange Division has been significantly enhanced by its Bahrain based bank subsidiary The International Banking Corporation, which after little more than eighteen months since start-up has achieved healthy profitability.*
>
> *The management team of TIBC has been further strengthened during the year and both TIBC and the Algosaibi Money Exchange are governed by executive committees, which although independent, are each chaired by Sheikh Suleiman Hamad Algosaibi, with Saud Abdulaziz Algosaibi and Maan Abdulwahed Al Sanea acting as the other committee members. In this way, the Money Exchange and TIBC are able to operate independently but necessary coordination of their businesses is also ensured.*"[569]

706. Thus, Saud could have been in no doubt, not only as to the activities and operation of TIBC, but that the Money Exchange's lenders were being told that he was a Board member of both the Money Exchange and TIBC.

707. Saud would also have been aware that the balance sheet was (again) heavily misleading because:

(i) The loans and advances of SAR 3.6bn (SAR 1.587bn of which was loans to related parties) was lower than: (a) the figure for 2001 of SAR 4.128bn (gross) that Saud had included in Saud's Calculations; (b) the figure of SAR 5.637bn (gross) and SAR 4.1bn (net) which Saud had seen in the Attachment 9 for 2002 (which recorded that he had seen the "*full*

---

569 **{N/1/3}**

*report*");[570] and (c) the actual figure for 2004 (which Saud must have seen as part of the Audit Pack for that year) of SAR 7.335bn (gross) and SAR 4.89bn (net).[571]

(ii) The borrowing figure of SAR 5.11bn was still very much lower than the SAR 7.8bn calculated in Saud's Calculations.

2006 and the false financial statements for 2005

708. Preparation of the Money Exchange's financial statements for 2005 appears to have been delayed, such that it was only on 10 May 2006 that Saud, Suleiman, Yousef and Al Sanea signed Resolution R/124 which, as per usual: (i) affirmed the payment of the dividend to the Partners of SAR 36m; (ii) affirmed Resolution R/66 and the false accounting; (iii) affirmed the issuance of an English language set of financial statements; and (iv) tasked Omar Saad to liaise with El Ayouty about preparation of the financial statements.[572] This copy of this resolution was found in Saud's villa (the Arabic as well as the English translation bearing images of the signatures).

709. Following this resolution, on 13 May 2006, Saud wrote to Al Sanea in English[573] stating:

> "*Dear Maan,*
>
> *We have received from Arab Bank the yearly renewal for Algosaibi Group facilities. Noticed that there has been an increase in M.E. facilities. Would like to know the rationale behind the increase and uses.*
>
> *If the intent not to use the increase facility and keep it as stand by, would like to suggest to allocate the increase to Algosaibi Head Office*."

570 **{H30/46}**; **{H30/46.1}**
571 **{F/137/77}**; **{F/138.1/77}** addressed by El Ayouty: "*Attn: All partners. His Excellency Sheikh Suleiman Algosaibi-Chairman of the Board of Directors.*"
572 **{H30/50}**; **{H30/50.1}**
573 **{N/545}**

710. On the face of it, this letter is inconsistent with the "New for Old" case. Not only does it suggest that Saud knew of increases in facilities (having received updates on those facilities from the bank directly) but that he (and it must be assumed the other AHAB Partners, including Suleiman whom Omar Saad said he advised) were sufficiently comfortable with it that Saud directed that if it was not to be used by the Money Exchange, it should be allocated to AHAB H. O.

711. Al Sanea's response is found at the bottom of the letter. This copy was produced by AHAB as coming from AHAB H.O. as relating to the Money Exchange[574] and on which Al Sanea stated, apparently in immediate and cordial response, as follows:

> "*DEAR SAUD,*
>
> ***THE RATIONALE TO INCREASE THE FACILITIES IS TO REDUCE OUR OVERDRAFT BORROWING***. *WE ARE CURRENTLY PAYING 12% P.A. WHICH WE WOULD LIKE TO REDUCE THE OD TO 6% WHICH WILL GIVE US A SAVING OF 6%.*
>
> *FURTHER THIS INCREASE WOULD BE UTILISED TO REPAY THE OVER DRAFT LINE. THEN, AFTER NOT UTILISING THE FACILITY FOR AT LEAST TWO MONTHS, THIS WOULD RING THE BELLS WITH THE BANK AND THEY WILL ASK AS TO WHY WE ARE NOT UTILISING THE INCREASED LINES!! THE ANSWER WOULD BE THAT IT IS TOO COSTLY FOR US AND WILL OPEN THE DOOR FOR NEGOTIATIONS WITH THEM AND ESTABLISH A NEW RATE OF BASE -4% OR BASE 5%. AT THAT TIME I.E. AFTER THE NEGOTIATIONS ARE COMPLETED UP TO OUR REQUIREMENTS (WHICH WILL TAKE UP TO AUGUST OR SEPTEMBER OR MAY BE EARLIER) WE CAN GIVE YOU THE SAR 100 M INCREASE FOR HEAD OFFICE UTILISATION. WE WILL SPLIT THE INCREASE ON A 50:50 BASIS I.E. WE WILL GIVE HEAD OFFICE SAR 100 AND WE WILL KEEP SAR 100. AT A LATER TIME IN THE YEAR IF YOU NEED ANOTHER 100, WE COULD OF COURSE CONSIDER THIS BASED ON THE SITUATION AT THAT TIME OR AFTER WE HAVE CORRECTED THE SITUATION.*

---

574 **{H22/103}**

> ***HOWEVER, THE MAIN CONCERNS FOR THE MOMENT WITH ALL LOCAL BANKS IS FINANCIALS, AS WE ARE ALMOST OVER DUE TO THEM THE SUBMISSION OF FINANCIALS PER OUR AGREEMENT*** *WHICH STIPULATES A PERIOD OF 120 DAYS AND WE ARE WELL ABOVE 150 DAYS SINCE THE YEAR END. THEREFORE,* ***I WOULD APPRECIATE IF YOU COULD SIGN THE FINANCIALS AND SEND IT FORWARD TO ME SO THAT I CAN GET IT SIGNED BY AL AYOUTY ON MY TRIP TO RIYADH TOMORROW****.*
>
> *ALSO, I LOOK FORWARD TO RECEIVING THE SIGNED ARAB BANK DOCUMENTATION AT YOUR EARLIEST CONVENIENCE*"(emphasis added).

712. Thus, Al Sanea's response to Saud's query was:

(1) Openly to acknowledge and explain this increase in borrowing;

(2) To note the high cost of borrowing such that it was necessary to increase borrowing to service earlier borrowing (i.e.: "reduce the overdraft");

(3) To request that Saud sign the financial statements of the Money Exchange with the understanding that they must urgently be issued to the banks; and,

(4) To request that Saud either sign (or procure Suleiman's signature) the Arab Bank documentation in question, clearly implicating Saud in a process for renewal of facilities staunchly professed by him to have involved only Al Sanea, Badr and Suleiman.

713. When cross-examined by Mr. Crystal on this letter, Saud disjointedly claimed both not to remember, as well as to remember it. I excerpt extensively from the transcript on this issue because of its obvious importance to an appropriate assessment of Saud's veracity on the crucial issue of "New for Old" as well as his involvement with oversight of the Money Exchange:[575]

> "*Q. You are simply saying, let's split the increase?*

[575] **{Day48/80:17} – {Day48/83:6}**

A. *No, no, no, not split. I say allocated. It's clear. Maan is giving an explanation here, I do not know what, very complex explanation. But my question to Maan is very clear. I didn't tell him to split or something. I just ask him -- it says, give it to the head office, we allocate to head office.*

Q. *Yes, allocate the increase to head office –*

A. *Yes, sir.*
Q. *-- and he then writes back proposing a split of the additional overdraft facility between head office and the Money Exchange. Is that right?*

A. *I don't recall his response to this. But he answered what he answered here. But –*

Q. *I'm suggesting if you read what he answered, that is what I've just put to you?*

A. *Maan wanted to do something different than my question, yes.*

Q. *And you didn't disagree with him, did you?*

A. *When we -- there was no -- as my recollection, we did not increase the facilities at the head office. So you say disagree or don't agree; I don't remember his response, to begin with. And I told you I remember the incident and there is like nothing happened or something.*

Q. *If you didn't --*
A. *You ask me about specifics of something that I don't recall. Okay. How can I answer something that I have no memory of? Did I –*

Q. *If your memory --*
A. *Did I this or that? I don't know.*
Q. *If your memory is -- and it may or may not be right -- that there wasn't an additional allocation to head office then it's plain, isn't it --*

A. *(audio distorted)*

Q. *-- that there was going to be an additional allocation to the Money Exchange, and you were content with that?*

A. *I don't recall, I don't recall. I don't have memory, exact memory of the details. Maan is suggesting something here, presenting a very complex argument, and it took me like now to -- and your examination, just to understand. What has transpired at the -- I don't have recollection. The -- the -- what I know is that the head office facilities always been small and remained small. So Maan is talking about split -- it hit me, what split? What he's talking about in this letter? You know, no -- zero, nothing, you know? Nothing comes to mind.*

Q. *He's suggesting -- it's clear, isn't it?*

A. *He suggests what he suggests. If he suggested something, you know? He suggests what he suggests.*

Q. *And you didn't reply back to him, "That's not acceptable"? That's right?*

A. *I don't remember –*

Q. *I'm suggesting to you that you did not reply back, saying, "No, we're not doing this"?*

A. *Did I -- did my uncle, we said no over the phone? I don't remember. Did I reply not reply? I don't remember. But -- but I know that what we wanted is just this -- my memory is what our request was.*

Q. *In other words, to have the increased facility made available to head office?*

A. *Yes, to move it. But something that I don't think has happened, so I -- I don't of what -- I don't have -- I don't remember.*"

714. In these exchanges, Saud denied that the financial statements referenced by Al Sanea were those for the Money Exchange, suggesting that they were those of the AHAB H.O. When the obvious was put to him, that they were the financial statements of the Money Exchange, Saud became increasingly angry and incoherent:[576]

---

[576] **{Day48/84:8} – {Day48/85:20}**

"*Q.* *-- I thought you had accepted on a number of occasions that Mr. Al Sanea had nothing to do with head office financials. Do you remember accepting that?*

*A.* *Yes, he has nothing to do with financial, yes. With head office financials, yes.*

*Q.* *Therefore I'm suggesting to you it's obvious from his request that he is here referring to the submission of Money Exchange financials. Do you accept that?*

*A.* *Maan Al Sanea in charge of the Money Exchange financials, not Saud Algosaibi. If -- if -- he's requesting Algosaibi financials, the head office part, and I sign, and I don't sign them anyway. So I don't really don't know what he is talking -- referring to this here. Maan Al Sanea has nothing to do -- and this is why I think he's asking about the head office financials. But I don't remember this really; I don't. You know, I don't remember the response, to begin with.*

*A.* *I remember that, you know, yes, they increase the facility. This incident about travelling to Riyadh, back, it brings no memory really. I*

*Q.* *I am going to ask you once more. We will come back to this topic later no doubt in the cross-examination anyway. I am suggesting that the financials here being referred to are Money Exchange financials. Do you accept that?*

*A.* *I don't accept that. Maan Al Sanea -- Maan Al Sanea in charge of the Money Exchange, the El Ayouty reports to Maan Al Sanea in regard to Money Exchange financials. This is the practice. This is Maan -- Money Exchange is Maan domain and he played us around, he fooled the company, want to run us down. And I sign his financials? He manages the Money Exchange, sir. He doesn't manage the head office. So if he's asking about the head office financials that I sign, even those I don't. I don't sign the Money Exchange financials and I don't even sign the head office financials. Yes, sir.*"

715. Despite the clear force of the documentary evidence and that cross-examination, it is AHAB's submission[577] that it is "*quite possible, logical and plausible*" that the referenced exchanges between Al Sanea and Saud may have been about the AHAB H.O. financial statements rather than those of the Money Exchange. This argument was sought to be made good by reference to the respective dates of the statements, especially that the El Ayouty Audit Report for the Money Exchange was dated 10 April 2006 and so fully a month before Al Sanea's chasing memo.

716. I find that in fact, these exchanges between Saud and Al Sanea were about increased borrowing, primarily for the Money Exchange. It appears moreover, that as Al Sanea requested, Saud did sign the 2005 Money Exchange financial statements. While no copy of the audited English financial statements for 2005 had been disclosed as coming from its records by AHAB,[578] there is nevertheless a copy of the draft English financial statements which bears the signature of both Saud and Al Sanea on both the balance sheet and the statement of income.[579]

717. Saud's explanation for this signature is, as the Defendants submit, bizarre. He claims at paragraph 164.3 of Saud 1W[580] that he does not recall signing the document, does not recall the figures and that he does not believe he would have signed the document, at least not without seeing his uncle's signature on it first. This explanation, such as it is, is rejected. Plainly what happened is that Saud and Al Sanea signed the balance sheet and statement of income on the document, prior to sending it to El Ayouty in order to show

---

577 AHAB's Closing Submissions, **Section 4.235 - 4.239**: **{D/4/139}** to **{D/4/143}**
578 A copy was obtained from El Ayouty upon the Order of this Court directing AHAB to require disclosure from El Ayouty: **{F/172}**.
579 **{F/161/2}**; **{F/161/3}**
580 **{C1/2/34}**

that they had read and understood it.[581] Moreover, it appears that El Ayouty must have relied upon these financial statements to produce the Audit Report for the Money Exchange for 2005 dated 15 April 2006 and which contains the same balance sheet and income statement figures used in these financial statements.[582] In the circumstances, the fact that this El Ayouty Audit Report is dated before the 16 May 2006 memo, while incongruous, is not any more consistent with Al Sanea's reference having been to the financial statements for the AHAB H.O. when one bears in mind that the Audit Report for AHAB H.O. which would have followed based upon them, was itself dated 13 May 2006, three days before Al Sanea's memo.[583]

718. Having found that Saud did indeed sign the financial statements along with Al Sanea, it is obvious that Saud must have understood the figures at the time of signing the document. As such, again, he would have known that the document was misleading:

(1) The loans and advances of SAR 3.95bn (SAR 1.71bn of which was loans to related parties) was lower than: (a) the figure for 2001 of SAR 4.128bn (gross) for Al Sanea alone that Saud had included in Saud's Calculations; (b) the figure of SAR 5.637bn (gross) and SAR 4.1bn (net) which Saud had seen in the Attachment 9 for 2002 (which recorded that he had seen the "*full report*";[584] and the actual figure for 2005 (which Saud must have seen as part of the Audit Pack for that year) of SAR 10.116bn (gross) and SAR 4.531bn (net).[585]

---

581 As discussed below, this appears to have been the approach adopted in 2007 for the 2006 financial statements.
582 **{F/172}**: the Audit Report for 2005 produced by El Ayouty following the Order of this Court.
583 **{F/175/3}**
584 **{H30/46}**; **{H30/46.1}**
585 **{F/171/77}**; **{F/172.1/77}**

(2) The borrowing figure of SAR 5.415bn was still very much lower than the SAR 7.8bn calculated in Saud's Calculations and lower than the actual figure for 2005 (which Saud must have seen as part of the Audit Pack Attachment 8 for that year) of SAR 12.059bn.[586]

719. Even on their own deliberately understated terms, the financial statements also showed an increase in the amount owed to banks from SAR 4,261,523,000 as at 31 December 2004 to SAR 5,415,666,000 as at 31 December 2005.

720. During cross-examination,[587] Saud was forced to accept that it would be obvious to anyone viewing the financial statements that there had in fact been an increase in the borrowing of the Money Exchange:

> *Q.* ***"So there had been a very large increase, hadn't there, in the borrowings from banks and other financial institutions between year end 31 December 2004 and year end 31 December 2005. Do you see that?'***
>
> *A.* ***Yes, I see that, yes****.*
>
> *Q.* *That would indeed be obvious to anybody who read this page of the document?*
>
> *A.* *Yes. What is the question, sir?*
>
> *Q.* *That would indeed be obvious to anybody who read this page of the document?*
>
> *A.* ***Yes. I mean, there is an increase, yes, I see that****.*" (Emphasis added.)

721. Thus, the fact that along with Al Sanea, Saud signed the balance sheet for the 2005 English financial statements rather than challenging Al Sanea about the increased

---

586 **{F/171/76}**; **{F/172.1/76}**
587 **{Day48/90:21}** – **{Day48/91:6}**

borrowing of more than SAR 1.1bn, is entirely inconsistent with AHAB's "New for Old" case. For this reason also, I do not accept AHAB's submissions to the contrary[588] in which it is sought to explain away Saud's acceptance of the much smaller increase in borrowing to be obtained from Arab Bank discussed in Al Sanea's memo of 16 May 2006, as being consistent with the "New for Old" case.

722. Equally, as with previous years, it is plain that Saud's involvement with the production and manipulation of the financial statements for 2005 show that he was fully aware of the activities of the Money Exchange, its borrowing (including the increases in that borrowing) and Al Sanea's indebtedness.

<u>2007 and the false financial statements for 2006</u>

723. On or around 21 March 2007, Suleiman (in his own right and for Yousef), Saud and Al Sanea signed Resolution R/125 which, as per usual: (i) affirmed the payment of the dividend to AHAB; (ii) affirmed R/66 and the false accounting; (iii) affirmed the issuance of an English language set of financial statements; and (iv) tasked Omar Saad to liaise with El Ayouty about preparation of the financial statements. Copies of Resolution R/125 were found at the Money Exchange as well as at Saud's villa.[589]

724. On or around 10 April 2007, Al Sanea sent a letter to Badr stating that "*I am enclosing herewith a draft of the balance sheet of AlGosaibi company, Main headquarters and Ahmad Hamad AlGosaibi & Brothers Co. Money Exchange, Commission and Investment*" and asking Badr to "*arrange to have it approved by brother Saud AlGosaibi*

---

588 AHAB's Closing Submissions, **Section 4.141 (4)**: **{D/4/77}**.
589 **{G/5731}**; **{G/5733}** and **{H30/52.1/1}**; **{H30/52/1}**

*and kept us updated about it.*"[590] This letter was found on H.O. files and a copy of the draft financial statements in English for 2006, signed by Saud and Al Sanea (in the same way as they had signed the previous year) is the document from the H.O. records immediately following the letter.[591]

725. The letter contains Arabic manuscript annotations in Badr's handwriting which stated that "*necessary action was taken. 12/04*", apparently two days after the letter was written. This indicates that Badr did indeed obtain Saud's "*approval*" in respect of the financial statements of the Money Exchange for the year ended 31 December 2006 – hence Saud's signature along with Al Sanea's on the document. When cross-examined by Mr. Smith on this document, Saud professed to have no memory of signing the financial statements. His response, while typical in its invocation of loss of memory, is also revealing in its typical deflection of the issues by charges of deception against Al Sanea:[592]

"*MR. SMITH:*

*Q. "Necessary action was taken". That can only mean that Mr Badr did what he was asked to do in this letter. Do you agree?*

*A. I -- I don't know what was -- I -- I have no recollection of -- of signing the -- er, er, you know, the Money Exchange stuff. This is, er -- Money Exchange is Maan Al Sanea and he -- it is his account. And he report to uncle. So, yani, if -- if it comes -- if Maan wants to make such a request, I will just simply ignore it normally. And what was done I don't know, because he doesn't highlight here, Badr, what was done. Er, and therefore I -- I cannot help you in this.*

*Q. What I am suggesting to you, Mr Algosaibi, is that the note of Mr. Badr indicates that Mr. Al Sanea's request was dealt with and that you did approve the accounts.*

---

590 **{H22/57}**; **{H22/58}**
591 **{H22/59}**
592 **{Day58/137:14} – {Day58/139:25}**

A. *I have no recollection whatsoever, sir, of approving the accounts in the -- in the Money Exchange.*

Q. *I quite understand frailty of memory, Mr Algosaibi.*

A. *No, but –*

Q. *Does that mean -- let me finish, Mr Algosaibi, then you can have your say.*

A. *All right.*

Q. *I quite understand the frailty of memory, Mr Algosaibi, but does your answer saying you have no recollection mean that it could have happened?*

A. *Okay. Sir, the chain of -- of -- of job functions and work does - - the -- does not follow -- I mean, Money Exchange, Maan does not report to me. Okay? So if he wants an approval such as this one, he would have to sign it himself because he's in charge of these accounts, the consolidation. And that then would go to uncle. Now, seeing such a request in this letter, huh, when you say "you remember", this doesn't follow the – the way we ran the company. Now, if Maan wants me to -- in his devious ways and manipulation and games and deceits, and he wants me to somehow -- huh? -- maybe he tried and failed. I don't know what Maan contemplate -- was contemplating when he send this.*

A. *I -- I don't know what was -- I -- I have no recollection of -- of signing the -- er, er, you know, the Money Exchange stuff. This is, er -- Money Exchange is Maan Al Sanea and he -- it is his account. And he report to uncle. So, yani, if -- if it comes -- if Maan wants to make such a request, I will just simply ignore it normally. And what was done I don't know, because he doesn't highlight here, Badr, what was done. Er, and therefore I -- I cannot help you in this.*"

726. Thus, as with his signature for the previous year, Saud claims not to remember signing the draft financial statements in English for 2006.[593] This evidence is rejected: as with the

---

[593] See also Saud 1W, **paragraph 164.5**, where he also earlier denied recalling the matter: **{C1/2/34}**.

statements for 2005,[594] it is plain that Saud and Al Sanea both signed these statements in turn, Saud having done so after they were brought to his attention by Badr. Here, this inference is strengthened given that a copy of the 2006 English financial statements, signed by Saud, was found on AHAB H.O. Files.[595]

727. As was the case in relation to the previous financial statements, Saud must have known that the balance sheet that he signed was misleading:

(1) The loans and advances of SAR 4.202bn for 2006 (SAR 1.56 bn of which was loans to related parties[596]) was: (a) barely higher than the figure for 2001 of SAR 4.128bn (gross) that Saud had included in Saud's Calculations; (b) lower than the figure of SAR 5.637bn (gross) and SAR 4.1bn (net) which Saud had seen in the Attachment 9 for 2002 (which recorded that he had seen the "*full report*";[597] and (c) bore no relationship in reality to the actual figure for 2006 (which Saud must have seen as part of the Audit Pack for that year) of SAR 14.099bn (gross) and SAR 10.1bn (net).[598]

(2) The borrowing figure of SAR 6.005bn was still very much lower than the SAR 7.8bn for 2001 calculated in Saud's Calculations and ludicrously lower than the actual figure for 2006 (which, per Omar Saud and El Ayouty, Saud must have seen as part of the Audit Pack for that year) of SAR 22.076bn.[599]

728. Saud must therefore be regarded as fully aware when signing the balance sheet for 2006, that he was signing a thoroughly dishonest document.

---

594 **{F/161/2}**; **{F/161/3}**
595 **{H22/59}**
596 Note 5: **{H22/59/13}**
597 **{H30/46}**; **{H30/46.1}**
598 **{F/197/77}**; **{F/197.1/77}**
599 **{F/197/76}**; **{F/197.1/76}**

729. Further, the balance sheet that Saud signed showed that the amount owed by the Money Exchange to banks and financial institutions had increased again by some SAR 600m, from SAR 5.416bn as at 31 December 2005, to SAR 6.006bn as at 31 December 2006. Consonant with his denial of knowledge, Saud has failed to provide any explanation whatsoever as to why he felt comfortable with such an increase or how his signature on these financial statements could possibly be consistent with his alleged "New for Old" case.

730. In AHAB's Closing Submissions, the issue of Al Sanea's letter to Badr of 10 April 2007 and these financial statements is dealt with briefly,[600] essentially by recitation of and reliance on Saud's denials in cross-examination. However, AHAB also notes[601] that the El Ayouty Audit Report 2006 for the Money Exchange[602] and the Audit Pack were respectively signed and dated by El Ayouty on 21 and 17 March 2007, some two to three weeks before the date of the letter to Badr seeking Saud's approval of the draft financial statements, drafts which ought to have preceded the El Ayouty documents. While this, like so many other factors in this byzantine case, is strange and begging of explanation, it cannot negate the compelling effect of the presence of Saud's signatures on the draft statements themselves nor the clear implications of Badr's note on the copy of the letter found at AHAB H.O.[603]

---

600 AHAB's Closing Submissions, Section 4.240 - 4.243: **{D/4/143}**. There is reference at **Section 4.242 {D/4/144}** to further treatment in Section 6 **{D/6}** but I did not find this latter reference**.**

601 AHAB's Closing Submissions, Section 4.242: **{D/4/144}**.

602 **{F/200/1}**; **{F/201.1}**; **{F/201.1/1}**

603 **{H22/57}**; **{H22/58}**; **{H22/59}**

731. In my view, here again as in previous years, Saud's involvement with the 2006 financial statements is only consistent with him being fully aware of the activities of the Money Exchange.

<u>2008 and the false financial statements for 2007</u>

732. On 8 February 2008, Saud wrote a handwritten note to Badr[604] regarding the future of the Money Exchange. While Saud challenged the accuracy of its translation and meaning under cross-examination and asserted that he recalled no reason for sending it,[605] in my view, the note coming from a Partner of AHAB, is only consistent with Saud's ongoing oversight of the affairs of both the AHAB Partnership and the Money Exchange and being closely involved in directing their future plans:

> "*Brother Badr*
>
> *For the budget*
>
> *1) A financial statement shall be issued for the Exchange.*
> *2) A financial statement for AlGosaibi Group without the Exchange*
>
> *1) Reasons: the intention is to change the Exchange to become a closed joint stock company and to engage in the business of real estate finance, which is estimated to be in the future of a size around $ 40 billion, as well as the possibility of expansion in the field of money exchange by opening new branches and the like.*
>
> *2) As for AlGosaibi, to be transformed into a closed joint stock company.*
>
> *3) To act accordingly for the Exchange and also for AlGosaibi.*
> *Saud*
> *8/2/2008*."

604 **{H21/4}**; **{H21/5}**
605 **{Day54/120:20}** – **{Day54/135:25}**

733. While in cross-examination Saud suggested that this note "*looks like only thoughts*, *you know? Sound like a brainstorming*,"[606] if any contextual meaning at all is to be attributed, Saud must be taken as having contemplated the existing size of the Money Exchange such that it could increase in size to become a US$40bn company.

734. There is no evidence that Saud discussed this plan with Al Sanea. However, what is clear is that around 21 March 2008, Al Sanea sent to Saud the proposed adjustments to the financial statements of the Money Exchange "*to show* [the] *financial statements in English in a way that matched the figures of previous year*."

735. While no final copy of the letter has been disclosed, a draft of the letter[607] together with a manuscript annotation requiring "*Mr. Tariq*" to amend the date "*21/03/2007*" to "*today's date*"[608] stated:

> "*We enclose herewith the [adjustment]*[609] *restrictions and classification proposed to be made on the book financial statements for the year ended December 31, 2007 to show financial statements in English in a way that matched the figures of previous year*."

736. As discussed above, similar adjustment schedules for earlier years had been sent. It is therefore highly likely that this letter was sent with its enclosure once the date had been amended.

737. There appears, however, to have been some further delay in finalising the financial statements. On 5 May 2008, Suleiman (on his own behalf and on behalf of Saud), Yousef and Al Sanea signed Resolution R/126 of the Board of Directors of the Money Exchange

---

606 **{Day54/119:17}**
607 **{G/6226.8}**; **{G/6226.9}**
608 Which would have been around March/April 2008 - the time when the 2007 year-end financial reports would ordinarily have been finalised.
609 The word has been incorrectly translated as "*amendment*" in the translation in the trial bundles. However, the Court interpreter said that the word should be translated as "*adjustment*" at **{Day66/41:14}**.

which, as per usual: (i) affirmed the payment of the dividend to AHAB; (ii) affirmed Resolution R/66 and its false accounting practices; (iii) affirmed the issuance of an English language set of financial statements; and (iv) tasked Omar Saad to liaise with El Ayouty about preparation of the financial statements.[610]

738. Despite not signing Resolution R/126 himself, it can be safely inferred that Saud was fully aware of the contents of the 2007 Money Exchange financial statements:

(1) Resolution R/126, signed by Suleiman (on behalf of himself and Saud), Yousef and Al Sanea was found in duplicate copies in Saud's villa;[611]

(2) A copy of the audited Exchange and Investment Division financial statements for 2007 was found in his villa;[612]

(3) A draft copy of the 2007 English financial statements was found in his villa[613] and the balance sheet and statement of income were signed by Saud and Al Sanea as in previous years.

739. Saud claims not to remember signing this document (Saud 1W, paragraph 164.7).[614] He offered that these documents had come to his villa as part of the exercise undertaken by the Younger Algosaibis in the immediate aftermath of the collapse of the Money Exchange and the discovery of Al Sanea's fraud and denied that their presence in his villa means that they must have underwent "*some scrutiny by him*." AHAB invites me to

---

610 **{G/6684}**; **{G/6685}**
611 **{H30/56}**; **{H30/56.1}**; **{H30/57}**; **{H30/57.1}**
612 **{H30/55}**; **{H30/55.1}**
613 **{H30/55.2}**
614 **{C1/2/35}** and in cross-examination: **{Day59/5:23} – {Day59/6:5}**.

accept his explanation for their presence (as indeed implicitly also, the presence of the many other relevant documents found in his villa).[615]

740. This is rejected for the same reasons given above for rejecting his claim of ignorance of the financial statements for previous years: it is obvious that Saud and Al Sanea signed the draft financial statement prior to sending it to El Ayouty in order to confirm their acceptance of the information it contained. And as for the significance of the presence of these documents in Saud's villa, I state my general conclusion here that even if they were gathered by the Younger Algosaibis as Saud claimed, it cannot have been mere random coincidence that that exercise could have effected a virtual culling of relevant financial records. Saud would have had to have directed the cull and would certainly have inspected the documents selected (as he acknowledged when he earlier attested about it).[616]

741. As with previous years, the balance sheet signed by Saud was misleading:

(1) The loans and advances of SAR 1.71bn said to be loans to related parties was lower than: (a) the figure for 2001 of SAR 4.128bn (gross) that Saud had included in Saud's Calculations; (b) the figure of SAR 5.637bn (gross) and SAR 4.1bn (net) which Saud had seen in the Attachment 9 for 2002 (which recorded that he had seen the "*full report*");[617] and (c) the actual figure for 2007 (which

---

615 AHAB's Closing Submissions, **Section 4.244**: **{D/4/144}**.

616 As set out in his statement for the London Proceedings in May 2011 as follows: "*Very shortly after the problems with the Money Exchange came to light in May 2009, some of the younger male members of the family looked for documents relating to the Money Exchange at the Head Office*"**{L1/7/6}**, Saud went on to admit that he reviewed the documents brought to him: Saud 2A, **paragraph 25 {L1/8/7-8}**, repeated in Saud 1W, **paragraph 366 {C1/2/76}**.

617 **{H30/46}**; **{H30/46.1}**

Saud must have seen as part of the Audit Pack for that year) of SAR 24.9 bn (gross) and SAR 13.7bn (net).[618]

(2) The borrowing figure of SAR 5.327bn was still very much lower than the SAR 7.8bn calculated in Saud's Calculations and lower than the actual figure for 2006 (which Saud must have seen as part of the Audit Pack for that year in Attachment 8) of around SAR 40bn.[619]

742. Again, it must have been the case that Saud was fully aware, when signing the balance sheet for 2007, that he was signing a thoroughly dishonest document.

743. Equally, the balance sheet (signed by Saud) showed an increase in the total liabilities of the Money Exchange from SAR 6.234bn as at 31 December 2006 to SAR 8.803bn as at 31 December 2007. This includes an increase in the term loans from SAR 143.571m as at 31 December 2006 to SAR 3,275bn as at 31 December 2007. Again, no explanation has been provided by AHAB as to how this could possibly be consistent with the "New for Old" case.

744. Moreover, when Saud received the 2007 Audit Pack, he must have known, not only that the liabilities of the Money Exchange and Al Sanea were increasing, but that the liabilities of the Money Exchange were sufficient to wipe out AHAB many times over even if Al Sanea repaid all of his indebtedness:

(i) Attachment 3 to the 2007 Audit Pack showed the value of the entire Money Exchange investment portfolio to be SAR 11.269bn;[620]

(ii) However, Attachment 8 showed liabilities of SAR 40.098bn;621

---

618 **{F/229/76}**; **{F/230/76}**
619 **{F/229/75}**; **{F/230/75}**
620 **{F/230/61}**

(iii) Thus, even if Al Sanea had repaid his entire net indebtedness of 13.7bn[622] *and* the Money Exchange had liquidated its entire portfolio (which may not have been possible), it would still have had liabilities as at 31 December 2007 of SAR 15bn.

745. Despite such overwhelmingly clear implications of the 2007 Audit Pack, AHAB in Closing Submissions[623] submits that the Defendants cannot point to a contemporaneous document which shows that Saud actually received the Attachment 9 (Ledger 03 in the Money Exchange's records) figures or the financial statements for the Finance Division revealing the true extent of the Al Sanea net indebtedness. I reject this argument by which AHAB merely alights upon a marginal but telling aspect of the cross-examination without addressing the obvious implications of the broader picture.[624] It is an argument which focused upon the comparison between the SAR 7.8bn for overall bank borrowing shown in Saud's Calculations in 2002 for year end 2001, with here the year end 2007 bank borrowing shown as increased to SAR 8.5bn, (according to the English language balance sheet[625] but absurdly less than the real amounts shown in the Audit Pack).

746. It was put to Saud by Mr. Smith that he must have appreciated that even the figure of SAR 8.5bn shown in the balance sheet for the Exchange and Investment Division was greater than the SAR 7.8bn which he encountered when working on Saud's Calculations in 2002. The relevant exchange was as follows:

---

621 **{F/230/75}**
622 **{F/230/76}**
623 AHAB's Closing Submissions, **Section 4.245**: **{D/4/146}**.
624 **{Day59/8:22}**; **{Day59/9:22}**
625 **{H30/55.2/2}**

"*Q.* *I'm sure you will agree with me -- and perhaps you can simply answer "yes" or "no" -- that SAR 7.8 billion is less than SAR 8.5 billion.*

*A.* *Yes, yes, sir, of course.*

*Q.* *I am putting to you that you knew of this increase and allowed it to occur.*

*A.* *I disagree.*

*Q.* *How could this increase occur, given your assertion that there was a new for old policy?*

*A.* *Okay. We -- we have reached, you know, an agreement with Maan after that, you know, the papers you showed me yesterday for Maan to repay his debt, and we believe that he repay his debt. Now, over the years, as these papers came to -- to my uncle, the -- there must be at times, er, where he -- he may have allowed some interest to accumulate to increase or one bank for another, and that was my understanding of the old for new, for he always wanted to see the old one and the new one, as -- as he many times told me that this is the practice he did.*

*Q.* *Mr Algosaibi, what I am putting to you is that the third party bank borrowing has clearly gone up, when one compares the document on the right to the document on the left.*

*A.* *I -- I don't have recollection of this, yani. But you say it's gone up, then it's gone up.*"

747. This reluctant acceptance of the obvious was, in my view, the transparently opportunistic articulation of the "New for Old plus a little bit for interest" version of AHAB's case, arising from Saud's recognition that some kind of explanation was required for the increased borrowing. But even while Saud acknowledged this increase of SAR 700m over 6 years as being explicable by Suleiman's accommodation for interest charges, he steadfastly ignored the fact that that proposition bears no relationship to the real increase in borrowing from SAR 7.8bn in 2001 to the SAR 40.09bn disclosed by the 2007 Audit Pack. He would certainly have consulted the 2007 Audit Pack for the true amount of the

Money Exchange borrowing and the Al Sanea indebtedness. In addition to Omar Saad's evidence, one is reminded of this also by Yousef's evidence[626] to the effect that Saud would have seen the Audit Packs and Reports between 2003 and 2009.

## SAUD'S CONTINUED INVOLVEMENT IN EFFORTS TO SELL THE MONEY EXCHANGE

### Further evidence of Saud's knowledge of the financial affairs of the Money Exchange appears from his involvement with the efforts to sell it to Maan Al Sanea

748. Including as discussed above involving Yousef, it is common ground that there were sporadic attempts to sell or close the Money Exchange prior to 2008. It is hardly surprising that such efforts were made because the spiralling liabilities of the Money Exchange posed an obvious risk to AHAB.

749. It is likely that during discussions which apparently occurred between 2004 and 2006 or subsequently, AHAB continued to inform itself of the value of the share and property portfolios (which information was in any event at H.O.), the Money Exchange's total borrowing and Al Sanea's net indebtedness (by obtaining up-to-date information from El Ayouty); as Yousef, Suleiman and Saud had done on previous occasions.

750. The evidence suggests that Saud would have been the person primarily responsible for the continued efforts to sell.

Evidence of Discussions

751. Saud appears to have written to Al Sanea in April 2003 referencing a sale of the Money Exchange "*… regarding what was agreed on with me and uncle Suleiman and my cousin Yousef a few months ago…*" (although no signed copy of that letter has been

---

[626] **{Day29/77:3} – {Day29/79:18}**; **{Day38/61:23}** and earlier discussed above at paragraph 438

disclosed).[627] It is apparent that there were irreconcilable differences over the re- transfer of the SAMBA shares held by Al Sanea and how the Al Sanea indebtedness was to be redeemed. Whatever the real source of his understanding in this regard, as much is confirmed by Saud at paragraph 231 of Saud 1W.[628]

752. Saud also speaks in his witness statement of other meetings with Al Sanea when the sale of the Money Exchange to him was discussed.[629] Dawood also gives an account of a meeting involving Suleiman.[630] Whatever the terms of those discussions may have been, it is inconceivable that they could have been entered into without especially Saud, Suleiman and Yousef having apprised themselves of the true state of the Money Exchange's bank liabilities and of the Al Sanea indebtedness. This is therefore yet another indicator about the true state of the AHAB Partners' knowledge from time to time.

753. The truth is that agreement on the sale could not be reached because, as Saud acknowledges,[631] the share portfolio was not available for sale to repay the bank liabilities. The shares had long since been pledged as security to SAMBA and part of Al Sanea's indebtedness had been guaranteed by Abdulaziz on his behalf and on behalf of AHAB. Saud was well aware that nothing could have changed for the better in this regard, when he made his last ditch effort to sell to Al Sanea "*for a nominal sum*" on 9 May 2009.[632]

---

627 **{G/3222}**
628 **{C1/2/49}**
629 Saud 1W, **paragraphs 232 – 241**: **{C1/2/49-50}**.
630 Dawood 1W, **paragraph 29**: **{C1/1/9}**.
631 Saud 1W, **paragraph 231**: **{C1/2/49}**.
632 Saud 1W, **paragraph 351**:**{C1/2/72}**.

A more detailed look at Saud's attempts to produce financial statements for SAMA

754. In light of AHAB's case of disengagement from the Money Exchange, Saud's dealings with SAMA are significant for a further number of reasons:

(i) As a result of his dealings with SAMA, Saud had to have acquired a detailed understanding of the financial statements (and, by extension, the financial position) of the Money Exchange;

(ii) These dealings demonstrate that Saud must have known that the financial statements of the Money Exchange were false and misleading;

(iii) The interchange with SAMA and the frustration of being unable to join in the merger of Saudi Arabian money exchanges (and thereby acquire a substantial valuable shareholding in the consolidated entity, Al Bilad bank) appears to have been a catalyst for the establishment of TIBC in 2003 (see below).

755. SAMA's merger proposal had initially fallen to Abdulaziz to deal with. On 10 August 2000, Abdulaziz wrote to El Ayouty[633] informing them of the intention on the part of the SAMA to create a single banking institution by merging some of the existing money exchanges in Saudi Arabia "*and then granting us a banking licence...for that establishment*." He therefore requested for the purposes of the application, that El Ayouty provide AHAB with an unaudited financial position report "*only for the money exchange office, as at 30 June 2000*."

756. It appears however, that over the next couple of years, the SAMA plan became more of an edict such that without a licence from SAMA, money transmittance business would be

---

633 **{G/2197.1}**; **{G/2197.2}**

prohibited.[634] Following Abdulaziz's stroke, Saud was immediately forced to deal with SAMA and considerable difficulties appear to have emerged within AHAB for presenting the required financial statements.

757. It was AHAB's intention to comply and Saud appears to have been attracted by the idea of the merger:[635]

> "*Q. The fourth thing that you would have indicated to Uncle Suleiman is that AHAB might be able to rescue itself if it could negotiate a reduction in its debt to foreign third party banks.*
>
> *A. This is -- no. We were doing the consolidation with the exchanges. Huh? Was I -- was I thinking of -- of --I don't know what I was thinking of. Huh? When – when that -- when you say half, I don't know what I was thinking of, but I know it had no relation to what you are saying under foreign banks. Because at the time period we were doing the consolidations with the – with the exchanges. Now, if the consolidation with the exchanges would have happened, the value of the shares would be multiple, multiple of what you are talking about. Okay? Because this -- the shares which we have got, it would have skyrocketed. So the -- yani, what we had in mind at the time period when my father is sick, to -- to comply with the government's request for consolidation, because that would have been making even more money for us.*
>
> *CHIEF JUSTICE:*
>
> *Q. Could you explain, Mr. Algosaibi, why you say the consolidation would have made you even more money?*
>
> *A. Yes, sir, because we would have gotten shares and –
> and -- and -- they -- that big bank and the share value would have skyrocketed.*"

758. However, Saud must also have been aware that compliance with SAMA's requirements for audited financial statements presented serious risks for AHAB. This was because, as the detailed examination above in this Judgment reveals, accurate financial information

---

634 On 2 April 2003 a circular to that effect was sent out by SAMA to all banks and exchanges operating in the Kingdom: **{G/3668}**; **{G/3669}**.

635 **{Day58/113:17} – {Day58/117:16}**

about the Money Exchange could not be presented to SAMA without revealing the longstanding fraud in which AHAB and the Money Exchange had been involved.

759. And so, Saud and Al Sanea appear to have devised a solution: to bring about a legal separation of the "*Exchange Division*" from the remainder of the Money Exchange. To this end, Al Sanea wrote to Saud on 17 April 2001[636] stating:

> "*Concerning **our proposed letter to Mr. Salah Al Ayouti**, we request to postpone it pending completion of the financial statements on 31/12/2000, and separation of the exchange from investment and preparation of its statements and **establishing exchange division separately from the investment and finance division**.*
>
> *We will issue the balance sheet on 31/6/2000 through KPMG or one of the big five, as requested by the Agency*" (Emphasis added.)

760. The "proposed letter" to El Ayouty has not been disclosed.

761. However, in the handwritten text at the bottom of this letter[637] we see Saud's immediate response to Al Sanea:

> "*Maan Abdul Wahid Al Sanie*
> *[handwritten text]*
>
> *Brother Abu Saad*
>
> **We can not do that because we appointed A1 Ayouti to perform that;*
> **The said comments are easy to deal with and easy to amend;*
> ** We have to start the arrangements because this will be in the public interest- as delay will have several impacts that would be difficult to control in the future.*
> ** Separation of the two divisions will be easier if we reduced the comments and accelerated submission to the Agency*
> ** The financial statements for the last 5 years have the same comments.*
>
> *Your brother*
> *Saud*
> *18/4/001*"

636 **{N/277}**; **{N/276}** (the English translation of Al Sanea's letter is mistakenly dated "2011").
637 **{N/277}**

762. While this letter is the subject of further examination below, its significance in this context is the insight it offers into Saud's knowledge of and supervisory role over the Money Exchange, here for the purpose specifically of "separation of the two divisions," to comply with the SAMA edict. As will be apparent below, Saud must have eventually agreed that a "big five" auditor, **E&Y**, be engaged.

763. As can be seen from Saud's immediately preceding letter of 16 April 2001[638] in which he enclosed a list with 17 points (i.e. Saud's List, examined above), he and Al Sanea had also had a meeting:

> "***According to our last meeting***, *attached you will find* ***a list with some comments regarding the issues that have been repeated for several years on the balance sheet*** *that should be remedied. Please take the appropriate steps to remedy these issues*" (Emphasis added.)"

764. Thus, it is plain beyond argument that in all these communications Saud was clearly addressing issues in the Money Exchange's financial statements with which he was fully acquainted. Yet, none of these communications are discussed in Saud's witness statements.

765. SAMA continued to advance the process of merging Saudi Arabia's Money Exchanges. On 26 May 2001, Deputy Governor Al Suhaimi of SAMA wrote to AHAB and asked for four years of audited financial statements, "*for the years 97, 98, 99 and 2000 so that we can complete the commissioned committee procedures*."[639] This was obviously a problem.

766. AHAB clearly was unwilling to comply with SAMA's order. That was not because AHAB did not have Money Exchange financial statements: it clearly did. Instead, Saud

---

638 **{G/2430.1/1}**; **{G/2430.2/1}**
639 **{G/2472.2}**; **{G/2472.3}**

wrote to Mr. Al Suhaimi of SAMA[640] stating that "*...the Exchange is one of the branches of the company relating to investment which is why it does not have a separate balance sheet and we are in the process of preparing independent financial statements for the Exchange Branch as on 30/6/2001 to present it to you after being ratified by an accredited auditor.*"

767. This was a carefully crafted and misleading letter, which avoided the danger of producing the existing Money Exchange accounts. Saud was seeking to buy time by offering to separate out the "Exchange Division" for a six month period. It is not known what, if any, response was received from SAMA.

768. A draft of this letter was discussed with Yousef and Suleiman and then sent to Al Sanea after being signed by Saud under cover of a note from Saud.[641] This demonstrates the difficulty and delicate nature of SAMA's request such that Saud felt it necessary to seek Yousef's and Suleiman's counsel. A signed version of the letter to SAMA appears at {G/2481.1} {G/2481.2}.

769. El Ayouty clearly found it difficult to deliver six months of audited accounts for the "exchange branch" as explained in a letter of 20 June 2001 addressed to Al Sanea referencing his and Saud's earlier instructions.[642] Nevertheless, they did produce draft financial statements as at 30 June 2001.[643] Manuscript writing on the top of the front page of the document identifies that this included the balance sheet proposed to be sent to SAMA.

770. However, the financial statements were not satisfactory:

640 **{N/328}**; **{N/329}**
641 **{G/800.1}**; **{G/800.2}**
642 **{G/2497.3}**; **{G/2497.4}**
643 **{F/105}**; **{F/106}**

(1) They were unaudited draft financial statements and were misdated "25 March 2000G."[644]

(2) Rather than simply showing the Exchange (i.e. the remittance business) part of the Money Exchange:

(i) they continued to show the investment portfolio of SAR 708m at cost and SAR 958m at fair market value.[645]

(ii) they also showed liabilities of SAR 668m, which were far in excess of those one would expect to see in a remittance business.[646]

771. Clearly, these financial statements could not be and were not sent to SAMA. It was obviously difficult to separate out the "Exchange Division" without exposing the fact that it was a façade with no appreciable trade. El Ayouty's draft shows that AHAB was grappling with the challenge of presenting it as a substantial business.

772. The fact that AHAB did not comply with SAMA's order is consistent with the Defendants' case that Suleiman and Saud knew that the financial statements were false. In fact, no innocent or positive explanation has been given by Saud as to why SAMA's request was not complied with simply by sending Money Exchange accounts. If Saud had thought that the financial statements had been prepared honestly, there is no reason why he would not have done so.

773. Instead we see that as late as 31 May 2003, Saud wrote to Governor Al Sayari of SAMA[647] citing first Abdulaziz's stroke and then his subsequent demise, as the reasons why AHAB had not complied. This letter bears close reading as it also reveals: (i) Saud's

644 **{F/106/6}**
645 **{F/106/3}**; **{F/106/10}**
646 **{F/106/12}**
647 **{G/3361}**; **{G/3362}**

ability to speak on behalf of AHAB and his expressed assumption of responsibility for the implementation of the merger of the Money Exchange; (ii) in this wise, his concern to assure SAMA, presumably in light of its prohibition against unlicensed trading[648] that he has "*endeavoured to reorganize the Company's situation in ways that ensure that its activities will continue in a regular and sound manner*"; and (iii) his anxiousness to "*assure (SAMA) about our desire and full readiness to enter into the merger… We would appreciate if your Excellency would assist the Company in achieving this goal by approving our having a cash stake in the new company [the Merged Entities], after specifying the amount of the cash stake required from us in this case*."

774. This clear evidence of Saud's high level responsibility was nonetheless steadfastly sought to be denied by him in his usual refrain that "*everything has to do with exchange has to do with Maan*."[649]

775. The fact that AHAB never managed to participate in the merger can only be attributed to its inability to present accurate and reliable audited accounts for the Money Exchange.

<u>Saud's Correspondence with El Ayouty in 2001</u>

776. It will be recalled that Saud had promised SAMA six months of accounts for the Money Exchange from an "accredited auditor". El Ayouty had been unable to produce them for six months ending 30 June 2001 (as discussed above). Whether this meant the initial opportunity was lost or whether Saud was preoccupied with his father's illness, the preparation of accounts for SAMA appears not to have been resumed until the year end accounts for 2001 were being prepared.

---

648 See above and **{G/3668}**; **{G/3669}**.

649 {**Day43/83:3**}; **{Day43/84:17}**

777. In 27 March 2002, Saud corresponded with El Ayouty in Arabic[650] about the detail of the 2001 financial statements of the Money Exchange *pre*-audit:

> "*Subject: budget and closing accounts for the exchange division for the period ending on 31 December 2001 AD*
>
> *Please work on preparing the comments expected on the 2001 AD year budget for the exchange division, so that we may review them with you as well with Mr. Jalal Al Sharif, as I am attempting to liquidate most of them so that mention to them may be avoided in the budget report to be issued this year.*
>
> *I hope this will be done as quickly as possible as I am going to be traveling overseas shortly.*"

778. El Ayouty must have answered this letter[651] because Saud sent a further letter the next day[652] referencing the "*misunderstanding received in the letter sent to you on 27 March 2002*" stating:

> "*We would like to explain to you that after the suspended items and the comments must be finished. After this is done, they will be submitted to the money exchange administration for the managing director for discussion. After settlement they will be submitted to us. This, however, must take place without any delay in the budgets for your information.*"

779. In cross-examination, Saud reluctantly confirmed that this was part of a process by which El Ayouty's comments on the financial statements would be submitted for AHAB to be reviewed.[653]

E&Y Consolidated Accounts

780. On or around 29 May 2002, E&Y delivered consolidated financial statements for the

---

650 **{G/2798.3.1}**; **{G/2798.3.2}**
651 Though this response has not been disclosed.
652 **{G/2798.5}**; **{G/2798.6}**
653 Again, at **{Day43/78:3} – {Day43/84:17}**.

Money Exchange and AHAB Head Office[654] ("the E&Y Accounts"). However, rather than carrying out a full audit, E&Y had simply reviewed the balance sheet and consolidation schedules for arithmetical accuracy and compliance with consolidation principles (i.e. they had not reviewed any of the underlying financial information).[655] And hence, I suppose, their description of their report as "PROFORMA."

781. While Saud generally denies responsibility for oversight of the Money Exchange's response to the SAMA merger (which in the end excluded the Money Exchange) and implicitly having received the E&Y Accounts or indeed any consolidated accounts,[656] this contention must be rejected:

(1) Saud had a reason for these accounts to be produced: he had discussed with Al Sanea issuing these accounts through a "*big five*" firm[657] and had promised to provide SAMA with accounts "*after being ratified by an accredited auditor*."[658] Consolidated accounts from E&Y would have helped Saud present respectability to SAMA.

(2) The E&Y Accounts were addressed to "*The Partners*" and a firm such as E&Y can be presumed to have sent them out properly to the addressees.[659]

(3) Saud has not plausibly explained why he was involved in dealing with audit questions for the Money Exchange in April 2001 if this was out of the ordinary.

(4) Saud's denial must be viewed in the context of his previous willingness to deny inconvenient facts (such as the fact that he signed the financial statements in the

---

654 **{F/110}**
655 **{F/110/4}**
656 Saud1W: **{C1/2/36-40}**.
657 {**N/277**}; {**N/276}**
658 **{N/328}**; {**N/329}**
659 **{F/110/2}**

2000s or the fact that he possessed documents in his safe). His blanket denial here is no more credible than in other instances.

782. I accept that it is more probable than not that Saud received and read the E&Y Accounts. On doing so, he would immediately have seen that the balance sheet understated the liabilities and the related party loans and grossly overstated the partners' equity capital as being SAR 1.2bn (when it was never before expressed as more than SAR **200m**, being the capital of the Money Exchange and which he must have known had never been paid).

**AHAB PARTNERS' KNOWLEDGE OF THE FINANCIAL BUSINESSES**

783. In the maintenance of its case of lack of knowledge and involvement in the fraud upon the banks, AHAB has sought to distance itself from the Financial Businesses, laying the blame for their operations solely and squarely upon Al Sanea. For instance, in its written opening submissions AHAB asserted that "*The establishment and operation of TIBC is one of the most brazen aspects of Mr. Al Sanea's fraud.*"[660]

784. The reality disclosed by the evidence is very different and shows that the AHAB Partners, including more latterly Suleiman and Saud, were very much aware of the establishment of the Financial Businesses and approved of their use for the procurement of billions of dollars of borrowing.

785. Here again I will adopt extensively the closing written submissions of the Defendants,[661] with my comments added throughout.

---

660 **{U/1/79} [460]**

661 **{E1/17}** with schedules of documents at **{E1/17.1/1} – {E1/17.5/1}**; and **{E1/14/66-74}**.

**AIH**

786. As mentioned above, the first of the Financial Businesses, AIH, emerged in the 1980s. Incorporation of AIH was first approved at a meeting of the AHAB board of directors on 9 October 1983 attended by Ahmad and Suleiman.[662] The meeting resolved that AIH would be established in Bahrain and its shares would be divided equally between Ahmad, Abdulaziz and Suleiman, the then partners of AHAB. The Board resolution, which was also witnessed by Al Sanea, records that the purpose of AIH was:

> "*…to hold and manage certain investments on behalf of the shareholders and to provide investment management services to third parties. The Company will essentially act as an arm of our Money Exchange Bureau which is a division of Ahmad Hamad Algosaibi & Bros. Co.*"

787. Further approval was later given at another meeting on 1 May 1984,[663] called by Abdulaziz "*to review the proposal submitted by him for presenting a request to the government of the State of Bahrain to incorporate an investment company in Bahrain."*

788. At that meeting, attended by Abdulaziz, as well as Ahmad, Suleiman, Yousef and Mr. Hindi; it was determined that AIH would be "*solely owned*" by the Money Exchange "*due to the nature of this company's business activity being in the same field. AlGosaibi Money Exchange will pay and cover the proposed capital with its funds and profits*."[664]

789. The meeting also authorized Al Sanea, as managing director of the Money Exchange "*to take the necessary procedures towards completing the formation of this company*" and delegated to him "*all powers and mandates that may facilitate the formation and establishment of this company*."[665]

---

662 **{G/993}**
663 **{H29/55/1}**; **{H29/55.1/1}**.
664 **Ibid**.
665 **Ibid**.

790. AIH was incorporated in Bahrain on 21 May 1984.[666] Ahmad, Abdulaziz and Suleiman were all recorded as attending an Ordinary General Meeting of AIH on 28 May 1984, a week after it was incorporated, at which the following appointments were made:[667]

(1) The first Board of Directors, comprising Ahmad (Chairman), Abdulaziz (Deputy Chairman), Suleiman, Yousef and Al Sanea;

(2) Al Sanea as Managing Director (and he was re-appointed in that role on 9 December 1986).[668]

791. A further meeting of the Board of Directors was held on 29 May 1984, attended by Ahmad, Abdulaziz, Suleiman, Yousef and Al Sanea.[669] At that meeting John Potter was appointed General Manager. In common with Al Sanea, Mr. Potter was re-appointed on 9 December 1986[670] when Mr. Astley-Cooper was also appointed Investment Manager. Other staffing appointments were also made.

792. Al Sanea resigned as Managing Director and as a director of AIH on 25 October 2005,[671] and Mr. Shaheen was appointed as a director in his place.[672] Al Sanea continued to be involved in the running of the business of AIH, notwithstanding his resignation.

**ATS (formerly AIS)**

793. Algosaibi Investment Services Limited ("AIS") was incorporated on 3 September 1985 in Bermuda.[673] It changed its name to Algosaibi Trading Services Limited ("ATS") on 13

---

666 As noted in Note 1 to its consolidated financial statements presented by PWC for the year ended 30 June 2008: **{G/7491/10}**.
667 **{G/1011/1}**, with the appointments on **{G/1011/2}**.
668 **{G/1101/1}**
669 **{G/1010/1}**
670 **{G/1101/1}**
671 **{G/4984/1}**
672 **{G/4975/1}**
673 **{G/1050/2}**

February 2002.[674] It is an entity distinct from Algosaibi Trading Company, an AHAB subsidiary based in Al-Khobar which does not play a direct part in these proceedings.

794. ATS was initially owned by the Partners of AHAB,[675] but it was resolved by an AIH board resolution of 16 March 2005 that AIH would acquire all the shares therein,[676] and the transfer was effected on 29 April 2005.[677] Accordingly, since AIH was owned by AHAB or its Partners, ATS was at all material times directly or indirectly owned by AHAB or its Partners.

795. ATS was managed from Bahrain. It had a small branch office in Dubai.[678] As at 31 May 2005, the directors of ATS were Suleiman, Yousef, Al Sanea, Mr. Moolman, Mr. Potter and Mr. Stewart.[679] Al Sanea resigned as a director on 25 October 2005.[680] He continued to be involved in the running of the business of ATS, notwithstanding his resignation.

796. It is not disputed that the functions of ATS included obtaining finance through trade finance facilities.[681]

**<u>TIBC</u>**

797. TIBC ("The International Banking Corporation") was a bank, formed in 2003, ostensibly as AHAB's offshore banking subsidiary, and licensed in Bahrain.

798. TIBC was at all material times 93% owned by AHAB.[682] The remaining 7% went

---

674 **{G/1050/1}**
675 See for example **{G/3997/1}** dated 30 March 2004 (as per its footnote) and **{G/3643/1}** which transferred shares owned by Abdulaziz to his heirs upon his death.
676 **{G/4598/1}**
677 **{G/1050/11}**
678 **{G/3997/1}**
679 **{G/1050/12}**
680 **{G/4982/1}**
681 AHAB's Opening Submissions **[453]** **{U/1/176}** and Charlton London 1W **[195]** **{L1/25/74}**.
682 Statement of Claim **[18.1]** **{A1/2.3/7}**, and contemporaneous documents **{G/3296/1}**, **{G/7657/7}**, **{F/267/27}**.

through a series of ownership changes, as described by Dr Omar Al Mardi:[683]

(1) "*Mr Al Sanea held 5% and Sana Abdulaziz Algosaibi ("Sana") (the wife of Mr Al Sanea and niece of Suleiman) held the other 2%*".

This is supported by Articles of Association dated 20 May 2003[684], an undertaking of the same date,[685] a "Summary of Contract"[686] which appears to be an official document which was faxed by El Ayouty, apparently to Saud, in June 2003, and what seems to have been an early presentation to the BMA.[687]

(2) "*Later Mr Al Sanea transferred his 5% to Sana*". This apparently occurred following a resolution to that effect which was passed at an Extraordinary General Meeting in April 2004, and approved by the BMA in June 2004.[688] The transfer seems to have been effected by December 2004 since memos between Mr. Hayley and Al Sanea from that time (in the context of an increase in share capital) refer to Sana'a being a 7% shareholder.[689]

(3) *"The 7% held by Sana was transferred to Algosaibi Investment Holdings Ltd in August 2006 after Mr Al Sanea set up Awal Bank in Bahrain"*. This is confirmed by approval from the BMA in January 2006[690] and the 2009 AHAB Group Profile referring to AIH owning 7%.[691] Since AIH was owned by AHAB or its partners, following that transfer, TIBC was owned entirely by AHAB or its

683 Al Mardi 3A **[7] {C2/16/4}**
684 **{G/3296.1/1}** ■C
685 **{G/3296/1}**
686 **{N/218/1}** ■N-4/03 <Ar> {N/219/1} <Tr>.
687 **{G/612/2}** - slide presentation addressed to the Bahrain Monetary Authority in support of the application for TIBC's licence.
688 **{G/4127.1/1}** and **{G/4152/1}**.
689 **{G/4462/1}** and **{G/4469/1}**.
690 **{G/5082}**
691 **{G/7657/7}**

partners (directly or indirectly).

799. The original intention appears to have been that TIBC's directors would be Abdulaziz (Chairman), Suleiman, Yousef and Al Sanea.[692] Dr Al Mardi says Suleiman was Chairman from the date of formation.[693] In any event, Suleiman at some point did become Chairman,[694] and steps were taken following the death of Abdulaziz to appoint Saud as a director.[695]

800. Al Sanea resigned as Managing Director of TIBC on 23 December 2004,[696] and as a director on 25 October 2005.[697] Al Sanea remained involved in the affairs of TIBC, notwithstanding his resignations.

801. Yousef, Saud and Dawood's evidence as to their knowledge of the Financial Businesses is to the same effect. They deny knowing about the existence and activities of ATS and TIBC until May 2009.[698] They have, however, stated that they were aware of the Money Exchange having "*some sort of representative office in Bahrain*" (Yousef's wording[699]); a "*small, representative presence in Bahrain*" (Saud's wording[700]); or a "*branch or representative office in Bahrain*" (Dawood's wording,[701] although he had used a different description in the London Proceedings: "*I had believed that the Money Exchange had a presence in Bahrain, but that it was limited to a small office*"[702]).

692 **{G/3296/2}**
693 Al Mardi 3A **[8]** **{C2/16/4}**
694 **{G/612/3}**
695 **{G/4014.1/1}** <Ar> **{G/4014.2/1}** <Tr>.
696 **{G/4480/1},** accepted by the board of TIBC on 27 December 2004 **{G/4490/1}**.
697 **{G/4983/1}**
698 Including Yousef 1W **[129]** **{C1/3/28}**; Saud 1W **[35]** **{C1/2/8}** & **[39.2]** **{C1/2/9}**; Dawood 1W **[32]** **{C1/1/9}**.
699 Yousef 1W **[133]** **{C1/3/30}**.
700 Saud 1W **[34]** **{C1/2/8}, [299]** **{C1/2/62}, [424]** **{C1/2/87}**.
701 Dawood 1W **[33]** **{C1/1/9}**, **[68]** **{C1/1/16}**.
702 Dawood London 1W **[38}** **{L1/2/12}**

802. Whatever the wording used, the assertions have in common a lack of specificity.

803. Neither Saud nor Dawood made any attempt to explain why they never made any enquiry about what the role of that 'representative office' or 'presence' might have been, or why they remained ignorant in that respect. Yousef put it in the vaguest of terms: [703]

> "Before May 2009, I was aware that the Money Exchange had some sort of representative office in Bahrain but not that it engaged in any substantial financial activity. I assumed that it played a role (although I did not know what) in the authorised business of the Money Exchange. I believed that the representative office had been present in Bahrain for a number of years and that John Potter, whom I knew a little, worked there. I never visited the representative office in Bahrain."

804. In his witness statement for the London Proceedings, AHAB's "*trusted business adviser*",[704] Mr. Hindi, addressed his own and the AHAB partners' knowledge of ATS and TIBC.[705] He did not mention a 'representative presence', and asserted that "*I had never heard of either of* [ATS or TIBC] *before May 2009 and was entirely unaware of their activities*".[706.] His omission of an express reference to AIH risks being overlooked, but is telling in light of the evidence that showed his involvement with AIH, including participation at the very meeting at which the Partners resolved for its formation.[707] It must be inferred from the absence of a denial in that respect, that he was aware of AIS and AIH.

805. Indeed, it is plain beyond argument from the foregoing and even without reliance on the evidence of Dr Al Mardi which AHAB seeks to refute, that the AHAB Partners were aware of and approved of the activities of the Financial Businesses. In addition to the

---

703 Yousef 1W **[133] {C1/3/30}**
704 Yousef 1W **[18] {C1/3/5}**
705 Hindi London 1W **[82-87] {C1/20/23-24}**.
706 Hindi London 1W **[82} {C1/20/23}**
707 **{H29/55/1}** and above.

foregoing relating to their establishment and operations, very many documents recovered from AHAB H.O. locations or bearing Suleiman's signature refer to the Financial Businesses. Many facility-related documents signed by Suleiman and referring to the Financial Businesses which were in AHAB H.O. files are examined by the Defendants in their closing submissions and listed therein.[708]

806. While by no means exhaustive, the volume of just these in their Annex {E1/17.1} examined and listed by the Defendants at approximately 100, is significant. I accept and adopt their analysis of these documents. Following as taken from their submissions, are particular observations about the involvement of Abdulaziz, Suleiman and Saud, which I accept.

1.1 **Abdulaziz**

807. Abdulaziz was fully aware of AIH and AIS (which did not become ATS until after he was incapacitated). Documents within AHAB H.O. or Saud's villa demonstrate that he was involved in their activities. Examples of relevant evidence, in chronological order (most of which were put to Saud in cross-examination and none of which are on AHAB's Forgery Schedule) are as follows:

808. As set out above, AHAB first resolved to incorporate AIH on 9 October 1983: the board resolution to that effect was signed by Ahmad and Suleiman, and was found in Saud's villa.[709] There was then another meeting the following year, convened by Abdulaziz, in order for him to set out his proposal in relation to AIH for presentation to the State of Bahrain. This resulted in a further resolution signed by Abdulaziz, Suleiman, and Mr.

---

708 **{E1/17/11-49}** and Annex **{E1/17.1}**.
709 Board Resolution: **{G/993/1}** ■<u>**V**</u>.

Hindi,[710] which was also found in Saud's **v**illa. These documents were plainly considered important given they were retained after his death, and either identified by the Younger Algosaibis as being significant when they conducted their rapid sweep of files in the Money Exchange and Head Office, or were already in Saud's possession prior to May 2009.

809. In July 1986, Dr Sami, who was General Manager of AHAB's Accounts Department at that time,[711] received telexes from Mantrust, Bahrain, which referred to AIH accounts.[712] They were in a file within one of the AHAB H.O. archives. Those telexes do not support the suggestion that AIH was merely a representative office of the Money Exchange since it was referred to as being distinct, and queries which were raised were specific to AIH, including as to "*USD 4MM LENT BY AIH TO YOURSELVES.*"

810. Amongst the documents found in Saud's villa were two copies of a generic letter on AIH headed paper, dated 15 June 1987, outlining the delegation of signing authorities in relation to AIH, signed by Abdulaziz (and Al Sanea).[713] The letter also referred to AIS. Again, this document because of where it was located, was either identified by the **Younger** Algosaibis as being significant, or was already in Saud's possession. The letter contains a paragraph that is very telling of the intended relationship between the Money Exchange and AIH:

> "*It should be noted that our sister company, Ahmad Algosaibi & Bros. Co., Money Exchange Commission & Investment, is authorized to act as treasury for this company in which capacity it will place deposits, execute*

---

[710] **{H29/55/1}** ■V <Ar> {H29/55.1/1} <Tr>.
[711] Fakhri 1W **[9]** **{C1/7/3}**
[712] **{G/1091/1}** ■HO-A and **{G/1093/1}** ■HO-A; put to Saud **{Day56/92:6} – {Day56/94:4}**.
[713] **{G/1123/1}** ■V and **{G/1124/1}** ■V; put to Saud **{Day56/94:5} – {Day56/95:24}**.

*loan drawdowns/repayments and other related transactions for this company".*

811. In February 1989, Abdulaziz attended a signing ceremony in Bahrain in relation to a Euro-Note facility between AIH on the one hand, and Lloyds Bank plc, Banque Indosuez, American Express Bank Ltd and Arab Banking Corporation BSC on the other.[714] Saud was also due to attend; although he was vague in cross-examination about whether he actually did,[715] there is nothing to suggest that he and Abdulaziz did not do so. Further, there can be no question that Abdulaziz, the "*authoritarian man who maintained very firm control*" (according to Saud[716]), would not have been fully aware of AIH and the transaction it was entering into.

812. A file within AHAB H.O. belonging to Badr contained an invoice from TWH Management Ltd ("TWH") addressed to a range of companies, including AIH and AHAB (as well as Saad Investments Inc, presumably an Al Sanea entity). In the invoice AIH was referred to by its full name of "Algosaibi Investment Holdings EC". The invoice was dated 24 May 1990 and was in the sum of £205,000.[717] In the same file was a letter of the same date from TWH to Abdulaziz, again expressly referring to AIH,[718] and a letter from Abdulaziz on the same subject, which suggests that he was well aware of the issue at stake although disclaiming responsibility for Al Sanea's role on behalf of Saad.[719] Whilst the subject matter is not material for the purposes of these Proceedings, these documents demonstrate Abdulaziz's active involvement in a matter involving and

---

714 **{G/1220/1}**
715 **{Day53/108:23}** – **{Day53/115:13}**
716 Saud 1W **[404]** **{C1/2/83-84}**
717 **{G/1296/1}** ■HO-3; put to Saud **{Day56/91:18} – {Day56/92:5}**.
718 **{G/1295/1}** ■HO-3
719 **{G/1308/1}** ■HO-3 <Ar> **{G/1308.1/1}** <Tr>.

expressly referencing AIH.

813. The summary of board resolutions of the Money Exchange for 1991, signed by Abdulaziz and Suleiman, at item 12 expressly referred to AIH as being owned by the Money Exchange.[720]

814. Within one of Badr's files in AHAB H.O., described as containing "*Correspondents (sic) between Maan Al Sanea and Abdul-Aziz Algosaibi*", were minutes of a meeting of the board of directors of AIH which had taken place on 4 April 1996[721] **in** Manama, Bahrain. Abdulaziz was recorded as being present, having chaired the meeting, and he signed the minutes. Present also was Al Sanea while Suleiman and Yousef were represented by proxy. The minutes record authorising Mr. Astley-Cooper, Investment Manager of AIH who had also been in attendance, to sign an application to invest US$1m in a leasing fund on behalf of AIH.

815. Within Money Exchange files were examples of a letter sent to banks on 1 June 1999 enclosing Money Exchange and AHAB accounts. The letters bore Abdulaziz's signature. Some concluded:

> "Should you wish to discuss any suggestion which you may have in this respect, please contact John Potter at Algosaibi Investment Holdings, Bahrain"

816. Examples include letters to Burgan Bank, Arab Bank plc and MashreqBank plc.[722] A variation of the letter sent to Riyad Bank referred the addressee to Mr. Stewart at AIS.[723]

817. Within Badr's files from his office at AHAB H.O. were documents from 1999 relating to Al Baraka Investment & Development Company and AIS, including:

---

720 **{G/1425.1/1}** <Ar> **{G/1425.2/1}** <Tr>.

721 **{G/1651/1}** ■HO-3; put to Saud **{Day56/115:18} - {Day56/116:16}**.

722 Burgan Bank **{G/1923/1}**; put to Saud **{Day56/116:17} - {Day56/118:4}**. Arab Bank plc **{H23/133/1}** and MashreqBank plc **{H23/570/1}.**

723 **{H23/706/1}**

(1) An AIS Board Resolution dated 23 July 1999 resolving to accept a US$20m murabaha and lease facility on terms and conditions contained within a commercial cooperation letter dated 7 July 1999.[724] It was signed by Abdulaziz, and is on AIS headed paper, which stated that AIS was represented in Bahrain by AIH.

(2) A Money Exchange Board Resolution dated 16 October 1999, authorising Abdulaziz to act on its behalf in its capacity as guarantor of AIS in relation to a commercial cooperation letter dated 11 October 1999.[725] The Board Resolution was signed by Abdulaziz.

(3) The commercial cooperation letter of 11 October 1999 itself appeared on the same file having been signed and sent by the counter-party Al Baraka Investment & Development Co. It was again counter-signed by Abdulaziz.[726] It related to a murabaha and lease facility to be renewed in the sum of US$30m.

818. AHAB H.O. files also contained facility agreements and other related documents signed by Abdulaziz where one or more of the Financial Businesses was a party. These include:

(1) A Supplemental Agreement with Crédit Agricole Indosuez dated 10 May 2000 relating to a Short Term Loan Facility, Foreign Exchange Line and Standby Letter of Credit Facility.[727] The parties were AHAB and AIH jointly and severally. Abdulaziz had initialled each page and signed on behalf of each of AHAB and AIH. The borrowing was for at least US$90m, based on a stated amount for the short term loan facility of up to US$40m and the standby letter of

---

724 **{H9/56/1}** ■HO-3; put to Saud {Day56/119:12} – **{Day56/121:6}**.
725 **{H9/62/1}** ■HO-3; put to Saud {Day56/121:7} – **{Day56/122:13}**.
726 **{H9/54/1}** ■HO-3; put to Saud {Day56/122:15} – **{Day56/123:6}**.
727 **{H2/155/1}** ■HO-A; put to Saud **{Day56/118:5}** – **{Day56/119:11}**.

credit facility up to US$50m.

(2) A credit facility agreement dated 16 September 2000 between AIS and AIH as the Obligor, AHAB as the Guarantor, and Commercial Bank of Kuwait was within AHAB H.O. archive files. It related to a facility of US$10m and was initialled on each page, and signed by Abdulaziz on behalf of each of AIS, AIH and AHAB.[728]

819. Additionally, an AHAB board resolution resolving to issue a continuing guarantee covering the obligations and liabilities of AIS in relation to that facility was within the same AHAB H.O. file, and again signed by Abdulaziz.[729]

820. In light of this documentation it cannot sensibly be suggested that Abdulaziz was unaware of AIS and AIH, or their role in raising finance for AHAB.

Suleiman

821. It is suggested by AHAB, in particular by Mr. Hindi and Saud, that Suleiman's lack of confidence meant that he would have sought advice and discussed the Financial Businesses, had he been aware of them.[730] But this would ignore the compelling documentary evidence that he was aware of all of the Financial Businesses.

822. As already mentioned above, Suleiman attended the board meetings at which the incorporation of AIH was agreed, and he signed both resolutions to that effect.[731]

823. He also signed Money Exchange Board Resolution R/40/91 dated 26 May 1991 which referred, at the fourth paragraph, to AIH being owned by the Money Exchange. Copies of

---

728 **{H2/14/1}** ■HO-A; put to Saud **{Day56/123:7} – {Day56/125:5}**.
729 **{H2/13/1}** ■HO-A; put to Saud **{Day56/125:6} – {Day56/126:3}**.
730 Hindi London 1W **[86] {C1/20/24}** and Saud 1W **[37] {C1/2/9}**.
731 **{G/993/1}** ■V; put to Saud **{Day56/132:11} – {Day56/136:16}** and **{H29/55/1}** ■V <Ar> **{H29/55.1/1}** <Tr>.

that board resolution were found in two of Saud’s files from AHAB H.O.,[732] and it is not on the Forgery Schedule.

824. Suleiman also signed various facility-related documentation. A selection of these documents were put to Saud in cross-examination, and examples of these are set out at Annex **{E1/17.1}** to the Defendants’ Submissions and are all from AHAB H.O. files. The majority of those referred to are not included in AHAB’s Forgery Schedule and where they are, that is expressly stated. Where they refer to ‘AIH’ and or ‘AIS’ those terms were written out in full, making clear that the ‘A’ stood for Algosaibi and therefore that they were Algosaibi companies. Insofar as it might be said that Suleiman would not have understood where they were written in English, at least some of the documents were in Arabic. Furthermore, many of the documents can be found in files maintained by Badr, and one of the purported reasons he was retained by Suleiman after the death of Abdulaziz is that he spoke English,[733] and could explain the documents to him. Whether the documents are or are not alleged to be forgeries, the fact that they are in Head Office files (principally in files maintained by Badr) and that they specifically refer to the Financial Businesses means that Suleiman and Saud in particular must have been aware that those entities existed, and of their role in raising finance for AHAB.

825. The documents set out and discussed next below from the Defendants’ Submissions are said not to represent all of the documents referring to AIH and/or AIS/ATS which were in AHAB H.O. locations, or bearing Suleiman’s signature. They are presented merely as examples. Many more facility-related documents signed by Suleiman and referring to the

---

732 **{H22/191/1}** ■HO-A <Ar> **{H22/192/1}** <Tr>. Two copies in the N files: **{N/209/1}** ■**N-3/03** <Ar>, **{N/209/3}** ■N-3/03 <Ar>.

733 Saud 1W **[132]** **{C1/2/26}**

Financial Businesses which were in AHAB H.O. files are included in Annex **{E1/17.1}** which itself is not comprehensive, as it only covers those which were put in cross-examination to Yousef, Saud and or Dawood. Nevertheless, the volume of even the following selection of documents is significant.

826. The facility-related documentation includes:

(1) Documents relating to Al Baraka Investment & Development Company ("Al Baraka") including:

(i) An AIS Board Resolution, on AIS headed paper expressly referencing that it was represented in Bahrain by AIH, resolving to accept a US$20m murabaha and lease facility from Al Baraka.[734] The resolution dated 23 July 2001, was signed by Suleiman for and on behalf of AIS.

(ii) Within an AHAB H.O. archive file, a promissory note on AIH headed paper issued by AIS in favour of Al Baraka in the sum of US$20m, dated 30 June 2002.[735] What seems to be an earlier copy of the same document was also within Badr's files.[736]

(iii) The same AHAB H.O. archive file contained more than 20 promissory notes from ATS to Al Baraka, and other relevant documents, as set out in Annex **{E1/17.2}**. That so many documents exist in one file, each referring to ATS and signed by Suleiman (and which do not appear on the Forgery Schedule) demonstrates overwhelmingly Suleiman's knowledge of ATS.

---

734 **{H9/55/1}** ■HO-3; put to Saud **{Day57/10:24} – {Day57/12:1}**.
735 **{H3/4/1}** ■HO-A <Ar> **{H3/4.1/1}** <Tr>.
736 **{H9/57/1}** ■HO-3 <Ar> **{H9/57.1/1}** <Tr>. Both versions put to Saud **{Day56/136:17} – {Day56/137:11}**.

(2) Credit facility agreements and associated documents relating to Commercial Bank of Kuwait, including:

(i) A credit facility agreement dated 18 September 2001[737] and apparently a renewal a year after the facility, signed by Abdulaziz. Again, the agreement was between AIS and AIH as obligor, AHAB as guarantor and the bank as the lender. In cross-examination, Saud agreed that it might be Suleiman who had initialed the pages.[738] Suleiman had also signed on behalf of each of AIS, AIH and AHAB.

(ii) An AHAB Board Resolution in which AHAB resolved to act as guarantor of AIH in the same transaction dated 22 September 2001. This was within the same AHAB H.O. file and also signed by Suleiman.[739]

(iii) A further credit facility agreement dated 2 May 2002, signed by Suleiman on behalf of each of AIS, AIH and AHAB.[740]

(iv) A continuing corporate guarantee from AHAB in relation to that facility, expressly referring to AIH, signed by Suleiman.[741]

(3) Facility-related documentation concerning National Bank of Bahrain including:

(i) A confirmation of credit facility, addressed to AIH at its address in Bahrain, dated 20 November 2001[742]. It related to a revolving short-term loan facility of US$5m and was signed by Suleiman on behalf of each of AIH, AHAB, and himself as a guarantor, and likewise Abdulaziz and the

---

737 **{H2/23/1}** ■HO-A; put to Saud **{Day56/137:13-25}**.
738 Saud xx **{Day56/137:21-25}**
739 **{H2/25/1}** ■HO-A; put to Saud **{Day56/138:6}** – **{Day56/139:24}**.
740 **{H2/41/1}** ■HO-A; put to Saud **{Day57/1:12}** – **{Day57/2:7}**.
741 **{H2/42/1}** ■HO-A; put to Saud **{Day57/2:8-18}**.
742 **{H2/26/1}** ■HO-A; put to Saud **{Day56/140:5}** – **{Day56/141:8}**.

heirs of Ahmad as guarantors.

(ii) A further facility letter entered into between that bank and the Money Exchange on the same date, which included a "*Guarantor Line*" of US$5m "*To cover your corporate guarantee covering Revolving Short Term Loan to Algosaibi Investment Holdings E.C.*". Copies of that document were in two different files at AHAB H.O., the only difference being that one bore Money Exchange stamps and the other did not.[743]

(iii) A further confirmation of credit facility in the same amount and again addressed to AIH in Bahrain, dated 22 September 2002.[744] Whilst on that occasion Suleiman did not sign on behalf of AIH, he signed on behalf of all of the other parties and AIH was clearly referenced on the signature page.

(iv) A further facility letter between the bank and the Money Exchange signed by Suleiman referencing an irrevocable guarantee to cover facilities granted by AIH.[745]

(v) Within the same file, an undated Board Resolution on AIH headed paper appointing Suleiman and Al Sanea to execute various specified powers in relation to National Bank of Bahrain, signed by Suleiman.[746]

(4) Documents relating to Mashreqbank:

(i) A continuing guarantee from AHAB dated 12 October 2003 in relation to

743 **{H2/27/1}** ■HO-A and **{H5/3/1}** ■HO-A; put to Saud **{Day56/141:9}** – **{Day56/142:3}**.
744 **{H2/46/1}** ■HO-A; put to Saud {**Day57/2:19}** – **{Day57/4:10}**.
745 **{H2/47/1}** ■HO-A; put to Saud **{Day57/4:11}** – **{Day57/6:3}**.
746 **{H2/153/1}** ■HO-A; put to Saud **{Day57/6:6}** – **{Day57/7:6}**.

facilities granted to AHAB "*and its subsidiary companies as listed on Page 3*".[747] The list of subsidiary companies includes AIH and ATS, amongst others. The guarantee was apparently given in the names of the AHAB partners individually. Suleiman signed as "*attorney in fact*" on behalf of all of them, including Saud, alongside a 'Sign Here' sticker (which suggests a direction to Suleiman and, contrary to AHAB's wide spread allegations of forgery, suggests a genuine signing process), and on the same page as the list referencing AIH and ATS.

(ii) A Facilities Letter Agreement dated 30 August 2006 and addressed to AIH (via AHAB) at its address in Bahrain, in the total sum of US$429m.[748] The document was signed on each page by Suleiman[749] (with his signature verified by an officer of the Saudi British Bank).

(5) An AHAB Board Resolution dated 28 August 2004 resolving to accept and sign a credit facility agreement between ATS as obligor, AHAB as corporate guarantor, and Sabanci Bank plc.[750] It was signed by Suleiman on behalf of AHAB, himself personally, and the heirs of Ahmad and Abdulaziz; the signature is on the Forgery Schedule as being matched.

(6) Credit facility agreements between ATS and Gulf Bank KSC which set out the full address of ATS in Bermuda and that it was represented in Bahrain by AIH:

---

747 {H4/107/1} ■HO-A; put to Saud {Day57/7:10} – {Day57/9:20}.
748 {H2/96/1} ■HO-A; put to Saud {Day57/9:21} – {Day57/10:23}.
749 Another copy of this document {G/5400/1} is on the Forgery Schedule and is also said to have been manipulated and is dealt with at {E1/27} of the Defendant's Closing Submissions and see Section 5 of this Judgment.
750 **{H5/78/1}** ■HO-A; put to Saud **{Day57/12:6} – {Day57/13:19}.**

**(i)** An agreement dated 25 July 2006 in the sum of US$258m.[751] It bears Suleiman's signature on behalf of ATS dated 1 August 2006. This document is on the Forgery Schedule and is also said to have been manipulated. It is dealt with at E1/27 of the Defendants' Closing Submissions and in Section 5 of this Judgment.

**(ii)** An agreement dated 23 June 2008 in the sum of US$277m, signed by Suleiman on behalf of ATS.[752] This document is on the Forgery Schedule.

(7) Addendums to credit agreements with SAMBA:

(i) An addendum dated 13 January 2007 sets out a number of facilities, including "*Facility No. 4*" the purpose of which is stated as being:[753]

> "To issue Stand By Letter of Credit (SBLCs) to support Murabaha transactions done by Al-Gosaibi Trading Services (ATS)"

Suleiman had signed the addendum on each page. It was put to Saud in cross-examination that he too would have been aware of this agreement, since he benefited personally from one of the other stipulated facilities (a credit card), and was on the credit approval committee of SAMBA. Whilst it is his case that he did not take part in the SAMBA approval process in relation to AHAB facilities,[754] he appeared to accept, that he must have been aware that they were being discussed in order to have recused himself (his evidence in cross-examination being that he left the room[755]).

---

751 **{H2/88/1}** ■HO-A; put to Saud **{Day57/13:14} – {Day57/15:18}.**
752 **{G/6753.3/1}** ■HO-3; put to Saud **{Day59/52:23} – {Day59/53:13}.**
753 **{H2/120/1}** ■HO-A; put to Saud **{Day57/127:1} – {Day57/135:15}.**
754 Saud 1W [199] **{C1/2/43}.**
755 Saud xx **{Day57/134:12-20}**

He accepted that he may have been aware of the agreement:[756]

> *Q:* *Suleiman is the gentleman signing this agreement, which we see from {H2/120/7}.*
>
> *A:* *This is page 7, okay, because the bottom is -- ah, yes, sir.*
>
> *Q:* *But I am suggesting that you would have been aware of this agreement.*
>
> *A:* *I may have, yes.*

(ii) There was another addendum a year later, dated 26 January 2008, which also referred to the issue of payment guarantees in the context of ATS. Two versions of this document were found in AHAB H.O. files. A copy signed by Suleiman was within one of the Saud Files,[757] with his signature appearing alongside 'Sign Here' stickers. An unsigned copy[758] was in the same file as the 2007 addendum.

(iii) The addendum dated 16 February 2009 again referred to ATS in the same terms as the previous addenda. Saud accepted in cross-examination that it was signed by him. It was in one of the files maintained by him or on his behalf.[759] An earlier unsigned version was in the same file.[760]

(8) Documents relating to agreements between AHAB and ATS on the one hand, and Barclays plc on the other:

---

756 Saud xx **{Day57/129:11-17}**
757 **{H21/48/1}** ■HO-SA1; put to Saud **{Day49/90:13}** – **{Day49/92:18} and {Day55/5:11-25}.**
758 **{H2/73/1}** ■HO-A; put to Saud **{Day57/135:18-20}.**
759 **{H21/33/1}** ■HO-SA1; put to Saud **{Day50/35:12} – {Day50/42:4}.**
760 **{H21/38/1}** ■HO-SA1; put to Saud **{Day55/4:12} – {Day55/5:10}.**

(i) A first supplemental agreement dated 7 June 2007.[761] This document is on the Forgery Schedule, and is also said to have been manipulated (see Section **{E1/27}** of the Defendants' Closing Submissions and Section 5 of this Judgment). Suleiman's signature was on behalf of AHAB, and appears immediately above a reference to ATS. The document is addressed to both AHAB and to ATS, and the facility is clearly described as being for ATS.

(ii) A third supplemental agreement dated 4 December 2007 referring to facilities as amended totalling US$90m.[762] The document bears Suleiman's signature at the foot of each page, alongside a handwritten amendment to an interest rate on the third page, and on the final page on behalf of AHAB, again above text referring to ATS. Whilst this document is on the Forgery Schedule, only one of the three signatures is said to be matched.

827. Further, of course, AHAB now positively relies upon facility documents it alleges were manipulated that expressly refer to facilities made available to ATS[763] and to AIH.[764] That, in and of itself puts paid to any credible suggestion that Suleiman could possibly have been ignorant of either the existence of these entities, or their role in raising finance for AHAB. This is because AHAB's allegation of manipulation implies that the document in question would actually have been put before Suleiman for his signature, albeit falsified as to the true amount being borrowed. This was ventilated in the course of

761 **{H2/126/1}** ■HO-A; put to Saud **{Day57/15:19} – {Day57/16:24}.**
762 **{H2/132/1}** ■HO-A; put to Saud **{Day57/16:25} – {Day57/18:6}.**
763 Gulf Bank KSC; Gulf Investment Corporation (AIS); Gulf International Bank; Al Ahli Bank of Kuwait; Barclays.
764 Mashreqbank.

AHAB's Amendment Application:[765]

> *MR. QUEST:* *My Lord, I am dealing at the moment with the case about the manipulation of these documents. Clearly there is an issue -- again, one that has been ventilated quite a lot in the past -- about partner knowledge of the Money Exchange, of ATS and of TIBC. Saud and Yousef have both given evidence about that.*
>
> *CHIEF JUSTICE:* *I think at the very least you would be prepared to accept then that on the face of these documents, whatever else they may stand for, there is evidence that contradicts that aspect of your case?*
>
> *MR. QUEST:* *Clearly, on the face of these documents, there is a reference to ATS receiving a facility in a substantial amount.*
>
> *CHIEF JUSTICE:* *Yes. Well, we will duly note that ...*

828. There is also evidence of AHAB H.O. secretaries dealing with correspondence on Suleiman's behalf which referred to the Financial Businesses, in particular a draft letter dated 28 January 2009 from Suleiman to Dr Al-Eisa of SAMBA, which stated:

> "In December 2008 as we then explained, Algosaibi Trading Services (ATS)'s metal trading business is supported by lines of credit for the discount of trade bills, and funding is required to bridge payment obligations on occasions when receivable settlements which are delayed. (sic)
>
> Over the past few years, ATS's business has seen significant growth, Whereas under normal circumstances, the gap between settlement of ATS's trade obligations and matching receivable payments can be handled out of the company's own resources, the prevailing credit squeeze is making this significantly more difficult.
>
> In the circumstances we require temporary addition financing (sic) for USD 180 Million over our standby L/C, for six months until such time as the global banking system has reverted to normal".

---

765 **{Day27/126:3-16}**

829. The letter was found in the electronic files of both Mr. Basha John and Mr. Shabiudeen.[766] As was put to Saud in cross-examination, those secretaries must have been acting on instructions: Suleiman must have been aware of the drafting of this letter and its content relating to ATS.[767]

830. In fact, Saud would also have been aware of this letter. Obtaining additional financing from SAMBA around this time is something that he accepts he was involved in.[768] The reference to "December 2008" in the Suleiman draft letter is likely to be a reference to a letter dated 13 December 2008 which had been sent by Saud to SAMBA a copy of which is contained within one of the Saud Files.[769] He accepted that the signature looked like his.[770] Saud's letter in places contained identical wording to the draft intended to be sent by Suleiman. Saud's letter contained the following description of ATS and its funding requirements:

> *"Dear Mousa,*
>
> *In February 2005, you put in place for us a standby L/C facility of US$ 120 million, which is used to support the activities of our sister company Algosaibi Trading Services (ATS).*
>
> *As we then explained, ATS's metal trading business is supported by lines of credit for the discount of trade bills, and funding is required to bridge payment obligations on occasions when receivable settlements which are delayed.*
>
> *Over the past few years, ATS's business has seen significant growth. Whereas under normal circumstances, the gap between settlement of ATS's trade obligations and matching receivable payments can be*

---

766 **{G/7443/1}** ■<u>HO-e</u> and **{G/7444/1}** ■<u>HO-e</u>; put to Saud along with the letter from Saud to SAMBA of **{Day57/18:7} - {Day57/22:15}.**

767 Saud xx **{Day 57/21:14-16}.**

768 Saud 1W [205]-[209] **{C1/2/44-45}**

769 **{H21/62/1}**_ ■<u>HO-SA1</u>

770 Saud xx **{Day50/6:21-25}**

> *handled out of the company's own resources, the prevailing credit squeeze is making this significantly more difficult".*

831. When Saud was asked about the references to ATS in his letter, his response was evasive to the point of incoherence:[771]

> *Q. But, Mr Algosaibi, how can you accept that you signed this letter on your uncle's instructions whilst at the same time suggesting that both you and your uncle were ignorant of Algosaibi Trading Services?*
>
> *A. I wasn't involved in Bahrain operations nor they reported to me; they reported to Maan Al Sanea. And what they -- what Maan Al Sanea, what they managed historically present, yani, at the same time, I have no knowledge. This is Mr Maan Al Sanea's domain. You know, they report to him, yani, what they call the companies. If I was asked to sign something, I would -- I would sign to help out in the business. I wouldn't, you know, think it. And in this case, most likely I was under the guidance of my uncle for some reason, I -- I – they said, "Your uncle is not there, sign this," so I signed it to help out, as instructed.*
>
> *Q. That wasn't my question, Mr Algosaibi. I'll ask it again.*
>
> *A. Yes.*
>
> *Q. How can you at one and the same time accept that you signed this letter –*
>
> *A. Yes.*
>
> *Q. -- and yet say that you and your uncle were ignorant of Algosaibi Trading Services?*
>
> *A. I didn't speak for uncle, I'm speaking of myself here.*
>
> *Q. Then speak for yourself.*
>
> *A. Yes.*

---

771 Saud xx **{Day57/24:4} - {Day57/25:15}**

> *Q.* *How can you say, having signed this letter, that you are ignorant of what you refer to as "our sister company Algosaibi Trading Services"?*
>
> *A.* *I didn't repeat the words as you mentioned them. But I said, Algosaibi Money Exchange, we knew that they had business there in Bahrain; they reported to Maan Al Sanea. Huh? And that they did not report to me. So my ignorance because I did not get involved in that business. Simple.*

832. I accept that these letters provide a striking illustration of the understanding of both Suleiman and Saud that ATS existed and of its role in AHAB's borrowing.

833. Suleiman's knowledge of the Financial Businesses can further be seen from other documents, including a memo of 15 December 2003 from Al Sanea to Badr which enclosed documentation for review and signature by Suleiman, referring to the following which were said to be attached:[772]

> "2. Share Transfer Forms – The Bahrain Monetary Authority requires the enclosed Bill of Sale and Schedule of Sale to be resigned and submitted to them for the year end auditing of TIBC.
>
> 3. Mashreq Bank - Account opening form for Algosaibi Trading Services Ltd., Bahrain".

834. Item 1 being Guarantees for Al Baraka, and item 4 being signature pages for Al Baraka. Whilst it is not clear exactly what Al Sanea forwarded, as already noted above, there were numerous documents relating to that bank, signed by Suleiman in the same file in which this memo was found. Under Item 1 Guarantees, the memo refers to related documents "*recently signed by Uncle Suleiman*", suggesting that Suleiman would have had an ongoing involvement with these banking arrangements for TIBC and ATS.

835. Early on in the process of setting up TIBC, Suleiman signed a BMA Personal

---

772 **{H3/155/1}** ■HO-A; put to Saud **{Day57/34:10} - {Day57/36:16}.**

Questionnaire for Directors and Managers.[773] It named the institution as 'Algosaibi Bahrain Bank', but it is clearly a misnomer of the entity that became TIBC. The document is not on the Forgery Schedule.

836. I am assisted in relation to the formation of TIBC by the evidence of Dr Al Mardi. Whilst I did not have the benefit of hearing from Dr Al Mardi directly, and while AHAB would have me doubt his credibility by ascribing some unspecified ulterior motive to him, there is no dispute as to his longstanding relationship with AHAB. He is a partner in the law firm Ahmed Zaki Yamani which has offices in Saudi Arabia and Bahrain, and managing partner of the Bahrain office. His evidence on this issue is that:

> "In 2003 the Algosaibi family decided to set up a bank in Bahrain. As a result, TIBC was incorporated in Bahrain on 20 May 2003. I received instructions regarding the setting up of the bank directly from Suleiman, who was then the Chairman of AHAB, and also from Mr Al Sanea …. Suleiman was fully aware of the establishment of TIBC and actively participated in it."[774]
>
> "I received the substantial majority of my instructions in relation to TIBC from Suleiman directly."[775]

837. When asked about him in cross-examination, while not admitting his credibility, Saud struggled to cast any aspersions as to the *bona fides* of Dr Al Mardi:[776]

> "*Q. Leaving aside TIBC for the moment, which we will come to later, do you accept that Dr El Mardi was an honest and reputable lawyer?*
>
> *A. I agree that he was a lawyer represented the law firm of Sheikh Zaki Yamani in Bahrain, yes.*
>
> *Q. He had been a legal adviser to the Algosaibi family and AHAB since the 1980s, hadn't he?*

---

773 **{G/240.47/1}**
774 Al Mardi 3A [5] **{C2/16/3}**
775 Al Mardi 3A[10] **{C2/16/5}**
776 Saud xx **{Day47/33:19} - {Day47/36:2}**

*A. He had been around for a long time. I used to see him a lot, yes.*

*Q. He had been given powers of attorney and proxies for various members of the family, including your father and your Uncle Suleiman?*

*A. I -- I'm not aware of that. I wasn't present, I wasn't here to know what dealing they had with Mardi or not.*

*Q. You knew that he had been secretary of the board of directors of Saudi United Insurance Company?*

*A. Huh? Again, who? What?*

*Q. Secretary of the board of directors of Saudi United Insurance Company?*

*A. He had something about -- to do with the insurance, yes.*

*Q. Indeed, he was adviser to you on the establishment of a reinsurance company in Saudi Arabia?*

*A. Yes, we sought his advice at the time, yes.*

*Q. What I was suggesting is that you would not have retained the services over this length of time of Dr El Mardi unless you had every confidence in his honesty and probity. Do you accept that?*

*A. I -- I wasn't dealing with Mardi. I only dealt with him -- first time I dealt with him was over the Saudi reinsurance. So you ask me about events that I was not here, retaining him over several years, I did not do that. We -- when we did the reinsurance, we wanted to -- to work out the articles of association, and I've learnt at the time that the capital joint venture group which I was involved in, the office, that they – you know, Sheikh Zaki Yamani, have done them, so we speak to Mardi on the same thing. That's my recollection. If Maan have consulted Mardi of something or other, I have no recollection of that, nor it was my, you know --er –*

*Q. Did you ever hear your father say that Dr El Mardi could not be trusted?*

*A My father doesn't speak much, sir, to us, you know. He -- he -- you know, he stutters, he just tells us things like this, but he –*

*Q. Did you ever hear your Uncle Suleiman say that Dr El Mardi could not be trusted?*

*A. I did not hear one way or the other, both sides. There was no comment.*

*Q. Did you ever hear Yousef Algosaibi say that Dr El Mardi could not be trusted?*

*A. I did not hear, the subject never came up, so – you asked me about Mardi, whether he can be trusted or not. I wasn't involved -- yani, my -- my first initial contact with Mardi was regarding the establishment of reinsurance. Other than that I had no contacts with him. Whether he was there before doing something that I wasn't involved with, maybe, I don't know. I know what the things I did.*"

838. There are still other documents expressly referring to TIBC in AHAB H.O. files which show a link to Suleiman. They include:

(i) A letter signed by Suleiman on AHAB headed paper to HSBC Bank Middle East dated 2 December 2003, which noted the willingness of that bank to extend facilities "*to our recently established subsidiary, The International Banking Corporation BSC ©, incorporated in Bahrain under Commercial Registration No. 50830*".[777] The letter confirmed that AHAB owned 93% of the shares of TIBC and that TIBC had a paid up capital of US$100m. There can have been no doubt in the mind of anyone reading this letter (including Suleiman) as to the relationship between AHAB and TIBC. It was contained within a file alongside documentation relating to other facilities, and referred to by AHAB in its discovery lists as a "loan file".

(ii) A Chairman's Statement relating to the unaudited accounts of the Money

777 **{H3/152/1}** ■<u>HO-A</u>; put to Saud **{Day57/36:17} - {Day57/37:16}.**

Exchange for the half year ending 30 June 2003, signed by Suleiman.[778] The fourth paragraph stated:

> "Meanwhile, our Bahrain banking subsidiary, The International Banking Corporation, has been incorporated and will have a paid-up capital of US$ 100 million. The new bank will commence operations imminently".

(iii) A Statement of the Board of Directors in relation to the Money Exchange financial statements for the year ending 31 December 2003, signed by Suleiman and Saud, a further copy of which was located in Saud's Villa.[779] It stated in the final paragraph:

> "In May 2003, a new banking venture named The International Banking Corporation was established in Bahrain under an offshore banking license as a 93% subsidiary of the Money Exchange division. Aside from revaluation gains on equities sold to TIBC by the Algosaibi Money Exchange, our new banking venture achieved profitability in its first period of operation and promises to be an important part of the Group's financial services business in the future."

Saud was unable to explain in cross-examination why there were copies in AHAB H.O. and his villa (or indeed why it was in his villa at all) and claimed not to remember signing the statement. The full version of the financial statements contains an identical Statement of the Board of Directors, therefore also including reference to TIBC, which also bears the signatures of Suleiman and Saud[780]. The

---

778 **{H3/218/1}** ■HO-A; put to Saud **{Day57/37:17} - {Day57/39:18}.**

779 **{H3/161/1}** ■HO-A and **{G/3788/1}** ■V; put to Saud **{Day57/39:20} - {Day57/59:10}.**

780 **{F/127/1}** ■C, with their signatures at **{F/127/3};** put to Saud in the context of referring to TIBC within the transcript range in the above footnote. The financial statements formed part of AHAB's disclosure described as 'Collation' meaning that they were amongst documents "*collated by the Investigation Team or an AHAB HO staff member or a member of the AHAB family (no further source information is available)*". See AHAB's Key to File Lists **{H6/9/6-7}**; description relating to 'TAB 6 – COLLATION' in the Money Exchange Hard-Copy File List.

signatures on the two versions are clearly different[781] and it was suggested to Saud in cross-examination that he and Suleiman had potentially signed the standalone statement, and then separately the statement once it had been incorporated into the accounts. He was unable to assist the Court in that respect. Suleiman's signature on the financial statements is included in the Forgery Schedule as being matched, but Saud's is not; the standalone version of the statement is not on the Forgery Schedule. Saud and Suleiman must therefore be taken to be aware of the contents.

(iv) A letter to Kuwait Finance House of 6 October 2003 on AHAB headed paper[782]. The letter bore Suleiman's signature, alongside a 'Sign Here' sticker. It outlined membership of the Money Exchange board and advised "*that Maan Al Sanea also has Chief Executive responsibility for our Bahrain Banking subsidiary, The International Banking Corporation and as well as our other financial services affiliates operating out of Bahrain*". This letter referred specifically to TIBC, but also made clear that there was not just one entity in Bahrain but more than one "financial services affiliate" in addition to TIBC. This was put to Saud:[783]

> *Q.* *What do you think those other financial services affiliates were?*
>
> *A.* *Now or then?*
>
> *Q.* *Then.*

781 i.e. **{H3/161/1}** ■HO-A and **{G/3788/1}** ■V.
782 **{H4/105/1}** ■HO-A; put to Saud **{Day57/59:11} - {Day57/61:2}.**
783 Saud xx **{Day57/60:21} - {Day57/61:2}**

> *A.* *I have no -- the -- the Money Exchange had -- had a subsidiary in Bahrain which was transferred to a bank. That -- yes.*

Saud was pressed the following day as to when exactly he knew that a subsidiary had become a bank. This is addressed further in paragraph 852 below.

(v) There are many documents in AHAB H.O. files from 2003 and 2004 bearing Suleiman's signature, which relate to shares being transferred by the Money Exchange to TIBC as set out in Annex E1/17.3 to the Defendants' Closing Submissions. The sheer volume and financial significance of these means that their existence and content cannot have been overlooked by AHAB H.O. staff, and so Suleiman, and no doubt Saud, must have been aware of them. The shares were sold to TIBC because of the need to capitalise it: this was clear in a letter from Al Sanea to Badr dated 27 August 2003, also found in AHAB H.O., which attached relevant documents for Suleiman to sign:[784]

> "*I am herewith enclosing the letters addressed to the New bank regarding the sale of shares for the capital of new bank.*
>
> *I am also enclosing the previous copies authorizing the sale, please note that the enclosed documents needs to be executed by Uncle Suleiman accordingly for book entries and for submittal to our auditors.*"

839. A selection of the documents relating to those sales was put to Saud in cross-examination in the context of exploring his knowledge of the Financial Businesses, and it was made clear that there were more of them.[785] The documents put were as follows:

(i) A bill of sale dated 19 May 2003 between the Money Exchange and TIBC

---

784 **{H3/107/1}** ■HO-A
785 Saud xx {**Day57/73:13-24}**

relating to the sale of 144,882 shares in Saudi British Bank.[786] Also relating to this sale:

(a) An Appointment of Trustee, whereby TIBC appointed the Money Exchange as its trustee and agreed that the shares would be registered to the Money Exchange on TIBC's behalf.[787]

(b) A letter dated 31 May 2003, from Suleiman to TIBC, on Money Exchange headed paper, confirming receipt of US$15m.[788]

(ii) A bill of sale dated 19 May 2003 between the Money Exchange and TIBC relating to the sale of 157,563 shares in SAMBA.[789] Also relating to this sale:[790]

(a) A letter dated 28 May 2003 from Suleiman to TIBC, on Money Exchange headed paper, confirming receipt of US$15m and that the shares were in safe custody under the trust agreement executed with the bank.

(iii) A bill of sale dated 19 May 2003 between the Money Exchange and TIBC relating to the sale of 188,916 shares in Arab National Bank.[791] Also relating to this sale: [792]

(a) A letter dated 7 June 2003, from Suleiman to TIBC, on Money Exchange headed paper, confirming receipt of US$15m and confirming that the shares were in safe custody under the trust agreement executed with the

786 **{H3/219/1}** ■HO-A; put to Saud **{Day57/66:2-19}.**

787 **{H3/68/1}** ■HO-A; put to Saud **{Day57/66:20} - {Day57/68:1}.**

788 **{H3/76/1}** ■HO-A; put to Saud **{Day57/35:18} - {Day57/36:16}.** A different original version of this letter is on the Forgery Schedule on the basis of the signature being mechanically applied (Giles) / fused toner powder (Handy): **{G/3360}.**

789 **{H3/220/1}** ■HO-A; put to Saud **{Day57/68:6-16}**.

790 **{H3/75/1}** ■**HO-A**; put to Saud **{Day57/68:17} - {Day57/69:17}**. A different original version of this letter is on the Forgery Schedule, on the same basis as the above: **{G/3355}**.

791 **{H3/70/1}** ■HO-A; put to Saud **{Day57/70:1-22}**.

792 **{H3/81/1}** ■**HO-A**; put to Saud **{Day57/70:23} - {Day57/71:6}**. A different original version of this letter is on the Forgery Schedule, on the same basis as the above): **{G/3389}**.

bank.

(iv) A bill of sale dated 7 December 2004 between the Money Exchange and TIBC relating to the sale of 15,488 shares in Banque Al Saudi Al Fransi.[793] Also relating to this sale:[794]

(a) A declaration of trust whereby TIBC appointed the Money Exchange as its trustee, agreeing that the shares although standing in the name of the Money Exchange in fact belonged to TIBC and were held on trust for it.

(v) A bill of sale dated 7 December 2004 between the Money Exchange and TIBC relating to the sale of 279,721 shares in Eastern Cement Company.[795] Also relating to this sale:[796]

(a) A declaration of trust whereby TIBC appointed the Money Exchange as its trustee, agreeing that the shares although standing in the name of the Money Exchange in fact belonged to TIBC and were held on trust for it.

(vi) An ISDA Master Agreement dated 15 May 2006 between the Money Exchange and TIBC,[797] signed by Suleiman on behalf of both entities[798] including on the schedule thereto.[799]

840. A particularly telling document in an AHAB H.O. file is a letter dated 11 May 2006 on TIBC headed paper signed by Suleiman as Chairman of the Board of TIBC.[800] It does not appear in the Forgery Schedule and was in Arabic, so there can be no suggestion that he

---

793 **{H5/90/1}** ■HO-A; put to Saud **{Day57/71:8-18}**.
794 **{H5/91/1}** ■HO-A; put to Saud **{Day57/71:18} - {Day57/72:10}**.
795 **{H5/92/1}** ■HO-A; put to Saud **{Day57/72:11-21}**.
796 **{H5/93/1}** ■HO-A; put to Saud **{Day57/72:22} - {Day57/73:10}.**
797 **{H2/85/1}** ■HO-A; put to Saud **{Day57/74:5} - {Day57/77:12}.**
798 **{H2/85/19}**
799 **{H2/151/1}**■HO-A, with the signature at **{H2/151/5};** put to Saud along with the substantive document as above.
800 **{H22/101/1}** ■HO-SA2 <Ar> **{H22/102/1}** <Tr>.

would not have understood the contents when he signed it. The letter requested approval from the Governor of the BMA to appoint Dr Al Mardi to the board of directors, stating: "*We hope that this request of ours meets with your kind approval, due to the great trust the shareholders place in (Dr Al Mardi)*". The AHAB H.O. file in which it was found was one maintained by or on behalf of Saud. Accordingly it seems likely that he was also aware of this letter contemporaneously, despite his vagueness as regards Dr El Mardi's role on behalf of AHAB and more specifically in this respect in cross-examination:[801]

"*Q. It's perfectly plain, isn't it, that Uncle Suleiman on behalf of the shareholders is asking the governor of the Bahrain Monetary Authority, the Bahrain Monetary Agency, for his approval to appoint Mr El Mardi as a non-executive member of the board of TIBC?*

*A. Yes, I don't know.*

*Q. When you say you don't know, do you have no recollection of this or you definitely don't know anything about this at all?*

*A. I don't know anything about this.*

*Q. You're sure?*

*A. Yes, I'm not aware of it nor –*

*Q. You're absolutely sure?*

*A. This is my recollection. I don't -- I don't remember ever anyone mentioning this to me during the time that -- or -- I'm reading this as you're reading it now. This is my ...*

*Q. Anything else?*

*A. As you read it. No. No.*

*Q. You see, Mr Algosaibi, the document that we are looking at is on your files. Do you follow?*

801 Saud xx **{Day52/53:12} - {Day52/54:16}**

> *A.* *Yes, I -- I don't know. You showed me something my Uncle Suleiman signed, may look like my Uncle Suleiman's signature. And -- and all I can say, this document says what it says as it says it, you know?*
>
> *Q.* *Can you give the court any explanation as to why a copy of this letter is to be found on your files?*
>
> *A.* *Sir, I don't know what he means, my files, for the office has many files as we collected them. But I have no recollection of this.*"

**Saud**

841. In addition to the documents set out above, the Defendants have shown that there were many other documents in AHAB H.O. put to Saud in cross-examination, which show his knowledge of the Financial Businesses. Examples of these are set out below as adopted from the Defendants submissions.[802]

842. A set of contact details was found on Mr. John's computer.[803] It was presumably maintained on Saud's behalf since Saud was his primary responsibility.[804] A similar document was also found on Mr. Shabiudeen's computer.[805] Both contained contact details for Mr. Potter as General Manager of AIH and of ATS[806] and Dr. Al Mardi as Acting Chairman of TIBC. Saud's response in cross-examination that "*This is their paper, you know, secretaries' stuff*"[807] sought, in my view, to evade the obvious that the secretaries would have no need to keep contact details for people their boss did not need to contact. The only reason they would need to have those details would be for the use of Saud, and other AHAB Partners.

843. A hard copy contact card within an AHAB H.O. archive location relates to "*Algosaibi*

---

802 At **{E1/17/26}** et seq.
803 **{G/3/1}** ■HO-e; put to Saud **{Day57/109:2} - {Day57/114:3}.**
804 Saud 1W [66.1] **{C1/2/14}** and confirmed in cross-examination including in this context **{Day57/112:3}.**
805 **{G/234/1}** ■HO-e; put to Saud along with the document found on Mr. John's computer, as above.
806 **{G/3/25-26}** and **{G/234/26-27}.**
807 Saud xx **{Day57/111:19}**

*Investment Services Ltd. (Bermuda) represented in Bahrain by Algosaibi Investment Holdings, E.C.*”.[808] It shows knowledge within AHAB H.O. of the Financial Businesses’ employees, since it lists Mr. Desmond Astley-Cooper amongst others, with telephone, fax and telex numbers, and has handwriting adding in Mr. Yaseen Khan and Mr. Martin Lathan. In fact, Mr. Astley-Cooper was known to Saud as far back as 1994. He had written to Saud on 15 June 1994,[809] on AIS letterhead and stated:

> “It was a pleasure to see you yesterday with Richard Neasham and Richard Thomas of United Bank of Kuwait. They both told me that they enjoyed their meeting with you very much, and in particular looking at the various antiquities that you have in your office.
>
> We have excellent business relations with UBK, particularly on the Islamic finance side and I am sure this meeting will help develop this further.
>
> Lastly, I hear that your wife gave birth to a fourth daughter on 13th June. May I offer my congratulations and wish you and your family well.”

844. Saud accepted the handwritten annotation on the letter as being his[810], and it was within a file expressly labelled with his name:[811] he must have seen and read it. The letter provides a useful illustration of Saud’s understanding of the Financial Businesses:

(1) It is on AIS headed paper, which gave its address in Bermuda and stated that it was represented in Bahrain by AIH. There can have been no doubt in Saud’s mind that there were multiple entities.

(2) It evidences Saud meeting banks on behalf of the Financial Businesses. The suggestion that he would have done so without having an understanding of what

---

808 **{G/233/1}** ■HO-A; put to Saud **{Day57/114:4} - {Day57/115:1}.**
809 **{G/1557/1}** ■HO-A; put to Saud **{Day57/115:2} - {Day57/123:7}.**
810 Saud xx **{Day57/115:2-8}** and again **{Day57/116:9-11}.**
811 The spine is **{G/220/1}** ■HO-A <Ar> **{G/220.1/1}** <Tr>.

those entities did, or what was being sought from the banks, does not stand up to scrutiny. It was not merely "*a chitchat*" as Saud suggested.[812]

(3) In particular, it shows Saud being aware that the Financial Businesses were undertaking transactions "*on the Islamic finance side*", and were not simply an extension of what he says were the Money Exchange's authorised functions of trading as a currency exchange and remittance operation, operating an American Express franchise and holding Algosaibi investments in real estate and shares.[813]

(4) It also demonstrates that Saud was familiar with a Financial Business employee in addition to Mr. Potter. It follows that he must have been aware of what they did within the Financial Businesses.

845. A Personal Declaration relating to ATS contained Saud's name and some details in relation to him. From the notes to the Declaration it apparently related to his beneficial interest in ATS as they explain that any person holding 5% or more must declare.[814] Whilst not fully completed, it was nevertheless within an AHAB H.O. archive file, specifically one of those described by AHAB in discovery as being a "*loan file*". Saud's responses in cross-examination merely focused on the address given on the document for AHAB itself being wrong, suggesting that that was indicative that the document was not genuine. He failed to explain why his name would have been on the document, or why it would even exist, had he been ignorant of the Financial Businesses as he asserts.

846. In 2003, an un-named secretary of Saud's contacted Mr. Potter asking if Saud could use an office in Bahrain to conduct a job interview on Sunday 30 November 2003, as

---

812 Saud xx **{Day57/118:22}**

813 Saud 1W [83] **{C1/2/18}**

814 **{H3/204/1}**■HO-A; put to Saud **{Day57/144:15} - {Day57/146:11}.**

indicated by a memo from Mr. Potter to Al Sanea to that effect found in a Money Exchange file.[815] Saud in his written statement said: "*I have never asked to visit or use the AHAB representative offices in Bahrain*"[816] and suggested that perhaps it had been the Managing Director of Arabian Pipe Coating (**"**APCO**"**) who, upon Saud's suggestion, had made the request, wanting to interview potential employees to work in Jubail. In cross-examination his answer repeated this in part, insisting that his discussion with the MD of APCO was about using the Money Exchange's office in Bahrain.[817] However, contemporaneous emails, put to Saud in cross-examination, showed that it was in fact Saud who suggested he would himself conduct the interview on 30 November 2003 at ATS' offices in Bahrain:

"The date of sunday 30th Nov is fine with me. May I suggest Bahrain as a venue for the meeting"[818]

847. The interviewee related to an AHAB Pepsi project in Iraq rather than to APCO in Jubail. Regardless of whether the interview actually took place (Saud suggested it did not), for his secretary to have actually contacted Mr. Potter means there must on Saud's part have been sufficient awareness of the ATS offices for him to want to actually use them.

848. As discussed in other places in **t**his **J**udgment, from at least 2004, Saud was involved in the borrowing relationship with SAMBA and was party to a considerable amount of correspondence relating in particular to the details of the collateral provided by AHAB. That issue becomes relevant in the context of Saud's knowledge of the Financial Businesses, because references to ATS and Islamic trade agreements run through the

---

815 {**G/3684/1**}; put to Saud **{Day57/146:12} - {Day57/147:8}.**
816 Saud 1W [464] **{C1/2/94}**
817 Saud xx **{Day57/147:1-8}**
818 **{G/3680.1/1}** ■**<u>HO-A</u>**; put to Saud with the memo from Mr. Potter so included in the above.

correspondence, including:

(i) A letter found in the N Files, from Saud as MD of AHAB to Mr. Al Mousa of SAMBA, dated 27 November 2004,[819] and which refers to murabaha trading and brokerage transactions being a "fast developing part of our Group financial services activities". It is submitted by the Defendants and I accept, that Saud must have been aware of, and referring to, the fact that this was being undertaken under the auspices of the Financial Businesses (as revealed in transactional documents).

(ii) A letter from Mr. Al Mousa of SAMBA to Saud dated 15 June 2005[820] which expressly referred to increasing the US$100m facilities extended to AHAB, and the fact that the extension related to ATS. Saud's suggestion in cross-examination that he believed that to be a reference to Algosaibi Trading Company, a separate entity based in Al Khobar,[821] does not stand up to scrutiny given the levels of borrowing being referred to. Indeed, his suggestion that when he saw reference to ATS in the past he assumed it referred to Algosaibi Trading Company which "did business with ARAMCO" was a patently contrived "recent invention", as pointed out by Mr. Crystal and as became obvious at that stage in the cross-examination:[822]

> "*Q.* *Mr Algosaibi -- and we will look at it when we get to 2009 -- the explanation you gave for not spotting ATS in 2009 was not that you thought it was another company. Do you follow? And I'm suggesting to you that you have simply just made up dishonestly the explanation you have just given to the learned judge about this reference to ATS in the letter of 15 June 2005. Do you accept*

819 **{N/23/1}** ■N-2/03
820 **{H22/127/1}** ■HO-SA2 <Ar> **{H22/128/1}** <Tr>
821 Saud xx **{Day48/21:12} - {Day48/22:8}.**
822 Saud xx **{Day48/26:12} - {Day48/27:23}.**

*that? Do you want to change your answer?*

A. *I accept what -- whatever I wrote in the – my statements, I accept, and I accept that; I remember what I remember. You know, I'm trying best to answer your questions and I'm under oath, I swore under the Koran, and I'm -- I'm trying to best recollect events that had 15, 20 years ago, these questions. I'm trying my best: here to help the court and to answer your questions.*

Q. *I am going to be inviting the learned judge, as will be obvious, to disbelieve this recent invention of yours. Is there anything else you want to say about it?*

A. *No, that's it.*

MR. CRYSTAL: *My Lord, would that be a convenient moment?*

CHIEF JUSTICE: *Yes, it will be. But let me ask Mr Algosaibi the obvious question that occurs to me. When one looks at this particular document, it refers to financing for murabaha transactions.*

A. *Yes.*

CHIEF JUSTICE: *Does that have anything to do with the Algosaibi Trading Company you are talking about?*

A. *What I recall -- yani -- I do not get engaged in -- in -- when I'm asked about, like, facilities like this, if something that would help the business, and I'm asked by -- to sign, like by my uncle or someone ask me, I will do that. I do not necessarily review these papers. So I -- I recall talking, you know, showing me these documents about murabaha transactions. But there are two separate things between -- I'm -- I'm asking to sign something, then getting engaged and knowing the details of what I'm signing. Two separate things.*"

849. I am compelled to find that this was yet another characteristically evasive and incoherent response from Saud.

850. A letter from Al Sanea to Saud on 9 August 2005[823] in response to an earlier letter from Saud relating to Saud's wish to pledge certain bank shares to SAMBA in order to obtain the release of title deeds for land and buildings of Pepsi and Saudi Cement. Al Sanea attached two appendices, with Appendix 2 setting out security already held by SAMBA for borrowing and referring twice to "*Murabaha for ATS*".[824] These documents were found in the N Files and so may be regarded as coming from among Saud's working papers.

851. There were many documents in AHAB H.O. put to Saud in cross-examination evidencing his own knowledge of TIBC (in addition to those already referred to above).

852. For example, a document within Saud's own N Files[825] demonstrates at the very least, his awareness of TIBC at the time of its incorporation, but more likely that he was actually involved in its inception. The document is headed (in the translation) "*Summary of Contract of International Banking Corporation*", and set out the capital of TIBC, that its purpose was as an offshore banking unit, and that AHAB held 93% (along with Sana'a and Al Sanea holding the other 7%). The fact that it relates to TIBC is further supported by cross-referencing the registration number referred to on the document of '50830' to TIBC's registration certificate.[826] The document was sent from El Ayouty by fax on 8 June 2003 (as shown on the Arabic original). The only credible explanation for Saud having been sent it is his direct involvement. It also undermines the vague suggestion of

---

823 **{N/550/1}** ■N-2/03
824 **{N/550/3}** ■N-2/03 & {N/550/4} ■N-2/03.
825 **{N/218/1}** ■N-4/03 <Ar> **{N/219/1}** <Tr>; put to Saud **{Day58/7:1} - {Day58/7:17}**.
826 **{G/3311.1/1}**

him being aware of a "*small representative presence in Bahrain*", given the capital in the company of 15m in cash and 35m in kind, as set out on the document. In cross-examination this document was put to Saud:[827]

> "*Q.* *What I'm suggesting to you is that because this document was faxed by El Ayouty and ended up in the N files, you would have looked at it and, as a result of that, I'm suggesting that you were involved in the establishment of TIBC from the very beginning. Do you understand?*
>
> *A.* *Yes, I -- I disagree. I understand but I disagree.*
>
> *Q.* *Let's look at some documents --*

*CHIEF JUSTICE:*

> *Q.* *Before you go on, do you accept that you were aware that what you call a "bank", a small representative office converted to a bank, had been established?*
>
> *A.* *Yes.*

*CHIEF JUSTICE:*

> *Q.* *When did you become aware of that?*
>
> *A.* *I think the -- the -- I was aware that the -- the – the branch, as I knew it by then, at that time, the – the business, was being converted to a bank. Er, I think the -- as I recall, Badr may have told me something and then uncle later on, that -- and -- and I thought that was a good thing. If the subsidiary that we had in Bahrain was going to convert to a bank by the regulatory authority in Bahrain, it's a good thing.*

*CHIEF JUSTICE:*

> *Q.* *Do you recall when you were told about this?*
>
> *A.* *Yes, I was told about it at the time of -- when it happened, and that basically my involvement -- I mean, not involvement but what I knew of -- of the -- the -- of what was happening in Bahrain.*"

---

827 Saud xx **{Day58/6:16} - {Day58/7:16}**

853. Saud's answers were notable in their lack of fluidity. His reference to "*my involvement*" which he quickly corrected to "*not involvement*" is telling. In light of the contents of this document, the suggestion that Saud only had a superficial awareness and was not fully cognisant of the creation of TIBC, or what its role in AHAB's structure was intended to be is not credible and is not worthy of belief.

854. The chronology in relation to the application for Saud to be appointed as a director of TIBC is covered in detail below from the Defendants' Closing Submissions, however it is important to highlight here that documents in this respect were in AHAB H.O. files, specifically:

855. A memo from Al Sanea to Badr dated 19 October 2003 in which he stated:[828]

> "I am writing to you with regard to the enclosed form which is required to be filled completely by Mr. Saud Algosaibi together with his signature.
>
> This is required for submitting it to the BMA."

856. There is on it a handwritten note added that a copy of Saud's passport was also needed. Saud accepted in cross-examination by Mr. Smith, that the BMA reference was to the Bahrain Monetary Agency and that the memo could relate to his appointment as a director of TIBC:[829]

> *Q. "I am suggesting, because of the reference to "BMA", this must have related to your appointment to the board of TIBC. Do you understand?*
>
> *A. Yes, it says -- the letter says what it says, Bahrain, BMA Bahrain, as explained to me before, Bahrain Monetary Authority, yes.*

828 **{H3/118/1}** ■HO-A
829 Saud xx **{Day58/9:4-16}**

> *Q. The letter says what it says, Mr Algosaibi. What I'm putting to you is that this letter is relating to your appointment to the board of TIBC. Do you agree?*
>
> *A. I don't know. It may. From what you -- you -- when -- when we were discussing this -- the funding papers which you showed -- I was shown. But it may be related, it may be not."*

857. That Saud was aware of the requirement for him to complete a form for the BMA is evident from a document from his own 'Working Papers' N file, being a letter from Al Sanea to him dated 29 June 2004 which stated that "*the BMA Director Application*" was needed "*at the earliest*", to be submitted the following day.[830] Importantly, he accepted three times that it was his handwriting containing a filing instruction,[831] which means he must have read the letter, notwithstanding his assertions that such an instruction meant the opposite. Having read it, if he was in ignorance before receiving the letter about the content of a BMA Director Application form, it is inconceivable that he would not have queried with Al Sanea what the form was required for. He was asked about this by Mr. Smith in cross-examination:[832]

> "*Q. You can see it is Mr Al Sanea chasing you regarding the BMA director application.*
>
> *A. Yes.*
>
> *Q. Mr Algosaibi, you must have known that such an application was being required of you.*
>
> *A. Why?*
>
> *Q. Because the letter says so.*
>
> *A. Okay. If -- I have nothing to do in Bahrain. If this letter may have*

830 **{N/32/1}** ■N-2/03
831 Saud xx **{Day47/62:21} - {Day47/63:18}**; **{Day54/76:2-25}**; **{Day58/13:11-20}**.
832 Saud xx **{Day58/13:11} - {Day58/15:14}**, although he had also been asked about it from **{Day47/44:6}**.

*come, I would have just filed it because I have nothing to do with it; I have nothing to do in Bahrain.*

*Q.* *Mr Algosaibi, I suggest that you would have done one of two things: you would have either completed the application form or you would have written back to Mr Al Sanea, saying, "What on earth are you talking about? Why do I have to fill this form in?" The one thing you would not have done is said nothing and filed it. Do you agree?*

*A.* *I disagree. The -- the -- we -- we get instructions from my Uncle Suleiman, so if Uncle Suleiman ask me, but he did not. And therefore I don't know what Maan Al Sanea is talking about; and therefore, if he wanted to get me involved in his own operations, let him. I'm not going to get involved and I have a basic job function at the head office and I follow it as instructed, as dictated by -- before, you know, the things that I had -- during my father's days and continually after he passed away, and following the instructions of uncle in -- in the business we are engaged in. That business I wasn't engaged in, the whole Money Exchange and what they relate to. So if Maan wants something, Maan wants something. Let him -- he wants what he wants.*

*Q.* *I thought if Mr Al Sanea approached you for help, you would give it?*

*A.* *Yes, but this is not help. He is asking to me to disobey uncle instructions. Simple. I mean, we follow -- we -- we have -- we have rules. I engaged with Abu Riyadh in the businesses we are engaged in. If something comes about like this, huh, I have to get instructions; and if Maan is suggesting this, I would dismiss it right away, without thinking.*

*Q.* *It is quite odd then, isn't it, Mr Algosaibi, that we find in the files a completed questionnaire regarding TIBC?*

*A.* *Yes, sir.*"

858. Saud's assertions that he did not complete the form lacks credibility when considered in particular against the fact that a completed form existed within AHAB H.O. files, along

with a covering letter sending it to the BMA a couple of weeks later on 15 July 2004.[833] Saud accepted that it looked like his signature on that form,[834] and it is not included on the Forgery Schedule. Whilst he has repeatedly relied on the fact that there are errors in this form (notwithstanding that they are relatively minor including a misdiscription of his bachelors degree) the focus of his explanation for not having signed it was that he would not have wished to be involved "*in these financial matters*". His responses were unconvincing:[835]

> "*CHIEF JUSTICE: That's a chain of command, I think I understand what you are saying. But what you would have been aware of is that this small representative office converting to a bank would have been owned by the Money Exchange, which itself was a majority, a great majority, owned by AHAB.*
>
> *A. Yes, yes, yes. Yes, sir. Yes, my Lord.*
>
> *CHIEF JUSTICE: What I'm trying to understand is why would you have objected to becoming a director of this bank in Bahrain, had you been asked?*
>
> *A. Because the financial services is handled by Maan Al Sanea, my Lord, not we in manufacturing; it is outside the businesses which we run. So if -- if Maan asked me, he should really ask the boss, which is my uncle. I'm not the person to be asked for that. So if I -- I saw this, as it may be when I saw this, I probably dismissed it at all without questioning it, yani; it's not my area of responsibility --*"

859. Within the AHAB H.O. archive was also a letter from Saud and Al Sanea to the King of Bahrain on behalf of many members of their respective families requesting Bahraini nationality.[836] The document referred to their connection with TIBC, and apparently

---

833 **{G/4219/1}** ■<u>HO-e</u>
834 Saud xx **{Day58/17:15-18}**
835 Saud xx **{Day58/19:3-20}**
836 **{G/4171/1}** ■**<u>HO-A</u>** <Ar> **{G/4171.1/1}** <Tr> and **{G/4170/1}** <Tr>- references to "*Al-Qusaibi*" apparently being an alternative spelling for "*Al-Gosaibi*".

attached, inter alia, the TIBC Articles of Incorporation:[837]

> "*We have had investments and commercial activities in Bahrain for 20 years and own various properties and land in Sehla and Janabiyah, as well as Al-Qusaibi Investments Company and Awal Bank, having a total paid capital of 200 million dollars; The International Banking Corporation (TIBC) with a capital of 200 million dollars; Saad Investment Company and Saad Securities Company holding a capital of 50 million dollars; in addition to other investments, since 1984 (See attached copy of civil [ID] card, driver's license, passport, incorporation contracts, and land and properties ownership deeds). Our affiliation with Bahrain is a familial bond. It would be our honour to enjoy the good graces of your Royal Order.*"

860. In cross-examination Saud twice accepted that it looked like his signature on the letter.[838] Of particular note is the fact that the document was within a file expressly attributed to Saud, as explained during cross-examination:[839]

> "*MR. SMITH: If we look at the file in which this document was contained, at {G/79/1} and at {G/79.1/1}, you see this is the spine of a lever arch file. Do you see that, Mr Algosaibi?*
>
> *A. Yes.*
>
> *Q. This is the file that is described as being in the third floor archive at AHAB head office.*
>
> *A. Okay.*
>
> *Q. You see it is numbered 16 at the top.*
>
> *A. Yes.*
>
> *Q. Below that there is your name, "Saud Abdulaziz Algosaibi".*
>
> *A. Yes.*
>
> *Q. This is your file.*

---

837 **{G/4171/2}** ■**<u>HO-A</u>** <Ar> **{G/4171.1/2}** <Tr>.
838 Saud xx **{Day47/70:21-23}** and **{Day58/23:13-15}**.
839 Saud xx **{Day58/23:16} - {Day58/24:5}**

*A.* *Yes, it appears so from – yes.*"

861. Another significant inference to be drawn from this letter is Saud's apparent knowledge of the by then well-established business interests held by Al Sanea in Bahrain; viz: Awal Bank, Saad Investment Company and Saad Securities Company.

862. On 29 May 2004 Saud wrote to Al Sanea in the context of wishing to finalise what ought to be done with the Money Exchange.[840] The English translation of the letter referred to the possibility of Al Sanea purchasing "*the branches of the Exchange and affiliates outside the Kingdom*". During cross-examination the interpreter clarified that a more accurate translation would be 'related entities' rather than 'affiliates'.[841] Saud's response in cross-examination was unconvincing, and failed to deal with the fact that his own wording demonstrated that he was aware that there existed more than one AHAB related entity outside Saudi Arabia, and that those entities were distinct from branches of the Money Exchange:[842]

"*Q.* *Mr Algosaibi, I'm suggesting that when you are referring to "the related entities outside the Kingdom", you meant AIS, ATS and TIBC, didn't you?*

*A.* *I just meant what they relate to as -- as here, and to buy the Money Exchange branches. Huh?*

*Q.* *I understand the Money Exchange branches, Mr Algosaibi; I'm not asking you about that. I'm asking you about the related entities outside the Kingdom, which means outside Saudi Arabia.*

*A.* *And what they follow outside the Kingdom. What it followed outside the Kingdom. Yes, this is ...*

---

840 **{N/565/1}** ■**N-2/03** <Ar> **{N/566/1}** <Tr>, put to Saud in the context of the Financial Businesses using the Magnum G bundle reference of **{G/4100/1}** <Ar> **{G/4104/1}** <Tr> which is still the same original document. **{Day58/44:13}** - **{Day58/49:6}**. I note that Saud was asked about other aspects of the letter by Mr. Crystal **{Day46/120:1}** - **{Day46/133:9}**.

841 Saud xx **{Day58/45:18}** - **{Day58/46:20}**

842 Saud xx **{Day58/47:7}** – **{Day58/48:19}**

*Q. I'll ask one more time and then we can move on.*

*A. Okay.*

*Q. The letter refers to –*

*CHIEF JUSTICE: I think we should at least hear what Mr Algosaibi says he thinks he wrote in this respect.*

*MR. SMITH: My Lord, of course. What do you think you are saying here, Mr Algosaibi?*

*A. What I -- what I'm saying here is that basically I had -- I was -- to sell the branches, you know, what we have in Saudi Arabia, branches of the Exchange, and what they relate to outside, meaning the -- the -- whatever that the Money Exchange had outside of Saudi Arabia. Of course I was talking Bahrain because – but in -- in -- in the context, because I don't know what they have, so I -- I did not elaborate of -- of – of anything here. So otherwise I would have named things, you know? But here it was very short and what they relate. There is nothing in specific.*

***Q. Mr Algosaibi, I'm simply suggesting that you wouldn't make a proposal regarding the disposition of entities outside the Kingdom without knowing what they were.***

***A. Yes, we knew that the Money Exchange had business in Bahrain, you know? And -- and -- and they all reported to Maan Al Sanea. We know that. Er, er, and that's what basically I meant by here. This is my understanding.***"

(Emphasis added.)

863. It is simply incredible that when writing in contemplation of the sale of the Money Exchange and its "*related entities outside the Kingdom*" to Al Sanea, Saud could either have thought that there was merely a single "*small representative office*" or that there was no need to become fully acquainted with the businesses of those entities. On the contrary, the only sensible conclusion is that Saud was already fully aware.

864. On Mr. John's computer were a number of copies of a document which seems to have been a questionnaire for compilation of information for an AHAB company brochure

(possibly a Group Profile) or website wording.[843] As already mentioned, Mr. John worked principally for Saud.[844] On its second page the document sets out an "*Organization Structure*" which included "*International Banking Corporation ...( 93%)*". The fact that there were so many copies on Mr. John's computer (three are on Magnum and there are at least another three which the Defendants say were disclosed but are not on Magnum) suggests that this was an important document to AHAB. Given that AHAB owned 75% of the Money Exchange, the reference to 93% of '*International Banking Corporation*' highlights that it was not simply a representative presence in that respect but a separate entity, and Saud must have been aware of this document and of that information.

**SAUD'S ROLE IN ESTABLISHING TIBC**

865. It repays the effort to look in a bit more detail at Saud's relationship with TIBC and to consider how that reflects the overall involvement of the AHAB Partners.

Genesis of TIBC

866. At paragraph 35 of Saud 1W, Saud initially contended that:

(1) he had never heard of TIBC until the events of May 2009;[845]

(2) he knew no more than that AHAB had a small representative office in Bahrain.[846]

867. This was untrue. The documents plainly show that Saud participated in setting up TIBC and knew the logic behind doing so; namely, that doing so created another avenue for the Money Exchange to borrow money at crucial times.

---

843 **{G/5080/1}** ■HO-e; put to Saud **{Day58/26:15} - {Day58/29:22}**. Additional copies on Magnum **{G/1/1}** ■HO-e and **{G/231/1}** ■HO-e.

844 Saud 1W **[66.1] {C1/2/14}** and confirmed in cross-examination including in this context **{Day57/112:3}**.

845 **{C1/2/8}**

846 **{C1/2/8}**; **{C1/2/87}**

868. As discussed above, it will be recalled that SAMA had ordered the Saudi money exchanges to merge. And as also discussed above, when the Money Exchange was excluded from the merger, Saud attempted to persuade SAMA to allow AHAB to buy into the merged bank but to no avail. It seems to have been when that came to nothing, that TIBC was established.

869. It will also be recalled that, as part of their attempts to consolidate all Saudi money exchanges, SAMA took action to close those remaining money exchanges that had not been consolidated. On 2 April 2003 the circular was sent out by SAMA prohibiting unlicensed remittance businesses.[847]

870. This circular clearly concerned Saud. As discussed above, he wrote on 31 May 2003 again to SAMA,[848] falsely claiming that he had been unable to produce financial statements because of Abdulaziz's stroke but that he had now attempted to rationalise the company's position. That, in any event, AHAB wished to have "*a cash stake in the new company.*"

871. However, having failed to join the Bank Al Bilad merger (and thereby take advantage of rising share prices), it appears that Saud, Al Sanea and AHAB decided that incorporating a bank would enable them to continue to claim a genuine business for the Money Exchange (which was necessary given SAMA's prohibition on unlicensed remittance operations). They would also be able to obtain greater leverage at possibly lower cost than the prevailing rates offered by Saudi banks.

872. The fact that TIBC was, at least in part, the result of Saud's inability to persuade SAMA

---

847 **{G/3368}**; **{G/3369}**
848 **{G/3361}**; **{G/3362}**

to allow the Money Exchange to become part of a bank in Saudi Arabia (the Al Bilad merger), is consistent with steps AHAB took at this time in an apparent attempt to progress its banking ambitions.

873. At some stage in 2002 or 2003, AHAB made an application to SAMA for a banking licence. This emerges from a confidential memo dated 29 June 2003 from Mr. Hayley to Al Sanea lamenting Al Sanea's instructions to the Money Exchange (passed on by Mr. Jamjoum) to follow the SAMA prohibitions and "*cease all remittances*."[849] Mr. Hayley attempted to make the argument in rebuttal, inter alia, as follows:

> "*Of more significance is the fact that to all our bankers, we have represented ourselves as being licensed by the Ministry of Commerce to undertake banking services. We have asserted that we will shortly receive a full banking license from SAMA and, to those banks that know about the SAMA f.x. restrictions, we have claimed that we are in the clear. Any suspicion now that we have been shut down by SAMA would inevitably cause problems with our bankers and would be the subject of questions that might endanger our credit facilities.*"

874. Equally, on 3 April 2002, Mr. Stewart and Mr. Potter jointly signed off on AIH letter head, an application to the Governor of the BMA for the establishment of an Offshore Banking Unit ("OBU") in Bahrain named "*Algosaibi Bahrain Bank*" (which would later become TIBC).[850] Their letter proposed that this would be achieved by converting the existing license of AIH to an OBU license. The ownership structure would be the Money Exchange 60%, Al Sanea 30% and Yousef 10%. The OBU would be capitalized on the initial basis with US$75m.

875. On or around 15 April 2002, Dr. El Mardi prepared the draft Memorandum and Articles of Association for TIBC and was instructed to prepare an application to the BMA. This

---

[849] **{G/3424}**
[850] **{G/2803.1}**

appears from a memo of that date to Al Sanea from Mr. Potter in which he wrote:[851]

> "*I attach a draft of the Memorandum and Articles of Association for the new bank received from Dr. Omer El Mardi. They are in a format required by the BMA and comply with the new companies' law in Bahrain…*
> *Once we are happy with the text … we must submit them to the BMA together with our application for the banking license.*"

876. TIBC was later incorporated on 22 May 2003.[852]

*Saud's knowledge of TIBC*

877. Saud himself signed off the application for the Licence. In June 2004, Al Sanea forwarded to Saud a letter headed "*urgent-urgent-urgent*" requesting that Saud sign an application to the Bahraini Monetary Authority in respect of TIBC, required by the BMA "*to be submitted by tomorrow.*"[853] This application, in the form of a "Personal Questionnaire" was then signed by Saud and submitted.[854] At page 8, Saud disclosed that an application had also been made to SAMA for a banking licence for the Money Exchange which was "*currently under review by SAMA*."

878. Saud signed a BMA application for becoming a director of TIBC (which was submitted on his behalf by Mr. Stewart by letter on 15 July 2004)[855] and the evidence plainly suggests that this was not some form of *non est factum*. While Saud initially denied signing it, he ultimately asserted merely that "*I have no memory of this*."[856]

879. The history of AHAB's connections with Bahrain and still further documents point to Saud's involvement with TIBC from inception:

---

851 **{G/2827}**
852 See **{G/3311.1}** - TIBC's registration certificate. See also **{F/116/1}**, the first audit review of TIBC conducted by PWC for its first period of operation 22 May 2003 – 30 September 2003. Here at Note 2 **{F/116/9},** PWC states the date of TIBC's establishment and commencement of operations. Apparently in error, Dr. El Mardi stated the date of incorporation as 20 May 2003: El Mardi **{C2/16/3}**, referenced above.
853 **{N/588}**. The letter bears Saud's manuscript "*file working papers*" and initials.
854 **{G/46}**
855 **{G/4219/1}** (already discussed above).
856 Saud xx **{Day47/62:17} - {Day47/64:5}**

(1) Bahraini ventures used by the Money Exchange to hold investments for AHAB Partners and to borrow money from foreign banks were already familiar to AHAB. Abdulaziz, Suleiman and Yousef had established AIS and AIH in the mid-1980s.[857] The relevant records, found in Saud's villa safe, must have been seen by Saud amongst Abdulaziz's papers, even if - contrary to Omar Saad's recollection that Saud had taken them himself – they had been taken to him by the Younger Algosaibis in their rapid sweep of the AHAB H.O.

(2) Another document, in Arabic entitled "*Summary of Contract of [TIBC]*", which sets out the name and shareholding of TIBC and references its purpose as an offshore banking unit and incorporation certificate number, was located in the N Files.[858] As already discussed above, this document contains a fax header indicating that it was faxed by El Ayouty to AHAB on 8 June 2003 with TIBC's incorporation having occurred only two weeks earlier on 22 May 2003.

880. On 26 August 2003, Al Sanea forwarded a number of documents to Saud under the cover of a letter expressed, "*for your information*".[859] The documents provided were:

(1) A copy of the Algosaibi Group Profile prepared and forwarded to the banks;

(2) A copy of our Credit Policies and Procedures Manual currently being followed by Money Exchange;

(3) A copy of our Anti-Money Laundering Procedures Manual;

(4) A copy of the Anti-Money Laundering Compliance Certificate;

(5) Copies of KPMG Al Fozan Bannaga Reviewed 3 Year Projections for Head

857 **H29/55**; **H29/55.1** (also as discussed above).
858 **{N/218}**; **{N/219}**
859 **{N/589}**. The letter is located within an "N File" the spine of which is labelled "*File No 2/03 … Working Papers Algosaibi Money Exchange*" **{N/541/1}**.

Office and Money Exchange.

881. The letter contains a handwritten annotation in the top right hand corner which states "*ME file*" which Saud accepted was his handwriting.[860] While all of these documents were clearly reviewed by Saud, the most significant for present purposes as explained below, were the "*Copy of the Algosaibi Group Profile*" ("the Group Profile")[861] and the KPMG 3 Year Projections.

882. The Group Profile addressed a number of issues of which Saud claims to have been unaware:

(1) The Group Profile noted the pending application for a banking licence from SAMA under the heading "*Future Developments*":[862]

> "*A near monopoly exercised by nine domestic clearing banks allows them to charge aggressively, particularly for credit. … This has allowed the Algosaibi Money Exchange to offer mid-market corporate credit at pricing which is profitable, yet competitive for the borrower. Under strict internal credit policies and procedures (see Appendix 2) this business is being carefully developed,* ***in anticipation of the grant either of a full banking licence, or an investment company license. (The latter is a proposed new license category that does not confer clearing status but permits financial institutions to accept deposits and extend credit)****.*
>
> ***On the grant of a license, the Money Exchange will also expand into the retail sector, providing consumer and ultimately mortgage finance****. …*" (Emphasis added.)

(2) The Group Profile also contained a detailed description of the incorporation and operation of TIBC:[863]

> "*The International Banking Corporation, Bahrain – A newly*

---

860 Saud xx **{Day 46/4:11} – {Day46/5:11}**.
861 **{G/3773}**
862 **{G/3773/23}**
863 **{G/3773/17}**; **{G/3773/24}**

*formed offshore banking subsidiary of the Company. A detailed background note relating to its legal structure, activities and other functions is given below in this report.*"

…

"*The Group has meanwhile established a new banking venture in Bahrain. This entity, named The International Banking Corporation (TIBC), is* ***intended to enhance and complement the financial services capability of the Algosaibi Money Exchange, both now, and in the latter's anticipated role in Saudi Arabia as a fully licensed financial institution****. ...*

*At the end of 2002 the Algosaibi Group was granted an offshore banking license by the Bahrain Monetary Agency. With an authorized and paid up capital of US $ 100 million, the new bank began operations in July 2003 under the name International Banking Corporation ("TIBC"). ...*

*TIBC will provide commercial loans and will extend trade related finance. Risk assets will be short-term in nature, and will relate to working capital borrowing or trade activities. The bank will target top-tier corporate obligors as well as those who are well known to the Group in Saudi Arabia and within the GCC region.* ***The Bank intends to provide trade finance through the issuance of import letters of credit and discounting of trade acceptances drawn under letters of credit, and will accept bank-avalised forfaiting assets. …***

***Effectively, the Bank will take over most of the existing investments and activities from Algosaibi Investment Holdings E.C. in Bahrain. …***

Further:[864]

***TIBC will be funded from the interbank market and, in need, by the Parent Company****….*
***In accordance with Bahrain Monetary Authority regulations, TIBC will operate at arm's length from the Algosaibi Group and will have no exposure to its parent company or to group related-parties***" (Emphasis added.)

864 **{G/3773/25}**. This section of the Group Profile also included a statement that "*a sum of SR million (US$93 million) is projected as investment in [TIBC] in the year 2003…*" **{G/3773/79}**; **{G/3773/84}**.

(3) The Group Profile also contained similarly detailed descriptions of AIH and ATS:[865]

> "*Algosaibi Investment Holdings, E.C, Bahrain - An offshore investment company incorporated in Bahrain. The company manages certain international investment portfolios for its shareholders, provides financial advisory services and represents another sister company, Algosaibi Trading Services (Bermuda). Ltd. in Bahrain as well as Algosaibi Client Services Limited. The company is wholly owned by the Algosaibi Partners.*
>
> *Algosaibi Trading Services (Bermuda), Ltd., Bermuda (formerly Algosaibi Investment Services Ltd.) is a sister company, wholly owned by the Partners. Its registered office is in Bermuda but the company is managed from Bahrain under the umbrella of Algosaibi Investment Holdings, E.C. Algosaibi Trading Services (ATS) specialises in arranging structured Islamic trade transactions, mostly on a Murababa basis, for third parties, acting as agents for commodity suppliers*."

883. The enclosed KPMG 3 Year Projections which were addressed to the AHAB Partners[866] and recovered from an N File, also contained a reference to TIBC:[867]

> "*14. Investments:*
> *A new banking venture named 'The International Banking Corporation' (TIBC) is being established in Bahrain under an offshore banking license granted by the Bahrain Monetary Agency with an authorized and paid up capital of US $ 100 million, as a 93% subsidiary of the A.H. Algosaibi & Brothers Company. Accordingly, a sum of SR 349 million (US$ 93 million) is projected as investment in subsidiary in the year 2003. The income, if any, from this investment is not taken to consideration as the projected period is assumed as a start up phase*."

884. Accordingly, both the Group Profile and the documents produced by KPMG found in the N Files made extensive reference to TIBC.

885. In cross-examination, Saud at least twice admitted that he knew that TIBC was established and that it was going to be a licensed bank. The first was on Day 58 as

865 **{G3773/18}**
866 **{N/139}**
867 **{N/139/8}**

excerpted above.[868] The second was on Day 66 as excerpted following:[869]

> *"Q. You were well aware that TIBC as a bank had been established in mid-2003 and in these accounts that's what we can see you signing up to.*
>
> *A. Yani, I -- I don't know when as of the dates, but I know of -- of -- of -- that the subsidiary, the Money Exchange subsidiary in Bahrain was going to, er, be a bank, a licensed bank by the regulators, okay."*

886. In addition, Saud (along with Suleiman) signed the Money Exchange 2003 Financial Statements.[870] Directly above Saud's signature, the Statement of the Board of Directors records:

> "*In May 2003, a new banking venture named The International Banking Corporation was established in Bahrain under an offshore banking license as a 93% subsidiary of the Money Exchange division. Aside from revaluation gains on equities sold to TIBC by the Algosaibi Money Exchange, our new banking venture achieved profitability in its first period of operation and promises to be an important part of the Group's financial services business in the future.*"

887. The intention behind TIBC was to provide a respite from the liquidity problems of the Money Exchange. By gaining access to fractional reserve banking, TIBC would be able to borrow far more extensively than would the Money Exchange, which was represented to be a private investment vehicle. Equally (just as it had with AIH and ATS), incorporating an offshore vehicle to borrow would enable AHAB to get around the single borrower limits of Saudi banks which, as the evidence revealed, so significantly concerned Saud.

888. Indeed this, as the evidence reveals, is precisely what happened. After 2003 there was a

---

868 Saud xx **{Day58/6:23} - {Day 58/7:16}**.

869 Saud xx **{Day66/8:17-23}**

870 **{F/127/3}**. While Suleiman's signature is alleged by AHAB to have been mechanically applied, the same is not suggested in respect of Saud's signature. Saud himself said he had no memory of signing the document **{Day64/90:8} - {Day64/91:14}**.

massive escalation in borrowing through the Financial Businesses while the rate of increase in the borrowing of the Money Exchange itself was much more gradual.[871] As the financial statements and Audit Packs reveal:

(1) while the bank borrowing of the Money Exchange increased from SAR 2.449bn in 1999 to SAR 4.679bn in 2008;

(2) the "*deposits*" (which reflected borrowing through AIH, ATS and TIBC) increased from SAR 2.273bn in 1999 to SAR 34.558bn in 2008.

**<u>Dawood Algosaibi</u>**

889. A number of documents signed by Dawood following the death of Suleiman in February 2009 expressly referenced one or other of the Financial Businesses. Whilst they were not found in AHAB H.O. locations but in the Money Exchange or the offices in Bahrain, nor are they on the Forgery Schedule. Examples put in cross-examination are included in the schedule of documents at Annex E1/17.4 of the Defendants' Closing submissions.[872] Dawood cannot have overlooked the references to the Financial Businesses (ATS and TIBC) when executing these documents. Given that his evidence was that he only understood there to be one small office in Bahrain, references to various different entities ought to have led him to query what they were. In cross-examination by Mr. Phillips he claims to have not done so: the Defendants say that the reason is that he was fully aware of the Financial Businesses.[873]

890. Indeed, Dawood's position was that he could not remember signing these documents. He

---

871 As discussed in Section **{E1/3}** of the Defendants Closing submissions - False Accounting: Table setting out Bank borrowing, at pages 56 and Table of Deposits at page 63.

872 **{G/7762/1}**; **{G/7670/1}**; **{G/7676/1}**; **{G/7697.2/1}**; **{G/7711/1}**; **{G/7671/2}**; **{G/7713/1}**; **{G/7743/1}**; **{G/7767/1}**; **{G/7766/1}**; **{G/7785/1}**.

873 **Dawood xx {Day78/41:6-13}**

suggested that they must have been indiscriminately put before him by unidentified staff while in the throes of his grief in the aftermath of his father's death:[874]

"*Q. Do you see your signature there? This is the top box on the left-hand side at {G/7636.1/4}.*

*A. Yes, I see it. I told you, I don't remember. Look like my signature but I don't remember.*

*Q. I'm not asking whether you remember. Do you see your signature there?*

*A. Yes, it look like.*

*Q. Underneath that we get the first guarantor, the first guarantor is Saud, and we see that you have signed on Saud's behalf. Do you see your signature there under –*

*A. Yes, I see.*

*Q. Next to that we get the second guarantor, which is Yousef, and you have signed on behalf of Yousef. Do you see that?*

*A. Yes, I see it, yes.*

*Q. Then in the bottom box you have the wider members of the Algosaibi family, if I can put it that way?*

*A. Yes, I see.*

*Q. The first guarantor is members of the family, including you.*

*A. Yes, I see.*

*Q. You have signed on their behalf. Do you see that?*

*A. I see, yes. I told you before it look like, but I don't remember I signed the document, you know?*

*Q. Yes.*

*A. I don't think so I signed all that document.*

---

[874] **Dawood xx {Day78/29:17} - {Day 78/32:17}**

*Q. You have managed to not remember signing eight times on this particular facility.*

*A. Okay. Because I'm not involved in borrowing or something, that's why I told you I don't remember I signing for the bank. (Arabic spoken)*
*(Through interpreter) I don't remember to sign any documents related to banks.*

*CHIEF JUSTICE:*
*Q. At this point in time it may be convenient -- when we started, Mr Algosaibi, this morning, you said, "They bring me a lot of documents for all the companies".*

*A. Yes, my Lord.*

*CHIEF JUSTICE:*
*Q. What were you referring to when you said that?*

*A. Because when my father died, they give me -- Badr tell me that I sign for the company, but they -- you know, they bring me -- you know, it's a new job for me and they bring for me a lot of paper for the company I was signing, but I don't remember what I sign, what --that's what I say.*

*CHIEF JUSTICE:*
*Q. So you could have signed these documents but you don't remember signing them, is that what you have said?*

*CHIEF JUSTICE:*
*Q. Who are they –*

*A. But –*

*CHIEF JUSTICE:*
*Q. "They" who? Who are the people who brought you these documents?*

*A. You know, our adviser, you know, our secretary adviser, they bring for me papers for the company to sign it, but I don't remember that I signed that thing. (Arabic spoken)(Through interpreter) They brought a lot of documents for me to sign but I don't remember that I have ever signed any papers or documents related to banks.*

*CHIEF JUSTICE:*

*Q. One question that arises, would you have signed these documents without even reading them?*

*(Question interpreted)*

*A. (Through interpreter) I have signed a lot of documents, a lot of documents, but when one of the employees, they bring me documents, I trust him so I sign them. But I don't remember that I signed documents or papers related to banks.*

*CHIEF JUSTICE:*

*Q. These employees were the secretaries, were they?*

*A. (Through interpreter) Secretaries and advisers.*

*CHIEF JUSTICE:*

*Q. Like who, Mr Basha John?*

*A. Not Basha. Ratib, Naim, sometimes -- there is, you know, three or four but now I -- the name goes from me.*"

891. The foregoing was typical of Dawood's responses when asked to explain his signatures to facility documentation committing AHAB to liabilities of some SAR 10.7bn (US$2.8bn) between February 2009 and 27 April 2009, the final months of operation of the Money Exchange. This represents 42 per cent of the SAR 25.642bn (US$6.93bn) of borrowing from banks which AHAB finally seeks to recover in this action.[875] Dawood's responses varied between denial of his signatures to non-recollection of the documents even though none is on the Forgery Schedule.

892. Dawood's evidence in this regard had been first set out at paragraphs 39-40 of his first witness statement:[876]

"*39. Following my father's funeral (which ended on 25 February 2009), over the next several weeks, I began to take on my new*

---

875 Section **{E1/24/1}** of the Defendants' closing submissions citing Charlton 20A, Exhibit SAC 18 **{Y2/16/92}** (AHAB's "*Schedule of Claims*" identifying the claims of the "*Bank Claimants*" which AHAB finally seeks to recover in this action).

876 **{C1/1/11}**

*responsibilities in AHAB. I found this an emotional and difficult time. I was mourning the loss of my father while trying to familiarise myself with the considerably expanded role I now had in AHAB, for which I felt unprepared. I was also much busier than I had been in my previous role, working full time for the first time in many years after my long absence as a result of my illness.*

*40. In the first two months or so in my new role I was presented with a very large number of documents for my signature. I remember that Mr Badr presented some of these documents to me. I understood from what I was told that a lot of the documents were routine in nature and related to the amendment of partnership and company documents to reflect the changes in the partnership following my father's death. I do not recall signing any agreements or related documentation during this period entering into, extending or renewing bank borrowing, and I did not knowingly do so. I would not have read every document I signed: if the person giving documents to me for signature gave me an explanation of their purpose which satisfied me that there was no need for me to read them completely, I would not always have done so. Certainly, nothing that I was aware of signing gave me any notice of the large amounts of borrowing within the Money Exchange and I would not have signed such documents without further inquiry.*"

893. That account when taken with responses from Dawood of the kind set out above, led the Court to wonder what really was AHAB's position in relation to the documents signed by Dawood. It emerged that AHAB's case in this regard is that notwithstanding his signatures on the documents, Dawood "*had no knowledge of this borrowing*". This emerged from the following exchanges between the Court and Mr. Quest:[877]

*"CHIEF JUSTICE: Before we rise, I think I need to have a sense of where we are going on this particular tranche of documents we have been hearing about since this morning. There is no allegation of forgery, is there?*

*MR. QUEST: They are not on the forgery schedule.*

*CHIEF JUSTICE: There is no allegation of manipulation, is there?*

[877] **{Day 78/92:5} – {Day 78/94:6}**

*MR. QUEST:* *No.*

*CHIEF JUSTICE:* *What is it that is going to be said, is this non est factum? It is not a plea I have seen pleaded anywhere.*

*MR. QUEST:* *Your Lordship has seen Dawood Algosaibi's witness statement;* ***he simply has no recollection of signing these documents****.*

*CHIEF JUSTICE:* *We just established that there is only one of these facilities where specific reference is made in that witness statement. That was certainly my recollection before.*

*MR. QUEST:* *Yes.*

*CHIEF JUSTICE:* *We have seen many of them this morning, to the tune of millions of dollars, either renewed or new facilities, in the last two months before the collapse.*

*MR. QUEST:* *Yes.*

*CHIEF JUSTICE:* *So what am I to be asked to make of these?*

*MR. QUEST:* *In relation to Dawood, that he had no knowledge of these facilities.*

*CHIEF JUSTICE:* *His signature --*

*MR. QUEST:* ***Whether or not his signature appeared on them, he had no knowledge of them because as far as he was concerned, he was being presented with documents, as he explained, which had nothing to do with them.***

*CHIEF JUSTICE:* *Is that tantamount to a plea of non est factum? What is it?*

*MR. QUEST:* *As far as these proceedings are concerned -- obviously we are not concerned at the moment with claims to enforce the documents, we are concerned in these proceedings, as far as this witness is concerned, his knowledge of these facilities. Our case is that he did not have knowledge of* ***this borrowing.***

*CHIEF JUSTICE:* ***So I am being asked to simply accept that?***

*MR. QUEST:* ***Yes.***

*CHIEF JUSTICE:* ***Irrespective of the fact his signatures appear on them and they are not said to be forged or in any other way challenged?***

*MR. QUEST:* ***They are not admitted. We are not admitting them, on the other hand, they are not on the forgery schedule, so there is no forensic evidence in relation to them. As far as Dawood is concerned****, and it is dealt with in his witness statement at paragraphs 40 and onwards,* ***he had no knowledge of this borrowing****. And that is --*

*CHIEF JUSTICE:* *This is becoming surreal*" (Emphasis added.)

894. By way of setting the context for this account of AHAB's position described as "*surreal*", Dawood's evidence was that he had little or no involvement in the AHAB business before 2009.[878] In effect, implying that he therefore did not understand the nature of the documents put before him; that he simply and unquestioningly signed them without reading and because they were presented to him by trusted members of staff, particularly Badr.

895. But this account too was exposed by the Defendants as a convenient untruth, as shown by the following excerpts from their closing submissions:[879]

"***<u>Dawood's Experience in Relation to AHAB's Businesses</u>***

*Dawood's evidence that he had little or no involvement in the AHAB business before 2009 is untrue. Dawood first began to work for AHAB in 2000 (at the age of 30), having completed a degree at King Abdulaziz University in 1999.[880] Thereafter, Dawood had significant experience of AHAB's businesses and undertook a number of positions of responsibility in relation to them. Dawood's evidence in relation to a number of AHAB businesses is not, of itself, directly probative of him signing facility documents in 2009. However, the fact that he lied about the extent of his involvement in AHAB's business before 2009 is revealing. If Dawood was prepared to lie about his involvement in the businesses before 2009, the*

878 Dawood 1W **[5] – [10] {C1/1/2}**.
879 **{E1/24/4-5} [11] - [14]** and expanded upon in detail to **[55]**.
880 Dawood 1W, **paragraph 5**, **{C1/1/2}.** Dawood xx: **{Day77/26:4}**.

*Court is entitled to approach his evidence in relation to the period in 2009 when he signed multiple AHAB facilities with considerable scepticism.*

*Dawood acted as the Managing Director of the Algosaibi Hotel from 2000.*[881] *He became a member of the board of directors of AHAB in May 2003, following the death of Abdulaziz. He has remained a member of the board of AHAB ever since.*[882]

*In addition to his responsibilities in relation to the Algosaibi Hotel and as a member of AHAB's board of directors, Dawood acted as director of the following AHAB subsidiaries/divisions: Continental Can of Saudi Arabia Ltd, Emirates Can Company Ltd, Jeddah Beverage Can Making Co., Saudi Stevedoring and Shipping Co., Middle East Can Co. Ltd., National Factory for Can Ends Ltd., RSAL, Tecmo Arabia Co. Ltd., APCO and Corro Coat Saudi Arabia Co. Ltd.*[883]

*Dawood was also involved in a number of AHAB's joint ventures, proposed joint ventures or other business endeavours including Panarabia Petrochemical Company, Crown Arabia Can Company Ltd, The Saudi Re for Cooperative Reinsurance Company ("**Cooperative Re**"), Jotun Powder Coatings UAE Ltd (LLC), RFIB Saudi Arabia Ltd, Sterile Syringes, In Motion and Manama Re Limited.*"

896. Dawood's account of being imposed upon to sign the loan documents is also inconsistent with Saud's evidence of an arrangement by which it was specifically agreed that Dawood would be signing facility documentation and in keeping with the "New for Old" policy:[884]

*Q. I want to ask you this question: we have obviously discussed the new for old policy before in connection with the period when your Uncle Suleiman was alive. After your Uncle Suleiman died, how on your understanding did the new for old policy work then?*

*A. You know, they bring the old documentation and the new documentations.*

*Q. Who were they presented to?*

*A. Who what?*

---

881 Dawood 1W, **paragraph 5**, **{C1/1/2}**.
882 Dawood xx: **{Day77/27:17}**.
883 Curriculum vitae of Dawood at **{G/3084.1/1}**. Dawood xx: **{Day77/26:10}**.
884 Saud re-ex {**Day67/122:7} – {Day67/124:1}**.

*Q. Who were those documents shown to?*

*A. Er, er, these documents, er, were -- were shown to? I mean, you know, they get to Badr, huh, to Badr, obviously.*

*Q. What on your understanding did Badr do with them in 2009?*

*A. Yes, he -- he matched them to -- to do the matching, and then he would, er, give them to us, presumably, at the time.*

*Q. At {G/7648/1} --*

*CHIEF JUSTICE:*

*Q. Before you go on, this is the last answer Mr Algosaibi gave: "... he would ... give them to us, presumably, at the time." "Us" meaning whom?*

*A. It means me or Dawood, but Dawood mainly. This is the -- but Dawood, after his father passed away, he took more of, er, some of the activities that, er, er, my uncle did.*

*MR. QUEST:*

*I was just going to ask you about that, because we see there is a memo at {G/7648/1}, March 2009.*

*A. Yes.*

*Q. From the executive committee to various people. You are not included here, but it refers to documents – it says: "Please be advised that the documents that you will forward for the signature of Saud Algosaibi should be amended for the signature of Dawood Algosaibi as most of the time Saud will be travelling and the documentation will be delayed for execution." What was your understanding as to why documents went to Dawood to sign and not to you?*

*A. It was just an agreement I made with Dawood, er, you know, in the office, that, er, er -- it's not about travelling or something, just something, er, er, I agreed with Dawood to be done.*"

897. When asked about the agreement between him and Saud for the signing of documents, Dawood resorted to loss of memory:[885]

> "*Q.* *Your cousin Saud has told this court that there was an agreement between you and him that documents would come to you to be signed. Do you see that?*
>
> *A.* *Yes, yes.*
>
> *Q.* *And that is after your father's death.*
>
> *A.* *Yes, I see.*
>
> *Q.* *So it is in this period where we see you signing all of these facility documents that Saud has told this court that there was an agreement between you that you were going to take on more of the signing of documents. Do you understand?*
>
> *A.* *Yes. Yes, I understand. But –*
>
> *Q.* *Is Saud's evidence accurate?*
>
> *A.* *I don't know. I don't remember things. But maybe documents for the company, I don't know -- for the AHAB company. That's what I think maybe.*
>
> *Q.* *It must be me, but I didn't understand that answer.*
>
> *A.* *(Through interpreter) Maybe the papers he was speaking about related to AHAB, the company. Because at the time I didn't know anything about the borrowings but after the problem happened.*
>
> *Q.* *What agreement do you say you reached with Saud? What was the agreement you made with your cousin Saud about signing documents?*
>
> *A.* *Maybe -- I don't remember but -- I think it's about the company, the AHAB company. You know, the daily work or something like that, for Pepsi, for other companies.*
>
> *Q.* *You can see the difficulty we have got, Mr Algosaibi, is your cousin Saud has told us that there was an agreement that you were*

---

[885] Dawood xx **{Day78/104:25} - {Day78/106:10}.**

> *going to take on more of the signature duties and, lo and behold, we see 130 of your signatures and there is –*
>
> *A. I don't remember it. I don't remember it.*
>
> *Q. You don't remember the agreement that Saud has told us about?*
>
> *A. No, I don't remember it.*"

898. That there was an agreement for Dawood to sign is evidenced independently by a contemporaneous document put to Saud as coming from the "Executive Committee"[886] in cross-examination as referenced above. This was in fact a memo from Al Sanea who had taken to referring to himself in that fashion from about 2005[887] instead of as Managing Director of the Money Exchange and in which he wrote respectively to the staff at the Money Exchange, TIBC and AIH (without any cognisance of the existence of the "New for Old" policy) as follows:

> "*Please be advised that the documents that you will forward for the signature of Saud Algosaibi should be amended for the signature of Dawood Algosaibi as most of the time Saud will be travelling and the documentation will be delayed for execution. Further to the Partners Resolutions it is mentioned that either members of the Board Mr. Saud; Mr. Yousif or Mr. Dawood can sign the documents.*"

899. Dawood's evidence strikes me as a false and convenient narrative aimed at avoiding the fact that his involvement, as a partner of AHAB, fixes AHAB with his knowledge of the massive borrowing which he transacted, not only on behalf of the Money Exchange but also on behalf of the Financial Businesses, in early 2009. This he claimed to have done virtually unwittingly in a fashion which was wholly inconsistent with Saud's narrative on the "New for Old" case. Either – as Saud implied – Dawood was briefed by Saud as to

---

886 **{G/7648/1}**, dated 20 March 2009 and sent to the Money Exchange, TIBC and AIH.
887 Hayley 1W, **[53] {C1/9/14}**.

the requirements of "New for Old" and told that he would be presented with facility documentation which he then knowingly executed, or he was not. The fact that they so woefully contradict each other (Dawood resorting in the end to loss of memory), does not augur well for a finding that the "New for Old" policy even existed.

900. The fact that Al Sanea, signing as the Executive Committee but nonetheless openly directing staff to present documents for massive amounts of increased borrowing to Dawood for execution in Saud's absence is also contradictory of AHAB's allegation of concealment by forgery.

901. At sections 4.47 to 4.86 of AHAB's Closing Submissions,[888] Al Sanea's use of the title "Executive Committee" is examined in detail as an aspect of his strict control over of the Money Exchange and his systematic separation of its operations from that of the rest of AHAB. All of this pointing ultimately, as it is submitted, to his ability to have at once defrauded the AHAB Partners along with the banks.

902. AHAB relies in this context very much again upon the evidence of Mr. Hayley but, on careful analysis, the effect of Mr. Hayley's evidence is not that he or anyone else at the Money Exchange, let alone at AHAB H.O., was deceived by the misleading title. As Mr. Hayley explains: "*[d]espite the reference to "Executive Committee" on Mr Al Sanea's memos, I understood all instructions to have emanated from Mr Al Sanea and nobody else*."[889]

903. The "Executive Committee" was, it seems to me, a figment of Al Sanea's imagination intended, it seems unsuccessfully, to mislead his staff into thinking that he was no longer

---

888 **{D/4/23-41}**
889 Hayley 1W [75] **{C1/9/17}.**

in exclusive day to day control but was operating with direct oversight and involvement by others. This in no way affected the nature of his relationship with the AHAB Partners.

904. As regards his knowledge of the existence of the Financial Businesses, it is also telling that Dawood also signed a board resolution dated 21 April 2009 appointing Dr. Al Mardi as acting Chairman of TIBC, ATS and AIH:[890] no forgery allegation is made in respect of that signature. Both Dawood and Saud were typically vague when asked about this in cross-examination,[891] but in the circumstances both must have been aware of the appointment, contrary to AHAB's case as already examined above.

Accounts and Audit Packs

905. In addition to all of the above, references to the Financial Businesses are rife in Money Exchange accounts and Audit Packs. As discussed earlier in this Judgment, the AHAB Partners would have seen those documents each and every year, and many were in AHAB H.O. files in any event. Specific references to the Financial Businesses in Accounts and Audit Packs found at AHAB H.O. include:

(1) The Money Exchange Financing Division accounts for the year ending 31 December 1993 found in the drawer in Abdulaziz's office refer to "*Deposits in the name of AIH Bahrain*."[892]

(2) The Audit Pack for the year ending 31 December 1994 was found in Saud's villa.[893] This is also as discussed above and put to him in some detail in cross-examination.[894] AIS was expressly referenced on two pages,[895] and there were

---

890 **{O2/1/2};** an exhibit to Dr Al Mardi's Third Affirmation.
891 Dawood xx: **{Day80/90:9-13}**. Saud xx: **{Day 51/6:11} – {Day 51/21:7}.**
892 **{N/464/1} ■N-AA** <Ar>, **{N/466/1}** <Tr>; reference to AIH on **{N/464/7}**.
893 **{H29/141/1} ■V** <Ar> **{H29/141.1/1}** <Tr>.
894 Saud xx **{Day60/17:21} - {Day60/46:6}**.
895 In the translation: **{H29/141.1/22}** and **{H29/141.1/37}**.

also numerous references to "*Algosaibi Investment Company*" in the translation[896] which is probably a reference to either AIS or AIH.[897]

(3) Within the N Files was the Annex 2/8 for the year ending 31 December 2001.[898] This was a standard attachment to the Audit Reports. In addition to having been found in the N Files, it is known that Saud saw this document since it contained the input figure of SAR 7,810,900,000 used in Saud's Calculations which he undertook around this time, also addressed above. The Annex 2/8 referred to "*Loans through AIS Bahrain*", which contributed SAR 2,493,600,000 to the SAR 7.8bn figure, so nearly a third of the total, and recorded increases in that respect on the previous year.

(4) A copy of the Chairman's statement for the unaudited accounts of the Money Exchange for the half-year ending 30 June 2003 was within a file within the AHAB H.O. archives, and referred to the incorporation of TIBC.[899] It was signed by Suleiman.

(5) As also already considered above, the N Files also contained a copy of the KPMG 3 Year Projections[900] which had been sent to Saud under cover of a letter of 26 August 2003 from Al Sanea.[901] The projections for the Money Exchange stated:[902]

> *"A new banking venture named 'The International Banking Corporation' (TIBC) is being established in Bahrain under an offshore banking license granted by the Bahrain Monetary Agency with an authorized and paid up capital of US $ 100 million, as a*

896 **{H29/141.1/9}**, **{H29/141.1/34}**, **{H29/141.1/36}**, **{H29/141.1/37}**, **{H29/141.1/42}**.
897 Saud xx **{Day60/34:13-18}**
898 **{N/782/1}** ■**N-2/03** <Ar> **{N/783/1}** <Tr>
899 **{H3/218/1}** ■**HO-A**
900 **{N/139/1}** ■**N-2/03**; Money Exchange, and **{N/140/1}** ■**N-2/03** AHAB.
901 **{N/589/1}** ■**N-2/03**
902 **{N/139/8}**

> *93% subsidiary of the A.H. Algosaibi & Brothers Company. Accordingly a sum of SR 349 million (US$ 93 million) is projected as investment in subsidiary in the year 2003. The income, if any, from this investment is not taken to consideration as the projected period is assumed as a start up phase.*"

(6) The Statement of the Board of Directors relating to the Money Exchange accounts for the year ending 31 December 2003 also referred to TIBC.[903]

(7) A copy of the Statement of the Board of Directors relating to the Money Exchange accounts for the year ending 31 December 2004 was within one of the AHAB H.O. files maintained by or on behalf of Saud, and signed by both Suleiman and Saud.[904] It referred to TIBC in five separate paragraphs, including on the signature page:[905]

> "*The standing of the Algosaibi Money Exchange Division has been significantly enhanced by its Bahrain based bank subsidiary The International Banking Corporation, which after a little more than eighteen months since start-up has achieved healthy profitability.*
>
> *The management team of TIBC has been further strengthened during the year and both TIBC and the Algosaibi Money Exchange are governed by executive committees, which although independent, are each chaired by Sheikh Suleiman Hamad Algosaibi, with Saud Abdulaziz Algosaibi and Maan Abdulwahed Al Sanea acting as the other committee members. In this way, the Money Exchange and TIBC are able to operate independently, but necessary coordination of their businesses is also ensured.*"

(8) The notes to the Financial Statements for the Money Exchange each year included a section headed 'Investment in Subsidiary' which described TIBC as follows:

> "*A banking venture name[d] 'The International Banking Corporation (TIBC) was established in Bahrain on 22 May 2003 under an offshore banking license granted by Bahrain Monetary*

903 **{H3/161/1}** and **{G/3788/1}**.
904 **{H22/177/1}** ■**HO-SA2**
905 **{H22/177/2}**

> *Agency, with an authorized and paid up capital of US$ 100 million (SR 375 million), as a 93% subsidiary of the A.H. Algosaibi & Brothers Company.*"

906. The notes then went on to set out the specifics in relation to TIBC for the relevant year. Copies were in AHAB H.O. locations as follows:

(a) For the year ended 31 December 2004 there were two different documents, both in the same file being one of those maintained by or on behalf of Saud. One copy contained a KPMG auditor's statement,[906] and the other did not.[907] A version of the former was also amongst the loose papers found in Saud's office in May 2011.[908] It contained the Statement of the Board of Directors relating to the Money Exchange accounts for year ended 2004 referred to at 61(7) above.

(b) For the year ended 31 December 2006, a copy was in the same file maintained by or on behalf of Saud,[909] and signed by him.

(c) For the year ended 31 December 2007, three copies were found in Saud's villa; one was signed by him[910] (and not on the Forgery Schedule), and of two unsigned versions, one contained an El Ayouty auditor's report[911] and the other did not[912]. Since the substantive content was the same, the section which addressed TIBC was in all of them.[913]

(9) The Audit Pack for the year ending 31 December 2008 was also located within

---

906 **{H22/181/1}** ■**HO-SA2**; TIBC note on **{H22/181/16}**. Further copy at **{H22/178/1}**; TIBC note on **{H22/178/16}**.
907 **{H22/180/1}** ■**HO-SA2**; TIBC note on **{H22/180/14}**.
908 **{N/1/1}** ■**N-L**
909 **{H22/59/1}**; TIBC note on **{H22/59/14}**.
910 **{G/6217/1}** ■**V**
911 **{G/6214/1}** ■**V**
912 **{G/6213/1}** ■**V**
913 **{G/6217/18}**, **{G/6213/19}** and **{G/6214/20}**.

AHAB H.O.;[914] its chain of physical control was explored in some detail in the cross-examination of various AHAB witnesses, in particular Saud and Mr. Ali. The Audit Pack expressly referred to TIBC in its text, several times. There were also references to both AIH[915] and ATS[916].

907. Saud also signed the Money Exchange accounts for the year ended 31 December 2005;[917] AHAB has not disclosed a copy from an AHAB H.O. location but there are no allegations of forgery in relation to Saud's signature, which he accepted in cross-examination:[918]

> "*Q.* *If we go over the page to {F/161/2}, we can see your signature, can't we?*
>
> *A.* *Yes, I see my signature, yes, sir, what looks like.*
>
> *Q.* *If we go to {F/161/3} we can also see your signature?*
>
> *A.* *Yes, I see that, yes.*"

908. The Money Exchange accounts include the same description of TIBC as set out at the top of the previous page above, and noted that:[919]

> "*The capital of TIBC was increased to US$ 400 million during the year ended 31 December 2004 (31 December 2004: US$300 million). The Company's share of 93% in the additional increase in the capital of TIBC of US$ 93 million (SR 348.75 million) was contributed in cash.*"

909. It went on to set out TIBC's net profit for the year as being US$494m.

910. Other accounts and related documents which referred to the Financial Businesses and

---

914 **{G/7748/1} ■HO** <Ar> **{G/7749/1}** <Tr>.
915 In the translation: **{G/7749/42}**; **{G/7749/44}**; **{G/7749/45}**; **{G/7749/46}**; **{G/7749/72}**.
916 **{G/7749/31}**; **{G/7749/45}**; **{G/7749/46}**; **{G/7749/50}**; **{G/7749/72}**.
917 **{F/161/1}**
918 Saud xx **{Day48/89:20-24}**
919 **{F/161/13}**

which were put to Saud and/or Yousef in cross-examination but were not from AHAB H.O. locations, are included in Annex E1/17.5 of the Defendants' Closing Submissions. For the reasons identified therein, these documents further respectively reveal the knowledge of Suleiman or Saud of the Financial Businesses.

**Other important AHAB witnesses on the subject of the Partners' knowledge of the Financial Businesses.**

Mr. Mohammed Hindi

911. Mohammed Salem Hindi was Senior Vice President and a member of the AHAB board of directors. He joined AHAB in 1958 and became one of its most trusted and venerated senior employees. Indeed, because also of his seniority, it appears that he was the only person (apart from Al Sanea) not an AHAB Partner who participated in the decision making of the AHAB or Money Exchange boards of directors.

912. He presented in his witness statement a picture of AHAB's affairs as characterised by fiscal probity and conservatism which is inconsistent with the documentary evidence analysed in detail in this case:[920]

> "*39. It was always Abdulaziz's view that AHAB should not load itself with debt, because we ought to be working for ourselves, not the banks. That view has prevailed throughout my involvement with the Algosaibis, and AHAB's manufacturing and trading businesses were always run without excessive debt. Once Suleiman became Chairman, his cautiousness in business was an additional reason why he was averse to substantial borrowing.*
>
> *40. Within reason, the individual businesses were (and are) expected to finance their day-to-day operations from their own income…"*
>
> "*86. As I have explained, Suleiman was cautious in business and inclined to seek counsel in relation to any significant business*

[920] **{C1/20/12}** and **{C1/20/24}** submitted by AHAB under cover of Hearsay Notice dated 15 March 2011: **{C1/19}**.

> *decision. It is simply inconceivable to me that he could have had any knowing involvement in the activities of the Bahraini businesses controlled by Mr Al Sanea without me being aware of it. The same is true of the supposed involvement of Yousef and Saud. These would have been important business matters and I have no doubt that if they had been involved in them they would have discussed them with me, as they did with their involvement in AHAB's business operations generally.*
>
> *87. Knowing Suleiman and his view of Mr Al Sanea as I did, I am confident that he would not have permitted Mr Al Sanea to establish or develop the Bahraini businesses using AHAB's name, nor would he have agreed to provide guarantees in AHAB's name or in the names of the individual AHAB partners. Such conduct would have been entirely inconsistent with his personal dislike of Mr Al Sanea and his long-held view that the Algosaibis should not be in business with him.*"

913. These passages set the context for Mr. Hindi's unreserved allegations against Al Sanea, by which he ascribes to him the single-handed responsibility for the fraud upon the banks and the predicament that has befallen AHAB.

914. There is good reason however, quite apart from his admitted personal dislike of Al Sanea[921] to question Mr. Hindi's objectivity and the fairness of his assessment of what transpired with the Money Exchange and the Financial Businesses.

915. In his witness statement he gave the following evidence as to his ignorance of the Financial Businesses and more particularly as to the absence of documents about them at AHAB H.O.:[922]

> "*I have also learned since Mr Al Sanea's fraud began to unravel in May 2009 that he operated businesses in Bahrain, particularly Algosaibi Trading Services (**ATS**) and The International Banking Corporation (**TIBC**), to raise trade finance and loans, which were then funnelled to the Money Exchange. I had never heard of either of these entities before May*

---

921 **{C1/20/14}**, where at **[47]** he describes Al Sanea thus: "*As I got to know Mr Al Sanea, my impression of him was of an aggressively ambitious, overbearing and ostentatious man, and I never warmed to him.*"

922 Hindi 1W **[82] - [83] {C1/20/23}**

*2009 and was entirely unaware of their activities.*

*I understand that there are documents in the files of the Money Exchange, ATS and TIBC which suggest that AHAB and members of the Algosaibi family were actively involved with ATS and TIBC. In particular, I understand that there are documents apparently signed by Abdulaziz in the 1990s approving trade finance facilities for ATS, and guarantees of those facilities by AHAB, and documents apparently bearing Suleiman's signature suggesting that he did the same (in much larger volumes) in the 2000s. In addition, I understand that Suleiman, Yousef and Saud are all said to have been involved in the establishment of TIBC in 2003, and in its subsequent operations.*

*As far as I am aware, there are no such documents or files at AHAB Head Office. Neither I nor (as far as I am aware) anyone else at Head Office was aware of the supposed involvement of Abdulaziz, Suleiman, Yousef or Saud in these businesses prior to May 2009.*"

916. As the Defendants submit and is now apparent, there were many documents - and of the type he described – at AHAB H.O. Mr. Hindi's evidence is therefore shown to be wrong.

917. In fact, a number of documents from AHAB H.O. show that Mr. Hindi himself was fully aware of the existence of AIS and AIH. And it is perhaps significant that his witness statement excerpted above only expressly denied knowledge of ATS and TIBC.

918. As discussed earlier in this Judgment, Mr. Hindi is recorded as being present at the meeting of 1 May 1984 called by Abdulaziz at which the incorporation of AIH was approved, and he signed the minutes to that effect.[923]

919. Documents relating to Mr. Hindi's knowledge of AIS and AIH which were put to Saud in cross-examination were as follows:

(1) Within an AHAB H.O. archive file, expressly attributed to Mr. Hindi within

[923] **{H29/55/1}** **■V** <Ar> **{H29/55.1/1}** <Tr>

AHAB's discovery (and deemed by AHAB to be "*Not relevant*"),[924] was an AIS newsletter dated 25 July 1989.[925] It was on AIS headed paper, so again also expressly referred to AIS being represented in Bahrain by AIH. It had not simply been ignored upon receipt: someone had written on it "*open a new file call it AISL* <u>*NEWSLETTER*</u>" (underlining in the original). The handwriting is thought by the Defendants to be Saud's. However, he denied in cross-examination that it was his. The contents of the Newsletter were informative: the lead article is entitled "*Is the United States' Monetary Policy Changing?*" and it closes with a report on the relative regional weightings (distributions) of the AIS investments.

(2) Mr. Hindi actually had an account with AIH, as evidenced by:

(a) A signed letter from him to Mr. Khan of AIH dated 27 March 1990, on his personal AHAB letter heading (as "*Vice President/Director*"), referring to a telecon of earlier that day, and asking Mr. Khan to transfer US$60,665 from his account with AIH to his account with the Money Exchange "*by the fastest means possible*".[926]

(b) A similar letter from him to Mr. Astley-Cooper of AIH dated 20 June 1990, again on his personal AHAB letter heading, referring to a telecon that morning requesting to transfer US$125,000 from his account with AIH to his account with the Money Exchange.[927]

This is telling evidence of Mr. Hindi's knowledge of AIS and AIH, and especially of the

---

924 Its original file location was 4FA-1095, (AHAB H.O. 4th Floor Archive) and it appears at row 753 of the Archive Hard Copy File List **{H6/5/1}** as outlined to the Court **{Day56/129:5-18}**.

925 **{G/1253/1}** ■**<u>HO-A</u>**; put to Saud **{Day56/127:22}** - **{Day56/129:20}**.

926 **{G/1283/1}** ■**<u>HO-A</u>**; put to Saud **{Day56/129:20}** - **{Day56/130:10}**.

927 **{G/1309/1}** ■**<u>HO-A</u>**; put to Saud **{Day56/130:12}** - **{Day56/132:10}**.

latter as a banking entity carrying on business in Bahrain. Given that he held significant deposits with AIH, he could not have simply forgotten about it when providing his witness statement. I note also that in his supplementary witness statement,[928] Mr. Hindi was called upon to explain the existence of a number of documents which show that financing was arranged through the Money Exchange for certain AHAB entities which were under his management. His explanations, consistent with the fiscal conservatism he professed and implicitly to the effect that the documents may not be genuine, is not convincing.

Mr. Mark Hayley

920. Mark Hayley became the General Manager of the Money Exchange on 1 January 1998. At paragraph 61 of his witness statement[929] he explains that from the time he commenced as General Manager, Al Sanea never worked at the Money Exchange but instead worked from his office at STCC in Al Khobar and issued instructions remotely. Nonetheless, that while the Money Exchange occupied the first floor of the AHAB H.O. building (with the H.O. itself located upstairs on the third floor), Al Sanea exercised strict control regarding the conduct of the Money Exchange business. No employee was permitted to carry out any action concerning the business of the Money Exchange without Al Sanea's authority. "*He exercised strict control over every aspect of the business*" states Mr. Hayley "*and did not delegate any authority to me, such as authority to approve expenses or staff salary payments*". At paragraph 62-63 he continues:

> "*In my role as General Manager, I would consult Mr. Al Sanea as and when necessary concerning any matters that required action and if appropriate make*

---

928 **{C1/21}**, also the subject of Hearsay Notice dated 11 May 2011: **{C1/19}**.
929 **{C1/9/15}**

> *recommendations accordingly. He would make the necessary decisions and instruct accordingly. Mr. Al Sanea would instruct Money Exchange employees to accept only instructions that were issued or approved by Mr. Al Sanea himself.*"

921. This apparent exclusive and strict control by Al Sanea of what was in fact a division of AHAB was enabled because, as Mr. Hayley explains at paragraph 26:[930]

> "*The Money Exchange was run as an entirely independent entity from the other AHAB group businesses. There was no back office support or oversight given by the AHAB Head Office situated on the third floor of the AHAB building. The Money Exchange was completely self-sufficient and there was no overlap between the employees of AHAB Head Office with the Money Exchange.*"

922. At paragraph 33, Mr. Hayley goes on to describe his impression of what the real purpose of the Money Exchange was:[931]

> "*After approximately six months as General Manager, I became aware that, rather than generating operating revenue, Mr Al Sanea wanted to use the Algosaibi name in order to borrow through the Money Exchange for the purpose of funding the Saad Group which at that time was not sufficiently credit-worthy. The borrowings of the Money Exchange were also used to service its existing debt. I soon discovered that the Money Exchange had borrowing to the extent of US$1 billion.*"

923. At paragraph 31:[932]

> "*I was told that leverage and borrowing were anathema to Abdulaziz Algosaibi, who came from a culture of using cash flow to fund expenditure. By contrast, Mr Al Sanea used leverage as a means of business expansion.*"

At paragraphs 44 – 48:[933]

> "*…To my knowledge, the Money Exchange had no role as a central treasury for other business divisions of the AHAB group… The Money Exchange borrowed money at Mr Al Sanea's direction and for his use…There were occasions where AHAB Head Office asked for expenses to be paid by the Money Exchange, but to my knowledge no material funds were ever distributed to the AHAB businesses. As I have said, any borrowing was to service the existing debt of the Money Exchange and to fund the Saad Group.*"

---

930 **{C1/9/7}**
931 **{C1/9/9}**
932 **{C1/9/9}**
933 **{C1/9/12-13}**

924. This evidence (and further evidence from Mr. Hayley and other witnesses) as to the separation of the Money Exchange from the rest of AHAB and its exclusive control by Al Sanea, is of course, crucial to an understanding and acceptance of AHAB's case that the Partners did not know or authorise Al Sanea's use of the Money Exchange as the potent engine of fraud that it became. That Al Sanea had managed to create the perfect hermetically sealed environment for the conduct of his fraud which he perpetrated for the exclusive benefit of himself and his Saad group of companies. Thus, this Court is invited to accept that although it was taking place virtually "*right under their noses*", the Partners knew nothing of one of the biggest Ponzi schemes in history being run out of their business from within the very building in which they worked.

925. This extraordinary proposition called for the very careful kind of scrutiny of the evidence undertaken in this trial and which as I have explained, necessarily came to depend upon what the historic documents objectively revealed rather upon the subjective views or recollections of individual witnesses. The result for the assessment of Mr. Hayley's evidence was no different than for that of the other witnesses of fact: where his impression of the relationship between Al Sanea as the controlling mind of the Money Exchange and the AHAB Partners as the unwitting victims of his fraud is not supported by the documentary evidence, I am compelled to rely upon the documentary evidence.

926. For instance, contrary to his views, the Defendants were able to show by careful examination of the transactional records and facility documents that the Money Exchange did indeed undertake a very significant amount of borrowing for the benefit of other AHAB entities. Whether or not this justified the "*central treasury*" label became irrelevant. The fact of the matter is that there are early resolutions of the AHAB Board of

Directors expressing their intention to develop the Money Exchange as AHAB's "*central treasury*"[934] and over time, AHAB became the direct beneficiary of very significant borrowing through the Money Exchange to fund its other operations, it Partners' personal expenses and, even more significant, the cost of its investments. Indeed, it became common ground at the trial that one of the principal functions of the Money Exchange was to purchase and hold investments for AHAB.

927. The "*central treasury*" issue is the subject of specific examination by the Defendants at Section E1/16 of their closing submissions. In this massive case, it is impossible to address in this Judgment every detail of every issue. It will therefore suffice that I note here my acceptance of the Defendants' submissions on this issue.

928. This showing of the Money Exchange as an important source of funding for AHAB and its Partners serves, *ipso facto*, to falsify Mr. Hayley's narrative. But it is important all the same to recognise that not even he, a key AHAB witness, goes so far as to assert that the Partners had no knowledge of the fraud. He speaks only to his impression of the goings on as between Al Sanea and the different Partners at any given point in time and confirms that he was never privy to any meetings between them.[935] He himself met with an AHAB Partner only on "*the rare occasions.*"[936] Moreover, as the documents themselves reveal, the typical communication in writing between an AHAB Partner (mainly Saud) and Al Sanea would have gone directly from STCC's offices where Al Sanea was based and

934 **{G/966/1}**, considered above, and Abdulaziz's reminder to other Board members dated 20 December 1990**: {G/1356/2}**; **{G/1357/2}**.

935 **{Day23/43:23}-{Day23/44:20}** in which Mr. Hayley said his only dealing with the partners were when meeting banks and two meetings with Saud; **{Day69/68:16}-{Day69/70:10}** in which Mr. Hayley describes his limited interaction with AHAB H.O.

936 **[54] {C1/10/14}**

AHAB H.O. or vice versa. As Omar Saad confirmed,[937] the many meetings of the Money Exchange Board of Directors shown by the minutes to have been attended by Al Sanea, took place at AHAB H.O.

929. Of more fundamental importance to the proper conclusions in this case, Mr. Hayley acknowledged that the Money Exchange's ledgers contained an accurate record of all its transactions, including the crucial Ledger 3 which recorded to the last dollar, the extent of Al Sanea's and his Saad entities' indebtedness to the Money Exchange. This is the ledger which became Attachment 9 to the El Ayouty Audit reports.

930. The same implications carry through into Mr. Hayley's evidence in relation to the Financial Businesses. He gives his overall impression of the Financial Businesses at paragraph 36 of his witness statement:[938]

> "*The Money Exchange worked in conjunction with related financial services companies: The International Banking Corporation ("TIBC"); Algosaibi Investment Holdings ("AIH") and Algosaibi Trading Services ("ATS"). In effect, these were managed with the primary aim of securing more funds for the Money Exchange, so that these could in turn be used to fund Mr. Al Sanea and/or the Saad Group. I carried out my role in conjunction with my counterparts related financial services entities TIBC.,AIH and ATS.*"

931. At paragraphs 37 – 41, Mr. Hayley goes on to explain in detail his understanding of the purpose and operations of the Financial Businesses, including their arrangements with banks and the titles and functions of their key employees, in particular Mr. Potter and Mr. Stewart and concludes:

> "*Mr. Potter (like Mr. Stewart) also acted under the direct instructions of Mr. Al Sanea. Routinely, we worked together to achieve Mr. Al Sanea's objectives; that is, to obtain more funding for Mr. Al Sanea and the Saad*

---

937 **Day88/67:1-22; Day89/26:1-11** (although he testified that after Abdulaziz died, Al Sanea attended few meetings).
938 **{C1/9/10}**

*Group*."

932. While Mr. Hayley does not go so far as to suggest that this meant that the AHAB Partners did not know of the existence of the Financial Businesses or were unaware of their use for the procurement of billions of dollars of borrowing offshore Saudi Arabia in the name of AHAB, any such implication from his testimony would be contrary to the facts revealed from the examination of the documentary evidence in this case.

Mr. John Potter

933. I accept, as the Defendants submit,[939] that a further factor evidencing the AHAB Partners' awareness of the Financial Businesses is their knowledge of Mr. John Potter.

934. A witness statement from Mr. Potter was presented by AHAB[940] but he was not called to testify in person. AHAB relies on his statement in support of its case that Al Sanea was in exclusive control of the Money Exchange and the Financial Businesses and this is what, in effect, Mr. Potter had to say was how things appeared from his perspective. Mr. Potter was appointed General Manager of the Money Exchange in 1982 and later, after he moved to Bahrain, as General Manager of AIH on 29 May 1984. It appears that he wore several hats while based in Bahrain over the ensuing years: he was also a director of AIS/ATS as well as "*advisor*" to TIBC and worked also on behalf of the Saad Group at Awal Bank. This is the narrative from his witness statement on the issue of interaction with the Algosaibis and Al Sanea's control:[941]

> "*When I joined ALGME, the business was engaged in some borrowing activities (mostly for group companies), but nothing significant (approximately USD70 - 80 million). The Algosaibi family had little*

939 **{E1/17/41}**
940 **{C1/29}**, by way of a hearsay notice: **{C1/25/1}**
941 **[5] - [6] {C1/29/1}**.

*involvement with ALGME. Abdulaziz Algosaibi was involved in the big picture; however, Mr. Al Sanea was in charge of the day to day running of the business and I was told he had a power of attorney from the Algosaibi family to run ALGME on their behalf. He was also an authorised signatory for ALGME. I never saw the aforementioned power of attorney.*

*Interaction with the Algosaibi family*

*I was the only person in the group that knew the family. Glenn Stewart ("Mr. Stewart") met socially with the Algosaibi family, but only on very few occasions. I don't believe that Mark Hayley ("Mr. Hayley"), the General Manager of ALGME had direct contact with the family. The structure put in place by Mr. Al Sanea aimed to conceal information from the Algosaibi Family. Mr. Al Sanea gave direct instructions not to communicate with any members of the Algosaibi Family regarding business matters. In my opinion Mr. Al Sanea was a tyrant.*

*Maan Control*

*[Documents that needed signatures from the Algosaibi family were transported to Saudi Arabia by daily driver], and were returned bearing the required signature of the Chairman. On many occasions, these signatures were verified by Saudi banks and the Chamber of Commerce in Saudi Arabia.*

*Initially, the memos [between staff in Bahrain and Al Sanea] were addressed to "Maan Al Sanea". On or about late 2005, Mr. Al Sanea decided that all communications should be addressed to the Executive Committee or "ExComm." I understood the ExComm to be Mr. Al Sanea himself and not a separate management committee.*

*Setting up AIH/AIS/ACS/ATS*

*I was asked by Mr. Al Sanea to move back to Bahrain in the middle of 1984 to set up [AIH]. AIH was to be the investment arm of ALGME in Bahrain. The legal work for the set up of AIH was carried out by the lawyer Dr Omar El Mardi ("Dr El Mardi") … The Algosaibi family was aware that AIH was being set up in Bahrain, what its role in the group was, and understood my role as business leader for the company.*

*In 1985, I helped establish Algosaibi Investment Services (AIS)*[942]*, which was used for private client business and subsequently Islamic brokerage*

[942] Mr. Potter here explains in a foot note to his statement that AIS was established in Bermuda "*to protect the clients' assets given the Iraq/Iran war at the time.*"

> *business (Murabaha trade transactions). The business was successful and it grew to USD2.5 billion in managed assets. AIS started to arrange trade finance facilities for the Algosaibi group and with the change in activities, AIS changed its name to Algosaibi Trading Services ("ATS"). We established Algosaibi Client Services ("ACS") to handle the private client business and segregate it from trading activities.*[943]
>
> *.. AIH, AIS/ATS and ACS were all considered extensions of ALGME, and the Algosaibi family was not involved with the financial services side of the business which was handled entirely by Mr. Al Sanea. It was obvious that Mr. Al Sanea wanted to distance everyone who worked at AIH, ATS and ACS from the Algosaibi family. Mr. Al Sanea gave specific instructions to employees not to interact with any of the Algosaibi family and that all transactions/requests had to go through him first.*"

935. There is no reason to think that Mr. Potter was being untruthful in these accounts of the inter-relationships as he perceived them. His sense of Al Sanea's strict (or even tyrannical) control over the Financial Businesses and over staff who worked for him is consistent with the picture that emerged from the documentary evidence and the accounts of other witnesses, in particular AHAB's key witness Mr. Hayley, who spoke in similar terms of Al Sanea's control over the Money Exchange.[944] From all the evidence I am prepared to accept that Al Sanea did indeed give the impression that he "*wanted to distance everyone who worked at AIH, ATS and ACS from the Algosaibi family*."

936. That however, is not the same as a finding that the distance Al Sanea sought to create between the staff and the Algosaibis was against the wishes of the AHAB Partners or that Al Sanea succeeded in keeping secret from the Partners the very existence of the Financial Businesses and the nature or scope of their operations.

937. Even in the case of Mr. Potter as a senior member of the Financial Businesses staff, there

---

943 This entity did not figure in the trial.

944 Hayley 1W **{C1/9/3}**, where for instance at paragraph 9, he relates his experience of being required "*to act on instructions without question*."

are compelling aspects of the evidence to the contrary.

938. Mr. Potter speaks of himself as "*the only member of the group that knew the (Algosaibi) family.*" It is clear that he did not mean this literally but relatively: other members of staff had made acquaintances but his was the most long-standing and accessible relationship.

939. The relationship between Mr. Potter and the AHAB Partners should therefore be fully contextualised.

940. The following analysis by the Defendants helps, in my view, to set the proper context.

941. Mr. Hayley states that as one of the executives of ATS Mr. Potter, along with Mr. Stewart, was "*very successful in developing relationships with banks in the region, particularly Islamic banks.*"[945]

942. Yousef stated:[946]

> "*I believed that the representative office had been present in Bahrain for a number of years and that John Potter,* ***whom I knew a little****, worked there.*" ( Emphasis added.)

943. Yousef also confirmed in cross-examination that he remembered him.[947] He mentioned Mr. Potter when asked about the Bahrain businesses on a later day:[948]

> "*Q.* *If there was an office in Bahrain, what did you think it was doing for the Money Exchange?*
>
> *A.* *Which one is that?*
>
> *Q.* *You say in that sentence –*
>
> *A.* *Excuse me, I have to make it clear. The only one I know is about the one who runs by Potter.*
>
> *Q.* *Yes.*

945 Hayley 1W **[40] {C1/9/11}**
946 Yousef 1W **[133] {C1/3/30}**
947 Yousef xx **{Day30/50:19-22}**
948 Yousef xx **{Day33/21:11} - {Day33/22:9}**

*A. John Potter.*

*Q. Yes.*

*A. That I know. That I know about it.*

*Q. What did you think John Potter was doing in Bahrain?*

*A. I never -- I have no idea.*

*Q. Why would you have the expense of an office in Bahrain if you had no idea what it was doing?*

*A. It's the family who runs that, but not me myself.*

*Q. But you have an interest in the Money Exchange?*

*A. Yes, yes, I have. Yes.*

*Q. You knew about this office in Bahrain, did you never ask yourself what Mr Potter was doing in Bahrain?*

*A. No, I never did.*

*Q. That's not very good supervision for AHAB of the Money Exchange's affairs, if you don't know what the office is doing in Bahrain, is it?*

*A. Somebody else was looking after it.*"

944. On Day 38 of the trial Yousef again made the point that he knew about a business in Bahrain which was run by Mr. Potter:[949]

"*Q. I'm suggesting you knew perfectly well that there were companies in Bahrain, even if you had forgotten the names.*

*A. The only one is with Potter, John Potter. Otherwise, the others I can't -- I don't remember -- I don't know about it.*"

945. Saud referred to Mr. Potter in his witness statement as follows:[950]

---

949 Yousef xx **{Day38/19:6-11}**.
950 Saud 1W **[299] {C1/2/62}**.

> "*I believe I met Mr Potter (in Yousef's office) while I was on holiday from my studies in the USA.*"

946. The fact that Mr. Potter even attended Yousef in his office is telling.

947. Saud also accepted in cross-examination that he knew of Mr. Potter and that their paths crossed:[951]

> "*Q. You knew Mr Potter, didn't you, Mr. Algosaibi?*
>
> *A. I -- I've seen him on occasions here and there but at that time I had no -- no interaction with him, no.*
>
> ...
>
> *Q. Let's just be clear about this. You knew the face of Mr Potter and you knew –*
>
> *A. Yes.*
>
> *Q. -- that that was his name?*
>
> *A. John Potter, now, yes.*
>
> *Q. And that was all that you knew. You knew nothing else?*
>
> *A. I saw him long time ago. I remember before the events, and I don't recall where exactly. Could have been at social event, and I think that was the case. And that's what I know of him. What he did for us, what he didn't do for us, or he worked for other company; I had no interaction with him.*"

948. Mr. Potter was present at a signing ceremony in Bahrain in 1989 which Abdulaziz and Saud also attended. Saud's evidence in cross-examination in relation to his reasons for attending was vague, but he would have recognised Mr. Potter:[952]

> *"Maybe I attended the lunch. You asked me about Potter, did I see Potter? I may have.*"

And

---

951 Saud xx **{Day53/89:8-11}** and **{Day53/91:6-17}**.
952 Saud xx **{Day53/113:7-8}** and **{Day53/115:1-2}**.

> *…….. So, was Potter there? He may have, yes. Did I know what he was doing? Maybe not.*"

949. Saud wrote to Mr. Potter on 15 November 1999 addressed to him at AIH in Bahrain:[953]

> "*Please find enclosed a copy of a proposal I received from an Investment Bank in USA. They propose to establish the first ever Islamic bank in America. I thought you would be the right person to deal with this subject.*"

950. This was a letter from which Saud tried to distance himself in his statement.[954] The letter existed electronically on Mr. John's computer, and a signed version was in an AHAB H.O. archive location. On any view, therefore, it was drafted on Saud's behalf, signed by him, and sent. It demonstrates that Saud had sufficient awareness of Mr. Potter's role to realise correctly that he had an interest in Islamic banks, and was "*the right person to deal with this subject*". Even if (which is not accepted) he only passed the proposal on because Abdulaziz or Al Sanea told him to and did so "*blindly*" (as he suggested in cross-examination) the fact remains that he already understood that it was to Mr. Potter that it should be sent.

951. An example of Saud and Mr. Potter meeting the same people can be seen in a chain of emails from October and November 2005 between Mr. Potter and Mr. Freeth of J P Morgan.[955] The title of the emails was 'AIH and Algosaibi Trading Services'. In them, Mr. Freeth referred to having seen Mr. Potter recently in Bahrain, and that:

> "*I was also fortunate enough to meet Sheikh Saud Algosaibi a few days later with Badr Eldin Badr and my colleague Ramzi Abukhadra from our Bahrain office, which was a nice introduction.*"

---

953 **{G/1988/1}** ■**HO-e** and signed version **{G/1989/1}** ■**HO-A**; put to Saud **{Day55/73:11}** - **{Day55/85:16}**.

954 Saud 1W **[298]-[299]** **{C1/2/62}**: "*I do not recall this letter or the subject matter. Looking at it now, I think that what probably happened was that Head Office had received an initial approach from the investment bank and my father told me to pass the proposal on either directly to Mr Potter, or to Mr Al Sanea who then asked me to forward it to Mr Potter.*"

955 **{G/4991/1}**

952. It is implausible that Mr. Freeth, at the referenced meeting with Saud, would not have mentioned to him his recent meeting with Mr. Potter, or his dealings with him and ATS and AIH.

953. Mr. Potter was sufficiently familiar with Saud and Yousef to send them condolence letters upon the death of Suleiman, in which he stated that he had unfortunately been "*unable to attend the condolences in Alkhobar before the last day*".[956] Whilst his letters were not found within AHAB H.O. but amongst documents in Bahrain, importantly a response from Yousef was found on the computer of Mr. Shabiudeen at AHAB H.O.[957] This suggests that the letter to Yousef at least must have been received. It is notable that both Saud and Yousef were addressed on first name terms: "*Dear Saud*" and "*Dear Yousef*", suggesting a degree of familiarity not denied by Saud in cross-examination:[958]

> "*Q. Again, he is on quite familiar terms with you; it is "Dear Saud", "Dear Yousef", not "Dear Sheikh Algosaibi"?*
>
> *A. Yes, sir.*"

954. The AHAB Partners' awareness of and familiarity with Mr. Potter over a long period of time, makes it inconceivable that they would not have had an understanding of what he did. He was obviously not an employee based in Bahrain dealing only with "*a small representative office business*", i.e.: currency exchange, remittances and an American Express franchise. He was an expatriate experienced in Islamic banking and finance. The AHAB Partners must have known that he was working for the Bahrain operation in a capacity that required that kind of expertise. Additionally, as Mr. Hayley is reported as

---

956 **{G/7540.1/1}** to Yousef; **{G/7540/1}** to Saud; put to Saud **{Day57/123:11} - {Day57/126:25}**.
957 **{G/7556.2A/2}** ■**HO-e**
958 Saud xx **{Day57/126:23-25}**.

having said, Mr. Potter had developed relationships with local banks; many of which also dealt with AHAB. It is also clear from his statement that Mr. Potter knew the Algosaibi family well and had significant contact with them. See for instance, at paragraph 43 of his witness statement,[959] his account of his discussions with Saud about the split of beneficial ownership of SAMBA shares as between AHAB and Al Sanea.

955. I accept, as the Defendants submit, that Mr. Potter and his role within the Financial Businesses cannot have gone unnoticed or unremarked during the 25 years of his employment by AHAB, first in Al Khobar until 1984 and subsequently in Bahrain.

956. Yet, it appears that not once was he approached by any of the AHAB Partners seeking an understanding, independent of Al Sanea for whom they professed universal dislike and distrust, of what was happening with their interests in Bahrain. Mr. Potter was clearly someone with whom Saud and Yousef at least, enjoyed a trusting and accessible relationship. The fact that no such approach was made is, in my view, a circumstance that can be explained only by them having otherwise acquired that understanding.

Group Profiles

957. A great deal of evidence was given as to whether the AHAB Partners saw the Group Profiles. The evidence supports the Defendants' case that they would have been fully aware of their existence and contents. Submissions as to whether Saud saw a version of the Group Profile which was prepared shortly after Abdulaziz's death and which referred to TIBC were considered above and are further set out in Section E1/15 of the Defendants submissions.[960] For present purposes I accept that it is significant that the N

---

959 **{C1/29/9}**
960 **{E1/15/39-41}**

files contained a letter to Saud from Al Sanea dated 26 August 2003[961] expressly referring, inter alia, to "*the Algosaibi Group Profile*". It is inconceivable that Saud would not have received and read it. The document refers to TIBC,[962] AIH[963] and ATS,[964] and contains descriptions of their activities.

958. Likewise the 2004 Group Profile[965] had specific entries for each of AIH,[966] ATS[967] and TIBC[968] as well as referring to them throughout the document.

959. The Group Profile was updated again in March 2009.[969] It too referred to AIH,[970] ATS[971] and TIBC.[972] An interesting document from an archive location within AHAB H.O. dated around this time is further supportive of AHAB H.O. knowledge of the Group Profile: it is titled "*The Algosaibi Group Profile - Approved List of Banks*" and is dated 26 April 2009.[973]

960. The Group Profiles were sources of information which were readily available to the AHAB Partners which openly attested to the existence of the Financial Businesses and their extensive borrowing activity.

<u>Documents in the public domain</u>

961. Within Dawood's electronic files was a soft copy of a magazine supplement setting out

---

961 {N/**589/1**} ■**<u>N-2/03</u>**
962 **{G/3773/24-25}**; **{G/3773/29}**.
963 **{G/3773/18}**; **{G/3773/19}**; **{G/3773/24}**.
964 **{G/3773/18}**; **{G/3773/19}**.
965 **{G/4500.2/1}**
966 **{G/4500.2/13}**
967 **{G/4500.2/13}**
968 **{G/4500.2/38}**
969 **{G/7657/1}**
970 **{G/7657/7}**; **{G/7657/15}**.
971 **{G/7657/15}**; **{G/7657/16}**
972 **{G/7657/3}**; **{G/7657/6}**; **{G/7657/7}**; **{G/7657/17}**; **{G/7657/33}**; **{G/7657/34}**.
973 **{G/230/1}** ■**<u>HO-A</u>**

"*The World's 50 Richest Arabs*".[974] Unsurprisingly, it featured the Algosaibi family and referred to "*The International Banking Corporation (TIBC -Bahrain)*". I accept that Dawood must have read this, and discussed it with other members of the family including Saud. Saud in cross-examination attempted to deflect questioning by explaining away TIBC as being the name for a Money Exchange subsidiary:[975]

> "*A.* *Yes, Money Exchange had a subsidiary, in this case they named the subsidiary as "TIBC Bahrain".*
>
> *Q.* *No, TIBC Bahrain is listed separately from the Money Exchange.*
>
> *A.* *Yes, yes.*
>
> *Q.* *What it is saying is that these are group investments of the Algosaibi family. What they are doing is tying TIBC directly to the Algosaibi family.*
>
> *A.* *Okay.*
>
> *Q.* *Do you see that?*
>
> *A.* *Yes, they are writing, this stuff they know, yes.*
>
> *Q.* *What is being suggested in this little article is that the International Banking Corporation, TIBC Bahrain, is a significant part of the wealth of the Algosaibi family. Do you see that?*
>
> *A.* *They just speak of the -- the companies that -- that had to do with Algosaibi family, and so they name them, even below here, the paragraph below it. They start with "The Algosaibi Group are industrial partners," and so on and so forth. So basically they list all of the activities. I mean, whoever did this tried to compile some information from here and there, although some -- I don't know what date is this, but some may be very historical. I mean no longer valid at some point in the document -- in the fourth paragraph.*"

962. The 'Richest Arabs' article in a local Arabian publication, is a prime example of

---

974 **{G/5845.1/1}**: in the October 2006 edition of "*Arabian Business*".
975 Saud xx **{Day58/37:1} - {Day58/38:1}**.

information about AHAB's ownership of TIBC being in the public domain. There was no secret in that respect. It is highly unlikely that the Partners would not have read about it as information which was available publically, or that it would not have been raised in conversation on either a business or social level.

963. Saud was asked in particular about online articles from 3 May 2006 reporting that S & P's had assigned a credit rating to TIBC.[976] Both articles stated that TIBC's ratings reflected its strong capitalisation and full ownership by AHAB. There was no mention of the Money Exchange, or of it being a subsidiary thereof:[977]

> "*Q. The point I want to put to you is that it was not a secret that AHAB owned TIBC.*
>
> *A. Yes, Money Exchange had business in Bahrain and later, you know, it became licensed by the Bahrain Central Bank.*
>
> *Q. None of these articles refer to the Money Exchange, all of these articles refer to AHAB.*
>
> *A. Yes, AHAB owns the Money Exchange, yes, and Money Exchange, by virtue of being owned -- huh -- they owned a bank in Bahrain, yes.*
>
> *Q. My point is that what was being widely reported on is the connection between AHAB and TIBC.*
>
> *A. Okay.*
>
> *Q. Clearly it wasn't a secret. Do you understand?*
>
> *A. Yes, okay.*
>
> *Q. What I suggest from that is that it simply isn't possible that you and your family could have been unaware that you owned a company that was being rated by Standard & Poor's.*

---

976 **{X3/14/1}** and **{X3/13/1}**; put to Saud **{Day58/39:24} - {Day58/41:22}**.
977 Saud xx **{Day58/42:20} - {Day58/44:12}**.

> A. *Define unaware, yani. We know that Money Exchange had -- we had business there a long time ago when my father -- in Bahrain, and later that became a bank. Okay? If in this case, huh, as it happened that they called it "TIBC" then they called it "TIBC", yani, and all that reported to Maan Al Sanea.*
>
> Q. *My point is, Mr. Algosaibi, that what they are reporting in the financial press is not only that this is a bank, not only that this is a bank owned by AHAB but this is a bank rated BBB/A-3 by Standard & Poor's.*
>
> A. *Yes, okay. I don't -- I wasn't aware of it. Now you tell me. It's fine, I read it with you here now.*
>
> Q. *It's obviously not a small representative company of the Money Exchange. Do you agree?*
>
> A. *I know what I know. All I know is that they have a small office in Bahrain. Now -- now that became, you know, a small presence -- that became a bank. That's the only thing I know. Later on we discovered that Maan -- Maan created this false sense of a big – you know, and that -- that we were somehow involved and -- and for -- and I don't know the Central Bank of Bahrain or -- or the -- either that or the prosecutor found multiple -- not multiple, more than multiple -- forgeries in TIBC and -- yani.*"

964. AHAB's ownership of TIBC was referred to elsewhere on the internet. As was put to Saud in cross-examination,[978] the page on Wikipedia referring to AHAB mentioned its ownership of TIBC between at least 9 November 2006 and May 2009.[979]

**<u>Conclusion on knowledge of the Financial Businesses</u>**

965. It was put to Saud several times in cross-examination that documents from AHAB H.O. referring to the Financial Businesses must have been discussed, including amongst the Partners.[980] He was adamant that they were not.

966. Saud also referred repeatedly to the fact that some of the documents were very old, as he

---

978 Saud xx **{Day60/7:1} - {Day60/14:4}**.
979 9 November 2006: **{X4/13/1}**; 22 March 2009: **{X4/14/1}**; 25 May 2009: **{X4/15/1}**.
980 Saud xx **{Day57/77:13} - {Day57/88:17}**

did when asked about documents evidencing his own knowledge, for example a letter to El Ayouty re the Money Exchange's financial statements for year end 1993:[981]

"*Q.* *At {G/1557/1} is a letter on Algosaibi Investment Services paper.*
*A.* *Yes, okay.*
*Q.* *Do you see the handwriting in the top right-hand corner?*
*A.* *Okay, yes.*
*Q.* *That's your handwriting, isn't it?*
*A.* *It looks like my handwriting, yes. Yes, this is '94 --*
*Q.* *This letter –*
*A.* *-- from time immemorial, yes.*"

967. I accept that these older documents demonstrate the Partners' knowledge of the Financial Businesses from their inception.

968. At the conclusion of this area of Saud's cross-examination, he was asked whether he still confirmed as true the paragraph in his witness statement in which he denied knowledge of the Financial Businesses.[982] Astonishingly, he did. The Defendants submit and I accept that that is a deliberate and transparent lie. That Saud, Yousef and Dawood can seek to maintain their pretence of ignorance in the face of such an overwhelming volume and variety of documents, found in files in AHAB H.O., is manifestation of AHAB's desperation to avoid the truth. Here I also refer to the schedule setting out the documents that were put to one or more of them in cross-examination, identified at Annex E1/17.1 of the Defendants' Closing Submissions.

969. I also refer to the further "*Note on knowledge of Financial Businesses*" submitted in

---

981 Saud xx **{Day57/115:2-10}**. English translation including Saud's manuscript note at top : "*Preparation of all the writing points first and reply to them in full, with response to be provided to all points*": {**G/1557.2**}.

982 Saud xx **{Day58/49:7}-{Day58/50:15}**.

writing by the Defendants as foreshadowed in Closing Submissions.[983] This Note examines in detail the treatment of the reports and comments on the Financial Businesses in the many Audit Packs and Financial Statements of the Money Exchange which came in the end to be part of the evidence at trial. I accept that together they show that any AHAB Partner reading these documents, or any number of them, cannot but have immediately appreciated that:

(a) there were multiple financial businesses;

(b) these were substantial businesses or at least presented in that fashion to the world. That appearance would have been obvious from the increasing level of deposits placed by them with the Money Exchange and additionally, in the case of TIBC, the stated net profits accorded it in the Money Exchange ledgers; and,

(c) the purpose of ATS and TIBC was to raise money for the Money Exchange by use of facilities guaranteed by the Partners of their parent AHAB. That would have been obvious from the repeated reference to those arrangements in documents throughout the period.

970. While it cannot be found that the Partners collectively or individually would have seen and considered each and every one of the Audit Packs or Financial Statements, the foregoing examination undertaken in this Judgment satisfies me that each of Abdulaziz, Suleiman, Yousef and Saud would have seen and considered significant numbers of these records, so much so that there can be no reason to doubt that they would have been aware of the mounting indebtedness of the Money Exchange (including as acquired through the Financial Businesses) and of the increasing Al Sanea indebtedness.

---

983 **{E1/17.0/1}** referred to at **{Day118/38:24}-{Day118/39:8}**.

971. More particularly, there can be no question that each of Yousef, Saud, and Dawood, and Suleiman and Abdulaziz before them, were aware of such of the Financial Businesses as existed in their lifetime, and that those businesses were actively involved in borrowing substantial amounts on AHAB's behalf, and with their knowledge and approval.

**Saud's Actions in 2009**

972. The examination in this Judgment of the evidence on the knowledge and authority of the AHAB Partners can be usefully concluded by looking into Saud's actions taken in 2009, after the fraud at the Money Exchange started to unravel.

973. His actions are wholly inconsistent with someone who knew nothing of the Money Exchange. They demonstrate knowledge of the borrowing of the Money Exchange and of Al Sanea's debt. They are also the occasion when Saud and the Algosaibis can be seen taking steps to conceal the bank fraud.

**2008 Audit Pack**

974. Suleiman died in Switzerland on 21 February 2009 and Yousef was appointed as his successor, as recorded by the AHAB Board's resolution of a meeting convened on 26 February 2009.[984] By this stage the financial position of the Money Exchange was dire:

(1) Attachment 8-1 to the 2008 Audit Pack recorded liabilities to banks and financial institutions of SAR 33,506,026,013.[985] This included deposits held as borrowing by the Financial Businesses of some SAR 20bn and was an increase on the previous year's liabilities of nearly SAR 5bn;

984 **{G/7539/1}**; **{G/7539/4}**
985 **{F/259/71}**; **{F/260.1/71}**

(2) The "*assets*" of the Money Exchange included wrongly capitalised interest of SAR 12,464,739,000;[986]

(3) Al Sanea's gross indebtedness had increased over the previous year by SAR 3.989bn to SAR 28.972bn and his net indebtedness had increased by SAR 2.279bn to SAR 16.003bn.[987]

975. It appears that the 2008 Audit Pack, which made clear the dire financial position of the Money Exchange, was received and understood by the Partners. It is expressed as having been sent, as usual to "*All Partners, to be delivered to H.E. Sheikh Yousef Algosaibi*" on 6 April 2009.[988]

976. As discussed above:

(1) Yousef accepted that he received a copy of the 2008 Audit Pack (which recorded that it was "*to be delivered to Yousef …*") and that he passed the document to Omar Saad and may have discussed it with Saud;[989]

(2) El Ayouty also confirmed that they provided the document to Saud.[990]

977. On 8 May 2009, as part of Saud's attempts to deal with the financial crisis engulfing the Money Exchange, Saud asked Mr. Hassan Zaatar to come to his house[991] and tasked him to investigate the affairs of the Money Exchange. Mr. Zataar was at that time, the Deputy General Manager for Financial Affairs of the National Bottling Company, one of

---

986 **{F/259/40}**; **{F/260.1/40}**: El Ayouty noted: "*It is worth mentioning that this balance (investments) is represented by the cost of the annual capitalisation of investments registered in the company's name.. and that this had risen from 60.5 million at the end of 1983*," viz: an increase of 20,000%. They go on to lament the consequences (which they had foretold): "*..capitalisation*" *is primarily linked to the asset for which the loan is taken out, such as the purchase of shares of domestic companies. However, it appears that borrowing was not limited to financing the purchase of investments but was also given as loans to partners and their subsidiaries, which makes calculating the cost of annual borrowing subject to the arbitrary considerations of the management to a large degree*."

987 **{F/259/72}**; **{F/260.1/72}**: the Attachment 9.

988 **{F/259/2}**; **{F/260.1/2}**

989 {**Day 38/61:23} – {Day38/-62:24}**

990 SIFCO5's Hearsay Notice of the El Ayouty interview by Deloitte (at item 15): **{C4/7}**

991 Zaatar 1W, **paragraph 24**: **{C1/14/7}**.

AHAB's most important trading divisions.

978. Mr. Zaatar's evidence was then that within a matter of hours he was able to establish the financial position of the Money Exchange.[992] It appears that Mr. Zaatar was able to do so because he reviewed the Audit Pack for 2008 and reconciled the trial balance to the general ledger:

(1) A copy of the 2008 Audit Pack in the trial bundle (in the original Arabic) contains manuscript notes and underlinings which Mr. Zaatar accepted were his.[993]

(2) In particular, Mr. Zaatar appears to have identified from the Audit Pack, Al Sanea's gross and net indebtedness and the loans to banks, both of which he accepted were of great interest to him in May 2009, given the task that Saud had set him.[994]

(3) Mr. Zaatar's witness statement states that he received the document in 2010 from Mr. Hindi. That in May 2009 he had received only hesitant assistance from the Money Exchange staff and had not gotten any co-operation from El Ayouty. After a few days of making no progress with his investigations, he discussed with Saud bringing in external accountants which led to his recommendation of Deloitte.[995]

979. It is much more likely that he received the document in 2009 (rather than a year later when he had no involvement with the Money Exchange) and then passed it to Saud.

980. He accepted in cross-examination by Mr. Phillips that he was not sure when he received the document:[996]

---

992 **{C1/14/8-9}**
993 (See e.g. **{F/261/2}**; **{F/261/3}**; **{F/261/41}**; **{F/261/45}**; **{F/261/47}**; **{F/261/49}**
994 **{Day88/26:16} – {Day88/30:5}**
995 Zaatar 1W, **paragraphs 37 - 40**: **{C1/14/10}**
996 **{Day88/32:1-10}**

"*MR. PHILLIPS:*

*Q. Mr Zaatar, you have told us that you don't remember when Mr Hindi gave you that audit report, yes?*

*A. Exactly, yes, I don't know.*

*Q. You told us that you were asked by Mr Charlton, you said, in 2016.*

*A. Yes. I'm not sure, because this is 2016 or 2015, I cannot remember.*

*Q. I suggest to you that it is more likely that this document was given to you in May 2009 than any later.*

*A. I'm not sure.*"

981. In all the circumstances, including especially the evidence from the face of the 2008 Report itself, that it was produced and sent by El Ayouty in April 2009, I find that Saud, (along with Yousef and Dawood) must have received and read the 2008 Audit Pack before 8 May 2009 when Saud tasked Mr. Zaatar to investigate the affairs of the Money Exchange.

**"Billion Dollar Problem"**

982. Having received the 2008 Audit Pack, it appears that Saud resolved to divest the Money Exchange to Al Sanea. As the evidence reveals, this had been the subject of discussion on a number of occasions in the past but the situation had now reached the point of crisis: the banks were refusing to lend because the Money Exchange was defaulting. Saud admits that Mr. Hindi, he and various members of the family began to receive calls from banks.[997]

983. Separately, Mr. Hayley had decided that he could no longer remain slient and, from his

---

[997] Saud 1W, **paragraph 342**: **{C1/2/98}**.

point of view, because they may have been unaware, that the time had come when he could no longer fail to inform the Algosaibis of the crisis at the Money Exchange. Saud was travelling but he was able to make telephone contact with him (it seems while he and Dawood were transiting the Beirut Airport) through Head Office. He reports that he told Saud that "*there was a problem at the Money Exchange and he asked me what was the sum involved. I said $8 billion and that he needed to speak with Mr. Al Sanea when he returned to Saudi Arabia.*" He continues that "*I had a short meeting with Saud and Dawood the following day and Saud asked me if US$ 1 billion would resolve the problem. I said it would, in the short term only. Saud reassured me that he would sort out the problem and he instructed me to maintain a position of strength with our bankers.*"

984. Saud claims not to remember Mr. Hayley mentioning an "*$8 billion problem*" in their telephone conversation[998] although Mr. Hayley was quite specific in his account of the conversation. This is not insignificant because that was a remarkably accurate estimate of the scope of the problem and had he been told, Saud's immediate calm and collected reaction would have been very telling. Saud confirms that he and Dawood went to see Mark Hayley on 4 May 2009, in order to discuss the Money Exchange's default[999] and to determine whether the liquidity problem could be solved in the short term.

985. Saud accepts that he may have asked Mr. Hayley whether a payment of US$1bn would solve the problem and that he reassured him that he would sort out the problem and instructed him to maintain a position of strength with the Money Exchange's bankers.[1000]

986. On the same day, Saud and Dawood went to see Al Sanea. The details of this meeting are

---

998 **{Day51/77:13-25}**.
999 Hayley 1W, **paragraphs 317-318**: **{C1/9/64};** Saud 1W, **paragraph 340**: **{C1/2/70}**.
1000 **Ibid**.

murky and neither Saud nor Dawood gave a clear account of what occurred. However, it is probable that, having sounded out Mark Hayley with the US$1bn proposal, a suggestion that he should repay that sum would have been made to Al Sanea.[1001]

987. AHAB, through Mr. Quest, makes the point[1002] that had it registered with Saud that there was an "*$8 billion problem*", or that the size of the Al Sanea debt was anything like it actually was, Saud would not have thought that a payment of $1 billion would solve the problem. This is not a telling point when it is borne in mind that Mark Hayley's advice was heavily qualified: US$1bn was only a short term solution. The fact that Saud was not shocked at that proposition seems in and of itself very revealing as to his true state of mind: he must have recognized that the long term solution involved an even greater problem. I accept Mark Hayley's evidence on this issue also for the reason that his estimate was remarkably close to the true position: the consolidated balance sheet for the Money Exchange as at 31 December 2008, shows "*due to non-banks*" liabilities at SAR 33bn approx., at ordinary exchange rates, a "US$8 billion dollar problem."[1003]

988. Be that as it may, in sounding out Mr. Hayley, there is no reason why Saud would have picked a number such as US$1bn unless this was a sum he thought he could justify. The Defendants invite me to infer that it is therefore no coincidence that in the period 31 December 2008 to 30 April 2009, Al Sanea's net indebtedness had increased from SAR 16.003bn1004 to SAR 19.706bn by 30 April 2009,1005 i.e. it had increased by SAR

---

1001 Saud prepared a draft sale agreement leaving the price blank **{G/269}** **{G/270}** which Saud accepted was in his handwriting **{Day51/35:7} – {Day51/37:2}**.

1002 AHAB's Closing Submissions, **Section 4.784** **{D/4/402}**.

1003 **{H29/252.26/1}**; **{H29/252.27/1}** - found in Saud's Villa's safe but a document which would have been generated internally at the Money Exchange before being presented to the Auditors, El Ayouty. Saud was cross-examined on this issue in detail on **{Day60/113:9}** – **{Day60/117:19}**. The amounts due to non-banks represent bank loans held in the names of TIBC and AIH.

1004 **{F/259/72}**; **{F/260.1/72}**: Attachment 9 to the 2008 Audit Pack.

3.7bn or US$1bn.

989. I accept that a reasonable inference was that Saud wanted Al Sanea to repay US$1bn because he knew that to be the increase in Al Sanea's indebtedness from 31 December 2008 to 30 April 2009. Saud could have obtained this information but only by comparing the Attachment 9 in the 2008 Audit Pack with the Attachment 9 for 30 April 2009 which was found in his safe.[1006]

990. I accept that Al Sanea's contemporaneous behaviour was nothing short of dishonest. It seems that even while Mr. Hayley was anxious to inform the Algosaibis about the true state of crisis at the Money Exchange, Al Sanea's main focus was to extract every last bit of cash he could for himself. And so, on 3 May 2009, he wrote to Mr. Hayley:[1007] "*You are hereby instructed to transfer funds currently held with our Bank of America nostro account to the account of A. H. Algosaibi with Awal Bank. Please retain $2 million with Bank of America*."

991. Mr. Hayley confirms that he reluctantly complied with these instructions resulting in the transfer of US$192m to the Algosaibi account with Awal Bank because "*I considered the transfer to be from one bank account held by the Money Exchange to another of its bank accounts*."[1008]

992. Given the then known circumstances, the transfer of such a large sum, virtually wiping out the Money Exchange's only USD account for a transfer to Awal Bank known to be controlled by Al Sanea, Mr. Hayley's cannot be regarded as an acceptable explanation.

---

1005 **{H29/206.1/1}**; **{H29/206/1}**: Attachment 9 to the Audit Pack for 2009 found in Saud's safe.
1006 **Ibid**.
1007 {**G/7848**}, signed by Al Sanea as "Executive Committee".
1008 Hayley 1W, **paragraph 316 {C1/9/63}**.

993. AHAB submits[1009] that this conduct of Al Sanea's, albeit facilitated by Mr. Hayley, was entirely consistent with Al Sanea's fraud on AHAB, suggesting that AHAB was, at all times, an unwitting and innocent party.

994. I do not accept that submission. This, although characteristically greedy and dishonest conduct on the part of Al Sanea, was merely an opportunistic grab for whatever he could get as he departed the sinking ship. The fact that the ship was bound to sink was already well known to the AHAB Partners.

**Bid to sell the Money Exchange to Al Sanea**

995. There had been efforts in the past, as discussed above, to sell the Money Exchange for a price which was never agreed. As discussed below, on 4 May 2009, it appears that Saud offered to give it to Al Sanea for no consideration. This, I accept, plainly demonstrates that by that stage the Algosaibis knew that the financial position of the Money Exchange was so dire (notwithstanding the prestigious portfolio and the large receivable from Al Sanea) that they needed, above all, a swift exit.

996. By letter dated 4 May 2009, Saud wrote to Al Sanea[1010] stating:

> *"Referring to **our letter from yesterday concerning your purchase of the Money Exchange free of charge**, Brother Dawood has reviewed the content of the letter and he has requested the preparation of all the necessary documents and files as soon as possible in order for it to be signed and finalized to finish what Uncle Suleiman (God rest his soul) has started with you concerning the purchase of the company. And with that concluding what Father started with you concerning the Money Exchange's financial position. **I will acquaint Brother Yousef today (God willing) and I do not foresee his objection to this**. You are free to transfer the company under Sister Sana's name or any other company that you deem appropriate **for the ease of ownership transfer of banks registered***

[1009] AHAB's Closing Submissions, **Section 4.787 {D/4/403}**.
[1010] **{H30/61}**; **{H30/61.1}**

> ***in Bahrain*** *and all the registration documents of the Money Exchange branches in Saudi Arabia to clear us from all potential liability.*" (Emphasis added.)

997. From the words first in emphasis above, it appears that Saud had written a letter the day before (i.e.: 3 May 2009), also offering to give the Money Exchange to Al Sanea for free (something that Saud reluctantly accepted).[1011]

998. This was an entirely new offer which had never been made before. It marked a sea change from Al Sanea's reported previous offer to purchase the Money Exchange for a billion riyals in 2007 or 2008[1012] and from Saud's proposal discussed above – the basis of which was never clearly explained by him[1013] – to offer the Money Exchange to Al Sanea for US$1bn.

999. It was put to Saud in cross-examination, that these offers to Al Sanea to take the Money Exchange for free were made in the desperate realisation at which he had already arrived, that there truly was an $8 billion dollar problem. And that his account of Al Sanea's attempts to keep himself and Dawood in the dark by telling them that the Money Exchange had been defaulting because a bank had not honoured an FX transaction, was untrue. That this was because Saud already knew the real reason:[1014]

> "*MR. LOWE:*
>
> *Q. You made an offer free of charge on 3 May 2009. Is that correct?*
>
> *A. I may have, yes.*

---

[1011] **{Day60/108:2} – {Day60/109:15}**

[1012] Dawood 1W, **paragraph 29 {C1/1/19}**, where he reports an account given to him by his father, Suleiman, of this offer made by Al Sanea while they were together at an Ifabanque shareholders' meeting in Bahrain.

[1013] At one point in the cross-examination, Saud suggested that he had in mind the comparable value of the investment portfolio: **{Day60/103:9} – {Day60/104:1}**.

[1014] **{Day60/108:2} – {Day60/110:8}**

*Q.* *You may have. It's not something you have ever mentioned in any of your witness statements or affidavits, that you had a discussion and you started talking about a transfer of the Money Exchange for this kind of deal.*

*A.* *No, we had -- we had this -- this -- the discussion --regarding the --*

*Q.* *Before this letter, Mr. Algosaibi. I'm only interested in before this letter. Stop generalising, please. Before this letter?*

*A.* *I'm not going to generalise, because the discussion on Maan buying the Exchange started with my Uncle Suleiman.*

*Q.* *No, I am asking you, Mr Algosaibi, about what happened on 3 May. Do you know? 3 May, the day before this letter which you haven't disclosed to us, what happened on that day? You haven't told us in your witness statement, you have never told us before what happened on that day when you made that offer.*

*A.* *Okay. So?*

*Q.* *What you told us instead is that Mr. Al Sanea on that day was mumbling about some split FX transaction and that's how the conversation finished.*

*A.* *Yes.*

*Q.* *That's not true, is it?*

*A.* *No, it's true.*

*Q.* *No, it's not true, because the conversation finished by you making an offer to give him the Money Exchange. You hardly would have been discussing a split FX --*

*A.* *I was talking about explaining; it's two separate things. You are putting two things together; there's two separate things.*

*Q.* *That conversation ended on 3 May by you offering to give him the Money Exchange. It had nothing to do with the split FX.*

*CHIEF JUSTICE:*

*Q.* *Do you accept that?*

*A.* *Yes, I'm trying to answer. He doesn't want to hear the answer.*

*CHIEF JUSTICE:*

*All right, let us hear your answer.*

*A.* *Okay, there's two things. There's the – the continuation of the --*

*MR. LOWE:*

*No.*

*CHIEF JUSTICE:*

*Let's hear his answer, Mr Lowe.*

*A.* *Yes, the discussion which my uncle carried, and that's separate from the problems which Maan was telling us regarding the FX transaction. Two separate things. What Maan told us regarding these -- the banks who were calling us, that it was a mismatch on an FX transaction and all is going to be sorted out. So that's one. Now, we have on the other hand the continuation of the discussion that, er, er, that started from my uncle's days. And to selling the Exchange to Maan Al Sanea for a value. Hm? And that's a different discussion than the -- the -- what that meeting, er, er, when we went to Maan's house, so it's separate things.*"

1000. I have my doubts about the accuracy of Saud's report of the meeting with Al Sanea but as Al Sanea has chosen not to participate in these proceedings, I have no admissible account from him for proper consideration. But whether or not the putative split FX transaction was raised by him as a decoy, there can be no suggestion that Saud (and Dawood for that matter) were misled as to the true state of crisis. Offering the Money Exchange to Al Sanea for free was consistent only with a real understanding of the true state of affairs. Saud would not have offered the Money Exchange for free merely out of concern for the consequences of one errant FX transaction. When cross-examined further as to his real reason, his responses lacked conviction:[1015]

---

[1015] **{Day60/111:18} – {Day60/115:4}**

"*MR. LOWE:*

*Q. There had never been an offer ever to give the Money Exchange to Al Sanea for nothing. There had never been such an offer in any correspondence or any discussion that you have ever referred to. This was a completely new position you were taking.*

*A. No. It's here. I read it here. But this is a continuation of -- of -- of -- what the discussion, early discussion my uncle started with Maan Al Sanea, and now uncle died, huh, so we have to -- finalise it with Maan.*

*Q. That's a lie, Mr. Algosaibi. This letter was found in your villa.*

*A. Okay. So? Yes.*

*Q. Where did you put it in your villa?*

*A. I was in the villa, living in the villa.*

*Q. The Money Exchange held a portfolio of shares. Why give him the Money Exchange for nothing?*

*A. The -- the shares -- it's all in the details. Huh? There is -- nothing is for nothing. The -- the --*

*Q. According to your letter it is?*

*A. I don't recall what was the specifics of -- real what we talked about but what we had in mind at the time to try to -- to finish off the discussion with the – finish off the discussion with uncle, that uncle started, is, look, we --*

*Q. I will tell you why, Mr. Algosaibi, you were prepared to give it to him for nothing. Let me suggest a reason to you.*

*A. Okay.*

*Q. Because you had the document at {H29/252.26/1]} and [H29/252.27/1]. This is in the safe files, my Lord.*

*A. Okay. So there is a letter, so okay.*

*Q. Let's look at the other one, which is also in English.*

*A. Okay.*

*Q.* *It is not part of the audit review report, Mr. Algosaibi, that we looked at earlier today at {F/260/1}. This is a consolidated balance sheet which does not appear anywhere in the audit review report. It only appears as this copy in your safe. Okay?*

*A.* *Okay.*

*Q.* *What we can see from this is that it is indeed a consolidated balance sheet for the Money Exchange and consolidates the finance division and investment division.*

*A.* *Okay.*

*Q.* *If you look at the numbers, they in fact look, at least in terms of the liabilities, familiar. The loans and advances are SAR 31 billion.*

*A.* *Okay.*

*Q.* *The liabilities are SAR 48 billion.*

*A.* *Yes, okay.*

*Q.* *This balance sheet was produced to you, as I suggest, by El Ayouty in the days before 7 May. It had to be because you never saw them afterwards. And it was handed to you or Dawood, right at the beginning of their attendance that week. Do you remember that?*

*A.* *No, I don't. No, I don't remember that.*

*Q.* *How did this get in your wife's safe?*

*A.* *I had a lot of papers, yani, coming to my house.*

*Q.* *No, no, how did this document, which was obviously prepared in May 2009 by the auditors, get into your safe?*

*A.* *Okay. Sir, we, we -- let me explain, huh, we did not discuss the safe thoroughly. But, okay, now the – a lot of papers came, if this someone exercise or maybe -- I don't know who has exercise to make us understand what is the Money Exchange, what is the liabilities, then it is.*

*Q.* *Exactly. And I'm suggesting to you that because you had this right at the beginning, you were so frightened of the liability that you*

*went to Al Sanea and you offered to give him the Money Exchange for nothing.*

A. *No, no, sir. No, no, no, no, no.*

Q. *You saw that the investments were under 6 billion and the liabilities were astronomical. And that's why you wanted to give away the Money Exchange.*

A. *The discussion which uncle did have with -- with regards was 400 million, 500 million, it ended up like this, riyals, which was never executed. So the idea here is just to -- just we want to finish with it, yani. And Maan Al Sanea knows the business, he's in charge of the business, we know nothing of it, and -- and -- and we are really involved in the shipping and in manufacturing and we -- we don't know what is this business, I mean the Money Exchange's. So, er -- so, er, it's best, if Maan was so keen on it, take it, let's finish with it".*

**<u>Saud's knowledge as revealed also from the updated audit pack</u>**

1001. Default notices began to be received in April 2009. Given that the Money Exchange had now reached a stage of default, although Saud denied this,[1016] it appears that Saud asked El Ayouty to update the 2008 Audit Pack in order that he could fully understand the up-to-date financial position of the Money Exchange.

1002. El Ayouty produced a number of updated financial documents which updated the December balance sheet:

(i) The new consolidated balance sheet for the Money Exchange as at 31 December 2008 found in Saud's safe now showed "Cost Fund" at SAR 12.46bn (i.e. the wrongly capitalised interest) in the Partners' Equity part of the Balance Sheet and again showed total liabilities of SAR 48bn.[1017]

---

1016 **{Day60/94:16} – {Day60/95:7}**; **{Day60/96:2} – {Day60/96:15}**; **{Day60/98:10} – {Day60/98:16}**
1017 **{H29/252.26/1}**; **{H29/252.27/1}**

(ii) An updated "Attachment 9" as at 30 April 2009 again found in Saud's safe showed Al Sanea to have gross indebtedness of SAR 33.264bn and net indebtedness of SAR 19.707bn.[1018]

(iii) Documents as at 30 April 2009 showing the accounts of AHAB and others.[1019]

(iv) Summaries of the deposits of Al Sanea, AHAB and TIBC.[1020]

1003. Saud denied that prior to the 8 April 2009 meeting he had instructed El Ayouty to update the financials.[1021] However, this was a task which they must have completed on or before that date, this being the last day on which Saud had any contact with El Ayouty. Deloitte was brought in on Mr. Zataar's recommendation on 9 May 2009. Saud's denial is plainly untrue:

(i) Copies of each of these financial reports were found in Saud's safe. Saud's implausible explanation for this inconvenient fact was that his wife put documents in the safe.[1022] However, not only is this highly implausible, Saud was able to offer no reason why she would have done so, nor was he able to explain how the documents would have come into her possession - there were hundreds of pages of financial reports and other sensitive documents relating to the Money Exchange, which according to AHAB's case, even Saud himself, let alone his wife, would have had no reason to obtain;

(ii) 8 May 2009 was the very last day on which AHAB had any contact with their auditors before Deloitte became involved. In other words, Saud must have had the

---

1018 **{H29/206.1/1}**; **{H29/206/1}**. El Ayouty also provided an updated breakdown of Al Sanea's accounts as at 30 April 2009 **{H29/252.7}**; **{H29/252.6/1}**; **{H29/252.32/1}**; **{H29/252.33/1}**; also found in Saud's safe.

1019 **{H29/252.29/1}, {H29/252.28/1}, {H29/252.23/1}, {H29/252.22/1}, {H29/252.25/1}, {H29/252.24/1}**

1020 **{H29/252.43/1}; {H29/252.42/1}**

1021 **{Day60/94:16} – {Day60/95:7}; {Day60/96:2} – {Day60/96:15}; {Day60/98:10} – {Day60/98:16}**

1022 **{Day60/120:13-17}**

documents found in his safe (e.g. the December 2008 balance sheet and April 2009 Attachment 9)[1023] on 8 May 2009, if not before;

(iii) Saud clearly put them in his safe: they were very important because they showed the indebtedness of the Money Exchange and the enormous borrowing that Al Sanea had been permitted to make. Saud would have wanted to keep the fact of AHAB's knowledge of the true state of affairs hidden from the outside world. As much was put to Saud in cross-examination when it was suggested to him that he kept these documents in his safe because he wanted to keep the information they revealed about the extent of the Money Exchange borrowing and the Al Sanea indebtedness, secret. Saud denied this, implausibly asserting that "..*these were just assortment of papers…*" and "..*Everything was open at all times to everybody.*"[1024]

1004. I note here that AHAB takes this point up at Section 4.831 of their Closing Submissions: "*Moreover, there is insufficient direct evidence, and insufficient evidential foundation for an inference to be drawn, that Saud had directed that documents be brought to his villa [by the Younger Algosaibis] in order for them to be concealed or destroyed. What is clear from the evidence is that documents in Saud's Villa were made available to both Baker and Mackenzie and Deloitte.*"[1025]

1005. Whatever may have been Saud's attitude after 9 May 2009, I have serious misgivings

---

1023 **{H29/252.26/1} and {H29/206.1/1}; {H29/206/1}, respectively.**

1024 **{Day60/133:9} – {Day60/133:17}** and **{Day60/135:2} – {Day60/136:10}**

1025 **{D/4/416},** citing here **{T/285/1},** a letter from Mourant on behalf of Baker and McKenzie confirming that their lawyers had met with Saud at his villa on 4 July 2009 and had been allowed to take certain documents from the villa on 9 July 2009. And the evidence of Simon Charlton of Deloitte **{Day84/3:15-16}**: "..*we visited his villa on a regular basis; I had free access"* {Day84/6:2-5}: "*We had free access to everywhere. There was nowhere we weren't allowed to look. There didn't have to be a particular event that required a search.*"

about his stated reasons for instructing the Younger Algosaibis to carry out what can only fairly be described as a ransacking of the records of the Money Exchange and AHAB H.O., an exercise which had been carried out even before Deloitte arrived in Al Khobar.[1026] When engaged, Deloitte was instructed not to make direct contact with El Ayouty but that any such contact must first be made by the Partners themselves. This, as the evidence revealed, resulted in Audit Packs not being inspected by Deloitte until after the order was made by this Court directing that they be obtained from El Ayouty.

1006. I have already considered above the byzantine circumstances under which the N Files came to be disclosed, with the still unanswered question how it is that they were not disclosed while in Saud's villa. There are many other factors pointing to what the Defendants termed "*The Flawed Investigation*", as their description for the Deloitte investigation. I accept their criticisms as set out therein[1027] and adopt them as part of the basis for concluding that the real reason for the ransacking of the records by the Younger Algosaibis on Saud's instructions was to purge the institutional records of documents which could show the true state of knowledge on the part of the AHAB Partners. I can think of no other reason, and certainly none was offered by Saud, who was characteristically wavering and vague when asked why this exercise was carried out. The suggested notion that this was to allow him to get an understanding of the state of affairs leading to the demands from the banks,[1028] is contrary to common sense. For what better way for a sophisticated man of business to get that understanding than to examine the records in situ or than to ask Mark Hayley, who was by then openly willing to give any

---

1026 Defendants' Written Closing Submissions: **{E1/9/1}**.
1027 Defendants' Written Closing Submissions, Section F **{E1/8/1}**.
1028 **{C1/2/75}**

information Saud might have wished? And in any event, how could Saud, in his professed state of ignorance of the affairs of the Money Exchange, have sensibly instructed the Younger Algosaibis as to what documents to remove; either as he claims, so as to have enlightened his own state of ignorance or to protect the sensitive documents?

1007. Equally unlikely therefore, was Saud's reason that "*there was also considerable concern that (Al Sanea) might attempt to cause documents (whether in the Money Exchange offices or in AHAB's* ***head office****) relating to his activities to be destroyed and we therefore thought it sensible to remove potentially relevant documents from AHAB's offices for safekeeping*."[1029] This building, including the offices of the Money Exchange, belonged to AHAB. Al Sanea had for many years been operating out of his STCC building. The obvious thing to have done was to secure the AHAB building. Indeed, some kind of security was already in place by the time Mr. Zaatar arrived because he gained entry only after Saud (or the El Ayouty representatives) must have intervened with certain employees.[1030]

1008. Nor was it lost on this Court that not one of the Younger Algosaibis was presented to testify as to their conduct relating to the important question of the provenance of documents removed from AHAB H.O. and the Money Exchange. This was also although Mohammed Algosaibi, who had at first been clearly named by Saud as one of the Younger Algosaibis, was present in court during the early stages of the trial, becoming conspicuously absent from the time questions started to arise about this issue. My

---

1029 Saud 1W, **paragraph 363 {C1/2/75}.**
1030 Zataar 1 W, **paragraph 30 {C1/14/8}.**

concerns were only exacerbated when the Defendants raised this issue and Saud then claimed to have been mistaken in his recollection that Mohammed was one of them.[1031]

**INFERENCES TO BE DRAWN**

1009. Given all the circumstances shown to have arisen at the time of the collapse of the Money Exchange in April to May 2009, the following is a summary of inferences which the Defendants urge me to draw and which I consider to arise irresistibly from the conduct of the Partners (especially Saud and Dawood) in relation to Al Sanea, the lending banks and other interlocutors, at the time.

1010. It appears from the context examined above, that El Ayouty's work on the updated 2008 Audit Pack was completed before 8 April 2009. It follows that if AHAB's case were true, it is inexplicable that no alarm was sounded with the authorities and the banks then and there. Instead, Saud's instruction to Mark Hayley was that the Money Exchange should maintain a position of strength with the banks. Saud's reaction on behalf of AHAB was not that of a victim of a devastating fraud.

1011. From among the incomplete information available,[1032]nonetheless of further note in this context, on 9 May 2009, Mark Hayley wrote a memo to Saud setting out discussions he had had with Arab Bank.[1033] Mark Hayley had been told and relayed to Saud, that a default of the debts of the Money Exchange (US$285.43m including US$10m for TIBC) would be sufficiently large to impact Arab Bank's viability. There can be no doubt that, at this stage, Saud knew the extent of the crisis the Money Exchange was in. A further

---

1031 **{Day59/73:19} – {Day59/74:9}**

1032 Resulting to a significant extent, it must fairly be noted in this context, from the fact that Al Sanea has managed to secret away records which were generated and kept at STCC, including some records of the Money Exchange and the Financial Businesses.

1033 **{G/7872}**

memo of the same date jointly from Mr. Hayley and Mr. Stewart was sent to Saud and Al Sanea. It was entitled "Group Re-organisation", and recommended a standstill agreement with all banks, given the extent of the liabilities.[1034] However, Hayley, acting on Saud's instructions, did not alert the banks that a fraud had been carried out by Al Sanea but instead promised repayment. Nor would it have been lost on Saud that Mr. Stewart must have been speaking on behalf of one or other of the Financial Businesses.[1035]

1012. The Algosaibis continued to fail to mention any possibility that they had been defrauded and indeed carried on as if that was not the case:

(a) Dawood, the supposed uninitiate, had been employing a distinct strategy - at a meeting with SBB/HSBC on 11 May 2009, he promised immediate repayment and blamed Mr. Hayley:[1036] "*Dawood explained that the damage was caused by Mark Hayley who did not follow the proper procedure and also did not give immediate instructions to cover FX transactions. Moreover, Dawood mentioned that Mark Hayley has been removed from AlGosaibi Finance, and replacement has been already made. The name of the new incumbent will be communicated to the Banks shortly.*"

(b) No mention was made to the two banks he was then assuaging (and through their onward reporting, the wider banking community), of the fraud later alleged against Al Sanea.

1013. Instead, Dawood's strategy is later reflected in a note to Saud from Al Sanea, dated 13 May 2009, (written on a memo dated 11 May 2009 from Mark Hayley to Al Sanea about

---

1034 **{G/7873}**
1035 **{G/7881.1}**
1036 **{G/7880/5-6}:** *part of an extensive email report from HSBC Middle East offices referencing a meeting with Dawood and Saud Algosaibi on 12 May 2009 and an earlier meeting on 11 May with Dawood at AHAB H.O.*

failed FX transactions) and in which Al Sanea blamed Mr. Hayley and his team and suggested that they be dismissed.[1037]

1014. AHAB comments on this note from Al Sanea to Saud in Closing Submissions[1038] to suggest that this was Al Sanea, "(*not being) happy with Hayley's efforts to inform the family of the insurmountable mountain of debt*" seeking to drive a wedge between Hayley and the family. This does not however, explain how it is that Dawood had already, on 11 May, started spreading the word that Hayley was to be blamed.

1015. On 14 May 2009, Saud and Dawood attended a meeting of the board of TIBC.[1039] It appears from the evidence of Tariq Ali that he persuaded Saud and Dawood to attend this meeting, Saud in particular having expressed anxiety about attending: "*We met and discussed the agenda of the TIBC board meeting. Saud was clearly upset and still obviously shell-shocked by what was unfolding before him. He said to me that he didn't want to go into the meeting. He told me that he didn't know anything about TIBC and that he was anxious about embarrassing himself through ignorance. While I could understand why Saud was anxious about engaging with TIBC's directors before he understood properly what was going on, I told him that he needed to attend the meeting because he was listed as an officer on the company's documents*."

1016. AHAB invites me to accept Tariq Ali's account as an impartial and reliable assessment of Saud's true state of mind at the time.[1040] It cannot be surprising that I decline to do so. Not only is Mr. Ali's merely a second-hand account of Saud's state of mind, it is irreconcilable with all the facts established in this case from the documentary evidence.

---

[1037] **{G/7879.1}**
[1038] AHAB's Closing Submissions, **Section 4.820 – 4.823 {D/4/412}.**
[1039] **{G/7880/1}**
[1040] AHAB's Closing Submissions, **Section 4.824-4.827 {D/4/413}.**

There is overwhelming proof of Saud's knowledge of the Financial Businesses. As but two illustrative examples especially to be noted in this context: first it is to be remembered[1041] that in 2004, Saud proposed the sale of the Money Exchange and "*affiliates outside the Kingdom*", to Al Sanea.[1042] Second, only 10 days before, on 4 May 2009, Saud had again proposed to transfer the Money Exchange and "*banks registered in Bahrain*" to Al Sanea, this time (as it seems he had done the day before) free of charge.[1043]

1017. As the Defendants submit, the minutes of this meeting on 14 May 2009 of TIBC are significant for a number of reasons, however, the most obvious point which arises from them is that nowhere in the minutes did the Algosaibis mention that they had no idea of the existence of TIBC or of their shareholding in it. One would expect it to have come up. Instead, neither Saud nor Dawood made mention of a fraud by which they had come to own one of the largest banks in Bahrain. Tariq Ali's report of Saud's and Dawood's apparent reticence at the meeting[1044] is therefore equally consistent with prior knowledge and lack of surprise on their part as it is with his impression of their state of shock and surprise.

1018. Tariq Ali, through his firm Gulf Banking Consultants ("GBC") was formally engaged by Saud to provide "*debt restructuring advice*" to AHAB and the Algosaibis. On 16 May 2009 a report[1045] was prepared by GBC and sent to Saud regarding AHAB and TIBC and stated, inter alia:

---

1041 See above at paragraph 862.
1042 **{G/4104}**
1043 See above at paragraph 995.
1044 Ali 1W **{C1/4/15}**; **{C1/4/17}**.
1045 **{G/7901}**

> "*Our observation so far is that the current predicament of TIBC and AHAG will most likely have serious implications for Awal Bank Bahrain and SAAD Group in Al Khobar as the full picture emerges. The general perception that Al Gosaibi Money Exchange the entity with the largest borrowing within AHAG and the majority owner of TIBC has been managed by SAAD group is appearing to be the case*."

1019. While AHAB submits that by the time of this initial report, "*Mr. Ali had learned enough to conclude that some sort of fraud had taken place*,"[1046] there was no mention of any allegation of fraud against Al Sanea.

1020. On 16 May 2009, Tariq Ali sent an email to Saud noting that "*most of the Money Exchange transactions failed because the incoming payments from SAAD group did not come in...*"[1047]

1021. On 26 May 2009, Tariq Ali advised Saud and Dawood in a detailed memorandum entitled "Potential broader implications of debt default by (AHAB) and (TIBC)"[1048] that AHAB was finally facing the "*direct consequences of [AHAB's] excessive leveraging*" and identifying the indebtedness of both entities together precisely (and accurately) at $8,194,221,931. Again, there was no focus on what AHAB would later come to claim was one of the biggest frauds of recent times. Instead, in keeping with the assessment that AHAB and TIBC had simply engaged in "excessive leveraging," the report concludes:

> "*The situation requires that the regulatory authorities be immediately made aware of the potential implications and their guidance and support be sought in managing this crisis and averting the impact of any potential serious implications for the financial sector and the economies.*"[1049]

---

[1046] AHAB's Closing Submissions, **Section 4.828 {D/4/415}**.
[1047] **{G/7902.3}**
[1048] **{G/7945}**
[1049] **{G/7945/3}**

1022. Indeed, Saud's evidence about when AHAB alleges it became aware of a fraud is very imprecise. It is certainly not on or about 8 May 2009. Saud's written evidence suggests that he did not know by the second week of May that there was a fraud.[1050] If AHAB had not been aware all along of the borrowing and of Al Sanea's debt, the obvious moment in time when the Algosaibis should have had an epiphany was when Mr. Zataar was able to establish at the Money Exchange, "*that large debit balances apparently related to Mr. Al Sanea and explained that it seemed... that the Money Exchange had been used to raise loans to fund Mr. Al Sanea's businesses*."[1051]

1023. That was on 8 May 2009. One would have expected to hear the allegations of fraud and misappropriation within days, if not immediately thereafter. But this did not happen. As the Defendants submit, the reality is that Saud and Yousef had known all along. The borrowing from the banks and the Al Sanea indebtedness were all along and at least since Saud's Calculations in mid-2002, the subject of ongoing scrutiny and concern and, as usual, they were fully recorded in the 2008 Audit Report on the Money Exchange. They were readily identifiable by Mr. Zataar from the Audit Report and, at all events, by Mr. Hindi who had undoubtedly received it and discussed its contents with Saud. Hindi it was who gave the report to Mr. Zataar. Indeed, the reason why Saud summoned El Ayouty to his villa on 7 May 2009 must have been to get the up to date report, having been told by Mark Hayley in rough terms on 4 May what the size of the problem was.

1024. AHAB's actions at the time were inconsistent with their fraud claim which later emerged: if, as the Defendants ask rhetorically, the Partners genuinely thought they were

---

1050 Saud 1W, **paragraphs 350- 353 {C1/2/72}.**
1051 **{C1/14/9}**

being defrauded, why did they lie to their lending banks rather than crying from the rooftops that they had been the victims of a massive and sophisticated fraud? Why did AHAB continue to negotiate with Al Sanea until at least 20 May 2009,[1052] when they knew on 9 May 2009 (eleven days earlier) that the debts of the Money Exchange were in the order of magnitude of an "$8 billion problem" and that a single obligation was so large that it could bring down one[1053] of Saudi Arabia's largest banks?

1025. It does appear that a reason for not sounding the alarm was that AHAB was playing for time. The Partners needed time to complete the exercise of being in a position of deniability and being able to blame Al Sanea. Saud had, by this time, instructed the Younger Algosaibis to make their sweep of the documents.

1026. Saud says these instructions were given "*As the problems at the Money Exchange began to be revealed in early to mid-May 2009.*"[1054] On that version of events that cannot have been much later than when Mr. Zaatar returned on 8 May 2009 and reported back that there had been something "abnormal" (at which Saud appeared to Mr. Zaatar (or feigned) to be shocked).[1055]

1027. As the Defendants submit in their Closing Submissions[1056] and as I wholly accept and incorporate in this Judgment by reference, Saud's instructions to the Younger Algosaibis were to remove documents which revealed the knowledge of the AHAB Partners, such as

---

1052 See Al-Zayer 4A {**C2/11/3**}, in which he describes ongoing negotiations between the AHAB Partners and Al Sanea, including a meeting in Bahrain on 20 May 2009 involving, among others, Tariq Ali and the disowned Dr. Omar El Mardi, at which Dawood Algosaibi is reported to have offered not only that TIBC should merge with AWAL Bank but also that the Saad Group should acquire ATS, AIH and the Money Exchange**.**

1053 SABB, as discussed above: **{G/7880}**. It is worth noting that in this report by SABB/HSBC, the writer comments that unlike SABB/HSBC and the many other banks listed, SAMBA's exposure was fully secured because "*Saud Algosaibi is a director*." Saud would therefore have been acutely aware that among the wider banking community, it would have been thought that he was aware of the extent of the Money Exchange's borrowing, at least from the local banks.

1054 Saud 1W, **paragraph 363 {C1/2/75}**.

1055 Zataar 1W, **paragraphs 35-36 {C1/14/9}**.

1056 Defendants' Closing Submissions **{E1/7}**: "Documentary Evidence and AHAB's Concealment of Relevant Documents."

the El Ayouty correspondence and Audit Reports. Saud had to create an opportunity for that to be done.

1028. There is evidence of tampering even after Deloitte was brought in, as revealed, for example, by the fact that two files labeled "*Correspondence with El Ayouty*" which had been recovered and made its way to AHAB's discovery list compiled by the Deloitte Investigation team,[1057] subsequently went missing without explanation as at the end of the trial.

1029. It is accepted that by prevaricating and waiting to announce AHAB's fraud claim, Saud provided himself and the other Partners an opportunity for him (and the Younger Algosaibis) to remove and suppress significant documents. As the Defendants have explained,[1058] this was an opportunity he grasped with both hands.

## CONCLUSIONS ON KNOWLEDGE AND AUTHORITY

1030. During Abdulaziz's time, the fraudulent practices of the Money Exchange were institutionalised for the purposes of defrauding the banks. He was knowingly aware of this and was the primary architect of the practices. During his lifetime, Suleiman and Yousef were also knowingly aware of the fraudulent practices and they continued the practices after Abdulaziz's time.

1031. Saud's Calculations are a clear revelation of his knowledge of the extent of the borrowing and the Al Sanea indebtedness as reported in Attachments 8 and 9 of the 2001 El Ayouty Audit Pack. Saud claims to have undertaken his Calculations at Suleiman's request and admitted to having brought them to Suleiman's attention. From no later than that occasion, Saud would have known that the Audit Packs and reports were the reliable

---

[1057] **{H6/2}; {E1/7/40}**
[1058] **{E1/7}**

source of information as to the state of affairs at the Money Exchange. The evidence reveals that Saud was fully aware of the fraudulent practices and of the financial position of the Money Exchange throughout the period 2000 to 2009. His assertions to the contrary are rejected as deliberately untruthful.

1032. He was consistently involved, not just in monitoring the financial position of the Money Exchange, but in the significant decisions taken by the Money Exchange.

1033. As such, I am left in no doubt that Saud knew of and authorised Al Sanea's activities.

# SECTION 2

# RELATIVE BENEFITS RECEIVED BY AHAB/AHAB PARTNERS AND AL SANEA THROUGH THE MONEY EXCHANGE

## RELATIVE BENEFITS RECEIVED BY AHAB/AHAB PARTNERS AND AL SANEA THROUGH THE MONEY EXCHANGE

1. My foregoing conclusions on the knowledge of the AHAB Partners and their implicit authority of the borrowings obtained by or through the Money Exchange must stand by themselves, as justified objectively by the evidence examined.

2. Those conclusions therefore do not depend on any other hypothesis such as whether or not or the extent to which the AHAB Partners benefitted from the Money Exchange. Nor do they depend on the extent of any such benefits relative to any benefits obtained by Al Sanea.

3. I am satisfied that the knowledge and authority of the AHAB Partners is overwhelmingly and conclusively proven.

4. AHAB expressly acknowledged that once this is established, an enquiry into the reasons for the borrowing and the application of the funds borrowed by the Money Exchange, would no longer require a definitive answer in this case.

5. However, it has been a constant refrain of AHAB's throughout these proceedings, that so little did the Partners benefit from the Money Exchange compared to the lopsidedly greater benefit obtained by Al Sanea, that that very fact by itself shows that they could not have been aware of or authorized the borrowing of the massive and devastatingly large indebtedness incurred by the Money Exchange in AHAB's name.

6. The proposition first appeared in Mr. Charlton's first witness statement in the London Proceedings, in which was sought to be given the impression that the only benefits received by AHAB and/or its Partners from the Money Exchange, were personal expenses and dividends obtained from the SAMBA shares. In this regard, paragraphs 8

and 19 of the "*Executive Summary*" to Charlton London 1W state as follows (emphasis added):[1059]

> *"18. From January 2000 to May 2009, the total flow of cash through The Money Exchange was over US$330 billion. As at 31 May 2009 there remained outstanding approximately US$9.2 billion in funding owed to 118 banks around the world. Over US$5.5 billion was transferred through The Money Exchange to or for the benefit of Mr Al Sanea and his Saad Group.* ***The remainder was used predominantly to fund and maintain the pyramid scheme orchestrated by Mr Al Sanea, which by its very nature required a constant expansion of credit.***
>
> *19.* ***Over the period 2000 to May 2009, AHAB and the partners of AHAB received approximately US$146 million from The Money Exchange****, (and were credited with US$94.8 million dividends derived from The Money Exchange's ostensible profit). This is to be compared with: the balance of borrowed funds outstanding at the end of the same period (US$9.2 billion); the amounts paid to Mr Al Sanea (over US$5.5 billion); and the flow of cash through The Money Exchange (US$330billion)."*

7. In its written opening submissions at paragraph 23,[1060] AHAB framed the issue in the following rhetorical terms (original emphasis):

> "*Overlaying all of the detailed points that AHAB makes about Mr Al Sanea's fraud is one fundamental question. Why would the Algosaibis have permitted Mr Al Sanea to borrow, for his own benefit but in their name, amounts so large that they could entirely wipe out the family's wealth? It simply makes no sense. The Defendants have not put forward any plausible answer to that question.*"

8. And AHAB framed the argument in its closing submissions ultimately in this way:[1061]

> "*(1) In the relevant period,*[1062] *October 2000 until May 2009, Mr Al Sanea withdrew cash from the Money Exchange in a net amount of*

---

1059 Charlton London 1W, paragraphs 18 and 19, **{L1/25/8}**.

1060 **{U/1/11}**

1061 At paragraph 3.80 **{D/3/23}**.

1062 Starting after Abdulaziz's stroke in October 2000 and the imposition of the putative "New for Old" policy, until the collapse of the Money Exchange in May 2009.

*about USD 4 billion, mostly by cheque and via sham LCs. By contrast, AHAB withdrew no more than 150 million.*

(2) *In (approximately) the same period, the total external borrowings of the Money Exchange increased by about USD 7 billion* [SAR 25.9bn], *from about USD 2 billion* [SAR 7.4bn] *to about USD 9 billion* [SAR 33.3bn].

(3) *Although part of the borrowing, and perhaps part of the increase, can be regarded as attributable to the carrying cost of the Money Exchange investment portfolio, that part is no more than about USD 1.5 billion of the final total. The rest can only be attributable to the cost of funding Mr Al Sanea's withdrawals."*

9. While a definitive answer to AHAB's argument is rendered moot in light of the conclusions reached on its knowledge and authority, there does in fact appear to be an explanation for AHAB's complicity.

10. As I find, in agreement with the Defendants' proposition and as the evidence reveals, it appears to be this: the pursuit by the AHAB Partners, beginning in the 1980s with Abdulaziz and carried on ever since, of the strategy – through the instrumentality of the Money Exchange under the management of Al Sanea – to use borrowing in order to acquire and hold investments, comprising the strategic equity investments in banks and other institutions, together with land holdings. At the same time, because of AHAB's failure to inject capital or to pay down the borrowings of the Money Exchange - whether by liquidating the equity investments or otherwise but instead "capitalizing" interest liabilities - the strategy also required the constant taking of further borrowing to repay earlier borrowing.

11. The quid pro quo was that Al Sanea was allowed to deploy a similar strategy for his own purposes as well - all resulting in the spiraling vortex of indebtedness which inevitably overwhelmed the Money Exchange.

12. This is the obvious explanation for AHAB's complicity, indeed the only explanation available from the evidence, which so tellingly includes the meticulous record keeping of accounts by the Money Exchange in its Ledger 3, not only of the AHAB withdrawals but also of the Al Sanea borrowing and net indebtedness - indicating that this was not a grand scheme of theft by Al Sanea but a compact with AHAB.

13. It is also the only explanation for the AHAB Partners' failure to heed the faithful advice rendered by El Ayouty each year to them about the reckless borrowing policy and the Al Sanea indebtedness, all of which was also meticulously detailed in Attachment 9 to their Audit Packs.

14. This meticulous record of the Al Sanea indebtedness crucially reveals the intention as between himself and AHAB, contrary to AHAB's case of lack of knowledge and authority, that his indebtedness was all expected to be repaid.

15. Consistent with this is the inevitable conclusion that there was no fraud perpetrated upon AHAB. The fraud was perpetrated by AHAB and Al Sanea acting in concert against the banks, to obtain borrowing which would certainly not have been provided had the banks known the true financial position of the Money Exchange.

16. It is against the background of those unavoidable conclusions that I now turn to look at the question of the relative benefits received by AHAB and Al Sanea which, not surprisingly, far from supporting AHAB's contention, bear out those conclusions.

**<u>The history of the acquisition of the share portfolio</u>**

17. While we have already examined some of the evidence relating to the acquisition of the share portfolio, there was a significant debate about the extent to which shares were acquired for the benefit of AHAB or for the benefit of Al Sanea.

18. Given the incomplete state of the disclosure in this case, this is not a debate which can be definitively resolved. But what the evidence reveals, sufficiently, is the acquisition over time, of a massive and expensive body of SAMBA shares, the carrying costs of which, however ascribed as between AHAB and Al Sanea, accounted for a very large portion of the Money Exchange's fraudulent borrowing and its ultimate crippling indebtedness to the banks.

19. In this regard, the Defendants' detailed submissions[1063] are very helpful.

20. As already seen by reference to the early records of the Money Exchange from the early 1980s, AHAB (and, in particular, the "authoritative" Abdulaziz, who was the "driving force" behind AHAB),[1064] were driven by a desire to own a bank and to expand into financial services.

21. In order to achieve this goal, AHAB acquired strategic stakes in major Saudi financial institutions and other important businesses (such as the Pepsi bottling and cement companies).

22. In the early 1980s, the Money Exchange acquired stakes in financial institutions including:

(4) A founding stake in SAMBA, which is addressed in more detail below;

(5) A 30% share in Ifabanque, a private bank based in Paris, in which Yousef also held an interest and which was a lender to the Money Exchange;

(6) A 10% stake (402,996 shares) in Saudi United Commercial Bank (of which AHAB was a founding member and which was later to merge with SAMBA); and

---

1063 At {**E1/20/8**}-{**E1/20/31**}.

1064 See for example, per Mr. Hindi: Hindi London 1W, paragraph 14 **{C1/20/5}** and paragraph 17 **{C1/20/6}**.

(7) A 5% stake in Saudi British Bank of which AHAB was also a founding member.

23. A number of other interests were also acquired, in:[1065]

(1) Arab National Bank;

(2) Bank Al-Jazira;

(3) Al Bank Al Saudi Al Fransi (Banque Saudi Fransi);

(4) Saudi Kuwaiti Cement Co. (later changed its name to Eastern Province Cement Company);

(5) Saudi Bahraini Cement Co. (later merged into Saudi Cement Company);

(6) Saudi Livestock and Transportation Co.;

(7) Hail Agricultural Development Co.;

(8) Algassim Agricultural Co;

(9) Tabuk Agricultural Development Co;

(10) Arabian Consumer Company.

24. In addition to this, the Money Exchange acquired a large portfolio of real estate. While the acquisition dates of this portfolio are unclear, it appears that around SAR 85m in real estate was acquired prior to 1987,[1066] a further SAR 40m was acquired between 1987 and 1997[1067] and an additional SAR 200m was acquired between 1997 and 2004.[1068] As at 31 December 2008, the Money Exchange valued this portfolio at SAR 6.539bn[1069]

---

1065 As set out in the El Ayouty Audit Report for 1985 **{F/13/7}**.

1066 **{F/19/23}** AHAB – Finance Development and Investment Review Report by El Ayouty for year end 1987 – commentary relating to the Al-Jawhara land shares.

1067 **{F/69/15}** – the El Ayouty Audit Report for year end 1996.

1068 **{F/138/16}** – the El Ayouty Audit Report for year end 2004 - where properties acquired are listed to a total value of SAR 312,417,774 based on acquisition costs.

1069 **{F/260.1/15} –** the El Ayouty Audit Report for year end 2008, where at note 4.2, it is reported that an external valuation for the properties was made by a property agency on 31 December 2008, arriving at this very large value and increase in value of SAR 500m over December 2007 valuation.

(US$1.77bn); although El Ayouty repeatedly complained that they had not been permitted to inventory the portfolio or to check the valuations.[1070]

25. Yousef Algosaibi, as noted earlier, confirmed that the acquisition of shares in financial institutions was part of a business strategy for the Algosaibis to become bankers:[1071]

> *"MR. LOWE:*
> *Q. In the late 1970s -- you understand? – your uncles and your father decided to buy shares in local banks, didn't they?*
>
> *A. Yes.*
>
> *Q. And those were strategic -- you remember I used the word "strategic" earlier? That was part of a business strategy, wasn't it?*
>
> *A. Yes.*"

26. Indeed, Yousef's evidence confirmed that the purpose of the re-establishment of the Money Exchange was to acquire shares in banks and financial institutions:[1072]

> *"Q. You told us this earlier today, that the brothers together had a strategy which involved acquiring interests in financial institutions, banks, in Saudi Arabia mainly.*
>
> *A. Yes, that's correct.*
>
> *Q. The Money Exchange was going to be used, wasn't it, to acquire more shares in banks?*
>
> *A. Probably, yes."*

27. The ownership of the SAMBA shares was a source of tremendous prestige to the family, as Yousef also confirmed:[1073]

> *"MR. LOWE:*

1070 **{F/260.1/15}**.
1071 Yousef xx **{Day30/29:19}-{Day30/30:1}**.
1072 Yousef xx **{Day30/97:20}-{Day30/98:2}**.
1073 Yousef xx **{Day30/33:4}-{Day30/33:16}**.

> *Q. I was asking you about SAMBA before the break, Mr Algosaibi. Your family were founding shareholders in SAMBA, weren't they?*
>
> *A. Yes.*
>
> *Q. That was a very prestigious position that you had as a result, wasn't it?*
>
> *A. I'm sorry, I don't understand the question.*
>
> *Q. Being the founding shareholders was very good for AHAB's reputation, wasn't it?*
>
> *A. Yes.*
>
> *Q. Abdulaziz I think in 1984 became the chairman of SAMBA, didn't he?*
>
> *A. Yes."*

28. Yousef also accepted in cross-examination that the SAMBA portfolio was the single most important shareholding held by AHAB:[1074]

> *"Q. The Money Exchange acquired, just as AHAB did -- well, a much larger stake than AHAB did, in the SAMBA shares, do you remember that, right from the beginning?*
>
> *A. Yes.*
>
> *Q. That was the most important share in the portfolio, wasn't it?*
>
> *A. Probably.*
>
> *Q. You must have realised in 1980 or 1981 when you became a partner that the acquisition of shares in SAMBA was seen by your father and your uncles as the most important acquisition they were making; correct?*
>
> *A. Yes, but I -- because I don't look at those figures, so I don't know. I can't remember.*
>
> *Q. You knew that SAMBA was there and you knew that by 1984 Abdulaziz was a board member of SAMBA and shortly afterwards became the chairman. And you knew that the SAMBA shareholding within the portfolio was the most important biggest shareholding, didn't you?*

---

1074 Yousef xx **{Day33/10:6}**-**{Day33/11:3}**.

*A. Yes.*

*Q. The reason, I suggest to you, that your father and both your uncles turned up at a lot of the meetings is because this company was very important to them.*

*A. Of course."*

29. It appears that the prestige and influence acquired from the shareholding was such that Abdulaziz was appointed to the board of SAMBA in or around November 1985 and actively participated in the management of the bank from then on.[1075] Later Saud took over Abdulaziz's role, himself becoming chairman. Al Sanea was later appointed a director to the board, an event which may also be attributable to the holding of SAMBA shares in his name, as will be further discussed below.

30. It is reasonable to conclude that it was at least significantly for this reason that, notwithstanding the difficulties that the Money Exchange would later face and despite El Ayouty's advice to liquidate and pay down the debt, the Partners were unwilling to trade the SAMBA shares.[1076]

31. This strategy was the very reason why Yousef himself wanted to become a Money Exchange partner (the resolution constituting the Money Exchange recorded Yousef's wish to become a partner).[1077] His interest was not to become merely involved in a small money changing operation:[1078]

---

1075 Following his death in 2003, Abdulaziz was succeeded by Saud and Al Sanea as SAMBA board members. At Saud 1W, paragraph 71 **{C1/2/16}** he confirms that following Abdulaziz's death he was invited to join the SAMBA board of directors and that he served as Chairman from 2007 to 2009.

1076 As already also mentioned and to be further discussed below, the liquidation of the shares would have been an uneconomical proposition after the collapse of the Tadawul and the market prices in 2006.

1077 **{G/885/1}**, the Minutes of the Money Exchange Board resolutions of meeting on 27 July 1981.

1078 Yousef xx **{Day31/95:12-21}**.

*"Q. One of the main reasons -- you told us earlier that this was one of the reasons -- the Money Exchange was set up was so that it could acquire shares in banks. One of the reasons.*

*A. Yes.*

*Q. In fact, that was the most important part of its activities, as far as you were concerned.*

*A. Probably.*

*Q. With your 10 per cent.*

*A. Probably, yes."*

32. Yet, despite this strategy, AHAB's written evidence[1079] and pleaded case, as we have seen, is to the effect that the primary focus of the Money Exchange was the money changing business and that giving Al Sanea the ability to "manage" that business, was some form of dowry.

33. It is clear that this was a false rationale, intended to obscure AHAB's own role in having set a strategic direction for the Money Exchange and AHAB's real reason for allowing the Money Exchange to engage in its unchecked programme of fraudulent borrowing.

**ENORMOUS COST OF THE SHARE PORTFOLIO COMPARED TO AHAB'S BALANCE SHEET**

34. The relative size of the investments undertaken by the Money Exchange compared to the overall capital value of AHAB itself is revealing.

35. The 1982 Financial Statements for the Money Exchange recorded that the cost of the investments was SAR 82,614,000.[1080]

---

1079 See Yousef 1.1A, paragraph 11 **{L1/10/3}** and AHAB's pleaded case as discussed above under "Knowledge and Authority".

1080 **{F/6/4}** the El Ayouty audit report for the Money Exchange, year end 1982.

36. By 31 December 1983, this had increased to SAR 357,479,000[1081] and by 1984 this figure was SAR 441,067,000.[1082] As the Financial Statements show, by end 1983 the Money Exchange, only 18 months after it was re-established, had bank loans of SAR 550m.[1083] These were "colossal" sums of money in 1983 and 1984, as Yousef accepted in cross-examination[1084] - something in the order of US$120m and were over three times the current liabilities recorded in the financial statements of the AHAB Partnership itself (i.e. AHAB H.O. Financial Statements) for the same period.[1085]

37. At this time the financial statements also included an element of capitalisation of costs of funds, part of which, as is now proven and acknowledged by AHAB,[1086] was reflected misleadingly in the balance sheet as adding to the capital value of investments.

38. According to the El Ayouty Audit Pack for 1987, the acquisition cost of the portfolio as at 31 December 1987 was SAR 425.9m.[1087]

39. And so, by the early 1990s, the Money Exchange appeared very rapidly to have outgrown its parent. The Partners were obviously aware of this comparison and the manner in which the Money Exchange's assets were being projected:

    (1) In 1984 AHAB H.O.'s own investments amounted to SAR 347m[1088] which was nearly SAR 100m less than the figure for the investments of the Money Exchange

---

1081 **{F/12/5}** the El Ayouty audit report for the Money Exchange, year end 1984.

1082 Ibid.

1083 Ibid.

1084 Yousef xx **{Day31/99:13-16}**.

1085 In the sum of SAR 162m: **{F/11/10}**.

1086 Not only as we have seen, as advised against by El Ayouty, but also now confirmed by Mr. Hatton to have been an improper and misleading practice. See Hatton 1R, for instance at paras 4.23 – 4.26: **{I/1.59/17}**. Mr. Bullmore also gives conclusive opinions to the same effect about this issue: Bullmore 1R {**1/7/19-23**}, where he also calculates the net costs of capitalization of interest at SAR 12,465bn, an amount to be further discussed**.**

1087 See table at **{F/19/21}**.

1088 **{F/14/5}**: The Financial Statements and Audit Report for year end 1985 for AHAB itself.

shown in the financial statements at the time (SAR 441m),[1089] albeit that this value was inflated by cost of funds.

(2) By 1985, the figure for the investments of the Money Exchange in the financial statements (again inflated by cost of funds) (SAR551m)[1090] was SAR125m higher than the figure for AHAB's own investments (SAR 426m).[1091]

(3) While the financial statements may have been inflated, the audited cost of **acquiring** the investments in 1987 (SAR 425.9m)[1092] was in fact also higher than AHAB's investments.

(4) By 1989, notwithstanding a considerable increase in AHAB's investment figures to SAR 485,704,000,[1093] the figure for the investments of the Money Exchange in its financial statements (SAR 687.5m)[1094] were over SAR 200m higher than AHAB's.

**COST OF BORROWING BY THE MONEY EXCHANGE**

40. When attempting to estimate the cost of borrowing attributable to holding (and never selling) the shares, together with the cost of the benefits received by the AHAB Partners, it is necessary to try to determine the rate of interest that the Money Exchange paid on its borrowing.

---

1089 **{F/12/5}**: The El Ayouty audit report for the Money Exchange, year end 1984.
1090 **{F/13/8}**: El Ayouty Audit, Money Exchange, year end 1985.
1091 **{F/14/5}**: El Ayouty Audit AHAB Partnership, year end 1985
1092 **{F/19/21}**: Money Exchange audit report year end 1987.
1093 **{F/26/6}**: AHAB audit year end 1989.
1094 **{F/28/7}**: Money Exchange audit year end 1989.

41. As between the experts,[1095] there was a debate about the rate of interest to be assumed to have been paid by the Money Exchange on its borrowing. Mr. Hatton would assume an average of 4.8 – 5.8%, Mr. Bullmore at least 8%. Eventually, while agreeing to disagree on this, Mr. Hatton acknowledged that an assumption by Mr. Bullmore of 8%, was not unreasonable.[1096]

42. No proper record has been disclosed which demonstrates the full cost of the financing in monetary terms. It can, however, be seen from the combined financial statements of the Money Exchange that the annual cost of borrowing was always high. The Money Exchange was paying, on average, 4.6% above the relevant US dollar LIBOR rate. From his extensive research, Mr. Bullmore assessed that the average rate that AHAB paid on its borrowing for the period 1990-2008 was approximately between 8.8% and 9.1% p.a. (and may have been even higher).[1097]

43. Mr. Bullmore's unchallenged opinion was therefore that it is reasonable to assume that the Money Exchange paid an effective rate of interest of 8% per annum although this is likely to be too low and the real rate may have been higher.[1098]

44. I conclude that it is reasonable to accept Mr. Bullmore's assessment of 8% for the purposes of calculating the carrying costs of the share portfolios.

45. Among other points made by the Defendants,[1099] Mr. Bullmore's methodology is unimpeachable: by looking at the Audit Packs (which, it is common ground accurately

---

1095 Mr. Hatton for AHAB: Hatton 1W, paragraph, 11.13(vii) **{I/1.59/62}**; and Mr. Bullmore for SIFCO 5 (whose evidence was adopted by the other Defendants): Bullmore 2R, paragraph 23 **{I/12/5}**.

1096 Hatton xx **{Day95/42:14-21}**.

1097 Bullmore 2R, paragraph 41 **{I/12/11}** by reference to the El Ayouty Audit Packs.

1098 Bullmore 2R, paragraph 17 **{I/12/4}**.

1099 At **{E1/20/16-19}**.

reflected the position of the Money Exchange), Mr. Bullmore calculated that the average financing cost actually paid by the Money Exchange was 8.6% p.a. without adjustment for TIBC rate anomalies[1100] and with an adjustment to reflect possible TIBC rate anomalies, he comes to the figure of 8.4%.[1101]

46. Mr. Bullmore's conclusion is also supported by contemporaneous documentation:

(1) Interest rates were high in the 1990s. By 1994 the annual financing cost of shares was running at SAR 150m.[1102] By 1995 the annual financing cost of shares had increased to SAR 246m. At that rate another SAR 1,250m would have been added to the total by the year 2000.[1103]

(2) This cost continued to be high into the 2000s (as I am satisfied Saud was well aware). For example, on 13 May 2006, Al Sanea wrote to Saud[1104] providing him with details of the recent increases in the rates of interest being provided by certain local banks:

> *"I am herewith enclosing copies of the letters received from the local banks advising us of the increase in Base rate. As you can see these banks are becoming expensive, I would appreciate if you could finalise the Arab National Bank facility, sign it and return to us so that we can now reduce the OD facility.*
>
> *I look forward to receiving the signed documentation.*"

47. He then enclosed:

---

1100 Bullmore 2R, Table 2 **{I/12/10}**.

1101 Ibid, paragraph 39 **{I/12/10}**.

1102 **{G/1642/2}**: El Ayouty's trenchant "preliminary report " to the AHAB Partners of 27 January 1996 in which they repeated their advice against capitalization of interest and against the unchecked loans being taken by Al Sanea. At page 2 under the heading "Second: Investments", they estimate the interest cost of the investment at SAR 150m for 1995 and SAR 246m for 1996.

1103 Mr. Bullmore's unchallenged evidence was that in the 1990s, the effective borrowing cost paid by AHAB on its borrowing was between 9-10% (see Bullmore 2R, Table 2 {**I/12/10**}).

1104 **{H22/114}**.

(i) A letter dated 7 May 2006 from Saudi Investment Bank to the Money Exchange informing of the bank's then current base rate of 12%;[1105]

(ii) A letter dated 7 May 2006 from Arab National Bank to the Money Exchange informing of the bank's then current base rate of 11%;[1106] and

(iii) A letter dated 7 May 2006 from Saudi British Bank to the Money Exchange informing of the bank's then current base rate of 10.75%.[1107]

48. Mr. Bullmore also noted that:

> "*…while I have excluded the adjusted rates of interest from the 1990 and 1991 financial statements, I note that, given that the calculated total interest rate for 1990 was 13.9% and for 1991 was 12.3%, the inclusion of these years would have the effect of raising the total interest rate paid by the Money Exchange to about 9.1%*".[1108]

49. It is therefore submitted by the Defendants, and I accept, that in what is always likely to be a rough and ready calculation, the figure of 8% is indeed a conservative figure to use to estimate the carrying costs, not only of the share portfolios but also other relevant items of the Money Exchange's expenditure.

**SAMBA SHARES: THE ORIGINAL PORTFOLIO**
**SHARES DERIVED FROM THE ORIGINAL SAMBA PORTFOLIO**

50. As already noted, the most significant shareholding held by the Money Exchange was its shareholding in SAMBA, which became the largest and arguably most prestigious bank in Saudi Arabia.[1109]

---

1105 **{H22/115/1}**.

1106 **{H22/116/1}**.

1107 **{H22/117/1}**.

1108 Bullmore 2R, paragraph 40 **{I/12/11}**.

1109 SAMBA is an international bank incorporated in Saudi Arabia in 1980, by First National City Bank ("**Citibank**") pursuant to a Royal Decree on 12 February 1980. The SAMBA shares were listed on Tadawul, the Saudi Arabian Stock Exchange. Citibank held 40% of the shares of SAMBA following SAMBA's incorporation. This shareholding was

51. While the precise chronology of the SAMBA share acquisition is somewhat opaque, it appears that the purchases began even before the Money Exchange was re-launched in 1980 and the bulk of the purchases were made between 31 December 1982 and 31 December 1984.

52. AHAB was intimately involved in the creation and operation of the bank:

(1) The Money Exchange bought founder shares in SAMBA in 1980. That this was almost the first act of the Money Exchange is vividly evidenced by the SAMBA share certificates acquired by the Money Exchange beginning with founder shares in 1980.[1110]

(2) There were further early purchases in 1982-3.[1111]

(3) Purchases continued thereafter through to the late 1980s.[1112]

(4) By January 1986, the AHAB Group held about 20% of the shares of SAMBA, according to the Algosaibi Group Profile of that month.[1113]

(5) It appears that the Money Exchange had acquired 358,831 shares in SAMBA by 1988 just prior to an expected 2 for 1 share split. The cost was around SAR 250m at a price of around SAR 700 per share according to the minutes of the Money Exchange Board meeting of 6 December 1988.[1114] SAMBA shares represented

---

reduced in 1991 to 30% and then, following a merger with USCB in 1999, it was further reduced to 22.83%. Citibank finally disposed of its shareholding in SAMBA following the end of a technical management agreement in 2003.

1110 **{G/819/1}**: SAMBA Share Certificate dated 13 February 1980. See also: **{G/820/1}**; **{G/821/1}**; **{G/822/1}**; **{G/823/1}**.

1111 **{G/948/1}**; **{G/949/1}, {G/953/1}, {G/954/1}** and **{G/955/1}**; **{G/961/1}**; **{G/962/1}**; **{G/963/1}**; **{G/974/1}**-**{G/979/1}**; **{G/981/1}; {G/992/1};** and **{G/994/1}**-**{G/996/1}**.

1112 **{G/1003/1}**; **{G/1008/1}**; **{G/1009/1}**; **{G/1013/1}**; **{G/1014/1}**; **{G/1015/1}**; **{G/1084/1}**; **{G/1086/1}**; **{G/1090/1}**; **{G/1094/1}**; **{G/1095/1}**; **{G/1172/1}**; **{G/1195/1}**; **{G/1197/1}**; **{G/1208/1}**.

1113 **{G/1071/1}** at page 2 under the heading "Banking".

1114 **{G/1206/5}**; **{G/1207/5}**.

nearly 60% of the total cost of the Money Exchange's share portfolio (excluding financing costs) calculated as at 31 December 1987.[1115]

53. A reconstruction of the history of AHAB's interest in SAMBA is set out below from the Defendants' submissions but it is common ground that a substantial proportion of the AHAB/Money Exchange shares in 2009 were derived from the 358,831 shares in SAMBA acquired prior to June 1988.[1116] By 1989, the Money Exchange held 717,000 shares in SAMBA.[1117]

54. By February 1993, there had been either further share splits or purchases such that the overall shareholding had increased to 1,412,864 shares with a balance sheet value of SAR 669,995,000.[1118]

55. By 1994, SAMBA shares alone had cost SAR 288,918,060 (stated as the book value) and still represented over 50% of the share acquisitions.[1119]

56. In or around 1994/5, there was a further SAMBA share split which Al Sanea communicated to Abdulaziz by a note of 26 October 1995.[1120]

57. Following SAMBA's acquisition of USCB in 1999, the Money Exchange converted its 2,014,828 shares in USCB into 619,947 SAMBA shares. At the same time, SAMBA also declared a bonus issue of 0.27 shares for every share held.

---

1115 According to the Audit Pack for 1987, the acquisition cost of the portfolio as at 31 December 1987 was SAR 425.9m **{F/19/21}**.

1116 See Hatton 1R, paragraph 11.36 **{I/1/71}**, Bullmore 2R, paragraph 45 **{I/12/12}**, **{G/1207/5}**.

1117 See Hatton 1R, Appendix 11F **{I/1.34/1}**.

1118 Mr. Hatton notes at Hatton 1R, paragraph 11.41 **{I/1/72}** that this was in fact 22,460 shares fewer than expected. It appears that a small disposal may have taken place in 1990, which would be consistent with the reduction in the cost of the investments (as shown in the financial statements) from SAR 687,356,000 to SAR 669,985,000 **{F/32.1/10}**.

1119 **{F/56.1/10}** the El Ayouty Audit Report for year end 1994.

1120 **{G/1621/1}**; **{G/1621.1A/1}**.

58. It is common ground that there then occurred further share splits with the result that, by 31 May 2009 89,585,043 SAMBA shares were derived from the Money Exchange's original Portfolio.

**TRANSFER OF SAMBA SHARES TO AL SANEA**

59. With AHAB's agreement, Al Sanea held a large number of SAMBA shares:

(1) Sometime before May 1994 (in fact before February 1993),[1121] 355,600 shares had been transferred into Al Sanea's name. It is apparent from AHAB's Share Inventory as on 9 May 1994 that 1,057,040 SAMBA shares were then held in AHAB's name and 355,600 "*Certificates with Mr. Maan*", for a total 1,412,640 SAMBA shares acquired by AHAB.[1122]

(2) At some stage after February 1993 but before the end of the year, the Money Exchange transferred a further 400,000 shares to Al Sanea, giving him a total of 755,600 and leaving 657,264 shares in AHAB's name.[1123]

(3) As a result of the 1994/5 share split, as at 13 December 1995 Al Sanea held 1,511,392 shares in SAMBA and AHAB held 1,314,528 shares, making them the second and fourth largest shareholders in SAMBA respectively.[1124]

---

1121 Per Share Certificates dated 8 February 1993 in name of AHAB and dated 24 January 1993 in name of Al Sanea, respectively for exactly these number of shares. These are discussed by Mr. Hatton at Hatton 1W, paragraph 11.40 **{I/1/72}** and attached as Exhibit HH.11.9, D3.XLS and supporting certificates **{Q/764/1}**.

1122 **{Q/766/1}**: Exhibit HH.11.16 to Hatton 1W, paragraph 11.48 **{I/1/74}**.

1123 Hatton 1W, paragraph 11.42 {**I/1/72**}.

1124 **{G/1625/1}**; **{G/1625.1A/1}**. The SAMBA Report of the Major Shareholders by number of shares dated 13 December 1995. At this stage Al Sanea's net indebtedness to the Money Exchange stood at SAR 2.123bn: **{G/1629/1}**; {**G/1630/1**} - attachment 9 to the El Ayouty Audit Pack for 1995.

(4) Following a further bonus issue[1125] these shareholdings were converted into 3,022,400 shares in the name of Al Sanea and 2,629,056 shares in the name of AHAB.[1126]

(5) All of the 619,947 new SAMBA shares created on the acquisition of USCB and the bonus shares in 1999 were transferred into Al Sanea's name.[1127]

60. Accordingly, prior to 2000 all of the SAMBA Shares transferred by AHAB to Al Sanea were all derived from the original portfolio of shares.

61. By 31 May 2009, the combined shareholding of AHAB and Al Sanea, derived from the original portfolio paid for by the Money Exchange, stood at 89,585,043 shares:

- It is common ground that 52,930,924 SAMBA shares held by Al Sanea[1128] were attributable to the shares transferred to him by AHAB before end of 1993 and 1999.[1129]

62. It is also common ground that 36,554,119 SAMBA shares held contemporaneously in AHAB's name were attributable to the shares held by the Money Exchange in 1993 (indeed as far back as 1989).[1130]

---

1125 Hatton 1W, paragraph 11.42 **{I/1/72}**.

1126 **{G/1921/1}**; **{G/1921.1/1}** – The SAMBA Report of Major Shareholdings dated 27 May 1999.

1127 Hatton 1W, paragraph 11.44 **{I/1/73}**.

1128 **{G/7965/1}**.

1129 As Mr. Bullmore notes in Bullmore 2R by reference to Hatton 1W, paragraph 45: **{I/12/12-13}** and paragraph 74: **{I/12/19}**.

1130 Bullmore 2R, paragraph 45: **{I/12/12-13}**. A further "*pledged*" portfolio is addressed at Bullmore 2R, paragraphs 71 to 73: **{I/12/18}**.

## AHAB'S CONSENT TO TRANSFERS TO AL SANEA

63. As explained above, by 1993 AHAB had caused 755,600 shares to be held in Al Sanea's name and in 1999 transferred further shares to him. At the final tally in 2009, 52,930,924 SAMBA shares held in his/STCC's name were derived from these transfers by AHAB.

64. AHAB kept all the share certificates of the Money Exchange in a AHAB H.O. safe and treated the shares purchased by the Money Exchange as its own (see Omar Saad's testimony).[1131] The transfers of SAMBA shares to Al Sanea could not therefore have been unauthorised transactions, carried out by Al Sanea in the name of the Money Exchange, without reference to AHAB.[1132]

65. I agree, as the Defendants propose, that the question therefore has to be asked: why did AHAB transfer shares to Al Sanea personally? AHAB must have had a reason to do so.

66. The answer I accept, lies (at least in part) as Saud stated, in the fact that, from an early stage, AHAB realised that it could only acquire limited interests in financial institutions in the name of the Money Exchange (that being only a division of AHAB):

> "*I understand that part of the reason it was decided that Mr. Al Sanea should hold personally part of the family's portfolio of shares was because at the time it was not possible for one person to hold greater than 5% of the shares in a particular company. Accordingly some of the shares were held in Mr. Al Sanea's name, so that effectively he could act as nominee*".[1133]

67. Accordingly, it was decided to transfer certain of the SAMBA shareholdings into Al Sanea's name. The initial motivation was plainly to "evade" regulatory requirements on

---

1131 Omar Saad xx: {**Day90/41:4-10**}. I note here that the financial statements of AHAB and books and records do not show **legal** ownership of the shares. AHAB does not appear to have disclosed the shareholder records.

1132 No such lack of authority has been pleaded or alleged by AHAB.

1133 Saud 1W, paragraph 91 {**C1/2/19**}.

the holding of shares. That Abdulaziz was very cagey about this is evident from his correspondence with El Ayouty.

68. Not long after the initial transfer had been made to Al Sanea it was questioned by El Ayouty:[1134]

> *"It was found that 355,600 shares were not inventoried as their certificates are in the name of Mr. / Maan Al-Sanea and are held by him. These shares should be either transferred to the name of the Company in order to appear on its budget, or registered to the account of Mr. Maan at it cost value including the capitalized interests on them, and should therefore be excluded from investments".*

69. The AHAB Partners were clearly reluctant to respond to El Ayouty. A draft letter was prepared dated 18 June 1994 from Abdulaziz, Suleiman, Yousef and Al Sanea stating:[1135]

> *"With regard to what has been recorded in the name of the partner (Maan al Sanea) in terms of the shares from the Saudi American Bank as per the Board of Directors' decision on 29 December 1991 AD,* ***with the board of directors withholding the reasons that promoted this to be done****, we inform you that the profits distributed from those shares for the year 1993 were shown among the exchange division revenues for the same year. …*
>
> *Meanwhile, those shares will be settled in the event the accounts of the partners are liquidated, either by returning them to the company or logging into the account of the partner at the market value for those shares."* (Emphasis added.)

70. A further unsigned draft was then prepared dated 28 June 1994[1136] which deleted the second paragraph, stating instead that AHAB had decided by Board Resolution of 29 December 1991 that the SAMBA shares would be registered in Al Sanea's name and "*the Board reserves its reasons*". Significantly, the draft letter goes on to state that "*We wish*

---

1134 **{G/1546/3}** (Arabic), **{G/1544/3}** (translation).

1135 **{G/1557.1/3}** (Arabic), **{G/1557.2/3-4}** (translation).

1136 One in materially similar terms dated 21 June 1994 appears at **{G/1558}** (translation), **{G/1559}** (Arabic).

*to inform you that the dividends received for these shares for 1993 have been received from the company* [SAMBA] *and shown as "Share Revenue" and this has been confirmed by your correspondent*".[1137]

71. And so even while acknowledging that the shares transferred still belonged to AHAB and being reluctant to give the reason for the transfer, we see AHAB recording the reality which was that Al Sanea held the shares for AHAB's benefit.

72. Abdulaziz and Al Sanea also wrote to El Ayouty on 19 July 1994 regarding "*shares of the Saudi American Bank*".[1138] They stated that:

> "*This is in reference to your message…dated 19 May 1994 regarding the shares registered under the name of Mr. Maan Abdulwahed Al-Sanea and amounting to 355,600 shares in the above-indicated Bank, as per the decision of the board of directors dated 29 December 1991.* ***The board of directors is withholding stating the reasons that have prompted this action****.*
>
> *We inform you that the main reason that has led to such a procedure being taken is that the current term of the chairmanship of uncle Abdulaziz Al Gosaibi over the board of directors of the bank is considered his last term. Hence, we have decided to register the shares (in) the name of Mr. Maan Al-Sanea until he gets the chance to run for elections to the membership of the board of directors of the bank. As you are aware, the term of his ownership over these shares gives him the power to coordinate with major shareholders supporting this nomination.*
>
> *In the event the above reason is no longer in effect, there will be no objection from his side to transfer ownership of those shares to the company*" (Emphasis added.)

73. Whatever the regulatory or other stated reason, it clearly suited AHAB to provide Al Sanea with a significant number of SAMBA shares:

---

1137 **{G/1562/2}** (translation), **{G/1563/2}** (Arabic).

1138 **{G/1564/1}** (Arabic), **{G/1564.1/1}** (translation).

- AHAB was thus able to acquire further shares in SAMBA in its own name and circumvent any regulatory limits on their holdings (thus furthering Abdulaziz's banking ambitions).
- AHAB could maintain privacy over the sheer scale of the shareholdings in SAMBA (particularly during market corrections, in which the price of those holdings dropped).
- Through Al Sanea, AHAB maintained its control over SAMBA as Abdulaziz noted in his letter to El Ayouty of 19 July 1994.[1139]

74. In any event, leaving aside questions of strict legal ownership, the original shares (which, by reason of share splits and capital increases, had transformed by 2008 into 97,420,305 shares) were consistently included in the Money Exchange financial statements, despite the fact that they were registered in the names of AHAB, Al Sanea or STCC.[1140]

75. It would almost certainly have been a breach of negative covenants in lending arrangements to have given the shares paid for by the Money Exchange away. If the Money Exchange's financial statements had revealed that shares were not properly inventoried or held in the name of the Money Exchange, that would no doubt have caused consternation amongst bankers.

76. When the original portfolio was acquired in the 1980s, Al Sanea did not have the capital nor would he have been able to borrow sufficient sums from third parties. As will be explored further below, the only reasonable inference is that any shares acquired in his name must have been funded through borrowing by the Money Exchange.

---

1139 **{G/1564/1}** (Arabic), **{G/1564.1/1}** (translation) (quoted immediately above).

1140 See for instance the 1994 Audit Pack found in Saud's safe: **{H29/141.1/10-11}**, where 2,875,236 SAMBA shares are listed among the Money Exchange's investments although 711,200 are noted to be in Al Sanea's name.

77. It is also highly probable, as the foregoing examination shows, that Al Sanea held a very significant number of the SAMBA shares derived from the original portfolio of shares registered in his name as nominee for AHAB, in a relationship known as a Muhasa (a very common relationship in Saudi family businesses).[1141]

78. It appears also to have been the case that the shares held in Al Sanea's name were pledged in respect of his own borrowing. To have collateralised these shares would most probably have been in breach of negative pledges that the Money Exchange had given to many of the lending banks. There is no suggestion that AHAB objected to this and Saud had clearly known about it from during Abdulaziz's time, as he acknowledged in his witness statement.[1142] Indeed, there it is that he goes on to relate that Abdulaziz had given him to understand that:

> "*... AHAB needed to sell the shares to repay the borrowing used to fund the acquisition of the portfolio, but that Mr. Al Sanea could not return them, as they were pledged. Although my father did not expressly say this to me, my understanding was that until the position was resolved the Money Exchange would not be closed*".

79. The implications of this, even then "*Late in the 1990s or perhaps in 2000*"[1143] would have been obvious: until the shares were sold to repay the borrowing, the carrying cost of the shares had to be met and this, given AHAB's strategy established from the beginning of the Money Exchange, meant that further borrowing would be taken to service existing debt.

---

1141 {**K1/3/48**}: the Saudi law expert report of Dr Adli A. Hammad where he explains that the hallmark of a Muhasa is that it is an undisclosed business association of which third parties are therefore unaware. That it is particularly common for members of a family to enter into informal arrangements to hold assets for each other, for example using written or unwritten Muhasa agreements. Indeed, as set out below, this relationship explains the guarantee of Al Sanea's indebtedness by Abdulaziz.

1142 Saud 1W, paragraph 231 {**C1/2/49**}.

1143 Per Saud in Saud 1W, **Ibid**.

80. I will now turn to look at these implications in a bit more detail in the present context of identifying the benefit obtained by the AHAB Partners through the Money Exchange.

## THE COST OF FUNDING THE ORIGINAL PORTFOLIO OF SHARES

### *(i) Borrowing to Pay for the Investments*

81. The fatal flaw in AHAB's strategy was that, from the outset, the Money Exchange had no real income and certainly not enough to fund the purchase of a portfolio of property and strategic shareholdings.

82. Accordingly, from the outset, the Money Exchange borrowed in order to fund these purchases. Yousef confirmed that he was aware from the time he became an AHAB Partner that the Money Exchange would borrow in order to fund the acquisitions:

> *"Q. You knew that when you became a partner of the Money Exchange. You knew that the investments had to be purchased with borrowing.*
>
> *A. Of course.*[1144]*"*

83. It is common ground that the borrowing was never actually repaid; nor, to the knowledge of the AHAB Partners,[1145] was it capable of being repaid by the Money Exchange from the income of the Money Exchange's day-to-day business activities.

84. The Money Exchange had to borrow the funds for the original purchases because it had no other means to pay for the share portfolio. Indeed, it is uncontroversial that the SAMBA shares and other bank shares, acquired by AHAB and/or the Money Exchange and/or Al Sanea (on behalf of AHAB and/or the Money Exchange), were wholly or

---

1144 Yousef xx: {**Day33/7:23**}-{**Day 33/8:1**}.
1145 See for example, Yousef xx: {**Day31/97:23**}-{**Day31/98:10**}.

exclusively acquired with borrowings by AHAB and the Money Exchange from banks and other financial institutions.[1146]

85. Yet, despite plainly being aware of an on-going borrowing program to fund the share portfolio, even now (as discussed above) AHAB has failed to give any credit for this cost when seeking to allocate all of the liabilities of the Money Exchange to Al Sanea's alleged fraud against AHAB.

86. The accumulated cost quickly and inevitably became very significant indeed. Within a decade, the funding cost was twice the value of the portfolio that was being held. As the 1990 Audit Pack demonstrated, by 1989, not only had the Money Exchange incurred the cost of SAR 669m of the share portfolio itself but additional financing costs of SAR 621.7m were incurred, i.e. a total carrying cost by December 1989 of SAR 1,290m.[1147] That would have been a very large black hole in AHAB's balance sheet, had AHAB consolidated its accounts with the Money Exchange, something which AHAB steadfastly failed to do, leading to the repeated description of the Money Exchange by Leading Counsel for the Defendants as "*AHAB's dirty secret"*.

***(ii) Cumulative Funding Cost of the Original Portfolio***

87. The borrowing to meet the on-going cost of holding the shares continued relentlessly until 2009. Borrowings simply had to keep accumulating because they could only be repaid with other borrowings. This continued *ad infinitum*. Anybody who looked at this

---

1146 For example, in their notes to the 1997 Money Exchange Financial Statements, El Ayouty noted that the shares in SAMBA, together with other financial investments were financed by short-term loans and bank loans: {**G/1698/3**} - their letter of 1 April 1997 to Abdulaziz (on behalf of all Partners) responding to AHAB's letter of 29 March 1997 regarding the 1996 Financial Statements and in which El Ayouty once more identify the fatal flaw in AHAB's strategy "*Resorting to banks to borrow to face the expansion in purchasing shares… resorting to borrowing from banks as a substitute for increasing the paid capital or increasing own resources."*

1147 {**G/1367/4-5**}: El Ayouty's *"most important observations on the audit of the accounts of [AHAB Money Exchange] for year ending 31 December 1990*".

knew there was no end to this unless and until these strategic shareholdings were sold.[1148] However, given that the shares were pledged, these shares could not be sold and no serious attempt was made to do so.

88. Given that a substantial proportion of the Money Exchange's borrowing by 2009 was directly and clearly referable to the original acquisition in the 1980s of the portfolio of banking shares (of which SAMBA was the largest, most significant investment), Mr. Bullmore reconstructed the 2008 cumulative total carrying cost of the **original** portfolio of shares using the lower interest figure of 8% p.a. (as used by Mr. Hatton):

- By 31 December 2008 the total cost of acquiring and carrying the original portfolio of shares transferred to Al Sanea would have been SAR 5.5bn.[1149] Further costs would have been added by May 2009.

**(iii) "*Pledged portfolio*"**

89. In addition, AHAB acquired a further "*pledged portfolio*" of around seven million shares between 2000 and 2002 under the name "*Special Investment Fund 100 (Gosaibi)*" (which were pledged in respect of further borrowings). Mr. Bullmore and Mr. Hatton agree that the cost of this portfolio was in the region of SAR 500m.[1150]

90. Accordingly, leaving to one side the **additional** SAMBA share acquisitions, the December 2008 cumulative total cost of acquiring and carrying the original shares and

---

1148 Again, a point raised repeatedly by El Ayouty in their letters to the AHAB Partners highlighting concerns from their audits, this one dated 1 April 1997, regarding the 1996 Money Exchange Financial Statements: {**G/1698/5**}.

1149 Hatton 1W, paragraph 11.75 **{I/1/84}**; Bullmore 2R, paragraph 63 **{I/12/16}**.

1150 Hatton 1W, paragraph 11.77 **{I/1/84}**; Bullmore 2R, paragraph 72 **{I/12/18-19}**.

the pledged portfolio totalled **at least SAR 6bn**.[1151] On any view, this cost represents a significant part of the liabilities of the Money Exchange (equating to some **US$1.6bn**).

**THE ADDITIONAL SAMBA SHARE ACQUISITIONS**

91. In addition to the portfolio of shares set out above, it is plain that further SAMBA share purchases were made after 1993 for which the cost was between SAR 11bn and SAR 14bn. This is not in dispute. However, AHAB does not accept that it should be accountable for the acquisition cost or cost of funding those shares.

**THE COST OF ADDITIONAL PURCHASES OF SAMBA SHARES**

92. As explained above, Mr. Hatton is prepared to acknowledge the combined cost of purchasing and holding around 97 million SAMBA shares[1152] at a cost of SAR 6bn (although Mr. Bullmore's unchallenged suggestion was that the actual cost may have been materially higher).

93. However, the SAMBA shareholder list for April and May 2009[1153] shows a total of 157,111,132 SAMBA shares in the name of AHAB, Al Sanea and the Saad Group.

94. Some of these shares were acquired at some point after 1999 and there is no obvious reason why these further purchases should not be included in a calculation of the total cost of borrowing, irrespective of the true beneficial entitlement to them.

95. Mr. Bullmore has therefore calculated the total cumulative carrying cost, not only of the circa 97 million shares referenced in Mr. Hatton's witness statement, but also of the remaining circa 59.7 million shares for which Mr. Hatton does not account.

---

1151 As Mr. Bullmore explains, the cost may have been significantly higher **{I/12/19}**.

1152 Consisting of the 36 million shares held by AHAB, 53 million shares held in the name of Al Sanea, and the pledged portfolio of 8 million shares.

1153 {**G/7965/1**}.

96. According to the investigations, the breakdown of the outstanding 59,690,827 shares as at 2009 is as follows:

(1) 3,976,121 were acquired between 1999 and 2008 in the name of AHAB ("the AHAB Tranche");

(2) 17,552,800 were acquired in two tranches in the name of Al Sanea:

(i) The first tranche of 11,518,645 shares was acquired between May 1999 and October 2008 ("the First Al Sanea Tranche");

(ii) A second tranche of 6,034,155 shares was acquired between October 2008 and May 2009 ("the Second Al Sanea Tranche");

(3) 38,161,906 were acquired after 1999 in the name of STCC ("the STCC Tranche").[1154]

97. The cost of acquiring and carrying these additional 59.7 million SAMBA shares is likely to have been very significant indeed. Using the analysis presented in Mr. Bullmore's supplemental report,[1155] on the assumption that these shares were funded by the Money Exchange's borrowings, the cost would be around SAR 4.9bn (which uses the conservative assumption of smooth purchases over time).[1156]

98. When added to Mr. Hatton's figure of SAR 6.1bn, the 31 December 2008 cost of acquiring and carrying the original portfolio and the total of 157 million SAMBA shares was at least SAR 11bn.

---

1154 It is entirely possible that each such tranche was acquired in a number of sub-tranches.

1155 Bullmore 2R {**I/12/1**}.

1156 Mr. Bullmore estimates, at Bullmore 2R, paragraph 23 **{I/12/5}** that these shares, together with the pledged portfolio (which he states at paragraph 25 would have cost SAR 535m **{I/12/5}**) would have cost around SAR 5.4bn. Thus, eliminating the pledged portfolio costs produces a figure of SAR 4.9bn.

99. If, as seems likely, the shares were acquired in 2005, at the peak of the market,[1157] the costs of acquiring and carrying those shares may have been considerably higher:

- In 2004, Citibank placed its SAMBA shares on the market when it disposed of its interest in SAMBA and its commercial relationship with the bank ended. This would have resulted in a substantial number of shares coming onto the market in 2004/5, probably in staggered fashion.
- AHAB/Money Exchange/Al Sanea/STCC as a substantial shareholding group clearly did consider making such purchases.
- Given that a very large number of additional shares were purchased between 1999 and 2008, it is more probable than not that this occurred in the context of the Citibank exit.
- Indeed, all the correspondence points to 2004/2005 as being the critical period during which serious consideration was given by AHAB, the Money Exchange, Al Sanea and STCC to increasing the SAMBA shareholding.

100. Accordingly, if the AHAB Tranche, the First Al Sanea Tranche and the STCC Tranche were acquired in 2005, the 2008 cost of acquiring and carrying those additional shares[1158] would have been SAR 9.1bn. The total cost attributable to the share portfolio would thus have been as much as SAR 15bn.

101. It follows that adding the 2008 carrying cost of the original share portfolio to the cost of the additional share purchases is capable of providing an explanation for a very

---

1157 Bullmore 2R, paragraph 86 **{I/12/24}**.

1158 Together with the Second Al Sanea Tranche.

substantial part of the borrowing of the Money Exchange as at December 2008, accounting for between SAR 11bn and SAR 15bn.

### (2) WERE THE ADDITIONAL PURCHASES FUNDED BY MONEY EXCHANGE BORROWING?

102. The Defendants sought to demonstrate that bank borrowing from the Money Exchange must have been used for the additional purchases of SAMBA shares. It is, of course, a separate matter, to ascertain what relationship exists between the additional borrowings and Al Sanea's indebtedness so fully recorded in the Money Exchange's records of accounts.[1159]

103. Mr. Hatton asserts that the further share acquisitions held by Al Sanea and STCC "*were not funded by AHAB or the Money Exchange but through other sources*". It seems Mr. Hatton's basis for saying this is simply that the additional shares were in the name of Al Sanea or STCC, rather than in AHAB's name.[1160]

104. Of course it is clear that STCC had significant borrowing of its own (and was therefore capable of substantial outlay). However, in forming this view, Mr. Hatton appears, as the Defendants observe, to have adopted a position that is entirely inconsistent with AHAB's tracing claim. On the one hand, in order to avoid the inference of knowledge arising from AHAB's awareness of the acquisition of all SAMBA shares through the Money Exchange, AHAB's position appears to be that it is able to identify that the payments by Al Sanea and STCC to acquire the additional SAMBA shares were made with funds that did not emanate from the Money Exchange. However, when it comes to its tracing claim,

---

1159 Ultimately in the 2008 Audit Pack which AHAB accepts provided a "*more or less accurate understanding of what was really happening at the Money Exchange*": AHAB's oral opening submissions: {**Day2/71:7-9**}.

1160 Hatton/Bullmore Joint Statement, paragraph 21.C {**I/13/5**}.

AHAB suggests that all of STCC's funds should be treated as emanating from the Money Exchange.

105. In reality, given the significant other sources of funds that both Al Sanea and STCC had, it is impossible to say that any particular payment by STCC came from funds emanating from the Money Exchange.

106. But in examining the issue of relative benefits, the question at this stage is where did the funds to purchase the additional shares come from? It is in my view reasonably to be inferred that the additional shares identified by Mr. Bullmore were purchased by Money Exchange borrowings:

(i) It is AHAB's case that Al Sanea did not have capital funds of his own and that throughout the period 2003-2009 the spiralling borrowings of the Money Exchange were used to fund his activities.

(ii) Indeed, it is in fact consistent with the substantial increase in Al Sanea's Ledger 3 captioned as "*indebtedness*" in the period 2003-2009 (see below) that borrowings from the Money Exchange were used for these additional purchases.

(iii) It is common ground that the original shareholding in the name of Al Sanea or his companies was paid for with borrowing by the Money Exchange. If Suleiman simply wished to carry on as Abdulaziz had done,[1161] then the Money Exchange would have been the vehicle through which the borrowing for the additional shares purchases was obtained.

---

[1161] As Yousef confirmed in cross-examination and in his witness statement.

(iv) The significant increases in the borrowing of the Money Exchange after 2003 were consistent with the cost of such additional shares having been funded by the Money Exchange:

| **Borrowing** | | | |
|---|---|---|---|
| | **E&I Division SAR m** | **Finance Division SAR m** | **Total SAR m** |
| **2003** | 3,108 | 6,376 | 9,483 |
| **2004** | 4,262 | 7,197 | 11,456 |
| **2005** | 5,416 | 9,332 | 14,748 |
| **2006** | 6,006 | 16,071 | 22,076 |
| **2007** | 8,513 | 20,005 | 28,518 |
| **2008** | 8,725 | 24,781 | 33,506 |

(v) During that time the Money Exchange's foreign bank borrowing increased substantially largely because of the establishment of TIBC.

(vi) A visual inspection of Mr. Hatton's table, tracking the Accumulated Cost Funds reflected in Ledger 3 (Hatton 1W para 11.75),[1162] against the Cost of Shares compounded at 8% reveals that the two were almost identical throughout the 1990s. Indeed, if the "*Special Investment Fund 100 (Gosaibi)*" is included, Leger 3 Cost Funds only begins to diverge upwards from the notional compounded cost from around 2001/2002. That is when further share purchases started to take place and can account for the increase in Cost of Funds.

1162 Hatton 1W, paragraph 11.75 **{I/1/84}**.

107. Indeed, this is all consistent with the understanding of the Money Exchange management, the internal accounting records of the Money Exchange and the Audit Packs, as discussed below.

108. The 2008 Audit Pack, which AHAB accepts provided a "*more or less accurate understanding of what was really happening at the Money Exchange*",[1163] records as follows in respect of the capitalisation cost of the Money Exchange's investments as at 31 December 2008 (emphasis added):[1164]

> *"It is worth mentioning that this balance (investments) is represented by the cost of the annual capitalisation of investments registered in the company's name at the company's branch. This annual increase is attributed to the company's policy to capitalise the Division's losses annually,* ***as can be seen from tracking the balance of this capitalisation which was approximately SAR 60.5 million at the end of 1983 and continued to rise annually until at the end of 2008 it reached approximately SAR 12,464.7 million****."*

109. The consolidated balance sheet of the Money Exchange as at 31 December 2008 (a copy of which was in the safe in Saud's villa) records the same figure of SAR 12,464.7m as that referred in the 2008 Audit Pack which it refers to as "*Cost Fund*".[1165]

110. This sum of SAR 12,464.7m (i.e. US$3.365bn) as at 31 December 2008 in respect of the capitalised cost of the Money Exchange's investments, is consistent with Mr. Hayley's recollection of a conversation between him and Mr. Jamjoum in or around the Spring of 2009 recorded in Mr. Hayley's Witness Statement, as follows:[1166]

> *I recall discussing the Money Exchange's debt with Mr. Jamjoum, on numerous occasions. He would advise me that approximately half the borrowings represented Mr. Al Sanea's obligations and the residue was*

---

1163 AHAB's oral opening submissions: **{Day2/71:7-9}**.
1164 **{F/260.1/40}** (translation).
1165 **{H29/252.26/1}**.
1166 Hayley 1W, paragraph 304: **{C1/9/61}**.

> *the capitalised cost of purchasing the shares. For example, as at Spring 2009, I understood, from my conversations with Mr. Jamjoum, that Mr. Al Sanea's obligations were about US$4 billion*[1167] *and the capitalised cost of the shares was a similar amount.*

111. Whatever the precise position in relation to the allocation of carrying costs of financing the investments held by the Money Exchange, they were obviously huge. I accept that whatever may have been the precise underlying beneficial entitlements to some of the SAMBA shares as between Al Sanea and AHAB, this was a massively significant benefit provided to AHAB by the Money Exchange and provided with the knowledge and authorization of AHAB Partners.

**AHAB'S REASONS FOR ADDITIONAL SHARES BEING HELD IN AL SANEA'S NAME**

112. As with the original SAMBA shareholding, AHAB had its own reasons of convenience already discussed for not having many more additional SAMBA shares in its own name.

113. Substantial consideration appears to have been given internally, particularly in 2004, to the entity in whose name additional shares would be acquired:

(1) There was substantial correspondence between Mr. Hayley and Mr. Stewart in February 2004 designed to structure a deal to acquire shares on behalf of AHAB and STCC.[1168] These discussions seemed to have centred around financing to be raised from a syndication of banks, including Gulf International Bank (GIB).[1169]

(2) Mr. Hayley and Mr. Stewart appear to have had further such discussions with Al Sanea over the financing of further shares purchases in SAMBA in 2004, including the difficulties presented with AHAB as borrower by the "*negative*

---

1167 i.e. about SAR 15bn.

1168 **{G/3914/1}**; **{G/3914.0.1/1}**; **{G/3914.0.3/1}**; **{G/3914.02/1}**.

1169 **{G/3932/1}**.

*pledges*" over existing shareholding preventing them being used as leverage for further funding[1170] and potential for the payment of a "*special dividend*" to the AHAB Partners if shares are purchased in AHAB's name.[1171]

(3) It appears from a memo from Mr. Hayley that Al Sanea's initial plan was to place the shares in the name of the Money Exchange.[1172] However, (given the significant indebtedness of the Money Exchange) all parties were alive to the fact that by having pledged its portfolio the Money Exchange was in breach of its negative borrowing covenants. If the Money Exchange was to borrow to fund equity purchases, that would raise questions as to how the Money Exchange had obtained that borrowing. Purchasing the shares in the name of the Money Exchange therefore ran the risk of revealing the true financial position of the Money Exchange and that the new shares had been pledged to secure the borrowing (in breach of negative pledges).[1173]

(4) By November 2004, it appears from a further memo from Mr. Hayley to Al Sanea that the share portfolio had "*increased substantially during the past nine months, yet we are prevented from borrowing against them, due to our negative pledges*". In Mr. Hayley's words "*Very simply, ALGME could sell some (say SAMBA[1174]) shares either to you or to the Partners. In order to finance this acquisition you or the partners could then pledge the shares in your individual names to secure*

1170 **{G/3843/1}**; **{G/3911/1}**.

1171 **{G/3944/1}**.

1172 **{G/3943/1},** dated 7 March 2004.

1173 **{G/4268/1}**: a memo dated 18 August 2004, from Al Sanea to Mr. Hayley, instructing him to establish an elaborate structure of new companies in the AHAB Partners' names through which to acquire the further SAMBA shares by bank borrowing and concluding "***Most importantly- with this structure we will not breach our negative pledges***."

1174 Which he notes could be sold without changing the list of holdings required to be disclosed to overseas banks.

*personal borrowing from a domestic bank"... "the net result is that the shares remain within Algosaibi ownership yet are put to use to obtain necessary liquidity."*[1175]

(5) Thus, Mr. Hatton's view that the increase in the value of the shareholding meant that there was no good reason to transfer the SAMBA shares to Al Sanea is contradicted by the contemporaneous documents.

114. In addition, it appears that AHAB has, in other proceedings, acknowledged that further shares were purchased in Al Sanea's name:

- On 17 June 2009, AHAB wrote a Letter of Demand (signed by Yousef) to the Public Prosecutor and Royal Committee demanding that Al Sanea be required to return 58,429,870 shares in SAMBA (with "profits (dividends) from 1995 to 2005) which it alleged were owned by AHAB.[1176] Yousef did not, however, explain the reasons that the shares had been transferred to Al Sanea. Rather, the letter simply referenced a promissory noted signed by Al Sanea promising the return of the shares and stated that the shares were:

  > *registered in [Mr. Al Sanea's] name due to specific conditions achieving the interests of the company and in agreement to his concession of them to the company so that it may be re-registered in the name of the company.*

- On 4 October 2009, the Law Office of Abdulaziz Hamad Al-Fahad (who was acting on behalf of AHAB in connection with the proceedings before the Royal

1175 **{G/4422/1}**.

1176 **{G/7990/3}** (Arabic), **{G/7990.0.1/3}** (translation).

Committee) wrote to the Chairman of the Royal Committee on behalf of AHAB again, demanding the return of 58,429,870 shares in SAMBA held by Al Sanea.[1177]

- However, the number of shares claimed is higher than the number attributable to the shares transferred to Al Sanea in 1993:

  (i) Mr. Hatton and Mr. Bullmore agree that the number of shares held by Al Sanea attributable to the shares transferred to Al Sanea in 1993 is 52,930,924.[1178]

  (ii) This is 5.5 million fewer shares that AHAB now claims (as explained above) it is entitled to recover from Al Sanea.

  (iii) It would follow (barring some record keeping error) that AHAB itself accepts that further shares were either purchased on its behalf by Al Sanea or purchased by the Money Exchange on its behalf and transferred into his name.

  (iv) AHAB has provided no explanation whatsoever for this discrepancy.

**PURCHASES IN THE NAME OF AHAB**

115. Further, there is no controversy at all that further share purchases were made in the name of AHAB:

(1) Mr. Bullmore's unchallenged opinion was that a further 3,976,121 SAMBA shares were purchased in AHAB's name between May 1999 and October 2008.[1179]

(2) Mr. Hatton concurs with this view.[1180]

---

1177 {**M/28/1-6**} – although 52,429,870 shares are referenced in the subject-heading, in the body of the letter 58,429,870 shares (and dividends for 1995 -2009) are claimed.

1178 Bullmore 2R, table 2: {**I/12/12**}; Hatton/Bullmore Joint Report, paragraph 17: {**I/13/4**}.

1179 Bullmore 2R, paragraphs 62 to 68: {**I/12/16-17**}.

116. Given the historical use of the Money Exchange to fund its investments and the contemporaneous exchanges seen above, the only way that AHAB could have paid for this was through an increase in Money Exchange borrowing:

(1) There is no evidence whatsoever that these shares were acquired by AHAB using its own funds;

(2) Given that the Money Exchange was the vehicle which acquired and held AHAB's shares in SAMBA (and other investments) it would be surprising for the shares to have been purchased other than through the Money Exchange.

117. Mr. Bullmore's unchallenged evidence was that the purchase price for these shares was between SAR 124m, with a carrying cost of SAR 197m, (if acquired in 2002) and SAR 517m with a carrying cost of SAR 651m, (if acquired in 2005).[1181]

118. I accept, as the Defendants submit,[1182] that it was far more likely that the shares were purchased in or around 2005:

(1) In 2004/2005 Citibank sought to divest its shares in SAMBA with the result that a great many came on the market. Al Sanea and Saud had extensive correspondence about the reaction of AHAB to the IPO.[1183]

(2) As those exchanges show, Saud's response was that AHAB and Al Sanea should each purchase half a billion riyals worth of SAMBA shares.

(3) It appears, therefore, that this is precisely what AHAB did.

---

1180 Hatton/Bullmore Joint Report, paragraph 17: **{I/13/4}**.

1181 Bullmore 2R, Table 5: **{I/12/18}**.

1182 **{E1/20/44}**.

1183 Discussed in the last section of this Judgment (Section 8: The GTD Counterclaims) and see **{N/52}** (Arabic). **{G/3939}** (translation); **{N/675}** (Arabic), **{N/676}** (translation); **{N/694}** (Arabic), **{N/695}** (translation); **{N/626}** (Arabic), **{N/627}** (translation), ending eventually with Saud's "*recommendation for each (of AHAB and Maan Al Sanea) to subscribe to the shares registered in his name*": **{N/547}**.

119. This position is entirely inconsistent with AHAB's suggestion that the borrowing of the Money Exchange was capped in 2000. Not only did the borrowing increase in 2004/2005, it appears that it did so in part to fund purchases on behalf of the Algosaibi family.

120. At the very least, AHAB had the benefit of shares, the carrying costs of which were US$1.6bn; viz. the original portfolio (US$1.48bn, SAR 5.5bn)[1184] as well as the "*pledged portfolio*" their carrying costs of which was USD132m (SAR 490m).[1185]

121. When the carrying costs of the SAMBA shares in Al Sanea's name are taken into account, added benefit of SAR 5.416bn (US$1.46bn), for a total carrying costs benefit to AHAB of SAR 10.9bn (US$2.96bn), in respect only of the SAMBA share portfolio[1186] the "jewel in the crown", let alone the carrying costs of the other shareholdings and real estate holdings.

122. As we have seen, the land portfolio was by itself valued by AHAB and carried on its books with a value of over SAR 6bn (US$1.6bn).

123. There were further benefits to the AHAB Partners which will be examined under the following three headings:

- Sums withdrawn (whether borrowed or otherwise)[1187] by AHAB and/or AHAB Partners and/or entities related to them, from the Money Exchange.
- Dividends distributed to the AHAB Partners by the Money Exchange.

---

1184 Hatton 1W, paragraph 11.75: {**I/1/84}.**

1185 Hatton 1W, paragraph 11.77: {**I/1/85**}.

1186 Bullmore 2R, paragraph 25: {**I/12/5}.**

1187 As commented on further below, the accounting treatment of sums obtained from the Money Exchange by the AHAB Partners was different from that applied to sums obtained by Al Sanea related entities, where they were treated as loans.

- Other benefits received from the Money Exchange, including payments made to fund the personal expenses of the Algosaibis; Yousef's Loans; Group Lending; the Al Oumi Centre; the Etisalat Shares[1188] and Overseas Deposits.

124. These benefits also provide objective evidence that the alleged "New for Old" policy did not exist. This is because all the withdrawals had their own escalating costs of borrowing so long as they were not repaid. It is common ground that the borrowings of the Money Exchange were not and could not have been repaid without the sale of the SAMBA shares.

125. The withdrawals also show that AHAB and its Partners benefited directly from the Money Exchange's fraud on the banks.

126. Each of the categories of benefit is considered below. As a consequence of them, it is the inescapable conclusion, contrary to AHAB's case, that AHAB had at all times, an enormous financial interest in the affairs of the Money Exchange.

**Dividends Distributed by the Money Exchange**

127. As accepted by AHAB from its evidence and submissions excerpted above, AHAB received the benefit of dividends distributed by the Money Exchange. According to Mr. Hatton[1189], between 1 January 2000 and 31 May 2009, AHAB and Yousef's total share of the dividends distributed by the Money Exchange was SAR 355.5m [US$94.8m]. The dividends were credited to AHAB H.O.'s account with the Money Exchange.[1190]

---

1188 Shares held either in Etihad Etisalat Co (a telecommunications company) or Saudi Telecom (which was the reference made to the shares in the Money Exchange general ledger).

1189 Hatton 1W, paragraph 8.1.2 {**I/1/51**}.

1190 **Ibid**.

128. As we have seen, AHAB had procured the Money Exchange to declare and pay dividends purportedly from the SAMBA shares on the regular annual basis, going back at least to 1993.[1191]

129. One can therefore readily estimate that the total amounts of dividends paid from 1993, instead of from 2000, until the collapse of the Money Exchange, was much greater than the sum of SAR 355.5m calculated by Mr. Hatton.

130. The AHAB Partners knew that the dividends being distributed by the Money Exchange were not being distributed from profits (or at least had no regard to whether there was any distributable profit). In cross-examination, Saud said as follows (emphasis added):[1192]

> *"Q. You know, don't you, that in order to declare a dividend a company has to have a profit that it can distribute as a dividend?*
>
> *A. We distributing out of the SAMBA shares?*
>
> *Q. No, the Money Exchange could only declare a dividend out of its own distributable profit, surely; isn't that right?*
>
> *A. The practice was we -- we tied it up to the dividends of SAMBA and this is the way we did it, sir.*
>
> *Q. Mr. Algosaibi, it is normal, isn't it -- you were the director of a bank and you are a director of other companies and you gave credit approval to companies --that a company would normally pay a dividend out of its distributable profits. Isn't that correct?*
>
> *A. Yani, companies do it, all companies do it different ways. The -- the –*
>
> *Q. No, they don't.*
>
> *A. The -- the -- what I came to -- huh, what –*

---

1191 **{P/130/6}**: Summary of Board Resolutions 1993, R/22, dated 11 November 1993 at item 10 – resolving to distribute 'profits" of SAR 66,090,008 in the agreed proportions - AHAB 65%,Al Sanea 25% and Yousef 10%.

1192 Saud xx: **{Day61/126:20}-{Day61/128:13}.** See also **{Day62/11:19}-{Day62/12:10}; {Day62/14:10}-{Day62/16:5}; {Day62/75:20-24}**.

*Q. Do you know of any other company that declares dividends out of something other than its profits?*

*A. Sir, I -- this is -- yani, long continuation tradition and this is the way it was done, huh, before, and we continued it. So you ask me why. I wasn't the guy, the person who called for this or -- and I don't know the reason but this is what we -- I came to find when I started to get engaged a little bit in this, after my father was sick at one point and died.*

*Q. When you discovered this, you looked at your father's record, did you, and you discovered that for a long time the Money Exchange had been paying out dividends without regard to whether or not it had made any profit. Is that the case?*

*A. No. I'm saying that, tying up these dividends to SAMBA, that was the case, tradition, that that was carried on and this is what I understood what was happening and what was called all the time by my uncle, that we had to follow through.*

*Q. Didn't it seem rather strange to you that a company would be paying out dividends when it owned the shares without regard to any distributable profit?*

*A.* ***I didn't regard one way or the other. This is the practice, this is was my uncle call. It was before my father's call, so he just followed what they did, yani, basically".***

131. Yousef also said as follows as to his understanding as to the basis upon which the Money Exchange declared dividends:[1193]

*"Q. The Money Exchange was giving its income, or part of its income, to AHAB by declaring dividends; isn't that correct?*

*A. Yes.*

*Q. What income was the Money Exchange going to be left with to pay its bank borrowings and the cost of finance?*

*A. That I don't know.*

1193 Yousef xx: {**Day76/22:14-25**}.

*Q.* *Isn't it obvious that if the Money Exchange's principal source of income is paid to AHAB, that the Money Exchange will be incapable of paying its bank borrowings?*

*A.* *I don't know."*

132. This line of cross-examination was of course, entirely properly premised: the shares were carried on the books of the Money Exchange as an asset of the Money Exchange and had been acquired through borrowing undertaken by the Money Exchange. As we have seen, much if not all of the share portfolio was pledged to secure borrowing. By syphoning off the dividends rather than allowing them to be used to repay debt, the AHAB Partners were not simply benefiting themselves, they were doing so in preference to the Money Exchange's creditors. They must have known that they were stripping out the only source of income of the Money Exchange available to pay against its loans.

**Personal Expenses of the AHAB Partners**

133. Personal expenses of the AHAB Partners, including their American Express card expenditure, were paid by the Money Exchange. Yousef accepted this in cross-examination:[1194]

*"Q.* *The Money Exchange paid your American Express bills, didn't it?*

*A.* *Probably.*

*Q.* *And your family's American Express bills.*

*A.* *Yes.*

*Q.* *And certain other expenses?*

*A.* *Yes.*

1194 Yousef xx: {**Day76/9:6-15**}.

> *Q. There was a running account to deal with that, wasn't there? Must have been?*
>
> *A. But we haven't -- we don't have cash, we don't".*

134. Such expenses paid for by the Money Exchange were credited to the running account between AHAB H.O. and the Money Exchange (in respect of which AHAB H.O. maintained a ledger in Arabic).[1195] Omar Saad said as follows about this in cross-examination:[1196]

> *"Q. The intercompany ledger recorded the receipt of dividends and the payment of expenditure on behalf of the partners, didn't it?*
>
> *A. We had a current account between us and the Money exchange. Only a current account. Intercompany account, a current account."*

135. As it contained detailed entries made on the daily basis, of the Partners personal withdrawals or payments made on account, the operation of this account required considerable communication and cooperation between staff located on the Third Floor (i.e. AHAB H.O. staff) and staff located on the First Floor (i.e. Money Exchange staff). Omar Saad said as follows in cross-examination (emphasis added):[1197]

> *"Q. At {G/3786/2} and {G/3786.1/2}, if you look down the list from the top, you can see "Visa card payoff", item number 94, check to Suleiman, "Medical bills". Then at 142 you can see Amex payments for a number of members of the family, and transfers below that to Beirut, to the US, to Saud, to Dawood; that sort of thing. Amex payments again. Do you see that?*

---

1195 See for example the Arabic ledger for the year ended 31 December 2003 at {**G/3786/1**} (Arabic) {**G/3786.1/1**} (translation).

1196 Omar Saad: {**Day89/27:19-24**}.

1197 Omar Saad: {**Day91/13:3**}-{**Day91/15:10**}.

*A.* *Yes, exactly.*

*Q.* ***Every year there are several hundred entries of transactions in this account.***

*A.* ***Yes. Each year we have such a statement.***

*Q.* *It was the Money Exchange that had the franchise for the American Express, wasn't it?*

*A.* *Yes, I think they have the franchise. If someone wants to travel abroad, they can give him the travellers cheques.*

*Q.* *These payments were all being handled by the Money Exchange, weren't they?*

*A.* *Yes.*

*Q.* *The records for these payments would have all originally been with the Money Exchange, wouldn't they?*

*A.* *Yes, should be.*

*Q.* *You explained to us that the references enable you to check the records of these payments in your own papers; is that correct? For example, 142, you would be able to go to a file and see the backup for this entry.*

*A.* *Yes, exactly.*

*Q.* *These records must have been delivered up to you from the Money Exchange in order for you to make those entries.*

*A.* *We received them immediately or one by one, so you can see that the dates are different. ...*

*Q.* *At the end of the month or the end of the year, you must have needed to reconcile your records with the Money Exchange's records, just by way of check –*

*A.* *They sent us each week, each 10 days, a statement and we have to reconcile them with our records.*

*Q.* *Do you know what's happened to those statements? Where would you have kept them?*

A. *Everything in the files. We can refer to the reference number here and you can check them in the files.*

Q. *Did you keep files of documents that you received from the Money Exchange?*

A. *Yes, of course". The Account Statement of the Partners' current account discussed above with Omar Saad, showed very large sums being withdrawn from the Money Exchange. This record, for but a single year -01/01/2003 to 31/12/2003- showed a carried forward balance from 2002 of SAR 54, 918, 873. 92, with payments out on behalf of Partners ( entered as "credits" on the Money Exchange side of the accounts)during 2003 of SAR42,879,802 .50 and payments in on behalf of the Partners of SAR56,627,020.97 (entered as "debits") for end of year 2003 balance of SAR41,171,655.45".*

**No correlation between dividends declared by the Money Exchange and payment of SAMBA dividends**

136. This absence of correlation is shown by Mr. Davies in his second witness statement.[1198] The significance is that funding may well have come, at least in the first place, from borrowed funds, which of course, would have had long term implications on the liabilities of the Money Exchange.

**GROUP LENDING**

137. There was also significant group lending to AHAB and to the Partners. The Audit Packs (Attachment 8) disclosed by AHAB show considerable sums in the AHAB current account for each year:

(1) For 1994 the figure was SAR 50,401,594;[1199]

(2) For 1995 the figure was SAR 43,534,275;[1200]

---

1198 Davies 2W, paragraphs 595 to 602: {**1/11/261-265**}.

1199 {**F/56/64**}.

(3) For 1996 the figure was SAR 87,554,021;[1201]

(4) For 2003 the figure was SAR 42,431,664;[1202]

(5) For 2004 the figure was SAR 30,045,418;[1203]

(6) For 2005 the figure was SAR 40,865,430;[1204]

(7) For 2006 the figure was SAR 55,804,820;[1205]

(8) For 2007 the figure was SAR 79,291,982;[1206]

(9) For 2008 the figure was SAR 114,477,341.[1207]

138. This gives a total of circa SAR 587m.

139. Mr. Charlton's evidence was that the total amount debited to the AHAB H.O. account between 2000 and 2009 was SAR 547m.

140. The Money Exchange was clearly engaged in significant group lending, so much so that quite some time was taken at trial examining the issue whether the Money Exchange actually operated as AHAB's central treasury[1208], as it had been early described by the Money Exchange board itself[1209]. Specific evidence of this kind of lending was found going back as early as 1988[1210]. The Group lending document for 1994[1211], recorded that

1200 **{F/69/66}**.
1201 **{F/69/66}**.
1202 **{F/138/66}**.
1203 **{F/138/66}**.
1204 **{F/172/68}**.
1205 **{F/197/67}**.
1206 **{F/230/64}**.
1207 **{F/260/62}**.
1208 A full and helpful treatment of the subject was provided by the Defendants at **{E1/16}** of their closing submissions which I adopt as a fuller examination of this subject.
1209 **{G/966/1}**.
1210 **{G/1209}; {G/1368}; {G/237}; {G/1460}; {G/1512}; {G/1594}**.
1211 **{G/1594}**.

overall group lending amounted to SAR 680m, including AHAB H.O. borrowing of SAR 317m, and borrowing by Yousef Algosaibi Establishment of SAR 55m[1212].

141. It is unclear how much of this borrowing was ever repaid or when the precise loan amounts were extended. However, even on the conservative assumption that this lending was extended in 1994, the carrying cost at 8% per annum of such borrowing, would have been SAR 1.997bn (US$540m) by 31 December 2008.[1213]

**<u>YOUSEF'S VILLA</u>**

142. In or around 1985, Yousef received a loan of around SAR 45m from the Money Exchange in order to fund the construction of his house in Al Khobar.[1214] While at first suggesting that this money came from dividends paid by the Money Exchange, Yousef reluctantly accepted that this was a loan and was paid for by bank borrowing (as were all of the other loans to AHAB):

> *"Q. That money that was being lent on to you, to AHAB, to its subsidiaries and to Al Sanea, that money could only come from bank borrowing, couldn't it?*
>
> *A. Probably, yes.*
>
> *Q. I think you very fairly agreed that the Money Exchange didn't have the money to lend you the purchase price of your house if it didn't borrow the money.*
>
> *A. Sure."*[1215]

---

1212 It is noted that this overall sum of SAR 680m is circa 13 times the sum of SAR 50 million recorded in the Attachment 8 for 1994 (above, {**F/56/64**}). AHAB has not explained the difference between the Attachment 8 figures and the figures recorded in the specific Group Lending documents.

1213 It is accepted by the Defendants who present it, that this figure would be lower if the borrowing had been repaid. See {**E1/20/61**}.

1214 {**Day29/60:19**} - {**Day29/63:6**}.

1215 {**Day33/60:20-23**}.

143. This loan was never repaid. Each year, El Ayouty specifically discussed this debt, along with the other indebtedness of the Partnership, making it the subject of Attachment 4 to their Audit Pack. The last, the subject of the 2008 Audit Pack, shows the debt at SAR45,778,554, while showing the overall indebtedness of the Partners (including a joint loan for Yousef and Al Sanea of SAR20m) at SAR 1,342 900,000.[1216] These are staggeringly large amounts of money. According to the Defendants, assuming an interest rate of 8%, the carrying cost of Yousef's loan of SAR 45,778,554 by itself, to the Money Exchange from around 1985 until 31 December 2008, would have been in the region of SAR 264m.[1217]

**YOUSEF'S LOAN IN THE FINANCE DIVISION**

144. As appears from the Audit Report for 2008, that further loan of SAR 2m appears to have been made to Yousef at some stage.[1218]

145. While in the context of this case, this is not a large sum, when taken with the larger loan for the construction of his house and the very much larger overall loans and their carrying costs assumed by the Money Exchange on behalf of the Partners, the fact that these were all recorded only in the Finance Division and so not revealed to the Banks, speaks volumes, not only about the benefits they received but also about the complicity of the Partners in the fraud upon the Banks.

[1216] **{F/260/62}** at the same time the Al Sanea indebtedness is recorded here also at SAR 3,632,285,097.
[1217] **{E1/20/61}**.
[1218] **{F/260.1/41}**.

## AL OUMI CENTRE

146. A further expense of the Money Exchange was the loan made in respect of the "Al Oumi" centre. This was a loan made at the Partners' behest[1219] to a friend of the Algosaibis, as Yousef confirmed.[1220] It was never repaid and quickly became a bad debt in the books of the Money Exchange.[1221]

147. This loan appears to have been made at some stage prior to 1987 for around SAR 74.3m. However, even by 1987, the amount due (including interest due on the loan) stood at SAR 93m.[1222] By 1990, the figure was SAR 136m and was the subject of comment by El Ayouty and treatment by them as "amongst those debts, the recouping of which is doubtful" in their comments to the Partners on the 1990 Audit Report.[1223]

148. No repayment of the Al Oumi centre's debts was ever made. Instead AHAB appears to have claimed to take ownership of SAR 98.5m worth of property belonging to the Al Oumi centre as a means of reducing the indebtedness of the centre from SAR 175.6m to SAR 77.125m. This was criticised by El Ayouty:[1224]

> *"Commissions charged to the account of Alomi Center are SAR one hundred million or more. This is not consistent with banking custom. This indebtedness has not been settled despite the company's takeover of the properties held as guarantees to such indebtedness. This year, a sum of SAR 98,500,000 of those properties, according to the management estimates, was included in the*

---

1219 The **1987 Audit Pack {F/18/11} {F/19.1/11}** records that "*The review of the client file indicates that the motivation for dealing with him was of a personal nature in terms of his outstanding reputation, his guarantor, and his relationship with the owners of the Company without careful consideration to the facilities granted to him according to the generally known proper banking grounds.*"

1220 **{Day33/61:4-7}.**

1221 **{F/18/11}; {F/19.1/11}.**

1222 **{F/18/12}; {F/19.1/12}.**

1223 **{G1366/3}; {G1367/3}.**

1224 **{F/92/9}; {F/93/9}.**

> *investments. Despite request, we have not received the Sukuks supporting this operation."*

149. Even this remaining SAR 77.125m was never repaid.[1225] Again this too was criticised by El Ayouty in the 2008 Audit Pack who also raised doubts as to whether the land had ever been obtained from Al Oumi:[1226]

> "*No notable change occurred in this account except that an amount of SAR 98.5 million was included as an entry within the investments of the branch.* ***We did not receive anything to prove that a settlement was conducted with the customer, nor did we see any deeds to prove this customer's ownership of properties, especially since the indebtedness of the Al Oumi Centre has not been settled to date, despite the management seizing the property that guaranteed this indebtedness****, as well as having a personal guarantee (a performance bond from Mr. Abdul Latif Yousef A1 Oumi for SAR 165 million).*
>
> *There were also two promissory notes [advances], the first of which had a blank amount and maturity date and was signed by Mr. Yousef Al Oumi, and the other was for SAR 15 million with a blank maturity date and signed by Mr. Yousef Al Oumi and Mr. Abdul Latif Al Oumi (the foregoing information was taken from copies of the documents. As in past years, no inventory was made of the originals in spite of our request to verify their existence…)."* (Emphasis added.)

150. However, even if the land had been taken into AHAB's name, it is clear from the 2008 Audit Pack that such land was not sold to pay down the borrowing that the Money Exchange had been required to incur in order to make the loan in the first place.

151. Accordingly, say the Defendants,[1227] the costs of this loan never having been repaid were met by rolled over borrowing. Assuming an interest rate of 8%, the cost of the loan of SAR 74.3m would by 31 December 2008 have been around SAR 374m.

---

1225 **F/259/41}; {F/260.1/41}.**

1226 **{F/259/42}; {F/260.1/42}.**

## ETISALAT SHARES

152. Between 2003 and 2005, the Money Exchange acquired what were referred to as shares in a successful telecom company, Etisalat Company.[1228] The 2004 Audit Pack noted that 1,560 shares in Etisalat had been purchased in 2004 for SAR 991.2m.[1229] Etisalat declared dividends of SAR 21.8m.[1230]

153. The cost of this purchase was initially added to Al Sanea's indebtedness. [1231]

154. These shares were sold in 2005 for SAR 1.288bn and the allocation of the proceeds of sale was not made clear to El Ayouty in preparation of the 2005 Audit Pack.[1232]

155. However, looking at the general ledger, it appears that the proceeds of sale of these shares, shown as SAR 1,310,400,000, were in fact attributed to AHAB:[1233]

| Branch | Name_ | Account No | CurrGL | Ledger_Name | Date | Description | | Curr Dr | Curr Cr | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| SHARES INVESTME | HEAD OFFICE IN S.R | 91 01 0 20090 2002/6 | SAR | OTHER FUNDS S.R. | 2004-12-31 | MISC | 254 | 0.00 | 991,224,000.00 | -929,518,296.56 |
| SHARES INVESTME | SAUDI TELECOM | 91 01 0 41013 2201/5 | SAR | LOCAL STOCKS | 2004-12-31 | MISC | 254 | 991,224,000.00 | 0.00 | -991,224,000.00 |
| SHARES INVESTME | SAUDI TELECOM | 91 01 0 41013 2201/5 | SAR | LOCAL STOCKS | 2004-12-31 | MISC | 256 | 156,000.00 | 0.00 | -991,380,000.00 |
| INVESTMENT DIVI | HEAD OFFICE IN S.R | 03 01 0 20090 2002/7 | SAR | OTHER FUNDS S.R. | 2004-12-31 | MISC | 011 | 991,224,000.00 | 0.00 | -286,692,445.76 |
| INVESTMENT DIVI | SAAD COMPANY TAMWEEL | 03 01 2 55018 4801/8 | SAR | | 2004-12-31 | MISC | 011 | 0.00 | 991,224,000.00 | -1,643,011,067.18 |
| SHARES INVESTME | ACCRUED REVENUE | 91 01 0 73010 1201/4 | SAR | SUSPENSE SR | 2005-06-27 | MISC | 143 | 0.00 | 21,840,000.00 | -522,214.00 |
| SHARES INVESTME | HEAD OFFICE IN S.R | 91 01 0 20090 2002/6 | SAR | OTHER FUNDS S.R. | 2005-06-27 | MISC | 143 | 21,840,000.00 | 0.00 | -339,143,523.33 |
| INVESTMENT DIVI | SUSP. INCOME SHARES | 03 01 0 73024 1201/4 | SAR | SUSPENSE SR | 2005-06-27 | MISC | 134 | 21,840,000.00 | 0.00 | -63,556,626.00 |
| INVESTMENT DIVI | HEAD OFFICE IN S.R | 03 01 0 20090 2002/7 | SAR | OTHER FUNDS S.R. | 2005-06-27 | MISC | 134 | 0.00 | 21,840,000.00 | 731,778,106.40 |
| SHARES INVESTME | SELLING SHARES | 91 01 0 75370 1510/7 | SAR | SECURITIES COMMISSION | 2005-12-31 | MISC | 001 | 0.00 | 297,180,000.00 | 327,691,818.25 |
| SHARES INVESTME | INCOME SAUDI TELECOM | 91 01 0 75025 1513/0 | SAR | SHARES INCOM. | 2005-12-31 | MISC | 001 | 0.00 | 21,840,000.00 | 21,840,000.00 |
| SHARES INVESTME | HEAD OFFICE IN S.R | 91 01 0 20090 2002/6 | SAR | OTHER FUNDS S.R. | 2005-12-31 | MISC | 001 | 1,310,400,000.00 | 0.00 | -514,950,721.88 |
| SHARES INVESTME | SAUDI TELECOM | 91 01 0 41013 2201/5 | SAR | LOCAL STOCKS | 2005-12-31 | MISC | 001 | 0.00 | 991,380,000.00 | 0.00 |
| HEAD OFFICE | H/OFF - SHRS | 90 01 0 80003 1901/6 | SAR | SUBSIDIARIES COMPANIES SR | 2005-12-31 | MISC | 001 | 0.00 | 1,310,400,000.00 | 1,168,955,991.82 |
| HEAD OFFICE | ALGOSAIBI GROUP | 90 01 0 65004 4801/8 | SAR | CURRENT ACCOUNT S.R. | 2005-12-31 | MISC | 001 | 1,310,400,000.00 | 0.00 | -1,310,400,000.00 |

1227 **{E1/20/63}.**

1228 It is unclear whether this referred to shares in Etihad Etisalat Co (a telecommunications company) or Saudi Telecom (which was the reference made to the shares in the general ledger).

1229 **{F/137/9}; {F/138/9}:** where it is also stated that an equivalent amount "was added to Saad Company", suggesting either that an equivalent purchase was made for Saad Company or that the purchase price of SAR 991.2m was debited to Saad Company account as a debt owed to the Money Exchange.

1230 **{F/137/38}; {F/138/38}; {F/137/65}; {F/138/65}**.

1231 **{F/137/77}; {F/138/78}:** Attachment 9 for 2004, where it is entered as SAR 991,380,000**.**

1232 **{F/171/8}; {F/172/8}; {F/172/64}**.

1233 **{Z/30/1}**.

156. Thus, it appears that AHAB obtained SAR 1.3bn in respect of the Etisalat shares and which it never repaid to the Money Exchange which purchased them for SAR 991.2m in 2004.

157. This purchase was obviously funded by borrowing by the Money Exchange. Accordingly, assuming an interest rate of 8%, the cost of this purchase to the Money Exchange by 31 December 2008 would have been in the region of SAR 1.35bn.

158. No mention of this purchase is made by the Partners in their evidence. There is no evidence that either they or, significantly, Suleiman, were unaware of it. As the Defendants argue, this obviously begs the question, how could it possibly have been consistent with "New for Old" for the Partners to have borrowed nearly a billion riyals to spend on shares, taken the proceeds and then provided nothing to repay the borrowing?

***OVERSEAS DEPOSITS***

159. On Tuesday 29 May 1984, the board of AIH (consisting of Ahmed, Abdulaziz, Suleiman, Yousef and Al Sanea) attended a meeting in Manama, Bahrain, agreeing to appoint John Potter as managing director of AIH[1234]. Yousef accepted in cross-examination that despite having in his witness statement denied knowledge of AIH, ATS and TIBC before May 2009[1235] he was in fact aware of AIH and Mr. Potter.[1236]

---

1234 **{G/1010}**.
1235 **{C1/3/28} [129]**.
1236 **{Day33/19:16}–{Day33/20:20}**.

160. A year later, on 3 September 1985, ATS was registered under the name Algosaibi Investment Services as a Bermudian exempt company.[1237] As appears from documents disclosed by Al Sanea,[1238] within a month of incorporation, ATS and the Money Exchange began making deposits in foreign banks:

(1) In June 1985 Abdulaziz renewed a monthly roll over deposit of nearly US$3.8m with Kleinwort Benson Geneva, "*until further notice under telex advice and written confirmation to our Bahrain office as usual*".[1239]

(2) On 28 June 1985, Abdulaziz placed GBP 1m on deposit with Banque Worms in Geneva.[1240]

(3) On 28 June 1985, Abdulaziz placed GBP 4m on monthly roll over deposit with Chase Manhattan, Geneva, as "arranged through your Bahrain office".[1241]

(4) In July 1985, Abdulaziz renewed also on monthly roll over, a deposit at Bankers Trust of US$3.25m.[1242]

(5) On 4 September 1985, Lloyds Bank in Geneva by telex to AIH, confirmed three deposits each of more than US$7m.[1243]

---

1237 **{G/1050/7}** This document also sets out that Yousef, Suleiman, Mr. Potter and Al Sanea were registered as directors of ATS **{G/1050/12}**. It also demonstrates that a month after this company was set up, AIH became the largest shareholder in ATS in receiving two transfers of 4,000 shares in April 2005 from Yousef and Suleiman respectively **{G/1050/11}**.

1238 As exhibits to his affirmations filed in these proceedings.

1239 **{P/144/102}**.

1240 **{P/144/50}**.

1241 **{P/144/86}**.

1242 **{P/144/98}**.

(6) On 18 September 1985, Abdulaziz and Suleiman gave instructions to American Express Bank in Zurich for transfer of a sterling pound deposit upon maturity (amount unspecified) to Midland Bank London and deposited US$6.28m with American Express Bank in Zurich.[1244]

(7) On 3 October 1985, Ifabanque confirmed receipt of US$8,260,000 on deposit from Bankers Trust, New York for AIH.[1245]

(8) On 28 September 1985, Ifabanque confirmed receipt of GBP 5.9m, FFR 0.6m and US$0.3m from AIH.[1246]

(9) On 29 September 1985, Abdulaziz directed that deposits be made of US$6.28m with American Express IBC in New York, US$5.82m at Chase New York, US$8.26m at Credit Lyonnais in New York, US$5.9m Morgan Guaranty New York and US$1.4m at Philadelphia International in New York.[1247]

(10) On 7 October 1985, US$5.9m was placed by Suleiman and Al Sanea on deposit at Robert Fleming AG.[1248]

(11) On 29 October 1985, Abdulaziz deposited US$6.3m with American Express Bank in Zurich.[1249]

---

1243 **{P/144/44}**.
1244 **{P/144/18}**.
1245 **{P/144/30}**.
1246 **{P/144/32}**.
1247 **{P/144/19}**.
1248 **{P/144/77}**.

161. Equally, there are references to the foreign deposits in the 1987 Audit Pack. [1250]

162. While Yousef's witness statement (as said by him to have been drafted for him by Mr. Brett Walter) stated that *"Before May 2009, I was aware that the Money Exchange had some sort of representative office in Bahrain but not that it engaged in any substantial financial activity"[1251],* when cross examined on the issue, Yousef's evidence was that he was sure that AIH had been set up for the purpose of making these deposits:[1252]

> *"Q. Do you accept now that, having looked at the documents where immediately when AIH and the Bahraini office was set up these deposits were being made, that AIH, the Bahraini business, was set up for the very purpose of making such deposits and obviously raising the money to make those deposits?*
>
> *A. I'm sure it's been set up for that purpose."*

163. While it appears from Abdulaziz's letter of 20 December 1990 that part of overseas deposits equivalent to SAR 289m were *"repatriated"* at some stage in 1990 after the invasion of Kuwait *"when requests from owners of deposits…rained down on us",* [1253] that does not mean it found its way back into the Money Exchange to reduce bank indebtedness. Al Sanea affirmed that a further much larger deposits of nearly US$2 billion was made in 1990 or 1991 during the Gulf War.[1254]

164. Again, such deposits could only have been made by AHAB through Money Exchange borrowing (as AHAB had minimal borrowing of its own). Yousef's evidence was that he

---

1249 **{P/144/14}**; though this may have been a continuation of the deposit above.

1250 **{F/19/1}** where more than SAR 62m are itemized as held in foreign banks.

1251 **{C1/3/30}**.

1252 **{Day33/54:7-13}**.

1253 **{G/1359}; {G/1361}**.

1254 **{L2/9/93}**.

had no idea where the money could have come from in order to make such deposits other than through borrowing:[1255]

> *"Q. The persons directing those deposits were your father, Suleiman and Abdulaziz.*
>
> *A. Yes.*
>
> *Q. Where did the money come from to make the deposits in Switzerland? The Money Exchange didn't have any capital. We saw that it had to borrow a substantial sum of money by 1984. Where did the money come from to make these deposits?*
>
> *A. I have no idea.*
>
> *Q. The only way that the Money Exchange could have made these deposits is by borrowing more money, isn't it?*
>
> *A. I don't know. Maybe. I'm not sure.*
>
> *Q. You can't tell us how the Money Exchange would have done this without borrowing the SAR 300 million for that purpose?*
>
> *A. No, I'm sorry.*
>
> *Q. And paying the interest on that borrowing over that period?*
>
> *A. No, not at all".*

165. If a deposit of a billion riyals was made in 1991 (funded through borrowing) then, according to the Defendants[1256] the carrying cost of such a deposit would by 2009 have been similar to the cost of the original portfolio of shares i.e. SAR 6bn. We know from Abdulaziz's letter of 20/12/91 that part only of overseas deposits amounted to SAR 289m at that time.

---

1255 Yousef xx: **{Day33/44:21}-{Day33/45:7}; {Day33/49:24}-{Day33/50:5}**.
1256 **{E1/20/69}**.

**Failure to Provide Full Disclosure of Assets**

166. In determining the benefits received by AHAB and/or AHAB Partners from the Money Exchange, the Defendants rightly submit that I should also have in mind that they have not been provided with full disclosure of the AHAB and/or AHAB Partners' assets.

167. For instance, the contemporaneous documents indicate that AHAB and/or AHAB partners held very substantial overseas assets, the probable source of which was money borrowed by the Money Exchange. On 1 January 2002, Al Sanea wrote to Saud in the following terms while Saud was in Texas:[1257]

> *"Happy New Year! I hope you enjoyed your celebrations last night at the Millionaires Club and that the Texan girls were enticing enough for many dollar bills!*
>
> *As we discussed over the telephone, it would be appropriate to reveal that the corporate, real estate and financial assets of the Ahmad Hamad Algosaibi family, held by the Partnership as well as in the individual and personal names of family members, generated domestic and offshore gross revenue in the region of US$ 1.3 billion, equivalent to SR 4.8 billion, for 2001. The family net income was some $280 million (SR 1.05 billion).*
>
> *The net assets of the Ahmad Hamad Algosaibi family, both in Saudi Arabia and offshore were conservatively in excess of $3.3 billion. Please note that the family's domestic and international real estate assets, are treated at cost, and this $3.3 billion net worth figure excludes any land revaluation gains.*
>
> *With best possible wishes for a successful and happy 2002."*

168. Saud accepted that this letter was written in connection with information Forbes magazine wanted to publish about the Algosaibis in relation to the world's richest

---

1257 {**G/2709.1/1**}.

people.[1258] In cross-examination, Saud said as follows about the reference in this letter to the net assets of AHAB both in Saudi Arabia and offshore (emphasis added):[1259]

> *"Q. Can we go back to the third paragraph of the letter?*
>
> *A. Yes.*
>
> *Q. Maan is saying: "The net assets of the Ahmad Hamad Algosaibi family, both in Saudi Arabia and offshore were conservatively in excess of $3.3 billion." Do you see that?*
>
> *A. Yes, I see that.*
>
> *Q. How much is that in riyals?*
>
> *A. About SAR 10 billion or 11 billion.*
>
> *Q. That's quite a lot of money, isn't it?*
>
> *A. Yes, it is, yes.*
>
> *Q. Maan says: "Please note that the family's domestic and international real estate assets, are treated at cost, and this $3.3 billion net worth figure excludes any land revaluation gains." Do you see that?*
>
> *A. Yes.*
>
> *Q. What domestic real estate assets did the family have at*
>
> *this time?*
>
> *A. What domestic? You mean our own houses here in Saudi Arabia? Private houses? This is what this is referring to? I mean, this doesn't make sense to me, sir. I mean all the numbers, the letter, the context -- and I just can't make it out.*
>
> *Q. **The reason you say it doesn't make sense to you, Mr. Algosaibi, is because the Algosaibi family now has very large undisclosed***

---

[1258] Saud xx: {**Day43/58:10-13**}.

[1259] Saud xx: {**Day43/70:9**}-{**Day43/71:15**}.

***assets outside Saudi Arabia which it wants to keep away from its creditors. That's right, isn't it?***

*A.* ***That's right."***

Following a dispute raised by AHAB as to its accuracy, the Court directed the transcript should record Saud's answer set out in the passage above was "*That's right*" (not "*Not Right*" as contended by AHAB):[1260]

CHIEF JUSTICE:

"Q. *Could we now have the transcript in its original state? It is page 71. Having heard the record of transcript yesterday, I confirmed that what was on the transcript originally is what I heard and it seems what everybody else heard, except on Mr. Quest's side of the room. I am obliged to direct that the transcript reflect what I said yesterday, just before I rose, which is that the answer is "That's right." That being the case, I have listened this morning to what Mr. Quest had to say, the record reflects it, I confirm that if there is a concern about the transcript, about what was said, that is a matter to be resolved by way of re-examination. I am prepared to note that the transcript does record the fact that Mr. Quest disputes the correctness of the answer. That's all I am prepared to say at this point in time".*

169. In re-examination, Saud, in response to Mr. Quest, said as follows about this:[1261]

"Q. *You see, just to give you the context, the letter is quoted to you at the bottom of page {Day43/70:12}, and I think this is Mr. Crystal, he has quoted the letter to you with a reference to domestic and international real estate assets of $3.3 billion.*

*A.* *$3.3 billion.*

*Q.* *If you turn back to page {Day43/71:3}, you were asked: "Question: What domestic real estate assets did the family have ..."*

[1260] Saud xx: {**Day45/10:22**}-{**Day45/11:14**}.

[1261] Saud re-x: {**Day67/36:21**}-{**Day67/38:9**}.

A. *Ah, the family, okay.*

Q. *Then you answered that, and in the middle of the answer you say, "This doesn't make sense to me, sir".*

A. *I mean, this is a -- a very large number. So this number, and -- and what they are talking about here did not -- did not make any sense to me. I -- I may have been referring to that. The question here was put as to domestically this real estate, did the family have, which meant the private houses. Now I understand. Okay. And -- yes.*

Q. *If you go on to line {Day43/71:10}, you will see the question picks up on what you have said. It says: "Question: The reason you say it doesn't make sense to you, Mr. Algosaibi, is because the Algosaibi family now has very large undisclosed assets outside Saudi Arabia which it wants to keep away from its creditors. That's right, isn't it?" You see on the transcript your answer is: "Answer: That's right."*

A. *No, that's not right.*

Q. *What's not right?*

A. *We don't have any undisclosed assets outside of Saudi Arabia. So there must be a mistake here.*

Q. *Do you know, or did you know, whether the figure in the letter of $3.3 billion -- did you know whether that was a correct figure for the assets of the Algosaibi family?*

A. *No, the -- the -- I don't think this is a correct, er, figure.*

Q. *Too high or too low?*

A. *I think it's too high".*

170. Whether or not Saud said "*that's right*" or "*not right*" in cross-examination, it is the case, as the Defendants submit, that he failed to give any coherent explanation as to why Al Sanea was suggesting to him in his letter of 1 January 2002 that "*The net assets of the Ahmad Hamad Algosaibi family, both in Saudi Arabia and offshore were conservatively in excess of $3.3 billion…*". If, as Saud suggested in re-examination, he thought the figure set out in Al Sanea's letter to him was "*too high*", he gave no explanation as to why he did

not seek to correct Al Sanea. Indeed in cross-examination, Saud asserted that the letter was "*a draft, someone drafted this for Maan and never gone through*".[1262] That answer was not credible. The letter was clearly sent by Al Sanea to Saud so as to keep Saud informed about important disclosures that were intended to be made about the Algosaibi family's wealth.

171. As already discussed above, that the Algosaibi family held substantial assets overseas is corroborated by a letter[1263] dated 20 December 1990 from Abdulaziz to the "*members of the board of directors of* [AHAB]" in relation to the repatriation of substantial assets in the sum of SAR 289,470,351 held by AHAB outside of Saudi Arabia following the Kuwait war.[1264] The letter records that those assets were "*entered into our accounts with the exchange*." The letter is signed by Abdulaziz. It is also countersigned by Suleiman and Yousef. It is worth repeating here that when cross-examined as to the source of "*deposits transferred from abroad*" referred to in this letter Yousef said as follows (emphasis added):[1265]

> "Q. *One of the things you would have seen from that letter is that there had been deposits overseas of foreign currency of nearly SAR 300 million. Yes?*
>
> *A. That's what it says.*
>
> *Q. You would have asked yourself, wouldn't you, "Whose 3 money is that that has been deposited?" Because you wouldn't have known where the Money Exchange got it from if it wasn't from borrowings?*

1262 Saud xx: {**Day43/63:14**}.

1263 Already also considered in the last section of this Judgment on the Partners knowledge and authority.

1264 Yousef xx: {**Day33/47:15**}.

1265 Yousef xx: {**Day33/53:23**}-{**Day33/54:13**}.

> *A. I didn't ask from where and how.*
>
> *Q. Do you accept now that, having looked at the documents where immediately when AIH and the Bahraini office was set up these deposits were being made,* ***that AIH, the Bahraini business, was set up for the very purpose of making such deposits and obviously raising the money to make those deposits?***
>
> *A.* ***I'm sure it's been set up for that purpose".***

172. Such disclosure as has been provided by AHAB of its Partners' assets is incomplete and unsatisfactory. There are schedules of assets of AHAB Partners in the confidential exhibit to Charlton 21A.[1266] I am invited by the Defendants to look at those schedules in this context of AHAB's claim not to have benefited very significantly from the Money Exchange. I conclude that it is fair to do so.

173. No information or discovery has been provided by AHAB as to how those assets were acquired. When cross-examined as to the extent of their assets both in Saudi Arabia and overseas the answers given by Yousef, Saud and Dawood are properly characterized by the Defendants as opaque.[1267]

174. There has been no independent investigation as to the extent of the AHAB Partners' assets or as to how they acquired those assets.

175. Furthermore, unlike the position in relation to payments to Al Sanea, it has not been possible to determine the precise accounting treatment of payments to AHAB Partners in

---

1266 While reference is made to the contents of Charlton 21A and the exhibit thereto those contents are not incorporated into the Judgment here by reference and remain sealed pursuant to an Order of the Court made at Trial and subject to further Order.

1267 Yousef xx: **{Day29/97:7}-{Day29/99:19};** and **{Day30/1:10}-{Day30/3:25};** Saud xx: **{Day43/64:11}-{Day43/71:14}**; Dawood xx: **{Day76/82:5}**; and **{Day81/22:6}-{Day81/25:18}**. The Defendants were unable to put any questions to Yousef about his assets because of his ill health cutting short his cross-examination.

the ledgers of the Money Exchange. As described in the Defendants' submission by reference to the expert accounting evidence[1268] of the cheques paid by the Money Exchange that have been produced by Saudi Arabian British Bank (SABB) a number are payable to AHAB Partners.[1269] Of the 6,540 cheques that AHAB received from SABB, 216 (totalling US$48m) were made payable to "*AHAB and Related*" parties.[1270] Of these, 97 cheques were made payable to Abdulaziz, Suleiman, Yousef (or entities containing his name) and Saud totalling US$12m.[1271] Unlike the position in relation to the cheques posted to the Money Exchange's Saad Company Tamweel ledger account, it has not been possible to establish the precise accounting treatment in respect of the cheques made payable to the AHAB Partners.[1272] As explained by Mr. Davies in re-examination:[1273]

> A. *"Yes, by contrast, [to] Mr. Maan Al Sanea -- when cheques were paid to Mr. Maan Al Sanea, we were able to follow those: through to the ledger, as monies owed by Mr. Maan Al Sanea, and we couldn't do the same by reference of where those cheques [were paid] to the other partners …."*

**Conclusion**

176. Contrary to the misleading impression AHAB sought to give, and despite the inescapable inferences that they have failed to make full disclosure of assets, I am compelled to the conclusion that AHAB and/or the AHAB Partners have received enormous benefits from the Money Exchange.

---

1268 {**E1/28/37**} **[78]**.

1269 It is noted that the cheques produced may not be exhaustive. There may have been more cheques payable to the Algosaibis which have not been produced.

1270 Hargreaves 1W, paragraph 47 **{I/2.27/17}**; see also Davies 2W, paragraph 595 and Table K.5, {**I/11/261**}.

1271 Davies 2W, paragraph 595 and Table K.5, {**I/11/261**}; Hatton 2W, paragraph 2.6, table 2.1, {**I/8/7**} and Appendix 2.A to Hatton 2W {**I/8.1/1**}.

1272 Hatton 1W, paragraph 8.5 **{I/1/52}**.

1273 One of the Defendants' accountancy experts: Davies re-x: {**Day96/127:24**}-{**Day96/128:3**}.

177. Mr. Hayley's empirical understanding of the allocation of borrowing as being equal as between AHAB and Al Sanea and his sense of the crisis at the Money Exchange as an *"$8 billion problem*" as reported to Saud, are closely borne out by the contemporaneous documentation.

# SECTION 3

# AHAB'S "NEW FOR OLD" CASE

## SECTION 3

## AHAB'S "NEW FOR OLD" CASE

1. As mentioned earlier in this Judgment, [1274] "New for Old" is pleaded by AHAB as a policy that Suleiman - sometime after Abdulaziz's stroke on 30 September 2000 - implemented to restrict borrowing by Al Sanea through the Money Exchange to only such loans as had been taken before the time of its implementation**.**

2. The introduction of "New for Old" thus represented a fundamental change to AHAB's case. [1275] AHAB's case as originally pleaded was that all borrowing through the Money Exchange by Al Sanea was unauthorized borrowing.[1276] That, in summary, the AHAB Partners had nothing to do with the loan documentation, all of which was forged by the unauthorized application of their signatures and that all borrowing, as set out in Schedule 6 to the Statement of Claim, was unauthorized.

3. The disclosure of the N Files and Saud's Calculations within them revealed that at least until mid-2002, AHAB through Saud (and on Saud's account Suleiman as well) were aware of and had authorized borrowing by the Money Exchange in the order of SAR 7.8 billion. This included loans or "drawings" taken by Al Sanea, for his own purposes, in the order of SAR 4.1 billion.[1277]

4. Not only did this revelation falsify the factual basis of AHAB's case as pleaded at least until mid-2002, it also naturally gave rise to the inference that beyond that time, indeed

---

[1274] See Section 1: "Knowledge of the AHAB Partners of the Fraud Upon the Banks (etc)".

[1275] **Ibid**.

[1276] {**A1/2.2/37**}: AHAB's Re-Re-Re-Amended Statement of Claim, **[98]** to **[99]**, citing the total as at end May 2009 of about SAR 34.6 billion (US$9.2 billion).

[1277] {**N/744**}; {**N/745**}.

up until the collapse of the Money Exchange in May 2009, the Partners remained aware of and continued to authorize the ever increasing borrowing.

5. If AHAB had any hope of succeeding in its claims against the Defendants, that inference had to be dispelled. A break in knowledge and authority on the part of the Partners had to be established.

6. "New for Old" was then introduced for the first time. Without it, there could be no basis for a finding that there was at any time placed upon Al Sanea's authority to borrow, any restriction such as to have rendered his actions unauthorized and, unless unauthorized, no basis for the claim that he had defrauded AHAB.

7. In his Opening Submissions, Mr. Quest explained the significance of "New for Old" as follows: [1278]

> "*They say it is a recent invention. On our side, of course, it is of equally great importance for two reasons: first, because it underlines the fundamental position that the Algosaibis took, that borrowing was not to be increased at the Money Exchange, and that Al Sanea's drawings were to be repaid; and it also explains, of course, on our case, why it was necessary for Al Sanea to forge documents, because obviously if there was a new-for-old policy in place, then he needed to do something to get around it.*"

8. Given its "*great importance*" it is surprising that "New for Old" was not mentioned as a feature of AHAB's case until two years after these proceedings commenced, and only after the disclosure in the London Proceedings of the N Files.

9. Given the alleged discovery of widespread forgery by the 'Younger Algosaibis' in early May 2009 from their sweep through the Money Exchange's records at Saud's behest, one would have expected that "New for Old" would have been one of the very first matters

[1278] **{Day3/37:13-22}**

brought to the attention of the Deloitte Investigation Team upon their engagement by AHAB later in May 2009. As Mr. Quest asserts, the evasion of "New for Old" was, crucially, Al Sanea's reason for resorting to the forgery which had allegedly been discovered.

10. Having already found in this Judgment that the AHAB Partners were at all material times respectively aware of and authorized the borrowing, there is no scope at all for a conclusion either that there really was in place a "New for Old" policy or that Al Sanea resorted to forgery in order to get around it. Thus, the exercise which I will now undertake of examining the alleged "New for Old" policy is not essential to the conclusions of this Judgment.

11. However, given the sheer size, scope and significance of AHAB's claim, I am obliged to explain my reasons for finding, as I do, that "New for Old" is indeed a recent invention, raised in a desperate attempt to salvage AHAB's falsified case.

12. Al Sanea's alleged resort to forgery for evading "New for Old" is said by AHAB to have been effected in two ways: (1) by the application of forged signatures to bank facilities documents which never came to the attention of the Partners, in particular Suleiman, whose signature was most often involved; and (2) by the manipulation of other such documents in order to induce Suleiman to sign by making them appear on their face to be compliant with "New for Old."

13. The Defendants have provided critical responses to these allegations which will be examined further in this Judgment.[1279]

---

1279 Below, under the headings "The Forgery Allegations" and "The Manipulation of Documents**".**

14. It is nonetheless appropriate that I note here, especially in relation to the allegation of manipulation of documents, that these documents, although always present within the records of AHAB H.O. files,[1280] formed no part of AHAB's case either as originally pleaded or as amended to plead "New for Old" after disclosure of the N Files.

15. Instead, they are documents which were identified by the AwalCos and included in the electronic Trial Bundle at bundles H2-H5 at their request because they appeared to have been loan files maintained by Badr (at least in significant part). They contain some 600 documents, including numerous bank facilities signed in large part by Suleiman (and in some instances by Saud) and so, coupled with their provenance from within AHAB H.O. files, on their face contradict AHAB's primary case of lack of knowledge and authority on the part of the AHAB Partners.

16. It is against that background and from that record of documents which had been in its possession for some eight years into its pleaded case, that AHAB came, as late as mid-August 2016 and a month after this trial began, to identify 16[1281] sets of bank facility documents which it alleges were manipulated by Al Sanea as his second way of getting around "New for Old."

17. And notwithstanding that AHAB, near the end of the trial, eventually presented a witness statement from Badr as the person said to have been charged with oversight of "New for Old" and from whose files they had been retrieved, he made no mention of the 16 sets of

---

[1280] Found within the AHAB H.O. 1st floor Archives.

[1281] Which actually transpired to be 15 different documents (one document, {H4/52}, being relied on as a source document for another document {G/3166} rather than purportedly having been manipulated in its own right) with matching altered versions.

documents[1282] and did not address AHAB's allegation of manipulation at all. In fact, no witness was called by AHAB to testify to the significance of the manipulations.

18. Instead, AHAB's case on manipulation is based entirely on argument, as I described it in a written judgment delivered upon AHAB's application to further amend its pleadings to include the allegation of manipulation, which is:[1283]

> *"[That the 16 documents] give rise to only one reasonable inference, which is that Mr. Al Sanea must have been responsible for their creation and must have successfully deployed them as a decoy to his fraudulent program of unauthorized borrowings and misappropriations in evasion of the "new for old" policy.*"

19. The absence of evidence does not beset only the manipulated documents but the entire "New for Old" case itself.

20. Yousef, Saud and AHAB's other key witnesses, Mr. Hayley and Mr. Charlton, had signed various statements and affirmations in connection with the London Proceedings and these proceedings, explaining the basis of AHAB's case.

21. Yet no mention was made by any of them, as might have been expected, of "New for Old." This is in itself quite remarkable given that laying at the heart of AHAB's case has always been the Partners' asserted lack of knowledge and authority of Al Sanea's fraudulent use of the Money Exchange. After all, although its provenance is said by AHAB to be limited in time and utility (from not before late 2000), "New for Old" is all about the curtailment of borrowing authority imposed upon Al Sanea by AHAB.

22. For instance, Yousef, who never attested to the existence of "New for Old"[1284] made no mention of it in his earlier evidence although one would have expected him to have

---

1282 For the purposes of the Trial, listed and described in detail as compared to other versions of the documents in a Schedule of "Manipulated documents": **{W/25/1}.**

1283 Delivered on 31 August 2016: **{W/33/3} [7].**

known about it if it existed. In his first affidavit filed in these proceedings on 22 July 2009[1285] he referred to the early findings of the Deloitte Investigation Team (including as set out in Mr. Charlton's first affidavit) in relation to Al Sanea's alleged fraud upon AHAB and stated:

> "*I have been informed by those advisors that the reconstructed, consolidated financial statement (sic) of the Money Exchange reflect purported liabilities that exceed $9 billion which were neither known to, nor authorised by, AHAB, its Board, or its partners.*" [1286]
>
> *"I have reviewed in draft the Charlton Affidavit and in particular the sections of the Affidavit where he describes the schemes which Mr. Al Sanea has used to raise money for the Money Exchange and other companies using the name and credit of AHAB… I can confirm categorically that I was not aware of the transactions described in these paragraphs or the resulting liabilities in the books of the Money Exchange until they were disclosed by Deloitte's investigation. I have discussed the nature of these transactions with the other directors of AHAB and they have confirmed to me that they were similarly unaware that this was going on. Nor to the best of my knowledge did any of the other partners know of these transactions or that Mr. Al Sanea had incurred these huge undisclosed potential liabilities for AHAB… Indeed I can say that the Board were deeply shocked at the results of Deloitte's investigation and that AHAB does not accept that these transactions have incurred valid liabilities on behalf of the partnership."* [1287]
>
> *"I do not know exactly when Mr. Al Sanea began to raise enormous borrowings for the Money Exchange using the name and credit of AHAB…"*[1288]
>
> *"Deloitte has informed me that numerous loan facility documents have been located that were allegedly signed by my Uncle Suleiman. I do not believe that these are genuine documents. I was in regular contact with my Uncle Suleiman. He never told me of such facilities and I do not believe that he authorized the borrowing of billions of dollars that was not*

---

1284 As acknowledged in AHAB's Closing Submissions: {**D/4/217**} **[4.366].**
1285 Yousef 1A **{L1/9} [12]**
1286 **Ibid [11]**
1287 **Ibid [12]**
1288 **Ibid [23]**

> *required in our business operations. I certainly do not believe that he would not have told me."*[1289]

23. Yousef also addressed in this affidavit at [18] to [21],[1290] the fact that he had been aware that as at 31 December 1998,[1291] during Abdulaziz's time, Al Sanea had been borrowing large amounts from the Money Exchange, at that time in the order of SAR 2.3bn (US$610m) - personal debts which Abdulaziz had guaranteed on the basis that they would be secured by sufficient security posted by Al Sanea and would not be increased:[1292]

> "*My understanding was that my Uncle Abdulaziz had made clear that Mr. Al Sanea was to limit his borrowing and secure it, and that Mr. Al Sanea had accepted that.*"

24. Yousef then continued:[1293]

> *"In 2003, my Uncle Abdulaziz passed away and my Uncle Suleiman, as senior member of the family, became Chairman of AHAB. I knew that Uncle Suleiman would not indulge Mr. Al Sanea the way my Uncle Abdulaziz had and my clear understanding was that no new loans were granted to Mr. Al Sanea through the Money Exchange.…"*

25. Given the close relationship Yousef claims to have shared with his Uncle Suleiman,[1294] his anxious discussions with him in the context of the unsuccessful attempts to end AHAB's involvement in the Money Exchange[1295] and his *"clear understanding that no new loans were granted to Mr. Al Sanea through the Money Exchange",* one would have expected Yousef to have been then also informed about "New for Old" by Suleiman and

---

1289 **Ibid [24]**
1290 **{L1/9/9-10}**
1291 And as already discussed above in Section 1 when examining Yousef's knowledge.
1292 Yousef 1A **{L1/9/10} [21]**
1293 **Ibid** [22]
1294 Explained by Yousef in Yousef 1W: **{C1/3/25} [112]**.
1295 See Section 1: "Knowledge of the AHAB Partners of the Fraud Upon the Banks (etc)".

to have mentioned it in the context of his discussions with Mr. Charlton and in his subsequent narratives on the new strictures imposed by Suleiman upon Al Sanea.

26. Yet no such mention is made here or in any of Yousef's subsequent affidavits or witness statements, including his Second Affirmation in these proceedings[1296]; his second witness statement in the London proceedings after the disclosure of the N Files[1297]; and his Witness Statement in these proceedings.[1298]

27. There is a similarly inexplicable absence of reference to "New for Old" in Saud's evidence before the disclosure of the N Files.

28. Saud also signed various witness statements in connection with the London Proceedings:

(1) On 7 July 2010, he signed a witness statement in Cause No. 2009 Folio 1203 (one of the 5 Folios comprising the London Proceedings) in which he specifically addressed his understanding of Al Sanea's authority. However, nowhere does he mention "New for Old":[1299]

> *"I was aware that the Money Exchange had some borrowing, and that the amount was reasonably substantial - although I had no idea that it even remotely approached the level of indebtedness that Mr AI Sanea is now known to have incurred. I had no involvement in the Money Exchange's operations. However, I understood the borrowing to be (at least in substantial part) long-term borrowing which had been successively renewed but had originally been used to fund the acquisition of the share portfolio which the Money Exchange held on behalf of AHAB. This was a large portfolio of blue-chip Saudi securities which included substantial holdings in financial institutions such as Saudi American Bank, Arab National Bank and Saudi British Bank. I*

---

1296 Yousef 2A **{L1/14/1}** where he refers to various discussions relating to a potential sale of the Money Exchange to Al Sanea.

1297 Yousef London 2W: **{L1/12/1}** in which he specifically at **[45]** repeats the evidence relating to limits imposed upon Al Sanea's authority in the 1990s and at **[80]-[81]**, to Suleiman's aversion to borrowing and his distrust of Al Sanea.

1298 Yousef 1W{**C1/3/1**} **[108] and [112]** where Yousef reiterates his "*clear understanding*" from Suleiman that Al Sanea was to be allowed no new additional borrowing, gained from his "*regular contact*" and "*very close relationship*" with Suleiman.

1299 Saud London 1W **{L1/5/1} [5]**

> *understood that the borrowing was offset or secured by realisable assets, including the share portfolio itself. I believed that all of this borrowing would have been formally authorised and signed for by Mr. Uncle Suleiman (and, before him, my father). Certainly I did not believe that Mr Al Sanea was in a position to commit AHAB to borrowing of this nature on his own authority".*

(2) On 15 March 2011, Saud signed a witness statement for the purposes of the trial of the London Proceedings.

(a) Again, he directly addressed the issue of Al Sanea's authority to enter into facility agreements with third party banks. In particular, he addressed Al Sanea's authority to commit AHAB or the Money Exchange to borrowing:[1300]

> *"It has been explained to me that in the witness statement made by my cousin, Yousef Algosaibi, for the purposes of these Proceedings, he has referred to events in the early 1990s leading to a review of Mr Al Sanea's authority to run the Money Exchange and to an express restriction on his borrowing authority to SAR 300,000. I have no direct knowledge of these matters, which relate to a time before I had any substantial involvement in AHAB's business.*
>
> *However, what I can say is that since I have been involved in the management of AHAB's businesses, Mr Al Sanea has never been granted any general or unrestricted authority to commit AHAB or the Money Exchange to borrowing. …"*

(b) He also referred to various attempts to dispose of the Money Exchange in the 2000s after his father's stroke. He states that his knowledge of the level of borrowing in early 2009 was SAR 4bn,[1301] and that *"I regarded*

---

1300 Saud London 2W **{L1/6/13} [47-48]**

1301 Saud London 2W **{L1/6/18} [67]** - this statement itself patently untrue because Saud's Calculations show he was aware of SAR 7.8 billion borrowing by mid-2002: **{N/744}, {N/745}**.

*the indebtedness of the Money Exchange of which I was aware as substantial and I was extremely uncomfortable about it …”*.[1302]

(c) If ever there was an appropriate time to mention "New for Old" this was it. The issue of authority was front and centre in the London Proceedings which began and ended with the vital distinction between authorised and unauthorised borrowing. It is inconceivable that this critical issue - of which Saud now says he was aware from shortly after his father's stroke - had not been mentioned in Saud's witness statement prepared for the purposes of the Trial, unless (of course) "New for Old" never existed.

29. "New for Old" found its first expression in Saud's Supplemental Witness Statement filed in the London Proceedings on 9 May 2011,[1303] shortly after the disclosure of the N Files and with their implications having become apparent.

30. A further four months passed before it found expression in these proceedings by way of Saud's Second Affirmation of 10 September 2011 in these terms:[1304]

> *"… there was no question of my Uncle Suleiman (or any other member of my family) having authorised Mr Al Sanea to expand his borrowing through the Money Exchange on such a huge scale …*
>
> ***If anything****, Mr Al Sanea's authority to borrow in the name of AHAB was curtailed when my Uncle Suleiman took over the responsibilities of Chairman of AHAB after my father suffered his stroke. My Uncle's attitude to Mr Al Sanea and the Money Exchange was that AHAB's commercial relationship with them should be ended, implementing a longstanding agreement between the senior male AHAB partners to that effect ….*

1302 Saud London 2W **{L1/6/19} [70]**
1303 Saud London 3W **{L1/7/7-9} [25]-[35]**
1304 Saud 2A: **{L1/8/14} [49]-[51]**

> *Until this could be achieved, either by shutting the Money Exchange down (which was the original agreement) or selling it to Mr Al Sanea (which became the preferred option after my Uncle Suleiman took over my father's responsibilities), my Uncle sought to restrict borrowing by the Money Exchange* ***to the levels which had previously been authorised by my father****. To this end, my Uncle told Mr Al Sanea that if he wished to renew or replace any existing borrowing of the Money Exchange, he had to show head office documentation which established that the proposed new borrowing was not an increase on the expiring arrangement. The idea was that only if satisfied that this was the case would my Uncle Suleiman approve and sign the new agreement. …"* (Emphasis added.)

31. Saud's account of "New for Old" as set out in his Second Affirmation is patently unsatisfactory in a number of respects:

(1) Whilst he refers to Suleiman seeking to restrict borrowing by the Money Exchange to the levels previously authorised by Abdulaziz, he provides no detail as to what those levels were.

(2) Whilst he refers to the idea underlying the policy, he provides no details as to whether he was even present when it was discussed, or how the idea came about.

(3) Whilst he states that Suleiman "*told Mr. Al Sanea*" about "New for Old", he provides no particulars of when or how this was done (or even whether he was present).

32. Importantly, however, whilst Saud does not provide a particular date when "New for Old" came into force, he suggests that it was "*about 2001*".[1305]

33. Saud had suggested in his First Affirmation, that (against the background of his professed disassociation from the operations of the Money Exchange) he became aware by early 2009 that the Money Exchange had borrowing of several billion SARs, and that he was

1305 Ibid **[53]**

*"extremely uncomfortable about it"*.[1306] This was some 8 years after he claims to have become aware of the existence of "New for Old". Had he thought that "New for Old" was in force, it is difficult to see how Saud could have expressed himself in that way. He ought either to have been (1) confident that "New for Old" was operating as it should, and that those levels of borrowing were either consistent with previous levels or duly authorised; or (2) concerned that "New for Old" was not working, and spoken to Suleiman or Al Sanea (and Badr) about such concerns.[1307]

34. No doubt appreciating that this earlier evidence of his mere discomfort was inconsistent with the strictures of "New for Old", Saud seeks to downplay its importance in his Second Affirmation:[1308]

> *"I was not usually involved in the implementation of this "new for old" process, which was administered at head office level by Mr Badr, who became Mr. Al Sanea's head office contact for the purpose (and, we subsequently came to suspect, fell under his influence and assisted his fraud). I did not therefore have a full picture of the Money Exchange's borrowing over the period following the introduction of the policy. In my previous affirmation in these proceedings (paragraph 29) I explained that when I discovered at the start of 2009 that the Money Exchange had borrowing of several billion SARs (the figure I recalled in my later English witness statement was about SAR 4 billion) I was uncomfortable that this appeared to be a substantial increase on the amount of Money Exchange borrowing I had known about in the early 2000s. That reaction was based on the recollection (which, in the light of the N bundle documents I now believe to have been faulty) that I had heard in 2000 that the borrowing was in the region of SAR 1 billion. If I had recalled that in fact in 2002 my understanding had been that the borrowing then was also in the region of SAR 4 billion, I would probably have been less concerned in that it would have been consistent with bank borrowing having been contained through the "new for old" arrangements until the contemplated sale of the Money Exchange to Mr Al Sanea could be completed".*

1306 Saud 1A **{L1/4/7} [29]-[30]**

1307 As Saud inconsistently suggests he did on occasion, see for example, **Saud 1W {C1/2/61} [295]**, referring to a letter dated 13 May 2006 which he wrote to Al Sanea, querying an increase in facilities obtained from Arab Bank.

1308 Saud 2A: **{L1/8/15} [52]**

35. Having had to concede that he was aware of a higher level of borrowing than he had previously suggested, he here posits the view that he would *"probably have been less concerned in that it would have been consistent with bank borrowing having been contained through the "New for Old" arrangement".*[1309] To have expressed in his First Affirmation his mere unease at the level of lending, without at the same time mentioning "New for Old" at all, fundamentally undermines the suggestion that the Policy (or Protocol) actually existed at all.

36. The premise of his explanation here is also patently falsified by the fact that his own Calculations[1310] show that he was aware in mid-2002 of borrowing, not of the SAR 4bn which he here adopts as consistent with borrowing having been contained by "New for Old" but of the much larger amount of SAR 7.8bn.

**Saud's reasons for not mentioning "New for Old" earlier**

37. In its Written Closing Submissions AHAB proffered the following explanations for Saud's failure to have mentioned "New for Old":[1311]

> "*Saud was also asked why he did not mention the new for old policy in any evidence prior to May 2011.*[1312] *Saud responded that he had not done so before because he had not been asked about it.*[1313] *It seems that, in his own mind, he distinguished between his knowledge of the level of debt, and the procedure put in place to deal with the debt.*[1314] *That may seem simplistic and surprising at first but it should not be forgotten that the Algosaibis (including Saud) had no experience or material knowledge of proceedings in common law jurisdictions. In the circumstances, they might not be expected to do anything other than respond to questions and*

---

1309 Saud 2A **{L1/8/14} [52]**

1310 **{N/744}; {N/745}**

1311 **{D/4/221-222} [4.370]**

*1312 Saud was specifically asked why he recalled paragraphs 26 to 29 of* ***{L1/7/8}*** [where he mention "New for Old" for the first time]*: See* ***{Day64/45:16}*** *–* ***{Day64/46:7}****.*

*1313* ***{Day64/46:8-10}***

*1314* ***{Day64/46:20}***

> *answer the best way he could.*[1315] *In any event, regardless of the point in time at which Saud referred to the new for old policy in his evidence, the Court has before it contemporaneous documents some of which are sent by Mr Al Sanea himself which evidence the new for old policy. No one is suggesting, nor can they, that those documents have been fabricated after the event by the Algosaibis to bolster the new for old case*".

38. The argument that Saud might have failed to think of "New for Old" when giving his earlier accounts of events to the Investigation Team and AHAB's lawyers is an exercise in casuistry and an affront to common sense. By the time of the London Proceedings and the filing of its claims before this Court, the question of the Partners' knowledge and authority was no mere forensic issue – it had become for AHAB a matter of existential importance. Had "New for Old" existed in reality from the outset, Saud would therefore certainly have understood its importance for the protection of AHAB's position. In those circumstances, it is simply incredible that he could have failed to raise it even while addressing the very subjects of indebtedness and authorization to which it is said to relate.

39. And while "no one is suggesting that those documents [relied upon as proof of "New for Old"[1316]] have been fabricated after the event by the Algosaibis", it certainly has not been accepted by the Defendants that they are capable of proving "New for Old". I will return below to deal with the submissions on these documents.

---

[1315] ***{Day64/46:8-10}***

[1316] 47 documents which will be examined below and listed at **{T/216.3/1}**.

40. Of further contextual significance, is the fact that AHAB's case as originally pleaded alleged that the AHAB Partners, contrary to the notion of "New for Old", had had nothing at all to do with the loan documentation:[1317]

> "*Mr Al Sanea instructed Money Exchange employees that when loan documentation required approval or signature on behalf of AHAB, as it almost invariably did, it should be delivered to his office at the Saad Group (in a different building from the Money Exchange) and not to the AHAB partners or directors (whose offices were on a different floor in the same building* [as the Money Exchange]*). He would then forge or cause to be forged the relevant signatures and return the signed documentation to the relevant lender, sending a copy to the Money Exchange for its files. No loan documentation was sent to the AHAB partners or directors and there was no correspondence concerning the unauthorised borrowing with them.*"

41. In those terms, the stage had been set for AHAB's case that the Money Exchange was Al Sanea's exclusive domain which he ran with dictatorial control over its employees, with his fraudulent campaign hermetically sealed from AHAB intrusion and oversight, even while occupying the same building.

42. On that version of events, there simply was no room for any such thing as "New for Old." As it required direct oversight by Suleiman, it simply could not have co-existed with AHAB's case of the Partners' non-involvement with loan documentation as originally pleaded. Conversely, if "New for Old" did exist, it is simply inconceivable that AHAB could have pleaded its case as it did.

43. Certainly, it seems that Saud (who is the only person[1318] who gives live evidence on the point) is simply unable to assist the Court on the question of whether or how, or when if at all, it was ever communicated, or imposed on Al Sanea, or (if it was communicated

---

1317 **{A1/2.2/42} [101],** and already touched upon above at Section 1 of this Judgment dealing with AHAB knowledge and authority.

1318 Other than Mr. Hayley, considered below. The witness statement of Badr will also be examined below.

and imposed) if it was followed or monitored by anyone (whether Al Sanea; Badr, or Suleiman – or even Saud himself):[1319]

> *"It was my understanding through Uncle Suleiman that, during this period, Mr Al Sanea was operating generally under the "new for old" policy that we had instituted – that is, whilst existing bank facilities could be renewed on the same terms, there were to be no new or increased bank loans. I would note, however, that I was not directly involved in the management of the Money Exchange and accordingly* ***I do not know how closely this policy was followed.****"* (Emphasis added.)

44. In cross-examination, Mr. Hayley, the man daily in charge of the Money Exchange for the last decade of its operations, was asked about answers provided in the course of a private examination in London on 8 December 2015 (pursuant to section 236 of the Insolvency Act 1986) relating to "New for Old":[1320]

> *Q. Would you then go to page 40:21. You were asked the following question: "Question: Have you ever heard the expression 'new for old'?" Do you see the question?*
>
> *A. Yes.*
>
> *Q. At line 22 you asked the questioner a question: "Answer: Can you enlighten me?" Do you see that?*
>
> *A. Yes.*
>
> *Q. Then the questioner said: "Question: No, I cannot. Can you ever remember hearing the expression 'new for old'? "Answer: No, I don't understand your question." Do you see that?*
>
> *A. Yes.*
>
> *Q. Over the page. "Question: Were you ever aware of any guidelines for the Money Exchange which required there to be new for old borrowings only; in other words, no increase in the borrowings?" To which the answer you gave was "True"? Do you see that? (Pause) I'm sorry, the answer is "No".*

---

1319 Saud 2A **{L1/8/16} [57]**

1320 Hayley xx **{Day21/143:3} - {Day21/144:3}**

*A. It was "no", yes.*

45. When he was first asked about the private examination in the course of his cross-examination in these Proceedings, however, he suggested that his answer had been wrong but now to be revised for very disquieting reasons:

*CHIEF JUSTICE:*
*Before you go on, let me be sure I understand what is being said. You are at page 41, and there is a specific question at the very top of the page.*

*A. Yes, my Lord.*

*CHIEF JUSTICE:*
*Q. To which you answered "No"?*

*A. I did answer "No".*

*CHIEF JUSTICE:*
*Q. Are you now saying that that answer was not true?*

*A. That answer was not true.*

*MR. CRYSTAL:*
*Q. Why did you give it, Mr. Hayley?*

*A. Because I believed it to be true at the time I gave it.*

*Q. So at the time you gave that answer, you believed it to be true; is that right?*

*A. To the best of my recollection, I believed it to be true.*

*Q. Right. So something has happened since you gave that answer to the High Court, on oath, in London on 8 December 2015; is that right?*

*A. Yes.*

*Q. What is it that has happened, Mr. Hayley? Who have you been talking to?*

A. *I have been asked by the -- um, by the -- by the lawyers whether or not I had any recollection of the concept that there was to be no increase in borrowings for the Saudi banks.*

Q. *Let's be a little bit clearer: which lawyer asked you about this?*

A. *I believe Andrew Ford asked me.*

Q. *Mr. Ford has been the lawyer who has been drafting your witness statements with you since your first witness statement before you left Saudi Arabia in November 2009; is that right?*

A. *Um, I think that it actually says in my witness statement that he did draft my witness statements with me.*

Q. *That's what I thought I was putting to you.*

A. *That is correct.*

Q. *He has been doing that with you since November 2009; is that right?*

A. *Yes.* [1321]

Q. *Right. So, how soon after your examination in London did you have this conversation with Mr. Ford?*

A. *I had this conversation with Mr. Ford -- I can't recollect precisely, I would think maybe a month ago.*

Q. *A month ago?*

A. *Yes.*

Q. *After you made your witness statement in these Proceedings?*

A. *Yes.* [1322]

A. *I can't recollect exactly how the conversation started. I would say that there was—that the phraseology "new for old" was introduced. Perhaps I should go back to say that when I was in Saudi Arabia, I do recollect that there was a period when the*

---

[1321] Hayley xx **{Day21/145:4} – {Day21/146/19}**
[1322] Hayley xx **{Day21/147:1-9}**

*Algosaibi family didn't want any increases in the borrowings from local banks; and I think that they disseminated that to the local banks. But the actual phrase "new for old" was not one that I recall from my period in Saudi Arabia; and the phrase "new for old" is one that has been introduced recently during my conversations with the lawyers for Algosaibi.*
*...*

*Q. Where was the conversation?*

*A. Um ... I'm sorry, I don't recall exactly. It might have been over the telephone, it might even have been here, while I was here.*

*Q. When you say while you were here, do you mean in the last 10 days?*

*A. Yes.*

*Q. You have been speaking to Mr. Ford, have you, while you have been here?*

*A. I have.*

*Q. About your evidence?*

*A. No, not about my evidence, about this particular concept of new for old.*

*Q. Who started the conversation?*

*A. I didn't. Mr. Ford did.*

*Q. So Mr. Ford initiates a conversation with you in the last 10 days in the Cayman Islands about "new for old"; is that right?*

*A. To the best of my recollection, yes.* [1323]

46. And so, despite what appears to have been efforts on AHAB's behalf to prompt his recollection, what is clear is that at the time of his private examination on 8 December 2015, more than 6 years after the filing of AHAB's claim in this case, Mr. Hayley had not

---

[1323] Hayley xx **{Day21/148:15} – {Day21/150/6}**

heard of "new for old". This is confirmed from the passage excerpted from his cross-examination above and deserving of repetition here:[1324]

> "*But the actual phrase "new for old" was not one that I recall from my period in Saudi Arabia; and the phrase "new for old" is one that has been introduced recently during my conversations with the lawyers for Algosaibi."*

47. Mr. Hayley's evidence is of real contextual significance and even in its Written Closing Submissions[1325] AHAB relies upon Hayley as explaining "*the rigour with which the signing of facility agreements was approached by Mr Al Sanea*" to the exclusion of any involvement by AHAB Partners – here referring to Hayley's account in his witness statement to that effect.[1326] According to Mr. Charlton, it was to Mr. Hayley that the Investigation Team were required to speak in order to get an understanding of the process by which AHAB authorisations for borrowing was obtained. This is apparent from Mr. Charlton's evidence (in his 24 July 2009 affidavit filed in support of AHAB's pre-amended case on AHAB's application for the ex parte WFO which had been granted in this case).[1327]

48. According to Mr Charlton:

> *"Mr. Al Sanea also caused AHAB, without the authority of its Board and in many cases by forging documents, to borrow from banks and financial institutions;"* [1328]
>
> *"To date, our investigations indicate that Mr. Al Sanea's scheme has left AHAB (and its related entities) with recorded potential liabilities of ... approximately 9.2 billion United States Dollars".*[1329]

---

1324 Hayley xx **{Day21/148:23} – {Day21/149:1}**
1325 **{D/4/319} [4.605]–[4.607]**
1326 Hayley 1W **{C1/9/48-50} [231]-[239].**
1327 Charlton 1A **{L1/16/19} [49.1]**
1328 Charlton 1A **{L1/16/7} [12]**
1329 Charlton 1A **{L1/16/7} [13]**

> "*As part of our investigative activities, we have attempted to ascertain the full extent of such third party borrowings that Mr. Al Sanea caused to be borrowed by AHAB. We estimate that amount at SAR 35 billion which is approximately US $9.2 billion.*"[1330]
>
> *"Investigations so far give serious cause to doubt that these loans and other transactions were properly authorised and indeed it appears that they were actively concealed from AHAB's Board of Directors … "*[1331]
>
> *The process by which Board authorisations were obtained for new, renewed or amended bank facilities has been described to me by Mr. Hayley."*[1332]

49. Yet, as we have seen, Mr. Hayley had not heard of "New for Old" at any time whilst in Saudi Arabia and had attested to a process insisted upon and controlled exclusively by Al Sanea as being amenable to his forgery of the Partners' signatures but a process which was wholly incompatible with "New for Old", which is described as having involved the documents being sent directly from the Money Exchange to AHAB H.O.

50. At no point did Mr. Hayley, or AHAB, seek to explain how he could still be giving evidence that does not fit with their current case. In addition to its inconsistency with the ″New for Old″ case, Mr. Hayley's evidence was notable for the fact that he made no reference to the ″New for Old″ policy. On the face of it he knew nothing about it. That is an extraordinary state of affairs. On AHAB's case, Mr. Hayley was the General Manager responsible for arranging loans from the banks. If his authority extended only as far as arranging new loans that replaced old loans, you would expect someone to have told him. You would expect, in his evidence, a clear explanation of how the ″New for Old″ policy

---

1330 Charlton 1A **{L1/16/67} [165]**

1331 Charlton 1A **{L1/16/17} [48]**

1332 Charlton 1A **{L1/16/19} [49.1]**

affected his ability to arrange loans. As noted above, Mr. Hayley said that he had no recollection of the phrase "New for Old" from his time in Saudi Arabia.[1333]

51. When considering the weight to be attached to aspects of Mr. Hayley's evidence that are said to support AHAB's case, I record here that I accept that I should also have in mind that in cross-examination Mr. Hayley accepted that an important aspect of his Witness Statement,[1334] relating to a meeting between him and El Ayouty which occurred shortly following the appointment of Deloitte in May 2009, was "*not complete*" and that he had omitted highly material information in relation to the meeting.[1335]

52. In short, on 8 December 2015, Mr. Hayley gave an account of his meeting with El Ayouty during the course of the aforementioned examination in London. This account of Mr. Hayley's meeting with El Ayouty differs in two critical respects from the account given in Hayley 1W. First, paragraph 325 of Hayley 1W makes no mention of the fact that he had been informed by El Ayouty that, up to 2005, El Ayouty had reported on the financial position of the Money Exchange to Al Sanea "*and to Saud*". The reference to Saud has been removed from the account of the meeting set out in Hayley 1W. Secondly, the word "*only*" has been inserted after "*Mr. Al Sanea*" in paragraph 325 of Hayley 1W. Mr. Hayley did not say in his examination that "*after about 2005, he* [i.e. Saleh El Ayouty] *sent the annual reports to Mr. Al Sanea only*". He said that "*they told me that after 2005 they ceased reporting to Saud Algosaibi.*" Mr. Hayley's evidence had, therefore, been changed in two critical respects to suit the Algosaibis' case.

---

1333 Hayley xx **{Day21/148:23}**

1334 Hayley 1W **{C1/9/64-65} [323] - [325]**

1335 Hayley xx **{Day21/177:19} – {Day21/180:1}**. As he accepted in cross-examination, Hayley 1W "*leaves out the period … between the death of Sheikh Abdulaziz and 2005 when* [Hayley had been informed by El Ayouty that] *the reports were also sent to the partners of AHAB*".

53. In cross-examination, Mr. Hayley accepted that the truthful account of his meeting with El Ayouty is what he said in the London Examination (not what is set out in paragraph 325 of Hayley 1W[1336]).[1337] As to how paragraph 325 of Hayley 1W came to be drafted in a misleading manner, Mr. Hayley said as follows in cross-examination:[1338]

> *Q. Paragraph 325 is all your own work, is it?*
>
> *A. No, it's not.*
>
> *Q. Then whose work is it?*
>
> *A. I -- I drafted paragraph 325 together with, um, an employee of Lipman Karas, whose name I'm sorry escapes me.*
>
> *Q. Male or female?*
>
> *A. Female.*
>
> *Q. Caroline Phipps?*
>
> *A. Is it Caroline Phipps? I'm sorry. I believe so, yes.*
>
> *Q. And -- you were saying?*
>
> *A. That I drafted this paragraph together with Caroline Phipps.*
>
> *Q. Did you tell her that the paragraph was misleading?*
>
> *A. No.*
>
> *Q. So who actually drafted the paragraph?*
>
> *A. We drafted it together.*
>
> *Q. Did you point out to Ms Phipps that this paragraph as drafted together was misleading?*
>
> *A. No.*

---

1336 Hayley 1W **{C1/9/64}**

1337 Hayley xx **{Day21/179:24} - {Day21/180:1}**.

1338 Hayley xx **{Day21/178:7-21}**

54. Mr. Hayley also showed selective recall in relation to the Algosaibis' involvement. His evidence about speaking to Saud in May 2009 to tell him it was all over, demonstrated that Mr. Hayley believed that Saud knew about the fraud on the banks at the Money Exchange, and that Saud knew of the US$8 billion debt. Mr. Hayley was not as forthcoming as he might have been about his conversations and involvement at that time.[1339]

55. Before relying on it, I would be astute to ensure that Mr. Hayley's evidence is supported by contemporaneous documents. Wherever there is a conflict between his evidence and a contemporaneous record, the contemporaneous record should be preferred.

56. I accept however, as the Defendants also point out,[1340] that Mr. Hayley did not lie about everything. The evidence he gives adverse to the Algosaibis should be accepted. Mr. Hayley said that he always assumed that the Algosaibi family knew about the debt at the Money Exchange.[1341] The evidence he gives about the fraud on the banks – that all borrowing during his time was procured by fraud - should be accepted. I also accept that Mr. Hayley spoke to Saud[1342] in order to tell him "*it was over*" and told Saud it was an US$8 billion problem, and that he told Saud that US$1 billion would resolve the problem but in the short term only.[1343] I also accept Mr. Hayley's account of his one to one meeting with Saud in 2006 (of which Saud has "*no memory*") when Saud went downstairs to the offices of the Money Exchange and asked Hayley "*Can the Money*

---

1339 His evidence about these conversations is contained in two short paragraphs in his witness statement: see Hayley 1W **{C1/9/64} [317]** and **[318]**.

1340 **{E1/4/8}**

1341 Hayley xx **{Day69/50:3}**

1342 As already mentioned in Section 1 addressing "Knowledge of the AHAB Partners (etc.)"

1343 Hayley 1W **{C1/9/64} [318]**.

*Exchange repay its debts?*".[1344] That meeting took place in the context of a massive crash in the Saudi Arabian stock market in 2006. Saud was obviously extremely concerned about the huge drop in the value of the Money Exchange's securities and the very large amounts of money which he knew that the Money Exchange had borrowed.[1345]

**"New for Old": further lack of specificity**

57. Still further indication that it did not exist arises from the absence of specifics or details about "New for Old."

58. As gleaned from AHAB's various pleading, "New for Old" is said to have been implemented "*In or around late 2002 or early 2003*"[1346] and "*After 30 September 2000, Mr Al Sanea was authorised to maintain the level of borrowing by arranging the renewal or replacement of existing facilities*".[1347]

59. In AHAB's Written Opening Submissions, it was stated that the "New for Old" policy was introduced and (by implication) communicated to Al Sanea "***probably*** *in about 2002*" (emphasis added).[1348]

60. Having earlier asserted the various times in its pleadings for its implementation,[1349] the recognition and choice of this date appears to have been taken by AHAB from its legal team's analysis of Bundles H2-H5 which the AwalCos had required to be uploaded to the Trial database ("Magnum").

---

1344 Hayley 1W **{C1/9/28} [134]-[136]**

1345 The meeting is considered in further detail in the Detailed Narrative prepared by the Defendants: **{E2/1}**.

1346 **{A1/2.2/40} [99K]**

1347 **{A1/2.2/41} [99O(b)]**

1348 **{U/1/45} [103]**. See also **{U/1/70} [173(11)]**: "By spring 2002"; **U/1/162 [146]**: "in or around 2002"

1349 See from paragraph 1 above, and Section 1 of this judgment, and AHAB's re-re-re-amended Statement of Claim: **A1/2.2/39 [99G]** where it is also averred that Suleiman imposed borrowing restrictions "On assuming responsibility from Abdulaziz".

61. It is fair to infer that this was the cause of AHAB's epiphany, as appears from AHAB's Written Opening Submissions:[1350]

> "*That the new for old policy was introduced by Suleiman and communicated to Mr Al Sanea in or around 2002 is clear from documents found in Bundles H2 to H5 and H9. Within these files, which were contemporaneously maintained by Badr, are various memos from Mr Al Sanea to Badr asking him to obtain Suleiman's signature on enclosed facility agreements and associated documents. The memos date from 2002[1351] through to 2008[1352]. A number of them refer expressly to the* <u>*renewal*</u> *of the facility in question[1353] and two of them refer to tables showing how the new facility relates to the old facility in terms of amount.[1354]*

62. These documents had been in AHAB's possession (and available to the Investigation Team) in AHAB H.O. in files kept by Badr for over eight years, but had not previously been considered of any importance. This in itself is significant. Given Badr's supposedly central role in "New for Old", an understanding of which would have been of critical importance (or ought to have been had the Policy ever existed) on the issue of Al Sanea's authority to borrow and on how the alleged fraud could have occurred, it is odd that files said to have been his had not been identified immediately, scrutinised in infinite detail, preserved intact, and uploaded to the Trial Bundle by AHAB. This is all the more peculiar in light of AHAB's assertion that Badr had departed under a cloud of suspicion of having colluded in the fraud with Al Sanea.[1355]

63. The significance of these documents (as already mentioned) was said to be that they showed that *"Mr Al Sanea fabricated or manipulated facility and related documents*

---

1350 **{U/1/162} [416]**

*1351* ***{H2/39}***

*1352* ***{H2/136}***

*1353* *see **{H2/129}**; **{H2/136}**; **H3/104}***

*1354* ***{H2/39}** - although it appears that the table does not accurately reflect the full extent of the renewal which included a USD 5 million revolving syndicate at **{H2/37/6}**. **{H3/108}***

1355 See for instance Saud 2A **{L1/8/15} [52]** excerpted above at paragraph 25 and Saud 1W **{C1/2/53-55} [259]**

*which were presented to Suleiman for signing, with the aim of deceiving Suleiman and creating the impression of Mr Al Sanea's compliance with the policy imposed upon him by Suleiman in 2002 that new lending should only replace old lending so that the Money Exchange's overall borrowing levels did not increase (which in fact they did)."*[1356]

64. In the course of his Oral Opening, Mr. Quest attached considerable significance to these "*manipulated*" documents. There were, he suggested *"a lot of these".*[1357] It was submitted by him that AHAB had found *"an increasing number of similar situations where documents have been tampered with in a way plainly designed to deceive the Algosaibis and to subvert the new for old process".*[1358]

65. AHAB's case on manipulation will be addressed subsequently in this Judgment. Not surprisingly, none of the Defendants' Written Opening Submissions addressed the manipulation argument at all. This, I accept, is because AHAB's Opening was the first time that the manipulation case had been raised or explained.

**AHAB'S application to further re-amend**

66. AHAB issued a summons on 12 July 2016 seeking permission to further amend its Statement of Claim.[1359] Far from narrowing its pleaded case (as might be expected at that late stage at the Trial), it sought to broaden its pleadings so as make "New for Old" less, not more specific. AHAB sought:

---

1356 AHAB's written Opening Submissions: **{U/1/22} [53]**
1357 **{Day3/56:13-14}**
1358 **{Day3/59:19-22}**
1359 **{W/1/1}**

(1) To delete "late" in paragraph 99K, so as to allege rather than "late 2002" that it was in 2002 or early 2003 that Suleiman instructed Al Sanea on "New for Old";[1360]

(2) To delete once and for all the wording in paragraph 101 stating that no loan documentation was sent to the AHAB Partners and that they had received no correspondence in relation to unauthorised borrowing. That case was quite obviously untrue, as has already been amply demonstrated in this Judgment.[1361] Instead it inserted wording into paragraph 101 which reads:[1362]

> "*In other cases, Mr Al Sanea would send the loan documentation to AHAB's Head Office for signature in purported compliance with the new for old policy pleaded in paragraph 99K above. In a small number of cases, he would send loan documentation to AHAB's Head Office even where the signature on the counterpart returned to the lender was forged by him. AHAB is not able to say in which cases loan documentation was sent to AHAB's Head Office save to the extent that such loan documentation is found on AHAB's Head Office files.*"

(3) To amend Schedule 14 (the forgery schedule); and

(4) To amend paragraph 103 so as to add the new allegation that Al Sanea manipulated 16 sets of banking facilities (particulars of which are said to be set out in Schedule 15) as follows:[1363]

> *"103A. Further, Mr Al Sanea forged facility documents by manipulating the text and/or content of documents (including by increasing the amount) after they had been signed by Suleiman pursuant to the procedure pleaded in paragraph 99K above.*

---

1360 **{A1/2.3/40} [99K]**
1361 In Section 1 "Knowledge of the AHAB Partners of the Fraud Upon the Banks (etc.)"
1362 **{A1/2.3/42}**
1363 **{A1/2.3/44}**

> *103B. Further, Mr Al Sanea dishonestly induced Suleiman to sign new facility documents pursuant to the procedure pleaded in paragraph 99K above by presenting manipulated existing facility documents in order to conceal the fact that the facility had increased or was increasing".*

67. The application to further re-amend was heard on 22, 23 and 24 August 2016 (Days 25, 26 and 27 of the Trial). No objection was taken by the Defendants to the amendments to paragraph 101. By judgment dated 31 August 2016,[1364] permission was granted for the additions to the Forgery Schedule and for the amendment to delete the reference to "late" in paragraph 99K. The amendments to the manipulation case were refused.[1365] Subsequently that aspect of the application was renewed, and granted by consent on terms including that AHAB provided further discovery.[1366]

**AHAB'S case on "New for Old": post-amendment**

68. Notwithstanding the numerous occasions on which AHAB has had the opportunity to explain its "New for Old" case, it remains confused and incoherent.

**Timing of "New for Old"**

69. AHAB's case on "New for Old" was most recently summarised in its skeleton argument in support of its Amendment Application[1367] and its written speaking notes lodged in relation to its Amendment Application.[1368]

70. In its skeleton argument, AHAB explained that the manipulated documents were relevant to: *[1369]*

---

1364 **{W/33/1}**

1365 Both the forgery case, and the manipulation case are dealt with in more detail in later sections of this Judgment. Forgery is dealt with in Section 4; and Manipulation in Section 5.

1366 **{B/69/1}**

1367 **{W/24/4} [10]**; **{W/24/5-7} [12]-[15]**; **{W/24/8-11} [21]-[31]**

1368 **{W/48/1}**

1369 {**W/24/4**} **[10]**

> *"the process which was established for checking that that* ***"New for Old" policy*** *was adhered to (see paragraphs 99F; 99G and 99K of AHAB's statement of case). That process is referred to herein as the* ***"New for Old" protocol.*** *It has been AHAB's pleaded case since July 2012 that restrictions were imposed upon Mr. Al Sanea's borrowing through the "New for Old" policy after Abdulaziz's stroke"* (Emphasis added.)

71. This is the first reference to the ""New for Old" protocol", and, as the Defendants submit, it is mired in confusion.

72. AHAB's case on "New for Old" had shifted again. AHAB's legal team submitted that the "New for Old" Policy was established in 2000, whereas what was established in 2002 or early 2003 was a separate and entirely different thing - the "Protocol". As emerged from exchanges with the Court during AHAB's application, the Protocol was supposedly the means for checking that the Policy imposed two to three years earlier was adhered to:[1370]

> *CHIEF JUSTICE: You are saying the new for old policy was articulated at the end of September 2000?*
>
> *MR. QUEST: Yes.*
>
> *CHIEF JUSTICE: But an actual procedure was put in place in late 2002?*
>
> *MR. QUEST: That's right. The principle that the borrowing should not increase took effect from 30 September 2000 but there was no procedure, as it were, whereby you actually had to produce an old and a new document unti1 rather later on. I should say that is the point made in paragraph 13 of my speaking note".*

73. AHAB suggested that even without the proposed amendment, the Court was required to determine various questions about the existence, operation and effect of the "New for Old" Policy and the (separate) Protocol intended to enforce it. This was news to the Defendants and the Court. No such distinction had previously been referred to, and it does not feature in any of the witness evidence. Nor is it pleaded. Nor is a "New for

---

[1370] **{Day25/79:1-12}**

Old" Protocol mentioned in AHAB's Written Opening Submissions. Indeed, in AHAB's Written Opening Submissions AHAB had *positively averred* that the ""New for Old" Policy" was imposed upon Al Sanea in 2002.[1371]

74. In AHAB's written speaking notes for its Amendment Application,[1372] references to "a Protocol" were replaced with references to "*the "New for Old" procedure*".[1373] AHAB's speaking notes implied that Saud's witness statement refers to the limit on Al Sanea's authority, and separately to "*the process*" imposed to enforce it.[1374] It does not.

75. Saud's evidence on "New for Old" in these Proceedings is set out in full at Saud 1W in terms similar to those in which he had raised it on AHAB's behalf for the first time in these proceedings[1375]:[1376]

> "*When my father suffered his stroke in 2000, AHAB lost its main driving force and an authoritative leader. Uncle Suleiman's aim when he took over the duties of Chairman (particularly before it was clear that my father would not recover) was to try to keep AHAB on the course my father had set, doing things the way my father had done them or required them to be done. That was the approach he required us to follow.*
>
> *In relation to Mr Al Sanea and the Money Exchange, my uncle's attitude was that AHAB's relationship with them should be ended, implementing the longstanding agreement between the senior male partners to that effect* ….
>
> *Until this could be achieved, either by shutting the Money Exchange down (which was the original agreement) or selling it to Mr Al Sanea (which became the preferred option after Uncle Suleiman took over my father's responsibilities), my uncle sought to restrict borrowing by the Money Exchange to the levels which had previously been authorised by my father. To this end, my uncle told Mr Al Sanea that if he wished to renew or*

---

1371 **{U/1/22} [53]**; **{U/1/45} [103]**; **{U/1/53} [133]**; **{U/1/70} [173(11)]**; **{U/1/162} [416]**
1372 **{W/48/1}**
1373 See for example **{W/48/5-6} [12(4)]**; **[13(1)]**
1374 **{W/48/6} [14(1)]**
1375 Saud 2A **{L1/8/14} [49]-[51]**
1376 **{C1/2/53} [254]-[258]**

> *replace any existing borrowing of the Money Exchange, he had to show Head Office documentation that showed the proposed new borrowing was not an increase on the expiring arrangement. The idea was that only if satisfied that this was the case would Uncle Suleiman approve and sign the new agreement.*
>
> *"Mr Al Sanea was to send a copy of the existing agreement and the new facility agreement to Badr, who was supposed to check the old agreement against the new one. If the new agreement was not essentially the same as the old one (particularly the amount), he was told to reject it and return it to Mr Al Sanea. If he considered that the new agreement was effectively a like-for-like replacement of existing borrowing, he was to take it to Uncle Suleiman, explain its contents to him, and obtain his approval and signature.*
>
> *Occasionally, Badr would try to involve me in this process, but I was reluctant to be involved. My Uncle would have to authorise any borrowing. I did not have a full picture or understanding of the Money Exchange's operations and I did not feel I could add anything useful to the process. On the occasions that Badr approached me with material from Mr. Al Sanea, I would usually redirect him to my uncle unless I felt I could deal with the matter easily".*

76. Contrary to the case put forward by Mr. Quest, Saud's evidence on this issue was typically evasive in his reluctance to refer to any detail, let alone any dates. Saud also did not draw any distinction between the restriction of Al Sanea's borrowing authority (i.e. what AHAB now calls the Policy), and the need to produce documentation to Head Office so that it could be checked (i.e. the Protocol). As shown in the extract above, he runs the two concepts together as part and parcel of the same thing.

77. That there is no separation between a Policy imposed in 2000 and a Protocol in 2002/2003 is obvious from paragraph 260 of Saud 1W:[1377]

> *"In addition to the "new for old" regime, **other controls** were also sought to be imposed on Mr Al Sanea's borrowing by my uncle, with my assistance, from about 2001/2002"* (Emphasis added.)

---

1377 Saud 1W **{C1/2/54} [260]**

78. By way of example, Saud then refers to the board resolution dated 14 May 2001. [1378] The clear implication is that the (alleged) "New for Old" regime was imposed around the time of Abdulaziz's stroke in late 2000, and not 2002 or early 2003 (as now contended for by Mr. Quest).

79. In so far as Saud had previously given evidence as to a date when "New for Old" was allegedly imposed the best he could do was suggest it was 2001,[1379] which is the one year between 2000 and 2003 that does not feature at all in AHAB's current version of events.

80. In cross-examination by Mr. Lowe (referring to paragraphs 26 to 29 of Saud's Third Witness Statement in the London Proceedings[1380]), Saud was asked when he was told about "New for Old". The best he could do was to say it was "*early on*": [1381]

> *Q. You don't give any date of your conversation with Uncle Suleiman or say what the occasion or place was of this conversation. If you look at paragraphs 26 to 29, see if you can give me the date of your conversation.*
>
> *A. Which one you want me to look at? 29 on the one on the right?*
>
> *Q. Read the page at {L1/7/8}. What date was it when you had a conversation that enabled you to understand this procedure exactly?*
>
> *A. This -- what date?*
>
> *Q. Yes, what date?*
>
> *A. This is early on, yani, I -- I don't remember as to date, yani, huh. But this is early on; the system that my uncle implemented."*

---

1378 **{G/2460/1}** <Ar> **{G/2458/1}** <Tr>
1379 Saud 2A **{L1/8/15} [53]**
1380 Saud London 3W **{L1/7/8}**, i.e. the first time on which "New for Old" is ever mentioned.
1381 Saud xx **{Day64/47:15} – {Day64/48:3}**

81. Mr. Quest's argument on "New for Old" is also inconsistent with the statement AHAB has sought to adduce from Badr. Badr suggests in his belated witness statement that he was told of the "New for Old" Policy after Abdulaziz had suffered his stroke, at a meeting attended by Suleiman and Saud in 2000.[1382] Badr also does not draw any distinction between the restriction of Al Sanea's borrowing authority (i.e. the Policy), and the production of documentation to Head Office so that it could be checked (i.e. the Protocol/ Procedure/ Process).

82. The case ultimately contended for by AHAB per Mr. Quest, of there being two phases to "New for Old": the "New for Old" Policy formulated and communicated in 2000; and the Protocol in 2002 or early 2003, is far more sophisticated than any of the versions of the story put forward by AHAB's witnesses, and is unsupported by any witness evidence or contemporaneous documentation.

**The formulation and implementation of "New for Old"**

83. The lack of specificity also bedevils AHAB's account of how "New for Old" was formulated and implemented.

84. As excerpted above from his witness statements,[1383] Saud seeks to suggest that "New for Old" was a system that Suleiman implemented without any discussion or input from him. This is inconsistent with what Badr suggests:[1384]

> "*16. In 2000, Abdulaziz suffered a serious stroke and stopped coming to the office because of his health.*
>
> *17. Around this time, I was asked to meet with Suleiman and Saud. They explained that they would like me to take on an additional role, reviewing*

---

1382 **{C1/40/12} [16]-[17]**

1383 See again **Saud 1W {C1/2/53} [254]-[258]** and **Saud 2A {L1/8/14} [49]–[51]**.

1384 See again **{C1/40/12-13} [16]-[18]**

> *loan documents for the Money Exchange before any loan document was signed.*
>
> *18. I was told that Mr. Al Sanea would send bank loan documents for me to check. I remember that they wanted me to compare any loan agreement to be signed (the "**new loan**") with the older version of that agreement (the "**old loan**"). I was asked to check that the old loan agreements had been signed by Abdulaziz or Suleiman".*

85. In the course of re-examination, Saud suggested that he first learned about the "New for Old" Policy verbally: [1385]

> *Q. Just so far as you remember, if no memos were sent by you or by your uncle, do you remember how you came to learn about the new for old policy?*
>
> *A. Verbally. Verbally.*
>
> *Q. From who?*
>
> *A. From uncle --*
>
> *Q. And do you know how --*
>
> *A. -- and Badr most likely later at some point, and Badr at some point as well."*

86. Had "New for Old" ever existed Saud would certainly not have learned about it first from Badr. One would expect that he would have heard about it directly from Suleiman, his uncle and fellow board member. In fact, Badr suggested, as excerpted from his statement above, that it was the other way around, and that he was told of the "New for Old" Policy at a meeting attended by Suleiman and Saud in 2000. Saud makes no mention of this meeting but sought in his evidence to give the impression that "New for Old" was something that his Uncle wanted to do, and instructed should be done exclusively as between himself, Badr and Al Sanea. For instance, when cross-examined in relation to a

1385 Saud xx **{Day67/79:8-16}**

number of facilities renewal documentation which showed contrary to "New for Old" Saud's direct involvement in the process, Saud's responses verged on incoherence:[1386]

*Q.* *This letter was found, as you can see from the reference in the bottom right-hand corner, in head office in one of the loan files that was produced on discovery.*

*A.* *Okay. Badr's or someone, okay.*

*Q.* *Mr Algosaibi, what I'm suggesting to you is that this letter would have gone to you, and by virtue of its terms we can see that you were intrinsically involved in the process of renewing facilities.*

*A.* *Yes, I mean, he's talking about some documentation which had to do with Uncle Suleiman's signatures, and to be -- this is what this -- what involvement? He -- even here doesn't suggest what you're suggesting. "I have enclosed the previous document signed".*

*Q.* *What Mr Al Sanea is asking you to do is to have the documents finalised at the earliest.*

*A.* *Yes, okay, "finalised" meaning signed or something which is a job for Badr.*

*Q.* *He's entrusting the job to you.*

*A.* *So what? I'm -- I'm not -- this -- this thing is – is between, er, er, the papers, the flow between Badr and my uncle. So he tells me, I say, "Okay, Badr, take some -- do the things that are mandated by Uncle." We follow Uncle instruction, we don't follow Maan's instruction. So Uncle instruction, basically, you know, 1 these get reviewed. I mean, they get received by Badr, and from Badr to Uncle. Simple. And I said in the statement many times over, I will just -- if Maan want to get me involved, I say, "No, you go to" -- huh -- "go to Uncle. Badr go to uncle."*

*Q.* *Mr Algosaibi, the only problem with that answer is that neither Mr Badr nor your uncle are mentioned by name in this letter.*

*A.* *You know --*

*Q.* *This is a letter sent by Mr Al Sanea to you.*

---

1386 Saud xx **{Day58/124:2} – {Day58/125:22}**

> *A.* *Yes, but it's not my job. My job is -- again and again and again. I'm in manufacturing. I'm assigned to manufacturing. This is not -- this is my business. This is something my uncle wanted to be done, old for new, and this is the process he established: Badr, Uncle. What my have to -- if Maan wants to get me involved in something, disobeying my uncle, I cannot do that, I cannot help Maan out. So the papers -- we should follow the chairman instruction, and this is the way he wanted. The papers, the new for old, they get two copies and they go to Uncle."*

87. The fact that Badr's account - that "New for Old" arose from a meeting he had with Saud and Suleiman - is so fundamentally inconsistent with Saud's account, means that it is improbable that either is true.

88. Such doubts about the origins and existence of "New for Old" are only reinforced by the fact that the contemporaneous documentation shows that Al Sanea would often send them to Saud to obtain Suleiman's signature.\

**Lack of written record**

89. It is not suggested by AHAB that either (1) the "New for Old" Policy; or (2) the Protocol, was recorded in writing. This is despite the fact that the definition of "protocol" imports a document or record.

90. There are no documents that record or refer to either the Policy or the Protocol. Saud does not suggest that there was ever any written communication to him that refers to them:[1387]

> *Q.* *Your uncle didn't send you a memo?*
>
> *A.* *Why he would? My uncle would send me a memo? I'm not his boss. He's the chairman of the board. He owns 33 per cent or more of the company. He's the chairman. He send me a memo?*

---

[1387] Saud xx **{Day64/48:4-8}**

91. Saud does not mention the date when Al Sanea was supposedly informed of the "New for Old" Policy (let alone the Protocol) but, the clear implication from his witness statements is that (if it took place at all) it was immediately following his father's stroke (so 2000 or 2001).[1388]

92. Saud was asked by Mr. Lowe on Day 64 how the "New for Old" Policy was communicated to Al Sanea and was again unpersuasive:[1389]

> Q. *You sent Al Sanea a memo, did you, yourself?*
>
> *A. Why would I send -- why would I send Maan a memo? If he had -- in -- in -- did this procedure then he did this procedure; and this is the practice we saw at the office.*

93. Saud was re-examined on this point by Mr. Quest:[1390]

> *Q. Do you know how the new for old policy was communicated to Mr Al Sanea?*
>
> *A. My understanding is that something, er -- not really, no, how that communicated to Al Sanea. At the time period I was with my father in America. But I -- I came to learn of it as -- as something he had done. He may have communicated that to Al Sanea directly and – and that could be the case. I don't know. The answer is I don't know.*
>
> *Q. You said, "I came" --*
>
> *A. You said how and -- in -- in the question as a note, is that what you're --*
>
> *Q. Yes, I asked you how the new for old policy was communicated to - -*
>
> *A. Probably they have a conversation over it.*

---

1388 See above and Saud 2A **{L1/8/14} [50]:** "*If anything, Mr Al Sanea's authority to borrow in the name of AHAB was curtailed when my Uncle Suleiman took over the responsibilities of Chairman of AHAB after my father suffered his stroke.*"

1389 Saud xx **{Day64/48:4-13}**

**1390** Saud xx **{Day67/79:17} – {Day67/80:8}**

> *CHIEF JUSTICE: It is speculation. He can't say, can he, from what he has said so far.*

94. It thus became clear that Saud simply cannot say when or how (or in what terms) the "New for Old" Policy (or Protocol) was communicated to Al Sanea, or even whether he was told about it at all.

95. That, in itself is significant. As Mr. Quest pointed out in his Opening, the relationships between the Algosaibis and Al Sanea were formal:[1391]

> *"The other thing I would ask your Lordship to note when you look at some of these documents is that there is a lot of formality when Al Sanea and the Algosaibis communicate with each other. When they want to discuss something, they write each other letters. One doesn't get a sense from reading this correspondence, or indeed from the witness evidence, that they were regularly meeting personally and socialising, and discussing things outside the formal context. It is quite a formal relationship. I say that because your Lordship I think can get an idea about the sort of contact they had with each other by looking at the letters. If things were discussed, they would have been in letters; if there were important things, they would have been in letters. If they are not in the letters, then they probably weren't discussed."*

96. On AHAB's own case, therefore, if limits upon Al Sanea's activities had been imposed we should expect to see it written down as it had previously been, according to Yousef, in the 1990s at an earlier turning point when restrictions on Al Sanea's borrowing powers were imposed "*after the death of my father* [Ahmad]",[1392] and at least some instruction given as to how it was to operate. As it is not written down, the probability is that it never existed.

---

1391 **{Day3/23:13} – {Day3/24:4}**

1392 See Yousef London 1W **{L1/11/4} [14] and [16]** – referring to a borrowing limit of SAR 300,000 which he states was imposed upon Al Sanea in the 1990s, requiring him to seek Partners' approval if he wished to borrow in excess of that amount. Importantly, Yousef there recalls that this was documented in writing, in a letter to Al Sanea at the time, yet he then made no mention of "New for Old".

97. It is important to bear in mind what *was* being written down around this time. In addition to the supposed introduction of "New for Old", Saud suggests that:[1393]

> *"…other controls were also sought to be imposed on Mr Al Sanea's borrowing by my uncle, with my assistance, from about 2001/2002. As appears from the board resolution dated 14 May 2001 signed by Mr Al Sanea and my uncle Suleiman[1394], at that time Uncle obtained Mr Al Sanea's agreement to repay SAR 400 million of his indebtedness to the Money Exchange by the end of the year and to give up control of certain facilities which had been granted to the Money Exchange by local Saudi banks".*

98. The fact that "New for Old" was <u>not</u> recorded in writing at the same time that these (parallel) proposals for repayment of debt were, speaks for itself and supports the Defendants' contention that there was no such thing as "New for Old".

99. Saud's evidence on "New for Old" is convoluted. According to his witness statement, Suleiman ought never to have even been asked to approve a facility involving an increase. Yet it is obvious from Saud's own statement that he was aware that facilities were increasing, and assumed that any increase was authorised.[1395] When confronted in cross-examination with documents signed by Suleiman which clearly referred to increases, his position changed and he suggested that "New for Old" could for example, factor in interest, and he assumed that Suleiman must have approved them:[1396]

> *Q. It is your case, is it, that your Uncle Suleiman would have authorised old for new or new for old because it included an element of interest? Is that correct?*

---

1393 Saud 1W **{C1/2/54} [260]**

1394 **{G/2460/1}** <Ar> **{G/2461.3/1}** <Tr>

1395 See, for example, Saud 1W **{C1/2/44} [205]-[208]**; Saud 1W **{C1/2/56} [269];** Saud 1W **{C1/2/61} [295]**; **{N/545/1}** **<u>N-2/03</u>** (Letter 13 May 2006, Saud to Al Sanea *"… Noticed that there has been an increase in ME facilities. Would like to know the rationale behind the increases and uses. If the intent not to use the increase facility and keep it as stand by, would like to suggest to allocate the increase to Algosaibi Head Office"*).

1396 Saud xx **Day 64/70:12-20**

> A. *No, my -- my knowledge, my knowledge that we had an old for new, this policy, that -- the old documents come with the new document to my uncle. Now, if there was an increase, my assumption is that they must have been approved by uncle, otherwise how come the increase would have happened?*

100. According to Saud's witness statements he ought not to have been involved in reviewing facilities, renewing them or obtaining new facilities. Yet, as shown above (and as already touched upon in this Judgment[1397]) the documentation found in Head Office files shows that Al Sanea engaged with him seeking his assistance in finalising documentation and in relation to obtaining facilities for the Money Exchange.[1398]

101. That involving the Arab Bank facility discussed above by reference to Saud's correspondence with Al Sanea provides a striking example of Saud's confusing position. As shown above, the correspondence shows Saud, far from condemning the proposed increase in facilities, proposing that "*If the intent not to use the increase [*for the Money Exchange*] would like to suggest allocate the increase to Algosaibi Head Office.*" [1399]

102. In re-examination, Saud was asked by Mr. Quest by reference to this facility how, as he understood it, the "New for Old" system would have worked.[1400] Saud's responses were unconvincing:[1401]

> A. *I mean, we have this old for new, that means matching documentation, old facility for a new facility. Now, if -- if there was one bank that -- let's suppose that was reduced or no longer we would have a facility with, then we would expect another bank to go up, maintaining the level. And -- and in this letter, from the context of this letter I'm asking Maan for the rationale, and if the bank have given -- extended the facility without*

---

1397 Under "AHAB Partners knowledge and authority"

1398 See for example: **{H3/51/1}** (Saud xx at **{Day58/121:18}** – **{Day58/125:22}**); **{H9/34/1}** (Saud xx at **{Day58/127:21}** – **{Day58/133:3}**); **{H9/44/1}** (Saud xx at **{Day58/133:4}** – **{Day58/134:12}**); **G/7761/1**, **G/7757/1** (Saud xx at **{Day59/43:16} –** {**Day59/47:23**}).

1399 **{N/545/1} N-2/03**

1400 Saud xx **Day67/75:15-17**

1401 Saud xx **Day67/75:18-76:22**

*insufficient purpose, I understand by -- to take it away from, basically, the Exchange to maintain the – the rule, the -- that we had.*

*CHIEF JUSTICE: I'm sorry, I didn't get that. To do what?*

*A. The rule that we had, old for new. Which is what I refer to, give it to the head office. If that's already given to the bank -- given by the bank.*

*MR. QUEST: I think the learned judge was saying that you ended your previous answer by saying, "If the bank had given the facility without insufficient purpose, I understand to take it away from the Exchange." He just wants to clarify that.*

*A. Yes, because we had the old for new policy, I mean, that was strict.*

*CHIEF JUSTICE: So you mean to bring it to the head office, rather than to disallow it?*

*A. No, I might -- we -- no, I -- in this context I may have had -- had some need of it for some other business, 2006. Maybe we had the Saudi reinsurance or something I was contemplating at the time and maybe that's what I was thinking of, or something else. I cannot recall at this time."*

103. This explanation suggests another hitherto unheard of exception to "New for Old"- the acceptance of facilities which, although obtained by Al Sanea in breach of "New for Old", provided only that they could be used for other AHAB purposes.

104. AHAB addresses this issue in its Written Closing Submissions[1402] without seeming to recognize the fundamental way in which Saud's explanation negates the very existence of "New for Old" itself.

**Dislike and distrust of Al Sanea**

105. AHAB's evidence suggests that there was an element of dislike of Al Sanea (expressed most strongly in these Proceedings by Yousef,[1403] although Saud also refers to the

---

[1402] **{D/4/229} [4.386]**

animosity between family members and Al Sanea[1404]). It is, however, a moot question as to whether or not the Algosaibi family (other than Abdulaziz) positively distrusted him:

(1) Yousef's evidence was that the opinion of the entire Algosaibi family was that Al Sanea was "*dishonest*"; "*not straightforward*"; "*difficult*"; "*clearly out of control*"; and someone "*you wouldn't have trusted … as far as you could throw him*";[1405] and

(2) Saud's evidence is that:

> "*We trusted him; we thought he was a decent fellow. We had our trust in him. He is my brother-in-law. My father trusted him*"[1406]
>
> "*Although many family members disliked Mr Al Sanea and did not want to have much to do with him, it did not mean that he was mistrusted to the extent that we thought him capable of acting against the family's interests.*" [1407]

106. Whatever else they thought, Yousef was "*unhappy that [Al Sanea] had been able to engineer a situation in which he was running a business in respect of which AHAB's managers did not have the same full oversight as they did of all our other businesses. My father* [*Ahmad*] *and my uncle Suleiman had strongly held views that were similar to mine, as did my brothers, and I believe that Mr. Hindi was also unhappy with the situation*".[1408]

107. The probability, against this backdrop, is that the Partners would have been sure to record the imposition of "New for Old" in writing. The fact that there is no such document, and

---

1403 Yousef 1W **{C1/3/18} [83]** *"I found him aggressive, highhanded and brash … My father and Uncle Suleiman disliked him for similar reasons, and were very critical of his tendency to flashy self-promotion"*.

1404 Saud 1W {**C1/2/5} [17]**

1405 Yousef xx **{Day31/1:10} – {Day31/16:22}** ff. See also Omar Saad xx **{Day89/46:12-15}**.*"I think that after Abdulaziz passed away they didn't have any trust [in Al Sanea]"*

1406 Saud xx **{Day49/29:21-24}** ff and Saud 1W **{C1/2/4} [15]** "*someone we trusted*".

1407 Saud 1W **{C1/2/5} [17]**

1408 Yousef 1W **{C1/3/18} [82]**

that AHAB does not even suggest that one was ever prepared, or provided to anyone, speaks volumes.

**Badr's evidence**

108. The Defendants deal incisively and comprehensively with the subject of Badr's evidence as well as in sections {E1/21/1-49} and {E1/6/39-52} of their Written Closing Submissions and I find myself in full agreement. Immediately following below, I will therefore largely adopt their submissions on Badr's evidence as part of my reasons for concluding that AHAB has failed to satisfy me that "New for Old" was real.

109. In my judgment on AHAB's Amendment Application of 12 June 2016,[1409] I expressed concern at the lack of direct evidence on the "New for Old" Policy,[1410] and at the circumstance that Badr, although alive and well, was not to be called as a witness because Saud *"does not regard him as a suitable or reliable witness"*.[1411] And so, when first dismissing AHAB's application to plead its manipulation case, I indicated:

> *"If the state of the evidence were to change, for instance by the adduction of direct evidence from a witness who had relevant knowledge of the putative "New for Old" policy and its workings and so could speak to the significance of the manipulated documents, I consider that the matter would be capable of being reconsidered".*[1412]

110. AHAB subsequently (and after cross-examination of all of the relevant factual witnesses had concluded) sought to adduce by way of a hearsay notice, a statement from Badr. In short, my conclusion is that Badr's statement is woefully deficient and unsatisfactory. It bears many signs of contrivance. So far as "New for Old" is concerned, Badr provides no

---

1409 **{W/33/1}**

1410 Apart from "*what, by any measure, must be regarded as the terse second-hand description of the "new for old" policy given by Saud Algosaibi*" **{W/33/7}** **[17]**.

1411 **{W/33/4}** **[8]**

1412 **{W/33/29}** **[45]**

answer to the concerns expressed by me, and his evidence at best takes matters no further forward, and at worst is positively inconsistent with the way in which AHAB now puts its case.

111. Badr's evidence, as excerpted from his witness statement is that:

(1) In around 2000 after Abdulaziz's stroke *"I was asked to meet with Suleiman and Saud. They explained that they would like me to take on an additional role, reviewing loan documents for the Money Exchange before any loan document was signed.*[1413] Saud does not refer to this meeting, and in his evidence as discussed above, distances himself from the "New for Old" Policy.[1414] He suggested in oral evidence that he learned of the "New for Old" Policy from Suleiman, and Badr:[1415] *"I was told that Al Sanea would send bank loan documents for me to check. I remember that they wanted me to compare any loan agreement to be signed … with the older version of that agreement. I was asked to check that the old agreements had been signed by Abdulaziz or Suleiman".*[1416]

(2) He would usually receive the loan documents in a sealed envelope. *"When I received the documents, I would open the envelope and check whether the amount of the new loan was the same amount as the old loan. I would also look to see if the old loan agreement had been signed by Abdulaziz or Suleiman."*[1417] "*I would take the documents to Suleiman, whether the new loan and old loan*

1413 Badr 1W **{C1/40/12} [16]–[17]**

1414 Saud 1W **{C1/2/54} [258]:** "*Occasionally, Badr would try to involve me in this process, but I was reluctant to be involved … I did not feel I could add anything useful to the process … On the occasions that Badr approached me with material from Mr Al Sanea, I would usually redirect him to my uncle unless I felt I could deal with the matter easily*".

1415 See above.

1416 Badr 1W **{C1/40/12} [18]**

1417 Badr 1W **{C1/40/13} [23]**

*amounts were the same or not*".[1418] "*Together Suleiman and I would review the signatures on the old loan documentation … I would also advise him if there was an increase in the amount of the new loan, or if it was the same as the limit in the old loan agreement*"[1419]. This is inconsistent with Saud's witness statement. In his witness statement Saud asserted that if the new agreement was not essentially the same as the old one (particularly the amount) Badr was told to reject it and return it to Al Sanea – without going to Suleiman.[1420] It was only if he considered the new agreement was effectively a like-for-like replacement of existing borrowing that Badr was to take it to Uncle Suleiman, explain its contents to him, and obtain his approval and signature. Saud changed his position in oral evidence[1421] to say that Suleiman may have approved increased facilities.

112. Neither story is consistent with Badr's statement: "*If there was an increase, Suleiman did not sign the new loan agreement. He would ask me to return it unsigned to Mr Al Sanea. Suleiman did not sign any new loan agreements that were for an increased amount*"[1422]. This is inconsistent with Saud's witness statement. According to Saud, Suleiman would not even see any loan agreements for increased amounts because Badr had been told to reject them out of hand.[1423]

113. Further, Badr's assertion that Suleiman did not sign any new loan agreements for an increased amount is revealed by the documentation to be plainly untrue: "*Sometimes,*

---

1418 Badr 1W **{C1/40/14} [24]**
1419 Badr 1W **{C1/40/14} [25]**
1420 Saud 1W **{C1/2/54} [257]**
1421 See above.
1422 Badr 1W **{C1/40/14} [26]**
1423 Saud 1W **{C1/2/54} [257]**

*before going to see Suleiman, I would visit Saud, if he was in the office, and show him the documents. I recall that sometimes, when the new loan was for an increased amount, I would confirm with Saud that the documents should be rejected and returned to Mr Al Sanea unsigned; I would do so without troubling Suleiman*"[1424]. "*If the new loan amount was the same as the old loan agreement, Saud would tell me that I could take them to Suleiman*".[1425] This evidence is both inconsistent with Saud's evidence, and internally inconsistent.

114. So far as Saud's evidence is concerned: First, he does not refer to the visits that Badr describes. Secondly, in so far as he says Badr occasionally tried to involve him, he says he was reluctant to be involved because he did not have a full picture.[1426] Therefore, the idea that Saud would take a decision on a loan without bothering Suleiman is inconsistent with Saud's version of events. Thirdly, whereas Badr's evidence suggests that Saud was the gatekeeper to Suleiman, Saud's evidence is that he would usually redirect Badr to Suleiman.

115. Badr's evidence is internally inconsistent in that it suggests (1) that he would take the documents to Suleiman whether the new loan and old loan amounts were the same amount or not; and then also (2) that he would confirm with Saud whether the documents should be taken to Suleiman or not: [1427]

> *"As I say, documents were returned unsigned to Mr Al Sanea if the new loan was for an increased amount. I recall that there were a number of times when shortly after the documents had been returned to Mr Al Sanea,*

---

[1424] Badr 1W **{C1/40/14} [28]**
[1425] Badr 1W **{C1/40/15} [29]**
[1426] Saud 1W **{C1/2/54} [258]**
[1427] Badr 1W **{C1/40/15} [32]**

> *Mohsin*[1428] *would deliver a new envelope to me containing the same loan documents. However, when the new documents were delivered, the amount of the new loan had been changed so that it was now the same amount on the old loan (i.e. the new loan was no longer for an increased amount)*".

116. This evidence appears to tilt at AHAB's manipulation argument (dealt with later in this Judgment). In summary, however, the Defendants make the following points which I accept:

(1) Badr fails to deal with, or even refer, to any of the documents that AHAB alleges were manipulated, or address the allegations at all.

(2) According to Badr, replacement documents were delivered "*shortly*" after the purportedly rejected documents had been returned.[1429] The clear implication is that he remembered the previous figures when looking at the replacement documentation.

(3) Badr says that it is the *new* loan amount that had been changed to match the old loan figure, so that the new agreement *"was no longer for an increased amount"*[1430] i.e. the new loan amount was reduced. This is, of course, the opposite way around to AHAB's manipulation case: on AHAB's case it is the old loan amount that is increased to match the new. And, as regards the forgery allegations, this makes no sense either because it implies that Suleiman would then have been induced to sign, thus avoiding any need to forge his signature.

(4) It is odd, to say the least, that there is no record of any documentation being returned for not having complied with "New for Old".

---

[1428] By one of Al Sanea's drivers from Saad Group Offices.

[1429] Badr 1W **{C1/40/15} [32]**

[1430] Badr 1W **{C1/40/15} [32]**

(5) Badr's evidence (or at least one version of it) is that he would take facilities to Saud and confirm whether they were to be taken to Suleiman or not. If this is correct, when the revised version was sent by Al Sanea back to Badr at AHAB H.O. with the new loan reduced to match the old, Saud would also have seen it. Saud does not mention this.

117. Badr also asserts: "*I did not have a system for making copies of the facility documents, though I may have kept some copies. I do not remember being asked to keep schedules of the documents or to keep track of the overall borrowing and I did not do so on any regular basis*".[1431]

(1) Badr cannot say one way or another whether he kept copies even though it is obvious from the documents - including those 16 sets that AHAB now relies upon from Badr's H.O. files - that he did.

(2) Badr cannot say one way or another whether he was *asked* to keep schedules of the documents, or to keep track of the overall borrowing. He says that he did not do so "*on any regular basis*".

118. Nowhere in his evidence does Badr refer to a single document relating to AHAB's "New for Old" case, or its manipulation case.[1432] He does not explain by reference to any documentation at all, how "New for Old" supposedly operated. Nor does he refer to the files he kept. He does not address the differences between his account, and Saud's evidence. Nor does he address AHAB's new case of a separate "New for Old" Policy imposed in 2000, and Protocol imposed at some point either in 2002 or early 2003

---

1431 **{C1/40/16} [34]**

1432 AHAB's manipulation case is dealt with in the next section of this Judgment.

(despite his statement post-dating by 8 months the introduction of this last iteration of "New for Old" in these Proceedings).

119. Even if taken at face value and at its (unhelpfully) superficial level, Badr's statement (a) contradicts Saud's evidence in material respects; (b) undermines AHAB's argument on manipulation (in that he does not suggest that he was deceived by any of the 16 documents AHAB relies upon); and (c) is inconsistent with AHAB's pleaded case.

120. AHAB's pleaded case is that Badr failed to act in accordance with the alleged "New for Old" Policy (not that he complied with it). AHAB also positively denies that Badr acted *bona fide* and (ironically in the circumstances) put the Defendants to strict proof if they wish to contend otherwise,[1433] and that remains AHAB's position.[1434]

121. At the same time, AHAB maintains that it did not know what Badr's state of mind was. In the course of his Opening, Mr. Quest put the position as follows in response to questions from the Court: [1435]

> *CHIEF JUSTICE: I think we can get to the heart of the issue by looking at the pleadings for a moment. I understand it's very important in this case whether or not there was a new-for-old policy. And as I understand it, it is important to the plaintiff's case that Badr was involved as part of the policy.*
>
> *MR. QUEST: Yes, that is certainly our belief.*

---

1433 AHAB's Re-Re-Re-Amended Reply and Defence to Counterclaim of the GT Defendants **{A1/15.1/21} [52B.5]**: "*52B.2 Badr's employment ceased when he resigned in or around May 2010 during investigations into Mr Al Sanea's fraud; 52B.3 upon the introduction of the policy set out at paragraph 99K of the Statement of Case (i.e. that pending sale or closure of the Money Exchange, there should be no increase in borrowing and any new facility should be limited to a rollover or refinancing of existing borrowing), Badr was instructed by AHAB to check any new facility against the existing borrowing of the Money Exchange to ensure that it complied with the "new for old" policy;*
*52B.4 Badr failed to act in accordance with the instructions set out at paragraph 52B.3 above;*
*52B.5 it is denied (if it is intended to aver) that Badr acted* bona fide *and the GT Defendants are put to proof of the same if it is to be contended at trial that Badr acted* bona fide*; …"*

1434 See further Section **{E1/21/}.**

1435 **{Day5/24:10} – {Day5/25:12}**

*CHIEF JUSTICE: Whether or not he acted bona fide in that context is what you are being put to take a position on. The pleading, as I just read it, seems to be suggesting that -- at least the GT defendants have asserted; I haven't read the defence fully -- that he was honest, that he acted bona fide. Your reply suggests that you do not accept that.*

*MR. QUEST: We do not accept that, no.*

*CHIEF JUSTICE: What is your position? Is it simply that you do not accept it, or you assert that he acted dishonestly?*

*MR. QUEST: We do not accept his honesty in relation to this process. We do say that the process was subverted by the use of these documents. We do not accept that he played an honest role in that. On the other hand, we do not know what his state of knowledge was of precisely whether these documents were forged or not. So we do not know whether the process was intended to deceive him or whether it was intended to provide him with something that he could put on the file to deceive others who looked at the file.*

122. Having had the opportunity to do so, it seems that AHAB has not asked Badr to comment on the manipulated documents, or indeed to comment on any documents at all, or respond to AHAB's allegation or concern that he was dishonest.

123. Whether Badr was honest or dishonest is, of course, critical. If he was honest, but careless and himself deceived by manipulated documents, then Al Sanea's risk was so much greater given that Badr could, at any point, stumble upon the truth. As we now know, Badr did keep some historic documents in his AHAB H.O. files. If Badr was dishonest then (given that Suleiman could not speak English), Al Sanea's alleged machinations (whether in relation to manipulation or forgery) make no sense whatsoever. With a dishonest Badr as his accomplice, there would have been no need to manipulate or forge documents. Badr would simply but fraudulently have assured Suleiman, the non-English speaker, that the loan documents (which were mainly if not all in English) were compliant with "New for Old". On AHAB's case as finally presented, this would hardly

have been difficult to do as "New for Old" would have come to allow significant increases to cover interest. Implicitly therefore, AHAB is seen as accepting that Badr must have been allowed the necessary discretion to put before Suleiman even facilities which showed increases.

124. Whilst Badr is, at least according to AHAB, the witness who ought to have relevant knowledge of the putative "New for Old" policy, he has been unable to explain it or its workings properly or at all, and is unable or unwilling to speak to any of the relevant documentation.[1436]

125. Badr resigned from AHAB in 2010, 6 years before this trial began. As important a witness as he would obviously become, no statement was apparently obtained from him at the time, or at least if it was, no copy was retained (whether prepared by the Investigation Team or AHAB's lawyers). In light of what is now known about Badr and his role as the interface between AHAB and the Money Exchange this is extraordinary.

126. Following Badr's departure and prior to trial, AHAB had 6 years to find Badr and produce a statement from him but did not do so. In the course of opening, Mr. Quest asserted that "*we don't have access to Badr, he is not giving evidence.*"[1437] That proved not to be the case in so far as a statement was obtained from Badr after my misgivings about his absence were expressed.

127. On 8 March 2017, AHAB announced unexpectedly that it had not only located Badr, but had also been able to obtain a witness statement from him. He was however, not to be

---

1436 See Judgment dated 31 August 2016 **{W/33/29} [45]**.
1437 **{Day5/22:1}**

available to testify in person and the only indication why not appeared at paragraph 4 of his statement:[1438]

> "*I have been asked by AHAB's lawyers to give my evidence in person. I am over 80 years old and, aside from not being willing to travel a long distance, I do not want the pressure of being asked questions about my job and role at AHAB. I have provided the information set out in this statement freely, which is as far as I am prepared to assist.*"

128. This explanation for Badr not being called to testify was deeply unsatisfactory. The reason he gives for not testifying (aside from travel which could be avoided by video-link) is that he "*does not want the pressure of being asked questions* ***about my job and role at AHAB***" (emphasis added).

129. This is an extra-ordinary statement which, if accepted by the Court, would be tantamount to the acceptance of evidence that a witness is uncomfortable about the veracity of his own account of the very subject-matter of his statement - in Badr's case, his job and role at AHAB.

130. Regrettably moreover, his statement does not address critical issues in the case as the Court was entitled to expect, given his central role as a senior officer of AHAB[1439] and the person to whose oversight "New for Old" was allegedly entrusted.

131. Recognising the force of the concerns about Badr's absence from the trial, AHAB in its Written Closing Submissions[1440] accepts that "*only limited weight can be put on Badr's evidence, given that he declined to attend for cross-examination and given AHAB's own reservations about his bona fides.*"

---

1438 **{C1/40/10} [4]**

1439 One of two (the other being Mr. Naim Fakhri) Assistant General Managers of Finance or Financial Controllers for AHAB and "co-ordinator" between AHAB and the Money Exchange; according to Mr. Fakhri in xx: **{Day 87/121:2-7}**.

1440 **{D/4/222} [4.372] – [4.380]**.

132. AHAB did not however, let the matter of Badr's evidence rest there.

133. As regards his refusal to testify, this is how the Court is invited by AHAB to view the matter:[1441]

> "*...it is perhaps unsurprising given his age (over 80) and location (Egypt) that he would not want the physical and mental pressure of being subject to a cross-examination within a foreign trial process, even if video arrangements could have been made to avoid lengthy travel*".

134. Despite his age, Badr's statement is presented as proof of his ability to recollect the "New for Old" policy several years after the events which he had left behind in Al Khobar. Indeed, there was no evidence to justify a suggestion that he was absent from the trial because of infirmity of mind or body. What is most surprising therefore, is the fact that AHAB, having refrained from pursuing a statement from him over the years but having done so when faced with the expressed concerns of the Court about his absence, could have failed to secure his attendance, either in person or by video link, to support its case.

135. This failure on AHAB's part became even more puzzling once it became known that despite AHAB's stated misgivings about Badr's allegiances and honesty, AHAB intended positively to rely upon Badr's statement as a truthful and reliable account of "New for Old".

136. AHAB addresses this conundrum in its Closing Submissions in the following, at times internally conflicting terms:[1442]

> *"(1) Badr was dismissed from service in 2010 at a time when there was a question mark having* [sic] *over him about his bona fides.*[1443] *Mr. Hayley's*

---

[1441] **{D/4/222} [4.372]**

[1442] **{D/4/222} [4.373]-[4.374]**

[1443] *See Saud 1/259 {C1/2/54}*

*impression of Badr was that he was Mr. Al Sanea's* "*eyes and ears in the Algosaibi Head Office*".[1444]

> *"121. I came to the conclusion that he was Mr Al Sanea's 'mole' in AHAB Head Office and would do his bidding. Essentially, he acted as the intermediary between Mr Al Sanea and the AHAB Head Office. I recall Mr Jamjoum telling me that Badr was in Mr Al Sanea's pocket. I know that Badr reported to Mr Al Sanea, and I saw him in Mr Al Sanea's office (at Saad) on a number of occasions. I recall on one occasion (post May 2009), Mohammed Hindi telling me 'We know Badr and Khaled Fawzi [Saud's secretary] are Mr. Al Sanea's informants."*[1445]

*(2)* *Mr Hayley was asked about Badr during his cross-examination. In accordance with this written evidence[1446], Mr Hayley explained that he had been in contact with Mr Badr from time to time over the years and went to see him from time to time in his office[1447]. Mr Hayley did not recall ever having discussed the details of any particular banking facility in English with Badr[1448]. The following day he was asked whether he considered that Badr was the sort of individual who would not action matters himself without approval from Saud. Mr Hayley considered that to be a fair observation of Badr's personality (at least as he perceived it)[1449]. Mr Hayley's oral evidence was consistent with his written evidence that he considered Badr's work at AHAB's Head Office to be "at a very low level"[1450] and that he viewed Badr as "unsophisitciated* [sic] *and singularly unimpressive", "ineffectual and timid" and "quietly spoken and scared of his own shadow"[1451].*

*(3)* *AHAB cannot be certain of Badr's bona fides, or otherwise. Rightly or wrongly, he was under suspicion, not least because he communicated with Mr Al Sanea on a regular basis, including in relation to administering the new for old policy. As a result of being the middle-man between Mr Al Sanea and AHAB in relation to the issue which was at the heart of the Money Exchange's collapse – its enormous borrowing - Mr Badr was viewed as being a potential mole.*

---

[1444] *Hayley/120 {C1/9/26}*
[1445] *Hayley/121 {C1/9/26}*
[1446] *Hayley/119 {C1/9/26}*
[1447] *{Day23/75:4-7}*
[1448] *{Day23/75:19-21}*
[1449] *{Day24/60:12-17}*
[1450] *Hayley/118 {C1/9/25}*
[1451] *Hayley {C1/9/26} [129]*

*(4) As we submitted in the oral opening submissions:* [1452]

> *"We do not accept [Badr's] honesty in relation to this process. We do say that the process was subverted by the use of these documents. We do not accept that he played an honest role in that. On the other hand, we do not know what his state of knowledge was of precisely whether these documents were forged or not. So we do not know whether the process was intended to deceive him or whether it was intended to provide him with something that he could put on the file to deceive others who looked at the file…. Ultimately, it really doesn't matter [to AHAB's case] because ultimately, what we see happening here is documents being created, which have the result of Suleiman signing renewal agreements on the basis of forged documents. Ultimately, exactly the part Badr played in that – whether it was totally honest or totally dishonest – doesn't really matter to our case."*

*4.374 Nevertheless, the Court can and should take into account Badr's statement as further evidence corroborating the existence of the new for old policy. It also includes additional and specific details which have not been mentioned previously; likely, this is because such details are known only to Badr and Mr Al Sanea.*"

137. Thus, on the crucially important issue of whether Badr's statement is a truthful and reliable account of "New for Old", AHAB invites the Court to accept that it is. However, on the equally important issue of whether Badr must have conspired with and assisted Al Sanea in the evasion of "New for Old", itself also a central theme of AHAB's case (for how else would Suleiman, when he did sign, have been persuaded to sign facilities for obvious increases in borrowing?) - AHAB has become agnostic.

138. AHAB blows both "hot and cold" at the same time, in effect leaving it to the Court to figure out for itself, the reason for what, on AHAB's case, must itself be a Damascene

---

[1452] *{Day5/25:3-21} - See also the exchange which followed the quoted passage {Day5/25:22} – {Day5/26:24} during which Mr Crystal QC contended tha* (sic) *paragraph 52B.5 of AHAB's Reply {Day5/26:10-13} was a pregnant averment of mala fides*

conversion on Badr's part – from the instrument of Al Sanea's fraud, to the now truthful and reliable proponent of "New for Old".

139. Moreover, it appears that AHAB has already been less than forthcoming about Badr's evidence. This appears not to have been the first witness statement to obtained from Badr:

(8) In AHAB's Hard Copy File List,[1453] AHAB's lawyers note that there was "*a hand written draft letter related to the Money Exchange facilities agreements in which Badruddin Badr states that the partners were not aware of any Money Exchange related facility agreement*" found in Saud's villa. The description then puts in brackets *"(Work Product)"*, suggesting it is clearly an unsigned draft.

(9) The Hard Copy File List also states that the draft is "*missing*". This must mean that the document was logged as having been in Saud's villa on or about 31 August 2010 but was not delivered to AHAB's lawyers on 18 October 2010 as required[1454] but had instead gone missing. It was not in Saud's villa in 2015 when last checks were made and Mr. Charlton did not know what had happened to it.

(10) No explanation has been given by AHAB as to why it has failed to find or disclose the statement: Saud was unable to offer any explanation as to how the file went missing:[1455]

*Q. ... I asked you why the document was missing.*

---

1453 **{H6/2}** – see Tab: "Saud's Villa".

1454 All as explained by Mr. Brett Walter in his statement **{L2/27/26}**, following on the Investigation Team's visit to Saud's villa on 31 August 2010 when this was among the many documents listed as having been found there. According to Mr. Walter, this should have been among documents delivered back to the AHAB H.O. building at the request of the Investigation Team for scanning. Documents from Saud's villa were not delivered for scanning until 18 October 2017: **{L2/27/27}**. This document was not among them.

1455 **{Day61/18:9-22}**

*CHIEF JUSTICE:* *Why the file is missing.*

*A.* *I don't know. I -- I said -- I don't know why (unclear). I answered that at the beginning and I try to --*

*MR. LOWE:* *I suggest to you you didn't want anybody to see that you couldn't get Badr to sign the statement.*

*A.* *No, that's not the case. Like I said, I have open file. We have -- we were -- yani, doing -- working at the same time out of the house, so papers -- like I said, they were going and -- yani and I was going, like I said, twice a week to Riyadh. Mind you, all the other things we were doing at the same time.*

(11) Since Mr. Charlton's evidence was that the documents were secure if they were held at his client's villa,[1456] the natural inference is that Saud retained custody of the document and that it was subsequently lost or destroyed.

140. As discussed above, there are a large number of matters that Badr's witness statement simply fails to address. Nor does he identify the documents that he was shown although it must be inferred that he was shown many of the documents, at the very least those relied upon by AHAB as evidencing "New for Old".

141. The irresistible inference is that his statement has been drafted with no intention of telling the whole truth. Its purpose seems to have been purely to give AHAB some evidential support for its "New for Old" case but otherwise to say no more than is necessary. This is wholly unsatisfactory as written evidence.

142. Given that (a) Badr's draft statement disappeared after it had been logged for disclosure and (b) AHAB has made no serious or earnest attempts to secure his attendance at trial there is a compelling general inference that his oral evidence under cross-examination

---

[1456] **{Day84/15:5-6}**

would have been deeply unhelpful to AHAB. Indeed, there would have been many other topics apart from "New for Old" upon which he might have been expected to testify, such as on the knowledge of the Partners and the disappearance of documents.[1457]

143. That this is the treatment advised by the case law is made good by the Defendants' Submissions:[1458]

> "*77. It is trite law that, in general, a Plaintiff seeking to bring a fraud claim should seek to prove the matters that form part of their claim by oral evidence at trial. While, as set out above, the probative value of that evidence may be very limited, it is nonetheless incumbent upon AHAB to provide evidence (particularly as to the Partners' knowledge) in order to support its case.*[[1459]]
>
> *78. However, it cannot seriously be disputed that, in a number of cases, AHAB's witnesses are silent on important topics or do not give evidence at all. In such circumstances, the first question for the Court is: what inferences, if any, may be drawn from such a failure?*
>
> *79. The starting point is that where a party either fails to call evidence from an important witness* *<u>or is silent</u>* *in the face of evidence presented by the other side, that failure may have the effect of converting that evidence into proof:*
>
>> "In our legal system generally, the silence of one party in face of the other party's evidence may convert that evidence into proof in relation to matters which are, or are likely to be, within the knowledge of the silent party and about which that party could be expected to give evidence. Thus, depending on the circumstances, a prima facie case may become a strong or even an overwhelming case. But, if the silent party's failure to give evidence (or to give the necessary evidence) can be credibly explained, even if not entirely justified, the effect of his silence in favour of the other party, may be either reduced or nullified."

---

1457 As discussed in more detail by the Defendants at **{E1/6/39-52}**.

1458 At **{E1/6/36}**. Indeed, the Defendants' Written Closing Submissions on the subject generally on the assessment of the AHAB witness testimony at **{E1/6/1-60}** and **{E1/4/1-33}** I have found to be very helpful.

1459 This is especially so in respect of AHAB's "New for Old" case, which it seems to accept, despite the alleged existence of a "Protocol", was not set out in any document.

R v Inland Revenue Comrs, Ex p TC Coombs & Co [1991] 2 AC 283 per Lord Lowry with the support of the rest of the committee at 300 {**R1/18.2**}. Approved in Prest v Petrodel Resources [2013] UKSC 23 [2013] 2 A.C. 415 per Lord Sumption JSC at paragraph 34 **{R1/44.5/73}**.

80. *Moreover, the ability of the court to draw an adverse inference from a party's silence extends not just to the failure to call a witness but to the failure of a witness (or witness statement) to address particular topics which the Court can legitimately expect the witness to address:*

> "From this line of authority I derive the following principles in the context of the present case:
> (1) In certain circumstances a court may be entitled to draw adverse inferences from the absence **or silence** of a witness who might be expected to have material evidence to give on an issue in an action.
> (2) If a court is willing to draw such inferences, they may go to strengthen the evidence adduced on that issue by the other party or to weaken the evidence, if any, adduced by the party who might reasonably have been expected to call the witness.
> (3) There must, however, have been some evidence, however weak, adduced by the former on the matter in question before the court is entitled to draw the desired inference: in other words, there must be a case to answer on that issue.
> (4) If the reason for the witness's absence or silence satisfies the court, then no such adverse inference may be drawn. If, on the other hand, there is some credible explanation given, even if it is not wholly satisfactory, the potentially detrimental effect of his/her absence or silence may be reduced or nullified." (Emphasis added.)
> Wiszniewski v Central Manchester HA [1998] P.I.Q.R. P324 per Brooke LJ (with whom Aldous and Roch LJJ agreed) at 340 **{R1/30.5}**

81. *Thus it is no answer for AHAB simply to point to the fact that their witnesses put in witness statements. The court is still entitled to draw adverse inferences if those witness statements are silent on important issues.*

82. *It is also no answer for AHAB (as it did with Mr Badr) to seek to put in a wholly inadequate document which fails to address*

*significant topics by way of a hearsay notice. As Brandon J (as he then was) famously said in <u>The Ferdinand Retzlaff [1972] 2 Lloyd's Rep 120 at 127 **{R1/9.2.0.1}**</u>:*

> "…matters of this importance, in a case of this kind, should be proved by oral evidence … I cannot think that the Civil Evidence Act 1968 was intended, in general, to change the long-established system by which seriously disputed central issues in civil cases are tried on oral evidence, given on oath and capable of being tested by cross-examination, and to substitute for it a system of trial on unsworn documents brought into existence by parties to the proceedings post litem mortam (sic), and I do not think the Act should be used, or rather abused, so as to produce such a result".

*83. This statement was affirmed in <u>Djibouti v Boreh</u> [2016] EWHC 405 (Comm) **{R1/59.2}** by Flaux J who stated:*

> "58 Furthermore, in circumstances where the issues in the case turn upon the credibility of the parties' respective principal witnesses, as they so clearly do in the present case, witness statements put in under hearsay notices pursuant to the Civil Evidence Act, as were the President's statements in the present case, are to a large extent evidentially worthless…
>
> 59 In any event, quite apart from that salutary warning about not abusing the trial process by reliance on hearsay statements, the actual witness statements served from the President are inadequate and simply fail to grapple with some of the most difficult issues in the case so far as the Republic is concerned.""

144. I refuse to accept Badr's evidence as presented on the basis that it has, especially in these circumstances where he could have been presented for cross-examination but was not and no acceptable reason has been offered why not.

145. AHAB's acceptance that "*only limited weight can be put on Badr's evidence*" is an understatement.

146. In the light also of all its many weaknesses identified by the Defendants as discussed above, I ascribe to it no weight whatsoever. Indeed, in the circumstances presented, it

does seem to me appropriate to draw adverse inferences against AHAB for its failure to call Badr to give evidence, in particular that Badr's evidence would very probably have been unsupportive not only of AHAB's "New for Old" case but of other important issues on its case, such as the Partners' knowledge and authority, generally.

**"New for Old": incompatible with events after Suleiman's death**

147. Despite the suggestion that Saud was aware of "New for Old" and assumed that it was operating effectively during Suleiman's lifetime, curiously he does not address in his witness statements the question of what happened after Suleiman's death. Mr. Quest in Opening, suggested that Al Sanea adopted a quite deliberate strategy to ensure that Saud would not sign documents after Suleiman's time, and that Dawood would be asked to sign them.[1460]

148. Saud's evidence is marked by his attempt to distance himself from the day-to-day operations (both before and after Suleiman's death), and seeks to emphasise his unwillingness to have engaged with Badr on the subject.[1461] Yet when confronted in cross-examination with various facility agreements signed by him in February/ March 2009 for large amounts of money, his default position (whilst denying any recollection of the facilities concerned) is that if it was part of the "*old for new policy*" he might have done so "*following the practice*"[1462]. He also said in response to cross-examination:[1463]

> *Q. It's clear, isn't it, that by the end of March 2009, you have signed off personally in connection with billions and billions of riyals of*

1460 **{Day6/74:19}-{ Day6/76:9}**

1461 See for instance **{Day58/124:2}-{Day58/125:22}** as excerpted above.

1462 **{Day50/104:11-16}**, as part of cross-examination in relation to Ahli United Bank which was covered **{Day50/74:23}-{Day50/78:19**; **{Day50/101:12}-{Day50/105:7}**.

1463 **{Day50/111:14}-{Day50/112:3}**

*facilities that had been advanced, or are to be advanced, by a variety of banks to AHAB, the Money Exchange and ATS?*

*A. You showed me, sir, some documentations which showed Dawood's signature, some my signature, and apparently that there is -- they are facilities agreement. And they speak for themselves. We -- after my Uncle Suleiman died, we wanted to make sure, you know, that the same -- what was done during my uncle's time, that we followed in regard to old for new. Was this part of this? Are these real, not real? Er, er -- yes, there are -- and I see numbers here and I don't argue with that.*

149. Oddly, he had never before mentioned being actively involved in "*the practice*" (whether before or after Suleiman's death) in his various affirmations and witness statements.

150. Badr suggests that when Suleiman passed away:[1464]

> *"Saud informed me that Dawood would replace his father and that Dawood was to sign the new loan agreements.* ***I attended a meeting with Saud and Dawood in Saud's office when I was given these instructions. I was told that the same process was to be followed****.*
>
> *As had been done with Suleiman, I would advise Dawood if the new loan was for the same or an increased amount as the old loan. If it was for an increased amount, he did not sign, but if the amount was the same (or lower) he would sign."* (Emphasis added.)

151. Neither Saud nor Dawood refers to any such meeting in their statements. The suggestion that it was Saud's and not Al Sanea's suggestion that Dawood sign documents is, of course, inconsistent with AHAB's case. Dawood did not refer at any point during his written or oral evidence to the alleged "New for Old" Policy. Indeed, AHAB's position in relation to the facility documents signed by Dawood is that, notwithstanding Dawood's signatures being on the documents, he "*had no knowledge of this borrowing".*[1465]

---

1464 Badr 1W **{C1/40/17} [38]-[39]**

1465 As explained by Mr. Quest to the Court during cross-examination of Dawood **{Day78/92:13}-{Day78/93:19}** and described by the Court as "*becoming surreal*".

152. This is despite Dawood having signed SAR 10.7bn (US$2.8bn) of facilities (which included increases in facilities made available to AHAB). There is no documentation suggesting that anything like "New for Old" was applied to facilities after Suleiman's death. Yet these (being the most recent documents) might be expected to be those most likely to have survived in Head Office, and to be disclosed on discovery. None of the documents relied upon by AHAB as supporting "New for Old" post-date Suleiman's death.[1466] The absence of any such documentation is remarkable.

153. Given that Suleiman only died in February 2009, one might have thought that when things collapsed just three months later, both Saud and Dawood would have been keen to understand what had gone wrong; to explain "New for Old" to Mr. Charlton; to show him the relevant documents; and then present that evidence to the Court. They did not do so.

**"New for Old": not fit for purpose in any event**

154. "New for Old" could not have worked, as contended for by AHAB. "Like-for-like" facilities would never have been enough, as (at the very least) interest on existing borrowing would need to be paid with new borrowing. As Saud was compelled to accept, AHAB's requirement for funding was inevitably going to increase (as indeed it did, as we have seen).

(1) In the course of cross-examination by Mr. Smith, it having been acknowledged that significant increases were known to AHAB, he resorted to the notion of interest as the explanation for the first time:[1467]

*Q. How could this increase occur, given your assertion that there was a new for old policy?*

---

[1466] **{T/216.3/1}**

[1467] {**Day59/9:4-16**}

*A.* *Okay. We -- we have reached, you know, an agreement with Maan after that, you know, the papers you showed me yesterday for Maan to repay his debt, and we believe that he repay his debt. Now, over the years, as these papers came to -- to my uncle, the -- there must be at times, er, where he -- he may have allowed some interest to accumulate to increase or one bank for another, and that was my understanding of the old for new, for he always wanted to see the old one and the new one, as -- as he many times told me that this is the practice he did.*

(2) In the course of cross-examination by Mr. Lowe he said:[1468]

*A.* *Yes. I mean the -- the -- I can't, yani, I don't know what exactly the -- the -- the -- as the rules set by my uncle, you know, old for new and he may have allowed for some interest as a result, yes.*

*Q.* *Old for new now includes interest, does it?*

*A.* *So -- so -- so I assumed that this borrowing was authorised, not -- until we discovered all these forgeries, we were shocked.*

*Q.* *Old for new, or new for old as we know it, includes interest for borrowing, does it, for existing borrowing?*

*A.* *Well, I -- my -- my understanding, that if there was an increase it must have been approved by my uncle.*

*Q.* *You just said a moment ago -- can we look at {Day59/17:14} of the transcript, which is Mr Crystal asking you questions. Line 14: "Question: Let me get this right, Mr Algosaibi: you are suggesting that this increase was authorised by Uncle Suleiman; is that right? "Answer: I'm not suggesting anything. But I'm -- I'm just explaining, er, er, the old for new policy, yani. All these borrowings, I mean borrowing, I mean old papers, new papers, goes to my uncle. If he have allowed for some minor increase because of the interest then that be it. Yani."*

*A.* *Yes, this is what I just told you.*

*Q.* *Sorry?*

*A.* *This is what I just said.*

---

1468 **{Day64/69:10}-{Day64/71:7}**

*Q.* *It is your case, is it, that your Uncle Suleiman would have authorised old for new or new for old because it included an element of interest? Is that correct?*

*A.* *No, my -- my knowledge, my knowledge that we had an old for new, this policy, that -- the old documents come with the new document to my uncle. Now, if there was an increase, my assumption is that they must have been approved by uncle, otherwise how come the increase would have happened?*

*Q.* *If you are paying interest and you have to pay interest with borrowing --*

*A.* *Yes.*

*Q.* *-- you have to make new borrowing, increased borrowing, at the beginning of the year in order to have the money to pay the interest, don't you?*

*A.* *Er, yes, and we had large dividends that came from the stocks. Huh? So -- so -- yes, so there is interest, there is the operation -- there is the Money Exchange operation itself and I don't know how much it was making or not making and we have the dividends of the -- of the share portfolio itself.*

155. Of course, that reference to dividends although aimed at explaining that it was used in part to pay interest on the borrowing, Saud must have known was untrue: as we have seen, the Partners almost invariably took the dividends.

156. When pressed, AHAB is unable to explain how the "New for Old" Policy could be effective at all, given that it was so obviously and fundamentally flawed. This is illustrated by the following exchange in the course of AHAB's Amendment Application:[1469]

*CHIEF JUSTICE:*
*Is therefore another inference that you would invite me to draw, taking this view of not just the particular documents you compare*

[1469] **{Day27/74:23}-{Day27/75:21}** and **{Day27/78:2}-{Day27/79:11}**

*but other relevant documents forming part of the context, which is that Suleiman and Badr, and anybody else at head office who may have been responsible, were not in the habit of checking the history of transactions? They never bothered to go back any further than the exact documents being placed before them at any given point in time.*

*MR. QUEST:*

*Well, it seems not. The process that has been described by Saud as being the new for old process is a process of producing an expiring document and a new document. This was a business, the evidence is, that was essentially run by Mr Al Sanea. He was the managing director. The oversight, it is said, on the evidence that Suleiman had in the business, was extremely limited, and it was limited to the new for old process. So Mr Al Sanea was essentially left, at least during the 2000s, to manage the facilities himself, subject only to producing from time to time an expiring and a new facility, which obviously was thought -- and that was the purpose of the process -- to be the limit on what he was doing. .....*

*Your Lordship raised the point about, couldn't someone have kept a record in AHAB of the progress of the facilities.*

*CHIEF JUSTICE:*

*Well, you would expect that, wouldn't you?*

*MR. QUEST:*

*With hindsight, that might have been a more efficient thing to do. Of course, we don't see that. In fact, the process of new for old actually is a different kind of process because if you kept a record -- if you decided that the way in which you were going to keep tracks on Mr Al Sanea was to keep a careful record all along, you wouldn't need new for old, because you wouldn't need to be presented with the old agreement and the new agreement because you would know what the old position was. The very fact that the system was set up, obviously in hindsight it was not a very effective system, obviously with hindsight it would have been better to --*

*CHIEF JUSTICE:*

*That's an understatement.*

*MR. QUEST:*

*Absolutely. Obviously, with hindsight, knowing of the massive fraud that was committed, of course a great deal more could and perhaps even should have been done to keep Mr Al Sanea in control. But the system that for whatever reason was imposed on him was, one can see with hindsight, a rather ineffectual one*

> *because it relied only on being able to show two documents the same and, as we see, it turned out that was a system that was very easy to circumvent.*

*CHIEF JUSTICE:*

> *I suppose another way of putting the concern is that there is very little evidence about the system. It is all a matter of inference, based on the documents which you have identified. But a further aspect of it which I'm going to have to infer is what we are now discussing, which is that they never bothered to check the historical documents. And I must assume that they existed.*

157. In fact, the increase in facilities was obvious. For example, it is alleged that Al Sanea forged signatures on SAMBA facilities dated 13 February 2005, and 14 December 2005[1470] presumably in order to defeat "New for Old" and deceive the Partners. Yet Saud was a director of SAMBA from 2003, and was (for example) required to complete returns disclosing AHAB's borrowing,[1471] and would be notified when AHAB's borrowing was to be discussed at Board Meetings. In particular, a document itemising the elements of the increase between the 2004 and 2005 facility level was found in H.O. Files.[1472]

158. More generally, there was in fact a record of facilities kept by Badr, at least up until 31 December 2001 when we see him writing to Saud in manuscript in the form of a spread sheet setting out facilities from 21 local and foreign banks which were "*upon your approval, signed by Mr Abu-Dawood* [Suleiman]"[1473]. This document shows Badr keeping track of the facilities by noting increases and decreases. It is the kind of document one would expect to have been maintained scrupulously and specifically for

---

1470 Facility dated 13 February 2005: **{G/4545/1}**; Promissory Note in the sum of SAR 75,000,000: **{G/4546/1}**; Facility dated 14 December 2005: **{G/5038/1}**.

1471 See for example **{G/3688/1}** (Saud xx at **{Day43/5:17**–**{Day43/10:15}**).

1472 **{H22/96/1}** <Ar> **{H22/97/1** <Tr> (Saud xx at **{Day59/55:9-57:19}**).

1473 **{H9/3/4}** <Ar> **{H9/4/4}** <Tr>

the oversight of "New for Old", had it existed.

159. Of course, even on AHAB's own case Saud was aware that the borrowings of the Money Exchange were increasing (and therefore that "New for Old" was clearly not working – if it ever existed), and (on one version of his evidence) was *"uncomfortable"* about it.[1474] At any time, Saud could reasonably have been expected to raise this with Suleiman who was - after all - apparently *"not a natural businessman, and he did not have the commercial energy or acumen of my father"* and was *"cautious in business"*.[1475] If Saud is confident that it would have been *"entirely out of character for [Suleiman] to have engaged in financial activity of the magnitude that took place at the Money Exchange, ATS and TIBC"*, and Saud had *"no doubt at all that he would have wanted to consult me and other AHAB partners and members of the AHAB head office staff about it …"*,[1476] Al Sanea risked discovery at any moment.

**"New for Old": unnecessary if Saud believed that Al Sanea had repaid his indebtedness**

160. According to Saud's evidence in these Proceedings:[1477]

> *"In addition to the "new for old" regime, other controls were also sought to be imposed on Mr Al Sanea's borrowing by my uncle, with my assistance, from about 2001/2002. As appears from the board resolution dated 14 May 2001 signed by Mr Al Sanea and my uncle Suleiman ..., at that time Uncle obtained Mr Al Sanea's agreement to repay SAR 400 million of his indebtedness to the Money Exchange by the end of the year and to give up control of certain facilities which had been granted to the Money Exchange by local Saudi banks. Mr Al Sanea broke that agreement, and in April 2002 we made a further attempt to get him to honour it…*

---

1474 Saud 2A **{L1/8/15} [52].**

1475 Saud 1W **{C1/2/9} [37].**

1476 Saud 1W **{C1/2/9} [37]**

1477 Saud 1W **{C1/2/54} [260]; {C1/2/55} [263]**.

> *It was also my understanding that Mr Al Sanea was repaying money borrowed from the Money Exchange. I was told (by Mr Al Sanea, but also I believe by Badr) that Mr Al Sanea had made repayments of his indebtedness, which I took to confirm my understanding. I did not check that he had, but I had no reason to doubt that what I was told was true at the time."*[1478]

161. Repayment of Al Sanea's debt and "New for Old" were therefore linked, according to Saud. Further, according to him:[1479]

> *"As to Mr Al Sanea's borrowing from the Money Exchange, I must accept that at least in 2001/2002 I was aware of the amount*[[1480]]*, and that I believed it to be in the region of SAR 4 billion (gross), albeit that I subsequently forgot this (i.e. that the amount was somewhat in excess of US$ 1 billion, not SAR 1 billion). As I have explained above, I was subsequently told by Mr Al Sanea himself – some time, I believe, before my father died in May 2003 – that he had repaid his borrowing to the Money Exchange….*
>
> *Mr Al Sanea subsequently told me (as I recall, sometime before my father died in 2003) that he had repaid his borrowing. I recall that Badr showed Suleiman a receipt to confirm that Mr Al Sanea had paid money in to a Money Exchange account at SAMBA, repaying his debt. Uncle Suleiman then told Badr to take the receipt and show me, which he did."*

162. In cross-examination, Saud's evidence was remarkably inconsistent.[1481] So, for example, for the first time he suggested that it was Suleiman who told him that Al Sanea had repaid his debt.[1482]

163. Given the lateness with which this piece of evidence was introduced and Saud's confused testimony about it, I do not accept either that Al Sanea paid his debt, or that Saud ever thought that he had done so. The sheer implausibility of this account of a misplaced

---

1478 Saud goes on to say "*I have come now to understand that Badr's statements were not accurate (or if they were accurate at particular times, they represented a temporary payment of debts as a kind of window-dressing, with the debts simply going back up when the payments were reversed.*" Saud 1W **{C1/2/55} [263]**. Badr does not refer to any repayment by Al Sanea, or deal with Saud's allegations in his witness statement.

1479 Saud 1W **{C1/2/58} [277]; [278]**.

1480 As revealed by Saud's Calculations discovered in the N Files: **{N/744}**; **{N/745}**.

1481 See generally Saud xx at **{Day65/18:1}** - **{Day65/37:17}**.

1482 Saud xx **{Day65/38:25} - {Day65/40:23}**

receipt for the payment of some SAR 4.4bn into the AHAB SAMBA account, is revealed by the following exchanges in Saud's cross-examination:[1483]

> *Q. Then you go on to say -- and this is entirely new: "I recall that Badr showed Suleiman a receipt to confirm that Mr Al Sanea had paid money in to a Money Exchange account at SAMBA, repaying his debt. Uncle Suleiman then told Badr to take the receipt and show me, which he did." Where is that receipt?*
>
> *A. I don't know. I don't know.*
>
> *Q. What do you mean you don't know? You are one of the plaintiffs and it is not disclosed and you are here referring to a document. Where on earth is it?*
>
> *A. I don't know. You know, he showed me some piece of paper, huh, as he was standing and I went to uncle after it.*
>
> *Q. This the first time in 15 years that you have made any mention of a receipt in any document relating to this conversation.*
>
> *A. This is --*
>
> *Q. How did you remember the receipt so suddenly? You don't seem to remember the details of when and where these conversations took place. How did you remember a receipt?*
>
> *A. I -- I remember a -- a piece -- a small piece of paper, that's what I remember, that -- that Badr held in his hand. That's what I remember.*
>
> *Q. Who was it signed by?*
>
> *A. I did not really look at it, er --*
>
> *Q. It wasn't a receipt signed by Maan, was it, it would have been a receipt signed by Uncle Suleiman, presumably?*
>
> *A. I -- I really don't remember what was in it."*

164. That account is simply incredible. The repayment at once of Al Sanea's massive

---

[1483] Saud xx **{Day65/34:5}-{Day65/35:11}**

indebtedness would have been nothing less than salvation for AHAB. If Saud had really thought that Al Sanea had repaid his debt by the time of his father's death in 2003, "New for Old" would have been wholly unnecessary. Any need for the Money Exchange to require any further significant borrowing, let alone from SAMBA,[1484] would have been inexplicable. Saud cannot sensibly at one and the same time aver that he thought that Al Sanea had repaid his debts, and that the money was used to repay SAMBA, one of the biggest lenders, while accepting that he knew of increased borrowings (and while assuming they were approved by his uncle), and yet still maintain that "New for Old" applied. With something in the order of half of the Money Exchange's liabilities eliminated, the objective thereafter would surely not simply have been to replace old borrowing with new borrowing of equal amount (with increases to cover interest) but a commensurate overall reduction in borrowing from then on.

**The documents relied upon by AHAB in arguments as evidence of "New for Old"**

165. Mr. Quest in his Oral Opening suggested that *"there is ample contemporaneous documentation to show this procedure in action"*.[1485] This has simply been shown to be wrong. AHAB has produced a list of just 47 documents which are said to support the alleged "New for Old" policy.[1486] In my view, none of these documents articulates any "New for Old" policy.

166. In the context of the discovery exercise undertaken in this case which involved in the region of 2.3 million documents, to belatedly list just 47 documents that supposedly support what AHAB maintains is a key plank of its case is in itself revealing of its

[1484] Which already held many if not all of AHAB's SAMBA shares as security.
[1485] **{Day3/39:12-13}**
[1486] **{T/216.3/1}** and also at **{X1/1/1}**.

dubious existence. This is all the more so when set against the overwhelming volume of documents that are inconsistent with any concept of "New for Old" and which establish both (1) increased borrowing on the part of AHAB; the Money Exchange and the Financial Businesses; and (2) the Algosaibis' knowledge of and participation in that borrowing.[1487]

167. Not one of AHAB's witnesses referred to or relied upon any of these documents. Nor were they taken to them in examination in chief. Further, Badr (the supposed interface essential to "New for Old") whose evidence was submitted months after the documents were uploaded (by the AwalCos) to Magnum, as already noted did not suggest that any of these documents had any relevance.[1488] Unhelpfully, he did not in fact, refer to a single document. My conclusion is that the documents do not support AHAB's case.

168. Following is my overview of these 47 documents, assisted by the Defendants' helpful examination. I also comment on AHAB's submissions (or lack thereof) on these documents respectively in context.

169. AHAB relies on three documents dated in 2001[1489] that could not possibly support "New for Old" given that the "Protocol" upon which AHAB now relies, at its earliest took effect in 2002, if it existed at all.

170. In some instances, the documents listed simply reflect a facility that is being renewed

---

[1487] See in particular Section 1 "Knowledge of the AHAB Partners of the Fraud Upon the Banks and of the Extent of the Bank Borrowings".

[1488] **{H2/18/1}**; **{H3/214/1}**; **{H3/53/1}**; **{H2/54/1}**; **{H2/134/1}**; **{H2/161/1}** appear on the List of Documents at **{T/216.3/1},** and are referred to by Mr. Nawwaf Hamad (an accountant employed at AHAB H.O.) in his second witness statement **{C1/8.1/7} [6]** where he merely confirms that he recognizes Badr's handwriting on these documents. Contrary to Saud's accounts of "New for Old" Badr's handwriting on one of these documents **{H2/161/1}** show Saud's involvement as approving new facilities and another shows Saud being informed by Al Sanea about other new facilities **{H3/53/1}**.

[1489] **{H2/18/1}** (dated 13 August 2001); **{H2/22/1}** (dated 18 September 2001); **{H9/3/1}** (a list of AHAB loans in Arabic manuscript, dated 31 December 2001).

either at the same or at a lower level. The fact that there are renewals in and of itself is entirely neutral as to whether or not there is a "New for Old" Policy or Protocol, and certainly does not demonstrate that there was either. Even while including these documents in its list of 47, AHAB makes no reference to them in its Written Closing submissions[1490].

171. In other cases the documents reflect *increases* in facilities. This is entirely inconsistent with there being any "New for Old" Policy. So, for example:

(1) SAMBA: One of the documents relied upon by AHAB relates to the renewal of a SAMBA facility and "*so comprehensively explodes AHAB's case that it is quite difficult to understand how, in the interests of self-preservation, it made its way into AHAB's list at all*"[1491]. This document is an Addendum to the Credit Agreement dated 14 December 2005 dated 13 January 2007[1492] relating to facilities totalling SAR 1,488,880,000. A manuscript note dated 26 January 2008 translates as "*Renewal was done on 26/01/2008 for the amount of 1,414,110 Saudi Riyals*".[1493] At first blush, this looks like a reduction, and AHAB has therefore assumed it to be consistent with "New for Old". However, in doing so it has ignored the critical fact that according to documents found on AHAB's own files, during the period "New for Old" supposedly operated, borrowing from SAMBA significantly increased, as demonstrated by the following:

---

1490 **{D/4/235} [4.402]-[4.458]**.

1491 Mr. Smith in Opening Submissions **{Day19/64:24}-{Day19/65:4}**.

1492 **{H2/120/1}**, with a translation of the Arabic handwriting at **{H2/120.1}**.

1493 It is assumed that this must mean SAR 1,414,110,000.

(a) By an agreement dated 21 December 2003,[1494] AHAB obtained facilities totalling SAR 889m from SAMBA; and

(b) According to a list of "*Exchange Facilities with SAMBA*"[1495] borrowing had increased to SAR 964m in 2004 and was SAR 1,414m in 2005.

The fact that that borrowing then increased to SAR 1,488,880,000 in 2007, and then returned to SAR 1,414m in 2008 does not make this document[1496] consistent with AHAB's "New for Old" case. On the contrary, the pattern of borrowing with SAMBA is entirely inconsistent with any such notion. AHAB offered no response to these criticisms either.[1497]

(2) National Commercial Bank: AHAB relies upon eight documents relating to National Commercial Bank.

(a) Four relate to the increase of the facility from SAR 893m to SAR 927m.[1498] In particular, Al Sanea wrote to Saud on 1 May 2002 even while stating that increased borrowings to be obtained from other local banks will be used to repay earlier loans "*which will also keep our overall exposure to the banks at the same level as before*" he goes on expressly to point out that the result will be an overall large increase of circa SAR 600m or SAR 800m.[1499] And so, whilst the letter refers to a reduction in facilities with various other banks (upon which Mr. Quest relies), it is

---

1494 **{H21/50/1}**
1495 **{H22/97/1}**
1496 **{H2/120/1}**; **{H2/133/1}**.
1497 **{D/4/235} [4.402]-[4.458]**.
1498 **{H9/44/1}**; **{H3/14/1}** <Ar> **{H3/14.1/1}** <Tr>; **{H9/45/1}**; **{H3/214/1}** <Ar> **{H3/214.1}** <Tr>
1499 **{H9/45/1}**; **{G/2844.1/1}**. AHAB also includes as a separate item **{H9/44/1}** which is simply the covering letter for this document when Al Sanea sent a copy to Badr.

clear that the repayment in those respects was at the request of the banks (and not the Money Exchange or the Partners), and that replacement finance was being obtained. Further, the second page of the letter refers to five banks prepared to provide additional facilities of SAR 300m to SAR 400m each. A guarantee in the increased sum of SAR 927m was later signed.[1500] It is also clear (from a document at Head Office) that the guarantee increased to SAR 979m on "*16 August*".[1501]

(b) AHAB also relies upon the Credit Facilities Agreement dated 1 October 2005, which reflects a further increase in credit facilities to SAR 1,062,250,000.[1502]

172. AHAB includes these documents in its schedule of documents in support of its "New for Old" argument. According to AHAB's Written Closing submissions:[1503] here "*Mr Al Sanea was highlighting the reduction in other facilities as the justification for the increase in the NCB facility. There would be no reason for him to do this and to add the [that he looked forward to receiving Saud's positive response to the proposal] if he was not operating under restrictions imposed on the level of borrowing by the Algosaibis*". This is merely selective reliance upon two phrases of the document while seeking to ignore the rest of its import, which is that further borrowing of SAR 800m was being proposed for the Money Exchange's "*hedging strategy going forward*". Far from relying on these documents in support of "New for Old", in the course of cross-examination,

---

1500 **{H2/14/1}**
1501 **{H2/14.1/1** being the translation of Arabic handwriting on **{H2/14/1}**.
1502 **{H2/71/1}** <Ar> **{H2/71.1/1}** <Tr>
1503 **{D/4/237} [4.407]**

Saud feigned ignorance of them:[1504]

> *Q. At {H9/44/1}, this is again from the same file as the document we saw previously.*
>
> *A. Yes.*
>
> *Q. You see it's a letter that's not signed, but it has Mr Al Sanea's name at the bottom.*
>
> *A. Yes, sir.*
>
> *Q. It is addressed to Mr Badr.*
>
> *A. Okay.*
>
> *Q. It says: "I am enclosing herewith a copy of the letter sent to Mr Saud Algosaibi, please coordinate with Mr Saud and finalise the documentation for NCB."*
>
> *A. Okay.*
>
> *Q. "Thank you for your assistance regarding this matter."*
>
> *A. Okay. Yes, sir.*
>
> *Q. We don't have the letter sent to you; we haven't been able to identify that. But clearly you are the prime mover in this.*
>
> *A. Yani, I -- I -- how many times I say it? Yani, I don't know what -- where it come from or -- 2002, my father is there. Maan -- did Badr says, "Okay, talk to Saud"? Listen, I'm not going to talk -- ah, yani -- to move papers. And I don't know what -- I -- most of the time I was with my father, get busy and following the things I -- best I can to follow. If Maan Al Sanea wanted me to -- to help move some paper, er, er, yani, he can do it without talking to me, yani, he talk to my uncle and that's it. So if Badr is -- is it Badr and his -- Badr wanted to do this, to come through me, Badr -- yani, Badr reported to many people at the time. Er, er, he did work for multiple persons. Er, er, so I -- yani, I cannot say more than what's in my statement and what I'm trying to explain to you".*

---

[1504] **{Day58/133:4}-{Day58/134:12}** xx of Saud on letter from Al Sanea to Saud dated 4 April 2002 (unsigned copy) **{H9/44/1}**. Also **{Day56/42:13}-{Day56/44:25}** xx of Saud on letter from Al Sanea to Saud dated 1 May 2002: **{H9/45/1}**.

173. As AHAB also recognized in its Written Closing submissions,[1505] this was not the first time Saud was being asked about this transaction for which Al Sanea sought his approval or assistance in obtaining Suleiman's approval. Saud was searchingly questioned about this by Mr. Crystal as well. His answers then were equally dissembling:[1506]

> *Q.* *What Maan is doing is updating you on various facilities with various banks, those facilities being facilities of the Money Exchange. Do you see that?*
>
> *A.* *Yes.*
>
> *Q.* *It is plain from the top of {G/2844.1/2} that you and he have had conversations about facilities; is that right?*
>
> *A.* *Maybe he mentioned something. This is but what he says, yes.*
>
> *Q.* *Then he says: " ... following our conversations, I have been contacted by the local banks for the hedging strategy going forward and in this regards the following banks are willing to provide us with additional facilities of SR 300MM to SR 400MM for undertaking interest rate swap deals with them as indicated in my earlier two faxes ..." Then he identifies the banks. Do you see that?*
>
> *A.* *Yes.*
>
> *Q.* *Then he says: "Each of the above will provide us with SR 400M facility for the hedging. I am still awaiting your signature on the document sent earlier to proceed with the above." Do you see that?*
>
> *A.* *Waiting for signature? To obtain my signature, or obtain signature on the documentation, from Uncle Suleiman.*
>
> *Q.* *What you are being told by --*
>
> *CHIEF JUSTICE:*

---

1505 **{D/4/81} [4.142]**

1506 **{Day43/85:16}-{Day43/90:23}**

*Q. Before you go on, you should look at the second to last paragraph. It says "your signature".*

*A. The signature on the NCB documents as required. Before "sincerely, "I look forward to receiving your response in positive to the above and your advice to Badruddin", and the first letter at the beginning says Badruddin refused to do anything on them, which I think he meant by here obtaining signature from Uncle Suleiman. So he is asking my help here for -- to tell Badr to take them to my Uncle Suleiman.*

*CHIEF JUSTICE:*
*Look at the paragraph above that.*

*A. Yes: "Each of the above will provide us ... I am still awaiting your signature on the document sent earlier to proceed with the above." That doesn't ring any bells, sir, to me. Because, you know, my -- my signature is -- has no value here. I -- so I -- what he meant by that, I don't know. From the context of the letter, I cannot tell.*

*MR. CRYSTAL: If you go to the top of {G/2844.1/2}, after referring to the conversations between you and him, he says that he has been contacted by local banks in relation to a hedging strategy and that the banks, who he names, which includes Saudi British Bank and SAMBA, are willing to provide additional facilities of SAR 300 million to SAR 400 million for undertaking interest swap deals. Do you see that?*

*A. Rate swap, yes.*

*Q. He is telling you that the Money Exchange is going to be obtaining further substantial additional facilities to undertake interest rate swap deals from one or more of these banks. Do you see that?*

*A. Yes.*

*Q. That would have been clear to you at the time?*

*A. I -- I was not involved with the Money Exchange. If someone like Maan asked me here to help him out, you know, to do something, like I would do that for anyone when he asked help. He is here asking for this. In this particular paragraph, the one you're referring to, he's asking for -- for some -- something on which I -- I cannot approve or disapprove. It has to go to my uncle.*

*Q. He is telling you --*

A. *So he is asking me for something that I cannot do anything about.*

Q. *Mr Algosaibi, he is telling you that the Money Exchange is going to get additional facilities of SAR 300 million to SAR 400 million to undertake interest rate swap deals, isn't he?*

A. *Yes. Yes. He says that.*

Q. *Pardon?*

A. *Yes, he says that in this letter, yes.*

Q. *Nothing could be clearer.*

A. *He says that, yes, it's here.*

Q. *You must have understood that at the time when you got this letter?*

A. *First of all, I never remembered the letter, sir. But I'm trying to help, you know, in trying to read it together. You ask me, "Does it say this? Does it say that? And I am responding to you. In the letter he is asking my assistance on this. Now he's talking about some hedge strategy and some additional facilities. This has to go, not to me or to be -- he is asking for something, and I -- I cannot make anything of -- you know, we had the Money Exchange business and this is, you know -- I don't know. I...*

Q. *He is talking about additional facilities of SAR 300 million to SAR 400 million for the Money Exchange business, isn't he?*

A. *Yes. If he wants something, it would go to my uncle. I mean, I'm not the guy to approve or disapprove.*

Q. *I'm not asking you about to approve or disapprove. I'm asking you to confirm that you understood that Maan was in the process of seeking to obtain additional facilities for the Money Exchange of SAR 300 million to SAR 400 million for undertaking interest rate swap deals. Do you follow?*

A. *Yes. Like I said, I don't remember the letter but I'm trying to read it with you to help understand what it says, sir.*

Q. *So read the letter now and tell me whether you agree with what I've just put to you.*

> *A.* *You are saying that whatever the letter says, what it says. I don't disagree with what it says. But I don't recall the letter, let alone -- but this is -- I was in Dallas, my father -- this guy, he wants my assistance, he's informing me of something, I have no -- it just doesn't make sense. I mean, you know, if Maan is asking for me to help to get signatures, I would. If he's informing me of something else that I have nothing to do with, okay, he's informing me of something. I wouldn't have paid attention to it.*
>
> *Q.* *What he was informing you of was of very substantial additional facilities that were going to be obtained for the Money Exchange. That's clear, isn't it?*
>
> *A.* *I have nothing to do with the Money Exchange. Management is rested with Maan Al Sanea, he related to -- if he's seeking my help to help him in something, I most likely do -- would help him. If my uncle give me an assignment, in this letter he's informing me of something, and that I would have no clue at. I was a junior, even at the time. Remember that my father was in Dallas, I was going back and forth, I had a junior role, assistance to vice-president. You assume – you want me to assume a bigger role. This is not correct.*

174. AHAB relies on a letter dated 10 November 2003 from Al Sanea to Badr which refers to various bank facilities, including some being renewed. [1507] It concludes with Al Sanea noting: "*I would appreciate if you could obtain the required signature on the documents and return to us here*." The letter however, refers to the inclusion of Board Resolutions relating to each of the five sets of bank facilities, including for renewal of two sets of facilities and bank account opening forms for Bank Al Saudi Al Fransi - thus suggesting that these had already been approved, not that they required approval per "New for Old". AHAB makes no further reference to this letter in Closing.[1508]

175. AHAB refers in its list of 47 to a number of documents which are also relied upon as

---

1507 **{H3/194/46}**, found in AHAB H.O. 1st floor archives**.**

1508 See **{D/4/235-257}**.

having been manipulated.[1509] These are dealt with in detail at Section 5 of this Judgment but here it must be noted that such reliance is counter-intuitive to AHAB's primary case of forgery for the evasion of "New for Old" because the manipulation of documents suggests using them to dupe Suleiman into actually signing them. And so, some of these manipulated documents appear, also counter-intuitively, on the Forgery Schedule (why the need to have manipulated if the Suleiman signatures on them were forged?).[1510] In addition, there are four further examples where a document equivalent to that found in Head Office and relied upon by AHAB as evidencing "New for Old" is also found in the Trial "G Bundle", and that G Bundle reference is found on the Forgery Schedule.[1511] The fact that allegedly forged documents appear on Head Office files is inconsistent with AHAB's "New for Old" case (given that forgery was supposedly used as a means to circumvent "New for Old" and bypass the Partners altogether). Nonetheless AHAB purports to rely upon them here.

176. AHAB seeks to address these internal contradictions in its Written Closing Submissions[1512] by positing, among other things, that "*The documents were manipulated in a number of ways but always in relation to a document that had already been executed*" And that: *"In some instances,* ***after Suleiman had signed*** *a facility document authorising a renewal pursuant to the new for old policy,* ***Mr Al Sanea then increased the amount on the document before sending if back to the bank****. Suleiman was, thus, unaware that the new for old policy had been breached by the increase in the borrowing*

---

1509 **{H2/81/1}**; **{H2/90/1}**; **{H2/95/1}**. This is despite the fact that AHAB states that its list of 47 does not refer to manipulated documents.

1510 **{H2/81/1}**; **{H2/90/1}**; **{H2/95/1}**.

1511 **{H2/75/1}** see **{G/5115/1}**; **{H2/116/1}** see **{G/5552/1}**; **{H2/112/1}** see **{G/5456/1}**; **{H2/138/1}** see **{G/6663/1}**.

1512 **{D/4/244-245}**

*effected by the manipulation after he had signed the (un-manipulated) document".* [citing Gulf Bank KSC Guarantee[1513]; Gulf Investment Corporation guarantee[1514]; Gulf International Bank guarantee[1515]]. (emphases added)

177. By way of explaining why I regard this approach of AHAB's to the manipulated documents as highly speculative, I will comment here on but one of these three sets of guarantees of facilities, provided by AHAB per Suleiman – the Gulf Bank KSC guarantee.

178. Mr. Quest on behalf of AHAB argued[1516] that the only reasonable inference to draw is that Al Sanea must have submitted the version of the guarantee showing US$30 million to Suleiman for signature via Badr in keeping with "New for Old" but then later removed the signature page (which is said to be identical to that on the US$ 80 million version) and attached it to the rest of that document for the guarantee in that larger amount. By that means he argued:[1517]

> "*Al Sanea would have been able to subvert new for old because he would have been able to present documents which made it look as if the facility was reducing from US$40million [the earlier guarantee dated 1 September 2001] to US$30 million but actually he is signing off on a document for US$80 million and he is forging a guarantee for $80 million to go with it."*

179. In the first place, this is speculative because there was no evidence to establish which version was actually submitted to the bank while AHAB relies on the inference that it was the larger guarantee of US$80m that was. But, in the absence of direct evidence, as

---

1513 **{G/2895.1/1}** dated 30 June 2002 in the sum of US$80m; and also referring at **{D/4/246}** to **{H4/39/1}** found in H.O. files, dated also 30 June 2002 but in the lesser sum of US$30m and a third document **{G/2547.2B/1}** in the still different amount of US$40m but dated 1 September 2001.

1514 **{G/2982.1/1}**

1515 **{G/3166/1}**; **{G/3165/1}**.

1516 In Opening also – **{Day3/53:16}-{Day3/56:11}**.

1517 **Ibid**, at **{Day3/56:5-11}**.

Mr. Smith suggested,[1518] it may be that there were two facilities that required guarantees to be executed, one for US$30m and one for US$80m. This possibility cannot be discounted in light of the fact that by 3 September 2003, just more than a year later, this Loan Facility Amount is shown to have increased to the cumulative total of US$110m.[1519]

180. Perhaps the most telling point is that on the same date of the impugned US$80m guarantee - 30 June 2002 – Suleiman had also signed a renewed guarantee renewal which he provided personally, and jointly and severally with AHAB to Gulf Bank KSC in the sum of US$80m.[1520] This document does not appear on AHAB's Forgery Schedule.[1521] AHAB has offered no explanation why, if he was being deceived, Suleiman would on the one hand sign a Corporate Guarantee in the much lower sum of US$30m, and on the same day also sign a Personal Guarantee in the higher sum of US$80m.

181. Moreover, on 1 May 2004 Suleiman signed a Joint and Several Continuing Personal Guarantee to Gulf Bank K.S.C in the amount of US$130m in respect of the ATS loan facility.[1522] A copy of this was found in the Money Exchange and is not alleged to be a forgery. Contrary to AHAB's case therefore, between 2002 and 2004 Suleiman had signed documentation relating to increased facilities in relation to Gulf Bank and ATS alone, which increased from US$30m to US$130m. Whatever the explanation for the alterations (or "manipulations") might be, it cannot have been to deceive Suleiman.

182. It is also worthy of note here, that a number of documents relied upon by AHAB in

---

1518 **{Day 21/76:17}–{Day 21/77:13}**.
1519 **{G/3547.3/1}**
1520 **{G/3547.3/1}**
1521 **{W/10/1}** – final Forgery Schedule as at 2 August 2016.
1522 **{G/4066.1/5}**

support of "New for Old" refer to borrowings by AIS and ATS.[1523] These documents were from AHAB H.O. locations, yet the AHAB Partners deny knowledge of those entities. In its effort to shore up its "New for Old" case and in positively relying upon such documents, AHAB has exposed another fiction in this case: its alleged lack of knowledge of the Financial Businesses (addressed already under "Knowledge of the AHAB Partners of the Fraud Upon the Banks (etc.)[1524]").

183. As Mr. Smith described in Opening: *"It is as though AHAB has done a word search through Magnum, using the terms "new", "old" and "renewal", and simply included those documents responsive to that search"*. [1525] Far from supporting AHAB's "New for Old" case, these documents simply demonstrate Saud's close involvement in the approval of increasing and additional facilities. Had Saud thought that they supported the "New for Old" case, one might perhaps have expected him to have explained the Policy by reference to these documents in his witness statements. As it is, when any document was referred to Saud in cross-examination, he generally feigned ignorance of it, and/or its purpose.[1526]

**Conclusions on "New for Old": A case based on inference**

184. Again, I find myself in agreement with the following summary of the analysis presented by the Defendants and which I adopt.

185. In the absence of credible witness evidence, and given the lack of contemporaneous

---

1523 **{H2/22/1}** ■**HO-A**; **{H2/75/1}** ■**HO-A**; **{H2/89/1}** ■**HO-A**; **{H2/93/1}** ■**HO-A**.

1524 See above at Section 1.

1525 **{Day19/64:14-17}**

1526 In addition to **{Day58/133:4}-{Day58/134:12}** cited above, see National Commercial Bank Facility documents referred to in cross-examination at **{Day58/133:4}-{Day55/134:12}**. Also Saud xx **{Day58/127:21}-{Day58/130:18}** regarding letter dated 15 July 2002 from Al Sanea to Badr re Al Ahli Bank **{H9/34/1}**.

documentation to support it, AHAB's case on "New for Old" is based almost entirely on purported inference. At its root the "New for Old" argument is circular. So, it is said, (1) "New for Old" should be accepted because it is the explanation for why documents are found with matched (forged) signatures; and (2) it should be accepted that documents were forged in order to deceive the Algosaibis because it was necessary for Al Sanea to do so in order to circumvent "New for Old". The two propositions are parasitic each upon the other, but lacking in support from the evidence. A similarly circular hypothesis is presented to explain the manipulated documents: that their very existence is evidence of Al Sanea's circumvention of "New for Old" and therefore the documents themselves are evidence of the existence of "New for Old".

186. The reality is that there is no objective evidence to prove its existence. "New for Old" is not supported by the documents.

187. The irresistible inference is that AHAB's case on "New for Old" is so difficult to pin down, and no witness is able to provide a coherent account of it because it never happened. If it had, AHAB would have a date for it; it would have been discussed by Suleiman with Yousef and Saud; it would have been written down and communicated in writing to Al Sanea and Badr; its operation would have been policed and all relevant documentation filed at Head Office. Saud and Dawood would have discussed it after Suleiman's death, and three months later Mr. Charlton and the Investigation Team would have been told about it and would have been asked to investigate its operation. Witnesses would be able (and willing) to speak to it by reference to contemporaneous documents and with specificity. As presented AHAB's case on "New for Old" is devoid of any such proof.

188. I conclude that it never existed.

## SECTION 4

## THE FORGERY ALLEGATIONS

1. The most troubling aspect of this case has been the allegation of wide-spread forgery. AHAB's case pivots around the allegation that Al Sanea, in his fraud upon AHAB, engaged in forgery "*on an industrial scale*[1527]" and relies on the presence of "matched" signatures and apparently manipulated documents recovered from among the records of the Money Exchange, AHAB H.O. and the other Financial Businesses.

2. No direct evidence of forgery or manipulation of bank facility documents by Al Sanea (or by anyone on his direction) has however, been adduced.

3. AHAB's case is rhetorical and inferential: why would Al Sanea have needed to forge or manipulate documents if he had the authority of the Partners to borrow?[1528]

4. AHAB relies upon this hypothesis notwithstanding the fact (examined later in Section 6 of this Judgment), that the Al Sanea indebtedness was meticulously and accurately recorded in the accounts of the Money Exchange and reported upon to AHAB by El Ayouty in the annual Audit Packs and audit reports.[1529]

5. Based on inference as it is, AHAB's case of forgery presumes at least three crucial findings: (1) that the presence of "matched" signatures and manipulated documents is in and of itself, proof of forgery; (2) that Al Sanea was responsible for their creation and deployment; and (3) that no one else had any reason for using matched signatures or manipulated documents.

---

1527 Per Mr. Quest in Opening {**Day2/5:10-12**}.

1528 Per Mr. Quest in Closing.

1529 The Al Sanea indebtedness was (along with AHAB Partners' withdrawals) the subject of Ledger 3 in the Money Exchange Accounts and by itself was treated by El Ayouty as the subject of Attachment 9 of the Audit Packs.

6. As we have seen, forgery was the fundamental premise of AHAB's case not only in respect of borrowing after Abdulaziz's time but in respect of all borrowing as originally pleaded. It was averred that the AHAB Partners knew nothing of and authorized none of the borrowing which by paragraphs 98 and 99 of the Statement of Claim as originally pleaded, was all to be regarded as "*unauthorized borrowing*." By paragraph 100 it was originally (and still is) pleaded that Al Sanea "*obtained the unauthorized borrowing by forging or causing to be forged not only Suleiman's but before May 2003, Abdulaziz's signature as well.*"

7. It is a marked peculiarity of AHAB's case, given its case of widespread forgery during Abdulaziz's time as originally pleaded, that of the more than 1650 documents first presented by AHAB as bearing forged signatures,[1530] only 34 relate to Abdulaziz.

8. We have, however, also seen how radically AHAB's pleaded case changed after disclosure of the N Files.

9. What was formerly pleaded in paragraph 98 of the Statement of Claim as the details of the unauthorized borrowing of US$9.2bn as set out in Schedule 6 became rather more superficially, the details of the total borrowing. And by the re-re-re-amendments as set out in paragraphs 99A through 102, the Partners' lack of knowledge and authorization became confined to only such borrowing as occurred after 30 September 2000, following Abdulaziz's stroke.

10. It necessarily followed that the allegations of forgery became similarly confined such that to the extent paragraph 100 of the Statement of Claim as mentioned above remains

[1530] Subsequently, upon the insistence of the Defendants after the trial began, winnowed down to the 872 now on the Forgery Schedule.

worded as originally pleaded to include general allegations of forgery of Abdulaziz's signatures, it too must be read as confined almost exclusively, to allegations of forgery after Abdulaziz's time.

11. Indeed, as will be shown below, very little of the impugned documentation (only the aforesaid 34 documents) relate to Abdulaziz's time or to any time before Suleiman assumed the chairmanship of AHAB and the Money Exchange.

12. This, in and of itself, is not insignificant: to the extent that there might have been common use of "matched" or possibly " stamped" signatures during Abdulaziz's time, to that extent also it might have been appropriate to draw inferences other than forgery arising from circumstances after Abdulaziz's time. That kind of common use would have been consistent with the Partners' knowledge and authority given in general for the application of their signatures.

13. However, in the way that the case has been presented, AHAB's Forgery Schedule[1531] contains only such documents as were selected from among those taken by the "Younger Algosaibis" during their sweep through the Money Exchange and AHAB H.O.

14. Of these, only two impugned documents in Abdulaziz's name pre-date 30 September 2000[1532] with only the other 32 post-dating 30 September 2000.

15. As to the 32 documents with Abdulaziz's signature which post-date 30 September 2000, there is no dispute that Abdulaziz therefore could not have signed these himself. These, along with the two which pre-date 30 September 2000, will all be examined in context below.

---

1531 {**A2/23.1/1**}.

1532 {**G/2191/1**} and {**G/2188/1**}, being respectively a Money Exchange partners' resolution and an AHAB Partners' resolution.

16. At this juncture, the point to emphasise, is that the forgery inquiry has been confined in keeping now with AHAB's case based on "New for Old", essentially to post-30 September 2000.

17. In the absence of direct evidence from Abdulaziz, Suleiman or Al Sanea about the execution or deployment of documents , the provenance of the impugned documents have therefore become of some importance to the assessment of the inferences which AHAB invites the Court to draw.

18. As the following examination of the evidence reveals, AHAB's conduct in relation to that issue of provenance proved to be irregular and unreliable and the inferences to be drawn became, for that reason also, inconclusive**.**

**AHAB's case on forgery as finally pleaded**

19. As mentioned above, in paragraph 100 of the Statement of Claim AHAB pleads (emphasis added):[1533]

> *"Mr Al Sanea obtained the unauthorised borrowing* ***by forging or causing to be forged*** *the signatures of the chairman of AHAB (Abdulaziz Algosaibi until May 2003 and thereafter Suleiman Algosaibi until February 2009) on the loan documentation."*

20. On Day 6 Mr. Quest summarised the forgery case in the following terms:[1534]

> *"...we say the evidence shows that Al Sanea was responsible for a very extensive programme of forgery. It included the manual forgery of Abdulaziz's signature and the forgery of Suleiman's signature when they were in hospital; it included the swapping of signature pages between documents; it included the application by electronic means of scanned signatures on to documents; it*

---

[1533] {**A1/2.3/42**}.
[1534] AHAB opening: {**Day6/126:17**}.

> *included the manipulation and alteration of documents after they had been signed; it included the forgery of public documents such as 2 notarial deeds; and it included the forgery of very large promissory notes".*

**Burden and Standard of Proof**

21. Given the allegations of wide-spread forgery, as a preliminary matter, it is important that I set out the law on the subject of burden of proof. I accept and adopt the submissions of the Defendants which were uncontroverted by AHAB, on the subject.

22. AHAB, as the party making the allegation of forgery, is obliged to prove it: **Constantine Line v Imperial Smelting Corp**.[1535] The case against each Defendant must also be considered separately: **Otkritie International Investment Management Ltd v Urumov**[1536] a not insignificant issue here where the relationship between Al Sanea as the alleged fraudster and each of his Defendant Groups of Companies was different.

23. The standard of proof in civil proceedings is the balance of probabilities and when determining whether this standard has been met in respect of a given event, any inherent improbability of that event should be taken into account.

24. In a series of decisions of the House of Lords and the Supreme Court following **Re H Minors**[1537]: (see **Re B**,[1538] **Re S-B,**[1539] and **Re J**[1540] it appears to have been established that:

    (1) There is only one civil standard of proof and that is proof that the fact in issue more probably occurred than not: **Re B** at [13] per Lord Hoffmann.

---

1535 **[1942] A.C 154**, 174.
1536 **[2014] EWHC 191 (Comm)** [84].
1537 **[1996] AC 563**, 586.
1538 **[2009] 1 AC 11** [5].
1539 **[2010] 1 AC 678** [11]-[13].
1540 **[2013] 1 AC 680** [35].

(2) When considering whether it is more likely than not that an event took place, it is relevant to consider the inherent probability that, all things being equal, people do not act unlawfully (see **Urumov**).

(3) But the proposition that "*the more serious the allegation, the more cogent the evidence needed to prove it*" should no longer be used: **Re B** at [35]; **Re S-B** at [13] and **Re J** at [35].

(4) Thus it would seem to follow that once the Court is satisfied that a person has acted fraudulently on one occasion, it ceases to be inherently improbable that such a person would have done so on another occasion (see **Urumov** [89]).

(5) However, it is not enough that fraud may be inferred from the pleaded facts if those facts are also consistent with an innocent explanation. For fraud to be established it must be the only possible explanation for the facts relied upon: **Armitage v Nurse**:[1541]

> *"The general principle is well known. Fraud must be distinctly alleged and as distinctly proved: **Davy v Garrett** (1878) 7 Ch. D 373, 489, per Thesiger L.J. It is not necessary to use the word "fraud" or "dishonesty" if the facts which make the conduct complained of are pleaded; but, if the facts pleaded are consistent with innocence, then it is not open to the court to find fraud."*

25. Here it is undoubtedly the case that Al Sanea behaved dishonestly. However, it is equally plain that Abdulaziz and Suleiman (and from the chronological review of their knowledge and conduct already undertaken Saud and Yousef) also behaved dishonestly. It follows, as the Defendants submit, that no question of inherent improbability arises in relation to allegations of dishonesty in this case. Allegations of fraud and dishonesty are

1541 **[1998] Ch 241** at 256.

pervasive on all sides.

26. It is nonetheless essential for the Court to be mindful of the precise state of the evidence adduced by the Plaintiff, AHAB, in support of its claim. There is no burden on the Defendants to provide an alternative explanation or to prove a negative. Accordingly, the Court is not bound always to make a finding one way or the other with regard to the facts averred by the parties. The Court has open to it the third alternative of saying that the party on whom the burden of proof lies, in relation to any averment made by it, has failed to discharge that burden: **Rhesa Shipping Co. S.A. v Edmunds.**[1542]

27. In summary, therefore, AHAB's claims of dishonesty and fraud must fail where the facts pleaded by AHAB in support of them are either: (i) consistent with another possible explanation; or (ii) are insufficient for the Court to be satisfied that dishonest or fraudulent behavior is the only inference that may be drawn from them. As regards the possibility of less culpable inferences, I will come below to look at the case law relating to the authorized used of facsimile signatures.[1543]

28. The Defendants allege against AHAB a different fraud and SIFCO 5 (as the Defendant who assumed the lead responsibility to prove it) accepts (as it did in opening that it was prepared to assume the burden of presenting the case as if it were an indictment), that it has the burden of showing that AHAB behaved dishonestly. On that case the same principles logically apply as they do to AHAB's burden of proving its case.

**What is Forgery of a Signature?**

29. The Penal Code (2013 Revision) provides (emphasis added):

---

1542 **[1985] 1 WLR 948** per Lord Brandon at 955-6.

1543 **Gordon Ramsay v Love** (below).

Section 280:

> *"Forgery is the making of a false document with intent to defraud or deceive."*

Section 282:

> *"A person makes a false document who –*
>
> *(a)* ....
>
> *(b)* *alters a document* ***without authority*** *in such a manner that if the alteration had not been authorised it would have altered the effect of the document; or*
>
> *(c)* *signs a document –*
>
> *(i)* *in the name of any person* **without his authority** *...."*

30. Forging a signature is applying a signature to a document without authority intending to deceive the recipient into believing that the signature was applied with authority. It is fraud and so the rules on pleading and proving fraud apply.

**Authorised and unauthorised signatures**

31. Lack of authority is an essential ingredient of forgery. The first question is whether or not the facility in question was authorised. The question of whether a signature was authorised or unauthorised does not depend on how it was applied. It depends upon whether or not application of the signature was authorised by AHAB. That a signature is matched to another signature, or applied in any particular way, cannot answer the question whether it was authorised or whether it was forged.

**Increased facilities**

32. In the case of an increased facility, on AHAB's current "New for Old" case,[1544] increases in the amount borrowed from a bank are said to have been unauthorised and the signatures on increased facilities could only have been applied without authority. This is of course now to be taken as subject to those increases which were authorized to allow for a "*bit more for interest"* per Saud.[1545] The obvious difficulty about this qualification however, is that AHAB has offered no evidence on how such increased facilities are to be identified from the rest or to what extent the overall level of increased borrowing should be regarded as approved relative to the qualification.

**Renewed facility**

33. On AHAB's "New for Old" case renewed facilities are authorised.

34. It follows that for AHAB's forgery case to be tenable, the 'forged' signatures should be expected to be found on increased facilities. If there are unquestioned (unmatched) signatures on an increased facility, that is not consistent with AHAB's forgery case because, subject to AHAB's ill-defined *bit more for interest* case, facilities should not have increased at all, let alone those which appear to have been authorised for large increases. Similarly, if matched or allegedly 'forged'' signatures appear on renewed facilities, that is also inconsistent with AHAB's "New for Old" case. The incidence of matched and unmatched Suleiman signatures on increased facilities and renewed facilities is considered by the Defendants in terms which I adopt in more detail below.

1544 The changes in AHAB's forgery case, including its "New for Old" case, are considered below.
1545 Dealt with earlier under the heading "New for Old" .

**Authority**

35. A signature is not a forgery if it is applied to a document with authority of the person on whose behalf it is applied. This was made clear in **Gordon Ramsay v Love**.[1546] The signature in that case was put onto a guarantee of a lease by a signature machine. Morgan J identified *"The principal dispute in this case is one of fact as to whether Mr. Hutcheson did or did not have actual authority to commit Mr. Ramsay to the guarantee in this case."*[1547] Morgan J held (emphasis added):[1548]

> *"110. I find that when Mr. Hutcheson committed Mr. Ramsay to the guarantee in the lease of the premises, Mr. Hutcheson was acting within the **wide general authority conferred on him by Mr. Ramsay at all times until Mr. Hutcheson's dismissal in October 2010**. I also find, in particular, that in Mr. Ramsay's own words, which I have just quoted, **that authority extended to Mr. Hutcheson offering, on behalf of Mr. Ramsay, Mr. Ramsay's guarantee in relation to a lease when the business required it.** That formulation covers the facts of this case. Mr. Ramsay may now regret the transaction in relation to the premises. He may particularly regret his involvement as a guarantor. He may consider that Mr. Hutcheson did a bad deal. However, on my findings, he is not able to say that Mr. Hutcheson exceeded his authority in any respect. I hold that Mr. Ramsay, acting through his agent Mr. Hutcheson, is bound by the guarantee in the lease of the premises."*

36. That was a case of actual, not ostensible authority. It is important to note that Mr. Hutcheson's authority was a "wide general authority" to offer Mr. Ramsay's guarantee in relation to a lease "when the business required it".[1549] The landlord did not have to demonstrate that Mr. Ramsay had authorised the application of his signature to the

---

1546 **[2015] EWHC 65**
1547 Supra [6].
1548 Supra [110].
1549 Supra [110].

particular guarantee of the particular premises. It was a question of authority and the giving of a guarantee of a lease "when the business required it" fell within Mr. Hutcheson's authority.[1550]

37. In the present case, if the Algosaibis had authorised entering into bank facilities, that is actual authority for those facilities to be signed. How the signature was applied cannot alter that fact. AHAB no longer advances a case that <u>all</u> banking facilities were unauthorised. On AHAB's finally pleaded case, the Algosaibis had authorised the entering into and renewal of facilities up to the amount outstanding in September 2000 when Abdulaziz had his stroke. On AHAB's case the Algosaibis also understood that the interest on outstanding facilities needed to be paid and would be added to the loans. On AHAB's "New for Old" case <u>all borrowing is authorised apart from increased borrowing.</u>

38. Thus, if a banking facility in question was authorised, it matters not that the signature was applied using pen-and-ink, laser printer, ink jet printer, writing machine or hand stamp. The signature is not a forgery. The real difficulty facing AHAB therefore is proving those signatures which it says were unauthorized from among the many which must have been authorized.

39. The Algosaibi family are shown to have given wide general authority to each other and to others including Al Sanea to enter into or to sign agreements as necessary. They habitually delegated the running of their various businesses to others. This included authority to sign bank facility agreements and related documents.

40. On the deaths of Abdulaziz in 2003,[1551] Khaled in 2005[1552] and Suleiman in 2009,[1553]

---

**1550** Supra [110].

1551 {**G/3263/1**} (Arabic), {**G/3263/3**} (translation).

very broad powers of attorney were respectively granted by each member of the family to other members of the family, in particular to Suleiman and Saud.

41. AHAB passed numerous Board Resolutions authorising AHAB Partners or Al Sanea to enter into particular facilities.[1554]

42. For the reasons already examined.[1555] AHAB needed to enter into renewed and increased facilities to keep AHAB from collapsing. AHAB needed facility documents to be signed and it needed the lending banks to be satisfied that the signatures on documents were authorised signatures.

43. On AHAB's own case Suleiman, Saud and Dawood expected to sign documents on behalf of AHAB for themselves and for various branches of the family and they had authority to do so.

44. In his testimony Mr. Hayley said that he thought that the Algosaibis knew of and had approved the bank facilities. He was justified in taking that view:[1556]

> "Q. *Mr. Hayley, just a final couple of questions. This is merely asking you in each case to confirm what you have already said in witness statements that you have given. The first of these questions is: it is right, isn't it, that you always assumed that the Algosaibi family knew about the debt at the Money Exchange?*
>
> *A. Yes.*

[1552] {**G/4996.2/1**} (Arabic), {**G/4998**} (translation); {**G/4999.0.1/1**} (Arabic), {**G/4999/1**} (translation).

[1553] {**G/7549**} (Arabic), {**G/7549.1**} (translation); (Saud, Yousef and Dawood granting each other wide powers of attorney including to execute banking transactions {**G/7550/1**} (Arabic), {**G/7550/2**} (translation); {**G/7551/1**} (Arabic) {**G/7551/2**} (translation); {**G/7552/1**} (Arabic), {**G/7552/2**} (translation).

[1554] There are hundreds of such resolutions. An early example of Al Sanea being authorized as a sole signatory is {**R/5**} of 27 July 1981: {**G/328**}. Individual resolutions are considered in the forgery context below.

[1555] Most particularly under the heading "Benefits".

[1556] Hayley xx: {**Day69/49:25**}.

*Q.* *It is also right that when you saw signatures of AHAB partners on copies of loan documentation, you assumed that they were genuine and that the AHAB partners had approved the borrowing?*

*A.* *Yes.*

*MR. CRYSTAL:*
*Thank you, Mr. Hayley".*

45. A possible inference of a broad authority to apply Algosaibi signatures as necessary to bank facility and related documents is also supported by the memorandum of 28 March 2004[1557] written at the time when Suleiman matched signatures first seem to have appeared on facility documents as relied upon by AHAB, and by the agreement made between Saud and Dawood in 2009 that Dawood should take over signing responsibilities.[1558]

**AHAB's changing case on Al Sanea's role in forging Algosaibi signatures**

46. AHAB's pleaded case is that Al Sanea instructed that documents requiring approval or signature should be delivered to his office at *"the Saad Group"*, and that *"in very many cases"* Al Sanea would then *"forge or cause to be forged"* the relevant signatures and return the signed documentation for delivery to the banks. In paragraph 101 of the Statement of Claim AHAB plead (emphasis added):[1559]

> *"Mr Al Sanea instructed Money Exchange employees that when loan documentation required approval or signature on behalf of AHAB,* ***as it almost invariably did****, it should be delivered to his office at the Saad Group ... and not to the AHAB partners or directors…* ***In very many cases****, he would then forge or cause to be forged the relevant signatures and return the signed documentation to the relevant lender, sending a copy to the Money Exchange for its files."*

---

1557 **G/3970/1**}, from Mr. Hayley to Al Sanea advising that Gulf International Bank (GIB) "*will accept Uncle Suleiman's signature on behalf of all the Partners*" and Al Sanea's typed response among other things that "*Uncle Suleiman usually gets emotionally upset and uptight whilst signing for all the heirs individually."*

1558 Saud 1W: {**C1/2/84**} [406] and see further below.

1559 Statement of Claim, paragraph 101 {**A1/2.3/42**}.

47. This is a plea that loan documentation was *"almost invariably"* delivered to Al Sanea's office at the *"Saad Group"*.

48. Thus, the pleaded case is that *"in very many cases"* the relevant signatures would be "*forged or caused to be forged*".

49. Further, that documents for signature would be taken to *"Saad Group"* offices where they would be forged and then returned, Mr. Quest said in opening that *"Al Sanea ensured that when documents came in for signature they always went through him"*[1560] (emphasis added).

50. Indeed, the allegation of forgery on an industrial scale carried out by James Dennis at Saad Group's offices was the story advanced in support of AHAB's original case that all the borrowing was unauthorised and that the Algosaibis knew nothing about it. The original paragraph 101 of the Statement of Claim included the averment that:[1561]

> "***No loan documentation was sent to the AHAB partners or directors*** *and there was no correspondence concerning the unauthorized borrowing with them".*(Emphasis added.)

51. On 23 July 2012 the words *"In very many cases"* were added. Prior to that amendment, AHAB's case was that all signatures were forged. Such a change of pleading is explicable only on the basis that AHAB was unaware of or had intended to suppress the very many documents in its possession and subsequently disclosed as coming, not only from the Money Exchange but also from AHAB H.O. and which show that very many signatures were not forged (or could not be alleged to be forged).

---

1560 AHAB opening: {**Day2/119:23**}.

**1561** {**A1/2.3/42**}.

52. Nonetheless as we have seen, in opening Mr. Quest did not shrink from making submissions consistent with the original case of "*forgery on an industrial scale*" - that signatures were typically *"forged"* at the Saad Group offices by Mr. Dennis using electronic means:

53. Mr. Quest said that the matching process revealed by AHAB had involved signatures being applied electronically (emphasis added):[1562]

> *"We had understood from the very beginning of the case that what we call the matching signature process, which Dr Giles talks to and which we will look at later, where signatures were applied electronically to* ***documents****, we understood about that method, that was detected right at the very beginning of the case…*

And:[1563]

> *That means that whoever created these documents had the electronic image stored on their computer, so they could print it out with a laser printer. They had an image of a Suleiman signature on their printer ready to print out…*

And:[1564]

> *The only way to do that would be to have an image of the signature in your computer. So for example, you could feed -- one way of doing it --*
>
> *CHIEF JUSTICE: Well, apart from you explaining it, is there going to be evidence to this effect?*
>
> *MR. QUEST: My Lord, no, …*

And:[1565]

1562 AHAB opening: {**Day3/58:25**}.
1563 AHAB opening: {**Day3/115:18-22**}.
1564 AHAB opening: {**Day3/112:19-24**}.
1565 AHAB opening: {**Day4/135:25}-{Day4/136:18**}.

> *The only practical way you could create a document like this, we say, is* ***if you had -- as almost certainly Mr. James Dennis had -- a library of the signatures on your computer****, so you could say, we will have 1, 2, 3, 4, 5. That is clearly how this document was created. I take this as another example because of the way you see the memo and the reference to Saud not wanting an increase in facilities. Again, this is far from an isolated instance. We see a number of documents which have multiple matched signatures, each one taken from a different source. Staying with forgery for a moment, we see that by this time, indeed for some years now, it appears Al Sanea had perfected the technique of executing facility documents using matched signatures. In a sense,* ***he no longer needed to involve the partners at all****; if he had the signatures on the computer he could just reel off these documents as and when he wanted; and indeed that's what we say he was doing".*

54. Thus, AHAB rely on an electronic process to support their submission that *"it is overwhelmingly more likely to have been done at the Saad Group by James Dennis"* (emphasis added): [1566]

> "MR. QUEST: *Exactly. There is a slight development to that point. If they were applied by some electronic process, "Photoshop" or something else similar, that is* ***overwhelmingly more likely to have been done at the Saad Group by James Dennis****…"*

55. AHAB's case now is that the forgery started at the same time as the "New for Old" procedure in September 2000 following Abdulaziz's stroke. But Mr. Dennis started working for the Saad Group in 2002.

56. In July 2009, AHAB had launched its claim based upon the proposition that all the borrowing from the banks entered into by the Money Exchange was unauthorised and that all of the signatures on all of the bank facilities and related documents were forgeries – the basis for the allegation of "forgery on an industrial scale".

---

1566 AHAB opening: {**Day3/125:9-13**}.

**AHAB’s changed Case: "New for Old"**

57. Having already dealt with AHAB’s “New for Old” case in the immediately preceding section of this judgment, I address in context here only as required to deal with the case of forgery and manipulation of documents.

58. On 23 July 2012 AHAB amended its Statement of Claim to plead its “New for Old” case, which I have already found to be thoroughly discredited. This resulted from the disclosure in the N Files from which it had become clear that the Algosaibis had known for years about borrowing from the banks. The Statement of Claim was amended pursuant to an undertaking given to the Court as a condition of leave being granted to amend.

59. And so in July 2012, AHAB no longer alleged that the Algosaibis knew nothing about the borrowing. Instead, AHAB now alleged that the Algosaibis had reached an agreement in about late 2000 with Al Sanea that borrowing would not be increased. Faced with this inconvenient truth, the Algosaibis suddenly remembered that there had been an agreement with Al Sanea all along.

**"Manipulation"**

60. During discovery it became apparent that there were documents, signed by Suleiman found in AHAB H.O. that were inconsistent with the "New for Old" case. On the face of these documents, uploaded to the Trial Bundle at the request of the AwalCos, Suleiman had approved increased facilities. As a result, AHAB amended the "New for Old″ case to add new pleading that Al Sanea had been presenting manipulated documents to Suleiman in order to dupe him into signing increased facilities. AHAB's case had gone from one where the Algosaibis knew nothing about the borrowing to a case where they were being

duped into signing increased facilities. The case had gone from one where all documents were being taken to the Saad Group offices for Mr. Dennis to forge signatures, to a case where Suleiman was signing many documents presented to him for very large amounts of borrowing and the fraud was in fooling Suleiman into signing those documents.

61. In this regard, during the trial, AHAB amended its case in order to plead that Al Sanea had *"manipulated"* documents in two ways:

a. In paragraph 103A of the Statement of Claim it is pleaded (emphasis added): [1567]

*"Further, Mr Al Sanea forged facility documents by* ***manipulating the text and/or content*** *of documents (including by increasing the amount) after they had been signed by Suleiman pursuant to the* ["New for Old"] *procedure…"*

b. In paragraph 103B of the Statement of Claim it is pleaded (emphasis added): [1568]

*"Further, Mr Al Sanea dishonestly induced Suleiman to sign new facility documents pursuant to the* ["New for Old"] *procedure… by* ***presenting manipulated existing facility documents*** *in order to conceal the fact that the facility had increased or was increasing."*

62. I note here that this allegation remains inconsistent with the case pleaded in paragraph 101 of the Statement of Claim. The claim that documents were taken to the Saad Group offices in order to have forged signatures applied is inconsistent with the new allegations

---

1567 Statement of Claim, [103A] {**A1/2.3/44**}.
1568 Statement of Claim, [103B] {**A1/2.3/44**}.

that documents were presented to and signed by Suleiman. This inconsistency has not been dealt with by AHAB.

**AHAB's case is not made on a *"facility by facility basis"* – the authorised limit**

63. AHAB submitted that the case on borrowing is *"not really a case that we make primarily on a facility-by-facility basis"* and that they do not submit *"we authorised this, we did not authorise that"*.[1569] In Charlton 19A, sworn on 31 August 2016 (after AHAB had finished opening its case on 26 July 2016) it states (emphasis added):[1570]

> *"AHAB's case on authority is pleaded in section F.1bis of the Statement of Claim.* ***It is not made by reference to individual facilities*** *but by reference to the total amount of the borrowing. Mr Al Sanea's authority to borrow money in the name of AHAB was limited to maintaining the level of borrowing taken by the Money Exchange at the time of Abdulaziz's stroke in 2000.Mr Al Sanea breached his authority to the extent that he increased the borrowing in excess of that level and/or to the extent that he used the borrowing for his own benefit rather than for the benefit of the Money Exchange.*
>
> *Any borrowing that increased the level of borrowing from the time of Abdulaziz's stroke on 30 September 2000 – even if signed by Suleiman – was not authorised. AHAB calculates its claim for damages by reference to the difference between (1) the level of Financial Businesses' (as defined in paragraph 19 of the RASOC*[*1571*]*) borrowing at October 2000 and (2) the level of that borrowing in April/May 2009."*

64. As the Defendants submit, this case is confused and deeply flawed. A signature is applied to a particular facility. It is either a forgery when applied to the document or it is not. If a signature is a forgery, then the argument arises that the facility is unauthorised. A signature does not become a forgery simply because a borrowing limit is exceeded. If part of the facility was within the limit and part over the limit is the signature then to be

---

1569 AHAB opening: {**Day2/142:23-24**}.

1570 Charlton 19A, [15] and [16] {**Y2/11/4**}.

1571 Paragraph 19 defines the *"Financial Businesses"* as *"The Money Exchange, TIBC, AIH and ATS"*.

regarded as forged, partially forged or not forged? AHAB's submission that they do not say that an *"individual facility"* is unauthorised does not work with the forgery allegations.

65. The history is one of AHAB trying in vain to make a fraud case which does not fit the facts. Whenever the case hits a major obstacle, AHAB comes up with a new case that they advance as being consistent with the facts that they are then confronted with. AHAB started with a case that all the borrowing was unauthorised and in support of that it alleged that all the signatures on facility documents were forged and that this had been done by Al Sanea embarking on *"forgery on an industrial scale"*. That case was shown to be unsustainable and is no longer run. In the context of the "New for Old" case, the forgery allegations make little sense because there would have been no need to present documents to Suleiman for signature at all if Al Sanea could and would simply have forged them. The forgery allegations make even less sense in the context of the manipulation case where there would have been no need to both manipulate and forge the same documents. The case in Charlton 19A makes no sense at all because as mentioned above, the allegation of forgery is fact based and must relate to particular documents.

**The Evidence**

**The witness evidence on the process for signing documents**

66. One of the tensions at the heart of AHAB's case is that the process described by Mr. Quest in opening is different from, and in several respects inconsistent with, the evidence as to the process for signing documents given by AHAB's witnesses. The evidence given by AHAB's witnesses sets out different versions of the process for obtaining Suleiman's signature on documents. It is concerning that these different versions reflect the state of

AHAB's case at the time they gave their evidence. Mr. Hayley's evidence was that all the documents went to the Saad Group offices for signature. That reflects AHAB's early case of forgery on an industrial scale by Al Sanea. Mr. Badr's belated evidence is that the documents would go to the Saad Group offices, back to AHAB where they would be signed, then back to the Saad Group offices and on to the banks. That is patently an attempt to marry Mr. Badr's role in the "New for Old" procedure with the evidence of documents going back and forth to the Saad Group offices.

67. I have already dealt in some detail in this Judgment with the issue of Mr. Hayley's credibility and reliability as a witness when dealing with the "New for Old" case. Here I will focus on his evidence as it relates to the forgery case.

68. His evidence about the process for signing documents was to the effect that documents were taken to the Saad Group offices and returned signed. That, as taken from his witness statement was the case before the "New for Old" process became AHAB's case :[1572]

> *"232.*
> *The procedure for execution of facility documents was prescribed by Mr Al Sanea. Execution copies were received from the banks at the Money Exchange. If an AHAB Partner signature was required then the copies were forwarded by Money Exchange staff to STCC's offices for processing by Mr Al Sanea or his personal assistants Mr Sohail or Mr Abbas. The signed documents would then be returned to the bank by Mr Al Sanea directly under cover of a letter that I had drafted in anticipation of Mr Al Sanea obtaining the relevant partner's signature. Obviously, the simplest thing would have been for one of the Money Exchange staff to take the facility documents to the third floor, so that they could be signed by the relevant partner. However, Mr Al Sanea was adamant that everything should go through him, as I have described throughout this witness statement.*
>
> *237.*
> *In terms of logistics, when a proposed transaction required signature by*

---

1572 Hayley 1W {**C1/9/48**} [232] and [237].

*an AHAB partner, Mr Al Sanea's rule was that the document had to be forwarded from the Money Exchange to STCC for handling by Mr Al Sanea or his personal assistant, Mr Sohail (and before him 'Abbas'). Accordingly, when documents came in to the Money Exchange for signature, I, or my staff, would review the documentation to check the terms and then forward it to Mr Al Sanea. I would also send Mr Al Sanea a cover letter addressed to the bank, signed by me, which was used to forward the documents to the bank after they had been executed. Even though the Money Exchange was in the same building as the AHAB Head Office,* ***I cannot recall a single occasion when a facility document was walked upstairs for a signature to be obtained. Instead it was invariably sent to Mr Al Sanea at his offices at STCC****. As I understood it, Mr Al Sanea would then obtain the required signature from the relevant AHAB partner — he told me that he ate dinner with members of the Algosaibi family every night — and he would forward the document directly to the bank, under the cover of the letter I had previously sent to him for that purpose."* (Emphasis added.)

69. As to the necessary Board Resolutions: [1573]

> *"233.*
> *Not only was obtaining this authorisation the Money Exchange's normal practice, it was also insisted upon by the banks with whom the Money Exchange dealt. The standard practice of (as far as I can recall) every bank with whom we dealt was to obtain formal proof, usually in the form of an AHAB board resolution, that the signatory or signatories on behalf of AHAB were duly authorised to sign by the AHAB partners."*

70. The completed documents would be sent directly by STCC to the banks and copies returned to the Money Exchange for filing.[1574]

> *"239.*
> *These were sent by STCC direct to the banks. Copies of the executed agreements were sent to the secretaries in the Money Exchange for filing, and these wouldn't cross my desk."*

---

1573 Hayley 1W [233] {**C1/9/48**}.
1574 Hayley 1W [239] {**C1/9/50**}.

71. As to pre-signing:[1575]

> *"293*
> *I have read what Mr Al Sanea has said about the use of "pre-signed" signature pages at paragraph of 228 of MAS5. I was not aware of such a practice at AHAB. As far as I understood the position, documents including board resolutions would be signed on behalf of AHAB as and when they were required."*

72. In cross-examination Mr. Hayley accepted that his witness statement was "*not complete*":[1576]

> *"I realised that the -- the, um, the information that I gave in my witness statement was not complete and that there -- there came a time when the procedure changed. In the early days -- I've used the expression "in the early days", it is quite clear from your examination that the Money Exchange -- that we sent documents out from the Money Exchange".*

73. In cross-examination as to the practice during Abdulaziz's time:[1577]

> *"A. Um, I believe it was the practice -- and I'm trying to cast my mind back to the times when Abdulaziz signed -- but I believe it was the practice to put a yellow sticker at the places where a signature was required, and the yellow sticker I think would have the annotation "Sign here"."*

74. In cross-examination Mr. Hayley could not explain why a SAMBA facility had been sent to SAMBA by the Money Exchange. He said the procedure changed:[1578]

> "Q. *There we have you returning the documentation from the Money Exchange direct to SAMBA. That's right, isn't it?*
> *A. Um -- at this time I'm not sure.*
> *Q. When you say "at this time", in 2016 or at the time when this letter was written?*
> *A. At the time when this letter was written.*
> *Q. What are you not sure about, Mr. Hayley?*

---

1575 Hayley 1W [293] {**C1/9/59**}.
1576 Hayley xx: {**Day23/119:2-9**}.
1577 Hayley xx: {**Day23/20:10-15**}.
1578 Hayley xx: {**Day23/117:15**}-{**Day23/118:17**}.

*A. What I'm not sure about was the procedure at 2001. Um --*
*Q. And what are you not sure about in relation to the procedure in 2001?*

*A. Um, during the time when, um, Abdulaziz Algosaibi was signing facility documentation, you have pointed out to me that the procedure was to send the facility documentation to Mr. Al Sanea, who arranged for it to be signed, for the facility documentation to be returned to the Money Exchange and stamped, and for the Money Exchange to send the facility documentation on to the bank. Um, during the course of my -- my time in Saudi Arabia, that changed. Um, the procedure was that I wrote -- the procedure was that I checked the documentation or my staff checked the documentation, I wrote a covering letter, which I forwarded to Mr. Al Sanea, Mr. Al Sanea arranged for the documentation to be executed and he sent it to the bank. Whereafter a copy of the documentation was sent to the Money Exchange."*

75. In cross-examination Mr. Hayley acknowledged that Arabic documents may have been sent to AHAB H.O.:[1579]

*"I have to say that -- though, that I have no recollection of a document of this nature. So it – it may or may not have been sent to me.*
*Q. It may have been sent direct to head office, may it not?*
*A. It may.*
*Q. Where there were a large number of Arabic speakers?*
*A. Which was predominantly Arabic speaking, yes.*
*Q. The head office?*
*A. Head office."*

76. By contrast, Saud's evidence (as also already examined in the Judgment under "New for Old") about the process for Suleiman signing documents was the "New for Old" process: [1580]

[1579] Hayley xx: {**Day23/67:20**}-{**Day23/68:3**}.
[1580] Saud 1W, [257] and [258] **{C1/2/54}**.

> *"Mr. Al Sanea was to send a copy of the existing agreement and the new facility agreement to Badr, who was supposed to check the old agreement against the new one. If the new agreement was not essentially the same as the old one (particularly the amount), he was told to reject it and return it to Mr. Al Sanea. If he considered that the new agreement was effectively a like-for-like replacement of existing borrowing, he was to take it to Uncle Suleiman, explain its contents to him, and obtain his approval and signature."*
>
> *"Occasionally, Badr would try to involve me in this process, but I was reluctant to be involved. My Uncle would have to authorise any borrowing. I did not have a full picture or understanding of the Money Exchange's operations and I did not feel I could add anything useful to the process. On the occasions that Badr approached me with material from Mr. AI Sanea, I would usually redirect him to my uncle unless I felt I could deal with the matter easily."*

77. Dawood's evidence about the process for Suleiman signing documents was concerned with whether Suleiman gave authority to others to sign for him and whether Suleiman ever "*pre-signed*" documents or applied his own stamp: [1581]

> *"I have been asked whether my father ever authorised others to sign documents on his behalf, either by hand or mechanically. As far as I am aware, he did not do so. In my experience, it would be unusual in Saudi Arabia to permit someone else to place your signature on a document. It would have been out of character for my father to entrust his signature to someone else, particularly in relation to an important matter such as bank lending. Had my father given anyone that authority, I believe that I would have known about it.*
>
> *I am not aware of any practice of 'pre-signing' having been used in AHAB, either by my father or others. I did not adopt a practice of pre-signing documents either."*

78. And: [1582]

---

1581 Dawood 1W, [36] **{C1/1/10}**; [55] {**C1/1/14**}.

1582 Dawood 2W, [3] to [6] **{C1/23/2}**.

> *"I have been asked by AHAB's lawyers to comment on how my father, Suleiman Algosaibi, signed documents and in particular if he had, or used, a stamp to apply his signature.*
>
> *I often saw my father sign documents but I never saw my father apply his signature to a document using a stamp. Whenever I saw him apply his signature to a document, he did so using a pen.*
>
> *To my knowledge, my father did not use a stamp (or anything other than a pen) to apply his signature.*
>
> *To my knowledge, my father did not have a signature stamp."*

79. Mr. Badr's evidence (also already examined herein[1583]) about the process for signing documents suggested that a Saad Group driver would deliver the documents to him for him to give them to Suleiman. On this basis, AHAB's case appears now to be that Mr. Hayley would give the documents to a Saad Group driver. The driver would take the documents to the Saad Group offices. The Saad Group driver would bring the documents back to AHAB and hand them to Mr. Badr who would then take the documents to Suleiman or to Saud and then Suleiman for signature. The signed document would then be returned to the Saad Group offices. This is set out in Badr's statement:[1584]

> *"Usually, I received the loans documents in a sealed envelope from a Saad driver. He would come to my office, on the third floor of AHAB Head Office, to deliver this envelope to me personally. I recall that the driver was a man named Mohsin. I knew that Mohsin worked for the Saad Group and reported to Mohammed Sohail, Mr. Al Sanea's personal secretary at Saad. I understood that the loan documents were delivered to me at the instruction of Mr. Al Sanea.*
>
> *The sealed envelope usually contained the new loan agreement (one or more copies), a copy of the old loan agreement and, often, a drafted board resolution. Sometimes it also would include a promissory note or guarantee.*

---

[1583] See above under "New for Old" , Section 3.

[1584] Badr 1W [21] to [29] **{C1/40/13}** – already excerpted herein in the context of "New for Old".

*When I received the documents, I would open the envelope and check whether the amount of the new loan was the same amount as the old loan. I would also look to see if the old loan agreement had been signed by Abdulaziz or Suleiman.*

*I would take the documents to Suleiman, whether the new loan and old loan amounts were the same or not. However, I would not take the documents to Suleiman if there was no old loan agreement in the envelope. In those circumstances, I would return the unsigned documents in the envelope with the Saad driver.*

*Together, Suleiman and I would review the signatures on the old loan documentation. I would always point out to him his brother Abdulaziz's or his own signature. I would also advise him if there was an increase in the amount of the new loan, or if it was the same as the limit in the old loan agreement.*

*If there was an increase, Suleiman did not sign the new loan agreement. He would ask me to return it unsigned to Mr. Al Sanea. Suleiman did not sign any new loan agreements that were for an increased amount.*

*If the amount of the new loan was the same (or less) than the old loan, then Suleiman would sign the documents, in front of me, and give it to me so I could return it to Mr. Al Sanea. Sometimes there were two copies of the new loan agreement and on other occasions there was only one copy. If there were two copies, Suleiman would sign both copies.*

*Sometimes, before going to see Suleiman, I would visit Saud, if he was in the office, and show him the documents. I recall that sometimes, when the new loan was for an increased amount, I would confirm with Saud that the documents should be rejected and returned to Mr. Al Sanea unsigned; I would do so without troubling Suleiman.*

*If the new loan amount was the same as the old loan agreement, Saud would tell me that I could take them to Suleiman."*

On the use of signature stamps: [1585]

*"I have been asked if Suleiman signed documents with a pen or if he (or anyone on his behalf) used an ink stamp bearing his signature. To my knowledge, Suleiman did not have such a stamp and I do not believe one was ever used at AHAB. I saw him sign very many documents and he always signed with a pen.*

1585 Badr 1W [33] {**C1/40/15**}.

> *During my many years at AHAB, I did not see anyone use a stamp to apply a signature."*

80. Omar Saad's evidence about the process for signing documents, in relation to Board Resolutions was that he presented them to the AHAB partners for signature: [1586]

> *"I have been shown two Money Exchange Board Resolutions authorising the payment of dividends (*{G/5221} *and* {G/6686}*). I remember these types of documents and I believe they were drafted by the Money Exchange. My recollection is that the AHAB Head Office accounts department would receive these documents from the Money Exchange but Mr. Al Sanea arranged for the AHAB Partners' to sign them. There may have been an occasion where I asked one of the AHAB Partners to sign the document to make sure the accounting entries could be made in the intercompany ledger; I do not recall specifically."*

81. Mr. Naim Fakhri's evidence about the process for signing board resolutions was that he presented them to the AHAB Partners for signature and, as regards the Money Exchange documents, Badr took them to the AHAB Partners but Mr. Fakhri knew nothing about what the documents were: [1587]

> *"When an AHAB Head Office board meeting went ahead, I would record the subjects discussed and then the board members would sign the minutes. From March 1992 until the present day, it has been my responsibility to draft any minutes or resolutions made by the AHAB Head Office Board and then present those minutes to the board members for approval .... I provide the minutes to the board members. They read them and sign them. In the event draft minutes are approved by the Board, they are signed by each board member. Before 2009, I do not recall seeing any resolution signed by one member of the Board alone.*
>
> *I also knew Badr received documents from the Money Exchange and took them to Sheikh Abdulaziz and Sheikh Suleiman but I did not know what these documents were."*

---

1586 Omar Saad 1W, [28] {**C1/11/16**}.

1587 Fakhri 1W, [21] {**C1/7/6**}; [41] {**C1/7/10**}.

82. The foregoing overview of the witnesses evidence reveals the irreconcilable conflict within AHAB's case between its allegations of forgery and "New for Old". First, it had been clearly asserted in support of the forgery allegations, that all documents requiring AHAB Partner signatures would go directly from the Money Exchange to Al Sanea at Saad Group Offices where the signatures would be forged by a mechanical process. Mr. Hayley was clear in his witness statement that this remained the process throughout. If so, that would have been irreconcilable with the process described by Saud and Badr as designed to suit "New for Old".

**Methods of application**

83. Depending on what process was actually adopted for obtaining signatures to documents, the methods of application of signatures become important. If, as AHAB claims, documents were invariably required to be presented to a Partner for the application of original manuscript signatures, the inference of forgery would be unavoidable in respect of the many hundreds of matched signatures which have been found. However, no such inference arises if other methods were allowed. As discussed further below, a number of methods were identified by the experts, Dr. Audrey Giles and Mr. Michael Handy, with only one – the use of hand stamps found by Mr. Handy to have been possibly involved – not being the subject of full agreement by Dr. Giles.

**Expert evidence on forgery**

84. I come next below to consider the expert evidence on forgery and so it is convenient that I set out here the approach which the case law advises I should adopt. I acknowledge the

assistance of the opening submissions of the Defendants in this regard[1588].

**Documents and Allegations of Forgery**

85. In determining whether or not documents are forged, the Court is obliged to take all of the relevant evidence into account, not just expert handwriting evidence; indeed, it has regularly been the case that Courts have found that documents are genuine in the face of expert handwriting evidence to the contrary: **Nina Kung v Wang Din Shin[1589]** The correct approach to expert handwriting evidence is encapsulated in **Fuller v Strum**[1590]:

> "*Mr. Mitchell submits that I cannot reject the expert evidence of Dr Giles. In my judgment, however, there is a world of difference between the type of expert evidence led in Re B[1591] and the evidence contained in Dr Giles's report in this case. The training of experts enables them to identify facts which a lay witness or a judge could not identify, without expert help. Such evidence may truly be described as scientific and the radiologists' evidence as to when an injury occurred falls plainly within this category. But some expert evidence may amount to no more than the drawing of inferences from facts observable as much by the expert as by a lay witness; and the inferences to be drawn from those facts may be capable of being drawn as much by the expert as by a lay witness. Of course, in such a case, the views of the expert are entitled to be given great weight. After all, the expert's training and experience will have equipped him or her to draw these inferences. But in relation to this type of expert evidence the judge, I think, is entitled to form his own view, having regard to, and balancing, the other evidence available to him in the case.*"

86. In **Fuller**, the Court determined that, notwithstanding expert evidence to the effect that a signature on a will had been forged, on the balance of probabilities the will was in fact genuine when balanced against the surrounding evidence from lay witnesses. In short, expert evidence, whilst helpful and potentially of high probative value, is never

1588 {**U/3/1/80**}.

1589 **[2005] HKFCA 54** at [12] to [15].

1590 **[2000] All. E.R (D) 2392:** subsequently reversed on appeal, but on other unrelated grounds**.**

1591 Which was medical evidence as to the date on which a fracture occurred.

determinative insofar as handwriting is concerned. It draws educated inferences, but the Court is entitled to weigh those against the other evidence of fact in determining whether a given document is in fact a forgery.

87. The application of a signature by mechanical means does not make a document a "forgery", or mean that the apparent signatory did not authorise the document in question[1592].

88. If that were the case, pre-signed letters from chief executives to investors (later to be replicated with different addressees) would all be "unauthorised" and fraudulent; and a client could not rely on a legal opinion where the signature was applied by the law firm or counsel using computer technology. Both situations are commonplace. The real, indeed only, question raised by the mechanical application of a signature is whether there was in fact authority from the relevant person to execute the document in this way.

**The Forensic evidence: The Forgery Schedule**

89. In paragraph 102 of AHAB's Statement of Claim it is pleaded that particulars of *"the forgeries"* are set out in Schedule 14.[1593] This is the Forgery Schedule. The pleaded forgery allegations relate only to documents on the Forgery Schedule. If a document does not appear on the Forgery Schedule, AHAB has not positively identified any of the signatures on that document as forged. I therefore may not conclude[1594] that any of the signatures on such a document was forged.[1595]

---

1592 See again **Ramsay v Love (supra).**

1593 {**A1/2.3/43**}, {**A2/23.1/1**}.

1594 In keeping with the legal principles discussed above.

1595 It is noteworthy that there is no pleaded allegation of *"forgery on an industrial scale"*.

90. The genesis of the Forgery Schedule was Appendix A of Dr. Audrey Giles' report.[1596] That is headed *"Questioned signatures",* significantly not *"forged signatures."* In cross-examination Dr. Giles described Appendix A as follows (emphasis added):[1597]

> *"Q. At {J/6.1/1}, which is the most recent appendix A, on the last page, {J/6.1/53}, we see we are up to 138 batches or groups, or whatever you want to call them. Do you see?*
> *A. That's correct, yes.*
> *Q. Documents in appendix A were* ***not in chronological order*** *they were in the order of the groups or batches in which you received them. That's right, isn't it?*
> *A. Yes, usually referring to an entity or a bank, or such like.*
> *Q. There are over* ***1,650 documents*** *in appendix A. Does that sound about right to you?*
> *A. Yes, I think some are duplicates, though.*
> *Q. At {J/1.1/1} we see that in relation to some of the documents you record "No relevant signature", "Not applicable". Also, if we look in the middle, we see "Not matched." Do you see that?*
> *A. Yes.*"

91. Appendix A was a record of the documents examined by Dr. Giles. There were over 1,650 documents. They were not in chronological order but in the order in which they had been sent to Dr. Giles. That meant that it was difficult to analyse the context of the documents said to have forged signatures on them. For example, it did not easily appear that there were no matched signatures on facility documents before March 2004. Dr. Giles had not identified matched signatures on about half of the documents sent to her.

92. The GTDs sought particulars of the forgery allegations. AHAB pleaded Schedule 1 to the Amended Reply and Defence to Counterclaim served on 27 September 2013.[1598] On 1

---

1596 Giles 1R Appendix A {**J/1.1/1**}.

1597 Giles xx: {**Day86/5:2-19**}.

1598 {**A2/64/1**}; Schedule 1 included "*dividers*" and "*blank pages*". The documents were not arranged in date order, but the order in which they were sent to Dr. Giles. Navigation of this schedule was unnecessarily difficult. Numerous documents were included despite there being "*No relevant signature"*. Numerous documents were included where the signature is "*Not matched*". Numerous documents were included where the evidence was said to be "*inconclusive"*. A

March 2016, AHAB served the first Forgery Schedule.[1599] This listed 1,566 documents. On 6 July 2016 AHAB served a revised Forgery Schedule that listed 1,631 documents.[1600] During the course of the trial the GTDs identified a series of errors. On 25 July 2016, the number of documents referred to was reduced to 900.[1601] On 2 August 2016 the number of documents was reduced to 871 documents.[1602] The final version of the Forgery Schedule which has been agreed between the parties refers to 872 documents and 16 documents said to have been manipulated. The Forgery Schedule is now in chronological order.

**Limitations to the forensic evidence**

93. I accept as the GTDs submit,[1603] that there are two limitations to the forensic exercise. First, there are very few original documents to examine. All the documents produced by AHAB from the Money Exchange or AHAB H.O. are copy documents. Two sets of originals selectively produced by Al Sanea will be mentioned further below. Second, the chain of custody of the examined documents is broken.

**Copy documents**

94. The original bank facility documents were of course, ordinarily sent to the third party banks. AHAB has said that there have been very few cases in which the banks have provided AHAB with original documents. This gives rise to two problems. First, the Court cannot know whether or not the original is in the same state or form as the copy

---

number of documents with original signatures on them were said to have "*Weak positive evidence genuine*". Other documents are said to have signatures where "*Authenticity inconclusive*".

1599 {**W/4/1**}.

1600 {**W/5/1**}.

1601 {**W/7/1**}.

1602 {**W/10/1**}.

1603 {**E1/26/20**}.

held by AHAB or whether the original was signed by Suleiman and matched signatures placed onto the copies. Second, copy documents cannot be examined in the same manner as originals. There is no way of knowing the answer to either of these questions. In the Joint Statement Mr. Handy and Dr. Giles agree: [1604]

> *"2.1 It is true that copy documents cannot be examined in the same manner as originals and that the conclusions regarding the examination of signatures on copy documents will normally be restricted."*

**Chain of Custody**

95. The chain of custody of the documents which have been the subject matter of forensic examination is incomplete.

96. In its oral opening AHAB contended that: "*The other thing is we will see that quite a lot of our documents, certainly documents from the Money Exchange, were later removed by Al Sanea*."[1605] In support of that contention, AHAB relied on two matters. Firstly, that Al Sanea had caused certain books and records of the Saad Group (not of the Money Exchange) to be removed from the premises of Saad Financial Services (SFS) in Geneva in July 2009.[1606] Secondly, a memorandum dated 29 August 2001 from Al Sanea to Mr. Hayley and Mr. Jesudas[1607] in which Al Sanea said:[1608]

> *"...following fire at Al-Khodhari building and the offices of Talal Abu-Gazaleh ... it is my intention to establish a backup system for Money Exchange and ... have established central filing system here at the Head Office. In this regard, please arrange to send the entire original documents that you have in files to the Head Office."*

97. Mr. Quest submitted that this was the reason why there was a lack of original documents

---

1604 Joint Statement of Mr. Handy and Dr. Giles [2.1] {**J/9/2**}.
1605 AHAB opening: {**Day2/22:21-23**}.
1606 See AHAB opening: {**Day2/23:12-23**} and {**G/8010.3/1**}.
1607 {**G/2542/1**}.
**1608** {**G/2542/1**}**.** See also AHAB opening: {**Day2/141:2**}-{**Day2/142:1**}.

for the experts to examine (emphasis added):[1609]

> *"140: As I say,* ***one of the problems with forensic examination is the lack of original documents****, which it seemed to us strange when we went into the Money Exchange that we didn't find anything, or hardly anything, with original signatures on when there should have been a counterpart kept at the Money Exchange. The reason for that, as you know, is because Al Sanea removed all those originals. We can see that from {G/2542/1}. It is interesting to note the date; this is August 2001. So this is shortly after the whistle blower episode..."*

98. As to the memorandum of 29 August 2001, it is at best equivocal as to whether at that point in time (nearly 8 years before the collapse of the Money Exchange) Al Sanea wished to remove documents from the Money Exchange as opposed to preserve them from damage, which is what this memorandum suggests. While Al Sanea has refused to return them, just what inferences arise from that fact is itself also at best equivocal. The reality is that AHAB has presented its case of forgery based on the available documentation and its case must be judged on that basis.

99. Similarly, the conduct of Al Sanea in July 2009 in relation to documents held at the offices of SFS, while perhaps potentially relevant in particular to AHAB's tracing claim, has no bearing on Al Sanea's conduct in relation to documents <u>held at the Money Exchange</u> or AHAB H.O. As already established, many documents were removed in the period between early May 2009 and mid-June 2009, including some which will be considered below. At this point Al Sanea was not physically at the Money Exchange and the evidence is that the documents were removed by the 'Young Algosaibis'.

**Removal of documents by the 'Young Algosaibis'**

100. The "*Young Algosaibis*" went into the Money Exchange and AHAB H.O. in early to mid-

---

1609 AHAB opening: {**Day2/140:22**}-{**Day2/141:6**}.

May 2009 at Saud's behest.[1610] Some five or six weeks' later, a selection of documents made by the "*Young Algosaibis*" was sent to Dr. Giles for examination as explained in a letter from AHAB to the Defendants:[1611]

> "*As we have already stated, the manner in which the Source Signatures were selected and provided to Dr Giles does not, in any way, affect Dr Giles' conclusions (and can only be of peripheral relevance). However, we hope that the explanation below is satisfactory to assist your understanding*".

It was junior members of the Algosaibi family (the sons of some of the male AHAB Partners) who first noticed that some of the signatures of Suleiman on facility documentation at the Money Exchange appeared unnaturally similar to each other. This was in late-May 2009 when the crisis broke and the Algosaibi family were in tumult at the discoveries being made by Deloitte at the Money Exchange; younger members of the Algosaibi family started to take a look at copies of facility agreements to try and make sense of them and the default notices AHAB had been receiving at that time. They observed similarities in the signatures of Suleiman appearing in different documents. They asked Deloitte if they could be provided with copies of documents so that they could examine the documents by holding them up to a window and comparing signatures by overlapping them (in effect, a rudimentary attempt at the sort of examination conducted by Dr. Giles). If they found a document which they thought bore a signature which appeared to match a signature on another document they would put that first

---

1610 Walter 1W, paragraph 23: {**L2/27/7**} - explaining how these documents were processed by the Deloitte Investigation team after recovery from Saud's villa and uploaded to the Electronic Database; see also Deloitte's List detailing where documents were collected: {**H6/9/6**} - where it is confirmed that these documents had been taken to Saud's villa by the "*Young Algosaibis*" and later collected by the Deloitte Investigation Team.

1611 Letter dated 9 June 2016 - {**T/180/2**}; Mr. Charlton confirmed documents were sent to Dr. Giles on 2 June 2009: see Charlton xx: {**Day84/43:23**}.

document aside and use it as a reference point. As the family observed what they thought were more matched signatures they brought this to the attention of Deloitte, who suggested that Dr. Giles should be instructed to investigate (as she was). Dr. Giles was sent the series of documents identified by the Algosaibi family members with reference numbers 1 to 10 to examine for the purposes of her First Report. As Dr. Giles explains in the First Report:

> "*Amongst the papers within the Buff Coloured Folder [2] are a series of part copy documents [02-012] - [02-025]. Various signatures on these copy documents [02-012] and [02-025] have been numbered (1) to (36). I shall refer to these signatures as the "Source Signatures"*".

101. The term "*Source Signature*" is not a term of art; but was used to describe the sets of signatures initially identified by the Algosaibi family but which became reference points or "*base signatures*"; and which Dr. Giles subsequently found were re-used again and again.

102. After Dr. Giles prepared her First Report, members of the Algosaibi family continued to look at facility documentation and find documents which they thought bore signatures that matched signatures on other documents. These further "*Source Signatures*" were provided to Dr. Giles in August 2009 (see the letter from Baker & McKenzie of 24 August 2009 referred to earlier) and are referred to in subsequent reports prepared by Dr. Giles."

103. So, it is clear that the documents bearing the "*Source Signatures*" (those against which documents bearing "*matched signatures*" were later identified by Dr. Giles and came to comprise the Forgery Schedule) had been selected by the "*Young Algosaibis*".

104. But, as we have seen, their reasons for having assumed that task, their manner of doing it and the documents they selected are issues which have been explained only by way of

hearsay. None provided a witness statement or was called to testify and this, although at least one – Mohammed Algosaibi – who was at first identified by AHAB's lawyers,[1612] was present here at early stages of the trial.

105. In their witness statements, AHAB's witnesses had failed to identify the "*Young Algosaibis*" who removed documents. It was in response to a specific request that AHAB, by the aforementioned letter dated 28 July 2016, identified the "*Young Algosaibis*" as **Ahmed** Algosaibi (the son of Abdhul Mohsin Algosaibi) and **Mohammed** Algosaibi (the son of Yousef). They did **not** identify **Waleed** Algosaibi.

106. However, months later, in cross-examination, Saud identified the "*Young Algosaibis*" as being **Ahmed** Algosaibi and **Waleed** Algosaibi. He specifically denied that **Mohammed** Algosaibi was involved:[1613]

> *"Algosaibis, I think you referred to, that we all refer to, from your witness statement, are Mohammed, who is Yousef's son; is that right? And Khaled, who is Abdul Mohsin's son?*
>
> *A. It was Mohammed Ghamdi as -- there was several of the boys working together. Waleed was there. The names -- Mohammed -- the boys -- no, Mohammed did not participate in that. I think Waleed was -- yes.*
>
> *...*
>
> *Q. Take your time. Can you remember who they were? Just take your time.*
>
> *A. I think -- I know Waleed was there. Hamad Algosaibi was there, and I don't know who went where and what, but the boys, Abdulrahman and Waleed, Hamad, this is my recollection.*
>
> *Q. You don't remember Mohammed being one of them?*

---

1612 By letter dated 28 July 2016: **{T/218/1}**.

1613 {**Day59/73:19**}-{**Day59/74:9**}.

*A.* *Mohammed, Yousef's son, no, he was not one of them."*

107. Saud was quite unable to explain why his lawyers had identified Mohammed as one of the "*Young Algosaibis*". No evidence was called to explain the inconsistency or to correct what had been said in correspondence:[1614]

> *"Q.* *Mr. Algosaibi, the people who came to your villa, who did the document collection, I asked you about who you meant by that?*
>
> *A.* *Yes, I answered that.*
>
> *Q.* *The names you gave me did not include Mohammed?*
>
> *A.* *Yes, yes, sir.*
>
> *Q.* *So Mohammed was not one of the people who helped with the documents?*
>
> *A.* *Yes, sir.*
>
> *Q.* *What do you mean, "Yes, sir"?*
>
> *A.* *As far as I know, yani.*
>
> *Q.* *He didn't come?*
>
> *A.* *No, the younger boys, as I stated, my recollection, is that Khaled, Waleed, Abdulrahman and Ahmad. And this is my memory, yani, of the people who were collecting the papers. Hamad, I don't in what context this is, huh, or what was the discussion with the lawyers, but you asked me, I answered.*
>
> *Q.* *Same context?*
>
> *A.* *You asked me, I answered.*

1614 {**Day61/30:17**}-{**Day61/31:21**}.

*Q.* *Can you explain why your lawyers Mourant, who are your lawyers in Cayman, got this wrong and told us that Mohammed was one of the Young Algosaibis?*

*A.* *I don't know. You know, you ask them. I don't know. You ask me a question, I answer.*

*Q.* *Presumably they asked you because you are the person who dealt with the Young Algosaibis and you must have told them it was Mohammed.*

*A.* *Sir, I mean, we -- we are a close family, so everyone knows we are not that many…"*

108. Moreover, Mr. Hayley's evidence was that Mohammed Algosaibi **was** present in the Money Exchange from time to time after the collapse:[1615]

*"A.* *I believe Mr. Mohammed Algosaibi was present in the Money Exchange from time to time.*

*Q.* *From time to time during what period of time?*

*A.* *During the, um, period from, I suppose about May until November when I left."*

109. If Mohammed Algosaibi was not on Saud's instructions in the Money Exchange (which, accordingly to Mr. Charlton was "*locked down*"[1616]) it is not clear what the reason he would possibly have had to be there.

110. AHAB could easily have resolved these issues. Mohammed Algosaibi was in Court for much of the trial and it would not have been difficult to call the other "*Young Algosaibis*" to give evidence as to what they did and who was involved.

111. The failure on AHAB's part to have done this can only sensibly be regarded as a deliberate strategy to withhold evidence from the Court on a crucial issue – the

---

1615 {**Day23/37:10-14**}.

1616 {**Day83/149:20**}-{**Day83/150:2**}.

provenance of the documentation relied upon to support the forgery case.

112. This apparent strategy of suppression of evidence, in its wider manifestations, is considered further in the Defendants' written submissions in compelling terms.[1617]

113. This is an unacceptable strategy in any case, let alone one that depends on inferences.

114. For present purposes, where it is important to AHAB's case that the Court should infer that Al Sanea must have been the person responsible for the alleged forgery of documents by use of the "*Source Signatures*" and "*Matched Signatures*", AHAB was obliged to satisfy the Court about the integrity of the chain of custody involving these documents.

115. AHAB has failed deliberately to do so.

**Al-Jazira Documents**

116. The second group of documents in respect of which there is an incomplete chain of custody is the Al-Jazira documents. Those documents were produced by Al Sanea during the course of his application to challenge the jurisdiction of this Court. They were produced for examination by Dr. Giles but were not produced for examination by Mr. Handy. Dr. Giles' opinion is that these have original pen and ink signatures on them. There is no evidence as to how Al Sanea came to have bank documents with original pen and ink signatures in his possession. As already noted, the original facility documents should have gone to the bank. There will be further consideration of these documents below.

**SICL and Singularis Promissory Notes**

117. The third group of documents where there is an incomplete chain of custody is the Promissory Notes in favour of SICL and Singularis. Those Promissory Notes are

[1617] Section E.1: {**E1/7/1**}.

regarded by Dr Giles as original documents signed with pen and ink. They were produced by Al Sanea's representative at a meeting held with a representative of the GTDs and are crucially relied upon by the GTDs in support of their counter-claim.[1618] They assert that the chain of custody after that meeting is complete. But there is no evidence as to the provenance of these Promissory Notes or their chain of custody before that meeting. While neither Dr. Giles nor Mr. Handy opine that the signatures on the Promissory Notes are forged, I will come to explain in dealing with the counter-claim why I am not satisfied about their authenticity.

**The Agreed Joint Statement**

118. The forensic evidence is mostly agreed. Mr. Handy and Dr. Giles produced a Joint Statement dated 1 February 2017.[1619] Any remaining points of difference or emphasis are of no real consequence.

119. In addition, the following matters were agreed by Dr. Giles during her cross-examination.

(1) It is agreed that forensic experts cannot say **who might have applied** signatures to documents unless the signatures were original genuine signatures.[1620]

(2) It is agreed that the forensic experts could not give evidence on **when** a signature might have been applied to a document. There are no methods for reliably dating the kinds of ink which would have been used even had the originals been available.[1621]

---

1618 {**G/7226/1**}; {**G/7227/1**}; {**G/7228/1**}; {**G/7229/1**} and {**G/7447/1**}.
1619 Handy/Giles Joint Statement: {**J/9/1**}.
1620 Giles xx: {**Day86/11:4-9**}.
1621 Giles xx: {**Day86/11:10-11**}.

(3) It is agreed that forensic experts cannot opine on *"non-forensic"* evidence of forgery.[1622] There are 127 entries in the Forgery Schedule under the heading *"AHAB observations"* that relate to what AHAB has termed *"non-forensic"* evidence of forgery, for example who witnessed a document, whether it was dated at a time when Abdulaziz or Suleiman were incapacitated or whether it related to TIBC, AIH or ATS.

(4) It is agreed that the forensic experts cannot give evidence on **where** a document had been before they received it.[1623]

(5) It is agreed that forensic experts could not give evidence on **who** may have copied a document.[1624]

**The signatures alleged to be forgeries**

120. The Forgery Schedule refers to signatures of Abdulaziz, Suleiman, Yousef, Saud and Dawood. The Defendants deal with each in turn[1625] and as I adopt and interpolate below.

**Abdulaziz signatures**

121. There are no "*matched*" Abdulaziz signatures. Where Abdulaziz signatures were not applied by his hand there is no evidence it was done by transposing signatures from one document to another. The concern here, as I see it, is that Abdulaziz's signatures were applied after he had become incapacitated.

122. The first two documents said to be forged in Abdulaziz's name are a Money Exchange

---

1622 Giles xx: {**Day86/9:3-23**}.
1623 Giles xx**:** {**Day86/10:22-25**}.
1624 Giles xx: {**Day86/11:1-3**}.
1625 At section E of the Defendants' closing submissions: {**E1/26/23**} and following.

Partners' resolution,[1626] and an AHAB Partners' Resolution[1627] in respect of a Calyon bank facility and both pre-date Abdulaziz's stroke. Respectively, these resolutions purport to grant to Abdulaziz and Al Sanea individual signing authority for bank facilities. Abdulaziz's signatures as Chairman are not matched but Mr. Handy's evidence is that the signatures were mechanically applied.[1628] The resolutions are both dated 24 July 2000. Abdulaziz's stroke happened on 30 September 2000. These resolutions cannot be found to be forgeries because: (a) even on AHAB's case forgery does not start until the *"New for Old"* policy was put in place, which was after Abdulaziz's stroke and (b) Abdulaziz knew of the bank borrowing incurred during his time.

123. I agree with the Defendants that the only rational explanation for these resolutions having mechanically applied signatures is that the signatures were applied mechanically as a matter of convenience. That is consistent with a memorandum dated 23 July 2000 in which Al Sanea instructed Mr. Hayley and Mr. Michael Davis at the Money Exchange (copied to Mr. Stewart):[1629]

> *"Please note that I would like you to limit the documents for signature of Uncle Abdulaziz, as advised earlier I require you to send only the facility documents (either renewal or new) and Promissory Notes for his signature. Any other paper work should be prepared either for my signature or with my approval you should sign them.*
>
> *I would like to send a minimum* [of] *paper for Uncle Abdulaziz's signature starting immediately".*

124. The resolutions taken with this memorandum are significant because: (a) they pre-date

---

1626 {**G/2191/1**}.

1627 {**G/2188/1**}.

1628 Mr. Handy says that the signatures were applied by fused toner powder, indicative of the use of a photocopy machine - Forgery Schedule, lines 2 and 2.1 {**A2/23.1/1**}.

1629 {**G/2187/1**}.

AHAB's forgery case; (b) they show a concern to limit the documents for signature, which is a concern repeated in relation to Suleiman;[1630] (c) the resolutions contain no references to *"renewal"* or *"new"* and so cannot be taken as references to *"New for Old"* which, in any event on AHAB's case, had not yet been devised in July 2000; (d) the reference in the memorandum to *"(either renewal or new)"* bank facility does not suggest any different treatment between the two; (e) the resolutions purport to give Al Sanea sole signing authority yet, if he ever sought to exercise it, no such facility is identified as being unauthorised or a forgery. If Al Sanea refrained from exercising that authority then why would he have forged the resolution?

125. Abdulaziz suffered his stroke on 30 September 2000. In the Forgery Schedule there are the aforementioned 32 documents with Abdulaziz signatures that post-date 30 September 2000. There is no dispute that Abdulaziz could not have signed those documents himself. In relation to all but two documents, the forensic evidence does not reveal how the signatures were applied and the expert evidence is inconclusive.

126. In relation to Abdulaziz signatures Mr. Handy and Dr. Giles agree:[1631]

> *"6.1 The signatures of Abdulaziz Algosaibi are simple and variable. Where we have examined signatures in his name on various documents we have not, with one exception* [an HSBC facility]*, reached any strong conclusion as to the authenticity of the signature".*

**The HSBC Facility**

127. The one exception is the two copies of the HSBC facility. Two original copies of the HSBC facility dated 18 October 2000 were produced by HSBC and have been examined by Mr. Handy and Dr. Giles. They bear what purport to be original hand written

---

1630 To be examined below by further reference to the 28 March 2004 memorandum: {**G/3970/1**}.
1631 Handy/Giles Joint Statement, paragraph 6.1: {**J/9/4**}.

Abdulaziz signatures but which could not have been written by him on 18 October 2000. There is also a copy version of this HSBC facility.[1632] Mr. Handy and Dr. Giles agree:[1633]

> *"6.2 The exception is the original signatures in the name of Abdulaziz Algosaibi on documents* {**G/2254/1**} *and* {**G/2258/1**}. *Dr Giles has concluded that there is strong positive evidence to support the view that these questioned signatures are not genuine signatures of Abdulaziz Algosaibi. Mr. Handy agrees that there is positive evidence that these signatures* {**G/2254/1**} *and* {**G/2258/1**} *are not genuine, but finds the evidence to be weak".*

128. The HSBC facility is a US$10m LC and Bill Acceptance Facility. The borrower is AIS and AHAB was guarantor. The Abdulaziz signature was for AHAB as guarantor while Al Sanea signed for the borrower AIS. There are two different Abdulaziz signatures that have been applied by hand on two different documents.[1634] The signatures are not the same on each document. The copy document at {**G/2259.1/1**} is a copy of the document at {**G/2254/1**} on which the HSBC corporate stamps had not been applied.[1635]

129. The Defendants suggest[1636] that there were three reasons why AHAB would have applied or agreed to apply Abdulaziz's signature: (1) the Algosaibis needed the HSBC facilities to keep the business running; (2) Abdulaziz was the driving force behind the business and he was in a coma and it appears (as discussed below) that the AHAB Partners took steps to keep his incapacity secret from the outside world; and(3), under AHAB's Articles of Association, the only person authorised to sign facilities was Abdulaziz. If Abdulaziz was acknowledged to be incapacitated, AHAB would have been run by a provisional Board.[1637] There is no evidence of this having happened.

---

1632 The HSBC facility is at lines 14, 15 and 16 of the Forgery Schedule {**A2/23.1/1**}.

1633 Handy/Giles Joint Statement, paragraph 6.2: {**J/9/4**}.

1634 One on {**G/2254/16**} and one on {**G/2258/16**}.

1635 In Giles 1R, {**J/1/38**}: Dr. Giles said that the signature on the photocopy was "*inconclusive*".

1636 {**E1/26/26**}.

1637 See Articles of Association {**G/1341/5**}: Article 10(1) provides that Abdulaziz as "*Founding Partner*" was chairman of the board with power "*for the management of the Company and the running of its affairs in the manner he deems*

130. As to the steps which appear to have been taken to keep the seriousness of Abdulaziz's condition from the outside world: (1) Suleiman requested a medical report that stated *"that brothers Abdulaziz Bin Hamad Algosaibi is in good health, and he is undergoing only physical therapy"*.[1638] This resulted in letters from Dr. Killen dated 27 February 2001[1639] and 3 October 2001[1640] and a letter from the Baylor University Medical Center dated 3 October 2001,[1641] each of which said Abdulaziz showed signs of improvement;[1642] (2) Abdulaziz is represented as having made the Chairman's statement in SAMBA's Annual Report for 2002 on which his signature appeared;[1643] and (3) in January 2003, Al Sanea signed a letter to Sandy Weill of Citigroup on behalf of Abdulaziz seeking extension of time before the bank terminated its relationship with AHAB.[1644] Al Sanea, signing here on behalf of Abdulaziz, would have conveyed to the bank that Abdulaziz, fully two and a half years after his stroke, remained in charge. A copy of this letter was sent to Saud by Al Sanea under cover of another letter of 12 February 2003 and which bears a further note from Al Sanea to Saud "*P.S: I will discuss it when I return from London*". This letter of 12 February 2003 was marked by Saud *"file working papers*

---

*conducive*". Article 11(2) provides that in a case of compelling and legitimate excuse that prevented Abdulaziz from the performance of his duties "*the person designated by*" Abdulaziz should undertake the duties and responsibilities of the Chairman. Article 11(3) provides that if the Chairman no longer possessed legal capacity to perform the duties and responsibilities of his office, or if the compelling and legitimate excuse preventing him from performing his duties continued for two years, Abdulaziz's duties and responsibilities vested in a Board chaired by Suleiman on which Yousef, Saud, Hindi and Al Sanea would have sat.

1638 {**G/2381.2/1**}.

1639 {**G/2383.1/1**}.

1640 {**G/2393.1/1**}.

1641 {**G/2564.1/1**}.

1642 This is dealt with in more detail in paragraphs 216 to 229 of the Detailed Narrative very helpfully prepared by the Defendants {**E2/1/1**}.

1643 {**G/3125.1/9**}.

1644 {**G/3123/1**}.

*M.E."* and found in the N Files.[1645] Saud, it must be inferred, was fully aware of Al Sanea's signing on behalf of Abdulaziz, indicative of an understanding within AHAB that Abdulaziz would be represented to the outside world as remaining in charge.

131. It was in those circumstances that someone put Abdulaziz's signature on the two HSBC documents on 18 October 2000, then in the early period after his stroke. There is no evidence as to where it was done or by whom. It is known that on 18 October 2000, Saud[1646] and Al Sanea[1647] were in Dallas, but Yousef[1648] and Suleiman[1649] appear to have been in the Arabian Peninsula on 18 October 2000. Any of them, the Defendants submit, could have given an instruction to put Abdulaziz's signature on the HSBC facilities.

132. AHAB responds specifically on this issue in Closing.[1650] AHAB submits that there are other contemporaneous documents which show that Al Sanea's first intention was to sign facility documents himself. AHAB's contention is however, based, *in arguendo*, on inferences which it invites me to draw from these other documents when taken with those bearing Abdulaziz's questioned signature – the Partner resolutions of AHAB and the Money Exchange, as well as the HSBC facilities documents. Because of the importance of the forgery allegations to AHAB's case, I excerpt in detail below its arguments on this issue which, I felt obliged to conclude nonetheless, did not meet the test laid down in the case law for concluding that Al Sanea must have forged these documents.

---

1645 {**G/3137/1**}.

1646 Saud bought a ticket to London on 1 October {**H26/112/1**}, paid the Grosvenor Hotel on 6 October {**H26/111/2**}, hired a car in Oklahoma on 7 October {**H26/112/1**}, departed the Dallas Westin on 15 October {**H26/111/2**} and on 21 October paid Hertz in Dallas {**H26/112/2**}.

1647 Al Sanea was in London on 3 October {**G/2230/1**}, he sent a facsimile from a Dallas facsimile number on 18 October {**G/2257/1**}.

1648 Yousef was in London until at least 14 October, travelled British Airways on 15 October and was in Dubai on 19 October, {**H26/187/2**}.

1649 Suleiman arrived in Bahrain on 8 October {**H8/18/6**}, {**H8/18/9**} and {**H8/18/19**}.

1650 At section {**D/4/325-331**} of its closing submissions.

> "*The contemporaneous documents indicate that Mr. Al Sanea's initial idea was to sign the facility documents himself: a few days after Abdulaziz's stroke, on 3 October 2000, he sent a fax to Mr. Potter at AIH entitled 'Documents for signing'.*[1651] *He told Mr. Potter that Abdulaziz had had a 'minor operation to his right hand finger and after a few days he will be having therapy for a better recovery".*

He continues:

> *"In view of this situation, please note that any document that require Uncle Abdulaziz's signature* ***should be prepared for my signature until Uncle Abdulaziz recover full from this operation***. *As you are aware that we have earlier prepared a board resolution which will authorise me to sign the documents on behalf of the Algosaibi Money Exchange."* (Emphasis added.)

133. Al Sanea also signed a further fax that day from LA Investments to Mr. Mohammed Abbas, a Saad Group employee, explaining his own ability to sign banking documentation:

> *"As you are aware, we already have obtained signature of Uncle Abdulaziz Algosaibi on the board resolutions which authorises me to sign the documents from the banks on behalf of the Money Exchange, please coordinate closely with Mark Hayley, Glenn Stewart and Jawdi Jamjoum in order to start releasing these to the banks accordingly. Please provide me with a list of banks…".*[1652]

134. In this way, rather than asking Suleiman, Yousef or another AHAB Partner to sign in place of Abdulaziz, Al Sanea tries to engineer a situation where he can sign the facility documents himself **without reference to the Algosaibis** (emphasis added).

135. Significantly, the board resolutions to which Al Sanea is referring in his memos, and which seemingly granted him authority to sign facility documents, are the earliest dated documents on the Scott Schedule dated 4 April 2017[1653] [now the Forgery Schedule] for

---

[1651] *{**G/2231/1**}.*
[1652] *{**G/2230/1**}.*
[1653] {**A2/23.1/1**}.

which there is positive forensic evidence of forgery. They are a Money Exchange Partners' resolution and an AHAB Partners' resolution, both purportedly dated 24 July 2000, each one containing exactly the same wording in its body (only differing by their headers, signatures and corporate stamps) purporting to give both Abdulaziz and Mr. Al Sanea authority to "***individually*** *sign and accept and perform all things necessary under any credit facility agreement"'*[1654] (emphasis added). Dr. Giles and Mr. Handy have examined the originals of these documents and they agree that they could not have been signed manually; the signatures have been applied using a colour laser printer.

136. However, Al Sanea's plan that he could sign the documents himself encountered a stumbling block. Mr. Hayley became aware of Abdulaziz's stroke at about the time that it happened on 30 September 2000,[1655] but he was not aware that Abdulaziz was moved to hospital in Dallas shortly afterwards.[1656] In a memorandum dated 4 October 2000,[1657] Mr. Hayley explains the problem to Al Sanea. He wrote:

> *"The board resolutions of the Partnership and the Money Exchange dated 24th July 2000 cover the operation of existing facilities, i.e. the execution of promissory notes and drawdown notices, acceptance of bills of exchange, etc.*
>
> *New facilities and facility renewals are not however covered by the above resolutions. Specifically it is necessary for the Board to issue fresh resolutions for acceptance of new facilities and also for the issuance of guarantees on behalf of the Company. Up to now, Uncle Abdulaziz has signed* ***individually*** *all such resolutions in terms of his personal powers as Chairman of the Board…*

---

1654 See: {**G/2191**} - Item No. 2 on the Scott Schedule dated 4 April 2017 {**A2/23.1/1**}; {**G/2188**}: Item No. 2.1 on the Scott Schedule dated 4 April 2017 {**A2/23.1/1**}.

1655 {**Day23/87:17-25**}.

1656 {**Day23/93:11-17**}.

1657 {**G/2236/1**}.

> *In terms of Article, 11 clause 2 of the Articles of Association, in the event that the Chairman of the Board is unable to perform his duties, it is necessary for someone to be designated by the Chairman to undertake his duties and responsibilities on a temporary basis. It follows that the designated acting Chairman will be an existing board member.*
>
> *I have cited the Articles of Association because our bankers will undoubtedly refer to this document for verification for resolutions which do not bear Uncle Abdulaziz's signature."* (Emphasis added.)

137. In addition to explaining to Al Sanea that the banks will expect to see a document signed by a member of the AHAB Board (either Abdulaziz, or if not Abdulaziz then another of the AHAB Partners), in the same memo Mr. Hayley also told Al Sanea that:

> *"As it happens, AIS has a new facility from HSBC Bahrain requiring the guarantee of Head Office and supported by a Board Resolution. The documentation will shortly be ready for execution. Please may I have your instructions".*

138. Mr. Hayley was asked about this memo in his cross-examination.[1658] He agreed that he knew that the execution of documents had become an issue with Abdulaziz's poor health[1659] and the inference to be drawn from the contents of the memo was that Abdulaziz was not in a position to perform his duties.[1660]

139. On 11 October 2000, Mr. Hayley sent a further memorandum to Al Sanea informing him that the documentation for the HSBC Bahrain bill acceptance facility US$10m for AIS was in order and had been forwarded to Al Sanea through Mr. Abbas on 7 October 2000 for execution.[1661] In cross-examination, Mr. Hayley explained that he did not know that

---

1658 **{Day23/88:12}-{Day23/92:13}**.
1659 **{Day23/89:1-3}**.
1660 **{Day23/91:11-15}**.
1661 **{G/2246/1}**.

Abdulaziz was in hospital in Dallas at this time.[1662]

140. **Notwithstanding the fact that he could not sign the documents himself, Mr. Al Sanea found a way to execute the documents** (emphasis added). On 18 October 2000, Mr. Potter wrote to HSBC:

> *"Dear Dudley*
>
> *Please find enclosed the three original Letter of Credit and Bill Acceptance Facility Agreements which have been signed from our side. I also include the original board resolutions from* [AHAB] *and* [AIS].
>
> *Please advise us once the facility is executed from your side and all is in order".*[1663]

141. All of the documents attached to the letter were purportedly signed by Abdulaziz. These documents, found in the Money Exchange's files, must have had the signatures applied to them between 7 October 2000 and 18 October 2000 because the letters show that they were received from HSBC and then sent to Al Sanea on 7 October 2000 and then returned to HSBC with signatures applied on 18 October 2000. Furthermore, the AIS board resolution[1664] enclosed under cover of Mr. Potter's letter to HSBC records that a board meeting had purportedly taken place, stating:

> *"The meeting of all Directors of the Company was held in Al Khobar on 7 October 2000 at 18:00 hours at which a quorum was present.*
>
> *Mr. Abdulaziz Hamad Algosaibi chaired the meeting whereas Mr. Maan Abdulwahed Al Sanea acted as secretary of the meeting. It was reported to the meeting that the company was availing Banking facilities with HSBC Bank Middle East, Offshore Banking Unit, Bahrain".*

142. Throughout this period, Abdulaziz was incapacitated and so could not have chaired or

---

1662 **{Day23/93:11-17}**.

1663 **{G/2256/1}**.

1664 {**G/2237/1**} and {**G/2240/1**}.

attended any meetings with Al Sanea (or anyone else), let alone sign the documents. For this reason alone the signatures are plainly forgeries.

143. I break the narrative of AHAB's submissions here to make the following observations:

(1) First, it will be seen from words in emphasis above that Al Sanea had told Mr. Potter of AIS and Mr. Abbas of the Saad Group, that the intention was that he would be signing documents **himself**. Indeed, the authenticity of the impugned Partner resolutions aside for the moment, that would have been the objective of procuring them.

(2) Despite this, we see AHAB arguing [also in emphasis above] that "*Notwithstanding that Al Sanea could not sign these documents himself (he) found a way to execute the documents*".

(3) However, as we have seen, Al Sanea appears not to have been physically present in Saudi Arabia at the time these documents were executed, leaving open the possibility that someone else applied the signatures, including possibly with AHAB's knowledge. A further indication of this is that had Al Sanea been present, an equally plausible inference is that to the extent an authorized signatory other than Abdulaziz would suffice, he would have signed himself. On the basis of the now impugned resolutions, he had obtained authority to do so. And as already seen above, at least one of the AHAB Partners, Saud, was aware that Al Sanea had been signing important documents on behalf of Abdulaziz. Of those AHAB Partners responsible for the Money Exchange, Suleiman appears to have been the only one present in Saudi Arabia at the time. AIS, AHAB's Bahraini business of which the AHAB Partners were fully aware, needed to borrow. The

situation with HSBC as advised by Mr. Hayley, was not that no other Board member could sign for Abdulaziz, it was that a further resolution in keeping with the AHAB Articles of Association would have been required designating a substitute for Abdulaziz as Chairman and authorised to sign on new facilities. Despite Abdulaziz's incapacitation, it is clear that AHAB was itself not yet ready to appoint Suleiman as Chairman.

(4) In those circumstances, AHAB's argument that Al Sanea must himself have been responsible for forging these documents (in the sense of without AHAB knowledge and authority), is simply unsubstantiated. This is of course, different from a finding that Al Sanea was not responsible for obtaining or privy to the simulation of Abdulaziz's signatures. Given the attendant circumstances, he must have been aware that the signatures were not written by Abdulaziz.[1665]

144. AHAB's argument for an inference of forgery does not improve by reliance on the forensic expert evidence about the HSBC facility:[1666]

> "*But there is also forensic evidence of the forgery of Abdulaziz's signature which it is convenient to address here. When the two original copies of the facility agreements*[1667] *were examined by Dr. Giles and Mr. Handy (the documents having been made available by HSBC as they were not in AHAB's possession), the experts agreed*[1668] *that the manual pen signatures on the documents were not (or were not likely to have been) applied by*

1665 And this puts the lie to his statements in the London proceedings (to be further commented upon below) that he had no knowledge of simulated signatures ever being applied to bank facility documents: Al Sanea London - {**L2/9/45**},[5/166]; {**L2/9/42**}, [5/158]; {**L2/9/54**}, [194].

1666 AHAB Closing submissions, **Ibid**.

1667 The two documents are: (1) Dr Giles reference [52-001]; {**G/2254**} Item No. 14 on the Scott Schedule dated 4 April 2017 {**A2/23.1/1**}; and (2) Dr Giles reference [125-001]; {**G/2258**} Item No. 15 on the Scott Schedule dated 4 April 2017 {**A2/23.1/1**}.

1668 It should be noted that Dr Giles' evidential assertions are stronger than those of Mr. Handy, being that Dr Giles has found strong evidence to suggest they were not signed by Abdulaziz and Mr. Handy will only go so far as to say that there is weak evidence to this effect, see paragraph 6.2 of the Handy/Giles Joint Report: {**J/9/4**}.

> *Abdulaziz, i.e. someone else had attempted to copy Abdulaziz's signature onto the documents by hand".*

145. More particularly, Dr. Giles concluded that, although manually applied in each case, there is strong positive evidence that the signatures on each version of the document was not signed by Abdulaziz. It is worth setting out her conclusions in relation to these documents in full:

> *"The questioned signature on this document [125-001] is in the name Abdulaziz Algosaibi and is written in blue ballpoint pen ink. I examined this original signature using a Video Spectral Comparator, obliquely directed light and stereomicroscope as described elsewhere in my reports.*
>
> 1. *I found no guide lines associated with this signature [125—001], or any impressions which could have been used as guide lines.*
>
> 2. *The questioned signature [125-001] is fluently written with light pen movements showing no sign of overwriting, retraces or hesitation*
>
> *In the course of my examinations l have been provided with a very similar document [52-001] also dated 18th October 2000. This document [52-001] also bears a signature in the name Abdulaziz Algosaibi. Document [52-001] is referred to in my Consolidated Report dated 7th January 2011 where I state with regard to the signature [52-001]:*
>
> *"The signature in the name Abdulaziz Algosaibi on the Credit Facility Agreement [52—001] is fluently executed. However, this signature is substantially different when compared with the undisputed signatures of Abdulaziz Algosaibi available to me. The undisputed signatures listed in Appendix E cover a period up to December 1999. I have, therefore, considered the possibility that the differences observed in this questioned signature [52-001] have arisen as a result of natural development of the signature over the years. However, the differences observed in this signature [52-001] place it well outside the range of variation seen in the undisputed signatures. I have concluded that there is strong positive evidence to support the view that the signature in the name Abdulaziz Algosaibi on the Credit Facility Agreement [52-001] is not genuine but is an attempt to simulate his genuine signature."*
>
> *I note, using the non-destructive examinations available to me, that the ink used for the signature [125—001] is indistinguishable from that used for the signature [52-001].*

> *I compared the signature on document [125-001] with that on document [52-001] and with the undisputed signatures of Abdulaziz Algosaibi listed in Appendix D. As a result of this comparison I have noted that the signature [125-001], whilst showing a close resemblance to the signature [52-001], differs from the signatures in Appendix D. Whilst the questioned signature [125-001] is dated 18th October 2000, the undisputed signatures listed in Appendix D cover a period up to December 1999. I have, therefore, considered the possibility that the differences observed in this questioned signature [125-001] have arisen as a result of natural development of the signature over the years. However, the differences observed in this signature [125—001] place it well outside the range of variation seen in the undisputed signatures.*
>
> *I have concluded that there is strong positive evidence to support the View that the signature in the name Abdulaziz Algosaibi on the Credit Facility Agreement [125-001] is not a genuine signature of Abdulaziz Algosaibi but is an attempt to simulate his genuine signature, and that it is from the same source as the signature on the Credit Facility Agreement [52-001]".*[1669]

146. This evidence was not challenged by the Defendants in cross-examination and Mr. Handy's position in relation to these documents is summarised in the Joint Statement in this way: "*The exception is the original signatures in the name Abdulaziz Algosaibi on documents [52- 001] and [125-001]. Dr Giles has concluded that there is strong positive evidence to support the view that these questioned signatures are not genuine signatures of Abdulaziz Algosaibi. Mr. Handy agrees that there is positive evidence that these signatures [52-001 and 125-001] are not genuine, but finds the evidence to be weak*".[1670]

147. Relying on these circumstances, AHAB submits that the only conclusion that the evidence permits is that these documents, signed at a time when Abdulaziz was incapacitated, "*were forged by Mr. Al Sanea (or at his instigation)*".

---

1669 Giles 4R: {**J/5/11-12**}.

1670 Giles/Handy Joint Statement, paragraph 6.2: {**J/9/4**}.

148. Given all that we now know about AHAB's efforts to suppress news of Abdulaziz's illness – including, it is fair to assume – AHAB's knowledge of his signature on the SAMBA Reports[1671] – the conclusion that Al Sanea must have **forged** Abdulaziz's signature on the HSBC facility documents is not the only plausible conclusion. While, on the basis of Dr. Giles' evidence (and the known circumstances) the signatures were certainly not applied by Abdulaziz himself, the evidence does not satisfy me that they must have been forged by Al Sanea or by someone else at his instigation, in the sense of having been simulated to bank documents without the knowledge and authority of AHAB.

149. The same conclusion is reached in relation to other facilities on the Forgery Schedule purportedly signed by Abdulaziz. For instance, another relied upon by AHAB as proof of Al Sanea's direct knowledge of and involvement in the *"forgery"* of Abdulaziz's signature, is that with Mashreq Bank.[1672] At the time of the execution of this facility in November 2000, Abdulaziz was in hospital in Texas, a fact known to Al Sanea who attests to having, along with his wife Sana'a, attended on Abdulaziz there.[1673]

150. There is no onus on the Defendants to disprove the allegation of forgery by Al Sanea. AHAB has failed to meet its onus of proof in this regard, as it has even more conclusively, in relation to the other 30 Abdulaziz signatures on the Forgery Schedule (apart from the HSBC facility) in respect of which the experts agree the evidence is

---

1671 Saud's evidence at trial to the effect that Abdulaziz's illness was well known to the outside world including to SAMBA {**Day42/113:23**}-{**Day42/114:20**}, could easily if true have been substantiated by independent evidence but AHAB chose not to adduce any such evidence. Given that Saud succeeded Abdulaziz on the SAMBA Board, it is peculiar, to say the least, that he didn't "*have a clue about*" how his father's signature could have come to be applied to two successive SAMBA Annual Reports as Chairman in 2001 and 2002 {**Q/538/8**}; {**Q/539/9**}. Saud xx: {**Day42/118:25**}-{**Day41/120:9**}.

1672 Forgery Schedule, lines 17-20.

1673 Al Sanea 5A, paragraph 245: {**L2/9/67**}.

inconclusive.[1674]

151. This agreed position of the experts has not, however, deterred AHAB from arguing that Al Sanea must also have forged these 30 Abdulaziz signatures, relying on the fact that several of these documents purport to record meetings at which both Abdulaziz and Al Sanea were present and/or were signed by Al Sanea himself.[1675] That when he signed these documents, Al Sanea must have known that no such meeting had taken place. That he knew therefore that the documents recording the meetings were fraudulent and he knew that Abdulaziz had not himself signed the relevant document.

152. While *vis-à-vis* the outside world these documents were certainly "*fraudulent*", this argument entirely begs the question whose fraud this was – was it Al Sanea's alone or Al Sanea's and AHAB's?

**Suleiman signatures**

153. Mr. Handy and Dr. Giles agree that there are a number of Suleiman signatures that have been duplicated or matched to other Suleiman signatures. In the Joint Statement Mr. Handy and Dr. Giles state:[1676]

> *"We are agreed that there are a specific number of signatures in the name Suleiman Algosaibi that have been duplicated on the questioned documents".*

154. In almost all cases original pen and ink signatures have **not** been identified. In the Joint Statement Mr. Handy and Dr. Giles Agree therefore that they are unable to conclude

1674 They are entered on the Forgery Schedule as "*not matched*" – lines 4-13 and 16-34: {**A2/23.1/1**}.

1675 AHAB Closing submissions: {**D/4/333**}.

1676 {**J/9/2**}.

whether the "*Source Signatures*" had been written by Suleiman: [1677]

> *"However, with some specific exceptions dealt with below (identified by Dr Giles but not confirmed by Mr. Handy* [[1678]]*) the original documents on which the pen-and-ink Source Signature was made has not been identified. Nor are we able to determine if any of these duplicated signatures (the Source Signatures) were actually written by Suleiman Algosaibi".*

155. The forensic evidence has identified matched signatures and, in some cases, the method by which the signature may have been applied.

156. It is however, as already explained, impossible to determine whether or not a signature was forged without knowing the context in which the signature was applied; viz. with or without authority. AHAB has not sought to particularise the context in which allegedly forged signatures were applied. Instead, its inferential case is based on the very existence of the matched signatures.

157. It must of course be recognised and accepted that having genuine signatures on their facility documents mattered to the banks,[1679] otherwise they were at risk of AHAB defending claims on their facilities on the grounds that the signatures were forgeries and the borrowing was not authorised. That is what happened in the present case, as the London Proceedings showed.

158. However, as the following examination shows, the occurrence of Suleiman matched signatures among the documents was so much at random as to suggest that they occurred for reasons other than a deliberate and selective campaign of fraud and forgery by Al

---

1677 **{J/9/3}.**

1678 The Al-Jazira documents: {**G/6155/1**} and {**G/6152/1**}.

1679 See for example the Witness Statement of Geoff Duncanson, paragraph 21: {**C2/22/6**}: *"I would have expected the signatures to have been applied by hand by the individual whose signatures they purported to be ... Had I suspected that the signatures on some of the Facility documentation had not been applied by hand I would not have accepted the documents."*

Sanea against AHAB. This pattern suggests that their occurrence could not have been aimed at the evasion of AHAB's putative "*New for Old*" policy.

**Suleiman signatures in the period between Abdulaziz's stroke and his death**

159. Abdulaziz died on 11 May 2003. There are two Suleiman signatures on documents that pre-date Abdulaziz's death that are said to be matched.[1680] The first is described in the Forgery Schedule as the *"Money Exchange Consolidated Financial Statements"*. In fact this is the Financial Statement for the Money Exchange Commission & Investment in English for the year end 31 December 2002 – the versions that were sent to the banks. AHAB accepts that Abdulaziz knew that these Financial Statements were sent to the banks and that Suleiman continued Abdulaziz's policies. There therefore appears to be no reason why this Suleiman signature would have been forged. Being but a matched signature, it may have been applied with his authority but that is not forgery.

160. The second Suleiman signature pre-11 May 2003, is on AHAB's Financial Statements for the year ended 31 December 2002 in English.[1681] Here AHAB asserts an extraordinarily illogical allegation. Taken at face value, AHAB here alleges that Suleiman's matched signature was fraudulently applied by Al Sanea to AHAB H.O. accounts. But AHAB H.O. accounts, even on AHAB's case, had nothing whatsoever to do with Al Sanea. Here Suleiman's signature appears on the Chairman's Statement in which he speaks very much in the first person as the new Chairman of AHAB; e.g.: *" I am honoured to succeed my brother as Chairman of the Algosaibi Partnership*". Upon Abdulaziz's passing, there could no longer be any pretense that he was still at the helm. Far from supporting

---

[1680] Forgery Schedule, lines 53 and 54 {**A2/23.1/2**} and {**G/3229**}; {**F/114**}.

[1681] {**F/114/1**}.

AHAB's forgery case, this document undermines it, because this is an AHAB H.O. document that had nothing to do with the Money Exchange but on which a matched signature has been applied. Its existence on this document suggests a reason other than forgery for the use of matched signatures.

**The period between 11 May 2003 and March 2004**

161. In the period between 11 May 2003 and March 2004 there are **seven** documents said to have matched signatures on them.[1682]

(1) The first four documents are letters from AHAB to various bankers, bearing not only Suleiman signatures but unquestionably Saud's as well.[1683] For example, a letter dated 24 May 2003 to the CEO of Bahrain Islamic Bank[1684] and an identical letter to the relationship manager with Credit Agricole Indosuez.[1685] There are 17 of these identical letters in the trial bundle (four of which are in the Forgery Schedule[1686]) and there may have been more. They were sent to all the banks on AHAB headed notepaper notifying the banks of *"the constitutional position of* [AHAB] *following the recent death of our Founding Partner and Chairman Abdulaziz Hamad Algosaibi"*. The letter announced:

> *"The new Board of Directors has elected Founding Partner, Suleiman Hamad Algosaibi as Chairman with full executive powers and Yousif Ahmad Algosaibi as President. Saud Abdulaziz Algosaibi has been elected Managing Director of the Company with full executive powers".*

---

1682 Forgery Schedule, lines 55 to 57 and 74 {**A2/23.1/3**} and {**G/3322**}; {**G/3329**}; {**G/3313**}; {**G/3328**}; {**G/3338**}; {**G/3677**} and {**F/127**}.

1683 See lines 55 and 56 of the Forgery Schedule where no allegation is in relation to these Saud signatures.

1684 {**G/3322/1**}.

1685 {**G/3329/1**}.

1686 {**G/3313/1**}, {**G/3328/1**} and {**G/3329/1**}, {**G/3322**}.

In the case of the Money Exchange, the letter stated:

*"In the case of the Algosaibi Money Exchange, Suleiman Hamad Algosaibi has been appointed Chairman and Saud Abdulaziz Algosaibi has been elected as a director. Otherwise, the Money Exchange Board continues unchanged".*

It is entirely credible that the Algosaibis would have had their signatures applied to this circular letter to all the banks. Whether Suleiman's signature was applied to each letter individually, or whether Suleiman signed one letter onto which the addresses were later added, matters not. It is, as the Defendants submit, probable that this was done as a matter of convenience, and with authority. That AHAB itself would have approved the application of matched Suleiman signatures to a letter of this type undermines AHAB's forgery case. Moreover, there appears no reason why Al Sanea would have wished to forge these letters.

(2) The fifth document said to have a matched Suleiman signature is a Declaration of Trust dated 25 May 2003 in favour of TIBC by the Money Exchange of 55,514 Al Banque Al Saudi Fransi shares.[1687] As a Bahrain company, TIBC did not have legal capacity to hold shares in a Saudi bank. The shares would therefore have been held by the Money Exchange as trustee for TIBC. The application of Suleiman's signature in this context is not by itself sufficient to ground an inference of forgery given the findings already expressed in this Judgment[1688] that AHAB was fully aware of the existence of TIBC.

1687 {**G/3338/1**}.

1688 Above.

(3) The sixth document is AHAB's financial statements for the year ended 31 December 2003.[1689] As with the AHAB H.O. Financial Statements for the year ended 31 December 2002, this undermines AHAB's case. Again as Al Sanea had nothing to do with AHAB H.O. accounts, it suggests that AHAB applied Suleiman signatures to documents when it was convenient to do so. This does not support the case on forgery. Here, moreover, Suleiman's signature appears as Chairman on the same page with Saud's unquestioned signature as Director[1690] giving rise to the inference that Saud may well have been aware of the method of application of Suleiman's signature.

(4) The seventh document is a letter from Arab Banking Corporation to AHAB dated 17 November 2003 extending the availability period of a US$38m short-term revolving credit facility.[1691] This amendment did not increase the amount available to AHAB. This facility was originally granted on 29 May 1990 and extended annually by amendments.[1692] On AHAB's finally pleaded case, Suleiman would have signed this letter because it did not contravene the "*New for Old*" policy. The original facility does not appear on the Forgery Schedule but the 21 November 2002 amendment does.[1693] The Suleiman signatures on this earlier amendment are however, listed as "*Not matched*". Similarly, the Suleiman signatures on what appears to be a further facility from Arab Banking Corporation

---

1689 {**F/127/1**}.

1690 {**A2/23.1/3**}: Line 74 of the Forgery Schedule records the agreement between Mr. Handy and Dr Giles that Saud's signature here is not a matched signature.

1691 {**G/3677/1**}.

1692 C.f. {**G/3041/1**}.

1693 At line 47.

in a similar amount of US$38m but taken by AHAB for ATS 13 July 2004 and renewed on 24 July 2005 are not on the Forgery Schedule.[1694]

162. Of the other 22 documents (dated within the period between 11 May 2003 to March 2004[1695]), four of the documents[1696] have *"TIBC"* under the AHAB observations in the Forgery Schedule and 17 of the documents[1697] have *"Witnessed at Saad/Money Exchange/ATS"*. AHAB makes no observations on the last of the 22 documents. The fact that a document relates to TIBC is question begging. It can only support a forgery allegation if the Algosaibis knew nothing of TIBC, which for reasons already explained,[1698] is not accepted. The fact that a document is witnessed at Saad (STCC), the Money Exchange or ATS is no support for a forgery allegation. As the Defendants have shown,[1699] there are numerous cases of documents similarly witnessed that are not said to be forged.[1700]

**The March 2004 memorandum**

163. On AHAB's pleaded case there are no matched signatures on any bank facility document

---

1694 {**G/4862/1**}.

1695 This period begins with the passing of Abdulaiziz and the latter date is of significance for reasons which follow.

1696 Forgery Schedule, lines 58, 59, 60 and 62 {**A2/23.1/3**}.

1697 Forgery Schedule, lines 63, 65, 66, 67, 68, 69, 70, 71, 72, 73, 75, 76, 77, 78, 79, 80 and 81 {**A2/23.1/3**}.

1698 See under "Knowledge and Authority" in Section 1

1699 See {**E1/26/31**}.

1700 Documents, several involving very large facilities for the Financial Businesses and similarly witnessed, recovered both from AHAB H.O and the Money Exchange and not alleged to be forged are at: {**H3/82/1**}, {**H4/6/1**}, {**H4/11/1**}, {**H4/13/1**}, {**H4/17/1**}, {**H4/26/1**}, {**H4/29/1**}, {**H4/35/1**}, {**H4/38/1**}, {**H4/39/1**}, {**H5/9/1**}, {**H9/180/1**}, {**G/7233/1**}, {**G/5293/1**}, {**G/4862/1**}, {**G/4447/1**} and {**G/4066.1/1**}. {**G/7712.5/1**} is a joint and several guarantee in favour of Al Khalij Commercial Bank dated 29 March 2009 signed by Dawood five times (for himself and on behalf of all the "*heirs*"; viz: all the other Partners) and is witnessed by Ahmed Fawzi and Mosin Hassan of STCC. Dawood's signatures (as in other instances) are independently verified by an officer of the Saudi British Bank whose stamp appears on the document and it appears further, by a Notary as well.

before 25 March 2004.[1701]

164. On 28 March 2004, Al Sanea wrote a note to Mr. Hayley in the context of the **GIB** guarantee.[1702] Al Sanea wrote (emphasis added):

> *"I NOTE THE ABOVE, WHILST I TRY TO EXECUTE THE DOCUMENTATION FROM UNCLE SULAIMAN PLEASE COULD YOU REVERT TO ALI NAIMI AND HIS PEOPLE AT GIB AGAIN WITH A VIEW TO CONVINCING THEM TO ACCEPT THE SIGNATURE PAGE INSERTION AS PER THE ABC FORMAT OR THE FORMAT WHICH WE SENT TO YOU TODAY IN THE MORNING.* ***UNCLE SULEIMAN USUALLY GETS EMOTIONALLY UPSET AND UPTIGHT WHILST SIGNING FOR ALL THE HEIRS INDIVIDUALLY"***.

165. On the face of this Suleiman did not like signing too many documents, particularly on behalf of the various heirs. There were a lot of documents to sign. This guarantee was in English and so Suleiman could not have read what he was signing. It appears to have been convenient therefore and it made sense to put Suleiman's signatures on authorised documents.

**The period after March 2004**

166. Suleiman's matched signatures are frequently on bank facility and related documents in the period after March 2004.

167. On AHAB's case of forgery, this was necessary for Al Sanea to *"get around"* the *"New for Old"* policy. But a key point that AHAB has entirely ignored is that under the *"New for Old"* policy the **only** facilities **which would not have been authorised** were increases. On AHAB's case when a facility was **increased** Suleiman's signature should be

---

1701 {**G/3967**} –Acknowledgement of Guarantors of four facilities given by Gulf International Bank (GIB) and bearing Suleiman matched signatures and entered at line 83 of the Forgery Schedule. Before this time there were the matched signatures entered at lines 53, 54, 55, 56, and 74 already discussed above.

1702 {**G/3970/1**}.

a forgery but when it is simply **renewed** it should not be. Renewals were not only authorised but AHAB has said that Suleiman expected to sign them: [1703]

> *"Of course, if they genuinely were renewals, there would be no problem with that, he could send them the renewals and it would go through under new for old".*

168. It follows that Al Sanea had no reason to forge signatures on facility and related documents where there was a renewal. Forging signatures on renewals would be counterproductive, because AHAB's case is that Suleiman expected to sign renewals.

**The Bank Narrative Chronologies**

169. There are 91 different banks on the Forgery Schedule. The Defendants Bundle E3 contains very carefully presented Narrative Chronologies for 56 of the lending arrangements between AHAB/the Money Exchange/the Financial Businesses and each of those banks.[1704] The Narrative Chronologies have been produced for (a) banks listed in the Forgery Schedule with the largest claims[1705] against AHAB; (b) banks whose lending to the AHAB Group appears to have increased over the years but whose facilities do not appear on the Forgery Schedule; and (c) banks that appear to have renewed (but not increased) lending to AHAB whose renewals are subject to forgery allegations.

170. There is a spread sheet overview of the lending relationship with each bank and which identifies the inconsistencies between the established facts and AHAB's pleaded case.[1706] On the spread sheet, facilities are identified under various headings including: (1) increased facilities but which are not alleged to be forged; (2) renewed facilities (without

---

1703 AHAB's opening submissions: {**Day4/137:5-7**}.
1704 {**E3/1/1**}- {**E3/56/1**}.
1705 In various fora around the world.
1706 {**E3/1/1**}.

increases) which are alleged to be forged; (3) facilities (and supporting documents or related correspondence) with both matched and non-matched signatures on them; (4) facilities where there is other evidence of AHAB Partner knowledge of the borrowing or of the matching signatures on them; (5) facilities where the borrower is ATS, AIH or TIBC where there is no allegation of forgery although an AHAB Partner signed the facility contrary to AHAB's pleaded lack of knowledge of these entities; and (6) facilities where the borrower is shown as ATS, AIH or TIBC and, contrary to AHAB's pleaded lack of knowledge of these entities, the documents are said to have been manipulated to induce Suleiman to sign.

171. Because of such inconsistences, not only does the forensic evidence fail to support AHAB's case but much of it undermines it. In very many instances, **renewed** facilities, which on AHAB's case there would have been no need to forge, have matched signatures, and **increased** facilities, which should have been forged on AHAB's case, do not have matched signatures.

172. Adopting the submissions of the Defendants, I comment in more detail as follows:

**Increased facilities with Suleiman signatures not alleged to be matched**

173. There are **increased facilities** with signatures that are not alleged to be forged. If, as alleged by AHAB, the AHAB partners implemented a "*New for Old*" policy, then any increase in the amount borrowed from a bank was unauthorised and the signatures on those increased facilities should, on AHAB's case, be forgeries. As such, where there are unchallenged signatures on an increased facility, this is inconsistent with AHAB's "*New for Old*" case.

**Arab National Bank Chronology:**

174. The Arab National Bank Chronology notes[1707] that AHAB had a banking relationship since at least 1985. The facility taken in 1985 was the first example of AHAB entering into what can be described as "omnibus facilities" in which Arab National Bank ("ANB") provided multiple lines of credit to various entities within AHAB Group. These facilities were renewed and/or increased over ensuing years. The facility agreement between AHAB and ANB is an example of the inconsistency in AHAB's case where there are unchallenged signatures on increased facilities after 30 September 2000:

(1) On 28 March 2006, AHAB entered into a facility agreement, containing various facilities, with ANB, totalling SAR 720.5m (US$192.1m).[1708]

(2) On 14 March 2007, AHAB increased its facilities with ANB from SAR 720.5m to SAR 970.5m (US$258.8m);[1709] an **increase** to AHAB of SAR 250m.

(3) This increase mirrors the amount suggested by Badr in a handwritten letter he had sent to Saud nine months previously (on 18 July 2006).[1710] While what was proposed involved an increase in facilities for the Money Exchange, Badr was here telling Saud that the matter was left to him because it involved an "*Accreditation increase (by way of transfer of some earlier facilities granted AHAB to the Money Exchange) and not a loan or overdraft".*

---

1707 {**E3/11/1**}.

1708 {**G/65/2**} to {**G/65/10**}, translation at {**G/65.1/2**} to {**G/65.1/11**}.

1709 {**G/5718/1**} - This is the Arabic. I have seen no reference for the translation. The entry on the G Bundle states, among other things that this Agreement "*clearly reference(s) facilities allocated to the ME in addition to a number of AHAB companies*".

1710 {**H22/28/1**} (Arabic), {**H22/29/1**} (translation).

(4) The 14 March 2007 facility (i.e. the increased facility) was signed by Suleiman but the signature is **not alleged to be matched**.[1711]

(5) In addition, the 'original' facility dated 28 March 2006 was itself an increase of a previous facility dated 12 February 2005[1712] bearing **non-matched** signatures of Saud and Suleiman.

**Arab Bank Chronology:**

175. This banking relationship went back to at least 1993.[1713] In 2006 the amount available under the 2005 Revolving Credit Facility was **increased by US$10m** to US$30m.[1714] It was signed three times by Suleiman. Suleiman also signed a guarantee dated 17 January 2006 in Arabic and English, a promissory note and a letter providing various confirmations (all of the same date).[1715] None of these Suleiman signatures is alleged to be a match.

**Abu Dhabi Commercial Bank ("ADCB") Chronology:**

176. By a letter from Mr. Hayley to Mr. Shariq Azhar, it appears that banking relationships were established in about December 2003.[1716] According to the ADCB Bank Chronology, ATS was the first of the AHAB Group, on 19 April 2004 to accept a facility from ADCB.[1717] Suleiman signed the April 2004 facility twice. The first signature is an agreed match to Suleiman Source Signature (79); the second is not alleged to be matched.[1718] As

---

1711 Again: {**G/5718/1**}.
1712 {**G/4539/7**}; {**G/4539.1**}.
1713 {**G/1273/5**}; {**G/1509/1**}; (a syndicated facility).
1714 Arab Bank Chronology, paragraph 31: {**E3/8/10**}.
1715 **Ibid.** at paragraph 32.
1716 {**H23/57**}.
1717 {**E3/2/1**} at paragraph 2 - the 19 April 2004 facility letter is at {**G/4033/1**}.
1718 Forgery Schedule, line 87.

analysed in the ADCB Bank Chronology[1719] there are 27 Suleiman signatures on documents that related to **increases** in the AHAB Group's borrowing from ADCB which are not alleged to be matched. That Saud was aware of the banking relationships with ADCB is plain from his letter of 31 March 2009 to Al Sanea, confirming a meeting he was scheduled to attend with ADCB on 6 April 2009 at 12pm.[1720]

**Commercial Bank of Kuwait ("CBK") Chronology:**

177. Only one Suleiman signature has been matched on a facility-related document that increased AHAB's borrowing. By way of amendment agreement in English dated 30 September 2006 (the "2006 Amendment Agreement")[1721] between ATS/AHAB and CBK, a 2005 facility was renewed for a further 12-month term and the amount of borrowing was increased to US$30m. Suleiman signed the 2006 Amendment Agreement twice: on behalf of AHAB as "*obligor*" and on behalf of ATS as "*agent*". The first signature, on behalf of ATS, is an agreed match to Suleiman Source Signature (36b). The second signature, on behalf of AHAB, is not alleged to be matched.[1722] Three Suleiman signatures on documents that **increased** AHAB's borrowing under further amendment to this Agreement are not alleged to be matched.[1723]

178. The Narrative Chronologies show that many of the increases do not bear matched signatures. In the Bank Chronologies spread sheet,[1724] there are at least 21 facilities with separate banks which were increased, but where the facility providing the increase has no

---

1719 {**E3/2/16**} at paragraph 51.
1720 {**G/7737.6/1**}.
1721 {**G/5444/1**}.
1722 Forgery Schedule, line 343.
1723 **C_CAY_AHAB_0000093868** and **0000094009** and see {**E3/25/6**}, paragraphs 21 - 23.
1724 {**E3/1/1**}.

"*matched*" signatures.

**Renewed facilities with Suleiman signatures alleged to be matched**

179. On AHAB's case, the AHAB Partners and Suleiman in particular, approved renewals of facilities that did not increase the level of borrowing. Where matched signatures appear on renewed facilities (i.e. for the same amount, with no increase), this is inconsistent with AHAB's "*New for Old*" case because **renewed** facilities would have been authorised. There was no need for Al Sanea to forge such documents. The application of matched signatures cannot therefore be related to Al Sanea getting around *"New for Old"*. Yet many of the matched signatures appear on renewals.

**CBK (cont'd).**

180. A good starting example, carried on from the CBK Chronology, is the Amendment Agreement in English dated 26 November 2008 (the "CBK 2008 Amendment Agreement").[1725] By this the 2005 Facility was renewed for the third time, for another 12-month term (from September 2008), and in the case of which earlier renewals as we have seen, there were also increases where the Suleiman signatures are not alleged to be forged. By the CBK 2008 Amendment Agreement however, the amount of borrowing **did not increase**. Suleiman signed twice: on behalf of AHAB as "*obligor*" and on behalf of ATS as "*agent*". The first signature, on behalf of ATS, is an agreed match to Suleiman Source Signature (10).[1726] The second signature, on behalf of AHAB, is an agreed match to Suleiman Source Signature (11). Mr. Handy has identified Suleiman Source Signature

---

1725 {**G/7205/1**}.
1726 Forgery Schedule, line 747.

(10) and (11) as "*possibly matched to stamps*."[1727] Suleiman also signed the minutes of a joint meeting between AHAB as "*obligor*" and ATS as "*agent*", in English dated 20 December 2008, where it was resolved to accept the terms of the CBK 2008 Amendment Agreement.[1728] Suleiman's signature on this document is an agreed match to Suleiman Source Signature (18).[1729] In that line of the Forgery Schedule, Mr. Handy has identified Suleiman Source Signature (18) as "*possibly matched to stamps*."

181. The inclusion by AHAB of these bare renewal facility documents on the Forgery Schedule, is rendered even more illogical by the fact that in a letter dated 21 December 2008, Al Sanea wrote to Badr "*enclosing the board resolution related to the renewal facility with (CBK) for a period of another one year, which was forwarded to you yesterday and asking Badr to 'have them executed and returned to us as soon as possible'*".[1730] Badr annotated this letter and signed his annotation. Badr wrote "*Delivered to them today (Moshen) 27/12*".

182. These circumstances, far from suggesting forgery of Suleiman's signatures, strongly invite the inference that these signatures were indeed applied at AHAB H.O. by hand stamps, for convenience.

**Saudi Hollandi Bank Chronology:**

183. AHAB had banking relationships with Saudi Hollandi Bank on behalf of the Money Exchange since at least 1989.[1731] On 24 July 2007, AHAB entered into a facility

---

1727 The possible use of hand stamps for the application of signatures identified by Mr. Handy (without disagreement from Dr. Giles), is the subject of further discussion under "*Methods of Application*" below.

1728 {**G/7295/1**}.

1729 Forgery Schedule, line 764.

1730 {**G/133/10**} (Arabic); {**G/133.1/5**} (translation).

1731 {**G/1346/1**} - a letter dated 3 October 1990 from the bank, confirming to AHAB Money Exchange (attn. Al Sanea) an extension and increase of facilities in substitution for facilities granted April 1989.

agreement, containing various facilities, with Saudi Hollandi Bank, totaling SAR 362.5m (US$96.7m).[1732] This facility replaced a 3 October 2006 facility[1733] but did **not** increase the amount that was available to AHAB. This renewal was signed nine times by Suleiman (once on each page) and those signatures are all agreed to be matched.[1734] Six of these signatures are found by Mr. Handy to have been possibly applied by hand stamps. The 'original' facility dated 3 October 2006 was itself a renewal signed nine times by Suleiman that bears six agreed matched signatures.[1735]

**Arab Bank Chronology (cont'd):**

184. There are several examples of Arab Bank facilities having been simply renewed but where "*matched*" signatures were found. For example, by a letter in English dated 3 October 2005, Arab Bank agreed to extend the availability date of the Facility originally provided in 1998 (in the amount of US$110m) to 11 September 2006. The amount available under the 1998 facility **did not increase**. This letter is signed three times by Suleiman: on behalf of AHAB and as guarantors, on behalf of himself and the AHAB heirs.[1736] All three signatures are agreed matches.[1737] As analysed in the Arab Bank Chronology,[1738] there are 68 matched Suleiman signatures on Arab Bank facility documents, and related documents, in the Forgery Schedule. All 68 signatures are on

1732 {**G/5943/1**}.
1733 {**G/5456/1**}.
1734 Forgery Schedule, line 450 {**A2/23.1/16**}.
1735 Forgery Schedule, line 345 {**A2/23.1/13**}.
1736 {**G/5463/2**}.
1737 The first matches Suleiman Source Signature (44b); and the second and third match Suleiman Source Signature (36b): Forgery Schedule line 346: {**A2/23.1/13**}.
1738 {**E3/8/1-7**}.

documents that relate to **renewals** or extensions of facilities.[1739] Not one of these 68 is on a document that relates to increased facilities.

**ADCB Chronology (cont'd):**

185. Fifteen of the Suleiman signatures that have been matched are on facility documents that did not increase the AHAB Group's borrowing.[1740] Several of these Suleiman signatures have been identified by Mr. Handy as "*possibly matched to a stamp*".[1741]

**CBK (cont'd):**

186. No allegations of forgery are made in relation to facility documentation with CBK in the period September 2000 (when banking relations appear to have begun) and 10 November 2004, including large amounts of borrowing by AIS and AIH. Also, as discussed above facilities for large increases in 2006 and 2007 are not alleged to have been forged. However, six Suleiman signatures have been matched on documents that renewed but did not increase AHAB's borrowing from CBK.[1742] Here too, the reasonable inferences arising do not support AHAB's case. For instance, these six include a Suleiman signature on an AHAB Board resolution of 6 October 2005[1743] authorising a facility dated 30 September 2005 which was the renewal without increase of a 2004 US$15m facility. This Suleiman signature is an agreed match to Suleiman Source Signature (48). However, the 30 September 2005 facility document itself, signed also by Suleiman[1744], is not alleged to

---

1739 {**G/4255/1**}, {**G/4521/1**}, {**G/4700/1**}, {**G/4710/1**}, {**G/4703/1**}, {**G/5463/1**}, {**G/6136/1**}, {**G/6236/1**}, {**G/6286/1**}, {**G/6850/1**}, {**G/6853/1**}, {**G/6854/1**}, {**G/6856/1**}, {**G/6857/1**}, {**G/6858/1**}, {**G/6886/1**}, {**G/6880/1**}, {**G/6885/1**}, {**G/6887/1**}, {**G/6890/1**}, {**G/7017/1**} and {**G/7018/1**}.

1740 ADCB Chronology {**E3/2/15**} [49].

1741 For example: Suleiman Source Signatures (37), (Forgery Schedule line 444), (22) (Forgery Schedule line 394), (14) (Forgery Schedule line 586).

1742 As summarized at {**E3/25/8**} [30].

1743 {**G/4969**} and Forgery Schedule line 246.

1744 **C_CAY_AHAB_0000093886**.

be forged. Moreover, three others of these six Suleiman signatures have been identified by Mr. Handy as "*possibly matched to stamps*".[1745]

187. This apparently random occurrence of matched and unmatched signatures on facility documents which did not increase borrowing suggests that Source Signatures were being applied for convenience. Consistent also - as Mr. Handy opines by his identification of the possible use of hand stamps in some instances - with the use of such a method of application.

188. From my own examination of them, the Narrative Chronologies show that many of the matched signatures are on renewals. In the Bank Chronologies spread sheet[1746] there are listed some 36 facilities with separate banks that were simply renewed, but where signatures on the renewed facility are found to be matched and are included by AHAB in the Forgery Schedule.

**Matched and unmatched signatures on the same facility document**

189. There are matched as well as unmatched signatures on the same facility document, including some which increased as well as some (such as the last mentioned CBK facility) which did not increase borrowing. Where only some signatures on a facility document are matched, but other signatures on a facility document are not, that scenario does not support AHAB's case. Where a facility is increased, on AHAB's case, all the signatures on a facility document should be matched. But in the spread sheet[1747] there are some ten facilities with separate banks which have a mixture of matched and unmatched signatures. Four of these are discussed here:

---

1745 Suleiman Source signatures (10), (11) and (18) - Forgery Schedule lines 747 and 764, respectively.
1746 {**E3/1/1-2**}.
1747 {**E3/1/1-2**}.

(1) Gulf International Bank ("GIB") Chronology: AHAB had banking relationships with GIB since at least 1983.[1748] By a letter dated 6 November 2006,[1749] AHAB renewed without further increasing, a working capital facility with GIB which had been provided originally on 25 March 2004[1750]. Suleiman signed this facility twice (at pages 5 and 22): the first signature is not alleged to be matched. The second signature is an agreed match to Suleiman Source Signature (83).[1751]

(2) Saudi Investment Bank ("SAIB") Chronology:

(i) AHAB is said to have had banking relationships with SAIB since at least September 1989.[1752] By an agreement dated 20 June 2005,[1753] AHAB increased its borrowing from SAIB from SAR 525m to SAR 625m. Suleiman signed this agreement four times: the first signature is an agreed match to Suleiman Source Signature (70). Mr. Handy (but not Dr. Giles) has matched the second signature to Suleiman's signatures on other documents[1754] and the fourth signature to Suleiman Source Signature (49)[1755]. The third signature is not alleged to be matched.

(ii) By an agreement dated 1 August 2006,[1756] AHAB increased its borrowing from SAIB from SAR 625m to SAR 825m. Suleiman signed this

---

1748 **C_CAY_AHAB_0000031485**.
1749 {**G/5488/1**}.
1750 **C_CAY_AHAB_0000123508**.
1751 Forgery Schedule, line 353.
1752 {**E3/50/1**} [1].
1753 {**G/5286/1**} **to** {**G/5286/4**}.
1754 {**G/3338/1**}; {**G/5448/1**} and {**G/5546/1**}.
1755 Forgery Schedule, line 222.
1756 {**G/5358/1**}, duplicate at {**G/5359/1**}.

agreement four times: here too three of his signatures have been matched[1757] and one signature is not alleged to be matched.

(3) National Commercial Bank ("NCB") chronology: AHAB has had banking facilities with NCB since at least1983.[1758] By an agreement in Arabic dated 2 October 2004,[1759] AHAB renewed a facility with NCB and reduced its borrowing to SAR 959m. Suleiman signed this agreement three times:[1760] all three of his signatures are agreed matches.[1761] However, on 1 October 2005 AHAB entered into an SAR 1,062.25bn facility with NCB which replaced the October 2004 Facility and so significantly increased the amount available to AHAB. Suleiman signed the 2005 Facility five times on behalf of AHAB;[1762] none of these signatures is alleged to be matched. Suleiman also signed the agreement seven times on behalf of AHAB Partners as guarantors joint and several: Suleiman himself, the heirs of Abdulaziz and the heirs of Ahmad Hamad. None of those signatures is alleged to be forged. The sub-facilities provided by NCB were set out in a schedule in Arabic and English.[1763] Suleiman signed this schedule six times on behalf of AHAB; none of these signatures is alleged to be matched. Suleiman also signed the schedule eight times on behalf of the same guarantors; none of these signatures is alleged to be a match.

---

1757 Forgery Schedule, line 321.
1758 **C_CAY_AHAB_0000038571**.
1759 {**G/4359/1**}.
1760 {**G/4359/1-3**}.
1761 Forgery Schedule, line 136.
1762 {**H23/676/1**} to {**H23/676/5**}.
1763 **C_CAY_AHAB_0000114275**.

(4) ADCB (cont'd): By an agreement dated 19 April 2004,[1764] ATS entered into a new facility with ADCB for US$20m. This was the first facility that any AHAB entity entered into with ADCB. Suleiman signed this facility twice: the first of these signatures has been matched to Suleiman Source Signature (79) but the second is not alleged to be matched.[1765] The same pattern of matched and unmatched Suleiman signatures appears throughout the contemporaneous documents required by ADCB in keeping with the terms of this April 2004 facility.[1766] Notably, these include an AHAB Partners' resolution in English and Arabic dated 24 April 2004, taken in support of the April 2004 facility.[1767] This document specifically authorized the "*company to sign the Facility Letter Agreement, for its subsidiary Algosaibi Trading Services Ltd (ATS Ltd) for the purpose of financing purchase of commodities (aluminium and copper).*" Suleiman signed this document; this signature is not alleged to be matched.

**Matched signatures on supporting documents but not on the facilities**

190. There are allegations of matched signatures on supporting documents (including correspondence) but not on the facilities themselves (or vice versa). Where there are matched signatures appearing on supporting documents to facilities or correspondence regarding the facility, and not on the facility itself (or vice versa), this is obviously not consistent with AHAB's case - the facilities themselves were *ex facie* authorized.

**(CBK) (cont'd):**

191. On 30 September 2005, AHAB entered into a further facility agreement with the CBK for

1764 **{G/4033/1}**.
1765 Forgery Schedule, line 87.
1766 As discussed in the Bank Chronology: {**E3/2/1-2**}.
1767 {**G/4048/1**}.

US$15m.[1768] This renewed the 2004 Facility and included a requirement for the Special Power of Attorney to remain valid. The amount available to AHAB did not increase. Suleiman signed this facility and his signature is not alleged to be matched. The facility was authorised by an AHAB board resolution written in English, dated 6 October 2005.[1769] Suleiman signed this board resolution and his signature is matched.[1770]

**Deutsche Bank chronology:**

192. Another example of apparently unquestioned facilities but questioned related documentation is Deutsche Bank with whom AHAB started banking relations in 1999.[1771] On 21 August 2007, AIH entered into a facility agreement with Deutsche Bank for US$200m with AHAB acting as guarantor ("the 2007 AIH Facility").[1772] Suleiman signed this facility on behalf of AIH and his signature is not alleged to be matched. The facility was authorised by an AHAB board resolution dated 22 August 2007[1773] Suleiman signed this board resolution and Mr. Handy has matched this signature to Suleiman's signatures on other documents.[1774]

**ATS, AIH and TIBC facilities**

193. On AHAB's case, AHAB Partners did not know about ATS or AIH.[1775] It follows that any AHAB signatures on ATS, AIH or TIBC documents should be "matched" signatures. However, this is also not the case. As discussed above and as is widely shown in the

---

1768 **C_CAY_AHAB_0000093886**.
1769 {**G/4969/1**}.
1770 Forgery Schedule, line 246.
1771 {**H4/29/1**} - a corporate guarantee given by AHAB to Deutsche Bank on 30 January 2002 referencing facilities originally given on 30 January 1999.
1772 **C_CAY_AHAB_0000048461**.
1773 {**G/5992/1**} - it appears from the minutes that the meeting was convened especially to deal with the 2007 AIH Facility.
1774 {**G/4848/1**}; {**G/5038/1**}; {**G/5915/1**} and {**G/5965/1**} (discussed at {**E3/29/7**} [28]).
1775 AHAB Partners' knowledge of the Bahraini Financial Businesses is dealt with generally in Section 1 of this Judgment.

Bank Chronologies, there are many instances of Suleiman signatures on documents relating to facilities for the Bahraini Financial Businesses which are not matched. Some further telling examples follow:

(1) Barclays Bank ("Barclays") Chronology: AHAB has had banking facilities with Barclays since at least 1984.[1776] On 4 October 2007 Suleiman signed a second supplemental agreement on behalf of ATS, increasing ATS' borrowing with Barclays from US$40m to US$43.5m.[1777] This document was signed by Suleiman and his signature is not alleged to be matched. Nor is Suleiman's signature on the related AHAB guarantee (in English) for the sum of US$43.5m.[1778] A further supplemental agreement in English dated 4 December 2007 more than doubled the amount of borrowing to US$90m. There are two versions of this document. One version[1779] was signed once by Suleiman and his signature is an agreed match to Suleiman Source Signature (21).[1780] The other version[1781] was found in AHAB H.O. files. Suleiman signed this version five times; none of these signatures is alleged to be a match. A guarantee was given in English on 4 December 2007 for US$90m, by the Partners of AHAB.[1782] This document was signed by Suleiman and the signature is not alleged to be a match. Suleiman also signed another supplemental agreement dated 18 September 2008 on behalf of AHAB and ATS further increasing the borrowing to US$135m.[1783]Neither of the

---

1776 Credit facility for US$3m at document **C_CAY_AHAB_0000033328**.
1777 {**G/6091.1/1**}.
1778 **C_CAY_AHAB_0000238442**.
1779 {**G/6163**}; duplicates at {**G/6164/1**}; {**G/6164.1/1**} and {**G/6164.2/1**}.
1780 Forgery Schedule, line 492.
1781 {**H2/132/1**}.
1782 **C_CAY_AHAB_0000238430**.
1783 **C_CAY_AHAB_0000238383**.

two Suleiman signatures is matched even though the borrower was ATS (and the level of borrowing increased). Ancillary to this, a limited guarantee of even date for US$135m was given by the AHAB Partners in English.[1784] Suleiman signed this guarantee; this signature is not alleged to be matched.

(2) ADCB (cont'd): Twenty-four Suleiman signatures on documents relating to ATS's borrowing (some of which are in Arabic) from ADCB are not alleged to be matched. Some of these relate to facilities which increased borrowing. As we have seen above, Saud was aware of AHAB's relationship with ADCB.[1785] In fact, Saud signed off on the final amendments to ADCB facilities and related documents in February 2009 which then secured borrowing of over US$1.5bn for ATS and US$50m for AHAB.[1786] None of Saud's signatures on these documents are alleged to be forged.[1787]

(3) CBK (cont'd): Sixteen Suleiman signatures on documents relating to borrowing involving ATS or AIH are not alleged to be matched, including four signatures on documents that increased borrowing.[1788]

(4) Deutsche Bank: Six Suleiman signatures on documents relating to borrowing by ATS and AIH are not alleged to be matched. Three Suleiman signatures on facilities for TIBC have been matched but the facilities did not increase borrowing.[1789]

---

1784 **C_CAY_AHAB_0000238393**.
1785 {**G/7737.6/1**}.
1786 {**G/7500/1**}, duplicate at {**G/7507/1**}, {**G/7500**} to {**G/7500/14**}; **(duplicates at** {**G/7501/1**} and {**G/7502/1**} {**G/7500/15**} to {**G/7500/19**} (duplicates at {**G/7505/1**} and {**G/5021/1**}; and {**G/7500/20**} to {**G/7500/25**}; {**G/7508/1**}; {**G/7509/1**} respectively.
1787 See generally {**E3/2/1-16**}.
1788 See generally {**E3/25/1-8**}.
1789 See {**E3/29/7**}.

(5) BNP Paribas chronology: AIH was involved in syndicated lending with Paribas (later BNP Paribas)[1790] from at least 1985.[1791] AHAB guaranteed this lending. In 2002 AIH entered into a credit facility agreement with BNP Paribas in a total amount of US$31.3m. Suleiman signed the agreement 3 times; on behalf of Abdulaziz as guarantor, on behalf of himself as guarantor and on behalf of AHAB as borrower. These signatures are not alleged to be matched. In order to satisfy certain administrative requirements of BNP Paribas in relation to its accounts AIH on 25 May 2003, assigned title to various assets to its shareholders, who were Suleiman, the heirs of Abdulaziz and the heirs of Ahmad Algosaibi. These assets included an investment in Winchester Future Limited which were ascribed an agreed market value of US$2,690,973.20. AHAB on the same date 25 May 2003 also agreed to pass these Winchester Future Limited shares to TIBC by way of a "*Shareholders Resolution and Deed of Transfer of in-kind Subscription to Title Paid Up Capital of TIBC*" which specified the "*investment in Winchester Future Limited*" and related "*outstanding loan of USD1,675,903.00 from BNP Paribas*".[1792] This document was signed three times by Suleiman; on behalf of himself, on behalf of the heirs of Ahmad and on behalf of the heirs of Abdulaziz. These signatures are not alleged to be matched.[1793]

194. In the Bank Chronologies spread sheet,[1794] there are 22 facilities identified with separate banks where the borrower is ATS, AIH or TIBC and an AHAB Partner has signed the

---

1790 **C_CAY_AHAB_0000042636** and {**E3/21/1**}.
1791 **J_CAY_AHAB_0000005588** and {**E3/21/1**}.
1792 **R_CAY_AHAB_0000033349** and {**E3/21/2**}.
1793 {**E3/21/3**} [7].
1794 {**E3/1/1-2**}.

facility but there is no claim of forgery. According to the Defendants[1795] there are 14 facilities with separate banks where there is other evidence of the AHAB Partners' knowledge of ATS and AIH borrowing. I will come below to look at the allegations of document manipulation. Here it is worth noting that there are five facilities with separate banks identified in the spread sheet where the borrower is ATS, AIH or TIBC as shown on the face of the documents but where it is alleged that the documents were manipulated in order to dupe Suleiman into signing them.[1796]

**Badr's involvement in increased facilities signed by Suleiman**

195. Badr's evidence is dealt with generally earlier in this Judgment.[1797] Here it is worth noting Badr's further[1798] involvement in getting particular facilities signed. There is evidence that Badr was involved in getting increased facilities signed, including where many matched as well as some unmatched signatures were used.[1799] There is evidence that Badr recorded that the facility was an increase. A Supplemental Agreement between ATS and Gulf Bank entered into on 31 January 2008 (the 2007 Supplemental Agreement) increased the total amount available to ATS to US$279m.[1800] Both the earlier Agreement and the Supplemental Agreement were alluded to by Badr in manuscript notes on the respective AHAB Partner guarantees as having been authorised. Badr wrote respectively: "*Renewal was done according to their letter dated 3/9/07*"[1801] and "*Renewal was done on*

1795 {**E1/26/38**}, column 7.
1796 {**E3/1/1**}, column 8.
1797 See Sections 3 "New for Old".
1798 We have seen above in relation CBK, an example of Badr's involvement in getting the renewal of the 2008 Amendment Agreement and where nonetheless Suleiman matched signatures were identified and some found by Mr. Handy as "*possibly matched to stamps*".
1799 {**E3/31/1**} - the Gulf Bank Chronology.
1800 {**E3/31/11**}.
1801 {**H2/91/1**} (Arabic). {**H2/91.1/1**} (translation).

*31/1/08 for an amount KD279,000*"[1802] Badr also alluded to the 2007 Supplemental Agreement in a further manuscript note:[1803] "*Renewal was done according to their letter dated 31/1/08"*. Twenty-three Suleiman signatures relating to these facilities are matched although it is clear that Badr was involved in the execution. Ten Suleiman signatures are not alleged to be matched. Twenty of the twenty-three matched Suleiman signatures are found by Mr. Handy to be "*possibly matched to stamps*".[1804] As illustrated above, there is also evidence of Badr's involvement in facilities that are renewals but also where AHAB has alleged that the signature is matched.[1805]

**The SICL and Singularis Promissory Notes**

196. The allegations of forgery relating to these promissory notes will be dealt with under the heading "Counter-Claims".

**Yousef's signatures**

197. As regards Yousef, the signatures on two pairs of documents have been matched to one another. In the Joint Statement it says:[1806]

> *"Dr Giles's examinations of questioned signatures in* [Yousef's] *name relate only to the identification of duplicates of the same signature on two or more*[1807] *documents;* {G/5256/1} and {G/5631/1} *and* {G/6415/1} and {G/5934/1}. *Mr Handy… is in agreement…"*

198. The first pair of documents is a signature on a proxy dated 31 May 2006 appointing Dr. Al Mardi as Yousef's proxy for a board meeting of TIBC on Thursday 8 June 2006[1808]

---

1802 {**H2/89/1**} (Arabic). {**H2/89.1/1**} (translation). - The Defendants submit that this is to be read as a reference to US$279 m {**E3/31/12**} **[38]**.
1803 {**H2/93/1**} (Arabic). {**H2/93.1/1**} (translation).
1804 {**E3/31/6**} {**E3/31/10**} -{**E3/31/14**}.
1805 See for instance **FN 270** (above), re CBK.
1806 Joint Statement of Mr. Handy and Dr. Giles, paragraph 7.1 {**J/9/5**}.
1807 There are only two signatures that appear twice.
1808 {**G/5256/1**}.

which is the same (aside from the different dates) as the signature on a proxy dated 4 February 2007 appointing Dr. Al Mardi as Yousef's proxy for a board meeting of TIBC on Wednesday 28 February 2007.[1809] The second pair of documents is a signature on a TIBC board resolution dated 2 July 2007[1810] that matches a signature on the minutes of a meeting of TIBC held on 27 February 2008.[1811]

199. There is no evidence as to why these two pairs of signatures are the same and the GTDs could not ask Yousef questions about it in cross-examination.[1812] There are no other Yousef signatures on the Forgery Schedule.

**Saud's signatures**

200. Mr. Handy and Dr. Giles both say that they have identified documents bearing duplicate signatures in the name of Saud Algosaibi.[1813] In the Forgery Schedule there are fifty-one[1814] documents that bear Saud signatures.

**Non-banking related documents**

201. Ten of those fifty-one documents do not relate to bank facilities. It is not alleged Saud's signatures on seven of these ten documents are matched.[1815]

(1) The first four documents[1816] are letters to banks dated 24 May 2003. There are 17

---

1809 {**G/5631/1**}.
1810 {**G/5934/1**}.
1811 {**G/6415/1**}.
1812 His cross-examination was concluded prematurely due to illness.
1813 Joint Statement of Mr. Handy and Dr. Giles, paragraph 5.1 {**J/9/4**}.
1814 {**G/5562.1/1**} (Forgery Schedule, line 368 {**A2/23.1/14**} is the first three pages of {**G/5552/1**}, line 367 {**A2/23.1/14**}. These two lines in the Forgery Schedule refer to a single document: a confirmation of credit and banking facilities with the National Bank of Bahrain, dated 19 December 2006, signed twice by Saud and Suleiman. These signatures are discussed further below.
1815 The eighth is an undated signature list on which the Saud signature is matched: {**G/218/1**}, Forgery Schedule, line 857, {**A2/23.1/30**}. There is no evidence as to when or in what circumstances this signature came to be applied and by whom. It is not known whether this could have been used as a source for later signatures. The ninth and tenth are documents related to Awal Bank.
1816 **{G/3322/1}**, {**G/3329/1**}, {**G/3328/1**} and {**G/3313/1**}. Forgery Schedule, lines 55, 56, 56.1 and 56.2, {**A2/23.1/3**}.

identical letters in the trial bundle.[1817] They were sent to all the banks on AHAB headed notepaper notifying the banks of "*the constitutional position of* [AHAB] *following the recent death of our Founding Partner and Chairman Abdulaziz Hamad Algosaibi*".

(2) The fifth and sixth documents are the English accounts for the Commission and Investment Divisions of the Money Exchange for the years ended 31 December 2003[1818] and 31 December 2004.[1819] Saud's signature appears along with Suleiman's on the Statements of the Board of Directors. On the 2003 Statement Saud's signature is not matched, while Suleiman's is matched. Just above these signatures in the Directors' Statement is the clear reference to the establishment of TIBC in Bahrain "*under an offshore banking license as a 93% subsidiary of the Money Exchange*". Both signatures on the 2004 Directors' statement are matched.[1820]

(3) The seventh document is AHAB's financial statements for the year ended 31 December 2004.[1821] Saud's signature appears along with Suleiman's. Suleiman's signature is matched.[1822] Saud's signature has not been matched and there is no forensic evidence of forgery. These are AHAB H.O. accounts that had nothing to do with Al Sanea and which he could have had no reason to forge. It suggests that Suleiman's signatures were being put onto different sets of accounts but not by Al

1817 Referred to in Section 1 above.
1818 {**F/127/1**}.
1819 {**F/153/1**}.
1820 {**F/127/3**} for 2003 and {**F/153/3**} for 2004. Forgery Schedule, lines 74, {**A2/23.1/3**} for 2003 and line 155 for 2004, {**A2/23.1/6**}.
1821 {**F/140/1**}.
1822 Forgery Schedule, line 170, {**A2/23.1/6**}.

Sanea without Suleiman's authority. It may well have been a matter of convenience.

**TIBC related documents**

202. AHAB alleges that a further eight documents relating to TIBC signed by Saud are forged.[1823] Saud's knowledge and involvement in TIBC is dealt with earlier in this Judgment.[1824] One of the signatures is Saud's signature on a copy of his personal questionnaire to the Bahrain Monetary Authority dated 23 September 2004.[1825] However, this was a replacement to an earlier personal questionnaire in respect of his appointment as a director of TIBC that Saud did sign and in respect of which no forgery allegations are made.

**Saud's signatures on bank facility and facility related documents**

203. In his first statement Saud stated that he never knowingly signed facilities:[1826]

> "*Other than the 2009 Samba facility extension… I have never knowingly signed any loan or other facility documents in respect of borrowing by the Money Exchange (still less, TIBC or ATS, whose existence I knew nothing about).*"

---

1823 {**G/5254/1**} (appointing Dr. Al Mardi as proxy re TIBC) Forgery Schedule, line 301 {**A2/23.1/11**}. {**G/5266/1**} (minutes of meeting of TIBC Board where Saud is recorded as present by Dr. Al Mardi as proxy. Saud's signature on the record of minutes appears under the heading "Minutes Reviewed and Endorsed" suggesting ex post facto approval. This document also bears Suleiman, Yousef and Al Mardi signatures (among others). Yousef's signature was not examined by the experts. Forgery Schedule, line 303 {**A2/23.1/11**}. {**G/5629/1**}, **(**again, this time on 4 February 2007 appointing Dr. Al Mardi as proxy re TIBC) **Forgery Schedule, line 385**, {**A2/23.1/14**}. {**G/5697/1**}, (minutes of TIBC Board meeting of 28 February 2007 signed off apparently ex post facto like before). Saud's signature is <u>not</u> matched. Yousef's was not examined: Forgery Schedule, line 400 {**A2/23.1/15**}. {**G/5934/1**}, (TIBC Board resolution of 2 July 2007) Saud's, Suleiman's and Yousef's signatures are matched: Forgery Schedule, line 448, {**A2/23.1/16**}. {**G/6415/1**} (minutes of TIBC Board meeting 27 February 2008, apparently signed ex post facto like before), Saud's Suleiman's and Yousef's signatures are matched: Forgery Schedule, line 542, {**A2/23.1/19**}. **G/188/1**} (Saud's proxy to Dr. Al Mardi for the 27 February 2008 TIBC meeting) Saud's signature is matched. Forgery Schedule, line 843, {**A2/23.1/30**}. {**G/46/1**}, (copy of Saud's Personal Questionnaire to the BMA) Saud's signature on this replacement copy is matched: Forgery Schedule, line 844, {**A2/23.1/30**}**.** His signature on an earlier questionnaire re his appointment as a director of TIBC was not matched.

1824 See discussion of this document in Section 1, above.

1825 {**G/46/12**}, Forgery Schedule, line 844, {**A2/23.1/30**}.

1826 Saud 1W, [406], {**C1/2/84**}.

204. This has been shown to be untrue. Saud signed a number of facility documents and related documents. It is moreover inconsistent with Saud's evidence, that he agreed that Dawood should take over signing banking facilities in early 2009. For if Saud had never been involved in signing banking facilities, he would not have agreed with Dawood that Dawood should take over the signing of those facilities, which Dawood did. This is an issue already touched upon under the heading "New for Old" where AHAB's inconsistent position on how Dawood became involved in signing bank facilities is examined. It became clear that Saud was aware of and approved of Dawood's involvement. The following excerpts from his evidence in re-examination by Mr. Quest confirm this:[1827]

> *"I want to ask you this question: we have obviously discussed the new for old policy before in connection with the period when your Uncle Suleiman was alive. After your Uncle Suleiman died, how on your understanding did the new for old policy work then?*
>
> *A. You know, they bring the old documentation and the new documentations.*
>
> *Q. Who were they presented to?*
>
> *A. Who what?*
>
> *Q. Who were those documents shown to?*
>
> *A. Er, er, these documents, er, were -- were shown to? I mean, you know, they get to Badr, huh, to Badr, obviously.*
>
> *Q. What on your understanding did Badr do with them in 2009?*
>
> *A. Yes, he -- he matched them to -- to do the matching, and then he would, er, give them to us, presumably, at the time.*
>
> *Q. At {G/7648/1} --*

---

1827 Saud re-ex: {**Day67/122:7-123:10**}.

*CHIEF JUSTICE: Before you go on, this is the last answer Mr. Algosaibi gave: "... he would ... give them to us, presumably, at the time." "Us" meaning whom?*

*A. It means me or Dawood, but Dawood mainly. This is the -- but Dawood, after his father passed away, he took more of, er, some of the activities that, er, er, my uncle did.*

*MR. QUEST: I was just going to ask you about that, because we see there is a memo at {G/7648/1}, March 2009.*

*A. Yes.*

*Q. From the executive committee to various people. You are not included here, but it refers to documents – it says: "Please be advised that the documents that you will forward for the signature of Saud Algosaibi should be amended for the signature of Dawood Algosaibi as most of the time Saud will be travelling and the documentation will be delayed for execution." What was your understanding as to why documents went to Dawood to sign and not to you?*

*A. It was just an agreement I made with Dawood, er, you know, in the office, that, er, er -- it's not about travelling or something, just something, er, er, I agreed with Dawood to be done."*

205. In opening Mr. Quest had asserted that Al Sanea went *"more or less seamlessly from using Suleiman signature matches to using Saud signature matches"* (emphasis added):[1828]

59:23 - 60:5
"*The Bilad facility hadn't yet been signed by the time Suleiman died; and Suleiman's death became public fairly quickly, so obviously Al Sanea couldn't keep using his signature. We see at [G/7642.1], it is now 18 March, the documents from Bilad Bank have obviously come in, and Mr. Hayley is sending them to the executive committee, that is Al Sanea:"*

61:6 - 61:12
"*Again, what we infer is that when Al Sanea realised he was going to have to start putting Saud's signature on things, he went back to find some old*

---

[1828] AHAB opening: {**Day6/59:23-60:5**}. AHAB opening: {**Day6/61:6-12**}. AHAB opening: {**Day6/61:23-62:3**}.

> *examples, gave them to James Dennis, so we see this document with multiple different Saud matches on. And also we see, if we look at [G/7624], which is part of the same suite of documents, at [G/7624/2]...*"
>
> 61:23 - 62:3
> "*It seems Al Sanea has gone more or less seamlessly from using Suleiman signature matches to using Saud signature matches. He had used Saud signature matches before because we saw them on some of the TIBC board minutes. But now that Suleiman is out of the picture, he has gone straight into using Saud.*"

206. In support of this assertion, AHAB has identified facilities with four banks that bear matched Saud signatures: National Bank of Bahrain ("NBB"), Bank Al-Jazira, Saudi Investment Bank ("SIB") and Bank Al Bilad. A fifth and sixth bank in the Forgery Schedule that have facilities bearing Saud signatures are Abu Dhabi Commercial Bank ("ADCB") and the Commercial Bank of Qatar ("CBQ"). As discussed above, none of Saud's signatures on the ADCB documents is alleged to be forged.[1829] Nor is any of Saud's ten signatures on the CBQ facility documents alleged to have been forged.[1830] The Narrative Chronologies of the lending arrangements between AHAB/the Money Exchange/the Financial Businesses and each of NBB, Bank Al- Jazira, SIB and Bank Al-Bilad are included in Bundle E3.[1831]

207. There is moreover, the clear evidence that for years before the collapse of the Money Exchange in 2009, Saud had been involved in the oversight of NBB facilities and of those from many other banks: as we have seen, on 31 December 2001 Badr sent a handwritten note in spread sheet format in Arabic to Saud enclosing "*statements of the banking facilities from both foreign and local banks, which were, upon your approval, signed by*

---

1829 See again ADCB Chronology: {**E3/2/1-16**} [52].
1830 Commercial Bank of Qatar Chronology: {**E3/26/1-16**} [39].
1831 At {**E3/44/1**}; {**E3/14/1**}; {**E3/50/1**} and {**E3/13/1**}, respectively.

*Mr. Abu-Dawood* [Suleiman]".[1832] Twenty-one banks are listed showing facilities then, at end 2001, amounting to SAR 2.7bn.

208. As regards the assertion that Al Sanea transitioned seamlessly into forging Saud's signature, not only does the forensic evidence fail to support AHAB's case, but much of it undermines it.

**Increased facilities with Saud signatures not alleged to be matched**

209. There are increased facilities with Saud signatures that are not alleged to be forged. On 4 October 2005, the Money Exchange agreed to the terms of a US$53,063,660 facility with NBB.[1833] The amount made available to the Money Exchange by NBB increased by US$5m. Saud and Suleiman signed the 2005 Money Exchange Facility on their own behalf and on behalf of the heirs of Ahmad and Abdulaziz. Saud's signatures are not alleged to be matched.

**Renewed facilities with Saud signatures alleged to be matched**

210. There are matched Saud signatures on renewed facilities (i.e. for the same amount, with no increase):

(1) On 19 December 2006, the Money Exchange agreed to the terms of a US$53,063,660 facility with NBB.[1834] The amount made available to the Money Exchange by NBB did not increase. Saud's and Suleiman's signatures appear on the facility on their own behalf and on behalf of the heirs of Ahmad and

---

1832 {**H9/3/4**} Ar. {**H9/4/4**} trans. discussed in the NBB Chronology at {**E3/44/9**} [31] and above under "New for Old" and found in a file kept by Badr at AHAB H.O.

1833 {**G/4363/1**}, duplicate at {**H5/113/1**} found in loan file A1-15, found in AHAB H.O. 1st Floor Archive and see {**E3/44/16**}.

1834 {**G/5552/1-3**}, duplicates at {**G/5553/1**}; {**G/5556/1**}; {**G/5562.1/1**} and {**H2/116/1**}, which was found in the AHAB H.O. 1st Floor Archive. The annexure to the 2006 Money Exchange Facility is dated 22 November 2006 {**G/5552/4**}; duplicates at {**G/5528/1**}; {**H2/115/1**}, also from 1st floor archive. The supporting guarantee also refers to the 2006 Money Exchange Facility as being dated 22 November 2006 {**G/5552/2**}.

Abdulaziz. Saud's (but not Suleiman's) signatures are matched.[1835] Saud's signatures also appear on an annexure to the 2006 Money Exchange Facility,[1836] on a joint and several guarantee[1837] and on an on-demand order note in English and Arabic.[1838] Saud's signatures on these documents are matched while one of two Suleiman signatures is not matched.[1839] Given that this was simply a renewal of facilities, AHAB partners would have been expected to sign these documents, there would have been no need to forge Saud's signatures (or that of Suleiman's which was matched).

(2) Likewise, on 16 January 2008, the Money Exchange agreed to the terms of a US$53,063,660 facility with NBB.[1840] The amount made available to the Money Exchange by NBB did not increase. Saud's signature appears on the facility on his behalf and on behalf of the heirs of Ahmad and Abdulaziz. Saud's signatures are agreed matches.[1841] Suleiman's signatures are also agreed matches but are identified by Mr. Handy as "*possibly matched to stamps*". Saud's signatures also appear on a joint and several guarantee.[1842] Saud's signatures on this guarantee are matched.[1843] Suleiman's are also agreed matches but identified by Mr. Handy as "*possibly matched to stamps*".

**Matched signatures on facilities but not on the supporting documents (or vice versa)**

211. There are matched signatures on supporting documents (including correspondence) but

---

1835 {**G/5552/1**}, {**G/5562.1/1**}, and Forgery Schedule line 367, 368.
1836 {**G/5552/4**}, {**G/5528/1**}.
1837 {**G/5552/1**}.
1838 {**G/5558/1**}.
1839 Forgery Schedule, lines 358 and 367; Forgery Schedule, line 366; Forgery Schedule, line 365 {**A2/23.1/13**}.
1840 {**G/6293/1**}, {**X1/53/1**}.
1841 Forgery Schedule, line 518, {**A2/23.1/18**}.
1842 {**G/6291/1**}, {**X1/53/7**}.
1843 Forgery Schedule, line 518, {**A2/23.1/18**}.

not on the facilities themselves (or vice versa). On 6 October 2004, the Money Exchange agreed to the terms of a US$48,063,660 facility with NBB.[1844] Saud's signatures on the facility are matched.[1845] Saud also signed an on demand order note in English and Arabic on behalf of AHAB unconditionally and irrevocably undertaking to pay to the order of NBB the sum of US$22,632,000.[1846] Saud's signature is not alleged to be matched. This is in light also of another order note of 6 October 2004 for US$17,612,732 in respect of the same facility with NBB[1847] in respect of which the Suleiman signature is not matched even while Saud's is an agreed match.[1848]

**The period after March 2009**

212. In relation to facility documents signed by Saud in March 2009, AHAB has failed to come up with a credible reason why Al Sanea would have forged Saud's signature on documents when Dawood (and to a lesser extent Yousef) would be signing them pursuant to an agreement reached with Saud. The submission made by Mr. Quest that in March 2009 Al Sanea *"has gone more or less seamlessly from using Suleiman signature matches to using Saud signature matches"*, is again shown to be wrong. The following analysis is undertaken bearing in mind the evidence examined above which shows an agreement between Saud and Dawood that Dawood would sign facilities in Saud's absence.

1844 {**G/4366/1**}.
1845 Forgery Schedule, line 138, {**A2/23.1/5**}.
1846 {**H5/84/1**}.
1847 {**G/4370**}.
1848 Forgery Schedule line 139 {**A2/23.1/5**}.

**Saudi Investment Bank (SIB):**

213. On 9 March 2009 Saud and Dawood signed a renewed and amended facility with SIB.[1849] The amount available to the Money Exchange did not increase but remained at SAR1.725bn. Saud's four signatures are matched.[1850] Saud also signed a copy of the General Lending Conditions,[1851] a copy of a promissory note,[1852] and a guarantee.[1853] Saud's seven signatures on these documents are matched.[1854] The facility was supported by an AHAB Board Resolution dated 14 March 2009 signed by Saud.[1855] Saud's signature is matched.[1856] In addition to the copies of facility documents on which Saud's matched signatures appear there are copies of these documents signed by Dawood. No Dawood signature is alleged to be matched. Here again, the irresistible inference is that Saud's signatures were applied with his consent and for convenience.

**Bank Al Bilad:**

214. On 8 March 2009, AHAB passed a Board Resolution permitting Saud to enter into facilities with Bank Al Bilad.[1857] Saud's signature on the Board Resolution is matched.[1858] There are two versions of the Al Bilad facility dated 16 March 2009,[1859] four versions of a supporting Guarantee[1860] and three versions of a Promissory Note[1861]

---

1849 {**G/7588/1**}. This facility included an FX facility for SAR 250m. If AHAB is right and the loss making FX trades were all booked on 16 March 2009, a week later, those FX trades would have enabled AHAB to draw down on this FX facility. See also SIB Chronology: {**E3/50/19-21**}.

1850 Forgery Schedule, line 804 {**A2/23.1/29**}.

1851 {**G/7590/1**}.

1852 {**G/7595/1**}.

1853 Different matched signatures on the copies at {**G/100/1**} and {**G/101/1**}.

1854 Forgery Schedule, line 805 {**A2/23.1/18**}. Forgery Schedule, line 806 {**A2/23.1/18**} Forgery Schedule, lines 846 and 861 {**A2/23.1/19**}.

1855 {**G/7603/1**}.

1856 Forgery Schedule, line 807 {**A2/23.1/18**}.

1857 {**G/7578/1**}. There is a second copy of the same resolution at {**G/7577/1**}. Dr. Giles and Mr. Handy have matched the signature on the second Board Resolutions to different Source signatures.

1858 Forgery Schedule, line 800 {**A2/23.1/18**}.

1859 {**G/7617/1**} and {**G/7636.8/1**}.

1860 {**G/7624/9**}, {**G/7625/1**} (also signed by Dawood), {**G/7626/1**} and {**G/7631/1**} (also signed by Yousef).

that were signed by Saud. All of the Saud signatures on versions of these documents signed by him are matched.[1862] However, Yousef and Dawood also signed versions of the Guarantees and the Promissory Note together with Saud.[1863] Dawood signed each of two versions of the Bank Al Bilad facility 8 times.[1864] Dawood's and Yousef's signatures are not alleged to be forged. Some appear not to have been examined.[1865] The same inference arises here as to the application of Saud's signatures.

**Evidence Saud authorised others to apply his signature to documents**

215. Indeed, there is evidence that Saud was content to allow his signature on important documents to be applied by others with his authority. This is apparent from his cross-examination in relation to a letter from Saud in Arabic dated 1 December 2002 to the King of Bahrain in relation to a request to grant Saud, his wife and children Bahraini citizenship.[1866] Saud said as follows in relation to his signature on this letter (in cross-examination):[1867]

> "*Looking at the English for a moment, we see this is a letter from you to His Majesty the King of Bahrain. Do you see that?*
> *A. Yes.*
> *Q. The Arabic is at [G/3049/1]. Is that letter signed by you, Mr. Algosaibi?*
> *A. No. It's a friend of the family who signed it on my behalf.*
> *Q. I'm sorry? This is a letter being written to the King of Bahrain?*
> *A. Yes.*
> *Q. And it was signed by a friend of the family on your behalf; is that right?*

---

1861 {**G/7624/6**}, {**G/7632/1**} (also signed by Dawood and Yousef) and {**G/7635/1**} (also signed by Yousef).
1862 Forgery Schedule, line 811.1 (the facility), lines 808, 814, 809, 812 (the supporting guarantees in the order listed in the footnote immediately above) and line 813 (the Promissory Note), {**A2/23.1/18**}.
1863 {**G/7632/1**} and {**G/7634/1**}, {**G/7635/1**} and {**G/7634/1**} (with duplicates at {**G/7633/1**}, {**G/7633/2**}), {**G/7635/2**}, {**G/7636/1**} and {**G/7634/2**}. The GT Defendants have set out in the Bank Al Bilad Chronology a detailed history of Yousef and Dawood signing the March 2009 Bank Al Bilad facilities: {**E3/13/1**}.
1864 {**G/7636.1/1**} and {**G/7636.7/1**} (Arabic), {**G/7624.1/2**} (translation).
1865 Forgery Schedule lines 812 and 814: {**A2/23.1/18**}/.
1866 {**G/3049**} (Arabic), {**G/3049.0.1**} (translation).
1867 Saud xx: {**Day43/111:10-112:21**}.

*A.* *Yes. He called me up and he said, "Would you permit me to sign?" I said, "Fine" because he's carrying the letter by himself.*
*Q.* *Who was that?*
*A.* *A friend of the family in Bahrain, sir.*
*Q.* *What was his name?*
*A.* *Abduljalil El Ali Saleh(?).*
*Q.* *Is that his signature or is it your signature he's copying?*
*A.* *No, he just wrote my name. There is no signature, just put "Saud".*
*Q.* *Just identify what you are referring to.*
*A.* *Yes, he said "Saud" here. He wrote my name only.*
*Q.* *He just wrote the name "Saud", did he?*
*A.* *Yes.*
*Q.* *On the letter to the King of Bahrain?*
*A.* *Yes.*
*Q.* *And the subject of the letter is a request by you to the King to grant Bahraini citizenship; is that right?*
*A.* *Yes.*
*Q.* *Did the King grant Bahraini citizenship?*
*A.* *Yes, he did.*
*Q.* *Did that come with a Bahraini passport?*
*A.* *Yes, of course."*

**Dawood**

216. No Dawood signatures are alleged to have been forged. The Joint Statement says:[1868]

> *"8.1 Dr Giles was unable to carry out any useful examination of signatures in* [Dawood's] *name. Mr. Handy examined a number of reference signatures in the name Dawood Algosaibi but found that no meaningful comparison could be made with the questioned signatures based on the copy documents."*

217. Between 19 February 2009 and 27 April 2009 Dawood signed facilities, guarantees, promissory notes and related documents committing AHAB to liabilities to 15 banks in the sum of SAR 10.7bn (US$2.8bn). That is 42 percent of the facilities in relation to which AHAB finally makes its claim.[1869] This followed an agreement made with Saud that Dawood should sign documents. This is dealt with above and in greater detail in the

---

[1868] Joint Statement of Mr. Handy and Dr. Giles, {**8.1**}, {**J/9/5**}.
[1869] Charlton 20A, Exhibit SAC 18, page 92: {**Y2/16/92**} (AHAB's "Schedule of Claims" exhibited to Charlton 20A identifying the claims of the "Bank Claimants" in respect of which AHAB seeks to recover in these proceedings).

Defendants' written closing submissions[1870] from which I adopt the following passages:

218. AHAB's position in relation to the bank facilities signed by him, as emerged from exchanges with Mr. Quest is that, notwithstanding that Dawood's signature is on the documents, he "*had no knowledge of this borrowing*" (emphasis added):[1871]

> 92: 5 "*CHIEF JUSTICE: Before we rise, I think I need to have a sense of where we are going on this particular tranche of documents we have been hearing about since this morning. There is no allegation of forgery, is there?*
>
> *MR. QUEST: They are not on the forgery schedule.*
>
> *CHIEF JUSTICE: There is no allegation of manipulation, is there?*
>
> *MR. QUEST: No.*
>
> *CHIEF JUSTICE: What is it that is going to be said, is this non est factum? It is not a plea I have seen pleaded anywhere.*
>
> *MR. QUEST: Your Lordship has seen Dawood Algosaibi's witness statement; he simply has no recollection of signing these documents.*
>
> *CHIEF JUSTICE: We just established that there is only one of these facilities where specific reference is made in that witness statement. That was certainly my recollection before.*
>
> *MR. QUEST: Yes.*
>
> *CHIEF JUSTICE: We have seen many of them this morning, to the tune of millions of dollars, either renewed or new facilities, in the last two months before the collapse.*
>
> *MR. QUEST: Yes.*
>
> *CHIEF JUSTICE: So what am I to be asked to make of these?*
>
> *MR. QUEST: In relation to Dawood, that he had no knowledge of these*

---

1870 **{E1/24/1-4}**. See also "Schedule of Facilities Signed by Dawood": **{X7/28}**, handed up to the Court by Mr. Phillips on 14 July 2017.

1871 {**Day78/92:5**} to {**Day79/94:6**}.

*facilities.*

*CHIEF JUSTICE: His signature --*

*MR. QUEST: Whether or not his signature appeared on them, he had no knowledge of them because as far as he was concerned, he was being presented with documents, as he explained, which had nothing to do with them.*

*CHIEF JUSTICE: Is that tantamount to a plea of non est factum? What is it?*

*MR. QUEST: As far as these proceedings are concerned -- obviously we are not concerned at the moment with claims to enforce the documents, we are concerned in these proceedings, as far as this witness is concerned, his knowledge of these facilities. Our case is that he did not have knowledge of this borrowing.*

*CHIEF JUSTICE: So I am being asked to simply accept that?*

*MR. QUEST: Yes.*

*CHIEF JUSTICE: Irrespective of the fact his signature appears on it and they are not said to be forged or in any other way challenged?*

*MR. QUEST: They are not admitted. We are not admitting them, on the other hand, they are not on the forgery schedule, so there is no forensic evidence in relation to them. As far as Dawood is concerned, and it is dealt with in his witness statement at paragraphs 40 and onwards, he had no knowledge of this borrowing. And that is --*

*CHIEF JUSTICE: This is becoming surreal".*

219. Dawood's evidence in this regard is set out at paragraphs 39 to 42 of his First Witness Statement (emphasis added):[1872]

*"39. Following my father's funeral (which ended on 25 February 2009), over the next several weeks, I began to take on my new responsibilities in AHAB. I found this an emotional and difficult time. I was mourning the loss of my father while trying to familiarise myself with the considerably expanded role I now had*

1872 Dawood 1W, paragraph 39, {**C1/1/11**}.

> *in AHAB, for which I felt unprepared. I was also much busier than I had been in my previous role, working full time for the first time in many years after my long absence as a result of my illness.*
>
> *40. In the first two months or so in my new role* ***I was presented with a very large number of documents for my signature****. I remember that Mr. Badr presented some of these documents to me. I understood from what I was told that a lot of the documents were routine in nature and related to the amendment of partnership and company documents to reflect changes in the partnership following my father's death.* ***I do not recall signing any agreements or related documentation during the period entered into, extending or renewing bank borrowing, and I did not knowingly do so.*** *I would not have read every document I signed:* ***if the person giving documents to me for signature gave me an explanation of their purpose which satisfied me that there was no need for me to read them completely, I would not always have done so. Certainly, nothing that I was aware of signing gave me any notice of the large amounts of borrowing within the Money Exchange and I would not have signed such documents without further inquiry.***
>
> *41. I have been asked if I signed any documents at Saad's offices or if I signed documents in front of witnesses who worked at Saad; in particular, I have been asked if I signed documents in front of Mr. Al Sanea's employees, Khalil Khalil and/or Ahmad Fawzi. I do not believe that I ever met these gentlemen and I did not sign documents in front of Saad employees*
>
> *42. AHAB believes that Mr. Al Sanea engaged in widespread production of false loan documents as part of his fraud. In light of the many instances of forgery already uncovered by AHAB's advisers, I am not prepared to accept that any signatures on documents I do not recall signing (and would not have signed had I been aware of their contents) are genuine."*

220. However one approaches this evidence, the starting point is that Dawood accepts that he was presented with a "*very large number*" of documents for signature. He says that if he was satisfied with the explanation of the person giving him the document he would sign it. The evidence that he was not aware that he was signing facility documents and would not have done so had he known is simply not credible. It is not supported by any of

AHAB's other witnesses. Indeed, Saud's evidence was that he and Dawood had agreed that Dawood should take over signing facility documents.[1873] There would have been no point in Saud reaching such an agreement with Dawood if Dawood was not actually going to be signing facility documents. Nor can it be doubted that Dawood would have been able to read and understand bank facility documents. While he claims in his witness statement to have had little or no involvement in the AHAB businesses, the reality is that Dawood had been working in various senior roles within AHAB for a decade since he completed his degree at King Abdulaziz University in 1999. He was Managing Director of the Algosaibi Hotel from 2000[1874] and a member of AHAB's board since May 2003 following Abdulaziz's death.[1875] Dawood also acted as director of at least 10 other AHAB entities, some of them such as Continental Can of Saudi Arabia, Corro Coat Saudi Arabia Co Ltd and Tecmo Arabia Co Ltd were major undertakings for AHAB.[1876] He was also involved in a number of AHAB's joint ventures, proposed joint ventures or other business endeavours.

221. Dawood's confounded claim of incognizance is indicative generally of the position of AHAB partners to facility documents bearing their signatures. Dawood is "*not prepared to accept that <u>any</u> signatures on documents I do not recall signing … are genuine*". But at the same time, Dawood does not "*recall signing <u>any</u> agreements or related documentation during the period entered into, extending or renewing bank borrowing*". This is in circumstances where, even on AHAB's case, facility documents for billions of SAR needed to be signed and Saud's evidence is that an agreement had been reached

---

1873 As discussed in passing above and further examined in detail by the Defendants at {**E1/24/20-22**} [56]-[62].
1874 Dawood 1W [5], {**C1/1/2**}.
1875 Dawood xx: {**Day77/27:17**}.
1876 *Curriculum vitae* of Dawood at {**G/3084.1/1**} and Dawood xx: {**Day77/26:10**}.

between him and Dawood that Dawood would be signing those facility documents.

222. AHAB's argument in its oral openings was that "*if one were trying to get documents past someone, Dawood would be an easier route for Mr. Al Sanea than Saud*".[1877] This thinly veiled plea of naivety and susceptibility to manipulation by Al Sanea is entirely unsupported by the evidence. Indeed, it is fair to say that Dawood had sought to avoid addressing the issue altogether. He did not refer in his written or oral evidence to any request being made of him by Al Sanea to sign any document. Indeed, he said he was unable to identify Al Sanea's initials on the documents signed by him.[1878] Neither did Dawood refer at any point during his written or oral evidence to the alleged "*new for old*" policy.

223. I accept, as the Defendants' submit, that AHAB's case in relation to the facilities signed by Dawood is, like its case in relation to "*knowledge and authority*" generally, inherently inconsistent and inherently implausible.

224. Dawood had knowledge of the facility documents bearing his signature (which included increases in facilities). His evidence to the contrary is untrue and is rejected.

**Methods or processes of application of matched signatures**

225. It became common ground that signatures were applied to documents in various different ways. This was acknowledged by Mr. Quest in opening: [1879]

> *We can prove that a very large number of documents must have been forged in various different ways. And the real point about forgery is this: our case about borrowing is not really a case that we make primarily on a facility-by-facility basis: we authorised this, we didn't authorise that. Although we do say a lot of facilities were unauthorised. But more*

---

1877 AHAB's opening submissions: {**Day6/67:24-68:11**}.
1878 See for example Dawood xx: {**Day80/83:1**}; and {**Day80/88:8**}.
1879 AHAB opening: {**Day2/142:19-143:11**}.

*fundamentally --and this will come on to the new-for-old issue later -- we say that Al Sanea's authority to borrow money in the name of the Algosaibis was, from the time that Abdulaziz had his stroke, limited to renewing and rolling over the existing balance. He was not entitled to increase it, and he violated that authority. However he did it, however he got the signatures, whether by forgery or deception or otherwise, he violated that authority by borrowing increased amounts for his own benefit. Of course, in order to do that, he needed to embark on the campaign of forgery that we will see.*

226. Mr. Quest said that there were *"a lot of schemes of forgeries"*:[1880]

> 57: *19 …. We already have two schemes of forgeries and there is a lot more to come, there are several, or two more schemes of forgery. We see that already Al Sanea is no ordinary fraudster, he's a very resourceful and cunning man and there's almost literally nothing he would not do in order to get his way".*

227. Mr. Handy and Dr. Giles agree that various processes were used (emphasis added):[1881]

> "*With a few exceptions, where signatures appear as coloured signatures on documents, we are in agreement that these signatures have not been applied to the individual documents in a normal manner with pen on paper, but have been applied by **various mechanical processes**.*"

228. Mr. Handy and Dr. Giles identify three processes:[1882]

(1) <u>Laser Printer technology</u> – Dr. Giles identifies 68 such documents and Mr. Handy

> *"A number of the duplicated signatures in the name of Suleiman Algosaibi have been applied to documents by means of laser printer technology."*

(2) <u>Ink Jet Printer technology</u> (emphasis added):

> *"In other cases the mode of application is not clear. Dr Giles has suggested that a number of the Source Signatures have been applied by means of ink jet printer technology. **Mr. Handy agrees** that there are examples of signatures applied by this means…."*

---

[1880] AHAB's opening: {**Day3/57:19-24**}.
[1881] Joint Statement of Mr. Handy Dr. Giles, paragraph 4.1 {**J/9/3**}.
[1882] Joint Statement of Mr. Handy Dr. Giles, paragraph 4.1 {**J/9/3**}.

(3) Mechanical process, possibly hand-stamps (emphasis added):

> *"Mr. Handy… identified forty-eight documents bearing sixty-eight signatures that he considers were applied by a mechanical process other than by laser printer technology or ink jet technology, and suggested that they may have been produced by a hand-stamp.* ***Dr Giles does not disagree*** *with Mr. Handy that a hand-stamp may have been used in some cases."*

**Fused toner powder and Inkjet**

229. Where they have been able to examine original documents, Mr. Handy and Dr. Giles have identified some signatures applied with fused toner powder (indicative of application by photocopier or laser printer) and some signatures applied by inkjet (indicative of application by photocopier or inkjet printer).[1883]

**Hand Stamps**

230. The possible use of hand stamps is suggestive of authority by the Algosaibis that their signatures should be applied on their behalf. Moreover, its possible use is inconsistent with AHAB's case that it was Mr. James Dennis applying matched signatures from a stored data-base, using his computer.[1884] In his first report Mr. Handy opined (emphasis added):[1885]

> "*44. The disputed document numbered 09-002 consists of a 'glossy' paper, the surface of which would be less absorbent than a standard 'matt' paper. The mechanically applied signature on this document exhibits a concentration of ink along the borders of pen lines and this observation of 'tram lines' is a characteristic of ink applied under pressure, such as occurs with a 'rubber stamp'[1886]. It is therefore* ***possible*** *that all the signatures recorded as mechanically applied were made using a 'rubber stamp'.*"
>
> …

1883 Handy 1R, paragraph 42, {**J/2/8**}. Giles 1R, page 41 {**J/1/41**}.
1884 As suggested inferentially per AHAB witness Jean-Michel Thomas at [157]-[172] {**C1/13/1**}.
1885 Handy 1R, paragraphs 44 and 46 {**J/2/9**}.
1886 By which Mr. Handy meant a hand stamp.

> "*46. .... Where two superimposable signatures are mechanically applied, it is **possible** that they were both produced by the same 'rubber stamp'.*"

231. Mr. Handy does not consider such "*tram lines*" to be consistent with the application of the signature by an inkjet printer:[1887]

> Q. *Here there is a difference of opinion, as you saw in the evidence, between you and Dr Giles. Dr Giles says that tram lines could also be produced by an ink jet?*
>
> *A. She says that, yes.*
>
> *Q. Do you agree with that or disagree with it?*
> *A. I have never seen an ink jet produce tram lines which appear comparable with those produced by a hand stamp.*
>
> *Q. But it is possible for an ink jet to produce tram lines?*
>
> *A. You can get concentration along the periphery of an image, but it has a different appearance, in my experience.*
>
> *Q. If Dr Giles is saying that the tram lines on this document are not inconsistent with an ink jet, you would disagree with her, would you?*
>
> *A. It is not something I've seen for that to be comparable with an ink jet."*

232. In addition to the 'tram lines' Mr. Handy observed that on document 9-002, there were four other factors that suggest the use of hand stamps was possible. First, the signatures had been applied using a single colour liquid ink and it is rare for that to have been done using an ink jet printer.[1888] Secondly, the mechanically applied signatures did not exhibit the microscopic specks of ink or blurred edges associated with an ink jet printer.[1889]

---

1887 Handy xx: day 101, page 74, line 14 to page 75, line 4 {**Day101/74:14**}.
1888 Handy 4R, paragraph 27 {**J/10/7**}.
1889 Handy 4R, paragraph 29 {**J/10/7**}.

Thirdly, un-inked areas were observed within 'pen lines' where there were undulations on the paper which would not be expected with an ink jet application as the liquid would go into the undulations.[1890] Fourthly, a number of original documents with mechanically applied signatures showed clear evidence that they had been printed using ink jet printers, but the signatures on them had not been applied using ink jet printers.[1891]

233. Mr. Handy considered that it was possible that the signatures he had identified as mechanically applied could have been applied with hand-stamps. Indeed, he could not think of any other method by which they might have been applied (emphasis added):[1892]

> *"Q. Could you remind his Lordship how could a mechanically applied signature be applied, if it was not applied by ink jet?*
>
> *A. Well, one possible method is by use of a hand stamp.*
>
> *Q. Any others?*
>
> *A. If it's not an ink jet, which I've excluded laser printer type technology,* ***I can't think of another method which could be used, if it's not an ink jet."***

234. While Dr. Giles' preferred view was that these signatures were (or were likely to have been) applied with an ink jet printer, she did not disagree with Mr. Handy on the possible use of hand-stamps. AHAB in closing nonetheless describes the Defendants' "stamp theory" as "risible".[1893]

235. In my view, the possibility that Suleiman's signatures may have been applied using stamps is reinforced by two pieces of circumstantial evidence. First, the fact that a suitcase labelled as having stamps in it went missing from AHAB's discovery. Secondly,

---

1890 Handy 4R, paragraph 30 {**J/10/7**}.
1891 Handy 4R, paragraph 32 {**J/10/8**}.
1892 Handy xx: {**Day101/97:10-17**}.
1893 AHAB's written closing: {**D/4/349**} [4.672].

the fact that two stamp manufacturers, with long term relationships with AHAB, made it clear that they could manufacture signature stamps and representatives of those firms told Mr. Al-Harbi of the Al Ghasim Zamakchary law firm that they had produced stamps for the AHAB Partners.[1894]

**The missing suitcase of stamps**

236. On 24 and 25 May 2015, representatives of SIFCO 5 travelled to AHAB's offices in Al-Khobar to inspect various items listed in AHAB's discovery. The items that the SIFCO 5 team wished to inspect included an item listed in AHAB's discovery as "*a suitcase that contains stamps and keys*".[1895] This item later became missing and could not be found; although representatives of Deloitte confirmed that it had been in their possession.[1896]

237. AHAB has sought in closing to avoid the implications of this troubling turn of events by the following remarks:[1897]

> "*There was no evidence of signature stamps in the name of the AHAB partners having existed with(in) the AHAB Building or elsewhere. The Defendants mis-read a description of the contents of suitcase on a discovery list which referred only to stamps, not signature stamps: "a suitcase containing stamps and keys.*"

238. This is an attempt by AHAB to suggest, without any evidential foundation, that the missing item was other than it was understood by the parties to be as late as on the eve of the start of the trial. This understanding appears from Mr. Matthews' statement referencing his visit to AHAB H.O. in Al Khobar in May 2016, in these terms:

> "*We had a list of 15 stamps which we believe to be of interest from our review of the Hard Copy File List. All but two items were found: the two*

1894 Al-Harbi Attendance Notes {**C2/47/1**}, {**C2/49/1**}.
1895 {**H6/5/1**}. Tab: "*3rd Floor Archive*", line 1264.
1896 Matthews 2W, paragraph 16 {**C4/3/4**}.
1897 AHAB written closing: {**D/4/349**} [4.669].

> *missing items are understood to be a single Algosaibi Investment Services stamp and what is described as a "suitcase containing stamps and keys." In respect of the suitcase, the Deloitte representatives confirmed that it had been in their possession, however after performing a lengthy search, they were unable to locate it. They confirmed that they would continue with this search in our absence. The findings were communicated to the other defendants. The GTDs have since requested that the stamps, including the two items which were not located during our visit, be provided for inspection by their handwriting expert and AHAB has undertaken to do so."*

239. AHAB has not sought to deny having given that undertaking. Nor could AHAB have misunderstood that it was undertaking to locate and provide hand-stamps which may be relevant to the forgery allegations. I am compelled to regard AHAB's belated and unfounded suggestion - that the missing suitcase did not contain hand-stamps but some other kind of stamps - as nothing less than an attempt to obfuscate an issue which is of marked importance in the case.

**The evidence of the stamp manufacturers**

240. The GTDs instructed lawyers to ask two stamp companies in Saudi Arabia and Bahrain known to have worked for AHAB (Ideal Rubber Stamps & Engraving and Al Muhaizee Printing Press) if they had ever produced signature stamps for AHAB. These enquiries took place in late May 2016. Mr. Salah AlHarbi of the law firm AlGhasim Zamakchary spoke to Mr. Al Mutalab from Al Muhaizee Printing Press and Lynne Catitig from Ideal Rubber Stamps & Engraving. Mr. AlHarbi recorded the conversations in two attendance notes.[1898] Mr. AlHarbi's evidence[1899] was tested in cross-examination. While he was

---

1898 The conversations with Al Muhaizee Printing Company are recorded in an attendance note at {**C2/47/1**}. The conversations with Ideal Rubber Stamps & Engraving are recorded in an attendance note at {**C2/49/1**}.

1899 Al-Harbi 1W, {**C2/51/1**} (Arabic), {**C2/51/59**} (translation) It is supported by a witness statement of Mr. Abdulaziz Al-Toukhi, also of AlGasim Zamakhchary, who also spoke to Al Muhaizee Printing Press and Ideal Rubber Stamps &

unclear in cross-examination about the length of the respective calls and the exact times when he made notes of the calls, he was clear about having transcribed the notes no later than when he sent them a few days later to his senior at the law firm by email. While I am troubled by the later evidence of the witnesses from the stamp companies (including their respective principals Mr. Mosditchian and Mr. Al Muhaizee) contradicting Mr. AlHarbi's accounts, I can see no reason why Mr. AlHarbi, an independent lawyer having no interest in the case, would perjure himself. I accept that what is recorded in his attendance notes is accurate. Mr. Al–Toukhi a more senior lawyer of his law firm also made later attempts to obtain information from the principals but was unsuccessful. It appears from his witness statement that Mr. Al Muhaizee had determined not to assist with what he had been told by Mr. Al-Touki would be evidence for a notorious case- the case of "*Algosaibi against Al Sanea outside the Kingdom of Saudi Arabia*". Despite this, Mr. Al Muhaizee turned up as a witness for AHAB. I am not satisfied about his impartiality and objectivity. For one thing, I would have wished to ask him whether he contacted anyone at AHAB before deciding not to assist with Mr. Al-Touki's enquiries.

241. On the other hand, the questions Mr. AlHarbi asked the stamp companies were the questions he had been instructed to ask. There is no reason to doubt that he asked them and no reason to doubt that the attendance notes record the answers he got.[1900] I am not

---

Engraving: Al Toukhi1W, {**C2/50/1**} (Arabic), {**C2/50/11**} (translation). Mr. Al-Toukhi was not required for cross-examination.

1900 Mr. Al-Harbi was a young lawyer acting on instructions. In cross-examination Mr. Al-Harbi said he had been practising as a lawyer for two years: Al-Harbi xx: {**Day87/51:19-21**}. He had no background in the AHAB case (it is noteworthy that he thought he was acting for the Algosaibi liquidators: Al-Harbi xx: {**Day87/29:17**} and no relevant knowledge that could have coloured this information gathering exercise: Al-Harbi xx: {**Day87/29:25-31:21**}. Mr. Al-Harbi was clear when challenged in cross-examination that he had been instructed to ask about signature stamps: AlHarbi xx: {**Day87/31:6**}. Mr. Al-Harbi was clear that he had specifically asked about signature stamps: Al-Harbi xx: {**Day87/35:6-53:20**}. Mr. Al-Harbi confirmed that both Ideal Rubber Stamps and Al Muhaizee had understood that signature stamps were the subject of his enquiries: AlHarbi xx: {**Day87/54:23**}.

concerned that he and the persons he spoke to may have been "*at cross-purposes*", as suggested to him by Mr. Quest in cross-examination.[1901] The choice is stark and clear: either he did ask those questions and got the answers he noted or as the witnesses from the stamp companies assert, those questions were not asked and those answers were not given.

242. For the reasons just identified and those to follow from the further discussion below, I prefer his account.

(1) According to Mr. AlHarbi, Mr. Al Mutalab[1902] of Al Muhaizee Printing Press confirmed to him that Al Muhaizee *"has and still does produce stamps for companies and individuals"*.[1903] In Mr. AlHarbi's second call, Mr. Al Mutalab *"confirmed that they have produced signature stamps for both AHAB companies and AHAB individual directors/partners, and that they have enjoyed a long relationship with AHAB spanning more than 30 years."*[1904]

(2) Mrs. Catitig[1905] of Ideal Rubber Stamps & Engraving confirmed to Mr. Al-Harbi that *"they had* [*made stamps for AHAB*]" and *"explained that he believed* [they

---

1901 {**Day87/55:5-13**}.

1902 Mr. Al Mutalab was the only witness produced by AHAB on this issue for cross examination. The owner Mr. Al Muhaizee, who did not speak to Mr. Al-Harbi and was away when the call took place, was not produced for cross-examination. For reasons explained above, I attach no weight to Al Muhaizee 1W **C1/38/1** (Arabic), **C1/38/4** (translation). In cross-examination Mr. Al Mutalab of Al Muhaizee confirmed that AHAB was a long-standing client of Al Muhaizee. Al Mutalab xx: {**Day87/9:21**}. Mr. Al Mutalab accepted that the contents of Mr. Al-Harbi's Attendance Note were broadly accurate, save where it recorded that Al Muhaizee had been asked, or given answers, about its production of signature stamps for AHAB: Al Mutalab xx: {**Day87/16:15**}. In contrast to Mr. Al-Harbi, Mr. Al Mutalab had not made a note of the conversation: Al Mutalab xx: {**Day87/10:25**}.

1903 Attendance Note: {**C2/47/1**}.

1904 Attendance Note: {**C2/47/1**}. Mr. Al-Harbi called Al Muhaizee on 15 and 16 May 2017. The disclosed phone records show that Mr. Al-Harbi made a call to 0138644097 (being the landline telephone number for Al Muhaizee) on *"08/08"* of the *Hirji* calendar, corresponding to 15 May in the Gregorian year of 2016: {**T/270/3**} (Arabic), {**T/271/3**} (translation). On 16 May 2017 (*"09/08"* of the *Hirji* calendar) Mr. Al-Harbi telephoned Al Muhaizee for a second time: {**C2/51/23**}. The number dialled is there translated as *"0138677097"* (emphasis added), but the number ought properly to have been translated as *"0138644097"* (emphasis added), which is the landline number for Al Muhaizee.

1905 Mrs. Catatig was not called for cross-examination so her conversations with Mr. Al-Harbi could not be put to her. Mr. Mosditchian the 50 percent owner and manager of Ideal Rubber Stamps & Engraving was not called for cross

had made signature stamps for individual AHAB directors/partners] *and that in order to be sure, they asked me to send across the signature stamps in questions for them to give a definitive answer…"*.[1906]

243. Significantly, in answer to a question from the Court Mr. Al Mutalab confirmed that Al Muhaizee Printing Press produced signature stamps.[1907]

> "*CHIEF JUSTICE: Should I understand that they should not be producing signature stamps?*
>
> *A. There are requirements and conditions and requirements for any signature stamp. If anybody who wants to produce a signature stamp for him, he has to come here and he sign once, twice, three times and four times, even for six times, just to confirm, just to be sure that this is his signature, and I have to keep a copy of his ikama and I have to keep it.*
>
> *CHIEF JUSTICE: Are there circumstances where your company has made signature stamps on that basis for individuals?*
>
> *A. Yes".*

244. It is clear that both Muhaizee Printing Press and Ideal Rubber Stamps & Engraving produced signature stamps. Both companies had produced stamps of some kind for AHAB over the years. Both companies, as I accept, confirmed to Mr. AlHarbi that they had produced stamps for AHAB. It is likely that Mr. Al Mutalab confirmed to Mr. AlHarbi that Al Muhaizee Printing Press produced signature stamps for AHAB. It is likely that Mrs. Catitig asked for the signature stamps to be sent to Ideal Rubber Stamps & Engraving to confirm if they had manufactured them.

---

examination. With these witnesses too it would have been helpful to know the circumstances under which they came to give their witness statements.

1906 {**C2/49/1**}. This answer confirms that Ideal Rubber Stamps & Engraving made signature stamps. The question asked of Mr. AlHarbi by Mrs. Catitig was whether he could send the signature stamp so that they could confirm if it was one produced by them.

1907 Al Mutalab xx: {**Day87/21:18-22:4**}.

245. The evidence of the witnesses from the stamp companies does not, to my mind, affect Mr. Handy's opinion (agreed by Dr. Giles) nor the conclusions to be derived - that it is possible that signature stamps were produced and were used and that the suitcase containing such stamps disappeared after being logged in the Discovery List by Deloitte. Despite AHAB's extensive treatment of this subject in closing submissions,[1908] that remains the conclusion from the expert evidence.

**Suleiman applying his own signature stamp**

246. The evidential basis of AHAB's response on this issue is the evidence of Dawood and Omar Saad – that neither knew of Suleiman ever having or ever having used a signature stamp to sign documents.[1909] Even if these witnesses are to be believed on this issue (and I have serious reservations in that regard especially in relation to Dawood), this response misses the point. The function would have been a clerical one. It would not have been Suleiman who kept or applied his stamp to a document. It would have been someone else, most likely at a level well below even Omar Saad, let alone Dawood or Suleiman himself. The whole point of using mechanical means to apply signatures, whether by stamp or any other method, would have been for the sake of convenience - to save the elderly Suleiman the trouble of signing a very large number of documents. A signature stamp would not have been produced for Suleiman to use it himself.

247. That point aside, AHAB makes other submissions as to why the stamp theory should be rejected:[1910]

---

1908 {**D/4/356**}-{**D/4/385**}.
1909 Dawood 2W, paragraphs 3 to 6, {**C1/23/2**}. Omar Saad 2W, paragraph 3 to 6 {**C1/22/5**} (translation).
1910 Extracted from {**D/4/395-397**}.

"*In summary, Mr. Al Harbi is a young lawyer, who was new to the case, who did not even know who his client was, who did not appreciate the significance of signature stamps, and may not have known what they were, and whose attendance notes and recollection have been shown to be unreliable. In the circumstances, we submit that the evidence of the stamp manufacturers' employees should be preferred*[1911].

*Mr. Al Sanea's stance - As we highlighted in our opening submissions*[1912], *Mr. Al Sanea has denied forging any documents and has never suggested that documents were signed using signature stamps, whether with or without the knowledge of the AHAB partners. He has said: "I never had any cause to think that "forged" or even "simulated" signatures were being used."*[1913] *(underlining added) On any view, a signature applied using a signature stamp would be 'simulated'. The Defendants' stamp theory finds no support here either.*

*To draw this together:*

(1) *There is unchallenged evidence of the existence of facilities at the Saad group to reproduce electronically stored signatures [Thomas 1W];*

(2) *The handwriting experts agree that these sorts of facilities could have produced the laser printed and ink jet printed signatures which the experts agree appear on 30% of original documents;*

(3) *There is no clear evidence of any signature stamps having been produced by a stamp manufacturer in the name of Suleiman or any other Algosaibi;*

(4) *There is no clear evidence of any signature stamps having existed in the AHAB Building;*

---

1911 The statement of the Defendants' witness Mr. Al Toukhi {**C2/50/11**}, who was not called for cross-examination by AHAB, adds nothing material to this aspect of the case.

1912 {**U/1/151**} at paragraph [386].

1913 Al Sanea 5/166 {**L2/9/45}** - See also Al Sanea 5/158 {**L2/9/42}** & 194 {**L2/9/54}.**

(5) *There is clear, unchallenged evidence of two witnesses that Suleiman did not use a stamp to apply his signature;* [Dawood and Omar Saad, but see above]

(6) *29 hand stamps, at least 2 showing the same signature in different sizes, would have been needed;* [Joint Statement of the experts {**I/9.2**}; {**J/9/5**}, {**I/9.4**}; {**J/9/5**}]

(7) *Mr. Handy's tentative suggestion of the possibility of the use of stamps to produce the signatures he has characterised as 'mechanically applied' is based on one outlying, anomalous (Suleiman) signature;* [document numbered **09-002**; {**G/6661**}]

(8) *Three of the 'mechanically applied' Source Signatures also appear in printed form on original documents;*

(9) *Mr. Handy has not ruled out the possibility of the use of ink jet printers for the application of 'mechanically applied' signatures;*

(10) *The overwriting of 'mechanically applied' signatures is not explained by the underlying signature being applied by stamp;*

(11) *Not even Mr. Al Sanea has suggested that signatures were applied by stamp; and*

(12) *The GT Defendants' desperate attempts to bolster an already ambitious theory about the use of stamps led them to adduce unreliable evidence from Mr. Al Harbi and to instruct Mr. Handy to conduct an experiment which proved nothing other than how easy it was for someone to produce a Suleiman signature stamp*

*from a copy document 9 years after his death without the Algosaibis' permission.*

4.1 *Taking all of these factors into account, we submit that the Court should reject the notion that any of the signatures applied to the disputed documents were applied by stamp, still less were such signatures applied with the approval and knowledge of their purported author".*

248. I am not prepared to accept these points made merely *in arguendo* by AHAB so as to reject the possibility of the use of hand stamps in circumstances where AHAB has failed in its duty to produce the missing suitcase of stamps which is the very subject of the enquiry. AHAB has given no explanation in evidence to support Mr. Quest's conjecture that the suitcase contained stamps other than signature stamps. It is impermissible for AHAB to argue for a conclusion to that effect without presenting credible evidence as to the actual contents of the suitcase and what became of them.

249. As regards the reliability of Al Sanea's witness statement cited by AHAB, I do not accept nor is it necessary to accept that he knew nothing about and had nothing to do with the "simulation" of signatures.[1914] Given the confusion in AHAB's case about whether bank facility and related documents would have been executed at AHAB H.O. or at STCC, the most I think I need say here is that I am unable to conclude that Al Sanea must himself have been responsible for the application of "simulated" or matched signatures. None of the 872 questioned documents (or 16 "manipulated" documents) on the Forgery Schedule came from STCC. The 872 were all selected by the "Younger Algosaibis" from among the documents they had taken from AHAB H.O. and the Money Exchange. The originals

[1914] See my earlier findings upon this issue in relation to Abdulaziz's signatures above.

of these (apart from 10 Al Jazira documents to be next considered below) remain with the banks and so have not been examined by the experts. The so-called "source" signatures cannot be confirmed by the experts to be the very first of their kind and so to be truly without any precursors. There is evidence of "Photoshop" capability not only at STCC but also within AHAB itself.[1915] Just what conclusions might have been drawn from an examination of the originals with the copies relied upon by AHAB, we simply will never know.

250. As to whether Al Sanea was himself capable of or complicit in forgery (as distinct from the authorized simulation of signatures), I will have more to say on the subject when I come to deal particularly with the counter-claim.

**The 10 Al-Jazira signatures**

251. In 2009 Dr. Giles was supplied with three documents that have 10 signatures on what appeared to be Al-Jazira Bank documents. The original documents were supplied by Al Sanea.[1916] They were not provided to Mr. Handy for his examination. Dr. Giles concluded the documents bear original ink signatures in the name of Suleiman. Not having seen the originals, Mr. Handy was unable to confirm Dr. Giles' conclusion.[1917]

252. It is common ground that the 10 Suleiman signatures have been matched to signatures appearing on 305 documents.[1918] There is no doubt but that the 10 signatures were either transposed from the Al-Jazira documents (whether by computer, scissors and paste or

---

1915 See Defendants' submissions:E1/7.

1916 Al Sanea 5A, paragraph 177 {**L2/9/48**}. In this affidavit Al Sanea does not explain how he came into possession of what he describes as "*Bank Al Jazira documents, the originals of which I have in my possession and which I have provided to Mr. Lesnevich (his expert) for examination*." It appears that Dr. Giles received them subsequently from Al Sanea's solicitors.

1917 Joint Statement of Mr. Handy and Dr. Giles, paragraph 4.2 {**J/9/3**}.

1918 Joint Statement of Mr. Handy and Dr. Giles, paragraph 4.3 {**J/9/3**}.

hand stamp) or that the same signatures were put onto the Al-Jazira documents as were put onto the other 305 documents (although this latter is contrary to Dr. Giles' unrefuted opinion that these were original handwritten signatures).

253. The significance of the signatures on these Al Jazira documents is explained by Dr. Giles and Mr. Handy in their joint memorandum:

> *"In 2009 Dr Giles was supplied with a number of Al-Jazira Bank documents [99] which she concluded bear original ink signatures in the name Suleiman Algosaibi. These Series [99] documents were provided to her by the solicitors acting for Maan Al-Sanea as comparison signatures. Three of the Al-Jazira Bank documents [99-022, 99-023 and 99-024] are identified by Dr Giles as bearing original ink signatures which were used to create Suleiman Algosaibi Source Signatures (1), (5), (6), (8), (9), (10), (11), (13), (16) and (17). Mr. Handy has not been provided with the original Al-Jazira Bank documents [99-022, 99-023 and 99-024] and although Dr Giles has provided him with high quality images of these signatures taken during her own examination, Mr. Handy is unable to confirm from these images that these are original pen-and-ink signatures. Nevertheless, we are agreed that duplicates of these particular Suleiman Source Signatures (1, 5, 6, 8, 9, 10, 11, 13, 16 and 17) appear on a large number of the documents examined (three hundred and five such documents have been identified by Dr Giles in Appendix A of her report). In each case where a copy of one or more of these Suleiman Source Signature signatures (1, 5, 6, 8, 9, 10, 11, 13, 16 and 17) appears on a document, Dr Giles found that there is conclusive evidence to support the view that the particular document was not signed by Suleiman Algosaibi. We have no evidence as to whether or not Suleiman Algosaibi, in person, appended his signature or caused his signature to be appended to these documents. Whilst in the absence of the original Al-Jazira Bank documents Mr. Handy is unable to confirm this conclusion, he and Dr Giles agree that ten of the "mechanically applied" signatures identified by Mr. Handy match the ten Al-Jazira Suleiman Source Signatures (1, 5, 6, 8, 9, 10, 11, 13, 16 and 17) found on the three documents [99-022, 99-021 and 99-023].*"[1919]

254. Assuming the 10 Al-Jazira signatures were original signatures, there is no dispute that <u>those</u> signatures were transposed to other documents. Dr. Giles and Mr. Handy agree that

[1919] Giles-Handy Joint Statement 1/4.2 {**J/9/4**}.

in the case of five of the 10 signatures transposition would have been "*not ideal*" because the signatures on the Al-Jazira documents intersect with printing on the document or pencil crosses on the documents (emphasis added):[1920]

> "*We note that in the case of Source Signatures (1), (8) and (16) the pen lines of the signatures intersect with the printing of the respective document. Further, the Suleiman Source Signatures (1), (10) and (13) intersect with pencil crosses on the documents. Images of these particular signatures* ***would not be ideal for making hand stamps, or for any other transposition process****, since they would have had to have been manipulated to remove traces of the intersecting printing and pencil marks before the stamp or suitable image could be made.*"

255. It is important to note that this is the case for any form of transposition, be it by computer, by scissors and paste or by hand stamp because they would have had to have been manipulated to remove the trace evidence of their original source.

256. But whatever method of transposition was used, AHAB's forgery case heavily <u>depends</u> (to the order of some 305 of the 872 documents on the Forgery Schedule) upon the Al Jazira signatures having been transposed. It appears that the main point AHAB makes in relation to the Al-Jazira documents is that Suleiman Source Signatures (1), (8), (16), (10) and (13) could not have been transposed using hand stamps because they were "*not ideal*" because of the intersecting printing and pencil marks. [1921] In the cross-examination of Mr. Handy, Mr. Quest put the point as follows:[1922]

> "*Q. If there is a stamp, it has to be derived from the Al Jazira document?*
>
> *A. Yes.*

---

1920 Joint Statement of Mr. Handy and Dr. Giles, paragraph 4.3 {**J/9/4**}.
1921 Handy/Giles Statement, paragraph 4.3 {**J/9/4**}.
1922 Handy xx {**Day101/61:17**}.

*Q. Again -- I think this is a point you discussed with Dr Giles -- it would not be usual, would it, if I can put it as neutral as possible, if you wanted to create a hand stamp, to use a pre-existing signed document as the template for the stamp?*

*A. I have never encountered that before.*

*Q. The usual way of doing it -- if I wanted to have a stamp made and I went to a stamp shop -- you may have heard, we have had some evidence from stamp providers. If I went to a stamp shop, they would normally ask me, wouldn't they, to sign my signature on a blank piece of paper?*

*A. Having never had one made, I don't know, but I would have thought that would be something...*

*Q. Because to use an existing signature on an existing document would be both unnecessary and unnecessarily difficult.*

*A. All I can say is I've never encountered the use of a pre-used signature for a stamp.*

*Q. And in particular because you'd have to clean up the signature, wouldn't you?*

*A. You may have to, yes."*

257. AHAB's point here is at best inconclusive for two main reasons. First, it assumes that the Al Jazira documents bear the originals of the signatures which appear on them when, as we have seen, that is only one of two possibilities – the other being (although firmly rejected by Dr. Giles) that these signatures are themselves matched from another source. Second, even if they do bear the original signatures, it makes no difference whether the method of subsequent transposition was by computer, by scissors and paste or by stamp. It is common ground that transposing five of the signatures from the three Al-Jazira documents would have been *"not ideal"*. The difficulties put to Mr. Handy apply whatever method of transposition is used. They do not mean that the Al-Jazira signatures could not have been used to make stamps. In fact, again assuming that they are the

originals, 10 of them had been transposed to 305 different documents by one process or another. The evidence simply means that producing the stamps using the Al Jazira documents would have been not ideal. As the same is true for any method of transposition, there is nothing in the point- AHAB's case is that they were in fact transposed to 305 other documents.

258. Despite Dr. Giles' firm opinion, we see for instance from the Al Jazira Bank Chronology,[1923] that facility documents bearing the 10 Suleiman Source Signatures appear for the first time in relation to the 1 December 2007 Facility, a facility which did not increase the amount of borrowing available to the Money Exchange. The obvious question arising is why would Al Sanea have gone to the trouble of manually forging these signatures to be used on documents which did not increase borrowing and so would have been allowed by Suleiman on AHAB's "new for old" case? Four of these signatures then reappear on the 10 September 2008 Facility which did increase borrowing.[1924]

259. Even more puzzlingly, 3 of these 10 Suleiman Source signatures ((9), (8) and (1)) had appeared some ten days prior to what, on Dr. Giles' evidence, should have been their first appearance on the Al Jazira 1 December 2007 facility, on a Bahrain Islamic Bank ("BIB") facility of 21 November 2007.[1925] A fourth - Suleiman Source Signature (10) - appeared on 10 December 2007 but on a letter addressed from Suleiman to BIB in relation to the same 21 November 2007 facility.[1926] The 4 Suleiman Source signatures

---

1923 {**E3/14/11-14**}.
1924 Ibid.
1925 Bahrain Islamic Bank Chronology {**E3/12/4-5**} and Forgery Schedule lines 480-482 and {**G/6140**}; {**G/6139/1**} and {**G/6138/1**}.
1926 {**E3/12/5**} [16.3]; Forgery Schedule line 497 and {**G/6170**}.

attributed to the Al Jazira documents but appearing on the earlier BIB facility are all treated by Mr. Handy as having been mechanically applied and "*possibly matched to stamps.*"[1927] Assuming that they were in fact applied earlier to the 7 November 2007 BIB Facility, they appear to give the exception to Dr. Giles' conclusion[1928] that "*These Bank Al- Jazira documents [99-022, 99-023 and 99-024] are of particular importance since any document bearing a copy of one of these particular Suleiman Source Signatures (1), (5), (6), (8), (10), (11), (13), (16) and (17) cannot have been signed independently by Sheik Suleiman Algosaibi.*" That would be so because this conclusion is itself based on the assumption that "*any document bearing a copy of one of these particular Suleiman Source Signatures*" must have been generated subsequently.

**Conclusion on AHAB's forgery case**

260. AHAB's allegations of forgery are necessarily confined to the time following Abdulaziz's stroke until the collapse of the Money Exchange in May 2009. Before that time, Abdulaziz is shown to have known about Al Sanea's activities and to have authorized them. For that reason also, AHAB's forgery case is also at once both confined and confounded by its pleading of "New for Old" – a case which is incoherent, inconclusive and contradicted by the evidence of many matched signatures on documents which, on AHAB's case, cannot be regarded forgeries. The forgery allegations are shown to have been made on a random scatter-shot basis without any reasonable foundation for a finding that the questioned documents and signatures were deployed by Al Sanea without the knowledge and authority of AHAB Partners.

---

1927 {**E3/12/4-5**} [13]-[16.3] and Forgery Schedule lines 480-482 and 497.
1928 Expressed in her Report: {**J/1/10**} and {**J/1/41**}.

261. The enquiry into the allegations of forgery is also inextricably linked to the context in which AHAB is overwhelmingly shown to have known about yet permitted Al Sanea to continue the scheme of fraudulent borrowing after Abdulaziz's time. AHAB needed bank facilities in order to keep going and they needed facility documents to be signed. The documents purportedly signed by Abdulaziz after he had his stroke were certainly not signed by him. However, as we have seen, it was the Algosaibi family who saw the need to pretend to the world that Abdulaziz was still able to run AHAB, and it will have been the family, no doubt including Al Sanea, who arranged to put Abdulaziz's signatures onto documents during that period. As I already noted above,[1929] Al Sanea's denial of knowledge of simulated signatures is simply incredible. That however, by itself is not proof of forgery deployed against AHAB. Being himself the subject of allegations of fraud against the banks, he has other reasons for not admitting to the deployment of simulated signatures to the deception of the banks.

262. There are documents in the Forgery Schedule undeniably signed by Yousef, Saud and Dawood. Those documents should not be there. In the case of Yousef there is no evidence to support a suggestion that Al Sanea forged his signature. In the case of Saud, I have expressed my findings throughout about his knowledge and involvement in AHAB's business, the Money Exchange, the Financial Businesses and the borrowing from the banks. Saud was fully involved at several levels. It is in that context that I am compelled to conclude that Saud's matched signatures were not forgeries but were applied with his knowledge and authority. Whether it was for general convenience, or because Saud was travelling at the times, these signatures were applied for Saud and with

---

1929 When dealing with Abdulaziz's signatures.

his authority. They are not forgeries.

263. A similar inference is inescapable where Suleiman matched signatures were involved. The fact that Al Sanea is shown to have had in his possession the Al Jazira documents which bear 10 original Suleiman Source Signatures does nothing to negate these inferences. If these documents were actually signed by Suleiman (rather than by someone else skilled enough to simulate his signatures by hand), their subsequent use as matched signatures on 305 documents (selected it should be remembered by the Younger Algosaibis from among AHAB H.O. and Money Exchange records) by itself tells us nothing about whether his signatures were applied with or without Suleiman's knowledge and authority. Nor even whether they were used as the source of the matched signatures before or after they came into Al Sanea's possession. As we have seen for instance, from the examination last above of the Bank Al Jazira and BIB facilities, inferences other than forgery reasonably arise.

264. In the case of Dawood, he signed his signature over 130 times on bank documents for over SAR 10bn, following an agreement between him and Saud that he should do so during the final months leading to the collapse of the Money Exchange. Little wonder then that even while they appear on the Forgery Schedule, far from alleging that his signatures at this crucial time of reckoning for AHAB were forged, Dawood feigned ignorance and amnesia.

265. During the trial it became clear that one of the first responses of AHAB to any document unhelpful to its case was to question its authenticity. If it is a signed document, the respective AHAB Partner would question the signature. At its inception, AHAB's pleaded case was simple; they alleged that every signature on facility documents was a forgery.

That case is shown to have been dishonest. AHAB resiled from that allegation but not one AHAB witness gave any explanation to this Court as to how they could have pursued that dishonest claim for almost two years. There was no acknowledgement that on their instructions they had pursued dishonest forgery allegations. Far from it, and despite the overwhelming evidence and AHAB's own admissions, AHAB has "edged its bet" to the very end as to whether or not Abdulaziz would be found to have been knowingly involved with the fraud on the banks. AHAB's credibility has suffered from its propensity not only for suppression of evidence but for dissemblance as well.

266. The fact that AHAB made pleaded allegations of forgery in relation not only to Suleiman's but also to Dawood's, Saud's and Yousef's signatures, speaks volumes about AHAB's willingness to make such allegations, even where there is no evidence to support them.

267. In the case of Suleiman, the evidence does not support the pleaded case. AHAB has failed to show matched signatures on all (or even a significant majority) of increased facilities. In fact, as shown above, there are matched signatures on numerous renewals. On AHAB's case there was never any need to forge a signature on a renewal.

268. I am not able to determine why any signature was applied. It may have been a matter of convenience. Given the fact that some 54,000 bank facilities were obtained during Suleiman's time,[1930] it may have been because Suleiman did not like or was simply incapable of signing so many documents. I am unable to say how each signature was applied. Some may have been applied using a computer and laser printer, some using

1930 Requiring hundreds of thousands of signatures over the 9 year period (as many as 15 for some facilities as evidenced by the Bank Chronologies or more than 200 signatures per day); see also as discussed above under "Knowledge of the AHAB Partners" by reference to Charlton London 1W: **L1/25/8** [24].

scissors and paste and some possibly by using hand stamps. In the circumstances it is not possible to conclude that Suleiman's signatures were applied without his authority, let alone to conclude that Al Sanea forged Suleiman's signatures.

## SECTION 5

## THE "MANIPULATION" OF DOCUMENTS

### Introduction

1. As already mentioned, AHAB's manipulation case, based on 16 sets of bank facility documents,[1931] emerged very late in the day.

2. Following the AwalCo Defendants' identification of the H2 to H5 files as containing many documents of relevance in the case, AHAB sought to rely upon 16 of them in support of "New for Old". In its Written Opening, AHAB suggested that the significance of these documents was that they showed that *"Mr Al Sanea fabricated or manipulated facility and related documents which were presented to Suleiman for signing, with the aim of deceiving Suleiman and creating the impression of Mr Al Sanea's compliance with the policy imposed upon him by Suleiman in 2002 that new lending should only replace old lending so that the Money Exchange's overall borrowing levels did not increase ...".*[1932] In Oral Opening, Mr. Quest claimed that there were a lot of these documents, and that they had been tampered with in a way *"plainly designed to deceive the Algosaibis".*[1933]

---

1931 Actually 15 different documents (one, **{H4/52}**, being relied on as a source document for **{G/3166}** rather than purportedly having been manipulated in its own right, as **{H4/53}**, not in the schedule, is relied on as the source document for **{G/3165}**) with matching altered versions, all but 4 of the 16 (**{G/2895.1}**, **{G/2982.1}**, **{G/3166}**, **{G/3165}**) were found in AHAB H.O. and involving 9 different banks (Gulf Bank KSC, Gulf Investment Corporation, Gulf International Bank, Bank of Tokyo Mitsubishi, Al Ahli Bank of Kuwait, Mashreq Bank, Lloyds Bank, The Arab Investment Company and Barclays Bank) and set out in Schedule 15 to AHAB's RASOC and now in the Forgery Schedule: **{A2/23.3/1}**.

1932 {**U/1/22**} **[53]**.

1933 **{Day3/59:18-22}**.

3. Later, in the course of AHAB's application to amend to plead manipulation, Mr. Quest developed, for the first time (as discussed above[1934]), the idea that there was a distinction between a "New for Old" Policy, and a separate "New for Old" Protocol. The Policy was said to have applied from 30 September 2000, and the Protocol applied from a date that AHAB is unable to identify but was sometime "*[i]n or around 2002, or early 2003*". It seemed to emerge that it was the later "Protocol" which Badr was apparently enlisted to administer, and in relation to which AHAB now alleges he and/or Suleiman were deceived.

4. AHAB's case, therefore, was no longer that all borrowing was unauthorised and all facility documents were forged, but had become *some* borrowing was authorised under "New for Old"; *some* facility documents were forged; and *some* documents were manipulated by Al Sanea in order to deceive Suleiman and presumably Badr into thinking that the existing and new facility agreements (respectively "Old Facility" and "New Facility" agreement) were for the same amount when they were not. This manipulation case, is said (with an obvious circularity of reasoning) to point at once both to the existence of the "New for Old" Policy, and to Al Sanea's evasion of it. The circular hypothesis emerged that the documents would not have been manipulated unless to deceive and so they show that "New for Old" was in place, for why else would there have been a need to manipulate documents?

5. AHAB's "New for Old" case (Policy and/or Protocol) and forgery case are dealt with in earlier sections of this Judgment.[1935] I will here address AHAB's manipulation case, once

---

[1934] Under "New for Old" above at Section 3.
[1935] See above under Sections 3 and 4.

more with copious reliance on the Defendants' written submissions including where appropriate, AHAB's arguments.

**<u>AHAB's application to amend</u>**

6. AHAB's manipulation case arose (on AHAB's own admission) out of a request from the AwalCos to upload to the Trial Bundle certain <u>Head Office</u> loan files identified by them which appeared to have been maintained by Badr (at least in part) and found in AHAB's Head Office, namely: H2; H3; H4; and H5.[1936] The files contained numerous facilities signed in large part by Suleiman. Those documents, even when now examined in the context of AHAB's manipulation case as indisputably bearing Suleiman signatures, obviously refute the evidence of, for example, Yousef who maintained that:[1937]

> *"112. Deloitte has informed me that numerous loan facility documents were located as part of its investigations which appear on the face of them to have been allegedly signed by Uncle Suleiman. I do not believe that these are genuine documents. I was in regular contact with Uncle Suleiman and he never told me of such facilities. I had a very close relationship with Uncle Suleiman and do not believe that he would have authorised new borrowing of billions of dollars - borrowing that was not required in AHAB's business operations – without ever having mentioned this to me."*

7. It is worth noting that these files would likely never have come to light at all in these Proceedings had matters been left to AHAB. It was the AwalCos who requested file discovery from AHAB: a request that was originally resisted.[1938] These files had been in AHAB's possession for seven years, and they were either not looked at, or considered not to be of any importance. That in itself, of course, suggests that "New for Old" was a later invention, because had it existed, these files kept by Badr whom AHAB claims to have

---

1936 Subsequently **H9** was added.

1937 **{C1/3/25}**

1938 **{B/48/1}** - while in the end agreed by AHAB, an order of the Court was required and made on 28 October 2015.

been responsible for oversight of "New for Old", ought to have been immediately directed to the attention of the Deloitte Investigation team.

8. On 12 July 2016 - shortly before the trial commenced - AHAB applied to further amend its pleadings, in particular to plead its new manipulation case. AHAB's application was refused, and AHAB filed an appeal.

9. Faced with disruption to the trial timetable, and the inevitable diversion of resources that an appeal would entail, the Defendants adopted a practical course. In order to maintain progress with the trial, AHAB was invited by them to renew its amendment application and, subject to terms requiring further discovery from AHAB, the Defendants, while reserving their position on the merits, withdrew their opposition to the proposed amendments and they were allowed by the Court.

10. Subject to three points to be discussed below, the position as regards the evidence before the Court remains the same now as it was at the time of AHAB's application to amend. As was submitted at the time of AHAB's application, this is not a case where there was any real possibility of further evidence becoming available, whether by way of discovery (the documents having already been in AHAB's possession for years), or cross-examination.

**(1) Handwriting and Forensic Document Analysis**

11. The first additional area of evidence that has become available is in the area of handwriting and forensic document analysis. At the time that Mr. Quest opened AHAB's manipulation case, he did so without any evidence to support it. Dr Giles, he said, would be providing a report that would support what he wished to say. That report - her Fourth -

which addressed the "Series 137 documents", was finally produced dated 8 August 2016.[1939]

12. Mr. Handy has also had an opportunity to consider (1) the Series 137 documents; and (2) other documents relating to a relevant counter-party bank, and relating to the Series 137 documents or forming part of the same series ("the Schedule H documents"). The Schedule H documents were identified by the Defendants from the spread sheets provided by AHAB pursuant to the Order of 3 November 2016.[1940]

13. Mr. Handy reported his findings in his Fourth Report dated 10 March 2017.[1941] The purpose of his examination was to determine whether or not there was evidence that documents had been derived one from another or from a common precursor.

14. In summary, Mr. Handy agreed with the conclusions of Dr Giles in relation to the Series 137 documents: that certain documents have been derived one from another or from a common precursor document, and identified some further matched signatures.[1942] Having examined the related Schedule H documents, Mr. Handy found no further evidence of manipulation of the kind alleged by AHAB:[1943]

> *"Whilst there were similarities consistent with the use of a common word processor template, there were no instances where two or more signed documents had been derived from a common precursor document but with amendment to, for example, a monetary entry."*[1944]

---

1939 **{J/5/1}**

1940 **{B/69/1}**

1941 **{J/10/1}**

1942 **{J/10/4} [19]**

1943 Save for two documents referred to at **{J/10.3/7}** i.e. documents 95 and 96 which are to be found on Head Office Files, namely **{H2/91/1}** (Personal Guarantee in the sum of US$258m); and **{H2/93/1}** (Personal Guarantee in the sum of US$279m). These documents relate to the Gulf Bank Facility dated 25 July 2006 which is item 12 on Schedule 15 to AHAB's Re-Re-Re-Re-Amended Statement of Claim [now also part of the Forgery Schedule **{A2/23.3/1-2}**]. In relation to these documents, the signature page was identical.

1944 **{J/10/6}** [**20**]

15. The Defendants accept that the specific documents identified by AHAB have been altered. That much is clear. However, that in and of itself, they submit, takes matters no further forward to proof of allegations of fraudulent manipulation. They submit and I agree that it is not known when the documents were altered; by whom, or (crucially) why it was done.

16. Contrary, moreover, to the impression that Mr. Quest sought to give when opening to the issue, there emerged no evidence to show that these 16 documents are other than individual and isolated examples of altered bank transactional documents among the many tens of thousands known to have been executed.

**(2) Badr**

17. In my judgment at first refusing the amendment application, I concluded that: "*On the present state of the evidence, when one asks rhetorically, "what is the true reason for the manipulation of documents?"; the only fair answer is: "no one really knows*"".[1945] But while dismissing AHAB's application, I left open the possibility that: "*If the state of the evidence were to change, for instance by the adduction of direct evidence from a witness who had relevant knowledge of the putative "new for old" policy and its workings and so could speak to the significance of the manipulated documents, I consider that the matter would be capable of being reconsidered*".[1946]

18. Suleiman is, of course, dead, and cannot give evidence as to the context or significance of the manipulated documents. In his witness statement, Saud had given what is, at best, a

---

1945 Judgment dated 31 August 2016 **{W/33/8} [20]**.
1946 Judgment dated 31 August 2016 **{W/33/29} [45]**.

"second hand" description of the "New for Old" Policy,[1947] and did not provide any evidence in relation to manipulation at all (perhaps not surprisingly, since the argument did not appear to have occurred to anyone at the time that his statement was signed in April 2016). At the time of the amendment application Badr, the putative supervisor of "New for Old", was not intended to be called by AHAB as a witness.

19. Thus, at the prompting of the Court, as well no doubt in an attempt to address the lacunae identified in its evidence about "New for Old", AHAB very belatedly adduced evidence from Badr under a hearsay notice. However, in his statement, Badr surprisingly made no mention at all of manipulation – a statement which I have, in any event, rejected.[1948] On any analysis, Badr ought to have been the person best placed to explain the context and significance of the manipulated documents, in particular in the absence of Suleiman. However, he does not.

20. Nowhere in his statement does he refer to the documents alleged to have been manipulated; or even to the concept of manipulation, either in general terms or at all. Nor is there any suggestion in his statement that he regards himself as ever having been deceived, or having himself deceived Suleiman (as AHAB also variously claims to have been concerned). He has not referred to (nor apparently been shown) the H2-H5 files, or been asked about any other files that may have been maintained by him. Having had the chance to do so, it seems that either AHAB chose not to ask him about its manipulation case or show him the documents upon which it relies; or that AHAB did so and chose not to use his answers.

---

1947 As discussed at length under "New for Old" above.

1948 See above again under "New for Old" **[107]-[146]**.

21. AHAB's pleaded case is that Badr was "dishonest" and in cahoots with Al Sanea. Yet, in the course of its submissions on manipulation, AHAB suggested that Badr too was deceived. These two positions are wholly inconsistent. If Badr was, as AHAB pleads, dishonest, then, in light of the fact that Suleiman did not speak English and is said to have relied on him, there would have been no need for Al Sanea to manipulate any documents at all. This is because Badr could have told Suleiman whatever he liked about the documents which, on AHAB's case, Suleiman could not read for himself. If Badr was honest,[1949] then Al Sanea risked being exposed at any moment as he could not have been assured that Badr kept no record of earlier transactions. As was seen above when dealing with "New for Old" and the forgery allegations, Badr did keep such a record in spread sheet format.

**(3) Discovery**

22. Pursuant to the Order granting AHAB permission to amend its Statement of Claim,[1950] AHAB was required to provide further discovery of relevant documents. As Mr. Ford explains in his Twenty Seventh[1951] and Twenty Eighth Affidavits,[1952] he did not expect there to be any, and no extra documents were provided. What was provided were spread sheets pursuant to paragraph 5 of the Order which provided further information relating to the documents that AHAB had already provided. The result is that whilst the Defendants have obviously investigated the documents further, in the end they and the Court were provided relatively little by way of further context.

---

1949 An impermissible proposition given AHAB's prevarication on this issue as discussed above.

1950 **{B/69/1}**

1951 **{L6/28/1}**

1952 **{L6/29/1}**

**Pleading dishonesty**

23. As already discussed when considering AHAB's forgery allegations, the Court cannot be invited to infer dishonesty from primary facts, if those primary facts might also be consistent with an honest explanation. It is not enough to plead primary facts with particularity. If those primary facts are consistent with an innocent explanation, that is insufficient for an allegation of dishonesty. "*There must be some fact which tilts the balance and justifies an inference of dishonesty, and this fact must be both pleaded and proved".*[1953]

24. The burden and standard of proof is the ordinary civil standard of the balance of probabilities. A party wishing to prove fraud will need particularly cogent evidence to persuade the court that dishonesty or fraud, which are unlikely, has, on the balance of probabilities, occurred. That burden always remains on the party alleging fraud.[1954]

25. It was however an indication of AHAB's difficulties with its manipulation case that it argued on its amendment application that:

> "*Applying those observations to this case*[1955]*, as it is the Defendants who are relying upon the authenticity of the various documents which, in its pleadings, AHAB disputes and in relation to which AHAB has put the Defendants to proof,* ***it is the Defendants who bear the burden of establishing the authenticity of those documents on the balance of probabilities.***"[1956] (Emphasis added.)

---

1953 **Three Rivers DC v Bank of England (No. 3)** (HL(E)) **[2003] 2 AC 1 @ 292B {R1/34.5/292}**, per Lord Millett); see also **Jonesco v Beard [1930] AC 298** at 300 **{R1/5.2/3}**: *"It has long been the settled practice of the Court that the proper method of impeaching a completed judgment on the ground of fraud is by action in which, as in any other action based on fraud, the particulars of the fraud must be exactly given and the allegation established by the strict proof such a charge requires.*" per Lord Buckmaster, and **JSC Bank of Moscow v Kekhman [2015] EWHC 3073 [20] {R1/51.0.1/7}**.

1954 This subject was extensively discussed above under the heading "Forgery Allegations", sub-heading "Burden and Standard of Proof".

1955 From **Tigris Industries v Ghassemian** (below).

1956 {**W/24/13**} **[42]**

26. In support of that contention, AHAB relied on **Tigris Industries v Ghassemian**.[1957] AHAB's contention was rejected.[1958] The burden remains on AHAB to prove its case.

**AHAB's pleaded case**

27. AHAB's pleaded case on manipulation in its RASOC is as follows:

> *"103A. Further, Mr Al Sanea forged facility documents by manipulating the text and/or content of documents (including by increasing the amount) after they had been signed by Suleiman pursuant to the procedure pleaded in paragraph 99K above.*[[1959]]
>
> *103B. Further, Mr Al Sanea dishonestly induced Suleiman to sign new facility documents pursuant to the procedure pleaded in paragraph 99K above by presenting manipulated existing facility documents in order to conceal the fact that the facility had increased or was increasing."*[1960]

28. I agree with the Defendants that AHAB's claim is inadequately particularised. The documents upon which AHAB relies are identified in Schedule 15 (now in the Forgery Schedule). Whilst paragraph 103C suggests that particulars are also provided in Schedule 15, they are not. What are provided are brief summaries of AHAB's "observations" simply added as a column to the Forgery Schedule.[1961] Nowhere does AHAB clearly set out the primary facts, and the inferences that AHAB invites the court to draw from those facts, in relation to each manipulated document. I agree with the Defendants that this is not an academic pleading point: as was apparent from AHAB's Amendment Application, what AHAB alleges actually happened varies considerably in relation to each document. For instance, nowhere is it concisely and clearly set out how AHAB alleges that Al Sanea

---

1957 **[2016] EWCA Civ 269 {R1/54/1}**, a case in which the English Court of Appeal per Lewison LJ approved of the dictum of Norris J in the court below who discussed the different subject of the evidential burden having shifted where the opposite party adduced strong evidence to support its case.

1958 Judgment dated 31 August 2016 **{W/33/28-29} [42]–[44]**

1959 i.e. the "New for Old" Procedure.

1960 **{A1/2.3/44}**

1961 **{A2/23.3/1}**

used any of these documents to induce Suleiman to sign them in the context of AHAB's own allegations that Badr, the pivotal go-between, was also involved in the dishonesty.

29. Mr. Lowe addressed this on Day 26:[1962]

> "*At paragraph 103A on page {W/3/43}, at the bottom of the page: "Further, Mr Al Sanea forged facility documents by manipulating the text and/or content of documents ... after they had been signed by Suleiman ....*
> *Paragraph 103B says that he manipulated facilities before they had been signed. You see that.*
> *In either case, it doesn't really matter whether he did it before or afterwards. If you break down what AHAB is alleging, it really has to come in the following form: the first thing it has to allege, if you saw it pleaded out properly, was that Al Sanea represented by his conduct, by presenting a facility document, that it was a new-for-old document. They have to actually say that his conduct amounted to some form of representation, because Suleiman didn't form this belief in the ether; there has to be something to tie it to. If it is conduct of Al Sanea in presenting a facility, the traditional legal characterisation of that is that you imply a representation from conduct. So that is the first thing you have to be able to do.*
> *The representation AHAB is alleging is: here is a facility which is new-for-old. That is the representation that is being made.*
> *The second thing you have to do is you have to allege that the representation was communicated to Suleiman in circumstances where Suleiman didn't speak English and can't read the numerals that we read. So you are going to have to have a case about Badr, as Mr Crystal kept telling your Lordship, I think. Because if Badr is innocent, that makes sense. But if Badr is dishonest, why on earth would you need to do this at all? He could just lie* [to Suleiman] *about what the document said. So it is incumbent really on the plaintiff to have a case about this, although all they have to plead is that the representation was communicated by Badr, but the assumption must be that Badr was honest in that sense. That is the second element of this allegation.*
> *The third element that you have to imagine is being pleaded, because all you have is a generic pleading by reference to a schedule which sets out 18 fairly unintelligible particulars -- but what you assume with each of these is that you are pleading out these facts. The third fact they would have to plead is that Suleiman believed that in signing this facility, he was signing no*

---

[1962] **{Day26/121:16}-{Day26/124:22}**

*more than new-for-old. That must be the third fact, because if Suleiman didn't believe that, the allegation doesn't make sense. The problem here for the plaintiff is they are going to have to ask you to infer that belief, because Suleiman is not going to give evidence, and there is no evidence from Badr, and there is no other evidence of a record or anything else being kept. So this has to be by way of inference. The problem is that if AHAB has in its possession a document with* [i.e.: which shows] *a higher facility, it is impossible to infer belief* [on the part of Suleiman] *that it was signing for a lower facility only,* [in other words] *that there was no higher facility in existence. That's why Mr Quest said to you repeatedly, when he was making submissions, "Well, this is what was in the Money Exchange's files and this is what was in AHAB's files, and we didn't have in our files the higher facility." So he is actually sliding into his explanation a fact which he ought to have pleaded, that AHAB didn't have the higher facility, and the only means of knowledge that Suleiman could have had of this was in the Money Exchange's files, which he* [Suleiman] *didn't have.*
*So that's important because, as you will see in a moment, at least* [in relation to] *two or three of these facilities we can show that AHAB had the higher facility in its possession, and therefore it is not open to the court -- it won't be open to the court to draw the inference that the plaintiffs must ask you to draw* [but have failed to plead].
*The fourth fact that has to be pleaded is that the statement* [made by representation] *is false. Now, that might sound surprising but in at least two of the cases that we have on the facilities* [documents], *it is self-evident that Al Sanea, if he was giving a document to Suleiman, it was not in fact a higher facility than was in place, and that Suleiman could* [therefore] *have believed to have been in place. So that is in relation to the Arab Investment Corporation and Lloyds* [Bank]*; I can show your Lordship".*

30. Mr. Smith put it a slightly different way, but what it amounts to is the same thing:[1963]

*"I hesitate to go back 25 years to bar school, but I will. When I was at bar school, you had to plead a representation that was false, that was made intentionally false or reckless as to its falsity, and that was* [said to have been] *relied upon and induced the person to whom it was made. That is what you have to plead in order to make good the allegation that is here being made, which is that Suleiman was induced to sign by way of a deception by Mr Al Sanea.*

---

1963 **{Day26/111:11}–{Day26/112:20}**

> *My Lord, that needs to be done in each of these 15 or 16 cases -- I don't want to get drawn on that. One needs to say, "Right, here is how it happened, this is how the fraud was done, this is how Suleiman was duped into signing the facility."*
> *My Lord, there is one final very important point to bear in mind in relation to this inducement case. At {X2/5/1}, I can make the point most clearly in relation to this. It is the later facilities that matter more than the earlier.*
> *Let's suppose, without in any way conceding, that my learned friend is right and a manipulated document was served up in around 2002 or 2003 to Suleiman, and he signed the facility thinking it was US$30 million, when in fact it was US$80 million. My Lord, if the story ended there, and provided the details were properly set out and pleaded, that would be a sustainable case which we could deal with. But, of course, one gets seven* [related] *facilities after that. And if they were freely signed by Suleiman, then the earlier alleged fraudulent misrepresentation is of historic interest only.*
> *My Lord, what my learned friend has to plead – and by all means plead a whole series of alleged fraudulent misrepresentations -- the one that matters is the one that induced the facility which a bank is now claiming on against AHAB".*

**AHAB's manipulation case**

General

31. There are a number of general points to make in relation to the documents set out in Schedule 15:

(1) Although 16 documents are listed, some of these are related. For example:

(a) Documents 2 and 3 relate to the same Gulf Investment Corporation transaction;

(b) Documents 4; 5 and 6 all relate to the same Gulf International Bank transaction;

(c) Documents 7 and 13 relate to the same Bank of Tokyo Mitsubishi transaction;

(d) Documents 8 and 9 relate to the same Al Ahli Bank of Kuwait transaction;

(e) Documents 10 and 15 relate to the same Mashreqbank transaction.

(2) Taking this into account, the Court is concerned with 10 instances of alleged manipulation in the period from 2002 until AHAB's collapse in May 2009. According to Mr. Charlton,[1964] *"Between 2000 and 2009 more than 12,500 new loans were taken out or renewed, and by 2009 there would be up to 20 facilities maturing per day"*. The level of alleged manipulation is *de minimis* in comparison.

(3) These 10 instances of manipulation arose over a period of 7 years:

(a) Two are alleged to have taken place in 2002 (Gulf Bank, and Gulf Investment Corporation);

(b) One in 2003 (Gulf International Bank);

(c) One in 2004 (Al Ahli Bank of Kuwait);

(d) None in 2005;

(e) Five in 2006 (Lloyds; Gulf Bank; Bank of Tokyo Mitsubishi; Arab Investment Corporation; Mashreqbank);

(f) One in 2007 (Barclays);

(g) None in 2008;

(h) None in 2009.

32. In short, there is no consistency or pattern to the manipulation that AHAB has identified. If, as AHAB alleges, the activity was calculated to ensure that Suleiman was deceived into thinking the alleged "New for Old" Policy and/or Protocol was being applied, given

---

1964 Charlton 1W London **{L1/25/14} [39**] and **{L1/25/9} [24**] where he speaks of "*The large number of loans and finance transactions (53,940 transactions opened between 1 January 2000 and 3 June 2009)*".

the massive number of transactions, one would expect there to have been more instances of such conduct, and that they would arise consistently, and (presumably) in relation to the same banks. Nor is there any consistency as to how the manipulation is alleged to have occurred. All this though is at risk of speculation prompted by the lack of particularisation in AHAB's case.

33. On AHAB's pleaded case, it cannot say whether the documents signed in 2002 or 2003 are subject to the "New for Old" Protocol (if it ever existed) at all.[1965] AHAB is unable to give a date when it took effect and is only able to say *"In or around 2002 or early 2003"*. Prior to the last re-amendment, this window of time was expressed as "*In or around late 2002 or early 2003"*. Had the word "late" not been deleted by this amendment to accommodate the pleading of the manipulation case, the three earliest of these documents would not have been signed during the currency of the putative Protocol, and so there would have been no need for Al Sanea to deceive Badr and/or Suleiman in relation to them.[1966]

34. Importantly, as a simple question of timing, given the dates of these 16 documents (the latest being 7 June 2007), it is difficult to see how any of them could be the document that induced a facility that was in effect in May 2009, or in respect of which a bank is now claiming against AHAB. In fact, in many instances, later facilities were entered into with the same banks, signed by Suleiman, for increased amounts of borrowing.[1967]

---

1965 RASOC **{A1/2.3/40} [99K]**. I have already expressed the reasons for my not being satisfied that it did exist - see above: "New for Old".

1966 See Schedule 15 and Forgery Schedule **{A2/23.3/1}**, lines 1,2 and 3 – re Gulf Bank KSC and Gulf Investment Corporation.

1967 See Bank Chronology Spread Sheet: **{E3/1/1-2}** and Narratives for 5 banks: **{E3/18/1}**; **{E3/20/1}**; **{E3/31/1}**; **{E3/32/1}**; **{E3/43/1}**.

35. Six of the 16 documents upon which AHAB relies are guarantees. As indicated above from Mr. Handy's report, these documents having come from AHAB H.O. files, appear to have been generated internally by AHAB from word processor templates. Guarantees are a secondary source of information as to what a facility level may have been. They are not the equivalent of facility agreements which would have been provided by the third party banks. Further, given that they appear to be a draft form that is frequently adopted by AHAB, it is therefore inherently likely that a number of different iterations will have been created, dependent on the status of negotiations.

Categories of Manipulations

36. According to AHAB's Written Speaking Notes for the Amendment Application, the manipulated documents fall into two categories.[1968]

Category 1 Manipulations:

37. The first category of manipulation is said to be documents manipulated by increasing the amount of a new facility document after it had been signed to reflect a higher amount. Here, these documents are referred to as "Category 1 Manipulations".

38. This is said to apply to the earlier dated documents i.e. Gulf Bank of Kuwait; Gulf Investment Corporation, Gulf International Bank, Bank of Tokyo Mitsubishi[1969] and Al Ahli Bank of Kuwait. These are items 1 to 9 on AHAB's Schedule 15.[1970]

39. The inference AHAB seeks to draw is that this was done in order to obtain a document to send to the bank bearing a Suleiman signature but in a sum higher than Suleiman would

---

1968 See AHAB's Written Speaking Notes for its Amendment Application **{W/48/11}**.

1969 It is difficult to see how this BoTM document fits into this analysis, as it is alleged to be one of the documents manipulated to persuade Suleiman to sign a facility for US$40m 3 years later in 2006 and is linked to document 13 dated 30 July 2006, on Schedule 15.

1970 And Forgery Schedule: **{A2/23.3/1-2}**.

in fact have authorised. This is said to have been achieved by obtaining Suleiman's signature on one document and then using that page on another, higher facility document or guarantee. As the Defendants set out in Part 2 of their submissions on Manipulation,[1971] this summary does not in fact fit all of the Category 1 Manipulations.[1972]

40. By way of example, in the case of Gulf Bank of Kuwait AHAB alleges that there are two Corporate Guarantees dated 30 June 2002 which are the same (including the same signature page) but reflecting different amounts on the first page. The lower version is a guarantee in the sum of US$30m;[1973] and the higher is US$80m.[1974] The lower version was found in the Head Office files; the higher version is said to have been found in the Money Exchange. So, it is said, Suleiman actually signed the lower version, and the page with his signature was then affixed to the higher version and sent to the bank.

Category 2 Manipulations:

41. The second category of manipulation is documents said to have been altered by increasing the amount of the Old Facility document before the New Facility is signed. Here, these documents are referred to as "Category 2 Manipulations".

42. This is said to apply to the later dated documents: Mashreqbank; Gulf Bank of Kuwait; Bank of Tokyo Mitsubishi; Arab Investment Company, Lloyds and Barclays i.e. items 10 to 16 on AHAB's Schedule 15.

---

1971 From **{E1/27/24}**, which I have noted below that I agree with.
1972 Al Ahli; Bank of Tokyo Mitsubishi.
1973 **{H4/39}**
1974 **{G/2895.1}**

43. The inference AHAB seeks to draw is that this was done in order to give the impression that the New Facility was not an increase on the Old Facility. So taking by way of example, the case of Lloyds Bank, AHAB suggests that whereas the Old (2006) Facility was for US$17,066,000, it was manipulated at some point before the New (2007) Facility in the sum of US$22,066,000 was due to be signed to make it look as though the Old (2006) Facility was also US$22,066,000, and that there was therefore no increase. The manipulated version of the Old Facility was then provided to Badr together with a draft of the New Facility, which Suleiman then signed thinking that the 2006 and 2007 Facilities were for the same amount, whereas in fact there was a US$5m increase which he would never have approved.

<u>The inferences that AHAB seeks to draw</u>

44. AHAB called no witness to testify to the significance of the manipulations, but seeks to argue that the 16 documents "[*give*] *rise to only one reasonable inference, which is that Mr Al Sanea must have been responsible for their creation and must have successfully deployed them as a decoy to his fraudulent program of unauthorized borrowings and misappropriations in evasion of the "new for old" policy*".[1975]

45. According to AHAB:[1976]

> *"...the starting point is that there is no obvious proper reason why there should be in existence different versions of loan documents that not only bear the same date but also bear identical and identically placed signatures. Where there are different versions in the Money Exchange files and the Head Office files, the obvious inference ... is that the purpose of the manipulation was to conceal the activities of the Money Exchange from Head Office".*

---

1975 Judgment dated 31 August 2016 **{W/33/3} [7]**.

1976 See AHAB's Written Speaking Notes for its Amendment Application **{W/48/12} [39]** and **{Day25/108:22} - {Day25/109:18}**.

46. Underpinning AHAB's argument is the assumption that *"The process of manipulation is inherently dishonest"*.[1977] AHAB maintained that it could make its case without evidence from Suleiman:[1978]

> *"Obviously he is not here to give evidence but we say, from an inferential perspective, one can ask the question: what would be the point of Mr Al Sanea or indeed anyone else doing this, if not for the purpose of concealing something from the person who was being asked to authorise either the borrowing or the relevant guarantee? Particularly in the context -- one has to see this in the context -- that new for old was in operation, on our case, and it was necessary -- first of all, that meant there was a resistance or a prohibition on facilities increasing and there was also a need to present an old and a new facility in order to get them to sign off on the new one.*"

47. Manipulation is an emotive term. The documents AHAB is referring to have been altered or amended. There are a number of possible answers to Mr. Quest's rhetorical question. These were helpfully outlined in detail in a Note submitted by the GT Defendants on the Amendment Application and it was adopted in full in their Closing Submissions[1979]. While I do not need to and so make no conclusive finding on any of these other possible inferences, the fact of the matter is that it is for AHAB to show that none reasonably arises in all the circumstances of this case.

48. Further, many of the documents alleged to have been "manipulated" are guarantees and in very similar form. Mr. Handy's unchallenged evidence is that there were documents with*"similarities [which] may be considered indicative of the use of a common word*

---

1977 See AHAB's Written Speaking Notes for its Amendment Application **{W/48/12} [39]** and **{Day25/110:7} - {Day25/111:6}**.

1978 **{Day25/110:19} - {Day25/111:6}**

1979 **{W/32/1}**

*processor template”.*[1980] As such, it is possible that the “manipulations” reflect various iterations of amendments, or negotiations; or bear standard signature pages which Suleiman was aware might be attached. This is particularly so given that the signature pages relate to a form of guarantee which appears to have been AHAB’s own basic template.

49. As part of the process of negotiation it appears from some of the examples, that AHAB’s practice (AHAB having been the guarantor) may have been to take the old version of a document and mark up a new one.

50. As regards the attachment of signature pages, it is possible that a copy of a signature page may have been affixed at some point (possibly in the process of filing it) to a copy of an agreement that did not have one, and simply the wrong one was attached. That could also have happened when, for example, the 'younger Algosaibis', who were deliberately not presented for cross-examination,[1981] were looking through documents. That would not lead to the inevitable conclusion that fraud is at large.

51. Further, AHAB has failed to explain why the concealment from Suleiman was required at all given that:

(1) Suleiman did not speak English and therefore could not possibly have been misled by manipulated English documents;

(2) Badr was, on AHAB’s pleaded case at least, dishonest and a party to Al Sanea’s fraud, and therefore could have obtained Suleiman’s signature without any manipulation being required;

---

1980 **{J/10/4} [18]**

1981 Concerns about this issue are addressed earlier in this Judgment and referenced, with approval, to the Defendants’ written Closing Submissions at **{E1/7/82-91}**.

(3) On AHAB's case, Al Sanea could (and did) forge the signatures he required.

Refinements to AHAB's Manipulation Case

52. AHAB's case on manipulation received a number of refinements in the course of Mr. Quest's submissions. These refinements were required to negotiate around the fact that a closer examination of the documents did not support AHAB's manipulation case. Each refinement had a knock-on consequence on the inferences that the Court was, and is, being asked to draw.

(1) Location of Documents

53. Critical to AHAB's manipulation case is the location where documents were found. So, in relation to a Category 1 Manipulation, on AHAB's case it is the lower facility that would be found in Head Office, the signature page of which would be added to a higher version found at ATS or the Money Exchange. In a Category 2 Manipulation, the presumption would be that the lower facility would be found in the Money Exchange, and a manipulated or higher version found in Head Office.

54. In reality, this proved not to be the case. The document it was alleged was concealed was in fact found on Head Office files giving rise to the clear inference that Badr and/or Suleiman must have been aware of it, and therefore of an increase in facilities. In other instances (as in the case of Barclays Bank) the document expressly referred on its face to the fact that the New Facility was an increase.

55. When just such an inconvenient document arose, Mr. Quest's answer was:[1982]

*MR. QUEST:* *"... but we don't know when this document was put on the file. Subsequently, when it came, for example, to increase the facility in a subsequent year, no doubt it would be*

[1982] **{Day27/106:3-9}**

*possible at that stage for Mr Al Sanea to present the true document and say, "Well, actually, we have a US$15 million facility.""*

56. This resulted in the following exchange:[1983]

| | |
|---|---|
| *CHIEF JUSTICE:* | *Of course, one must recognise that a fundamental aspect of your argument depends on where these documents were found.* |
| *MR. QUEST:* | *Yes.* |
| *CHIEF JUSTICE:* | *In the case, it seems to me, where it suits your argument, you are prepared to ask me to draw the inference that Suleiman would have had knowledge or would not have had knowledge, depending on where the documents were found. In this particular case, you are saying the fact it was in the head office file doesn't mean that he would have known. In other cases, precisely because it wasn't, you are saying he wouldn't have known.* |
| *MR. QUEST:* | *I am saying that just because a document was on a file, it doesn't follow from that that Suleiman would necessarily have known about it. What is significant in terms of his knowledge and what he did as a result is where you can see documents that have been produced as part of the new for old process; because if they had been produced as part of the new for old process, they have been produced for the purpose of showing to Badr and showing to him. Subsequently, obviously, the facilities are issued, and the next time it comes to a renewal, there is a process of showing the then existing facility and the new one.* |
| *CHIEF JUSTICE:* | *Well, there is a huge question being begged there, but we will have to get to that sooner or later."* |

57. The inference that Mr. Quest invites the Court to draw is inconsistent. On the one hand, his manipulation case must proceed on the basis of Suleiman's knowledge being limited to what was on Head Office files. Yet when those files reveal something potentially

1983 **{Day27/106:25} - {Day27/108:2}**

unhelpful to AHAB's case, the retort is to question when it was put there, or whether or not Suleiman would have been aware of it. This betrays the fragility of AHAB's case.

(2) Manipulation and Forgery

58. In particular in the case of the Category 2 Manipulations, in many instances versions of the New Facility did not bear Suleiman's signature at all, but appear on the Forgery Schedule. This is again wholly inconsistent with the idea that Suleiman is being deceived into authorising – by his signature – a facility that is (unbeknownst to him) an increase on the borrowing in the previous year. There is no point in manipulating a document to induce a signature if it is not going to be used for that purpose. And equally, no point in forging a signature on a manipulated document which on AHAB's hypothesis, would only have been manipulated to induce Suleiman to sign.

59. In an attempt to negotiate this problem, Mr. Quest argued that AHAB's Category 2 Manipulations were needed – not to obtain a signature for the bank, because Al Sanea allegedly could and did forge that – but simply in order to give Suleiman the impression that "New for Old" was being complied with, and give Suleiman something to sign. For example:

60. In relation to Bank of Tokyo Mitsubishi:[1984]

> *"Your Lordship asked me this morning what the connection was between the manipulation case and the transposition of signatures case and whether one was inconsistent with the other. What I explained was that, particularly by 2007, when it came to sending out documents to banks, Mr Al Sanea was able to do that by applying electronic signatures to documents. The purpose of this exercise is not so much to obtain documents to send to the banks but to convince Suleiman and the partners that the procedure was being followed."*

---

1984 **{Day27/121:14-23}**

61. In relation to Mashreqbank:[1985]

*"MR. QUEST:* *It is on the forgery schedule, which means the signature is a matched signature. Again, it is one of those situations, as I indicated before, where when it came to actually the execution of documents going to banks, certainly by 2007, Mr Al Sanea was in a position to apply signatures electronically, but, nonetheless, he still needed to maintain the pretence of presenting new and old documents as part of that process. The new and old documents that he presented -- or the old document, the existing facility that he would have presented is the one at tab A. It is dated August 2006.*

*CHIEF JUSTICE:* *But why would he present anything if he simply applied the signature himself?*

*MR. QUEST:* *Because if he adopted a process of simply applying signatures to everything without involving the head office at all, it would be apparent that he was not complying with new for old at all. In other words, given that the partners were already aware of borrowing and, therefore, would have been expecting to see this process being operated, that's something Mr Al Sanea had to do."*

62. The inference that AHAB seeks to draw raises more questions than it answers:

(1) AHAB cannot give any sensible explanation as to why Al Sanea would forge the New Facility if in fact he had a genuine signature. In other words, there is no explanation for why Al Sanea would obtain a genuine signature and then not use it;

(2) If the real purpose was simply to create the impression that "New for Old" was operating, one would expect to see frequency and some consistency to the manipulation process (in particular given the alleged sophistication of Al Sanea's fraud) but there appears to be none;

---

1985 **{Day27/133:8} - {Day27/134:4}**. See also **{Day27/139:2} - {Day27/140:17}**.

(3) The perceived need to give the impression that "New for Old" was operating as it should ought to mean that there was some form of supervision over the process. Yet, as is set out in paragraph 64 below, the Court is now also invited by AHAB to infer that Head Office had no idea of the history of any of the transactions at all.

63. There is a further layer of complication: in some instances there are various copies of a document or copies in a suite of documents each with a different forged signature, only one of which is said by AHAB to have been manipulated.[1986] It makes no sense to manipulate some documents in a suite of documents and not others; or to manipulate some copies of a document and obtain an original signature, but to forge others.[1987]

<u>(3) No Check on "New for Old"</u>

64. It is (or became) part of AHAB's case that the Court must also infer that nobody at Head Office who may have been responsible for implementing the "New for Old" Policy or Protocol bothered to check the history of transactions anyway:[1988]

*CHIEF JUSTICE:* "*Is therefore another inference that you would invite me to draw, taking this view of not just the particular documents you compare but other relevant documents forming part of the context, which is that Suleiman and Badr, and anybody else at head office who may have been responsible, were not in the habit of checking the history of transactions? They never bothered to go back any further than the exact documents being placed before them at any given point in time.*"

---

1986 See for example Mashreqbank: **{G/5579.1.1}** (<u>not</u> **{G/5579.1}** as shown in the Forgery Schedule); **{H2/74}** (<u>not</u> **{H2/64}** as shown in the column "AHAB Observations" in the Forgery Schedule) and **{H2/118}**. On the face of these there is an obvious error- **{H2/118}** and **{H2/74}** show US$35m in numbers but US$30m in words. More to this point here: **{G/5400}** (for US$272,100,000) said to have been manipulated to produce **{H2/96}** (for US$429,000,000) but each has a different matched Suleiman signature. See item 15 on the Forgery Schedule.

1987 As Mr. Phillips submitted: **{Day14/20:17} - {Day14/37:6}**.

1988 **{Day27/74:23} - {Day27/76:1}**

*MR. QUEST: "Well, it seems not. The process that has been described by Saud as being the new for old process is a process of producing an expiring document and a new document. This was a business, the evidence is, that was essentially run by Mr Al Sanea. He was the managing director. The oversight, it is said, on the evidence that Suleiman had in the business, was extremely limited, and it was limited to the new for old process. So Mr Al Sanea was essentially left, at least during the 2000s, to manage the facilities himself, subject only to producing from time to time an expiring and a new facility, which obviously was thought -- and that was the purpose of the process -- to be the limit on what he was doing. But we say, as these documents demonstrate, it was in fact being used by him as a tool of the fraud. He, no doubt, appreciating that the only control on him was the new for old process, needed to show that the process was being operated and used these documents to do that."*

65. It is now suggested that the Court must infer that Suleiman (and presumably Badr) was unaware of documents that were available to him. Yet as I then observed: [1989]

> "*.... if I am to at the end of the day conclude that this was a device to induce him to sign documents which he would otherwise not have signed, the inference would have been that he wasn't aware of the history. But as we speak it seems to me that it is reasonable to draw the inference the other way, which is that there would have been a record kept of these borrowings."*

66. To invite the inference AHAB seeks to draw is absurd, and undermines the very nature of the "New for Old" process or "Protocol" for which AHAB contends. The logical consequence of Mr. Quest's argument is that AHAB's "New for Old" Policy could never have worked – even at a basic level - and, moreover, that nobody ever realised in over seven years that it was not working, or ever did anything about it. That is inherently unlikely and in turn leads to bolster the conclusion that there never was a Policy or a Protocol at all.

---

1989 **{Day27/83:4-10}**

(4) Errors in the manipulations

67. Further refinement was required when AHAB was faced with the Mashreqbank documentation. In that instance, there was an error that was readily apparent on the face of the document.[1990] That, Mr. Quest sought to address by suggesting the following:[1991]

"*MR. QUEST: Let me explain how it works. It doesn't require foresight. What happens, in June 2007 -- let's take it through stage by stage -- the new facility has to be agreed in June 2007. Al Sanea gets from the bank a new facility for US$429 million. Al Sanea needs to take it to Suleiman and he needs to take with it an old facility document in the same amount, but he doesn't have one, because the old facility agreement is only for US$272 million. So he can't show him old and new the same because the old is a smaller one and the new is a bigger one. What does he do? He takes the existing old one -- I don't suppose he does it himself, I suppose James Dennis does it -- he takes it to James Dennis and says to James Dennis, "Change this document, leave the signatures, leave the date, leave everything else, but change the old one we already have so it says 429 instead of 272, then I can take both of them to Suleiman and show him two the same." It doesn't require foresight. This process would have been done at the time the new facility was to be agreed.*

*CHIEF JUSTICE: They overlooked the line at the bottom?*

*MR. QUEST: Unfortunately, no matter how clever fraudsters are, they always overlook something. Of course, the line at the bottom is the clue that the one on the right is the genuine one and the one on the left is the false one. Bearing in mind Suleiman didn't read English and this was going past Badr and who knows what he did with it, you don't know how much care they took over it, but it does look as if they missed that point. My Lord, there can't be, as I say, an honest explanation for there being two versions of the same document with different numbers. The only person who could have been responsible for this and who had the motive to*

[1990] **{H2/96}** and **{G/5400}**
[1991] **{Day4/142:23} - {Day4/144:9}**

> *do it is Al Sanea It can hardly be supposed that AHAB would have forged a document in their own files."*

68. AHAB had the opportunity to ask Badr, and the position (according to AHAB) remains that nobody really knows what Badr did with the documents, or how much care he took. Here again, the Court is being invited to draw inferences in a vacuum.

**Conclusion**

69. These 16 sets of documents simply cannot bear the weight of inference that AHAB wishes to place upon them. It is not possible to infer from the very existence of these 16 documents (or 10 transactions) either the existence of the "New for Old" Policy, or its evasion. In the case of these documents, there is no clear inference that can be drawn in AHAB's favour. On the contrary, the inferences required to support AHAB's "New for Old" case become ever more complex and byzantine.

70. Whatever the reason for the alteration of these documents might have been at the time, the one thing the documents show (from those for higher amounts being found at AHAB H.O.) is that AHAB was in fact aware of the increasing facilities – that, in and of itself, is inconsistent with any concept of "New for Old", and with the evidence of AHAB's own witnesses.

71. In the end, the position remains as it was at the time of AHAB's Application to Amend, as I was compelled to observe and as already mentioned above: *"When one asks rhetorically, "what is the true reason for the manipulation of documents?"; the only fair answer is: "no-one really knows"*.[1992]

---

1992 Judgment dated 31 August 2016 **{W/33/8} [20]**.

72. At Part 2 of their written submissions,[1993] the Defendants examine each of the manipulated documents by reference to all documents which were in the end disclosed as relevant. This examination served in my view to reinforce the conclusion that AHAB's contentions based on these documents are unsustainable. I do not see the need in this Judgment to examine or incorporate the submissions set out at Part 2 but I note here that I agree with them.

1993 **{E1/29/24-57}**

# SECTION 6

## THE AL SANEA INDEBTEDNESS TO THE MONEY EXCHANGE

## SECTION 6

## THE AL SANEA INDEBTEDNESS TO THE MONEY EXCHANGE

1. I have already set out in an earlier section of this Judgment, my findings and conclusions on the knowledge and authority of the AHAB Partners relating to the borrowings of the Money Exchange.[1994] There I also mentioned in passing, my views on the reasons why the Algosaibis were willing to allow the massive personal borrowing of Al Sanea to go unchecked: it was the *quid pro quo* for his willingness also to use the Money Exchange to procure fraudulent borrowing on behalf of the AHAB Partners themselves.

2. What follows in this section is a more detailed analysis of the borrowing arrangements or agreement between AHAB and Al Sanea as it developed during Abdulaziz's time and was allowed (however reluctantly) by Suleiman and Saud to continue until the Money Exchange collapsed (the result of illiquidity when the banks stopped lending at the time of the world financial crisis of 2008-2009).

3. This analysis has been prepared by the Defendants.[1995] I adopt and adapt it with such changes as I regard necessary to express my conclusions. I also incorporate such aspects of AHAB's written Closing Submissions as I regard necessary to express my conclusions.

---

1994 See above at Section 1.

1995 At {**E1/19/1-13**} and {**E1/20/48-52**} of the Defendants' Written Closing Submissions

**(1) THE BORROWING AGREEMENT.**

4. AHAB's case is that there was no commercial purpose or reason for AHAB to permit Al Sanea to "*take huge amounts of money*"[1996] from the Money Exchange and they therefore invite the Court to infer that such withdrawals were unauthorised or misappropriations.[1997]

5. The correct view of the arrangement is that payments to Al Sanea were not "misappropriations" but loans which were expected to be repaid.[1998] Ledger 3 recorded an ongoing facility for Al Sanea to borrow funds. This, I conclude, was a facility that was granted to Al Sanea by Abdulaziz and was never revoked.

6. Whatever the borrowing was used for (whether or not Al Sanea's indebtedness was partly the result of holding SAMBA shares for the family and whether or not other expenditure was for his own benefit), Al Sanea's net indebtedness was debt, it was understood by the Algosaibis as debt and it was accounted for as debt.

7. This is extremely significant. AHAB has neither pleaded, nor demonstrated in evidence, a limit on Al Sanea's borrowing from the Money Exchange. Accordingly, the natural inference is that the facility granted to Al Sanea by Abdulaziz (authorising him to borrow funds) continued. Accordingly (as I have found that the "New for Old" case is not made out), Al Sanea was entitled to procure funds on behalf of the Money Exchange and to borrow those funds provided they were properly accounted for.

8. The Algosaibis assumed, not unreasonably, that Al Sanea would be able to pay back his debt (at least as much of it as was genuinely his). He was thought to be one of the

---

1996 Per Saud for example: **{C1/2/4} [15]**

1997 See for example: **{U/1/11}**

1998 At least insofar as they reflected genuine loans rather than relating to financing for shares held on behalf of AHAB.

wealthiest men in the world. What they had not reckoned on and what shocked them in May 2009 was that he would be unable to do so. The reality is that they had made a bad credit decision.

## (2) INDEBTEDNESS IN THE 1980s AND 1990s[1999]

9. There is a compelling inference that in the 1980s and 1990s Abdulaziz, Suleiman and Yousef all agreed with Al Sanea (albeit maybe in Yousef's case through gritted teeth) that if he withdrew money he could do so on the basis that he procured the funds from the banks, his personal borrowing was accounted for and he accepted his liability to repay them.

10. There can be no doubt that the funds, in the equivalent of many billions of dollars, were procured from the lending banks. Available funds were in turn borrowed by Al Sanea and were very clearly accounted for. The manner in which the withdrawals were all clearly (and meticulously) accounted for demonstrates that Al Sanea accepted liability for his withdrawals subject to any set-off or claim that he had:

    (12) From an early stage, when AHAB (Dr Sami) instituted the bookkeeping of the Money Exchange, Al Sanea's withdrawals were captioned as debt.

    (13) The Money Exchange kept accurate sub-ledgers of Al Sanea's *debit* balances and after 1993 these were maintained within Ledger 3.

    (14) The Audit Packs for each year discussed Al Sanea's "*indebtedness*" and the accompanying Attachment 9s set out precise figures for that "*indebtedness*" and allowed for comparison to prior year balances.

---

1999 **{E1/19/4}**

(15) From 1993 onwards each year, financial statements for the whole of the Money Exchange reflecting Al Sanea's indebtedness were presented by El Ayouty to the AHAB Chairman, approved and signed.

11. That this was the arrangement pursuant to which Al Sanea was permitted by Abdulaziz to borrow is a natural inference based on the fact that Abdulaziz (as well as the other Algosaibis) knew that this was precisely the manner in which Al Sanea withdrew funds (i.e. the bank borrowing was arranged by him, his withdrawals were accounted for and he accepted his liability to repay).

(1) There is overwhelming evidence that Abdulaziz, as well as the other Partners were well aware in the 1980s and 1990s that Al Sanea had a growing debit balance which was reflected in the accounts.

(2) Abdulaziz clearly authorised this. That he did not find this to be unacceptable is demonstrated by the fact that, from the Audit Packs, he saw from year to year how the debt increased. Not only did he reject El Ayouty's criticisms, he agreed to guarantee Al Sanea's debit balance.[2000]

(3) There is no evidence of Al Sanea having to go cap in hand to Abdulaziz and seek *prior* approval for withdrawals. He was plainly allowed to go on borrowing, provided that he was prepared to repay that borrowing and accounted for his withdrawals (which he never ceased to do). Nothing in the documentary evidence of exchanges between them, suggested that either Abdulaziz or Al Sanea suggested to El Ayouty that there had to be prior approval for the borrowing.

---

[2000] As set out below from Section {**E1/20**} of the **Defendants' Closing Submissions**, this may have been as a result of part of Al Sanea's indebtedness being attributable to his holding shares in SAMBA on behalf of the Money Exchange.

(4) There is also no evidence of any limit being placed on the indebtedness by Abdulaziz or what any such limit might have been so as to allow Al Sanea's indebtedness to rise to the level it did by the time of Abdulaziz's stroke in October 2000.

12. In those circumstances, there is a compelling inference that Al Sanea was indeed permitted to borrow available funds from the Money Exchange.

**(3) CONTINUATION AFTER ABDULAZIZ'S STROKE[2001]**

13. As set out above, there is a clear inference of agreement prior to 2000 in Abdulaziz's lifetime allowing Al Sanea to borrow from the Money Exchange (and to account for that borrowing as a debt owed to the Money Exchange). This is not, therefore, as AHAB seeks to argue, a case of a director having "granted himself" a loan. This, I accept, was a facility granted to Al Sanea by AHAB with the full knowledge and authority of its Chairman.

14. Accordingly, it is for AHAB to prove that such agreement was *revoked* after Abdulaziz's stroke:

(1) Rather than there being evidence of a change after Abdulaziz's stroke, Suleiman made it clear that he wished to continue as before.

(2) There is overwhelming evidence that throughout the 2000s Suleiman, Yousef and Saud continued to know of Al Sanea's indebtedness.[2002]

---

2001 **{E1/19/6}**

2002 See Section 1 of this Judgment on "AHAB Partners' Knowledge and Authority."

(3) The Partners gave evidence in their witness evidence about attempts to have Al Sanea repay the "*indebtedness*" and never described the prior withdrawals as misappropriations.[2003]

15. The Algosaibis have lied about their knowledge of Al Sanea's debt. Saud's evidence is shown to have been wholly unreliable. For example, he plainly gave false evidence that Al Sanea had told him that he repaid everything[2004] (this is evidence which I have rejected).

16. I accept that it is really for that reason that Al Sanea's continued indebtedness is not addressed directly at all in AHAB's pleadings. AHAB has failed to plead any express limit on his authority to borrow from the Money Exchange, nor has it evinced any evidence of such a limit (apart from its false "New for Old" narrative). Accordingly, the only reasonable conclusion available to me is that the borrowing facility available to Al Sanea was allowed to continue.

17. Moreover, it is to be inferred from the annual approval of accounts by AHAB that Al Sanea was indeed permitted to increase his indebtedness from funds borrowed by the Money Exchange. Each year the Audit Packs were provided to the Partners and it was known from Attachment 9 precisely what Al Sanea's debt was. Approval of accounts in which the Al Sanea's indebtedness was evident would be sufficient conduct from which to infer agreement (see **In re George Newman & Co. Ltd**;[2005] **Salomon v Salomon &**

---

2003 See for example. Yousef 1W: **{C1/3/22}: [97] "***The acknowledgement [signed by Abdulaziz] recited that Mr. Al Sanea had a total indebtedness as at 31 December 1999 of approximately SAR 3.5 billion (approximately $930 million) and deposits of approximately SAR 1.2 billion (approximately $320 million), implying a net indebtedness of approximately SAR 2.3 billion (approximately $600 million) which was essentially consistent with the information which El Ayouty had shown me."*

2004 **{Day65/18:1}**

2005 **[1895] 1 Ch 674**

**Co Ltd**;[2006] **Ho Tung**;[2007] **In re Express Engineering Works, Limited**;[2008] **In re Duomatic Ltd**;[2009] **Re Gee & Co (Woolwich) Ltd**;[2010] **Prospect Properties Ltd v McNeill**;[2011] and **Gunewardena v Conran Holdings Ltd**).[2012]

18. These cases show that unsigned or unregistered articles of association or the formally unapproved accounts of a company which have been relied upon and acted upon by the shareholders for long periods of time will be treated as the articles or accounts of the company by virtue of acquiescence and implied agreement.

19. This principle which has been termed "the Duomatic principle" is well known and well established. It gets its name from one of the line of cases cited above and in which it was applied (**In re Duomatic Ltd**, above). In the case the principle was summarized by Buckley J. in the following terms:[2013]:

> "*Where it can be shown that all shareholders who have a right to attend and vote at a general meeting of the company assent to some matter which a general meeting could carry into effect, that assent is as binding as a resolution in a general meeting would be.*"

20. In those circumstances, the mere absence of the technicality of a formal resolution in general meeting becomes immaterial. Assuming, in the absence of evidence to the contrary, that Saudi law on the subject would be the same, it must be taken in the attendant circumstances proven in this case, that the Al Sanea indebtedness was acquiesced in and approved by the AHAB Partners.

---

2006 **[1897] A.C. 22 {R1/4}**
2007 **[1902] A.C 232, 235 {R1/4.3}**
2008 **[1920] I Ch 426**
2009 **[1969] 2 Ch 365, 373 {R1/8.4}**
2010 **[1975] Ch 52 {R1/9.2.2}**
2011 **1990-1991 CILR 171 {R1/16.2.1}**
2012 **[2017] Bus. L.R. 301 {R1/59.1}**
2013 [1969] 2 Ch 365, 373 {R1/8.4} at page 373 C-D.

## PERCEPTION OF AL SANEA'S WEALTH[2014]

21. For the sake of completeness, I address the rhetorical argument of AHAB, which is whether, as AHAB suggests, it is inherently implausible that Al Sanea would be allowed to borrow such large sums. I find that given the attendant circumstances as proven in this case, it is not.

22. The reality is that the Algosaibis allowed Al Sanea to use the Money Exchange to borrow because they also benefitted.[2015] They also allowed Al Sanea to borrow from the Money Exchange without restriction because they thought he would be able to repay. The evidence shows that everyone, including the Partners, thought that Al Sanea was one of the world's wealthiest men:

(1) Saud's evidence was that he thought that Al Sanea was "*fabulously wealthy:*"[2016]

> *Q. Put yourself back in the period before you knew what you knew about Al Sanea all right, before 2009?*
>
> *A. Yes.*
>
> *Q. He was somebody who you thought was fabulously wealthy, didn't you?*
>
> *A. Yes, I thought he was making money out of the stocks or something, and the businesses he did.*
>
> *Q. He had a very lavish house, didn't he?*
>
> *A. Yes, he had a big house, yes.*
>
> *Q. Big house in Al Khobar. He had big parties?*
>
> *A. Yes, he has big parties. From my father's days, always he had big parties, yes.*

---

2014 **{E1/19/8}**

2015 The subject of an earlier section of this Judgment.

2016 **{Day59/131:14} - {Day59/132:9}**

*Q. He had a plane or more than one plane that he used?*

*A. At one point later on, he bought these planes, yes.*

*Q. He had his own zoo, didn't he?*

*A. I learned later of that. I did not see that.*

*Q. Did you not know he had a zoo and an ice rink?*

*A. I was told that.*

*Q. He was very extravagant, wasn't he, lavish, his behaviour?*

*A. Yes, I mean -- yes."*

(2) Similarly, Dawood's evidence was that he too believed Al Sanea to be extremely wealthy:[2017]

*Q. He was reputed, I think, to be one of the wealthiest men in the Middle East in his own right, wasn't he?*

*A. Yes. That's what we heard, yes.*

*Q. That's what people thought, wasn't it?*

*A. Yes, yes.*

*Q. He had his own entry in Forbes' rich list, didn't he?*

*A. Yes.*

*Q. He had his own zoo?*

*A. Yes, I think so.*

*Q. Two big planes?*

*A. Yes, but I never been. I heard they have a big zoo.*

---

2017 **{Day81/37:8-23}**

*Q. It's about what you heard and thought, not about what you actually know.*

*A. Yes, yes.*

*Q. Lavish parties?*

*A. Yes, that's what I heard, yes.*

(3) It is entirely credible on AHAB's own case that everyone supposed Al Sanea to be extraordinarily wealthy:

(i) The evidence of Mr. Thomas[2018] (Al Sanea's former sommelier) was that Al Sanea would host lavish dinners where staff would be tipped thousands of dollars each, or be given Rolex watches or Tiffany jewellery.

(ii) Al Sanea owned multiple private aircraft, each the size of a commercial airliner. Indeed, a memo from Al Sanea regarding the arrangements to be made for his A340 aircraft refers to Wedgwood china, crystal glassware, a bespoke storage area and his requirement that Mr. Thomas and a chef be among the as many as 11 crew members to be available on board the flights.[2019]

(4) More fundamentally, in around 2007, Al Sanea became the largest individual shareholder in HSBC[2020] and was listed in Forbes as one of the wealthiest men in the world.[2021]

---

2018 **{C1/13}**

2019 **{G/6700.1}**

2020 **{G/7328.1}** Guardian Article: Saudi billionaire snaps up 3.1% stake in HSBC (reporting on the purchase of 360m shares by Al Sanea through Singularis Holdings, a Cayman Islands investment company, now one of the GT Defendants in liquidation). See also **{G/7328.2}** Forbes Article: Billionaire Al Sanea bets on HSBC (purchasing 360m shares for USD6.6 billion).

23. I accept that it is entirely plausible that the Partners would have been comfortable allowing one of the world's wealthiest men (and a member of their family by marriage), to owe them a large amount of money. Saud's evidence was to the effect that he expected Al Sanea to repay his indebtedness and never imagined that he could not pay it:[2022]

> *Q. You would never have imagined that he wouldn't be able to repay his indebtedness to AHAB, would you?*
>
> *A. Yani, he --*
>
> *Q. Before 2009?*
>
> *A. In early days when we had a deal to -- when he promised us that he would repay the money and -- we thought he repaid. So you're asking 2009, while we were talking about an earlier period which we felt that he repaid.*
>
> *Q. Even in 2009 when you discovered that he had a big debt and you approached him, you expected him to be able to repay it, didn't you?*
>
> *A. We -- we talked to him, trying to understand what was going on, and he tried use deception on us.*
>
> *Q. Didn't it come as an enormous shock to you when you found out that he actually wasn't able to repay it?*
>
> *A. It's not able or not able, he was lying to us."*

24. The Algosaibis also thought that Al Sanea was engaged in large part in the purchase of assets that could be liquidated to pay down his indebtedness to the Money Exchange. For example:

(1) Saud could not have been unaware of Al Sanea's purchase of SAMBA shares:

---

2021 **{G/7328.2/1}; {X2/3/1} (**Financial Times article**)**
2022 **{Day59/132:10-25}**

(i) As the Chairman of SAMBA, Saud could not have been unaware of the fact that by 2008, Al Sanea and STCC had a combined 14% stake in SAMBA[2023] and that not only did Al Sanea have a greatly increased shareholding in his name, STCC had nearly the same number of shares as AHAB.

(ii) Saud appears to have received updated shareholder lists directly from SAMBA (see a fax dated 29 November 2008 direct to Saud from SAMBA sending across the 2008 shareholder list).[2024] There then appear to have been handwritten calculations carried out based on that list.[2025]

(iii) The shareholder list for 1999[2026] was recovered from head office files.

(iv) Saud appears to have produced a list of the shares held by Al Sanea and STCC.[2027]

(2) Saud must also have known that, as widely reported in the financial press, Al Sanea had taken a substantial shareholding in HSBC.[2028]

25. As examined earlier in this Judgment in Section 1 related to the AHAB Partners' knowledge and authority, Suleiman was aware of and was concerned about (particularly as instigated by Yousef) the size of Al Sanea's indebtedness. Despite this, Suleiman did not prohibit increases on his borrowing (the false "New for Old" narrative aside). This

2023 **{H21/110}**: List of Shareholders holding 2000,000 Shares and above in SAMBA, found in H.O. Money Exchange file kept for Saud. Al Sanea is listed at 4th as holding 64,449,569 shares, STCC at 7th as holding 37,653,577 shares and AHAB itself at 6th as holding 40,530,240 shares.

2024 **{H21/109}**; **{H21/110}**

2025 **{H21/111}**; **{H21/112}; {H21/113}**; **{H21/114}**.

2026 **{H21/103}**; **{H21/104}**.

2027 **{H21/117}**; **{H21/118} -** showing the accurate total based on the 2008 Shareholder List of 102,103,146 shares held by Al Sanea and STCC.

2028 **{X4/7}** (Financial Times Article); **{X4/8}** (Financial Times Article: "HSBC's Saudi Investor to raise $5bn"; **{X4/9}**: HSBC website extract "Share analytics"; **{X4/10}**: Telegraph article: "Saudi billionaire snaps up stake in HSBC".

can only have been because the Partners always believed that he would be able to repay. While this turned out to be a poor credit decision, it was transparently not a fraud on the Partners.

26. From all this background, I accept that it was only in May 2009, when the global financial crisis erupted (causing the banks to stop lending, the liquidity crisis for the Money Exchange and the end of Al Sanea's ability to perpetrate the Ponzi scheme), that it became clear to Saud (and Dawood) that Al Sanea could not repay his debt owed to the Money Exchange.

**AL SANEA'S LEDGER 3 INDEBTEDNESS**

27. Here, in agreement with the Defendants, I discuss the evidence which suggests that much of the Al Sanea's indebtedness was related to the expenditure on SAMBA shares, including those acquired by him or held in his name on behalf of AHAB. This aspect of the enquiry also goes to answer AHAB's rhetorical argument as to why the Partners would have allowed Al Sanea unrestricted borrowing through the Money Exchange.

**RELATIONSHIP BETWEEN LEDGER 3 AND THE SAMBA SHARES TRANSFERRED TO AL SANEA**

28. As examined earlier in this Judgment under the heading "Relative benefits", the funds borrowed by the Money Exchange were used in substantial part to pay for the cost of funding the original share portfolio which, by 31 December 2008, accounted for at least SAR 6bn.

29. It is therefore a natural inference that Al Sanea's accounts in Ledger 3 were debited with the cost of acquisition and cumulative carrying cost of the SAMBA shares transferred to him or acquired in his name:

(1) A substantial number of the SAMBA shares transferred to Al Sanea prior to 1999 were supported by the Money Exchange continuing to borrow money to carry those shares.

(2) Al Sanea was given dominion over those shares. For example, it is common ground that Al Sanea pledged the Money Exchange's original SAMBA shares in respect of his own borrowing and that both Saud and Abdulaziz acquiesced in this.[2029] This account from Saud's statement comes as close to a true account of events, especially as to the cause of the demise of the Money Exchange, as any other evidence given by Saud in this case.

(3) Despite the shares having been pledged, AHAB nevertheless had the right to call for Al Sanea's SAMBA shares and to have him manage them in concert with AHAB's shares. This was reflected in the text of Abdulaziz's guarantee set out below which contains the sentence "*The stock was registered in my name temporarily and with specific conditions in the interest of the company*."

(4) This was also reasonable because Al Sanea's control and dominion over the SAMBA shares pre-supposed that he was liable to AHAB for the associated price and cost of funding. If he wanted to keep the shares, he would clearly have to make a payment to AHAB to reflect the cost being met by borrowing of the Money Exchange.

---

[2029] **Saud 1W [231]: {C1/2/49}**: "*Late in the 1990s or perhaps in 2000, my father told me, briefly, and in general terms only, that the Money Exchange had borrowings which had been used to fund the acquisition of the share portfolio, and that Mr. Al Sanea had pledged the shares (or some of them) to secure borrowing of his own. I understood the position to be that AHAB needed to sell the shares to repay the borrowing used to fund the acquisition of the portfolio, but that Mr. Al Sanea could not return them, as they were pledged. Although my father did not expressly say this to me, my understanding was that until the position was resolved the Money Exchange would not be closed.*"

30. The Defendants here posit, quite logically in my view, that the flipside to this arrangement was that AHAB could not simply expect Al Sanea to repay his Ledger 3 indebtedness, understanding that this would require a sale of the SAMBA shares:

(1) No serious attempts were made, during Abdulaziz's lifetime, to get Al Sanea to repay anything. The auditors were (repeatedly) ignored by Abdulaziz (as was Yousef) when they called for Al Sanea to repay his deposits, as it is to be inferred that AHAB knew that the debt could not be paid without a sale of the SAMBA shares.[2030] As the evidence revealed, the balance was allowed to increase relentlessly, without question.

(2) The most significant indication that prior to 2003/2004 (whatever El Ayouty said) AHAB did not view Al Sanea's "*indebtedness*" as a real or recoverable debt, was AHAB's decision on numerous occasions up to 2 March 2000 to guarantee Al Sanea's Money Exchange Ledger 3 debt in return for Al Sanea pledging the "sale and relinquishment" of the shares.[2031]

(3) The sale document (signed by Al Sanea and counter-signed by Abdulaziz in acceptance on behalf of AHAB) provided that:

> "*I, Maan Abdel Wahed Al-Sanea, pledge to sell and relinquish stock in the Saudi-American Bank totalling 1,803,017 shares (and the dividends related thereto) to the Ahmad Hamad Al-Gosaibi and*

---

[2030] **{G/1431/1}**: (letter from Suleiman and Yousef to Abdulaziz re termination of the Money Exchange); **{G/1432/1} {G/1433/1}**: (further letter to Abdulaziz from Suleiman in same vein**)**; **{G/1434/1}; {G/1435/1}:** (further copies of letter) **{G/1436/1}**; **{G/1453/1}**; **{G/2012/1}**; **{G/2013/1}**: (Yousef's complaint to Abdulaziz about favourable treatment of Al Sanea's indebtedness); **{G/2014/1}; {G/2020/1}; {G/2021/1}; {G/2022/1}**: (Yousef's letters to Abdulaziz imploring him to "cancel" the partnership arrangements for the Money Exchange because of the Al Sanea indebtedness); **{G/2023}**; **{G/2029.1}**; **{G/2029.2}**: (Yousef's letter to Abdulaziz in the same vein and making specific reference to Yousef having had to call for and obtaining the El Ayouty Audit Report for 1998, including their report on the Al Sanea indebtedness).

[2031] **{G/2100}; {G/2100.1} (**Arabic Translation -.I note that the translation in **{G/2100.1}** is different from but to the same effect as that set out above from the Defendants' written Submissions).

*Bros. Company, to be re-registered in the company's name and with a certificate attesting to this provided by me. This relinquishing of stock will not result in any reconciliation of the books of the banking division, nor is repayment of the stocks' value due to me from the company, insofar as the company has always been the owner of the stock.* ***The stock was registered in my name temporarily and with specific conditions in the interest of the company; however, its dividends were entered as company income and distributed according to the provisions of the partnership contract as stated in Board of Directors Decision #10/R on 3/3/1993, signed by Messrs. Abdel Aziz Hamad Al-Gosaibi and Suleiman Hamad Al-Gosaibi****. This is to be carried out for the financial statements of December 31 1999.*" (Emphasis added.)

(4) In return, the guarantee provided:[2032]

"***I, Abdulaziz Hamad Algosaibi****,* ***in my capacity as Chairman of the Board of Directors and partner in the Ahmad Hamad Algosaibi & Bros Company,*** *hereby declare that I am a* <u>*joint*</u> *guarantor of the debts owed by Mr.* ***Maan Abdelwahed Al-Sanea*** *and his corporations and companies, that I hold in my possession the ownership deed for land and real estate covering these debts in the name of Mr.* ***Maan Abdelwahed Al-Sanea*** *and that I am willing to transfer them into the name of the company in order to receive these rights from the value thereof, in accordance with the official powers of attorney that are in my possession from Mr.* ***Maan Abdelwahed Al-Sanea****, copies of which are attached,* ***together with a statement of these debts according to the books of the Money Exchange, Investment and Finance Divisions as at 31 December 1999****, as follows:-*

*To the nearest million Saudi rials (sic)*

| | |
|---|---|
| *3,472.7* | *(Total liability as at 31 December 1999)* |
| *Less* | *(Total deposits and current accounts payable that he holds in the name of his subsidiary companies after* |
| <u>*(1,238.5)*</u> | *removal of those listed as deposits).* |
| *2,234.2* | *Net liability as at 31 December 1999, as shown in the records.* |

2032 **{G/2099}**; **{G/2093}**.

> *(Two thousand two hundred and thirty four million two hundred thousand rials only).*" (Emphasis added.)

(5) The Defendants submit[2033] that at the time, Al Sanea's debt was recorded as SAR 2.234bn (consisting of a total liability of SAR 3.472bn of liabilities less SAR 1.239bn of deposits and current accounts payable to him and his subsidiary companies). For this they give a document reference: **{G/2093/1}**.

(6) However, I have not found such a document reference in the G Bundle. The Bundle contains the El Ayouty audited Financial Statements for the Finance Division (the "bad silo") for Year End 1999,[2034] which reported the net Al Sanea indebtedness at the nearly equal amount of SAR 2,181,156,433.

(7) Whichever of those figures is used, the guarantee shows the commercial reality behind Al Sanea's stated indebtedness. It would have been irrational for AHAB to guarantee the repayment of a debt owed to the Money Exchange in which it had a 65% interest (70% if Yousef's interest is included), particularly a debt which it expected to be repaid. Instead, I accept, as the Defendants submit, that this guarantee reflected the fact that Al Sanea's "debt" was related, at least to a large extent, to the continuing cost of his holding shares on behalf of AHAB.[2035]

31. The indebtedness recorded in the guarantee had obviously increased over time before Abdulaziz's stroke and guarantees were apparently signed in similar form in prior years

---

2033 At **{E1/20/48}**

2034 **{G/2042/9}** and see hard copy at **{F/93/9}.**

2035 Equally, this agreement is plainly at odds with Saud's suggestion that Al Sanea's indebtedness caused concern in the early 2000s and that steps were taken to ensure that it was repaid.

and are mentioned in El Ayouty's Audit Reports. The figure was bound to increase in the same way following the last disclosed guarantee in 2000:

(1) The cost of holding the original shares would continue to rise (as the borrowing continued to be rolled over) and such costs would have to be added to the running tally in Al Sanea's indebtedness, but could not have been thought to be recoverable from Al Sanea unless he kept the shares (or they were sold to liquidate his indebtedness pro rata with AHAB's).

(2) While AHAB has not disclosed any further guarantees, if Suleiman had "carried on as before," it is to be expected that he would also have been willing to renew Abdulaziz's guarantees, if asked by Al Sanea.

32. I accept that it is to be inferred that the only reason why Abdulaziz would have caused AHAB in 2000 to "guarantee" Al Sanea's debt rather than cause the Money Exchange to cancel it in return for the re-transfer of the shares, was so that AHAB could continue to treat the debt as an asset. Had any of his debt been cancelled, AHAB would have recorded a massive fall in its balance sheet – the realisable value of the shares having, at almost all times, been less than the amount of the debt.

33. I also recognise, of course, that Al Sanea had additional balances in Ledger 03 that were his and which would not have been intended to be covered by Abdulaziz's guarantees.

34. Securing the repayment of Al Sanea's indebtedness was not straightforward. Not only was he holding AHAB's SAMBA shares (for which there would need to be a reduction in his "indebtedness" if he returned them), he was also entitled to certain amounts from the Money Exchange:

(1) As a 15% partner in the Money Exchange, he (on behalf of his son)[2036] was plainly entitled to 15% of its assets.

(2) Equally, although Yousef had complained about it in the early 1990s, Al Sanea had been granted a further "one off" 15% payment.[2037]

(3) The meaning of this latter entitlement was opaque to say the least. Yousef himself accepted that this would need to be worked out on any liquidation:[2038]

> *Q.* *"Just imagine when you are signing this; okay? I know you didn't agree on the 15 per cent but you signed it and we see that on {G/915/4}.*
>
> *A.* *But it wasn't me only who signed it; right?*
>
> *Q.* *True, true. Listen to the question: one day, not on the day when you signed it but one day in the future after you signed it, you realised Al Sanea would one day come to you and say, "*I want my 15 per cent*"?*
>
> *A.* *Okay.*
>
> *Q.* *Assuming he behaved properly and he earned his money and he stayed in the business, you would have to look at this document to work out how much 15 per cent was, wouldn't you?*
>
> *A.* *Of course.*
>
> *Q.* *Looking at that paragraph yourself, do you accept it would have been very difficult for you to work out 15 per cent?*
>
> *A.* *No, I don't know how to work out.*
>
> *Q.* *The answer is yes, it would have been very difficult?*
>
> *A.* *Yes, of course it's very difficult.*

---

2036 See {**H29/61.1/1**} : Minutes of meeting of 8 December 1984 recording Al Sanea's "*waiver of his share in the capital of [the Money Exchange] to his son, Saad Maan Abdul Wahed Al Sanea, under the control of his father"*.

2037 **{G/915/6}**

2038 **{Day31/51:3} - {Day31/52:3}**

*Q. And there would have been lots of room for argument?*

*A. Probably.*

*Q. It's because of this provision that you had difficulty working out what Mr. Al Sanea should get on a liquidation, isn't it?*

*A. Yes."*

35. It is therefore unsurprising that AHAB and Al Sanea, when discussions were engaged in earnest, could not agree how much of the debtor balance in Ledger 3 could genuinely be attributed to him. I agree with the Defendants, that the fact that the real balance between Al Sanea and the Money Exchange was uncertain explains why the attempt to split the Money Exchange foundered:

(1) Saud's evidence about these attempts makes little sense:[2039] if the Money Exchange had this millstone of spiralling debt and no assets, why would Al Sanea have agreed simply to take it over without some form of balancing payment?

(2) In the fragments of what is truthful in Saud's description of earlier negotiations, it seems clear that Suleiman, Yousef and Saud wanted to keep as much as possible of the original share portfolio and could not agree how to divide it up or calculate any balancing payment.

(3) This is explicit in the correspondence between Saud and Al Sanea found in the N Files in which Saud stated that they could not think of further investments in SAMBA until they had agreed what shares of the acquired portfolio belonged to AHAB (see undated letter, probably written in 2004 (as it refers to the upcoming

[2039] Particularly as to discussions in May 2009 - see above under Section 1, "AHAB Partners' Knowledge and Authority."

IPO of SAMBA)).[2040] In the last sentence, Saud clearly makes the link between the need to agree the value and allocation of the shares and the conclusion of the sale of the Money Exchange to Al Sanea who at the time was working on obtaining the "commercial register" or banking licence for the Money Exchange.

36. It is therefore accepted that, in addition to finding that Al Sanea's "*indebtedness*" was authorised by the Partners, I should also find that the amounts guaranteed by Abdulaziz were not exclusively Al Sanea "*indebtedness*" but were also costs of borrowing attributable to the SAMBA shares held in Al Sanea's name on behalf of AHAB.

**THE NATURE OF AL SANEA'S INDEBTEDNESS AND WHY IT WAS PERMITTED TO INCREASE**

37. If, as I have accepted, a substantial portion of Al Sanea's indebtedness can be accounted for as having been related to the ongoing carrying cost of the SAMBA shares transferred to him by AHAB, what of the remaining indebtedness?

38. Part of that indebtedness must have funded the further purchases of SAMBA shares by Al Sanea and STCC:

(1) As accepted above, the additional share purchases were funded by the Money Exchange's borrowing;

(2) It cannot therefore be in dispute that Al Sanea withdrew the funds to make those purchases from the Money Exchange;

(3) It is common ground that such withdrawals were accounted for as Ledger 3 debit balances;

---

[2040] **{G/409}**

(4) The acquisition cost of these additional shares alone could have been as much as SAR 8bn.

39. It is the Defendants' case and I accept that Al Sanea was essentially buying the SAMBA shares to add to the same concert party pursuant to which he held the other SAMBA shares transferred to him by AHAB before 2000. However, for present purposes what matters is that a large part of his Ledger 3 indebtedness can be accounted for as related to these further purchases, whether or not they were for his own ends. Moreover, it is also common ground that Ledger 3 was a full and proper account of his withdrawals, including those made for that purpose.

40. Of course, as set out and discussed above (see under "Relative Benefits")[2041], part of the indebtedness in Ledger 3 undoubtedly included borrowing for Al Sanea's own ends. It is worth noting from that discussion above that the cost of the SAMBA shares from the original portfolio and the further purchases accounts for about half of Al Sanea's total indebtedness.

41. The remaining indebtedness will have financed Al Sanea and STCC, no doubt enabling him to make other investments and to obtain the massive amounts of borrowing which are disclosed in STCC's financial statements.

42. These withdrawals simply gave rise to a debt. And so to return to AHAB's rhetorical proposition, the real question is why would the AHAB Partners, caught up as they were with Al Sanea in the spiralling cycle of borrowing to repay earlier borrowing, not have allowed Al Sanea to make these withdrawals provided he acknowledged them as his indebtedness which he was liable to repay? This is the real question to which AHAB has

[2041] In Section 2 "Benefits"

failed to provide any compelling answer. The answer is, contrary to AHAB's allegations, that Al Sanea did not steal from AHAB; his "indebtedness" to the Money Exchange comprised the financial costs of the share portfolios as well as his drawings to fund his own business enterprises and investments, all of which was meticulously accounted for in Ledger 3 as debt.

# SECTION 7

## AHAB's PROPRIETARY TRACING AND PERSONAL CLAIMS AGAINST THE DEFENDANTS UNDER CAYMAN AND FOREIGN LAW

## SECTION 7

## AHAB's PROPRIETARY TRACING AND PERSONAL CLAIMS AGAINST THE DEFENDANTS UNDER CAYMAN AND FOREIGN LAW

1. In this section of the Judgment I consider the legal principles and their application to AHAB's proprietary and personal claims against the Defendants.[2042]

2. It is held firmly in mind that these are primarily claims by AHAB in the asserted position of beneficiary seeking to assert and vindicate continuing beneficial interests in property (or in property representing that property), which it claims has been misappropriated in breach of trust, by way of breach of fiduciary duties.[2043] In this case, AHAB's claims are thus not being pursued only against the allegedly dishonest fiduciary himself but against the Defendant companies in liquidation, into whose hands it is said that the misappropriated property has come. Thus understood, AHAB's claims are primarily proprietary in nature seeking to recover what is its property (or the traceable substitutes) from the Defendants. In order to succeed, AHAB must therefore have met the requirements of the proprietary remedies which it seeks.

3. Notwithstanding that it asserts personal claims against the Defendants, AHAB's proprietary claims are essential to its success in this action. Unless AHAB proves that the assets held by the Defendants are its property, AHAB cannot secure priority over the existing contractual claims of third party banks, claims which have been admitted as debts in the respective liquidations of the Defendants.

---

2042 As described by AHAB at {**D/8/1-173**} of Closing Submissions to be considered further below.

2043 In this context trusts are not confined to trusts in the strict sense, but extend also to property which at the outset was subject to a fiduciary relationship: **Agip (Africa) Ltd v Jackson** [1990] Ch. 265 at 290G-291A {**R1/16/26-27**}.

4. Conversely, if AHAB succeeds it will have established that the assets of the Defendants which represent its property belong to it and so to that extent would supersede and likely extinguish the contractual claims of the third party banks. It seems that this would be entirely so in the case of all the Defendants, except perhaps only rateably so, in the case of the AwalCos according to assets they hold which are not subject to third party bank claims.[2044]

5. In light of my primary findings that at all times up to the collapse of the Money Exchange in May 2009, the AHAB Partners knew about and authorized Al Sanea's fraudulent use of the Money Exchange for borrowing from the banks, as well as the full extent of the Al Sanea indebtedness; there is no basis for AHAB's proprietary claims against the Defendants. Those claims are premised, fundamentally, upon there having been fraudulent breaches of fiduciary duties owed by Al Sanea to AHAB in his allegedly undisclosed abuse of the Money Exchange to defraud AHAB. Having at all times been privy to and authorized Al Sanea's activities, AHAB has failed to prove that fundamental premise of its case.

6. However, given the great time and expense invested in bringing this matter to trial, the admirable industry of the parties (especially the Defendants) in ensuring that all the issues, including questions of law, have been fully identified and explored in arguments, I believe it is incumbent on me at the very least, to indicate my findings not only on the primary issue[2045] but also on the secondary issues[2046] and on the applicable legal

---

2044 See above per Mr Hargreaves "Overview of the funding of the AwalCos".

2045 AHAB Partners' knowledge and authority of Al Sanea's use of the Money Exchange to defraud the banks is dealt with as a discrete issue in Section 2 of this Judgment).

2046 By which I mean the nonetheless important and related issues, in particular (i) the putative "New for Old" policy; (ii) the allegations of "forgery on an industrial scale" by Al Sanea, including the allegations of manipulation of documents;

principles. I am minded that, given the very high stakes involved, this case is not likely to rest on my decision at first instance. It might therefore be important to the ultimate outcome that my views on the secondary issues and the legal principles are also known.

7. As with my attempt at a full treatment of the factual issues, I will therefore also express views on the differences between AHAB and the Defendants on the legal principles which are applicable especially to AHAB's proprietary claims.

8. I proceed, I believe most conveniently, by discussing first below from AHAB's Submissions[2047] and from the Submissions of the AwalCos[2048] on the subject of Equitable Tracing, Knowing Receipt and Unjust Enrichment. I then move on to discuss the subject of foreign law as it relates to AHAB's claims which are all receipts based claims. These include the existence of a proprietary base for AHAB's equitable claims as a matter of Saudi law, the law of the place where the events giving rise to the claims arose. The question of double actionability arises in relation to AHAB's tort claims in conspiracy also as a matter of Saudi law. Questions of foreign law also arise in relation to assets in the name of SICL which AHAB claims and which are shown to have passed through or ended up in other jurisdictions, Switzerland in particular.

9. Finally, on issues of foreign law, the question of attribution of Al Sanea's knowledge to the Defendants arises for determination in the context of the conspiracy claims. This issue will also be addressed, albeit briefly, in this section of the Judgment. A similar question of attribution of Al Sanea's knowledge to the Defendants arises in the context of the

---

(iii) the illegality defence; (iv) the relative benefits received by AHAB Partners and Al Sanea through the Money Exchange; (v) the recording and status of the Al Sanea indebtedness to the Money Exchange and the role of El Ayouty, the AHAB auditors; (vi) AHAB's alleged "Money Out Schemes" as the starting point for its proprietary claims and (vii) (the present issue) the equitable and conflicts of law legal principles which govern AHAB's claims.

2047 {**U/1/252**}; {**D/8/1-103**}.

2048 {**E1/29/127-135**}.

Knowing Receipt and Unjust Enrichment/Restitution claims and will be dealt with when considering SIFCO 5's response to the legal merits of AHAB's claims against it. Those Submissions of SIFCO 5[2049] have been expressly adopted and expanded upon by the other Defendants.

10. Where necessary and appropriate, I rely upon excerpts from the respective Submissions made on behalf of AHAB, the AwalCos, the GTDs[2050] and SIFCO 5.[2051]

11. First, from AHAB's Submissions[2052] on equitable tracing.

> ***"Observations on the law***
>
> 671. *In light of some of the basic errors made by the Defendants in their unsuccessful attempts to answer AHAB's claim, it is necessary to address equitable tracing, and the claims to which it gives rise, in some detail.*
>
> 672. *First, there can be no doubt that Cayman law governs AHAB's proprietary claim to funds which can to be traced into the Defendants' 'hands'. Millett J (as he then was) in* **El Ajou v Dollar Land Holdings plc**[2053] *described as "misconceived"*[2054] *the suggestion that tracing is defeated where misappropriated funds are routed through civil law jurisdictions. It is well-settled*

---

[2049] {**E1/30/50-59**} and a note of further Submissions from Mr. Crystal delivered, at the request of the court, to the court on 14 August 2017 as being relevant to (1) the CBK transaction with STCC/SICL, (2) the receipt by the AwalCos of capital contributions by Al Sanea, (3) the receipt by SICL of capital contributions by Al Sanea and (receipt by SIFCO 5 of capital contributions by Al Sanea. These issues, as questions of fact, are all separately examined below.

[2050] {**E1/32/1**}; {**E1/34/1**}.

[2051] {**E1/33/1**}.

[2052] {**U/1/252**}.

[2053] *[1993] 3 All ER 717 {**R1/20/1**}, reversed by the Court of Appeal on other grounds (conclusion on tracing affirmed) [1994] 2 All ER 685 {**R1/21/1**}.*

[2054] *[1993] 3 All ER 717, 736g* ***{R1/20/20}.***

*that the proper law governing any claim based on equitable tracing is the law of the place where the funds are received. In this context, "received" refers to the location of the party against whom the right is asserted, i.e. the person who is purporting to set up a beneficial title adverse to that of the true owner. It does not mean the nominal location of one or more banks that a wrongdoing receiving party has chosen to use to launder the true owner's assets. This is because equity acts in personam, even where such action has proprietary consequences.*

673. *Millett J put this beyond any doubt in* **El Ajou**. *His Lordship explained that:*

> "Although equitable rights may found proprietary as well as personal claims, it has long been settled that they are classified as personal rights for the purpose of private international law. The doctrine was stated by Lord Selbourne LC in Ewing v Orr Ewing (1883) 3 App Cas 34 at p. 40 as follows:
>
>> 'The Courts of Equity in England are, and always have been, Courts of conscience, operating in personam and not in rem: and in the exercise of this personal jurisdiction they have always been accustomed to compel the performance of contracts and trusts as to subjects which were not either local or ratione domicilii within their jurisdiction. They have done so as to land, in Scotland, in Ireland, in the Colonies, in foreign countries…."
>> …
>> DLH's [the defendant] argument is based on the premise that, for the plaintiff to succeed in tracing his money in equity through successive mixed accounts, he must have been in a position to obtain an equitable charge against each successive account. Even if the premise were

correct, however, it would not matter where the accounts were maintained. It would be sufficient (and necessary) that the account holders were within the jurisdiction [emphasis added]. But, in my judgment, it is not correct. It is not necessary that each successive recipient should have been within the jurisdiction; it is sufficient that the defendant is. This is because the plaintiff's ability to trace his money in equity is dependent on the power of equity to charge a mixed fund with the repayment of trust moneys, not upon any actual exercise of that power [emphasis in original]. The charge itself is entirely notional….

…

An English court of equity will compel a defendant who is within the jurisdiction to treat assets in his hands as trust assets if, having regard to their history and his state of knowledge, it would be unconscionable for him to treat them as his own".[2055]

674. *A unanimous Court of Appeal upheld Millett J's conclusion on tracing (described as "unimpeachable" by Rose LJ[2056]) and departed from the judge only in the Court of Appeal imposing liability on the defendant; Millett J having dismissed the claim on the basis only of an absence of knowledge on the part of the defendant.*

675. *Millett J's conclusion in* **El Ajou** *has never been doubted either in the Cayman Islands or elsewhere. Smellie CJ applied Millett J on this point in* **Hutchinson Limited, Crain Creek Limited, Mountain Dew Limited and Forum Limited v Cititrust**

2055 [1993] 3 All ER 717, 736h-737h {R1/20/20-21}.
2056 [1994] 2 All ER 685, 699b-c {R1/21/15}.

**(Cayman) Limited**[2057] *and recorded that* "[a] cause of action founded on receipt of funds at the time known to be trust funds is complete when the funds are received and the proper law governing the cause of action is the law of the place where they are received. Knowing receipt and its common law counterpart, money had and received…are receipt-based restitutionary claims.*"*[2058] *In that case, the relevant defendants were all domiciled in Switzerland, unlike the instant case where each of the Defendants is located within the jurisdiction.*[2059]

676. *We also note here that, in a similar vein, for conflict of laws purposes a claim for dishonest assistance should be treated as a tortious claim*[2060]*, with the result that the "double actionability" rule would apply if the acts which were the foundation of the tort took place outside the Cayman Islands… AHAB submits that the dishonest assistance went beyond the receipt of misappropriated funds*[2061] *and turned on acts that may be said to have taken place in Saudi Arabia. In those circumstances, it is submitted that the double actionability rule is satisfied as, based on the evidence of*

---

2057 [1998 CILR 43] {R1/29/1}.

2058 *[1998 CILR 43], 63* ***{R1/29/21}****.*

2059 *[1998 CILR 43], 62* ***{R1/29/20}****.*

2060 ***OJSC Oil Company Yugraneft (in liquidation) v Abramovich & ors*** *[2008] EWHC 2613 at [223]* ***{R1/39/56}****: "Dishonest assistance, a form of equitable wrongdoing, is so closely analogous to a claim in tort (as characterised for purely domestic purposes) that it should, I would have thought, be so characterised for private international law purposes."*

2061 *To the extent the dishonest assistance of the Defendants turned on the receipt of AHAB's funds only, we submit that the above analysis in relation to knowing receipt should apply.*

*Professor Vogel,[2062] the Defendants' conduct in assisting Mr Al Sanea's fraud would be actionable under Saudi Arabian law.*

***Flaws in Annex M1 to the AwalCos Re-Amended Defence***

677. *As noted above, the Defendants' characterization of the principles to be applied to equitable tracing where misappropriated funds have been laundered is wrong. These are set out in Annex M1 to the AwalCos Re- Amended Defence.[2063] The only expert evidence before the court from any of the three sets of Defendants concerning tracing (the reports of Mr Hourigan and Mr Lawler prepared for the AwalCos) has been explicitly predicated on the accuracy of these principles as set out in Annex M1. Those reports are thus an unusual mixture of expert opinion and legal submission. The nature of the instructions given by the AwalCos to their experts inevitably renders the reports wholly dependent upon the Defendants' legal arguments first prevailing before their expert evidence can have any relevance. It cannot be of any use to the Court if (as is the case) the legal principles on which the AwalCos have instructed their experts to proceed are wrong".*

[2062] *See the summary of Professor Vogel's expert opinion at Vogel 1/25 {**K1/1/9**} – {**K1/1/10**}. His evidence is more fully developed in **Vogel 1/50-69 {K1/1/19} – {K1/1/27}; 78-79 {K1/1/31}** – {**K1/1/45**}**; 108-118 {K1/1/45}** – {**K1/1/50**}**.***

[2063] Annex M1 **{A2/46}.**

12. I interpose for convenience here by way of extract the aforementioned Annex M1, being the AwalCos' summary of the principles as they see and apply them[2064] (and as adopted by the other Defendants), based upon the so-called 'rule" in *Clayton's* case:[2065]

***"ANNEX M1***
***THE RULES OF TRACING APPLICABLE TO***
***PAYMENTS INTO AND OUT OF BANK ACCOUNTS***

***(paragraph 51C(1) of the Defence)***

***1.*** *A bank account constitutes a debt between the bank (on the one part) and the bank's customer (on the other part).*

***2.*** *Transactions recorded in relation to a bank account will be kept as a running account of credits and debits. In other words, the various transactions between the parties will not be individuated for accounting purposes, but will instead be offset against one another, with only one balance (i.e. a single sum owed by the bank to the customer or by the customer to the bank) being stated. Thus, by way of example:*

| ***Description*** | ***Money in*** | ***Money out*** | ***Balance*** |
|---|---|---|---|
| *Transaction 1: Payment into the account* | *£100.00* | | *£100.00* |
| *Transaction 2: Payment out of the account* | | *£50.00* | *£50.00* |
| *Transaction 3: Payment into the account* | *£25.00* | | *£75.00* |

*Instead of there being three separate debts between the bank and the customer (identified separately as Transactions 1, 2 and 3), there is a single balance owed by the bank to the customer.*

---

2064 In particular, by the AwalCos' accountancy expert witnesses, Mr Hourigan and Mr Lawler, as will be further discussed below.
2065 {**A2/46**}.

**3.** *The following paragraphs assume that a third party ("TP") has a "proprietary base" sufficient to entitle it to follow monies into a bank account. On this assumption, the right to continue to trace is limited or circumscribed by the factors set out in the following paragraphs.*

**4.** *Where the traceable payment constitutes a subsequent addition to an account already in credit, TP cannot trace into sums of money owed to the customer by the bank where these subsisted prior to that traceable payment. Thus, by way of example:*

| *Description* | *Money in* | *Money out* | *Balance* |
|---|---|---|---|
| *Existing balance* | | | *£100.00* |
| *Transaction 1: Payment into the account in respect of which TP has a proprietary claim* | *£50.00* | | *£150.00* |

*In this case, TP will be entitled to trace into the £50.00 paid into the account pursuant to Transaction 1, but will not be able to trace into the £100.00 pre-existing balance. TP will have an equitable co-ownership interest in the £150.00 in the amount of £50.00.*

**5.** *Where there is a subsequent addition to the balance in the account, TP cannot trace into that addition. Thus, by way of example:*

| *Description* | *Money in* | *Money out* | *Balance* |
|---|---|---|---|
| *Existing balance* | | | *£100.00* |
| *Transaction 1: Payment into the account in respect of which TP has a proprietary claim* | *£50.00* | | *£150.00* |
| *Transaction 2: Payment into the account* | *£25.00* | | *£175.00* |

*In this case, TP will be entitled to trace into the £50.00 paid into the account pursuant to Transaction 1, but will not be able to trace into the £100.00 pre-existing balance nor into the additional payment of £25.00 made pursuant to*

*Transaction 2. TP will have an equitable co-ownership interest in the £175.00 in the amount of £50.00.*

***6***. *Where TP's payment is paid into an account that is overdrawn, then that puts an end to all possibility of tracing by TP. That is so, even if the account subsequently comes into credit. Thus, by way of example:*

| Description | Money in | Money out | Balance |
|---|---|---|---|
| Existing balance | | | -£100.00 |
| Transaction 1: Payment into the account in respect of which TP has a proprietary claim | £50.00 | | £-50.00 |
| Transaction 2: Payment into the account | £100.00 | | £50.00 |

*In this case, TP's £50.00 and any right to trace into it is lost. The fact that Transaction 2 puts the account back into credit is irrelevant. TP has no interest in the balance of £50.00.*

***7.*** *In the case of subsequent transactions following TP's traceable payment, these will be analysed in accordance with the rule in Clayton's Case. According to this rule, the first payment into an account will be the first payment out of the account. Thus, by way of example:*

| Description | Money in | Money out | Balance |
|---|---|---|---|
| Existing balance | | | £100.00 |
| Transaction 1: Payment into the account in respect of which TP has a proprietary claim | £50.00 | | £150.00 |
| Transaction 2: Payment into the account | £25.00 | | £175.00 |
| Transaction 3: Purchase of securities | | £125.00 | £50.00 |
| Transaction 4: Purchase of land | | £25.00 | £25.00 |

*Transaction 3 will be funded by all of the "existing balance", and £25.00 of Transaction 1. TP will thus have an interest of £25.00 in the £125.00 of securities, and will continue to have a £25.00 interest in the balance of £50.00.*

***8.*** *Where the property that TP seeks to trace is acquired by a bona fide purchaser of the legal estate for value without notice of TP's claim (a "BFP"), then such BFP takes free of TP's claim, which expires. The claim does not revive even if the BFP transfers the property to a party with knowledge of TP's claim".*

13. AHAB's rejoinder to the Defendants' Submissions in Annex M1 on the question of the applicability of the so-called "rule" in *Clayton's case* is set out as follows:[2066]

678. *["AHAB submits that the Defendants are wrong that]:*

*(1) the so-called "rule" in Clayton's Case[2067] is either (a) a rule; or (b) has anything to do with equitable tracing;[2068]*

*(2) it is impermissible to trace through an overdraft or liability;[2069] and*

*(3) a party in the position of a wrongdoing trustee[2070] is not subject to punitive evidential presumptions and a duty to render an account in respect of misappropriated funds.[2071]"*

679. *Each of these propositions is wrong. This has two consequences. First, the* [Defendants'] *expert evidence on tracing cannot be relied upon because it is predicated on the assumption that the Defendants' legal position is correct. Secondly, the only evidence before the court on tracing is that of AHAB which should be*

2066 {**U1/1/256**}.

2067 ***Devaynes v Noble, Clayton's Case*** *(1816) 1 Mer 529 {R1/1/1}.*

2068 *Annex M1/2-5; 7 {**A2/46**}.*

2069 *Annex M1/6 {**A2/46**}.*

2070 *A party in the position of a wrongdoing trustee includes an express trustee or fiduciary, as well as a knowing recipient. This is the sense in which the editors of Snell's Equity, 33 rd ed. discuss the concept: "In this context, wrongdoer means the defaulting trustee or person who has received the money with notice of the breach of trust"; para.30-056 {R2/4/3}. Mr Al Sanea and the Defendants are each within this category.*

2071 *See, for example, the Re-Amended Defence of the Awalcos/3(5) {A1/13/6} and 51C {**A1/13/104**}.*

*accepted. The Defendants' errors are examined in detail under the following headings.*

<u>Applicability of Clayton's Case</u>

680. *Annex M1 proceeds on the basis that equitable tracing into and out of a bank account must be "analyzed in accordance with the rule in Clayton's Case". According to this rule, "the first payment into an account will be the first payment out of the account."*[2072] *["FIFO"]. This is not correct. The principle in Clayton's Case is not a "rule":*[2073] *even where it applies, it is merely a presumption that will yield to evidence to the contrary.*[2074] *Secondly, and more fundamentally, Clayton's Case had nothing to do with either tracing or proprietary rights. It concerned the appropriation of payments in a running account as between a bank and its customer: a relationship of debtor and creditor.*[2075] *Judicial observations about Clayton's Case confirm that it has no application to a tracing exercise:*

---

2072 *A2/46/3/para.7* ***{A2/46/3}.***

2073 *It has been described as "…the so-called rule in Clayton's Case…"* ***Russell-Cooke Trust Co v Prentis*** *[2003] 2 All ER 478, 494g* ***{R1/35/17}****, per Lindsay J.*

2074 ***In re Hallett's Estate*** *(1880) LR 13 ChD 696, 728* ***{R1/2/33}*** *per Jessel MR (Court of Appeal); even in cases where, unlike the instant case, the presumption in Clayton's Case will apply, it is not conclusive and may be displaced quite easily:* ***Cory Brothers and Company Limited v The Owners of the Turkish Steamship "Mecca" (The Mecca)*** *[1897] AC 286, 295* ***{R1/3/10}*** *per Lord Macnaughten (House of Lords).*

2075 *As Annex M1/1* ***{A2/46/1}*** *correctly notes, without also noting (as it should) that tracing is concerned with property rights, not debts.*

"…not a case of tracing at all, but a case as to the appropriation of payments";[2076] "It seems to me that the rule in Clayton's Case has nothing to do with tracing and therefore provides no help in the present action"[2077]; "…a case about appropriation of payments and not about tracing."[2078] *Having predicated the whole of their case on the rule, it is fatal to the Defendants' case.*

681. *It is necessary to distinguish between three distinct factual categories:*[2079]

(1) *A non-proprietary account (i.e. a running account of credits and debits) as between a banker and its customer (Category 1): this is the factual context within which Clayton's Case itself was decided. Absent other evidence of intended appropriations,* **Clayton's Case** *remains relevant to this exercise.*[2080]

---

2076 ***Barlow Clowes International Ltd (in liquidation) v Vaughan*** *[1992] 4 All ER 22, 28b-c* ***{R1/19/7}****, per Dillon LJ (Court of Appeal).*

2077 ***Barlow Clowes International Ltd (in liquidation) v Vaughan*** *[1992] 4 All ER 22, 44d* ***{R1/19/23}*** *per Leggatt LJ (Court of Appeal).*

2078 ***Commerzbank Aktiengesellschaft v IMB Morgan plc*** *[2005] 2 All ER 564 (Comm), 574c-d* ***{R1/37/11}****, per Lawrence Collins J (as he then was).*

2079 *Leggatt LJ distinguished these categories in* ***Barlow Clowes International Ltd (in liquidation) v Vaughan*** *[1992] 4 All ER 22, 44b-c* ***{R1/19/23}****.*

2080 *But yields to contrary evidence: "…it is, I think, important to observe that even in cases prima facie falling within the doctrine of Clayton's Case (1) the account between the parties, however it may be kept and rendered, is not conclusive on the question of appropriation."*
***Cory Brothers and Company Limited v The Owners of the Turkish Steamship "Mecca" (The Mecca)*** *[1897] AC 286, 295* ***{R1/3/10}*** *per Lord Macnaughten (House of Lords)*

(2) *A contest between a party in the position of a wrongdoing trustee*[2081] *and a claimant beneficiary, where the beneficiary's money has been wrongly mixed with the trustee's money in breach of trust (Category 2).* **Clayton's Case** *has no application to Category 2:* **In re Hallett's Estate**[2082]***;*** **In re Oatway**.[2083]

(3) *Competing claims by multiple claimant beneficiaries (i.e. claimants in the same proprietary right) to a fund that is insufficient to satisfy all their claims (Category 3). In England, Clayton's Case remains the starting point for Category 3 cases, although in modern times it is always displaced in practice. It no longer has even this theoretical application in Australia, Canada, or New Zealand.*

682. *The instant case is a Category 2 case. It cannot be a Category 1 case, because none of the Defendants is a bank at which any relevant account is held. In any event, AHAB's claim is proprietary, rather than a matter of debt. It cannot be a Category 3 case, because AHAB is the only proprietary claimant.*[2084]

---

2081 *"In this context, wrongdoer means the defaulting trustee or person who has received the money with notice of the breach of trust." Snell's Equity, 33 rd ed., para.30-056* ***{R2/4/3}****.*

2082 *(1880) LR 13 ChD 696* ***{R1/2/1}****.*

2083 *[1903] 2 Ch 356* ***{R1/5/1}****.*

2084 *In order to come within Category 3, there must be multiple beneficiary claimants; the fact that the trustee has creditors is not the point:* ***Commerzbank Aktiengesellschaft v IMB Morgan plc*** *[2005] 2 All ER 564 (Comm), 572g* ***{R1/37/9},*** *per Lawrence Collins J (as he then was).*

683. *It has been unarguable that* **Clayton's Case** *has any possible application to a Category 2 case since (at the latest) 1880, when the Court of Appeal explained the correct position in* **In re Hallett's Estate**.[2085] *Jessel MR distinguished between the exercise of accounting between a bank and its customer as creditor and debtor (i.e. a Category 1 case) and cases where a trustee mixes trust money with their own (i.e. a Category 2 case).*[2086] *While* **Clayton's Case** *could provide* "a very convenient rule" *in a Category 1 case*[2087]*, the Master of the Rolls explained that it was simply inapplicable to a Category 2 case. This was because it was not open to a wrongdoing trustee to say that he had spent the beneficiary's money before he spent his own: "Now, first upon principle, nothing can be better settled, either in our own law, or, I suppose, the law of all civilized countries, than this, that where a man does an act which may be rightfully performed, he cannot say that that act was intentionally and in fact done wrongly…Wherever it can be done rightfully, he is not allowed to say, against the person entitled to the property or the right, that he has done it wrongfully. That is the universal law."  the beneficiary's money*

---

[2085] *1054 (1880) LR 13 ChD 696* ***{R1/2/1}****. The report of the relevant appeal is at 724 onwards; the facts are stated by Jessel MR at 726.*

[2086] *1055 (1880) LR 13 ChD 696****, 727-728 {R1/2/32}-{R1/2/33}****.*

[2087] *1056 Although capable of displacement by contrary evidence:* ***(****1880) LR 13 ChD 696, 728* ***{R1/2/33}*** *the beneficiary's money before he spent his own: "Now, first upon principle, nothing can be better settled, either in our own law, or, I suppose, the law of all civilized countries, than this, that where a man does an act which may be rightfully performed, he cannot say that that act was intentionally and in fact done wrongly…Wherever it can be done rightfully, he is not allowed to say, against the person entitled to the property or the right, that he has done it wrongfully. That is the universal law."*

*before he spent his own*: "Now, first upon principle, nothing can be better settled, either in our own law, or, I suppose, the law of all civilized countries, than this, that where a man does an act which may be rightfully performed, he cannot say that that act was intentionally and in fact done wrongly…Wherever it can be done rightfully, he is not allowed to say, against the person entitled to the property or the right, that he has done it wrongfully. That is the universal law."[2088] *Baggallay LJ concurred and held that* "…full effect should be given to the principle of attributing the honest intention whenever the circumstances of the case admit of such a presumption."[2089]

684. *The principle in* **Re Hallett's Estate** *remains the invariable position today. Woolf LJ explained in* **Barlow Clowes International Ltd (in liquidation) v Vaughan**[2090] *that the effect of* **Re Hallett's Estate** *had been to* "exclude the application of Clayton's Case to the situation in **Re Hallett's Estate**. It did so because, if a person who holds money as a trustee or in a fiduciary character pays it into his bank account and mixes it with his own money and afterwards draws out some from the account for his own purposes, he will be presumed to be acting honestly and drawing his own money from the account in priority to the money

---

2088 *(1880) LR 13 ChD 696, 727* ***{R1/2/32}****.*
2089 *1058 (1880) LR 13 ChD 696, 743* ***{R1/2/48}****.*
2090 *1059 [1992] 4 All ER 22* ***{R1/19/1}****.*

which he held as trustee or in a fiduciary character."[2091] *It was cited with approval last year in* **National Crime Agency v Robb**[2092] *by Sir Terence Etherton C (as he then was).*

685. *The approach taken in* **Re Hallett's Estate** *unquestionably reflects the law in the Cayman Islands and this has long been the case: in* **Amerasia Industrial Corporation v E Rasko and M Rasko**,[2093] *Chief Justice Summerfield directed himself (correctly) according to* **Re Hallett's Estate** *in a mixed account case:*

> "…The funds in both sub-divided accounts had a common origin…the tainted moneys from Amerasia being mixed with Rasko's money in that account. The subsequent movements of portions of that mixed fund is of no consequence in the light of the principles involved.
>
> It follows that Amerasia can follow the misappropriated funds into the account of Rasko with the trust company and has a charge on the balance in the trust company's hands. Rasko's drawings of any nature and for any purpose (other than by way of direct refund to Amerasia) must be taken to have been drawn out of his own money in preference to the trust money.
>
> As the balance, at the time when the account was frozen, was less than the total amount misappropriated and paid into the account the whole of that balance is due and payable to Amerasia…"[2094]

---

2091 *1060 [1992] 4 All ER 22, 37j* ***{R1/19/16}****. This was a Category 3 case, but Woolf LJ's remarks were directed to a Category 2 situation.*

2092 *1061 [2015] Ch 520, 534H* ***{R1/48/15}****.*

2093 *1062 [1980-83 CILR 19]* ***{R1/11/1}*** *(Summerfield CJ).*

2094 [1980-83 CILR 19], 25-26 {**R1/11/7/8**} (Summerfield CJ).

686. *Similarly, in* **Hampshire Cosmetic Laboratories Limited v Mutschmann and Cayman National Bank**[2095]*, Smellie CJ directed himself (by reference to* **Re Hallett's Estate***) as follows:* "…it seems to be now settled law that if the recipient has mixed the beneficiary's money with his own, the beneficiary's claim must be satisfied from any identifiable part of the fund before the recipient could get anything".[2096]

687. *In Category 2 cases, the English court will only depart from the presumption in* **Re Hallett's Estate** *(i.e. that the wrongdoer spends his own money first) in cases where it is in a beneficiary's interests for the wrongdoer to have spent the beneficiary's money first. This development of* **Re Hallett's Estate** *derives from* **In re Oatway**[2097]*, a case in which a wrongdoing trustee had mixed his own money with the fruits of a breach of trust, bought some shares with the mixed fund, and then dissipated the balance. It was not open to those interested in the wrongdoing trustee's estate to say that the wrongdoer had first spent his own money on the shares before dissipating the beneficiary's money, even though this would have been the consequence of a slavish interpretation of the*

---

2095 1064 [1999 CILR 21] **{R1/31/1} (**Smellie CJ).
2095 1065 [1999 CILR 21], 30 **{R1/31/10}** (Smellie CJ).
2096 1066 [1903] 2 Ch 356 **{R1/5/1}**.

*presumption in* **Re Hallett's Estate.** *Joyce J held in* **Re Oatway** *that* "…when any of the money drawn out has been invested, and the investment remains in the name or under the control of the trustee, the rest of the balance having been afterwards dissipated by him, he cannot maintain that the investment which remains represents his own money alone, and that what has been spent and can no longer be traced and recovered was the money belonging to the trust. In other words, when the private money of the trustee and that which he held in a fiduciary capacity have been mixed in the same banking account, from which various payments have from time to time been made, then, in order to determine to whom any remaining balance or any investment that may have been paid for out of the account ought to be deemed to belong, the trustee must be debited with all the sums that have been withdrawn and applied to his own use so as to be no longer recoverable, and the trust money in like manner be debited with any sums taken out and fully invested in the names of the proper trustees. The order of priority in which the various withdrawals and investments may have been respectively made is wholly immaterial."[2098]

688. **Re Hallett's Estate** *and* **Re Oatway** *are consistent with the punitive approach that is taken towards a wrongdoing trustee who fails to provide an account. Everything is assumed in favour of the*

---

*2098 1067 [1903] 2 Ch 356, 360-361* ***{R1/5/5-6}*** *(emphasis added).*

*beneficiary. The correct approach to an account by a wrongdoing trustee is dealt with under the heading* "The nature and evidential content of the duty to account" *below.*

689. *In England (but not elsewhere)* **Clayton's Case** *appears to remain the theoretical starting point in a Category 3 case, i.e. in determining the entitlement of multiple competing proprietary claimants inter se to a fund that is insufficient to satisfy all proprietary claims*[2099]*. Even in England, however, the principle is no longer applied in practice: Lindsay J referred to* "…the so-called rule in Clayton's Case...",[2100] *which may be* "…displaced by even a slight counterweight. Indeed, in terms of its actual application between beneficiaries who have in any sense met a shared misfortune, it might be more accurate to refer to the exception that is, rather than the rule in, **Clayton's Case**."[2101] *Every time the point has been considered in recent years, the English court has declined to apply* **Clayton's Case** *even to a Category 3 case:* **Barlow Clowes International Ltd (in liquidation) v Vaughan**[2102]*;* **Russell-Cooke Trust Co v**

---

[2099] *1068* ***Barlow Clowes International Ltd (in liquidation) v Vaughan*** *[1992] 4 All ER 22, 33g* ***{R1/19/12}*** *per Dillon LJ, 39a.* ***{R1/19/18}*** *per Woolf LJ, 44g* ***{R1/19/23}*** *per Leggatt LJ;* ***Russell-Cooke Trust Co v Prentis*** *[2003] 2 All ER 478, 494j* ***{R1/35/17}*** *per Lindsay J.*

[2100] *1069 [2003] 2 All ER 478, 494g* ***{R1/35/17}.***

[2101] *1070 [2003] 2 All ER 478, 495b* ***{R1/35/18}.***

[2102] [*1992] 4 All ER 22, 33h* ***{R1/19/12}*** *per Dillon LJ, 42g* ***{R1/19/21}*** *per Woolf LJ, 46c-e* ***{R1/19/25}*** *per Leggatt LJ.*

**Prentis**[2103]*;* **Commerzbank Aktiengesellschaft v IMB Morgan plc**[2104]*;* National Crime Agency v Robb[2105].

690. *Indeed, following an exhaustive review of the authorities on* **Clayton's Case** *across the common law world in* **Re French Caledonia Travel Service Pty Ltd (in liquidation)**[2106]*, Campbell J in the Supreme Court of New South Wales concluded that only once since Re Hallett's Estate was decided in 1880 had an English court applied Clayton's Case even to a Category 3 case*[2107]*. Campbell J went on to decide that* **Clayton's Case** *did not reflect even the starting point in a Category 3 case for Australian purposes, let alone a doctrine that should be applied in practice*[2108]*. This approach has been adopted by the Supreme Court of Canada*[2109]*, where Clayton's Case is confined strictly to the bank-customer relationship. The leading Canadian work on trusts has referred to Clayton's Case as* "…a rule governing the banker-customer relationship and it should never have been

---

2103 [2003] 2 All ER 478, 495g **{R1/35/18}**, per Lindsay J.
2104 [2005] 2 All ER (Comm), 575j **{R1/37/12}**, per Lawrence Collins J (as he then was).
2105 [2015] Ch 520, 536A-D {**R1/48/17**}, per Sir Terence Etherton C (as he then was).
2106 (2003) ACSR 97, 143-25 **{R1/36/48}.**
2107 1076 The solitary example identified by Campbell J was **Re Diplock; Diplock v Wintle** [1948] 1 Ch 465 **{R1/6/1}**, a Category 3 case with nothing in common with the fraud suffered by AHAB.
2108 1077 (2003) ACSR 97, 147-35 **{R1/36/52}**.
2109 1078 **Re Ontario Securities Commission and Greymac Credit Corp** (1988) 52 DLR (4 th) 767 **{R1/15/1}**. The Supreme Court of Canada did not call upon the respondent's counsel or deliver a reasoned judgment but simply adopted the judgment of Morden JA in the Ontario Court of Appeal (1986) 30 DLR (4 th) 1, 13 who had expressly upheld the decision of Parker ACJHC below to the effect at Clayton's Case was strictly confined to the bank-customer relationship.

imported into tracing[2110]" *and* "…now *discredited as relevant to tracing.*[2111]*" A similar attitude is taken to* **Clayton's Case** *by the Court of Appeal of New Zealand*[2112].

Mixed funds, the role of inference, and non-sequential substitutions

691. *As well as placing reliance on* **Clayton's Case***, the Defendants proceed on the equally mistaken basis that equitable tracing is defeated by the payment of money into an overdrawn account*[2113]*. If this ever was the law, then this is no longer the case. An overdraft is simply a debt that the account holder owes to the bank at which the account is held. Accordingly, the "overdraft" principle applies to any non-sequential substitution of value, or to any tracing exercise that involves one party's promise to reimburse another. This is referred to as "backward" tracing in the literature. It is closely connected to the issue of filling the gaps in evidence that inevitably exist in cases of fraud or money laundering by means of inferences drawn from primary facts.*

692. *The correct approach is that where money laundering or other sophisticated fraud is present, the courts will not allow historic technicalities (such as tracing through a liability) to defeat a claim. Essentially, the courts have recognized that equitable*

2110 1079 **Waters' Law of Trusts in Canada**, 4 th ed, footnote 80, p.1350 **{R2/5/5}**. An editor of Waters' is Professor Lionel Smith, whose seminal The Law of Tracing (OUP: Oxford, 1997) remains the leading scholarly work on tracing.

2111 *1080 Waters' Law of Trusts in Canada, 4 th ed, footnote 80, p.1351* ***{R2/5/6}****.*

2112 *1081* ***Re Registered Securities Ltd*** *[1991] NZLR 545, 553-25* ***{R1/18/10},*** *per Somers J: "The automatic application of the rule in Clayton's Case as between beneficiaries will not in our view withstand scrutiny."*

2113 *1082 Annex M1/6* ***{A2/46/2}.***

*principles must develop if they are to remain useful in an era of complex fraud and money laundering.*

693. *As explained in more detail below, within the context of laundered funds,* **Relfo Limited (in liquidation) v Varsani**[2114] *has made clear that tracing is not defeated even where substitutions of value are non-sequential.* **Relfo** *further shows that it is possible for the court to infer its way through significant gaps in evidence. The Privy Council has reached a similar conclusion recently in* **Federal Republic of Brazil v Durant International Corpn**[2115], *involving analogous facts to those in* **Relfo. Durant** *also expressly approved the principle of tracing through an overdrawn bank account.*

**694.** *The process of tracing and the assertion of a proprietary claim are different things.* ***As has been stated many times in the case law, tracing is not a claim, but an evidential process leading to a claim***[2116]***. An antecedent breach of express trust or fiduciary duty is required to commence an equitable tracing exercise. Where assets can be traced, the true owner may be able to assert a proprietary claim. That claim will only be possible where the defendant retains the traced asset or its traceable proceeds.*** *However, a knowing receipt claim may bridge the gap, by*

---

2114 *1083 [2015] 1 BCLC 14* ***{R1/46/1}****.*
2115 *1084 [2015] 3 WLR 599* ***{R1/50/1}****, on appeal from the Court of Appeal of Jersey*
2116 *1085* ***Boscawen v Bajwa*** *[1996] 1 WLR 328, 334D* ***{R1/25/7}****, per Millett LJ (Court of Appeal*)***; Foskett v McKeown*** *[2001] 1 AC 102, 128D-E* ***{R1/33/27}****, per Lord Millett (House of Lords).*

*imposing a personal liability on the part of a third party (who is a third party in the sense of not being an express trustee or fiduciary) who receives traceable assets with the necessary level of knowledge of the antecedent breach of trust or fiduciary duty. Such a person is required personally to account for the receipt as if they were a trustee themselves[2117].”* (Emphasis added.)

14. I pick up here again the narrative from AHAB's Submissions:

<u>*Knowing receipt*</u>

695. *"It is worth noting that there is no requirement that the antecedent breach of trust or fiduciary duty is dishonest for <u>knowing receipt claims</u> – albeit that AHAB alleges that it was. While both the express trustee and the third party will often be dishonest in such cases, it is beyond question that there is no need for the antecedent breach of trust to be dishonest[2118]. The relevant knowledge of a third party recipient is knowledge of a breach of trust sufficient to render it "unconscionable" for the benefit to be retained by the third party[2119]. On the facts of this case, the knowledge, unconscionability or dishonesty of the Defendants cannot be in material doubt given the beneficial ownership, control and direction of the Defendants by Mr. Al Sanea."*

---

2117 ***Agip (Africa) Ltd v Jackson*** *[1990] 1 Ch 265, 291F-G* ***{R1/16/27}****, per Millett J, upheld on appeal [1991] Ch 547* ***{R1/18.3/1}****. See also Snell's Equity, 33 rd ed. para.30-056* ***{R2/4/3}****.*

2118 ***Belmont Finance Corporation v Williams Furniture Ltd (No 2)*** *[1980] 1 All ER 393, 410h-j* ***{R1/12/18}*** *per Goff LJ (as he then was);* ***Agip (Africa) Ltd v Jackson*** *[1990] 1 Ch 265, 292A- B* ***{R1/16/28}*** *per Millett J (as he then was).*

2119 ***Bank of Credit and Commerce International (Overseas) Ltd v Akindele*** *[2001] Ch 437, 455E-F* ***{R1/31.1/19}*** *per Nourse LJ.*

15. It is unclear what distinction AHAB seeks to draw here between an honest and dishonest breach of trust. Even if this statement of legal principle is accepted as correct (and I do not doubt that it is), the antecedent breach of trust relied upon by AHAB in this case is premised upon Al Sanea's dishonesty against AHAB and the absence of knowledge and authority on the part of the AHAB Partners of his use of the Money Exchange for new borrowing after October 2000. That premise having been disproven, there was no antecedent breach of trust.[2120]

16. To return to AHAB's submissions*:*

> 696. *"Mixing does not defeat the proprietary tracing exercise in equity. This is a fundamental principle. Indeed, the main utility of equitable tracing (about which the authorities are clear) is usually regarded as the ability to trace through mixed funds. In giving the leading speech in the House of Lords in Foskett v McKeown, Lord Millett held that* "…the beneficiary's right to elect to have a proportionate share of a mixed substitution necessarily follows once one accepts, as English law does, (i) that a claimant can trace

---

[2120] There was a possible exception in relation to Al Sanea's activities at the very end, when he directed Mark Hayley to make the final transfers out of the Money Exchange's Bank of America Account and when he must have known that the Money Exchange might never be able to repay the sums then transferred because the banks had stopped lending. Even in the context of the compact between Al Sanea and AHAB to use the Money Exchange to obtain fraudulent borrowing from the banks, it might have been arguable that at this stage, Al Sanea had determined to defraud AHAB as well, and this despite the fact that the transfer out was ostensibly to AIH's account with AWAL Bank: {**G/7848**}; Hayley 1W [316] {**C1/9/63**} (also discussed in Section 2 above under AHAB Partners knowledge and authority"). Prior to this point in time, the faithful and meticulous recording of the Al Sanea indebtedness did not allow for any such inference of breach of trust. A claim based on this limited premise was however, not available to AHAB given its dishonestly pleaded case of ignorance and lack of authority of all new borrowing, post circa October 2000. Whether AHAB would have been able to show the transactional links between these last transfers and the accounts of the Defendants necessary for proving a tracing claim or a claim based on knowing receipt, would have been an entirely different matter.

in equity into a mixed fund and (ii) that he can trace unmixed money into its proceeds and assert ownership of the proceeds." [2121] *In the mid-1990s, the Grand Court recognized the possibility of tracing through mixed funds even if (in a less compelling case than AHAB's) the funds had been mixed by an innocent volunteer.*[2122]

697. *It is not necessary for a plaintiff to prove every transactional step by reference to documentary evidence. Where appropriate, the court will infer the missing step. The authorities show an increasing willingness to fill evidential gaps using inference where funds have been subjected to a process designed to conceal the route they have taken. In other words, the courts have shown an unwillingness to allow tracing to be defeated by the deviousness of fraudsters. This is consistent with the approach taken in the Cayman Islands: Foster J* "made it clear more than once" that litigants' "destruction of potentially discoverable documents" *could lead to inferences being drawn against them.*[2123]

698. *A contention that a gap in the evidence of transactions must be fatal to a proprietary tracing exercise was run unsuccessfully by the defendant in* **Relfo Limited (in liquidation) v Varsani**[2124], *and was decisively rejected by the Court of Appeal. Arden LJ, giving*

2121 ***Foskett v McKeown*** *[2001] 1 AC 102 at 131G* ***{R1/33/30}.***
2122 ***Barclays Bank PLC v Kenton Capital Limited, Etoile Limited and Highlander Limited*** *(Smellie J) 1994-95 CILR 489* ***{R1/24/1}.*** *See also* ***Hampshire Cosmetic Laboratories Ltd v Mutschmann and Cayman National Bank*** *(Smellie CJ) [1999 CILR 21]* ***{R1/31/1}***.
2123 ***Renova Resources Private Equity Limited v Gilbertson (****Foster J) [2012] (2) CILR 416, para.69* ***{R1/44/39}***.
2124 *[2015] 1 BCLC 14* ***{R1/46/1}***.

*the leading judgment, summarized the appellant's counsel's main submission in Relfo in these terms:* "Relfo has not shown that the same asset came out through the chain of substitution. The claim form simply states that the same amount turned up at the end…no transactional link was identified…Relfo simply made out cause and effect. The court should not reverse the burden of proof. There was no authority for the proposition that the court could infer a whole series of transactions of alleged substitution of which there was no evidence."

699. *Applying the inferential approach of Millett J in* **El Ajou v Dollar Land Holdings plc**[2125]*, the Court of Appeal in Relfo rejected the narrow approach advocated by the appellant. Not only was it unnecessary to show every transactional step, it was not even necessary that those transactions happened in sequential order:*

> "The inference that the judge made means that he found that what had happened was on the following lines. At the start of the chain of transactions, Relfo had money on deposit with its bank, i.e. it had the benefit of a debt owed to it by its bank. It exchanged this right for a debt owed to it by Mirren [i.e. the first laundering intermediary to whom Relfo's director paid away Relfo's money]. The value of this debt lay in the credit balance on this account. Mirren agrees to transfer this balance to another person or person [sic] at some future date in exchange for Intertrade [the second laundering

[2125] *[1993] 3 All ER 717* ***{R1/20/1}****, reversed in part by the Court of Appeal (conclusion on tracing affirmed)* ***[1994] 2*** *All ER 685* ***{R1/21/1}****.*

> intermediary that rendered payment to the defendant] making the Intertrade payment [to the defendant].
>
> I therefore accept [Relfo's counsel's] submission that the fact that Mirren did not reimburse anyone for the Intertrade payment until after the Intertrade payment had been made does not matter. On the judge's findings, the Intertrade payment and the other payments made throughout the chain of substitutions was made on the faith of the arrangement that Mirren would provid*e* reimbursement. By making that arrangement*,* Mirren exploited and used the value inherent in Relfo's money that had been paid into Mirren's account."[2126]

700. *The Defendants in the instant case appear to argue that equitable tracing is only permitted where the transactions can be (a) documented at every stage; and (b) shown to be sequential: "x" pays "y" and "y" then pays the same money to "z". This is not reflected in the authorities. For example, in* **Relfo***, far from there being evidence of an unbroken chain of transactions, there was no evidence at all that Mirren (the first laundering entity) had ever made a payment to Intertrade (the second laundering entity). Indeed, it could be shown (because the bank statements of Mirren and Intertrade for the relevant period were available) that Mirren categorically had not made a payment to Intertrade prior to Intertrade paying the defendant. Yet the Court of Appeal was prepared to infer that Intertrade must have (somehow at some*

---

[2126] *[2015] 1 BCLC 14 at 28b-e* ***{R1/52.2/15}****.*

*point by someone) been reimbursed: so on the facts of* **Relfo,** *"y" (Intertrade) paid out to "z" (the defendant) before being subsequently reimbursed (the court inferred) by "x" (Mirren). The evidential gap filled by the Court of Appeal was not merely to infer a payment between the two known intermediaries, because the evidence showed that there had, as a matter of fact, been no such payment, much less a sequential one. Instead, the court was prepared to go further and infer the existence of intermediaries about whom nothing was known, making payments to reimburse Intertrade as the ultimate intermediary at some unknown time.*

701. *The Court of Appeal's robust approach was applied in the explicit context of international money laundering. Plainly, equitable principles have developed to take account of the changed environment in which fraud is perpetrated and concealed. The Grand Court has shown itself ready to take a similarly flexible approach to tracing.*

702. *In* **Renova Resources Private Equity Limited v Gibertson***,[2127] it was alleged that a director had breached his fiduciary duty in having inter alia procured the gratuitous issue of new shares in a company. It was contended by the defendants that this failed to satisfy one of the essential elements for a claim in knowing receipt (the requirement that there be a disposal of the principal's assets*

[2127] *[2012 (2) CILR 416]* ***{R1/44/1}*** *(Foster J).*

*in breach of fiduciary duty*[2128] *because the unissued shares were not "assets" of the company. Accordingly, it was argued, there was no "disposal" of anything because the shares did not exist prior to the breach.*[2129] *Foster J approached the defendants' contention in a manner entirely consistent with the modern cases on tracing and held it to be* "unduly restrictive and strict." *The learned judge continued:* "This is an equitable concept and it does not seem to me that the reference to disposal of assets in Lord Hoffmann's first requirement for liability for knowing receipt in **El Ajou v Dollar Land Holdings**…would have been intended to or did restrict the terms "a disposal of assets" or "assets which are traceable as representing the assets of the plaintiff" to mean pre-existing tangible items of property already legally and beneficially owned by the plaintiff. The court must look at the particular circumstances concerned in order to achieve a fair and equitable result."[2130]

703. *__Tracing__ through non-sequential transfers is clearly supported by English authority such as* **Relfo.** ***The Privy Council expressly approved tracing through an overdrawn bank account in*** **Federal Republic of Brazil v Durant International Corporation**.[2131] *The*

---

[2128] *1096 See Hoffmann LJ in **El Ajou v Dollar Land Holdings** [1994] 2 All ER 685, 700 **{R1/21/16},** as applied by Foster J in **Renova Resources Private Equity Limited v Gilbertson** [2012 (2) CILR 416], para.75 **{R1/44/41}**.*

[2129] *1097 [2012 (2) CILR 416], para.76(ii) **{R1/44/42}**.*

[2130] *1098 [2012 (2) CILR 416], para.76(v) **{R1/44/43} (Foster J).***

[2131] *1099 [2015] 3 WLR 599 **{R1/50/1}**.*

*facts were analogous to those in Relfo in that "y" paid out to "z" before "y" was reimbursed by "x". The Privy Council's advice was short and bold. It took a very similar approach to the Court of Appeal in* **Relfo** *in respect of non-sequential payments. The leading House of Lords decision* **Foskett v McKeown** *was referred to extensively by the successful claimants in Durant, whose argument was summarised as follows:* "…it is inaccurate to speak of tracing one asset into another. Rather, the court is concerned with tracing the value inherent in a trust asset. Whether it can properly be traced into another asset depends on whether there is a sufficient transactional link. In considering that question the court should concentrate on the substance of the transaction and not the form."[2132]

704. *Just as the Court of Appeal had done in Relfo, the Privy Council explicitly grounded its robust approach in the modern problem of laundering of misappropriated funds:*

> "The development of increasingly sophisticated and elaborate methods of money laundering, often involving a web of credits and debits between intermediaries, makes it particularly important that a court should not allow a camouflage of interconnected transactions to obscure its vision of their true overall purpose and effect. If the court is satisfied that the various steps are part of a co-ordinated scheme, it should not matter that, either as a deliberate part of the choreography or possibly because of the incidents of

---

[2132] *1100 [2015] 3 WLR 599 at 608C-D* ***{R1/50/10}****.*

> the banking system, a debit appears in the bank account of an intermediary before a reciprocal credit entry."[2133]

705. *The Privy Council went on to address explicitly the long-standing issue surrounding the ability to trace funds through an overdrawn account. As noted above, it had previously been held that once money is paid into an overdrawn account, the ability to trace is extinguished, because there is no longer any asset in existence; all that exists is a debt owed by the account holder to its bank. The Privy Council explicitly confronted this head-on:*

> "…the Board does not consider that it should matter whether the account used for the purpose of providing bridging finance was in credit or in overdraft at the time. An account may be used as a conduit for the transfer of funds, whether the account holder is operating the account in credit or within an overdraft facility.
>
> The Board therefore rejects the argument that there can never be backward tracing, or that the court can never trace the value of an asset whose proceeds are paid into an overdrawn account. But the claimant has to establish a co-ordination between the depletion of the trust fund and the acquisition of the asset which is the subject of the tracing claim, looking at the whole transaction, such as to warrant the court attributing the value of the interest acquired to the misuse of the trust fund. This is likely to depend on inference from the proved facts, particularly since in many cases the testimony of the trustee, if available, will be of little value."

17. I have expressly above accepted this dicta as being applicable in principle to a case such as the present.

---

[2133] *1101 [2015] 3 WLR 599 at 609F-H* ***{R1/50/11}****.*

706. *The Board went on to make clear that it did not doubt the leading case* **In re Goldcorp Exchange Ltd**[2134], but the distinction was that in *Goldcorp* there was no "*evidence of an overall transaction embracing the co-ordinated outward and inward movement of assets*."[2135]

707. *In AHAB's case, there plainly was an overarching and coordinated campaign by Mr. Al Sanea to divert AHAB's money away from AHAB to the Defendants through many and various transactions, some of which cannot be proved or are not purely sequential or which involved the repayment of debts or the incurring of debts. On the basis of the settled law set out above, none of this prevents AHAB from tracing its assets.*

18. Herein lies the fundamental problem facing AHAB – the recitation of this dicta from **Durant** is no substitute for proof of the transactional links, even if it is accepted that they need not have been sequential. Recognizing this problem, AHAB resorted, impermissibly in my view, to a claim for equitable accounting for reversal of the burden of proof, as discussed below.

*"The nature and evidential content of the duty to account*

708. *The editors of Snell's Equity explain that* "[p]unitive presumptions of identification apply where the other contributor to the bank account is a wrongdoer. They aim to preserve the value contributed

---

[2134] *1102 [1995] 1 AC 74* ***{R1/22/1}***.
[2135] *1103 [2015] 3 WLR 599 at 610C* ***{R1/50/12}***.

by the wrongdoer. A reversed burden of proof operates. The mixed money in the bank account is presumed to belong to the innocent trust claimant to the extent that the wrongdoer cannot prove that it is attributable to his own contributions to the account.” [2136]*The authority cited for the foregoing proposition by the editors of Snell was* **El Ajou v Dollar Lands Holdings plc**,[2137] *a first-instance decision of Millett J (as he then was). Lord Millett recently returned to this area in* **Libertarian Investments Ltd v Hall**[2138] *(a decision of the Hong Kong Court of Final Appeal). Lord Millett (sitting as a non-permanent judge of the court) gave a short judgment explaining the beneficiary's right to require an account from a defaulting fiduciary. Often the word "account" is misunderstood as if it simply refers to an order that "x" pays such-and-such an amount to "y". Rather, the beneficiary's right to an account includes the right to be shown by the accounting party what has become of the property in specie. This is a critical aspect of the beneficiary's right, because knowing where the property has gone may open up further possible avenues for proprietary or personal relief in respect of assets in the hands of other parties. Lord Millett NPJ's judgment explains:*

---

2136 *Snell's Equity, 33rd edition, 30-057* ***{R2/4/4}***.

2137 *[1993] 3 All ER 717, 735-736* ***{R1/20/19}-{R1/20/20}*** *(reversed in part by the Court of Appeal (conclusion on tracing affirmed) [1994] 2 All ER 685)* ***{R1/21/1}***.

2138 *[2014] 1 HKC 368,* ***(2013) 17 ITELR 1 {R1/45/1}***.

> "*In the first place an account is not a remedy for a wrong. Trustees and most fiduciaries are accounting parties, and their beneficiaries or principals do not have to prove that there has been a breach of trust or fiduciary duty in order to obtain an order for account….*
>
> *In the second place an order for an account does not in itself provide the plaintiff with a remedy; it is merely the first step in a process which enables him to identify and quantify any deficit in the trust fund and seek the appropriate means by which it may be made good.…Where the defendant is ordered to make good the deficit by the payment of money, the award is sometimes described as the payment of equitable compensation….*
>
> *But the plaintiff is not bound to ask for the disbursement to be disallowed. He is entitled to ask for an inquiry to discover what the defendant did with the trust money which he misappropriated and whether he dissipated it or invested it, and if he invested it whether he did so at a profit or a loss….*"[2139]

709. *The dual proprietary/personal consequence of the equitable account was referred to earlier this year for the purposes of English law by the Supreme Court in* **FHR European Ventures LLP v Mankarious**[2140] *in which it confirmed that* "[t]he expression equitable accounting can encompass both proprietary and non-proprietary claims."

710. *Although* **Libertarian Investments** *concerned an express trustee, the nature of the personal liability imposed on a third party knowing recipient or dishonest assistant is to account as if* that

---

[2139] *[2014] 1 HKC 368, 412I-413E, (2013) 17 ITELR 1, 46E-47B* ***{R1/45/46}.***
[2140] *[2015] AC 250 at 270H* ***{R1/47/21}****.*

third party were an express trustee.[2141] AHAB's case is that Mr. Al Sanea owes a duty to account as an express fiduciary. In the case of the GT Defendants, the AwalCos and SIFCO 5, AHAB submits that they received the traceable proceeds of AHAB's money with the requisite knowledge of Mr. Al Sanea's antecedent breach of fiduciary duty, so as to render them liable to account…"

19. The following 14 paragraphs are taken from AHAB's Written Closing submissions:[2142]

*8.48 The Defendants other than Mr. Al Sanea are liable to account on exactly the same basis as Mr. Al Sanea himself. Although none of the Defendant companies was expressly appointed as AHAB's fiduciary, they are in no better position than Mr. Al Sanea is himself to resist AHAB's demand for an account.*

*8.49 It appears from certain remarks made on the Defendant companies' behalf during cross-examination that they may attempt to argue that some or all of them might be in the position of innocent third parties. For example:[2143]*

*"CHIEF JUSTICE: Of course, if I recall correctly, for the purposes of tracing, the thief's money is regarded as being taken first.*

*MR. SMITH: My Lord, you are absolutely right. If one takes Re Hallett's case and one is in a fiduciary position, that is absolutely right. Were that to be Mr Al Sanea at the beginning, that is entirely correct. <u>But if</u>*

---

2141 ***Agip (Africa) Ltd v Jackson*** *[1990] 1 Ch 265 at 291F-G* ***{R1/16/27},*** *per Millett J. See also Snell's Equity, 33 rd ed. para.30-056* ***{R2/4/3}****.*

2142 {**D/8/19-24**}.

2143 ***{Day71/13:11-21}****.*

> *one is presuming that Awal Bank is the innocent recipient of traced monies then the rules would be different. But your Lordship is quite right to pick me up on that. I am presuming a non-fraudulent case to explore FIFO."* (emphasis added).

*8.50* *Mr. Smith assumes (without argument) that Awal Bank can be an* "innocent recipient". *In fact, the controlling mind of Awal Bank, as with all entities in the Saad Group at all material times, was Mr. Al Sanea. Accordingly, none of the entities in the Saad Group can be an innocent recipient if (as has been established and proved) Mr. Al Sanea (as their director/agent and/or controlling mind) was a wrongdoer.*

*8.51* *The Defendants other than Mr. Al Sanea are also constructive trustees of a kind that renders them liable to account to AHAB as if they were express trustees. As noted above, in* **Paragon Finance plc v D B Thakerar & Co**,[2144] *Millett LJ (as he then was) distinguished between two kinds of constructive trustee and found that a* "category one" constructive trustee "really is a trustee" *and is subject to the same accounting duties as an express trustee. Mr Al Sanea is a* "category one" *constructive trustee.*

*8.52* *This category of constructive trustee was further extended in* **Miller v Bain (sub nom Pantone 485 Ltd)** [2145] *to apply to a situation where a fiduciary confers a benefit on a company he*

---

2144 [1999] 1 All ER 400 {**R1/31.0.1**}.
2145 [2002] 1 BCLC 266 {**R1/35.0.1/1**}.

*controls. In proceedings by the fiduciary's principal against such a company, any receipt by the company will be treated as a receipt by the fiduciary himself, and the company will also be a* "category one" *constructive trustee per Millett LJ in* **Paragon Finance**. *Accordingly, the company, although ostensibly a third party, will be subject to exactly the same accounting duties and obligations as the fiduciary himself, which means all the accounting duties and obligations of an express trustee. Mr Richard Field QC (sitting as a deputy High Court judge) held in* **Miller v Bain** *that:*[2146]

> "…as a matter of basic principle, where a fiduciary uses his beneficiary's money to confer a benefit on a company he controls he is denying the beneficiary's title to the money for his own purposes and this amounts to conversion for his own use. The same is true where a fiduciary causes his beneficiary to incur a liability for the benefit of a company which the fiduciary controls."

8.53 *Mr Field QC's judgment in Miller v Bain was recently expressly approved by the Court of Appeal in* **Burnden Holdings (UK) v Fielding.**[2147] *David Richards LJ (with whom Tomlinson and Arden LJJ agreed) approved the passage from* **Miller v Bain** *set out in the preceding paragraph*[2148] *and continued:*[2149]

> "The significance of control of a company is that it enables the controller to obtain, in a number of ways, the benefit of the assets of the company, or indeed the assets themselves or their proceeds of sale, provided that all statutory and other legal restrictions are observed. If section 21(1)(b)

[2146] [2002] 1 BCLC 266, at [2] {**R1/35.0.1/2**}.
[2147] [2017] 1 WLR 39 {**R1/61/1**}.
[2148] [2017] 1 WLR 39 48B-C {**R1/61/10**}.
[2149] **[2017] 1 WLR 39** 48B-C {**R1/61/10**}.

> were construed to apply only to those cases where the trustee directly and personally acquires the trust property, its evident purpose would be much constrained and easily avoided. In my judgment, a construction which includes within its terms a transfer to *a company directly or indirectly controlled by the trustee is within the meaning of this provision."*

*8.54* *This extension of principle in* **Miller v Bain and Burnden v Fielding** *can be seen as part of the same direction of travel in the development of the law as that seen in* **Relfo Limited (in liquidation) v Varsani**[2150] *and* **Federal Republic of Brazil v Durant International Corpn**.[2151] *Without it, sophisticated fraudsters such as Mr Al Sanea, who abuse the corporate form and take advantage of the ease with which assets may be moved electronically between jurisdictions, would face little resistance to their activities.*

*8.55* *Accordingly, each of the Defendant companies is in the same position as an express trustee and is to be treated as a "real" trustee within the categories established by Millett LJ in* **Paragon Finance** as applied by **Miller v Bain** and **Burden Holdings v Fielding** *and is liable to account as such. None of them is in any better position than Mr Al Sanea himself to resist AHAB's demand for an account.*

---

[2150] Above. {**R1/52.2/1**}.
[2151] Above. (on appeal from the Court of Appeal of Jersey) {**R1/51/1**}.

8.56 *Several other entities in the Saad Group (or at least controlled by Mr Al Sanea) were employed by Mr Al Sanea in his fraud, which are not before the court. Of greatest relevance are STCC, Awal Bank and TIBC. The interposition of these entities makes no difference to AHAB's claim and does not strengthen the position of the Defendants. In particular, the interposition of these entities does not mean that the Defendants are in any better position to resist AHAB's demand for an account.*

8.57 *Both STCC and Awal Bank were controlled and beneficially owned by Mr Al Sanea, so are in the same position as Mr Al Sanea as accounting parties, on the basis set out above. While AHAB was nominally a shareholder in TIBC, it has been demonstrated in evidence (rigorously tested in cross-examination) that AHAB was not aware of TIBC's operations at the material times and TIBC was under the complete control of Mr Al Sanea or those acting on his instructions. Accordingly, TIBC would also be in no better position than Mr Al Sanea in resisting AHAB's demand for an account.*

8.58 *It does not make any difference to AHAB's claim against the Defendants that STCC, Awal Bank and TIBC are not before the court in the instant proceedings. In Federal Republic of Brazil v*

*Durant International Corporation,*[2152] *the claimant succeeded on far weaker facts. A Brazilian politician (Mr Maluf) took bribes connected with public works contracts. He expatriated the bribes from Brazil using doleirs*[2153] *and offshore companies. Funds were credited to an account (the "Chanani account") in New York. At first instance,*[2154] *and on appeal to the Jersey Court of Appeal,*[2155] *it was contended by the defendants that it was impossible to show that the funds credited to the Chanani account were derived from the fraud: all that could be shown was that the money had come from one or more doleiros, none of whom were before the court and about which nothing was known.*[2156] *The case in respect of the doleiros was far weaker than the case in respect of STCC, Awal Bank and TIBC is for AHAB, because there was no evidence that the doleiros were under the control of the defendants in Durant, whereas it is clear that STCC, Awal Bank and TIBC were under the control of Mr Al Sanea.*

8.59 *Despite this comparative weakness, the Royal Court of Jersey*[2157] *had no hesitation in finding against the defendants on this point and applied the decision of the English Court of Appeal in* **Sinclair**

2152 Above. (Privy Council) {**R1/52.2/1**}.
2153 Brazilian black market currency dealers: see the first instance decision of the R**oyal Court of Jersey** [2012] JRC 211, at [7] {**R1/44.0.C/3**}.
2154 [2012] JRC 211, a decision of Commissioner Howard Page QC sitting with two jurats. {**R1/44.0.C/1**}.
2155 [2013] JCA 71, a decision of James MacNeill QC, Jonathan Crow QC and Sir David Calvert-Smith {**R1/45.2**}. This argument was not appealed to the Privy Council.
2156 [2012] JRC 211 at [203] {**R1/44.0.C/68**}.
2157 [2012] JRC 211 {**R1/44.0.C/1**}.

**Investments (UK) Ltd v Versailles Trade Finance Ltd**, [2158] *which addressed the correct approach to take where evidence of financial transactions has been obscured by a fraudulent* "maelstrom" *or* "black hole". *In a first-instance judgment that was commended by the Privy Council as* "a thoughtful and thorough review of the authorities and academic writings*",*[2159] *the Royal Court held that it was for the defendants* to explain the role of the intermediaries, failing *which, every evidential presumption would be made against them:*[2160]

> "In the present case, the plaintiffs having adduced evidence from which, in the absence of any other explanation, a court would be more than justified in concluding that funds stolen from the Municipality had found their way, within a matter of days, into the Chanani account, the evidential burden shifts to the defendants to displace that conclusion. No countervailing evidence having been adduced by the defendants to demonstrate that the inferred link with the Chanani account is unfounded or that the plaintiffs' original proprietary interest in the stolen money was lost by reason of the rules relating to tracing through mixed bank accounts, the plaintiffs are entitled to invite the court to conclude that the credits to the Chanani account in question represent funds in which the plaintiffs continued to have an unbroken thread of proprietary interest even though they are unable to show – because they have no means of knowing – the exact route by which the funds reached their destination.

---

2158 [2012] Ch 453 {**R1/41/1**}. Since the decision of the Royal Court of Jersey in Durant, the Supreme Court of the United Kingdom in **FHR European Ventures LLP v Mankarious** [2015] AC 250 has overruled Sinclair v Versailles in part (concerning proprietary rights to bribes and secret profits), but the "maelstrom" point applied by the Royal Court, and relied upon by AHAB in the instant case, is undisturbed: see the expressly limited basis of the Supreme Court's overruling of Sinclair at [2015] AC 250, 275C {**R1/47/26**}.

2159 [2016] AC 297 306A {**R1/51/10**}.

2160 *[2012] JRC 211 at [207]-[208] {**R1/44.0.C/69**}.*

> That this conclusion accords with elementary notions of justice is, moreover, underlined by the fact that the plaintiffs' inability to trace the movement of funds step by step in the consequence of the Malufs' (and thus the defendants') deliberate creation of what [counsel] referred to as a 'black hole' or 'maelstrom' of coded bank accounts and doleiros designed to obscure transactions in which they had an interest…"

*8.60 A distinguished Jersey Court of Appeal (James MacNeill QC, Jonathan Crow QC and Sir David Calvert-Smith) upheld the Royal Court on this point,*[2161] *which was not pursued on Mr Maluf's further appeal to the Privy Council.*

8.61 *If every evidential presumption was made in* **Durant** *in respect of intermediaries about which nothing was known, then it is axiomatic that such presumptions must be made in respect of intermediaries that are under the control of, and beneficially owned by, Mr Al Sana who is undoubtedly a wrongdoing fiduciary vis-à-vis AHAB.*

20. To return to AHAB's Opening Submissions at paragraph 710:[2162]

710. *"...AHAB's case is that Mr. Al Sanea owes a duty to account as an express fiduciary. In the case of the GT Defendants, the AwalCos and SIFCO5, AHAB submits that they received the traceable proceeds of AHAB's money with the requisite knowledge of Mr. Al Sanea's antecedent breach of fiduciary duty, so as to render them liable to account. Accordingly, AHAB submits that the*

---

2161 *[2013] JCA 71, at [43] {**R1/45.2/14**}.*
2162 {U/1/270}.

*Defendants have an obligation to account to AHAB for the property they have received, i.e. explain what has become of it. The Defendants' attempts to do that to date have been inadequate and* **Libertarian Investments** *shows that a claimant should not be prejudiced by an accounting party's default in rendering its account.*

711. *Similarly,* [as discussed above], *in* **Sinclair Investments (UK) Ltd v Versailles Trade Finance Limited (in administrative receivership)**[2163]*, the Court of Appeal held that where (as here) a dishonest fiduciary had created a "maelstrom" by means of a huge number of circular payments (referred to in the judgment as "cross- firing"), an inability to identify with precision exactly what had happened to the claimant's money did not defeat the claimant's tracing exercise and that the onus should be on the fiduciary to establish the part of the mixed fund which is the fiduciary's property.*[2164] *Further, the reversal of the burden of proof which Sinclair supports is not limited to the dishonest fiduciary himself: a third party liable in knowing receipt or dishonest assistance is required to account as if they were an*

---

[2163] *[2012] Ch 453 {R1/41/1}*

[2164] *[2012] Ch 453 at 492* ***{R1/41/40}****, per Lord Neuberger MR. Sinclair has been overruled in part by the Supreme Court in* ***FHR v Mankarious*** *[2015] AC 250, but the "maelstrom" aspect of Sinclair is undisturbed: see [2015] AC 250, 275C* ***{R1/47/26}****.*

*express trustee, so the evidential requirements for tracing are the same.*[2165]

712. *In short, the Defendants cannot rely upon AHAB's lack of information about precisely how the money travelled from AHAB to the Defendants and for what purpose, if the Defendants themselves are not able to fill that gap.*

*"Unauthorised profits*

713. *It appears that the Defendants may have misunderstood AHAB's claim to the proceeds of the Letters of Credit (LCs). We address it briefly here.*

714. *AHAB puts its claim to the proceeds of the LCs not merely on the basis of tracing, but also on the footing that the fruits of the LCs were themselves unauthorised profits made in breach of Mr. Al Sanea's fiduciary duty and, accordingly, AHAB has a proprietary right to them. This is consistent with the recent decision of the English Supreme Court in FHR, which made it clear that a beneficiary or principal has a proprietary right to unauthorised profits obtained in breach of fiduciary duty the moment that such unauthorised profit is made. The same approach is adopted in*

2165 *The "maelstrom" principle in **Sinclair v Versailles** was expressly applied to a "maelstrom" created by non-fiduciary launderers by the Royal Court of Jersey at first instance in **Federal Republic of Brazil v Durant** [2012] JRC 211, para.210-211 **{R1/40.0.C/71}**. This aspect of the Royal Court's decision was not appealed to the Privy Council, who commented that the Royal Court's judgment included "a thoughtful and thorough review of the authorities and academic writings": [2016] AC 297, 306A **{R1/51/10}**.*

*Australia,*[2166] *which was referred to with approval in FHR.*[2167] *AHAB's claim to the proceeds of the LCs is as follows:*

*(1) Mr. Al Sanea would not have been able to cause AHAB to open the letters of credit had he not been AHAB's fiduciary;*

*(2) the entire scheme to open the LCs was a fraud perpetrated by Mr. Al Sanea for his own or his associates' benefit;*

*(3) procuring the opening of LCs with such an object was a breach of fiduciary duty;*

*(4) the payment of massive sums to sham accounts at TIBC purportedly in the names of genuine suppliers – but in fact held for the benefit of Mr. Al Sanea - was outside the scope, and was an abuse, of Mr. Al Sanea's fiduciary duty; and*

*(5) any payment made by an issuing bank to sham accounts under Mr. Al Sanea's control was an unauthorised profit made by Mr. Al Sanea in breach of fiduciary duty.*

715. *Thus, based on* **FHR,** *AHAB is entitled to assert a direct proprietary claim to the proceeds of the LCs the moment they were paid out to the sham accounts of the fake loan customers. Mr. Al Sanea should have accounted to AHAB as soon as the funds came*

---

2166 Grimaldi v Chamelon [2012] FCAFC 6 {R1/43/1}.
2167 [2015] AC 250, 273F-G {R1/47/24}.

*under his control and could not apply the funds for his own benefit. AHAB's proprietary right arose as soon as the issuing banks paid out on the LCs. Accordingly, AHAB does not need to trace through the LCs: AHAB's proprietary right arose immediately upon the payment out of the funds."*

*"Unjust enrichment*

716. *We also take the opportunity here to explain, with regard to unjust enrichment claims, that the current state of English law based on the Supreme Court's recent decision in* **Menelaou v Bank of Cyprus**[2168] *is that recovery is possible against an indirect recipient provided that there is a sufficient causal connection between the payment in question and the enrichment of the recipient. AHAB contends that there is.*

717. *Furthermore,* **Menelaou** *establishes that proprietary remedies are available in response to a successful unjust enrichment claim. Accordingly, this offers AHAB a second legal basis for claiming the return of its assets currently in the Defendants' hands."*

21. In its written closing submissions[2169] SIFCO 5 responds to these arguments of AHAB based on the **Menelaou** case in the following terms which I accept:

"125. *Even if this [AHAB's] was the correct interpretation of Menelaou (which is highly doubtful), this interpretation of English law*

[2168] [2016] AC 176 {**R1/52/1**}.
[2169] {**E1/30/56-59**}.

*cannot survive the decision of the Supreme Court in* **Commissioners for HM Revenue and Customs v Investment Trust Companies (In Liquidation)** [2017] UKSC 29.

126. *The facts of ITC were relatively straightforward:*

(1) *The ITCs were investment trusts that sought to reclaim refunds of mistakenly paid VAT. The ITCs had been charged a notional £100m VAT on the services provided by their investment managers ("the IMs"). The IMs in turn had passed on to the commissioners £75m, being the net of VAT collected ("output tax") and the VAT paid ("input tax"). Although the IMs had been able to recover some of the VAT for the ITCs they could not recover more than £75 actually paid by them and the statutory recovery mechanism imposed a limitation period. The ITCs sought the shortfall from the commissioners on the grounds of unjust enrichment.*

(2) *There was no direct transfer of value from the ITCs to the commissioners. The case therefore raised the question whether enrichment had to be direct.*

(3) *Henderson J held that the commissioners had been unjustly enriched for the full extent of the £100. but that the ITCs could not recover the lost years. The Court of Appeal held that the ITCs could recover in respect of the lost years but*

*could not recover more than the £75 which the commissioners had received. Both Henderson J and the Court of Appeal considered that the "at the expense" requirement could be satisfied without the need for a direct transfer.*

127. *The Supreme Court disagreed. In his careful speech Lord Reed explained why the balance needed to be restored. From this speech it is clear that the* "at the expense of" *limb connotes five basic ideas:*

(1) *First, the process of enriching must have involved a "transfer of value" to the defendant (see* **ITC** *[42]–[43]).*

(2) *Second, the transfer to the defendant must be of a "normatively defective" kind (see* **ITC** *[42]–[43]).*

(3) *Third, the claimant must have suffered a "loss" or a diminution in wealth through the provision of that benefit (see* **ITC** *[43]–[45]).*

(4) *Fourth, the general rule is that there must be direct dealings between claimant and defendant: where the benefit has not been received "directly" from the claimant it will be "difficult" to demonstrate that one has been enriched by the other (see* **ITC** *[51]).*

(5) *Fifth, this rule is subject to limited "exceptions" primarily when the general law is otherwise prepared to treat certain*

*transactions as "equivalent" to a direct transfer (see* **ITC** *[52]).*

128. *As an example, Lord Reed cited the arrangement in* **Relfo** *which had been found to be a sham for the precise purpose of concealing the defendant's involvement (see* **ITC** *[48]). "As a matter of substance, or economic reality, [the defendant] was a direct recipient" (see* **Relfo** *[99]).*

129. *Similarly, a court might look behind the corporate veil to identify the real recipient when companies have been interposed to conceal their identity or been established to evade liability (Lord Sumption's "concealment" or "evasion principle" in* **Petrodel Resources v Prest** *p484 [28]).*

130. *However, AHAB has been able to establish no such link in the case of SIFCO 5 [or in the case of the other Defendants as will be discussed in turn below]. AHAB has relied solely upon the debunked swollen assets theory and a misguided attempt to reverse the burden of proof in order to show any link at all between the payments from the Money Exchange to Mr Al Sanea and STCC and the payments from SICL to SIFCO 5. That is insufficient to establish a tracing claim, it is even more insufficient to establish equivalence for the purposes of unjust enrichment.*

***Good Consideration***

131. *In any event, given that good consideration was provided for all of the payments received by SIFCO 5 under the terms of the arrangement between SICL and Barclays and the ASO* [to be discussed in Section 7C below] *there can be no question of any enrichment of SIFCO 5 being unjust (see* **Fairfield Sentry PC [2014] 1 C.L.C. 611**, *a case where the contractually conferred benefit was the payment of money; see paragraph 18.*

***<u>Unjust Enrichment as a substitute for tracing</u>***

132. *In its opening, AHAB also argues that:*

> *"*Menelaou *establishes that proprietary remedies are available in response to a successful unjust enrichment claim. Accordingly, this offers AHAB a second legal basis for claiming the return of its assets currently in the Defendants' hands."*

133. *This is plainly misconceived. If unjust enrichment could supply a remedy against a third party whenever the law of property would refuse one, the strictures of tracing could simply be ignored. Why would it then be necessary, for example, for the claimant to establish a proprietary base at all?*

134. *This is not a substitute for tracing funds through chains of transferees in circumstances where the chain of transfers was not preordained, close in time or uncertain. There is no clear chain from AHAB to SIFCO 5.*

135. *Nor can indirect enrichment be used so as to ignore separate corporate personality of SICL and SIFCO 5 or AWAL Bank and SIFCO 5 as to do so would be contrary to public policy (see* **Petrodel Resources v Prest [2013] 2 A.C. 415**.

136. *Further, even if unjust enrichment could in theory ground a proprietary claim (such statements in* **Menelaou** *being controversial and obiter dicta at best), there would be no justification for doing so on these facts given that, as set out above, AHAB has failed to establish that it has a personal claim in unjust enrichment.*

22. The foregoing analysis on behalf of SIFCO 5 shows, in my view, that AHAB's argument based upon the UK Supreme Court decision in **Menelaou** is misconceived. In any event, again, AHAB has failed to prove the pleaded fraudulent breach of trust and the "*sufficient causal connection between the payments in question and the enrichment of the recipient*".

23. For example, in the case of SIFCO 5 as will be discussed in detail below, the payments in question were made pursuant primarily to the terms of an Accreting Strike Option (ASO) by means of funds provided by Barclays Bank and SICL. AHAB has shown (and could show) **no** connection between funds leaving the Money Exchange and those funds.

24. And specifically, also as regards the alleged use of TIBC to defraud AHAB of the proceeds of the LCs, there is the overwhelmingly clear evidence that AHAB Partners knew about and at least implicitly authorized Al Sanea's use of TIBC (and the other

Bahraini Financial Businesses)[2170] for ongoing borrowing from foreign banks. This program of borrowing escalated after it became clear to Saud Algosaibi that further unrestrained borrowing from the local banks would no longer be possible because of their common ability to monitor AHAB borrowing through the SAMA clearing system.[2171] I note here again also, that Al Sanea's borrowing through TIBC for his own purposes was as meticulously recorded within the Money Exchange's Ledger 3 as was all his other indebtedness.

25. Set out following are the AwalCos' written submissions[2172] on tracing which were adopted by the other Defendants. Here too, I will interpose where still necessary in light of my foregoing conclusions on the rules of tracing, my conclusions on the areas of disagreement with AHAB's submissions.

*"THE APPLICATION OF INFERENCES TO TRACING*

337. *At §691 to 707 of the Written Opening Submissions[2173] AHAB sets out its submissions on the role of inference in a tracing claim. However, by knitting together a series of authorities outlining exceptions to the fundamental requirements of tracing, perspective is lost. It is akin to looking down a telescope from the wrong end. It is suggested that the better way to understand the role of inference is to establish first, where the starting position is. The starting position is the requirement to prove a chain of*

---

2170 As considered above under "AHAB Partners' knowledge and Authority" and as examined in greater detail in the Defendants Closing Submissions at {**E1/17/1**} (Knowledge of the Financial Businesses) - Submissions which I accept.

2171 See above under "AHAB Partners Knowledge and Authority" and {**N/675**}, {**N/676**}, {**N/589**}, {**N/541/1**} {**G/3773/17-24**}.

2172 {**E1/29/127**}.

2173 *{**U/1/262**}{**U/1/268**}- as excerpted above.*

*transactions linking the expropriation of the plaintiff's money with a receipt or receipts into the hands of a defendant and the subsequent use to which that receipt or receipts is put.*

The Rules of Tracing

338. *"Tracing" must be distinguished from "following". "Following" describes the process whereby an owner recovers his property in the hands of another. "Tracing" "identifies a new thing as the potential subject matter of a claim, on the basis that it is the substitute for an original thing which was itself the subject matter of a claim".Calnan[2174] describes the difference as follows:*

> "A owns a taxi. He allows B to operate it. B sells the taxi to C for cash without obtaining A's permission. A has a personal claim against B for converting his taxi, but he also has two potential proprietary claims: A may be able to recover his original asset - the taxi - from C…
>
> Alternatively, A may be able to claim a proprietary interest in the substitute asset - the proceeds of sale held by B. His ability to do so depends on whether he is able to trace his ownership of the taxi into its proceeds."

339. *In the case of money, tracing is far more common than following simply because, when money is transferred from one account to another, one chose in action replaces another. The owner of the money is not following specific notes and coins, but tracing substitutes of what was once a debt owed to him.*

2174 *Proprietary Rights and Insolvency §7.04 {**R2/8/2**}.*

340. *There are very specific rules that determine whether a given asset can be regarded as the substitute for another asset. The process of tracing is not discretionary, but rule based. Although the fact that a wrongdoer has misappropriated another's property is necessary to create the plaintiff's claim, the fact that such a claim exists does not mean that the plaintiff can necessarily trace. Tracing can only occur where the plaintiff can prove (the burden being on him) that some property in the hands of the misappropriator represents the substitute of what was once his asset.*

341. *In short, property rights are specific to a particular thing. Unless a plaintiff can show - by the rules of tracing - that a particular thing held by a defendant represents the traceable proceeds of property that was the plaintiff's, the plaintiff can have no claim to the defendant's property at all. The point is very well put by Smith*[2175]:

> "The ability to assert proprietary rights in traceable proceeds is sometimes attacked on the ground that it leads to unfairness among claimants. In the context of a bankruptcy, it may be that one claimant is able to trace into some asset and another is not. It is said to be arbitrary that the first claimant should be able to recover in full, while the other should be reduced to claiming as a creditor with the inevitable loss which that entails. The important point is that the source of any arbitrariness lies not in the ability to claim traceable proceeds; it derives from the nature of proprietary rights themselves. Proprietary rights always have a specific subject matter. When that subject matter is

---

[2175] The Law of Tracing pp 303-304 {**R2/6.1/4**}.

destroyed, so are the rights. As James Steven Rogers has written:

> "Suppose that Oswald and Tom each own a 1928 Ford Model T. Tom then steals Oswald's. Each morning, Tom flips a coin to decide which car to drive. One day, he drives one of the flivvers off a cliff. Tom then sells the remaining car to Barney and disappears. Can Oswald get the remaining Model T back from Barney? The answer depends on which car was crashed and which was sold. If Tom crashed Oswald's car, then Oswald is left with a worthless cause of action against Tom, and Barney keeps his car. If Tom crashed his own car, then Oswald gets his car back from Barney and Barney is left with a worthless cause of action against Tom.
> …
>
> There is no question…that Tom is a bad fellow. He ought to have his knuckles rapped, and either be rehabilitated or drawn and quartered depending on the mores of the time. That, however, tells us nothing about whether Oswald or Barney should suffer the loss. There really is no terribly compelling ethical basis, or at least none arising out of the equities of the particular case, for choosing between Oswald and Barney. The outcome depends solely on the coin toss that controlled which car Tom would drive the day he crashed. That may seem arbitrary, but nobody said life was going to be fair. It's a terrible shame some people's cars get destroyed and other people's cars don't, but that's just the way it is. Or, more to the point, that's what it means to say this is my car and that is your car".

342. *Tracing* ***i****s the process by which a plaintiff identifies property as his. In* **Foskett v McKeown**[2176] *Lord Millett stated:*

---

[2176] *[2001] 1 AC 102 at 128D-F {**R1/33/27**}.*

> "Tracing is thus neither a claim nor a remedy. It is merely the process by which a claimant demonstrates what has happened to his property, identifies its proceeds and the persons who have handled or received them, and justifies his claim that the proceeds can properly be regarded as representing his property. Tracing is also distinct from claiming. It identifies the traceable proceeds of the claimant's property. It enables the claimant to substitute the traceable proceeds for the original asset as the subject matter of his claim. But it does not affect or establish his claim. That will depend on a number of factors including the nature of his interest in the original asset…The successful completion of a tracing exercise may be preliminary to a personal claim…or a proprietary one to the enforcement of a legal right…or an equitable one."

343. *Tracing at law is very difficult in the case of money because the common law does not allow tracing into mixed funds or (generally) the tracing of intangibles. AHAB accepts that it is seeking trace in equity and not at law.*

344. *It is worth briefly identifying some of the circumstances in which tracing will end, assuming Cayman law applies. Thus, if the substitute asset in question has ceased to exist, it can no longer be traced* ***. In particular, if money is paid in reduction of an overdraft, the asset ceases to exist. In the case of bank accounts, if assets have been mixed, a plaintiff will not be entitled to any subsequent additions to the mixture. Finally, it is clear that where the substitute asset is acquired by a bona fide purchaser without notice, the asset again can no longer be traced****.* ***[emphasis added]***

26. Whilst I agree with the description of the process and legal consequences of tracing as set above by the AwalCos, I disagree with the notion that the principles do not permit of tracing into an overdrawn bank account or one that contains mixed funds (the words last in emphasis above). I accept that it is normally sufficient to prevent tracing if the funds are paid into an overdrawn bank account: **Re Goldcorp (above**). But this presumption can be overcome in circumstances where a different inference is justified, for instance where the court can be satisfied that the "*various steps (taken to launder the proceeds of fraud including payment into an ostensibly overdrawn account) are part of a co-ordinated scheme"* to obfuscate the movement of the proceeds. What matters is the showing of the co-ordinated transactional links. It is in this context that I recognise the principles most authoritatively stated in **Durant**, as discussed above. However, as becomes apparent below, there was no real disagreement from the AwalCos about the application of these principles

27. To return to the AwalCos' submissions:[2177]

> 345. *"In* **Steamship Mutual Underwriting Association Ltd v Trollope & Colls Ltd**[2178] *May LJ observed that it is an abuse of process for a plaintiff to commence proceedings where he "has no reasonable evidence or grounds on which to serve a statement of claim"*[2179]*. This was endorsed by Cooke J in* **Nomura International plc v Granada Group Ltd**[2180] *which, although a decision post-dating the introduction of the Civil Procedure Rules*

[2177] {E1/29/129}.
[2178] *(1986) 33 BLR 81 {R1/13.2/1}.*
[2179] *(ibid) @ p87 {R1/13.2/7}.*
[2180] *[2007] 1 CLC 479 {R1/37.5/1}.*

*paid express regard to the position under the old Rules of the Supreme Court. In paragraph 37 of the judgment, Cooke J stated*[2181]*:*

> "If a claimant cannot do that which is necessary to prosecute the claim by setting out the basis of it, even in a rudimentary way, a claimant has no business to issue a Claim Form at all 'in the hope that something may turn up'."

346. *As regards pleading claims in contract and tort (which were the claims Nomura was seeking to bring), Cooke J stated*[2182]*:*

> "Insofar as it sought to make any claim in contract, it would be necessary for it to be able to identify the particular contract and the alleged breach. In the case of any breach of tortious duty, it would be necessary for it to be in a position to identify the essential acts or omissions which constituted the breach of duty, negligence or negligent misstatement. For the purposes of negligent misstatement, Nomura would have to be able to identify what advice or information was inaccurate and what was given negligently, at least in essence. If Nomura was not in a position to do this, it was not in a position properly to issue a claim, since it could not have proceeded properly to plead Particulars of Claim without the off chance occurring that something would turn up".

347. *Where it is alleged that a plaintiff can trace into someone else's property and that that person holds that property beneficially for the plaintiff, it is incumbent upon the plaintiff to plead each element of the chain linking the original misappropriation with the property held by the defendant. Any claim that involves proving equitable title by tracing must allege a chain of title, that being the*

---

2181 *(ibid) @ p497A-E {R1/37.5/19}.*
2182 *(ibid) @ p498C-E {R1/37.5/20}.*

*essence of tracing. The plaintiff must show how a substitute of the property that he once held ended up with the defendant.*

348. *Of course, this will just be the beginning of the exercise, for the chain can then be examined to see whether the defendant does indeed hold what may be said to be the plaintiff's property according to the rules of tracing. Necessarily, this means looking at every link of the chain. Suppose B misappropriates US$10m of A's money, and the allegation is that a substitute of that US$10m has ended up with E. The chain of title will look like this*:

*A ' B ' C ' D ' E*

349. *It may be that A can successfully trace the US$10m to E, but that will depend on all of the facts. If the US$10m was paid into C's bank account which was US$20m overdrawn, then the tracing claim will fail at that point. Equally, the claim will fail if C was a bona fide purchaser for value without notice.*

*Inferences*

350. *Whilst AHAB have cited a number of cases where inference may be allowable in substitute for direct evidence of a link, or links, in the chain, it is important to recognise that this is the limit of the role of inference. It is impermissible to rely upon a mere assertion of receipt of monies. It is also impermissible to rely upon a receipt of monies without linking that to a specific misappropriation, or set of misappropriations to found their receipt-based claims.*

351. *That is tantamount to reliance upon the so-called "swollen assets" theory of tracing that has long been discredited.*[2183] *Put simply, this is the theory that a claimant, with a beneficial interest in the original asset ought to be given priority over the unsecured creditors of the recipient even if he is unable to identify the substitute of that specific asset merely by virtue of the fact that there was a receipt into the recipient's estate.*[2184]

352. *That theory has been comprehensively rejected in a number of cases*[2185]*. The Court has already held in these Proceedings that AHAB cannot avail itself of the "swollen assets" theory. In the* ***December 2011 Judgment*** *the Court held:*

> "It is not open to AHAB to overcome an inability to trace its specific property by instead asserting a general proprietary right to or lien over the assets of the Defendants in liquidation, merely on the basis their assets have been or must have been "swollen" by the contribution made to them by Mr. Al Sanea with what is alleged to be AHAB's money misappropriated by him. The so-called "swollen assets theory" - as derived from the obiter dictum of Lord Templeman in the Privy Council decision in Space Investments v Canadian Imperial Bank of Commerce (Bahamas) Ltd [1986] 1 WLR 1072 - has been distinguished by the Privy Council itself (in Re Goldcorp [1995] 1 AC 74) and the theory rejected in later cases, including in Serious Fraud Office v Lexi Holdings (above)."[2186]

---

2183 Bishopsgate Investment Management Ltd v. Homan [1995] Ch 211, 220ff {R1/23.1/10}.

2184 Space Investments Ltd v Canadian Imperial Bank of Commerce (Bahamas) Ltd [1986] 1 WLR 1072, 1074 {R1/13.3/3} per Lord Templeman.

2185 Re Goldcorp Exchange Ltd [1995] 1 AC 74 , 109–110 {R1/22/36}-; Bishopsgate Investment Management Ltd v. Homan [1995] Ch 211, 217-219 {R1/23.1/7-9}; Serious Fraud Office v Lexi Holdings [2009] QB 376, [49]-[53] {R1/39.2/18-19}.

2186 December 2011 Judgment, [36].

353. *The following principles can be extracted from the authorities.*

*(3) The "swollen assets" theory does not enable a plaintiff to circumvent facts which will defeat a trace (e.g. an overdrawn account or the lowest intermediate balance rule).*[2187]

*(4) There must be a nexus between the assets in the recipient's estate and the misappropriated funds. If there are no assets left in existence identifiably derived from the misappropriated funds the claim must fail.*[2188]

354. *The onus is, and remains upon, the plaintiff to prove the necessary nexus and to prove the existence of assets derived from the misappropriated funds. There is no burden- shifting, such as AHAB seeks to rely upon.*[2189]

355. *Of course, the rules of tracing do not permit of evasion where transactions are deliberately structured to avoid their operation. For instance, it may be appropriate to* ***disapply*** **Clayton's Case** *where the claimant is one of a number of common victims of a large scale fraud.*[2190] ***[emphasis added].*** *On the same principle, the Court will be slow to allow a trace to be defeated by the deliberate*

---

2187 **Re Goldcorp Exchange Ltd** [1995] 1 AC 74, 105 {**R1/22/32**}, per Lord Mustill (for the whole Board, which included Lord Templeman); **Bishopsgate Investment Management Ltd v. Homan** [1995] Ch 211, 219 {**R1/23.1/9**}.

2188 **Serious Fraud Office v Lexi Holdings** [2009] QB 376, [50] {**R1/39.2/18**}.

2189 **Serious Fraud Office v Lexi Holdings** [2009] QB 376, [53] {**R1/39.2/19**}.

2190 **Barlow Clowes International Ltd v Vaughan** [1992] 4 All ER 22, 39 {R1/19/18} El Ajou v Dollar Land Holdings (No 2) [1995] 2 All ER 213, 222 {R1/23.2/10} **Commerzbank Aktiengesellschaft v IMB Morgan Plc and Others** [2004] EWHC 2771 (Ch), [48] {R1/36.2/19}.

*interpolation of ostensibly unconnected legitimate transactions. Similarly, where transactions were ordered*[2191] *with the deliberate intent of frustrating a subsequent tracing of misappropriated funds, the Court may be willing to re-order transactions. In such cases, the court may be willing to infer, in the absence of clear evidence of a link the chain, the existence of that link. Thus:*

(1) *In* **Relfo Limited (In Liquidation) v Varsani**[2192] **,** *the fact the claimant was unable to adduce evidence of specific transactions linking the wrongful payment out of the claimant's account of £500,000 with a payment of £500,000 (less 1.3%) into the defendant's account on the same day did not defeat the trace. The court was entitled to draw the inference of such link given, amongst other things, evidence showing a link(ed) transaction had been intended, the close relation in time and amount of the sums and the absence of any other reason for the payment to the defendant.*[2193]

(2) *However, this approach was not a departure from the property rights-based and evidential approach to tracing, as Arden LJ stressed*: "[t]racing is not a matter of discretion but of property rights: **Re Montagu's Settlement Trust**

---

2191 That is the crediting to an account the 'true' source of a withdrawal later than that withdrawal was effected.
2192 Above {R1/46/1}.
2193 ***Relfo Limited (In Liquidation) v Varsani*** *[2014] EWCA Civ 360 at [5]-[25], [28]-[68] {**R1/46/2-14**}.*

**[1987] Ch. 264 at 285B-C.** per Megarry J. There must [be] something in the nature of a series of direct substitutions"[2194].

(3) *In* **Federal Republic of Brazil v Durant**[2195] *the fact that (i) three of a total of a series of bribes were paid into an account some days after the money was paid out of that account to the first defendant; and (ii) on two occasions payments had been made from the account to the first defendant's account which exceeded the maximum which could be said to have come from the bribes and therefore had to have come from other sources, did not prevent the court from inferring the bribes and the receipts into the first defendant's account were linked. The Privy Council held that a:* "a court should not allow a camouflage of interconnected transactions to obscure its vision of their true overall purpose and effect. If the court is satisfied that the various steps are part of a co-ordinated scheme, it should not matter that, either as a deliberate part of the choreography or possibly because of the incidents of the

2194 **Relfo Limited (In Liquidation) v Varsani** [2014] EWCA Civ 360 [28] {R1/46/6}.
2195 [2016] AC 297 {R1/51/1}.

banking system, a debit appears in the bank account of an intermediary before a reciprocal credit entry".[2196]

(4) The Privy Council was prepared to accept an inference could be drawn, notwithstanding the timing of payments, where the necessary transactional link was established. The defendants did not dispute the relevant payments were linked. The Privy Council rejected the general proposition that money utilized in repayment of a debt could be traced into the asset acquired in return for the debt, noting:

> "the plaintiffs submit, as Professor Smith argues, that money used to pay a debt can in principle be traced into whatever was acquired in return for the debt. That is a very broad proposition and it would take the doctrine of tracing far beyond its limits in the case law to date. As a statement of general application the Board would reject it. The courts should be very cautious before expanding equitable proprietary remedies in a way which may have an adverse effect on other innocent parties. If a trustee on the verge of bankruptcy uses trust funds to pay off an unsecured creditor to whom he is personally indebted in the absence of special circumstances it is hard to see why the beneficiaries' claim should take precedence over those of the general body of unsecured creditors"[2197].

28. I note here that it is based upon the immediately foregoing discussion of the **Relfo** and **Durant** cases in particular, that I discern the agreement between AHAB and the Defendants on the principles which they decide, even while the parties disagree on the

---

2196 **Federal Republic of Brazil v Durant** [2016] AC 297, [38] {R1/51/15}.
2197 **Federal Republic of Brazil v Durant** [2016] AC 297, [33] {R1/51/15}.

way in which they may be applied. I here confirm my agreement with the Defendants on the way in which they may be applied and as set out following from the AwalCos' submissions and as I will come at the end to summarize. First I return to the AwalCos' submissions:[2198]

356. *"The rules of tracing are just that – rules. Unless there are clear-cut rules, one personal claimant will be able – reformulating a personal claim into a proprietary one – illegitimately to leapfrog rival claimants to a limited pot of money. The following points particularly need to be noted:*

*(1) First, where there is no direct evidence of a specific transaction forming a link in the chain, there may nonetheless be sufficient circumstantial evidence of receipt of misappropriated funds from which the court could infer the missing link or links. What is sufficient will always be fact sensitive. However, it is axiomatic that any inference must be evidentially sound. There is no presumption of receipt.*

*(2) Second, if the plaintiff can establish receipt of misappropriated funds by direct evidence, or if the link between receipt and misappropriation is common ground save for an intervening transaction then, if the plaintiff can establish that intervening transaction is part of a co-*

2198 {E1/29/133}.

*ordinated scheme of outward and inward movement of assets designed to defeat tracing, the Court may repair the break in the link in the chain by inference.*

*(3) In any event, such flexibility does not and cannot warrant an abandonment of the rules of tracing so as to absolve a claimant from having to establish the close causal and transactional links between an asset in the hands of the defendant and allegedly misappropriated funds.*

<u>Conclusion</u>

357. *AHAB's apparent assertion that by merely pleading AwalCos' receipt of AHAB monies the burden of proof is reversed and a duty imposed on the AwalCos to account is, regardless of any issue of attribution of knowledge, unsustainable. It is AHAB's burden to establish, on the evidence, that the AwalCos received funds misappropriated from the Money Exchange. It has failed to do to that.*

*R. 13 CAUSES OF ACTION AGAINST THE AWALCOS*

358. *As has already been explained [in Section R.4. above[2199]], all of AHAB's claims against the AwalCos require it to prove that the AwalCos received monies belonging to AHAB. This it cannot do,*

---

2199 In the AwalCos' written Closing Submissions at {**E1/29/13-22**}, by reference to the expert evidence of Messrs David Lawler and John Hourigan, the AwalCos' accountancy experts, in response to Mr Hargreaves.

*for all of the reasons already explained, and as such all of AHAB's claims must fail.*

359. *Even if, contrary to that contention, AHAB was able to trace into the assets of the AwalCos, the legal principles explained by SIFCO5 in Section S.V. also apply to the AwalCos. Further, none of the AwalCos' actions can properly be described as "assistance" (or dishonest); AHAB has failed to identify any agreement between the AwalCos and Al Sanea to "act as a repository for the proceeds of fraud". Even if (which is denied) the AwalCos received AHAB's monies they could only have done so by a very circuitous route or routes, as to which AHAB has adduced no evidence. Plainly that is insufficiently direct for a claim in unjust enrichment.*

360. *AHAB's claims based on dishonest assistance; conspiracy; and unjust enrichment must fail, and should be dismissed".*

29. On the basis of the foregoing line of authorities[2200] (which I recognize as highly persuasive and as being applicable here), AHAB seeks to assert as against the Defendants, a liability to account on the basis of their dishonest involvement with Al Sanea and knowing receipt of the proceeds of his fraud against AHAB. The Defendants are said to have participated with Al Sanea in the creation of the "maelstrom" and to have been involved with him in the "cross-firing" of transactions. Thus branded as constructive trustees, the Defendants would become subject to the reversal of the burden

[2200] **FHR European Ventures {R1/47/1}, Libertarian Investments {R1/45/1}, Miller v Bain {R1/35.0.1/1}, Paragon Finance {R1/31.0.1/1}, Burnden Holdings (UK) {R1/61/}, Durant {R1/50/1} and Sinclair v Versailles {R1/41/1}** (all above).

of proof and impressed with a duty to account, which was AHAB's ultimate attempt at overcoming the evidential obstacles facing its proprietary claims. Here too, however, the case law nonetheless requires that AHAB must first prove the antecedent breach of trust by Al Sanea, before it might rely on this line of cases towards the "*reversal of the burden of proof*" for which it contends. I state again that AHAB has failed to do so.

30. At all events, AHAB also had to prove that <u>its</u> money reached the Defendants before it would have been entitled to this reversal of the burden of proof, and so being entitled to call upon the Defendants "*to fill in the evidential gaps*". For proof of this crucial element of its case, AHAB sought primarily to rely upon the evidence of Mr. Neil Hargreaves who was asked to identify transfers by Al Sanea from the Money Exchange to the Defendants by way of the so-called "Money Out Schemes" (cheques, letters of credit and electronic transfers). In his report,[2201] Mr. Hargreaves immediately recognized[2202] that "*The apparent use by MAS of the Money Exchange as a general source of funding for the various MAS-related companies (particularly STCC), and the extent of mixing and churning of funds makes the exercise of tracing difficult*".

31. The significance of the role of STCC should not be understated. STCC, as the Saudi head office of the Saad Group, was the hub of its wheel. The vast majority of transfers out of the Money Exchange alleged to have gone to the Saad Group went to STCC. There was also a very large flow of funds the other way, to the Money Exchange from STCC.

---

2201 {**I/2/1**}.
2202 At {**1/2/6**} at [6].

32. As appears from its published financial statements, not only did STCC hold very large portfolios of assets[2203] but itself had also incurred large amounts of debt from many banks.[2204] Given this source of wealth and funding raised independently of funding obtained by STCC through the Money Exchange; without disclosure of its internal financial records and bank accounts, it was not possible in the trial to identify and trace (in the traditional sense of chains of linked of transactions) through STCC to the Defendants, funding which originated with the Money Exchange. AHAB, having decided not to join STCC as a defendant to these proceedings, had no way of compelling it to give that kind of crucially important disclosure. AHAB must therefore accept the consequences of the evidential weaknesses in its case – weaknesses which cannot be made good simply by reliance upon the kind of evidential presumptions discussed above in the case law in the absence of evidence of receipt of its money by the Defendants.

33. Despite the absence of transactions linked to the Defendants, Mr. Hargreaves reported[2205] that "*I have been able to draw various inferences as set out below about the likely movement of very large amounts of cash from the Money Exchange to the Defendant companies.*"

34. For this exercise Mr. Hargreaves, as he explained throughout his report, relied upon what he identified as "patterns" of movement of sums of money which, having left the Money Exchange accounts to STCC, there then followed movements (many of which were not contemporaneous), in the accounts of some of the Defendants which he opines gives rise

---

[2203] Davies 1W {**1/6/78**}, where total assets are shown as ranging from US$1.43bn as at Y.E 2004 TO US$14.27 bn as at Y.E 2008.

[2204] Davies 1W {**I/6/79**}, where total borrowing by STCC is shown as having ranged from US$0.6bn as at Y.E. 2004 to US$4.3bn as at Y.E. 2008.

[2205] Ibid.

to the inferences that all of those transactions are linked.[2206] Typically what this meant was that money was shown to leave the Money Exchange primarily to STCC (by one means or another of the Money Out Schemes) and certain sums were shown to have been later paid by STCC to AWAL Bank and on to the AwalCos or on to SICL or Singularis.

35. Further transfers of cash were found to have been made by SICL to SIFCO 5. Some transfers were shown to have been made directly from the Money Exchange to SICL and the reason for these became the subject of much debate.[2207]

36. I set out here the illustrative flow chart from Mr. Hargreaves' report.[2208]

---

2206 For the exercise Mr Hargreaves relied upon three main sources of information {**I/2/6-8**}: 1. The Cenza "Transactional Database" into which had been transferred the information from all the hard copy bank and bank asset statements provided by AHAB and the Defendants; 2. A copy of AWAL Bank's accounting system in Microsoft Excel Format ("MIDAS"). Midas contains the accounting data for AWAL Bank ( which sits at the Apex of the AwalCos) and for the AwalCos and was used to identify transactions relevant to Mr Hargreaves "tracing" exercise and to corroborate the nature of transactions identified through his review of AWAL Bank and AWALCOs bank statements. 3.Other documents within the Parties' discovery which could assist with finding links or corresponding postings to bank statements available within the Transactional Database and postings in the MIDAS database which link cash flows to key events such as capital distributions taking place to the Defendants (presumably from Al Sanea as their principal).

2207 One of these was the payment for the Palmer Square bonds which I regard as a proven linked transaction that could have satisfied the principles of proprietary tracing but for AHAB's failure to prove that Al Sanea lacked authority.

2208 {**I/2/12**}.




37. At the end of the day, what Mr Hargreaves' evidence amounted to was that the "patterns" he observed may be relied upon for the drawing of inferences that they represented money originally transferred from the Money Exchange to STCC.

38. Missing from Mr. Hargreaves' analysis however (as it is from his flow chart above), is the fact that STCC was itself the recipient of large amounts of funding from third party banks (as mentioned above). For the clear and obvious reason that there may well likely have been other sources of funding within STCC from which the identified payments could have been funded, Mr. Hargreaves' "patterns" was not a sound basis for the drawing of such inferences, let alone in this context, as proof of a proprietary tracing claim.

39. I think that it is also fitting to note my conclusion here that there was no basis for a finding that as between Al Sanea and the Defendants there was the kind of "cross-firing" of payments or transactions aimed at creating a "maelstrom" as discussed above in the

cases, i.e. deliberately for the purposes of obfuscating the purposes or sources of the payments. While there were elaborate schemes used by Al Sanea – such as the creation of a fictitious client base for TIBC for procuring letters of credit from banks and dubious Forex transactions through the Money Exchange (sometimes rigged in favour of the counter-party Saad entity and even the third party bank to mimic genuine Forex trading), these were all meticulously recorded internally within the Money Exchange ledgers or Deal Management System ("DMS"). The reasonable inference is not that they were aimed at defrauding AHAB but that they were aimed at enabling the Money Exchange to defraud the banks.

40. For such reasons I also do not accept, as AHAB submits, that "*the interposition of (Al Sanea) entities which are not joined before the Court "makes no difference to AHAB's claim.*" Simply referring to these entities as controlled by Al Sanea and seeking to attribute his knowledge to them is insufficient for proof of AHAB's claim unless AHAB also shows their involvement in the alleged fraud. This could only have been done on AHAB's case, by showing that they were in knowing receipt of the proceeds of the fraud.

41. I will come below to consider in the next Sections 7A and 7B to discuss a bit more closely the arguments on the expert evidence, including that of Mr. Hargreaves.

42. Here I express my findings on AHAB's submissions that the Defendants, in their rigid illustration in ANNEX M1 (above)[2209] of the rule in **Clayton's Case**, rely on two fundamental errors in their approach to equitable tracing.

---

[2209] And as the illustration came to inform the "reverse tracing" exercise undertaken by the AwalCos' experts Mr Hourigan and Mr Lawler (considered in the last preceding section) in tracing any connections between the 7 Capital Contributions (paid into the AwalCos by Al Sanea himself or other Saad entities) and funds leaving the Money Exchange.

43. First, that the **Clayton** "rule" does not apply to a case like the present where the contest is not between a claimant and a bank but a "category 2 case", where the contest is between a beneficiary and a dishonest fiduciary (and those who assisted him in his fraud upon his beneficiary). In a case like the present, the notion that payment into a defendant's overdrawn account immediately and invariably extinguishes a proprietary tracing claim even if the account subsequently returns to a credit balance, is wrong.

44. Had AHAB been able in this case to establish the necessary antecedent breach of trust, I would have been compelled to reject the **Clayton rule** as the defining rule for the resolution of the claims. In such circumstances, the Defendants' statement of the principle could not be regarded as correct invariably in light of the principles later settled in **Relfo**[2210] and **Durant**.[2211] These cases explain that the courts may draw reasonable inferences in the tracing process even where substitutions of value in a bank account are non-sequential. I will come below to summarize the principles from these cases as I find them to apply.

45. Moreover, the **Oatway rule**[2212] establishes that where withdrawals from a mixed bank account have been made by a defaulting trustee and used for buying assets which survive or which are traceable into their proceeds of sale, but the credit balance remaining in the account has been dissipated by the trustee, the trustee is not permitted to maintain that the assets bought by him with the money withdrawn from the account or their traceable proceeds of sale, represent his money alone. The assets become subject to a lien in favour of the beneficiary. In the context of a running account which becomes overdrawn from

[2210] Above {**R1/46/1**}.
[2211] Above and to be more fully discussed below {**R1/50/1**}.
[2212] Re Oatway (above) {R1/5/1}.

time to time, the lien attaches to any transfers out to other accounts (in the form of choses in action) for the benefit of the defaulting trustee. It must also follow then, that such a lien would attach to transfers back into the account which may be identified as related to the earlier transfers out.

46. Second, in such circumstances the **Clayton rule** would often result in unfairness. It proceeds on the assumption that the first payment of funds into the dishonest trustee's account containing his funds mixed with traceable proceeds, will be deemed to be the first payment out ("FIFO"), rather than the assumption that the dishonest trustee will have spent his own money first. The invariable application of the FIFO process can result (and in the past has resulted) in injustice because accessible funds remaining in the accounts will be treated as belonging to the dishonest trustee. For this reason, the application of the FIFO process for disentangling the credit balance remaining in an account has been refused in other jurisdictions where the rule in **Clayton's case** (which is still applicable in England in limited circumstances discussed above), has been rejected and the last in first out approach ("LIFO") has been preferred.[2213]

47. Ever since **Re Hallet's Estate**,[2214] where the question is only between the beneficiary and the dishonest trustee (and other assisting wrong-doer) and not other innocent transactors, the rule has been modified, and so long as withdrawals made by the trustee can be attributed to money paid by him into the account, those withdrawals if spent by him, may be attributed to the trustee's own money, leaving the trust money intact.[2215]

---

2213 See for instance **Re Winsor and Bajaj** (1991) 75 D.L.R. (4TH) 198 and the discussion in Lewin on Trusts (op cit) 41-65.

2214 Above {**R1/2/1**}.

2215 Re Hallett's Estate (above) at 726 et seq. {**R1/2/31**} and see Lewin (op cit) 41-66 (where it is described as the "Hallett rule").

48. This rule follows from the general principle cited by AHAB, that where a man does an act which might be rightfully performed, he will not be allowed to say that the act was intentionally, and in fact, done wrongly; so far as possible the honest intention of drawing out his own money must be attributed to the defaulting trustee. Thus, the beneficiary is able to locate the value represented by the trust money paid into the account in the credit balance remaining in the account.

49. The rule is not that withdrawals by the trustee must be attributed to the trustee's own money in priority to the trust money, but rather that the trustee may not say that the money he withdrew was attributable to the trust money if it can be attributed to his own money.[2216] In other words, the **Hallett rule** is the way of applying the principle of subordination to mixed bank accounts- the beneficiary becomes subordinated to the rights of the dishonest trustee.

50. Moreover, especially with regard to dicta cited from **Foskett v McKeown**,[2217] it must now be regarded as settled, that a claimant in equity has the right to trace into a mixed fund or into assets acquired by use of the traceable proceeds.

51. Still moreover, in light of the more flexible approach taken in the modern case law to the drawing of reasonable inferences for the application of the **Hallett rule** to the tracing of trust monies through different running bank accounts, as will be discussed further below, especially in light of the Privy Council's decision in **Durant**,[2218] I accept that those principles are also applicable.

---

2216 Lewin (op cit), Ibid.
2217 Below {**R1/33/1**}.
2218 Above {**R1/50/1**}.

52. However, even if AHAB had been able to establish the antecedent breach of trust by Al Sanea (which it has not), it would still have had to prove (whether by application of the FIFO process, the LIFO process or by inference) the necessary transactional links invariably required by the case law, between its funds taken from the Money Exchange and the accounts of the Defendants. As I will come in the next sections of this Judgment to explain, that requirement was not in my view satisfied by AHAB.

53. Here by way of emphasis, I note that for every proprietary tracing claim, two premises must be established (1) the antecedent breach of trust of fiduciary duty; and (2) the identification of the traced asset or its traceable proceeds in the possession of the defendant.

54. I have expressly above accepted the dicta from **Durant** as being applicable in principle to a case where there is an antecedent breach of trust and where it becomes necessary for the court to draw reasonable inferences from proven facts in order to find the transactional links. As already also stated, this is not such a case. Here, while there were myriad and complex transactions going back and forth between the Money Exchange and Saad entities (some as discussed in the next Sections 7A and 7B), there were apparent commercial reasons for the transactions (albeit that they appear to have been designed mainly to facilitate Al Sanea's and his Saad companies' business objectives). In other words, there is no factual basis for concluding that he used these transactions merely as "an overarching and coordinated campaign to divert AHAB's assets" or as "cross-firing" to create a "maelstrom"[2219] to obfuscate fraudulent activity. The transactions appear to

---

[2219] As described in **Sinclair v Versailles** {**R1/41/1**} (above, and further considered below).

have been invariably and accurately recorded for accounting purposes within the ledgers and DMS of the Money Exchange and, to the extent the records of the Saad entities are available, within their records as well.

55. Indeed, herein lies the fundamental problem facing AHAB- the recitation of this dicta from **Durant** (and the other modern cases further discussed below) is no substitute for proof of the transactional links, even if it is accepted that they need not have been sequential. Recognizing this problem, AHAB resorted, impermissibly in my view, to a claim for equitable accounting for reversal of the burden of proof, as set out and discussed above.

56. In dismissing AHAB's claims, I have ultimately agreed with the foregoing submissions of the Defendants.[2220] As I understand the modern cases, I regard them as establishing:

*(1)* **Relfo:** far from establishing that the evidential rules of tracing are to be relaxed whenever allegations of fraud are involved, the case explains that the court will disregard "*intervening and meaningless arrangements orchestrated for no other purpose than to disguise the source of funds*" and "*specifically designed*" to subvert the ability of creditors; to recover misappropriated funds. It was this fraudulent design that justified the inference that the liquidator of Relfo was entitled to trace into assets held by the defendant. The case does not diminish the general rule that it is necessary to establish a chain of transactional links in order to trace between the funds of a claimant and those held by a defendant.

[2220] As well as those of SIFCO 5 as set out at {**E1/30/12-20**}.Further submissions of SIFCO5 on the law of tracing and attribution of knowledge are discussed fully in Section 7C below.

*(2)* **Durant:** similarly, the Board noted[2221] that "*The development of increasingly sophisticated and elaborate methods of money laundering, often involving a web of credits and debits between intermediaries, makes it particularly important that a court should not allow a camouflage of interconnected transactions to obscure its vision of their true overall purpose and effect. If the court is satisfied that the various steps are part of a co-ordinated scheme, it should not matter that, either as a deliberate part of the choreography or possibly because of the incidents of the banking system, a debit appears in the bank account of an intermediary before a reciprocal credit entry*". However, significantly, the Board reaffirmed that both **Roscoe v Winder**[2222] and **In Re Goldcorp**[2223] remain good law and were to be distinguished on their facts.[2224] Accordingly, the Board did not interfere with the general requirement of a tracing claim that the relevant payments must be linked. Indeed, in **Durant** itself, the defendants did not dispute that the relevant payments were linked. While the Board accepted the correctness of "backward tracing" in the case where the co-ordinated scheme (showing the transactional links) was established, it rejected (at **[33]**) the general proposition that money used to pay a debt could be traced into the asset acquired in return for the debt, explaining that "*The Courts should be very cautious before expanding equitable proprietary remedies in a way which might have an adverse effect on other*

2221 At [2015] UKPC 35 at [38] {**R1/50/11**} (emphasis added).
2222 Below {**R1/5.6/1**}.
2223 Above {**R1/22/1**}.
2224 At page 610 [41] {**R1/50/12**}: "The Board does not doubt the correctness of the decisions in **James Roscoe (Bolton) Ltd v Winder** [1915] 1 Ch 62 and **In re Goldcorp Exchange Ltd** [1995] 1 AC 74, but in neither case was there evidence of an overall transaction embracing the coordinated outward and inward movement of assets".

*innocent parties. If a trustee on the verge of bankruptcy uses trust funds to pay off an unsecured creditor to whom he is personally indebted, in the absence of special circumstances it is hard to see why the beneficiaries' claims should take precedence over those of the general body of unsecured creditors."*

*(3)* **Sinclair v Versailles:**[2225] the case decides that where a dishonest fiduciary has created a "*maelstrom*" by means of a number of circular payments (referred to in the Judgment as "*cross-firing*"), an inability to identify with precision exactly what had happened to the claimant's money did not defeat the claimant's tracing exercise and that the onus should be on the fiduciary to establish the part of the mixed fund which is the fiduciary's property. The principle applies to a "*defaulting trustee*".[2226]

57. It is clear that what is envisaged is the kind of "*coordinated scheme*" referred to in **Relfo** and **Durant.** It would be insufficient, in order to reverse the burden of proof, simply that the tracing exercise is difficult. Lord Neuberger's statement[2227] that "*I do not see why this should mean that a proprietary claim is lost simply because* ***the defaulting trustee, while holding much of the money*** *has acted particularly dishonestly or cunningly by creating a maelstrom"* ***[emphasis added]*** envisages that the maelstrom has been created by the defaulting fiduciary precisely in order to defeat attempts to trace relevant funds.

58. The applicability of the foregoing principles will of course, depend on the circumstances of the case but in every case there will be the minimal requirement of the proof a deliberate attempt to create a "*co-ordinated scheme calculated to hinder any attempt to*

2225 Above {**R1/41/1**}.
2226 Per Lord Neuberger at [135] {**R1/41/39**}.
2227 At [138] {**R1/41/40**}.

*trace*" relevant funds before the burden of proof will be reversed. Such circumstances, for the reasons to be more fully explained in subsequent sections of this Judgment, have not been proven by AHAB in this case.

59. In keeping with the immediate objective of explaining my conclusions on the questions of law, I will now turn to address the further submissions of the Parties, as they go especially to the issues of the proper law of the action, the double actionability of causes of action and the attribution of Al Sanea's knowledge to the Defendants. These are the specific conflict of laws issues which arise in this case. First, here I pick up and continue with AHAB's Submissions to completion, on these issues.[2228]

*"**Saudi law and other foreign law***

*718. If AHAB is wrong about the application of Cayman law* [as the proper law governing its proprietary claims]*, AHAB contends that the law of Saudi Arabia should apply (being the law with the closest connection to the facts and circumstances of the claims). AHAB has adduced evidence from its Saudi law expert, Professor Vogel, on a variety of issues of Saudi law. On the issue of proprietary claims under Saudi Arabian law, in very brief summary, Professor Vogel's evidence*[2229] *is that:*

*(1) A claim for the return of traceable money is possible against the Defendants, even if they were not the wrongdoer who engaged in the misappropriation itself and*

---

2228 In its Opening Submissions {**U/1/273**}.

2229 *See, primarily, Vogel 1/38-69* ***{K1/1/16} – {K1/1/27}*** *and* ***Vogel 3/8-47 {K1/7/4} – {K1/7/19}; 56-67 {K1/7/23} – {K1/7/29}****.*

*even if they did not know that the source of funds was an unlawful misappropriation (although it is AHAB's case that they did know).*

*(2)* *By analogy to the tort of usurpation* ["ghasb"] *it is possible for AHAB to recover the traceable monies, plus any traceable proceeds from trading in those monies, and compensation for any loss of such monies.*

*(3)* *Tracing is available even through mixed funds, resulting in the restoration of the misappropriated property through an award of the proportionate share of the mixture.*[2230]

*719.* *The GT Defendants' Saudi law expert, Professor Mallat, and SIFCO5's Saudi law expert, Dr. Hammad, seem to take a different view. The reasons for their different opinions are summarised in the relevant joint memoranda*[2231]*... It is worth explaining here though, that the principal difference between Professor Mallat and Professor Vogel is that Professor Mallat has focused his analysis on the contractual relationship between Mr Al Sanea and the Money Exchange arising from the Money Exchange partnership agreement.*

---

2230 *Vogel 1/28* ***{K1/1/3} – {K1/1/11}; 44-49 {K1/1/17} – {K1/1/19} Vogel 3/65 {K1/7/27} – {K1/7/28}****.*

2231 ***{K1/4}.***

(1) *In **Mallat 1**[2232], it seemed that Professor Mallat might have been suggesting that the contractual foundation for the relationship between Mr Al Sanea and AHAB precluded AHAB from pursuing any remedy which could not be characterised as a contractual remedy under Saudi law, with the result that AHAB was not entitled to relief for breach/betrayal of trust, usurpation* ["ghasb"] *or analogues to it (including proprietary relief), whether sought against Mr Al Sanea or the Defendants[2233]. However, **Mallat 1** did state that* "ghasb appeared relevant only to a general extent, and occurs only if the act of ghasb and any other alleged tort is proven to be unlawful. Unlawfulness in this context would require a deliberate intention on the part of [Mr Al Sanea] to defraud or deceive his ME partners… If successfully proved, the legal consequence of ghasb is restitution in relation to property that continues to exist, otherwise compensation."[2234]

(2) *It is now clear that Professor Mallat agrees with Professor Vogel that (1) there is a unifying theory of liability in Saudi law (where harm, a wrongful act and causation arise) which transcends the division between contract and*

---

[2232] ***{K1/2)*** [sic].
[2233] *Mallat 1/26-30* ***{K1/2/7} – {K1/2/8}; 166 {K1/2/40}; 169 {K1/2/41}; 179 {K1/2/44}.***
[2234] *Mallat 1/31* ***{K1/2/8}****.*

> *tort*[2235]*; and (2) that Mr Al Sanea and the GT Defendants could be liable in tort (depending on the facts as found).*[2236] *Professor Mallat has also stated:* "…if MAS did not breach the contract by fraud or a worse crime (theft, betrayal of trust), the GT Defendants cannot be assimilated to him."[2237] *The converse of this must be that if Mr Al Sanea did commit a fraud or betrayal of trust, the GT Defendants can be assimilated to him.*"

60. While I am prepared to accept this as a correct statement of Prof Mallat's opinion and of the general theory, (described by him as the "unifying theory") of responsibility in tort (or for present purposes responsibility in contract) and so of the modern position under Saudi law, again, the absence of proof that Al Sanea, as AHAB's fiduciary ("amin") committed a fraud against AHAB as pleaded, means that AHAB may not require that the Defendants are "*assimilated to him*".

61. Nor does the "unifying theory" as explained by Prof Mallat assist AHAB to establish the proprietary links between its property and the assets of the Defendants. Prof Mallat, unlike Prof Vogel, did not go so far as to expressly accept that under Saudi law, a claim comparable to a proprietary tracing claim could be pursued for the recovery of intangible property (dayn), such as a balance in a bank account, as distinct from a claim for usurpation[2238] (ghasb) in personam for the recovery of tangible property (ayn), such as gold coins. Whether speaking of restitution of stolen property or compensation in damages, I understood Prof Mallat to have been speaking of personal remedies, to be imposed in personam against the wrong-doer, not to proprietary remedies which could be

---

2235 *See the Vogel-Mallat Joint Memorandum/3.7* ***{K1/4/7}****; Mallat 2/6* ***{K1/6/2} – {K1/6/3}****.*
2236 *Mallat 2/37* ***{K1/6/8}****.*
2237 *Mallat 2/37* ***{K1/6/8}****.*
2238 The unlawful or unjust taking of the property of another.

imposed in rem against intangible property (dayn). Such a concept is tantamount to a contradiction in terms, under Saudi law.

62. I found Prof Vogel's argument for the existence of such a proprietary claim "analogous" to usurpation, based upon a certain Saudi case in which compensation appears to have been awarded for embezzlement, to be unpersuasive.[2239] Prof Vogel's position that, by analogy, tracing/following can be applied to third parties other than the usurper was also shown to be inconsistent with his earlier evidence given in 2004[2240] and is unsupported by any Saudi legal authority. Certainly, whether because the reporting of decided cases is a new phenomenon in Saudi Arabia such that other cases of relief analogous to usurpation exist but cannot be cited or because the general or "unifying" theory is still in its infancy, there is no clear basis for finding that Saudi law has out-grown its civilian roots, to the stage where it now allows for proprietary tracing claims into intangible property. Prof Mallat was clear in emphasizing in cross-examination, the compensatory as distinct from proprietary nature of remedies available under the unifying theory in relation to the tort of embezzlement.[2241] The difference is between the in personam nature of the latter and the in rem nature of the former, type of remedy.

---

[2239] Decision No. 3447287, Mudawwana 1434, 26:228 (General Criminal Court , Riyadh 1434 ) discussed at footnote 19 of his report: Vogel 1R, paragraphs 57 to 58 {**K1/1/22**}. Prof Vogel in his report sites "many instances of tracing in Islamic texts" (see Vogel 1R, paragraph 45 {K1/1/17} in relation to the entitlement of an owner to recover usurped tangible property (ayn) but cited no such authority for tracing into intangibles, referencing instead the willingness of the modern Saudi Court to rely upon accounting principles for the resolution of commercial disputes. It was agreed to be common ground that under Saudi law, the Courts would award compensation against a person to the extent of his "receipt" of embezzled funds and that would include any person who is particeps criminis. "But what the courts cannot do is say "And I want to look in your bank account and see how much of it you've still got left" which is really where the essential divide is here": {**Day125/33:24**}-{**Day125/34:3**} per Mr. Crystal.

[2240] In Saudi Basic Industries Corp. v Mobil Yanbu Petrochemical Company Inc and Exxon Chemical Arabia Inc {**X7/22/7**}; {**X7/23/9**}.

[2241] {**Day105/123:13**}-{**Day105/124:1**}.

63. Despite this (the Professors' agreement on the **existence** of the unifying theory), there may remain a difference of opinion between Professors Vogel and Mallat as to AHAB's ability to seek relief for the return of misappropriated property from Al Sanea and/or the Defendants[2242] and there is a difference of opinion concerning the relevance of the relative culpability of defendants who have jointly participated in an intentional tort when their liability vis-à-vis the victim/claimant is under consideration.[2243]

64. Thus, AHAB's submissions recognize the difference of opinion on two important issues. First, that just discussed above as to the availability of a proprietary tracing remedy "analogous" to usurpation. Second, as to joint and several liability of conspirators under Saudi law. The second became another significant area of disagreement because of AHAB's argument that each Defendant would be jointly and severally liable to compensate AHAB for all damages flowing from the alleged tortious unlawful purpose conspiracy with Al Sanea. I will come to the Defendants' very clear and helpful submissions (per the GTDs) on this second issue below.

65. Here, AHAB's submissions next continue by reference to the different but related subject of liability under Swiss law.[2244]

> *720. "The GT Defendants have claimed that Swiss law applies to any claims to SICL's assets which are held in Switzerland, whilst the Awalcos have claimed that Bahraini, Swiss or German law applies to funds which are or have passed through accounts in those jurisdictions before reaching their final destination. The GT*

---

[2242] Mallat 1R, paragraph 192 **{K1/2/47};** paragraph 205 **{K1/2/50}**.
[2243] Vogel 1R, paragraph 118 **{K1/1/50}**; Vogel 3R, paragraphs 48 to 55 **{K1/7/19}-{K1/7/22};** Mallat 2R, paragraph 64 **{K1/6/16}**.
[2244] In its Opening Submissions {**U/1/275**}.

> *Defendants and the Awalcos contend that no tracing or following rules are recognised in those systems of law which would be available to AHAB on the facts of, and in relation to the assets in question, in this case. As mentioned above, AHAB contends that none of these jurisdictions provides the governing law of AHAB's claims merely because money passed through bank accounts in those jurisdictions or because dematerialised securities are held on behalf of the Defendants in one of those jurisdictions."*

66. I have noted above my acceptance of this aspect of AHAB's submissions to the extent that AHAB's claims are made to assets which are subject only to Cayman law. However, claims are made by AHAB in respect of intangible assets held by SICL in Switzerland subject to a "mini-bankruptcy" proceeding there (worth some US$225 million).[2245] Unlike other claims to assets which may have passed through civil law jurisdictions to reach the Defendants in Cayman, these assets are shown to have been and remained throughout, in Switzerland.[2246] The opinions of the Swiss law experts on whether under Swiss law a proprietary or only a personal right to claim is available in relation to intangibles (here such as credit balances in bank accounts or dematerialized securities)[2247] were helpfully explained by Mr. Crystal[2248] The position is that Swiss law does not admit of a proprietary tracing claim into intangibles. Indeed, to the extent that AHAB needs to show that it could pursue a tracing claim into a credit balance with a bank or other

---

2245 RASOC {**A1/9/81**}.
2246 And so ownership must be resolved on the basis of principles to be distinguished from the principle stated in **El Ajou v Dollar Land Holdings plc** {**R1/20/1**}, {**R/21/1**} (above).
2247 Such as undocumented shares or bonds which are recorded on a computer system but not in tangible form.
2248 {**Day125/9:1-12**}.

intangibles under the laws of any civil law jurisdiction,[2249] the following exchanges with Mr. Crystal came, in the end, to encapsulate the Defendants' views of the applicable principles and the views to which I am persuaded:[2250]

> *"MR CRYSTAL:*
>
> *I think your Lordship appreciates the potential significance of this recognition of the notion of physicality in the civilian law jurisdictions.*
>
> *CHIEF JUSTICE:*
>
> *I think I have got it, yes. My concern is whether the question is properly framed. Because it seems to me where this all leads to is the notion that there wouldn't be a remedy for the recoverability of intangible property which has been misappropriated beyond relief against the person who actually misappropriated it, ie compensation in personam.*
>
> *MR CRYSTAL:*
>
> *That is right, my Lord.*
>
> *CHIEF JUSTICE:*
>
> *That seems to be where I'm being left with this argument.*
>
> *MR CRYSTAL:*
>
> *That is exactly right, my Lord. That is the whole point of the argument, yes.*
>
> *CHIEF JUSTICE:*
>
> *I follow.*
>
> *MR CRYSTAL:*
>
> *Compensation against anybody who is subject to the jurisdiction of the particular court, who was "received", you don't have a property right against that person but you have a right of compensation.*

---

2249 There are a number involved with the transactions or alleged transactions: Saudi Arabia, Bahrain; Switzerland and Germany and about the laws of which expert evidence was given. In the end however, no relevant transfer through Germany was identified.

2250 {**Day125/29:18**}-{**Day125/30:14**}. Mr. Quest, based on agreement between the experts, agreed that under Swiss law no proprietary claim was available but argued instead for a claim in unjust enrichment.

*CHIEF JUSTICE:*
*Which is a right in personam.*

*MR CRYSTAL:*
*Exactly, yes."*

67. I think it would be helpful for me to state here my understanding of the merits of this claim as a distinct issue. AHAB needed to establish a proprietary right to these SICL assets, assets to which, as a matter of Swiss law, as these are intangibles, it is common ground that SICL itself had only a personal, not a proprietary basis of claim. It follows that AHAB could have had no proprietary right to these assets claiming against SICL, irrespective of how it frames its claim. A judgment of this court in favour of AHAB based on unjust enrichment would have been a judgment in personam against SICL and so could not have improved AHAB's position to become that of the proprietary owner of these assets, which is what AHAB needed to do to "leap frog" the claims of other creditors which between them must rank pari passu (whether under Swiss law in the mini bankruptcy as the law of the lex situs (**MacMillan Inc v Bishopsgate Investment Trust**[2251] and **Dicey, Rule 129(1)**)[2252] or under Cayman law as the place of incorporation and ultimate winding up of SICL). It is trite as a matter of Cayman law, that these assets are subject to a statutory trust which requires the liquidators to deal with them for the benefit of all the creditors in keeping with the order of priorities determined by the statutory scheme. This is all as explained in exchanges between the Court and Mr. Crystal,[2253] (citing **Polly Peck (No 2)**[2254] where it was decided that where an asset was

---

2251 (No.3)[1996] 1 WLR 387 {**R1/26.1/1**}.
2252 {**R2/2.2/3**}.
2253 {**Day125/73:12**}-{**Day125/75:25**}.
2254 [1998] 3 All 3 ER 812 {**R1/28.2.3/1**}.

the absolute beneficial property of a company in liquidation or administration, there was no general power in the liquidator or administrator or the court to amend or modify the statutory scheme so as to transfer that asset or declare it to be held for the benefit of another person, since to do so would be to give preference to another person who enjoyed no preference under the statutory scheme). Whether **Polly Peck (No 2)** precludes a declaration of a remedial constructive trust in favour of someone in whom **beneficial title** is found to repose is a different matter that I did not need to decide, as AHAB can assert no such claim under Swiss law to these assets**.**

68. In any event, as the evidence showed, the value of assets held in SICL's name in Switzerland had from in the 1990s exceeded the value of these in the mini-bankruptcy to which AHAB lays claim and so there could have been no sustainable basis for a tracing claim into these assets as AHAB's proprietary base for its claim is alleged to have originated after October 2000.[2255]

69. AHAB's position on foreign law, in brief summary, became in the end the following:[2256]

> *"(1) AHAB's Bahraini law expert (Ms Al Awadi) explains that a proprietary claim would be available to a claimant in AHAB's position under Bahraini law, enabling it to recover a misappropriated asset.[2257]"*

70. While assets may have passed through Bahrain, there is no specific claim under Bahraini law. AHAB assets shown, through the necessary transactional links (whether directly or by inference), to have reached the AwalCos in Cayman through Awal Bank in Bahrain

2255 {Day125/66:4}-{Day125/68:17}; {G/1511/42-45}; see also {E1/34/5} and {X7/29/1}.
2256 In its Opening Submissions, paragraph 721 {U/1/275}.
*2257 {K7/2} The scope of the Bahraini experts' report is different and not readily reconciled.*

would therefore have been amenable to a claim under Cayman law. Here too however, AHAB failed to prove either the necessary antecedent fraudulent breach of trust or the transactional links.

71. AHAB continues:[2258]

> *"(2) The Swiss law experts agree that under Swiss law no proprietary claim is available to AHAB in relation to the assets which passed through or were held in Switzerland {K3/4}. However, AHAB's expert (Professor Jeandin) explains that an unjust enrichment claim may be available to recover an asset or its equivalent value by way of an unjust enrichment claim under Swiss law (if there is a sufficient nexus or economic link between the impoverishment and the enrichment, which may not be the case in the circumstances of indirect transfers from the claimant to the defendant).[2259]"*

72. I have set out above my finding as the issue relates peculiarly to the SICL intangibles.

73. AHAB continues:[2260]

> *"(3) The German law experts agree that under German law there is no claim which German law would classify as a proprietary claim available to AHAB in relation to the assets which passed through that jurisdiction **{K5/4}**. However, AHAB's expert (Dr Spehl) explains that AHAB would be able to make a claim for a specific asset or its equivalent value through a damages claim (for direct or indirect recipients)[2261] or an unjust enrichment claim (for direct recipients)[2262] under German law."*

---

2258 In itsOpening Submissions , paragraph 721 {U/1/275}.
2259 Jeandin 1/38-68 {K3/1/15} – {K3/1/25}
2260 In its opening submissions, paragraph 721 {U/1/276}.
2261 Spehl 1/43-57 {K5/3/9} {K5/3/13}
2262 Spehl 1/58-62 {K5/3/14}

74. No German law claim is being advanced. In the end, apart from the Swiss law issue re the SICL intangibles, the relevant debate on foreign law centered around the law of Saudi Arabia as the place where the alleged dishonest assistance and unlawful means conspiracy were centered in the person of Al Sanea and the alleged misappropriations from the Money Exchange occurred. It was therefore on the law of Saudi Arabia that the further debate was focused.

75. For reasons to be illuminated below, it is of importance, that while this Court has been determined to be the *forum conveniens* for the trial of AHAB's claims,[2263] this court is required nonetheless, where matters of substance rather than procedure arise for determination,[2264] to apply the proper law of the obligation; viz: the law of the place where the actions giving rise to the claims have their closet connection (the *lex causae*).

76. As the case law reveals (both in the judgments themselves[2265] and from academic analysis)[2266] the choice and application of the proper law of the obligation can be a difficult exercise. This may be so whether obligation is said to arise in equity for breach of trust or at common law in tort, such as for conspiracy where the double actionability rule applies.

77. As **Dicey** observes[2267] "*Equitable doctrines may give rise to particular difficulties of classification in the conflict of laws, for example as to the classification of tracing. This involves identification of property or its value when it has changed its form through*

---

2263 **AHAB v SICL et al** 2010 (2) CILR 289 {**B/17/1**}.
Once the distinction is clearly discernible, it is settled that procedural matters are governed by the lex fori: Dicey Rule 19 {**R2/2.2/2**}.
2265 See for instance, the majority and dissenting judgments of the House of Lords in **Boys v Chaplin** [1971] AC 356 {**R1/9.1/1**}.
2266 See for instance, Dicey, Chapter 7 and Yeo, Choice of Law for Equitable Doctrines (2004), Chapter 4.
2267 Dicey, Chapter 7, [7-010].

*mixture or substitution. It could be argued that tracing should be classified as procedural, since "In truth, tracing is a process of identifying assets; it belongs to the realm of evidence. It tells us nothing about the legal or equitable rights to the assets traced".*[2268] *Nevertheless, tracing will be an essential step in the bringing of substantive actions in the law of property, trusts and restitution. The better view is that it should be treated as substantive and governed by the law applicable to the claimant's cause of action.*[2269] *It is suggested that the question of whether a constructive trust arises is substantive.*[2270] *A court should apply, in principle, the law governing the cause of action which is said to give rise to the trust.*[2271]*"*

78. I am persuaded that the proper law governing AHAB's equitable claims is the law of Saudi Arabia. The arguments are persuasively set out on behalf of the Defendants (per Mr. Lowe on behalf of SIFCO 5)[2272] in the following terms which I accept.

***"PROPER LAW OF RECEIPTS BASED CLAIMS IS SAUDI***

*7. It is submitted that the proper law governing AHAB's receipts based claims is the Law of Saudi Arabia. As set out below, the law of tracing is substantive rather than procedural.*

*8. AHAB does not claim in these proceedings to have had any rights of property* in rem *to the funds in the Defendants' bank accounts. Its proprietary claims against the Defendants are properly*

---

2268 Citing **Foskett v McKeown [**2001] 1 AC 102 (above) per Lord Steyn at 113 {**R1/33/12**}.

2269 Citing **Chase Manhattan v Israel-British Bank** [1981] Ch 105; **El Ajou v Dollar Holdings** (above) {**R1/20/1**} (reversed on a different point [1994] 2 All ER 685 {**R/21/1**}).

2270 Citing Chase Manhattan (above) at p.127 (obiter).

2271 Citing Yeo, op cit. (above) pp 127-8 but noting "However, the position may be more complex where the governing law does not know the concept of the constructive trust".

2272 {**E1/33**/7}-{**E1/33**/11}.

*understood as* in personam*, receipts based, claims for (i) dishonest assistance (ii) knowing receipt and (iii) restitution. The first two claims are put as claims for a proprietary remedy based on constructive trust.*

*9.* *It might be thought (wrongly) that the question of whether AHAB has any rights in the Defendants' property by reason of any constructive trust arises solely under the law of the Cayman Islands because it fastens on the conscience of the Defendants within the jurisdiction (see* **Akers v Samba***...[2273]).* [The Supreme Court also noted that the amenability of the defaulting trustee to the personal jurisdiction of the court had always been enough to justify the enforcement of his obligations. This was so however, until and unless the disposition of an asset had the effect under the lex situs of overriding the protected trust rights.][2274]

*10.* *There was a time, until recently, in England (before the principles of receipt-based liabilities were properly developed) when the Courts appeared to adopt the position that, in a fraud case, common law equitable remedies were available whenever England was the place where the enrichment occurred and when it also*

---

2273 *[2017] 2 W.LR. 713 p 740-741 and authorities cited there.*
2274 Found not to have been the case with the assets in dispute (shares in SAMBA).

*happened, as forum, to be a place of enforcement.* **El Ajou**...[2275] *is the best known example of this.*

11. *This is clearly no longer the rule: equitable remedies depend on the application of a choice of law rule and not on adopting the lex fori whenever the forum has jurisdiction over a defendant. Only rarely will the relevant choice of law rule point to the law of the place of enrichment.*

12. *Dicey Rule 172 … provides that:*

> "the law applicable to a cause of action or issue determines whether a person is required to hold property on constructive or resulting trust."[2276]

13. *Illustrations of how choice of law rules have been applied (before domestic common law equitable rules of tracing have been held to apply) are as follows:*

    *(1)* **Lightning v Lightning Electrical Contractors Ltd**...[2277] approved in **Akers** [above] *was a resulting trust case in which it was held that English law governed because that was the law which applied to the relationship between the parties.*

    *(2)* *Another illustration of a choice of law rule being applied rather than the forum imposing equitable principles against someone in its jurisdiction is* **Luxe Holdings v Midland**

---

2275 *Above {**R1/20/1**}; {**R1/21/1**}; {**R1/23.2/1**}.*
2276 *Op cit. {**R2/.2/1**}Vol 2 [29R-075], p 1519*
2277 1998 WL 1044250 [1998] N.P.C. 71 {**R1/30.3**}.

**Resource Holdings**...[2278] *There a vendor-purchaser constructive trust was governed by English law because the parties had selected that law themselves. The remedy was not applied by reason of the defendant being amenable to the jurisdiction.*

*(3)* *In* **El Ajou***...*[2279]*, the Plaintiff claimed to be able to trace the proceeds of a fraud committed in Amsterdam through intermediate resting places in Geneva, Gibraltar, Panama and Geneva (again) to London, where they were invested in a property development project with Dollar Land Holdings plc. It was assumed that England was the law of the place that governed the receipt based claim because that is where the funds ended up (see Millet J at p715). This would not now be the conflict rule but explains the outcome.*

*(4)* *In* **Fiona Trust Holdings Corp v Privalov***...*[2280] *Andrew Smith J rejected the submission that English law as the forum could apply equitable principles whenever there was something in the other jurisdiction akin to dishonest assistance (i.e. a wrong for which a constructive trust would be applied if the cause of action were English). The Judge said the remedy was governed by the cause of action*

---

2278 Above [2010] EWHC 1908 (Ch) {**R1/38.7.1**}.
2279 Above[1993] B.C.C. 698 {**R1/20/1**}.
2280 *[2010] EWHC 3199 at [155]-[159] {**R1/39.8/1**}.*

*determined by reference to the choice of law rule. Since the Russian remedy was damages it was irrelevant that a proprietary/equitable remedy could be given in English law on those facts.*

*(5)* *In* **Yugraneft v Abramovitch**...[2281] *the Court decided that the proper law of the cause of action was Russian law and, as a result, the receipts based claims were not tenable.*

14. *It follows that, in accordance with Rule 172, the Court needs to identify and choose the law applicable to the claims made. The modern choice of law to be applied to receipts-based claims in the Cayman Islands is that set out in Dicey Rule 257 which provides:*

(1) A non-contractual obligation arising out of unjust enrichment, including payment of amounts wrongly received, which concerns a relationship existing between the parties, such as one arising out of a contract or a tort/delict which is closely connected with that unjust enrichment, is governed by the law which governs that relationship.

(2) Where the law applicable cannot be determined on the basis of clause (1) and the parties have their habitual residence in the same country when the event giving rise to unjust enrichment occurs, the law of that country applies.

(3) Where the law applicable cannot be determined on the basis of clauses (1) or (2), the law of the country in which the unjust enrichment took place applies.

(4) Where it is clear from all the circumstances of the case that the non-contractual obligation arising out of unjust enrichment is manifestly more closely

---

2281 *[2008] EWHC 2613 (Comm) {**R1/39/1**}.*

> connected with a country other than that indicated in clauses (1), (2) and (3), the law of that other country applies." *(emphasis added)*[2282]

15. *It is submitted that, applying Rule 257(1) or (2) the receipts-based claims very obviously arise from the* [alleged] *torts or delicts of embezzlement, breach of trust or fraud in the course of Mr Al Sanea's relationship with AHAB in the conduct of their Saudi partnership in the Money Exchange. Moreover Mr Al Sanea and AHAB were based in Saudi Arabia.*

16. *In any event, the receipts-based claims are manifestly more closely connected with Saudi Arabia than anywhere else. The close connection principle in Rule 257(4) was approved and set out in the decision of Christopher Clarke J in* **Yugraneft v Abramovich…**[2283]:

> "I reject the suggestion that a claim in knowing receipt with a foreign element is to be regarded as determined simply by asking whether or not the receipt is such that, in the eye of English equity, it cannot in conscience be kept or disposed of otherwise than by restoration to the equitable owner. Any obligation to restore an unjust enrichment, including a claim in knowing receipt as well as a claim in unjust enrichment itself, must in principle be determined by its proper law, which is, intrinsically, that law which has the closest connection with that obligation."

17. *Christopher Clarke J* [after review of the cases including that decided by Lawrence Collins J (as he then was) in **Barros Mattos**

[2282] {R2/2.2.2}.
[2283] Above {**R1/39/1**}.

> **Jnr v Macdaniels Ltd**][2284] *also rejected the idea that the proper law of the enrichment in a receipts based claim is the place where the enrichment occurs. The proper law for the receipts based claims is the law with which "the critical events had their closest and most real connection".*[2285]

79. Having accepted this principle as being applicable here, the finding that Saudi law does not admit of a proprietary claim against intangibles (dayn), means that AHAB could not satisfy the conflict of laws rules in respect of its receipt-based or proprietary claims for knowing receipt, dishonest assistance or unjust enrichment/restitution.

80. The pursuit of such claims requires a Saudi cause of action which not only satisfies double actionability but which also (i) recognizes proprietary claims against third parties into whose hands the claimed property is said to have come and (ii) can allow the property in their hands to be identified as AHAB's property regardless of the forms of transfer which took place (i.e., which allows substitutional tracing). The fact that AHAB had no such cause of action in Saudi Arabia means that AHAB was unable to establish the "proprietary base" for its claims which, therefore, rendered them untenable.[2286]

81. Whether regarded as proprietary or personal, AHAB's claims against the Defendants all depended on AHAB being able to trace its funds as they are alleged to have been

---

2284 which itself embodied an extensive review of the authorities [2005] EWCH 1323**; [2005] I.L.Pr. 45 630** **{R1/37.0.2}**.

2285 Above at p 60 **{R1/39/60}**

2286 I note here that AHAB (at **{D/8/1}** of its written Closing Submissions) draws a distinction between its receipt-based claims and assistance-based claims, stating that the latter encompasses its claim for conspiracy against Al Sanea acting in conjunction with the Defendants. The former is said to comprise (1) proprietary claims as a consequence of AHAB having traced its assets into the hands of the Defendants; (2) personal claims in knowing receipt against the Defendants to the extent that the Defendants' assets are insufficient to satisfy proprietary claims; and (3) common law personal restitutionary claims in unjust enrichment against the Defendants, "which do not require a tracing exercise in order to succeed."

misappropriated from the Money Exchange at Al Khobar, into the hands of the Defendants here in Cayman. Both as a matter of Saudi and Cayman law, no such claim was tenable. That finding by itself, precludes such claims.

82. Nonetheless, as to the further claim based on an unlawful means conspiracy, AHAB sought to address the further issue of double actionability as follows:[2287]

***"Conspiracy***

722. *Under Cayman law the question of what law governs liability in tort is the same as the position under English common law, i.e. it is a combination of the law of the forum and the law of the place where the tort was committed. This is the "double actionability" rule which requires that the act be actionable as a tort under Cayman law* [had it been] *committed there and that the act be actionable under the law of the foreign country where it was committed.*[2288] *AHAB submits that, if the view is taken that the combination between Mr Al Sanea and the Defendants, and the acts in execution of that combination, were committed in Saudi Arabia rather than in the Cayman Islands (on the basis that that is where Mr Al Sanea was primarily based and from where he masterminded the conspiracy), the double actionability rule is satisfied, as explained below.*

---

[2287] It its Opening Submissions {**U/1/276**}.
[2288] *Dicey & Morris, 12th ed, rule 205*

723. *Under Cayman (and English) law, it is well established that the tort of conspiracy turns on an agreement (which need not be a contractually binding agreement), a combination, a common intention, a common understanding or a concert of two or more people to do an unlawful act (or a lawful act by unlawful means) which causes damage to the claimant.*[2289] *AHAB alleges that Mr Al Sanea and the Defendants were engaged in an unlawful means conspiracy with the result that it is not necessary for AHAB to establish a predominant purpose held by the Defendants to injure its interests.*[2290]

724. *The following principles regarding the tort of conspiracy are also well-established:*

(1) *A company, as a separate legal person, can conspire with its directors.*[2291]

(2) *The knowledge of the company may be found in the person who has management or control of the transaction or act in question which is said to evidence the company's involvement in the conspiracy.*[2292]

---

2289 ***Belmont Finance Corp v Williams Furniture Ltd (No 2)*** *[1980] 1 All ER 393 (CA).*

2290 ***Belmont Finance Corp v Williams Furniture Ltd (No 2)*** *[1980] 1 All ER 393 (CA); see Clerk & Lindsell on Torts, 21st ed at 24-93 and 24-95* .

2291 ***Belmont Finance Corp v Williams Furniture Ltd (No 2)*** *[1980] 1 All ER 393 (CA); Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204 (CA).*

2292 ***Belmont Finance Corp v Williams Furniture Ltd (No 2)*** *[1980] 1 All ER 393 (CA).*

*(3) The conspirators need not all join in at the same time, nor need they have exactly the same aim in mind.*[2293]

*(4) A party to the conspiracy must play an active role; only participating in a meeting which formed part of the combination is unlikely to be sufficient.*[2294]

*(5) A generally broad approach to damages for conspiracy is adopted, as summarized in* **McGregor on Damages** *in this way:* "…while a showing of pecuniary loss is necessary to ground the action for conspiracy, the damages are at large so that, once some pecuniary loss is shown, the damages are not limited to the precise calculation of pecuniary loss actually proved."[2295]

725. *Based on these principles, AHAB submits that:*

*(1) It is legally possible for Mr Al Sanea and the Defendants to have joined together in a conspiracy to defraud AHAB, even if, as AHAB contends, Mr Al Sanea was the ultimate beneficial owner and the directing mind of each of the Defendants. Although under English* criminal *law*[2296] *it was held in the middle of the last century that a conspiracy between a one man company and its sole controller is*

---

2293 ***The Dolphina*** *[2012] 1 Lloyd's Rep 304 at [282]: "A conspirator need not know all of the details of the plot so long as he is aware of the common objective and what his role in bringing it about involves".*

2294 *Clerk & Lindsell on Torts, 21st ed at 24-97.*

2295 *McGregor on Damages, 19th Ed, 46-020. See also the same work at paragraphs 46-021 to 46-023.*

2296 ***R v McDonnell*** *[1966] 1 QB 233.*

*impossible because it does not give rise to an agreement between two or more minds, it is not clear that that approach is applicable when liability for conspiracy under civil law is in issue. In* **Lee v Lee's Air Farming Ltd** [2297] *(on appeal from New Zealand) it was held that the controller of a one man company can make a binding contract with his company. The Privy Council observed that it was* "a logical consequence" *of the decision in* **Salomon v Salomon**[2298] *that one person could function in dual capacities and, acting in one capacity, he could give orders to himself in another capacity. Thus, the Privy Council held that the controlling shareholder of a company could enter into a contractual employment relationship with the company. Furthermore, there is Irish authority*[2299] *supporting the analysis that a combination of two or more wholly owned companies would constitute a sufficient combination for the purposes of a cause of action in conspiracy. In any event, as the Defendants emphasise in their pleaded cases, individuals other than Mr Al Sanea sat on the boards of directors of each of the Defendant*

---

2297 *[1961] AC 12 PC, per Lord Morris (at 25): "It is well established that the mere fact that someone is a director of a company is no impediment to his entering into a contract to serve the company. If, then, it be accepted that the respondent company was a legal entity their Lordships see no reason to challenge the validity of any contractual obligations which were created between the company and the deceased."*

2298 *[1897] AC 22.*

2299 ***Taylor v Smith** [1991] IR 142.*

*companies, such that the Defendants are not "one man companies" for the purposes of this analysis.*

(2) *It is irrelevant that the Defendants were incorporated at different times and were not all in existence in October 2000 when AHAB contends that Mr Al Sanea's fraud upon AHAB began in earnest* [ie: following Abdualziz's stroke]. *Indeed, of the Defendants to these proceedings, it was only SICL which was incorporated in October 2000 (the other entities being incorporated later in the 2000s), although STCC was also already in existence as well.*

(3) *It is irrelevant to the establishment of the combination or acting in concert that the different Defendants benefitted from the conspiracy in different ways, or in different amounts.*

(4) *Each of the Defendants did play an active role in the conspiracy as each of them received directly or indirectly the benefit of the fruits of the fraud arising from Mr Al Sanea's defalcations (whether personally or through an entity controlled by him) from the Money Exchange, and put them to their own (ultimately Mr Al Sanea's) use in acquiring assets which augmented Mr Al Sanea's asset base.*

726. *Unsurprisingly, the authorities show that the Cayman and English courts adopt a robust approach when considering claims for unlawful means conspiracy. One Cayman authority is worth particular mention given the facts of AHAB's case and the nature of Mr Al Sanea's fraud:* **International Credit and Investment Company (Overseas) Ltd (In Liquidation) and Finance Investment International Ltd v Adham**[2300] *which related to one part of the BCCI collapse. Illustrating the application of the principles listed above, in* **ICIC v Adham***, it was held by Schofield J that:*

*(1)* *It was not necessary to prove that all conspirators were present at the inception of the fraudulent scheme. Schofield J referred to Australian authority which highlighted that frequently in conspiracies there is one person around whom the rest revolve. Schofield J quoted the following passage from* **R v Robertson**[2301]*:* "It is not even necessary that the conspirators should all get together and orally form their intention to do the illegal act. They may, of course, do just that. In some cases the Crown brings evidence that they were all assembled in some flat or penthouse, and they there entered into an agreement to carry out some common

---

[2300] Grand Court, Schofield J, 22 May 1995 [1996 CILR 89].
[2301] (1978) ACLC 30092.

purpose. But that they should all meet together to concoct the agreement is not necessary. It frequently occurs in conspiracies that there is one person around whom the rest, as it were, revolve – to use the metaphor the hub of a wheel as the centre and the extremities of the spokes as those who communicate only with the hub... What is necessary is that they should have a common intention in which they all share and, except for one, the hub, who knows the lot of them, the others know only the person at the hub."[2302]

*(2)* *In AHAB's case, although the analogy does not work exactly because there was some interaction between the companies inter se, Mr Al Sanea may be seen as the hub. He created more and more companies who, under his direction and with his knowledge, joined in with and became part of his fraudulent scheme.*

*(3)* *Schofield J also applied the principle that it was not necessary to prove that all conspirators were involved in each part of the conspiracy or benefitted from each transaction which put the conspiracy into effect. He said:* "Each one of these individuals may not have been present at the conception of the scheme, but they played their

[2302] ***ICIC v Adham*** *[1996 CILR 89] at pp 103-104.*

separate parts in putting the [fraudulent] purchase together, through the formation of [a company]… It is not alleged that each party was present at each move in the scheme and it is not necessary for the plaintiffs so to prove."[2303] *Later he stated that it was* "trite law that parties can join a conspiracy after its commencement and can leave it before its end."[2304]

(4) *Schofield J rejected the argument that an element of foreseeability should be introduced into a claim for damages for conspiracy. He relied upon this passage of Lord Denning in* **Doyle v Olby (Ironmongers) Ltd**[2305]*:* "…In fraud, the defendant has been guilty of a deliberate wrong by inducing the plaintiff to act to his detriment. The object of damages is to compensate the plaintiff for all the loss he has suffered, so far, again as money can do it. In contract the damages are limited to what may reasonably be supposed to be in the contemplation of the parties. In fraud, they are not so limited. The defendant is bound to make

2303 **ICIC v Adham** [1996 CILR 89] at p 103.
2304 **ICIC v Adham** [1996 CILR 89] at p 108.
2305 [1969] 2 QB 167.

reparation for all the actual damages directly flowing from the fraudulent misrepresentation."[2306]

*(5)* *Regardless of the particular role each conspirator played in the conspiracy, Schofield J decided that all conspirators were liable for the whole of the losses sustained by the plaintiff as a consequence of the fraudulent scheme in which they were conspirators. He stated:* "It is clear that a conspirator does not have to be present at the conception of the conspiracy and that he can join it after the conspiracy has started. To adopt the defendants' approach is to lead the court into areas of assessment of the degrees of culpability of individual conspirators. It must be the case that once the tortious liability of a conspirator is established he is liable for all the loss and damage held to be properly arising from the conspiracy."[2307] *It seems therefore that Schofield J (rightly) considered all conspirators joint tortfeasors*[2308] *liable for the resulting loss suffered to the claimant, irrespective of the role which each conspirator played in the conspiracy.*

---

2306 **ICIC v Adham** [1996 CILR 89] at pp 113-114. The principle that damages awarded in deceit need not be reasonably foreseeable is well established under English law by the House of Lords authority **Smith New Court Securities v Scrimgeour Vickers** [1997] AC 254 (decided after ICIC v Adham).

2307 ***ICIC v Adham*** *[1996 CILR 89] at p 115.*

2308 *Joint tortfeasors are jointly and severally liable, such that a claimant may sue one, some or all: McGregor on Damages, 19th ed, at 50-057.*

> 727. *There is also English authority supporting Schofield J's analysis that participation in conspiracy makes all conspirators jointly liable for the loss caused by the conspiracy. In* **Grupo Torras SA v Sheikh Fahad & Ors** *[1999] EWHC 3000 it was said that (a)* "…the requirement of dishonest assistance relates not to any loss or damage which may be suffered but to the breach of trust or fiduciary duty. The relevant enquiry is … what loss or damage resulted from the breach of trust or fiduciary duty which has been dishonestly assisted. In this context, as in conspiracy, it is inappropriate to become involved in attempts to assess the precise causative significance of the dishonest assistance in respect of either the breach of trust or fiduciary duty or the resulting loss" *and (b)* "Prima facie, participation in conspiracy makes all conspirators jointly liable for the loss caused thereby."*"*

83. The immediately foregoing submissions address a number of issues: (i) whether a shareholder or director can combine with his company for the purposes of joining in a conspiracy to defraud a third party (a different but not entirely dissimilar question from whether the knowledge of a director or agent of a company can be attributed to the company for the purposes of rendering it liable for a fraudulent breach of trust committed against a third party beneficiary); (ii) whether participation in the joint enterprise will result in all conspirators being jointly liable for the damages arising and (iii) whether damages for conspiracy are at large rather than being confined by a causation test.

84. These are all matters about which, as matters of Cayman law, I am satisfied AHAB's submissions should be accepted. This is provided of course, it is also understood that in order to show liability emanating from a common design it is also "necessary to show some act in furtherance of the common design, not merely an agreement": **Unilever plc v Chefaro**, per Glidewell LJ. Liability results from the parties acting in concert, pursuant to a common design: **CBS Songs Ltd v Amstrad Ltd**, per Lord Templeman.

85. The further question is whether these principles are also established as matters of Saudi law.

86. This was especially important to AHAB's case based on personal restitutionary claims in unjust enrichment which are said "not to require a tracing exercise in order to succeed". If AHAB could succeed in showing joint and several liability, then each of the Defendants shown to have joined with Al Sanea in the conspiracy would be jointly and severally liable for the entirety of the damages alleged to have been suffered by AHAB. It was to this end that AHAB argued as follows next below.

> 728. *"There can be no doubt that conspiracy is wrongdoing which is actionable according to the law of Saudi Arabia, and that the double actionability rule is satisfied.*
>
> 729. *Professor Vogel's evidence is clear that the law of Saudi Arabia does recognise the liability of direct and indirect participants of an intentional tort.*[2309] *In particular, he refers to the commission of a tort by pre-agreement or conspiracy, known as 'tamalu'.*[2310] *He*

---

2309 *See generally Vogel 1/108-118* ***{K1/1/45} – {K1/1/50}****.*
2310 *Vogel 1/113* ***{K1/1/47}****.*

*states:* "Direct participants by *tamalu* are each liable for the entire punishment for the offence committed, and are together liable in tort for the damages caused."[2311] *He goes onto state that* "Saudi courts now favour the view that direct actors by *tamalu* are liable jointly and severally. The Supreme Judicial Council, the highest appellate level in the general court system, has so ruled in a case of participation in embezzlement, reversing a judgment for equally shared liability".[2312] *Professor Vogel's analysis explains why he considers that the Defendants could be characterized as direct participants (on two different approaches) leading to their joint and several liability*[2313] *and he has confirmed his views in his supplemental report stating,* "[a]s to conspiracy not existing in Saudi law, it seems to me that the difference between us *[i.e. between Professor Vogel and Professor Mallat*[2314]*]* is terminological only, since without doubt the concept of *tamalu* (conspiracy) does exist in Saudi law. I explain in *[Vogel 1/113],* and the concept applies to intentional torts which constitute crimes as well as torts.*"*[2315] *Professor Vogel remains of the clear view that joint and several liability arises under Saudi law where an accessory* "strongly enables another tortfeasor to commit a direct

2311 *Vogel 1/113* ***{K1/1/47}***.
2312 *Vogel 1/114* ***{K1/1/48}***.
2313 *Vogel 1/118* ***{K1/1/50}***.
2314 *See Mallat 1/259* ***{K1/2/61}***.
2315 *Vogel 3/50* ***{K1/7/20}***.

act" *irrespective of the benefit conferred on each tortfeasor as a result of the tort.*[2316]

**The amounts claimed by AHAB**

730. *Relying upon the principles of tracing set out above, and on the basis that the below sums were used to acquire the Defendants' assets, AHAB claims the following from the Defendants* ***on a proprietary basis or on the basis of knowing receipt, dishonest assistance or unjust enrichment*** (foregoing emphasis added):

*(1)* ***USD 2.5 billion*** *from SICL on the basis that this is the increase in shareholder loans and share capital contributed by Mr Al Sanea between 30 June 2001 and 31 December 2008*[2317]*; alternatively* ***USD 2.26 billion*** *on the basis that this is the total of cash contributed by Mr Al Sanea between 30 June 2002 and 31 December 2008 as reported in SICL's consolidated cash flow statements.*[2318]

*(2)* ***USD 3.2 billion*** *from Singularis on the basis that this is the increase in shareholder loans and share capital contributed by Mr Al Sanea between 3 November 2006 and 30 April 2008 (less* ***USD 4.3 billion*** *of artificial deposits);*[2319]*alternatively USD 1.123 billion on the basis*

---

[2316] *Vogel 3/54* ***{K1/7/22}****.*
[2317] *1160 Davies 2/401 and Table G.4.*
[2318] *1161 See the cashflow statements at* ***{F/131/8}; {F155]8}*** **[sic]*****; {F/219/7}; {F/247/7}****.*
[2319] *1162 Davies 2/502; 503 and Table H.2.*

*that this is the total of cash contributed by Mr Al Sanea between 30 June 2007 and 30 April 2008 as reported in Singularis' cash flow statement (less USD 4.3 billion of artificial deposits).*[2320]

(3) *USD 695 million from the Awalcos on the basis of Awal Bank funding (originating from Mr Al Sanea) of USD 495 million*[2321] *plus a total of USD 200 million paid to AwalCo4 and AwalCo6 by SICL (and ultimately funded by Mr Al Sanea).*[2322]

(4) *USD 94,645,285 from SIFCO5 on the basis of receipts from SICL and Awal Finance Company Limited (both ultimately owned and controlled by Mr Al Sanea) between 1 February 2007 and 3 June 2009.*[2323]

731. *AHAB claims USD 7.3 billion from all the Defendants* ***on a joint and several basis in damages****, being the increase of AHAB's liabilities arising from the Defendants' dishonest assistance in Mr Al Sanea's scheme and/or their combination with him in an unlawful means conspiracy. This figure is calculated by deducting from the total debt of USD 9.2 billion owed by AHAB as a result of*

---

2320 *1163* ***{F/238/7}****.*

2321 *Lawler 1/ Annex 4.*

2322 *In relation to AwalCo4/SIFCO4 see Awalcos' Re-Amended Defence/29* ***{A1/13/12}*** *and Lawler* ***{1/7.3.5}*** *(USD 95 million). In relation to AwalCo6/SIFCO6 see Awalcos' Re-Amended Defence/35* ***{A1/13/15}*** *and Lawler 1/8.3.8 (USD 105 million).*

2323 *USD 12 million was paid by SICL to SIFCO5 on 28 February 2007 (see Matthews 1/19* ***{C4/1/5}*** *plus USD 82,645,285.17 according to Schedule 2 of SIFCO5's Re-Amended Defence {****A2/62****}.*

*borrowing in the names of AHAB, ATS and TIBC at May 2009 from the amount of existing borrowing recorded in the El Ayouty Reports for 2000, being USD 1.902 billion (SAR 7.123 billion)"* [emphasis added].

87. Set out in stark relief above against the backdrop of each of its equitable and common law claims, the massive sums claimed by AHAB in the end, are defined by its purported losses arising from Al Sanea's alleged fraud against it following Abdulaziz's stroke. For the reasons already explained, quite apart from their unproven factual basis, **the equitable claims** are untenable as a matter both of Cayman and Saudi law.

88. The massive claim last described above based on **the alleged unlawful means conspiracy** between Al Sanea and the Defendants is also shown to be untenable, both as a matter of Cayman and Saudi law. As already also discussed, at all events AHAB also needed to prove that the Defendants, in each case of participation in the alleged conspiracy, did actually receive proceeds of that crime in order to ground civil (as distinct from criminal) liability for damages. AHAB sought to overcome this difficulty through the evidence of Prof Vogel who testified to the effect that under Saudi civil law there was strict joint and several liability attaching to each *particeps criminis* in a conspiracy such as to make each jointly and severally liable for the harm and the payment of damages at large.

89. While even such a premise if proven could not have elevated AHAB's claim in the liquidation of any Defendant company to a proprietary (as distinct from a personal damages) claim, for the sake of completeness I think I should explain why this head of claim, too, was rejected. I found, in agreement with the Defendants, that in Saudi law,

there is no hard and fast strict rule of joint and several liability for harm and damages at large, for conspiracy (which itself, is not recognized as a distinct tort).

90. I can do no better than set out here the written submissions of the Defendants (per Mr. Crystal and Mr. Phillips on behalf of the GTDs) which I accept.[2324]

***"U1. SAUDI LAW***

*U.1.1. Introduction*

1. *If the Court accepts the submissions* [as to the absence of fraud upon AHAB and so the lack of a proprietary tracing claim] *set out in previous Sections of these Written Closings, then no issues of foreign law arise for adjudication by the Court.*

2. *However, in the event that the Court were to find that any aspect of AHAB's claim against the GTDs were made out, important questions arise under the law of Saudi Arabia (amongst other laws).*[2325]

3. *The claims advanced by AHAB against the GTDs fall into five categories: (i) knowing receipt; (ii) dishonest assistance; (iii) conspiracy; (iv) unjust enrichment (or restitution); and (v) proprietary / tracing claims.*

---

2324 {**E1/32/1**}.

2325 The GTDs' Written Closing Submissions on SICL's Swiss assets and the law of Switzerland are set out in Section U3 below.

4. *The Cayman Islands legal principles applicable to each of these claims are set out in the GTDs' Written Opening Submissions at Section H and Appendix 3.*[2326]

5. *The evidence of Prof Mallat is that there does not exist, under the law of Saudi Arabia, causes of action in dishonest assistance, knowing receipt, unjust enrichment or conspiracy.*[2327] *As described in Section U1.4 below there does, however, exist under the law of Saudi Arabia a general theory of claims for pecuniary loss or damage.*

6. *Under this general theory, the Saudi Judge has a discretion or power to apportion liability between joint tortfeasors to be exercised by him depending on the detailed facts of the case before the Court. The damages to which AHAB might be entitled as against each GTD are not, under the law of Saudi Arabia at large.*[2328] *Rather, where there is more than one tortfeasor, the Saudi Court would decide who was the person responsible for causing the particular 'harm' or damage and will apportion liability according to the Court's determination of the merits of the case.*

---

2326 GTDs' Written Opening Submissions, paragraphs 321 to 347, {**U/3/104**} to {**U/3/112**} and Appendix 3 {**U/3/182**} to {**U/3/195**}.

2327 Mallat 1R, paragraphs 35, 37 and 40 {**K1/2/8**} to {**K1/2/9**}.

2328 Under the law of the Cayman Islands damages at large means "the award is not limited to the pecuniary loss that can be specifically proved": **Lonrho Plc. and Others v Fayed and Others (No. 5)** [1993] 1 W.L.R. 1489 at 1494 per Dillon LJ. See also paragraphs 28 to 33 of Appendix 3 to the GTDs' Written Opening Submissions, {**U/3/189**} to {**U/3/191**}.

7. *In the circumstances of this case the Saudi Judge would apportion liability between joint tortfeasors (i.e.* "for what" *they are liable) on an actual* "receipts" *basis.*[2329] *As a consequence of the* "double actionability" *rule,*[2330] *the liability of the GTDs under the law of the Cayman Islands is also restricted to actual receipts (if any).*

8. *The remainder of this Section is divided into four parts, which consider:*

   (1) *The Cayman Islands'* "double actionability" *rule and other relevant aspects of private international law.*

   *(2) How the Court should approach the expert evidence of Prof Vogel and Prof Mallat.*

   *(3) The law of Saudi Arabia in relation to the apportionment of liability between joint torfeasors.*

   *(4) Two additional matters of Saudi Arabian law, namely:*

      (a) *The effect under the law of Saudi Arabia of the releases* (musadaqa) *provided to Al Sanea throughout the 1980s, 1990s and 2000s.*

      *(b) Knowledge and the duty of each of the partners of the Money Exchange (including AHAB and Yousef)*

2329 As to the meaning of actual "receipts" see Section U1.4 below.
2330 Which is considered in Section U1.2 below.

*to enquire as to the conduct of the other partners and the business of the Money Exchange.*

9. *This Section does not address any issues relating to tracing under the law of Saudi Arabia (which are considered in in the submissions of SIFCO5 at Section U2).*[2331]

***U1.2. Double Actionability and Other Relevant Aspects of Private International Law***

***Double Actionability***

10. *Under the law of the Cayman Islands, a civil wrong committed elsewhere must be civilly actionable both under the law of the Cayman Islands and the place where the wrong occurred.*[2332]

11. *For the purposes of the double actionability rule,* "actionability" *excludes liability which is exclusively criminal.*[2333]

12. *The double actionability rule is derived from the following dictum of Willes J. in* **Phillips v Eyre (1870) LR 6 QB 1 at 28 to 29:**

> "The civil liability arising out of a wrong derives its birth from the law of the place, and its character is determined by that law. Therefore, an act committed abroad, if valid and

---

2331 The expert reports of Prof Mallat and Prof Vogel cover a number of areas not referred to in this Section U1 or in Section U2. To the extent differences in the evidence of Prof Mallat and Prof Vogel arise in relation to those points, the GTDs' position is reserved.

2332 Dicey and Morris, The Conflict of Laws (12th ed) pages 1487–1488. The position is now different in England. In England, the Private International Law (Miscellaneous Provisions) Act 1995 abolished the double actionability rule in the case of tort. That Act has subsequently been superseded by the Rome II Convention. By contrast, the position in the Cayman Islands remains based on the common law.

2333 Dicey and Morris, The Conflict of Laws (12th ed.) at page 1496; **Kuwait Oil Tanker Company SAK v Al Bader** [2000] 2 All ER (Comm) 271 (CA) per Nourse L.J. at [171].

unquestionable by the law of the place, cannot, so far as civil liability is concerned be drawn in question elsewhere … As a general rule, in order to found a suit in England for a wrong alleged to have been committed abroad, two conditions must be fulfilled. First, the wrong must be of such a character that it would have been actionable if committed in England … Secondly, the act must not have been justifiable by the law of the place where it is done."[2334]

13. *The rule applies to equitable and restitutionary claims (including claims for knowing receipt and dishonest assistance, such as those advanced by AHAB against the GTDs in the present case) as well as claims in tort:* **OJSC Oil Company Yugraneft v Abramovich & Ors [2008] EWHC 2613** *(Comm) at [177] to [223].*

14. *As to determining the place where the relevant conduct occurred, the correct test is to* "… look at the sequence of events constituting the tort and ask: where in substance did this cause of action arise?"[2335]

15. *Applying this simple test to the facts of the present case, the* "substance" *of the claims made by AHAB plainly arises in Saudi*

---

2334 **In Boys v Chaplin** [1971] AC 356 Lord Wilberforce (at 389) restated the rule as one requiring: "actionability as a tort according to England, subject to the condition that civil liability in respect of the relevant claim exists between the actual parties where the act was done".

2335 See Dicey and Morris, The Conflict of Laws (12th ed.) at page 1510; cf. **Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc** [1990] 1 QB 391 at 443, 446 (per Slade J.); **Kuwait Oil Tanker Company SAK v Al Bader** [2000] 2 All ER (Comm) 271 (CA) at [131] per Nourse L.J..

*Arabia. In particular Saudi Arabia is the place where: (i) the most important elements of the alleged fraud were allegedly organised and implemented; and (ii) the alleged loss and damage caused to AHAB is alleged to have occurred. AHAB's contentions to the contrary (which essentially amount to no more than reliance on the fact that the GTDs were incorporated in the Cayman Islands) are wrong.*[2336]

16. *The Court said as follows in relation to AHAB's alleged causes of action, in so far as they relate to Al Sanea, in its judgment of 25 June 2010 in the Proceedings on Al Sanea's application to challenge the Court's jurisdiction (at paragraph 126(v)):*[2337]

> "The law applicable to the issues which lie at the heart of the fraud dispute is the law of Saudi Arabia. That has not been disputed by AHAB. The alleged breaches of trust and duty on the part of Mr. A1 Sanea took place in Saudi Arabia and the extent to which they may amount to actionable wrong-doing would therefore be a matter of Saudi law. In an action in this jurisdiction in which the primary allegations of fraud would have to be proved, there would be a requirement that AHAB establishes that the claim is actionable under Saudi law; as well as under Cayman law."

17. *AHAB's claims against the GTDs (or any of them) are equally only actionable in the Cayman Islands to the extent that the alleged acts that make up the claims are also civilly actionable according to the laws of Saudi Arabia (as well as the Cayman Islands).*

---

2336 See paragraphs 56.1 to 56.3 of AHAB's Re-Re-Re-Re-Amended Reply and Defence to Counterclaim of the GTDs, {**A1/15.2/30**}.

2337 {**B/17/48**}. AHAB admits that the duties owed by Mr Al Sanea to AHAB arise under the law of Saudi Arabia: paragraph 54.1 of AHAB's Re-Re-Re-Re-Amended Reply and Defence to Counterclaim of the GTDs, {**A1/15.2/27**}.

*Liability and Double Actionability*

*Substance v Procedure*

18. *In determining whether or not a defendant would be liable under a foreign law the Cayman Court will ignore any bar to recovery (including a defence) which is purely procedural:* **OJSC Oil Company Yugraneft v Abramovich & Ors***...*[2338] . *This is a consequence of the Cayman Islands rule that all matters of procedure are governed by the domestic law of the country where the legal proceedings have been brought (the lex fori): Dicey, rule 7R-001.*

19. *Under Cayman Islands law, damages are treated as partly procedural and partly substantive. The quantification of damages is a matter of procedure which falls to be determined by the* lex fori *alone (in the present case, Cayman law).*

*The Scope of the Defendants' Liability*

20. *However, all rules which determine the scope of a defendant's liability or 'for what' he is liable are substantive and not procedural. As such, all matters of causation (including apportionment) and recoverable heads of loss are substantive matters to be determined by the law of Saudi Arabia.*

21. *Accordingly, if Saudi law would not treat a particular loss as being caused by the defendant's conduct or does not recognise a*

---

2338 [2008] EWHC 2613 (Comm) at [298] per Clarke J.

*particular head of loss, then the defendant is not liable for that loss in an action brought in the courts of the Cayman Islands.*

22. *In Cox v Ergo Versicherung AG...*[2339] *Lord Sumption said as follows in this regard (emphasis added):*

> "I consider that the relevant German damages rules are substantive. This is because they determine the scope of the liability. … Questions of causation are substantive, as Lord Hoffmann pointed out in the passage which I have quoted from **Harding v Wealands**. Such questions include questions of mitigation, because they determine the extent of the loss for which the defendant ought fairly, reasonably or justly to be held liable. "The inquiry is whether the plaintiff's harm or loss should be within the scope of the defendant's liability, given the reasons why the law has recognised the cause of action in question": **Kuwait Airways Corporation v Iraqi Airways Co (Nos 4 and 5) [2002] 2 AC 883, at paragraph 70** (Lord Nicholls of Birkenhead). The rule of German law which makes damages available for psychological distress in certain circumstances, and makes damages for bereavement as such unavailable, is also substantive. These are paradigm examples of rules governing the recoverability of particular heads of loss, the avoidance of which lies within the scope of the defendant's duty."

23. *And at [41] in* Cox *Lord Mance said as follows:*

> "For the purposes of the distinction, substance includes the identification of heads of recoverable loss, such as pain and suffering (see Boys v Chaplin itself) and loss of consortium (solatium): see **M'Elroy v M'Allister 1949 SC 110**, cited in **Boys v Chaplin, p 82B-E,** per Lord Guest, and see p 389E, per Lord Wilberforce. It further includes, as Lord Hoffmann stated in **Harding v Wealands**, paragraph 24, the rules governing causation and remoteness and, as Lord Rodger accepted at paragraph 74, traditionally also mitigation. The rules governing these matters are, as Lord Hoffmann indicated in paragraph 24, rules which determine the scope of a defendant's liability, or "for what" he is

2339 [2014] UKSC 22 at [17].

> liable. When Lord Hoffmann referred in this connection to what he "previously had occasion to say", he was clearly referring to **South Australia Asset Management Sorpn v York Montague Ltd** ("SAAMCO") case **[1996] UKHL 10, [1997] AC 191**, where the House limited the scope of a surveyor's liability for a negligent over-valuation to such loss as flowed from the over-valuation - excluding, in effect, the further consequences of subsequent market fall as well as any increased risk of default."

24. *The passage from Lord Hoffmann's judgment in* **Harding v Wealands**...[2340] *to which Lord Sumption and Lord Mance both referred to in the extracts from* <u>*Cox*</u> *set out above is as follows (emphasis added):*

> "… the courts have distinguished between the kind of damage which constitutes an actionable injury and the assessment of compensation (ie damages) for the injury which has been held to be actionable. The identification of actionable damage is an integral part of the rules which determine liability. As I have previously had occasion to say, it makes no sense simply to say that someone is liable in tort. He must be liable for something and <u>the rules which determine what he is liable for are inseparable from the rules which determine the conduct which gives rise to liability. Thus the rules which exclude damage from the scope of liability on the grounds that it does not fall within the ambit of the liability rule or does not have the prescribed causal connection with the wrongful act, or which require that the damage should have been reasonably foreseeable, are all rules which determine whether there is liability for the damage in question</u>. On the other hand, whether the claimant is awarded money damages (and, if so, how much) or, for example, restitution in kind, is a question of remedy."

2340 [2007] 2 AC 1 at [14].

25. *In* **Harding v Wealands***...*[2341], *Lord Rodger said that, in addition to mitigation of damages, matters such as contributory negligence and* volenti non fit injuria "*would traditionally fall on the substantive side of the line for purposes of private international law*".

<u>*Importance of the Rules in the Present Case*</u>

26. *One important consequence of these rules relates to the apportionment of liability in cases where there are joint tortfeasors. The GTDs rely upon the following four propositions (referred to on Day 104*[2342] *of the trial):*

 *(1) Rules which determine the scope of a particular defendant's liability or 'for what' he is liable are substantive and not procedural.*[2343]

 *(2) Accordingly, all matters of causation and recoverable heads of loss are substantive rules to be determined by the law of Saudi Arabia).*[2344]

 *(3) The apportionment of liability between joint tortfeasors is a fundamentally causal concept, which determines the extent to which a particular defendant is treated as being responsible for a particular loss.*

---

2341 Above at [74].

2342 Day 104, page 187, line 25 to page 188, line 18 {**Day104/187:25**}.

2343 **Cox v Ergo Versicherung AG** [2014] UKSC 22 at [41] per **Lord Mance; and Harding v Wealands** [2007] 2 AC 1 at [24] per Lord Hoffmann (set out in paragraphs 22 to 25 above).

2344 **Cox v Ergo Versicherung AG** [2014] UKSC 22 at [17] per Lord Sumption and at [41] per Lord Mance; and **Harding v Wealands** [2007] 2 AC 1 at [24] per Lord Hoffmann and [74] per Lord Roger (set out in paragraphs 22 to 25 above).

*(4) As described in Section U1.4 below, the Saudi Judge can, and would likely, apportion liability between joint tortfeasors in the circumstances of this case on an actual receipts basis.*

*27. Accordingly, the damages to which AHAB might be entitled as against each GTD are* *__not__*, *under the law of Saudi Arabia* *__at large__*. *Rather, the Saudi Court would decide who was the person responsible for causing the particular 'harm' or damage and will apportion liability according to the Court's determination of the merits of the case. In a case involving alleged misappropriation, the Saudi Judge will apportion the liability of each party to the extent of his participation in the scheme. As a consequence, the liability of the GTDs under the law of the Cayman Islands is restricted to actual receipts (if any).*

***__U1.3. Approach to the Evidence of Prof Vogel and Prof Mallat__***

*__Prof Vogel__*

*28. On points of material difference between the evidence of Prof Vogel and Prof Mallat, the Court is invited to prefer the evidence of Prof Mallat. This is so for four reasons.*

*29. First, in* **Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co., 2003 Del. Super. LEXIS 294** *("SABIC")*

*Judge Jurden of the Superior Court of Delaware said as follows of Prof Vogel (emphasis added):*[2345]

> "Having had the opportunity to watch Dr. Vogel testify, observe his demeanour on the witness stand when his interpretation of Saudi law was challenged, and review his latest affidavit as well as his prior affidavits and deposition testimony, the Court finds he has become (or been exposed as) more of an advocate than an objective scholar of Islamic law. His relentless attacks on Dr. Hallaq's qualifications and expertise further undermine his credibility in the Court's eye. The Court is concerned about Dr. Vogel's objectivity."

*30. That decision was upheld on appeal by the Supreme Court of Delaware.*[2346]

*31. Unfortunately, similar concerns arise in the present case. Prof Vogel did not provide simple and straightforward answers to the questions put to him but, on a number of occasions, sought to make long speeches which were both difficult to follow and designed to advocate the theories propounded by him (as opposed to seeking to provide the Court with a balanced and unbiased view as to the law of Saudi Arabia).*[2347] *Indeed, after one such speech (which takes up over three pages of the transcript) Prof Vogel said that he found* "this area" *(i.e. the question of apportionment of liability of joint*

---

2345 {**X7/18/7**}.

2346 {**X7/19/27**}. The Supreme Court of Delaware said in relation to the passage from the judgment of Judge Jurden set out above "That finding is entitled to deference on appeal".

2347 See for example Vogel xx: day 102, page 86, line 6 to page 88, line 18 {**Day102/86:6**}. Vogel xx: day 102, page 96, line 8 to page 99, line 6 {**Day102/96:8**}. Vogel xx: day 105, page 17, line 25 to page 20, line 21, {**Day105/17:25**}. The FSD Guide B5.2(b)(iii) provides as follows (emphasis added): "An expert witness should provide Independent [sic] assistance to the Court by way of objective unbiased opinion in relation to matters within his expertise. An expert witness should never assume the role of an advocate or seek to promote his client's case".

*tortfeasors under the law of Saudi Arabia)* "very intricate" *and* "very difficult"*:*[2348]

99: 7
Q. Is there anything else you want to add to your explanation, I want to move on.

A. I would like to apologise that this area is very intricate. I found it very difficult. And I hope to explain it clearly, but it is always a challenge.

32. *In fact, as discussed below, the relevant Saudi Arabian legal principles relating to apportionment of liability are not "very intricate" or* "very difficult"*; they are straightforward. Rather it was the theory advocated by Prof Vogel in relation to apportionment that was both* "very intricate" *and* "very difficult".

33. *Putting the position at its lowest, Prof Vogel got carried away with his own ideas and could no longer see the wood for the trees, as he accepted in cross-examination scholars sometimes did:*[2349]

*66: 18*
Q ..sometimes scholars -- would you accept this, talking generally, get carried away with their own ideas and notions and can't see the wood for the trees?

A. Yes.

34. *Secondly, during the course of his cross-examination Prof Vogel sought to introduce new matters, not previously referred to in his Reports, in a manner that was not helpful to the Court or the*

2348 Vogel xx: day 102, page 99, lines 7 to 11 {**Day102/99:7**}.
2349 Vogel xx: day 103, page 66, lines 18 to 22 {**Day103/66:18**}.

*parties (and should have been addressed previously in writing). For example, in cross-examination, Prof Vogel was asked on three occasions[2350] whether the following extract from footnote 100 to Vogel 1R was true and accurate (emphasis added):[2351]*

> "In ta`zir crimes, however, as in tort cases, in fixing liability the judge will weigh the contribution of each participant, both direct and indirect, in causing the crime. Id. (ta`zir crimes); Zarqa, al-Fi`l, 113 (Hanbali rule is proportional liability in tort); Vogel, Islamic Law, 129 (apportionment is current Saudi Arabian practice for shared causation in negligence)."

35. *Rather than answer the question directly, on each occasion, Prof Vogel sought to "put it in context" by reference to new matters not referred to his Reports (emphasis added):[2352]*

> 93: 7
>
> Q. "In ta'zir crimes, however, as in tort cases, in fixing liability the judge will weigh the contribution of each participant, both direct and indirect, in causing the crime. Id. (ta'zir crimes) …." Then there's a reference to an author called "Zarqa", which we'll look at tomorrow,
> "... (Hanbali rule is proportional liability in tort); Vogel, Islamic Law, [that's your own book] 129 (apportionment is current Saudi Arabian practice for shared causation in negligence)." Do you see all that?
>
> A. Yes.
>
> Q. Are those sentences true and accurate?
>
> A. Yes, I need to --

---

2350 Vogel xx: day 102, page 93, line 19, line 21 and 25 {**Day102/93:19**}, {**Day102/93:21**} and {**Day102/93:25**}.

2351 Vogel 1R, paragraph 115(a)(iii) {**K1/1/49**}.

2352 Vogel xx: day 102, page 93, line 7 to page 95, line 15 {**Day102/93:7**}.

Q. Are those sentences true and accurate, Professor Vogel?

A. I'm afraid I need to explain.

Q. No, would you please answer my question?

A. My Lord?

CHIEF JUSTICE:
Q. Could you answer first and then explain.

A. Yes, I mean, they are accurate, but I need to explain one or two points, if you don't mind, to put it in context.

Q. I'm sure you want to put things in context, because it seems convenient for you to be reminded of these sentences, but let's just see where we are. There is nothing wrong with those three and a half lines, is there.

A. In the last few weeks I discovered a minor point which I might like to bring to your attention, but otherwise, yes, they're accurate. But, again, in the context of the footnote.

Q. Well, let's go back then from the end to the beginning?

A. Please, thank you.

Q. The reference to your own book, "apportionment is current Saudi Arabian practice for shared causation in negligence", right? That was and is correct, isn't it, Professor Vogel?

A. Oh, yes, absolutely.

….
95: 5
Q. Is the Zarqa reference here fully and accurately summarised in your bracketed "Hanbali rule is proportionality liability in tort"?

A. That is correct that is what Zarqa is saying; I've discovered that it's actually not the case.

Q. But that is what he's saying, and when we go and look at the text tomorrow, we will see that, won't we?

A. Yes, we will. But in the last about two weeks ago, I checked his references, and they don't say what he says they say.

36. *Whether or not Prof Vogel was correct to say that the references in Zarqa's "al-Fi`l" "don't say what he says they say" (which is not accepted) it was not helpful to the Court or the parties for new matters such as these to be introduced in cross-examination.*[2353] *If Prof Vogel considered that any aspect of his report required qualification that should have been addressed prior to his cross-examination in writing. The reason that Prof Vogel wished to attempt to belatedly qualify footnote 100 to Vogel 1R in cross-examination was because he realised it was entirely inconsistent with the theory he was advocating as to the apportionment of liability of joint tortfeasors under the law of Saudi Arabia.*

37. *Thirdly, Prof Vogel maintained the view advocated by him on appeal in SAIBC (and rejected by the Supreme Court of Delaware in that case*[2354]*) that it was not possible for a Western Court to*

2353 Paragraph B.5.2(viii) of the FSD Guide provides as follows: "If, after the exchange of reports, an expert witness changes his view on a material matter having read another expert's report or for any other reason, such changes of view should be communicated in writing (through the party's attorneys) to the other side without delay, and, when appropriate, to the Court."

2354 {**X7/19/24**} to {**X7/19/26**}.

*perform* "ijtihad"[2355] *because it did not possess the relevant tools for doing so. In so doing, Prof Vogel showed a fundamental misunderstanding of the Court's function when determining a question of Saudi Arabian law (namely, it is applying the* <u>*law*</u> *of Saudi Arabia as it finds it to be; it is not purporting to change the law of Saudi Arabia):*[2356]

> *62: 23*
> CHIEF JUSTICE:
> Q. Did she[2357] practise ijtihad or did she apply the Saudi law as she thought it was to be applied.
>
> A. She -- in my position, my opinion was that her decision and her instructions to the jury overrode two or three fundamental requirements of usurpation, the very ones that I mentioned in this case. And I thought that that -- it's like overruling a whole body of US law or English law by one -- overruling a bunch of precedent, centuries of precedent.
>
> CHIEF JUSTICE:
> Q. What you were really saying is that you thought the judge was wrong – that she was practicing ijtihad.
>
> A. No, then she -- my feeling was ijtihad is fine, if you are simply evaluating facts or picking among a Hanafi -- two different Hanbali views, perhaps even applying a third school or a second school, but to fundamentally change the definition of usurpation and to reach a result that would be utterly unprecedented under Saudi law, that's a form of ijtihad that I'm not -- I don't think even the most

---

2355 Prof Vogel said in xx at day 103, page 57. lines 2 to 7, {**Day103/57:2**} that ijtihad means "the effort by a scholar to determine God's law, the divine law, the Shari'a, for any particular matter before him, drawing on the sources of Islamic law. Ultimately the Qur'an and the Sunna, but also, you know, the legacy of work from scholars throughout the centuries."

2356 Vogel xx: day 103, page 62, line 23 to page 64, line 4 {**Day103/62:23**}.

2357 *i.e. Judge Jurden in SABIC.*

senior judges in Saudi Arabia would dare to practice. And my point was, when you are about to make such a transformative change in the law in Saudi Arabia, your qualifications have to be extremely high. In fact, I can't imagine this change occurring.

CHIEF JUSTICE:
Q. My only point is that she wasn't purporting or could she have done that?

A. I'm sorry?
64: 1
Q. She was applying the law as she thought it was [to be applied]. She wasn't purporting to change the law of Saudi Arabia.

A. Yes, I was unable to convince her that these mistakes were made."

*38. Fourthly, the facts which Prof Vogel was asked to assume bear no relationship to the actual facts of this case.*[2358] *The facts Prof Vogel was asked to assume included that:*

"5. AHAB/the AHAB Partners did not have knowledge of the full extent of Mr Al Sanea's borrowing from third parties or the misappropriations and did not have knowledge that companies outside AHAB received the misappropriated funds. Nor did AHAB/the AHAB Partners authorise, approve or consent to *this activity.*

21. STCC is a general partnership under Saudi Arabian law which is ultimately majority beneficially owned and controlled by Mr Al Sanea. STCC was funded by money misappropriated from the Money Exchange/AHAB. STCC was used (amongst other things) as a conduit to disguise Mr. Al Sanea's misappropriations from the Money Exchange and the receipts of those misappropriations by the Defendants."

2358 {**K1/1.3/1**}.

39. *For present purposes, there are two particular difficulties with these factual assumptions. First, they take no account of, amongst other things, AHAB's acceptance that*[2359] "Abdulaziz knew about and authorised the issue of the financial statements understating the assets and liabilities and the provision of the English language statements to the banks prior to his stroke…" *(i.e. that AHAB was a party to a fraud on its banks). Prof Vogel accepted in cross-examination that these matters had not been drawn to his attention:*[2360]

> *66: 2*
> Q. Had you seen this document {**X2/8/1**} and {**X2/8/2**} at any stage before I just showed you it on the screen?
>
> A. No, I have not seen this.
>
> Q. Have your instructing attorneys, at any stage since 26 August 2016, drawn these matters to your attention?
>
> A. Not at this length, for sure. I mean, I can relate casual conversation but not any formal communication to me as an expert.

40. *Secondly, in so far as the alleged acts of the GTDs are concerned, the factual assumptions on which Prof Vogel was asked to proceed were entirely founded on alleged receipt of misappropriated funds by the GTDs. For the reasons set out in Section Q above {E1/28/1}, AHAB has failed to demonstrate any such receipt.*

---

2359 Answer 3 to the "Points for AHAB to Answer in Light of the Defendants' Openings and AHAB's Answers" {**X2/8/2**}.
2360 Vogel xx: day 102, page 66, lines 2 to 9 {Day102/66:2}.

*Prof Mallat*

41. *Prof Mallat was an impressive and straightforward expert witness. Prof Mallat is a lawyer and a law professor, with expertise in Middle Eastern and Islamic law, including the law of Saudi Arabia and the Arab Gulf Region. He has been awarded professorial tenure separately on three continents.*[2361]

42. *Prof Mallat gave straightforward and impartial answers to the questions put to him. His evidence was intended to assist the Court. His impartiality, credibility or expertise was not questioned in cross-examination. Indeed, Mr Quest referred to Prof Mallat during the course of his cross-examination as a "very distinguished international lawyer".*[2362]

***U1.4. The Law of Saudi Arabia: Apportionment of Liability Between Joint Tortfeasors***

*The General Theory for Pecuniary Loss or Damage*

43. *Prof Mallat and Prof Vogel are agreed as to the existence under the law of Saudi Arabia of a general theory of claims for pecuniary loss or damage (the "General Theory").*[2363] *Paragraph 3.7 of their Joint Report provides as follows:*[2364]

> "The general theory of claims for pecuniary loss or damage. The experts agree that:

---

2361 Mallat 1R, paragraphs 3 to 8 {**K1/2/4**}.
2362 Mallat xx: day 105, page 50, line 24 {**Day105/50:24**}.
2363 Also referred to as the "Unifying Theory".
2364 Vogel/Mallat Joint Statement, paragraph 3.7 {**K1/4/7**}.

a) This theory has three elements: harm (darar), wrongful act (ta`addi), causation (sabab).

b) This theory is also the basis for claims of damage from contract breach.

c) This theory unifies both tort and contract."

44. *Prof Mallat says as follows about the General Theory in paragraph 256 of Mallat 1R:*[2365]

> "The formula which recurs in Diwan al-Mazalem[2366] … is as follows: 'The principle in adjudicating reparation is the occurrence of the defendant's fault (khata'), harm (darar) to the person concerned, and a causality relation ('ilaqat sababiyya) between the fault and the harm.' The following formula recurs time and again in the court decisions on liability: 'Compensation for tortious liability, mas'uliyya taqsiriyya, arises only supported by the three pillars of fault, harm and the causal relation between them."

45. *In his Vogel 1R Prof Vogel states at paragraph 73 that the General Theory "is now universally recognized in the courts in Saudi Arabia."*[2367]

*Apportionment of Liability: The Differences Between the Experts*

46. *The differences between Prof Mallat and Prof Vogel in relation to the question of apportionment of liability of joint tortfeasors are summarised in their Joint Report at paragraphs 5.8 and 5.9.*

2365 Mallat 1R, paragraph 256 {**K1/2/60**}.
2366 i.e. the Saudi Arabian Board of Grievances, "the best known court in the Kingdom": Mallat 1R, paragraph 13 {**K1/2/6**}. Vogel xx: day 102, page 17, lines 8 to 17 {**Day102/17:8**}.
2367 Vogel 1R, paragraph 73 {**K1/1/28**}.

*Paragraph 5.8 of the Joint Report summarises Prof Mallat's position as follows (emphasis added):*[2368]

> "For Prof. Mallat, the Saudi judge has a discretion as regards the apportionment of liability in cases where there is more than one tortfeasor, to be exercised depending on the facts. A Saudi court will consider the immediate cause is given priority over the more remote one, and the judge is in a position to decide who is the person ultimately responsible for causing the damage. Major ingredients in the apportionment of liability include: (i) distinction between author and instigator (ii) the sequencing of torts; (iii) the degree of intent, participation and/or contribution of each of the wrongdoers.
>
> In relation to a hypothetical example whereby A agrees with B to steal 100 Saudi Arabian Riyals ("SAR") from C, and A keeps for himself the whole of the SAR100 stolen from C, the judge will apportion the liability of each party to the extent of his participation in the scheme. This is likely to mean that the recoverable compensation would be the equivalent of the financial benefit received by each party."

47. *Prof Mallat's view is, therefore, straightforward:*

(1) *The Saudi Judge has a discretion as regards the apportionment of liability in cases where there is more than one tortfeasor, to be exercised by him depending on the facts.*

(2) *In a case involving alleged misappropriation, the Saudi Judge will apportion the liability of each party to the extent of his participation in the scheme. This means that the recoverable compensation would be the equivalent of the*

---

[2368] Vogel/Mallat Joint Statement, paragraph 5.8 {**K1/4/16**}.

*actual financial benefit received by each party (i.e. actual receipts).*[2369]

48. *Paragraph 5.9 of the Joint Report summarises Prof Vogel's position in relation to the apportionment of liability as follows:*[2370]

> "Prof. Vogel considers that under Islamic law, concepts analogous to conspiracy and aiding and abetting in the commission of an intentional tort are component parts of a larger general theory referred to as "participation" (ishtirak) in the commission of torts and crimes. His view is that, if the Defendants were found to have participated in a tort with knowledge that monies were being misappropriated, they might be:
>
> (a) construed as direct participants, each committing the crime in its "material element" by pre-agreement with other Defendants and MAS and his affiliated entities (i.e. tamalu'), in which case they would be jointly and severally liable for the full amount of the victim's losses. This, indeed, assuming their knowledge of the misappropriation, is the outcome to which daman al-yad leads, though only as to monies they had received. Even if all or any of the Defendants are not direct participants sharing in the commission of the tort, the guilty knowledge of each means that each intended that the tort occur (that property of AHAB and the ME be misappropriated to their benefit). As they also committed the wrongful act of accepting the monies regardless of whether they were entitled to them, they could be assimilated to direct participants, and be held jointly and severally liable; or
>
> (b) seen as merely agreeing in advance to join in

2369 Vogel/Mallat Joint Statement, paragraph 5.8 {**K1/4/16**}.
2370 Vogel/Mallat Joint Statement, paragraph 5.9 {**K1/4/16**}.

committing the tort, or as assisting in it, in which case they would be liable as indirect participants, with a share of the total liability to be determined in the discretion of the judge.

The above are Prof. Vogel's views on multiple actors contributing to causing a loss when all the actors have criminal intent to do harm. If some or all of such tortfeasors act wrongfully (by ta`addi) but without such intent, and contribute to causing the harm, then Hanbali law sources offer many principles and exemplary cases to govern the attribution of liability among those tortfeasors, addressing many different factual situations. One of the principles in this area (to which Prof. Mallat may be referring in mentioning priority for the "immediate cause" over a "more remote one") is that the direct actor (mubashir) is generally held liable over the indirect actor (mutasabbib); but even this rule has exceptions. Given this large body of Hanbali and Saudi law on the question of allocation among tortfeasors, in Prof. Vogel's view, it cannot be said that the Saudi judge has the right to decide these questions in his discretion, disregarding these principles and rules.

There are many examples in fiqh works where a co-conspirator or accessory is held liable for the entire loss without inquiry into whether he benefited from the tort. As noted in Prof. Vogel's Report, Saudi cases also reach this outcome."

*49.* *Prof Vogel, therefore, seeks to introduce into the General Theory suggested theories of criminal law, advocated by him, so as to draw a distinction between what he terms:*

(a) "Direct participants" … "each committing the crime in its "material element" by pre-agreement (i.e. tamalu')"; and

(b) "Indirect participants".

*50.* *In the case of direct participants, it is Prof Vogel's argument that*

"they would be jointly and severally liable for the full amount of the victim's losses". *In the case of indirect participants, Prof Vogel's argument is that their liability is* "to be determined in the discretion of the judge".

*51.* *In paragraph 113 of Vogel 1R, Prof Vogel purports to explain the basis upon which* "direct participation" *occurs as follows:*[2371]

> "Direct participation occurs in one of two ways. The first way is by tawafuq, "coincidence," i.e., participants commit an offence simultaneously but without prearrangement or common plan, each from an independent impulse – as with the acts of a mob. The other way is by pre-agreement or conspiracy (tamalu'). Direct participants by tawafuq or coincidence are liable only for their own acts. Direct participants by tamalu' are each liable for the entire punishment for the offence committed, and are together liable in tort for the damages caused."

*52.* *For the reasons set out below, the views of Prof Mallat should be preferred to those of Prof Vogel. There is no rule of Saudi law under which "direct participants" are to be held jointly and severally liable for the full amount of the victim's losses. In the case of* <u>*all*</u> *participants, the Saudi Judge has a discretion as regards the apportionment of liability in cases where there is more than one tortfeasor, to be exercised by him depending on the facts.*

***<u>Reasons Why Prof Mallat's Views Should be Preferred to Those of Prof Vogel</u>***

---

2371 Vogel 1R, paragraph 113 {**K1/1/47**}.

<u>*Little or No Weight Should be Placed by the Court on Prof Vogel's Reliance on Awda*</u>

53. *In support of his advocated theory that under the law of Saudi Arabia there is such a distinction between* "direct" *and* "indirect" *participants, Prof Vogel relies upon the work of an* "Egyptian scholar"[2372] *'Abd al-Qadir 'Awda ("Awda") entitled* al-Tashri` al-jina'I al-islami: muqarana bi-al-qanun al-wad`i *[The Islamic Criminal Law: Comparison with Positive Law].*

54. *At paragraph 109 of Vogel 1R, Prof Vogel states as follows in relation to Awda's book:*[2373]

> "A useful way to penetrate the Islamic teachings as to criminal participation is through a seminal work of comparative law by the Egyptian scholar `Abd al-Qadir `Awda (d. 1954). 82 `Awda's book seeks to achieve a modern synthesis of Islamic criminal law according to all its schools (including the Hanbali school applied in Saudi Arabia) while expressing his findings in terms easily permitting comparison with modern laws, particularly the laws of Egypt. The work includes a 23-page synthesis of the Islamic legal rules governing criminal liability in cases where more than one person participates in the commission of a single offence."

55. *And at paragraph 112 Prof Vogel states as follows:*[2374]

> "Awda's key distinction is between what he calls "direct participants" and "participants by causation" (or "indirect participants"). This dichotomy builds on a basic distinction as to causation under Islamic law mentioned above – between

2372 Vogel 1R, paragraph 108 {**K1/1/45**}.
2373 Vogel 1R, paragraph 109 {**K1/1/46**}.
2374 *Vogel 1R, paragraph 112 {**K1/1/47**}.*

> those who bring about an event by their own act, directly, without any intervening chain of causation, and those who instead bring about a chain of events that lead to the event. For purposes of analyzing participation, Awda renders the distinction as one between those who commit the offence in its "material element" and those who do not commit the offence itself but further it in some way."

56. *For the two reasons set out below, no weight should be placed by the Court on Prof Vogel's reliance on Awda.*

57. *First, Awda's book was written in or around the 1950s about Egyptian criminal law (not the current civil law of Saudi Arabia). Prof Vogel accepted this in cross-examination:*[2375]

*143: 5*

Q. Now, Professor Vogel, please try and answer my question. I will put it again. Awda is writing about classical criminal law, isn't he?

A. He is writing about criminal law, but he is drawing on much material that is outside of criminal law.

Q. What he is doing, and you rely on this heavily, is to lay down, in the criminal context, a series of guidelines in relation to how you characterise the participants, when there is more than one participant involved in a crime; is that right?

A. Yes, the reason, as I explained --

Q. Is that right what I've just put to you?

A. I'm sorry, I should have listened more closely.

Q. No, it would help if you did.

A. Yes, sir.

---

2375 Vogel xx: day 102, page 143, lines 5 to 24 {**Day102/143:5**}.

Q. What he's doing is laying down a series of guidelines in the criminal context, in relation to how you characterise participants when more than one participant is involved in a crime.

A. Yes.

58. *As Prof Vogel accepted in cross-examination, Awda does not address civil liability, civil claims or civil causes of action:*[2376]

*33: 11*
Q. Now, in any of the extracts that we have look at so far in the passages from Awda which have been included in your report on your instructions by AHAB's attorneys, have we seen any reference whatsoever expressly to civil liability, civil claims or civil causes of action?

A. No, Awda does not address that, except in the context perhaps, in passing, of blood money, which is a replacement for retaliation. But it is not his concern in this book.

59. *Secondly, as was also accepted by Prof Vogel in cross-examination, Awda's book has an agenda.*[2377] *One of its purposes was to try to persuade the ruling Egyptian administration to adopt an Islamic system of law (Egypt at that time had, and still has, a civil law system). Prof Vogel said as follows in cross-examination:*[2378]

*105:*
Q. I'm sorry, Professor Vogel, Awda, who died in 1954, is an Egyptian criminal law scholar, and what you are referring to is a part of his book which is a

---

2376 Vogel xx: day 103, page 33, lines 11 to 19 {**Day103/33:11**}.
2377 Vogel xx: day 102, page 147, lines 18 to 20 {**Day102/147:18**}.
2378 Vogel xx: day 102, page 105, lines 12 to 22 {**Day102/105:12**}.

comparative treatise between what he viewed as Islamic classical criminal law and modern positive, ie modern substantive law, in Egypt and a number of other civil law jurisdictions; is that right?

A. Yes.

Q. And in 1954, Egypt had, and still has, a civil law approach to criminal law?

A. Yes.

60. *And as follows (emphasis added):*[2379]

*A. Yes, he's probably referring to then contemporary, at that time, Egyptian penal code.*

*Q. It also refers, as I suggested earlier, we will look at this tomorrow, the Polish Criminal Code, the Belgium Criminal Code, the French Criminal Code; is that right?*

*A. Yes.*

*Q. When he can pluck out of those criminal systems, things that he suggests can be equiparated with things that you can in Islamic classical criminal law; is that right?*

*A. Yes. Authors like this set themselves a task of –*

*Q. An agenda.*

*A. Of understanding traditional law and comparing it to contemporary laws, and it is very useful to use these books for that reason. They partly translate the old law into something contemporary.*

*Q. I wanted to ask you something, and I'm not sure whether I got the question out. Can you remember what is the year of this publication?*

---

2379 Vogel xx: day 102, page 146, line 13 to page 147, line 20 {**Day102/146:13**}.

*A.* *No, I can't remember the year off the top of my head. He was executed, I believe in the early '60s or late '50s.*

*Q.* *No, he was executed in 1954 because he was a card-carrying member of the Muslim brotherhood, wasn't he?*

*A.* *Yes.*

*Q.* *And the Muslim brotherhood, then and now, is keen to portray the values of Islamic law as opposed to French or other western law; that's right, isn't it?*

*A.* *Yes, I think his book is seeking to prove the superiority of Islamic law.*

*Q.* <u>*Yes, so as I was suggesting, it's actually a book with an agenda; I think you would agree with that?*</u>

*A.* <u>*Yes.*</u>

61. *Given its agenda, subject matter and the date it was written little or no weight should be attributed to Awda when determining what constitutes the current civil law of Saudi Arabia in relation to apportionment of liability between joint tortfeasors.*

<u>*In Any Event, Awda Does Not Support Prof Vogel's Theory*</u>

62. *In any event, Awda does not support Prof Vogel's advocated theory as to the apportionment of liability. Classical Islamic criminal law draws a distinction between* hudud *crimes (where the relevant penalty is fixed) and* ta'zir *crimes (where the Judge* <u>*always*</u> *has a discretion as to the punishment that might be awarded). Prof*

*Vogel accepted this in cross-examination (emphasis added):*[2380]

*44: 7*
*A.* *Yes, "ta'zir" literally means "correction". It applies wherever a sin has been committed, and a sin is something that is categorically against the Islamic law, and it also involves intent. So if a sin has been committed, it doesn't go unpunished simply because there is no specified punishment in the Qur'an or the Sunna. Rather, the judge in his discretion will examine the condition of the proof, the condition of the accused; and also consider the utility to the society at large if this act is deterred by punishment. All these considerations go in; based on that, he decides on a quantum of punishment applied to that sin and that accused.*

*MR CRYSTAL:*

*My Lord, I was going to follow this up, if you don't mind, because it is actually quite important. So we have hadd crimes with prescribed penalties in the Qur'an.*

*A.* *Yes.*

*Q.* *And we have got -- leaving aside qisas and diyah – all other crimes, which are fairly to be described as "ta'zir crimes". And in relation to a ta'zir crime, the judge decides what the penalty is --*

*A.* *Yes.*

*Q.* *-- because there is no fixed penalty?*

*A.* *Yes.*
...
*Q.* *So there is really quite an important point here for the learned judge to understand, which is that in the Saudi criminal law system, the distinction between a hudud crime and a ta'zir crime?*

*A.* *Extremely important distinction.*

---

2380 Vogel xx: day 102, page 44, line 7 to page 46, line 18 {**Day102 /44:6**}.

63. *Prof Vogel also said as follows in cross-examination in relation to ta'zir crimes (emphasis added):*[2381]

> 119: 7
> …liability. Criminal liability is -- in ta'zir is always highly discretionary with the judge. There are really no guidelines for him to follow, except the ones I mentioned: the criminality of the act, the victim, what is his personal traits; they actually want to know is he residuous -- I mean, is he recidivist -- and finally the social need. <u>But apart from that, ta'zir is one of the areas where the judges have immense discretion</u>.

64. *Accordingly, where the relevant crime is a* ta'zir *crime the Saudi Judge* <u>*always*</u> *has a discretion as to the punishment that might be awarded. The Saudi Judge has a discretion* "to let the punishment fit the crime". *As explained by Prof Mallat in paragraph 46.1 of Mallat 2R, this is expressly accepted by Awda:*[2382]

> "Even in the text of Egyptian scholar 'Abd al-Qader 'Awda, on which Professor Vogel relies heavily (Vogel 1, fn 79 ff), one finds the following noteworthy remark for the case at hand in the chapter on participation:
>
> 'In ta'zir crimes there is no difference between the punishment of the direct participant and the participation by causation, and this is the opinion we prefer. This is because the crime of both participants is a ta'zir crime, and the penalty for it is a ta'zir penalty, and the law (shari'a) does not differentiate between one ta'zir crime and another, and does not ascribe for such crimes a specific penalty, **and leaves the judge to decide on choosing the penalty that fits the crime and the criminal.** (Vogel 1, exhibit to fn 79 etc. Awda, 374 and emphasised here 14)'."

---

2381 Vogel xx: day 102, page 119, lines 7 to 14 {**Day102/119:7**}.

2382 {**K1/6/12**}. Other authors relied upon by Prof Vogel also support this view: see Mallat 2R, paragraphs 46.1 and 46.1, {**K1/6/12**} to {**K1/6/13**}.

65. *Prof Vogel said that he agreed with this paragraph of Mallat 2R in cross-examination.*[2383]

66. *Indeed, footnote 100 of Vogel 1R states as follows (emphasis added):*[2384]

> "In ta`zir crimes, however, as in tort cases, in fixing liability the judge will weigh the contribution of each participant, both direct and indirect, in causing the crime. Id. (ta`zir crimes); Zarqa, al-Fi`l, 113 (Hanbali rule is proportional liability in tort); Vogel, Islamic Law, 129 (apportionment is current Saudi Arabian practice for shared causation in negligence)."

67. *As described in paragraph 36 above, in cross-examination Prof Vogel attempted to qualify this footnote to Vogel 1R. The reason that Prof Vogel wished to attempt to do so was because he realised it was inconsistent with his advocated theory as to the apportionment of liability under the law of Saudi Arabia.*

68. *In the present case, there is no allegation that Al Sanea or the GTDs participated in* hudud *crimes. At paragraph 25 of Vogel 1R Prof Vogel states that* "Al Sanea's misappropriations constitute … embezzlement".[2385] *Embezzlement is not one of the* hudud *crimes.*[2386]

> *41: 3*
>
> Q. I will come to the punishments in a moment, but there is a distinction, isn't there, between theft, as it has been interpreted, and embezzlement?

---

2383 Vogel xx: day 103, page 38, line 2 {**Day103/38:2**}.
2384 {K1/1/49}.
2385 {**K1/1/9**}.
2386 Vogel xx: day 102, page 41, line 3 to page 44, line 1 {**Day102/41:3**}.

A. Yes.

Q. If we could, just for a moment, pick up your witness statement, which we can do figuratively, by inviting the operators to put on the screen {K1/1/32} paragraph 83. You say:

> "The basic Hanbali fiqh works say very little about the tort and crime of 'ikhtilas' beyond language distinguishing it both from usurpation or ghasb and from theft or sariqa. Linguistically, it is defined as a taking from an inattentive person and fleeing and has become the term for embezzlement in modern times. It might have fallen within the definition of theft (taking surreptitiously from a place of custody), and been punishable by the severe punishment for theft, the cutting of the hand, were it not from a report from the Prophet excluding the embezzler from that punishment."…

43: 20

Q. There is a distinction between theft, which involves the cutting of the hand, and embezzlement, which is not a specified Qur'anic crime; is that right?

A It is not, yes.

Q. It is dealt with invariably under the concept of a ta'zir crime?

A. Yes.

69. *At paragraph 47 of Mallat 2R, Prof Mallat concludes in relation to Prof Vogel's purported reliance on criminal law concepts that:*[2387]

> "If the analogy with criminal law stands, the prescribed penalties are irrelevant, because none of the accusations made against MAS and the GT Defendants belong to the five crimes of *hadd*.[2388]"

---

[2387] {K1/6/13}.

[2388] Hadd is the singularr of hudud crimes.

*70. The Court is invited to accept Prof Mallat's opinion set out above.*

*<u>The Saudi Arabian Cases Relied Upon by Prof Vogel do Not Support his Theory</u>*

*71. The Saudi Arabian cases relied upon by Prof Vogel in his Reports do not support his theory. In paragraph 47 of Vogel 1R, Prof Vogel (in the context of tracing) relies upon a case relating to embezzlement concerning bank card* "pin" *numbers. Paragraph 47 of Vogel 1R states as follows in relation to the case:*[2389]

> "A published case from the general courts for the year 1434 (2012-2013) involves an embezzlement scheme where monies were illegally transferred from the account of a bank customer and routed to the personal accounts at that bank of relatives of the embezzler, who then transferred the funds onward to him."

*72. Prof Vogel makes no reference to this case in the sections of his Reports relating to apportionment of liability. The reason he does not do so is because the case is inconsistent with his theory. The relevant facts of the case are set out in the "Summary of Case" (akin to a headnote) as follows:*[2390]

> "The public prosecutor accused the first and second defendants of using their positions at the …… Bank to embezzle money from a customer's account without his knowledge or the knowledge of the bank's administration. This was done after prior planning and coordination between them. The second defendant stole the pin numbers of some of the bank's employees and branch managers to make illegal transfers to the personal account of his colleague, the

---

2389 {**K1/1/19**}. There is, in any event, no system of precedent in Saudi Arabia. Paragraph 3.1(b) of Prof Vogel and Prof Mallat's Joint Report provides as follows in this regard: "Court decisions are not ordinarily binding, but represent at least an example of how one Saudi court has chosen to interpret and apply Saudi law."{**K1/4/5**}.

2390 {**K2.A/8.1/2**}.

first defendant. The third, fourth, fifth and sixth defendants were accused of giving the first one the freedom to act on their personal accounts, which made it easy for him to embezzle those funds from the customer's account without his knowledge. The …… Bank's management was accused of negligence in monitoring customer accounts routinely, which resulted in a number of transfers being made from their customer's account to other accounts, without being detected for a long time."

73. *As Prof Vogel accepted in cross-examination this is a case of "ishtirak"*[2391] *(described by Prof Vogel in Vogel 1R as ""participation" (ishtirak) in the commission of torts and crimes").*[2392]

74. *The case considered both the criminal penalties to be imposed on the defendants and civil compensation. As explained by Prof Vogel in cross-examination this is not uncommon in Saudi Arabian cases:*[2393]

*36: 1*

Q. The code of criminal procedure which operates in Saudi Arabia not only reflects the concept of a public prosecution -- that's right, isn't it?

A. As I recall, yes.

Q. But also a private right of action to persons alleging they have been harmed by a crime?

A. Yes.

Q. So that what you will find from time to time when we look at the judgments, is both, if you like, a criminal aspect and a partie civile aspect; do you

---

2391 Vogel xx: day 102, page 118, line 9 {**Day102/118:9**}.
2392 Vogel 1R, paragraph 108 {**K1/1/45**}.
2393 Vogel xx: day 102, page 36, lines 1 to 15 {**Day102/36:1**}.

understand what I mean?

A. Can you repeat the last few words?

Q. The civilian notion that is being referred to here is "partie civile"; do you agree with that?

A. Yes.

75. *The Saudi Judge held that both the first defendant and the second defendant were guilty of having <u>participated</u> in embezzlement. However, he awarded differing criminal punishments in relation to both of them:*[2394]

> "All of the above have proved to me: the guilt of the defendant …… and ….. of abusing their posts and participating in the embezzlement of a monetary sum from a customer's account, without his knowledge or the knowledge of the bank's management; and the guilt of defendant … for using the pin numbers of some of the bank's employees, without their permission or their knowledge, to make illicit and irregular transfers;
>
> I have sentenced them for this as follows: A/ under public law: 1 – Jail for defendant …… for eight years and eight hundred lashes divided between ten instalments, with each instalment comprising eighty lashes.
>
> 2 –Jail for defendant … for three years and two hundred lashes divided into four instalments, with each instalment comprising fifty lashes."

76. *Furthermore, only the first defendant (not the second defendant) was ordered to compensate the plaintiff:*[2395]

> "1 – Defendant …… is to be compelled to hand over to the private plaintiff, the …. Bank, three hundred and thirty two

2394 {**K2.A/8.1/24**}.
2395 {**K2.A/8.1/25**}.

thousand and one hundred and eighty–four …. Bank shares and pay seven hundred riyals in fees for setting up the portfolio and pay four hundred and twenty-eight thousand and nine hundred and thirty-eight riyals and sixty-one halala, the rest of the profit [/dividends] after the deduction of the sum in the account."

77. *The decision of the first instance Saudi Judge was affirmed on appeal.*[2396]

78. *In response to questions put by the Court, Prof Vogel refused to accept that the case was one of joint participation in an embezzlement (emphasis added):*[2397]

CHIEF JUSTICE:
It seems from my reading of it anyway, that the second defendant's participation in that offence was in relation to the procurement of the pin numbers, and the abuse of the pin numbers.

A. Yes.

CHIEF JUSTICE:
That is what the judge found.

A. Yes.

CHIEF JUSTICE:
Isn't that tantamount to finding participation in the offence of embezzlement?

A. No, it could mean that the judge wants to punish him for abusing pin numbers. You see, it's -- a judge, you know -- we could point to it in other cases, someone may not be found guilty of the crime itself, but it's come to the court's notice that they committed this or that act. The court has freedom to punish them on

---

[2396] Vogel xx: day 102, page 132, lines 9 to 12, {Day102/132:9} {**K2.A/8.1/28**}.
[2397] *Vogel xx: day 102, page 136, line 21 to page 137, line 18, {**Day102/136:21**}.*

> the spot for that act, with ta'zir. And so, you know, again, I didn't want to claim that's true of this case. I'd like to see it in Arabic and carefully study it. I just have my recollection that, for several reasons, it wasn't very persuasive for me on the issue of the allocation of the civil liability amongst participants.

*79.* *Contrary to Prof Vogel's evidence, the Court's reading of the case was correct. Prof Vogel was not asked about the case further in re-examination. The case is inconsistent with Prof Vogel's theory. It is a case involving joint participation in embezzlement. However, differing criminal punishments and civil orders were made against the first and second defendants who participated in that embezzlement. There is no discussion in the case of any concept of* "direct" *or* "indirect" *participants (as one would expect to find if Prof Vogel's advocated theory had any foundation).*

*80.* *In paragraph 114 of Vogel 1R Prof Vogel states as follows:*[2398]

> "Saudi courts now favour the view that direct actors by tamalu' are liable jointly and severally. The Supreme Judicial Council, the highest appellate level in the general court system, has so ruled in a case of participation in embezzlement, reversing a judgment for equally shared liability."

*81.* *The decision of the Supreme Judicial Council relied upon by Prof Vogel also does not support his theory. The case involved the embezzlement of money by two bank employees from a bank safe in circumstances where the safe could only be opened with two keys,*

[2398] {K1/1/48}.

*one held by each of the employees.*[2399] *Prof Vogel accepted this in cross-examination:*[2400]

Q. This is a case, Professor Vogel, about the two keys; do you remember that?

A. Yes, I do.

Q. The safe could only be opened if both keys were inserted, right?

A. Yes.

Q. The question was whether, in those circumstances, the criminal defendants' behaviour, for the purposes of the compensation claim which arose in the context of the criminal proceedings, should be regarded as joint or several, right?

A. Yes.

Q. Good. Let's just look at this in a little bit more detail. I think this is from the Reporter series, but we can see that the subject of the decision is "Joint Payment of an Embezzled Amount."

Then Decision Summary:

"Determining that the two defendants in the case are jointly liable, as the bank made them both responsible by giving each of them one key for a safe that could only be opened by using both keys. What happened was with the knowledge of them both." And then the decision that both of them had to repay the full amount; do you see that?

A. Yes.

82. *Given that the conduct of the two defendants was inseparable (because in order to open the safe both had to use their keys) it is*

---

2399 {K2.A/49.1/1}.
2400 Vogel xx: day 103, page 3, line 11, to page 4, line 10 {Day103/3:11}.

*not surprising that both were held jointly liable. The fact the Supreme Judicial Council made such a finding on the particular facts of this case does not, however, support Prof Vogel's view that* "Saudi courts now favour the view that direct actors by tamalu' are liable jointly and severally". *Indeed, as Prof Vogel accepted in cross-examination the word tamalu' does not even appear in the judgment of the Supreme Judicial Council:*[2401]

> 10: 10
> Q. The first word that does not appear in this judgment is the word "ishtirak"; is that right?
>
> A. That's right.
>
> Q. The second word which does not appear in this judgment is "tamalu'".
>
> A. Yes.
>
> Q. The word that's used in the Arabic, if we go back to {K2.A/49.1/6} in the English for the expression of "being an accomplice", do you see that?
>
> A. Yes.
>
> Q. Is the word "tawa'tu."
>
> A. Yes.

83. *Similarly, there is no discussion in the case of any concept of* "direct" *or* "indirect" *participants, as one would expect to find if Prof Vogel's advocated theory had any foundation.*

84. *The same is true of other cases relied upon by Prof Vogel in*

[2401] *Vogel xx: day 103, page 10, lines 10 to 21 {**Day103/10:10**}.*

*paragraph 114 of Vogel 1R.*[2402] *None supports Prof Vogel's theory. As Prof Mallat explained in cross-examination a Saudi Judge can make an order that defendants are jointly and severally liable. However, the Saudi Court* "generally makes a distinction" *and the cases in which it has not done so are a* "very rare instance" *(emphasis added):*[2403]

144: 14
Q. Which is, as I understand your position, your view is that where there are participants, the court will always apportion damages severally between the defendants according to its view of their contribution?
A. Yes, and to be exactly precise on this because I think it will help you, it can decide jointly and severally.

Q. Right.

A. But it can decide severally. It's not constrained with a decision under any circumstance of saying everybody is fully, jointly and totally liable.

Q. Right. Well, that --

A. It could and there are instances where it does, but when it comes to participation, the factoring in is much more complicated and it's a matter of fact.

Q. This may shorten things considerably, Professor Mallat because I was going to suggest that to you.

A. Good. Good.

Q. The evidence of Professor Vogel gave yesterday --

A. Yes.

---

[2402] {**K1/1/48**}.
[2403] Mallat xx: day 105, page 144, line 14 to page 147, line 16 {Day105/144:14}.

Q. You don't need to look a back at, it but the evidence that Professor Vogel gave yesterday is, trying to put it neutrally, is that in certain circumstances the Saudi court can make participating defendants jointly and severally liable. Now, as I understand it, you are not necessarily disagreeing that it is possible for the Saudi court to makes defendants jointly and severally liable.

A. Absolutely.

Q. In an appropriate case, a court can make them jointly and severally liable. Indeed, we saw, didn't we, a case where that happened, didn't we?

A. Yes.

Q. I think you were in court, weren't you, when Professor Vogel was asked about the two keys case; do you remember that?

A. Right.

Q. And --

A. And that's precisely that case where it was so blatant that there was no way that they could get to that safe without operating the two keys. The court said, well, I can't make a distinction between them. Right.

A. <u>But generally it makes a distinction</u> because there is a host of factors that we tried try to approach, both Professor Vogel and I, but we do it in a different way and I am much more comfortable allowing the judge on the cases that I have seen in Saudi Arabia, not being too constrained to direct/indirect. But, again, to the monies received that will also be a factor, so the harm and the money received will also be factored in.

Q. So, it is more of a nuanced difference then between you and Professor Vogel which is that you would, as it were, reject the slightly more rigid classification between direct and indirect and you would --

A. With all due respect to Professor Vogel, I think his

classification is too rigid.

Q. And you would say that it is really a matter for the judgments for the judge on the facts, to determine how to apportion damages.
A. Absolutely.

Q. But one the ways in which damages could be apportioned is by making two or more parties jointly and severally liable?

A. It is a possibility, but from the cases that we've seen, it is a very rare instance. Most of the cases that I've seen in criminal, as well as civil, is one which naturally, particularly on a very complex set of cases they are not going to throw them all into the same joint and several liability; they are going to try to understand the facts and apportion in ways that they find fair. There would be a number of factors, yes.

Q. So, it is a matter for the court.

A. Yes.

Q. Whether joint liable is imposed is a matter for the court to decide looking at the facts of the case?

A. Exactly.

85. *Prof Mallat also said as follows in this regard in cross-examination (emphasis added):*[2404]

A. 149: 23
A. I've looked at participation in both criminal and civil contexts and it is almost a constant that there is distinction made because the court is able to find a number of factors that are different. It goes from the action itself to how much each one received, to how the degree of harm, the degree of intensity, even recidivism is something that appears in some of the criminal cases, so they will generally give different penalties or compensation.

2404 Mallat xx: day 105, page 149, line 23 to page 150, line 6 {**Day105/149:23**}.

86. *The Court is invited to accept Prof Mallat's evidence set out in paragraphs 84 and 85 above.*

*There Is No Need for the Court to Have Recourse to Prof Vogel's Theory Given the Agreement Between the Experts as to the Existence of the General Theory*

87. *There is no need for recourse to Prof Vogel's advocated theory in relation to the purported distinction between* "direct" *and* "indirect" *participants given the agreement between Prof Mallat and Prof Vogel as to the existence of the General Theory. Given the existence of the General Theory a Saudi Judge would not need to consider the suggested theories of criminal law, advocated by Prof Vogel.*

88. *Prof Mallat states as follows in this regard at paragraph 6 of Mallat 2R:*[2405]

> "6. In all the above, the judge in Saudi Arabia will not give much shrift to the equivalent of a word in a foreign context, and ultimately resort to what Professor Vogel and I probably agree on: a balance of factors in the assessment of responsibility. I believe we also agree that the judge's appreciation is likely to differ from a purely classical approach based on the principle of absolute liability. Ultimately, the court would in my view adopt our agreed summary to decide on the facts that it will have distilled: 'The general theory of claims for pecuniary loss or damage […] (a) has three elements: harm (darar), wrongful act (ta`addi), causation (sabab). (b) This theory is also the basis for claims of damage from contract breach; (c) This theory unifies both tort and contract.' (JM at 3.7.)"

---

[2405] {**K1/6/2**}.

89. *Prof Mallat's views set out in this paragraph were not challenged in cross-examination. As Prof Mallat explained in cross-examination:*[2406]

87: 15

Q. The tripartite part of it is 3.7(a), where you and Professor Vogel agree that the theory has three elements: harm, wrongful act and causation?

A. Yes.

Q. You say at (b): "This theory is also the basis for claims of damage from contract breach. "(c) ... [and it] unifies both tort and contract."

A. Yes.

Q. So with that refinement, a Saudi court would approach any case before it by looking to see whether those elements were satisfied?

A. In a civil context.

Q. Of course in a civil context. If those elements were satisfied, then liability will be established?

A. Definitely.

Q. The Saudi court, in doing that exercise, wouldn't need to ascribe to it some particular kind of wrong --

A. Exactly.

Q. -- as we would do in the common law system?

A. You are actually describing my difference with Professor Vogel.

Q. I'm not sure if that is a difference with Professor Vogel.

---

2406 Mallat xx: day 105, page 87, line 15 to page 88, line 18 {**Day105/87:15**}.

A. Well, at this stage it isn't, but then of course afterwards we differ on the introduction of Professor Vogel's of all these concepts, which I think are superfluous, because the court will be much more comfortable in doing this exercise.

90. *The Court is invited to accept this evidence. Given the existence of the General Theory, there is no need for any recourse to Prof Vogel's theory in relation to the purported distinction between* "direct" *and* "indirect" *participants.*

*Conclusion*

91. *In all these circumstances, the Court is invited to reject Prof Vogel's advocated theory that there exists under the relevant law of Saudi Arabia any distinction between* "direct" *and* "indirect" *participants under which* "direct" *participants will be jointly and severally liable for the full amount of the victim's losses. No such law exists.*

92. *Instead, the Court is invited to accept the views of Prof Mallat described in paragraph 47 above that:*

*(1) The Saudi Judge has a discretion as regards the apportionment of liability in cases where there is more than one tortfeasor, to be exercised by him depending on the facts.*

*(2) In a case involving alleged misappropriation, the Saudi Judge will apportion the liability of each party to the extent of his participation in the scheme. This means that the recoverable compensation would be the equivalent of the*

*actual financial benefit received by each party (i.e. actual receipts).*

93. *On the facts of this case, this means that the Saudi Judge would likely apportion liability on an actual* "receipts" *basis. Receipt in this context means monies actually received by a defendant the benefit of which is retained by that defendant (not simply money passing through an account).*

94. *In so doing, a Saudi Judge will* "follow the cash". *Prof Vogel said as follows in this regard in cross-examination:*[2407]

48*: 10*

Q. You remember yesterday that we looked at the assumed facts --

A. Yes.

Q. -- on which you have been instructed, and we had a discussion about the receipt allegations in the assumed facts; do you remember that?

A. Yes.

Q. Perhaps you can help us with this. Under the Saudi civil procedural law, facts can be introduced into a case in Saudi Arabia if they're relevant and material; is that right?

A. Yes.

Q. If, for example, you were trying to demonstrate -- I'm talking entirely generally now -- to a Saudi judge, that A had made a payment to B through the

2407 *Vogel xx: day 103, page 48, line 10 to page 49, line 6 {**Day103/48:10**}.*

banking system -- do you follow me so far?

A. Yes.

Q. The Saudi judge would be entitled to receive, and would expect to see, a bank statement in which he could follow the cash from A to B; would you agree with that?

A. Yes, I would expect bank statements to be documented -- I mean, bank transfers to be documented.

91. As noted in the introduction of the foregoing submissions of the Defendants, I accept them based upon Prof Mallat's evidence, as being the correct representation of the Saudi law on the subject.

92. Following is the Defendants' treatment of the subject of "Musadaqa" based upon documents disclosed in the case which show that AHAB had provided Al Sanea with what, on its face, appears to be blanket releases from liability in respect of his management of the Money Exchange. I include these submissions for the sake of completeness but note that I do not accept that AHAB could have meant (whether as a matter of Saudi or Cayman law) to grant releases for fraudulent conduct of the kind alleged in this case (but not proven) to have been committed by Al Sanea against AHAB.

***"Two Additional Matters of Saudi Law***

*Musadaqa*

*95. As described in the Detailed Narrative, throughout the 1980s, 1990s and 2000s, AHAB partners provided to Al Sanea* musadaqa *(or releases) in respect of his conduct in relation to the Money Exchange.*

96. *In so far as the period following Abdulaziz's death is concerned, resolution R/66 provided, in so far as material for these purposes, as follows:*[2408]

> "At the meeting of the Board of Directors of Ahmad Hamad Algosaibi & Brothers Co. Money Exchange, Commission and Investment, held at the Company Offices in Khobar on 25 November 2000, the following has been decided:
>
> First: The adoption of Board Resolution No 2 /2 on 28/02/2000 for the same previous conditions, as signed by Sheikh Abdulaziz Algosaibi for all the points mentioned therein. …"

97. *Resolution 2 of 2000 (R/2) dated 28 February 2000 (signed by Abdulaziz), which is referred to in the first resolution of resolution R/66, authorised Abdulaziz and Al Sanea to:*[2409]

> *"[Ratify*[2410]*]* … all resolutions related to the company business which precede the date of signing this summary which were approved by Mr. Abdulaziz Hamad Algosaibi and Mr. Maan Abdulwahid Al Sanea jointly or severally whether they be current or capital expenses, facilities provided to others, loans or any liabilities incurred whether to the company or to others as a result of their signature."

98. *As described in the Detailed Narrative, resolution R/66 was* "approved and adopted" *by AHAB partners every year from 2002 through to 2008.*

99. *Prof Mallat explains as follows in relation to the effect of musadaqa in Mallat 1R at paragraphs 313 and 316:*[2411]

---

2408 {**N/204/1**} (Arabic), {**G/2289/1**} (translation).

2409 {**P/75/5**} to {**P/75/8**} (Arabic) also at {**G/2087/1**}; {**G/2088/1**} (translation).

2410 i.e. "musadaqa": see Yousef xx: day 34, page 100, line 19 {**Day34/100:19**}. The word is translated as "confirmation" in the translation at {**G/2088/1**}.

2411 {**K1/2/73**} to {**K1/2/74**}.

> "313. Unreserved approval is entailed by the musadaqa in general. Musadaqa is a formal way under Islamic law to acknowledge and accept the other party's action so that it cannot be contradicted thereafter. Classical dictionaries, both general and legal, consider the person who confirms (saddaqa) someone else's words as having accepted it. Muhit al-muhit, another classical dictionary, uses denial and belying, inkar wa takdhib, as antonyms to tasdiq. Confirmation of past actions by all the parties to the musadaqa is presumed to have taken place in full knowledge of the act or document confirmed. …
>
> 316. … In Saudi law, therefore, both under the classical understanding of musadaqa, and in modern court decisions … acknowledgments stand for admission and release. In the present case, the releases stand as prima facie evidence that the ME partners, including AHAB, have examined the acts of MAS, and agreed to them."

*100. As further explained by Prof Mallat in cross-examination:*[2412]

> 55: 16
>
> Q. I mean, they are releases in a very general form, aren't they?
>
> A. That's the form usually, yes.
>
> Q. They don't refer specifically to any particular activities of Mr Al Sanea?
>
> A. That's correct.
>
> Q. So, they don't demonstrate on their face, do they, disclosure or awareness that Mr Al Sanea was taking large amounts of money out of the Money Exchange, if that's what he was doing?
>
> A. They presuppose it, yes. Maybe not on their face. I don't know. It all depends on what you mean by "on their face".

---

2412 *Mallat xx: day 105, page 55, line 16 to page 56, line 8 {**Day105/55:16**}.*

Q. Well, they don't presuppose that he's taking billions of dollars out of the Money Exchange, do they?

A. Of course not.

Q. They are releases in the most general form?

A. That's right. These are.

101. *In the Joint Report at paragraph 5.17, Prof Vogel said of the* musadaqa *that* "they appear to be ratifications or confirmations (musadaqa, meaning consent, approval, verification, ratification) of past decisions on activities of ME by, or at least known to, the ME Board."[2413]

102. *Whilst not accepting that* musadaqa *implies authorisation or knowledge, Prof Vogel said in cross-examination that the word* musadaqa *meant "you have spoken the truth" as follows (emphasis added):*[2414]

72: 8
CHIEF JUSTICE:
Q. Do you accept that on the face of these documents, there is implication of authorization and knowledge? Is that something you accept?

A. No, I don't accept it. I mean knowledge of things that are not stated or not before the board, no. But whatever is known to the board or they, themselves, did so they are presumed to know, they can ratify that, but something that they are unaware of...

---

2413 ***{K1/4/22}***.
2414 *Vogel xx: day 102, page 72, line 8 to page 74, line 25 {**Day102/72:8**}*.

CHIEF JUSTICE:
He seems to go further. He seems to suggest that because of the nature of the relationship between the board and in this case, Mr Al Sanea as its agent or employee –

A. Yes.

CHIEF JUSTICE:
-- that there is a duty to have supervised and a duty to have ascertained –

A. Yes, my Lord.

CHIEF JUSTICE:

-- before they granted the release.

A. Yes.

CHIEF JUSTICE:
So, on that basis he seems to be saying that there is this implied authorisation and knowledge.

A. Yes, my Lord.

CHIEF JUSTICE:
Q. Do you accept that?

A. No, that's a separate point on which I disagree with him.

CHIEF JUSTICE:
I see.

MR CRYSTAL:
Just to clarify, Professor Vogel, you accept from the face of the document and the use of the expression "musadaqa," that there is ratification?

A. Yes.

Q. For there to be ratification, there has to be knowledge of that which is being ratified?

A. Yes.

….

A. Yes, if they know what they're ratifying, they're ratifying.

Q. And the use of the word "musadaqa" is a word which is used because it is quite a formal word, where one has knowledge and where one authorises?

A. What it literally means is you have spoken the truth. Somebody says something, another says "sa'daq". I say that you are telling me the truth. I say that what you have said is true. That is literally what it means.

CHIEF JUSTICE:
In other words there would be "affirmation."

A. Affirmation would be a good term for it.

*Knowledge and The Duty to Enquires*

*103. Paragraphs 293 to 297 of Mallat 1R state as follows:*[2415]

"293. Knowledge by partners provides a strong defence both in classical Islamic law and in the modern law of Saudi Arabia. In classical law, the reference to knowledge pervades the discussion on partnership, and the law of obligations generally, and partners are presumed to operate on trust in their partners. In codified Saudi law, Article 24.2 of the LC states, in addition, that:

> [a] partner may personally follow up the partnership's business at its head office, examine its books and documents, extract a summary statement on the financial standing of the partnership, and extend advice to its manager. Any agreement, that contradicts such provisions, shall be null and void.

294. Saudi courts have emphasised the duty for partners to examine the work of the partnership, for which they are required to file periodic releases. …

2415 ***{K1/2/70}*** *to* ***{K1/2/71}***.

295. In one decision, the Saudi judge rejected the complaint of a partner who had presented it before he examined the company's documents, stating that it was the duty of the partners to enquire about the position of the company before resorting to courts:

> [This is] what the law imposes as a right of the himself the situation of the company, the rights he has in it and his losses, and the degree of soundness (literally 'degree of health') in the directors' work.

296. Accordingly, 'knowledge' in this case is far more encompassing than turning one's blind eye, simple acknowledgment, tacit approval or open consent. Saudi law requires a partner to make enquiries. That duty is imposed by law on the partner because of his responsibility towards the partnership's well-being, and can only be trumped by deliberate fraud on the part of the other partner. …

297. In the present case, therefore, each of the partners of the ME (including AHAB and Yousef) would have a duty to enquire as to the conduct of the partners and the business of the ME. This duty presumes knowledge. The AHAB partners in the ME are bound by the IPA to perform their duties actively in the ME."

*104. Prof Vogel's views in relation to these matters are set out in paragraph 5.15 of his Joint Report with Prof Mallat as follows:*[2416]

"On the other hand, Prof. Vogel considers that, since MAS was in the status of amin toward AHAB, Saudi law presumes that he lacks authority to deal for his own account to the detriment of AHAB absent clear and convincing proof of such authority, which must moreover be granted by a party authorized by AHAB to grant it. A similar situation would apply to the ME. AHAB's various delegations of managerial authority to MAS to act on its behalf in transactions with third parties would not be relevant to this issue."

[2416] *Vogel/Mallat Joint Statement, paragraph 5.15 {**K1/4/21**}.*

105. *Prof Vogel's views are wrong. They relate, at best, to questions of burden of proof (which are governed by the* lex fori *i.e. Cayman Islands law). This is to be contrasted with Prof Mallat's views which relate to substantive defences available to the GTDs under the law of Saudi Arabia and/or the duty of AHAB partners to enquire as to the conduct of Al Sanea and the business of the Money Exchange (which are governed by Saudi law).*

106. *Prof Mallat's view is shared by Dr Hammad, SIFCO5, Saudi Arabian law expert. Paragraph 92 of Dr Hammad's First Report states as follows in this regard:*[2417]

> "92. The practice of reporting to the Chairman or CEO of the Family Business is an essential part of the Chairman/CEO's exercise of his duties. As the head of the Family Business, the Chairman/CEO acts as agent for all of the other Partners/Members of the Family. He is therefore required, as a matter of both law and of general practice, to familiarise himself with all aspects of the business and to maintain oversight over the operations of the different strands of the business in order to protect the family's interests. As such he is required:
>
> (a) Upon being appointed, to conduct a thorough investigation into the affairs of the business and to make sure that nds the way it is being run and any potential challenges that the business may face;
>
> (b) To continue to monitor the running of the business, particularly where there is an area of concern that could affect the wellbeing of the family;
>
> (c) Where there are concerns about an individual (in particular a junior or non-family member) within the business, to limit their freedom to act within

2417 {K1/3/28}.

narrowly defined boundaries.

93. If he fails to do this, he is in clear breach of his duties and may be liable to the company/partnership for damages."

107. *In cross-examination, Prof Mallat said as follows:*[2418]

53: 10

Q. So if deliberate fraud is proved in this case, then Mr Al Sanea wouldn't have a strong defence, would he?

A. Mr Al Sanea ...?

Q. Mr Al Sanea wouldn't have a strong defence if deliberate fraud is proved?

A. Yes, but it is qualified, if I may, but -- yes.

Q. What was the qualification?

A. The qualification would be to look -- and that's, I think, one of the major points of difference, my Lord, with my colleague, is that the court would look very closely at the partnership and question everyone on the partnership very seriously.

Q. Yes.

A. And --

CHIEF JUSTICE:
For what, collusion?

A. Well, yes, for collusion and for knowledge and for allowing things to go -- to go in this dramatic way with --

CHIEF JUSTICE:
Turn a blind eye, I think you --

A. Yes. And so I think that's the main difference that I have on the first part with my distinguished

---

2418 Mallat xx: day 105, page 53, line 10 to page 54, line 9 {Day105/53:10}.

colleague, that the partnership is going to be looked at very closely for the duties -- the fiduciary duties of all the partners.

MR QUEST:

As indeed it has been in this case. The Court is invited to accept the views of Prof Mallat set out above.

# SECTION 7A

# THE SO-CALLED "MONEY OUT SCHEMES" AND AHAB'S ABILITY TO TRACE ITS MONEY INTO THE HANDS OF THE DEFENDANTS: HERE THE GTDS.

# SECTION 7A

# THE SO-CALLED "MONEY OUT SCHEMES" AND AHAB'S ABILITY TO TRACE ITS MONEY INTO THE HANDS OF THE DEFENDANTS: HERE THE GTDS.

## THE RESULTS OF THE DELOITTE INVESTIGATION – THE SO CALLED 'MONEY OUT SCHEMES'

1. AHAB's case depends upon three things: (a) bank borrowing being unauthorised, (b) forgery, and (c) the unauthorised bank borrowings being misappropriated, or stolen, by Al Sanea. To be fraudulent all three things have to have been unknown to the Algosaibis. In relation to the unauthorised bank borrowings being misappropriated, that depends upon the so called 'money out schemes'. These are described by Mr. Hargreaves[2419] as "*the three principal schemes used by MAS to transfer billions of dollars out of the Money Exchange and into or for the benefit of parties including the Defendants. In common with Hatton 1, I describe these three schemes as (i) Cheques; (ii) Letters of Credit; and (iii) Electronic Transfers. I refer to them collectively* [in my statements] *as the "Money Out Schemes"*.

2. The transfers out as well as the borrowings are all recorded in the books and records of the Money Exchange, most notably in Ledger 3. AHAB's claim depends upon that state of affairs having been kept secret from the AHAB Partners. As examined above in this Judgment and as the Defendants have been able to show, AHAB's claim of ignorance and non-authorization is false. The Deloitte Investigation which proceeded on the basis of

---

[2419] Hargreaves1W, paragraph 41 **{I/2/15}**.

the veracity of AHAB's claim was therefore itself fundamentally flawed and render unreliable the subsequent evidence of Mr. Charlton, and that of Mr. Hatton and Mr. Hargreaves, all of whom relied in their statements upon the findings of the Deloitte Investigation.

3. Having found that the AHAB Partners knew about and authorized Al Sanea's activities through the Money Exchange, I have rejected AHAB's primary case based upon its allegations of fraud.

4. As explained in the last section of this Judgment, I have also found that AHAB has failed to establish, either as a matter of Cayman or Saudi law, the necessary proprietary bases for its claims, all of which are receipts based claims.[2420]

5. In this section of the Judgment, I accept and to a very large extent adopt the detailed and painstakingly careful submissions of the Defendants in relation to the so-called "money out schemes".[2421] Here I examine, in turn, the allegations that the GTDs , the AwalCos

---

[2420] All of AHAB's claims are receipts based: (**1**). A claim for compensation and/or damages for dishonest assistance by the Defendants in Al Sanea's breaches of fiduciary duties which he owed to AHAB: **RASOC paragraphs 180-183B** : **{A1/2.2/87-88}**. In this regard, the Defendants are alleged to have acted as "*repositories for the misappropriated money and/or investing it for Mr. Al Sanea and/or handling it"*. **(2).** A claim for compensation and/or damages for the knowing receipt by the Defendants of monies misappropriated from AHAB by Al Sanea in breach of fiduciary duties he owed to AHAB: **Ibid.** In particular at paragraph 182 that Al Sanea "*exercised complete control over (the Defendants). Accordingly, all of (the Defendants) knew through Mr. Al Sanea that the money received by them was traceable to a dishonest breach of duty by him."* **(3).** A claim for compensation and/or damages arising from the Defendants' participation in an unlawful means conspiracy against AHAB: **RASOC paragraph 184**: **{A1/2.2/88}.** The Defendants' alleged participation in the conspiracy is (i) to act as "*repositories for the proceeds of fraud or a large part of them and/or received payments directly from the Money Exchange."* (**4**). A claim in restitution based upon the alleged unjust enrichment of the Defendants by their receipt of the money alleged to have been misappropriated from the Money Exchange: **RASOC, paragraph 186 {A1/2.2/89}. (5).** A proprietary claim based upon AHAB's alleged right to trace the purportedly misappropriated monies into assets held by the Defendants: **RASOC, paragraphs 187-188B {A1/2.2/90}**. **(6)** A claim that the Defendants (other than Al Sanea) as a consequence of their knowing receipt of the proceeds and/or dishonest assistance to Al Sanea's fraud against AHAB, are each liable as constructive trustee to account to AHAB in like manner as Al Sanea himself, for any advantage, profit or deficit in the" trust fund" (defined as money misappropriated from the Money Exchange by Al Sanea): **RASOC, paragraphs 183A, 183B {A1/2.2/87} as read with 176 and 176A {A1/2.2/84}**.

[2421] Where they examine side-by-side, the arguments and findings based upon their own (Messrs Davies, Lawler and Hourigan) as well as AHAB's (Messrs Hatton and Hargreaves) experts' evidence.

and SIFCO 5 were the recipients of funds which left the Money Exchange through those schemes.

6. However, my objective in this section of the Judgment is simply illustrative - to show why it is that I find that AHAB has failed to prove to the required standards of proof that the Defendants received funds which may be regarded as belonging to the Money Exchange; i.e. funds against which AHAB could assert a proprietary claim. The objective here is not to show that the Defendants did not, in fact, receive monies appropriated (or misappropriated on AHAB's case) by Al Sanea from the Money Exchange. I do not need to and so do not go so far as to conclude that the Defendants never received funding through Al Sanea obtained from the Money Exchange. The point of the exercise is to illustrate the inconclusiveness of AHAB's evidence tendered in support of its proprietary claims.

7. Mr. Hargreaves has accepted that other than in the case of a number of transfers totaling US$165 million, he has failed to trace or follow the payment of any funds directly from the Money Exchange to the GTDs. To the extent that the evidence reveals that these transfers were made for commercial purposes allowed by AHAB as between the Money Exchange and the GTDs, AHAB's claim in relation to them is unsustainable. On that basis alone, I accept that AHAB's claims must fail in relation to these payments and as no other payments have been traced, for that reason alone, the claims against the GTDs have failed. The failure also to show receipt by the AwalCos and SIFCO 5, to be separately considered below, means that AHAB's claims against those Defendants also fails on that basis alone.

8. Likewise as also discussed in the last preceding section of this Judgment, the duty of a constructive trustee to account does not arise where there was no receipt of monies in relation to which a constructive trust could arise. It follows that there is no duty on the Defendants to account unless AHAB establishes receipt. As AHAB cannot establish receipt, AHAB's assertion that a reversed burden of proof applies to the Defendants because of their duty to account[2422] is also misconceived.

## EVIDENCE RELIED UPON: "FOLLOW THE CASH", AUDITED ACCOUNTS, THIRD PARTY DOCUMENTS

9. Some of AHAB's books and records, and some of the Money Exchange's books and records, have proved to be unreliable. In particular, as already discussed,[2423] the English accounts of the Money Exchange were wholly unreliable and were used to defraud the banks. There are documented Forex and Letters of Credit (LCs) transactions that were fictitious and entered into in order to enable the Money Exchange to make drawdowns under its banking facilities.

10. This unreliability means that the Court cannot rely upon the books and records alone, but should look to corroborating evidence. I accept that the Court should look for the best evidence to support the transactions recorded in the books and records.

### Bank Statements

11. I accept that the best evidence is to "follow the cash" through bank statements or other third party documents.[2424] Mr. Davies explained what this meant:[2425]

---

2422 **RASOC, paragraphs 183B.1; 183B.2 {A1/2.2/87-88}**.

2423 Mainly under "AHAB Partners' knowledge and authority".

2424 The accountants agree that using the bank statements is best and that where possible company books should be reconciled to bank statements. See for example: Davies xx **{Day95/78:8}** "*What's important to me is following the cash*"; Andrews xx **{Day97/31:8-14}**: "*Q…I think your colleague, Mr. Davies …said…the best evidence of whether a*

> *"A. It is always easiest for me to -- best evidence for me as regards whether a cash-flow has actually happened is by following the cash through bank statements, ideally, third-party-produced bank statements that explain them. That's what I meant by that, is following -- looking to follow -- bank statements would be the best evidence of where the cash has actually moved, rather than a note or something else. Also, I'm looking for is third-party evidence, as well, which is more independent than otherwise, if that makes any sense, my Lord.*"

**Audited Accounts**

12. If there are no bank statements, the next best evidence is to rely upon information from third parties. Audited accounts are a useful source of information to the extent that they have a clean audit report and the entries are based upon bank statements and confirmations from third parties (other than parties connected to the Algosaibis or Al Sanea). Mr. Davies said:[2426]

> *"Now, insofar as what happened to those monies -- and this, I think, is a matter obviously for the court to deal with, I would imagine -- I can't say, because of course I -- for the bank statements to check to watch the money coming in, I haven't got the bank statements to see necessarily those monies going out. And thereby, I'm slightly fettered. So what I've tried to do is go on third-party information, which is the audited accounts ..."*

---

*cash flow had actually happened was to follow the cash…through the third-party bank statements. A. I would certainly agree with that…*" Once it is established that a cash transaction actually happened, it does not matter that an FX or LC transaction was not genuine. The FX or LC transaction was a means of getting the cash to move. Mr. Hargreaves said that bank statements are the best evidence: Hargreaves xx **{Day71/22:5-23:14}**; and **{Day74/10:1-17}**. See also Mr. Hargreaves comments on reconciling MIDAS statements to cash statements: Hargreaves xx **{Day70/116:8}** to **{Day70/117:2**}. See also Mr. Hourigan on the desirability of relying on bank statements: Hourigan xx **{Day98/96:8}-{Day98/97:13**}.

2425 Davies xx **{Day96/146:5-15}.**

2426 Davies xx **{Day95/79:1-9**}.

## The El Ayouty Audit Packs

13. The El Ayouty Audit Packs are a useful source of evidence, particularly in relation to Al Sanea's borrowing from the Money Exchange. The Audit Packs provided a "*more or less accurate understanding of what was really happening at the Money Exchange*".[2427]

14. According to the Attachment 9s to the El Ayouty Audit Packs, the Money Exchange recorded that it had lent billions of US dollars to Al Sanea. There is no dispute that, by May 2009, there was a recorded debt due from Al Sanea to the Money Exchange of US$5.2 billion. That debt was recorded in the Attachment 9s and was, as I have found, authorized, either expressly or impliedly. The Algosaibis had known about the lending to Al Sanea for many years.[2428] It follows that establishing that funds were transferred to Al Sanea, by whatever means, was not enough for AHAB. AHAB needed to establish that the transfers it relies upon were thefts by Al Sanea from the Money Exchange.

15. There is a crucial and obvious difference between a recorded debt and a secret theft. AHAB has failed to show that there were secret thefts. There was no secrecy. There were loans recorded as debt due from Al Sanea, or his related companies, to the Money Exchange.

16. AHAB invites the Court to infer that all of the outflows under the 'money out schemes' were funded by unauthorised borrowing as a necessary antecedent to inviting the

---

2427 AHAB's Opening Submissions**{Day2/71:7}**. Mr. Hatton and Mr. Bullmore agree that a proficient reader of the audit packs would have been aware that the financial statements of the Money Exchange were misleading; that the Money Exchange was in fact loss making; and that Al Sanea was heavily indebted to the Money Exchange: Hatton/Bullmore Joint Statement, paragraph **[14] {I/13/3}**. This is however, very different from their joint opinion on the misleading English language audit reports: both experts agree that El Ayouty should not have issued "clean" (i.e.: unqualified) reports based on the misleading financial statements**: Ibid [13]**.

2428 Al Sanea's borrowing and the Algosaibis' knowledge are topics dealt with separately under those headings (in Sections 6 and 1 respectively).

inference that all of the funds at the disposal of the Saad Group were AHAB monies. However, in order to draw that inference it would have been necessary:

a. To ignore bank statement evidence which shows that the Money Exchange itself received substantial monies from the Saad Group during the same period; and

b. To ignore accounting evidence that a substantial proportion of the payments to STCC by way of Electronic Transfers gave rise to no change in net cash flow for the Money Exchange. In other words, there were inflows from the Saad Group as well.

17. In the case of the GTDs (in common in many respects with the case against the other Defendants), AHAB relies upon the following methods of payment in support of the 'money out schemes':

- Direct Electronic Transfers.
- Cheques.
- LC transactions.
- Cash withdrawals.
- Generic Transfers.
- Indirect Transfers to the Defendants.

18. The GTDs have examined the extent to which there is evidence of funds going to them. Set out following are their findings and submissions which I accept,[2429] subject only to such comments as I will add from time to time.

*"**Direct Electronic Transfers***

*AHAB's pleaded case*

*17. AHAB pleads that US$165,182,502 was misappropriated by direct electronic transfers from the Money Exchange to SICL:[2430]* [AHAB relies

[2429] In the GTDs' Written Closing Submissions, starting at {**E1/28/5**}.
[2430] *Statement of Claim, paragraphs 158W, 158X, {A1/2.3/72}.*

upon Mr. Hargreaves' tracing exercise as described in his witness statement.[2431]]

158W. Mr Al Sanea caused money misappropriated from the Money Exchange to be paid directly to SICL for SICL's own benefit…

158X. The total received by SICL from such fraudulent transfers was equivalent to US$ 165,182,502[…]

*18. AHAB pleads that full particulars are set out in Schedule 9 to the Statement of Claim. Schedule 9 contains a total of 411 alleged transfers from the Money Exchange to SICL[2432] (totalling US$165,182,502).*

*Payments 'matched' to the bank statements*

*19. Direct electronic transfers are transfers between banks. In "following the cash" it should be possible to identify a transfer out of an AHAB bank account and to match that transfer out to a transfer into a SICL bank account. AHAB has only been able to match 113 of the 411 alleged transfers listed in Schedule 9 from AHAB's bank statements to SICL's bank statements. According to Mr. Davies, those 113 transfers total US$151,657,695:[2433]*

> "Of the 411 alleged transfers, AHAB alleges (in the sixth and eighth columns of Schedule 9) that it has "Traced" 113 transfers with a total value of US$151,657,695 to the "AHAB bank statement" and "SICL bank statement". AHAB provides an ID Cenza for both the payment from AHAB and the receipt by SICL, and it is therefore possible to validate these 113 transactions."

2431 {**I/2/62**}.
2432 *{A2/14/1}, Davies 2W, paragraph 14, {I/11/5}.*
2433 *Davies 2W, paragraph 14, {I/11/5}.*

20. *Mr. Hargreaves agrees that it is only possible to match 113 alleged transfers to the Transactional Database:*[2434]

> "I agree that USD 152m of the USD 165m direct transfers from AHAB to SICL are matched to the Transactional Database as both payments on AHAB bank statements and receipts on SICL bank statements, as stated by Mr. Davies [WD2 para 14]."

21. *Mr Davies, Mr Hargreaves and Mr Hatton agree that there is no evidence identifying or matching the balance of transfers pleaded in Schedule 9 (i.e. 298, totaling US$13,524,807).*[2435] *Those pleaded transfers are unproved and fall away.*

<u>*The 113 'matched' transfers*</u>

22. *The claim can only relate to the 113 'matched' transfers made by the Money Exchange to SICL. In relation to those:*

    (1) *Seven were made in respect of repayment of monies paid by SICL to Dresdner Klein Wasserstein ("**DKW**") for Palmer Square bonds held in the name of AIH, totalling US$122,369,277.86;*[2436]

    (2) *60 were made in respect of interest owing to SICL on money market placements, totalling US$21,596,299.89;*[2437]

---

[2434] *Hargreaves' Matter Agreed, paragraph 2, {I/19/3}.*

[2435] *Davies 2W, paragraph 14, {I/11/5}:* "AHAB has not provided both ID Cenzas for the balance of 298 alleged transfers, and it is therefore not possible to validate these transactions." *Hargreaves xx: at day 74, page 70, lines 7 to 18, {Day74/70:7}*: "They have not been matched." *Hatton xx: day 94, page 51, lines 8 to 23, {Day94/51:8}:* "Q: You haven't been able to match any more payments since Mr. Hargreaves put in that agreed statement? A: Correct."

[2436] *Davies 1W, paragraph 249(a), {I/6/102} and Davies 2W, paragraph 30, Table D.2, {I/11/19}.*

[2437] *Davies 1W, paragraph 249(b), {I/6/103}; Davies 2W, paragraph 16(a), {I/11/6} and Davies 2W, Table D.1, {I/11/7}.*

*(3) 41 were made in respect of service fees relating to agreements entered into between AHAB financial businesses and Saad Financial Services ("**SFS**"), totalling US$1,025,000;*[2438] *and*

*(4) Five (5) were unable to be identified from discovery, totaling US$6,667,117.40.*[2439]

*23. On the evidence it is possible to identify a commercial rationale for all but those 5 of the 113 'matched' transfers made by the Money Exchange and SICL. This was agreed by Mr Hargreaves*[2440] *who remarked that Mr Davies had "gone into a lot more detail than I have"."* [2441]

**DKW – The Palmer Square Bonds**

**US$121,707,589.14 cash paid by SICL**

19. There was a debate over the true beneficial ownership of the Palmer Square bonds. As will be discussed below, the purchase price was paid to DKW by SICL. SICL was shown to have obtained repayment from AIH on instructions to the Money Exchange from Al Sanea. However, pointing to records disclosed in the proceedings, AHAB avers that SICL was the true beneficial owner of these bonds and so the monies "repaid" by AIH on Al Sanea's instructions, were misappropriated.

20. The starting point is that SICL made payments to DKW for margin calls on repurchase transactions related to these bonds. Following the cash, SICL made seven payments to

---

2438 *Davies 2W, paragraph 16(b), {I/11/6}.*

2439 *Davies 1W, paragraph 249(c), {I/6/103} and Davies 2W, paragraph 16(d), {I/11/6}. The remaining five were not able to be identified because of a lack of documents in discovery: Davies 1W, paragraph 249(c), {I/6/103}; Davies 2W, paragraph 16(d), {I/11/6}; Statement of Matters Agreed by Mr. Hargreaves in relation to Mr. Davies' evidences dated 7 November 2016 ("**Hargreaves' Matters Agreed**"), Hargreaves' Matters Agreed, paragraph 7, {I/19/3}.*

2440 *Hargreaves' Matters Agreed, paragraph 3, {I/19/3}; see also Hargreaves xx: day 74, page 92, line 19 to 24, {Day74/92:19}.*

2441 *Hargreaves xx: day 74, page 92, line 19 to 24, {Day74/92:19}.*

DKW totaling US$121,707,589.14. Of those, four payments totaling US$113,918,443.17 are attributable to the bond: "Palmer Square FRN 02Nov2045".[2442] Mr. Hargreaves says:[2443]

> "*… that USD 122.4m of the transfers to SICL relate to monies paid by SICL to [DKW] for margin calls on certain bonds as set out in WD1 Table 12 (USD 120.9m) and WD2 Table D.3 (USD 1.5m)*"

21. Mr. Hatton says: [2444]

> "*I agree that the fund transfers were used to pay margin calls and repo finance obligations as outlined in WD1.*"

**Was AIH the buying party?**

22. It is agreed that the bonds were held in the name of AIH.[2445] This is evidenced by the following contemporaneous documentation:

23. In a memorandum dated 13 December 2005 (facsimiled at 2:04pm) from Al Sanea to SFS, Al Sanea instructed Graham McMahon and Mike Wetherall (employees of SFS) to purchase US$320 million Palmer Square bonds "*for AIH*":[2446]

> "*Further to your memorandum Ref. GE/05/2490 of today's date regarding the above, please note that I have no objection to the following:*
>
> *1. To increase the subscription amount of Palmer Square from US$ 100 m to US$ 320M (i.e. increase also the total to US$ 400 m). [sic] for AIH, please find enclosed the signed purchase forms and proceed accordingly.*
>
> *2. Proposal for Awal Bank for US$ 100 M is also approved…*

---

2442 Davies 1W, paragraph 273 **{I/6/109}**. Hatton 2W, paragraph 5.29.5 **{I/8.7/55}**, (this is red-lined).

2443 Hargreaves' Matters Agreed, paragraph 4 **{I/19/3}**.

2444 Hatton 2W, paragraph 5.29.5 **{I/8/55}**.

2445 During Mr Quest cross-examination of Mr. Davies, Mr. Quest put to Mr. Davies*: "Q. I don't think we are disagreeing that the bonds were in the name of AIH? A. Yes."*: Davies xx **{Day96/75:13}-{Day96/76:1}**.

2446 **{G/5033/1}**. During cross-examination, this memorandum was put to: (a) Hargreaves xx **{Day74/77:24}-{Day74/78:13}**; (b) Hatton xx **{Day94/68:10-24}**; and (c) Davies xx **{Day96/78:1-15}**.

> 3. *I have signed the purchase forms for SICL's subscription of US$ 30 M to increase its total portfolio to US$ 572 M for the half-year end."*[2447]

24. The purchase by AIH was confirmed by Graham McMahon and Mike Wetherall to Al Sanea in a memorandum dated 13 December 2005 (facsimiled at 9:30pm):[2448]

> "*Further to your requests to purchase bonds, I can update you as follows;*
>
> *SICL purchased $ 30 million Palmer Square. Purchases complete.*
>
> *Awal Bank purchased $ 12 million HSBC and $ 100 million Palmer Square, total $112 million…*
>
> *AIH purchased $ 12 million Bear Stearns, $ 29 million SLMA and $ 320 million Palmer Square ($ 18 million still to purchase)."*[2449]

25. AIH and DKW entered into a repurchase transaction on 9 January 2006 in respect of the Palmer Square bonds. DKW traded as principal and the letter records the following in respect of the repurchase transaction:[2450]

> "*This confirmation supplements and forms part of, and is subject to, the Global Master Repurchase Agreement as entered into between us as of as the same may be amended from time to time (the "Agreement")…*
>
> *Contract Date 09JAN06 at 13:34*
> *Purchased Securities PALMER SQUARE PLC FRN 02Nov2045 2A*
> *Security ID numbers US69688RAB06*
> *Nominal Amount [US$] 320,000,000.00*
> *Buyer ALGOSAIBI INVESTMENT HOLDINGS*
> *Seller Dresdner Bank AG London Branch*
> *Purchase date 02FEB06*
> *Consideration [US$] 317,897,349.83*
> *Countervalue [US$] 318,752,140.48*

---

2447 Mr. Hatton accepted during cross-examination that the memorandum made separate instructions in relation to purchases for Awal Bank and SICL: *"Q. Then you can see that there are separately instructions in relation to Awal Bank and SICL; do you see that? A. Yes, I do."* Hatton xx **{Day94/68:21}**.

2448 {G/5032/1}. During cross-examination, this memorandum was put to: (a) Hargreaves xx **{Day74/78:14}-{Day74/79:6}**; (b) Hatton xx **{Day94/68:25}-{Day94/69:13}**; and (c) Davies xx **{Day96/78:16}-{Day78/79:2}**.

2449 Mr. Hatton accepted during cross-examination that the memorandum made separate instructions in relation to purchases for Awal Bank and SICL: *"Q. Again, purchases for SICL and Awal are identified separately? A. Yes."* Hatton xx **{Day94/69:11-13}**.

2450 **{G/5086/1}**.

*Repurchase Date 02FEB06…"*

26. The purchase was entered into pursuant to a Global Master Repurchase Agreement between DKW (then known as Dresdner Bank AG) and AIH dated 9 January 2006 (Repurchase Agreement).[2451] The terms of this agreement provide:[2452]

> "*Subject to sub-paragraph (b) below, neither party may assign, charge or otherwise deal with (including without limitation any dealing with any interest in or the creation of any interest in) its rights or obligations under this Agreement or under any Transaction without the prior written consent of the other party…"*

27. The significance of this provision is that AIH could not have assigned its rights or obligations under the Repurchase Agreement without the consent of DKW. AIH's rights under the Palmer Square bonds were security for DKW for AIH's obligations to DKW. To protect DKW's rights, AIH could not deal in the Palmer Square bonds without DKW's consent.

28. The GTDs submit that for an assignment of AIH's rights, or a transfer of its obligations in respect of the Palmer Square bonds, to be effective, two documents were essential: (a) there had to be an assignment agreement between AIH and the assignee and (b) there had to be consent in writing from DKW. This seems to be correct on the face of the transactional documents.

**US$122,369,277.86 transferred by the Money Exchange to SICL**

29. It is also agreed that seven direct transfers were made by the Money Exchange to SICL, totaling US$122,369,277.86. There is no dispute that the evidence shows that four of these seven transfers were made in respect of the Palmer Square bonds and the remaining

---

2451 {**G/5087/1**}.
2452 {**G/5087/26**} clause 16(a).

three were in respect of margin calls. According to Mr. Davies, those transfers were made as repayment for the money paid by SICL to DKW:[2453]

> "*five…transfers from AHAB to SICL totaling US$120,889,277.86 were made as repayment for monies paid by SICL to [DKW] on behalf of AIH (and were not, therefore, payments made for the benefit of SICL).*"
>
> "*An additional two of the transactions in Schedule 9 were also repayments for monies paid by SICL to DKW on behalf of AIH. The details of these two payments as recorded in Schedule 9 are set out in Table D.2 ... [which amount to US$840,000 and US$640,000]*"

30. On the face of the cash transfers, the GTDs submit that the position is very simple. SICL made transfers to DKW. The Money Exchange reimbursed SICL. There is no dispute that the payments from SICL to DKW were all made in order to clear balances owing on repurchase transactions entered into between DKW and AIH.[2454] This was accepted by AHAB's witness, Mr. Hatton:[2455]

> "*Q. Look at paragraph 4 of the matters agreed: "I agree that USD 122.4m of the transfers to SICL relate to monies paid by SICL to Dresdner Klein Wasserstein ... for margin calls on certain bonds as set out in WD1 Table 12 ..." Of Mr Davies' statement and D3 of the second statement; do you see that?*
>
> *A. Yes, I do.*
>
> *Q. It relates to payments to DKW and it is common ground that these payments related to margin calls on the Palmer Square bonds. I think we have got to the point where we know what it is we are discussing?*

---

2453 Davies 1W, paragraph 249(a) **{I/6/102}**; Davies 2W, paragraph 30 **{I/11/19}**; see also Davies 1W, Table 12, **{I/6/108}**; and Davies 2W, Table D.2, **{I/11/9}**.

2454 Davies 1W, paragraph 249(a) **{I/6/102}**. Mr. Davies details both the payment from SICL to DKW and the repayment from the Money Exchange to SICL (along with the supporting documentation) at: Davies 1W, paragraphs 251 to 271 **{I/6/104}** (summarised in Davies 1W, Table 12, **{I/6/108}**) and Davies 2W, paragraphs 29 to 32 **{I/11/17}**.

2455 Hatton xx **{Day94/51:24}-{Day94/52:16}**.

A. *Yes, that's right. I can't recall whether it was only the Palmer Square bonds; I think that was the majority of it. I would need to refresh my memory.*

Q. *Well, we will see. . But certainly that was, if not all of it, the vast majority of that,*

A. *Yes, that's correct.*"

31. This was also accepted by Mr. Hargreaves:[2456]

"Q. *In paragraph 4 you say: "I agree that USD 122.4m of the transfers to SICL relate to monies paid by SICL to Dresdner Kleinwort Wasserstein ('DKW') for margin calls on certain bonds as set out in WD1 Table 12 (USD 120.9m) ..." For the transcript, it is US$120,889,277.86. And there are also two payments of US$1.48 million. What is agreed is that there are five transfers whereby the Money Exchange was reimbursing SICL for payments to DKW. That's right, isn't it?*

A. *That's right, and the reason I can agree is because I mentioned that in my report as well.*

Q. *I know you did. We are going to go through all the detail, don't worry.*

A. *Good.*

Q. *I think you can agree with me that these payments relate to margin calls on the Palmer Square bonds.*

A. *Yes.*"

**The issue on the Palmer Square Bond payments**

32. The issue on the Palmer Square bond payments arises because Deloitte argues that the Palmer Square Bonds were the property of Al Sanea not AIH. If so, the Money Exchange, on behalf of AIH, should not have been required to make the payments to DKW as set out above.

---

2456 Hargreaves xx **{Day74/70:23}-{Day74/71:15}**.

33. The argument was first raised by Mr. Charlton in the London Proceedings. The argument is that the beneficial ownership was transferred by AIH to Al Sanea and that Al Sanea became liable to DKW for the calls under the Palmer Square bonds. The mechanics of these transfers is unclear. However, from this, Deloitte argues that the payments from the Money Exchange to SICL were not repayments of money paid by SICL in respect of an AIH liability and that the cash paid by SICL can be ignored. If the cash paid by SICL is ignored, the cash paid by the Money Exchange was a theft by Al Sanea from the Money Exchange.

34. Mr. Charlton's argument is based upon an e-mail from Mr. Hayley and some entries by El Ayouty. As is explained in more detail below, Mr. Hayley's e-mail refers to an assignment, but it refers to an assignment by Al Sanea to AIH and not from AIH to Al Sanea, which, as the GTDs submit, would appear to be a necessary first step. The El Ayouty references appear to refer to bonds belonging to Al Sanea. What Deloitte appear to have ignored in this analysis is that there is no evidence of an assignment from AIH to Al Sanea. This, on the state of the documentary evidence as it is, I agree is the necessary first step.

35. There is no evidence of the written consent of DKW required under the Repurchase Agreement, nor evidence of the assignment referred to by Mr. Hayley from Al Sanea to AIH. The Deloitte argument is also inconsistent with statements made in formal published documents by AHAB, to be considered below Unsurprisingly, the highest Mr.

Hatton was prepared to put it was that the issue of who owned the bonds was "*obscure; it is not clear*".[2457]

**The Deloitte argument on the materials**

36. Deloitte argue that, while the bonds are in the name of AIH, the bonds were for the benefit of Al Sanea.

37. In Hargreaves 1W, Mr. Hargreaves in relying on this argument states: [2458]

> "*Approximately USD 120m of the direct transfers to SICL was used to pay margin calls on bonds held for the benefit of Al Sanea. This is further detailed in Appendix 7E of Charlton London 1*."

38. However, in evidence Mr. Hargreaves said he did not take any view as to who held the bonds. He could do no more than describe where the money went:[2459]

> "*Q.* *Mr Hargreaves, what you see -- and I appreciate it is a matter for his Lordship, not a matter for you -- the position is that you have accepted what Mr Charlton said, that these bonds were held for Mr Al Sanea. That's your position, isn't it?*
>
> *A.* *My position is that I'm unable to agree whether or not that is the case. I have no opinion on it.*
>
> *CHIEF JUSTICE:*
> *I think the point you are making is that the transfer took place.*
>
> *A.* *My statement is simply that the transfer took place, and that's all I --*
>
> *CHIEF JUSTICE:*
> *Whatever the ultimate beneficial purpose may have been.*
>
> *A.* *Exactly, my Lord.*
>
> *CHIEF JUSTICE:*
> *That's paragraph 190 of your statement.*

---

2457 Hatton xx **{Day94/76:18}**.
2458 Hargreaves 1W, paragraph 190 **{I/2.27/62}**.
2459 Hargreaves xx **{Day 74/81:6-12}** and **{Day74/85:9-17}**.

> *A. Yes.*"

39. The GTDs submit that the problem with Mr. Hargreaves' answer is that the Deloitte argument is undermined by the question where the money went, because SICL made the first transfers and the Money Exchange made identical transfers back.[2460]

40. In Hatton 2W, Mr. Hatton also states the bonds were held for the benefit of Al Sanea:[2461]

> "*However, it appears from the memorandum and the El Ayouty Reports that the liabilities being settled were not those of AIH, as asserted in WD1, but were* [Al Sanea's] *(or indirectly were* [Al Sanea's])."[2462]

**Mr. Charlton's analysis**

41. The argument that the Palmer Square bonds were beneficially owned by Al Sanea, was first found in Appendix 7.E of Charlton London 1W, where Mr. Charlton states:[2463]

> "*US$117 million was transferred to SICL in relation to the depreciation in value of several bonds purchased by AIH on behalf of Mr. Al Sanea. These transfers, referred to as "Repo Rollover Payments", were made to [DKW], who had provided the repo financing for these bonds. In an agreement relating to these investments with AIH ({G/2655/1}), Mr. Al Sanea agreed to "immediately meet any margin calls received from Algosaibi within two business days of such demand." To date, The Investigation Team has not identified any reimbursement of these transfers by Mr. Al Sanea or the Saad Group*."

**The materials relied upon by Mr. Charlton**

42. The agreement referred to in Appendix 7.E between AIH and Al Sanea, dated 12 December 2001 and entitled "Investment Management Agreement", records:[2464]

> *"I* [Al Sanea] *... authorize and request* [AIH] *"Algosaibi" to:*

---

2460 See Davies 1W, Table 12 **{I/6/108}**. For example, the payment by SICL to DKW of US$4,133,616.41 had a value date of 15 November 2007. The corresponding payment by the Money Exchange to SICL had a value date of 19 November 2007, being received by SCIL on a value date of 20 November 2007.

2461 Hatton 2W, paragraph 5.29.5 **{I/8.7/55}**.

2462 Hatton 2W, paragraph 5.29.5 **{I/8.7/55}.**

2463 Charlton London 1W, Appendix 7.E, paragraph 7.E.9 **{L1/25.1/136}**.

2464 **{G/2655/1}**.

> 1. *open an account or accounts in my name and to hold therein the sum of USD (to be agreed) and any other sums in major currencies which I may hereafter pay to Algosaibi (other than any fees, commissions or expenses) any investments or securities which I may hereafter authorize you to manage (collectively the "Investments"); and*
>
> 2. *manage the Investments on my behalf at Algosaibi's advice (execution only)."*

43. The "*Investment Management Agreement*" does not identify the securities Al Sanea was asking AIH to manage. It does not identify the Palmer Square Bonds as bonds to be managed by AIH on behalf of Al Sanea. Mr. Hatton accepted he had seen no contractual document detailing arrangements between AIH and Al Sanea in relation to the Palmer Square bonds:[2465]

> "*Q.* *So he refers to this agreement. If we could go to {G/2655/1}, please. We have seen Mr Charlton, in his London witness statement, refer to an agreement, and we have here an agreement between AIH and Mr Al Sanea; do you see that?*
>
> *A.* *Yes, I do.*
>
> *Q.* *Can you confirm that this is the agreement that Mr Charlton was referring to?*
>
> *A.* *It would appear to be, yes.*
>
> *Q.* *Do you see that this it is an investment management agreement?*
>
> *A.* *Yes.*
>
> *Q.* *Nowhere in this agreement is there any reference to the Palmer Square bonds.*
>
> *A.* *Correct.*
>
> *Q.* *Correct?*

2465 Hatton xx **{Day94/66:5}-{Day94/68:9}**.

*A. So it appears.*

*Q. Have you identified any document in which arrangements were made for between AIH and Mr Al Sanea for the Palmer Square bonds to be managed on his behalf?*

*A. Not other than the documents that you took me to earlier which refer to that.*

*Q. Have you seen any document by which, in which, arrangements were made between AIH and Mr Al Sanea for the Palmer Square bonds to be managed on his behalf?*

*A. No specific document, no contractual document, no; I have not seen one.*"

**The Hayley memorandum of 3 June 2008**

44. The first of the documents relied upon by Deloitte is a memorandum from Mr. Hayley. In Hatton 2W, Mr. Hatton states that:[2466]

> "*I agree that the fund transfers were used to pay margin calls and repo finance obligations as outlined in WD1. However, it appears from the memorandum [{Q/827/1}] and the El Ayouty Reports that the liabilities being settled were not those of AIH, as asserted in WD1, but were Mr. Al Sanea's (or indirectly were Mr. Al Sanea's).*"

45. The memorandum from Mr. Hayley to Al Sanea, relied on by Mr. Hatton, is dated 3 June 2008.[2467] The memorandum records the purported ownership history of a series of bonds, which includes "*Palmer Square Plc FRN 2/11/2045*", and goes on to state:

> "*The ownership/holding structure for these bonds is as follows:*
>
> *1. AIH purchased the bonds for its customer, M.A.S.*
>
> *2. [Al Sanea] owns the bonds and holds the liability for the repo financing.*

---

2466 Hatton 2W, paragraph 5.29.5 **{I/8.7/55}**.
2467 **{Q/827/1}**.

> 3. *[Al Sanea] has assigned the bond assets to Algosaibi Finance; [Al Sanea] has retained the repo financing liability.*
>
> 4. *The bond assets are reflected in Algosaibi Finance balance sheet without any financing liability."*

46. The first point to note is that the assignment Mr. Hayley refers to is an assignment of "the bond assets" by Al Sanea to the Money Exchange. That presupposes that Al Sanea already had the beneficial interest in the bond assets to assign. It is not an assignment by AIH to Al Sanea of its interests under the bond assets. Accordingly, the GTDs submit that without an assignment to Al Sanea, and the written consent of DKW, Al Sanea could not have had any interest in the Palmer Square bonds. There would have been nothing for Al Sanea to assign.

47. I accept that this point carries force, given the state of the evidence.

48. Further, as regards the assignment described by Mr. Charlton:

   a. In cross-examination Mr. Hatton accepted he had not seen an assignment referenced in paragraph three of the memorandum dated 3 June 2008:[2468]

   > "*Q. Have you seen an assignment as referred to in paragraph 23 3?*
   >
   > *A. Yes, I do.*
   >
   > *Q. No, sorry, have you seen an assignment? It refers to an assignment. Have you seen a copy?*
   >
   > *A. No, I haven't.*"

   b. On 4 June 2008 (the day after this memorandum), Mr. Hayley signed an authorisation letter in relation to a revolving commodity murabaha facility for US$30,000,000 for AHAB's benefit arranged by European Islamic Investment Bank ("EIIB") and

2468 Hatton xx **{Day94/55:22}-{Day94/56:4}**.

Gatehouse Bank dated June 2008.[2469] In Appendix 2, entitled "*Quoted Debt Securities held by* [AHAB]" as at 31 December 2007, it includes "*Palmer Square Plc FRN 2/11/2045* [in Saudi Riyals Thousands] *1,182,000*" as a pledged security held by AHAB.[2470]

49. Even accepting that Mr. Hayley was a party to a fraud, I agree with the GTDs that it is unsatisfactory to rely on his memorandum of 3 June 2008 in circumstances where he contradicted it the following day by way of this authorization letter.

50. The GTDs submit that as a technical description of assignments that may have taken place, Mr. Hayley's description is wholly inadequate and unreliable. Again, on the state of the evidence as it is, this must be accepted (even if as between AIH and Al Sanea, there was some undocumented or otherwise undisclosed understanding that he was the real beneficial owner of the bonds).

51. In addition, Mr. Hatton relies on the El Ayouty Audit Packs between 2004 and 2008 (excluding 2006) that describe "bonds" being owned by Al Sanea. For example, in 2008 the El Ayouty Audit Pack states:[2471]

> "*It is worth mentioning that these bonds belong to* [Al Sanea] *and are recorded in the Finance Division. Just as in the previous years we did not obtain a confirmation of these balances, despite our request for this, other than that the balances have an equivalent in the Finance Division.*"

---

2469 **{G/6703/6}**.

2470 **{G/6703/61}**; this was put to Mr. Hatton in cross-examination **{Day94/73:14}-{Day94/74:2}:** *"Q. Do you remember that the memorandum you rely on for Mr. Hayley was dated 3 June, 2008? A. Yes, it was. Correct. Q. Turn the page, please [G/6703/6]. Do you see that this document is signed "for and on behalf of" AHAB. There are two signatures there. Do you recognise these signatures? A. I see that, yes. Q. Do you recognise the signatures? A. I recognise the one on the right, which I believe is Mr. Jesudas Q. Whose is the signature on the left? A. I think it is Mr. Hayley. It's not very clear. Q. It is Mr. Hayley's signature".*

2471 **{F/260.1/9}**.

52. It is submitted by the GTDs that the audit reports for 2004 and 2005 cannot support the argument but can only undermine it. Moreover, that Mr. Hatton accepts that the Ayouty Audit Packs for the years ending 2004 and 2005 could not be relevant for two reasons:

(1) First, the repurchase transaction between AIH and DKW was entered into on 9 January 2006:[2472]

> "*Q. Do you accept that the bonds are the subject matter of this purchase agreement in January 06 cannot be the subject matter of the entries in the 2004 and the 2005 El Ayouty audit packs that you have relied on?*
>
> *A. That would seem to be the case, yes.*
>
> *Q. Thank you.*
>
> *CHIEF JUSTICE:*
> *This seems to be [addressing] the purchase for $320 million-worth of bonds, discounted to whatever it is.*
>
> *MR PHILLIPS:*
> *Yes.*
>
> *CHIEF JUSTICE:*
> *But before that, there had been transactions in relation to bonds worth 152 million.*
>
> *MR PHILLIPS:*
> *Yes, the point is they have to be different bonds.*
>
> *CHIEF JUSTICE:*
> *Right.*"

(2) Second, that the 2004 and 2005 Ayouty Audit Packs were issued before the prospectus that relates to the Palmer Square bonds was issued (it was issued on 3 October 2005):[2473]

---

2472 **{G/5086/1}**; Hatton xx **{Day94/61:20}-{Day94/62:9}**.
2473 **{G/4965/2}**; Hatton xx **{Day94/57:12}-{Day94/58:4}**.

> "*Q.* *Can we then replace that with {G/4965/1}. Do you see, Mr Hatton, this is the Palmer Square Bond prospectus; right?*
>
> *A.* *Yes.*
>
> *Q.* *What I would like to do is look under the word "Disclaimer" at the first sentence: "Attached please find an electronic copy of the Preliminary Prospectus dated 3 October 2005 relating to the offering by Palmer Square 2 PLC and Palmer Square 2 LLC of certain securities." Do you see that?*
>
> *A.* *Yes, I do.*
>
> *Q.* *So the prospectus for the Palmer Square bonds was issued on 3 October of 2005. You will agree with me that the reference in the accounts to the year ended 31 December 2004 cannot be a reference to the Palmer Square bonds. Do you agree?*"

53. And so say the GTDs, whatever bonds the El Ayouty reports for 2004 and 2005 are referring to, it cannot be the Palmer Square bonds, as neither AIH nor Al Sanea could have had an interest.

54. As to the references in the 2007[2474] and 2008[2475] El Ayouty Audit Packs, they are difficult to follow. However, fundamentally, if they record that Al Sanea owned the Palmer Square bonds there is nothing to explain the basis on which Ayouty took that view. Mr. Hatton's conclusion was that it is "obscure; it is not clear" with regard to who owned the bonds:[2476]

> "*Q.* *Mr Hatton, you have seen this material that relates to the Palmer Square bonds?*
>
> *A.* *Yes, I have.*
>
> *Q.* *You have seen that the material you relied on at many instances predated the issue of the Palmer Square bonds? Yes?*

---

[2474] **{F/230/8}**.
[2475] **{F/262/9}** and **{F/260/58}** (Arabic - reference to the Palmer Square bonds not found in the translation).
[2476] Hatton xx **{Day94/75:7}-{Day94/76:2}**.

*A.* *Well, the El Ayouty audit report of 2004 clearly predates what we have seen here, yes, that's correct.*

*Q.* *You have seen that there are no references to Palmer Square in any of the material that you relied upon, other than the Hayley email; that's right, isn't it?*

*A.* *I believe so, yes.*
*Q.* *You have seen Mr Hayley having been a signatory to the information memoranda that went out to the banks?*

*A.* *Correct, I have.*

*Q.* *In the light of the material that you have now seen, some of which you very fairly told us that you had not seen before, do you accept that the view you have expressed, that you took from Mr Charlton's London 1 affidavit, is a mistake?*

*A.* *No, I don't actually.*

*MR PHILLIPS:*
*If that is a convenient moment, my Lord.*

*A.* *Can I explain that a little?*

*CHIEF JUSTICE:*
*Yes, I think we may as well have the explanation.*

*MR PHILLIPS:*
*Yes, please.*

*A.* *I mean, I see that these bonds have been taken onto the balance sheet, as we have seen, but I do not -- I have not seen a document that shows that the liability to DKW rests with AHAB as opposed to with Mr Al Sanea. So, if that is the question, I mean, I can see we have these Palmer Square bonds on the balance sheet. And as my understanding is that SICL paid the -- we have seen a margin call and other payments related to those, and they were reimbursed by AHAB, but what I do not see from these documents is whose liability it was to make those payments. To me, it is obscure; it is not clear.*"

55. I accept that a conclusion that it is "obscure" and "not clear" is no basis for a finding that payments to SICL were a theft.

56. Mr. Hargreaves adds nothing to elucidate the debate.

57. Mr. Hargreaves relies on Appendix 7.E to Charlton London 1W to support the proposition that the bonds were held for "the benefit of Al Sanea".[2477] However, aside from relying on Appendix 7.E, this is not something he "passes comment on":[2478]

> "*Q.* *You say: "Approximately USD 120m of the direct transfers to SICL was used to pay margin calls on bonds held for the benefit of Al Sanea. This is further detailed in Appendix 7E of Charlton London 1."*
>
> *A.* *Yes.*
>
> *Q.* *Where you disagree comes from the statement we see in the middle "held for the benefit of Maan Al Sanea". Do you see that?*
>
> *A.* *Yes.*
>
> *Q.* *You quite fairly point out that that is based upon something that is contained on an appendix to Mr Charlton's London statement.*
>
> *A.* *And as I understand it, it's something that is not agreed between the parties, and not something that I've been able to pass comment on.*"[2479]

**The documentary evidence that contradicts Deloitte's argument**

58. The GTDs submit that not only is the material Deloitte has found obscure and unclear but Deloitte's argument is contradicted by what they have not found. They have not found an assignment by AIH of any interest in the Palmer Square bonds to Al Sanea. They have

---

2477 Hargreaves 1W, paragraph 190 **{I/2.27/62}**.

2478 Hargreaves xx {**Day74/74:3-18**}.

2479 Mr. Hargreaves accepted in cross-examination he did not independently look at the Investment Agreement between AIH and Al Sanea and relied on Mr. Charlton's assertion that the bonds were held by Al Sanea: *"Q…the agreement, as you can see from the margin, is at {G/2655/1}. Have you looked at this document before? A. No."* **{Day74/75:19-21}**; *"Mr. Hargreaves, what you see -- and I appreciate it is a matter for his Lordship, not a matter for you – the position is that you have accepted what Mr. Charlton said, that these bonds were held for Mr. Al Sanea. That's your position, isn't it? A. My position is that I'm unable to agree whether or not that is the case. I have no opinion on it."* **{Day 74/81:6-12}**; *"CHIEF JUSTICE: I think the point you are making is that the transfer took place. A. My statement is simply that the transfer took place, and that's all I -- CHIEF JUSTICE: Whatever the ultimate beneficial purpose may have been A. Exactly, my Lord CHIEF JUSTICE: That's paragraph 190 of your statement. A. Yes."* **{Day74/85:9-17}**.

not found a written consent of DKW to any such assignment. They have not found the assignment of an interest back to AIH described by Mr. Hayley.

59. There are, indeed, contemporaneous memoranda, letters and financial documents that record the bonds as being an asset of AHAB, that are inconsistent with Deloitte's argument:

1.) A memorandum dated 28 February 2006 from Mr. Hayley to Mr. Potter (then General Manager of AIH):[2480]

> "*Please could issue [sic] your usual letter addressed to the Algosaibi Money Exchange confirming that you hold the securities on our [i.e. the Money Exchange's] behalf:*
>
> *Palmer Square Plc FRN 2/11/2045 $ 320,000,000"*

2.) A letter dated 7 August 2006 from Mr. Hayley to Kazi Hussain (Manager at the European Islamic Investment Bank Plc), which enclosed (among other things) a schedule of the AHAB Partnership's Combined Equity Investments as at 31 December 2005. The AHAB Partnership's "*Debt Securities*" include "*Palmer Square Plc FRN 2/11/2045*" in the amount of SAR 1.2 billion (i.e. US$320 million);[2481]

3.) A letter dated 14 February 2007 from Mr. Hayley to Jon Mortell (Head of Corporate Banking at Lloyds TSB Bank Plc), which enclosed a schedule of the AHAB Partnership's Combined Equity Investments. The AHAB Partnership's

---

2480 **{G/5126.3/1}**; During cross-examination, the memorandum was put to Mr. Hatton: **{Day94/59:21}-{Day94/60:22}**. See, in particular at page 60, line 7: *"Q. You see it refers to the Palmer Square bonds, US$320 million? A. Sorry? Q. Yes, nominal. Do you see? A. I see that, yes. Q. Would you accept that if that is accurate, that is inconsistent with an entry in the 05 account to them being Maan Al Sanea's bonds? A. This is to John Potter at AIH, I assume? So, he may be confirming -- my understanding is that AIH are holding the securities on behalf of Algosaibi, but that AIH -- sorry, that Algosaibi is holding them on behalf of AIH but also that AIH are holding the bonds on behalf of Mr. Al Sanea. Q. I see. A. I think that is my understanding of this."* **{Day94/60:7}**.

2481 **{G/5376.2/1}** and **{G/5376.2/3}**. During cross-examination, the letter was put to: (a) Hatton xx **{Day94/69:14}-{Day94/70:10}** and (b) Davies xx **{Day96/80:19}-{Day96/82:2}**.

"*Debt Securities*" included (as at 31 December 2005) "*Palmer Square Plc FRN 2/11/2045*" in the amount of SAR 1.2 billion;[2482]

4.) AHAB's Group Profile (undated, circa 2007), which, in Appendix IV, includes AHAB's "investment Securities". Under the title "*Debt securities as at 31.12.2006*" it included "*Palmer Square Plc FRN 2/11/2045*" in the amount of SAR 1.2 billion;[2483]

5.) A draft of a syndicated term loan facility for US$500,000,000 for AHAB arranged by BNP Paribas and WestLB dated January 2007, which, in Appendix 1, contained a "*Breakdown of Algosaibi's Investment Securities*". Under the title "*Debt securities as at 31.12.2006*" it included "*Palmer Square Plc FRN 2/11/2045*" in the amount of SAR 1.2 billion;[2484]

6.) The aforementioned revolving commodity murabaha facility for US$30,000,000 for AHAB arranged by EIIB and Gatehouse Bank dated June 2008, which, in Appendix 2, contained "*Quoted Debt Securities held by* [AHAB]" as at 31 December 2007. The Appendix included "*Palmer Square Plc FRN 2/11/2045*" in the amount of SAR 1.182 billion (i.e. US$320 million);[2485] and

7.) An email from George John (employee of SFS) to Mr. Hayley dated 7 December 2007, in which Mr. John notes:[2486]

---

2482 **{G/5657.1/1}** and **{G/5657.1/4}**. During cross-examination, the letter was put to Mr. Hatton **{Day94/70:11}-{Day94/71:18}**.

2483 **{G/296/1}** and **{G/296/35}**.During cross-examination, the Group Profile was put to: (a) Hargreaves xx **{Day74/79:7}-{Day74/80:8}**; (b) Hatton xx **{Day94/71:25}-{{Day94/72:7}**.

2484 **{G/5625/1}** and **{G/5625/66}**.During cross-examination, the syndicated term loan was put to: (a) Hargreaves xx: **{Day74/80:9-16}**; (b) Hatton xx **{Day94/72:8}-{Day94/73:1}**.

2485 **{G/6703/1}** and **{G/6703/6}**.During cross-examination, the murabaha was put to: (a) Hargreaves xx: **{Day74/80:17}-{Day74/81:5}**; and (b) Hatton xx **{Day94/73:2}-{Day94/74:10}**.

2486 **{G/6166/1}**. During cross-examination, the email was put to Mr. Hatton **{Day94/74:11}-{Day94/75:3}**.

> *"We have paid USD 840,000/- as margin call to DKW on behalf of AIH. This is mainly due to the decrease in value of Palmer Square. Can you please send this amount as soon as possible to our account with Citibank, Geneva where you made the previous payment*".

**Conclusion on the US$122,369,277.86 transferred by the Money Exchange to SICL**

60. Only had it been shown that the Palmer Square bonds were the property of Al Sanea, could the Deloitte argument for theft have been sustainable. If the Palmer Square bonds were not beneficially owned by Al Sanea then the payments to SICL by the Money Exchange were a reimbursement of the payments SICL made to DKW. As such, AHAB's proprietary tracing claim in respect of these transfers i.e. totaling US$113.9m, falls away. This was put to Mr. Hargreaves during cross-examination:[2487]

> "*Q. Let's go back to paragraph 190, at {I/2/62}. You see -- and this is agreed: "Approximately USD 120m of the direct transfers was used to pay margin calls on bonds held ..."Put to one side "held for the benefit of Maan Al Sanea".*
>
> *A. Yes.*
>
> *Q. Then look at paragraph 4 at {I/19/3}. You see what is agreed: "I agree that USD 122m of the transfers to SICL relate to monies paid by SICL to ... ('DKW') for margin calls on certain bonds ..."*
>
> *A. Yes.*
>
> *Q. That's all agreed.*
>
> *A. That's the extent to which I can agree, yes.*
>
> *Q. That is all agreed.*
>
> *A. Yes.*
>
> *Q. The money paid to SICL, the transfer to SICL, was to reimburse SICL. You have agreed it. I don't know –*

---

2487 Hargreaves xx **{Day74/86:11}-{Day74/87:19}**.

> A. *It was for margin calls, yes. Whether it was for reimbursement or otherwise, it was for those margin calls, yes.*
>
> Q. *If his Lordship determines that those bonds were not beneficially owned by Maan Al Sanea, a claim in respect of that transfer must fall away, mustn't it?*
>
> A. *Again, you are asking me on issues of law, and that's not what I'm here to comment on. All I can say is that this is where the money went, my Lord. If a claim goes away as a result of that determination, my Lord, then that's a legal issue.*
>
> Q. *We can agree that if it goes away it goes away.*
>
> A. *Well -- no, we can agree if it goes away then it's a legal matter as to what impact that might have.*"

61. The Court is left with the fact that SICL made cash payments to DKW. The Palmer Square bonds were purchased by AIH and on the face of the documents AIH could not have assigned its interest in the bonds without the written consent of DKW. No document evidencing an assignment or consent has been found. Deloitte rely upon a memorandum from Mr. Hayley that describes an assignment by Al Sanea to AIH. The assignment has not been found. Deloitte rely on four El Ayouty Audit Packs, two of which pre-date the issue and purchase of the Palmer Square bonds and so cannot have been referring to them.[2488] That leaves the El Ayouty Audit Packs for 2007 and 2008 but they say nothing about the basis on which Al Sanea is supposed to have had an interest in the Palmer Square bonds. Against that, from the initial purchase documents and seven contemporaneous documents, including the draft of the US$500m syndicated loan and the US$30m murahaba facility, the ownership of the Palmer Square bonds would appear to rest with AHAB. I am unable to conclude that the payments to SICL were not by way

---

[2488] Hatton xx **{Day94/57:12}-{Day94/58:4}**.

of reimbursement of payments made by SICL to DKW on behalf of AIH, and cannot therefore conclude that the transfers to SICL were thefts.

62. AHAB has not discharged the burden upon it to prove that the payments totaling US$122,369,277.86 transferred by the Money Exchange to SICL belonged to the Money Exchange and so were misappropriated by Al Sanea.

63. There remains the question about the status of the other 113 "*matched*" payments to SICL.

64. At **{E1/28/25-30}** of their closing submissions, these 113 payments are analysed by the GTDs. From this analysis it appears, and I am satisfied, that these payments totaling some US$50m (approx.) must, on the available evidence, be regarded as payments which were part of the running account between the Money Exchange and the GTDs. For instance, the great bulk of these payments (some US$41m) are recorded as interest owing to SICL on money market placements which SICL is recorded as having held with the Money Exchange.

65. I am compelled to the conclusion that AHAB has no proprietary tracing claim in relation to the funds which were the subject of these 113 transfers.

**<u>CHEQUES</u>**

**AHAB's pleaded case in relation to cheques**

66. AHAB pleads that US$2,185m was misappropriated by the drawing of cheques on the Money Exchange's bank accounts:[2489]

> *"Mr. Al Sanea misappropriated about US$2,185m by drawing a large number of cheques on the Money Exchange's bank accounts (on which he was a signatory) payable to himself or to Saad Group companies. This is*

---

[2489] Statement of Claim, paragraph 68 **{A1/2.3/25}**; see also paragraph 62 **{A1/2.3/20}**.

> *demonstrated by 6,540 copy cheques obtained by AHAB from the Saudi British Bank in the total sum of US$1,613,360,050 and by entries on the Saad Tamweel ledger at the Money Exchange in relation to the balance. The Money Exchange had no liability to the Saad Group and there was no proper reason for the payments."*

67. AHAB pleads that full particulars are set out in Schedules 3 and 3a to the Statement of Claim. Schedule 3 to the Statement of Claim refers to 8,300 unique cheques (there are six duplicates) that total approximately US$1,902m.[2490] Schedule 3a to the Statement of Claim refers to 6,540 copy cheques that AHAB received from Saudi British Bank.[2491]

68. Schedules 3 and 3a do not completely overlap. 5,367 of the 6,540 cheques listed on Schedule 3a (which amount to a total of US$1,435m) match the 8,306 cheques listed in Schedule 3.[2492]

**No cheques payable to the GTDs**

69. None of the cheques listed in Schedule 3a were made payable to any of the GTDs. Mr. Davies says:[2493]

> "*307. The cheques on Schedule 3a detail the beneficiaries of the cheques. None of the cheques detailed in Schedule 3a are made payable to either SICL or Singularis, or any other GT Defendant."*

> *"339. No cheque listed in Schedule 3a states that SICL or Singularis, or any of the other GT Defendants, is a beneficiary*."

2490 **{A2/3/1}**. Davies 2W, paragraph 312 **{I/11/145}**.
2491 **{A2/4/1}**.
2492 Davies 2W, paragraph 337 **{I/11/151}**.
2493 Davies 2W, paragraph 307 **{I/11/143}** and Davies 2W, paragraph 339 **{I/11/151}**.

TABLE E.7

| Description | No. cheques | Value US$ million | Value SAR million | US$ value% |
|---|---|---|---|---|
| Saad Trading and Contracting Company | 5,926 | 1,494 | 5,603 | 92.61 |
| Saad Specialist Hospital | 448 | 89 | 335 | 5.53 |
| Mr Al Sanea | 78 | 15 | 55 | 0.90 |
| Saad Travel and TourismCompany | 80 | 15 | 55 | 0.91 |
| Al Saad National School | 5 | 0.5 | 2 | 0.03 |
| SaadNational Schools | 3 | 0.3 | 1 | 0.02 |
| **Total** | **6,540** | **1,613** | **6,050** | **100.00%** |

70. That uncontroverted position is indeed, as the GTDs submit, the end of AHAB's claim against the GTDs based upon the cheques. On the basis that the great majority of cheques were paid to STCC,[2494] the trail leads there and the difficulties facing AHAB in relation to tracing through STCC return to confound its cheques claim.

71. Mr. Hargreaves agrees about the identity of the payees:[2495]

> "*Like Mr. Davies, I have not seen any of the Cheques made payable to SICL or Singularis [WD2 para 339].*"

72. Mr. Hargreaves confirmed this during cross-examination:[2496]

> "*Q. If we look at paragraph 19 at {I/19/7}, of the matters agreed, you say: "Like Mr. Davies, I have not seen any of the Cheques made payable to SICL or Singularis ..."*
>
> *A. Yes, that's correct.*
>
> *Q. That's right, isn't it?*

2494 With others paid to other Saad entities, Al Sanea himself or to AHAB Partners and related entities (the 94 mentioned above under "*Benefits received*").
2495 Hargreaves' Matters Agreed, paragraph 19 **{I/19/7}**.
2496 Hargreaves xx 101, line 4 **{Day74/99:22}-{Day74/101:4}**.

*A.* *That's correct.*

*Q.* *Just to be crystal clear, no one has found any cheques made payable to SICL, Singularis or indeed any of the other GT defendants?*

*A.* *I'm not sure who the other GT defendants are, but SICL and Singularis, as I say in that statement there, I haven't seen any cheques made payable to them.*

*Q.* *You can take it from me that none of the GT defendants fall within the list you have produced in paragraph 48 of your report.*

*A.* *Right.*

*Q.* *If we look back at {I/2/5}, I will just remind you of paragraph 4(i) of your instructions. You had been asked to identify transfers from the Money Exchange, including cheques. That's one of the things you were expressly asked to look at.*

*A.* *Yes, by reference to those schedules that I have referred to as being the starting point, yes.*

*Q.* *It is fair to say, isn't it, that you don't record in your statement what you do record in the matters agreed, which is that you didn't find any that were payable to SICL or Singularis?*

*A.* *No, but it can be inferred from the schedule that you have just referred to that there weren't any cheques payable to SICL or Singularis, because the schedule on the following page lists the payees of those cheques that we received.*"

73. Mr. Hatton also confirmed in cross-examination not only that none of the GTDs were payees of the cheques but that neither were any of the other Defendants:[2497]

"*Q.* *Then I think you returned to this in your second statement. If we take those pages off the screen and go to {I/8/7}, there, at paragraph 2.6, we see that you deal with some additional cheques that have been forthcoming.*

*A.* *That's correct, yes.*

---

[2497] Hatton xx **{Day95/2:18}-{Day95/3:13}**.

*Q.* *You can see that from the heading, and you provide an analysis of those at table 2.1?*

*A.* *Yes, I do, my Lord.*

*Q.* *If we turn the page, you then combine the results so we can see what we're working with.*

*A.* *That's correct.*

*Q.* *We see there are 6,617 cheques in total, made payable to Mr Al Sanea and various Saad entities?*

*A.* *That's correct, yes, my Lord.*

*Q.* *They total US$1.62 billion. We see from this table, can't we, that STCC is by far the largest beneficiary?*

*A.* *Yes, we can.*

*Q.* *None of the defendants in these proceedings are payees of those cheques?*

*A.* *So it seems; that's correct.*"

**Cheques paid to AHAB Partners and "related" parties**

74. It is worth noting that cheques made payable to AHAB Partners and related parties appear to have been treated differently in the Money Exchange ledgers than those made payable to Al Sanea and Saad entities when they were invariably entered in the Saad Company Tamweel ledger account as debts owed to the Money Exchange. 216 cheques (totaling US$ 48m) recovered from SABB by AHAB and disclosed in the proceedings had been made payable to AHAB or related parties.[2498] Unlike the cheques posted to the Saad Company Tamweel ledger account, it has not been possible to establish the precise

---

[2498] Hargreaves 1W, paragraph 47 **{I/2.27/17}**; Davies 2W, paragraph 595 and Table K.5 **{I/11/261}**.

accounting treatment in respect of the cheques made payable to the AHAB Partners.[2499]

As explained by Mr. Davies in re-examination[2500]:

> "*A.* *Yes, by contrast,* [to] *Mr Maan Al Sanea – when cheques were paid to Mr Maan Al Sanea, we were able to follow those through to the ledger, as monies owed by Mr Maan Al Sanea, and we couldn't do the same by reference of where those cheques* [were paid] *to the other partners…"*

**<u>LETTERS OF CREDIT ("LCS")</u>**

**AHAB's pleaded case in relation to LCs**

75. In the Statement of Claim, AHAB pleads:[2501]

> *"72 Mr Al Sanea caused the Money Exchange to open LCs as payment for goods purportedly supplied to AHAB. The goods included very large quantities of air conditioning and heating equipment, lift machinery, marble and fabrics. AHAB had no need of these goods, did not order them and never received them – they did not exist. The proceeds of the LCs were paid initially to accounts in the names of the purported suppliers but then retransferred to STCC or otherwise to Mr Al Sanea or the Saad Group."*

76. AHAB pleads that full particulars of LCs allegedly opened for this purpose are set out in Schedule 4 to the Statement of Claim.[2502] Further particulars of the 'same' LCs are set out in Schedule 4a to the Statement of Claim.[2503]

**No LC payments to GTDs**

77. There were **no direct payments** from the LCs listed in Schedules 4 and 4a to the GTDs. Mr. Hargreaves accepted this in cross-examination:[2504]

---

2499 Hatton 1W, paragraph 8.5 **{I/1/52}**.
2500 Davies re-x **{Day96/127:24-25}** and **{Day96/128:1-3}**.
2501 Statement of Claim, paragraph 72 **{A1/2.3/26}**.
2502 **{A2/5/1}**.
2503 **{A2/6/1}**. Statement of Claim, paragraph 73 **{A1/2.3/27}**. While AHAB plead Schedule 4a is the "*same*" set of LCs as contained in Schedule 4, there is an unexplained difference in the total of US$2,025 (Schedule 4 totals US$2,029,824,423, whereas Schedule 4a totals US$2,029,826,448).
2504 Hargreaves xx **{Day74/115:7-16}**.

"*Q. You agree that it is not alleged that letters of credit were paid directly to any of the GT defendants, so it's not alleged they were paid directly to SICL or Singularis, and you can take it from me that that includes the other GT defendants.*

*A. When you say "weren't paid directly", what do you mean by that? Sorry, weren't paid by –*

*Q. The Money Exchange did not directly pay SICL or Singularis?*

*A. Not in relation to the letters of credit, no.*"

78. Mr. Hatton also accepted that no direct payments were made to the GTDs during cross-examination:[2505]

"*Q. It is your evidence that a total of just over US$2 billion of letters of credit were repaid by the Money Exchange?*

*A. That's right.*

*Q. For the benefit of STCC?*

*A. For the benefit of STCC, that's correct.*

*Q. You agree that none of the defendants in these proceedings were the beneficiaries of these letter of credit payments?*

*A. Yes, certainly not the direct beneficiaries. That's correct.*"[2506]

79. Mr. Hatton also clarified that he had no basis for believing any payment to STCC was a so-called pass-through payment to any other party:[2507]

"*CHIEF JUSTICE:*
*Do you see a difference between a direct beneficiary and a beneficiary?*

*A. Well, I mean, as far as I can tell, the money -- the beneficiary was STCC in most of these cases. I only made that comment because*

---

2505 Hatton xx **{Day95/3:24}-{Day95/4:9}**.

2506 See also Hatton xx **{Day95/4:24}-{Day95/5:5}**. "*MISS LUCAS: Can I ask you to turn to [I/1/44]. In relation to the last answer you gave, paragraph 7.11. Do you see there the last sentence? A. Yes, I do. Q. Do you confirm that the destination of the monies was STCC? A. That's right, yes, my Lord.*"

2507 Hatton xx **{Day95/4:16-23}**.

> *we have seen a lot of pass-through payments in this matter, but I have no basis for believing there were pass-through payments in relation to the LCs or the cheques.*"

**Why LCs were required by the Money Exchange to enable it to drawdown funds**

80. The LCs enabled the Money Exchange, primarily through TIBC, to drawdown under its facilities with its banks. AHAB opened facilities with different banks that included separate sub-facilities for LCs. It was necessary to structure LC transactions, at least in appearance, so that it could drawdown under those sub-facilities.

81. By way of example, Calyon Bank opened a facility with AHAB on 21 November 2006.[2508] The agreement provided a LC sub-facility for US$10m:[2509]

> *"(i) Up to a maximum limit of Ten Million (10,000,000) United States Dollars or its equivalent in Alternative Currencies; for the opening of Sight Letters of Credit and Usance Letters of Credit.*
>
> *(ii) Up to a maximum limit of Ten Million (10,000,000) United States Dollars, which will be a sub-limit of the amount of the Letter of Credit Facility, for the opening of Sight Letters of Credit for the importation of gold bullion."*

82. The facility was provided on the following terms:[2510]

> "(i) *Interest on Sight Bills under Letters of Credit will be charged on the amount due but unpaid at the rate of LIBOR plus 1.25 % per annum and debited to the current account of the Borrower upon settlement of documents. This rate may be subject to change from time to time with reference to prevailing market conditions.* […]
>
> *(ii) The validity of each Letter of Credit shall be a minimum of ninety (90) days and a maximum of one hundred [and] eighty (180) days.*
>
> *(iii) The acceptance period under Usance Letters of Credit shall not exceed one hundred* [and] *eighty (180) days."*

---

2508 **{G/5522/1}**.
2509 Clause 3(c) (i)-(ii) **{G/5522/3}**.
2510 Clause 3(c) (iii), (vii) and (viii) **{G/5522/3}**.

83. If AHAB had had no apparent LC business, it could not have drawn down from the bank under the sub-facility. The LCs were a mechanism for fully utilising the LC sub-facilities and a means of getting that part of the facilities from the banks. To the extent that the LCs were fake, that was to defraud the banks.

84. Mr. Hargreaves confirmed on cross-examination that for AHAB to draw down under its facilities, AHAB or the Money Exchange were required to enter into a number of purported LCs:[2511]

> "*Q. In order to draw down under this facility, in order to draw down under a letter of credit sub-facility, the Money Exchange had to enter into letters of credit, didn't it?*
>
> *A. I presume so. Otherwise, AHAB or the Money Exchange were unable to use that part of the facility.*
>
> *Q. Of course, if the Money Exchange did not enter into letters of credit then it wouldn't be able to use that part of the facilities. That must be right, mustn't it?*
>
> *A. I guess that flows naturally from that statement, yes.*"

85. The LCs were intended, and were necessary, to generate cash flow for the Money Exchange and allowed TIBC to lend to the Money Exchange.

86. In a memorandum dated 17 August 2003 from Mr. Potter to Al Sanea, Mr. Potter explained how to generate cash flows on LC transactions:[2512]

> "*With the establishment of TIBC, it is clear that we have moved from a free and unregulated environment to a structured and highly regulated one. We therefore must be very careful to comply with the letter and spirit of BMA [Bahrain Monetary Authority] regulations…*
>
> *We recommend that you consider adopting the following policy guidelines regarding the type, mix and quality of assets to be booked by TIBC:*

---

2511 Hargreaves xx **{Day74/105:14-22}**.
2512 **{G/3512/1}.**

> *A) CORPORATE LENDING IN SAUDI ARABIA – We expect this activity to be limited to borrowers known to the Group. We must be very aware of the quarterly Large Exposure Report that we must file with the BMA for all assets exceeding 10% of our capital (currently $10 million). Clearly, loans in this report will be scrutinized very carefully by the BMA. Therefore, we should ensure that no single facility of this type exceeds this limit and we recommend keeping each limit below $9 million for the time being, so as not to attract attention.*
>
> *B) TRADE FINANCE FOR CORPORATE CUSTOMERS – Trade finance is merely another type of facility for corporate borrowers and the credit file requirements will be the same. However, funding for these deals will come from trade finance lines from other banks.*
>
> *The most important consideration is to avoid transactions that look odd and that are not logical from a commercial point of view.*
>
> *If TIBC opens an L/C, then it should be advised and confirmed by another bank in the same location as the beneficiary to appear bona fide. The beneficiary will then draw time drafts (usance drafts), say up to 180 days on the confirming bank. Many banks will not handle commercial letters of credit without shipping documents. In other words, they are not keen to process L/Cs for metals where there is no movement of goods. We have to have a logical and plausible explanation for each trade deal.*
>
> *Above all, trade finance transactions take time to execute. We must allow at least two weeks for payment to take place under an L/C once it is opened. We must expect delays due to documentary discrepancies and human error in banks with which we deal. If we push the banks too much and insist every time that the deal be rushed through, we will arouse suspicion and errors will occur. Banks never do this when handling normal documentary transactions on behalf of customers.*
>
> *We must avoid unduly large concentrations in certain commodities when providing trade finance facilities.*
>
> *It is also evident that activities A and B above are labor intensive, particularly the trade finance business with the further disadvantage that the timing of cash flows on trade deals is not very predictable."*

87. In a memorandum dated 4 September 2003 from Mr. Hayley to Al Sanea, Mr. Hayley wrote about funds being channeled to the Money Exchange, in effect setting the blue

print for the fraudulent use of fictitious customers of TIBC to enable TIBC to obtain LCs from the banks (emphasis added):[2513]

> "*Since TIBC cannot risk lending to ALGME, these funds will have* ***to be drawn under temporary loan facilities given to customers of TIBC*** *and I understand Glenn has some potential accounts for this purpose.*
>
> *However, this procedure is cumbersome:*
>
> *Any single drawing must be less than the TIBC single borrower limit.*
>
> *Accordingly, three borrowers must be established.*
>
> *It looks transparent if all three borrowers happen to draw on the same day, each time for the same amount.*
>
> *Funds are evidently being channeled to ALGME*
>
> *An Alternative method is for ALGME to place a CALL deposit with TIBC. This deposit should not be pledged and must be available for repayment to ALGME on demand. In this way there is no lending by TIBC to ALGME…..*
>
> *In this way, TIBC will have a $15 [million] deposit on its books from ALGME, which can be repaid to ALGME on demand.*
>
> *Virtually all the funds will be repatriated to ALGME except for about $0.8 [million], which TIBC retains in cash.*
>
> *It will look good for TIBC to have a deposit on its books from the parent company. Incidentally if TIBC's financial year-end is not the same as ours, we can draw these funds over the year-end, which will be very useful in reducing our local OD.*
>
> *I would also mention that we can of course expand this concept later, so that if ALGME wants permanent funding at a higher level, it can easily be arranged. Since TIBC is a subsidiary of the ALGME, this will make no difference to our consolidated accounts."*

88. Mr. Hargreaves notes a "*clear trend*" of cash-flow from the issuing bank to TIBC and on to STCC, with the liability settled by the Money Exchange: [2514]

---

2513 **{G/3551/1}.**

> "*73. …the above shows a clear trend of cashflow from the issuing bank to TIBC and on to STCC, with the liability settled by the Money Exchange.*"*…*
>
> *78. We have identified the settlement of the liability arising from the majority of the LCs as coming from the Money Exchange and, where information is available, there is a clear trend of the proceeds of the LCs finishing in an account in the name of STCC".*[2515]

89. Notwithstanding that the proceeds of the LCs ended up with STCC, Mr. Hargreaves gives the following summary of the of the use to which those proceeds, amounting to some US$2.030bn was put and refers to a "tracing exercise" which ended with STCC:[2516]

> *24.* "*In summary, LCs were raised using forged or sham documentation where no goods were delivered and the suppliers were either fictitious or unaware of the transactions taking place using their company names. The funds were paid by the issuing bank based on the forged/sham documents into bank accounts of these purported suppliers ("**Supplier Accounts**"). The Supplier Accounts were under the ultimate control of MAS and the funds initially paid to the Supplier Accounts were transferred on to accounts held in the name of entities under MAS' control, including STCC. The resulting liability to the issuing bank for the funds paid into the Supplier Accounts pursuant to the LCs was settled by the Money Exchange on the date of the maturity, typically 180 days later. The result of the LC Scheme was that funds were extracted from the Money Exchange into entities, or bank accounts, under the control of MAS.*
>
> *25. The tracing exercise in relation to the LC Scheme is divided into two parts. First, to establish the total amounts extracted from the Money Exchange under the LC Scheme, we have matched the settlement of the liability by the Money Exchange to the issuing bank on or around the maturity date of an LC. Second, to identify*

---

2514 Hargreaves 1W, paragraph 73 **{I/2.27/23}** and paragraph 77 **{I/2.27/24}**; see also Hargreaves xx: **{Day74/119:7}**. It is important to note that Mr. Hargreaves looked at 9 percent of the population of cheques, and the remaining 91 percent may not follow that trend.

2515 Hargreaves 1W, paragraph 78 **{I/2.27/24}**.

2516 Hargreaves 1W, paragraphs 58-59 **{I/2.27/20}**.

> *the amount that ultimately found its way to STCC, we have tracked the cash transferred from the issuing bank to the Supplier Accounts at The International Banking Corporation ("**TIBC**") and then transferred from TIBC to STCC."*

90. As set out following from the GTDs' submissions, there was no secret about the use of the LCs to provide funding to STCC. This was fully recorded within the accounts of the Money Exchange where the vast majority of these funds are accounted for as Al Sanea indebtedness. That fact by itself destroys AHAB's proprietary tracing claim to the proceeds of the LCs. They are shown as comprising a contractual debt owed by Al Sanea and/or Saad entities to the Money Exchange.

**Treatment of LC transactions in the Money Exchange's ledgers and financial accounts: The 1,723 LCs**

91. Of the 1,817 LCs detailed in Schedule 4a, 1,723 LCs totaling approximately US$1.9bn correspond to debit entries on the Money Exchange's ledgers, which bear the name of Saad, and were included in the financial statements and Al Sanea's net indebtedness statements (Attachment 9s).[2517]

92. 1,723 LCs correspond to debit entries on either Account 90 01 7 55018 4801/8 named in the Money Exchange's ledgers as "SAAD CO. L/C" (the "Saad Letter of Credit Account") or Account 90 01 0 55018 4801/9 named in the Money Exchange's ledgers as "SAAD CO KH" the "Saad Letter of Credit KH Account". This means that the Money Exchange has recorded a debt from "Saad" to the Money Exchange in respect of 1,723 of the LCs listed in Schedule 4a.[2518]

---

[2517] Davies 2W, paragraph 350 {**I/11/154**}. Paragraph 350 of Davies 2 was updated in Davies' Errata Schedule dated 17 February 2016 from 1,688 LCs to 1,723 LCs {**T/268/5**}.

[2518] Davies 2W, paragraph 350 {**I/11/154**}. Paragraph 350 of Davies 2 was updated in Davies' Errata Schedule dated 17 February 2016 from 1,688 LCs to 1,723 LCs {**T/268/5**}.

93. The year-end balances on the Saad Letter of Credit Account and the Saad Letter of Credit KH Account are all included in the calculation of the figure for Al Sanea's net indebtedness to the Money Exchange in the Attachment 9 (and Attachment 5 or 7 as appropriate) to the Ayouty Audit Packs for 2004 to 2008.[2519]

94. Mr. Hargreaves agrees:[2520]

> *"I agree that of the 1,800 LCs, approximately 1,700 LCs totaling USD 1.9bn are posted to Money Exchange Ledger accounts in the name of 'Saad', as stated and shown in WD2 para 350 and Tab F001. I agree that these ledger accounts are included in the El Ayouty audit reports as receivables from Mr. Al Sanea and form part of Mr. Al Sanea's net indebtedness [sic] in these reports, as set out in WD2 para 343."*

95. In cross-examination Mr. Hargreaves said:[2521]

> *"Q. I think what you accept is the following: you accept that the vast majority of the letters of credit were posted as debit entries to two Saad ledger accounts.*
>
> *A. Yes, that's correct.*
>
> *Q. You accept that these amounts formed a part of Mr Al Sanea's net indebtedness as recorded in the El Ayouty accounts.*
>
> *A. Yes, like the cheques, my Lord."*

**The remaining 94 LCs**

96. In relation to the balance of LCs on Schedule 4a (i.e. 94 LCs), a further 5 LCs correspond to debit entries on different ledgers of the Money Exchange bearing the name of Saad, Lombard Atlantic Bank or STCC.[2522]

---

2519 Davies 2W, paragraph 356 {**I/11/156**}; see more detail at Davies 2W, paragraphs 359 to 372 {**I/11/157**}.
2520 Hargreaves' Matters Agreed, paragraph 20 {**I/19/8**}.
2521 Hargreaves xx: {**Day73/9:16-23**}.
2522 Davies 2W, paragraph 343 {**I/11/152**}. Paragraph 343 of Davies 2 was updated in Davies' Errata Schedule dated 17 February 2016 {**T/268/5**}. Mr. Davies was able to identify an additional 35 LCs that were previously not identified {**T/268/5**}.

97. The remaining 89 cannot be identified in the Money Exchange's ledgers, due to Discovery not having sufficient detail. For example:[2523]

6 entries pre-date 1 January 2000 (given that AHAB has only provided a copy of the Money Exchange's ledgers from 1 January 2000 in its discovery, there is no available accounting data in respect of these entries); and 59 entries contain insufficient information to identify corresponding LCs in the Money Exchange's ledgers (in that seven entries are missing the figure in respect of the amount, or value, of the LC, and a further 52 have no, or insufficient, information regarding the date of the LC).

**Capitalisation of Equipment**

98. During cross-examination, to make the point that AHAB had not received any benefit from the LCs, it was put to Mr. Davies that one would expect to see capitalisation of equipment received pursuant to the LCs on the books of AHAB.[2524] The point being that, if the equipment was not shown in the accounts, it was unlikely to have existed and that the proceeds must therefore have gone to Al Sanea's Saad entities.

99. I do not regard this as controversial. The difficulty facing AHAB was showing that the proceeds of the LCs reached the Defendants after they left the Money Exchange's accounts.

100. In this regard and contrary to AHAB's case, Mr. Davies pointed out that there was a huge amount of capitalisation in STCC's accounts from which it follows that it is not possible

---

[2523] Davies 2W, paragraph 354 {**I/11/152**}. Paragraph 354 of Davies 2W was updated in Davies' Errata Schedule dated 17 February 2016 {**T/268/5**}.

[2524] Davies xx: {**Day95/89:3**}.

to know whether the equipment actually existed. Had the proceeds of the LCs reached STCC as capital assets, they could not have made their way to the Defendants[2525]:

"*A.* *Well, if it's air-conditioning units, then you'd expect to see those capitalised.*

*Q.* *Yes.*

*A.* *In that example we're discussing. But not necessarily. If it's a cost of something that has not been capitalised then you wouldn't necessarily.*

*Q.* *But if I'd spent $1.9 billion –*

*A.* *Yes.*

*Q.* *-- on capital equipment of one sort or another –*

*A.* *Yes.*

*Q.* *-- you'd expect it to feature somewhere in my financial statements?*

*A.* *It probably would be material, yes.*

*Q.* *It would be there as inventory or capital or something like that?*

*A.* *Or something, yes.*

*Q.* *Did you see anywhere in AHAB's financial statements evidence of the receipt of $1.9 billion of...*

*A.* *No.*

*Q.* *-- goods and equipment?*

*A.* *No.*

*Q.* *Did you see anywhere in the STCC financial statements evidence of the receipt of $1.9 billion of equipment?*

*A.* *STCC -- all I've got is their accounts, and there is a huge amount of capitalisation in those accounts as they were building some*

---

2525 Davies xx: {**Day95/89:3**}-{**Day95/90:11**}.

*hotels, I think, weren't they? There was -- so there is a huge amount of capitalisation actually in STCC's accounts. I think -- I'd perhaps need to look at those accounts to confirm that, but there is -- there is quite a large amount of capitalisation.*

*Q.* *Perhaps we'll revert to that point when we come to STCC's accounts, but it's not in AHAB's accounts?*

*A.* *No."*

101. In STCC's consolidated balance sheet, in its accounts for the year ended 2008, there are entries for "Investment property", totaling SAR 22,919,556,000 and "Property and equipment", totaling SAR 2,071,421,000[2526] (both amounts totaling US$6.5bn approx). The notes to those entries state:

102. In relation to the "Investment property", note that the figure includes equipment and furniture:[2527]

"*Investment property principally represents land and buildings (including equipment and furniture and fixtures) related to 'Oasis Residential Resorts' and other properties."*

103. In relation to the "property and equipment", notes detail movements in property and equipment.[2528]

104. The inclusion of equipment in STCC's accounts was confirmed by Mr. Davies in re-examination:[2529]

*"Q:* *Did you see anywhere in the STCC financial statements evidence of the receipt of $1.9 billion of equipment?*

*A:* *STCC -- all I've got is their accounts, and there is a huge amount of capitalisation in those accounts as they were building some hotels, I think, weren't they? There was -- so there is a huge amount of capitalisation actually in STCC's accounts. I think -- I'd*

---

2526 {**G/7418/5**}.
2527 {**G/7418/23**}.
2528 {**G/7418/24**}.
2529 Davies re-x: {**Day96/130:7**}-{**Day96/132:4**}.

*perhaps need to look at those accounts to confirm that, but there is -- there is quite a large amount of capitalisation." On the right-hand screen at {G/7418/5} please, do you see that, Mr Davies?*

A. *Yes.*

Q. *Do you see that that is STCC's accounts?*

A. *Yes.*

Q. *At "Noncurrent assets" there is an entry for "Investment property."*

A. *Yes.*

Q. *Do you see that it refers to note 8, and there is a sum of SAR 22.9 billion odd; do you see that?*

A. *Yes.*

Q. *And the second entry I want you to look at, do you see "property and equipment." Do you see that, two down?*

A. *Yes.*

Q. *Do you see "note 10"?*

A. *Yes.*

Q. *And it refers to note 10 and it refers to SAR 2 billion odd. On the left-hand side at {G/7418/23}, please. Do you see note 8? Do you see that?*

A. *Yes.*

Q. *Do you see investment property and we see the same SAR 22.9 billion odd. Would you like to just cast your eye over the note at the end, the small paragraph at the end, please?*

A. *Do you want me to read it out?*

Q. *No, just cast your eye over it for the moment, please.*

A. *Yes.*

Q. *Do you see what it says in brackets?*

*A. Yes, this is what I was referring to yesterday.*

*Q. Thank you very much. That was the question. Over the page at {G/7418/24} do you see note 10?*

*A. Yes, again, there's additions. My Lord, this is what I mentioned yesterday, with the word "additions" of a capital nature in the books of Saad Trading. There is another example of the point I was trying to make yesterday."*

**Reimbursements**

105. A number of LCs listed on Schedule 4a were reimbursed by STCC to the Money Exchange.

106. SAR 161,633,545.91 (US$43,102,278.90) was reimbursed by STCC to the Money Exchange between January and June 2001 in relation to LCs.[2530] This is agreed by Mr. Hargreaves:[2531]

> "*I agree that approximately USD 43m (SAR 161m) was reimbursed by STCC to the Money Exchange in relation to LCs issued in 2000 and 2001 as stated in WD2 para 376."*

107. This reimbursement was confirmed during Mr. Hargreaves' cross-examination:[2532]

*"Q. We have seen at {I/19/8} that you have agreed US$43 million, at {I/11/162}, Davies paragraph 376, you there see the reimbursements that Mr Davies is talking about, and the total value at the bottom: "The total value of all the reimbursements listed in the schedule [is] (SAR 161 [million]) ..."*

*A. Yes."*

108. These reimbursements were identified by Mr. Davies from a contemporaneous 'Reimbursement Schedule' provided by AHAB on discovery, and exhibited to Davies

---

[2530] Davies 2W, paragraph 376 {**I/11/162**}.

[2531] Hargreaves' Matters Agreed, paragraph 21 {**I/19/8**}. Mr. Hargreaves refers to LCs issued in 2000 and 2001 rather than reimbursements between January and June 2001.

[2532] Hargreaves xx: {**Day74/122:1-9**}. See also Hargreaves xx: {**Day74/121:6-9**}. *"Q. If we look at paragraph 21, you agree that approximately US$43 million was reimbursed by STCC to the Money Exchange in relation to some LCs in 2000 and 2001? A. Yes."*

2W.[2533] Mr. Hargreaves acknowledged that this schedule of reimbursements was possibly incomplete:[2534]

> *"Q. You can't help the court on whether this is a complete list or not.*
>
> *A. No, I can't, but this is Mr Davies' list, isn't it?*
>
> *Q. Not really, Mr Hargreaves. This is a document -- this isn't a list that was compiled by Mr Davies -- that emerges from the discovery that was provided by AHAB in the course of these proceedings, which Mr Davies happens to have spotted.*
>
> *A. I see.*
>
> *Q. It's not in any way an after-the-event table that has been compiled by a witness in these proceedings; this is a contemporary document.*
>
> *A. Right.*
>
> *Q. Do you understand?*
>
> *A. Yes.*
>
> *Q. So it is, of necessity, something of a snapshot.*
>
> *A. Yes.*
>
> *Q. What I'm suggesting, therefore, is that given that this is simply a statement of STCC LCs that have been reimbursed to the Money Exchange, there could be other reimbursements not listed here?*
>
> *A. Yes, there could be, and I would expect those to be recognised in the LC account, which, as we mentioned earlier, forms part of the net indebtedness of Mr Maan Al Sanea to the Money Exchange. So those would appear as credits to that account."*

109. There are a number of additional memoranda from Mr. Jesudas of the Money Exchange to Mr. Khalil Hammad of STCC, asking when the Money Exchange may expect to

---

2533 {**Q/454/1**}.

2534 Hargreaves xx: {**Day73/49:25**}-{**Day73/50:25**}.

receive funds from those LCs. For example, in a memorandum date 23 December 2001, Mr. Jesudas notes:[2535]

> "*The following LC's [sic] were negotiated on the dates indicated. Could you kindly advise when we may expect to receive the funds.*"

110. Other communication was sent from Mr. Jesudas to Mr. Hammad detailing when LCs were negotiated/refinanced.[2536]

111. In addition, there are 32 credit entries, totaling SAR 372,766,323.47 (US$99,404,352.93), recorded on either the Saad Letter of Credit Account or the Saad Letter of Credit KH Account, which has the effect of reducing the amount owed by STCC to the Money Exchange.[2537] These credits correspond to receipts received in to the Money Exchange's SABB Account.[2538] This is also agreed by Mr. Hargreaves:[2539]

> "*I agree that the credit entries to the Saad Letter of Credit ledger accounts at the Money Exchange total USD 99m (SAR 373m) and can be traced to the bank statements, which is stated in WD2 para 380*."

112. Mr. Hargreaves confirmed these credit entries during cross-examination:[2540]

> "*Q. At {Q/456/1}, can I be absolutely clear: this is a document that was produced by Grant Thornton, it is one of the exhibits to Mr Davies' statement, and it is a summary showing 32 occasions on which credit entries were applied to the Saad letter of credit account. If we look at paragraph 22 at {I/19/8}, you agree that US$99 million, which is SAR 373 million, can be traced to the bank statements. At {Q/456/1}, it is right that if you look at the total on the right-hand side at the bottom, that is where that figure comes from, isn't it?*
>
> *A. Yes, that's correct.*

---

2535 {**G/2660.1/1**}. See also: {**G/2655.1/1**}; {**G/2487.2/1**}; {**G/2516.1/1**}.
2536 For example: {**G/7056.1/1**}; {**G/7556.2/1**}; {**G/6141.1/1**}.
2537 Davies 2W, paragraph 380 {**I/11/164**}.
2538 Davies 2W, paragraph 378 {**I/11/164**}.
2539 Hargreaves' Matters Agreed, paragraph 22 {**I/19/8**}.
2540 Hargreaves xx: {**Day74/121:21-25**}; {**Day74/122:10-13**}.

*Q.* *For completeness, if we look at {I/11/161}, if we go through this part, what Mr Davies has done in great detail, he has gone through all of the reimbursements in order to -- it goes all the way up to {I/11/165}, where he does the detailed analysis of all of those reimbursements.*

*A.* *Yes."*

**Conclusion**

113. Mr. Davies and Mr. Hargreaves are agreed that the LCs listed in Schedule 4a have either been accounted for as a debt owed by Al Sanea/Saad entities to the Money Exchange or reimbursed:[2541]

"*Q.* *That's fine. Where we have got to is that you have agreed that in relation to the LCs they are either accounted for as a debt or in a limited number of cases reimbursed.*

*A.* *Yes."*

114. The Money Exchange could draw down on its LC facilities with third-party banks:[2542]

"*Q.* *Is it not fair that the Money Exchange had to purport to be doing letter of credit business in order to draw down on the letter of credit facility?*

*A.* *Yes, I agree with that, my Lord, yes."*

115. It is therefore not open to AHAB to avoid the legal analysis in relation to the LCs, that the Money Exchange received the benefit of either a debt owed to it from STCC on its financial accounts or it received the funds reimbursed from STCC. This was recognized by Mr. Hargreaves:[2543]

"*Q.* *The other benefit that the Money Exchange would get is either it's getting the benefit of a debt due from STCC which you have identified in the accounts –*

---

2541 Hargreaves xx: {**Day74/121:16-20**}.
2542 Hargreaves xx: {Day74/124:16-19}.
2543 Hargreaves xx: {**Day74/124:20**}-{**Day74/125:7**}.

> *A.* *Yes.*
>
> *Q.* *That's right, isn't it?*
>
> *A.* *Yes.*
>
> *Q.* *Or, where we can see reimbursements to the Money Exchange, it is getting the cash.*
>
> *A.* *Yes, I agree.*
>
> *Q.* *You didn't consider, did you, whether or not what you call the letter of credit scheme was a mechanism of getting money from the banks to fund the Ponzi scheme?*
>
> *A.* *No, that wasn't part of my work, no."*

116. That last answer is also an acknowledgement that Mr. Hargreaves (and Deloitte) did not consider whether the LCs were but another instrumentality of AHAB's use of the Money Exchange for defrauding the banks. At all events, the accounting for the proceeds of the LCs as between the Money Exchange and Al Sanea/STCC was inconsistent with them having been stolen from the Money Exchange. They are recorded as debts owed to the Money Exchange and may well be recoverable as such from Al Sanea/STCC.

117. AHAB can establish none of its claims against the Defendants in relation to the LCs.

**CASH WITHDRAWALS**

118. By way of expansion of the three components of the "money out scheme" identified by Mr. Hargreaves, he has sought to support AHAB's case by relying upon (1) certain cash withdrawals from the Money Exchange; (2) thousands of transfers termed "generic transfers" to the GTDs as identified from their bank statements and (3) indirect transfers, said by Mr. Hargreaves to comprise of traceable funds from the Money Exchange by virtue of "patterns" which he says links the transfers to payments out of the Money Exchange. For lack of evidence by which funds from any of these sources can properly

be said to have been traced to the Defendants from the Money Exchange, these propositions do not improve AHAB's case.

119. Following I will make brief reference to these three propositions, sufficient I believe for explaining why they must be rejected. Again, at all events, these very large amounts were all recorded within the Money Exchange's accounts as withdrawals by Al Sanea, a fact which AHAB pleads but in argumentative terms[2544]:

> "*Mr. Al Sanea would complete and initial a debit advice directing a debit to a Saad account in the amount of the money he had taken from the branches. However, as with the other methods of misappropriation, the debit did not represent a genuine loan and Mr. Al Sanea had no intention of repaying the money".*

**AHAB's pleaded case – US$560m cash withdrawals**

120. In the Statement of Claim, AHAB pleads that Al Sanea misappropriated from the Money Exchange US$560 million by withdrawing cash from the Money Exchange's branches.[2545] AHAB pleads that the sum of US$560m is based upon "Mr. Hayley's spreadsheets".[2546]

**AHAB's lack of evidence**

121. However, there is no evidence of cash being withdrawn from the Money Exchange and deposited with SICL or sSingularis. There is a paucity of information to substantiate AHAB's pleading that cash was misappropriated from the Money Exchange by withdrawing cash from the Money Exchange's branches. The figure of US$560m is wholly unsupported by evidence. The only recipient that has been identified is STCC:

---

2544 RASOC, paragraph 82 {**A1/2.2/31**}.
2545 RASOC, paragraph 62 {**A1/2.2/20**}.
2546 RASOC, paragraphs 80 to 83A {**A1/2.2/31**}.

122. Mr. Hargreaves states that, due to the limited evidence, the cash withdrawals do not form part of his 'tracing' evidence (emphasis added):[2547]

> "*Section 7.22 of Hatton 1 and paragraph 151 of Charlton London 1 describe transfers to MAS using the 'Cash Withdrawals' scheme. However* ***given the limited information available*** *and work performed,* ***it does not form part of the tracing witness statement."***

123. In Charlton London 1W, Mr. Charlton states:[2548]

> "*We have seen a number of debit advices passed from the Saad Group to The Money Exchange instructing that branch withdrawals be recorded in the Saad Group accounts…in the accounting recorded of The Money Exchange...*"

124. However, nothing is exhibited to Charlton London 1W, or Hatton 1W, or can be located anywhere else in the parties' discovery, that evidences these alleged debit advices. There is no evidence as to the number or value of the debit advices; and the discovery does not contain any documentation that shows the alleged cash withdrawals were "*circulated*" and "*applied for the benefit of the Defendants*" as pleaded by AHAB.[2549]

**The Hayley spreadsheets**

125. Mr. Hayley's evidence about this is:[2550]

> "*On my instructions, Mr. Menon also maintained a spreadsheet that recorded and analysed drawings of funds in favour of the Saad [sic] via a number of means (as I describe below). These included transfers by cheque, transfers via payments on sham letter of credit transactions, and withdrawal of cash from Money Exchange branches*."

126. Both Mr. Charlton and Mr. Hatton rely on Mr. Hayley's spreadsheets:

127. In Charlton London 1W, Mr. Charlton says:[2551]

---

2547 Hargreaves 1W, paragraph 26, footnote 6 {**I/2.27/11**}.
2548 Charlton London 1W, paragraph 151 {**L1/25/59**}.
2549 Statement of Claim, paragraph 83A {**A1/2.3/31**}.
2550 Hayley 1W, paragraph 149 {**C1/9/31**}.
2551 Charlton London 1W, paragraph 156 {**L1/25/61**}.

> "*The Money Exchange files contain a series of detailed cash flow spreadsheets which were found on the computer of Mr. Viswanathan. The spreadsheets categorised the outgoings of The Money Exchange under the headings "ALGF" (Al Gosaibi Finance – a term used to describe The Money Exchange) and "STCC". Interest and facility fees associated with borrowing arranged by The Money Exchange recorded in the DMS were detailed as outgoings of ALGF, whilst cheque and LC payments to Mr. Al Sanea and his companies were recorded as STCC…*"

128. In Hatton 1W, Mr. Hatton says:[2552]

> "*Spreadsheets [were] found on the computer of Mr. Viswanathan, an employee of the Money Exchange who worked in the treasury department…*"

129. Mr. Hayley's understanding was that all outgoings were either to service the interest on existing borrowings of ALGF or to fund payments to the Saad Group. Mr. Hayley says he was not interested in the destination of the payment recorded in his schedules, rather he was concerned with the fact of payments going out of the Money Exchange:[2553]

> "*As these spreadsheets show, my understanding of the arrangement was that all outgoings were either to service the interest on existing borrowings or to fund payments to the Saad Group. I was not concerned about the destination of the payments; rather my concern was the amounts of money that had actually been drawn from the Money Exchange. I did not know where the payments were going nor was I in a position to find out. This was because the instructions came from Mr. Al Sanea to Mr. Jamjoum, who gave instructions for the payments to be executed. Paragraph 65 of AHAB's Re-Amended Statement of Claim sets out a few examples of the type of memoranda I would send to Mr. Al Sanea, outlining the level of the outgoings and expressing my concern that the levels were unsustainable…*"

---

2552 Hatton 1W, paragraph 7.23 {**I/1.59/47**}. This paragraph is red lined in part.
2553 Hayley 1W, paragraph 147 {**C1/9/31**}.

**The US$303m**

130. Deloitte has only been able to identify a total of US$303m of the US$560m as being paid to STCC in the category 'branches'. Deloitte was not able to find debit advices to support the whole of that amount.

131. In Charlton London 1, Mr. Charlton says:[2554]

> "*…The spreadsheets, found on the computer of Mr. Viswanathan [the Hayley spreadsheets],…suggest that a total of US$303 million was paid to STCC in the category "branches"; however, we did not find debit advices to support the whole of that amount and it may include some of the payments which we have categorised as electronic transfers. I have therefore not included any amount relating to cash withdrawals in the figure of US$5.5 billion given above".*

132. In Hatton 1W, Mr. Hatton says:[2555]

> "*Spreadsheets found on the computer of Mr. Viswanathan, an employee of the Money Exchange who worked in the treasury department, suggest that a total of USD 303 million was paid to STCC in the category "branches" over the period 2007 to 2009; however, the Investigation Team did not find debit advices to support the whole of that amount…."*
>
> "*Mr. Hayley stated that the amount for the period 2000 to 2009 was approximately USD 500 million*."

133. This statement, attributed to Mr. Hayley, does not appear in written statements.[2556] In any event, if Mr. Hayley said that the amount was approximately US$500m, that is inconsistent with the figure on the spreadsheets.

---

2554 Charlton London 1W, paragraph 151 {**L1/25/59**}.

2555 Hatton 1W, paragraph 7.23 {**I/1.59/47**}. Part of this is red-lined.

2556 Mr. Hayley does not say, nor provide any analysis for the statement, that *"…the amount for the period 2000 to 2009 was approximately USD 500 million.",* as asserted by Mr. Hatton in Hatton 1W, paragraph 7.23 {**I/1.59/47**}. In addition, Mr. Hayley makes no mention in his evidence that Saad Group drivers regularly took cash from the Money Exchange (an assertion that finds evidential support only in the witness statement of Jean Michel Thomas, at material times employed as Mr. Al Sanea's chef).

134. The foregoing is no basis to find that Al Sanea stole US$560m, or any sum, from the Money Exchange by way of cash withdrawals or that the proceeds of such cash withdrawals reached the Defendants.

**'GENERIC TRANSFERS'**

135. AHAB's case is that every transfer that has a generic description in the GTDs' bank statements should be treated as a transfer to them by the Money Exchange. The total amount of such transfers is US$37,488,846,644. AHAB is attempting to prove misappropriations totaling US$37,488,846,644 by virtue of its lack of evidence of where money has come from. That is over SAR 140bn, more than five times the total value of AHAB's claim. This is indeed, as the Defendants submit, a ridiculous allegation. It only demonstrates the hopelessness of AHAB's attempts to trace with any degree of specificity monies going to the Defendants from the Money Exchange as distinct from other sources.

**AHAB's pleaded case**

136. In the Statement of Claim, AHAB pleads (emphasis added):[2557]

> "*158Z. Mr. Al Sanea caused a total of US$ 37,488,846,644 to be paid to SICL, Singularis and… Saad Investment Finance Company…with either (a) generic transaction narrative/description/details; or (b) unparticularised transaction narrative/description/details, as set out in schedule 10.*"
>
> "*158Ag. As to every unparticularised transaction set out in schedule 10 other than those with the generic narrative/description/details "TRANSFER" or "Incoming Funds (MCMM [sic] advice) 0000000 0000000 0000000",* ***in the premises and in the absence of any competing explanation, the Court should infer that every such receipt by SICL and/or Singularis and/or Saad Investment Finance Company Limited was money misappropriated from the Money Exchange.*** *To the extent*

2557 Statement of Claim, paragraph 158Z {**A1/2.3/72**} paragraph 158Ag {**A1/2.3/73**}.

> *this is denied in whole or in part, the Defendants are put to proof and required to demonstrate (a) which transactions with unparticularised narrative/description/details did not constitute such misappropriations; and (b) which assets in their hands are not the traceable proceeds of assets misappropriated from the Money Exchange."*.

137. AHAB pleads that particulars of the generic transfers are set out in Schedule 10 to the Statement of Claim.[2558] There are 3,933 receipts contained in Schedule 10 totaling US$37,488,846,644, comprising:

1,023 receipts AHAB has given the generic description "TRANSFER" and the "Client name": "Saad Investment Company Limited". These receipts total US$3,759,249,510;[2559] 374 receipts AHAB has given the generic description "Incoming Funds (MXMM advice)" and the "Client name": "Singularis Holdings". These receipts total US$19,125,164,375;[2560] and 2,536 receipts do not have either the generic description "TRANSFER" and the "Client name": "Saad Investment Company Limited" or the generic description "Incoming Funds (MXMM advice)" and the "Client name": "Singularis Holdings". These receipts total US$14,604,432,759.

**Generic transfers to SICL**

138. There are 1,023 receipts that AHAB has given the generic description "*TRANSFER*" and the "*Client name*": "*Saad Investment Company Limited*". These receipts total US$3,759,249,510, over SAR 14bn.[2561] As a partial subset of these receipts, AHAB

---

[2558] {**A2/15/1**}.
[2559] Davies 2W, paragraph 45 {**I/11/29**}.
[2560] Davies 2W, paragraph 112 {**I/11/70**}.
[2561] Davies 2W, paragraph 45, {**I/11/29**}.

pleads two things in relation to receipts by SICL with the generic narrative/description/details "*TRANSFER*":[2562]

a. They were treated by SICL, and recorded in SICL's records, as having been received from Al Sanea/STCC. These transactions are particularised in Schedule 10a. Schedule 10a contains 22 receipts totaling US$197.4m.[2563]

b. They can be matched against misappropriations from AHAB's bank account at Bank of America. These matches are particularised in schedule 10b. Schedule 10b contains 36 receipts totaling US$144.3m.[2564]

c. Together, these 58 receipts in Schedules 10a and 10b, total US$341.6m, and represent nine percent by value of the 1,023 receipts on Schedule 10 with the generic description "*TRANSFER*" and the "*Client name*": "*Saad Investment Company Limited*".

**Mr. Hargreaves' failure to trace**

139. Mr. Hargreaves says that his 'tracing' has been significantly impacted in relation to the generic transfers pleaded by AHAB:[2565]

> "*The absence of any accounting system for both SICL and Singularis has significantly impacted the tracing exercise and more specifically the ability to provide clarity on the sources or recipients of transfers with generic or vague narratives*".

140. Mr. Hargreaves focused on those transfers contained in Schedule 10 of the Statement of Claim that included the term "*TRANSFER*" in the bank statements:[2566]

---

2562 Statement of Claim, paragraphs 158Aa and 158Ab, **{A1/2.3/72}**. While it appears these transactions were intended to be a subset of Schedule 10, Schedule 10b it not a direct subset of Schedule 10 as it contains six receipts not included in Schedule 10: Davies 2W, paragraph 81, **{I/11/54}**.

2563 **{A2/16/1}**; Davies 2W, paragraph 45, **{I/11/29}**.

2564 **{A2/17/1}**; Davies 2W, paragraph 79, **{I/11/52}**.

2565 Hargreaves 1W, paragraph 225, **{I/2.27/72}**. This paragraph is red-lined.

> *"From our review of the SICL and Singularis bank account statements, we identified a large number of transactions containing generic or vague narratives that do not provide sufficient details to identify the origin of funds. Schedule 10 to the RAMSOC included a list of 3,933 transfers into SICL and Singularis accounts that contain such generic or vague narratives, totaling approximately USD 37,489m. I have focused on one category of these transfers, being those that simply include the term 'TRANSFER' in the narrative of the bank statements".*

141. Mr. Hargreaves identified 1,022 transfers (totaling US$3,759,083,988) with the term '*TRANSFER*' in the narrative of the bank statement.[2567] Of these, Mr. Hargreaves was only able to find documentation in relation to 58 of the 1,022 receipts he identified. This is less than 10 percent by value of the 1,022 transfers to SICL identified by Mr. Hargreaves. The 58 transfers comprise:

(1) 22 receipts, which correspond to the receipts listed in Schedule 10a;[2568] and

(2) 36 receipts, which correspond to the receipts listed in Schedule 10b.[2569]

**Schedule 10a – the 22 receipts**

142. Schedule 10a contains 22 receipts totaling US$197.4m.[2570] These receipts have been identified from a document in the GTDs' discovery that Mr. Hargreaves describes as the "*MAS Funds Schedule*":[2571]

---

2566 Hargreaves 1W, paragraph 224, **{I/2.27/72}**. This paragraph is partly red-lined.

2567 Hargreaves 1W, paragraph 226, **{I/2.27/72}**. This paragraph is red-lined. See also Appendix E.4/2: "*Generic Narrative 'Transfer' which matches 'transfers from the Money Exchange to SICL that appear on the SICL Citibank statement with the generic narrative 'Transfer'*" **{I/2.24/1}**. Appendix E.4/1 excludes one generic transfer to SICL with the narrative '*TRANSFER*' (totaling, US$165,522). This transfer has Morgan Stanley detailed as the bank/finance institution (all others specify Citibank).

2568 Hargreaves 1W, paragraph 227 to 229, **{I/2.27/72}**.

2569 Hargreaves 1W, paragraph 230, **{I/2.27/73}**. For completeness, Davies 2W notes that there are 37 receipts in Schedule 10b and Hargreaves 1W, Appendix E.4/2. This is because Mr. Davies split one of the receipts into two as part of it related to the repayment of a principal amount and the remainder was interest: Davies 2W, paragraph 83, Table D.25, **{I/11/54}**.

2570 **{A2/16/1}**. Davies 2W, paragraph 45, **{I/11/29}**, the total specified by Mr. Davies is US$197,359,537; Hargreaves 1W, paragraph 229, **{I/2.27/73}**: the total specified by Mr. Hargreaves is US$197,359,717 (difference of US$180).

2571 **{G/5542/3}**. Hargreaves 1W, paragraphs 227 to 229, **{I/2.27/72}**. This is partly red-lined. It is noteworthy that Mr. Hargreaves blames Al Sanea for the removal of documents. He appears to be unaware of the role of the "*Younger Algosaibis*" in removing documents.

> "*Although information is limited, we have identified documents within the Defendants' disclosure which provide evidence that at least some of the transactions with the generic transfer narrative "TRANSFER" may have originated from STCC or other Saad related entities. A version of the document is included at Exhibit 5…*
>
> *Pages 3, 4, and 5 of Exhibit 5 {G/5542/3} are titled 'Saad Investments Company Limited – Funds received from and paid to MAS' ("MAS Funds Schedule"). I have assumed that 'MAS' is the acronym for Maan Al Sanea. I have also assumed that this document is intended to reflect cashflows into and out of SICL which ought to be supported by entries in the Transactional Database. However, the removal of documents and accounting data by MAS means that we cannot comment on the completeness of the transactions recorded in such schedules".*

143. Mr. Davies and Mr. Hargreaves agree about the originators of the SICL receipts listed in Schedule 10a:[2572]

> *"I agree the originators of SICL receipts based on the relevant credit advice slips relied upon by Mr. Davies [WD2 – Tabs D135 to D144] for USD 197.4m worth of transactions with the generic narrative 'TRANSFER' taken from the MAS Funds Schedule…"*

144. Mr. Hargreaves lists the originators from the credit slips. From this it is clear that these are not funds transferred by the Money Exchange. Receipt of funds from the Money Exchange cannot be proved.[2573]

| **Originator** | **US$m** |
|---|---|
| STCC | 109.6 |
| Mr. Al Sanea | 50.9 |
| Saad Medical | 30.0 |
| TIBC | 6.9 |
| **Total** | **197.4** |

2572 Hargreaves' Matters Agreed, paragraph 9, **{I/19/4}**. At paragraph 9, Mr. Hargreaves agrees with an analysis that does not appear in Davies 2W. While Mr. Davies does not disagree with this analysis, it should be noted that the immediate source of these receipts cannot be verified due to the lack of bank statements in the parties' discovery.

2573 Hargreaves' Matters Agreed, paragraph 9 **{I/19/4}**.

145. Mr. Davies analysed the 22 receipts identified by Mr. Hargreaves to identify documentation that might provide an explanation for the transfers. Of the 22 receipts: Eight receipts were subsequently returned in full by SICL to the Money Exchange, totaling US$72,489,770.[2574] Mr. Hargreaves agrees with Mr. Davies' analysis:[2575]

> *"I agree the contents of Table D.10 [WD2 para 53] and I agree that these amounts were transferred from the Money Exchange to SICL and from SICL to the Money Exchange on the value dates shown".*

146. This was confirmed by Mr. Hargreaves during cross-examination:[2576]

> *"Q. At {I/11/32}, Mr Davies in paragraph 52, what he then does -- you recollect there were 22 transactions in schedule 10a, and Mr Davies then goes through those transactions and he points out: "Eight of the amounts received by SICL were subsequently transferred in full from SICL to AHAB ..."*
>
> *A. Yes.*
>
> *Q. So it goes from SICL to AHAB?*
>
> *A. Yes.*
>
> *Q. You have agreed that.*
>
> *A. Yes, I have.*
>
> *Q. At {I/19/4}, paragraph 10 of the matters agreed: "I agree ... Table D.10 ... [in paragraph 53] and I agree that these amounts were transferred to the Money Exchange from SICL to the Money Exchange ..." and so on.*
>
> *A. Yes.*
>
> *Q. You agree with table D.10. If we go over to {I/11/33}, so we can see the table, and then flick over to {I/11/34}, that is the table and that is agreed".*

---

2574 Davies 2W, paragraph 52(a), **{I/11/32}** and paragraphs 53 to 54 **{I/11/33}**.
2575 Hargreaves' Matters Agreed, paragraph 10, **{I/19/4}**.
2576 Hargreaves xx: **{Day74/128:6-25}**.

147. I accept that there cannot be a claim in respect of transfers returned to the Money Exchange.

148. Five receipts, totaling US$109,999,985, received by SICL were subsequently returned in part from SICL to the Money Exchange. The part returned totaled US$49,000,000.[2577] Mr. Hargreaves agreed:[2578]

> *"Q. Then if we go back to {I/11/32}, Mr Davies explains: Five amounts, totaling US$109 [million] were transferred in part from SICL to AHAB. The total of US$50 [million] was paid that way. This is dealt with in paragraphs 50 to 72. If we can just flick forward to page 36... My Lord, am I going too quickly?*
>
> *CHIEF JUSTICE: No, I think I'm following. Thank you.*
>
> *MR PHILLIPS: If you look at {I/11/35}, in this part of Mr Davies' statement he deals with the US$109 million. You see table D.11 over the page at {I/11/36}, which is the various payments that make up the US$109 million. That continues through to paragraph 72, where he analyses each of those payments, on {I/11/48}. Mr Hargreaves, if Mr Davies' description of that underlying paper is accurate, then this is correct, isn't it?*
>
> *A. Yes, that's right.*
>
> *Q. Then at {I/11/32} –*
>
> *CHIEF JUSTICE:*
> *Q. So that's US$50 million of that US$109 million was paid to AHAB?*
>
> *MR PHILLIPS:*
> *A. Yes".*

149. I accept that there cannot be a claim in respect of funds returned.

---

2577 Davies 2W, paragraph 52(b), **{I/11/32}**; Table D.11 **{I/11/36}** (note change in Davies' Schedule of Errata, page 1, paragraph 66, **{T/268/1}**) and paragraphs 55 to 72, **{I/11/35}**.

2578 Hargreaves xx: **{Day74/129:1-22}**.

150. Mr. Hargreaves appeared to agree with Mr. Davies that eight receipts, totaling US$7,999,880, were used to fund the purchase of an A320 aircraft on behalf of Saad Air (A320) Limited.[2579]

151. Mr. Hargreaves appeared to agree with Mr. Davies that there are no documents in discovery that indicate the destination of the one remaining receipt received by SICL, totaling US$6,869,902.[2580]

152. While Mr. Hargreaves appeared to agree to each of the transfers detailed by Mr. Davies, at the end of Day 74, Mr. Hargreaves said that he wanted to consider the question overnight.[2581] After reviewing overnight, on re-examination, Mr. Hargreaves said:[2582]

> *"Q. Yesterday you were asked a lot of questions about generic transfers.*
>
> *A. Yes.*
>
> *Q. You were invited to think about that overnight. Is there anything now you want to add to what you said yesterday?*
>
> *A. No. Only that I stand by what I said yesterday, in that I'm not able to agree those specific transfers with Mr Davies at this stage. It wasn't an oversight, as Mr Phillips had suggested".*

153. Mr. Hargreaves added nothing substantive to his apparent disagreement, simply disagreeing in relation to nine of the receipts. Given that there are only 22 receipts in Schedule 10a, Mr. Hargreaves' failure to give substantive evidence in relation to nine of them is indicative of how weak AHAB's claim is under this head.

---

2579 Davies 2W, paragraph 52(c), **{I/11/32}** and paragraphs 73 to 77, **{I/11/48}**. Hargreaves xx: **{Day74/129:23}-{Day74/130:7}**.
2580 Davies 2W, paragraph 52(d), **{I/11/32}** and paragraph 78, **{I/11/51}**. Hargreaves xx: **{Day74/130:8-12}**.
2581 Hargreaves xx: **{Day74/131:23}-{Day74/134:6}**.
2582 Hargreaves re-x: **{Day74/79:15-24}**.

**Schedule 10b – the 36 receipts**

154. Schedule 10b contains 36 receipts by SICL totaling US$144,250,738.[2583] AHAB alleges that these receipts contain the generic narrative "*TRANSFER*" and can be matched to payments from AHAB's bank account at Bank of America.[2584] Mr. Hargreaves states:[2585]

> "*…a review of the direct transfers from the Money Exchange into SICL, shows at least 36 transactions totaling USD 144m that also have just the description 'TRANSFER' on the SICL bank statements (see Appendix E.4/2)*".

155. Mr. Davies undertook an analysis of the 36 receipts identified by Mr. Hargreaves. Of the 36 receipts:[2586]

(1) Mr. Hargreaves appeared to agree with Mr. Davies that 29 receipts received by SICL were in respect of interest earned on money market deposits placed by SICL with the Money Exchange.[2587] Mr. Hargreaves confirmed in cross-examination that he had no evidence whether the deposits existed or not.[2588]

(2) Seven receipts received by SICL were returns of deposits placed by SICL with the Money Exchange:

2583 **{A2/17/1}**; Davies 2W, paragraph 79 **{I/11/52}**.

2584 Statement of Claim, paragraphs 158Ab **{A1/2.3/72}**.

2585 Hargreaves 1W, paragraph 230, **{I/2.27/73}**. Schedule 10b and Appendix E.4/2 (an Appendix to Hargreaves 1W) contain the same 36 receipts. However, Schedule 10b and Appendix E.4/2 are not a complete subset of the receipts listed in Schedule 10 to the Statement of Claim. There are six transfers (totaling US$40,253,383) that appear in Schedule 10b and Appendix E.4/2, that do not appear in Schedule 10 of the Statement of Claim: Davies 2W, paragraph 81 and Table D.24, **{I/11/54}**.

2586 For completeness, Davies 2W notes that there are 37 receipts in Schedule 10b. This is because Mr. Davies split one of the receipts, US$20,004,167 on 3 January 2003, into two as part of it related to the repayment of a principal amount (US$20,000,000) and the remainder was interest (US$4,167): Davies 2W, Table D.23, paragraph 83, Table D.25, **{I/11/54}**.

2587 Davies 2W, paragraph 83, Table D.25, **{I/11/54}** and paragraphs 84 to 87 **{I/11/55}**. Hargreaves xx: **{Day74/130:23-131:7}**.

2588 Hargreaves xx: **{Day74/131:7-13}**.

(3) Three receipts received by SICL, totaling US$40,000,000, were a partial return of the principal amount placed on deposit by SICL with the Money Exchange (i.e. a principal deposit of US$69,000,000);[2589]

(4) Two receipts received by SICL, totaling US$60,000,000, were a return of the full principal amounts placed on deposit by SICL with the Money Exchange;[2590] and

(5) Two receipts received by SICL, totaling US$36,000,000, were likely receipts in respect of the return of the principal amount, in part or in full, placed on deposit by SICL with the Money Exchange;[2591]

156. Mr. Hargreaves was unable to give any reason why he did not agree with Mr. Davies' analysis in relation to these deposits. However, he did not particularise his disagreement with Mr. Davies.[2592]

157. There are no documents in discovery that allowed Mr. Davies to determine the remaining receipt received by SICL, totaling US$2,400,000.[2593]

**Conclusion**

158. I accept the foregoing analysis by the GTDs. Of the 1,022 receipts identified by Mr. Hargreaves from Schedule 10, as related to SICL and having "*TRANSFER*" in the narrative,[2594] Mr. Hargreaves was only able to analyse 58 receipts (totaling US$341.6 million).[2595] These 58 receipts correspond to AHAB's pleading in Schedules 10a and 10b.

---

2589 Davies 2W, paragraph 83, Table D.25, **{I/11/54}** and paragraphs 88 to 89 **{I/11/59}**.
2590 Davies 2W, paragraph 83, Table D.25, **{I/11/54}** and paragraphs 90 to 102 **{I/11/60}**.
2591 Davies 2W, paragraph 83, Table D.25, **{I/11/54}** and paragraphs 103 to 108 **{I/11/63}**.
2592 Hargreaves xx: **{Day 74/131:14}-{Day74/134:6}**; and Hargreaves xx: **{Day74/79:15-24}**.
2593 Davies 2W, paragraph 83, Table D.25, **{I/11/54}** and paragraphs 109 to 110 **{I/11/67}**.
2594 Contained in Hargreaves 1W, Appendix E.4-1 **{I/2.23/1}**.
2595 Schedule 10a: US$197.4m; Schedule 10b: US$144m.

159. Of the 58 receipts, Mr. Davies was able to provide an explanation in relation to 56 receipts. There were only two receipts in relation to which Mr. Davies was not able to find any documentation in discovery. The only question is whether Mr. Davies' analysis of the receipts is correct.[2596] As to that, Mr. Hargreaves either expressly agreed with Mr. Davies' analysis or he was unable to produce any reason to question Mr. Davies' analysis.

160. There is no basis for finding that these transfers to SICL were funded by monies stolen from the Money Exchange.

**Generic transfers to Singularis**

161. There are 374 receipts, totaling US$19,125,164,375, that AHAB has given the generic description "*Incoming Funds (MXMM advice)*" and the "*Client name*": "*Singularis Holdings*".[2597] AHAB pleads:[2598]

> *"Receipts by Singularis with the generic "narrative/description/details" "Incoming Funds (MXMM advice) 0000000 0000000 0000000" can be matched against misappropriations from AHAB's bank account at Bank of America. These matches are particularised in Schedule 10c."*
>
> *"Receipts by Singularis with the generic "narrative/description/details" "Incoming Funds (MXMM advice) 0000000 0000000 0000000" can be matched against debits to TIBC's*[2599] *bank account at Standard Chartered Bank. These matches are particularised in Schedule 10d."*

---

2596 Mr. Hargreaves agreed that this is correct at **{Day74/135:6}-{Day 74/138:3}**.
2597 Davies 2W, paragraph 112 **{I/11/70}**.
2598 RASOC paragraphs 158Ad to 158Ae, **{A1/2.2/73}**.
2599 This part of the claim depends upon the allegation that TIBC was entirely a vehicle for fraud.

162. In the Statement of Claim, AHAB produces two Schedules in relation to the purported generic transfer to Singularis:

(1) Schedule 10c, containing eight receipts totaling US$585m;[2600] and

(2) Schedule 10d, containing nine receipts totaling US$450m.[2601]

163. The 17 receipts in Schedules 10c and 10d total US$1,035m and represent just five percent by value of the 374 receipts on Schedule 10 with the generic description "*Incoming Funds (MXMM advice)*" and the "*Client name*": "Singularis Holdings".

**Schedule 10c – 8 receipts**

164. In relation to the eight receipts contained in Schedule 10c:[2602]

(1) Six receipts, totaling US$450m, were funds that originally came from accounts in the name of SICL and were paid to AHAB.[2603] AHAB then used these funds to make the payments to Singularis as detailed in Schedule 10c.[2604] Mr. Davies was unable to determine the source of funds used by SICL in relation to five of the six payments. However, Mr. Davies was able to determine that one payment by SICL to AHAB (totaling US$100m on a value date of 17 January 2008[2605]), originated from a third party source i.e. a loan of US$100m from Deutsche Bank (and, therefore, was not a misappropriation by SICL from AHAB).[2606]

(2) The remaining two receipts, totaling US$135m, appear to originate from a Saad entity, this almost certainly being SICL. SICL made payments of US$35m and

---

2600 **{A2/18/1}**; Davies 2W, paragraph 115, Table D.32 **{I/11/71}**.
2601 **{A2/19/1}**; Davies 2W, paragraph 152 **{I/11/85}**.
2602 **{A2/18/1}**.
2603 Davies 2W, paragraph 116, **{I/11/72}** and paragraphs 117 to 139 (details each payment) **{I/11/73}**.
2604 Davies 2W, paragraph 116, **{I/11/72}** and paragraphs 117 to 139 (details each payment) **{I/11/73}**.
2605 Davies 2W, Table D.32, Item 6 **{I/11/71}**.
2606 Davies 2W, paragraphs 132 to 139 **{I/11/78}**.

US$100m from its Deutsche Bank and Bear Sterns bank accounts (respectively) to AHAB's Bank of America account (account number 6550-7-84587). Thereafter, AHAB made the two payments of US$70m and US$65m on 22 January 2008 and 24 January 2008 (respectively) to Singularis contained in Schedule 10c.[2607] Mr. Davies was not able to determine the source of SICL's funds.[2608]

165. Mr. Hargreaves accepted that the source of the funds in Schedule 10c was SICL.[2609] However, Mr. Hargreaves confirmed that he did not address Schedule 10c in his witness statements or in Hargreaves' Matters Agreed.[2610] Mr. Hargreaves was taken through Davies 2W,[2611] and said "*there may be more to it than that*" but he would not elaborate.[2612] In the absence of evidence to gainsay Mr. Davies' analysis, I agree that it should be accepted. The receipts in schedule 10c originated from SICL.

**GENERIC TRANSFERS – SCHEDULE 10 - 3,933 RECEIPTS**

166. There are 3,933 receipts in Schedule 10 totaling US$37,488,846,644. Excluding the receipts in Schedules 10a to 10d, a total of 3,864 receipts remain (totaling US$36,152,489,751).[2613] Mr. Hargreaves' analysis is limited only to those with "*TRANSFER*" in the narrative and, therefore, his analysis does not deal with the vast bulk of receipts listed on Schedule 10.[2614]

**The 49 largest transactions**

---

2607 Davies 2W, paragraph 116, **{I/11/72}** and paragraphs 140 to 151 (details each payment) **{I/11/81}**.
2608 Davies 2W, paragraphs 140 to 150, **{I/11/81}**.
2609 Hargreaves xx: **{Day74/139:18-24}**; **{Day74/140:7-19}**.
2610 Hargreaves xx: **{Day74/140:7-19}**.
2611 Hargreaves xx: **{Day74/141:22-143-21}**.
2612 Hargreaves xx: **{Day74/140:20-141:4}**.
2613 Davies 2W, paragraphs 167 to 168, Table D.45, **{I/11/92}**.
2614 Hargreaves 1W, paragraph 224, **{I/2.27/72}**: "*I have focused on one category of these transfers, being those that simply include the term "TRANSFER" in the narrative of the bank statements*."

167. Mr. Davies has analysed 49 transactions from Schedule 10 that comprise the largest by value,[2615] and any remaining receipts with an equivalent value greater than US$200 million.[2616] Together, the 49 receipts totaled an equivalent of US$17,099,659,675 and represented 47 percent of the total US$37,488,846,644 value of Schedule 10, excluding the receipts in Schedules 10a to 10d.[2617]

168. Of the 49 receipts analysed:

(1) Two receipts, totaling US$230,158,068, were repaid by SICL to AHAB;[2618]

(2) 19 receipts, totaling, US$9,169,672,784, came from a source other than AHAB, for example, from loans, sale of financial assets, foreign exchange sales, DKW, sale of SIFCO 4, fiduciary placements and margin calls/returns.[2619] Mr. Hargreaves agreed.[2620]

(3) In the case of 28 receipts, totaling US$7,699,828,823, Mr. Davies was not able to determine the source of the funding.[2621]

169. During cross-examination, Mr. Hargreaves did not disagree with any of Mr. Davies' analysis.[2622] Asked what follows from the generic descriptions for these transactions, Mr. Hargreaves said:[2623]

---

2615 In each of the 32 generic description categories assigned by AHAB.
2616 Davies 2W, paragraphs 169 **{I/11/93}**.
2617 Davies 2W, paragraphs 170 **{I/11/93}**.
2618 Davies 2W, paragraph 172 to 186 **{I/11/97}**.
2619 Davies 2W, Table D.51 and paragraphs 187 to 246 **{I/11/100}**.
2620 Hargreaves Matters' Agreed, paragraph 8 **{I/19/4}**.
2621 Davies 2W, paragraphs 247 to 251, **{I/11/120}**. This figure is the balance of the 28 items not discussed in Davies 2W, paragraphs 172 to 246, **{I/11/97}** (i.e. see Tables D.46, D.47 and D.48, items 11, 15, 17, 18, 20 to 24, 27 to 29, 32 to 34, 36 to 47 and 49, **{I/11/93}** – which total US$7,699,828,823 and Davies 2W, paragraph 171, **{I/11/96}**.
2622 Hargreaves xx: day 74, page 145, line 22 to page 148, line 21, **{Day74/145:22}-{Day74/148:21}**.
2623 Hargreaves xx: day 74, page 149, line 3 to 23, **{Day74/149:3-23}**.

*"Q. What follows from the fact that there are these generic transactions?*

*A. Well, there are a number of things that follow. One is it shows simply the scale of transactions involving these businesses, so US$39 billion or US$40 billion of transactions involving the word "transfer", so it shows the scale. The other is -- I simply did not know the source of those funds, because it uses a generic description. I think Mr. Davies' analysis, which I agree is much more thorough than mine, but he still identifies -- half of his sample where he's not able to identify the source of those funds. I'm not asking the court to draw any particular inference from that, other than to really reinforce the challenges that we have in tracing funds into these businesses.*

*Q. Let me just get this straight. Your evidence is that the relevance of the generic transactions is it is another indicator of how difficult it has been for you to trace funds through?*

*A. That's one of them, yes".*

170. AHAB, through Deloitte, relies on the generic description and nothing more. That is not good enough to support a proprietary claim. In relation to a number of 'generic' transfers listed in Schedule 10, it is evident from the bank statements that they contain narratives that provide further information as to what the payment/receipt may have been in respect of.[2624] For example, in Schedule 10, AHAB has identified the following transaction:[2625]

| ID Cenza | Currency | Narrative/Description/Details (1) | Transaction value | Bank/ Financial institution | Client name | Value date | Amount (USD equivalent) | Generic Term |
|---|---|---|---|---|---|---|---|---|
| 420164 | GBP | Incoming Funds (MXMM) 0000000 0000000 0000000 | 410,103,000 | Citibank | Singularis Holdings | 2-Jul-07 | 833,307,536 | Incoming Funds (MXMM advice) |

2624 Davies 2W, paragraph 228 **{I/11/115}**.
2625 **{A2/15/19}**.

As to that transaction:

- In the relevant bank statement, the "*Activity*" column in relation to this transaction states "*HSBC Transfer to Dresdner*".[2626]
- In the Master Repurchase Agreement between Singularis and Dresdner Kleinwort Securities Limited dated 29 June 2007, related to this transaction, the purchase price of GBP410,103,000, along with the other relevant terms, is listed in the agreement.[2627]
- In a letter from Commerzbank to Grant Thornton dated 27 May 2010 and exhibited to Davies 2W, Commerzbank notes:[2628]

> "*Over the period from 29 June 2007 until 2 January 2009 Commerzbank funded Singularis's ownership of HSBC ordinary shares ("Shares") through consecutive repurchase agreements ("repos"). Initially the repos related to 54,000,000 Shares. But at Singularis' request, the new repo on 28 November 2008 was for only 49,000,000 Shares. Then in December 2008 Commerzbank decided to initiate the unwinding of this repo financing with the aim of completing such unwind prior to year end…*"

171. This example, along with the documents, was put to Mr. Hargreaves during cross-examination.[2629] I accept, as the Defendants submit, that what it shows is that when you dig down into a transaction and look behind the generic description, there may well be other documents that explain the activity behind the transaction. Mr. Hargreaves declined to put in any further evidence in support of the generic transfers.[2630]

172. I accept that no claim arises out of the 'generic transfers'. An allegation of theft in relation to US$37,488,846,644 in a context where there were ongoing complex

2626 **{Q/346/24}**.
2627 **{Q/348/1}**.
2628 **{Q/347/1}**.
2629 Hargreaves xx: **{Day74/157:19}-{Day74/159:8}**.
2630 Hargreaves xx: **{Day74/159:9}-{Day74/161:9}**.

commercial transactions between the Money Exchange, SICL, Singularis and their respective external funding banks, based merely upon the existence of generic transfers is unsustainable.

173. It is impossible to trace money from the Money Exchange to the GTDs partly because, in many cases, the source of the funds is not known, and moreover, in others the source of the funds is a party other than the Money Exchange. There is often material from which it is possible to identify a commercial transaction but Deloitte chose not to do so. Mr. Hargreaves said that Mr. Davies had been more thorough than him.[2631]

174. Those transfers AHAB is able to identify provide no basis for any sort of claim. There are explanations for those transactions that have been looked at. There is no reason to doubt the accuracy of Mr. Davies' analysis of the transfers he has looked at, and far from supporting AHAB's claim, they undermine it.

**"INDIRECT" TRANSFERS TO THE GTDs**

175. The remainder of AHAB's case against the GTDs depends upon Mr. Hargreaves' 'patterns'. Here too AHAB has not been able to demonstrate that money from the Money Exchange was paid to the GTDs. AHAB has therefore constructed an argument based upon Mr. Hargreaves' subjective observation of 'patterns'. The argument depends upon large sums of money being stolen from the Money Exchange at the same time as large sums of money were paid to the GTDs, notably SICL and Singularis. The claim depends upon the "*coincidence*" of timing and amounts as between sums allegedly stolen from the Money Exchange and the amount of money shown to be in the GTDs' bank accounts.

176. The concept of "*patterns*" is no basis for a proprietary tracing claim.

---

[2631] Hargreaves xx: **{Day74/149:12-13}**.

**AHAB's pleaded case**

177. In the Statement of Claim, AHAB's pleads (emphasis added):[2632]

> *"...the total sum of US$ 2,121,644,422 was paid to SICL by entities under the absolute control of Mr. Al Sanea, including STCC and Awal Bank, as particularised in schedule 13.* ***The sums identified in schedule 13 have at all times been the absolute beneficial property of AHAB and impressed with a constructive trust in favour of AHAB.*** *To the extent this is denied in whole or in part, SICL is put to proof and required to demonstrate (a) which transactions did not constitute misappropriations from the Money Exchange; and (b) which assets in their hands are not the traceable proceeds of assets misappropriated from the Money Exchange."*

178. Here again AHAB seeks to rely upon a reversal of the burden of proof on the assumption that the monies must have originated from the Money Exchange although they were paid to SICL by STCC, AWAL Bank, SFS or a third party bank.

179. The particulars of these transfers are set out in Schedule 13 to the Statement of Claim.[2633] Schedule 13 contains 87 receipts by SICL, totaling an equivalent of US$2,121,644,422.[2634] AHAB has allocated each receipt to an "*originator*" i.e. the bank or entity from which SICL received the funds in each case.[2635] In tabular form the originators and number of transactions is as follows:[2636]

| **Originator** | **No. of transactions** | **Total US$** | **% of total** |
|---|---:|---:|---:|
| Awal Bank | 58 | 1,704,092,928 | 80% |
| Saad Financial Services | 18 | 237,194,918 | 11% |
| STCC | 4 | 174,570,413 | 8% |
| Delmon Dana | 2 | 4,692,150 | 1% |
| Golden Belt | 4 | 964,013 | - |
| Lombard Atlantic | 1 | 130,000 | - |
| **Total** | **87** | **2,121,644,422** | **100%** |

2632 Statement of Claim, paragraph 159A **{A1/2.3/74}**.
2633 **{A2/23/1}**.
2634 Davies 2W, paragraph 253 **{I/11/122}**.
2635 Davies 2W, paragraph 253 **{I/11/122}**.
2636 Davies 2W, paragraph 253 Table D.56 **{I/11/122}**.

180. The inference AHAB seeks to draw is that the source of the funds used by the 'originator' to make the payment to SICL was from funds belonging to AHAB/the Money Exchange. AHAB seeks to argue that the funds paid by the originator were the "*absolute beneficial property of AHAB*".[2637] AHAB's argument breaks down at this point.

**AHAB's absolute beneficial property**

181. Mr. Davies examined a sample of 29 receipts out of the 87 receipts listed in Schedule 13.[2638] These 29 receipts comprised:

(1) 26 receipts that were the largest transactions by value (where the originator was in fact Awal Bank, SFS or STCC); and

(2) Three receipts, being the largest receipt from each of the remaining originators (being Delmon Dana, Golden Belt and Lombard Atlantic).[2639]

182. The sample selected by Mr. Davies accounts for 70 percent of the total US$2,121,644,422 value of the 87 receipts detailed in Schedule 13.[2640]

183. Of the 29 receipts analysed by Mr. Davies:

(1) Nine receipts, totaling US$586,117,543, were identified by Mr. Davies as being from sources demonstrably not AHAB;[2641]

---

2637 Statement of Claim, paragraph 159A **{A1/2.3/74}**.

2638 Davies 2W, paragraphs 252 to 293 **{I/11/122}**.

2639 Davies 2W, paragraph 254, **{I/11/123}**. For completeness, one of the receipts within the 26 receipts does not fall within the largest transactions by value, but is rather linked to a transaction that does.

2640 Davies 2W, paragraph 255, **{I/11/123}**.

2641 Davies 2W, paragraphs 259, **{I/11/125}** and 266 to 287, **{I/11/127}**. In relation to one receipt (US$300m dated 27 September 2007), there is a disagreement between Mr. Hargreaves and Mr. Davies as to the source of the payment. Mr. Davies' evidence is that it was transferred from Awal Bank (Davies 2W, paragraphs 268 to 269, **{I/11/128}** and 491, **{I/11/213}**); Mr. Hargreaves states that the transfer was made from STCC's customer account at Awal Bank (Hargreaves 1W, paragraph 175.1, **{I/2.27/57}** and Hargreaves' Matters Agreed, paragraph 25, **{I/19/9}**).

(2) Two receipts, totaling US$100,157,986, were identified by Mr. Davies as being returned to the originator (i.e. STCC);[2642]

(3) 18 receipts, totaling US$804,228,136, Mr. Davies was not able to determine the source of the receipt. Although, of these:

(i) Three receipts, totaling US$139,198,271, were identified by Mr. Davies as having the wrong originator (in all cases the originator being SICL not SFS. These were transfers between accounts in the name of SICL, not transfers from SFS);[2643]

(ii) In the case of one receipt, totaling US$130,000, Mr. Davies was not able to confirm or identify the originator (which AHAB identifies as Lombard Atlantic on Schedule 13); and

(iii) Subsequent investigation by the GTDs shows that another receipt totaling US$39,999,995, with a value date of 31 October 2008, appears to be from ATS, but no evidence has been provided by any party in relation to this receipt.[2644]

184. Of the 70 percent sample analysed by Mr. Davies from Schedule 13, no receipt can properly be considered as being sourced from AHAB.

185. There is nothing beyond bare assertion to support AHAB's pleaded case that the funds listed in Schedule 13 are its "*absolute beneficial property*".[2645]

186. There can be no claim in relation to the US$2,121,644,422 identified in Schedule 13.

---

2642 Davies 2W, paragraphs 260, **{I/11/125}** and 288 to 293, **{I/11/134}**; Mr. Hargreaves agrees these two receipts were returned: Hargreaves' Matters Agreed, paragraph 11, **{I/19/5}**.

2643 Davies 2W, paragraph 257, Table D.59, **{I/11/126}** and paragraphs 261 to 265, **{I/11/126}**.

2644 This receipt was subsequently identified by the GTDs after the close of evidence. There is no evidence from either party in relation to this receipt coming from ATS.

2645 Statement of Claim, paragraph 159A, **{A1/2.3/74}**.

**The US$174.5m**

187. That conclusion is reaffirmed from the analysis of four (4) transfers identified in Schedule 13 as coming from STCC.

188. Mr. Hargreaves conducted keyword searches across the Transactional Database **to identify direct cash transfers between STCC's and SICL's bank accounts**.[2646] Only four transfers, totaling US$174.5m, out of the 87 transfers identified in Schedule 13 were found in the Transactional Database by Mr. Hargreaves:[2647]

| UTR | Value Date | Narrative | USD | SICL Bank Account |
|---|---|---|---|---|
| GL00009609 _007-T046 | 9-Jan-06 | O/saad trading contracting co al Khobar via commercial bank of Kuwait, Kuwait credit under reserve subject to receipt of final cover | 50,082,153 | Citibank – 7339448013 |
| GL00009609 _007-T045 | 9-Jan-06 | o/saad trading and contracting co al Khobar via commercial bank of Kuwait, Kuwait credit under reserve subject to receipt of final cover | 50,075,833 | Citibank – 7339448013 |
| AHAB_CEN ZA_0005843 2_249-T184 | 13-Sep-06 | o/saad trading and contracting co alKhobar via hsbc bank USA, N.Y. o/bk Saudi British Bank, Riyadh less charges credit under reserve subject to receipt of final cover | 4,412,427 | Citibank – 7339448013 |
| AHAB_CEN ZA_0007108 7_042-T002 | 28-Sep-07 | Remittance order of Saad trading, contracting and | 70,000,000 | Credit Agricole-1225710000 1USDCC |

189. Mr. Davies agreed during cross-examination that those four transfers, totaling US$174.5m, saw cash move from STCC to SICL.[2648] However, in relation to those transfers:

(1) Two transfers, totaling US$100.1m (comprising US$50,082,153 and US$50,075,833), were returned by SICL to STCC:[2649]

[2646] Hargreaves 1W, paragraph 193, **{I/2.27/63}**.

[2647] Hargreaves 1W, paragraph 193, **{I/2.27/63}**. This is despite keyword searches being run over circa a million transactions in the Transactional Database. This was confirmed by Mr. Hargreaves during cross-examination at **{Day74/93:1-18}**.

[2648] Davies xx: **{Day96/43:18}-{Day96/44:4}**.

> "*…I agree that USD 100.1m was transferred from SICL to STCC as set out in WD2 para 288 to 293*".

The return of the US$100.1m was confirmed by Mr. Hargreaves. Mr. Hargreaves said this was "*spotted by Mr. Davies*".[2650]

190. AHAB describes such payments and repayments as "*circular transactions*" (to support its "*maelstrom*" or "*cross-firing*" analogy). There is no evidence from which it is possible, in the context of the commercial relationships shown to have existed between these entities, to conclude that these transactions are anything other than what the fund flows show, payments and repayments.

191. The remaining two transfers, totaling US$74,412,427 (comprising US$4,412,427 and US$70,000,000), did not remain with SICL:[2651]

> "*Of the remaining USD 74.4m [USD 174.5 million – USD 100.1 million] of direct transfers from STCC to SICL, I note that:*
>
> *USD 70m was received by SICL on 28 September 2007 and combined with a USD 30m received [sic] from STCC's account at Awal Bank on the same day, and was used to make a USD 100m cash transfer out on 1 October 2007 with the narrative 'PAY.ORD FAVOUR ROYAL BANK OF SCOTLAND PLC LONDON'; and*
>
> *USD 4,412,427 was received by SICL on 13 September 2006. On the following day, USD 4,412,442 was used to make transfer out [sic] with the narrative 'JET AVIATION AG BASEL 32677912'*".

192. This was confirmed by Mr. Hargreaves during cross-examination.[2652] It was also confirmed by Mr. Davies.[2653]

---

2649 Hargreaves' Matters Agreed, paragraph 11, **{I/19/5}**; see also Davies 2W, paragraphs 288 to 293, **{I/11/134}**.
2650 Hargreaves xx: **{Day74/94:1}-{Day74/95:2}**. See also: Davies xx: **{Day96/44:5}-{Day96/45:15}**.
2651 Hargreaves' Matters Agreed, paragraph 12 (footnotes omitted), **{I/19/5}**.
2652 Hargreaves xx: **{Day74/95:3}-{Day76:5}**.
2653 Davies xx: **{Day96/45:18}-{Day96/46:1}** (although, Mr. Davies did not refer to the US$4.4m with the narrative 'JET AVIATION').

193. In relation to all four of the transfers identified by Mr. Hargreaves evidencing direct cash transfers from STCC to SICL, totaling US$174.5 million, the funds did not remain with SICL (and so may not now constitute a proprietary claim against SICL). The transfers out of SICL were confirmed by Mr. Hargreaves during cross-examination:[2654]

> *"Q. Every one of the direct transfers that you identified from STCC into SICL [related to the US$174.5m] has left SICL.*
>
> *A. Yes. If that Royal Bank of Scotland transfer has left then, yes, everyone has, yes".*

194. There is therefore no basis on which it could be concluded that the transfers into SICL identified by AHAB are transfers of AHAB funds, either as having reached SICL in the first place or as now remaining within SICL.

**<u>CONTRIBUTIONS TO SICL AND SINGULARIS BY AL SANEA AS SHAREHOLDER</u>**

195. AHAB's pleaded case is that these contributions represent AHAB's monies misappropriated by Al Sanea from the Money Exchange.

196. In the Statement of Claim AHAB pleads:

- Al Sanea as the ultimate beneficial owner of the shares in SICL "*must have*" provided the funds that resulted in total capitalisation of SICL of US$2,318m. That Al Sanea's principal source of funds was money he had misappropriated from the Money Exchange, either routed through STCC or otherwise.[2655]
- Singularis' financial statements report contributions by shareholders of US$7,530m in the period 2006 to 2008. AHAB "*believes*" that about US$4,500m of the reported contributions were fictitious in that they were represented by the

---

[2654] Hargreaves xx: **{Day74/96:6-9}**.
[2655] RASOC, paragraph 159 **{A1/2.2/74}**.

false deposit confirmations. That at least about US$3,000m was contributed to Singularis by Al Sanea as the ultimate beneficial owner of the shares and who "*must have*" provided those funds.[2656]

- That AHAB is the equitable owner of the money and is entitled to trace those moneys into and through the hands of the recipients. AHAB was, at the time of the payment and receipt, "*the equitable owner of*":

  (1) US$2,318m paid to SICL as shareholder contributions; and

  (2) About US$3,000m paid to Singularis as shareholder contributions

- AHAB claims "*those moneys*" under a constructive trust.[2657]
- And that AHAB is entitled to and does elect to appropriate its beneficial interest to any assets of the Defendants that are still in their possession by reason that the Defendants "*must be presumed to have spent their money before having recourse to the traceable proceeds*" of money misappropriated from the Money Exchange.[2658]

197. The claim is founded on the fact that SICL and Singularis were capitalised, which is common ground, and the proposition that Al Sanea "must have" provided the funds out of money taken from the Money Exchange. The claim simply assumes the thefts. The claim does not purport to rely upon showing that funds taken from the Money Exchange can be traced into SICL or Singularis. The claim ignores SICL and Singularis' other sources of funds and Al Sanea's other sources of funds. As a proprietary tracing claim, the claim is therefore unsustainable.

---

2656 RASOC paragraph 162 **{A1/2.2/76}**.
2657 RASOC, paragraphs 187 and 188 **{A1/2.2/74}**.
2658 RASOC paragraph 188A, **{A1/2.2/90}**.

**AHAB'S GENERAL APPROACH: HARGREAVES 'TRACING' AND 'PATTERNS'**

198. Mr. Hargreaves admits that it is not possible to track the flow of money that was used to fund SICL and Singularis' share capital contributions:[2659]

> "*Billions of dollars of loans from MAS have been effectively converted to equity of SICL and Singularis. Amongst the Defendants' discovery, we have identified the loan cancellation documentation in favour of shares in SICL and Singularis. However we have not identified documentation showing the timing of the loans or assets provided by MAS that were used to convert to equity. As a result, it has not been possible to track specific flows of money that have been used to fund the majority of the share capital contributions*".

199. Mr. Hargreaves also says that it is not possible to track specific flows of money, or trace any payment from the Money Exchange, into the share capital or share loan accounts of SICL:[2660]

> *"MR PHILLIPS: At {I/2/75}, paragraph 241 is your summary in your section on capitalisation. ... You make it clear that it has not been possible to track specific flows of money that have been used to fund the capital contributions.*
>
> *A. Yes.*
>
> *Q. You said that you can't trace any particular payment from the Money Exchange into the share capital or share loan accounts of SICL or Singularis.*
>
> *A. From the Money Exchange, yes".*

200. That answer confounds AHAB's tracing claim to what it says are Al Sanea's capital contributions to SICL and Singularis by way of funds from the Money Exchange.

201. As the GTDs argue, AHAB cannot trace any payment from the Money Exchange into SICL or Singularis. AHAB has therefore constructed a novel, and on analysis hopeless,

---

2659 Hargreaves 1W, paragraph 241 **{I/2.27/75}**.
2660 Hargreaves xx: **{Day75/1:5-21}** and **{Day75/2:24}-{Day75/3:2}**.

tracing claim based upon a "*specific pattern*" that might link money purportedly coming out of the Money Exchange to certain capital contributions. There is no principle of "*specific pattern*" tracing as a matter of law. As a matter of fact, it does not work either. The idea appears to have come from Deloitte, as Mr. Hargreaves sets out:[2661]

> *"So I looked at how monies came out of the Money Exchange. I looked at whether there were specific transactions and specific patterns that might link that money to certain capital contributions…"*

202. The "specific pattern" Deloitte came up with is explained (emphasis added):[2662]

> *"We have considered the share capital and shareholder contributions of SICL and Singularis. Of the SICL capital contributions, USD 300m was funded by the STCC account at AWAL Bank ... Over USD 3bn worth of loan notes from MAS that were converted to equity of SICL and Singularis for which we have identified the loan cancellation documentation in favour of shares in SICL and Singularis.* ***The loans provided to SICL and Singularis by MAS are over the same period as funds extracted by MAS from the Money Exchange…****"*

203. Mr. Hargreaves is relying on the fact that Al Sanea provided loans to SICL and Singularis over the same period as funds were extracted from the Money Exchange. Put to one side the pejorative that the funds were "*extracted*" from the Money Exchange, this is no more than coincidence. This is not tracing; there is no link. The Money Exchange cannot follow its money or say that the funds in SICL and Singularis are substitutes for the money said to have been extracted from the Money Exchange. This proposition does not even satisfy a causation test. It does not get past the first step of a "*but for*" test because the money that was used for capitalisation may have come from other sources.

---

2661 Hargreaves xx: **{Day73/60:19-22}**.
2662 Hargreaves 1W, paragraph 35 **{I/2.27/14}**.

204. Mr. Hargreaves' "specific pattern" is simply that: (a) Al Sanea increased capital by cancelling his loans to SICL and Singularis; and (b) it occurred at the same time money was being "extracted" from the Money Exchange. It is the coincidence between the money out of the Money Exchange and the increased capital by cancelled loans in Al Sanea's companies that Mr. Hargreaves relies on. This was confirmed by Mr. Hargreaves during cross-examination:[2663]

> *"Q. At paragraph 35 on {I/2/14}, just to explain to my Lord and to remind you, this is section E in which you summarise your position on SICL and Singularis, your evidence on SICL and Singularis. In paragraph 35 you say that you: "... have considered the share capital and shareholder contributions of SICL and Singularis. Of the capital contributions, USD 300m was funded by the STCC account at Awal Bank [which we will come back to] ... USD 3bn worth of [loans] from Al Sanea that were converted to equity of SICL and Singularis for which we have identified the loan cancellation documentation in favour of shares in SICL and Singularis. The loans provided to SICL and Singularis by [Mr. Al Sanea] are over the same period as funds extracted by [Mr. Al Sanea] from the Money Exchange ..."*
>
> *A. Yes.*
>
> *Q. If I understand your evidence correctly, it is that there was a period of time when Maan Al Sanea cancelled various loans and converted them into capital in SICL and Singularis.*
>
> *A. Yes.*
>
> *Q. In other words, their capital increased.*
>
> *A. Exactly, yes.*
>
> *Q. At the same time, money that you say was extracted came out of the Money Exchange.*
>
> *A. That's correct.*

---

2663 Hargreaves xx: **{Day75/3:8}-{Day75/4:13}**. In this context it is noteworthy that the same pattern occurred in relation to STCC's increased capitalization, to be mentioned further below.

*Q. It's the coincidence between the money out from the Money Exchange and the capital in at a Maan Al Sanea company that you're relying on?*

*A. That's the link that I'm relying on, yes".*

**Audited financial statements**

205. In this context, AHAB relies on the financial statements of SICL and Singularis to evidence those companies' capitalisation. As already set out above, AHAB pleads:

*"SICL's financial statements report contributions by shareholders totaling US$2,318m between 2004 and 2008 and that Al Sanea is the ultimate beneficial owner of the shares in SICL and must have provided these funds."*[2664]

*"Singularis's financial statements report contributions by shareholders of US$7,530m in the period 2006 to 2008. AHAB believes that about US$4,500m, of the reported contributions were fictitious. However, "it appears" that at least about US$3,000m was contributed to Singularis by Al Sanea as the ultimate beneficial owners of the shares who "must have" provided those funds.*[2665]*"*

206. In this respect Mr. Hargreaves' evidence was:

(1) Mr. Hargreaves relies on the audited financial accounts of both SICL and Singularis to evidence the increase in capital.

207. As regards SICL:[2666]

"*235.The 2008 audited SICL financial statements show additional 'funds contributed by the shareholder' of USD 669M, therefore in total MAS has contributed approximately USD 2.7bn to SICL".*

208. As regards Singularis:[2667]

---

2664 RASOC, paragraph 159 **{A1/2.2/74}**.
2665 RASOC, paragraph 162 **{A1/2.2/76}**.
2666 Hargreaves 1W, paragraph 235 **{I/2.27/74}**.

> "*239. Singularis' audited financial statements show that, in addition to the USD 2bn share capital, 'Other funds contributed by shareholder' was USD 5,530m as at 30 April 2008 (the last identified audited financial statements). Therefore the total amount contributed by MAS amounts to USD 7.53bn*".

209. In cross-examination, Mr. Hargreaves accepted that he relies on the audited financial statements.[2668] In the case of SICL and Singularis, Mr. Hargreaves was unable to rely on the MIDAS database[2669] and banking records. This meant he could only do a high level review and he could not trace particular funds:[2670]

> "*Q. So you have done a high level review and you have not been able to trace particular funds. Mr Hargreaves, with the AwalCos you had more records, as I understand your evidence.*
>
> *A. That's correct, my Lord, we had Midas.*
>
> *Q. You had a more complete Midas and banking records than you had for SICL and Singularis. That's right, isn't it?*
>
> *A. That's correct, yes.*
>
> *Q. It is based on the material that you went through with my learned friend Mr Smith that you say you can identify patterns.*
>
> *A. Yes.*
>
> *Q. Which is not something I'm going back to, but in the case of SICL and Singularis, the defendants other than the AwalCos, you don't have that, do you?*
>
> *A. No.*"

**Capitalisation of SICL**

210. It is agreed between the experts that:

---

2667 Hargreaves 1W, paragraph 239 **{I/2.27/75}**.
2668 Hargreaves xx: **{Day75/4:14-21}**.
2669 Disclosed by the AWALCOs
2670 Hargreaves xx: **{Day75/2:7-23}**.

(1) SICL's financial statements show that by 31 March 2009:[2671]

(i) SICL's Shareholder Loan Accounts (i.e. funds contributed by shareholders) rose to US$719m (an increase between 30 June 2001[2672] and 31 March 2009 of US$705m); and

(ii) SICL's Share Capital balance rose to US$3.15bn (an increase between 30 June 2001 and 31 March 2009 of US$2.75bn). SICL's Share Capital includes:[2673]

(a) US$1.519bn transferred from SICL's Shareholder Loan Accounts;

(b) US$923m transferred from SICL's retained earnings; and

US$7m transferred from SICL's share premium.

(2) The remaining balance of US$300m of the Share Capital increase was transferred to SICL on 27 September 2007.[2674] The increase relates to an issue of new shares to Saad Group Limited (worth US$300m on 27 September 2007) in exchange for which SICL received US$300m into its Citibank account from Awal Bank

---

2671 Davies 2W, paragraph 398 and Table G.3, **{I/11/171}**. This was agreed by Mr. Hargreaves, Hargreaves' Matters Agreed, paragraph 23, **{I/19/9}**: "*I agree that SICL's Financial Statements show an increase of USD 3,455m in Shareholder Loan Accounts (USD 705m) and Share Capital (USD 2,750m) from 29 June 2001 to 31 March 2009 as set out in WD2 para 398. I also agree with the movement in the Shareholder Loan Account and the Share Capital as set out in Table G.3 in WD2 para 398*."

2672 A starting time roughly approximate with the beginning of AHAB's purported "*New for Old*" policy on one version of it.

2673 Davies 2W, paragraph 399, **{I/11/171}**; Hargreaves' Matters Agreed, paragraph 24, **{I/19/9}**.

2674 Hargreaves' Matters Agreed, paragraph 25, **{I/19/9}**; Davies 2W, paragraph 491, **{I/11/213}**. However, during cross-examination Mr. Hargreaves noted that, while he agrees with the conclusions as set out in paragraph 24 and 25 of Hargreaves' Matters Agreed, he has not gone through the detail of Mr. Davies: "*A. Yes. Just to clarify, my Lord, I'm not agreeing to all of the detail in Mr. Davies' report, I'm just agreeing to those numbers. Because I haven't been through that detail sufficiently with him to agree that.*" **{Day75/6:6-9}**; and "*CHIEF JUSTICE: Let me see if I understand the nature of your concern. Has it got to do with conclusions as to how, for instance, the shareholder loan account was funded? A. My Lord, I'm happy to agree with the movement in that shareholder loan account and the statement that I have made here. What I don't want the court to infer from that is I agree with every single word of Mr. Davies' statement, which arrives at that, because there is an awful lot of detail in there that I haven't necessarily been through, but I do agree with the overall conclusion. CHIEF JUSTICE: What's the danger in relation to the details that you have not been able to analyse? A. I don't know whether there's a danger or not, but I don't want the court to infer from what I'm saying that I agree with everything he has said because I haven't been through it in enough detail. ...*'" **{Day75/7:18}-{Day75/8:10}**.

(however, Mr. Hargreaves notes that the transfer was made from STCC's customer account at Awal Bank rather than Awal Bank, as per Mr. Davies' evidence).[2675]

211. Mr. Davies has followed the cash, and identified SICL's immediate source or recipient of the capital contributions, by reference to bank statements recording the receipts or payment of funds, as well as third party documentation, such as payment confirmations, SWIFT messages and correspondence with external banks.[2676] Mr. Davies uses SICL's Trial Balance, which is contained in SICL's audit pack, called the SFS Report, which:[2677]

> *"...whilst incomplete and not fully explaining all movements, provides the best evidence I have been able to identify as regards the immediate source of funding for SICL's capitalisation".*

212. Mr. Davies said during cross-examination neither he nor Mr. Hargreaves was able to determine the ultimate source of the funds. Reverse tracing is not possible.[2678]

> "*Q. What you've tried to do in this table is to identify, is this right, the immediate source of the money that flowed into the SICL shareholding account?*
>
> *A. That's right, yes. And it's important it's "the immediate source."*
> *Q. I understand. I was going to say, you don't know obviously what the ultimate source of the money was?*
>
> *A. No.*
>
> *Q. What you've tried to do is set out the immediate source.*
>
> *A. Yes, just to clarify I think. There really wasn't much information available to me in the disclosure. This SFS document [ie: the SICL audit pack called "the SFS Report"] is not perfect, by any means, and it doesn't cover all the ledgers either. It's the best that I had. I*

---

2675 Hargreaves' Matters Agreed, paragraph 25, **{I/19/9}**; Davies 2W, paragraph 491, **{I/11/213}**; Hargreaves 1W, paragraph 175.1, **{I/2.27/57}**.
2676 Davies 2W, paragraph 392 **{I/11/169}**: detailed analysis between paragraphs 394 and 421, **{I/11/169}**.
2677 Davies 2W, paragraphs 384 – 387 **{I/11/166}**.
2678 Davies xx: **{Day96/62:17}-{Day96/63:10}**.

*think it is a matter that Mr. Hargreaves does not necessarily, significantly disagree with the work that I've done. There are some points, you know, that he does disagree with me..."*

213. Mr. Davies provides a table (based upon the trial balance in the SFS Report) of the immediate source or recipient of the funds that contribute to the net increase in SICL's Shareholder Loan Accounts' balance:[2679]

"Table G.8"

| Section reference | Category of capital contributions | Increase or (decrease) to SICL's Shareholder Loan Accounts (US$ million) | Number of transactions |
|---|---|---|---|
| | SICL's Shareholder Loan Accounts as at 1 January 2003 | 32 | |
| G.4.1 | Singularis | 240 | 1 |
| G.4.2 | Awal Bank | 127 | 5 |
| G.4.3 | SFS | (42) | 4 |
| G.4.4 | STCC | 195 | 18 |
| G.4.5 | Mr. Al Sanea | 532 | 17 |
| G.4.6 | Saad Air | 25 | 5 |
| G.4.7 | Airbus | (25) | 2 |
| G.4.8 | Saad Medical Centre | 30 | 1 |
| G.4.9 | The Money Exchange | (50) | 4 |
| G.4.10 | Transactions for which the immediate source or recipient is unclear | 742 | 55 |
| G.5 | The effect of interest and exchange rate differences on SICL's Shareholder Loan Accounts | 41 | 496 |
| G.6 | SICL Capital Transfers | (1,419) | 8 |
| | Transactions below US$10 million | 33 | 276 |
| | SICL's Shareholder Loan Accounts as at 30 June 2009 | 461 | 892 |

214. SICL's shareholder loan accounts' balance increased by US$429m between 1 January 2003 and 30 June 2009. What Mr. Davies' analysis shows is that there is no evidence of

2679 Davies 2W, paragraph 420 **{I/11/180}**.

capital contributions coming directly from the Money Exchange.[2680] Indeed, the only direct transfer between SICL and the Money Exchange went from SICL to the Money Exchange, totaling US$50m.[2681] Mr. Hargreaves agrees with Mr. Davies' categorisation of the immediate source or recipient of funds:[2682]

> "*I agree with the categorisation of the immediate source or recipient of the funds (where stated) that contribute to the net increase in SICL's Shareholder Loan Accounts at Table G.8 at WD2 para 420…*"

215. Mr. Davies has identified the immediate sources of the capital contributions of SICL by reference to bank statements and other third party banking documentation.[2683] While Mr. Davies also referred to internal documentation such as SICL's general ledger extracts, and inter-office memoranda, he did not rely on internal documentation to determine the immediate sources of funding. It is clear from Mr. Hargreaves' evidence that, in some instances, Mr. Hargreaves relied solely on internal documentation to identify the immediate sources of the funding, which on occasion leads to a different categorisation of funds to Mr. Davies.[2684] However, as none of the sources was the Money Exchange, whilst less accurate, it does not matter. Nowhere does Mr. Hargreaves suggest that the money came from the Money Exchange; it either came from STCC or Al Sanea.[2685]

---

2680 Davies 2W, paragraph 420 **{I/11/180}**.

2681 Mr. Hargreaves accepted this during cross-examination: **{Day75/16:12}-{Day75/17:3}**: "*CHIEF JUSTICE: Before we do, in the table on the right at* **{I/11/180}** *there is a sum of negative US$50 million opposite the Money Exchange. Is that of any significance? ... CHIEF JUSTICE: Does that indicate a payment back to the Money Exchange from the SICL shareholder loan account? A. Yes. MR. PHILLIPS: That's right, Mr. Hargreaves, isn't it? A. Yes.*"

2682 Hargreaves' Matters Agreed, paragraph 27, **{I/19/9}**. The only disagreements between Mr. Hargreaves and Mr. Davies relate to: (a) A US$300m Share Capital increase that was transferred to SICL on 27 September 2007. Davies 2W notes that it was transferred from Awal Bank, whereas Mr. Hargreaves states that the transfer was made from STCC's customer account at Awal Bank (Hargreaves' Matters Agreed, paragraph 25, **{I/19/9}**; Davies 2W, paragraph 491, **{I/11/213}**; Hargreaves 1W, paragraph 175.1, **{I/2.27/57}**); and (b) Mr. Hargreaves disagrees with the categorisation of the immediate source of 11 payments detailed by Mr. Davies in Table G.8: Hargreaves' Matters Agreed, paragraphs 27 to 37 **{I/19/9}**; see also Hargreaves xx: **{Day75/11:12}-{Day75/17:21}**.

2683 Davies 2W, paragraph 392 **{I/11/169}**.

2684 See Hargreaves' Matters Agreed, paragraphs 27 to 37 **{I/19/9}**.

2685 Hargreaves' Matters Agreed, paragraphs 27 to 37 **{I/19/9}**.

216. Mr. Hargreaves accepted during cross-examination that nobody has been able to identify: (a) the ultimate source of the capitalisation funds; or (b) a link between the capitalisation funds and the funds extracted from the Money Exchange. Mr. Hargreaves said that there is no chain, and said that it is exactly right that there is no link between funds allegedly extracted from the Money Exchange and the capitalisation:[2686]

> *"MR PHILLIPS: I think your position is clear, Mr Hargreaves. You haven't identified anything that is incorrect in Mr Davies' material, have you?*
>
> *A. No, but I had a few questions and queries that I would have liked to have answered before I could agree more.*
>
> *Q. Perhaps you could have agreed more, but the only debate that we could have relates to the immediate source of funding.*
>
> *A. Yes.*
>
> *Q. That's right, isn't it?*
>
> *A. Well, the immediate source or the ultimate source, because there is some analysis that has been done of the immediate source of the funding of those loan accounts, but the ultimate source of that funding is not something that we have been able to consider.*
>
> Q. *The position is that nobody has been able to identify the ultimate source and nobody –*
>
> *A. Exactly.*
>
> *Q. That's right, isn't it?*
>
> *A. Exactly.*
>
> *Q. And nobody has been able to find a link, which is the discussion we had about 10 minutes ago. That's right, isn't it?*
>
> *A. A link to the funds extracted from the Money Exchange.*

---

[2686] Hargreaves xx: **{Day75/8:12}-{Day75/9:20}**.

*Q. Exactly.*

*A. Yes.*

*Q. So we don't have a chain.*

*A. No.*

*Q. The only question that you seem to be very vexed about is whether or not you agree with Mr Davies in relation to the immediate source of the funds, which would be the last link in any chain.*

*A. Yes, and there is a level of agreement between Mr Davies and I in respect of the immediate source of funds".*

217. As regards other sources of funds, Mr. Hargreaves said he could not make any link between Al Sanea's loans being converted with any source of funds other than the immediate source of funds:[2687]

"*Q. We know that the immediate source of that increase in capitalisation is largely loans from Mr Al Sanea. That's right, isn't it?*

*A. Yes.*

*Q. And we also know that Maan Al Sanea had recorded borrowing, because you have seen the attachment 9s.*

*A. Yes.*

*Q. But nobody is able -- you are not able to make any link between the fact that his loans were converted and any other source of funds.*

*A. Other than the immediate source of funds for those loans, my Lord, yes.*

*Q. Exactly…"*

218. In any event, there were various alternative sources of funds that may have been used by SICL's shareholders for the capitalisation of SICL.[2688] AHAB has therefore failed to

---

2687 Hargreaves xx: **{Day75/10:18}-{Day75/11:5}**.

establish its pleaded case that SICL's capitalisation "*must have*" been funded by money from the Money Exchange.

**Capitalisation of Singularis**

219. It has not been possible to identify the ultimate source of funds that may have been used by Singularis' shareholders for the capitalisation of Singularis.[2689]

220. From 31 December 2007, Singularis had share capital of US$2bn, made up of a subscription of US$1bn under a Subscription Agreement dated 28 September 2007,[2690] and a subscription of US$1bn under a Subscription Agreement dated 31 December 2007.[2691] Mr. Hargreaves says that this share capital was funded by "*effectively releasing Singularis' indebtedness to Al Sanea*".[2692] Mr. Hargreaves also says that there were other funds contributed by shareholder of US$5,530m:[2693]

> "*Singularis' audited financial statements show that, in addition to the USD 2bn share capital, 'Other funds contributed by shareholder' was USD 5,530m as at 30 April 2008 (the last identified audit financial statements). Therefore, the total contributed by MAS amounts to USD 7.53bn*".

221. Singularis' financial statements show that, by 30 April 2008:[2694]

(1) Singularis' Shareholder Loan Accounts' balance rose to US$5.5bn; and

(2) Singularis' Share Capital balance rose to US$2bn.

---

2688 The question is whether the funds used were funds stolen from the Money Exchange not whether there is an alternative source of capital compliant with the requirements of company law.

2689 Davies 2W, paragraph 492 **{I/11/215}**.

2690 **{G/6070/1}**.

2691 **{G/6226/1}**. Hargreaves 1W, paragraph 237 **{I/2.27/75}**.

2692 Hargreaves 1W, paragraph 238, **{I/2.27/75}**. It is agreed between Mr. Davies and Mr. Hargreaves that Singularis' share capital increase by US$2bn due to conversion from debt to equity: "*Singularis' share capital increased from US$1 as at 30 June 2007 to US$2bn as at 31 December 2008. It appears that this has risen due to the conversion of shareholder debt to equity across the period*". Davies 2W, paragraph 494, **{I/11/215}**."*I agree that the USD 2,000m share capital increase was funded effectively by a transfer from the Singularis shareholder loan account i.e. reducing the amount owed to Al Sanea* [WD2 para 531] [**{I/11/227}**] *and increasing his capital in Singularis. I agree the steps as set out in WD2 paras 533 to 557* [**{I/11/228}**] *to increase Singularis' share capital.*" Hargreaves' Matters Agreed, paragraph 39 **{I/19/16}**.

2693 Hargreaves 1W, paragraph 239, **{I/2.27/75}**. This is in part red-lined.

2694 Davies 2W, paragraph 502 and Table H.2, **{I/11/217}**. This is agreed by Mr. Hargreaves, see Hargreaves' Matters Agreed, paragraph 38, **{I/19/12}**. See also Hargreaves agreement at: **{Day75/19:12-17}**.

222. There is no evidence of Singularis' capital contribution coming from the Money Exchange. Mr. Hargreaves acknowledged as much:[2695]

> *"Q. You said that you can't trace any particular payment from the Money Exchange into the share capital or share loan accounts of SICL or Singularis.*
>
> *A. From the Money Exchange, yes."*

223. In any event, as also shown, there were various alternative sources of funds that may have been used by Singularis' shareholders for the capitalisation of Singularis.

**Conclusion on SICL and Singularis Capitalisation**

224. The Defendants have shown that Mr. Hargreaves has been unable to track any specific flow of funds into the capitalisation of SICL and Singularis:[2696]

> *"Q. Let's stand back a moment in relation to the capitalisation. I just want to make sure that I understand what your evidence is in relation to this. You have quite fairly told the court that you are unable to track specific flows of money into any of these capitalisations?*
>
> *A. I am unable to track the flow of those funds. These capitalisations are based on the accounting records, albeit limited accounting records, of SICL and Singularis.*
>
> *Q. That is the material you have?*
>
> *A. That's correct."*

225. The only link between SICL and Singularis' capital contributions is Mr. Hargreaves' "*specific pattern*" which he finds in the coincidence that SICL's and Singularis' capital increased at the same time money allegedly came out of the Money Exchange:[2697]

---

2695 Hargreaves xx: **{Day75/2:24}**-**{Day753:2}**.
2696 Hargreaves xx: **{Day75/21:5-16}**.

> "Q. *The pattern you have identified is that SICL and Singularis' capital increased -- we can see the dates -- the key point for you is that it increased at the same time as what you have been told were extractions from the Money Exchange.*
>
> *A. Well, that was an observation, yes, my Lord."*

**Conclusion**

226. I agree with the Defendants that "*specific patterns*" or what may be a coincidence, does not warrant the Court finding an irrebuttable inference that the money paid out of the Money Exchange can be traced or followed into the money that capitalised SICL or Singularis.

**SICL'S AND SINGULARIS' EXTERNAL FUNDING**

227. Further militating against AHAB's pleaded case is the fact that each of SICL and Singularis had significant external debt funding of its own, which could be the ultimate source of untraced funds in the hands of either of those companies.

228. It is agreed between Mr. Hargreaves and Mr. Davies that, as at 31 December 2008, SICL was funded by US$4.6bn of external debt, from third party banks.[2698] In Hargreaves 1W it is stated:[2699]

> "*SICL was funded by USD 4.6bn of debt at 31 December 2008. Debt therefore accounted for approximately 50% of SICL's funding*".

229. This was confirmed by Mr. Hargreaves during cross-examination:[2700]

> *"Q. ... And the other factor that I just want to ask you about at this point, at paragraph 236 at {I/2/74}: "In addition to the amount contributed by [Al Sanea] and the retained earnings, SICL was funded by USD 4.6bn of debt as at 31 December 2008. Debt therefore accounted for approximately 50% of SICL's funding." At*

---

2697 Hargreaves xx: **{Day75/22:1-24}**.
2698 Davies 1W, at paragraphs 181 to 189 **{I/6/69}**, describes SICL's long term and short term borrowing.
2699 Hargreaves 1W, paragraph 236, **{I/2.27/74}**. Agreed by Mr. Davies in Davies' "*Schedule of matters commented on by Mr. Davies in respect of Hargreaves' witness statements*" dated 3 November 2016, paragraph 236, **{I/18/2}**.
2700 Hargreaves xx: **{Day75/11:5-15}**.

> *{I/6/67}, Mr Davies goes through and deals with the debt. You both agree that at least 50 per cent of the money going into SICL was debt funding.*
>
> *A. Yes, my Lord."*

230. It is further agreed that, as at 30 April 2008, Singularis was funded by US$14.7bn of external debt from third party financial institutions. This debt accounted for approximately two thirds of Singularis' funding:[2701]

> "*In addition to the amount contributed by MAS, Singularis was funded by USD 14.7bn of debt as at 30 April 2008. Debt therefore accounted for approximately two thirds of Singularis' funding*".

231. Mr. Davies examined Singularis short and long-term sources of debt funding.[2702] Mr. Davies was able to list from the general ledger ten (10) third party financial institutions that provided the US$14.7bn debt funding to Singularis.[2703] Mr. Hargreaves said he had no reason to doubt that list.[2704]

**FUNDS INTO STCC**

**AHAB's pleaded case**

232. In the Statement of Claim, AHAB pleads:[2705]

(1) STCC was extensively funded by money misappropriated from the Money Exchange.

(2) STCC was used by Al Sanea, *inter alia,* as a conduit to disguise his misappropriations from the Money Exchange and the receipts of the traceable proceeds of those funds by the Defendants.

---

2701 Agreed by Mr. Davies in Davies' "*Schedule of matters commented on by Mr. Davies in respect of Hargreaves' witness statements*" dated 3 November 2016, page 2 (re Hargreaves 1W, paragraph 240), **{I/18/2}**.
2702 Davies 1W, paragraphs 204 to 211 **{I/6/84}**.
2703 Davies 1W, paragraph 208 **{I/6/88}**.
2704 Hargreaves xx: **{Day75/19:20}-{Day75/21:1}**.
2705 RASOC, paragraph 28, 28.3 to 28.5, 28.8, **{A1/2.2/10}**.

(3) Al Sanea and STCC have failed to disclose any of STCC's books and records in an unsuccessful attempt to confound AHAB's claim.

(4) AHAB elects that payments out from STCC to the Defendants were made using AHAB's money and appropriates its beneficial interest to these payments.

233. The Defendants argue that AHAB has not, and cannot, establish (1) and (2). As to (3), they point to the fact that AHAB chose not to join STCC to the proceedings. As a result, no party in these proceedings has access to STCC's books or records. Beyond the obvious point, namely, why should they, there is no evidence as to whatever STCC's motives might be as a non-party not to give disclosure. As to (4), AHAB cannot elect that a fact be in its favour. Payments out from STCC were either made with funds that can be traced or followed or they were not. AHAB has failed to establish that it is entitled to trace or follow any funds coming out of STCC.

234. The evidence shows that money went into STCC from a number of different sources, including from the Money Exchange[2706] and from third party banks. STCC was a major trading company and so it had trading revenues as well. The evidence also shows that large amounts of money was paid out of STCC and large remained in STCC. What AHAB has failed to do is prove that where funds were paid out of STCC to the Defendants, that those funds came from the Money Exchange, and that those funds were

2706 In addition to the cheques, LCs and electronic transfers that were said to be paid to STCC by AHAB, it is also alleged by AHAB that the Money Exchange booked deposits in accounts for the Saad Group companies, while simultaneously booking debits of equal value on accounts apparently related to the Saad Group: see Statement of Claim, paragraphs 122 to 125, **{A1/2.3/53}**; Charlton 1A, paragraphs 78 to 82, **{L1/16/34}**; Hatton 3W, paragraphs 3.25 to 3.28, **{I/21.15/11}**; and Davies xx: **{Day96/116:16}**-**{Day96/126:13}**. The allegation is that Al Sanea purportedly caused the Money Exchange to create "*paper*" transactions that made it look as if the Money Exchange owed money to STCC. This allegedly provided a rationale for the transfer of additional funds from the Money Exchange to STCC. Leaving to one side the evidential basis for this allegation (Hatton 3W is only able to provide evidence in relation to US$598m of the US$2.8bn alleged in Charlton 1A), as with the other so called 'money out schemes', AHAB is only able to show money being transferred to STCC.

stolen. Money from the Money Exchange might have stayed in STCC. Money paid to the Defendants might have come from third party sources (directly or through STCC). On the evidence as it stands, I accept that there is simply no way of knowing.

235. AHAB chose not to pursue any claim against STCC in this proceeding, despite AHAB pleading (as above), and Mr. Hatton and Mr. Hargreaves providing evidence of, STCC's central role. STCC was "*by far*" the main recipient of funds coming out of the Money Exchange.[2707] That was probably because STCC is Al Sanea's main trading company. Mr. Hatton's evidence was:[2708]

> *"MR PHILLIPS:*
> *Q. Mr Hatton, the main recipient of funds transferred from the Money Exchange was STCC; that's right, isn't it?*
>
> *A. Yes.*
>
> *Q. And STCC is not a defendant in these proceedings?*
>
> *A. That's correct.*
>
> *Q. STCC, as you may know, is Maan's major trading company; are you aware of that?*
>
> *A. Yes, I'm aware of that".*

**STCC's business**

236. STCC is one of the largest companies in the Saad Group. STCC's principal activities are investing in real estate, investing in equity securities, predominantly in the banking sector and construction and construction related activities.[2709] STCC has nine divisions:

---

[2707] Hargreaves 1W, paragraph 21 (red-lined), **{I/2.27/9}**.
[2708] Hatton xx: **{Day94/77:2-10}**.
[2709] Golden Belt offering circular dated 14 May 2007, **{G/5848/1}** at **{G/5848/49}**.

Investment Property,[2710] Investment,[2711] Construction and Contracting,[2712] Information Technology,[2713] Landscape Architecture and Design,[2714] Transport,[2715] Furniture,[2716] Catering[2717] and Medical and Pharmaceutical supply.[2718] In May 2007 Standard & Poor's described STCC as "*a conglomeration of international financial services, manufacturing facilities, investment companies, and health care, education, and real estate developments*" and "*core to the Saad Group"*. The credit rating was BBB+/Stable/A-2.[2719] STCC total assets were said to be "*about SAR17.3bn*". Saad Group assets were said to be US$15.2bn .[2720]

**STCC's audited accounts**

237. The parties have access to STCC's published audited financial statements. The analysis of STCC is based almost entirely on STCC's financial statements, because the parties do not have STCC's trial balances, or any transaction-level detail for STCC's capitalisation.[2721] The absence of supporting third party documentation is unhelpful. The GTDs acknowledge that questions arise in relation to the STCC audited accounts. However, they say that it is the best evidence they have, and whilst a skeptical approach is appropriate, it would not be right to reject out of hand what those audited accounts appear to show. I accept this, as far as it goes for the limited purpose of showing the unreliability

2710 **{G/5848/49}**.
2711 **{G/5848/49}**. The Investments are in Land, Bank shares and Construction.
2712 **{G/5848/50}**.
2713 **{G/5848/52}**.
2714 **{G/5848/52}**.
2715 **{G/5848/52}**.
2716 **{G/5848/53}**.
2717 **{G/5848/53}**.
2718 **{G/5848/53}**.
2719 In 2008 this was BBB+/Negative/A-2.
2720 Standard & Poor's - **{G/5854/1}**.
2721 Davies 2W, paragraphs 558 to 559 {**I/11/237**}.

of AHAB's inferences that SICL and SHL capitalisation flowing through STCC must have come from the Money Exchange.

**STCC – increased capital**

238. STCC's audited financial statements for the year ended 31 December 2005, the year ended 31 December 2006, the period ended 30 June 2007, and for the year ended 31 December 2008, show that:[2722]

(1) The balance of STCC's partner loan account increased by US$4.9bn for the period 1 January 2004 to 31 December 2008.[2723]

(2) STCC's share capital increased from US$267m to US$1.6bn. US$0.4bn was due to cash contributions and the balance of US$0.9bn was due to re-allocation of profits.[2724]

239. Mr. Hargreaves and Mr. Davies agree that the STCC Financial Statements show:[2725]

(1) An increase of SAR 18,446m (US$4,919m) in STCC's partners' loan accounts for the year ending 31 December 2004 to 31 December 2008. [2726]

(2) An increase of SAR 5.0bn (US$1.3bn) in STCC's Share Capital from the year ending 31 December 2004 to 31 December 2008, funded by SAR 3.5bn (US$0.9bn) transferred from retained earnings and SAR 1.5bn (US$0.4bn) by partner cash contributions.[2727]

---

2722 Davies 2W, paragraphs 560 to 561 {**I/11/237**}.
2723 Davies 2W, paragraph 560 {**I/11/237**}.
2724 Davies 2W, paragraph 561 {**I/11/237**}. Reallocation of profits is an internal accounting journal entry and not an external source of capital.
2725 Hargreaves' Matters Agreed, paragraph 41 to 43 {**I/19/13**}.
2726 It is also agreed that the notes to the STCC Financial Statements match the annual movement and categorisation in the Partners' loan accounts as set out in Table I.2 and I.3 (as stated in Davies 2W para 570 {**I/11/241**}).
2727 As stated in as stated in Davies 2W, paragraph 572 {**I/11/243**}.

(3) The annual net cash contributions in the partners' loan accounts from 2004 to 2008, as stated in the notes to the STCC Financial Statements, match the net cash movements in amounts 'due to partner' in the STCC Cash Flow Statements.

240. During cross-examination, Mr. Hatton agreed that on a net basis US$4.9bn was lent to STCC by Al Sanea and that it was used to increase STCC's loan capital :[2728]

> *"Q. Let's try this: do you agree that the STCC accounts show that on a net basis, Maan Al Sanea lent 4.9 billion to STCC and that that money was used to increase STCC's loan capital?*
>
> *A. Yes, that is what appears to be said here, yes, I agree."*

**Third party funds into STCC**

241. In addition, STCC was also funded by US$4.3bn of external debt as at 31 December 2008. This included:

a. US$2.75bn in relation to a revolving credit facility;[2729] and

b. US$650m in relation to the Golden Belt Sukuk.[2730]

242. This shows that the Money Exchange was not the only source of funds that went into STCC. There was also third party funding. These third party funds could have funded money leaving STCC. This means that funds that came from the Money Exchange did not necessarily leave STCC.

243. I accept that tracing is therefore impossible on the evidence as it stands – funds from the Money Exchange may have stayed in STCC, funds out from STCC may have been from third parties.

---

2728 Hatton xx: {**Day94/96:19-23**}.
2729 Davies 1W, paragraphs 196(a) 198 to 199 {**I/6/80**}.
2730 {**G/5848/1**}.

244. While it has not been possible to trace specific flows of money that have been used to fund the capital contributions of STCC, nor the ultimate source of STCC's funding,[2731] Mr. Hargreaves accepted during cross-examination, based on STCC's financial statements, that if any of the US$4.9bn lent by Al Sanea represented funds allegedly misappropriated from AHAB, then those funds (which served to increase STCC's capitalization) cannot have been received or retained by the GTDs:[2732]

> *"Q. Then at paragraph 584 you see Mr Davies says: "The net impact of all cash movements was that STCC increased its cash and cash equivalents by SAR 15,233 million (US$4,062 million) during the period from 2004 to 2008. Insofar as that net increase in cash and cash equivalents represents funds allegedly misappropriated from AHAB, such funds cannot have been received and retained by the GT Defendants during that period." That must be right, mustn't it?*
>
> *A. Well, yes, as I say at paragraph 45 {I/19/13}, I agree with the logic of that statement.*
>
> *Q. You do, and that's absolutely right.*
>
> *A. Yes, if money stayed in STCC it hasn't gone anywhere else.*
>
> *Q. Exactly. You agree that funds remaining in STCC would not be retained by other parties, although you then go on and make a different point about how they got to STCC. It is fair to say that you rely on flow-throughs, don't you; your approach is entirely based on flow-throughs? That's right, isn't it?*
>
> *A. Well, yes, because the money has flowed through STCC and down into the defendants by way of capital contributions, based on my analysis.*
>
> *Q. Unless it hasn't, which is the point you agree –*
>
> *A. Unless it stayed within STCC.*

---

[2731] This is because the parties do not have STCC's trial balances or any transaction-level detail for STCC'scapitalisation:Davies 2W, paragraph 558 {**I/11/237**}.

[2732] Hargreaves xx: {**Day75/38:7**}-{**Day75/39:11**}.

*Q. Unless it stayed in STCC, absolutely. That is the point you make in paragraph 46.*

*A. Yes."*

245. Applying Mr. Hargreaves' "specific pattern" approach to STCC: a "coincidence in timing" between (a) funds coming out of the Money Exchange, and (b) capitalisation of a company, would be sufficient to prove a link for the purpose of 'tracing' those the funds into the company's capital. If that were right (and I accept that it is not), there is an equally persuasive link between the Money Exchange and STCC based on the audited financial statements of STCC. The GTDs say that they do not seek to persuade the Court that there is such a link but to demonstrate to the Court that this is not a safe or principled way to reach any conclusion about "specific patterns" or "links". It is not good enough to establish a tracing claim.

246. I agree that the Court cannot safely reach any conclusions about whether monies that originated from the Money Exchange either came out of STCC and went to SICL, SHL or any other Defendant, or stayed in STCC.

247. In the end, Mr. Hargreaves was compelled to accept, during cross-examination, that there was also a stronger "pattern" of money ending up in STCC:[2733]

*"Q. There is an increase in STCC's capitalisation over this period.*

*A. Yes.*

*Q. A combination of the US$4.9 billion and the US$400 million. That is agreed, isn't it, Mr Hargreaves?*

*A. Yes.*

[2733] Hargreaves xx: {**Day75/45:6**}-{**Day75/46:19**}.

*Q.* *At the same time there are alleged misappropriations from the Money Exchange.*

*A.* *Yes.*

*Q.* *That is the same coincidence as you have told us you saw with SICL and Singularis in relation to their capitalisation, isn't it?*

*A.* *That would be a coincidence or a potential link, yes.*

*Q.* *The same coincidence, the same pattern, if you like, yes?*

*A.* *It's -- yes, I agree.*

*Q.* *Except that in the case of STCC, you have told the court that most of the cheques were made out to STCC. That's right, isn't it?*

*A.* *Yes, they were.*

*Q.* *And you have told the court that most of the LC proceeds went to STCC.*

*A.* *Yes.*

*Q.* *And you have told the court that most of the direct transfers went to STCC.*

*A.* *Yes.*

*Q.* *So, as patterns go, the STCC pattern is rather bolder than the SICL and Singularis pattern; would you agree?*

*A.* *I would say, how does that reconcile to the payments going from STCC to these entities?*

*Q.* *I'm sorry, Mr Hargreaves, you don't ask the questions, you answer the questions. You have given us a pattern that you said gave rise to SICL and Singularis being the recipients of the capital; and we have got a stronger pattern in relation to STCC, haven't we?*

*A.* *Well, based on these financial statements, then there is a pattern, yes."*

248. So, in the final analysis, STCC is a potential ultimate repository of the alleged misappropriations. There is evidence of transfers of the allegedly misappropriated funds from the Money Exchange, directly to STCC, in relation to electronic transfers, cheques and LCs, as discussed above under each of those headings. There are also third party sources from which payments out from STCC might have been made.

A tracing claim by the Money Exchange through STCC is therefore unsustainable.

**<u>CBK "DEPOSITS"</u>**

249. AHAB lays a further specific claim against SICL to a very large sum (US$1,026,901,686.75) said to represent a deposit held by Commercial Bank of Kuwait ("CBK") in the name of STCC on behalf of SICL.

250. AHAB's case is that although bank statements are not available the Court should infer that "*at least some of these deposits relate to funds extracted from the Money Exchange in 2007 and directed to STCC*." In the Statement of Claim, AHAB pleads:[2734]

> "*Further, by a written instruction signed by Mr. Al Sanea and dated 17 December 2007, the Commercial Bank of Kuwait (CBK) was instructed to transfer the sum of US$ 1,026,901,686.75 from an account held in the name of STCC to an account held in the name of SICL. CBK complied with that instruction and effected the transaction shortly thereafter. These sums were the traceable proceeds of money misappropriated by Mr. Al Sanea from the Money Exchange and were impressed with a constructive trust in favour of AHAB."*

251. In paragraph 152 of its written opening submissions AHAB submitted:[2735]

> "*MAS approved the transfer of deposits of more than USD 1 billion from STCC to SICL in December 2007. Both bank accounts which were affected by this transfer were held by the Commercial Bank of Kuwait. However, SICL's bank statements for this account are not available*."

---

[2734] RASOC, paragraph 160A {**A1/2.2/74**}.
[2735] AHAB's Written Opening Submissions, paragraph 152 {**U/1/59**}.

252. But more to the point, STCC's bank statements are not available. In the absence of bank statements the Court cannot "follow the cash". The Court therefore cannot safely reach conclusions about the movements of funds, let alone whether there is any evidence of theft by Al Sanea from the Money Exchange.

253. If STCC and SICL had bank accounts at CBK, it is to be expected that there would have been bank statements for those accounts at CBK. The most obvious source for copies of those bank statements would be CBK. I am told that the GTJOLs of SICL tried, and failed, to get hold of any SICL bank statements from CBK. The GTJOLs enlisted the assistance of the Central Bank of Kuwait but that was also unsuccessful. There is no evidence that AHAB has tried to obtain bank statements from CBK. The GTDs submit that CBK is one of the creditor banks with an admitted claim against AHAB that AHAB is trying to pass onto the Defendants.[2736] It was clear from no later than Mr. Hargreaves' evidence that the accountants needed to see the CBK bank statements. Following the exchanges on Day 96, AHAB knew that any relevant CBK bank statements were potentially significant, and that the GTJOLs of SICL had tried to get them, but could not.

---

[2736] The claim has been admitted by AHAB for SAR 218m. CBK's claim arises out of an Amendment Agreement dated 6 November 2008 between CBK, AHAB (as obligor) and ATS (as agent) {**G/7205/1**}. The facility amount is US$60m (SAR 225m). That Amendment Agreement was approved by a board resolution passed on 20 December 2008 {**G/7295**}. The Suleiman signatures on these documents are matched. The 2008 facility was a renewal. On 21 December 2008 Al Sanea wrote to Badr "*enclosing the board resolution related to the renewal facility with Commercial Bank of Kuwait for a period of another one year, which was forwarded to you yesterday*." {**G/133.1/5**}. Al Sanea sent Badr the signed facility and the signed Board Resolution. A manuscript note by Badr on the letter says "*Delivered to them today* (Mohsen)" in Arabic. AHAB's case is that the signatures on these renewal documents are forgeries (they are matched). However, for these signatures to be forgeries is inconsistent with AHAB's case (particularly with AHAB's case on Badr's involvement because it is a renewal. Badr is here noted as having actually seen and passed on the resolution and the facility documents for signature. The more likely inference, as already considered above under "*Forgery Allegations*", is that the signatures were applied electronically or mechanically, for convenience. The facility document and the Board Resolution are passed by Al Sanea through Badr at AHAB H.O. who forwards them to CBK. On AHAB's case Badr would have taken them to Suleiman for signature, and Suleiman would have signed them because the 2008 facility was for the same amount as the 2007 facility (he could have been shown the "*old*" and signed or authorized the signing of the "*new*"). The increase to US$60m had occurred on 9 October 2007 and that is not alleged to have been forged. The facility was entered into pursuant to an AHAB Board resolution dated 11 October 2007. The increased facility and the AHAB Board resolution are both signed by Suleiman and his signatures are not matched nor alleged to be forged. This too is inconsistent with AHAB's case. I note that I have seen and considered the narrative chronology of CBK's relationship with AHAB.

**Mr. Hargreaves' evidence**

254. In Hargreaves 1W, Mr. Hargreaves states: [2737]

> "*202…funds extracted from the Money Exchange peaked at just over USD 1bn. The absence of both CBK STCC and / or SICL bank statements has limited our ability to investigate the source and timing of the original USD 1bn deposit with CBK. However, given the scale of the STCC deposit that were in place towards the end of 2007, it could be inferred that at least some of these deposits relate to funds extracted from the Money Exchange in 2007 and directed to STCC.*"

255. I do not accept that it is proper to infer that any of the deposits "*relate to funds extracted from the Money Exchange."* To do so would be to allow AHAB to rely upon the absence of CBK bank statements. It is referred to in both paragraph 152 of AHAB's written opening submissions[2738] and paragraph 202 of Mr. Hargreaves' statement.[2739] In circumstances where AHAB could have asked for them from what is one of its creditor banks, and the GTJOLs of SICL tried and failed to get them, it is not open to AHAB to rely upon the absence of bank statements in order to support an inference that funds came from the Money Exchange. [2740]

256. Moreover, Mr. Hargreaves ignores third party funding into STCC, standing only one year later as at December 2008, of US$4.3bn[2741].

257. During cross-examination, Mr. Hargreaves accepted that the only evidence of the US$1bn transfer was simply an interpretation of a facsimile and certain internal accounting entries:[2742]

---

2737 Hargreaves 1W, paragraph 202 {**I/2.27/65**}.
2738 AHAB's Written Opening Submissions, paragraph 152 {**U/1/59**}.
2739 Hargreaves 1W, paragraph 202 {**I/2.27/65**}.
2740 Davies 1W, section L {**I/6/75**}.
2741 See Davies 1W, paragraphs 196(a), 198 to 199 {**I/6/80**}, and {**G/5848/1**}discussed at [241]- [242] above.
2742 Hargreaves xx: {**Day74/98:2-21**}.

*"MR PHILLIPS: To be clear, you haven't been able to show any fund movements based upon any bank statements, that's right, isn't it?*

*A. That's right, because the bank statements aren't in the database, my Lord.*

*Q. This section of your report, this part of your report, is based entirely on the interpretation of a fax. That's right, isn't it?*

*A. Yes. The interpretation of the fax and the accounting entries that were made with regard to that transaction, my Lord.*

*Q. This is an accountant interpreting intention from a fax and handwritten notes.*

*A. I'm not -- I wasn't looking at the intention of the parties, I have drawn conclusions from the documents that I have seen.*

*CHIEF JUSTICE: Suffering from the very weaknesses that you have already identified when speaking about reliance on the accounting records only.*

*A. That's correct, yes."*

258. There are indeed, weaknesses in relying upon the internal accounting entries. The GTDs' safer approach is to "follow the cash" wherever possible, as is explained in paragraph 11 above.

**The letter of 17 December 2007**

259. The primary document relied upon is a letter, addressed to Elham Y. Mahfouz, the acting general manager of CBK, dated 17 December 2007, signed on behalf of both STCC and SICL by Al Sanea, which states:[2743]

"*Please treat this letter as authority to transfer the following time deposits totaling [sic] USD 1,026,901,686.75 value 24 December 2007 from the name of Saad Trading, Contracting & Financial Services Company*

---

2743 {**G/6218/2**}.

*(Account No. 01-11-02179-0) with you, to the name of Saad Investments Company Limited (Account No. 01-11-02296-4) with you:"*

260. The letter refers to a deposit of US$1,026,901,686.75 to an account in favour of STCC with an account number 01-11-02179-0, and to an account in favour of SICL with an account number 01-11-02296-4. The references to the bank accounts are specific.

261. A handwritten annotation at the top of the letter stated:[2744]

| | |
|---|---|
| *"DR CBK call a/c* | *1,026,901,686.75* |
| *CR Algme (0361)* | *330,000,000.00* |
| *CR AMT (0381-01)* | *203,036,346.57* |
| *CR STCC (2381-01)* | *285,000,000.00* |
| *CR Agme [sic] 0361-02* | *208,865,340.18"* |

This is described by Mr. Hargreaves as "*accounting treatment*" that "*appears to have been followed based on the ledger prints included within the GT Defendants' discovery*".[2745]

**Facsimile of 14 January 2008**

262. The second document relied upon is a facsimile that was sent to CBK Treasury Operations on 2 January 2008 and from CBK Treasury operations to STCC Finance Department on 14 January 2008.[2746] The facsimile is headed "OUTSTANDING AS ON 31-December-2007". The trades referred to coincide with the time deposits referred to in

---

2744 Reflected in four ledger entries in SICL's books: US$330,000,000.00 is recorded in the Money Exchange's ledger balance (0361-01) as a credit with a posting date of 27 December 2007 and the narrative "JV5087 FM CBK 0356/01 {**G/6312/17**}; US$208,865,340.18 is recorded in the Money Exchange's ledger balance (0361-02) as a credit with a posting date of 27 December 2007 and the narrative "JV5087 FM CBK 0356/01"{**G/6312/16**}; US$203,036,346.57 is recorded in SHL's ledger as a credit with a posting date of 27 December 2007 and the narrative "JV5087 FM CBK 0356/01."{**G/6312/13**}; US$285,000,000.00 is recorded in STCC's ledger balance as a credit with a posting date of 27 December 2007 and the narrative "JV5087 FM CBK 0356/01"{**G/6312/14**}. Mr. Hargreaves refers to an entry in SICL's general ledger, as at 31 December 2007, which records an asset of US$1,026,901,686.75 but took no account of other entries in SICL's ledger {**Q/567/18**}.

2745 Hargreaves 1W, paragraph 198 {**I/2.27/64**}.

2746 {**G/6312/10**}.

the letter of 17 December 2007. The total was written in manuscript on the facsimile and is US$1,026,901,686.75.

**The GTJOLs' attempts to get CBK bank statements**

**and the proceedings against Al Sanea;**
**CBK's refusal to give information to the GTJOLs**

263. I am advised that on 10 September 2009, the GTJOLs wrote to CBK requesting that CBK provide copies of all records relating to SICL's transactions with the Bank. No response was received to that letter. The GTJOLs wrote again on 11 December 2009, 1 April 2011, 26 October 2011 and 16 November 2011 reiterating the request in their 10 September 2009 letter. The GTJOLs received no written response to those letters from CBK.[2747]

264. The GTJOLs' legal advisers in Kuwait, Bader Saud Al-Bader & Partners, then met with representatives of CBK. Elham Mahfouz, to whom the 17 December 2007 letter had been sent, did not attend the meeting. At the meeting, a colleague of Ms Mahfouz and CBK's legal counsel claimed CBK knew nothing of the matter and had seen no documents in relation to it.[2748]

265. In July 2014 the GTJOLs sought further information from CBK. The Central Bank of Kuwait was engaged to press CBK for information.[2749] On 25 July 2014, the Law Office

---

2747 First Affidavit of Stephen John Akers sworn 10 October 2012, paragraphs 291 and 292 {**L3/7/77**}.

2748 First Affidavit of Stephen John Akers sworn 10 October 2012, paragraphs 292 {**L3/7/78**}.

2749 CBK was not subject to the jurisdiction of the English Court for the purposes of section 236 of the Insolvency Act 1986. Deposits alleged to be held by Emirates Bank were also the subject matter of the proceedings brought by SICL against Al Sanea referred to in more detail below. The GTJOLs secured an order under section 236 of the English Insolvency Act 1986. In response to that order, on 20 June 2013, Antony Bush, Managing Director of Group Funding and Principal Investment in Emirates Group Treasury, made a statement stating: "*I have no knowledge of any deposits held by SICL with Emirates, or any appropriation of the same by Emirates under a directive or otherwise*."

of Bader Saud Al-Bader & Partners telephoned CBK. In an email to Linklaters,[2750] Bader Saud Al- Bader wrote:

> "*A) Commercial Bank has replied to the CBK [Central Bank of Kuwait]*[2751] *stating that:*
>
> *1. its relationship with Saad Investment started on 24th January 2008 with a deposit of US$ 96,900;*
> *2. the account was closed on 28th January 2009;*
> *3. there is no other account with the bank in the name of Saad; and*
>
> *4. it did not respond to the correspondence [sic] from the liquidators as there was no contractual relationship with the company on the date of the enquiry;*
>
> *B) [Central Bank of Kuwait's] view is that:*
>
> *1. the Commercial Bank's explanations are acceptable;*
>
> *2. the complaint is not related to the Central Bank but it is a legal dispute arising between the bank and the liquidators; and*
>
> *3. accordingly the matter does not require the involvement of [Central Bank of Kuwait]."*

In his Fourth Affidavit sworn on 21 November 2014 (in connection with the proceedings by SICL against Al Sanea discussed below) Mr. Akers said:[2752]

> "*19. The JOLs have made enquiries of ... CBK in relation to the Missing Deposits. These enquiries have proved inconclusive. The JOLs rights (and the rights of SICL) as against persons other than Mr. Al Sanea in relation to the Missing Deposits are fully reserved.*"

**SICL'S CLAIM AGAINST AL SANEA**

---

2750 {**Z/35/1**}; The GTJOLs' London solicitors.
2751 "CBK" in this instance was a reference to the Central Bank of Kuwait.
2752 {**L3/12/5**}.

266. On 12 October 2012, the GTJOLs filed a Statement of Claim in this Court against Al Sanea.[2753] SICL claimed US$818,469,674 in relation to cash deposits placed by SICL with CBK.

267. On 12 December 2012, Al Sanea challenged the Court's jurisdiction. By a Consent Order dated 13 March 2013, Al Sanea consented to the dismissal of the Jurisdiction Summons. In his First Affirmation dated 11 February 2013,[2754] sworn in support of the Jurisdiction Summons, Al Sanea admitted that the CBK deposit existed. Al Sanea said the CBK deposit and the Emirates deposit had been appropriated by CBK and Emirates, respectively:[2755]

> *"...in relation to the attempts to seek to recover from me the value of the "missing deposits" as they are described at section N of Mr. Akers' Affidavit in the SICL proceedings, these deposits have to the best of my knowledge been appropriated by CBK and Emirates pursuant to directives issued by their respective central banks and set off against other debts owed to those banks by Saad Group companies. These are matters which it is incumbent on the JOLs to take forward and no longer matters for me, and not matters in respect of which I can be said that I am liable on any view."*

268. On 9 April 2013, this Court entered a default judgment against Al Sanea. On 21 June 2013, SICL applied for an interim payment on account of damages.[2756] The application for interim payment did not include a claim in respect of the CBK deposit or the Emirates

---

2753 {**L3/8/1**}.
2754 {**L3/9/1**}.
2755 First Affirmation of Al Sanea, affirmed 11 February 2013, paragraph 16(g) {**L3/9/8**}.
2756 Supported by the Third Affidavit of Akers sworn on 25 June 2013 {**L3/10/1**}. In its skeleton argument SICL relied upon the following proposition: "*The default judgment is conclusive on the issue of the liability of MAS as pleaded in the Statement of Claim: Pugh v Cantor Fitzgerald International [2001] EWCA Civ 307 at [27] per Ward LJ; Ahmed Hamad Algosaibi and Brothers Company v Saad Investments Company Limited, unreported (12 June 2012) at 55 per Chief Justice. This means that all questions as to MAS's liability for breach of fiduciary duty to SICL have been conclusively determined.*"

deposit. It is submitted that this was because the GTJOLs were making further enquiries in respect of these claims:[2757]

> "*At this stage no claim for an interim payment is made in respect of the CBK Deposit and the Emirates Deposit. This is because further enquires are being undertaken by the JOLs in respect of these claims at this time."*

269. On 26 July 2013, an Interim Payment Order was made (in respect of other claims made by SICL against Al Sanea but not those in relation to the CBK deposit or the Emirates deposit). Al Sanea has not complied with the Interim Payment Order.

270. On 13 October 2014, SICL issued an application for an assessment of damages. On 11 November 2014, Foster J made an Order for Directions in relation to that application including for service of the application and SICL's evidence in support on Al Sanea. Under those directions, Al Sanea was also given an opportunity to file evidence in response to SICL's evidence.

271. In his Fourth Affidavit sworn 21 November 2014 in support of the application for assessment of damages,[2758] Mr. Akers said:[2759]

> "*The JOLs have made enquiries of both Emirates and CBK in relation to the Missing Deposits. These enquiries have proved inconclusive…*"

272. On 15 January 2015, there was an assessment of damages. Al Sanea had put in no further evidence. His admission that there were deposits had not been withdrawn. Under the heading "The Missing Cash Deposits" the GTJOLs' skeleton argument referred to Al Sanea's First Affirmation and stated:

---

2757 Third Affidavit of Stephen John Akers sworn 25 June 2013, paragraph 14 {**L3/10/5**}.
2758 {**L3/12/1**}.
2759 Fourth Affidavit of Stephen John Akers sworn 21 November 2014 {**L3/12/5**}.

> "*42. Accordingly, in his evidence to this Court MAS accepted that the Missing Deposits existed but contended that they had been "appropriated" by CBK and Emirates....”*
>
> *43. No claim for an interim payment was made in respect of the Missing Deposits. This was because further enquiries were being undertaken by the GT JOLs in respect of these claims at that time: “The JOLs have made enquiries of both Emirates and CBK in relation to the deposits. These enquiries have proved inconclusive…”*
>
> *44. SICL's case in these proceedings .... is that in breach of his fiduciary duties to SICL, MAS has removed and/or misapplied the Missing Deposits. Liability in respect of that case is established by the Default Judgment. Accordingly, the Court is therefore invited to assess damages in respect of the full amount claimed by SICL in its Statement of Claim in respect of the deposits."*

273. Final Judgment was entered against Al Sanea on 15 January 2015.[2760]

274. I recognise that as between Al Sanea and SICL, SICL was entitled to proceed on Al Sanea's admission and the default judgment and that was enough to have damages on the CBK deposit quantified. In the present proceedings, the Court may have regard to Al Sanea's admission, in considering the evidence of the CBK deposit, but I accept that it is plainly evidence that the Court will want to see corroborated.[2761]

**Conclusion**

275. In the absence of the bank statements it is not possible to identify what funds may have been in the CBK accounts nor the source of those funds. In such circumstances, AHAB has failed to establish that any deposits held ostensibly on behalf of SICL "*relate to funds extracted from the Money Exchange in 2007 and directed to STCC*".

2760 {**L3/12.1/1**}.

2761 I accept that Mr. Akers' evidence in those proceedings is, and can be, no more than a report to the court on what the GTJOLs' investigations showed and did not show.

276. Here too in relation to the CBK deposit as in relation to AHAB's other claims, AHAB has failed to show that it can trace its money into the hands of the GTDs.

# SECTION 7B

# AHAB'S TRACING CLAIM: THE AWALCOs

## SECTION 7B

## AHAB'S TRACING CLAIM: THE AWALCOs

1. AHAB's tracing claim against the AwalCos is also based upon Mr. Hargreaves "patterns" approach.

2. In his witness statement[2762] Mr. Hargreaves sets out his "tracing exercise" in relation to five (5) transfers from AWAL Bank to the AwalCos which he says constitute capital contributions by Al Sanea to the AwalCos and are linked to funds "extracted" from the Money Exchange.[2763]

3. In this section of the Judgment, my intention again, is to illustrate the reasons for my conclusion that Mr. Hargreaves "tracing exercise" does not meet the requirements of the law for the proof of AHAB's proprietary claims against the AwalCos.

4. For these purposes, I do not consider it necessary to analyse each of the five exercises undertaken by Mr. Hargreaves. The foibles of all five are amply illustrated, for present purposes, by the foibles of any one.

5. The starting point is common ground: the AwalCos did not receive any monies <u>directly</u> from the Money Exchange.[2764] It follows that in order to prove its claims against the AwalCos which are all receipts based claims, AHAB must show that monies which went to the

---

[2762] Hargreaves 1W section D.2 : "Overview of the funding of the AwalCos": **{I/2/28},** the "AwalCos Trace" beginning at **{I/2/31}.**

[2763] These are 5 transactions having a value of USD310 million (from among 12 transactions with an overall value of USD470 million) transferred from Awal Bank to the AwalCos: Hargreaves 1W: **{I/2/29}.**

[2764] This was effectively conceded by AHAB in its response to the AwalCos' request for further and better particulars in March 2011: **Answer 16 {A1/4/8-9}***"16.1 Awal Bank was the recipient in the first instance of the misappropriations pleaded in section E.6 of the Statement of Claim. It is not presently alleged that any of the AwalCos were recipients in the first instance of misappropriations. 16.2 AHAB's case is that all equity or loan contributions by Awal Bank or other Saad Group companies represented proceeds of the fraud. Pending discovery by the AwalCos, the only information available to AHAB as to the amount of such contributions is that set out in the AwalCos summary".*

AwalCos came – at least indirectly, from the Money Exchange.

6. I will proceed by first setting out Mr. Hargreaves' approach as taken from his witness statement, primarily in relation to "Capital Contribution 3". Then I will adopt so much of the AwalCos' responses as I consider are suitable and necessary to assist in the illustration of my reasons for rejecting Mr. Hargreaves' approach.

7. It is of fundamental importance to the exercise to note that Mr. Hargreaves' starting point for his tracing exercise was with funding flowing from Awal Bank into the AwalCos. He does not purport to begin with funding flowing from the Money Exchange to the AwalCos because, as already noted, there were none. Instead he seeks to show, by reference to the coincidence of amounts and timing of roll over of deposits, that there are links between some of the funding from Awal Bank and funding which flowed contemporaneously from the Money Exchange. I set out following, the excerpts from Hargreaves 1W which set out the steps of his tracing exercise in relation to what he describes as "Capital Contribution 3" as itself derived from "Capital Contribution 1".

***"Overview of the funding of the AwalCos***

*87. Funding from the Saad Group for the AwalCos came primarily from Awal Bank. In the case of AFCL4 (previously Saad Investments Finance Company (No.4) Limited ("SIFCO 4")) and AFCL5 (previously Saad Investments Finance Company (No 6) Limited ("SIFCO 6")), Awal Bank purchased these companies from SICL in September 2007 for USD 257m[2765]. In addition, third party bank funding came from a single financial institution for each of the AwalCos, namely:*

*87.1 JP Morgan Chase Bank for AFCL and AFCL4;*

*87.2 Citibank New York for AFCL2 and AFCL5; and*

[2765] *As per paragraphs 29 and 35 of the AwalCos' Amended Defence there was no cash movement for these transactions, instead Awal Bank had a liability to SICL* **{A1/13/13} – {A1/13/14}.**

*87.3 Goldman Sachs for AF1F.*

*88. The AwalCos' liquidators' reports dated 31 March 2015 identify that USD 542m of the total USD 545m remaining liability of the AwalCos is directly or indirectly owed to Awal Bank. Therefore, it appears that nearly all (99%) third party debt (which must include the debts owed to the above three financial institutions) has been settled.*

*89. Appendix D.1/1 details 63 transfers totalling USD 470m from Awal Bank to or for the benefit of the AwalCos and summarised in the table below (the colouring of certain transactions is explained in the following paragraph). At least USD 386m of the USD 470m has been confirmed as being paid into the AwalCos in the AwalCos' Defence dated 21 April 2011 ("AwalCos' Defence")[2766] and/or AwalCos' Amended Defence dated 8 January 2016 ("AwalCos' Amended Defence")[2767].*

| No | Date | Recipient Awal Co | Transaction value (USD) | Confirmed AwalCos' Defence |
|---|---|---|---|---|
| 1 | 29-Aug-06 | AFCL | 42,000,000 | Amended Defence |
| 2 | 29-Aug-06 | SIFCO 4/AFCL 4[2768] | 25,000,000 | Defence |
| 3 | 29-Nov-06 | AFCL 2 | 86,500,000 | Amended Defence |
| 4 | 29-Nov-06 | AFCL | 3,500,000 | Amended Defence |
| 5 | 31-Oct-06 | AFCL | 6,600,000 | Defence |
| 6 | 28-Dec-06 | AFCL | 9,400,000 | Amended Defence |
| 7 | 6-Feb-07 | AFCL | 22,000,000 | Defence |
| 8 | 27-Mar-07 | AF1F | 152,700,000 | Defence |

2766 *Table at paragraph 57 of AwalCos' Defence.*
2767 *Table at paragraph 56 of AwalCos' Amended Defence.*
2768 *SIFCO 4 was purchased by Awal Bank from SICL in September 2007 and renamed AFCL 4.*

| | | | | |
|---|---|---|---|---|
| *9* | *31-Aug-07* | *AFCL 2* | *14,043,550* | *Defence* |
| *10* | *23-Oct-08* | *AF1F* | *7,300,000* | |
| *11* | *18-Dec-08* | *AFCL5* | *22,000,000* | *Amended Defence* |
| | *52 transfers of less than USD 3m each* | | *79,273,612* | |
| | **Total** | | **470,317,162** | |

90. *I have selected the three largest Awal Bank to AwalCos transfers (1, 3, and 8 in the above table) together with transfers 2 and 4 (as they occur on the same day as transfers 1 and 3 respectively) to show the link between these receipts by the AwalCos and funds extracted from the Money Exchange. I have shaded them in three different colours, which match to the tables and charts in section D.2. These five transfers in my sample amount to a total of USD 310m of the USD 470m (66%) of transfers from Awal Bank to the AwalCos and in section D.2. I explain in detail the tracing exercise which we have carried out.*

***D.2. AwalCos Trace***

92. *This section sets out the tracing exercise in relation to the following five transfers from Awal Bank to the AwalCos (as extracted from the table at paragraph 89).*

| ***No*** | ***Date*** | ***Recipient Awal Co*** | ***Transaction value (USD)*** |
|---|---|---|---|
| *1* | *29-Aug-06* | *AFCL* | *42,000,000* |
| *2* | *29-Aug-06* | *SIFCO 4/AFCL 4* | *25,000,000* |
| *3* | *29-Nov-06* | *AFCL 2* | *86,500,000* |
| *4* | *29-Nov-06* | *AFCL* | *3,500,000* |
| *8* | *27-Mar-07* | *AF1F* | *152,700,000* |
| | | ***Total*** | ***309,700,000*** |

93. *There were a total of seven Awal Bank capital contributions totalling USD 2bn between August 2004 and June 2008 as set out below and in Paragraph 52 of the AwalCos' Amended Defence.*

| ***Capital Contribution no.*** | ***Date*** | ***Amount (USD)*** |
|---|---|---|
| *1* | *4-Aug-04* | *250,000,000* |
| *2* | *31-Jan-05* | *50,000,000* |
| *3* | *21-Jun-05* | *200,000,000* |
| *4* | *18-Dec-06* | *250,000,000* |
| *5* | *21/22-Feb-07* | *250,000,000* |
| *6* | *28-Sep-07* | *500,000,000* |
| *7* | *11-Jun-08* | *500,000,000* |
| | ***Total*** | ***2,000,000,000*** |

94. *For the purpose of this section, to track the movements of the funds identified in paragraph 92 into the AwalCos, the relevant Capital Contributions are 3 and 4, from STCC and MAS respectively*[2769] *(shaded in the above table). I consider the remaining Capital Contributions in Section D.3 where I illustrate the interdependencies of the various MAS controlled entities by showing significant transfers of funds between them, linked to these capital contributions.*

95. *Before setting out the details of the money flows for each of the five transfers from Awal Bank to the AwalCos in August 2006, November 2006 and March 2007 (see paragraph 92 above), I explain the methodology and*

---

[2769] *Based on bank statement narrative*

*the information used to track these cash movements.*

***Tracing methodology***

96. *As I explain below, Capital Contributions 3 and 4 were initially paid into Awal Bank in June 2005 and December 2006 respectively and* ***are repeatedly placed on short term deposits for varying amounts and durations (most commonly for a week) with a number of different financial institutions. The maturity of the final short term deposits has been matched to the cash payments made down to the AwalCos in August 2006, November 2006 and March 2007.*** (Emphasis added.)

97. *The trend of repeated short term deposits in Awal Bank can be confirmed with a high degree of certainty.* ***In addition to matches on dates and amounts, reference numbers in the narrative field within MIDAS' ledger accounts can link the deposits and maturities together.*** *The majority of the relevant transactions take place within Awal Bank's account at Arab Bank account 2001-001182-510 ("Arab Bank 510") and account 2001-001182-530 ("Arab Bank 530") and for these transactions a reference number on the bank statement is also used to link together the deposit and maturity. I have illustrated this using the following example.* (Emphasis added.)

98. *Example: the deposit and maturity of USD 25m between 26 July 2006 and 2 August 2006 can be linked using the first six digits in the MIDAS narrative (such as 400630) and/or the seven digits following FTD on the bank statements (such as FTD1105280), as set out in the tables below. The rollover of the deposit takes place on the same day as the maturity of the previous one, giving it a new reference number in both MIDAS (400638) and on the bank statement (FTD1116145). All the dates and the transaction amounts match between the MIDAS data and the bank statements.*

MIDAS

| | Value Date | Posting Narrative | Posting Amount |
|---|---|---|---|
| 1 | 26-Jul-06 | 400630 ARAB BANK PLC OBU | (25,000,000) |
| 2 | 2-Aug-06 | 400630 ARAB BANK PLC OBU | 25,025,424 |
| 3 | 2-Aug-06 | 400638 ARAB BANK PLC OBU | (25,000,000) |
| 4 | 9-Aug-06 | 400638 ARAB BANK PLC OBU | 25,025,472 |

Arab Bank statement

| | Value Date | Narrative_Description_Details (1) | Transaction Value |
|---|---|---|---|
| 1 | 26-Jul-06 | TFR FTD1105280 2001-001182-530 | (25,000,000) |
| 2 | 2-Aug-06 | MAT FTD1105280 2001-001182-530 | 25,025,424 |
| 3 | 2-Aug-06 | TFR FTD1116145 FTD1105280 | (25,000,000) |
| 4 | 9-Aug-06 | MAT FTD1116145 2001-001182-530 | 25,025,472 |

99. *The chart below shows the same USD 25m deposit being rolled nine times from 19 April 2006 through July and August 2006 until 7 November 2006. Each time the new deposit date is the same date as the maturity date of the previous deposit. Chart A of Appendix D.2/5 reproduces the below chart but includes the MIDAS and bank statement references for the various transactions.*




100. *Unless otherwise shown or stated, the deposits are placed from Arab Bank 510 or Arab Bank 530 current accounts into a fixed term deposit account at Arab Bank. Where other banks are involved in a specific trace, I have shown them as follows:*




101. *This means that the deposit is placed from Awal Bank's HSBC account with SAMBA.*

*102. Specific details and the elements identified in the Transactional Database for each trace are set out in the following sub-sections and/or in the relevant Appendices.*

*103. I set out below our findings showing how Capital Contributions 3 and 4 were used to partly fund the cash transferred by Awal Bank to the AwalCos."*

8. It is on Capital Contribution 3 that I focus for present purposes.

***"Capital Contribution 3***

*104. Capital Contribution 3 was transferred in a single lump sum of USD 199,999,975 from SICL with the value date 21 June 2005*[2770] *into Arab Bank 510 with the narrative:*

*"TFR FUNDS RCVD B/O SAAD TRADING & CONTR IN OUR A/C WITH CS,ZURICH"*[2771] *.*

*105. Based on the above narrative, I understand that the funds were transferred by order of STCC and in the absence of other information, I assume came from STCC.*

*106. The accounting entry within MIDAS for Capital Contribution 3 summarised immediately below, shows that cash for the increase in share capital was paid into the Arab Bank 510 account. Other than the above stated transfer, we have not identified any other cash transfers into Awal*

---

2770 *The posting date on the bank statement is 22 June 2005.*

2771 *UTR –AWALCO-00150-T007* **{Q/724}.**

*Bank's Arab Bank accounts at this time that could relate to the share capital.*

| ***Posting Date*** | ***Value Date*** | ***Customer Name*** | ***Posting Narrative*** | ***Posting Amount (USD)*** |
|---|---|---|---|---|
| *22-Jun-05* | *21-Jun-05* | *AWAL BANK BSC.* | *JV245-INCREASE OF CAPITAL* | *(200,000,000)* |
| *22-Jun-05* | *21-Jun-05* | *ARAB BANK PLC OBU* | *JV245-FUNDS FROM SBB-RE CAPTAL* | *200,000,000* |

107. *We have identified the following four transfers totalling USD 157m in 2006 into the following AwalCos that are* ***in part traceable to this Capital Contribution 3 from STCC (below is an extract of the table at paragraph 92 above).*** *A total of USD 67m was paid from Awal Bank on 29 August 2006 (coloured orange) and USD 90m paid from Awal Bank on 29 November 2006 (coloured blue).* (Emphasis added.)

| ***No*** | ***Date*** | ***Recipient Awal Co*** | ***Transaction value (USD)*** |
|---|---|---|---|
| *1* | *29-Aug-06* | *AFCL* | *42,000,000* |
| *2* | *29-Aug-06* | *SIFCO 4/AFCL 4* | *25,000,000* |
| *3* | *29-Nov-06* | *AFCL 2* | *86,500,000* |
| *4* | *29-Nov-06* | *AFCL* | *3,500,000* |
| | | | |

108. *The chart below provides a summary of the cashflow analysis from* ***receipt of the USD 200m Capital Contribution 3 by Awal Bank in June 2005*** *to the ultimate payment from Awal Bank into the AwalCos in August and November 2006. For ease of reference, as I work through the description of the various stages of the cashflow (steps 1 to 9, in green), I have reproduced the chart below shading in grey the relevant step being discussed.* (Emphasis added.)




*Capital Contribution chart*

109. *This chart shows that the 29 November 2006 payments of USD 90m have been tracked to Capital Contribution 3 via Traces A, B, and E on the above chart. The 29 August 2006 payment of USD 67m has been tracked to Capital Contribution 3 via Traces C and D on the above chart.*

***Tracing structure***

110. *I set out below the tracing exercise using the referencing used in the Capital Contribution chart, starting at the USD 200m Capital Contribution 3. I deal first with the 29 November 2006 payment to the AwalCos (identified in blue in the above chart) and second with the earlier 29 August 2006 payment (identified in orange in the above chart).*

***Transfer to AwalCos on 29 November 2006***

***i) Introduction***

111. *As I show in the tables at paragraphs 92 and 107 above, there were two*

*transfers from Awal Bank to the AwalCos on 29 November 2006: USD 86.5m to AFCL 2 and USD 3.5m to AFCL. Both were from Awal Bank's HSBC account 000-14430-4 (the Awal HSBC Account") and were the only transfers out of that account on 29 November 2006.*

112. *On the same day, the only transfer into the Awal HSBC Account was a single receipt of USD 107m from Arab Bank 530. Before the receipt of USD 107m, the balance on the Awal HSBC Account was USD 29m.*

113. *Turning to the Arab Bank 530 account, the balance on this account on 29 November 2006, just prior to the USD 107m transfer out to the Awal HSBC Account mentioned above, was USD 108.7m. The key credits contributing to this balance of USD 108.7m (excluding rollover of deposits[2772]) were as follows:*

***Arab Bank 530 account summary***

| Trace Ref (see Capital Contribution chart) | Date | Narrative | UTR | Transaction value ( USDm) |
|---|---|---|---|---|
| | 12-Oct-06 | Brought forward | | 13.9 |
| B | 12-Oct-06 | MAT FTD1211399 2001.001182.530 | AWALCO-00245-T008 | 25.2 |
| A | 7-Nov-06 | MAT FTD1199614 2001.001182.530 | AWALCO-00248-T001 | 25.2 |
| E | 28-Nov-06 | MAT FTD1270321 2001-001182-530 | AWALCO-00248-T008 | 25.0 |
| | 29-Nov-06 | MAT CL1AWAL BK 009 DRAWDOWN | AWALCO-00248-T009 | 20.0 |
| | | Other | | (0.6) |
| | | | | **108.7** |

[2772] *Rollover of deposits have been excluded as they represent movement between the current account and amount placed on deposit for Awal Bank and are not cash transfers out to other entities.*

114. *As I explain below, the three maturing deposits of USD 25.2m (on 12 October 2006), USD 25.2m (on 7 November 2006) and USD 25.0m (on 28 November 2006) respectively each arise from maturing short term deposits that can be tracked back to Capital Contribution 3 from STCC. I have given each of these 3 deposits a trace label (of B, A and E) respectively in my narrative below. I start with Capital Contribution 3 on 21 June 2005 and work my way down to the cashflows into the AwalCos.*

*(i)* ***Step 1 - Trace ABCDE***




115. *As explained at paragraph 104 above, the USD 200m Capital Contribution 3 was made on 21 June 2005. This can be tracked through a series of short term deposits maturing on 28 December 2005 using both the MIDAS and the bank statement references*[2773] *(See Table ABCDE and Chart ABCDE in Appendix D2/1 for full details).*

---

[2773] The maturity of the deposit with MIDAS reference 400438 and bank statement reference FTD773812 on 17 November 2005 is paid into Arab Bank 530 instead of the Arab Bank 510 account from where the deposit was paid from. The rollover of deposits continues in the Arab Bank 530 account.

116. *The total amount on short term deposits remains USD 200m or more from 21 June 2005 to 28 December 2005.*

117. *On 28 December 2005, on the maturity of a USD 200m short term deposit, the deposit was divided: USD 140m was placed on deposit with Arab Bank (Trace ABC – Step 2) and USD 50m was placed on deposit with SAMBA (Trace DE – Step 3). I deal with the USD 140m Trace ABC below in Step 2 and USD 50m Trace DE in Step 3 as it finds its way to the AwalCos through a different route.*

(ii) ***Step 2 - Trace ABC***




118. *The USD 140m deposit on 28 December 2005 has been tracked using both the MIDAS and the bank statement references (see Table ABC and Chart ABC in Appendix D.2/2). This USD 140m deposit is rolled over three times. At each rollover date, the amount deposited is less than the amount maturing, resulting in a USD 113m deposit maturing on 2 February 2006.*

*This maturing deposit was then divided into two deposits: USD 63m (Trace AB – Step 4) and USD 50m (Trace C – Step 9).*

*(iii)* ***Step 3 - Trace DE***




*119. The USD 50m deposited with SAMBA on 28 December 2005 can be tracked to a series of short term deposits and ultimately to the deposit maturing on 30 May 2006 (see Table DE and Chart DE in Appendix D.2/3). Based on the MIDAS postings and supported by the transactions on the bank statements the funds flow through Awal Bank's current bank accounts and the deposit banks as follows:*




*(i)* ***From 28 December 2005 to 27 April 2006 – USD 50m*** *was placed on deposit at SAMBA from Arab Bank 530 with the principal and interest rolled over each month until 27 April 2006.*

*On 27 April 2006, MIDAS recorded the maturity amount in the HSBC nostro ledger account. This record is supported by the Awal HSBC Account showing accumulated interest on USD 50m from 28 December 2005 to 27 April 2006 as*

*USD 784,725*[2774] *in the Transactional Database, with the principal placed on deposit with SAMBA.*

(ii) ***From 27 April 2006 to 30 May 2006*** *– USD 50m from the Awal HSBC Account placed on deposit with SAMBA with the interest element paid on 30 May 2006.*

120. *On 30 May 2006, the USD 50m deposit matured and was divided into two deposits, USD 25m (Trace E – Step 7) and USD 25m (Trace D – Step 8).*

*(iii)* ***Step 4 - Trace AB***




121. *The USD 63m deposit on 2 February 2006 was placed on successive short-term deposits at Arab Bank and can be tracked to the deposit of USD 63m maturing on 19 April 2006 using both the MIDAS and the bank statement references (see Table AB and Chart AB in Appendix D.2/4). On 19 April 2006 the USD 63 m was divided into two further deposits, USD 25m (Trace A – Step 5) and USD 38m (Trace B – Step 6).*

---

2774 *UTR – AHAB_CENZA_00079631_074-T042* **{Q/725}.**

### (v) *Step 5 - Trace A*




122. *Using both the MIDAS and the bank statement references, the USD 25m deposit on 19 April 2006 was rolled over in successive short-term deposits at Arab Bank and can be traced to a deposit maturing on 7 November 2006 (see Table A and Chart A in Appendix D.2/5).*

123. *As set out in the table at paragraph 113, the maturing deposit on 7 November 2006 for USD 25.2m with MIDAS reference 400697 and bank statement reference FTD1199614, forms part of the balance used to make the transfer to the Awal HSBC Account on 29 November 2006 and the onward transfer to AFCL and AFCL2.*

*(vi)* ***Step 6 - Trace B***




124. *Using both the MIDAS and the bank statement references, the USD 38m deposit in Arab Bank on 19 April 2006 can be tracked to a series of short-term deposits and ultimately a USD25m deposit maturing on 12 October 2006 (see Table B and Chart B in Appendix D.2/6).*

125. *The amount on deposit reduced from USD 38m to USD 25m on the 12 July 2006[2775].*

126. *As set out in the table at paragraph 113, the maturing deposit of USD 25.2m on 12 October 2006 with MIDAS reference 400707 and Arab Bank statement reference FTD1211399, forms part of the balance used to make the USD 107m transfer to the Awal HSBC Account on 29 November 2006 and the onward transfer to AFCL and AFCL2.*

---

2775 *This is because Arab Bank 530 went into overdraft of USD 12.7m between the placement of the USD 38m on 3 July 2006 and the maturity of that deposit on 9 July 2006.*

*(vii)* ***Step 7 - Trace E***

*127. The trace from the Capital Contribution 3 down to 30 May 2006 is covered under Steps 1 and 3 above. This Step 7 deals with the USD 25m deposit on 30 May 2006 from Trace DE – Step 3.*




*128. The USD 25m deposit on 30 May 2006 can be tracked to a deposit maturing on 28 November 2006 (see Table E and Chart E in Appendix D.2/7). Based on the MIDAS postings and supported by the transactions on the bank statement, the funds flow through Awal Bank's current accounts and the deposit banks as follows:*




*i)* ***From 30 May 2006 to 7 September 2006*** *– USD 50m placed on deposit at SAMBA from the Awal HSBC Account. Only the interest is received into the Awal HSBC Account at the maturity dates of each deposit, with the principal amount rolled over. The interest amounts have been identified in the Transactional Database as*

*detailed in Table E.*




*ii)* ***From 7 September 2006 to 9 November 2006*** *– the principal mount with interest totaling USD 25,050,944*[2776] *is paid from SAMBA into the Awal HSBC Account on 7 September 2006. On the same day a USD 25m is placed on deposit at Calyon Bank*[2777]*. For the two-month period, the principal amount and the interest earned are rolled over into new deposits on a weekly basis until 9 November 2006 when USD 25,229,866 (principal plus accumulated interest) is received into the Awal HSBC Account.*




*iii)* ***7 November 2006 to 28 November 2006*** *– on 7 November 2006, USD 25m is transferred from the Awal Bank HSBC Account to Arab Bank 530 Account. This is then placed on deposit and rolled over until 28 November 2006, matching on both MIDAS and bank statement references.*

*129. Although the transfer of USD 25m from the Awal HSBC Account to Arab Bank 530 Account took place on 7 November 2006 whilst the deposit with Calyon matured two days later, on 9 November 2006, a link between the two can be deduced from the following:*

*129.1 The USD 25m was originally transferred as part of a USD 50m from Arab Bank 530 (see Trace DE).*

*129.2 The trend of placing the USD 25m on deposit continues in Arab*

---

[2776] *UTR - AHAB_CENZA_00079631_343-T016* **{Q/726}.**
[2777] *UTR – AHAB_CENZA_00079631_343-T019* **{Q/726}.**

*Bank 530.*

*129.3 No further deposits are placed with Calyon from the Awal HSBC Account in November 2006.*

*130. The maturing deposit on 28 November 2006 for USD 25,025,375 with MIDAS reference 400744 and Arab Bank statement reference FTD1270321, forms part of the balance used to make the USD 107m transfer to the Awal HSBC Account on 29 November 2006, as described in paragraphs 112 and 113.*

***Summary of 29 November 2006 transfer to AwalCos***

*131. In summary, USD 90m was transferred from the Awal HSBC Account to the AwalCos on 29 November 2006. On the same day, USD 107m was transferred from Arab Bank 530 to the Awal HSBC Account. Of this USD 107m,* ***we have shown how USD 75m is linked back to Capital Contribution 3 through three separate amounts of USD 25m.*** (Emphasis added.)

***Transfer to AwalCos on 29 August 2006***

***i) Introduction***

*132. Having considered the trace between the Awal Bank Capital Contribution 3 from STCC and the payments from Awal Bank to the AwalCos on 29 November 2006, I now consider the payments from Awal Bank to AFCL and SIFCO4/AFCL4 on 29 August 2006 totaling USD 67m. As I explain below there is a similar pattern of the funds from Capital Contribution 3 being placed on short-term deposit before being transferred to those*

*AwalCos.*

133. *Both payments on 29 August 2006, being the USD 42m to AFCL and the USD 25m to SIFCO4/AFCL4*[2778]*, totalling USD 67m, were made from the Awal HSBC Account.*

| ***No*** | ***Date*** | ***Recipient Awal Co*** | ***Transaction value (USD)*** |
|---|---|---|---|
| *1* | *29-Aug-06* | *AFCL* | *42,000,000* |
| *2* | *29-Aug-06* | *SIFCO 4/AFCL 4* | *25,000,000* |

134. *On the same day, the only two transfers into the Awal HSBC Account were as follows:*

134.1 *USD 25m as the maturity of funds on deposit with SAMBA from the Awal HSBC Account. I describe this as Trace D; and*

134.2 *USD 50m from the Arab Bank 530 account. I describe this as Trace C.*

135. *The brought forward balance on the Awal HSBC Account on 29 August 2006 was only USD 13m.*

136. *Steps 1-3 set out above are common to the flow of money from STCC to Capital Contribution 3 to the 29 August payments and are therefore not repeated. I have described in the following paragraphs the Trace D and Trace C transactions.*

---

[2778] *Paragraph 58 of the AwalCos' Defence states the total USD67m was paid/contributed to AFCL. MIDAS shows that Awal Bank settled a liability of USD 25m AFCL had with SIFCO 4, meaning that only USD 42m was paid to AFCL.*

***ii) Step 8 - Trace D***

*137. On 30 May 2006, the USD 50m (Trace DE – Step 3) deposit matured and*




*was divided into two deposits, USD 25m (Trace D – Step 8) and USD25m (Trace E – Step 7). As can be seen from the illustration below, Steps 1 and 3 detail the trace back to Awal Bank Capital Contribution 3 The USD 25m from Trace D was then placed on deposit from HSBC into SAMBA. At each rollover, with the exception of 14 July 2006 and 18 July 2006, the interest receivable has been matched into the Awal HSBC Account in the Transactional Database.*

*138. The principal plus the interest totaling USD 25,025,375 was received on 14 July 2006 and the USD 25m was placed back on deposit on 18 July 2006. Other than a USD 40,825 payment on 17 July 2006, there were no transactions between the maturity on the 14 July 2006 and the deposit on 18 July 2006, therefore maintaining the rollover connection between*

*14 and 18 July 2006. The deposits continue to roll over from 18 July 2006 to 29 August 2006. On the same day, USD 42m was transferred to AFCL and USD 25m was transferred to AFCL4 (See Table D and Chart D in Appendix D.2/8).*

139. *In summary, the USD 25m deposit on 30 May 2006 can be tracked to a deposit maturing on 29 August 2006, the same day as the transfers to AFCL (USD 42m) and AFCL4 (USD 25m).*

***iii) Step 9 - Trace C***

140. *Trace ABCDE and ABC are covered in Steps 1 and 2 above. On 2 February 2006, a deposit matured with the value of USD 113m (Trace ABC – Step 2), which was divided and placed into two deposits, USD 63m (Trace AB – Step 4) and USD 50m (Trace C – Step 9). I set out below the tracing exercise for Trace C (see Table C and Chart C in Appendix D.2/9).*



141. *The USD 50m deposit placed on 2 February 2006 matured on 2 March 2006. From 2 March 2006 to 8 June 2006, there were multiple smaller amounts from USD 10m to USD 40m placed on rollover deposits, as well as other cash movements in the Arab Bank 530.*

142. *A USD 50m deposit was made on value date 8 June 2006 and can be tracked based on both MIDAS and bank statement references with 10 rollovers until 29 August 2006.*

143. *The USD 50m deposit matured on 29 August 2006 and was paid from Arab Bank 530 into the Awal HSBC Account on 29 August 2006, to enable the USD 67m transfer into AFCL (USD 42m) and AFCL4 (USD 25m).*

144. *In contrast to the other traces, which follow a largely uninterrupted trend of short- term deposits, Trace C includes a 3-month gap referred to above. I have still included this in my analysis as it shares some similarities with the other traces including the following:*

    145.1 *Funds placed on a series of short-term deposits before 2 March 2006 and tracked back to Capital Contribution 3;*

    145.2 *Funds placed on a series of short-term deposits after 8 June 2006; and*

    145.3 *On the maturity of the final rollover, the funds are transferred to Awal HSBC Account on the same date as the payment down into the AwalCos.*

***Summary of 29 August 2006 transfer to AwalCos***

145. *In summary, USD 67m was transferred from the Awal HSBC Account*

*down to the AwalCos on 29 August 2006. On the same day, a USD 25m short term deposit matured into the Awal HSBC Account and we have shown how this is linked to Capital Contribution 3. Also on the same day, USD 50m was transferred to the Awal HSBC Account from Arab Bank 530 and* ***we have shown a number of similarities between this transfer and others that are linked to Capital Contribution 3.****"* (Emphasis added.)

9. There are three elements to Mr. Hargreaves' "pattern-based approach":

   (1) An assumption that Capital Contributions 3 (and 4) comprise AHAB monies;

   (2) An assumption that Capital Contributions 3 (and 4) are 'rolled over' through a series of deposits; and

   (3) A coincidence of timing between the maturity of certain short-term deposits, and certain payments to the AwalCos.

10. Mr. Hargreaves describes the "rolling over" of deposits by assigning letters to the last maturing deposit before a payment to the AwalCos. In the case of Capital Contribution 3 this is said over time to be "rolled over" into 5 separate deposits called, respectively Trace A, B, C, D & E. (Capital Contribution 4 is said to fund one deposit, called Trace F.)

11. As elaborate as the foregoing exercise is, it ends where it begins: with only a part of Capital Contribution 3 being sourced to STCC and no closer to the Money Exchange than STCC. Given (as discussed in the last preceding section of this Judgment) the independent source of large amounts of third party bank funding that was available to STCC, AHAB had no hope of showing that Capital Contribution 3 came from the Money Exchange.

12. Yet, as the AwalCos observe,[2779] (and for the avoidance of doubt), Mr. Hargreaves contends that of the 7 Capital Contributions amounting to USD2 billion, it is only Capital Contribution 3 and 4 that can be linked to certain of the 12 Payments[2780] by his "pattern-based" approach. As for the remainder of the Capital Contributions and payments to Awal Bank from either AHAB or Saad Group entities, including Al Sanea, Mr. Hargreaves discerns no pattern at all:[2781]

> *24: 5*
> *"Q. As I understand your position, although one has as inflows to Awal Bank capital contributions and cash transfers, in terms of what is funding the payments to the AwalCos, it is, on your assessment, the capital contributions only?*
>
> *A. … There are two boxes there, "Cash Transfers" and "Capital Contributions". I recall that -- and this is money coming in from STCC, so you will see the box for Saad Group, but primarily STCC. There are transfers we have identified that go into Awal Bank, but according to Midas they can be treated in at least two ways and possibly more. One is that they are recorded within Midas as a capital contribution to Awal Bank, and the other is that they are posted to an STCC account within Awal Bank which, to me, appears to be like Awal Bank acting as STCC's banker. So when I'm looking at cash transfers into Awal Bank on this screen -- I may need to refresh my memory when I look at section E3 -- but I think I'm talking there about the monies that are being treated within Awal Bank as STCC money within an account at Awal Bank, as opposed to the capital contribution box, D2 and D3, which is treated within Midas as a capital contribution. So you have these two buckets, at least. Going back to your question, the capital contributions through Awal Bank to the AwalCos are the ones I have identified as being relevant.*
>
> *30:17*
> *A. Because when one looks at Midas and the transactional database, there are, as you rightly pointed out, billions and billions of dollars flowing through various accounts in Awal Bank and, to me,*

---

2779 At **{E1/29/53}** of the Defendants' Closing Submissions.

2780 Viz: those amounting to USD470 million as set out in the table above

2781 Hargreaves xx **{Day70/24:5}-{Day70/25:9}; {Day70/30:17}-{Day70/31:7}**.

*I wasn't able to identify any clear patterns with regard to those transactions, but what I was able to identify were these capital contributions that were rolled over; and that -- from my review of the information, that seemed relevant to the court. But I couldn't do an exercise of tracing billions and billions of dollars through a bank to get to a company.*

*Q. Mr. Hargreaves, are you saying that you actually looked at all of these other transactions and reached a positive conclusion that there were no patterns?*

*A. I looked at the accounts and there weren't patterns that sprung out at me."*

13. Further, he states:[2782]

*"A. I also talk in the report about the other capital contributions, and I make it clear that there isn't the link with those.*

*Q. You see, Mr. Hargreaves –*

*CHIEF JUSTICE:*
*Just a moment. You said you make it clear that there isn't the link or that there is?*

*A. Sorry, my Lord, the other capital contributions, for example 5, 6, 7 and so on, I don't see the same pattern and link with the AwalCos as I do with 3 and 4.*

*CHIEF JUSTICE:*
*I see."*

14. At **{X3/25/1}** to {X3/25/3}[2783] the Capital Contributions to Awal Bank and the 12 Payments to the AwalCos are set out.

15. Those of the 12 Payments which Mr. Hargreaves contended in his written evidence were linked to Capital Contribution 3 are shaded in mustard and add up to US$157m. The one

2782 Hargreaves xx **{Day73/141:6-16}**.

2783 The AwalCos' tabular comparison of Mr. Hargreaves' treatment of Capital Contributions 1-7 with the findings of Mr. Lawler based on Mr. Hourigan's reversed tracing exercise conducted by way of a computer coded Tracing Tool written in keeping with a defined set of tracing rules based on FIFO and as set out in Annex M1 to the AwalCos Defence**{A2/46}** (and as set out above at Section 7 of this Judgment).

payment out of the 12 Payments which Mr. Hargreaves contended in his written evidence was linked to Capital Contribution 4 is shaded in blue-grey and amounts to US$152.7m.

16. In light of Mr. Hargreaves' evidence, any allegation that AHAB makes regarding payments from STCC to Awal Bank and on from Awal Bank to the AwalCos - apart from those which AHAB now seek to adopt from the AwalCos tracing evidence[2784] is entirely unsupported by evidence

17. Whilst it might seem from the Statement of Claim[2785] as though AHAB claims that the entire US$1,149,949,239 of transfers from STCC to Awal Bank somehow found its way to the AwalCos, AHAB's only witness giving evidence on the point, Mr. Hargreaves, was unable to find any such link.

18. He only finds a link in respect of Capital Contributions 3 and 4 (which, for the avoidance of doubt, does not form any part of the US$1,149,949,239).

19. According to the bank statement for one of Awal Bank's bank accounts with Arab Bank ("Arab Bank 510") for the relevant period, Capital Contribution 3 was received by Awal Bank for value on 21 June 2005.[2786] At that point in time, on the basis of the same evidence, the account had an overdrawn balance of US$199,925,222.99.

20. That overdrawn balance had arisen due to the placement of a deposit of US$200m.[2787]

21. From the bank statement[2788] that deposit appears to have occurred earlier on the same day. Prior to the placement of that deposit there were two further transactions for value on 21 June

2784 The exercise conducted by Mr. Lawler based on Mr. Hourigan's work.
2785 Statement of Claim/§158O, §§158Q-158S **{A1/2.3/68}-{A1/2.3/71}**
2786 **{Q/724/1}**
2787 For the sake of clarity, it is common ground that placements of deposits appear in the bank's statement as outwards transfer of funds as the money is placed on deposit in another account with the same institution or with another institution. The maturity of a deposit appears therefore as an inwards transfer of funds.
2788 i.e. based on the order the transactions appearing in the bank statement.

2005, as per the bank statement (i) first, the maturity of a deposit of US$71,541,291.25 and, (ii) subsequently, the placement of a new deposit of US$71.6m.

22. On that basis, substantially all of Capital Contribution 3 was applied by Arab Bank in repayment of that overdrawn balance, as can be seen from the new balance on the account as shown on the statement of US$74,752.01.

23. Mr. Hargreaves stated in his written evidence: *"the USD 200m Capital Contribution 3 was made on 21 June 2005. This can be tracked through a series of short-term deposits maturing on 28 December 2005"*[2789]. As can be seen from lines 1 and 2 of Appendix D2/1 to Hargreaves 1W,[2790] that tracking depends on Mr. Hargreaves having reversed the order of transactions shown on the bank statement.

24. In Mr. Hargreaves' Appendix D2/1, he treats the receipt of Capital Contribution 3 as having occurred before the placement of US$200m on deposit, rather than afterwards.

25. Mr. Hargreaves made no reference in his written evidence to having done so. In cross-examination, the reversal of the order of transactions in Appendix D.2/1 was put to him:[2791]

> "37: 6
> Q. *But what you have done is you have presumed to invert the order of these two transactions.*
>
> *A. I have -- what I have done is I have linked the two.*
>
> *Q. No, you haven't linked the two.*
>
> *A. I haven't inverted them.*
>
> *Q. You have ignored the negative US$199 million balance, because if the bank statement is right as it stands, that is the end of capital contribution 3.*

---

[2789] Hargreaves 1, §115, **{I/2/38}**

[2790] **{I/2.8}**

[2791] **{Day71/37:6-42:12}**

A. *I don't know whether that's the end of capital contribution 3 or not. All I've done in my statement is presented a set of transactions which suggest to me that they are linked.*

…

41: 5

Q. *… you turn the order around in your appendix D.2/1, and my question to you is: why did you do that?*

A. *I didn't turn it round. I treated those four transactions on that same day as linked.*

Q. *No, Mr. Hargreaves. Look at your table and what appears at line 1. Which one appears at line 1? The capital contribution.*

A. *On 21 June.*

Q. *Then look at what appears at line 2.*

A. *Which is the deposit on 21 June.*

Q. *Yes, but you are choosing to order them in that way. Why?*

A. *Well, because to my mind, that US$200 million funded that deposit.*

Q. *But if you inverted it in your table and put the US$200 million payment out first and the capital contribution in second, your linkage falls away. So you have to be pretty confident that you are right, haven't you?*

A. *I accept that if we were looking at a period of more than a day between these transactions then you're absolutely right. But we are looking at transactions that all appear on the same day. So if US$200 million had gone out on 20 June and US$200 million had come in on 21 June, then that would have been flagged to me as clearly something that would be worthy of comment and explanation. But what I saw when I looked at this bank statement was on 21 June US$200 million coming in and US$200 million going out on the same day. And on the same day, US$71 million coming in on another deposit and US$71 million going out as a rollover of that deposit.”*

26. Mr. Hargreaves' distinction between an overdrawn position arising a day earlier and one

arising on the day is misleading. In either case, the reasonable presumption must be that the bank would apply the incoming funds first in satisfaction of the overdraft. Particularly if that is what the bank statement appears to show.

27. The position on 21 June 2005 cannot logically be distinguished from the position on the Arab Bank 530 Account on 9 July 2006. There, on Mr. Hargreaves' evidence[2792] a US$38m deposit (comprising a component of Capital Contribution 3) matured on 9 July 2006 in the amount of US$38m and was paid into the Arab Bank 530 Account. Earlier in the same day the account had become overdrawn by US$12.7m. In that instance, US$12.7m of the deposit was applied in repayment of that overdraft and (on Mr. Hargreaves' evidence) the remaining US$25m of the US$38m was rolled into a new deposit on 12 July 2006.

28. In short, if as Mr. Hargreaves contends[2793] a maturing deposit comprising a capital contribution was applied on 9 July 2006 in repayment of an overdraft that had arisen earlier on the same day, logically there is no reason to disregard the evidence on the bank statement on 21 June 2005 and assume Capital Contribution 3 must have been paid into the account before the US$200m deposit was placed

29. Further, Mr. Hargreaves' primary explanation for inverting the order of the transactions is to form the very pattern he seeks to find.[2794] That is entirely self-fulfilling:[2795]

---

2792 Hargreaves 1, §125 and fn 36 **{I/2/43}.**

2793 Hargreaves 1, §125 and fn 36 **{I/2/43}.**

2794 Another example of Mr. Hargreaves inverting the order of transactions in the bank statement was put to Mr. Hargreaves at **{Day71/110:17}-{Day71/131:6}** In short, a US$103m transfer from a cash collateral account, comprising on Mr. Hargreaves' evidence, US$63m of Capital Contribution 3 (i.e. Trace AB), matured into the Arab Bank 530 Account on 29 March 2006. On the same date, but earlier according to the bank statement **{X3/74/2}**, the account became overdrawn in the amount US$17.2m. Mr. Hargreaves did not reduce Trace AB at all to take account of the overdrawn position. In fact, Mr. Hargreaves' written evidence was entirely silent regarding this apparently overdrawn balance or why Mr. Hargreaves considered it appropriate to ignore. Mr. Hargreaves gave his reasons orally at **{Day71/121:8}-{Day71/122:2}**.

2795 Hargreaves xx **{Day71/38:1-19}**

*"Q. You see, comparing those two lines to what is set out on the account statement, that you have inverted the order.*

*A. The order is different to the bank statement, yes.*

*Q. Yes, it is a different way around; absolutely 100 per cent the other way around.*

*A. It is the other way around to the bank statement, yes. But all on the same day.*

*Q. Why didn't you in your report address this?*

*A. Well, to me, the pattern seemed very clear when you look at this bank statement. And they all appear on the same day, okay? All these transactions appeared on the same day. So, for me, it made sense to amalgamate them on that day.*

*Q. Mr. Hargreaves, there is no pattern because we are talking about line 1.*

*A. Yes, but when you take this forward you will see that that US$270 million rolls over and rolls over. So that's where you establish the pattern, by looking at the entirety of the information."*

30. It is plain that a pattern of rolling over of deposits in the Arab Bank 510 account, if such pattern exists, is no basis upon which to assume the deposits were funded by Capital Contribution 3. A pattern of deposits is merely evidence of a pattern of deposits. It does not provide any information as to what funded the initial deposit.

31. Mr. Hargreaves also indicated in cross-examination that the date "22 June 2005" (appearing to the left of the line of the Arab Bank 510 statement)[2796] which showed the receipt of Capital Contribution 3 for value 21 June 2005) might be relevant. In particular:[2797]

*"A. From the top of the page going down, yes. The statement date of*

---

2796 **{Q/274/1}**

2797 Hargreaves xx **{Day71/44:20}-{Day71/45:9}**

*that transaction, being the date on the left-hand side, says 22 June. So that is what we describe as the posting date or the account date. So for some reason the bank has not posted that transaction to this statement until 22 June, although it has a value date…*

*CHIEF JUSTICE:*

*That is the point I was making when I pointed to that column earlier, whether that made a difference.*

*A. Right. I understand, my Lord. Yes. So 21 June is the value date, which is the important date. But the posting date will drive the order of the transactions that are shown on this bank statement."*

32. I accept, as the AwalCos submit, that it is just as likely that the 22 June 2005 was the date on which the transfer of Capital Contribution 3 occurred:[2798]

*"114: 5*

*Although you and Mr. Hargreaves have approached this in a different way, you've approached it in a rules-based system, he has approached it on what he called a "pattern-based system", in relation to this particular example, which was the subject of Mr. Hargreaves' cross-examination, both you and Mr. Hargreaves have treated the in-flows and in-flows as having occurred in the same order, because both you and he have treated the in-flow as occurring before the out-flow?*

*A. I think for different reasons, but yes."*

33. There are, at least, three distinctions to be drawn between their respective approaches:

(1) Mr. Hourigan's reordering was applied consistently across the dataset and explained fully in his report. Mr. Hargreaves, from his own evidence, appears to have re-ordered the transactions ad hoc and without any explanation in his written evidence;

(2) MIDAS is an internal accounting record. As such, there is no reason to assume

2798 Hourigan xx **{Day98/114:5-15}.**

particular care would be taken to order transactions within a day. The Arab Bank 510 bank statement was produced with the purpose of showing the account holder its running balance with the bank at any particular point in time, and does show an intra-day running balance. That gives rise to a reasonable presumption that transactions would be ordered intra-day carefully, and on a rational basis;

(3) As Mr. Hourigan explained, the reordering in MIDAS was to the AwalCos' disadvantage because it potentially understates the number of occasions when there was an overdrawn balance. Conversely, by re-ordering the transactions on the 21 June 2005, Mr. Hargreaves is able to continue tracing funds his clients assert to be AHAB property rather than ending the trace in the repayment of an overdraft.

34. The foregoing discussion of Mr. Hargreaves' "patterns based" approach clearly reveals its unreliability. There were other weaknesses identified and discussed by the AwalCos at **{E1/29/60-114}** of Written Closing submissions in relation to the Capital Contributions which I also regard as compelling, including very tellingly, the ignoring of massive cash flows the other way around, from STCC and Awal Bank to the Money Exchange. However, the foregoing discussion is, I believe, sufficient for explaining my rejection of AHAB's tracing claim against the AwalCos which would have depended upon Mr. Hargreaves' "patterns", had AHAB been able to establish its primary allegations of fraud.

# SECTION 7C

# TRACING AND OTHER CLAIMS AGAINST SIFCO5

## SECTION 7C
## TRACING AND OTHER CLAIMS AGAINST SIFCO5

i. SIFCO5 responded in its own right to AHAB's proprietary claims based upon Mr Hargreaves' so-called "money out schemes." Following are SIFCO5's submissions with which I agree except where otherwise indicated.

***"I. SUMMARY***

*1. Even if, contrary to SIFCO 5's case, AHAB's illegality/lack of clean hands does not bar the claim*[2799] *and AHAB succeeds in showing that Al Sanea committed a massive fraud on the AHAB Partners, it is submitted that AHAB still has no case against SIFCO 5 under the law of the Cayman Islands.*[2800]

***(1) SIFCO 5 AS A SPECIAL PURPOSE VEHICLE TO HOLD COLLATERAL***[2801]

2. *The structure and operation of SIFCO 5 was straightforward:*

(1) *Pursuant to the terms of the Accreting Strike Option ("the ASO")*[2802] *a portfolio of funds ("the Funds Portfolio") was contributed by SICL to SIFCO5 as an in specie contribution for the allotment of all the class B shares in SIFCO 5 to Barclays.*

(2) *Barclays paid US$70m directly to SICL upon conclusion of the transaction.*[2803] *As AHAB acknowledges, this sum was not used by SIFCO*

---

[2799] As to the Illegality defence, see below at Section 7D of this Judgment.

[2800] *The position as a matter of Saudi law is addressed* [in the last preceding section of this Judgment].

[2801] **{E1/30/4}**

[2802] As described and explained in the First witness statement of Nicolas Matthews, one of the SIFCO5 liquidators: {**C/4/1-32**} at **[9]** and in exhibits {**O6/1/2-45**}

[2803] *US$30m was paid to SIFCO 5 directly by Barclays on 27 February 2007.*

*5 but paid to SICL (see AHAB's Statement of Claim, para 161D.*[2804]

(3) *The class B shares allotted to Barclays were preferential equity shares. The shares were the only participating shares in SIFCO 5 with the result that no capital returns could be made to any other share class until the Class B shares were redeemed.*

(4) *In any winding-up of SIFCO 5's affairs, Article 122 of SIFCO 5's Articles of Association provided that the nominal amount of the class B shares should be repaid in priority to the class A shares.*[2805]

(5) *Once the transaction had been concluded SICL, (via Saud Financial Services, Geneva ("SFS")) became a manager of SIFCO 5's assets under a typical arrangement. The class A shares, management shares, were issued and allotted to SICL and had the voting rights over day to day management of SIFCO 5. The extent of control given by the B shares reflects the fact that SICL was the portfolio manager and subject to all the controls that implies. No criticism is made by AHAB of any action taken by SICL in managing SIFCO 5's affairs.*

(6) *SICL had a right (but not an obligation) of "redemption" in the Funds Portfolio which it could exercise by paying the "Strike Price", mimicking the right of a mortgagee to recover property. It could at given stages defined by the ASO pay the Strike Price, ascertained by reference to a formula and recover the B Shares.*

---

2804 **{A1/2/75}**
2805 **{G/5443}**

(7) *The ASO was a "derivative" which has features of both a swap and an option (see generally "The Law on Financial Derivatives" 5th ed.). The option meant that SICL limited its exposure to losses on the portfolio. Barclays could not require SICL to repay the funds that it had provided or was to provide to SICL or SIFCO 5. The ASO meant that Barclays' only recourse was to the B shares and to the rights of capital those shares conferred.*

(8) *In addition, the "*accretion*" in terms of an interest component under the ASO terms reflects the fact that the amount payable by SICL would effectively be increased by floating rate interest payments, much as if SICL had borrowed and mortgaged the securities directly, as well as some compensation for the cost of hedging its position.*

*3. The ASO was a financial product sold by Barclays to hedge funds prior to 2008. Significantly, the ASO arrangement enabled SICL to raise money on the Funds Portfolio without having to show a liability in the amount of the loan and record losses in the value of the Funds Portfolio. Contractually, SICL had sold this portfolio to SIFCO5/Barclays. It had a right of redemption but no liability to repay the funds provided by Barclays (as equity investment).*

*4. Looking at the substance rather than form, once the financial engineering is stripped back, two features of the transaction between Barclays and SICL stand out:*

(1) *This transaction would have been exactly the same if SICL had simply mortgaged the portfolio direct to Barclays, save that this would not have had the favourable accounting consequences of the ASO.*

(2) *SIFCO 5 was established purely as a special purpose vehicle, its raison d'etre being to provide sole recourse security to Barclays in return for a substantial loan to SICL (see AHAB's Statement of Claim, para 161B).*[2806]

5. *As at the date of the Winding Up Order,*[2807] *Barclays held 124,508,062 class B shares and SICL held 100 class A shares in SIFCO 5, both classes having been issued at US$1 par value. The number of class B shares issued to Barclays reflected the provision by it of US$100m in re-financing capital (US$70m of which was paid to SICL, and US$30m of which was paid to SIFCO 5), and (b) a 'premium' element under the terms of the ASO of the remaining US$24,508,062 of shares.*

6. *The appointment of receivers over SICL's assets on the ex parte application of AHAB on 24 July 2009 constituted an event of default under the ASO which brought about its demise, resulting in Barclays' petition to wind-up SIFCO5 on the just and equitable basis.*

### *(2) THE CLAIMS AND SIFCO5'S RESPONSE IN SUMMARY*[2808]

7. *AHAB advances five claims against SIFCO 5:*

---

2806 **{A1/2/75}**

2807 *An Order of the Grand Court dated 18 September 2009.*

2808 **{E1/30/7}**

(1) *First, that AHAB has a proprietary claim against SIFCO 5 because SIFCO 5 holds assets into which AHAB is entitled to trace its beneficial interest in monies taken from the Money Exchange.*

(2) *Secondly, that SIFCO 5 knowingly received property to which AHAB was beneficially entitled.*

(3) *Thirdly, that SIFCO 5 dishonestly assisted Mr Al Sanea's fraud. The particulars of that allegation are that SIFCO 5 assisted by receiving stolen funds.*

(4) *Fourthly, that SIFCO 5 conspired with Mr Al Sanea in the carrying out of his fraud. The particulars of participatory acts are that SIFCO 5 received stolen funds.*

(5) *Fifthly, that AHAB is entitled to recoup the funds paid to SIFCO 5 by way of unjust enrichment.*

8. *There were no direct transfers of funds from AHAB to SIFCO 5. Because of the way in which these claims are put against SIFCO 5, a necessary pre-requisite of <u>all</u> of these claims is establishing that AHAB is able to demonstrate that SIFCO 5 <u>received</u> <u>stolen</u> <u>funds</u>. In other words, unless AHAB can trace its property to SIFCO 5, none of the claims have any pleaded basis.*

9. *However, AHAB has failed to particularise a proper tracing case against SIFCO 5:*

(1) *Instead, AHAB simply asserted that SIFCO 5's assets were acquired by SICL with funds misappropriated from the Money Exchange and sought to shift the burden of proof onto SIFCO 5 to prove otherwise.*

(2) *Mr Hargreaves devoted a mere six paragraphs in his report to the tracing claim*[2809]*, none of which purported to identify any link between the payments from the Money Exchange to Mr Al Sanea and the payments to SIFCO 5. As such AHAB's case against SIFCO 5 is still unclear.*

*10.* *AHAB's attempts to trace into the assets of SIFCO 5 are without merit. AHAB has failed to particularise how it alleges that it is entitled to trace into SIFCO 5's assets, save for the application of a "swollen assets" theory, which has been thoroughly debunked.* [See the treatment of the theory at the last preceding section of this Judgment].

*11.* *This failure is particularly damning given that a significant proportion of the Funds Portfolio was acquired prior to 2003 (i.e. before the alleged "new for old" conversation or "protocol" and the alleged limits were placed on Mr Al Sanea's authority).*

*12.* *Equally, SIFCO 5 received very significant funding from sources which demonstrably did not or could not have been involved in any fraud on AHAB. For example:*

(1) *Many of the assets acquired by SIFCO 5 were acquired by SICL prior to 2000 (and therefore could not have been acquired using post 'new for old" misappropriated funds).*

(2) *The bulk of the funds provided to SIFCO 5 came from Barclays Bank rather than AHAB.*

---

2809 **{I/2/77}**

(3) *In respect of payments of money received from SICL (which amounted to at least US$66m), these were also funded largely by money from Barclays and were used to meet the ongoing capital calls.*

*13. In respect of the claims in knowing receipt, it is denied in any event that SIFCO 5 had the requisite knowledge such that AHAB can found such a claim. In particular, it is denied that the knowledge of Mr Al Sanea is that of SIFCO 5.* [This will be addressed in detail below].

*14. In any event, in respect of the Funds Portfolio SIFCO 5 is a bona fide purchaser for value without notice, the purchase price constituting the issue of 100 class A shares to SICL and 124,508,062 class B shares to Barclays.*

*15. Given the bona fide commercial purpose underlying the establishment of SIFCO 5 (which it fulfilled by acquiring interests in private equity vehicles which it then managed), it is denied that the establishment of SIFCO 5 was dishonest or that any of its activities amounted to dishonest assistance or conspiracy to defraud AHAB.*

## II. LAW ON TRACING AS IT APPLIES TO SIFCO 5[2810]

### (1) BASIC PRINCIPLES

ii. In addition to the extensive treatment of this topic in Section 7 of this Judgment, I set out here SIFCO 5's brief summary of the principles which I regard as a correct statement of the principles:

[2810] **{E1/30/10}**

*16*[2811]*. AHAB's proprietary claim against SIFCO 5 depends upon showing that SIFCO 5 received property that belonged to AHAB. However, it is also essential to do so in order for any of AHAB's personal claims to succeed:*

(1) *A claim for knowing receipt in any case presupposes this (see* **Boscawen v Bajwa**.[2812]

(2) *Equally, SIFCO 5 being a passive investment vehicle, AHAB is unable to identify any "*assistance*" or conspiratorial dealing which SIFCO 5 could have rendered otherwise than by its dealings with the receipt of AHAB's alleged money as "*repository.*"*

*17. Since, unlike some of the other Defendants, it is not alleged that SIFCO 5 received money directly from AHAB, AHAB needs to show that it can follow or trace its funds to money in SIFCO 5's hands.*

(1) *"*Following*" and "*tracing*" are not remedies but processes whereby the Plaintiff establishes what has happened to his property and can make good his claim that an asset represents his property.*

(2) *At the conclusion of this exercise, which is essentially evidential in nature, the Plaintiff can establish his proprietary or personal claim. The relevant principles were authoritatively explained by Lord Millett in* **Foskett v McKeown**[2813] *and his earlier decision in* **Boscawen v Bajwa**.[2814]

---

2811 **Ibid**
2812 **[1996] 1 WLR 328 at 334) {R1/25} and above in Section 7.**
2813 [2001] 1 AC 10228 **{R1/33} and above in Section 7**
2814 Above

18. *The requirements of such an exercise demand that the Plaintiff establishes three elements to his case: see* **OJSC Oil Company Yugraneft v Abramovich & Ors**[2815] *per Clarke J:*

> "349 In order to be able successfully to trace property it is necessary for the claimant,
>
> [(i)] firstly, to identify property of his, which has been unlawfully taken from him ("a proprietary base");
>
> [(ii)] secondly, that that property has been used to acquire some other new identifiable property. The new property may then have been used to acquire another identifiable asset ("a series of transactional links").
>
> [(iii)] thirdly the chain of substitutes must be unbroken."

19. *The second proposition encapsulates the notion that the Plaintiff must show that there is a causative link or nexus between his original property and the newly acquired asset (see* **Serious Fraud Office v Lexi Holdings Plc**[2816] *per Keene LJ). That can only be achieved, as per the third proposition, if the Plaintiff retains property in the funds at every stage in the chain of recipients to the holder of the alleged traceable proceeds.*

20. *The transactional links can take different forms. The simplest form of transactional link involves proof that the original asset has been exchanged for another, the so called "simple substitution":* **Foskett v McKeown** *at p130.*[2817]

21. *A more complex transaction involves a "mixed substitution". The Claimant gets only a proportionate share in the mixed fund – or can charge the fund with a lien in support of a personal right (if he has one):* **Foskett v McKeown** *at p131.*[2818]

---

2815 [2008] EWHC 2613 **{R1/39/86}**

2816 [2009] QB 376 **{R1/39.2}**

2817 **{R1/33/29}and above**

*22. In these proceedings, this Court has already noted[2819] that:*

> "…the chain of substitutes must be unbroken. This is in the sense that the unbroken chain of transactional links leads to new, identifiable property which has ended up in the hands of the defendant."

***(2) AHAB'S APPROACH TO TRACING[2820]***

*23. Given AHAB's faulty attempts to particularise a tracing claim, it seeks to rely upon the modern approach to tracing as an unprincipled free-for-all in which the Court could essentially pick and choose which assets to make the subject of a proprietary claim with the burden falling squarely on the Defendants to prove that the assets were not misappropriated.*

*24. In particular, AHAB relies heavily upon two arguments:*

(1) *First, that the modern authorities established that even where monies have come from an overdrawn account, it is open to the Court to* infer *that funds were the traceable property of AHAB;*

(2) *Secondly, that the principles requiring trustees and fiduciaries to account for trust monies placed the burden upon the Defendants to show that the monies they received were not the traceable property of AHAB.*

*25. Both arguments are without merit* [as I have already explained and decided in the Section 7 of this Judgment by reference to **Clayton's Case**;[2821] **Re Halletts**;[2822] **Re Oatway**;[2823] **Re Goldcorp Exchange**;[2824] **El Ajou**;[2825] **Roscoe v Winder**;[2826]

---

[2818] **{R1/33/30}**
[2819] **{B/34/17}**
[2820] **{E1/30/12}**
[2821] **Above**
[2822] **{R1/2} and above**
[2823] **{R1/5} and above**

**Relfo**;[2827] **Paragan Finance**;[2828] **Hampshire Cosmetics v Mutschman**;[2829] **Miller v Bain**;[2830] **Sinclair v Versailles**;[2831] and **Durant**[2832] and the several other cases there discussed]**.**

***(i) Inferential Tracing – Reduction of Account Balances and Overdrafts***[2833]

<u>*General Principles*</u>

*26.* *The starting point is that the tracing process comes to an end when the value being traced is dissipated. Property is lost when it is dissipated or lost, just as when the recipient uses trust funds to buy a meal which he consumes or a house which he burns down, so also when the recipient uses the funds to pay off debts (see* **Northern Counties of England Fire Ins. v Whipp*;*** [2834] **Re Goldcorp Exchange*;*** [2835] *and* **Re Diplock; Diplock v Wintle*):*** [2836]

> "The equitable remedies presuppose the continued existence of the money either as a separate fund or as part of a mixed fund or as latent in property acquired by means of such a fund. If, on the facts of any individual case, such continued existence is not established, equity is as helpless as the common law itself."
>
> "It is, therefore, a necessary matter for consideration in each case where it is sought to trace money in equity, whether it has such a

2824 **{R1/22}and above**
2825 **{R1/23.2}and above**
2826 **{R1/5.6} and above**
2827 **{R1/43.1} and above**
2828 **{R1/31.0.1}and above**
2829 **{R1/31} and above**
2830 **{R1/35.0.1} and above**
2831 **{R1/41.1} and above**
2832 **{R1/51/1} and above**
2833 **{E1/30/13}**
2834 **(1884) 26 Ch D 482 to 495-6 {R1/2.1/14} - {R1/2.1/15}**
2835 **Above**
2836 **[1948] 1 Ch 465 supra p521 {R1/6/57}**

> continued existence, actual or notional, as will enable equity to grant specific relief."

27. *Funds in bank accounts are not followed. As funds are transferred from one person to another, the owner of the account acquires his own chose in action against the bank. The bank is a purchaser for value and it is therefore usually impossible to trace into its hands.*

28. *Instead, as Lord Millett explained in* **Foskett**[2837] *(p127-8) the claimant normally sues the "recipient" account holder to claim the proceeds of the money. He can trace his proprietary claim to the recipient account holder's chose in action against his bank.*

29 *This is of particular significance here because it is* *__normally__* *sufficient to prevent tracing if the funds are paid into an overdrawn account. In such a case the property has ceased to exist (***Re Goldcorp Exchange Ltd***).*[2838] *Purchases made with funds taken from an overdraft account are not traceable proceeds of payments made into that account (see* **Re Tilley's Will Trusts***).*[2839]

30. *A corollary of this principle is that when an account containing the Plaintiff's money is reduced, so is the property of that Plaintiff commensurately reduced.*

31. *In* **Roscoe v Winder***,*[2840] *a company sold its business under an agreement containing a promise by the purchaser to collect on behalf of the vendor the amount of the book debts owed to it at the date of the agreement. From the sums collected, the purchaser paid £455 into his general bank account, but he failed to*

---

2837 **{R1/33/26} and above**
2838 At **pp104-5 {R1/22/31} and above**
2839 **[1967] Ch 1179 at 1193 {R1/8.1/15}**
2840 **{R1/5.6} and above**

*account for the money to the vendor and made drawings from the account which reduced it at one stage to £25. He later made payments into the account from an unrelated source, and died with a balance in his account of £358, to which the vendor claimed to be beneficially entitled. Sargant J held that the maximum which the vendor was entitled to trace was £25, representing the lowest sum to which the balance on the account had fallen between the payment of the £455 into the account and the purchaser's death, on the ground that at that date of the lowest balance the purchaser must have denuded the account of all the trust moneys except to the extent of £25.*

*32. Accordingly, this case established the rule known as the "lowest intermediate balance" principle meaning that tracing cannot occur for any larger sum than is the lowest balance in the account between the time when the money goes in and the remedy is sought.*

*33. In* **Re Goldcorp Exchange Ltd** *a company mixed bullion belonging to some of its customers with other bullion. It then reduced its stock to less than the amount which belonged to those customers. It later bought more bullion, but there was no evidence to link the later purchases with the earlier depletion of the stock. On the company being placed in receivership, the customers claimed an equitable lien over the stock of bullion held by the company at the time of the receivers' appointment. The judge found that the amount of bullion held by the receivers on behalf of those customers was an amount equal to the lowest balance of bullion held by the company at any time, applying* **Roscoe v Winder***. The Board upheld his decision. Lord Mustill, at p 109, cited the judgment of the Court of Appeal in*

**Re Diplock**,[2841] *and observed that the law relating to equitable tracing was still in a state of development, but that it would be inequitable to impose an equitable lien in favour of the customers in that case, since there was no evidence that their bullion continued to exist as a fund latent in property held by the company.*

*AHAB's Misreading of Modern Authorities*[2842]

34. *AHAB suggests at paragraphs 697 and 693, respectively of its written submissions that*

> *"it is not necessary for a plaintiff to prove every transactional step by reference to documentary evidence. Where appropriate, the court will infer the missing step."*[2843]
>
> **"…** within the context of laundered funds, Relfo Limited (in liquidation) v Varsani 1083 has made clear that tracing is not defeated even where substitutions of value are non-sequential. Relfo further shows that it is possible for the court to infer its way through significant gaps in evidence. The Privy Council has reached a similar conclusion recently in Federal Republic of Brazil v Durant International Corpn, involving analogous facts to those in Relfo. Durant also expressly approved the principle of tracing through an overdrawn bank account.**"**[2844]

iii. For the reasons already discussed and explained in Section 7 of this Judgment, I agree with Mr Lowe's argument here that this suggestion by AHAB is misconceived. AHAB is mistaken in its suggested application of the modern authorities.

---

2841 **{R1/6/57} and above**
2842 **{E1/30/15}**
2843 **{U/1/264}**
2844 **{U/1/263}**

44. [ But reliance on the modern authorities] *takes AHAB's case no further:*[2845]

(1) *First, the relevant passages from the judgments in* **Sinclair Investments** *relied upon by AHAB are simply authority for the proposition that where a trustee has mixed trust property with his own property, so that they cannot be separated with perfect accuracy, then the onus is on the trustee to distinguish the separate assets and to the extent he failed to do so, they belonged to the trust: see Lord Neuberger MR at [135] to [141].*[2846] *Thus the principle will only apply to a situation where the plaintiff is seeking to trace into property into the hands of a "*defaulting fiduciary*".* I accept, as Mr Lowe submits, that "*SIFCO 5 was not, on any view, a fiduciary of AHAB*".

(2) *Secondly, the "maelstrom"* described *by Lord Neuberger plainly envisages the kind of "coordinated scheme" referred to in* **Relfo** *and* **Durant**. *[As already noted above], it is insufficient, in order to reverse the burden of proof, simply that the tracing exercise is difficult. Lord Neuberger's statement that "I do not see why this should mean that a proprietary claim is lost simply because <u>the defaulting fiduciary, while still holding much of the money</u>, has acted particularly dishonestly or cunningly by creating a maelstrom"*[2847] *(emphasis added) envisages that the maelstrom has been created by the defaulting fiduciary precisely in order to defeat attempts to trace the relevant funds.*

---

[2845] **{E1/30/19}**

[2846] **{R1/41/39} - {R1/41/40}**

[2847] Para **[138]**

*No "Co-ordinated Scheme"*[2848]

45. *AHAB's position is therefore entirely dependent upon its establishing that there was a "co-ordinated" scheme*[2849] *calculated to hinder any attempt to follow the funds paid out to Mr Al Sanea in order to overcome the general rules that:*

(1) *It is not* [ordinarily] *possible to trace into an overdrawn account; and*

(2) *AHAB is required to identify with particularity the precise substitutions (or transactional links) at every stage.*

46. *No evidence whatsoever has been produced by AHAB to support the suggestion that the payments to SIFCO 5 were part of a "*co-ordinated scheme*" to "*divert AHAB's money away from AHAB to the Defendants through many and various transactions*":*

(1) *No particulars have been given as to how it is suggested that SIFCO 5 formed part of this scheme;*

(2) *To the contrary, AHAB's own pleading makes clear that the purpose of SIFCO 5 was to hold the Funds Portfolio as part of the refinancing transaction that was the ASO;*

(3) *No evidence has been produced to suggest that SIFCO 5's purpose or operation was anything other than: (i)* bona fide *in accordance with the ASO (drafted by Barclays); and (ii) that it received funds solely for the purposes and in accordance with the terms of the ASO.*

---

2848 **{E1/30/20}**

2849 *A position that AHAB accepts* ***{U/1/252}, {U/1/268}***

47. *Accordingly, given that SIFCO 5 was not party to any such scheme, there is nothing to justify the Court seeking to trace into the assets held by SIFCO 5* [including] *through overdrawn accounts.*

48. *These principles have the consequence that:*[2850]

    (1) *AHAB is unable to trace any payment to SIFCO 5 which was used to fund a capital call on the Funds Portfolio; such payments being the equivalent of a payment into an overdrawn account.*

    (2) *Unless AHAB could show that the payments it made resulted in ever-increasing additions of traceable assets to the various estates to which they were paid, it is highly likely that it would have lost a high proportion of such funds, if any, as belonged to it. As the London proceedings demonstrated, the Saad group as well as AHAB was over-laden with debt.*

49. *AHAB cannot make claims on profits which have been made by the Defendants on funds to which AHAB had no title (see* **Sinclair Investments (UK) Ltd v Versailles Trade Finance Group Plc.**[2851] *It is not enough to say that a Defendant might have been placed into a position whereby that profit could be made e.g. by making a Defendant creditworthy. Profits derived from funds lawfully paid to SIFCO 5 are therefore not recoverable.*

***(ii) Duty to Account***[2852]

50. *AHAB's second argument on tracing is that the Defendants, including SIFCO 5, owe a duty to account as the recipients of the misappropriated funds (applying* **El**

---

2850 **{E1/30/21}**
2851 **{R1/41.1} and above**
2852 **{E1/30/22}**

**Ajou v Dollar Lands Holdings Plc,**[2853] *(reversed in part by the Court of Appeal ([1994] 2 All ER 685)*[2854] *to argue that the Defendants have the burden of proving where the misappropriated monies went.*

*51.* *This suggestion is without merit:*

(1) *Clearly a* ***defaulting trustee or fiduciary*** *is required to account for what has become of the trust funds under their hands.* (Emphasis added.)

(2) *However, that does not absolve AHAB of the burden of demonstrating that particular funds were trust assets.*

(3) *The duty of a trustee is to account for what has* become *of the trust fund, not to account for what funds formed part of the trust fund in the first place.*

*52.* *Clearly, if it was established that SIFCO 5 received trust assets (and knowledge of the trust is to be attributed to SIFCO 5 upon that receipt), SIFCO 5 would then be required to account for what became of the receipts.*[2855] *However, AHAB asks the Court to* presume *that SIFCO 5 holds misappropriated property in order that SIFCO 5 would then have a burden of disproving that any assets under their hands were trust assets.*

*53.* *Such an approach is contrary to principle and to common sense. It assumes the central fact (i.e. the receipt of the Plaintiff's property) without which there is no duty to account. It is for AHAB to demonstrate that SIFCO 5 received the traceable proceeds of any misappropriations by showing a direct link between the*

---

2853 Above at **735-736 {R1/20/19} - {R1/20/20}**

2854 **{R1/21} and above**

*2855 As SIFCO 5 has done. All of the funds received went on capital calls to finance the Funds Portfolio.*

*money paid out from the Money Exchange into the hands of SIFCO 5; where it has failed to do so, there is no basis for reversing the burden of proof.*

## III. AHAB'S INABILITY TO ESTABLISH A PROPRIETARY BASE[2856]

### (1) AHAB'S PLEADED CASE

*54. In its initial Statement of Claim, AHAB made no mention whatsoever of SIFCO 5. Following AHAB's initial amendments, the Statement of Claim contained a mere five paragraphs particularising AHAB's alleged tracing case against SIFCO 5. That has not changed. It appears from AHAB's pleaded case that it now seeks to trace two categories of assets:*

(1) *The Funds Portfolio, which it is alleged "could only" have been acquired using moneys contributed by Mr Al Sanea to SICL which he had misappropriated from AHAB and which was therefore "at all times the absolute beneficial property and impressed with a constructive trust" (*[RASOC]*, para 161D.)*[2857]

(2) *Payments of US$82,645,285 (consisting of US$65,284,759 from SICL and US$17,360,526 from Awal Finance Company (No.2) Ltd and Awal Finance Company (No.5) Ltd (see* [RASOC]*, para. 161A)).*[2858]

*55. It is important to remember that AHAB here bears the burden of proof. It is wholly improper for AHAB* (as it seeks to do at paragraphs 161E and 166 of the [RASOC]);[2859] *to seek to shift the burden of proof onto SIFCO 5 and put it "*to

2856 **{E1/30/24}**
2857 **{A1/2.3/75} - {A1/2.376}**
2858 **{A1/2.3/75}**
2859 **{A1/2.3/76} - {A1/2.3/77}**

strict proof*" of a negative, namely that the portfolio "*must have been purchased using the moneys contributed to SICL by Mr Al Sanea*" or that its assets do not belong beneficially to AHAB (as per paragraph 161D of the* [RASOC].[2860]

56. *It is for AHAB properly to plead and prove every step/transactional link in its tracing case and, if it is unable to do so, any claim based on that tracing must fail.*[2861]

**(2) AHAB'S INABILITY TO TRACE**

57. *AHAB's assertion that the Funds Portfolio could* <u>*only*</u> *"*have been acquired using moneys contributed by Mr Al Sanea to SICL which he had misappropriated from AHAB*" is bizarre for five reasons:*

(1) *First, such a proposition was unsupported (and undermined) by its "expert" evidence* [Mr Hargreaves', as further discussed below].

(2) *Secondly, Mr Al Sanea had become independently (if notoriously) wealthy and the Saad Group had access to credit and borrowing independent from the Money Exchange. Indeed Mr Hatton* [the other AHAB "expert"] *positively avers that some of the assets held by the Saad Group entities were acquired using funds that did not come from the Money Exchange but instead came from "other sources".*[2862]

(3) *Thirdly, by 2003, a total of US$93m had been expended in order to acquire the interests comprising the Funds Portfolio. In light of AHAB's*

---

2860 **{A1/2.3/76}**

2861 (See ***Lewin*** **paragraph 41-138** and e.g. ***Lexi Holdings*** per Keene LJ **{R1/39.2} and above, *OJSC Oil Company Yugraneft*** per Clarke J at **paragraph 353) {R1/39 and above}.**

2862 **{I/1/60}**

*case that the borrowing of the Money Exchange prior to 2003 was not unauthorised,*[2863] *these interests could not possibly be assets into which AHAB can now trace.*

(4) *Fourthly, it misunderstands the nature of the Funds Portfolio which required consistent capital contributions in order to maintain the assets.*

(5) *Fifthly, the funds provided to SIFCO 5 to meet those capital calls manifestly did not originate from AHAB and AHAB has failed to give credit for that.*

***(i) AHAB's Expert Evidence***[2864]

*58. In an attempt to supplement what was, on any view, a sparsely pleaded tracing claim, AHAB adduced evidence from Mr Hargreaves of Deloitte as an "*expert*" on matters relating to tracing.*[2865]

*59. However, of the 80 pages that Mr Hargreaves devotes to tracing into the assets of the defendants, only six paragraphs relate to SIFCO 5*[2866] *(these six paragraphs are also summarised in four paragraphs*[2867]*:*

> "37. SICL provided funding for SIFCO 5 and I understand has made a claim against SIFCO 5 for approximately USD100m as an intercompany balance. As explained above, SICL was the recipient of significant funds from MAS, STCC, Awal Bank and other Saad Group related entities.

---

2863 Albeit that AHAB's "New for Old" case was purported to have commenced variously at different times.

2864 **{E1/30/26}**

2865 *Whether or not Mr Hargreaves can truly be termed an expert is addressed by the GTDs at **{E1/31}**.* [The concern was that Mr Hargreaves, as a Deloitte employee, may not claim to be independent and so did not meet the independence test required of expert witnesses. In the end, the objection to his evidence (as to that of the other Deloitte "expert" witnesses) was not pressed and their evidence was taken, *de bene esse*].

2866 **{I/2/77}**

2867 **{I/2/14}**

38. Without the SICL or SIFCO 5 accounting systems we currently have insufficient information to link the balance on the SICL/SIFCO 5 intercompany account to STCC or other MAS controlled entities. However, the funding of one of SIFCO 5's funds can be linked to MAS.

39. Schedule 1 to SIFCO 5's Amended Defence includes at page 26, details of transactional information for Lightyear Capital Fund II. The "Original commitment" on this fund is stated as USD 25m, which is split as follows: ASJ-USD 10m; STC&FSC – USD 10m; and Chairman – USD 5m. It is reasonable to assume that STC&FSC is an abbreviation of Saad Trading Contracting and Financial Services Company (previously STCC) and the Chairman refers to MAS. This fund appears to have a value of USD 13.6m as at September 2009.

40. Of the USD 25m Original Commitment, a total of USD 14.3m had been drawn down from 10 November 2006 to 13 August 2008. I am unable to identify from the disclosure how much of the USD 14.3m is drawn against each of the three contributors but it appears that STCC and MAS have directly contributed to this fund."

*60. The closest to a trace of funds from AHAB into SIFCO 5 that Mr Hargreaves was able to muster was his suggestion at paragraph 38* [above] *of his witness statement that "*the funding of one of SIFCO 5's funds can be linked to MAS*" referring to the payments made by SIFCO 5 to Lightyear Fund II. Aside from that one instance that he had identified, he did not identify any link between the funds paid to SIFCO 5 and either funds from Mr Al Sanea or funds paid out from the Money Exchange.*

*61. In cross-examination, the sole instance in which Mr Hargreaves purported to have identified a contribution from Mr Al Sanea/STCC to one of SIFCO 5's funds was revealed to be incorrect:*

(1) *At paragraphs **[248-249]** of his statement,*[2868] *Mr Hargreaves maintained that:*

> "Page 26 of Schedule 1 details the transactional information for Lightyear Capital Fund II. The 'Original commitment' on this fund is stated as USD 25m, which is split as follows; ASJ – USD 10m; STC&FSC – USD 10m; and Chairman –USD 5m. It is reasonable to assume that STC&FSC is an abbreviation of Saad Trading Contracting and Financial Services Company (previously STCC) and that Chairman refers to MAS. This fund appears to have a value of USD 13.6m as at 30 September 2009.
>
> 249. Of the USD 25m Original Commitment, a total of USD 14.3m had been drawn down from 10 November 2006 to 13 August 2008. It appears that STCC and MAS have directly contributed to this fund at least. I am unable to identify how much of the USD 14.3m is drawn against each of the three contributors."

(2) *Mr Hargreaves suggested at paragraph 40*[2869] *of his statement that he was unable to identify "*from the disclosure*" how much was drawn against SIFCO 5, STCC and Mr Al Sanea. However, in cross-examination, he accepted that he had not made any searches of the disclosure to establish whether his inference was correct.*[2870]

(3) *In fact Mr Hargreaves' inference was incorrect. All of the funds were in fact subscribed to by SIFCO 5.*[2871]

(4) *Mr Hargreaves then suggested that it was "*not possible*" to see where the funds had come from "by looking at the transactional database."*[2872]

---

2868 **{I/2/77}**

2869 **{I/2/14}** and excerpted above

2870 **{Day74/22:2}**

2871 **{X6/18/3}** -The summary of investment in the private equity funds, item 33); **{X6/11/8}** - Subscription Agreement for Lightyear Capital Fund 11–USD10m investment)**; {X6/12/8} -** Subscription Agreement for Lightyear Capital Fund 11–USD5m investment; **{X6/13/8} -** Subscription Agreement for Lightyear Capital Fund 11-USD10m investment)

2872 **{Day74/27:25} {Day74/28:2}**

*However, far from being "*impossible*", it was relatively straightforward to establish the source of the payments.*

*(i)* *The "*original commitment*" was US$25m. However, only US$14m was drawn down. That means of the "*original commitment*" only US$14m was ever actually paid. As set out in Schedule 1 to SIFCO 5's Defence, all payments in respect of Lightyear Capital were made after 10 November 2006.*[2873]

*(ii)* *The first six payments to Lightyear Capital were made out of a bank account held by SICL.*[2874] *This is the designated SICL bank account set out in a letter agreement dated 25 September 2006 between Barclays and SICL which incorporated ISDA Equity Derivative conditions ("the Confirmation*"*).*[2875]

*(iii)* *The remainder of the payments were made out of a bank account held by SIFCO 5. On 8 January 2007 two payments of US$42,007 and US$21,003 were made from SIFCO 5's account.*[2876] *On 29 May 2007 two payments of US$1.281m and one payment of US$640,000 were made from SIFCO 5's account.*[2877] *On 13 November 2007, two payments of US$1.480m and one payment of US$740,000 were made from SIFCO5's account.*[2878] *On 10*

2873 **{A2/61/26}**
2874 **{X6/5/11}** - available to Mr Hargreaves as part of the CENZA database
2875 **{O6/1/13}** - Barclays Capital's letter of 25 September 2006 to SICL
2876 **{X6/5/11}**
2877 **{X6/7/12}**
2878 **{X6/8/10}**

*December 2007, two payments of US$7,550 and one payment of US$3,775 were made from SIFCO 5's account.*[2879] *On 22 August 2008, two payments of US$869,000 and one payment of US$434,000 were made from SIFCO 5's account.*[2880]

*(iv) All of the payments from SICL and SIFCO 5's accounts match the payments set out in Schedules to SIFCO 5's Defence.*

(5) *Accordingly, simply by checking subscription documents and the bank statements of SICL and SIFCO 5, it was possible to establish that neither Mr Al Sanea nor STCC ever paid anything into this fund.*

(6) *When challenged, Mr Hargreaves agreed he had done nothing to investigate the position and had simply drawn (what turned out to be an incorrect) inference from a misreading of a document attached to SIFCO5's Defence.*[2881]

*62. More generally, Mr Hargreaves accepted that he had not done very much to investigate the position of SIFCO 5, which was a "bit of an afterthought."*

*Q.* *"*You haven't really done much in the way of investigating into the affairs of SIFCO 5, you have just looked at SIFCO 5's defence?

A. No, I haven't. The extent to which I have looked at SIFCO 5 is to consider the defence and see if there are any relevant transactions in the transactional database, my Lord.

Q. SIFCO 5 was a bit of an afterthought.

---

2879 **{X6/9/8}**

2880 **{X6/10/12}** - an account which is shown to have often been in overdraft

2881 {**Day74/34:1**}

A. Well, you might say that."[2882]

63. *Mr Hargreaves did, however, reluctantly accept that AHAB's pleaded case that the Funds Portfolio, as an asset of SICL could only have been acquired using monies contributed by Mr Al Sanea to SICL which he had misappropriated from AHAB, was incorrect:*

MR WATSON:
"That is right: "The Funds Portfolio as an asset of SICL could only have been acquired using monies contributed by Mr Al Sanea to SICL which he had misappropriated from AHAB ..."

A. Read just in isolation, I agree with that statement but I think one has to read the whole document together and, as I say, I can't comment on the statement of claim.

Q. We have seen already that SICL had other sources of funds, didn't it?

A. That is correct, and that is why I said that, read in isolation, that sentence doesn't seem right to me. But as I say, read in isolation; I don't know about the whole context in which that is given."[2883]

64. *Following a suggestion from the Court that the Funds Portfolio might not have been purchased* exclusively *with funds misappropriated from AHAB,*[2884] *Mr Hargreaves made clear that he had done no work to identify which assets were and were not purchased with such funds:*

MR WATSON:

2882 **{Day74/34:18} - {Day74/35:1}**
2883 **{Day74/51:22} - {Day74/52:10}**
2884 **{Day74/53:21-22}**

> "If one looks at 161D, it said: "The Funds Portfolio ... could only have been acquired using monies contributed by Mr Al Sanea ..."Even if it is not exclusively, Mr Hargreaves, you haven't done any investigation into which funds interests were and weren't?
>
> A. No."[2885]

***(ii) Mr Al Sanea/SICL's Independent Wealth[2886]***

*65. Had Mr Al Sanea and SICL had no assets of their own, it might at least have been vaguely intelligible for AHAB, given the rest of its case, to have argued that all of Mr Al Sanea's/SICL's assets were in fact the product of AHAB's assets. That cannot be the case once it is acknowledged that Mr Al Sanea had assets of his own.*

*66. Assuming AHAB property was passed to Mr Al Sanea, then it will have been mixed with his own money to a point where the property can no longer be identified in his hands (and is not identified by AHAB). There is no attempt by AHAB to show how its funds were passed on to SICL and then used to acquire the Funds Portfolio.*

*67. In particular, AHAB has failed to identify (a) the accounts from which it is alleged that SICL advanced funds used to finance the Funds Portfolio or (b) any payments into that account by Mr Al Sanea which represent the traceable proceeds of assets of the Money Exchange. As such AHAB has failed to make out any case to trace into the assets of SIFCO 5.*

---

2885 **{Day74/53:23} - {Day74/54:4}**

2886 **{E1/30/30}**

***(iii) Acquisition dates of the Funds Portfolio***[2887]

68. *Equally, by reference to the dates upon which various interests in the Funds Portfolio were acquired, it can be demonstrated that many of those interests could not on any view have been acquired with misappropriated funds.*

69. *Schedule 1 to SIFCO 5's Defence sets out the subscription dates for each of the 58 funds in the Funds Portfolio.*[2888] *However, sixteen of those funds were subscribed to before September 2000 (i.e. before the time when, on AHAB's case, the misappropriations began).*[2889]

70. *In addition,* [the table of Funds' Portfolio Capital Calls][2890] *shows a compilation of the yearly capital call payments made by SICL, Saad Investments Geneva and SIFCO 5 collated. From this table it is clear that:*

(1) *US$27.6m, €3.4m and GBP 15.1m in capital contributions were made prior to 30 September 2000. This represents 10% of total US dollar contributions, 9% of total euro contributions and 60% of total pound sterling contributions. These contributions could not possibly have been made with misappropriated money if the alleged theft started in September 2000. Mr Hargreaves appeared to accept that these contributions could not have been made using misappropriated funds:*

*Q.* "I am going to suggest that if you look at this table at [X6/15/1], the payments identified in the first line couldn't possibly have been made with funds misappropriated from the Money Exchange because

2887 **{E1/30/31}**
2888 **{A2/61/6}**
2889 **Lines 5, 6, 7, 10, 11, 13, 15, 17, 19, 20, 21, 22, 23, 24, 41, 43**
**2890** **{X6/15/1}**

on AHAB's case, that misappropriation hadn't started yet?

A. I can understand the logic of that argument."[2891]

(2) *Similarly, US$50.3m, €4.5m and GBP 22.8m in capital contributions were made prior to year-end 2002. This represents 17.89% of total US dollar contributions, 12.05% of total euro contributions and 89.61% of total pound sterling contributions. Given that Saud clearly knew (as shown from Saud's Calculations) of the level of borrowing of the Money Exchange and of Mr Al Sanea in 2002, it follows that these contributions could not have been made with misappropriated funds.*

*71. However, despite the fact that these contributions were apparent from the face of SIFCO 5's pleading (which Mr Hargreaves accepted was one of the few documents he had read), no credit is given by AHAB for these payments.*

*72. Mr Hargreaves also accepted that he had not looked at redemption receipts that SIFCO 5 would have been able to recycle into new commitments and capital calls. He was therefore unable to say which assets had been acquired with funds that were misappropriated:*

Q. "You haven't been asked to look at how much SIFCO 5's interests were redeemed for, or if they were redeemable at all?

A. No.

[2891] **{Day74/41:14-19}**

Q. From the exercise you have done, you can't say which of the assets held by SIFCO 5 were acquired with funds that AHAB says were misappropriated?

A. No. Not based on the information that I've got, my Lord."[2892]

iv. This admission by itself puts an end to AHAB's claim against SIFCO5.

***"(iv) Funds Paid to SIFCO5 did not emanate from AHAB[2893]***

*73. SIFCO 5's funds were provided from a variety of sources, principally as follows:*

(1) *US$30,000,000 was remitted to it by Barclays pursuant to the ASO and at least US$30,600,000 was advanced to it by Citibank by way of loans. At least US$101,356,526.82, €12,019,410.51 and £7,770,071.97 was provided by way of distributions from the Limited Partnership interests in the Funds Portfolio. There can be no question of tracing into these funds.*

(2) *At least US$66,877,629.28, €1,191,718.21 plus £100,000 was remitted to it by SICL. Again, none of these funds represent the traceable proceeds of moneys paid out to Mr Al Sanea. Of the funds provided to SIFCO 5 by SICL:*

*(i) At least US$4,573,503.60 and €170,721.56 represented distributions General Partners had made to SICL subsequent to the transfer of the Funds Portfolio from SICL to SIFCO 5.*

*(ii) The sum of US$70,000,000 was remitted to SICL by Barclays under the terms of the ASO. These funds were in turn remitted by SICL to SIFCO 5: this was consistent with the terms of the ASO and through this*

2892 **{Day74/42:6-14}**
2893 **{E1/30/33}**

*borrowing the Funds Portfolio was refinanced through the payment of the capital calls, and through the purchase of further investments.*

(3) *US$17,360,526 (being US$8,680,263 by Awal Finance Company (No.2) Limited and US$8,680,263 by Awal Finance Company (No.5) Limited) was paid to SIFCO 5 when SIFCO 5 sold some of its shares in the Parvus European Absolute Opportunities Fund ("the Parvus Shares"). AHAB cannot demonstrate that any, let alone all the funds of the AwalCos belonged to it:*

*(i)* *On 1 October 2008 SIFCO 5 transferred 108,802.50 of the Parvus Shares to Awal Finance Company (No.2) Limited for a consideration of US$8,680,243.45. On the same day, the same number of shares were transferred, for the same quantum of consideration, to Saad Investments Finance Company (No.6) Limited (which was subsequently renamed Awal Finance Company (No.5) Limited).*

*(ii)* *SIFCO 5 gave full value for its receipt of funds. Here the complaint seems to be that the Awalcos held traceable funds but AHAB has nowhere near established that the relevant companies did hold traceable proceeds.*

*(iii)* *The remaining Parvus Shares were redeemed post-liquidation by the JOLs for a consideration of US$12,637,566.02. The redemption proceeds were received by the JOLs into a liquidation bank account on 1 June 2010.*

(iv) *Accordingly, as explained below, given that the funds for this transaction were acquired from Barclays, there is no question of AHAB being able to trace into these funds.*

*74. AHAB cannot trace into the Parvus Shares. These shares were acquired by SIFCO 5 on or around 28 February 2007, when it subscribed for the purchase of 336,080.06 shares in Parvus for a consideration of US$42m. The subscription price was paid on 28 February 2007 out of a Citibank account held in SIFCO5's name. The US$42m purchase monies emanated from two sources:*

(1) *Firstly, on 27 February 2007 Barclays Bank remitted the sum of US$30m (which is the same US$30m particularised above and which was a payment made under the ASO) to the said Citibank account.*

(2) *Secondly, on 28 February 2007 SICL remitted the sum of US$12m which was funded by a payment to it from Barclays under the ASO of US$21m on or around 5 February 2007.*[2894]

(3) *Prior to the payments into the Citibank account of US$12m and US$30m, the account had a credit balance of US$753,914.92.*

(4) *In the circumstances the Parvus Shares were not purchased with monies which belonged to or which represented property belonging to AHAB, but*

---

[2894] Reflected by the timing and number of the second allotment of the two tranches of class B shares to Barclays. The first allotment was of 82,508,062 shares on 30 October 2006. The second allotment was on 1 March 2007, *i.e.* the day after the subscription for the Parvus Shares. That second allotment to Barclays was of 42,000,000 shares, which reflects the purchase price of the Parvus Shares and the resultant increase in value of the Funds Portfolio. Following that second allotment the total number of class B shares held by Barclays represented the re-financing of US$100,000,000, plus a premium element of US$24,508,062.

*were purchased with monies provided by Barclays (whether directly to SIFCO 5 or indirectly through SICL).*

75. *In an attempt to give the impression of having particularised its tracing claim, AHAB has provided a list of transactions at Schedule 12 to its RASOC which, it claims, represents sums which are the absolute beneficial property of AHAB. Schedule 2 to the Defence of SIFCO 5 sets out the reason for each of the payments identified in Schedule 12 of the RASOC. These payments largely consisted of:*

(1) *Payments made by SICL to SIFCO 5 for the purposes of financing capital calls on the Funds Portfolio. These payments were made to shore up/increase the value of SICL's equity of redemption under the ASO and are payments made pursuant to that arrangement with Barclays.*

(2) *Distributions from the Private Equity elements of the Funds Portfolio which were paid to SICL and then remitted to SIFCO 5. They were only paid to SICL as the former owner of those interests and SICL was obliged to account to SIFCO 5 for the distributions, having no interest in the private equity holdings other than its equity of redemption under the ASO.*

(3) *Transactions of sale related to the Parvus Shares, into which, as explained above, AHAB is unable to trace.*

(4) *Two transactions (rows 24 and 51) are simply reversals of previous transactions whereby the SICL deposit into the SIFCO 5 was reversed on the same day, resulting in nil funds being received by SIFCO 5 from SICL. One transaction (row 32) has been erroneously included in the schedule*

*as being from SICL; the deposit was in fact from Partners Group, a fund owned by SIFCO 5.*

76. *Further, it is clear that many of the payments made by SICL to fund the capital calls were not made with funds misappropriated from AHAB. Quite apart from the funds provided to SICL by Barclays, Mr Hargreaves accepted in the case of payments to Lightyear Capital that these payments were made from an overdrawn account.*[2895]

77. *Again, AHAB has given no credit for the receipt of any of these monies. In fact, Mr Hargreaves also recognised that he had done nothing to establish whether any assets held by SIFCO 5 were acquired using funds provided by Barclays:*

> MR WATSON:
> Q. " In respect of the Barclays money, you haven't attempted to trace that money into the hands of SIFCO 5?
>
> A. No, because it's not part of the tracing exercise, because it is Barclays' money, it's not AHAB's money."[2896]

***(v) Nature of the Funds Portfolio***[2897]

78. *SIFCO5's assets were (with the exception of the Parvus Shares discussed above), interests in PE funds which required payments to shore up/maintain the value of the equity of redemption. Put simply, the interests in the Funds Portfolio were not akin to conventional shares but were instead interests that had to be maintained through payments made following capital calls by the general partner of each fund. Thus any interests transferred to SIFCO5 required further funding commitments in the form of capital calls on the various private equity interests. If*

---

2895 **{Day74/30:4-7}**
2896 **{Day74/49:6-9}**
2897 **{E1/30/38}**

*those capital calls were not paid, then the interests could have been forfeited or reduced.*

*79.* *As such, a claim to SIFCO 5's assets requires AHAB not only to demonstrate that monies misappropriated from AHAB were paid over to SIFCO 5, but also to identify the capital calls that it says were met by SIFCO 5 using AHAB's funds rather than funds received from Barclays.*

*80.* *Moreover, given that many of the capital calls were paid with funds that:*

(1) *Were not misappropriated from AHAB because the capital calls were paid before any alleged fraud began; or,*

(2) *Were, (at least arguably) not misappropriated because they were funds that came from an overdrawn account;*[2898]

*AHAB could only ever be entitled to a proportionate share of any individual fund interest.*[2899]

*81.* *It is common ground that, following the imposition of the WFO,*[2900] *many of SIFCO 5's interests were forfeited or the subject of penalties. Accordingly, it is incumbent upon AHAB to identify with particularity the specific contributions which it alleges were made using misappropriated funds. Otherwise the Court simply has no evidence to suggest that any funds misappropriated from AHAB were in fact redeemed for value.*

---

2898 Relying on ***Re Diplock*** (above)

2899 *An analogy can be drawn with the payments to maintain an insurance policy:* ***Foskett v McKeown***

2900 Worldwide Freezing Order of 24 July 2009: **{B/1/1-17}**

82. *However, Mr Hargreaves' evidence was that he had not looked at the composition of the capital calls*[2901] *and had not examined whether any assets of SIFCO 5 were redeemed or for what amounts.*[2902] *It follows therefore that AHAB has failed to provide the Court with any evidence that monies allegedly misappropriated from AHAB remain in the hands of SIFCO 5.*

**(3) SWOLLEN ASSETS**[2903]

83. [As explained in Section 7 of this Judgment on the law of tracing above in this Section], *in the absence of specific identification of property,* [AHAB] *has no case.* [AHAB] *has to identify the original proprietary right in respect of a particular asset and then show that there are the necessary "*transactional links*" between the original asset and the new asset.*[2904]

84. *It is not open to AHAB to overcome its inability to trace its individual property by asserting instead a general property right to or lien over all of SIFCO 5's assets because of the post-2003 transfers to Mr Al Sanea/SICL from the Money Exchange. However much AHAB seeks to deny it, this is nothing more than the discredited swollen assets argument. AHAB's case can only rest on the generalised assertion that all of the assets of SICL, Awal Finance Company (No.2) Ltd and Awal Finance Company (No.5) Ltd represented the traceable proceeds of assets misappropriated from the Money Exchange, notwithstanding*

---

2901 **{Day74/38:25}**

2902 **{Day74/42:6}**

2903 **{E1/30/39}**

*2904* *See* **Underhill and Hayton,** *Law of Trusts and Trustees, 18th ed. Para.* ***90.49 {R2/10}****, citing* **Napier and Ettrick (Lord) v Hunter** ***[1993] AC 713*** *and* **Bishopsgate Investment Management Ltd v Homan.** ***{R1/23.1} and above.***

*the fact that they had substantial assets of their own. This much was acknowledged by Mr Quest QC in opening:*

> "Again, we say the SIFco5 is not in any relatively different position from SICL, because the ultimate source of what went into SIFco5, whether in the form of cash or investments, was money that flowed through the chain of companies through SICL into SIFco5. So, if applying the relevant inferences that we discussed, the assets and money flowing into SICL are traceable back to the Money Exchange, then they can be traced on into SIFco5."[2905]

85. *The so-called "*swollen assets*" theory is derived from an obiter dictum of Lord Templeman in* **Space Investments v Canadian Imperial Bank of Commerce and Trust Co (Bahamas) Ltd.**[2906] *The beneficiaries were unable to trace their money into any particular asset and were treated as unsecured creditors. Lord Templeman said that when a bank trustee has dissipated funds so that tracing becomes impossible, the beneficiaries can trace their money into all the assets of the bank.*

86. *This controversial dictum was distinguished by the Privy Council in* **Re Goldcorp**[2907] *and the theory was rejected in* **Bishopsgate Investment Management v. Homan**,[2908] **Moriarty v Customers of BA Peters**[2909] *and* **Serious Fraud Office v Lexi Holdings Plc**[2910] *in which Keene LJ made the following important observations:*

---

2905 **{Day6/120:23} – {Day6/121:6}**
2906 **{R1/13.3} and above**.
2907 Above
2908 Above
2909 **[2008] EWCA Civ 1604 {R1/37.9}**
2910 Above, at p **393, F-G**

> "49 Based on this passage, Mr. Marshall submitted that where a trustee mixes trust funds with his own assets in such a way as to make it impossible for the beneficiary to identify which of the trustee's assets are affected by an equitable charge the court will impose the charge over all the assets of the wrongdoing trustee.
>
> 50 This cannot be right, in our view. For the equitable charge to attach it must attach to assets in existence which derive from the misappropriated trust funds. There must be a nexus. Were it otherwise the principles of following and tracing could become otiose. On the contrary, tracing in this area is a vital process: just because it is by that process that the necessary nexus is established and the proprietary remedy, be it by way of constructive trust or equitable charge, made effectual. In It is for that reason that if all the misappropriated trust funds in any given case are paid into an account which was and remains overdrawn then the proprietary remedy is lost: for there are no identifiable assets left in existence, deriving from the misappropriated trust funds, to which a constructive trust or an equitable charge could attach: see, for example, In re Diplock [1948] Ch 465, 521 and Bishopsgate Investment Management Ltd v Homan [1995] Ch 211, such a situation it is not open to a beneficiary to seek to shift the claim for an equitable charge to other assets, which do not derive from the misappropriated trust funds."

*87.* It is accepted that it is legally unintelligible to advance a case in this way. A Plaintiff cannot begin to conduct a tracing exercise without first identifying the property to which his claim relates.

## (4) "IMPOSSIBILITY" OF TRACING[2911]

*88. While no such argument has been pleaded, it is anticipated that AHAB will seek to argue that it is "*impossible*" properly to particularise each transactional link between funds paid out from AHAB and funds received by SIFCO 5[2912] and therefore it is not required to plead such links.*

---

[2911] **{E1/30/41}**

**[2912]** At **{Day74/49:10}** Mr Hargreaves laid down this marker for such an argument, later developed by Mr Quest in the context of seeking to reverse the burden of proof based on the "maelstrom" argument: "*I'm not trying to say whether or*

*89. This argument is misconceived and suggestion of impossibility itself has no merit for three reasons:*

(1) *First, the Court has insufficient information as to the investigation performed by AHAB to enable it to come to such a conclusion. Mr Hargreaves' evidence that such a tracing exercise is impossible is undermined by the fact that:*

*(i) He failed to identify the individuals who had performed the relevant searches, giving the Court no ability to test their competence or qualifications.*

*(ii) He failed to identify the documents that had been reviewed or the searches carried out.*

*(iii) In relation to SIFCO 5, he claimed only to have read SIFCO 5's Defence together with conducting unspecified searches of the transactional database.*

*(iv) He failed to list anywhere the searches that had been carried out. This is significant because these searches clearly missed instances in which payments made by SIFCO 5 were made with funds that demonstrably did not come from AHAB.*[2913]

---

*not all the assets in SIFCO 5 are the property of AHAB. What I'm presenting is the information that I've seen, which might suggest that some of them are. To do a full and detailed analysis of the monies going into SIFCO 5 and the source of those monies is, in my opinion, impossible because we have incomplete information within the transactional database. It is the same reason that I give for not being able to trace all the monies through the transactional database in other tracing exercises, because the information is simply incomplete.*"

2913 **{Day74/49:6} - {Day74/51:17}**

*(v) He accepted that SIFCO 5 was an "afterthought" and, it appears, therefore devoted very little time or energy to investigating that part of the tracing claim.*

Thus it is available to the Court to conclude as I do that AHAB has deliberately failed to investigate its tracing claim for fear that the results of that investigation would demonstrate that it had no such claim against SIFCO 5.

(2) *Secondly, as set out above, it is clear that when the bank statements of SICL and SIFCO 5 are analysed, it is possible (at least to some extent) to identify the source of funds paid to SIFCO 5. While the fact that those funds were not misappropriated from AHAB is inconvenient for AHAB's case, it does not mean that tracing is "impossible."*

(3) *Thirdly, as set out above,* [and most compelling in my view] *there is nothing to suggest that SIFCO 5 was part of a coordinated scheme to defeat creditor claims. It was set up and run for the bona fide purpose of refinancing the Funds Portfolio in accordance with the ASO. Accordingly, even if AHAB was to establish that fully particularising a tracing claim was not possible, that would not assist AHAB because I accept that I would not be entitled to infer that AHAB could make such a claim against the assets of SIFCO 5 (and therefore take priority over SIFCO 5's other creditors).*

### *IV. BONA FIDE PURCHASER*[2914]

---

[2914] **{E1/30/43}**

90.[I also accept that even if AHAB had otherwise been able to trace monies/assets into the hand of SIFCO 5, that exercise would be barred through the application of the bona fide purchase defence].

*91. The right to trace cannot be maintained against a* bona fide *purchaser for value. The right to trace is also lost if the property is destroyed. There is no claim against a volunteer who receives from a* bona fide *purchaser. A transactional link is only intact when the proceeds of the plaintiff's property passes into the hands of: (a) an innocent volunteer (i.e. a "***Re Diplock recipient***": see* **Re Diplock**[2915]*); or (b) a purchaser* with *notice.*

*92. A purchase for value is sufficient: the purchase does not have to be for full or equal consideration*[2916]*. It is not therefore necessary to measure the precise consideration moving under the ASO described in more detail below. There is normally no inquiry into value:* ***Bassett v Nosworthy***;[2917] ***Midland Bank Ltd v Green***.[2918]

*93. AHAB contends that SIFCO5 must establish the defence because SICL transferred the Funds Portfolio to SIFCO5 and not Barclays: that Barclays acquired only shares in the cipher holding the Funds Portfolio and not the Funds Portfolio itself.*

94. [Mr. Lowe submits that] *this is artificial and over-simplistic because: (i) Barclays was the real purchaser as a matter of substance; (ii) Barclays was the contractual*

---

2915 Above

2916 **Lewin on Trusts** *18th Ed para **41-115 {R2/11}**, citing* **Basset v Nosworthy** ***(1673) 2 W. & T.L.C (9TH Ed) 136; (1673)*** **Rep Temp Finch** ***102 {R1/0.1}***

2917 Above

2918 ***[1981] AC 513*** **{R1/12.5}**

*purchaser of the Funds Portfolio; and (iii) Mr Al Sanea's knowledge is not to be attributed to SIFCO 5.*

***(1) BARCLAYS WAS THE REAL PURCHASER***[2919]

*95. The question of who is a "*purchaser*" for these purposes is a question of substance not form. Equity will identify the real purchaser in a case involving restitutionary remedies and eschews pure formalism which focuses on nominal parties (see* **Banque Financier de la Cite v Parc (Battersea) Ltd**[2920] *and* **Menelaou v Bank of Cyprus UK Ltd**,[2921] **Swynson Ltd v Lowick Rose LLP,**[2922] **Official Trustee v Citiban**k[2923] *and see* **Foster v Foster***).*[2924]

96. [I accept that, in substance, the real purchaser was Barclays:]

(1) *In reality and in substance, Barclays bought and paid for the Funds Portfolio and SIFCO 5 was merely the cipher for that purpose. Barclays paid the equivalent of US$100m in return for the entire equity in the Funds Portfolio.*

(2) *At the heart of the refinancing transaction was the ASO. The ASO involved exchanges of value between Barclays and SICL but not SIFCO 5. It was an agreement between Barclays and SICL and not SIFCO 5.*

(3) *This is because the risk of loss on the Funds Portfolio was left with Barclays. SICL did not undertake the risk of a borrower that the Funds Portfolio would be insufficient to repay the sum Barclays had advanced.*

---

2919 **{E1/30/44}**

2920 ***[1999] 1 AC 221, 225, 237*** *and* ***238*** **{R1/29.1}**

2921 **{R1/52}**

2922 ***[2016] 1 W.L.R 1045,*** *para* ***54*** **{R1/51.2}**

2923 ***[1999] BPIR 754*** **{R1/31.2}**

2924 ***Unrep. 9 December 2015, Grand Court Mangatal J,*** *para* ***171-173*** **{R1/46.12/78}**

*SICL's interest was simply embodied in the option to repurchase the Funds Portfolio.*[2925]

(4) *The transaction represented a 5-year arrangement, at the conclusion of which, in 2012, Barclays might have transferred part or all of its shares back for not less than the US$70m. SICL received a right to realise any upside (by purchasing Barclays' shares in the SPV) if the value of the Funds Portfolio increased.*

*97.* *Further, looking at the arrangement in its entirety, the transfer of the Funds Portfolio to SIFCO 5 was part of the consideration moving to Barclays in return for assuming the role of the counterparty under the ASO and providing funds given to SICL. There is nothing contractually wrong with the purchaser (Barclays) directing the transferor (SICL) to pay those assets to a third party (SIFCO 5). The fact that the parties nominate the transferee of the assets does not change the fact that the contractual purchaser is Barclays.*

*98.* *This is also reflected in the ASO transaction documents itself. The ASO transaction is set out in two documents. The more detailed terms appear in the Confirmation). The initial transfer of the portfolio of equity interests took place pursuant to an agreement set out in a letter of the same date ("**the Side Letter** *[**Agreement**]*")*:[2926]

(1) *Although the ASO is complex, the effect of the transaction is simple enough. SICL and Barclays agreed, pursuant to the Side Letter*

---

[2925] *Provided that it maintained the prescribed ratios as set out in the ASO.*
[2926] **{O6/1/2}**

[Agreement]*, that SICL would transfer a valuable portfolio to an SPV, the economic benefits of which Barclays would then own subject to SICL's option to purchase Barclays' shares.*

(2) *By Clause 2 of the Side Letter* [Agreement]*, the referenced portfolio of funds was to be transferred to the SPV as soon as practicable after the 25 September 2006. Importantly SICL gave a clear and express covenant to Barclays to transfer those assets to the SPV, which was ultimately SIFCO 5.*

(3) *The portfolio to be transferred (i.e. the reference asset under the ASO) was not absolutely fixed. Hence the Side Letter* [Agreement] *in Clause 2 shows that Barclays and SICL still had to agree which funds should be comprised within the Funds Portfolio.*

(4) *Until the composition of the Funds Portfolio was agreed, the value of the Funds Portfolio ("*the Transfer Amount*" – see Clause 2 of the Side Letter* [Agreement]*) would not be known. For the same reason the amount to be paid to SICL by Barclays on 27 September 2006 called "*the Financing Amount*" – see Clause 5) was not absolutely fixed either. The ASO itself defines the Strike Price as "*initially up to USD 70 million*".*

(5) *The value of the Funds Portfolio to be transferred had to satisfy a ratio whereby the Financing Amount (i.e. initially US$49m being the actual cash to be transferred to SICL on 29 September 2006 under Clause 6) would not be more than 70% of the Transfer Amount (i.e. the value of the Portfolio).*

(6) *Under Clause 7 of the Side Letter* [Agreement]*, SICL then had until the deadline date (i.e. one month after the Financing Amount was received in clear funds – say 1 November 2006) to transfer to SICL Shares in the SPV with an NAV which had to be at least equal in value to the Financing Amount (US$49) and the Premium ("*initially up to*" US$21,811,850 – US$21m is 30% of US$70m).*

*99. The net effect of this is that SICL was required to put a portfolio of US$70m into the SPV as a matter of obligation between it and Barclays. Barclays was entitled to all the equity in that SPV to cover its financing of US$49m together with US$21m premium payment. The premium therefore operated as Barclays' cushion. The total was equivalent to the Strike Price under the ASO.*

*100. The fact that SICL was given an option to indirectly reacquire the portfolio by purchasing Barclays' shares in SIFCO 5 for the amount of the Strike Price under a complex formula, does not alter Barclays' status as purchaser. Indeed it confirms that Barclays had the economic interest of the owner of the portfolio:*

(1) *The ASO enabled SICL (described as "*Party B*") after 5 years to pay the "*Strike Price*" or exercise price to Barclays ("*Party A*") in three instalments between September 2011 (the* "Tranche Settlement Dates*") and March 2012 ("*the Settlement Date*"). In return for this payment, at those dates Barclays, as Party A, was to give up "*Shares*" (i.e. its interest in SIFCO 5).*

(2) *The Strike Price was to be set by 1 October 2006 (i.e. within 2 days of the Effective Date). There were to be monthly payments by SICL to Barclays*

*which in practice represented a gradual accretion to the Strike Price at a rate of US dollar 1 month LIBOR + a spread/interest rate. This was therefore a built-in financing charge and is why the agreement was referred to as an Accreting Strike Option.*

(3) *The "*NAV*" was to be calculated by the Calculation Agent and was defined to represent the value of Barclays' Class B Shares in SIFCO 5 (i.e. net assets of the company less par value of A Shares). The rights attached to the Class B Shares meant that Barclays' shares entitled it to the Net Asset Value which was defined as "*the aggregate value of the Company…[less] the nominal value of all A shares outstanding*". In other words, the A shares were only worth par and the remainder of the capital value of the SPV belonged to Barclays.*

(4) *By March 2012, Barclays was to have transferred B shares in SIFCO 5 to SICL in return for SICL paying the Strike Price. Although SICL could require Barclays to make "*a Strike Increase Payment*" to SICL* [it was capped at a maximum of US$100m[2927] and] *was only permissible if the Strike Price and NAV was kept at the defined ratio.*

(5) *In contrast, if the NAV deteriorated, SICL could require Barclays to reduce the Strike Price, which SICL would otherwise have to pay when the transaction unwound but then had to make "*a Strike Reduction Payment*." The effect of that was to reduce interest charges. If SICL wished to exercise its option, it would have to pay the Strike Price sooner or later,*

[2927] Though in practice this may have been US$124m.

*regardless of the value of the Portfolio. Accelerating payment merely saved the Strike Price Accretions.*

(6) *If the NAV of the portfolio fell too far in relation to the Strike Price (a maximum ratio was set) that would eventually require SICL as Party B to make payments to Barclays as Party A either by way of "*Additional Premium*" or "*Strike Reduction*". Failure to do so would trigger an Event of Default and Barclays would be able to terminate the agreement and retain the B Shares free from any interest (see Strike Trigger Adjustment).*

*101.* *The ASO makes it plain that AHAB could not trace any asset of SICL's into SIFCO 5. It is doubtful enough* [as already discussed above] *that AHAB had any proprietary interest in the equity portfolio of SICL (or any assets of SICL) before this transaction. Once SICL entered into the ASO, it was Barclays that benefitted from the covenant to transfer assets to the SPV. This was a specifically enforceable covenant. SIFCO 5 was merely the nominated third party SPV to which Barclays could insist that SICL transferred the assets. Barclays was entitled to the capital represented by the Funds Portfolio. SICL, as the option holder, ceased to have any interest in the Funds Portfolio itself and simply had an option over the shares in the SPV.*

*102.* *The agreement to transfer the assets to an SPV was a valuable contractual right, or chose in action, which represented the consideration moving to Barclays in return for the payment covenants given to SICL under the ASO.*

*103.* *SICL obviously obtained valuable consideration for the sale to the SPV. The portfolio was "*swapped*" in return for the funding and Barclays' agreement to*

*pay monies direct to SICL. SICL's continued prospect of return on that portfolio was purely synthetic in that it stemmed from a payment obligation assumed by Barclays and not from some proprietary interest.*

*104.* [It appears then that] *SIFCO 5 was a mere cipher of the ASO, designed to hold the Funds Portfolio for Barclays. Given that equity looks to the substance of the transaction and not its form,* [I accept that]*, in substance, Barclays was the real purchaser.*

**(2) ATTRIBUTION OF KNOWLEDGE[2928]**

*105. Even if, contrary to the above, SIFCO 5 was the purchaser, it is submitted* [by Mr Lowe] *that SIFCO 5 was also a* bona fide *purchaser. If it is found that Barclays was not the purchaser, that can only be because SIFCO 5 was a purchaser. Further, it is said that there is no evidence that SIFCO5 ever received notice of Mr Al Sanea's activities at the Money Exchange.*

106. *AHAB's* [pleaded response to this argument] *is at paragraph 182 of the RASOC[2929] where it is suggested that Mr Al Sanea's knowledge of the fraud is to be attributed to SIFCO5 as a result of his "*complete effective control*" over that entity.*

AHAB develops this argument in its written Closing Submissions in the following terms which I set out here before returning to deal with SIFCO5's responses:[2930]

---

2928 **{E1/30/50}**

2929 **{A1/2/87}**

2930 **{D/8/1-15}**

## ***SECTION 8: CLAIMS AGAINST THE DEFENDANTS***

*8.1 AHAB's claims against the Defendant companies broadly fall into two categories: (1) receipt-based claims and (2) assistance-based claims. It should be noted that the latter encompasses AHAB's claim for conspiracy against Mr Al Sanea.*

### ***RECEIPT-BASED CLAIMS***

#### ***AHAB'S CLAIMS***

*8.2 AHAB deals with its receipt-based claims first. They comprise the following:*

*(1) proprietary claims as a consequence of AHAB having traced its assets into the hands of the Defendants;*

*(2) personal claims in knowing receipt against the Defendants to the extent that the Defendants' assets are insufficient to satisfy the proprietary claims; and*

*(3) common law personal restitutionary claims in unjust enrichment against the Defendants, which do not require a tracing exercise in order to succeed.*

*8.3 Both the proprietary and knowing receipt claims arise in consequence of the Defendants' receipt of the traceable proceeds of AHAB's assets. The claims in unjust enrichment arise as a consequence of the Defendants having been unjustly enriched at AHAB's expense. The claims are all framed in Cayman law, that being the law that AHAB contends is applicable. The consequences if Saudi law or another law is applicable instead (or as well) are discussed below; in essence, AHAB's position is that there is no relevant difference between Saudi and Cayman law on the relevant issues.*

***THE POSITION OF THE DEFENDANTS[2931]***

*8.4 Mr Al Sanea's wrongdoing is established and proved, as set out in detail in Section 7.[2932] The Defendants are liable in exactly the same way as Mr Al Sanea. That liability arises in two distinct ways. Firstly, the wrongdoing of Mr Al Sanea is to be attributed to the Defendants. Secondly, the Defendants' position as constructive trustees is of a kind that puts them in the same position as an express trustee for the purposes of their liability to account. These aspects of the Defendants' liability are dealt with in the following paragraphs.*

***ATTRIBUTION OF MR AL SANEA'S WRONGDOING[2933]***

*8.5 One of the issues for the Court to determine is the attribution of knowledge and conduct of Mr Al Sanea to each of the Defendant companies. At the outset of this discussion, it is important to remember that AHAB brings claims against the Defendant companies, of which Mr Al Sanea was chairman and director at all material times, and none of the Defendants is pursuing Mr Al Sanea for his breach of duty owed to them. Given the nature of the claims before the Court, it is surprising that the Defendants have sought to dispute the question of the attribution of Mr Al Sanea's knowledge. The ordinary rule of the attribution of the knowledge of the director as the company's agent should apply.*

***The law of attribution***

*8.6 The essence of the law on attribution is straightforward and is consistent with common sense. It is fact and context sensitive, particularly with regard to the*

---

2931 **{D/8/1}**
2932 **{D/7}**
2933 **{D/8/2}**

*nature of the claim being pursued. In* **Bilta v Nazir (No 2),**[2934] *Lord Neuberger JSC, agreeing with Lord Mance JSC, considered that the question of attribution in any given case is "*simply an open one: whether or not it is appropriate to attribute an action by, or a state of mind of, a company director or agent to the company or the agent's principal in relation to a particular claim against the company or the principal must depend on the nature and factual context of the claim in question.*"*[2935] *Drawing on Lord Hoffmann's speech in* **Meridian Global Funds Management Asia Ltd v Securities Commission***,*[2936] *who had explained that "*any question of attribution is ultimately always one to be found in considerations of context and purpose,*"*[2937] *Lord Mance expressed the question to be considered in this way: "*whose act or knowledge or state of mind is *for the purpose* of the relevant rule to count as the act, knowledge or state of mind of the company*?"*[2938] *(original emphasis).*

8.7 *Lord Mance JSC queried whether, when attribution is considered in this manner, there is any need to focus closely on a distinction between a company's directing mind and will and an ordinary employee because "*any such distinction cannot in any event override the need for attention to the context and purpose in and for which attribution is invoked or disclaimed*".*[2939] *Lord Mance JSC stated clearly that "*it is not the law that the ordinary principles of attribution are replaced in the

---

2934 **[2016] AC 1 {R1/51.1}**
2935 **Bilta v Nazir (No 2)** *[2016] AC 1 at* ***[9]*** **{R1/51.1/10-11}**
2936 ***[1995] 2 AC 500 {R1/26.2.1}***
2937 *Per Lord Mance in* **Bilta v Nazir (No 2)** ***[2016] AC 1*** *at* ***[41]*** **{R1/51.1/18}**
2938 **Bilta v Nazir (No 2)** ***[2016] AC 1 at [41]*** **{R1/51.1/18}**
2939 **Bilta v Nazir (No 2)** ***[2016] AC 1 at [41]*** **{R1/51.1/18}**

case of a company, any more than they are in the case of an individual, by some general principle that the only relevant conduct or state of mind is that of someone who is or can be treated as an alter ego or directing mind and will of the relevant company or individual.*"*[2940] *Lord Sumption JSC expressed the point in this way:* *"*The question what persons are to be so far identified with a company that their state of mind will be attributed to it does not admit of a single answer.*"*[2941]

*8.8* *Therefore, it may not necessarily be the case that the company will only have attributed to it the state of mind of its formal directing organ according to its constitution. The court is permitted to consider the position as a matter of fact relating to the practice within the company for the exercise of the company's powers. The case of* **El Ajou v Dollar Land Holdings Ltd**[2942] *provides a useful illustration of this. Hoffman LJ explained:* "[t]he position as reflected in the articles may have to be supplemented by looking at the actual exercise of the company's powers. A person held out by the company as having plenary authority or in whose exercise of such authority the company acquiesces, may be treated as its directing mind.*"*[2943] *He went on to hold that the company in that case was fixed with the knowledge of its part-time chairman and non-executive director because he had acted as the directing mind and will for the particular purpose of arranging the company's receipt of the tainted funds.*

---

*2940* **Bilta v Nazir (No 2)** ***[2016] AC 1 at [49]*** **{R1/51.1/21}**

*2941* **Bilta v Nazir (No 2)** ***[2016] AC 1 at [67]*** **{R1/51.1/27}**

*2942* ***[1994] 2 All ER 685 {R1/21/1}***

*2943* ***[1994] 2 All ER 685 at p 705e-f {R1/21/21}***

8.9 *The contextual and purposive approach to attribution also explains why it is possible for a company to "*rely on attribution for one purpose, but disclaim attribution for another*".[2944] As Lord Sumption JSC put it: "*Where the purpose of attribution is to apportion responsibility between a company and its agents so as to determine their rights and liabilities to each other, the result will not necessarily be the same as it is in a case where the purpose is to apportion responsibility between the company and a third party.*"[2945] In their joint judgment Lords Toulson and Hodge JJSC made the same point that a company's role, whether as villain or as victim, need not be characterised in* the same way both as between the company and a third party and a company and its director.[2946]

8.10 *Thus, to enable a company to enforce the duty owed to it by its director, it is possible to disclaim the attribution of that director's knowledge or acts; however, if the company is suing a third party, or being sued by a third party (as the Defendants are here being sued by AHAB), the director's knowledge or acts can be attributed to the company. It is for this reason that an allegation of fraud made against the director by the company itself will result in the disclaimer of attribution of the director's knowledge by the company for the purposes of that claim. It would be contrary to justice and common sense if the fraudulent director could exculpate himself by arguing that the very company which he defrauded had his own knowledge of the fraud perpetrated against it.[2947] The*

---

2944 *Per Lord Mance in* **Bilta v Nazir (No 2)** *[2016] AC 1 at* ***[43] {R1/51.1/18}***.

2945 **Bilta v Nazir (No 2)** *[2016] AC 1 at* ***[92] {R1/51.1/40}***

2946 **Bilta v Nazir (No 2)** *[2016] AC 1 at* ***[166] {R1/51.1/59}***

2947 *As explained by Viscount Sumner* **JC Houghton & Co v Nothard Lowe & Wills** *[1928] AC 1* **{R1/5.8.3}** *and quoted by Lord Sumption in* **Bilta v Nazir (No 2)** *[2016] AC 1 at* ***[73]*** **{R1/51.1/30}**.

*rationale for and the scope of the exception was explained in clear terms by Lord Sumption JSC as follows:*[2948]

> "A claim by a company against its directors, on the other hand, is the paradigm case for the application of the breach of duty exception. An agent owes fiduciary duties to his principal, which in the case of a director are statutory. It would be a remarkable paradox if the mere breach of those duties by doing an illegal act adverse to the company's interest was enough to make the duty unenforceable at the suit of the company to whom it is owed. The reason why it is wrong is that the theory which identifies the state of mind of the company with that of its controlling directors cannot apply when the issue is whether those directors are liable to the company. The duty of which they are in breach exists for the protection of the company against the directors. The nature of the issue is therefore itself such as to prevent identification. …This is so whether the company is a one-man company or not, because the objection to the attribution of the culpable directors' state of mind to the company is that they are being sued for abusing their powers….The position is different where the company is suing a third party who was not involved in the directors' breach of duty for an indemnity against its consequences. In the first place, the defendant in that case, although presumably in breach of his own distinct duty, is not seeking to attribute his own wrong or state of mind to the company or to rely on his breach of duty to avoid liability. Secondly, as between the company and the outside world, there is no principled reason not to identify it with its directing mind in the ordinary way."

*8.11* *As Lords Toulson and Hodge JJSC explained: "*where a third party makes a claim against the company, the rules of agency will normally suffice to attribute to the company not only the act of the director or employee but also his or her state of mind, where relevant*."*[2949] *They endorsed Patten LJ's summary of the position in the Court of Appeal which has a particular resonance in the context of this case: "*attribution of the conduct of an agent so as to create liability on the part of the

[2948] **Bilta v Nazir (No 2)** *[2016] AC 1 at* ***[89]-[91]*** **{R1/51.1/39-40}**
[2949] **Bilta v Nazir (No 2)** ***[2016] AC 1 at [205]*** **{R1/51.1/71}**

company depends very much on the context in which the issue arises. He said that as between the company and the defrauded third party, the company should be treated as a perpetrator of the fraud…*"*[2950] *It followed that Lords Toulson and Hodge JJSC considered that there was a role for the concept of "*directing mind and will*" in the English law of attribution*[2951] *where the usual rules of agency do not resolve the question of attribution.*

*8.12 Plainly, AHAB's claim against the Defendant companies is not one in which Mr Al Sanea's duties owed to the Defendant companies are in issue. Therefore there is no question of the breach of duty or the fraud exception applying and the usual rules of agency should apply. In the circumstances of this case, given that Mr Al Sanea was a director of each of the Defendant companies the usual rules of agency apply to attribute the knowledge of Mr Al Sanea to each of the Defendant companies. Even if that were not the case, as Mr Al Sanea was the ultimate beneficial owner, chairman and director of the Defendant companies, and was intimately involved in arranging or directing the transactions which resulted in the receipt by the Defendant companies of the Money Exchange's (tainted) funds, the only possible conclusion to reach is that his knowledge should be attributed to the Defendant companies, whether one considers him the directing mind and will of the company or not – although he plainly was.*

*8.13 Once one understands (a) that the question of attribution is sensitive to the nature of claim in question, and (b) that this case is not one in which Mr Al Sanea's*

---

[2950] **Bilta v Nazir (No 2)** ***[2016] AC 1 at [208]*** **{R1/51.1/72-73}**
[2951] **Bilta v Nazir (No 2)** ***[2016] AC 1 at [180]*** **{R1/51.1/64}**

*directors' duties to the Defendant companies are in issue, the Court need not contemplate, for the purposes of determining whether Mr Al Sanea's knowledge should be attributed to the Defendant companies, the question of whether the Defendant companies received any benefit*[2952] *from the fraud in which they were implicated. As Lord Sumption JSC in* **Bilta v Nazir (No 2)** *explained it is "*unnecessary to address the elusive distinction between primary and secondary victimhood*"*[2953] *once one appreciates the more fundamental distinction in the nature of the claim being pursued by or against the company. The "*question of benefit, if any, to be received by the company *[from the relevant fraudulent scheme]* will be of particular importance*"*[2954] *but only in determining whether or not the company is the victim of the fraud perpetrated by its director or its directing mind and will.*[2955]

***The Defendants' position on attribution*** [2956]

*8.14 AHAB has pleaded*[2957] *and submits that the knowledge and conduct of Mr Al Sanea should be attributed to each of the Defendant companies. That is disputed*

---

2952 *This does of course remain a highly relevant question when it comes to any relief to be granted to AHAB based on the Defendant companies' receipt of funds misappropriated from AHAB.*

2953 **Bilta v Nazir (No 2)** ***[2016] AC 1*** *at* ***[93]*** **{R1/51.1/40}**

2954 **Beach Petroleum NL v Johnson** ***(1993) 43 FCR 1*** *at* ***30*** **{R1/20.3.3/30}** *applying the test from the Canadian Supreme Court case of* **Canadian Dredge and Dock Co Ltd v The Queen (1985) 19 DLR (4th) 314 {R1/13.1.1}**

2955 *As Von Doussa J stated in* **Beach Petroleum NL v Johnson** ***(1993)*** *43 FCR 1 at* ***[31]*** *(a decision from Australia):* **"**The exception to this rule [i.e. the rule of attribution] is where the director is acting <u>totally</u> in fraud of the company, that is, where <u>all</u> the director's activities are directed against the interests of the company, and <u>not partly for the benefit of the company</u>. If the director is guilty of fraudulent conduct which is not totally in fraud of the corporation, and by design or result the fraud partly benefits the company, the knowledge of the director in the transaction will be attributed to the company.*" (Emphasis added.)*

2956 **{D/8/6}**

2957 *AHAB's RASOC* ***paragraphs 2*** *and* ***182*** *to* ***183B.2 {A1/2.3/3}*** *and* ***{A1/2.3/87-88}***

*by the Defendant companies for the reasons set out below, which AHAB submits are ill-founded.*

***The GT Defendants***

*8.15 In these proceedings, the GT Defendants deny that Mr Al Sanea exercised complete control of the GT Defendants prior to the appointment of the liquidators. They plead:*[2958]

> "SICL and Singularis were not under the complete control of Mr Al Sanea nor did they act at his sole instance or in concert with him. Both SICL and Singularis had functioning systems of corporate governance and directors independent of Mr Al Sanea. There are no grounds for attribution of notice and/or knowledge and/or complicity **by SICL and/or Singularis in any fraud (if any) perpetrated by Mr Al Sanea** against AHAB or any other liability of Mr Al Sanea to AHAB." (Emphasis added.)

*8.16 As set out in detail in paragraphs 5.132 to 5.133 Section [5]*[2959] *the GT Defendants' stance in this litigation is contrary to the position their Joint Liquidators have taken in other proceedings where they have accepted that the Saad Group companies were controlled by Mr Al Sanea.*[2960]

*8.17 The GT Defendants also claim that not every act of Mr Al Sanea should be attributed to SICL and/or Singularis simply because Mr Al Sanea was a director of those companies (or even had the ability to control their affairs). They claim*

---

2958 *GT Defendants' Re-Re Amended Defence and Counterclaim paragraph **10 {A1/9/5}***

2959 **{D/5/45-46}**

2960 "The purpose of SICL was to hold certain offshore assets and manage investments of [Mr Al Sanea] and his family… Mr Al-Sanea controlled the Saad Group and was its ultimate beneficial owner. Mr Al Sanea was also the Chairman of SICL" - *see the affidavit of Stephen Akers dated 27 September 2012 at paragraph 9 in **SICL v Markant Holdings Inc**, In the High Court of Justice, Commercial Court, Folio No 1575 of 2011 **{L3/21/3}***
"SICL was part of the Saad group of companies controlled by Mr Al-Sanea." - *Affidavit of Stephen Akers dated 1 September 2011 at paragraph 9 in **SICL v Maan Al Sanea**, In the High Court of Justice, Commercial Division, 2011 Folio 1037 **{L3/17/3}**.*

*that it must be demonstrated that when carrying out the relevant act Mr Al Sanea was wearing his 'hat' as a director of SICL and/or Singularis.*

***The AwalCos***

*8.18 The AwalCos allege that the facts show that it cannot be said that Mr Al Sanea was the 'controlling mind' of the AwalCos and cannot be contended that his knowledge is attributable. They allege that:*[2961]

> "Contrary to allegations that they were mere puppets of Mr Al Sanea, or that there was anything amiss in the way that the AwalCos were operated or caused or conducted themselves, the AwalCos and their directors operated properly and with high standards of corporate governance. In particular:
>
> (1) The AwalCos were established for, and transacted business for, entirely legitimate purposes.
>
> (2) The AwalCos operated with a formal and independent board of directors.
>
> (3) The AwalCos obtained, and acted in accordance with, legal advice.
>
> (4) The internal operations of the AwalCos was entirely regular."

*8.19 The AwalCos also allege that they had a board of* "proactive directors"[2962] *who were* "given the authority to play a significant role in determining the affairs of the AwalCos*"*[2963], "behaved with independence"[2964] and "certainly did not simply 'rubber stamp' the actions of Mr Al Sanea"[2965]. *They claim that the board of directors, and not Mr Al Sanea alone, was the controlling mind of the AwalCos.*

---

[2961] *AwalCos' Written Opening Submissions paragraph 107;* ***{U/4/72}***
[2962] **{U/4/73}** *paragraph* ***109***
[2963] **{U/4/73}** *paragraph* ***109***
[2964] **{U/4/78}** *paragraph* ***116***
[2965] **{U/4/78}** *paragraph* ***116***

***SIFCO 5***

*8.20* *In relation to attribution, SIFCO 5's pleaded position is that: "*it is denied that there are any grounds for attributing notice and/or knowledge and/or complicity of or by SIFCO 5 in any fraud AHAB may establish against Mr Al Sanea.*"*[2966] *In their written opening submissions, SIFCO 5's position is that, "*in reality, the "directing mind and will"' of SIFCO 5 … was Barclays (or alternatively SFS)*".*[2967] *In SIFCO 5's oral opening submissions, SIFCO 5's leading counsel stated:*[2968]

> "When you consider whether you can attribute knowledge to SIFCO 5, you have to work out precisely who is doing what. You can't just simplify it and say SIFCO 5 is controlled by Mr Al Sanea, because for many purposes, neither the manager nor the directors had control of what they were doing, because it was all done under contract and with certain custodial interests."

*8.21* *SIFCO 5 also seems to rely on the fact that Mr Al Sanea was an officer of more than one of the Defendants (a fact which we submit supports AHAB's analysis of attribution and of the wider fraud perpetrated by Mr Al Sanea more generally) and state that "[t]here is no evidence before the Court that Mr Al Sanea was under a duty under Saudi law to communicate the source of the funds to SIFCO 5."*[2969]

***AHAB's position***[2970]

---

[2966] **{A1/14/190-191}** *paragraph* ***46.3(d)***
[2967] **{U/13/142}** *paragraph* ***294***
[2968] **{Day13/37:21}** *to* **{Day13/38:2}**
[2969] *SIFCO 5's Written Opening Submissions paragraph* ***296 {U/13/143}***
[2970] **{D/8/9}**

*8.22 AHAB submits that Mr Al Sanea's knowledge and conduct should be attributed to each of the Defendants. For the reasons outlined below, AHAB submits that each of the Defendants' interpretation of the relevant facts and the law of attribution is wrong.*

***Control of the Defendants***

*8.23 The Defendants (the GT Defendants and SIFCO 5 in particular) seem to assert that it is necessary for AHAB to show that Mr Al Sanea exercised complete control of the Defendants in order for his knowledge to be attributed to them. This is an incorrect interpretation of the law of attribution. In order for his knowledge to be attributed to the Defendant companies,* ***AHAB need only show that Mr Al Sanea was a relevant agent of the companies, which he was by virtue of being a director of each of the companies at the relevant time.*** *AHAB also submits, if it needs to, that Mr Al Sanea was the directing mind and will of the Defendant companies. This criterion is fulfilled by virtue of the facts that Mr Al Sanea:*

*(1) was a director of each of the Defendants;*

*(2) was the beneficial owner of each of the Defendants; and*

*(3) carried out executive functions and made decisions binding each of the Defendants.* (Emphasis added.)

*8.24 Separately, AHAB does submit that the evidence before the Court shows that Mr Al Sanea exercised a very high degree of control over the Defendants. The issue*

*of Mr Al Sanea's control of the Defendants is dealt with in Section 5*[2971]*. We highlight here three particularly telling illustrations of the level of control exercised by Mr Al Sanea:*

*(1) He directed the business plan for SICL to be implemented with the assistance of SFS.*[2972]

*(2) He approved the transfer of deposits of more than USD 1 billion from STCC to SICL in December 2007.*[2973] *Both bank accounts which were affected by this transfer were held by the Commercial Bank of Kuwait. However, SICL's bank statements for this account are not available.* [This transaction was examined above when considering the tracing claim against the GT Defendants].

*(3) He made key decisions regarding the capitalisation of SICL and Awal Bank.*[2974]

***The existence of boards of directors of each Defendant company***[2975]

*8.25 All of the Defendants rely heavily on the existence of, for each of them, a board which allegedly exercised a "functioning system of corporate governance."*[2976] *As outlined in Section 5*[2977]*, AHAB does not accept that the Defendants' asserted positions are well-founded. We remind the Court of two particular examples*

---

2971 ***{D/5}***
2972 ***{G/5484/1}***
2973 ***{G/6178/1}****. See also* ***{G/6312/1}*** *in connection with this transfer. See also Hargreaves 1/195-202* ***{I/2/64-65}]***
2974 ***{G/7025.1/1}***
2975 **{D/8/10}**
2976 ***{U/3/93}*** *paragraph* ***291***
2977 ***{D/5}***

*which reveal the practical reality of the functioning of the Defendant companies' boards of directors:*

*(1) The function of the board of SICL was limited by Mr Al Sanea by the establishment of an executive committee comprised of only him, his wife and Mr El Mardi.*[2978] *None of the other SICL directors were recorded as present in person or by proxy at the meeting which created the executive committee, and it is not recorded in the minutes that they had been notified, consulted or that they had any knowledge of the establishment of the executive committee.*

*(2) Mr Buxton explains in an interview with the GT JOLs that when things started to go wrong for the Saad Group at the end of 2008, Mr Al Sanea was personally placing deposits at this time and that the board had no idea what was happening to them.*[2979] *He further explains that the audit committee tried to find out what was happening but were unable to.*[2980] *He describes trying to call board meetings from early 2009 but that he kept receiving negative responses.*[2981] *Eventually in July 2009 he emailed Mr Al Sanea*[2982] *regarding the fact that SICL had not had a board meeting since August 2008 saying:*

> "Joe Consolo wrote a note to Mike Alexander and Maan Al Zayer dated June 6th in which he asked for regular information in accordance with normal standards of

[2978] *The executive committee was formed on 16 November 2004 by way of a resolution dated 16 October 2004* ***{Z/22/1}***

[2979] *Attendance note for 6 December 2010 meeting between GT JOLs and Andrew Buxton, paragraph 4* ***{Z/24/2}***

[2980] *Attendance note for 6 December 2010 meeting between GT JOLs and Andrew Buxton, paragraph 4* ***{Z/24/2}***

[2981] *Attendance note for 6 December 2010 meeting between GT JOLs and Andrew Buxton, paragraph 5* ***{Z/24/3}***

[2982] ***{G/8004.1/1}***

> corporate governance. Unfortunately that has not been forthcoming, and I, Christoph Gruninger, and Lee Thistlethwaite have been disappointed that our expertise has been ignored, but we have now reached a critical stage where the principles behind Joe's note must be implemented and a board meeting must take place.*"* *(emphasis added).*

8.26 *Describing the exclusion of the board from discussions at this time Mr Buxton described Mr Al Sanea as "*a typical Saudi Arabian and only continued to communicate with a small group of advisors, stopping all other communications outside this circle.*"*[2983]

8.27 *In any event, the existence of a functioning board of directors which carried out effective corporate governance does not assist the Defendants in their assertion that the knowledge of Mr Al Sanea should not be attributed to each of the Defendants. Even if (which is not accepted) Mr Al Sanea was one member of an effective board of directors and even if (which is not accepted) Mr Al Sanea was the only director who knew about the fraud, that does not somehow eradicate or suppress Mr Al Sanea's fraudulent knowledge or avoid its attribution to the Defendant companies. He remained an agent of the companies acting with their authority and on their behalf irrespective of the existence of the other directors.*

8.28 *As outlined at paragraph 8.13 above, the only scenario*[2984] *in which Mr Al Sanea's knowledge and conduct may not be attributed to the Defendants is the scenario in which the Defendants were the victims of his fraud. However, far*

---

2983 *Attendance note for 6 December 2010 meeting between GT JOLs and Andrew Buxton, paragraph 5*{**Z/24/3**}

2984 **Beach Petroleum NL v Johnson** *(1993) 43 FCR 1 at 30* {**R1/20.3.3/30**} *applying the test from the Canadian Supreme Court case of* **Canadian Dredge and Dock Co Ltd v The Queen** *(1985) 19 DLR (4th) 314* {**R1/13.1.1/1**}

*from being victims of the fraud, the Defendants were the beneficiaries of Mr Al Sanea's fraud, knowingly receiving billions of dollars misappropriated from AHAB.*

8.29 *The fact that Mr Al Sanea's actions have left the Defendants exposed to liabilities incurred to third parties as a consequence of the fraud against AHAB is immaterial to the legal analysis of attribution; without more, it does not render the Defendant companies victims of the fraud and the Defendant companies are not making any legal claims against Mr Al Sanea in these proceedings.*[2985] *Similarly, it is also irrelevant that the Defendants' creditors in liquidation would benefit from the defeat of AHAB's claim and/or success of the counterclaim, even if those creditors include those which were victims of the fraud.*[2986]

8.30 *Put shortly, on the claims before this Court in these proceedings, there is no basis upon which the Defendants can be considered victims of Mr Al Sanea's fraud so as to prevent Mr Al Sanea's knowledge being attributed to each of the Defendants.*

***Barclays was the controlling mind of SIFCO 5***[2987]

8.31 *SIFCO 5 have put forward no evidence in support of their assertion that Barclays was the controlling mind of SIFCO 5.*[2988] *SIFCO5's case in this regard rests solely on the fact that Barclays held shares in SIFCO 5. AHAB does not dispute that but it overlooks that the shares allotted to Barclays were class B non-voting*

2985 **Bank of India v Morris** *[2005] 2 BCLC 328 at 357 per Mummery LJ* **{R1/37.2.1/30}**; ***Stone & Rolls v Moore Stephens*** *[2008] 3 WLR 1146 at 1170-71 per Rimer LJ*

2986 **Stone & Rolls v Moore Stephens** *[2008] 3 WLR 1146 at 1186-1187* **{R1/38.1/25}**

2987 **{D/8/12}**

2988 ***{U/13/142}*** *paragraph* ***294***

*shares. They were preferential equity shares so that in the event of the winding up of the company these should be repaid in priority to the class A shares. It was the non-transferable class A shares which were the management shares, and these were issued and allotted to SICL throughout the life of SIFCO5 prior to its entry into provisional liquidation. Indeed, SIFCO5 state* "[t]he ASO *[the agreement with Barclays]* meant that Barclays' only recourse was to the B shares and to the rights of capital those shares conferred*."*[2989]

8.32 *Indeed, there is no evidence that Barclays played any role in managing SIFCO 5. The notion that the directing mind and will of SIFCO 5 is a bank which had no say or control in the management of the company, and had no right to have any such say or control, must be wrong. The directing mind and will of SIFCO 5 was Mr Al Sanea, the ultimate owner, director and Chairman of the company.*

***SFS was the controlling mind of SIFCO 5***[2990]

8.33 *Perhaps indicative of SIFCO5's lack of conviction in their own position that Barclays was the controlling mind, they submit that, in the alternative, SFS was the controlling mind of SIFCO5.*[2991] *However, they have adduced no evidence in support of their alternative theory either.*

8.34 *In any event, SFS was part of the Saad Group and just as much under the control of Mr Al Sanea as the Defendant companies. SFS was Mr Al Sanea's company in Geneva. As with the Defendant companies, Mr Al Sanea was the owner, director and the Chairman of SFS. Indeed, in other proceedings the GT Defendants have*

---

2989 ***{U/13/121}*** *para* ***242 (7)*** *of SIFCO 5's written Opening Submissions*
2990 {D/8/13}
2991 ***{U/13/142}***

*stated that, "*SFS is not an independent service provider – it is a member of the Saad Group and is controlled by Mr Al Sanea.*"*[2992] *Mr Al Sanea issued instructions to SFS in the same manner in which he did for the Defendants.*[2993] *The control Mr Al Sanea exerted over SFS is further shown by the fact that Mr Al Sanea ordered the removal and retention of documents belonging to the Defendants from SFS's offices in Geneva.*[2994] *As Isi Watt states in her email dated 29 August 2009,*[2995] *the documents were not returned despite the fact that Mr Al Sanea had told her that they would be.*

*8.35 Accordingly, Mr Al Sanea's knowledge and conduct should be attributed to SFS too. As such, SIFCO 5's unsupported assertion that SFS was the controlling mind of SIFCO 5 does not assist them: SFS is just another corporate manifestation of Mr Al Sanea.*

***Mr Al Sanea was wearing 'different hats'***[2996]

*8.36 The GT Defendants appear to suggest that in order for Mr Al Sanea's knowledge and conduct to be attributed to the Defendants, AHAB must show that for each transaction entered into by the Defendants Mr Al Sanea was wearing his 'hat' to*

---

2992 *See the first affidavit of Hugh Dickson dated 23 June 2010 at paragraph 23 in* **SICL v Montpelier Global Funds Limited and Deutsche Bank (Suisse) S.A.**, *FSD 159 of 2010; the first affidavit of Stephen Akers dated 7 June 2010 at paragraph 29 in* **SICL v Greenway Special Opportunities Fund Ltd and Credit Agricole (Suisse) SA**, *In the Supreme Court of Bermuda, 2010 and the first affidavit of Hugh Dickson dated 11 June 2010 at paragraph 19 in* **SICL v Moore Global Investments Ltd, Citco Fund Services (Bahamas) Ltd and Deutsche Bank (Suisse) SA**, *Commonwealth of the Bahamas, in the Supreme Court, Commercial Side* **{L3/33/6}**

2993 *See for example* **{G/3596/1}**

2994 *See the Seventh Affidavit of Hugh Dickson dated 16 November 2010 at paragraph 11 in In the Matter of* **SICL and ors** *FSC 15 of 2010* **{L3/2/3-4}**

2995 **{M/18/1}**

2996 **{D/8/13}**

*represent that particular Defendant.*[2997] *This wrongly seeks to put the onus on AHAB. Unless there is evidence to the contrary, when taking corporate decisions as a director of that company, Mr Al Sanea so acted wearing his 'hat' for that particular company. Anyone dealing with Mr Al Sanea in relation to a transaction for a particular Defendant, for example SICL, would be entitled to assume that when dealing with Mr Al Sanea as a director of SICL, Mr Al Sanea was wearing his 'SICL hat' and acting as the agent (or the mind and will) of that company.*

*8.37 Mr Al Sanea created a hugely complicated web of transactions (all the more complicated because some of these were only paper transactions) between the various companies which he owned and/or controlled, including the Money Exchange. He used the companies to maximise the leveraging possibilities and thereby his overall financial position. The notion that by Mr Al Sanea creating a tangled corporate web, AHAB now bears the onus to show which 'hat' he was wearing at any one time is misplaced and wrong. If the Defendant companies seek to suggest that when acting in each transaction, the position was other than the default position that Mr Al Sanea did so wearing a 'hat' for that particular company, the onus is on the Defendant companies to show that. If the position were otherwise, it would facilitate Mr Al Sanea hiding behind his web of companies.*

[2997] ***{U/3/192}*** *paragraph 36*

***Summary*[2998]**

*8.38* *AHAB submits that the law on attribution as it applies to these proceedings is straightforward, and can be summarised succinctly:*

*(1)* *Mr Al Sanea was a director, and agent, of each of the Defendants;*

*(2)* *He played an active role in running the Defendants both on a daily basis and at a strategic level;*

*(3)* *He was (if it is relevant) the directing mind and will of the Defendants;*

*(4)* *This is not a case in which it can be said that the Defendant companies are the victims of Mr Al Sanea's fraud, or, at the least, certainly not for the purposes of dis-applying any attribution of knowledge; and*

*(5)* *Accordingly, Mr Al Sanea's knowledge and conduct should be attributed to the Defendants.*

*8.39* *For the reasons outlined above, AHAB submits that the Defendants' position regarding the attribution of the knowledge and conduct of Mr Al Sanea to the Defendants is plainly wrong. To fail to attribute Mr Al Sanea's knowledge and conduct to the Defendants would be contrary to well-established authority and would facilitate fraud."*

*8.40* I now return to SIFCO5's response as presented by Mr Lowe.

v. Mr Lowe argues that AHAB has provided no particulars as to how Al Sanea was able to exercise control or complete control or complete effective control over SIFCO 5 (besides being one of its directors), nor are there any particulars of whether Al Sanea did in fact do so. Equally, no explanation is given as to what behaviour *"complete effective control"*

2998 **{D/8/14}**

over a company encompasses or may encompass, nor is the legal significance of exercising such manner of control specified.

vi. I have no difficulty in accepting that there is no evidence presented that Al Sanea ever exercised "*complete effective control*" over SIFCO 5.

vii. SIFCO 5 was established for a *bona fide* commercial purpose and, at all times, was operated in accordance with that purpose. Management functions were properly exercised by SFS, through the powers delegated to it by SICL as investment manager. There is no evidence that Al Sanea exercised any of his powers as director of SIFCO 5 otherwise than consistently with SIFCO 5 having a properly constituted board of directors, including independent directors, which exercised proper corporate governance, or otherwise than consistently with the due delegation of managerial functions to SICL and SFS.

viii. Indeed, it is arguable that in reality, the "*directing mind and will*" of SIFCO 5, for the purpose of assessing its *bona fides*, was Barclays (or alternatively SFS), given the nature of the purpose for which SIFCO 5 was established, as examined above.

ix. But there is also a fault line between AHAB and the Defendants as to <u>the requirements of the law</u> of attribution of knowledge. The Defendants say that where one person is an officer of two companies, his personal knowledge is not necessarily the knowledge of both companies. The knowledge which he has acquired as officer of the one company will not be imputed to the other company, unless he owes a duty to the first company to communicate his knowledge, and also a duty to the second company to receive the

notice: **Re Hampshire Land Co**;[2999] **Re Fenwick, Stobart & Co Ltd**;[3000] **Re David Payne & Co Ltd**;[3001] **Mid-Glamorgan CC v Ogwr BC**;[3002] **El Ajou v Dollar Holdings Plc**.[3003]

x. There is no evidence before the Court that Al Sanea was under a duty under Saudi law to communicate the source of the funds to SIFCO 5. Nor is there any such principle under Cayman Islands law. Thus, on no basis can any knowledge of Al Sanea as to his own activities at the Money Exchange, be attributed to SIFCO 5.

**Discussion on the law of attribution**

xi. It will be apparent from the excerpts above from AHAB's Closing Submissions, that AHAB contends for an assumption that, because of his position as director in respect of each of the Defendants, it is to be assumed that Al Sanea was the "*directing mind and will*" of each Defendant company and so that his knowledge of his alleged fraud against AHAB is to be attributed to each of the Defendants to ground each Defendant's liability in AHAB's receipts-based and assistance-based claims.

xii. Having already rejected the allegations that Al Sanea defrauded AHAB, this question of attribution of knowledge does not arise. However, in keeping again with the intention to address all issues of potential importance, I will here briefly state my understanding of the applicable law (contrary as it turns out, to AHAB's analysis of it).

xiii. ***In Re Hampshire Land Company***[3004] Vaughan Williams LJ held that:

---

2999 [1896] 2 Ch. 743 **{R1/2.5}**
3000 [1902] 1 Ch 507 **{R1/4.2}**
3001 [1904] 2 Ch 608 **{R1/5.5}**
3002 (1994) 68 P. & C.R. 1 at 10, per Hoffmann LJ **{R1/20.4}**
3003 Above (at 698, per Nourse LJ) **{R1/21}.**
3004 Above, at 748.**{R1/2.5}** (A decision which was approved by the House of Lords in **JC Houghton & Co v Nothard Lowe & Wills** [1928] AC 1 per Viscount Dunedin at p**15** and Viscount Sumner at p**19** **{R1/5.8.3}**)

> "*.. the knowledge which has been acquired by the officer of one company will not be imputed to the other company, unless the common officer had some duty imposed upon him to communicate that knowledge to the other company, and had some duty imposed on him by the company which is alleged to be affected by the notice to receive the notice.*"

xiv. In his oral Closing Submissions Mr Quest asserted that this well-established principle ("the **Hampshire Land principle**"), was not applicable where a person acted as a "*directing mind and will*" of a company either generally or for the purpose of a particular transaction. In particular, Mr Quest submitted that the Hampshire Land principle was "*a principle that applies to agency"* and did not apply "*when a person is treated as the directing mind and will."*[3005]

xv. It is clear from **Bilta v Nazir (No.2)**[3006] however, that this proposition is wrong. There it was decided (among other things)[3007] that where a company has been the victim of wrongdoing by its directors, or of which its directors had notice, then the wrongdoing, or knowledge, of the directors cannot be attributed to the company as a defence to a claim brought against the directors by the company's liquidator, in the name of the company and/or on behalf of its creditors, for the loss suffered by the company as a result of the wrongdoing, even where the directors were the only directors and shareholders of the company, and even though the wrongdoing or knowledge of the directors may be attributed to the company in many other types of proceedings.

xvi. Lord Sumption emphasized that questions of attribution of knowledge to a company (including where the company is itself sued by a third party) are a recognition of the fact

3005 **{Day128/34:20}; {Day128/35:3}**
3006 Above **{R1/51.1}**
3007 As summarized per Lord Neuberger at **[7]**

that the law treats a company as thinking through agents, just as it acts through them. At **[65]** Lord Sumption said as follows:

> "*English law might have taken the position that a company, being an artificial construct, was mindless. If it had done that, then legal wrongs which depended on proof of some mental element such as dishonesty or intention could never be attributed to a company and the present question could not arise. ... This question was however, settled as far as English civil law was concerned by the end of the 19th century. As Lord Lindley put it in Citizens Life Assurance Co Ltd v Brown [1904] AC 423, 426, once companies were recognized by the law as legal persons, they were liable to have the mental states of agents and employees such as dishonesty or malice attributed to them for the purpose of establishing civil liability… It cannot be emphasized too strongly that neither in the civil nor in the criminal context does this involve piercing the corporate veil.* ***It is simply a recognition of the fact that the law treats a company as thinking through agents just as it acts through them.****"* (Emphasis added.)

xvii. Lord Sumption also made clear in ***Bilta v Nazir (No. 2)*** that the concept of a "*directing mind and will*" of a company was a principle of the law of agency, not distinct from it; at **[67]**[3008]:

> "*The directing organ of the company may expressly or implicitly have delegated the entire conduct of its business* ***to the relevant agent,*** *who is actually although not constitutionally its "directing mind and will" for all purposes.*" (Emphasis added.)

xviii. At **[68]** Lord Sumption said that he regarded **El Ajou v Dollar Holdings plc**[3009] (relied upon here by Mr Quest) as an "*illustration of the attribution of knowledge to a company on the basis that* <u>*its agent*</u> *was its directing mind and will*" (emphasis added). At **[68]** he said as follows:

---

3008 **{R1/51.1/27}**
3009 Above

"*A modern illustration of the attribution of knowledge to a company on the basis that its agent was its directing mind and will for all purposes is Royal Brunei Airlines Sdn Bhd v Tan [1995] 2 AC 378, where the Privy Council was concerned with the knowledge required to make a company liable as a constructive trustee on the footing of knowing assistance in a dishonest breach of trust. The defendants were a one-man company, BLT, and the one man, Mr Tan. At pp392-393, Lord Nicholls of Birkenhead, delivering the advice of the Board, observed that Mr Tan had known the relevant facts and was therefore liable. "By the same token, and for good measure, BLT also acted dishonestly. [Mr Tan] was the company, and his state of mind is to be imputed to the company." On the other hand, El Ajou v Dollar Land Holdings plc [1994] 2 All ER 685 did not concern a one-man company. The issue was whether knowledge of the origin of funds received for investment by Dollar Land Holdings, a public company, could be imputed to it so as to found a liability to account as a constructive trustee on the footing of knowing receipt. Lord Hoffmann, delivering the leading judgment of the Court of Appeal and applying the principles which he would later explain in Meridian Global, held that the company was fixed with the knowledge of one Mr Ferdman, its part-time chairman and a non-executive director, because he had acted as its directing mind and will for the particular purpose of arranging its receipt of the tainted funds.*"

xix. Lord Sumption discussed **Hampshire Land** at paragraphs **[72]** and **[73]** of his judgment in **Bilta v Nazir (No.2).** He expressly referred to the *Hampshire Land principle* as approved by the House of Lords in **JC Houghton & Co v Nothard Lowe & Wills**[3010] and said at **[73]**:

"*Vaughan Williams J's dictum was subsequently adopted by two members of the House of Lords in JC Houghton &Co v Northard Lowe & Wills [1928] AC 1, where the issue was whether a company was bound by an arrangement adverse to the company's interest which had been made by two of its directors for their own benefit and was never approved by the board. It was contended that the knowledge of the two directors could be attributed to the company so as to found a case of acquiescence. Viscount*

[3010] Above

> *Dunedin (at p14) summarily rejected the suggestion that the company could be treated as knowing about a director's breach of duty by virtue only of the knowledge of the defaulting director himself.."*

xx. Thus, it is clear that the question of attribution of knowledge will be resolved on the basis of agency and that the concept of the "*directing mind and will*" of a company is a principle of agency.

xxi. It follows and I conclude that the *Hampshire Land principle*, (*that the knowledge which has been acquired by the officer of one company will not be imputed to the other company, unless the common officer had some duty imposed upon him to communicate that knowledge to the other company and had some duty imposed on him by the company which is alleged to be affected by the notice to receive the notice)* will therefore apply whether the person said to be authorized is a director or other employee or agent of the company said to be affected by the notice.

xxii. It is also important to note that in their joint judgment in ***Bilta v Nazir (No.2)****,* Lords Toulson and Hodge said that in a case where a party makes a claim against a company (as in this case) it will not be necessary to consider the concept of a "*directing mind and will*" at all except where the terms of a statute or contract require it. They said as follows at **[205]**[3011]:

> "… *where a third party makes a claim against the company, the rules of agency will normally suffice to attribute to the company not only the act of the director or employee but also his or her state of mind, where relevant. In this context, the company is like the absent human owner of a business who leaves it to his managers to run a business, while he spends his days*

[3011] **{R1/51.1/71} and above.**

> *on the grouse moors (to borrow Staughton LJ's colourful metaphor in PCW Syndicates v PCW Reinsurers [1996] 1 WLR 1136, 1142). Where the rules of agency do not achieve that result,* ***but the terms of a statute or contract are construed as imposing a direct liability which requires such attribution****, the court can invoke the concept of the directing mind and will as a special rule of attribution*. (Emphasis added.)

xxiii. No such statutory or contractual considerations arise in this case.

**Conclusion**

xxiv. The principles of attribution are the principles by which the knowledge and state of mind of individuals are attributed to companies in the management of which they are involved or on whose behalf they act. The ordinary rule of attribution is that the acts and states of mind of those who are the company's agents including, depending on context, the directing minds, will be attributed to the company. However, as the *Hampshire Land principle* makes clear, there is no assumption that the knowledge of a director who is a director of different companies, will be attributed to all his companies.

xxv. An allegation of knowledge of particular facts (here, knowledge of the facts involved in the alleged fraud by Al Sanea against AHAB) must be established on a "hat" by "hat" or company by company basis.

xxvi. In other words, the attribution of a director's knowledge to any of his companies in the capacity of agent, can be justified only on the basis and in the context of his respective relationship with each company.

xxvii. For all the reasons of fact and law discussed above, AHAB has failed to establish that Al Sanea's knowledge of a fraud against AHAB can be imputed to SIFCO 5.

xxviii. I have not had an enquiry into the relationships as between Al Sanea and the other Defendant companies sufficient to allow me to pass on this question of attribution as it

might have related to them in the event it were found that AHAB's allegations against Al Sanea are proven. In the event I have found that no such allegations are proven in this case.

xxix. AHAB raises no plea of estoppel in relation to the position taken by the GT JOLs in the earlier proceedings mentioned above.

xxx. In the circumstances as they stand, I consider that it is neither necessary nor appropriate for me to reach a conclusion on this question of attribution of Al Sanea's knowledge to either the GTDs or the AwalCos.

## IV. CAUSES OF ACTION AGAINST SIFCO5

xxxi. It is submitted by SIFCO 5 that if AHAB's tracing claim fails, so must its proprietary claim over the assets of SIFCO 5 and its claim in knowing receipt.

xxxii. Further, each of the dishonest assistance claim, the conspiracy claim and the unjust enrichment claim rests upon the allegation that SIFCO 5 received money or assets that represent the proceeds of funds misappropriated from the Money Exchange. Accordingly, if the tracing claim fails (which I have already concluded it must), so must all of these claims. What follows therefore was presented by SIFCO 5 in the alternative to that primary position, had I found to the contrary.

### (1) DISHONEST ASSISTANCE[3012]

xxxiii. [It is submitted that] *even if AHAB was able to trace into the assets of SIFCO 5, the facts pleaded by AHAB do not amount to dishonest assistance. None of SIFCO 5's actions amount in law to "*assistance*" for the purposes of dishonest assistance.*

3012 **{E1/30/52}**

xxxiv. *It is submitted that the mere receipt of funds, absent more, is insufficient to constitute "*assistance*" for the purposes of the tort of dishonest assistance (otherwise every knowing recipient would automatically also be liable as a dishonest assistant):*

(1) *Many of the misappropriations pleaded occurred well before SIFCO 5 was incorporated and accordingly SIFCO 5 could not have assisted in those breaches of duty (see* **Brown & Anor v Bennett & Ors**[3013]*);*

(2) *As set out above, SIFCO 5 did not act as a repository of any funds which may have been misappropriated by Mr Al Sanea but rather to fulfil the commercial purpose set out in the ASO which was principally:*

*(i)* *to provide collateral to Barclays through the issue of Class B shares for the provision of the refinancing to SICL; and,*

*(ii)* *only secondarily to provide an upside profit to SICL through the Class A shares should the investments prove to be successful (which in the event they were not).*

(3) *Following its establishment none of its '*acts*' provided any assistance to Mr Al Sanea in his alleged breaches of fiduciary duty – such acts would have occurred in any event, and would in no manner have been dependent upon and/or derived any assistance from the incorporation of SIFCO 5 or its acts as an asset-holding vehicle during its lifetime.*

xxxv. I accept the foregoing and that it is equally nonsensical to suggest that any such assistance was dishonest. SIFCO 5 would not have been created, nor its assets transferred to it, were it not for the ASO (which was a perfectly legitimate commercial

---

3013 **[1999] B.C.C. 525 {R1/30.2}**

agreement). Thereafter, any receipts by SIFCO5 were for the purpose of funding capital calls on the Funds Portfolio and fulfilling its obligations under the ASO. AHAB's submission that the receipt of the Funds Portfolio and the subsequent payments was dishonest is one that is unsupported by the evidence.

## (2) CONSPIRACY[3014]

xxxvi. *AHAB's pleaded conspiracy claim (at paragraph 184.3 of AHAB's Statement of Claim)*[3015] *is that SIFCO 5:*

> "…at all material times acted under the control of Mr Al Sanea and in concert with him, acted as repositories for the proceeds of the fraud, or a large part of them, as pleaded in section I, and/or received payments directly from the Money Exchange".

xxxvii. I hold that this pleading is insufficient to ground a claim for conspiracy. As SIFCO5 submits:

(1) *It is well established that the tort of conspiracy requires an agreement between the conspirators (see for example* ***Clerk & Lindsell on Torts*** *21st Ed at 24-95).*[3016]

(2) *AHAB has failed to identify any agreement between SIFCO 5 and Mr Al Sanea to "*act as a repository*" for any such proceeds. In fact, there could hardly have been such agreement for the reasons of the purposes for which SIFCO 5 was established as set out above.*

xxxviii. Accordingly, the claim in conspiracy fails.

## (3) UNJUST ENRICHMENT[3017]

---

3014 **{E1/30/54}**
3015 ***{A1/2/88}***
3016 ***{R2/1/3}***

xxxix. *The final claim made against SIFCO 5 is one in restitution (more properly referred to as a claim in unjust enrichment).*

I have addressed this claim as it relates to SIFCO 5 and in principle also to the other Defendants in Section 7 of this Judgment dealing with the law relating to AHAB's equitable claims. As this is as much a receipts-based and assistance-based claim as the others, it fails on the basis that AHAB has not proven the alleged fraud nor been able to show receipts of the proceeds of fraud.

## VI. CONCLUSION ON AHAB'S CLAIMS

AHAB's attempts to trace are unparticularised and unprincipled. It has failed to establish that any funds represent the traceable proceeds of funds from the Money Exchange. It has further failed to articulate any discernible cause of action against SIFCO 5 in respect of those alleged funds. In such circumstances AHAB's claims must be dismissed.

[3017] **{E1/30/55}**

# SECTION 7D

## THE ILLEGALITY DEFENCE

## SECTION 7D

## THE ILLEGALITY DEFENCE

1. As the consequence of my conclusions that the AHAB Partners authorised Al Sanea's conduct and were complicit throughout in the fraud upon the banks, AHAB's proprietary and personal claims against the Defendants as Al Sanea's ciphers have been found to be unsustainable. There is, therefore, no need for the Defendants to invoke the illegality defence.

2. In the event, however, it is ultimately decided that AHAB should prevail on the factual basis of its case, in particular that "New for Old" really existed and was actually sought to be implemented by Suleiman, the outcome could be very different. AHAB may then be able to establish the predicate fraudulent breach of trust by Al Sanea, and subject to meeting the requirements of the rules of tracing, to trace into the assets of the Defendants on the basis of its proprietary claims and arguably also on the basis of its knowing assistance and unjust enrichment claims against the Defendants in person, casting them in the mould of constructive trustees.

3. Accordingly, and notwithstanding my decision on the merits of AHAB's claims, it is appropriate that I express my findings on the illegality defence raised and very ably argued by SIFCO 5 and adopted by all the other Defendants.

4. As I trust will be fully explained in this section of the Judgment, the illegality defence is entitled to succeed, not only on the basis of AHAB's continuous complicity in the fraud from beginning to end but even in the event "New for Old" was real, because of AHAB's indisputable involvement, through Abdulaziz until October 2000, in what had already

become a massive fraud on the banks and one which AHAB must have known would be continued, even if curtailed in order to give effect to "New for Old" itself. In other words, the "New for Old" policy itself involved the continued dissemination to the banks of falsified accounts, in order to induce the banks to continue to lend at least as much as was required to prevent the collapse of the Money Exchange and other Financial Businesses.

5. I pause here to acknowledge my indebtedness to Mr. Lowe and his instructing attorneys for their elucidating analysis of the legal principles and their application of the principles to the facts and circumstances of this case. Having found myself to be in complete agreement, I will gratefully adopt and adapt their submissions to express my decision and reasoning on the subject.

6. However, before doing so I will set out next, an excerpt from AHAB's Closing Submissions[3018] which I regard as being helpful also for setting the context for the discussion of the principles:

> *9.1 "It is perhaps obvious, but worth stating right at the outset, that in any case (irrespective of the facts or the particular causes of action in issue) the illegality defence (if successful) operates to prevent the plaintiff's recovery pursuant to a claim which the Court* <u>*has otherwise found*</u> *has the merits on its side. Here, therefore, if it is to consider the application of the illegality defence, the Court will have already concluded that AHAB has brought good claims against Mr. Al Sanea and the Defendant companies and is (subject to the possible application of the*

[3018] **{D/9/1}-{D/9/3}**

*illegality defence) entitled to remedies against those defendants. As a consequence, the Court will be approaching its consideration of the illegality defence with the overarching question of whether it is appropriate in all the circumstances to deny AHAB something to which it is otherwise entitled.*

9.2 *The main thrust of SIFCO 5's entire approach to this case since June 2016, i.e. the month before the trial began, has been that the Algosaibis are as much fraudsters as Mr. Al Sanea and they should be barred from any recovery because of their complicity in a fraud perpetrated against the banks which lent funds to the Money Exchange and the other Financial Businesses. In short, their predominant case theory is that the Algosaibis were and have been in cahoots with Mr. Al Sanea in defrauding the banks since the early 1980s and their involvement in this 'illegality' should prevent them from recovering anything as against the Defendant companies.*

9.3 *It is worth noting that the allegation that AHAB's conduct was unlawful or otherwise wrongful and should prevent any recovery did not materialize until relatively late given the history of this case. SIFCO 5's pleading did not refer to the illegality defence until an amendment was made to its defence in June 2016 to include the following paragraph: "Further AHAB's claims against SIFCO 5 and/or each of them are founded upon or*

*otherwise in substance arise from AHAB's unlawful or quasi-unlawful or otherwise wrongful conduct as set out in [earlier paragraphs of the defence] and/or represent attempts to recover the fruits and/or proceeds of such unlawful or quasi-unlawful conduct (in circumstances in which, accordingly, AHAB lacks "clean hands"). In the premises herein, AHAB is precluded from recovering the same."*[3019]

*9.4 The burden falls on SIFCO 5 to make good that pleaded case.*

*9.5 AHAB did not oppose the amendment (neither on the basis of its substance nor due to its lateness) but it is telling that it was not until June 2016, many months into discovery and shortly before the trial was due to start, that SIFCO 5 considered that it could make this allegation. It is also worth noting that there was, and there remains, no specific allegation, either in the pleadings or the written submissions, of precisely what criminal conduct was engaged by AHAB or the AHAB partners. That is of particular importance where the Court is being asked to invoke illegality in relation to conduct in Saudi Arabia, and at any rate outside the Cayman Islands. Any allegation of criminal conduct should be made with care and consideration. That is no less true when a defence of illegality is raised.*

---

3019 **{A1/14/202}** at **paragraph 52D**

*9.6 The other Defendant companies did not make any similar amendment and nor do their pleaded positions formally advance the illegality defence. It is accepted by AHAB that that is not a bar to the Court considering the illegality defence in their favour. However, it is revealing that the other Defendant companies did not consider that the illegality defence was even worth pleading.*

*9.7 In Section 6 {D/6} of these closings submissions, the question of the extent of the Algosaibis' involvement in Mr. Al Sanea's fraud on the banks has been considered. The three central points of Section 6 are:*

*(1) Whilst the evidence shows that Abdulaziz knew of the misleading accounting practices of the Money Exchange which were implemented in the 1980s and continued into the 1990s,* ***the Court does not have sufficient evidence before it to conclude that Abdulaziz deliberately and knowingly engaged in a fraud on the banks.***

*(2)* ***Even though those accounting practices were continued by Mr. Al Sanea after Abdulaziz's stroke on 30 September 2000 throughout the 2000s to May 2009, the balance of the evidence is that Suleiman, Saud and Yousef had no appreciation or understanding that such practices were being used to effect a fraud on the banks;***

***indeed, they paid little or no regard to the accounting or reporting at the Money Exchange beyond the receipt of dividends from it. There is material on which the Court could find that they exercised insufficient diligence or attention, but not a finding of a dishonesty or participation in illegality.*** (Emphasis added).

*(3) The one person who is the consistent feature throughout 1981 to 2009, who was in control of the financial affairs of the Money Exchange, who understood the effect of the accounting practices and deliberately continued them so as to perpetrate a fraud against the banks and against AHAB during the period between October 2000 & May 2009 is Mr. Al Sanea."*

7. I accept, as AHAB posits above, that SIFCO 5 (as the lead Defendant on this subject) had the burden of establishing the illegality defence. Not only had AHAB met the test for the grant of leave to proceed against the Defendant companies in liquidation[3020] but its case had also survived a strike out application[3021] - the Court thus confirming that AHAB had on the pleadings, *prima facie,* a good arguable case.

8. I also note here AHAB's complaint that there has been "*no specific allegation*" of illegality, whether as a matter of Cayman or Saudi law.

---

[3020] **2010 (1) CILR 553**; **{B/14/1}**

[3021] **2011 (2) CILR 434**; **{B/30/1}**

9. However, there should have been no perceived lack of specificity as a matter of Cayman law[3022] in light of the Defences which relied throughout upon the averment that AHAB authorized and was in cahoots with Al Sanea in the fraud upon the banks. See for example the following averment from the re-re-amended Defence and counter-claim of the GT Defendants:[3023]

> "*It is denied that Mr. Al Sanea used his position at the Money Exchange to defraud AHAB by misappropriating very large amounts of money from the Money Exchange. Further or alternatively, AHAB had knowledge of and/or authorised* and/or consented to and/or acquiesced in *the alleged conduct of Mr. Al Sanea so that it is not now entitled to make complaint of it as against the GT Defendants.*"

10. Nor, to the extent it matters, (Cayman law being the *lex fori*) should there have been any lack of clarity about the allegation as a matter of Saudi law. As discussed in Section 7 above, the fraud upon the banks was undoubtedly criminal conduct under Saudi law.

11. What AHAB's response comes down to then, are the words in emphasis above from its Closing Submissions. In effect, it is that AHAB is deserving of being afforded a locus poenitentiae for having corrected the error of its ways after Abulaziz's time. Moreover, that even during Abdulaziz's time, there is no clear evidence that he knew that his conduct in falsifying the accounts and sending them to the banks was criminal.

---

3022 Obtaining property by deception, obtaining pecuniary advantage by deception, false accounting and the publication of false accounts by directors of an incorporated body being , respectively, indictable criminal offences under **sections 247, 248, 255 and 257 of the Penal Code (2017 Revision).**

3023 **{A1/9/5} at [9];** see also SIFCO 5's pleading at **paragraph 8A207.6 of its Re-Amended Defence: {A1/14/121}**, further discussed below**.**

12. For the reasons to be explained as adopted from SIFCO5's lucid submissions below, I find that there was no possibility of AHAB establishing a locus poenitentiae in the face of its conduct during Abdulaziz's time and its admitted continuing involvement in the use of fraudulent accounts to obtain loans from the banks, even if only, as AHAB (in my view dishonestly) claims, to sustain the "New for Old" policy.

13. With those introductory observations I now turn to the detailed examination of the issues, noting again, my grateful and copious reliance upon the excellent submissions of SIFCO

**(I) THE NATURE OF THE ILLEGALITY DEFENCE.**

14. The illegality defence has been radically reconsidered and restated in the recent Supreme Court decision of **Patel v Mirza**.[3024] While unanimous as to the outcome, in its majority judgment the Court rejected the traditional reliance test for the illegality defence in favour of a more flexible tri-partite policy based approach.

15. While I will be adopting in detail below SIFCO 5's analysis of the decision, the following introductory summary will help to set the context.

16. The case involved the use of a "*Spread Betting*" account to speculate on price movements of Royal Bank of Scotland plc ("RBS") shares. The account holder (Mr. Mirza) intended to use inside information for this purpose, through contacts he had at RBS. The inside information was expected to be a government statement about RBS which would have led to its share prices increasing. Mr. Patel paid Mr. Mirza £620,000 which it was agreed Mirza would use to fund the Spread Betting account for the purpose of speculating on the movement of the RBS share prices.

---

[3024] **[2016] UKSC 42 {R1/55}**

17. The agreement was plainly contrary to the prohibition on insider dealing in section 52 of the Criminal Justice Act 1993.

18. As events transpired, the agreement could not be carried out because the expected inside information was not forthcoming. Mr. Mirza failed to return the money to Mr. Patel. Mr. Patel sued Mr. Mirza for a claim in unjust enrichment.

19. Mr. Mirza's main contention was that the claim should fail because of the illegality of the agreement.

20. At first instance his claim failed. Applying the "*reliance principle*" in **Tinsley v Milligan**,[3025] the judge held that P's claim was unenforceable because he had to rely on his own illegality as a party to the unlawful agreement, to establish it. The majority of the Court of Appeal agreed, but held that because the scheme had not been executed, Patel's claim succeeded.

21. The majority of the Supreme Court concluded (in its lead judgment delivered by Lord Toulson) that a claimant who satisfies the requirements of a claim in unjust enrichment should be entitled to the return of his money or property and such a person should not prima facie be debarred from recovering money paid or property transferred by reason of the fact that the consideration which had failed in whole or in part was unlawful consideration; and that, since an order for restitution of the money paid by Mr. Patel to Mr. Mirza would merely return the parties to their previous position before the conclusion of the illegal agreement and prevent the defendant Mirza gaining by unjust enrichment, such an order should be made.

---

[3025] **[1994] 1 A.C. 340 {R1/20.2}**

22. The majority of the Supreme Court concluded that there were policy reasons for the common law doctrine of illegality as a defence to a civil claim: (i) a person should not be allowed to profit from his own wrong doing and (ii) the law should be coherent, not self-defeating, and should not condone illegality. Whether allowing a claim would be harmful to the integrity of the legal system depended on a tripartite test: (i) whether the purpose of the prohibition that had been transgressed would be enhanced by denying the claim; (ii) whether denying the claim might have an impact on another relevant public policy; and (iii) whether denying the claim would be a proportionate response to the illegality. Within that framework, a range of factors might be relevant and it was not helpful to prescribe a definitive list. That said, the courts could not decide cases in an undisciplined way and a principled and transparent assessment had to be made. Potentially relevant factors included the seriousness of the conduct, its centrality to the illegal agreement, whether it was intentional, and whether there was disparity in the parties' respective culpability. Punishment for wrongdoing is the responsibility of the criminal courts. The civil courts are generally concerned with determining private rights and obligations, and they should neither undermine the effectiveness of the criminal law nor impose additional penalties disproportionate to the nature and seriousness of any wrongdoing. The courts had to abide by the terms of any relevant statute, but they are to have regard to the considerations of policy and the nature and circumstances of the illegal conduct.

23. The reliance rule laid down in **Tinsley v Milligan** should no longer be followed.

24. In my discussion below of the principles, it will be seen that the policy considerations and relevant factors identified by Lord Toulson are examined in the context of AHAB's claims.

25. To begin, it will be readily apparent how very different the circumstances of AHAB's claims are from those of Mr. Patel. On the basis of the evidence which I accept in this case, the unlawful compact between AHAB and Al Sanea to defraud the banks was not a one-time undertaking, it had been successfully executed on an ongoing basis for more than 20 years. As the result of it and as already noted in this Judgment (and discussed further below), more than US$330bn was fraudulently obtained during the last decade alone of the Money Exchange's operations – during the putative "New for Old" period. More than 100 of the world's leading banks were victimised and many remain without any firm prospect of recoveries.

26. And so, as SIFCO 5 submits, AHAB's claim against Al Sanea and the Defendants (as his incorporated ciphers) is rather to be likened to that of the highwayman in **Everet v Williams**,[3026] who was seeking an account from his fellow robber of the ill-gotten gains of their venture. The notation of this long-standing case records the court's dismissal of the Bill of claim for being "*scandalous and impertinent*" to the dignity and honour of the court. Despite the unavailability of the judicial dicta from the case, it has been repeatedly invoked over the years by the Courts at the highest level: see **Stone & Rolls v Moore Stephens**;[3027] **R. v Ahmad (Shakeel)**;[3028] **Laboratoires Servier v Apotex**;[3029] **Bilta (UK) Ltd v Nazir (No 2)**[3030] and **Patel v Mirza** (itself).

---

3026 **(1725) (unreported but noted (1893) 9 LQR 197 {R1/24}** and **Lindley on Partnership 2nd Ed. Chapter VI. {R2/12.2}**

3027 **[2009] 1. A.C. 1391 {R1/38.8}**

3028 **[2015] A.C. 299 {R1/46.10}**

3029 **[2015] A.C. 130**. **{R1/45.5}**

3030 Above, **[2015] UKSC 23 at [59]. {R1/46.11/21}**

27. As is common ground and found to be proven, instead of stealing property from users of the highway, the Money Exchange obtained the proceeds of loans by deception from local and international banks. The deception consisted of AHAB and the Money Exchange employing dishonest and false accounting practices in order to produce misleading financial statements.

28. The allegation of illegal conduct was not in fact disputed on the pleadings:

(3) At paragraph 207.6 of its Re-Amended Defence,[3031] SIFCO 5 pleads that:

> "*The provision of the English Financial Statements by the Money Exchange to the Money Exchange's bankers resulted in the Money Exchange and AHAB repeatedly obtaining and/or extending borrowings or otherwise obtaining funds from those bankers*."

(4) AHAB implicitly admits this allegation at paragraph 4E.1 of its Re-Amended Reply to the Defence of SIFCO 5.[3032]

29. Remarkably, the evidence of AHAB's first witness, Mr. Hayley, was that every single bank was dishonestly misled so that every dollar that had ever been borrowed was dishonestly obtained.[3033] Accordingly, it has to be regarded as common ground that the bank loans of the Money Exchange were procured by means of dishonest accounting information.

30. I accept that the production of the false accounting information for the purpose of inducing the bankers is relevant turpitude for the purposes of the illegality defence (see

---

3031 {**A1/14/121**}

3032 {**A1/17.2/7}.** Here SIFCO 5 cites paragraph 4A1.3a of AHAB's Re-Amended Reply to SIFCO 5's Defence as an outright admission but this appears at AHAB's Re-re-re-amended Reply at 1/17.2/22} where AHAB pleads that Al Sanea alone was responsible.

3033 {**Day24/113:19}-{Day24/114:16}**- this will be excerpted verbatim below.

**Laboratoires Servier v Apotex)**.[3034] While, as already noted above, AHAB's conduct would be deemed unlawful as a matter of Saudi law, it is therefore unnecessary to identify illegality under any foreign law to determine whether the use of dishonest accounting information is criminalised under the law that applied to the relevant transaction. Under Cayman Islands law, AHAB's turpitude is sufficient to bar its claim.

31. It must also therefore be regarded as common ground that Al Sanea's withdrawals from the Money Exchange represented the withdrawal of ill-gotten gains from the banks through a venture of dishonest and fraudulent borrowing:

(1) The proceeds of these loans in the hands of the Money Exchange were no different from the proceeds of the robberies of the highwaymen.

(2) Just as Everet sought an account/recovery of the proceeds of the robberies, AHAB is seeking to recover the proceeds of its deceptions from Al Sanea (and also from the companies with whom he was connected):

(i) Al Sanea was a partner in the Money Exchange, as was AHAB.

(ii) On AHAB's own case (as admitted per Mr Hayley) the Money Exchange held only dishonestly procured funds.

(3) Accordingly, like Everet the highwayman, AHAB is seeking relief from another partner on the improper footing that the funds of which banks were defrauded became the partnership property i.e. the property of the Money Exchange.

---

3034 Above - where in the context of a claim for infringement of pharmacological patents, the Supreme Court held, inter alia (while finding on the facts of the case that the public interest was not sufficiently engaged to invoke the ex turpi causa rule) that "*acts which constituted "turpitude" for the purposes of the ex turpi causa rule were not confined to criminal acts but extended to acts which were quasi-criminal in that they were contrary to the public law of the state and engaged the public interest, which was the foundation of the illegality defence; that non-criminal acts which engaged the public interest included dishonesty or corruption even in the context of purely civil disputes, and the infringement of rules which were enacted for the protection of the public interest and which attracted civil sanctions of a penal character…*"

32. However, it must be understood that this case is even more brazen because, unlike Everet, AHAB is seeking to trace the ill-gotten gains into the hands of *third party* transferees (at least one of whom (SIFCO 5 as I have found) has given good consideration) rather than merely from their fellow wrongdoer. AHAB's case is not simply akin to seeking to sue AHAB's fellow highwayman but also akin to bringing proceedings against the highwayman's publican for the funds transferred to him.

33. It must also be borne in mind that AHAB was no sleeping partner. The evidence has shown that AHAB actively instigated the dishonest practices and the deception practised on the banks. AHAB (through its Chairmen, Abdulaziz and Suleiman, as well as through Saud and Yousef) was not merely complicit in the fraud on the banks but initiated it and repeatedly endorsed it. Those AHAB Partners involved in the dishonest practices of the Money Exchange never sought to countermand what had occurred and would continue to occur until 2009. In the 2000s AHAB wallowed in its own culture of dishonest accounting practices. There can be no question but that dishonesty/turpitude should be attributed to AHAB.

34. Nor can it be said that AHAB was in any sense the <u>victim</u> of the unlawful and dishonest behaviour:

(1) As demonstrated in Section 2 of this Judgment dealing with "Relative Benefits", the borrowing was necessary to fund the grand scheme of the Algosaibis to become bankers and financiers and to build up significant stakes in Saudi and certain foreign banks.

(2) I have also found that a large part of the borrowing (probably equivalent to 50% of Al Sanea's booked indebtedness) was used to further AHAB's own ambitions

and, unlike Al Sanea, AHAB assumed no obligation to repay that borrowing. See Section 6 dealing with the Al Sanea indebtedness.

(3) The assets built up over time (in particular the SAMBA and other banking shares) were in fact used for AHAB's benefit, enabling it to gain prestige and influence in Saudi Arabia.

(4) In addition to these assets, the Partners also obtained huge benefits in the form of wrongfully paid dividends and loans which have still not been repaid.

**[The following subparagraph which refers to the evidence on day 83 in camera is embargoed from further publication until further order].**

(5) [redacted][3035] [redacted][3036]

35. Despite AHAB's somewhat desperate protestations to the contrary, I agree with the submission that it is not and never has been seeking to make recovery on strictly on behalf of creditors or acting in a fiduciary sense, like a liquidator. AHAB has assumed none of the functions of a liquidator. And so the Defendants, in raising the illegality defence, are not seeking to prevent the enforcement of any duty owed to creditors or even to AHAB. The Defendants' complaint is that, quite independent of Al Sanea's alleged breaches of duty to them, the AHAB Partners engaged in a serious fraud. That it is therefore offensive that these Partners are now seeking an indemnity against the

---

3035 See in particular the Judgment on applications by the Defendants for security for costs. **{B/39/7}**

3036 [redacted]

consequences of that fraud and to recoup from the Defendants the proceeds of that fraud which were paid to Al Sanea (primarily through a non-party cipher of his: STCC).

36. As already indicated, there can be no recognition of any locus poenitentiae on the part of AHAB. Far from withdrawing from the fraud following Abdulaziz's stroke, AHAB repeatedly affirmed that it was to continue. No admission of the fraud has been made by any Algosaibi Partner (it was denied by both Saud and Yousef and to the very end, not even frankly admitted in relation to Abdulaziz). When offered the opportunity to apologise for what had happened, Saud steadfastly refused to do so.[3037]

37. Even if illegality had not been specifically pleaded (which it has been by SIFCO 5 – see Re-Amended Defence para 52D),[3038] the Court of its own motion would have been required to examine whether AHAB's claim could proceed notwithstanding the largely unchallenged evidence of unlawful and dishonest conduct: **Scott v Brown Doering McNab & Co**[3039] and **Chettiar v Chettiar**.[3040]

## (II) APPLICATION OF THE RELEVANT PRINCIPLES OF ILLEGALITY.

## (1) POSITION PRIOR TO PATEL V MIRZA

### (i) Origins of Illegality/Unclean Hands

38. The formulation of the illegality principle is traditionally taken from the judgment of Lord Mansfield CJ in **Holman v Johnson**:[3041]

---

3037 {**Day66/47:20**}, and see further below.

3038 {**A1/14/202**}, **cross-referencing paragraphs 7S, 8A207** (in particular at **8A207.6** it is averred that **"***The provision of the [falsified] English Financial Statements by the Money Exchange to the Money Exchange's bankers resulted in the Money Exchange and AHAB repeatedly obtaining and/or extending borrowings or otherwise obtaining funds from those bankers"* **)** and **8A208-270.**

3039 **[1892] 2 QB 724 {R1/2.3}**, per Lindley LJ at **p728 {R1/2.3/5}**

3040 **[1962] A.C. 294 PC {R1/6.2},** per Lord Denning, approving and applying **Scott v Brown Doering**.(above)

3041 **(1775) 1 Cowp 341 at [343] {R1/0.2/2}**

"*No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the court says he has no right to be assisted.*

*It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally in fault, potior est conditio defendentis.*"

39. As has been repeatedly pointed out (see **Tinsley v Milligan; Bilta v Nazir (No 2)** and **Les Laboratoires Servier v Apotex**) (all above); the second part of this dictum demonstrates that the principle is one of public policy. The public policy is to maintain the integrity of the legal system by not allowing recovery for what is illegal and so by disapproving of its abuse (see **Patel v Mirza (**above**)** and earlier cases: **Hounga v Allen**;[3042] **Hall v Hebert**).[3043]

3042 **[2014] 1 WLR 2889 {R1/46.5}**

3043 **(1993) 101 DLR (4th) 129,165 {R1/20.3.2}.**

40. Since, as in equity, nobody is expected to lead a blameless life (see **Dering v Earl of Winchelsea**[3044] and **Loughran v Loughran**)[3045] a sufficient connection must be shown between the misconduct and the claim of illegality being advanced.

41. A related ground for preclusion, applying to equitable claims (such as seeking accounts, tracing or establishing constructive trusts) is the bar placed on a plaintiff by virtue of unclean hands. In that context it is established that there must be an "*immediate and necessary relation to the equity sued for*" (see **Dering** and **Loughran** (both above) and **Moody v Cox**).[3046] This is established by a sufficient causal connection between the misconduct and the claim: **Sang Lee Investment Co v Wing Kwai Investment Co**[3047] and **Kation Pty Ltd v Lamru Pty Ltd**.[3048] Here, as to whether AHAB's unlawful or immoral conduct had the "*immediate and necessary relation*" to the equitable reliefs claimed by it, there clearly is such a connection.

**(ii) Tinsley v Milligan and the Highwayman's Case**

---

3044 **(1787) 1 Cox 318 {R1/0.3}**: where it was said that while **"***a man must come to equity with clean hands, it does not mean (that he must be free of all) general depravity; it (the particular depravity or unlawfulness) must have an immediate and necessary relation to the equity sued for***". [**In that case a contribution to the payment of surety bond for which the plaintiff and defendant had both signed but the plaintiff was said by the defendant to have inveigled the unlawful conduct of the person for whom the bond had been given.**]**

3045 **292 US 216 (1934) {R1/5.10}**: where it was sought to deny a widow her otherwise well founded claim against the estate of her deceased husband for unpaid alimony on the ground that she had married him unlawfully (under Virginia or Florida law at the time) for having been previously married and divorced on ground of her adultery. It was held (per Justice Brandeis) inter alia, at **[21-23]**; that "*here the relation of the alleged illegality to the relief sought was indirect and remote; the wrong done was a thing of the past and collateral ... a person does not become an out-law and lose all rights by doing an illegal act. Equity does not demand that its suitors shall have led blameless lives"* **{R1/5.10/6}**

3046 **[1917] 2 Ch 71 {R1/5.8}**

3047 **(1983) PC No 28 of 1982, The Times, 14 April 1983 {R1/13.4} see also the Official Transcripts (1980-1989) Lexis Citation [1983] {R1/13.4.1}:** where in considering a plea for specific performance of a contract entering into based on misrepresentations on both sides, the PC held that in a case of where there were alleged improprieties on both sides, the court should first decide whether there had been want of faith, honesty or righteous dealing on the part of the person seeking relief and should then decide whether as a matter of discretion and in all the circumstances, which might include any relevant misconduct on the part of the person resisting equitable relief, it was right to refuse to grant it. No balancing exercise as if to compare the misconduct on one side with the misconduct on the other fell to be exercised**.**

3048 **[2009] NSWCA 145 {R1/38.9}**.

42. While it has been overruled by **Patel v Mirza**, in **Tinsley v Milligan**[3049] the majority of the House of Lords had decided that the principle of illegality only applied in a proprietary case if the plaintiff needed to rely on the facts constituting unlawfulness. In the Cayman Islands, **Tinsley v Milligan** was applied in the context of proprietary claims in **Jose's Ltd v Esso Standard Oil SA**[3050] and **Chisholm v Smith**.[3051]

43. However, for the sake of completeness, it is worth noting that **Tinsley v Milligan** did not overrule the special rule that applied to unlawful partnerships:

(1) **Everet v Williams** (above) (the fons et origo of the rule) concerned a partnership entered into by two highwaymen by which they split equally the proceeds of their robberies.

(i) For some time, the two engaged profitably in this pursuit on Hounslow Heath, as well as at Pagshot, Salisbury, Hampstead, and elsewhere. The pleadings of the plaintiff robber Everet went on to state euphemistically that the parties had "*dealt with several gentlemen for divers watches, rings, swords, canes, hats, cloaks, horses, bridles, saddles, and other things to the value of £200 and upwards*", and that these goods were obtained for "*little or no money… after some small discourse with the said gentleman*", adding that "*the said things were dealt for … at a very cheap rate.*"

(ii) When the proceeds of these activities were sold, John Everet believed that Joseph Williams had manoeuvred himself into receiving more than his fair

---

3049 **Above**.

3050 **[2000] CILR 304 {R1/31.4}**.

3051 **[2013] (2) CILR 32 {R1/44.7}. Cf: TCB Creditor Recoveries Ltd v Arthur Anderson LLP [2008] CILR 486 {R1/37.8}**, which is readily distinguishable.

share of the profits. He therefore sued Williams for the balance he thought due, pleading "*for discovery, an account, and general relief*" for the "*profits*" made under their "*partnership*".

(iii) The Court of Exchequer was less than impressed with the idea of being asked to settle a dispute amongst highwaymen regarding the division of the spoils and, as cited above, dismissed the claim as "*both scandalous and impertinent*".[3052]

(2) Thus, the rule arising out of **Everet v Williams** was that where the court is faced with an unlawful partnership (or a partnership formed to carry out an unlawful purpose) the court will not condescend to redistribute the proceeds of ill-gotten gains among wrongdoers.

(3) Significantly, **Everet v Williams** always stood as a clear exception to the now overruled reliance test: **Stone & Rolls v Moore Stephens**, **R. v Ahmad (Shakeel), Laboratoires Servier v Apotex; Bilta (UK) Ltd v Nazir (No 2)** (all above).

(i) In **Bilta** (above), Lord Sumption pointed out at **[59]** that in **Everet v Williams** the two highwaymen did not plead the nature of their business. "*But that did not prevent the court from looking through the gaps and circumlocutions to the substance of the transaction*".

[3052] Worse was in store for both Everet and Williams. Williams, the defendant, was arrested and executed by hanging in 1727, while Everet, the plaintiff, was hanged 3 years later. Finally, one of the solicitors involved in the action, Wreathock, was convicted of robbery in 1735 and sentenced to hang, but his sentence was commuted and he was transported to Australia.

(ii) Prior to **Patel v Mirza** the outcome of **Everet v Williams** was incompatible with the reliance or "pleading" test in **Tinsley v Milligan** and yet it was repeatedly approved as representing good law. The reason for this, it must be assumed, was that **Everet v Williams** clearly represented a freestanding head of illegality, distinct from the reliance test; viz: the unlawful partnership or enterprise.

**(2) THE APPLICATION OF THE PRINCIPLES DERIVED FROM PATEL V MIRZA.**

**(i) The Facts and Result**

44. The essential facts of **Patel v Mirza** were straightforward, are already described above but can be very briefly recited here for convenience.

(1) Mr. Patel transferred £620,000 to Mr. Mirza for the purpose of betting on the price of RBS shares using advance insider information which Mr. Mirza expected to obtain from RBS contacts regarding an anticipated government announcement which would affect the price of the shares. This agreement constituted an offence under section 52 of the Criminal Justice Act 1993.

(2) As it happened, Mr. Mirza's expectation of the announcement proved to be mistaken and therefore the intended betting did not take place. Accordingly, the illegal purpose was never put into effect.

(3) Mr. Patel therefore sought the return of the sums that he had paid. The claim was based on contract and unjust enrichment. It was therefore necessary for him to explain ("plead") the nature of the illegal agreement in order to bring his claim.

45. A nine-person panel of the Supreme Court unanimously upheld Mr. Patel's claim. However, while the court was unanimous as to the result, there was a split as to the reasoning:

(1) Lord Toulson articulated a new test for illegality. His speech was concurred with by Lady Hale and Lords Kerr, Wilson and Hodge. In addition to agreeing with Lord Toulson [144], Lord Kerr also added some brief supporting remarks as to the application of the test that Lord Toulson had articulated.

(2) Lord Neuberger gave an independent speech, but concluded at paragraph [174] that "*the approach suggested by Lord Toulson in para 101 above provides as reliable and helpful guidance as it is possible to give in this difficult field*".

(3) Lords Mance, Sumption and Clarke disagreed with Lord Toulson's test and articulated an alternative narrower approach.

46. Accordingly, having commanded the support of six of the nine justices, Lord Toulson's speech should be considered the authoritative statement of English law on the issue of illegality.

**(ii) The "reliance test"**

47. At paragraph [1], Lord Toulson noted, citing **Holman v Johnson**,[3053] that the underlying rationale behind the illegality was one of policy, namely that where a party seeks to bring a cause of action which is inextricably linked with his own unlawful conduct, he has no right to be assisted by the courts. Lord Toulson also drew upon the statement of Lord Hoffmann in **Gray v Thames Trains Ltd**[3054] that the maxim *ex turpi causa* expresses not

[3053] **Above {R1/0.2}**
[3054] **[2009] A.C. 1339 at [30]- [32] {R1/39.5A/15}**

so much a principle but a policy based on a group of reasons, which vary in different situations.

48. Lord Toulson recognised that the orthodox "*rule*" in **Tinsley v Milligan,** namely that a party's claim would not be defeated by their illegality provided they did not need to "*rely*" upon it, had been the subject of much criticism (**paragraph [20]).**

**(iii) Authorities since Tinsley v Milligan**

49. Lord Toulson then conducted a detailed review of the authorities following **Tinsley v Milligan** and the confusion to which this decision had led, culminating in the English Law Commission Consultation Paper on Illegal Transactions: the Effect of Illegality on Contracts and Trusts, LCCP 154 (1999).

50. Having done so, Lord Toulson reviewed the position in a number of jurisdictions including Australia, Canada and the United States, noting at paragraphs [50]-[54] that the High Court of Australia had rejected the **Tinsley** approach.

51. Lord Toulson's discussion of the leading Canadian case of **Hall v Hebert**[3055] is particularly instructive because it illustrates the significance of whether recovery in the proceedings would allow the plaintiff to profit in any way from the unlawful conduct:

(1) **Hall v Hebert** concerned a claim by a drunk driver against the owner of the car who had knowingly allowed him to drive the car while intoxicated and his ability impaired, resulting in personal injuries to him.

(2) Giving the judgment of the majority, McLachlin J held that the basis of the power to bar recovery lay in the duty of the courts to preserve the integrity of the legal system by not allowing a person to profit from illegal or wrongful conduct or to

[3055] **[1993] 2 SCR 159 {R1/20.3}**

permit an evasion or rebate of a penalty prescribed by the criminal law, i.e. allowing the plaintiff to profit from his own wrong.[3056]

(3) McLachlin J therefore rejected the application of the illegality defence, largely as a result of the fact that the driver would in no sense "profit" from the illegal character of his conduct.

52. In **Patel v Mirza**, Lord Toulson also reviewed the recent English authorities on the subject of illegality, noting that, following three decisions of the Supreme Court in **Les Laboratoires Servier v Apotex**, **Hounga v Allen** and **Bilta v Nazir**, (above) there was a sharp division of opinion as to whether the courts ought to adopt a strict rule-based approach or a more flexible approach by which the court would look at the policies underlying the doctrine and decide whether they militated in favour of the defence, taking into account a range of potentially relevant factors (see paragraph **[81]**).

**(iv) Disapproval of the reliance test**

53. In relation to the strict, rule-based approach (i.e. the reliance test), Lord Toulson cited, with approval, the criticisms of such an approach by Professor Andrew Burrows in his Restatement of the English Law of Contract. In summary, these criticisms were that:

(1) It could produce different results according to procedural technicality which had nothing to do with the underlying policy (paragraph **[87]**);

(2) The rule as stated did not permit differentiation between minor and serious illegality or between peripheral and central illegality (paragraph **[88]**);

(3) The rule drew no distinction between serious criminality and relatively minor breach of a statutory regulation (paragraph **[89]);**

---

[3056] Which, in the context of a claim in tort was a direct pecuniary award for an act of wrongdoing.

(4) The cases do not always fit the rules (paragraph **[90]);**

(5) The attempts to remove deficiencies of the rule by appropriate exceptions, had never been satisfactorily accomplished (paragraph **[92]).**

54. In light of these criticisms and in light of the generally unsatisfactory state of the law, Lord Toulson held that **Tinsley v Milligan** should no longer be followed (paragraph **[110]**) and rejected a strict rule-based approach. Instead, Lord Toulson held at paragraph **[108]** that insofar as "*the integrity and harmony of the law permit – and I would say require such flexibility*".

55. At paragraph **[120]**, reiterating what he had said at paragraph **[110]**, Lord Toulson held (as already summarised above) that the illegality defence ought to be a flexible application of a framework of clear principles reflecting the circumstances of the case:

> *"120. The essential rationale of the illegality doctrine is that it would be contrary to the public interest to enforce a claim if to do so would be harmful to the integrity of the legal system (or, possibly, certain aspects of public morality, the boundaries of which have never been made entirely clear and which do not arise for consideration in this case). In assessing whether the public interest would be harmed in that way, it is necessary a) to consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim, b) to consider any other relevant public policy on which the denial of the claim may have an impact and c) to consider whether denial of the claim would be a proportionate response to the illegality,*

*bearing in mind that punishment is a matter for the criminal courts. Within that framework, various factors may be relevant, but it would be a mistake to suggest that the court is free to decide a case in an undisciplined way. The public interest is best served by a principled and transparent assessment of the considerations identified, rather by than the application of a formal approach capable of producing results which may appear arbitrary, unjust or disproportionate*."

56. In particular, Lord Toulson noted at **[116]** that:

> "*…there may be circumstances in which a court will refuse to lend its assistance to an owner to enforce his title as, for example, where to do so would be to assist the claimant in a drug trafficking operation, but the outcome should not depend on a procedural question*."

57. Lord Toulson also provided guidance as to the application of the proportionality test. At paragraph **[107]**, while noting that it was not possible to lay down a prescriptive or definitive list because of the infinite possible variety of cases, the list given by Professor Burrows at paragraph **[93]** was helpful.

**<u>(3) NEW TEST FOR ILLEGALITY</u>**

58. Accordingly, as a result of the decision in **Patel v Mirza**, the proper approach for the court when applying the illegality defence is to consider:

(1) the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim;

(2) any other relevant public policy on which the denial of the claim may have an impact; and

(3) whether denial of the claim would be a proportionate response to the illegality.

59. In particular, I accept as is submitted by SIFCO5 that (applying paragraph **[107]** of Lord Toulson's speech) a useful benchmark for the court when considering the application of the illegality defence is to ask:

(1) how seriously illegal or contrary to public policy the conduct was;

(2) whether the party seeking enforcement knew of, or intended, the conduct;

(3) how central to the contract or its performance the conduct was;

(4) how serious a sanction the denial of enforcement is for the party seeking enforcement;

(5) whether denying enforcement will further the purpose of the rule which the conduct has infringed;

(6) whether denying enforcement will act as a deterrent to conduct that is illegal or contrary to public policy;

(7) whether denying enforcement will ensure that the party seeking enforcement does not profit from the conduct;

(8) whether denying enforcement will avoid inconsistency in the law thereby maintaining the integrity of the legal system.

60. In this regard, I also accept that it is important to remember that, crucially, the highwayman's case (**Everet v Williams**) remains good law, save that Lord Toulson has updated the example for modern times to include a drug trafficking operation or

enterprise. At paragraphs **[110]**[3057] and **[116]**,[3058] Lord Toulson ought therefore to be read as articulating the well-known proposition (repeatedly affirmed following the highwayman's case) that parties to a fraudulent partnership or enterprise will not be entitled to invoke the powers of the court to recover the proceeds of their fraudulent partnership from their fellow criminal so as to profit from it.

## III. APPLICATION OF LORD TOULSON'S FACTORS TO AHAB'S CLAIM

### (1) SERIOUSNESS OF THE ILLEGALITY

61. As to the first factor identified by Lord Toulson (*the seriousness of the illegality*): there can be no doubt as to the gravity of the fraud perpetrated by AHAB. This was a fraud carried out, with increasing sophistication, from as early as 1981. The total sums borrowed pursuant to AHAB's fraud numbered in the hundreds of billions of dollars. In short, this was an enormous, long-standing Ponzi scheme which defrauded more than a hundred banks.

62. The position was graphically summarised by Mr. Hayley during cross-examination:[3059]

> *Q. "Mr. Hayley, let's just see by way of summary where we are and where we're heading towards. Throughout the period that you worked at the Money Exchange, almost every financial statement*

---

3057 Where he said: "*There may be circumstances in which a court will refuse to lend assistance to an owner to enforce his title as, for example, where to do so would be to assist the claimant in a drug trafficking operation, but the outcome should not depend on a procedural question"* [viz: whether he needs to rely upon the illegal enterprise to plead his claim] **{R1/55/32}**

3058 Where in endorsing the approach and conclusion of Gloster LJ in the Court of Appeal, he stated "*She correctly asked herself whether the policy underlying the rule which made the contract between Mr. Patel and Mr. Mirza illegal would be stultified if Mr. Patel's claim in unjust enrichment were allowed. After examining the policy underlying the statutory provisions about insider dealing, she concluded that there was no logical basis why considerations of public policy should require Mr. Patel to forfeit the moneys which he paid into Mr. Mirza's account, and which were never used for the purpose for which they were paid. She said that such a result would not be a just and proportionate response to the illegality. I agree… Mr. Patel is seeking to unwind the arrangement, not to profit from it."* **{R1/55/36}**

3059 **{Day24/113:19}-{Day24/114:16}**

*that was sent to the banks by the Money Exchange was fraudulent and misleading because it concealed the true state of the borrowing of the Money Exchange; is that right?*

*A. Um, I wouldn't say "almost every", I would say "every".*

*Q. And so far as you are concerned, you deliberately misled all the banks when you either wrote to them or spoke to them in order to obtain facilities for the Money Exchange?*

*A. That's correct.*

*Q. There was indeed no bank to whom you provided a complete and honest account of the financial position of the Money Exchange?*

*A. That's correct.*

*Q. And this dishonest behaviour started before you arrived at the Money Exchange in 1998?*

*A. It did.*

*Q. And it continued throughout your time at the Money Exchange, down to 2009?*

*A. It did."*

63. This remarkable passage acknowledges that every single dollar or riyal that ever flowed into the Money Exchange was obtained dishonestly through fraudulently obtained borrowing.

64. Rather than being a Ponzi scheme on investors, this scheme concerned lending banks. Loans were either rolled-over or repaid with new borrowing, all of which was obtained

through AHAB fraudulently misrepresenting its financial position. Certain features of this scheme demonstrate the magnitude of the fraud:

(1) As in any Ponzi scheme, the dishonesty applied to every dollar raised. Every time lender A was paid off, he was paid off through money obtained by defrauding lender B. Every time a lender renewed a facility, he was defrauded with a bigger lie to persuade him to roll the debt over.

(2) The total borrowing that flowed into the Money Exchange after 2000 was US$330bn.[3060] Moreover, given that Deloitte did not calculate the value of the transactions going through the Money Exchange prior to 2000, the total amount of dishonestly obtained borrowing was clearly far higher than US$330bn.[3061]

(3) By comparison, this type of Ponzi scheme had a much greater turnover than the scheme operated by Bernie Madoff because the time intervals for repayment were much shorter than the cycle of redeeming investors and therefore new loans were taken out with much greater frequency. Mr. Charlton's evidence was that between 2000 and 2009 more than 12,500 loans/facilities were newly taken out or renewed, and by 2009 there were up to 20 finance facilities maturing per day.[3062]

(4) The 28-year period of time over which this fraud operated is also staggering. Having begun in 1981, it continued unabated on an ever-increasing scale until 2009. Indeed, it remained concealed from the Courts (both here and in London)

---

3060 Per Mr. Charlton in Charlton 1W in the London Proceedings: {**L1/25/41**}; {**L1/25/47**}.

3061 SIFCO 5 submit that for context, and to see just how obscene this fraud was, the dishonestly obtained amount in the 2000s was higher than the GDP of Hong Kong, higher than the value of the Saudi Tadawul in 2009 and over half the total GDP of Saudi Arabia itself.

3062 **{C1/5/12}**

that have dealt with AHAB's complaint until the commencement of the trial here when AHAB made its limited and guarded admissions.[3063]

(5) The fraud is complete. As with other Ponzi schemes, the dishonesty perpetrated by AHAB is impossible to unwind and no attempt is being made to do so. It is undoubtedly the case that banks that were paid off in the past received the proceeds of fraudulent borrowing.

(6) The overall scope of the bank fraud dwarfed the alleged "misappropriations" by AHAB's accomplice, Al Sanea. It is therefore significant that AHAB's claim is that it is the victim of a comparatively small fraud on itself given the enormity of its own fraud on the banks, even though the sums claimed (at US$6.7bn or US$7.3bn or US$9.2bn – depending on the version of AHAB's claims) are, by any measure, enormous.

(7) The Money Exchange was, from its very inception, a criminal enterprise. It remained so throughout its existence. It will be recalled that its earliest financial statements[3064] had adopted the fraudulent practice of capitalised interest and removed this expense from its profit & loss account so as to show a profit that never really existed.

65. Given the scale and extent of the fraud, this case is indeed very different to cases such as **Patel v Mirza** where the illegal purpose failed or was never put into effect. Here the illegal purpose was successful for 28 years.

---

3063 {**X2/8/2**}, about which more below.
3064 {**F/6/5**} and {**F/9/3**}.

**(2) KNOWLEDGE OF THE ILLEGALITY**

66. By reference to AHAB's admissions[3065] and the results of the detailed enquiry undertaken during this case, it became common ground that the Money Exchange secured its borrowing by:

(1) dishonestly manipulating its financial statements so as to understate the Money Exchange's assets and understate its liabilities; and

(2) dishonestly providing those financial statements to banks so as to induce them to lend or to renew or extend such lending.

67. It is also common ground that this fraud was instigated by the AHAB Chairman (whether wittingly or not). AHAB accepts that:

(1) "*Abdulaziz knew about and authorised the issue of the financial statements understating the assets and liabilities and the provision of the English language statements to the banks prior to his stroke. …*";

(2) "*Until 30 September 2000, AHAB (through Abdulaziz) knew how the financial statements were prepared and that the English language financial statements were provided to the banks*."[3066]

68. AHAB has produced no authority for the proposition that the court, even on AHAB's case, should deem AHAB to have "*forgotten*" its role in carrying out such a fraud.

69. In any event, quite apart from their knowledge of Al Sanea's activities, AHAB was an active participant in the fraud from inception to its unravelling in 2009:

---

3065 **{X2/8/1}**, and see for example the Joint Statement of the accountancy witnesses, Humphry Hatton and Theo Bullmore: **{I/13/2}**-**{I/13/3}**

3066 **{X2/8/2}**

(1) As discussed in Section 1 of this Judgment,[3067] the accounting fraud was instigated by AHAB and the process of manipulating the financial statements was carried out at AHAB's Head Office.

(2) Suleiman had been a party to the fraud on the lending banks since its inception. In particular, he signed critical documents (including the Board resolutions) to advance it in the 1980s and 1990s. There is no evidence whatsoever that Suleiman in fact forgot about the ongoing fraud or his involvement in it.

(3) The AHAB Partners imposed a code of silence about the Money Exchange which nobody was permitted to mention at meetings with outsiders present. Only a very small number of trusted AHAB employees were privy to information about the Money Exchange.

(4) There was clearly a culture of false accounting at AHAB because the Partners also fraudulently manipulated their own financial statements. This culture was clearly present throughout the 2000s after Abdulaziz's stroke.[3068]

(5) As also discussed at Section 1 of this Judgment, both Suleiman and Yousef expressly signed up to resolutions not only approving false accounting, but acknowledging that the purpose of that false accounting was to deceive third parties (viz: the banks).

(6) Suleiman, Saud and Yousef continued to sign up to such resolutions after Abdulaziz's stroke (and Saud not only had such resolutions in his possession, but was involved in drafting them). See here also Section 2 of this Judgment.

---

[3067] And more fully analysed at **{E1/3/1}-{E1/3/82}** of the Defendants' Closing Submissions.

[3068] More fully examined also at **{E1/3/1}-{E1/3/82}**and **{E1/3.1/1}-{E1/3.1/17}** of the Defendants' Closing Submissions

(7) On a number of occasions Suleiman also signed the director's reports attached to the financial statements of the Money Exchange (see for example in 2003, in 2004 and in 2005).[3069]

(8) After his father died, Saud signed a number of directors' reports attached to the accounts such as in 2004[3070] and in 2005.[3071] Thereafter Saud specifically signed off:

(i) Balance sheets in 2006[3072] and in 2007.[3073]

(ii) Profit loss account in 2006[3074] and in 2007.[3075]

70. Thus, quite apart from the Partners' knowledge of Al Sanea's activities, I have been compelled to find as a fact that Suleiman, Saud and Yousef were aware of the fraud being carried out by AHAB and the Money Exchange.

**(3) CENTRALITY OF THE FRAUD TO THE ENTERPRISE**

71. As to the third factor (the centrality of the fraud to the enterprise), as set out above (and in Section 2 of this Judgment),[3076] the fraud on the banks was the *raison d'etre* of the Money Exchange. The purpose of the Money Exchange was to acquire a portfolio of investments with borrowings that would not appear on AHAB's books.

72. Here the fraud on the lending banks was the central premise of the way in which the Money Exchange was operated. Without the fraud it would have been unable to borrow

---

3069 **{F/115/2}**: **{F/118.1/4}**; **{F/127/3}**; **{F/148/2}** respectively
3070 **{F/127/3}**; **{F/148/2}**
3071 **{F/153/3}**
3072 **{F/161/2}**
3073 **{F/187/2}**
3074 **{F/161/3}**
3075 **{F/185/3}**; **{F/187/3}**
3076 And in chronological detail in the Detailed Narrative of the Defendants' Closing Submissions: **{E2/1/4}-{E2/1/66}**; **{E2/1/117}-{E2/1/213}** and **{E2/1/222} - {E2/1/254}**

in the manner that it did. Defrauding the lending banks was in the Money Exchange's DNA.

73. This case is therefore entirely different to such further cases as **ParkingEye Ltd v Somerfield Stores Ltd**[3077], where the illegality defence failed in part because the transaction would have been carried out in the same way without the illegality.

74. Accordingly, had the fraud not occurred, the character of the Money Exchange would have been profoundly different:

(1) It would not have been (as it undoubtedly was) a vehicle established solely to borrow funds;

(2) It would have closed down, never having become a profitable trading business;

(3) It would not have held the land or investments that it did in fact hold because they would never have been acquired.

75. Looking at the claims themselves, AHAB, as partner in the fraudulent enterprise, is seeking to recover funds which have been fraudulently obtained from the banks in its claim for indemnification by the Defendants.[3078] While the Defendants were initially told the figure for that claim, it has been struck out and the amount is still as yet uncertain. Every loan outstanding in 2009 had been obtained by means of the dishonest financial information.

76. In its claim to recover the amounts allegedly misappropriated from the Money Exchange, AHAB is seeking to recover both as a proprietary claim and as damages, US$6bn

---

3077 **[2013] QB 840 {R1/45.6}**

3078 RASOC: **{A1/2.2/89} - {A1/2.2/91}**

withdrawn by Mr. Al Sanea. Yet every dollar he withdrew was derived from the funds dishonestly obtained from the lending banks.

77. Accordingly, it is the case as I find and as SIFCO5 has submitted, that the Money Exchange is indistinguishable from the case of the highwayman or the modern-day example of the drug dealer given by Lord Toulson. AHAB seeks to recover the ill-gotten gains of dishonestly obtained borrowing of the venture of which it was a partner in the same way as Everet did:

(1) The argument over the proceeds of that illegality (i.e. the fraudulently acquired borrowing) is indistinguishable from the highwayman's case: it is akin to the argument over the proceeds of a theft and is not a matter over which the courts should adjudicate. This is particularly the case given that the highwayman is seeking an account from third parties rather than his fellow wrongdoer.

(2) The foundation of the clean hands/illegality doctrine is that the court ought not to adjudicate upon illegal arrangements and it is inconsistent with the foundations of that doctrine for the court to make available the equitable remedy of tracing in circumstances where the funds came from an illegal source.

(3) In this case, when I ask myself the guiding question from **Patel v Mirza**,[3079] whether it would be contrary to the public interest to enforce AHAB's claim if to do so would be harmful to the integrity of the legal system (or possibly, certain aspects of public morality, the boundaries of which have never been entirely clear but which [such as potential unfairness to innocent third party creditors] could arise in this case), the resounding answer is "yes".

---

[3079] Per Lord Toulson at **[110]** and **[120]** as set out above.

(4) Accordingly, I hold that AHAB's claim ought to have been barred in any event,[3080] through the application of the Court's policy that it will not enforce an illegal arrangement and/or because AHAB lacks clean hands and so is not entitled to invoke the equitable remedies.

78. What follows to the end of this section of the Judgment is a consideration of the further factors identified by Lord Toulson in **Patel v Mirza** and other potentially relevant issues. I include them out of appreciation for the thoroughness of the research and treatment of the issues by Mr. Lowe and his team of SIFCO5 lawyers and, of course, as well because of the potential significance of those issues in this case and in other cases coming within in our jurisdiction.

**(4) BENEFITS TO AHAB FROM THE ILLEGALITY**

79. Looking at Lord Toulson's seventh factor (*whether denying enforcement will ensure that the party seeking enforcement does not profit from the conduct*), it is apparent that AHAB has obtained significant benefit from the fraud at the Money Exchange prior to the commencement of proceedings which it is not proposing to restore.

**(i) AHAB's Direct Benefits from the Fraud**

80. As discussed at Section 2 of this Judgment,[3081] AHAB has in fact obtained substantial benefits from its fraud on the lending banks:

(1) The fraudulent borrowing paid for AHAB's SAMBA shares.

(2) As a consequence of owning the SAMBA shares:

---

3080 Ordinarily the plea of illegality as a defence to a claim would be taken logically before embarking upon the trial of the claim. Here however, as explained above because of AHAB's unwillingness "to make a clean breast of it", proof of the Partners' knowledge of and involvement in the illegality had to be established at trial before the defence could properly be assessed.

3081 And in more detail at section **{E1/20}; {E1/10}** of the Defendants' Closing Submissions

(i) Abdulaziz and Saud were able to take the prestigious position of Chairman of SAMBA.

(ii) Saud became chairman of the Chamber of Commerce.

(3) Between 2000 and 2009, the Partners stripped out SAR355.5m (US$96.1m) in "*dividends*".[3082]

(4) AHAB used the Money Exchange to make foreign deposits. It is unclear whether these were ever re-credited to the Money Exchange or evolved into even greater deposits.

(5) AHAB also obtained significant loans from the Money Exchange which do not appear ever to have been repaid. Mr. Charlton and Mr. Hatton's evidence was that the total amount debited to the AHAB Head Office account between 2000 and 2009 was SAR 547m[3083] (US$148m).

(6) Yousef received an unsecured SAR 45m (US$12.2m) loan in 1985 to build his villa which has never been repaid. For many years he paid no interest and thereafter a preferential interest rate was put in place.

(7) AHAB appears, at least arguably, to have received SAR1.3bn (US$351m) from the sale of Etisalat shares.[3084]

81. All of these benefits were paid for by borrowing by the Money Exchange and were not returned to the Money Exchange either before or after the collapse in May 2009.

---

3082 As Mr. Charlton acknowledged: **{L1/25.1/168}**
3083 **{I/1/51}**
3084 See again **{E1/20}**

82. It is, by way of emphasis, appropriate to note here an important distinction between past benefit as discussed in this context and potential "profit" to be obtained by a grant of AHAB's claim.

83. In this latter regard I note, and am prepared to accept as a correct qualification on Lord Toulson's meaning of his seventh factor, the following passage from AHAB's written Closing Submissions:[3085]

> *6.9 "In his analysis of [the established common law policy considerations,[3086]leading to the development of his tripartite policy considerations] Lord Toulson appeared to counsel against a wide interpretation of the "not to profit" statement in his reference to the* **Spycatcher case, Attorney General v Guardian Newspapers Ltd (No 2***)[3087]***.** *In* **Spycatcher** *Lord Goff said that the statement was in "very general terms" and "does not of itself provide any sure guidance to the solution of a problem in any particular case"[3088]. Lord Toulson also agreed with McLachlin J's view of the "not to profit" policy consideration in the Canadian case of* **Hall v Herbert***.*[3089] *McLachlin J favoured a narrow meaning of "to profit" but, as Lord Toulson noted, more fundamentally, she expressed the view that it may have the undesirable effect of tempting judges to focus on whether the*

3085 **{D/6/4}**
3086 ***Patel v Mirza [2016] 3 W.L.R. at [100] per Lord Toulson {R1/55/30}***
3087 ***[1990] 1 A.C. 109 {R1/16.3}***
3088 Ibid.
3089 **[1993] 2 SCR 159 {R1/20.3.2}** and **above.**

> *plaintiff is getting something out of the wrongdoing, rather than on the question whether allowing recovery for something which was illegal would produce inconsistency and disharmony in the law, and so cause damage to the integrity of the legal system."*[3090]

84. Accordingly, it should be understood that my consideration of the benefits obtained and which could be obtained by AHAB does not focus on whether AHAB would "profit" from the grant of relief. Rather, the focus here has been whether the grant of relief would be contrary to the public interest (in the sense undermining the integrity of the legal system) to enforce AHAB's claim. In this context, for the reason among others discussed, that it would be primarily if not exclusively AHAB's, the wrong-doer's, interests that would be advanced.

**(ii) Al Sanea's benefit**

85. For the reasons of principle already discussed, it is also irrelevant to weigh the relative benefits obtained by Al Sanea from the fraud on the banks in assessing whether the illegality defence should apply. There is no denying that Al Sanea obtained a greater sum than the AHAB partners in *liquid* funds. Of course, it is highly debatable whether Al Sanea's benefit is greater if the share/real estate portfolio is accredited to AHAB.

86. This, nevertheless, misses the point. There can be no reason to excuse AHAB from the full effects of illegality by pointing to the relatively greater benefit of a co-offender engaged in the same illegality. I have proceeded on the basis that the question of AHAB's

---

[3090] See **Above** at pages 175-176. Lord Toulson also agreed with Professor Burrows' observation that this expression leaves open what is meant by inconsistency (or disharmony) in a particular case, but Lord Toulson did not view that as a particular weakness in the policy at **[100].**

benefit from the fraud is to be addressed by reference to its own position and not that of Al Sanea.

**(iii) The Defendants**

87. By the Court upholding the illegality defence to deny the claim, there can be no question of Al Sanea profiting from any wrong. All of the Defendants are in liquidation with their own substantial claims being made by creditor banks. And so I am assured by their liquidators (as SIFCO 5 itself here submits) that funds held by the Defendants will be distributed to innocent third parties.

**(5) HOW SERIOUS A SANCTION IS THE DENIAL OF ENFORCEMENT OF AHAB's CLAIM?**

88. Lord Toulson's fourth factor is relevant to the issue of proportionality. Clearly, the Court must have in mind the seriousness of the sanction when set against the gravity of the illegality. For example, in **ParkingEye**,[3091] the illegality defence would have been a disproportionate sanction as the illegality was *de minimis*.

89. In contrast, in this case the illegality was enormous and the fraud involved a much greater sum than the amount which would be denied to AHAB if the claim was rejected. The denial of the claim by way of sanction would not be financially disproportionate.

90. Nor would denial of the claim be inappropriate or disproportionate in terms of culpability. AHAB has concealed its active role in the fraud on the lending banks since 2009. It has refused to make a clean breast and presented a dishonest case until the conclusion.

---

[3091] **Above**, as discussed in **Patel v Mirza** itself.

## (6) THE PURPOSE OF THE INFRINGED RULE AND THE DETERRENT EFFECT

91. The reasoning of Lords Toulson and Hodge in **Bilta v Nazir (No 2)**[3092] is a good illustration of the operation of Lord Toulson's fifth and seventh factors in the illegality analysis which are concerned to ensure that the non-enforcement of the claim furthers, rather than undermines, the purpose of the rule which has been infringed and that denying enforcement would act as a deterrent to contravention of the infringed rule.

92. The company in **Bilta** was intended to serve as a vehicle for defrauding HMRC by way of misappropriation of VAT payments. It was submitted that the doctrine of illegality barred the company (acting by its liquidators) from suing dishonest directors or their co-conspirators (who caused the company's participation in the dishonest scheme) as a means of recovering the company's loss for the benefit of its creditors.

93. Lords Toulson and Hodge rejected the claim on the grounds of public policy for the simple reason that to deny enforcement at the instance of the liquidators would undermine the very duty that was infringed and embolden rather than deter company directors from acting in breach of duty:

> *"129. ... The context is always important. In the present case the public interest which underlies the duty that the directors of an insolvent company owe for the protection of the interests of the company's creditors, through the instrumentality of the directors' fiduciary duty to the company, requires axiomatically that the law should not place obstacles in the way of its enforcement.* ***To allow the directors to escape liability for breach of their fiduciary duty on***

[3092] **Above**

***the ground that they were in control of the company would undermine the duty in the very circumstances in which it is required.*** *It would not promote the integrity and effectiveness of the law, but would have the reverse effect.* ***The fact that they were in sole control of the company and in a position to act solely for their own benefit at the expense of the creditors, makes it more, not less, important that their legal duty for the protection of the interests of the creditors should be capable of enforcement by the liquidators on behalf of the company.***

*130. For that reason in our judgment this appeal falls to be dismissed. The courts would defeat the very object of the rule of law which we have identified, and would be acting contrary to the purpose and terms of sections 172(3) and 180(5) of the Companies Act, if they permitted the directors of an insolvent company to escape responsibility for breach of their fiduciary duty in relation to the interests of the creditors, by raising a defence of illegality to an action brought by the liquidators to recover, for the benefit of those creditors, the loss caused to the company by their breach of fiduciary duty.* ***In everyday language, the purpose of the inclusion of the creditors' interests within the scope of the fiduciary duty of the directors of an insolvent company towards the company is so that the directors should not be off the hook if they act in disregard of the creditors' interests.*** *It would be*

> *contradictory, and contrary to the public interest, if in such circumstances their control of the company should provide a means for them to be let off the hook on the ground that their illegality tainted the liquidators' claim."* (Emphasis added.)

94. This reasoning has a form of obverse application here. The application of the rule in barring AHAB's claim here is concerned with the need to ensure behaviour in good faith towards lenders and banks (rather than presenting dishonest financial information). To disallow AHAB's claim plainly tends to discourage dishonest behaviour and promotes the rule that has been infringed. Unlike the effect it would have had upon the liquidators' bona fide claim in **Bilta,** here the rule should deter someone in AHAB's position from repeating the type of behaviour that has occurred. Non-enforcement of AHAB's claims ought to bring about a realisation in the market in which AHAB operates that conduct of this kind (even by a powerful family) is unacceptable.

**(7) AVOIDING INCONSISTENCY IN THE LAW**

95. **Bilta** is also an example of the application of the eighth factor, which is concerned with circumstances where enforcement of the claim or denial of enforcement would avoid or bring about an inconsistency in the law. In that case, had enforcement been denied because of the unlawful behaviour of the director then the very duty which he had broken by that behaviour would become unenforceable against him.

96. Attributing responsibility to the company itself so as to deny enforcement of the claim would have been inconsistent with the policy underlying the duty which was the subject of the claim. It could be said that to deny enforcement in those circumstances would have undermined the integrity of the legal system.

97. That could not be said of the denial of enforcement of AHAB's claim here. Denying AHAB's right to enforce its claim would, in my view, uphold rather than undermine the integrity of the law. There is no circularity that defeats the operation of a rule of law, as would have been the case in **Bilta** had the defence operated. The Defendants are not seeking to blame AHAB for the wrongs for which the Defendants are responsible. Instead the Defendants are seeking to blame AHAB for the wrongs for which AHAB is responsible.

## IV. INSOLVENCY

98. It is assumed for the purposes of the discussion next following, that AHAB's protestations that the claims against the Defendants are being solely advanced on behalf of its creditors, are aimed at preventing the imposition of the illegality defence through the misguided suggestion that, where a company is in liquidation, the illegality defence does not apply. This may not be a far-fetched assumption because of the emphasis placed by AHAB upon the JDEK process[3093] in its Closing Submissions.

99. Also, SIFCO5 submits that correspondence between the parties during the latter stages of the trial suggests that AHAB will paint itself as being in "*liquidation*". It was not clear the extent to which this argument was seriously being advanced. However, if AHAB seeks to advance such an argument (leaving aside the propriety of seeking to make a case in correspondence which was generated after the evidence was closed) for reasons which follow I would accept SIFCO5's argument that it is misconceived.

100. To be clear, AHAB's response is based primarily upon its rejection of the contention that the AHAB Partners were *particeps criminis* with Al Sanea in the fraud upon the

[3093] More below.

banks.[3094] The present discussion is pertinent, therefore, because I have rejected that contention and so one looks to see what it is that AHAB contends should be the outcome on the basis of its proven complicity.

101. It appears in this respect, that AHAB's primary contention is that any complicity found should be regarded as marginal (i.e. at worst AHAB Partners were unwitting or negligent accomplices)[3095] and so that it would be disproportionate to deny AHAB's claim on the basis of the illegality defence. AHAB does not expressly rely on **Bilta v Nazir** for this argument but there is pointed reliance on the threat of liquidation arising out of the JDEK process:[3096]

> *9.8 "The JDEK process and the proposed settlement agreement, which AHAB is striving to conclude with its creditors (as to which see Appendix V {D/A5}), has been the focus of much of the Defendants' attention and, it is submitted, unnecessarily so. The real significance of the JDEK process and the proposed settlement agreement to the issues that this Court must determine lies in the fact that under the proposed terms of the settlement agreement,[3097] if this litigation is successful and recoveries are made from it, all recoveries up to an amount of SAR 6 billion (approximately USD 1.6 billion) will be fully directed to AHAB's creditors. If AHAB achieves recoveries over SAR 5 billion, it will*

3094 See extract from AHAB's closing from **{D/9/1}-{D/9/2}** above and those submissions in general.
3095 See for instance: **{D/9/2}** at **[9.7]**
3096 At **{D/9/9} [9.28]- [9.29]** and **{D/9/19} [9.57] – [9.61]** of AHAB's closing
3097 Consent of footnote 3097 is subject to confidentiality provisions ordered by the Court. See paragraph 47 of Appendix V **{D/A5/10}** of AHAB's Written Closings

*recover 50% of its real estate portfolio pledged as collateral to the settlement. Any further recoveries over SAR 6 billion will and must be used by AHAB to "buy back" the remaining 50% of its real estate portfolio. It is only if and when AHAB has bought back its entire real estate portfolio that it will begin to receive a pecuniary benefit.*

*9.9 AHAB accepts that to the extent that the proposed settlement agreement and the regime that it imposes avoids a court-ordered liquidation of the AHAB businesses, and segregates certain assets from the pool of assets available to creditors, that is beneficial to the Algosaibis (in the same way that a CVA or IVA could confer a benefit on the near-insolvent company or individual). If the proposed settlement agreement is not approved by the JDEK, the JDEK will put AHAB into a court-supervised liquidation process. In either event, any recoveries made by AHAB through these proceedings in the Cayman court will be apportioned to AHAB's creditors.*

*9.10 The severity of the sanction for AHAB if its claim is denied cannot be understated. It will be denied of its entitlement to remedies in personam or in rem which ex hypothesi the Court will have found established on the evidence before it. AHAB has agreed to commit the recoveries, to which (we submit) it is entitled, to its creditors.*

9.11 *If the illegality defence is successful, AHAB will be deprived of its right to recover funds from the Defendant companies and it will not be able to use those recoveries to make payments to its creditors.*

9.12 *As submitted above, there is no express prohibition that has been breached and no express rule that has been infringed by the allegedly unlawful conduct which it is said AHAB engaged in. In those circumstances, it is not possible for the Court to consider in any precise fashion the purpose or aim that should be furthered or the conduct that is to be deterred.*

9.13 *Of course, AHAB recognizes that, in general terms, deterring fraudulent conduct, promoting honesty and avoiding parties from profiting from dishonesty are aims that are at the core of most (if not all) legal systems. However, as already explained, it is not the denial, but the success of AHAB's claims, which will further those aims.*

**(1) <u>FURTHERING THE PURPOSE OF THE RULE WHICH HAS BEEN INFRINGED:A DETERRENT TO CONDUCT THAT IS ILLEGAL OR CONTRARY TO PUBLIC POLICY</u>**

102. The involvement of the JDEK has a further important consequence for the Court's consideration of policy matters. Since the alleged criminal conduct is supposed to have taken place in Saudi Arabia or in connection with a Saudi Arabian entity, one would expect that Saudi policy is, at least, relevant. But the JDEK is the body seised with the question of what should happen to AHAB's assets, including any recoveries in these

proceedings. If the JDEK thinks that the AHAB Partners had an involvement in the fraud at the Money Exchange such that they should be deprived of any possibility of any pecuniary benefit, then it has the power to order that all of their assets, including any recoveries, should be distributed to its creditors.

**(2) A GENERAL EXCEPTION FOR LIQUIDATORS?**

103. So, while the argument is one of proportionality, AHAB seeks to rely also on the notion that this Court should be assured that the recoveries it would make from its claims would not be primarily for its benefit but for the benefit of is creditor banks, the victim of the fraud it maintains was Al Sanea's fraud. But the notion that denial of relief would then be disproportionate implies an exception where a form of supervised liquidation or insolvency process, like JDEK, is in place.

104. But I agree with SIFCO 5 that the idea that there is some general exception for liquidators or a liquidation process could be misconceived. In **Bilta v Nazir**[3098] their Lordships agreed (as already discussed above) that the defence of *ex turpi causa* could not operate to prevent a claim brought by the liquidators on behalf of a company against its former directors. This was on the basis that, where the company was essentially the victim of a fraud by the directors, the conduct of the directors would not be attributed to the company and thereby treat the company as a party to the illegality.

105. It is not altogether easy to extract a single ratio from **Bilta** because, as Lord Neuberger pointed out **[12]**, their Lordships came to their unanimous decision by virtue of somewhat different routes. The reasoning of Lords Toulson and Hodge has already been discussed earlier in the context of the fifth and seventh factors identified by Lord Toulson in **Patel v**

---

3098 Above.

**Mirza**. Lord Sumption (with whom Lords Mance and Neuberger also express qualified agreement) rested his judgment on attribution.

106. Given that a body corporate can only act through human agents, the application of the *ex turpi causa* principle to a body corporate necessitates identifying the relevant corporate actor whose mental state can be attributed to the company. As Lord Sumption noted at [**62**], attribution is one of the three questions that commonly arise whenever illegality is raised as a defence.

107. Accordingly, in **Bilta** the fundamental question was "*whose act or knowledge or state of mind is for the purpose of the relevant rule to count as the act, knowledge or state of mind of the company?*" **[41]**. It had for some time been recognised that a "*breach of duty*" exception[3099] exists so that when the relevant actor has defrauded his principal or acted in breach of his duties to the principal, it is generally inappropriate to attribute that actor's knowledge to the principal.

108. Lord Sumption was concerned with the purpose for which the rule of attribution exists:

> "*In an action against the company by a third party who had been defrauded, the company was responsible. But it did not follow that the company was to be treated as responsible for a fraud for the purposes of an action against the dishonest director. In such an action, the illegality defence cannot be available, whether the damages claimed arose from the liability which the company was caused to incur to a third party or from the direct abstraction of the company's assets.*"

---

[3099] Also known as the *"Hampshire Land principle*" after in **Re Hampshire Land Co [1896] 2 Ch. 743 {R1/2.5}** (also discussed in Section 7C when discussing the Defendants' liability for being attributed with Al Sanea's knowledge of the alleged fraud against AHAB.

109. When a claim is *against* the company by third parties and the mental state of the company is in issue (as it may be for dishonest assistance as claimed, for instance, by AHAB here against the Defendants) then there is no reason why the mental state of the director would not be attributed. In contrast, claims *by* the company against the director or a third party are as Lord Sumption said *"paradigm cases for the application of the breach of duty exception*" [to the illegality defence] **[89]**:

> *"The reason why it is wrong is that the theory which identifies the state of mind of the company with that of its controlling directors cannot apply when the issue is whether those directors are liable to the company. The duty of which they are in breach exists for the protection of the company against the directors. The nature of the issue is therefore itself such as to prevent identification."*[3100]

110. I accept therefore that this analysis demonstrates that the breach of duty exception from **Bilta** has no direct application to the facts of this case. The application of the illegality defence here has nothing to do with attributing the wrongs of its delinquent fiduciary (i.e. Al Sanea) to AHAB. The Defendants have been concerned to show that the relevant partners of AHAB were themselves dishonest and therefore AHAB itself is guilty of the relevant illegality (and this is accepted by this Court as proven). It is not suggested that Al Sanea's state of mind should be attributed to AHAB. Instead, the Defendants rely on the agency of two of AHAB's Chairmen (Abdulaziz and Suleiman), its managing director, Saud and Yousef (one of its partners as well as a partner of the Money

3100 Per Lord Sumption at **[89]**

Exchange). It is not denied by AHAB that these individuals were capable of binding AHAB and that their knowledge is to be attributed to AHAB.

111. Accordingly, any attempt by AHAB to escape the application of the illegality defence based on the **Bilta** breach of duty exception must fail at the first hurdle.

**(3) AHAB AS DE FACTO LIQUIDATOR**

**(i) Equally, Non-Enforcement Does Not Negate Any Duty To Creditors**

112. As set out above, AHAB maintains that its claim is brought in order to allow it to restore the very creditors who have been defrauded or remain the victims of the illegal conduct. This argument suggests, again by analogy with **Bilta,** that it would be not only be disproportionate but also circular to deny AHAB enforcement.

113. It may be important to examine carefully why this argument could not succeed on the **Bilta** breach of duty exception and the difference between the facts of **Bilta** and the position in this case. For these purposes it is only necessary to examine the reasoning of Lords Toulson and Hodge:

> *"(8) In* **Bilta** *the defendants sought to negate the enforcement of the fiduciary duty owed by the directors which existed for the protection of innocent third party creditors (as explained in* **West Mercia Safetywear v Dodds**).[3101] *As Lords Toulson and Hodge stated at* ***[126]-[127]****:*
>
> > '***the protection which the law gives to the creditors of an insolvent company while it remains under the directors' management is through the medium***

3101 **[1988] BCLC 252-253 {R1/15.0.2}**

> ***of the directors' fiduciary duty to the company, whose interests are not to be treated as synonymous with those of the shareholders but rather as embracing those of the creditors.***
>
> ***127 Such protection would be empty if it could not be enforced.'"*** (Emphasis added.)

114. AHAB here alleges that Al Sanea breached his fiduciary duty to it but has never pleaded or alleged that this duty existed for the protection of creditors whether under Saudi law or otherwise. Nor has any evidence been presented that this was the basis of Al Sanea's duties to AHAB under Saudi law. Nor has it been suggested that his duties existed for the benefit of the bankers of the Money Exchange under Saudi law. It must be squarely recognized therefore, that in legal actuality, AHAB is not enforcing a claim for the benefit of the banks or its creditors (as was the case in **Bilta**).

115. Furthermore, the Defendants' case on illegality does not involve negating the duties that AHAB alleges existed for its own protection and those of its creditors. It is not necessary for the illegality defence to excuse Al Sanea's withdrawals or the alleged breach of duty in subjecting the Money Exchange to improvident liability.[3102]

116. This is, in large part, because it was not a necessary corollary of breaches of duty by Al Sanea to AHAB that *AHAB's Partners* would participate in a fraud on the banks.

117. Accordingly, AHAB's Partners, having practised a fraud on the banks, now seek:

(1) an indemnity against the consequences of the fraud; and,

(2) to recover part of the proceeds of the fraud.

---

3102 Although the Defendants' primary case and my conclusion is that those withdrawals were fully authorised.

118. In contrast, these Defendants (and their creditors, for whom recovery is sought) were not parties to the deceitful, fraudulent raising of funds which depended on the production of fraudulent accounts, whereas AHAB was plainly involved through Abdulaziz, Suleiman, Saud and Yousef.

**(ii) AHAB is not in liquidation**

119. There is also the other obvious but important distinguishing feature between **Bilta** and the present case which, it is worth noting for completeness, which explains why the illegality defence failed in that case but would not in the present. In **Bilta** the claim was advanced by an independent liquidator and not by the fraudulent management or directors themselves.

120. As Lords Toulson and Hodge stated at [127]:

> *"127* ***To give effect to*** **[the protection given to creditors]*, this action is brought by the liquidators*** *in the name of the company* ***to recover, for the benefit of the creditors, the loss caused*** *to the company by the directors' breach of their fiduciary duty."* (Emphasis added.)

121. Again, although obvious, for the reasons set out further below, and as appears from even the passages quoted above from AHAB's Closing Submissions, AHAB is a long way from being in the position of a liquidator seeking by these proceedings to realise assets on behalf of its creditors.

122. Not only does AHAB continue to trade but Mr. Charlton made very clear that the JDEK process is designed to prevent any process that might resemble liquidation:

**[The following excerpt from the evidence on day 83 is embargoed from further publication until further order].**

[redacted] [3103] [redacted] [3104]

123. Thus, far from being involved in an insolvency process, these proceedings are an attempt by AHAB to *avoid* a real insolvency process.

124. Moreover, AHAB intends by this litigation to ensure that it will keep all of its subsidiary businesses and personal assets and operate much, as it did before 2009. The only subsidiary which will not remain part of the previous portfolio is the Pepsi plant which closed because AHAB lost the franchise (not because it was seized by creditors). The proceeds of AHAB's settlement of a dispute with Pepsi were distributed to the AHAB Partners.[3105]

---

3103 **{Day83/12:19-24}**
3104 **{Day83/56:8-12}**
3105 See **Detailed Narrative: {E2/1}**

125. In addition, as Mr. Charlton explained in the course of Day 83, and as appears from the excerpts above from AHAB's Closing Submissions) this litigation is part of the settlement process with creditors by which the AHAB Partners will get to keep a substantial portion of their personal assets:

**[The following excerpt from the evidence on day 83 is embargoed from further publication until further order].**

[redacted]

[redacted]

[redacted]

[redacted] [3106] [redacted]

126. Thus even if (which appears unlikely), AHAB has given full disclosure of its assets, the Partners will nonetheless be permitted to keep a substantial portion of their assets (which it must be assumed were largely acquired by means of the fraud upon the banks) and so would be ill-gotten gains as a result of this litigation.

[**The next paragraph [127] of this section of the Judgment will be embargoed from publication until further order having regard to the sealing order made at trial in respect of the documents at Bundle Y2/19]**

[redacted] [3107] [redacted] [3108]

[redacted] [3109]

[redacted]

---

[3106] **{Day83/58:13} - {Day83/60:3}**

[3107] **{Y2/19/74}**

[3108] **{Y2/19/74}**

[3109] **{Y2/19/117}**

**(iii) Instead of undertaking an investigation AHAB has attempted in these proceedings to stifle a proper inquiry**

128. It is well-established that the function of a liquidator at common law includes the duty to investigate the affairs of the company and the circumstances in which it failed:

(1) As Vinelott J observed in **Re Polly Peck Int**[3111] the purposes of the liquidation, the administration or the receivership, as the case may be, must include the gathering of information as to the conduct of the affairs of the company and those responsible for it.

(2) As Lord Millett observed in **Re Pantmaenog Timber**:[3112]

> *"From the earliest days of the joint stock company the liquidator has exercised functions which serve the public interest and not merely the financial interests of the creditors and contributories. The Cork Committee (Cmnd 8558) observed (in para 192 of its report) that: "The law of insolvency takes the form of a compact to which there are three parties: the debtor, his creditors and society."*

(3) Lord Walker at [**77**] put the matter thus:

> *"It seems to have been assumed that those functions do not include the conduct of disqualification proceedings under s6 of the Company Directors Disqualification Act 1986 ("*the Disqualification Act*"). Any such assumption would in my view be*

3110 As appears in various reports on the internet from the Economist and other news publications.

3111 Above and for the sake of ease of reference here: **[1994] BCC 15 P16a-b {R1/22.3/2}**

3112 **[2004 1 A.C. 158 [52] {R1/36.0.1A/16}**

*incorrect. It would overlook the fact that winding up has, and has had almost throughout the history of company law, a dual purpose. One purpose is the orderly settlement of a company's liabilities and the distribution of any surplus funds, prior to the company being dissolved. The other is the investigation and the imposition of criminal or civil sanctions in respect of misconduct on the part of persons (especially directors of an insolvent company in compulsory liquidation) who may be shown to have abused the privilege of incorporation with limited liability. The first function is primarily a concern of a company's creditors and shareholders; the second function serves a wider public interest."*

(4) These principles were followed by Henderson J in **Re Parmalat**[3113] whose decision was approved by the Privy Council[3114] and endorsed by the Grand Court in **Re GFN Corporation Ltd**.[3115]

(5) This function is underpinned by an entirely independent and free-standing statutory power of every liquidator in the Cayman Islands to investigate and report to the Court in the public interest (see Section 102 of the Companies Law (2016 Revision)).

129. AHAB plainly does not consider itself to be under a duty to investigate its own affairs:

(1) As set out at Section E of the Defendants' submissions,[3116] AHAB made very few attempts to investigate the position with El Ayouty.

---

3113 **[2006] CILR 171** at **[18] {R1/37.2.5/5}**
3114 **[2008] CILR 202 {R1/38.9.2}**
3115 **[2009] CILR 135 at [42] {R1/39.2.1}**

(2) Mr. Charlton's position was that, so far as he was concerned, he was appointed to do a job for his client, rather than to investigate in the manner that a liquidator would do so:

> *"But then I cared about how much was owed and where had it gone, and the knowledge of the various partners about who knew what, saw what when -- you know* ***I suppose if I had been appointed by an external regulator, maybe that would have been more of a focus. But these were the people who hired me, they brought me in*** *and said, "Please help us figure out what the position is."*[3117] (Emphasis added.)

*A.* *One,* ***as I've said, I wasn't particularly interested in financial statements****. As I also said earlier, the first time that I requested specific documents, to the best of our knowledge, was in 2015, I think, when the attachment 9 documents --* ***I wasn't interested in El Ayouty producing to me*** *-- I was not --* ***I mean, I wasn't hired by somebody, "Please will you come in and investigate what my knowledge was of a fraud that I allege against X".***

*Q* *No, that's fair.*

*A.* *That's not how you are hired. Presumably if they had wanted me to do that, they wouldn't have hired me. That would seem –*

***Q.*** ***You were asked to come in and investigate a fraud that you had been told had gone on by your clients?***

3116 **{E1/8}: The Flawed investigation**

3117 **{Day84/74:22} - {Day84/75:4}**

*A.* ***I don't think it was ever put in that sense, no. I was asked to figure out how much money had been borrowed in their name and where that money had gone. I wasn't particularly interested at day 1 in how the rubbish accountants had put together fake financial statements.*** *That wasn't something that particularly interested me. But we did ask for meetings and we did ask for documents.*"[3118] (Emphasis added.)

(3) These exchanges illustrate one of the core differences between AHAB's position and that of a liquidator. While a liquidator is required to even-handedly assess the evidence before taking a view as to how to proceed, AHAB's approach from day 1 was to deny knowledge of the fraud, to ignore all evidence to the contrary, and to seek to avoid their liabilities to the banks.

130. This is particularly significant because, had AHAB been subject to any recognisable liquidation, I accept that its liquidator should have cooperated in seeking to ascertain the truth and assisted the Defendants in holding AHAB Partners to account instead of merely shuffling all the blame onto Al Sanea in an attempt to help the AHAB Partners escape the consequences of their actions.

131. The JDEK claimants appear to be banks whose claims are based on the advances made to the Money Exchange/AHAB. I have no evidence as to whether they realise that they are the victims of a quite different and much larger fraud.

---

[3118] **{Day84/118:11}-{Day84/119:8}**

132. Throughout these proceedings, I have found that AHAB has sought to obscure any inquiry into its own role in the fraud on lending banks. Again, for these purposes I refer to Section E of the Defendants' Submissions.[3119]

**(iv) AHAB is not independent**

133. Further, it is relevant that AHAB does not have the independence that is the hallmark of a liquidator. AHAB is tainted by the illegality in a way that the liquidator of a company in **Bilta** was not. Yousef is now AHAB's Chairman and Suleiman's son, Dawood, who signed many of the relevant facilities, will take over:

(1) Even on AHAB's case, it knew of and signed off on the fraud on the banks for many years.[3120]

(2) In contrast, the liquidator in **Bilta** stood apart from the fraud and the creditors were entirely innocent.

(3) There could be no sense in which the decision of the court there would have vindicated or protected the reputation of the claimant.

(4) A liquidator would clearly seek to recover the proceeds of AHAB's fraud from the Partners in addition to seeking to sue Al Sanea; AHAB in contrast has refused to sacrifice its own assets. It appears also to have refrained from suing STCC, Al Sanea's central repository of his proceeds from the fraud upon the banks.

134. In executing its functions, a liquidator would be subject to the ultimate supervision of the Court. AHAB is not subject to any supervision as to the way in which these proceedings

---

3119 **{E1/7}.**

3120 **{X2/8}**

have been progressed, at least not one disclosed to the Defendants or the Court. JDEK has no such function, although I am told it would be interested in the outcome.

135. As set out at Section E of the Defendants' submissions,[3121] AHAB has failed to preserve large quantities of its own books and records. The blasé attitude adopted by Mr. Charlton (even in his testimony in Court) to the way that documents have gone missing and the failure to look for documents, demonstrates that AHAB does not consider itself to be under a duty to preserve the books and records of the company.

**(v) Proceedings were not commenced for creditors**

136. It is plain that when these proceedings commenced, AHAB was not litigating with a view to recovering on behalf of its creditors:

(1) Not only did AHAB seek to recover c.US$9.2bn (rather than the lower amount currently claimed) it sought to do so in circumstances whereby AHAB was also staunchly attempting to resist the banks' claims in London;

(2) AHAB only admitted its liability to its creditors in the London proceedings, once it became clear that AHAB had misled the court as to its knowledge of the borrowing of the Money Exchange;

(3) Put simply, AHAB sought to make an enormous windfall from this litigation.

**(V) FURTHER ON LOCUS POENITENTIAE**

137. A second possible argument advanced by AHAB is that after Abdulaziz's stroke (and the alleged extinguishment of AHAB's corporate memory of the fraud), his successors' lack of knowledge about the Money Exchange constituted a *locus poenitentiae* so as to absolve AHAB from illegality.

---

3121 **{E1/7}**

## (1) PRINCIPLES

138. The *locus* defence was most recently considered in detail by the Court of Appeal in **Patel v Mirza**:[3122]

(1) An exception to the illegality principle was recognised in **Tinsley v Milligan** as applying in circumstances when the unlawful purpose has not been carried into effect.[3123]

(2) Another example of a case of early repentance was **Perpetual Executors and Trustees Association of Australia Ltd v Wright**[3124] where the Court observed at p198:

> *"In this case no creditors have been defrauded, the illegal purpose has never been in any respect carried into effect, and therefore the [plaintiff] was entitled to succeed."*

(3) The Courts however emphasised that after the illegal purpose was put into effect, it was too late and there was no possibility of any *locus poenitentiae*:

> "*…however generous an attitude is taken to the exception,* ***I do not think that it can sensibly cover a situation, where creditors have been successfully deceived over a number of years****…*"[3125] (Emphasis added.)

(4) As the Court observed in **Tribe v Tribe** [3126] what mattered was not whether the *transaction* was carried into effect but whether the *dishonest purpose* had been

---

3122 **[2015] Ch 271 {R1/46.8}**
3123 (see **[1994] 1 AC 340** at **pp356 {R1/20.2/17}** and **374 {R1/20.2/35}**).
3124 **(1917) 23 CLR 185 {R1/5.1.0A}**
3125 **Collier v Collier [2002] EWCA Civ 1095** per Mance LJ. **{R1/34.8}**
3126 **CHANF 94/0100B (unrep) {R1/26.2.5}**

carried into effect. That would not have happened until creditors had been deceived.

139. All these cases illustrated that, in order to establish *locus poenitentiae*, the courts required the plaintiff to show repentance *before* the unlawful result occurred. Obviously, in the present case, AHAB could not conceivably deny that creditors have already been defrauded.

140. It is difficult to see how, in the light of the Supreme Court decision in **Patel**, *locus poenitentiae* will continue to have any distinct doctrinal relevance. It is clear that the *locus poenitentiae* exception to the illegality defence is now subsumed within the general balancing act which the court must perform: **Patel v Mirza** per Lord Toulson at [**116**].

141. However, since the concept that a party may repent is plainly wrapped up in the balancing exercise entailed in Lord Toulson's eight factors, it may be a useful check to see how far or how close AHAB is to falling within the former principle.

## (2) *LOCUS POENITENTIAE* – CONDUCT TO 2009

142. It is clear, on the basis of the correctness of the foregoing analysis, that there is no possibility of AHAB establishing *locus poentitentiae* from 2000 onwards because the unlawful purpose was put into effect and there is, therefore, no conceptual scope for *locus*.

143. In order to take advantage of *locus poenitentiae*, it would be necessary to *withdraw* from the unlawful purpose. But AHAB did no such thing:

(1) By the time of Abdulaziz's stroke, AHAB had been carrying on a fraud at the Money Exchange for close to 20 years, obtaining hundreds of loans in the process.

Abdulaziz and Suleiman were involved with the fraud by the Money Exchange for nearly 20 years. Both knew of the false accounting.

(2) Even if the Partners had chosen to withdraw from the process following Abdulaziz's stroke it would have been far too late to do so for establishing a *locus*. Abdulaziz had helped set the Money Exchange on its thoroughly dishonest path. After his stroke, the Money Exchange could no longer change course unless it was closed down. It would continue to borrow and the borrowings would continue to increase.

(3) On the contrary, AHAB's own "New for Old" case assumes that Suleiman *sanctioned a continuation and escalation* of the fraud.

(i) The "New for Old" case is premised on the basis AHAB sanctioned further borrowing to pay for the old borrowing and, as AHAB now acknowledges, for the increases needed to meet at least the interest costs of funds.

(ii) The renewals were, however, all based on false and fraudulent accounting information.

(iii) AHAB has not suggested that Suleiman, as part of "New for Old" also told Al Sanea that he was to cease misleading the banks and to start producing honest financial statements. Given that this would involve coming clean to financial institutions about the fraud and disclosing the black hole in the finances of the Money Exchange, it is difficult to see how Suleiman could possibly have done so.

(4) In fact, as set out above, both Suleiman and Saud signed financial statements after 2003 which they knew were misleading or (if the Defendants' case had been rejected) at the very best had no rational basis for believing to be accurate.

(5) Accordingly, while AHAB claims to have sought to reduce the *amount* of the borrowing of the Money Exchange following Abdulaziz's stroke, it does not claim to have altered the fraudulent manner by which that borrowing was obtained. Put another way, AHAB's complaint is not that Al Sanea stole from the banks but that he stole more than they wanted him to.

144. Nor would it be a sufficient answer for the AHAB Partners to claim that they did not know about the fraud. In Lord Toulson's list of factors, absence of knowledge is one factor among many, which is not an automatic answer of itself to illegality. In particular, incompetence on the part of AHAB does not enable it to establish any *locus*:

(1) Dr Hammad's unchallenged evidence was that Suleiman and Saud were under a legal duty in Saudi Arabia to get to grips with the affairs of the Money Exchange and to monitor its activities.[3127] Any failure to do so was a breach of their duties to AHAB (and I would assume, to AHAB's creditors as well).

(2) It cannot be seriously disputed that the Partners signed up to resolutions approving the false accounts and signed off false financial statements.

(3) The Partners' incompetent failure to monitor their own business (in breach of their duties) may not absolve them for having signed up to the continuation of Abdulaziz's fraud.

---

3127 **{K1/3/29}**

## (3) CONDUCT FROM 2009 ONWARD

145. As the Defendants submit, I do not accept that in 2009 it was still open to AHAB to repent from unlawful conduct. However, far from exonerating AHAB, its conduct post-May 2009 is entirely inconsistent with *locus poenitentiae* and demonstrates how different "*the investigation*" and pursuit of the Defendants was to a liquidation.

146. AHAB made no mention whatsoever of their involvement (on their case through Abdulaziz) in the fraud on the banks until August 2016 after the trial began, when they accepted his involvement.

147. AHAB initially asserted that Ledger 3 was maintained as an internal record and was not included in the financial statements of the Money Exchange.[3128] This position was maintained until November 2015, notwithstanding the fact that Mr. Charlton was aware of the production of separate financial statements by March 2010:

*Q. Did you know what it said about the financing division and the exchange and investment division?*

*A. I mean, to be honest with you, by that point I'm not sure I really cared.*[3129]

*Q. But this statement -- they prepared a separate financial statement for what you would have known as ledger 3, the investments ledger -- you understood that, I think, broadly before the meeting? It didn't come as a –*

---

3128 **{A1/2/61}**

3129 {**Day85/87:4-7**}

> *A.* *I'm pretty sure by March 2010 I was aware of that, yes, either from documents or discussions with people like Mark Hayley or -- I don't believe this is where I learned that fact.*[3130]

148. However, it was not until the production of their Re-Amended Statement of Claim in late November 2015 that AHAB acknowledged the production of separate financial statements.[3131]

149. Even then, the Re-Amended Statement of Claim in 2015 made no mention of Abdulaziz's involvement in this fraud and instead maintained that Al Sanea maintained separate financial statements for his internal use.[3132]

150. When AHAB finally did acknowledge Abdulaziz's involvement in the production of fraudulent financial statements, it made no attempt to apologise for what was, on any reasonable view, the admission of involvement in a massive fraud over many years. In fact, AHAB maintained that it did not admit that Abdulaziz's behaviour was dishonest.

151. Indeed, when the issue was raised with the Partners, they steadfastly refused to apologise for misleading the banks:

> *Q.* *No, I am suggesting you were involved in a fraud on banks, Mr. Algosaibi.*
>
> *A* *And we knew that Maan stole -- stole money from us and -- and he did his forgery, would -- would you think I -- we would have sat down? We would have challenged him, we would have went to him, we would have done a lot of things.*

---

3130 **{Day85/109:2-9}**
3131 **{A1/2/61}**
3132 **{A1/2/61}**

*Q. This is all about your reputation, isn't it? That's why you are here. That's all you care about is your reputation, that's right, isn't it?*

*A. Sir, sir, Maan stole money, he forges, he tried to do many things.*

*Q. You did the same to the banks; isn't that right?*

*A. No, that's not correct, not correct, sir.*

*Q. You stole from the banks, SAR 330 billion your family stole from banks?*

*A. Not correct, sir.*

*Q. Do you think you should apologise to the banks for that? Do you feel any remorse for that?*

*A. I said -- I told you, not correct. You should apologise to me for this assertion. If you want apologies, you apologise.*

*Q. It is your case that you have something called a locus poenitentiae, so I am trying to see if you are apologetic for the illegality I suggest your family was involved in.*

*A. I -- I don't know about this -- this legal. You ask, I answered; you present something, I try to answer the best I can."*[3133]

152. Similarly, when it was suggested to Dawood that he should apologise for misleading SBB, he also refused:

[3133] Saud xx **{Day66/47:3} - {Day66/48:5}**

Q *"Are you likely to have apologised to Saudi British Bank for what had happened?*

A. *Why apologise? I don't know about -- (Arabic spoken). (Through interpreter) I don't know anything about the problem to apologise for it.*

Q *Let's carry on: "It was a management error of mismatched/mistimed funding, which the partners were not aware of until you called Saud Algosaibi on Saturday evening." So you told Saudi British Bank that it was a management error that you were not aware of until Saudi British Bank called Saud on Saturday evening. Do you see that?*

A. *(Through interpreter) We don't manage the Money Exchange, Maan Al Sanea is the person who manages the Money Exchange. So why we have to apologise to the bank?"*[3134]

153. Thus there can be no suggestion of repentance because AHAB has failed to make any attempt at penitence long after the fraud took place.

154. The effects of the fraud were entirely irreversible. The loans obtained by the Money Exchange have been paid off many times with the proceeds of other dishonestly borrowed funds. Even if the Partners had sought to withdraw from their illegality, they would not have been able to do so and the JDEK proceedings do nothing to unravel the years of robbing one creditor to pay off another.

---

3134 **{Day79/89:10} - {Day79/90:1}**

155. As set out above, through their acquisition of loans and shares AHAB obtained considerable benefit from the Money Exchange which they have never returned.

156. Moreover, AHAB, through its proposals before the JDEK, does not intend to return the proceeds of the fraudulently acquired borrowing as it is intended that the Partners will hold on to both their personal assets and a great deal of their substantial business empire.

157. Accordingly, far from seeking to make amends for their unlawful conduct, AHAB has continued to benefit from it and shows no signs of returning those benefits.

158. AHAB's case would have failed in the light of the illegality defence, in any event.

# SECTION 8

# THE GTD COUNTERCLAIMS

## SECTION 8

## THE GTD COUNTERCLAIMS

1. The GTJOLs' counterclaims against AHAB are for a total of about US$5.9bn. That is broken down as follows, adopting the headings in the Defence and Counterclaim ("**D&CC**"):

   (1) Singularis Promissory Note: **US$4,495,006,252**;

   (2) Land held on trust for SICL: **US$783,604,200**;

   (3) Foreign exchange ("FX") transactions between SICL and AHAB: **US$ 75,655,603**;

   (4) Cash due to SICL from AHAB: **US$ 516,992,660**.

2. The claims are, by any standard, very large indeed. However, the GTJOLs called but one witness in support of the counterclaims and this was by way of accountancy opinion evidence: Mr. Andrews, a Grant Thornton partner. No witness of fact was called to support any aspect of the counterclaim. Al Sanea, at whose instigation the counterclaim for US$4.5bn, based on the Singularis Promissory Note was brought, has steadfastly distanced himself from these proceedings.[3135]

3. Two AHAB witnesses were cross-examined in relation to the counter-claim: Saud and Omar Saad. As will become clear below, neither provided evidence which could be regarded as supportive or probative of the counterclaims.

---

[3135] Having at the outset unsuccessfully challenged the jurisdiction of the court and failed to file a defence. See Judgment of the Court of Appeal, 1 December 2010: {**B/20/1**}.

4. The GTJOLs rely upon certain accounting entries in the records of SICL and Singularis and upon certain land transactional documents as proof of the respective liabilities alleged to be owed by the Money Exchange. As will also become clear below, including from crucial admissions which the GTJOLs were compelled to make, many of these accounting entries and land transactional documents proved also at best to be inconclusive and in some instances utterly unreliable sources of evidence. Nor is the fact that the SICL accounts appear to have been audited by one of the "Big 4" accountancy firms anything to the point in circumstances like these where no one appeared to speak to the reliability of the records examined.

5. In summary, the evidence relied upon in proof of the counterclaims is unsafe and unreliable. It arises, like the rest of the evidence in this byzantine case, against the background and out of the cauldron of fraud that has been shown to characterise the existence and operation, not only of the Money Exchange and other Financial Businesses but also the existence and operation of SICL and Singularis in the manner of their use by Al Sanea to foster the growth of his wealth by defrauding others. So complex and massive had the Ponzi scheme of borrowing through the Financial Businesses and Al Sanea's Saad entities become, that no court could be expected to rely merely upon accounting records from within them as proof of these multi-billion dollar counterclaims, unsupported by the evidence of a single witness who would speak to the correctness of the accounts or provenance of the purported liabilities.

6. These concerns are amply demonstrated by the full and frank (albeit as I have decided, ill-founded) arguments of the GTJOLs, and all the more so when read with the counter-

arguments of AHAB. These are all set out in detail below and juxtaposed by me in context in relation to each head of the counterclaims.

7. For instance, it will be seen in relation to certain of the cash counterclaims, that while the internal accounts of SICL purport to show entries for the liabilities, there are no matching entries within the accounts of the Money Exchange to reflect them as one would expect and as would be essential to a claim based upon the existence of such accounting entries and counter-entries.

8. Similarly, in relation to cash claimed as due to SICL from AHAB based upon alleged profits made by SICL on 20 forward FX trades between SICL and the Money Exchange, the undisputable evidence is that these were "rigged" to guarantee a profit to SICL. Money was not transferred to SICL based upon these sham transactions but the records generated allowed SICL to record the transactions in its accounts to reflect enormous profit, further enabling SICL to falsify its accounts in its campaign of fraud against its lenders.

9. Before proceeding as explained above to illustrate my conclusions, I must however, seek to clarify my reasoning insofar as it may be thought that I am here confounding any aspect of my earlier conclusions in relation to the outcome on AHAB's claims. In that context, in particular in my rejection of AHAB's tracing claims, I expressed the view that not only did Ledger 3 represent an accurate record of the Al Sanea indebtedness[3136] but also that transactions recorded as between the Money Exchange and Saad entities may be regarded as evidence of commercial activity between them.

---

[3136] A matter of common ground between the accountancy witnesses.

10. I do not resile from those views here. The point I wish to explain is that my earlier views were not intended to reflect upon whether or not the commercial rationale underlying the transactions was either transparent or legitimate.

11. While Al Sanea used the Money Exchange and other Financial Businesses with the certain knowledge and authority of the AHAB Partners to defraud the banks, as part of the quid pro quo of that nefarious arrangement, he was also given free reign to use the Money Exchange to support his own Saad Group's activities, even where, as it has been shown, that involved his separate campaign of fraud against the outside world. If this meant that using the Money Exchange to "cook the books" of SICL and Singularis suited his ends, I do not doubt that the AHAB Partners saw no need to inquire into or interfere with such activities.

12. And so, while in the context of the SICL and Singularis counterclaims their accounting records may not safely be relied upon as proof of anything, that does not mean that the commercial activity between the Saad entities and the Money Exchange was conducted by the "cross-firing" of transactions to create a "maelstrom"[3137] in order to defraud AHAB. That is not at all what the evidence here suggests. The counterclaims are based upon entries found in SICL's and Singularis' accounts which do not appear in the Money Exchange's ledgers. As has been conceded by AHAB and accepted by the Defendants, the Money Exchange's ledgers and DMS contained accurate accounts of its activities. What is really in question here is the accuracy of the SICL and Singularis accounts. The fact that Al Sanea appears not to have insisted upon the missing counter entries being

---

[3137] As described in **Sinclair Investments (UK)_ Ltd v Versailles Trade Finance Ltd [2012] Ch 453** {**R1/41/1**} (discussed also above in sections 7 and 7C and dealing with AHAB's tracing claims).

entered in the Money Exchange's accounts gives rise, in my mind, to at least two important inferences.

13. First, and that most relevant here to disposal of the cash counterclaims; that the liability of the Money Exchange did not really exist. Second, that the generation of such sham activity, like the fictitious use of LC transactions through TIBC, was not meant during the operation of the Money Exchange to defraud AHAB but to enable Al Sanea to continue to defraud AHAB's bankers and to wage his own campaign of fraud against the outside world.

14. A different view must, of course, be taken of Al Sanea's state of mind now in relation to what I also regard as his fraudulent instigation of these counterclaims as they relate to the SICL and Singularis Promissory notes.

15. I do not suppose that this is the first or last time that the forensic world will have seen such dishonourable behaviour following upon the unravelling of a fraudulent compact.

16. In the result, and for the further reasons to be explained in detail below, I can state here that I accept AHAB's criticisms of the counterclaims.

17. As explained above, I will set out the GTJOLs' arguments juxtaposed with AHAB's responses which I accept, respective to each head of the counterclaims.

**First the GTJOLs' Arguments on SICL's Counterclaim**

18. SICL's counterclaim arises out of its running account with AHAB. The claim is made up of different elements. Some related to the net proceeds of sale from land transactions SICL claims were entered into by AHAB on its behalf in respect of 5 properties – called respectively Properties 0, 1, 2, 3, and 4. Others related to FX transactions which were entered as resulting in net profits owed to SICL. It is agreed that there was a running

account with the Money Exchange. Many elements of the running account are agreed. Most of the elements are backed by cash movements on bank accounts. The issues arise in relation to entries relating to some deposits, certain FX transactions,[3138] and purchases and sales in relation to the five properties.

19. On the basis of the evidence, the GTJOLs have concluded that it may not be safe to conclude that all of the FX transactions were genuine. AHAB may have been entering into at least some FX transactions with SICL to enable AHAB to make drawdowns under its FX facilities with the banks. They are not evidence of theft from AHAB by Al Sanea. If the FX transactions recorded in Accounts 3 and 4 were not genuine, then the entries in Accounts 3 and 4 relating to those FX transactions should be reversed, resulting in a reduction of US$374,742,297[3139] in the cash counterclaim and no FX counterclaim. As regards the property transactions, the purchase and sale of Property 0 was genuine. The evidence in relation to Properties 1, 2, 3 and 4 is more equivocal. It is agreed that if any of the properties did not exist the account entries need to be adjusted. That would mean no claim for the value of Properties 3 and 4, but the cash claim would increase by either US$359,475,528 (if Property 0 did not exist) or US$559,475,528 (if Property 0 did exist). No other adjustments should be made. The adjustments will change the quantum of the claim, but not the fact of the claim.

3138 Including the 20 FX forward transactions between SICL and the Money Exchange that had not matured at 5 August 2009. They are referred to in more detail in paragraphs **[86]** to **[97]** below.

3139 US$278,883,000 in relation to Account 3 and US$95,859,297 in relation to Account 4.

**The SICL Promissory Notes**

20. SICL's running account with AHAB was secured by two promissory notes ("SICL Promissory Notes"). Both SICL Promissory Notes are dated 1 December 2008.[3140] For each SICL Promissory Note there is a related Security Agreement that refers to the SICL Promissory Note.[3141]

21. The Security Agreements provide that AHAB will pay under the SICL Promissory Notes on demand all outstanding liabilities due, owing or incurred to SICL by AHAB on any current account or otherwise. The sums due from AHAB to SICL shown in SICL's books and records are the sums payable on demand under the SICL Promissory Notes:

(1) The second clause of the SICL Promissory Note Security Agreements provides (emphasis added):[3142]

> "[AHAB] *hereby unconditionally and irrevocably undertakes, agrees and guarantees under this Agreement, upon* [SICL's] *first written demand, to immediately repay* [SICL] *and fully settle and* ***discharge all outstanding liabilities*** *together with all penalties, fees, commission, banking charges and all sorts of costs, expenses and charges, being or which* ***will from time to time become due, owing or incurred to*** **[SICL]** ***by*** **[AHAB]** ***on any current account or otherwise*** *or in any manner whatsoever…"*

(2) The third clause of the First SICL Promissory Note Security Agreement provides (emphasis added):[3143]

> "[AHAB] *confirms that his maximum liability under this Agreement shall include the principal amount (the value of the promissory note) issued by him in favor of* [SICL] *of US$1,423,400,000… in addition*

---

3140 First SICL Promissory Note: {**G/7219/1**}. Second SICL Promissory Note: {**G/7230/1**}.

3141 First Security Agreement: {**G/7220/1**}. Second Security Agreement: {**G/7231/1**}.

3142 {**G/7220/1**}; {**G/7231/1**}.

3143 {**G/7220/2**}. In the Second Promissory Note Security Agreement the figure in the third clause is US$810m: {**G/7231/2**}.

> *to all penalties fees, commissions, and all sorts of costs, expenses and charges being or which will, from time to time, become due, owing or incurred by* [SICL] *by reason of* [AHAB] *in any manner whatsoever and any where.*
>
> *Taking into consideration such maximum amount,* ***the liabilities shall be equal to the amounts outstanding and due from*** **[AHAB]** ***to*** **[SICL]** ***from time to time****. Such liabilities shall not be discharged or affected by the fact that the aggregate utilization of any covered drawings or revolving financing facility is in excess of the maximum amount stated above."*

22. The ninth clause of the SICL Promissory Note Security Agreements provides that the entries in SICL's books and records are conclusive evidence of the liabilities owed to SICL:[3144]

> "[SICL's] *entries, books and records are considered conclusive evidence as to the correctness of the liabilities owed by* [AHAB] *to* [SICL]."

23. While the chain of custody of the SICL Promissory Notes is not complete,[3145] there is no evidence that the original pen-and-ink signatures on the SICL Promissory Notes and the Singularis Promissory Notes were forged.[3146] In their Joint Statement, Mr. Handy and Dr. Giles state: [3147]

> *"3.1 ....Where we have examined questioned documents bearing original pen-on-paper signatures in the name of Suleiman Algosaibi, our conclusions regarding the authenticity of all these original signatures are inconclusive."*

---

3144 {**G/7220/3**}; {**G/7231/3**}.

3145 See Crawford 1W {**C2/3/1**} and Greenhalgh 1W {**C2/4/1**}.

3146 The GTDs were not able to put to Yousef (due to illness) the circumstances in which the SICL Promissory Notes were signed such as: where they were signed? When they were signed? Who was present when they were signed?

3147 Joint Statement of Dr. Giles and Mr. Handy, paragraph 3.1 {**J/9/2**}. See also Giles 1R, paragraph 6.1 {**J/1/13**}; paragraph 6.3 {**J/1/16**}; Handy 1R, paragraph 67 {**J/2/13**}; Forgery Schedule lines 749, 750, 751, 752 and 788 {**A2/23.1/28**}.

24. Saud's evidence was that the signatures look like Suleiman's and he does not remember being present when the SICL Promissory Notes were signed (emphasis added):[3148]

> *"Q. Do you have any recollection of being present when this promissory note was signed on 1 December 2008. "Yes" or "no"?*
>
> *A. **I don't remember**, I was not present while this -- I cannot say I was present when this -- when I was doubting the signature, sir. I mean --*
>
> *Q. If you remember being present, Mr. Algosaibi, **I was going to make a suggestion to you as to where it was signed**.*
>
> *A. No.*
>
> *Q. But you are not able to say you were present, so I'm not going to do so, so let's move on.*
>
> *A. Okay, I wasn't present and I have a problem with the whole document, sir.*
>
> *Q. **You weren't present**.*
>
> *A. **Okay. All right**.*
>
> *Q. At {G/7226/1} is a further promissory note which appears to bear Suleiman's signature. Do you see that?*
>
> *A. Yes, **I see that, what looks like my uncle's signature**, to something quite unbelievable. Yes.*
>
> *Q. Again, I'm going to ask you: do you have any recollection of being present when this promissory note was signed on 1 December 2008? "Yes" or "no"?*
>
> *A. I was -- first of all, I don't think this was true. Second, I was not present. For what looks -- this is -- all of this is not true. So --*
>
> *Q. I'm asking you a question; can you just focus on the question. Have you any recollection of being present when this document was signed?*

---

3148 Saud xx {**Day53/40:13**}-{**Day53/41:18**}.

> *A.* ***I have no recollection of present nor knowledge*** *nor uncle talked about it nor a transaction that took place of this amount."*

25. The SICL Promissory Notes are enforceable. They were signed by Suleiman in December 2008 and there is no evidence that signatures were forged. They were given for value; value passing through the running account between SICL and AHAB. They are security for the sums outstanding on the cash account. The SICL Promissory Notes do not give rise to an additional sum due from AHAB but they do give SICL security[3149] for the sums due.

26. Clause nine of the Security Agreements is potentially significant.[3150] The parties agreed a mechanism that would limit the scope for disagreement. The entries in SICL's books and records are conclusive evidence of SICL's claims. In the context of the counterclaims, if the Court concludes that the evidence on a particular payment is equivocal, the Court should break any such deadlock by giving preference to the entries on SICL's books and records. This may arise in the context of Accounts 4 to 9. The exact equivalents to Accounts 4 to 9 have not been identified in the Money Exchange's books and records, although the majority of the entries themselves are recorded in the Money Exchange's books and records. In that context the Court is entitled to rely upon the entries in Accounts 4 to 9 because that is what the agreement between SICL and the Money Exchange provides.

---

[3149] Not security in the sense of a right over AHAB property but security in the sense of a separate and easily enforceable covenant.

[3150] {**G/7220/3**}; {**G/7231/3**}.

27. Immediately following in quotation are AHAB's responses on the SICL Promissory notes which I accept:[3151]

(1) "*SICL Promissory Notes and Security Agreements*

10.50 *The GT liquidators previously pursued a further claim for USD 2.2 billion said to be payable under two promissory notes, one for USD 1,423,000,000 and one for USD 810,000,000, dated 1 December 2008 and purportedly given by AHAB to SICL.*[3152] *The claim was abandoned a few months before the trial*[3153] *It is now said that the promissory notes were given not as absolute obligations but by way of security for such amounts as might otherwise be due from AHAB to SICL. Reliance is placed on two security agreements dated 1 December 2008.*[3154]

10.51 *AHAB's position is and has always been that the promissory notes and associated security agreements are forgeries. The position is very similar to the SHL promissory note: the original SICL notes were produced by Mr Al Sanea; no copies or references were found in AHAB's or SICL's files; the handwriting expert evidence is inconclusive.*

10.52 *There was no good reason for AHAB to have provided security of USD 2.2 billion at the end of 2008. Even according to SICL's own*

---

3151 In its written closing submissions {**D/10/11**}.

3152 *D&CC para 268 {**A1/9/119**} and 274 {**A1/9/122**}; {**G/7226/1**}; {**G/7227/1**}.*

3153 *See the amendments to the prayer in blue at paragraph 317 of the Re-re-amended D&CC dated April 2016 {**A1/9/155-156**}.*

3154 *{**G/7228/1**}; {**G/7229/1**}.*

*trial balance, the amount due from the Money Exchange as at 31 December 2008 was only USD 162 million.*[3155] *Mr. Andrews was unable to suggest how the USD 2.2 billion figure might have been arrived at.*[3156]

10.53 *Another suspicious feature of the SICL promissory notes is that Mr Al Sanea also produced, in other proceedings between him and AHAB, another promissory note and security agreement, also for USD 1,423,000,000 but in favour of him personally rather than SICL and dated 16 November 2008.*[3157]

10.54 *Although no separate claim is now made under the promissory notes, the GT Liquidators rely on clause 9 of the security agreements, which provides that SICL's entries, books and records are considered conclusive evidence as to the correctness of the liabilities owed by AHAB. Since the security agreements are forgeries, that clause is irrelevant. But in any event, clause 9 could not sensibly be construed as permitting SICL to rely on its records to the extent that they deliberately and fraudulently overstated liabilities of AHAB*."

**The GTJOLs' submissions on the Cash Accounts**

28. As it is when considering AHAB's claims against the Defendants, it is important that the Court looks for the best evidence to support transactions namely, third party evidence,

---

3155 ***{I/5/28}***

3156 ***{Day98/52:19}*** *to* ***{Day98/53:1}***.

3157 ***{G/7152.1/1}***

such as bank statements. The best evidence is to "*follow the cash*" through bank statements or other third party documents.[3158]

29. Mr. Davies explained what this meant:[3159]

> "*Q. It is always easiest for me to -- best evidence for me as regards whether a cash-flow has actually happened is by following the cash through bank statements, ideally, third-party-produced bank statements that explain them. That's what I meant by that, is following -- looking to follow -- bank statements would be the best evidence of where the cash has actually moved, rather than a note or something else. Also, I'm looking for is third-party evidence, as well, which is more independent than otherwise, if that makes any sense, my Lord.*"

30. Mr. Davies explained that if he had not got the bank statements he went on other third-party information, such as audited accounts:[3160]

> "*Now, insofar as what happened to those monies -- and this, I think, is a matter obviously for the court to deal with, I would imagine -- I can't say, because of course I -- for the bank statements to check to watch the money coming in, I haven't got the bank statements to see necessarily those monies going out. And thereby, I'm slightly fettered. So what I've tried to do is go on third-party information, which is the audited accounts…*"

31. In the context of the counterclaims Mr. Andrews said:[3161]

> "*Q. All right. I think your colleague, Mr Davies, when he was giving evidence last week, said that so far as he was concerned, the best evidence of whether a cash flow had actually happened was to follow the cash, he said, through the third-party bank statements. That's sensible advice, isn't it?*

3158 The accountants agree that using the bank statements is best and that where possible company books should be reconciled to bank statements. See for example: Davies xx {**Day95/78:8**}: "*What's important to me is following the cash*"; Andrews xx {**Day97/172:3**}: "*follow the cash*". Mr. Hargreaves said that bank statements are the best evidence: Hargreaves xx {**Day71/22:5**}-{**Day71/22:23**} and {**Day74/10:1**}-{**Day74/10:17**}. Mr. Hargreaves on reconciling Midas statements to cash statements: Hargreaves xx {**Day70/116:8**}-{**Day70/117:2**}. Mr. Hourigan on the desirability of relying on bank statements: Hourigan xx {**Day98/96:8**}-{**Day98/97:13**}.

3159 Davies re-x {**Day96/146:2**}-{**Day96/146:15**}.

3160 Davies xx {**Day95/79:1**}-{**Day95/79:9**}.

3161 Andrews xx {**Day97/31:8**}-{**Day97/31:14**}; see also {**Day97/174:19**}-{**Day97/174:24**}.

*A.* *I would certainly agree with that, my Lord.*"

32. The Money Exchange and SICL each maintained a number of general ledger accounts to record transactions between one another. These ledger accounts did not necessarily match one another in each company's ledgers.[3162] Removing double-counting across Accounts 3 and 4, the net balance on the nine accounts in SICL's trial balance as at 5 August 2009 shows a sum due from AHAB to SICL's ledgers is US$516,992,660.41.[3163]

33. The areas of disagreement between Mr. Andrews and Mr. Hatton are limited. Where there is disagreement, the effect of the disagreement on the balance due from AHAB to SICL is agreed.

**The Nine Accounts in SICL's Books and Records**

34. As at 5 August 2009, SICL held nine accounts in respect of the Money Exchange showing balances owed to or from the Money Exchange as recorded in SICL's trial balance. For the purposes of these Proceedings, these accounts have been termed Accounts 1 to 9.[3164]

35. The net balance on the nine accounts recorded in SICL's trial balance as at 5 August 2009 is an amount due to SICL from AHAB of US$598,470,319.41. This sum however includes some double-counting across Accounts 3 and 4.[3165] Removing the double-counting, the sum recorded as due from AHAB to SICL in SICL's ledgers is reduced to

---

3162 Andrews/Hatton Joint Statement, paragraph 36 {**I/22/8**}.
3163 Andrews/Hatton Joint Statement, paragraph 37 {**I/22/8**}.
3164 Andrews/Hatton Joint Statement, paragraph 38 {**I/22/8**}.
3165 The double-counting is not controversial.

US$516,992,660.41 in the SICL trial balance at 5 August 2009, being the sum claimed by SICL.[3166]

36. Mr. Andrews and Mr. Hatton agree that SICL's financial statements were last audited for the year to 31 December 2008,[3167] and that:[3168]

> *"the balances on four of the Nine Accounts changed between 31 December 2008 (the date to which SICL's financial statements were last audited) and 5 August 2009. For two of these four accounts the changes were only due to currency fluctuations)."*

37. Thus, the balances on five of the accounts recorded in SICL's trial balance as at 5 August 2009 were the same as at the year-end 31 December 2008.

38. Accounts A, B and C in respect of SICL in the Money Exchange's ledger 90 correspond to Accounts 1 to 3 in respect of the Money Exchange in SICL's trial balance.[3169] In addition, the balances recorded on Accounts 1, 2 and 3 as at 31 December 2008 correspond with the balances recorded on Accounts A, B and C as at the same date, once certain account entries which have value dates in December 2008 (and should be included in the balance as at 31 December 2008) are included.[3170] Accounts 1, 2 and 3 in SICL's trial balance reconcile to Accounts A, B and C in the Money Exchange's ledger 90 at both 31 December 2008 and 5 August 2009.

**The Agreed Balances**

39. The balances on Accounts 1, 2, 4 and 5 are agreed.

---

3166 Andrews/Hatton Joint Statement, paragraph 37 {**I/22/8**}.

3167 Andrews 1W, paragraph 72 {**I/5/27**} and Tab H5 {**G/7351/1**}.

3168 Andrews/Hatton Joint Statement, paragraph 40 {**I/22/9**}.The joint statement also cross-refers to Andrews 1W, paragraphs 75 to 77 {**I/5/28**}.

3169 Andrews/Hatton Joint Statement, paragraph 43 {**I/22/9**}.

3170 Andrews/Hatton Joint Statement, paragraph 44 {**I/22/9**}.

(1) Account 1: It is agreed that the records for Account 1/Account A in both SICL and the Money Exchange's respective ledgers both record that the Money Exchange owed SICL CHF 1,921.92 for some time.[3171] This balance arose as a consequence of SICL depositing a cheque payable at Arab Bank to "*SAAD INVESTMENTS CO.E.C.*" for CHF 1,921.92 dated 3 April 2001 into its CHF bank account at the Money Exchange.[3172]

(2) Account 2: It is agreed that the balance of Account 2/Account B of EUR 12.90 is recorded in both SICL and the Money Exchange's respective accounting ledgers.[3173] SICL has a record of the sum of EUR 12.90 having been owed by the Money Exchange to SICL from at least as early as 31 December 2006.[3174] The Money Exchange has a record of this sum having been owed by the Money Exchange to SICL since at least as early as 31st December 1999.[3175] Mr. Hatton confirmed that the sum of EUR 12.90 was owed by the Money Exchange to SICL:[3176]

> *"Q. It is agreed that the records for Account 2, which is also "Account B" as described in the Money Exchange's ledger's, state that the Money Exchange owes SICL EUR 12.90 […]*
>
> *A. That is correct."*

(3) Account 4: It is agreed that the balance on Account 4 in SICL's trial balance at 5 August 2009 is US$117,374,479 due to the Money Exchange. The transactions

---

3171 Andrews/Hatton Joint Statement, paragraph 49 {**I/22/10**}.
3172 Andrews 1W, paragraphs 97 to 98 {**I/5/38**} and Tab H25 {**G/2560/1**}.
3173 Andrews/Hatton Joint Statement, paragraph 50 {**I/22/10**}.
3174 SICL's trial balances exhibited at Andrews 1W, Tabs H1, {**Q/554/1**}; H5, {**Q/555/1**}; and H18 – 24, {**Q/563/1**}, {**Q/564/1**}, {**Q/565/1**}, {**Q/566/1**}, {**Q/567/1**}, {**Q/568/1**}, {**Q/569/1**}.
3175 Andrews 1W, Tab H7 {**Q/557/1**}.
3176 Hatton xx {**Day94/102:5**}-{**Day94/102:9**}.

recorded in Account 4 are described as either FX transactions or Property transactions.[3177] SICL's records for Account 4 date back to 31 December 2006.[3178] This balance is subject to the double-counting between Accounts 3 and 4, which is agreed, and is discussed below.

(4) Account 5: It is agreed that in SICL's trial balance at 5 August 2009 Account 5 records a balance of US$148,865,340.18 due to the Money Exchange by SICL.[3179] SICL's accounting records include two entries, one dated 27 December 2007 for US$208,865,340.18 due from SICL to the Money Exchange[3180] and one dated 30 December 2007 for US$60 million due from the Money Exchange to SICL.[3181]

40. It is notable that AHAB has agreed the balances on Accounts 4 and 5 because those accounts show balances due to AHAB.

**Double-Count between Accounts 3 and 4**

41. SICL's discounted profits on 26 FX transactions, discussed in more detail below, were recorded in Account 4 before the trades had matured.[3182] SICL was recording forward FX transactions that had not yet matured.[3183] The first six of the 26 FX transactions were reversed from Account 4 after they had matured[3184] and the non-discounted profits (the actual profits) were then recorded in Account 3.[3185]

---

3177 Andrews/Hatton Joint Statement, paragraph 62 {**I/22/12**}.
3178 Andrews 1W, paragraph 111 {**I/5/46**} and Tab H19 {**Q/564/1**}.
3179 Andrews/Hatton Joint Statement, paragraph 64 **{I/22/13}**.
3180 Andrews 1W, paragraph 119 {**I/5/50**} and Tab H46 {**Q/588/1**}.
3181 Andrews 1W, paragraph 119 {**I/5/50**} and Tab H46 **{Q/588/1}**.
3182 Andrews 1W, paragraphs 114(b) {**I/5/46**} and 115(b)(ii) {**I/5/47**}.
3183 Andrews 1W, paragraph 117 {**I/5/49**}.
3184 Andrews 1W, paragraph 118 {**I/5/49**}.
3185 Andrews 1W, paragraphs 107 to 110 {**I/5/43**} and Tabs H41 {**Q/582/1**}, H42 {**Q/584/1**}, H8 {**Q/558/1**}.

42. The profits on the remaining eight of the first 14 of these 26 FX transactions were also recorded in Account 3 but were not reversed out of Account 4.[3186] It follows that, the (discounted) profits on these eight transactions (US$81,477,659[3187]) were recorded in Account 4 and the non-discounted profit (actual profit) was recorded in Account 3. This is double-counting. The discounted profit should have been reversed out once the actual profit was recorded and it is agreed that it should be reversed out now. Accordingly, the GTDs have deducted **US$81,477,659** from the balances shown on Accounts 1 to 9.[3188]

**Account 3 – What is Agreed**

43. The records for Account 3/Account C in both SICL and the Money Exchange's ledgers record that the balance on Account 3/Account C fluctuated such that at some points in time the balance was in favour of SICL, whereas at other points in time, the balance was in favour of the Money Exchange. As shown in Appendix A the double-counted amount has been deducted from Account 4.[3189]

44. As at 31 December 2008, the balance recorded in the Money Exchange's Account C, when adjusted for reconciling items identified in paragraph 52 of the Joint Statement and in SICL's Account 3, was US$112,874,088.[3190]

45. The balances recorded on SICL's Account 3 as at 5 August 2009 and the Money Exchange's Account C as at 30 April 2009[3191] in the accounting ledger of each entity

3186 Andrews 1W, paragraph 118 {**I/5/49**}.
3187 Andrews 1W, paragraph 118 {**I/5/49**}, and Table 15 {**I/5/50**}.
3188 Andrews 1W, paragraph 62 {**I/5/24**}. The double-counting is agreed in Hatton/Andrews Agreed statement paragraph 37 {**I/22/8**}.
3189 Andrews/Hatton Joint Statement, paragraph 51 {**I/22/10**}.
3190 Andrews/Hatton Joint Statement, paragraph 52 {**I/22/11**}.
3191 Which is the date at which the Money Exchange's ledger 90 for Account C cuts off.

were US$387,539,072[3192] and US$323,384,072.[3193] The difference is US$64,155,000. This is equal to the value of three pairs of FX trades, which were recorded as maturing[3194] after 30 April 2009.[3195]

**Account 3 – Mr. Hatton's "R*ecalculation*"**

46. Mr. Hatton seeks to remove three items from Account 3: (a) a balance of US$214.7 million in respect of FX transactions, (b) a debit of US$11,933,333.33 in respect of the purchase of Property 1 transaction and (c) two deposits totalling US$123.6m.

**The Seven Pairs of FX Transactions**

47. It is agreed that there are seven pairs of FX forward transactions in Account 3 with value dates between 24 January 2009 and 5 August 2009 that record a profit of US$150,445,000.[3196] There are US$278.9m FX transactions in Account 3.[3197] There are US$214.7m entries in Account C.[3198] There are a further 20 FX transactions that were entered into between SICL and the Money Exchange of which 12 were recorded in Account 4 for a net value of US$95,859,297[3199] and eight were not recorded by SICL for a net value of US$75,655,703 (which form the FX counterclaim). If FX transactions recorded in Accounts 3 and 4 were not genuine but were to enable AHAB to draw down

---

3192 It is agreed that between 31 December 2008 and 5 August 2009 (in SICL's records), the net balance recorded in SICL's records moved from SICL owing the Money Exchange US$112,874,088.42 to the Money Exchange owing SICL US$387,539,072.26, a movement of US$500,413,161. See: Andrews/Hatton Joint Statement, paragraph 56 {**I/22/12**}.

3193 Andrews/Hatton Joint Statement, paragraph 54 {**I/22/11**}.

3194 On the basis of their value date.

3195 Andrews/Hatton Joint Statement, paragraph 55 {**I/22/11**}.

3196 Andrews/Hatton Joint Statement, paragraph 57 {**I/22/12**}.

3197 Andrews 2W, paragraph 62 {**I/10/21**}.

3198 Hatton 1W, paragraph 12.48 {**I/1.59/97**}.

3199 This is the net profits entered in Account 4 in respect of some of the 20 FX transactions considered in more detail below. Andrews/Hatton Joint Statement, paragraph 93 {**I/22/16**}.

under its FX facilities with the banks, those entries should be reversed.[3200] The question whether the FX transactions were genuine is considered in paragraphs [86 to 97] below. On the balance of the evidence, the Court may conclude that these were not genuine FX transactions, but transactions intended to enable AHAB to draw down under its banking facilities, such as the SIB facility signed by Dawood on 9 March 2009. If so, the **US$95,859,297**, which appears in Account 4 and US$278,883,000 which appears in Account 3, should be reversed and the FX Counterclaim in respect of the eight FX transactions should be disregarded.

**Land Transactions As Reflected in the Accounts**

48. Account 3 includes the credit of US$200 million in relation to the sale of Property 0 and a debit of US$211,933,333.33 in relation to the acquisition of Property 1.[3201] There is a net debit of US$11,933,333.33 on Account 3.

49. AHAB challenge the validity of the Land Transactions, but they have not considered the impact on the cash account of reversing the credits and debits related to those transactions. As appears in paragraph [66 below], Mr. Hatton agreed that the credits and debits would have to be reversed. The effect on the cash counterclaim of the property transactions not being genuine is set out in more detail in paragraphs [163 to 167 below], but in summary:

(1) Properties 0 to 4 did not exist: If none of the properties existed then all the entries in the accounts relating to the property transactions would have to be reversed. This includes the net debit of US$11,933,333.33 on Account 3. Together with net

---

3200 Hatton 1W, paragraph 12.49 {**I/1.59/98**}.

3201 Hatton 1W, paragraph 12.52 {**I/1.59/99**}. These credits do not relate to cash movements.

debit entries on other accounts, a total of US$359,475,528 would be reversed, increasing the cash claim by that amount.

(2) Property 0 exists, Properties 1 to 4 do not exist: If Property 0 existed, but Properties 1 to 4 did not exist, then the entries in the accounts relating to all the property transactions would have to be reversed. This includes the entry for US$211,933,333.33 on Account 3. Together with net debit entries on other accounts, a total of US$559,475,528 would be reversed, increasing the cash claim by that amount.

**The US$123.6 Million Deposits**

50. The balance on Account C/Account 3 at 5 August 2009 includes US$123.6m due from the Money Exchange to SICL, booked in the Money Exchange's Account C, that relates to three cash payments received by the Money Exchange from SICL on 2 July 2007 totalling US$123m (plus US$0.6m accrued interest).[3202] These three cash payments are for the same quantum as the principal balance of three deposits maturing on 28 June 2007, as recorded on the Money Exchange's DMS. The Money Exchange made four payments to SICL totalling US$124.7m on 28 June 2007 that was made up of US$123m paid in respect of the principal SICL had deposited plus US$1.7m paid in respect of interest (which was not subsequently reinvested by SICL).[3203] It is agreed that the Money Exchange has recorded US$123m as being on deposit by SICL for large parts, but not continually, of the period 2 January 2004 to 26 September 2007 and that the DMS

---

3202 Andrews/Hatton Joint Statement, paragraph 58 {**I/22/12**}. Mr. Andrews dealt with the interest: Andrews xx {**Day98/66:2**}-{**Day98/66:4**}.

3203 Andrews/Hatton Joint Statement, paragraph 59 {**I/22/12**}.

records the Money Exchange as holding SICL deposits for large parts of the period from June 1997 onwards,[3204] which is before it is alleged Al Sanea's fraud started.

51. Mr. Hatton has rolled back the US$123m deposits to at least January 2004 and possibly before 2000. Mr. Hatton concludes (emphasis added):[3205]

> *"3.41 The USD 123 million deposits identified by Mr Andrews, which he states were placed on 2 July 2007,* ***actually originate from a much earlier period****, at least 2 January 2004. As indicated from a review of the DMS, the funding for these deposits may have occurred prior to 2000 and been continually rolled over until the end of 2007. Due to the complexity of the way in which these deposits were rolled over (i.e. the number and size of individual deposits being constantly changed), it is not possible to identify the original placement or placements.*
>
> *3.42 As one tries to unwind the deposits further back in time the evidence available to determine whether they are, in fact, backed by cash or a transfer of value becomes insufficient."*

52. On the material, the Court is able to conclude that SICL made deposits of US$123m some time before the commencement of Al Sanea's alleged fraud. The Court cannot safely conclude that these were fictitious deposits and that the entries in relation to the US$123m should be reversed. There should be no adjustment to Account C/Account 3 for the US$123m deposits (or the US$0.6m of accrued interest).

**Accounts 6, 7 and 8**

53. It is possible to follow the cash into and out of Accounts 6, 7 and 8. There are bank statements that show SICL recorded the transfers accurately. AHAB takes the point that these are "*circular transactions*" or "*pass through payments*" because there are payments from SICL to the Money Exchange at around the same time as payments from the Money

---

3204 Andrews/Hatton Joint Statement, paragraphs 60 and 61 {**I/22/12**}.

3205 Hatton 3W, paragraphs 3.41 to 3.42 {**I/21.15/16**}.

Exchange to other Al Sanea controlled entities at or about the same time for at or about the same figures. In the case of the payments in Accounts 6 and 7, the entity receiving money from the Money Exchange was not SICL. Payments to a different entity cannot be characterised as "*circular*" and the description "*pass through payment*" has no legal significance. In the case of Account 8, while the recipient of the payments out of the Money Exchange was SICL, which means that they could be characterised as circular, the payments result in a net sum due to AHAB. If that net sum due to the Money Exchange is voided, the claim against the Money Exchange increases.

**Account 6**

54. Account 6 in SICL's trial balance at 5 August 2009 records a balance of US$285m due from the Money Exchange to SICL.[3206] US$285m was transferred from SICL to the Money Exchange's Bank of America bank account. This is recorded in SICL's Account 6.[3207] There were four payments into the Money Exchange's Bank of America account. The payments of this cash by SICL to the Money Exchange are not challenged. It was put to Mr. Andrews by Mr. Quest on the basis that the cash payments had been made. [3208]

(1) On 16 January 2008, SICL transferred US$50m from its Lehman Brothers' account to the Money Exchange's Bank of America account.[3209]

(2) On 17 January 2008, SICL transferred US$100m from a Deutsche Bank account to the Money Exchange's Bank of America account.[3210]

---

3206 Andrews/Hatton Joint Statement, paragraph 66 {**I/22/13**}.

3207 Andrews/Hatton Joint Statement, paragraph 68 {**I/22/13**}. Andrews 1W paragraphs 122 and 123 {**I/5/53**}. The payments out are recorded in Appendix 2, paragraph 2.1 {**I/22.1/7**}. Hatton xx {**Day94/111:10**}-{**Day94/112:1**}.

3208 In Mr. Andrews' cross-examination, Mr. Quest said: *"Just to be clear, I'm not disagreeing that there was a cash transfer of 285 million from SICL to the Money Exchange."* {**Day98/37:1**}-{**Day98/37:3**} and "*These four payments, as you are at pains to point out, come in cash from SICL to the Money Exchange."* {**Day98/37:9**}-{**Day98/37:11**}. Following the cash, there is no doubt that SICL paid US$285 million to the Money Exchange.

3209 Andrews 1W, paragraph 121(a) {**I/5/51**}.

(3) On 22 January 2008, SICL transferred US$35m from its Deutsche Bank account to the Money Exchange's Bank of America account.[3211]

(4) On 23 January 2008, SICL transferred US$100m from its Bear Stearns account to the Money Exchange's Bank of America account.[3212]

55. On or about "*the same date*" a total of US$285m was transferred from the Money Exchange's Bank of America account to Singularis' bank account.[3213] Mr. Hatton relies upon four payments from the Money Exchange to Singularis. A payment to the Money Exchange at or about the same time as a payment out for a similar or the same amount by the Money Exchange does not invalidate the first payment made to the Money Exchange. The payments out are made to Singularis not back to SICL. Even if the payments had a strong link, it is of no legal significance. If the money had been paid back to SICL no doubt SICL would have given credit for it and the sum due on Account 6 would have reduced, but the Money Exchange did not pay it back to SICL and there is no cash back to SICL the Money Exchange can follow. In addition to the payments out of the Money Exchange identified by AHAB not going back to SICL, Mr. Hatton has not been able to match the amounts and dates of all of the payments to the Money Exchange with the payments out of the Money Exchange:[3214]

(1) On 16 January 2008, US$50m was paid by the Money Exchange to Singularis.[3215]

---

3210 Andrews 1W, paragraph 121(b) {**I/5/51**}.

3211 Andrews 1W, paragraph 121(c) {**I/5/52**}.

3212 Andrews 1W, paragraph 121(d) {**I/5/52**}.

3213 Andrews/Hatton Joint Statement, paragraph 69 {**I/22/13**}. The value dates of the payments are set out in Appendix 2 paragraphs 2.1 and 2.2 {**I/22.1/7**}.

3214 In cross-examination Mr. Andrews confirmed each payment: Andrews xx {**Day98/38:7**}-{**Day98/38:15**}.

3215 Hatton 2W, table 4.11 {**I/8.7/30**}.

(2) On 17 January 2008, US$100m was paid by the Money Exchange to Singularis.[3216]

(3) On 22 January 2008, US$70m was paid by the Money Exchange to Singularis.[3217] That was the day before the Money Exchange received a payment of US$100m from SICL. The Money Exchange had only received US$35m on 22 January 2008.

(4) On 22 January 2008, US$65m was paid by the Money Exchange to Singularis.[3218] The Money Exchange paid out US$135m and it had only received US$35m. The Money Exchange did not receive US$100m until the 23 January 2008.

(5) The payments out on 22 January 2008 cannot be characterised as a "*through payment*" of money that the Money Exchange had not yet received.

56. In re-examination Mr. Andrews said (emphasis added):[3219]

*"Q. If we look first at the Account 6 transfers.*

*A. Yes, I see that.*

*Q. My learned friend Mr Quest -- and it is on page 47, but I don't think we need to pull it up -- suggested to you that all these payments were for the same amount on the same day. Do you remember that?*

*A. I do remember that.*

*Q. Could you look at the dates and amounts of the transfers in 2.1 and 2.2, please?*

*A. Yes, I can see that.*

---

3216 Hatton 2W, table 4.12 {**I/8.7/31**}.
3217 Hatton 2W, table 4.13 {**I/8.7/32**}.
3218 Hatton 2W, table 4.13 {**I/8.7/32**}.
3219 Andrews re-x {**Day98/71:2**}-{**Day98/72:6**}.

*Q.* *Do you see in 2.1 that what you and Mr Hatton have set out is the transfers from SICL to the Money Exchange's Bank of America account; do you see that?*

*A.* *I see that, yes.*

*Q.* *You and Mr. Hatton have put in 2.2 -- and it says, "on or around the same date" -- it identifies transfers from the Money Exchange's Bank of America account to Singularis' account.* ***Can you help the court as to whether it was correct to say that they were or the same amounts on the same days?***
*A.* ***It was not correct because the two -- the third and fourth items, I should say, although in total they were the same amount, they were for -- individually they were different amounts****.*

*Q.* *Thank you. Could we then look at the Account 7 --*

*CHIEF JUSTICE:*
*Q.* *Or some of them?*

*MR. PHILLIPS:*
*A.* *Yes, my Lord, absolutely. Your Lordship sees that there are different amounts and there are different dates, for some of them."*

57. There are agreed payments from SICL to the Money Exchange. It is possible to "*follow the cash*" into and out of the bank accounts. The payments into and out of the Money Exchange were recorded by the Money Exchange in their Bank of America account ledger in ledger 90. Mr. Hatton has failed to establish an exact link to SICL between the payments into the Money Exchange with the payments out. Even if he could, that does not invalidate the payments into the Money Exchange and SICL is under no obligation to give credit for cash SICL never received. It is legally irrelevant. There is no basis on which the balance in Account 6 can be challenged.

**Account 7**

58. Account 7 in SICL's trial balance at 5 August 2009 records a balance of US$400m due from the Money Exchange to SICL.[3220] US$400m was transferred from SICL to the Money Exchange's Bank of America account. This transfer is recorded in SICL's Account 7.[3221] SICL made two cash payments to the Money Exchange:[3222]

(1) On 1 February 2008, SICL transferred US$200m to the Money Exchange's Bank of America account.

(2) On 4 February 2008, SICL transferred US$200m to the Money Exchange's Bank of America account.

59. US$400m was transferred from the Money Exchange's Bank of America account to Awal Bank's bank account and this transfer is not recorded in Account 7.[3223] Mr. Hatton relies on five transfers by the Money Exchange to Awal Bank. A payment to the Money Exchange, a legal entity, at or about the same time as a payment out for a similar or the same amount by the Money Exchange does not invalidate the first payment made to the Money Exchange. Account 7 records agreed payments of cash made by SICL to the Money Exchange. The payments out are made to Awal Bank not back to SICL. On 1 February 2008 the Money Exchange made five transfers of US$82m, US$90m, US$75m, US$65m and

---

3220 Andrews/Hatton Joint Statement, paragraph 71 {**I/22/13**}.
3221 Andrews/Hatton Joint Statement, paragraph 73 {**I/22/13**}.
3222 Andrews/Hatton Joint Statement, Appendix 2, paragraph 2.3 {**I/22.1/7**}. Hatton 2W, Table 4.14 {**I/8.7/33**}.
3223 Andrews/Hatton Joint Statement, paragraph 74 {**I/22/13**}.

US$88m to Awal Bank.[3224] The Money Exchange did not receive the second US$200m until three days later on 4 February 2008. Mr. Hatton has not been able to match the amounts and dates of all of the payments to the Money Exchange with the payments out of the Money Exchange.

60. In re-examination Mr. Andrews said:[3225]

> "*Q. Could we look at account number 7 at the bottom. On page 50, my learned friend said that this was on the same dates as well. Can you see the dates on which money was transferred from SICL to the Money Exchange?*
>
> *A. Yes, they were two different dates, yes.*"

61. There are agreed payments from SICL to the Money Exchange. It is possible to "*follow the cash*" into and out of the bank accounts. The payments into and out of the Money Exchange, were recorded by the Money Exchange in their Bank of America account ledger in ledger 90. Mr. Hatton has failed to establish an exact link between the payments into the Money Exchange with the payments out to Awal Bank. Even if he could, that does not invalidate the payments into the Money Exchange and SICL is under no obligation to give credit for cash SICL never received. It is legally irrelevant. There is no basis on which the balance in Account 7 can be challenged.

**Account 8**

62. AHAB's case in relation to Account 8 is that the transactions recorded are "*through payments*" and therefore cannot be relied upon. This is surprising for two reasons. First, the transfers recorded in Account 8 are the result of cash

---

3224 Andrews/Hatton Joint Statement Appendix 2, paragraph 2.4, value dates {**I/22.1/8**}.
3225 Andrews xx: {**Day98/71:7-12**}.

transfers into and out of bank accounts, so it is possible to "*follow the cash*".[3226] Second, SICL's trial balance at 5 August 2009 records a balance of US$155m due **from** SICL to the Money Exchange.[3227] If the transactions cannot be relied upon the Money Exchange loses a credit of US$155m in the running account between the Money Exchange and SICL. The balance arises out of the transfers that are agreed.[3228] The transfers support the fact that there was a running account between SICL and the Money Exchange.

63. Mr. Hatton confirmed that the balance on Account 8 arose as a result of cash transfers between SICL and the Money Exchange.[3229]

64. AHAB's challenge to the balance on Account 8 is confused. The transactions on Account 8 result in the sum of US$155m being due from SICL to the Money Exchange. On the cash counterclaim SICL gives the Money Exchange credit for this sum. If the entries on Account 8 were voided, the claim against the Money Exchange would increase by US$155m.

**Account 9**

65. Account 9 in SICL's trial balance at 5 August 2009 records a balance of US$52,830,760 due from SICL to the Money Exchange, related to a number of the Land Transactions.[3230]

66. Mr. Hatton confirmed that the balance of US$52,830,760 due from SICL to the Money Exchange arose in relation to property transactions and has not changed since 31

---

3226 The transactions were recorded in the Money Exchange's Bank of America nominal ledger but not recorded as assets or liabilities of the associated entity in the Money Exchange's records. Andrews/Hatton Joint Statement, paragraph 89 {**I/22/15**}.

3227 Andrews/Hatton Joint Statement, paragraph 76 {**I/22/14**}.

3228 Andrews/Hatton Joint Statement, paragraphs 77 to 88 {**I/22/14**}. Appendix 2, paragraphs 2.5 to 2.16 {**I/22.1/8**}.

3229 Hatton xx: {**Day94/112:20}** and {**Day94/113:1**}.

3230 Andrews/Hatton Joint Statement, paragraph 90 **{I/22/15}**.

December 2008 (the period for which the financial statements were last audited by PwC).[3231] Mr. Hatton also confirmed that if the property transactions were not genuine then the accounting entries would have to be reversed:[3232]

> *"Q. Mr. Hatton, if the property transactions were not genuine then the entries in Account 9 should not have been made, should they?*
>
> *A. That is correct, yes.*
>
> *Q. They should be reversed?*
>
> *A. I would assume so, yes.*
>
> ...
>
> *Q. There is agreement that the property transactions were reflected by the entries in the ledgers. That's right?*
>
> *A. Yes, there is simply agreement on what the accounts state. I mean, it would be hard to imagine there could be disagreement.*
>
> *Q. If the properties were not genuine, then the entries in those ledgers should not have been made, should they?*
>
> *A. I would agree with that, yes, my Lord.*

*CHIEF JUSTICE:*

> *Q. Properties or the transactions?*

*MR. PHILLIPS:*

> *A. The properties, my Lord. If the properties did not exist. It would be the transactions as well, because they would be transactions in relation to properties that didn't exist, my Lord.*

*CHIEF JUSTICE:*

> *Right."*

---

3231 Hatton xx: **{Day94/113:19}**.
3232 Hatton xx: **{Day94/114:4}** and **{Day94/118:6}**.

67. There were five land transactions that are reflected in the cash account. If the Land Transactions are genuine, SICL should be the owner of two properties. In that event SICL has a separate counterclaim to recover the value of its land. If the land transactions, or any of them are not genuine, then, as Mr. Hatton agreed, the entries in the cash account relating to the purchase and sale of the properties should be reversed. In that event, there would be no separate claim for the value of the land; *ex hypothesi*, the land does not exist. However, the cash claim would increase because, in essence, SICL would get back its money that it paid for the land.

68. The Property transactions, and the effect of their reversal on the cash account, are considered in more detail in paragraphs [98 to 167 below].

**<u>11 January 2009 Audit Confirmation</u>**

69. On 11 January 2009, at a time when the Algosaibis were trying to keep the business alive, an audit confirmation letter dated 11 January 2009, that may be a draft, was signed by Mr. Jesudas.[3233] There is a stamp on the copy in the Trial Bundle that says "*FAXED 19 JAN 2009*".[3234] AHAB was confirming information relating to SICL's accounts maintained with the Money Exchange. The three typed account numbers are Accounts 1 to 3, or A, B, C of Ledger 90. There is a manuscript on the document that records "*CALL ACCOUNT BALANCES*" and that gives a balance of US$275,496,053.15 CR. That balance reconciles to the sum of Accounts 4 to 9.[3235]

---

3233 {**G/7378/1**}.

3234 The same stamp appears on the Amended Confirmation.

3235 Andrews/Hatton Joint Statement, paragraph 46 {**I/22/9**}: it is agreed that the balance is *"equal to the sum total of the balance of Accounts 4 to 9 for the Money Exchange in SICL's trial balance as at 31 December 2008"*.

70. On 19 January 2009, a letter entitled "*Amended Confirmation*" included the three figures for Accounts 1, 2 and 3, or A, B and C of Ledger 90 and the figures for the "*CALL ACCOUNT BALANCE*" was typed onto the letter.[3236] This confirmation reconciles to all nine accounts held by SICL with the Money Exchange.[3237] This was also signed by Mr. Jesudas (it is not alleged that this signature is matched to the signature on the 11 January 2009 confirmation). There is a stamp on this copy that says: "*FAXED 19 JAN 2009*". This is likely to be the final copy sent to PwC. There is no evidence that PwC was asked by AHAB which copy they received.

71. AHAB argue that the Amended Confirmation is not genuine. However, the figure added by Mr. Jesudas for "*CALL ACCOUNT*" includes the entries in Accounts 6, 7 and 8 which record payments into and out of the Money Exchange recorded by the Money Exchange in their Bank of America account ledger in ledger 90. While the Money Exchange did not record the transactions in Accounts entitled 6, 7 and 8, they were recorded elsewhere. The *"CALL ACCOUNT"* figure also included the balances on Accounts 4 and 9 that related to FX transactions and property transactions and the balance on Account 5. Those transactions made up part of the running account between SICL and the Money Exchange. The cash transfers were recorded by the Money Exchange in Ledger 90. Mr. Jesudas added the balance of the transactions that were not recorded in Accounts A to C under *"CALL ACCOUNT"*. While it is not possible to identify accounting entries for all of the items that made up the *"CALL ACCOUNT"* a large number of them were cash

---

3236 {**G/7379/1**}.

3237 Andrews/Hatton Joint Statement, paragraph 47 {**I/22/10**}: it is agreed that this *"included Accounts A, B and C and the typed "Call Account", a general ledger number and the balance* [of Accounts 4 to 9]*"*.

transactions backed by bank statement entries. At the very least, the balances following those transactions needed to be added to the audit confirmation.

72. It was no secret from PwC that the audit confirmation had been changed. The 19 January 2009 letter had "*amended confirmation*" written on it. It is also noteworthy that there is no correspondence from SICL to the Money Exchange asking the Money Exchange to add the "*CALL ACCOUNT*" amount. If the Money Exchange had not added at least the cash backed transactions in Accounts 6, 7 and 8, the audit confirmation would not have been accurate. Taking account of the adjustments identified as part of the forensic exercise in this case, the highest the point can be put is that the addition made by Mr. Jesudas was not 100 percent accurate, but not that it was entirely fictitious.

73. If Mr. Jesudas had not added a balance for the "*CALL ACCOUNT*" the sums in the Amended Confirmation would have been inaccurate.

74. Following in quotation below are AHAB's submissions on the cash accounts counterclaim which I accept:

> "*Cash due to SICL from AHAB*
>
> **(i) Overview**
>
> *10.1 SICL's case is that "the books and records of SICL in the possession of the [GT liquidators] record that a cash balance was due to SICL from AHAB in the total sum of US$598,470,319.41 as at 5 August 2009".*[3238] *That figure is made up of the balances on nine accounts with the Money Exchange, recorded in SICL's trial balance.*[3239]

---

3238 *D&CC para 302 {**A1/9/141**}.*

3239 *Andrews 1W, paragraph 69 {**I/5/26-27**}; {**Q/554/4-5**}.*

| *Account ref* | *Balance/USD* |
|---|---|
| *1* | *1,808.44* |
| *2* | *18.56* |
| *3* | *387,539,072.26* |
| *4* | *-117,374,479.67* |
| *5* | *-148,865,340.18* |
| *6* | *285,000,000.00* |
| *7* | *400,000,000.00* |
| *8* | *-155,000,000.00* |
| *9* | *-52,830,760.00* |
| *Total* | *598,470,319.41* |

*Positive balances represent debts recorded by SICL as due from the Money Exchange.*

10.2 *After deduction of a double-counted balance, SICL claims that cash is due from AHAB in the amount of USD 516,992,660.*[3240]

10.3 *However, on proper analysis, no part of the balances on Accounts 1 to 9 represents either a genuine cash transfer to the Money Exchange or a valid debt due from the Money Exchange.*

***(ii) Accounts 1 and 2***

10.4 *Account 1 and Account 2 record very small balances in favour of SICL and need not be discussed.*

***(iii) Account 3***

10.5 *Account 3 in SICL's trial balance corresponds with account 90 02 0 83019 4802-9 (Account C) in the Money Exchange ledgers.*

10.6 *There is a difference between the final balances recorded on Account 3 and Account C. That is because the last entry in the Money Exchange ledgers was on 31 May 2009 but SICL ledgers ran on to 5 August 2009. The balances can be reconciled. As at 31 May 2009, Money Exchange Account C was USD 323.4 million in*

3240 *D&CC para 304A {**A1/9/142**}.*

*credit (in favour of SICL). Credits arising from the subsequent settlement of three FX trades would have increased that balance to USD 387.5 million by 5 August 2009, which is the same as the final balance on Account 3.*[3241]

10.7 *However, the final balance of USD 387.5 million overstated the true position because it included a number of non-cash items connected with false transactions, namely:*

(1) *credits to SICL of USD 214.7 million representing profits made by SICL on sham FX trades with the Money Exchange that had settled before 31 May 2009;*[3242]

(2) *credits of USD 64.1 million representing profits on similar trades settled between 1 June and 5 August 2009;*[3243]

(3) *a credit of USD 123.6 million relating to certain historical deposits discussed below.*[3244]

10.8 *The FX trades have been discussed above. The profits on those trades were not genuine and the corresponding credits should be reversed out of the account.*

10.9 *The USD 123.6 million historical deposits were discussed by Mr. Hatton in Hatton 3.*[3245] *Although there was a transfer of cash from SICL to the Money Exchange in July 2007, the same amount had been transferred in the other direction just a few days earlier. Mr. Hatton therefore attempted to roll back the deposits to their initial placement, to see whether the cash came originated SICL. Despite some very detailed work, the results were inconclusive.*[3246]*Mr. Andrews agreed.*[3247]

*"Q. But I think because of the lack of records, neither you nor Mr. Hatton was able to trace back to the origin of this deposit?*

*A. That is correct, my Lord.*

---

3241 *Andrews xx: {**Day98/14:6-25**}.*
3242 *Hatton 1W, paragraph 12.53 {**I/1/99**}.*
3243 *Andrews xx {**Day98/15:4-8**}.*
3244 *Hatton 1W, paragraphs 12.50-12.51 {**I/1/98**}.*
3245 *Hatton 3W, paragraphs 3.1-3.44 {**I/21/5**}.*
3246 *Hatton 3W, paragraphs 3.44 {**I/21/16**}.*
3247 *Andrews xx {**Day98/20:5-12**}.*

*Q. So neither you nor he was, in the end, able to say whether originally the cash came from SICL?*

*A. Based on what the records say, that is the position we have, yes."*

*The GT liquidators cannot therefore discharge their burden of proving that USD 123.6 million was deposited with the Money Exchange. Given the number of other fictitious deposits purportedly placed by Saad Group, it is certainly not sufficient for them simply to rely on accounting records without being able to follow the cash.*

*10.10 There is a further adjustment to be made, in SICL's favour. Account C was debited with USD 211.9 million in respect of the purported purchase of Property 1, which of course never took place. However, a corresponding credit was made in a ledger 3 account called "Saad GVA property – sale". In relation to Property 0, no debits or credits were made on Account C but a debit of USD 200 million was made in a ledger 3 account called "Saad GVA property – purchase". Those two ledger 3 balances should be brought into the overall account, resulting in a net credit to SICL of USD 11.9 million.*

*10.11 Once Account 3/Account C is adjusted as set out above, then the balance reduces from USD 387.5 million in favour of SICL to USD 0.3 million in favour of the Money Exchange. Mr. Hatton set out the calculation at Hatton 1/12.53;[3248] he was not challenged on it.*

***(iv) Accounts 6 and 7***

*10.12 There were no accounts in the Money Exchange ledgers corresponding to Accounts 6 and 7. The balances on these accounts (USD 685 million in total) are fictitious deposits recorded in SICL's ledgers. Although cash was transferred by SICL to the Money Exchange, it was, on the instructions of SFS, immediately passed on to SHL and Awal Bank. See the discussion in Section 5 paragraphs 5.44 to 5.48 {D/5/16-17}. The Money Exchange did not record any debt due to SICL and there was no*

3248 ***{I/1/99}***.

*reason for it to have done so. There is no basis for any claim by SICL for repayment of the balances on Accounts 6 and 7.*

***(v) Account 4, 5, 8 and 9***

*10.13 There were no accounts in the Money Exchange ledgers corresponding to these accounts either. In any case, the final balances on the accounts were in favour of the Money Exchange and so they are not relevant to the counterclaims.*

*10.14 Accounts 4 and 9 were used by SICL to book entries relating to the Properties and the sham FX trades. Account 5 was used by SICL to record the receipt of money from CBK and for other, unexplained, purposes.*

***(vi) Summary***

*10.15 Of the accounts said by SICL to comprise the cash counterclaim:*

*(1) only Accounts 1, 2 and 3 have corresponding entries in the Money Exchange ledgers;*

*(2) Accounts 1 and 2 have negligible balances;*

*(3) Account 3, when adjusted for the fake FX profits and other non-cash items, has a small balance in favour of the Money Exchange;*

*(4) Accounts 4, 5, 8 and 9 have balances in favour of the Money Exchange. (For the avoidance of doubt, AHAB does not claim those balances from SICL; it is no part of AHAB's case that SICL's accounting is truthful in any respect.);*

*(5) the balances on Accounts 6 and 7 represent fictitious placements with the Money Exchange.*

*10.16 Nothing is therefore payable to SICL."*

**Following are the GTJOLs' submissions on the FX Transactions**

75. The FX Counterclaim is based on 20 FX forward transactions between SICL and the Money Exchange that had not matured at the date of the GTJOLs' appointment and some of which are not accounted for, and hence not included in the Cash Counterclaim.[3249]

76. SICL made a total net profit of US$171,515,000 on the 20 FX counterclaim transactions. However, given that US$95,859,297 of this profits was recorded in SICL's trial balance as at 5 August 2009, and is recorded in SICL's accounts and is part of the cash counterclaim, the FX counterclaim is a claim by SICL for payment of the sum of US$75,655,703, which is the balance of SICL's profits on the 20 FX counterclaim transactions.[3250]

**Background to FX Businesses at SICL and the Money Exchange**

**The Nature of FX Forward Trading**

77. At the Court's request an expert's report was obtained from Dr. M. Desmond Fitzgerald.[3251] Dr. Fitzgerald explains how spot and FX forward trades are made.

78. Trading one currency for another can be carried out on a spot or forward basis. Spot trading involves exchanging one currency for another on a date immediately after the transaction, normally described as a value date.[3252]

79. FX can also be traded on a forward basis. This means that the value or settlement date for the trade is delayed to a date further away in the future.[3253]

---

3249 Andrews/Hatton Joint Statement, paragraph 92 {**I/22/16**}.
3250 Andrews/Hatton Joint Statement, paragraph 93 {**I/22/16**}.
3251 Fitzgerald 1R {**I/20/1**}.
3252 Fitzgerald 1R, paragraph 2.1 {**I/20/5**}.
3253 Fitzgerald 1R, paragraph 2.5 {**I/20/5**}.

80. Settlement or exchange of the cash amounts (resulting from either a spot or forward trade) will normally occur on the value date or approximately two business days later.[3254] It is also possible to conduct two trades, one trade "*opening*" a currency position and another subsequent trade "*closing*" it out, with the same counterparties and the same value date. The counterparties then only need to settle the net cashflows on the one value date.[3255]

81. In AHAB's opening submissions Mr. Quest said (emphasis added):[3256]

> *"CHIEF JUSTICE:*
> *Q. Is it suggested that any of these transactions actually took place? By definition, trading in currency involves buying and selling currency, and it should have had to have involved real banks, because what we see here has happened between the Money Exchange and SICL – is there any suggestion that any of that actually took place in relation to any of these transactions?*
>
> *MR. QUEST: No, it did not.*
>
> *CHIEF JUSTICE:*
> *Q. Nobody suggests that?*
>
> *MR. QUEST:*
> *A.* ***I don't know whether the defendants suggest that but our position is it did not. There was no cash movement or no dollars or pounds movement."***

82. Mr. Quest's submissions were confused, but to the extent that the submissions were that the non-transfer of cash in some way invalidated the FX transactions, it is clear from Dr. Fitzgerald's report that Mr. Quest was wrong. As Dr. Fitzgerald explains, it is only the net cashflows that are exchanged and only on the value date.

---

3254 Fitzgerald 1R, paragraph 2.3 {**I/20/5**}.
3255 Fitzgerald 1R, paragraph 2.3 {**I/20/5**}.
3256 AHAB's opening submissions: {**Day5/146:11**}.

**The FX Business at the Money Exchange**

83. The Money Exchange conducted an FX business throughout the period between 1997 and 2009.[3257] Documents going back to the 1990s show that the Money Exchange had an active FX trading business with banks and Saad entities. The Money Exchange commenced FX trading from at least as early as December 1996, conducted between 2,000 to 4,000 FX transactions in each year from 1997 to 2008 and in excess of 1,000 transactions in the first half of 2009.[3258] The Money Exchange maintained a number of staff to conduct these FX transactions. The Money Exchange had a team of at least 14 employees who were involved in FX operations during the period when the Money Exchange entered into the 20 FX counterclaim transactions (February 2008 through February 2009).[3259]

84. Many of the Money Exchange's banking facilities included FX sub-facilities. In order to draw down under its facilities with the banks the Money Exchange needed what appeared to be FX business to show to the banks. This point is considered in the context of backdating of transactions below.

**The FX Business at SICL**

85. SICL also conducted an FX trading business, trading with a number of investment banks. SICL also entered into FX trades with other Saad Group companies and recorded FX

---

3257 Andrews/Hatton Joint Statement, paragraph 94 {**I/22/16**}. Thomas Johansen of Calyon Bank and BNP Paribas says that he carried out FX trading with the Money Exchange for both BNP Paribas, which he joined in 1992, and Calyon Bank which he joined in 2000. He describes AHAB as "*a long established client*" of Calyon Bank at the time he joined in 2000, {**C2/33/2**}. He describes the course of dealing and said that the trade on which AHAB had defaulted was "*typical and routine*" with AHAB. Thomas Johansen Statement, paragraph 14 {**C2/33/4**}.

3258 Andrews 1W, paragraph 143, {**I/5/72**} and Tab I2 {**Q/617/1**} where the DMS recorded trades up to 15 May 2009; Andrews 1W, Tab I3 {**G/7974/1**}; {**G/7964/1**}; {**G/7912/1**}; {**G/7853/1**}; {**G/7786/1**}; {**G/7770/1**}; {**G/7745/1**}; {**G/7654/1**}; {**G/7616/1**}; {**G/7584/1**}; {**G/7548/1**}; {**G/7530/1**}.

3259 Andrews 1W, paragraph 144 {**I/5/72**} and Tabs I6 {**G/137/1**}, I7 {**G/2410/1**} and I8 {**Q/628/1**}.

forward transactions with the Money Exchange.[3260] SICL maintained a number of staff to conduct these FX transactions.[3261]

**FX Trading between the Money Exchange and SICL**

86. It is agreed that the Money Exchange and SICL conducted FX trades with one another as well as with third parties.[3262] 122 FX forward transactions between SICL and the Money Exchange were recorded in the DMS between 2007 and 2009.[3263] There was no reason why the Money Exchange and SICL could not enter into *bona fide* FX trades between themselves. An advantage to the Money Exchange of dealing with SICL is that SICL's counterparty limits would not have been as restrictive as the banks' counterparty limits. The Money Exchange could enter into bigger and more numerous trades with SICL than it could with any of the banks, and given the Money Exchange's need for FX transactions in order to draw down under its facilities with third party banks, this was of considerable benefit to the Money Exchange.

87. The Money Exchange and SICL entered into an ISDA Master Agreement with one another governing the forward FX trades between them. This was dated 18 July 2007 and bears the signature of Suleiman on behalf of the Money Exchange and Al Sanea on behalf of SICL.[3264]

88. Between 2007 and 2009, the Money Exchange and SICL recorded a number of FX forward transactions with one another. SICL recorded a profit on some of the FX forward

---

3260 Andrews/Hatton Joint Statement, paragraph 95 {**I/22/16**}.

3261 Andrews 1W, paragraph 146, {**I/5/74**} and Tab I13 {**G/1744/1**}; {**G/7807/1**}.

3262 Andrews/Hatton Joint Statement, paragraph 96 {**I/22/16**}.

3263 Andrews/Hatton Joint Statement, paragraph 99.1 {**I/22/17**}.

3264 Andrews 1W, paragraph 148 {**I/5/74**} and Tab I14, {**G/5933/1**}. There are two Suleiman signatures on the Master Agreement that are matched.

transactions recorded with the Money Exchange while, on other occasions, the Money Exchange recorded a profit on its FX forward transactions with SICL.[3265] The quantum of the FX forward transactions between the Money Exchange and SICL is greater than those entered between the Money Exchange and third party banks.[3266] The profits accrued by SICL or the Money Exchange were recorded in Account C.[3267]

89. 12 FX forward transactions between SICL and the Money Exchange were recorded in December 2007, on which the Money Exchange made a US$50.822m profit.[3268] 14 FX forward transactions (the 14 FX Transactions considered in relation to the Cash Counterclaim[3269]) between SICL and the Money Exchange were recorded in the period 21 January 2008 through to 11 February 2008, on which SICL made a US$150.445m profit.[3270]

**<u>The 20 FX Counterclaim Transactions</u>**

90. The 20 FX transactions are 20 FX forward transactions between SICL and the Money Exchange that had not matured at 5 August 2009.[3271] SICL recorded a profit on each of the ten pairs of trades.[3272]

91. There are a number of documents that record these 20 FX transactions that support the conclusion that these were genuine trades:[3273]

---

3265 Andrews/Hatton Joint Statement, paragraph 97 {**I/22/17**}.
3266 Andrews/Hatton Joint Statement, paragraph 98 {**I/22/17**}.
3267 Andrews/Hatton Joint Statement, paragraph 101, {**I/22/17**}**.** These profits were settled when the trades matured on SICL's Nostro account at the Money Exchange (Account C) which operated as SICL's US$ bank account at the Money Exchange. Andrews 1W, paragraph 156, {**I/5/78**} and Tab I19 {**Q/635/1**}.
3268 Andrews/Hatton Joint Statement, paragraph 99.3 {**I/22/17**}.
3269 Being those which matured before 5 August 2009 and were recorded by SICL in Account 3 as referred to in paragraphs 35 and 42, above.
3270 Andrews/Hatton Joint Statement, paragraph 99.3 {**I/22/17**}.
3271 Andrews/Hatton Joint Statement, paragraph 102 {**I/22/18**}.
3272 Andrews/Hatton Joint Statement, paragraph 103 {**I/22/18**}.
3273 Andrews/Hatton Joint Statement, Appendix 3, paragraph 3.1 {**I/22.1/13**}.

(1) Deal tickets produced by SICL and the Money Exchange and deal confirmations produced by the Money Exchange;

(2) SICL and the Money Exchange's respective contemporaneous records/lists of transactions, including the DMS and various other records; and

(3) SICL and the Money Exchange's accounting books and records.

92. The rates at which the FX trades were transacted support the conclusion that these were genuine trades. It is agreed that the rates were market rates:

(1) The traded rates for the 20 FX transactions have been compared to the market rates of equivalent FX forward contracts from Bloomberg.[3274]

(2) Twelve of the 20 trades were conducted at rates with less than a US$0.01 differential against the market rate. The largest rate differential is 2.7 percent. Five of the eight trades have a differential of less than US$0.01 when compared to the rate on the value date minus one day.[3275]

(3) The majority of the 20 FX transactions took place at rates with no more than a US$0.01 difference to the Bloomberg Historical Market Rates. To the extent that there are trades for which there is a differential greater than US$0.01 between the traded rate and either the Bloomberg Historical Market Rate, all but three of the

---

3274 Andrews 1W, paragraph 168 {**I/5/86**}; Tab I28 {**Q/645/1**}; Table 24 {**I/5/86**}**;** and paragraph 169 {**I/5/86**}: "*these equivalent FX forward contracts are FX forward contracts with the same value dates and the same "spot value dates" (i.e. the date on which the contracts commence, typically two business days after the trade date on which the deal is made) as the 20 FX Counterclaim Transactions. As the market rate data for these transactions is more than five years old, the only information available on Bloomberg for these forward rates is the end-of-day bid and offer rates. The Bloomberg end-of-day bid rate is the price at which a financial obligation is purchased and records the closing price for a forward trade, with the closing price being the price, or spread of prices, at which transactions are made just before the close of official business in a particular market..*"

3275 Andrews 1W, paragraphs 171 to 173 {**I/5/87**}; Table 24 {**I/5/86**} and Table 25 {**I/5/88**}.

trades display a differential of less than US$0.01 when compared against the Bloomberg Historical Market Rate.[3276]

93. The fact that there were no transfers of funds adds nothing. It is a red herring. As Dr. Fitzgerald explains, it is the balance falling due from one party to another on FX forward trades that will be settled. Where there is a running account between the parties, the net balance is settled by entries in that running account. AHAB's reliance on the absence of cash movements is misconceived and does not help the Court on the question whether or not these 20 FX trades were genuine.

**<u>Were These Entries Backdated, and If So Why?</u>**

94. The real question is whether or not these 20 FX transactions were backdated i.e. not entered into on the trade dates but entered into subsequently in order to generate FX trades in the Money Exchange's and SICL's books. AHAB has drawn attention to the following matters that support the conclusion that the book entries in relation to the 20 FX transactions may have been backdated:

(1) If the transactions were backdated, the fact that the transactions were at market rates is unsurprising as the Money Exchange and SICL would have known the rates on the chosen trade dates.

(2) The deal tickets for the 20 FX transactions are sequential. If the tickets were recorded in chronological order Mr. Andrews agreed that the opening and closing

3276 Andrews 1W, paragraph 174 {**I/5/88**}.

legs of the transaction would be expected to be around 200 apart. The opening and closing legs in relation to the 20 FX transactions are sequential:[3277]

> *"Q. If they are processed on the dates on which they are recorded as having been processed, you would expect the ticket numbers to be far apart?*
>
> *A. Yes, that's correct.*
>
> *Q. So this is unexpected?*
>
> *A. On that basis, yes."*

(3) The 20 FX trades were not entered into the DMS until after trades entered into on 16 March 2009.[3278] Mr. Andrews said:[3279]

> "Q. *So this trade is not in the chronological sequence?*
>
> *A. That is correct.*
>
> *Q. Where you'd expect to see it. The closing trade, which was dated 5 February 2009, if we go forward to line 36871, we don't see the closing trade in the chronological sequence either, do we?*
>
> *A. That is correct.*
>
> *Q. In fact, we don't see either leg of the trade until we get to line 37305. There we see them at line 37305, 37306, coming into the DMS with their trade dates, 23/01/09 and 05/02/09. They come in as consecutive entries?*
>
> *A. That is correct, yes.*
>
> *Q. They come in after trades that were done on 16 March?*

---

3277 See for example {**Q/632/152**} and {**Q/632/161**}. The trade dates are two weeks apart and the deal ticket numbers are consecutive. Andrews xx: {**Day97/104:17**}; and {**Day97/105:9**}.

3278 {**H27/634/1**} at lines 37305 and 37306.

3279 Andrews xx: {**Day97/106:6**}.

*A. Yes, that is correct."*

(4) The bookkeeping entries are consistent with the trades being created around 16 March 2009 and being given an earlier trade date.[3280]

(5) On 15 March 2009, Mr. Narang sent an e-mail addressed to Mr. Menon of the Money Exchange, but on the face of it speaking to Mr. Jesudas that stated:[3281]

> *"Dear Benjamin.*
> *As discussed, I would appreciate if you could prepare the deal tickets for* [SICL] *as per details below and forward these to me.*
> *Best Wishes*
> *Jagjit"*

Attached to the e-mail was a schedule setting out three pairs of FX transactions that generated a net loss to the Money Exchange of US$50,445,000.[3282]

(6) The forward maturity listing dated 15 March 2009 did not include the 20 FX transactions. That indicates that they had not been entered into the system at this point.[3283]

95. If the deals were backdated, the question is why. The suggestion that this is indicative of money being transferred from the Money Exchange to SICL is unsupported. The e-mail of 15 March 2009 and the booking of the FX transactions after 16 March 2009 came a week after Dawood had signed a facility agreement dated 9 March 2009 in Arabic and English between AHAB and Saudi Investment Bank comprising four separate facilities.[3284] Facility (C) of the SIB facility was a "*spot and forward foreign exchange*

3280 Andrews xx: {**Day97/130:13**}.
3281 {**G/7616.2/1**}.
3282 {**G/7616.3/1**}.
3283 Andrews 1W, Tab I3.
3284 {**G/7587/1**}.

*contracts*" facility in the amount of SAR 250 million. The Money Exchange needed FX transactions in order to draw down under this facility. This is US$66.66m. If the FX transactions identified in Mr. Narang's e-mail were backdated, it enabled the Money Exchange to draw down US$50m under this facility.

96. In the Audit Report for 31 December 2008, El Ayouty said that FX transactions were entered into *"for the purpose of stimulating its accounts at the financial institutions"*:[3285]

> *"The management resorted to these forward contracts for the purpose of stimulating its accounts at the financial institutions so that its accounts appear to be continually active throughout the year and give the impression to the financial institutions that part of the facilities granted are in use so that the credit department will make note that the customer is active....It was also used to cover up the losses that could result from paying its commitments in a foreign currency due to the fluctuation in exchange rates....Actually, the management broadened its use of such contracts to cover its commitments towards the Banks, especially those in USD."*

97. From the evidence of backdating, and from the El Ayouty Audit Packs, it can be inferred that FX transactions were entered into that were not genuine. This may have been in order to enable AHAB to *"give the impression"* to its banks that its *"facilities granted are in use"* and draw down under the FX part of AHAB's facilities, for example the SIB facility signed by Dawood. The Court may conclude that it is not safe to find that these were genuine FX transactions and, as a result, the FX transactions recorded in Accounts 3 and 4 should be reversed, which means the removal of US$278,883,000 from Account 3

---

3285 {**F/260.1/30**}.

and US$95,859,297 from Account 4.[3286] It also means that the Court cannot enter judgment for the balance of the FX transactions, which is US$75,655,703.

**Following in quotation are AHAB's submissions on the FX Transactions which I accept:**

*(1) "Foreign exchange transactions between SICL and AHAB*

*10.17 The FX counterclaim is for the profit made by SICL on 20 forward FX trades between SICL and the Money Exchange that had not settled by 5 August 2009. They are set out in Mr. Andrews' first statement[3287] and pleaded by the GT Defendants at {A1/9/143-150}.*

*10.18 The total recorded profit was USD 171,515,000. However, part of that figure is also claimed by SICL in the Cash counterclaim, because it was debited to the Money Exchange on Account 4, so the claim under this head reduces to USD 75,655,703.*

*10.19 The trading followed the pattern described in Section 5 paragraphs 5.89 to 5.101 {D/5/28-35}. SICL would open a trade by buying from the Money Exchange an amount in GBP in exchange for USD at an agreed rate, for settlement on a future value date, and then close the trade by selling back the same amount in GBP at a different agreed rate, for settlement on the same future value date, or vice versa. However, the rates were in each case set to guarantee a profit to SICL; the trades were then backdated to make it appear that the parties had used the prevailing market rate.*

*10.20 In those circumstances, the FX trades cannot be regarded as genuine and enforceable contracts between SICL and AHAB.*

*(1) As Mr. Hayley explained[3288], the FX trades were put together in order to generate a profit for SICL and the Saad Group. When the trades reached maturity, they were settled by an accounting entry – no cash ever changed hands. The obvious inference is that no-one involved in the creation of the trades intended them to be enforced; the documentation was there simply to enable the profit to be booked. They were a classic sham, involving "acts done or documents executed by the parties to the 'sham' which are intended by them to give to third parties or to the court the*

3286 It is agreed that of the total net profits of US$171,515,000 on the 20 FX transactions, US$95,859,297 is recorded in SICL's trial balance at 5 August 2009 and claimed under the Cash Counterclaim. Andrews/Hatton Joint Statement, paragraph 93 {**I/22/16**}. It is this entry that should be reversed if the 20 FX transactions are not genuine.

3287 *Andrews 1, paragraph 160 {**I/5/80-81**}.*

3288 *Hayley 1, paragraphs 171-176 {**C1/9/35-36**}.*

*appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create" (per Diplock LJ in* ***Snook v West Riding****).*[3289] *The Court will not enforce a sham transaction.*

*(2) Alternatively, if there was any intention to enforce the trades then that was a fraud on the Money Exchange, since everyone involved knew that the trades were bound to result in a loss to the Money Exchange. No representative of SICL or the Money Exchange could honestly enter into such a transaction. The Court will not enforce a contract known by those making it to be a fraud on one of the parties whom they represent.*

*(3) Alternatively, the trades are unenforceable because they lack consideration from SICL. It is of the essence of the FX forward trade that the parties take a risk on the movement of the currency pair; here the outcome was a foregone conclusion, and nothing was risked by SICL and nothing gained by the Money Exchange."*

**Following are the GTJOLs' submissions of the Land acquisitions allegedly held in trust for SICL**

**<u>The Acquisition of Land in Saudi Arabia</u>**

98. SICL could not acquire land in Saudi Arabia. AHAB could and so an arrangement was made whereby AHAB would acquire land in Saudi Arabia for SICL and hold that land for SICL. The Land Counterclaim is for the value of two properties paid for by SICL but apparently purchased by AHAB. However, there is evidence that these properties may not have existed and that AHAB may have entered into fictitious transactions. In that event, the account entries relating to those purchases should be reversed.

99. On 17 July 2007, SICL and AHAB entered into a "*Master Agency, Trust and Service Agreement*".[3290] This agreement is governed by the law of the Cayman Islands.[3291] The reason for this agreement was that SICL, as a Cayman company, did not have legal

---

3289 ***[1967] 2 QB 786 at 802*** *{R1/8.1.1/17}.*
3290 {**G/5929/1**}; Andrews 1W, paragraphs 185 to186 {**I/5/95**}.
3291 {**G/5929/13**}.

capacity to own land in Saudi Arabia. Non-Saudis are not entitled to own land in Saudi Arabia. The main purpose of the agreement was to allow SICL to acquire beneficial interest in real and other property in Saudi Arabia.[3292]

100. In 2007, the ownership of land by non-Saudis was regulated by Royal Decree No M/15 dated 17/4/1421H (equivalent to 19 July 2000) titled, "*Regulation of Ownership and Investment in Real Estate by Non-Saudis*".[3293] Unlike SICL, AHAB had the legal capacity to purchase, sell, trade and hold legal title to real estate in Saudi Arabia.[3294]

101. Clause 1.1 of the 2007 agreement between AHAB and SICL provided:[3295]

> *"SICL hereby appoints the Money Exchange during the term hereof as its agent and as its true and lawful attorney in fact, to act in SICL's name and on SICL's behalf to:*
>
> *(A) purchase and hold as trustee for SICL real and other property in Saudi Arabia;*
>
> *(B) sell real and other property in Saudi Arabia;*
>
> *(C) let real property in Saudi Arabia;*
>
> *(D) otherwise deal in real and other property in whatever way it sees fit; and*
>
> *(E) otherwise to perform an act, power, duty, right or obligation whatsoever that SICL now has or may subsequently acquire in connection with or arising from the foregoing, including the execution of all closing documents necessary for the completion of any and all such transactions."*

102. Clause 2.1 of the 2007 agreement between AHAB and SICL provided:[3296]

---

3292 Andrews 1W, paragraph 188 {**I/5/92**}.

3293 Andrews 1W, paragraph 189 to 190, {**I/5/92**}. {**Q/647/1**}. Pursuant to the Royal Decree, a non-Saudi entity, such as SICL, could only become a registered owner of land if such ownership was required to conduct a licensed professional, technical or economic activity and was approved by the licensing authority.

3294 {**G/5929/2**}.

3295 {**G/5929/3**}.

> *"SICL hereby appoints the Money Exchange as its Trustee according to the terms of this Agreement in respect to the Assets."*

103. AHAB accepted the appointment and acknowledged that its appointment would *"create no rights to the Money Exchange with regard to any Asset other than those specifically set forth in* [the] *Agreement"* and that *"any Asset will not, by virtue of* [the] *Agreement, any bill of sale, any trust deed, or any related document, become assets of the Money Exchange nor be subject to any lien or claim by the Money Exchange's creditors."*[3297] The arrangement was that AHAB would acquire property and hold it for SICL.

**Omar Saad's Role in Acquiring Land for AHAB**

104. The land transactions were entered into on behalf of AHAB by Omar Saad. He did so pursuant to powers of attorney granted to him by AHAB and the Partners.

(1) After the death of Abdulaziz in 2003, Omar Saad was granted a number of Powers of Attorney:

(a) By power of attorney dated 27 May 2003 Saud, on his own behalf and as attorney in fact on behalf of the Partners in their capacity as owners of AHAB, appointed Omar Saad as their attorney in fact to represent them in a range of matters[3298] in respect of a number of subsidiary companies.[3299] In cross-examination, Omar Saad said as follows in respect of this power of attorney:[3300]

---

3296 {**G/5929/3**}.

3297 {**G/5929/3**}, pages 3 to 4.

3298 {**G/3354.1.1**} (Arabic) {**G/3354.1.2**} (translation).

3299 Continental Can of Saudi Arabia Ltd, Arabian Pipecoating Company Ltd, Tecmo Arabia Ltd, Saudi Chemical and Oil Fields Ltd, BP Solar Arabia Ltd, SHE Arabian Industrial Construction Company Ltd, Jeddah Beverage CAN Making Company Ltd, Jeddah National Company for Can Ends Ltd, Corro Coat Saudi Arabia Ltd, Emirates Can Company Ltd, Saudi Chemicals and Oil Fields Company and Eastern Insulation Company.

3300 Omar Saad xx: {**Day91/24:19**}.

> *"Q. That includes appearing before government bodies, appearing before a notary on the transfer of land; is that right?*
>
> *A. Yes."*

(b) By power of attorney dated 17 June 2003 Saud, on his own behalf and as attorney in fact on behalf of the Partners in their capacity as owners AHAB, appointed Omar Saad as their attorney in fact to represent them in a range of matters, including the purchase of lands, in respect of the same subsidiary companies.[3301]

(c) By power of attorney dated 17 June 2003 Saud, on his own behalf and on behalf of the Partners in their capacity (emphasis added):[3302]

> *"As owners of Ahmad Hamad AlGosaibi & Brothers* ***Money Exchange, Commission and Investment,*** *he acknowledged saying I have appointed Omar Saad Salmeen Hamdah, a Saudi citizen, as our attorney in fact, to represent us is following up, proving, identifying, accepting the purchase, and recording all types of real estate in the name of the referenced company...."*

(d) In cross-examination Omar Saad said as follows in respect of this power of attorney:[3303]

> *"Q. Do you see the wide powers that it gives to you on behalf of the Money Exchange?*
>
> *A. Yes, exactly."*

(2) After the death of Khalid in 2005, Omar Saad was granted a number of Powers of Attorney:

3301 {**G/3390.1/1**} (Arabic) {**G/3390.2/1**} (translation).
3302 {**G/3397.0.1/1**} (Arabic) {**G/3397.0.2/1**} (translation).
3303 Omar Saad xx: {**Day91/28:18**}.

(a) By power of attorney dated 28 November 2005 Saud, in person and as attorney in fact for the Partners in their capacity as owners of AHAB, appointed Omar Saad as their attorney in fact to act on their behalf in, *inter alia,* selling, buying, vacating and approving lands and buildings and collecting and delivering the funds.[3304]

(b) By power of attorney dated 28 November 2005 Saud, on his own behalf and as attorney in fact on behalf of the Partners in their capacity as owners of AHAB, appointed Omar Saad as their attorney in fact to represent them in their personal capacity and on behalf of the company in, *inter alia*, following up, recording, renewing, accepting the purchase, disposition, and recording all real estate of all kind.[3305]

(c) By power of attorney dated 28 November 2005 Saud, on his own behalf and as attorney in fact on behalf of the Partners (emphasis added):[3306]

> *"As owners of Ahmad Hamad AlGosaibi & Brothers* ***Money Exchange, Commission and Investment,*** *he acknowledged saying, I have appointed Omar Saad Salmeen Hamdah, a Saudi citizen, as our attorney in fact, to represent us in the following up, proving, identifying, accepting the purchase and recording all types of real estate in the name of the referenced company and to sign on our behalf…"*

(d) By power of attorney dated 28 November 2005 Saud, in person and as attorney in fact on behalf of the Partners, appointed Omar Saad as attorney

3304 {**G/5008.3/1**} (Arabic) {**G/5008.4/1**} (translation).
3305 {**G/5008.5**} (Arabic) {**G/5008.6/1**} (translation).
3306 {**G/5008.1**} (Arabic) {**G/5008.2**} (translation).

in fact to act on his behalf by, *inter alia*, attending general meetings of all companies in which AHAB is associated.[3307]

(3) Omar Saad was also given a specific Power of Attorney in relation to the sale of a specific piece of land. By power of attorney dated 9 December 2007 Saud, as attorney in fact on behalf of Mohammed Algosaibi and Khaled Algosaibi in selling their share of land located in Safwa, appointed Omar Saad (emphasis added):[3308]

> *"…as Attorney in Fact to act on my behalf in my aforesaid capacity to vacate the aforesaid land to* ***Ahmad Hamad AlGosaibi & Brothers Money Exchange, Commission and Investment Company****…"*

In cross-examination, Omar Saad said as follows in respect of this power of attorney:[3309]

*"MR. PHILLIPS:*

*Q. Mr. Saad, if you look at the power of attorney, it says Saud appoints you as attorney in fact on his behalf to vacate the land to the Money Exchange for that price. Are you not accepting that that is what you were appointed to do?*

*A. I can say that this power of attorney is not from Algosaibi, this is from Saud, as the agent, in his capacity. This is not for Algosaibi. The sale was -- we sold this land to the Money Exchange.*

*Q. Yes. And you were appointed to vacate the land to the Money Exchange. You were appointed on that sale.*

*A. Yes."*

---

3307 {**G/5008.7**} (Arabic) {**G/5008.8**} (translation).

3308 {**G/6168.2**} (Arabic) {**G/6168.3**} (translation).

3309 Omar Saad xx: {**Day91/37:25**}-{**Day91/38:11**}.

(4) After the death of Suleiman in 2009, Omar Saad was granted a number of Powers of Attorney. These Powers of Attorney included powers to buy and sell land on behalf of the Money Exchange despite Omar Saad's evidence that he had nothing to do with the Money Exchange:

(a) By power of attorney dated 3 March 2009 Saud, on his own behalf and as attorney in fact on behalf of the Partners, in their capacity as owners of AHAB, appointed Omar Saad as their attorney in fact to represent them, inter alia, in the purchase of lands.[3310]

(b) By power of attorney dated 3 March 2009 Saud, acting for himself and as an attorney for the Partners (emphasis added):[3311]

> *"As owners of Ahmad Hamad AlGosaibi & Brothers Co.* ***Money Exchange, Commission and Investment****.... I hereby appoint Omar Saad Salmeen Hamdah – Saudi – civil registration number 1014185472 as an attorney acting for us to carry out reviewing, proof, selection, and acceptance of purchase agreements, registration of real estate of all types in the name of the listed company."*

(c) In cross-examination Omar Saad confirmed that each time an Algosaibi died he was granted new Powers of Attorney. Omar Saad also confirmed that these Powers of Attorneys were for the Money Exchange, and that they were kept in his files:[3312]

*"MR. PHILLIPS:*

*Q. Mr. Saad, what we have seen is Saud Algosaibi giving you powers of attorney on behalf of the*

---

3310 {**G/7570.3**} (Arabic) {G/7570.4} (translation).

3311 {**G/7570.1**} (Arabic) {**G/7570.2**} (translation).

3312 Omar Saad xx: {**Day91/43:6**}.

*Money Exchange on each occasion when there was a death in the family. Do you follow?*

*A.* *Yes. I also have powers of attorney from Yousef and Dawood.*

*Q.* *In relation to the Money Exchange?*

*A.* *Yes, the Money Exchange and the office.*

*Q.* *These powers of attorney are kept by you in your files; is that right?*

*A.* *Yes, of course.*

*Q.* *We have seen that these powers of attorney give you very wide powers to deal with shares and dividends and land.*

*A.* *Yes, I didn't use all these powers, but they had to mention them in these powers of attorney."*

This evidence contradicted Omar Saad's account in his witness statement (emphasis added):[3313]

> *"I have been granted a number of powers of attorney over the years. These include powers of attorney to buy or sell land, or to purchase shares, all on AHAB's behalf (**by which I mean AHAB Head Office, not the Money Exchange)."***

That was wrong. This inconsistency was put to Omar Saad in cross-examination. He admitted that this aspect of his witness statement is incorrect. At one point Omar Saad asked who has said he did not have Power of Attorney for the Money Exchange:[3314]

3313 Omar Saad 1W {**C1/11/9**} (Arabic) {**C1/11/19**} (translation).
3314 Omar Saad xx: {**Day91/43:21**}.

*"Q. If in your witness statement it said that you had powers of attorney to buy or sell land or purchase shares not on behalf of the Money Exchange, that would be incorrect, wouldn't it?*

*A. How?*

*Q. I will repeat the question: if in your witness statement it said that you had powers of attorney to buy or sell land or purchase shares, but not on behalf of the Money Exchange, that would be incorrect, wouldn't it?*

*A. How could it be incorrect?*

*Q. At {C1/11/9} and {C1/11/19}, would you look at paragraph 42. It says:*

> *"I have been granted a number of powers of attorney over the years. These include powers of attorney to buy or sell land, or to purchase shares, all on AHAB's behalf (by which I mean AHAB Head Office, not the Money Exchange)."*

*A. Who said that, "not for the Money Exchange"?*

*Q. "Who said that, 'not for the Money Exchange'?"*

*A. You only asked me about the powers of attorney now.*

*Q. Yes. Mr. Saad, is your evidence that whoever has said what you can read in paragraph 42 has made a mistake?*

*A. My work was focused on the Algosaibis. Yes, they put my name on the Money Exchange, but I don't deal with it, I don't purchase or sell anything related to the Money Exchange. I didn't say that I'm not -- I don't have a power of attorney for the Money Exchange.*

*Q. The sentence "These include powers of attorney to buy or sell land ... all on AHAB's behalf (by which I mean AHAB Head Office, not the Money*

> *Exchange)", is your evidence that that is correct or incorrect?*
>
> *A. I have powers of attorney for the Money Exchange and for the Algosaibi. I didn't say that I don't have powers of attorney for the Money Exchange.*
>
> *Q. So this is incorrect?*
>
> *A. Yes, incorrect."*

Omar Saad was thereafter asked who had written this paragraph for him. He said he could not recall who wrote it, effectively admitting that at least part of his witness statement had been prepared by someone else:[3315]

> *"Q. Can you help the court by telling us who it is that wrote this paragraph for you, or are these your words?*
>
> *A. I don't remember who wrote it. I have express powers of attorney and you have seen them and read them."*

105. Contrary to what was stated in Omar Saad's witness statement, throughout the history of this matter, he had authority to enter into land purchase and sale transactions on behalf of the Money Exchange.

106. Omar Saad entered into a number of property related transactions on behalf of AHAB that are not in respect of the properties the subject matter of the counterclaim, but which show a course of dealing with land for AHAB. He entered into numerous land transactions, some of which he said he remembered, some of which he said he did not remember. There are a number of examples of Omar Saad exercising powers of attorney

---

[3315] Omar Saad xx: {**Day91/45:7**}.

in respect of land on behalf of AHAB and the Money Exchange. Some of the transactions occurred before the acquisition of the land that is the subject matter of the counterclaim, some at the same time, and some after. Given the number of transactions it is not surprising that he remembered very few of them specifically.

(1) By agreement dated 14 December 1988, the Bank of Bahrain and Kuwait agreed to sell land in Al Khobar to the Money Exchange for SAR 8.5m.[3316] Omar Saad represented the Money Exchange in the sale and signed the contract on their behalf. In cross-examination Omar Saad said as follows in respect of this document:[3317]

> *"Q. Let me just get this straight, Mr. Saad. Your response to this document at {G/1208.0.1/1} is it has your signature on it, you don't remember seeing it before, and you are not sure if it's yours or not? By that, do you mean you're not sure if it's genuine?*
>
> *A I can't say that this is not genuine but I -- I suspect this my signature.*
>
> *Q. Is that because this document refers to the Money Exchange?*
>
> *A. Yes."*

This land was acquired for the Money Exchange in 1988. It is not alleged that this was not a genuine transaction. Omar Saad, on seeing that it was for the Money Exchange, raised doubts about whether it was genuine.

(2) By five endorsements dated 24 and 25 June 1989 Omar Saad, as attorney for the Partners under a power of attorney no. 11382 dated 9 May 1987, registered

[3316] {**G/1208.0.1/1**} (Arabic) {**G/1208.0.2/1**} (translation).
[3317] Omar Saad xx: {**Day91/63:2**}.

related parcels of land in Al Khobar owned by his client.[3318] In cross-examination Omar Saad said as follows in respect of these endorsements:[3319]

> *"Q. I think we are agreed, Mr. Saad, that for you to enter into these transactions, you would have been exercising a power under a power of attorney. That's common ground, is it not?*
>
> *A. Okay, yes. Yes, this relates to splitting the lands of the hotel. As I said, a big deed and they split them into smaller ones.*
>
> *Q. It related to splitting those land parcels down. That's right, isn't it?*
>
> *A. Yes, for the hotel.*
>
> *Q. Mr. Saad, you wouldn't do something of that sort without an express authority found in a power of attorney, would you?*
>
> *A. Yes, exactly."*

107. Omar Saad entered into all of the property transactions that are the subject matter of the counterclaim for AHAB. He did so pursuant to these powers of attorney.

**<u>Property 0</u>**

108. Property 0 is an interest in a residential compound and golf resort at the Musaad Oasis, Aziziah Beach, Al Khobar ("**Property 0**"). It is situated near to the Algosaibi family compound and was owned by Sana'a Algosaibi, Abdulaziz's daughter. There is no basis on which it can be suggested that Property 0 was not owned by Sana'a Algosaibi.

---

3318 {**H21/75/1**} (Arabic) {**H21/76/1**} (translation); {**H21/77/1**} (Arabic) {**H21/78/1**} (translation); {**H21/79/1**} (Arabic) {**H21/80/1**} (translation); {**H21/81/1**} (Arabic) {**H21/82/1**} (translation); {**H21/135/1**} (Arabic) {**H21/136/1**} (translation).

3319 Omar Saad xx: {**Day91/68:21**}.

109. On 24 June 2001, Sana'a Algosaibi and SICL entered into a Sale and Purchase Agreement by which SICL purchased from Sana'a Algosaibi a 20 percent interest in the 'Investment Property' for US$50m.[3320] The 'Investment Property' is described in Schedule I to the Sale and Purchase Agreement.[3321] There were two parts to the Investment Property. First, *"The Musaad Oasis – Residential Compound and Resort – location at Azizyah Beach, West of Alkhobar"*. This was land of approximately 1085m x 240m with a 240m beach front. The Project value was given as SAR 759,668,400. Of that the work, completed at the date of the Sale & Purchase Agreement was SAR 109,368,400. There was SAR 650,300,000 work to do. The second part to the 'Investment Property' was *"Musaad Oasis Golf Club – location at Azizyah Beach West of Alkhobar"*. This was 445,889 sqm of land with a value of SAR 100 per square meter. The value of the Golf Club land was SAR 44,588,900. The Project Value was SAR 219,836,125. Of that the work, completed was SAR 33,971,505. There was SAR 185,864,620 work to do. Taken together the total project value was SAR 979,504,525 (US$261,201,207) of which SAR 143,339,905 (US$38,223,974) had been completed.

110. Property 0 was recorded as an asset in SICL's books in the amount of US$50m and was recorded in SICL's trial balance as at 30 June 2007.[3322] AHAB has not suggested that the transfer of Property 0 to SICL was not a genuine transfer.

111. On 17 September 2007 Property 0 was sold by SICL to the Money Exchange for US$200m.[3323]

---

3320 {**G/2528/1**}; Andrews/Hatton Joint Statement, paragraph 105.1 {**I/22/18**}**.** The Share Purchase Agreement was faxed by Ravi Uppal to PwC on 31 July 2001. There are minutes of a SICL Board meeting approving the acquisition dated 23 June 2001 {**G/2528/3**} signed by Al Sanea and Dr. Al Mardi.

3321 {**G/2528/12**}.

3322 {**G/6223/1**}. Andrews/Hatton Joint Statement, paragraph 105.3 {**I/22/18**}.

(1) A Bill of Sale exists dated 17 September 2007 that records the sale and is signed by Al Sanea for SICL, the seller, and bears a signature of Suleiman Algosaibi for the Money Exchange as the buyer.[3324] This is not on the Forgery Schedule.

(2) Property 0 was removed from SICL's books as a result of its sale to the Money Exchange and the gain of US$150m made on the disposal of Property 0 was recorded in SICL's books.[3325]

(3) The cash moved from the Money Exchange to SICL. SICL's and the Money Exchange's accounting records and bank statements show that the Money Exchange made five separate transfers totalling US$200m from the Money Exchange's Bank of America account to the SICL Citibank Account on 17 and 18 September 2007. These were recorded in Account C/Account 3.[3326]

(4) US$200m was recorded in the Money Exchange's ledger 3 as a debit entry to the "*SAAD GVA PROPERTY – PURCHASE*" account on 7 October 2007 (with the same value date).[3327] The Money Exchange considered it had purchased Property 0.

112. AHAB suggests that the Musaad Oasis resort and golf club did not exist or had not been developed. This is based in part on a misreading of a report by DTZ Bahrain W.L.L ("**DTZ**")[3328] and in part on a statement by Saud that there is no golf club next to the

---

3323 Andrews/Hatton Joint Statement, paragraph 105.4 {**I/22/18**}.
3324 Andrews/Hatton Joint Statement, paragraph 105.5 {**I/22/18**}.
3325 Andrews/Hatton Joint Statement, paragraph 105.6 {**I/22/18**}.
3326 Andrews/Hatton Joint Statement, paragraph 105.7 {**I/22/19**}.
3327 Andrews/Hatton Joint Statement, paragraph 105.12 {**I/22/19**}.

3328 {**G/8006.2/1**} Saud 2W, paragraph 7 **{C1/2.1/2}**.

Musaad Oasis beach resort.[3329] AHAB also rely upon a document dated 29 September 2007 recording the transfers that refers to the US$200m as a placement from SICL in manuscript after crossing out *"returned"* by SICL.[3330] Far from support AHAB's case, that document undermines it.

113. Saud's statement is very carefully worded. He says *"the plot of land opposite the beach resort is not a golf club."* [3331] From that it follows that there is a beach resort. Mr. Hayley confirmed the existence of the beach resort in his evidence.

114. It is also clear, from Mr. Hayley's description, and from the DTZ report, that work had been done on developing the Musaad Oasis Beach Resort, and that probably explains the increase in value between 2001 and 2007:

(1) During his cross-examination, Mr. Hayley described where the Musaad Oasis is located and explained that it was a beach property used by Saad employees, which comprised extensive facilities:[3332]

> *"Q. Just so you can help us with this: you have described the little city, the Soha Oasis. How far was that away from the Musaad Beach, which is the subject matter of your letter at {G/2824.1/1}?*
>
> *A. About 20 minutes. I mean, if you extrapolate that, at about an average of 60k it was about 20 kilometres away.*
>
> *Q. This was a facility, was it, that was available for families living in the little city, the Soha Oasis?*

3329 Saud 2W, paragraph 7 {**C1/2.1/2**}.
3330 {**G/6079/1**}.
3331 Saud 2W, paragraph 7 {**C1/2.1/2**}.
3332 Hayley xx: {**Day24/54:4**}.

> *A.* *This was originally available for families in the Soha Oasis, but subsequently it was, um --- it became a facility for Saad employees to use.*
>
> *Q.* *As to the beach itself, were there facilities at the beach?*
>
> *A.* *Um, yes. This is the same facility that we discussed yesterday. Um, the -- would you like me to describe it, my Lord?*
>
> *Q.* *Yes, please.*
>
> *A.* *The, um -- the piece -- um, if you are driving along the coast road and then turning off and then turning off the road into the Musaad Beach facility, I would say that there was a 200- or 300-yard drive with wasteland in the middle, which was what was intended to be developed as per our conversation yesterday, and at the end of the --at the end of the drive there was a beach front. The beach front was probably 100 yards long. There were, um, jetties and walls that went out into the water to separate this beach from the neighbouring beaches. Um, there was a -- there was a sort of a clubhouse and a ballroom on the beach front and also out on one of the jetties, one of the promontories, was a fish restaurant which was built with several storeys. Whether or not that was ever commissioned, I don't know. And on the other side there was supposed to be a saltwater swimming pool. So they were quite considerable and extensive facilities."*

(2) The DTZ report is a report in July 2009. It does not tell the Court what the position was in 2007. The DTZ report states (emphasis added):[3333]

> *"During our inspection it was not possible to access all of the buildings on the facility."*
>
> *"At the time of inspection, the properties were in a fair condition for age and type; however the properties in the main section were nearing* ***the completion of a complete refurbishment***

[3333] {**G/8006.2/15**}.

> ***programme.***[3334] *A regular and rolling programme of maintenance and repair is required to combat the effect of the harsh regional climate."*
>
> *"**Beach Front Section** At the time of inspection was undergoing substantial redevelopment and in effect comprises to section."*

115. The report describes a manmade bay, houses, substations, a slipway, a fish farm, a 6,260 sqm recreation building with a swimming pool, restaurant, café and games area, health club, changing and showering facilities, sauna gym and a lift. There was also a resort club house of 1,915 sqm, a restaurant of 4,460 sqm and a boat shed. Around the beach access road, in 2009 it was being prepared for residential development. There was also a farm site occupied by poly tunnel type structures, associated water tanks that had capacity to service any proposed development.

116. AHAB rely upon transfers in SICL's and the Money Exchange's accounting records and bank statements totalling US$200m to the Money Exchange between 18 and 19 September 2007.[3335] That is immediately after the Money Exchange had paid SICL. As appears below, SICL transferred US$200m to the Money Exchange after the Money Exchange had paid for Property 0 in order to purchase Property 1. That transfer cannot invalidate the purchase of Property 0 by the Money Exchange. The transfers can be traced into bank statements and they were recorded in both SICL and the Money Exchange's ledgers. AHAB rely on the document dated 29 September 2007 recording the transfers that refers to the US$200m as a placement from SICL in manuscript after

---

3334 That is only consistent with the buildings having been built some time before. New buildings do not need complete refurbishments.

3335 Andrews/Hatton Joint Statement, paragraph 105.10 {**I/22/19**}.

crossing out "*returned*" by SICL.[3336] That document is recording the running account between SICL and the Money Exchange and the property transactions involving the sale of Property 0 and the purchase of Property 1. The reference to "placement" related to the placement of US$200m against the cost of Property 1 and this terminology was apt given that SICL paid US$200m due for Property 1. The same document also refers to: [3337]

> *"ALGF paid USD 200 MIO to SICL for land purchased from SICL" and "USD211.93 debited to SICL account Ref SICL purchase of property."*

117. There is also a handwritten note on a letter stating *"$200m paid to Saad GVA. Not to be shown in C/A Consideration ALGF bought land."*[3338] This is further evidence of the payment of US$200m for the purchase by the Money Exchange of Property 0 from SICL.

118. The cash transfers are supported by contemporaneous correspondence that support that the purchase by the Money Exchange of Property 0 was genuine.

(1) On 15 September 2007, Mr. Hayley sent an e-mail to Mr. Narang that stated:[3339]

> *"We have noted to settle $160 for value Monday 17th September in respect of our property purchase from SICL."*

(2) On 16 September 2007, Mr. Narang replied:[3340]

> *"The fair value of the property has been ascertained at US$200 million. As discussed, the transfer of funds could be made in two tranches of US$160 million on Monday and the balance of US$40 million after receipt of the funds."*

119. In his witness statement, Mr. Hayley, who was involved in the purchase of Property 0, does not say that it was not a genuine transaction. Mr. Hayley was asked about it and

---

3336 **{G/6079/1}**.
3337 **{G/6079/1}**.
3338 **{G/6054/1}.**
3339 **{G/6035/1}**.
3340 **{G/6035/1}**.

what he says is that he has no recollection of the real estate transactions. [3341] He points out that non-Saudis cannot own real estate and that he had seen land deeds but they were in Arabic.[3342]

120. Mr. Hatton confirmed during his cross-examination that the records regarding the purchase of Property 0 and the transfers totalling US$200m are agreed: [3343]

> *"Q. Moving on, we see that the next section in the joint statement is the land counterclaim. Paragraph 105 deals with Property 0, so-called. The records relating to the purchase of Property 0 and the transfers of US$200 million are agreed. That's right, isn't?*
>
> *A. Yes, that is right."*

121. The Court should conclude that the purchase and sale of Property 0 took place and that the transfers of cash were made. None of the agreements is said to be forged. SICL made a profit over its purchase from Sana'a of US$150m, probably because of the work done on the Musaad Oasis Beach resort. SICL made a payment of US$200m to the Money Exchange immediately after the sale of Property 0 in order to purchase Property 1 (as defined below).

**Property 1**

122. Property 1 is a plot of land in the district of Al Olaya, Riyadh ("Property 1"). AHAB purchased Property 1 on behalf of SICL in September 2007 for SAR 794,750,000 (US$211,933,333.33).

123. There is a letter dated 18 September 2007 from the Money Exchange to SICL which states that Property 1 was purchased for SAR 794,750,000 (US$211,933,333.33).[3344]

---

3341 Hayley 1W paragraph 278 {**C1/9/57**}.
3342 Hayley 1W paragraph 278 {**C1/9/57**}.
3343 Hatton xx: {**Day94/117:7-13**}.

124. The deed of purchase is dated 16 September 2007.[3345] It was entered before Mohammed Bin Fahd Al Ismail, First Notary in Riyadh. According to the deed, the vendor, Abdul Aziz Abdul Rhaman Ali Al-Ghamedi, appeared before the notary and stated:

> *"I own and have at my disposal Parcels No. 15 through 25 of Plan No. 112/2, which are located in the Olaya District of Riyadh, are bordered on the **north** by a street that is 60 metres* [wide] *and four hundred twenty five metres 425 m long, on the **south** by a street that is 20 m wide and four hundred twenty five 425 m long, on the **east** by a street that is 15 metres wide and eight hundred fifty metres 850 m long, and on the **west** by a street that is 15 metres wide and eight hundred fifty metres 850 m long, and have a total **area** of three hundred sixty one thousand two hundred fifty square metres 361,250 m2, pursuant to the deed issued by this department under no. 3211/3 on 11/09/1402 A.H. [03/07/1982 A.D] I sold these parcels to Ahmad Hamad Algosaibi & Brothers Co. Finance, Development and Investment, which holds Commercial Register No. 2051030083, dated 15/08/1425 A.H [29/09/2004 A.D], and is represented by Omar Saad Salmeen Hamdo, who holds a power of attorney that was noted in the record. The parcels were sold for a sum of (794,750,000) seven hundred ninety four million seven hundred fifty thousand Saudi riyals, which was paid via a bank cheque whose number was noted in the record..."*

125. Omar Saad represented AHAB pursuant to the power of attorney given to him for the Money Exchange described above. In cross-examination Omar Saad said as follows in respect of this deed:[3346]

> *"Q. You don't know anything about this land? Mr. Saad, can we move on from two points: one, you did have power to enter into contracts to buy land on behalf of the Money Exchange. That is correct, isn't it?*
>
> *A. Yes, yes.*
>
> *...*
>
> *Q. Mr. Saad, do you remember entering into this transaction?*
>
> *A. No."*

---

3344 Andrews/Hatton Joint Statement, paragraph 106.2 {**I/22/20**}.

3345 {**G/6060/1**} (Arabic).

3346 Omar Saad xx: {**Day91/73:12**}-{**Day91/74:19**}.

126. The Money Exchange's accounting entries for the purchase of Property 1 record funds of US$211,933,333.33 being credited from the Money Exchange's Bank of America account on 29 September 2007. The Bank of America bank statements do not record this payment, but they do record the US$200m from the sale of Property 0. The US$211,933,333.33 credit entry was offset by a debit entry of US$211,933,333.33 on 7 October 2007. On the same day a credit for US$211,933,333.33 was posted to a Ledger 3 account entitled "*SAAD GVA PROERTY – SALE*".[3347]

127. SICL's and the Money Exchange's accounting records and bank statements show that SICL made transfers totalling US$200m to the Money Exchange on 18 and 19 September 2007, and these were recorded in Account 3/Account C.[3348] These transfers are the proceeds of sale of Property 0 discussed above. They were a placement towards the purchase of Property 1.

128. The overall net result from the transactions recorded in the Money Exchange's Ledger 3 for Properties 0 and 1 is a net receivable balance due to the Money Exchange per the SICL Money Exchange Account C/Account 3 of US$11,933,333.[3349]

129. AHAB sold Property 1 on 8 September 2008 for SAR 1,300,500,000 (US$346,800,000). Mr. Andrews and Mr. Hatton agree that the total gain of approximately US$135m made on the sale of Property 1 was recorded in the books and records of SICL.[3350]

---

3347 Andrews/Hatton Joint Statement, paragraph 106.4 {**I/22/20**}.

3348 Andrews/Hatton Joint Statement, paragraph 105.10 {**I/22/19**}.

3349 Andrews/Hatton Joint Statement, paragraph 106.5 {**I/22/20**}.

3350 Andrews/Hatton Joint Statement, paragraph 106.6 {**I/22/20**}.

**The 27 March 2016 Visit to the Notary**

130. On 27 March 2016, the GTJOLs' Saudi Arabian counsel and AHAB's Saudi Arabian counsel visited the First Notary Public in Riyadh and submitted to the notary a request for verification of the authenticity and ownership of the deeds that relate to the purchase of Property 1, Property 3 and two of the plots forming part of Property 2. The Joint Report of that visit states as follows (emphasis added):[3351]

> *"At the Registry, we were requested by the clerk to follow him to the Head of the Riyadh First Notary (the Head). There, we were asked to wait for approximately 20 minutes. Thereafter, we were asked to follow a clerk and a police officer. They took us to the office of the police at the Riyadh notary. There they explained that* ***the deeds were forgeries*** *[...]"*

**Property 2**

131. Property 2 was four plots of land, one of which is in the Rawda district of Riyadh, one of which is in the Sulaimaniya District in Riyadh and two of which are in Yanbu ("Property 2"). AHAB purchased Property 2 through four purchases for a total of SAR 1,105,168,880 (US$294,711,434.67).

**The Riyadh Properties**

132. AHAB purchased a property in the Rawda District of Riyadh by a deed dated 10 May 2008.[3352] The vendor appeared before Mohammed Bin Fahd Al Ismail, First Notary in Riyadh. In the deed the vendor, Jassem Bin Aayad Bin Abdul Rahman Al-Nuwaider, stated:

> *"I own and have at my disposal Parcels No. 17 through 32 of Plan No. 15/1, which are located in the Rawda District of Riyadh, are bordered on the* ***north*** *by Parcels no. 15 and 16 that are eight hundred fifteen metres 815 m long, on the* ***south*** *by a street that is 45 m wide and eight hundred fifteen metres 815 m long, on the* ***east*** *by a street that is 85 m wide, King Abdulaziz*

---

3351 {**Q/659/1**}.

3352 {**G/6636/1**} (Arabic), {**G/6636.1/1**} (translation).

*Road, and three hundred twelve metres 312 m long, and on the **west** by a street that is 50 m wide and three hundred twelve metres 312 m long, and have a total **area** of: two hundred fifty four thousand two hundred eighty square metres, 254,280 m2, pursuant to the deed issued by this department under no. 121/3 on 17/07/1426 A.H. [22/08/2005 A.D]. I sold these parcels to Ahmad Hamad Algosaibi & Brothers Co. Finance, Development and Investment, which holds Commercial Register No. 2051030083, dated 15/08/1425 A.H [29/09/2004 A.D], and is represented by Omar Saad Salmeen Hamdo, who holds a power of attorney that was noted in the record. The parcels were sold for a sum of (590,183,880) five hundred ninety million one hundred eighty three thousand eight hundred eighty Saudi riyals, which was paid via a bank cheque whose number was noted in the record..."*

133. In cross-examination Omar Saad said as follows in respect of this deed:[3353]

> *"Q. Mr. Saad, is your evidence that you don't remember entering into this transaction?*
>
> *A. I don't remember the contract. I never purchased the land in the amount of hundreds of million. It should be reasonable. But this is not reasonable."*

134. AHAB purchased a property in the Sulamaniya District of Riyadh by deed dated 12 May 2008.[3354] The vendor appeared before Mohammed Bin Fahd Al Ismail, First Notary in Riyadh. In the deed, the vendor, Salem Bin Mohammed Bin Abdul Rahman Al-Dawsari, stated: [3355]

*"I own and have at my disposal Parcels No. 4 through 19 of Plan No. 123/2, which are located in the Sulaimaniya District in Riyadh, are bordered on the **north** by the parcels no. 2 and 3 that are three hundred and eleven metres long 311 m long, on the **south** by a street that is 50 m wide and three hundred eleven metres 311 m long, on the **east** by a street that is 80 m wide and one hundred seventy metres 176 m long, and on the **west** by a street that is 50 metres wide and one hundred seventy six metres 176 m long, have a total **area** of: fifty four thousand seven hundred thirty six square metres, 54,736 m2, pursuant to the deed issued by this department under no. 12/2 on*

---

3353 Omar Saad xx: {**Day91/76:23**}-{**Day91/77:2**}.

3354 {**G/6646**} (Arabic), {**G/6646.1**} (translation).

3355 {**G/6646**} (Arabic), {**G/6646.1**} (translation).

> *05/05/1418 A.H. [07/09/1997 A.D]. I sold these parcels to Ahmad Hamad Algosaibi & Brothers Co. Finance, Development and Investment, which holds Commercial Register No. 2051030083, dated 15/08/1425 A.H [29/09/2004 A.D], and is represented by Omar Saad Salmeen Hamdo, who holds a power of attorney that was noted in the record. The parcels were sold for a sum of (131,366,400) one hundred thirty one million three hundred sixty six thousand four hundred Saudi riyals, which was paid via a bank cheque whose number was noted in the record..."*

135. In cross-examination Omar Saad said he did not remember this deed.[3356]

136. Omar Saad also said, in his witness statement, that: *"...the deed is apparently prepared and signed by a notary in Riyadh. If I had been involved in this purchase, I would have been required to attend the notary office in Riyadh to represent AHAB for this purchase. However, I have never been to Riyadh to purchase land on behalf of AHAB."*[3357]

137. Omar Saad was wrong to suggest that there could not be land in Riyadh because he had not been to Riyadh to purchase land for AHAB. Omar Saad was the person who entered into land transactions for AHAB. In cross-examination Saud accepted that from at least 2003 AHAB owned land in Riyadh:[3358]

> *"Q. Let me show you, so that there is no dispute about this, a real estate valuation which refers to land in Riyadh, just so you can have an opportunity of commenting on it.* ***{G/952/1}****. There are a number of these independent valuations of land running through from 2003 onwards. Let's look at this one by way of illustration.* ***{G/5925/1}*** *is a valuation of land owned by the Money Exchange by a real estate office in Al Khobar, Hassan Bin Ali Al Harithi. Do you see that?*

---

3356 Omar Saad xx: {**Day92/5:3-4**}.

3357 Omar Saad 1W, paragraph 44 {**C1/11/19**}. Yousef says in paragraph 154 of Yousef 1W, *"To my knowledge, AHAB has never owned substantial plots of land in Riyadh."* {**C1/3/35**}. The GTDs were unable to put the material they put to Saud that demonstrates, as Saud accepted, that AHAB did own plots of land in Riyadh.

3358 Saud xx: {**Day53/45:5**}-{**Day53/46:12**}.

*A. Yes, I see that, yes.*

*Q. Do you know that real estate agency?*

*A. I don't have recollection at this point who's this.*

*Q. Then you see what the valuation does is to value land owned by the Money Exchange. There is, first of all, a reference to land in Al Khobar. Do you see that?*

*A. Yes.*

*Q. Then reference to land in Dammam. Do you see that?*

*A. Yes. Yes.*

*Q. Over on* ***{G/5925/2}****, can you see a reference to Riyadh Block 1 and Riyadh Block 2?*

*A Riyadh Block 1 and Block 2, yes.*

*Q. At* ***{G/5925/4}*** *we can see other land at Riyadh, under the heading "Other". Do you see that?*

*A. Yes, Jubail land, land in the south of something. What is -- I see -- I see "Riyadh", yes.*

*Q. That is the 2003 valuation. I am not going to go through each year. At* ***{G/5925/35}*** *is a valuation by the same real estate office in Al Khobar, dated 12 July 2007. Do you see that?*

*A. 2007, yes, I see that.*

*Q. Over to* ***{G/5925/37}*** *we can see references to the same Block 1 and Block 2 land in Riyadh?*

*A. Okay."*

**<u>The Yanbu Properties</u>**

138. AHAB purchased property in Yanbu by deed dated 11 May 2008.[3359] The vendor appeared before Fawaz Bin Sattam Al-Mutairi, Notary of Yanbu. In the deed, the vendor, Saoud Bin Salman Bin Abdullah Al-Khuwaiter, stated:

> *"I own and have at my disposal*
>
> *Parcels No. (46) through (54) of Approved Plan No. 11/1, which are located on Yanbu Al-Bahr Street, Bordered*

| | |
|---|---|
| *on the north by* ***a street that is 30 m wide*** | *Length: two hundred eighty eight metres 288m* |
| *on the south by* ***a street that is 30 m wide*** | *Length: two hundred eighty eight metres 288m* |
| *on the east by* ***a street that is 25 m wide*** | *Length: two hundred eighteen metres 218m* |
| *on the west be* ***a street that is 20m*** *wide* | *Length: two hundred eighteen metres 218m* |

> *Total area (62,784 m2) sixty two thousand seven hundred eighty four square metres*
>
> *Pursuant to the deed issued by* ***Yanbu Court*** *No.* ***36/2*** *dated* ***16/11/1410 A.H.*** *I sold* ***them to the buyer/Ahmad Hamad Algosaibi & Brothers Co. Finance, Development and Investment, which holds Commercial Register No. 2051030083, dated 15/08/1425 A.H. [29/09/2004 A.D.], and is represented by Omar Saad Salmeen Hamdo, who holds a power of attorney that was noted in the record****.*
>
> *For the purchase price of (199,289,600)* ***one hundred ninety nine million two hundred eighty nine thousand six hundred Saudi riyals only*** *which were received in full* ***pursuant to the bank cheque whose number was noted in the record****."*

139. In cross-examination Omar Saad said as follows in respect of this deed:[3360]

---

3359 {**G/6639/1**} (Arabic), {**G/6639.1/1**} (translation).

> *"Q. Do you remember entering into this transaction, Mr. Saad?*
>
> *A. I never been in Yanbu before."*

140. AHAB purchased land in Yanbu by deed dated 11 May 2008.[3361] The vendor appeared before Abdul Majeed Bin Saleh Al-Qurashi, Notary of Yanbu. In the deed, the vendor, Basem Bin Abdul Rahman Bin Mohammed Hussein Al - Jame, stated:

> *"I own and have at my disposal*
>
> *Parcels No. (30) through (45) of Approved Plan No. 11/1, which are located on Yanbu Al-Bahr Street, Bordered*

| | |
|---|---|
| *on the north by* ***a parcel No. 28 and 28*** | *Length: two hundred ninety six metres 296m* |
| *on the south* ***by a street that is 50 m wide*** | *Length: two hundred ninety six metres 296m* |
| *on the east by* ***a street that is 80 m wide*** | *Length: four hundred seventy metres 470m* |
| *on the west be* ***a street that is 50m*** *wide* | *Length: four hundred seventy metres 470m* |

> *Total area (139,120 m2) one hundred thirty nine thousand one hundred twenty square metres*
>
> *Pursuant to the deed issued by* ***Yanbu Court*** *No.* ***35/2*** *dated* ***11/11/1410 A.H.*** *I sold* ***them to the buyer/Ahmad Hamad Algosaibi & Brothers Co. Finance, Development and Investment, which holds Commercial Register No. 2051030083, dated 15/08/1425 A.H. [29/09/2004 A.D.], and is represented by Omar Saad Salmeen Hamdo, who holds a power of attorney that was noted in the record****.*
>
> *For the purchase price of (264,328,000) two hundred sixty four million three hundred twenty eight thousand Saudi riyals only which were received in full pursuant to the bank cheque whose number was noted in the record."*

---

3360 Omar Saad xx: {**Day91/78:11-12**}.

3361 {**G/6640**} (Arabic), {**G/6640.1/1**} (translation).

141. In cross-examination Omar Saad said he did not remember this deed.[3362]

**The 21 March 2016 and 27 March 2016 Visits to the Notaries**

142. On 21 March 2016, the GTJOLs' Saudi Arabian counsel and AHAB's Saudi Arabian counsel visited the First Notary Public in Yanbu and submitted to the notary a request for verification of the authenticity and ownership of the deeds which relate to the purchase of two of the plots forming part of Property 2. The Joint Report of Saudi Arabian Counsel of that visit states as follows:[3363]

> "[...] *we submitted the request to the Registry. Approximately 15-20 minutes after submission, we were called back by the clerk at the Registry. He advised us that the Deeds' numbers were incorrect and not in the correct format. He informed us that the first two numbers of any deed were unique to each notary. He noted that each of the Deeds were signed by different notaries, however, both had the same two numbers and therefore there appeared to be an error in the Deeds. When asked by* [AHAB's Saudi counsel] *about whether they had searched for the Deeds in the register by their numbers and by their dates, the clerk advised that they had and did not find them. The clerk advised that we return with copies of the back of the Deeds where there would usually be recorded the volume and page of the register in which they were registered. On the basis of the copies provided, there was nothing else that the Registry could do to locate the Deeds."*

143. On 27 March 2016, the GTJOLs' Saudi Arabian counsel and AHAB's Saudi Arabian counsel visited the First Notary Public in Riyadh and submitted to the notary a request for verification of the authenticity and ownership of the deeds which relate to the purchase of Property 1, Property 3 and two of the plots forming part of Property 2. The Joint Report of that visit is set out in paragraph 130 above.

---

3362 Omar Saad xx: {**Day92/3:10-11**}.

3363 {**Q/659/3**}.

144. AHAB sold Property 2 in October 2008 for SAR 1,439,900,400.[3364]

**Property 3**

145. Property 3 was two plots of land located in the districts of Al-Murabaa and Ajza, Riyadh ("Property 3"). AHAB purchased Property 3 on behalf of SICL in August and September 2008 for SAR 1,464,279,000 (US$390,479,200). The difference between the sale price of Property 1 (US$346,800,000) and the purchase price of Property 3 (US$390,479,200) was recorded in Account 9.

146. AHAB bought property in the Al-Murabaa District of Riyadh by deed dated 30 August 2008.[3365] The vendor appeared before Mohammed Bin Fahd Al Ismail, First Notary in Riyadh. By the deed the vendor, Abdullah Bin Mohammed Munawer Al-Harbi, stated:

> *"I own and have at my disposal Parcels No. 3 through 15 of Plan No. 121/2, which are located in the Al-Murabaa District of Riyadh, are bordered on the north by a street that is 20 metres wide and two hundred ninety seven metres long 297 m long, on the south by a street that is 30 m wide and two hundred ninety seven metres 297 m long, on the east by a street that is 20 metres wide and one hundred eighty eight metres 188 m long, and on the west by a street that is 30 metres wide and one eighty eight 188 m long, and have a total area of: fifty five thousand eight hundred thirty six square metres, 55,836 m2, pursuant to the deed issued by this department under no. 155/4/2 on 12/06/1415 A.H. [16/11/1994 A.D]. I sold these parcels to Ahmad Hamad Algosaibi & Brothers Co. Finance, Development and Investment, which holds Commercial Register No. 2051030083, dated 15/08/1425 A.H [29/09/2004 A.D], and is represented by Omar Saad Salmeen Hamdo, who holds a power of attorney that was noted in the record. The parcels were sold for a sum of (809,622,000) eight hundred nine million six hundred twenty two thousand Saudi riyals, which was paid via a bank cheque whose number was noted in the record..."*

147. In cross-examination Omar Saad said he did not remember this deed.[3366]

---

3364 {**G/7097/1**}.

3365 {**G/6974/1**} (Arabic), {**G/7042/1**} (translation).

3366 Omar Saad xx: {**Day92/8:6-8**}.

148. AHAB purchased property in the Ajza District of Riyadh by deed dated 8 September 2008.[3367] The vendor appeared before Mohammed Bin Fahd Al Ismail, First Notary in Riyadh. By the deed the vendor, Qasem Bin Ahmed Bin Ali Al-Tawil, stated:

> *"I own and have at my disposal Parcels No. 5, 6 and 7 of Plan No. 119/3, which are located in the Ajza District of Riyadh, are bordered on the **north** by a street that is 30 metres wide and two hundred ninety metres long 290m long, on the **south** by a street that is 20 m wide and two hundred ninety metres 290m long, on the **east** by a street that is 30 metres wide and one hundred seventy five metres 175m long, and on the **west** by a street that is 20 metres wide and one hundred seventy six metres 175m, have a total **area** of: fifty thousand seven hundred fifty six square metres, 50,750 m2, pursuant to the deed issued by this department under no. 149/3/2 on 09/09/1416 A.H. [30/01/1996 A.D]. I sold these parcels to Ahmad Hamad Algosaibi & Brothers Co. Finance, Development and Investment, which holds Commercial Register No. 2051030083, dated 15/08/1425 A.H [29/09/2004 A.D], and is represented by Omar Saad Salmeen Hamdo, who holds a power of attorney that was noted in the record. The parcels were sold for a sum of (654,675,000) six hundred fifty four million six hundred seventy five thousand Saudi riyals, which was paid via a bank cheque whose number was noted in the record..."*

149. In cross-examination Omar Saad said he did not remember this deed.[3368]

150. Property 3 is the subject matter of the Land Counterclaim. If the land in Al-Murabaa and Ajza, Riyadh exists, it is held by AHAB on trust for SICL. AHAB should either transfer the land to SICL[3369] or pay its value.

**<u>Visit to the Notary on 27 March 2016</u>**

151. As referred to in paragraph 130 above, on 27 March 2016, the GTJOLs' Saudi Arabian counsel and AHAB's Saudi Arabian counsel visited the First Notary Public in Riyadh and submitted to the notary a request for verification of the authenticity and ownership of the

---

3367 {**G/6994/1**} (Arabic), {**G/7042/2**} (translation).

3368 Omar Saad xx: {**Day92/6:16-17**}.

3369 Or an entity that can hold the land for SICL.

Deeds which relate to the purchase of Property 3. The Joint Report of that visit is set out in paragraph 130 above.

**Property 4**

152. Property 4 consists of two plots of land located on the Al-Azizia Corniche and Azizia Road – Shati' Nisf Al-Qamar ("Property 4"). AHAB purchased Property 4 for SICL in October 2008 for SAR 1,474,218,750 (US$393,125,000).

153. AHAB purchased land in Al-Azizia Cornish by a deed dated 13 October 2008.[3370] The vendor appeared before Saad Bin Abdul Rahman Al-Saqr, Notary of Dammam. By the deed, the vendor, Hussein Bin Mohammed Ghallad Al Ghanem, stated: [3371]

> *"I own and have at my disposal Parcels No. 21, 23, 25, 27, and 29 of Approved Plan No. 30/2, which are located on the Al-Azizia Corniche.*
>
> *They have the following borders and dimensions:*

| | |
|---|---|
| *North: A street that is 30 metres wide* | *Length: (250) two hundred fifty metres* |
| *South: Parcels 22,24,26 and 28* | *Length: (250) two hundred fifty metres* |
| *East: A street that is 50 metres wide* | *Length: (680) six hundred eighty metres* |
| *West: A street that is 30 metres wide* | *Length (680) six hundred eighty metres* |

> *Total area is: (170,000) one hundred seventy thousand square metres, and its relinquishment is based upon the deed issued by this department under no.99 volume 9/1, dated 10/09/1412 A.H [15/03/1992 A.D.]*
>
> *Ownership thereof was transferred to: Ahmad Hamad Algosaibi & Brothers Co. Finance, Development and Investment, which holds*

3370 {**G/7075/1**} (Arabic), {**G/7158/1**} (translation).

3371 {**G/7075/1**} (Arabic), {**G/7158/1**} (translation).

> *Commercial Register No. 2051030083, dated 15/08/1425 A.H. [29/09/2004 A.D.], and is represented by Omar Saad Salmeen Hamdo, who holds a power of attorney that was noted in the record, for a sale price of 816,000,000 eight hundred sixteen million Saudi riyals…"*

154. In cross-examination Omar Saad said that he had seen this deed before and after speaking to Saud about it he went to visit the notary (emphasis added):[3372]

> *"Q. It records that the ownership of that land was transferred to Ahmad Hamad Algosaibi & Brothers Co, Finance, Development and Investment, represented by you, Mr. Saad, "who holds a power of attorney that was noted in the record". Do you see that?*
>
> *A. I can see it, but **it wasn't me**.*
>
> *Q. The sale price is recorded as SAR 816 million. Do you see that?*
>
> *A. I didn't see this deed before. I didn't sign it.*
>
> *Q. Of course you didn't sign it, Mr. Saad. Do you remember this deed, Mr. Saad?*
>
> *A. (Arabic spoken)*
>
> *CHIEF JUSTICE:*
> *Pause for a moment. Mr. Interpreter, please stop for a moment. Let us hear what Mr. Saad had to say.*
>
> *A. This deed exactly was brought by Saud Algosaibi from Bahrain. Saud asked me about this deed. I said I don't know anything about it, so **I went to the notary of Dammam. I asked him, I wanted to see my signature on this deed because I have to sign in the ledger he has. But they told me that this notary already left. This deed exactly. I have already seen it before**.*
>
> *MR. PHILLIPS:*
> *You have seen it before. Thank you.*
>
> *CHIEF JUSTICE:*
> *Q. He said the notary had already left. What does that mean, "They told me that this notary already left"?*

---

3372 Omar Saad xx: {**Day92/9:7**}-{**Day92/10:10**}.

> *A.* ***It means that he's not working there anymore****; he left the court. I asked them to review my signature in the record, but they said, "We cannot do this.""*

On this occasion the notary did not say that the deed was a forgery, instead that the notary had left, which is why Omar Saad could not inspect his signature in the notary's ledger.

155. AHAB purchased land on Al-Aziza Road – Shati' Nisf Al Qamar by deed dated 21 October 2008:[3373]

> *"The entirety of Parcels No. (37 through 45) of Approved Plan No. 144/1, which are located on Al - Azizia Road - Shati' Nisf Al-Qamar, and whose borders are as follows:*

| | |
|---|---|
| *North: A street that is 35 metres wide* | *Length: (885) eight hundred eighty five metres* |
| *South: A street that is 30 metres wide* | *Length: (885) eight hundred eighty five metres* |
| *East: A street that is 30 metres wide* | *Length: (875) eight hundred seventy five metres* |
| *West: A street that is 35 metres wide* | *Length: (875) eight hundred seventy five metres* |

> *The total area is: (774,375) seven hundred seventy four thousand three hundred seventy five square metres only,*
>
> *And its relinquishment is based upon the deed issued by this department under no. 32/2, volume 320/2, dated 17/01/1410 A.H. [19/08/1989 A.D]*
>
> *Ownership thereof was transferred to: Ahmad Hamad Algosaibi & Brothers Co. Finance, Development and Investment, which holds Commercial Register No. 2051030083, dated 15/08/1425 A.H. [29/09/2004 A.D.], and is represented by Omar Saad Salmeen Hamdo, who holds the a power of attorney that was noted in the record, for a sale price of 658,218,750 six hundred fifty eight million two hundred eighteen thousand seven hundred fifty Saudi riyals…"*

156. In cross-examination Omar Saad said as follows in respect of this deed:[3374]

---

3373 **{G/7094/1}** (Arabic), {**G/7158/2}** (translation).

> *"Q. We see this relates to land in a similar area to the previous deed, also at the first notary public department in Dammam. Do you remember this deed?*
>
> *A. No. I don't know anything about this deed."*

**The 16 March 2016 Visit to the Notary**

157. On 16 March 2016, the GTJOLs' Saudi Arabian counsel and AHAB's Saudi Arabian counsel visited the First Notary Public in Dammam and submitted to the notary a request for verification of the authenticity and ownership of the deeds relating to the purchase of Property 4. The Joint Report by Saudi Arabian Counsel of that visit states as follows (emphasis added):[3375]

> "[...] *We entered into the office of the Assistant Head to the Dammam Notary and gave his clerk our request with copies of the Deeds attached.* [...] *The clerk took the documents and spoke with the Assistant Head before leaving the office for nearly 20 minutes.*
> *The clerk then returned and spoke with the Assistant Head again before asking us to follow him into another office. He then handed back the documents and said we should leave immediately to "save ourselves". He explained that the Assistant Head instructed him to write a report and attach the copies of the Deeds to have the Bureau of Investigation and Public Prosecution start an investigation. The clerk said to us more than once "you know what I mean,"* ***which we both understood this to mean the notary believes the title deeds to be forgeries*** [...]"

158. Property 4 is the subject matter of the Land Counterclaim. If the land in Al-Azizia Corniche and Azizia Road – Shati' Nisf Al-Qamar exists, it is held by AHAB on trust for SICL. AHAB should either transfer the land to SICL[3376] or pay its value.

---

3374 Omar Saad xx: {**Day92/13:7-10**}.

3375 {**Q/669/2**}.

3376 Or to an entity to hold it for SICL.

**Documents and Accounting Entries**

159. There are documents that detail the purchase and sale of Properties 1 and 2 and that detail the purchase of Properties 3 and 4.[3377] SICL's accounting ledgers and audited accounts reflect what is stated in the supporting documents relating to Properties 1, 2, 3 and 4.[3378]

160. The value of the properties as recorded in SICL's books and records as at 5 August 2009 is US$783,604,200.[3379]

161. It is agreed that Account 9 in SICL's trial balance at 5 August 2009 records a balance of US$52,830,760 due from SICL to the Money Exchange, related to a number of alleged properties said to be held on trust by the Money Exchange/AHAB which are the subject of the counterclaim.[3380] The US$52,830,760 is the difference between the sale price of Property 1 and the purchase price of Property 3 and the difference between the sale price of Property 2 and the purchase price of Property 4.

162. Mr. Hatton confirmed during his cross-examination that the records relating to the purchase and sale of properties 1, 2, 3 and 4 are agreed (emphasis added):[3381]

> *"Q. It is agreed that documents exist that purport to detail the sale and purchase of properties 1, 2, 3 and 4, and a list of those documents is included in appendix 4 of the joint statement. That's right, isn't it?*
>
> *A. That is correct, yes.*

---

3377 Andrews/Hatton Joint Statement, paragraph 107 {**I/22/20**}. A list of these documents has been included in Appendix 4, paragraph 4.2 to 4.7 of the Andrews/Hatton Joint Statement.

3378 Andrews/Hatton Joint Statement, paragraph 108 {**I/22/20**}.

3379 Andrews/Hatton Joint Statement, paragraph 109 {**I/22/20**}.

3380 Andrews/Hatton Joint Statement, paragraph 90 {**I/22/15**}.

3381 Hatton xx: {**Day94/117:14**}-{**Day94/118:10**}.

*Q.* *It is agreed that as detailed in NDA1, SICL's accounting ledgers and audited accounts reflect what is stated in the supporting documents relating to properties 1, 2, 3 and 4?*

*A.* *Yes, that is agreed.*

*Q.* *It is agreed that the value of the properties recorded in SICL's books and records as at 5 August 2009 is US$783,604,200, and we see that in paragraph 109 of the statement of agreement.*

*CHIEF JUSTICE:*

*Q.* *That is over the page, is it?*

*MR. PHILLIPS:*

*I'm so sorry, my Lord* ***{I/22/20}****.*

*A.* *Yes, that is agreed.*

*Q.* *There is agreement that the property transactions were reflected by the entries in the ledgers. That's right?*

*A.* *Yes,* ***there is simply agreement on what the accounts state. I mean, it would be hard to imagine there could be disagreement****."*

**<u>Reversal of the Entries in the Accounts</u>**

163. The Court may conclude that it cannot be satisfied that the properties, or some of them, existed. It is submitted that on the balance of probabilities Property 0 existed and the purchase and sale of Property 0 described above happened. However, in respect of Properties 1, 2, 3 and 4 there is evidence that the deeds may have been forged. On the other hand, Omar Saad's involvement is consistent with his involvement in other AHAB property purchases.

164. It is common ground that, if the properties did not exist, and the transactions in relation to them were not genuine, the credits and debits in SICL's ledgers and the entries in the Money Exchange's ledgers, would need to be reversed. The Money Exchange would not be entitled to the credit of US$52,830,760 on Account 9, but the account (and Accounts 3

and 4[3382]) would need to be restated. Mr. Hatton accepted this during his cross-examination (emphasis added):[3383]

> *"Q. If the properties were not genuine, then the entries in those ledgers should not have been made, should they?*
>
> *A. I would agree with that, yes, my Lord.*
>
> *CHIEF JUSTICE:*
> *Q. Properties or the transactions?*
>
> *MR. PHILLIPS:*
> *A. The properties, my Lord. If the properties did not exist. It would be the transactions as well, because they would be transactions in relation to properties that didn't exist, my Lord.*
>
> *CHIEF JUSTICE:*
> *Right.*
>
> *MR. PHILLIPS:*
> *I will rephrase the question so there is no misunderstanding.*
> ***If the properties were not genuine, if the transactions were not genuine, then the entries in those ledgers should not have been made**.*
>
> *A. **I would agree with that, yes**.*
>
> *Q. And they should be reversed?*
>
> *A. In SICL's books, yes, I agree, my Lord.*
>
> *Q. **If the properties did not exist, the Money Exchange would not be entitled to credit for the transfers of value recorded by SICL for nonexistent properties**; That's right, isn't it?*
>
> *A. **That is correct, yes**."*

165. Mr. Andrews and Mr. Hatton agree that the value of Property 3 and Property 4 as recorded in SICL's books is US$783,604,200.[3384] If the aggregate value of the entries

---

3382 This is explained in paragraphs 165 to 166 below.

3383 Hatton xx: {**Day94/118:11**}-{**Day94/119:8**}.

related to the land purchases recorded in SICL's books as liabilities in favour of the Money Exchange are deducted from this amount, the net value of the Land Counterclaim would be US$424,128,672. This is because the aggregate value of the liabilities recorded in SICL's books in favour of the Money Exchange, in respect of these transactions, amounts to US$359,475,528, which is broken down as follows:

(1) US$11,933,333.33, reflecting the difference between the purchase price of Property 0 and the purchase price of Property 1, which was recorded in Account 3/Account C as being due to the Money Exchange;[3385]

(2) US$294,711,434.67, reflecting the purchase price of Property 2, which was recorded in Account 4 as a balance due to the Money Exchange;[3386] and

(3) US$52,830,760 which, as explained above, represents the sum of the difference between the sale price of Property 1 and the purchase price of Property 3 and the difference between the sale price of Property 2 and the purchase price of Property 4 and was recorded as a balance due to the Money Exchange in Account 9.[3387]

166. Accordingly, if Property 1, Property 2, Property 3 and Property 4 do not exist, SICL is entitled to the repayment of the US$200m paid by SICL to the Money Exchange on 18 and 19 September 2007 for the purchase of Property 1. In addition, SICL would be entitled to reverse the above entries in its books. The net result of the book entry reversals if Property 1, Property 2, Property 3 and Property 4 do not exist is an increase in the net

---

3384 Andrews/Hatton Joint Statement, paragraph 109 {**I/22/20**}.

3385 Andrews 1W, paragraph 250 {**I/5/114**}.

3386 Andrews 1W, paragraph 114(a) {**I/5/46**}.

3387 Andrews 1W, paragraph 132 {**I/5/64**}; Andrews/Hatton Joint Statement, paragraph 90 {**I/22/15**}.

cash balance due to SICL of US$559,475,528. The separate claim for the value of the land would be disregarded.

167. To the extent that Property 0 and the above properties do not exist, the relevant book entries should be reversed and the net result is an increase in the net cash balance due to SICL of US$359,475,528. The separate claim for the value of the land would be disregarded.

## V.6. Conclusion on the SICL Counterclaim: Restatement of the Accounts

168. At Appendix V.1 **{E1/35.1/1}** is a schedule that shows the amounts due on each of the nine accounts together with the adjustments that fall to be made. The first column shows the sums due pursuant to Accounts 1 to 9 adjusted to remove double-counting.[3388] The second column shows the adjustments that might be made should the Court conclude that the FX transactions recorded in Accounts 3 and 4 are not genuine transactions. The third column gives the revised balance following that adjustment. The fourth column gives the adjustments arising should the Court conclude that Property 0 existed but Properties 1, 2, 3 and 4 did not exist. The fifth column shows the revised balance following that adjustment. The sixth column gives the adjustments required should the Court find no properties exist. The final column gives the revised balance following those adjustments.

169. If the Court finds that the following matters were not genuine, then the following adjustments fall to be made:

(1) If the Court concludes that the FX transactions recorded in Accounts 3 and 4 are not genuine transactions, then US$95,859,297 should be deducted from Account

[3388] The double-counting has been deducted from Account 4 balance rather than Account 3 balance because the Money Exchange recorded these transactions, subject to reconciled timing differences, in its Account C and it is appropriate to retain these transactions in Account 3.

4 and US$278,883,000 should be deducted from Account 3. The net balance due to SICL, which is US$516,992,660 before this adjustment, falls to US$142,250,363.

(2) If Property 0 existed but none of the other properties existed then the net cash balance due to SICL increases by US$559,475,528 increasing the balance due to SICL to US$701,725,891.

(3) If none of the properties existed, including Property 0, then the net cash balance due to SICL increases by US$359,475,528, increasing the balance due to SICL to US$501,725,891.

170. If the Court finds that all the FX transactions were not genuine, the sum due from the Money Exchange to SICL on its running account and under the SICL Promissory note is US$701,725,891 (if Property 0 existed) and US$501,725,891 (if it did not).

**Following in quotation are AHAB's submissions in response to the GTJOLS' land trust counterclaim and which I accept:**

*"Land held on trust for SICL*

*10.21 SICL pleads four alternative claims in relation to its land transaction with the Money Exchange.[3389] It claims:*

*(1) the transfer to it of Property 3 and Property 4 ("the Properties"), which, it says, were purchased by AHAB for SICL and are held by AHAB on trust for SICL;[3390]*

*(2) alternatively, payment of USD 783,604,200 as the value of the Properties;[3391]*

---

[3389] *{**A1/9/139-141**}.*

[3390] *D&CC para 300 {**A1/9/139**}.*

[3391] *D&CC para 301 {**A1/9/139**}.*

*(3) alternatively, a reversal of accounting entries in its books and records relating to the Properties;*[3392]

*(4) alternatively, restitution of money paid by SICL to AHAB for the purchase the Properties.*[3393]

*10.22 There is a short answer to the first two claims: AHAB never purchased the Properties on behalf of SICL. Indeed, the Properties did not exist. There is therefore no basis for SICL's claim to recover the Properties or their value.*

*10.23 SICL relies on copies of notarial deeds recording the purchase of the Properties by AHAB and on declarations of trust purportedly executed by AHAB. Those documents were produced by SICL; no copies were found in the AHAB or Money Exchange files.*

*10.24 The deeds are forgeries: that is what the parties' lawyers were told by officials when they sought to verify the deeds*[3394] *and there is no reason to doubt the official position. There is no evidence of the Money Exchange having paid any money to the purported vendors; and Mr. Saad, who according to the deeds purportedly represented AHAB, said that he had no knowledge of the purchases.*[3395]

*10.25 The declarations of trust are also forgeries: the copies bear purported Suleiman signatures but the signatures are matched.*[3396]

*10.26 SICL alleges that the Properties were purchased with the proceeds of earlier transactions involving Property 0, Property 1 and Property 2. As set out in Section 5 paragraphs 5.59 to 5.83 {**D/5/19-27**}, those transactions were also fictitious or concocted.*

*10.27 On the assumption that the Properties did not exist, SICL claims a reversal of accounting entries; that issue arises in connection with the Cash counterclaim and is discussed below.*

---

[3392] *D&CC para 301A {**A1/9/139-140**}.*

[3393] *D&CC para 301B {**A1/9/140-141**}.*

[3394] *{**Q/659**}.*

[3395] *{**Day92/5:22**}-{**Day92/13:10**}.*

[3396] *{**G/6653/1**}; Item No 594 on Scott Schedule dated 4 April 2017 {**A2/23.1/22**}.*
*{**G/6993/1**}; Item No 712 on Scott Schedule dated 4 April 2017 {**A2/23.1/26**}.*
*{**G/7109/1**}; Item No 736 on Scott Schedule dated 4 April 2017 {**A2/23.1/27**}.*

*10.28 SICL alternatively claims restitution of the money that it paid to AHAB in connection with the Properties. However, there is nothing to restore. There were only two movements of cash in relation to the purported transactions.*[3397] *USD 200 million was transferred by AHAB to SICL on 17/18 September 2007, purportedly as the price of Property 0, and the same amount was transferred back from SICL to AHAB on 18/19 September, purportedly to fund the purchase of Property 1. The net cash flow in connection with the Properties was zero.*

*10.29 It might be said that, even though there was no net cash flow, AHAB has in some way been enriched by the fact that it acquired Property 0. However, Property 0 has no real value – it is no more than a device used by SICL to manipulate its financial statements – and, moreover, it was never validly transferred to AHAB, the bill of sale being a forgery. At any rate, AHAB has no interest and wants no interest in Property 0; it is fully prepared to transfer whatever rights it may have in Property 0 if that is what the GT Liquidators want."*

**Following Are The GTJOLS' Submissions on Singularis' Counterclaim**

171. Singularis' counterclaim arises under the promissory note signed in its favour by Suleiman ("Singularis Promissory Note"). SICL claims payment of the sum of US$4,495,006,252.54 under a promissory note executed by AHAB in favour of Singularis dated 28 January 2009.[3398] There is no evidence Suleiman's signature was forged.[3399] Saud said that he could not recollect being present when Suleiman signed the Singularis Promissory Note.[3400] Yousef was not available for cross-examination on the questions: where the Singularis Promissory Note was signed? When it was signed? And who was present when it was signed?

---

*3397 Andrews-Hatton Joint Statement /105.7 and 105.10 {**I/22/19**}.*

3398 {**G/7448/1**}.

3399 See paragraph 23 above.

3400 Saud xx: {**Day53/34:5-10**}.

172. The Singularis Promissory Note provides that AHAB will pay on demand. A demand was served on 18 April 2011.[3401]

173. The GTJOLs have presented the available evidence to the Court. According to Singularis' ledger, Singularis made two deposits with the Money Exchange, a deposit of US$1bn with an opening date of 25 September 2007[3402] and a deposit of US$3.3bn with a value date of 22 October 2007.[3403] In Singularis' books, the treasury deposits accrued interest were rolled over periodically until 2009 at which time the deposits were respectively valued at US$1,048,490,027.76 on 27 July 2009 and US$3,459,226,128.47 on 26 May 2009.[3404]

174. Mr. Andrews and Mr. Hatton agree that the Singularis deposits are recorded in Singularis' ledgers as a receivable due from the Money Exchange.[3405] Mr. Andrews and Mr. Hatton agree that the total principal plus estimated interest of the treasury deposits as at 28 January 2009 is US$4,490,000,571.78, similar to the face value of the Singularis Promissory Note of US$4,495,006,252.54; a difference of US$5,005,680.76 (or approximately 0.11 percent)[3406] of the face value of the note.[3407]In the Joint Agreed Statement of Mr. Andrews and Mr. Hatton it states:[3408]

> *"26 Andrews and Hatton agree the existence of treasury confirmations and other documents in relation to two purported SHL deposits consisting of principal amounts of US$1 billion and US$3.3 billion as detailed in NDA1,*

---

3401 Andrews 1W, paragraphs 54 to 55 {**I/5/22-23**}; Tab F50 {**M/76/1**}.

3402 Andrews 1W, paragraph 45(a) {**I/5/12**}: Tab F12 {**G/6058/1**}.

3403 Andrews 1W, paragraph 45(c) {**I/5/13**}; Tab F16 {**G/6106/1**}.

3404 Andrews 1W, paragraphs 44 to 53 {**I/5/11-22**}.

3405 Andrews/Hatton Joint Statement, paragraph 25 {**I/22/6**}.

3406 Andrews 1W, paragraph 58 {**I/5/23**}.

3407 Andrews/Hatton Joint Statement, paragraph 34 {**I/22/7-8**}.

3408 Andrews/Hatton Joint Statement, paragraph 26 {**I/22/6-7**}. Andrews/Hatton Joint Statement, paragraph 27 {**I/22/7**}.

*paragraphs 42, 44 and 45 (a to ff) and as set out in Appendix 1, paragraph 1.9.*

*27 Andrews and Hatton agree that these documents indicated a pattern of rolling over of the SHL deposits (the "Smaller" and the "Larger" deposits) as evidenced in NDA1, paragraph 49, Table 2 and Table 3 and in HH1, paragraph 12.38 apart from absence of an initial roll of the alleged US$1 billion detailed in paragraph 28".*

175. Promissory notes are widely used in Saudi Arabia. It is noticeable that there are promissory notes in support of most of the facilities given by the banks. A number of promissory notes signed by Suleiman do not have matched signatures on them.[3409] Promissory notes give the creditor an efficient way of enforcing his debt. This was confirmed by Saud in cross examination:

(1) Day 43 (emphasis added):[3410]

*"Q. You know from your own experience, don't you, that the giving of promissory notes by customers was very important to banks in Saudi Arabia?*

*A. From my experience later or then or -- or at the time period? **Yes, I know from, you know, getting involved with SAMBA, that promissory notes are important, yes**.*

*Q. They are very important and they need to be taken seriously and responsibly by customers of banks. Do you agree with that?*

*A. Yes."*

(2) Day 53 (emphasis added):[3411]

*"Q. I now want to turn to another topic, which I hope we can deal with fairly quickly, which is the topic of promissory notes.*

---

3409 {**G/2523/1**}; {**G/2572/1**}; {**G/3000/1**}; {**G/3757/1**}; {**G/4543/1**} (Arabic), {**G/4543.0.1/1**} (translation); {**G/4888/1**} (Arabic), {**G/4888.1/1**} (translation); {**G/5048/1**} (Arabic), {**G/5048.1/1**} (translation); {**G/5404/1**} (Arabic); {**G/5404.0.1/1**}.

3410 Saud xx: {**Day43/55:2-11**}.

3411 Saud xx: {**Day53/32:11-20**}.

*A. Okay.*

*Q. Do you accept that over very many years, AHAB partners -- your father, Uncle Suleiman and others -- signed many, many promissory notes in favour of banks and others?*

*A. **In the course of doing business, they may have done so, yes, as any company would, you know, in Saudi Arabia."***

(3) Day 53, in relation to promissory notes signed in favour of SABB and SAMBA, Saud said it looked like Suleiman's signature and his signature, but he had no recollection of the documents:[3412]

*"Q. Then at {**G/5404/1**}, is that a promissory note – this one is in Arabic -- for SAR 925,000 in favour of SABB, dated 30 August 2006?*

*A. Yes. What is the question?*

*Q. Do you recognise your Uncle Suleiman's signature on that promissory note?*

*A. Yes, I see what looks like my Uncle Suleiman's signature, yes.*

*Q. Do you have any recollection of being present when your Uncle Suleiman signed this promissory note?*

*A. No.*

*Q. At {**G/5613/1**} we have a promissory note dated 23 January 2007 for SAR 1,488,880,000 signed by your Uncle Suleiman. Do you see that?*

*A. Yes, I see that, yes.*

*Q. Do you have any recollection of being present when your Uncle Suleiman signed that promissory note?*

*A. No, I don't have any recollection.*

---

[3412] Saud xx: {**Day53/35:20**}-{**Day53/37:1**}.

*Q. At {**G/7497/1**} is a promissory note signed by you in favour of SAMBA, dated 17 February 2009, this time for SAR 1,814,215,000. Do you see that?*

*A. Yes, I see, yes.*

*Q. Then at {**G/7569/1**} –*

*CHIEF JUSTICE:*

*Q. I take it you say this looks like your signature as well?*

*A. No, I said -- you know, I know I signed some of the -- some of the SAMBA -- SAMBA papers. So this is why I -- I didn't dispute the signature.*

*CHIEF JUSTICE:*

*You accept this signature?*

*A. I -- I don't recall this document specific. But yes, I -- I got engaged with the SAMBA at the time, you know, at one point."*

176. Saud's evidence in relation to the Singularis Promissory Note was that the signature looks like Suleiman's signature and that he does not remember being present when it was signed (emphasis added):[3413]

*"Let's deal with the third one, at {**G/7448/1**}. This is a promissory note dated 28 January 2009.*

*A. Okay.*

*Q. It appears to bear Suleiman's signature. Do you see that?*

*A. Yes, **I see what looks like my uncle's signature, yes**.*

*Q. Have you any recollection of being present on 28 January 2009 when this promissory note was signed?*

*A. **I have no recollection of this document nor I was present** nor informed about its content from my uncle or anyone else, nor anyone telling us that we took money of this Singularis, sir."*

---

3413 Saud xx: {**Day53/41:20**}-{**Day53/42:7**}.

177. Notwithstanding that there is a promissory note that is signed by Suleiman, and that not only is there no evidence of forgery but the signature is recognised by Saud as looking like Suleiman's, the GTDs are faced with the following difficulties:

(1) The treasury deposits do not appear in the ledgers of the Money Exchange:[3414]

> *"29. Andrews and Hatton agree that the SHL deposits are recorded in SHL's ledgers as a receivable due from the Money Exchange and that no corresponding payable is recorded as due to SHL in the ledgers of the Money Exchange and that there is no balance included in the Money Exchange's trial balance for the quantum of the SHL deposits".*

(2) The GTJOLs have been unable to find payments and receipts in the bank statements of the Money Exchange:[3415]

> *"30. Andrews and Hatton agree that they have not seen any payments and receipts or any other equivalent transfers of value, which reconcile to these SHL deposits in the bank statements of the Money Exchange".*

Mr. Andrews agreed that the documents suggest the deposits were not made:[3416]

*"Q. I'm asking you this: I'm saying if you take into account the Bank of America statements and the Money Exchange ledgers as well, then the documents suggest that the deposits were not made?*

*A. That is correct.*

*Q. Then they were therefore fictitious?*

*A. Well, that is correct, yes."*

178. The GTJOLs do not invite the Court to find that the deposits were made. However, on the balance of the evidence, there was a commercial relationship between Singularis and the

---

3414 Andrews/Hatton Joint Statement, paragraph 29 {**I/22/7**}.

3415 Andrews/Hatton Joint Statement, paragraph 30 {**I/22/7**}.

3416 Andrews xx: {**Day97/67:8-14**}.

Money Exchange with payments running between them, the Singularis Promissory Note was issued to Singularis for value and is enforceable on its face in accordance with its terms.

**Following below in quotation are AHAB's submissions on the Singularis Promissory note which I accept:**

*"Singularis Promissory Note*

*10.5 The GT liquidators claim*[3417] *payment of either:*

*(1) USD 1,048,490,027 and USD 3,459,226,128 under two treasury deposits purportedly made by SHL with the Money Exchange; or*

*(2) USD 4,495,006,252 under a promissory note dated 28 January 2009 purportedly issued by AHAB to SHL.*

*10.6 The two claims are made in the alternative but are interlinked because the promissory note is said to have been issued in connection with the treasury deposits. That is apparent from the fact that the value of the note matches exactly the stated value of the deposits as at 28 January 2009 (allowing for accrued interest).*[3418]

*10.7 The evidence relating to the treasury deposits has already been discussed in Section 5 paragraphs 5.29 to 5.38 {**D/5/10-15**}.*[3419] *They are, without doubt, fictitious. The Money Exchange issued to SHL a sequence of treasury deal confirmations purporting to confirm the deposit by SHL of USD 1 billion and USD 3.3 billion in September/October 2007 and the rollover with interest of those deposits through to 2009; it also issued audit confirmations. However, no money was in fact deposited by SHL with the Money Exchange and there was no record of its receipt in the ledgers or bank statements of the Money Exchange. Mr. Andrews accepted those facts and accepted that the deposits were therefore fictitious.*[3420]

---

3417 *See D&CC para 281 {**A1/9/127**}.*

3418 *See calculation at {**X1/28**} and {**Day97/68:5-16**}.*

3419 Of AHAB's closing submissions which I see no need to incorporate here and so cross-reference in this regard.

3420 *{**Day97/67:14**}.*

10.8 *It follows that the GT liquidators' claim for repayment of the deposits fails because the deposits were never in fact made.*

10.9 *As to the separate but linked claim under the promissory note, AHAB's defence is that the note is not genuine and does not record a real obligation of AHAB.*

10.10 *Before examining the evidence in support of the claim, it is necessary to comment on the burden of proof. It is the GT liquidators who have pleaded the claim, they who have produced the promissory note and introduced it into evidence, and they who rely on it. The burden of proof therefore lies on them; and the Court must be satisfied on the evidence that it is more likely than not that the promissory note was executed or authorised by AHAB.*

10.11 *The GT liquidators cannot discharge their burden simply by pointing to the promissory note itself, for, as the Court of Appeal explained in* ***Tigris Industries Inc v Ghassemian***[3421] *by endorsing Norris J's approach at [15],"****simply producing a piece of paper proves nothing, unless the paper is admitted to be genuine****".*[3422]

10.12 *The promissory note is signed: it bears a handwritten signature purporting to be that of Suleiman. However, the expert forensic evidence is inconclusive as to whether or not the signature was written by Suleiman.*[3423] *So the signature in itself proves nothing.*

10.13 *The provenance of the promissory note is highly dubious. The original note was handed to the GT liquidators by a representative of Mr. Al Sanea at a meeting on 7 June 2011.*[3424] *However, despite its apparent value and importance, no copy of the note was found in the files of SHL or SFS obtained by the GT liquidators following their appointment; nor was there any reference to the note in those files. Nor was a copy or counterparty of the note, or any reference to it, found in the files of AHAB, the AHAB partners or the Money Exchange.*

---

3421 ***[2016] EWCA Civ 269 {R1/54/1}****.*

3422 ***[2016] EWCA Civ 269 {R1/54/7}****.*

3423 *Giles-Handy Joint Statement 1/3.1 {****J/9/2****}; Handy 1/51-55 {****J/2/10****}.*

3424 *Greenhaigh 1 {****C2/4****}.*

*10.14 The very first mention of the note was in Mr. Al Sanea's affirmation in these proceedings dated 2 December 2009.[3425] In the course of explaining why he had put SHL into liquidation, he said, at paragraph 64:[3426]*

*Further, the substantial $4.95 billion claim which SHL has against AHAB in respect of amounts owing by AHAB to SHL under a promissory note (MAS1 365) would not be affected at all by the mere fact of the liquidation of the SHL entity. No doubt the Liquidators of SHL will be pursuing AHAB for the amounts due under this promissory note, again, with my help and support if necessary.*

*10.15 It can be seen therefore that it was Mr. Al Sanea who was the original instigator of the claim, although he did not raise it until more than six months after the collapse of the Money Exchange.*

*10.16 There is no good reason why AHAB would have given a promissory note to SHL for USD 4.5 billion and, aside from the fictitious treasury deposits, none has been suggested by the GT liquidators. AHAB had executed promissory notes before but only to external banks in relation to their facilities and in much smaller amounts. As Mr. Andrews accepted, the SHL note was out of the ordinary.[3427]*

*10.17 Prior to obtaining the original note from Mr. Al Sanea, the GT liquidators pressed him, on a number of occasions, for an explanation of the circumstances in which it came into being, its commercial context and a full explanation of what it represented. Indeed, they made the point to him, in a letter dated 12 August 2010,[3428] that without such information it was "highly unlikely that [the liquidators] would be able to make any use of the Promissory Notes". They were right to make that point.*

*10.18 We do not know whether Mr. Al Sanea ever gave such an explanation or, if he did, what it was. The GT liquidators have asserted privilege over such communications with Mr. Al Sanea on the ground that they were made subject to common interest. See the discussion between the Court and counsel at*

---

[3425] ***{L2/5}**.*

[3426] ***{L2/5/32}**.*

[3427] ***{Day97/10:17}**-**{Day97/11:2}**.*

[3428] ***{P/146/157-159}**.*

*{**Day88/85:15**} to {**Day88/96:25**}. The Court must therefore proceed on the basis that there is no explanation in evidence.*

*10.19 Finally, Saud's evidence was that he knew nothing about the note or about AHAB taking money from Singularis: "**I have no recollection of this document nor I was present nor informed about its content from my uncle or anyone else, nor anyone telling us that we took money of this Singularis, sir.**"*[3429]

*10.20 Taking all of those matters together – the inconclusive handwriting evidence, the dubious provenance, the fiction of the treasury deposits and the lack of any other rationale for the note, and Saud's evidence – the Court cannot be satisfied that the SHL promissory note is genuine".*

179. AHAB here goes on to submit that I should find that the Singularis (and SICL) Promissory notes were forged "*by Al Sanea as part of his fraud on AHAB*" and (at AHAB's **{D/10/13}** [10.58]) that "*The specious nature of the counterclaim is further compelling evidence of Mr. Al Sanea's fraud upon AHAB*". And further (at [10.60]) that "*Mr. Al Sanea's attempts to defraud AHAB continue, long past the initial discovery of Mr. Al Sanea's fraudulent enterprise in May 2009*".

180. For the sake of clarity, it should be understood that while I have rejected and dismissed the counterclaim and in doing so accept that Al Sanea as its partial instigator would seek to defraud AHAB, this conclusion does not suggest an acceptance on my part that his running of the Money Exchange prior to its collapse in May 2009 involved a fraud by him upon AHAB. That issue is separately and from my point of view conclusively dealt with above in this Judgment in which is examined the overwhelming evidence of the AHAB's Partners' knowledge and authorisation of his activities at the Money Exchange (and to a lesser but no less significant extent, at the other Financial Businesses).

---

3429 *{**Day53/42:4-7**}. The whole exchange between Saud and counsel is at {**Day53/41:3**}-{**Day53/42:20**}.*

181. The counterclaims are refused and dismissed.

182. Costs reserved, to be determined at a hearing to be listed on a date to be fixed together with any other consequential matters arising out of the Judgment.

Hon. Anthony Smellie
Chief Justice

May 10, 2018 – Judgment released in draft for sight of the parties and their advisers only.

May 31, 2018 – Judgment released in final form.