# Baden v Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France SA
# [1993] 1 WLR 509

# Exhibit 2-1

NOTE

[CHANCERY DIVISION]

## *BADEN AND OTHERS v. SOCIÉTÉ GÉNÉRALE POUR FAVORISER LE DÉVELOPPEMENT DU COMMERCE ET DE L'INDUSTRIE EN FRANCE S.A.

[1977 B. No. 3712]

1982 Jan. 11–15, 18–20, 26–28;
Feb. 1–5, 8–12, 15–19, 22–25;
March 1–5, 8–12, 16, 18, 19, 22–25;
April 20–23, 26–30;
May 4, 5, 7, 10–14, 17–21, 24–28;
June 8–11, 14–18, 21–25, 28–30;
July 1, 2, 5–9, 12–16, 19–23, 26;
Dec. 20
1983 April 20–22; 25

Peter Gibson J.

*Trusts—Constructive trust—Fraud—Bahamian bank depositing funds in trust account with defendant bank—Transfer of funds to non-trust account procured by fraud—Whether defendant's knowledge sufficient to found constructive trust—Whether defendant liable as constructive trustee*

ACTION

On 15 June 1977 the plaintiffs issued a writ against the defendant, Société Générale pour Favoriser le Développement du Commerce et de L'Industrie en France S.A., a French bank with offices in London, seeking a declaration that they were entitled to recover U.S.$4,009,697·91 which the defendant bank had held for its customer, Bahamas Commonwealth Bank Ltd. ("B.C.B.") in a trust account, but which sum the defendant bank, on 10 May 1973 on B.C.B's instructions, had, by arrangement with the Algemene Bank in Amsterdam, misapplied by having it transferred, electronically, to the Banco Nacional de Panama in Panama, to be placed in a non-trust account standing in B.C.B's name. The plaintiffs, who claimed that the moneys belonged to them, were George Baden, Jacques Delvaux and Ernest Lecuit, liquidators of the Luxembourg Mutual Investment Fund, as first plaintiffs, the Fund of Funds ("F.O.F."), as second plaintiff, Venture Fund (International) N.V., as third plaintiff, F.O.F. Proprietary Funds Ltd., as fourth plaintiff, and I.O.S. Growth Fund Ltd., as fifth plaintiff. The fund of which the first plaintiffs were liquidators and the second, third and fifth plaintiffs were known, collectively as "the dollar funds." The plaintiffs claimed that in making the transfer the defendant bank thereby became a constructive trustee in respect of the moneys, and liable in equity to account to them for the trust moneys which had been dissipated from the account in Panama and could not be recovered; alternatively the plaintiffs claimed that the defendant bank owed the plaintiffs a duty of care and were liable in damages accordingly, for the loss which the plaintiffs had suffered.

The facts are stated in the judgment.

*Leolin Price Q.C.*, *James Munby* and *James Arbuthnot* for the plaintiffs.
*James Leckie*, *Thomas Putnam* and *Caroline Abele* for the defendant.

*Cur. adv. vult.*

The following cases are referred to in the judgment:

*Abouloff v. Oppenheimer & Co.* (1882) 10 Q.B.D. 295, C.A.
*Anns v. Merton London Borough Council* [1978] A.C. 728; [1977] 2 W.L.R. 1024; [1977] 2 All E.R. 492, H.L.(E.)
*Astro Valiente Compania Naviera S.A. v. Government of Pakistan Ministry of Food and Agriculture (No. 2)* [1982] 1 W.L.R. 1096; [1982] 1 All E.R. 823
*Bandon (Earl of) v. Becher* (1835) 3 Cl. & F. 479, H.L.(I.)
*Barnes v. Addy* (1874) L.R. 9 Ch.App. 244
*Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250; [1978] 3 W.L.R. 712; [1979] 1 All E.R. 118, C.A.
*Berwick-upon-Tweed Corporation v. Murray* (1857) 7 De G.M. & G. 497
*Birch v. Birch* [1902] P. 130, C.A.
*Bolton v. Stone* [1951] A.C. 850; [1951] 1 All E.R. 1078, H.L.(E.)
*Boswell v. Coaks (No. 2) (Note)* (1894) 86 L.T. 365, H.L.(E.)
*Britain v. Rossiter* (1879) 11 Q.B.D. 123, C.A.
*Carl Zeiss Stiftung v. Herbert Smith & Co. (No. 2)* [1969] 2 Ch. 276; [1969] 2 W.L.R. 427; [1969] 2 All E.R. 367, C.A.
*Clarke v. Clarke* [1899] W.N. 130, Kekewich J. and C.A.
*Coco v. A. N. Clark (Engineers) Ltd.* [1969] R.P.C. 41
*Coleman v. Bucks and Oxon Union Bank* [1897] 2 Ch. 243
*Competitive Insurance Co. Ltd. v. Davies Investments Ltd.* [1975] 1 W.L.R. 1240; [1975] 3 All E.R. 254
*Consul Development Pty. Ltd. v. D. P. C. Estates Pty. Ltd.* (1975) 132 C.L.R. 373
*de Lasala v. de Lasala* [1980] A.C. 546; [1979] 3 W.L.R. 390; [1979] 2 All E.R. 1146, P.C.
*Feuer Leather Corporation v. Frank Johnstone & Sons* [1981] Com. L.R. 251
*Foxton v. Manchester and Liverpool District Banking Co.* (1881) 44 L.T. 406
*Gray v. Johnston* (1868) L.R. 3 H.L. 1, H.L.(I.)
*Gray v. Lewis* (1869) L.R. 8 Eq. 526
*Hampshire Land Co., In re* [1896] 2 Ch. 743
*Harding, Ex parte; In re Smith, Fleming & Co.* (1879) 12 Ch.D. 557, C.A.
*Jonesco v. Beard* [1930] A.C. 298, H.L.(E.)
*Karak Rubber Co. Ltd. v. Burden (No. 2)* [1972] 1 W.L.R. 602; [1972] 1 All E.R. 1210
*Kingston (Duchess of) Case* (1776) 20 St.Tr. 355
*Lee v. Sankey* (1873) L.R. 15 Eq. 204
*Lyell v. Kennedy* (1889) 14 App.Cas. 437, H.L.(E.)
*Manchester Trust v. Furness* [1895] 2 Q.B. 539, C.A.
*Marfani & Co. Ltd. v. Midland Bank Ltd.* [1968] 1 W.L.R. 956; [1967] 3 All E.R. 967, Nield J. and C.A.
*Marsden v. Regan* [1954] 1 W.L.R. 423; [1954] 1 All E.R. 475, C.A.
*Naas (Lady) v. Westminster Bank Ltd.* [1940] A.C. 366; [1940] 1 All E.R. 485, H.L.(E.)
*Nelson v. Larholt* [1948] 1 K.B. 339; [1947] 2 All E.R. 751
*Ochsenbein v. Papelier* (1873) L.R. 8 Ch.App. 695
*Overseas Tankship (U.K.) Ltd. v. Miller Steamship Co. Pty.* [1967] 1 A.C. 617; [1966] 3 W.L.R. 498; [1966] 2 All E.R. 709, P.C.
*Payne (David) & Co. Ltd., In re; Young v. David Payne & Co. Ltd.* [1904] 2 Ch. 608, C.A.
*Perry v. Meddowcroft* (1846) 10 Beav. 122
*Price v. Dewhurst* (1837) 8 Sim. 279
*Reg. v. Sinclair* [1968] 1 W.L.R. 1246; [1968] 3 All E.R. 241, C.A.
*Ross v. Caunters* [1980] Ch. 297; [1979] 3 W.L.R. 605; [1979] 3 All E.R. 580

*Rowlandson v. National Westminster Bank Ltd.* [1978] 1 W.L.R. 798; [1978] 3 All E.R. 370
*Securities and Exchange Commission v. Vesco* (1981) 548 F. Supp. 1270
*Selangor United Rubber Estates Ltd. v. Cradock (No. 3)* [1968] 1 W.L.R. 1555; [1968] 2 All E.R. 1073
*Shaw (John) (Rayners Lane) Ltd. v. Lloyds Bank Ltd.* (1944) 5 LDB 396
*Shedden v. Patrick* (1854) 1 Macq. 535, H.L.(Sc.)
*Syal v. Heyward* [1948] 2 K.B. 443; [1948] 2 All E.R. 576, C.A.
*Taylors Fashions Ltd. v. Liverpool Victoria Trustees Co. Ltd. (Note)* [1982] Q.B. 133; [1981] 2 W.L.R. 576; [1981] 1 All E.R. 897

20 December. PETER GIBSON J. delivered the following judgment.

*Introduction*

1. A decade or more after the troubles affecting the financial complex known as I.O.S. excited the attention of the financial world, disputes arising from those troubles are still not resolved. In this action the plaintiffs seek to recover a sum a little in excess of U.S.$4m. from the defendant ("S.G."), a major French bank which carries on a banking business in, inter alia, the City of London. S.G. had held that sum in an account designated as a trust account by its customer, Bahamas Commonwealth Bank Ltd. ("B.C.B."), a Bahamian bank. S.G. on 10 May 1973 transferred that sum on the instructions of B.C.B. to an account not so designated with a Panamanian bank in Panama. The plaintiffs say that that sum belonged to them but that it has not been recovered, and that in making that transfer S.G. became a constructive trustee liable in equity to account for that sum to the plaintiffs. Alternatively the plaintiffs say that S.G. owed a duty of care to them and was negligent when making that transfer and is liable in damages accordingly for the loss they have suffered.

*The plaintiffs*

2. The late 1950s and the 1960s saw the creation and phenomenal growth of a financial empire built by the American financier, Bernard Cornfeld. Cornfeld established a business undertaking known as Investors Overseas Services which grew into a vast complex comprising numerous companies and other entities set up in many parts of the world and carrying on business in the fields of banking, insurance and property. By 1970 a company incorporated in Canada, but operating from Switzerland, I.O.S. Ltd. ("I.O.S.") was at the head of this complex. But at the heart of the I.O.S. complex were various offshore mutual funds attracting, with the aid of a large sales force, moneys from investors throughout the world. Those mutual funds were managed by companies owned by a subsidiary of I.O.S. By 1970 those funds held assets having a value well in excess of U.S.$1,000m.

3. Four of those funds were known as, and I shall call, the dollar funds. Shares in those funds were valued and quoted in dollars and a substantial part of their assets consisted of American securities.

4. First and largest there was a fund established under Luxembourg law and described as "The Luxembourg Mutual Investment Fund I.I.T." ("I.I.T."). As a legal entity I.I.T. does not appear to have any exact parallel in English law, but it is somewhat akin to a unit trust. It published a prospectus from time to time inviting subscriptions from investors for shares in the fund, such shares conferring on their holders the right in all normal circumstances to have their shares redeemed at the net asset value per share of the fund. The fund is usually referred to as an open-end fund, because it was open to investors to subscribe for shares at any time and the shares carried the right of redemption which I have described. An open-end fund is to be contrasted with a closed-end fund which corresponds to an English investment trust, shares in which ordinarily confer on the holder no right of redemption and can only be sold if a buyer can be found for such shares, such as by a sale on a stock exchange. I.I.T. was not a

corporate entity; it did not have any directors or employees. It was managed by a separate entity, I.I.T. Management Co. S.A. ("I.I.T. Management"), as I shall describe later. However, it was a body that under Luxembourg law could be dissolved, and on 18 December 1973 the District Court of Luxembourg ordered the dissolution of I.I.T. The first plaintiffs, Georges Baden, Jacques Delvaux and Ernest Lecuit, were appointed the liquidators of I.I.T. Ernest Lecuit died after the commencement of these proceedings and Georges Faber was appointed as a joint liquidator in his place on 12 March 1980.

5. A second dollar fund was a company incorporated under Ontario law but not resident there, the second plaintiff, the Fund of Funds Ltd. ("F.O.F."). F.O.F. was also an open-end mutual fund, but having an issued share capital made up of two classes of shares, a comparatively small number of common shares which had voting rights and all of which were held by its management company, F.O.F. Management Co. Ltd. (F.O.F. Management), and a large number of class A, non-voting preference shares. It too published a prospectus from time to time inviting subscriptions from the public for its A shares. Those shares gave their holders the right to have the shares redeemed at net asset values per share in normal circumstances. On 1 April 1973 the Supreme Court of Ontario ordered the winding up of F.O.F. and John Orr was appointed liquidator of F.O.F.

6. A third dollar fund was the third plaintiff, Venture Fund (International) N.V. ("Venture"). This was also an open-end mutual fund but incorporated under the laws of the Netherlands Antilles. Venture had a small number of voting common shares held by its management company, Venture Management Co. Ltd. ("Venture Management"). Venture also had a large number of non-voting class A shares. It too published a prospectus inviting subscriptions from the public for its A shares which carried a right of redemption at net asset value per share in normal circumstances. It was wound up by the Curaçao court on 4 April 1974 and Jacob Schiltkamp and Cornelis Hartog were appointed the liquidators of Venture.

7. The fourth of the dollar funds was the fifth plaintiff, I.O.S. Growth Fund Ltd. ("Growth"), another company incorporated under the laws of Ontario. It too was an open-end mutual fund with a small number of voting common shares held by its management company. I.O.S. Growth Fund Management Ltd. ("Growth Management"). Growth also had a large number of non-voting A shares. Again it published prospectuses inviting subscriptions from the public for A shares which conferred on their holders the right to have their shares redeemed at net asset value per share in normal circumstances. On 1 August 1973 the Ontario court ordered the winding up of Growth and Orr was appointed liquidator of Growth.

8. F.O.F. had a wholly-owned subsidiary, the fourth plaintiff, F.O.F. Proprietary Funds Ltd. ("Prop"), a Canadian company. Prop is a closed-end investment company through which F.O.F. made most of its investments. Prop has the distinction of not being in liquidation, but Orr is its president and effectively it is being managed as though it were in liquidation. Although Prop is not strictly a dollar fund, it was often referred to with I.I.T., F.O.F., Growth and Venture as the dollar funds. I shall call them together "the funds."

*History*

9. Having thus introduced the parties to this action, I must next embark on a detailed history of the events leading up to the transfer of the $4m. in May 1973. I do so not only to provide the background to the relevant events but also because an important part of the claims by the plaintiffs is that the transfer was part of a fraudulent and dishonest design, but I say at once that it is not alleged that S.G. was itself fraudulent or dishonest.

*The I.O.S. complex in 1970*

10. I start by describing the relevant parts of the I.O.S. complex about the middle of 1970 and the way the funds were then being operated. I.O.S. had a

share capital divided into two classes of shares, preferred shares of which there were over 39 million in issue and which gave the preferred shareholders the right to elect two-thirds of the directors of I.O.S. and over 23 million common shares. Cornfeld held more than 6 million preferred shares at that time and until the spring of 1970 was the chairman of the board of I.O.S. The I.O.S. complex comprised four main parts, first, management companies for the I.O.S. mutual funds, second, banking companies, third, property companies and fourth, insurance companies.

11. I.O.S. controlled the management companies of the dollar funds (the management companies) through its holding of 80 per cent. of the shares in Transglobal Financial Services Ltd. ("T.F.S."), an Ontario company. T.F.S. owned virtually all the shares in the management companies. I.I.T. Management, which managed I.I.T., was a Luxembourg company and, because of I.I.T.'s constitution, was the only person through which I.I.T. could act. F.O.F. Management was a Canadian company which was the manager of and owned the voting shares in F.O.F. Venture Management was a Luxembourg company which was the manager of and owned the voting shares in Venture. Growth Management was an English company which was the manager of and owned the voting shares in Growth. There were other I.O.S. management companies which managed other I.O.S. entities.

12. I.O.S. wholly owned I.O.S. Financial Holdings Ltd. which in turn owned various banks. Of these I need mention only three: Overseas Development Bank Luxembourg S.A. ("O.D.B. Lux."), a small Luxembourg bank, O.D.B. Geneva S.A. a bank based in Switzerland but with an office in London, and O.D.B. Bahamas Ltd., a small Bahamian bank.

13. There were various I.O.S. property companies. One such company was I.O.S. Real Estate Holdings Ltd. ("R.E.H."), which managed property and held the voting shares of a Canadian property company, Investment Properties International Ltd. ("I.P.I.") until June 1969 I.P.I. had been a wholly-owned but dormant subsidiary of I.O.S., which owned the 100 issued shares of I.P.I. On 4 June 1969 I.P.I. issued 9,900 shares to R.E.H. for cash and I.O.S. subsequently transferred its 100 shares to R.E.H. On 1 July 1969 I.P.I. purchased all the property investments of Prop for an issue by I.P.I. to Prop of A shares. At the same time I.P.I. made a public offer of A shares for which the public subscribed some $90m. On 7 August 1970 Prop's shares in I.P.I. (approximately 47 per cent.) of I.P.I.'s A shares) were acquired by Global Natural Resources Properties Ltd. ("G.N.R.P."), then a newly formed English company also controlled by I.O.S. I.P.I. Management Co. Ltd., an English company the shares in which were owned by T.F.S., had a management contract with I.P.I.

*The dollar funds*

14. An investor contemplating an investment in one of the dollar funds in early 1970 would have found several reassuring features.

15. First, there was the sheer size of the dollar funds. At 31 December 1969 I.I.T.'s net assets were $704m. There is no evidence as to what F.O.F.'s assets were at that date but at 31 March 1972 Growth's net assets (including its interest in its wholly-owned subsidiary Prop) amounted to $114m. Venture at 31 December 1969 had net assets of $169m. while Growth had net assets of $27m. at that date.

16. Second, there was what investors were told was the investment policy for the dollar funds. It was of course important to investors that, should they wish their shares to be redeemed, the fund in which they were shareholders should be readily able to realise investments to allow the redemptions to be made. According to I.I.T.'s prospectus dated 31 March 1970 (no later prospectus was ever issued) its primary investment objective was long-term capital growth, it could invest in listed securities on stock exchanges and in special or local investment situations which involved sensible risks and unusually high profit potential, and it could not lend any of its assets except by purchasing government, corporate or municipal bonds. F.O.F.'s investment powers were

limited to investing in any American or Canadian investment company, in A
obligations of any American or Canadian governmental authority and of any public body or corporation owned by any such authority and in other near-cash investments. According to F.O.F.'s prospectus dated 2 May 1968 (no further prospectus was issued thereafter), the primary investment objective of F.O.F. was long-term capital growth, investments were concentrated in securities in the U.S.A. and F.O.F. was prohibited from lending any of its assets except by the purchase of government bonds. Venture's prospectus dated 31 March 1970 (this B
too was its last prospectus) stated that the investment policy of Venture was designed, within limits, to maximise the possibilities of growth, and although Venture's constitution permitted it to invest all or any part of its assets in unlisted securities, most of Venture's assets were generally invested in securities actively traded on recognised stock exchanges and generally investments were concentrated in the United States securities market. Growth's constitution allowed it to invest in a wide choice of investments but its last prospectus dated
April 1970 stated that its main investment goal was to achieve long-term capital C
growth and thereby at the same time to make available a source of income for the future, and that investments would be concentrated in the United States.

17. Third, as all prospectuses of the dollar funds stressed, the funds' securities and cash were looked after by very large, long-established and recognised financial institutions wholly independent of I.O.S. Each of the funds had such an institution as custodian (and in I.I.T.'s case also as sub-custodian)
of securities and as depository of cash. I.I.T. had Montreal Trust Co. as D
custodian of securities and Bank of New York and Crédit Suisse as sub-custodian of securities and depository of cash respectively. F.O.F. had Bank of New York as custodian of securities and Crédit Suisse as depository of cash. Prop. and Growth had Bank of New York as custodian of securities and depository of cash.

*Vesco acquires control of I.O.S.* E

18. In the spring of 1970 I.O.S. was in some disarray. Its days of growth had ended and in April at a board meeting of I.O.S. the board was told that I.O.S. was running at a loss. Cornfeld, who at the end of 1969 had been replaced as president of I.O.S., resigned in May from being chairman of the board of I.O.S. The board was concerned at the lack of liquidity of I.O.S. and looked about for financial assistance. Interim financing obtained in May from the American oil
magnate, John King, did not solve I.O.S.'s problems. F

19. In June 1970 another American, Robert Lee Vesco made his entrance onto the I.O.S. stage, offering financial assistance. He was then only 34 years old, the chairman of the board and chief executive officer of a modest-sized American manufacturing company, International Controls Corp. (I.C.C.), shares in which were traded on the American stock exchange. In August 1970 Vesco was invited to an I.O.S. board meeting at which he offered I.O.S. a $5m. loan
with a $5m. facility, in return for which he asked for warrants to purchase G
I.O.S. common shares. Reading through the minutes of the I.O.S. board meeting of this time, I find it surprising that despite the very limited assistance he was purporting to offer I.O.S. he was nevertheless able to persuade the board to welcome his proposals. His powers of persuasion must have been very great.

20. He stated to the I.O.S. board that he was not looking to control I.O.S.
and was interested only in making money. He said that he had no plans to get H
any financing out of the I.O.S. funds. But he did suggest that he and an associate of his, Milton Meissner should go onto a finance committee which he suggested should be established to take financial control over I.O.S. He wanted to be represented on the existing executive committee of I.O.S. and to have two members on the board. However, light is thrown onto Vesco's real intentions by Cornfeld's deposition in the subsequent investigations made by the Securities and Exchange Commission ("the S.E.C.") which led to the institution by the S.E.C. of proceedings in New York against Vesco and others. Vesco sought

Cornfeld's help to enable Vesco to move into I.O.S. and stated to Cornfeld that it was his intention to take control and that the loan that he would be offering I.O.S. would have in the terms of a loan agreement a large number of negative provisions that would for all practical purposes give the lender control of I.O.S. Vesco indicated, according to Cornfeld, that there would be virtually no transaction, however small, that the company would be able to engage in without the approval of the finance committee which he in turn would control under the terms of the loan agreement, and that he could exercise control over the company by his right to put the company into default under the loan agreement. Cornfeld was not willing to co-operate with Vesco, but the I.O.S. board found Vesco's proposals acceptable, even though Cornfeld protested to the board that they were effectively giving away the company for $10m.

21. The loan agreement dated 31 August 1970 was a formidable document some 69 pages long which gave substance to Cornfeld's protest. The loan agreement was made between I.O.S. and a newly formed Bahamian subsidiary of I.C.C., I.C.C. Investments Ltd. ("I.I.L."). By it I.O.S. agreed to sell and I.I.L. to purchase (a) $5m. of promissory notes maturing on 24 May 1971 and bearing a fully commercial rate of interest and (b) warrants to purchase 4m. of I.O.S.'s common stock, for the aggregate purchase price of $5m., completion to be on 17 September 1970. Further, I.O.S. could require I.I.L. by notice before 1 March 1971 to purchase up to a further $5m. of such notes and also warrants to purchase one million shares, but I.I.L.'s obligations in this regard would terminate in the event of any default by I.O.S. of its obligations under the loan agreement, and I.O.S. would then be obliged to deliver up, without receiving further payment, however many of the one million warrants as had not been purchased. Further, at the request of I.O.S. but subject to I.I.L.'s agreement I.I.L. would purchase up to a further $5m. of such notes and 2½ million warrants. I.I.L. was given the right to designate two directors of I.O.S., two members of the executive management committee and two members of a finance committee to be formed, such finance committee to consist of not more than five members, two of whom were to be designated by I.O.S., two by I.I.L. and a fifth member by I.O.S. but not without the consent of three out of the other four members. The finance committee was to have power to veto virtually every financial transaction of the company. I.O.S. also agreed to use its best endeavours to retain Meissner as consultant to it. I.O.S. further entered into a large number of complex covenants affecting both itself and its subsidiaries. For example there was a covenant against creating or suffering to exist any liens or funded or current debt, and making or allowing to remain outstanding any loans or investments. There was also a covenant against Cornfeld becoming an officer or director or employee of I.O.S. or of any subsidiary. In the event of any default nor remedied within 10 days after notice from I.I.L., I.I.L. could declare the promissory notes it held to be due and could require I.O.S. to purchase its warrants at 74 cents each and I.I.L. would have power to sell any of I.O.S.'s assets to repay the promissory notes and the purchase price of the warrants. Effectively, therefore, for a commercial loan which was limited in time to nine months and in amount to a maximum of $10m. unless I.O.S. otherwise consented, Vesco was given a firm grip on I.O.S. which by two amendments to the loan agreement became a stranglehold on I.O.S.

22. There was a first amendment to the loan agreement on 4 November 1970. I.O.S. wanted to enter into certain transactions in respect of its operations in Italy but these transactions were prohibited by the terms of the loan agreement. I.I.L. consented to the transactions on terms which included a provision that not less than $4m. of the proceeds received in those transactions should be placed at the request and risk of I.I.L. in an account in a small Bahamian bank, Butlers Bank Ltd., Nassau ("Butlers Bank"), and any remainder of such proceeds in an account with such other bank or banks as met criteria imposed by the finance committee. Further, funds in any of the accounts could not be withdrawn without the approval of a majority of the finance committee. By that date the finance committee had Vesco as its chairman and Meissner was

another member. Further, this first amendment to the loan agreement provided A
that until the Italian transactions were completed and so long as at least $1m. were in such accounts the right of I.O.S. under the loan agreement to require I.I.L. to purchase the further $5m. of promissory notes and warrants was suspended.

23. A further remarkable amendment to the loan agreement was agreed on 25 January 1971, following allegations by Vesco that various events of default had occurred under the loan agreement. I.I.L. agreed to relinquish its rights
arising from the claimed defaults on terms then specified. One term was that B
I.I.L. should be allowed to invoke the default provisions of the loan agreement if any of certain other conditions were not satisfied. These conditions were, first, that I.O.S. should deposit $1½m. on or before 27 January 1971 for a year in a bank designated by I.I.L., second, that the $4m. agreed to be deposited in Butlers Bank should be charged as security for I.O.S.'s obligations to I.I.L. under the loan agreement and, third, that I.O.S. should deposit a further
$3,600,000 for a year in a bank designated by I.I.L. I.O.S. to have limited C
powers to withdraw $1,200,000 if the finance committee approved. It was also provided that unless the common and preferred stockholders of I.O.S. before 1 August 1971 approved the sale by I.O.S. of all or substantially all I.O.S.'s assets to another company in which I.I.L. or its stockholders should have at least 25 per cent. interest and unless that sale was completed by the end of 1971 I.I.L. had the right to require I.O.S. to repurchase from I.I.L. up to three
million of the I.O.S. warrants at $1·20 per warrant, and even if those conditions D
were satisfied I.I.L. had the right to sell to I.O.S. 3m. of its warrants for $750,000.

24. I have referred to the loan agreement and the amendments thereto in some detail as they not only show the method by which Vesco so quickly gained control of I.O.S. but they reveal that despite the assurances he had given the board of I.O.S. he was prepared right from the start to use for his own purposes
I.O.S. moneys which he required to be deposited with banks designated by him. E
They also show that Vesco was from a very early stage looking to reorganise I.O.S. in such a way that I.O.S. would transfer its assets to another entity which Vesco could effectively control. The irony of the transaction with I.C.C. was that, although it purported to provide finance for I.O.S. suffering a liquidity crisis, the reality was that I.C.C. did not have the moneys to lend I.O.S. and that moneys under the control of I.O.S. had to be used. On 23 September 1970,
six days after the completion date under the loan agreement but in fact with a F
view to completing the loan to I.O.S., I.I.L. borrowed $4m. from an American finance house, Hale Bros. Associates Inc., on the security of the I.O.S. promissory notes and warrants. I.I.L. repaid that loan by borrowing the like sum from Butlers Bank on 6 November. Butlers Bank in turn would not have had the liquidity to make the loan to I.I.L. but for the deposit by I.O.S. of $4m. in accordance with the amendment of 4 November 1970 to the loan agreement.

25. I.O.S. in its report for 1971 to its shareholders informed them that, as a G
result of the arrangement with I.I.L., I.O.S. not only received financing but also management assistance from members of the staff of I.C.C. in I.O.S.'s stabilisation and proposals for reorganisation and recapitalisation. It also reported that Vesco was elected chairman of the board of I.O.S. on 25 February 1971. Vesco brought into the I.O.S. complex with him in addition to Meissner several other associates including Ulrich Strickler, Gilbert Straub, Richard Clay and
Frank Beatty. They were all directors or employees of companies in the group H
headed by I.C.C. Another person Vesco brought in was a Canadian accountant, Norman LeBlanc, who by July 1971 was vice-president finance. By early 1972 Vesco and his associates were in complete control of the management of I.O.S. The executive committee consisted of LeBlanc, Vesco, Meissner and one other. The finance committee consisted of Vesco, Meissner and LeBlanc. Meissner was soon in control of the dollar funds and of the management companies. Thus on 15 December 1971 he was empowered by the board of I.I.T. Management to bind the company on his sole signature.

26. In late 1970 and in early 1971 Vesco was arranging for the purchase of the six million I.O.S. preferred shares then held by Cornfeld. Cornfeld was not willing to sell to Vesco himself. But he was prepared to sell those shares to another purchaser for $5·5m. The purchaser that was found by Vesco was a Panamanian corporation, Linkink Progressive Corp. ("Linkink"), which had been a subsidiary of Union Bank Suisse until the day of the purchase, 15 January 1971. Cornfeld himself believed that he had sold to a subsidiary of a large Swiss bank. Allan Butler, the head of Butlers Bank, said in his deposition in the S.E.C. proceedings that Vesco told him in 1971 that he arranged the purchase of Linkink from the subsidiary of the Swiss bank and the purchaser was Red Pearl Bay S.A. ("Red Pearl"). Red Pearl is another Panamanian corporation and it is not entirely clear who owned Red Pearl at the time of the purchase by Linkink. But what is abundantly clear is that in the purchase Linkink was acting in concert with Vesco. The sale agreement was signed on behalf of Linkink by two Butlers Bank employees acting as attorneys of Linkink, one being Frederick Weymar. Weymar deposed in the S.E.C. proceedings to the fact that the attorneys signed the agreement because Vesco had told Weymar that he had lost in a London taxi the agreement which had been signed by officers of Linkink. On 19 May 1971 a Canadian company, Hemisphere Financial Services Ltd. ("H.F.S."), then called American Interland Ltd., a wholly-owned subsidiary of I.C.C., agreed to purchase the shares in Linkink from Red Pearl.

27. The money required for the purchase by Linkink of the six million shares from Cornfeld came from Butlers Bank. But Butlers Bank itself had to be provided with the liquidity to make the loan to Linkink. On 11 January 1971 Meissner instructed the portfolio manager of the dollar funds to transfer $6,200,000 of I.I.T.'s money with Crédit Suisse to a numbered account at Manufacturers Hanover Bank in Frankfurt. This appears to have been an account of Butlers Bank, as on 11 June Butlers Bank telexed Manufacturers Hanover Bank, asking it to issue against a receipt of £2m. from Crédit Suisse cheques for $5½m. in favour of Cornfeld. The instructions were not in fact carried out, probably because Crédit Suisse refused, but again the fact that such instructions were issued shows an absence of scruples about using I.O.S. moneys, this time of a dollar fund, for Vesco's own purposes. Vesco then arranged for Arthur Lipper Corp., which acted as brokers for I.O.S. in New York, to deposit $5½m. for a limited period with Butlers Bank to enable Butlers Bank to lend Linkink the same amount. With the acquisition by H.F.S. of the shares in Red Pearl, if not before, I.C.C. indirectly became the owners of the 6m. preferred shares in I.O.S. that had belonged to Cornfeld and, with other purchases made by I.I.L. of I.O.S. shares by March 1972, I.C.C. through I.I.L. and H.F.S. owned 45 per cent. of the issued preferred shares in I.O.S. and 28 per cent. of I.O.S.'s issued common shares.

*Reorganisation of the I.O.S. complex*

28. At the beginning of 1971 and even before the amendment made to the loan agreement on 25 January 1971 in which reference was made to the reorganisation of I.O.S., Vesco put forward proposals for reorganising the structure of the I.O.S. complex. A memorandum of I.C.C.'s American lawyers, Hogan & Hartson, records that Vesco then proposed to various I.O.S., officers as well to I.O.S.'s American lawyers, Wilkie Farr & Gallagher, and its Canadian lawyers, Zimmerman & Winters, that a new corporation should be found or acquired in some tax haven which would acquire all or substantially all the assets of I.O.S. in return for the acquisition of certain liabilities of I.O.S. and the issue of debentures for only one-third of the common stock of the new corporation. I.C.C. or a subsidiary would own a further one-third and the remaining third would be divided between various other investors. Vesco also proposed the merger of, inter alia, the dollar funds. He was not averse to revealing his ideas for the reorganisation of I.O.S. to I.O.S.'s perfectly respectable professional advisers, no doubt because as Patrick Daniels of Simmons & Simmons (who, as

an assistant solicitor with Freshfields, I.O.S.'s English solicitors, had encountered Vesco) said in evidence before me: A

"Vesco was very good at getting you to give him the advice that he wanted . . . He liked to negotiate with his own advisers, and I confess he was very good at it. He could be very convincing in putting up arguments . . . inevitably one felt he ended up getting the advice that he wanted."

Vesco's proposals underwent various changes, but it is clear that from an early stage of his involvement with I.O.S. his reorganisation plans included (1) the putting of I.O.S. assets into offshore corporations over which Vesco would enjoy effective control and (2) the restructuring of the dollar funds. B

30. As to the first, in the deposition of Weymar in the S.E.C. proceedings, what Vesco proposed was put thus:

"The idea was to dismantle I.O.S. and take its various operating functions, its banking, insurance, its real estate and whatever other things it was involved in, and put them into separate holding companies, and then spinning those holding companies off to I.O.S.'s investors." C

Weymar explained the thinking underlying the proposals as follows:

"The reason for it was that I.O.S. was apparently in their eyes vulnerable to litigation, lawsuits, etc., and in order to take the attachable assets out of [I.O.S.], this plan of the spin-off to the shareholders was proposed, the first of which was I.B.L." D

The reference to I.B.L. is a reference to International Bancorp Ltd. ("I.B.L."), in the formation of which Weymar was to play a large part.

31. I.B.L. was incorporated in October 1971 in the Bahamas. That same month Butlers Bank had formed B.C.B. as a new banking subsidiary. Weymar in his deposition describes the function of B.C.B., as suggested in conversation between Butler and Vesco, as a way to take off Butlers Bank's hands some of the loans which had been associated with Vesco and other loans which were hard to collect and to provide Butlers Bank with additional liquidity. Weymar ceased to be an employee of Butlers Bank and purchased all the shares of B.C.B. from Butlers Bank for $1,800,000, of which only a sum of $300,000 was in cash. Weymar then exchanged all his shares in B.C.B. for 2½m. shares of I.B.L., 30 per cent. of its issued share capital. I.O.S. transferred to I.B.L. all its shares in its principal banking subsidiaries, including O.D.B. Lux., in exchange for some 5,600,000 shares in I.B.L., $8,655,000 of 7 per cent. debentures 1979, $1,250,000 7 per cent. notes and $144,000 in cash. Almost immediately thereafter I.O.S. distributed as a dividend to its shareholders the I.B.L. shares it had received and the greater part of the I.B.L. debentures. I.C.C., through its subsidiaries I.I.L. and H.F.S. received as a dividend some 1·7m. shares in I.B.L. or 22 per cent. of its issued share capital. Weymar deposed to the S.E.C. that there was a "gentlemen's agreement" between him and Vesco that neither side would damage the other's interest and that, if either side wanted to acquire the other's shares, they were prepared to negotiate a sale. Weymar became president and a director of I.B.L. and the other I.B.L. directors were Clay, LeBlanc, Straub and Vesco. E F G

32. I.B.L. in February 1972 sold two small banks it had acquired from I.O.S., one being O.D.B. Bahamas Ltd., to a Bahamian company Vector Ltd. controlled by LeBlanc. O.D.B. Bahamas Ltd. later changed its name to Trident Bank Ltd. H

33. The next part of the reorganisation of I.O.S. was the placing of most of I.O.S.'s property and insurance assets in another Bahamian company, Value Capital Ltd. ("V.C.L."). V.C.L. was incorporated on 1 December 1971. By an agreement of 14 December 1971 I.O.S. sold to V.C.L. assets which included the shares in R.E.H. (thereby transferring to V.C.L. control of I.P.I.), its shares in I.P.I. Management and the shares of certain I.O.S. insurance companies. The consideration for the sale was some 6·2 million shares in V.C.L. which were

A then distributed by way of dividend to the I.O.S. shareholders. I.C.C. received through I.I.L. and H.F.S. some 2,300,000 shares in V.C.L., being 38 per cent. of V.C.L.'s issued share capital. The board of V.C.L. included Vesco, Beatty and Clay.

34. Thus by the end of 1971 Vesco had spun off its main banking, property and insurance interests to new companies not under I.O.S. control but under the effective control of Vesco and his associates.

B 35. On 18 March 1971 the S.E.C. issued an order directing an investigation into I.C.C.'s relationship with I.O.S. and many officers of I.C.C. as well as others were compelled to give evidence to the S.E.C. By early 1972 it was clearly an embarrassment to I.C.C. that it was connected with I.O.S., and Vesco wanted both I.C.C. and himself to be seen to be dissociated from the I.O.S. complex. On 27 March 1972 Vesco told the S.E.C. by letter that I.C.C. was considering a plan for the sale of its I.O.S. securities to present members of I.O.S. management. On 30 March 1972 I.C.C. sold all of the I.O.S. shares C which it owned through its subsidiaries to a Bahamian company, Kilmorey Investments Ltd. ("Kilmorey"). This was a shell company owned by LeBlanc, Meissner, Strickler and another Vesco associate, Stanley Graze. Under the sale agreement the consideration that I.C.C. received for its I.O.S. shares consisted of $500,000, made up of $200,000 cash and a promissory note for $300,000. As provided for by the agreement, prior to completion, H.F.S. executed a promissory note in favour of I.C.C., in the sum of $412,048, while I.I.L. D executed a promissory note in favour of I.C.C. in the sum of $225,267. H.F.S., I.I.L. and Linkink agreed to indemnify I.C.C. against certain tax liabilities, and it was provided that any payment to I.C.C. under such tax indemnification agreement was to be deemed to be additional consideration for the purchase by Kilmorey. The inclusion of the tax indemnification agreement although of doubtful value enabled Vesco to claim that I.C.C. made a profit of over $1m. from its involvement with I.O.S. The I.B.L. and V.C.L. shares previously E owned by I.O.S. had been distributed as dividends and were thus excluded from the sale. Although it was publicly represented by Vesco and I.C.C. that the agreement with Kilmorey ended the affiliation of Vesco and I.C.C. with I.O.S., the reality was that Vesco, in the capacity of consultant to Kilmorey as well as to I.O.S. and in particular in concert with other associates of his, continued to control and direct the I.O.S. complex.

36. Plans for restructuring the dollar funds were under active consideration F in 1971 and the first half of 1972. One plan put forward by Vesco and considered with his advisers involved placing, inter alia, the assets of the dollar funds into a new closed-end company given the code name A.B.C. N.V., It was envisaged that holders of shares in the dollar funds unless they opted for redemption would be given irredeemable and non-voting shares in such a company in place of their redeemable shares in the dollar funds. It was believed that a very large number of shareholders in the dollar funds had invested in violation of their G national laws and would not opt for redemption. James McMenamin, an accountant with Coopers & Lybrand, I.O.S.'s auditors, deposed in the S.E.C. proceedings that at a meeting in January 1972, Vesco in jocular fashion called the proposed new company L.P.I., standing for "Looting and Plundering Inc."

37. By May 1972 Vesco determined that I.C.C. should transfer its interest in V.C.L. and I.B.L. to a new corporation which LeBlanc would own and which Vesco and his associates would control and in which one of the dollar funds H would invest. On 22 March 1972 two Bahamian companies were incorporated, Global Holdings Ltd. and Global Financial Ltd., as subsidiaries of I.B.L. On 3 June 1972 I.B.L. sold all the five issued shares of Global Holdings to LeBlanc for $1,000 and all the five issued shares of Global Financial to Global Holdings for a further $1,000. By an agreement dated 3 June 1972 I.C.C. sold to Global Financial its 1,760,767 I.B.L. shares and its 2,360,767 V.C.L. shares as well as the $300,000 Kilmorey promissory note, the H.F.S. $412,048 promissory note, the I.I.L. $225,267 promissory note and a promissory note of V.C.L. due on 8 February 1975 for $935,190. The consideration received by I.C.C. was

ostensibly five unsecured promissory notes of Global Financial for sums due on 1 July 1973 and in the four subsequent years totalling $7,350,000. But this was subject to a proviso that, if LeBlanc ceased to own 50 per cent. of the Global Holdings issued shares of any class, then the whole amount of the Global Financial promissory notes would become due and payable not later than 30 days after written notice from I.C.C. to Global Financial. It is clear from the minutes of a board meeting of I.C.C. held the day before that agreement that it was contemplated throughout that one of the dollar funds would make a purchase of shares in Global Holdings such that LeBlanc would cease to own 50 per cent. of the issued share capital of Global Holdings; this would cause the promissory notes to become due and by the injection of the purchase moneys which were envisaged as amounting to £20m. I.C.C. could be paid off. Before the end of June 1972 Venture had made a $20m. "investment" in Global Holdings and Global Financial and I.C.C. had received $7,350,000. I shall come back to that $20m. "investment" a little later.

38. Another reorganisation plan put forward by Vesco and implemented about this time involved the formation of a further new company into which V.C.L. and I.P.I. would put virtually all their respective assets. The new company was Property Resources Ltd. ("P.R.L."), which was incorporated in March 1972 as a Bahamian subsidiary of V.C.L. P.R.L. had two classes of shares, common shares conferring on the holders thereof the right to vote at general meetings and class A shares which did not confer any such right. On 1 June 1972 V.C.L. sold, inter alia, all the shares of R.E.H. and I.P.I. Management for 10,000 common shares and 3,140,000 class A shares in P.R.L. On 29 June 1972 I.P.I. transferred assets considerably greater in value, that is to say assets in excess of $90m., a large part of which was in cash, to P.R.L. in return for 10,810,811 A shares and the cancellation of an I.P.I. management contract. Thus I.P.I. though contributing the greater part of the assets of P.R.L. received no voting shares at all and thereby it gave control of its assets effectively to V.C.L. The public shareholders of I.P.I. holding only non-voting shares in I.P.I. were not consulted about the transaction, even though it involved a major departure from I.P.I.'s previous investment policies. I very much doubt whether I.P.I. received fair consideration in comparison with what V.C.L. received. In particular the value placed on the cancellation of the I.P.I. management contract of nearly $15m. seems far too high for a terminable contract under which I.P.I. had paid only $500,000 a year in each of the previous two years though it was estimated that it would have to pay $1m. in 1972. The like valuation of the corresponding benefit of that contract was described by V.C.L.'s auditors in 1972 as "not susceptible to auditing procedures". Gilbert Bennett, of Zimmerman & Winters, described the relative values being placed on the V.C.L. and I.P.I. assets as "ridiculous." Unhappy with Vesco's plans in relation to the Globals transaction (which I shall describe later) and the Paradise Island transaction (which I shall describe in paragraph 67) as well as the amalgamation of the assets of V.C.L. and I.P.I., he withdrew his firm from all further representation of I.O.S. entities other than I.O.S.'s Canadian funds. It is true that a report was obtained from Kidder Peabody & Co. approving the valuation of the assets contributed by I.P.I. and V.C.L. respectively. But the report is only two pages long, the person who reported was, for some wholly unexplained reason, someone in the Beirut office of that company and no details were given in the report or elsewhere of the explanations said to have been furnished to Kidder Peabody & Co. by V.C.L. and I.P.I. I should, however, add that one of the objectionable features of the transaction was put right early in 1973, when all the P.R.L. non-voting shares became voting shares.

*Vesco acquires control over dollar fund assets*

39. Another major change occurring in 1972 was the replacement of nearly all the large independent financial institutions, which had hitherto been serving the funds, with smaller and, in the case of all the cash depositories, associated

banks. The first to go was Crédit Suisse. New Swiss regulations relating to mutual funds operating from Switzerland provided Vesco with the opportunity for a change as Crédit Suisse's name could no longer be used in selling such funds. Nor was Crédit Suisse unhappy to cease to be associated with I.O.S. There was an unsuccessful attempt to find a German bank as a replacement. But an internal memorandum, dated 27 March 1972, of the Bank of New York records that Vesco wanted the profitable business carried out by Crédit Suisse in relation to the funds to go to the I.O.S. banks. On 29 March I.I.T., F.O.F. and Venture terminated the agreement whereunder Crédit Suisse was depository of cash for those funds,and O.D.B. Lux was appointed depository in its place.

40. O.D.B. Lux was then a small bank with a staff of only 25 and its capitalisation had to be increased from $1¼m. to $5m. to comply with the I.I.T. fund regulations and the Luxembourg banking commissioner's requirements. The Bank of New York was most uneasy at the replacement of Crédit Suisse by O.D.B. Lux. O.D.B. Lux was not what the Bank of New York termed a first class bank. In the opinion of the Bank of New York O.D.B. Lux lacked the expertise and the personnel to perform its duties properly. It was not independent of the I.O.S. group, and officers of the Bank of New York in internal memoranda in March 1972 expressed the view that once cash was channelled into O.D.B. Lux it would be difficult to account for fund cash. As one official put it, "Vesco is quite free to use the balances as he sees fit and we cannot do much about it." On 8 March the Bank of New York wrote to O.D.B. Lux asking for its balance sheet, information on its management and as to the control of O.D.B. Lux. On 4 April the Bank of New York wrote to LeBlanc as executive vice-president of I.O.S. stating that it had not yet received the information it had requested and informing I.O.S. that, in relation to those funds for which Crédit Suisse had been the cash depository, the Bank of New York would not release cash arising from day-to-day portfolio changes of investments held by it or income from those investments.

41. This was not well received by the I.O.S. management, and later in April I.O.S. had discussions with another but smaller American bank, American National Bank and Trust of New Jersey ("American National"), about American National taking over the functions of the Bank of New York. On 25 April Vesco told the Bank of New York that its functions would be terminated and that American National would replace it. American National's experience in relation to mutual funds was limited to acting for one very small fund, but it had been banker to I.C.C. and one of American National's officers, Wilbert Snipes, had been a director of I.C.C. since 1 January 1970. On 26 April 1972 I.I.T. Management gave the Bank of New York notice of the termination of its functions as sub-custodian of securities for I.I.T. and American National was appointed on 13 June by Montreal Trust Co. as a sub-custodian of American securities for I.I.T. from 1 July. By a letter dated 20 June Growth, and by a letter dated 22 June F.O.F. and Prop respectively, gave notice to the Bank of New York terminating the custodianship of the Bank of New York of the securities of those funds respectively. On 22 June Growth appointed American National custodian of securities and depository of cash. F.O.F. the same day appointed American National custodian of securities. Also on the same day Prop appointed American National custodian of securities and depository of cash and Venture appointed American National custodian of securities.

42. But American National itself did not last long as depository of cash. By letter dated 27 October Prop gave American National notice terminating its depository agreement and by a depository agreement of the same date Prop appointed O.D.B. Lux depository of cash. Similarly Growth, by letter dated 27 October, gave American National notice of termination of its depository agreement and by a depository agreement of that date both appointed O.D.B. Lux depository of its cash. The depository agreements of Prop and Growth despite their dates did not in fact come into effect until the beginning of December.

43. Under each of the depository agreements made on 29 March and on 27 October respectively between O.D.B. Lux and each of the funds it was provided that O.D.B. Lux would credit to a separate account in the name of the fund all moneys received by it for the account of that fund and that O.D.B. Lux would only have limited powers of disbursement from moneys owned by that fund. It was also provided that O.D.B. Lux should, pursuant to written instructions of the fund (or, in the case of I.I.T., I.I.T. Management), hold time deposits at other banks in the name of O.D.B. Lux but for the account and risk of the fund. There was also provision for O.D.B. Lux to appoint another banking institution as sub-depository upon terms and conditions approved in writing by the fund (or, in the case of I.I.T., I.I.T. Management). Each depository agreement was expressed to be governed by the law of Luxembourg.

44. By another agreement ("the sub-depository agreement") not under seal and dated as of 27 October 1971 and expressed to be made between O.D.B. Lux as the depository of the first part, B.C.B. as the sub-depository of the second part and I.I.T. Management (on behalf of I.I.T.), F.O.F., Growth, Venture and Prop of the third part, B.C.B. was expressed to be appointed sub-depository of the cash of each of the funds. The sub-depository agreement recited the due appointment of O.D.B. Lux as the cash depository of the funds and the wish of O.D.B. Lux to appoint B.C.B. to assist it in its duties as depository. Under the sub-depository agreement B.C.B. was required to keep under strict and safe custody in a separate account for each of the funds any cash belonging to the funds and received pursuant to "written instructions from the depository." This was a defined term meaning written instructions mailed or delivered to B.C.B. and signed in the name of O.D.B. Lux by any two employees of O.D.B. Lux designated by it and specifying the fund concerned.

45. Clause 3(b) and (d) was in the following form:

> "The sub-depository shall . . . (b) on written instructions from the depository, deliver any cash held in custody hereunder in accordance with such written Instructions . . . (d) deal with the cash held hereunder in any other manner as may be authorised by written instructions from parties of the first part or third part."

Clause 3 concluded:

> "The sub-depository shall not act hereunder on the instructions of any person, firm or corporation other than the parties of the first part or third part. Except for any claim made by the funds against the sub-depository under paragraph (5) hereof the funds and each of them agree not to interfere, communicate or deal with sub-depository in any manner whatsoever."

Clause 5(b) stated:

> "The sub-depository acknowledges and agrees that all cash held by it hereunder are beneficially owned by each of the funds respectively and that the sub-depository shall be accountable both to the respective funds and to the depository for any loss or damage resulting from its action or omission to act or otherwise arising out of its negligence or wilful misconduct."

The sub-depository agreement was expressed to be governed by Bahamian law and it was provided that the rights of the funds were separate from each other as though the agreement had been entered into by each fund separately.

46. At this time the board of B.C.B. included Vesco, Clay, Straub and LeBlanc, and Michael Rogers was B.C.B.'s secretary. The board of O.D.B. Lux, which consisted of Clay (as chairman), Pierre-Emile Lamboray, Robert Robertson, Rogers and Straub, on 19 October approved the appointment of B.C.B. as sub-depository in principle, subject however to the satisfaction of certain conditions. Those conditions were that no loss of income be suffered by O.D.B. Lux, that the funds submit revised operating procedures, that O.D.B. Lux's management and, where appropriate, its legal advisers approve such

A procedures, that where necessary the approval of the appropriate Luxembourg authorities be obtained and that satisfactory financial statements be received from B.C.B. The first condition no doubt depended on the absence from the sub-depository agreement of any term having an adverse effect on O.D.B. Lux's income; but none of the other conditions had been satisfied when on or before 27 October Clay, and subsequently on Clay's request Lamboray, executed the sub-depository agreement on behalf of O.D.B. Lux.

B

*The funds change their investment policies*

47. In the summer and autumn of 1972 virtually the entire portfolio of readily marketable American securities held by each of the funds was liquidated. There had been substantial redemption by holders of shares in all the dollar funds since 1970. But prior to such liquidation there were still substantial amounts invested in American securities and shareholders in the dollar funds C were given no warning of any impending change in investment policy.

48. At 31 March 1972, of I.I.T.'s net assets worth $260m., readily marketable American securities amounted to $104m. and cash deposits to $21m. I.I.T. shareholders were informed in a report for the quarter ended 31 March 1972:

> "I.I.T.'s holdings in the United States constituted 46·6 per cent. of net assets at 31 March. The securities market there remained strong throughout the period showing little reaction to persistent Vietnam problems. To a D large degree the fund's securities are now concentrated in larger more established companies with lower price earnings ratios and higher yields. This should not be construed as a defensive policy but rather as one that should permit participation in a continued bullish environment."

Of the net assets of F.O.F. and Prop at 31 March 1972 having a total value of $133,700,000, $55m. were in readily marketable American securities and $51,200,000 were in cash and deposits. In the report sent to shareholders of E F.O.F. for the quarter ended 31 March 1972 the management's belief was stated to be "that solid, well capitalised companies with strong earnings yields constitute the most promising investments for above average capital growth in the current market climate." Of Venture's net assets at 31 March 1972 worth $51m., $41m. were in readily marketable American securities and $7,300,000 were in cash and deposits. Of Growth's net assets at 31 March 1972 having a total value of just under $10m., $1,100,000 were invested in readily marketable American securities F and $7½m. were in cash and deposits.

49. Between 1 April and 31 October there were sales of more than $121m. of American securities belonging to I.I.T. Between 16 June 1972 and 31 October there were net sales of $64m. of F.O.F.'s and Prop's American securities. Between 1 April and 31 October there were net sales of $41m. of Venture's American securities. The bulk of Venture's sales were carried out in May and June. On 27 November a telex from O.D.B. Lux to Graze and Meissner G referred to many complaints being received by shareholders in I.I.T., F.O.F. and Venture because the Dow Jones index of American securities had gone up considerably while shares in those funds had gone down.

50. The boards of the funds met in Nassau on 19 and 20 June 1972. Meissner told the directors of the funds that it was important to have a more flexible investment policy which allowed the investment adviser and the investment manager to make restricted investments (that is to say investments in securities H which were not readily marketable) without the prior authority of the board of directors, and that in view of the diminishing assets of the funds, and the costs of administering the funds separately, there was a need to consider some reorganisation. The F.O.F. board minutes recorded the suggestion that the acquisition of "independent investment advisory series would be a logical step." The management companies had contracts to provide investment management services for their respective funds. But on 17 July 1972 T.F.S., the parent company of the management companies, contracted with International Capital Investments Ltd. ("Incap"), a Bahamian company owned by LeBlanc and

Graze, for Incap to provide investment services to T.F.S. and its subsidiaries for a fee of $30,000 per month plus a fee based on a percentage of net assets of the funds. The introduction of Incap made no change in the services being provided for the funds which had hitherto been provided by an I.O.S. subsidiary, I.O.S. Management Services Ltd., but left Incap entitled to substantial fees. Graze was in overall charge of Incap.

51. There then followed a number of transactions involving the application of moneys of the funds in making restricted investments, as Meissner had advocated. Indeed in all but one of those transactions Meissner was himself directly involved, and, as the dominant figure in the funds and the management companies, the transaction which was the sole exemption is hardly likely to have been carried out without his consent.

*The Global transaction*

52. On 20 June Meissner convened a meeting of the directors of Venture in Nassau. There were in fact only two directors present, Meissner, who was the chairman of the meeting, and John Schuyler. Of the other two directors of Venture one was ill and the other was a Curaçao company, Curaçao Corp, N.V. (under Netherlands Antilles law a company incorporated there had to have a resident director), for which Schuyler held the proxy. Meissner proposed that Venture should invest $20m. in Global Financial and Global Holdings, $10m. by way of loan and $10m. by way of equity, and told Schuyler that Venture's investment would be protected by a "put" option. Meissner voted for the investment. Schuyler voted his own vote against the investment and purportedly divided the proxy vote half in favour and half against the proposed investment. The proposal was carried by virtue of Meissner exercising his casting vote as chairman in favour. By an agreement dated 22 June Venture agreed to purchase 4m. class B non-voting shares in Global Holdings for $10m. and to lend $10m. to Global Financial on an unsecured debenture bearing 7 per cent. interest (but not until 1 January 1973) and repayable in 1988.

53. Bruno Lederer, whose function it was to see that every proposed investment for a dollar fund was within the powers of that fund, was unhappy about the transaction and refused to authorise payment towards the investment. Lederer felt that the transaction was not an arm's length transaction, because LeBlanc, who controlled Global Financial and Global Holdings, was still intimately involved with I.O.S. even though officially he had ceased to hold any office in the I.O.S. complex. On 14 August LeBlanc spoke to Lederer and assured him that the transaction was an arm's length transaction. But the next day Lederer met Meissner, who admitted that the transaction was not an arm's length transaction and told Lederer that he had to understand that there were certain postures that had to be taken for S.E.C. purposes. Venture completed the transaction without receiving a "put" option. It was indeed a remarkable transaction: no less than 44 per cent. of Venture's assets were placed in two unmarketable high risk investments in companies over which it had no control. It was not a transaction for the benefit of the shareholders in Venture, and it is plain that a major purpose was to provide Global Financial with the means to repay to I.C.C. the amounts due under the promissory notes. The liquidators of Venture have not recovered any moneys from Global Financial or Global Holdings.

*The San Cristobal transaction*

54. The next transaction entered into with moneys of one of the dollar funds was with a Costa Rican company, Sociedad Agricola Industrial San Cristobal S.A. ("San Cristobal") was a manufacturer of rope, rugs and bags from hemp and was also interested in low-cost housing in Costa Rica. More relevantly 60 per cent. of the stock of San Cristobal was owned by members of the Figueres family, to which President Figueres of Costa Rica belonged. He himself was vice-president of San Cristobal and his son was a director. An adviser to the president, Alberto Alvarez, was also a director.

55. In July 1972 Richard Pistell, whose business included that of finding investment opportunities for investors, introduced Vesco to President Figueres. Pistell, in the S.E.C. proceedings, testified as follows: "My whole realm with Mr. Vesco as far as Costa Rica was concerned, which was the one thing that Mr. Vesco was harping on like a broken record, was relocating his local headquarters of fund banking, monetary financial complex, to a new location." Pistell told Vesco that San Cristobal needed financing. It is clear from a letter of 23 July from Howard Cerny, Vesco's American lawyer, to Vesco and LeBlanc regarding various matters, relating, inter alia, to San Cristobal, that both Vesco and LeBlanc were taking an active part in the arrangements in respect of San Cristobal.

56. On 28 July I.I.T. agreed to advance $2,150,000 to San Cristobal for five years. The consideration was to be an unsecured promissory note in that sum with interest at seven per cent. per annum and warrants to purchase 500,000 shares at a minimum of $1 per share. Completion took place on 31 July 1972. Trident Bank for no consideration received warrants to purchase one million San Cristobal shares. Pistell received $150,000 as a finder's fee from San Cristobal. The day San Cristobal paid the $2,150,000 into its bank account, a sum of $50,000 was paid out of that bank account into the personal account of President Figueres. I.I.T. exercised the right to purchase 500,000 shares shortly thereafter at a cost of $300,000 thus making its total investment in San Cristobal $2,650,000. I.I.T.'s loan to San Cristobal was in contravention of the I.I.T. regulations, nor was it for the benefit of the shareholders in I.I.T. that I.I.T.'s money should be risked in an unmarketable investment in a company over which I.I.T. had so little control. I.I.T.'s liquidators have not received from San Cristobal any of the moneys I.I.T. put into it, and San Cristobal is in severe financial difficulties.

*The Inter American transaction*

57. A much larger transaction involving Costa Rica followed. Prop, between the middle of June and the middle of August, made sales of American securities in an amount exceeding $41,500,000. With other cash in hand Prop had more than $60m. available for investment. Cerny arranged for the incorporation of a Costa Rican corporation, Inter American S.A. Inter American had two classes of shares, common shares with voting rights and non-voting preferred capital shares. The common shares must have been under the control of Vesco and his associates. In addition to arranging for the incorporation of Inter American, Cerny in the letter of 23 July 1972 to LeBlanc and Vesco, to which I have already referred, reported on a number of matters involving Inter American, and it is clear from that letter that Vesco and LeBlanc were taking a direct and active part in the arrangements for the investment in Inter American. The signatories for Inter American for an account with B.C.B. included Vesco, Clay and Straub. Some months after the $60m. had already been invested by Prop in Inter American, LeBlanc arranged for a prospectus to be printed. This included the following statement:

> "No limitations are placed on the percentage of the company's assets which may be invested in any one company or the per cent. of any one investment situation or type of investment that [Inter American] may own."

The prospectus referred to the fact that it was contemplated that a significant part of the proceeds from the offering would be invested in one or more closed-end investment companies incorporated under the laws of Panama. The Panamanian company in contemplation was Phoenix Financial S.A. ("Phoenix"), a shell company which Cerny purchased in July 1972.

58. There was no board minute or other recorded authorisation for the investment in Inter American by Prop or F.O.F. Schuyler told the S.E.C. that he had attended a meeting of the boards of the funds in Amsterdam on 11 July and was told by Meissner in August 1972 that, while Schuyler was out of the room, Meissner, Strickler and Walter Howkins had held a F.O.F. board meeting

authorising a $60m. investment in Inter American. Howkins, in an affidavit A
dated 26 February 1975 in proceedings in the Bahamian court for the winding up of P.R.L., denied that he was involved in any way in authorising the Inter American transaction. However, Meissner and Schuyler, on the basis of what he had been told by Meissner on 16 August 1972, on behalf of Prop agreed to purchase six million preferred capital stock in Inter American for $60m. pursuant to the then non-existent prospectus of Inter American dated 1 August 1972.

59. Even before then, to obtain the money for the investment, Prop had B
requested the Bank of New York to transfer $60m. in three tranches to F.O.F.'s account with O.D.B. Lux. F.O.F. then gave promissory notes to Prop for that sum. But once in the hands of O.B.D. Lux the moneys were redesignated as belonging to Prop, and on 30 October instructions were given by Prop to American National to deliver the notes for cancellation because of the repayment by F.O.F. of the loan of $60m. This was simply a device to get the moneys away from the Bank of New York. The moneys went from O.D.B. Lux to B.C.B. for
Prop's account, and, on completion, to Inter American's account with B.C.B. C

60. Lederer's unhappiness over the transactions with Global Financial and Global Holdings was increased by the Inter American transaction. On being unable to find out details of the investment then contemplated he telexed Graze on 11 August as follows:

> "In view of the enormous and unprecedented transfers of money to Nassau for [Prop], I am astounded that no one has seen fit to advise me of the
> details of the investment being contemplated, or for that matter of the D
> entire new direction that fund seems to be taking."

On 14 August LeBlanc spoke to Lederer and told him that the $60m. was for investment in Inter American but that that was all that he, LeBlanc, knew, and that he had nothing to do with it. That was plainly a lie in view of the letter of 23 July 1972, to which I have referred. On 16 August Lederer resigned.

61. Of the $60m., $54m. were invested by Inter American in purchasing E
5,400 preferred non-voting shares in Phoenix. Trident Bank entered into a management contract with Phoenix and the $54m. were transferred by B.C.B. to Trident Bank's account and were thus placed under the control of LeBlanc.

62. Again by any standards this was a remarkable investment. More than half of the assets of F.O.F. and Prop had been placed in a single illiquid investment in a company over which F.O.F. and Prop had no control, and that company had promptly placed most of its moneys in a single illiquid investment
in a company over which it had no control. I find it impossible to see how the F
Inter American transaction could have been for the benefit of the shareholders in F.O.F. Neither the liquidators of F.O.F. have, nor has Prop, been able to recover any moneys from Inter American.

*The E.H.G. transaction*

63. A further surprising investment of fund moneys took place in September G
1972. E.H.G. Enterprises Ltd. ("E.H.G.") is a Puerto Rican property company. The directors included two brothers, Ariel and Enrique Gutierrez, and Alvarez, who was a relation of theirs. E.H.G. had sought additional finance with the aid of its financial advisers, Hornblower & Weeks-Hemphill Noyes, who suggested a private placing of $6m. of 15-year notes (protected by a sinking fund) with warrants, although Ariel Gutierrez said he wanted $8m. But after several
months no investors had been found when, on 31 August 1972, a meeting took H
place at the house of Alvarez in Costa Rica between Alvarez, the Gutierrez brothers, Vesco, Straub and Meissner to discuss E.H.G.'s desire to obtain financing. Vesco suggested a figure of no less than $12m. and also offered to provide banking facilities to enable Ariel Gutierrez to purchase 200,000 shares of E.H.G. from another shareholder for approximately $1,300,000.

64. On 15 September 1972 I.I.T. Management, on behalf of I.I.T., entered into an agreement with E.H.G. and E.H.G. International Financial Corp. ("E.H.G.I.F."), a Netherlands Antilles corporation and a wholly-owned

subsidiary of E.H.G. By that agreement I.I.T. agreed to acquire for a total consideration of $9½m. a $9½m. subordinated debenture of E.H.G.I.F., the principal amount being due in 15 years and bearing interest at 12 per cent. for the second and third years, and at eight per cent. thereafter, but paying no interest in the first year, together with warrants to purchase 316,667 shares of the E.H.G. common stock. There was no sinking fund for the debenture. By a further agreement, dated 15 September 1972, Venture agreed to purchase 250,000 shares of preferred stock of E.H.G. for $2½m., such shares being convertible into common stock after four years. On 13 April Ariel Gutierrez borrowed $13m. from B.C.B., bought the 200,000 shares as contemplated, signed a promissory note in favour of B.C.B. for $13m., pledged 200,000 E.H.G. shares as collateral security and granted B.C.B. an option to purchase 100,000 shares. The $9½m. of I.I.T. moneys and the $2½m. of Venture moneys were transferred by O.D.B. Lux to B.C.B. Completion took place on 28 September 1972 in Nassau.

65. But it was never intended that E.H.G. or E.H.G.I.F. should have the immediate use of all of the $12m. E.H.G.I.F. on the request of LeBlanc entered into a collateral agreement relating to half that sum. By a letter of 28 September 1972 from E.H.G. to I.I.T. Management on behalf of I.I.T., E.H.G. gave instructions that $6m. should be deposited for 181 days to the account of E.H.G.I.F. at B.C.B. for which E.H.G.I.F. would receive a certificate of deposit. That account bore interest at only 4 per cent. A letter of the same date from E.H.G.I.F. to B.C.B. set out the terms of the collateral agreement. The letter recorded an agreement that E.H.G.I.F. would purchase $6m. of debentures in a real estate company being formed by a customer of B.C.B. capable of meeting the terms and conditions of the debentures, which would have substantially the same terms and conditions as the $9½m. debenture. If E.H.G.I.F. failed to purchase the debentures of the real estate company within 181 days from 28 September 1972, it would forfeit and transfer to I.I.T. the certificate of deposit. The real estate company was a company controlled by Straub, Gulf Stream (Bahamas) Ltd. ("Gulf Stream"), as appears from a letter of 29 September 1972 to B.C.B. from Gulf Stream.

66. E.H.G. was in poor financial condition at the time of the transactions with it and E.H.G.I.F., and E.H.G. has since gone into bankruptcy. The liquidators of I.I.T. have not recovered any part of the $12m.

*The Paradise Island transaction*

67. Gulf Stream featured in a further transaction contemplated by Vesco in 1972 but not carried through to completion. In early 1972 Pistell introduced Vesco to James Crosby, the president of Resorts International, which operated a casino, hotel and other properties on Paradise Island off Nassau in the Bahamas. Vesco opened the negotiations for the purchase of such properties and by early October 1972 the terms of the transaction had been negotiated but not completed. The form of the transaction was to be that P.R.L. would acquire, inter alia, two subsidiary companies of Resorts International, Paradise Island Ltd. and the Britannia Beach Hotel Co. Ltd., for $35m., whilst Gulf Stream would acquire Paradise Enterprises Ltd., which owned the casino on Paradise Island and the toll bridge from Nassau to the island for $25m. Coopers & Lybrand were asked to report on the proposed transaction and in February 1972 they did so orally to Vesco, Clay, Straub and LeBlanc. On 16 October William Jennings of Coopers & Lybrand presented to Vesco a written memorandum which updated what had been reported in February. Jennings was troubled by the fact that the assets that P.R.L. were to purchase were loss-making. He wrote in his memorandum "Without knowledge of the concepts underlying the ownership structure of this purchase . . . it is difficult to understand the rationale for the P.R.L. investment i.e. $35m. for negative annual cash flow," and he asked the question "How can P.R.L. justify $35m. investment in companies with no cash flow?" Vesco told Jennings on 16 October that Gulf Stream was going to enter into a partnership with the Bahamian government, whereby the

government would own 50 per cent. of Gulf Stream, in exchange for not taxing the gambling profits, and 40 per cent. would be owned by Straub. A

68. The transaction was not completed because of the commencement of S.E.C. proceedings in November 1972 as I shall shortly mention, but prior thereto American National, early in October 1972 at the direction of O.D.B. Lux, transferred $15m. of I.I.T. moneys to B.C.B., designated for the account of I.I.T. reference Gulf Stream. These Gulf Stream moneys appear to have been used by B.C.B. for its own purposes. In any event they were never returned, and have not been recovered by the liquidators of I.I.T. B

*The Vencap transaction*

69. The last investment involving fund moneys that I must mention related to a company called Vencap Ltd. ("Vencap"). Pistell formed Vencap in the Bahamas in July 1972. Its original share capital consisted of 4,000 common shares with voting rights. Approximately half the common shares were issued to C Pistell. On 31 August 1972 the shareholders of Vencap resolved to authorise the issue of 30,000 $100 redeemable preference shares. Those shares had no voting rights, they were entitled to a 6 per cent. non-cumulative dividend only as and when declared, and to share in one-third of the net earnings of Vencap only as and when declared. They were to be redeemable only at Vencap's option at par, together with 6 per cent. interest (but only for any unexpired portion of the year of redemption). On 29 September an agreement providing for I.I.T. to invest in D Vencap was executed by Meissner on behalf of I.I.T. Management, and by Pistell on behalf of Vencap. By the agreement I.I.T. Management, on behalf of I.I.T. agreed to subscribe for 30,000 redeemable preference shares of Vencap for $3m. and Vencap agreed to issue to I.I.T. warrants to purchase a further 30,000 redeemable preference shares on or before 6 October 1975. The agreement was completed in October 1972, $3m. being transferred by American National to B.C.B., which transferred that sum to Vencap. E

70. A written memorandum was prepared by Pistell in connection with the investment made by I.I.T. In the memorandum it is stated that Vencap proposed to offer on a very limited basis $3m. in preference shares (i.e. 30,000 $100 shares) to a select group of "sophisticated investors" who recognised that "risk deserves a high return." In fact I.I.T., the only subscriber for the preference shares, had no right to a return at all, unless the holders of the common shares agreed. F

71. After Vencap had received the $3m. from I.I.T., Pistell was able to obtain a loan for himself of $590,000 by the following method. Vencap deposited $600,000 in Handelskredit Bank for which Vencap received a certificate of deposit. Pistell then caused Intercapital N.V., a Netherlands Antilles corporation, to borrow $550,000 from Handelskredit Bank, Intercapital N.V. lent $550,000 to Pistell, and Vencap pledged its $600,000 certificate of deposit to Handelskredit Bank as security for Intercapital N.V.'s borrowing from Handelskredit Bank. Pistell used part of the $590,000 to pay his own tax arrears and outstanding G loans.

72. Again it is hard to see any commercial justification for such a transaction by I.I.T. The application by I.I.T. of its moneys in such an illiquid, unmarketable and risky investment cannot have been for the benefit of the shareholders of I.I.T. I infer that the intention was to do a favour for Pistell. The liquidators of I.I.T. have recovered only $2,400,000 of the $3m. put into Vencap.

H

*Transfers to B.C.B. of dollar fund moneys*

73. Both before and after 27 October (the date as of which the sub-depository agreement was to take effect), O.D.B. Lux and American National were instructed by the funds to make transfers to B.C.B. of very large sums following the massive sales of securities to which I have referred. The funds' instructions were that the sums were to be placed in interest-bearing call accounts, identified by specific reference numbers. In October alone I.I.T.'s net

sales were $91½m., F.O.F.'s and Prop's were $22,300,000, Venture's were $7½m. and Growth's were $6,200,000. On 26 October I.I.T. Management directed O.D.B. Lux to transfer $106½m. from I.I.T.'s account with O.D.B. Lux to B.C.B. The same day F.O.F. directed O.D.B. Lux to transfer in the same way to B.C.B. $1,800,000 from its account with O.D.B. Lux. Again on 26 October Prop directed American National to transfer to B.C.B. $18½m. Still the same day Venture directed O.B.D. Lux to transfer $10,200,000 from other banks to its own call account, and then to transfer that sum in the same way to B.C.B. Finally Growth also on the same day instructed American National to transfer $6·4m. to B.C.B. All the directions were given over the signatures of Meissner and Schuyler. These sums were not received by B.C.B. till 30 October. Each of the funds thereafter caused further addition to and at least one withdrawal from B.C.B. so that by 6 December, if interest is ignored, sums amounting to £120,950,000 derived from I.I.T., $18,550,000 derived from Prop, $13,800,000 derived from Venture, $6,420,000 derived from Growth and $2,400,000 derived from F.O.F. (making a total of $161,920,000) were with B.C.B. On 4 December American National authorised B.C.B. to redesignate the moneys derived from Prop and Growth as held for O.D.B. Lux for Prop and Growth respectively.

74. On 27 October O.D.B. Lux told Schuyler, as secretary for I.I.T., F.O.F. and Venture, that in respect of the intended deposits with B.C.B. of moneys of those funds, as the sub-depository agreement was not yet in force, O.D.B. Lux felt it was its responsibility to tell fund management, but that it would execute instructions under the terms of the depository agreements. In respect of all the moneys which went to B.C.B. (including the moneys which came from American National and were redesignated) O.D.B. Lux, in its advice notes to the management companies, recorded that it was acting under the terms of the depository agreement with the fund concerned for the account of and at the risk of that fund. There is no reference in such advice notes to the sub-depository agreement. However, there is no record of any contemporaneous instruction by O.D.B. Lux to B.C.B. indicating that it was under the depository agreements that the moneys were transferred to B.C.B. Indeed, as I shall recount, the communications between B.C.B. and O.D.B. Lux, at any rate initially, show that it was contemplated not only by B.C.B. but also by O.D.B. Lux that the moneys were held by B.C.B. under the sub-depository agreement.

75. Plainly Vesco and his associates wanted this enormous sum of money derived from the funds to be in the hands of B.C.B., which could deal with it in the Bahamas as they thought fit. B.C.B. was not in a healthy financial position and, as Mr. Leckie on behafl of S.G. accepted, the principal purpose of having the moneys in B.C.B. can be inferred to have been to protect B.C.B.'s liquidity.

*Movements of fund moneys by B.C.B.*

76. All of the $161,920,000 transferred to B.C.B. was placed by B.C.B. on deposit with various banks and was the subject of numerous movements to other banks over the next few months. Under the direction of David Jones, one of the joint liquidators of B.C.B., a thorough investigation was made in 1975 of those movements. The result of that investigation was an elaborate document, produced in August 1975 and known as the flowchart, which shows in diagrammatic form the receipt of those moneys on and after 30 October 1972, and their movements thereafter till 12 April 1973. S.G. accepts that the flowchart is factually correct in showing the placing of moneys derived from the funds with B.C.B. on the dates and in the amounts specified in the flowchart, and that the moneys were therafter placed by B.C.B. and moved in the manner that is shown in the flowchart, and that at 12 April 1973 the moneys' location has been correctly identified in the flowchart. But whilst in that period both I.O.S. and B.C.B. were purporting to be able to identify which fund owned which moneys deposited with which bank. Jones's investigations showed, and it has been accepted before me, that the moneys transferred to B.C.B. and derived from the various funds in fact became intermingled in B.C.B.'s hands and cannot now

be allocated on an individual basis between the funds. They were however kept segregated from other moneys held by B.C.B. A

*The S.E.C. proceedings*

77. On 27 November 1972 the S.E.C. proceedings commenced in the United States District Court, Southern District of New York, against Vesco and 18 other individuals and 21 companies. The S.E.C. is an American statutory body set up under the American Securities and Exchange Act 1934, but it is B independent of government. It has wide powers of investigation and can institute proceedings in respect of offences under that Act and regulations made thereunder. The S.E.C. proceedings were the culmination of months of investigation.

78. In its filed complaint, a written document of some 53 pages, the S.E.C. set out in detail its allegation against the defendants to those proceedings. In the first and major count it was alleged against Vesco and 16 other individuals C including LeBlanc, Meissner and Straub, and 14 companies including B.C.B. and O.D.B. Lux that they had engaged and were continuing to engage in acts and practices which constituted violations of section 10(*b*) of the Securities Exchange Act 1934 and of regulation 10B–5 of the regulations made thereunder. That section makes it unlawful for any person by any of certain specified means to use or employ in connection with the purchase or sale of any security any manipulative or deceptive device or contrivance in contravention of rules and D regulations prescribed by the S.E.C. Regulation 10B–5 makes it unlawful for any person by any such specified means, inter alia, to employ any device, scheme or artifice to defraud or to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security. Other counts alleged other offences under the Act of 1934 and regulations.

79. In the complaint the S.E.C. traversed much the same ground as has been E traversed thus far in this judgment and it unequivocally raised the accusation of fraud. Thus in paragraphs 29 and 30 it was said:

> "29. From prior to 1 March 1972, up to and including the present, defendant Vesco and the defendants named in the next paragraph have . . . employed a scheme to defraud investors, engaged in acts and practices which have operated as a fraud or deceit . . . in connection with the purchase and sale of: . . . (c) securities owned by public investors in four F mutual funds managed by I.O.S. subsidiaries which invest primarily in the United States securities markets. These mutual funds, known as the "dollar funds," include [Venture], [F.O.F.], I.I.T. and [Growth]; and (d) portfolio securities owned by the four mutual funds just named.
> "30. In engaging in the aforesaid scheme and fradulent acts and practices, defendant Vesco had acted in concert with and has been aided and abetted by defendants LeBlanc, Meissner, Stickler, Graze, Beatty, Clay, Snipes, G Roosevelt, Weymar, Straub, Buhl, Richardson, Schuyler, Stoltenberg, Cerny, Conwill, Merritt, D'Alimonte, [I.C.C.], [B.C.B.], [O.D.B. Lux], [I.B.L.], [V.C.L.], I.O.S., [T.E.S.], [Kilmorey], Global Holdings, Global Financial, I.I.T. Management, [F.O.F. Management], Venture Management and [Growth Management]."

80. The general nature of the alleged scheme and allegedly fraudulent acts and practices was described as including the following in paragraph 32(b): H

> "Defendant Vesco, in March and April 1972, caused effective control of the cash and securities of the dollar funds to be transferred from independent and responsible banks, including the Bank of New York, which were acting as custodians of the assets of the dollar funds to newly formed thinly capitalised foreign entities—[O.D.B. Lux] and [B.C.B.], both controlled by defendant Vesco. Then, from April 1972 through the present, defendant Vesco and his group have caused the dollar funds to sell in the United

> States securities markets a major part of their securities portfolios, consisting of high grade, readily marketable securities issued by United States companies, in furtherance of a scheme to remove the proceeds from banks located in the United States to entities outside the country and to use these proceeds, which to date have exceeded $224m., to further the personal interests and pursuits of defendant Vesco and his group (to the detriment of investors in the dollar funds)."

The S.E.C. described as "Vesco and his group" the following persons, namely Vesco, LeBlanc, Meissner, Stickler, Graze, Beatty, Clay, Straub and Weymar. In paragraph 35(a) there was a reference to the "intended misappropriation [by Vesco and his group] of the assets of the dollar funds and of the assets of . . . [I.P.I.] and [G.N.R.P.]."

81. In paragraph 63 of the complaint Vesco and his group were alleged to have caused large amounts of dollar funds moneys (there stated probably to exceed $60m.) to be placed with B.C.B. and O.D.B. Lux.

82. Paragraph 75(a) contained the following allegations:

> "Defendants LeBlanc, Meissner, Strickler, Graze, Beatty, Clay, Snipes, Weymar, and Straub are trusted and close aides of defendant Vesco and participated in his formulation of plans to mulct the dollar funds and helped to execute those plans . . . defendants Clay and Straub served, respectively, as president and chairman of the board of directors and vice-president and vice-chairman of the board of [O.D.B. Lux], through which defendant Vesco funnelled and diverted moneys of the dollar funds. Defendants Clay, Snipes, Straub and Weymar (along with defendant Vesco) served as directors of [B.C.B.], defendant Vesco's chief conduit for the diversion of dollar fund assets."

83. The relief sought in the complaint included injunctions to prevent further acts and practices in violation of section 10B of the Securities Exchange Act 1934 and regulation 10B–5 of the regulations made thereunder, and the appointment of a receiver. The S.E.C. also at the same time moved for a preliminary injunction and temporary receiver. In support it filed a pre-trial memorandum, another massive document which with its appendices amounts to 62 pages and in which are set out the facts and arguments which the S.E.C. relied on. Again there are unequivocal assertions of fraud backed by detailed allegations of fact with references to the sources of those facts, be they documents or oral testimony. The language used is again vivid: it refers for example to the "wholesale looting" by Vesco and his group of the dollar funds. It further alleged that the flow of dollar fund assets to Vesco and his group was continuing unabated, and cited as an example the transfer by American National to B.C.B. during the early part of November 1972 of $10m. representing sales proceeds of United States securities of the dollar funds.

84. On 20 December 1972 by consent and without adjudicating on objections taken by some defendants to the jurisdiction and without making any findings of fact, District Judge Stewart in the District Court made what was known as "the bridge order," whereby it was ordered that none of the dollar funds should make any new investment commitment except for purchases of publicly traded American securities and certain specified transactions such as certain bank deposits, in each case in accordance with the investment policies set forth in the last prospectus of that fund, and that the management companies should give the S.E.C. frequent and regular information on each fund's transactions.

85. The S.E.C. complaint, in the words of Daniels giving evidence before me, "burst like a bombshell on the I.O.S. organisation." The launching of the S.E.C. proceedings with the attendant wide publicity that it received both here and in the American press must also have come as a great shock to those dealing with that organisation. In October 1972 Kilmorey had sold its holding in I.O.S. to some Spanish investors who then went onto the board of I.O.S. and that of T.E.S., and started to take control, as can be seen from the fact that on 10 November through T.F.S. they gave instructions to Graze that without

further instructions Incap was to cease all movements of funds, investments or any other activity affecting or relating to the management, control or investment policy of the funds under management by the management companies. The institution of the S.E.C. proceedings caused the Spanish investors hastily to unscramble the sale. At Meissner's request at the end of November two independent English directors were voted onto the board of I.O.S., George Roberts and Jack Shepard. But there were four Latin Americans who became directors and they were certainly not independent: they could not even speak English and looked to a Vesco associate like Strickler (who was another director of I.O.S.) not only to translate for them but also to indicate to them how they should vote.

*Attempts by O.D.B. Lux to recover the dollar fund moneys from B.C.B.*

86. At the same time as instituting its proceedings the S.E.C. sent representatives to England, Luxembourg and Switzerland to encourage the authorities there to take action to prevent what the S.E.C. believed to be the further looting of the funds. On 27 November the Luxembourg banking commissioner, Albert Dondelinger, requested O.D.B. Lux by telephone that it should freeze the I.O.S. funds with O.D.B. Lux. On 28 November Dondelinger wrote to O.D.B. Lux requesting it to suspend payments for investment by order of I.I.T., to deposit I.I.T.'s liquid assets with Luxembourg banks, to withdraw the deposits of F.O.F., Prop, Venture and Growth from B.C.B. to Luxembourg banks and to report on the assets and liabilities of the funds with O.D.B. Lux. This request was passed on by telex to B.C.B. by O.D.B. Lux the same day, and B.C.B. was asked to liquidate deposits in Nassau. But Graze replied by telex also the same day that, since they had received specific orders from the new owners of I.O.S. and from T.F.S., they lacked authority and were powerless to follow the request of O.D.B. Lux unless new instructions were received from the respective funds and management boards.

87. Still on 28 November O.D.B. Lux telexed B.C.B. for details concerning deposits of $153,250,000 and to transfer urgently the total amount to O.D.B. Lux. Rogers in his capacity as a director of O.D.B. Lux telexed back from Nassau confirming that O.D.B. Lux should use its utmost endeavours to comply with Dondelinger's request but advised that it should not expose itself to a claim for damages by "clients." Rogers asked that legal advice be obtained from O.D.B. Lux's Luxembourg lawyer, Maître Dupong, as to O.D.B. Lux's obligations if "clients" refused to move the cash as directed by Dondelinger, and continued: "It seems to me that under sub-custodian agreement"—I interpose to say that this is a reference to the sub-depository agreement—"only the depository may give instructions to sub-custodian to move cash." On 29 November O.D.B. Lux after receipt of legal advice from Dupong telexed B.C.B. in confirmation of its telex of 28 November and requested pursuant to the terms of paragraph 3(b) of the sub-depository agreement that B.C.B. should deliver $153,250,000 to O.D.B. Lux. This was made up of $15m. Gulf Stream moneys and $121,850,000 of other moneys from I.I.T., $14m. from Venture and $2,400,000 from F.O.F. In a further telex the same day O.D.B. Lux repeated to Graze the request that the moneys held by B.C.B. be transferred back to O.D.B. Lux, such request being said to be pursuant to the terms of the sub-depository agreement.

88. On 29 November B.C.B. telexed to O.D.B. Lux its reply, in the drafting of which Rogers as secretary of B.C.B. had a hand. It said that all the moneys placed by O.D.B. Lux with B.C.B. had been placed by B.C.B. with major banks on time deposits in segregated accounts in accordance with previous instructions, that the sub-depository agreement provided that the dollar funds might also give instructions direct to B.C.B. and a reference was made to the instructions of T.F.S. communicated on 15 November, to which I have already referred, and B.C.B. pointed out that those instructions conflicted with O.D.B. Lux's instructions. B.C.B. also referred to the fact that it, as well as O.D.B. Lux, was subject to allegations by the S.E.C. and that in addition B.C.B. was affected by actions by the Ontario Securities Commission and subject to direct

23-01165-mew Doc 106-2 Filed 07/03/25 Entered 07/03/25 17:38:30 Exhibit 2-1 Pg 26 of 58


regulation by the Bahamian Monetary Authority. B.C.B. also stated that its legal counsel had advised that no action should be taken by B.C.B. until its position was clarified and that the Bahamian Monetary Authority was in accord with that. B.C.B. said that it regretted consequently that it was unable to comply with O.D.B. Lux's request "until clear authority from the appropriate parties and jurisdictions have been determined pursuant to the laws and regulations that govern [B.C.B.]."

89. On 30 November O.D.B. Lux telexed B.C.B. referring to the sub-depository agreement and pointing out the terms of clause 3(b) by which B.C.B. was obliged to deliver any cash held thereunder in accordance with written instructions from O.D.B. Lux. O.D.B. Lux stated that the instructions of 28 and 29 November were given pursuant to those terms. O.D.B. Lux also referred to the concluding terms of clause 3 whereby the funds agreed not to interfere with B.C.B., and stated that pursuant thereto O.D.B. Lux again requested the transfer of moneys. It appears from a summary of events prepared by O.D.B. Lux for its English lawyers that on 4 December O.D.B. Lux again telexed B.C.B. referring to the sub-depository agreement and that on 5 December Dupong telexed Meissner in particular in respect of the interpretation of the sub-depository agreement. B.C.B. also received written advice on 7 December from Graham Thompson & Co., its Bahamian lawyers, on the interpretation of that agreement and was informed that the instructions of the funds prior to the delivery of written notice by O.D.B. Lux would have to be obeyed. Graham Thompson & Co. also advised that the placing of cash with a bank was an investment within the meaning of the bridge order (and so an act which was prohibited), but not the delivery of cash to O.D.B. Lux. On 12 December the board of O.D.B. Lux met. There Robertson raised the point for the first time that the sub-depository agreement may not have been valid as not having complied with the resolution of the board of O.D.B. Lux conditionally authorising O.D.B. Lux to enter into the agreement. Dupong advised that approval of the Luxembourg authorities had to be obtained especially for I.I.T. and this had not been done. The board concluded that the sub-depository agreement was probably not valid and that O.D.B. Lux had the right to call the deposits back. The board resolved that following the instructions of Dondelinger O.D.B. Lux had no option but to recall the deposits of I.I.T. placed with B.C.B. and that two directors should endeavour to obtain the return of moneys relating to the other funds as well. The sanction which the board feared was the revocation of its banking licence by the Luxembourg government. The threat to the corporate existence of O.D.B. Lux was the dominating consideration in the thinking of the O.D.B. Lux board thereafter and, although I.B.L. as its parent company could have used its voting power to dictate to O.D.B. Lux, there is no evidence that it did. O.D.B. Lux acted as though it was a wholly independent company.

90. On 18 December Dondelinger telexed I.I.T. Management repeating instructions to B.C.B. to transfer the deposits of seven Luxembourg banks including Kredietbank and Banque Internationale. On 20 December O.D.B. Lux wrote to B.C.B. giving notice of recall of I.I.T. moneys deposited with B.C.B. B.C.B. informed O.D.B. Lux that it would be prepared to transfer the moneys subject to certain conditions being satisfied including instructions being received from I.I.T. Management and notification being given to the Bahamian Monetary Authority and the New York District Court. On 22 December B.C.B. gave instructions for the transfer on 27 December of $19,200,000 of the I.I.T. moneys deposited with it to Kredietbank by way of deposit, such deposit not to be released without the written instructions of O.D.B. Lux together with the approval of the Luxembourg banking commissioner as well as the written instructions of I.I.T. Management. A further sum of $2,300,000 was transferred to Kredietbank on 9 January 1973 on the same term and this sum was shortly thereafter placed with Banque Internationale. Thus a total of $21½m. had been returned to Luxembourg though not into the sole name of O.D.B. Lux.

91. On 9 January 1973 the Bahamian Monetary Authority (which had regulatory powers over Bahamian banks like B.C.B.) wrote to B.C.B. asking for details of the relationship between B.C.B. and O.D.B. Lux and requesting that no further action be taken in respect of O.D.B. Lux's deposits with B.C.B. Ian Heatley, B.C.B.'s manager, in his affidavit dated 12 February 1973 in the subsequent proceedings brought by O.D.B. Lux against B.C.B. in the Bahamas stated that B.C.B. had treated the request as an order. However B.C.B. continued to reinvest the deposits as they matured but relied on the Bahamian Monetary Authority's request as one of the reasons for refusing to return the deposits to Luxembourg.

92. At the beginning of January O.D.B. Lux took the advice of Daniels, then an assistant solicitor with Simmons & Simmons. He advised the board of O.D.B. Lux on 12 January that proceedings would have to be brought in the Bahamas to obtain repayment of the sums deposited by O.D.B. Lux with B.C.B. O.D.B. Lux accepted that advice. Daniels instructed English leading counsel, Paul Baker Q.C., and the Bahamian firm of Callenders Orr Pyfrom & Roberts ("Callenders Orr"), the partner chiefly concerned being Colin Callender. O.D.B. Lux then with the approval of Dondelinger commenced proceedings against B.C.B. in the Bahamian Supreme Court on the equity side (the Bahamian equivalent of the Chancery Division) on 31 January.

93. By the originating summons it sought:

> "Repayment of the respective balances outstanding of sums forming part of the [funds] deposited by [O.D.B. Lux] as depository of the [funds] with [B.C.B.] between 4 October 1972 and 27 November 1972."

At the same time it sought an interlocutory injunction preventing B.C.B. from paying otherwise than to or with the agreement of O.D.B. Lux any such moneys and in particular $155,420,000 shown deposited as follows:

| | |
|---|---|
| $10,000,000 | Algemene Bank Nederland N.V. ("Algemene Bank") |
| $88,370,000 | Bank of Montreal, Montreal |
| £10,050,000 | Bank of Montreal (Bahamas and Caribbean) Ltd., Nassau ("Bank of Montreal, Nassau") |
| $15,000,000 | Chase Manhattan Bank, Nassau |
| $2,000,000 | First National City Bank Ltd., Nassau |
| $5,000,000 | Union Commercial Bank of Cleveland, Nassau ("Union Commerce") |
| $15,000,000 | Barclays Bank International, New York |
| $10,000,000 | B.C.B. |

94. The sum of $155,420,000 was made up of the $161,920,000 (the net deposits of the funds with B.C.B.) plus the $15m. Gulf Stream moneys less the $21½m. deposited with the Luxembourg banks and already subject to a condition that they could not be moved without the agreement of O.D.B. Lux. The situation of the remaining deposits accorded with information contained in a telex sent to O.D.B. Lux by B.C.B. on 8 January. However, Heatly, in an affidavit sworn by him on 12 February on behalf of B.C.B. in the same proceedings, said that the position of the $155,420,000 on 1 February was as follows:

| | |
|---|---|
| $85,370,000 | Bank of Montreal, Montreal |
| $18,050,000 | Bank of Montreal, Nassau |
| $20,000,000 | Crédit Lyonnais |
| $10,000,000 | Algemene Bank |
| $7,000,000 | Union Commerce |
| $15,000,000 | B.C.B. |

The flowchart shows that the first five banks mentioned did at that date have the sums stated by Heatly to be with them. Accordingly the $15m. shown as being with B.C.B. represented the $15m. Gulf Stream money.

95. Lamboray swore an affidavit on 29 January on behalf of O.D.B. Lux. In setting out the basis of the claim of O.D.B. Lux he referred only to the

A depository agreements, as Baker and Daniels supported the view that the sub-depository agreement was not effective to bind O.D.B. Lux.

96. An interim injunction in the terms requested by O.D.B. Lux was granted ex parte by the Bahamian Chief Justice, Brice C.J. on 1 February. Consideration was at the same time given by Daniels to the possibility of an injunction being sought by O.D.B. Lux in Canada in respect of the moneys deposited by B.C.B. with the Bank of Montreal, Montreal. But the Canadian lawyers of O.D.B.
B Lux, Stikeman Elliott, in a telex to Daniels were pessimistic as to the possibility of obtaining an interlocutory injunction and expressed concern about the effect of clause 3(d) of the sub-depository agreement.

97. It was soon appreciated by B.C.B. that the injunction which had been obtained from the Bahamian court had serious practical disadvantages. The moneys the subject of the injunction could not be reinvested to best advantage as deposits matured. Further Daniels was concerned lest B.C.B. might be put into liquidation by creditors and the moneys deposited by O.D.B. Lux might not
C be treated as trust moneys, with the result that they would be claimed by the liquidator to pay B.C.B.'s debts. Daniels suggested to O.D.B. Lux that the moneys be put in the joint names of B.C.B. and O.D.B. Lux. To segregate funds in this manner, he telexed O.D.B. Lux on 15 February, would assist to prevent the possibility of their being seized by other creditors of B.C.B. because their nature as trust funds would then be clear to all parties concerned. Alternatively, he suggested by that telex, putting the funds into the name of a
D trustee bank for the benefit of O.D.B. Lux and B.C.B. would have the same effect. He further pointed out that, if O.D.B. Lux merely continued the injunction, it had to rely on B.C.B. for information as to where the moneys were placed.

98. Dondelinger was pressing for the return of the moneys to Luxembourg. In the meantime Dupong had been urging Roberts and Shepard that the funds should intervene, and the funds, acting through Meissner, Roberts and Shepard,
E on 14 February instructed an American firm of lawyers. Arnold & Porter, who were already acting for the funds in the S.E.C. proceedings, to represent them in the Bahamas. The attitude adopted by Meissner, Roberts and Shepard on behalf of the funds (though, in the case of Meissner, that was only his overt attitude, as I shall explain) was to support the return of the moneys to Luxembourg, preferably into O.D.B. Lux's sole name, but alternatively into the joint names of O.D.B. Lux and B.C.B. Daniels was extremely anxious to obtain
F an agreed interim order which would leave effective control of the moneys with O.D.B. Lux, while at the same time he wanted the moneys to be seen to be trust moneys held in trust for the funds by B.C.B. B.C.B. refused to return the moneys to Luxembourg and on 22 February suggested that a list of banks and currencies be agreed so that the moneys might be placed on the inter-bank market. Among the banks suggested by B.C.B. was S.G. in London. Even though he did not have Dondelinger's approval, Daniels agreed with B.C.B. the
G form of a consent order, which on 23 February the Bahamian court made. B.C.B. thereby continued until the determination of the originating summons to be restrained from paying (otherwise than to O.D.B. Lux or as it should direct) any balance outstanding of the sums deposited by O.D.B. Lux with B.C.B. and in particular the sums shown in the schedule to the order; but this was subject to a proviso that the direction of O.D.B. Lux should not be unresonably withheld in respect of any proposal to place those sums in freely convertible funds or in freely convertible currency, such funds to be placed in trust accounts in any of
H 19 specified banks for the benefit of the particular fund to which the moneys related. S.G. in Paris and London was one of the specified banks.

99. The schedule to the order showed $155,420,000 as follows:

| | |
|---|---|
| $10,000,000 | Algemene Bank |
| $105,370,000 | Bank of Montreal, Montreal |
| $18,050,000 | Bank of Montreal, Nassau |
| $7,000,000 | Union Commerce |
| $15,000,000 | B.C.B. |

Again if the \$15m. shown as being in B.C.B. are treated as the Gulf Stream moneys, the schedule accurately records the situation of the \$161,920,000 derived from the funds other than the \$21½m. deposited with Luxembourg banks.

100. Daniels reported to O.D.B. Lux and thence to Dondelinger by telex and, commenting on the requirement that funds be placed in trust accounts, said that this was vitally important in that those funds were clearly seen to be trust funds in the event of any liquidation of B.C.B. both as regards B.C.B. and more importantly the third party banks holding the funds.

101. Arnold & Porter in the meantime caused Bahamian lawyers, Isaacs Johnson & Thompson, to be instructed to intervene in the Bahamian proceedings on behalf of the funds. Kendall Isaacs Q.C. was the partner chiefly concerned. Isaacs was told that the interest of the funds was that the moneys be returned to O.D.B. Lux. On 26 February a summons was taken out in the Bahamian proceedings asking for F.O.F., Venture, I.I.T. and Growth (and later by amendment I.I.T. Management and Prop) to be joined as defendants on the ground that all of the moneys in issue in the proceedings were the property of the funds, and the sub-depository agreement was exhibited on an affidavit filed on behalf of the applicants. An order to that effect was made on 6 March.

102. One possible problem in connection with the implementation of the order of 23 February was foreseen by Daniels. All inter-bank movements of dollars had to pass through the New York clearing system and Daniels was worried that if moneys were designated for one of the funds they might be frozen by the S.E.C. in New York. Accordingly on his suggestion it was decided that, when moneys were placed in a trust account, that account should merely be designated a B.C.B. trust account without mention of the fund for the benefit of which the moneys were held.

103. On 28 February another regulatory agency, the Quebec Securities Commission, on the instigation of the S.E.C. froze the deposits held in the name of B.C.B. by the Bank of Montreal in Montreal. B.C.B. represented to the commission that one of the B.C.B. accounts, with a credit balance of £3,400,000 was a drawing account of B.C.B. and asked that it be unfrozen. The commission acceded to that request but, after \$1m. had rapidly been drawn out of that account, the account was refrozen.

104. Following the order of 23 February there were negotiations between the various persons representing interested parties, though not all of them were parties to the proceedings. The negotiations were with a view to settling the proceedings before the hearing of the originating summons fixed to commence on 9 April. The interested parties had numerous lawyers acting for them. O.D.B. Lux had Daniels, Callender and Baker. Werner Kronstein of Arnold & Porter and Isaacs acted for the dollar funds. The management companies had Calvin Cobb of the American firm of Steptoe & Johnson acting for them. Dondelinger had Bahamian attorneys, Seligman and Maynard, looking after his interests in Nassau. B.C.B. had two firms of Bahamian lawyers, Dupuch & Turnquist, of whom Eugene Dupuch Q.C. was the partner concerned, and Graham Thompson & Co. Also involved was an American lawyer, William Metz, who was Meissner's personal legal adviser. There were even some German lawyers acting for German shareholders in the dollar funds who at one stage wanted to intervene in the Bahamian proceedings. The American lawyers were particularly concerned at the effect of the bridge order on any agreement, and they thought it important that the S.E.C. and the District Court in New York should be kept informed, and should give their respective approvals to any such agreement.

105. Initially the primary negotiations were between LeBlanc on behalf of B.C.B. and Meissner on behalf of the funds and management companies. By 9 March negotiations had reached the stage where a written outline of an agreement had been prepared as well as a draft (prepared for B.C.B. by Graham Thompson & Co.) of an agreement. The outline envisaged that there would be a written agreement between the management companies and B.C.B.

which would be consented to and signed by the funds, O.D.B. Lux and I.B.L., and that the agreement would provide, inter alia, that deposits of $176,920,000, were as shown in an appendix A thereto, setting out which fund's moneys were located at which bank, that B.C.B.'s fees up to the date of the agreement were $690,000, that all deposits less $25m. would be returned on a scheduled roll over basis in accordance with an appendix B thereto in tranches over ten months, that the management companies would direct B.C.B. to place moneys in accordance with an agreed schedule of banks set out in an appendix C thereto, that the $25m. would remain on deposit at B.C.B. but that, immediately on completion, the parties would acknowledge that the $25m. would take the form of certificates of deposits or time deposits until a separate agreement was implemented, whereby I.B.L. would issue debentures therefor, and that all the parties would agree to a consent order in the Bahamas court.

106. Appendix A showed deposits as follows:

| | | | |
|---|---|---|---|
| I.I.T. | $135,920,000 | O.D.B. Lux | $2,900,000 |
| | | Kredietbank | $21,500,000 |
| | | B.C.B. term | $20,000,000 |
| | | Bank of Montreal, Nassau | $5,000,000 |
| | | Bank of Montreal, Montreal | $86,500,000 |
| | | | $135,900,000 |
| Prop | $18,550,000 | B.C.B. term | $5,000,000 |
| | | Bank of Montreal, Montreal | $13,800,000 |
| | | | $18,800,000 |
| Venture | $13,800,000 | Union Commerce | $7,000,000 |
| | | Bank of Montreal, Nassau | $6,800,000 |
| | | | $13,800,000 |
| Growth | $6,410,000 | Bank of Montreal, Nassau | $3,400,000 |
| | | Bank of Montreal, Montreal | $3,000,000 |
| | | | $6,400,000 |
| F.O.F. | $2,200,000 | Bank of Montreal | $2,200,000 |

107. There are obvious discrepancies between the figures in the column on the left and those in the column on the right. More importantly there are discrepancies between the deposits shown in appendix A and the actual deposits, the true position and amounts of which are shown in the flowchart. The $15m. of Gulf Stream moneys which can be identified with $15m. of the $20m. of I.I.T. moneys shown as being with B.C.B. can for this purpose be ignored. The inaccuracy of the figure of $21½m. shown as at Kredietbank ($2,300,000 was in fact with Banque Internationale, Luxembourg) is unimportant. What are significant are the omission of $10m. at Algemene Bank and the inclusion of $10m. as "B.C.B. term." There is no evidence that instructions were ever given by the funds or O.D.B. Lux that the deposits made by them of fund moneys should become term deposits. Further a deposit of £2,900,000 is shown as at O.D.B. Lux. That appears to have been a reference to a sum of $2,900,000 provided for O.D.B. Lux when it increased its capital in March 1972 but which was left deposited with B.C.B. until January 1973 when inadvertently B.C.B. returned that sum to O.D.B. Lux which refused to return it. The £2,900,000 was not derived from the funds, as B.C.B. must have known. Thus the appendix purports to show a total of £12,900,000 moneys derived from the funds as being at places where we know from the flowchart they were not. But it is to be noted that $7m. was still shown to be with Union Commerce, as was correct.

108. The draft agreement was in the form envisaged in the outline. There are only a few matters contained therein which I need mention. It was recited that the funds deposited moneys of theirs with O.D.B. Lux in accordance with the depository agreements, that by the sub-depository agreement O.D.B. Lux appointed B.C.B. sub-depository in respect of those moneys, that the sub-depository agreement provided that B.C.B. should deal with those moneys in

accordance with the written instructions of O.D.B. Lux and the funds, that the funds and B.C.B. had agreed that the injunction ordered by the Bahamas court on 23 February should be stayed, and that those moneys should be managed by B.C.B. as provided in the agreement.

109. Those recitals show that B.C.B. and the funds were proceeding on the footing that the sub-depository agreement was valid and that under its provisions they could exclude O.D.B. Lux from further control of the moneys. The operative part of the draft agreement contained, inter alia, an acknowledgement by the parties that the moneys listed as being on deposit at the banks named in appendix A thereto (which no doubt corresponded to appendix A to the outline) constituted all of the moneys of the funds under the depository agreements, sub-depository agreement and the Bahamas court order of 23 February and a provision that the $25m. to remain with B.C.B. would be repayable over a 10-year period. A draft indorsement to the agreement was proposed whereby O.D.B. Lux would consent thereto and would indemnify B.C.B.

110. On 10 March there were two meetings in Nassau between LeBlanc for B.C.B. and Cobb for the management companies, and in addition at the second meeting Kronstein and his associate Tom Scheuneman were present for the funds. The purpose of those meeting was, as Kronstein reported to the S.E.C. by letter dated 28 March, to find out what LeBlanc was willing to do by way of release of moneys of the funds held by B.C.B. The American lawyers had received on 9 March the draft agreement to which I have referred, but clearly they wanted to know if LeBlanc would go further. Kronstein told LeBlanc that any agreement had to be one which the S.E.C. would approve. The discussions started from the premise that not all the moneys deposited with B.C.B. would be returned in the short term but that there would be a balance left with B.C.B. for a longer period. That balance was referred to as being between $15m. and $25m. which LeBlanc said was committed on long-term loans but the identity of which he said he could not disclose without the borrowers' consent. He wanted six to eight years to repay them but he was willing to provide the loans as security together with the security provided to B.C.B. for the loans. Two other matters which were referred to at those meetings should be mentioned. One is that the American lawyers knew that B.C.B. was claiming that the $10m. deposit with Algemene Bank was not a deposit of moneys derived from the funds. The sudden disappearance of the $10m. caused the American lawyers some concern. However there was no attempt by them to ascertain precisely where the moneys were. The other is that, as Scheuneman's note of the second meeting records, LeBlanc said of the moneys deposited with B.C.B.: "We've treated this money now as being a fiduciary responsibility or a trust—not in our liquidity reports."

111. LeBlanc's proposals were passed on to the various interested parties including O.D.B. Lux and its legal advisers, who, not surprisingly, found them unacceptable. So did Roberts. There were further discussions between Roberts and Daniels to produce terms acceptable to Dondelinger and to the S.E.C. They wanted some $140m. returned to O.D.B. Lux within two months and the remaining $15m. to be returned within two or three years, and in the interim to be secured.

112. The funds in the meantime sought Isaac's advice as to the status of the deposits in B.C.B.'s hands. On 16 March Isaacs advised that under the sub-depository agreement B.C.B. held the moneys deposited with it as trustee for O.D.B. Lux and the funds. But he gave no consideration to the question whether the moneys had in fact been deposited under the sub-depository agreement or to the question of the validity of that agreement.

113. On 1 and 2 April B.C.B. telexed O.D.B. Lux, Roberts and Daniels with further proposals for settling the Bahamas litigation. B.C.B.'s proposals were modifications of those that had been put forward in early March. All the deposits of what were called fund moneys were to be identified in the first schedule to the proposed agreement and were to include $19m. at B.C.B., which was not to be returned in the short term. B.C.B. was to advise every

bank named in that schedule that the moneys shown therein were on deposit by B.C.B. for the benefit of the funds, and each account was to be identified accordingly. All of the moneys were to be put in the joint names of the appropriate management company and B.C.B. and progressively transferred into the name of O.D.B. Lux and the management company to the exclusion of B.C.B. As to the $190m. B.C.B. would issue to I.B.L. $19m. of certificates of deposit repayable over eight years and I.B.L. would issue a secure deposit or four-year debenture in a sum of $19m., such deposit or debenture to be secured by all unpledged assets of I.B.L., and B.C.B. would deliver the secured deposit or debenture to the funds in payment of the $19m.

114. The unpledged assets of I.B.L. were not intended to include the shares in B.C.B., for, as Meissner explained by telex to Roberts on 2 April, and as was discussed at a board meeting of I.O.S. in Nassau over the weekend of 7 and 8 April, the proposed agreement to settle the Bahamas litigation was intended to be the first of a three-part transaction. Another part was to be the purchase by T.F.S. of all the shares held by LeBlanc in Global Holdings after he had purchased the shares held by Global Holdings in V.C.L. and B.C.B. LeBlanc was also to cause P.R.L. to purchase B.C.B. so that P.R.L.'s $100m. of assets would be available to back B.C.B. and this would provide greater security for the $19m. left with B.C.B. A further part was to be the acquisition by T.F.S. of the voting stock of Inter American, or the conversion of the non-voting shares held by F.O.F. in Inter American to voting shares. Thus it was hoped to remove from controversy the "investments" that had provoked the greatest criticism from the S.E.C., those in Global Holdings and Global Financial and that in Inter American.

115. Roberts and Daniels found B.C.B.'s proposals unsatisfactory and O.D.B. Lux proceeded with its preparation for the forthcoming hearing of the originating summons in the Bahamas with a view to obtaining judgment against B.C.B.

116. In the meantime covert agreements were reached between Meissner on behalf of the funds and management companies and LeBlanc for B.C.B. A letter dated 13 March signed by LeBlanc and Straub for B.C.B. and addressed to and signed by Meissner as president of the management companies and the funds, stated the following:

> "This is to confirm that you, in your capacity as president of [the management companies] and [B.C.B.] are negotiating with regard to moneys belonging to the funds and directed by the fund management companies . . . The parties have agreed as follows: 1. all prior instructions from the funds and the fund management companies to B.C.B. under the [sub-depository agreement] are hereby rescinded and that you acknowledge that the moneys are at the banks and in the amounts included in the schedule attached hereto; 2. the moneys will remain on deposit at the said banks pending the outcome of the present negotiations and until such time as a formal agreement is executed, except that by mutual agreement the moneys be moved to other banks if necessary . . . 4. the parties further agree that as to the location and amounts of money referred to in the attached schedule that this is a correct analysis after making a detailed review of all the accounting on behalf of the funds and the instructions received from various parties. Further that the attached sets out the correct status of the principal amounts of the capital fund moneys and their location at the present date, notwithstanding any schedules or information that has been supplied to the funds, fund management companies, [O.D.B. Lux] or otherwise, and that in the original submission of various lists there were certain errors in the submissions, and in particular the $10m. deposit at the Algemene Bank was not for the account of the funds but was for the account of another client of B.C.B."

The schedule contained the same details as were set out in appendix A to the outline which I have already described. Thus Meissner and LeBlanc were

purporting to bind the bodies which they respectively represented to a schedule which was inaccurate in the various respects which I have mentioned. A

117. The letter agreement of 13 March was not revealed at that time to Kronstein although actively negotiating on behalf of the funds, nor was it revealed to Meissner's co-directors Roberts and Shepard, nor it seems, from a letter dated 17 April from Roberts and Shepard to Meissner, was it shown even to Meissner's own legal adviser, Metz. By a letter dated 2 April Meissner on behalf of the management companies again wrote to B.C.B. The heading of the letter referred to the sub-depository agreement and in it Meissner said: B

> "Pursuant to the provisions of the above agreement, please accept this letter and my prior letter dated 13 March 1973, as your written instructions from the [management companies] to deal with the funds the subject of the agreement so that they shall be held on deposit in the amounts and with the banks set out on the attached schedule."

C

This was effectively a direction that whatever the true position of the moneys derived from the funds the deposits shown in the schedule were to be substituted therefor.

118. There were in fact two schedules to the letter, one called "Schedule of roll out of fund moneys" and the second called "Schedule of fund moneys and banks." The second schedule, like that attached to the earlier letter of 13 March, shows sums totalling $176,920,000, but various changes are shown in the deposits. A sum of only $3m. is shown at S.G. and this is attributed to Venture. In fact what had happened was that of the $7m. with Union Commerce $5m. on 13 March had been deposited with Sumitomo Bank, London, and $2m. with S.G. and the $5m. with Sumitomo Bank had been redeposited with S.G. a week later. A note in Isaac's file correctly records the movements of 13 March to Sumitomo Bank and S.G., and correctly shows, at 2 April, the date of the note, $7m. with S.G. Someone therefore in B.C.B. must have given accurate information to Isaacs at that time. The second schedule to the letter of 2 April also shows for the first time a sum of $1m. with Banco de Ponce and $1m. with Banco Credito (two Puerto Rican banks), $1½m. with Virgin Islands National Bank, $1m. with First National City Bank of Puerto Rico and $1½m. with Barnett Bank of Miami. These deposits do not accord with the flowchart and they had already been made the subject of an injunction on 28 March by Judge Stewart in the S.E.C. proceedings. Again the letter of 2 April was not revealed to Kronstein or to Roberts or to Shepard at the time. D E F

119. Meissner wrote another letter to B.C.B. on 2 April to the effect that, in view of the negotiations then taking place, the funds agreed that an adjournment of the hearing on 9 April be obtained until the next available date, and the letter was exhibited by Heatly to an affidavit on behalf of B.C.B. asking for an adjournment. Kronstein was disturbed at the prospect of an adjournment as it seemed likely to necessitate a delay till July. The Bahamas were then about to become independent and the Chief Justice, who had heard the interlocutory applications and was due to hear the originating summons on 9 April, was to be replaced. Nor was O.D.B. Lux prepared to agree to an adjournment. G

120. In the event the hearing did start on 9 April, with Baker opening the case on behalf of O.D.B. Lux. It appears that he was supplied with, and referred to, the first letter of 2 April. In the course of the first day's hearing Kronstein was disturbed to learn that B.C.B. had a possible defence, based on instructions that it had received from the funds which might override O.D.B. Lux's request for return of the moneys. He questioned Meissner on this, and Meissner then produced the letter agreement of 2 April and the letter of 13 March. Kronstein urged Meissner to withdraw the letters so as to remove from B.C.B. the defence it might mount on the basis of the letters, but, Kronstein said, in evidence before me, that Meissner appeared to be intimidated and afraid not to follow whatever directions he might be getting from Vesco and LeBlanc. Kronstein had also insisted that advance approval for any agreement should be obtained from Judge Stewart in the S.E.C. proceedings because of the H

A bridge order. Meissner decided not to accept Kronstein's advice, and on 11 April terminated Arnold & Porter's instructions. Thereafter Isaacs took instructions directly from Meissner on behalf of the funds.

121. Roberts and Shepard, after learning of the letters of 13 March and 2 April, protested to Meissner by letter dated 17 April for keeping them uninformed about those letters. Their letter included the following:

> "Even if these letters were right to be written at all, which we by no means
> B accept, what we cannot readily forgive is your having persistently concealed from us that you were doing these things. The consequence has been that you have knowingly allowed us to make incorrect representations to governmental authorities in ignorance of the true facts. You even yourself attended with us a meeting in Luxembourg as recently as 5 April and permitted these representations to continue when the true position was well known to you . . . The tenor of your hitherto secret letter of 13 March 1973
> C also strongly negates the story which has been fostered by you that there remains no undercover relationship between yourself on the one hand and LeBlanc on the other."

However Roberts and Shepard continued to act as directors of I.O.S. with Meissner.

122. On 9 April further instructions were telexed to Callender and Baker by Daniels, setting out terms of settlement which Dondelinger was prepared to
D approve. A short adjournment was sought by Baker and obtained. Those terms were (in summary) that a Luxembourg Bank, Cie. Luxembourgeoise de Banque, would act as agent of the funds in managing all sums returned to Luxembourg, that there would be an agreement between the funds and B.C.B. for the return of the moneys deposited with B.C.B. such agreement to be conditional on an order of the Bahamian court, and to contain a list of banks holding the deposits and particulars of the deposits. Daniels expected the list of banks and deposits
E to be as follows:

| | |
|---|---|
| $10,000,000 | Algemene Bank |
| $105,370,000 | Bank of Montreal, Montreal |
| $18,050,000 | Bank of Montreal, Nassau |
| $5,000,000 | S.G. |
| $2,000,000 | Sumitomo Bank |
| $15,000,000 | B.C.B. |
| F $2,300,000 | Kredietbank |
| $19,200,000 | Banque Internationale |

The last two figures as well as the figures for S.G. and Sumitomo Bank were, of course, simple transpositions. Daniels said in the telex that he had received a copy of Judge Stewart's injunction of 28 March relating to a total of $6m., but he commented, "This does not relate to moneys held by B.C.B. for benefit of the funds." Other detailed terms approved by Dondelinger were specified in the
G telex.

123. On 10 and 11 April intensive negotiations followed between Baker and Callender for O.D.B. Lux, Dupuch and LeBlanc for B.C.B. and Isaacs for the funds with a view to agreeing terms of an order to be made by the Bahamian court and the agreement to go with it. Baker took primary charge of drafting the agreement. Throughout the only source of information as to what deposits were held in what banks was B.C.B. Baker looked to Robertson, the O.D.B.
H Lux director who accompanied him to Nassau, to provide him with the details of the deposits to go into the agreement and, as he told me in evidence, he himself was not concerned with the details of where the moneys were; if there were errors in the information he had no means of ascertaining the position and he does not recall ascertaining whether there were errors. But had he known that there had been negotiations on the deposits between LeBlanc and Meissner he would not have regarded those negotiations as at arm's length.

124. On 12 April the Bahamian court made a consent order ordering B.C.B. to pay O.D.B. Lux $155,420,000, subject to a stay so long as B.C.B. should

satisfy the judgment debt in the manner provided by a written agreement (which the parties were directed to execute) by the instalments set forth in the schedule to the order. Thre schedule provided for payment of $155,420,000: $136,400,000, by three instalments on 12 April 1973 and one month and two months thereafter respectively and the remaining $19m. by six half-yearly payments of $$2\frac{1}{2}$m. commencing on 31 December 1973 and a final payment of $4m. on 31 December 1976. Why O.D.B. Lux obtained judgment in the sum of only $155,420,000 (instead of $176,920,000) is a mystery. The remaining $$21\frac{1}{2}$m. represented by deposits in Luxembourg were not overlooked as they feature in the agreement.

125. The agreement, which was dated 13 April, was between (1) B.C.B. (therein defined as 'the bank'), (2) I.I.T. Management as the manager of I.I.T., (3) F.O.F., (4) Venture, (5) Prop, (6) Growth and (7) O.B.D. Lux. The recitals referred to the depository agreements and to the placing with B.C.B. pursuant to the provisions contained in the depository agreements and on the instructions of I.I.T. Management, F.O.F, Venture, Prop and Growth, of "cash deposits being part of the said mutual funds." Recital (5) was in the following form: "The said cash deposits are now represented (in part) by the deposits shown in the first schedule hereto." Sums totalling $157·9m. were shown in the first schedule. Recital (7) stated that B.C.B. had agreed with I.I.T. Management, F.O.F., Venture, Prop and Growth "to repay, transfer or otherwise satisfy the deposits."

126. In the operative part of the agreement under paragraph 1 the term "the agent" was defined to mean in the first place O.D.B. Lux until the appointment of Cie. Luxembourgeoise de Banque "or other company as may be appointed by the management companies as agent of the said mutual funds." Under paragraph 2 B.C.B. had on 13 April to instruct the banks mentioned in the second column of the first schedule to designate the deposits shown in the third column as being held on behalf of the fund indicated against each deposit in the first column. Under paragraph 3 B.C.B. was also on 13 April to instruct the banks mentioned in part I of that schedule to hold each of the deposits mentioned in part I to the order of the agent jointly with the management company of the fund indicated against each deposit. Under paragraph 4 B.C.B. was also on 13 April to instruct the banks mentioned in parts II and III of that schedule to hold each of the deposits therein mentioned on the joint instructions of B.C.B., the agent and the appropriate management company. Under paragraph 5 B.C.B. had one month after 12 April to instruct the banks mentioned in part II of that schedule to hold each of the deposits mentioned in part III to the order of the agent jointly with the appropriate management company. Under paragraph 6 B.C.B. was two months after 12 April to instruct the banks mentioned in part II of the schedule to hold each of the deposits mentioned in part III to the order of the agent jointly with the appropriate fund (or, in the case of I.I.T, I.I.T. Management). Paragraph 7 was in the following form:

> "The bank will repay the remaining $19m. referred to in the second schedule hereto in manner following: (a) The bank will deliver to a Bahamian trust company to be appointed by the management companies with the approval of the agent (in a form to be settled and approved by the respective attorneys of the parties hereto) a secured deposit of [I.B.L.] (or at the option of the fund management companies) a debenture of I.B.L. (in a form settled as aforesaid), such deposit or debenture (i) to be secured on the assets of I.B.L. (other than the bank) but including not less that $19m. of certificates of deposits issued by the bank and delivered to [I.B.L.]; (ii) to provide for payment instalments to match in amounts and dates the second schedule hereto."

It would appear that in sub-paragraph (i) the reference to certificates of deposit issued by B.C.B. and delivered to I.B.L. should be a reference to certificates of deposit issued by I.B.L. and delivered to B.C.B. as on 5 April B.C.B. entered into a written agreement with I.B.L. whereby B.C.B. would deposit $25m. with I.B.L. in return for certificates of deposit to be issued by I.B.L. and secured on

A I.B.L. assets. The second schedule listed seven instalments totalling $19m. and dates of payment, corresponding to the seven half-yearly payments in the schedule to the order of 12 April.

127. Paragraph 8 referred to the possibility that certain portions of the agreement might be governed by the bridge order and to the wish of the management companies and the funds to advise the New York court of those transactions; accordingly the provisions relating to the delivery of the secured B certificates of deposit or debentures were to be deferred in execution for 10 days. But the operation of the agreement and in particular of paragraph 7 was not made conditional on the consent of the New York court.

128. Under paragraph 9 B.C.B. had to "account for and pay all interest received to be received by the bank in respect of the said deposits in manner following." There then followed four sub-paragraphs. Under sub-paragraph (a) B.C.B. within 10 days from 12 April was to pay, release or give irrevocable C instructions for transferring to the agent "all such interest as aforesaid then accrued other than the sum of $690,000." Under sub-paragraph (b) B.C.B. had within one month after 12 April to pay, release or give irrevocable instructions for transferring to the agent all interest then accrued in respect of the deposits mentioned in parts II and III of the first schedule and under sub-paragraph (c) B.C.B. had the like obligations within two months after 12 April in respect of all interest then accrued in respect of the deposits mentioned in part III of the D first schedule. The repeated reference to interest on the part III deposit led Mr. Leckie, for S.G. to suggest that the first reference should be deleted; but the better explanation seems to me to be that sub-paragraph (c) was intended to catch interest accrued since the obligation under sub-paragraph (b) was carried out, the obligation under sub-paragraph (c) being simultaneous with the obligation under paragraph 6. Under sub-paragraph (d) B.C.B. was, simultaneously with the payment, release and transfer referred to in the previous sub-paragraphs, to E provide the agent and each of the other parties to the agreement with an account of all such interest, and was to pay the agent any balance of the sum of $690,000 after deducting therefrom a management fee and custodian fee based on the principal amounts held by B.C.B. from time to time "on deposit as aforesaid" up to 12 April, and proper banking disbursements. Under paragraph 10 B.C.B. had to comply with directions from the management companies to make payments in respect of additional management fees, charges and expenses, F and could debit such payments to the payments of interest or principal referred to in paragraphs 7 and 9. There was of course no reference to interest in paragraph 7 relating to the $19m. nor indeed anywhere else, and, although Mr. Price submitted that the reference to "the said deposits" was a reference to the cash deposits referred to in the recitals (i.e. $176·92m.) as distinct from the deposits in the first schedule, I think it tolerably clear that the only obligation in respect of interest was that B.C.B. should account for and pay interest on the G deposits in the first schedule, to interest on which alone there are express references in paragraph 9.

129. The first schedule was in the following form:

Part I

| *Name of fund* | *Name of bank* | *Amount* |
|---|---|---|
| I.I.T. | Kredietbank, Luxemboug | $21,500,000 |
| I.I.T. | Bank of Montreal, Montreal | 47,500,000 |
| Venture | S.G. | 3,000,000 |
| I.I.T. | B.C.B. | 2,000,000 |

H

Part II

| | | |
|---|---|---|
| I.I.T. | Bank of Montreal, Montreal | 38,000,000 |
| I.I.T. | Banco de Ponce | 1,000,000 |
| I.I.T. | Banco Credito | 1,000,000 |
| I.I.T. | Virgin Islands National Bank | 1,500,000 |

Part III A

| | | |
|---|---|---|
| I.I.T. | First National City Bank | 1,000,000 |
| I.I.T. | Barnett Bank | 1,500,000 |
| I.I.T. | B.C.B. | 6,900,000 |
| Prop | Bank of Montreal, Montreal | 13,800,000 |
| F.O.F | Bank of Montreal, Montreal | 2,200,000 |
| Growth | Bank of Montreal, Nassau | 5,000,000 |
| Venture | Bank of Montreal, Nassau | 6,900,000 |
| Growth | Bank of Montreal, Montreal | 1,200,000 |
| Venture | Bank of Montreal, Montreal | 3,900,000 |

B

130. In reality, as is common between the parties, the moneys which were derived from the funds and had been deposited with B.C.B. (other than the $15m. Gulf Stream moneys) were sited at that time as follows:

| | |
|---|---|
| $10,000,000 | Algemene Bank |
| $105,370,000 | Bank of Montreal, Montreal |
| $19,200,000 | Kredietbank |
| $2,300,000 | Banque Internationale |
| $18,050,000 | Bank of Montreal, Nassau |
| $7,000,000 | S.G. |

C

The only movements which had taken place since 31 January in respect of the $161,920,000 derived from the funds were the movement of $20m. from Crédit Lyonnais to Bank of Montreal, Montreal, on 13 February, the movement on 13 March of $7m. from Union Commerce ($5m. to Sumitomo Bank and $2m. to S.G.) and the movement on 20 March of $5m. from Sumitomo Bank to S.G. D

131. The agreement of 13 April was signed by LeBlance for B.C.B., Meissner for I.I.T. Management, F.O.F., Venture, Prop and Growth, and Robertson for O.D.B. Lux.

132. B.C.B. in accordance with its obligations under paragraphs 2, 3 and 4 of the agreement gave instructions to the banks shown in the first schedule; but E the injunctions affecting much of the moneys shown in that schedule had the result that the agreement was never fully implemented. The moneys with the Bank of Montreal remained frozen. The $6m. the aggregate of the moneys at Banco de Ponce, Banco Credito, Virgin Islands National Bank, First National City Bank and Barnett Bank remained subject to the injunction imposed by Judge Stewart on 28 March. On 20 April Judge Stewart granted a temporary injunction restraining, inter alios, LeBlanc, Meissner, B.C.B., O.D.B. Lux, the F funds and the management companies from implementing the agreement. That injuction was temporarily continued on 10 April and 8 May, and on 10 May Judge Stewart made a further order. That order recited that the court did not have sufficient evidence before it to support the finding proposed by the S.E.C. (the hearing of the S.E.C.'s motion for preliminary injunction on 20 March and continued till 18 May) and that the court had not made any determination as to whether any defendant had engaged in any wrongdoing. But the court held that G the agreement of 13 April materially affected the provisions of the bridge order, that the agreement and, in particular paragraph 7 thereof relating to the payment by B.C.B. of $19m., might constitute a breach of the bridge order in that a new investment commitment was made by the funds, and that their existing claims might be compromised and extinguished, and that the court had no proof that the funds were being treated fairly under the agreement and receiving adequate consideration for the claims they might be relinquishing. H Judge Stewart granted an injunction, until further order, restraining the implementation of the agreement. Nor did B.C.B. carry out its obligations in respect of the two sums of $2m. and $6,900,000 shown in the first schedule as deposited with it, nor its obligations under paragraphs 7 and 9 of the agreement. But in its own books it caused a redesignation of the accounts, which previously bore reference numbers relating to all the funds. The accounts were redesignated to accord with the agreement. Thus the account with S.G. labelled as a trust account in B.C.B.'s books shows $3m. redesignated in accordance with the

agreement and the remaining $4m. redesignated as a B.C.B. account. Similarly of the two accounts with Bank of Montreal, Nassau, containing $15m. and $3,050,000 respectively of moneys derived from the funds, B.C.B.'s books show the $15m. account was redesignated as $11,900,000 in accordance with the agreement and the balance of $3,100,000 was designated as held on B.C.B.'s own account.

*P.R.L.*

133. At this point I must go back a little in time to refer to what was happening in England. In February 1973 P.R.L. had not yet become involved in any litigation. Surprisingly, it has not been made a defendant in the S.E.C. proceedings. Its assets still included over $50m. in cash mainly invested in certificates of deposits with leading banks, though it was considering a property transaction in Monaco. It placed money in the money market on the advice of Ian Rowe, the money market manager of Incap. Its directors consisted of Clay (who was also president), Howkins and LeBlanc. David Warham was its controller and Oliver Wingrove its secretary. Two further directors, Paul Palmer and a Panamanian, Eusebio Morales, were appointed in late March.

134. Since the institution of the S.E.C. proceedings companies associated with I.O.S. were experiencing difficulties in opening bank accounts and procuring banks to act for them. Clay and Warham came to London at the beginning of March to try to establish new banking relationships with banks in London. With them came Don Aberle, the president of Columbus Trust Co. Ltd., ("Columbus"), a newly formed Bahamian company connected with LeBlanc and set up to give P.R.L. help with its banking problems. The intention appears to have been to interpose Columbus between P.R.L. and the banks. They visited various banks in London. A meeting with Hill Samuel, Warham said in evidence before me, "disintegrated" when that merchant bank concluded that P.R.L. was associated with Vesco. But Clay, Warham and Rowe visited, and were well received at, S.G. on 6 March. I must come back to S.G.'s involvement in a little while. Clay and Warham were introduced by Don Aberle to an English secondary bank, David Samuel Trust Ltd. ("D.S.T."), with which they opened an account. D.S.T.'s function was to take over $40,750,000 in certificates of deposit from the Royal Bank of Canada, London, which held the certificates at that time but which, being a Canadian bank, it was feared by LeBlanc and Vesco might become subject to an injunction at the suit of the S.E.C. D.S.T. was to hold those certificates in a special account with National Westminster Bank ("Natwest"). As the certificates matured or were sold the proceeds would be credited to P.R.L.'s account with D.S.T., but P.R.L. would then instruct D.S.T. to credit those proceeds to Columbus.

135. In early March $4½m. of P.R.L.'s certificates of deposits were, on the instructions of Clay and Warham (acting on LeBlanc's instructions), liquidated prior to their maturity dates. Columbus, on the instructions of LeBlanc and Wingrove, then purchased Costa Rican bonds having a face value of $5,700,000 from B.C.B., which held them for an unnamed client, possibly Phoenix. According to Warham the treasurer of Columbus had told him that the purchase moneys for the Costa Rican bonds were disbursed by Columbus on the instructions of LeBlanc acting for B.C.B. in the following manner: $2m. went to LeBlanc personally, $900,000 went to B.C.B. and $2m. went to Banco Nacional de Panama for the account of Trident Bank. At the beginning of December 1972 Rogers on behalf of B.C.B. and one McGlinchey on behalf of Trident Bank had been to Panama to call on various banks with a view to seeing whether they would do business with B.C.B. and Trident Bank. Rogers on 2 December reported to LeBlanc that while the Chase Manhatten Bank in Panama refused to open an account the manager of Banco Nacional de Panama (a bank owned by the Panamanian government) was "prepared to talk to us on any type of proposal whatsoever."

136. Warham as controller of P.R.L. was uneasy about the purchase of Costa Rican bonds and on 15 March wrote a memorandum to LeBlanc, Clay

and Hawkins suggesting that consideration be given to various matters relating to the bonds such as the interest rate payable and their maturity date. He received no response to that memorandum. On 30 March Warham had a discussion about the bonds with Clay. Clay told him that B.C.B. had its cash frozen in a number of countries and desperately needed money. However Warham pointed out to Clay that B.C.B. received no cash other than $900,000.

137. On 27 March Columbus instructed Rowe to liquidate $15m. of P.R.L.'s certificates of deposit by 6 April. Rowe telexed Warham and Clay asking for confirmation of Columbus's instructions. Clay about this time was resigning from the board of P.R.L. and neither he nor Warham knew anything about the transaction. On 3 April D.S.T. was instructed by P.R.L. to transfer the proceeds of the $15m. certificates of deposit to Columbus's account. On that day Warham resigned from his position as controller of P.R.L. He called J. W. Roche, a director of G.N.R.R., which through its shareholding in I.P.I. had a substantial interest in P.R.L., and gave him the full details concerning the reasons for his resignation including his concern over what was happening in P.L.R. On 4 April J. W. Roche and another director of G.N.R.P., Walter Saunders, telexed to D.S.T. their strong objection to the transfer of $15m. into an account with Columbus. They expressed their concern that "this follows pattern of other financial manipulations now under severe attack by the [S.E.C.]." J. W. Roche instructed Clifford-Turner & Co., and on 6 April proceedings (the P.R.L. proceedings) were commenced by those solicitors in the name of two German minority shareholders of I.P.I., Kuno Beck and Dr. Rolf Fetscher, in the Chancery Division. The defendants named were I.P.I., V.C.L., P.R.L., LeBlanc, Howkins, Clay, Palmer, Morales and D.S.T. By the originating summons the plaintiffs claimed a declaration that to procure the transfer of the sum of $15m, or such other sum standing to the credit of P.R.L.'s account with D.S.T., to Columbus or to any person, firm or body corporate controlled by or acting in concert with LeBlanc or V.C.L.—those defendants and those persons firms and bodies corporate were therein referred to as "the LeBlanc group"—would constitute a breach of duty on the part of the P.R.L. directors, in respect of which they would be acting not in the best interests of P.R.L. but with a view to conferring a benefit on the LeBlanc group at the expense of P.R.L. and its shareholders. The other relief sought by the originating summons included an injunction to restrain D.S.T. from concurring or assiting in the transfer of the $15m.

138. On 5 April LeBlanc and Wingrove on behalf of P.R.L., sent instructions to D.S.T. to liquidate all the certificates of deposits which D.S.T. was holding on their behalf as quickly as possible and without taking the advice of Rowe, and to credit the proceeds to Columbus. By 10 April Clifford-Turner & Co. had discovered that a sum of $40¾m. was standing in an account with Natwest to the order of D.S.T. on behalf of P.R.L., and that a sum of $7m. was standing to the credit of an account with S.G. in the name of P.R.L. The originating summons was amended to make G.N.R.P. a plaintiff and to make S.G. and Natwest additional defendants. S.G. was first incorrectly named as Société Générale (France) Bank Ltd. but this was corrected on 11 April. By the amended originating summons the like relief was sought against S.G. and Natwest, in respect of the sums of $7m. and $40.¾m. respectively, as were being sought against D.S.T. in respect of the sum of $15m.

*S.G.'s involvement*

139. I must now recount in greater detail how S.G. became involved both in the P.R.L. proceedings and in the matters the subject of the present proceedings before me.

140. London in 1973 was the centre of the growing Euro-currency market. That market dealt in all the leading currencies, but the dollar was the major currency. It was a market which originated largely in London, and banks throughout the world borrowed and lent money by receiving and placing deposits. This was largely an inter-bank market, transactions being carried out

between banks, but it was not unknown for commercial corporations to arrange deposits with banks.

141. One bank very active in the money market was S.G. in London. Its average daily turnover on the market was between $500m. and $1,000m. Its London office consisted of a staff of some 350 persons. At its head were a manager, Jean Sebire, and two deputy managers, Raymond Roche and M. Barat, who together coinstituted what was known in S.G. as the management. Immediately below them in rank was Bernard Lengrand, who was head of the department known as the secretariat. Its functions included the opening of accounts with private and commercial customers and handling all the documentation connected with such customers and obtaining information on and keeping files relating to such customers. Dealings in the money market were handled by dealers in the dealing room of S.G., and Roy Dainty was the assistant manager in charge.

142. If a broker wished to make a deposit for a client with S.G., he would normally speak on the telephone to a dealer in S.G. and indicate the amount of the intended deposit and the intended period of the deposit, but he would not at that stage reveal the name of the client. S.G. would then state whether it was willing to accept such a deposit, and would state further what was the rate it would offer on such a deposit. If the terms were mutually acceptable, the identity of the client of the broker would be made known. At this stage it was still possible for the bank to refuse to conclude the deal, but in the absence of a refusal the agreement would then be made orally. The dealer would prepare a dealing slip containing the bare details of what had been agreed, and on the footing that it was an inter-bank transaction and not a transaction with a private or commercial customer the slip would be passed to the back office, the instructions department headed by Raymond Gibbins, another assistant manager. The broker would prepare written confirmation of the deal agreed upon and would include repayment instructions at the same time. The instructions department in S.G. would also prepare a written confirmation and send it to the client of the broker. The deals would normally be arranged two days before what is known as the value date, when, by telex, the moneys are transferred. A deal in dollars had to be routed through New York. Thus a deposit with S.G. would be made by the depositor, instructing directly or indirectly a New York bank with which the depositor had credit, to transfer to another New York bank for the account of S.G., S.G.'s correspondent bank in New York was its associated bank, European American Bank and Trust Co. ("Euramtrust").

143. On 23 February (the same day as the Bahamian interlocutory order which referred to S.G. as one of the banks with which deposits could be placed) P.R.L. through its brokers, Meridian Deposit Brokers Ltd. ("Meridian"), and on the advice of Rowe agreed to deposit $4m. from 26 February to 2 March with S.G., and thereafter the deposit was renewed from time to time, the interest being rolled over, until the injunction (which I shall mention later) in the P.R.L. proceedings. A further deposit of $3m. was made by P.R.L. on 5 March through Meridian with S.G. for three months. In each case payment was made to S.G. through Euramtrust and the repayment instructions were to repay "Royal Bank of Canada New York a/c Royal Bank of Canada London a/c [P.R.L.]."

144. Despite the fact that the amount of the deposits and their terms were nothing out of the ordinary for S.G., the matter was brought to the attention of Roche, whose responsonsibilities included the dealing and administrative departments of S.G. The acceptance of the P.R.L. deposits contravened the internal rules of the bank. P.R.L. was obviously not a bank; yet the deposit had been offered to and accepted by S.G. as though it were a dealing done on the inter-bank market, coming, as the deposit did, through brokers. The procedural rules of S.G. required that (a) if a commercial customer wanted to place a deposit with S.G. it had to open a current account as well as a deposit account and complete various forms so that S.G. could be satisfied that the commercial customer was acting within its powers, and (b) such a customer, if a company,

had to supply a list of directors, officers and signatories of the company so that A
S.G. could be satisfied that it was safe to act on instructions from the company.

145. It was not within Gibbins's authority to give the deposits from a commercial customer a deposit account number; that was the function of Lengrand's department. Gibbins came to see Roche on this problem, and he told Gibbins to pass the transaction on to the secretariat. There was an argument between Gibbins and Lengrand, and Roche had to intervene, to make Lengrand handle the transaction and regularise it by procuring that all the necessary
documentation for the opening by a commercial customer of an account with B
S.G. was obtained.

146. It is not entirely clear when all the documentation of P.R.L. was obtained. The standard S.G. documentation includes a form of board resolution for a commercial customer which is a limited company with lists of directors, officers and authorised signatories. But S.G. had produced on discovery a list of signatories, containing only three signatures (those of Clay, Howkins and
Warham) out of the five signatories and dated 5 March, as well as another list C
containing all five signatures, that is to say those of LeBlanc and Wingrove in addition to the three obtained earlier. What I think is likely to have happened is this. Warham and Clay came to London armed with a copy of the memorandum and articles of P.R.L., a resolution of the board of P.R.L. authorising the opening of new banking accounts, and a certificate of incorporation of P.R.L. At an early stage after the first deposit with S.G. when it was appreciated that
this was not an inter-bank transaction, someone in S.G. must have asked, D
through Meridian, that the formal documentation for opening an account be completed. Clay, Warham and Howkins (who was also in London) completed the documents so far as they could. Clay and Warham, who with Rowe visited S.G. on 6 March and met Legrand, brought these documents for that meeting. Lengrand was not satisfied with the signatures of only three out of P.R.L.'s five signatories, and he required that a complete list be provided. On 20 March
Rowe sent by letter an S.G. form containing all the signatures of the directors E
and officers. The matter was then brought to Roche's attention again. Roche commented that the documents obtained from P.R.L. were not convincing, and theat S.G. had no proof of the authentiticy of the signatures. Because of that comment, on 26 March Lengrand wrote to P.R.L. asking that its bankers should certify the signatures. But it does not appear that such certificate was ever obtained.

147. Warham, in his evidence before me, said that when Clay and he saw F
Lengrand they told him about the S.E.C. proceedings and the problems they were having. Lengrand has no recollection of this. But then he did not recall the visit of Warham, Clay and Rowe at all until the late discovery, after Warham had given evidence, of a brief "compte rendu de conversation," which he had prepared after the visit to summarise what had been said. He evidence of the meeting is based purely on reconstruction from what is obtlained in the compte
rendu. Lengrand's memory was not good and I accept Warham's evidence on G
this point as accurate. Lengrand may well not have appreciated the significance of the reference to the S.E.C. proceedings and may not have realised the possible implications for S.G. of holding moneys derived from an I.O.S.-related source.

148. On 9 March Meridian wrote to S.G. as follows:

> "We confirm lending you U.S.$2m. from 13/3/73–20/3/73 at an interest
> rate of 9¾ per cent. per annum on behalf of the [B.C.B.] trust a/c payment H
> instruction: [Euramtrust] New York a/c Société Générale, London. Repayment instructions: Barclays Bank New York a/c Barlays Bank, Nassau favour [B.C.B] trust a/c Nassau."

Thus both the lending and the repayment instructions refer to B.C.B. trust account. B.C.B. itself, in its telex to S.G. on 12 March, confirmed payment of $2m. and stated that it was for the account name of B.C.B. trust account and, by a credit advice dated 14 March, Euramtrust advised S.G. that by order of

Union Commerce Nassau it had received $2m. which it was crediting as being for the account of B.C.B. Nassau trust account.

149. On 16 March Meridian wrote to S.G. confirming lending S.G. $2,003,597·22 (that is to say the original $2m. plus interest earned) from 20 March for a further period, again on behalf of B.C.B. trust account. By the same letter Meridian confirmed lending S.G. $5m. for a week from 20 March on behalf of B.C.B. trust account, with the same payment and repayment instructions as with the initial $2m. Again there was confirmatory advice from Euramtrust that it had received $5m. which it was crediting S.G. for the account of B.C.B. trust. On 26 March Meridian wrote again confirming lending $7m. for B.C.B. trust account Nassau for another week but asking that interest be repaid to Barclays Bank New York for the account of Barclays Bank Nassau for the account B.C.B. trust account. Similar instructions were given by Meridian on 3 April and 10 April respectively rolling over the deposit for a further week at a time. S.G.'s contemporaneous formal documentation referred to this deposit as a single deposit of $7m.

150. On 6 April Roche had a telephone conversation with an official of the Royal Bank of Canada, in which he made an exchange control inquiry about the payments of $4m. and $3m. made by that bank to P.R.L. It is surprising that someone as senior in S.G. as Roche should have himself made such an inquiry. It does not appear that he was yet aware that P.R.L. was connected with I.O.S., but plainly the P.R.L. deposits were already causing him some concern and in cross-examination he agreed with Mr. Price that he was following up the doubts that he had about the whole P.R.L. matter. Those doubts were to be greatly increased in the course of the next few days.

151. On 9 April S.G. received a telex from B.C.B. containing a request from P.R.L. under the signatures of LeBlanc as director and Wingrove as secretary asking S.G. to remit $4m. that S.G. was holding for P.R.L. direct to P.R.L.'s account at Banco Nacional de Panama, Panama City. It referred to a confirmatory letter as "following." S.G. telexed its reply the next day, saying that it could not effect payment until receipt by it of the confirmatory letter. On 10 April a further telex arrived at S.G. from LeBlanc as president and director of P.R.L., as asking whether S.G. had transferred the $4m. to Banco Nacional de Panama and saying that a letter about the $4m. was being hand-carried that night.

152. Also on 10 April a letter addressed to Roche at Société Générale (France) Bank Ltd. from Clifford-Turner & Co. was delivered to Roche by hand. In it those solicitors said they were acting for certain minority shareholers in I.P.I., that they were instructed that P.R.L. had placed on deposit with that bank the sum of $7m., and that it was intended by certain persons acting or purporting to act on behalf of P.R.L. that that company should transfer the money on deposit with that bank to Columbus, and that they were instructed that there was reason to believe that the money was intended to be used for a purpose which would be other than in the interests of P.R.L. The letter further referred to the writ of 6 April, and it was stated that the purpose of the letter was to place that bank on notice of the allegations made by their clients and to ask that bank not to dispose of the money on deposit, pending hearing further from those solicitors.

153. A telex of 9 April from Herbert Towning, a director of D.S.T. to Leslie Lavy, another director of D.S.T., reveals that Lavy was told by Towning that the funds from S.G. were urgently needed for day-to-day expenses of operating P.R.L. Towning continued, "I cannot overstress the importance of getting these funds out to P.R.L. at Banco Nacional de Panama" and Towning asked Lavy to explore every possible avenue to send those funds which he said were not yet frozen. A telex by Le Blanc and Wingrove to Lavy on 10 April reveals that there may previously have been some thought of transferring the funds to Columbus as Lavy was told that the funds should be held in a D.S.T. suspense account and not transferred to Columbus pending remittance to Panama.

154. On 11 April Roche telexed back to Clifford-Turner & Co. that Société Générale (France) Bank Ltd. had no account in the name of P.R.L. and asked for their source of information but revealed nothing further. However Roche received a telephone call from G. W. Staple of Clifford-Turner & Co. that morning, informing him that Walton J. had granted leave on 10 April for Société Générale (France) Bank Ltd. and Natwest to be joined as defendants in the P.R.L. proceedings. Roche told Staple that the deposit was made with S.G. and that S.G. had instructions to transfer $4m. to a bank in Panama. This was an unusual act for a banker like Roche, supplying as he was confidential information as to a customer without the customer's authority. But, faced as he was with the certainty of a writ, it is entirely understandable that he should have revealed that information. However he admitted in cross-examination that there was very grave cause for concern about the money in the P.R.L. account with S.G. He said: "I had a feeling there was a fraud somewhere—whether it was I.O.S. or just P.R.L. I cannot say." Staple later that morning sent by hand a letter placing on record that conversation, informing S.G. that an application was to be made to join S.G. at 2 p.m. and enclosing a copy of the writ as then amended.

155. Roche had recently procured the appointment of an in-house lawyer for S.G. Peregrine Widdrington was then a 28-year-old solicitor. He had had two years as an assistant solicitor with one private firm and a very short period with another before he joined S.G. on 2 April. This was a new appointment for S.G. Roche handed the copy writ over to Widdrington.

156. Other important events occurred on 11 April. Lavy spoke by telephone to Roche in the moring, no doubt to alert him to that fact that written instructions from P.R.L. were on their way. A letter from Towning, wrongly addressed to Roche of Société Générale de Belge, was received in S.G. at 3.30 that afternoon, together with two letters dated 10 April from P.R.L., the first authorising Towning to deliver the second letter containing P.R.L.'s instructions to transmit $4m. to Panama.

157. But, before Roche saw these letters, S.G. received two telephone calls from the S.E.C. in Washington. The first was to tell Roche to expect a telephone call from the S.E.C., and that he should not act on instructions to transfer "the moneys" to Panama or anywhere else until S.G. heard from the S.E.C. Clearly the S.E.C. had been made aware that S.G. had instructions to transfer moneys to Panama. The second call, which Roche himself took three-quarters of an hour later, was from Stanley Sporkin, who was the officer in charge of the S.E.C. investigations, and (speaking on another extension) Irving Pollack, then the director of the enforcement division of the S.E.C., inquiring about P.R.L. Roche dictated a compte rendu of this conversation immediately afterwards, recording, mainly in question and answer form, his recollection of what was said. The S.E.C. ascertained from Roche and S.G. was holding $7m. in the name of P.R.L., that it had received repayment instructions and, in answer to a question whether the funds were to be transferred to Panama, that the funds were to be transferred for P.R.L.'s account with Banco Nacional de Panama, but that repayment had not yet been affected as the instructions that had been received were by telex and unauthenticated. He told the S.E.C. that B.C.B. had purported to sign the telex and he was asked who were the signatories. He said that they were a director and secretary whose names were not in front of him. He was asked to continue to stall payment as lawsuits were in the process of being instituted. To that Roche answered that they were aware of it. It was suggested that he might pay the funds into court, and he said that they had envisaged that possibility. He was told that if there should be any further problems perhaps he should contact the S.E.C. direct, or Staple direct, or a named person at the American embassy. Roche agreed and then volunteered the following: "Incidentally, we had deposited with us a total of $7m. in the name of Bahamas Commonwealth Trust, Nassau." The S.E.C. replied that that was very interesting, that they were not aware of it and that they would look into it.

158. The conversation with the S.E.C. as recorded by Roche does not explain why the S.E.C. was interested in P.R.L., but Roche accepted in cross-examination that it was possible that he was in fact told of the reason for the S.E.C. inquiry, and indeed I would expect that some such explanation would have been volunteered by the S.E.C., if not demanded by Roche. Pollack in his evidence before me said that they alerted S.G. to the fact that not to move the moneys without giving the S.E.C. notice was protection for S.G. as well as for shareholders in the dollar funds

> "because of the endeavours by Mr. Vesco and others to move these funds . . . because of the circumstances which were involved here and the fraudulent efforts by Mr. Vesco and others connected with him to loot or syphon these funds out."

Roche is an intelligent and experienced banker, as befits his rank in the bank. He already knew in a general way of a scandal about Vesco and I.O.S. Indeed he went so far as to say, "I knew the I.O.S. was a fraud . . . it was common knowledge." Roche also said that, had he thought that the money coming to S.G. was I.O.S. money, he would not have taken it.

159. The conversation between Roche and the S.E.C. is noteworthy in several respects. Again Roche was breaking the banker's customary secrecy by volunteering information about customers, first about P.R.L. and then about B.C.B. The S.EC. in asking who were the signatories of the telex instructions showed that they were interested in the individuals apparently participating in the movement of the P.R.L. moneys. The names of the signatories were the only information about the telex that Roche did not supply in the course of the telephone conversation. No doubt that was one of the reasons why the S.E.C. the next day asked Roche, by telephone through Clifford-Turner & Co., that the text of the telex instructions be cabled to New York. By then Roche had had second thoughts as to the propriety of passing to the S.E.C confidential information about a customer. He was deliberately non-commital in answer to that request and decided not to comply with it. The conversation with the S.E.C. also shows that Roche made a connection between the P.R.L. $7m. and the $7m. B.C.B. money. He said in his evidence before me that he was most uneasy about that money.

160. Roche was prepared to delay payment to Banco Nacional de Panama and on his instructions Widdrington prepared a memorandum of reasons justifying such delay. Widdrington concluded:

> "We have been put on enquiry by the letter we have received from Clifford-Turner & Co. dated 10 April and the writ which we know is to be issued against us, and would be acting negligently if we transferred the U.S.$4 million on deposit to the Panama bank on these instructions and without fully investigating the appointment of the directors of [P.R.L.]."

161. One matter that was causing some concern in the bank about this time was the correct designation of the B.C.B. account. Although the documents prior to 12 April from Meridian confirming the transactions relating to that account make it almost impossible for anyone to be confused as to the correct designation of that account there is one telex from Euramtrust referring to "Bahamas Commonwealth Bank and Trust," and apparently someone in S.G. (probably Gibbins) considered that the reference to B.C.B. "trust account" was a reference to a trust company. Certainly it was unusual that money bearing a trust account label should be received by S.G. on the inter-bank market. Contrary to the instructions received from Meridian on two advices from S.G. to B.C.B. rolling over the deposits on 3 and 10 April, the "trust account" designation was omitted even though S.G. gave B.C.B. its correct name, so that the word "trust" did not appear in that name. Roche cannot say whether he spotted it or whether someone brought it to his attention, but he was insistent that the correct designation in accordance with the instructions of S.G.'s customer was attached to the account. Roche was well aware that the label

"trust account" had significance for a bank, though he himself did not believe that inter-bank money could really be trust money. He said in evidence that if a bank had a customer account labelled "trust account" it was under a duty to make sure the terms of the trust were respected and he was aware that in certain circumstances the bank would be put upon inquiry as to what use was to be made of the money in the account.

162. S.G. sought confirmation from Rowe that the deposits of $2m. and $5m. should be held in the name of B.C.B. trust account and not B.C.B. That inquiry was passed on by Rowe to B.C.B. on 11 April, and the answer came back to S.G. from B.C.B. the same day that $7m. was to be held in the name of B.C.B. trust account. About this time Roche gave instructions to Gibbins to split up the $7m. into two accounts and to issue fresh documentation wherever previously S.G. had referred to the $7m. deposit as a single deposit. As he put it, "I thought it was safer not to amalgamate these two deposits in case it was not the same trust they were referring to." Gibbins on 11 or 12 April retrospectively produced new documentation relating to the $5m. and $2m. deposits. He even wrote out in his own hand fresh dealing slips and typed out fresh advices concerning the two deposits.

163. Also on Roche's personal instructions on 12 April an urgent telex was sent to Euramtrust under the signature of Roche referring to the two deposits of $2m. and $5m. respectively and continuing, "In view of likely lawsuit, kindly let us know urgently exact name of beneficiaries as indicated to you by paying bank." The reference to "beneficiaries" is a reference to the persons in whose name accounts are opened and to whom funds are credited. There was a telex back from Euramtrust on 12 April that referred, in relation to the $5m. deposit, to the B.C.B. "Tr a/c B.L.O. [B.C.B.]" but, in relation to the $2m. deposit, to the B.C.B. trust account. Roche felt that the abbreviations used in the telex in relation to the $5m. deposit left the matter unclear, and he again caused Gibbins to make a further query. By a further telex of 13 April to Euramtrust clarification was sought that "Tr a/c" meant "Trust Account" and that "B.L.O." meant "by order of." The telex continued: "If necessary please refer back to other banks involved. We regret having to revert to this matter once again but you will appreciate that owing to present circumstances precise details are absolutely essential." Euramtrust eventually did provide that information, but not until 24 April.

164. What was meant by the reference to "present circumstances" is not entirely clear, but Euramtrust and S.G. were in daily communication by telephone and one matter which was likely to have been discussed was an order of preliminary injunction made by Judge Stewart in New York on 11 April, a copy of which was served on Euramtrust on 12 April, purportedly as agent of S.G. Judge Stewart's order recited the default by LeBlanc, B.C.B. and V.C.L. in the S.E.C. proceedings and that pending the entry of a default judgment it was essential that the assets of V.C.L. and its subsidiaries including P.R.L. be preserved. In the operative part of the order it was ordered that LeBlanc, B.C.B., V.C.L., P.R.L. and persons acting for or in concert or in active participation with them including Natwest (with a New York address), "Société Générale S.A." (again with a New York address), D.S.T. and Columbus be enjoined pending the entry of default judgments or further order from withdrawing or traferring P.R.L. deposits with Natwest in the sum of $40¾m. and with S.G. in the sum of $7m. Euramtrust spoke to Sebire and informed him that they had several calls from the S.E.C., and told him of the injunction ordered by Judge Stewart. Euramtrust passed this information on to S.G. and Roche by telex on 12 April. Roche on 13 April telexed Euramtrust asking for a copy of the injunction to be airmailed. However a copy of the injunction became available to S.G. the same day in the P.R.L. proceedings, as I shall mention in a moment.

165. On the morning of 12 April Roche received a phone call from Lavy inquiring whether S.G. could execute the instructions it had received from Towning. Roche said he could not and gave several excuses, including the fact

that S.G. had received a writ. This was of course a reference to the writ in the P.R.L. proceedings. Roche recalls taking an instant dislike to Lavy on the telephone. He told me: "I was uneasy. I had a feeling that swindling was going on somewhere." He had caused an inquiry to be made of Natwest about D.S.T.'s standing, but Natwest had nothing adverse to report.

166. On 12 April S.G. was served with a writ in the P.R.L. proceedings. Again Roche handed this over to Widdrington, who then instructed solicitors. One of the two firms of solicitors usually used by S.G. was Bischoff & Co. ("Bischoffs"). Widdrington went to see Bischoffs and there met a partner, D'Arcy Hart, and a senior and experienced managing clerk, Peter Turner. It was a short meeting. Bischoffs were instructed generally in the matter. Widdrington was told that Turner would deal with S.G.'s problems and would instruct counsel for the hearing of the motion. It was decided that the attitude of the bank would be to fall in line with whatever the other defendant banks were going to do and to abide by the decision of the court.

167. The motion was heard by Brightman J. on 13 April. Mr. Donald Rattee of counsel was briefed by Turner and appeared for S.G. and other counsel appeared for each of D.S.T. and Natwest and the plaintiffs were represented by leading counsel. None of the other named parties were represented. Turner and Widdrington attended the hearing. S.G. had received no affidavits before 13 April and was served with the evidence at the hearing. S.G.'s own witnesses, Widdrington and Turner, gave somewhat different accounts of the affidavit evidence read in court and made available to S.G. Turner thought it was only Staple's first affidavit on behalf of the plaintiffs that was read to the court and he says he only received three affidavits. This is a reconstruction from the fact that at a later stage on 19 April when counsel was instructed to advise S.G. only three affidavits were handed to counsel. Turner's recollection is that the hearing took place during the morning only. That day was a normal motion day. Widdrington on the other hand recalls a lot of affidavit evidence and recalls hearing a substantial part of that evidence. He also recalls that the hearing took virtually the whole day. The order which was approved after amendment by Turner recites the reading of nine affidavits, of which four were by Staple. It is not important how long the hearing took or how much evidence was in fact read, though I prefer the evidence of Widdrington on whom a hearing in court so soon after arriving at S.G. is likely to have made a more enduring impression. Further it seems to me likely that the court would have heard the greater part of the evidence referred to in the order, given that Walton J. had only two days previously rejected an application for an injunction. Further the three banks though present and not opposing the order, gave no undertakings and all the other defendants including the owner of the moneys sought to be made subject to the injunction were persons abroad and not represented.

168. What is important is what evidence was available to S.G. There can be no doubt but that it was S.G.'s right to receive copies of all the evidence referred to in the order, and of course Turner knew that. Widdrington recalls taking all the affidavit evidence including the exhibits home with him and reading it in detail afterwards. Staple's first affidavit of 10 April sets out the background to the proceedings, including the purchase of the Costa Rican bonds with P.R.L. money and the instructions to transfer $15m. from D.S.T. to Columbus. The exhibits to the affidavit include copies of the S.E.C. complaint and of the pre-trial memorandum, both of which I have already described. They are summarised by Staple as follows:

> "As can be seen LeBlanc, Clay and V.C.L. are defendants to the complaint and among the relief claimed is the transfer to a receiver of the shares in V.C.L. Broadly speaking the complaint alleges fraud by the defendants in respect of assets under their control. The assets belong to a variety of funds in which the general public hold shares, which are managed and controlled by the defendants. As can be seen from paragrpah 35(a) on page 12 of the complaint, one of the allegations made is that certain of the defendants referred to as "Vesco and his group" (which include LeBlanc

> and Clay) intended to misappropriate the assets of (among other bodies) I.P.I." A

That affidavit referred to a sum of $7m. standing to the credit of an account in the name of P.R.L. with Société Générale (France) Bank Ltd. Staple's second affidavit of 11 April corrected that statement and referred to the $7m. as being with S.G. A third affidavit of Staple sworn on 12 April, inter alia, exhibited a transcription of the order made on 11 April by Judge Stewart. Staple's fourth affidavit (which like some of the other affidavits may well have been available B only in draft form at the hearing of the motion) gave further details of the Costa Rican bonds which were marketable, if at all, only in Costa Rica.

169. Another affidavit filed in support of the notice of motion was sworn on 11 April by Thomson von Stein, an attorney employed by the S.E.C. In it he said that since March 1971 he had participated in the S.E.C.'s investigation into the affairs of Vesco, I.O.S. and the other defendants in the S.E.C. proceedings. He said that the alleged misappropriation and misuse of the I.O.S. dollar fund C moneys as set forth in the S.E.C. complaint was a true and accurate description of the facts involved to the best of his information, knowledge and belief, and that the S.E.C. had received documentary and "testamentary" information that similar activities had continued after the S.E.C. proceedings were instituted in 1972 and were now continuing. He gave as an example the fact that the dollar funds had demanded from B.C.B. the return of fund moneys deposited with B.C.B. and that B.C.B. had failed to comply with that demand. The affidavit D concluded:

> "We have now received evidence that steps have now been initiated to invade funds of [P.R.L.] . . . in the same manner as trust fund moneys were misused as described in the S.E.C.'s complaint. We believe that if such funds are moved out of the United Kingdom, that they will be for ever lost to fund shareholders who are the rightful and beneficial owners of [P.R.L.]."

170. That affidavit exhibited a letter dated 28 March from Kronstein to the E S.E.C. reporting on the meeting in Nassau on 10 March with LeBlanc. That letter referred to the intervention of the funds in the Bahamian proceedings and to their interest in securing the transfer of the moneys in B.C.B. to O.D.B. Lux, as the designated cash depository. It also referred to the adivce of Bahamian counsel that moneys belonging to the funds and deposited in B.C.B. by O.D.B. Lux pursuant to the sub-depository agreement had to be held in trust by B.C.B. and were subject to the written instructions of O.D.B. Lux. F

171. Another affidavit was by the G.N.R.P. director, Saunders, who referred to the board meeting on 7 April of G.N.R.P. to which I have already referred. He deposed to the concern expressed by a number of directors present at that meeting as to information which had come to them to the effect that P.R.L. had recently been, and was currently engaged in, "unusual and uncharacteristic movements of its various substantial liquid resources amounting to a figure in excess of $US50m." He also stated that the directors of G.N.R.P. made G inquiries of LeBlanc concerning deposits of P.R.L. money with B.C.B. LeBlanc was asked whether B.C.B. was in a position to make payment if required to do so. LeBlanc, he said, did not categorically answer these questions but stated that certain balances of B.C.B. had been attached in the United States and Canada and that if a substantial number of depositors attempted to withdraw their deposits in the immediate future B.C.B. would not be able to meet its obligations.

172. Warham also swore an affidavit on 12 April. He gave details of the H purchase by P.R.L. of the Costa Rican bonds and of the fact, according to the information he had received from B.C.B., that a large proportion of the purchase price ended up directly in LeBlanc's hands or in the hands of Trident Bank, which was under LeBlanc's control. He explained the reasons which led to his resignation as follows:

> "I therefore felt that in the light of the transactions involving the Costa Rican Bonds, LeBlanc's association with B.C.B., the financial state of

B.C.B., and what I know to be alleged by the [S.E.C.] in its action in the New York Court, there is a real probability that the substantial cash assets still in London would be dealt with in a manner contrary to the best interests of P.R.L. and calculated to benefit LeBlanc and his associates at the expense of P.R.L. and through I.P.I. and [G.N.R.P.] the general public who hold shares in these companies, and that I should resign from P.R.L., V.C.L., and I.P.I."

Warham exhibited what he described as copies of the orders made by the Bahamian court. One was a copy of the order made on 1 February. The other, which bore the date 22 February, was a draft or transcription (erroneous only as to the date) of the order of 23 February. The other evidence filed in support of the notice of motion consisted of affidavits by experts in Bahamian and Canadian law respectively.

173. Brightman J. granted interlocutory injunctions as requested. S.G. was restrained from transferring any of the P.R.L. moneys but it was empowered to put moneys into a deposit account. The moneys frozen in the hands of S.G. remained with S.G. until as late as 1980.

174. S.G. produced on discovery various articles from newspapers and journals relating to I.O.S and Vesco which had been kept in its files. But with one exception there is no evidence that any of them came to the attention of any relevant person in S.G. The exception was an article in "The Sunday Times" of 7 January 1973, several copies of which were produced. To them had been stapled copies of P.R.L.'s certificate of incorporation and a typed note of what S.G. had been told by Barclays Bank on 11 April in response to an inquiry about B.C.B., including the fact that B.C.B. had been sued by another bank (a reference to the Bahamian proceedings). The article related to the abortive Paradise Island transaction and the transfer of the $15m. Gulf Stream moneys and was headed, "How Paradise turned into a parking lot for I.O.S. cash." It was in critical terms and linked Vesco with P.R.L., B.C.B., LeBlanc and Straub. Widdrington, who had read the article when it came out, must have obtained a copy of the article and looked at it with the other two documents about this time and at any rate before 19 April. The copies of the article show by the underlinings thereon that the article was carefully read in S.G.

175. On Friday, 13 April B.C.B. telexed S.G. as follows:

"Ref. our deposit in the name of [B.C.B.] trust a/c in the amount of [$7m.] please be advised that as a result of a court order dated 12 April 1973 issued by the Supreme Court of the Bahamas we hereby instruct that [$3m.] of the above deposit is to be designated as being held by [B.C.B.] on behalf of [Venture]. The remaining funds are to be held in the name of [B.C.B.]"

A second telex from B.C.B. to S.G. that day referred to the $7m. deposit which had been the subject of instructions of the earlier telex. It advised S.G. that as a result of the Bahamian court order dated 12 April B.C.B. instructed S.G. that S.G. was to hold its deposit of $3m. to the order of O.D.B. Lux jointly with Venture Management. O.D.B. Lux also on 13 April telexed S.G. that S.G. would be receiving from B.C.B. those instructions relating to the $3m. and asked for confirmation of their receipt.

176. A third telex was sent by B.C.B. to S.G. on 13 April. This like the other two telexes of the same date was not received until Monday, 16 April. It was in this form:

"Ref. our deposit in the amount of [$4m.] (original principal [$7m.] maturing 24 April) please break deposit and transfer value 17 April [$4m.] plus any interest accrued to date on original principal to [Natwest] London for a/c Banco Nacional de Panama, Panama a/c [B.C.B.] under advice to Panama and ourselves [—] [Please] also advise penalty incurred [—] Please be advised that [Morales] will be visiting you. He is director of this bank, is fully authorised to act on behalf of this bank."

177. These three telexes of 13 April came to the attention of Widdrington A
and he brought them or their contents to the attention of Roche. Widdrington wrote in the margin of the third telex "effect of Bahamas injunction." He said in cross-examination that he wrote this reasonably contemporaneously, but it is not clear whether he did so before or after seeing a copy of the order. The third telex in particular made a great imapact on Roche. B.C.B. had only on 12 April through Meridian contracted with S.G. to roll over the deposits of $7m. for another week from 17 April, yet here was B.C.B. doing what in Roche's B
experience was unprecedented on the inter-bank market, that is to say seeking to break the deposit agreement and incur whatever penalty S.G. thought appropriate. Further it was a matter of concern to Roche (who had been insistent that the B.C.B. account should be clearly designated "trust account") if the money in that account was at any time disposed of in a manner which might have consequences for the bank arising from that designation.

178. Widdrington decided that S.G. needed further documents. On 16 April S.G. telexed B.C.B. concerning the accounts totalling $7m., and asking B.C.B. C
to supply S.G. urgently with the following documentation: first, a copy of the "trust deed or the deed/documents constituting the trust for which the accounts are held," second, the memorandum and articles or charter of B.C.B., the list of current directors and a list of authorised signatories for the account together with the authorisation and verification of the signatories from one of B.C.B.'s London correspondent banks; third, a copy of the Bahamian court order relating to the $3m. S.G. advised B.C.B. that it regretted that owing to present D
circumstances it was unable to give consideration to the instructions contained in the telexes of 13 April until receipt by S.G. of the documentation which it was asking for by that telex. S.G. also advised O.D.B. Lux in the like terms on 17 April.

179. On 17 April, as foreshadowed in the third telex of 13 April from B.C.B., Morales came to S.G. and saw Roche and Widdrington. He brought a letter dated 13 April from B.C.B. and signed by Heatly and B.C.B.'s assistant E
manager, Lunn. The letter referred to the first two telexes of 13 April and said that a copy of the Bahamian court order of 12 April and the agreement of 13 April were attached. After referring to the $3m., the letter continued:

> "The balance of these deposits are to remain in the name of [B.C.B.], together with accrued interest, if any, on the entire [$7m.] . . . In conjunction with this court order, which effectively releases our balances in the amount of [$4m.] plus accrued interest, we now request that you pay F
> this amount to Banco Nacional de Panama, Panama, R.P., for account of [B.C.B.]."

S.G. was asked to transfer those moneys through Natwest, as one of the correspondent banks in London of Banco Nacional de Panama, and to break the deposit. The letter continued that the bearer thereof, Morales, a director of B.C.B., was fully authorised to act on behalf of B.C.B. and S.G. was thereby G
authorised to accept his instructions concerning the $4m. deposit remaining in the name of B.C.B. The interview with Morales was a short one and Roche recalls that Morales was "most unpleasant." Roche said S.G. was not going to break the deposit. That meant that S.G. had at any rate until 24 April, the date of maturity of the deposit, to decide what to do.

180. Morales was accompanied by Wingrove, who met Widdrington again at S.G. on 18 April. At the meeting on 17 April or that on 18 April Widdrington H
was told that the deposits with S.G. represented moneys lodged with B.C.B. pursuant to the sub-depository agreement. It was that agreement which Wingrove told Widdrington was the document constituting or declaring the relevant trusts relating to the deposit moneys. At the meeting on 18 April Wingrove handed to Widdrington a copy of the sub-depository agreement, the memorandum and articles of association of B.C.B., a certificate of the officers and directors of B.C.B. and what was to be described by Widdrington in some notes he prepared for Bischoffs as "a director's certificate and secretary's certificate concerning the

appointment of one E.A. Morales as a director of B.C.B." It has not been possible to identify the last-mentioned document or documents with any existing document or documents. I must assume from Widdrington's description that no details of the board of B.C.B. were given other than that Morales was a director. The certificate of the officers and directors of B.C.B. was sent to Barclays Bank International Ltd. for verification and not returned until 25 April and then without verification as to Morales being a director.

181. Roche and Widdrington decided, probably about 16 April, that counsel should be instructed to advise as to what S.G. ought to do in relation to the instructions from B.C.B. However no action to obtain that advice was taken by Widdrington until he had the documents which he had asked for from B.C.B. Accordingly it was not until the afternoon of 18 April that Widdrington got in touch with Turner of Bischoffs. Widdrington had mentioned the fact of the B.C.B. deposits to Turner at an earlier stage, as appears from the reference in a letter from Widdrington to Turner of 16 April to the fact that the deposit of $7m. had been renewed until 24 April and the comment by Turner on 18 April in a letter to Widdrington, "We were very interested to read that the deposit of $7m. by [B.C.B.] has been renewed." Widdrington spoke to Turner on the telephone on the afternoon of 18 April to say that he wanted advice from counsel and referred to the urgency of the matter as the deposit matured on 24 April. Unfortunately 18 April was the last day of the Hilary term, the following day, 19 April, being Maundy Thursday and the first day of the Easter vacation. Widdrington expected Mr. Rattee to be instructed but Mr. Rattee was not available, as Turner reported to Widdrington. Widdrington was told by Roche that advice had to be obtained from some other counsel. It was arranged that Turner would instruct counsel to advise in conference and then deliver a written opinion.

182. Widdrington prepared what he described in an accompanying letter dated 18 April (but received by Bischoffs only on 19 April) as "Some notes setting out that the relevant facts to assist Bischoffs in preparing instructions to counsel." This consisted of a single sheet of typed notes in the following form:

> "1. We received an application for the opening of an account in the name of [B.C.B.] and unfortunately the usual investigations into the company's memorandum and articles, who the directors were and who the authorised signatories were, was not carried out. Also [B.C.B.] was not asked to pass the usual form of bank mandate setting out the authorised signatories.
>
> "2. Initially we received a deposit of [$2m.] and when this deposit came up for renewal a further [$5m.] was received with instructions to add the two deposits together in one account. When we received the initial deposit our instructions were to hold the money on behalf of [B.C.B.] (trust account) so that we had notice of a trust. In spite of this, the two deposits were held in one account of [$7m.] and later instructions to divide the $7[m.] into two accounts of $3[m.] and $4[m.] were also carried out.
>
> "3. On reviewing the situation, it was decided to reconstitute the accounts as two accounts of $5[m.] and $2[m.] both held in the name of [B.C.B.] (trust account). This was done because we had notice of the trust and did not know whether the money belonged to the same trusts."

183. Paragraph 4 referred to the order made on 12 April in the Bahamian court relating to the $3m. and paragraph 5 referred to the telex instructions relating to the $3m. and O.D.B. Lux's request for confirmation that the instructions had been carried out. Paragraph 6 referred to the instructions from B.C.B. to transfer $4m. to "[Natwest], London account Banco Nacional de Panama account B.C.B. Ltd." The absence of a comma between "London" and "account" is to be noted. It was also stated that S.G. did not propose to carry out any instructions until the maturity date, 24 April. Paragraph 7 referred to the certificate of the directors of B.C.B. (a document which was not, in fact, supplied to Bischoffs or to counsel as it was still being verified by Barclays Bank) and the certificates concerning the appointment of Morales as a director

of B.C.B. It also referred to the visit of Morales to London and the fact that he had left no written instructions. In paragraph 8 counsel was asked to advise—

> "(a) at to what would constitute valid instructions to safeguard [S.G.] (b) assuming that eventually we do get valid instructions, whether we can follow the instructions in view of the fact that the $4m. is directed to be paid to the Panamian bank mentioned, about which bank we have grave suspicion (c) whether we should keep the $7m. on deposit as one account, two accounts of $5m. and $2m. respectively, or two accounts of $4m. and $3m. respectively in view of the fact that we have notice of a trust, and (d) generally."

184. Widdrington did not consult with Roche or show Roche these notes before they were delivered to Bischoffs. Paragraph 1 is inaccurate in so far as it purports to state what was S.G.'s usual practice in relation to a bank like B.C.B., depositing moneys on the inter-bank market. This was probably a misunderstanding by Widdrington of what he had been told, probably by Gibbins. The last sentence of paragraph 2 is also inaccurate. The only instructions to divide the $7m. into two parts were by the telexes and letter of 13 April and at that stage had not been carried out. The original of Widdrington's notes which went to Bischoffs and thence to counsel was as I have described those notes. Another copy was produced by S.G. on discovery and on it Widdrington had in manuscript deleted from paragraph 8(b) the words "the Panamanian bank mentioned, about which bank we have grave suspicion" and added "Natwest etc. a/cs etc as above." Widdrington said that while he could not remember it specifically, he would be surprised if he did not mention the amendment to counsel. I think it probable that he did not mention it. The conference was only a brief one, as I shall describe, and if the amendment was mentioned one would have expected it to have been recorded on counsel's top copy of the notes. Widdrington cannot recall the reason for S.G.'s suspicions as originally recorded but it is likely that it was the fact that the Panamanian bank had been the one to which but for the injunctions obtained in the P.R.L. proceedings I.R.C.'s $4m. would have been transferred. Counsel was not informed of this fact. Nor could Widdrington recall the reason for the amendment. The documents accompanying the notes consisted only of the Bahamian court order of 12 April and the agreement of the following day and the documents which I have mentioned as having been received from Wingrove on 18 April other than the directors' certificate. None of the telexes or letters referred to accompanied the notes. Nothing was said about the claim by B.C.B. as to the effect of the Bahamian court order on the $4m. deposit. No reference was made to the S.E.C. telephone call with Roche or the unprecedented request to break the deposit. No attention was drawn to the fear that the moneys that were deposited by B.C.B. were I.O.S. moneys. No attention was drawn to the S.E.C. complaint and to the allegations that had been made against B.C.B. and LeBlanc and Straub, two of the three persons on whose instructions, on behalf of B.C.B., S.G. was asked to act. No mention was made of the P.R.L. proceedings or of the allegations made therein against LeBlanc and Morales as directors of P.R.L., two of the persons giving S.G. its instructions. Indeed no attention was drawn to the signatories of those instructions.

185. Two explanations may account for some at least of these striking omissions. One is that Widdrington had already returned the P.R.L. papers to Bischoffs and asked Bischoffs to send them to counsel. Turner of his own initiative subsequently prepared instructions to counsel in which he referred to the P.R.L. proceedings. The second explanation is that Widdrington was expecting to have a meeting with Turner to prepare the instructions for counsel. That never took place as there was insufficient time.

186. Turner arranged a conference with another counsel in Mr. Rattee's chambers, Mr. John Bradburn, then a very senior and experienced Chancery junior. Turner prepared brief written instructions to counsel as follows:

"Counsel is instructed on behalf of [S.G.] a French bank and is asked to advise in conference in connection with a sum of [$7m.] deposited with them by [B.C.B.]. As counsel will see from documents 2 and 3 herewith [S.G.] was a defendant when a motion came before Brightman J. on the 13 April 1973 and an injunction was granted restraining dealings with a sum approximately of U.S.$7,008,000 held by the bank on deposit on behalf of [P.R.L.]. There are numerous companies connected with the I.O.S. group and as counsel will see from the affidavits a Mr. LeBlanc effectively controls the group. Although [B.C.B.] is not a party to the action it is mentioned in the affidavits and [S.G.] are concerned as to their position with regard to the moneys on deposit with them. Counsel will see from the bank's note therewith that there is an order of the court in the Bahamas as to part of the deposit and that instructions have been received as to the balance. Counsel is asked to advise in conference as to the position of the bank generally."

Thus counsel's attention was drawn in very broad terms to the P.R.L. proceedings, the I.O.S. group of companies, LeBlanc's controlling position in that group, the reference to B.C.B. in the affidavits and the Bahamian court order.

187. The papers accompanying the instructions were, first, the notes of Widdrington and the documents therewith, second, the writ and notice of motion in the P.R.L. proceedings and, third, three affidavits in support of the motion. It is to be noted that only three of the nine affidavits in support of the motion were sent to counsel. Turner is insistent, and I accept, that he did not make a selection of the affidavits but merely sent all that he had in his possession. He cannot remember which were the three affidavits, but two of them must have been Staple's first two affidavits. The third is likely to have been von Stein's affidavit (being earlier than the remaining affidavits) or perhaps Staple's third affidavit. Remarkably Widdrington never saw the instructions to counsel or what documents were sent to counsel other than those emanating from himself. Turner never consulted a partner either before the conference or after. His attitude was that he was being instructed by a solicitor and it was not for him to consider the meaning and effect of the notes drawn by Widdrington.

188. The instructions were sent down to counsel by messenger and at some stage on 19 April the conference was held and attended by Widdrington and Turner. There is an acute conflict of evidence on the part of S.G.'s own witnesses as to the time and the length of the conference.

189. Turner's evidence is largely a matter of reconstruction from his experience of attending conferences with counsel and from an attendance note which he made and which reads as follows:

"Attending Mr. Widdrington when he handed us papers and note for counsel re [B.C.B.] Attg. Mr. Bradburn's clerk arranging urgent conference. Attg. in conference when Mr. Bradburn advised that the bank should act in accordance with the customer's instructions."

Turner recorded the duration as two hours. In examination he said that the instructions and papers were sent "late in the morning of the 19th," that he did not know how long before the conference actually took place the papers were sent but thatf it must have been before lunch because he always sent papers down before a conference so that counsel could read them. He did not know the precise time of the conference but he said: "I should think, bearing in mind that it was Maundy Thursday, it would be as early as possible after lunch, possibly 2.30 or possibly 3 o'clock." He said that the two hours' duration referred to in the attendance note was the length of only the conference and possibly travelling time, in which event he said he would imagine the conference would take at least $1\frac{1}{2}$ hours in any event.

190. Turner's evidence as to the timing and length of the conference was supported by Christopher Watts, the senior clerk in Mr. Bradburn's chambers, but he candidly admitted that on these points his evidence was "pure conjecture."

Watts produced the chambers diary which he kept and this shows only two entries on the lined page for 19 April. The first on lines 17 and 18 is a reference to another conference at 12 o'clock held by another counsel in those chambers. Five lines below that entry was the entry relating to Mr. Bradburn's conference with Bischoffs but surprisingly it did not give the time of the conference. Watts and Mr. Bradburn inferred from the position on the page of the entry relating to Mr. Bradburn's conference that it took place in the afternoon. But Mr. Price after looking for only a few seconds at the diary was able to demonstrate from another entry on another page how unsafe it was to draw any such inference. What seems to me to be significant is the absence of any time fixed for the conference. To my mind it indicates that when the conference was fixed the time for it was not certain. All that one can say is that at the time the entry was made, or if made before the entry for the other counsel at the time of the making of the latter entry, Mr. Bradburn's conference was not expected to take place before 12 o'clock. Mr. Bradburn's own suggestion in his evidence before me was that "it could be that the solicitors themselves did now know exactly when they would be able to come, so that it was left open." I agree and I think it likely that the conference was fixed to start as soon as Widdrington joined Turner and came to counsel's chambers.

191. Not surprisingly after such an interval of time Mr. Bradburn has no recollection whatever of the conference. The fee note sent out by his clerk charged a fee of £16 before value added tax for "Advising in conference" (without any reference to perusing or considering papers). Bischoffs' fee in connection with the obtaining of counsel's advice was £40 plus value added tax. In view of Mr. Bradburn's standing and the amount of money about which he was asked to advise, his fee is consistent with a short conference for which little time for preparation had been allowed or spent.

192. This is strongly supported by Widdrington's evidence, which was of direct recollection (rather than reconstruction) and was more specific than that of the other witnesses. He recalls Turner ringing him up to tell him the time of the conference. That conference, he said, was round about midday, either 12 or 12.30. He thinks it probable that he and Turner went to counsel's chambers together. His recollection was that the conference was not very long; he put it as "20 minutes at the outside."

193. I do not doubt that Mr. Bradburn, Watts and Turner did their best to assist the court but I have no hesitation in preferring Widdrington's evidence as to the time of the conference and the length of it. He had good cause to remember so unusual an event as a conference with counsel occurring so soon after his arrival at S.G. and in a matter for which he had been given considerable responsibility. Further the conference was remarkable in that he was suprised by what occurred at it. His evidence in examination-in-chief was:

> "The conference didn't go the way I had expected. It was a fairly weighty bundle of documents before counsel and I had been expecting that we would have to initially go through with counsel outlining the facts and referring to the documents. But counsel did not ask us any of these questions. Virtually as soon as we came in he said he thought the bank could pay away. Very firm unequivocal advice."

194. Turner described his own part at the conference as being "rather a spectator . . . I was merely sitting in." Widdrington was asked by Mr. Leckie whether he himself had asked counsel any questions. Mr. Widdrington's answer was:

> "Yes. His initial reaction was that we had instructions from the legal depositor and that we could pay away. I said at some stage during the proceedings, 'Wasn't the bank on inquiry because of the various sets of proceedings?' The reply was that he did not see why with civil sets of proceedings; 'Did I know of anything in banking law in particular as to why the bank should not pay away?' To which I replied, 'No.' I wouldn't have gone to counsel if I had known the answer."

The course of the conference as described by Widdrington is consistent with his evidence as to its length.

195. Widdrington's note of the advice given by Mr. Bradburn was as follows:

> "1. Certificate as to who are directors notarially certified as being all the directors of B.C.B. 2. Instructions to act signed by all directors. Certificate on instructions that these are signatures of directors they purport to be of. (a) 'trust a/c' can be kept in accounts as directed (b) on instructions as above we can deal with money as directed (c) put Natwest London on notice. (Natwest are in jurisdiction)."

Widdrington's explanation of paragraph (a) was that it referred only to the $3m. deposit, the subject of the Bahamian court order. His explanation of paragraph (c) was that it was intended as a gesture of friendship between banks and that it was to find out whether Natwest would make the transfer. However this is hardly consistent with the note that Natwest were in the jurisdiction. That must be a reference to Natwest being subject to the jurisdiction of the English courts, and the relevance of that must have been that, if compliance with the instructions to pay money to Panama was for any reason improper, Natwest might be answerable. It was Mr. Bradburn's advice to put Natwest on notice and he is not likely to have been concerned with gestures of friendship between banks. Although Widddrington was not disposed to accept that the advice given was to put Natwest on notice of the circumstances in which S.G. received the money and were paying the money, so that if the moneys were subject to a trust Natwest would be on notice of that trust, I think it probable that that must have been the purport of that advice.

196. Mr. Bradburn's advice caused Widdrington surprise. Before Widdrington went to the conference he thought that the advice would be the other way, that is to say that S.G. should keep the money. Widdrington's notes which went to counsel had adverted to S.G. being put on notice of a trust by the designation "trust account," but there does not appear to have been any specific reference to this at the conference nor to the effect of the Bahamian court order and the agreement of 13 April on the moneys in the trust account. There was no reference at the conference to the S.E.C. proceedings or to the S.E.C. complaint or memorandum. Widdrington's explanation was:

> "At this time I was a young solicitor and I was faced with a rather senior junior counsel giving advice in a firm manner and it would have been impertinent of me to suggest that he had not read the documents before on which he was seeking to advise."

Widdrington was asked in examination: "Were you satisfied that he had made himself familiar with the documents?" Widdrington's answer was: "I could only assume that he had."

197. It is common ground between Mr. Price and Mr. Leckie that Mr. Bradburn would have had in front of him not only the first affidavit of Staple but all the exhibits thereto including the very bulky S.E.C. documents. If the other two affidavits copies of which were supplied to Mr. Bradburn were, as seems probable, the second affidavit of Staple and the affidavit of von Stein or alternatively the second and third affidavits of Staple together with the exhibits thereto respectively (as distinct from the even lengthier affidavit of Warham, for example, and the exhibits thereto), it would still have taken some hours for counsel to have read and made himself familiar with all the documentary material that was put before him. At the time the name I.O.S. did not convey very much to Mr. Bradburn. When Mr. Bradburn's attention was drawn in cross-examination to some of the more striking allegations made in the S.E.C. complaint and memorandum, he accepted that had he read those allegations he would not have forgotten them. After referring to what he called "the Vesco scandal," he said: "I can certainly say that at the time of the conference I did not appreciate that what I was being consulted on was anything to do with such an affair as that." I conclude that Mr. Bradburn did not read the S.E.C.

complaint and memorandum, nor did he pay much attention to the references in the first affidavit to the S.E.C. proceedings. Indeed I cannot see how Mr. Bradburn had time to read all or even much of the documentary material. He must have read the notes of Widdrington and his instructions from Bischoffs and I would expect him to have looked at the writ and notice of motion in the P.R.L. proceedings and the affidavits sent to him, if only quickly. It is unlikely that his reading went any further in the time available. A

198. Because of the Easter vacation, it was decided that no written opinion need be given. Widdrington reported orally to Roche what counsel had advised, though not the advice to put Natwest on notice. On the same day he wrote a letter to B.C.B. (sending a copy to Wingrove, who was still in London) in which he indicated to B.C.B. that S.G. would carry out the instructions which B.C.B. had sent with regard to the $3m. and would carry out whatever instructions S.G. was given by B.C.B. with regard to the remaining $4m. on deposit provided that S.G. received (1) a list of all the directors of B.C.B. notarially certified, (2) written instructions to deal with the $3m. and the $4m. signed by all the directors, the signatures to be notarially certified. Counsel's advice to put Natwest on notice was, however, not complied with, probably because of the lack of time. It is idle now to speculate what would have happened had Natwest been put on notice, nor would the giving of such notice have saved S.G. from any liability that resulted from acting on B.C.B.'s instructions. Although Widdrington was not entirely happy with Mr. Bradburn's advice, he said in examination that he went away that weekend, thought about the advice and came to the conclusion that Mr. Bradburn must be right. However, in cross-examination he admitted to continuing to be "a bit unhappy" about the position, but he never revealed his doubts to Roche. B C D

199. On 24 April Euramtrust by telex provided the confirmation that the initial instructions relating to the $5m. deposit designated that it should be held for a trust account. Widdrington, for the benefit of Roche, wrote a note on a copy of that telex: "Counsel is of opinion that the various sums accepted may be kept in one account or as per instructions." E

200. On 24 April solicitors for B.C.B. contacted S.G. Beer & Partners ("Beers") asked Widdrington if S.G. would be prepared to comply with B.C.B.'s instructions given through Wingrove in person or by telex from B.C.B. Widdrington told Beers that S.G. was not prepared to do so and confirmed that by a letter of 24 April. In it he said:

> "The bank of course does not want to be involved in any legal proceedings but if [B.C.B.] is not prepared to let us have instructions in accordance with our letter of 19 April, the bank would be only too happy to be the subject of any court proceedings in order that this matter may be cleared up." F

In examination Widdrington gave this explanation: "It was the one way I could see the bank dealing with this particular deposit with no risk." Beers were also told that, as was the fact, the $7m. had been placed together with interst in a suspense account. The suspense account was in fact labelled "Current trust account." The continuing trust designation relating to all the $7m. was placed with the knowledge and probably on the advice of Widdrington. G

201. On 24 April Beers spoke again to Widdrington and agreed over the telephone a form of wording for instructions from B.C.B. to S.G. and for the other documents that S.G. required such as would be acceptable to S.G. Beers sent copies to S.G. on 25 April. The agreed wording did not refer to interest and when by letter of 27 April Widdrington confirmed S.G.'s agreement to the wording he said that interst would be apportioned between the $3m. and the $4m. On 26 April Beers wrote to S.G. enclosing a letter from B.C.B. dated 24 April, setting out the directors with their signatures notarially certified and a second letter from B.C.B. of the same date setting out instructions as to the sums of $3m. and $4m. again signed by all the directors of B.C.B., the signatures being notarially certified. In the second letter B.C.B. diected S.G. to hold $3m. in accordance with the order of the Bahamian court dated 12 April H

A and the agreement of 13 April, and directed S.G. to pay $4m. plus all accrued interest (and not merely the interest on $4m.) by telegraphic transfer to Banco Nacional de Panama for the account of B.C.B. B.C.B. requested that in effecting that payment the transfer of the funds should be made through Natwest for the account of Banco Nacional de Panama a/c B.C.B. Thus compliance with the payment instructions would remove the trust label from the $4m.

202. On 27 April S.G. attempted to comply with those instructions. The
B $3m. were placed in a trust account for the benefit of Venture and held to the order of O.D.B. Lux and Venture Management. S.G. attempted to pay the remaining £4m. and interest amounting to $9,697·91 (being the interest on $7m. down to 24 April) in accordance with B.C.B.'s directions. But Natwest informed S.G. that S.G.'s payment order was unacceptable to Natwest because their New York office had received an injunction not to accept any dealings concerned with B.C.B.

C 203. This was a surprising development, and it must have drawn to S.G.'s attention the probable connection between the S.E.C. proceedings and the moneys it held for B.C.B. But Widdrington did not consult either Bischoffs or counsel. In examination Widdrington was asked: "In your mind, was this $4m. at this stage fixed with any form of trust?" His answer was:

> "There was still a possibility that it was subject to trust, but I had the advice from Mr. Bradburn and I can only assume at this stage that I
> D assumed that he knew of the proceedings in New York and, therefore, it was not necessary to go back to Mr. Bradburn."

As I have already said, no reference was made in the course of the conference with Mr. Bradburn to the S.E.C. proceedings. In cross-examination Widdrington admitted that it was such a development as looking back in tranquillity from today merited going back to solicitors and counsel.

204. On 30 April Widdrington informed Beers that S.G. wanted fresh
E instructions and B.C.B. was similarly informed by telex. On 30 April B.C.B. telexed back asking S.G. to pay by wire Algemene Bank for the account of Banco Nacional de Panama. S.G. promptly replied that it was unable to pay Algemene Bank without B.C.B.'s written instructions signed by three directors notarially certified.

205. On 2 May Rowe rang Widdrington about B.C.B. and wanted to know the position with respect to the $7m. deposit. Widdrington told him that $3m.
F was subject to the Bahamian court order and that S.G. was awaiting instructions in respect of the $4m. together with interest. He explained to Rowe in what form S.G. wanted instructions from B.C.B. Widdrington's note of this telephone conversation includes, "Rowe is a financial adviser for LeBlanc group in London." Widdrington originally started writing "Vesco," but corrected that to LeBlanc.

206. On the same sheet of paper Widdrington wrote, "Stoltenberg of I.O.S.
G (investment manager)." That note seems likely to have been a reference to a subsequent telephone conversation on 3 May whereby Edward Stoltenberg, an accountant employed till July 1973 in the I.O.S. complex and responsible for accountancy records of the funds, arranged to see Widdrington. Stoltenberg's evidence in examination was that he was informed on the afternoon of 2 May by Rowe that the money on deposit for the benefit of the funds was being attempted to be moved to the Caribbean. Stoltenberg telephoned Cobb in
H America. Cobb was counsel both to him personally and to the management companies. Cobb advised Stoltenberg to proceed with full speed to try to stop the money from going to the Caribbean. Stoltenberg then went to talk to Rowe and they attempted to contact Widdrington by telephone. Widdrington was not in, but they contacted him by telephone in the morning of 3 May, when Stoltenberg was able to talk with Widdrington directly. Widdrington did not want to talk about it over the telephone, so Stoltenberg went to Widdrington's office some time between 11 a.m. and noon. He identified himself by his American passport and told Widdrington that he felt the beneficial owners of

the money were I.O.S. funds, and that in his opinion he thought it was not in the best interests of the funds that those moneys be transferred to the Caribbean. It is likely that Stoltenberg was even more specific as to who owned the moneys. Another note of Widdrington headed "Stoltenberg" records the following: "4·8m. Venture Fund 2·2m. F.O.F." Widdrington's reaction was, in Stoltenberg's words, "generally non-committal," but Widdrington told him that the moneys were B.C.B. moneys and that B.C.B. had asked that the moneys be transferred to the Caribbean. Widdrington showed Stoltenberg Morales's calling card. Widdrington told Stoltenberg that if no claim was made then S.G. would have to pay away in accordance with instructions from the depositor and that if Stoltenberg wanted to do anything about it he should obtain legal advice.

207. Stoltenberg spoke by telephone on 3 May to Daniels, with whom he was acquainted and whom he knew to be the solicitor representing O.D.B. Lux. He told Daniels that the $7m. deposited with S.G. belonged as to $4,800,000 to Venture and $2,200,000 to F.O.F., that S.G. had had instructions to move the $7m. and that he had seen S.G. He said in examination that he told Daniels: "Widdrington wanted some sort of communication from them as representatives of the bank who had custodial responsibility, giving him some guidance as to what to do with the money." It is clear therefore that Stoltenberg left Daniels to follow the matter up, on the footing that O.D.B. Lux was the cash depository of the funds. Stoltenberg then flew to America and spoke to Cobb, who told Stoltenberg that he would take it up with Meissner. Daniels telexed Callender on 3 May and reported to him that Stoltenberg had seen S.G. concerning the $7m. deposits held by S.G. as to $4,800,000 for Venture and $2,200,000 for F.O.F. Daniels in that telex drew attention to the fact that part of the schedule to the agreement of 13 April only referred to $3m. held for Venture and asked Callender to obtain B.C.B.'s "confirmation" that the $7m. was held in the way Stoltenberg had contended. Also on the afternoon of 3 May, Daniels spoke on the telephone to Widdrington about Stoltenberg's information as to the $7m. deposited by B.C.B. with S.G. Daniels said in examination that Widdrington's reaction was sympathetic, but he wanted Daniels to produce some form of documentation or something to substantiate what Daniels was telling Widdrington. Daniels followed this with a letter which he personally delivered to Widdrington on 4 May. The heading of that letter referred to O.D.B. Lux. In the letter Daniels first adverted to his understanding that $7m. had been deposited by B.C.B. in an account designated as a trust account but held in B.C.B.'s name and he continued:

> "Having regard to the fact that the total of £7m. represents trust funds and that we are informed by Mr. Stoltenberg that the said sum is held by [B.C.B.] as to $4,800,000 on behalf of Venture . . . and as to $2,200,000 on behalf of [F.O.F.], we shall be glad if you would confirm that our understanding . . . is correct."

Daniels said that he would also be grateful if, on receipt by S.G. of instructions from B.C.B. as to any transfer of the said sum or any part of it, B.C.B. might be requested to provide information to S.G.'s satisfaction that the transfer instructions were "with the authority of the trust on whose behalf the moneys are held." Daniels also said that in the meantime he was seeking through his Bahamian correspondents, Callenders Orr, to clarify the matter with B.C.B. and would let S.G. know what transpired as soon as possible.

208. Widdrington read the letter in Daniels's presence and indicated that the letter was not as strong as he had hoped and that what he wanted was somebody to take proceedings to freeze the moneys. In a telex on 7 May to Callender, Daniels reported on his conversation with and letter to Widdrington. He said that he had spoken and written to Widdrington with a request that he defer implementation of B.C.B.'s instructions to transfer the $4m. until he had B.C.B.'s "confirmation" that the moneys were transferred "in accordance with trust on which they are held." Daniels suggested to Callender that, if Robertson agreed, O.D.B. Lux should suggest to Isaacs that formal instructions in writing

from Venture and F.O.F. pursuant to clause 3(d) of the sub-depository agreement be given to B.C.B. to retain the moneys in S.G. pending clarification of the matter. Daniels asked that copy instructions be telexed to him so that he could deliver them to S.G. on behalf of the funds not later than 10 a.m. on 9 May. Daniels said that he did not wish O.D.B. Lux to give instructions as it had never officially agreed that it was bound by the terms of the sub-depository agreement.

209. Widdrington replied by letter to Simmons & Simmons thanking them for their letter on which he said that he was taking B.C.B.'s instructions. On the same day he sent by hand to Beers a letter referring to the letter from Simmons & Simmons acting on behalf of O.D.B. Lux concerning the $7m. deposit and to the information received from them that $4,800,000 should be held in a trust account for Venture and $2,200,000 in a similar account for F.O.F. Widdrington continued:

> "In the light of this disclosure, we have had to reconsider the legal advice given to us. Would you please either confirm that the U.S.$7m. deposited by yourselves have nothing to do with [Venture] or [F.O.F.] or, if the funds do belong to these two companies, please set out which proportion of the U.S.$7m. belongs to which of the two companies mentioned and explain why the figures for the amount belonging to each company differ from those set out by the solicitors for [O.D.B. Lux]. On re-perusing the trust document (sub-custodian agreement) dated 27 October 1972, any instructions that we receive concerning the balance of the U.S.$7m. deposit from yourselves must be confirmed by written instructions by either [O.D.B. Lux] (the party of the first part of the above agreement) or the party or parties mentioned as being party of the third part to the above agreement to whom the funds belong in accordance with clause 3 (B or D) of the agreement."

The "sub-custodian agreement" is of course the sub-depository agreement and the third party thereto the funds. Beers replied that day saying that they had no instructions but that they were taking thier client's instructions and would communicate with S.G. further in due course.

210. On 3 May Beers had telexed Widdrington to the effect that B.C.B. wanted to give instructions in the terms of a letter set out in the telex. Widdrington was asked to let Beers know over the telephone whether such instructions with certified signatures would be acceptable and could be carried out. The draft letter gave instructions as follows:

> "1. To pay U.S.$4,009,697·91 by wire, to Algemene Bank . . . Amsterdam, for account Banco Nacional de Panama sub-account Bahamas Commonwealth Trust Corporation Ltd. Alternatively, and only if in the event the above is not accomplished, you are hereby instructed as follows: 2. Please prepare U.S. dollar draft in the amount of U.S.$4,009,697·91 payable to Algemene Bank . . . account Banco Nacional de Panama. You are hereby authorised to deliver this cheque to . . . Wingrove who has previously identified himself to your bank."

Widdrington spoke to Beers over the telephone and caused to be added after "U.S.$4,009,697·91" in each of the numbered paragraphs the words "(less proper bank charges)." That addition was incorporated in a letter dated 3 May from B.C.B. to S.G. and signed by LeBlanc, Straub and Morales, and containing B.C.B.'s instructions as I have set out. That letter, together with a letter showing the signatures notarially certified of LeBlanc, Straub and Morales, as being the three directors of B.C.B., was delivered to S.G. on 4 May.

211. The instructions were, in Roche's own words in his evidence before me, "unusual." They contemplated that there might be difficulty in effecting payment: hence the alternative instructions. They differed from the previous instructions in various particulars. Payment was to be made through the Algemene Bank in Amsterdam, and not through a bank within the jurisdiction. The payee under