# Baden v Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France SA [1993] 1 WLR 509

# Exhibit 2-2

the first alternative was not B.C.B. but Bahamas Commonwealth Trust Corp. A Ltd. S.G. knew nothing about that company, but Widdrington (somewhat illogically) thought that that payee accorded more with the designation "trust account" that had attached to the account, and he was better pleased with that payee than if it had been B.C.B., simply because of the word "trust" in the name of the payee. Again this reflected his unease with the situation.

212. Roche surprisingly was not told either of the information supplied by Stoltenberg or of the alternative instructions. He was not aware that a new payee had been designated. In response to a question from me he said that had B he known at the time that a payee other than B.C.B. had been designated he would not have agreed to make that payment. On being reminded by Mr. Leckie of the instructions S.C. received and the advice of counsel he was asked: "Does the fact that the money went to Bahamas Commonwealth Trust Corporation Ltd. by order of [B.C.B.] give you any cause for concern?" He answered: "Slightly, but, if counsel tells us to carry out B.C.B. instruction, then we have to carry out that instruction properly authentified [sic]." In response to C further questions from me to try to clarify his inconsistent answers, he said:

> "In normal term, had we not contacted counsel . . . I would not have agreed. But we had consulted counsel. He gave us advice to carry out the instructions and the instructions were in order, they were signed by all the directors of the bank, the signatures were notarially certified. It is on headed paper. If counsel will say it's O.K., the instruction O.K. . . . in fact D what we are doing there is no longer repaying a deposit, we are making a payment on behalf of B.C.B. on proper instructions."

213. The alternative instructions if complied with would have left Wingrove in sole command of the moneys. He could have opened an account at the Banco Nacional de Panama and dealt with it on his sole instructions. Roche's evidence was clear. "This would not have been acceptable because it did not indicate B.C.B. as beneficiary." He said he would have taken counsel's advice on the E matter.

214. Widdrington had continued to be uneasy as to whether the moneys held by S.G. were trust moneys and this unease had been heightened by Stoltenberg's information. But although Turner was in communication with Widdrington by telephone on 3 and 4 May about the draft order in the P.R.L. proceedings, and although Widdrington had reconsidered the legal advice S.G. had received, as he admitted in cross-examination because a situation had arisen which was not F covered by the legal advice S.G. had received, Widdrington did not seek the advice of Bischoffs or of counsel on the developments that had occurred since the advice of counsel was taken.

215. Also on 4 May Widdrington wrote a second letter to Simmons & Simmons. Again it was headed "O.D.B. Lux" and it was in the following terms:

> "We write to say that with regard to the balance of the moneys that we hold, proceedings must be started against us by Wednesday 9 May 1973 or G else we have to carry out our customer's instructions."

Widdrington could not explain how it came about that the second letter to Simmons & Simmons was written on 4 May. I think it likely to have been prompted by the arrival of the letter of instructions from B.C.B. in the form which S.G. had required. The deadline imposed by Widdrington was what he considered reasonable. It appears that he posted this letter, so that it would not H have been received by Daniels till the Monday after the weekend, that is to say 7 May.

216. Also on 4 May Widdrington wrote a second letter to Beers stating that S.G. had written to the solicitors of O.D.B. Lux saying that, unless proceedings were started against S.G. by 9 May in respect of the balance of the moneys S.G. held, S.G. considered that it would have to carry out B.C.B.'s instructions provided that S.G. received a satisfactory reply to its first letter of 4 May. Thus, although S.G. had received instructions in a form which complied with its

requirements, it was still representing to its customer's solicitors that it required the matters raised in the first letter to be answered, even if proceedings were not started by O.D.B. Lux by 9 May. That proviso was not mentioned in the letter to Simmons & Simmons. Beers replied on 8 May by letter saying that they noted the position and were endeavouring to take instructions. At no time before payment were further communications received either directly from B.C.B. or through Beers, nor was any further inquiry made of B.C.B. or Beers by S.G.

217. Another event of 4 May was the sending of a telex to Algemene Bank by S.G. That stated that it was possible that S.G. might be called upon to effect through Algemene Bank a payment in dollars in favour of Banco Nacional de Panama Sub-account Bahamas Commonwealth Trust Corporation Ltd. by order of B.C.B. S.G. informed Algemene Bank that cover would be remitted by S.G. for Algemene Bank's account to its New York office, who could possibly be subject to an injunction obtained, as S.G. understood, by the S.E.C. in 1972 against various American banks in respect of B.C.B. funds. S.G. asked Algemene Bank to let S.G. know as soon as possible if it would be prepared to execute such a payment order. Roche recalls that after the telex of 30 April from B.C.B. giving instructions to S.G. to pay Algemene Bank he directed that S.G. should query with Algemene Bank whether it was prepared to take the money. On 8 May S.G., not having heard from Algemene Bank, sent a further telex requesting it to let S.G. know that day if Algemene Bank would be prepared to effect the payment in favour of Banco Nacional de Panama. The matter was described as being "of extreme urgency." Algemene Bank telexed its reply the same day. It said that no injunction had been served on its New York office. It was therefore prepared to execute the payment order.

218. On 8 May Daniels received a reply by telex to his two telexes to Callender of 3 and 7 May. The telex was from a partner of Callender, Jerry Pyfrom, and informed Daniels that Callender was absent until late that evening and Isaacs was already in London for the Bahamas constitutional talks. Pyfrom had not heard from Robertson and could get no clarification from Graham Thompson & Co. or Dupuch & Turnquist (B.C.B.'s Bahamian legal advisers) on the $4m. balance. Pyfrom suggested action be taken at Daniels's end with Isaacs. Alternatively he asked to be advised to the contrary. Daniels tried unsuccessfully to contact Isaacs at one London hotel, but Isaacs was not staying there and Daniels did nothing further.

219. Subsequently, on 16 May, Callender wrote to Daniels apologising that the telexes which Daniels had sent on 3 and 7 May had arrived during his absence from Nassau. He said that Pyfrom did whatever he could to try and clarify the matter but to no avail. Callender said he understood that Pyfrom did speak to Robertson on 8 May and that Robertson informed Pyfrom that he would deal with the matter himself. In a letter dated 21 May Daniels wrote to Callender that Robertson had raised the question with B.C.B. while he was in Nassau but obtained no satisfactory reply. In a note of a telephone conversation between Daniels and Stoltenberg on 6 August, Daniels recorded that he had arranged for Robertson to take up the matter directly with LeBlanc and that Daniels had understood from Robertson that LeBlanc's reaction was to the effect that none of the funds in question could really be called fund moneys, and that the bank deposits in question were merely moneys belonging to B.C.B. from which repayments to O.D.B. Lux would be effected. Cobb told Stoltenberg that he had spoken to Meissner about the moneys at S.G. and had been told that they were not fund moneys and that there was nothing further to be done. Whilst this is hearsay, there is documentary evidence in the form of minutes which record that Meissner attended meetings in Luxembourg between 4 and 6 May at which Cobb, Metz, Roberts and Shepard as well as various representatives of shareholders of the dollar funds were present, and that there were discussions about the settlement of the Bahamian proceedings and the implementation of parts of the agreement of 13 April. I think it highly probable that what Cobb had heard from Stoltenberg and the question whether the $4m.

at S.G. belonged to the funds were discussed between Cobb and Meissner, and A that Meissner decided that the funds should take no action. Certainly no action was taken by the funds or the management companies to try to prevent the movement of the moneys from S.G., although they, through Meissner, were aware that S.G. was under instructions from B.C.B. to move the $4m. from London to the Caribbean.

220. On 9 May Widdrington telephoned Simmons & Simmons in order to speak with Daniels. He spoke with Daniels's secretary, who passed on to B Widdrington Daniels's opinion that O.D.B. Lux did not have a claim in law against S.G. and that accordingly proceedings would not be taken by Simmons & Simmons. This was confirmed in writing by letter from Widdrington to Simmons & Simmons dated 11 May and by a letter from Simmons & Simmons to Widdrington on 22 May. Daniels's view of the matter, as recorded in his letter of 21 May to Callender, was that O.D.B. Lux could not take any action other than to raise inquiries with B.C.B., though it was possible that the funds, as they had always regarded the sub-depository agreement as in force, could C have sought to enforce the terms of that agreement with respect to the $4m. and insisted on an undertaking from B.C.B. that the moneys be not removed from S.G. without their consent.

221. Widdrington took the decision to comply with B.C.B.'s instructions. He regarded the indication from Simmons & Simmons that O.D.B. Lux would not be bringing proceedings as an indication that the $4m. in S.G.'s hands were not trust moneys but were free moneys belonging to B.C.B. He said in examination: D

> "I could not see any other claims being made on the money if [O.D.B. Lux], as the main depositor, were not going to make a claim. I could not very well see that anybody else could make a claim, but I obviously must admit to some disquiet over the whole question really. It was a matter of trying to rationalise the various options open to the bank."

He went on to say that in his mind there were no options open to the bank E other than the one he took. In cross-examination he repeated that he formed the opinion that the moneys must be free moneys, and that O.D.B. Lux and the funds had no claim on the moneys with S.G. When asked what cause there was to think that the various funds were no longer interested, he answered: "Because Stoltenberg as a representative of the funds had known what we had stated to Simmons & Simmons as regards making claims and no claim had been made." He explained that he never had any direct knowledge of what Simmons & F Simmons had said to Stoltenberg but said "It must follow that they had told Stoltenberg what my reply was as a matter of inference." That inference was not correct. But Widdrington had, as I have said, already told Stoltenberg on 3 May that, if no claim was made, S.G. would obey B.C.B.'s instructions. Further he knew that O.D.B. Lux had brought proceedings and obtained judgment against B.C.B. to recover moneys derived from the funds.

222. On 10 May S.G. telexed Algemene Bank asking it to pay telegraphically G that day $4,009,697·91 to Banco Nacional de Panama, Panama, sub-account Bahamas Commonwealth Trust Corporation Ltd. by order of B.C.B. Algemene Bank was told that S.G. was covering it that day with its New York office. There was a minor variation from the instructions S.G. had received in that S.G. did not deduct any bank charges; it is not clear why. There was a minor hiccup in that Algemene Bank replied that it could not trace S.G.'s previous telexes of 4 and 8 May and asked for the text of those telexes to be sent. H Algemene Bank said that the matter was very urgent "considering the amount involved." S.G. complied with that request but the next day telexed Algemene Bank asking for confirmation that payment was duly executed. Algemene Bank replied that it had credited Banco Nacional de Panama on the previous day. Thus on 10 May Algemene Bank, Amsterdam, credited Banco Nacional de Panama with $4,009,697·91, S.G. caused a corresponding payment to be made to Algemene Bank, New York, and extinguished B.C.B.'s account with S.G. Again there was a further hiccup in that S.G. caused Euramtrust to credit

A Algemene Bank, New York for the account of Algemene Bank, London, instead of for the account of Algemene Bank, Amsterdam. But this was quickly put right.

223. Thus on 10 May S.G. in compliance with the written instructions of B.C.B. acting through its directors transferred the moneys out of the jurisdiction. S.G. had not obtained the confirmation that had been sought in Widdrington's first letter of 4 May to Beers that the moneys had nothing to do with Venture or
B F.O.F. nor had it obtained the written instructions of O.D.B. Lux or the funds. But it did have the oral assurance (subsequently confirmed in writing) of O.D.B. Lux through Daniels that O.D.B. Lux, though aware that B.C.B. had given instructions for the movement of the $4m. to the Caribbean, would not bring proceedings against S.G.

224. It is not clear when the funds first knew that the moneys had gone from S.G. Stoltenberg found this out from Rowe at an unspecified date. Daniels had spoken on or about 29 June to Meissner whose reaction had been that it would
C be inappropriate to upset the agreement of 13 April simply in the hope of obtaining the $4m. which it might not be possible to establish belonged to the funds. S.G. did not receive any claim or inquiry after 4 May from any of the funds or the management companies. Nor did the S.E.C. contact S.G. about those moneys, even though it had been told by Roche on 11 April that $7m. was held by S.G. and had said it would look into it; nor did the S.E.C. attempt to obtain an injunction in New York or elsewhere relating specifically to those
D moneys. Nor too did anyone bring any proceedings against B.C.B. in the Bahamas or elsewhere to prevent the movement of the $4m. either from S.G. or from Panama.

*The aftermath*

225. The $4m. joined the $10m. Algemene Bank moneys which had been transferred to the Banco Nacional de Panama on 17 April, and on 19 May $2m.,
E once part of the moneys derived from the funds in the B.C.B. account with Bank of Montreal, Nassau, was added to the same account in Panama. That account was a savings account carrying interest at only 4½ per cent., well below the rate obtainable on the inter-bank market in London, but S.G. had no knowledge of that fact. The plaintiffs have traced the subsequent movements of the moneys in the account with Banco Nacional de Panama. There was no movement at all till 30 May 1973 and more than $4,800,000 remained in the
F account until 20 June. I need not go through the details of the movements as it is common ground that nearly all of the money has been expended by B.C.B. for its own purposes and not for the purposes of the funds.

226. After 13 April little was done to implement the agreement of that date apart from the attempts by B.C.B., in compliance with paragraphs 2 and 3 of that agreement, to give directions to the other banks holding deposits identified as fund moneys by that agreement. Discussions continued up to 29 June to agree
G the terms on which Cie. Luxembourgeoise de Banque would become the agent for the purposes of that agreement, but on that date the negotiations broke down as Meissner refused to agree what he considered were the excessive fees demanded by that bank.

227. It appears that about this time the S.E.C. Dondelinger and the Ontario Securities Commission decided that they would take steps to wind up all I.O.S.-related entities and take action against the leading figures in I.O.S. Meissner
H was arrested in Luxembourg on 29 or 30 June. But after spending some months in prison he was released because of his poor health and he was not in fact put on trial. He is thought to have gone to join Vesco and LeBlanc, probably in Costa Rica. A memorandum of 2 March 1973 from Morales to I.B.L. shows that Morales had obtained material in Washington on the subject of extradition treaties with the knowledge and consent of LeBlanc. LeBlanc and Vesco, although in 1976 indicted on criminal charges in New York with Graze, Clay, Straub and Strickler for conspiring to misappropriate dollar fund assets, stayed out of the jurisdiction of the American courts, and are believed to remain in the

Caribbean. On 30 July the charter of T.F.S. was revoked in Ontario and the A
Public Trustee of Ontario subsequently dealt with its assets as though it had been wound up. On 1 August F.O.F. and Growth were wound up in Ontario on public policy grounds. Also that day in Luxembourg I.I.T. Management was adjudicated bankrupt. On 9 August Dondelinger decided that the banking licence on O.D.B. Lux should be removed.

228. On 28 September 1973 the first final order in the S.F.C. proceedings was made. This was against LeBlanc, B.C.B., O.D.B. Lux, I.B.L., V.C.L., B
Kilmorey, Global Holdings and Global Financial, all of whom had objected to the jurisdiction of the New York court, and had taken no part in the proceedings. They were found to have engaged, and were still engaging, in violations of section 10(b) of the Securities Exchange Act 1934 and regulation 10B–5 of the regulations made thereunder and permanent injunctions were ordered against them. This was the first occasion on which allegations in the S.E.C. complaint had been found by a court to be proved against any of the defendants in those C
proceedings. Judge Stewart made an order of preliminary injunction on 8 November against Vesco, Meissner, Strickler, Graze, Straub, Weymar, I.O.S. and the management companies.

229. On 22 October I.P.I. was ordered to be wound up in the Bahamas on a contributory's petition. On 5 November I.O.S. was compulsorily wound up in Canada. On 24 January 1974 I.I.T. was ordered to be wound up by the Luxembourg court. On 14 February Venture was adjudicated bankrupt in Curaçao. On 26 April O.D.B. Lux was placed under the control of commissioners D
appointed by the Luxembourg court. It was wound up on 22 January 1975. On 21 June 1974 B.C.B.'s banking licence was withdrawn. On 5 July the Bahamian court ordered the appointment of provisional liquidators of B.C.B. On 8 July Jones and his partner Kemp of Peat Marwick Mitchell & Co. in Nassau were appointed provisional liquidators of B.C.B. On 13 May 1975 B.C.B. was ordered to be wound up by the Bahamian court and Kemp and Jones were appointed liquidators. The petitioners were F.O.F., Prop, Growth, Venture, E
I.I.T. and O.D.B. Lux. It was alleged by the petitioners and the court held, that B.C.B. had failed to comply with its obligations under the order of 12 April 1973 and the agreement of the next day. In particular it was alleged that B.C.B. had failed to comply with its obligations to pay $2½m. in accordance with the schedule to the order nor had it complied with its obligations under the agreement in respect of the sums of £2m. shown in part I of the first schedule to that agreement as being I.I.T. moneys with B.C.B. and $6,900,000 shown in F
part III of that schedule as also being I.I.T. moneys with B.C.B. Thus the petitioners were to that extent relying on the validity of the order and of the agreement. On 3 July 1975 V.C.L. was ordered to be wound up by the Bahamian court. On 1 December the Bahamian court ordered the winding up of I.B.L. On 11 March 1977 the Bahamian court ordered the winding up of Global Holdings and Global Financial.

230. The liquidators of the dollar funds and Orr in his capacity as president G
of Prop after their respective appointments took active steps to recover moneys of the funds. Proceedings were brought to recover moneys from the Bank of Montreal which had remained frozen despite being designated as belonging to the funds of the agreement of 13 April. The original statement of claim of 7 June 1974 referred to the depository agreements and the placing of cash belonging to the funds with O.D.B. Lux or in the name of O.D.B. Lux in other banks subject to the direction of the funds. It also referred to the sub-depository H
agreement and to the fact that cash held by B.C.B. under that agreement was beneficially owned by the funds. It was pleaded in paragraph 16 that at no time did the management companies, B.C.B., O.D.B. Lux or Bank of Montreal have any proprietary or beneficial interest in the cash deposits made by B.C.B. with the Bank of Montreal. A fresh statement of claim was substituted for the original statement of claim on 17 June 1976, that is to say after the flowchart had been prepared. The new statement of claim pleaded more specifically that the deposits made by B.C.B. with the Bank of Montreal were trust moneys

pursuant to the sub-depository agreement, but I do not think that it changed the substance of the claim. In particular it kept the pleading in paragraph 16. On 2 February 1977 the proceedings were compromised. The moneys with the Bank of Montreal had grown, by the addition of interest, to $148,800,000 and it was agreed that $25m. was to be paid to B.C.B., then in liquidation, and the funds would submit a claim in the liquidation, such claim to be in respect of an unsecured and non-preferential debt, whilst $123,800,000 was to be released forthwith to the funds. As Orr explained, it was thought better to have the bulk of the moneys released immediately without further delays and, as the funds' claims in the liquidation of B.C.B. amounted to 96 per cent. of the amounts claimed by creditors, the funds would get back the bulk of the $25m.

231. Other proceedings were brought on behalf of the funds to recover moneys lost. For example, actions were brought against Bank of New York and American National, each of which resulted in a compromise settlement and the payment of some moneys. There were also proceedings relating to the $6m. frozen by Judge Stewart on 28 March 1973 in which I.I.T. in reliance on the agreement of 13 April claimed the moneys as its own but subsequently the bulk of the moneys were by consent released to the B.C.B. liquidators. On 23 June 1976 the plaintiffs entered into an agreement to pool moneys recovered and to divide the same in agreed proportions.

232. On 15 June 1977 the writ in these proceedings was issued. The plaintiffs have made a claim in the liquidation of B.C.B. in respect of the moneys lost to the funds which passed through B.C.B. including the $4m. the subject of the present proceedings. A dividend of 40 cents in the dollar has been paid so far by way of an interim distribution. The amount of any further dividend is uncertain, but Jones said in evidence, and I accept, that there is no possibility of creditors recovering in full.

233. Finally in this narrative of the relevant events I should record that on 9 November 1981 District Judge Stewart delivered final judgment in the S.E.C. proceedings against those defendants who had neither been discharged nor settled with the S.E.C. nor had judgment in default delivered against them in September 1973 (see *Securities and Exchange Commission v. Vesco* (1981) 548 F. Supp. 1270). Judge Stewart found that there had been a scheme by Vesco and his group to use I.C.C. to obtain control over the I.O.S. complex, and then to divert substantial assets from the funds into shell corporations and ultimately into accounts which could be used for the personal benefit of the Vesco group. An order of disgorgement was made against Vesco, LeBlanc, Meissner, Strickler, Graze, Clay and Straub.

*The law*

234. I turn next to consider the principles of law relevant to the present case and the application of those principles to the facts. I shall consider in turn the plaintiffs' claims in equity and in tort.

*Constructive trust*

235. The plaintiffs say that S.G. by transferring $4,009,697·91 from the trust account with it to the Algemene Bank for the account of Banco Nacional de Panama for the account of the Bahamas Commonwealth Trust Corporation Ltd., became a constructive trustee and liable to account to the plaintiffs for that sum. The plaintiffs do not differentiate between the $4m. principal and $9,697·91 interest making up the aggregate sum of $4,009,697·91. Their claim stands or falls in respect of the whole sum.

236. It is clear that a stranger to a trust may make himself accountable to the beneficiaries under the trust in certain circumstances. The two main categories of circumstances have been given the convenient labels in *Snell's Principles of Equity*, 28th ed. (1982), pp. 194–195, "Knowing receipt or dealing" and "Knowing assistance." The first category of "Knowing receipt or dealing" is described, at p. 194:

> "A person receiving property which is subject to a trust . . . becomes a A constructive trustee if he falls within either of two heads, namely—(i) that he received trust property with actual or constructive notice that it was trust property and that the transfer to him was a breach of trust; or (ii) that although he received it without notice of the trust, he was not a bona fide purchaser for value without notice of the trust, and yet, after he had subsequently acquired notice of the trust, he dealt with the property in a manner inconsistent with the trust."

B

237. I admit to doubt as to whether the bounds of this category might not be drawn too narrowly in *Snell*. For example, why should a person who, having received trust property knowing it to be such but without notice of a breach of trust because there was none, subsequently deals with the property in a manner inconsistent with the trust not be a constructive trustee within the "knowing receipt or dealing" category? Thus in *Lee v. Sankey* (1873) L.R. 15 Eq. 204, though cited in *Snell* in support of limb (ii) of this category, Bacon V.-C. held C that solicitors who were employed by two will trustees to receive trust moneys and who received the moneys without any breach of trust but with knowledge that the moneys were trust moneys, were liable when subsequently they paid the moneys to one of the trustees without the receipt of the other. But it would be wrong to burden a lengthy judgment with further consideration of this category, as Mr. Price disclaims reliance thereon. It is only the second category of "knowing assistance" on which the plaintiffs seek to found their claim in equity D and I record, without comment, Mr. Price's explanation that this follows from (i) the long and well-established principle that a bank is not a trustee for its customer; (ii) the fact that a bank dealing with a customer acts only as the agent of that customer, and (iii) the fact that, at the time when it received the moneys from B.C.B. the defendant was a bona fide purchaser for value without notice of any breach of trust.

238. The second category is described thus in *Snell*, at pp. 194–195:

E

> "A person who does not actually himself receive the trust property may also incur liability to the beneficiaries if he knowingly assists in a fraudulent design on the part of the trustee. But 'strangers are not to be made constructive trustees merely because they act as the agents of trustees in transactions within their legal powers, transactions, perhaps of which a court of equity may disapprove, unless those agents receive and become chargeable with some part of the trust property, or unless they assist with F knowledge in a dishonest and fraudulent design on the part of the trustees.'"

239. The quotation in the passage cited from *Snell* is taken from *Barnes v. Addy* (1874) L.R. 9 Ch.App. 244, 251, *per* Lord Selborne L.C. In that case, the husband of the life tenant under a trust was appointed sole trustee. He subsequently misappropriated the trust property. The issue for the court was whether the solicitors who had acted in respect of his appointment were liable to make good the misappropriations and the court held that the solicitors could not G be made so liable. In referring to "agents" Lord Selborne L.C. had in mind professional men who act on instructions from trustees. For, as he went on, after the passage which I have cited, at p. 252:

> "Those are the principles, as it seems to me, which we must bear in mind in dealing with the facts of this case. If those principles were disregarded, I know not how any one could, in transactions admitting of doubt as to the view which a court of equity might take of them, safely discharge the office H of solicitor, of banker, or of agent of any sort to trustees."

240. The "knowing assistance" category as formulated by Lord Selborne L.C. appears to be directed to strangers who do not receive trust property and that is how it is described in *Snell*. But Mr. Leckie has not sought, in my view rightly, to argue that strangers who receive trust property cannot be made liable as constructive trustees within that category, if a plaintiff chooses to attempt to discharge the burden of proving that the stranger's conduct falls within that

A category. Both *Selangor United Rubber Estates Ltd. v. Cradock (No. 3)* [1968] 1 W.L.R. 1555 and *Karak Rubber Co. Ltd. v. Burden (No. 2)* [1972] 1 W.L.R. 602 provide recent examples of strangers being held liable within that category although trust property was received by the stranger. Indeed it was the act of parting with the trust property that caused the liability to arise.

241. Mr. Price accepts as pertinent the warning given by Lord Selborne L.C. in *Barnes v. Addy*, L.R. 9 Ch.App. 244, 251, and echoed frequently thereafter
B that the doctrine of constructive trusts must not be strained by unreasonable construction beyond its due and proper limits so as to render liable persons who may be practically innocent. In particular he accepts that the law should not be extended beyond the principle as formulated by Lord Selborne L.C. However, he points out that Lord Selborne L.C.'s statement of the principle should not be treated as though it were the words of a statute, and he submits that the remarks of Oliver J. in *Taylors Fashions Ltd. v. Liverpool Victoria Trustees Co. Ltd. (Note)* [1982] Q.B. 133, 151, 152, albeit uttered in the context of equitable
C estoppel, are applicable to the present case, that is to say that, in considering whether or not to grant equitable relief, it is not enough merely to inquire whether the circumstances can be fitted within the confines of some preconceived formula serving as a universal yardstick for every form of unconscionable behaviour. Nevertheless Mr. Price accepts that there are four elements which must be established if a case is to be brought within the category of "knowing assistance." They are (1) the existence of a trust; (2) the existence of a dishonest
D and fraudulent design on the part of the trustee of the trust; (3) the assistance by the stranger in that design; and (4) the knowledge of the stranger. I would add that whilst it is of course helpful to isolate the relevant constituent elements of the "knowing assistance" category in this way, it is important not to lose sight of the requirement that, taken together, those elements must leave the court satisfied that the alleged constructive trustee was a party or privy to dishonesty on the part of the trustee.

E 242. As to the first element, the trust need not be a formal trust. It is sufficient that there should be a fiduciary relationship between the "trustee" and the property of another person. If A is placed in possession of or continues to exercise command or control over the property of B while it remains B's property, and A can deal with B's property only for the benefit of B or for purposes authorised by B, A is a trustee of that property for the purposes of constructive trusteeship. Thus directors of a company, in consequence of the
F fiduciary character of the duties which they owe to the company, are treated as if they were the trustees of the company's property under their control; both the *Selangor* case [1968] 1 W.L.R. 1555 and the *Karak* case [1972] 1 W.L.R. 602, provide examples of such a trust. Similarly the manager of a company may owe a fiduciary duty to that company in relation to information he acquires in that capacity such as to constitute the manager a trustee within the category of "knowing assistance": see *Consul Development Pty. Ltd. v. D.P.C. Estates Pty.
G Ltd.* (1975) 132 C.L.R. 373, an Australian case in which a stranger was held not liable as constructive trustee within this category because the stranger lacked the requisite knowledge that the manager's design was fraudulent.

243. In the previous reported cases, the alleged trustee has held or controlled the trust property, and it is that trustee's fraudulent design in relation to that property that has been relevant to the claim in equity by the beneficiary. In the present case the position is different in that the alleged trust property was held
H by a company, Bahamas Commonwealth Bank Ltd. (B.C.B.), and it is not alleged by the plaintiffs that B.C.B. had a fraudulent design in relation to the trust property. Instead the directors of B.C.B. are alleged to have had, or been party to, the fraudulent design. Mr. Price submits that where a company is the trustee of property of the beneficiary under the trust, the relevant trust constructive trusteeship purposes can be a combination of the fiduciary relationship between the trustee company and the beneficiary and the fiduciary relationship between the directors and the company. He says that consistently with the fiduciary duty owed by the directors to the company they could not use

their powers dishonestly to steal, or attempt to steal, for themselves or their A
associates or for their company the property of the beneficiary. Mr. Leckie however submits that the duty of directors of a trustee company is owed only to the company and not to the beneficiary of the trust of which the company is trustee, and that while the acts of the directors may give rise to a claim by the beneficiary against them in conspiracy, they cannot found a claim by the beneficiary in equity against them. Accordingly, that combination of fiduciary relationships, he submits, cannot be relevant to claims by the beneficiary in B
constructive trusteeship.

244. It seems to me that Mr. Leckie's approach on this point is altogether too technical for a flexible remedy in equity, intended to satisfy the demands of justice and conscience. I am not concerned with whether or not the plaintiffs have a claim in equity or otherwise against the directors of B.C.B. What I am concerned with is whether there is a trust such as will found a claim against a stranger in constructive trusteeship. What is crucial is that there should be trust property held in trust for a beneficiary. If there be such a trust and the trustee is C
a company, I can see no reason in principle why a claim in equity should not lie if it is alleged that the individuals who control the company—and ex hypothesi a company can only act through individuals—and not the company itself, have the relevant fraudulent design in relation to the trust property. The directors of a company owe fiduciary duties to the company not only in relation to the property beneficially owned by the company but also in my judgment in relation to the property of which the company is a trustee. Those duties extend to D
preventing a misapplication of the trust property, even if the misapplication consists of the wrongful appropriation to the company itself of the trust property. It cannot be in the true interests of the company to steal trust property. In my judgment for the purpose of constructive trusteeship a person beneficially interested in trust property held by a corporate trustee can rely on the fiduciary relationship between the directors and the trustee company as well as on the trust affecting the trust property in the hands of the company. Accordingly if E
Mr. Price can satisfy me that the moneys in the hands of B.C.B. were trust moneys held for the Funds and that the directors of B.C.B. were using their position as directors to cause the misappropriation of the trust moneys, I would regard the first element of the *Barnes v. Addy*, L.R. 9 Ch.App. 244, formulation as satisfied.

245. As to the second element the relevant design on the part of the trustee must be dishonest and fraudulent. In the *Selangor* case [1968] 1 W.L.R. 1555, F
1582 and 1590, Ungoed-Thomas J. held that this element must be understood in accordance with equitable principles for equitable relief and that conduct which is morally reprehensible can properly be said to be dishonest and fraudulent for the purposes of that element. But in *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250 the Court of Appeal made clear that it is not sufficient that there should be misfeasance or a breach of trust falling short of dishonesty and fraud. For present purposes there is no distinction to be G
drawn between the two adjectives "dishonest" and "fraudulent:" see the *Belmont* case [1979] Ch. 250, 267. It is common ground between the parties that I can take as a relevant description of fraud "to take a risk to the prejudice of another's rights, which risk is known to be one which there is no right to take:" *Reg. v. Sinclair* [1968] 1 W.L.R. 1246, 1249. Thus Mr. Leckie did not dispute Mr. Price's submission that the director of a company who owes a duty to use the assets of the company in what he honestly believes to be the best interests of H
the company, is fraudulent if he takes a risk in using the assets which risk no director could honestly believe to be taken in the interests of the company and which is to the prejudice of the rights of others. It is also common ground that while the standard of proof of an allegation of fraud is no higher than a balance of probabilities, the more serious the allegation, the more cogent is the evidence required to overcome the unlikelihood of what is alleged and thus to prove it.

246. As to the third element it seems to me to be a simple question of fact, whether or not there has been assistance. The payment by a bank on the

A instructions of fraudulent directors of a company of moneys of the company to another person may be such assistance, as in the *Selangor* case [1968] 1 W.L.R. 1555 and the *Karak* case [1972] 1 W.L.R. 602. Mr. Leckie submitted that there cannot be assistance for the purposes of constructive trusteeship unless that which is done by the stranger inevitably has the consequence that a loss is suffered, and that a mere payment which in itself does not have that consequence is not sufficient. I accept that the assistance must be an act which is part of the fraudulent and dishonest design and must not be of minimal importance, but I B am not aware of any reasons of principle or by way of authority why Lord Selborne L.C.'s test should bear the further gloss which Mr. Leckie would put on it.

247. It is in respect of the fourth element, knowledge, that there has been the greater part of the legal debate, though in the event the area of dispute between Mr. Price and Mr. Leckie on the principles to be applied was comparatively small. In particular I should make clear that in this case there has C been no challenge by Mr. Leckie to the correctness of the decisions in the *Selangor* and *Karak* cases.

248. I start, first, by considering what it is that the alleged constructive trustee must know. I think it clear that he must know the three elements already mentioned. He must know that there was a trust though I do not think it necessary that he should know all the details of the trust: see for example *Foxton v. Manchester and Liverpool District Banking Co.* (1881) 44 L.T. 406, D 408. He must know of the dishonest and fraudulent design of the trustee. Again, however, I do not think it need be knowledge of the whole design: that would be an impossibly high requirement in most cases. What is crucial is that the alleged constructive trustee should know that a design having the character of being fraudulent and dishonest was being perpetrated. Further he must know that his act assisted in the implementation of such design. In circumstances such as the present the defendant must be shown to have known that the $4m. was E trust property, that the fraudulent and dishonest design extending to the $4m. was being perpetrated by the directors of B.C.B. and that by moving the $4m. to Panama the defendant assisted in the implementation of this design.

249. Further the relevant knowledge must be of facts and not of mere claims or allegations. This is established by the decision of the Court of Appeal in *Carl Zeiss Stiftung v. Herbert Smith & Co. (No. 2)* [1969] 2 Ch. 276. In that case the plaintiffs in an action in which they claimed that the property of the defendant F belonged to them sought to make the solicitors to the defendant accountable for moneys received by the solicitors from the defendant for their fees and expenses. The basis of the claim against the solicitors was that they knew of all the matters averred by the plaintiffs in the action against the defendant and were therefore constructive trustees when they received moneys from the defendant for their fees. The Court of Appeal held that the solicitors had knowledge only of a disputed claim that the property of the defendant was held in trust for the G plaintiffs and that they did not have knowledge that such property was in fact trust property; accordingly it was held that the solicitors having knowledge only of a doubtful equity lacked the requisite knowledge to be constructive trustees. Although the *Carl Zeiss* case was one relating to the "knowing receipt or dealing" category of constructive trusteeship I can see no justification for treating the two categories of constructive trusteeship differently on this point. Each category requires knowledge of the trust. It seems to me also that for the H "knowing assistance" category a similar standard must apply to knowledge of the fraud and of the assistance. Again to differentiate between the different matters knowledge of which is requisite would not in my view be justified.

250. What types of knowledge are relevant for the purposes of constructive trusteeship? Mr. Price submits that knowledge can comprise any one of five different mental states which he described as follows: (i) actual knowledge; (ii) wilfully shutting one's eyes to the obvious; (iii) wilfully and recklessly failing to make such inquiries as an honest and reasonable man would make; (iv) knowledge of circumstances which would indicate the facts to an honest and

reasonable man; (v) knowledge of circumstances which would put an honest and reasonable man on inquiry. More accurately, apart from actual knowledge they are formulations of the circumstances which may lead the court to impute knowledge of the facts to the alleged constructive trustee even though he lacked actual knowledge of those facts. Thus the court will treat a person as having constructive knowledge of the facts if he wilfully shuts his eyes to the relevant facts which would be obvious if he opened his eyes, such constructive knowledge being usually termed (though by a metaphor of historical inaccuracy) "Nelsonian knowledge." Similarly the court may treat a person as having constructive knowledge of the facts—"type (iv) knowledge"—if he has actual knowledge of circumstances which would indicate the facts to an honest and reasonable man.

251. Formulations (iii) and (v) are taken by Mr. Price from authority: see the *Belmont* case [1979] Ch. 250, 267, *per* Buckley L.J. and the *Selangor* case [1968] 1 W.L.R. 1555, 1590, *per* Ungoed-Thomas J. respectively. Mr. Price submits that the court will treat a person as having constructive knowledge of the facts—"type (iii) knowledge"—if he wilfully and recklessly fails to make such inquiries as an honest and reasonable man would have made. He says that this is so even if the plaintiff cannot show that such inquiries would have given him actual knowledge of the facts. Similarly Mr. Price submits that the court may treat a person as having constructive knowledge of the facts ("type (v) knowledge") if he, without wilfulness or recklessness, fails to make such inquiries as an honest and reasonable man would have made. Again he says that this type of knowledge does not depend on the plaintiff showing that such inquiries would have given him actual knowledge of the facts. Mr. Price however accepts that these formulations require modification to this extent, that if the alleged constructive trustee can show that on a balance of probabilities inquiries would have produced answers acceptable to the honest and reasonable man even if such answers be incorrect, constructive knowledge is not to be imputed. Mr. Leckie submits that the correct formulation of these two types of knowledge includes a requirement that it must be shown that the inquiries, if made, would have given actual knowledge of the facts. This formulation comprehends Mr. Price's modification but goes beyond it in not permitting constructive knowledge to be imputed to a stranger to a trust in a case where there is no probability shown of the inquiry producing actual knowledge. Mr. Leckie's formula is substantially in accord with what Edmund Davies L.J. said in *Carl Zeiss Stifung v. Herbert Smith & Co. (No. 2)* [1969] 2 Ch. 276, 304, where he recognised as a possible exception to the requirement of actual knowledge the case:

> "where the agent is under a duty to inquire into the validity of the third party's claim and where, although inquiry would have established that it was well-founded, none is instituted."

252. I shall come back later to this difference between the parties on the formulation of type (iii) knowledge and type (v) knowledge (though on the facts this difference is not critical), but first I shall consider whether on the authorities all or any of the types of constructive knowledge that I have mentioned are relevant for the purposes of constructive trusteeship. No court which has considered the problem has been content to limit knowledge to actual knowledge.

253. One logical basis for allowing, as relevant to constructive trusteeship types of constructive knowledge, would be to allow only those types arising from circumstances in which the conscience of the alleged constructive trustee was affected. This would accord with the equitable basis of constructive trusteeship. Thus if a person shuts his eyes to the obvious, or if he wilfully and recklessly fails to make obvious inquiries, that person is guilty of unconscionable behaviour such that a court of equity might wish to impute to him the knowledge that he would have gained by opening his eyes or making the obvious inquiries. To extend the categories of knowledge relevant for the purposes of constructive trusteeship beyond actual knowledge to Nelsonian knowledge, as well as to type (iii) knowledge but no further, accords with the provisional views expressed by

Buckley L.J. in *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250, 267. Goff L.J. expressed similar views at p. 275.

254. In the *Carl Zeiss* case [1969] 2 Ch. 276, 297, Sachs L.J. said he was inclined to the view that for constructive trusteeship dishonesty or consciously acting improperly had to be proved and referred only to actual or Nelsonian knowledge as satisfying that test. Edmund Davies L.J., at pp. 301 and 302, expressed the view that the concept of "want of probity" provided a useful touchstone in considering circumstances said to give rise to constructive trusts and that the authorities appeared to show that nothing short of it would do. These obiter views on the necessity for the presence of want of probity in all constructive trusteeship cases appear, with respect, to be too widely stated and indeed Mr. Leckie did not seek to rely on them as stating the law. It is not difficult to conceive of circumstances in which a constructive trusteeship would be imposed by the court even though there was no dishonesty on the part of the alleged constructive trustee, e.g. where no trustee is acting and a stranger to the trust intermeddles with a view to his preserving trust property for the benefit of the beneficiaries. Mr. Leckie, consistently with his acceptance of the correctness of the *Selangor* case [1968] 1 W.L.R. 1555 and the *Karak* case [1972] 1 W.L.R. 602 in each of which there was no want of probity on the part of the bank held liable in equity, accepted that want of probity is an indication but not a criterion, of constructive trusteeship. But in the case of an agent sought to be made a constructive trustee within the "knowing assistance" category it is a particularly important indication.

255. Type (iii) knowledge imports in part an objective test in that the inquiries which were wilfully and recklessly omitted must be those which the honest and reasonable man would have made. There are other authorities which support the view that a wholly objective test is appropriate in determining whether knowledge is to be imputed to the alleged constructive trustee. Although the concept of the reasonable man is one of the common law, Megarry J. said in *Coco v. A. N. Clark (Engineers) Ltd.* [1969] R.P.C. 41, 48, that he saw no reason why that hard-worked creature should not labour in equity as well as at law. The *Selangor* case [1968] 1 W.L.R. 1555, contains an extensive review by Ungoed-Thomas J. of most of the relevant authorities. He reached this conclusion on the principles to be applied, at p. 1590:

> "The knowledge required to hold a stranger liable as constructive trustee in a dishonest and fraudulent design, is knowledge of circumstances which would indicate to an honest, reasonable man that such a design was being committed or would put him on inquiry, which the stranger failed to make, whether it was being committed."

256. In the *Selangor* case the plaintiff company was seeking to recover moneys misapplied by its directors in that the moneys were used to finance the purchase of the plaintiff's own shares. There were two circular cheque transactions each involving a different bank. The allegation against the bank in the first transaction, the District Bank, was that it paid out moneys of the plaintiff in circumstances in which it ought to have known that the payment was to finance the purchase of the plaintiff's shares. It was not alleged that that bank was under a duty to inquire. It was held that even though the officials of the bank did not realise that the payment was being made for the purpose of purchasing the plaintiff's own shares, a reasonable banker knowing what the District Bank did know would have known that that was the purpose, and accordingly the bank was held liable as a constructive trustee. In the second transaction it was alleged that the bank concerned, the Bank of Nova Scotia, was put on inquiry. It was held that because of certain explanations offered to the bank it was not put on inquiry and hence was not liable.

257. In the cases before the *Selangor* case no distinction is drawn between type (iv) and type (v) knowledge. But the distinction is drawn in the *Selangor* case and the subsequent cases.

258. In *Consul Development Pty. Ltd. v. D. P. C. Estates Pty. Ltd.*, 132 A C.L.R. 373, all the judges of the High Court of Australia indicated provisional acceptance of type (iv) knowledge as relevant for a constructive trust. Gibbs J. said, at p. 398:

> "it does not seem to me to be necessary to prove that a stranger who participated in a breach of trust or fiduciary duty with knowledge of all the circumstances did so actually knowing that what he was doing was improper. It would not be just that a person who had full knowledge of all the facts B could escape liability because his own moral obtuseness prevented him from recognising an impropriety that would have been apparent to an ordinary man."

But three of the four judges indicated that they did not accept that type (v) knowledge was applicable.

259. In *Feuer Leather Corporation v. Frank Johnstone & Sons* [1981] C Com.L.R. 251, it was alleged that leather, the property in which remained in the plaintiff, was sold improperly and in breach of trust by a director of a company, the agent of the plaintiff, to the defendant, and that the defendant received the leather as constructive trustee with notice of the breach of trust by the director of the agent company. Neill J. held that the court should apply an objective test and that if by the test notice was given, liability could not be avoided by proof merely of the absence of actual knowledge. Although Neill J. went on to deal specifically with Nelsonian knowledge, as I read his judgment, D he was accepting the applicability of type (iv) knowledge. However he rejected type (v) knowledge as being inapplicable to the commercial transaction which he was considering. It is the relevance of type (v) knowledge that has been the main subject of judicial controversy since the *Selangor* case [1968] 1 W.L.R. 1555.

260. Ungoed-Thomas J. reviewed various authorities on this point. In *Barnes v. Addy*, L.R. 9 Ch.App. 244 itself, it is to be noted, there were references in E Lord Selborne L.C.'s judgment, at pp. 252 and 254, both to the absence of knowledge and to the absence of any suspicion on the part of the alleged constructive trustee. The relevance of suspicion is that it puts, or may put, the person concerned on inquiry.

261. One of the cases cited to Ungoed-Thomas J., as it was to me, was *Berwick-upon-Tweed Corporation v. Murray* (1857) 7 De G.M. & G. 497. The question for the court in that case was whether one William Murray, who F received a bank deposit note representing moneys misappropriated by a fiduciary, was liable to restore the moneys in circumstances in which he claimed that he had no actual knowledge that the moneys were misappropriated. Lord Cranworth L.C. said, at p. 512: "But were not the circumstances such as must have forced an honest man to make inquiry?" Lord Cranworth L.C. then described the circumstances and said: "It is impossible that suspicions should not have been excited." He continued, at p. 513: G

> "Perhaps inquiry might not have brought out the truth; but it does not lie in the mouth of William Murray to say this. He made no inquiry, although the circumstances were such as ought to have induced hm to do so. . . . It is impossible to permit a man who received, by way of security from a defaulting agent, a deposit of money which had been withdrawn from the funds of his principal, to insist in circumstances like these on his ignorance of the truth. I am clearly of opinion, that William Murray must be treated H as a person who had notice of the truth."

In a separate judgment in the same case relating to a different point, Lord Cranworth L.C., at p. 520, referred to William Murray as having received money "under circumstances which have satisfied me that the latter knew it was the money of the corporation." It seems to me, as it did to Ungoed-Thomas J., that what Lord Cranworth L.C. meant by "knew" was that, by an objective test, the court would impute to him knowledge of the truth.

A 262. Mr. Leckie also cited to me *Gray v. Lewis* (1869) L.R. 8 Eq. 526, a decision of Malins V.-C. which was reversed on appeal but the relevant part of whose judgment was unaffected. It was held that a bank must have known of the rule that the company in question was prohibited from purchasing its own shares. But Malins V.-C. continued, at p. 543:

> "even if they did not know of the rule, I am of opinion that the transaction was one of so unusual and extraordinary a character that it became their
B duty to inquire and investigate as to the rights of this company to enter into such a transaction in the very first hour of its existence, and I must therefore treat the bank as having had express notice that what was being done was a gross breach of trust, in which they consequently became participators."

There again I respectfully agree with Ungoed-Thomas J. in his comment on this
C case that Malins V.-C. was expressing the view that circumstances sufficiently unusual would put a bank on inquiry and thus may fix it with notice of a fraudulent breach of trust.

263. In *Coleman v. Bucks and Oxon Union Bank* [1897] 2 Ch. 243 Byrne J. held that the payment by a bank of trust moneys into a trustee's personal account which was overdrawn was not a breach of trust by the bank as the bank had no knowledge that a breach of trust by the trustee was intended. But he
D said, at p. 254:

> "If bankers have the slightest knowledge or reasonable suspicion that the money is being applied in breach of a trust, and if they are going to derive a benefit from the transfer, and intend and design that they should derive a benefit from it, then I think the bankers would not be entitled to honour the cheque drawn upon the trust account without some further inquiry into the matter."

E

The significance of a benefit to the bank is most easily explained by citing the remarks of Lord Cairns L.C. in *Gray v. Johnston* (1868) L.R. 3 H.L. 1 where he said, at p. 11:

> "if it be shown that any personal benefit to the bankers themselves is designed or stipulated for, that circumstance, above all others, will most readily establish the fact that the bankers are in privity with the breach of
F trust which is about to be committed."

In other words, where a benefit is stipulated for, then the court will readily infer that the bank is a knowing party to the misapplication. But, as Mr. Leckie accepted, it does not follow that the bank must stipulate for or take a benefit if it is to be such a knowing party.

264. Mr. Leckie drew my attention to the remarks of Lord Westbury in
G *Gray v. Johnston*, L.R. 3 H.L. 1 as they are not adverted to by Ungoed-Thomas J. in the *Selangor* case [1968] 1 W.L.R. 1555. Lord Westbury said, at p. 14:

> "A banker is bound to honour an order of his customer with respect to the money belonging to that customer which is in the hands of the banker; and it is impossible for the banker to set up a jus tertii against the order of the customer, or to refuse to honour his draft, on any other ground than some
H sufficient one resulting from an act of the customer himself. Supposing, therefore, that the banker becomes incidentally aware that the customer, being in a fiduciary or a representative capacity, meditates a breach of trust, and draws a cheque for that purpose, the banker, not being interested in the transaction, has no right to refuse the payment of the cheque, for if he did so he would be making himself a party to an inquiry as between his customer and third persons. He would be setting up a supposed jus tertii as a reason why he should not perform his own distinct obligation to his customer."

265. Those remarks are obiter and appear to go surprisingly far in exonerating a banker from liability notwithstanding actual awareness of the intention to commit a breach of trust and of the drawing of the cheque for that purpose, provided the knowledge arises only incidentally, and not as a result of the banker being interested in the transaction. I cannot see why the way in which the banker acquires knowledge should be crucial. The more orthodox view was expressed by Lord Cairns L.C. in the same case, at p. 11:

> "On the one hand, it would be a most serious matter if bankers were to be allowed, on light and trifling grounds—on grounds of mere suspicion or curiosity—to refuse to honour a cheque drawn by their customer, even although that customer might happen to be an administrator or an executor. On the other hand, it would be equally of serious moment if bankers were to be allowed to shelter themselves under that title, and to say that they were at liberty to become parties or privies to a breach of trust committed with regard to trust property, and, looking to their position as bankers merely, to insist that they were entitled to pay away money which constituted a part of trust property at a time when they knew it was going to be misapplied, and for the purpose of its being so misapplied. I think, fortunately, your Lordships will find that the law on that point is clearly laid down, and may be derived without any hesitation from the authorities which have been cited in the argument at your Lordships' bar, and I apprehend that you will agree with me when I say that the result of those authorities is clearly this: in order to hold a banker justified in refusing to pay a demand of his customer, the customer being an executor, and drawing a cheque as an executor, there must, in the first place, be some misapplication, some breach of trust, intended by the executor, and there must in the second place, as was said by Sir John Leach V.-C. in the well known case of *Keane v. Robarts* (1819) 4 Madd. 332, 357, be proof that the bankers are privy to the intent to make this misapplication of the trust funds."

As Ungoed-Thomas J. said in the *Selangor* case [1968] 1 W.L.R. 1555, 1586 in respect of that passage it again leaves open the question what is to be taken as "proof" of the misapplication and what establishes privity to the intent to make the misapplication.

266. In *Nelson v. Larholt* [1948] 1 K.B. 339, Larholt, a turf accountant, had received eight cheques signed by one Potts expressly as an executor. The beneficiaries under the will of which Potts was the executor brought an action against the defendant who contended that he had no notice of Potts's want of authority. Denning J. held that the plaintiffs succeeded and in so doing he applied the following test, at p. 343:

> "But did he have notice of the want of authority? That depends upon what amounts to notice. . . . He must, I think, be taken to have known what a reasonable man would have known. If, therefore, he knew or is to be taken to have known of the want of authority, as, for instance, if the circumstances were such as to put a reasonable man on inquiry, and he made none, or if he was put off by an answer that would not have satisfied a reasonable man, or, in other words, if he was negligent in not perceiving the want of authority, then he is taken to have notice of it."

Plainly an objective test was applied in that case.

267. Ungoed-Thomas J.'s formulation of the law applicable to the "knowing assistance" category of constructive trusteeship was further reviewed in *Karak Rubber Co. Ltd. v. Burden (No. 2)* [1972] 1 W.L.R. 602. That formulation was attacked by the defendants in the *Karak* case on the grounds that it was inconsistent with ratio decidendi of, and was impliedly overruled by, the decision of the Court of Appeal in *Carl Zeiss Stiftung v. Herbert Smith & Co. (No. 2)* [1969] 2 Ch. 276, and that important and decisive cases were not brought to the attention of Ungoed-Thomas J.

268. The ratio decidendi of the *Carl Zeiss* case was that knowledge of a doubtful equity was not sufficient to give an alleged constructive trustee knowledge of the trust, and I respectfully agree with Brightman J. that the *Selangor* case [1968] 1 W.L.R. 1555 though expressly referred to in *Carl Zeiss Stiftung v. Herbert Smith & Co. (No. 2)* [1969] 2 Ch. 276 was not expressly or impliedly overruled. However it is clear that the obiter views of Sachs L.J. and Edmund Davies L.J. cast doubt on the principles stated by Ungoed-Thomas J. in the *Selangor* case [1968] 1 W.L.R. 1555 in relation to knowledge. Sachs L.J. [1969] 2 Ch. 276, 298, was inclined to the view that, even if the circumstances giving rise to type (v) knowledge could be established, the further element of dishonesty had to be proved. But Edmund Davies L.J., whilst also looking for the element of want of probity to be present (in a passage at p. 304 to which I have already referred) recognised as a possible exception from the necessity of establishing actual knowledge the case where the agent is under a duty to inquire, but fails to inquire, into the validity of the third party's claim, although inquiry would have established that it was not well founded. In the *Carl Zeiss* case [1969] 2 Ch. 276 it was conceded that the solicitors were under no duty of inquiry.

269. Sachs L.J. referred to type (v) knowledge by reference to section 199 of the Law of Property Act 1925. So to label knowledge seems to me apt to mislead as it conjures up the picture of leisurely and detailed inquiries made by conveyancers about title to land and it implies that inquiries are inappropriate in other types of cases. Whether any duty to inquire arises and what sort of inquiry is appropriate must of course depend on the particular facts of each particular case.

270. In the *Selangor* case [1968] 1 W.L.R. 1555, Ungoed-Thomas J. was not referred to a line of cases which establish that in commercial transactions the general rule is that the equitable doctrine of constructive notice has no application. Thus in *Manchester Trust v. Furness* [1895] 2 Q.B. 539 it was held that the reference in bills of lading to a charterparty was not sufficient to give the holders constructive notice of the contents of the charterparty. In the *Karak* case [1972] 1 W.L.R. 602 Brightman J. was referred to that line of cases but he did not comment thereon. In *Feuer Leather Corporation v. Frank Johnstone & Sons* [1981] Com.L.R. 251, Neill J. relied on the general rule in holding that in the commercial transaction with which he was concerned no duty of inquiry arose. The good sense of the general rule in relation to ordinary commercial transactions, where there is no time or opportunity to make inquiries, is obvious. But it would be very surprising if the law today was that the mere fact that a transaction was a commercial transaction was sufficient to prevent any duty of inquiry ever arising whatever the circumstances, particularly so many years after the confluence of the separate streams of equity and common law. Mr. Leckie accepts that cases like *Manchester Trust* and *Feuer* are illustrative of the principle that the courts will not readily import a duty to inquire in the case of a commercial transaction, but he does not seek, in my view rightly, to argue that a duty to inquire can never arise in a commercial transaction. I would add that in the recent case of *Astro Valiente Compania Naviera S.A. v. Government of Pakistan Ministry of Food and Agriculture (No. 2)* [1982] 1 W.L.R. 1096, 1107 Staughton J. refused to regard the *Manchester Trust* case as authority for the proposition that where a bill of lading states that some terms of a charterparty are incorporated it is nevertheless improper to look to the charterparty for aid in discovering which terms, and he held that such a bill of lading required one to look at the charterparty.

271. In the *Karak* case [1972] 1 W.L.R. 602 Brightman J. was not content simply to accept Ungoed-Thomas J.'s statement of the law without considering the position afresh and expressing his own opinion thereon. Having reviewed the authorities he reached the conclusion that Ungoed-Thomas J. was correct in treating type (iv) and type (v) knowledge as applicable to constructive trusteeship. The *Karak* case was on its facts similar to the *Selangor* case [1968] 1 W.L.R. 1555 in that it too related to a circular cheque transaction in which a bank

participated and which related to the provision by a company of finance to purchase its own shares. It was held that the officers of the bank, though acting honestly, ought to have made inquiries which would have revealed to the bank that the signatories of its customer were misusing their authority and accordingly the bank was held liable both in negligence and as a constructive trustee. A

272. The principles laid down in the *Selangor* and *Karak* cases were applied by Mr. John Mills Q.C. sitting as a deputy judge of the Chancery Division in *Rowlandson v. National Westminster Bank Ltd.* [1978] 1 W.L.R. 798 where again a bank was held liable as constructive trustee for failing to make the inquiries which the reasonable banker would have made. But he was not referred to three cases decided after the *Karak* case [1972] 1 W.L.R. 602, in which the question of knowledge in the context of constructive trusteeship arose. B

273. The first case was *Consul Development Pty. Ltd. v. D. P. C. Estates Pty. Ltd.*, 132 C.L.R. 373 to which I have already referred. The second was *Competitive Insurance Co. Ltd. v. Davies Investments Ltd.* [1975] 1 W.L.R. 1240, in which Goff J. distinguished the *Selangor* and *Karak* cases on the ground that they related to the "knowing assistance" category of constructive trusteeship, whereas the case before him related to the "knowing, receipt or dealing" category, there being no fraudulent or dishonest design in which there could be participation. But Goff J. indicated his approval of the approach of Sachs L.J. and Edmund Davies L.J. in the *Carl Zeiss* case [1969] 2 Ch. 276 though he recognised that a liquidator was an agent of a special character with a statutory power to submit questions to the court and as such might be under a duty of inquiry and incur personal liability as a constructive trustee if he wilfully shuts his eyes or neglects his duty to inquire. The third case was the *Belmont* case [1979] Ch. 250, and I have already referred to the provisional views of Buckley L.J. and Goff L.J. that in addition to actual knowledge only Nelsonian knowledge and type (iii) knowledge are relevant. C D

274. Because of the judicial controversy to which the *Selangor* and *Karak* cases have given rise and the full citation to me of authorities by counsel on each side I have thought it right to review the authorities even though Mr. Price and Mr. Leckie effectively are at one in accepting that all five types of knowledge are relevant for the purposes of constructive trusteeship and neither has sought to submit that there should be or is any distinction on this point between the "knowing receipt or dealing" category and the "knowing assistance" category. I agree with counsel. It is plainly right that a person with Nelsonian knowledge or type (iii) knowledge should be treated as having knowledge for the purpose of constructive trusteeship. It seems to me, as it did to Ungoed-Thomas J. and Brightman J., that there is a sufficient line of authorities to justify treating a person with type (iv) or type (v) knowledge as having knowledge for that purpose. It is little short of common sense that a person who actually knows all the circumstances from which the honest and reasonable man would have knowledge of the relevant facts should also be treated as having knowledge of the facts. The dividing line between Nelsonian and type (iv) knowledge may often be difficult to discern. If an objective test is appropriate to let in type (iv) knowledge, it would be illogical not to apply a similar objective test in circumstances where the honest and reasonable man would be put on inquiry (type (v) knowledge). E F G

275. But in my judgment the court should not be astute to impute knowledge where no actual knowledge exists. In particular, it is only in exceptional circumstances that the court should impute type (v) knowledge to an agent like a bank acting honestly on the instructions of its principal but alleged to have provided knowing assistance in a dishonest and fraudulent design. It is not every inquiry that might be made that the court will treat the agent as having been under a duty to make inquiry even though the omitted inquiry would, if made, have led to the agent having knowledge of the facts. If an explanation is offered, the presumption of honesty is strong and the court will not require the agent to be hypercritical in examining that explanation. Two cases in which banks were held not to be privy to the dishonesty of their customers illustrate the cautious H

approach of the courts. In the *Selangor* case [1968] 1 W.L.R. 1555, as I have indicated, the Bank of Nova Scotia was held not to have been under a duty of inquiry or further inquiry despite its participation in transactions involving the circular movement of cheques. The reason why the bank was not held liable was because the solicitor for the plaintiff company gave as an explanation that the cheques were for internal accounting or bookkeeping reasons. That explanation was not further particularised and was open to criticism, as Ungoed-Thomas J. accepted, but it was held that the bank was justified in assuming the explanation to be honest and it did not put the bank on further inquiry. In *John Shaw (Rayners Lane) Ltd. v. Lloyds Bank Ltd.* (1944) 5 LDB 396, a receiver of the plaintiff company under a forged debenture had opened an account with the defendant bank and credited the account with moneys of the plaintiff and then drawn on the account for his own fraudulent purposes. The plaintiff sought to recover from the bank. Hallett J. held that the account was the fraudulent receiver's account and the bank was not privy to the receiver's fraud, as despite the existence of some unusual and indeed suspicious circumstances known to the bank, the bank had no knowledge that the receiver was misappropriating the moneys of the plaintiff. It had consulted and received assurances from the apparent directors appearing on the register, and had also consulted and been reassured by the official receiver as the provisional liquidator of the plaintiff. Although Hallett J. held that there was an inquiry which the bank could have made but did not make and which would have revealed the fraud, that is to say an inquiry of the person alleged to be the debenture holder, the bank was nevertheless in all the circumstances not liable in negligence for having failed to make that inquiry.

276. There are thus limits to what inquiries the banker is under a duty to make. The banker cannot be expected to play the detective. Further in *Marfani & Co. Ltd. v. Midland Bank Ltd.* [1968] 1 W.L.R. 956, a case on the statutory successor to section 82 of the Bills of Exchange Act 1882, Diplock L.J. said, at p. 977:

> "It does not constitute any lack of reasonable care to refrain from making inquiries which it is improbable will lead to detection of the potential customer's dishonest purpose if he is dishonest, and which are calculated to offend him and maybe drive away his custom if he is honest."

That was said in the context of a bank seeking to avail itself of the statutory defence by showing that it had acted without negligence; it had not been put on inquiry by suspicious circumstances but was under a general duty in respect of the opening of a bank account with it to make inquiries to discover whether their new customer might use the account for the fraudulent purpose of cashing cheques belonging to other people. Despite its limited context, the passage cited to my mind contains a statement of general principle, that is to say that there can be no duty to make inquiries which are never likely to give the inquirer knowledge of the facts. As Ungoed-Thomas J. said in the *Selangor* case [1968] 1 W.L.R. 1555, 1645, the only purpose of an inquiry is to get an answer, not to perform some ritualistic mumbo-jumbo. No doubt it was some such reason that led the Court of Appeal in the *Carl Zeiss* case [1969] 2 Ch. 276, to approve the concession made by the plaintiff in that case that the solicitors were under no duty of inquiry; the facts to be proved in the action were complicated and the law difficult and there could be no certainty until judgment in the action.

277. In considering whether a duty of inquiry arises, the court will have regard to all the circumstances. For a bank a material circumstance is whether the customer's account with the bank is a trust account. It is common ground that a trust account has a special significance. Both sides accept the accuracy of the statements in *Paget's Law of Banking*, 8th ed. (1972), pp. 88, 89 relating to trust accounts:

> "It is sometimes asserted that bankers can avoid having notice of trust accounts; that is not so. It is not a question of whether or not the account is opened under a heading distinctly describing it as a trust account. . . .

> "And, apart altogether from any question of heading, if the banker has A notice, however received, that an account is affected with a trust, express or implied, that the customer is in possession or has control of the money in a fiduciary capacity, he must regard the account strictly in that light. . . .
>
> "When once the banker is fixed with the fiduciary nature of the account he has to bear in mind two somewhat conflicting influences. He has to consider the interests of the persons beneficially entitled, indirectly involving his own, and he has to recognise the right of his customer to draw cheques on the account and have them honoured. This divided duty has led to B complications. The banker obviously must not be a party or privy to any fraud on the beneficiaries, any misapplication of the trust fund. He could not, on the mere instruction of the customer, transfer trust funds to private account, to wipe out or reduce an overdraft.
>
> "It is with the cheque that difficulties arise. It is not the business or right of a banker, to whom a cheque is presented, to set up the claim of any third person against the mandate of his customer; at the same time, he cannot C shelter himself behind his character of banker to cover complicity in fraud. Mere suspicion does not justify the banker in refusing payment of a cheque."

In respect of the last cited paragraph I would comment that the same considerations must apply to any instructions, whether or not in the form of a cheque, from the customer to the banker to move money from the trust D account. Other circumstances which are relevant to the question of whether a duty of inquiry arises—such as whether the transaction is unusual—were set out by Brightman J. in the *Karak* case [1972] 1 W.L.R. 602, 630, and I must come back to them later.

278. Mr. Price's submissions on making inquiries can be summarised as follows: (a) a duty to inquire only arises if there are such solid grounds for suspicion that the banker cannot safely act without making inquiries; E (b) therefore the banker can be in no better position if inquiries are made and produce unsatisfactory answers than if no inquiries had been made at all; (c) once the duty to inquire has arisen the banker can safely act only if it appears that the result of proper inquiries would have been to dispel in the mind of an honest and reasonable banker the suspicion which initially gave rise to the need for inquiries; (d) it is necessary to ascertain on a balance of probabilities what answers would actually have been given to the inquiries which should have F been made, and to decide whether or not those answers would have been acceptable to the honest and reasonable banker in dispelling his initial suspicions; and (e) it is to be presumed against the banker that the answers to any inquiries it ought to have made, but did not make, would have been true although it is open to the banker to prove, if it can, that inquiries would have produced answers acceptable to an honest and reasonable banker.

279. Again there is a good deal of common ground between the parties. Mr. G Leckie accepts, indeed stresses, that a mere suspicion is not enough to put the bank on inquiry; something more substantial is required. He further accepts that a bank is under a duty not to act on its customer's instructions not only when the bank knows that the moneys in the customer's account are to be misapplied but also so long as it is under a duty of inquiry. He also agrees that the court must determine what would have been the answers to inquiries which should have been but were not made, and whether those answers would have been H acceptable to the honest and reasonable banker. I would add that the like position must obtain in relation to proper inquiries which were made but were not answered and that similarly the court must determine on a balance of probabilities whether answers given or information volunteered would have been acceptable to the honest and reasonable banker or would have put the banker on further inquiry. There are, however, two main areas of dispute. One is as to the circumstances in which a bank having come under a duty of inquiry, and hence a duty not to comply with the customer's instructions, ceases to be under

A the latter duty. The other is as to the knowledge that is to be attributed to the bank which has failed to make an inquiry which it should have made and in particular as to the presumption of a truthful answer to such inquiry.

280. Mr. Leckie submits that if after making all proper inquiries the bank does not have knowledge of an intention to misapply the moneys in the account, it must comply with its customer's instructions even though the bank may remain suspicious. Mr. Price submits that the duty to refuse to comply with its
B customer's instructions extends beyond the subsistence of a duty to inquire, and that once it has come under a duty of inquiry the bank must refuse to act until its suspicions are wholly dispelled even if there are no further inquiries that can be made. In support of this submission he says that a bank in the position of the defendant could invoke the protection of the court. There were, he says, four possible ways in which this could have been done by the defendant (i) by interpleading under R.S.C., Ord. 17, r. 1(1)(*a*); (ii) by commencing an action against B.C.B. for a declaration and then making payment into court under
C R.S.C., Ord. 29, r. 2(3); (iii) by taking out an originating summons under R.S.C., Ord. 85 and then making payment into court, and (iv) as a last resort, by making payment into court under section 63 of the Trustee Act 1925.

281. Let me deal at once with the question of the bank instituting proceedings. In circumstances where a bank holds money which is not its own, and of which it is not a trustee and it is sued or expects to be sued by two or more persons with adverse claims, the bank would be under a duty of inquiry
D and could not comply with its customer's instructions until the true owner was ascertained; and no doubt the most practical course for the bank to adopt in the performance of its duty would be to interplead. But on the facts of the present case on 10 May 1973, S.G. had not been sued and could have had no genuine expectation that it would be sued by two or more persons with adverse claims. In the circumstances, in my opinion, interpleader was not available to S.G. To my mind it is wholly unrealistic to expect a bank in the position of S.G. to
E institute any of the other proceedings suggested, I have grave doubts as to the propriety of S.G. contriving a lis between it and its customer, B.C.B., so as to found an action against B.C.B. for a declaration, presumably relating to the ownership of the $4m. which the defendant was in no position to assert for itself or the funds. The terms of R.S.C., Ord. 85 are, I think, wide enough to permit the institution of proceedings by a bank like S.G., although neither a trustee nor beneficially interested in moneys which might be trust moneys and which it
F holds. But I do not think it would have occurred to the reasonable banker to embark upon an administration action. Further all the potential defendants to either set of proceedings would be outside the jurisdiction and leave would be needed to effect service; and there are at least serious doubts as to whether S.G. could bring itself within the letter of paragraphs (*e*) and (*f*) of R.S.C., Ord. 11, r. 1(1)—on which Mr. Price relied. Those doubts are heightened in relation to the necessity for S.G. to bring itself within the spirit of those paragraphs when
G the substantial question in issue was the subsistence of a trust created, so far as S.G. knew, only by the sub-depository agreement, the proper law of which was Bahamian and which had allegedly been affected by a Bahamian court order and when all the intended defendants were out of the jurisdiction. I am unable to see how court proceedings were a realistic possibility. Nor, in my judgment, was it open to S.G. which was not a trustee, actual or constructive (at any rate until it had paid away the $4m.), to avail itself of section 63 of the Trustee
H Act 1925.

282. The refusal by a bank to comply with its customer's instructions in relation to moneys in the customer's account can have seriously adverse consequences both for the customer and for the bank. That is a practical consideration that militates strongly against the court extending the duty on the bank not to comply with the customer's instructions beyond what is the minimum reasonably necessary to ensure that the bank does not knowingly allow a misapplication of moneys in a customer's account with the bank. What judicial authority there is points to the duty not to comply with the customer's

instructions being co-extensive with the subsistence of the duty of inquiry. The bank has what Brightman J. in the *Karak* case [1972] 1 W.L.R. 602, 629 referred to as a primary obligation to pay a cheque on demand. In more general terms that is a primary obligation to comply with the customer's instructions in relation to the moneys in the account. In exceptional circumstances, in what Brightman J. called an extreme case, that obligation must yield to an obligation to make inquiries. In the *Selangor* case [1968] 1 W.L.R. 1555, 1599, Ungoed-Thomas J. referred to the bank's duty of care as including a requirement that the bank should make inquiries before acting, and for this purpose, postpone honouring the customer's cheques, and at p. 1626 he referred to the bank being entitled to suspend payment pending justifiable investigation. If an inquiry is made and answered, the only relevant question that arises is whether or not that answer would put the honest and reasonable banker on further inquiry. If it does then the bank must continue to refuse to obey its customer's instructions. That was the approach of Ungoed-Thomas J. in the *Selangor* case in relation to the explanation given to the Bank of Nova Scotia.

283. Mr. Price would, I think, have a tertium quid, an answer which does not put the bank on further inquiry but leaves him subject to a duty not to comply with the customer's instructions because his suspicions have not been wholly dispelled. He posed the example of a proper inquiry which elicits the response "Mind your own business." But in that case no answer was given to the inquiry and unless information is received from another source which dispenses with the need to persist in the inquiry, the duty to refuse to comply with the customer's instructions continues to subsist just as the duty of inquiry subsists. In the circumstances of the present case Mr. Price submits that none of the inquiries which he says ought to have been made could have satisfied the honest and reasonable banker. If that were right S.G. would never have come under any duty to make those inquiries as there cannot be a duty to make useless inquiries. In posing a test which requires that suspicions should be dispelled Mr. Price to my mind suggests too rigorous a test of certainty. The honest and reasonable banker may well have doubts but in all the circumstances be prepared to accept an answer given to an inquiry. A bank with its suspicions not dispelled can always choose to wait and be sued by its customers, but I think it would be going too far to hold that it has a duty to do so once there are no further inquiries it ought to make.

284. In my judgment therefore, a bank, when put on inquiry, remains under a duty not to comply with its customer's instructions either if it acquires knowledge of the intended misapplication of moneys which it holds or whilst it is pursuing its inquiries it ceases to be under such duty when it receives information, whether in answer to its inquiries or from another source, that the honest and reasonable banker would accept without further inquiry.

285. The second area of dispute relates to the knowledge to be imputed to a bank which ought to have made but failed to make inquiries or which, having made inquiries failed to await the answers thereto. As I have said, Mr. Price submits—and Mr. Leckie accepts—that the court must ascertain on a balance of probabilities what would have been the actual answers to the inquiries which were never made and whether those answers would have put the honest and reasonable banker on further inquiry. It is hard, therefore, to see much room for the operation of the presumption of truthfulness on which Mr. Price relies. I suppose that it would apply only in circumstances where the court could reach no conclusions on the facts. But Mr. Price and Mr. Leckie are again at one in saying that the mass of evidence in the present case enables the court to reach a view as to the answers that would probably have been given. It is therefore an academic question in this case whether there is, as Mr. Price contends, or is not, as Mr. Leckie contends, a presumption of truthfulness applicable to a failure to inquire and I propose to express only briefly the view to which I incline.

286. Although Ungoed-Thomas J. in the *Selangor* case [1968] 1 W.L.R. 1555, 1607, was able to say that the weight of authority establishes the presumption of truthful answers to inquiries which ought to have been but were

not made, the point as Brightman J. in the *Karak* case [1972] 1 W.L.R. 602, 631, noted was conceded before Ungoed-Thomas J. It is true that Brightman J. said that the remarks of Ungoed-Thomas J. were not to be read as meaning that there was an irrebuttable presumption of truthfulness and that he further stated his view that it was open to the defendant bank to prove that the inquiries would have produced acceptable answers so that the failure to inquire led to no loss, but he then referred to authority to establish that the onus of proving the casual connection between the breach of duty to inquire and the loss lay on the plaintiff. He went on to hold that on the facts inquiry would have revealed the impropriety of the transaction under consideration. In other words he did not apply any presumption of truthfulness against the bank. As at present advised I would adopt the same approach. It is for the plaintiffs to discharge the onus of proving that the failure to inquire caused loss, and to apply the presumption would effectively release a crucial part of that burden: I doubt if it is right to found a constructive trust on so artificial a basis. This point is relevant to the difference between Mr. Price and Mr. Leckie as to the correct formulation of type (iii) and type (v) knowledge. By parity of reasoning I incline to the view that Mr. Leckie is correct in submitting that the relevant inquiries must be such as would have given to the honest and reasonable man knowledge of the facts.

287. I summarise therefore the principles of law that, in my judgment, I must apply in respect of the claim in equity as follows. (1) The plaintiffs must show (a) the existence of a trust affecting the $4m. deposited by B.C.B. with S.G.; (b) the fraudulent and dishonest design on the part of the directors of B.C.B. who gave instructions to S.G. to transfer the $4m. to Panama; (c) the assistance by S.G. in that design; (d) S.G.'s knowledge of (a), (b) and (c). (2) The knowledge must be actual knowledge or knowledge which it would have obtained but for shutting its eyes to the obvious or wilfully and recklessly refraining from making such inquiries as the reasonable banker would have made from the circumstances known to S.G. or would have obtained from inquiries which the reasonable banker would have made, the onus being on the plaintiffs to establish that S.G. possessed that knowledge.

*Trust*

288. Was there a trust affecting the $4m. with S.G.? This question falls to be answered as at 10 May 1973 when the $4m. was paid by S.G. to Banco Nacional de Panama. But to answer this question it is of course necessary to consider the events prior to that date. The plaintiffs' case can be summarised thus: the moneys deposited by B.C.B. with S.G. which included the $4m. were derived from moneys belonging to and deposited by the funds with O.D.B. Lux, and placed with B.C.B. on the funds' directions; B.C.B. received and held those moneys in a fiduciary capacity as the moneys throughout remained in the beneficial ownership of the funds; the trust was created either (a) by the sub-depository agreement or (b) by the receipt by B.C.B. of the moneys in a fiduciary capacity or (c) by the depository agreements: in each case the trust was not affected by the order of 12 April or the agreement of 13 April or if the effect of the order and agreement was to make the $4m. cease to be trust moneys, that effect is to be ignored as the order and agreement were obtained by fraud.

*The sub-depository agreement*

289. It is common ground between the parties that under the terms of sub-depository agreement B.C.B. was to hold all moneys to which that agreement related as trustees for the funds which retained the beneficial ownership of the moneys. I have set out the relevant terms of that agreement in paragraphs 44 and 45, and clause 5(b) of the sub-depository agreement makes explicit that the funds were to remain the beneficial owners of moneys held under the agreement. S.G., however, submits that the sub-depository agreement never took effect as O.D.B. Lux never delivered any cash to B.C.B. under that agreement and the

agreement by its express terms only applied to cash so delivered. Further, it submits that, as the funds and B.C.B. knew, the principal signatories on behalf of O.D.B. Lux lacked authority to bind O.D.B. Lux, and consequently O.D.B. Lux was not bound by the agreement and without the participation of O.D.B. Lux the agreement, in Mr. Leckie's words, is a nonsense. A

290. As I have stated in paragraph 74, every transfer to B.C.B. made by O.D.B. Lux was expressed to be made under the depository agreements, and not under the sub-depository agreement; O.D.B. Lux expressly so advised the funds. When the moneys which came to B.C.B. from American National were redesignated in early December 1972, O.D.B. Lux similarly advised the funds that the deposits were made under the depository agreements. There were therefore no moneys to which the sub-depository agreement in fact applied. Further, as I have set out in paragraph 47, the conditions imposed by the O.D.B. Lux board for the approval of that agreement were not satisfied when Clay and Lamboray purported to sign on behalf of O.D.B. Lux. The funds must be taken to have been aware of this, because O.D.B. Lux had informed the funds, by telexing Meissner and Schuyler on 24 October 1972, of all the conditions save that affecting B.C.B., that is to say, that satisfactory financial statements must be received from B.C.B. The telex was also addressed to Rogers, probably in his capacity as an officer of O.D.B. Geneva whose London office was also intended to be a sub-depository with B.C.B. The funds did not comply with the conditions requiring action on their part. Further, on 27 October, O.D.B. Lux telexed Schuyler as secretary of I.I.T., F.O.F. and Venture that as the sub-depository agreement was not yet formally in force and as O.D.B. Lux had not yet received the information sought in its telex of 24 October it would execute instructions which O.D.B. Lux had received to transfer some $117m. to B.C.B. under the terms of depository agreements and, as I have said, all the subsequent transfers to B.C.B. were made by O.D.B. Lux pursuant to the depository agreements as O.D.B. Lux expressly advised the funds. B C D E

291. The knowledge of B.C.B. on this point is less clear. There is no communication in writing or recorded in writing to B.C.B. from O.D.B. Lux about the conditions. But O.D.B. Lux cannot be assumed to have imposed a condition relating to B.C.B. in vain. I infer that it must have been intended that one or more of Clay, Rogers and Straub, who had attended the O.D.B. Lux board meeting on 19 October, was or were to communicate with B.C.B. (of which company Clay and Straub were directors and Rogers was secretary) as to the conditions affecting B.C.B., if not all the conditions. The minutes of a board meeting of O.D.B. Lux of 12 December record Rogers reporting that he had, as a director of O.D.B. Lux in Nassau, expressed an opinion to the directors of B.C.B., and it is clear that, as one would expect, such communications did take place about this time though the persons were serving in dual capacities. It is well established that knowledge acquired by a director or officer of one company who is also a director or officer of another company will be imputed to that other company if he has a duty as a director or officer of the one company to communicate to the other company and as a director or officer of the other company to receive the information: see *In re Hampshire Land Co.* [1896] 2 Ch. 743 and *In re David Payne & Co. Ltd.; Young v. David Payne & Co. Ltd.* [1904] 2 Ch. 608. In the circumstances and in particular having regard to the importance to O.D.B. Lux and to B.C.B. of the sub-depository agreement I think that it must have been the duty of one or more of Clay, Rogers and Straub, as directors of O.D.B. Lux, to communicate O.D.B. Lux's conditions to B.C.B. and as directors or secretary of B.C.B. to receive the information. Further, B.C.B. must have known of the failure to satisfy the conditions, if only because no financial statements were supplied to B.C.B. by O.D.B. Lux. Accordingly I hold that B.C.B. as well as the funds were aware that the signatories on behalf of O.D.B. Lux had no authority to execute the sub-depository agreement and that O.D.B. Lux was not bound thereby. F G H

A 292. The plaintiffs also submit that because O.D.B. Lux relied on the sub-depository agreement for the purpose of demanding repayment from B.C.B. during November and December 1972, it accepted the benefit of it and was therefore bound by it and obliged to give effect to all its conditions. It is now well established that he who accepts the benefit of a transaction must also bear the burden of that transaction; but I do not think that that principle applies to the present case. There must be the acceptance of a real benefit for the principle to apply. Although O.D.B. Lux did initially rely on the sub-depository agreement B in making demands for repayment of moneys deposited with B.C.B., no moneys were repaid pursuant to such demands. After the meeting of the O.D.B. Lux board on 12 December, when the validity of the sub-depository agreement was first questioned there is no record of any reliance being placed thereon by O.D.B. Lux. The plaintiffs say that O.D.B. Lux relied on the agreement in encouraging the funds to become parties to its litigation. But, in recognising that the funds might have rights against B.C.B. under the agreement, O.D.B. Lux C itself cannot in my judgment in any real sense be said to be taking the benefit of the agreement. Accordingly in my judgment O.D.B. Lux cannot be held to the validity of the sub-depository agreement, as it never received any benefit from it.

293. The next question is whether, despite the absence of O.D.B. Lux as a party, the sub-depository agreement was valid and effective to regulate the relationship between B.C.B. and the funds. The plaintiffs submit that where it is D contemplated that a deed or other instrument will be executed by A, B and C, but only A and B actually execute it, the deed or instrument is, nevertheless, binding upon A and B, and can be enforced against them unless an equity sufficient to relieve them is both specifically alleged and proved. They say that such equity arises only if, as a result of the non-execution of the deed or instrument by C, the obligation sought to be enforced against A and B is substantially different in kind from that contemplated by A and B, so that C's E failure to execute the deed or instrument materially affects the substance of the transaction, with the consequence that to enforce it upon A and B would be to impose upon them a greater liability than they ever intended to bear and to create a substantial injustice. Mr. Price made good these submissions as propositions of law by reference to *Naas (Lady) v. Westminster Bank Ltd.* [1940] A.C. 366 and *Ex parte Harding, In re Smith, Fleming & Co.* (1879) 12 Ch.D. 557. But the insuperable difficulty facing the plaintiffs on this point is that, as I F have held in paragraph 290, there were no moneys to which the sub-depository agreement in fact applied, or could apply without O.D.B. Lux's participation in transferring moneys to B.C.B. under that agreement.

*Receipt of moneys by B.C.B. in fiduciary capacity*

294. Was B.C.B. a trustee by virtue of the capacity in which it received the deposits? The sub-depository agreement was dated "as of 27 October 1972" and G although instructions to transfer to B.C.B. were in several cases given by the funds on 26 October the value date for every transfer was 27 October or a subsequent date. In my judgment that cannot have been a mere coincidence and it must have been intended by the funds and B.C.B. that B.C.B. should hold on the terms of the agreement the moneys deposited with it after 27 October. Even though the participation of O.D.B. Lux was known to be subject to conditions it was no doubt envisaged that the conditions would eventually be satisfied or H withdrawn. Indeed I am left with the impression that O.D.B.Lux was treated by B.C.B. and the funds as something of a tiresome irrelevance. Under the sub-depository agreement, as B.C.B. was well aware, B.C.B. was clearly intended to be a fiduciary in relation to moneys held thereunder. At no time prior to April 1973 was there any indication that B.C.B. or the funds intended that the moneys deposited with B.C.B. should be governed otherwise than by that agreement. In particular there is nothing to show that B.C.B. treated the deposits as though they were loans to B.C.B. creating the ordinary debtor/creditor relationship between a banker and his customer. The moneys were kept separate from

B.C.B.'s own moneys and in accounts numbered by reference to each of the funds. B.C.B. on 29 November relied on the sub-depository agreement in resisting O.D.B. Lux's claim for the return of the deposits. Without opposition by B.C.B. the funds became parties to the Bahamian proceedings, claiming that they were the beneficial owners of the moneys deposited with B.C.B. and relying on that agreement. B.C.B. consented to the order of 23 February requiring new deposits by B.C.B. to be designated as trust accounts for the funds. At the second meeting on 13 March with the American lawyers in Nassau, LeBlanc acknowledged that the moneys had been treated by B.C.B. as trust moneys and did not feature in B.C.B.'s liquidity reports. It was that agreement which was put forward by B.C.B. to S.G. in April 1973 as being the trust document governing the trust account with S.G. Daniels's evidence in examination was that the funds and B.C.B. intended the sub-depository agreement to be binding whatever O.D.B. Lux's position may have been.

295. Mr. Leckie submitted that if the funds or B.C.B. intended the beneficial interest of the funds to be created by the sub-depository agreement, it is not open to the court to imply that the beneficial interest arose in some way other than under that agreement as that would be to imply something contrary to the express intention of B.C.B. and the funds. Mr. Leckie relied on *Britain v. Rossiter* (1879) 11 Q.B.D. 123 in support of that proposition; but that case has no relevance to the facts before me. It only establishes that where there is an existing contract whcih is unenforceable because of the Statute of Frauds it is not possible to imply a different contract from acts done in performance of the existing contract.

296. It seems to me inconceivable that a court of equity would allow a recipient and holder of moneys, in the circumstances in which B.C.B. received and held the deposits derived from the funds, to claim that it did not receive and hold the moneys in a fiduciary capacity but was the beneficial owner of the moneys. Mr. Price relies on the remarks of Lord Selborne L.C. in *Lyell v. Kennedy* (1889) 14 App.Cas. 437, 457:

> "A man who receives the money of another on his behalf, and places it specifically to an account with a banker ear-marked and separate from his own moneys, though under his control, is in my opinion a trustee of the fund standing to the credit of that account. For the constitution of such a trust no express words are necessary; anything which may satisfy a court of equity that the money was received in a fiduciary character is enough. It is not requisite that any acknowledgement of such a trust should be made to the cestui que trust or his agent; to whomsoever made it is evidence against the trustee."

On the facts of the present case it seems to me clear that B.C.B. did receive the moneys deposited with it by the funds in a fiduciary character and held this money including the $4m. in that character and separate from its own moneys, at any rate until the order of 12 April.

*The depository agreements*

297. In case I am wrong on that conclusion I should also consider the alternative submission of the plaintiffs that a fiduciary relationship was created under the terms of the depository agreements. There can be no doubt but that O.D.B. Lux, as it told the funds, sought to give effect to the instructions of the funds to deposit moneys with B.C.B. by doing so pursuant to the terms of the depository agreements. Those agreements were expressed to be governed by Luxembourg law and I have had the benefit of a written opinion from Maître André Elvinger, a Luxembourg advocate, on the effect of those agreements. It is common ground between the parties that Elvinger's opinion can be treated as correctly stating the relevant Luxembourg law.

298. Under that law the general rule is that trusts are ignored. The relationship created between O.D.B. Lux and the funds was that of debtor/creditor. However, under article II(C) of the depository agreements,

whereby time deposits were to be held at other banks in the name of O.D.B. Lux but for the account and at the risk of the funds the deposits fell to be treated as fiduciary deposits, O.D.B. Lux acting as the agent of the funds when placing the deposits. As between O.D.B. Lux and B.C.B. the funds were the beneficial owners of the deposits with B.C.B., so that if B.C.B. defaulted in repayment the funds could demand payment from O.D.B. Lux only to the extent that it received payment from B.C.B. Thus the funds bore the risk in relation to the deposits. As between the funds and B.C.B. the funds had direct rights of action against B.C.B. either under a provision of the Luxembourg Civil Code authorising any creditor to exercise the right of action of his debtor against his debtor's debtor, or, if B.C.B. was aware of the purely fiduciary capacity of O.D.B. Lux (as it was in the present case), pursuant to ancient French precedents which Luxembourg law recognises as applicable. Even under English law, with its well-developed trust concepts, the fact that a bank is aware of the purely fiduciary capacity of its customer in relation to an account of its customer would not make the bank a fiduciary in relation to the moneys in that account. I do not read Elvinger's opinion as meaning that the alternative right of direct action against B.C.B. as a result of B.C.B.'s awareness that O.D.B. Lux was a fiduciary, gave the funds any greater rights than those which were enjoyed by O.D.B. Lux, and O.D.B. Lux's relationship with B.C.B. was purely that of creditor and debtor. In my judgment there is nothing in Elvinger's opinion that supports the view that under the depository agreements B.C.B. was a trustee or fiduciary of the moneys deposited with it by O.D.B. Lux; the most that the funds could do directly with B.C.B. was to exercise O.D.B. Lux's rights of action as a creditor against B.C.B. Accordingly in my judgment no fiduciary relationship was created between B.C.B. and the funds by the depository agreements.

*Bahamian order of 12 April 1973*

299. Immediately prior to the order of 12 April all the moneys derived from the funds which were deposited with B.C.B. were trust moneys for the reasons I have given. For the sake of completeness I should mention that at one stage Mr. Leckie said that the covert agreements of 13 March and 2 April signed by LeBlanc and Meissner which purported to identify all the moneys derived from the funds bound the funds. However, in the final form of his submissions when delivered to me in written form (both sides adopted the helpful course of providing me with outlines in writing of their submissions) Mr. Leckie rightly did not rely on these manifestly fraudulent agreements as freeing the $4m., part of the $7m. with S.G., from the trusts affecting that sum. But Mr. Leckie submits that the order effected a substitution of the moneys referred to in the agreement of 13 April for the moneys which had previously been trust moneys.

300. It is common ground that, by reason of the direction in the order of 12 April to the parties to execute the agreement, the agreement should be treated as part of the order. The agreement falls to be construed against the factual background that the proceedings instituted by O.D.B. Lux related to all the moneys of the funds that remained deposited with B.C.B., that the ex parte injunction of 1 February and the inter partes injunction of 23 February likewise related to all those moneys, that both injunctions expressly applied to the deposits from which the $7m. with S.G. (one of the specified banks) should be in a trust account for the benefit of the funds to which the moneys related, and that the order of 23 February with its injunction was expressed to last only until the determination of the originaging summons. There can be no doubt therefore that by the order of 12 April (including the agreement) the $4m. with S.G. was materially affected, in that the court thereby ceased to injunct B.C.B. from paying or ordering the payment of the $4m. and ceased to require that the $4m. be in a designated trust account. This is emphasised by the fact that $3m. of the $7m. was expressly dealt with in the agreement in a way that showed that the sum was to continue to belong to one of the funds, whilst the agreement is silent as to the remaining $4m.

301. I have set out the terms of the agreement in paragraphs 125 to 129. Much debate at one stage centred on the words in recital (5) "in part." I think it clear that they referred to the fact that of the $176,920,000 deposited with B.C.B., only $157,900,000 was purportedly identified in the first schedule, and the balance (save for a minor discrepancy of $20,000) was what was described in paragraph 7 of the agreement as "the remaining $19m. referred to in the second schedule." The deposits identified in the first schedule, to the extent that they differed from the deposits which were in reality derived from the funds, were by the order substituted for the true deposits. The only question is whether paragraph 7 with its provisions for payment of $19m. with the delivery of security therefor created rights in substitution for the balance of the true deposits.

302. Mr. Price submits that it did not. He says that the order and the agreement did not deal, or purport to deal, with the whole of the funds' moneys deposited by O.D.B. Lux with B.C.B., and in particular with the $4m. As I have already indicted the order and agreement did relate to all the moneys deposited including the $4m. The agreement recited the placing of deposits with B.C.B. and recital (7) shows that the agreement intended to provide for the repayment, transfer or otherwise the satisfaction of those deposits. Mr. Price relied on the obligation on B.C.B. to account for and pay all interest, received and to be received by S.G. in respect of "the said deposits," as indicating that B.C.B. had to account for interest on all the deposits which were in fact derived from the funds. But, as I have said in paragraph 128, the reference to "the said deposits" must in its context be a reference to the deposits in the first schedule. I would add that in any event Mr. Price's construction would be unworkable, as, given that there was a partial substitution effected by reference to the deposits in the first schedule, there is no way of identifying which of the true trust deposits were substituted by the false trust deposits in the first schedule. The $4m. with S.G. might be substituted wholly or in part by amounts said, for example, to be with B.C.B. or the deposits frozen by Judge Stewart on 28 March. Finally, Mr. Price said that paragraph 7 of the agreement could not effect a substitution, as until I.B.L. (which was not a party to the agreement) gave security, there could be no substitution. But paragraph 7 created an immediate contractual obligation enforceable against B.C.B. to repay $19m. in the manner indicated and I do not see why this could not be the subject matter of a substitution. Further, B.C.B. could secure I.B.L.'s compliance so as to ensure the performance of its own obligation, and we know it had already on 5 April entered into an agreement with I.B.L. to deposit $25m. with I.B.L. and for I.B.L. to issue to B.C.B. secured certificates of deposit. Paragraph 7 would be inconsistent with the continuation of an immediate right in the funds to $19m. of trust deposits. Had there been any intention to preserve the funds' rights to trust deposits in that sum there would surely have been some provision in the agreement protecting the same, as had been done by the interlocutory order. I conclude that the provisions of the agreement were intended to and did effect a substitution of the rights under that agreement (to which, of course, the funds were parties as well as O.D.B. Lux) for the true trust deposits. Thus in my view the apprehension expressed in the order made by Judge Stewart on 10 May 1973 that the agreement might compromise and extinguish the funds' claims was justified.

303. Was the order of 12 April (with the agreement of 13 April) obtained by fraud? To the extent that it substituted other moneys for the deposits which were truly derived from the funds, in my judgment there can only be one answer to the question. It must be borne in mind that, as we now know from the flowchart, all the moneys derived from the funds did exist in the form of deposits with reputable banks. The flowchart was compiled from B.C.B. documents and there is no reason to suppose that LeBlanc did not know the true position. Indeed the discrepancies strongly suggest that they were no accident, and that LeBlanc must have been aware of what he was doing. The sums of $1m. in Banco de Ponce, $1m. in Banco Credito, $1½m. in Virgin

A Islands National Bank, $1m. in First National City Bank and $1½m. in Barnett Bank within a week of being frozen by Judge Stewart on 28 March were falsely claimed to be moneys of the funds and as such included in the first schedule. Further, there was the inclusion of a sum exceeding by more than $1m. the actual trust moneys in the frozen accounts with the Bank of Montreal, Montreal. These are clear pointers to the fact that there was a deliberate decision taken to substitute moneys in frozen accounts as well as other moneys said to be at
B B.C.B. ($6,900,000 of which would not have to be repaid for two months) for trust moneys in Algemene Bank, S.G. and Bank of Montreal, Nassau, which were not frozen and cuold be moved immediately to whatever destination and for whatever purposes those controlling B.C.B. chose.

304. Mr. Leckie submitted that Meissner may not have been privy to LeBlanc's fraudulent intentions. Meissner was described in favourable terms by several witnesses. A former Rhodes scholar, he was said by Daniels to have an agreeable personality and to have given Daniels the impression of "bending over
C backwards after the S.E.C. complaint to try to clear his name and appear to be co-operating as best he could with the authorities." Shepard in September 1972 would have said that Meissner was a perfectly upright and straightforward individual. But the relevation of the covert agreements of 13 March and 2 April 1973 was to change Shepard's views of Meissner and I have already (in paragraph 121) referred to the letter of protest of 17 April written by Roberts and Shepard to Meissner. Daniels too, in cross-examination after being referred
D to those covert agreements, agreed that if he had known that Meissner had entered into those agreements but had concealed them from those instructed by him to advise the funds, he would have appreciated that it was dishonest. Daniels said that the instructions immediately after 17 April to pay the $10m. with Algemene Bank to Panama made apparent that the purpose of his dishonesty and concealment was to steal that money for the benefit of B.C.B. He was then referred to the fact that the sums totalling $6m. which could not
E have been trust moneys were made the subject of an injunction by Judge Stewart on 28 March, and gave evidence in response to Mr. Price's question as follows:

"Q. But very shortly afterwards this $6m., subject to a local embargo, is placed in the order pursuant to arrangements surreptitiously agreed between Meissner and LeBlanc? A. Yes.

"Q. What purpose do you say today that substitution served? A. The
F convenient purpose of leaving us with blocked funds over which B.C.B. had no right of disposal, and allowing them the use of other funds which would thereby be free.

"Q. And which would thereby be purportedly freed and able to be spirited away to serve the dishonest purpose of Vesco and his men. A. Yes. They were in control of B.C.B.; I wouldn't know what they would want to do with the money. Rumour had it, or at least I think they said, that at that
G stage B.C.B. was virtually insolvent anyway, but who were the creditors I do not know.

"Q. And similarly with the schedule. If we stick to the telex [referred to in paragraph 122] there is the $5m. Société Générale, $2m. Sumitomo not brought up to date as the $7m. all at Société Générale, but there is the $7m. of trust money? A. Yes.

"Q. But in the other schedule which you have in the blue file, the schedule
H to the agreement, only $3m. of that. So I suggest when the facts appear, the same purpose? A. Yes.

"Q. In retrospect any reliance you placed on Dr. Meissner was greatly misplaced, wasn't it—and when I say 'you' I mean any reliance placed by anybody on Dr. Meissner was greatly misplaced? A. Yes, certainly, I accept I did not think that he was capable of this sort of surreptitious agreement that you have brought to my attention.

"Q. And Mr. Baker was absolutely right in his reaction, that had he known that the alleged locations of trust money had been negotiated between

> Meissner and LeBlanc, he would not have been able to rely on him? A. Yes. I suppose I have to part company slightly there. I was always realistic enough, I think, to see that the only way B.C.B. would consent would be through Dr. Meissner's intervention. Therefore I don't think I ever had any doubts that he had a hand in the negotiation, but I didn't realise that it was effectively a put up job from some time previously . . . A
> "Q. Do you think with the information that you now have that there were indications, if only you had taken note of them, that he was behaving in a thoroughly dishonest way, and that you might, if you had been luckier, have noticed these acts of his and you would not then have relied upon them? A. Certainly if I had thought that he was colluding wholesale with Mr. LeBlanc and that they were effectively devising a script and leaving the professionals, as it were, to play to that script, yes, I would have clearly played it differently." B

I accept Daniels's evidence and for my part I have no doubt but that Meissner was colluding with LeBlanc in fraudulently effecting the substitution of non-trust assets for trust assets. C

305. O.B.D. Lux throughout the Bahamian proceedings and the settlement negotiatons was acting in an entirely independent and honest way, as indeed one would expect from the legal representatives whom it had instructed, and it was not a party to LeBlanc's and Meissner's schemes or privy to their dishonesty. It was dependent throughout on B.C.B. to provide it with the information as to where the moneys which it had deposited with B.C.B. were situate, and it was, of course, B.C.B.'s duty as a fiduciary to provide such information. Baker looked to Robertson to obtain the necessary information from B.C.B., and had no means of ascertaining, nor initiated any steps to ascertain, whether there were errors in the information supplied by B.C.B. Although Daniels in examination said that the removal of the $10m. deposit with the Algemene Bank and the $4m. deposit with S.G. was part of the overall "horse-trading" to get an agreement with S.G., he accepted in cross-examination that if there had been "horse-trading" it must have been between Meissner and LeBlanc and he was never consciously party to any process of thought that trust moneys were being treated as non-trust moneys as a matter of bargaining. As he said: D E

> "I think my element of bargaining was simply to establish what funds there were available within B.C.B. which they were prepared to designate in accordance with the agreement and return to us." F

Nor was Daniels conscious that anybody else had agreed that $4m. of the $7m. with S.G. should be treated as released from trust. O.D.B. Lux proceeded on the hypothesis that the information supplied by B.C.B. was correct. In the event that hypothesis was false and in my judgment O.D.B. Lux's honest part in the obtaining of the order does not in any way detract from the conclusion that I reach without hesitation that that part of the order which effected a substitution of non-trust assets for trust assets was obtained by fraud. G

306. Mr. Price submitted that the consequence of such fraud is that so far as concerns the $4m. deposited with S.G. the order and the agreement are not binding upon the plaintiffs, notwithstanding that no proceedings have ever been instituted in the Bahamas to set aside the order and the agreement. But if Mr. Price is right the effect must go wider than that, as he accepted. In his submission the judgment in the sum of $155,420,000 would not be vitiated, but he accepted that the rest of the order including the whole of the agreement would not be binding upon the plaintiffs. In view of this it is unnecessary to consider whether he is right in excepting the money judgment from the effect of the fraud. The basis of Mr. Price's submission is the frequently cited principle that fraud unravels all. The application of that principle to English judgments is, he says, that the English court will decline to give effect to such a judgment when obtained by fraud or collusion notwithstanding that no direct attack has ever been made in proceedings to set it aside. He further submits that in any H

A event, whatever the position in respect of English judgments, the English court will decline to give effect to a foreign judgment obtained by fraud or collusion.

307. There are many judicial statements as to the effect of fraud on a judgment. That most commonly cited is the answer of de Grey C.J. on behalf of the judges to the questions of the House of Lords in the *Duchess of Kingston's Case* (1776) 20 St.Tr. 355, 544.

> "Fraud is an extrinsic, collateral act; which vitiates the most solemn B proceedings of courts of justice. Lord Coke says, it avoids all judicial acts, ecclesiastical or temporal."

Another like statement was made by Lord Brougham in *Earl of Bandon v. Becher* (1835) 3 Cl. & Fin. 479, 510,

> ". . . you may at all times, in a court of competent jurisdiction . . . where you appear as an actor, object to a decree made in another court, upon C which decree your adversary relies; and you may, either as actor or defender, object to the validity of that decree, provided it was pronounced through fraud, contrivance, or covin of any description, or not in a real suit; or if pronounced in a real and substantial suit, between parties who were really not in contest with each other . . . if the decree has been obtained by fraud it shall avail nothing for or against the parties affected by it, to the prosecution of a claim, or to the defence of a right."

D

In that case an innocent remainderman was allowed to go behind a decree obtained collusively for the sale of settled property. Mr. Price cited to me other cases, such as *Perry v. Meddowcroft* (1846) 10 Beav. 122, and *Shedden v. Patrick* (1845) 1 Macq. 535, in each of which the court held that a person whose status was directly affected by an earlier judgment obtained by fraud or collusion could make a claim inconsistent with the earlier judgment on the footing that the judgment was impeachable.

E

308. But the generality of those early statements has been qualified in subsequent cases and by the emergence of procedural rules. The *Duchess of Kingston's Case* was described by Lord Selborne L.C. in *Boswell v. Coaks (No. 2) (Note)* (1894) 86 L.T. 365, 366, as

> "an example [of a class of case] in which by the collusion of the parties the process of the courts has been abused and the whole proceeding may be F described as it was described in language used in that case as fabula non judicium."

Lord Selborne L.C. distinguished that class of case from a second class of case in which "it is not sought to treat as a nullity what has passed, but to undo it judicially upon judicial grounds treating it as in itself, and until judicially rescinded, valid and final." *Boswell*'s case was an example of the second class of case. The House of Lords affirmed the decision of the Court of Appeal, which, G as appears from *Birch v. Birch* [1902] P. 130, 137–138, set aside a judgment only as against those who procured the judgment by fraud and not against other defendants. There can be no doubt but that the right of a party to earlier English proceedings to challenge in subsequent proceedings the judgment on the grounds that it was obtained by fraud is now subject to stringent procedural rules, at any rate when the challenge is sought to be made in proceedings against the other party to the earlier proceedings. In *Jonesco v. Beard* [1930] H A.C. 298, 300, Lord Buckmaster said:

> "It has long been the settled practice of the court that the proper method of impeaching a completed judgment on the ground of fraud is by action . . ."

In *de Lasala v. de Lasala* [1980] A.C. 546, 561 Lord Diplock said:

> "Where a party to an action seeks to challenge, on the ground that it was obtained by fraud or mistake, a judgment or order that finally disposes of the issues raised between the parties, the only ways of doing it that are

> open to him are by appeal from the judgment or order to a higher court or by bringing a fresh action to set it aside." A

In such an action the court would require to be satisfied that the evidence of fraud was not available at the time of the earlier hearing. In the present case relating as it does to a foreign judgment, it is unnecessary and indeed undesirable that I should attempt to decide whether and in what circumstances the court will allow an English judgment to be impeached on the ground of fraud, as the authorities show clearly that the rules relating to a foreign judgment are not B identical.

309. In relation to a foreign judgment the primary rule is that a foreign judgment which is relied upon as such in proceedings in England is impeachable for fraud: see, for example, *Ochsenbein v. Papelier* (1873) L.R. 8 Ch.App. 695. In contrast to the procedural rules relating to English judgments, the court will investigate an allegation of fraud even though the same facts were investigated and the same issues debated in the foreign courts. It will even allow what is C effectively a retrial in England, notwithstanding that the plaintiffs deliberately refrained from adducing at the original trial the facts upon which the allegation of fraud is based: see *Syal v. Heyward* [1948] 2 K.B. 443. Mr. Leckie, however, points out that all the authorities on foreign judgments obtained by fraud are cases in which the fraudulent party has sought to rely on the judgment he has obtained. He submits that it is only in such a case that the English court will treat the foreign judgment as of no effect. Indeed in one of the leading cases, D *Abouloff v. Oppenheimer & Co.* (1882) 10 Q.B.D. 295, the ratio of the decision of the Court of Appeal was that a foreign judgment obtained by the fraud of the party who subsequently seeks to enforce it by an English action will not be enforced by the English court and Lord Coleridge C.J. gave as the justice for the proposition the rule that no man shall take advantage of his own wrong. But the rule goes wider than that: it extends, for example, to a case where the fraud is on the part of the foreign court pronouncing the judgment. In *Dicey &* E *Morris, The Conflict of Laws* 10th ed. (1982), vol. 2, p. 1081, r. 187 is expressed in the following broad terms:

> "A foreign judgment (other than a Scottish or Northern Irish judgment extended to England under the Judgments Extension Act 1868) relied upon as such in proceedings in England, is impeachable for fraud. Such fraud may be either (1) fraud on the part of the party in whose favour the judgment is given; or (2) fraud on the part of the court pronouncing the F judgment."

Although in one sense the judgment in the Bahamas was against B.C.B., in another and more real sense that part of the judgment which consisted of the agreement which mitigated the effect of the money judgment against B.C.B. was in favour of B.C.B. Only in respect of foreign judgments in rem where third parties are affected is the mere possibility of a different rule recognised by the editors. In the *Ochsenbein*'s case, L.R. 8 Ch.App. 695, 698, Lord G Selborne L.C. cited with approval the remarks of Shadwell V.-C. in *Price v. Dewhurst* (1837) 8 Sim. 279, 302–303:

> "This, I apprehend, I am at liberty to do, namely, to see whether a judgment obtained abroad has been fraudulently obtained or not; and I apprehend that, if the court finds that certain proceedings abroad have been fraudulent, then it is at liberty to deal with the parties it finds before it, and the subject it has to administer, just in the same manner as if the foreign H judgment had never taken place."

The authorities thus show that the courts have consistently been prepared to go behind fraudulent foreign judgments where reliance is sought to be placed on them in the English courts.

310. Mr. Leckie advanced two further arguments against allowing the plaintiffs to go behind the Bahamian court order. One was that the plaintiffs have relied on the validity of the order on several occasions, most notably when

they successfully petitioned for the winding up in the Bahamas of B.C.B., relying on B.C.B.'s failure to perform its obligations under the agreement of 13 April 1973. I confess that I have been troubled by this, and I think that in an appropriate case the court must be able to refuse to go behind a fraudulent foreign judgment, for example when it would be unconscionable for the plaintiffs to assert that the judgment was fraudulent, having regard to their subsequent conduct. But the plaintiffs when petitioning for the winding up of B.C.B. did not have the knowledge that the flowchart was subsequently to bring, and therefore, though with some hesitation, I reject the first argument. Mr. Leckie in his second argument also relied on the fact that the agreement of 13 April was not only part of an order but was in its own right an agreement. He submitted that an agreement procured by fraud is voidable, not void, until proceedings to set it aside had been brought successfully and will not be set aside if it has been affirmed. It would indeed be strange if an agreement of which the proper law was not English and which did not have the sanction of an order made by a court of competent jurisdiction had to be treated by the English court as valid notwithstanding that the court was satisfied that the agreement had been procured by fraud, when, for example, a consent order made by the foreign court could be impeached before the English court for fraud. But Mr. Leckie cited no case on the point and he has not satisfied me that the general principle that fraud unravels all is inapplicable in a case where, as against the defrauded parties, reliance is sought to be placed on a foreign agreement shown on have been fraudulently procured even if the agreement has previously been relied on by the defrauded parties but at a time when they lacked knowledge of the fraud.

311. In this state of the authorities and in view of my finding that fraud was practised in the obtaining of the order and the agreement in the present case, it seems to me that I am at liberty, and ought, to apply the basic principle that fraud unravels all. I do not think it right to deny the defrauded parties who have satisfied me that fraud was practised the ordinary consequences of the application of that principle in English proceedings in which reliance is sought to be placed on the order and agreement as against the defrauded parties, particularly as it leaves unaffected S.G.'s right to contend that it lacked the necessary knowledge of that fraud.

*Fraudulent design*

312. The plaintiffs submit that the Vesco group (meaning thereby Vesco, Strickler, Straub, LeBlanc, Graze, Meissner and Clay) conceived and implemented a dishonest and fraudulent design for misappropriating the moneys of the funds to their own use and benefit, that the implementation of that fraud necessitated the systematic breach by members of the Vesco group and by those conspiring with them (including Morales) of the duties which they owed both to the funds and to the other entities including B.C.B. of which they were officers or over which they exercised control and that in authorising the withdrawal of the funds' moneys from the B.C.B. account with S.G. the signatories for B.C.B. were acting for their own fraudulent ends in breach of their duties to B.C.B. and in breach of B.C.B.'s obligations to the funds. The plaintiffs plead that from not later than the end of 1971 and the beginning of 1972 the Vesco group were participants in and actively implementing a previously conceived fraudulent and dishonest conspiracy to defraud the funds and the shareholders in the funds and in I.O.S. companies, and they plead that the scheme implemented by the Vesco group had four main specific purposes: (a) the creation of the illusion that Vesco, who had obtained control of the I.O.S. complex through the medium of I.C.C., had relinquished such control whilst in fact control of the I.O.S. complex was transferred to shell companies outside the United States controlled by members of the Vesco group; (b) the transfer of the effective control of the cash and moneys and securities of the funds from Crédit Suisse and Bank of New York to O.D.B. Lux and B.C.B., newly formed and thinly capitalised banks controlled by the Vesco group, or to American National, a bank now well

qualified to control moneys and securities of the funds; (c) the virtually complete liquidation by sale of the funds' portfolios of readily marketable United States securities; and (d) the wholesale looting of the assets of the funds by the removal of the proceeds of such liquidation and other moneys of the funds to entities outside the United States controlled by members of the Vesco group for the purpose of being there used in and to further the personal interests and pursuits of members of the Vesco group to the loss and damage and detriment of the funds and of investors in the funds.

313. Mr. Leckie has been at pains to stress to me that it is no part of his brief to defend or excuse Vesco or any other member of the Vesco group. He accepted the main substance of sub-paragraphs (a), (b) and (c) of the last paragraph and also that some of the transactions entered into with fund moneys must be taken to be fraudulent, but he submits that there is insufficient evidence to enable the court to hold that there was such a fraudulent design as the plaintiffs contend, and in particular that there was any such design which encompassed the $4m. with S.G. He says that the court should be especially cautious in reaching findings of such a serious nature in the absence of all the alleged conspirators both as parties to and even as witnesses in these proceedings. I wholly accept the need for caution in these circumstances. Nevertheless, if on the evidence before me I find that the allegation of fraud is made out, then it is my duty so to hold.

314. I have set out at considerable length the history of this matter in the earlier part of this judgment. It shows to my mind that Vesco was the dominating figure in the I.O.S. complex from September 1970 onwards, even after he had purportedly relinquished control in March 1972. In the words of Daniels, Vesco finally determined what happened to the various I.O.S. companies like B.C.B. Obviously an able man, he was also ruthless and quite prepared right from the start of his involvement with I.O.S. to use I.O.S. assets, including fund moneys, to further his own purposes. In my judgment the history reveals a pattern of events in the course of which control of the major part of the I.O.S. complex was systematically transferred to entities outside the United States and large parts of the assets of the funds were similarly removed from the jurisdiction of regulatory authorities like the S.E.C. to go to destinations where they could be freely used by Vesco and his associates. Daniels recalled a time when as an assistant with I.O.S.'s English solicitors, Freshfields, there was speculation among the advisers as to which of the many companies in the I.O.S. complex would "end up with the goodies." He said that the advisers' belief was that the decision would be made by Vesco and there was no serious belief that "the goodies" would be placed in their ultimate destination in the best interests of the investors who provided the money.

315. When the particular transactions involving the use of fund moneys are considered, I am left in no doubt but that the pattern was both deliberate and dishonest. Each of the "investments" in Global Holdings and Global Financial, Inter American, San Cristobal, E.H.G. and Vencap and the projected investment in Paradise Island followed the realisation of ordinary dollar investments on a large scale and involved taking a risk with fund moneys which no honest director could have believed was for the benefit of the funds or of those investing in them, and in particular these transactions inevitably prejudiced the rights of the shareholders in the funds to have their shares redeemed. Time after time the funds parted with large sums of money for securities which were usually without voting rights, offering unattractive returns and scant hope of capital appreciation and were unmarketable. The transactions were not arm's length transactions. The heavy involvement with Costa Rica, as witness the San Cristobal and Inter American transactions (as well as the purchase by P.R.L. of Costa Rican bonds), is explicable in my view only by Vesco's desire to provide himself with a base there secure from regulatory agencies. The use of O.D.B. Lux as depository and in particular of B.C.B. as the sub-depository of vast sums of money again involved the taking of a major risk with the moneys in question. Daniels in cross-examination said that it occurred to him in early 1973 that neither O.D.B.

A Lux nor B.C.B. was a suitable receptable for so much money or for the functions imposed on each of them. B.C.B. in particular was not only thinly capitalised but also not in a healthy financial condition in October 1972 nor at any time thereafter. Though at least some of its junior officials, like Irene Pollington who gave evidence before me, were undoubtedly honest, B.C.B. was under the control of LeBlanc and Vesco who were thereby able to control the moneys of the funds deposited with B.C.B. so that they might be used for
B whatever purposes they thought fit. The secrecy laws affecting banks in the Bahamas meant that the Bahamas offered advantages to those who, with dishonest intentions, controlled a Bahamian bank like B.C.B.

316. I have already held that the substitution of non-trust assets for trust assets by the order of 12 April and agreement of 13 April was fraudulent. It was designed to enable B.C.B. to have the free use of trust assets, including the $4m. with S.G. not subject to injunctions, for which were to be substituted moneys of B.C.B. already subject to injunctions and debts owed by B.C.B. The
C removal of the $4m. to Panama (like the similar removal of the $10m. of fund moneys from the Algemene Bank) to an account for B.C.B. (through a nominee) and free of the trust label was part of the dishonest pattern. Panama with its secrecy laws was also a good place for those with dishonest intentions to deposit trust moneys. As Pollack in examination said of the attempts made by the S.E.C. to obtain information in Panama about I.O.S. moneys:

D "We were unable to obtain information in Panama either from the equivalent authorities to the [S.E.C.] or from the banks, again because of the purported secrecy, and Panama was therefore being used as an intermediary step in concealing the movement of securities and funds."

317. Vesco was throughout aided and abetted by his two chief henchmen, Meissner and LeBlanc. Meissner, who accompanied Vesco onto the board of I.O.S. at the outset, was placed by Vesco in charge of, and was the man in
E control of, the funds and their management companies, and I have already recounted the part Meissner played in the various transactions effected with moneys of the funds. LeBlanc, who was brought into I.O.S. in the summer of 1971, became its chief financial officer and was put in charge of I.B.L. and B.C.B. as well as other important entities like Global Holdings and Global Financial, in which fund moneys were invested, and Trident Bank which managed fund moneys received via Inter American and Phoenix. I have already
F held that LeBlanc and Meissner were deliberately dishonest in relation to the substitution of non-fund moneys for fund moneys in the agreement of 13 April.

318. The other members of the Vesco group, Strickler, Straub, Graze and Clay, were all placed by Vesco in important positions in the I.O.S. complex. Strickler acted as a director of I.O.S. of three of the management companies (including I.I.T. Management), and of T.F.S., and of F.O.F., Prop and Growth as well as of I.P.I. and Kilmorey and president of H.F.S., Straub, another
G coming from I.C.C. with Vesco, acted as a director of I.O.S., Venture, I.B.L., Gulf Stream and B.C.B. Graze was a director of T.F.S. and occupied the key position in Incap. Clay, described by Daniels as a very loyal henchman of Vesco, was till April 1973 president and director of each of V.C.L., I.P.I. and P.R.L., and was a director of B.C.B. and O.D.B. Lux. Morales too in 1973 occupied important positions as director and vice-president of V.C.L., P.R.L. and I.P.I., and as a director of I.B.L. and B.C.B., and I have recounted the
H part he played in procuring the movement of the $4m. from S.G. to Panama. None of these persons can, I think, be described as a prime mover in the conception or implementation of the dishonest design. But Straub and Morales, as directors of B.C.B. with access to the books of B.C.B. must be taken, like LeBlanc, to have been aware of what they were doing in causing the $4m. to be moved from S.G. to Panama.

319. In the light of all the facts put before me I reach the conclusion that (a) there was a fraudulent and dishonest design on the part of Vesco, Meissner and LeBlanc involving the misappropriation of moneys of the funds, (b) such

design encompassed the $4m. deposited by B.C.B. with the defendant and moved by B.C.B. to Panama, and (c) Straub and Morales with LeBlanc as the directors of B.C.B. who caused the movement of the $4m. from the defendant to Panama to be held by a nominee of B.C.B. for B.C.B.'s own purposes knew of and participated in that design, so that to that extent the fraudulent design can be said to be theirs. A

*Assistance* B

320. Did S.G. assist in the fraudulent and dishonest design? This question can be answered shortly in the light of the facts which I have found. In my judgment the defendant did provide such assistance. Having received moneys from B.C.B. with a trust account designation the defendant obeying the instructions which it received from the directors of B.C.B. to move those moneys to an account which did not have that designation on the basis that they were not trust moneys and to a country, Panama, used to conceal the movement C of fund assets.

*Knowledge*

321. The plaintiffs submit that S.G. knew on 10 May 1973, (i) that the B.C.B. account was a trust account designated as such, that B.C.B. was acting as a trustee or fiduciary and that the funds were the ultimate owners of the D moneys in that account, (ii) that there was on foot a dishonest and fraudulent design for misappropriating the moneys of the funds including the $4m. with S.G., and (iii) that in permitting the $4m. to be sent to Panama it assisted in that design. They say that S.G. knew of these matters in the sense that (a) it knew of circumstances which would have indicated the facts to an honest and reasonable banker (type (iv) knowledge); (b) it wilfuly shut its eyes to the obvious (Nelsonian knowledge); (c) it wilfully and recklessly failed to make such inquiries as an honest and reaonable banker would have made (type (iii) E knowledge); (d) alternatively it failed to make such inquiries as an honest reasonable banker would have made (type (v) knowledge). Mr. Price submits that the relevant inquiries would have given S.G. knowledge of the relevant facts. It is common ground that the individuals in S.G. whose knowledge can be taken to be the knowledge of S.G. are Roche and Widdrington. In considering the question of knowledge it is particularly important that I put out of mind what is now apparent only with the benefit of hindsight and I must judge this F question in the light of the circumstances prevailing at the relevant time.

322. I deal first with the submission that S.G. had type (iv) knowledge. It is clear that prior to the receipt by S.G. of the three telexes and letter of 13 April 1973, S.G. had actual knowledge that the B.C.B. account was a trust account designated as such, because B.C.B. had expressly told S.G. that. Once S.G. had received the sub-depository agreement as the document put forward by B.C.B. as the trust document, it knew that B.C.B. was accepting that in relation to the G moneys in the trust account B.C.B. was the fiduciary and that the funds were the beneficial owners. But the assertion by B.C.B. in the letter of 13 April that the court order effectively released the $4m. was not a claim that S.G. could dismiss. Indeed, as I have held, it was in fact an accurate assertion, subject only to the effect of fraud in the procuring of the order and the fact of that fraud could not have been a circumstance of which S.G. had actual knowledge. As against B.C.B.'s claim S.G. was told by Stoltenberg that the $7m. of which the H $4m. formed part belonged to Venture and F.O.F. The claim of B.C.B. and the claim of the funds asserted by Stoltenberg must in my view have had the effect of converting what prior to the Bahamian order S.G. could accept as the fact of the trust into a doubtful equity the subject of rival contentions.

323. Mr. Price relies on the allegations in the Securities and Exchange Commission [S.E.C.] complaint and memorandum of which S.G. was aware by reason of Widdrington's perusal of the affidavits and exhibits served on the defendant at the hearing of the motion in the P.R.L. proceedings. Mr. Price

says that in the circumstances the allegations were of such strength and quality that they must be taken as true. The Securities and Exchange Commission was an independent statutory body, unlike the ordinary private litigant with a private interest in the litigation, the allegations were made after considerable investigations and were backed by evidence referred to in the memorandum, its conclusions had been reported and commented on in the English press and there had been no libel proceedings. Despite my ready acceptance of the great weight that the honest and reasonable banker would attach to the allegations by the Securities and Exchange Commission, in my judgment those allegations which at the material time in April and May were the subject of the then current hearing in the New York court remained allegations and not facts and, as is recited in the order made by Judge Stewart of 10 May, that court had not made any determination as to whether any defendant to the Securities and Exchange Commission's proceedings had engaged in any wrongdoing. In my judgment the circumstances actually known to S.G. would not have indicated to the honest and reasonable banker the existence on 10 May of the trust or the existence of the fraudulent design and consequently they would not have indicated that S.G. by obeying its instructions was assisting in that design. Accordingly I reject the plaintiff's submissions on type (iv) knowledge.

324. For similar reasons the plaintiffs' submissions that S.G. wilfully shut its eyes to the obvious must fail. The facts of the trust, the fraud and the assistance were not obvious. Nor in any event can I accept that there was any wilfulness on S.G.'s part in failing to recognise the trust, the fraud and the assistance. Mr. Price's submission on this and that part of his submission on type (iii) knowledge that alleges wilfulness and recklessness on the part of S.G. in failing to make inquiries were based on Widdrington's own evidence as to his state of mind on 10 May. Widdrington in cross-examination admitted that on 4 May when he told Beer & Partners by his first letter of that date that he had reconsidered the legal position, the $4m. were still in a labelled trust account—the current trust account—and that he was uneasy about the duties of inquiry which that label might impose upon S.G. Yet with no further information coming to S.G. (save for the indication that Daniels thought O.D.B. Lux could not bring proceedings against S.G. and that O.D.B. Lux would not be bringing such proceedings), and without waiting for any answer from Beer & Partners to his inquiries in that first letter, Widdrington caused S.G. to pay the $4m. I have set out in paragraph 221 Widdrington's evidence as to his thought processes at the relevant time. He was mistaken in inferring that Daniels would have passed on to Stoltenberg what Widdrington had said to Daniels, but that inference was not irrational. I accept that Widdrington felt some disquiet but I also accept that he was genuinely of the view that the absence of a claim meant the $4m. were not trust moneys. Whatever might be said of the judiciousness of Widdrigton's conduct, in my judgment he cannot properly be accused of wilfulness in failing to recognise facts or wilfulness or recklessness in failing to make inquiries. On the contrary, having seen him in the witness box, I am satisfied that he is not a rash or impetuous man but was genuinely and conscientiously concerned as to whether the moneys in S.G. were trust moneys. Indeed he would have welcomed an adverse claim. If there was a failure to make inquiries (and I examine this question next) it was not wilful or reckless. I accordingly reject the plaintiffs' submissions based on Nelsonian knowledge and type (iii) knowledge.

325. What inquiries, if any, ought S.G., by the standard of the honest and reasonable banker, to have made which would have given S.G. the requisite knowledge? Mr. Price submits that S.G. was put on inquiry and should have made inquiries to obtain knowledge that the moneys remained trust moneys and knowledge of the fraud. If it obtained such knowledge, it would, I think, have knowledge of its assistance in the fraud as ex hypothesi it would know that the fraudulent design extended to the $4m. Adapting Brightman J.'s statement in *Karak Rubber Co. Ltd. v. Burden (No. 2)* [1972] 1 W.L.R. 602, 630, of circumstances putting a bank on inquiry, Mr. Price submits that in relation to the question whether S.G. was on inquiry as to the fraudulent design, it is

necessary to consider (i) first and foremost whether the operation was consonant with the normal conduct of business or unusual and out of the ordinary course of business; (ii) the magnitude of the transaction; (iii) the time and opportunity available to S.G. for making inquiry, and (iv) the degree of suspicion which the known facts would have provoked in the mind of a reasonable banker, always allowing for the prima facie assumption that men are honest. I accept that these are matters to be considered both in relation to knowledge of the trust as well as of the fraud. I deal with these matters in turn.

326. (i) Was the transaction which S.G. was instructed to complete unusual? For S.G. there were some highly unusual happenings before it completed the transaction. Interbank deposits had been received labelled "trust account" for the first time in S.G.'s very considerable experience of the interbank market and this unusually had led to the deposits being brought to the attention of Roche who had insisted that the two deposits could not be safely amalgamated as they might belong to different trusts. Roche by 11 April had linked the B.C.B. deposits with the earlier deposits made by P.R.L. which, again unusually, had been brought to Roche's attention, which had been the subject of injunctions in New York and also in London in proceedings to which the defendant had been made a party and which had been the subject of a transatlantic telephone call from the Securities and Exchange Commission—again an unprecedented event for S.G. Roche had been so concerned about the B.C.B. deposits that in that telephone conversation he broke the bank's customary secrecy to volunteer to the Securities and Exchange Commission the information that S.G. held the $7m. deposit from B.C.B. and the commission expressed an interest in that deposit. Roche linked the B.C.B. deposit with I.O.S., the scandal about which he had heard; indeed had he known that the deposits were connected with I.O.S. he would not have accepted such moneys. The telex and letter instructions of 13 April required $4m. of the $7m. deposit—as well as the interest on the whole of the $7m. including the $3m. remaining as trust moneys—to be treated as free from any trust. This, S.G. was told, was the effective result of a Bahamian court order so that S.G. knew that the deposits had been the subject of litigation. Further the instructions were that the contract of deposit be broken—again an unprecedented event for an interbank deposit in S.G.'s experience—and B.C.B. was prepared to incur an unquantified penalty. S.G. was also instructed to send the $4m. via the National Westminster Bank Ltd., to an account with Banco Nacional de Panama. Thus the instructions were for S.G. to send to the same bank as S.G. had been instructed to send the $4m. from the P.R.L. deposits. S.G. took the unusual step of consulting counsel on whether it should comply with its customer's instructions. When S.G. attempted to carry out those instructions, the National Westminster Bank refused because of the injunction in New York and S.G. had to seek further instructions which came in remarkable alternative form; this showed that it was expressly contemplated that further difficulties might be experienced. The second of the two alternatives would in any event not have been acceptable to the defendant. The first of these alternatives showed the ultimate recipient to be not B.C.B. but another company, itself an unusual circumstance, and the route to be via Algemene Bank, and S.G. took the trouble to check in advance whether the instructions were acceptable to that bank. Further S.G. had received the information from Stoltenberg, apparently backed by solicitors of such eminence as Simmons & Simmons, that all the $7m. were trust moneys.

327. (ii) The magnitude of the transaction was not out of the ordinary for S.G. in its dealings on the inter-bank market. Nevertheless that sum of $4m. is sufficiently large to make any bank careful to see that in obeying instructions to more that sum it was acting properly. This is the more so when the bank was being asked to treat what was previously placed on the customer's own instructions in a trust account as free money which the customer could dispose of at will.

328. (iii) The time available for S.G. to make inquiries commenced with the receipt by S.G. on 16 April of the first instructions by telex to transfer the $4m.

A It knew that it had at least until 24 April when the deposit matured to make inquiries. The refusal by the National Westminster Bank of its payment instructions gave S.G. further time pending the receipt of further instructions. However the moneys were thereafter on call in the current trust account. From the receipt on 4 May of those further instructions, S.G. was under some pressure of time. With modern communications systems available to S.G. it had the opportunity to make inquiries of whomsoever it thought appropriate. But as B a practical matter the opportunity to make inquiries was greater in relation to those with whom it was already in communication or had meetings in London and in relation to its customer B.C.B. which in any event had English solicitors through whom inquiries could be made.

329. (iv) It is to my mind manifest that S.G. came under a duty of inquiry on receipt of its first instructions on 16 April to treat the $4m. as free from trust. The receipt of such instructions in the circumstances which I have recounted would have put the honest and reasonable banker on inquiry as to whether C those instructions were the true instructions of its customer and were not improper. Mr. Leckie does not dispute that S.G. came under that duty. He submits that S.G. discharged that duty by making appropriate inquiries. It sought and obtained from B.C.B. the main documents relevant to B.C.B.'s assertion by telex and letter of 13 April that the $4m. were effectively released by the order of 12 April—(together with the agreement of 13 April). On the advice of counsel, S.G. obtained proof that the instructions of LeBlanc, Straub D and Morales were the instructions of B.C.B.'s proper representatives. The first paragraph of Widdrington's notes which went to counsel may well have suggested to counsel, as Mr. Price pointed out, that S.G.'s real concern related to the question whether S.G. could be sure it had instructions from the duly authorised representatives of its customer rather than to the more substantial question whether the moneys were no longer trust moneys. I very much doubt if Mr. Bradburn adequately directed his mind in the time available to the latter E question. There was no discussion at the conference as to whether, and if so how, the moneys ceased to be trust moneys. Such reliance as Widdrington and hence S.G. placed on counsel's advice as comprehending this question seems to me to have been misplaced. I do not think that much direct reliance was placed by Widdrington on the order and agreement as freeing the $4m. from trust. It is true that Widdrington wrote against the telex instructions of 13 April relating to the $4m., "effect of Bahamas injunction." But that does not appear to have F been a considered view of his, and as he said in evidence, the absence of any reference in the order and agreement to the $4m. with S.G. made an impact on him when he read those documents and he had it in mind that there might have been a mistake concerning the amount of the funds with all the banks. S.G. in deciding that it could obey its customer's instructions as counsel had advised appears to have done so without a proper appreciation of reasons which might have justified it in so doing.

G 330. Although I am primarily concerned with the question whether S.G. remained under a duty of inquiry, on 10 May and between 16 April and that date there occurred the important events of 3 and 4 May, which Mr. Price submitted would put S.G. on inquiry if it had ceased to be on inquiry before that date, it is helpful to consider whether S.G. ceased to be under a duty of inquiry after 16 April and before 3 May. I must apply an objective test to this question. The honest and reasonable banker would accept, from the trust H account designation imposed by B.C.B. on the account containing the $4m. and from the sub-depository agreement supplied by B.C.B. as the relevant trust document, that the $4m. were trust moneys and did not belong to B.C.B. at any rate prior to the order of 12 April. But he would also have seen that order and the agreement of 13 April as well as the copies or transcriptions exhibited in the P.R.L. proceedings of the earlier orders made in the Bahamas proceedings, and he would have in mind B.C.B.'s claim that the $4m. were effecively released by the order of 12 April. The word "released" implies that the $4m. were previously subject to a restriction and it may well be that the honest and reasonable banker

would have sought confirmation of this from B.C.B., and if sought there is no reason to suppose that such confirmation would not have been forthcoming or, when it came, not accepted. I think it probable that the honest and reasonable banker would have regarded as significant the absence from the order and from the agreement of 13 April of any reference to the $4m. S.G. knew of O.D.B. Lux's role in the Bahamas proceedings in recovering judgment in respect of moneys derived from the funds and knew of the functions under the sub-depository agreement of O.D.B. Lux as, in Widdrington's words, "the main controlling party to the trust," yet O.D.B. Lux had concerned itself in its communications with the defendant only as to the $3m. held in the designated trust account. In my judgment the honest and reasonable banker would have accepted B.C.B.'s claim as correct, as was the fact, as I have held, subject only to the effect of the fraud practised in procuring the order and agreement. Should S.G. have made inquiries to ascertain on what basis of law the $4m. had been released or whether the order and the agreement had been fraudulently obtained? Mr. Price has stressed the fact that the agreement was signed by LeBlanc and Meissner who were two of the persons named as defendants in the Securities and Exchange Commission's proceedings and against whom such serious allegations had been made by the commission. But the fact of those proceedings appeared expressly in paragraph 8 of the agreement, and the Bahamian court must be taken to have been aware of that fact, yet it had directed the parties to execute the agreement. In my judgment the reasonable banker would be entitled to assume, and would assume, that the order of a court of competent jurisdiction had been duly obtained and that the agreement which the court had directed to be executed was therefore a proper one. Mr. Price has suggested, primarily in relation to the question wheher at 10 May S.G. was under a duty of inquiry, a number of inquiries that the honest and resonable man would have made and no doubt he would suggest that most if not all of those inquiries should have been made at the earlier stage. It is convenient to deal with this point later, but subject to that point in my judgment S.G. would have ceased to be under a duty of inquiry before 4 May.

331. The receipt on 3 May of Stoltenberg's information, supported as it was by Daniels on behalf of O.D.B. Lux, again, in my judgment, put S.G. on inquiry. The specific claim that the $7m. with S.G. belonged to two of the dollar funds in specific proportions was consistent with what Widdrington knew of the sub-depository agreement, though inconsistent with B.C.B.'s assertion that $4m. were effectively released by the Bahamian court order. The reasonable banker would not in my view have disregarded Stoltenberg's information without further inquiry, particularly in view of the background of suspicious circumstances which I have described. What Widdrington did was in effect to make inquiries of the funds through Stoltenberg, of O.D.B. Lux through Daniels and of B.C.B. through its solicitors, Beer & Partners as to whether there was substance in that information.

332. S.G. had no contact with any of the funds and in my judgment it was reasonable for Widdrington, suspicious as he justifiably was of information coming from a person claiming to be connected with I.O.S. but not poviding any documentation or other proof of his information, to suggest to Stoltenberg that if no claim was made S.G. would have to act on B.C.B.'s instructions and that if Stoltenberg wanted to do anything about it he should obtain legal advice. In effect therefore Widdrington was inquiring whether the funds would make a formal claim. Stoltenberg was not in fact an employee of or officer of the funds, though as an employee in the I.O.S. complex he had important responsibilities relating to the moneys of the funds, and it is clear from his action, taken with the encouragement of Cobb, a lawyer of the American firm of Steptoe & Johnson who acted for the management companies, that he felt he could intervene on behalf of the funds. In my view it was reasonable for Widdrington to assume that Stoltenberg, having taken the trouble to intervene, would, if his information had substance, cause the management of the funds to be informed. Daniels too expected Stoltenberg to tell the funds' management, and via Cobb

that is what Stoltenberg did do. Widdrington at one stage in his cross-examination said that at the time when on 9 May he heard from Daniels' secretary that O.D.B. Lux would not be bringing proceedings, he could not really remember whether he had in mind the possibility of a claim by the funds. But given the fact that Widdrington had told Stoltenberg that in the absence of a claim S.G. would comply with the instructions of its customer and that S.G. had on 3 May already been asked by B.C.B. to transfer the moneys to the Caribbean, the absence of any claim by the funds by 10 May would in my judgment have been treated by the reasonable banker as significant.

333. It is clear that what chiefly persuaded Widdrington that the moneys were not trust moneys was the communication from Simmons & Simmons on 9 May. Mr. Price has understandably laid stress on the fact that Widdrington knew that Daniels acted only for O.D.B. Lux and did not represent any of the funds, that the letter from Daniels of 4 May to Widdrington shows that Daniels was not purporting to act for the funds and was representing that O.D.B. Lux was quite separate from the funds, and that when Daniels indicated to Widdrington on 9 May that Daniels' opinion was that his client did not have a claim in law against S.G., both Daniels and Widdrington knew that Daniels' client was O.D.B. Lux and not the funds. But Widdrington had told Stoltenberg, as Stoltenberg reported to Daniels, that Widdrington wanted guidance from O.D.B. Lux, as having custodial responsibility, and O.D.B. Lux, as Widdrington knew, had been the plaintiff in the Bahamas proceedings in which it sought to recover for the benefit of the funds their moneys deposited with B.C.B. In my judgment it was reasonable that Widdrington should ask of Daniels, as representing O.D.B. Lux and as having made himself known to S.G. by supporting Stoltenberg's information, first further information to substantiate Stoltenberg's assertion and second to inquire whether O.D.B. Lux would be making a claim. Widdrington had perused the sub-depository agreement which had been held out by B.C.B. as the trust document. He knew from that document that O.D.B. Lux was the main depository of the moneys of the funds and "the main controlling party to the trust," that B.C.B.'s role as sub-depository was to assist O.D.B. Lux in its duties and that B.C.B. had to act on instructions from O.D.B. Lux and to account to O.D.B. Lux. Widdrington knew from Daniels' letter of 4 May that their Bahamian correspondent lawyers were making inquiries of B.C.B. in the Bahamas. The reasonable banker would assume that when on 9 May Simmons & Simmnons not merely said that O.D.B. Lux would not be bringing proceedings but also volunteered their opinion that O.D.B. Lux had no claim in law, they were also expressing their view on all the facts known to them including the answers to their inquiries that the moneys were not trust moneys. In my judgment the reasonable banker would have accepted that communication as confirmation of the like claim which B.C.B. had already made by its letter of 13 April. It is the funds' misfortune that Daniels should on 9 May have expressed himself as categorically as he did. He took no point (though my view he would have been justified in taking the point) on the inadequacy of Widdrington's arbitrary time limit. He knew that both Stoltenberg and Widdrington looked to him as the representative of O.D.B. Lux with its custodial reponsibilities relating to moneys of the funds. Daniels frankly admitted in cross-examination that with hindsight it would have been wiser to have told Widdrington that although he had asked for information to confirm Stoltenberg's assertion there had been no reply thus far. But the judiciousness of Daniels' conduct is not a matter with which I am concerned.

334. The other inquiry that was made was of B.C.B. by Widdrington's letters to Beer & Partners of 4 May. By these letters Widdrington sought two things. One was information as to the ownership of the moneys. The other was written authority from the funds and O.D.B. Lux for the transfer of the $4m.

However, unless the $4m. continued to be trust moneys held under the sub-depository agreement, Widdrington could not have insisted on the funds or O.D.B. Lux giving written authority for the transfer and I need not consider further the failure to insist on compliance with the final paragraph of

Widdrington's first letter of 4 May to Beer & Partners. Was Widdrington justified in not insisting on an answer to his question as to the beneficial ownership of the deposit before he paid away the $4m.? The first letter was written at a time when S.G. had yet to receive instructions in proper form from B.C.B., but it is clear from the same letter to Beer & Partners within the same day that, after such instructions had been received, Widdrington was then still insisting on a satisfactory answer to the first letter even if proceedings had not been started within the time limit that he imposed on O.D.B. Lux. Moreover Beer & Partners had by two separate letters in response to Widdrington's two letters indicated that they would be taking B.C.B.'s instructions thereon. They had not said that the inquiry was unreasonable or would not be answered. B.C.B. could hardly have complained had S.G. withheld payment pending receipt of an answer from B.C.B. Yet was there a duty on S.G. to wait for that answer? The reasonable banker would take account of the fact that the only persons who might have interests in the deposits, if Stoltenberg's information was correct, were two of the funds as beneficial owners and O.D.B. Lux in a fiduciary capacity, that O.D.B. Lux's eminent solicitors had expressed an opinion tantamount to saying that there was no trust, that Stoltenberg despite being aware that S.G. was instructed to transfer $4m. to the Caribbean and despite being warned that unless a claim was made the defendant would have to obey B.C.B.'s instructions and despite being advised to take legal advice had not, nor had the funds on whose behalf he had intervened, made a claim and that B.C.B., inquiries of which he might assume had been made by O.D.B. Lux's Bahamian lawyers, had already told S.G. that the $4m. were released by the Bahamian order. In these circumstances whilst Widdrington was, I believe, injudicious in not awaiting an answer from B.C.B. before paying I do not think he can be said to have failed in any duty.

335. The plaintiffs submit that there were other inquiries which S.G. should have made but did not make. They say that the honest and reasonable banker would have made inquiries not only of Stoltenberg, Daniels, B.C.B. and Beer & Partners but also of the Securities and Exchange Commission, Staple, National Westminster Bank, Barclays Bank, Warham, Rowe and Meissner and that such inquiries would relate not only to the existence of a trust but also to the fraudulent design. By this submission the plaintiffs to my mind contend for an impractically extensive duty of inquiry for a bank in the position of S.G.

336. I say again that a bank cannot be required to act the detective. Still less can it be required to act the judge. When matters not within a bank's actual knowledge are the subject of current litigation and the court which is seised of the litigation made no determination I cannot see that it can be the duty of the bank to make inquiries of either party making allegations in the litigation. To make an inquiry of the Securities and Exchange Commission would have been likely to produce a reaffirmation of the allegation; it would not have given the defendant actual knowledge of the fact of the fraud or of the trust. I should add in relation to the Securities and Exchange Commission that it is one of the surprising features of the case that the commission which under the Bridge order was kept regularly informed of the movement of moneys belonging to the funds, which had been told on 11 April of the $7m. with S.G. and which had told Roche that it would look into it, nevertheless never did anything further by communication with S.G. or otherwise to try to prevent the movement from S.G. of any part of that sum.

337. I can deal quite shortly with the suggestion that S.G. ought to have made inquiries of the other persons named. I do not see how it can reasonably be said to have been the duty of S.G. to make inquiries of Staple (the solicitor to the plaintiffs in the P.R.L. proceedings), National Westminster Bank (which had explained to S.G. its reasons for refusing to comply with first payment instructions), Barclays Bank (which had at S.G.'s request verified the signatures of two of the three B.C.B. directors), Warham (who had been involved with P.R.L. until his resignation at the end of March 1973) or Rowe (International Capital Investments Ltd.'s money market adviser who had sought and obtained

from S.G. on 3 May information about the B.C.B. deposit). Even if they had been prepared to divulge information I do not see that S.G. would reasonably have been expected to obtain or would in fact have obtained from those sources actual knowledge of the trust or the fraudulent design. The plaintiffs suggest Meissner as a person of whom inquiries should have been made because he was a signatory of the agreement of 13 April on behalf of the funds. In so far as this is a suggestion that S.G. should have inquired whether the agreement and order were procured fraudulently, I repeat that the reasonable banker would not have sought to go behind the court order. In so far as it is a suggestion that S.G. should have contacted the funds directly to see whether they would be making a claim, Meissner, who was universally regarded as having authority to take decisions for the funds and the management companies, between 4 and 6 May must have been consulted by Cobb following Stoltenberg's conversations with Cobb. Cobb whom Daniels regarded as taking a dominant position among the American lawyers acting for the funds and the management companies, is a lawyer against whom no criticisms have been levelled. As I have stated in paragraph 219, it appears that Meissner denied that the moneys were fund moneys and I think it probable that if S.G. had inquired of the funds directly, the defendant would have been told that, like O.D.B. Lux, the funds had decided to make no claim. I do not see that the reasonable banker would have been put on further inquiry by such answer.

338. In my judgment therefore in the circumstances S.G. had ceased to be under a duty of inquiry at the time it made payment. In case I am wrong in that conclusion, I shall consider two further questions. First, what answer would have been received had S.G. insisted on an answer to its inquiries of B.C.B. on 4 May, and secondly, would that answer have satisfied the honest and reasonable banker? Mr. Price relies on the contemporaneous reactions of one of the protagonists, Daniels, who did not, in response to Stoltenberg's information, say that the order had effected a substitution releasing the $4m. from the trusts but sought "confirmation" from the Bahamas that Stoltenberg's information was correct. He said in cross-examination:

> "I did feel that faced with this evidence that there was $7 million there and assuming that it was still on trust account that B.C.B. would have no option but to admit that if pressed by the appropriate authority."

I am not satisfied that such an admission would have been given in response to S.G.'s inquiry. Mr. Leckie relies on what in fact happened. B.C.B. had already told S.G. that the order had effectually released the $4m. Robertson, a member of the board of O.D.B. Lux had taken the matter up with LeBlanc on behalf of B.C.B., who is reported to have said that none of the funds in question could really be called trust moneys. That reply in that form would not have been satisfactory and would have put the inquirer on further inquiry. But it seems to me that on the balance of probabilities LeBlanc if pressed would have repeated the assertion in the letter of 13 April and would have said, as Meissner appears to have done, that the moneys were not fund moneys and that he would have relied on the order as having effectively released the moneys. I have already expressed the view that the honest and reasonable banker would have accepted that the order did have that effect. Accordingly in my judgment had Widdrington insisted on an answer to his inquiry of B.C.B. he would not have obtained knowledge of the trust, still less of the fraud, and I would therefore not have been prepared to attribute to S.G. constructive knowledge by reason of Widdrington's failure so to insist.

339. Mr. Price also submits that in addition S.G. ought to have made a systematic search of its own files containing press cuttings to see what light they might have thrown on the problem. But those cuttings contain allegations only, for the most part repeating those made in the Securities and Exchange Commission proceedings by the commission. They would not have given S.G. knowledge of any relevant fact.

340. In the result, in my judgment, S.G. did not have knowledge of any type of the continued existence of the trust or of the fraudulent design, nor hence, of its assistance in that design. It did not therefore become a constructive trustee. S.G.'s conduct in the handling of the $4m. is not beyond criticisms, in particular in the way in which it took counsel's advice without ensuring that he was fully instructed or that he had proper opportunity to give a considered opinion on the problems troubling S.G. and also in the way in which it abandoned its earlier insistence on an answer from B.C.B. to its inquiry as to the ownership of the moneys. It may well be that if Roche had kept himself informed in greater detail in the period after the advice of counsel was taken, he, as the cautious banker that he was, would have insisted that counsel's advice be taken again. It is very surprising that S.G. was content to leave so much responsibility to a young and inexperienced solicitor so new to the bank without greater supervision from its senior management. Nevertheless I reach the conclusion that S.G. was not a constructive trustee the more willingly because S.G. acted honestly throughout and in my view it can in no real sense be said to have been party or privy to the fraud being practiced in relation to the funds' moneys.

341. In view of my conclusions on the question of knowledge, the plaintifs' claim in equity must fail and it is unnecessary for me to consider three further lines of defence, viz., that the funds suffered no consequent loss, that the funds are estopped and that S.G. should be excused under section 61 of the Trustes Act 1925. But having heard full argument on these defences, I shall briefly express my views on the first two and I shall make brief comments on the section 61 defence.

342. Mr. Leckie submitted that in any event no loss resulted from S.G.'s action as distinct from the funds inaction. He says that the true cause of the loss to the funds was their failure to take any steps to prevent the movement of the moneys to Panama, whether by proceedings here or in the Bahamas. Further he submits that even after the moneys were moved to Panama, as they remained in the bank account there for a considerable time and were then traceable, no loss was suffered whilst they could have been traced. I cannot accept these submissions. In my judgment a trustee or other person holding trust property who wrongly removes money from the trust thereby causes immediate loss to the trust, whether that money remains traceable or not. Mr. Leckie's submission on this confuses the loss with a remedy for the loss. Nor does it seem to me right to say that it was the funds' inaction that caused the loss. The loss was the direct consequence of S.G.'s action in transferring the moneys from the trust account to a non-trust account in Panama.

343. Next Mr. Leckie submits that the plaintiffs are estopped from pursuing their claim for three reasons: (1) O.D.B. Lux was the agent of or trustee for the funds and the representations on 10 May by O.D.B. Lux that it would not be bringing proceedings against S.G. was made on behalf of and bound the funds; (2) the funds by consenting to the Bahamian order of 12 April and entering into the agreement of 13 April and taking no steps to set aside that order and agreement represented to S.G. that the sum of $4m. was not trust moneys; (3) the funds acquiesced in the transfer of the $4m. to Panama.

344. I cannot accept the first of these submissions. Daniels' communications to S.G. cannot properly be understood as containing a representation to the defendant that O.D.B. Lux was the funds' agent nor did S.G. understand O.D.B. Lux to be the funds' agent. Widdrington knew that O.D.B. Lux by its Bahamian proceedings had obtained judgment in respect of moneys belonging to the funds, but the sub-depository agreement—and in particular clauses 3(d) and 5(b) thereof—made clear that the funds as beneficial owners had rights independent of O.D.B. Lux. In my judgment when Daniels said through his secretary to S.G. that O.D.B. Lux was not bringing proceedings against S.G. he was not purporting to make and was not making and was not understood by Widdrington as making any representation that bound the funds.

345. I am prepared to give the funds the benefit of the doubt on the second submission on the footing that the representation said to have been made by the

funds was not sufficiently clear and unambiguous to found an estoppel. But the third submission is, in my judgment, sound. It is based on the test indicated by Oliver J. in *Taylors Fashions Ltd. v. Liverpool Victoria Trustees Co., Ltd. (Note)* [1982] Q.B. 133, 151, 152 as now being the appropriate test for, inter alia, estoppel by acquiescence viz., whether in particular individual circumstances, it would be unconscionable for a party to be permitted to deny that which, knowingly or unknowingly, he has allowed or encouraged another to assume to his detriment. Mr. Leckie submits that there was a duty on the funds to have made a claim and brought it to the attention of S.G. before it parted with the $4m. Widdrington had told Stoltenberg on 3 May that B.C.B. had asked for the transfer of the moneys to the Caribbean and that if no claim was made S.G. would have to pay the moneys away in accordance with B.C.B.'s instructions. Stoltenberg had then spoken to Cobb and Cobb had spoken to Meissner at the meeting in Luxembourg between 4 and 6 May, so that the funds knew that the moneys would be paid away in the absence of a claim, yet no claim was made by or on behalf of the funds to prevent S.G. acting to its detriment by transferring the moneys to Panama. Mr. Leckie relies on the statement in *Spencer Bower and Turner, Estoppel by Representation*, 3rd ed. (1977), p. 50 as apposite to the present facts:

> "56. Where a person, having a title, right, or claim to property of any kind, perceives that another person is innocently, and in ignorance, conducting himself with reference to the property in a manner inconsistent with such title, right, or claim, it is the duty of the former to undeceive the other party forthwith; if he omits to do so, and if all the other conditions of a valid estoppel are satisfied, he is precluded from exercising or asserting his right or title or claim as against such other party on any subsequent occasion. In such cases, the law follows the language of the church in the marriage service—'let him now speak, or else hereafter for ever hold his peace,'—and regards the absence of notice or protest as a representation of the absence of the right, title or interest which should have been the subject of such notice or protest."

In my judgment in the circumstances the funds were under a duty to give notice to S.G. that they were making a claim but they failed to do so. Thus although this is a case of mere passivity as distinct from encouragement on the part of the persons allegedly estopped, I would hold that the funds were estopped unless Mr. Price is right in submitting, as he does, that it is not unconscionable for the funds now to make the claim because at the relevant time they were under the control of the dishonest Meissner. Whilst I accept that the funds were under that control, in my judgment this is a factor internal to the funds and not one which ought to deprive an innocent third party, S.G., of the right to succeeded on its defence based on estoppel.

346. S.G.'s last line of defence is based on section 61 of the Trustee Act 1925. It pleads that it took the advice of counsel, acted on the advice of counsel, acted honestly and reasonably and ought to be excused. It is common ground that S.G. acted honestly and that in taking the advice of Mr. Bradburn it took the advice of competent counsel. Nevertheless it is clear that there is no right to automatic relief merely because a trustee took and acted upon apparently competent legal advice: see *Marsden v. Regan* [1954] 1 W.L.R. 423, 434, 435. For the reasons I have already given I do not think Mr. Bradburn was adequately instructed nor allowed sufficient time to give properly considered advice on the question whether the $4m. ceased to be trust moneys and this should have been apparent to Widdrington and hence to S.G. To the extent therefore that this defence is based on obtaining the advice of counsel, it is not well founded. However, that leaves the questions whether S.G. otherwise acted reasonably and ought fairly to be excused. I think it unprofitable to consider these questions on the hypothetical basis that contrary to my views S.G. was a constructive trustee and I shall say no more about them.

23-01165-mew Doc 106-3 Filed 07/03/25 Entered 07/03/25 17:38:30 Exhibit 2-2 Pg 46 of 49


*Negligence*

The second way in which the plaintiffs put their case is in negligence. They say that S.G. is liable for breach of a duty of care which it owed to the plaintiffs. This is a claim independent of the claim in equity, though there are important features common to both claims.

*The law*

348. It is trite law that the plaintiffs must establish that (1) S.G. owed the plaintiffs a duty of care, (2) S.G. committed a breach of that duty, and (3) loss resulted therefrom. Again there is much that is common ground between the parties on the applicable principles.

349. Mr. Price submits that where a paying bank is on notice that its customer is a fiduciary in respect of moneys in an account with the bank it owes a duty of care to the persons beneficially interested in those moneys, as soon as the bank is put on such notice. Mr. Leckie does not dispute this, and that concession was rightly made, in my view, in the light of *Ross v. Caunters* [1980] Ch. 297. In that case the intended beneficiary under a will recovered damages against solicitors who had prepared a will but negligently failed to warn the testator that the will should not be witnessed by the spouse of a beneficiary. Sir Robert Megarry V.-C. in determining the question whether a duty of care arose followed the two-stage approach laid down by Lord Wilberforce in *Anns v. Merton London Borough Council* [1978] A.C. 728. Lord Wilberforce in that case said, at pp. 751–752:

> "First one has to ask whether, as between the alleged wrongdoer and the person who has suffered damage there is a sufficient relationship of proximity or neighbourhood such that, in the reasonable contemplation of the former, carelessness on his part may be likely to cause damage to the latter—in which case a prima facie duty of care arises. Secondly, if the first question is answered affirmatively, it is necessary to consider whether there are any considerations which ought to negative, or to reduce or limit the scope of the duty or the class or person to whom it is owed or the damages to which a breach of it may give rise: . . ."

Sir Robert Megarry V.-C. held (1) that a solicitor who was negligent could be liable not only in contract to his client but also at the same time in tort both to his client and to others, (2) that a solicitor instructed by his client to carry out a transaction that will confer a benefit on a third party owes a duty of care to that third party in that the third party is a person within his direct contemplation as someone likely to be so closely and directly affected by his acts or omissions, that he can reasonably foresee that the third party is likely to be injured by those acts or omissions, (3) that the mere fact that the loss to such third party caused by the negligence is purely financial is no bar to the claim against the solicitor, and (4) that there were no considerations which sufficed to negative or limit the scope of the solicitor's duty to the beneficiary. If one then turns to the position of a bank which knows that an account with it is a trust account, in my judgment a bank which is negligent in transacting banking business in relation to the account may be liable not only in contract to its customer but also in tort to the customer and others. Further a bank instructed by its customer to pay moneys out of that account owes a duty of care to the beneficiaries interested in the account in that the beneficiaries are within the bank's direct contemplation as persons likely to be so closely affected by the bank's acts and omissions that it can reasonably foresee that the beneficiaries are likely to be injured by those acts or omissions. Also the mere fact that the loss to the beneficiaries caused by the negligence is purely financial is no bar to the claim against the bank. No considerations negativing or limiting the scope of the banker's duty to the beneficiaries have been suggested or occur to me.

350. In my judgment the scope of the duty of care owed by the bank to the beneficiaries extends at least this far, that the bank must exercise reasonable

care and skill in transacting banking business relating to that account and that such duty includes making such inquiries as may in the circumstances be appropriate and practical if the bank has, or a reasonable banker would have, grounds for believing that the customer or its authorised signatories are misapplying, or acting fraudulently in respect of, the trust moneys in that account. This much is, I believe, common ground between the parties. Mr. Price and Mr. Leckie are further at one in submitting that the circumstances which give rise to a duty of inquiry and the duties consequent on the arising of that duty are the same in relation to a claim in negligence as in relation to a claim that a person alleged to be a constructive trustee has type (v) knowledge. Mr. Price again submits that once the duty to inquire has arisen the bank is under a duty not to comply with its customer's instructions until the bank's suspicions which gave rise to the duty to inquire are dispelled. Again for the same reasons as I gave in paragraphs 280 to 284 in my judgment the duty not to comply with the customer's instructions will cease when the bank receives information which the honest and reasonable banker would accept, with the result that he is not put upon further inquiry. Thus if a bank while the duty to inquire subsists pays moneys out of the trust account and it can be shown that the loss is consequent on the failure to perform the duty of inquiry, the beneficiaries would be able to recover in negligence against the bank.

351. There was some debate before me on the question of foreseeability in relation to the duty of care. Mr. Price and Mr. Munby for the plaintiffs, founding themselves on *Overseas Tankship (U.K.) Ltd. v. Miller Steamship Co. Pty.* [1967] 1 A.C. 617, submit that what the court has to consider is whether there existed a real risk—even if less than a probability—that damage would be caused by the action of the person alleged to have been negligent and that if such risk did exist and was ignored and damage resulted that person would be liable in negligence. But in my judgment that overstates the true position in law. Lord Reid, at p. 642, referred to the celebrated case of *Bolton v. Stone* [1951] A.C. 850. In that case a bypasser in a public road had been injured by a cricket ball hit out of the adjacent cricket ground but had been held unable to recover damages in negligence, not because the risk was not real or foreseeable but because the risk was small. Lord Reid continued [1967] 1 A.C. 617, 642:

> "In their Lordships' judgment *Bolton v. Stone* [1951] A.C. 850 did not alter the general principle that a person must be regarded as negligent if he does not take steps to eliminate a risk which he knows or ought to know is a real risk and not a mere possibility which would never influence the mind of a reasonable man. What that decision did was to recognise and give effect to the qualification that it is justifiable not to take steps to eliminate a real risk if it is small and if the circumstances are such that a reasonable man, careful of the safety of his neighbour, would think it right to neglect it."

In the case the appellant whose engineers had without justification discharged oil into a harbour was held liable in negligence; the reasonable man would have known that there was a real risk of fire with consequent damage both foreseeable and probable and action to eliminate the risk would have presented no difficulty, involved no disadvantage and required no expense. Each case must turn on its own particular circumstances and in particular on what the reasonable man would have done in those circumstances. Every bank knowing that an account with it is a trust account can readily foresee that a drawing on that account, unless on its face a transfer to another account of the trust, might be in breach of trust with loss to the beneficiaries, a fortiori if the drawing is in favour of the trustee himself, but the plaintiffs do not, and in my judgment, could not reasonably suggest that the mere fact of a drawing on that account by a trustee even in favour of the trustee himself is sufficient to put the bank on inquiry and to subject it to a duty to withhold payment. Trustees frequently pay out of their own pocket expenses incurred on behalf of their trust and then reimburse themselves. The question is whether the reasonable banker would at the time of

payment in the light of the circumstances then known to him ignore the risk that it was a drawing in breach of trust.

352. In the present case, in my judgment, S.G. owed the funds a duty of care in that it knew, from the trust account designation placed by B.C.B. on the account, that B.C.B. recognised that it was fiduciary and that others were beneficially interested in that account, and it knew from the sub-depository agreement, proffered by B.C.B. as the trust document, that the beneficiaries were the funds. The plaintiffs repeat the submissions made in respect of the claim in equity that S.G. knew of the dishonest and fraudulent design and submit that in the circumstances S.G. owed the funds a duty not to make any payment in compliance with B.C.B.'s instructions in the absence of further information which might be elicited by inquiries—being the like inquiries which as they submitted in respect of the claim in equity, should have been made. They submit that in permitting the $4m. to be withdrawn without such further information, S.G. failed to exercise reasonable care and that loss has resulted therefrom.

353. For the reasons which I have already given in relation to the claim in equity, in my judgment by 10 May 1973, S.G. had come under a duty of inquiry but that duty ceased by that date. Accordingly S.G. was not negligent in transferring the $4m. to Panama. If that is wrong and S.G. remained under a duty of inquiry—and hence under a duty to withhold payment—by virtue of its failure to insist on an answer from B.C.B. to its inquiry as to the beneficial ownership of the $4m. no loss resulted from that failure, as, for the reasons given in paragraph 338 the answer that would have been received from B.C.B. would have been that the order of 12 April released the $4m. from the trust and that answer would not have put S.G. on further inquiry or required it to withhold payment further.

354. For these reasons I conclude that the plaintiff's claim in tort also fails. In my judgment for the like reasons given in paragraphs 343, 344, and 345 S.G. also succeeds in its claim that the funds having acquiesced in the transfer of the $4m. to Panama are estopped in respect of the claim of negligence.

355. S.G. also pleaded contributory negligence by way of defence. Mr. Leckie submitted that if there has been negligence on the part of S.G. no loss has been caused by S.G., the true cause of that loss being the failure on the part of the funds to take action to prevent the movement of the moneys. I cannot accept this. If S.G. was negligent in failing to withhold payment, the loss—constituted by the removal of trust moneys from the trust—seems to me to be the direct consequence of that negligence. Any failure on the part of the funds to take action to prevent payment would not in my view substitute that failure wholly or in part for S.G.'s negligence as the cause of the loss.

*Conclusion*

356. In the result despite the very real sympathy that I have throughout this case felt for the funds and their innocent shareholders in respect of the loss which they have suffered and notwithstanding the meticulous care with which, and the skilful and attractive manner in which, the plaintiffs have presented their case, I must dismiss this action.

357. I must not conclude without expressing my thanks to all who have taken part in this lengthy case the hearing of which did not end till its 108th day. Happily this is not a case in which the veracity of any witness or his or her willingness to assist the court has been in doubt, though not surprisingly the ability of witnesses to recall accurately events occurring so long ago may from time to time have been doubted. To them and in particular to solicitors and counsel who have had the very considerable burden of conducting this case, I am very grateful.

25 April 1983. After further argument on the form of the order to be made, Peter Gibson J. delivered a further judgment in which he gave reasons

A for ordering that the action be dismissed with a primary order that the plaintiffs do pay the defendant's costs, but that from that order should be excepted three-quarters of any increase in the defendant's costs of proving facts specified in a notice to admit, and that the defendant be ordered to pay three-quarters of the increase of the plaintiffs' costs of proving those facts.

*Order accordingly.*

B On 27 February 1985 the Court of Appeal (Lawton, Fox and Dillon L.JJ.) dismissed an appeal by the plaintiffs on the ground that S.G. had not been negligent in transferring moneys out of its customer's account in compliance with that customer's instructions, and that the question of constructive trust did not arise. The decision of the Court of Appeal does not call for report.

C *Solicitors: Herbert Smith & Co.; Bischoff & Co.*

T. C. C. B.

D

---

[COURT OF APPEAL]

## *REGINA v. DAVIS

E

## REGINA v. ROWE

## REGINA v. JOHNSON

1993 Jan. 14, 15 — Lord Taylor of Gosforth C.J., Owen and Curtis JJ.

F *Crime—Evidence—Prosecution evidence—Disclosure of information to defence—Public interest immunity—Claim by prosecution to withhold evidence from defence—Procedure to be adopted*

The prosecution has the duty generally to disclose voluntarily all unused material to the defence solicitor if it has some bearing on the offences charged and the surrounding circumstances of
G the case. Where public interest immunity or sensitivity is relied on to justify non-disclosure the prosecution should, whenever possible, give notice to the defence that application is being made for a ruling by the court, indicating at least the category of the material held and the defence should have the opportunity to make representations to the court. Where disclosure of the category of the material would in effect reveal that which the
H prosecution claimed should not in the public interest be revealed, the prosecution should notify the defence that an application is to be made to the court, but the category need not be specified and the application should be made ex parte. Where the court considers that the normal inter partes procedure ought to have been followed, it will so order, but otherwise it will rule on the ex parte application. In a highly exceptional case, where to reveal even the fact that an ex parte application is to be made could stultify the application, the prosecution should apply ex