# Banque Nationale de Paris v Hew Keong Chan Gary
# [2000] SGHC 239

# Exhibit 3

# Banque Nationale de Paris v Hew Keong Chan Gary and Others
# [2000] SGHC 239

**Case Number** : Suit 1936/1998

**Decision Date** : 20 November 2000

**Tribunal/Court** : High Court

**Coram** : Lai Kew Chai J

**Counsel Name(s)** : Herman Jeremiah and Roger Foo (Helen Yeo & Partners) for the plaintiff; Philip Fong and Chua Sui Tong (Harry Elias Partnership) for the fourth defendant; Chiah Kok Khun and Simon Jones (Wee Swee Teow & Co) for the fifth defendant

**Parties** : Banque Nationale de Paris — Hew Keong Chan Gary

*Agency – Construction of agent's authority – Whether specific or general authority given by customer to bank employee to enter into banking transactions*

*Banking – Accounts – Duty of customer – Whether customer under duty to inform bank of unauthorised transactions which customer becomes aware of*

*Equity – Estoppel – Estoppel by representation – Whether doctrine of estoppel applicable*

*Evidence – Admissibility of evidence – Whether evidence given in criminal proceedings – ss 32(c) & 45A Evidence Act (Cap 97) – Whether incriminating statements admissible – Matters admissible under s 45A Evidence Act (Cap 97)*

*Tort – Conspiracy – Conspiracy to injure by unlawful means – Whether defendants party to agreement to injure by unlawful means*

*Tort – Inducement of breach of contract – Whether customer induces employee to breach employment contract with bank*

*Trusts – Accessory liability – Dishonest accessory liability – Elements to be proved – Test of dishonesty – Whether defendants dishonest – Whether claim made out*

: ***Introduction***

Lord Nicholls of Birkenhead in the seminal case of **Royal Brunei Airlines Sdn Bhd v Tan (Philip Kok Ming)** [1995] 2 AC 378 at p 392 laid down the rule that `(a) liability in equity to make good resulting loss attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation.` This case raises issues generally about the elements of this rule. In particular, the specific question of law raised in this case is whether a third party, without receiving and mishandling any trust property, is liable to account for a loss sustained by a principal as a result of a third party inducing or assisting a fiduciary in the commission of a breach of fiduciary duty. In the factual context of this case, which initially involved share transactions and later foreign exchange contracts, three important issues of fact are raised, namely, (1) whether the two third parties in question had `assisted` the fiduciary in breaches of his fiduciary obligations; (2) if so, whether the assistance caused the losses in question; and (3) subject to the answers to questions (1) and (2) being in the affirmative, whether they had assisted the fiduciary dishonestly. There are, however, other causes of action and they raise important issues of fact and law which will later emerge in this judgment.

The plaintiff is a multinational bank incorporated in France. At all material times, it carried out banking business but was restricted to operate only a branch in Singapore. It has a substantial presence in Singapore. Its Private Banking Department (`PBD`) was staffed by private banking officers or OICs, who were all headed at the material time by Mr Pierre Michel Hamery (`Hamery`). He was posted out of Singapore long before the hearing of this case and though still in its employ he was not called to

give evidence on behalf of the bank.

The first defendant, Gary Hew Keong Chan (`Hew`) was an employee of the plaintiff from 23 May 1988 until his dismissal in the latter part of October 1998. Prior to his dismissal he was holding the position of an Assistant Vice President in the plaintiff`s PBD. Hew was not called by any of the three parties in these proceedings to give evidence.

The second and third defendants named in this action were not in any way concerned with the matters in issue in this case. Judgment has been entered by the plaintiffs against them on entirely separate transactions. Though they were the private banking clients of the plaintiff and were attended to by Hew, it was common ground that they did not know and had nothing to do with either the fourth or fifth defendant in relation to the transactions in question in this case.

In 1991 Hew married the fourth defendant (`Nancy`) but to all intents and purposes they ceased living as husband and wife from 1995. At all material times, they did not live together and, apart from interacting with each other over private banking transactions from 26 December 1996, they were not in communication with each other. They led separate lives. Nancy, 37 years old, is a university graduate with a degree of Bachelor of Science (Estates Management) from the National University of Singapore. Since her graduation in 1986 she has been working in the property management line of business. She is a senior manager with a property developer`s section on Corporate Affairs. An executive and a secretary work under her.

The fifth defendant (`Tan`) is 40 years old and is the elder brother of Nancy. He was at all material times a businessman. From 1995 to 1998 he made many trips to Hong Kong, running the business of a printing company known as Oriental Sincere Printing Ltd in which he had invested HK$10m. That business and another company, known as Panasia Holdings Limited which was registered in the British Virgin Islands, suffered considerable losses. He was therefore no longer actively involved in the affairs of either company. When he gave evidence before me, he was employed by a company owned by his cousin to perform general clerical and messenger duties. His salary was $1,200 per month. He is married with 3 children whose ages ranged from 8 months to 5 years.

Tan became a customer of the plaintiff on 9 May 1994. Initially, he carried out some ordinary banking transactions. I will come to the controversial and hotly disputed transactions later on. On 26 December 1996 Nancy also opened her Singapore dollar current account with the plaintiff at the request of Hew. Hew had also informed Nancy that the purpose was to use the account and the securities she had placed in her account as a third party pledge for her brother, Tan`s account. It should be pointed out that by the end of September 1998 Hew had handled the accounts of both Nancy and Tan so badly that they were owing the plaintiff substantial sums of money. Tan`s liabilities, without taking into account his assets, was US$1,253,854.46. Nancy`s `contingent` liabilities on forward foreign exchange was quite high: see 5AB1209.

In the first week of October 1998 Hew entered into speculative foreign exchange transactions amounting to US$9m in the names of the second defendant, third defendant, Nancy and Tan in the respective amounts of US$2m, US$2m and US$5m respectively. In the belief, which was popularly held at the material times, that the Japanese Yen would weaken, Hew sold JYP short against the US$9m. He therefore anticipated that a huge profit would be made by entering into nine contracts to reverse the earlier contracts when the Japanese Yen weakened. Obviously, and here admittedly I am inferring that Hew thought that this was an opportunity not to be missed to recoup the losses sustained in the accounts of both Nancy and Tan. Hew entered into those highly volatile exchange transactions without the authorisation of Nancy and Tan. In fact, Tan was completely unaware of the disputed transactions until after Hew informed him on the evening of 8 October 1998 that substantial losses

had been incurred and the plaintiff was about to close out the positions. Hew had also informed Nancy about the disputed transactions.

A dramatic strengthening of the Japanese Yen against the US dollar took place starting on 6 October 1998 when the average rate was JPY 132. By 8 October 1998 it took only JPY 116 to exchange for US$1. At about 6:43pm on 8 October 1998 the plaintiff closed out all positions taken out by Hew regarding the US$9m disputed transactions. In consequence, the heavy losses incurred in the names of the second to fifth defendants were crystallised.

On 15 October 1998 Nancy faxed a letter to the plaintiff formally informing it that she was not aware and had not authorised Hew to enter into the disputed transactions in her name. Two days later, she lodged a report to the police.

Following investigations by the Commercial Affairs Department (`CAD`) Hew was charged with seven offences relating to his authorised trading in breach of s 102(b) of the Securities Industry Act (Cap 289) and s 54(b) of the Futures Trading Act (Cap 116). The prosecution proceeded with three charges, and four others were taken into consideration for sentencing.

On 8 July 1999 Hew pleaded guilty and was sentenced to a term of 12 months` imprisonment. The statement of facts admitted by him included summaries of the three types of unauthorised transactions he had entered into. They were (1) authorised securities transactions in the name of Tan, (the second charge); (2) unauthorised forex transactions in the name of Tan, (the fifth charge); and (3) unauthorised Forex transactions in the name of Nancy (the seventh charge). Hew in open court admitted to the sentencing district judge that he had entered into the disputed transactions in the names of Tan and Nancy without their authorisations.

***The plaintiff`s claims***

According to the plaintiff`s re-amended statement of claim and the plaintiff`s opening, the plaintiff claims that Nancy and Tan had given express and specific authority or general authority to Hew to enter into the forex transactions and that Tan had done so in respect of the share transactions. Alternatively, it claims that they had by their respective conduct ratified or adopted Hew`s unauthorised acts in respect of the disputed transactions.

It should be noted that the plaintiff by paras 17 to 19 of the re-amended statement of claim has pleaded together the tort of procuring a breach of contract and the equitable wrong of dishonest assistance. Those paragraphs were preceded by the caption `Procuring breach of contract/Accessory Liability`. In short, it asserts that Nancy and Tan had procured Hew to breach the term in his contract of employment with the plaintiff under which that he, Hew, was not permitted to enter into foreign exchange transactions in the name and for the account of a customer of the plaintiff without authorisation from the customer. By those paragraphs, the plaintiff also avers that both Nancy and Tan knew that Hew could not transact for his own purposes and benefit using the name of a customer as it would breach his fiduciary duties of good faith and fidelity owed to the plaintiff. At the commencement of the hearing, counsel for the plaintiff focussed on the specific allegation that Nancy and Tan dishonestly assisted Hew in breaches of his fiduciary obligations owed to the plaintiff.

Alternatively, by para 20 of the re-amended statement of claim the plaintiff avers that `from in or about the period between 26 January 1996 to 8 October 1998 and/or thereafter each of ... (Nancy) and (Tan) unlawfully conspired with (Hew) separately or alternatively together to injure the plaintiff by unlawful means ...`. The unlawful means relied on are the alleged procurement of a breach of

contract and dishonest assisting a fiduciary in breaching his fiduciary duties. The plaintiff alleges that Nancy and Tan did the following overt acts. The first act was allowing Hew to conduct foreign exchange transactions or enter into purchase and sale transactions of shares (in the case of Tan) in their respective names and on their respective accounts `when they knew that they would not assume liability for these transactions in the event of loss and when they knew or ought reasonably to have known that (Hew) by doing so was in breach of his duty of good faith and fidelity to the (plaintiff) or fiduciary obligation owned to the (plaintiff).` Their second act relied on by the plaintiff was in permitting Hew to use their respective accounts with the plaintiff to remit and/or to receive funds from various accounts, including the accounts of the other defendants. The next two overt acts were really acts of omissions. The plaintiff says that they failed to inform it that Hew entered into the transactions without their authority. They further failed to inform the plaintiff that Hew was entering into the relevant transactions nominally in their respective names but they were contracted for Hew`s `own purpose`. Finally, the plaintiff relies on the attempts of both Nancy and Tan to evade liability incurred `in relation to certain transactions purportedly on the ground that (Hew) had not been authorised by them to enter into the said transactions. The `certain` transactions were not identified but the case proceeded on the basis that all disputed transactions were meant to be referred to.

By para 24 of the re-amended statement of claim, the plaintiff further alleges that Nancy and Tan owed the plaintiff a duty to notify it of any unauthorised transactions of which they had become aware. It goes on to assert that both of them knew about the relevant transactions listed in Sch 2 to the statement of claim. In this connection, the plaintiff relies on the following matters. First, it refers to the confirmations of foreign exchange transactions, of the debit and credit notices and the periodic statements of the accounts which Nancy and Tan received or which were, at any rate, sent to their address, which was one and the same. Secondly, Hew informed them of the transactions. Thirdly, Nancy gave written instructions to Hew to remit profits arising from the foreign exchange transactions to the accounts of various parties. Lastly, Tan acknowledged through telephone messages in the voice-mail of the plaintiff`s representative, Hammery, on 8 October 1998 that he agreed to close out the USD-JYP positions for the relevant exchange transactions.

So far as Tan is concerned, and in relation only to the share transactions, the plaintiff asserts that he knew of those transactions. First, confirmations of the share transactions, confirmations of the debits or credits of his account and periodic statements of his account were sent to him at his Singapore address which he shared with Nancy. Secondly, Hew did inform him of those share transactions.

The plaintiff asserts that Nancy and Tan failed to inform it that they had not authorised the transactions. If they had, the October 1998 forex transactions could have been avoided. The loss of Japanese Yen 156,392,000 (or US$1,309,487.00 at the then prevailing exchange rate of Japanese Yen 119.43 to US$1 as at 14 October 1998) would have been averted.

I now come to the plaintiff`s claim under the credit facilities agreement which was agreed by Tan. By a letter of 13 August 1997 the plaintiff increased the credit facilities granted to Tan on 20 June and 9 December 1994 respectively upon the terms and conditions which Tan indisputably had signed in writing on 20 October 1997 [lcub ]`the facility`). This was nearly a year before the October 1998 forex transaction disaster carried out by Hew. The material terms of the facility are now set out. The credit facilities granted a multi-currency short term loan and/or overdraft up to US$2m (or its equivalent in other currencies) for general investment purposes. The rate of interest shall be at the rate of the plaintiff`s prime rate plus 0.5% per annum for the overdraft and at the rate of the plaintiff`s cost of fund plus 1% per annum for short term loan. The facility was secured by a charge over cash dated 30 May 1994 and a memorandum of charge/deposit dated 30 May 1996 both executed by Tan and the memorandum of charge/deposit dated 26 December 1996 which was

executed by Nancy. She also executed a charge on cash amounts dated 26 December 1996 to secure the liability of Tan to the plaintiff. That these documents were all executed were proved by those documents. Both Tan and Nancy offered their explanations. To those I will turn in due course. As at 31 March 1999, there has been owing by Tan under the facility substantially in respect of the cost of the shares purchased, losses incurred in respect of the trading in shares, foreign exchange losses in respect of the conversion of the currency of the loans and accrued interest. Despite a demand,

Accordingly, the plaintiff`s claims against both Nancy and Tan are based on five causes of action. They are (1) accessory liability for dishonestly assisting Hew`s breaches of his fiduciary duties; (2) breach of the duty to inform the plaintiff of Hew`s unauthorised transactions; (3) express or general authorisation of Hew`s activities; (4) procuring a breach of Hew`s employment contract with the plaintiff; and (5) conspiracy with Hew. The plaintiff claims from Tan the outstanding amount due and payable under the facility.

The plaintiff claims JYP90,662,000 against Tan in relation to losses incurred on the October 1998 disputed forex transactions. It is also claiming JYP 161,033,593 from Tan under certain credit facilities. It is not disputed before me that the balance on Tan`s loan account with the plaintiff largely arose in respect of share transactions and forex exchange losses on conversion of the loans. Tan claims that these earlier transactions were entered into solely by Hew for his own benefit and account and without his authorisation. He explained to me that he had allowed them to stand as debits in his account and had done a number of things, which I will elaborate, because he did not want to expose Hew and cause him to lose his job.

The plaintiff claims JPY32,365,000 against Nancy as losses incurred in her account with it as a result of the two October 98 forex transaction entered into by Hew in her name. In the alternative, it claims against each of the five defendants for the total sum of JYP156,392,000 and JYP161,033,593 notwithstanding that not all the transactions were booked into their accounts as the plaintiff alleges that the defendants and each of them had conspired by unlawful means to procure Hew to breach his contract of employment with it.

The plaintiff further avers that Nancy and Tan, by reason of their failure to inform the plaintiff that the previous transactions were unauthorised and having taken a number of actions which will be set out later, they are now estopped from asserting that they had not authorised the subsequent disputed forex transactions which Hew entered into in October 1998.

***Nancy`s counterclaims***

Nancy asserts three counterclaim against the plaintiff. She avers that there is in the contract for private banking services an implied term that the plaintiff would exercise all due professional skill and care in handling her accounts with it.

Alternatively, she asserts that the plaintiff owed her a duty of care in the law of tort. She says that the plaintiff was in breach of the implied term or duty of care and the particulars are set out in paras 33 and 34 of her re-amended defence and counterclaim. Thirdly, she avers that the plaintiff was in breach of its fiduciary duties owed to her as a private banking customer. She therefore claims for (1) restoration of her collateral placed with the plaintiff in the form of 37,588 UOB Ltd local shares and 10,000 UIC Ltd shares; (2) a declaration that the plaintiff is not entitled to claim from her losses arising from the unauthorised transactions amounting to Japanese Yen32,365,000 or its equivalent as at 14 October 1998; and costs.

***Tan`s counterclaims***

Similarly, Tan like his sister claims that the plaintiff has committed breaches of its contractual duty to exercise professional skill and its duty of care in tort. He also alleges that the plaintiff had breached its fiduciaries duties. The particulars of those averments are set out in paras 46 to 48 of Tan`s amended defence and counterclaim. He therefore asks for the following relief: (1) restoration of collateral in the form of 234,613 UOB shares and fixed deposit of US$50,000 as at 4 November 1997, including all accrued dividends and interest thereto; (2) a declaration that the plaintiff is not entitled to claim from him losses arising from the unauthorised transactions amounting to JY90,662,000 as at 14 October 1998; (3) a declaration that the plaintiff is not entitled to claim from him the alleged loan facility in the sum of JY161,033,593 as at 31 March 1999; and a declaration that the plaintiff is not entitled to claim from him damages of US$1,309,487 as pleaded in paras 17 to 19 and 23 to 28 of the re-amended statement of claim.

***The background***

I return to the PBD of the plaintiff. For the purposes of this case, it is necessary to set out briefly the structure of its private banking business and the documented control procedures. The OICs of PBD, who are employees of the plaintiff, provide customised services to clients on a one on one basis. They advise clients on financial matters, investment decisions and/or portfolio management. In the usual course of business they would call a dealer in forex with the dealing room in the Treasury Department to place the orders of the trades on behalf of clients. The dealer would then key in the order into the plaintiff`s system. Mr Raymond Goh (PW2) was one such PBD dealer, who accepted instructions from PBD OICs. The procedures required the OICs to give, and the dealers to be informed, of the name of the client at the time the order was placed with the dealing room.

The trades done by the dealers were captured by the plaintiff`s electronic information system. Prior to May 1998, dealers would fill in deal tickets to be passed to Treasury Operations (`TOPS`). After May 1998, dealers and their assistants would key into the system the relevant particulars of the contract deals. The details would be contained in a form or dealing slip. Ms Carol Oehlers (PW3), the Operations Manager, was at all material times in charge of the back office. Where the dealing slips contained the names of the clients these documents would confirm that the procedure of receiving trades with clients` names had been complied with by Treasury Department. If the dealing slips arrived on a `no-name` basis, the backroom should become aware that the prescribed procedure had not been complied with.

The plaintiff`s system also generated a confirmation notice which was shortly thereafter sent to customers in the usual way. These confirmations were supposed to be signed and returned by the customer to the plaintiff to confirm and acknowledge the trade. Its system provided for the despatch of a further confirmation to the customer if that customer failed to acknowledge the trade. However, its system took no further step thereafter to obtain confirmation from customers.

According to the evidence led, the PBD at all material times had a Risk Manager who was a senior management position. His job was to monitor and review the PBD portfolio, identify irregular accounts and ensure that all such irregular accounts are regularised. He had access to current information on a daily basis. According to normal procedure, he would in the first instance request the OIC concerned to deal with any irregularity. If any irregularity was not dealt with to his satisfaction, he had to inform the Head of PBD or report it to the Chief Controller. At the material times, the Risk Manager was Mr Chong Tjang Shing. In the wake of the events which led to this piece of litigation he was dismissed

from the service of the plaintiff. His dismissal was the consequence of an adverse report by the plaintiff`s external auditors. The Chief Controller was and is Mr Colin Meyer (PW9).

The plaintiff had in place periodic internal and external audits. Internal audits were conducted on the PBD and the Treasury Department.

In relation to foreign exchange contracts, the court was told that clients could be granted extensions. The effect of such extensions was to postpone the maturity or settlement date of the contract. The plaintiff allowed extensions on either the historical rate (ie the rate at which the first contract was transacted) or the current market rate. However, extensions of forward contracts at historical rates wee regarded as irregular and these were accordingly highlighted in a weekly Summary prepared by the Treasury Department. The Summary was inspected, or supposed to be inspected, by many officers, including, among others, the Chief Controller and the Head of PBD. They had the discretion to investigate any account which suggested a pattern of extensions at historical rates or the postponement of a problem account. It was an important piece of internal control.

***The banking transactions of Tan and Nancy***

I should now outline the banking transactions which were booked in the names of both Tan and Nancy. They could be broadly divided into three phases, namely (1) the initial, uneventful phase during which minor banking business was done; (2) the controversial phase during which both Tan and Nancy learnt of Hew`s unauthorised share transactions, their reticence and, significantly (at least from the perspective of the plaintiff, their provisions of `topping up` securities to enable Hew to comply with the plaintiff`s margin calls; and (3) the October 1998 forex transactions which turned out so disastrously. On 9 May 1994 Tan opened a Singapore dollar current account with the plaintiff through Hew. He placed a fixed deposit of S$250,000 with the plaintiff. Using his fixed deposit as security, he obtained a bank guarantee from the plaintiff in favour of the Controller of Immigration for $125,000 to enable his 12-year-old nephew, who was liable to perform national service in Singapore, to live with his parents in Hong Kong. The guarantee would be called if his nephew failed to return to Singapore to perform his national service duties.

In opening his current accounts, Tan signed a document headed `Specimen Signature Card-Individuals`. He did not fill in his personal particulars because Hew offered to fill in the necessary details for him.

In November 1994 Tan needed to finance the activities of his two companies, one of which was the printing company in Hong Kong. On Hew`s advice, he applied for and was granted personal overdraft facilities up to $123,000 which were secured against the balance of his fixed deposit with the plaintiff. He signed the letter of application drafted by Hew and a document entitled `Irrevocable Letter of Authority` dated 28 November 1994. In due course, he operated the overdraft account and kept it within the limit. Tan told the court that Hew habitually asked him to sign a number of documents at one time. On such occasions Hew would put crosses where he was required to sign. Tan said he used to sign as Hew turned the pages rapidly.

In preparing for this trial, Tan had read para 6 in the document and it stated:

> *The maximum amount which the Bank shall be entitled to act in accordance with any single instruction given by me/us and by telephone and/or telex and/or fax shall be ... and in default of any specified sum United States Dollars Five Hundred Thousand (US$500,000/[equals]) or its equivalent in my/our currrency.*

In January 1996 Hew was promoted to the position of Assistant Vice President, Private Banking. In February that year, Tan applied to convert his overdraft into a term loan. He claims that Hew had advised him to do so as interest would be cheaper and less hassle of having to deposit money into the overdraft account. He claimed that Hew drafted the letter for him. Having heard him in court I accept that Hew did draft the letter for him.

On 1 March 1996 the S$100,000 loan was credited to Tan`s account No 01-012617-001-41. The account (`Account 1`) was used mainly to remit money in Hong Kong dollars to Panasia Holdings Limited. Tan entered into several foreign exchange (`fx` ) transactions to purchase HKD. The spot sales of Hong Kong dollars and the plaintiff`s purchase of Singapore dollars were confirmed by the plaintiffs confirmation printouts which were despatched to the residence of Tan at Toh Tuck Place, Singapore.

By a letter of 16 April 1996 which Tan signed he instructed the plaintiff to open a BNP Nominees Account and a new SGD current account for the purpose of settlement of share transactions, and to appoint Nancy as the power of attorney to operate these two new accounts. The new Singapore dollar current account opened could be refered to as `Account 2`. Documents in the plaintiff also showed that Tan had entered into an agreement with BNP Nominees Singapore Pte Ltd.

Although Hew did not give evidence on behalf of the plaintiff, suffice it to say that the averments in its statement of claims, which referred to the establishment of the facility, the share transactions and the conversions into different currencies were all proved by the contemporaneous documents. Between 17 April 1996 and 9 January 1998, there were 116 share purchases and 120 share sales done in the name of the account of Tan. Every transaction had at least a confirmation sent out to Tan. The last share transaction of Tan took place on 9 January 1998. That they did take place was not in dispute. Tan said in evidence that he knew as early as July 1996 upon receipt of an advice from the plaintiff that Hew was using his account for unauthorised share transactions. He knew he could have reported to the authorities and knew that Hew could have lost his job. Tan says that he decided against reporting. He decided not to report Hew as Hew had promised to sell the shares. He says he trusted him. Instead of keeping his word, Hew bought more shares. Those transactions are denied by Tan. He says he did not know. However, in April 1997 Tan was again told by Hew that there was a need to top up his account by additional collateral. Although he claims that he was shocked yet he allowed about 219,613 UOB shares (which were worth about S$1.88m) to be mortgaged as additional securities to meet the margin call. The issue is whether both Tan and Nancy are still bound by their mortgages of their respective tranches of shares.

I turn now to the forex transactions. It was on 13 February 1998 that the forex transactions booked under the account of Tan first started. They were mainly JYP-USD deals. They continued until end of September, 1998 and they culminated in the October 1998 deals. The usual confirmations, confirmations for debits or credits and periodic statement of accounts were sent to Tan at his address.

On 5 March 1998 Hew was recorded in the plaintiff`s automatic voice recording system, which was in place to record conversations and instructions of clients and all other conversations, to have telephoned Tan at about 7.47pm. They talked for about 13 minutes. They began by talking generally about the banking scene in Hong Kong, about banks having to make provisions. Tan said his bank was calling in the banking lines. This was in the wake of the Asian financial crisis which began in July 1997. Then Hew informed Tan that he had entered into two forex transactions in the name of Tan. Hew `opened two contracts, which (he) closed, both today`. That was because the dollar rallied very

quickly against the Ringgit. In one contract, there was a `small` loss of RM62,000 whereas the other had a profit of RM153,000. The net profit was about RM91,000. Tan was interested in the profit. When Hew mentioned that it was noticed that Tan did not have a line with the plaintiff Tan immediately observed that he did have a line, to which the profit presumably could be channelled. But Hew told him that the line in question was only for the financing of shares. As required by the plaintiff`s risk control people, Hew said that Tan had to sign and return the Risks Disclosure Form .

On the following day the plaintiff wrote to Tan informing him of the net profit from the forex contracts done between 13 February and 5 March 1998 and enclosing the confirmation and the risk disclosure statement for Tan`s signature. He signed and returned the confirmation and risk disclosure statement duly signed. Tan therefore knew of the two forex contracts, that Hew entered into them without reference to him and he did not protest. There was of course the net profit which Tan was anxious to keep. From the tone, tenor and terms of the telephonic conversation, it was clear that this was the first occasion that Tan was apprised of the entry into forex transaction without his approval.

In July 1997 Nancy sold several lots of UOB shares to raise funds to buy a property in the UK and to meet various cheque payments. She bought British Pound to effect payments on two occasions for her property in the UK. Apart from those, there were no foreign exchange transactions until April 1998. From then until October 1998 there were forex transactions. They were mainly JPY-USD. In the usual way, the plaintiff despatched its requests for confirmations to her and the off-setting confirmations. As reflected in the monthly current account statements despatched to her, profits and losses from the forex transactions were credited to or debited from her relevant current accounts.

As I will revert to later in greater detail, Nancy maintains that she had authorised Hew to open only one SGD account and had not authorised him to open the other two JYP and RM accounts in her name. As she had not authorised the opening of the JYP account, and as she knew nothing about the two October 1998 JYP forex transactions, she denies responsibility for them. She maintains that she was deceived by Hew into signing a booklet shortly after 15 July 1998. She thought her signing of the booklet was to `update` her records, as stated in the plaintiff`s accompanying letter, signed by the plaintiff`s Head, Credit & Customer Services, Private Banking and Hew in his capacity as Assistant Vice President, Private Banking. Hew, she claims, had after her signature filled in the booklet to open accounts in JYP and MYR currencies without her authorisation at all.

On 23 April 1998 Hew and Nancy had a brief telephone conversation. The plaintiff produced the transcript after Tan had sworn her affidavit evidence in chief. Hew informed her that there was a contra profit of JYP3.5m which would be credited into her account and he said he would prepare a note for her to sign to transfer the profits to her brother`s account. I heard the recording.

Four days later, they had another brief conversation. Hew had made JYP1.3m and he arranged again for her to sign the transfer of the profit to Tan`s account. Nancy signed three letters dated 23 April, 98, 24 April 1998 and 27 April 1998, which were prepared by Hew for the transfers of profits to Tan`s account.

The plaintiff produced a transcript of a telephone conversation between Hew and Tan. Hew called Tan who was in Hong Kong on 29 July 1998 and their conversation lasted between 4.17pm and 4.27pm. After the usual preliminaries, Hew mentioned that the plaintiff`s management wanted a written commitment from Tan to reduce his loan to the plaintiff. Hew suggested that they try to pay US$20,000 per month. Tan exclaimed: `Wah, how am I going to do that?`. Hew, quite solicitously responded: `We have to, you know, eh eh eh, do some you know currency trading to ... to ... earn it lah ... on a conservative basis, ah? So try to ... its not a, a, a big sum lah, ...`. Hew said that he had told the plaintiff`s management that Tan would try to, starting from August 1998. He said he had

drafted a letter. Tan cautioned against giving too firm a commitment and suggested to Hew to draft the letter saying that Tan would `attempt` to pay. Tan was obviously hesitant and a little earlier in the conversation he adverted to Hew`s ability to make that much of profit from currency trading by asking him: `... how`s your confidence (laugh) in doing it main? Aiyah ...` Hew assured Tan by saying: `So anyway there`s no firm commitment, you know I`m sure we`ll try to ... raise this sum, and ... we`ll try to raise more lah ...`

Following the conversation, Hew sent him the draft letter. Tan signed it and faxed it to the plaintiff for the attention of Hew. The letter referred to his two accounts and his loan from the plaintiff. He stated that he was `aware that the utilisation margin is in excess of the agreed ratio of 60% of the market valuation of the pledged shares` and that because of cashflow in the wake of the `ongoing economic crisis affecting Asia`, he requested for a grace period. As a starter, he stated that he would attempt to reduce his loan by about US$20,0000 per month starting next month.

We now come to the events on the eve of the highly disputed forex transactions effected by Hew in October 1998. He called Nancy at about 6.09pm on Tuesday 29 September 1998. He has not been in touch with her for quite sometime. He asked her: `Where are you working now, by the way?`. He then proceeded to assure Nancy that her account was `completely regularised already`, that there was `no more overdraft in her account`. He then went on to say that there was a credit of `200 over thousand Yen ... almost 300,000 ... credit` in her account. He also told her that he had a `over 2m dollar Yen going into your account`. In the next breath, he told her that `there was a 2m over Yen contract ... which you know we put under your name, lah, ... so what happen is that tomorrow I will ... prepare a letter` which Nancy was asked to sign and fax back to him. The whole exercise was to effect payment out of her account. Nancy did not object and she did not ask for any particulars. We will come to her explanation later.

In relation to the loans of Tan, the loan which was designated Loan 5b was repaid through the drawdown of two new JPY loans for JPY100,000 (`loan 5c`) and JPY60,000 (`Loan 5d`). As reflected in the consolidated statements as at 31 March 1999 the total of the loans unpaid was JPY161,033,593: see AB1891.

Hew went on leave on 7 October 1998. Though he was on leave he gave instructions over the telephone. Between 30 September and 8 October 1998 he had either contracted or extended the maturity dates of ten forex contracts. Three of them were purportedly for the account of the second and third defendants. As they did not take part in these proceedings, we are not concerned with those transactions. Hew placed two orders in the name of Nancy. In each of them, she sold to the plaintiff US$1m and sold to it JPY at 133.33 with maturity date on 6 October 1998. That contract was extended by another at the rate of 133.18 with the maturity date on 14 October 1998. The other order was placed 6 October 1998 at 128.03 with maturity date on 9 October 1998. Hew had placed the orders for the contracts on a `no-name` basis, and the dealers had accepted and acted on them, contrary to established and prescribed procedures of the plaintiffs. Such a practice exposed customers of the plaintiff to very real abuses by the PBD OICs.

The other five forex contracts were all placed in the name of Tan by Hew. According to the evidence, the first deal bearing reference 10106926 was put in the name of Tan at about 3.49pm on 6 October 1998: see Vol 10(ii) AB2863. The second deal was placed on 1 Oct 1998 at 9.19am and Hew gave the name of Tan at 4.42pm. The third deal was placed on the morning of 1 October 1998 and Hew gave Tan`s name the following morning. In the morning of 7 October 1998 Hew sent to his assistant, Ms Harnin Sim, a fax showing the three deals as `BOT` (short for `Bought`) and this evidence (Vol 11AB3120) did not support the plaintiff`s assertion that in fact the apportionment of the three contracts to Tan was done before Hew knew they were confirmed done. It was conceded by

Raymond Goh (PW2) that Tan`s name was only provided for the fourth deal at 9.30am on 7 October; the deal was placed with one Kok Chee on 6 October 1998 at 5.20pm. It should be noted, as will emerge later, the Japanese Yen strengthened to the average of 132.75 on 6 October and to 125.82 on 7 October 1998: see Vol 2AB590. The Yen reached the exceptional high of 116.2 average on 8 October 1998. It was plain that a loss had already occurred in respect of the fourth deal before it was confirmed in the name of Tan. The fifth and last forex deal was placed on a `no-name` basis by Hew on 6 October 1998 at 5.20pm with the dealer Kok Chee. The order was confirmed prior to 9.30am on 7 October 1998.

In the face of the cross over rise of JPY 19 for every US$, Treasury rooms the world over went into full alert, noting any big Yen positions. Mr Hammery telephoned Hew and told him that the plaintiff would close the ten forex contracts entered into under the accounts of the second to fifth defendants to cut losses. Mr Hammery noted at about 6pm on 8 October 1998 that there was a loss `of about $350,000`. He noted that the plaintiff already had `trouble with these people` (meaning the second and third defendants, Nancy and Tan). He told Hew to tell them that the plaintiff was closing out the Yen positions and that they were to bring in cash to cover the loss the next day.

On 8 October 1998 Hew informed Nancy and Tan, who was in Malaysia, of the forex deals which he had conducted in their name and which had incurred huge losses. According to both Nancy and Tan, Hew asked them to speak to Billy Au-Yeung and Mr Hammery respectively. According to Tan, Hew was crying over the telephone and requested him to telephone Mr Hammery to agree to the closing out of his positions. He said he agreed, just in case matters got worse, although he had no prior knowledge of the relevant forex deals in his name. They also say that Hew drafted two letters for them to send to the plaintiff. The gists of the drafts were to confirm that they, Nancy and Tan, had been apprised of the transactions and had agreed to Hew engaging in forex deals in an attempt to reduce the liabilities incurred in the account of Tan. The draft letters also included a plea to the plaintiff to give them time to pay off their liabilities arising out of the October 1998 forex deals. Those letters were not sent to the plaintiff.

On 8 October 1998 the plaintiff closed out the forex positions. Nancy`s account was debited with the loss of JPY32,365,000 and Tan`s account was debited with the loss of JPY90,662,000. Mr Hammery tried to contact Nancy and Tan and failing to do so he instructed Billy Au-Yeung (PW10), the Marketing/Account Manager of the plaintiff who was Head of PBD marketing and the immediate superior of Hew, to get in touch with them. On the same day, Tan, who was in Malaysia, left two voice messages in the voice-mail system of Mr Hammery. First, he left the message that Hew had told him about closing the forex positions. He said he would call again. Twenty minutes later, Tan called again. He said that he had heard from Hew that the plaintiff proposed to close his Yen positions and he said he `basically agreed` with the suggestion and he asked Mr Hammery politely to do so. He did not protest at all.

On 9 October 98 (Friday), Billy Au-Yeung spoke to Nancy over the telephone at 3.47pm. He told her that her two forex contracts had been closed out and the loss was about JPY32.4m. Billy Au-Yeung said that the plaintiff would like to know how she was going to settle these losses. In response, Nancy said: `Oh, I see. What are the various ways to be done?`. She said she was in a meeting and later she said she was driving at that time. She did not express any surprise and did not raise any objection.

After Hew returned from his leave on 9 October 1998 Mr Hammery and Ms Carol Oehlers (PW3) met him in the evening. Ms Oehlers made a note of the meeting at about 1pm the following day. She did not e-mail them, as its text suggested, but had rather sent hard copies to both the addressees, namely, Mr Hammery and Mr Yves Drieux. She recorded that Hew had told them that Tan had agreed

with the US$5m forex contracts and that Tan`s sister had also agreed to the deals. It was not clear whether the approvals were `before or after` the deals: see Vol 2AB581 and the fourth and fifth paragraphs of Ms Oehlers affidavit evidence in chief.

On 12 October 1998 Nancy met Hew at the Westin Stamford lounge shortly before midnight. Hew`s brother, Michael Hew, was present. A friend of Nancy, Samantha Tan, was also present. Hew confessed to those present that he had carried out the two forex deals in Nancy`s name without her authorisation. He also admitted that he had not been authorised by Tan to enter into the five forex deals in October 1998.

On 13 October 1998 the plaintiff wrote to Nancy and Tan for their confirmations of the forex contracts in their names. On the following day, Tan wrote to the plaintiff and denied knowledge of or having authorised the five forex contracts.

On Wednesday, 14 October 1998 Mr Hammery, Carol Lau and Billy Au-Yeung met with Hew for his explanation regarding Tan`s denials. Hew told them for the first time that Nancy was his wife and Tan was his brother-in-law. He said he was separated from his wife for the past three to four years and that they did not speak to each other. He said he was still legally married to Nancy although each one was waiting for the other to start divorce proceedings. Hew said he had no family life which was why he spent so much time in the plaintiff bank.

Hew further told those present that the JPY loan outstanding in Tan`s account was due to his (Hew`s) own trading in shares for himself. He accepted full responsibility for the loan, saying that the account for Tan was originally opened for some facilities, like a bank guarantee, for Tan`s own requirements in respect of which Tan had deposited cash and shares as collateral. Subsequently, Tan cleared his outstandings with the plaintiff but left his shares as collateral to continue to secure the credit facility. Hew said he used the credit line to trade in shares for himself, which was why he felt he was responsible for the account.

Hew further explained that when utilisation went into excess of collateral sometime ago, Nancy pledged her shares as additional security to the plaintiff, for her brother`s account. Hew said that Nancy did this to help her brother, not to help him (Hew). Hew said she would not do anything to help him at all.

Hew had at the earlier meeting said that his research and analysis showed that the Japanese Yen would weaken against the US$. He decided to enter into those unauthorised October 1998 forex transactions to repay the loan outstanding in Tan`s account. Hew admitted that he had done wrong and confirmed that no one in the plaintiff bank had colluded with him on those transactions. Hew was reminded of the seriousness of his acts and told to speak to his family and find a solution. Hew signed the record of the meeting on 16 October 1998: see AB454.

On 15 October 1998 Nancy wrote to the plaintiff and denied any knowledge of or having authorised the transactions. ON 17 October 1998 both Nancy and Tan filed police reports. Nancy reported that Hew had told her on 8 October 1998 of two forex contracts. She reported that she had not instructed Hew to enter into any of the two transactions. Tan in his police report stated that Hew had traded in shares and forex transactions in his name without his authorisation. He said the losses were about US$750,000.

On 20 October 1998 Ms Oehlers on behalf of the plaintiff also filed their police report. On 28 October 1998 the plaintiff instituted this action against Hew. On the same day, it obtained a Mareva injunction against Hew.

On 16 April 1998 the plaintiff obtained an order of court granting leave to include in this action the second to fifth defendants as additional defendants. As stated earlier, Nancy is the fourth defendant and Tan is the fifth defendant.

As stated earlier, Hew pleaded guilty to three charges for unauthorised trading and was sentenced to 12 months` imprisonment.

***Hew`s evidence***

Hew was not called by any party to give evidence in court. It does not follow that no evidence may be led of what he had said or admitted in open court when he pleaded guilty. I will shortly set out those parts of his evidence which are admissible. Those admissible evidence, which have to be evaluated since Hew was not cross examined, will help resolve the question of fact whether Hew in fact had carried out unauthorised transactions, without the consent and authorisation of Nancy and Tan, or did they assist him dishonestly in his breaches of his fiduciary duties. The plaintiff alleges that Hew was taking the fall himself and was covering up and protecting both Nancy and Tan. That was the effect of the evidence of Ms Oehlers who alleges that Hew was lying to prevent the plaintiff from pursuing Nancy and Tan. She says that he had shifted from what he first told her and Mr Hammery. All the evidence will have to be carefully evaluated. On the question whether both Nancy and Tan had dishonestly assisted Hew, both the legal and the evidentiary burden of proof rests of course on the plaintiff.

Before I set out Hew`s admissible evidence I should describe him briefly. He is 39 years old and a Malaysian. He joined the plaintiff on 23 May 1988 and was employed by the plaintiff until his dismissal on 30 October 1998. He was suspended from 14 October 1998. He first joined as an Organisation & Methods Officer with the Data Processing/Organisation & Methods Department of the plaintiff. His functions were the development and improvement of systems and procedures within the plaintiff. He remained in that department until at his request he joined the plaintiff`s Private Banking Division from 1 April 1994. In September/October 1998, there were a total of 24 OICs in PBD. Hew was one of the six Assistant Vice Presidents. Following the closing out of the forex transactions on 8 October 1998 Hew met Mr Hammery and Ms Oehlers on 9 October and 14 October 1998.

As Hew had made statements against his interest during the second meeting, and which would expose him to a criminal prosecution or to a suit for damages, those statements are admissible under s 32(c) of the Evidence Act. He was recorded to have stated and he confirmed having stated:

> *Gary [Hew] said that the JPY loan outstanding in Mr Tan`s account was due to Gary`s own trading in shares for himself. He claimed full responsibility for the loan, saying that the account for Mr Tan was originally opened for some facilities, like a B/G, for Mr Tan`s own requirements in respect of which, Mr Tan deposited cash and shares as collateral. Subsequently, Mr Tan cleared his outstanding account with the bank but left his shares as collateral with the bank to continue to secure the credit facility. Gary said that he used the credit line to trade in shares for himself, which is why he feels responsible for the remaining loan in Mr Tan`s account.*
>
> *When the utilisation on Mr Tan`s account went into excess of collateral sometime ago, Ms Nancy Tan pledged her shares as additional security to the bank for her brother`s account. Gary said that his wife did this to help her brother, not to help him (Gary) as he said she would not do anything to help him at all.*

*Gary admitted that he had made the unauthorised JPY deals against USD for the three clients, viz USD5m for Mr Tan Shee Chin`s account, USD2m for Ms Nancy Tan`s account and USD2m for Mr Chan`s account.*

After the matter had been reported to the Commercial Affairs Department, Nancy telephoned Hew in the evening of 20 October 1998. She had by then consulted her lawyers. She taped the conversation. Hew confirmed that he had initially traded in shares using Tan`s account. He incurred losses and he engaged in multi-currency trading in the hope of making a profit and paying off the liabilities. These admissions were clearly made and there was no indication, as suggested by counsel for the plaintiff, that the telephonic conversation was contrived. Hew also told Nancy that CAD officers had raided his office and his home earlier that day.

The important evidence elicited from Hew came from the admissions he made to the district judge in his statement of facts. He made the admissions in open court and their reliability is underscored by the fact that there could not be any suggestion of any coercion or mistake. Under s 45A of the Evidence Act the document containing the details of the charges, agreed statement of facts and the record of proceedings , where relevant, are admissible in evidence. These were all produced at the hearing.

Hew volunteered that, apart from the banking account known as SGD 41 account of Tan, he (Hew) gave instructions to the plaintiff`s officers to open other accounts in Tan`s name without Tan`s knowledge or consent. He was able to do this as the plaintiff`s procedure allowed customers to open additional accounts on the basis that they had signed the initial account opening form. Hew deceived the plaintiff`s officers by fraudulently misrepresenting that Tan had given the instructions to open the additional accounts. By these deceptions, Hew opened a Singapore dollar account and a Japanese Yen account in the name of Tan. Hew said he used these two accounts for the purposes of recording the transactions carried out by him but which `were not authorised by him`. By para 9 of the statement of facts, it was admitted by Hew that he `carried out his own share and foreign exchange trading in the other accounts of (Tan), which were kept separate from Tan`s own transactions carried out in Tan`s SGD 41 account`.

According to Hew, and as stated in para 12 of the statement of facts, Tan `subsequently became aware that (Hew) had opened other accounts in his name, which (Hew) was using for trading. (Tan) then confronted (Hew), who assured him that he would sell off the shares and close the accounts. (Hew) also took the responsibility for all the unauthorised trades at that time. Therefore (Tan) allowed (Hew) to continue trading in his accounts, in order to recover some of the losses incurred, and eventually to close out all the positions`.

Hew admitted that there was no profit-sharing between Hew and Tan from the unauthorised trades carried out in Tan`s accounts. Profits from Hew`s trades were used to repay personal loans taken by Hew, or to meet payments for Hew`s property in Malaysia. Some of the profits were also used to offset Hew`s trading losses in Tan`s accounts. The net losses incurred was about S$977,709.

In relation to Nancy`s account, Hew had without her knowledge and consent opened a Japanese Yen which Hew used to trade in Japanese Yen against the US dollar. Contrary to what was stated in para 21 of the statement of facts, Nancy in evidence denied any knowledge that Hew was using her account and disputed the fact that Hew had assured her that he (Hew) would be responsible for his transactions. She was asked if she had told the CAD officers that piece of information. She denied it.

The plaintiff issued a writ of subpoena duces tecum to compel the CAD to produce Nancy`s statements given to CAD in official confidence. The CAD certified that it would be against the public interest to disclose those statements. Mr David Chong on behalf of the Attorney General applied to set aside the Writ under s 126 of the Evidence Act. In the end, I decided to read the statements of Nancy and finally decided that they were indeed given in official confidence pursuant to s 126 of the Evidence Act. Since the statements were excluded, there was no admissible evidence of Nancy to contradict Nancy`s evidence in court and the plaintiff cannot rely on para 21 of the statement of facts in the absence of Hew, who was there making a self-serving statement. The plaintiff, however, rely on the inference which must be drawn from the fact that confirmations had been systematically sent to Nancy following each forex deal and she must have read them and appreciated their import in view of her education and work experience. The plaintiff further relies on the fact that Hew had phoned her a few times and obtained her agreement to transfer funds to the account of Tan out of the profits from the forex deals. I will set out Nancy`s evidence, the submissions and my findings later in this judgment.

***Nancy`s evidence***

Although Nancy and Hew were separated and she was about to initiate divorce proceedings, they maintained a polite relationship with each other. She still trusted his professional competence and integrity, having known him as a hardworking and meticulous person. I gathered the distinct impression that she trusted him.

In December 1996, nearly two years before the October 1998 forex deals, Hew informed Nancy that Tan`s account was `irregular` and had to be topped up. She understood that to mean that her brother`s account had incurred losses. Hew did not inform her `as to why or how the (Tan`s) account had become "irregular"`. That suppression of the material facts from Nancy was both unfair and dishonest. The omission calls into question whether her agreement to help her brother could be held against her. Nancy was aware that Tan had an account with the plaintiff through Hew. She remembers having signed a document sometime in 1996 giving her a power of attorney for Tan. She was merely informed by Hew that he had discussed the matter with Tan and that Tan had agreed to give Nancy the power of attorney. However, she never exercised her power under the power of attorney.

Nancy asserts in evidence that she and Tan never discussed financial matters at home. Tan lived in the same house with her when he was in Singapore but he was constantly overseas attending to his business in Hong Kong or spending time with his family in Kuala Lumpur, Malaysia.

She persuaded me that she was willing to help her brother financially if she could do so. In connection with her agreement to help the `irregular` account of Tan, she signed several documents given to her by Hew. However, the details in all those documents were all left blank. She was merely asked by Hew to sign on the areas indicated by him. She did not read the documents as Hew said he would fill in the details for him. She was never challenged on this aspect of the evidence. She says that she trusted Hew to complete the details accurately.

At Hew`s request, she provided security in the form of 10,000 UIC shares and 40,000 UOB shares. Since the commencement of this litigation, she has been shown a folder entitled `Account Opening File`. She had not filled in the details. But that was the only account she had mandated to be opened.

Sometime in April 1997 she was told that Tan`s account had incurred further losses. She was shown

plaintiff`s letter to Tan. It stated that Tan`s account had utilised 90% of the share values of the collateral provided. Again Hew did not inform her of how or why the loses were incurred. Hew asked Nancy to help. Hew expressly informed her that the securities would not be used for any other purpose. She provided additional UOB shares, which she could not even remember at the time she swore her affidavit evidence on 6 January 2000.

She came across as a person who had inherited her shares from her parents, just like Tan, her brother. They are children of a banker of a local bank and they were amply provided for by their late father, who founded a local bank. As between them, they were quite willing and ready to give each other financial assistance so long as they were able. Money did not really matter to her very much. Her entire working experience did not involve the financial markets. She did not trade in shares. She sold her own inherited shares whenever she needed money. She had no experience in any currency trading. Her knowledge of it was rudimentary.

As for the statements, confirmations and advices which were sent to her by the plaintiff, she tells me that she had no knowledge of the material ones. She had only read the initial monthly statements provided by the plaintiff in 1997. This was because she had bought British pounds to pay for her purchase of a property in London. Apart form those, she just left the other communications from the plaintiff unopened. CAD seized many of them and they were found un-opened. She was pressed during her cross-examination over the fact that she must have received substantial amount of communications from the plaintiff in June and July 1998. She said she did not monitor them. She just put it one side. If she had opened them, she took a cursory look and put in on one side. The purport of the transactions did not register.

She explained that she did not read the communications with any care because she thought that Hew, who was such a meticulous person, would draw her attention to anything significant. As Hew did not highlight anything, she assumed that there was really nothing very much for her to look at. I asked myself if she did not want to look at them because she did not want to know; that she was in a state of denial, having seen the level of liabilities which her brother had incurred. I do not think she thought about it. She simply put them aside and proceeded on the basis that if there was anything important Hew would highlight it to her. She relied on Hew, far too much as it turned out. She was also busy with her own life and often came home late. She furnished the collaterals and she did not bother herself with the transactions between her brother and Hew.

The plaintiff relies on seven letters signed by Nancy, five of which contained instructions to the plaintiff authorising the transfers of profits arising from forex trades and two dealt with matters relating to Nancy`s Singapore dollar account. Those letters were signed over the period from April to September 1998. It is a central contention of the plaintiff that by signing those letters Nancy had actual knowledge of Hew`s forex trades carried out in her account. She explained that she really did not know the implication of the letter she was signing. They were prepared by Hew `someone I (had) known for many years` and at the time of signing them Nancy said she had no reason to have any doubts on his integrity. That she did not take any care in the matter was shown in an example. In one letter she had not signed her full signature or the signature reflected in her specimen signature card. She had to re-sign it.

Whether her evidence is credible depended on a number of factors. The fact that the plaintiff had sent her many confirmations about the forex trades and the fact that she had signed letters authorising the transfers of profits from forex trades to her brother are substantial evidence which strongly suggest that she knew that Hew was engaging in forex trades in her name. On the other hand, she came across as a witness who was quite forthright in her answers. I was sceptical about her denials of not registering the documents from the plaintiffs after she `scanned` them but

considering her unquestioning trust of Hew, Hew`s purposeful manipulations, her own state of disorganisation over her personal matters, like keeping on one side those documents, which were not opened and found by the CAD as not having been opened, and the entire evidence as a whole, I accepted her evidence that it did not register at all. After all, she stood to gain nothing. She had offered her own shares to top up the margin, just to regularise Tan`s account. Nobody told her candidly how much Tan had lost. She just wanted to help her sibling tide over a difficult time, which was experienced by many in the wake of the Asian financial crisis. Is she telling the truth when she says that she really did not think about it and that she trusted Hew entirely when she signed?

There was a tell tale telephonic conversation between Hew and Nancy on 23 April 1998. Hew was recorded to have told Nancy that there was a profit of two million which would be credited to Nancy`s account on next Monday, 27 April 1998 and a profit of one and a half million Yen which would be credited on 30 October. It`s instructive to listen to the transcript recorded in the voice recording system of the plaintiff, which the plaintiff had not disclosed until after Nancy had sworn her affidavit in chief. I set out the transcript:

| | |
|---|---|
| Gary: | Ah, ha, ah ha, I see ok. Erm, alright, basically what`s happened is this, er ... they ... there is going to be a two million Yen ah ... |
| NT: | Mmmh. |
| | ... |
| Gary: | Profit ah? |
| NT: | Yah. |
| Gary: | Er ... er ... in your account, ok? |
| NT: | Mmmh. |
| Gary: | That will be paid to you ah, on the 27th ah, which is next Monday. |
| NT: | Mmmh. |
| Gary: | Alright? And then there will be a one and a half million Yen profit that will be paid to you on the 30th ah ... |
| NT: | Mmmh. |
| Gary: | So I will er ... prepare a ... a ... a ... note ah, to transfer this profit ah, to Ah Chin`s (ie Tan`s) account. |
| NT: | You want me to sign it is it? |
| Gary: | Yes. I need you to sign for the transfer of the funds ah, er ... er ... er from your account to Ah Chin`s account. |
| NT: | Ok lah, probably in the morning ah. |

In para 20(ii) and (iii) of her affidavit evidence in chief, which was sworn before the disclosure of the above transcript by the plaintiff, Nancy stated as follows:

> *ii I can also remember a few occasions in or around April/May and September 1998 when (Hew) called me on separate occasions to inform me that he would be faxing over letters that he had prepared for me to sign. He informed me that these were standard letters and he did not explain these letters to me. As I had no reason to doubt his integrity at that point of time, I simply signed the letters*

*without reading them. (The seven letters are annexed as exh NT5 pp 68-74.)*

*iii Having now examined the letters as exhibited herein ... and upon the advice of my solicitors, I now realise that (Hew) had traded in foreign exchange contracts purportedly in my name and without my authorisation. Any profits received upon settlement of the foreign exchange contracts were transferred to other accounts. I wish to state that I did not have any knowledge of the transactions stated in the letters, nor had I consented to such transactions. (Hew) had clearly abused my trust and confidence in him by deceiving me into signing these letters and therefore facilitating such transfers.*

For the plaintiff, it was strenuously pointed out that according to the telephonic conversation and the letters which Nancy had signed, it was quite clear that Hew had explained to Nancy what he had done. He had explained to her the forex contracts he had entered into in her accounts and the profits made, and that he intended to transfer them to Tan`s accounts. She was repeatedly told that the profits were in her account. The plaintiff submits that this meant that the forex trades were done in her account. In any event, the forex contracts referred to in the fax instructions would have confirmed this. The plaintiff also referred to another telephonic conversation between Hew and Nancy on 27 April 1998. Hew told Nancy that he had made 1.3m Yen and `it`s going through your account`. Hew then mentioned that Nancy was to do the same thing they did the last time. He concluded by saying that he would sort out the details and the rest later. The plaintiff also relies on Hew`s telephone conversation with Nancy on 29 September 1998, nearly on the eve of the momentous October 1998 forex deals, that her overdraft account had been regularised and that there was a credit of two million over Yen which was being paid into her account. He said part of the money had to be remitted out. As the fax instructions had confirmed, there were instructions to the plaintiff to pay the `profits` to a number of parties. Nancy signed it without so much as asking why other parties should be paid.

I heard the recordings. The tone and tenor, and not only what was recorded as having been said, came through in the course of the opportunity to hear the recordings. She was not only disinterested; her answers were far too brief. She was impatient with Hew who tended to be both solicitous and long-winded, beating about the bush. He was engaged in several turns of disassembling and disarming his interlocutor. Obviously, Hew adopted those tones and postures because he was manipulating Nancy. He would at most times go into great details and at times he was strategically economic in his description of what had happened. Nancy`s impatience was evidenced by the fact that she rather pointedly, and impatiently, asked him: `You want me to sign is it?`. It was as if to tell him to get to the point. The next notable feature was her disinterest in any profit for herself or, even in some cases, for her brother. She never profited at all. She trusted Hew so much that she allowed him to direct where the `profits` were to be channelled. He did not seek her consent; he only wanted her to sign and put through the transactions he and he only had decided. In my view, she was not told enough to know that Hew had used her account to engage in forex trades. I find on the evidence that Hew had deceived her and had abused her trust in him.

In fact, she had opened a Sing dollar account for the sole purpose of mortgaging her shares against her brother`s account. She did so in the hope, which was far too innocent, that Hew would in due course get the brother out of the mess Hew had created for the brother. She was, in my judgment, unaware that Hew had entered into forex trades on her account until 8 October 1998 when Hew for the first time came clean. She never signed any confirmations of the forex trades. She never adverted to the possibility of Hew trading in her name as it never occurred to her. From beginning to

the end, there was not an iota of evidence that she had agreed to any forex deal; Hew confessed to having traded without her authorisation. She did not have the level of knowledge and she did not draw any inference that Hew was engaged in forex trading in her name. One could not quadrate the fact that she knew there were profits to be transferred out that she must have known of the forex deals in her name.

***Tan`s evidence***

Tan was actively engaged in the business of Oriental Sincere Printing (`OSP`) in which he had invested about HK$10m. He was a majority shareholder of OSP by virtue of his ownership of OSP`s parent company. From 1995 to 1998 he made many trips to Hong Kong although he had no expertise in the company`s business of printing. Among the wealth he inherited from his late father was a company called Grand Victory Trading Pte Ltd. Although he was the `manager`, he in fact had no duties to perform. By the time he was giving evidence, he was employed by his cousin and was performing clerical and messenger duties. He earns $1,200 per month.

In contrast, Hew, his brother in law, holds a degree from the National University of Singapore. Tan was no match for his brother-in-law in intellect or in business acumen. Tan struck me as the son of a very rich father who left him some wealth but, unfortunately, no training and equipment for the vicissitudes of life, and in particular business life. For his usual banking needs, he started an account with the plaintiff on the advice of Hew. He signed the plaintiff`s documents such as the irrevocable letter of authority dated 28 November 1994 at the places indicated by Hew. This document contained para 6, the contents of which had been set out earlier, regarding the limit of a single instruction to US$500,000. At the suggestion of Hew, he replaced his overdraft with the plaintiff, which was fully secured, into a term loan. From about February 1996 Tan spent about one third of each month in Singapore. The rest of the time was spent in Hong Kong or in Kuala Lumpur.

Hew was aware that Tan had a substantial holding of quoted securities inherited from the latter`s late father. Tan`s father was one of the original shareholders of the ICB Bank, which was later acquired by United Overseas Bank Ltd (`UOB`) in exchange for UOB shares. Hew advised Tan to mortgage some of these shares as collateral for any future loans which he might require for his Hong Kong investments. Hew also arranged for him to open a BNP Nominees Account and a new current account for the settlement of share transactions. As far as he knew, the only `share transactions` involved his sales of UOB shares to raise finance for his Hong Kong investments. At Hew`s suggestion, Tan appointed his sister, Nancy, as his Attorney to act for him in his absence. In the event, he mortgaged 50,000 UOB shares as collateral for his accounts. He was advised by the plaintiff that he was granted a second loan of $100,000.

In connection with the mortgage of his UOB shares, Tan was asked by Hew to sign a memorandum of charge/deposit of securities (`Memorandum`) dated 30 May 1996. Since the break of the trouble, Tan was shown a list of share transactions dated 30 May 1996 which was inserted after p 34 of the Memorandum. Tan says that the signature on this list was not his and this list was not drawn to his attention at the time he signed the Memorandum. Tan`s evidence in this respect was unchallenged.

Tan says that he had never authorised or mandated Hew to speculate in shares at his own discretion. Sometime in July 1996 he received a debit advice form dated 11 July 1996 from the plaintiff which was mailed to his Singapore address. It related to an application he was said to have made for 20,000 shares of an Initial Public Offering of PT Kedwaung Setia Industrial Ltd. Tan knew nothing about this application. He was very disappointed and considered Hew`s conduct disgraceful. He confronted him and it transpired that Hew had purchased a number of Malaysian securities in Tan`s name without

Tan`s consent or knowledge. Tan scolded him for his actions and Hew pleaded for time to sell off all the shares bought in Tan`s name. Hew said the sale should be done gradually to minimise the loss. He said Hew promised him that when all the shares had been disposed of he would close the account through which he had traded.

Tan explains that he was faced with a very difficult decision. He could either give Hew a chance to keep his word and wind-down the outstanding share positions, or he could report Hew`s actions to the authorities. The latter course would result in Hew losing his job with the plaintiff and the possibility of penal sanctions. His primary consideration was that Hew was his sister`s husband and he did not want to get him into trouble.

At the end of a very acrimonious conversation with Hew, Hew promised Tan to sell the shares as soon as possible. During the period from July 1996 to April 1997, Tan continued to travel for most of the time. When subsequently Hew left documents at his house in Singapore, or when mail arrived from the plaintiff, Tan assumed that they related to Hew`s closing of the positions he had taken.

Tan referred to Hew`s internal memorandum dated 21 March 1997 purporting to give instructions to the plaintiff to credit `all Singapore dollar dividends except UOB` to the share trading account while the UOB dividends should be credited to his SD A/c No 41.

In April 1997 Hew disclosed to Tan that he had not reduced the unauthorised share positions and had, contrary to his promises, continued to trade under his name. In view of the deteriorating share market, he had incurred huge losses in and under Tan`s account. Hew said that the plaintiff would make a margin call on him unless he deposited more UOB shares as additional collateral. After `continual pleading` by Hew, Tan agreed to pledge his remaining 219,613 UOB shares to the plaintiff. Hew told him that someone else working at the plaintiff was involved with him in the unauthorised trade which had occurred. This was a lie.

On one occasion Hew talked to Tan on the phone and informed him that they had made some money from Natsteel Electronics, but the money would come in on 28 October 1997. In the meantime, he asked to borrow $13,000 from Tan`s account on a temporary basis pending the arrival of the proceeds.

Towards the end of 1997 Hew told Tan that he had sold most of the unauthorised shares they had purchased, albeit at a loss. But Hew said that he had converted the losses into loans so that his UOB shares would not have to be sold at an immediate loss to settle with the plaintiff. Hew told Tan that he had procured the loans in `weak` currencies which were expected to fall, thereby making it easier to pay the loans.

Tan says that he continued to receive documents from the plaintiff but he was advised by Hew not to attempt to understand them. Hew told him that he would take care of everything.

Tan then explains how he was tricked by Hew into signing the Risks Disclosure Form and the plaintiff`s request for confirmations both dated 6 March 1998. Hew gave him the impression that without his signature Hew would not be able to transfer the profits that had been made to reduce the losses which Hew had incurred.

On 29 July 1998 Tan was in Hong Kong on OSP business. Hew called him. The conversation was taped by the plaintiff`s voice recording system. Tan was recorded to have remarked to Hew:` I thought you have been paying down the loan` to which Hew agreed and said he had been `trying, ... bit by bit.` This confirmed Hew`s confession during his trial that he had carried out the unauthorised share

transactions. Hew was obviously stringing along Tan, hoping for his unauthorised activities to take a turn for the better. In the same conversation, he asked Tan to agree to sign a letter to the plaintiff indicating that he (Tan) would reduce the loan by monthly payments of US$20,000. In the course of the conversation, Hew did mention that he would try to switch to currency trading to earn some money. Tan points out that there was, however, no mention of Hew using his (Tan`s) account in that connection, and Hew did not go into details. Tan signed the letter, which Hew had drafted and faxed it to the plaintiff.

Tan then explains to the court how Hew tricked him into signing both the new `Specimen Signature Card` and the `Account Information Form`. He signed with blank spaces for Hew to fill. However, the key document headed `Mandate for Account(s) (Individuals)` (`the mandate`) was completed by Hew in his own handwriting making reference to accounts denominated in no less than eight different currencies. These were Singapore dollars, US dollars, Indonesian Rupiah, Malaysian Ringgit, Hong Kong dollars, French Francs, Japanese Yen and Deutschmarks. Tan maintained that all the details were left blank. He was sure that he did not authorise Hew to open accounts in those currencies. He said Hew had tricked him to go to plaintiff`s office to sign the documents on the fraudulent misrepresentation that he had to renew his account.

Tan says that on 5 October 1998 he was in Kuala Lumpur to spend some time with his wife and children. He did not know that Hew had between that date and 8 October 1998 entered into the five forex contracts purchasing US dollars against the Japanese Yen.

Sometime between 6.30 and 7.30 on the evening of 8 October 1998 Tan received a telephone call at his wife`s family home in Kuala Lumpur. He could hear Hew crying over the telephone. Hew told him that he had lost over US$1m in FX dealings relating to Japanese Yen. It soon became clear to him that Hew had taken those loss-making positions in his name without his authorisation. Hew said that his superior, Mr Hammery, had decided to close the Yen positions. Hew asked him to telephone Mr Hammery to say that those positions should be closed. Surprisingly, Tan agreed to call Mr Hammery. He called twice and not getting him he left short messages to the effect that Mr Hammery should go ahead to close the positions.

Tan remained in his wife`s family home in Kuala Lumpur from 8 October to 12 October 1998. On 10 October 1998 Hew telephoned him. He said his superiors had told him to resign because he had not followed internal procedures and that his activities might even involve criminal prosecution.

Hew begged Tan to corroborate his version of the events to save him. Tan gathered that he had been told to accept responsibility for losses on two accounts through which Hew had carried out unauthorised trades. Those were the accounts of Nancy and Tan. Tan told Hew to reduce what he wanted him to say into writing. On his return to his Singapore home on 12 October 1998 he found an envelope from Hew addressed to him. He found a two-page document with the heading `Events leading up to the USD/JPY Losses` dated 9 October 1998. There were also statements of accounts from the plaintiff which he had never seen before. Tan says that Hew had made up a completely fictitious account of the events, which he hoped Tan would adopt or corroborate. On 12 October 1998 Hew called him and asked him if he would corroborate his story. Tan told him that he would not lie to save him and that he must tell the truth. Later, Hew called again and pleaded with him. But Nancy stepped in and stopped the communication, fearing that Tan might agree to corroborate his story out of pity.

On 14 October 1998 Tan wrote to the plaintiff stating that he had no knowledge of the transactions detailed in their fax of 13 October 1998. He also stressed that the transactions were not authorised by him. On 17 October 1998 he lodged a police report about Hew`s unauthorised trading in both

shares and forex trades by using his name.

***Causes of the losses***

Both Nancy and Tan are submitting that Hew`s `rogue trading` activities and a series of control weakness and judgmental failures which occurred at various levels of management of the plaintiff were primarily the causes of the plaintiff`s losses as a result of the unauthorised shares and forex trading. I have set out the unauthorised activities of Hew, a senior personnel of the plaintiff. I will now set out the internal control failures and other breaches of the plaintiff`s procedures.

Nancy`s account was operated in an irregular fashion from the very first trade on 13 April 1998. Its trade ran foul of MAS`s ruling. No forex line had been established for such forex transactions. No security had been pleaded by Nancy to secure the account. The plaintiff`s Chief Controller, Mr Colin Meyer (PW9) said in evidence that the plaintiff`s PBD Risk Manager Chong Tjang Shing (`Chong`) would, in the course of his daily duties checking the daily report known as AAP3600, would have known of the irregularity from the very first trade. In fact, Chong rather belatedly by his memo of 6 July 1998 reminded Hew about this infraction. He should have taken a firmer stand and stopped all future transactions until the matter was properly regularised with Nancy. If he had done it, Nancy`s unauthorised forex trades would not have happened.

According to the plaintiff`s rules, Chong was required to have reported to Mr Hammery. In spite of the irregularity, Hew was allowed to trade in the name of Nancy for another three months, without a forex line, credit facility or any security.

I now come to the eve of the October 1998 unauthorised forex transactions. On 30 September 1998 Chong sent a further e-mail to Hew stating as follows:

> *Client does not have any credit facility or fx/option trading facility. Moreover, she does not have any assets with us other than the UOB shares which are pledged to secure the account of Tan Shee Chin.*
>
> *As such, it is not advisable to allow her to trade fx/option contracts unless she have some deposits. By allowing her to do fx/option trading, we may have violate(sic) MAS ruling which require all clients to have fx/option trading and for the purposes of hedging she must have credit facility or deposits place (sic) with us.*

Mr Colin Meyer obviously tried to play down the error of Chong. He speculated that Chong would have spoken to Hew and obtained an explanation. He went on to make the further speculation that Chong would have evaluated Hew`s explanation and made an independent evaluation of the situation and decided that Hew would do what was necessary to regularise the account. He drew attention or alluded to other problematic accounts which had to be monitored more closely. In my view, Chong`s failure to take a more decisive step and his failure to get Mr Hammery to put a stop to Hew`s trading just before the unauthorised October 1998 forex deals in the name of Nancy was as unfortunate as it was the most causative of the web of causes, of which Hew`s rogue behaviour was the other main contributory factor.

I am fortified in my view by the plaintiff`s Auditor Long Form Report for the year ended 31 December 1998. The report stated:

> *The Internal Audit Department of the Branch has carried out an investigation and submitted investigation reports to the management. The private banking officer allegedly put through FX deals since March 1998, possibly with the customers` knowledge. The customers concerned did not have any approved FX trading lines with the Branch.* ***The unauthorised deals would have been detected earlier if the Risk Manager for private banking had performed documented control procedures as soon as they occurred. It is clear that he failed to perform these controls and the unauthorised FX transactions continued until October 1998.*** *[Emphasis added.]*

I would like to underline the fact that the investigation reports were produced in court. It did not shed more light as to what had happened.

The plaintiff was also aware, through its Chief Controller, Mr Colin Meyer, that irregular extensions of forward contracts at historical rates were also conducted through Nancy`s account. The particulars in the spreadsheet were gone over during the trial. Such historical rate transactions were seriously discouraged by MAS as well as the plaintiff`s own top management. The reasons are that such practices might be used to hide losses or perpetrate fraud, such as the unauthorised trading of Hew using the name of a customer. MAS Guidelines dated 4 April 1995 stated very clearly thus:

> *Merchant banks should also note that the Authority strongly discourages the use of non-current rates for the extension or roll-over of maturing forward exchange contracts and other derivative contracts,* ***as they may be used to conceal losses or to perpetuate fraud****. Where customers have genuine trade-related needs for rollover of maturing contracts using non-current rates, such roll-overs should only be done using the express approval of senior management of both the merchant bank* ***and that of the customer****. The express approval of the senior management of Head Office should be obtained for the merchant bank in Singapore to engage in such rollover transactions.* ***Credit exposures and funding costs must be recognised and unrealised losses must be booked as part of the credit facilities provided by the merchant bank to the customer, and they must be within approved credit limits of the merchant bank as well as the Authority`s prudential limits on credit facilities. These guidelines should be clearly established and adhered to.*** *[Emphasis added.]*

It was accepted that these guidelines applied with equal force to a restricted bank such as the plaintiff as they apply to merchant banks. Contrary to assertions of the plaintiff`s witnesses, the infraction of these guidelines led to fraud and concealment of losses in the case of Nancy`s account.

The top management of the plaintiff, including Mr Hammery, strongly discouraged the placing of orders by OICs without names of customers and the provision of names after the deal was done. Surprisingly, Raymond Goh, one of the plaintiff`s dealers in the Treasury Department, says in evidence that it was standard procedure to place an order and provide the name after the deal is done. I reject his evidence, as unsupported by Mr Hammery`s three written instructions issued by him in February, July and September 1998. In the last memo, he stated in the clearest possible terms: `It is strictly forbidden to give order to the dealing room without specifying the name of the client. In the case of pooled order you have to supply the list of names. Dealers on their side will be reminded not to accept incomplete orders.`

It is undisputed that the two forex deals in the name of Nancy and the five forex deals in the name of Tan were placed first without their names being provided. They were provided after the deals were

done. Where it appeared that he had assigned Tan`s names to his Assistant, Ms Harni Sim, at 9.17am on 7 October 1998 ( see vol 11AB3129) I was satisfied that Hew must have known that the two forex deals had been done at JPY 130.50 and JPY 129.50). It was left entirely to Hew to assign the deals to whichever party he chose. One shudders to imagine what he would have done if the US dollar had strengthened against the Japanese Yen instead by the same extent.

According to the internal control procedures of the plaintiff in relation to the return of confirmations sent out to customers, it is provided that `the acknowledgement of FX transactions by customers is compulsory and must be followed.` Nancy did not acknowledge any of the confirmation advices sent to her. From April until September 1998 the plaintiff knew that Nancy had not signed the Risks Disclosure Form. In addition, the transactions exceeded the express limit of US$500,000 of any single instruction. This limit was not restricted to money transfers only.

In relation to Tan, he says that he did not render any assistance to Hew to breach his fiduciary duties. He points to other acts and omissions of the plaintiff and its officers which directly caused the losses combined with the `rogue` activities of Hew, as he confessed before the sentencing District Judge.

To begin with, Hew deceived Tan time and time again as recited above. Hew then lied to his employer, the plaintiff, by fraudulent and blatant misrepresentations about the net worth of Tan. As set out in AB221, the details he gave to the plaintiff showed his mendacious capacity.

As required by MAS circular 612, the plaintiff ought to have conducted independent checks on the financing standing and assets of Tan. If they had done so, they would have found out that he had a very modest yearly income: see his income tax assessments for the years 1997 to 1999. Tan was never asked any question nor asked to produce any documentary proof of his net worth.

It was noteworthy that for a period of nine months from January to early October 1998, Tan had a substantial and steadily increasing net deficit on his overall position with the plaintiff. The plaintiff`s prudential margin of 60% was completely ignored. This enabled Hew, on a frolic of his own, to have entered into 113 speculative forex trades, with a total value of US$150m, in the name of Tan. No officer other than Hew had any contact with Tan at all material times. It was obvious that the plaintiff trusted Hew who proved to be a capable officer.

Tan did not sign any type of Risk Disclosure Statement till 6 March 1998. By that time, Hew using his account had accumulated a loss of MYR1,278,123.62. As noted earlier, the taped conversation between Hew and Tan on 5 March 1998 that Hew confirmed that they `had never talked of foreign exchange so that`s why you (Tan) did not sign the Risk Disclosure Form.`

In any event, the Risk Disclosure Statement in question was not relied upon by the plaintiff in any way. It was retained in the residence of Hew, where it was subsequently seized by CAD officers. The statement could not have `assisted` Hew in any breach of his duties, contractual or fiduciary.

Furthermore, Tan signed only one confirmation dated 5 March 1998. He did not return duly signed about 200 computer-generated confirmations of the plaintiff. In any case, that solitary signed confirmation could not have `assisted` Hew in the breach of any of his duties as he kept it in his own residence and was not filed by anyone in the plaintiff`s office.

I should finally note that in the closing out of the seven forex deals in question, nothing that Nancy or Tan could have done would have influenced the decision of Mr Hammery. Mr Hammery had made a firm decision. Nothing that Tan had said or left behind in the voice-mails of Mr Hammery would have made

a scintilla of difference.

Tan`s counsel therefore submits that the plaintiff`s own actions and omissions, culminating in Hew`s rogue behaviour in effecting the October 1998 forex deals, constituted a `novus actus interveniens`. The acts of the plaintiff`s own trusted senior officer, viz Hew, and the errors and dereliction of duties of the other officers, constituted fresh and independent causes of the plaintiff`s own losses.

I now deal with the various causes of action which I had referred to earlier. The plaintiff concentrated on establishing accessory liability on the part of Nancy and Tan for dishonestly assisting Hew`s breach of fiduciary duty. The plaintiff did not abandon the other causes of action on which, however, it did not place anything like the degree of reliance on asserting that Nancy and Tan are secondarily liable, having dishonestly assisted Hew in the breaches of his fiduciary duties to the plaintiff.

***Dishonest accessory liability***

The elements to prove dishonest accessory liability are:

(a) existence of a trust or fiduciary obligation;

(b) existence of a breach of the trust or fiduciary obligation;

(c) accessory to the breach; and

(d) dishonestly assisting the fiduciary in his breach of his fiduciary duties.

The leading case is **Royal Brunei Airlines v Tan (Philip Kok Ming)** [1995] 2 AC 378. The plaintiff airline appointed a travel company, BLT, to act as its agent. Under the agreement BLT was required to account to the airline for all the amounts received from the sale of the tickets. It was expressly constituted trustee of the moneys subject to the right to deduct commission. In fact, the airline did not pay airline moneys into a separate account. On the instructions of the managing director, they were paid into their current account and were utilised in the ordinary course of business. When BLT became insolvent, the airline sued the managing director and principal shareholder of BLT on the ground of knowing assistance. Roberts C.J. upheld the claim. But he was reversed by the Court of Appeal of Brunei on the ground that although BLT had been badly mismanaged, it had not been guilty of fraud or dishonesty. A further appeal to the Privy Council was allowed and it was held that BLT was in breach of trust, that the managing director assisted in that breach of trust and that both BLT and the managing director had acted dishonestly.

Dealing with the state of mind of the accessory, the Privy Council accepted the majority judicial view that dishonesty or want of probity was required.

The Privy Council went on to point out that honesty was an an ***objective*** standard (at p 389):

> *Honesty, indeed, does have a strong subjective element in that it is a description of a type of conduct assessed in the light of what a person actually knew at the time, as distinct from what a reasonable person would have known or appreciated. Further, honesty and its counterpart, dishonesty, are mostly concerned with advertent conduct, not inadvertent conduct. Carelessness is not dishonesty. Thus for the most part dishonesty is to be equated with conscious impropriety. However, these subjective characteristics of honesty do not mean that individuals are free to set their own standards of honesty in particular circumstances. Honesty is not an optional scale, with higher or lower*

> *values according to the moral standards of each individual.*

The Privy Council therefore considered that the basis for the imposition of accessory liability was fault on the part of the third party. Whether there was dishonesty in many cases should be clear. Intentionally deceiving someone thereby causing him harm, deliberately participating in a misapplication of trust asset or turning a blind eye to misconduct, are clearly acts of dishonesty. Undoubtedly, there would be difficult cases. Generally, however, as pointed out by the Privy Council an honest person `should have little difficulty in knowing whether a proposed transaction, or his participation in it, would offend the normally accepted standards of honest conduct.`

When an honest person knows there is a doubt, what does honesty require him to do? Lord Nicholls elaborated thus (pp 390-391):

> *The only answer to these questions lies in keeping in mind that honesty is an objective standard. The individual is expected to attain the standard which would be observed by an honest person placed in those circumstances. It is impossible to be more specific. Knox J captured the flavour of this, in a case with a commercial setting, when he referred to a person who is `guilty of commercially unacceptable conduct in the particular context involved`: see* ***Cowan de Groot Properties Ltd v Eagle Trust plc*** *[1942] 4 All ER 700, 761. Acting in reckless disregard of others` rights or possible rights can be a tell-tale sign of dishonesty. An honest person would have regard to the circumstances known to him, including the nature and importance of the proposed transaction, the nature and importance of his role, the ordinary course of business, the degree of doubt, the practicability of the trustee or the third party proceeding otherwise and the seriousness of the adverse consequences to the beneficiaries. The circumstances will dictate which one or more of the possible courses should be taken by an honest person. He might, for instance, flatly decline to become involved. He might ask further questions. He might seek advice, or insist on further advice being obtained. He might advise the trustee of the risks but then proceed with his role in the transaction. He might do many things. Ultimately, in most cases, an honest person should have little difficulty in knowing whether a proposed transaction, or his participation in it, would offend the normally accepted standards of honest conduct.*

There are in the realms of human affairs and commercial activities, not only complex and very difficult issues of morality and ties of kinship and sentiments but there are also the inevitable vagaries, vicissitudes and multitudinous chances and changes of commercial transactions. Transactions in forex and share trading, especially the former, involve high risks. Many lay people, like Nancy and Tan, in contrast to professionals, like Hew the rogue trader, do not even understand the complexities and volatility of forex deals. Hence, many private banking departments of multi-national banks the world over boast of their indispensable high order professional expertise, recommending `stop losses` mechanisms and other prudential measures and analyses before an investment or a position is undertaken by a lay customer. In such situations, the position is not always so straightforward when a participant in such transactions is a trusting novice or tyro who happens to have a `rogue` relative working in a private banking department and finds himself, most unfortunately, in a moral bind at the wrong time. It is also in this connection that one must always and punctiliously guard against the illogical flaw of judging any conduct of such tyros with the benefit of hind sight. If a person is imprudently optimistic, especially when he is not motivated by any personal pecuniary gain, directly or indirectly, I do not think that such imprudence is dishonesty. As Lord Nicholls helpfully stated in the context of taking risks: `All investment involves risks. Imprudence is not dishonesty, although

imprudence may be carried recklessly to lengths which call into question the honesty of the person making the decision. This is especially so if the transaction serves another purpose in which that person has an interest of his own` (p 389H). His Lordship is there pointing obviously to the motive or motivation which drives or lies behind the acts or omissions of the alleged accessory. If he stands to gain something, the `touchstone` of dishonesty is probably triggered as an ingredient constituting the equitable wrong of a dishonest accessory. On the other hand, if he is driven by ties of kinship, compassion, altruism or an exaggeratedly credulous or trusting nature or disposition, I do not think that such traits or shortcomings, however lamentable, amount to dishonesty in the context of accessory liability.

His Lordship has this piece of advice for a trial judge, which should lighten a trial judge`s tasks in reaching a correct and appropriate finding of facts in his application of the law of accessory liability: `Likewise, when called upon to decide whether a person was acting honestly, a court will look at all the circumstances known to the third party at the time. The court will also have regard to personal attributes of the third party, such as his experience and intelligence, and the reason why he acted as he did` (p 391B).

The Privy Council also pointed out that it was no part of the test of dishonesty that the third party should `knowingly` participate in the breach of trust. Knowledge, it was pointed out, was an inappropriate criterion to adopt where `the difference are of degree rather than of kind`. Lord Nicholls of Birkenhead made the point that the now notorious five-point scale of degrees of knowledge put forward in **Baden v Societe General** [1992] 4 All ER 161[1993] 1 WLR 509 at pp 575-576 were, in the context of dishonest accessory liability, `best forgotten`.

Lord Nicholls concluded (at p 392):

> *Drawing the threads together, their Lordships` overall conclusion is that dishonesty is a necessary ingredient of accessory liability. It is also a sufficient ingredient. A liability in equity to make good resulting loss attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation. It is not necessary that, in addition, the trustee or fiduciary was acting dishonestly, although this will usually be so where the third party who is assisting him is acting dishonestly. `Knowingly` is better avoided as a defining ingredient of the principle, and in the context of this principle the **Baden** [1993] 1 WLR 509 scale of knowledge is best forgotten.*

Five years earlier, an instructive case where dishonest accessory liability was imposed was decided by Millet J (as he then was) in **Agip (Africa) Ltd v Jackson** [1990] Ch 265. The defendant firm of accountants assisted by means of shell bank accounts and `cut outs` in the laundering and concealment of funds misappropriated from the plaintiff company. The judge pointed out that it was not necessary for the plaintiff to prove that the defendant had received any part of the trust property. He identified the essence of this equitable wrong by saying: `The basis of the stranger`s liability is not receipt of trust property but participation in a fraud`: p 292. The Court of Appeal affirmed his finding that the defendants were professional men and that they obviously knew that there were laundering money and that `(t)hey must have realised at least that their clients might be involved in a fraud on the plaintiffs`: p 294.

For our present purposes, I need to draw attention to the point made that for liability to attach the defendant does not need to know exactly what is going on, so long as he suspects that something dishonest might be going on. Millet J in ***Agip (Africa) v Jackson*** stated at p 295:

> *... it is no answer for a man charged with having knowingly assisted in a fraudulent and dishonest scheme to say that he thought it was `only` a breach of exchange control or `only` a case of tax evasion. It is not necessary that he should have been aware of the precise nature of the fraud or even of the identity of its victim. A man who consciously assists others by making arrangements which he knows are calculated to conceal what is happening from a third party takes the risk that they are part of a fraud practised on that party.*

Referring to the defendant firm of accountants, Millet J found that they `were at best indifferent to the possibility of fraud. They made no inquiries of the plaintiffs because they thought it was none of their business. That is not honest behaviour. The sooner that those who provide services of nominee companies for the purpose of enabling their clients to keep their activities secret realise it the better. In my judgment it is quite enough to make them liable to account as constructive trustees`: p 295.

A few months after the judgment in **Royal Brunei Airlines v Tan** (Unreported) it was considered in **Brinks v Abu-Saleh (No 3)** (Unreported) . A security guard of the plaintiff (indisputably a fiduciary) facilitated the robbery of gold and other valuables worth Â£26m from its Heathrow warehouse to his accomplices in the robbery. He provided the keys to, and internal photographs of, the warehouse. The plaintiffs sued a number of dishonest accessories. One of them was the defendant who accompanied her husband in the car which was driven to Zurich and which transported the proceeds of the robbery in the sum of over Â£3m to Zurich. She accompanied him in four trips during which various sums of money were transported to Zurich. She was sued for dishonestly assisting the laundering the money. Her husband, who was also sued, had reached a settlement with the plaintiff.

Rimer J found as a fact that the defendant and her husband had believed that the money was derived from one of the robber`s business empire and that they were helping to transport it for the purpose of tax evasion. Rimer J further found as a fact that the defendant had accompanied her husband as his wife, and in her spousal capacity her presence did not constitute the relevant `assistance` in furtherance of the breach of the constructive trust imposed in respect of the proceeds of the robbery, which was traceable in equity. The trial judge relied on a number of facts. First, he found that the robber`s couriering arrangements were made exclusively with the husband and she was not a party to it. Secondly, it was the husband who carried out all the elements of the couriering operation. Thirdly, there was no evidence justifying the conclusion that the robber had imposed a condition, or even made a request, to the effect that the defendant should accompany her husband on the trips with a view to provide some cover that they were going to shop in Zurich. It was also a fact that the husband had gone on two trips alone.

***Existence of trust property***

Counsel for both defendants raise the preliminary question of law whether the cause of action now known as dishonest accessory liability applies to cases where an alleged accessory has not assisted in any breach of trust property. They point out that the plaintiff is asking the court to extend this equitable wrong to cases where a breach of fiduciary duty is alleged but where there is no property which is impressed with a trust (express, implied, resulting or constructive. Counsel for Nancy relies on **Satnam Investments Ltd v Dunlop Heywood & Co Ltd** [1999] 3 All ER 652, a decision of the English Court of Appeal. A firm of surveyors, who had acted for the plaintiffs, in the course of which

they obtained confidential information of commercial importance, disclosed the information to a competitor of the plaintiffs. The competitor subsequently bought the property in question. Consequently, the plaintiffs alleged that the competitor had been aware of the surveyors` breach of fiduciary duty and that it held the property upon constructive trust for the plaintiffs. The trial judge upheld that contention, even though he made no finding that the competitor had acted dishonestly or participated in the surveyors` breach of fiduciary duty.

The English Court of Appeal allowed the appeal. Mere knowledge of a breach of fiduciary duty and making use of it to buy the property, without more, did not make the competitor a constructive trustee of the property.

The Court of Appeal went on further to say that the competitor could not be held liable for having been a dishonest accessory for the simple reason that the trial judge had not made any finding that the competitor had acted dishonestly.

However, counsel relied on what the Court of Appeal stated at p 671a: `Before a case can fall into either category [knowing receipt or knowing assistance] there must be trust property or traceable proceeds of trust property.` This sentence has been described in a later case as `compressed` and I will shortly advert to it. Counsel also quoted, quite properly and for completeness, what Lord Nourse delivering the judgment of the Court of Appeal went on to say at p 671b-c: `... As for knowing assistance, of which dishonesty on the part of the accessory is a necessary ingredient ... we would not have wanted to shut out the possibility of such a claim`s being successful if the judge had made a finding of dishonesty against (the surveyors), dishonesty for this purpose having been equated, for most part, with conscious impropriety: see ***Royal Brunei Airlines Sdn Bhd v Tan*** ...`.

The issue and these dicta came up for consideration in ***Goose v Wilson Sandford & Co*** , a decision delivered by the English Court of Appeal (Civil Division) on 14 March 2000: see Tab 49 of plaintiff`s supplementary bundle of authorities PSBA at p 646. In that case, the plaintiff who farmed his own land in Lincolnshire, UK, wished to acquire further agricultural land in France. For that purpose, he had an arrangement with one Peter Bray (`Bray`) who also wanted to buy a similar property. He turned out to be a `crook` He breached his fiduciary duties owed to the plaintiff. Bray retained the defendants, a firm of accountants, who arranged the intended purchases by both plaintiff and Bray. The accountants were alleged to have assisted Bray in his breaches of fiduciary duties. The Court of Appeal found on the facts that there did not subsist any fiduciary relationship at the relevant time and that the partner concerned in the defendant accountants firm `played no part in the breach of duty which then arose.`

The Court of Appeal referred to the `compressed` statement and stated at PSBA 678, though in fairness to Lord Nourse, it has to be pointed out the judgment read as a whole, which should always be done, would remove any misunderstanding:

> *However we feel that the statement quoted above may be so compressed as to admit of misunderstanding. It applies to both the alternatives recognised by Lord Selborne in* ***Barnes v Addy****. In the case of the first, `knowing receipt` there must, by definition, be or have been trust property or its traceable proceeds of sale. But it is not a prerequisite of liability that it is still in existence at the time the claim form is issued. In the case of the second, `knowing assistance`, it is not a requirement of liability that any property should have been received or handled by the defendant. The issue is whether the dishonest breach of trust in which the defendant assisted must have involved the misapplication of trust property or its proceeds of sale. The formulation of the principle by Lord Nicholls of Birkenhead (para 80 above) does not embrace such a requirement. Whether or not such a requirement is an essential feature of*

> *this head of liability is not a point we have to decide and, like the Court of Appeal in that case, we would not like to shut out the possibility of such a claim in its absence.*

In my view, the head of claim under dishonest accessory liability (a description which has been preferred by Lord Nicholls to `knowing assistance`) can in principle be maintained even if there is no mishandling of any trust property or its traceable proceeds of sale provided the assistance causes the loss in question. It has been explicitly made clear in ***Royal Brunei Airlines Sdn Bhd v Tan*** that `(a) liability in equity to make good resulting loss attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation.` That statement of the cause of action is plain and unambiguous. This liability has been emphatically and firmly segregated from the rules of subtractive unjust enrichment. Professor Peter Birks has been at the forefront of this clarification more than a decade ago. He pointed out that whereas knowing receipt is a cause of action in unjust enrichment, knowing assistance is a cause of action in the law of wrongs. He concludes ([1989] LMCLQ 296, at 334: `The equitable liability for assisting fraud is virtually unintelligible without fault.` The touchstone is dishonesty. Accordingly, the plaintiff in the absence of any mishandling of trust property may recover if it makes good the ingredients required to found liability under this head of claim.

***Conclusions***

I now come to my findings. In relation to the plaintiff`s claims against Nancy and Tan for full equitable compensation because they had dishonestly assisted Hew in the breaches of his duties, there are two central questions of fact, viz did they assist Hew in the breaches of his fiduciary duties; and, if so, were they dishonest.That Hew was a fiduciary of the plaintiff is plainly made out. It is also beyond dispute that he owed the plaintiff duties of fidelity as he was entrusted to conduct the financial transactions with the utmost probity. He did not and breached one of the basic tenets of a fiduciary. He placed his interest above those of his principal. He betrayed its trust.

***Assistance***

As has been recited, the facts which emerged during the trial point to the stark reality that Hew was the sole person responsible for each and every one of the unauthorised share or forex transaction which were booked in the names of Nancy and Tan. He alone decided what shares to buy and to sell and at what price. He placed the orders for each forex trade and often, most certainly the 7 October 1998 forex contracts for which the plaintiff seeks to attach dishonest accessory liability on Nancy and Tan, the orders for the forex trades were placed at first on a `no-name basis` with the plaintiff`s dealers who, contrary to very firm and clear control documented procedures, accepted those orders and effected the deals. Hew entered into those unauthorised share transactions solely for his own benefit and he engaged in the unauthorised forex transactions in the vain hope that he could earn enough profits and trade Tan`s account out of the woods.

I turn to the seven unauthorised forex deals done in October 1998. I am satisfied that Hew thought, erroneously as it turned out, that the popular forecast of a weakening Japanese Yen, a view popularly held within the plaintiff`s PBD towards the end of September 1998, was an excellent opportunity to earn a substantial profit. Events, unfortunately, proved him wrong and it was his unravelling. His career was ruined and he went to jail.

Hew, amazingly, had a free hand in his management of the accounts of Nancy and Tan within the

plaintiff`s PBD. He flouted every material control procedure with impunity. He did not even get a wrap on the knuckle. He was allowed to extend the maturity of forex contracts at historical rates, contrary to clear MAS directions, and this facilitated in the concealment of the losses. Payments for the losses were postponed and rolled over into so-called `loans`. He could open accounts in both names without any reference to them and on the few occasions he had to get them to sign, he deceived them by a litany of lies. Incredibly, whatever was signed by Tan, was retained by Hew in his residence! The consequence must be that the plaintiff was not misled in any way by any of those documents signed by Tan. It was incredibly coincidental that just before the disastrous October 1998 forex deals the Risks Manager had sent Hew a strong request that he should refrain from any further infraction. If firmer action had been taken to stop him from any forex deals on Nancy`s account, which did not have any forex trading facility, then the two forex deals contracted in her name would not have happened.

Neither Nancy nor Tan was really aware of the misfeasance committed by Hew. Tan especially allowed his sentiments to get the better of him. He should have been less sympathetic. Both of them provided additional collaterals just to give Hew more time and opportunity to trade out of the deficit that he had accumulated. It never occurred to them that there could potentially be a downside and further losses. The reasons were clear. They were taken in hook, line and sinker by Hew who took advantage of their trust and confidence in his professional expertise. They never thought that he would drag them further into the financial quagmire. It never occurred to them at any time that they were `assisting` him in his acts of misfeasance against the plaintiff. Nancy certainly was a tyro and novice; she was not even an investor or trader in shares, let alone the more exoteric but more volatile forex trades. I would not be far wrong to describe her as a person who hardly thought about the material importance of preserving her inheritance. I was at first sceptical about her evidence that Nancy never really bothered about the many confirmations and statements of accounts which the plaintiff had routinely sent to her after each forex trade. That she had put them aside and did not bother about them was quite credible. She was that sort of person. She had decided to help her brother and she trusted Hew to extricate him in due course. That was why even if she had scanned any document from the plaintiff bank, it did not `register`.

As for Tan, he could not resist the entreaties of Hew who by his solicitous manipulations could ultimately get him to do what he wanted him to do. It is incredible that he could be persuaded to part with his last batch of inherited UOB shares as additional collaterals to be mortgaged with the plaintiff. That was because Hew was a skilful deceiver. He told him a number of very serious lies. Unfortunately, Tan was not astute to see through him. As far as Tan was concerned, I think he had read the confirmations and statements during those periods that he was in Singapore. They did not raise any concern to him because he had decided to help Hew and he was taken in completely by him.

I am driven to the conclusion that both Nancy and Tan were grievously sinned against by Hew, and ill served by the plaintiff as a private banker, rather than sinning at all. The last thing they wanted to do was to assist Hew in committing any acts of betrayal or infidelity against the interest of the plaintiff.

In my judgment, Hew`s fraudulent conduct was the primary cause of the losses sustained by the plaintiff. His fraudulent conduct and his breaches of his fiduciary duties led to the losses. The next web of material causative factors which was responsible for the plaintiff`s losses were the plaintiff`s systemic internal failures and serious lapses of controls. As Hew committed all those acts in the course of his employment with the plaintiff, the plaintiff must be vicariously responsible. It is, in the final analysis, responsible for its dishonest servant and, to the extent that it had breached the contractual and tortuous duties of care, it was the author of its own misfortune.

***Were Nancy and Tan dishonest?***

That is indeed the central and most crucial question over which I had agonised hard and long in my review of the evidence in its totality. Bearing in mind the helpful guidance from the principles and dicta emanating from the many cases dealing with dishonest accessory liability, I have come to the conclusion that neither of them were dishonest in any assistance, if at all, which they had unwittingly rendered. The first point to highlight is the crucial fact that they stood to gain not a cent. They found themselves in a dilemma. Influenced by their background, their upbringing and values, and compounded by their credulous, naÃ¯ve and trusting pre-dispositions they (particularly Tan, and to a much lesser degree Nancy on whom the implications simply did not `register`) imprudently refrained from reporting Hew to the plaintiff and to the authorities. Nancy unquestioningly left it to him to direct any funds in her account to whomever he directed. They were foolish and woefully imprudent to have provided the additional collaterals. But foolishness, credulity and imprudence, which unfortunately were the besetting flaws of both Nancy and Tan, are not the same as dishonesty. They were both, in my opinion, and if I may say so of them, more fools than knaves. They were victims of the purposeful manipulations of Hew rather than his fellow participants in his frauds perpetrated against the plaintiff.

After Tan was assured by Hew that he (Hew) would try and recoup the losses, did his suspect any misfeasance on the part of Hew. Did Nancy suspect anything untoward on the part of Hew when he asked her to provide the third party collateral for the brother? On the evidence, I have come to the conclusion that they did not. They had confidence in him; they thought he was a smart professional, on top of the trades, and would get Tan out of the loss. They over-estimated both his abilities and his standards of integrity.

***Conspiracy***

This part of the plaintiff`s claim, which was not pursued with any vigour, is that Nancy and Tan together with Tan, and strangely enough at one stage even the second and third defendants were roped in, conspired to injure the plaintiff. It relies on the same material facts and submissions, which it asserts in support of their claims against them as dishonest accessories. That it is doing so is because the elements of both the civil wrongs of dishonest assistance and conspiracy overlap and they involve dishonesty and hostile intentions respectively. They are in that sense analogous wrongs in equity and in the law of torts. To establish the tort of conspiracy to injure the plaintiff, it has to prove that there was an agreement between them to injure it by unlawful means. On my conclusions, neither Nancy nor Tan was a party to any agreement. Hew was the villain of the piece and he deceived the plaintiff as well as Nancy and Tan. The existence of an agreement must be proved: see **Seagate Technology (S) Pte Ltd v Heng Eng Li** [1994] 1 SLR 534 .

***Procuring breach of duty***

The plaintiff alleges that Nancy and Tan had tortiously procured Hew`s breaches his contractual, for instance. that he would serve the plaintiff in good faith and fidelity, that he would look after the plaintiff`s interest rather than his own and that he would honestly and faithfully serve the plaintiff. One of the elements completing this tort is the element of procurement or inducement. In **DC Thomson & Co Ltd v Deakin** [1952] Ch 646, Upjohn J identified three forms of interference which could give rise to this tort at p 647: `The intervener knowing of the existence of a contract between A and B and acting with the object of procuring its breach by A to the damage of B will be liable not

only (1) if he directly intervenes by persuading A to break it, but also (2) if he intervenes by the commission of some act wrongful in itself so as to prevent A from in fact performing his contract and also (3) if he persuades a third party to do an act in itself wrongful or not legitimate (as committing a breach of a contract of service with A) so as to render, as was intended, impossible A`s performance of his contract with B`.

In my judgment, it would be highly artificial and inconsistent with the picture that emerges to say that Tan and Nancy had procured Hew`s breaches of the basic implied terms of his employment contract. Tan was responding to Hew`s unauthorised acts and, wrongly as it turned out, he provided the additional collaterals on two occasions with the sole intention of preventing Hew`s exposure. There was no evidence whatsoever that he intended to gain anything out of the whole salvaging exercise. In relation to Nancy, it is clear beyond any peradventure that she was only helping her brother, as Hew himself acknowledged to both Ms Oehlers and Mr Hammery, and that she, like her brother, with unusual, but yet very real and self-sacrificial credulousness, not only provided further collaterals but signed whatever disposal instructions which Hew placed before her in respect of any profits or surplus in her account. Hew`s skills of deception and acts of disassembly proved to be effective and mesmerising where both of them were concerned. From beginning to end, Hew was the initiator of every move, culminating in the 7 October 1998 forex deals which he signed in their names entirely on a frolic of his own.

***Breach of duty***

By paras 24, 27 and 28 of its re-amended statement of claim, the plaintiff avers that Nancy and Tan `owed a duty to the plaintiff in relation to the current accounts in their names with the plaintiff to notify the plaintiff immediately of any unauthorised transactions of which they became aware`. It is further pleaded that Nancy and Tan had breached their duty to notify immediately and that had the plaintiff been informed, the 7 October 1998 forex deals could have been avoided and `the plaintiff would not have suffered the loss and damage in respect of the foreign exchange losses of Japanese Yen 156,392,000 ...`. Note the specificity of the implied duty pleaded; there is no other duty pleaded and I therefore having regard to the content of the pleadings did not have to consider any other duty.

The plaintiff points to cases of forged cheques such as **Greenwood v Martins Bank** [1933] AC 51 and **Tai Hing Cotton Mill v Liu Chong Hing Bank Ltd** [1986] AC 80 and to the Singapore case of **Kodrat Suradji v Banque Nationale de Paris** [1992] 2 SLR 676 and the Hong Kong case of **Fung Kai Sun v Chang Fui Hing & Ors** [1951] AC 489 which dealt with forgeries of the charge over cash documents and mortgaged document. It was admitted by the plaintiff that these were all cases involving the operation of the equitable doctrine of estoppel. But it was pointed out on behalf of the plaintiff that in **Lipkin Gorman v Karpnale Ltd** [1992] 4 All ER 409[1989] 1 WLR 1340 May LJ opined that the first two named cases in this paragraph made it clear that it is an implied term of the relationship between a banker and his customer at least in relation to the operation of a current account that the latter will notify the former as soon as he learns that the account is being operated by a dishonest person.

In my view, there is in principle considerable conceptual difficulty in erecting an implied duty of care in contracts involving private banking activities such as share transactions and forex deals. Unlike the payment by a bank under a mandate evidenced in a cheque or some other document, with the right of reimbursement, and which of necessity and good conscience require, a duty of care on the part of the counter party, contractual arrangements between a bank and customer for share transactions or forex transactions do not as readily give rise to any implied. Why must it be necessarily so for the

efficacious working of the contract? The private investment bank may invoke the doctrine of estoppel in the appropriate circumstances. But to imply a duty to notify any unauthorised transaction is another proposition for which no authority has been cited.

***General authority***

Under this defence, the plaintiff relies heavily on Tan`s provision of additional securities after being told by Hew about the unauthorised share transactions and the conversation between Tan and Hew on 5 March 1998 when Hew mentioned for the first time that he had done some speculative foreign exchange deals for Tan`s account and that there was a net profit. Tan asked how the repayment was progressing. Hew`s response was a studied piece of disarming misinformation. He gave Tan the idea that he was not working alone in the plaintiff bank to reduce the debt level of Tan`s account and that he had been trying to use other funds to pay off the interest because he wanted to reduce the debt to `as low as possible`. It is a significant fact that Tan had later asked: `It`s not getting bigger, is it?` If he had read the confirmations, debit advices and statements of accounts from the plaintiff up to that conversation, why did he ask this question. He ought to have known! Tan`s casual attitude also betrayed the fact that his financial plight had not come home to him in any meaningful sense. He even tried to be clever with the benefit of hindsight and joked that Hew should have asked former President Suharto of Indonesia, then convert to Rupiah and get to pay off the debt with ease! The fact of the matter was that he left it to Hew to sort it out, content to play the role of a kind-hearted soul in not having reported Hew.

In view of my conclusions set out in this judgment, it is hardly tenable to suggest that both Nancy and Tan had given either specific or general authority. They did no such thing.

***Estoppel***

The plaintiff invokes the doctrine of estoppel against Tan in respect his liabilities under the loan account, as distinct from the October 1998 forex transactions. His silence after learning about the unauthorised share transactions amounted to a misrepresentation. Even for forex transactions, the plaintiff maintains that Tan`s provision of additional collateral for the continuation of the forex transaction, inter alia, induced the plaintiff to believe that there was nothing irregular about Tan`s account.

For estoppel to operate, the plaintiff has to establish: (a) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (b) an omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; (c) detriment to such person as a consequence of the act or omission; and (d) mere silence cannot amount to a representation, but when there is a duty to disclose, deliberate silence may become significant and amount to a representation. In connection with item (d) the plaintiff relies on ***Greenwood v Martins Bank*** , ***Kodrat v BNP*** and ***Fung Kai Sun v Chan Fui Heng*** .

On the facts as found on the evidence, I am of the view that Tan did not intend to induce the plaintiff to continue to allow Hew to trade in shares in his account. He was told by Hew that those share transactions would be stopped. By the time he was asked to provide his last batch of his inherited UOB shares, totalling 219,613 shares, the losses had been accumulated and the damage was done by Hew. The losses had been crystallised. In those circumstances, it would be wholly inequitable to tell Tan that he must keep his silence and be precluded by an equitable doctrine to raise and rely

on the indisputable fact that none of the share and forex transactions was authorised by him as a defence.

I refer to the five forex trades put in Tan`s name in October 1998 without his authorisation. Hew had acted entirely on a frolic of his own, thinking that he could take advantage of the market perception that Japanese Yen would weaken. He kept the deals away from Tan who was out of Singapore during the material period. Tan had not made any representation to lead the plaintiff to think that he would have authorised the placing of the five forex trades of US$1 million each.

So far as Nancy is concerned, on the facts it is plainly unsustainable to invoke estoppel against her.

***Nancy`s and Tan`s counterclaims***

In view of my conclusions , it is unnecessary to deal with those counterclaims.

All the transactions were unauthorised and the losses remaining in the accounts of both Nancy and Tan have to be borne by the plaintiffs. The unauthorised debits and credits in those accounts have to be reversed accordingly. All securities and collateral furnished by both Nancy and Tan must be returned to them freed from all encumbrances. The plaintiff`s claims are accordingly dismissed with costs. Parties are directed to settle the draft order. They have liberty to appear, if necessary, to settle the draft order.

**Outcome:**

Plaintiff`s claim dismissed; fourth and fifth defendants` counterclaim allowed.

Copyright © Government of Singapore.