# Bilta (UK) Limited (In Liquidation) v Natwest Markets Plc [2020] EWHC 546 (Ch)

# Exhibit 4

# Bilta (UK) Limited (In Liquidation) and others v Natwest Markets Plc, Mercuria Energy Europe Trading Limited

**Court**
Chancery Division

**Judgment Date**
10 March 2020

Case No: FL-2016-000017

High Court of Justice Business and Property Courts of England and Wales Chancery Division Financial List

**[2020] EWHC 546 (Ch), 2020 WL 01169967**

Before: Mr Justice Snowden

Date: Tuesday 10 March 2020

Hearing dates: 14, 18-22, 25-27 June, 2-6, 10-11, 17-20 July 2018

**Representation**

Christopher Parker Q.C. , Orlando Gledhill Q.C. and Oliver Butler (instructed by Rosenblatt Limited ) for the Claimants.
John Wardell Q.C. and Michael Ryan (instructed by Pinsent Masons LLP ) for the First Defendant.
Kenneth Maclean Q.C. and Steven Elliott Q.C. (instructed by Slaughter and May ) for the Second Defendant.

**Approved Judgment**

Mr Justice Snowden:

**A. Introduction**

1. These proceedings concern a claim for dishonest assistance and knowing participation in fraudulent trading. The claim is brought by Bilta (UK) Limited and a number of other companies incorporated in England and Wales which are in insolvent liquidation, together with their respective liquidators (the "Claimant companies" or the "Claimants").

2. The First Defendant is NatWest Markets plc, which at the relevant time was called The Royal Bank of Scotland plc, and hence will be referred to in this judgment as "RBS". The Second Defendant is Mercuria Energy Europe Trading Limited, which at the relevant time was an indirect subsidiary of RBS called RBS Sempra Energy Europe Limited, and hence will be referred to as "RBS SEEL".

3. RBS SEEL was the employer of traders who traded European Union ("EU") carbon credits called EU Allowances ("EUAs") on behalf of RBS pursuant to a joint venture between RBS and Sempra Energy which operated under the name RBS Sempra.

By such trading, RBS and RBS SEEL are alleged to have participated in the commission of missing trader intra-community VAT fraud ("MTIC fraud") in the summer of 2009.

4. The MTIC fraud was perpetrated by the directors of the Claimant companies, who caused their companies to participate in chains of transactions for the purchase of EUAs from other EU member states (which did not attract VAT) and the sale of those EUAs to UK counterparties (which did attract VAT). The directors of the Claimant companies then misappropriated or misapplied (or consented to the diversion by their counterparty of) the VAT payable on the EUAs that they had sold, rather than accounting for it to HMRC. The Claimant companies were then left without assets and defaulted on their obligations to HMRC.

5. It is alleged that these breaches of fiduciary duty by the directors to the Claimant companies were dishonestly assisted by the two traders employed by RBS SEEL, who caused RBS to buy very large quantities of EUAs from an intermediary called CarbonDesk Limited ("CarbonDesk"). It is alleged that, against a background of rumours of VAT fraud in the emissions trading market, the two traders had clear suspicions from 17 June 2009 about the legitimacy of the very significantly increased volume and nature of the very profitable trading which they were doing with CarbonDesk; but that instead of raising their suspicions with the compliance department at RBS Sempra or with CarbonDesk directly (as the traders now contend that they did), in fact the two traders dishonestly turned a blind eye and carried on trading regardless.

6. It is alleged that this trading continued unchecked until a letter was received by RBS on 30 June 2009 from BlueNext, the leading exchange for trading in spot EUAs, querying the sudden surge in volumes traded by RBS and asking RBS to provide details of the source of the EUAs that it was selling on the exchange. Although receipt of this letter led to the involvement of the compliance and anti-money laundering ("AML") departments at RBS Sempra and RBS, trading continued for several days whilst the position was investigated.

7. As well as investigating the trading with CarbonDesk, at the same time concerns were also raised by the AML team at RBS about the account activities of another company which was involved in the MTIC fraud. A decision was then made in the afternoon of Friday 3 July 2009 by RBS management to cease emissions trading with CarbonDesk.

8. The trading of which complaint is made also includes some trades which were conducted with CarbonDesk on Monday 6 July 2009 after the decision had been made on Friday 3 July 2009 that trading should cease. This occurred because there was concern within RBS that if trading stopped immediately, CarbonDesk might refuse to reissue about €40 million of invoices with a corrected VAT number which were required to enable RBS to reclaim VAT. It is said that, independently of propriety of the earlier trading, the decision of a lawyer at RBS that trading should continue in those circumstances until the reissued VAT invoices were received, was dishonest.

9. The Claimant companies are now all in insolvent liquidation. The total value of the pleaded claim for dishonest assistance is more than £83 million. This is alleged to be the amount of the Claimant companies' unpaid VAT liabilities to HMRC in respect of 445 transaction chains. These include the trading between RBS and CarbonDesk, together with further trades between RBS and another intermediary called GW Deals.

10. In the alternative, the liquidators of each of the Claimant companies claim compensation from RBS and RBS SEEL under section 213 of the Insolvency Act 1986 ("Section 213") on the basis that they knowingly participated in fraudulent trading by the Claimant companies.

11. As I have indicated, the Claimants' pleaded case included claims in relation to RBS's trading with GW Deals. As the evidence unfolded at trial, however, I had very little visibility of the events in relation to GW Deals – still less as to the traders' knowledge and state of mind in relation to their trading with that company. The allegations of turning a blind eye in relation to GW Deals were not clearly developed or put to the traders. I therefore propose to dismiss the Claimants' case in relation to such trading and I will confine my narrative and analysis of the evidence to the facts in relation to the trading with CarbonDesk.

**B. Mtic Fraud and the Carbon Emissions Market**

*Mtic Fraud*

12. At the time of the events in issue in this case, MTIC fraud was an EU-wide criminal activity which exploited the fact that imports of goods from one EU country to another were VAT-free. In its most basic form, an MTIC fraud involved a company in one EU member state importing easily transportable goods VAT-free from another EU member state, and selling them within the first country with VAT added to the sale price. This resulted in the importer running up extensive liabilities to national revenue authorities to account for the VAT which it had received. The dishonest directors of the importer would then cause its VAT receipts to be paid away to third parties and the remainder of the price to be paid to the supplier of the goods, with the result that the importer would be left with no assets and would default on its liabilities to the revenue authorities.

13. A more detailed description of the classic elements of an MTIC fraud (including so- called "contra-trading") was given by Christopher Clarke J in *Red 12 Trading Limited v HMRC [2010] STC 589* ,

> "2. Trader A imports goods, commonly computer chips and mobile telephones, into the United Kingdom from the European Union ("EU"). Such an importation does not require the importer to pay any VAT on the goods. A then sells the goods to B, charging VAT on the transaction. B pays the VAT to A, for which A is bound to account to HMRC. There are then a series of sales from B to C to D to E (or more). These sales are accounted for in the ordinary way. Thus C will pay B an amount which includes VAT. B will account to HMRC for the VAT it has received from C, but will claim to deduct (as an input tax) the output tax that A has charged to B. The same will happen, mutatis mutandis, as between C and D. The company at the end of the chain – E – will then export the goods to a purchaser in the EU. Exports are zero-rated for tax purposes, so Trader E will receive no VAT. He will have paid input tax but because the goods have been exported he is entitled to claim it back from HMRC. The chains in question may be quite long. The deals giving rise to them may be effected within a single day. Often none of the traders themselves take delivery of the goods which are held by freight forwarders.
>
> 3. The way that the fraud works is that A, the importer, goes missing. It does not account to HMRC for the tax paid to it by B. When HMRC tries to obtain the tax from A it can neither find A nor any of A's documents. In an alternative version of the fraud (which can take several forms) the fraudster uses the VAT registration details of a genuine and innocent trader, who never sees the tax on the sale to B, with which the fraudster makes off. The effect of A not accounting for the tax to HMRC means that HMRC does not receive the tax that it should. The effect of the exportation at the end of the chain is that HMRC pays out a sum, which represents the total sum of the VAT payable down the chain, without having received the major part of the overall VAT due, namely the amount due on the first intra-UK transaction between A and B. This amount is a profit to the fraudsters and a loss to the Revenue.
>
> ….
>
> 5. A jargon has developed to describe the participants in the fraud. The importer is known as "the defaulter". The intermediate traders between the defaulter and the exporter are known as "buffers" because they serve to hide the link between the importer and the exporter, and are often numbered "buffer 1, buffer 2" etc. The company which export the goods is known as the "broker".

> 6. The manner in which the proceeds of the fraud are shared (if they are) is known only by those who are parties to it. It may be that A takes all the profit or shares it with one or more of those in the chain, typically the broker. Alternatively the others in the chain may only earn a modest profit from a mark up on the intervening transactions. The fact that there are a series of sales in a chain does not necessarily mean that everyone in the chain is party to the fraud. Some of the members of the chain may be innocent traders.
>
> 7. There are variants of the plain vanilla version of the fraud. In one version ("carousel fraud") the goods that have been exported by the broker are subsequently re-imported, either by the original importer, or a different one, and continue down the same or another chain. Another variant is called "contra trading" … Goods are sold in a chain ("the dirty chain") through one or more buffer companies to (in the end) the broker ("Broker 1") which exports them, thus generating a claim for repayment. Broker 1 then acquires (actually or purportedly) goods, not necessarily of the same type, but of equivalent value from an EU trader and sells them, usually through one or more buffer companies, to Broker 2 in the UK for a mark up. The effect is that Broker 1 has no claim for repayment of input VAT on the sale to it under the dirty chain, because any such claim is matched by the VAT accountable to HMRC in respect of the sale to UK Broker 2. On the contrary a small sum may be due to HMRC from Broker 1. The suspicions of HMRC are, by this means, hopefully not aroused. Broker 2 then exports the goods and claims back the total VAT. The overall effect is the same as in the classic version of the fraud; but the exercise has the effect that the party claiming the repayment is not Broker 1 but Broker 2, who is, apparently, part of a chain without a missing trader ("the clean chain"). Broker 2 is party to the fraud.
>
> 8. HMRC will have records of whatever returns have been made to them by companies registered for VAT and will know what has been accounted to them and what has not. Using those records and information provided by VAT registered companies they are able to trace a chain of transactions in respect of which output tax received has been accounted for and claims to deduct input tax have been made. They can, thus, trace back from exporter E to (say) importer A. But at some stage the trail is likely to go cold. In the classic version of the fraud it will do so when HMRC gets to A because A and its documents have disappeared. HMRC will know that A has defaulted on its obligations in respect of VAT since it will not have received any of the output tax paid by B to A (as accounted for by B).
>
> 9. However, HMRC may not be in a position to know whether A is in fact the importer or whether there may have been earlier companies in the chain, either as purchasers or transferees, such that its full length was (say) Y – Z – A – B etc. In that example there will have been a defaulter (A), who will not have accounted to HMRC for VAT, but there will also have been an importer (Y). Whether or not Y or Z are liable to account for VAT may depend on the exact nature of the dealings between Y, Z and A, between whom money may not have changed hands."

14. Although Christopher Clarke J gave trading in computer chips or mobile phones as an example of MTIC fraud, the instant case concerns an intangible asset which proved to be just as capable of being used to commit MTIC fraud – namely EU carbon credits, in particular EUAs. The opportunity for EUAs to be used for MTIC fraud arose because spot trades in EUAs were characterised as sales of physical commodities and therefore were subject to VAT. A brief description of the nature of the issue, use and trading in carbon emission credits is therefore appropriate.

*The Carbon Emissions Market*

15. EUAs are a form of emission allowances issued under the European Union Emissions Trading Scheme ("EU ETS"). The EU ETS is one of the mechanisms that the EU established to meet its obligations under the 1999 Kyoto Protocol, and was designed as an economically efficient way to incentivise industrial sectors to reduce their carbon dioxide ("CO2") emissions.

16. The EU ETS began in 2005, with Phase 1 running from January 2005 to December 2007 and Phase 2 running from January 2008 to December 2012. Phase 3 has been running since January 2013 and will end in December 2020. The events in the current proceedings therefore occurred during Phase 2.

© 2025 Thomson Reuters.

17. Under the EU ETS, the companies covered by the scheme who were major emitters of greenhouse gases (so-called "compliance companies"), were obliged to surrender an emission allowance certificate for every tonne of CO2 that they emitted each year. The total tonnes of CO2 emitted by each compliance company also had to comply with an aggregate cap on annual greenhouse emissions set by their EU member state.

18. Each year, EU member states allocated or sold a fixed number of emissions allowances to the compliance companies within their borders, with allocations made by 28 February each year. Compliance companies had to report emissions for the year ending on 31 December by 31 March the following year and had to surrender the relevant emissions allowances by 30 April of that following year. In the event that a compliance company surrendered an insufficient number of allowances to cover the emissions it had produced that year, it was required to pay a penalty per excess tonne of emissions and also to make up the shortfall in allowances surrendered the following year.

**Euas**

19. EUAs are the most common form of emission allowance. One EUA represents the right to emit one metric tonne of CO2 or other specified gases. EUAs exist in digital form, are individually numbered, and are registered on and readily transferable via accounts held on an electronic registry system (the "EUTL").

20. Although registrable, EUAs are fungible and can be freely traded. Accordingly, compliance companies which have more EUAs annually than they need to cover their emissions can sell them on, either to other compliance companies who do not have sufficient EUAs, or to traders who do not require the EUAs for compliance obligations, but have chosen to participate in the carbon trading market. This provides an incentive for compliance companies to reduce their emissions to a cost per unit of emissions which is lower than the market price for EUAs, as they can then either sell their spare allowances for profit in the market or reduce the amount they need to spend on additional allowances.

21. In 2009, at the time of the events in the present proceedings, there were a number of market participants without any compliance obligations who were trading in EUAs. Some of the main participants were banks which assisted large companies in meeting their compliance needs, but also engaged in proprietary trading in EUAs. Trading houses and funds would also engage in speculative trading in the EUA market.

**Cers**

22. Another form of emission allowance which may be used within the EU ETS is created through the Clean Development Mechanism ("CDM") of the Kyoto Protocol.

23. Under the CDM, companies are encouraged to make investment into emission reduction or removal enhancement projects in developing countries which contribute to their sustainable development. A Certified Emissions Reduction ("CER") is issued for every tonne of CO2 reduced under the mechanism. Like EUAs, CERs can also be freely traded.

**Compliance Companies**

24. As stated above, in order to distinguish them from traders, the companies in the EUA market which owned and operated installations and therefore had compliance obligations were generally known as "compliance companies".

25. In terms of distribution of EUAs across compliance companies, there was a relatively small number of major installations which had a large allocation of EUAs, and a large number of installations which each had a very small allocation of EUAs.

26. Electricity utilities companies have always been the largest users and buyers of EUAs, followed by large industrial conglomerates such as companies in the steel and cement sectors. In 2009, the largest compliance companies often had their own dedicated EUA trading desks which would trade on a daily basis, typically via brokers. Alternatively, such large compliance companies would trade via investment banks.

27. Smaller compliance companies on the EUA market comprised a wide range of industrial plants. Typically, these industrials would trade more infrequently than larger installations, and only if they had a shortfall or surplus of EUAs.

**Spot, Future and Forward Trading**

28. There were three ways in which EUAs were typically traded;

© 2025 Thomson Reuters.

1) Spot Trading. This was the simplest and cheapest form of trading in EUAs in which delivery and payment took place within a day or two of the trade being agreed. A transfer of allowances was generally required for each individual spot trade;
2) Forward Trading. This involved agreeing delivery and payment of the EUAs for a specified future date. A forward trade would be agreed directly between two market participants, so the name of counterparties would be known before the trade was confirmed and credit lines and legal documentation could be put in place before the trade was completed; and
3) Futures Trading. This was a standardised form of forward trade contract used in clearing houses which facilitated trading on an exchange. As the agreement for the carbon credits was made with the clearing house, this form of trading was completely anonymous.

**Otc and exchange trading**

29. Although the market in EUAs began as a purely over the counter ("OTC") trades market, by 2009 various exchanges had been established. The main exchanges trading EUAs were BlueNext (named PowerNext from 2005 to December 2007), Nordpool, EEX, ICE and Climex. The largest of these by far was BlueNext, which saw the majority of the spot trading that occurred during the relevant period for this claim.

30. The totality of RBS's purchases of EUAs from CarbonDesk in relation to the alleged fraud in the present proceedings was OTC spot trading. RBS then sold the EUAs which it acquired from CarbonDesk on the BlueNext exchange as well as to companies called Vertis and STX.

**C. Dramatis Personae**

31. Before setting out a chronology of the course of events and analysing the issues in dispute in this case, I will first give a brief dramatis personae of the key individuals and witnesses in these proceedings.

*Rbs and Rbs Seel*

**Andrew Gygax**

32. Mr. Gygax gained a Masters in Economics at university before beginning his career as an analyst for a regional electricity company. From there, he worked as a trading analyst for E.ON, where he was later promoted to the role of Senior Power & Carbon Trader. This role required him to take responsibility for his own trading book and profit and loss, including making decisions about the trading positions and strategies that should be adopted. He did not, however, undertake any spot trading.

33. Prior to taking on his role at RBS Sempra, Mr. Gygax worked as Director of Emissions Trading at Constellation Energy Global Commodities Group ("Constellation"). He was brought in to Constellation to build up the business' portfolio in relation to trading EUAs and CERs, particularly with regards to EUA and CER swaps and hedging of carbon exposures. Again, Mr. Gygax did not engage in any spot trading during his employment at Constellation.

34. Mr. Gygax was employed by RBS SEEL as Senior Energy Trader towards the end of May 2009, three months after leaving Constellation. He was Head of the Emissions Desk at RBS Sempra which handled EUA trading on behalf of RBS. Mr. Gygax had responsibility for the performance of the emissions trading operation, managing the other staff on the trading desk and developing the trading operation. He was the line manager for Mr. Jonathan Shain and also for the sales and marketing team.

**Jonathan Shain**

35. Mr. Shain had a background in accountancy, training as a chartered accountant at PricewaterhouseCoopers LLP and then working for a brief period at Ernst & Young. He joined RBS SEEL in 2003 as an accountant, before being appointed to a trade support role on the Eastern European Power Desk in 2006. Mr. Shain's trade support role comprised booking trades, dealing with the clearing houses, and intra-day administration. From 2 August 2008 Mr. Shain joined the emissions trading desk at RBS Sempra as a junior trader. In addition to some support activities, he began to conduct simple customer flow trading, buying or selling credits to customers of RBS. Mr. Shain initially reported to Mr. Daniel Mulder, who left on 22 April 2009. For a short time Mr. Shain was the only trader on the desk and reported to Mr. Michael Walter, but when Mr. Gygax joined RBS Sempra towards the end of May 2009, Mr. Shain reported to Mr. Gygax.

© 2025 Thomson Reuters. 

**Michael Walter**

36. Mr. Walter was employed by RBS SEEL to act as Managing Director and head of European energy trading at RBS Sempra. This role consisted of managing the European power, coal and emissions trading businesses. Mr. Gygax reported directly to Mr. Walter in respect of carbon emissions trading. Mr. Shain also reported to Mr. Walter with regards to his support role for the other trading desks.

**Rene Vanhaesendonck**

37. Mr. Vanhaesendonck was a director and General Counsel at RBS SEEL.

**Christopher Savage**

38. Mr. Savage was employed by RBS Sempra Metals Limited as a Compliance Officer. His responsibilities included all aspects of compliance and anti-money laundering (AML) in relation to RBS Sempra and he was the first point of contact for Mr. Gygax and Mr. Shain in relation to such matters.

**Frank Baum**

39. Mr. Baum was vice-president of credit control for RBS Sempra.

**Piotr Rosol**

40. Mr. Rosol was one of two analysts in the operations team at RBS Sempra who dealt with emissions trading.

**James Duncan**

41. Mr. Duncan was an accountant in the VAT department at RBS Sempra.

**Julie Aspinall**

42. Ms. Aspinall was employed by RBS between July 2002 and December 2011. In 2009, she was employed as an AML Consultant within RBS's Global Banking and Markets division. Within her role, Ms. Aspinall would provide AML advisory support to the operations teams in the Global Banking and Markets (GBM) division, which included RBS Sempra.

**Christine Brannigan**

43. Ms. Brannigan was a manager within RBS's AML Operations team and head of the money laundering detection unit sub-team. Ms. Brannigan's main role in AML Operations was dealing with automated alerts and Internal Money Laundering Suspicion Reports ("IMLSR").

**Irvine Rodger**

44. Mr. Rodger was the head of the Global Banking Markets (GBM) money laundering prevention unit at RBS.

**Alex Boxall**

45. Mr. Boxall was legal counsel, business and commercial banking in the RBS group legal department.

*Carbondesk*

**Jay Ward**

46. Mr. Ward was CarbonDesk's main trader and the main point of contact for the RBS SEEL traders. Prior to working as a trader at CarbonDesk, Mr. Ward was a recruitment consultant.

*Expert Witnesses*

**Louis Redshaw**

47. Mr. Redshaw appeared as a carbon trading expert witness for the Claimants.

48. He has around 22 years of experience of energy markets, 14 of which have been dedicated to the international carbon markets. Notably, he was employed by Barclays Capital from March 2004 until November 2013, first working as Head of Emissions Trading before being promoted to Managing Director in 2010. He was therefore employed at Barclays at the time of the events relating to the present proceedings. Since leaving Barclays, Mr. Redshaw has set up and worked for his own companies.

**Karim Kanji**

49. Mr. Kanji appeared as a carbon trading expert for RBS SEEL.

50. Mr. Kanji is a trader in physical and derivative energy products and was involved in the trading of power, natural gas, coal and emissions products in at various companies from 1998 until 2016. In 2016, Mr. Kanji left the energy markets sector to explore other opportunities.

51. In 2006, Mr. Kanji joined Barclays Capital on its newly formed trading desk, working alongside Mr. Redshaw and he was employed there until 2013 when the bank started winding up its commodities trading business. At Barclays Capital, he gained experience trading on every major emissions exchange, including BlueNext.

**Daniel Radov**

52. Mr. Radov appeared as a carbon trading expert witness for RBS.

53. Mr. Radov is not an emissions trader. He is a Director at NERA Economics Consulting ("NERA"), leading its environmental economics team in London, where he has been employed since 2000. His work at NERA has focussed on the analysis of policies designed to address climate change and air quality, including emissions trading.

54. Mr. Radov does a great deal of work for governmental bodies, including a study for the European Commission in 2001-2002 to set out and evaluate different design options for the proposed EU ETS, and follow-up studies regarding the distribution of emissions allowances. Mr. Radov also provides advice to private companies and industry groups about environmental regulations and markets and has authored and co-authored a number of reports and studies regarding emissions trading, climate change policy and environmental regulation.

**Luke Steadman Fca**

55. Mr. Steadman appeared on behalf of the Claimant as an expert witness in forensic accountancy.

56. Mr. Steadman is a Fellow of the Institute of Chartered Accountants in England and Wales and a Partner of Alvarez & Marsal Disputes and Investigations LLP, which is a firm of forensic accountants.

57. He has around 25 years' experience in accounting. He began his career at Baker Tilly in 1992 as a chartered accountant, before moving to Lee & Allen in 1996, where he was Vice President and head of the fraud and forensic accounting investigation team. Mr. Steadman joined Alvarez & Marsal in 2010.

**Diane Hughes Fca**

58. Ms. Hughes appeared as an expert witness for the Defendants in forensic accountancy.

59. Ms. Hughes has been the Managing Director of AlixPartners, a global business advisory firm, since 2015. She specialises in forensic investigations and litigation support assignments, with over 30 years' experience in professional services and in industry. Ms. Hughes began her career by qualifying as a chartered accountant, before working in audit and business advisory. She has been a Director of several companies throughout her career and set up her own recruitment business in 2001, which she sold in 2006. Prior to joining AlixPartners, Ms. Hughes led the Forensic & Litigation Support team at Zolfo Cooper Europe for almost six years.

**D. The Facts in Outline**

60. I set out below a basic chronology of events as a basis for discussion of the issues.

*Rbs Sempra's involvement in the Carbon Market until June 2009*

61. The carbon credit trading which is relevant to the current case was carried out on behalf of RBS by the emissions trading desk at RBS SEEL (the "Desk") which comprised Mr. Gygax and Mr. Shain ("the Traders"). The office was open plan and the Traders sat next to one another.

62. Mr. Gygax and Mr. Shain each had a base salary and an annual bonus. The annual profit or loss of the Desk had an impact on the size of this bonus.

63. Although the Desk also engaged in managing carbon projects and some proprietary trading on RBS's own account, it was so-called "customer flow" trading which formed the bulk of the Desk's business relevant to this case. In such trading, RBS would act as a buyer from, or seller to, its clients, and make a profit on such trading as a result of the difference between the price at which it had bought or sold (as the case might be) and the price at which it could sell or buy the EUAs in the market. In order to minimise risk, RBS would aim to carry out each side of the transaction in quick succession so that the EUAs were held for a limited period. If the EUAs could not be sold on immediately, RBS would look to hedge the position.

64. Towards the end of 2008 and during the first half of 2009, there was significant acceleration in the growth of the carbon spot market. There was a significant growth in overall volumes traded, mainly on BlueNext, and an influx of new market participants. Spot prices fell to a low point on 8 February 2009, from which low point they then steadily rose.

65. The Desk was aware of the growth in EUA volumes traded in the first half of 2009. On 8 April 2009, Mr. Mulder sent an email to the emissions distribution list with the subject line *"volumes in emissions market keep rising"* . The email then set out data on recent volumes. The Desk also noted the decline in spot trading prices until mid-February 2009, with Mr. Shain sending emails to the emissions distribution list on both 11 and 12 February 2009 detailing the record lows.

*Approach by Carbondesk to Rbs Sempra and onboarding*

66. On 9 March 2009, RBS Sempra was approached by CarbonDesk via an email from Mr. Ward. The email stated that CarbonDesk were seeing some *"decent flow"* with regards to spot trading of EUAs and CERs and that they were looking for some counterparties to expand. The email continued,

> "Our main business is looking after small to medium sized compliance buyers, and as such we do not wish to compete with the major brokers per se, however we do need the other side to our trades."

67. Mr. Mulder met Mr. Ward at the PointCarbon Conference in Copenhagen which took place 17-19 March 2009. Following the conference, RBS Sempra began the process of "onboarding" CarbonDesk as a counterparty. To that end, Mr. Ward provided RBS Sempra with a Certificate of Incorporation and Memorandum of Association for CarbonDesk. Financial information was also provided through CarbonDesk's listing document for its admission to the PLUS market.

68. After approval from the credit and legal departments at RBS Sempra, trading with CarbonDesk was approved on 1 April 2009.

*Early trading with Carbondesk*

69. Via the Desk, RBS began trading with CarbonDesk on 2 April 2009, entering into 4 spot trades to acquire 232,012 EUAs. Over the next two weeks until Mr. Mulder left on 22 April 2009, RBS entered into four further spot trades with CarbonDesk, purchasing a total of 53,000 EUAs.

70. On around 20 April 2009, there were discussions within RBS Sempra about extending a credit line of $50,000 to CarbonDesk. The view was expressed internally that CarbonDesk was new and developing, but not yet creditworthy, so that trading should take place on the basis that payment would only be made after delivery of the EUAs had been verified.

71. Between 23 April and 14 June 2009, the Desk caused RBS to enter into a further 14 trades with CarbonDesk, purchasing a total of 740,500 EUAs.

72. On 3 June, Mr. Gygax received a link to an emissions trading blog post headed " *BlueNext: VAT scams or Simple Money Laundering?* ". The blog ran to three printed pages and referred to the "recent flurry of trading activity that has many suspicious elements, but no one can quite put their finger on it", and referred to VAT fraud as a possible explanation for such increased activity on BlueNext. Mr. Gygax forwarded the link to the blog on the same day to Mr. Owen Lloyd, a former colleague with the comment,

> "20 years experience is claimed, thought you were older".

That was a reference to a comment towards the end of the blog that the author was "a trader with 20 years of experience".

*Closure of Bluenext and rumours of Vat fraud*

73. The next day, Thursday 4 June 2009, the French emissions registry closed and remained closed the following day. On Monday 8 June 2009 at 5.50am, BlueNext sent an email to members of the exchange, informing them that the BlueNext spot market on EUA and CER contracts would "have a delayed opening until further notice". Later that morning, Mr. Gygax responded to a request from a colleague for an explanation, saying, "Technical issues claimed – VAT avoidance issues speculated…"

74. Later that day, the French Ministère du Budget announced that it had made EUAs and CERs exempt from VAT. BlueNext announced that the exchange was to remain closed for the next two days in order to allow members to make any necessary changes to their systems and to inform their customers of developments. The exchange was scheduled to re-open on Wednesday 10 June 2009.

75. Both the closure of the BlueNext exchange and the new French VAT exemption were extensively reported in the market press and commentaries in the week of 8 June 2009. The press and commentaries often made the connection between the recent developments and the rise of VAT fraud. As an example, among articles which were read by Mr. Gygax was an article from Point Carbon on 9 June 2009 entitled "UK not planning to follow French lead on VAT". This specifically referred to the French move to remove VAT on spot transactions of carbon as having been made against the backdrop of rumours that EUAs "could be used in a so-called VAT carousel fraud, which has been highly prevalent in the UK recently". The article gave an extended description of how a carousel fraud operated, with goods being moved across borders between EU states. It also made the point that unlike carbon futures contracts, spot carbon deals were classified as physical commodities and so were subject to VAT.

76. Mr. Gygax sent that Point Carbon article under cover of an email to Mr. Rosol, quoting the reference to VAT being charged on spot carbon deals and asking a question about the VAT treatment of buying spot trades and selling futures in London. Mr. Rosol replied that he should follow up with Mr. Duncan in the VAT department.

77. Later that morning, Mr. Gygax received a Bloomberg article titled "France Finds 'Carousel' Tax Fraud in Carbon Emissions Market" which stated that the French government had found evidence of carousel fraud relating to the VAT on EUA trades. This statement was corrected later the same day to confirm that the French government had found "a risk of carousel fraud".

78. The BlueNext exchange re-opened the next day, 10 June 2009, but saw a huge reduction in traded volumes to about 2.4 million EUAs from the 20 million EUAs which had been traded on 2 June. Mr. Gygax noted this change in an email to the emissions distribution list at 17:06 that day, stating,

> "Today marked the return of the Bluenext market, huge reduction against recent volumes despite being out for a number of days – with only 2.4mt having traded."

79. Also on 10 June 2009, Mr. Gygax sent an email to a colleague stating that RBS SEEL would "for now" not be able to trade with any new counterparties from outside the EU and asking that she maintain a consistent line with him if asked why. The line proposed by Mr. Gygax was that,

> "In view of recent developments around spot market activity in carbon, we currently have a freeze on all new counterparties until the management understand the full nature of the problems and any potential risks to the market and the company."

80. BlueNext volumes dropped further again on 11 June 2009 – the fall being reported in the market press.

*The possibility of Vat fraud affecting emissions trading is discussed at Rbs Sempra*

81. On 11 June 2009 Mr. Savage circulated an email to (among others) Mr. Gygax under the heading "EUA emissions and VAT fraud – confidential". The email stated, "There are concerns in this market that there may be a VAT fraud particularly originating in France" and warned,

> "Please note that under EU regs adopted in the UK if one is part of a chain even if divorced from the fraud the revenue can apply joint and several liability down the chain."

82. Mr. Savage's email also included hotlinks to two Reuters articles and attached 3 documents. The first Reuters article to which a link was provided had been dated a couple of days earlier and was entitled, "France makes CO2 credits VAT-exempt to avoid scam". It quoted a French Budget Ministry source as having said that the VAT regime had been changed as a preventative measure because of a risk of VAT carousel fraud. The article commented,

> "Emissions traders said rumours were circulating that a recent surge in volumes in EU emissions permits traded over BlueNext, Europe's main exchange for spot permit trading, were suspicious.
>
> 'Part of this volume was sound, coming from the market expanding and new players entering, but a share of it might be hard to explain,' said one emissions analyst."

The article also stated, however, that the Ministry and BlueNext were both denying that there was any evidence of fraud on the exchange and that BlueNext had said the rumours of fraud were "unsubstantiated".

83. The second Reuters article was to similar effect, indicating that an inquiry was underway in relation to a VAT fraud in France, but that no-one was yet under official investigation. It stated,

> "A ministry source said there had been no evidence of a VAT fraud, despite rumours circulating that a recent surge in volumes in the European Union emissions permits traded over BlueNext, Europe's main exchange for spot permit trading, was suspicious.

> Through carousel fraud, also called missing trader fraud, fraudsters import goods VAT-free from other countries, and then sell the goods to domestic buyers, charging them VAT. The sellers then disappear without paying the collected tax to the government collection authorities."

84. The documents attached to Mr. Savage's email included a summary of UK VAT legislation, an HMRC notice on joint and several liability for unpaid VAT, and a paper headed "EUA Spot Market – Risk of Carousel Fraud". The latter paper explained clearly, and in some detail, the concept of carousel fraud, how a carousel fraud could be committed using exchange traded EUAs, and how a company could be exposed to carousel fraud via OTC traded EUAs. The concluding "Summary" section of the paper stated:

> "Parties must continue to take extreme care in establishing the " *bona fide* " status of all counterparties. By demonstrating robust counterparty acceptance procedures Parties should be able to defend their positions as regards the claiming of input tax and reverse charge sales of commodities.
>
> Implementing procedures to identify suspicious trading activity; small traders continually selling commodities, with UK VAT or overseas buyers continually buying commodities should trigger a warning."

85. It is common ground that these documents were discussed between Mr. Gygax, Mr. Savage and Mr. Duncan from the VAT department at RBS Sempra.

86. That evening, 11 June 2009, Mr. Gygax went to a dinner hosted by Tony Maynard, an emissions broker at Spectron and attended by traders from a number of financial institutions. The next day, 12 June 2009, Mr. Savage emailed a number of people, including Mr. Gygax and Mr. Duncan, a link to the results of a Google search for "VAT fraud". Mr. Gygax responded, saying that,

> "BNP and SocGen traders were aware of the issues over a month ago - was digging last night with brokers/cptys"

87. The same day, Mr. Gygax also sent Mr. Savage a further article concerning an investigation into the possible French VAT fraud. That article contained the following,

> "PARIS/LONDON (Reuters) - The Paris prosecutor's office confirmed on Thursday a probe was under way into a suspected multi-million euros value-added tax (VAT) fraud in the French carbon emissions market.
>
> "An inquiry is under way but we are not yet about to place people under official investigation," a source at the Paris prosecutor's office said.
>
> The French Budget Ministry has made carbon permits exempt from VAT in order to prevent a potential scam linked to a French emissions exchange, a government source said on Monday.
>
> A ministry source said there had been no evidence of a VAT fraud, despite rumours circulating that a recent surge in volumes in the European Union emissions permits traded over BlueNext, Europe's main exchange for spot permit trading, was suspicious.

Through carousel fraud, also called missing trader fraud, fraudsters import goods VAT-free from other countries, and then sell the goods to domestic buyers, charging them VAT. The sellers then disappear without paying the collected tax to the government collection authorities.

A BlueNext spokesman told Reuters on Thursday there was no evidence VAT fraud was occurring over its exchange and that the rumours were "unsubstantiated," adding he was unaware of any investigation relating specifically to the exchange."

88. Following his earlier email of 11 June 2009, Mr. Savage completed a draft of additional requirements for onboarding new counterparties and circulated them to the legal and compliance teams on the evening of 12 June 2009 for comment. In summary, the new requirements consisted of obtaining a copy of the counterparty's VAT registration certificate and checking the VAT number on the EU VAT checker website.

*Week commencing Monday 15 June 2009*

89. Mr. Shain returned from holiday at the start of the week commencing 15 June 2009. That week, the Desk caused RBS to purchase a total of 6.625 million EUAs from CarbonDesk. The total price was €94 million (including VAT).

90. Around lunchtime on 15 June 2009, Mr. Savage circulated an email regarding additional onboarding requirements in order to ensure that RBS SEEL fully understood a counterparty's business and that careful due diligence was carried out, particularly on smaller companies. He promised to circulate a new due diligence procedure later. The email stated:

"We have recently been made aware of the existence of a number of (VAT) carousel frauds in Europe – particularly relating to the emissions market.

The existence of VAT carousel fraud is not, however, restricted to this market.

Therefore with immediate effect as part of our on-boarding process the following additional work will be carried out.

For all UK/EU companies – including regulated companies – we will require:

…

In addition to this documentation we need to ensure that we clearly understand their business, therefore the normal KYC procedures need to be followed, and for those companies which are small and involved with physical trading (e.g. LME Metal Warrants, carbon emissions etc) we need to ensure that we clearly understand their involvement in the business; therefore, an enhanced due diligence programme must be carried out – this will be forwarded later."

Mr. Shain and Mr. Gygax were not copied into this email.

91. On Wednesday 17 June 2009, Mr. Baum sent an email entitled "Emissions business" to various people involved in emissions trading at RBS SEEL, including Mr. Gygax and Mr. Shain. In this email, he set out the credit terms that had been discussed between the Desk, back office and credit relating to CarbonDesk, which included the term that, on spot purchases, RBS would only pay once delivery of certificates was confirmed. He said:

"I understand from Andrew [Gygax] that this business is rather profitable and that is the main reason why we are willing to accommodate trading with these small cptys and very weak credits, which

© 2025 Thomson Reuters.

> under normal credit standards we would not do without some form of collateral in hand prior to trading."

92. At 07:32 hrs on Thursday 18 June 2009, Mr. Gygax made a call to "Siv" at Hoare Capital. The contents and significance of this conversation were much debated at the trial and I shall return to consider it in greater detail later. Among other things, there was a discussion of how new smaller companies involved in spot trading were achieving significant trading volumes, and Mr. Gygax said that he had been "blown away" by the flow some of the smaller boutique brokerage companies had been getting from dealing with industrial clients. Siv then brought up CarbonDesk as an example and told Mr. Gygax that he had been making inquiries and really didn't know where CarbonDesk was getting its EUAs from. Mr. Gygax responded:

> "I don't know, you… I don't know if it's even worth getting something on the website just getting linked in emissions trading bang people see a name then maybe they ask the questions because that's the same thing that we are scratching our heads at and just kinda going well how are they, how are they getting these people up and on boarding and kinda come to the conclusion what, maybe they're just can't interfere through us because corporate bank divisions just say well, fine from money lender will not be trading because there are certain issues that we have … but I don't know I don't know the first instance how they are getting on board second how they're getting them in the first place."

93. That evening, Mr. Ward asked Mr. Gygax if he and Mr. Shain would like to go for a drink. Neither of them were available, but Mr. Gygax said he would arrange a dinner instead. In a call with Mr. Ward during the afternoon of Friday 19 June 2009, Mr. Gygax confirmed that he had booked a venue for a dinner between RBS SEEL and CarbonDesk for the following Thursday, 25 June 2009.

*Week commencing Monday 22 June 2009*

94. During this week, the Desk caused RBS to purchase 14.451 million EUAs from CarbonDesk, paying CarbonDesk about €210 million (inclusive of VAT). Wednesday 24 June 2009 was a particularly busy day for the Desk, with 3.61 million EUAs purchased from CarbonDesk across 38 trades. This marked a new daily high and was more than a 50% increase from the previous daily high.

95. At 13:52 hrs on 24 June 2009, Mr. Shain and Mr. Ward had a telephone conversation which included the following:

> "Shain: It's not…not that busy a day really. Ward: Mmm…
>
> Shain: [inaudible]
>
> Ward: You work out how much volume we've done, and you look at Blue Next volume?
>
> Shain: Where's all the other side, I don't understand? Ward: What?
>
> Shain: Where are these guys buying it all from? Ward: I think the same place. At your interest.
>
> Shain: He's buying from me and selling it to me as well? Ward: Probably.
>
> Shain: That's dodgy, no?
>
> Ward: No. Why is that? It's just intraday trading.
>
> Shain: They must be buying it higher than…than they're selling it [inaudible]."

Bilta (UK) Ltd (In Liquidation) v Natwest Markets Plc, 2020 WL 01169967 (2020)

96. On Thursday 25 June 2009, the Desk caused RBS to buy 3.995 million EUAs from CarbonDesk across 41 trades, marking a new all-time high in purchases from CarbonDesk.

97. That evening, Mr. Gygax and Mr. Shain had dinner with CarbonDesk at The Gaucho in Broadgate. Mr. Gygax recalls that he had drinks with about five people from CarbonDesk before the dinner. He left straight after the dinner, while Mr. Shain and Mr. Ward went out to a nightclub afterwards until around 04.30 a.m. What was, or was not, discussed at the dinner became an important issue in this case. The next day, 26 June 2009, Mr. Shain was away from work but exchanged emails with Mr. Ward, joking about the after-effects of the previous evening.

98. That afternoon, Mr. Walter emailed Mr. Baum, copying Mr. Gygax, indicating that it was "OK with me to increase daily flow to 400-500 kt" for CarbonDesk. Mr. Baum responded and asked for a general discussion for 15 minutes on Monday. Mr. Walter also sent Mr. Gygax and Mr. Shain an email concerning the Desk's profits, stating,

> "Great job cracking the 4 mil usd mark!!"

*Week commencing 29 June 2009*

99. In the week commencing 29 June 2009, the Desk caused RBS to purchase 21.474 million EUAs from CarbonDesk across 190 trades at a cost of €315 million.

100. On Monday 29 June 2009, Mr. Gygax emailed Richard Paran, the Desk's account manager at BlueNext, introducing himself and seeking to arrange a meeting, citing the fact that RBS had recently become one of BlueNext's largest players and liquidity supporters. In response, Mr. Paran agreed that RBS had become a major component of BlueNext's trading activity, and a meeting was arranged for 9 July.

101. On the same day, 29 June 2009, the RBS Legal and Compliance committee held a meeting at 15:00 which was attended, among others, by Mr. Savage and Mr. Walter. One of the items discussed at the meeting was "Onboarding and VAT", and the minutes recorded the following,

> [Mr. Savage] noted that in in connection with Bluenext Emissions trading in France; the VAT authorities raised concerns about carousel frauds. The VAT rate has been decreased from 19% to 0% and volumes have dropped substantially. The emissions team have been fully briefed, and indeed raised this issue with the compliance team. As a result, VAT numbers are now obtained for all prospective clients as part of the onboarding process. [Mr. Walter] noted that its often smaller counterparties that we trade with and this can therefore be a problem. [Mr. Winget] noted that since the VAT rate has fallen hopefully it should no longer be a problem and [Mr. Savage] agreed that this is probably the case.

*The Bluenext letter and compliance concerns over Carbondesk*

102. At about 16.24 hrs the next day, Tuesday 30 June 2009, RBS received an email from BlueNext with the subject heading *"BlueNext Market Surveillance: Explanation of RBS volume"* . The email attached a letter ("the BlueNext Letter") seeking an explanation from RBS for the increase in RBS Sempra's trading activity between 16 and 29 June 2009, which had amounted to more than 37.5% of the activity on BlueNext for that period. The letter stated,

© 2025 Thomson Reuters. 

"Because RBS Sempra has modified its trading position (from mainly buyer to mainly seller) and has significantly increased its market activity, we kindly request you to provide us with some explanation on RBS Sempra last 10 trading days as well as the origin of the sold EUAs."

103. After Mr. Savage was sent a copy of this email and letter, he told the Traders to continue "business as usual" in order to avoid committing the offence of "tipping off" their counterparties under section 333A of the Proceeds of Crime Act 2002 .

104. The next day, Wednesday 1 July 2009, the Desk caused RBS to buy 2.147 million EUAs from CarbonDesk across 23 trades.

105. During the morning of 1 July 2009, Mr. Duncan told Mr. Gygax that there was an issue with an erroneous VAT number on CarbonDesk's invoices. After consulting Mr. Savage and Mr. Vanhaesendonck, Mr. Gygax called CarbonDesk at 11:36 hrs and asked for a copy of its VAT registration certificate. A copy was faxed to Mr Gygax at 12:47 hrs and Mr. Duncan confirmed that this was in order.

106. At 16:07 hrs on 1 July 2009, Mr. Gygax emailed Mr. Walter (copied to Mr. Shain). The email was as follows,

"Bit of a scare this morning, CarbonDesk's VAT number provided on their invoice proved to be an invalid number, sparking a scare that they were about to do a runner with our VAT payment.

Subsequent checks showed that they had migrated from a limited company under a previously held VAT number, to a new 'group' VAT number - by which time I had aged 5 years plus, as had our internal tax man.

Briefed Bill at a very high level so he was at least aware of the potential issue, given that people from Group compliance could be getting involved prior to gaining clarity on the VAT number change. Also spoke with Rene during this interim period to ensure he was equally aware.

Chris Savage is currently writing a report to RBS compliance on the issue, which you should also be aware of.

Where we are now is approximately where we were yesterday, some questions about the counterparty, but have been advised to continue as business as usual and await further guidance.

Throughout this process I have asked for an e-mail from compliance to clarify that we (Jon and I) have raised all the questions and continue to trade following compliance sign off.

Without which, Jon and I are feeling a little uncomfortable now. Can I ask that you support this request and get this e-mail issued to us from the compliance team? To date we have had nothing but words claiming that they are grateful for our efforts in providing clarity on the counterparty and broader concerns within the market, and that they are happy we have done all that we should."

107. That afternoon, 1 July 2009, Mr. Savage prepared an IMLSR in relation to CarbonDesk. He sent the final draft to Ms. Aspinall at 16:13 hrs that day. Under the heading "Reasons for Suspicion", the report stated:

"The company is an aggregator for the EUA Emission certificates for small companies/persons we believe based in the EU.

> We act as an intermediary for them to sell UK EUAs on BLUENEXT. BLUENEXT is a French emissions exchange.
>
> BLUENEXT has very publicly (in France) become involved in a series of VAT Carousel frauds such that the French authorities had to intervene. Since that time the volumes on the exchanges have decreased (22 MM to 2/4 MM Tonnes per day).
>
> We are latecomers to the market. CarbonDesk act for small companies but as they are charging significantly less than the present brokers then the result is that they have taken a very large proportion of the market business which has resulted in our % of the market volume for spot trades exceeding 37.5%. We have just received a notice from BLUENEXT asking for an explanation of the volumes.
>
> Our concern is that the increase in volumes may be caused by a volume increase as companies/persons use the additional VAT receipts generated as a financing source which in turn could in the present economic environment give rise to an increased risk of default and loss of VAT revenue.
>
> Whilst we are not specifically targeting CarbonDesk, we are concerned that the market structure could increase the risk of VAT Carousel fraud coming to the UK."

108. The IMLSR was forwarded by Ms. Aspinall to Ms. Brannigan at RBS, stating that although the issue relating to CarbonDesk's VAT number had been resolved, they still needed to submit a Suspicious Activity Report ("SAR") to the Serious Organised Crime Agency ("SOCA").

109. On the same date, a SAR was submitted to SOCA by the RBS AML Operations team in respect of suspicious activity on the account of a company called ISK Management Ventures ("ISK"). This was submitted as a result of an employee filing an IMLSR on 29 June 2009 in relation to ISK. The IMLSR relating to ISK was made due to an exceptionally high number of payments totalling over €40 million being recorded as passing through ISK's account since 23 June 2009. The IMLSR noted that the activity was unusual for ISK, as its usual business was property investment and development. The IMLSR recorded that all of the funds had been remitted to ISK by CarbonDesk, and all had been paid out in full to a company called Classic Mark International ("Classic Mark") with a Moscow bank account. Classic Mark is one of the Claimant companies in these proceedings.

110. The following morning, 2 July 2009, Ms. Brannigan emailed AML Operations saying,

> "We've got a VAT fraud case through here and CarbonDesk are the beneficiary."

It would appear that someone in Ms. Brannigan's AML team had made the link between the IMLSRs for ISK and CarbonDesk, as CarbonDesk was named in both. Ms. Brannigan then forwarded the ISK IMLSR to Ms. Aspinall saying:

> "Please see the attached SAR re CarbonDesk and details of a commercial currency account with VAT Fraud type activity where CarbonDesk is the beneficiary. Essentially, what this is suggesting to me is that CarbonDesk are a conduit for VAT fraudsters and I think we need some in-depth investigation here as this company and others like it may well be the next First Curacao."

111. Ms. Brannigan asked Ms. Aspinall for CarbonDesk's account details and an explanation of the services provided by RBS to it. Shortly afterwards, AML Operations emailed an AML distribution list regarding their suspicions of CarbonDesk and Classic Mark, and advised all the recipients to look out for the companies due to "suspected links to carousel trading/VAT fraud".

112. Ms. Aspinall duly asked Mr. Savage for more information about CarbonDesk. In return, he provided her with all the CarbonDesk onboarding documents, and a copy of the email of 11 June 2009 that he had sent to the Traders and others regarding VAT fraud, together with its attached documents. Mr. Savage also provided an email containing a "Summary Overview" which set out what he understood about CarbonDesk and explained the risk of defaults occurring in the VAT system. Mr. Savage's email stated,

> "CarbonDesk (CD) [is] an aggregator i.e. it brings together many small clients with whom market brokers will not deal with and trades the composite with the market broker. The business model CD uses is that they significantly undercut the present aggregators in the market as well as identified those customers who may have emission certificates available. The effect is they have apparently signed up a substantial client base. They earn their monies by charging a commission on each trade and rely on volume to generate the profits.
>
> The model looks like:
>
> Customer(s) Aggregator Broker Exchange
>
> Certificate Certificate Certificate
>
> Cash + VAT Cash + VAT Cash
>
> In this example the customer will receive his cash + VAT on the day he sells his certificate but only has to account for his VAT after 3 months.
>
> If the customer needs to create more cash then all he has to do is purchase separately from the Exchange particularly from a French broker and he will not be charged VAT the certificate can then be transferred to the UK registry without VAT.
>
> The trading currently has only been for the last 2-3 weeks and therefore we are unable to draw any conclusion as to whether the clients are trading certificates they hold [or] are using certificates they have recently purchased in the market.
>
> It is assumed that the aggregator will be paying over the sales proceeds and VAT to his customers on a daily basis as we assume that the relationships are all cash based. If this is true then the risks to the system will be at the customer and under customer level."

113. This information was then forwarded to Ms. Brannigan, with Ms. Aspinall commenting, "Presumably you will be reporting this to SOCA highlighting the connection to the [ISK SAR] reported yesterday." Ms. Aspinall also said that Mr. Savage was concerned that this intelligence/potential VAT fraud in the industry should be brought to the attention of HM Treasury.

114. A telephone conference call was arranged by the RBS AML team in the afternoon of 2 July 2009 concerning ISK. The intention to hold the call was notified by a member of the risk team to a variety of senior personnel in an email that gave "an early warning of a potentially sensitive case" and continued,

> "A Property Management Co. with a typical account turnover of circa. £500K recently opened two Euro accounts and the turnover has jumped to £40m. The payments in to the accounts related to

Bilta (UK) Ltd (In Liquidation) v Natwest Markets Plc, 2020 WL 01169967 (2020)

> Carbon Emission trades with a trader who deals with [RBS] and banks with HSBC. The payments out of the account are to Russia and there is a suspicion that this be a mechanism to exploit VAT."

115. The telephone call was due to be attended by a number of compliance and legal officers at RBS and RBS SEEL including Ms. Aspinall, Mr. Savage and Mr. Boxall and resulted in an email later that day reporting on what had been discussed. The email indicated that RBS's "exposure to this potential VAT fraud" had been further discussed with RBS's group head of AML and with Mr. Boxall after the call. It reported that the proposed course of action was to withdraw ISK's facilities as soon as possible and to seek consent from SOCA for all transactions which did not relate to ISK's "normal" business activity.

116. The email also indicated that HSBC had been contacted for information about CarbonDesk, and that Ms. Aspinall was due to contact SOCA to escalate the issue and gain "Law Enforcement attention". The email concluded,

> "Once we have received information from Law Enforcement and HSBC as to whether this is normal activity for their customer CarbonDesk Limited we can address the "trade" side of this concern (Chris [Savage], please continue to monitor the relationship and contact Julie [Aspinall] should you have any further concerns or questions)."

117. At the same time that this activity was taking place, early in the morning of Thursday 2 July 2009, Ms. Brandt emailed RBS's operations teams in response to an earlier email dated 19 June 2009 from cashflow operations, which had explained that, due to a US office holiday on 3 July, all invoices to be paid on 3 July needed to be submitted by the afternoon of 2 July. Ms. Brandt wrote:

> "Apologies for the late notice but given that we're putting huge transactions through with CarbonDesk on a daily basis, the desk would like to ensure we are able to make same day payments tomorrow. They are worried that, if we can't guarantee same day payment, CarbonDesk will take their business elsewhere – they've even offered to pay extra out of their books to have one of you guys available tomorrow for a few hours during our afternoon.
>
> Really sorry to dump this on you at the very last minute. I wasn't aware when the below email was sent how much transacting with CarbonDesk would take off…"

118. The next day, 3 July 2009, the Desk caused RBS to purchase 4.321 million EUAs from CarbonDesk across 34 transactions. On the same day, Mr. Walter sent Mr. Savage an email asking Mr. Savage to issue the email that Mr. Gygax had requested from Compliance on 1 July 2009. Mr. Savage did not provide such email.

119. During the morning of 3 July 2009, Mr. Savage was sent a note of a meeting which had been held between HM Treasury and various market participants on 30 June 2009. One of the two issues discussed was the suspected MTIC fraud on BlueNext. The relevant part of the note was as follows,

> "VAT Fraud
>
> ….
>
> NT advised that HMRC are aware of the potential fraud of trading emissions allowances and stated they are taking the threat very seriously. In particular, they are monitoring the position in the UK very carefully and considering options for the future to manage the position if fraud is identified in the UK……

> NT stated that HMRC would like assistance from stakeholders in being alert to any unusual trading patterns and volumes in the market place (which fall outside the impact of market conditions or other recognised patterns) and share such information with them. HMRC consider that it is difficult to know how to deal with the issue and are hoping that any information given to them by stakeholders and other information obtained will assist them in reaching an appropriate solution to manage any fraud issues that arise. A number of stakeholders seemed to be of the general opinion that applying a domestic reverse charge to emissions trades would assist in VAT fraud mitigation and not be considered a burden to apply."

*The decision to stop emissions trading*

120. In the morning of 3 July 2009 Mr. Rodger, the Head of RBS's GBM Money Laundering Prevention Unit, had a meeting with Ms. Aspinall and Mr. Savage. Mr. Savage, Ms. Aspinall, Mr. Boxall and a number of others then met after lunch at about 13.30 hrs. About an hour later, Ms. Aspinall emailed a colleague commenting that a decision had been made,

> "…basically pulling out of trading emissions for segment of market. All systems go to make it happen today!"

121. Ms. Aspinall then produced a note of the actions agreed at the meeting, which was circulated at 14.40 hrs to attendees and was copied to a number of people including Mr. Rodger. It recorded that the meeting had taken place, "to discuss recent events in relation to CarbonDesk following concerns regarding the potential for carousel VAT fraud in the emissions trading market". The note stated,

> "1. RBS Sempra had already submitted a SAR to GS&F. (This information was included in a Consent Form submitted to SOCA for a related case.)
>
> 2. Stephen Foster to speak directly to both HMT and FSA to provide generic information about our concerns regarding the potential risks facing the emission markets without reference to specific case details or customer names.
>
> 3. Stephen Foster to speak to Barclays MLRO as Barclays stopped trading in emissions recently possibly for the same reasons.
>
> 4. Chris Savage to ensure the suspension of this business line. Sempra senior management has agreed to do this with immediate effect, blaming change of business focus arising out of integration. In effect the relationship will be exited when the business is ceased.
>
> 5. Irvine Rodger to escalate this matter to Nancy Turner, Gerry Harvey, Azhar Chiragdin and Nigel Drury.
>
> 6. Julie Aspinall to determine whether a high level GNEP regarding this potential risk should be submitted.
>
> 7. Andrew Hartley to coordinate some further research on CarbonDesk Ltd by Group Intelligence."

122. As agreed, Mr. Rodger then escalated the matter to Nancy Turner (his line manager and RBS Head of Regulatory Risk and Compliance) and the other senior personnel mentioned in Ms. Aspinall's action list by an email sent at 14.58 hrs that afternoon. That email stated,

> "Nancy,
>
> A GNEP will need to be submitted in connection with RBS Sempra. Julie is working with Ops Risk in this regard.
>
> It concerns transactions which RBS Sempra is conducting for at least two of its customers in the emissions trading market. It seems that the emissions trading market in the UK is now rotten. Basically Sempra is being targeted by carousel trading fraudsters … The consequent losses to HMT to date (estimated to be far in excess of £100m) fall on HM Treasury but exposes RBS to significant reputational damage (RBS facilitating a major crime). Until 20 June, France was the victim but once the French closed the gap by reducing the VAT rate on such contracts to 0%, attention now seems to have moved to the UK.
>
> Julie has already made sure that Sempra submitted a SAR to SOCA.
>
> Julie and I had a meeting with Chris Savage this morning at which I urged immediate and decisive action be taken such as
>
> > • Circumvention of SOCA (quite ineffectual) by going straight to HMT. Stephen Foster is now going to HMT and FSA. He will also speak to Barclays MLRO as Barclays stopped trading emissions (for the same reason?)
> >
> > • Suspending this very profitable business line. Sempra senior management has agreed to do this with immediate effect, blaming change of business focus arising out of integration.
> >
> > • Exiting the customer relationship. This will happen automatically when the business is ceased…"

*The decision to continue trading until amended Vat invoices were received*

123. At 16:33 hrs on 3 July 2009, Mr. Savage replied to Ms. Aspinall's email concerning the actions to be taken following the meeting that lunchtime. After querying who was to make a report to the FSA, he said

> "We have just been told by our VAT department that some EU40MM of invoices have the old VAT number on and are potentially at risk. We have asked for them to be reissued and been told that they will do this on Monday. We need therefore to wait till Monday before pulling the plug to protect our VAT reclaim can someone please confirm this is acceptable."

This email was plainly sparked by concern that, if RBS communicated its withdrawal from trading before these invoices were reissued with the correct VAT number, it might not be able to obtain the reissued invoices from CarbonDesk.

124. Ms. Aspinall immediately forwarded this email to Mr. Boxall at 16.34 hrs. Ms. Aspinall then responded to Mr. Savage two minutes later, at 16:36 hrs, saying,

© 2025 Thomson Reuters. 

"Have discussed with Alex Boxall and it is OK to proceed on this basis".

125. After the weekend, on Monday 6 July 2009, the Desk caused RBS to purchase 1.833 million EUAs from CarbonDesk across 16 trades, paying CarbonDesk about €26.5 million (inclusive of VAT).

126. During the morning of 6 July, Mr. Ward attended the RBS office to deliver the re- issued VAT invoices. The Traders were then orally instructed to cease trading with CarbonDesk in the afternoon of 6 July 2009, with a formal email confirming that from Mr. Savage at 16:42 hrs. The email stated that RBS senior management had taken a decision to, "re-evaluate our footprint in the emissions market … [and] … are currently re-assessing our client facing business in the emissions market". This form of wording had been approved by the legal and compliance teams in draft earlier that day. The Traders were instructed to cease trading with GW Deals at the same time.

*Subsequent events*

127. RBS continued to trade with its other counterparties besides CarbonDesk and GW Deals, but its spot EUA volumes fell sharply as a result of the termination of business with these two counterparties.

128. On 7 July 2009 RBS notified HMRC that, due to the large VAT position arising from the activities at RBS Sempra, the VAT return for the RBS Group would show a net VAT repayment due for the accounting period. This notification was necessary because it was uncommon for there to be a net VAT repayment due to the RBS Group for an accounting period.

129. On 8 July, RBS was chased by BlueNext surveillance for a response to the BlueNext Letter and reminded of its obligations to the exchange. One of RBS's lawyers responded to the BlueNext Letter on 13 July 2009 in the following terms,

"In response to your query, currently, our proprietary trading is not at a high level. As a result, the bulk of our volumes are dependent on the volumes offered by our client base, which can vary from time to time."

130. BlueNext responded on 21 July 2009 complaining that RBS had not answered its request for information. Mr. Sen followed this up on 28 July 2009, attaching a pdf of trading information for the period between 16 and 29 June 2009, and stating,

"You have asked us for the "commercial rationale" behind the trades during this period. As we mentioned in our previous communications to yourselves, we have two distinct businesses within the EUA spot market: (a) speculative proprietary trading for the house book; and (b) flow trading to facilitate trades for our clients. The bulk of trades during the Period fell within (b). This was essentially the commercial rationale behind the trades. Fundamentally, where the trades fall under category (b), RBS Sempra charges its clients a fee for acting as the intermediary to the market."

131. On 21 July 2009, RBS filed a Suspicious Transaction Report with the FSA regarding the EUAs traded on BlueNext and ECX. The note attached to the form read as follows:

"During the 2nd week of June 2009 we were advised by our trading staff that there were allegations of significant VAT fraud in the EUA market, particularly that associated with Bluenext. This fraud became so significant that the French authorities altered the VAT rate on EUA trading on Bluenext

> to 0% (from 15%). The volumes on Bluenext tumbled from approximately 22 million tonnes per day to some 2-4mm tonnes per day.
>
> We then noted that suddenly our volumes started increasing around June 23 to the extent that we were a significant player in the market. This volume was produced by a UK company CarbonDesk Ltd (possibly seeking FSA authorisation) which acts as an aggregator i.e. grouping small clients together. Whilst we have no specific information concerning CarbonDesk, we believe that the market structure is such that a significant % of the market volumes will be due to VAT fraud.
>
> The issue in the market is that whilst France has reduced the VAT rate to 0% the UK has not; as a result it is likely that companies are purchasing direct in the French market (VAT free) and selling into the UK with VAT. In consequence, since the sales are settled daily but the VAT only once a quarter companies can quickly build up a significant VAT liability, which increases the risks of a VAT carousel fraud. To us it is very clear that the volumes (and direction of sales) are consistent with this risk."

132. It was announced by HM Treasury on 30 July 2009 that spot EUAs would be zero- rated for VAT, effective from 31 July 2009. The Desk resumed trading with CarbonDesk at significantly reduced levels after 31 July 2009.

133. As a result of these events, Mr. Savage circulated a "Lessons Learnt" paper within RBS on 27 October 2009. That paper included the following observations,

> "When we prepared the draft AML risks analysis for RBS Sempra Commodities - London there was an implicit assumption that the risks on our EUA trading (primarily BLUENEXT) were minimal. As can be seen from the attached chart this was by and large true until June 19, 2009. After that time the trading pattern completely changed.
>
> From that date we were unaware of the significant change in trading by the EUA desk until June 30, 2009 when we received a request from BLUENEXT to explain why we were accounting for 37% of the exchange volumes.
>
> A review was initiated and in consequence a view was developed (together with the trader) that there was a reappearance of the EUA VAT fraud - structured to take advantage of the French zero rate on BLUENEXT physical trading, as a result a SAR was submitted to MLPU. Whilst the SAR was being submitted we had to restrict our activities so as not to be in a "tipping off' position. As soon as it became clear that SOCA had no interest Group MLRO arranged a meeting for us with HM Treasury (July 3, 2009).
>
> The meeting with HM Treasury confirmed our view that there was a fraud. Until that point, we had no real evidence, only a view.
>
> As a result of the meeting and after discussion with management the desk was instructed to close down trading with counterparties where we identified potential risk. The closure instruction was worded by management to ensure that we could close customers without a "tipping off' risk."

*Communications with Hmrc and the Pinsent Masons Report*

134. VAT returns were filed by RBS on 31 July and 28 October 2009, showing a large net repayment due to the RBS Group.

135. During the course of 2010, there were various communications between HMRC and RBS regarding the VAT reclaimed from the EUA trades in June and July 2009. HMRC notified RBS in February 2010 that the tax risk in relation to its trading of

EUAs was likely to be around £89 million. HMRC also requested further information and documents from RBS throughout 2010 and 2011.

136. On 29 March 2012, HMRC wrote to RBS to advise it that HMRC considered it had sufficient grounds to deny RBS recovery of about £86 million of VAT from the trading of EUAs from 8 June 2009. It noted the huge increase in purchases of EUAs by RBS during this period and said:

> "Given that these supplies occurred after the temporary closure of the BlueNext exchange in early June 2009, which [RBS SEEL] knew was due to the prevalence of VAT fraud in the sector, this must have alerted [RBS SEEL] to the likelihood that this substantial spike in trading was due to these transactions being connected with VAT fraud."

137. In response to the HMRC letter, on 28 January 2014, RBS submitted a report produced by Pinsent Masons. This report used interviews with employees of the Defendants conducted in 2012 and 2013, for which privilege was subsequently successfully claimed by RBS: see *Bilta (UK) Ltd v RBS [2017] EWHC 3535 (Ch)* ). At the conclusion of his judgment, the Chancellor said,

> "70. I have, therefore, concluded that the documents and interviews were brought into being by RBS and its litigation solicitors for the sole or at least the dominant purpose of the expected litigation in the FTT following the expected assessment in respect of overclaimed input VAT. The documents and interviews were, therefore, covered by litigation privilege.
>
> 71. All that said, I must confess that I have wondered in the course of the argument in this case why RBS sought to assert privilege over at least the interviews of the witnesses who will themselves be called to give evidence at the trial. They will obviously cast light on what they said when initially asked about the events that underlie this litigation. They are as likely, I would have thought, to help as to hinder RBS and disclosing them would dispel a great deal of suspicion that seems to have affected the claimants' application. It is not for me to say what should be done on a voluntary basis. I have only to decide the application as it was argued before me and that is what I have done. My suggestion does not alter the fact that it is RBS's right to assert privilege where the required conditions are met and for the reasons set out above, I consider that they are met in this case."

138. In the event a decision was taken that the documents and interviews which were the subject of the application before the Chancellor should not be voluntarily disclosed by RBS, and they did not feature in the evidence before me.

**E. The Pleaded Cases in Outline**

*The Mtic fraud in this case*

139. The ten Claimant companies, in alphabetical order, have been referred to in abbreviated form as Ade, Bilta, Classic Mark, Duntai, Epicure, Green and Blue, Inline, Kaplan, Northumberland and Vehement. They were all registered for VAT in the UK and are all now in insolvent liquidation. Shortly prior to trial, the Defendants served notices admitting that the Claimant companies were all involved in deliberate and dishonest VAT frauds on HMRC. There is thus no remaining issue as to whether there were relevant breaches of fiduciary duty by the directors of the Claimant companies.

140. The Claimant companies all imported EUAs into the UK VAT-free from overseas suppliers. In the pleaded transaction chains, the EUAs were more often than not sold directly by the Claimant companies to CarbonDesk (in which case CarbonDesk was the only buffer). Less often there was a first or even second line buffer before the EUAs were sold on to CarbonDesk. The other buffers involved in the pleaded chains were called AH Marketing & Distribution Limited, Ambron Limited, C&M Distributors ("C&M"), Edge Connection Limited, ISK, and Pan 1 Limited.

© 2025 Thomson Reuters. 

141. CarbonDesk sold the great majority of its EUAs to RBS in the relevant period. RBS in turn exported the great majority of the EUAs it bought from CarbonDesk by selling them on the BlueNext exchange in France, to Vertis in Hungary and to STX in the Netherlands.

142. In the terminology of MTIC fraud, CarbonDesk was thus in the position of a first, second or occasionally third line buffer, and RBS was an exporter.

143. In many cases, the money (the purchase price inclusive of VAT) paid by RBS for the carbon credits purchased from CarbonDesk moved from RBS to CarbonDesk and then, possibly via one or more buffers, to one of the Claimant companies, from where the VAT element was diverted elsewhere. There were variations on the theme. In some cases, to which I shall return later, it would seem that the monies were diverted away by the first line buffer rather than being paid to the Claimant company.

144. Some of the cases also involved contra-trading. In particular, two companies called Microdyne and C&M would act as exporters in chains in which Vehement was the importer/defaulter, and would also act as buffers in chains involving RBS as exporter. The contra-trader would then claim a refund of VAT input tax by way of set-off against its liability for output tax in the chains involving RBS. The evidence as to the connections between Vehement, Microdyne and C&M was not seriously challenged, and I am satisfied that those companies were under the control of persons who caused them to engage together in MTIC fraud.

*The Claimants' case*

145. The Claimants' pleaded case on dishonest assistance and knowing participation in fraudulent trading is encapsulated in paragraphs 50-55 of the Re-Amended Particulars of Claim (the "RAPOC") as follows,

> "50. It is to be inferred that, contrary to Mr Gygax's denial, from 15 June 2009 and at all material times thereafter Mr Gygax and Mr Shain would have been aware that the nature and pattern of RBS's EUA trading with CarbonDesk was suspicious and such as to call for inquiry as to whether the trade was legitimate or whether there was a substantial chance that it was part of a VAT fraud. In particular, the Claimant will … rely upon …:
>
> (1) The fact that at all material times Mr Gygax and Mr Shain were aware of the risks of VAT fraud in the spot EUA market in which RBS was participating …
>
> (2) The sudden increase in availability of EUAs from and the huge number of EUAs sold to RBS by CarbonDesk, a supplier which had previously only sold small numbers of EUAs to RBS …
>
> (3) The fact that the volume of trading was unprecedented for RBS…
>
> (4) CarbonDesk was a new, undercapitalised concern with only a small number of employees.
>
> (5) The fact that CarbonDesk was unable to meet the requirements of and were therefore not present on the BlueNext Exchange (a factor which had expressly been mentioned in the context of exposure to VAT fraud in the internal email of 11 June 2009 …) and yet it was able to offer extremely large volumes of EUAs for sale to RBS on a regular basis.
>
> (6) The fact that the Sales were made at a substantial profit to RBS and were substantially low risk or no risk trades …
>
> (7) In the circumstances, the Sales were not explicable by reference to legitimate trade and were too good to be true.
>
> (8) There were no reasons for thinking that the Sales were unconnected with VAT fraud.

Bilta (UK) Ltd (In Liquidation) v Natwest Markets Plc, 2020 WL 01169967 (2020)

(9) The contents of the SARs dated 1 July and 3 July 2009 and the suspicious transaction report of 21 July 2009 which were drawn up on the basis of information provided by Mr Gygax or Mr Gygax and Mr Shain.

51. Notwithstanding the fact that Mr Gygax and Mr Shain were aware from 15 June 2009 that the nature and pattern of RBS's EUA trading was suspicious and/or called for explanation they failed to raise the trading as a matter of concern with Compliance as they should have done or (despite Mr Gygax and Mr Shain having dinner and drinks with CarbonDesk on 25 June 2009) to seek any or any satisfactory explanation from CarbonDesk as to how it was that it suddenly had such large volumes of EUAs available to sell at margins which were not consistent with ordinary legitimate trade and were choosing to sell them to RBS. In failing to report the trading to Compliance or to seek any such explanation or to investigate CarbonDesk's business thoroughly or properly Mr Gygax and Mr Shain were wilfully shutting their eyes to the obvious, which was that there was no legitimate explanation for the trades and/or that they were connected with VAT fraud. They wilfully and recklessly failed to do such reporting or make such inquiries as an honest man would have made in circumstances where it was in their pecuniary interest not to do so. As such, Mr Gygax and Mr Shain were dishonest in respect of trades with CarbonDesk from 15 June 2009 and their dishonesty is to be attributed to the Defendants. Further or alternatively, at all material times, Mr Gygax and Mr Shain were acting in the course of their employment and the Defendants are vicariously liable for their wrongful acts.

52. The Claimants rely on the willingness of RBS to enter into the trades with CarbonDesk in the circumstances pleaded above as evidencing the dishonesty of RBS's trading of EUAs generally as the Desk was reckless as to whether such trading was connected with VAT fraud.…

53. Further, RBS decided to suspend trading with CarbonDesk and GW Deals on 3 July 2009 with immediate effect as a result of concerns over involvement in VAT fraud. Notwithstanding that decision, RBS entered into a further 16 trades with CarbonDesk on 6 July 2009 amounting to net €23,126,570 and a further trade with GW Deals for 85,000 EUAs with a value of net €1,078,650. On 3 July 2009, shortly after the decision to suspend trading with immediate effect, Mr Savage emailed Ms Aspinall saying "[w]e need … to wait until Monday [i.e. 6 July 2009] before pulling the plug to protect our VAT reclaim", and seeking confirmation that this was acceptable. Ms Aspinall replied on the same day, saying "Have discussed with Alex Boxall and it is OK to proceed on this basis". The decision that RBS should participate in such trades, despite its well-founded concerns that (as was the case) it was thereby participating in a VAT fraud, in order not to risk Carbon Desk not providing it with corrected invoices which it was felt were needed for its claim to a refund of Input Tax of about £40 million from HMRC involved RBS preferring its interest in protecting its VAT reclaim over its duty to avoid becoming involved in VAT fraud. Such a willingness to participate for pecuniary benefit in trades which the Defendants recognised were probably linked to a VAT fraud was dishonest.

54. By participating in the Sales and in particular paying the purchase price for the EUAs which purchase monies were then passed along the chain and paid away by or at the direction of the Companies the Defendants assisted in the pleaded breaches of fiduciary duty by the Companies' directors. For the reasons pleaded … above, such assistance was dishonest. In the circumstances, the Defendants are liable to account to the Companies in equity for dishonestly assisting the pleaded breaches of duty by the Companies' directors.

55. Further or alternatively, the Defendants are liable to pay compensation pursuant to section 213 of the Insolvency Act 1986 for knowingly being a party to the carrying on of the Companies' businesses with intent to defraud creditors or alternatively for a fraudulent purpose, namely the non-payment of their liabilities to HMRC for VAT. But for the Defendants providing the funds for the Companies' purchase of the EUAs the Companies' fraudulent businesses could not have been carried on."

146. Although the Claimants sought to amend their pleadings further to include other bases for their allegations of dishonesty, they were refused permission to do so shortly prior to trial by Marcus Smith J. They are therefore confined to proving

© 2025 Thomson Reuters.

dishonesty on the basis of the allegations set out above. They did, however, refine their submissions to a contention that the date by which Mr. Gygax and Mr. Shain were aware that the trading by CarbonDesk was suspicious was 17 June 2009, rather than 15 June 2009 as originally pleaded.

147. In short, therefore, the Claimants' core allegation was that as a result of the Traders causing it to buy EUAs from CarbonDesk, RBS assisted the fraud committed by the directors of the Claimant companies and was a party to fraudulent trading by the Claimant companies; that the Traders each knew from 17 June 2009 that the nature and pattern of trading by CarbonDesk was suspicious and that there was an obvious risk that it was connected to VAT fraud, but they dishonestly turned a blind eye to that risk and did not either report their suspicions to Mr. Savage or seek a proper explanation from CarbonDesk; that the dishonesty of the Traders is to be attributed to the Defendants; and that both Defendants are vicariously liable for the wrongful acts of the Traders.

*The Defences*

148. In general terms, the defence of the Defendants is that at no relevant time were Mr. Gygax or Mr. Shain acting dishonestly. It is said that they neither knew nor closed their eyes to a risk that the trades that they were conducting on behalf of RBS with CarbonDesk were connected to a VAT fraud by CarbonDesk's clients.

149. The Defendants' case was that neither of the Traders fully understood the nature or extent of the risk of VAT fraud in the EUA market, or knew that such fraud was affecting transactions in the UK market (as opposed to the French market) at any relevant time prior to 1 July 2009. Indeed, the Defendants' case was that neither Mr. Gygax nor Mr. Shain even knew that VAT was chargeable on the spot trading of EUAs that they were doing with CarbonDesk until 1 July 2009.

150. The Defendants also contended that although the Traders noted a significant increase in the number of EUAs that they were acquiring from CarbonDesk in the week commencing 22 June 2009, they did not regard this as suspicious, but merely as raising some questions as to CarbonDesk's business model.

151. In that regard, the Defendants' case was that the Traders discussed the increased volumes and CarbonDesk's business model with Mr. Savage in the compliance department during the week commencing 22 June 2009, and agreed with Mr. Savage that they would ask questions about CarbonDesk's business model at the dinner that had been arranged for Thursday 25 June 2009. Their pleaded case was that at drinks before the dinner, Mr. Gygax asked questions of Mr. Ward about CarbonDesk's business model and the source of its EUAs, and was told that CarbonDesk had spent several months targeting compliance companies and had managed to obtain significant business by offering competitive pricing through charging a lower margin/commission and offering a better service. It was contended that Mr. Gygax was reassured by the explanation that he was given by Mr. Ward, and that he shared it with Mr. Shain and Mr. Savage after the dinner, who were also content with it.

152. RBS's Amended Defence further alleged that notwithstanding the explanation given at the dinner on 25 June 2009, the continued high volumes of trading in the following week together with the receipt of the letter from BlueNext seeking an explanation of RBS's increased volumes of trades on the exchange caused Mr. Gygax a feeling of unease, so that he approached the compliance department again on or around 30 June 2009 prior to receipt of the BlueNext letter. It is said that Mr. Gygax and Mr. Shain then provided Mr. Savage with information that assisted him to prepare the IMLSR on 1 July 2009 after receipt of the Blue Next letter, and that Mr. Savage also told the Traders to carry on trading normally with CarbonDesk so as not to fall foul of the tipping-off regime. It is said that the Traders then acted honestly and followed those instructions thereafter until trading with CarbonDesk was terminated on the instructions of RBS management on 6 July 2009.

153. So far as the trading on 6 July 2009 is concerned, RBS's Amended Defence states,

> "It is admitted that prior to the closing out of trading with CarbonDesk and GW Deals, on Monday 6 July 2009 RBS entered into the trades pleaded in the second sentence of this paragraph. The request to continue trading on 6 July 2009 was prompted by the discovery that the incorrect VAT number had been provided on CarbonDesk's invoices. In circumstances where there was no evidence or suspicion that [RBS SEEL's] trading was connected with VAT fraud, the decision to continue trading so as to protect the VAT Input Tax reclaim of [RBS SEEL] was honest and reasonable. Further, the exiting of the trading relationship with CarbonDesk required RBS and [RBS SEEL] senior management approval and preparation of a communication for the Emissions Desk relaying the message, as well as the resolution of the VAT invoicing issue referred to in the third sentence

of paragraph 53 [of the RAPOC]. The resolution of the VAT invoice issue was conducted with the involvement and input of [RBS SEEL's] VAT department and with the approval of Mr. Boxall of RBS Legal. The above steps were advanced in the course of Monday 6 July 2009, meanwhile the Emissions Desk continued to trade with CarbonDesk and GW Deals as previously instructed by [RBS SEEL's] compliance department …

In all the circumstances, the trading relationships were closed promptly and in accordance with Mr Savage's understanding of the legal obligations (backed by criminal sanctions) in order to avoid any risk of tipping off."

154. The Defendants further contend that the Claimants have not established that RBS's trades with CarbonDesk *assisted* the breaches of fiduciary duty by the directors of the Claimant companies as a matter of fact. The Defendants argue that, in contrast to the conventional case in which a defendant provides direct assistance to a fiduciary who breaches his duty to the claimant, in the instant case RBS simply acted as a counterparty in transactions with a third party intermediary, CarbonDesk. The Defendants contend that although RBS's provision of the purchase monies for the EUAs might have provided the opportunity for the fraud to be perpetrated by the directors of the Claimant companies, this does not qualify as assistance within the scope of the equitable doctrine of dishonest assistance.

155. For similar reasons the Defendants also deny that either RBS or the Traders were liable for any fraudulent trading by the Claimant companies under Section 213 . In particular it is said that since RBS and the Traders simply acted as counterparties to the trading with CarbonDesk, neither RBS nor the Traders could qualify as "parties to the carrying on of the business" of the Claimant companies in a fraudulent manner as required by Section 213 .

156. More generally, in response to the Claimants' claim that both of the Defendants are vicariously liable for the activities of the Traders, each of the Defendants deny that they are vicariously liable for such activities, and suggest that if there is such liability, it is the other that is vicariously liable. RBS denies vicarious liability because it is said that the Traders were at all times employed by, and operated under the management, supervision and control of RBS SEEL. For its part, RBS SEEL contends (i) that the Traders did not commit any actionable wrongs themselves to which vicarious liability could attach because the "assistance" of which complaint is made was the trading with CarbonDesk which was carried out by RBS as a corporate entity; and (ii) that although RBS SEEL employed the Traders who were subject to the management, supervision and control of RBS SEEL's senior management, those management, supervision and control functions were exercised by the RBS SEEL senior management as representatives of RBS.

157. In relation to attribution of knowledge, RBS accepts that the trading complained of was its corporate trading, and that at least up to 30 June 2009 the state of mind of Mr. Gygax is to be attributed to it for the transactions that he instigated. However, in respect of the trading from 1 July to 6 July 2009, RBS contends that Mr. Gygax's state of mind should not be attributed to RBS because he was no longer to be regarded as the controlling mind and will of RBS, but was merely operating under the "business as usual" direction given by Mr. Savage after receipt of the BlueNext letter. RBS further denies that Mr. Shain's state of mind is to be attributed to RBS at any time on the grounds that he was too junior and did not have any managerial responsibilities; and in any event because from 1 July to 6 July he was also operating under the direction given by Mr. Savage.

**F. The Law**

158. There are a significant number of legal principles applicable to this case. I shall now summarise those principles.

*Dishonest assistance*

159. Equity will impose liability on a person who renders dishonest assistance to a breach of trust or fiduciary duty and thereby causes loss to another. The basic requirements for such liability, set out in *Royal Brunei Airlines v Tan [1995] 2 AC 378* (" Tan ") at 382E are,

(1) there must have been a breach of trust or fiduciary duty;
(2) the defendant must have procured or assisted that breach; and
(3) the defendant must have acted dishonestly in doing so.

© 2025 Thomson Reuters. 

160. It is also clear that nothing less than dishonesty will suffice for liability: see *Tan* at 392 and *Ivey v Genting Casinos (UK) Limited [2017] 3 WLR 1212* (" Ivey ") at [62].

161. In the instant case the breach of fiduciary duty relied upon by the Claimants is the breach of duty by their directors in causing the VAT element of the price paid to their companies for sale of EUAs to be paid away and not remitted to HMRC to satisfy the Claimant companies' obligations to account for VAT. It was ultimately not disputed by the Defendants that there had been such breaches of duty by the directors of the Claimant companies.

162. What is sufficient for the ingredient of "assistance" is "simply conduct which in fact assists the fiduciary to commit the act which constitutes the breach of trust or fiduciary duty": *Madoff Securities International v Raven [2013] EWHC 3147 (Comm)* (" Madoff ") at [351]. Accordingly, if the defendant's conduct provides no assistance and does not enable the breach to be committed at all ( *Brown v Bennett [1999] BCC 525* at 533), or if it played no more than a minimal role in enabling the breach to be committed ( *Brinks v Abu-Saleh (No.3) [1996] CLC 133* at 148-149), there will be no liability.

163. It is not necessary, however, to show that what is done by the defendant inevitably has the consequence that loss is suffered: *Baden v Société Générale [1993] 1 WLR 509* at 575A-B. It is also not an answer to a claim for dishonest assistance to show that the breach of trust or fiduciary relationship would have occurred in any event, regardless of whether the assistance was provided: *Balfron Trustees Ltd v Peterson [2001] IRLR 758* at [21].

164. The conduct of the Defendants which is impugned in the instant case is not of the type that is often encountered in cases of dishonest assistance. More conventionally, the defendant to a dishonest assistance claim is a person who provides false documentation to facilitate a fraud ( *Madoff* ), who authorises or administers the payment away of trust monies ( *Barlow Clowes International v Eurotrust International [2006] 1 WLR 1476* (" Barlow Clowes ")), or who assists in covering up the fraud by laundering the money ( *Twinsectra v Yardley [2002] 2 AC 164* at [107]).

165. In the instant case, the conduct amounting to assistance is said to be the acts of the Traders in causing RBS to enter into OTC spot contracts for the purchase of carbon credits from CarbonDesk, and of RBS in paying CarbonDesk the amount of VAT chargeable on those contracts as a result. It is said by the Claimants that this assisted or enabled the subsequent breaches of fiduciary duty by directors of the Claimant companies, because without such contracts having been entered into and payment of VAT being made to CarbonDesk, CarbonDesk would not have been able to pay its own clients, and the directors of the Claimant companies further up the chains of transactions would not have been able to misappropriate or misapply the monies charged in respect of VAT.

166. The Defendants protested that this would be an illegitimate extension of the scope of dishonest assistance, because it was conduct too far removed from the breaches of duty. They contended that it would potentially render,

> "nearly the entire secondary market of EUAs liable for dishonest assistance to the fraud which took place in the summer of 2009. Only those people who purchased EUAs directly in auctions from European Governments or from industrials to whom they were allocated and sold directly to utility companies which used them for compliance purposes only could escape liability."

167. The Defendants sought to distinguish the only case relied upon by the Claimants in this respect which concerned MTIC fraud, namely *Alpha Sim v CAZ Distribution Services [2014] EWHC 207(Ch)* (" Alpha Sim "). In *Alpha Sim* , David Donaldson QC (sitting as a Deputy High Court Judge) found a number of defendants liable for dishonest assistance in relation to a series of MTIC frauds. Among them were a director (Mr. Sakhi) who caused his company (Fern) to enter into numerous transactions of purchase or sale of mobile phones or CPUs which formed links in a pre-arranged chain (line) of such transactions. The company (Fern) was not itself a defaulter on VAT, but a "buffer" company which took part in the chains for a fixed commission. Among other things, the evidence showed that Mr. Sakhi caused the goods to be released before Fern was paid, or caused payments to be made by Fern before the goods were released to it; and Mr. Sakhi did not freely negotiate the terms of the transactions which he caused Fern to enter into, but was instructed what prices to charge by others.

168. The claims were brought by liquidators of the importer companies, Alpha and UA. The Deputy Judge found (i) that Mr. Sakhi and Fern assisted the breaches of duty by the directors of Alpha and UA (at [61]), and (ii) that they did so dishonestly (at [65]- [67]),

© 2025 Thomson Reuters.

> "61. The participation of Fern in these lines was in each case an integral part of a scheme whose function was to divert payment of the VAT element on the importer's sale into the UK market to a prior European supplier. This could only be achieved with at the lowest the connivance of a person conducting the affairs of the importer company, and thus necessarily involved a breach of fiduciary duty owed by him to the company in engaging in arrangements under which the company incurred a VAT liability for monies which were not to be collected from its customer. Equally, it was only because of the existence of the whole line, and as part of it, that the management of Alpha and UA engaged their companies in these arrangements. It follows, and I so find, that in each of the cases in which it participated in such a line Fern (and through it Mr Sakhi) facilitated and thus assisted that breach.
>
> …
>
> 65. From at latest his meeting with HMRC in May 2005 Mr Sakhi was aware of the existence and nature of MTIC frauds and that they involved diversion of payment abroad. The fact that thereafter he himself did not perform the role of the party making that payment to an overseas recipient was likely to mean only that somebody else would do so. The other elements remained. I am in no doubt that his buy and sell prices were notified to him on the basis of an agreed and repeated margin, and that his account to me of prices being negotiated at arm's length on each occasion was untrue.
>
> 66. He may well not have known the identity of the supplier companies from which the payments were diverted, let alone of the employees or of the managers of those companies who were causing them to incur a VAT liability without collecting the corresponding amount from their purchasers, or that the law would categorise that conduct as a breach of fiduciary duty. But that degree of knowledge is unnecessary, provided he was aware of the general nature of the scheme and its implications in terms of the deliberate non-receipt of money by a prior supplier. As to that it is in my view most unlikely that the general mechanics of the scheme were not the subject of conversation by Mr Sakhi with those orchestrating the trading, but even if he refrained from exploring that subject, that in itself would be a powerful indicator of dishonesty, unless indeed he had no need of clarification. As it was, Mr Sakhi never engaged in evidence with such questions, consistently with his stance - which I have rejected - that all his trades and prices were negotiated by him ad hoc and at arm's length.
>
> 67. In the result I am satisfied and find that Fern assisted dishonestly the breaches of fiduciary duty by the management of Alpha and UA on those deals in which it participated, and, concomitantly, that Mr Sakhi also dishonestly assisted those breaches by causing Fern so to participate."

169. The decision in *Alpha Sim* was that the director of a company in a chain of MTIC transactions – and by logical extension the company itself - could be liable for dishonestly assisting the breaches of fiduciary duty by the directors of the importer/ defaulter company. The Deputy Judge clearly took the view that Mr. Sahki and his company were centrally involved in a number of entirely artificial transactions, without which the directors of the importer companies would not have been able to divert VAT monies that had been paid along the chain.

170. Although the facts were different, I accept that the decision in *Alpha Sim* is authority for the proposition that a person who causes a company to participate in a transaction under which monies are passed in one direction and goods are passed the other, together with the company itself, can be liable for providing "assistance" to defaulting fiduciaries of a company further along a chain of similar transactions. As a matter of principle, such actions provide the means by which an MTIC fraud can ultimately be committed by directors of an importer company further along the chain. Put another way, the defaulting fiduciaries would not be able to commit their breaches of duty if the defendant individual did not cause his company to enter into the transaction in question, and if the defendant company did not then pay or transmit the monies due under it.

171. I acknowledge that *Alpha Sim* appears to have been a case in which, in one sense, the defendants were more closely connected to the fraud than the Traders or RBS are said to have been involved in the instant case. It would seem that the judge in *Alpha Sim* took the view that all of the links in the chain were artificial transactions, whereas the Traders and RBS

were separated from the frauds at the Claimant companies by at least one buffer company (CarbonDesk), against which fraud is not alleged. It is also not alleged that the Traders had the same type of direct knowledge of the fraud as Mr. Sakhi (who was told what prices to agree for the trades).

172. However, if a chain of transactions can be established linking the actions of the Traders and RBS with the misappropriation or misapplication of the VAT monies by the directors of the Claimant companies, then I consider that the necessary assistance can still be said to have been given. I do, however, accept that the fact that the Traders and RBS are not alleged to have been as closely connected to the operation of a fraudulent scheme in the same way as Mr. Sahki, but were trading with a market counterparty against whom no fraud is alleged, does require the Court to look particularly closely at the allegations of dishonesty. But that is a different question to whether the necessary assistance has been given.

173. I also do not accept the Defendants' argument that this conclusion would lead to the absurd result that the entirety of the participants in the secondary market for trading in EUAs would be liable for dishonest assistance simply because there might be fraud at some point along a chain of otherwise legitimate transactions. The factual connection between the trading and the fraud still needs to be established. Moreover, even if it is, the essence of the liability for dishonest assistance is the requirement for proof of dishonesty. That requirement acts as an essential filter and limit to the scope of the equitable principle, which will ensure that parties who participate in the market in good faith are not held liable.

174. To take an example discussed in argument, in theory any third party who buys a piece of land from a company for cash could be said to assist a breach of duty by the director of the company who subsequently flees the jurisdiction with the money. There would, however, be no question of liability for the innocent purchaser who does not know that the director is planning to abscond with the proceeds of sale. But if the purchaser has that knowledge and agrees to buy the property in order to turn the immovable property into cash so as to give the director the opportunity to steal the money and abscond, there is no obvious reason why he should not be liable. That is so even if a full price has been paid for the asset, because the relevant loss is not that caused by conversion of the land into cash, but the loss caused by the subsequent theft of the money.

*Fraudulent trading*

175. Section 213 provides:

> "(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.
>
> (2) The Court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper."

176. For the purposes of Section 213(1) , it is necessary to show that there was either subjective intent to defraud, or a reckless indifference as to whether or not the creditors were defrauded. Dishonesty is an essential ingredient of liability: *Bernasconi v Nicholas Bennett [2000] B.C.C 921* at [14].

177. In *Re Maidstone Building Provisions [1971] 1 WLR 1085* at 1092F, Pennycuick V-C (referring to section 332 Companies Act 1948 which was in materially similar form to Section 213 ) said,

> "The expression "parties to the carrying on of the business" is not, I think, a very familiar one, but so far as I can see, the expression "party to" must on its natural meaning indicate no more than "participates in," "takes part in" or "concurs in." And that, it seems to me, involves some positive steps of some nature. I do not think it can be said that someone is party to carrying on a business if he

© 2025 Thomson Reuters.

> takes no positive steps at all. So in order to bring a person within the section you must show that he is taking some positive steps in the carrying on of the company's business in a fraudulent manner."

On the facts of that case, Pennycuick V-C held that a company secretary who was not a director, but was simply alleged to have given advice to the company whilst knowing it was insolvent and that it had no reasonable prospect of being able to pay its debts, could not be liable for fraudulent trading.

178. The facts and result in that case can be contrasted with those in *Re Overnight Ltd (In Liquidation) [2010] EWHC 613, [2010] BCC 796* . The secretary of an importer company which participated in an MTIC fraud and defaulted on its liabilities to HMRC, who set up and operated a bank account in his own name through which the receipts and payments of monies due to and from the company were passed, was held liable for being a party to the carrying on of business by that company with intent to defraud its creditors.

179. The issue of whether an outsider without direct involvement in the management of a company can be liable under Section 213 has been considered in several cases. In *Re Gerald Cooper Chemicals Ltd [1978] Ch 262* , a creditor who had been repaid its debt with money obtained by fraudulent trading was held liable even though it had not been involved in management of the company. Templeman J stated, at 268,

> "Mr. Evans Lombe submitted in the alternative that the respondents could not knowingly be parties to the carrying on of the business of the Cooper company with intent to defraud creditors of the Cooper company because they had no power of management or control over the carrying on of the business, and did not themselves assist in the carrying on of the business. I agree that a lender who presses for payment is not party to a fraud merely because he knows that no money will be available to pay him if the debtor remains honest. The honest debtor is free to be made bankrupt. But in my judgment a creditor is party to the carrying on of a business with intent to defraud creditors if he accepts money which he knows full well has in fact been procured by carrying on the business with intent to defraud creditors for the very purpose of making the payment. Mr. Evans Lombe said truly that section 332 creates a criminal offence and should be strictly construed. But a man who warms himself with the fire of fraud cannot complain if he is singed."

180. Some twenty years later, after the re-enactment of the fraudulent trading section in the 1986 Act, in *Re BCCI, Banque Arabe Internationale d'Investissement v Morris [2002] BCC 407* , Neuberger J considered as a preliminary issue the question of whether it was necessary to found liability under Section 213 that the defendant should have exercised a controlling or managerial function within the company concerned. He held that it was not.

181. Neuberger J referred to the decision in *Gerald Cooper Chemicals* and gave a number of further reasons for reaching that conclusion, the first two of which were as follows, at page 411-412,

> "First, as a matter of ordinary language, the ambit of s. 213(2) is not limited to those who perform a managerial or controlling role within the company concerned. Although I accept that the language of s. 213(2) is a little unusual, it appears to me that the concept of being 'parties to the carrying on' by a company of a type of business, or of a business in a certain way, is not limited to the person who actually directs or manages the business concerned. If anything it is a more natural reference to people who are not employed by the company at all, but who are third parties to the company.
>
> Secondly, there is a question of policy. It is obviously wrong to construe s.213(2) so as to cast its net so wide as to risk stultifying normal business transactions. It appears to me, however, that that is not a good reason for preventing a liquidator from pursuing a person who actively and dishonestly

assisted, and/or benefited from, the company in adopting a dishonest course of conduct, which predictably led to lenders to, or shareholders of, the company being defrauded."

182. Neuberger J then concluded, at page 414,

"In my judgment, just as an employee of the company who was merely carrying out orders does not fall within section 213(2) whereas somebody who orchestrates, organises or can seize of the business concerned does fall within the section, so a company or other entity which carries on (so far as it is concerned) a bona fide business with the company, does not fall within s.213(2) , but a company which is involved in, and assists and benefits from, the offending business, or the business carried on in an offending way, and does so knowingly and, therefore, dishonestly does fall or at least can fall within s. 213(2) ."

183. In *Bank of India v Morris [2005] BCC 739* , the Court of Appeal considered an appeal against a decision of Patten J holding Bank of India liable pursuant to s.213(2) . BCCI had placed deposits with Bank of India on uncommercial terms as part of a scheme to window-dress its accounts at the year-end. The liquidators of BCCI brought proceedings against Bank of India under s.213 on the ground that it had been knowingly party to the carrying on of business by BCCI with intent to defraud. Patten J found that the general manager of the Bank of India had deliberately turned a blind eye to what was going on, and that his knowledge was attributable to the bank.

184. The Court of Appeal (which included Neuberger LJ (as he had then become)) dismissed the appeal. In doing so it reaffirmed that liability under Section 213 could extend to "outsiders" who were not directors but who had simply dealt with the fraudulent company. Giving the judgment of the court, Mummery LJ introduced the discussion of the scope of liability under Section 213 as follows,

"97. Before dealing with the rival arguments on the policy of s.213 , we remind ourselves that both civil liability to pay compensation and criminal sanctions may be imposed on any person who is knowingly a party to fraudulent trading. Both types of liability extend beyond the company which actually carried on its business with intent to defraud creditors and its directors to "outsiders", meaning individuals and corporate third parties who have knowingly been parties to the fraudulent trading in question.

98. The predecessor provisions of s.213 were s.275 of the Companies Act 1929 and s.332 of the Companies Act 1948 . Those sections combined both compensatory and penal provisions. They were naturally regarded as penal legislation and, as such, were strictly construed so as to give the person charged the benefit of the doubt: *Re Maidstone Building Provisions Ltd [1971] 1 W.L.R. 1085* .

99. The position is different under the 1986 Act. Section 213 is not a penal provision. It only covers civil liability to pay compensation in cases where the company which traded fraudulently is being wound up. A "collective" action can be brought by the liquidator of the fraudulent company for contribution to be made to the assets of that company for the benefit of its creditors.

100. It is accepted that "outsider" companies can be made liable under s.213 , provided that it is established they were "knowingly" parties to the fraudulent trading. It has been held that the references to "fraudulent" in the legislation connote "actual dishonesty involving, according to current notions of fair trading amongst commercial men, real moral blame": *Re Patrick and Lyon Ltd [1933] Ch. 786* at p.790 *per* Maugham J. That was a decision on s.275 of the 1929 Act, under which the jurisdiction of the court was confined in civil cases to declaring that past or present directors, including shadow directors, of the company, which had carried on its business with intent to defraud creditors, should be personally responsible for all or any of the debts or other liabilities of the company as the court may direct.

© 2025 Thomson Reuters.

> 101. Section 332 of the 1948 Act extended liability beyond past or present directors of the company carrying on its business fraudulently to any persons, including other companies, who were knowingly parties to that fraudulent trading. It was still necessary, however, to establish dishonesty to found civil liability. The requirement of dishonesty presents problems of evidence and proof."

185. The Court of Appeal then considered the arguments on attribution of knowledge for the purposes of Section 213 . In doing so, it noted that the Bank of India had contended that the effect of Patten J's decision was to make companies such as banks, who were innocently participating in transactions with the fraudulent company, liable for lack of management supervision and negligent failure in management in the absence of a situation of "real moral blame" and of dishonesty. The Court of Appeal disagreed, saying,

> "111. In our judgment Patten J. was correct in his analysis of the policy of s.213 . Compensation of those who have suffered loss as a result of the fraudulent trading is the paramount purpose of the provisions imposing civil liability to contribute to the loss suffered.
>
> 112. If knowledge were not attributed to an outsider company in cases such as this the purpose of imposing liability upon such a company to pay compensation would, in our judgment, be emasculated. The crucial question is whose knowledge in the company counts, for the purposes of s.213 , as corporate knowledge of the outsider company…."

186. In my judgment, these statements of principle from *Bank of India v Morris* stand as clear Court of Appeal authority for the proposition that liability under Section 213 is not limited to those who have been involved in the management of the company whose business has been carried on with intent to defraud, but potentially extends to outsiders who simply deal with the company.

187. Finally in this regard, in the specific context of VAT carousel fraud, reference should be made to *Alpha Sim* . One of the defendants was a Mr. Allen, who was a director of a company called GTC. GTC was a company incorporated in another EU member state which operated as the supplier ("Strong European" or "catcher") which acquired goods abroad which it then sold (possibly via another EU company) to an importer (Revapoint) in the UK without VAT. Revapoint then resold the goods in the UK with VAT and directed its purchasers to pay the price (including VAT) to third parties overseas. It then defaulted on its liabilities to HMRC.

188. In his judgment, David Donaldson QC concluded, at [100],

> "Each of the … transactions was plainly choreographed as a part of a scheme under which payment of the purchase price, and in particular the VAT element, which Revapoint should have received was diverted abroad. I repeat mutatis mutandis my earlier observations [in relation to Fern and Mr. Sakhi]. GTC (and through it Mr Allen) played a pivotal role in the … lines. It was the Strong European or catcher at the start of the line and the recipient of the monies, and in particular of the VAT component, which were diverted out of the United Kingdom. I have no difficulty in concluding that GTC and Mr Allen facilitated and assisted the breach of fiduciary duty by Revapoint's management in causing that company to engage in an arrangement which created a VAT liability for which the company was to collect no money."

189. The Deputy Judge then went on to conclude that as a result of the decision of the Supreme Court in *Williams v Central Bank of Nigeria [2014] UKSC 10* , the claims against Mr. Allen and GTC for dishonest assistance by Revapoint were statute barred by limitation. Nonetheless, he went on to hold Mr. Allen and GTC liable to the liquidator of Revapoint for participating in the carrying on of Revapoint's business with intent to defraud its creditors (which claim was not statute-barred). He said,

> "… the same matters which led to my findings that (1) the management of Revapoint was guilty of the breach of fiduciary duty which I identified (2) … GTC and Mr Allen facilitated and assisted in that breach and did so dishonestly lead me equally to the conclusion that (a) Revapoint's business was carried on with intent to defraud creditors, namely HMCE, or for another fraudulent purpose, namely depriving the company of sums due to it, (b) each of these Defendants participated therein, and (c) they did so knowingly. On that basis it would be right that they should contribute to the company's assets to the extent of the loss which I have identified … as being appropriate in a claim for dishonest assistance. Contrary to the submissions of their counsel, I do not consider it appropriate to limit the contribution of any of them to only part of that loss."

190. In that passage, and consistent with the other authorities to which I have referred, the Deputy Judge equated the facilitation and assistance knowingly rendered by Mr. Allen and GTC in relation to the breaches of duty by Revapoint's directors, with those defendants being "knowingly parties to the carrying on of [Revapoint's] business" for a fraudulent purpose under Section 213 .

191. The imposition of liability under Section 213 on an outsider who has not been directly involved in the management of the company or its business, and in particular the parallels that seem to exist between Section 213 and accessory liability for dishonest assistance, have been criticised by David Foxton QC in an article, *Accessory Liability and* Section 213 Insolvency Act 1986 [2018] JBL 324. The author was critical of Neuberger J's reasoning and conclusion in *Re BCCI, Banque Arabe Internationale d'Investissement v Morris* . However, given that such reasoning was endorsed at the level of the Court of Appeal in *Bank of India* , I do not consider that I am entitled to hold that the scope of Section 213 cannot extend to an outsider to the company which has been carrying on its business with a fraudulent intent.

192. I acknowledge that a clear note of caution was sounded by Neuberger J in *Banque Arabe* against extending Section 213 too far, so as to "risk stultifying normal business transactions". However, for the reasons which Neuberger J then gave, and which I have echoed in the context of dishonest assistance above, if the facts demonstrate that the Traders turned a blind eye whilst causing RBS to enter into trades which facilitated the fraudulent trading by the Claimant companies, then in my judgment that should also be sufficient to found liability under Section 213 .

*Vicarious liability*

193. In *Bank of India v Morris* , after considering the scope and purpose of Section 213 , the Court of Appeal went on consider the question of attribution – i.e. whose state of mind should be attributed to a corporate defendant for the purposes of the claim for knowingly participating in fraudulent trading. A similar issue arises in relation to a claim in dishonest assistance and I shall return to consider it further below.

194. However, before doing so, the Court of Appeal in *Bank of India* also noted (at paragraph 113) that principles of vicarious liability might, in some cases, provide an alternative basis for liability,

> "In future cases it may well be possible, depending, of course, on the facts, to simplify cases of this kind by pleading and relying on the doctrine of vicarious liability, so that an employee in the position of Mr Samant could be made liable as a party to fraudulent trading and his corporate employer made vicariously liable to contribute to the losses caused by his wrongful acts. Reliance could be placed on the analysis of the doctrine of vicarious liability by the House of Lords in *Dubai Aluminium Co Ltd v Salaam [2002] UKHL 48; [2003] 2 A.C. 366* , particularly in the speeches of Lord Nicholls of Birkenhead and Lord Millett."

195. That route was relied upon in the instant case by the Claimants, who contended that if Mr. Gygax or Mr. Shain acted dishonestly when they caused RBS to enter into trades with CarbonDesk, then both RBS SEEL and RBS should be vicariously

© 2025 Thomson Reuters. 

liable for the Traders' wrongdoing. As indicated above, that contention was denied by the Defendants, who each contended that if there was liability on the part of the Traders, the other was vicariously liable.

196. The essential principle of vicarious liability to which the Court of Appeal referred in *Bank of India v Morris* which is relevant in the instant case was explained by Lord Nicholls in *Dubai Aluminium v Salaam [2003] 2 AC 366* at [30] as follows,

> "I turn, then, to cases such as the present where there is no question of reliance or "holding out", or of the employer having assumed a direct responsibility to the wronged person. Take a case where an employee does an act of a type for which he is employed but, perhaps through a misplaced excess of zeal, he does so dishonestly. He seeks to promote his employer's interests, in the sphere in which he is employed, but using dishonest means. Not surprisingly, the courts have held that in such a case the employer may be liable to the injured third party just as much as in a case where the employee acted negligently. Whether done negligently or dishonestly the wrongful act comprised a wrongful and unauthorised mode of doing an act authorised by the employer, in the oft repeated language of the "Salmond" formulation: see *Salmond, Law of Torts* , 1st ed (1907), p 83. As Willes J said, in *Barwick v English Joint Stock Bank (1867) LR 2 Ex 259* , 266:
>
> > "It is true, [the master] has not authorized the particular act, but he has put the agent in his place to do that class of acts, and he must be answerable for the manner in which the agent has conducted himself in doing the business which it was the act of his master to place him in."

197. Dealing shortly with one of the points made by RBS SEEL, it seems to me that the fact that transactions for purchase of EUAs in this case were entered into in the name of and by RBS as a company, rather than by the Traders themselves, does not mean that the principle of vicarious liability cannot apply. Assuming that the transaction chains are established, the Traders assisted the fraud at the Claimant companies by causing RBS to enter into the transactions with CarbonDesk, just as much as RBS as a corporate entity assisted the fraud by entering into those trades and paying the money due under them. It would, in the words of Lord Nicholls, be a case of an employee doing an act of a type for which he is employed and seeking to promote his employer's interests in the sphere in which he is employed, but using dishonest means.

198. The question arises, however, by which defendant or defendants was or were the Traders employed for this purpose?

199. The underlying rationale for imposing vicarious liability in a case in tort was considered by the Supreme Court in *Various Claimants v Catholic Child Welfare Society [2013] 2 AC 1* . At [34]-[35] the Supreme Court stated,

> "34. Vicarious liability is a longstanding and vitally important part of the common law of tort. A glance at the table of cases in *Clerk & Lindsell on Torts* , 20th ed (2010), shows that in the majority of modern cases the defendant is not an individual but a corporate entity. In most of them vicarious liability is likely to be the basis upon which the defendant was sued. The policy objective underlying vicarious liability is to ensure, in so far as it is fair, just and reasonable, that liability for tortious wrong is borne by a defendant with the means to compensate the victim. Such defendants can usually be expected to insure against the risk of such liability, so that this risk is more widely spread. It is for the court to identify the policy reasons why it is fair, just and reasonable to impose vicarious liability and to lay down the criteria that must be shown to be satisfied in order to establish vicarious liability. Where the criteria are satisfied the policy reasons for imposing the liability should apply. As Lord Hobhouse of Woodborough pointed out in the *Lister case [2002] 1 AC 215* , para 60, the

policy reasons are not the same as the criteria. One cannot, however, consider the one without the other and the two sometimes overlap.

35. The relationship that gives rise to vicarious liability is in the vast majority of cases that of employer and employee under a contract of employment. The employer will be vicariously liable when the employee commits a tort in the course of his employment. There is no difficulty in identifying a number of policy reasons that usually make it fair, just and reasonable to impose vicarious liability on the employer when these criteria are satisfied: (i) the employer is more likely to have the means to compensate the victim than the employee and can be expected to have insured against that liability; (ii) the tort will have been committed as a result of activity being taken by the employee on behalf of the employer; (iii) the employee's activity is likely to be part of the business activity of the employer; (iv) the employer, by employing the employee to carry on the activity will have created the risk of the tort committed by the employee; (v) the employee will, to a greater or lesser degree, have been under the control of the employer."

200. The Supreme Court then went on to consider the basis upon which vicarious liability might be "transferred" from a workman's employer to a third party who was using the employee's services under a contract or other arrangement with his employer. Referring to the decision of the House of Lords in *Mersey Docks and Harbour Board v Coggins & Griffith (Liverpool) Ltd [1947] AC 1* , the Supreme Court observed that the test for imposition of vicarious liability on the third party was very stringent and required it to be shown that the third party who had enjoyed the benefit of the services rendered "enjoyed the right to control the way in which the act involving negligence was done."

201. However, the Supreme Court then approved the decision of the Court of Appeal in *Viasystems (Tyneside) v Thermal Transfer (Northern) [2006] QB 510* which held that, contrary to a long-standing assumption, the law in fact permitted the possibility of dual vicarious liability. In doing so, at [45] the Supreme Court rejected the application of the stringent test of control derived from *Mersey Docks* in such a case, preferring instead the approach of Rix LJ in *Viasystems* .

202. In *Viasystems* , Rix LJ traced the development of the law in cases concerning an employee whose services were made available to a third party and continued, at [77],

"77. In my judgment, if consideration is given to the function and purposes of the doctrine of vicarious liability, then the possibility of dual responsibility provides a coherent solution to the problem of the borrowed employee. Both employers are using the employee for the purposes of their business. Both have a general responsibility to select their personnel with care and to encourage and control the careful execution of their employees' duties, and both fall within the practical policy of the law which looks in general to the employer to organise his affairs in such a way as to make it fair, just and convenient for him to bear the risk of his employees' negligence. I am here using the expression "employee" in the extended sense used in the authorities relating to the borrowed employee. The functional basis of the doctrine of vicarious liability has become increasingly clear over the years. The Civil Liability (Contribution) Act 1978 now provides a clear and fair statutory basis for the assessment of contribution between the two employers. In my judgment, the existence of the possibility of dual responsibility will be fairer and will also enable cases to be settled more easily."

203. Rix LJ then went on to consider the circumstances in which dual vicarious liability could arise. In a passage later endorsed by the Supreme Court in *Catholic Child Welfare Society* , Rix LJ continued,

"79. However, I am a little sceptical that the doctrine of dual vicarious liability is to be wholly equated with the question of control. I can see that, where the assumption is that liability has to fall wholly and solely on the one side or the other, then a test of sole right of control has force to it. Even the *Mersey Docks case [1947] AC 1* , however, does not make the control test wholly determinative.

© 2025 Thomson Reuters.

Once, however, a doctrine of dual responsibility becomes possible, I am less clear that either the existence of sole right of control or the existence of something less than entire and absolute control necessarily either excludes or respectively invokes the doctrine. Even in the establishment of a formal employer/employee relationship, the right of control has not retained the critical significance it once did. I would prefer to say that I anticipate that subsequent cases may, in various factual circumstances, refine the circumstances in which dual vicarious liability may be imposed. I would hazard, however, the view that what one is looking for is a situation where the employee in question, at any rate for relevant purposes, is so much a part of the work, business or organisation of both employers that it is just to make both employers answer for his negligence. What has to be recalled is that the vicarious liability in question is one which involves no fault on the part of the employer. It is a doctrine designed for the sake of the claimant imposing a liability incurred without fault because the employer is treated by the law as picking up the burden of an organisational or business relationship which he has undertaken for his own benefit.

80. One is looking therefore for practical and structural considerations. Is the employee, in context, still recognisable as the employee of his general employer and, in addition, to be treated as though he was the employee of the temporary employer as well? Thus in the *Mersey Docks* situation, it is tempting to think that liability will not be shared: the employee is used, for a limited time, in his general employer's own sphere of operations, operating his general employer's crane, exercising his own discretion as a crane driver. Even if the right of control were to some extent shared, as in practice it is almost bound to be, one would hesitate to say that it is a case for dual vicarious liability. One could contrast the situation where the employee is contracted-out labour: he is selected and possibly trained by his general employer, hired out by that employer as an integral part of his business, but employed at the temporary employer's site or his customer's site, using the temporary employer's equipment, and subject to the temporary employer's directions. In such a situation, responsibility is likely to be shared. A third situation, where an employee is seconded for a substantial period of time to the temporary employer, to perform a role embedded in that employer's organisation, is likely to result in the sole responsibility of that employer."

204. Turning to the "practical and structural considerations" in the instant case, the terms on which RBS SEEL made the Traders available to RBS were set out in a "Commodities Trading Activities Master Agreement" between (inter alia) RBS and RBS SEEL dated 1 April 2008 (the "CTAMA").

205. The relevant provisions of the CTAMA were as follows,

"WHEREAS, the Parties have agreed that both Sempra Metals Limited … and [RBS SEEL] (together … the "SET UK Entities"), each of which is an SET Company, will not act as agent for RBS, but rather will provide to RBS all its employees and other personnel (whether appointed under a contract for services or otherwise), including its senior managers and officers (the "SET UK Personnel") to RBS to undertake certain commodities trading and other activities as representatives of, and in the name of, RBS, as set forth in more detail below;

…

SECTION 2.1. Appointment . Subject to the terms and conditions of this Agreement, and except as set forth in Section 2.5, RBS hereby authorizes the SET Companies as an agent of RBS, and each of the SET Companies hereby accepts such authorization from RBS, to engage in the Trading Activities.

SECTION 2.2. Authority . In performing the Trading Activities (a) as agent of RBS or (b) as Section 2.5 Representatives of RBS, subject to the terms and conditions of this Agreement, each of the SET Companies (or where applicable the Section 2.5 Representatives nominated by the SET UK Entities in writing) shall have authority, on behalf of RBS, to enter into commitments or undertakings and do any other act or thing necessary for the proper performance of the Trading Activities, all of which

shall thereby be binding on RBS. Each of the SET Companies which acts as agent shall have the authority, in accordance with this Agreement, to delegate, in writing, officers of such SET Company to perform the Trading Activities and to execute transactions and related legal documents; provided that at all times such officers remain subject to the supervision and control of such SET Company. The SET Companies shall, and shall cause the SET Representatives to, in all cases comply with any instructions reasonably given by RBS in connection with, and consistent with the terms of, this Agreement. RBS shall have no obligation to, and may in its sole discretion direct the SET Companies not to (which direction shall also be binding upon the SET Representatives), enter into a specific trade or transaction or types or groups of similar trades or transactions under this Agreement.

….

SECTION 2.5. SET UK Entities . Notwithstanding any other provisions of this Agreement with respect to any Trading Activities and any Additional Activities the SET UK Entities will not act as agent for RBS, but rather the SET UK Entities will make the SET UK Personnel available to RBS to act as representatives of, and in the name of, RBS and to act in such capacity to engage in such Trading Activities and Additional Activities in the name of RBS (such persons in such capacity being the "Section 2.5 Representatives"). The SET UK Entities will continue to pay all salary, bonus, fees and other amounts or benefits (including reimbursement of business expenses) due to the SET UK Personnel, and such SET UK Personnel who are employees of either of the SET UK Entities shall remain the employees of such SET UK Entity at all times. The SET UK Entities shall cause the SET UK Personnel to devote as much of their time and attention to the provision of their services as is required for the purposes of this Agreement. The SET UK Entities shall cause their nominated directors and senior managers, acting as Section 2.5 Representatives, to supervise, manage and control the activities undertaken in accordance with this Section….

…

SECTION 3.2. Compliance with RBS Policies and Direction . Each of the SET Companies shall, and shall cause their respective SET Representatives to perform the Trading Activities and Additional Activities (i) in accordance with RBS Policies, including, without limitation, those relating to market risk, credit risk and other such policies and rules applicable thereto and (ii) in compliance with all guidelines and restrictions imposed from time to time by RBS, including any investment limitations, trading guidelines, VaR limits and position limits. Each of the SET Companies shall establish committees of its directors and officers (including where applicable committees of Section 2.5 Representatives) as requested by RBS for the purpose of authorizing or approving transactions, commitments, undertakings and other acts and things effected by the SET Companies and the SET Representatives hereunder.

…

SECTION 4.1. SET Fee . In consideration of the SET Companies acting as agents for, or providing the SET UK Personnel and other services to, RBS (as applicable) under this Agreement, RBS hereby agrees to pay to LLP for the benefit of the SET Companies quarterly in arrears as soon as practicable after calculation thereof pursuant to Section 5.2(a) fees in an amount (exclusive of VAT) equal to the aggregate amount of all reasonable costs, expenses and required fees (determined using principles in accordance with the Applicable Laws of the jurisdictions in which each of the SET Companies is organized, domiciled and operating at the time of calculation of such fees) of the SET Companies in performing the Trading Activities and Additional Activities hereunder for such period (the "SET Fees") including…

(b) employee compensation, including salaries, commissions, bonuses and benefit costs; provided that no payments shall be required in respect of estimated bonus payments;…"

206. "Trading Activities" was defined in a Schedule to the CTAMA to include the emissions trading conducted by the Traders, and "Additional Activities" was defined to mean all other activities and services incidental to the Trading Activities, such as documenting the transactions, preparing invoices and maintaining business relationships in furtherance of such Trading Activities.

207. It should first be noted that Section 2.5 of the CTAMA makes clear that all "Section 2.5 Representatives", including the Traders, remained employees of RBS SEEL at all material times. RBS SEEL also remained primarily liable to pay the Traders' salaries, bonuses, business expenses, and other benefits.

208. Section 2.2 also made it clear that although the Traders would have authority to bind RBS to trades, this was subject to a proviso, "that at all times such officers remain subject to the supervision and control" of RBS SEEL.

209. Section 2.5 further imposed an obligation upon RBS SEEL to cause the Traders "to devote as much of their time and attention to the provision of their services as is required for the purposes of this agreement". The natural reading of the final sentence of Section 2.5 is that RBS SEEL also had an obligation to ensure that its nominated directors and senior managers "supervise, manage and control the activities undertaken [by the Traders] in accordance with this Section".

210. As such, I consider that it is clear that RBS SEEL remained, in law and in fact, the employer of the Traders, and retained an obligation to exercise some supervision and control over the way in which the Traders were to perform their trading activities.

211. In that regard, I do not accept Mr. MacLean QC's argument that the final words of Section 2.5 meant that the persons at RBS SEEL who would be exercising such supervision and control of the Traders would themselves be acting as Section 2.5 Representatives, and would be doing so on behalf of RBS. Such an interpretation would negate the plain intent of the remainder of the wording of the Section which was to set out the status and obligations of the "SET UK Entities" (including RBS SEEL). It also ignores the essential point that the definition of Section 2.5 Representatives is expressly limited to persons engaging in Trading Activities or ancillary Additional Activities in their capacity as such ("such persons in such capacity being the "Section 2.5 Representatives""). In my judgment, Section 2.5 does not mean that any relevant persons at RBS SEEL, who would have the responsibility within RBS SEEL of ensuring that it complied with its direct obligations to RBS under Section 2.5, would also be deemed to be acting in that regard for RBS as Section 2.5 Representatives.

212. So far as RBS is concerned, Section 2.2 of the CTAMA made it clear that the Traders were to have the authority to perform their trading activities as agents for RBS. In addition, however, RBS SEEL agreed that it would procure that the Traders would comply with any instructions reasonably given by RBS in connection with, and consistent with, the terms of the CTAMA. In particular, it was expressly envisaged in Section 2.2 that RBS might give the Traders directions not to enter into specific trades or transactions or types or groups of similar trades or transactions.

213. Similarly, under Section 3.2, RBS SEEL agreed that the Traders would perform their trading activities in accordance with RBS policies relating to market risk and credit risk, and in compliance with investment and trading guidelines and restrictions imposed by RBS. RBS also agreed in Section 4.1(b) to make payments to reimburse RBS SEEL for the salaries, commissions and bonuses and benefit costs of the Traders.

214. In these circumstances, I consider this to be a paradigm case for the imposition of dual vicarious liability. To use the words of Rix LJ in paragraph [80] of *Viasystems* , the Traders plainly were still recognisable as the employees of RBS SEEL by whom they were legally employed, paid and supervised. But they were not simply operating within the RBS SEEL sphere of operations. On the contrary, the Traders had the power and authority to commit RBS to trading contracts as agents for RBS, the trading activity that they were conducting was that of RBS, and in that regard they were operating in the RBS sphere of operations too. Moreover, in so doing, the Traders had at all times to operate within the guidelines and restrictions imposed by RBS and were subject to directions that might be given by RBS. The cost of their employment to RBS SEEL was also reimbursed by RBS.

215. Taking these factors together, I therefore consider that it would be entirely appropriate, for the purposes of determining liability for their actions, to regard the Traders as employees of RBS as well as RBS SEEL. To use Rix LJ's words from paragraph [79] of *Viasystems* , I consider that the Traders were so much a part of the work, business or organisation of both RBS SEEL and RBS that it would be just to make both companies liable for any wrongs that the Traders committed to third parties.

© 2025 Thomson Reuters. 

216. Accordingly, if and to the extent that either of the Traders, in causing RBS to enter into the trading contracts with CarbonDesk, dishonestly assisted the breaches of duty by the directors of the Claimant companies or knowingly participated in the fraudulent trading by the Claimant companies, then both RBS SEEL and RBS will be vicariously liable to the Claimant companies for the Traders' misconduct.

*Attribution*

217. In the alternative to application of principles of vicarious liability, it is also possible to approach the question of liability by identifying whether there were any relevant acts of the corporate defendants constituting the necessary *actus reus* of assistance in the breach of duty or knowing participation in fraudulent trading under Section 213 , and then investigating whose state of mind is to be attributed to the corporate defendant for the purposes of determining whether the necessary *mens rea* exists.

218. In this respect, it is clear that, unlike the vicarious liability question where the issue is whether the two corporate defendants should be liable for any wrongs committed by the Traders personally (e.g. for causing trading by RBS to continue whilst turning a blind eye to the risk that they were thereby facilitating a VAT fraud), the question of attribution is only relevant in relation to RBS. That is because the only relevant corporate *actus reus* was the trading by RBS. There were no relevant corporate actions by RBS SEEL.

219. The modern law on attribution was summarised by Lord Sumption in *Bilta (UK) Limited v Nazir (No.2) [2016] AC 1* . At paragraph 67 Lord Sumption said,

> "67. The question what persons are to be so far identified with a company that their state of mind will be attributed to it does not admit of a single answer. The leading modern case is *Meridian Global Funds Management Asia Ltd v Securities Commission [1995] 2 AC 500* . The primary rule of attribution is that a company must necessarily have attributed to it the state of mind of its directing organ under its constitution, i.e. the board of directors acting as such or for some purposes the general body of shareholders. Lord Hoffmann, delivering the advice of the Privy Council, observed that the primary rule of attribution together with the principles of agency and vicarious liability would ordinarily suffice to determine the company's rights and obligations. However, they would not suffice where the relevant rule of law required that some state of mind should be that of the company itself. He explained, at p 507:
>
>> "This will be the case when a rule of law, either expressly or by implication, excludes attribution on the basis of the general principles of agency or vicarious liability. For example, a rule may be stated in language primarily applicable to a natural person and require some act or state of mind on the part of that person 'himself', as opposed to his servants or agents. This is generally true of rules of the criminal law, which ordinarily impose liability only for the actus reus and mens rea of the defendant himself."
>
> The directing organ of the company may expressly or implicitly have delegated the entire conduct of its business to the relevant agent, who is actually although not constitutionally its "directing mind and will" for all purposes. This was the situation in the case where the expression "directing mind and will" was first coined, *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705* . Such a person in practice stands in the same position as the board. The special insight of Lord Hoffmann, echoing the language of Lord Reid in *Tesco Supermarkets Ltd v Nattrass [1972] AC 153* , 170, was to perceive that the attribution of the state of mind of an agent to a corporate principal may also be appropriate where the agent is the directing mind and will of the company for the purpose

of performing the particular function in question, without necessarily being its directing mind and will for other purposes [1995] 2 AC 500, 507:

> "This is always a matter of interpretation: given that it was intended to apply to a company, how was it intended to apply? Whose act (or knowledge, or state of mind) was *for this purpose* intended to count as the act etc of the company? One finds the answer to this question by applying the usual canons of interpretation, taking into account the language of the rule (if it is a statute) and its content and policy."

(And see pp 509–511.)"

220. Lord Sumption then went on to give, as an example of this approach, a number of cases of dishonest assistance, to illustrate how the state of mind of someone other than the board might, for this purpose, be attributed to a defendant company,

> "68. A modern illustration of the attribution of knowledge to a company on the basis that its agent was its directing mind and will for all purposes is *Royal Brunei Airlines Sdn Bhd v Tan [1995] 2 AC 378* , where the Privy Council was concerned with the knowledge required to make a company liable as a constructive trustee on the footing of knowing assistance in a dishonest breach of trust. The defendants were a one-man company, BLT, and the one man, Mr Tan. At pp 392–393, Lord Nicholls of Birkenhead, delivering the advice of the Board, observed that Mr Tan had known the relevant facts and was therefore liable. "By the same token, and for good measure, BLT also acted dishonestly. [Mr Tan] was the company, and his state of mind is to be imputed to the company." On the other hand, *El Ajou v Dollar Land Holdings plc [1994] 2 All ER 685* did not concern a one-man company. The issue was whether knowledge of the origin of funds received for investment by Dollar Land Holdings, a public company, could be imputed to it so as to found a liability to account as a constructive trustee on the footing of knowing receipt. Lord Hoffmann, delivering the leading judgment of the Court of Appeal and applying the principles which he would later explain in *Meridian Global* , held that the company was fixed with the knowledge of one Mr Ferdman, its part-time chairman and a non-executive director, because he had acted as its directing mind and will for the particular purpose of arranging its receipt of the tainted funds."

221. The same approach can also be seen in relation to claims for fraudulent trading under Section 213 . In *Bank of India v Morris* (supra), having referred to *Meridian Global* and having considered the scope and policy of Section 213 , the Court of Appeal continued at paragraph 112,

> "In most companies of any size there will be a chain of command and delegation of authority and it is likely that the transactions with the fraudulent company will be dealt with at a level in the company below that of the board. It would in practice defeat the effectiveness of [Section 213] if liability were limited to those cases in which the board of directors was actually a direct privy to the fraud of the company with whom the transactions were entered into. The question is who had authority in Bank of India to deal with BCCI in respect of the relevant transactions. That requires a consideration of all the circumstances surrounding the transaction."

222. Applying these principles, it is perfectly clear that in the instant case the natural persons whose knowledge is to be attributed to RBS for the purpose of determining liability for both dishonest assistance and fraudulent trading are the Traders. They were the persons who were given the authority to conduct the relevant trades on behalf of RBS which are said to have amounted to the giving of assistance and also constituted the participation in fraudulent trading.

223. I do not, of course, suggest that the separate states of knowledge of the Traders can be combined in any way for this purpose. It is necessary to investigate the individual states of mind of the two Traders separately. But I consider that it is appropriate for Mr. Gygax's knowledge to be attributed to RBS not only in respect of his own trading, but also for the purposes of considering whether it was dishonest for the trading conducted by Mr. Shain to continue. That is because Mr. Gygax was the head of the Desk, worked beside and had responsibility as line manager for the trading being conducted by Mr. Shain, and could have instructed such trading to cease. As such, if Mr. Gygax had the requisite state of mind which meant that his own continued trading should be regarded as dishonest, then I think that his state of mind must also be attributed to RBS for any continued trading by Mr. Shain which, as his boss, Mr. Gygax did nothing to stop.

224. I shall return later in this judgment to consider the question of whether the state of mind of the Traders, and in particular Mr. Gygax, continued to be the relevant state of mind to be attributed to the Defendants after Mr. Savage gave his "business as usual" instruction after receipt of the BlueNext letter.

*Dishonesty*

225. As is apparent, the central requirement for liability for both dishonest assistance and fraudulent trading is that a person whose state of mind is to be attributed to the defendant should have behaved dishonestly.

226. Honesty is a basic moral quality which is expected of all members of society. It involves being truthful about important matters and respecting the property rights of others: *Wingate v SRA [2018] EWCA Civ 366* at [93]. Acting dishonestly means simply not acting as an honest person would in the circumstances: *Tan* at 389.

227. In what is now the leading case on dishonesty, *Ivey* , Lord Hughes said, at [74], that when dishonesty is in issue:

> "[T]he fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts. The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held. When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people. There is no requirement that the defendant must appreciate that what he has done is, by those standards, dishonest."

See also *Group Seven Limited v Notable Services LLP [2019] EWCA Civ 614* (" Group Seven ") at [57].

228. The requirement is thus for the court to determine what a defendant actually knew or believed, and then to appraise his conduct in light of that knowledge or belief against the objective standards of ordinary decent people.

229. It is clear, however, that a finding of dishonesty can be made where an assister does not actually know all the relevant facts. In *Barlow Clowes* at [10] the Privy Council affirmed as a correct statement of the law that dishonesty may consist of suspicion of the true facts, combined with a conscious decision not to make inquiries which might result in actual knowledge of those facts.

230. That statement follows many other similar statements. In *Jones v Gordon (1877) 2 App Cas 616* , 629 Lord Blackburn distinguished a person who was "honestly blundering and careless" from a person who,

> "refrained from asking questions, not because he was an honest blunderer or a stupid man, but because he thought in his own secret mind—I suspect there is something wrong, and if I ask

> questions and make farther inquiry, it will no longer be my suspecting it, but my knowing it, and then I shall not be able to recover."

Lord Blackburn characterised this as dishonesty.

231. To similar effect was the statement by Millett J in *Agip Africa v Jackson [1990] Ch 265* at 293,

> "The true distinction is between honesty and dishonesty. It is essentially a jury question. If a man does not draw the obvious inferences or make the obvious inquiries, the question is: why not? If it is because, however foolishly, he did not suspect wrongdoing or, having suspected it, had his suspicions allayed, however unreasonably, that is one thing. But if he did suspect wrongdoing yet failed to make inquiries because "he did not want to know", … or because he regarded it as "none of his business", … that is quite another. Such conduct is dishonest, and those who are guilty of it cannot complain if, for the purpose of civil liability, they are treated as if they had actual knowledge."

232. Likewise, in *Group Seven* at [58] the Court of Appeal said,

> "58. …. knowledge of a fact may be imputed to a person if he turns a blind eye to it, as Nelson is supposed to have done at Copenhagen, or if in legal parlance he deliberately abstains from enquiry in order to avoid certain knowledge of what he already suspects to be the case. It is convenient to use the expression "blind-eye knowledge" to denote imputed knowledge of this type. In the context of dishonest assistance for breach of trust or fiduciary duty, it was common ground before us, and we consider it correct in principle, to equate blind-eye knowledge with actual knowledge for the purposes of the first stage of the test laid down in *Tan* and endorsed in *Barlow Clowes* and *Ivey* . It is important, however, to understand the limits of the doctrine. It is not enough that the defendant merely suspects something to be the case, or that he negligently refrains from making further enquiries. As the House of Lords made clear in *Manifest Shipping v Polaris [2003] 1 AC 469* , the imputation of blind-eye knowledge requires two conditions to be satisfied. The first is the existence of a suspicion that certain facts may exist, and the second is a conscious decision to refrain from taking any step to confirm their existence: see the speech of Lord Scott at [112], and the observations to similar effect of Lord Hobhouse at [25]. The judgments also make it clear that the existence of the suspicion is to be judged subjectively by reference to the beliefs of the relevant person, and that the decision to avoid obtaining confirmation must be deliberate."

233. *Manifest Shipping v Polaris [2003] 1 AC 469* was a case in which the issue was whether the owners of a vessel had been "privy" to its unseaworthiness by reason of "blind-eye" knowledge and hence could not claim under a policy of insurance by reason of section 39(5) of the Marine Insurance Act 1906 . At [116], Lord Scott sounded a word of caution about the level of suspicion required for a finding of "blind-eye knowledge", saying,

> "116. … In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist. But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that may, at one extreme, be no more than a vague feeling of unease and, at the other extreme, reflect a firm belief in the existence of the relevant facts. In my opinion, in order for there to be blind-eye knowledge, the suspicion must be firmly grounded and targeted on specific facts. The deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to enquire into an

© 2025 Thomson Reuters. 

untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the basis of a finding of privity. That, in my opinion, is not warranted by section 39(5) ."

234. Founding themselves on the dicta in *Manifest Shipping* , in the course of their submissions, the Defendants emphasised that a finding of dishonesty would require proof that a defendant had a suspicion that was firmly grounded and targeted on specific facts, coupled with a deliberate decision to avoid obtaining confirmation of those facts. I accept that what is required is more than just a vague feeling of unease or concern. For a finding of dishonesty, a defendant must have a suspicion which is more focussed than that.

235. So, in the instant case, I accept that it would not be sufficient for the Traders simply to have had some general concerns or unanswered questions about the trading with CarbonDesk, e.g. as to the source of the large volumes that they were being offered. For a finding of dishonesty, I accept that the Claimants need to show that the Traders had a suspicion, based upon some identifiable matters, that the trading that they were doing with CarbonDesk was part of, or connected in some way, with VAT fraud. The Claimants then also need to show that the Traders deliberately decided not to inquire further to avoid obtaining confirmation of that fact.

236. I do not consider, however, that for a finding of dishonesty it is also necessary to show that the defendant knows, or has a suspicion of all of the detailed facts or aspects of the breach of trust or breach of duty. In *Barlow Clowes* at [28], the Privy Council observed that it was sufficient for the defendant to have entertained a "clear suspicion" that monies were being misappropriated from the company, and then made a decision not to ask questions about the transactions he was assisting. It did not matter that the defendant did not know that the monies that were being paid away were held on a trust or even what a trust meant, or that he did not know the precise involvement of the fraudsters. It was enough for liability that the defendant suspected that the relevant individuals had no right to use the company's money for speculative investments of their own, and yet he chose not to inquire.

237. Applied to the instant case, I consider that if the Traders had a clear suspicion that the trading with CarbonDesk was part of or connected with VAT fraud, and deliberately chose not to inquire into that possibility, I do not think that it matters that they did not understand the detailed mechanics of MTIC fraud, or have an understanding of the particular type of MTIC fraud that was being carried on, or as to the specific role of CarbonDesk in it.

*The burden of proof etc.*

238. There are a number of further, important, principles to be observed in any case involving allegations of dishonesty.

239. The first is that the burden of proving dishonesty lies upon the claimant. The second is that the standard of proof is the usual civil standard on the balance of probabilities – i.e. it must be established that the fact or conduct in dispute more probably happened than not. Thirdly, there is no rule of law that if the allegation is more serious (e.g. of dishonesty) more cogent evidence is required to prove it. Fourth, the court can take into account, as a matter of common sense, any relevant "inherent improbabilities" as to the defendant's behaviour. These points were all summarised by Eder J in *Otkritie International v Urumov [2014] EWHC 191* at [88]-[89].

240. When determining the subjective state of mind of a defendant, unless there is some external evidence in which the person expresses what they know or think, it will be necessary to draw inferences: *Barlow Clowes* at [26]. It has been said that in practice, the reasonableness of an alleged belief or state of mind may often be determinative of whether the Court will infer that a person held the stated belief: *Ivey* at [74]. However, it is also self-evident that care must be taken to avoid the use of hindsight, e.g. when assessing what a defendant might have suspected. I remind myself that this is particularly so when a defendant was in an unfamiliar or a fast moving situation.

241. Truthfulness is a characteristic of honesty, and untruthfulness is often a powerful indicator of dishonesty. However, truthfulness does not equate to honesty: a dishonest person may be truthful about his dishonest opinions: *Ivey* at [75]. In that regard, I also remind myself of the principles encapsulated in the direction given to juries in criminal cases derived from the decision in *R v Lucas [1981] QB 720* . Juries are routinely directed that the fact that a defendant tells lies in the witness box does not necessarily mean that he is guilty. They are told that people tell lies for all sorts of reasons: to bolster a weak defence, to conceal discreditable conduct, or out of panic, distress or confusion. They are also told to have in mind that the fact that a witness tells lies about some things does not mean that he or she is telling lies about everything.

*Oral and documentary evidence*

242. The events in this case took place nine years before the trial. When considering the strength and importance of oral evidence, especially in a case where the relevant events took place a significant number of years before and what is in issue is the state of mind of a witness, it is necessary to consider the observations of Leggatt J in *Gestmin SGPS v Credit Suisse (UK) Limited [2013] EWHC 3560 (Comm)* (" Gestmin ") at [18]-[20],

> "18. Memory is especially unreliable when it comes to recalling past beliefs. Our memories of past beliefs are revised to make them more consistent with our present beliefs. Studies have also shown that memory is particularly vulnerable to interference and alteration when a person is presented with new information or suggestions about an event in circumstances where his or her memory of it is already weak due to the passage of time.
>
> 19. The process of civil litigation itself subjects the memories of witnesses to powerful biases. The nature of litigation is such that witnesses often have a stake in a particular version of events. This is obvious where the witness is a party or has a tie of loyalty (such as an employment relationship) to a party to the proceedings. Other, more subtle influences include allegiances created by the process of preparing a witness statement and of coming to court to give evidence for one side in the dispute. A desire to assist, or at least not to prejudice, the party who has called the witness or that party's lawyers, as well as a natural desire to give a good impression in a public forum, can be significant motivating forces.
>
> 20. Considerable interference with memory is also introduced in civil litigation by the procedure of preparing for trial. A witness is asked to make a statement, often (as in the present case) when a long time has already elapsed since the relevant events. The statement is usually drafted for the witness by a lawyer who is inevitably conscious of the significance for the issues in the case of what the witness does or does not say. The statement is made after the witness's memory has been "refreshed" by reading documents. The documents considered often include statements of case and other argumentative material as well as documents which the witness did not see at the time or which came into existence after the events which he or she is being asked to recall. The statement may go through several iterations before it is finalised. Then, usually months later, the witness will be asked to re-read his or her statement and review documents again before giving evidence in court. The effect of this process is to establish in the mind of the witness the matters recorded in his or her own statement and other written material, whether they be true or false, and to cause the witness's memory of events to be based increasingly on this material and later interpretations of it rather than on the original experience of the events."

243. In the light of these points, Leggatt J observed that whilst the oral evidence of witnesses is of course important, it may well be better to draw inferences from the contemporary documents and known or probable facts rather than to rely primarily on witnesses' recollections: *Gestmin* at [22].

244. In that regard, it is necessary for the court to evaluate, in light of the circumstances surrounding its creation, whether a contemporaneous document is a reliable record, and what weight is to be given it. I also bear in mind that the significance of contemporaneous written documentation may equally lie in its absence, for instance where certain contemporaneous documentation is likely to have existed if a witness's evidence were correct: *Re Mumtaz Properties [2011] EWCA Civ 610* at [14].

245. With those introductory observations, I turn to consider the knowledge and state of mind of each of the Traders in respect of the central issues in the case.

**G. The Traders' States of Mind**

*The Eua market in 2009*

© 2025 Thomson Reuters. 

246. Any consideration of the states of mind of the Traders at the relevant time must be considered against the background of general perceptions of the EUA market in the first half of 2009.

247. The design of the EU ETS meant that, conventionally, most selling of surplus EUAs by compliance companies took place in the last quarter of a calendar year or the first quarter of the following year. At this time, the compliance companies could determine their CO2 output for the year with reasonable accuracy and determine whether they had surplus EUAs to sell. By the same token, other compliance companies which had exceeded their allowances for the year would need to purchase extra EUAs in the market to surrender by the end of April. The result was that, all other things being equal, the summer months would not be the busiest time for trading on the EUA market.

248. However, like all markets, the EUA market was affected by various political and economic decisions and changes in the world economy in 2008/9. One of the differences between Phase 1 (which ended at the end of 2007) and Phase 2 (which ran from 2008 to the end of 2012) of the EU ETS was that in Phase 2, there was a policy on the part of European governments to incentivize reductions of emissions in the utilities/power generation sector. This led to an expectation that there would be a greater shortfall of EUAs in this sector, and hence more buyers from this sector in the market for surplus EUAs.

249. A further factor was the delay in allocation of a material proportion of "free" allowances of EUAs to industrials for 2008 and 2009. The market was aware of this and was expecting some of these EUAs to be sold into the market in 2009.

250. Another significant aspect was that as a result of the global financial slowdown and crisis in 2008, European (and global) industrial output was reduced and the availability of credit severely reduced. This led to an expectation that there would be lower emissions and hence a greater surplus of EUAs in the hands of industrial end- users in 2009 than in 2008. In addition, it was anticipated that some industrials might wish to sell surplus EUAs to raise finance at a time at which there was a global lack of liquidity. Indeed, it was thought that some compliance companies might even sell their entire allocations of EUAs in the spot market in the expectation that they would be able to purchase the required EUAs in the spot market at a later date when required to be surrendered to national authorities. The advantage of using the spot market in this respect was that it did not require the provision of collateral or credit that trading in derivatives required.

251. In terms of traded volumes and price, there was a significant fall in the spot price of EUAs after the collapse of Lehman Brothers in September 2008 which continued into early 2009, reaching a low in February 2009. There was also a substantial increase in the volumes of EUAs traded, especially on BlueNext, over the same period. It was widely believed in the market that this increase in traded volumes and corresponding fall in the spot price was the result of industrial companies selling surplus EUAs.

252. After mid-February 2009 the EUA spot price began to rise. So, for a short period, did traded volumes, the overwhelming majority of which were on BlueNext. There was, however, a sudden and substantial fall in traded volumes on BlueNext on 3 March 2009, after which, counter-intuitively, traded volumes continued to rise steadily as prices also rose.

253. During this period, the vast majority of RBS's spot trades were purchases from BlueNext and sales to a company known as Vertis which operated out of Hungary, Lithuania, Poland and Romania. RBS also did a very small amount of trading for a number of compliance company clients.

*The Traders' knowledge of Vat and the risk of Mtic fraud*

254. As indicated above, the Defendants' case was that neither of the Traders knew that VAT was charged on their spot trading of EUAs until 1 July 2009, and that they thought that any risk of VAT fraud in relation to spot trading in EUAs was confined to transactions in the French market (in particular trades on BlueNext). That case was encapsulated in the following answers from Mr. Gygax early in his cross- examination, commenting upon an article from Platts Emissions Daily for 9 June 2009,

> "Q. As at 9 June, you were aware, were you not, that the rumours were about a fraud that involved carouselling?
>
> A. We understood that there was narrative in the market about VAT. I didn't understand the concept of carousel. But it was not a linear set of information flow within a market as well.

Q. And the next paragraph says: "…you buy and sell lots and lots of times and you're left after several months owing the taxman VAT. But then you've gone; you disappear." Again, you understood at 9 June that that was the basic vice of the fraud?

A. I didn't understand that that was the way in which VAT fraud worked. The simple reason is that through — through the process of talking to the business, talking to Compliance, we didn't understand that we even had a VAT position with the market. The answers I got implied that we didn't. Hence the conclusion that we formed that this was a problem, if it was a problem, associated with France and France only."

255. As an initial observation, it seems to me inherently unlikely that both Traders, who came to the Desk at different times and from different business backgrounds, would independently have formed, and been labouring under, the same fundamental misapprehension that VAT was not chargeable on the spot trading of EUAs that they were doing until they each discovered their error on 1 July 2009.

**Mr Gygax**

256. Mr. Gygax's written evidence was that on about 8 June 2009 he had a conversation with Mr. Vanhaesendonck from which he gained the belief that VAT was not payable on spot trades of EUAs. His evidence was,

"I remember that at some point around this time (I think it may have been before Monday 8 June 2009 … but I cannot be certain) I spoke to Rene Vanhaesendonck (Director & General Counsel at RBS SEEL) about VAT. I had been told (although I cannot recall by whom) that he was the signatory to our agreement with BlueNext and so I thought that he would understand the mechanics and hence our obligations and liabilities around VAT.

I asked Mr Vanhaesendonck whether we paid VAT on spot trades on BlueNext and he said "no". I also asked about VAT on ECX spot to which I got the same answer. I understood Mr Vanhaesendonck's response to mean that there was no VAT on any spot trades, whether with BlueNext or with a UK counterparty. I now know that this was wrong - French domiciled companies were subject to VAT in France, therefore VAT was payable by French companies on BlueNext; RBS plc would be subject to VAT on all UK based spot transactions; and ECX spot is exempt from VAT as it is, in fact, a three day forward future. There may have been a misunderstanding in my conversation with Mr Vanhaesendonck, but that is what I took away from our discussion and it shaped my thinking at the time."

257. Mr. Gygax then stated that the first occasion on which he was aware that VAT was chargeable on spot trading in EUAs was on 1 July 2009. In his witness statement, he explained how this occurred,

"178. At some point [during the morning of 1 July 2009], Mr Duncan, who was in the RBS Sempra VAT team, told me that he had identified an issue with the VAT number on CarbonDesk's invoices. I recall standing at Mr Duncan's desk and him showing me the VAT number and telling me that it was invalid. Mr Duncan was reasonably animated at this point.

179. As explained above, I did not believe VAT was chargeable on our EUA spot trades. As such, the VAT issue on the CarbonDesk invoices was the first time I appreciated that VAT was an issue in respect of EUA spot trades. I recall feeling sick at this point. As I noted in the email to Mr Walter described below, I thought that the presence of an invalid VAT number meant that CarbonDesk were imminently going to disappear with our VAT. Whilst I did not understand the mechanics of VAT in any detail, it just appeared to me, particularly given the recent BlueNext letter and the high volumes

© 2025 Thomson Reuters.

> of trading with CarbonDesk, that it could be potentially implicated in some form of VAT scam or fraud."

258. This account must be tested against the contemporaneous evidence. On 3 June 2009, Mr. Gygax received a link to the blog post at www.emissionstrading.blogspot.com to an article headed "BlueNext: VAT scams or Simple Money Laundering?". The blog referred to the increased volumes of trading on BlueNext and referred very clearly to VAT fraud as a possible explanation for such activity. Towards the end of the article there was a reference to the administrators of BlueNext having been unusually tight- lipped when asked about volumes and procedures, and the blog continued,

> "As a trader with 20 years of experience in a wide range of securities my instinct says that they are hiding something.".

259. About an hour after receiving the link to the blog, Mr. Gygax forwarded the link to Mark Owen Lloyd, a former colleague, asking,

> "Did you write this? … 20 years' experience is claimed, thought you were older."

260. In his witness statement, Mr. Gygax commented that this was meant as a joke, and stated,

> "The blog article refers to a hypothesis of the author, based on "anecdotal evidence", about the potential for VAT scams and money laundering in the French EUA market. I do not now recall this article or my views about it at the time. I must have opened the article since I sent it to Mr Lloyd, but I doubt that I would have paid much attention because the article set out a hypothesis based on no corroborating evidence and because I received the article in the middle of my second week at RBS Sempra, at which time I was busy as described above."

261. In cross-examination, however, Mr. Gygax gave a materially different account. It was pointed out that the reference to the writer being a trader with 20 years' experience was tucked away towards the end of the article, which suggested that Mr. Gygax must have read it through. To that, Mr. Gygax suggested that he had been told by a broker that the article had been written by someone with 20 years' experience.

262. Mr. Gygax then said that far from not paying the article much attention, he had "highlighted it to my management and I went straight to compliance with it as well, so I think I took it seriously". The cross-examination continued,

> "Q. You are now saying that you discussed the article with management, you raised it with compliance, you took it seriously?
>
> A. I remember very clearly the reaction of my line manager when I first mentioned this on the floor. Whether or not I believed it as being serious or not was by the by. His reaction didn't seem to indicate that he thought it was real in any kind of way. But, nonetheless, he pointed out where compliance was and the person to speak to, and I went up and spoke to Chris Savage."

© 2025 Thomson Reuters. 

263. I shall return later in the judgment to consider whether Mr. Gygax did speak to Mr. Savage as he suggested. But I reject Mr. Gygax's attempt to explain away his comment on the blog post. I am entirely satisfied that Mr. Gygax indeed read the blog post; that it was he and not some unidentified broker who spotted the point about it being written by someone with 20 years' experience; and that he cannot have failed to understand the connection which it drew between the increased volume of trading on BlueNext and the possibility that it was due to VAT fraud.

264. The day afterwards, 4 June 2009, the French emissions registry closed. After the weekend on 8 June 2009, Mr. Gygax received various emails from BlueNext announcing the suspension and then closure of the exchange, and the French government decision to exempt EUAs from VAT. Mr. Gygax responded to a query from a colleague about whether there was any explanation for the closure of BlueNext by saying,

> "Technical issues claimed – VAT avoidance issues speculated
>
> …",

and later emailed another who had asked whether such closure happened often, stating that,

> "[the] issue with BlueNext is VAT related – French Ministry changed the rules which is probably a partial cause of the problem".

265. Mr. Gygax said in his witness statement that he did not remember where he learned this information or what he meant by it. He was pressed about this in cross- examination:

> "Q. The point I'm putting to you, Mr. Gygax, is that here we are, it's 9.30 on the Monday morning, the BlueNext exchange has just closed and, of course, you don't say 'I don't know why, I'll try to find out', you immediately say 'VAT avoidance issues speculated'.
>
> So I'm putting to you that as at 9.30 on Monday 8 June, you immediately made the connection between BlueNext closing and the VAT fraud issue.
>
> A. We identified that it could be IT issues or that there were this speculation about the tax, yes.
>
> Q. Well, BlueNext weren't claiming that there were VAT avoidance issues; BlueNext were claiming that it was technical issues. I'm putting to you that you, by 9.30 on Monday morning, had already been engaged in discussions about whether BlueNext was the subject of VAT fraud.
>
> A. In discussions with who?
>
> Q. I don't know. At the moment I'm just trying to get you to accept that you had been discussing the volumes on BlueNext as possibly being the subject of VAT fraud such that when BlueNext closed, Monday morning you immediately linked the closure to the possibility of a VAT fraud.
>
> A. I think to me there were two things that were quite clearly open. One is it could be an IT problem in terms of the architecture of BlueNext in connecting to two different frameworks …the second one is attached to the fact that there's rumours…"

© 2025 Thomson Reuters.

266. I consider that this evidence was evasive: although Mr. Gygax had clearly paid attention to the fact that BlueNext was claiming that the closure of the registry was due to technical issues, I think it is obvious from his emails to colleagues that he well understood that the closure of BlueNext was being attributed in the market to the possibility that there had been VAT fraud in emissions trading in France.

267. It will be recalled that Mr. Gygax's case was that he thought the possibility of such VAT fraud was confined to France and was not relevant to RBS's trading in the UK because he thought that there was no VAT payable on spot trades in EUAs with UK counterparties. He attributed that understanding to a conversation with Mr. Vanhaesendonck on around 8 or 9 June 2009. There is, however, no documentary or other evidence which refers in any way to such a conversation between Mr. Gygax and Mr. Vanhaesendonck, and Mr. Vanhaesendonck did not give evidence.

268. Mr. Gygax's evidence as to such a conversation was also very unclear. So, for example, Mr. Gygax accepted that the issue whether VAT was payable on the contracts he was making was important to him and continued,

> "A. I think the point was that if I wasn't able to speak to James Duncan then, then I would have immediately gone to Rene Vanhaesendonck. My belief was that I had already spoken to him, but we would have gone back, most definitely, to James Duncan.
>
> I cannot recall that conversation, not in terms of the detail, not in terms of the colour — other conversations that I recall, probably because their understanding by that time was that there wasn't a VAT problem, and certainly from the conversations with Mr Duncan is that there wasn't VAT applicable."

269. Mr. Duncan was a VAT specialist with responsibility for RBS Sempra's VAT affairs. There was no explanation as to why, even if he had been asked by Mr. Gygax, Mr. Duncan would have given Mr. Gygax the wrong information on such a basic and important point as to whether the spot trading conducted by the Desk attracted VAT.

270. Moreover, on 9 June 2009, Point Carbon published an article which referred to the French decision to exempt EUAs from VAT, and the resultant suspension of trading on BlueNext. The Article contained the following,

> "Paris-based Bluenext, the exchange which handles the bulk of spot carbon deals in the EU, suspended trade today after the French government said it would remove VAT on all spot transactions of carbon.
>
> The move comes against the backdrop of rumours that spot EUAs and CERs could be used in a so-called VAT carousel fraud, which has been highly prevalent in the UK recently.
>
> Bluenext said no authorities have contacted the exchange in regard to fraudulent trading and it had been talking to the French government about lifting the levy for some time.
>
> However, the EU commission's Customs and Taxation Union department told Point Carbon it has information on cases of fraud in carbon trading, but refused to be any more specific.
>
> …
>
> Carousel fraud
>
> The fraud typically involves criminals trading goods repeatedly across the borders between EU states - trade which under EU rules is exempt from VAT.
>
> Once the goods are imported, they are then sold on within the country - but the importer then dodges the VAT it is liable to pay.

Examples of carousel fraud include criminals finally exporting the goods once more, and reclaiming VAT which in theory should have been paid at the start of the chain, triggering a loss to the taxpayer.

Unlike carbon futures contracts (such as the 2009 EUA) which are financial instruments, spot carbon deals are classified as physical commodities, and so are subject to VAT, which is charged at 15 per cent currently in the UK.

This means that any company can buy and sell spot EUAs in the UK without being subject to regulation by the Financial Services Authority.

The EU commission's Customs and Taxation Union department added that responsibility for tackling VAT fraud lay solely with member states."

271. Mr. Gygax clearly read this article carefully and thought it important, because he emailed Mr. Rosol early that same morning, 9 June 2009, specifically quoting the part of the sentence,

"spot carbon deals are classified as physical commodities, and so are subject to VAT, which is charged at 15 per cent currently in the UK".

Mr. Gygax's email said,

"I just want to make sure that I have fully understood this, and that I am not currently engaging in trades that could lead to losses, that otherwise have appeared profitable."

Mr. Gygax then raised a question about the VAT treatment of a transaction in which he might buy EUAs under a spot contract but at the same time sell a futures contract. Mr. Gygax's question was whether he would incur "further VAT costs from the spot contract that could otherwise result in losses on the trade".

272. The first, and obvious, point is that the very sentence that Mr. Gygax quoted from the Point Carbon article was crystal clear that VAT was chargeable on spot carbon trades in the UK. When that point was put in cross-examination to Mr. Gygax, he gave an evasive and incoherent explanation,

"Q. Yes, you are asking about if there are any costs that you have overlooked, it having been pointed out to you or having been reminded that there is VAT on spot contracts, you see. You specifically quote: "Spot carbon deals are classified as physical commodities, and so are subject to VAT, which is charged at 15 per cent currently in the UK."

You don't say "I didn't know that", you don't say "That's not right, is it". You simply say, "I just want to make sure that I have fully understood this." It's not a difficult sentence that you've quoted. You say you just want to make sure that you fully understand that and you go on to ask: are there any costs that I may have overlooked arising out of the fact that VAT is payable on spot contracts but not futures.

It's a specific question, isn't it, that proceeds on the basis –

A. I disagree with the conclusion. I think my sentence clearly illustrates that I did not know that VAT was included and I'm asking clarity, am I missing something on this, like, if I may answer it

again, because I do recall this email and I do recall a follow-up chat with Piotr [Rosol], is that it says, "I just want to make sure that I have fully understood this". There's a comma then the sentence that follows essentially says: I want to make sure that I'm not trading and missing something that might result in a loss. In other words, I don't understand that there's a VAT cost here. That is my — am I missing something. My understanding of VAT is not very good. I'm not a VAT expert. I went round to speak to Piotr as well. There was nobody from the finance team that could answer the question whether or not I was paying VAT. The answer is actually the indications were that I wasn't paying VAT. This also come about either after exactly the same time that I would have spoken to Rene [Vanhaesendonck] to clarify also about the VAT treatment. It is clear in my mind that this illustrates that I did not know about VAT. I'm asking, as an honest person would, not trying to hide anything, I did not know that VAT existed."

273. The second point is that if Mr. Gygax had had a conversation with Mr. Duncan or Mr. Vanhaesendonck on or shortly before 9 June 2009, in which they had said that VAT was not payable on spot trades in the UK, it would have been natural for him to raise the conflict in his email to Mr. Rosol of 9 June 2009. But he did not do so. Mr. Gygax again did not have any coherent answer to that point, but gave an answer that suggested to me that he did understand that VAT would be payable on the spot trade, albeit that there was an issue about whether it could be reclaimed ("I don't get the VAT back…I don't understand the VAT mechanics") if the spot trade was connected with a futures contract,

"Q. Now, the trouble I have with that account, Mr Gygax, is we can see, from the email that was sent to Mr Rosol, that you quote from the article:

"Spot carbon deals are classified as physical commodities, and so are subject to VAT, which is charged at 15 per cent currently in the UK."

And, as I said before, you say "I just want to make sure that I have fully understood this." There is no reference to this being contrary to what you had been told by Mr Vanhaesendonck, is there?

A. I disagree … The question I'm asking, on my understanding at this point in time, is really pitched at: I don't think there's VAT. I'm asking am I missing something. Now, that clarity, if this email is ambiguous, and I don't think the context by which it is written with the example afterwards, which I think at the time was my best attempt to provide clarity, and the reason being is if — I think in my mind I was probably thinking 17.5 per cent tax, but if 10 per cent on 13.20 is paid out as VAT, that would take the price to 14.50. If it's at 20 per cent, it's another 1.32 on top, so the clear illustration is that if I think I'm paying 30 cents and I'm paying out VAT, I'm not even understanding that I'm getting the VAT back at this point in time. I don't understand the VAT.

So to me, it's quite a clear statement and example from the way in which I'm thinking about things, is: am I losing money buying spot, selling futures, because I don't get the VAT back? I don't understand the VAT mechanics. So with an understanding of that example and why it's there in that kind of way, from a layman's example, never been involved in spot trades, never seen exposure to this, I'm asking the question: are we exposed to VAT in some way?

Hence I would like to re-read it:

> "…I am not currently engaging in trades that could lead to losses, that otherwise have appeared profitable."

> I don't understand VAT. I don't believe VAT is included."

274. BlueNext reopened on 10 June 2009. The volume of spot EUA trades on BlueNext was drastically reduced. Mr. Gygax was asked in cross-examination whether he was interested in seeing whether or not the volumes would be down once BlueNext reopened. At first, he said that he couldn't recall, adding that he didn't understand at the time what the VAT fraud was. He was then shown his end-of-day update to the emissions distribution list of 10 June 2009 in which he had commented:

> "Today marked the return of the Bluenext market, huge reduction against recent volumes despite being out for a number of days – with only 2.4mt having traded."

275. Mr. Gygax was asked why he had highlighted that point. His initial answer was (in effect) that he couldn't recall,

> "A. I can't go back to what I was thinking at the time. I think there were two thoughts. One, either that liquidity would need to grow again because liquidity breeds liquidity. There was this — I can't remember if I remember this at the time, if it came out afterwards, about a backlog of transactions that still needed to be cleared. For us, if the BlueNext had been closed, we wouldn't have been able to put permits on to the platform. I can't remember if people were able to take the permits out of the platform, just not trade it, during the time window. I can't answer more than that.
>
> Q. What I put to you, Mr Gygax, is that what informs that comment is your perception that if the volumes had been legitimate prior to the closure of BlueNext, then you would have expected there to be a pent-up demand for transactions to take place on BlueNext, so you would have expected, had the volumes been legitimate, that there wouldn't have been any reduction in the number of transactions taking place on BlueNext Exchange when it re-opened.
>
> A. I think we need to put this into context as well. Yes, but there were still rumours floating about on the market at this time, where people didn't know. We, I think, like most other people, would have had this market on watch at this particular point in time."

276. However, when Mr. Gygax was reminded of the point made in the original blog that he had seen on 3 June 2009 that because there was a possibility of a link between the increase in volumes of BlueNext and VAT fraud, a "precipitous drop in volume" on BlueNext might be anticipated when it reopened, Mr. Gygax acknowledged that he was among those ('everybody') who were looking to see whether the volumes would drop once BlueNext reopened after the French authorities had removed VAT on spot EUAs.

277. Again, I consider that this evidence from Mr. Gygax was evasive and sought deliberately to diminish the interest which he plainly had in the traded volumes after BlueNext reopened. In my judgment, Mr. Gygax well understood at the time the theory that a reduction in such volumes would indicate that the difference in the volumes of EUAs which had previously been traded on BlueNext were attributable to VAT fraud, and that such fraud had been possible because VAT had been charged on spot trading in France.

© 2025 Thomson Reuters.

278. It is common ground that the next day, 11 June 2009, there were discussions and correspondence between Mr. Gygax and Mr. Savage concerning the risk that spot trading in EUAs might be linked to VAT carousel fraud. Mr. Savage also consulted RBS SEEL's VAT department. Those discussions were referred to by Mr. Duncan of the VAT department in an email to a colleague that afternoon, in which he noted,

> "we've been on the carousel emissions issue all day today. Got the traders and compliance aware, we have already refused a deal"

279. In conjunction with those discussions, on 11 June 2009, Mr Savage sent Mr. Gygax an email flagged "follow up" with the subject line "EUA EMISSIONS AND VAT FRAUD – CONFIDENTIAL". The body of the email stated,

> "There are concerns in this market that there may be a VAT fraud particularly originating in France."

280. Mr. Savage's email contained links to two Reuters articles and attached three further documents. The email concluded,

> "Please note that under EU regs adopted in the UK if one is part of a chain even if divorced from the fraud the revenue can apply joint and several liability down the chain."

281. The documents accessible via the email links and attached to Mr. Savage's email contained clear explanations of the nature of a VAT MTIC fraud, of the suspicions that the recent high volumes on BlueNext had been linked to such a fraud, and of the risk that such a fraud could affect institutions in the UK.

282. So, for example, one of the attached documents was headed "EUA Spot Market – Risk of Carousel Fraud" and linked the removal of VAT on EUAs by the French authorities with rumours of carousel fraud on BlueNext. It then proceeded to give a clear statement of the basic theory of carousel fraud and discussed its implications for the emissions markets.

283. The document first outlined MTIC fraud as follows,

> **"Basic Theory of Carousel Fraud**
>
> Carousel Frauds (AKA Missing Trader Intra-Community "MTIC") follow three simple steps:
>
> 1. Buy commodity without paying VAT
> 2. Sell commodity with VAT
> 3. "Go Missing" before paying the VAT to the relevant tax authority
>
> The first two steps can be continually repeated until discovery becomes a risk at which point the trader "goes missing".

Traditionally fraudsters have exploited the "reverse charge" mechanism associated with intra-community sales of goods to buy commodities without paying VAT and selling on to a domestic purchaser with VAT. Certain classes of goods have been identified as being susceptible to carousel fraud, (high value, transportable, readily tradable e.g. mobile phones or computer chips). These commodities are shipped backwards and forwards between member states with a MTIC fraud executed at both ends of each journey.

Tax authorities have taken an approach of targeting the domestic purchaser who would recover the VAT paid as input tax. The domestic trader may or may not be an innocent party - HMRC argue that where the commercial activity makes no commercial sense the purchaser should have realised that the underlying transactions were fraudulent."

284. The document then clearly described how such a fraud could occur in relation to (i) exchange traded EUAs and (ii) OTC traded EUAs. In the latter respect, the document contained a section which stated (inter alia) as follows,

**"Exposure to Carousel Fraud via Otc traded Euas**

1) A UK fraudster could target a UK Company to act as the domestic purchaser by selling EUAs to UK Co with VAT which will never be paid.

a) UK Co would recover input tax on invoices issued from the UK company.

b) Once the fraud has been discovered **HMRC would look to deny UK Co's right to input tax recovery** ;"

(emphasis in original)

285. The document ended with a summary which indicated how a party could guard against the risk of becoming involved in such frauds,

**"Summary**

Any tradeable commodity subject to the reverse charge offers fraud opportunities (not just EUAs). In theory a fraudulent trader could use the reverse charge status of physical power and natural gas to operate a carousel fraud; however the regulatory requirements to establish a physical power or gas trading business are cumbersome (e.g. trading licences, system operator agreements, hub operator agreements, bank guarantees and regulatory approval).

Parties must continue to take extreme care in establishing the "bona fide" status of all counterparties. By demonstrating robust counterparty acceptance procedures Parties should be able to defend their positions as regards the claiming of input tax and reverse charge sales of commodities.

Implementing procedures to identify suspicious trading activity; small traders continually selling commodities, with UK VAT or overseas buyers continually buying commodities should trigger a warning."

© 2025 Thomson Reuters.

286. Mr. Savage's oral evidence was to the effect that he and Mr. Gygax shared a concern that VAT fraud might spread to affect RBS's emissions trading in the UK, and that he would have worked through these documents with Mr. Gygax to ensure that he understood such risks,

> "Q. And it's likely, isn't it, that you would have worked through these attachments with Mr. Gygax for the purposes of ensuring that he understood the risks to the UK emissions market and how to be alert to possible suspicious activity?
>
> A. The answer is yes, I would have discussed but I don't know how far — I cannot remember. It's …Q.You obviously can't say what Mr. Gygax's understanding was.
>
> A. No.
>
> Q. But doing the best you can, this is the sort of thing you think you would have been doing, working through these documents with Mr. Gygax because these rumours of the VAT fraud were something that you were working with Mr. Gygax to get on top of?
>
> A. I would assume so but my problem is that, yes, we would have been discussing, I have no problem, but how much, I have no idea.
>
> ….
>
> Q. You were having these conversations, weren't you, because you were concerned about the possibility of a risk of VAT fraud infecting RBS Sempra's emissions trading?
>
> A. Yes.
>
> Q. And that concern is something that at that time was shared by Mr. Gygax, wasn't it?
>
> A. Yes."

287. Mr. Savage was also asked whether he might have given Mr. Gygax an assurance that the VAT problems were confined to trading in France and could not affect his trading for RBS,

> "Q. And you never said to Mr. Gygax, did you, that he didn't need to worry about the rumours of VAT fraud because they were purely a French phenomenon?
>
> A. At that time — it's in documents and everything — we all believed it was a BlueNext problem, a French problem, and that was what we all believed.
>
> Q. But it was a problem you were concerned might migrate to the UK market?
>
> A. At the time there was — there was always a risk but it's not saying it had migrated, would migrate or anything.
>
> Q. But there was a greater awareness of that risk at that time, wasn't there?
>
> A. I don't know how to …yes, there is a risk but it was not the focus.

> Q. Well, we looked at the document a moment ago … with the attachment specifically concerned the position in the UK and you were circulating that to, amongst others, Mr. Gygax because the concern about VAT carousel fraud was a concern that fraudsters might use trades within the UK?
>
> A. Yes, might or could, yes.
>
> Q. Yes. And therefore there was an increased awareness of the risk of VAT fraud infecting the UK market?
>
> A. Yes.
>
> Q. And that's why you were spending time with Mr. Gygax to make sure that he was aware of the risk?
>
> A. Yes.
>
> Q. And you at no point led him to think that he didn't need to worry about this because it was something that could only happen in the French market, did you?
>
> A. No, it was — it was a possibility, yes.
>
> Q. And you never gave him any absolute assurance that the emissions market in the UK was free of fraud?
>
> A. No, you can't."

And later,

> "A. As far as I can remember, there were two – the issue was there was a fraud or an alleged fraud in the French market. There was obviously the issue of what had happened and there was obviously the issue what had been done to stop it. The question then is did that lead to anything we should be aware of in the UK. It didn't mean to say there was a fraud in the UK, nobody actually said there was. But it's something everybody had to be aware of because [of] what's in my statement."

288. In his cross-examination, Mr. Gygax professed variously not to have understood these documents provided to him by Mr. Savage, or the concept of VAT carousel fraud, or the relevance of such matters to his trading of EUAs for RBS with counterparties in the UK. For the reasons that follow, I do not accept that evidence.

289. As a preliminary point, it is inherently implausible that Mr. Gygax would have participated in discussions concerning VAT carousel fraud with his compliance officer without gaining a clear understanding of why he was doing that, and what potential relevance such VAT fraud had to the emissions trading for which he was responsible. There is, in short, no reason why Mr. Gygax should have engaged in detailed discussions with Mr. Savage either if he thought that VAT was not chargeable in the UK on spot trades in EUAs, or because he thought that the possibility of VAT carousel fraud was confined to France and would have no relevance to the trading being conducted by the Desk for which he was responsible.

290. In these regards, Mr. Gygax was asked about the section of the document provided to him by Mr. Savage on 11 June 2009 which explained how a carousel fraud could occur in the UK in relation to OTC traded EUAs. In response he simply asserted that he did not understand that VAT was payable on the spot trading of EUAs in the UK, and suggested that "Compliance" had not corrected his misunderstanding,

"Q. The heading there alerts the reader to the fact that it's going to explain how you can become involved in a carousel fraud through over the counter trading of carbon credits?

A. That's the headline, yes.

Q. And obviously, you are well aware that that is something that RBS Sempra did; it traded over the counter carbon credits?

A. Correct.

Q. It then goes on, the first numbered paragraph:

> "A UK fraudster could target a UK company to act as the domestic purchaser by selling [carbon credits] to UK Co with VAT which will never be paid ."

So that is alerting you, as RBS Sempra, a UK company, that there could be a fraudster in the UK selling questionable carbon credits with VAT and not paying the VAT that he receives to HMRC. That's what this is saying, isn't it?

A. That's — yes.

Q. And do I understand your testimony to be that at that point you thought, well, that can never happen because there is no VAT on over the counter carbon credits?

A. Over the counter or spot but to me they — neither spot nor — yes.

Q. Your understanding is you read that and thought that just can't happen to my trading because there is no VAT on spot?

A. That was my understanding, yes.

Q. And your testimony is that you discussed this with Mr. Savage and Mr. Duncan and you came away still thinking it could never happen because there is no VAT on spot?

A. I didn't believe there was VAT on spot.

Q. Well, I know that but your testimony is that you discussed this with Mr. Savage and Mr. Duncan and, as a result of those discussions, you still thought that a UK fraudster could never target RBS Sempra to act as the domestic purchaser by selling spot to RBS Sempra with VAT because there is no VAT on spot?

A. Correct.

Q. And therefore is it right that you thought that, well, everything else in here is actually irrelevant to spot trading?

A. Hence why I have gone to Compliance to say I have not understood, I don't understand this.

© 2025 Thomson Reuters.

Q. Yes, but they would then have explained that VAT was payable on spot and that this was relevant.

A. I really wish they had. We did not have this explained. Our understanding was there is no VAT, both myself and Jon, even though Jon has been through more payment cycles than myself, did not know there was VAT."

291. Likewise, when asked about the summary in the document provided to him by Mr. Savage on 11 June 2009 that expressly identified the need to implement procedures to identify suspicious trading such as small traders continually selling commodities with UK VAT, Mr. Gygax simply repeated that this was not something he thought relevant to his trading,

"Q. Is your testimony that even after your discussions with Mr. Savage and Mr. Duncan, your view was you didn't need to be concerned about small traders continually selling commodities with UK VAT, as far as your spot purchases were concerned, because there was simply no UK VAT on spot purchases?

A. My understanding was that we didn't have this as a risk."

292. I do not regard this as credible evidence. Mr. Gygax provided no sensible explanation as to how he could possibly have participated in discussions with Mr. Savage and Mr. Duncan about MTIC fraud on 11 and 12 June 2009, and still come away with a mistaken belief that those discussions were simply irrelevant to his trading activities for RBS.

293. In this regard, it will be recalled that one of the documents sent by Mr. Savage to Mr. Gygax on 11 June 2009 and discussed with him raised the possibility of HMRC seeking to make entities forming part of a chain in the UK liable. Mr. Gygax was asked about his understanding of this,

"Q. So Mr. Savage is highlighting there, is he not, that RBS in the UK should be wary of being part of a chain in the fraud?

A. That's not what I got when I received this document and I'm pretty certain that Jon Shain would clarify that as well, when he takes the stand, of what his material understanding and dialogue was with Chris Savage (inaudible). We didn't understand what carousel fraud was, we didn't fully understand, because we didn't understand the tax element, about being in a chain.

That, if anything, is why we paired ourselves closer – or that I did, paired myself closer to Compliance and we awaited what the additional requirements would be.

Q. What did you get from it then, when you read:

"Please note that under EU regs adopted in the UK if one is part of a chain even if divorced from the fraud the revenue can apply joint and several liability down the chain."?

A. I didn't understand what that meant.

Q. Did you ask Mr. Savage what it meant?

A. I believe we had — I think what was clear is that we conveyed to Chris Savage that we were confused. I can't give you the specific language at the time.

Q. What were you confused about?

A. I'm not sure if I can pin what my understanding may or may not have been at this point in time, what it may have been a week later, two weeks later, a month later, two years later but, for example, the joint and several liability of the chain, I didn't know whether or not that was if you had ten parties in the chain, that all ten parties are liable for a fine, for example. We didn't understand."

294. This was also not a credible answer. The document in question is clear in highlighting a potential risk of liability for RBS in the UK. Mr. Gygax's answer evaded the question of whether, if he did not understand the document, he would not simply have asked Mr. Savage for clarification: and the obvious difficulty with Mr. Gygax's answer was that if the Traders had conveyed to Mr. Savage that they were confused by the documents he had given them, he would have inevitably sought to remedy that confusion.

295. Mr. Gygax's evidence that he did not understand that VAT was payable on the spot purchases of EUAs from CarbonDesk until after receipt of the BlueNext letter on 30 June 2009 was also inconsistent with trading documents sent by CarbonDesk to Mr. Gygax in mid-June that plainly indicated that VAT was payable on their trades.

296. CarbonDesk routinely sent electronic documents entitled "Trade Summary" to Mr. Gygax seeking confirmation of the trades which had been done between them. Each Trade Summary was a one-page document which was included in a single pdf file with a second one-page document headed "VAT Invoice". As its title suggested, the VAT Invoice was an invoice for the transaction issued by CarbonDesk to RBS and which contained a statement of the VAT charged to RBS on the trades done, together with CarbonDesk's VAT number. This was necessary to enable RBS in due course to reclaim from HMRC the VAT which it had paid to CarbonDesk.

297. On 17 June 2009 at 14.26, Mr. Ward of CarbonDesk sent an email to Mr. Gygax asking Mr. Gygax to confirm five of the EUA trades they had done that day. The email attached the relevant Trade Summaries and VAT Invoices. Mr. Gygax confirmed the volumes and prices for the trades by email four minutes later with a copy email to his back office. However, 12 minutes later he sent a second email to Mr. Ward pointing out an error in the unit price which had been shown on CarbonDesk's VAT Invoice for the fifth trade. It is important to appreciate that the error was not in the confirmation of the trade: the error was in how it was recorded in the VAT Invoice.

298. In his cross-examination, Mr. Gygax first accepted that he had "clearly looked at the prices" on the VAT Invoice. However, he then quickly changed his evidence and said,

"I didn't check invoices. My view is my back office have come back to me with a trade error."

299. Although the obvious mechanism for the back office to have responded to Mr. Gygax's email confirming the trades would have been to reply to his email, there was no documentary evidence to support Mr. Gygax's "view" that a member of the back office had drawn the error in the VAT Invoice to his attention.

300. It was also put to Mr. Gygax that even if he had been alerted to the error in the VAT Invoice by the back office, he would have looked at the VAT Invoice to identify the error and understand the point before emailing Mr. Ward. Although Mr. Gygax denied that he would have opened the VAT Invoice, I do not think he had any answer to these points.

301. Instead Mr. Gygax sought to obfuscate by referring to what he would be required to do if there had been a simple error in the trade confirmation such as a discrepancy in the agreed price between himself and CarbonDesk,

© 2025 Thomson Reuters.

"Q. Okay. So you say ops picked this up and ops didn't communicate with Mr. Ward, ops communicated with you, either came round in person or sent you instant messaging?

A. That would be the normal, yes.

Q. And you would have looked for yourself to check what they say is right, wouldn't you?

A. If you are suggesting I would open the invoice up, no, I would check it against Affinity or what my bill pad says and say: this is the price we traded at.

Q. That's not the point, is it? The point is querying the documentation. You have already confirmed the deals in the earlier emails and this is a point on the documentation. I'm putting to you that you would have looked at the documentation to which your attention had been drawn for the purpose of understanding what you are being told?

A. I understand that you would like me to have looked at the documentation. I didn't look at the documentation. It wasn't required. What I need to do is look at what I've written down and what I've entered into the system. That is the relevant information to me. If there is discrepancy, the first thing I would do is look at the confirm sheet as to what I have actually visually confirmed. The next step is just to raise it with the trader and say, "We have this price."

302. Mr. Gygax was then also asked to explain how the back office might have spotted the error in the VAT Invoice and alerted him so quickly. He answered that since the trade details would be entered onto RBS's systems as the Traders did the deals, it would not be a lengthy task for the back office to check the trade details against the VAT Invoice details. Again, I thought that Mr. Gygax was ducking the real question, which was the (un)likelihood of someone in the back-office team spotting the error in this particular VAT Invoice, among the many trades done across RBS that day, and having taken the matter up with Mr. Gygax within ten minutes.

303. After his discussions with Mr. Savage on 11 June 2009, Mr. Gygax went to an evening dinner with other traders. In an email the following morning, in response to an email from Mr. Savage containing a link to the results of a Google search for "VAT fraud", Mr. Gygax said,

"BNP and Soc Gen traders were aware of issues over a month ago – was digging last night with brokers/cpty's".

Although Mr. Gygax sought in his cross-examination to downplay the scope of the conversations at the dinner and the extent of the problems that the other brokers were discussing, the fact that he saw fit to go "digging" and to relay the results to Mr. Savage strongly suggests that he did think that the issues over VAT fraud in France were relevant to the trading which the Desk was doing at RBS. The idea that Mr. Gygax would have been taking such steps and relaying the results to Mr. Savage about matters that he thought irrelevant to RBS's trading is fanciful.

304. On 12 June 2009 Mr. Gygax also sent Mr. Savage the Reuters article entitled "Probe underway in alleged French CO2 VAT fraud" which, as set out above, contained a summary of the developments in relation to the suspension of trading on BlueNext and the steps taken by the French government to exempt EUAs from VAT. As well as this text, the article went on to discuss the legality of the French decision to make carbon permits exempt from VAT.

305. Again, the very fact that Mr. Gygax sent that article to Mr. Savage supports a conclusion that he considered its content relevant to the emissions trading being conducted at RBS which had been the subject of the discussions the previous day. The article also included quotes from commentators to the effect that France was acting unilaterally and that its exemption of carbon credits from VAT might well be illegal under the European VAT directive unless the other 26 EU member states

agreed. That commentary only made sense on the basis that the other EU member states were continuing to charge VAT on carbon credits.

306. Mr. Gygax's evidence was that it was only when it was discovered that CarbonDesk had used an invalid VAT number on invoices to RBS on 1 July 2009 that he discovered that VAT was payable on spot purchases of EUAs from UK counterparties. This evidence must, however, be tested against the email that Mr. Gygax sent to Mr. Walter at 16.07 hrs that day.

307. That email is set out in paragraph 106 above. In it, Mr. Gygax recounted that discovery of CarbonDesk's invalid VAT number had sparked "a scare that they were about to do a runner with our VAT payment." According to his own written evidence (above), Mr. Gygax immediately made the connection between the increased volumes of trading with CarbonDesk and the possibility that CarbonDesk was involved in an MTIC fraud and was about to disappear ("do a runner") with the VAT that had been paid by RBS on the trading ("our VAT payment"). Mr. Gygax then went on to complain to Mr. Walter that,

> "…throughout this process I have asked for an email from compliance to clarify that we (Jon and I) have raised all the questions and continue to trade following compliance sign off. Without which, Jon and I are feeling a little uncomfortable now."

308. I shall return to consider other aspects of this request later in this judgment. For present purposes, however, I note that although Mr. Gygax appeared to be criticising the compliance department for their failure to provide an email covering the Traders for their actions during "this process", he made no mention of the fact, as he would have it, that both Traders had previously told Mr. Savage that they did not understand the documents they had been shown relating to VAT fraud and emissions trading, but had been allowed to continue to labour under the fundamental misapprehension that VAT was not payable on their trading. That is, to say the least, a surprising omission.

309. Taking these points together, it is very clear to me that Mr. Gygax was not telling me the truth when he claimed not to have appreciated that VAT was payable on the spot trades which the Desk was doing with CarbonDesk until about the time that RBS received the BlueNext letter on 30 June 2009. I also do not believe that Mr. Gygax was telling me the truth when he professed not to understand the documents circulated to him by Mr. Savage and discussed with him on 11 June 2009.

310. In my judgment, Mr. Gygax was, by no later than 11 June 2009, well aware that VAT was charged on any spot EUA trading which the Desk was and might do with a UK counterparty. I consider that he had also become well aware of the risk that spot trading in EUAs might be used as part of a VAT carousel or MTIC fraud. And I find that although the earlier problems had been seen on BlueNext and in France, Mr. Gygax was also well aware that there was a risk of similar MTIC frauds taking place in the future in the UK and affecting the emissions trading for which he was responsible at RBS.

**Mr Shain**

311. As can be seen from a number of his statements in cross-examination (above), Mr. Gygax sought to support his denial of knowing that VAT was chargeable on spot sales of EUAs in the UK until 1 July 2009 by an assertion that Mr. Shain also did not know that VAT was chargeable on spot trades until the beginning of July 2009; and that neither of their misapprehensions in that respect had been corrected by Mr. Savage or Mr. Duncan.

312. However, Mr. Shain's written evidence did not support Mr. Gygax's evidence. So, for example, Mr. Shain gave a description in his witness statement of his day-to-day work pricing OTC trades,

> "43. What follows is, to the best of my recollection, the process I adopted when pricing OTC trades for Emissions Desk customers.
>
> 44. Where I was considering the price at which I was prepared to buy, my usual starting point was to look to the bids on the ICE futures market. ….
>
> 45. To arrive at a price for the OTC counterparty, I would then discount the bid price on the Exchange by an amount to cover our trading costs and profit margin.

© 2025 Thomson Reuters.

45.1 Our trading costs took account of things such as BlueNext transaction fees, exchange membership fees, general overheads, a cost for liquidity slippage (i.e. a cost to cover the risk of not being able to sell the EUAs on quickly and so becoming exposed to EUA price movements); **managing foreign exchange exposure arising from VAT cash-flows (given that we were transacting with counterparties in Euros, and accounting for the associated VAT on those trades to HMRC in GBP); and VAT funding costs in respect of purchases from UK counterparties, and possibly other costs.** To be clear though, I was not calculating each of these every time I traded. Rather I had a rough overall figure in mind as to what would cover these, which I would use as a general "rule of thumb". The figure would have varied slightly in different circumstances, for example, if a client order was undertaken then there would have been less cost for liquidity slippage. Further, I believe that I only learnt of the VAT funding costs and the foreign exchange exposure arising from VAT cash-flows at some point towards the end of June or beginning of July 2009. I recall that I learnt of the VAT funding costs prior to the foreign exchange exposure; and that upon learning of each, we adjusted our pricing to reflect these additional costs / exposures. I discuss when and how I became aware of these matters below."

(my emphasis)

313. This passage did not suggest that Mr. Shain was, for a significant period of time whilst trading at RBS SEEL, wholly unaware that VAT was charged on spot trading in EUAs with UK counterparties. Instead, it suggested only that he did not appreciate the funding costs and foreign exchange exposure which RBS faced as a result of buying EUAs from UK counterparties and paying VAT on those purchases.

314. In that regard, Mr. Shain's witness statement gave the following further explanation of how VAT did not feature in his considerations when trading, but equivocated on the issue of whether or not he actually knew that VAT was charged on spot trading of EUAs with UK counterparties.

"94. In early June 2009, I do not believe that I had considered VAT in the context of spot EUA trading at all. As a trader, the data I reviewed on the Exchanges relating to spot EUA prices was exclusive of VAT and the prices that I would quote to our counterparties were net of VAT. Therefore, VAT had not been an issue which impacted my day-to-day job in any way. If I was even aware that VAT was charged on spot EUA trades with UK counterparties (about which I am not now sure), it was the responsibility of the back office team and the tax team in RBS Sempra to deal with it."

315. Mr. Shain expanded upon that point later in his statement, but again did not directly address whether he was aware that VAT was charged on spot trading of EUAs from a counterparty in the UK. Instead, he said that he did not consider the implications of having made purchases of EUAs from a UK company subject to VAT and then selling the same EUAs on the BlueNext exchange without VAT. He said,

"133. Between mid and late June 2009, I did not consider the VAT implications of buying EUAs from a company based in the UK and then selling the EUAs onto BlueNext, which was based in France. As previously mentioned, I regarded the mechanics of VAT to be an issue for the back office to deal with. It was not a factor considered as part of my trading, and the prices that traders quoted to each other, and the prices quoted on BlueNext, were always net of VAT.

134. At some point towards the end of June 2009 or in early July 2009, I learnt that, when we bought EUAs from UK companies, we paid VAT on these purchases, but when we then sold EUAs onto BlueNext, we did not charge VAT on the sales because we were selling to a company outside the UK. I understood that this meant that we were paying out monies in VAT that we would not receive back until our VAT repayment claim was processed by HMRC.

© 2025 Thomson Reuters. 

> 135. I believe I became aware of this when I queried with someone in our Accounting team (although I cannot now be sure who) why our daily interest charges were increasing. The daily P&L reports circulated by the Accounting team each day included a line item for interest charges, but the line item did not individually identify each source of interest being charged to the Emissions Desk. In other words, it was a total figure for all interest charges incurred by cash-flow exposures resulting from the Emissions Desk's trading activities – for example, it would also include interest charges in circumstances where the Emissions Desk purchased EUAs on a spot basis and sold them on a future basis. I recall learning that the increasing interest charge was being caused by the growing VAT cash flow exposure resulting from the increased purchases of EUAs from UK counterparties.
>
> 136. I also recall that the Accounting & Risk teams had noticed that the activity of the Emissions Desk was causing an FX exposure for RBS Sempra. As it was explained to me, because the VAT repayment from HMRC would be in sterling (as opposed to the VAT paid on the EUAs purchased, which would have been in Euros) and would not be received for a period of time, RBS Sempra was exposed to potential swings in the €/£ conversion rate in the meantime. My recollection is that this issue arose because there had been a significant loss recorded on the admin book due to an unfavourable change in the €/£ rate.
>
> …
>
> 138. In response to the Accounting department alerting us to these issues, it was decided by the Emissions Desk that it was necessary to start factoring in further costs into the trades we were conducting to cover the additional FX and interest charges. As I recall, we started to factor in about an extra 2-3 cents. I have a vague recollection of a discussion with CarbonDesk around this time where I had to justify the lower prices that we had started quoting to them by saying that we were having to take account of additional costs in our prices to cover issues of which we had previously been unaware. Again, I cannot recall exactly when we started factoring in these additional costs, but I believe that it was at some point in late June 2009 or early July 2009."

316. There was, however, no documentary record of such matters being raised by the accounting department with Mr. Shain in which Mr. Shain sought any confirmation of the true position as regards VAT from anyone else at RBS; or, for that matter, of Mr. Shain raising his discovery as to the true position in relation to VAT with Mr. Gygax.

317. The suggestion that Mr. Shain learned that VAT was payable on spot trades through looking at daily interest charges incurred on the increased trading "towards the end of June 2009 or in early July 2009" was also not consistent with Mr. Gygax's evidence that he only found out that VAT was chargeable on spot purchases of EUAs in the UK as a result of the "scare" over the wrong number on CarbonDesk's VAT invoices during the morning of 1 July 2009. In particular, if Mr. Shain had become aware of the extra interest costs caused by VAT being payable on spot trading "towards the end of June 2009", there is no explanation as to why Mr. Shain would not have discussed such an important commercial issue with obvious relevance to the pricing of the trading with Mr. Gygax straightaway.

318. At trial, Mr. Shain gave evidence after Mr. Gygax. At the start of his evidence, Mr. Shain sought to correct paragraph 45.1 of his witness statement in order to suggest that he definitely did not find out the VAT was payable on spot trading until the beginning of July as follows,

> "I now believe or think confidently that I didn't learn of the VAT funding costs before the FX exposure. It would have been learning about the FX exposure from accounting because of the FX [profit and loss] in a separate book and that would have led me to realise about another cost to do with the VAT to do with the funding of it. *So, yes, I didn't learn of the VAT funding costs before the FX exposure and it wouldn't have been the end of June, it would have been the beginning of July* ."

© 2025 Thomson Reuters. 

(my emphasis)

319. In seeking to explain how he had come to make this correction, Mr. Shain said,

"What would have happened, I would have seen our interest charges increasing during the month and I may have discussed with accounting, I may have just figured it out for myself but we were paying out cash on spot trades, inventory, net of VAT and because of that, because our net cashflow was negative, we were paying more interest on that. And then I realised – I started thinking about loads of things and piecing everything together. I looked at the 3 to 5-cents margin and definitely that's nothing to do with VAT because I wasn't aware of VAT until the FX was brought to our attention because the FX loss arose from VAT cashflows that went through the management book or the admin book. They – in that book they had been paying out euros in VAT to CarbonDesk – obviously, I didn't know this at the time but they were paying out euros and they weren't going to receive the GBP back from HMRC until end of August, when the three months is up."

320. When I asked Mr. Shain about these events at the end of his evidence, he became vague and equivocated,

"MR JUSTICE SNOWDEN: So when did you discover –

A. When the accounting came to us and said there's an FX loss in the management book. That results from VAT cashflows from our trading activity.

MR JUSTICE SNOWDEN: Right. But, in other words, up until then, what was your understanding as to whether VAT was payable on your trading with CarbonDesk?

A. I hadn't really given it too much thought.

MR JUSTICE SNOWDEN: So when management came to you and alerted you to this problem, was that the first time you had become aware that VAT was payable?

A. I can't say for sure."

321. In reality, Mr. Shain gave no explanation for his attempt to push the date of his discovery that VAT was payable via consideration of foreign exchange issues back from a date which might have been towards the end of June 2009 to a date which was definitely at the beginning of July 2009.

322. A further difficulty with this revised evidence from Mr. Shain was there was clear evidence that he was aware on 1 July 2009 that an incorrect VAT number had appeared on CarbonDesk's invoices relating to the trading that had been done with RBS, and that he had taken steps to check with Mr. Ward that the correct VAT number had been put on new invoices relating to his trading. That appears from the following conversation between Mr. Shain and Mr. Ward just after midday on 1 July 2009,

"Ward: CarbonDesk Shain: Hi, it's Jon here. Ward: Hello

Shain: Erm, I think Andy's got the documents. Erm, any chance you could put your new number on err the invoices?

Ward: What? Can…can who?

Bilta (UK) Ltd (In Liquidation) v Natwest Markets Plc, 2020 WL 01169967 (2020)

> Shain: Can you put your new, going forward, the new VAT number?
>
> Ward: The invoices that you got just now …have got the new VAT number on them.
>
> Shain: Oh, cool.
>
> Ward: You not checked them?
>
> Shain: No, I haven't. No I haven't looked at them. Ward: I don't blame you but they have [laughs]
> Shain: Alright, yeah. Alright perfect.
>
> Ward: No worries."

I find it impossible to see how Mr. Shain could have had that conversation without appreciating that VAT was chargeable on the spot trades with CarbonDesk which were the subject of the invoices in question.

323. In light of this evidence, I do not consider that Mr. Shain was telling the truth when he altered his evidence to suggest that he first learned that VAT was payable on spot trades in EUAs with CarbonDesk as a result of considering the foreign exchange implications of trading in early July 2009.

324. Mr. Shain's evidence as to his lack of knowledge that VAT applied to spot trading and of the risk of VAT fraud affecting the trading that he was doing in the UK should also be measured against his evidence of what occurred when he returned to the office from holiday on 15 June 2009. Mr. Gygax's evidence was that on Mr Shain's return he would have brought him up to speed with events in his absence. Mr. Gygax also said that he recalled having discussed Mr. Savage's email of 11 June 2009, and in particular the document headed "EUA spot market – Risk of Carousel Fraud" attached to it, with Mr. Shain once he returned to the office from holiday.

325. When it was put to Mr. Shain that Mr. Gygax had discussed this document with him on his return from holiday, he initially firmly denied that this was the case, saying "I very much doubt he did", and "I haven't seen this document before, I didn't get the email". However, he later retreated when confronted with Mr. Gygax's evidence to the contrary, and resorted to saying that he had no recollection of having seen the document,

> "Q. You are saying that's a false memory on the part of Mr. Gygax?
>
> A. Well, I'm saying I have no recollection of seeing this and I was under the impression I hadn't but …I'm surprised, to be honest, to be reading this.
>
> MR JUSTICE SNOWDEN: Why would you be so surprised to find that Mr. Gygax would have discussed this document with you when you returned from holiday?
>
> A. I'm not surprised that he would have done. I just have absolutely no recollection and it has never been brought to my attention that he may have done before.
>
> MR JUSTICE SNOWDEN: When you were asked about it the first time, the question to you was: "Mr. Gygax says that upon your return, 15 June, he did discuss these documents with you." And you said, quite strongly:
>
> > "I very much doubt he did."

Why did you take such a firm view?

A. I was under the impression that Andy, during this period, had been talking to Compliance about VAT – this is an impression I got afterwards – and that he hadn't been necessarily making me aware of what he was discussing, and I honestly have no recollection of seeing that email – seeing the documents.

MR PARKER: Do you have any recollection of discussing with Mr. Gygax upon your return from holiday VAT fraud?

A. I have no recollection of that.

Q. You have no recollection at any point of that week of having the discussion about VAT fraud?

A. No.

Q. That's not true, is it, Mr. Shain?

A. What, that I don't recollect or …?

Q. That you don't recollect the conversations about VAT fraud.

A. How am I supposed to recollect conversations from nine years ago?

Q. Well, let me back up then. Are you saying that you think there may have been conversations but you don't recollect them?

A. Based now on reading what Andy said that he thought he had discussed with me, I'm acknowledging possibly that he did, but I have absolutely no recollection of it and this is the first time that I've seen that."

326. I did not find this evidence remotely coherent or credible. I consider it overwhelmingly likely that on Mr. Shain's return to the office, Mr. Gygax would have discussed the events of the previous week with him, including the substance of his discussions with Mr. Savage concerning VAT fraud and the risks that it might affect the trading which the Desk was doing in the UK. I also consider it highly likely that Mr. Gygax would have shown Mr. Shain the documents which Mr. Gygax had received from Mr. Savage. I fully accept that Mr. Shain could not be expected to recall particular conversations from nine years earlier when giving evidence, but it was his initial emphatic denial of the possibility that indicated to me that he was intent on putting forward a particular version of events, rather than answering questions about his recollection candidly.

327. In summary, I do not believe Mr. Shain's evidence that he was unaware that VAT was payable on the spot EUA trading which he was conducting with CarbonDesk until some point in early July 2009. In my judgment, Mr. Shain was aware that VAT was payable on that trading at an earlier time. I also consider that after his return from holiday on 15 June 2009 he was made aware by Mr. Gygax that there was a risk that VAT fraud might affect the Desk's trading with counterparties in the UK.

*The Traders' knowledge and belief about the trading with Carbondesk*

328. I next turn to consider what the Traders knew and thought of the increased trading with CarbonDesk after 15 June 2009. I also consider whether they raised any concerns about such trading with Mr. Savage or with CarbonDesk itself.

329. The background to this is that in the ten weeks of trading between the commencement of trading on 2 April 2009 and 12 June 2009, RBS had traded intermittently with CarbonDesk and acquired a total of approximately 1.03 million EUAs in 22 trades. As a comparison to its total trading over this period, in April 2009 RBS acquired about 2.7 million EUAs from 10 counterparties, with a highest daily volume of 650,000; and in May 2009, RBS acquired approximately 1.16 million EUAs from 7 counterparties, with a highest daily volume of approximately 250,000. In terms of participation in trading on BlueNext, in April 2009 RBS only contributed about 0.54% by volume of sales of EUAs on the exchange, and in May 2009

© 2025 Thomson Reuters.

it contributed about 0.22% by volume of sales. Mr. Gygax was not involved in such trading and Mr. Shain gave evidence that the trading during this period was generally done by Mr. Mulder.

330. However, in the week beginning 15 June 2009, the frequency and volume of emissions trading between RBS and CarbonDesk increased significantly. In terms of volumes, on 15 June 2009 RBS acquired 358,000 EUAs in 4 transactions; on 16 June 2009 RBS acquired 720,000 EUAs in 8 transactions; on 17 June 2009 RBS acquired 1.91 million EUAs from CarbonDesk in 25 transactions; on 18 June 2009 RBS acquired 2.095 million EUAs in 31 transactions; and on 19 June 2009 RBS acquired 1.542 million EUAs in 25 transactions. In all, a total of 6.6 million EUAs were acquired by RBS from CarbonDesk in 93 trades during the week.

331. In the week beginning 22 June 2009, the overall level of trading between RBS and CarbonDesk increased even more markedly. Although there was a slight dip in volume on Monday 22 June 2009 with RBS acquiring 1.094 million EUAs in 18 transactions, it then acquired 2.371 million EUAs on Tuesday 23 June in 21 transactions; 3.601 million EUAs on Wednesday 24 June in 38 transactions; 3.995 million EUAs on Thursday 25 June in 41 transactions; and 3.390 million EUAs in 31 transactions on Friday 26 June 2009. In all, a total of 14.5 million EUAs were acquired in 149 trades during the week.

332. The level of trading increased further during the week beginning Monday 29 June 2009. On 29 June RBS acquired 5.466 million EUAs in 48 transactions; on Tuesday 30 June it acquired 4.189 million EUAs in 45 transactions; on Wednesday 1 July it acquired 2.147 million EUAs in 23 transactions; on Thursday 2 July it acquired 5.351 million EUAs in 40 transactions; and on Friday 3 July RBS acquired 4.321 million EUAs in 34 transactions. In all, RBS acquired 21.5 million EUAs in 190 trades during the week.

333. RBS also changed over this period from being a relatively insignificant player on BlueNext to one of its largest participants, driven almost entirely by selling the EUAs which it had acquired from CarbonDesk. In the 8 days starting on 17 June 2009, RBS was the largest single seller of EUAs on BlueNext and at its highest was responsible for over 55% by volume of daily sales on the exchange. This significant change in RBS's activity on the exchange led to the intervention of BlueNext's monitoring team in late June.

**The week commencing 15 June 2009**

334. Mr. Gygax's witness statement dealt with the increased trading in the week commencing on 15 June 2009 as follows,

> "I did not receive daily volume reports but I do recall becoming aware of increased business with CarbonDesk at some stage during this week. This awareness was likely the product of a combination of factors such as discussions with Mr. Shain, a sense of Mr. Shain's increased activity from sitting beside him, being copied on email confirmations with CarbonDesk, and reviewing the estimated P&L figures at the end of each day (such that I would have a feel for how much I had made and therefore a rough sense of the volume for Mr. Shain's flow trading).
>
> I recall feeling pleased that one of our counterparties was starting to put more business in our direction. I thought this reflected the fact that we were providing our counterparties with competitive pricing and good service, which indicated that the new approach I had tried to introduce to the Desk when I arrived at RBS Sempra was starting to pay dividends. I was also aware that Mr. Shain had been trading with CarbonDesk for a few months before my arrival and understood that they had built up a good relationship in that time."

335. As such, Mr. Gygax's written evidence sought simply to paint a picture that he had been "pleased" with trading in the week commencing 15 June 2009, and RBS's pleaded case was that it was only in the following week commencing 22 June 2009 that Mr. Gygax told Mr. Savage that the volumes being traded by CarbonDesk gave rise to questions in his mind about CarbonDesk's business model.

336. However, in cross-examination Mr. Gygax gave repeated and detailed evidence that he had in fact raised "enquiries" or "concerns" about the volume of EUAs that CarbonDesk was selling to RBS by 17 June 2009. Mr. Gygax said that he had taken those matters to Mr. Savage, who had said that there was no fraud in the market and had given Mr. Gygax "a clean bill of health". For example,

© 2025 Thomson Reuters.

"A. So on the 17th Mr. Savage has not come to me to tell me there is no problem in the market. I have gone to his end of the office and made an enquiry, to which I have been told there is no fraud in the market. So in terms of making a cut-off on the Wednesday and making it about Thursday/Friday/Monday, I think that's wrong because I believe I took it to him on the 17th about the volumes and was told by the business there is no problem….

Q. So your testimony, sorry, is that on the 17th you were told by Mr.. Savage that there was nothing to worry about because there is no fraud in the market. But then you went on the Monday, the 22nd, and said, "I have a concern nonetheless."

A. I continued to report the volumes to him that we were — in terms of what we were seeing within the market, the colour, so he would have got an understanding that CarbonDesk were a counterparty, that we were doing business with them,… For me – on the 17th – I feel I fulfilled my first obligation, which is to raise concerns. I did not have a problem after that on the volumes for the rest of that week because I had been given a clean bill of health and I believe industrials are selling and I believe CarbonDesk are sourcing them from industrials. It's the consistency of those volumes that prompted me to go back to Mr. Savage and question whether there is something else, if there is a problem."

337. Mr. Gygax repeated this evidence and sought to connect it with the telephone call which he had with "Siv" on 18 June 2009 which raised the question of how CarbonDesk were sourcing their EUAs,

"Q. And you told [Mr. Savage] you didn't know where they were getting the carbon credits?

A. I can't remember the level of detail of the conversations that I had with Mr Savage. The reason being is that it's nine years ago … what I can say is that we didn't arrive on the 25th and suddenly go to Chris Savage and say, "Ooh, we had better find something out." It was very seamless. There was no surprises. We gave this dialogue. And the understanding on the 17th – I believe it's the 17th because of the follow-up phone call with Siv – is that we had gone back with enquiries already and been told it's a clean bill of health. He would have had some indication of numbers from that….

….

Q. So is it right you have no recollection of sharing with Mr Savage the questions that you had shared with Siv: where are they finding these clients and how are they onboarding them?

A. No, I believe that Mr Savage would have had a fully informed picture of the market from the 17th.

….

MR JUSTICE SNOWDEN: [Do you recall] whether you discussed with Mr Savage the same questions that you discussed with Siv?

A. My belief is the reason why I believe I did is because I went to Mr Savage prior to that and there would have been the same notion of questions or understanding. And I think that the point of that interaction, it makes sense that that's got a reference to what we are doing there and then as well for Mr Savage. I cannot remember saying those words. I cannot remember saying those words. But it was me walking away, thinking, okay, so there is no – there is no problem, that there is relief in that but – okay. But he was not ambiguous about there not being a problem."

338. The Claimants contended that Mr. Gygax had invented this account of having consulted Mr. Savage to voice "concerns" on 17 June 2009, and of being told by Mr. Savage that there was no problem, in an attempt to explain away his inactivity after his telephone conversation with "Siv" on 18 June 2009.

339. That telephone call from Mr. Gygax to "Siv" of Hoare Capital took place at about 07.30 hrs on 18 June 2009. According to Mr. Gygax it was a courtesy call to reconnect with Siv, whom he had previously encountered when Hoare Capital was seeking to enter the market to take on the established brokerage houses. After some initial pleasantries, Mr. Gygax steered the conversation to the area of business in which he thought Siv was interested,

> "Gygax: …your kinda spec trading, emissions …was the kinda thing I wanted to just highlight I mean, we, we're sort of seeing really good volumes um on the spot flow off I guess guys who will follow the sort of niche that you're probably looking at.
>
> …you know, cos I still maintain I think you're gonna struggle to be a broker against um the likes of, you know, the [Prebon]s the GFIs, the ICAPs, it's gonna be a very difficult niche to crack into but I think what I've been blown away in the last few weeks is how much flow some of these smaller boutique brokerage companies are getting from dealing with the industrial clients….
>
> Um, you, you're not talking one or two hundred thousand tons it's... it's a lot, they're getting a hold of a lot of stuff so… Siv : What…what…what how…how do you think they're doing it? You know, they, they, they can't just be phoning these guys up and saying what are you…what…what…let's try and get rid of a few credits for you. I mean… Gygax : I think, I think the big problem is that this um, for if you take the likes of us and [Prebon] GFI … It's the KYC process. You're trying to get through these small kinda clients and there's credit issues as well …um but more, more significance to KYC trying to get it through regulation - who are they? What do they do? Proof of accounts and so on and so forth and it's a real struggle to get it through especially in the current kinda light financial kinda climate that we had that nobody wants the bad branding etc etc… Siv : That's right.
>
> Gygax : So it's... it's the kinda next tranche down that basically offer that gateway. Now what CO2E have done is um provided a service to themselves where…where they become um basically a counterparty to these guys and then trade directly as principal to us, um which is …the other resolution but I think a lot of the brokers, the rest of the broker community and traders don't like it because they kinda seems potentially priority trader, or at least being able to take positions through quite excessive margins on these uh customers.
>
> They don't like that so it seems more and more that this flow is coming in through boutique kinda brokerage houses and it's pretty big and it's exactly that what they're doing they're able to get them through um the KYC get them signed up and then providing a direct service whereby you know these guys will come and say right we need to …to sell a 100K or 200K …they're dialling in to 2 or 3 kinda trading houses so for example sales and that, [inaudible] big banks who …who basically accessing the market because it's quite, if you're not big it's... it's a ridiculous cost you know…"

340. When cross-examined about this section of the call, and in particular his comments about being "blown away in the last few weeks" by the amount of flow that some smaller boutique brokerage companies were getting from dealing with the industrial clients, Mr. Gygax denied that he was talking about the volumes that RBS had been buying from CarbonDesk over the previous few days. He said he was referring generally to companies in the sector such as Vertis,

> "Q. …. So I'm putting it to you that when you refer to your being blown away, you are talking about your own personal trading at RBS Sempra.

© 2025 Thomson Reuters. 

A. If I can just make sure I'm absolutely clear on this, the reference is to companies such as Vertis, my understanding of Vertis. I had been briefed by Jon, who explained to me that they were a sizeable counterparty.

If you had asked me prior to joining who Vertis are, I would not have known. These are all components of the market that make up – so two/three days with one trader and saying I would like you to get out there and compete against me with this trader doesn't make any sense. So what I've put to him is it is a rich market, I didn't know existed….."

341. One obvious difficulty with that explanation is that it would appear that Mr. Gygax understood from Mr. Shain that Vertis were a "sizeable counterparty" and not one of the "smaller boutique brokerage companies" to which he had referred in the call with Siv. The other difficulty, as was pointed out to Mr. Gygax in cross-examination, was that RBS had not bought any significant quantity of EUAs from Vertis.

342. Although Mr. Gygax sought to suggest that he was talking about the market more widely and not just the volumes that the Desk had bought from CarbonDesk in the preceding three days, that is not the context of his remark, which followed his observation that,

"… I mean, we're sort of seeing really good volumes um on the spot flow off I guess guys who will follow the sort of niche that you're probably looking at."

and was followed by the observation that

"you're not talking one or two hundred thousand tons it's... it's a lot, they're getting a hold of a lot of stuff …"

343. When pressed further on this in cross-examination, Mr. Gygax accepted that he "may well have been referencing one or two days" in his latter observation. He then stated that he remembered very well ringing Siv, "out of professional courtesy" and volunteered that "the significance of this timing" was that Mr. Savage had told him that the market "had no issues" the day before,

"Q. I put it to you, Mr. Gygax, that you are quite clearly here referring to RBS Sempra's purchase of really good volumes on the spot side, which have blown you away.

And that is all after 14 June, it's 15 June onwards, isn't it?

A. The significance of this timing is that it's my view that the day before – it could have been the day before that but Chris Savage has given me a very clear distinction of there being no issues with the market.

Q. You see, when you say:

"…you're not talking one or two hundred thousand tonnes it's …it's a lot, they're getting a hold of a lot of stuff."

If we look at my table, we can see that can only be a reference to what's happened since 15 June.

A. Sorry, I believe this is a sustainable business segment. I believe it exists, it's legitimate, from all the concerns and now the clarity that I've got, that I have been told there isn't a problem. I'm referencing a market, not a one-off counterparty

…I can tell you now the context of this entire phone call is about me saying this market is legitimate, it's out of professional courtesy. I certainly wouldn't do that if I didn't think it was legitimate.

Q. You can't say sensibly, can you, that there were small boutique brokerages getting hold of lots of spot before 15 June because you hadn't been dealing with any small boutique brokerages who were getting hold of large volumes of spot before 15 June?

A. I'm referencing Vertis into this as well.

Q. Well, can you just then explain why you use the expression, "It's a lot they are getting hold of …" when Vertis is purchasing from RBS Sempra?

A. I didn't know the back story on Vertis. I'm talking about a market segment that's quite deep."

344. I have no doubt that this evidence was untrue. It is worth placing the call with Siv into context. Prior to the closure of BlueNext, RBS's previous daily traded record was on 26 February 2009 when RBS purchased 1.7 million spot EUAs in a total of 45 individual trades. On 17 June 2009, the Desk comfortably surpassed that record, purchasing 2.1 million spot EUAs in 83 trades. Of those, sales by CarbonDesk accounted for 1.91 million EUAs - i.e. over 90% of the volume; and that represented a fivefold increase in the daily volume of EUAs sold by CarbonDesk to RBS over the space of just three days. I consider that in the call with Siv, Mr. Gygax was recounting, candidly, that he and Mr. Shain had indeed been astonished by the very large volumes of EUAs that CarbonDesk had recently been selling them over the days before the call.

345. Moreover, and for the following reasons, I also consider that Mr. Gygax's account of having taken "concerns" to Mr. Savage and having received an assurance from Mr. Savage on 17 June 2009 that there were no issues with the market, was a complete invention.

346. Mr. Savage had spent time at the end of the previous week with Mr. Gygax and the VAT department discussing the market rumours of VAT MTIC fraud on BlueNext and the risk that it might affect RBS's emissions trading in London. On Thursday 11 June 2009, Mr. Savage had circulated and discussed with Mr. Gygax a number of documents, one of which, as indicated above, summarised the steps that needed to be taken to guard against liability for becoming involved with such frauds. That summary said,

"Parties must continue to take extreme care in establishing the "bona fide" status of all counterparties. By demonstrating robust counterparty acceptance procedures Parties should be able to defend their positions as regards the claiming of input tax and reverse charge sales of commodities.

© 2025 Thomson Reuters.

> Implementing procedures to identify suspicious trading activity; small traders continually selling commodities, with UK VAT or overseas buyers continually buying commodities should trigger a warning."

347. Mr. Savage had plainly taken this on board, because on Friday 12 June 2009 and Monday 15 June 2009 he had circulated a draft and then a final version of enhanced due diligence procedures for RBS Sempra. Mr. Savage's email of 15 June 2009 to his compliance colleagues said,

> "We have recently been made aware of the existence of a number of (VAT) carousel frauds in Europe - particularly relating to the emissions market.
>
> The existence of VAT carousel frauds is not, however, restricted to this market.
>
> Therefore with immediate effect as part of our on-boarding process the following additional work will be carried out.
>
> For all UK/EU companies - including regulated companies - we will require:
>
> > 1. A copy of the VAT registration certificate if UK based or equivalent evidence if EU based.
> >
> > 2. The VAT number related to the products being traded will be checked on the EU VAT checker web site…
>
> In addition to this documentation we need to ensure that we clearly understand their business, therefore the normal KYC procedures need to be followed, and for those companies which are small and involved with physical trading (e.g. LME Metal Warrants, carbon emissions etc) we need to ensure that we clearly understand their involvement in the business; therefore, an enhanced due diligence program must be carried out - this will be forwarded later."

348. Although Mr. Savage's primary focus in this document was the onboarding process, as a compliance officer his responsibilities did not stop there; he was of course responsible for issues arising during the relationship with a client. Against this background, if, within a couple of days, Mr. Gygax had approached Mr. Savage on 17 June 2009 with questions or "concerns" (his word) about a significant increase in the volume of EUAs being sold by a small intermediary which had only started trading with RBS a couple of months earlier, it is inconceivable that Mr. Savage would simply have assured Mr. Gygax that there was no fraud in the emissions market that need concern him, and would have given him a "clean bill of health". That would have been flatly contrary to the warnings in the documents that Mr. Savage had obtained and circulated, and as Mr. Savage confirmed in his oral evidence, it was obvious that no such assurance about the situation in the UK could be given.

349. Moreover, any such enquiries from Mr. Gygax would plainly have been a matter of direct interest for Mr. Savage and would, in accordance with the underlying message of the documents and guidance abut the risks of VAT fraud that he had circulated, have caused him to take steps to ensure that RBS fully understood the business of CarbonDesk. That would inevitably have generated some internal communications and documentation. At very least Mr. Savage would have made a note of the enquiries. It would also, I consider, be very likely to have stuck in Mr. Savage's memory, even at this distance in time.

350. But there was no such documentary evidence to support Mr. Gygax's claim to have spoken to Mr. Savage, and Mr. Savage's evidence was that he had no recollection of any such issue being raised at this time,

"Q. If a trader came to you saying he had an increase in volumes that had him scratching his head as to how the counterparty had been able to acquire such a volume, that would be something that you would wish to probe further with him, wouldn't you?

A. If it wasn't in their business model, yes.

Q. That would be a matter of concern?

A. Interest or concern, yes.

Q. If we look at paragraph 106 of your witness statement, please, you say:

> "Had any event occurred in this period which I considered significant or of concern, I would have informed my colleagues in the Compliance and Legal departments and I would have notified my superiors. This is what I did upon becoming aware of rumours of VAT fraud in the French emissions market following the closure of BlueNext. There appears to be no record in the documents of me carrying out similar steps in the period up to 29 June 2009, which suggests to me that during this period I did not learn anything (whether from Mr Gygax or Mr Shain or elsewhere) which I considered to be significant or of concern."

At paragraph 108, you say:

> "If I had become aware of anything about the trading of EUAs or VAT in the period to 29 June 2009 which was significant or concerning from a compliance point of view, I am sure that I would have raised it at this meeting."

And it follows, doesn't it, from what we have just read, that in this period that you had not had Mr Gygax or Mr Shain coming to you saying that there had been an increase in the volumes that they were trading with a counterparty that left them scratching their heads as to where that counterparty had been able to acquire such a volume?

A. I stand by what I've said, yes."

351. I returned to this at the end of Mr. Savage's cross-examination,

"MR JUSTICE SNOWDEN: The chronology is you initially had the closure of BlueNext and the concerns that gave rise to and you circulated the VAT –

A. Enhanced due diligence.

© 2025 Thomson Reuters.

MR JUSTICE SNOWDEN: Enhanced due diligence and you circulated that email with three attachments, which we looked at.

A. Correct.

MR JUSTICE SNOWDEN: And that, I think, was on 11 June, from memory, and this is the period that then is up until 29 June 2009, so immediately before the letter from BlueNext arrives on the 30th.

A. Yes.

MR JUSTICE SNOWDEN: During that period your evidence in the witness statement was there was nothing that gave rise to any concern that was communicated to you by Mr Gygax or Mr Shain.

A. Correct, I don't recall anything.

MR JUSTICE SNOWDEN: Right. In fact, was there anything between you and Mr Gygax and Mr Shain in this regard –

A. Well, to a certain extent, because of the way the offices were laid out, I passed them all the time going up and down to the various departments and things. So invariably one would chat but there was nothing that I recall as needing any follow- up or anything else. A bit of office chit chat.

MR JUSTICE SNOWDEN: Office chit chat but no discussion about carbon emissions trading or anything like that?

A. I don't recall any."

352. It is also notable that Mr. Savage's "Lessons Learnt" document from 27 October 2009 expressly recorded that the compliance department was unaware of the significant change in trading by the Desk (which according to Mr. Gygax was the reason he had approached Mr. Savage on 17 June 2009) until receipt of the BlueNext letter.

353. In these circumstances, I find as a fact that, contrary to Mr. Gygax's evidence, no conversation took place between Mr. Savage and Mr. Gygax at any time prior to receipt of the BlueNext letter over the increased volume of emissions trading being undertaken by the Desk with CarbonDesk. Nor did Mr. Savage give any assurance to Mr. Gygax on 17 June 2009 or at any time that there was no fraud in the market or no possibility of VAT fraud with which Mr. Gygax need be concerned in his trading of spot EUAs in the UK.

354. Returning to Mr. Gygax's conversation with Siv on 18 June 2009, after the exchanges to which I have referred, Mr. Gygax then made the point that because trading spot EUAs meant that the trades cleared on the day and payments were made within a day or two, the small brokerages could set up and operate with very little capital. He said that the costs of entry were low and that "these guys must be making good money". At that point, Siv asked specifically about CarbonDesk,

" Siv : And…and have you heard of have you heard of these guys err the CarbonDesk?

Gygax : I have heard of the CarbonDesk yeah.

Siv : Ah you've heard of them. I guess, that's I mean that's more or less what they do.

Gygax : Right.

Siv : That's what they're doing. Um, I just wanted to know if you…just wanted to know if you'd heard of them um. I mean, you know that's, that's what we were looking to do, that's exactly what we're trying to do. …

Err but I must admit, I …I phoned personally…I've phoned about 10 smaller places just out of, just out of the list and all of them gave me different, different reasons of err we don't sell them, we don't need to sell them, we already, we already use this guy, so I…I…I'd be amazed to find where these where these guys are actually finding the credits from, the spot credits from. I…I…I really can't, I really don't know where they're getting them from. That's... that's the problem.

Gygax : I don't know, you…I don't know if it's even worth getting something on the website just getting linked in emissions trading …bang … people see a name then maybe they ask the questions because that's the same thing that we are scratching our heads at and just kinda going well how are they, how are they getting these people up and on boarding and kinda come to the conclusion what, maybe they're just can't interface through us because corporate bank divisions just say well, fine from money lender will not be trading because there are certain issues that we have um but I don't know I don't know the first instance how they are getting on board second one how they're getting them in the first place.

Siv : Yeah.

Gygax : That I can't…I can't help you with."

355. This section of the call clearly shows that by 18 June 2009, whatever general expectation might have existed in the market to the effect that industrials would be seeking to sell surplus EUAs, Mr. Gygax and Mr. Shain were searching for an explanation for the significant volumes that CarbonDesk - a small intermediary - had been offering to them. Mr. Gygax and Mr. Shain had been questioning in particular how CarbonDesk had found and onboarded clients with EUAs to sell in the volumes that they had seen - i.e. just short of 3 million EUAs over the space of three days. Moreover, when Siv raised similar doubts, on the basis of his own inquiries of small compliance companies, as to where the EUAs which CarbonDesk was selling were coming from, it is clear that Mr. Gygax had no explanation.

356. When these points were put to Mr. Gygax in cross-examination, he evaded the questions about the discussions which he and Mr. Shain had had concerning CarbonDesk, and again sought refuge in the assertion that prior to the call with Siv he had received an assurance from Mr. Savage that there was no problem with the market,

"Q. … You say: "We are scratching our heads." And I suggest that's because you and Mr. Shain have had discussions before the morning of the 18th to the effect of where on earth are CarbonDesk and GW Deals getting all these carbon credits and you just basically say to each other: we don't know. So you've got questions about the business model by the very latest on 17 June. That's right, isn't it?

A. I can't remember exactly when but I would have gone to Chris Savage and my best view is based on the time of this phone call, on 17 June we have got a clean bill of health.

Q. Well, you accepted at the beginning of my questioning that you had to understand the business model of your counterparty and I'm putting to you that, as we can see from this telephone transcript … on 18 June you did not understand the business model of the small boutique clients that you were working with, namely CarbonDesk and GW Deals.

A. Sorry, we didn't know the business or how they got the customers?

Q. You didn't know the business model of CarbonDesk or GW Deals.

A. I didn't know the exact details, no. We had an assumption that if it's – that's fine. It fitted what was around. We were talking to Compliance.

Q. And that specifically the questions that you and Mr. Shain have raised with each other is where are they finding their clients and how are they able to onboard them.

A. Sorry, are you asserting that's a conversation that me and Jon had –

Q. I'm saying that's a conversation that this telephone transcript suggests would have taken place by 17 June at the latest?

A. Between myself and Jon?

Q. Yes?

A. I can't remember a conversation like that. I do know that I spoke to Chris Savage. And that was well ahead of the week where the CarbonDesk dinner was.

Q. And you and Mr. Shain will have been speculating that these are clients who nobody else is prepared to onboard. The clients of CarbonDesk and GW Deals are companies that nobody else is prepared to onboard.

A. No, we thought the business flows was legitimate. In terms of how you go about onboarding, there is a whole load of process issues around costs, doing the background checks, we weren't financed to do it, we had a go at trying to market it. It proved too costly to do that as a business. It ended up with a conversation between myself, Michael Walter and Hartwig Schuen in which Hartwig gave his view on why it was that RBS Sempra was not able to be competitive in this area and that was about economics and about the economics of being able to do this side of the business. Other people can.

Q. And it's fair to say, isn't it, that by 17 June, if not earlier, you have questions about the trading that you and Mr. Shain are conducting with CarbonDesk and GW Deals, which questions are unanswered.

A. I have been told – in my opinion it's the 17th. I don't think it's the 18th because it's too early. I don't believe I would have made this phone call until after Chris Savage – Mr. Savage, sorry, had given the all clear on the market and told me there was no problem."

357. Although Mr. Gygax professed not to recall a conversation with Mr. Shain prior to 18 June 2009 in which the Traders were questioning where how CarbonDesk was getting its clients and the volumes of EUAs that it was offering to sell to RBS, he did not deny it; and on the basis of what Mr. Gygax volunteered to Siv, I see no reason to doubt that such a conversation had taken place.

358. Moreover, the reason for the Traders' questions about the source of the volumes of EUAs they had been offered by CarbonDesk – even by 17 or 18 June 2009 - were doubtless those which Mr Gygax and Siv discussed.

359. It is clear, first, that Mr. Gygax and Siv were working on the assumption that it would not have been the large compliance companies that would have been using the services of CarbonDesk. Such companies (e.g. those large emitters in the power, steel and industries) accounted for the overwhelming majority of allocated and surplus EUAs but would generally either have their own trading desks or would seek to sell EUAs through established brokers or investment banks. The transcript makes it clear that it was well understood between Mr. Gygax and Siv that it was only the smaller compliance companies who would conceivably be interested in using a small intermediary such as CarbonDesk. Siv expressly referred to such compliance companies and had phoned around a number of them: and Mr. Gygax speculated earlier in the exchange that these were the type of companies that would have problems with "know your customer" (KYC) and getting onboarded at the larger institutions, but could be signed up by a small boutique brokerage.

360. However, such compliance companies would generally only require and be allocated a relatively modest number of EUAs – the median level of emissions of companies in the EU ETS for 2008 was only about 15,000 tonnes per year. It also followed that the number of EUAs required to balance the emissions, or to be available for sale as surplus by any such compliance company would be smaller still. Accordingly, unless the compliance company was selling all of its allowances

to improve its short-term cash-flow with a view to buying what it needed in the market at the end of the EU ETS period in the Spring of 2010, the number of EUAs available from any one such source would be limited.

361. Even assuming some willingness on the part of some of the smaller compliance companies to sell all of their allocation, for any intermediary to be able to offer the volume of EUAs that CarbonDesk had offered RBS over just three days – 3 million EUAs – it would have had to acquire a large number of compliance clients. Even on the basis of the numbers that Mr. Gygax suggested such companies might want to sell, namely 100,000 to 200,000 EUAs, it would have required CarbonDesk to have obtained a significant number of clients who were all willing to sell their allowances at the same time. But to find and sign up such companies would have been very difficult, since as Siv pointed out, he had approached a sample of smaller compliance companies and had been variously told that they didn't sell their EUAs at all, they didn't need to sell them at the moment, or that they already had an established contact with an intermediary.

362. In summary, I find that by the time of the call with Siv on 18 June 2009, the Traders knew that CarbonDesk was a small company which had, with no similar trading history, suddenly sold to them a large number of EUAs over a short period. That steep increase in the volumes of EUAs had caused the Traders to question what CarbonDesk's business model might be. Specifically, the Traders were questioning how CarbonDesk was getting its clients and the volumes of EUAs that it had offered for sale to RBS. The Traders had no satisfactory answers to those questions, but neither of them took any concerns to Mr. Savage. In particular, Mr. Gygax's evidence at trial that he had done so on or before 17 June 2009, and that he had been assured by Mr. Savage that there were no issues in the market, was untrue.

**The week commencing 22 June 2009**

363. As indicated above, the volumes of EUAs being traded by CarbonDesk to RBS continued at approximately the same level on 18 and 19 June 2009, being a total of about 3.6 million EUAs over the two days, bring the weekly total to 6.6 million. There was then a further surge in volumes traded during the week commencing 22 June 2009, resulting in well over 3 million EUAs being sold by CarbonDesk to RBS on each of Wednesday 24 – Friday 26 June 2009, with a high of just under 4 million EUAs on Thursday 25 June 2009. In all, a total of 14.5 million EUAs were acquired in 149 trades during the week, bringing the cumulative total sold by CarbonDesk to RBS in the space of two weeks to over 21 million EUAs.

364. To put this level of trading in context, I note that the Defendant's trading expert, Mr. Kanji, gave the following evidence, based upon his time at Barclays, which was a much larger and more established emissions trading operation,

> "The absolute volumes traded on 22 June 2009 and 23 June 2009 were large, but not exceptionally so. However, by 24 June 2009, I consider that the volume traded was large enough to be exceptional; from memory I do not recall trading similar volumes with a single counterparty on a single or concurrent days during my time at Barclays."

365. RBS's defence contained the following pleading in relation to what occurred during the next week commencing 22 June 2009,

> "39.b. …. sometime in the week commencing 22 June 2009, Mr Gygax informed Mr Savage that the volumes from CarbonDesk gave rise to questions in his mind as to its business model, including the source of the EUAs, and that the dinner which had been arranged with CarbonDesk for 25 June 2009 provided a good opportunity to address such questions. As a comparatively new counterparty (with whom Mr Gygax in particular had only recently begun trading) with an increasing volume of trade, Mr Gygax was interested in understanding CarbonDesk's business and business model."

366. Mr. Gygax's written evidence was to similar effect,

© 2025 Thomson Reuters. 

"At the beginning of this week, I would have known that the CarbonDesk traders were continuing to send substantial volume in our direction and this level of activity prompted me to initiate further discussions with Mr Savage.

Around this time, I recall being told (I believe by Mr Shain) that CarbonDesk were dealing with end-users but I did not know the identity of those companies or whether CarbonDesk had been targeting lots of the small-medium sized end-users or had managed to build relationships with any larger end-users. Nor did I know whether CarbonDesk's principal client base was in the UK, a particular area of Europe, or elsewhere.

Since I had been maintaining a regular dialogue with Mr Savage over the past few weeks in relation to the emissions market, it was only natural to mention the planned dinner [with CarbonDesk on Thursday 25 June 2009]. I remember telling him that we had seen a rise recently in the volumes being traded with CarbonDesk and we agreed that I should use the dinner as an opportunity to find out more about their business as a means to better understand their volumes. I would have mentioned the increase in volumes because it was an increase in activity which I wanted to understand and something about which I thought he should be made aware.

I also asked Mr Shain to try to get some information from CarbonDesk about their clients during the course of his trading with them and in advance of the dinner. I do not remember the details but I have a recollection of attending the dinner already having acquired a high-level overview of CarbonDesk's business."

367. In his oral evidence, as well as maintaining his story that he had first raised his concerns with Mr. Savage on 17 June 2009, Mr. Gygax also suggested that he had raised questions about "the colour" of CarbonDesk's business with Mr. Savage prior to the dinner which had been arranged with CarbonDesk for 25 June 2009,

"Q. So your testimony, sorry, is that on the 17th you were told by Mr Savage that there was nothing to worry about because there is no fraud in the market. But then you went on the Monday, the 22nd, and said, "I have a concern nonetheless."

A. I continued to report the volumes to him that we were — in terms of what we were seeing within the market, the colour, so he would have got an understanding that CarbonDesk were a counterparty, that we were doing business with them … on the 17th – I feel I fulfilled my first obligation, which is to raise concerns. I did not have a problem after that on the volumes for the rest of that week because I had been given a clean bill of health and I believe industrials are selling and I believe CarbonDesk are sourcing them from industrials. It's the consistency of those volumes that prompted me to go back to Mr Savage and question whether there is something else, if there is a problem."

368. Mr. Gygax also stated that, although the dinner had not been arranged for the purpose, it was decided between him and Mr. Savage that he should use the dinner as an opportunity to find out more about CarbonDesk's business model and the source of its EUAs,

"Q. But for the moment you accept, don't you, that any conversation with Mr Savage that took place on 22 June was not prompted by the fact that there was going to be a dinner?

A. The dinner was arranged separate to a concern at that point in time. That's my opinion. We had the dinner in the diary. I can't definitively say at what point I told Mr Savage we had a dinner in

Bilta (UK) Ltd (In Liquidation) v Natwest Markets Plc, 2020 WL 01169967 (2020)

> the diary but we were maintaining ongoing discussions, so there wasn't – there wasn't anything the desk was withholding from Compliance.
>
> Q. So on that basis are you saying that you told Mr Savage on this conversation on 22 June that you and Mr Shain had been scratching your heads about where the carbon credits were coming from?
>
> A. I can't remember specifically saying that, no.
>
> Q. You recollect saying anything along the lines of not knowing what CarbonDesk's business model was?
>
> A. I remember questioning the business. I remember a conversation with Mr Savage in which it was determined that we try and find out about their customer business. I didn't feel — I didn't feel that was a rush job, for example, before the meeting; this was part of an ongoing discussion about the colour of their business and then the only real prominent conversation I remember with Mr Savage was about trying to establish their business and for which I went out trying to find out about – well, whatever I could and I come back with some information and I vaguely remember trying to put Jon Shain to task about asking questions about their business. What I can't do is say whether that was the 22nd, the 23rd – I'm just going to check the dates of the dinner. I believe we were ahead of this, than the 25th, it wasn't on the day of the dinner. That's my gut instinct, but I would have been talking to Mr Savage throughout this week."

369. Although rather vague about what he told Mr. Savage, Mr. Gygax was clear that he planned his approach to the dinner with him,

> "I sought guidance before the dinner from Chris Savage on exactly what questions were the best ones to ask as well."

370. For his part, Mr. Shain's witness statement included the following,

> "What I do recall is that I had discussions with Mr. Gygax at some point during [the week commencing 22 June] about the volumes of EUAs being offered by CarbonDesk, as they had been high for over a week and we were both curious about the number and size of the clients that CarbonDesk had managed to obtain.
>
> Whilst the purpose of the upcoming dinner with CarbonDesk was to build upon the existing business relationship, at this stage, in view of the increased volumes, Mr. Gygax told me that he wanted more information about CarbonDesk's clients and source of EUAs. I also remember Mr. Gygax telling me that he was going to inform Compliance about the volumes of EUAs being offered by CarbonDesk. I cannot now recall when exactly this was."

371. Mr. Shain's oral evidence was initially to similar effect. He initially said that in the days leading up to the dinner he discussed with Mr. Gygax the question of how it was that CarbonDesk was able to obtain the volumes of EUAs it was selling to RBS. He said that he was aware that Mr. Gygax wanted to find more information about CarbonDesk's clients and source of carbon credits, and was planning to report his findings to compliance. However, when pressed on the detail of this evidence, Mr. Shain became very vague and evasive,

> "Q. But you did come to have some sort of conversation along those lines with Mr. Gygax?

© 2025 Thomson Reuters. 

A. About?

Q. How it is that CarbonDesk were able to bring such volumes –

A. At some stage, yes, we definitely would have discussed that.

Q. When do you think that was?

A. Well, definitely the week [commencing 22 June] because that was – that was leading up to the dinner and I know that Andy wanted to use that to find out more about their business. As and when, before that, whether we discussed what was going on, probably, but I couldn't tell you when.

….

Q. ….you say in paragraph 122 of your witness statement,

> "Whilst the purpose of the upcoming dinner with CarbonDesk was to build upon the existing business relationship, at this stage, in view of the increased volumes, Mr. Gygax told me that he wanted more information about CarbonDesk's clients and source of [carbon credits]."

You remember Mr. Gygax asking you to try to get some information from CarbonDesk about their clients?

A. I don't remember specifically being asked to do it but it could well have been but from my point of view, I was encouraged by management to entertain CarbonDesk, because we actually viewed them as a client of ours, to build the relationship because we were getting some good business and I knew that Andy was going to be speaking to them about their business model. So whether or not I was going to also ask or whether I knew Andy was doing it anyway, I don't know. I knew that between us we were asking about their business model. I can't remember if specifically Andy had asked me to ask.

Q. You said "between us". You were supposed to find out about CarbonDesk's business model as well?

A. I don't know.

…

Q. You go on [in the witness statement]: "I also remember Mr. Gygax telling me that he was going to inform Compliance about the volumes of EUAs being offered by CarbonDesk."

So this would indicate this is a conversation you do remember?

A. It was probably something I remember in one of the many meetings I have had over the years. Right now – when all this was documented – I can't remember the specific conversation now.

Q. Well, in terms of timing, you put it as being before the upcoming dinner?

A. Okay.

Q. Does that help?

A. It doesn't help me remember. But I'm not denying this conversation didn't happen – I'm not denying it happened. I'm sure it did.

Q. Do you accept or do you not that you were charged by Mr. Gygax, you were asked by Mr. Gygax to find out more about CarbonDesk clients?

A. That I don't recall. I knew that he was going to be asking them. He might have asked me as well whether or not I did or I just was out there to have a good time to get to know them. I can't say."

372. Mr. Shain's evidence should be considered in the light of a number of telephone conversations which he had with Mr. Ward in the days leading up to the planned dinner. One such conversation took place on Tuesday 23 June 2009.

373. The background to the conversation is that from at least 15 June 2009 CarbonDesk had been asking RBS to agree to provide it with same-day payment for the EUAs that it was selling. The relevant part of the telephone call between Mr. Ward and Mr. Shain on 23 June 2009 was as follows,

"Ward: So just to let you know that for the fact that you guys can't settle past 12:30, I traded away from you 600k.

Shain: Wow, oh well.

Ward: [Laughs] But yeah, c'est la vie. Shain: Yeah. …What time's their cut off? Ward: 2.30.

Shain: 2.30? The same as…Ward: Yeah yeah I know it's brilliant, however I…I tell you it's a standard…Shain: Ok.

Ward: Yeah but let me put it this way, my client…my clients have a priority over kind of same day settlement, so can take a…take a hit of kind of 10 cents, especially if they bought 25 to 30 cents below, cos they like to do it intraday…Shain: Right.

Ward: …erm so he…he did me the price on screen was kind of well it was probably around this level, maybe a bit lower at 75…Shain: Right.

Ward: Erm we did 353k at 65. Shain: Wow.

Ward: Yeah. And I told my client you should wait, you should wait, you should settle tomorrow, it will be fine, it will be fine, but he's like no, but my client on the other end of my phone is telling me to sell now, so standard must be…well he can't handle any more at the moment, so…[laughs] I've got another 380 to do with him right now for same day settlement."

374. When cross-examined about this conversation, Mr. Shain was combative and evasive. At first, even though it was obvious from the call that Mr. Shain was interested in securing more business from CarbonDesk, and that he did react to being told the size of the trade which Mr. Ward said he had given to a third party, Mr. Shain was unwilling to accept that it was a very large trade to have lost. Then, after some prevarication, Mr. Shain appeared to accept that the client which Mr. Ward had been referring to was probably not an industrial compliance client, but a trader,

"Q. I'm putting to you that this conversation with Mr Ward is clearly identifying a particular client for whom he had traded away 600K because RBS Sempra couldn't provide same day payment?

A. Yes.

Q. And this particular client, if we proceed on your assumption that he was just talking about a single client, was –

A. Sorry, can I interrupt. When he is talking about a single client, he is talking about 10-cents here – if he bought 30-cents lower. I don't think he is talking about the same day payment on that bit, is he?

Q. Yes, it is. You see, we can see the bit where he says:

> "My client, my clients."

For present purposes, let's proceed on what you insist is the position, that he is just talking about a client. So this is a client who has got a priority of a same day settlement so can:

> "…take a hit of kind of 10-cents, especially if they bought 25 to 30-cents below …"

A. Okay.

Q. That is not an industrial, is it, somebody that's buying in and then selling on? It's not an industrial selling its surplus?

A. Somebody that's buying it and selling is probably not an industrial, no."

375. If, as their written and early oral evidence suggested, Mr. Gygax and Mr. Shain had really wished to find out more about CarbonDesk's business model and the nature of its clients before the dinner on 25 June 2009 in order to report back to Mr. Savage, it would, I think, have been obvious to Mr. Shain that this was just the type of information which Mr. Gygax would have wanted to be given. But when questioned on this basis, Mr. Shain again prevaricated, sought to downplay the significance of the point, and was unable to provide a coherent answer as to why he did not discuss such matters with Mr. Gygax before the dinner with CarbonDesk,

"Q. .…I'm simply putting to you as a matter of commonsense, reading the transcript, he is quite clearly informing you of at least one trader, not an industrial, who has had 600K available for sale –

A. I think he is informing me that he has one guy that's got 600K for sale. I'm not sure I made any connection there whether it's industrial or not. Later on, when he talks about 25 – they have bought 25/30-cents below because they like to do it intraday, yes, that's talking about day trader there.

Q. I put it to you that from this conversation it shows that Mr Ward was quite happy to tell you that his clients were not industrials?

A. I disagree. One of his clients is a day trader who likes to sell out if he buys it 25 to 30-cents below.

…

Q. But Mr. Gygax has said he wants to know more about the clients of CarbonDesk and here is Mr. Ward telling you about a client of CarbonDesk who is clearly not an industrial?

A. This is one conversation we are having about a client that likes to do intraday. Many conversations during the day. I'm not sure how much of this I'm registering, we are having the dinner on two days' time where we can discuss properly what they are doing.

Q. But you don't, do you?

A. I don't, no.

Q. You don't discuss with them?

A. I don't because I know Andy is. When I say I don't, I don't recall discussing it and I probably didn't but I knew that Andy was."

376. The second conversation involving Mr. Shain took place the following day, Wednesday 24 June 2009, the day before the planned dinner with CarbonDesk. That day, the Desk bought over 3.6 million EUAs from CarbonDesk in 38 trades. The conversation between Mr. Ward and Mr. Shain was as follows,

"Ward: Aggressive I am and none of it gets done. What's this all about [inaudible]?

Shain: Erm.

Ward: I thought it was quite all…was just after lunch. Kicking along. Bobbing along.

Shain: It's not not that busy a day really.

Ward: Mmm…Shain: [inaudible]

Ward: You work out how much volume we've done, and you look at BlueNext volume?

Shain: Where's all the other side, I don't understand? Ward: What?

Shain: Where are these guys buying it all from? Ward: I think the same place. At your interest.

Shain: He's buying it from me and selling it to me as well? Ward: Probably.

Shain: That's dodgy, no?

Ward: No. Why is that? It's just intraday trading.

Shain: They must be buying higher than. than they're selling it [inaudible].

Ward: But where did you…where was your interest at? Your interest was back at…at 90s wasn't it? A bit less than that I think it was.

Shain: Yeah but I was selling they were selling to me yeah, in the 90s.

Ward: No they were buying from you at 90s.

Shain: No er…no at my end…my other side…my other my other…Ward: Yeah.

Shain: Oh right, yeah I guess yeah. Alright mate you're done at 42.

Ward: Err. Done in 42? Shain: So far, yeah, half of it. Ward: Ok cool.

Shain: So you keep it as…Ward: Yeah, try and keep it as one. Shain: Ok cool."

377. When cross-examined about this telephone call, Mr. Shain gave a long and convoluted explanation, which he indicated he had developed shortly before the trial after spending time going through the transcript and listening to the audio recording at the behest of RBS's lawyers. Mr. Shain's explanation suggested that when he asked, "Where are these guys buying it all from?" he actually meant, "Who is buying the credits I am selling on BlueNext" and that he was not addressing the question of where CarbonDesk's clients were obtaining their EUAs at all.

378. In my judgment, that was not a credible explanation of the call, not least because it does not fit the remainder of the conversation, in which Mr. Shain became concerned that the same person might be both selling credits to him at one price (via CarbonDesk) and then buying from him at a higher price (on BlueNext). More importantly, I consider that Mr. Shain's questions to Mr. Ward plainly demonstrate that he well understood that at least one of CarbonDesk's clients was engaged in intraday buying and selling and hence was obviously not an industrial compliance company simply selling EUAs which had been allocated to it.

**The dinner on 25 June 2009**

379. RBS's pleaded case as to the dinner between the Traders and CarbonDesk was as follows,

"c. The dinner took place on 25 June 2009. Mr Gygax took the opportunity during the pre-dinner drinks to have a one- to-one discussion with Mr. Ward of CarbonDesk. During that conversation, Mr Gygax asked a number of questions as to CarbonDesk's business strategy/model and as to the source of its EUAs. He was informed by Mr Ward that:

i. CarbonDesk had spent approximately six to nine months speaking to compliance companies across Europe, in particular, targeting those with the biggest "long" positions (i.e. a company which owned more carbon credits than was necessary to meet its compliance requirements by reference to its intended emissions and thereby had a surplus to sell), the biggest "short" positions (i.e. a company which did not own sufficient carbon credits to meet its compliance requirements by reference to its intended emissions thereby needing to purchase additional credits) and even those with "outright" positions (i.e. a company with a balanced position of owning sufficient carbon credits to meet its compliance requirements by reference to its intended emissions, but who might wish to trade for liquidity/speculation reasons).

ii. Some of CarbonDesk's clients had previously been dealing directly with RBS' larger competitors and had become disgruntled with their level of service, pricing and overall attitude before moving to CarbonDesk.

d. Mr. Gygax understood from Mr. Ward that the rationale for the high volumes from CarbonDesk was that CarbonDesk wanted primarily to deal with one company which was reliable and trustworthy with competitive pricing.

e. Mr. Ward's explanation made commercial sense to Mr. Gygax, as it was the strategy which Mr. Gygax had been keen to pursue himself, namely targeting the end users of EUAs in order to avoid dilution of margin through a chain and generating interest from such industrials through competitive pricing. Therefore, Mr. Gygax thought that CarbonDesk had beaten him to it, and obtained large-scale industrial flow directly. Furthermore, it also made sense to Mr. Gygax that CarbonDesk would want to deal with RBS rather than BlueNext directly, due to barriers to entry …

f. In addition to CarbonDesk's business model making sense, a number of other aspects of the business were mentioned at the dinner which provided the Emissions Desk with further comfort. In particular, Mr. Gygax was informed that one of CarbonDesk's directors/owners had been on a committee of the South African Stock Exchange which provided additional credibility to the company; and CarbonDesk reiterated that it was going through the process for FSA authorisation (which it ultimately obtained on 11 August 2009).

g. Mr. Gygax thought that the explanation provided by CarbonDesk at the dinner on 25 June 2009 was credible and consistent with his knowledge of the market and would have informed Mr. Savage of such view."

Mr. Gygax's written evidence was to similar effect.

380. The first point to note is that it is now known that CarbonDesk did not source its EUAs from compliance companies looking to sell their surpluses. The evidence was that CarbonDesk acquired all of the EUAs that it sold to RBS from the Claimant companies or other companies that were only involved in trading carbon credits.

381. It follows that on Mr. Gygax's account, Mr. Ward told him an elaborate lie at the pre- dinner drinks as to the nature of CarbonDesk's clients, how CarbonDesk had built up its business, and the sources of the carbon credits which they were selling. Mr. Ward was not called as a witness by either party, so I did not hear his version of events. There is, however, considerable force in the point that this would have represented a dramatic change in approach by Mr. Ward, who, as I have indicated, had been quite willing to talk quite openly to Mr. Shain about the requirements of at least one (or more) of his clients for intraday trading in the telephone calls over the couple of days prior to the dinner. Given that, for all that Mr. Ward knew, Mr. Shain might well have spoken to Mr. Gygax about such conversations, and Mr. Shain was attending the dinner too, it would have been an unlikely deception for Mr. Ward to have attempted, and no-one has suggested any reason for him to have done so.

382. The only indirect evidence that I have as to Mr. Ward's version of events came from an interview which he gave to the liquidators of the Claimant companies on 1 July 2015. According to that interview, Mr. Ward had no recollection of being asked by Mr. Gygax about CarbonDesk's business model at the dinner. He also asserted that CarbonDesk had not actively chased its clients but had been approached by traders looking to capitalise on the market in EUAs and seeking the services of a broker.

383. Mr. Gygax's evidence in cross-examination about the specifics of his conversation with Mr. Ward at the pre-dinner drinks was also very vague. It will be recalled that on Mr. Gygax's evidence, he had previously discussed with Mr. Savage using the dinner as the opportunity to find out more about CarbonDesk's business and the source of its volumes. And when describing the dinner later in his cross-examination, Mr. Gygax said that he had,

"…gone in quite focused about what I felt I needed to know and understand and it has also got marker points around it, whereby you try to keep those memories fresh, the natural triggers."

384. Yet, according to Mr. Gygax, he was told nothing more about CarbonDesk's clients than they were industrials, and Mr. Ward gave no details of the identity, sector type or location of the companies which CarbonDesk had supposedly identified and targeted.

385. Further, although Mr. Gygax stuck to his account of having been told by Mr. Ward that some of CarbonDesks's clients had previously been clients of RBS's competitors and had moved to CarbonDesk due to dissatisfaction with service and pricing, on his own evidence, Mr. Gygax showed a remarkable lack of interest in, or any recollection of, the details of such loss of business by RBS's competitors, or even when that had occurred,

> "Q. [You say in your witness statement],
>
> > "Some of CarbonDesk's clients had previously been dealing directly with our larger competitors and had become disgruntled with their level of service, pricing and overall attitude before moving to CarbonDesk."
>
> So those statements are on the basis that CarbonDesk clients have previously been serviced by your competitors and then moved to CarbonDesk.
>
> A. Yes.
>
> Q. But it doesn't tell you anything about when they moved to CarbonDesk, does it?
>
> A. No, it doesn't … the only reference I got to timings was that they spent six to nine months.
>
> Q. But that in itself is odd. I mean, when did you think the six to nine months had occurred? What time period were they referring to?
>
> A. I can't remember now. I can't remember if or when they referenced when they got going. I can't answer that now. I don't know."

386. Nor, apparently, did Mr. Gygax inquire into the reasons for the sudden upsurge in the volumes of business that CarbonDesk had done with RBS after 15 June 2009. Of itself, the suggestion that CarbonDesk had suddenly obtained a clientele of compliance customers with an increasingly large and consistent volume of EUAs to sell, raised substantial questions,

> "Q. How was it that you thought that industrials were prepared to hand over their valuable carbon credits in such quantities to a company like CarbonDesk without being paid, without first being paid?
>
> A. I thought it had been built up over time as a relationship of trust. So, in other words, you start small….
>
> …
>
> Q. So you would have expected, wouldn't you, if this was at all a plausible business model, that CarbonDesk would have acquired increasing volumes steadily over a period of time, rather than appearing on your doorstep on 15 June with these huge volumes.

A. I would have expected them to be built up their client base over time in the volumes, yes.

Q. So who have [CarbonDesk] been selling the carbon credits to previously?…A.I don't know. I thought we would have done some business with them.

Q. You had done some limited business in very small amounts, nothing comparable to what you are receiving from 15 June onwards?

A. Yes.

Q. I put it to you that as somebody who is passionate about the market, if you wanted to know truly what the business model was, you would have enquired why it was they were only bringing such huge volumes to you now?

A. I did not have the background with the counterparty. That's one of the problems.

…

Q. And this, at the end of the day, is a dinner, it's not a formal meeting for the purposes of recording their answers. You are speaking to Mr Ward, whose background is in recruitment. Mr Shain and Mr Ward go off to a nightclub until all hours. If you had wanted to know who they had been trading with previously, that is something, given the atmosphere, that could have been asked, isn't it? …. you could have said, have you only just got these sudden volumes and if the answer was no, you could have asked who they had been selling them to previously?

A. We could have asked….

Q. But you didn't?

A. I don't believe – I don't think I did. No, I don't think so. I don't remember.

Q. Because you didn't want to know?

A. That's not true. When you pair the fact that we provided the compliance manager with a claim that they were getting FSA status as well as the background of a director on the company, we were doing checks beyond just the business model or our understanding of whether that worked, to check the integrity and credibility of that company as well. That was given to Chris Savage on the following day.

….

Q. That answer, "That's not true," would indicate that you did want to know. You did want to know whether they had suddenly got these huge volumes and if they hadn't, who they had been selling them to before. So why didn't you ask?

A. I don't remember. I don't know."

387. On his account of the conversation, Mr. Gygax also did not ask Mr. Ward anything about the continuing level of business that RBS could expect to do with CarbonDesk in the future. I asked Mr. Gygax about this at the end of his evidence,

"MR JUSTICE SNOWDEN: … So when you were going to the dinner and asking, because of the volumes … where [Mr. Ward] was getting the flows from, did you ask him what volumes might continue to be expected that he would be giving you?

A. No, I didn't.

MR JUSTICE SNOWDEN: Were you not interested in what volumes would be coming after the dinner?

A. I didn't ask and, to be honest, I don't know if I would have been given that – I don't know if I would have expected an answer other than something fairly cagey around it because people would be protective of their client, even though he has not said anything. I don't know. I didn't ask.

MR JUSTICE SNOWDEN: I'm just trying to understand the context of this. You are new to the set-up.

A. Yes.

MR JUSTICE SNOWDEN: You are looking to build the Desk.

A. Yes.

Q. Were you not curious or interested as to how these flows would continue?

A. I thought the flows that we would get from CarbonDesk would be a percentage of the entire flows of the market. That's what I thought and I think that's what we wanted as well.

MR JUSTICE SNOWDEN: Sorry, you had the opportunity to ask CarbonDesk about their business.

A. I didn't ask about forward-based volumes. I didn't ask about forward-based volumes. I had asked about their volumes there and then and the back story as well as to where they – how they had gone about getting them."

388. The experts on carbon trading were agreed that traders were generally secretive about the detail of the business they were conducting and would not generally reveal much information about counterparties. Mr. Kanji told me that a trader in a chain wouldn't know whether the volumes were going to continue, and if the trader was doing his own proprietary trading he wouldn't tell. He said it would be "fairly disrespectful" and would require "sensitivity" for such questions to be asked. Relying on this, RBS submitted that it would not have been reasonable to expect Mr. Gygax to conduct a "thorough cross-examination" or ask "probing questions" about CarbonDesk's customer base at the dinner on 25 June 2009.

389. But in my judgment that submission misses the point. It was Mr. Gygax's evidence – as indicated above - that he thought that CarbonDesk's clients were industrial (compliance) companies. He did not, apparently, think that CarbonDesk was simply trading as an intermediary in a chain, still less engaging in proprietary trading on its own account as Mr. Kanji postulated. Further, rather than thinking that it might have been seen as disrespectful, it was Mr. Gygax's case that he and Mr. Savage had agreed to use the pre-arranged dinner as the opportunity for him to ask specific questions to get an understanding of CarbonDesk's business.

390. Moreover, Mr. Gygax said that he had gone back to Mr. Savage in the compliance department precisely because of the consistently high volumes that the Desk was seeing from CarbonDesk during the week leading up to the dinner. As the person with direct responsibility for, and a personal financial interest in, the performance of the Desk, it would have been entirely natural for Mr. Gygax to want to know whether Mr. Ward envisaged such volumes continuing. That would not have required Mr. Ward to divulge any specific information concerning CarbonDesk's clients and would have been the least that Mr. Gygax would have wanted to know for his own business purposes. In these circumstances, even assuming Mr. Ward could not be expected to give details of particular clients, I regard it as incredible that, had the prior discussions between Mr. Gygax and Mr. Savage occurred as Mr. Gygax said, Mr. Gygax apparently did not even think to ask any questions of Mr. Ward about the continuation of the high volumes that the Desk had been trading with CarbonDesk.

391. Mr. Shain's evidence about the drinks and dinner on 25 June 2009 was vague and unconvincing. His written statement said,

"121. What I do recall is that I had discussions with Mr. Gygax at some point during this week about the volumes of EUAs being offered by CarbonDesk, as they had been high for over a week and we were both curious about the number and size of the clients that CarbonDesk had managed to obtain.

122. Whilst the purpose of the upcoming dinner with CarbonDesk was to build upon the existing business relationship, at this stage, in view of the increased volumes, Mr. Gygax told me that he wanted more information about CarbonDesk's clients and source of EUAs. I also remember Mr. Gygax telling me that he was going to inform Compliance about the volumes of EUAs being offered by CarbonDesk. I cannot now recall when exactly this was.

…

125. The dinner was informal and gave us a chance to chat and get to know each other. Mr. Gygax and I had not discussed any specific questions to ask but we did intend to gain a better understanding of their business model. I am unable to recollect the exact details of the conversations which took place over the course of the evening."

392. In cross-examination, however, Mr. Shain did not adhere to his witness statement and was extremely vague about his discussions with Mr. Gygax prior to the dinner,

"Q. [Referring to paragraph 122 of the witness statement], you remember Mr. Gygax asking you to try to get some information from CarbonDesk about their client?

A. I don't remember specifically being asked to do it but it could well have been but from my point of view, I was encouraged by management to entertain CarbonDesk, because we actually viewed them as a client of ours, to build the relationship because we were getting some good business and I knew that Andy was going to be speaking to them about their business model. So whether or not I was going to also ask or whether I knew Andy was doing it anyway, I don't know. I knew that between us we were asking about their business model. I can't remember if specifically Andy had asked me to ask.

….

Q. You go on here:

"I also remember Mr. Gygax telling me that he was going to inform Compliance about the volumes of EUAs being offered by CarbonDesk."

So this would indicate this is a conversation you do remember?

A. It was probably something I remember in one of the many meetings I have had over the years. Right now – when all this was documented – I can't remember the specific conversation now.

Q. Well, in terms of timing, you put it as being before the upcoming dinner?

A. Okay.

Q. Does that help?

A. It doesn't help me remember. But I'm not denying this conversation didn't happen – I'm not denying it happened. I'm sure it did.

Q. Do you accept or do you not that you were charged by Mr Gygax, you were asked by Mr Gygax to find out more about CarbonDesk clients?

A. That I don't recall. I knew that he was going to be asking them. He might have asked me as well whether or not I did or I just was out there to have a good time to get to know them. I can't say."

393. Mr. Shain was also very vague about his understanding of whether, and if so, when, Mr. Gygax might have spoken to Mr. Savage,

"Q. [Mr. Gygax] is telling you, according to your testimony, that he is going to inform Compliance about the volumes.

A. Okay.

Q. What did you understand he was going to speak to Compliance – why was he mentioning the volumes to Compliance?

A. I don't know if it was before the dinner or after the dinner but in any case he was concerned about the legitimacy of the volumes.

Q. He was concerned about the legitimacy of the volumes?

A. Yes. But I'm not sure if that was before the dinner or after the dinner. I think my recollection is during the dinner/after the dinner, he got comfort from speaking to them and then later on that week the volumes kept coming and then he was not sure later if what he had been told was necessarily the case and then that's when other things happened and it all kind of escalated from there.

Q. I'm trying to break this down. 25 June we have the dinner. That's the Thursday. The Friday, 26 June, you are away. 27th and 28th is the weekend. 29th, there is a day trading. You are back. 30 June is when the BlueNext letter arrives and Mr. Gygax has been telling us that the BlueNext letter was something that he got advance notice of before it arrived.

So in terms of Mr. Gygax telling you that he was going to speak to Compliance because he had concerns about the legitimacy of the volumes, when do you think that would have been?

A. He may have – he may have had concerns before the dinner, I don't recall specific conversation. I do recall him being more comfortable after the dinner and then again during that week, as the days went on, he probably had concerns again and then it coincided with the other stuff happening."

394. Mr. Shain was equally unclear about what happened at the dinner. He first suggested that when he left the dinner to go to the night club he "knew between us we had covered what [Mr. Gygax] wanted to do", but he was then unable to explain how that was so, other than by reference to a conversation which he supposedly had with Mr. Gygax on his return to work the following Monday, 29 June 2009,

"Q. No, you don't and that's the point, you appear to have no recollection as to your exchanges with Mr. Gygax about CarbonDesk clients before the dinner. You attend the dinner and you don't find out anything about the business model of CarbonDesk and I put it to you that the reason for that is that you and Mr. Gygax were not endeavouring to find out what the business model of CarbonDesk was?

A. I put it to you that I was aware Mr. Gygax was going to be asking questions about the business model. He may have asked me to ask questions, I may have asked questions, I don't necessarily recall and I knew that he was covering that side of things. I was also more concerned about building a relationship. As you can see, after dinner I went to a nightclub with them, without Andrew. I knew between us we had covered what Andy wanted to do. And that is in line with what happened next week when I was back on the desk and Andy being under the impression from his conversations with CarbonDesk that they had industrial clients.

MR JUSTICE SNOWDEN: How do you know that between you that you had covered what Andy wanted to do?

A. He would have told me that he was going to be asking the questions at the dinner. And he was at the dinner before I got there and I believe we had a conversation, although I can't recall the details, when I was back in the office – because I was off on the Friday – and he would have been comfortable about what he had found out from CarbonDesk."

395. When pressed on what he might have been told by Mr. Gygax after the dinner, Mr. Shain was again entirely unclear and became defensive and then argumentative on the point,

"Q. [In paragraph 140 of your witness statement] what you say you learnt is that CarbonDesk had invested a great deal of time in developing relationships with end-user industrial companies across Europe?

A. Right.

Q. And in your statement you say you don't remember whether that's what Mr. Gygax told you or whether it's something Mr. Ward and Mr. Beamish may have told you previously.

A. Okay.

Q .So you have no recollection of learning anything from the dinner, whether yourself or through Mr. Gygax?

A. Not at the dinner but afterwards I recall Andy telling me he had asked the questions and had got information about their business.

Q. That's not what this says. This says what you learnt about CarbonDesk's business may have come from Mr. Ward or Mr. Beamish and not Mr. Gygax.

A. Yes, I guess you could read into it from that. It's not very well written.

Q. What's the point of mentioning Mr. Ward and Mr. Beamish if it's not for the purpose of saying this might not have come from Mr. Gygax?

A. Well, he is saying – I'm saying I do not clearly remember what Mr. Gygax told me, as opposed to what Mr. Ward and Beamish may have told me previously. So I think what I'm saying here is I'm

not aware what Beamish and Ward had told me previously and whether that was different to what Andy was telling me now. Is that the right interpretation?

Q. I don't know.

A. I think that's what it is.

Q. Are you telling me you have a clear recollection of Mr. Gygax telling you on Monday 29 June that what he had been told by Mr. Ward was that CarbonDesk had invested a great deal of time in developing relationships with end-user industrial companies across Europe?

A. I have a recollection. I don't have a clear recollection. Andy was cross-examined last week. Did he say that he had got comfort from the dinner? Surely that's the key here."

396. Mr. Savage's evidence was that he had no recollection of a dinner between the Traders and CarbonDesk or of any discussion about it with the Traders before or afterwards. It should be borne in mind that this was only two weeks after Mr. Savage had circulated documents warning of the need for RBS to guard against liability for becoming involved with MTIC frauds, and at the end of the week after he had circulated enhanced due diligence procedures stressing the need to understand the business of companies in the emissions market as part of enhanced on-boarding procedures. Against that background, if Mr. Gygax had discussed with Mr. Savage using the dinner on 25 June 2009 to find out more about CarbonDesk's business model in the context of increased volumes of carbon trading with CarbonDesk, and certainly if they had gone so far as to discuss specific questions to be asked at the dinner as Mr. Gygax suggested, I am confident that Mr. Savage would have at very least have made a note and followed it up in internal communications afterwards, and that he would be likely to have remembered it. There were no such internal documents or records of such communications.

397. RBS's case that Mr. Gygax reported back to Mr. Savage after the dinner on 25 June 2009 and told him of the explanation allegedly given by Mr. Ward that CarbonDesk's clients were industrials can also be tested against a number of contemporaneous documents and, in particular, the evidence as to what happened after RBS received the BlueNext letter in the late afternoon of Tuesday 30 June 2009. It will be recalled that the BlueNext letter expressly requested an explanation of the Desk's trading for the last 10 days as well as the origin of the EUAs sold, and asked for a quick answer.

398. On Mr. Gygax's version of events, he had told Mr. Savage of the increased volumes of trading which the Desk had been doing with CarbonDesk during the preceding week and had also told Mr. Savage after the dinner at the end of the previous week that he had been comforted by Mr. Ward's explanation that the EUAs which RBS had bought emanated from industrial sellers which Carbon Desk had approached over a six to nine month period. However, neither the contemporaneous documents, nor Mr. Savage's evidence as to the action which he took upon receiving the BlueNext letter, made mention of any such explanation.

399. Instead, Mr. Savage's witness statement indicated that he was unaware of the size of the volumes which had been traded by RBS, and that he took several days to try to understand the circumstances giving rise to the BlueNext letter,

"111. My immediate reaction was to try to make sense of the number referenced in the BlueNext Letter to ascertain whether it was accurate and, if so, the reason for RBS Sempra representing this proportion of the market during this period.

112. My recollection is that there was a period of approximately three days from receipt of the BlueNext Letter (commencing on Wednesday 1 July 2009 given that the letter was only received by me late on Tuesday 30 June 2009) during which I was collecting and reviewing relevant trade data to test the accuracy of the statement from BlueNext and to try to understand the circumstances giving rise to it. I remember spending time in a meeting room with a whiteboard analysing the figures."

400. In cross-examination, Mr. Savage affirmed that the reason that RBS could not provide a quick explanation to BlueNext was that the Traders could not explain why CarbonDesk had so many carbon credits to sell,

Bilta (UK) Ltd (In Liquidation) v Natwest Markets Plc, 2020 WL 01169967 (2020)

"Q. We see from the body of the email, the text there at the bottom is that BlueNext are saying:

> "Please find enclosed a letter regarding explanation requested on RBS volume for the last ten days. Your quick answer would be appreciated."

Am I right in thinking you would have provided a quick answer if you could have done?

A. Yes.

Q. But the position was, wasn't it, that the Traders couldn't explain why CarbonDesk had such large volumes of carbon credits?

A. The problem was that because we had initiated POCA, we were in a position where, as far as I remember, we couldn't give an immediate answer.

…

Q. Yes, but on the basis of the information that was available at the time of initiation of POCA, the Traders weren't able to explain why it was that CarbonDesk had so many carbon credits, could they?

A. No, we had to ask them.

…

Q. But the reason you had such a high percentage on BlueNext was because of the volume of carbon credits that CarbonDesk were selling you, wasn't it?

A. Yes.

Q. And if, therefore, there had been a commercial rationale for the volumes that CarbonDesk were selling you, that would also have explained, wouldn't it, why you had such a large percentage of BlueNext trade?

A. Yes.

Q. So the reason why you can't provide an explanation for BlueNext is because you don't know why CarbonDesk have so many carbon credits?

A. Yes."

401. Further, neither Mr. Savage's draft IMLSR in relation to CarbonDesk nor his additional "Summary Overview" prepared on 1 and 2 July 2009 respectively contained any indication of earlier discussions having taken place along the lines suggested by Mr. Gygax.

402. In particular, the IMLSR stated,

> "The company is an aggregator for EUA Emission certificates for small companies/persons we believe based in the EU."

403. Mr. Savage's Summary Overview also characterised CarbonDesk as an aggregator which brought together "many small clients with whom market brokers will not deal", and stated,

> "The trading currently has only been for the last 2-3 weeks and therefore we are unable to draw any conclusion as to whether the clients are trading certificates they hold [or] are using certificates they have recently purchased in the market."

404. Both of the descriptions - "small companies/persons" or "small clients" - in the IMLSR were entirely generic. Significantly, they did not signify that the Traders had told Mr. Savage that they believed CarbonDesk's clients were entirely, or even mainly, industrial compliance companies. Likewise, and significantly, the Summary Overview made it clear that Mr. Savage had been given no indication by the Traders that they believed that CarbonDesk's clients were compliance companies with surplus EUAs to sell.

405. In cross-examination, Mr. Savage also accepted that in his "Summary Overview" on 2 July 2009 he advanced the idea that customers of CarbonDesk might be seeking to generate substantial VAT receipts to assist with their cash-flow purposes because nobody had been able to come up with any other commercial rationale for the volumes that RBS had been seeing from CarbonDesk,

> "Q. … what you put in your report … is that there aren't large volumes from legitimate trade. The large volumes are being generated because of a desire to acquire VAT.
>
> A. I'm happy with this.
>
> Q. Well, what I put to you is your comment is on the basis that there is a lot of carbon credit trading, which is commercially sensible, people are doing it because they are making profits, perfectly legitimately, and it just so happens they are availing themselves of the VAT as a loan. Your report is on the basis that these volumes have no other commercial explanation other than that people are trying to get their hands on the VAT.
>
> A. Yes, because they are trying – they are using it for funding and they may at some stage – or could do – a runner and at that point it becomes something else.
>
> Q. Yes, and you put what you put in your report because nobody has been able to come up with a commercial rationale for the volumes that RBS Sempra has been seeing from CarbonDesk.
>
> A. Yes, I think I have to agree."

406. Reference should again also be made to Mr. Savage's "Lessons Learnt" paper from October 2009. As indicated above, that stated,

> "When we prepared the draft AML risks analysis for RBS Sempra Commodities - London there was an implicit assumption that the risks on our EUA trading (primarily BLUENEXT) were minimal.

© 2025 Thomson Reuters. 

> As can be seen from the attached chart this was by and large true until June 19, 2009. After that time the trading pattern completely changed .
>
> From that date we were unaware of the significant change in trading by the EUA desk until June 30, 2009 when we received a request from BLUENEXT to explain why we were accounting for 37% of the exchange volumes."
>
> (my emphasis)

407. In these circumstances, I do not accept the Traders' evidence that they had been keeping Mr. Savage informed about their significantly increased levels of trading with CarbonDesk, or that during the week commencing 22 June 2009 they discussed with him the possibility of using the dinner on 25 June 2009 to find out more about CarbonDesk's business model.

408. I also do not believe that the Traders went to the drinks and dinner on 25 June 2009 with any intention of asking questions to find out about the nature of CarbonDesk's business model, its clients, or the sources of the EUAs it was selling for the purposes of reporting that to Mr. Savage. Nor did the Traders receive any assurances from Mr. Ward in those respects, or report their findings from the evening to Mr. Savage as they testified. Again, I believe that their evidence in that respect was a fabrication.

**Events after receipt of the Bluenext letter**

409. I have already explored to some extent the evidence as to what the Traders told (or rather did not tell) Mr. Savage about their understanding of CarbonDesk's business and the source of its EUAs following receipt of the BlueNext letter. The Traders also gave evidence in this respect. Mr. Gygax was asked about this in cross-examination,

> "Q. At the time of the arrival of the BlueNext notice, 30 June through 2 July, you knew at all material times that CarbonDesk clients were not industrials but were traders?
>
> A. On 30 June I understood them to be industrial. On 1 July my understanding of CarbonDesk swung quite significantly throughout the day.
>
> Q. Could you explain that, where you say your understanding swung quite significantly throughout the day?
>
> A. I can certainly try. The first – the first, I guess, big event was going to speak to James Duncan on 1 July, in which he was animated and hitting a calculator, as in punching it quite firm, and telling me that the VAT number was not a valid VAT number. So that was the first time I realised that there was a VAT existence and the second thing being that the VAT number wasn't valid.
>
> At that point in time, where I learn that we have paid, even though I had no idea of the amount, monies to CarbonDesk and they didn't have a VAT number, my immediate belief is that at that point in time the lack of a valid VAT number meant that we had passed money across to somebody that was most likely not going to be in the office that day, that they had gone.
>
> That was the first gut reaction that I had.
>
> MR JUSTICE SNOWDEN: Sorry, when you say that most likely not going to be in the office that day, they had gone, you thought that they would –
>
> A. In that moment I thought an invalid VAT number meant they had just made one up, as in they were not – at that point in time they were not a legitimate business."

410. Mr. Gygax was then asked to connect that explanation with his evidence as to the nature of CarbonDesk's clients,

"MR JUSTICE SNOWDEN: … What's the connection in your mind as at 1 July between discovering that they haven't got a valid VAT number and your understanding about who their customer base was. Can you join those two dots for us?

A. I didn't know if there was a customer base.

MR JUSTICE SNOWDEN: And that was because you were –

A. Because I thought maybe CarbonDesk were fraudsters. MR JUSTICE SNOWDEN: Right.

A. Potentially.

MR PARKER: And that understanding, that you didn't know what the customer base was, CarbonDesk might be fraudsters, how long did that understanding last?

A. Until I ended up speaking to CarbonDesk once I had made a phone call to them. The fact that they were there and they were willing to provide the documents that were required. So my initial concern that they were no longer at the office, they were there, the panic subdued.

Q. And what was your understanding as to who CarbonDesk's clients were at that point then?

A. The belief was that they were still industrial but, because I had been told in connecting the points altogether there was no fraud, that – sorry, let me retrace my thoughts. Because I was told there was no fraud, there was no VAT, everything that I had taken to Compliance and the answers that I felt [RBS Sempra] had given me were wrong or at least at risk."

411. This evidence is revealing. Mr. Gygax's first thought on learning that CarbonDesk had given an invalid VAT number was not that there was an innocent explanation such as a typographical or administrative error, but was that CarbonDesk was engaged in VAT fraud. That would have been quite a leap for someone who, according to him, had been told in a conversation with Mr. Savage that there was no risk of fraud in the market in which he was engaged, and had been reassured by Mr. Ward that CarbonDesk's clients were industrials with EUAs to sell. It was, however, the natural reaction of someone who, as I have found, had been involved in discussions with Mr. Savage about the risks of VAT carousel fraud affecting emissions trading in the UK only a few weeks earlier; who had received no clean bill of health from Mr. Savage; who had been unable to figure out a credible explanation of how CarbonDesk had been sourcing its clients and increasing volumes of EUAs when talking to Siv on 18 June 2009 and had then seen a steep further increase in volumes; and who had not sought or been given any explanation of such volumes by Mr. Ward at the dinner on 25 June 2009.

412. Moreover, Mr. Gygax's evidence does not explain why, having "panicked" about the legitimacy of CarbonDesk's operation, but (on his version of events) having then been reassured after CarbonDesk had provided the VAT documents requested on 1 July 2009, he did not communicate (or on his version of events, reiterate) the full details of his understanding of CarbonDesk's business model and the source of its EUAs to Mr. Savage to enable the compliance team to respond promptly to the question posed in the BlueNext letter which had arrived the previous afternoon.

413. Mr. Shain's evidence on the point was also revealing. In his witness statement, Mr. Shain had said, referring to the receipt of the BlueNext letter,

"148. At some point around this time, Mr. Gygax and I were told by Compliance that we could not stop trading and that we must continue to trade on a "business as usual" basis with all of our counterparties until further instructions were provided by the Compliance department. I cannot now recall who exactly gave me the instruction, or when it was given. It might have been Mr. Savage who gave me the instruction, or Mr. Gygax might have passed on the message to me from Mr. Savage.

The message was very clear. The purpose was to avoid any risk of "tipping off" our counterparties that the Compliance team was investigating our EUA trading. The explanation from Mr. Savage was that "tipping off" was a potentially criminal act and the risk of "tipping off" a counterparty was greater than any potential risk of carrying on trading. I understood that failure to abide by the regime would have personal consequences for me. I cannot recall exactly when Mr. Savage gave us these instructions.

149. I have a recollection of a discussion with Mr. Savage where he informed me that I could ask general questions of CarbonDesk to better understand their customer base, without risk of tipping off. I believe that in response to this, I made some general enquiries of Mr. Ward concerning CarbonDesk's client base. I recall Mr. Ward saying something to me to the effect that his clients were using VAT to fund their trading activities, referencing the fact there was a delay between them receiving the VAT on sales of EUAs and having to account for the VAT received to HMRC and that, in this way, their cash- flow position was assisted. I recall reporting this information to Mr. Savage, Mr. Gygax and James Duncan (VAT Accountant, RBS SEEL)."

414. Mr. Shain was asked about this evidence in cross-examination,

"Q. … what questions did you think Mr. Savage had in mind that you should ask that hadn't been asked at the dinner?

A. This is in line with what I was saying right at the beginning of my statement – my session here, that through the accounting pointing us out the FX loss from the VAT cashflows, we became aware that we had an FX exposure on VAT cashflows from the emission trades as well as paying out all this VAT, and it was around this time when we were on the tipping-off regime and we have received the BlueNext letter and I'm kind of possibly piecing things together now, now I'm aware of the VAT, and that's why I'm going back to Jay to find out about what's going on and that's when I had, I think, a response from Jay about his clients buying and selling to accumulate VAT to fund their trading activities and I have then gone straight to Compliance with that and you can see it in Chris Savage's SAR report, which I have never seen before until I have been shown the documents, and in that SAR report he gives the exact same description of what's going on that I had got from Jay in July, whilst we were on the tipping-off regime and we were under strict instructions to carry on.

…..

Q. … can you tell me why Mr. Savage would have asked you to ask questions about CarbonDesk customer base if you and Mr. Gygax thought you knew what CarbonDesk customer base was as a result of the dinner?

A. Because now we have reported the volumes, we have had the BlueNext letter. We are on the tipping-off regime. We realise this whole thing might be related to VAT carousel fraud. I've seen there is a big VAT cashflow and FX exposure. I'm trying to understand what's going on here. So I'm having a conversation with Chris about this whole thing and he is saying you can ask questions without tipping-off. It's different – we are in a different situation now to where we were a week ago.

….

Q. … What did Mr. Ward's response tell you about CarbonDesk's client base?

A. That it could be dodgy at this point. And that's why we raised the SAR report.

Q. So not industrials?

A. Yes. At this point, yes.

Q. Yes. So at this point you're understanding from Mr. Ward that CarbonDesk's clients are not industrials?

A. It's a different explanation to what he had given me before, yes.

Q. And did you make the point to anybody that it was a different explanation to what Mr. Ward had given you before?

A. I don't remember if I made that point or not.

Q. Well, it's a pretty big point, isn't it, that as a result of the dinner –

A. Up until this point Andy had been dealing with Compliance and I was not filled in on the details. At this point we are both on the tipping-off regime. I was talking to Chris, I had realised about the VAT implications of the businesses and we had a loss that I had to deal with management on that and I'm asking my own questions now."

415. A number of points arise from this cross-examination. First, Mr. Shain accepted that after receipt of the BlueNext letter "we" realised that "this whole thing" might be related to VAT carousel fraud. Although he sought to explain this realisation by suggesting that he had only just "realised about the VAT implications of the businesses", for reasons that I have explained, I do not believe that this was so: Mr. Shain had been aware of the implications of VAT for his emissions trading for some time.

416. Secondly, there is, in fact, no documentary evidence to support Mr. Shain's claim that shortly after the receipt of the BlueNext letter and Mr. Savage having cautioned the Traders against "tipping off", Mr. Savage agreed to Mr. Shain asking questions of Mr. Ward about CarbonDesk's customer base. That is itself telling: if Mr. Savage had actually been told that Mr. Shain was planning to start asking questions of CarbonDesk about its customer base when "tipping off" was a possibility, Mr. Savage would either not have been prepared to countenance such actions at all, or would surely have been very concerned to understand, agree and record precisely what Mr. Shain was going to ask.

417. Thirdly, there is also no evidence, either documentary or on tape, that Mr. Shain actually had such a conversation with Mr. Ward at any time. There are a number of transcripts of calls between Mr. Shain and Mr. Ward on or about 1 July 2009, but none include a conversation of the type referred to by Mr. Shain.

418. Fourthly, although Mr. Shain sought to suggest that his alleged conversation with Mr. Ward was reported to Mr. Savage and reflected in Mr. Savage's IMLSR, the text of the IMLSR does not actually support that contention. The relevant paragraph of Mr. Savage's IMLSR read,

"Our concern is that the increase in volumes may be caused by a volume increase as companies/persons use the additional VAT receipts generated as a financing source which in turn could in the present economic environment give rise to an increased risk of default and loss of VAT revenue."

That paragraph does not suggest that it is based upon a direct conversation with Mr. Ward in which he told Mr. Shain what (some of) his clients were seeking to achieve by their trading. Instead it is speculation, couched in tentative terms, expressing "concern" on the part of Mr. Savage as to what CarbonDesk's clients might be doing.

419. In addition, the first draft of Mr. Savage's IMLSR contained the same paragraph as appeared in the final version, and was prepared and circulated by Mr. Savage at 14.46 hrs on 1 July 2009. Accordingly, if Mr. Shain's claim was correct, he must have cleared his intention to have a conversation with Mr. Ward with Mr. Savage, have then had that conversation with Mr. Ward, and reported it back to Mr. Savage within a very short timescale after receipt of the BlueNext letter in the late afternoon of 30 June 2009. That is implausible and simply does not fit with Mr. Savage's evidence as to what he did after receipt of the BlueNext letter.

© 2025 Thomson Reuters. 

Bilta (UK) Ltd (In Liquidation) v Natwest Markets Plc, 2020 WL 01169967 (2020)

420. Fifthly, the paragraph of the IMLSR does not in any way reflect the point put to Mr. Shain in cross-examination, for which, in my judgment, Mr. Shain had no coherent or credible answer: namely that if Mr. Ward had indeed provided such an explanation to Mr. Shain, this would have been recognised by all concerned as a major change in the explanation that Mr. Ward had given to them at the dinner on 25 June 2009, and which, on their case, they had reported to Mr. Savage. Mr. Shain was asked about this in his cross-examination,

> "A. Okay, I agree that the explanation [Mr. Ward] gave me would not imply industrials but I can't tell you whether that explanation was about all his clients or about some of them. In any case, I've reported it.
>
> Q. Well, if we proceed on the assumption that you did report it
>
> –
>
> A. We did because you see it in the SAR reports.
>
> Q. – one would have expected you to say, "I have been told by Mr Ward that his clients are traders and the volume is a consequence of VAT funding but I'm troubled because that's not the explanation he gave me before."
>
> A. Well, I don't know if I said that or not but even if I didn't, wouldn't Andy – Andy was the one speaking to Compliance; wouldn't he have told him what he had been told? I'm just telling him what I found out on that day.
>
> Q. Well, I'm putting to you that if you were telling Mr Savage what you had found out that day, you would also, if this was a true account, have pointed out to Mr Savage that it's contrary to what Mr Ward had previously told you?
>
> A. Essentially, I could have pointed it out but I think it's quite fair for me to assume that I knew Andy would have said that already because Andy was dealing with Compliance and Andy was under the impression or had been told by Jay that they were industrial clients and I think it's quite reasonable to assume he already told Chris all that information. I'm just passing on new information."

421. Mr. Shain's explanation as to why he would not have pointed out the change in Mr. Ward's explanation of his clients' activities was incoherent. If Mr. Shain had been sufficiently motivated to make inquiries of Mr. Ward at all for the reasons that he gave, it is inconceivable that he would not then have thought fit to draw that significant change in CarbonDesk's explanation for its business to the attention of Mr. Savage and Mr. Gygax.

422. Sixthly, Mr. Shain's account of a conversation with Mr. Ward is also not supported by the terms of Mr. Savage's Summary Overview provided to Ms. Aspinall on 2 July 2009, in which he remarked,

> "The trading currently has only been for the last 2-3 weeks and therefore we are unable to draw any conclusion as to whether the clients are trading certificates they hold [or] are using certificates they have recently purchased in the market."

The simple point is that even by 2 July 2009, Mr. Savage was no further forward in his understanding of the nature of CarbonDesk's clients or their sources of EUAs. His Summary Overview document certainly shows no signs of having been informed by any information from Mr. Shain arising out of a conversation with Mr. Ward that Mr. Savage had authorised.

© 2025 Thomson Reuters.

423. Finally, as regards the knowledge of the Traders during this period, I should refer to the evidence concerning the email sent by Mr. Gygax to Mr. Walter (copied to Mr. Shain) on 1 July 2009 which asked Mr. Walter to instruct Mr. Savage to provide an exculpatory email to the Traders.

424. I have set out the full text of that email in paragraph 106 above. The email referred to the discovery that morning that CarbonDesk had provided an erroneous VAT number as having "spark[ed] a scare that they were about to do a runner with our VAT payment." The email then stated that Mr. Savage was writing a report to RBS compliance on the issue and concluded,

> "Where we are now is approximately where we were yesterday, some questions about the counterparty, but have been advised to continue as business as usual and await further guidance.
>
> Throughout this process I have asked for an e-mail from compliance to clarify that we (Jon and I) have raised all the questions and continue to trade following compliance sign off. Without which, Jon and I are feeling a little uncomfortable now. Can I ask that you support this request and get this e-mail issued to us from the compliance team? To date we have had nothing but words claiming that they are grateful for our efforts in providing clarity on the counterparty and broader concerns within the market, and that they are happy we have done all that we should."

425. When asked in cross-examination about this email, Mr. Gygax denied that the "process" to which he referred was that which had taken place on 30 June and 1 July. Instead he sought to suggest that the Traders had been raising questions with the compliance department for weeks, and that the email was to cover all of the trading which RBS had done with CarbonDesk from the first week in June,

> "Q …."Throughout this process" is simply a reference to what has been happening since BlueNext became involved?
>
> A. No.
>
> Q. And there is no reference here to your having raised anything with Mr. Walter previously.
>
> A. That's not correct. Mr. Walter would have been aware from the very first rumour story that I'd liaised with Compliance.
>
> Q. You say:
>
>> "…I have asked for an email from Compliance to clarify that we (Jon and I) have raised all the questions and continue to trade following Compliance sign-off."
>
> You are talking here about the process which has resulted in Compliance giving the tipping-off direction are you not?
>
> A. I remember this email and I remember having repeatedly asked for something from Compliance throughout the whole process. So even if it relates singularly, it's meant to capture everything, the entire period.

MR JUSTICE SNOWDEN: You talk about repeatedly asking for something from Compliance throughout the whole process.

A. Yes.

MR JUSTICE SNOWDEN: Over what period of time are we talking about?

A. I believe that I'm referring this right the way back to the whole process being from the first week of June or whenever the first headlines happened, right the way throughout the whole process. That's what – that's what my memory is of talking to Mr. Savage and as we rolled through the increasing volumes, the Compliance – the FSA issue. That's what I remember talking to Mr. Walter about."

426. This evidence seemed to me to suggest that the Traders had been sufficiently concerned to seek an exculpatory email from their compliance department to cover their increasing volume of trading with CarbonDesk from the earliest times after headlines appeared in the trade press relating to VAT fraud and BlueNext. If true, that would have been highly significant. I therefore sought to make sure I had understood Mr. Gygax's evidence,

"MR JUSTICE SNOWDEN: I just need to get [this] straight. Are you saying that from the first week of June, or whenever the first headlines happened, you were asking Compliance for an email to clarify that they were happy with your trading with CarbonDesk?

A. No, not – sorry, that was a misunderstanding. My reference to wanting an email spans the whole period. I can't remember the exact first request, whether it would have been around mid-June, whether it had been when we were told there was no fraud, whether we asked to just confirm stuff and then, as we continued through the process of volumes, that it became clear trying to get anything out of Mr. Savage was very difficult. So when the VAT number issue came up, I have naturally asked Mr Walter if he could support this because otherwise, without anything, it doesn't look good for us.

…..

MR JUSTICE SNOWDEN: So am I to understand now that you are saying that you were or you weren't asking from the time that the first headlines appeared about –

A. No, I wasn't asking – apologies. I wasn't asking for anything when the first headlines come out but when I'm asking for something from Compliance, it's to capture everything, to say that we have raised various things.

….

MR JUSTICE SNOWDEN: So let me just ask you my question again then: when did you first ask Compliance for an email?

A. I believe that the first marker point most likely would have been around the 17th, when I was told there was no fraud or, if not, after that, with reference to that. That's my belief.

MR PARKER: You've just made that up, haven't you, Mr. Gygax?

A. No."

427. This evidence from Mr. Gygax was not credible. Mr. Gygax's email of 1 July 2009 made no reference to any events in early or mid-June, but referred simply to the events of the morning of 1 July and of the day before. In context, the natural meaning of his reference to "this process" in the email referred only to the process mentioned in the earlier part of the email

© 2025 Thomson Reuters. 

and which had been followed since receipt of the BlueNext letter. Mr. Gygax's evidence that he had been repeatedly asking Mr. Savage for an exculpatory or confirmatory email was also unsupported by any documentary evidence, and was contrary to Mr. Savage's evidence.

428. In my judgment, this evidence was a disingenuous attempt by Mr. Gygax to reinterpret a request for an email covering only the actions of the Traders after receipt of the BlueNext letter, as a request for an email covering a much longer period. I consider that Mr. Gygax sought to advance this evidence in order to support his case that the Traders had been keeping Mr. Savage informed concerning their trading with CarbonDesk from 17 June 2009. I also consider that Mr. Gygax swiftly changed his evidence as to the date upon which he had supposedly first asked for such an email, from the start of events in the first week of June to the 17 June, when he realised the implications of what he had said – namely that the earlier date did not fit with his story of only having approached Mr. Savage with concerns and having been given a clean bill of health by him on 17 June.

429. I consider that the email of 1 July 2009 was prompted because the high levels of trading with CarbonDesk had come to the attention of the surveillance team at BlueNext and the compliance department at RBS, and this presented the Traders with a dilemma. The Traders plainly suspected that the trading was connected with a VAT carousel fraud, but because they had not previously reported any concerns to Mr. Savage or told him what they suspected, he had told them that they had to continue trading in the same way ("business as usual") to avoid committing the criminal offence of tipping off. The Traders were therefore between a rock and a hard place: carry on trading which they appreciated could facilitate further VAT fraud, or refuse to trade (or artificially reduce their trading) with CarbonDesk and risk committing a criminal offence by tipping-off. The email Mr. Gygax asked for was designed to absolve the Traders from any blame from the time at which Mr. Savage gave his "business as usual" instruction and in relation to their continued trading.

**Trading until 3 July 2009**

430. After receipt of the BlueNext letter, the Traders carried on trading as before, leaving Mr. Savage and the other members of the compliance and legal teams to check the trading volumes for themselves, to speculate about the source of CarbonDesk's EUAs, and eventually to come to a conclusion on 3 July 2009 that there was a real risk that CarbonDesk was involved in an MTIC fraud as a result of the connection made with the payments through ISK.

431. Although the Claimants criticised the Traders for failing to take steps that might have enabled them to reduce the level of trading on and after 1 July (e.g. by pretending to be absent from work) and even for facilitating trading (e.g. by arranging for cover for the 4 July holiday in the US) it seems to me that this makes no real difference to the case. That is because, for the reasons that I have just explained, when Mr. Savage gave the immediate instruction following receipt of the BlueNext letter that the Traders should continue to conduct "business as usual", it is clear that he had no accurate idea of the rise in trading volumes and had not been given anything remotely resembling a full and frank account by the Traders of their dealings with CarbonDesk. As is evident from his subsequent IMLSR and Summary Overview documents, Mr. Savage was in no position on 30 June 2009 to express any informed view, and did not express any informed view, as to propriety of CarbonDesk's business or the trading which it had been conducting with the Desk. All Mr. Savage was immediately concerned to do was to ensure that the tipping off rules were not breached whilst investigations proceeded.

432. As such, it seems to me that the giving of that "business as usual" instruction to the Traders by Mr. Savage changed nothing. Specifically, if the trading up to that point did not amount to dishonest assistance because the Traders were not acting dishonestly, then nothing in Mr. Savage's instruction could conceivably affect their state of mind so as to make it dishonest. But if the Traders had already been deliberately turning a blind eye to the fact that the trading with CarbonDesk was part of a VAT fraud, then an instruction to carry on "business as usual" from a person to whom they had not made full disclosure, and who plainly did not know the full facts, could not possibly legitimise continuation of that impropriety.

433. Picking up the point that I left unanswered in paragraph 224 above, I also do not accept RBS's submission that the giving of the "business as usual" instruction by Mr. Savage meant that from 1 July 2009 it was Mr. Savage's state of mind rather than that of the Traders (and in particular Mr. Gygax) which should be attributed to RBS for the purposes of determining liability for dishonest assistance. The fact is that it was still the Traders and not Mr. Savage who were making the trading decisions that bound RBS to the relevant contracts. In contrast, Mr. Savage was a compliance officer at RBS SEEL, who did not speak for RBS, and had no authority to bind RBS. It would, in my judgment, not be in accordance with the policy and purpose behind attribution in the case of dishonest assistance and knowing participation in fraudulent trading if the relevant knowledge and state of mind of the persons who were still making the trading decisions on behalf of the corporate actor could be displaced by the mindset of someone who had no authority from RBS to enter into any transaction, who did not know the

© 2025 Thomson Reuters.

full facts surrounding the trading, and who essentially followed a procedure designed to ensure that any wrongdoers would not be tipped off whilst an investigation took place to discover the true position.

**H. Conclusions on Dishonesty**

434. I therefore turn to consider whether, in light of my findings as to the knowledge of the Traders and the events that occurred, the Claimants have made out their case that the Traders dishonestly turned a blind eye to the fact that their trading with CarbonDesk was part of a VAT fraud.

435. I have found that, contrary to their evidence, the Traders were well aware at all times that VAT was chargeable on their spot trades of EUAs with CarbonDesk. I have also found that Mr. Gygax was aware at the time of the market commentaries which expressed the view that much of the trading on BlueNext prior to its closure had been attributable to VAT fraud in France, and that when the French government removed VAT on such trades, the volumes of trading on BlueNext had fallen dramatically.

436. Thereafter, on 11-12 June 2009, immediately prior to the upsurge in trading between CarbonDesk and RBS, Mr. Gygax had been sent and had discussed with Mr. Savage documents which clearly explained the nature of VAT carousel fraud and the possibility that it might be committed using OTC emissions trading in the UK. I have also found that, contrary to Mr. Gygax's evidence that he did not understand these documents or why they were relevant to the Desk's trading, he must have understood the documents concerning VAT carousel fraud and their relevance to the trading for which he was responsible as head of the Desk.

437. When Mr. Shain returned to work on 15 June 2009, I have no doubt that Mr. Gygax discussed all of these matters with him. It would have been the natural thing for him to do and Mr. Gygax would have been failing in his duties as head of the Desk if he had not ensured that Mr. Shain was up-to-date on the events that had occurred in his absence.

438. The volume of trades with CarbonDesk increased significantly after 15 June 2009, and within a few days Mr. Gygax and Mr. Shain had appreciated that there was something going on which raised questions. The conversation between Mr. Gygax and Siv on 18 June 2009 makes it absolutely clear that the Traders had been asking themselves, but were unable to answer, how a small and recently formed company such as CarbonDesk could possibly have found and onboarded sufficient industrials/compliance companies to provide the volumes of EUAs that they were seeing. This was also a question that Siv told Mr. Gygax he had looked into, but was unable to answer.

439. Although, by 18 June 2009, Mr. Gygax and Mr. Shain had already appreciated that there was something unusual about their trading with CarbonDesk, I am not persuaded that they had, by that stage, a clear suspicion that it was connected to VAT fraud. Perhaps more importantly, I am also not persuaded that by that date the Traders had made a conscious decision not to report such suspicions to compliance or make further inquiries for fear of what they might discover.

440. Although unusual, the volumes over the relatively short period from 15-17 June 2009 were not yet so consistently large that they might not have a legitimate explanation, based upon CarbonDesk having found a sufficient number of smaller compliance companies with EUAs to sell. That was the premise of the discussion between Mr. Gygax and Siv on 18 June 2009, and to my mind the tone and content of that conversation is one of genuine bemusement as to how CarbonDesk were obtaining the volumes seen from such sources. If Mr. Gygax actually suspected VAT carousel fraud was involved in the trading the Desk was doing, and in particular if he had deliberately decided not to inquire further by that stage because he did not want to know the answer, I see no reason why he should have sought to float the questions and ideas that he did with Siv.

© 2025 Thomson Reuters. 

441. However, the volumes sold by CarbonDesk to RBS continued to increase significantly for the rest of that week and into the next. By the end of trading on 24 June 2009 trading had reached levels, both daily and cumulatively, that would have been regarded as wholly exceptional, even for a much larger and more established emissions trading operation than RBS.

442. There can, I believe, be no real doubt that by this stage any reasonably attentive trader who had already been questioning the significant but lower volumes that the Traders had been seeing at the start of the previous week, would have had the most acute suspicions about CarbonDesk's business, and how it was obtaining a seemingly unending source of large volumes of EUAs to sell to RBS.

443. That conclusion is, I believe, consistent with and supported by the expert evidence. It was certainly the view of Mr. Redshaw (for the Claimants) whose evidence was that a trader would have been suspicious and made a connection with VAT fraud much earlier. But I consider that it is also consistent with the evidence of Mr. Kanji (for RBS SEEL).

444. Mr. Kanji's report stated,

> "In my view, the volumes that CarbonDesk traded with RBS Sempra to this point [the end of Wednesday 24 June 2009] were too large to solely represent selling by CarbonDesk's clients of an excess of allowances caused by business slow down. However, there were specific strategies that were widely accepted in the market, which could have resulted in a Compliance Company (who in this case would have been CarbonDesk's client) transacting these kinds of volumes."

445. Although Mr. Kanji then went on to give examples of such strategies by compliance companies (e.g. selling allowances in full for cash-flow purposes at a time when credit was difficult to obtain) he in effect concluded that by the end of Wednesday 24 June 2009, as an experienced trader he would have appreciated that such strategies could not account for the volumes that had been seen. In particular, he pointed out that even among the very large compliance companies from the utility sector and the steel and cement industries, there were very few companies which could have sold volumes of the scale in question over several consecutive days. It will, of course, be appreciated that at no time (e.g. in Mr. Gygax's conversation with Siv) had the Traders ever suggested that they thought that such very large compliance companies could be among the clients of CarbonDesk.

446. Moreover, Mr. Kanji's evidence was also that by the end of Wednesday 24 June 2009, he would have appreciated that such cumulative volumes could not have been coming from a large number of small compliance companies, for the simple reason that this volume of small business would be too difficult to source and coordinate. That was, of course precisely the difficulty which had been identified by Siv and Mr. Gygax in their conversation a week earlier on 18 June 2009 when Siv told Mr. Gygax of his experience in having called around a number of such companies.

447. Accordingly, although Mr. Gygax might have thought that CarbonDesk acting for a number of smaller compliance companies could have been a legitimate explanation of the volumes that he had seen at the time of his call with Siv on 18 June, I do not think that he could conceivably have remained of that view a week later when the volumes were very significantly larger, both on a daily basis and cumulatively.

448. Mr. Kanji's evidence was that at this point a thoughtful trader, although not necessarily concluding that CarbonDesk's business was connected with any VAT fraud, would have used the dinner which had been arranged with CarbonDesk to ask questions and gain more information about CarbonDesk's trading activity. His written evidence continued,

> "It was timely therefore, that RBS Sempra and CarbonDesk had arranged a dinner for Thursday 25 June at which the Traders could ask those questions and gain more information about CarbonDesk's trading activity. In my experience, an occasion such as this would be a good opportunity to ask questions. It naturally made sense to want to speak in person, and furthermore, I would have wanted to meet the people I had been doing this amount of business with.
>
> In addition, a dinner or meeting was the best way to have a full, in-depth discussion. Traders were generally busy and so to have anything more than a minute or two's conversation on the telephone with a client during the working day about matters other than the direct trade being considered was generally unviable. At Barclays, we regularly organised dinners with clients and counterparties to gain this kind of information and found these occasions useful in developing our understanding of what was happening in the market and discovering the views others held on it.
>
> The kinds of questions that I would have expected RBS Sempra's traders to ask would include those aimed at ascertaining how CarbonDesk had managed to build such a large business, the source of the EUAs it was trading (without expecting specific company names to be divulged), why the EUAs were being sold and how long the selling was likely to continue. However, as I have already discussed, there would have been some sensitivity surrounding many of these topics and CarbonDesk themselves would not necessarily have received answers from their clients to similar questions. In addition, traders would not want to be seen to be trying to "muscle in" on an aggregator's business, which is the impression that could have been given should traders continually probe them for information about their client base and their view of the market. Enquiries of this kind had to be delicately managed and it was easier to do that in a face-to-face setting over a meal and/or drinks, than on the phone in the middle of a working day."

449. I certainly agree that to use the dinner on 25 June 2009 to ask the type of questions that Mr. Kanji identified in his report would have been the entirely natural thing for any reasonable trader to have done. The high volume of trading that the parties had been doing had reached an all-time high that very day with almost 4 million EUAs sold by CarbonDesk. In the ordinary course of events, I would regard it as entirely natural and indeed inevitable that the Traders would have thought to ask those questions, including in particular asking in general terms the source of the EUAs that CarbonDesk was trading, and more importantly for the purposes of their own business and profitability, how long the selling was likely to continue.

450. However, as I have explained, it is clear to me that neither of the Traders asked the questions at the dinner that it would have been entirely natural for them to ask. Given the unprecedented levels of trading that had been done, for the Traders not to have used the dinner that evening as the ideal opportunity to find out more about CarbonDesk's business, and in particular to identify, in general terms, the source of the very large numbers of EUAs that they were trading, can, in my judgment, not have been due to mere omission or inadvertent oversight. In my judgment it can only have been the result of a deliberate decision on their part not to do so.

451. I also consider that there can only be one plausible explanation for such a deliberate decision not to inquire. I find that the reason that the Traders did not ask questions of CarbonDesk at the dinner was that they had a clear suspicion that the EUAs that they were being sold were connected with VAT carousel fraud, but they decided together that it would be best not to ask and thereby risk learning the truth behind the extraordinary levels of very profitable trading that they were doing.

452. In my judgment, both of the Traders' evidence to me to the contrary was untrue and designed by them to conceal that fact. Specifically, I consider that the Traders' evidence that neither of them appreciated that the spot trading that they were doing with CarbonDesk incurred VAT was totally implausible, as was Mr. Gygax's evidence that he had discussed the events on BlueNext and the materials concerning VAT carousel fraud with Mr. Savage and others without either understanding even the basic concept or its potential relevance to the Desk's trading. In my judgment, that evidence was designed falsely to suggest that there was no reason why the Traders should have made the connection between the increased trading they were seeing and the possibility that it was connected to VAT fraud.

453. Likewise, Mr. Gygax's evidence that he had been given an assurance by Mr. Savage on 17 June 2009 that the UK emissions market was free of fraud, the evidence that the Traders had kept Mr. Savage regularly informed of their trading with CarbonDesk and had consulted Mr. Savage before the dinner on 25 June 2009 as to what questions to ask of CarbonDesk, the evidence that Mr. Gygax had asked questions of Mr. Ward at the drinks before dinner and had received a plausible explanation of CarbonDesk's business model and source of EUAs, and that he had reported this subsequently to Mr. Savage were all, in my judgment, a fabrication.

454. I was particularly struck in that regard by the vagueness of both Traders' evidence as to what occurred in the run-up to the dinner and at the dinner on 25 June 2009; by the implausibility of Mr. Gygax's evidence that even though he was new to the Desk and obviously keen to build its business, he did not bother to inquire at the dinner whether the extraordinary volumes of trade that the Traders were experiencing with CarbonDesk might continue; and by Mr. Shain's apparent lack of any interest in finding out what Mr. Gygax had discovered at the dinner, or himself to ask any questions of Mr. Ward throughout a long night socialising together.

455. The Traders' evidence was also fundamentally undermined by the total lack of any documentary record to support any of their story which, according to the Traders, was played out under the gaze of Mr. Savage who, in my view, had been assiduous to ensure that the Traders understood the risks of VAT carousel fraud after the events on BlueNext in France only a few weeks earlier and would have been bound to document any concerns brought to him in that regard.

456. In closing submissions, Mr. Wardell QC and Mr. MacLean QC accepted that it was unlikely to be correct that Mr. Gygax had been told by Mr. Savage that there was no fraud in the UK EUA market on 17 June 2009. Mr. MacLean QC also accepted that Mr. Gygax's evidence of remembering discussions with Mr. Savage and, in particular, of having discussions with Mr. Savage in the week of 22 to 26 June 2009 was not accurate. Both Defendants' submitted, however, that such evidence had been honestly given by Mr. Gygax, who was simply mistaken in his recollection. They submitted, for example, that Mr. Gygax's evidence that he had received an assurance from Mr. Savage on 17 June 2009 that there was no fraud in the emissions market in the UK might have been a misinterpretation of a remark made by Mr. Savage during consideration of the materials circulated after the closure and re-opening of BlueNext. It was suggested that Mr. Savage might have made a remark of the type which was subsequently made by Mr. Winget at the legal and compliance meeting on 29 June 2009, and with which Mr. Savage concurred, to the effect that since the French authorities had removed VAT on spot trading, the problems which had been seen on BlueNext prior to its closure hopefully should no longer be a problem.

457. I have indeed found, for the reasons that I have given, that Mr. Gygax received no such assurance from Mr. Savage about the UK market at any time. I have also found that the Traders had no discussions with Mr. Savage in the run up to, or immediately after, the dinner with CarbonDesk on 25 June 2009. I do not accept, however, that in giving such evidence, Mr. Gygax was making an honest mistake or might have misunderstood a statement from Mr. Savage of the type suggested.

© 2025 Thomson Reuters. 

458. I fully acknowledge that Mr. Gygax (and Mr. Shain who supported him in his evidence) were giving evidence a considerable time after the events in question. I also acknowledge that there can be a tendency, alluded to by Leggatt J in *Gestmin* and explored in many other texts, that witnesses may, entirely honestly, persuade themselves after the relevant events that they actually did things that they subsequently realise they should have done; or that reconstructing events by reference to contemporaneous documents can create a false "refreshed" memory.

459. But the evidence from the Traders that I have found to be untrue was not limited to a few isolated events or a few issues. As I have demonstrated, such evidence was detailed, went to the heart of the case and was woven by both Traders into their account of other events. That both Traders expressly sought to corroborate each other also makes it most unlikely that their individual evidence was the product of genuine error or a "refreshed" memory on each of their parts. For example, Mr. Gygax professed to having a memory of having sought out Mr. Savage in the office on 17 June 2009 to ask him about increased trading volumes, then sought to rely upon having received such an assurance from Mr. Savage as a justification for having the conversation with Siv on the next day, 18 June 2009. Both Traders also gave independent evidence of recollections that Mr. Gygax kept Mr. Savage informed of trading and that he had consulted him prior to the dinner on 25 June 2009.

460. There could also be no such attempted justification for the evidence which I received as to the Traders' ignorance that VAT was payable on their spot trades with CarbonDesk. It is unlikely in the extreme that both of the Traders had genuinely, but mistakenly, persuaded himself that he had no appreciation that VAT was payable on the spot trading with CarbonDesk. It is similarly implausible that they each had genuinely persuaded themselves that they only discovered the truth, but for different reasons, on or about 1 July 2009. And I do not consider that Mr. Shain's alteration of his evidence in that regard at trial could conceivably be attributed to a genuine misrecollection.

461. In their submissions, the Defendants also relied upon a number of matters which they contended were inconsistent with a finding that the Traders had acted dishonestly. I should deal expressly with a number of these.

462. First, the Defendants relied upon a sequence of emails which commenced on 17 June 2009 with an email from Mr. Baum to various people including the Traders, Mr. Walter and Mr. Shuen concerning credit issues relating to the emissions trading. Mr. Baum set out a credit policy that had been discussed with the Traders and which, in relation to spot purchases, required RBS to have received the EUA certificates prior to making payment with a maximum exposure of 200,000 certificates outstanding at any time. The email concluded by recording,

> "I understand from Andrew [Gygax] that this business is rather profitable and that is the main reason why we are willing to accommodate trading with these small cptys and very weak credits, which under normal credit standards we would not do without some form of collateral in hand prior to trading."

463. Mr. Gygax replied a week later on 23 June 2009 accepting the principle, but highlighting a number of points. These included the following,

> "The volume threshold of 200kt does form a constraint, however one that we can work to under current market conditions. Should volumes pick up further (in particular during the Q4 selling seasons), we run the risk of passing business across to competitors and in turn run the risk of losing the relationship altogether.

© 2025 Thomson Reuters.

> The idea that we have a potential volume exposure of up to 200kt against a 3 day period for a defaulting party is understood; against this we are making solid profits on a regular basis which should equally taken into account.
>
> For commercial reasons I see absolutely no reason why this volume cannot be grown in line with profit growth from the flow business, albeit on a lagged basis to ensure a continuing robust business going forward.
>
> In practice customers deliver on a prompt time basis, as they know that accelerates their ability to get paid, and for this we are talking minutes…
>
> Just to borrow your line and put things into context, 'happy to put a couple of hundred thousand € on the line with cptys that do not justify such a limit'?; we are targeting a €lm profit for June so for me the answer is yes."

464. There were then a series of very short emails between Mr. Gygax, Mr. Walter and Mr. Baum on Friday 26 June 2009. Mr. Gygax must have informally requested an increase in trading limits, because Mr. Walter simply emailed him saying "OK with me to increase daily flow to 400-500 kt", and Mr. Baum responded asking for a general discussion on the following Monday, 29 June, for 15 mins.

465. Thereafter, on Tuesday 30 June 2009, and adding to the chain of emails that had included that on 23 June, Mr. Gygax emailed Mr. Baum, with a copy to Mr. Walter, stating,

> "We would need 500kt open limit at any given time with both Carbon Desk and Vertis. The rest of the direct customer base can remain at 200kt at any given time."

466. Mr. Walter immediately emailed back to agree, and Mr. Baum approved the request about an hour later, stating,

> "FYI, given the profitability of this business we have agreed to increase the 'open credit' volume for the below two names to 500,000 tons at any point."

467. The Defendants contend that these exchanges are inconsistent with dishonesty on the part of Mr Gygax, arguing that if he had been suspicious at this time that his trading with CarbonDesk was part of a fraud, it would have made no sense for him to be flagging the increased volumes of trading to his superiors by requesting an increase in the open credit limits for CarbonDesk.

468. Secondly, on 29 June 2009 Mr. Gygax spoke with Mr. Ward about general banking issues and offered to provide Mr. Ward with details of a "banking guru" at RBS who would be able to give CarbonDesk a recommendation about other banking issues. Later that day Mr. Gygax emailed Mr. Ward to put him in touch with Hartwig Schuen who was described as the "head

of origination" who could assist Mr. Ward to speak to the right contact within RBS for whatever business issues he had. It is suggested that if Mr. Gygax had suspicions about the trading with CarbonDesk it made no sense for him to put CarbonDesk in touch with other bankers at RBS to provide banking services.

469. Thirdly, the Defendants relied on the fact that also on 29 June 2009 Mr. Gygax emailed the account manager for RBS at BlueNext, Mr. Paran, to introduce himself as head of emissions trading, and to arrange a meeting when Mr. Paran was next going to be in London. Mr. Gygax's email commented that since he had joined RBS, "as I am sure you will be able to check, we have become one of Bluenext's largest players and liquidity supporters." It was submitted that if Mr. Gygax was acting dishonestly in relation to the trading with CarbonDesk, it would have made no sense whatever for him specifically to have highlighted this trading to the exchange.

470. Although these arguments were forcibly made and superficially attractive, there are, I think, a number of points that weaken their force. The first is that it must be recalled that dishonesty is not alleged on the basis that the Traders were themselves committing a VAT fraud or actually knew that their trading with CarbonDesk trading was part of a VAT fraud. The case is that the Traders had a clear suspicion that someone else was committing a VAT fraud, but decided not to report that suspicion or make inquiries which might have confirmed that suspicion, and decided instead to carry on trading regardless.

471. As such, this is at least two steps removed from the classic type of case in which it might be suggested that someone who is himself deliberately planning or actively carrying out a fraud would be most unlikely simultaneously to take steps that might draw attention to himself and his activities. I do not find it implausible to the same extent that a person who is not the fraudster himself, but who only has a suspicion about the conduct of another person, or even a suspicion which he has decided to ignore, should simply carry on his own business in the ordinary course.

472. Context is also important. So, for example, the original debate about the Desk's open credit limit for trading with CarbonDesk took place as part of a general review of the credit risks and limits for emissions trading before the trading with CarbonDesk took a significant increase. When Mr. Gygax made his arguments on 23 June 2009 he did not draw attention to CarbonDesk, but was simply arguing in technical terms based upon the process for trading EUAs why credit limits should not be set too low in relation to emissions trading. Moreover, even when Mr. Gygax asked for a specific increase in the limits for CarbonDesk and Vertis on 30 June, the primary focus was on open credit limits and credit risk rather than the actual volumes of trading that were being done.

473. It would also seem from the speedy manner in which the approvals were given that there could not have been any real expectation that there would be a detailed investigation into the Desk's trading by Mr. Baum or Mr. Walter given that the basic principles had been accepted in relation to credit risk. And it is notable from Mr. Gygax's arguments in his email of 23 June that his focus was on achieving his profit target for June, and from Mr. Walter's email to him on 26 June congratulating him on a "Great job cracking the 4 mil usd mark" that the focus of Mr. Gygax and Mr. Walter at the time was on the profits generated by the Desk.

474. A similar point can be made in relation to the approach to Mr. Paran at BlueNext. According to Mr. Gygax's evidence, the purpose of his email on 29 June was to follow up on an earlier conversation which he and Mr. Paran had had in the week commencing 22 June 2009, to see if he could negotiate a reduction in the fees that BlueNext were charging RBS on its sales of EUAs on the exchange. Pointing out to Mr. Paran, who was an account manager, that RBS was selling large volumes of EUAs on the BlueNext exchange would not directly draw attention to how or why RBS had acquired those EUAs through OTC transactions. It would not, for example, have been apparent to Mr. Paran that a substantial proportion of the EUAs that RBS was selling had been acquired by OTC purchases from the same small intermediary. Mr. Paran's focus as an account manager

© 2025 Thomson Reuters.

for BlueNext would have been on building the business of the exchange, and as such there would have been no obvious reason why Mr. Gygax would have expected him to have been interested to inquire into RBS's trading off the exchange.

475. That, indeed, was how events transpired. It was Mr. Gygax's evidence that he did not expect BlueNext to respond to his overture to Mr. Paran by sending back an email asking for an explanation as to the source of RBS's volumes sold on the exchange: and when Mr. Paran did respond later on 29 June it was simply to thank Mr. Gygax for his support and trust, and to acknowledge, without comment, that "Indeed, [RBS SEEL] has become a major component of our [i.e. BlueNext's] trading activity."

476. It is also notable that when the BlueNext letter was sent to RBS the next day, it was sent by the head of operations at BlueNext to Mr. Vanhaesendonck and Mr. Shain, rather than to Mr. Gygax, and it was not copied to Mr. Paran. The BlueNext letter also made no mention of Mr. Gygax's communications with Mr. Paran, and gave no indication that it was in any way connected with, or prompted by, Mr. Gygax's email to Mr. Paran.

477. Mr. Gygax's introduction of Mr. Ward to Mr. Schuen on 29 June 2009 also does not seem to me to support the weight that the Defendants sought to place upon it. The communication with Mr. Schuen seems to have been at a very high level of generality, and nature of the other banking issues for which Mr. Ward might have sought Mr. Schuen's assistance were not identified. Even putting aside the point that I have made above that this is not a case in which it is alleged that the Traders were themselves planning or conducting a fraud, there would be very little reason for Mr. Gygax to think that introducing Mr. Ward to Mr. Schuen in relation to other banking issues would result in any greater scrutiny of its emissions trading business.

478. The Defendants also sought to place considerable reliance upon evidence as to the approach that other institutions, and in particular Barclays, took to emissions trading in the UK at the time. In particular, the Defendants sought to attack the credibility and objectivity of the expert evidence of Mr. Redshaw who had commented directly on what he thought that the Traders at RBS should have appreciated and done at particular points in time. The Defendants sought to establish that the traders at Barclays under Mr. Redshaw's supervision had traded large volumes of EUAs on BlueNext and OTC in what were contended to be similar circumstances to those which Mr. Gygax and Mr. Shain faced at RBS. The arguments were effectively that if Mr. Redshaw and his team were not suspicious that they might be facilitating a VAT fraud at the time at Barclays, then neither would it have been reasonable for the Traders at RBS to be suspicious; that if the team at Barclays had thought it appropriate to carry on trading in similar circumstances, it could not be said to have been dishonest of the Traders to do so at RBS; and that it was disingenuous of Mr. Redshaw to suggest otherwise in his evidence.

479. So, for example, the Defendants sought to place reliance upon evidence that Mr. Redshaw was prepared to conduct significant volumes of trading on BlueNext on behalf of Barclays without knowing where the volumes of EUAs were originating from. The comparison was also made that Barclays was prepared to sell large quantities of EUAs to Vertis in June 2009 and carried on doing so until about 7 or 8 July 2009 notwithstanding that Vertis did not provide any clear answers to questions asked of it. Reliance was further placed on the fact that from 16 June 2009 Barclays bought increasingly large volumes of EUAs from a small intermediary company called SVS which had a substantially similar business to that of CarbonDesk, and that Barclays carried on doing so even after SVS was suspected (as was subsequently shown) to have been involved with another company in a circular sale and purchase of EUAs on 24 June 2009.

480. I shall address those examples below, but as a general observation, I found this type of evidence and argument of little assistance. My focus, according to the authorities, has been on the evidence as to the actual state of mind of the Traders at RBS, with particular reference to contemporaneous documents and their own evidence. I did not have anything like the same documentary materials or evidence as to the trading at Barclays so as to be able to make the same assessment of what

© 2025 Thomson Reuters. 

was happening there. This was, in particular, not a trial into the conduct of trading at Barclays, nor the trial of the separate proceedings that have been commenced in relation to the trading by SVS.

481. In addition, in the absence of detailed information as to the rival organisation and operations of the two banks, I have real doubts that some of the comparisons which the Defendants sought to draw with Barclays' trading were appropriate; and some of the points made by the Defendants were double-edged. So, for example, the point was made that Barclays traded more spot volume than RBS at all times during 2009 with the sole exception of the period relevant to this case. It is clear, however, that Barclays was the market leader and had a significantly more established and larger trading operation than RBS, so could naturally be expected to have traded higher volumes. In contrast, what might be said to be more significant is the fact that the only time that RBS traded more volume than Barclays during 2009 was during the period relevant to this case. That underlines just how exceptional the volumes sold by CarbonDesk to RBS in June actually were in the context of RBS Sempra's emissions trading operation.

482. As indicated above, the Defendants placed reliance upon the fact that Barclays was the largest trader on BlueNext during the period relevant to this case. They suggested that Mr. Redshaw's evidence effectively acknowledged that Barclays was prepared to buy large volumes on the exchange at a time at which there was no obvious legitimate explanation for such high volumes being available, because they could not have been due to industrial compliance companies selling. Mr. Redshaw's evidence was, in effect, that as the trading on BlueNext was anonymous he did not know from whom Barclays were buying the EUAs that they were being sold. He also said that beyond raising the issue internally and being reassured by BlueNext that the members of the exchange were fulfilling their KYC requirements, Barclays had no further information. The Defendants contended that this showed how novel the situation in the EUA market was in June 2009, and that if Barclays was prepared to continue trading on the basis of such thin assurances, it could not have been dishonest for the Traders at RBS to continue trading with CarbonDesk.

483. I do not find that argument very persuasive. The trading by RBS in issue in this case was not buying from members of a large exchange on which, by its nature, high volumes are routinely traded for a variety of reasons including speculation. RBS was buying large quantities of credits OTC directly from a single small counterparty. The two activities are different. Moreover, Mr. Redshaw's evidence that concerns were raised internally at Barclays and with BlueNext differentiates that situation from the instant case in which, as I have found, the Traders at RBS did not raise their concerns with either Mr Savage or BlueNext, but it was the exchange itself that first raised issues with RBS by sending the BlueNext letter.

484. Likewise, the Defendants relied upon the evidence given in cross-examination by Mr. Redshaw that Barclays was prepared to trade increasingly large volumes of EUAs with Vertis in June 2009. That evidence was as follows,

> "So when Vertis arrived all of a sudden, buying large volumes in the period, clearly there is a period of time where you are not really sure whether they are particularly big volumes and you are obviously not sure that they are going to continue and you don't know that it's an anomaly and this is, as I say, a longstanding counterparty of Barclays.
>
> As time progressed, the volumes got bigger and when the volumes got bigger, something was wrong. It becomes abundantly clear that something is wrong. So I called Vertis and I said: what are you trading? I can't remember their exact words. I can't remember all the questions I asked but they went along the lines of what are you trading and why are you trading it and who are your – I didn't say who are your counterparties because I know they are not going to give me the answer, what kind of counterparties have you got.
>
> And they said, don't worry, we have been through all of BlueNext's checks and we have had PwC come in and tell us how to do know your customer and I can tell you, Louis Redshaw, that all of

our counterparties pass KYC tests. Right? So they are as legitimate as any other counterparty can be, based on those tests.

So we went away and thought about it a little. In the meantime, the trading continues …The ultimate outcome of all of this was that we stopped trading with Vertis and we could have just continued. I mean you don't trade with a counterparty unless you are making a profit so we could have just continued trading with them and turning a blind eye but we figured we know there is no VAT fraud between us and them because they are in another jurisdiction. We don't understand actually there's any fraud at all but the volume is suspicious. So we turned them off

… I think, on 7 or 8 July and they implored with us to continue trading and I said at the moment, in the current environment where spot is generally suspicious, I'm not willing to continue with this trading relationship and we didn't start trading with them until the end of the year. So we did spot but it was a higher volume and we couldn't work out how there could be a fraud given that we were not giving them any VAT but we stopped trading with them nonetheless."

485. The Defendants contended that this demonstrated that Barclays were prepared to continue trading with Vertis notwithstanding that Mr. Redshaw had received no information at all in relation to his inquiries, but had simply been told by Vertis to rely upon its KYC checks and the involvement of PwC. Hence, it was argued, if Mr. Redshaw was prepared to give Vertis the benefit of the doubt on the basis of such assurances, no criticism could be levelled at Mr. Gygax for continuing to trade with CarbonDesk.

486. The fallacy in that argument is that the two situations were not comparable. In particular, the Defendants' argument depended on Mr. Gygax's evidence that he made inquiries of CarbonDesk and received seemingly plausible explanations for the source of its EUAs. But as I have found, Mr. Gygax did not make such inquiries or receive such assurances from CarbonDesk. The fact that Mr. Redshaw did make inquiries of Vertis and was, at least for a time, sufficiently satisfied with the answers to continue trading, does not assist the Defendants in a situation in which the Traders did not make inquiries of CarbonDesk.

487. Moreover, as Mr. Redshaw indicated, there is a clear factual distinction between (on the one hand) Barclays selling EUAs without charging VAT to a long-standing counterparty in another jurisdiction, and (on the other hand) RBS buying EUAs from a new counterparty in the UK and paying VAT. The risk that a transaction might be part of a VAT fraud must have been more apparent where the dealing was with a new counterparty and VAT was payable, than where it was with an established counterparty abroad and no VAT was payable.

488. Finally, the Defendants sought to rely upon Barclays' trading with SVS. That had commenced on 16 June 2009, and had continued for some time after Barclays had detected a circular trade which occurred on 24 June 2009 in which Barclays had sold 23,000 EUAs to a company called Innovative Energy and had then bought the same EUAs back from SVS about 40 minutes later. On discovery of this transaction, Barclays immediately ceased trading with Innovative Energy, but continued trading with SVS until 6 July 2009.

489. Mr. Redshaw explained that the compliance department at Barclays had been involved since the beginning of June and the trading team at Barclays had been placed under the tipping-off regime immediately after the circular transaction had been discovered on 24 June 2009. He said that it had been "easy" to terminate the relationship with Innovative Energy immediately, but that the situation with SVS, which was an FSA regulated financial services firm "required some sensitive handling". He also said that although it was obvious that there had been circularity in the trading on 24 June 2009, Barclays did not know who in the chain had been responsible for the VAT fraud. Accordingly he said that Barclays had taken steps to discourage

trading with SVS by raising its prices, and set out to investigate other transactions involving SVS using data from the EUA registry to try to track parcels of EUAs to see if SVS was involved in any other circular transactions.

490. The main criticism levelled at Mr. Redshaw by the Defendants in this regard was that he had not dealt with this situation in his expert reports and that it was relevant to his views on what the Traders at RBS should have appreciated or understood at the relevant time. In particular it was suggested that the fact that Barclays continued trading with SVS whilst it investigated the circularity of trading indicated that the general situation about VAT fraud was unclear and that even Barclays did not fully understand how VAT fraud operated at the time.

491. I do not attach much weight to those points. It seems to me that this was a very different situation from that involving RBS and CarbonDesk. First and foremost, Barclays' compliance department was involved at all times: that was not the case at RBS until the intervention of BlueNext. Secondly, so far as I can tell, the facts do not support a conclusion that Barclays was unaware that the circular transactions might have been part of a VAT fraud. Barclays seems to have been well aware of that risk because it immediately severed its relationship with Innovative Energy. The question which Barclays found more difficult to answer was whether this was a one-off (and potentially innocent) involvement of the FSA-regulated SVS in a circular transaction, or something more. In that regard, according to Mr. Redshaw's evidence, Barclays did not simply carry on trading regardless: it took steps to reduce the risk of further transactions occurring and sought pro-actively to investigate the position.

492. Finally, although it does not form a major part of my reasoning, I would also observe that the manner in which the Traders both gave evidence was, in contrast to Mr. Savage, not that of witnesses attempting genuinely to provide the Court with their unvarnished recollection. I thought that Mr. Savage was plainly attempting to give a candid account of what he could remember, was careful to indicate where he had no direct recollection, was prepared to acknowledge points where it was appropriate to do so, and generally avoided any temptation to argue the case or embroider his evidence. In contrast, each of the Traders were intent on making the points that they wished to make in support of their case and to explain their actions rather than answering the questions that they were asked candidly. A typical example was Mr. Gygax's frequent recourse to the assertion that he had obtained a clean bill of health from Mr. Savage on 17 June 2009. They were also both (and particularly Mr. Shain) frequently combative and argumentative.

493. Even allowing for the fact that the Traders' honesty was under direct attack and that the events that they were being asked to recall took place nine years' earlier, in my judgment much of the evidence of the Traders appeared to have been constructed by them to cover up what they well understood, after the event, was what they should have done but had failed to do; and more particularly to cover up what, from no later than the time of the dinner on 25 June 2009, they had decided not to do.

494. I take into account the submissions of counsel for the Defendants that Mr. Gygax and Mr. Shain were men of good character who would not have taken the risk of acting dishonestly, particularly as regards Mr. Gygax who was new to his employment at RBS SEEL. But I do not think that such points can overcome the weight of documentary and other evidence.

495. In particular, it should be borne in mind that I have not found that the Traders were fundamentally dishonest men from the start. I accept that at the start of the trading with CarbonDesk, the Traders were genuinely motivated, as good traders are, to make money and prove themselves to their employers. That was particularly so with Mr. Gygax who was new to his job and doubtless wished to get off to a good start.

496. But the evidence is that by 24 June 2009, the Traders were making very significant sums of money from rapidly increasing and sustained trading with CarbonDesk and still had no answers to the obvious question which had stumped them a week earlier of where CarbonDesk was getting its huge volumes of EUAs from. At this fork in the road, and against a

© 2025 Thomson Reuters.

background of concerns about VAT fraud spreading to the market in the UK, the Traders faced a choice of whether or not to report what was happening to Mr. Savage or ask questions of CarbonDesk to try to get answers. I have found that the Traders took the wrong road and decided that it would be better not to report their suspicions or ask questions in case they might learn the inconvenient truth and have to cease such profitable trading. This was dishonest, but it was not the conduct of men who had acted throughout with dishonest intent.

497. It follows that I am satisfied that by, at the latest, the time that the Traders went to the dinner with CarbonDesk after trading had concluded on 25 June 2009, they had deliberately decided to ignore the obvious risk that CarbonDesk's trading was connected with VAT fraud; and that by continuing to trade with CarbonDesk thereafter they acted dishonestly.

*Trading on 6 July 2009*

498. Given the point that I have made in paragraph 433 as regards Mr. Savage's instruction to carry on business as usual, that conclusion also suffices to determine the question of dishonesty as regards the trading which took place on 6 July 2009. I should, however, deal with the Claimants' contention that there is a second and independent basis upon which I should find that the trading which took place on 6 July 2009 was dishonest.

499. As set out above, the Claimants contended that in circumstances in which a decision had been taken by the legal, compliance and other personnel at the meeting at lunchtime on 3 July 2009 that trading with CarbonDesk should be suspended with immediate effect, it was dishonest for a subsequent decision to be taken that RBS should continue to trade with CarbonDesk after the weekend on 6 July 2009 in order not to risk CarbonDesk not providing it with the corrected invoices that were required for a claim to a refund of about £40 million of input tax.

500. I have set out the basic chronology of the decision that trading should cease being taken at the meeting which commenced at about 13.30 hrs on 3 July 2009 and which was attended by, among others, Mr. Savage, Ms. Aspinall and Mr. Boxall of RBS's legal department. The directly relevant part of the decision was summarised in Ms. Aspinall's email of 14.40 hrs,

> "4. Chris Savage to ensure the suspension of this business line. Sempra senior management has agreed to do this with immediate effect, blaming change of business focus arising out of integration. In effect the relationship will be exited when the business is ceased."

501. About two hours later Mr. Savage replied to Ms. Aspinall by email stating,

> "We have just been told by our VAT department that some EU40MM of invoices have the old VAT number on and are potentially at risk. We have asked for them to be reissued and been told that they will do this on Monday. We need therefore to wait till Monday before pulling the plug to protect our VAT reclaim can someone please confirm this is acceptable."

502. This email was then simply forwarded by Ms Aspinall to Mr. Boxall in the RBS legal department, and two minutes later Ms. Aspinall responded to Mr. Savage, saying,

> "Have discussed with Alex Boxall and it is OK to proceed on this basis".

503. Although the pleaded case appeared to be restricted to an allegation of dishonesty against Mr. Boxall, in their written closing, the Claimants contended that <u>both</u> the suggestion by Mr. Savage that RBS should wait until after it had obtained

the corrected VAT invoices from CarbonDesk before terminating the relationship with CarbonDesk, and the approval of that course of action by Mr. Boxall, were dishonest. They contended that this course of conduct involved RBS preferring its own interest over its duty to avoid involving itself in suspected financial crime. The Claimants submitted that the ordinary honest person would find it startling to be told that it was fine to continue to take steps that they suspected were facilitating crime, merely because it was thought that might improve their own financial position.

504. Mr. Boxall did not give evidence at the trial. The question of his attendance had been raised before the trial by the Claimants, but in the end the Defendants indicated that they would not be calling him, stating that Mr. Boxall had "sought to attach unreasonable conditions in relation to the provision of his evidence." Mr. Parker QC was critical of the Defendants for failing to ensure that Mr. Boxall came to give evidence, and he submitted that I could draw the necessary adverse inferences from Mr. Boxall's non-attendance.

505. Mr. Savage's written evidence was to the effect that whilst he was aware that there was a potential risk of VAT MTIC fraud coming to the UK, and that this was the reason why a decision had been made to exit the relationship with CarbonDesk, on 3 July 2009 he "still had no reason to believe or suspect that VAT MTIC fraud was operating in the UK EUA market". His witness statement continued,

> "161. Given the very short timescale involved in delaying implementation of the suspension of the business line i.e. between late afternoon (16:33, when trading had already ceased for the day) on Friday 3 July and Monday 6 July 2009, I did not consider that continuing to trade for another working day would create a real risk that the business would be involved in any inappropriate trading. In any event, there was going to be a delay in terminating the relationship whilst we finalised the draft of the notice to the emissions desk ….
>
> 162. In these circumstances, and given that there was a significant risk to the business in terms of the VAT reclaim position if the invoice issue was not resolved, I thought the decision was appropriate.
>
> 163. I wish to make very clear that, if on the afternoon of Friday 3 July 2009 (or for that matter, at any time) I had had any evidence that VAT MTIC fraud was, in fact, operating in the UK emissions market, I would not have been content for the trading with CarbonDesk to continue and would have said so, because by continuing trading we would be opening RBS Sempra up to the real possibility of facilitating a fraud."

506. It will be recalled that on 2 July 2009 the AML team headed by Ms. Brannigan had identified the activities of ISK as giving rise to what she described in her emails as a "VAT fraud case" or "VAT fraud type activity" where "CarbonDesk is the beneficiary". She also told Ms. Aspinall that "essentially what this is suggesting to me is that CarbonDesk are a conduit for VAT fraudsters". It will also be recalled that the same afternoon, a telephone meeting was held which resulted in an email to (among others) Mr. Savage, Ms. Aspinall and Mr. Boxall which reported that further discussions had taken place with RBS's head of AML to explain "the RBSG exposure to this potential VAT Fraud" and to set out a course of action which involved the withdrawal of banking facilities to ISK as soon as possible, further inquiries being made of HSBC concerning its customer CarbonDesk, and Mr. Savage being deputed to monitor the relationship with CarbonDesk.

507. During cross-examination, Mr. Savage agreed that the suggestion in paragraph 163 of his witness statement that he did not have any evidence that fraud was operating in the UK emissions market on 3 July 2009 probably reflected the fact that when he made the statement, he had not recalled the information about ISK which had been discussed with him on 2 and 3 July 2009.

508. In the circumstances, I cannot accept Mr. Savage's written evidence that on 3 July 2009 he "still had no reason to believe or suspect that VAT MTIC fraud was operating in the UK EUA market". Although it would seem that the precise nature of CarbonDesk's involvement was unclear, and the AML team thought that it might have been used as a "conduit" for VAT fraudsters, it is perfectly clear that the relevant teams at RBS had (at least) a strong suspicion that there had been VAT fraud arising from carbon emissions trading which had involved ISK and CarbonDesk and which had resulted in the suspicious flows of funds through ISK's accounts.

© 2025 Thomson Reuters.

509. Mr. Savage was not, however, pressed in cross-examination on the remainder of the explanation in his witness statement. In particular, he was not asked whether he now did accept that he should have objected to trading continuing after 3 July 2009, "because it would be opening RBS up to the real possibility of facilitating a fraud".

510. Instead, Mr. Savage was asked to expand upon his explanation for the concern that if the decision to cease business had been communicated to CarbonDesk before they had reissued the VAT invoices, CarbonDesk might not provide the new invoices,

> "Q. There are concerns, aren't there, that CarbonDesk trading isn't legitimate and that CarbonDesk might actually be dishonest? That's the concern, isn't it?
>
> A. The concern is that there was a – I'll use the word "potential fraud". Whether or not CarbonDesk were party to it or not, we didn't know.
>
> Q. But you were concerned they might be?
>
> A. There was a concern that somewhere along the line they were obviously involved because they are part of the channel – the process.
>
> Q. And the concern is that if they are dishonest, they won't reissue the invoices if they learn that there is no more illegitimate trading that they can do with RBS Sempra?
>
> A. That could be one reading, yes, but it's – it may well be that with the information that we had at the time, that they were – what's the word? I use the word "innocent", that they were just merely being used as well. We just could not prove one way or the other.
>
> Therefore, since we were being promised the invoices on the Monday and it was already, I think, pretty near close of business, the simplest thing to do was wait until Monday and that was communicated up and down the chain and that's what we did."

511. That was, in reality, the extent of the cross-examination of Mr. Savage on the point. It was not put to him that his view of "the simplest thing to do" was dishonest in light of the "concern that somewhere along the line [CarbonDesk] were obviously involved because they are part of the channel – the process".

512. There was also limited cross-examination of Ms. Aspinall, whose statement made it clear that she had very little direct recollection of events other than what she had been able to piece together from the documents which had been shown.

513. When Ms. Aspinall was asked about the position which had been reached on 3 July 2009 she did not accept that her view was as clear as that expressed by Mr. Rodger in his email of 3 July 2009 (that the "emissions trading market in the UK is now rotten. Basically Sempra is being targeted by carousel trading fraudsters"). She did, however, accept that there was concern that a VAT fraud had actually been taking place which the bank was investigating,

> "A. …you know, his language is not the language I would have used and I don't think I used that language at all again in my communications and I think, as we have seen in the build- up to this email, we were taking the necessary steps and investigating the matter thoroughly to look at a potential risk and see if it indeed it was more than that.
>
> Q. Well, you say "potential risk", it's potential normally means something in the future. This is arising out of actual events, isn't it? It's not a potential risk to the market; this is something that has actually happened involving RBS Sempra.

A. Well, I still disagree in terms of we were – we were in the process on this day, at the time of this email – we were still doing a thorough investigation and working together across the bank to piece it – piece it all together.

Q. Yes, but something that had actually happened. What had been ascertained, wasn't it, that a company, ISK, had been selling carbon credits to CarbonDesk, had received 40 million euros in a very short space of time and that company was actually said to be diversified into pharmaceuticals and at the same time Mr Savage had written a report that pointed out that the activities of CarbonDesk could be consistent with there being a VAT fraud. This is all about things that are actually happening, isn't it?

A. Yes, and at that time we were investigating the matter.

Q. Because people were concerned –

A. Because there was concern.

…

Q. The investigation was because of a concern that a fraud had actually been taking place?

A. And we were investigating the matter.

Q. Yes?

A. Yes."

514. Ms. Aspinall's statement said that she had no recollection of Mr. Savage's email to her seeking confirmation that it was acceptable, "to wait till Monday before pulling the plug to protect our VAT reclaim". Nor did she have any recollection of her brief subsequent discussion with Mr. Boxall in which he approved that course. Ms. Aspinall's statement suggested that she would not have regarded it as a decision within her remit or authority to make, and that she would have assumed that the decision fell to Mr. Boxall as the member of the group legal team who had been involved in the discussions. Ms. Aspinall was not challenged on that evidence.

515. Against this background, in his oral closing submissions, Mr. Parker QC altered position. He maintained his allegation against Mr. Boxall, but dropped the argument that Mr. Savage's suggestion in his email of 3 July 2009 had been dishonest. He submitted that it would be "fairly absurd" to suggest that someone who deferred to the decision of a lawyer would be acting dishonestly, and said,

"So, so far as Ms. Aspinall and Mr. Savage are concerned, they can be forgiven for perhaps a rather hasty suggestion because they were checking it with the lawyer: is this something we can do? It was a suggestion. Looked at in isolation, I said it was a dishonest suggestion but, fundamentally, because they are taking it to the lawyer, you can't sensibly say they were behaving dishonestly…"

516. Against this background, I shall deal separately with the three individuals who were involved in the decision to delay termination of the relationship with CarbonDesk.

517. As regards Ms. Aspinall, as I have indicated, no allegation of dishonesty was ever made against her and she was not cross-examined on her evidence as to her perception of her role. I therefore accept her evidence that she would simply have regarded this as a decision to be taken by others and hence not a matter to which she needed to turn her mind. The absence of any objection from her to continued trading cannot therefore be regarded as dishonesty on her part or on the part of RBS.

518. As regards Mr. Savage, I accept that he was unaware of the precise role that CarbonDesk had played in the VAT fraud that was suspected to have occurred, and which had been discussed in the meetings that he had attended. I also accept his explanation that since the decision to cease trading was taken shortly before trading closed for the day on the Friday 3 July 2009 and RBS had been promised new VAT invoices for the following Monday morning, he formed the view that it was unlikely that RBS would be involved in any inappropriate trading over that short time.

519. It might have been possible to challenge that evidence given the very high frequency and volume of trading that had been seen over the preceding days, and the likelihood that some trading with CarbonDesk would therefore occur on the Monday morning before the new invoices could be delivered. But although Mr. Parker questioned whether, given the distrust of CarbonDesk, RBS could have had any assurance that the invoices would be issued in a timely manner on the Monday, he did not follow through and put to Mr. Savage that he did not actually hold the view that inappropriate trading was unlikely to occur.

520. Nor was it put to Mr. Savage that even if he did hold the view that it was unlikely that any inappropriate trading would take place before the VAT invoices were to be delivered in the morning of 6 July, he could not honestly have thought that it was appropriate to take any such risk simply in order to protect RBS's ability to reclaim VAT. Mr. Savage plainly did think that this was at least a possible course to take because he raised it openly in his email to Ms. Aspinall – something that he was most unlikely to have done without any qualification if he actually thought that the proposal was improper.

521. Further, Mr. Savage did not simply act on his own view of matters. Instead, he took the precaution of asking for confirmation from others within RBS as to whether the view that he had formed was correct: and confirmation was then given from what was, on the face of it, a responsible senior figure who had been involved in the earlier discussions.

522. Agreeing in general terms with Mr. Parker QC's final position, therefore, in my judgment Mr. Savage's behaviour in these regards cannot be regarded as dishonest. I should say, however, that I do not accept (as Mr. Parker QC submitted) that Mr. Savage's suggestion was dishonest but that he should be "forgiven" for making it because he posed his question to a lawyer. Mr. Savage's conduct should not be sliced up in that way. On the evidence, I accept that Mr. Savage's suggestion was one which he genuinely thought was an appropriate response to the situation as he saw it, and in seeking confirmation from the other professionals at RBS that what he suggested was appropriate, Mr. Savage was in effect checking that his view met the standards of ordinary decent people. Looked at in the round, Mr. Savage behaved honestly.

523. On a point of detail, although it plainly bolsters Mr. Savage's position that the response to his question came from a lawyer, I do not think (as Mr. Parker QC submitted) that it was essential that Mr. Savage should have asked his question of a lawyer. As it happens, Mr. Savage did not in fact specify that confirmation of what he proposed should be given by a lawyer. When Mr. Savage sent his email to Ms. Aspinall, he simply asked, "can someone please confirm that this is acceptable". In my judgment it was the fact that Mr. Savage sought confirmation of what he proposed from a more senior person (as he put it "up the chain") that mattered.

524. I then turn to the decision taken by Mr. Boxall. The Claimants contend that an honest person in Mr. Boxall's position, who was aware that there was a clear suspicion that CarbonDesk had been involved in some capacity in relation to a VAT fraud relating to emissions trading, would not have taken the risk of facilitating further fraud by sanctioning a delay to the termination of the trading relationship. Mr. Parker QC also asked me to draw adverse inferences in relation to what Mr. Boxall might have said because of his unwillingness to give evidence without certain "conditions" being satisfied by RBS.

525. It is unsatisfactory that Mr. Boxall did not give evidence, and I have concerns about the very quick and informal way in which he appears to have taken his decision to give the confirmation that Mr. Savage sought. However, given the position that the Claimants took in relation to Mr. Savage, I am unable to draw the inference that Mr. Boxall must have been dishonest.

526. As a starting point in this regard, I note that it would not suffice for a finding of dishonesty that Mr. Boxall might have taken his decision carelessly or on a factual assumption that was mistaken. The only basis upon which I could reach the conclusion that Mr. Boxall was dishonest would be if no honest person in his position could have taken the view that it was appropriate to approve Mr. Savage's suggestion that RBS should delay terminating the relationship with CarbonDesk until the Monday morning.

527. In attempting, first, to understand what Mr. Boxall must have known, I infer that he must have been told by Ms. Aspinall that the request for confirmation had come from Mr. Savage. The fact that Mr. Savage had requested confirmation of his view

© 2025 Thomson Reuters. 

would not itself have alerted Mr. Boxall that there was any concern about the essential propriety of the course that he was advocating. Indeed, if anything, quite the reverse.

528. Secondly, it is also unclear to me precisely what Mr. Boxall knew of the detail of trading between RBS and CarbonDesk. Whilst Mr. Savage had been investigating the trading between CarbonDesk and RBS for a couple of days for the purposes of responding to the BlueNext letter, it is not clear to me that Mr. Boxall had been given the same level of detail of the trading relationship between RBS and CarbonDesk. His involvement seems to have been primarily prompted by the concerns raised by the AML team at RBS in relation to the activities of ISK, which then implicated CarbonDesk. It is not clear, therefore, what Mr. Boxall understood of what trading might take place between RBS and CarbonDesk on the Monday. Mr. Boxall might, for example, have made the same assumption as Mr. Savage that it was unlikely that any inappropriate trading would take place involving RBS before the replacement invoices were issued on the Monday morning – an assumption that, it will be recalled, was not challenged when Mr. Savage gave evidence.

529. It was also Mr. Savage who had been given the task of supervising the cessation of the trading relationship between RBS and CarbonDesk. As such I consider that Mr. Boxall may well have taken the view that Mr. Savage was better placed to understand the logistics and implications of the implementation of the decision to terminate the relationship.

530. Taking these issues together I am unable to conclude that Mr. Boxall must necessarily have appreciated that not "pulling the plug" until Monday morning after the replacement invoices had been received carried a real risk of RBS being involved in further VAT frauds. I therefore cannot conclude that his decision to endorse Mr. Savage's proposal was dishonest.

**I. Remedies**

531. Liability for dishonest assistance gives rise to a personal liability on the assister to pay compensation for loss flowing from the breach of fiduciary duty which he assisted.

532. The Defendants admit that, to the extent that the chains of transactions are admitted or found to be proven, the Claimant companies incurred outright liabilities to account for VAT to HMRC on the sales which they made of EUAs in those transaction chains. Mr. Richardson's evidence for the Claimants that no monies have been paid to HMRC by the Claimant companies in discharge of such liabilities was not challenged.

533. Payment of such liabilities would, in the ordinary course, have been funded by the monies paid by RBS to CarbonDesk and then passed along the chain. On the basis that such monies were received by the Claimant companies but then misapplied by their directors (or in the case of Inline permitted to be diverted by Northumberland prior to receipt) in amounts equal to the unpaid VAT liabilities, the Claimant companies claim compensation for loss in amounts equal to those VAT liabilities which they incurred to HMRC but which were not satisfied in respect of the admitted or proven transaction chains.

534. I accept that approach to the quantification of loss, which was not seriously challenged by the Defendants.

535. Under Section 213 , the Court may order such contribution to the insolvent company's assets as it thinks proper. The liquidators seek contributions in the same amounts as in respect of dishonest assistance, i.e. in the amount of the Claimant companies' unpaid VAT liabilities arising from admitted or proven transaction chains.

536. Again, it was not seriously disputed, and I accept that compensation in those sums reflects the loss caused to the Claimant companies' creditor (HMRC) by the carrying on of the companies' businesses with intent to defraud or for a fraudulent purpose to which the Defendants were knowingly parties, and is therefore appropriate.

© 2025 Thomson Reuters.

537. To avoid double recovery, the liquidators have confirmed that they do not seek contribution under Section 213 to the extent that the Claimant companies receive equitable compensation for their losses pursuant to their claims for dishonest assistance.

**J. The Transaction Chains**

*General approach*

538. In evidence that was not materially challenged, the liquidators of the Claimant companies set out factual evidence concerning the corporate characteristics and involvement of the Claimant companies in the commission of VAT MTIC fraud.

539. The RAPOC contained an Appendix which set out the 445 transaction chains which the Claimants contend included the trading done by RBS with CarbonDesk and GW Deals.

540. Consistent with the then evidence of their expert, Ms. Hughes, the Defendants' initially admitted 99 of the 445 transaction chains relied on by the Claimants, with a total VAT element of €25,001,900. By a second report served on 29 June 2018 and revised on 7 July 2018, Ms. Hughes accepted that further transaction chains had been proven to her satisfaction, giving a total of 161 chains in all, with a total VAT element of €36,725,964. To the extent that further transaction chains may be established, the admitted breaches of fiduciary duty by the directors of the Claimant companies are agreed to have extended to those chains as well.

541. For reasons that I set out at the start of this judgment, however, I do not consider that the claim in relation to trading with GW Deals was made out, and the transaction chains which depended upon such trading must therefore be excluded.

542. Further, and again for reasons that I have explained, I find that the case of dishonest assistance or knowing participation in fraudulent trading is only made out in relation to the trading between RBS and CarbonDesk after 25 June 2009. Accordingly, any transaction which included trades between CarbonDesk and RBS up to and including 25 June 2009 must also be excluded.

543. The evidence of the expert forensic accountants was directed at the factual question of whether each of the trades by RBS with CarbonDesk, by being part of a chain of related transactions involving the flow of monies in one direction and the flow of EUAs in the other, assisted the breach of duty by the directors of a Claimant company further along the chain.

544. For the Claimants, Mr. Steadman had regard to the evidence both as to the movement of EUAs in one direction, and the movement of funds in the other direction and made a judgment as to whether there was a sufficient connection between a trade involving RBS and a trade involving the Claimant company (either directly or via an intermediate buffer) so that the chain of trades had been "correctly assembled". Mr. Steadman looked, for example, at the entities, dates and volumes of EUAs transferred as shown in the EUTL, whether the transfers of EUAs occurred sequentially, and whether funds could be traced from bank statements as passing between the entities in settlement of the transactions.

545. Importantly, Mr. Steadman also placed some reliance on a schedule of deals prepared by CarbonDesk which had been supplied to investigators at HMRC in January 2010 (the "CarbonDesk Deal Schedule"). This was said to show, by reference to CarbonDesk's matching deal numbers for its sales ("A") and purchases ("B"), which also featured on its invoices to RBS, how CarbonDesk had connected its purchases of quantities of EUAs from the Claimant companies (or intermediate buffers) with its sales to RBS.

546. Ms. Hughes' approach was more limited. Before agreeing a transaction chain, she first regarded it as necessary that payment evidence derived from bank statements should exist for each link of the transaction chain. Ms. Hughes's report indicated that,

> "Absent any detailed and specific evidence of either the receipt and payment of monies by an intermediary entity, the timing of such payments and other cash inflows and outflows of the entities

© 2025 Thomson Reuters. 

and consequently of linked payments along the entirety of a Transaction Chain, it cannot be proven, in my view, that it was RBS's monies which 'passed along' the chain to the [Claimant] companies."

547. In addition to the flows of money, Ms. Hughes also required evidence that there was an exact match of specific EUAs flowing through the various links of the chain, based upon the records of transfers of specific EUAs at the EUTL registry. Only where there was an exact match of EUAs for an individual company in the chain was Ms. Hughes satisfied that the transaction chain had been established. Ms. Hughes was prepared to accept a chain which involved the same company splitting or amalgamating parcels of EUAs passing along an individual chain. If, however, there was any splitting or amalgamation of EUAs across more than one transaction chain, or involving transfers of EUAs to or from any other entities from outside the chain, then Ms. Hughes considered that the transaction chain had not been established.

548. Ms. Hughes did not appear to have placed any reliance upon the CarbonDesk Deal Schedule. In cross-examination, however, having had its origins explained to her, she appeared to accept that it was broadly accurate so far as it went in matching purchases and sales of EUAs by CarbonDesk, albeit that she maintained that she was right to focus on tracing EUAs by reference to the registry entries at the EUTL.

549. For the reasons that follow, I consider that Ms. Hughes' approach was too narrowly focussed and failed to take sufficient account of all of the relevant evidence in determining whether the transactions which the Traders had caused RBS to enter into with CarbonDesk assisted the breaches of duty by the directors of the Claimant companies. In particular, I consider that Ms. Hughes did not give sufficient weight to other evidence as to the connections between the various Claimant companies and buffers which explained the likely reasons for monies not flowing along every link in a transaction chain. Nor did she give any or any sufficient weight to the data in the CarbonDesk Deal Schedule, which was a broadly contemporaneous document based upon information contained in CarbonDesk's records and invoices.

550. So, for example, Ms. Hughes rejected all transaction chains involving Inline as defaulter on the basis that there was no evidence of any relevant payments actually having been made from Northumberland (as first buffer) to Inline. Ms. Hughes rejected the transaction chains in such a case even where there was a complete match of the specific EUAs passing along the chain from Inline to Northumberland, then to CarbonDesk and on to RBS.

551. In my view, this approach placed excessive reliance on the availability of bank records and failed to give due regard to other evidence concerning Inline and Northumberland. The Claimants' evidence showed that at the relevant time, in June 2009, Northumberland and Inline were both newly formed and thinly capitalised companies. They both had the same registered office address at an online company formation agency in Bushey, they both had a sole director resident in France who had been recently appointed, and both of them had an account at the same bank in Cyprus. Both companies also subsequently defaulted on substantial amounts of VAT.

552. A consideration of the bank statements of Northumberland for the period from 11 May 2009 to 29 March 2010 show receipts from CarbonDesk of a staggering €47 million. Of these receipts, only about €9,000 was paid to Inline, but €45.7 million was paid way to a French company called Ecosay.

553. In the absence of any other coherent explanation, it seems to me highly probable that Northumberland and Inline were not independent companies trading at arm's length, but were both under the control of VAT fraudsters. I consider it overwhelmingly likely that the monies paid by RBS to CarbonDesk were paid on to Northumberland and then paid away from that company with at least the tacit consent of the director of Inline, who plainly did nothing to ensure that her company was paid for the very large volumes of EUAs that it had sold to Northumberland. This must have amounted to a breach of duty by the director of Inline, which was assisted by the monies which had originated with RBS, just as much as if Inline had first been paid the monies and then they had been misapplied.

554. Ms. Hughes' focus on the EUTL registry and her failure to give any weight to the CarbonDesk Deal Schedule can be illustrated by reference to her rejection of every one of two sets of transaction chains assembled by Mr. Steadman where the payment flows were not in doubt.

555. The first set took place within 24 hours on 29 and 30 June 2009 and were summarised diagrammatically by Mr. Steadman in exhibit LS3-7 to his second supplemental report. The transactions involved CarbonDesk acquiring a total of 3,489,000 EUAs either directly from a number of the Claimant companies and one of the contra- traders, or indirectly via ISK and Northumberland as first line buffers. CarbonDesk then sold the same volume of 3,489,000 EUAs on to RBS.

© 2025 Thomson Reuters.

556. The second set all took place on 2 July 2009 and were summarised diagrammatically by Mr. Steadman in exhibit LS3-10 to his second supplemental report. The transactions involved CarbonDesk acquiring a total of 3,912,000 EUAs either directly from a number of the Claimant companies and two of the contra-traders, or indirectly via ISK and Northumberland as first line buffers. CarbonDesk then sold 3,732,000 EUAs to RBS and 180,000 to a third party which was identified as Gazprom.

557. All cash-flows in each of these transaction chains were verified as having occurred. The only exception were the transfers of funds in respect of the deals between Northumberland (as first line buffer) and Inline (as defaulter). Those fund transfers did not take place for the reasons that I have examined above, and should, in my judgment be regarded as having provided assistance to the breaches of duty by the directors of Inline in the same way as if the monies had in fact been paid over by Northumberland to Inline and then misapplied by Inline.

558. In addition to reasons connected with Northumberland and Inline, Ms. Hughes stated in her second report that she had rejected all of these transaction chains because of the large numbers of transfers of similar volumes of EUAs at the EUTL and because she had also identified from the EUTL a transfer of 38,000 EUAs by CarbonDesk to a company called Stikito in each of the time periods covered by the transaction chains, together with the transfer of 180,000 EUAs to Gazprom in the period covered by LS3-10. Referring to the EUTL registry entries, Ms. Hughes stated that in the circumstances, "the chances that the transfers of EUAs flowed as stated by Mr. Steadman are less than probable [and] that the identifiable EUTL transfers assembled by Mr. Steadman for this group of transaction chains may not be correct."

559. Ms. Hughes was asked in cross-examination to explain this opinion in relation to the transaction chains for LS3-7,

> "A …this is one where there are several options for combinations of purchases from different companies that a particular sale could relate to….What you have here between the times of these particular chains and included in the middle of these chains is this accumulation of volumes again, such that when I take any one of these chains, I can see that one might combine, for example, volumes that were purchased from ADE and Classic Mark before there is a sale to RBS.
>
> …there are a series of purchases before you get any sale to RBS … so by the time that you make a sale to RBS, you may have several hundred thousand EUAs and you don't know where they have come from to make that sale. These are the features of the groupings that I'm unable to accept. This one also happens to have some EUAs going to somebody other than RBS.
>
> Q. Is that the 38,000 [going to Stikito]?
>
> A. Yes."

560. Ms. Hughes also accepted, however, that when she had described Mr. Steadman's transaction chains as "less than probable", she had not in fact attempted for herself to construct any alternative chains to account for the particular volumes transferred and the entries on the EUTL. She accepted that Mr. Steadman's chains might be correct, but had formed the view that she could not accept them because they were only one of a number of possible ways of explaining the registry entries on the EUTL.

561. Ms. Hughes' reluctance to accept Mr. Steadman's transaction chains stemmed from the fact that she had focussed on entries at the EUTL registry, which record <u>transfers</u> of specific EUAs, rather than <u>trades</u> of EUAs. In doing so, Ms. Hughes focussed on the fact that EUAs are individually numbered, but in my view gave inadequate weight to the fact that EUAs are fungible and could be treated as such in the ordinary course of emissions trading.

562. The essence of the question for the purposes of determining whether assistance was given by RBS, or whether RBS participated in fraudulent trading, is whether the trades which the Traders caused RBS to enter into with CarbonDesk can be shown to have conferred an economic (monetary) benefit upon the Claimant companies which their directors then improperly misappropriated or diverted.

563. In that sense, what primarily matters is that a connection is established between the trades that were done and their associated cashflows. If, as the evidence clearly showed, CarbonDesk generally sought to deal on an intra-day trading basis

on behalf of its clients, then the critical question is whether there is sufficient evidence connecting a particular purchase or purchases by CarbonDesk of EUAs from one of the Claimant companies (directly or via a buffer) with the trades with RBS. That must primarily be a question of analysis of the deal volumes and times and the resultant money flows.

564. Such deals might have been (and in all the deals which Ms. Hughes was prepared to accept were) completed by registration of RBS as the holder at the EUTL of precisely the same EUAs as CarbonDesk had received from its client. But I do not regard it as essential that they should have been. The Claimant companies are not seeking to make proprietary claims to the EUAs that they sold. Given that EUAs are fungible, I do not consider that it should matter that CarbonDesk chose to complete a particular transaction by transferring differently numbered EUAs to RBS than it received from its client. Nor did it matter to RBS, which was simply concerned to receive the correct quantity of EUAs before releasing payment for the trade.

565. So, for example, in relation to the transaction chains in LS3-7, take Microdyne deals 20-22. According to the CarbonDesk Deal Schedule, EUAs were sold by Microdyne to CarbonDesk in three separate trades on 30 June 2009 involving 50,000, 113,000 and 84,000 EUAs. By matching the deal numbers (e.g. 5823, 5827 and 5843) the CarbonDesk Deal Schedule also shows that the same quantities of EUAs were sold on to RBS in three trades on the same day.

566. The EUTL entries show the transfers of two lots of EUAs from Microdyne to CarbonDesk on 30 June of 163,000 EUAs (i.e. 50,000 + 113,000) and 84,000 EUAs at 12.28 hrs and 15.19 hrs respectively. The EUTL entries do not, however, show precisely the same EUAs being transferred by CarbonDesk to RBS. Instead, Mr. Steadman treated the 163,000 EUAs traded under deals 5823 and 5827 as having been included in a transfer of a total of 200,000 EUAs recorded at the registry at 13.58 hrs, and the 84,000 traded under deal 5843 as included in a transfer of 150,000 EUAs recorded at the registry at 15.20 hrs. The balance of those EUTL registry transfers related to a series of trades done with Ade at about the same time on that day.

567. However, as I have indicated, the experts accepted that the relevant bank statements showed the correct monies flowing from RBS to CarbonDesk and then to Microdyne to reflect those transactions. Moreover, Mr. Steadman produced evidence (which Ms. Hughes did not challenge) to show that the total volumes of EUAs traded between CarbonDesk and RBS on 30 June 2009 as shown in his transaction chains precisely matched the volumes shown in the EUTL as having been transferred by CarbonDesk to RBS on that day.

568. Indeed, Mr. Steadman's evidence was that on each day from 25 June 2009 to 6 July 2009 there was an exact match between the daily volumes traded according to his transaction chains and the entries for those days for transfers from CarbonDesk to RBS at the EUTL registry. The only point of detail was a difference between the daily amounts in respect of 1 July and 3 July, but the difference was corrected the following trading day, a feature which Mr. Steadman explained related to the first legs in a chain occurring late in a day and the CarbonDesk to RBS leg occurring early the following day.

569. Mr. Steadman had also compared the volumes of EUAs shown in the CarbonDesk deal number schedule to have been transferred by CarbonDesk to third parties other than RBS, and had matched those volumes to the total CarbonDesk transfers to those entities as recorded in the EUTL.

570. I am accordingly satisfied that where the payment flows in Mr. Steadman's transaction chains are agreed, the fact that there might not have been an absolute identity between the individually numbered EUAs acquired by CarbonDesk and those which it transferred to RBS in satisfaction of the trades should not lead me to reject those transaction chains.

571. For similar reasons, provided that the Claimants' claims are limited to the monies put into a chain by RBS and that the flow of such monies can be shown to have been paid along a chain by reference to matching deals from the CarbonDesk Deals Schedule, I do not think that it matters that CarbonDesk sold a relatively small fraction of the EUAs that it bought from the Claimant companies (or an intermediate buffer) to a third party. RBS will still have assisted the breaches of duty by the directors of the Claimant companies to the extent that the monies which it paid for the remainder of the EUAs can be shown to have been paid along the chain.

572. So, for example, the fact that in the transaction chains assembled in LS3-10, 180,000 of the 3,912,000 EUAs which CarbonDesk acquired from the various Claimant companies on 2 July 2009 were sold on to Gazprom does not lead me to doubt the connection between the trades in respect of the remaining 3,732,000 EUAs.

573. In a relatively small number of transaction chains, payments for EUAs transferred up the chain were found, on the bank statements, to have flowed out of a particular company's account in payment for the EUAs that it had acquired before being received from the purchaser of those EUAs. Adopting a strict approach to the concept of assistance and causation, the

Defendants contended that this broke the chain for the purposes of determining whether the payments by RBS could be said to have assisted the fraud at the Claimant companies.

574. I do not accept that argument. Money is fungible and assistance and causation need to be approached in a commonsense way. Provided that a sufficiently close factual connection is established between the timing and amounts of the payments in and out and the quantities and price of the EUAs passing in the other direction, it does not seem to me to matter whether a company in the chain made a payment away in expectation of an imminent equivalent receipt, or only after actual receipt of the monies.

*Other specific issues*

575. There was a potential difference of opinion between the parties in relation to the extent of RBS's liability in respect of contra-trading involving Vehement and Microdyne. In the import chains, Microdyne sold EUAs both to CarbonDesk (which then sold them to RBS) (5.8 million) and to SVS (3.5 million). My understanding is, however, that the experts and the parties were eventually in agreement that the Claimants' claim should be limited to the VAT on the 5.8 million EUAs that were imported by Microdyne and sold to CarbonDesk and then to RBS.

576. The experts were agreed that Epicure Deal 34 was not established and should be excluded. They were also agreed that Classic Mark deal 43 was not established, but for different reasons. The Claimants sought to rely on that chain nonetheless, but as it relates to trades on 23 June 2009 which I have excluded because that was not a date by which the Traders had turned a blind eye, I do not have to resolve that issue.

**K. Conclusion**

577. For the reasons that I have explained, I find both RBS and RBS SEEL liable for dishonest assistance and knowingly being a party to fraudulent trading by the Claimant companies by reason of RBS's trading with CarbonDesk from 26 June 2009 to 6 July 2009 (inclusive). I dismiss the remainder of the claims.

578. I will make an order that the Defendants be jointly and severally liable for an amount which should be capable of being agreed between the parties on the basis of the determinations which I have made in relation to the points of principle concerning the transaction chains. I shall resolve any points of disagreement in that respect and all consequential matters at a further hearing on a date to be fixed.

579. I should, in conclusion, pay tribute to the highly efficient manner in which this case was prepared and presented. In contrast, I must sincerely apologise for my subsequent delay in production of this judgment.

Crown copyright