# Bilta (UK) Ltd (in liquidation) v Tradition Financial Services Ltd ("Bilta CoA") [2023] Ch 343

# Exhibit 5

Court of Appeal

# Bilta (UK) Ltd (in liquidation) and others *v* Tradition Financial Services Ltd

## [2023] EWCA Civ 112

2023 Jan 26, 27; Feb 10 — Lewison, Stuart-Smith, Falk LJJ

*Insolvency — Winding up — Fraudulent trading — Whether person capable of being party to fraudulent trading in business of company if not having controlling or managerial function within company — Insolvency Act 1986 (c 45), s 213*

*Company — Register — Restoration to register — Company dissolved but later restored to register — Company unable to pursue claim while dissolved — Whether company's claim time-barred — Whether company's directors at date of dissolution deemed to have remained in office until restoration — Companies Act 2006 (c 46), s 1032*

The claimant companies and their liquidators brought claims against the defendant arising out of the defendant's participation in missing trader intra-Community fraud in which the companies had become involved. The companies alleged that the defendant's conduct had amounted to dishonest assistance in the breach of fiduciary duty by the directors of those companies. The liquidators alleged that the defendant had been knowingly party to fraudulent trading in the businesses of the companies within section 213 of the Insolvency Act 1986[1]. Pursuant to the terms of a settlement agreement between the parties, the issues on the claims were narrowed. The judge dismissed the companies' claims in dishonest assistance on the ground that they were time-barred, rejecting their submission that the running of the limitation period should be postponed pursuant to section 32 of the Limitation Act 1980[2]; but held that the liquidators' claims under section 213 of the 1986 Act did not fail as the defendant came within the scope of that section. Two of the companies, which had been dissolved and later restored to the register by court order after the alleged fraud had occurred, appealed against the dismissal of their claims in dishonest assistance, each contending that pursuant to section 1032 of the Companies Act 2006[3] the directors who had been in office at the date of dissolution were deemed to have remained in office during the period between dissolution and restoration; that since those directors had been involved in the fraud their knowledge of the fraud could not be attributed to the relevant company; and that, accordingly, during the period between dissolution and restoration the company could not have discovered the fraud for the purposes of section 32 of the 1980 Act. The defendant cross-appealed against the finding that it came within the scope of section 213 of the 1986 Act, contending that it could not fall within that section because it had not exercised a controlling or managerial function within either company.

On the appeal and the cross-appeal—

[1] Insolvency Act 1986, s 213: see post, para 31.

[2] Limitation Act 1980, s 32(1): "where in the case of any action for which a period of limitation is prescribed by this Act, either— (a) the action is based upon the fraud of the defendant; or (b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or (c) the action is for relief from the consequences of a mistake; the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it . . ."

[3] Companies Act 2006, s 1032: see post, para 125.

© 2023 The Incorporated Council of Law Reporting for England and Wales

*Held*, (1), dismissing the cross-appeal, that, on a true construction of section 213 A
of the Insolvency Act 1986, the phrase "any persons who were knowingly parties to" the carrying on of the business of a company for any fraudulent purpose was not restricted to persons who exercised management or control over the company in question; that, rather, a person from outside the company who knew that the business he was dealing with was fraudulent would be a "party" to the fraudulent carrying on of that business for the purposes of section 213, although this did not set the outer limit of the scope of the section; that whether an "outsider" could be said to B
be "party" to the carrying on by that company of a fraudulent business might well be a question of fact and degree which required careful analysis, although that question did not arise in the present case because of the terms of the settlement agreement; and that, accordingly, the judge had been correct to hold that the defendant came within the scope of section 213 (post, paras 106, 108, 114, 118–120, 179, 180, 181).

*In re Gerald Cooper Chemicals Ltd* [1978] Ch 262 and *In re Augustus Barnett & Son Ltd* [1986] BCLC 170 applied. C

*Morris v Bank of India* [2005] 2 BCLC 328, CA considered.

(2) Dismissing the appeal, that where a dissolved company was restored to the register by court order, the provision in section 1032(1) of the Companies Act 2006 that the company was deemed to have continued in existence as if it had not been dissolved or struck off the register did not require the assumption that the directors in office at the date of dissolution remained in office throughout the period of enforced non-existence; that any potential injustice in that conclusion was readily capable of D
being prevented by an application for a direction under section 1032(3) of the 2006 Act, the purpose of which was to place the company and all other persons in the same position (as nearly as might be) as if the company had not been dissolved; that, thus, where a company had been dissolved and later restored to the register, the court had power under section 1032(3) of the 2006 Act to direct an extension of a limitation period under the Limitation Act 1980 in favour of a company which had a potential claim; that on an application for such a direction the court would balance the E
prejudice to the company in not having been able to begin proceedings and the prejudice to third parties who might be deprived of what would otherwise be a limitation defence; that, however, the power to make such a direction was exercisable only where the dissolution of the company was the real cause of its being barred from pursuing its claim and not where a direction would put the company in a better position than it would have been in if it had not been dissolved; that, in the present case, the companies had not attempted to advance the evidential case that F
was necessary for such a direction to be made; and that, accordingly, the judge had been correct to hold that the two companies' claims in dishonest assistance were time-barred under the 1980 Act (post, paras 126, 131–132, 142–153, 179, 180, 181).

*Fowler v Revenue and Customs Comrs* [2020] 1 WLR 2227, SC(E) applied.

*Davies v Ford* [2020] EWHC 686 (Ch) approved.

*Hawkes v County Leasing Asset Management Ltd* [2016] 2 BCLC 427, CA and G
*Davy v Pickering* [2017] Bus LR 1239, CA considered.

Decision of Marcus Smith J [2022] EWHC 723 (Ch); [2022] BCC 833 affirmed.

Decision of Marcus Smith J [2022] EWHC 1431 (Ch) affirmed.

The following cases are referred to in the judgment of Lewison LJ:

*Augustus Barnett & Son Ltd, In re* [1986] BCLC 170

*BCT Software Solutions Ltd v C Brewer & Sons Ltd* [2003] EWCA Civ 939; [2004] H
FSR 9, CA

*Bank of Credit and Commerce International SA, In re* [2001] 1 BCLC 263

*Barclays Mercantile Business Finance Ltd v Mawson* [2004] UKHL 51; [2005] 1 AC 684; [2004] 3 WLR 1383; [2005] 1 All ER 97, HL(E)

*Barras v Aberdeen Steam Trawling and Fishing Co Ltd* [1933] AC 402, HL(Sc)

© 2023 The Incorporated Council of Law Reporting for England and Wales

A *Bilta (UK) Ltd v Nat West Markets plc* [2020] EWHC 546 (Ch)
*Bilta (UK) Ltd v Nazir (No 2)* [2012] EWHC 2163 (Ch); [2014] Ch 52; [2013] 2 WLR 825; [2013] 1 All ER 375; [2015] UKSC 23; [2016] AC 1; [2015] 2 WLR 1168; [2015] 2 All ER 1083; [2015] 2 All ER (Comm) 281; [2015] 1 BCLC 443, SC(E)
*Bray (trading as The Building Co) v Bishop* [2009] EWCA Civ 768; [2009] TCLR 9, CA
B *Bridgehouse (Bradford No 2) v BAE Systems plc* [2019] EWHC 1768 (Comm); [2020] Bus LR 306
*Bridgehouse (Bradford No 2) Ltd v BAE Systems plc* [2020] EWCA Civ 759; [2020] Bus LR 2025; [2021] 1 All ER (Comm) 442, CA
*Capita (Banstead 2011) Ltd v RFIB Group Ltd* [2017] EWCA Civ 1032; [2017] 4 Costs LR 669, CA
*Colchester Estates (Cardiff) v Carlton Industries plc* [1986] Ch 80; [1984] 3 WLR
C 693; [1984] 2 All ER 601
*Cromptons Leisure Machines Ltd, In re* [2006] EWHC 3583 (Ch); [2007] BCC 214
*Davies v Ford* [2020] EWHC 686 (Ch)
*Davy v Pickering* [2017] EWCA Civ 30; [2017] Bus LR 1239; [2017] 2 BCLC 260, CA
*FSHC Group Holdings Ltd v GLAS Trust Corpn Ltd* [2019] EWCA Civ 1361; [2020] Ch 365; [2020] 2 WLR 429; [2020] 1 All ER 505; [2020] 1 All ER (Comm) 719, CA
D *Fowler v Revenue and Customs Comrs* [2020] UKSC 22; [2020] 1 WLR 2227; [2021] 1 All ER 97, SC(E)
*Gerald Cooper Chemicals Ltd, In re* [1978] Ch 262; [1978] 2 WLR 866; [1978] 2 All ER 49
*Gossage v Bishton* [2012] EWCA Civ 717, CA
*Hardie v Hanson* (1960) 105 CLR 451
*Hawkes v County Leasing Asset Management Ltd* [2015] EWCA Civ 1251; [2016]
E 2 BCLC 427, CA
*Joddrell v Peaktone Ltd* [2012] EWCA Civ 1035; [2013] 1 WLR 784; [2013] 1 All ER 13, CA
*Kupeli v Kıbrıs Türk Hava Yolları Şirketi (trading as Cyprus Turkish Airlines)* [2018] EWCA Civ 1264; [2019] 1 WLR 1235; [2018] 4 All ER 434, CA
*Langer v McKeown* [2021] EWCA Civ 1792; [2022] 1 WLR 1255; [2022] 1 BCLC 471, CA
F *Maidstone Buildings Provisions Ltd, In re* [1971] 1 WLR 1085; [1971] 3 All ER 363
*Manson v Smith* [1997] 2 BCLC 161
*Morphitis v Bernasconi* [2003] EWCA Civ 289; [2003] Ch 552; [2003] 2 WLR 1521; [2003] 2 BCLC 53, CA
*Morris v Bank of India* [2003] EWHC 1868 (Ch); [2004] 2 BCLC 236
*Morris v Bank of India* [2005] EWCA Civ 693; [2005] 2 BCLC 328, CA
*Murray-Watson Ltd, In re* (unreported) 6 April 1977, Oliver J
G *O'Keeffe v Ferris* [1997] 3 IR 463
*Overnight Ltd, In re* [2009] EWHC 601 (Ch); [2009] Bus LR 1141
*Patience v Tanner* [2016] EWCA Civ 158; [2016] 2 Costs LR 311, CA
*Powles v Reeves* [2016] EWCA Civ 1375; [2017] 1 Costs LR 19, CA
*Promar International Ltd v Clarke* [2006] EWCA Civ 332, CA
*R v Cartwright* [2020] EWCA Crim 369; [2020] Lloyd's Rep FC 547, CA
*R v Grantham* [1984] QB 675; [1984] 2 WLR 815; [1984] 3 All ER 166, CA
H *R v Hunter (Peter)* [2021] EWCA Crim 1785; [2023] QB 1; [2022] 3 WLR 485, CA
*R v Kellard* [1995] 2 Cr App R 134
*R v Miles* [1992] Crim LR 657; [1992] Lexis Citation 3932
*R v Schildkamp* [1971] AC 1; [1970] 2 WLR 279; [1969] 3 All ER 1640, HL(E)
*R (Kadhim) v Brent London Borough Council Housing Benefit Review Board* [2001] QB 955; [2001] 2 WLR 1674, CA

© 2023 The Incorporated Council of Law Reporting for England and Wales

*R (M) v Croydon London Borough Council* [2012] EWCA Civ 595; [2012] 1 WLR 2607; [2012] 3 All ER 1237, CA A
*R (Youngsam) v Parole Board* [2019] EWCA Civ 229; [2020] QB 387; [2019] 3 WLR 33; [2019] 3 All ER 954, CA
*Regent Leisuretime Ltd v NatWest Finance Ltd (formerly County Natwest Ltd)* [2003] EWCA Civ 391; [2003] BCC 587, CA
*SCT Finance Ltd v Bolton* [2002] EWCA Civ 56; [2003] 3 All ER 434, CA
*Secretary of State for Transport v Curzon Park Ltd* [2021] EWCA Civ 651; [2021] PTSR 1560, CA B
*Tyman's Ltd v Craven* [1952] 2 QB 100; [1952] 1 All ER 613, CA
*Venture Finance plc v Mead* [2005] EWCA Civ 325; [2006] 3 Costs LR 389, CA
*Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] AC 1189; [2014] 2 WLR 355; [2014] 2 All ER 489, SC(E)

The following additional cases were cited in argument: C

*AEI Rediffusion Music Ltd v Phonographic Performance Ltd* [1999] 1 WLR 1507; [1999] 2 All ER 299, CA
*Ad Valorem Factors Ltd v Ricketts* [2003] EWCA Civ 1706; [2004] 1 All ER 894; [2004] 1 BCLC 1, CA
*Alpha Sim Communications Ltd v Caz Distribution Services Ltd* [2014] EWHC 207 (Ch)
*Brawley v Marczynski (Nos 1 and 2)* [2002] EWCA Civ 756; [2003] 1 WLR 813; [2002] 4 All ER 1060, CA D
*Burnden Holdings (UK) Ltd v Fielding* [2016] EWCA Civ 557; [2017] 1 WLR 39, CA
*F&C Alternative Investments (Holdings) Ltd v Barthelemy (No 3)* [2012] EWCA Civ 843; [2013] 1 WLR 548; [2013] Bus LR 186; [2012] 4 All ER 1096, CA
*Inland Revenue Comrs v Metrolands (Property Finance) Ltd* [1981] 1 WLR 637; [1981] 2 All ER 166
*Jenks v Dickinson* [1997] STC 853 E
*Lowsley v Forbes (trading as LE Design Services)* [1999] 1 AC 329; [1998] 3 WLR 501; [1998] 3 All ER 897, HL(E)
*Piglowska v Piglowski* [1999] 1 WLR 1360; [1999] 3 All ER 632, HL(E)
*R (N) v Lewisham London Borough Council* [2014] UKSC 62; [2015] AC 1259; [2014] 3 WLR 1548; [2015] 1 All ER 783, SC(E)
*R (Quintavalle) v Secretary of State for Health* [2003] UKHL 13; [2003] 2 AC 687; [2003] 2 WLR 692; [2003] 2 All ER 113, HL(E) F
*RG Carter Projects Ltd v CUA Property Ltd* [2020] EWHC 3417 (TCC); [2020] Costs LR 1781
*Test Claimants in the FII Group Litigation v Revenue and Customs Comrs (formerly Inland Revenue Comrs)* [2020] UKSC 47; [2022] AC 1; [2020] 3 WLR 1369; [2021] 1 All ER 1001, SC(E)
*Volpi v Volpi* [2022] EWCA Civ 464; [2022] 4 WLR 48, CA
*White v White* [1983] Fam 54; [1983] 2 WLR 872; [1983] 2 All ER 51, CA G
*Young v Bristol Aeroplane Co Ltd* [1944] KB 718; [1944] 2 All ER 293, CA

The following additional cases, although not cited, were referred to in the skeleton arguments:

*BTI 2014 LLC v Sequana SA* [2022] UKSC 25; [2023] AC 877; [2022] 3 WLR 709; [2022] Bus LR 920; [2023] 1 BCLC 1, SC(E) H
*Barking and Dagenham London Borough Council v Persons Unknown* [2022] EWCA Civ 13; [2023] QB 295; [2022] 2 WLR 946; [2022] 4 All ER 51, CA
*Campbell, Ex p; In re Cathcart* (1870) LR 5 Ch App 703, CA
*Cave v Robinson Jarvis & Rolf* [2002] UKHL 18; [2003] 1 AC 384; [2002] 2 WLR 1107; [2002] 2 All ER 641, HL(E)

© 2023 The Incorporated Council of Law Reporting for England and Wales

*FAGE UK Ltd v Chobani UK Ltd* [2014] EWCA Civ 5; [2014] FSR 29, CA
*Kynaston-Mainwaring v GVE London Ltd* [2022] EWCA Civ 1339; [2023] RTR 17, CA
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500; [1995] 3 WLR 413; [1995] 3 All ER 918, PC
*OT Computers Ltd v Infineon Technologies AG* [2021] EWCA Civ 501; [2021] QB 1183; [2021] 3 WLR 61; [2021] 4 All ER 1095, CA

**APPEAL** and **CROSS-APPEAL** from Marcus Smith J

By claim forms issued on 8 November 2017 the claimants, Bilta (UK) Ltd, Weston Trading UK Ltd, Nathanael Eurl Ltd, Vehement Solutions Ltd and Inline Trading Ltd, brought proceedings against the defendant, Tradition Financial Services Ltd, for dishonestly assisting the directors of the claimant companies to engage in missing trader intra-Community VAT fraud through the trading of carbon credits. By the same facts the liquidators, Kevin Hellard and David Ingram in respect of the first, second, third and fifth claimants and Kevin Hellard and Ian Richardson in respect of the fourth claimant, sought compensation from the defendant under section 213 of the Insolvency Act 1986 as having knowingly participated in the fraudulent trading of the claimant companies. Following a settlement agreement on 22 February 2022 two issues remained for determination.

By a decision dated 31 March 2022 Marcus Smith J [2022] EWHC 723 (Ch); [2022] BCC 833 dismissed the claims in dishonest assistance as time-barred but held that the defendant came within section 213 of the 1986 Act. By a costs decision dated 8 June 2022 Marcus Smith J [2022] EWHC 1431 (Ch) made no order for costs relating to pre-settlement costs.

By an appellant's notice dated 29 June 2022 and with permission of the judge the third and fifth claimants appealed on the following grounds. (1) The judge had erred in law in holding that the deeming provision in section 1032 of the Companies Act 2006: (a) required the court to deem that the third and fifth claimants had directors in place throughout the period between dissolution and restoration; and/or (b) required the court to deem that those directors were not the individuals who held office when the companies were dissolved but hypothetical ordinary, competent and innocent directors. (2) The judge had erred as a matter of law in holding that where a claimant company had been dissolved and then restored to the register it was necessary for a claimant when relying on section 32 of the Limitation Act 1980 specifically to plead such reliance by reference to an ordinarily competent director and on that basis declining to address whether such a director could with reasonable diligence have caused his company to plead a viable claim against the defendant in fraud by 9 November 2011 (or if the judge did, in failing to recognise that such a director was not in the same position as, nor had the same powers as, a liquidator). (3) The judge had erred in the costs order made. The order whereby the successful claimants had to pay more costs to the defendant than it had to pay to the claimants was manifestly unfair, contrary to the overall justice of the case and was arrived at in a manner contrary to authority. It was an order that no judge could reasonably have made.

By an appellant's notice dated 29 June 2022 and with permission of the judge the defendant cross-appealed on the following grounds. (1) The judge had erred in law in deciding that the defendant came within section 213 of

© 2023 The Incorporated Council of Law Reporting for England and Wales

the 1986 Act. (2) The judge should have recognised that the defendant's limitation defence and the claims under section 213 fell outside the scope of the compromise agreement and so should have awarded the defendant its costs of the limitation issue for the whole of the proceedings and not just from post-settlement.

The facts are stated in the judgment of Lewison LJ, post, paras 3–18.

*David Scorey KC* and *Laurence Emmett KC* (instructed by *Greenberg Traurig LLP*) for the defendant, in relation to the cross-appeal.

The salient phrase in section 213(2) of the Insolvency Act 1986 ("any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned") has a meaning that is restricted to persons exercising management or control over the company in question.

This follows from the legislative history of provisions relating to fraudulent trading by a company in liquidation. Section 75 of the Companies Act 1928 (18 & 19 Geo 5, c 45) was chiefly concerned with removing the protection of corporate personality—the company itself "carried on business" under the management and control of its directors—and was not intended to (and did not) create a secondary form of accessory liability on third parties. Section 75 was re-enacted, with minor and irrelevant changes, in section 275 of the Companies Act 1929 (19 & 20 Geo 5, c 23). In 1945 the Cohen Committee (Cmd 6659) recommended that section 275 of the 1929 Act should be extended in such a way that it would deal with a case where the company's business was directed, controlled or managed by a criminal mastermind who was the brains behind the fraud and where the directors were merely dupes: see David Foxton QC, "Accessory Liability and Section 213 Insolvency Act 1986" [2018] JBL 324. Section 101 of the Companies Act 1947 (10 & 11 Geo 6, c 47) adopted the recommendation albeit in slightly different terms: "any persons who were knowingly parties to the carrying on of the business in manner aforesaid". By section 332 of the consolidating Companies Act 1948 (11 & 12 Geo 6, c 38) the wording was essentially retained. The Companies Act 1985 then separated the criminal liability and the civil liability into sections 458 and 630 respectively. Further amendments were made by Schedule 6 to the Insolvency Act 1985. The provisions relating to civil liability are now to be found in section 213 of the Insolvency Act 1986 and those relating to criminal liability are in section 993 of the Companies Act 2006.

The narrow reading of the statutory language is consistent with the purpose of section 213, within the overall scheme created by the companies and insolvency legislation.

First, section 213 includes the same wording as (now) section 993 of the 2006 Act which creates a criminal liability. One would expect clear words to create such a liability and any ambiguity should be resolved in favour of a narrower rather than a wider reading: see *Bennion, Bailey and Norbury on Statutory Interpretation*, 8th ed (2020), section 26.4 and *Ad Valorem Factors Ltd v Ricketts* [2004] 1 All ER 894. A narrower reading is supported by the authorities on the interpretation of an earlier criminal provision in section 458 of the 1948 Act: see *R v Miles* [1992] Crim LR 657, *R v Kellard* [1995] 2 Cr App R 134 and *R v Grantham* [1984] QB 675, 683 where the reference to "whoever was running this business" casts light on the limits

© 2023 The Incorporated Council of Law Reporting for England and Wales

of the offence. [Reference was also made to *In re Maidstone Buildings Provisions Ltd* [1971] 1 WLR 1085.]

Secondly, the mischief against which section 213 is directed is the abuse of the privileges of incorporation, i e separate corporate personality and limited liability. It provides for a form of veil-piercing that takes effect once a company is insolvent. It is not directed at the redress or punishment of fraud at large. (Indeed, there is no power to make a punitive order under section 213: see *Morphitis v Bernasconi* [2003] Ch 552.) It is not even directed at the redress of fraud merely because it has resulted in insolvency. For example, there is no equivalent provision to impose liability on persons who have been involved in the carrying on of business for fraudulent purposes by an individual who has been made bankrupt.

Thirdly, like any statutory provision, section 213 should be interpreted so as to generate logical and consistent results.

Fourthly, liability under section 213 arises only where as a question of fact the business overall has been carried on for a fraudulent purpose and not just where individual transactions are fraudulent: see *Morphitis v Bernasconi* [2003] Ch 552, para 43, citing *In re Murray-Watson Ltd* (unreported), 6 April 1977 and Patrick Ussher, "Fraudulent Trading" (1984) 6 Dublin ULJ 58. Thus, a person is only liable if they have been party to the overall carrying on of the business for a fraudulent purpose. "Party to the carrying on of the business" means "taking part in the carrying on of business". That reading is consistent with what it means to be "party to" a legal arrangement or activity in other contexts.

While the narrow interpretation has a sound basis in authority, the authorities supporting the wide interpretation are at best a patchwork. In *In re Bank of Credit and Commerce International SA* [2001] 1 BCLC 263, Neuberger J's reasoning produces odd results. *Morris v Bank of India* [2005] 2 BCLC 328 is not binding authority. *Alpha Sim Communications Ltd v Caz Distribution Services Ltd* [2014] EWHC 207 (Ch) does not assist because in that case the defendants took no point about the scope of section 213. Likewise *Bilta (UK) Ltd v NatWest Markets plc* [2020] EWHC 546 (Ch) is of limited effect.

Further, there are several potentially unsatisfactory consequences of adopting the wide interpretation of section 213. First, there is the question of limitation of actions. Under ordinary circumstances, a dishonest assistant in a breach of fiduciary duty is entitled to the benefit of a six-year limitation period, unlike a true fiduciary: see *Williams v Central Bank of Nigeria* [2014] AC 1189. There are good policy reasons why true fiduciaries should be liable for fraudulent breaches of trust without limit of time, which do not apply to dishonest assistants. By analogy, there may be good reason why time should not begin to run under section 213 until a company is in the course of winding up as against those who were in control of the company's fraudulent business, but those reasons do not apply to those who were no more than dishonest assistants. Even a fraudster is prima facie entitled to the benefit of a limitation period.

Secondly, there is the question of insolvency set-off under rule 14.25 of the Insolvency (England and Wales) Rules 2016 (SI 2016/1024). If a dishonest assistant is sued in equity, he will be entitled to set off any debt due to him by the company incurred before the onset of liquidation. By contrast,

© 2023 The Incorporated Council of Law Reporting for England and Wales

if sued under section 213 no set-off is available both because the liability A
under section 213 cannot arise until the company goes into liquidation and also because set-off is not available in cases of malfeasance: see *Manson v Smith* [1997] 2 BCLC 161. In addition, the court has power to direct that the pari passu principle is to be disapplied as between the company and the person liable under section 213: see section 215(4).

*Christopher Parker KC* and *Andrew Westwood KC* (instructed by *Enyo* B
*Law LLP*) for the claimants, in relation to the cross-appeal.

The words in section 213(2) of the Insolvency Act 1986—"any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned"—should be given a wide meaning. The relevant sense of the phrase "party to" is a person who is concerned in an action or affair; a participant; an accessory. C

Neuberger J in *In re Bank of Credit and Commerce International SA* [2001] 1 BCLC 263 rightly rejected a narrower meaning as "unarguable". There could be no good policy reason for interpreting section 213 otherwise: see *Morris v Bank of India* [2005] 2 BCLC 328. Considering the legislative history of section 213, it is significant that section 101 of the Companies Act 1947 changed those who could be liable under the provision from "any of the directors" to "any persons". This change did not result in section 213 D
looking to directors or shadow directors. Shadow directors had always been caught by the original wording of "directors" introduced by section 75(5) of the Companies Act 1928.

Neuberger J's construction is consistent with *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262 (concerned with section 332 of the Companies Act 1948 as precursor to section 213) and *In re Augustus Barnett & Son Ltd* E
[1986] BCLC 170. Neuberger J's reference to *Gerald Cooper* being an authority of long standing is particularly compelling given that the fraudulent trading provision as it had appeared in section 332 of the Companies Act 1948 (which had been reproduced as section 630(2) of the Companies Act 1985) was amended by the Insolvency Act 1985, but the wording of "any persons who were knowingly parties to the carrying on of the business in manner above mentioned" was retained. F

Applying the principle in *Barras v Aberdeen Steam Trawling and Fishing Co Ltd* [1933] AC 402, the wide interpretation given to section 332 in *Gerald Cooper* is the relevant clear judicial interpretation and the interpretation that Parliament must be taken to have adopted when it repeated those words in the Insolvency Act 1985. [Reference was also made to *Lowsley v Forbes (trading as LE Design Services)* [1999] 1 AC 329 and G
*R (N) v Lewisham London Borough Council* [2015] AC 1259.] Further, the limited amendments made by the Insolvency Act 1985 can be said to represent an endorsement of *Gerald Cooper*.

Authorities such as *R v Miles* [1992] Crim LR 657 and *R v Kellard* [1995] 2 Cr App R 134, which are decisions on section 458 of the Companies Act 1948, are not relevant. Likewise, *R v Grantham* [1984] QB 675 does not assist. *Morris v Bank of India* [2005] 2 BCLC 328 makes it clear that such H
decisions are not a reliable guide to a consideration of the policy behind, and therefore the correct interpretation of, section 213.

Neuberger J's wide construction was impliedly endorsed by the Court of Appeal in *Morris v Bank of India* and was followed by Snowden J in *Bilta*

© 2023 The Incorporated Council of Law Reporting for England and Wales

A *(UK) Ltd v NatWest Markets plc* [2020] EWHC 546 (Ch) and by the trial judge in the present case. The same interpretation of section 213 was applied in *Alpha Sim Communications Ltd v Caz Distribution Services Ltd* [2014] EWHC 207 (Ch).

The Court of Appeal is bound by the statements of principle in *Morris v Bank of India* that liability under section 213 is not limited to those who B have been involved in the management of the company whose business has been carried on with intent to defraud, but potentially extends to outsiders who simply deal with the company. [Reference to also made to *Young v Bristol Aeroplane Co Ltd* [1944] KB 718 and *R (Youngsam) v Parole Board* [2020] QB 387.]

*Scorey KC* replied in relation to the cross-appeal.

C *Christopher Parker KC* and *Andrew Westwood KC* (instructed by *Enyo Law LLP*) for the claimants, in relation to the appeal.

Where a company has been restored to the register by court order after being dissolved, section 1032(1) of the Companies Act 2006 provides that the company is deemed to have continued in existence as if it had not been dissolved or struck off the register. The judge was wrong to approach the D proper construction of section 1032 of the 2006 Act from the narrow perspective of the effect that he wished it to have in the area of extensions to the limitation period under section 32 of the Limitation Act 1980. The idea that the clear wording of section 1032 should be distorted and a wholly artificial construction placed upon it because of the court's dislike of stale claims is misconceived. The Court of Appeal has rejected any notion that E such considerations are relevant otherwise than as given effect to by the 1980 Act. [Reference was made to *Regent Leisuretime Ltd v Natwest Finance Ltd (formerly County Natwest Ltd)* [2003] BCC 587 and *Hawkes v County Leasing Asset Management Ltd* [2016] 2 BCLC 427.]

The effect of the deeming provision in section 1032(1) of the 2006 Act is that the two companies which were restored to the register in the present F case are deemed to have continued in existence "as you were" or "as never having been dissolved" with the same directors who were in office at the date of dissolution: see *Tyman's Ltd v Craven* [1952] 2 QB 100, *Joddrell v Peaktone Ltd* [2013] 1 WLR 784 and *Bridgehouse (Bradford No 2) Ltd v BAE Systems plc* [2020] Bus LR 2025. [Reference was also made to *Davies v Ford* [2020] EWHC 686 (Ch).] This consequence is not fact-dependent but G is the proper interpretation of the deeming provision. Here, the directors in office at the date of dissolution were the wrongdoing directors, whose knowledge of the wrongdoing for the purposes of section 32 of the 1980 Act could not be attributed to the relevant company: see *Burnden Holdings (UK) Ltd v Fielding* [2017] 1 WLR 39. It follows that during the period between the dissolution and the restoration, the company could not have discovered the fraud.

H In the alternative, section 1032 of the 2006 Act does not require an assumption to be made about the existence or attributes of any director. In consequence the judge should have found that because there was no company in existence and no directors, there was no one who could, with reasonable diligence, have discovered the fraud.

© 2023 The Incorporated Council of Law Reporting for England and Wales

As to the award of costs, the judge made an error of principle in relation to the pre-settlement costs. The outcome of the litigation was that the defendant ended up "writing the cheque", meaning that the claimants were the successful party. Even though the judge might not have been able to decide who would have won on liability if the whole case had gone to trial, nevertheless this was a case where the terms of the settlement agreement contained the answer. [Reference was made to *BCT Software Solutions Ltd v C Brewer & Sons Ltd* [2004] FSR 9, *R (M) v Croydon London Borough Council* [2012] 1 WLR 2607 and *RG Carter Projects Ltd v CUA Property Ltd* [2020] Costs LR 1781.] The general rule is that the unsuccessful party will be ordered to pay the costs of the successful party: see CPR r 44.2(2)(a). This should be applied based on costs following "the issue" rather than "the event" in accordance with *Langer v McKeown* [2022] 1 WLR 1255. Here the action was for the recovery of money, and the claimants recovered a substantial sum. The judge should have been able to tell from the size of the settlement sum how the costs should be borne. It was not necessary (and was an error of principle) for him to have considered who might have won at trial if all the issues had been litigated. The claimants should recover all their costs down to the date of the settlement agreement.

*David Scorey KC* and *Laurence Emmett KC* (instructed by *Greenberg Traurig LLP*) for the defendant, in relation to the appeal.

The modern approach to statutory interpretation is purposive: see *R (Quintavalle) v Secretary of State for Health* [2003] 2 AC 687 and *Test Claimants in the FII Group Litigation v Revenue and Customs Comrs (formerly Inland Revenue Comrs)* [2022] AC 1. [Reference was also made to *Jenks v Dickinson* [1997] STC 853, *Bennion, Bailey and Norbury on Statutory Interpretation*, 8th ed (2020), section 17.8 and *Inland Revenue Comrs v Metrolands (Property Finance) Ltd* [1981] 1 WLR 637.] The Supreme Court authoritatively stated the approach to statutory deeming provisions in *Fowler v Revenue and Customs Comrs* [2020] 1 WLR 2227.

The wording of section 1032(1) of the Companies Act 2006 does not support the claimants' contention that there is a rule of law that the individuals who were directors when the companies were removed from the register must be deemed for the purposes of section 32 of the Limitation Act 1980 to have remained in post. Further such a rule is contrary to authority. The effect of *Davies v Ford* [2020] EWHC 686 (Ch) is that if a company is to be restored on the basis that the former directors, or indeed any other person, should be treated as having remained in post as a director during the period of deemed existence, it is necessary to obtain an order under section 1032(3) of the 2006 Act. This must be right.

The decision as to whether any identifiable individual is to be treated as having been a director while the company was only "deemed" to exist must be made by reference to the facts. Moreover, an order which retrospectively "deemed" a person to have been a company director could have serious adverse consequences for that person. In any event the claimants place too much on the rulings on reinstatement/restoration in *Tyman's Ltd v Craven* [1952] 2 QB 100 and *Bridgehouse (Bradford No 2) Ltd v BAE Systems plc* [2020] Bus LR 2025 that the effect of an order under section 353(6) of the

© 2023 The Incorporated Council of Law Reporting for England and Wales

Companies Act 1948 was to place the company and all parties affected in an "as you were" position. This reads far too much into one phrase.

If it were to be treated as a statement of a general principle applicable to the position of directors of reinstated companies, it would naturally mean that the directors were to be placed back into their posts upon the company's reinstatement, not that they were to be treated as having been in post during the period in which the company was struck off. That has never been suggested and would be clearly wrong. One or more of the directors may have died during the period of "deemed existence"; or they may have become mentally incapacitated; or been made bankrupt and not discharged; or they may have taken other appointments inconsistent with continuing in post as a director—in which case their automatic reinstatement would create unfairness, not only to the directors but the third parties now relying on them in their other posts.

The claimants' interpretation generates a result which is factually unreal and absurd. It opens up the limitation regime to abuse. Even if it were correct, it would not be enough to show what the claimants have to show to succeed under section 32 of the 1980 Act.

As to the costs order, the judge in the present case took his guidance from cases which set out how to apportion costs where the parties have reached a settlement on issues other than costs, in particular *BCT Software Solutions Ltd v C Brewer & Sons Ltd* [2004] FSR 9 and *R (M) v Croydon London Borough Council* [2012] 1 WLR 2607. [Reference was also made to *Brawley v Marczynski (Nos 1 and 2)* [2003] 1 WLR 813.] The claimants' contention that since the ultimate judgment led them to recover a substantial sum they had "clearly succeeded" and therefore should be net recipients rather than net payers runs contrary to the approach for which they otherwise contend based on *Langer v McKeown* [2022] 1 WLR 1255 (i e costs "following the issue" and not "following the event"). There is no rule which says that just because a claimant made a substantial monetary recovery there must be a costs order in its favour: see *Capita (Banstead 2011) Ltd v RFIB Group Ltd* [2017] 4 Costs LR 669. The judge in his discretion decided that the claimants had "only succeeded in part" and made an order accordingly. An appellate court may interfere only if the decision was wrong in principle or is plainly unsustainable: see *AEI Rediffusion Music Ltd v Phonographic Performance Ltd* [1999] 1 WLR 1507, *Piglowska v Piglowski* [1999] 1 WLR 1360, *F&C Alternative Investments (Holdings) Ltd v Barthelemy (No 3)* [2013] 1 WLR 548 and *Volpi v Volpi* [2022] 4 WLR 48. Where the judge has decided the question of costs following a compromise, the appellate court is entitled to approach an appeal with an even greater degree of reluctance than is usually the case and will interfere only if the appellant makes out a case of manifest injustice: see *Venture Finance plc v Mead* [2006] 3 Costs LR 389, *Bray (trading as The Building Co) v Bishop* [2009] TCLR 9 and *Powles v Reeves* [2017] 1 Costs LR 19. Given the number of factors the judge considered, his exercise of discretion is unimpeachable.

*Parker KC* replied in relation to the appeal.

The court took time for consideration.

© 2023 The Incorporated Council of Law Reporting for England and Wales

10 February 2023. The following judgments were handed down.

**LEWISON LJ**

*Introduction*

1 There are three issues raised on this appeal from Marcus Smith J:

(i) The class of persons liable where the business of a company in liquidation has been carried on for fraudulent purposes.

(ii) The scope of the deeming provisions that apply when a dissolved company is restored to the register.

(iii) Whether the judge was entitled to make the costs order that he did.

2 The judge's judgment on the substantive issues is at [2022] EWHC 723 (Ch); [2022] BCC 833. His judgment on costs is at [2022] EWHC 1431 (Ch).

*The facts: an overview*

3 I can take the main underlying facts from the judge's substantive judgment.

4 By a claim form issued on 6 July 2015, the following five claimants (by their liquidators) issued proceedings against various defendants:

(i) Bilta (UK) Ltd ("Bilta").

(ii) Weston Trading UK Ltd ("Weston").

(iii) Nathanael Eurl Ltd ("Nathanael").

(iv) Vehement Solutions Ltd ("Vehement").

(v) Inline Trading Ltd ("Inline").

5 The liquidators of these companies (Mr Kevin Hellard and Mr David Ingram in respect of Bilta, Weston, Nathanael and Inline, and Mr Kevin Hellard and Mr Ian Richardson in respect of Vehement) were also named as claimants.

6 The defendants, at that stage, comprised (i) SVS Securities plc ("SVS"), (ii) a former director of SVS (Mr Virk); (iii) a former employee of SVS (Mr Fox); and (iv) Deutsche Bank AG ("Deutsche Bank").

7 The claims against SVS, Mr Virk, Mr Fox and Deutsche Bank all concerned missing trader intra-community fraud ("MTIC Fraud") which took place in the summer of 2009.

8 MTIC Fraud exploits the fact that imports from one EU country into another are VAT-free. The most basic form of MTIC Fraud involves traders importing goods VAT-free from elsewhere in the EU, selling them within an EU country with VAT added to the sale price and so running up large liabilities to account for the VAT to national revenue authorities. These importers then default on their liabilities to account for VAT, instead paying their VAT receipts away to third parties and going into insolvent liquidation.

9 MTIC Fraud thus concerns a failure, on the part of the responsible company, to account for its output VAT, which is the VAT that a company must calculate and collect when it supplies goods or services. Output VAT is calculated both on supplies to other businesses and supplies to ordinary consumers. By contrast, input VAT is the VAT added to the price when goods or services that are liable to VAT are purchased. If the person or business that is buying the goods or services in question is registered for VAT, then

© 2023 The Incorporated Council of Law Reporting for England and Wales

the input VAT may be claimed back from HMRC. Generally speaking, businesses registered for VAT will incur both input and output VAT, and the net amount will be paid to HMRC (in the case of the United Kingdom).

10 Those involved in MTIC Fraud will usually seek to transact in high-value, easily transportable products. Mobile phones, SIM cards and computer chips were popular product vehicles for MTIC Fraud in the early- to mid-2000s. The fraudsters involved tend to transact in high volume and at high speed and frequency, using back-to-back transactions between linked companies set up or acquired for the purpose. The transaction chains may also include companies that are not controlled by the fraudsters. The use of a chain of companies obscures the fraud and complicates the task of investigation.

11 In these proceedings, the MTIC Fraud involved spot trading in carbon credits under the EU Emissions Trading Scheme ("EUAs"). One EUA represents the right to emit one metric tonne of carbon dioxide or other specified gas. EUAs are required by so-called "installations" in energy intensive industries that emit carbon dioxide and are subject to obligations to comply with EU emissions rules. EUAs exist only in electronic form, are fungible, and can be traded almost instantly. Spot trading in EUAs within EU member states attracted VAT in 2009. Those rules changed when the authorities realised that EUAs were being used as the products in MTIC Fraud.

12 As a result of the MTIC Fraud, the claimants were left with enormous VAT liabilities owing to HMRC. In the case of all of the claimants, HMRC were and are the primary creditor.

13 The ordinary limitation period in respect of these claims ended by the summer of 2015. The claims against SVS, Mr Virk, Mr Fox and Deutsche Bank were all issued just within the ordinary limitation period. We are no longer concerned with those claims.

14 On 8 November 2017 the claimants issued a separate claim form against Tradition Financial Services Ltd ("TFS"). The claims against TFS were: (i) claims by the companies themselves alleging TFS's dishonest assistance in the breach of fiduciary duty by the directors of the claimants; and (ii) claims by the liquidators alleging participation by TFS in the fraudulent trading of the businesses of the claimant companies pursuant to section 213 of the Insolvency Act 1986.

15 The dishonest assistance claims alleged that through spot EUA trading carried out between May and July 2009, TFS participated in chains of transactions by which a large MTIC Fraud was perpetrated. That participation amounted to dishonest assistance by TFS in the breaches of fiduciary duty of the directors of the claimants, which those directors owed to those companies.

16 As a consequence of a partial settlement agreement between the claimants and TFS, there were two issues for the judge to decide:

(i) Whether, as TFS alleged, the claims in dishonest assistance were statute-barred;

(ii) Whether TFS were within the scope of section 213 of the Insolvency Act 1986.

17 On this first of those questions, the judge held that the claims against TFS were indeed statute-barred. Although the claimants had relied on

© 2023 The Incorporated Council of Law Reporting for England and Wales

section 32 of the Limitation Act 1980 (which postpones the running of time A where, in the case of an action based on the defendant's fraud, the claimant could not have discovered the fraud with reasonable diligence), the judge found against all of the claimants on the facts. On the second of those questions, the judge held that TFS were within the scope of section 213. The claims brought by the liquidators of Nathanael and Inline therefore succeeded under that section; but the claims by the liquidators of the other B claimants did not because they were statute-barred. Accordingly, the claims brought by Bilta, Weston and Vehement (and their liquidators) failed completely; and there is no appeal in relation to their claims. The claimants appeal against the first of the judge's conclusions in relation to Nathanael and Inline; and TFS cross-appeals against the second. We heard argument on these two issues in reverse order.

18 The costs appeal is, to a large extent, contingent on the outcome of C the two substantive issues.

*The claim under section 213*

19 Claims under section 213 of the Insolvency Act 1986 were brought by the liquidators of all five companies.

20 The judge did not make (and was not asked to make) any findings of D fact about TFS's precise role. The question that was placed before him under the terms of a consent order of 21 February 2022 was whether "on the facts pleaded" the claimants were entitled to the declarations claimed under section 213. The "facts pleaded" referred to the facts pleaded by the claimants, even though many of those alleged facts were disputed by TFS. Since the agreed issue referred to "the facts pleaded" (by the claimants), E before embarking on a consideration of the law, I should set out the assumed facts.

*The role of TFS on the assumed facts*

21 In brief the assumed facts were as follows. The five claimant companies all became insolvent owing sums to HMRC in respect of VAT. They were involved in the MTIC Fraud described by the judge, either as F defaulters (Nathanael and Inline) or because they took part in deal chains that led to defaulters (i e chains that led to Bilta, Weston or Vehement). SVS bought EUAs on a back-to-back basis for those companies.

22 TFS brokered deals on behalf of companies (i e its clients) that dealt with SVS on a back-to-back basis. TFS's role in brokering a deal was to find a counterparty and negotiate the terms on which that counterparty was G prepared to sell EUAs to or buy EUAs from the client company via SVS. TFS was paid brokerage by volume traded.

23 TFS participated in sales by SVS in the following ways. First, in the case of some of the deals to which the claim related, TFS introduced SVS to its overseas suppliers and liaised between SVS and the overseas supplier for the purpose of informing buyer and seller of the price and amount in which each was willing to trade. Second, it introduced Nathanael and Inline to H SVS. That was a fact relevant to only some of the EUA trades to which the claim related. Third, for those clients introduced to SVS, TFS liaised between those companies and SVS for the purpose of informing SVS of the price at which they were willing to sell and the amount that they wished to

© 2023 The Incorporated Council of Law Reporting for England and Wales

A sell. Overall, TFS were involved in a number of the deal chains, but not all of them.

24 TFS introduced Inline and Nathanael to SVS, knowing that they were unlikely to be legitimate trading concerns, without any belief that they would be engaging in spot trading of EUAs for legitimate purposes and in the knowledge that their purpose was to amass VAT.

B 25 TFS offered the suppliers of the EUAs who wanted to sell with VAT the prospect of selling through SVS with an expectation of payment the same day thereby enabling them to buy and sell further EUAs with the monies received. Payment on the same day or even the next day was unusual and limited the number of counterparties to whom SVS could sell, thus depressing the price that could be obtained for the EUAs.

26 TFS was aware of the likelihood that companies newly applying to C trade EUAs from around May 2009 were fronts for individuals wishing to conceal their involvement (or the extent of their involvement) in spot trading of EUAs and the likelihood that there was no legitimate reason for their wishing to do so.

27 TFS did not perform any genuine "know your client" ("KYC") inquiries of the suppliers aimed at reducing the possibility that the suppliers D were involved in any criminal activity before asking SVS to provide a conduit for their EUAs to exporters. TFS's traders knew this, and they also knew that SVS did not perform any genuine KYC inquiries.

28 TFS was aware that the nature and pattern of the EUA trading in which SVS and TFS were involved was suspicious and such as to call for inquiry as to whether the trading was legitimate; and knew, or did not care E whether, such trading was linked to a financial crime (including money laundering) and in particular a VAT fraud. Despite its suspicions, TFS failed to make inquiries with a view to trying to ascertain whether its clients' trading was legitimate and not connected with criminal activity in particular VAT fraud and whether or not to trade (or continue to trade) with such companies if there was reason to think it was.

29 To the contrary, TFS pretended it had credible explanations for its F clients' trading though neither of the explanations relied on were honestly thought to be adequate explanations for the trading.

30 Bilta was ordered to be wound up on 25 November 2009, and the liquidators were appointed on the same day. Nathanael was ordered to be wound up on 19 March 2012 and the liquidators were appointed on 19 August 2013. Weston was ordered to be wound up on 27 October 2010 G and the liquidators were appointed on 13 June 2011. Vehement entered creditors' voluntary liquidation on 23 October 2009 and the liquidators were appointed on 18 March 2010. Inline was ordered to be wound up on 8 June 2015 and the liquidators were appointed on the same day.

*Section 213*

H 31 Section 213 of the Insolvency Act 1986 provides:

"(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.

© 2023 The Incorporated Council of Law Reporting for England and Wales

> “(2) The court, on the application of the liquidator may declare that A any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company’s assets as the court thinks proper.”

**32** Because the application can only be made in the course of a winding up, and only by the liquidator, it is common ground that the cause of action arises when a winding up order is made, or the company goes into voluntary B liquidation. Once the cause of action has arisen, the liquidator then has six years to bring the claim: Limitation Act 1980, section 9; *In re Overnight Ltd* [2009] Bus LR 1141. Since the claim form was issued on 8 November 2017, it follows that in the case of any company where the winding up order was made before 8 November 2011, any cause of action under section 213 is statute-barred. That applies to the claims made by the liquidators of Bilta, C Weston and Vehement.

*The issue*

**33** The issue on this appeal is the scope of the words “any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned”. TFS argued that that phrase was restricted to persons D exercising management or control over the company in question. The judge rejected that argument, which TFS resurrects on this appeal.

**34** In the course of his oral submissions Mr Scorey KC, for TFS, did suggest that even if section 213 was not so limited, nevertheless TFS, on the facts of this case, was not liable under that section. That would involve a detailed evaluation of the facts relating to TFS, which the judge did not carry out; and which was not foreshadowed in the grounds of appeal or the E skeleton argument. In my judgment Mr Parker KC was justified in objecting that this appeal is concerned only with the narrow question of law I have identified.

*Legislative history*

**35** The argument for TFS rests, in part, on a detailed examination of the F legislative history of provisions relating to fraudulent trading by a company in liquidation; and a closely reasoned article by Mr David Foxton QC: “Accessory Liability and Section 213 Insolvency Act 1986” [2018] JBL 324.

**36** There have been provisions enabling the court to set aside transactions effected with intent to defraud creditors as far back as the Fraudulent Conveyances Act 1571 (13 Eliz 1, c 5). But the statutory history G of corporate fraudulent trading begins with section 75 of the Companies Act 1928. That section applied if, in the course of a winding up, it appeared that any business of the company had been carried on with intent to defraud creditors or for any other fraudulent purpose. Where that was established, the court was empowered to declare “any of the directors, whether past or present, of the company who were knowingly parties to the carrying on of the business in manner aforesaid” to be personally responsible for the debts H of the company. Section 75(5) in effect defined “director” to include what we would now call a shadow director. Section 75(3) imposed a criminal sanction on a director within section 75(1). TFS argues that this was, in effect, a “veil-piercing provision”, limited to directors as defined, and was

© 2023 The Incorporated Council of Law Reporting for England and Wales

not intended to (and did not) create a secondary form of accessory liability on third parties. Section 75 was re-enacted, with minor and irrelevant changes, in section 275 of the Companies Act 1929.

37 In 1943 the President of the Board of Trade appointed a committee under the chairmanship of Cohen J to consider what major amendments were desirable in the Companies Act 1929. The Cohen Committee reported in 1945 (Cmd 6659). Their recommendation in relation to section 275 was:

> "We think that the subsections should be extended so as to apply not only to directors but also to other persons who were knowingly parties to the frauds . . ."

38 Parliament accepted that recommendation; and made the legislative changes by section 101 of the Companies Act 1947, although not in precisely the same terms as the recommendation. Shortly afterwards, the companies legislation was consolidated in the Companies Act 1948. Section 332 of that Act provided:

> "(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory of the company, may, if it thinks proper so to do, declare that any persons who were knowingly parties to the carrying on of the business in manner aforesaid shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the court may direct."

39 TFS argues, supported by Mr Foxton's article, that the object of the Cohen Committee's recommendation was to deal with a case where the company's business was directed, controlled or managed by a criminal mastermind who was the brains behind the fraud and where the directors were merely dupes. Mr Foxton quotes some of the evidence given to the committee on that topic. Although it shows that the trigger for the thought process that led to the recommendation was indeed as TFS suggests, the inquiry itself went further. Thus, Mr Foxton quotes Cohen J as asking two distinguished witnesses whether it would be useful for the section to apply "to any other party who was knowingly party to carrying out the fraud". Moreover, the committee's ultimate recommendation was not limited to the criminal mastermind behind the scenes. We have no way of knowing what deliberations of the committee took place in private before it made its recommendation. It is also to be noted that the recommendation extended to persons who were "knowingly parties to the fraud" not merely those who were involved in the running of the fraudulent business. Since the legislation defined "director" in terms that included what we now call a "shadow director", it must have been the committee's intention to widen the net beyond those in active control of the business (whether formally directors or not).

40 The next relevant iteration of the legislation was the Companies Act 1985. The principal change effected by that Act (apart from a more modern style of drafting) was to separate the criminal liability and the civil liability

© 2023 The Incorporated Council of Law Reporting for England and Wales

into two sections (sections 458 and 630 respectively). In addition, under section 458 the criminal offence could be committed even if the company was not being wound up; thus departing from what the House of Lords had held in *R v Schildkamp* [1971] AC 1 (this amendment had in fact been made by the Companies Act 1981). In that respect, therefore, criminal liability was more extensive than civil liability. A

**41** Further amendments were made by Schedule 6 to the Insolvency Act 1985. Paragraph 6 of that Schedule inserted a new section 630(2): B

> "The court, on the application of the liquidator, may declare that any persons who were knowingly parties to the carrying on of the business in the manner above mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper."

**42** This amendment thus did two things. First, it narrowed the class of persons who could apply under the section. Whereas previously a creditor or contributory was able to apply, following the amendment the liquidator was the only person empowered to do so. Second, in place of the defendants being personally responsible for the company's debts and liabilities, the court now had power to declare them liable to "make contributions" to the company's assets. C D

**43** The provisions relating to civil liability are now to be found in section 213 of the Insolvency Act 1986 (quoted above) and those relating to criminal liability are in section 993 of the Companies Act 2006. Section 993(1) provides:

> "If any business of a company is carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, every person who is knowingly a party to the carrying on of the business in that manner commits an offence." E

**44** Conviction of the offence may result in a prison sentence of up to ten years or a fine (or both). Section 993(2) provides that the criminal offence may be committed whether or not the company has been or is being wound up. Section 213, on the other hand, only applies to a winding up. F

**45** To bring the legislative history up to date, section 9 of the Fraud Act 2006 created a parallel offence in relation to non-corporate businesses. The Explanatory Notes to that section state that case law establishes that the offence: "can be committed only by persons who exercise some kind of controlling or managerial function within the company."

**46** Provisions equivalent to section 213, but relating to companies in the course of administration, are now to be found in section 246ZA of the Insolvency Act 1986 (introduced by the Small Business, Enterprise and Employment Act 2015, section 117). G

*Case law on fraudulent trading*

**47** In *In re Maidstone Buildings Provisions Ltd* [1971] 1 WLR 1085 the company went into insolvent liquidation. Mr Penney was its company secretary. The allegation against him was that as well as being the company secretary, he was also its financial adviser, was present at board meetings and took no steps to prevent the company from continuing to trade. H

© 2023 The Incorporated Council of Law Reporting for England and Wales

Pennycuick V-C held that Mr Penney was not liable under section 332 of the 1948 Act. He said at p 1092:

> "The expression 'parties to the carrying on of the business' is not, I think, a very familiar one, but so far as I can see, the expression 'party to' must on its natural meaning indicate no more than 'participates in', 'takes part in' or 'concurs in'. And that, it seems to me, involves some positive steps of some nature. I do not think it can be said that someone is party to carrying on a business if he takes no positive steps at all. So in order to bring a person within the section you must show that he is taking some positive steps in the carrying on of the company's business in a fraudulent manner.
>
> "So far as the position of a secretary as such is concerned, it is established beyond all question that a secretary, while merely performing the duties appropriate to the office of secretary, is not concerned in the management in the company. Equally I think he is not concerned in carrying on the business of the company. On the other hand, it is equally well established, indeed it is obvious, that a person who holds the office of secretary may in some other capacity be concerned in the management of the company's business."

**48** He added at p 1093:

> "Counsel for the liquidator does not, I think, contend that the expression 'party to' covers everyone who has notice that the business of the company is being carried on fraudulently. That contention, if it were right, would lead to impossible results. But what he does say—I think this is the substance of his argument—is that Mr Penney in his position as secretary and financial adviser of the company and also member of the firm of the company's auditors owed a duty to the company to give them certain advice and that his omission to give that advice rendered him a party to carrying on the business of the company.
>
> "I find it impossible to accept that contention. Whatever duty Mr Penney may have owed to the company, I do not think mere omission to give advice could be regarded as amounting to being a party to carrying on the business of the company."

**49** This decision does give some slender support to a narrow interpretation. First, it seems to me that one of the questions for the Vice Chancellor was whether Mr Penney was "concerned in the management in the company". Second, the Vice Chancellor considered that the argument that the section embraced everyone with notice of the fraud would lead to "impossible results". On the other hand, all that the Vice Chancellor actually decided was that active participation was necessary; and that concurrence in the carrying on of the fraudulent business might be enough. By that he meant "taking some positive steps in the carrying on of the company's business in a fraudulent manner". He did not say that those positive steps must amount to management or control.

**50** In *In re Murray-Watson Ltd* (unreported) 6 April 1977 Oliver J said that section 332:

> "is aimed at the carrying on of a business . . . and not at the execution of individual transactions in the course of carrying on that business. I do

© 2023 The Incorporated Council of Law Reporting for England and Wales

not think that the words 'carried on' can be treated as synonymous with 'carried out,' nor can I read the words 'any business' as synonymous with 'any transaction or dealing'. The director of a company dealing in second-hand motor cars who wilfully misrepresents the age and capabilities of a vehicle is, no doubt, a fraudulent rascal, but I do not think that he can be said to be carrying on the company's business for a fraudulent purpose, although no doubt he carries out a particular business transaction in a fraudulent manner."

51 This observation takes a relatively narrow view of what amounts to carrying on a fraudulent business, but it does not, I think, shed much light on who may qualify as being party to the carrying on of that business. Unfortunately, it has not been possible to find a transcript of that case, and all that we have to go on is the quoted extract from the judgment.

52 In *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262 the respondents were a company and its directors who had lent money to the insolvent company. The loan had been repaid out of money raised by purported prepayments for the sale of goods under orders which could not be fulfilled, at a time when the company was already insolvent. Templeman J held that the company was carrying on business with intent to defraud creditors by accepting deposits knowing that they could not supply the goods and were insolvent. He went on to say at p 268:

> "Mr Evans-Lombe submitted in the alternative that the respondents could not knowingly be parties to the carrying on of the business of the Cooper company with intent to defraud creditors of the Cooper company because they had no power of management or control over the carrying on of the business, and did not themselves assist in the carrying on of the business. I agree that a lender who presses for payment is not party to a fraud merely because he knows that no money will be available to pay him if the debtor remains honest. The honest debtor is free to be made bankrupt. But in my judgment a creditor is party to the carrying on of a business with intent to defraud creditors if he accepts money which he knows full well has in fact been procured by carrying on the business with intent to defraud creditors for the very purpose of making the payment. Mr Evans-Lombe said truly that section 332 creates a criminal offence and should be strictly construed. But a man who warms himself with the fire of fraud cannot complain if he is singed."

53 Although the *Maidstone* case was cited to Templeman J he did not mention it; and he seems to me to have taken a broader view of the scope of section 332 than the Vice Chancellor.

54 Mr Scorey placed some reliance on the decision of the Court of Appeal, Criminal Division in *R v Grantham* [1984] QB 675. Mr Grantham registered a company as carrying on the business of importing root crops. He was the sole authorised signatory of the cheques and was the "consultant" in charge of administration and holder of the purse strings. The company traded at a loss. The trial judge directed the jury:

> "As against the individual, the individual defendant, the prosecution have to prove first that he took an active part in carrying on the business.

© 2023 The Incorporated Council of Law Reporting for England and Wales

A That is the first thing. They then have to prove that in doing so he had an intention to defraud creditors and thirdly they have to prove that he was acting dishonestly."

55 The trial judge's direction did not require the prosecution to prove that Mr Grantham exercised management or control of the business: merely that he took an active part in carrying it on. The jury decided all three B questions in favour of the prosecution. Mr Grantham appealed, but he only appealed on the question whether he had the necessary intent to defraud. He did not appeal on the question whether he had taken an active part in the business, even though his case on the facts was that he had not. For that reason, the Court of Appeal did not consider the trial judge's formulation of the first question. It is fair to say, however, that in the course of his judgment C Lord Lane CJ said at p 683:

"In the present case it was open to the jury to find, if not inevitable that they would find, that whoever was running this business was intending to deceive or was actually deceiving Jacob into believing that he would be paid in 28 days or shortly thereafter, when they knew perfectly well that there was no hope of that coming about."

D

56 I do not read the reference to "whoever was running this business" as casting any real light on the limits of the offence. In those circumstances it does not seem to me to be an authority of any real weight on that question.

57 *In re Augustus Barnett & Son Ltd* [1986] BCLC 170 concerned an attempt to impose liability under section 332 on the parent company E of an insolvent company. The parent had subsidised its subsidiary; and had also announced that it would continue to support it financially. But when it withdrew its support the subsidiary went into insolvent liquidation. Citing *Gerald Cooper*, Hoffmann J said at p 173 that the section required:

F "a finding that someone has done an act which can be described as carrying on some business of the company and that in doing so he had an intent to defraud. Equally, the words 'any business of the company has been carried on . . . for any fraudulent purpose' must mean that someone carrying on the business had a fraudulent purpose in doing so. Once this condition has been satisfied, the court may impose personal liability on any persons who were knowingly 'parties to' carrying on of the business G 'in manner aforesaid'. The words 'persons . . . parties to' may be wide enough to cover outsiders who could not be said to have carried on or even assisted the carrying on of the company's business but who nevertheless in some way participated in the fraudulent acts."

58 Hoffmann J seems to me to have analysed the section as imposing a primary liability on those carrying on a fraudulent business, and an H accessory liability on persons who in some way participated in the fraudulent acts. That analysis is consistent with the recommendation of the Cohen Committee, and contradicts TFS's argument.

59 But he went on to say that since no fraudulent intent was alleged against any person who actually carried on the business, there were "no

© 2023 The Incorporated Council of Law Reporting for England and Wales

fraudulent acts to which the outsider can have been a party and his own state of mind seems to me for present purposes irrelevant". He added: A

> "The only point with which I am concerned is whether section 332 can form the basis for imposing liability on a parent company otherwise than as accessory to fraudulent trading by the persons who actually carried on the business of the subsidiary. In my judgment it cannot. The language of the section is clear and unambiguous." B

60 Clearly Hoffmann J envisaged that a person could be liable as an accessory under section 332 even though not actually running the business.

61 By the time that *R v Miles* [1992] Crim LR 657 came to be decided the criminal offence had been hived off into section 458 of the Companies Act 1985. Mr Miles was charged with an offence under section 458. The Crown's case was that he had been selling worthless shares on behalf of a company. The Crown also asserted that Mr Miles had a managerial role in the company, whereas he contended that he was merely a salesman acting under orders. The trial judge directed the jury that they had to be sure that Mr Miles was "participating, or taking part or concurring in the actual trade which is involved in the business of the particular company". The Court of Appeal, Criminal Division held that that was a misdirection. But it is important to understand the submissions made by Mr Barnes QC on behalf of Mr Miles in order to evaluate the court's decision. Watkins LJ summarised them as follows: C D

> "(1) On the proper construction of the words of the statute, some controlling or managerial function is required to bring a defendant within section 458. The jury were never so directed. E
>
> "(2) Once it is conceded that not all those working for a company fall within section 458, if there is an issue as to whether or not a particular defendant comes within the words of the statute, the jury should be given clear, simple guidance as to the meaning of 'party to the carrying on of the business of the company' and how they should approach their decision on the facts of the particular case.
>
> "(3) The case was opened and argued on the basis that the appellant had a managerial role. The passage in the summing up 'participating, or taking part or concurring in the actual trade which is involved in the business of the particular company' widened the scope of the offence. This could have been avoided if the judge had invited counsel to address him on the law before beginning his summing up. In the event, his departure from the basis upon which the case had been presented was a material irregularity." F G

62 Giving the judgment of the court Watkins LJ said:

> "In our view, section 458 is designed to include those who exercise a controlling or managerial function, or who, in Lord Lane's phrase, are 'running the business'. A salesman who is not a manager and who sells shares he knows are worthless can be charged with offences under the Theft Act or with conspiracy. H
>
> "Circumstances will vary infinitely, but we accept the force of Mr Barnes' second proposition that where there is an issue as to whether or not a defendant comes within the ambit of the section, that issue

© 2023 The Incorporated Council of Law Reporting for England and Wales

should be put to the jury together with clear guidance, appropriate to the facts of the case, as to the meaning of 'party to the carrying on of the business of the company'.

"In this case, which had been presented on the basis that the appellant had a managerial role while he contended that he was merely a salesman acting under orders, the words used in the summing up, particularly 'concurring in the trade which is involved in the business of the company' could and may very well have had the effect of broadening the scope of the offence charged in the minds of the jury. In the circumstances, we feel that the jury did not receive the guidance to which they were entitled and that given to them may have seriously misled them."

63 The court referred to the *Maidstone* case in the course of the judgment but not to *Gerald Cooper*. What is important, however, is that the proposition that the court accepted was not Mr Barnes' first proposition (i e some controlling or managerial function is required) but his second (i e if there is an issue about whether a defendant who is working for the company comes within the section clear, simple guidance should be given). Had Mr Barnes' first proposition been accepted, it is difficult to see what further clear and simple guidance would have been needed. Moreover, the particular part of the summing up to which the court took exception, particularly in the way that the prosecution had put its case, was the trial judge's direction that it was enough that Mr Miles "concurred" in the trade. The court did not criticise the trial judge's direction that the jury had to be sure that the defendant was "participating, or taking part" in the carrying on of the business. One can concur in a trade without actively participating in it. To that extent, therefore, the Court of Appeal restricted the meaning that the Vice Chancellor had adopted in the *Maidstone* case. I consider that we can accept that in the context of civil liability as well as criminal liability, concurrence is not enough. Although it is true that the court referred to Lord Lane CJ's dictum in *Grantham*, they did not say that the offence was *limited* to those running the business; merely that it *included* such persons.

64 In *R v Kellard* [1995] 2 Cr App R 134 a number of defendants, including Mr Wright, were charged with fraudulent trading. The relevant counts, for present purposes, were counts 14 and 15. Counsel for Mr Wright submitted that the Crown's case on those counts was very weak because Mr Wright was neither a director nor employee of the companies concerned and could not be regarded as exercising a controlling or managing function or as one who was running the business (referring to *Miles*). Farquharson LJ said in relation to those counts:

"The only question that arises is whether Wright, despite not being a director or employee of either, was in fact assisting in the carrying on of the business. There was clear evidence that in the case of 'UK' he was, viz, (i) in dealing with and on behalf of the company with DCC, (ii) in seeking further finance for the company and (iii) in persuading a major creditor to postpone legal action against the company which, if proceeded with, would have led to its collapse. If this had happened, neither of its subsidiary companies could have continued trading. Although the case was weaker on counts 14 and 15, when the manner in which the group

© 2023 The Incorporated Council of Law Reporting for England and Wales

operated is looked at, there is little practical distinction between Wright's involvement in all three." A

65 The reason why Mr Wright was guilty was because he was acting on behalf of the company in question. The test was formulated, not as running or controlling the business, but "assisting" in carrying it on.

66 There the matter stood when Parliament enacted section 213. I digress at this point because Mr Parker relies on the *Barras* principle in support of his argument in favour of the wider meaning. The *Barras* principle derives from *Barras v Aberdeen Steam Trawling and Fishing Co Ltd* [1933] AC 402, 411 in which Viscount Buckmaster said: B

"It has long been a well-established principle to be applied in the consideration of Acts of Parliament that where a word of doubtful meaning has received a clear judicial interpretation, the subsequent statute which incorporates the same word or the same phrase in a similar context, must be construed so that the word or phrase is interpreted according to the meaning that has previously been assigned to it." C

67 Mr Parker submits that the interpretation given to section 332 in *Gerald Cooper* is the relevant clear judicial interpretation and the interpretation that Parliament must be taken to have adopted. I do not agree. In my judgment, the diversity of views expressed in the cases do not engage the *Barras* principle. I do not consider that, taken together, they can be said to amount to a "clear" judicial interpretation. Moreover, *Gerald Cooper* was a case decided by a first instance judge on a strike out application; and it cannot be assumed that Parliament had it in mind when re-enacting section 332 (see the example given by Lord Blanesburgh, recounting his experience as a pupil, in *Barras* at pp 433–434). So, I do not feel able to place any reliance on the *Barras* principle. In addition, in *Morphitis v Bernasconi* [2003] Ch 552 (decided after section 213 came into force) Chadwick LJ commented at para 46 that *Gerald Cooper* may have adopted too expansive a view of section 332. Nor do I consider that, as Mr Parker submitted, the limited amendments made by the Insolvency Act 1985 can be said to represent an endorsement of *Gerald Cooper*. The most that can be said is that Parliament did not explicitly repudiate the wide construction adopted in *Gerald Cooper*. But given the decision in *Miles*, Parliament might have taken the view that there was no need to do so. D E F

68 The next case chronologically, and a very influential one, is the decision of Neuberger J in *In re Bank of Credit and Commerce International SA* [2001] 1 BCLC 263 ("*BCCI*"), although it has been subjected to considerable criticism by Mr Foxton in his article. The liquidators of BCCI alleged that another bank (BAII) had (1) knowingly participated in BCCI's secret and illegal acquisitions and/or financing of shares in an American bank, (2) knowingly participated in BCCI's secret and illegal acquisition and/or financing of the acquisition of an American bank, and (3) knowingly participated in BCCI's fraudulent overstatement of assets and earnings by assisting BCCI artificially to service certain non-performing loans in its books thereby avoiding having to make any provision for the loan. The procedural question was whether Neuberger J should determine a G H

© 2023 The Incorporated Council of Law Reporting for England and Wales

preliminary issue which he reformulated as follows. BAII's contention was that:

> "a person cannot fall within section 213(2) unless he 'exercised a controlling or managerial function within the company concerned, and that as there is no allegation in the points of claim in their original form or as amended that BAII had any managerial function or any control over the business of BCCI within that company the claim is bound to fail'."

**69** Neuberger J held:

> "In my judgment, it is not arguable that these activities, if established, could not result in BAII falling within section 213(2) merely because it was not performing a managerial or controlling function within BCCI."

**70** It is to be noted that what Neuberger J actually decided was not that the claim against BAII would succeed. He merely decided that it was not bound to fail. His decision therefore leaves open the precise limits of the scope of section 213.

**71** Neuberger J gave six reasons for his conclusion. His first reason was that:

> "as a matter of ordinary language, the ambit of section 213(2) is not limited to those who perform a managerial or controlling role within the company concerned. Although I accept that the language of section 213(2) is a little unusual, it appears to me that the concept of being 'parties to the carrying on' by a company of a type of business, or of a business in a certain way, is not limited to the person who actually directs or manages the business concerned. If anything, it is a more natural reference to people who are not employed by the company at all, but who are third parties to the company."

**72** Mr Scorey takes issue with this reason. He argues that to be party to the carrying on of a business, a person must take part in its carrying on. That, he says, is how the word "party" is used in other legal contexts. A party to a contract, for instance, is someone with whom the contract is made, and who has legal rights and obligations under it. A party to legal proceedings is a person who has formally been joined in those proceeding. A party to a marriage is one of the persons who are married to each other.

**73** Mr Parker disputes this. He argues that as a matter of ordinary English a person who knows that the business he is dealing with is fraudulent is a party to the fraudulent carrying on of that business. The relevant sense of the phrase "party to" is that given by the *Oxford English Dictionary* (online edition): "With *to* (formerly also *in*): a person who is concerned in an action or affair; a participant; *an accessory*." (Emphasis added.)

**74** In my judgment, the phrase is capable of bearing either meaning. But even on Mr Scorey's argument it does not, in my judgment, follow that in order to take part in the carrying on of a business one must have a controlling or managerial function in it.

© 2023 The Incorporated Council of Law Reporting for England and Wales

75 Neuberger J's second reason was based on policy. Although he said that it would be wrong to interpret section 213 as so wide as to stultify "normal business transactions": A

> "that that is not a good reason for preventing a liquidator from pursuing a person who actively and dishonestly assisted, and/or benefited from, the company in adopting a dishonest course of conduct, which predictably led to lenders to, or shareholders of, the company being defrauded." B

76 Mr Scorey submits that policy-based reasoning is not appropriate. He accepts that everybody agrees that fraud is "a bad thing" but what constitutes fraud, and the legal remedies available, are questions that should be resolved by legal principles rather than policy.

77 It is no doubt true that questions of interpretation of statutes should not rest wholly on questions of policy, rather than the statutory language, but policy does have a role to play. In *Morris v Bank of India* [2005] 2 BCLC 328, for example, Mummery LJ, giving the judgment of this court said at para 93: C

> "Where, as here, civil and criminal liability are the creation of statute, and knowledge ('knowingly') is an essential ingredient of statutory liability, the starting point must be the language, context and policy of the legislation considered against the background of general legal principles." D

78 The court went on to discuss the policy underlying section 213 at paras 108–112. E

79 Neuberger J's third reason was the contrast in wording between section 213 on the one hand, and sections 212 and 214 on the other. Section 212, however, does not create any liability where none existed before. As Sealy & Milman put it in *The Annotated Guide to the Insolvency Legislation*, 25th ed (2022), vol 1, p 282: "It is well settled that the section creates no new liabilities, but only provides a simpler procedure for the recovery of property or compensation in a winding up." F

80 As far as section 214 is concerned, the impulse behind its enactment was the difficulty of establishing dishonesty under the predecessors of section 213. Nevertheless, the difference in wording is, in my judgment, a legitimate factor to take into account.

81 Neuberger J's fourth reason was the legislative history of section 213. He referred in particular to the recommendation of the Cohen Committee that the section be extended to "other persons who were knowingly parties to the fraud". In his article, Mr Foxton is critical of this reason. He points out that Neuberger J did not refer to the evidence which had prompted the Committee's recommendation. That is true, but for the reasons I have explained, I do not consider that the criticism is a weighty one. G H

82 Neuberger J's fifth reason was that it was consistent with first instance authority; and his sixth reason was that the decisions of the Court of Appeal, Criminal Division, were not directed to the particular point that arose in *BCCI*. It is convenient to take these reasons together. In his article,

© 2023 The Incorporated Council of Law Reporting for England and Wales

A Mr Foxton is particularly critical of Neuberger J's treatment of the latter cases. Dealing with the criminal cases, Neuberger J said of them:

> "The issue before the court in each case was effectively whether there was evidence that, or an effective direction to the jury that there must be a finding to the effect that, the defendant had managed or controlled the business rather than being a mere employee of the business."

B

**83** For reasons I have explained, I do not consider that that is what they (and especially *R v Miles*) decided. Neuberger J said:

> "All three cases involve consideration of a defendant who was employed by, or acted for, a company carrying on activities which were caught by the equivalent of section 213(1) . . . I do not consider that these cases assist BAII's argument because they were concerned each with the position of an employee or consultant of the company."

C

**84** Neuberger J went on to say:

> "In my judgment, just as an employee of the company who was merely carrying out orders does not fall within section 213(2) whereas somebody who orchestrates, organises or can seize [control?] of the business concerned does fall within the section, so a company or other entity which carries on (so far as it is concerned) a bona fide business with the company, does not fall within section 213(2), but a company which is involved in, and assists and benefits from, the offending business, or the business carried on in an offending way, and does so knowingly and, therefore, dishonestly does fall or at least can fall within section 213(2)."

D

E

**85** I think, with respect, that this does not adequately deal with *Miles*. What, in my judgment, the court held in *Miles* was:

(i) The offence was not restricted to persons who had a controlling or managerial function in the company;

(ii) But the jury needed clear and simple guidance.

**86** I do not think that the case turned on the fact that Mr Miles was only an employee and for that reason could not be guilty of the offence. In my judgment Neuberger J took an unnecessarily narrow view of what *Miles* decided.

F

**87** Mr Foxton writes of this part of Neuberger J's judgment:

> "There are a number of difficulties with this passage. First, an employee who 'sells shares he knows are worthless' is clearly dishonest, whether acting under direction (as to which there is no reference in *Miles*) or not. It was for that reason that the Court of Appeal in *Miles* stated that Miles could have been charged with an offence under the Theft Act or with conspiracy. The reason why that (ex hypothesi) dishonest individual did not commit the section 458 offence was because he was not engaged in the 'carrying on of the business', something which required the exercise of a managerial function. Secondly, Neuberger J's reasoning makes a false comparison. In the first part, he contrasts someone who exercises managing responsibility with someone who does not, and in the second, someone with a dishonest state of mind and someone without one. The first part of this judicial equation is concerned, in criminal terms with actus reus and the second with mens rea."

G

H

© 2023 The Incorporated Council of Law Reporting for England and Wales

88 As will be appreciated, I do not agree with Mr Foxton's analysis of *Miles* either. Mr Foxton in effect says that the court in *Miles* accepted Mr Barnes' first proposition. It did not. It accepted his second proposition. A

89 Mr Scorey also points to what he says are the odd results of Neuberger J's reasoning. If those managing a company carry on the business in a fraudulent manner and instruct an employee to complete transactions in order to further that purpose, then even if the employee knows about the fraudulent purpose, he will not be liable. On the other hand, a counterparty to those transactions will be liable even if he has no more than blind-eye knowledge. This submission depends on reading across the decision in *Miles* as regards the criminal offence into the scope of civil liability. It also presupposes that the court in *Miles* accepted Mr Barnes' first proposition, which in my judgment it did not. But in any event *Miles* does not occupy the whole of the field. Quite apart from the offences to which Mr Foxton referred, the company's employee who knows about the fraudulent intent and furthers that purpose could be charged with aiding and abetting fraudulent trading: *R v Cartwright* [2020] Lloyd's Rep FC 547. In addition, Neuberger J did not purport to define the scope of section 213. He merely said that the claim in that case was not bound to fail. B C

90 As Mr Scorey also points out, Neuberger J gave another reason for his decision (albeit obiter). He said: D

> ". . . I am by no means convinced that even if Mr Adkins' formulation is correct that that would mean that the claim should be dismissed. It seems to me that the allegations made against BAII are such that it could be said that BAII operated as agent for, or in some other way acted for BCCI, in particular in relation to the matter concerning Independent, in a manner which meant that in the loose sense it had some controlling or managerial function." E

91 Thus, the actual result of the case was that Neuberger J dismissed the application for the trial of a preliminary issue, with the consequence that the action was permitted to go forward to trial.

92 *Morphitis v Bernasconi* [2003] Ch 552 was concerned with what amounts to "the carrying on of a business with intent to defraud", rather than the question who would be "party" to the carrying on of such a business. Chadwick LJ said at para 46: F

> "For my part, I would accept that a business may be found to have been carried on with intent to defraud creditors notwithstanding that only one creditor is shown to have been defrauded, and by a single transaction. The *Cooper Chemicals* case is an example of such a case. But, if (which I doubt) Templeman J intended to suggest that, whenever a fraud on a creditor is perpetrated in the course of carrying on business, it must necessarily follow that the business is being carried on with intent to defraud creditors, I think he went too far. It is important to keep in mind that the precondition for the exercise of the court's powers under section 332(1) of the 1948 Act—as under section 213 of the 1986 Act—is that it should appear to the court 'that any business of the company has been carried on with intent to defraud creditors of the company'. Parliament did not provide that the powers under those sections might be exercisable whenever it appeared to the court 'that any creditor of the company has been defrauded in the G H

© 2023 The Incorporated Council of Law Reporting for England and Wales

course of carrying on the business of the company'. And, to my mind, there are good reasons why it did not enact the sections in those terms."

93 But this case, together with the decision of Oliver J in *In re Murray-Watson Ltd* (unreported) 6 April 1977 does support the proposition that in order to be liable under section 213 the defendant must have been party to the carrying on of a fraudulent business; and not merely a party to fraud. I agree with that. What must be established is that the company's business (or a discrete part of that business), taken as a whole, had been carried on fraudulently. Whether that is established in any particular case is a question of fact. Mr Scorey submitted that if the defendant was carrying on his own business, he could not be said to be party to the carrying on of a different business. I do not agree. The extent to which a counterparty must be involved in the carrying on of the fraudulent business may depend upon the facts. Suppose that a manufacturer regularly supplies counterfeit designer clothes to a retailing company, knowing that the retailer will pass them off as genuine. It is, in my judgment, no misuse of language to describe the manufacturer as "party to the carrying on" of a fraudulent business, even though he exercises no managerial or controlling role within the retailing company; and the manufacturer may have other business activities that are not fraudulent. The manufacturer knows about the retailer's fraudulent business and is actively participating in it in the sense of furthering and facilitating it. In my judgment, the allegedly odd results are more apparent than real.

94 *Morris v Bank of India* (to which I have already referred) was another case arising out of the collapse of BCCI. BCCI's liquidators brought a claim against the bank alleging that they were knowingly party to the carrying on by BCCI of a fraudulent business. The real issue in the case was whether the knowledge of a senior manager of the London branch of the Bank of India (referred to as "SBI") could be attributed to that bank. Patten J and this court both answered that question "yes". At first instance [2004] 2 BCLC 236 Patten J said at para 12:

> "Mr Potts also submitted that in order to establish liability under section 213, it was necessary to prove that SBI, through its officers and agents, was dishonest. This, he submitted, is an essential element of liability under section 213, which stems from the references in the section to the business of the company having been carried on with an intent to defraud. Those words obviously do connote actual dishonesty, and in the case of BCCI this is admitted. But in the case of a secondary party, sought to be made liable under section 213(2), all that is in terms required is that that party should have knowingly participated in the carrying on of the business with intent to defraud. It is difficult to see how, in practice, a conscious decision to participate in transactions which are known to be fraudulent does not constitute dishonesty, and for that reason I prefer to concentrate on the question whether SBI did in fact know what it was doing."

95 In this court [2005] 2 BCLC 328, as Mummery LJ recorded at para 86, the bank accepted that section 213 could apply to a corporate counterparty. This point reappeared at other parts of the judgment:

> "97. Before dealing with the rival arguments on the policy of section 213, we remind ourselves that both civil liability to pay

© 2023 The Incorporated Council of Law Reporting for England and Wales

compensation and criminal sanctions may be imposed on any person who is knowingly a party to fraudulent trading. Both types of liability extend beyond the company which actually carried on its business with intent to defraud creditors and its directors to 'outsiders', meaning individuals and corporate third parties who have knowingly been parties to the fraudulent trading in question." A

"100. It is accepted that 'outsider' companies can be made liable under section 213, provided that it is established they were 'knowingly' parties to the fraudulent trading." B

**96** The court considered the fact that since 1985 criminal liability and civil liability had been split into two different sections. As to that, they said at para 107 that the separation of criminal and civil liability made it easier to isolate and focus on the policy of imposing civil liability. The court discussed the policy underlying section 213, which was the subject of argument. At para 111 the court said: C

"In our judgment Patten J was correct in his analysis of the policy of section 213. Compensation of those who have suffered loss as a result of the fraudulent trading is the paramount purpose of the provisions imposing civil liability to contribute to the loss suffered." D

**97** They added at para 120:

"The application of section 213 requires a special rule of attribution in order to make its self evident policy effective. The policy is to make those who have been parties to fraudulent trading liable to compensate the creditors of the fraudulent company." E

**98** At para 129 the court returned to the inter-relationship between civil and criminal liability. They said:

"the severing of criminal and civil liability for fraudulent trading means that there is no question of any conclusion, in principle or on particular facts, as to civil liability affecting the basis on which criminal liability is assessed." F

**99** The next case to which I should refer is the decision of the Supreme Court in *Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1. The relevant defendants in that case were Jetivia SA (a Swiss company) and a Mr Brunschweiler, its sole director and a resident of France. It was said that they were liable both in conspiracy and dishonest assistance in a breach of fiduciary duty and also under section 213. The allegations against those defendants were not entirely easy to discern from the judgments in the Supreme Court in so far as concerns section 213. But they are set out in more detail in the judgment at first instance of Sir Andrew Morritt C [2014] Ch 52 at para 7. The overall case, like the present one, concerned an MTIC fraud in relation to trading in EUAs. Bilta bought EUAs from Jetivia, free of VAT, and sold them in the UK with VAT at prices net of VAT that were lower than the price they had paid. It was also alleged that the pattern of trading between Jetivia and Bilta was not bona fide or consistent with legitimate commercial trading and that Jetivia knew that its dealings with Bilta were dishonest and part of an MTIC fraud. The particular point raised before the Supreme Court was whether section 213 had extra-territorial effect. The G H

© 2023 The Incorporated Council of Law Reporting for England and Wales

Supreme Court unanimously held that it did. Most of the case concerned the scope of a defence of illegality. But in their joint judgment Lords Toulson and Hodge JJSC introduced section 213 as follows at para 213:

> "The section provides a remedy against any person who has knowingly become a party to the carrying on of that company's business with a fraudulent purpose. The persons against whom the provision is directed are thus (a) parties to a fraud and (b) involved in the carrying on of the now-insolvent company's business. Many British companies, including Bilta, trade internationally. Modern communications enable people outside the United Kingdom to exercise control over or involve themselves in the business of companies operating in this country. Money and intangible assets can be transferred into and out of a country with ease, as the occurrence of VAT carousel frauds demonstrates."

100 They added at para 215:

> "The substance of the section 213 allegation is that the appellants were party to a conspiracy to defraud Bilta in the context of a wider VAT fraud, that they were parties to the conduct of Bilta's business to that end, and that Jetivia obtained the proceeds of that fraud. If Bilta's liquidators establish those allegations after trial, we think it is likely that the court would decide to exercise its jurisdiction under section 213 of IA 1986 against the appellants, their foreign residence notwithstanding."

101 Although the point does not appear to have been argued, it seems to me that Jetivia's connection with the MTIC fraud was no more intimate than that of TFS in the present case.

102 In *Bilta (UK) Ltd v NatWest Markets plc* [2020] EWHC 546 (Ch) Snowden J said at para 186 that the statements of principle in *Morris v Bank of India* were "clear Court of Appeal authority" for the proposition that section 213 is not limited to those who have been involved in the management of the company whose business has been carried on with intent to defraud, but potentially extends to outsiders who deal with the company.

103 Mr Parker submits that Snowden J was right, and that we are likewise bound by those statements of principle. The judge below took a more nuanced view. He noted at para 76 that the choice between the narrow and the wide construction of section 213 was not argued in this court in *Morris v Bank of India*. He regarded that case as no more than persuasive authority.

104 In my judgment the judge was correct; and we are not strictly bound by the observations of this court in *Morris v Bank of India*. Whether a subsequent court is bound by a decision of a previous court on a point that was assumed to be correct, but which was not argued, is the subject of comprehensive discussion in *R (Kadhim) v Brent London Borough Council Housing Benefit Review Board* [2001] QB 955. At paras 21 and 22 Buxton LJ explained that there were several ways in which a proposition of law could become part of the ratio of a case in the sense that it was a necessary step in the court's reasoning. One such way was by agreement or concession. The important point to note is that Buxton LJ's subsequent discussion of the authorities is in the context that the proposition of law in

© 2023 The Incorporated Council of Law Reporting for England and Wales

question *is* part of the ratio of the earlier case. After a review of the authorities, Buxton LJ said at para 33:

> "We therefore conclude, not without some hesitation, that there is a principle stated in general terms that a subsequent court is not bound by a proposition of law assumed by an earlier court that was not the subject of argument before or consideration by that court. Since there is no direct Court of Appeal authority to that general effect we should indicate why we think the principle to be justified."

105 He then proceeded to explain the justification for that conclusion. In *R (Youngsam) v Parole Board* [2020] QB 387, to which we were referred, *Kadhim* was cited with approval but only for the method of identifying the ratio of a case. I do not read *Youngsam* as casting any doubt on the proposition stated in *Kadhim* at para 33. Moreover, in the later case of *FSHC Group Holdings Ltd v GLAS Trust Corpn Ltd* [2020] Ch 365 (referring to *Kadhim* among other cases) this court held at para 136:

> "Subsequent authorities have clearly established that the suggestion which attracted the Court of Appeal in *Joscelyne v Nissen* [1970] 2 QB 86 is a correct approach and that a court is not bound by a proposition of law which was not the subject of argument because it was not disputed in an earlier case (even if that proposition formed part of the ratio decidendi of the case)."

106 In my judgment, therefore, there is no authority binding on this court that holds that the wider interpretation of section 213 is correct. As I have said, the judge correctly said that there was no precedent binding on him, but that he should follow decisions of courts of co-ordinate jurisdiction unless persuaded that they were clearly wrong. That is an entirely conventional approach to authority: *Colchester Estates (Cardiff) v Carlton Industries plc* [1986] Ch 80; *In re Cromptons Leisure Machines Ltd* [2007] BCC 214. The judge said at para 79:

> "With that, I turn to Mr Foxton QC's article, which is—unsurprisingly, given the author—compellingly and clearly written. However, despite the critique of the decisions recording a wide approach, I am unpersuaded that that approach is clearly wrong. Indeed, given the fact that a defendant must participate knowingly in order for section 213 to bite, I see the force in Templeman J's dictum that 'a man who warms himself with the fire of fraud cannot complain if he is singed' . . . It seems to me that if this policy is to be unwound, given that it is based on a reading of the section that is a plausible construction (to put it no higher than that), that is something not for me, but for the Court of Appeal. I certainly do not consider the wide reading of the section to be clearly wrong. Rather, it is a perfectly defensible reading of the provision. In the interests of consistency, I therefore conclude that the claim made by the claimants under section 213 is a proper one."

*Approach to interpretation*

107 The modern approach to statutory construction is to have regard to the purpose of a particular provision and interpret its language, so far as

© 2023 The Incorporated Council of Law Reporting for England and Wales

possible, in a way which best gives effect to that purpose: *Barclays Mercantile Business Finance Ltd v Mawson* [2005] 1 AC 684, para 28. The purpose of section 213 is the compensation of those who have suffered loss as a result of fraudulent trading. It is to make those who have been parties to fraudulent trading liable to compensate the creditors of the fraudulent company: *Morris v Bank of India* [2005] 2 BCLC 328, paras 111 and 120.

108 Mr Scorey rightly submits that where contravention of a statutory provision entails both civil and criminal liability, the court should strive to avoid an interpretation which penalises someone where the legislator's intention to do so is doubtful. The difficulty with that submission is this court's conclusion in *Morris v Bank of India* that the statutory severance of criminal and civil liability has had the effect that a decision on the scope of civil liability has no effect on the scope of criminal liability. On the basis that that conclusion is correct, that leads to the further conclusion that, even if my reading of them is wrong, cases such as *Miles* and *Kellard* do not cut down the scope of civil liability under section 213. Although it might be anomalous for criminal liability to be wider than civil liability, it is not necessarily anomalous for civil liability to be wider than criminal liability, particularly where the statutory provisions are now contained in different sections and different Acts of Parliament. Moreover, as noted, the criminal offence may be committed even if the company is not in the course of winding up. Quite apart from that, a person with no managerial or controlling role within a company can be convicted of aiding and abetting fraudulent trading. If there is no objection to a person committing a criminal offence by aiding and abetting fraudulent trading, it is hard to see why there should be any objection to such a person incurring civil liability for the same actions.

109 I am prepared to accept that, as Mr Scorey submitted, at the statutory birth of this form of liability it was seen as principally concerned with removing the protection of corporate personality. It was, as he put it, a form of "veil-piercing" that made company directors liable for the company's own debts. But I consider that the deliberate widening of the scope of the section following the recommendation of the Cohen Committee, and the substitution of a liability to make contribution to the company's assets in place of a liability for the company's own debts have greatly weakened that link. The purpose of section 213, as it has evolved, is not limited to veil-piercing. It is to secure compensation for those who have suffered loss as a result of the fraudulent trading. As Dixon CJ explained in the High Court of Australia in *Hardie v Hanson* (1960) 105 CLR 451, 459 (cited by Mr Foxton), the original section:

> "surely must have been to enable the court to remove the protection of the no liability system . . . Now, however, in England the word 'persons' has been substituted for 'directors', a step which doubtless makes such an explanation of the provision much less cogent, if any longer tenable, in the country of its origin . . ."

110 That explanation has become even less tenable once the Insolvency Act 1986 substituted a liability to make contributions in place of personal responsibility for the company's debts.

© 2023 The Incorporated Council of Law Reporting for England and Wales

111 Mr Scorey referred to an article by Mr Patrick Ussher on the Irish equivalent of section 213: "Fraudulent Trading" (1984) 6 Dublin ULJ 58. He begins by saying that the Irish legislation is "a means by which the cloak of limited liability may be stripped away". But as the author goes on to say: A

> "Liability extends to anyone who knew of the fraudulent intent or purpose or part of it; and was party to the acts impugned or any of them. These will commonly be the active directors of the company, but no formal connection with it is in fact necessary." B

112 I accept also that, as Mr Scorey submitted, it is a precondition of liability that business has been carried on with fraudulent intent; and that incidental frauds committed in the course of a business are not enough. But it is clear in this case that the claimant companies who orchestrated the MTIC fraud were carrying on business with fraudulent intent. The question is who else can be made liable. As I have noted, the recommendation of the Cohen Committee was that liability should be extended to those who participated "in the fraud". In Mr Ussher's words, liability extends to those who were party to "the acts impugned" (ie the fraud). That does indeed appear to be the position in Ireland. In *O'Keeffe v Ferris* [1997] 3 IR 463 (cited by Mr Foxton) O'Flaherty J (giving the judgment of the Irish Supreme Court) said at p 469: C D

> "A person cannot be made amenable under the section unless he has actively participated in the management of the company. To impose liability on a shareholder it must be shown that he took part in making management decisions which were intended to defraud creditors. A third party who knowingly participates in an act of fraudulent trading committed by a company's directors (for example, a creditor of the company who accepts payment of his debt out of money which he knows its directors have obtained by fraud) may be compelled personally to restore the money so applied by means of an order under the section: *In re Cooper Chemicals Ltd* [1978] Ch 262." E F

113 This observation also distinguishes between primary liability and accessory liability. That is the same distinction that, in my view, Hoffmann J drew in *Augustus Barnett*. It is also pertinent to note that the observations of Patten J in *Morris v Bank of India* [2004] 2 BCLC 236 about secondary (or accessory) liability (quoted at para 94 above) were expressly approved by the Court of Appeal (Criminal Division) in *R v Hunter (Peter)* [2023] QB 1, para 128. G

114 As I have already said, the phrase "party to" can bear either of the two meanings for which Mr Scorey and Mr Parker respectively contended. It is, in my judgment, more consonant with the purpose of section 213 to interpret that phrase in the wider rather than the narrower sense. It is also more consistent with the line of authority to which I have referred. Any gap between the civil law and the criminal law is filled, in the case of the criminal law, by the offence of aiding and abetting. H

115 Mr Scorey emphasised a number of potentially unsatisfactory consequences of adopting the wide interpretation of section 213. First, there

© 2023 The Incorporated Council of Law Reporting for England and Wales

is the question of limitation of actions. Under ordinary circumstances, a dishonest assistant in a breach of fiduciary duty is entitled to the benefit of a six-year limitation period, unlike a true fiduciary: *Williams v Central Bank of Nigeria* [2014] AC 1189. There are good policy reasons, he said, why true fiduciaries should be liable for fraudulent breaches of trust without limit of time, which do not apply to dishonest assistants. By analogy, there may be good reason why time should not begin to run under section 213 until a company is in the course of winding up as against those who were in control of the company's fraudulent business, but those reasons do not apply to those who were no more than dishonest assistants. Even a fraudster is prima facie entitled to the benefit of a limitation period.

116 Second, there is the question of insolvency set-off under rule 14.25 of the Insolvency (England and Wales) Rules 2016 (SI 2016/1024). If a dishonest assistant is sued in equity, Mr Scorey says that he will be entitled to set off any debt due to him by the company incurred before the onset of liquidation. By contrast, if sued under section 213 no set-off is available both because the liability under section 213 cannot arise until the company goes into liquidation and also because set-off is not available in cases of malfeasance: *Manson v Smith* [1997] 2 BCLC 161. In addition, the court has power to direct that the pari passu principle is to be disapplied as between the company and the person liable under section 213; Insolvency Act section 215(4).

117 As far as the first of these points is concerned, there is, I think, some force in it. But even on Mr Scorey's formulation of the persons who fall within section 213 there may be some who are not fiduciaries in any real sense. So far as the second is concerned, it will apply to anyone who falls within the scope of section 213 and it does not, in my judgment, provide a basis for adopting a narrow interpretation of that section.

118 I should make it clear, however, that nothing I say must be taken as setting the outer limits of the scope of section 213. All that we are asked to decide is whether a person cannot fall within the scope of section 213 unless he has a controlling or managerial function within the company. Whether an "outsider" can be said to be party to the carrying on by a company of a fraudulent business may well be a question of fact and degree which requires careful analysis. That question does not arise in this case, because of the settlement agreement.

119 In concluding his article, Mr Foxton says:

> "In *Hardie v Hanson*, Menzies J described the Australian equivalent of section 213 as 'full of difficulties'. The intervening 60 years have done little to lessen those difficulties, and the extension of section 213 to 'outsiders' as a species of accessory liability has merely served to enhance them. Given the increasing prevalence of cross-border fraud, it is probably unrealistic to expect the judiciary to row back from an interpretation of section 213 which has produced a provision of such protean scope."

120 I consider that the last sentence is right. I would dismiss this appeal.

© 2023 The Incorporated Council of Law Reporting for England and Wales

*Nathanael and Inline* A

121 Nathanael and Inline differ from the other claimants because there was a substantial period during which both were dissolved before being restored to the register.

122 In the case of Nathanael, it was struck off and dissolved on 1 February 2011, and restored to the register on the petition of HMRC on 19 March 2012; at which time a winding up order was made. Liquidators B were appointed on 19 August 2013.

123 In the case of Inline it was struck off and dissolved on 7 December 2010 and restored to the register on the petition of HMRC on 8 June 2015; at which time a winding up order was made. Liquidators were appointed on 8 June 2015.

124 The significance of those facts is potentially two-fold. First, they C mean that in the case of those two companies, the liquidator's cause of action did not arise until the company in question was restored to the register and a winding up order made. That is why those claims under section 213 were not statute-barred. But the companies themselves (as opposed to their liquidators) also made claims in dishonest assistance in a breach of fiduciary duty; and, in connection with those claims, relied on section 32 of the Limitation Act 1980 to postpone the running of time. The D effect of restoration to the register is relevant to those claims.

125 Where a company has been restored to the register by court order after being dissolved section 1032 of the Companies Act 2006 provides:

> "(1) The general effect of an order by the court for restoration to the register is that the company is deemed to have continued in existence as if it had not been dissolved or struck off the register. E
>
> "(2) The company is not liable to a penalty under section 453 or any corresponding earlier provision (civil penalty for failure to deliver accounts) for a financial year in relation to which the period for filing accounts and reports ended— (a) after the date of dissolution or striking off, and (b) before the restoration of the company to the register.
>
> "(3) The court may give such directions and make such provision as F seems just for placing the company and all other persons in the same position (as nearly as may be) as if the company had not been dissolved or struck off the register."

126 The thrust of the claimants' argument as presented in the skeleton argument is that the effect of section 1032(1) is that the relevant companies are deemed to have continued in existence with the same directors who G were in office at the date of dissolution. This consequence was not fact-dependent, but was the proper interpretation of the deeming provision. Applying that interpretation to the facts of this case, the directors in office at the date of dissolution were the wrongdoing directors, whose knowledge of the wrongdoing could not be attributed to the relevant company. It follows that during the period between the dissolution and the restoration, the company could not have discovered the fraud. H

127 But in his oral submissions, Mr Parker submitted in the alternative that no assumption was required to be made about the existence or attributes of any director. In consequence the judge should have found that because, in reality, there was no company in existence and no directors, there

© 2023 The Incorporated Council of Law Reporting for England and Wales

was no one who could, with reasonable diligence, have discovered the fraud. This was, it seems, a point taken before the judge. It was mentioned in the grounds of appeal, but almost disavowed in the skeleton argument. Indeed, TFS prepared its skeleton argument on the basis that this argument had been abandoned. Nevertheless, Mr Scorey did not object to this argument being advanced.

128 The judge rejected those arguments. He held that it would be contrary to the scheme of the Limitation Act for the time that a restored company spends in enforced non-existence not to count towards the running of time for the purposes of limitation. The only difficulty lay in identifying the person or persons who would have been in control of the company during its enforced non-existence. The judge's answer was that the deeming provision in section 1032 required the assumption that Nathanael and Inline were properly constituted companies during the period of their non-existence and that they had the minimum number of ordinarily competent directors in place. He concluded, therefore, that as in the case of the claims by other claimants, the claims by Nathanael and Inline were also statute-barred.

*Deeming provisions*

129 The Supreme Court authoritatively stated the approach to statutory deeming provisions in *Fowler v Revenue and Customs Comrs* [2020] 1 WLR 2227, para 27:

> "(1) The extent of the fiction created by a deeming provision is primarily a matter of construction of the statute in which it appears.
>
> "(2) For that purpose the court should ascertain, if it can, the purposes for which and the persons between whom the statutory fiction is to be resorted to, and then apply the deeming provision that far, but not where it would produce effects clearly outside those purposes.
>
> "(3) But those purposes may be difficult to ascertain, and Parliament may not find it easy to prescribe with precision the intended limits of the artificial assumption which the deeming provision requires to be made.
>
> "(4) A deeming provision should not be applied so far as to produce unjust, absurd or anomalous results, unless the court is compelled to do so by clear language.
>
> "(5) But the court should not shrink from applying the fiction created by the deeming provision to the consequences which would inevitably flow from the fiction being real. As Lord Asquith memorably put it in *East End Dwellings Co Ltd v Finsbury Borough Council* [1952] AC 109, 133: 'The statute says that you must imagine a certain state of affairs; it does not say that having done so, you must cause or permit your imagination to boggle when it comes to the inevitable corollaries of that state of affairs.'"

130 The fifth of these principles deserves some emphasis. Although you must not permit your imagination to boggle at the *inevitable* corollaries of the deemed state of affairs, it does not permit a wide-ranging inquiry into consequences that were merely probable or possible consequences (see, for example, *Secretary of State for Transport v Curzon Park Ltd* [2021] PTSR 1560, para 42).

© 2023 The Incorporated Council of Law Reporting for England and Wales

131 That, in my judgment, is the short answer to the claimants' first argument. It is not an inevitable consequence of the deeming provision that the directors in office at the date of the dissolution would have remained in office during the whole of the period of what the judge called the companies' enforced period of non-existence if no dissolution had taken place. It is no more than a possible one. In any given case the relevant directors might have died, or become bankrupt, or might have been disqualified from acting as directors. Or, if the companies had remained in existence, HMRC might have presented winding up petitions and appointed liquidators earlier than they did. Nor is it an inevitable consequence of the companies' deemed existence that the wrongdoing directors would have persisted in their wrongdoing. Again, it is no more than a possible one. In my judgment, therefore, the conclusion that (irrespective of the facts of any particular case) section 1032(1) requires the assumption that the directors in office at the date of dissolution remained in office throughout the period of enforced non-existence is wrong.

132 Equally, I would not subscribe to the judge's view that section 1032(1) required him to assume that there was in place "the minimum number of ordinarily competent directors". That, in my view, is an assumption that the statute does not require, and which is not an inevitable consequence of the required assumption.

133 I consider that this approach is consistent with the authorities. But in order to explain them, I need to set out shortly how the statutory framework has developed. A detailed exposition can be found in the judgments of Munby LJ in *Joddrell v Peaktone Ltd* [2013] 1 WLR 784 and Newey LJ in *Bridgehouse (Bradford No 2) Ltd v BAE Systems plc* [2020] Bus LR 2025. In *Joddrell* Munby LJ explained:

> "11. The [Companies Act 2006] effected a significant change in the statutory framework. Prior to that, and for many years, successive Companies Acts had distinguished between two different routes to a judicial restoration of a dissolved or struck off company.
>
> "12. The first, which originated in 1900 and thereafter appeared successively in section 242 of the Companies (Consolidation) Act 1908, section 295 of the Companies Act 1929, section 353 of the Companies Act 1948 and section 653 of the Companies Act 1985, conferred on the court a power in defined circumstances, though exercisable for up to 20 years after dissolution, to order the restoration to the register of a company previously struck off by the Registrar of Companies. The effect of such an order was stated as being that the company is 'deemed to have continued in existence as if its name had not been struck off'.
>
> "13. The other, which originated in 1907 and thereafter appeared successively in section 223 of the 1908 Act, section 294 of the 1929 Act, section 352 of the 1948 Act and section 651 of the 1985 Act, conferred on the court a general power, though exercisable only within two years of the date of dissolution of the company, to 'make an order . . . declaring the dissolution to have been void'. The statute provided that 'thereupon such proceedings may be taken as might have been taken if the company had not been dissolved'. Importantly, the 'deeming' provision was not included."

© 2023 The Incorporated Council of Law Reporting for England and Wales

134 Since the coming into force of the Companies Act 2006, there have been two routes to restoration; namely administrative restoration (sections 1024 to 1028); and restoration by order of the court (sections 1029 to 1032). But importantly the deeming provision on restoration applies in both cases.

*Previous cases*

135 In *Tyman's Ltd v Craven* [1952] 2 QB 100 a company purported to apply to the county court for the grant of a new tenancy during the period of its dissolution. The hearing was adjourned, and before the resumed hearing the company was restored to the register. This court held by a majority that the effect of the restoration under section 353 of the Companies Act 1948 was that the application was to validate the application retrospectively. The majority (Sir Raymond Evershed MR and Hodson LJ) held that the effect of the restoration was to achieve an "as-you-were position" between the company and third parties. But that, as it seems to me, goes no further than to say that it is a necessary consequence of deeming the continued existence of the company that acts purportedly carried out by the dissolved company during the period of its dissolution must be treated as having been validly done. Jenkins LJ, in the minority, dissented on the ground that it was not a necessary consequence of the statutory hypothesis that the application for the new tenancy be validated, because the company could have continued in existence without making such an application.

136 In *Joddrell v Peaktone Ltd* [2013] 1 WLR 784 the claimant purported to bring a claim for damages for personal injury against a company which had been dissolved. On learning of the dissolution he applied for the restoration of the company to the register. This court held that the restoration of the company retrospectively validated the action purportedly commenced against the company during the period of its dissolution. As Munby LJ put it at para 29:

> "the effect of the deeming provision was to validate retrospectively what had happened while the company was dissolved, so that once the restoration order was made the company was to be regarded as never having been dissolved."

137 In essence, the decision in that case was the obverse of that in *Tyman's* case. Acts purportedly carried out (in this case against rather than by the company) were retrospectively validated.

138 In *Bridgehouse (Bradford No 2) v BAE Systems plc* [2020] Bus LR 306 a company had been struck off and dissolved. During the period of its dissolution a counterparty purported to terminate a contract on the ground that the striking off was an event of default. The company was subsequently restored to the register. Cockerill J held that the termination of the contract was nevertheless valid. As she put it at para 109, the authorities:

> "indicate that the deeming is directed towards the doing or undoing of 'incidents, which if the putative state of affairs had in fact existed, must inevitably have flowed from or accompanied it' or 'consequences which followed from the company having been struck off or dissolved'. It is directed to the direct or automatic effects of the removal from the register."

© 2023 The Incorporated Council of Law Reporting for England and Wales

139 At para 112 she added: "In my judgment these authorities reflect a line between direct and secondary consequences."

140 She concluded:

> "115. Ultimately and despite some discomfort about the position in relation to situations such as automatic forfeiture, I have reached the conclusion that this line between direct and indirect consequences is the line which the statute and the authorities indicate needs to be drawn. The deeming provision will have very wide application indeed. It will be (as it has been in the authorities) taken to undo the automatic consequences of a removal from the register or dissolution which is later undone in circumstances to which the deeming provision applies.
>
> "116. But there will be situations where consequences arise which are not automatic. A lease will become forfeit not because of the fact of the dissolution, but because, either consequent on that dissolution or independently of it, the lessee does not pay its rent. A contract will be repudiated for a similar reason and that repudiation will be accepted—as happened in [*Contract Facilities Ltd v Rees* [2002] EWHC 2939 (QB)]. Or, as in this case, a contractual party will have a choice as to whether to terminate a contract simply because of the removal from the register. The termination will not flow from, or be automatically a consequence of dissolution. It will occur where the party decides to make that decision and takes the step necessary to bring about that termination. Such consequences are, in my view, outwith the deeming provision."

141 Cockerill J's conclusion reflects my own; and, in particular that it is only the inevitable consequences of restoration that count.

142 A multiplicity of issues arose in *Davies v Ford* [2020] EWHC 686 (Ch). One of them was whether the effect of the restoration of a company was that the directors who were in office at the date of the dissolution were deemed to have continued in office during the period of dissolution. Mr Adam Johnson QC (sitting as a deputy High Court judge) held that the answer was "no". He gave a number of reasons for his conclusion:

(i) Directors have separate legal personalities from the company and their liability is not obviously within the deeming provision: para 387.

(ii) The argument, if correct, would lead to anomalous and unnecessary consequences: para 388.

(iii) The duties of a director are linked to his ability to exercise statutory powers; and it makes little sense to construe the deeming provision in a manner which automatically and retrospectively deems a person to have been subject to those duties during a period when he was unable to exercise the corresponding powers: para 391.

(iv) Policy requires a person to know, at any given time, whether or not he is subject to onerous fiduciary duties: para 392.

(v) If the circumstances require the deemed effect of restoration to be broadened, that can be achieved by a direction under section 1032(3): para 394.

143 I consider that these reasons are compelling. Indeed the crux of the claimants' first argument under this head depends on the proposition that a company and its directors are separate legal persons with the consequence that, on the facts of this case, the knowledge of the wrongdoing directors

© 2023 The Incorporated Council of Law Reporting for England and Wales

cannot be attributed to the companies. But the conclusion that they seek to draw about the effect of the deeming provision in section 1032(1) blurs (or even obliterates) that well-established distinction.

*Direction under section 1032(3)*

**144** In particular, I agree with Mr Johnson QC that any potential injustice in that conclusion is readily capable of being prevented by an application for a direction under section 1032(3). That, to my mind, is clear from the purpose identified in section 1032(3); namely "for placing the company and all other persons in the same position (as nearly as may be) as if the company had not been dissolved". It is through the application of section 1032(3) that questions of limitation are usually addressed: *Hawkes v County Leasing Asset Management Ltd* [2016] 2 BCLC 427, para 3; *Bridgehouse (Bradford No 2) Ltd v BAE Systems plc* [2020] Bus LR 2025 at para 26. It is in this way that the court can balance the prejudice to the company in not having been able to begin proceedings and the prejudice to third parties who might be deprived of what would otherwise be a limitation defence.

**145** The starting point here is that time runs against a dissolved company in the same way as it runs against an extant company: *County Leasing* at para 30. The court has power under section 1032(3) to direct an extension of the limitation period in favour of a company which has a potential claim; but that power is exercisable only where the dissolution of the company was the real cause of its being disabled from pursuing its claim. If the court concludes that it would probably have failed to pursue its claim in time anyway, then the causative prerequisite implied in section 1032(3) is missing: *County Leasing* at para 30. It is not simply a question of putting back the clock to the date of dissolution, but of requiring the court to ask what would have happened thereafter, during the period of dissolution, if dissolution had not occurred: *County Leasing* at para 33.

**146** The answer to that question is not, in my judgment, a matter of speculation or assertion: it is a question of evidence, to be decided by the court on the balance of probabilities: *Davy v Pickering* [2017] Bus LR 1239, paras 60 and 71.

**147** If the company can show that it is probable that, but for the dissolution, it would have begun proceedings in time, the court has a discretion whether to make a direction under section 1032(3). However, considerations of fairness will generally require that the company, like any other claimant faced with a limitation defence, should be left to meet that defence by recourse to the statutory regime in the Limitation Act 1980, rather than by a direction under section 1032(3): *Regent Leisuretime Ltd v NatWest Finance Ltd (formerly County Natwest Ltd)* [2003] BCC 587, para 90.

**148** Equally, as held in *Davy v Pickering*, where the limitation direction is sought by a potential claimant against a restored company, that potential claimant must show a clear causal link between the company's dissolution and his failure to bring proceedings within the applicable limitation period. No distinction is drawn between the company and third parties. The question is whether the claimant has proved, on the balance of probabilities,

© 2023 The Incorporated Council of Law Reporting for England and Wales

that if the company had remained in existence he would have brought his claim in time. That is a question of fact, to be decided on the evidence.

149 In addition, it is clear that a limitation direction under section 1032(3) should not place a person in a better position than they would have been if there had been no dissolution: *Davy v Pickering* at para 40.

*No directors?*

150 The alternative way of putting the case is that there were no directors during the period of the company's non-existence. But this, too, seems to me to require a positive assumption to be made which the section does not require. The section requires an assumption to be made about the company, not about the absence or presence of directors. In addition, it must be firmly borne in mind that the context in which the question arises is the postponement of the limitation period under section 32 of the Limitation Act 1980. Where the claimant relies on that section, the burden lies on him to prove on the facts that he could not with reasonable diligence have discovered the fraud. That is a question of fact. The claimants failed to discharge that burden.

151 In my judgment, the approach of the court in relation to the making of a direction under section 1032(3) should also inform the approach to the interpretation and consequences of section 1032(1). The three particular points are: first the company's dissolution must have been the real cause of the company being unable to pursue its claim (*County Leasing*); second, the company should not be in a better position under section 1032 than it would have been if it had not been dissolved; and third what would have happened if the company had remained in existence is a question of fact (*Davy v Pickering*). These are all questions to be decided on the evidence, and not on legal assumptions.

152 It does not appear to me that at trial the claimants attempted to advance the evidential case that would have demonstrated what would have happened if the relevant companies had not been dissolved; and that would have discharged the burden of proof. That, to my mind, also disposes of the claimants' secondary complaint under this head. They assert that the judge ought to have considered whether an ordinarily competent director of Nathanael and Inline respectively could have discovered the fraud at the same time as the liquidators could have done. The argument is that such a director did not have the investigatory powers possessed by an office holder. The difficulty with this argument is that the evidential case was not made; and the skeleton argument in relation to this ground of appeal deals with the argument in a single paragraph. The appellant's notice does not ask for a new trial on this point. It would be quite impossible, in my judgment, for this court to make any findings of fact that would be necessary to sustain this argument.

153 I would dismiss this appeal.

*The costs appeal*

154 The claim form was issued against TFS on 8 November 2017. The trial was due to begin in January 2021, but it was adjourned because of the illness of a crucial witness. But on 21 February 2022 the parties entered into

© 2023 The Incorporated Council of Law Reporting for England and Wales

a confidential settlement agreement which, among other things, provided for the judge to determine the substantive issues relating to the limitation defence and section 213, and also the costs of the whole proceedings. It is important to note that in the settlement agreement TFS did not admit liability; and that it agreed to pay a proportion of the amount claimed by each claimant if it were established that any of the claims succeeded either on the limitation issue or the section 213 issue. In the event, three claimants (Bilta, Weston and Vehement) failed to establish any valid claim and thus obtained nothing under the settlement agreement. Nathanael and Inline's claim for dishonest assistance in a breach of trust failed on limitation under section 32 of the Limitation Act 1980; but succeeded under section 213.

155 The judge had been the "docketed judge" in relation to the action, and had dealt with various matters of case management. He also, of course, heard the trial of the issues that the settlement agreement did not resolve. The judge approached the question of costs by saying that a bright line needed to be drawn between the costs incurred before the settlement agreement and the costs incurred subsequently. The former constituted the vast bulk of the costs. It is important to note that, as the judge recorded at para 9 of the costs judgment, neither side argued that the usual rule (costs follow the event) should be applied. Each party argued for an issues-based costs order.

156 The judge rejected the claimants' argument that they were the successful parties because they had recovered a substantial amount of money. He considered that it was a case in which he could not form a view about who would have won if the whole case had gone to trial. The payment that TFS agreed to make (without admission of liability) arose by way of settlement, not by a finding of liability and provided no element of vindication or indication of outcome. He concluded in [2022] EWHC 1431 (Ch) at [20]:

> "I cannot possibly proceed on the basis that TFS would have lost at trial. Nor can I say that simply because the settlement contained certain provisions, a consequence of making those concessions was that costs should be paid by TFS."

157 He therefore decided that this was not a case in which costs should follow the event. He then considered whether he should make an issues-based order, by "reading across" the parties' success or failure on the issues which he did decide in his substantive judgment. He considered that it was wrong to allow the issues on which there had been success or failure to inform the issues which could not be assessed one way or the other. In relation to the pre-settlement costs, he concluded at para 28:

> "As regards pre-settlement costs, the proper starting point is that there should be no order as to costs, and that each party should bear their own. That is because I cannot decide who would have won because there was no determination, and the settlement does not assist."

158 He made an adjustment to that, by allowing the claimants 7.5% of their pre-settlement costs to reflect the fact that, at TFS's behest, there had been two adjournments of the trial.

© 2023 The Incorporated Council of Law Reporting for England and Wales

**159** As regards the post-settlement costs he made an order that TFS should have its costs of the limitation defence, and the successful claimants should have their costs of the section 213 issue. A

**160** There is no appeal against the judge's decision as regards post-settlement costs. The judge himself gave permission to appeal against his decision on pre-settlement costs.

**161** It goes almost without saying that a first instance judge has a very wide discretion (a) whether to make any order for costs at all and (b) if so, what order to make. An appeal court can only interfere on very limited grounds. As Wilson J (sitting in this court) explained in *SCT Finance Ltd v Bolton* [2003] 3 All ER 434, para 2: B

> "This is an appeal brought with leave of the single Lord Justice from the county court in relation to costs. As such, it is overcast, from start to finish, by the heavy burden faced by any appellant in establishing that the judge's decision falls outside the discretion in relation to costs conferred upon him under CPR r 44.3(1). For reasons of general policy, namely that it is undesirable for further costs to be incurred in arguing about costs, this court discourages such appeals by interpreting such discretion very widely." C

D

**162** The question is not, therefore, whether we would have made the same order for costs as the judge, nor even whether we disagree with it. The question is whether the judge exceeded the wide discretion that the law gives him.

**163** Moreover, where the first instance judge has determined costs in a case in which the parties have settled their dispute (apart from costs) an appeal court is even more reluctant to interfere. E

**164** In a case in which the judge decides costs after settlement it has been said that an appeal court will only interfere if the judge's decision is "manifestly unjust". That test was first proposed by Mummery LJ (with whom Brooke LJ expressly agreed) in *BCT Software Solutions Ltd v C Brewer & Sons Ltd* [2004] FSR 9, para 9. The appeal in that case was dismissed because the judge's order was "not manifestly unjust in all the circumstances": para 20. That test was approved by this court in *Venture Finance plc v Mead* [2006] 3 Costs LR 389, paras 25 and 34; *Promar International Ltd v Clarke* [2006] EWCA Civ 332 at [35] and *Bray (trading as The Building Co) v Bishop* [2009] TCLR 9, para 5. In *Patience v Tanner* [2016] 2 Costs LR 311, para 33 Gross LJ questioned whether the reference to "manifest injustice" imposed a further threshold requirement, but was content to proceed as if it did. But as David Richards LJ pointed out in *Powles v Reeves* [2017] 1 Costs LR 19, para 25 the decisions in *Venture Finance plc v Mead* and *Bray v Bishop* do not appear to have been cited in *Patience v Tanner*. In *Powles v Reeves* David Richards LJ confirmed at para 26: F G

> "However the approach is expressed, I consider that these authorities show that an appellate court will be even more reluctant than in the case of a costs order after a contested hearing to interfere with a costs order made at the request of the parties after they have settled the substantive issues between them." H

© 2023 The Incorporated Council of Law Reporting for England and Wales

**165** The claimants do not criticise the judge for having distinguished so sharply between pre-settlement and post-settlement costs. But they argue that the judge did indeed make an error of principle in relation to the pre-settlement costs. They say that because the outcome of the litigation was that TFS ended up "writing the cheque" the claimants were the successful party. Even though the judge might not have been able to decide who would have won on liability if the whole case had gone to trial, nevertheless this was a case where the terms of the settlement agreement contained the answer.

**166** In the *BCT* case, for example, Mummery LJ said at para 7:

> "The judge has a discretion to decline to do what the parties ask him to do. If, on the one hand, the action is for damages, it will be relatively easy for the judge to tell from the size of the settlement sum and from the litigation history (offers, payments in and so on) how the costs should be borne. As I have already said, it would be relatively unusual for the parties themselves not to agree on the costs of such cases. In more complex cases, however, involving a number of issues and claims for discretionary equitable relief, the costs position is much more difficult for the judge to resolve without actually trying the case."

**167** In *R (M) v Croydon London Borough Council* [2012] 1 WLR 2607 Lord Neuberger of Abbotsbury MR differentiated between cases where the claimant had achieved all the relief that he sought, and cases in which the claimant had achieved part of the relief he sought. In the latter kind of case, he said at para 50:

> "The outcome will normally be different in cases where the consent order does not involve the claimant getting all, or substantively all, the relief which he has claimed. In such cases the court will often decide to make no order for costs, unless it can without much effort decide that one of the parties has clearly won, or has won to a sufficient extent to justify some order for costs in its favour. Thus the fact that the claimant has succeeded in obtaining part of the relief he sought may justify his recovering some of his costs, for instance where the issue on which the claimant succeeded was clearly the most important and/or expensive issue. But in many such cases the court may consider that it cannot fairly award the claimant any costs because, for instance, it is not easy to assess whether the defendants should have their costs of the issue on which the claimant did not succeed, and whether that would wipe out the costs which the claimant might recover in relation to the issue on which he won."

**168** He added at para 62:

> "I would accept the argument that, where the parties have settled the claimant's substantive claims on the basis that he succeeds in part, but only in part, there is often much to be said for concluding that there is no order for costs."

**169** *Gossage v Bishton* [2012] EWCA Civ 717 is another example of a case in which the achievement of partial success in a compromise resulted in no order for costs.

© 2023 The Incorporated Council of Law Reporting for England and Wales

170 Mr Parker also relied strongly on the decision of this court in *Langer v McKeown* [2022] 1 WLR 1255. That was a case of a petition for unfair prejudice brought under section 994 of the Companies Act 2006. There was a split trial of liability which was to be followed by the question of valuation if a buy-out order was made. The judge hearing the trial made an order for costs. The argument raised on appeal was that since the respondent had made a global *Calderbank* offer the judge was wrong not to have deferred the question of costs until after the second trial. This court rejected that argument. Whether to make a costs order was within the discretion of the judge. It is perfectly true that at para 37 Green LJ said that:

> "there is a general 'salutary' rule that costs follow the issue rather than the 'event'. This is because an overly robust application of a principle that costs should follow the final event discourages litigants from being selective as to the points they take in litigation and encourages an approach whereby no stone or pebble, howsoever insignificant or unmeritorious, remains unturned . . ."

171 But that was in the context of a split trial; and the actual decision in that case was that the costs order that the judge in fact made was within the ambit of his discretion. The court did not say that he would have been wrong to have approached the question of costs differently. In my judgment, Mr Parker's reliance on that case seeks to confine a judge's discretion over costs impermissibly.

172 Here, the claimants say, the action was for the recovery of money, and the claimants recovered a substantial sum. The judge should have been able to tell from the size of the settlement sum how the costs should be borne. It was not necessary (and was an error of principle) for him to have considered who might have won at trial if all the issues had been litigated. The claimants therefore argue that they should recover all their costs down to the date of the settlement agreement. Although I consider that there is considerable force in the argument that the terms of the settlement may in some cases provide a good proxy for deciding who is the successful party without having to second guess the result of a contested trial, this is not, in my judgment, a case of complete success, but of partial success. In addition it is, I think, necessary to consider the judge's costs order in the round in order to decide whether it was "manifestly unjust".

173 The result of the claimants' argument would produce the result that three claimants (Bilta, Weston and Vehement) whose claims failed completely would recover the bulk of their costs. That proposition only has to be stated in order to be seen to be unjust. This was not a case in which all costs were common costs. Substantial costs were incurred by TFS on individual claims by the individual companies. In addition, in relation to all the claimants, TFS won on a very substantial issue, namely the limitation defence. That entailed a detailed examination of the facts (unlike the section 213 issue which was a question of law). It could not be right that the claimants should recover their pre-settlement costs of that issue on which they all failed. Mr Parker was willing to accept that the claimants should not

© 2023 The Incorporated Council of Law Reporting for England and Wales

recover the costs of preparing Mr Hellard's witness statement on that issue, but there would no doubt have been other costs incurred in relation to that issue (for example, statements of case, disclosure and inspection of documents). There would also have been costs incurred on the question of quantum which were overtaken by the settlement agreement. If one were to apply the principle that the unsuccessful party pays the successful party's costs, and did not disaggregate the individual claimants, it might well be that TFS would recover three fifths of their costs, and Nathanael and Inline (or their liquidators) would recover all their costs, apart from the costs (both pre-settlement and post-settlement) of the limitation issue. Although the judge did not approach it in quite this way, netting those costs off, one can see how the judge could have arrived at the decision he did.

**174** As Lord Neuberger said in *Croydon*, in cases of partial success it may not be easy to assess whether the defendants should have their costs of the issue on which the claimant did not succeed, and whether that would wipe out the costs which the claimant might recover in relation to the issue on which he won.

**175** It is also worth examining the *BCT* case [2004] FSR 9 a little more closely. *BCT* was a claim for copyright infringement. Shortly after the trial began the parties settled on terms that BCT should recover £10,000. The judge was invited to determine costs. He made a complex costs order to reflect the fact that BCT had radically amended (and narrowed) its claim a month before trial. The only part of his order that was appealed was his decision that BCT should pay 62.5% of Brewer's costs after the amendment. This was, then, a case in which BCT did recover a sum from Brewer. At para 18 Mummery LJ said that if he had been the judge, he could probably have made no order for costs. Chadwick LJ said at para 27 that he agreed with Mummery LJ that the judge could not have been criticised if he had decided to make no order. Accordingly, even where the claimant does recover money from the defendant, a judge is not necessarily wrong in making no order for costs.

**176** The *Venture Finance* case [2006] 3 Costs LR 389 was a claim under a guarantee against two guarantors. The amount claimed was just under £300,000. Shortly before the claim was due to be heard the two guarantors agreed to pay £92,500 each. The judge made an order for costs. Although this court made an order for costs (which differed from the judge's order), Chadwick LJ said at para 12:

> "At first sight the present case was one in which the judge would have been entitled—indeed, I would say well advised—to decline to make any order as to costs. The claimant had obtained judgment (by consent) for less than one third of the amounts which it had been claiming in the application for summary judgment. There was nothing which enabled the judge to decide whether the claimant had been willing to settle at less than the amount claimed because it accepted that it could not prove the amount of funds in use on which the claim was based or because it accepted that the liability of each defendant was capped at the £100,000 limit. It is pertinent to keep in mind that the defendants had accepted, on the pleadings, that they were each liable up to £100,000 to the extent that the claimant could prove loss in that amount. It was impossible—as it

© 2023 The Incorporated Council of Law Reporting for England and Wales

seems to me—to say that one party had obviously won and the other party had obviously lost." A

177 *Capita (Banstead 2011) Ltd v RFIB Group Ltd* [2017] 4 Costs LR 669 is another case in which despite the fact that the claimants recovered a substantial sum the judge was entitled to make no order for costs, in view of the fact that they lost on one important issue. Thus even in a case where the claim was for money, and the claimant had recovered a substantial sum, it B would not have been an error of principle for the judge to have declined to make an order for costs. The mere fact that one party pays money to another does not necessarily mean that the receiving party is the successful party, particularly in a case of a group of claimants pursuing individual claims, some of whom succeed and some of whom fail: *Kupeli v Kıbrıs Türk Hava Yolları Şirketi (trading as Cyprus Turkish Airlines)* [2019] 1 WLR 1235.

178 In my judgment, the judge's decision on pre-settlement costs did C not fall outside the generous ambit of his discretion. I would dismiss this appeal.

*Result*

179 I would dismiss all the appeals. D

**STUART-SMITH LJ**

180 I agree.

**FALK LJ**

181 I also agree. E

*Appeals dismissed.*
*Cross-appeal dismissed.*

24 July 2023. The Supreme Court (Lord Briggs, Lord Kitchin and Lord Hamblen JJSC) allowed applications by the third and fifth claimants and the defendant for permission to appeal.

ALISON SYLVESTER, Barrister F

G

H

© 2023 The Incorporated Council of Law Reporting for England and Wales