# Bilta (UK) Ltd (in liquidation) v Tradition Financial Services Ltd ("Bilta Supreme Court") [2025] UKSC 18

# Exhibit 6

**Easter Term**
**[2025] UKSC 18**
*On appeal from: [2023] EWCA Civ 112*

# JUDGMENT

# Bilta (UK) Ltd (in liquidation) and others (Respondents) *v* Tradition Financial Services Ltd (Appellant); Nathanael Eurl Ltd (in liquidation) and another (Appellants) *v* Tradition Financial Services Ltd (Respondent)

before

**Lord Hodge, Deputy President**
**Lord Briggs**
**Lord Hamblen**
**Lord Burrows**
**Lord Richards**

**JUDGMENT GIVEN ON**
**7 May 2025**

**Heard on 11 and 12 December 2024**

*Appellant/Respondent – Tradition Financial Services Ltd*
David Scorey KC
Laurence Emmett KC
(Instructed by Greenberg Traurig, LLP)

*Respondent/Appellant – Bilta (UK) Ltd, Nathanael Eurl Ltd and others*
Christopher Parker KC
Andrew Westwood KC
(Instructed by Enyo Law LLP)

**LORD HODGE AND LORD BRIGGS (with whom Lord Hamblen, Lord Burrows and Lord Richards agree):**

1. These appeals raise two questions. The first involves the interpretation of section 213 of the Insolvency Act 1986 ("IA 1986") and asks whether the persons who may be required to make contributions to a company's assets because they were knowingly parties to the company's fraudulent trading are confined to those involved in the management or control of the fraudulent business. The second question is whether the claims of two of the claimant companies, which had been dissolved and later restored to the companies register, are time-barred. It raises a question of how the test in section 32(1) of the Limitation Act 1980 (whether the claimant could with reasonable diligence have discovered the fraud, concealment or mistake) operates during the period of the company's dissolution.

**1. Introduction: the nature of the dispute**

2. Bilta (UK) Limited ("Bilta"), which is in liquidation, is one of several companies which were vehicles in a missing trader intra-community fraud ("MTIC fraud") in the summer of 2009 involving spot trading in carbon credits under the EU Emissions Trading Scheme, also known as EU Allowances ("EUAs"). Spot trading in EUAs within EU Member States at that time attracted VAT. The rules were changed when the authorities realised that the EUAs were being used in MTIC fraud.

3. As Lewison LJ explained in his judgment in the Court of Appeal, MTIC fraud exploits the fact that imports from one EU country to another are VAT-free but VAT is added to the sale price when the imported goods are then sold on within the EU country into which they have been imported. The fraud involves traders running up large liabilities to account for VAT to national revenue authorities, such as HM Revenue and Customs Commissioners ("HMRC"), failing to account for the VAT due and instead paying their VAT receipts to third parties before going into insolvent liquidation.

4. MTIC fraud often involves a chain of transactions in high-value, easily transportable products. The fraudsters frequently carry out multiple back-to-back transactions at high speed between linked companies set up or acquired for that purpose. The use of a chain of companies obscures the fraud and complicates the task of investigation by the national revenue authorities.

5. In this case the MTIC fraud involved five companies which were left with enormous VAT liabilities owing to HMRC. Each of the companies is now in liquidation. HMRC were and are the principal creditors in their insolvencies. Those companies are: (i) Bilta, (ii) Weston Trading UK Ltd ("Weston"), (iii) Nathanael Eurl Ltd ("Nathanael"), (iv) Vehement Solutions Ltd ("Vehement"), and (v) Inline Trading Ltd ("Inline"). On 8

November 2017 those five companies and their respective liquidators issued a claim form against Tradition Financial Services Ltd ("Tradition"). Their claims were: (i) claims by the companies alleging that Tradition had dishonestly assisted their directors in the breach of their fiduciary duties to the claimant companies; and (ii) claims by the liquidators under section 213 of the IA 1986 alleging that Tradition had knowingly participated in the fraudulent trading of the businesses of the claimant companies.

6. The claimants and Tradition reached a partial settlement agreement which left two substantive issues for the judge to decide on the basis of assumed facts. Those issues were:

(i) Whether Tradition was within the scope of section 213 of the IA 1986; and

(ii) Whether the claims in dishonest assistance are statute-barred.

**2. The claim under section 213**

7. The parties agreed that the question whether Tradition was within the scope of section 213 would be determined on assumed facts. The facts pleased by the claimants, and which were to be assumed for the purpose of resolving the dispute in accordance with the compromise agreement, were substantially disputed by TFS in its pleadings and evidence. The consent order dated 21 February 2022 posed the question as being whether on the facts pleaded by the claimants, the claimants were entitled to the declarations sought under section 213.

***(i) The role of Tradition on the assumed facts***

8. The assumed facts were helpfully set out in the admirable Court of Appeal judgment of Lewison LJ ([2023] EWCA Civ 112; [2023] Ch 343) and repeated in the statement of facts and issues. We gratefully draw on that summary.

9. In the MTIC fraud, Nathanael and Inline were defaulters and Bilta, Weston and Vehement took part in deal chains which led to the defaulters. SVS Securities plc ("SVS") purchased EUAs on a back-to-back basis for those companies. Tradition brokered deals on behalf of companies which were its clients that dealt with SVS on a back-to-back basis. This involved finding a counterparty and negotiating the terms on which the counterparty was prepared to sell EUAs to or buy EUAs from the client company via SVS. Tradition was paid brokerage by volume traded.

10. Tradition participated in sales by SVS in the following ways. First, in some of the deals to which the claim related, Tradition introduced SVS to its overseas suppliers and liaised between SVS and the overseas supplier to inform the buying company and the selling company of the price and amount in which each was willing to trade. Secondly, it introduced Nathanael and Inline to SVS, which is a fact relevant to only some of the EUA trades to which the claim related. Thirdly, for those clients introduced to SVS, Tradition liaised between those companies and SVS to inform SVS of the price at which they were willing to sell and the amount they wished to sell. Overall, Tradition was involved in a number of the deal chains, but not all of them.

11. Tradition introduced Inline and Nathanael to SVS, knowing that they were unlikely to be legitimate trading concerns, without any belief that they would be engaging in spot trading of EUAs for legitimate purposes and in the knowledge that their purpose was to amass VAT.

12. Tradition offered the suppliers of the EUAs who wanted to sell with VAT the prospect of selling through SVS with an expectation of payment the same day thereby enabling them to buy and sell further EUAs with the monies received. Payment on the same day or even the next day was unusual and limited the number of counterparties to whom SVS could sell, thereby depressing the price that could be obtained for the EUAs.

13. Tradition was aware of the likelihood that companies newly applying to trade EUAs from around May 2009 were fronts for individuals wishing to conceal their involvement (or the extent of their involvement) in spot trading of EUAs and the likelihood that there was no legitimate reason for their wishing to do so.

14. Tradition did not perform any genuine “know your client” (“KYC”) inquiries of the suppliers aimed at reducing the possibility that the suppliers were involved in any criminal activity before asking SVS to provide a conduit for their EUAs to exporters. Tradition’s traders knew this, and they also knew that SVS did not perform any genuine KYC inquiries.

15. Tradition was aware that the nature and pattern of the EUA trading in which SVS and Tradition were involved was suspicious and such as to call for inquiry as to whether the trading was legitimate. Tradition knew, or did not care whether, such trading was linked to financial crime (including money laundering) and in particular a VAT fraud. Despite its suspicions, Tradition failed to make inquiries to try to ascertain whether its clients’ trading was legitimate and not connected with criminal activity, in particular VAT fraud, and whether or not to trade (or continue to trade) with such companies if there were reason to think that it was. To the contrary, Tradition pretended it had credible explanations for its clients’ trading although neither of the explanations relied on were honestly thought to be adequate explanations for the trading.

***(ii) Section 213 of the IA 1986***

16. Section 213 of the IA 1986 provides, under the heading “Fraudulent Trading”:

> “(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.
>
> (2) The court, on the application of the liquidator may declare that *any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned* are to be liable to make such contributions (if any) to the company’s assets as the court thinks proper.” (Emphasis added)

17. Because the application under section 213 can be made only by a liquidator in the course of the winding up of the company, the six-year limitation period under section 9 of the Limitation Act 1980 runs from the date of the winding up order or when the company goes into voluntary liquidation. As the winding up orders of Bilta, Weston and Vehement were made more than six years before the claim form was issued on 8 November 2017 the claims by their liquidators under section 213 are statute-barred, while the claims of the liquidators of Nathanael and Inline are not, because their winding up orders were made on 19 March 2012 and 8 June 2015.

18. The first issue which we address on this appeal is the scope of the words in section 213(2) which we have emphasised above: “any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned.” Tradition’s argument is that the phrase is restricted to persons exercising management or control over the company in question. Marcus Smith J in a judgment dated 31 March 2022 ([2022] EWHC 723 (Ch); [2022] BCC 833) rejected that argument. Tradition renewed it before the Court of Appeal. In a judgment dated 10 February 2023 ([2023] EWCA Civ 112; [2023] Ch 343) by Lewison LJ, with whom Stuart-Smith and Falk LJJ agreed, the Court of Appeal rejected it.

19. Before this court David Scorey KC for Tradition renews the submission. He states that the issue is whether Tradition should be treated as a party to the carrying on of the fraudulent business of the companies when the plan to defraud HMRC was hatched by the directors of the companies and it is not alleged that Tradition was a party to that conspiracy. He adopts the formulation of the issue by Marcus Smith J at para 73(2) of his judgment:

> "The question is whether section 213 is intended to apply only to persons exercising management or control of the company's business (eg directors, shadow directors and the like) or whether the provision extends to those who assisted or contributed to breaches of duty by the company or those controlling it."

He describes the first interpretation of section 213(2) as "the narrow interpretation" and the second as "the wide interpretation". We prefer to describe the second interpretation as being the proposition that the provision extends to those who dishonestly assisted or contributed to the carrying on by the company of any business which has been carried on with intent to defraud creditors. Little turns on that reformulation. The question is one of statutory interpretation and we address the established approach to statutory interpretation before applying that approach to section 213.

***(iii) The approach to statutory interpretation***

20. The court's approach to statutory interpretation is well established in our case law. The court derives the meaning of a legislative provision from the words which Parliament has used in that provision having regard to the context of the statute as a whole and the historical context in which the statute was enacted as the context may reveal the mischief which the provision addresses and shed light on its purpose. In *R (Quintavalle) v Secretary of State for Health* [2003] UKHL 13; [2003] 2 AC 687, Lord Bingham of Cornhill warned against giving a literal interpretation to a particular statutory provision without regard to the context of the provision in the statute and the purpose of the statute. He stated (para 8):

> "Every statute other than a pure consolidating statute is, after all, enacted to make some change, or address some problem, or remove some blemish, or effect some improvement in the national life. The court's task, within the permissible bounds of interpretation, is to give effect to Parliament's purpose. So the controversial provisions should be read in the context of the statute as a whole, and the statute as a whole should be read in the historical context of the situation which led to its enactment."

21. In *R v Secretary of State for the Environment, Transport and the Regions, Ex p Spath Holme Ltd* [2001] 2 AC 349 Lord Nicholls of Birkenhead made the important constitutional point (p 397) that citizens, with the assistance of their legal advisers, are intended to be able to understand parliamentary enactments and should be able to rely on what they read in an Act of Parliament. He acknowledged the value of the use by judges

of external aids to confirm an interpretation reached without such assistance but advocated circumspection in the use of such aids to displace otherwise clear and unambiguous meanings which did not produce absurdity (p 398).

22. That is not to say that there may not be circumstances in which the historical context provides strong pointers as to the meaning of a disputed statutory provision. The modern approach of a purposive interpretation of statutes supports a clear understanding of the mischief which Parliament is addressing in a statutory provision. In *Barclays Mercantile Business Finance Ltd v Mawson* [2004] UKHL 51; [2005]1 AC 684, in which the House of Lords clarified the principles underlying the so-called "Ramsay doctrine" by which sophisticated tax avoidance schemes were undermined, Lord Nicholls explained that tax law was being subjected to generally applicable principles of statutory interpretation. He explained the approach as being "to give the statutory provision a purposive construction in order to determine the nature of the transaction to which it was intended to apply and then to decide whether the actual transaction … answered the statutory description" (para 32).

23. More recently, this court has summarised the approach to statutory interpretation in *R (O) v Secretary of State for the Home Department* [2022] UKSC 3; [2023] AC 255. In that case, Lord Hodge, giving the majority judgment, stated (paras 29-31):

> "29. The courts in conducting statutory interpretation are 'seeking the meaning of the words which Parliament used': *Black-Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1975] AC 591, 613 per Lord Reid. More recently, Lord Nicholls of Birkenhead stated: 'Statutory interpretation is an exercise which requires the court to identify the meaning borne by the words in question in the particular context.' (*R v Secretary of State for the Environment, Transport and the Regions, Ex p Spath Holme Ltd* [2001] 2 AC 349, 396.) Words and passages in a statute derive their meaning from their context. A phrase or passage must be read in the context of the section as a whole and in the wider context of a relevant group of sections. Other provisions in a statute and the statute as a whole may provide the relevant context. They are the words which Parliament has chosen to enact as an expression of the purpose of the legislation and are therefore the primary source by which meaning is ascertained. There is an important constitutional reason for having regard primarily to the statutory context as Lord Nicholls explained in *Spath Holme*, p 397: 'Citizens, with the assistance of their advisers, are intended to be able to understand parliamentary enactments, so that they can regulate their conduct accordingly. They should be able to rely upon what they read in an Act of Parliament.'

> 30. External aids to interpretation therefore must play a secondary role. Explanatory Notes, prepared under the authority of Parliament, may cast light on the meaning of particular statutory provisions. Other sources, such as Law Commission reports, reports of Royal Commissions and advisory committees, and Government White Papers may disclose the background to a statute and assist the court to identify not only the mischief which it addresses but also the purpose of the legislation, thereby assisting a purposive interpretation of a particular statutory provision. The context disclosed by such materials is relevant to assist the court to ascertain the meaning of the statute, whether or not there is ambiguity and uncertainty, and indeed may reveal ambiguity or uncertainty: *Bennion, Bailey and Norbury on Statutory Interpretation*, 8th ed (2020), para 11.2. But none of these external aids displace the meanings conveyed by the words of a statute that, after consideration of that context, are clear and unambiguous and which do not produce absurdity. …
>
> 31. Statutory interpretation involves an objective assessment of the meaning which a reasonable legislature as a body would be seeking to convey in using the statutory words which are being considered. …"

***(iv) The application of this approach to section 213 of the IA 1986***

24. We begin this exercise by looking at the statutory words in section 213. Subsection (1), which is the gateway to the operation of subsection (2), addresses the business activities of the company and the purpose of those activities. If the persons who carry on the company's business do so with intent to defraud creditors or for any fraudulent purpose, subsection (2) comes into effect. That subsection identifies the persons who may incur the liability to make a contribution to the company's assets as the court thinks proper. They are "any persons who were knowingly parties to the carrying on of the business" of the company for any fraudulent purpose.

25. We note certain features of the language which limit the circumstances in which liability may be incurred under section 213. First, the person to incur liability must be a party to the carrying on by the company of a fraudulent business and not merely involved in a one-off fraudulent transaction, unless the fraud is sufficient evidence on its own of the carrying on of a fraudulent business: *In re Murray-Watson Ltd* (unreported) 6 April 1977, Oliver J; *Morphitis v Bernasconi* [2003] EWCA Civ 289; [2003] Ch 552, Chadwick LJ para 46. Secondly, being party to the carrying on by the company of a fraudulent business does not extend to a mere failure to advise: see *In re Maidstone Buildings*

*Provisions Ltd* [1971] 1 WLR 1085, in which Pennycuick V-C held that the failure of a company secretary to give advice to the company's directors did not bring him within the ambit of section 332 of the Companies Act 1948, a predecessor of section 213 the IA 1986: p 1092. Thirdly, the person liable must have had an active involvement in the carrying on of the fraudulent business by the company: *In re Maidstone* (above); *R v Miles* [1992] Crim LR 657.

26. Subject to those limitations, there is nothing in the language of section 213(2) which restricts the scope of the provision to directors and other "insiders" who were directing or managing the business of the company. The natural meaning of the statutory words – "any persons who were knowingly parties to the carrying on of the business" of the company for any fraudulent purpose – is wide enough to cover not only such "insiders" but also persons who were dealing with the company if they knowingly were parties to the fraudulent business activities in which the company was engaged. Such persons could include those who transacted with the company in the knowledge that by those transactions the company was carrying on its business for a fraudulent purpose.

27. We agree with Neuberger J in *In re Bank of Credit and Commerce International SA* [2002] BCC 407 ("*In re BCCI*") in which he stated (p 411):

> "[A]s a matter of ordinary language, the ambit of section 213(2) is not limited to those who perform a managerial or controlling role within the company concerned. Although I accept that the language of section 213(2) is a little unusual, it appears to me that the concept of being 'parties to the carrying on' by a company of a type of business, or of a business in a certain way, is not limited to the person who actually directs or manages the business concerned."

28. Turning to the statutory context, section 213 is located in Part IV Chapter X of the IA 1986, which is concerned with malpractice before and during the liquidation of a registered company. It is striking how the language used in the surrounding sections to identify the persons who are their targets differs from that of section 213(2). Section 212 provides a summary remedy against a delinquent director, liquidator or administrative receiver of a company and (section 212(1)(c)) a person who "is or has been concerned, or has taken part, in the promotion, formation or management of the company". Section 214 (headed "Wrongful trading") empowers the court to order that "a person who is or has been a director of the company" should contribute to the assets of the company where the company continues to trade after the person ought to have concluded that the company had no reasonable prospect of avoiding an insolvent liquidation. Section 214(7) provides that a director includes a shadow director. In both section 212 and section 214 those persons targeted by the provisions are closely defined. In section 212 the person must have been concerned in the promotion, formation or management of the insolvent

company, while in section 214 the targets are directors and shadow directors. They are all company insiders. Christopher Parker KC, who appears for Bilta, also referred the court to section 133 of the IA 1986 (public examination of officers) which in subsection (1)(c) identifies its targets by using the same formulation as that used in section 212 which we have quoted. We were also referred to sections 216 and 217 of the IA 1986. The latter section imposes personal liability for a company's debts where a person "is involved in the management of the company" and the company reuses the name of a company in insolvent liquidation contrary to section 216 of IA 1986. Section 216 applies to directors or shadow directors of a company at any time in the period of 12 months ending on the day before it went into liquidation. It is noteworthy that section 216(3), which prohibits certain actions in the period of five years after the commencement of the liquidation without the leave of the court, states that such a person may not:

> "(a) be a director of any other company that is known by a prohibited name, or
>
> (b) in any way, whether directly or indirectly, be concerned or take part in the promotion, formation or management of any such company, or
>
> (c) in any way, whether directly or indirectly, be concerned or take part in the carrying on of a business carried on (otherwise than by a company) under a prohibited name."

It is clear that Parliament in section 212 and in section 216(3)(b) has defined more narrowly than in section 213(2) the persons who are subject to those provisions. Further, the contrast between section 216(3)(b) and section 216(3)(c) shows that Parliament identified different types of involvement in a business, distinguishing between the management of a company and taking part in the carrying on of a business.

29. There is nothing in the statutory context which militates against giving the critical statutory words their natural meaning which Neuberger J described.

30. Turning to external aids to the interpretation of the statutory provision, Mr Scorey focused on the legislative history of the precursors to section 213 of the IA 1986. In our view the legislative history is of limited assistance but points to a parliamentary purpose of expanding the range of persons targeted by the fraudulent trading provision. The first statutory provision relating to fraudulent trading was section 75 of the Companies Act 1928, which empowered the court to declare that directors of the company (section 75(1)) and persons whom we would now call shadow directors (section 75(5)) were personally responsible without any limitation of liability for all or any of the company's debts as the court might direct. The section also made such fraudulent trading a criminal offence

(section 75(3)). Section 275 of the consolidating Companies Act 1929 altered the wording of the section in ways which are not material, but the targets of the provision remained directors and shadow directors, and the persons entitled to apply to the court remained the official receiver, the liquidator, or any creditor or contributory of the company.

31. In 1945 the Committee on Company Law Amendment chaired by Sir Lionel Cohen produced its report ("the Cohen Report") (Cmd 6659) which led to further statutory reform. One of the Committee's recommendations (para 149) was that section 275 of the 1929 Act be "extended so as to apply not only to directors but also *to other persons who were knowingly parties to the frauds*". (Emphasis added)

32. Parliament made the legislative changes by section 101 of the Companies Act 1947 but not precisely in the terms recommended. Section 275 of the 1929 Act as so amended was included as section 332 of the consolidating Companies Act 1948 which provided so far as relevant:

> "(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory of the company, may, if it thinks proper so to do, declare that *any persons who were knowingly parties to the carrying on of the business in manner aforesaid* shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the court may direct." (Emphasis added)

33. Before both the Court of Appeal and this court, Mr Scorey relied on a well-researched and reasoned article by David Foxton QC: "Accessory liability and section 213 Insolvency Act 1986" [2018] JBL 324. In that article the author recorded exchanges between Sir Lionel Cohen and two distinguished witnesses during the gathering of evidence. The exchanges suggested that Sir Lionel Cohen may have had in mind a need to extend the scope of section 275 of the Companies Act 1929 to cover the circumstance where a fraudster behind the scenes was manipulating a small private company and it was not possible to prove that the directors of the company had obeyed his orders so as to bring him within the ambit of the section. While this is an interesting piece of historical research, we do not find it assists the interpretation of section 213 of the IA 1986 for three reasons. First, we do not know what the authors of the report, when they came to write the report, considered the scope of their recommendation to be, beyond the words which they used and which we have quoted in para 31 above. We have no knowledge otherwise of their deliberations. Secondly, Parliament did not use those words in enacting section 332 of the Companies Act 1948. It used the words emphasised in para 32 above, which

words have in substance found their way into section 213 of the IA 1986. Thirdly, the attempt to extrapolate the meaning of a statutory provision from an exchange between a committee and a witness during the gathering of evidence for the Cohen Report offends against the point made by Lord Nicholls in *Spath Holme*, which we mentioned in para 21 above, about the importance of citizens being able to understand statutory provisions with legal advice. Delving behind the recommendations of a committee into the transcript of its proceedings would not involve the circumspection which Lord Nicholls advocated.

34. To complete the legislative history, we note that the Companies Act 1985 separated criminal liability and civil liability into two sections: sections 458 and 630, and provided that a winding up of the company was not a precondition for the commission of a criminal offence. We discuss the criminal provisions in paras 37–43 below. Paragraph 6 of Schedule 6 to the Insolvency Act 1985 inserted section 630(2), which is now section 213(2) of the IA 1986. This amendment restricted those who may apply to the court to the liquidator, removing the prior entitlement of a creditor or a contributory. It also replaced the defendants' personal responsibility for the company's debts and liabilities with a liability to make such contributions to the company's assets as the court thinks proper.

35. Subject to our consideration of the criminal provisions below, we take from the legislative history of the provisions that the Cohen Report recommended that civil liability be extended to "those who were knowingly parties to the frauds" and that in response Parliament enacted section 332 of the Companies Act 1948 which contains the phrase emphasised in para 32 above. That phrase is now in section 213(2) of the IA 1986 and defines the persons on whom the court may impose the liability to contribute to the company's assets. In our view there is nothing in the legislative history which militates against giving those words their natural meaning.

36. It is, as discussed above, relevant to consider the purpose of a statutory provision. Here the provision creates civil liability where a person is knowingly involved in fraud when he or she knowingly becomes a party to the carrying on of business by a company with intent to defraud creditors or for any fraudulent purpose. Liability under section 213(2) depends upon dishonest participation and it exists to discourage such participation. The purpose of discouraging fraud is not a reason for taking a maximalist interpretation of the relevant words so as to extend the ambit of the section if there are indications which might limit that ambit. The requirement of knowing participation in the fraudulent carrying on of the company's business is such a limitation; but it does not militate against the inclusion of a counterparty to a fraudulent transaction or transactions by the company within the ambit of the section where the counterparty has the requisite knowledge of, including wilful blindness to, the fraudulent activity in the conduct of the company's business. We agree with Lewison LJ in para 93 of his judgment in this case in which he stated:

> "The extent to which a counterparty must be involved in the carrying on of the fraudulent business may depend upon the facts. Suppose that a manufacturer regularly supplies counterfeit designer clothes to a retailing company, knowing that the retailer will pass them off as genuine. It is, in my judgment, no misuse of language to describe the manufacturer as 'party to the carrying on' of a fraudulent business, even though he exercises no managerial or controlling role within the retailing company; and the manufacturer may have other business activities that are not fraudulent. The manufacturer knows about the retailer's fraudulent business and is actively participating in it in the sense of furthering and facilitating it."

In *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262, 268 Templeman J famously stated that "a man who warms himself with the fire of fraud cannot complain if he is singed." We agree.

37. Mr Scorey submits that the analogous criminal provisions point towards a narrow interpretation of section 213(2). We disagree. Until 1985, the statutory provisions relating to fraudulent trading provided for civil liability and created a criminal offence. Thus, section 332(3) of the Companies Act 1948 provided that every person who was knowingly party to the company's carrying on of a business in the manner set out in subsection (1) (see para 32 above) shall be liable on conviction on indictment to imprisonment for up to two years or a fine of up to £500 or both. The Companies Act 1985 separated criminal liability from civil liability as mentioned above. The current criminal provision can be found in section 993 of the Companies Act 2006 ("CA 2006") which provides:

> "(1) If any business of a company is carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, every person who is knowingly a party to the carrying on of the business in that manner commits an offence."

Subsection (2) provides, in contrast to the civil liability, that this applies whether or not the company has been, or is in the course of being, wound up. Subsection (3) provides that a person so convicted on indictment may face imprisonment for up to 10 years or a fine or both and lesser penalties when convicted summarily.

38. Mr Scorey points to the similarity of the wording of section 213 of the IA 1986 and section 993 of the CA 2006 and submits that any ambiguity should be resolved so as to prevent persons suffering a criminal penalty: *Bennion, Bailey and Norbury on Statutory*

*Interpretation,* 8th ed (2020), para 26.4. In their commentary on the presumption against doubtful penalisation in the same paragraph the authors state:

> "Given that the presumption against doubtful penalisation is based on ideas of basic fairness and the need to warn people of the potential adverse consequences of their actions, the presumption against doubtful penalisation may carry less weight in circumstances involving conduct that sails close to the wind."

We do not accept that this presumption provides a basis for negating either the civil or criminal liability of a counterparty or other person with no managerial or controlling role within the company. There are three reasons for this view. First, we see no ambiguity in the statutory words; those words should be given their natural meaning in the absence of indications to the contrary. The penalisation is not doubtful. Secondly, criminal liability can arise only if the counterparty to the company's transactions or other outsider has dishonest knowledge of the company's fraudulent activity, including when the outsider is wilfully blind. The outsider must knowingly warm himself or herself with the fire of fraud. Thirdly, as Lewison LJ pointed out in para 108 of his judgment, the counterparty or other outsider is otherwise within the ambit of the criminal law as he or she can be convicted of aiding and abetting the fraud: see *R v Cartwright* [2020] EWCA Crim 369; [2020] Lloyd's Rep FC 547.

39. We do not attach significant weight to the fact that the civil and criminal provisions, which until 1985 appeared in one section of one statute, are now in different sections in different statutes. It is true that the criminal provision now extends more broadly than the civil provision, which applies on a formal insolvency as only a liquidator or an administrator of a company can apply for a contribution order. Nor do the criminal cases to which we were referred support a narrower interpretation of the critical words in section 213(2): none of the criminal cases addressed the question of the liability of an outsider.

40. In *R v Grantham* [1984] QB 675, an appeal against a conviction under section 332(3) of the Companies Act 1948, the appellant, who was the sole authorised signatory of the company's cheques, was in charge of the company's administration and controlled its expenditure. The judge's summing up to the jury, which the Court of Appeal upheld, focused on whether the defendant took an active part in running the company's business. In the context where the defendant was not a counterparty to a transaction by the company or other outsider, that focus was unexceptionable. It tells us nothing about the application of the provision where the defendant was a counterparty or other outsider.

41. In *R v Miles* (above), an appeal against a conviction under section 458 of the Companies Act 1985, the defendant was a salesman employed by the company whose directors had carried on the fraudulent trading and the question for the Court of Appeal was whether the judge's summing up had made clear to the jury that a person working for the company had to exercise a controlling or managerial function. The judge had instructed the jury to consider whether the defendant had been "participating, taking part or concurring" in the trade which was involved in the business of the company. The Court of Appeal held that to be a misdirection because the reference to "concurring in the trade" could have broadened the scope of the defence in the minds of the jury. In other words the court was addressing in a criminal context a similar issue to that which *In re Maidstone* (para 25 above) addressed in a civil context: whether the defendant had participated in the fraudulent activity.

42. In *R v Kellard* [1995] 2 Cr App R 134 Mr Wright was the chairman of one company (Britannia Park Ltd) in a group of companies but was not a director or employee of two companies within the group which were also engaged in fraudulent trading. The three companies were largely run as a single entity and the affairs of the other two companies were discussed at the board meetings of Britannia Park Ltd. The Court of Appeal upheld his conviction of being a party to the fraudulent trading of all three companies on the basis that he was assisting in the carrying on of the business of the other two companies (p 160).

43. As with *R v Grantham*, the judgments in *R v Miles* and *R v Kellard* give no guidance on the scope of the relevant statutory provision if a defendant was a counterparty to a transaction by a company or other outsider. In particular, they do not suggest that the narrow definition which Mr Scorey advocates should be applied to exclude outsiders from the ambit of the statutory provisions on fraudulent trading.

44. The civil cases relating to the predecessor provisions to section 213 of the IA 1986 are consistent with the conclusions which we have reached but, as we explain, do not determine the meaning of section 213. In *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262 the applicant was a creditor of Gerald Cooper Chemicals Ltd ("Cooper Chemicals"). The respondents were a company and its directors who had lent money to the insolvent Cooper Chemicals which accepted deposits from customers as prepayments for the sale of goods when to its knowledge it could not supply the goods as a result of its insolvency. Cooper Chemicals was therefore carrying on business with an intention to defraud creditors. Cooper Chemicals repaid the loan out of the prepayments and the respondents were alleged to know of all the circumstances giving rise to the repayment. Templeman J, in refusing a strike out application, stated (p 268):

> "[A] lender who presses for payment is not party to a fraud merely because he knows that no money will be available to pay him if the debtor remains honest. The honest debtor is free

> to be made bankrupt. But in my judgment a creditor is party to the carrying on of a business with intent to defraud creditors if he accepts money which he knows full well has in fact been procured by carrying on the business with intent to defraud creditors for the very purpose of making the payment."

There may be an argument that this formulation is too broad as mere awareness of the source of the funds may not amount to facilitating, assisting or participating in the fraudulent activity; but it is not necessary to decide that matter on this appeal.

45. In *In re Augustus Barnett & Son Ltd* [1986] BCLC 170 the company, which was a subsidiary of Rumasa SA, was able to continue to trade as a going concern only because Rumasa had given letters of comfort which were noted in the company's accounts and had made statements of continued support. After the company went into liquidation the liquidators commenced proceedings against Rumasa under section 332 of the Companies Act 1948 on the basis that Rumasa had induced the board of the company to continue to trade. Rumasa successfully applied for the claim to be struck out on the ground that it disclosed no reasonable cause of action. In striking out the claim Hoffmann J referred (p 173) to *In re Gerald Cooper Chemicals Ltd* and stated that the critical words ("any persons who are knowingly parties to the carrying on of the business in manner aforesaid") "*may* be wide enough to cover outsiders who could not be said to have carried on or even assisted the carrying on of the company's business but who nevertheless in some way participated in the fraudulent acts" (Emphasis added). He held that the claim failed (i) because there was no allegation of fraud against those who actually carried on the company's business and (ii) in any event there was no basis for inferring fraud on Rumasa's part. In relation to the first ground he stated (pp173-174):

> "The only point with which I am concerned is whether section 332 can form the basis for imposing liability on a parent company otherwise than as accessory to fraudulent trading by the persons who actually carried on the business of the subsidiary. In my judgment it cannot. The language of the section is clear and unambiguous."

We agree, subject to the qualification that we would not speak of accessory liability but rather of liability arising from participation in the fraudulent acts of those carrying on the business of the company.

46. In *In re BCCI* (above), one of many cases arising out of the insolvency of BCCI, Neuberger J was concerned with a preliminary issue as to whether a claim by BCCI's liquidators under section 213(2) of the IA 1986, that another bank, Banque Arabe Internationale d'Investissement SA ("BAII"), had knowingly participated in fraudulent

trading by BCCI, must fail because BAII was not exercising a controlling or managerial function within BCCI. Neuberger J rejected that contention and held (p 414) that a company which is involved in, and assists and benefits from, a company's fraudulent trading and does so knowingly and therefore dishonestly "does fall or at least can fall within section 213(2)" His first reason for so holding, which we have quoted in para 27 above, was founded on the ordinary meaning of the words in section 213(2). His other reasons were: (i) policy, (ii) the contrast of the wording of section 213(2) and sections 212 and 214 (which we also have founded on in our discussion of the statutory context in para 28 above), (iii) the legislative history of the provisions, including the Cohen Report, (iv) consistency with the first instance cases of *In re Gerald Cooper Chemicals Ltd* and *In re Augustus Barnett & Son Ltd* and (v) that the criminal cases which we have discussed in paras 40-43 above did not point in the other direction because they all concerned a defendant who was employed by, or acted for, the company which carried on the fraudulent trading and were not addressing the possible liability of persons outside the company.

47. In *Morphitis v Bernasconi* (above), as Lewison LJ has explained in this case (para 92), the Court of Appeal addressed the question of what amounts to "the carrying on of a business with intent to defraud" (ie the subject matter of section 213(1)) rather than a question under section 213(2) about who would be a "party" to the carrying on of that business). The latter question was not addressed as the solicitors who had advised the company on the scheme to divest itself of onerous leases had settled the section 213(2) claim against them by a payment into court. Chadwick LJ delivered the leading judgment and at para 46 referred to the *Gerald Cooper Chemicals* case, accepting that a business may have been carried on with intent to defraud creditors notwithstanding that only one creditor is shown to have been defrauded and by a single transaction. He expressed the view that if (which he doubted) Templeman J had intended to suggest in that case that whenever a fraud on a creditor is perpetrated in the course of carrying on business, it must necessarily follow that the business is being carried on with intent to defraud creditors, he had gone too far. The statutory precondition of liability in section 213(1) is that the business of the company is being carried on with intent to defraud creditors or for any fraudulent purpose.

48. In *Morris v State Bank of India* [2003] EWHC 1868 (Ch); [2003] BCC 735, another case arising out of the insolvency of BCCI, the principal question was whether the State Bank of India had knowledge that the transactions in which it was participating were intended to defraud the creditors of BCCI. Patten J held (para 12) that all that was required was that the counterparty should have knowingly participated in the carrying on of the business with intent to defraud. That knowledge was not established in that case.

49. In *Morris v Bank of India* [2004] EWHC 528 (Ch); [2004] BCC 404, yet another BCCI case, the liquidators of BCCI applied for an order that the Bank of India pay a contribution to the liquidators of BCCI for knowingly participating in six transactions by which BCCI sought to deceive its auditors and improve its balance sheet. The key issue

was whether the officials of the Bank of India, who entered into the transactions, knew that they were assisting BCCI to perpetrate a fraud on its creditors. Patten J recorded in para 7 that the Bank of India admitted that it had participated in the carrying on of the business of BCCI for fraudulent purposes but denied that it had *knowingly* participated in any fraud. Thus, the Bank of India's only defence was a denial of knowledge because it was common ground that a counterparty to a transaction with BCCI in this context could be within the ambit of section 213(2) (para 121). The case focused on the knowledge of a senior manager of the Bank of India ("Mr S") based in London and Patten J held (i) that he had knowingly participated in four of the six fraudulent transactions and (ii) that his knowledge was to be attributed to the Bank of India.

50. The Bank of India appealed this judgment. In the Court of Appeal (*Bank of India v Morris* [2005] EWCA Civ 693; [2005] BCC 739) Mummery LJ delivered the judgment of the court. Much of the judgment was concerned with (i) whether the senior manager had been dishonest and (ii) whether his knowledge could be attributed to the Bank of India. He recorded (paras 86 and 100) that the Bank of India accepted that it was possible for section 213(2) to apply to a corporate counterparty. He stated (para 97):

> "Before dealing with the rival arguments on the policy of section 213, we remind ourselves that both civil liability to pay compensation and criminal sanctions may be imposed on any person who is knowingly a party to fraudulent trading. Both types of liability extend beyond the company which actually carried on its business with intent to defraud creditors and its directors to 'outsiders', meaning individuals and corporate third parties who have knowingly been parties to the fraudulent trading in question."

51. Mummery LJ expressed the view (para 107) that the separation of the statutory provisions relating to civil and criminal liability made it easier to focus on the policy of imposing civil liability. He held that the paramount purpose of section 213 was to compensate those who had suffered loss as a result of the fraudulent trading and continued (para 112), "If knowledge were not attributed to an outsider company in cases such as this the purpose of imposing liability upon such a company to pay compensation would, in our judgment, be emasculated." Mr S was a senior manager and the board of the Bank of India had relied on his judgment in relation to the transactions; he had authority to enter into the transactions. For the purposes of civil liability under section 213 it was appropriate to attribute Mr S's knowledge to the bank.

52. In *Bilta (UK) Ltd v Nazir (No 2)* [2015] UKSC 23; [2016] AC 1 this court addressed a similar MTIC fraud in EUAs involving Bilta and counterparties who were a Swiss company, Jetivia SA, and its sole director, Mr Brunschweiler, who resided in France. The case concerned questions of the attribution of knowledge and the defence of

illegality. The main question relating to section 213 was whether it had extra-territorial effect and the court held unanimously that it did. In a joint judgment Lord Toulson and Lord Hodge described section 213 as follows (para 213):

> "The section provides a remedy against any person who has knowingly become a party to the carrying on of that company's business with a fraudulent purpose. The persons against whom the provision is directed are thus (a) parties to a fraud and (b) involved in the carrying on of the now-insolvent company's business. Many British companies, including Bilta, trade internationally. Modern communications enable people outside the United Kingdom to exercise control over or involve themselves in the business of companies operating in this country. Money and intangible assets can be transferred into and out of a country with ease, as the occurrence of VAT carousel frauds demonstrates."

53. They continued in para 215:

> "The substance of the section 213 allegation is that the appellants were party to a conspiracy to defraud Bilta in the context of a wider VAT fraud, that they were parties to the conduct of Bilta's business to that end, and that Jetivia obtained the proceeds of that fraud. If Bilta's liquidators establish those allegations after trial, we think it is likely that the court would decide to exercise its jurisdiction under section 213 of IA 1986 against the appellants, their foreign residence notwithstanding."

54. Those statements were made in a context in which the point which Tradition has taken on this appeal was not argued. But they are consistent with the line of judicial statements, which we have summarised above and which amount to a line of strong persuasive authority which points only in one direction. Like Lewison LJ in this case (para 104) we consider that the Court of Appeal's judgment in *Bank of India v Morris* (above), which proceeded on a concession, was not binding authority on the Court of Appeal. But the very significant concession was consistent with the prior case law and was accepted without question by the Court of Appeal.

55. In our discussion of English authorities we mention finally the judgment of Snowden J in *Bilta (UK) Ltd v NatWest Markets plc* [2020] EWHC 546 (Ch) in which he reviewed the case law which we have addressed in his discussion of the law between paras 175 and 192. That review demonstrates how the English case law points in one

direction but, as we have said, we agree with Lewison LJ that the Court of Appeal's judgment in the *Bank of India* case was not a binding authority on Snowden J.

56. We observe also that the Irish Supreme Court in a judgment by O'Flaherty J on Irish legislation (section 297 of the Companies Act 1963, which was the equivalent of section 332 of the UK Companies Act 1948) similarly held that a third party who knowingly participates in an act of fraudulent trading committed by the directors of a company may incur civil liability under that provision: *O'Keeffe v Ferris* [1997] 3 IR 463, 469.

57. Mr Parker seeks to go further. He submits that Parliament by substantially repeating the critical words from section 332 of the Companies Act 1948 ("any persons who were knowingly parties to the carrying on of the business in the manner above mentioned") in para 6 of Schedule 6 to the IA 1985, had adopted the meaning given to those words by Templeman J in the *Gerald Cooper Chemicals* case in 1977. (It cannot be and was not suggested that the replacement of "in manner aforesaid" by "in the manner above mentioned" altered the meaning in any way.) In so submitting, he founded on the so-called "Barras principle" from the judgment of the House of Lords in *Barras v Aberdeen Steam Trawling and Fishing Co Ltd* [1933] AC 402, in which Viscount Buckmaster stated (p 411):

> "It has long been a well established principle to be applied in the consideration of Acts of Parliament that where a word of doubtful meaning has received a clear judicial interpretation, the subsequent statute which incorporates the same word or the same phrase in a similar context, must be construed so that the word or phrase is interpreted according to the meaning that has previously been assigned to it."

58. We are not persuaded that the Barras principle applies in this case both because the *Gerald Cooper Chemicals* case, while reported in the Chancery Reports, was a first instance judgment on a strike out application, and, more significantly, there were dicta in *R v Miles*, which, if taken outside of the factual context of an "insider" defendant which they addressed, as Mr Scorey has sought to do, could support a narrower view of the ambit of the section. This rejection of the application of the Barras principle, however, is immaterial as we are satisfied that the correct interpretation of section 213(2) of IA 1986 is that third parties/outsiders who participate in, facilitate or assist fraudulent transactions by a company when they know that the company's business is being carried on for any fraudulent purpose are within the ambit of that section.

59. Finally, Mr Scorey raises a question about the scope of the compromise agreement which gave rise to the trial and the appeals. He submits, in short, that Bilta has still to

establish what it is about the assumed facts which brings Tradition within the scope of section 213. We can dispose of this contention very briefly. In the compromise agreement Tradition agreed to pay a certain sum without admission of liability subject to (i) its limitation defences discussed below, and (ii) its contention that the claims under section 213 fail as a matter of law as being outwith the terms of that section. In relation to the contention at (ii), the parties conducted the trial on the basis that Tradition's defence was that section 213 applied only to persons involved in the management or control of the fraudulent business, a position described in para 54 of the Statement of Facts and Issues as "the narrow interpretation". The matter was presented in the courts below and in this court as a binary choice between the narrow interpretation and a "wide interpretation" which is that section 213 applies to anyone who dishonestly assists in or contributes to the fraudulent breach of duty committed or procured by those controlling the company: see Statement of Facts and Issues, para 58. It is clear that the parties conducted their dispute at first instance and before the Court of Appeal on the basis that Tradition's liability to pay the agreed sum turned on the courts' answer to the question of whether the narrow interpretation of section 213 by itself causes Bilta's claim to fail: see Lewison LJ's judgment at para 34. It is too late to seek to change the battleground before this court.

**3. Whether the claims in dishonest assistance are statute-barred**

60. In addition to the claims which the joint liquidators have made under section 213, they have arranged for several of the companies of which they are the office-holders to bring their own claims against Tradition in dishonest assistance. The claimants were Bilta, Weston, Vehement, Nathanael and Inline. The judge held that all those claims were statute-barred. Permission to appeal to the Court of Appeal was refused to Bilta, Weston and Vehement, but granted to Nathanael and Inline. Nonetheless their appeals were dismissed.

61. Both Nathanael and Inline appeal to this court. They say that, on the facts which are to be assumed pursuant to the compromise agreement, and further facts which they say are to be deemed to be true pursuant to section 1032(1) of the CA 2006, they each enjoy the benefit of section 32 of the Limitation Act 1980, which postpones the running of time in relation to a claim based upon (inter alia) fraud until the time when the claimant has discovered the fraud or could with reasonable diligence have discovered it.

62. The question raised in relation to both companies by this issue is whether they have established an entitlement to a postponement of the running of time in their favour under section 32, until a date less than six years before they issued their claim in dishonest assistance against Tradition. For materially different reasons, turning mainly on the complex interrelationship between section 32 and section 1032 in relation to a formerly dissolved company which has been restored to the register, both the judge and the Court of Appeal held that they had failed to do so.

63. It is to be noted at the outset that because of the court's conclusion under issue 1 (for the reasons already given) that the liquidators of both companies have valid claims against Tradition under section 213, nothing of any commercial consequence now turns on the outcome of issue 2. This is because the amount payable by Tradition to the liquidators is by the settlement agreed to be the same in respect of the claim under section 213 as it is in respect of the companies' claim in dishonest assistance, and they are not cumulative. Nonetheless, because issue 2 has been fully argued, the reasoning of the courts below was different and there is no other authority directly in point, the court has considered that it ought to be addressed and decided because of its more general public importance.

***(i) The essential chronology***

64. The acts of alleged dishonest assistance by Tradition in the breaches of fiduciary duty by the directors of Nathanael and Inline occurred during the perpetration of the MTIC fraud between May and July 2009 (inclusive). Both companies were then abandoned by their directors. Dealing then first with Nathanael, it was struck off and dissolved on 1 February 2011 and restored to the register on the application of HMRC on 19 March 2012. On the same day it was ordered to be wound up on the unopposed petition of HMRC. Liquidators were appointed on 19 August 2013. As for Inline, it was struck off and dissolved on 7 December 2010 and restored to the register on 8 June 2015, with a winding up order being made and liquidators appointed all on the same day. Both companies issued their claim form on 8 November 2017.

65. Dishonest assistance claims have a primary limitation period of 6 years. Subject to the consequences of dissolution and restoration to the register, and any postponement of the running of time under section 32, both companies' claims therefore became statute barred at the end of July 2015, more than two years before the issue of proceedings. Section 32 would avail them only if they could show (the burden being on them) that they did not discover and could not with reasonable diligence have discovered the fraud before 8 November 2011. That is what they each set out to do, thus far unsuccessfully. On that critical date, neither company existed in fact.

***(ii) The Law***

66. Section 32 of the Limitation Act 1980 provides (so far as is relevant) as follows:

> "(1) Subject to subsections (3), (4A) and (4B) below, where in the case of any action for which a period of limitation is prescribed by this Act, either—

> (a) the action is based upon the fraud of the defendant; or
>
> (b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or
>
> (c) the action is for relief from the consequences of a mistake;
>
> the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it."

67. Section 1032 of the CA 2006 provides (so far as is relevant) as follows:

> "Effect of court order for restoration to the register
>
> (1) The general effect of an order by the court for restoration to the register is that the company is deemed to have continued in existence as if it had not been dissolved or struck off the register.
>
> (2) …
>
> (3) The court may give such directions and make such provision as seems just for placing the company and all other persons in the same position (as nearly as may be) as if the company had not been dissolved or struck off the register."

68. It is not alleged that either Nathanael or Inline did in fact discover the MTIC fraud by 8 November 2011. Their directors were up to their eyebrows in the fraud, in breach of their fiduciary duties to their companies. Their knowledge of the fraud is not to be attributed to the companies. Once deserted by its directors, neither company had officers capable of discovering the fraud until the liquidators were appointed, on 19 August 2013 and 8 June 2015 respectively. It is therefore common ground that the question whether either company's dishonest assistance claim against Tradition is statute-barred turns upon whether it could *not* with reasonable diligence have discovered the fraud before 8 November 2011. The interposition of "not" within that statement of the test imposed by section 32(1) (which is not within the statutory language) reflects the proposition of law (about which the parties are also rightly agreed) that the burden falls upon a party seeking

the benefit of the postponement of the running of time under section 32 to demonstrate that the conditions for its application are satisfied.

69. The question whether a claimant could not with reasonable diligence have discovered the fraud (or concealment or mistake) is plainly an objective one, at least so far as the identification of reasonable diligence is concerned. But, generally speaking, the court will take the facts about the fraud (including how deeply it may have been concealed) as read. It will in an ordinary case where the claimant is a company which has not during the relevant period been dissolved also take the company as it finds it, rather than construct some equivalent company the affairs of which are presumed to be in the hands of reasonably competent, honest and properly resourced officers, if that is not the case: see *OT Computers Ltd V Infineon Technologies AG* [2021] EWCA Civ 501; [2021] QB 1183.

70. The difficulty with applying that conventional approach to section 32 in the present case is that, for the critical periods (respectively) of 9 months and 11 months before the cut-off date of 8 November 2011, both companies had ceased to exist. Nonetheless upon restoration to the register they are both now to be deemed never to have been struck off, but rather to have continued in existence. That is plainly the effect of section 1032(1). Neither the companies nor Tradition have made any application for directions or provision under section 1032(3), which might have added to what is to be deemed about the companies under section 1032(1).

71. The two companies' central case is that during the periods when statutory deeming replaced history they had a bare existence, but with no other features: no directors, and no-one else (such as liquidators) who could have exercised reasonable endeavours to discover the fraud, so that time did not begin to run against them until they were each restored to the register, well after 8 November 2011. There were no directions or provision which they needed to seek under section 1032(3) to put flesh on the skeletonic bones created by section 1032(1). Alternatively, the two companies argued (before the judge and the Court of Appeal but not before this court) that they should be deemed to have had in place the fraudulent directors who had been in office when they were dissolved, so that knowledge of the fraud could not be attributed to them during the period which ended when they were in fact restored and put into liquidation.

72. The judge did not accept either of these arguments. On his view of section 32 the objectivity of the reasonable endeavours test required him to assume that each company be deemed to have had reasonably honest and competent directors in post, capable in principle of applying reasonable endeavours to discover the fraud. Since he had found, in relation to the other three companies (Bilta, Weston and Vehement, all of which had liquidators in place before 8 November 2011) that they could with reasonable diligence have discovered the MTIC fraud in which all of them had been engaged, not least because

HMRC already knew about it, he reached the same conclusion in relation to Nathanael and Inline.

73. The Court of Appeal took a more cautious approach to the relationship between section 32 and section 1032. In their view, as expressed by Lewison LJ, it could not be said that either section 32 or section 1032(1), or both in combination, required it to be deemed or assumed that the two companies either had, or did not have, in place competent directors or liquidators, before 8 November 2011. The result was that the companies failed to demonstrate, the burden being on them, that they could not with reasonable diligence have discovered the fraud.

74. In this court counsel for Tradition did not seek to uphold the judge's analysis that section 32 required him to assume that the two companies had competent directors in place during the period when they had been struck off, although they described it as both sensible and fair. Rather they relied upon the submission that the Court of Appeal had been correct in concluding that the two companies had failed to discharge the burden of proving that, had they not been dissolved, they could not with reasonable diligence have discovered the fraud. The slightly disappointing result is that the judge's simple analysis has not been subjected to detailed argument in this court.

75. While there is plenty of authority upon each of section 32 and section 1032, viewed separately, there is not much about their interaction where, as here, it is the previously struck-off company which seeks to surmount limitation difficulties arising during the period when it was dissolved, so as to be able to bring proceedings against a third party. Most of it concerns the making of what is usually called a "limitation direction" by means of the court's discretionary power conferred by section 1032(3). In two decisions of the Court of Appeal, *Regent Leisuretime Ltd v Natwest Finance Ltd (formerly County Natwest Ltd)* [2003] EWCA Civ 391; [2003] BCC 587 and *County Leasing Asset Management Ltd v Hawkes* [2015] EWCA Civ 1251; [2016] BCC 102, it was established that where it is the struck-off company that seeks a limitation direction in its favour, the discretion under section 1023(3):

(i) may only be exercised in exceptional circumstances,

(ii) has an effect which is completely to override the statutory limitation regime, and that therefore,

(iii) fairness would generally require that the company, like any other claimant faced with a limitation defence, should be left to attempt to meet that defence by recourse to the statutory regime in the Limitation Act 1980.

76. No limitation direction was sought by the two companies in the present case. Since a limitation period does not cease to run against a company while dissolved, it is common ground that the primary six year limitation period affecting the claims by the two companies against Tradition had long expired when these proceedings were issued, and that "recourse to the statutory regime in the Limitation Act 1980" means, in practice, relying upon the provision for the postponement of the running of time under section 32, by demonstrating that neither of the two companies could by the exercise of reasonable diligence have discovered the fraud by November 2011.

77. The two companies submit that section 1032(1) is sufficient to require the court to deem the two companies to have had no directors or other responsible fiduciary office holders (here, liquidators). They say that there were in fact no such officers in post while the two companies remained dissolved, and that nothing in section 1032 disturbs that fact, so that in the absence of a limitation direction under section 1032(3) it remains an incontrovertible fact.

78. The Court of Appeal did not accept this argument. Nor do we, for the reasons which follow. The starting point is that the court is applying section 32 to a counterfactual state of affairs, at least about the two companies, rather than to historical fact about them. The historical fact is that each had been struck off, dissolved and had ceased to exist. Of course they did not, in fact, have directors or liquidators while dissolved. But section 1032(1) requires the court to deem that they had not been struck off or dissolved, but had continued to exist. Does the deeming provision in section 1032 mean that they should be deemed to have had no directors or liquidators for as long as they remained struck off?

79. In our view the answer to that central question is "no". We reach it by two routes. The first is by applying well-settled principles about the extent of statutory deeming provisions. The second is by reference to a purposive construction of section 32. In *Fowler v Revenue and Customs Comrs* [2020] UKSC 22; [2020] 1 WLR 2227, at para 27, this court summarised the applicable principles as follows:

> (1) The extent of the fiction created by a deeming provision is primarily a matter of construction of the statute in which it appears.
>
> (2) For that purpose the court should ascertain, if it can, the purposes for which and the persons between whom the statutory fiction is to be resorted to, and then apply the deeming provision that far, but not where it would produce effects clearly outside those purposes.
>
> (3) But those purposes may be difficult to ascertain, and Parliament may not find it easy to prescribe with precision the intended limits of the artificial assumption which the deeming provision requires to be made.

(4) A deeming provision should not be applied so far as to produce unjust, absurd or anomalous results, unless the court is compelled to do so by clear language.

(5) But the court should not shrink from applying the fiction created by the deeming provision to the consequences which would inevitably flow from the fiction being real. As Lord Asquith memorably put it in *East End Dwellings Co Ltd v Finsbury Borough Council* [1952] AC 109, 133:

> "The statute says that you must imagine a certain state of affairs; it does not say that having done so, you must cause or permit your imagination to boggle when it comes to the inevitable corollaries of that state of affairs."

80. In our view the application of those principles, and in particular (2), (4) and (5) to section 1032(1) means that all which is to be deemed to be true about the restored company is that it continued in existence during the period of its dissolution, no more and no less. The question whether it should be assumed during that period to have had competent directors or liquidators is to be answered by other means. Having such officers, or not having them, are not consequences which inevitably flow from it being deemed to have continued to exist. Nor does the historical fact that during a period of dissolution a company necessarily has no officers mean that the absence of them is to be carried over into the counterfactual world where it is deemed to have continued in existence.

81. That question (whether the company is to be assumed to have had officers of some kind, and if so what type and during what periods) is to be answered on the balance of probabilities as a question of fact (counterfactual not historical) by reference to such evidence as is adduced by the opposing parties, and paying appropriate regard to the burden of proof if evidence is lacking: see generally *Davy v Pickering* [2017] EWCA Civ 30; [2017] Bus LR 1239 at paras 60 and 71. As David Richards LJ put it in that case, and Lewison LJ repeated in the Court of Appeal in the present case, the question what would have happened if the company had not been dissolved is not to be treated as a matter of speculation or assertion. It is a question of evidence, to be decided on the balance of probabilities. It is a question the answer to which section 1032 offers no assistance, either by deeming or otherwise.

82. A conclusion that section 1032(1) does not require it to be deemed that a restored company had no officers during the period of its former dissolution is also to be derived from a purposive construction of section 32. It is that section to which the principle laid down in the *Regent Leisuretime* and *County Leasing* cases leads, because it is the relevant part of the statutory limitation regime to which a restored company must expect to be subject. If every restored company wishing to pursue a claim in fraud was to be deemed

to have had no competent officers, and therefore to have been unable to discover the relevant fraud while dissolved, that would give restored companies carte blanche to rely upon the postponement of the running of time, because they could always demonstrate that they could not have discovered the fraud by the use of reasonable diligence. But that would run counter to the general purpose of section 32, namely to postpone the running of time in favour of prima facie deserving claimants, rather than those which (in most cases) only got struck off and dissolved through their own default.

83. A conclusion that section 1032(1) does not require it to be deemed or assumed that a restored company had no competent officers during the period of its dissolution leaves open the question whether the two companies must have failed to establish the factual basis for the postponement of the running of time. They failed, in the view of the Court of Appeal, because they adduced no evidence to prove that they could not with reasonable diligence have discovered the fraud. They did so in the context that the judge had found that the other three companies (Bilta, Weston and Vehement) could have discovered the fraud before November 2011, a conclusion which was not appealed.

84. Before this court, the only challenge to the conclusion that the two companies had advanced no evidential case on this issue was to point (in Ground 2 of their grounds of Appeal) to para 69(1) of the judge's judgment in which he had held that, prior to their restoration, neither company could have discovered the fraud, because it did not exist. The judge held:

> "Prior to their restoration to the register, Nathanael and Inline did not exist. There was no claimant who could, with reasonable diligence, have discovered the fraud, concealment or mistake."

But that was a finding based only upon the undoubted historical fact of the two companies' non-existence. Is says nothing about the counterfactual question: if the companies had not been dissolved, could they with reasonable diligence have discovered the fraud? That corporate non-existence is precisely the fact about which section 1032(1) requires the court to deem the contrary conclusion.

85. The result is that since we have concluded that the Court of Appeal was right in law to find that the burden lay upon the two companies to show that they could not with reasonable diligence have discovered the relevant fraud, we can see no answer to the conclusion that they had failed to discharge that burden. We would therefore dismiss their appeal.

**4. Conclusion**

86. We would therefore dismiss the appeal by Tradition and the appeals by Nathanael and Inline.