# Brinks Ltd v Abu-Saleh (No 3) [1996] CLC 133

# Exhibit 7

# *133 Brinks Ltd (formerly Brink's-Mat Ltd) v Abu-Saleh & Ors

**Court**
Chancery Division

**Judgment Date**
10 October 1995

**Report Citation**
[1996] C.L.C. 133

Chancery Division

Rimer J.

Judgment delivered 10 October 1995

*Trust—Breach of trust—Accessory to breach of trust—Tracing claim to recover proceeds of sale of robbery—Breach of fiduciary duty by security guard in participating in robbery—Stolen gold disposed of—Proceeds of sale laundered—Husband of defendant settled claim against him—Whether defendant liable as accessory to breach of trust.*

This was an application by the thirteenth defendant for an action to be dismissed and for compensation under a cross-undertaking in damages given by the plaintiffs on the obtaining of a Mareva injunction against the defendant.

On 26 November 1983 gold and valuables worth £26m were stolen from the plaintiffs' warehouse. A number of arrests and prosecutions followed. A security guard employed by the plaintiffs took part in the robbery. He pleaded guilty to robbery with violence and gave evidence against others. The gold was not recovered. It was smelted and disposed of and the proceeds of sale laundered. Prosecutions were brought against a number of accused for handling stolen goods and laundering offences. Some, including Parry, were convicted. Mr and Mrs £ were acquitted, Mrs £ on the basis that she had no case to answer.

The plaintiffs brought civil proceedings against 57 defendants to recover their stolen property or damages. Many of the claims were settled or sued to summary judgment. The remaining claims went to trial. The claim against Mr £ was settled on the first day of the hearing. Mrs E refused a settlement, seeking an order that the action against her be dismissed and compensation under the cross-undertaking in damages given by the plaintiffs on the obtaining of a Mareva injunction against her.

The plaintiffs alleged that Mrs E assisted her husband in the part he played in laundering some of the proceeds of the stolen gold by carrying £3m for Parry in cash from England to Switzerland by car. Mr E's reward was £30,000 plus expenses. It was the plaintiffs' case that as the gold was stolen from them with the assistance of a dishonest fiduciary, their security guard, the plaintiffs had an equity to trace into the proceeds which were in the nature of trust moneys. They claimed that Mrs E knew that she was involved in a dishonest conspiracy, which was sufficient for them to be entitled to recover. Mrs E denied all the allegations against her, maintaining that she believed her husband was assisting in tax evasion. She contended that the plaintiffs' settlement of their action with Mr E prevented them from pursuing their claims against her.

© 2025 Thomson Reuters. 

*Held* , dismissing the actions against Mrs E:

1. The plaintiffs' settlement with her husband did not operate to release Mrs E from liability in tort as: an accessory to the breach of trust, since the settlement discontinued the claims but did not release, discharge or extinguish the plaintiffs' cause of action against Mr E.

2. It was not only officers or directing minds of a company who were capable of committing breaches of fiduciary duty which constituted knowing assistance in a dishonest and fraudulent breach of trust. A security guard was employed by the plaintiffs in an important position of trust, and possessed valuable information relating to the security arrangements affecting property in the plaintiffs' custody. He owed the plaintiffs a duty not to divulge that information to anyone not entitled to it. In breach of that duty the security guard disclosed material information to the robbers thereby giving them vital assistance which enabled them to commit the robbery. That breach of his fiduciary duty was sufficient to entitle the plaintiffs to trace the gold and its proceeds in equity. ( *Royal Brunei Airlines Sdn Bhd v Tan Kok Ming [1995] 2 AC 378; [1995] BCC 899 applied* .)

***134***

3. There was no evidence that Mrs E provided assistance of a nature sufficient to make her an accessory to the breach of trust of which the plaintiffs complained. In order to be liable the plaintiffs had to prove that Mrs E both knew of and assented to the supposed tax evasion plan and joined in its execution. It was not sufficient that Mrs E knew the essence of what her husband was doing and acquiesced in it by accompanying him on several of the money laundering trips. Since that was all that had been established, it followed that the plaintiffs failed to show that Mrs E was accountable to them as an accessory to the breach of trust.

**The following cases were referred to in the judgment:**

*Agip (Africa) Ltd v Jackson [1990] Ch 265* ; *[1991] Ch 547* .
*Baden v Societe Generate pour Favoriser le Developpement du Commerce et de I'Industrie en France SA [1993] 1 WLR 509* .
*Barnes v Addy (1874) LR 9 Ch App 244* .
*Eagle Trust plc v SBC Securities Ltd [1993] 1 WLR 484* .
*Kronprinz, The (1887) 12 App Cas 256* .
*Polly Peck International plc v Nadir (No. 2) [1992] 4 All ER 769* .
*Royal Brunei Airlines Sdn Bhd v Tan Kok Ming [1995] 2 AC 378; [1995] BCC 899* .

**Representation**

Michael Tugendhat QC , Richard Parkes , Richard Spearman and David Parsons (instructed by Shaw & Croft ) for the plaintiffs.
Timothy Sisley and Aviva le Prevost (instructed by Goldkorn Davies Mathias ) for Ann Elscombe, the thirteenth defendant.

**JUDGMENT**

Rimer J:

**Introduction**

The plaintiff is Brinks Ltd (‘Brinks’), formerly known as Brink's-Mat Ltd. On 26 November 1983 it suffered a major robbery at its warehouse near Heathrow Airport. Gold and other valuables worth over £26m were stolen. Arrests and prosecutions followed. On 17 February 1984 Anthony Black pleaded guilty to a charge of robbery with violence and was sentenced to

six years imprisonment. Mr Black was employed by Brinks as a security guard and had betrayed his employers by providing others involved in the robbery with a key to, and internal photographs of, the warehouse as well as information about its security arrangements and procedures, and by participating in the planning and execution of the robbery. He later gave evidence against those whom he alleged were also involved, Michael McAvoy, Brian Robinson and Anthony White. On 2 December 1984 Mr McAvoy and Mr Robinson were convicted of robbery with violence and were each sentenced to 25 years' imprisonment. Mr White was acquitted.

The gold was not recovered. It was smelted together with other base metals and sold. Prosecutions were brought against various individuals in connection with this operation. On 24 July 1986 Kenneth Noye ('Mr Noye'), Brian Reader and Garth Chappell were each found guilty on charges of conspiracy to handle the stolen gold.

The sale proceeds were the subject of laundering operations. Prosecutions were brought in 1988 against a number of individuals alleged to have been involved. They included Michael Relton ('Mr Relton'), who was found guilty on 7 July 1988 on a charge of conspiracy to handle stolen goods; and John Elcombe and his wife, Ann Elcombe. Mr Elcombe was acquitted by the jury after he had given evidence. Mrs Elcombe was acquitted on the basis that she had no case to answer. Similar charges were brought in 1992 against a number of other defendants. They included Gordon John Parry ('Mr Parry'), who was found guilty on 17 August 1992 on ten counts of handling stolen goods. His involvement was at the heart of the 1988 trials, but he could not be tried then as he was in Spain. It is also at the heart of this action. They also included Brian Perry ('Mr Perry'), who was found guilty of conspiracy to handle stolen goods.

***135***

Brinks brought civil proceedings against 57 defendants aimed at recovering their stolen property or damages in respect of their loss. Many of the claims were settled or sued to summary judgment. The trials of those claims which remained alive commenced before me on 25 April 1995.

Two of the defendants against whom the claims were so alive are Mr and Mrs Elcombe. However, the claim against Mr Elcombe was settled on the first day of the trials on terms which I should mention, since they are of relevance to one of the, issues which I have to decide: Brinks were to have leave to discontinue their action against him; a Mareva injunction granted on 9 December 1986 was discharged, as was Brinks's cross-undertaking in damages; Mr Elcombe abandoned his claim to damages under that undertaking; and there was to be no order as to costs (save for a legal aid taxation of Mr Elcombe's costs), with all prior costs orders being discharged.

The claim against Mrs Elcombe was not settled. She is legally aided and Brinks recognise that she does not have sufficient assets to satisfy any judgment they might obtain against her. They were willing to discontinue against her on like terms as those on which they settled with Mr Elcombe but she would not agree to this. She wants to have the action dismissed and to pursue a claim for compensation under the cross-undertaking in damages given by Brinks on the obtaining of a Mareva injunction against her. The trial of Brinks's claim against Mrs Elcombe commenced on 21 June and concluded on 27 June 1995. Brinks were represented by Mr Tugendhat QC, Mr Parkes, Mr Spearman and Mr Parsons. Mrs Elcombe was represented by Mr Sisley and Miss le Prevost.

**The nature of the claim**

The case against Mrs Elcombe is that between August 1984 and February 1985 she assisted her husband in the part he played in laundering part of the proceeds of the stolen gold by carrying approximately £3m in cash for Mr Parry from England to Switzerland by car. Mr Elcombe's reward for doing this was a payment of £30,000 plus expenses. Brinks rely on Mr Parry's convictions as evidence that he committed various offences of handling stolen goods (see s.2(2)(a) of the Civil Evidence Act 1968 ). They rely on the indictment against him and on the transcript of the summing up at his trial for identifying the facts

© 2025 Thomson Reuters.

on which the convictions were based. They say that it is an inevitable inference from these facts that the money which Mr Elcombe carried to Switzerland was part of the proceeds of the stolen gold. They claim that as the gold was stolen from Brinks with the assistance of a dishonest fiduciary, Mr Black, Brinks have an equity to trace into such proceeds, which were in the nature of trust moneys. They claim that Mrs Elcombe knew that the money her husband was carrying represented proceeds of the stolen gold. But even if she did not, they say that she at least believed that he was engaged in a dishonest transaction intended to defeat the claims of the Inland Revenue or of companies in which Mr Parry was interested. In these circumstances Brinks argue that Mrs Elcombe is liable to account to them in equity because of her alleged dishonest assistance in a breach of trust. Alternatively, they claim that she was a party to a dishonest conspiracy. They say that it matters not that she may not have known that Brinks was its victim. Provided that she at least intended to practice a fraud on someone, that is sufficient to entitle Brinks to recover.

Mrs Elcombe disputes the claims against her. She says she knew nothing about her husband's activities involving the carrying of money to Switzerland for Mr Parry. She did not know it was the proceeds of the stolen gold. She knew nothing about any alleged intention to defeat the claims of the Inland Revenue. She does not admit that Brinks have any equity to trace into the proceeds or that the moneys were trust moneys. She denies that any claim of dishonest assistance or conspiracy is established against her. She says that the settlement by Brinks of their action with Mr Elcombe prevents them from pursuing their claims against her.

***136***

## The evidence

*(a) Background*

A transcript of Mr Elcombe's evidence given at the 1988 trial was made and Brinks gave notice of their intention to adduce it in evidence at this trial pursuant to s. 2(1) of the Civil Evidence Act 1968 . Directions were given that it could be so adduced provided that Mr Elcombe was tendered for cross-examination on behalf of Mrs Elcombe, and he was. The bulk of the summary which follows, until para. (m), is based on Mr Elcombe's evidence given at the 1988 trial.

Mr Elcombe is 48 and Mrs Elcombe is 47. They married on 1 February 1969. They have two children, Graham and Aaron. In 1984 Graham was 14 and Aaron was seven. Mr Elcombe left school at 15. He worked for a firm of printers for about three years and then as a driver of heavy commercial vehicles. Mrs Elcombe has had some experience of office work, and worked for a few years for the Kent County Constabulary. She has also always had an interest in antiques. In the 1970s the Elcombes started doing some part-time antique dealing and at about the end of the 1970s they started dealing full time. They went into partnership with a Mr Leech in about 1980 and developed contacts in Belgium. They later split up with Mr Leech. They acquired a shop at 32 High Street, Sandgate, Kent and carried on their antiques business from there in partnership under the name of 'The Oddity Shop' and subsequently 'Dench Antiques' and lived above the shop. Mr Elcombe said that approximately 60 per cent of his business was in cash. It was not his practice to disclose his cash transactions for revenue purposes. He admitted that he had been guilty of tax evasion. Although Dench Antiques was registered for VAT he said that he only paid VAT on 40 per cent of his dealings. In cross-examination he claimed to have no idea what his and his wife's joint income from the business was in 1984. He kept no records of those transactions which were not disclosed to the revenue. In re-examination he estimated their net profits for 1984 to have been about £25,000 and, for 1985, between £30,000 and £40,000. In early 1985 he opened a shop in Antwerp called Van Gray's Antiques, but Mrs Elcombe had no interest in that business.

Mr Elcombe had known the Parry family since he was a youngster. He associated it with betting shops in South London, which were owned by Mr Parry's father whom he knew, Mr Elcombe had a first cousin called Irene Beaumont ('Irene'). She and Mr Parry started living together in the 1970s, when Mr Elcombe first met Mr Parry. During the early 1980s he came to see a good deal of him. When he first met him he believed he had a recording studio. Whenever he came to London on business he would call on Mr Parry. He was very fond of Irene, who also got on well with Mrs Elcombe. They used to meet at family parties at Christmas. Mr Elcombe said that Mr Parry was very outward-going, he always had Mercedes cars, he gave the impression of having money and was very free with it.

Mr Parry had good taste in furniture and works of art and eventually became Mr Elcombe's best customer. Mr Elcombe sold him antiques costing between £60,000 and £70,000 to furnish his house in Kent and in all sold him furniture worth some £150,000, although most of these transactions took place after the couriering operation to which I shall shortly come. He

knew that Mr Parry had acquired a discotheque, which was thriving; that he owned a smallholding with greenhouses; and that he had a property company called Selective Estates Ltd (‘Selective’). He regarded Mr Parry's father as ‘unbelievably wealthy’ and believed that Mr Parry's money was derived from him. He said of Mr Parry that:

> ‘He had a way of telling you everything and telling you nothing. You could listen to him for hours and think: “My God, he's flash and outward-going”, and then you think he never told me anything, when you really summarise it at the end of the day. He would only tell you what he wanted you to know’.

***137***

In August 1984 Mr Elcombe, Mr Parry and Mr Perry set up a company called Denchlight Ltd. The intention was to operate it as an antiques business. Mr Elcombe had met Mr Perry at Mr Parry's house. He owned a mini-cab firm and collected art. Mr Elcombe's hope was that Mr Parry and Mr Perry would inject money into the business, but they did not and the business petered out almost before it had started. Shortly before the incorporation of Denchlight Mr Elcombe also met Mr Relton at Selective's offices. He was a solicitor whom Mr Elcombe understood to be Mr Parry's partner. Mr Relton looked after the legal side; of Denchlight's incorporation.

The charge against Mr Elcombe at the 1988 trial was that he conspired with Mr Parry and others to handle gold stolen from Brinks or the proceeds of it. He admitted taking at least £3m in cash to Switzerland at Mr Parry's request. His defence was that he knew nothing about the money being the proceeds of the Brinks robbery but believed that it represented moneys derived from Mr Parry's business empire on which he did not wish to pay tax.

*(b) Mr Parry's proposal*

Mr Elcombe's evidence at the 1988 trial was that in the summer of 1984 he had been seeing Mr Parry quite regularly in connection with the proposed formation of Denchlight. One Sunday towards the end of July there was a family lunch at Mr Elcombe's .parents' house. Present were Mr Elcombe's parents; Mr and Mrs Elcombe and their two sons; and Mr Parry, Irene and their baby daughter, Jessica. Over the table, quite openly, Mr Parry asked Mr Elcombe when he was going abroad again. He replied that it was at the end of August. Mr Parry asked him whether he would go the following week. He wanted him to take some money to Zurich for him. Mr Parry outlined his plans over the lunch in conversation with Mr Elcombe.and his parents. He had to get the money abroad in order to bring it back to invest it in property and said that ‘he had to go with it … because of the tax situation’. He said that it was money ‘we have accumulated over the years’. Mr Elcombe asked why he could not take it himself and he said it was mainly because he did not want to drive all the way. He had recently lost an eye. Mr Parry said that he would bring Irene and Jessica and Mr Elcombe could bring Mrs Elcombe and Aaron and they would have a nice weekend together in Zurich all at Mr Parry's expense. Mr Elcombe said all this was said openly at the lunch and that his mother expressed her concern that he would lose the money or have an accident. He understood that the money had come from Mr Parry's businesses and his father's betting shops.

Mr Elcombe said that no mention was made at this lunch of the amount he was to take or that there was to be more than one trip. At that stage all that was in it for him was a free weekend in Zurich. On being questioned by Mr Elcombe and his parents for more detail as to what underlay the proposal, Mr Parry replied in words to this effect:

> ‘It's the only way I can do it. I can't send money by telex or any other way, bank drafts, because it's all in cash anyway and it's got to stay in cash so I can take it to a bank abroad, bring it back into the country and re-invest it without paying tax on it’.

Mr Parry explained that he also had other business to do in Zurich. He was going to fly there.

A few days later Mr Elcombe went to Mr Parry's house in Greenwich where Mr Parry handed him a sports holdall containing money. He did not say how much. He said that he had booked rooms at the Hotel Zurich. Mr Elcombe looked in the bag and saw that it was full of £50 notes. There was this exchange during Mr Elcombe's evidence in chief at his 1988 trial:

> ‘Q. About how much do you think there was, doing the best you can?
>
> A. About half a million pounds, sir.
> **138*
> Q. Did you tell your wife?
>
> A. Yes sir, she was in the discussion over Sunday lunch, so she knew where I was going and what I was going for sir.
>
> Q. What did she think of that?
>
> A, Not very much, not at the time. I wasn't suspicious. How can I explain? Gordon John Parry was a millionaire and he was giving me half a million pounds. When a millionaire gives you half a million pounds it's just another half a million pounds. He could well afford half a million pounds, a lot more.’

There was this further exchange in Mr Elcombe's cross-examination:

> ‘Q. You did hot open it up and say to your wife: “Look what I've got in here”?
>
> A. No, my wife knew what was in there.
>
> Q. Did she know how much?
>
> A. No.’

*(c) The first trip*

Mr Elcombe's evidence was that on 2 August 1984 he, Mrs Elcombe and Aaron set off in the family Volvo Estate to Dover, across to Ostend and on to Zurich. Their luggage included the holdall full of money. All travelling expenses were reimbursed by Mr Parry when they returned. When they arrived at the Hotel Zurich Mr Elcombe handed the holdall to Mr Parry straight away, in the underground carpark, and did not see it again. He had seen news of the Brink's-Mat robbery (which had occurred eight months earlier) on the television but did not associate it with the Zurich operation. The Elcombes had a happy weekend in the Hotel Zurich, which he said was a high class hotel with a swimming pool, health club and so on. They came home via Belgium with the intention of buying antiques. Mr Elcombe recognised that he had, as he thought, taken part in a tax fraud.

On 3 August 1984 Mr Parry made a cash deposit of £850,435 into an account of his, code named the ‘Burton’ account, at the Hong Kong & Shanghai Bank plc, Zurich. Count 4 of his indictment, on which he was convicted, charged him with dishonestly arranging on or about 3 August 1984 to receive stolen goods, namely £850,435 cash, knowing or believing the same to be stolen goods. Having considered the directions given to the jury by the judge in his summing up I conclude that the jury was satisfied that the money was the proceeds of the stolen Brink's-Mat gold and that Mr Parry knew it was. The same applies to the moneys which were the subject of each of the other counts on which Mr Parry was also convicted, which I refer to below. I should mention, that in view of my decision in ***Brinks Ltd v Abu-Saleh*** *[1995] 4 All ER 74* , Mr Sisley

did not seek to argue before me that the summing up at the Parry trial was inadmissible. However, he did make clear that he wished to reserve his right so to argue if this case were to go higher.

*(d) The second trip*

Mr Elcombe went to see Mr Parry on his return. Mr Parry asked him how he felt and he said that he was ‘all right, as long as the money is all right’, to which Mr Parry replied that there was nothing illegal. Mr Elcombe confirmed that he and his family were still planning to go to Italy at the end of August, in order to visit Mrs Elcombe's mother. Mr Parry asked him to export some more money. He agreed and collected it from the Greenwich house. It was again in a holdall and again Mr Elcombe estimated it to be about £500,000.

On 29 August he, Mrs Elcombe and Aaron set off with the money in the Volvo for Zurich. This time they stayed in the Dolder Grand Hotel, which was chosen by Mr Parry, who was again footing the bill. The Elcombes arrived late and Mr Parry picked up the money the following day. There was a dinner that evening at the hotel, attended by Mr ***139** Parry, Mr Perry, Mr and Mrs Relton and the three Elcombes. Mr Parry had told Mr Elcombe that Mr Perry was going to be in Zurich as well: he wanted to open a bank account and Mr Parry was going to introduce him. Mr Perry did open an account, imaginatively codenamed the ‘Como’ account. During the dinner Mr Perry told Mr Elcombe that he was having no further part in Denchlight. Mr Elcombe did not know that the Reltons were going to be in Zurich.

The following day the Elcombes gave Mr Parry and Mr Perry a lift to Milan. They then rang Padua where they expected to visit Mrs Elcombe's mother, only to learn that she had departed for the mountains. They had not warned her that they would be calling on her. They stayed the weekend in Milan, paid for by Mr Parry. Mr Parry and Mr Perry flew home. The Elcombes then made their way home via Lake Garda, where Mr Elcombe wanted to see a contact in the antiques business, and also via Antwerp. They arrived back on either 4 or 5 September 1984.

At some stage, probably during this trip, Mr Parry and Mr Elcombe agreed that Mr Parry would pay Mr Elcombe £5,000 per trip plus expenses, Mr Elcombe made six trips in all, and received most, if not quite all, of the £30,000 due to him.

On 30 August 1984 Mr Parry made a cash deposit of £45,000 into an account he had opened that day with the bank in Liechtenstein, Vaduz, Liechtenstein. This account was codenamed ‘Glad’, after his mother. On 31 August 1984 he made a cash deposit of £999,701 into his Burton account.

Count 6 of Mr Parry's indictment charged him with dishonestly receiving £45,000 cash on or about 29 August 1984, knowing or believing it to be stolen goods. Count 5 was a like charge with regard to the receipt of £999,701 cash on or about 31 August 1984. He was convicted on both counts.

*(e) Mr Elcombe's Investment Bank of Ireland account*

On 6 September 1984 Mr Elcombe went with Mr Parry to the Bank of Ireland, Balham, where he (Mr Elcombe) made arrangements to open an account in his name with the Investment Bank of Ireland, Isle of Man (‘the IBI account’). On the same day he deposited £250,000 in cash, mainly or largely in £50 notes, at the Balham branch, which was then transferred by banker's draft to the IBI account. On 13 September 1984 he deposited a further £250,050 at the Balham branch, which was also transferred to the IBI account. The £500,050 was provided by Mr Parry. Mr Elcombe opened and operated the account on Mr Parry's instructions. It was to be a nominee account for him. He believed that this money too had been skimmed off the businesses of Mr Parry and his father. Mr Elcombe said that he agreed to do all this for Mr Parry in return for business transactions (i.e. antiques) he hoped to (and did) do with Mr Parry.

*(f) The third trip*

This was made between 19 and 22 September 1984. Mr Elcombe travelled alone. He again stayed at the Polder Grand Hotel. On 20 September he went with Mr Parry to the Liechtenstein Bank where £500,000 which he had carried was paid into the Glad account. Mr Elcombe also opened an account in his own name at the bank and paid into it £65,000, which he had also carried. It was a nominee account for Mr Parry. He said that Mr Parry asked him to open this account so that he would not need to be there when he was paying in money. On 21 September Mr Elcombe paid two further sums of £3,893 and £435,000 (totalling, with the £65,000, £503,893) into this account. These further moneys were given to him by Mr Parry in Switzerland and did not form part of the moneys which he had couriered from England. Each of Mr Elcombe and Mr Parry were signatories on the account and could operate it.

Count 7 of Mr Parry's indictment charged him with dishonestly arranging to receive stolen goods, namely £500,000 in cash, on or about 20 September 1984 knowing or ***140** believing the same to be stolen goods. Count 8 charged him with a like offence with regard to the receipt of £503,843 in cash on or about 20 September 1984. He was convicted on both counts.

*(g) The fourth trip*

This was on 3 December 1984. Both Mr and Mrs Elcombe went on it, with Graham and Aaron. They stayed for two nights at the Dolder Grand Hotel. Mr Parry did not also go to Zurich on this occasion, but he paid the Elcombes' hotel bill, which was some £500 a night. On 4 December Mr Elcombe paid £640,060 into his Liechtenstein account.

*(h) Withdrawals from Mr Elcombe's IBI account*

On 19 December 1984 £200,000 was withdrawn from the IBI account. Further withdrawals and transfers were made between 22 February and 8 July 1985. Six cash withdrawals were made totalling £300,150. On 4 April 1985 £10,000 was transferred to a Van Gray Antiques account in Belgium. On 8 July 1985 £500 was transferred to Mr Elcombe's current account and £13,774.04 was transferred to his Van Gray Antiques account at the Bank of Ireland, Balham branch. Mr Elcombe said that the money that went to him was all for furniture.

*(i) The fifth trip*

This was on 7 January 1985. Mr Elcombe travelled alone. On the same day he paid £453,000 into his Liechtenstein account.

*(j) The sixth trip*

This was between the evening of 29 January and 1 February 1985. Mr Parry had asked Mr Elcombe to make this trip a few days before. Mr Elcombe picked up the money on the evening he left. This time it was in two holdalls. He said that Mr Parry told him there was £500,000 altogether.

The trip was particularly memorable. It was made in a Mercedes car which Mr Elcombe claimed he had bought from Mr Parry on 24 January. His evidence was that he did not want this car, had declined to buy it in December 1984, but then changed his mind when he found out that he could export it to Australia at a profit. Mr Elcombe put part of the money, comprising bundles of notes of various denominations, into a plastic bin liner and concealed it in the boot. He put the rest under the back seat. Mrs Elcombe travelled with him.

At about 10.00 am on 30 January they were stopped by border guards at Aachen. The guards asked Mr Elcombe to open the boot and to take out the spare wheel, which he did. The bin liner containing the money was revealed. The guards asked him if he had any more money and he showed them the money hidden under the back seat. He said that the guards made some checks to see whether the money was forged. They asked him how much he had, and he wrote down the figures '350, 360, 710', the last being, and being shown as, the sum of the first two. He said these were simply the first figures which came into his head and he thought that writing them down would be the quickest way in which to get away from the border. He could not explain why he wrote the three numbers. One obvious inference is that the first two were the amounts of each lot of money in the car, although he denied this. He could not explain why he did not tell the guards that he had £500,000, the figure which he said Mr Parry had given him the previous evening. He told them that the money was the proceeds of his antiques business acquired over the previous 20 years. They took down the chassis and registration numbers of the Mercedes and then, at about 11.30 am, they allowed the Elcombes to continue their journey to Zurich. They arrived in the evening and stayed at the Zurich Hotel.

***141**

Despite his claim that Mr Parry told him he was carrying £500,000, Mr Elcombe said in evidence that he had about £500,000 to £600,000 with him. The bank records show that on 30 January 1985 £100,000 was paid into his Liechtenstein account. Mr Elcombe said that he did not make any such deposit on that day: he said it would have been impossible for him to drive from Aachen to Vaduz before the banks closed. He said that on the afternoon of 31 January He had a pre-arranged meeting with Mr Parry at the bank in Vaduz. He gave him the money he had with him. He believed that Mr Parry had also brought money with him. Mr Parry opened a new account at the bank (No. 720/3). Mr Elcombe's evidence about the banking transactions which then took place was not entirely clear, but its essence appears to be that the money he had carried was paid into his account and that all of the deposited money was then transferred to account 720/3 apart only from £100,000. The bank records show

that on 1 February 1985 £608,000 was paid into account 720/3 and that on 4 February a further cash sum of £493,077.77 was paid into it.

Count 9 of Mr Parry's indictment charged him with dishonestly arranging on or about 31 January 1985 to receive stolen.goods, namely £100,000 cash, knowing or believing the same to be stolen goods. Count.10 charged him with.a like offence with regard to the receipt of £608,000 on or about 31 January 1985. Count 11 charged him with a like offence with regard to the receipt of £493,970. He was convicted on all three counts.

Mr Elcombe told Mr Parry about the Aachen incident. He said that he thought that Mr Parry might get a tax bill as a result: He said that Mr Parry did not seem unduly concerned.

Mr Parry paid the Elcombes' bill at the Hotel Zurich. 1 February was their wedding anniversary and on 1 and 2 February they stayed at the Hotel Hermitage, Kusnacht. Mr Elcombe paid that hotel bill. Mrs Elcombe flew home and Mr Elcombe went to the auction houses in Zurich and then drove home via Belgium, where he devoted a couple of weeks to starting up his Van Gray Antiques business.

On 26 January 1985 there had occurred the tragic killing of Detective Constable John Fordham in the grounds of Mr Noye's house in Kent, on the occasion of a Flying Squad operation aimed at recovering the proceeds of-the Brink's-Mat robbery. Eleven bars of gold were found and Mr Noye was arrested on the same day. Mr. Elcombe had heard of that on the news but did not associate it with the operation he carried out for Mr Parry a few days later.

*(k) Withdrawals from Mr Elcombe's Liechtenstein account*

Between about 11 February and 10 September 1985 Mr Elcombe made a number of transfers and withdrawals from his Liechtenstein account, all with Mr Parry's authority. These included a transfer of approximately £1.6m to Mr Parry's 720/3 account on 11 February and £27,983 to Mr Elcombe's Van Gray Antiques account in August 1985. The latter transfer was part of Mr Elcombe's pay off for acting as Mr Parry's courier. The Liechtenstein account was closed on 10 September 1985.

*(1) The Elcombes are arrested*

On 12 June 1985 Mr and Mrs Elcombe were arrested. They were taken to Orpington police station where they were questioned about having taken.money to Switzerland for Mr Parry. The police put to Mr Elcombe that he had £710,000 with him on the January trip. He denied that he had that much with him. He made no comment as to whether or not he was carrying it for Mr Parry. The police put to him that the money had come from the Brink's-Mat robbery. Mr and Mrs Elcombe were later released and told that no charges would be brought. Mr Elcombe told Mr Parry what had happened and what the police had alleged about the money. Mr Parry said that it was nonsense. Mr Elcombe ***142** told him that he was not prepared to take any more money to Switzerland for him, nor did he. Later the same month Mr Parry was also arrested and interviewed but was then also released without being charged.

*(m) The Elcombes are arrested again*

Following the June 1985 arrest Mr Elcombe's only contacts with Mr Parry were in connection with the winding down of his IBI and Liechtenstein accounts, his antiques business and at family functions. One such function was in August 1986, when the Elcombes attended Jessica's christening. At the christening Mr Elcombe learned that Mr Perry had been arrested a few days before. In chief he said that he was told that it was on a charge connected with the Brink's-Mat robbery; in cross-examination he said he was told that it was on a charge involving ‘something to do with a property’.

On 21 October 1986 Mr and Mrs Elcombe were arrested again. They were taken to Cannon Row police station and charged with conspiracy to handle stolen goods, namely the proceeds of the stolen gold. Their trials were in 1988 and they were acquitted, as I have mentioned. The essence of Mr Elcombe's defence was that he believed that he was involved in nothing more than a large scale tax evasion exercise and that he had no idea that the money he had couriered for Mr Parry was the proceeds of either the Brink's-Mat or any other robbery. The inference from his acquittal is that the jury either accepted his evidence in this respect or at least that they were not satisfied that the prosecution case was established to the requisite standard of proof.

*(n) The evidence in the present action*

Brinks relied on Mr Elcombe's evidence given at the 1988 trial. Mr Sisley cross-examined Mr Elcombe. He put to him that Mrs Elcombe's position was that she had heard nothing of the couriering proposal made by Mr Parry to Mr Elcombe at the

© 2025 Thomson Reuters. 

family lunch party in July 1984 and did not know anything about the fact that her husband was carrying money for Mr Parry on the various trips to Zurich. Mr Elcombe readily agreed that if that was what his wife was saying then it was probably true. He said that he had taken it for granted that she had heard the conversation at the July 1984 lunch. He accepted that she had probably not heard it. He was reminded of the evidence he had given in cross-examination at the 1988 trial that his wife knew what was in the holdall on the first trip, and it was put to him that his wife denied any such knowledge. He said that she was right. He said that his evidence to different effect in 1988 was simply by way of a sidestepping of awkward questions. He said that his wife had no involvement with the accounts which he opened for Mr Parry, she never took charge of the money he couriered, she did not drive the car on any of the trips and she made no deposits in any bank.

Mrs Elcombe gave evidence and was cross-examined by Mr Tugendhat. She said that she and her husband started dealing in antiques together in about 1974. By 1984 they were both heavily committed in the business. They would make regular trips abroad with a view to buying antiques. She said that she had travelled through Switzerland on many occasions, on the way to Italy, but Switzerland was not one of the usual hunting grounds for antiques and she could not recall if they had ever bought antiques there. It was put to her that their antiques business was not much of a business in 1984 and that the bank was returning cheques. She disagreed with the former but accepted that the latter might have been correct. She did not know anything about her husband's transactions having included unrecorded cash deals. She said hers were all recorded. She said she paid tax and VAT in respect of all her transactions. She did not know that her husband had concealed any of his transactions from the revenue and from HM Customs and Excise. This came as news to her for the first time during her cross-examination. She said that she might have signed tax and VAT returns in respect of the partnership business but did not notice that the disclosed figures were too low. She was referred to a letter of 20 ***143** November 1984 from Joseph & Co, chartered accountants, which confirmed to a building society (for the purposes of a proposed mortgage) that the Elcombes' income from their antiques business was ‘in excess of £14,000 per annum’ and to her husband's evidence that that information had been supplied by her. She did not recall that. She said that she did not deal with all the finances of the business but that her husband dealt with those relating to his side of the business. Mrs Elcombe is not inexperienced in business matters. After leaving school she took a business studies course, she then worked for two years in the accounts department of a television company and then for 18 months doing secretarial work and invoicing for a publishing company.

She of course knew Mr Parry in 1984. She knew that he was involved in the property business and that he had a company called Selective Estates Ltd, but did not know how many other companies were involved. She regarded him as a wealthy property developer. She met Mr Perry for the first time during the second trip to Zurich.

She was referred to an affidavit sworn on 26 April 1994 by her solicitor, Mr Goldkorn, in support of an application to strike out the proceedings for want of prosecution. Mr Goldkorn was at that stage also acting for Mr Elcombe. The affidavit referred to the Elcombes' defence at their 1988 criminal trials being that ‘neither defendant knew anything of the robbery. They were innocent agents transporting moneys that they believed to be the property of [Mr Parry]’. She said that Mr Goldkorn was in error in deposing as he did and that she did not know that her husband was couriering money to Zurich for Mr Parry until she discovered it during the sixth trip (the Aachen one).

She denied hearing anything of the conversation at the July 1984 Sunday lunch when Mr Parry made his couriering proposal to Mr Elcombe. She said she would have been helping in the kitchen. She said that she regarded the first trip as a business trip to buy antiques. She was not aware that Mr Parry was offering the Elcombe family a free weekend in Zurich and her husband did not tell her that this was the. arrangement. She said that there were good auction houses in Zurich (although not ones, at which they had previously bought anything). She knew her husband had some cash with him, in order to buy antiques, but she did not know how much: it might have been anything from about £5,000 to £20,000. She said that on these trips she would take money with her as well. They did not discuss how much they were taking. She said that as far as she was concerned it was a coincidence that the Parry family was going to Zurich at the same time. Her evidence was that both children went with them, not just Aaron. She packed the children's clothes. Her husband would have carried the cases to the car and she did not see any sports holdall being packed. She disagreed with her husband's evidence that the Zurich Hotel was a high-class hotel and was somewhat dismissive about the weekend.

In the course of the hearing a statement prepared by Mrs Elcombe at some earlier stage was produced by her. She there said that:

> ‘In August 1984 we were invited by John Parry to go with his family for a short break abroad. We were going to Italy anyway, so we welcomed the company. We understood that he had business abroad and accompanied them to Switzerland. While we were there we went shopping, swimming

> with the children and saw the sights. Mr Parry went to run his business. I didn't have much to [do] with him, only on a social basis over dinner. He never discussed his business with me and he was always busy-here and abroad with meetings telephoning and working.'

If that is a reference to the second trip, it is curious that she makes no mention of the fact that the Elcombes had also met the Parrys on a family outing to Zurich earlier the same month. If it is a reference to the first trip I find it difficult to reconcile what she there says with her most recent account of that trip.

Mrs Elcombe remembered the second trip and the dinner on 30 August 1984. She did not notice any holdall in the car on that occasion either. She said that she must have ***144*** asked her husband why he kept going to Zurich to meet Mr Parry. She said that he assured him he was doing business with Mr Parry and that the answer must have been satisfactory at the time. She learned at some stage that her husband was being paid £5,000 per trip for Mr Parry but could not remember him telling her this. She agreed that a payment of this order was a significant sum in relation to their then net income from their antiques business.

Mrs Elcombe did not go on the third trip. She could not remember if she was asked to go on it or if it caused any problem at the time that she was hot going on it.

In September 1984 Mr Elcombe opened the IBI account for Mr Parry. Mrs Elcombe was aware of this because bank statements for the account arrived. Her husband told her that the account was to do with Mr Parry. She said that this caused a row, one of many between the Elcombes over Mr Parry. She said that these were all before the Aachen incident. She felt that her husband was devoting all his time to Mr Parry rather than to their business and family. She became withdrawn and her husband did his own thing. She said that by the latter part of 1984 the art of conversation between them had died. She did not know about the opening of Mr Elcombe's Liechtenstein account at that stage: she only learned of that during the 1988 trial.

She did not go on the fifth trip, but she remembered the sixth trip, the Aachen one. Until the money in the Mercedes was disclosed to the border guards, she had no idea her husband was carrying it. She heard her husband tell the guards that it was the proceeds of 20 years of antique trading, which she knew to be untrue. She said she was in a total state of shock. She said that when they were allowed to drive on she told her husband that she would require some explanations in Zurich. She said that the weather conditions were very bad and she did not want to start a row with him in those conditions. They arrived in Zurich late at night. She retired to bed with a migraine and Mr Elcombe went off somewhere, only returning much later. She said that the following day they did not have breakfast together and he was out somewhere all day. She said that the prospect of an unfriendly enquiry from the English authorities as a result of the Aachen incident did not cross her mind. It was not until 1 February that she sought and obtained an explanation, which was given to her at the Hermitage Hotel. He told her that it was all right, it was all to do with Mr Parry, from his betting shops. Mrs Elcombe said that she was not happy with this explanation and that the following day she flew home, although she had been planning to return with her husband by car. Her evidence did not suggest that she was concerned that her husband had been involved in something illegal, but rather that she had some interest in knowing which part of Mr Parry's business empire the money had come from, although she did not explain why that was important to her. She could not remember asking her husband why he had lied to the border guards.

In her earlier statement Mrs Elcombe also referred to the Aachen incident. Nothing that she there said conveyed that the revelation of the money in the car had come as a surprise to her. Her evidence about the purchase of the Mercedes also differed from that of her husband. Whereas his evidence was that he did not want and had no need for the car, she initially said that her impression was that it was a car which he liked and wanted to use himself.

She remembered the first arrest in June 1985. She exercised her right of silence and said nothing to the police. She told them nothing of Mr Parry's involvement in the matter and said that she left it to her husband to do so. She could not remember if she felt any loyalty to Mr Parry at that stage.

**Conclusions on the evidence**

I found neither of Mr and Mrs Elcombe to be satisfactory witnesses. Mr Elcombe is a dishonest man, who apparently believes tax evasion to be acceptable business conduct ***145*** which, is either not criminal at all or is at least a socially acceptable crime. His evidence before me suggested that certain of his answers at the 1988 trial were motivated by considerations of convenience rather than by those of truth. He lied to the Aachen border guards about the origins of the money he was carrying.

He acknowledged that he had given.them false information, about its amount. He was content to make positive assertions at the 1988 trial to the effect, that his wife knew all about what was he was doing and was equally content at the 1995 one to accept that she knew nothing about anything. Overall, I find it difficult to place confident reliance on Mr Elcombe's evidence.

I was also unimpressed by Mrs Elcombe. Her solicitor's earlier sworn account that his client's case was that she and her husband were ‘innocent agents transporting moneys that they believed to be the property of [Mr Parry]’ does not lie harmoniously with her evidence to me that she had no idea why her husband was making all these trips to Zurich. She is, if I may say so, plainly an intelligent woman. She is a businesswoman of some experience and does not claim that the business side of her and her husband's partnership Was all handled by him. Mr Sisley did not challenge Mr Elcombe's evidence that the family business was a vehicle through which he carried on major tax evasion yet Mrs Elcombe claimed to believe that all her husband's transactions were properly accounted for. I find incredible that, if his accounting for his side of the operation was as dishonest as he claimed, Mrs Elcombe remained in ignorance of it. I find incredible that she did not know the reason for what, as from August 1984, were virtually monthly trips made by her husband to Zurich. The suggestion that the first trip was to buy antiques is a surprising one bearing in mind that the Elcombes had never before bought antiques in Zurich. Her husband was a heavy goods lorry driver turned small time antiques dealer. He had not diversified into international banking. His monthly trips to, and meetings with, Mr Parry in Zurich would, if unexplained, have given rise to the greatest suspicion in a wife as intelligent as Mrs Elcombe. I find incredible; that, if on the morning of 30 January 1985 it really was news to her that her husband was transporting large sums of cash to Switzerland, she would have waited until 1 February for an explanation from him. Evidence which is apparently incredible is; not necessarily untrue. But Mrs Elcombe did not satisfy me that she was a witness on whose evidence! can place complete reliance.

In the result I have come to the conclusion that I am unable to accept Mrs Elcombe's evidence that she knew nothing of what these trips were about It may be that their consequence proved to be so appalling for her and her family that she subsequently tried to blank the whole episode out and has now convinced herself that she knew nothing about it. Such ignorance is not, however, something which she appears to have proclaimed before. Mr Elcombe's evidence in 1988 was that she did know what he was doing. Whilst I regard much of his evidence as unreliable, that piece of it, effectively volunteered by him, appears to me to have a compelling ring of probability about it.

I find as facts therefore that Mrs Elcombe knew that Mr Parry had asked her husband to courier money for him to Zurich and that that was the purpose of each of the six trips he made. I find that that all of that money was the proceeds of sale of part of the gold stolen from Brinks and that Mr Parry knew it was. I confess that I entertain the suspicion that there is a real possibility that Mr Elcombe also knew perfectly well that the money derived from the Brink's-Mat robbery: his claim that he believed that these vast sums of cash had been ‘skimmed’ off the Parry businesses and had now suddenly become ripe for export to Switzerland appears to me to stretch credulity.to its limits, and at this time he was also enjoying a close association with Parry, Perry and Relton, who knew exactly where the money had come from. However, unsurprisingly, Mr Sisley did not cross-examine Mr Elcombe on this aspect of the case and in those circumstances, and given Mr Elcombe's firm denial under oath of any such knowledge, I consider that I ought to accept Mr Elcombe's evidence as to what he believed the source of the money to-be and ***146*** I do so. I find also that Mrs Elcombe believed that the money derived from the Parry business empire and was the subject of a tax evasion exercise.

As to the amounts couriered, Mrs Elcombe accompanied her husband on the first, second, fourth and sixth trips. I find that on each of these trips he couriered (i) £850,435, (ii) £1,044,701, (iv) £640,060 and (vi) £608,000 respectively: in total, £3,143,196. As to the sixth trip, the evidence as to how much was carried is confused, and there is a respectable argument that it was either £708,000 or £710,000. However, there is some uncertainty relating to the £100,000 apparently paid into Mr Elcombe's Liechtenstein account on 30 January 1985, and I have come to the conclusion that only the £608,000 paid in on 31 January 1985 can safely be said to have been derived from Mr Elcombe's Mercedes.

© 2025 Thomson Reuters.

**The issues**

Brinks argue that Mrs Elcombe should be made accountable to them for (on my finding) £3,143,196 as if she were a constructive trustee, on the basis that she dishonestly assisted in a breach of trust, namely the further dissipation of moneys belonging to Brinks. Alternatively, they claim damages from her for fraudulent conspiracy. I will deal with each claim in turn but must first deal with Mr Sisley's argument that Brinks's settlement of their claims against Mr Elcombe, the terms of which I recited at the beginning of this judgment, operated to release their claims against Mrs Elcombe.

*(a) Have the claims been released?*

The argument is that, as conspirators are joint tortfeasors, the consequence of Brinks's settlement with Mr Elcombe is that Brinks's cause of action in tort for conspiracy against Mrs Elcombe was also released, as also was her alleged liability as an accessory in the breach of trust.

In my judgment this argument fails even to reach first base. In order to be able to run it, Mr Sisley has to show that the settlement with Mr Elcombe operated to release Brinks's claims against him. However, the settlement was by way of a discontinuance of such claims. The discontinuance of claims against a defendant brings the proceedings against him to an end. It does not, by itself, operate to release, discharge or extinguish the plaintiffs causes of action. Subject to express or implied terms preventing it, a plaintiff who discontinues a claim is at liberty to sue the defendant afresh on the same cause of action the following day: see RSC, O.21, r. 3 and compare *The Kronprinz (1887) 12 App Cas 256* . In this case no bar was imposed on Brinks preventing them from starting a fresh action against Mr Elcombe (although any new action would no doubt face limitation problems) and the terms of settlement did not purport either expressly, or in my view impliedly, to release, discharge or extinguish Brinks's causes of action against him. I cannot therefore see that the settlement can have had any effect on Brinks's claims against Mrs Elcombe. I reject Mr Sisley's first argument.

*(b) Dishonest assistance in a breach of trust*

This claim was originally presented as being one of knowing assistance in a dishonest and fraudulent breach of trust, in reliance on the second limb of the familiar statement in the judgment of Lord Selborne LC in *Barnes v Addy (1874) LR 9 Ch App 244* , at pp. 251–252. However, on *24 May 1995 the Privy Council delivered its judgment in Royal Brunei Airlines Sdn Bhd v Philip Tan Kok Ming [1995] 2 AC 378* . That judgment examines afresh the basis on which a person can be held liable as an accessory to a breach of trust. Mr Tugendhat submits that its effect is that, in order to fix Mrs Elcombe with liability in equity as an accessory, all he needed to do was to prove (i) that she had rendered assistance in what, objectively assessed, was a dishonest transaction and (ii) that the transaction involved a breach of trust.

***147***

The steps in Mr Tugendhat's argument are as follows:

(i) the robbery was facilitated with the benefit of vital assistance provided to the robbers by Mr Black in breach of his fiduciary duty owed to Brinks;
(ii) that circumstance enables Brinks to invoke the assistance of equity to follow the gold and its proceeds so far as still traceable;
(iii) Mr Parry's scheme for the further dissipation of part of such proceeds by transmitting it to Zurich was therefore a dishonest and fraudulent breach of trust affecting money which was still Brinks's property;
(iv) Mrs Elcombe provided material assistance in carrying out such breach of trust;
(v) she knew that the money her husband was carrying was the proceeds of the gold stolen from Brinks and therefore knew of the dishonest and fraudulent design in which she was assisting;
(vi) however, even if (as I have found) she did not know the true source of the money, she (as I have also found) at least believed that the operation was a tax evasion exercise by Mr Parry;
(vii) that operation was a dishonest one. and she was acting dishonestly in providing her assistance in it;
(viii) such dishonest assistance in what was in fact (although unknown to her) a breach of trust is sufficient under the law as clarified by the *Royal Brunei Airlines* case to make her accountable to Brinks as an accessory to the breach of trust, it being irrelevant that she was unaware of the breach of trust in which she was assisting; and
(ix) if it is necessary to show knowledge on her part that she was assisting in a breach of trust, it is sufficient to entitle Brinks to recover that she believed that the money her husband was couriering was derived from Selective and she knew,

or ought to have known, that its transmission to Switzerland involved a breach of the fiduciary duties owed to Selective by Mr Parry as one of its directors.

Mr Sisley challenged almost all the steps in that argument. First, whilst he accepted that Mr Black owed fiduciary duties to Brinks, he submitted that.he did not owe it a fiduciary duty sufficient to impress the proceeds of the robbery with a trust. His point was that, although Mr Black was a security guard, he did not have any relevant control over the gold. He submitted that a trust affecting the stolen property would only arise if it had been facilitated by acts in breach of fiduciary duty committed by one of Brinks's officers or other directing mind. He referred me to the following passage in the judgment of Millett J in *Agip (Africa) Ltd v Jackson [1990] Ch 265* , at p. 290D:

> ‘The requirement is, however, readily satisfied in most cases of commercial fraud, since the embezzlement of a company's funds almost inevitably involves a breach of fiduciary duty on the part of one of the company's employees or agents. That was so in the present case. There was clearly a fiduciary relationship between Mr. Zdiri and the plaintiffs. Mr. Zdiri was not a director nor a signatory on the plaintiffs' bank account, but he was a senior and responsible officer. As such he was entrusted with possession of the signed payment orders to have them taken to the bank and implemented. He took advantage of his possession of them to divert the money and cause the separation between its legal ownership which passed to the payees and its beneficial ownership which remained.in the plaintiffs. There is clear authority that there is a receipt of trust property when a company's funds are misapplied by a director and, in my judgment, this is equally the case when a company's funds are misapplied by any person whose fiduciary position gave him control of them or enabled him to misapply them.’

The case went to the *Court of Appeal (see [1991] Ch 547)* , which upheld Millett J's decision and made no criticism of that passage. I do not, for my part, interpret it as ***148** supporting Mr Sisley's submission that it is only officers or other directing minds of a company who are capable of committing relevant breaches of fiduciary duty. The last sentence of the quoted passage, with which I respectfully agree, suggests that the right approach is rather broader. Mr Black was not an officer or a directing mind of Brinks. But he was employed in an important position of trust by them and in such a position he possessed valuable information relating to the security arrangements affecting property in Brinks's custody at the Heathrow premises. He owed a duty to Brinks not to divulge that information to anyone not entitled to it. In breach of that duty he disclosed material information to the robbers and so gave them vital assistance enabling them to commit the robbery. In my judgment that breach of his fiduciary duty was sufficient to bring into play the equitable remedies on which Brinks rely.

Secondly, Mr Sisley submitted that anyway Mrs Elcombe did not provide any relevant assistance in furtherance of the breach of trust. He referred me to *Baden v Societe Generate pour Favoriser le Developpement du Commerce et de I'Industrie en France SA [1993] 1 WLR 509* . That case includes a discussion by Peter Gibson J of the basis on which strangers to the trust may be held accountable as trustees if they ‘assist with knowledge in a dishonest and fraudulent design on the part of the trustees’ (Lord Selborne's words in *Barnes v Addy (1874) LR 9 Ch App 244* , at p. 252). At p. 574, the judge said:

> ‘246. As to the third element it seems to me to be a simple question of fact, whether or not there has been assistance. The payment by a bank on the instructions of fraudulent directors of a company of moneys of the company to another person may be such assistance, as in the *Selangor case [1968] 1 WLR 1555* and the *Karak case [1972] 1 WLR 602* . Mr Leckie submitted that there cannot be assistance for the purposes of constructive trusteeship unless that which is done by the stranger inevitably has the consequence that a loss is suffered and that a mere payment which in itself does not have that consequence is not sufficient. I accept that the assistance must be an act which is part of the fraudulent and dishonest design and must not be of minimal importance but I am not aware of any reasons of principle or by way of authority why Lord Selborne L.C.'s test should bear the further gloss which Mr Leckie would put on it.’

© 2025 Thomson Reuters.

Did Mrs Elcombe provide sufficient relevant assistance in the breach of trust? Mr Tugendhat did not contend that the mere fact of her presence in the car in the various journeys on which she went, with the knowledge of what her husband was doing, by itself amounted to relevant assistance, nor did he argue that it made a material difference that she benefited from the trips by having her expenses paid by Mr Parry. But he submitted that she knew that the exercise was a dishonest one and that her role in it was to provide her husband with her company on his long car journeys to Zurich but also, and principally, to cloak what she knew to be an illegal operation with the apparent innocence of a family holiday or an antique buying trip. Her main role was, therefore, to provide an important element of cover intended to deter the suspicious from regarding the various journeys as other than commonplace and honest. Mr Tugendhat submitted that the filling by Mrs Elcombe of this role amounted to the provision of sufficiently material assistance to render her accountable in equity as an accessory.

Mr Tugendhat argued the point with great persuasiveness but I have decided that there is no evidence from which I can conclude that Mrs Elcombe provided assistance of a nature sufficient to make her an accessory to the breach of trust of which Brinks complain. First, I find that Mr Parry's couriering arrangements was made exclusively with Mr Elcombe and she was not a party to it. Secondly, I find that it was Mr Elcombe alone who carried out all the elements of the couriering operation. Thirdly, there is no evidence justifying the conclusion that Mr Parry imposed a condition, or even made a ***149** request, to the effect that Mrs Elcombe should accompany her husband on the trips with a view to providing the suggested cover. Nor is there is any other evidence that this was why Mrs Elcombe accompanied her husband. Moreover, Mr Elcombe made two of the trips by himself, which does not suggest that the ‘cover’ point was at the forefront of anyone's mind; and, ironically, the only trip on which the car was searched was one on which Mrs Elcombe did accompany her husband.

In my judgment the only conclusion which I consider that I can properly draw from the evidence is that Mrs Elcombe went on such trips as she did in the capacity of Mr Elcombe's wife, providing him with welcome company on what were long and no doubt tiring drives and in the happy knowledge that the expenses of herself and her children were all being paid for by her husband's rich and benevolent employer, whose benevolence was also explained by the fact that he was part of the family. Whilst not for one moment wishing to minimise the benefit to a husband of being able so to enjoy the company of his wife, I do not regard Mrs Elcombe's presence on such trips as constituting relevant ‘assistance’ in furtherance of the breach of trust of which-Brinks complain.

In my judgment it follows that Brinks fail in their claim that Mrs Elcombe is accountable to them as an accessory to the breach of trust. I do not, however, consider that Mrs Elcombe emerges with any credit from the story. I have found that she believed that her husband was engaged in an unlawful and dishonest tax-evasion exercise. An honest wife who knew that her husband was so engaged would counsel him to wash his hands of it immediately and, if he refused, would not wish to have any association with the operation, and certainly not as an all expenses paid passenger. But I do not consider that Mrs Elcombe's failings in these respects are, by themselves, sufficient to justify holding her accountable to Brinks for the losses which they have suffered in consequence of the Zurich operation.

Having come to this conclusion it is not strictly necessary for me to decide the issue raised by the main debate between counsel, namely: is it (as Mr Tugendhat contends) sufficient to fix Mrs Elcombe with liability as an accessory to the breach of trust merely to prove that she had provided her assistance to the furtherance of a dishonest transaction, regardless of whether she knew that it involved a breach of trust; or (as Mr Sisley contends) must Brinks still also prove that she had knowledge of the trust which was being breached? However, in case the matter, goes further and the point should become a live one I should perhaps at least indicate the nature of the debate and my findings of fact relevant to it.

*Barnes v Addy (1874) LR 9 Ch App 244* , at p. 251, contains this well known passage in the judgment of Lord Selborne LC:

> ‘Now in this case we have to deal with certain persons who are trustees, and with certain other persons who are not trustees. That is a distinction to be borne in mind throughout the case. Those who create a trust clothe the trustee with a legal power and control over the trust property, imposing on him a corresponding responsibility. That responsibility may no doubt be extended in equity to others who are not properly trustees, if they are found either making themselves trustees de son tort, or actually participating in any fraudulent conduct of the trustee to the injury, of the cestui que, trust. But, on the other hand, strangers are not to be made constructive trustees merely because they act

> as the agents of trustees in transactions within their legal powers, transactions, perhaps of which a Court of Equity may disapprove, unless those agents receive and become chargeable with some part of the trust property, or unless they assist with knowledge in a dishonest and fraudulent design on the part of the trustees'

The case concerned an unsuccessful attempt to make two solicitors answerable for losses which had been suffered in consequence of a breach of a formal trust established ***150*** by a will. In recent years the principles encapsulated in the last quoted sentence, usually abbreviated to 'knowing receipt' and 'knowing assistance', have commonly been resorted to in cases not involving the breach of any like formal trust, but in cases of a commercial nature in which a company's assets have been embezzled or misapplied in circumstances involving a breach of fiduciary duty and resulting in the embezzled or misapplied assets being regarded as trust money in the hands of those who have received them or have assisted in their dissipation.

As regards 'knowing assistance', there has been considerable discussion in the cases of what the requirements are. The essence of such a claim is that it is directed to making someone who is not a trustee accountable as if he were a trustee and unsurprisingly in those circumstances the cases have focused on the need for the accessory to have the requisite degree of knowledge of the trust in question (or at least of the facts giving rise to what the lawyers characterise as a trust) and of the trustee's fraudulent design. One of the issues which has been the subject of particular discussion has been whether it is sufficient to show merely constructive notice of the fraud in order to make the accessory liable, or whether the accessory must be shown to have lent dishonest assistance to its furtherance. The more recent cases have favoured the view that it is necessary to show the latter. See the *Agip case, at [1990] Ch 265* , at pp. 292–293; *Eagle Trust plc v SBC Securities Ltd [1993] 1 WLR 484* , at p. 495; and *Polly Peck International plc v Nadir (No. 2) [19921 4 All ER 769* , at p. 777.

In the *Royal Brunei Airlines* case, the judicial committee of the Privy Council reviewed the basis on which a stranger can be held accountable for 'knowing assistance' in a breach of trust. The judgment, delivered by Lord Nicholls of Birkenhead, drew attention to what the board regarded as an illogicality, namely that the law as it had developed since *Barnes v Addy* , only imposed liability on the stranger as an accessory to a breach of trust in a case where the trustee was also guilty of dishonesty in the breach of trust, but did not do so in a case in which the trustee was acting innocently in the breach of trust but the stranger was acting dishonestly.

The board held that the basis on which an accessory could be held liable for a breach of trust should not be dependent on the state of mind of the trustee. The trustee will be liable for the breach of trust even if he has acted innocently, unless he is excused by an exemption clause in the trust instrument or is relieved by the court. An accessory who assists in a breach of trust may also be held answerable in appropriate cases. The test for his liability was summarised in the judgment at p. 392F; 909D as follows:

> 'Drawing the threads together, their Lordships' overall conclusion is that dishonesty is a necessary ingredient of accessory liability. It is also a sufficient ingredient. A liability in equity to make good resulting loss attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation. It is not necessary that, in addition, the trustee or fiduciary was acting dishonestly, although this will usually be so where the third party who is assisting him is acting dishonestly. "Knowingly" is better avoided as a defining ingredient of the principle, and in the context of this principle the *Baden [1993] 1 W.L.R. 509* scale of knowledge is best forgotten.'

Mr Tugendhat's submission is that that principle is now the applicable one for the purpose of determining an accessory's liability. He says that it is sufficient to fix Mrs Elcombe with liability as an accessory that she dishonestly assisted in a transaction involving the disposal of Brinks's money abroad. She may have believed that all she was involved in was an essay in tax evasion and she may have had no actual knowledge that the money was in fact derived from the Brink's-Mat robbery or that it was affected by a trust in favour of Brinks. However, he submits that it is no answer for her to say that she believed she was only involved in some different dishonesty. Her dishonest part in what ***151*** did in fact involve the breach of the

fiduciary obligation affecting Brinks's money is sufficient to make her accountable even if she had no actual knowledge of the breach of trust in which she was assisting.

Whilst it is unnecessary for me to rule finally on that submission, I should perhaps indicate that I was and am unpersuaded by it. I agree that the passage I have quoted from the judgment may, read in isolation, be said to lend support to Mr Tugendhat's submission. However, I do not consider that the board intended to suggest that an accessory can be made accountable to the beneficiaries as a constructive trustee regardless of whether he had any knowledge of the existence of the trust. In the *Royal Brunei Airlines* case itself the claim was one against the director of the trustee company which had committed the breach, and he had conceded that there had been a breach of trust in which he had assisted with actual knowledge. Thus the case was one where the accessory did have the relevant knowledge. Further, in the board's analysis of the basis on which accessories have in the past been held liable for assisting in breaches of trust, the judgment made it clear, at p. 387D–G; 905B–D, that the law had never gone so far as to give a beneficiary a remedy against an accessory who dealt with a trustee in ignorance that he was a trustee, or who knew that he was a trustee but had no reason to know or suspect that the transaction in which he was assisting was in breach of trust. The board makes no suggestion that in this respect the earlier authorities were wrong. In my view the judgment proceeds on the basis that a claim based on accessory liability can only be brought against someone who knows of the existence of the trust, or at least of the facts giving rise to the trust; and all that the judgment is directed at clarifying is what further is also needed to be shown in order to make the accessory liable. The only further ingredient is dishonesty on the part of the accessory, and that is a sufficient ingredient. It is unnecessary that there should also be any dishonesty on the part of the trustee. In my view this is all that the board is saying in the passage at p. 392F; 909D which I have earlier cited.

In case this goes further and this issue becomes a relevant one, I make clear that I find that the transaction in which Mr Elcombe was engaged, and of which Mrs Elcombe was aware, was a dishonest one. I find that Mrs Elcombe did not believe that it was other than in connection with a tax evasion exercise being carried out by Mr Parry. I find that she had no knowledge of the precise nature of the alleged exercise or of which parts of the Perry's business empire were supposed to benefit from it. I find that she was unaware of any connection between the couriering operations and the Brink's-Mat robbery. I find that she made no inquiries of Mr Parry for further information as to what the operations were all about.

*(c) Fraudulent conspiracy*

The allegation here is that Mrs Elcombe, together with others, conspired to injure Brinks. Mr Tugendhat's argument is that, even accepting that neither Mr nor Mrs Elcombe knew that the money derived from the Brink's-Mat robbery, they at least believed that the Zurich trips were part of a tax evasion plan designed to defraud the Inland Revenue. He submitted that they must also have known that the removal of these large sums of money from the jurisdiction would cause damage to the companies in the Parry business empire from which they were derived. He submitted that proof of this was enough to entitle Brinks to recover in conspiracy. His argument was that, provided Mrs Elcombe intended to injure someone, that was enough to entitle Brinks to recover even if she was ignorant that Brinks was the victim. Mr Tugendhat was unable to support that last proposition by reference to any reported authority on the civil tort of conspiracy, but sought to make it good by relying on certain cases concerned with the crime of conspiracy.

Mr Sisley disputed both limbs of Mr Tugendhat's argument. He submitted that Mrs Elcombe's presence in the car on four of the trips did not amount to sufficient ***152** participation on her part to render her answerable in tort for conspiracy. He submitted further that the reported cases on civil conspiracy support the conclusion that it is necessary for the plaintiff to be identified by the wrongdoer as the intended victim. He cited various authorities, although none of them appeared to me to be directed to this particular point.

Mr Tugendhat accepted that conspiracy was very much a secondary line of attack. The first hurdle he must surmount is to show sufficient participation by Mrs Elcombe. I take the view that I have to be satisfied that Mrs Elcombe both knew of and assented to the supposed tax evasion plan and joined in its execution.

I find that the couriering arrangement was made exclusively between Mr Parry and Mr Elcombe and that Mrs Elcombe was not a party to it. I find that Mrs Elcombe knew that the various trips on which she went to Zurich were in pursuance of this arrangement. However, for reasons which effectively follow from my findings of fact in relation to the claim against Mrs Elcombe as an accessory to a breach of trust, I find that she provided no encouragement to her husband and provided no material assistance or played any material part in its execution. I do not consider that it is sufficient to fix her with participation in the alleged conspiracy that she knew the essence of what her husband was doing and acquiesced in it by accompanying him on four of the trips he made.

© 2025 Thomson Reuters.

I accordingly find that the case in conspiracy is not established either. It follows that I do not find it necessary to consider the issue of law which was debated before me as to whether it is essential for the alleged conspirator to intend to injure the plaintiff rather than someone else.

**Result**

The result is that the action against Mrs Elcombe will be dismissed.

*(Action dismissed)* ***153**