# Brown v Bennett [1999] BCC 525

# Exhibit 8

# Brown & Anor v Bennett & Ors.

Court of Appeal (Civil Division).
Morritt, Aldous and Hutchison L JJ.
Judgment delivered 1 December 1998.

*Practice – Statement of claim – Application for amendment and substitution – Conspiracy – Administrative receivership – Liquidation – Directors' breach of fiduciary duties – Conspiracy to force company into receivership – Receiver sold business – Purchaser connected with vendor company – Constructive trust – Dishonest and fraudulent design – Application refused – Appeal.*

**This was an appeal against an order of Rattee J ([1999] BCC 91) striking out the whole of a statement of claim in respect of the defendant company and part of the claim against the seventh defendant, alleged unlawfully to have conspired to force a company into financial difficulties leading to administrative receivership and liquidation for the purpose of enabling the defendant company to buy the company's business and build it into a profitable business in the defendant company's hands.**

**The defendant company, 'Oasis', purchased the business of the first company from its receivers. The latter company went into liquidation. The plaintiffs, shareholders in the company to whom a right of action had been assigned, claimed that they were entitled to the profits made by Oasis from the former business of the company. They claimed that Oasis had knowingly and dishonestly assisted in the plan of former directors of the company in breach of their fiduciary duties to pressurise the company into receivership with a view to its business being bought by the directors from the receivers via a new company, Oasis, formed for the purpose. Oasis knew that the receivers' breaches of duty were dishonest and the plaintiffs claimed that the knowledge of the directors should be imputed to Oasis since they were directors of Oasis. Oasis held the assets bought from the company and profits on constructive trust for the plaintiffs. The plaintiffs further claimed against Oasis an unlawful conspiracy with the directors and other defendants to injure the company or the plaintiffs as shareholders therein by the unlawful means of committing the breaches of duty previously pleaded.**

**Similar claims were sought against the company secretary, the seventh defendant, 'S', under the two headings of breach of fiduciary duty and conspiracy. The plaintiffs alleged that he assisted the directors to plan the acquisition of the company's business by preparing business plans and using confidential information of the company, for the carrying on of that business through a new company, and subsequent to Oasis acquiring the company's business he became company secretary of Oasis and was granted share options therein.**

**Rattee J granted leave for substitution of the proposed amended statement of claim subject to deletion of the allegations against Oasis and the allegations of breach of fiduciary duty against S. The plaintiffs appealed to the Court of Appeal against the deletions. They argued that Oasis obtained the business of the company in consequence of a dishonest and fraudulent design, of which it had notice of such receipt and in which it assisted with knowledge and was accordingly liable under the limbs of Barnes v Addy (1874) LR 9 Ch App 244, and as co-conspirator with other defendants.**

***Held*, dismissing the appeal subject to granting leave to amend in relation to S:**

**1. To enforce a constructive trust on the basis of knowing receipt, a plaintiff had to show a disposal of his assets in breach of fiduciary duty, beneficial receipt by the defendant of traceable assets of the plaintiff and knowledge by the defendant that the assets received were traceable due to a breach of duty (El Ajou v Dollar Land Holdings plc [1994] BCC 143 applied).**

**2. Oasis obtained the business bona fide under a purchase from independent fiduciary vendors, the administrative receivers, without any breach of trust. There was not a loss of**

**corporate opportunity involving directors using their knowledge for themselves to be held as constructive trustees of the company's property and of its fruits for the company from whence they took it as that would involve a distribution or disposal of the company's property in dishonest breach of trust by the directors. The judge had been right to strike out the allegation of knowing receipt against Oasis.** A

**3. In relation to knowing assistance, it was impossible on the undisputed facts to say that Oasis, which had no connection with the directors of the company until after the appointment of the receivers, assisted in any breach of the directors' duties: the breach and resultant damage to the company were complete before Oasis came on the scene. The judge had been right that Oasis could not be liable as a constructive trustee under the knowing assistance limb when it gave full value for the business of the company as it existed at the time when it acquired the business.** B

**4. The claim for conspiracy against Oasis stood or fell with the claim against it for knowing assistance and thus the submissions in relation to conspiracy must likewise not be accepted.** C

**5. The claim against S for knowing assistance had been struck out by the judge as dishonesty was required and had not been pleaded. The claim could go to trial with leave to amend.**

The following cases were referred to in the judgment of Morritt LJ: D

*Baden v Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France SA* [1993] 1 WLR 509.
*Barnes v Addy* (1874) LR 9 Ch App 244.
*Cook v Deeks* [1916] 1 AC 554.
*El Ajou v Dollar Land Holdings plc* [1994] BCC 143.
*Montagu's Settlement Trusts, Re* [1987] Ch 264.
*Royal Brunei Airlines Sdn Bhd v Tan Kok Ming* [1995] BCC 899; [1995] 2 AC 378. E

David Oliver QC and Nicholas Asprey (instructed by Abrahamson & Associates) for the appellant.

Barbara Dohmann QC and Robert Anderson (instructed by Berwin Leighton) for the respondent.

JUDGMENT F

**Morritt LJ:** This appeal is brought with the leave of Robert Walker LJ by the plaintiffs, Mr and Mrs Brown, from the order of Rattee J made on 25 November 1997. By that order the judge struck out the whole of the claim of Mr and Mrs Brown against the eleventh defendant, Oasis Stores, now a plc, and part of the claim against the seventh defendant, Mr Sarson.

G

In the action Mr and Mrs Brown sue as minority shareholders in and as the assignees of the twelfth defendant, Pinecord Ltd (to which I shall refer as 'the company'), the assignment having been executed by the liquidator. The company formerly traded under the name of Oasis as a retailer and wholesaler of ladies' clothes and fashion accessories and, in addition, franchised the name for use by others in connection with their own products.

The company went into administrative receivership on 24 January 1991, sold its business to a new company, the eleventh defendant, Oasis, on 7 March 1991 and went into insolvent liquidation on 9 June 1993. H

In these proceedings the Browns claim that Oasis obtained the business of the company in consequence of a dishonest and fraudulent design, of which it had notice at the time of such receipt, and in which it assisted with knowledge. The Browns allege that Oasis is

© 1999 CCH Editions Limited

A accordingly liable under both limbs of the well-known case of *Barnes v Addy* (1874) LR 9 Ch App 244, and as a co-conspirator with the other defendants in the action. Rattee J considered that all such claims were obviously unfounded and struck them out. As I have indicated, Mr and Mrs Brown now appeal.

The seventh defendant, Mr Sarson, became the secretary of the company on 10 August 1988. Mr and Mrs Brown allege that he was also involved in the dishonest design to B which I have already referred, and liable to Mr and Mrs Brown both for assisting in it and as a co-conspirator. Rattee J struck out the first but not the second allegation. The Browns appeal in respect of the first, but there is no cross-appeal in respect of the second.

It is necessary to refer to the underlying facts of the case in rather more detail. Down to 4 August 1988 Mr and Mrs Brown were the only shareholders in the company and, together with the fifth defendant, Mr Evans, and the sixth defendant, Mr Kane, the only C directors. On 4 August 1988 there was completed with some modifications an agreement which had been made on 19 February 1988, whereby the first and second defendants, Morris and Michael Bennett, became directors of the company and acquired a one per cent shareholding in the company and an option to acquire a further 39 per cent of the company, in consideration of a loan of £500,000 made by a finance company owned by them known as Camion.

On 20 March 1989 there was a formal agreement between the company and Camion D relating to further loans which had been made, aggregating some £630,000; and a formal option agreement, replacing all the earlier agreements, whereby options were conferred on Morris and Michael Bennett to acquire 45 per cent of the shares in the company.

On 15 September 1989 the eighth to tenth defendants, to which I shall refer as APA, a venture capital group, subscribed £1m for shares in the company. The loans made to the company by Camion were repaid and the Bennetts exercised their options to acquire E shares in the company, thereby reducing the percentage interest of Mr and Mrs Brown to 43.2 per cent. Then on 28 March 1990 the company raised £1m by a rights and convertible loan stock issue.

The Browns ceased to be directors of the company on 19 July 1990. They allege that they were forced to resign by the Bennetts' refusal to implement economies which they had said were necessary, such economies necessitating a reduction in the administrative F duties of the Bennetts. Whether that is so or not, we have to assume it for present purposes. Its only relevance, I think, is that that is why the Browns ceased to be directors on 19 July 1990. Of more importance is the fact that on 31 October 1990 the loan stock was converted into shares in the company, and thereafter the interest of the Browns was reduced yet further, to 33.8 per cent.

As I have indicated, the company went into administrative receivership on 24 January G 1991. Its then directors were the Bennetts, the third defendant, Mr Freedman (said to be a nominee of APA), the fourth defendant, Mr Scott, and Mr Evans and Mr Kane.

The receivers then advertised the business of the company as being for sale. A number of offers were received. An offer was received from the plaintiffs, Mr and Mrs Brown. An offer was also received from the Bennetts, and that was accepted by the receivers on 13 February 1991, subject to contract and to adequate finance being apparently forthcoming. Following that acceptance, on 21 February 1991 the Bennetts acquired H from company registration agents the outstanding issued shares in Oasis. They then and there, on that date, became the only two directors of Oasis.

Following the acceptance of their offer on 13 February, and more so after the acquisition of Oasis on 21 February, negotiations took place between the Bennetts on the one hand and outside investors on the other, formed together for the purpose under the aegis of a company called Tuneclass Ltd. Negotiations were directed to funding Oasis for

the purpose of the acquisition of the business of the company and for structuring that A
acquisition by Oasis. Thus it was that on 7 March 1991 the share capital of Oasis was increased to £1.1m, of which about 49 per cent was issued to the Bennetts and Mr Scott, and the rest to Tuneclass Ltd. Oasis bought the business of the company through the agency of the administrative receivers for £1.5m.

As I have indicated, the company went into insolvent liquidation on 9 June 1993. By contrast, Oasis prospered and on 28 June 1995 its shares were floated on the stock B
exchange, according to the statement of claim at a considerable profit to the Bennetts. The writ in the action was issued on 27 March 1996, followed by the assignment of causes of action by the liquidators to the Browns on 19 March in the same year.

Applications to strike out the statement of claim were made by Mr Sarson in relation to the claims against him on 20 January 1997 and by Oasis in respect of the claims against it on 23 October 1997. In the meantime, on 13 March 1997, the plaintiffs had sought C
leave to amend the statement of claim in order to put it in a rather more digestible form. These matters came before Rattee J at the end of July 1997, when he gave certain interim directions about the production of a further edition of the statement of claim. The actual summonses for leave to amend and to strike out came before him on 25 November. As I have indicated, he did strike out the whole of the claim against Oasis and part of the claim against Mr Sarson.

D
The application for leave to appeal came before Robert Walker LJ who, in granting leave to appeal, expressed the view that the judge's decision raised serious issues as to the limits of proprietary and restitutionary remedies. That then is the background to the action.

I will deal first with the claims against Oasis. The foundation to these claims lies in the claim against the Bennetts, which is summarised in para. 47 of the amended statement of claim. It is not necessary, I think, to read it verbatim. The effect of that allegation is that E
the Bennetts either intentionally or recklessly put the company into such financial difficulties that they might increase their share of the equity as a condition for extricating the company from the difficulties they had caused, and/or in order to put the company into administrative receivership with a view thereafter to buying the business from the receiver for the benefit of themselves and their associates.

The conduct relied on, on the part of the Bennetts and others, is that alleged in F
para. 48–53 of the amended statement of claim. As I have indicated, that conduct is alleged to have been fraudulent. The aspects of the conduct relied on are threats in October 1988 to call in the Camion loans, the fact that between February and July 1990 the Bennetts maintained the head office expenses of the company at a level in excess of the company's gross profits and refused to make the necessary economies, the fact that the Bennetts ultimately caused the company to move its head office, thereby incurring further costs whilst still paying the rent and excessive outgoings in respect of the old one G
and, finally but not by any means least, planning the phoenix operation by which the business of the company was acquired by Oasis for the benefit of the Bennetts and their associates Mr Scott, Mr Evans and Mr Sarson.

It is against that background that the claim against Oasis is made in para. 91 of the amended statement of claim. That alleges:

H
> 'Oasis purchased from the administrative receivers the goodwill and assets of the business by the Agreement dated 7 March 1991 pleaded in paragraph 34 above. At that date Oasis had knowledge of all the aforesaid breaches of fiduciary duty pleaded in paragraphs 48 to 53 hereof and moreover knew that such breaches of duty were dishonest, in that the knowledge of the Bennetts and/or of Mr Scott in those matters is to be imputed to Oasis as its directors.

© 1999 CCH Editions Limited

> A By such action Oasis participated in and/or assisted the Bennetts to commit the breaches of fiduciary duty pleaded in paragraph 53 above.
>
> Reference will be made to paragraphs 78 to 90 of the Particulars to support this allegation.'

Then in para. 92 the Browns allege a conspiracy to which Oasis was a party in these terms:

> B 'On or shortly after 2 January 1991 Oasis agreed with the Bennetts, Mr Freedman, Mr Scott, Mr Evans, Mr Sarson and/or APA to assist the Bennetts in the acquisition of the business for themselves by causing the company to go into receivership and buying the business back from the receiver with a view to each of the said parties participating in the business (via Oasis) when so purchased.
>
> Such agreement was an unlawful conspiracy in that it was an agreement to injure
> C the company and/or the plaintiffs as shareholders in the company by unlawful means namely by committing the breaches of fiduciary duty pleaded in [and then their various paragraph numbers are given].
>
> Reference will be made to paragraphs 78 to 90 of the Particulars to support this allegation. The participation of the Bennetts, Mr Freedman, Mr Scott, Mr Evans, Mr Sarson and APA in the conspiracy is pleaded at paragraphs [and then various
> D other paragraphs are set out].'

The conclusion alleged in para. 93 of the amended statement of claim is in these terms:

> 'As a result of the aforesaid breaches of fiduciary duty and/or conspiracies the company went into receivership and the business was purchased from the administrative receivers by Oasis as pleaded in paragraphs 33 and 34 hereof, and the Bennetts, Mr Scott, Mr Evans and Mr Sarson have since participated (via
> E Oasis) in the management and/or equity of the business and/or as an employee in the business.'

Then there is a reference to certain further particulars in specified paragraphs.

It is apparent from those paragraphs, from the judgment of the judge and the skeleton argument produced helpfully by counsel for Mr and Mrs Brown before us, that the causes of action relied upon against Oasis are three in number. First of all, there is what
F is labelled 'knowing receipt'; that is the first limb of the proposition established by *Barnes v Addy*. Secondly, there is 'knowing assistance', that is to say the second limb of the proposition established by *Barnes v Addy*. Thirdly, there is common law conspiracy. I propose to deal with each of those three in turn.

The allegation of knowing receipt, as set out in para. 91, is that Oasis purchased the assets with knowledge of all the dishonest breaches of fiduciary duty alleged by Mr and
G Mrs Brown. This was rejected by the judge in the passage in his judgment where he said this ([1999] BCC 97A–C):

> 'In the present case the statement of claim pleads no breach of trust, as opposed to a breach of fiduciary duty owed by a director to his company. The only relevant trust suggested at any stage by Mr Oliver was the trust to which a director has been said to be subject in relation to a company's property under the director's
> H control (see Halsbury's *Laws of England*, (4th edn Butterworths, 1996 reissue), vol. 7(1), para. 591). There is no allegation in the amended statement of claim that any of the directors of the company committed any breach of trust in relation to the company's property. Not surprisingly it is not alleged that the sale of the company's assets to Oasis was a breach of any trust in relation to those assets. It was carried out for full value by independent receivers. It cannot therefore be said, consistently with the proposed pleading, that Oasis received any trust property as

> a result of a breach of trust, so as to have become a constructive trustee of it under the "knowing receipt" limb of the *Barnes v Addy* formulation.' A

Before us Mr Oliver frankly accepted that he could not and did not allege that the acquisition of the remains of the business by Oasis from the administrative receivers was itself a breach of trust. He contended that the judge was wrong because, he said, it was plain that Oasis had the requisite knowledge through the Bennetts as from 21 February 1991 that the breaches of fiduciary duty alleged against the Bennetts gave rise to the sale B to Oasis on 7 March, without which it would not have occurred, so that (and this, as I understood it, was the alleged consequence) there was a knowing receipt within the principle because Oasis could not in those circumstances be a bona fide purchaser without notice.

For the Bennetts it was alleged by a respondent's notice that the knowing receipt claim had not been adequately pleaded, but in the circumstances we heard no argument on it.

C The knowing receipt claim is dealt with in a large number of authorities over many years. I take as a paradigm example of its proper expression the passage in the judgment of Hoffmann LJ in *El Ajou v Dollar Land Holdings plc* [1994] BCC 143. It is unnecessary to refer to the facts of that case. It is sufficient to go to the commencement of Hoffmann LJ's judgment at p. 154H:

> 'This is a claim to enforce a constructive trust on the basis of knowing receipt. For this purpose the plaintiff must show, first, a disposal of his assets in breach of D fiduciary duty; secondly, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.'

It is in my view quite plain from that statement of principle (and there are many other similar ones in the books) that the receipt must be the direct consequence of the alleged E breach of trust or fiduciary duty of which the recipient is said to have notice.

The matter, I think, can be tested in this way. Let us assume a mansion house vested in trustees. The trustees fail to perform their fiduciary duties and allow it to fall into appalling disrepair. They are then replaced by other trustees who decide that the matter has gone too far and decide to sell the property. They sell the property to a next-door neighbour, who for the previous 40 years has watched the mansion house falling into disrepair. The sale by the new trustees to the neighbour is entirely proper, at a proper F price. The neighbour unquestionably has notice of the previous breaches of duty, because he watched them happen, but the breaches of duty did not give rise to any receipt by the neighbour; the neighbour was not in any way responsible for them and he paid the full value for what he received from the new trustees when he bought. I can see no reason why in those circumstances there should be any constructive trust liability imposed upon the neighbour merely because he watched the house fall into disrepair before he was G enabled to buy it.

Mr Oliver, on the part of the plaintiffs, counters the suggestion that the proposition is as narrow as Hoffmann LJ expressed it in *El Ajou*. He makes three points. First he said that Hoffmann LJ was not seeking to define the outer limits of the principle. I agree, but he was expressing the principle in the conventional terms in which it has been expressed on countless occasions over countless years, and no one was able to produce any authority to indicate that the method of expression was not in fact properly used to H confine the principle to cases where the property is conveyed in breach of trust to the knowing recipient.

Second, he referred to the decision of Peter Gibson J in *Baden v Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France SA* [1993] 1 WLR 509, where at pp. 571–572, para. 236, Peter Gibson J set out:

© 1999 CCH Editions Limited

A 'The first category of "Knowing receipt or dealing" is described at p. 194 [of Snell's *Principles of Equity*]:

> "A person receiving property which is subject to a trust . . . becomes a constructive trustee if he falls within either of two heads, namely – (i) that he received trust property with actual or constructive notice that it was trust property and that the transfer to him was a breach of trust".'

B I omit the rest as being irrelevant for present purposes. Then he continued in para. 237:

> 'I admit to doubt as to whether the bounds of this category might not be drawn too narrowly in *Snell*. For example, why should a person who, having received trust property knowing it to be such but without notice of a breach of trust because there was none, subsequently deals with the property in a manner inconsistent with the trust not be a constructive trustee within the "knowing receipt or dealing"
> C category?'

Mr Oliver relies on that passage as indicating that the confinement of the principle suggested by Hoffmann LJ is not in fact right because it is envisaged by Peter Gibson J that there is a liability for knowing receipt in the circumstances there postulated. That may be so, but it does not appear to me to help in deciding this case. What Peter Gibson J was contemplating was the receipt by a volunteer who obtains notice of the trust before he distributes the trust property wherever he wishes. In those circumstances the notice
D that he subsequently receives imposes upon him the constructive trust because his original receipt was voluntary. It says nothing about the imposition of a constructive trust and the application of the knowing receipt principle to one who, as is admitted in this case, acquired the property bone fide under a purchase with independent fiduciary sellers, namely the administrative receivers.

Finally Mr Oliver refers to the corporate opportunity cases. Those are cases in which
E a beneficial commercial opportunity comes the company's way and forms knowledge owned or possessed by the directors as agents for the company. Those directors then seek to use that knowledge or opportunity for themselves and are subsequently held to be constructive trustees of it and of its fruits for the company whence they took it. A good example of that is *Cook v Deeks* [1916] 1 AC 554. But again, it seems to me in cases such as that that there is a distribution or a disposal of the property of the company in breach of trust. At stage one the director holds that property as agent for the company. At stage
F two he purports to hold it himself beneficially. If that were to be the case, it would involve a distribution of the property by himself to himself in breach of trust, and a dishonest breach of trust at that. I am wholly unconvinced that the proposition as established by Hoffmann LJ is in any sense too narrowly drawn. It seems to me in this case that the judge was entirely right to strike out the allegation of knowing receipt on the grounds on which he did.

G I pass then to the question of knowing assistance. This is again raised in para. 91 of the amended statement of claim, which I have already read. It is alleged that by such action (that is to say the purchase of the business) Oasis participated in and/or assisted the Bennetts to commit the breaches of duty. This claim was rejected by Rattee J for reasons apparent from the following passage of his judgment ([1999] BCC 91 at p. 97C–D):

> H 'As I have already said, the burden of the plaintiffs' complaint in this case is that the defendant directors of the company acted in breach of their fiduciary duty to manage the affairs of the company in the best interest of the company, in that they, for an ulterior motive, so managed such affairs as to put the company under unnecessary financial pressure, with a view to forcing it into receivership. In my judgment, to apply the "knowing assistance" limb of the *Barnes v Addy* formulation of constructive trusteeship to a case of assistance, not in a breach of

> trust affecting property, but in a breach of a director's duty in relation to the management of a company's affairs, would represent an extension of that head of constructive trusteeship beyond the limits so far recognised by the court.' A

As was pointed out by Lord Nicholls in delivering the advice of the Privy Council in *Royal Brunei Airlines Sdn Bhd v Tan Kok Ming* [1995] BCC 899 at p. 901B; [1995] 2 AC 378 at p. 382E:

> 'Liability as an accessory [i.e. a constructive trustee for knowing assistance] . . . is a form of secondary liability in the sense that it only arises where there has been a breach of trust.' B

However, Mr Oliver argued that this head of liability as a constructive trustee should extend to a case of knowing dishonest assistance in any breach of fiduciary duty, and not only to assistance in a breach of trust in relation to property. If a person dishonestly assists another to commit a breach of fiduciary duty, he should in equity be liable to compensate the person to whom the duty was owed for any loss caused by its breach. I see force in such argument, but it does not seem to me that it can avail the plaintiffs in the present case. The breach of duty which, if the plaintiffs are right, caused the company damage, was the deliberate or reckless management of the affairs of the company by the defendant directors in a manner calculated to put the company under unnecessary financial pressure, to the point where it was forced into receivership. It is impossible on the undisputed facts to say that Oasis, which had no connection with the directors of the company until after the appointment of the receivers, assisted in any such breach of the directors' duties. The breach and the resultant damage to the company were complete before Oasis came on the scene. C D

Rattee J then proceeded to consider an argument by Mr Oliver to the effect that the conclusion to which he had prima facie come was manifestly inequitable. After describing the argument, the judge said (at pp. 97H–98B): E

> 'I do not accept this on the undisputed facts of this case. There are numerous people interested in Oasis other than the defendants. Oasis's profitable running of the business formerly run by the company has been achieved in part as a result of the financing of Oasis by its other major shareholder, Tuneclass Ltd. I see no reason in equity why the company, or the plaintiffs as its assignees, should be entitled to that profit, as opposed to being compensated for any loss, including any loss of future profits, caused to the company by the alleged breach of duty by the director defendants in unnecessarily bringing the company to a state of financial collapse. This compensation will be payable by the defendants who were parties to such breach of duty, if the plaintiffs can prove their case. In my judgment there is no principle of law or equity which makes such compensation recoverable from Oasis, which played no part whatever in the directors' alleged breach of duty in the management of the affairs of the company before it went into receivership. By the time Oasis came on to the scene that management was no longer in the hands of the defendant directors. It was in the hands of the receivers. Any breach of duty by the directors was by then in the past.' F G

It can be seen from the first of the passages which I quoted from Rattee J's judgment that his conclusion on the question of liability for knowing assistance appears to be based on two reasons. The first appears to be that, in the view of the judge, there must be a breach of trust in relation to property, a breach of duty in relation to management not being sufficient. The second is that Oasis did not assist in the breaches of duty because all of them were complete before the time of its incorporation or, at least, before the time at which it acquired the business of the property. H

Mr Oliver, on behalf of Mr and Mrs Brown, contends that the judge was wrong on both counts. He submits that on authority and on principle, a breach of a fiduciary

© 1999 CCH Editions Limited

obligation is equivalent for all purposes to a breach of trust when a fiduciary obligation is one imposed upon a director of the company in relation to the management of the company's property. He submits, secondly, that Oasis' purchase assisted in the plan as alleged to have been concocted by the Bennetts because it was its purpose and ultimate culmination.

For Oasis, Miss Dohmann sought to justify the judge's first reason. She submitted that when one analyses the *Royal Brunei Airlines v Tan* case, it can be seen that in fact there was a disposal of the company's property and, therefore, a disposition of the property to which the knowing assistor could be secondarily liable. She says that it would be contrary to all principle to enable a constructive trust to be imposed upon a third party in relation to a loss which was in fact sustained by a breach of duty on the part of directors without any corresponding benefit on the part of ascertainable third parties.

It is sufficient for present purposes for me to say that it does seem to me that there is here an arguable point, which in the circumstances of the case it is not necessary to decide. I would not therefore uphold the judge's conclusion on knowing assistance on the first point. I recognise that to be arguable, and were that the only point I would be minded to allow the appeal in this respect. But it is not the only point.

The second point seems to me to be conclusive. The judge pointed out correctly that on the undisputed facts of this case the receivership and the sale of the property had been effectively completed and arranged before the acquisition of the shares in Oasis at all. One can see that from the chronology. The offer of the Bennetts had been accepted on 13 February, subject to contract and finance. What followed, and the acquisition of Oasis, was to provide the vehicle into which the investment of Tuneclass could be inserted, so that the acquisition with their money might go ahead through the vehicle of Oasis. Oasis had nothing whatever to do with the breaches of duty of which complaint is made, and in so far as it did anything at all, it was the wholly passive recipient. For reasons I have endeavoured to explain in relation to the knowing receipt clause, it is not liable as a constructive trustee under that heading for the receipt of the company's business, and I can see no reason in equity why it should be made liable as a constructive trustee for the business under the knowing assistance limb when, as is admitted, it gave full value for the business of the company as it existed at the time when it acquired it.

It is suggested by Mr Oliver that such a conclusion runs counter to statements or propositions of Peter Gibson J in *Baden* and by Sir Robert Megarry V-C in *Re Montagu's Settlement Trusts* [1987] Ch 264, that the remedy of constructive trusteeship is a flexible remedy designed to satisfy the demands of conscience and is not therefore susceptible to greater analysis. I can readily accept that, but if there is no causative effect and therefore no assistance given by the person, namely Oasis, on whom it is sought to establish the liability as a constructive trustee, for my part I cannot see that the requirements of conscience require any remedy at all. I would therefore uphold the judge's judgment on the second reason that he gave, under the claim of knowing assistance.

Mr Oliver, in my view frankly and wisely, accepted that the claim for conspiracy against Oasis stood or fell with the claim against Oasis for knowing assistance. It follows from my conclusion on knowing assistance that I would likewise not accept his submissions in relation to conspiracy.

This leaves the claim against Mr Sarson. That is pleaded in para. 83 of the amended statement of claim as follows:

> 'From about November 1990 Mr Sarson assisted the Bennetts to plan the acquisition of the business for themselves by causing the company to go into receivership and a new company to buy the business back from the receiver with a view to participating (via the new company) in the business himself when so

> purchased, and between January and March 1991 he assisted the Bennetts in the execution of that plan. A
>
> By such action he participated in and/or assisted the Bennetts to commit the breaches of fiduciary duty pleaded in paragraph 53 above knowing that the conduct of the Bennetts therein pleaded was dishonest.
>
> Reference will be made to paragraphs 78 to 90 of the Particulars to support this allegation.' B

When one goes back to para. 53, it is said that:

> 'From about November 1990 having caused such financial pressure, they [that is to say the directors] planned to acquire the business for themselves by causing the company to go into receivership and (via a new company) buying the business back from the receiver, and between January and March 1991 they duly executed that plan.' C

In the particulars, para. 78–90, to which the pleading refers, para. 78 refers to Mr Sarson being instructed by the Bennetts to prepare a plan for, effectively, a phoenix operation, and it is alleged that he duly prepared such a plan using the company's confidential information. Then further allegations are made with regard to the plan. In para. 80 it is alleged that Mr Sarson, again acting on the instructions of the Bennetts, prepared two more business plans, and then there is reference made to the incorporation D of Oasis, the increase of its capital and so forth. Paragraph 85 refers to the advertisement of the business of the company for sale, the change of name by the new company to Oasis and the sale agreement to Oasis made on 7 March 1991. Paragraph 86 alleges that, amongst others, Mr Sarson was employed by Oasis immediately and became its company secretary. Then in para. 89 it is asserted that, amongst others, Mr Sarson knew that the said plan was dishonest because he knew it was dishonest of the Bennetts to retain the head office costs at an insupportable level and to increase the costs and cause the E company to incur the aforesaid capital expenditure.

The judge considered that the allegations which I have sought to summarise did not adequately particularise a cause of action against Mr Sarson, of which dishonesty was a necessary ingredient. That dishonesty was a necessary ingredient for a dishonest assistance claim is apparent from the *Royal Brunei Airlines v Tan* case, to which I have already referred. The judge said ([1999] BCC 91 at p. 99G–H): F

> 'This head of claim against Mr Sarson depends upon the plaintiffs pleading and proving dishonesty on his part within the second limb of *Barnes v Addy* (as well, of course, as persuading the court to extend that limb to a case not involving a breach of trust affecting property). It does not seem to me that the proposed amended statement of claim contains any sufficient particulars of such dishonesty to comply with RSC Order 18 rule 12, and to judge by the voluntary particulars, no sufficient G such particulars would be forthcoming if sought.
>
> Accordingly I do not consider it appropriate to allow those parts of the proposed amended statement of claim which purport to plead a claim against Mr Sarson under the heading of breach of fiduciary duty.'

Mr and Mrs Brown, through Mr Oliver, contend that the judge was wrong. They submit that para. 83 in its original form alleges that Mr Sarson knew that the Bennetts' H conduct was dishonest and that that is sufficient. Mr Sarson, of course, disagrees with that, and sought to uphold the judge's decision on the grounds on which it was given. Before us Mr Oliver sought to maintain his appeal against the judge's conclusion. We were concerned that at root this was only a pleading point and, if that was the case, it could be exposed by an opportunity being given to Mr Oliver and Mr Asprey to produce a revised draft so as to put the pleading in a form with which they felt they were happy

© 1999 CCH Editions Limited

A and which they thought would give rise to sufficient particularity. The consequence was that at two o'clock they returned with a form of addendum to be inserted before the reference being made to para. 78–90 of the particulars in para. 83 of the amended statement of claim.

The addendum reads as follows:

> 'Such action [which refers back to the first paragraph, para. 83] was in itself
> B dishonest, in that participation in and/or assistance of the commission of breaches of fiduciary duty known to be dishonest is itself dishonest. Mr Sarson was the Company secretary and as such attended meetings of the board of directors and was responsible for production of the management accounts of the Company. He knew that it was dishonest of the Bennetts to retain the head office costs at an insupportable level and to increase the said costs and to incur the aforesaid capital expenditure in that no reasonable person could possibly have agreed to such
> C retention, increase or expenditure, and because all this occurred at a time when the Company was in breach of its banking covenants, it was unclear whether or upon what terms the Midland would be prepared to continue supporting the Company, and when no steps had been taken to secure funds to cover the resulting losses.'

Miss Dohmann contended that, notwithstanding those amendments, the pleading was still defective. She suggested that the particulars had been abandoned in the court below
D and that there was nothing in the notice of appeal by which they were resuscitated. She pointed out that Mr Sarson was only ever the company secretary and therefore had no executive responsibility for the acts of the Bennetts alleged to have been dishonest. She submitted that planning the phoenix operation was not of itself necessarily dishonest, and she suggested that the claim as made in the addendum was redolent of judicial review rather than claims for fraudulent conduct.

E I take the view that Miss Dohmann's objections may be proved right at trial, but that is no objection to the pleading of them at this stage. It seems to me that if, as Mr Oliver did, application is made for leave to amend it should be granted on the usual terms, and that he should be able to maintain that allegation to trial for such success as it may have given him. I reach that conclusion not only because technically I think it is an adequate pleading but, secondly, because since the claim for conspiracy is going to trial anyway, there seems to me little point in leaving out this central part of the plaintiff's claim
F because of a certain lack of particularity. For all the reasons I have endeavoured to explain, I would grant leave to amend in relation to Mr Sarson, but subject to that I would dismiss the appeal.

**Aldous LJ:** I agree.

**Hutchison LJ:** I also agree.

G (*Appeal dismissed with costs, subject to leave to amend in relation to the seventh respondent*)

H