# FM Capital Partners Ltd v Marino
# [2018] EWHC1768 (Comm)

# Exhibit 11

# FM Capital Partners Ltd v Frédéric Marino, Aurélien Bessot, Yoshiki Ohmura, Marit Sjøvaag

**Court**
Queen's Bench Division (Commercial Court)

**Judgment Date**
11 July 2018

Case No: CL-2014-000863

High Court of Justice Business and Property Courts of England and Wales Queen's Bench Division Commercial Court

**[2018] EWHC 1768 (Comm), 2018 WL 03377481**

Before: The Honourable Mrs Justice Cockerill

Date: 11/07/2018

Hearing dates: 12, 13, 14, 15, 19, 21, 22, 26, and 27 March 2018

**Representation**

Nathan Pillow QC & Anton Dudnikov (instructed by Hogan Lovells International LLP ) for the Claimant.
James Couser (instructed by Richard Slade and Company ) for the First Defendant.
Laurence Emmett & James Fox (instructed by Cooke Young and Keidan LLP ) for the Third Defendant.

**Judgment Approved**

Mrs Justice Cockerill:

1. In this action the Claimant ("FMCP") brings a variety of claims against the First Defendant ("Mr Marino") and the Third Defendant ("Mr Ohmura"). Claims against other defendants, principally the Second Defendant ("Mr Bessot") have been settled before this trial. FMCP is a UK company originally incorporated as a joint venture between Mr Marino, Mr Bessot and Libya Africa Investment Portfolio ("LAP"), a Libyan sovereign wealth fund, to manage LAP's assets. It is majority owned by LAP.

2. At all material times FMCP's directors included Mr Marino, who was also its employee and Chief Executive Officer, and Mr Bessot, who was also its Chief Investment Officer. At the same time Mr Marino and Mr Bessot were joint owners of another company, Ironfly International Limited ("Ironfly"), and Mr Marino was the owner of a company called Leopard Technology Limited ("Leopard").

3. The overarching claim is one in conspiracy to injure. There are two major strands to the alleged conspiracy. The first relates to a series of large investments of LAP assets in certain financial products offered by Bank Julius Baer & Co. ("JB"). These are referred to collectively as the JB Notes and known individually by their acronyms as GAIN, AMFC+, TRAC and

© 2025 Thomson Reuters. 

TRAC+. The initial investment in GAIN was US$125 million. Further tranches of LAP assets (previously held at another private bank, Union Bank Privée ("UBP")) were also invested in GAIN in October 2009 (c. US$48.5m); and in AMFC+ in May 2010 (c. US$70m); before both GAIN and AMFC+ were unwound and the assets re-invested in TRAC in November 2010. TRAC was replaced by TRAC+ in October 2011.

4. In relation to the JB Notes, payments of more than US$8.5m were made by JB's investment arm, GAM Structured Investments Ltd ("GAM"), to Ironfly and Leopard, the source of the funds being the monies invested by LAP. Of this sum more than US$1m was paid to companies owned by Mr Ohmura, the founder and General Director of GAM until late July 2009, and subsequently a trader on his own account. These companies were a Cayman Islands company called Conquest Capital Limited ("Conquest Cayman" - now dissolved) and a Swiss company called Conquest Financial Partners AG ("Conquest").

5. The second major strand of the alleged conspiracy relates to payments made to Conquest, Ironfly and Leopard arising out of a series of at least 14 one-off, shorter-term trades in structured products using LAP's assets (the "Structured Product Trades"). These payments, which again are said to have directly diminished LAP's asset values dollar-for-dollar, amounted to over US$7.5m.

6. The payments made to Ironfly, Leopard and Conquest are said by FMCP to be secret commissions. Consequently, as well as the claim in conspiracy, claims are made against both Mr Marino and Mr Ohmura on the basis of dishonest assistance, knowing receipt and bribery; and claims are also made against Mr Marino for breach of his duties as a director. There are also proprietary claims against each. The claims made against each of them by FMCP, and the amounts of those claims, are summarised in the Appendix to this judgment. In essence the total claims against both Defendants across the various trades (FM/YO) are:

i) Conspiracy: US$16,231,426/ US$16,231,426;
ii) Dishonest assistance: US$14,789,984/ US$12,183,713;
iii) Bribery: US$14,789,984/US$7,875,313
iv) Breach of fiduciary duty: US$14,789,984/zero;
v) Knowing receipt: US$13,933,713/US$625,000.

7. It is only the issues concerning these payments and giving rise to these causes of action with which I am concerned in this Phase I trial. Pursuant to a direction made by Andrew Baker J on 20 December 2016 there will at a later date be a Phase II trial concerned with claims relating to what is said to be a loss of c. US$46m caused by the forfeiture of capital protection on the GAIN notes, and claims relating to the extraction of various fees, without LAP's consent, both for FMCP and for the benefit of entities owned or controlled by Messrs Marino and/or Bessot.

8. I set out below a guide to the structure of this judgment:

i) The structure of the trial: Paragraph 9
ii) Uncontroversial facts: Paragraph 15

a) The Parties
b) LAP, its portfolio and initial contact with Mr Marino
c) The JB Notes and the IMAs
d) The Structured Product Trades
e) The Defendants' companies and the amounts paid to the Defendants
f) Sums paid to Third Parties
g) The PwC and BDO investigations
h) The Charles Russell letter and the current proceedings

iii) The legal common ground and the legal issues in outline: Paragraph 63

a) The standard of proof for dishonesty
b) Breach of fiduciary duties and directors' duties
c) Dishonest assistance
d) Knowing receipt
e) Bribery
f) Conspiracy

iv) Conclusions on Factual Issues and on Principal Claims: Paragraph 96

a) The witnesses and the inferences contended for
b) The background to FMCP's incorporation and the April Mandate
c) July - October 2009: GAIN I and II and the first payments
d) July - October 2009: The Vesper entities
e) January- July 2010: Mr Haggiagi
f) October 2009- September 2010: The Private Bank trades
g) May 2010: AMFC +
h) November 2010: TRAC
i) January 2011: Transfer of Custody to HSBC
j) Vesper: 2010-2011
k) January - June 2011: The Vesper Trades
l) October 2011: TRAC+
m) September 2012-July 2014: Payments to Mr Aversano and Mr Ay

v) Other Issues: Paragraph 409

a) The issue of loss
b) Knowing receipt
c) Bribery
d) Conspiracy
e) Limitation issues

vi) Choice of law and Swiss law: Paragraph 480

a) Choice of law
b) Swiss law: the substance

vii) Summary of conclusions: Paragraph 582
viii) Postscript: Remedies: Paragraph 583

a) Breach of Fiduciary Duty
b) Dishonest assistance
c) Knowing Receipt
d) Bribery
e) Conspiracy

**The Structure of the Trial**

9. The trial before me was structured to be a three week trial, in which each of the first three Defendants and Mr Eltriki for the Claimant would give factual evidence; and in which there would be three experts in structured products called (Mr Colas for the Claimant, Mr Beevers for Mr Marino and Mr Alpay for Mr Ohmura) as well as two experts in Swiss law: Professor Pieth for FMCP and Dr Weibel for Mr Ohmura.

10. Matters however developed in a number of respects. The Claimant indicated that they would not call Mr Bessot, with whom they had settled. After some debate, Mr Ohmura relied on Mr Bessot's witness statement, but no application was made by the Claimant to cross-examine him on it – not least because he was not in the jurisdiction.

© 2025 Thomson Reuters.

11. More surprisingly on Day 2 of the trial, Mr Couser for Mr Marino indicated that Mr Marino would not be called on his own behalf. A suggestion was made that his statements would be tendered in his absence, though he was or had been within the jurisdiction. However, following an indication that the Claimant would then apply to cross examine him under CPR 32.7 it was indicated that Mr Marino would not either put in or seek to rely upon his witness statements.

12. As a result, the only witnesses of fact were Mr Eltriki, who was cross- examined (through an interpreter) for a few hours and Mr Ohmura who gave evidence for nearly 3 days. I deal further with the submissions made on their evidence below.

13. When it came to expert evidence the planned timetable also collapsed. Firstly, the Claimant, having trailed Mr Colas' evidence fairly thoroughly in opening, elected not to call him. Following a necessarily short cross-examination of Mr Beevers by the Claimant, Mr Ohmura then also elected not to call his own expert witness Mr Alpay. Thus, the structured products evidence that was left before me was essentially the agreed parts of the Joint Memorandum of the experts, although ultimately reliance was placed (both by FMCP and Mr Ohmura) on parts of the evidence of Mr Alpay for Mr Ohmura as well as parts of the evidence of Mr Beevers (for Mr Marino). This was not an entirely satisfactory position, as the Joint Memorandum largely proceeded by reference to evidence which was never called. In the circumstances I have considered carefully to what extent any of this evidence actually assists and referred so far as possible only to truly agreed evidence, and then only to the extent necessary.

14. The two experts on Swiss law were called and were briefly cross-examined on their reports. The experts had different legal backgrounds, which was sometimes reflected in the different approaches they took to particular issues: Professor Pieth gave slightly more weight to academic writing while Dr Weibel focused more on what he said was the legal reality in practice. But there was considerable agreement between them and both gave clear and helpful evidence supported by decisions of the Swiss court.

**Uncontroversial Facts**

*The Parties*

15. Mr Marino was born in 1966. Since 2000 he has been involved in the derivatives business, initially at Rabobank and later (having been headhunted after developing a specialist fund derivatives business) at Merrill Lynch, Bear Stearns and following the Bear Stearns merger with JP Morgan, JP Morgan.

16. His experience is on the investment advisory side of the business having maintained CF21 Investment Adviser status with the FSA (as it then was). Essentially his role involved advising clients as to and selling them suitable products. This was reflected in his job title at Bear Stearns which was Head of Marketing and Sales. Mr Ohmura described him as being a specialist in "distribution", which appears to be a fairly generally used term for sales and marketing in this context. Mr Alpay described a distributor (which he said could be used interchangeably with the terms Promoter and Introducer) as *"the party which markets the structured fund linked note to investors."* A distributor might act for a single client, for example in sourcing a bespoke product for that client, in which case he would act as the liaison person between bank and client. In more *"vanilla"* cases the distributor might market a product to a network of clients.

17. Mr Marino was successful in his role. At Merrill Lynch he was earning a seven figure bonus; and his joining bonus at Bear Stearns was commensurate with that. It appears however that he was not happy at JP Morgan following the merger and was by early 2009 looking to set up his own business.

18. In his first job at Rabobank Mr Marino worked in the same team though at a senior level to Mr Bessot, who was an equity derivatives trader initially concerned with " *vanilla* " products which he priced and hedged, but later dealing with " *exotics* " (more complex derivative products). The two became friendly and kept in touch after Mr Marino moved on from

Rabobank. In early 2009, shortly after Mr Bessot moved from Rabobank to Bank of America, that bank merged with Merrill Lynch and Mr Bessot accepted voluntary redundancy.

19. FMCP is an English company incorporated on 3 July 2009 as the vehicle for a joint venture between, on the one hand, Messrs Marino and Bessot; and, on the other, LAP. LAP was at all material times FMCP's sole client. Prior to January 2014 (when Mr Bessot left), FMCP was owned by LAP as to 55%; by Mr Marino (through his company, Addison Participation Limited: "Addison") as to 33%; and by Mr Bessot (through his company, Mangusta Capital Limited: "Mangusta") as to 12%. The circumstances surrounding the creation of FMCP are in issue and are dealt with below.

20. Mr Ohmura has been a business associate of Mr Marino since around 2004. Between 2004 and August 2009, Mr Ohmura was the Global Head of the structured investments group at JB. He was the founder and General Director of one of its subsidiaries, GAM, which was incorporated in Guernsey. It was later (post July 2009) called Baer Alternative Solutions Limited ("BASL"). His expertise was in the design and technical structuring side of the structured products business.

21. As a result of their business encounters Mr Marino and Mr Ohmura developed a social as well as a professional relationship, with Mr Ohmura visiting Mr Marino at home on occasion.

22. Mr Ohmura had always been looking to start his own business in due course. By 2009 it became apparent that the provisional plans he had discussed with the management of JB were unlikely to eventuate following a change in management which was less focussed on promoting entrepreneurial businesses. He set up an email account for a company called Conquest in early 2009 and registered the domain for the company in February 2009. He discussed with Mr Marino the possibility of setting up a business in March 2009; that business would later become Vesper. It is unclear whether it was initially contemplated to be a joint business, or Mr Ohmura's own project.

23. He resigned from the JB group in July 2009 with his last working day being 31 July 2009; he remained under contract to them however (effectively for the purposes of bonus accruals) until the end of August 2009. Following his departure, he set up Vesper, initially with Mr Marino. He also established, and at all material times owned and controlled, Conquest Cayman and Conquest.

*LAP, its portfolio and initial contact with Mr Marino*

24. As mentioned above, LAP is a Libyan sovereign wealth fund with approximately US$5bn of assets. It was established on 6 February 2006. LAP's Articles of Association were approved by the Libyan General People's Committee on 4 May 2006 and amended on 10 April 2009.

25. During 2008 and early 2009, in the course of his employment with JP Morgan, Mr Marino met (and apparently got along well with) Messrs Haggiagi and Sharif. Mr Haggiagi was not an officer of LAP but became Head of Investment at some point in spring 2009. Mr Sharif was Deputy Chairman of LAP until 15 March 2009 when he was replaced by Dr Kagigi.

26. Mr Marino (then at JP Morgan) was asked to conduct a review of LAP's investments. A draft of his report ("the JP Morgan Report") was produced on 25 February 2009. It was a lengthy document which ultimately made conclusions and recommended various steps. It described a portfolio of US$1.6 billion which was held via mandates with a number of banks: UBP [already defined], Crédit Agricole, Deutsche Bank, LODH, JB, Man, Platinum, Stanford and Palladyne. The portfolio was spread across cash, bonds, equities, alternative, other, derivatives and commodities. Each mandate was analysed and then conclusions were drawn at a more general portfolio level.

27. The report concluded that the aggregate portfolio had generally outperformed or performed in line with benchmarks, but considered matters could be improved. Amongst the recommendations was that the worst performing portfolios (Palladyne, Platinum and DB Advisory) be redeemed and that a systematic approach to building the alternative portfolio be adopted (necessitating a restructure of the alternative portfolio).

28. Amongst the portfolios already in place and so analysed in the JP Morgan Report was a portfolio at JB. It had been initiated in July 2007 with an investment of US$150 million, with LAP's objective being to " *preserve capital with growth over a full investment cycle* ". The report noted that the bulk of the portfolio was allocated to alternative assets (i.e., hedge funds) invested primarily in GAM funds. The report noted that the portfolio was relatively illiquid with only 30% of the portfolio allocated to cash, equities and bonds, that it had outperformed the benchmark well while equities had underperformed; but it

© 2025 Thomson Reuters.

commented on the "lock-in" to one suite of funds regardless of performance and flagged the " *fee structure, as the investor is paying fees at the mandate level and management and performance fees at the fund level* ".

29. Also reviewed in the report were the portfolios at UBP and Stanford. Of the former Mr Marino concluded that the portfolio, invested in a variety of cash and alternatives, was performing in line with benchmarks but that the funds had been gated and were therefore illiquid. As for Stanford, although it had performed better than its rivals in substantially preserving capital throughout the 2008 crisis there was a question mark over future liquidity because of a pending investigation by the SEC into fraud.

*The JB Notes and the IMAs*

30. The JB Notes had a number of iterations. The first was the seven-year "Guaranteed Alternative Investment Notes" ("GAIN"). This gave a capital guarantee on the money invested, such that LAP was guaranteed to recoup at least the amount of its initial investment (assuming JB could pay) upon final redemption. This was invested in two tranches:

i) The first tranche of GAIN ("GAIN I") was in respect of US$125m of LAP funds in the JB account, previously managed by GAM, and was issued on 8 July 2009 (with a maturity date of 14 July 2016).
ii) The second tranche ("GAIN II") was for US$48.5m of LAP funds, which were formerly held in the account at UBP, and were invested on 13 October 2009.

31. In relation to GAIN FMCP entered into two agreements with JB:

i) A Note Advisory Agreement ("NAA") dated 6 July 2009, signed by Messrs Marino and Bessot for FMCP; and by Mr Ohmura and another director on behalf of GAM. It provided (in Clause 4) for FMCP to advise GAM regarding the initial structure and parameters of the products, including composition, level of protection, risk parameters and product fees. FMCP was also to provide assistance to GAM in communication with the investors and to advise on ongoing maintenance and reporting. FMCP was paid a Note Advisory fee. On its face this was 0.2% per annum, but in fact the whole fee was paid up-front. Thus, FMCP was paid Note Advisory Fees totalling US$2,410,910 for the two tranches of GAIN.
ii) A Sub-Advisory Agreement ("the FMCP SAA") also dated 6 July 2009 was signed by Messrs Marino and Bessot for FMCP and by Mr Ohmura and another director on behalf of GAM. The FMCP SAA provided for FMCP (as Sub-Advisor) to provide to GAM (as Investment Manager) various services relating to the management of the fund of hedge funds to which the performance of GAIN was linked. FMCP's duties included (Clause 4) assisting in co-ordinating the overall investment strategy, evaluating investments and advising on price movements, undertaking continuous analysis, and providing advice concerning " *all actions the USD Selection Segregated Portfolio should take in order to carry into effect… its investment objective and policy… and, as may be appropriate, subject to the terms of this Agreement, take such actions* ". FMCP's remuneration under the Sub-Advisory Agreement was 1% *p.a* . of the Net Asset Value of the Portfolio: and a total of US$9,331,738 was received by FMCP in Sub-Advisory Fees.

32. The subsequent iterations of the JB Notes were:

i) AMFC+: US$70 million in May 2010 (separate to GAIN);
ii) TRAC: US$243.2 million in November 2010 (rolled up proceeds from GAIN and AMFC+);
iii) TRAC+: the proceeds of TRAC in October 2011.

Unlike GAIN, none of these products involved capital protection (in the sense that the invested capital was safe).

33. There were also a series of investment management agreements ("IMAs") entered into between FMCP and LAP which had the result that FMCP was appointed the sole discretionary asset manager of LAP's assets held in various accounts with private banks and HSBC.

34. The first were a series of IMAs entered into on 30 July 2009 ("the Private Bank IMAs"). These were in respect of the accounts at RBS Coutts, Crédit Agricole, Deutsche Bank, and LODH. They were each in materially identical terms. Each of these agreements:

i) by Clause 1.1, appointed FMCP to manage " *all of the assets of the Accounts* ";
ii) by Clause 2.1, conferred upon FMCP *"full discretion and authority, without obtaining [LAP's] prior approval, to manage the Accounts on a day to day basis by investing, divesting and supervising [LAP's] assets in a manner consistent with the investment objectives and guidelines set forth in Clause 4"* ;
iii) by Clause 8.1 and Appendix IV, entitled FMCP to receive a management fee of 1.5% *p.a* . of the aggregate value of the assets of the accounts; and a performance fee of 15% of the net performance of the assets; and

© 2025 Thomson Reuters.

iv) Clause 8.2, dealt with commissions/fees as follows:

> "Within the context of its asset management and trading activities, the Manager [FMCP] may receive compensation for services performed for third parties (e.g. for the products' sponsors or issuers), that are not contemplated in this Agreement. Such compensation is totally independent from the remuneration provided in Clause 8.1 above and the Client [LAP] acknowledges that it has and will have no right to assert any proprietary claim or otherwise in this respect."

35. On 29 January 2010, a "Third Party Management Authorization Agreement" ("TPMAA") was signed by Messrs Marino and Bessot on behalf of FMCP, by Mr Haggiagi and Mr Naas for LAP and Mr Gonet for JB. This gave FMCP formal authority over the assets in LAP's account at JB and express authority to give trading instructions. The account in question held the JB Notes.

36. Under the TPMAA FMCP was appointed as an *"asset manager"* authorised to " *effect all banking investments worldwide (in established markets as well as in emerging markets) and to sell or replace existing investments* ". The management authorisation extended to:

> "[e]ffecting option transactions in securitized form (warrants) traded on- and off-exchange, unsecuritized options… on stocks, bonds, precious metals, commodities etc. or on reference rates such as currencies, interest rates, indices, etc."
>
> …
>
> "[e]ffecting further transactions in derivative instruments, such as combinations of option and forward transactions, swap transactions of all types, so-called certificates on one or more underlying security or asset, structured products and other derivative instruments of all types."

37. The TPMAA also expressly contemplated that FMCP would receive or charge certain fees: Clause 6 (" *Fees Paid by the Bank to the Attorney* ") and the last, unnumbered clause (" *Fee Authorization* ").

38. On 30 April 2010, FMCP and LAP entered into a further investment management agreement (the "HSBC IMA"), appointing FMCP as sole discretionary asset manager of LAP's assets held in accounts with HSBC Bank Plc ("HSBC"). The provisions of the HSBC IMA (including in particular, the provisions relating to fees) were materially identical to those of the Private Bank IMAs.

39. On a date on or about 15 March 2010 and 20 April 2010 FMCP entered into a new NAA with BASL, as GAM then had become. That document included a Clause 4.1(d), which required FMCP to carry out its duties *"with a view to reasonably safeguard the legitimate interests of the Investors in the Products [i.e., LAP]"* .

40. The second iteration of the JB Notes was the five-year "Actively Managed Fund Certificates Plus" ("AMFC+"), into which US$65.9m of LAP assets were invested on 18 May 2010 from funds formerly held by UBP. AMFC+ had no capital guarantee.

41. These funds were then brought together into the third notes, the five-year US$-denominated Tracker Certificates ("TRAC"). The funds held in GAIN and AMFC+ (then totalling US$243.2m) were restructured and consolidated into TRAC on 19 November 2010. TRAC also had no capital guarantee.

© 2025 Thomson Reuters.

42. The funds held in TRAC were further restructured into five-year US$-denominated Tracker Certificates with leverage ("TRAC+") on 31 October 2011, allowing for the addition of leverage into the portfolio.

43. The majority of the fund positions in the JB Notes were redeemed between December 2013 and February 2014. The funds that formerly comprised GAIN were redeemed for US$127.3 million. The original investment had been US$173.5 million, so a loss to LAP on those sums alone of some US$46 million was thereby crystallised.

*The Structured Product Trades*

44. There were two types of Structured Products trades:

i) The first were six trades using LAP assets held in private bank accounts then controlled by FMCP through discretionary investment mandates (the "Private Bank Trades"). Here, it is alleged that Messrs Marino and Bessot caused FMCP to enter the trades with LAP's money which they were managing under the Coutts, Crédit Agricole and HSBC IMAs whilst allowing Mr Ohmura to interpose Conquest into the transaction, entirely unnecessarily. The counterparty banks paid Conquest fees described as 'distribution' fees on each trade. Mr Ohmura transferred 90% of such fees to Messrs Marino and Bessot via Ironfly, keeping 10% for himself. These trades resulted in payments to Conquest/Ironfly of around US $1.5m and hence are also known as "Ironfly Trades 1-6".
ii) The second type of Structured Product Trade employed the LAP assets invested in the JB Notes, which had in turn been invested in certain funds managed by Mr Ohmura ("the Vesper Funds") – and hence are known as "the Vesper Trades". These funds were used to enter into further structured trades with counterparty banks. Again, commissions were paid via Conquest. These amounted to more than US$6m, of which about US$2.7m was passed to Mr Marino's company Leopard; and around US$1.7m to Ironfly. These trades are also known as "Ironfly Trades 7-9 and "Leopard Trades 1-5".

*The Defendants' companies and the amounts paid to the Defendants*

45. Mr Marino therefore received payments through two companies, Ironfly and Leopard. Ironfly, which he co-owned with Mr Bessot, was incorporated in the Seychelles on 9 April 2009. Leopard was also incorporated in the Seychelles and was owned by Mr Marino alone.

46. Conquest was owned by Mr Ohmura. It was incorporated in Switzerland on 21 August 2009.

47. The following key payments were made to the Defendants via their companies:

i) 12 August 2009: US$3,125,000 from JB to Ironfly (GAIN I)
ii) 13 October 2009: US$1,183,400 from JB to Ironfly (GAIN II)
iii) 16 October 2009: US$625,000 from Ironfly to Conquest Cayman (GAIN I/II)
iv) 1 October 2009: €90,000 from Rabobank to Conquest (Ironfly Trade 1)
v) 19 October 2009: €81,000 from Conquest to Ironfly (Ironfly Trade 1)
vi) 28 October 2009: US$150,000 from Rabobank to Conquest (Ironfly Trade 2)
vii) 10 November 2009: US$135,000 Conquest to Ironfly (Ironfly Trade 2)
viii) 12 January 2010: US$75,000 Rabobank to Conquest (Ironfly Trade 3)
ix) 25 January 2010: US$67,500 Conquest to Ironfly (Ironfly Trade 3)
x) 17 May 2010: US$50,000 Rabobank to Conquest (Ironfly Trade 4)
xi) 25 May 2010: US$45,000 Conquest to Ironfly (Ironfly Trade 4)
xii) 31 May 2010: US$1,750,000 from JB to Ironfly (AMFC+)
xiii) 8 September 2010: US$400,000 Rabobank to Conquest (Ironfly Trade 5)
xiv) 14 September 2010: US$360,000 Conquest to Ironfly (Ironfly Trade 5)
xv) 21 October 2010: €660,000 Deutsche Bank to Conquest (Ironfly Trade 6)
xvi) 25 October 2010: €594,000 Conquest to Ironfly (Ironfly Trade 6)
xvii) 24 November 2010: US$2,400,000 JB to Conquest (TRAC)
xviii) 9 December 2010: US$2,000,000 Conquest to Leopard (TRAC)
xix) 14 February 2011: US$900,000 Deutsche Bank to Conquest (Ironfly Trade 7)
xx) 22 February 2011: US$810,000 Conquest to Ironfly (Ironfly Trade 7)
xxi) 24 May 2011: US$1,000,000 to Conquest (Leopard Trade 1)
xxii) 26 May 2011: US$675,000 Conquest to Leopard (Leopard Trade 1)
xxiii) 9 March 2011: US$1,000,000 to Conquest (Leopard Trade 2)
xxiv) 26 April 2011: US$675,000 Conquest to Leopard (Leopard Trade 2)

xxv) 23 May 2011: US$990,000 to Conquest (Leopard Trade 3)
xxvi) 29 June 2011: US$675,000 Conquest to Leopard (Leopard Trade 3)
xxvii) 10 March 2011: €612,500 to Conquest (Ironfly Trade 8)
xxviii) 8 June 2011: €551,250 Conquest to Ironfly (Ironfly Trade 8)
xxix) 9 March 2011: US$312,400 to Conquest (Leopard Trade 5)
xxx) 28 March 2011: US$942,500 to Conquest (Leopard Trade 4)
xxxi) 26 July 2011: US$675,000 Conquest to Leopard (Leopard Trade 4)
xxxii) 30 June 2011: US$250,000 to Conquest (Ironfly Trade 9)
xxxiii) 7 December 2011: US$225,000 Conquest to Ironfly (Ironfly Trade 9)

*Sums paid to Third Parties*

48. There are two sets of payments which were made to third parties. The first is a set of payments made to Mr Haggiagi of LAP (and FMCP) by Mr Marino, which FMCP says were bribes.

49. Those payments were as follows:

i) On 7 January 2010, Mr Marino transferred US$21,070 from his personal account in Monaco to Mr Asem Haggiagi, on the instructions of Mr Haggiagi.
ii) On 11 January 2010, Mr Marino transferred US$235,201 from his personal account (having transferred it immediately beforehand from Leopard's account) to Mr Ikramul Haq Mian, again on Mr Haggiagi's instructions.
iii) Subsequently, Mr Marino and Mr Haggiagi procured the incorporation in Dubai of a company called Blue Tiger Limited ("Blue Tiger"), which then made the following payments:

a) On 13 July 2010, Mr Marino transferred US$700,298 from Leopard to Blue Tiger.
b) On 15 July 2010, he caused Blue Tiger to transfer US$600,000 to another (unidentified) Dubai company owned and controlled by Mr Haggiagi.

50. The second set of payments were to Mr Aversano and Mr Ay of GAM (later BASL). Between September 2012 and July 2014, Mr Marino met in person with Messrs Aversano and Ay in Monaco. At those meetings he handed over cash payments totalling probably between €600,000 and €800,000.

*The PwC and BDO investigations*

51. The accounts of FMCP (which was based in London and banked and accounted there) show profits of £3.74 million for 2009, £2.22 million for 2010, and £4.49 million for 2011. However, in the context of the market at the time LAP was not happy with those results.

52. In late 2011 LAP's management began to look into the management of their assets. As a result, in 2012 LAP commissioned Price Waterhouse Coopers ("PwC") to investigate and report.

53. That report concluded that *"at the level of the funds, the agreements (ie. The Fund IMA, the prospectus and subscription documentation) are broadly industry standard. However, the shareholders agreement regulating the ownership and governance of FMCP and the account management agreements ... are much less detailed and contain a number of provisions and omissions which do not reflect best practice."* It concluded that the structure had in the past led to a possibility for double charging. As regards the JB Notes PwC considered the relevant agreements were *"largely in line with what we would expect to see for such arrangements"*.

54. On 29 August 2014, LAP sent a letter to FMCP complaining about performance, the fees charged, failures to properly manage conflicts of interest, failures to seek the express, informed consent of LAP and failures generally to have regard to LAP's best interests. It concluded *"we have lost all confidence in Mr Marino's ability to properly manage the LAP assets and safeguard LAP's interests"* and called on FMCP to investigate LAP's concerns. By 1 September 2014, Mr Marino had been suspended and the forensic accountants BDO LLP ("BDO") were engaged by FMCP's solicitors to investigate LAP's complaints.

55. On 8 October 2014, the day before Mr Marino was due to be interviewed by BDO, he transferred £2.5m of the payments he had received via the transactions outlined above to his ex-wife's bank account in Norway.

56. BDO interviewed Mr Marino on 9 October 2014. Mr Marino was asked to give an explanation of the arrangements concerning Ironfly; after taking legal advice he terminated the interview.

*The Charles Russell letter and the current proceedings*

57. On 16 October 2014, Charles Russell Speechlys, LLP (then Charles Russell LLP) acting for Mr Marino, sent a 'whistleblowing' letter to the Financial Conduct Authority (and also to the National Crime Agency): "the Charles Russell letter". It appears that Mr Ohmura knew nothing of this letter at the time.

58. That letter contained a detailed statement that wrongdoing had been committed by *inter alia* Mr Marino, Mr Bessot and Mr Ohmura by the taking of payments in relation to the transactions which are the subject of this action. Mr Marino's case at trial has been that the Charles Russell letter set out an incorrect version of events. FMCP has relied on the letter as being a substantially true and accurate account.

59. In considering the Charles Russell letter I bear in mind that it speaks of Mr Marino as being unwell and in hospital in Norway. Certainly, I am told that that would have been the thrust of Mr Marino's evidence if called. However, his physical and mental state - including his ability to give proper instructions to the professionals he had plainly retained - was not vouched for by any proper medical evidence, and would doubtless have been the subject of cross-examination if he had been called. Accordingly, I am not prepared to discount the letter as a source of evidence. However, I have wherever possible had regard rather to the contemporaneous documents, looking to the letter only by way of comparison.

60. Mr Marino's disciplinary hearing was held on 30 October 2014 in his absence. He was found to have received secret profits, charged fees to LAP without obtaining its consent and breached his fiduciary duties by placing himself in a position of conflict of interest (which he failed to disclose). It was also found that he had improperly charged his personal expenses to FMCP's corporate account and used FMCP's funds to pay a related third party. On 3 November 2014, Mr Marino was dismissed with immediate effect for gross misconduct.

61. These proceedings were issued on 23 December 2014 and served on 19 February 2015. A freezing order was obtained against Mr Marino on 12 November 2015.

62. On 31 January 2017 Mr Marino was declared bankrupt. He was discharged from his bankruptcy on 31 January 2018. His financial difficulties led to a situation where Mr Couser was instructed to represent Mr Marino only shortly before the hearing. I would like to record that, despite the obvious difficulties which faced him, he discharged his role with admirable thoroughness and care.

**The Legal Common Ground and the Legal Issues in Outline**

*The Standard of Proof for dishonesty*

63. In this case many of the claims made involve elements of dishonesty. There is an issue between the parties as to the standard of proof which I should use in this regard. Mr Emmett, for Mr Ohmura, drew my attention to the dictum of Lord Nicholls in *Re H (Minors) [1996] AC 563* at page 586:

> "The balance of probability standard means that a court is satisfied an event occurred if the court considers that, on the evidence, the occurrence of the event was more likely than not. When assessing the probabilities, the court will have in mind as a factor, to whatever extent is appropriate in the particular case, that the more serious the allegation the less likely it is that the event occurred and, hence, the stronger should be the evidence before the court concludes that the allegation is established on the balance of probability. Fraud is usually less likely than negligence. Deliberate physical injury is usually less likely than accidental physical injury."

© 2025 Thomson Reuters. 

64. It was submitted that notwithstanding the impression given by some subsequent judgments of lesser authority, the point made in this statement of principle remains good and should be applied in the present case. In particular it was said that I should be guided by the common-sense observation that dishonesty is unusual.

65. FMCP says that I should indeed have regard to subsequent authority, in particular *Re S-B [2009] UKSC 17; [2010] 1 A.C. 678* and *Re J [2013] UKSC 9; [2013] 1 A.C. 680* as well as the summary of the relevant authorities by Eder J in *Otkritie International Investment Management Ltd v Urumov [2014] EWHC 191 (Comm)* at paragraphs [85]- [89].

66. In *Re S-B* Lady Hale said this:

> "If an event is inherently improbable, it may take better evidence to persuade the judge that it has happened than would be required if the event were a commonplace. This was what Lord Nicholls was discussing in re H (Minors) [1996] AC 563, 586. Yet, despite the care that Lord Nicholls had taken to explain that having regard to the inherent probabilities did not mean that the standard of proof was higher, others had referred to a "heightened standard of proof" where the allegations were serious."

67. This mirrors what was said by Eder J in *Otkritie* at [88-9]:

> "… it has been firmly established that:
>
> i) First, there is only one civil standard of proof and that is proof that the fact in issue more probably occurred than not: Re B at para 13 per Lord Hoffmann.
>
> ii) Second, the proposition that "the more serious the allegation, the more cogent the evidence needed to prove it" is wrong in law and must be rejected: Re S-B at §13 per Baroness Hale; Re J [2013] 1 AC 680 at para 35 per Baroness Hale.
>
> iii) Third, while inherent probabilities are relevant in considering whether it was more likely than not that an event had taken place, there is no necessary connection between seriousness and inherent probability: Re S-B at para 12 …
>
> 89. …. it may well be true to say that it is inherently improbable that a particular defendant will commit a fraud. But it all depends on a wide range of factors. For example, if the court is satisfied (or it has been admitted) that a defendant has acted fraudulently or reprehensibly on one occasion, it cannot necessarily be considered inherently improbable that such defendant would have done so on another; or if, for example, the court is satisfied (or it has been admitted) that a defendant has created or deployed sham or false documents, the court cannot assume that it is inherently unlikely that such defendant did so on other occasions. For the avoidance of doubt, I should make absolutely plain that this is not to say that inherent probability is irrelevant. On the contrary, as submitted by Mr Casella, I accept, of course, that the court should take into account the inherent probability of an event taking place (or not taking place) as is made abundantly plain by Baroness Hale in the passage from Re S-B quoted above. However, as it seems to me, the court must in each case consider carefully what is – and is not – inherently probable having regard to the particular circumstances – but the standard of proof in civil cases always remains the same i.e. balance of probability."

68. This, it seems to me, reflects a correct statement of the law in relation to the standard of proof. *Re H* simply says, briefly, what Eder J in *Otkritie* says more fully. It is on this basis that I have considered the evidence in relation to the issues where

© 2025 Thomson Reuters. 

dishonesty is relevant. I have also borne in mind the consideration in that case (at [90-1]) of when it is appropriate to draw inferences from circumstantial evidence and the importance of avoiding a piecemeal consideration of circumstantial evidence.

*Breach of Fiduciary / Directors' duties*

69. It is common ground that Messrs Marino and Bessot owed the directors' duties set out in ss. 171-177 of the Companies Act 2006 ("CA 2006"). The relevant duties on which reliance is placed by FMCP are:

i) S. 172 : to act in a way that was considered by them (in good faith) to be most likely to promote the success of the company for the benefit of its members as a whole, including having regard to the likely consequences of any decision in the long term, the need to foster the company's business relationships with suppliers, customers and others and the need to act fairly as between members of the company;
ii) S. 175 : not to place themselves in a position where their (direct or indirect) interests conflicted or might conflict with their duties to, or the interests of, the company;
iii) S. 176 : not to accept benefits (whether directly or indirectly) from third parties conferred by reason of their being or doing (or not doing) anything as directors; and
iv) S. 177 : to disclose to the other directors of the company prior to the company entering into any proposed transaction any direct or indirect interest in that arrangement or transaction with the company.

70. Specifically, the following propositions were in essence common ground.

**(1) The no-conflict rule (S.175 CA 2006)**

71. A fiduciary's distinguishing obligation is that of loyalty - see *Bristol & West Building Society v Mothew [1998] Ch 1* , 18 *per* Millett LJ:

> "A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations …"

72. No fiduciary is permitted to enter into engagements in which they have, or can have, a personal interest conflicting, or which may possibly conflict, with the interests of those whom they are bound to protect: *Bray v Ford [1896] AC 44* , 51; *Snell's Equity* (33rd ed.) at [7-018]. This is because by having a conflicting personal interest in a transaction, the fiduciary " *puts himself in such a position that he has a temptation not faithfully to perform his duty to his employer* ": *Boston Deep Sea Fishing & Ice Co v Ansell (1888) 39 Ch D 339* , 357.

73. This rule operates even if:

i) The conduct has been to the benefit of the fiduciary's principal: *Boardman v Phipps [1967] 2 AC 46* .
ii) The fiduciary acts honestly: *Aberdeen Railway Co, v Blaikie Bros (1854) 1 Macq 461* , 475.
iii) The transaction is fair; it is established that fairness is not a relevant consideration and " *no inquiry on that subject is permitted* ": *Aberdeen Railway Co* . 461, 471-472.
iv) The principal himself had some kind of beneficial interest in the opportunity: *Bhullar v Bhullar [2003] BCC 711* at [28].
v) The principal could have obtained the profit for itself: *Boston Deep Sea Fishing* , 355, 367; *IDC v Cooley [1972] 1 WLR 443* , 453G.

74. Regardless of any of these factors, a director is under a positive duty to make a business opportunity available to the company if it is in the company's line of business where the information is received by the director in his private capacity: *IDC v Cooley* , 451F; *Bhullar v Bhullar [2003] BCC 711* at [41].

**(2) The no-profit rule (s.176 CA 2006)**

75. A fiduciary is in breach of duty where he or she makes a profit by reason or in virtue of the fiduciary office or otherwise within the scope of that fiduciary office: *Snell's Equity* at [7-041].

76. Again, the rule operates even if:

i) There is no fraud or bad faith. The relevant element is the fact of the profit being made: *John Taylors v Masons [2001] EWCA Civ 2106* at [46], *Regal (Hastings) Ltd v Gulliver [1967] 2 AC 134* , 137, 144-145, 153, 154.
ii) The principal could have obtained the profit for itself ( *Boardman v Phipps* , 109) or was unwilling to take up the opportunity ( *IDC v Cooley* , 453G).
iii) The fiduciary's conduct has caused no loss to the principal: *Regal (Hastings) Ltd* , 154.

**(3) Duty of loyalty including to disclose own misconduct (S.172 CC 2006)**

77. Because a director's duty of loyalty requires him to act in what he in good faith considers to be the best interests of his company (see s.172 CA 2006 ), he is required to disclose his own misconduct: *Item Software (UK) Limited v Fassihi [2004] BCC 994* at [41], [63-68].

**(4) Authorisation: fully-informed consent**

78. A fiduciary will be absolved from liability in relation to the no conflict and no profit rule if he obtains fully informed consent from the principal (or where the profit is authorised by the instrument that created the fiduciary position): *Snell's Equity* at [7-019], [7-042]. The fiduciary bears the burden of establishing that fully informed consent had been obtained.

79. Where the company is a victim of fraud or wrongdoing by its directors, or of which its directors had knowledge, their acts or knowledge cannot be attributed to the company as a defence in an action against them: *Bilta (UK) v Nazir (No. 2) [2016] AC 1 (SC)* at [7], [89], [206]. This 'breach of duty' exception to the principle of attribution is not limited to fraud, but includes knowledge of a breach that falls short of dishonesty: *Bilta* at [71].

80. Further, where one party wishes to assert that it notified a principal of certain facts through the latter's agent, but knows that that agent will not pass on the information, the notice will be ineffective: *Bowstead & Reynolds on Agency* at [8-206].

81. In relation to authorisation or ratification of directors' breaches of duties by the board or shareholders:

i) Company directors can seek authorisation to act with a conflict between duty and interest from the other (non-interested) directors: s.175(4)-(6) CA 2006 . By contrast, breaches of s.176 (the no-profit rule) or the other directors' duties cannot be authorised by (non-interested) directors.
ii) Breaches of directors' duties can be ratified by a resolution of its members in general meeting, as set out in s.239 CA 2006 . Such a resolution is only effective if passed without counting votes in favour of the resolution by the defaulting directors and any members connected with them: s.239(3)-(4) . However, such a resolution is still not effective if it amounts to fraud or oppression of the minority of shareholders: *Cook v Deeks [1916] 1 AC 554* , 564; *Menier v Hooper's Telegraph Works (1873-74) LR 9 Ch App 350* , 353-354.
iii) The only other method is by the application of the *Duomatic* principle, which requires the unanimous informed consent of the shareholders: *Re Duomatic [1969] 2 Ch 365* , 373. This is summarised in *EIC Services Ltd v Phipps [2003] 1 WLR 2360* at [122]:

> "The essence of the Duomatic principle, as I see it, is that, where the articles of a company require a course to be approved by a group of shareholders at a general meeting, that requirement can be avoided if all members of the group, being aware of the relevant facts, either give their approval to that course, or so conduct themselves as to make it inequitable for them to deny that they have given their approval. Whether the approval is given in advance or after the event,

> whether it is characterised as agreement, ratification, waiver, or estoppel, and whether members of the group give their consent in different ways at different times, does not matter."

(see also: *Madoff Securities International Limited (In Liquidation) v Raven [2013] EWHC 3147 (Comm) [2014] Lloyd's Rep. F.C. 95* at [267]).

iv) However:

a) The principle does not permit shareholders to do informally what they could not have done formally: *Re New Cedos Engineering Co Ltd [1994] 1 BCLC 797* , 814g-h.
b) The shareholders must have acted in good faith and honestly in assenting to a course of action: *Bowthorpe Holdings Ltd v Hills [2003] 1 BCLC 226* at [50].
c) There must be an unqualified agreement, objectively established, between the shareholders; and a shareholder's mere internal decision, unaccompanied by any outward manifestation or acquiescence, will not suffice: *Re D'Jan of London [1993] BCC 646* , 648.
d) Unanimous shareholder consent cannot be used to authorise an act or omission that would be unlawful, for an improper purpose, in fraud of the company or dishonest: Mortimore, *Company Directors* (3rd ed.) at [10.51].

*Dishonest Assistance*

82. In this area, too, the law was not seriously in issue. The ingredients of liability in dishonest assistance are:

i) There must be a trust or fiduciary obligation owed by the trustee/fiduciary to the claimant. It suffices if the trust in question is a constructive or resulting trust: *McGrath, Commercial Fraud in Civil Practice* (2nd ed.) at [9.34].
ii) Because dishonest assistance is a type of accessory liability, there must be a breach by the trustee/fiduciary: *Royal Brunei Airlines v Tan [1995] 2 AC 378* , 382, *Novoship (UK) Ltd v Mikhaylyuk [2014] EWCA Civ 908; [2015] QB 499* . That is common ground for the purposes of my decision. However, I should note that Mr Ohmura reserves the right to argue, if this matter were to go to a higher court, that liability for dishonest assistance would not arise in relation to a breach of the kind that is alleged in this case.
iii) The breach by the trustee/fiduciary need not be dishonest: because liability of the third party is fault-based, what matters is the nature of their fault, not that of the trustee/fiduciary: *Royal Brunei Airlines* , 384-5, 392, *Twinsectra Ltd v Yardley [2002] UKHL 12; [2002] 2 AC 164* at [109].
iv) The third party must have assisted in, induced or procured the breach. It is necessary to show that the relevant assistance played more than a minimal role in the breach being carried out, but there is no requirement to show that the assistance provided would inevitably have resulted in the beneficiary suffering a loss: *Baden v Société General pour Favoriser le Development du Commerce et de l'Industrie en France SA [1993] 1 WLR 509* at [246].
v) The third party must have acted dishonestly in providing the assistance. The test in its modern incarnation derives from *Royal Brunei Airlines* at 386-7 and is now set out in *Ivey v Genting Casinos (UK) t/a Crockfords [2017] UKSC 67* at [74]:

> "When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts. The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held. When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people. There is no requirement that the defendant must appreciate that what he has done is, by those standards, dishonest."

vi) However, the standards in question are those of an ordinary honest person in the circumstances of the defendant. Thus, in applying the test of dishonesty, the Court must have regard to all the circumstances known to the defendant at

the time, and have regard to the defendant's personal attributes, such as their experience and the reason why they acted as they did: *Royal Brunei Airlines v Tan* at 391.

83. Accordingly:

i) There is no need to prove that the defendant was aware of the details of the underlying fraud, that there existed a trust, and/or they knew the facts which give rise to the trust: *McGrath* at [9.133]. It suffices if they simply know that they are assisting the fiduciary to do something he or she is not entitled to do: *Ultraframe (UK) Ltd v Fielding [2005] EWHC 1638 (Ch)* at [1505], *Twinsectra v Yardley* at [24] per Lord Hoffmann.
ii) The defendant has the requisite dishonest state of mind if they deliberately close their eyes and ears, or deliberately refrain from asking questions, lest they learn something they would rather not know, and then proceed regardless: *Royal Brunei Airlines* , 389. Or as it was put by Lord Scott in *Manifest Shipping Co v Uni-Polaris Insurance Co [2003] 1 AC 469* :

> "In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist. But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that may, at one extreme, be no more than a vague feeling of unease and, at the other extreme, reflect a firm belief in the existence of the relevant facts. In my opinion, in order for there to be blind-eye knowledge, the suspicion must be firmly grounded and targeted on specific facts. The deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to enquire into an untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the basis of a finding of privity."

iii) However, a defendant does not have the requisite dishonest state of mind if he merely suspects what is going on: *Heinl v Jyske Bank (Gibraltar) Ltd [1999] Lloyd's Rep Bank 511* where (in the context of a case with a distinct factual parallel to this one) Colman J put the matter with characteristic clarity and good sense:

> "it is not enough that on the whole of the information available to [the defendant] he ought as a reasonable man to have inferred that there was a substantial probability that the funds originated from the Bank. It must be established that he did indeed draw that inference…. If third parties are to be held accountable on the basis of accessory liability for breaches of trust committed by others the standard of proof of dishonesty, although not as high as the criminal standard, should involve a high level of probability."

84. If the requirements above are satisfied, the third party is liable to: (a) compensate for the losses resulting from the trustee/fiduciary's breach of duty; and/or (b) personally account for his or her profits: *Snell's Equity* [30-079] to 30-081; *McGrath* [9.137] to [9.138].

85. The defendant's liability is not limited to the loss caused by his assistance, but extends to the loss resulting from the relevant breaches of fiduciary duty. It is inappropriate to become involved in attempts to assess the precise causative significance of the dishonest assistance in respect of either the breach of trust or fiduciary duty or the resulting loss: *Otkritie* at [456]; *Snell's Equity* [30-081].

86. It was suggested for Mr Ohmura that the establishment of loss was an important element in the test for dishonesty. In this connection he relied on the dictum of Lord Nicholls in the *Tan* case:

> "Honest people do not intentionally deceive others to their detriment. Honest people do not knowingly take others' property. Unless there is a very good and compelling reason, an honest person does not participate in a transaction if he knows it involves a misapplication of trust assets to the detriment of the beneficiaries."

87. He also relied on the dictum of Lord Hoffmann in *Twinsectra* at [24]:

> "I do not suggest that one cannot be dishonest without a full appreciation of the legal analysis of the transaction. A person may dishonestly assist in the commission of a breach of trust without any idea of what a trust means. The necessary dishonest state of mind may be found to exist simply on the fact that he knew perfectly well that he was helping to pay away money to which the recipient was not entitled."

88. I cannot accept this submission. These authorities simply show (unsurprisingly) that the likelihood of loss can be a factor which assists a conclusion of dishonesty; but the inversion of the point is illogical. Its falsity is also, in my judgment, demonstrated by the fact that an account of profits is available as a remedy in dishonest assistance. Hence what was found in *Novoship* , *viz*... that a remedy in dishonest assistance is available where no loss is provable.

*Knowing Receipt*

89. So far as knowing receipt goes, the ingredients of the tort are again not in issue:

i) A claim for knowing receipt requires a claimant to show:

> "First, a disposal of his assets in breach of fiduciary duty; secondly, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty."

(See *El Ajou v Dollar Land Holdings plc [1994] 2 All ER 685* , 700; *BCCI v Akindele [2001] Ch 437* , 448.)

ii) Unlike dishonest assistance, dishonesty, even in the objective sense need not be shown. The critical question is whether the defendant had such knowledge as to render it unconscionable for him to retain the benefit of the receipt: *BCCI v Akindele* , 450, 455; see also *Snell's Equity* at [30-072].

iii) The defendant's liability is restitutionary. Thus:

> "it is fixed at the value of the property when he first received it. He remains liable even if the defendant dissipated the original property, or if it can no longer be specifically identified in the defendant's remaining assets. This is an important practical distinction between it and the proprietary claim founded on following or tracing": *Snell's Equity* at [30-071].

*Bribery*

90. The application of the law on bribery is more controversial as between FMCP and Mr Ohmura than is the law relating to some of the other claims. Mr Ohmura notes the debate which exists as to whether there is such a freestanding tort as bribery or whether the claim is a species of fraud: *Clerk & Lindsell* [18-055-18-056] *Mahesan v Malaysia Government Officers' Co-Operative Housing Society Ltd [1979] AC 374* at page 383 per Lord Diplock. However, it did not seem to me that this debate had relevance to the issues.

91. It was common ground that the most favoured iteration of the test in recent years has been that of Leggatt J (as he then was) in *Anangel Atlas v Ishikawajima-HHI [1990] 1 Lloyd's Rep 167* , 171:

> "a bribe consists in a commission or other inducement which is given by the third party to an agent as such, and which is secret from the principal."

92. The question of what is meant by an " *agent as such* " was a key issue when the law came to be applied to the facts in this case. As regards the constituent parts of this test, however, it did not seem to be in issue that the following principles emerge from the more recent authorities:

i) The test for whether a payment or other benefit or a promise of the same amounts to a bribe depends upon whether it puts the agent in a position in which their duties to the principal and their interests might conflict: *Fiona Trust v Privalov [2010] EWHC 3199 (Comm)* at [73] (per Andrew Smith J).
ii) Where there is an actual or potential conflict of interest, the requirement that a payment or promise must be made to the agent 'as such' does not provide any defence to liability for bribery even if the payment was made to the agent in a different role or capacity or in respect of valuable work done on his or her own account or for another principal: *"...the law does not excuse an actual or potential conflict of interest because it arises from a payment made to the fiduciary in some other capacity and not because he was an agent or other fiduciary: it still regards the payment as a bribe, unless there has been full disclosure"* : *Fiona Trust* at [1391-1392] (and see [73](iii)); *Otkritie v Urumov [2014] EWHC 191 (Comm)* at [69].
iii) It is unnecessary to show that the bribe was given in connection with a particular transaction or series of transactions. The possibility of a conflict between duty and interest may be created by a bribe paid to an agent in order to influence them in favour of the person paying it generally and not directed to any particular matter or intended to influence them in relation to a particular transaction: *Fiona Trust* at [73]; *Otkritie v Urumov* at [70].

*Conspiracy*

93. The parties pointed me first, by way of summary, to *Kuwait Oil Tanker SAK v Al Bader [2000] 2 All ER 271 (Comm)* per Nourse LJ at [108]:

> "A conspiracy to injure by unlawful means is actionable where the claimant proves that he has suffered loss or damage as a result of unlawful action taken pursuant to a combination or agreement between the defendant and another person or persons to injure him by unlawful means, whether or not it is the predominant purpose of the defendant to do so."

To similar effect is the dictum of Lord Neuberger in *HMRC v Total Network [2008] UKHL 19; [2008] 1 AC 1174* at paragraph [213].

94. The elements of the cause of action are as follows:

i) A combination, arrangement or understanding between two or more people. It is not necessary for the conspirators all to join the conspiracy at the same time, but the parties to it must be sufficiently aware of the surrounding circumstances

© 2025 Thomson Reuters.

and share the same object for it properly to be said that they were acting in concert at the time of the acts complained of: *Kuwait Oil Tanker* at [111].

ii) An intention to injure another individual or separate legal entity, albeit with no need for that to be the sole or predominant intention: *Kuwait Oil Tanker* at [108]. Moreover:

a) The necessary intent can be inferred, and often will need to be inferred, from the primary facts – see *Kuwait Oil Tanker* at [120-121], citing *Bourgoin SA v Minister of Agriculture [1986] 1 QB* : *"[i]f an act is done deliberately and with knowledge of the consequences, I do not think that the actor can say that he did not 'intend' the consequences or that the act was not 'aimed' at the person who, it is known, will suffer them".*

b) Where conspirators intentionally injure the claimant and use unlawful means to do so, it is no defence for them to show that their primary purpose was to further or protect their own interests: *Lonrho Plc v Fayed [1992] 1 AC 448* , 465-466; see also *OBG v Allan [2008] 1 AC 1* at [164-165].

c) Foresight that his unlawful conduct may or will probably damage the claimant cannot be equated with intention: *OBG* at [166].

iii) In some cases, there may be no specific intent but intention to injure results from the inevitability of loss: see Lord Nicholls at [167] in *OBG v Allan* , referring to cases where:

> "The defendant's gain and the claimant's loss are, to the defendant's knowledge, inseparably linked. The defendant cannot obtain the one without bringing about the other. If the defendant goes ahead in such a case in order to obtain the gain he seeks, his state of mind will satisfy the mental ingredient of the unlawful interference tort."

iv) Concerted action (in the sense of active participation) consequent upon the combination or understanding: *McGrath* at [7.57].

v) Use of unlawful means as part of the concerted action. There is no requirement that the unlawful means themselves are independently actionable: *Revenue and Customs Commissioners v Total Network [2008] 1 AC 1174* at [104].

vi) Loss being caused to the target of the conspiracy.

95. However, a person is not liable in conspiracy if the causative act is something which the party doing it believes he has a lawful right to do: *Meretz Investments NV v ACP Ltd [2007] EWCA Civ 1303; [2008] Ch 244* , per Arden LJ (paragraphs [126]- [127]) and Toulson LJ (paragraph [174]); *Digicel v Cable & Wireless [2010] EWHC 774 (Ch)* at Annex I, paragraphs [117]-[118] (Morgan J).

**Conclusions on Factual Issues and Principal Claims**

*The witnesses and the inferences contended for*

96. Before turning to the factual issues, I should indicate briefly my conclusions on the witnesses and the issues which arose in relation to them.

97. Both factual witnesses were heavily criticised by the other side, both for the content of their evidence and the way in which they gave it. As will be apparent I certainly do not accept the full extent of this criticism of either witness. In particular both witnesses were subject to criticism in relation to evidence which they gave *faute de mieux* , because of the absence of other better qualified witnesses. In the case of Mr Ohmura this was the result of the vicissitudes of this case, which meant that neither Mr Marino nor Mr Bessot gave evidence. In the case of Mr Eltriki, it was because no better qualified witness from LAP was made available (a point to which I shall return below).

98. Mr Eltriki was the only witness called by the Claimant. He was not a person who was centrally involved in the key events, having joined LAP only in September 2011. He served a witness statement which dealt in part with LAP's processes (to the best of his knowledge) and also with the search for documents which he had undertaken. Large parts of his statement were plainly inadmissible as being comments on documents which he had not generated or which reported on meetings which he had not attended.

© 2025 Thomson Reuters.

99. He was cross-examined substantially on the subjects of the process by which documents were selected for disclosure and on whether documents had been lost in the revolution of 2011. The Defendants made a number of criticisms of his evidence, characterising it as evasive, contradictory and unsatisfactory. While I did not find his evidence to be of much help to me, the impression I received was that Mr Eltriki was not attempting to be unhelpful, though he did convey the impression that he considered a number of the questions he was asked to be pointless. This impression was perhaps contributed to by the assertive tenor of the translation, which did not entirely match the tone in which Mr Eltriki himself seemed to answer the questions.

100. In relation to one area where he was particularly criticised, as to whether the LAP offices had been looted, I felt that he was not as forthcoming as he might have been; but at the same time, since he had not himself seen the offices until after the events of the revolution, he was right that he was not terribly well placed to give reliable evidence on this point, since he could not do a " *before and after* " comparison.

101. One key piece of his evidence was the answer he gave on Day 1:

> "Q. Are [the current executive management of LAP] a different group of people from those who acted as the executive management of LAP in January 2010?
>
> A. (Interpreted): 90% changed, they changed 90%. But the old team stayed in LAP as employees now. They are still working as employees. So, there was a change in positions, if you like, but the employees themselves are still working at LAP."

102. It was suggested for the Defendants that this evidence indicated that all of the relevant former directors of LAP were still employed by LAP, and there was no excuse for their not having been tendered to give evidence.

103. I am not persuaded that this passage can be concluded to bear the meaning placed on it. A number of meanings can be put on this answer other than the one which the Defendants urge. Certainly (and very understandably) the question was not specifically posed. Absent a specific answer I would be unwilling to conclude that the meaning urged was the correct one.

104. Mr Ohmura's evidence was, in the usual way, perceived very differently by the Claimant and the Defendants. The former asked me to conclude that he had lied repeatedly to the Court and evaded answers on difficult questions. The latter urged me to regard him as an impressive witness who stood up well to the ordeal of a long cross-examination at the hands of a skilled cross-examiner; and whose answers carried the ring of truth.

105. I did conclude that Mr Ohmura was an impressive witness in many ways; he is plainly very intelligent, and he dealt well with the ordeal of being the sole witness for the defence and being subjected to searching cross-examination for a lengthy period – longer than can have been anticipated, because the absence of Mr Marino meant that certain points which would have been put to Mr Marino were instead put to him.

106. He was also unfailingly courteous in the face of a very exhausting ordeal during the course of which serious allegations were put to him in round terms. He did not stall, but gave prompt answers. He was also capable of giving very clear and helpful answers, for example on technical matters. However, I have concluded that there were less impressive facets of his evidence. On a number of occasions, he appeared to me to be evading the question actually asked by addressing an offshoot of the question. There were also occasions when key questions were responded to with lengthy, superficially relevant answers, which when read back emerged not to be answers to the question at all.

107. I should make clear that I do not place a huge amount of weight on these points, in terms of assessing his evidence as a whole. Nor do I place any weight at all on his demeanour, which naturally varied over the course of such a long examination. This is because I do accept that maintaining concentration in the witness box for such a period is extremely difficult. It places huge physical and mental demands on a witness, and it is inevitable that there will be times over the course of any cross-examination longer than a couple of hours when even a relatively young and very intelligent witness, such as Mr Ohmura, will ramble, or misunderstand the question.

108. However, in the final analysis, on weighing his oral evidence against the other materials, for the reasons which I have given below I have been unable to accept significant portions of his evidence.

109. It was suggested on behalf of Mr Ohmura and Mr Marino that I should draw negative inferences against FMCP because of the way in which the proceedings have been handled and specifically because of the other witnesses who might have been tendered and who were not.

110. In relation to the first part of this submission, Mr Couser for Mr Marino pointed to the fact that LAP is in effect the *eminence grise* behind this litigation, since it has the controlling interest in FMCP, appointed all of its current directors, chose its solicitors (who were LAP's own solicitors) and is the party for whose benefit the claim is effectively brought. It was submitted that LAP's proceeding in this way (not formally a party but in fact in control) has had profound implications for the litigation, particularly in terms of disclosure; but also, because the " *change of guard* " in the control of LAP means that those in control are now inimical to those with whom Mr Marino initially dealt and on whose authority, he relies. So far as the Defendants are concerned there has been no sensible way of joining LAP as a party; therefore, there has been no way of accessing disclosure from LAP or putting LAP under real pressure to call witnesses thought to be particularly relevant.

111. It was submitted therefore that I should draw negative inferences against FMCP in relation to the absence of the documentary record, in relation to the case on LAP's knowledge and approval of payments to Mr Marino and in relation to the failure to call any of the principal officers of LAP at the relevant times.

112. The principles relied on derive from the case of *Wiszniewski -v- Central Manchester Health Authority [1998] P.I.Q.R. P324* . That case concerned a refusal to return to give evidence on the part of one of two medical professionals involved in a birth which resulted in the baby suffering irreversible brain damage in the minutes before delivery. The principles set out in the judgment were not in issue. They are:

i) In certain circumstances a court may be entitled to draw adverse inferences from the absence or silence of a witness who might be expected to have material evidence to give on an issue in an action.
ii) If a court is willing to draw such inferences, they may go to strengthen the evidence adduced on that issue by the other party or to weaken the evidence, if any, adduced by the party who might reasonably have been expected to call the witness.
iii) There must, however, have been some evidence, however weak, adduced by the former on the matter in question before the court is entitled to draw the desired inference: in other words, there must be a case to answer on that issue.
iv) If the reason for the witness's absence or silence satisfies the court, then no such adverse inference may be drawn. If, on the other hand, there is some credible explanation given, even if it is not wholly satisfactory, the potentially detrimental effect of his/her absence or silence may be reduced or nullified.

113. Mr Marino submits that this is such a case. In particular he invited me to infer from the absence of any of the relevant LAP witnesses (Dr Kagigi, Mr Haggiagi, Mr Siala, Mr Naas and the late Mr Kashadah) that they were not prepared to give evidence that supports FMCP's case and that if they were to give a truthful account of events at FMCP between 2009-2011, they would reveal that Mr Marino made full and frank disclosure to them and they (as directors of FMCP and representatives of LAP) gave their fully informed consent to the payments to him.

114. I do not consider that it would be appropriate to draw negative inferences in relation to these witnesses, or the witnesses to whose absence Mr Ohmura pointed.

115. The fundamental reason is simple. The drawing of negative inferences is not something lightly to be undertaken. In this context (as opposed to the context of document destruction or formally defective disclosure) it forms a part of the shifting evidential burden during a trial. This is why no adverse inference is available at all unless evidence has been adduced by the party who seeks the adverse inference on the matter in issue. It is therefore not open to the Defendants to seek adverse inferences simply from a failure to make voluntary disclosure (voluntary in that LAP is not a party to the litigation) or a failure to call a witness. There has to be (i) a case to answer on an issue and (ii) a case that the missing evidence would be relevant to the issue in question.

116. So far as concerns Mr Marino, he falls down at the first hurdle. It is not possible for him to say that there is a case to answer on authority when he has not given evidence (and so put his statements in) and consequently the only document in evidence which purports to give his story, the Charles Russell letter, specifically says he did not disclose the payments.

117. A similar point was taken on behalf of Mr Ohmura. So far as absent witnesses were concerned, three people were identified: Messrs Grant and Vojetta and Ms Hammersley. However, before any such negative inference could even be begun to be drawn it would be necessary to establish some sort of case that one or more of these witnesses would have had relevant evidence to give. Having considered the locations and connections in which their names cropped up I was myself unable to discern why they would be likely to have any relevant evidence to give. I invited Mr Emmett for Mr Ohmura to set out his stall in this regard, but he did not point me to any specific issues to which these individuals might be said to be relevant. They therefore can be ignored.

118. For Mr Ohmura it was also contended that negative inferences should be drawn from the Claimant's failure to call Mr Bessot and Mr Haggiagi; the former because it was said that the change of heart about his statement was not adequately explained and the latter because the statement served on his behalf was manifestly inadequate, and on the basis of Mr Eltriki's evidence it should be assumed that LAP did have the power to make him come.

119. Here there is a problem in that the question of the issues to which the evidence went was not identified, to enable the examination of whether a case had been put forward by Mr Ohmura on that issue for FMCP to answer; it might be said that these witnesses were more relevant to the case against Mr Marino than that against Mr Ohmura. Thus, in relation to authority, these witnesses might well be relevant, but the case of authority was one for Mr Marino rather than Mr Ohmura to make. I would not be minded to draw adverse inferences without the exercise of identifying the issue in question and the case advanced being thoroughly and carefully performed, which it has not been. I would therefore not be prepared to draw any adverse inferences for Mr Ohmura's benefit from the absence of Mr Haggiagi and Mr Bessot.

120. However, this is somewhat academic, at least as regards Mr Bessot, since I would not in any event be prepared to draw such inferences given the explanation advanced for his absence, which I regard as a good one. The explanations were as follows. As regards Mr Bessot FMCP says that it does not require his evidence to prove its case, and that it would be wrong to call him in circumstances where FMCP's case is in important respects that Mr Bessot is not a witness of truth but in calling him it would be unable to put that case to him unless it was in a position to declare him hostile (which, given the nature of his statement, seems implausible in this case).

121. I would also note that as regards Mr Bessot at least there was apparently an agreement that Mr Ohmura would not invite the court to draw such adverse inferences.

*The background to FMCP's incorporation and the April Mandate*

122. The first suite of controversial facts concerns the knowledge of Mr Ohmura regarding FMCP, the intention as regards whether the JB Notes should be managed by FMCP or whether they (or at least the initial iteration) should be regarded as introduced by Mr Marino as part of a separate work stream to that of FMCP and what is to be drawn from a document relied on by Mr Marino and known as "the April Mandate".

123. Mr Marino's recommendation in the JP Morgan report was that the portfolios across the various banks, including JB, should be monitored and managed in the aggregate rather than only at the mandate level and that there be appointed " *an advisor to partner with LAP* ", who would be able to take an overview of LAP's investments and implement guidelines at the aggregate portfolio level (which was not then happening). It also recommended the " *wrapping* " of the portfolio in a " *principal guarantee* ".

124. The idea of a corporate entity called "FM Capital Partners" had crystallised by March 2009 at the latest. A presentation of that date can be seen to envisage the launch of FMCP in July 2009, as in fact occurred. The intention was to have an FSA-regulated, independent financial advisory partnership (involving *inter alios* Mr Marino and Mr Bessot) covering three distinct areas: (a) portfolio construction and risk management; (b) trading; and (c) structuring, product research and development. It also envisaged training LAP's own staff to improve their skills in the area.

125. It was submitted that the pitch made by Messrs Marino and Bessot was for FMCP to have both advisory and management mandates, and for structured products to be squarely within FMCP's purview. This was implicitly in issue for Mr Ohmura whose case was that he understood FMCP did not undertake structured products work. While this is not determinative of Mr Ohmura's understanding I do find that the way FMCP was planned was that Mr Marino and Mr Bessot might arrange structured product trades. They said to LAP in terms in the May document: *"We will also sometimes suggest investment in*

*traditional asset classes via Structured Products. LIA can rely on our superior experience in that field to find the best products and track hidden costs/undesirable features."*

126. Another point referenced that Messrs Marino and Bessot would aim to reduce the multiple layers of fees and move away from the present position where *"investment decisions are not necessarily taken in LIA's interests…",* achieving an efficient cost structure.

127. It is not clear to what extent Mr Ohmura was privy to these discussions – whether he saw the JP Morgan report and hence knew that LAP was the client in question and what he knew of the progress of the planning of FMCP. That he knew of the plans to start FMCP at some point before it came into being seemed clear; but the date at which he gained that knowledge was not clear. Nor was the position on his knowledge of the JP Morgan report, though it seems likely that he was shown it at least at the point when the framework for his work on structuring was defined.

128. Mr Ohmura was not (as were certain other associates of Messrs Marino and Bessot) identified as a likely director or employee of FMCP. However, it is striking that he was taking steps to start his own business at exactly the same time as were Messrs Marino and Bessot and that there was plainly some discussion of their future plans in the Vesper discussion.

129. Mr Marino's pleaded case rests heavily on the April Mandate. He says that by this document he was engaged to broker an agreement for structured products between LAP and a bank. He says that he was instructed by LAP to create a capital guarantee in a personal capacity, completely separately from the FMCP project. He also says that he agreed a commission payment for work done pursuant to this mandate with Mr Sharif and Mr Haggiagi and that the various transactions later entered into in relation to the JB assets were covered by this mandate and this commission arrangement. He contends that since the committee appointed by LAP to negotiate with Mr Marino consisted of Mr Sharif and Mr Haggiagi as well as Dr Kagigi, Mr Siala and Mr Naas they must all have known and approved this agreement.

130. The April Mandate is a single page document apparently drafted by Mr Bessot and signed by Mr Sharif and Mr Marino. It is dated 2 April 2009. It states:

> "Dear Mr Frederic Marino
>
> This letter hereby confirms that Libya Africa Investment Portfolio, a Sovereign Fund registered in Libya …. (The Investor) is giving Frederic Marino the mandate to advise the Investor on the structuring of a portfolio comprising the following Funds:
>
> - UBP
> - Palladyne
> - Platinum
> - Stanford International Bank (SIB) CDs
>
> The total Notional of the portfolio is around USD650Mios
>
> The Investor gives Frederic Marino the mandate to
>
> - Select the banks to be involved in the structuring of the product

• Start structuring the product with them"

131. The effect of this document was hotly contested. Mr Marino and Mr Ohmura placed it squarely at the heart of their defences. They said that it evidenced an important qualification to the Business Plan which hived off a group of assets and placed them under the management of Mr Marino, which were separate to the assets which were to be under the management of the joint venture company, (the future FMCP). It reflected, they said Mr Sharif's wish not to have *"all the eggs in one basket"* . They also relied on the way in which matters were discussed between the parties at a meeting in early June (discussed further below).

132. FMCP formally challenged the April Mandate's authenticity. They therefore submitted firstly that, Mr Marino having failed to give evidence and verify its authenticity, the document was not in evidence and could prove nothing to aid Mr Marino or Mr Ohmura. Secondly, they submitted that it was plainly inapt and incapable of supporting Mr Marino's case.

133. Even assuming consent, they said, it was not capable of covering the transactions which are in question before me. They point to the fact that the April Mandate refers to the total " *Notional* " of LAP's portfolio being *"around USD 650 Mios"* , made up of assets in the accounts at UBP, Palladyne, Platinum and Stanford International Bank. Specifically, FMCP points out, this does not include the assets at JB (including those invested in GAM funds), which were of course the assets first used in GAIN.

134. FMCP also submitted that the April Mandate is expressly limited in another sense: in that it purports only to authorise Mr Marino to *"select the banks to be involved in the structuring of the product* " and " *start structuring the product with them.* " It notes that Mr Marino's own expert Mr Beevers accepted that it is *"not of the level of detail I would expect to see in a mandate letter between European or US counterparties. It is silent on many key issues."* He describes it as a *"soft commitment letter* ", noting that *"[l]etters of this sort are often used as a statement of intent, intended to be used to procure the interest and initial works of a counterparty financial institution* ". Accordingly, FMCP submitted that the April Mandate is not a document of any contractual force or effect.

135. FMCP also says that even if this document could provide some basis for commissions being paid to Mr Marino, the instruction must relate solely to GAIN (or possibly GAIN II) (the only structured products that could be described as a capital guarantee) and not to any of the other JB Notes or the Structured Product Trades.

136. Yet further they submit the April Mandate could not provide a basis for payments to Mr Bessot, who is not mentioned in the document at all.

137. FMCP also argued that if it could have any effect on its own terms the document in any event evidenced no valid consent even to so much, in that it was not agreed by anyone with authority and the case as to ratification did not stand up to scrutiny. As to this they note that Mr Sharif, who signed the document, had no formal role at LAP at the time the April Mandate was signed; consistently with this Mr Sharif's name is not accompanied by any description of his capacity.

138. It also submitted that there is insufficient evidence of knowledge and consent by LAP *qua* LAP and that Mr Marino comes nowhere near to discharging the burden – which they submit he as a fiduciary bears - of proving that his principal (FMCP) gave its fully-informed consent to the promise and receipt of huge personal commissions. They also submit that payments which were later made to Mr Haggiagi suggest strongly that not only was there no consent, but that Mr Marino well knew that there was no such consent.

139. FMCP also submits that the April Mandate would be expected to deal with remuneration if such a deal were in existence, and it points to the IMAs as providing an example of the sort of specific provision that one might expect to see had LAP intended the April Mandate to give Mr Marino consent to take personal fees in connection with transactions with LAP assets.

140. Finally, FMCP says that as to the key issue – remuneration – there is simply no evidence of this agreement at all since Mr Marino's evidence in his statement as to the existence of an oral agreement cannot be relied on by him.

141. Shortly after the April Mandate, on 23 April 2009, LAP executed a personal power of attorney in relation to the RBS Coutts portfolio. That document granted management authority to Mr Marino personally in respect of LAP's account at RBS Coutts (held in the name of another subsidiary of the LIA, the Libyan Foreign Investment Company ("LFICO")). This contained an express consent by LAP to the receipt by Mr Marino of " *payments from commissions and brokerage fees* " (Clause 5). It was expressly revoked shortly after FMCP was incorporated and granted its own power of attorney on 30 July 2009. No payments said to be made under this agreement are in issue.

142. Meanwhile in May preparations for the incorporation of FMCP proceeded with briefings to LAP. A document entitled " *FM Capital Partners – Financial Advisory – May 2009* " proposed that FMCP would have a management mandate for all of the private bank portfolios, including JB. FMCP, now planned to be a limited company (as it in due course became), was to provide various services to LAP, including: a full analysis of LAP's (global) portfolio, defining the strategic asset allocation, setting up investment procedures for alternative assets, in respect of which FMCP would provide " *sound and independent advice* ", as well as providing continuing review and analysis, risk management etc.

143. There was also specific mention of advice in relation to structured products. It was specifically stated that *"LAP can rely on our superior experience in that field to find the best products and track hidden costs / undesirable features"* and that FMCP would have a fully trained team with knowledge in " *[a]nalyzing Structured Products, validating pricing and legal term-sheets* ". The presentation stated that " *[o]ur independence is the guarantee of a fair and unbiased analysis* ".

144. Similarly, a further document, *"FM Capital Partners Business Proposal"* dated 5 May 2009 promised that FMCP " *will provide an independent platform where investment decisions are always taken in the best interests of LAP* ". This document also highlighted the fees situation saying " *LAP current set-up has many layers of fees. The worst case is when the private bank charges for advisory services, then invests in a fund of hedge funds, which itself invests in single hedge funds. The total fixed yearly fees can amount up to 4%.* "

145. At the LAP board meeting on 18 May 2009 the LAP board considered the JP Morgan report prepared by Mr Marino and the thrust of his recommendation, viz. that " *our portfolios are in urgent need of restructuring, as well as effective and direct management, in order to confront the current and future challenges, recover from the current drop in its assets, and, consequently, improve performance and realize a satisfactory return* " and indicated that it was *"comfortable"* with the proposal submitted by Mr Marino for a *"partnership"* with LAP, which would consist of an independent FSA-regulated company that would have " *the primary objective of developing international management in the field of asset and risk management as well as research. It would manage our portfolios as well as third party portfolios in a professional and scientific manner in order to achieve the best return possible… this partnership would provide [LAP] with a distinguished international presence* ". FMCP also draws attention to the fact that there is no sign that the April Mandate - or any agreement to pay commissions - was discussed.

146. The Board appointed a sub-committee, chaired by Dr Kagigi and comprising Messrs Siala, Haggiagi and Naas, to negotiate with Mr Marino and make any amendments to the terms of engagement they deemed appropriate in order to protect LAP's interests in the joint venture.

147. In parallel with this, steps were being taken in relation to the first of the JB Notes, GAIN. Initially it seems that Mr Marino did not identify LAP as the potential client, though somewhat later he did show Mr Ohmura, and probably others at JB, the April Mandate.

148. It appears that Mr Marino had, at least in principle, persuaded LAP to purchase GAIN by early June 2009, in that a Product Proposal for GAIN dated 3 June 2009 was signed by Dr Kagigi on 4 June. This appears to have occurred at or after a series of meetings held between Mr Marino and Dr Kagigi and Mr Haggiagi between 1 and 4 June 2009.

149. Mr Marino relied heavily on the minutes of these meetings, submitting they are consistent only with his case that Mr Marino had a personal mandate generally and specifically in relation to the JB Notes, noting the following:

i) The *"Capital Guaranteed products on the Julius Baer mandate"* section is separate and distinct from the *"FM Capital Partners"* section.
ii) The *"Capital Guaranteed products on the Julius Baer mandate"* section is referring to the JB Notes. There is no suggestion there that the JB Notes are to be brought into the FMCP fold later on.
iii) The minutes record that Dr Kagigi, Mr Haggiagi and Mr Marino *"discussed the details of the product, the mechanism and the benefits."* This is said to justify an inference that what was discussed included all the details of the products, including the commissions.

iv) The decision to give Mr Marino the mandate to execute the JB Notes is immediate and is not dependent upon FMCP's incorporation. Dr Kagigi and Mr Haggiagi had already signed the GAIN product proposal in the meeting.
v) The "FM Capital Partners" minutes do not record a binding agreement to incorporate FMCP, merely an agreed set of steps starting with a letter of intent signed by LAP to be sent to Mr Marino.
vi) The minutes include another separate section entitled *"RBS Coutts Portfolio"* referring to *"the RBS portfolio managed by himself [Mr Marino] and [Mr Haggiagi]"* . There is here no contemplation that the RBS Coutts portfolio would be transferred to FMCP once formed.

150. The Product Proposal which Dr Kagigi signed stated that GAIN offered the potential for capital growth linked to a Reference Underlying (i.e., the assets to which the value of the note was linked) along with *"the safety of 100% principal protection from [JB] at Maturity Date"* . The launch of the product was stated to be subject to the launch of the Reference Underlying *"including the conclusion of the relevant Sub-Advisory Agreement with FM Capital Partners"* . FMCP points to this in support of its argument that GAIN was indeed predicated upon the incorporation and involvement of FMCP.

151. A point which FMCP also stressed was the fact that the Product Proposal for GAIN made no reference to introducer fees or to any amount of "Amortization Fee" (although that term is mentioned in passing in the definition of "Early Redemption Charge"). It was Mr Ohmura's evidence that this was not surprising; this kind of document was an early stage document to provide a brief summary for the investor and an indication for the bank that the investor is seriously interested before substantial work is undertaken.

152. By late June the intention to enter into GAIN was clear. On 22 June 2009, LAP sent a Letter of Intent to Mr Marino confirming that: *"[LAP]…intends to invest in a financial advisory new company to be established by [Mr Marino] as set out in the presentation "FM Capital Partners – Financial Advisory" dated May 2009 …"* . On 24 June 2009, Mr Haggiagi and Mr Naas signed trading instructions, on behalf of LAP, addressed to Mr Gonet of JB, to exchange all cash and securities held in the LAP account at JB for the GAIN notes as and when they were issued in due course. This was of course before FMCP was incorporated.

153. It was Mr Ohmura's case that he did a lot of the work for structuring GAIN, in this period, but as he was then employed at GAM he received no payment for this.

154. There was also an issue as to exactly what Mr Ohmura knew about LAP and FMCP at this stage. It was his case that he did not initially know who the client was, and that he acquired this knowledge later, perhaps in May or June. Certainly, however by the time the contractual documents were being drawn up in early June 2009 he did know both who the client was and that FMCP was stated to be the Note Advisor and the Sub-Advisor for the product, taking fees for those roles.

**April Mandate - conclusions**

155. Having considered the evidence relating to the pre-incorporation discussions, and in particular in relation to the April Mandate I reach the following conclusions.

156. First, although it may technically be the case that the April Mandate was not formally in evidence, I consider it artificial to disregard it when the document was before the court and the subject of detailed submissions.

157. I have no hesitation in concluding that the April Mandate does not contain or evidence an agreement that Mr Marino (and Mr Bessot) should be entitled to an introducer fee in their personal capacities.

158. The starting point is that the portfolio of assets contemplated by this document is listed – and it is composed of accounts at a variety of banks other than JB. UBP, Palladyne, Platinum and Stanford International Bank are mentioned; JB is not. The plain inference is that it does not and was not intended to cover the JB assets. The document reads (and Mr Beevers' evidence appears to support this) as a mandate to do some introductory work on the non-JB assets.

159. The evidence which would be needed to transform this document into (a) a contractual document with the effect of enabling Mr Marino to control the assets and (b) a document with reference to an entirely separate portfolio are entirely lacking.

160. The kinds of agreement which would be expected were such an effect to be intended can be seen in the IMAs which were later concluded. These are very different documents.

© 2025 Thomson Reuters. 

161. Nor does the document deal with remuneration. This is consistent with the conclusion reached as to its non-contractual status; if Mr Marino were being retained to do work, a remuneration provision would be expected – as in the IMAs. This conclusion is yet further bolstered by the fact that the April Mandate could provide no basis for any payments to Mr Bessot.

162. In my judgment there is nothing in the June meeting minutes (to the extent they are even admissible in aid of construction of the April Mandate) which compels a different conclusion. While those minutes are plainly capable of being read the way in which they are read by Mr Marino, that is not the only reading open on the document, particularly when it is placed in its context of the ongoing work to deal with the LAP Portfolio and to bring FMCP into existence.

163. That being the case, authority does not arise. If it did so I would conclude that Mr Sharif lacked actual or apparent authority. He was not a director and did not hold himself out as a director.

164. It follows that it was the intention of the parties that the JB Notes would fall within the ambit of FMCP's business. I also conclude that the parties envisaged that the business which FMCP would in due course conduct might extend to structured product business; that it seems to me, is plain from the background documentation.

*July 2009- October 2009: GAIN I and II and the first payments*

165. On 3 July 2009, FMCP was incorporated.

166. I am asked by FMCP to conclude that an agreement for commissions was concluded on 6 July 2009 between GAM and Ironfly. The basis of this submission is that in the disclosure there is a document entitled "Introducer Agreement" between BASL (formerly GAM) and Ironfly, which was apparently prepared by Mr Aversano of GAM in around March 2010. This document states:

> "THIS AGREEMENT… replaces that made the 6th July 2009 between GAM Structured Investments Ltd. and FM Capital Partners…"

167. It includes signature blocks for Messrs Marino and Bessot, each supposedly as "attorney" for Ironfly. In fact, neither of them in fact held any formal power of attorney for Ironfly, which generally executed documents by its Seychellois nominee directors.

168. No 2009 Introducer Agreement has emerged in the disclosure exercise. Mr Ohmura did not dispute that an agreement of this sort was concluded; his evidence was that he could not recall whether one was concluded or not.

169. I conclude that some agreement was reached; the reference in the later document actually giving a date for the earlier document suggests strongly that some such agreement was not just concluded but was available to the drafters of the later Introducer Agreement.

170. The question is what were the terms of that agreement – and indeed who were the parties? FMCP contends that the terms were most likely the same as the terms of the later Introducer Agreement. That is not a conclusion which I am prepared to reach, based simply on the existence of a later agreement in particular terms. There was no evidence as to what GAM's processes had been, and whether they were adopted by the later entity, BASL. The burden of proof on this issue is not, in my judgment, satisfied.

171. As to the parties, given the payments which were later made to Ironfly, it seems more likely that the parties were GAM and Ironfly (despite the wording of the 2010 agreement). This conclusion is supported by a draft Novation Agreement which says that it is *"supplemental to the Introducer Agreement dated 06 July 2009 and made between BASL, under its former name GAM Structured Investments Limited, and [Ironfly]"* .

172. On 9 July 2009 FMCP entered into the NAA and the FMCP SAA. The FMCP SAA continued to apply to subsequent iterations of the JB Notes.

© 2025 Thomson Reuters. 

173. The terms of GAIN itself are contained in the Term Sheet and Prospectus. They did not differ between GAIN I and GAIN II.

174. There was an express provision dealing with " *Conflicts of Interests/Multiple Roles* ", limited to members of the JB group:

> "Members of the Julius Baer Group have various and multiple roles and responsibilities related to the issue, performance, management and administration of the Notes. Members of the Julius Baer Group and their directors, officers, employees and agents may also be involved in other financial investment or professional activities which may cause conflicts of interest with the issue and ongoing management and administration of the Notes."

No reference was made to any other actual or potential conflicts of interest.

175. The product included an " *Amortization Fee* ". This fee was much in focus because it covered the amounts later paid to Ironfly. The fee was stated to be *"a fee, expressed in per cent of Denomination and calculated as defined in the Product Terms, which serves to reimburse the Issuer for costs incurred in connection with the distribution of the Note"* . The fee was set at *"2.98 basis points per month of the Denomination, during the lifetime of the Notes"* – i.e., a total of 2.5%, being US $3,125,000 in respect of the first tranche and US$1,183,400 in respect of the second tranche of GAIN.

176. The amount of the Amortization Fee replicates the sums paid by GAM to Ironfly. It is common ground that the fact that sums were paid to Ironfly was not disclosed *per se* , though Mr Marino and Mr Ohmura explained that it was entirely normal and would be expected for an introduction fee to be payable and for it to be paid in this way. It is also common ground that the Amortization Fee was not paid by GAM out of its own fees, but that the cost of the Amortization Fee (in relation to this and the later JB Notes) came out of the LAP assets. The experts agreed that this structuring of the payment of an introducer's fee was not unusual.

177. The other fees relating to GAIN were:

i) A *"Risk Monitoring Fee"* payable to GAM of 1.30% *p.a* . of the Denomination according to the Term Sheet and Prospectus, but 1.40% according to the Product Proposal. This was the fee for creating the product (including design and structuring), managing it, and guaranteeing capital protection.

ii) There was also a *"Note Advisory Fee",* payable to FMCP, of *"0.20% per annum of the Denomination, during the lifetime of the Notes".* Two features should be mentioned:

a) In fact, and (it was agreed) unusually 1.4% (7 years x 0.2%) was agreed to be paid upfront as a lump sum within ten business days of the Issue Date. The result was that FMCP was immediately paid Note Advisory Fees totalling US$2,410,910 for the two tranches of GAIN. FMCP argued that this was unusual and inconsistent with the wording of the main term, indicating a degree of bad faith while Mr Ohmura contended that the *"during the lifetime"* wording effectively denoted an intention for a lump sum payment.

b) The Note Advisory Fee also diminished the assets of LAP, and the value of the Notes. Again, the expert evidence was that it is commonplace for such fees to be taken out of the investor's assets.

178. The position as to the payment of the Amortization Fee at least is nonetheless said to be key in relation to the case on GAIN against Mr Marino, given that it was his case that while LAP did expect him to get paid for his work on GAIN, it expected him to be paid by the bank, and not by LAP. This is one point on which Mr Marino's intended evidence was clear. In his first statement he stated that Mr Sharif expected Mr Marino to get paid by the Bank *"and not by LAP"* and that Mr Haggiagi *"did not expect LAP to pay"* Mr Marino. In his second statement he said that LAP agreed to himself and Mr Bessot being paid by JB *"from its profits (and not from LAP assets), because, otherwise, it would have had to pay us itself, which it did not want to do."*

179. Also, key to FMCP's case against both Mr Marino and Mr Ohmura was the contemplated role of FMCP, as evidenced by the two agreements into which it entered in connection with GAIN, which it says gives the lie to the suggestion that any

© 2025 Thomson Reuters.

further fees (for example to Mr Marino directly) were intended. FMCP submits that the duties of FMCP as Note Advisor were wide-ranging. Under Clause 4.1(a), one aspect of its role was to advise GAM (as Calculation Agent) regarding:

> "…initial structure and parameters of designated Products as per Schedule I [i.e. GAIN] including but not limited to *(i)* composition of initial portfolio and weighting of portfolio components, *(ii)* choice of basic Products parameters such as currency, denomination and tenor, *(iii)* level of principal protection and/or leverage, *(iv)* choice of Products risk parameters such as maximum exposure and the allocation table, and *(v)* determination of product fees."

180. This, FMCP says, reflects an agreement that FMCP be paid for the self-same tasks that Mr Marino argues that he performed in his 'personal' capacity. A similar point applies to the role of a 'distributor', which Mr Ohmura says was genuinely the role performed by Ironfly; FMCP says that this was expressly within the scope of FMCP's remit pursuant to the NAA: in particular when one looks at Clause 4.1(c), which required FMCP to provide *"assistance to [GAM] in communication with the investors in the Products [i.e. LAP]"* .

181. FMCP says this appears to be reflected by GAM's actions also in that it issued credit notes, signed by Messrs Aversano and Ay, for fees payable to FMCP on GAIN *"[i]n connection with [FMCP's] distribution efforts related to the issuance of [GAIN] in accordance with the established distribution agreement between GAM and yourselves".*

182. FMCP's role under the NAA also included (Clause 4.1(b)) advising on:

> "… matters of ongoing maintenance and reporting of Products as per Schedule I [i.e. GAIN], including but not limited to *(i)* monitoring of Products performance, *(ii)* reporting of Products performance and key Products parameters in light of investor needs, and potentially *(iii)* any modification of Products terms as may be conducted by the Calculation Agent and/or the issuer of the Products according to the Terms of the Products."

183. Clause 4.1(d) provided expressly for FMCP to perform its obligations in a fiduciary capacity *vis-à-vis* LAP, namely:

> "… at its reasonable discretion… with a view to reasonably safeguard the legitimate interests of [LAP], provided however always in accordance with *(i)* the Terms of the Products and *(ii)* the Terms of this Agreement."

184. FMCP points to these clauses and says that in the light of them Mr Marino's evidence that the work that he and Mr Bessot had done for LAP was *"completely separate and different in quality from the work which FMCP would do for LAP and the work which we would do for FMCP"* is demonstrably false – even as regards these earliest transactions.

185. Mr Marino submits that given the timeline on these agreements: the April Mandate (2 April 2009), JB's proposal for the structured products (4 June 2009) and LAP's sign-off on the proposal and the transfer of funds (24 June 2009) which all pre-dated the incorporation of FMCP (3 July 2009), there could be no breach of any obligation by Mr Marino. He says that he was under no obligation to bring a pre-existing contract between him and a third party into FMCP when it was incorporated. He says that there was no shared intention that the contract between himself and LAP would be migrated into FMCP once FMCP had been incorporated.

186. At the heart of this case are the payments made to Ironfly and Leopard. In relation to the GAIN transactions, the payments made were to Ironfly (the "GAIN Ironfly Commissions"). They were made by GAM into Ironfly's account with CFM Bank in Monaco. Specifically, the payments were as follows:

i) On 12 August 2009 – US$3,125,000, being 2.5% of the notional subscription in the first tranche of GAIN (US$125m); and

ii) On 13 October 2009 – US$1,183,400, being 2.5% of the notional subscription in the second tranche of GAIN (US $47.3m).

187. These commissions were then shared out by Messrs Marino and Bessot amongst themselves (through onward transfers to Leopard and Mr Bessot's company Regent 121) and to the extent of US$625,000, with Mr Ohmura.

188. Mr Marino's case is that these were effectively payments made pursuant to the April Mandate. He says that there was no breach of duty because the payments came to him via this earlier agreement. He therefore says that he was under *"no duty to disclose the receipt of this fee, or indeed payments I made following receipt"* ; and that there was not *"any need or occasion to disclose the introducer fees at FMCP board meetings"* . This case, that he did not disclose the payments, is consistent with his later admissions to the FCA in the Charles Russell letter.

189. A further key fact relied on by FMCP was the payment of US$625,000 which Mr Ohmura received from Ironfly on 16 October 2009 ("the US$625,000 payment"). The nature and indeed the subject of this was hotly contested. FMCP contended that it was paid to Mr Ohmura as a dishonest assistant or conspirator in relation to GAIN I while Mr Ohmura contended that it was a payment for structuring work which he did on the GAIN II transaction.

190. The facts regarding the payment itself are uncontentious. Soon after leaving GAM, Mr Ohmura incorporated Conquest Cayman, opened a bank account in its name, and received US$625,000 from Ironfly from the moneys it had received in relation to GAIN.

191. Mr Ohmura says that the payment was made pursuant to a Structuring Advisory Agreement between Ironfly and Conquest Cayman dated 21 September 2009 ("the Ironfly SAA"). This was a document drafted by Mr Ohmura himself using the NAA as a template. FMCP submits that it was created as a smokescreen to give a veneer of commerciality to the payment and to satisfy any anti-money laundering inquiries made by the banks handling the payment.

192. Another issue is that the obligations of Conquest Cayman under the SAA are almost identical to those undertaken by FMCP under the NAA. Therefore, there seem to have been three entities effectively being paid for the same work.

193. FMCP says that these factors drive the conclusion that the Ironfly SAA is a sham.

194. Mr Ohmura claims that regardless of these infelicities, the US$625,000 payment was a perfectly legitimate payment which related to structuring work he conducted for the second phase of GAIN (and also a sum for ongoing reporting and maintenance of the note).

**GAIN: conclusions on Mr Marino**

**Breach of Directors' duties**

195. As I have indicated above, I do not find the case advanced by Mr Marino (and adopted by Mr Ohmura) in relation to the April Mandate credible.

196. In a sense this disposes of Mr Marino's case on breach of fiduciary duty, because it, and the timeline argument, are predicated on the supposition that there was a valid agreement to pay an introducer fee pursuant to that April Mandate. At least one of the breaches alleged ( s. 175 – no conflict) is necessarily breached as soon as one concludes that there was no agreement as alleged by Mr Marino in the April Mandate. That is sufficient for liability on the part of Mr Marino, subject to the defences he raises.

197. But to the extent it survives the dismissal of the April Mandate, nor do I find the "timeline" argument at all persuasive. Looking at the contemporaneous documents which speak to the lead up to the incorporation of FMCP and the terms of the agreements which FMCP entered into it seems quite plain (as I have found above) that the parties were negotiating with a

view to LAP's JB portfolio being managed by FMCP and for such fees as might accrue in connection with the restructuring of the portfolio, including introducer fees, being paid to FMCP.

198. This is reflected in the documentation later agreed; in particular I consider that the NAA plainly contemplated FMCP (presumably via Mr Marino and possibly Mr Bessot) performing duties before its incorporation and that those duties were or included effectively those which one might expect an introducer to perform. That is harmonious also with the finding which I have made as to the inapplicability of the April Mandate.

199. That being the case, I conclude that it is quite plain on the evidence that by arranging for and receiving the sums paid to Ironfly, Messrs Marino and Bessot breached their employment duties and the directors' duties discussed above and specifically the no-conflict rule ( s. 175 CA 2006 ), the no-profit rule ( s. 176 CA 2006 ), and the duty of loyalty ( s. 172 CA 2006 ). They also failed to disclose their actions and thereby breached the duty to disclose their own misconduct.

200. To the extent that Mr Marino prays in aid the fact that the duties are prospective not retrospective, and claims that any profit was made before he came under director's duties, this cannot assist him. Although the introduction was performed before the incorporation of FMCP I have found that the payment was not made pursuant to the April Mandate. There is no other agreement even suggested by Mr Marino. Further it seems likely, given that an Introducer Agreement was concluded that the sums paid were paid pursuant to that Introducer Agreement. The conclusion of the Introducer Agreement was not until after the incorporation of FMCP, and hence a breach arose when it was concluded.

201. But in any event, it is clear that the payment of the sums to Ironfly came significantly after the incorporation of FMCP. In simple terms, even had Mr Marino reached a formal agreement for the payment of an introduction fee prior to the incorporation of FMCP he would upon its incorporation have come under a duty to declare an interest under s. 177 , and a duty not to accept a benefit under the agreement which was paid in part by reason of his (as a director) committing FMCP's client to the new products. He would also, it seems to me, even at that stage be in breach of his duty under s. 172 .

**Defences to the breach of statutory duty case**

202. Mr Marino has attempted to discharge the burden of showing that he obtained the fully informed consent of FMCP to his actions, or that his and/or Mr Bessot's breaches were authorised or ratified.

203. However, I conclude that he fails to do so. Crucially of course Mr Marino was himself the key witness on this point; and yet he failed to attend to give evidence and expressly elected not to rely on his witness statements. The evidence that he therefore would have given on this point is not before the court. In closing Mr Couser for Mr Marino correctly conceded that he *"cannot point to any document that shows LAP/FMCP consented to every individual trade/transaction of which complaint is made."* The only documentary evidence to which he has been able to point is the April Mandate and the 1-4 June minutes, with which I have already dealt and which I have found do not sustain the case that there was agreement.

204. Nor in this separate context do I consider that they evidence consent to the Ironfly payments. The existence of the RBS Coutts Limited Power of Attorney cannot in my judgment assist, pertaining as it does to separate assets. Indeed, the fact of this power of attorney seems to favour the contrary argument, that no power was given over the JB assets; and its revocation at the time FMCP was incorporated and replacement with a Power of Attorney in favour of FMCP only goes to support the conclusion to which I have come: that the parties' intentions were that FMCP should manage LAP's assets and it was FMCP which should receive such payments as were to be made.

205. Further there are issues with the mechanism of authority. Unless the authority stems from the June meetings (as I have found it does not) the authority on which Mr Marino relies comes only from non-directors of LAP (Mr Sharif and Mr Haggiagi) and in the case of the latter interested rather than non-interested parties. There has been no suggestion of ratification of any breaches by the shareholders in a general meeting. In any event authorisation would be required for breach of the no-profit rule and authorisation short of full shareholders' meeting or the *Duomatic* principle would not as a matter of law suffice.

206. To get around these difficulties it was suggested for Mr Marino that he could bring himself within the principle in *Re Duomatic* . It was argued that the knowledge of the LAP representatives who were directors of FMCP is to be attributed to FMCP for that purpose as per Moore-Bick LJ in *Jafari-Fini -v- Skillglass Limited [2007] EWCA Civ 261* . It was Mr Marino's case that all of the directors were fully aware of the arrangements and consented to them but, he submitted that he need only show that one of them had the requisite knowledge and that that could be done via the knowledge of Dr Kagigi

from the documents, in particular the June meeting minutes which he says show that the investment of the LAP funds was carried out on the instructions of Dr Kagigi.

207. Mr Marino then submits that those directors, having the authority of LAP, were able to and did bind LAP to consent to the arrangements in its capacity of shareholder of FMCP. Mr Marino, Mr Bessot and LAP at all times represented 100% of the issued share capital of FMCP and could therefore pass informal resolutions under the *Duomatic* principle.

208. However, I consider that this reliance is misplaced. In the first place, it is a bootstraps argument. The principle in *Duomatic* requires unqualified agreement that has been, or is capable of being, objectively established. There is no such evidence here. On the evidence there was no fully informed consent of the majority shareholder, LAP (and in fact, it is clear on the evidence that there has been no such consent). The April Mandate was, as I have concluded, not apt to permit payment of an introductory fee in relation to GAIN. The June meeting minutes do not evidence such agreement or consent. Mr Marino's case as to consent by Mr Sharif and Mr Haggiagi rested on his own evidence, which he declined to call. Mr Sharif had no relevant authority. As to Mr Haggiagi, I have concluded (see below) that he was corrupt and even had he had authority his knowledge is not to be attributed either to FMCP or to LAP.

209. A still further problem is that (as I will make clear below) I have concluded that the breach in question was dishonest and in fraud of the company, such that it was incapable of authorisation or ratification.

210. Mr Marino argues that even if, as I have found, he was in breach of his fiduciary duties to FMCP, he ought to be forgiven those breaches pursuant to section 1157 of the Companies Act .

211. This section states:

> "1157 Power of court to grant relief in certain cases
>
> (1) If in proceedings for negligence, default, breach of duty or breach of trust against–
>
> (a) an officer of a company, or …
>
> it appears to the court hearing the case that the officer or person is or may be liable but that he acted honestly and reasonably, and that having regard to all the circumstances of the case (including those connected with his appointment) he ought fairly to be excused, the court may relieve him, either wholly or in part, from his liability on such terms as it thinks fit."

212. He says that such breaches will have been innocent or negligent and, in all the circumstances of the case, he ought to be forgiven those breaches on the basis that he acted honestly and reasonably and that in all the circumstances of the case he ought fairly to be excused his culpability, in whole or in part. In support of that submission he relies on the case of *Re D'Jan of London [1993] B.C.C. 646* . That was a case where a director failed to ensure that an insurance proposal was accurate with the result that the insurers repudiated liability when there was a fire. Hoffmann J (as he then was) found that his breach was not gross, being the kind of thing which " *could happen to any busy man* " and that the only persons whose interests he was foreseeably putting at risk at the time of the breach were those of himself and his wife. He was therefore excused part of the consequences.

213. This case is very different from *D'Jan* . Mr Pillow described it as being " *not in the same ballpark* ". That phrase is overused in litigation, but here is, in my judgment, entirely fair. This is a case where Mr Marino's breaches were (setting aside dishonesty) both multiple and gross and where interests other than his own and Mr Bessot's were plainly affected by his failure. There can be no excusing of the breaches under section 1157 .

**Dishonest assistance**

214. The second main head of liability alleged against Mr Marino in relation to GAIN I and GAIN II is dishonest assistance. Given the conclusions which I have reached above, it follows that there was a breach of directors' duty also by Mr Bessot, Mr Marino's co-director. Since Mr Marino and Mr Bessot were acting together, they must logically have been assisting each

other, and the contrary was not argued. Those ingredients of dishonest assistance are not controversial. The issue here is as to dishonesty.

215. Mr Couser for Mr Marino has made a number of criticisms of the way in which the particulars of the case on dishonesty are pleaded. I do not however consider that these need to be unpicked at any length, given the fact that dishonesty is plainly pleaded and that being the case what really matters is the application of the test in *Ivey v Genting Casinos* .

216. The first step is to ascertain (subjectively) the actual state of Mr Marino's knowledge or belief as to the facts. On this I conclude that Mr Marino did not subjectively consider that what he was doing was honest. The bottom line is that he agreed a fee for himself in a transaction made by a company of which he was a director. The ethical difficulties involved in this must have been obvious to him. The very nature of the argument deployed to answer this evidences that there is no real answer to the case, unless the April Mandate argument were accepted and GAIN/the JB Notes were not to be part of the FMCP business. Given the fees also being paid to FMCP he must have been aware that there was an element of double payment going on; and he knew that fees were an issue which was important to LAP. The reality is that if he had thought that the arrangement which he put into place was acceptable to FMCP it is more likely than not that he would have told them exactly what the arrangement was. He did not do so.

217. What is more he had good reason not to do so because (on his own case) he knew that FMCP's client intended any fees to be paid by the Bank, and not to come out of their own funds.

218. Yet Mr Marino, knowing this, knew full well that the Ironfly payments were so structured that they in fact were paid from the LAP funds. This evidence alone would be incompatible with honesty; and tellingly, no attempt was made to deal with it.

219. That his conscience was subjectively affected is also evidenced by the payments made to Mr Haggiagi. Whether or not those are properly characterised as bribes, payments were made to Mr Haggiagi, who did no work, simply because (according to Mr Marino) he knew of the payments to Ironfly and wanted to keep him onside. The innocent explanation for this is hard even to hypothesise.

220. For similar reasons even if Mr Marino were not subjectively dishonest, I would conclude that the only possible answer to the question of whether his conduct was honest or dishonest by reference to the (objective) standards of ordinary decent people is that his conduct was dishonest. The payment of an introducer fee may be – and the evidence suggests it is - perfectly normal and acceptable in the banking world. That is not the point. This was not a simple payment of an introducer fee. This was the payment of an undisclosed introducer fee, to be taken from the client's own funds, in circumstances where the terms of the product made a separate payment for the same work to Mr Marino's and the client's joint venture company. This was not objectively honest behaviour.

**GAIN: conclusions on Mr Ohmura**

221. As regards Mr Ohmura the case advanced against him in relation to GAIN is primarily one in dishonest assistance, though claims are also made in knowing receipt and proprietary claims.

222. The case against him must be very carefully considered. I accept the submission advanced by Mr Emmett for Mr Ohmura that there has been a tendency in FMCP's approach to the case to elide the position of Mr Ohmura with that of Mr Marino and Mr Bessot, and that that elision assumes more than can be justified. In particular I bear well in mind that:

i) Mr Ohmura was not a principal in the dealings with LAP;
ii) He was not a director or even an employee of FMCP;
iii) He was not, it appears, a person whose job involved the contractual side of the business in any detail. While he was General Director at GAM, his business was making sure that the structuring/risk side of the transaction worked as it should;
iv) He could very properly, it appears to be common ground on the expert evidence, have regarded the payment of an introduction fee to the introducer of this business as entirely normal and unremarkable;
v) Whatever may be argued about some of the other transactions, it is clear that the GAIN transaction was a perfectly valid transaction for LAP to enter into and the evidence suggests that Mr Ohmura did some very real work on the structuring side of it.

223. The starting point in evaluating the evidence is that Mr Ohmura was certainly closely involved with GAIN: it was conceived, structured and issued while he was in charge of JB's Alternative Risk Group and was the General Director of GAM

itself. Further he was Mr Marino's contact at GAM, having been his long-standing business associate. His close involvement is reflected in the fact that the NAA and FMCP SAA were signed by Mr Ohmura for GAM. Mr Ohmura accepted that he for GAM had discussed the fees to be paid to Mr Marino and Mr Bessot before a meeting which took place on 9 June 2009. It would not be surprising if he had signed the Introducer Agreement, though he said he had no recollection of doing so.

224. The terms of the NAA and the FMCP SAA are significant as regards Mr Ohmura's position – particularly when taken with the revocation of GAM's mandate to manage the JB portfolio on 24 June 2009. In looking at these agreements and what may be taken from them I will deal here with the question of cross-examination of Mr Ohmura on the provisions of various contracts generally.

225. In relation to these agreements and the Ironfly SAA, the BPA and the Rabobank and Deutsche Bank agreements, Mr Ohmura was questioned closely about their meanings and sometimes as regards his understanding of their regulatory implications. Exception has been taken to this cross-examination by those acting for Mr Marino and Mr Ohmura, who say that such evidence was inadmissible, and that the line of questioning was unfair. I accept these complaints, but only in part. Although some of the cross-examination directed to the meaning of these and other agreements seemed to stray too far into his subjective opinion of meanings of provisions which were not germane to the issues and would not be admissible in relation to construction of those documents, it was valid in the context of reaching a conclusion as to his honesty to examine Mr Ohmura's understanding of the key provisions of agreements which he signed (and in some cases drafted).

226. Here (in relation to the NAA and the FMCP SAA) Mr Ohmura can be taken to have read the main contractual documents which he signed on behalf of his employer, committing JB to contractual relationships which had financial implications for the firm. His evidence was that the agreements were drafted by the legal department based on terms negotiated by him with Mr Marino and Mr Bessot and approved by the bank. The key provisions of these agreements are clear. He must therefore be taken to know from these agreements, which he signed for GAM, that FMCP was being paid fees for the product, that those fees were on their face apt to cover the introducer aspect of the deal and that (assuming FMCP did indeed come into existence) FMCP was to take over the management of the portfolio. Mr Ohmura's dismissal of the terms of the agreement as regards FMCP being responsible for introduction as being inconsistent with the chronology was not satisfactory, given the context and what he knew of Mr Marino's involvement with FMCP.

227. The fact is that Mr Ohmura knew the terms of the agreements and therefore he also knew of the broad scope of FMCP's functions and duties under the NAA. He knew that FMCP was not only being paid fees, but was being paid fees up-front - as one would expect of the introducer of the business, but as would be less usual if a normal Note Advisory role was being adopted. I would add that his evidence about the mismatch between the wording of the NAA on this, for payment " *during the lifetime of the note* " and the actual payment of the fees up front was not impressive. His first suggestion that the words actually meant up-front payment was simply not credible; the second, that they were the result of bad English from a JB lawyer, appeared very defensive.

228. This knowledge of the terms of the NAA creates a tension with the position which Mr Ohmura adopted as to Mr Marino's personal entitlement to be paid as an introducer.

229. On this, Mr Ohmura's position was that he saw nothing wrong with Messrs Marino and Bessot in the person of Ironfly receiving an introducer fee (which was standard market practice) in relation to an introduction which pre-dated the formation of FMCP, particularly as he said that it was his understanding that FMCP was not involved in structured products business and that Mr Marino intended to have a separate business alongside FMCP to perform such business.

230. He said that he considered this to be not just normal but also a reflection of the April Mandate, which he said that Mr Marino had showed him. His evidence on the April Mandate was somewhat contradictory. He said that in one sense he regarded the April Mandate as " *not that relevant* " because work was often done with introducers without seeing their agreements; if a distributor with a good history with JB had come along, he would have structured a product without the comfort of the mandate. However, he also said that he did read the April Mandate, and indeed filed it – an answer which is consistent with his case before me that he took comfort from the document.

231. The problem with this evidence is that it is actually hard to see how the April Mandate (if read with any degree of thoroughness) could have created any comfort as to Mr Marino's and Mr Bessot's entitlement to receive a private payment as introducers for this product. This is because, as noted above, it simply was not on its plain words apt to cover an introducer fee for the JB Notes – and still less one which included a payment to Mr Bessot.

232. Mr Ohmura's evidence on this point is therefore highly unsatisfactory (and not, as was suggested by Mr Marino, " *highly cogent* "). The reality is that if he had read the April Mandate it would not have provided him with comfort, but rather the reverse. It is of course possible that Mr Ohmura did not read the April Mandate carefully enough to note this point – and one possibility which I have considered, given Mr Ohmura's evidence on the various agreements, was that he is habitually careless about reading contractual documents. However, this was not what he said; his evidence was that he did read it – and the April Mandate is (unlike some of the other documents) short and straightforward. If read it would be understood by a man of Mr Ohmura's intelligence.

233. The conclusion which follows is that either his evidence was inaccurate in that he claimed to read something which he had not read, or he did read the document and claimed to take comfort which he could not sensibly take. Either way, that is unsatisfactory evidence.

234. A related piece of evidence which was far from satisfactory was Mr Ohmura's evidence regarding the Introducer Agreement. His pleaded case was that he considered it likely that the introducer's fee was paid pursuant to an introducer's agreement between GAM and Ironfly. This sits uneasily with his later reliance on the April Mandate as giving him comfort. But his oral evidence, in which he claimed not to recall whether an Introducer Agreement was concluded when the evidence strongly suggested one was concluded, and if it was the surrounding factual matrix, including his own position and the execution by him of other relevant documents, would suggest that he would have signed it for GAM appeared to be evasive.

235. As for Mr Ohmura's evidence that he considered FMCP to be outside the structuring business, that evidence seemed to have no solid base, and again to be inconsistent with the terms of the agreements which he signed for GAM. Similarly, Mr Ohmura originally in his statement sought to depict FMCP's role in very narrow terms, which is simply irreconcilable with the terms of the agreements – as he effectively conceded in his oral evidence. While I note that Mr Ohmura was at the time based in Switzerland and Swiss law applies there, this is not a legal point – and nor is Mr Ohmura a lawyer. Nor did he seek to say that his understanding of anything at that time was affected by legal advice.

236. FMCP also asks me to conclude that in addition Mr Ohmura knew things about Ironfly and Messrs Marino and Bessot which are incompatible with his acting honestly. In particular it is said that he knew at all material times that Ironfly was a shell company incorporated in an opaque jurisdiction, with no business premises or employees and no other business. It manifested only in connection with payments; there is no evidence of any work being done by it or communication between JB/GAM and Ironfly. No emails were sent from Ironfly email addresses; Mr Marino and Mr Bessot either used FMCP emails or their personal emails when dealing with Ironfly business. Its invoices were "homemade". It is also suggested that Mr Bessot's habit of sending Ironfly emails without appending his name indicated a secrecy which was incompatible with an innocent explanation.

237. I am not prepared to draw any conclusions as to Mr Ohmura's honesty in relation to the GAIN transactions from these facts. The fact that Mr Marino chose to take payment through a company in a tax efficient location would in my view be neither here nor there in the context of the banking world, where tax efficiency may well be viewed as a question of competence rather than moral laxness. Nor at this early stage do I see that Mr Ohmura (if acting honestly) would have been alerted to any wrongdoing by less than smooth use of emails and less than professional invoices. The parties in question were moving from employment in big banks to a more independent existence; start-ups take time and documentation may not proceed smoothly.

238. The position is however different as regards the related assertion that Mr Ohmura knew that Messrs Marino and Bessot were not employees of Ironfly and were directors of FMCP dealing with GAM in relation to GAIN as directors of FMCP – including at the time they signed the Introducer Agreement.

239. Whether or not Mr Ohmura knew their precise employment status I conclude that Mr Ohmura must have known that Mr Marino and Mr Bessot, whose idea FMCP was and who acted for FMCP, were directors of FMCP. I conclude that he must have known this from early in June 2009 when Mr Marino handed the signed Product Proposal to Mr Ohmura in a meeting and that he certainly knew it by the time that the inferential Introducer Agreement was signed, even if he did not do so when he first discussed the fee to be paid to Mr Marino. Nor do I consider that Mr Ohmura's evidence that the agreement for the commission was made earlier can assist, given that it was not until 6 July 2009 and after the incorporation of FMCP that any Introducer Agreement was signed. I would add that I regarded his evidence regarding the absence of disclosure by Messrs Marino and Bessot (" *to be honest, that's not part of the judgment we have to make from the structuring side* ") taken in conjunction with his not very satisfactory evidence as to the fee disclosure in the final document being adequate as indicating

© 2025 Thomson Reuters. 

a defensive response most easily consistent with an understanding that such disclosure should have been made and hence with, at least, " *blind eye knowledge* ".

240. As for the US$625,000 payment, given the timing of this payment it has certainly been tempting to accede to Mr Ohmura's submission that this was a payment for actual structuring work performed on GAIN II. However ultimately, I have been unable to accept that submission and I have concluded that the US$625,000 payment was indeed a payment made in relation to GAIN I and in circumstances which add some material into the consideration of Mr Ohmura's honesty or otherwise at this point in time. The first, and obvious point, is that the sum of US$625,000 represents exactly 20% of the first Ironfly payment. This is hardly probative, but it is striking - particularly when no positive case is put forward otherwise as to how that figure was arrived at; it makes no obvious sense in the context of the GAIN II figures. Mr Ohmura simply said, in effect, that there was no rhyme or reason to such fees.

241. Secondly, the Ironfly SAA between Ironfly and Conquest is on any view an unusual document. It was put together by Mr Ohmura without legal advice using the JB Note Advisory Agreement as a template. Unsurprisingly as a result it is a poor fit, complete with rogue references to parties who are not defined and regulatory licences which did not exist. I bear in mind that Mr Ohmura is not a lawyer and that he was in the process of starting up his own business, but given that he went to the trouble of producing this document, some of the infelicities which remain are surprising if it was really intended to be a genuine agreement which he " *thought was sufficient* ". That is still more so if (as he said in his statement but not in cross-examination) the agreement was intended to cover more than this one piece of business.

242. It does not specify the product to which it relates. It was not made (as would be usual) with the issuer or manager of that product. It is not clear what structuring work would be done pursuant to it; if one is considering GAIN I that work was done by Mr Ohmura as an employee of GAM, whereas if one is considering GAIN II there was very little structuring work to do since the product was already up and running. Mr Ohmura accepted that GAIN II was *"materially the same as the first tranche. In simple terms, all that happened was that the additional US$48.5 million was added into the existing note, to increase the total notional amount"* . In either event, GAM was already being paid for structuring work through the Risk Management Fee of 1.3% *p.a* which was payable under the GAIN terms.

243. I also note that the Ironfly SAA does not appear to have been considered a document of significance by Mr Marino, who never mentioned it.

244. The conclusion which I draw is that the Ironfly SAA was not intended to be a genuine document encapsulating an agreement for work to be done by Conquest in relation to GAIN II. That does not mean that there was no such agreement, but certainly the Ironfly SAA does not provide evidence of such an agreement and raises questions (not satisfactorily dealt with in Mr Ohmura's evidence) about what honest purpose it served.

245. Further the factual account which Mr Ohmura gives regarding his supposed work on GAIN II does not fit the known facts. There is no record of any such work by Conquest or Mr Ohmura (outside GAM) in the disclosed documents. Moreover, the evidence suggests that at least the bulk of such structuring work as there was to be done was done by GAM/UBP by 25 August 2009 when the instructions were given to transfer the UBP assets; yet it was not until 12 October 2009 that he was asking for fund information which would seem to be a starting point for doing any detailed work.

246. That the payment may not have been for work as such is supported by Mr Marino's account which was that the payment represents him sharing his *own* fees for GAIN with Mr Ohmura in order to help him set up Conquest and pay for office equipment, incorporation costs and costs of personnel. That is to some extent supported by a Bloomberg chat of 12 October which shows him asking for the payment to be sent so that he can pay some bills urgently. While Mr Ohmura says that the payment was for genuine work it is hard to see what it was, unless it related to GAIN I and represented a form of bonus over and above the salary he was paid for it.

247. In the light of these various points I conclude that the US$625,000 payment was not, as Mr Ohmura contends, for structuring work in relation to GAIN II but was rather a payment made with reference to GAIN I. Since Mr Ohmura was employed by GAM at the time, there would be no need to pay him for his structuring work. This and Mr Ohmura's unwillingness to accept the link to GAIN I suggests that the payment was for something else and most probably for assisting Mr Marino and Mr Bessot's plans to take a personal commission.

248. All in all I do reach the conclusion that in the light of what Mr Ohmura can be shown to have known, the circumstances surrounding the US$625,000 payment and the unsatisfactory nature of his evidence in certain key regards, the correct inference to draw - even bearing in mind the caution appropriate to drawing inferences from circumstantial evidence - is that

he was either aware that Mr Marino and Mr Bessot were acting in breach of duty or he was wilfully blind to that fact. The evidence in my judgment goes beyond his suspecting the truth.

249. It was asserted on behalf of Mr Ohmura that this question fell to be considered by reference to the fact that Mr Ohmura was at all times operating in Switzerland and under Swiss law directors are prohibited from profiting from their positions at the expense of the company and not otherwise. I do not consider that even if this were the case as a matter of Swiss law, this would impact on my conclusion. The first reason is that it is very specifically not said, in Mr Ohmura's pleading or in his oral evidence, or in the submissions advanced on his behalf that he believed that the actions of Mr Marino and Bessot were unobjectionable because this was his understanding of this point of Swiss law at the time. Indeed, his pleaded case and oral evidence both suggested that he did think that disclosure was necessary. His pleaded case was that he assumed disclosure had been made. His oral evidence, as I have noted above, was that it was not for him to make a judgment about disclosure. That being the case it is hard to see what relevance Mr Ohmura's presence in Switzerland and this point of law could have.

250. Further the obvious other candidate for the introducer fee was FMCP itself. Mr Ohmura agreed that the introducer fee to FMCP could have been increased if Mr Marino and Mr Bessot had not been being paid. As he said, to GAM *"the economics would have been the same"* . There must therefore have been at least a question as to whether Mr Marino and Mr Bessot aside from being in conflict of interest, were profiting at the expense of FMCP.

251. Thus, I conclude that like Mr Marino, Mr Ohmura was subjectively dishonest in relation to GAIN. This is a case where in the words of Lord Hoffmann in *Twinsectra* : *"he knew perfectly well that he was helping to pay away money to which the recipient was not entitled"* . This is very different to the findings in *Heinl* where Colman J found:

> "Given what he knew of Metcalf's operations, it would not be obvious to him that any funds under Metcalf's control probably originated with the Bank. Nor would it be obvious that because the funds were going into the accounts of companies under the control of Metcalf …. that meant that those funds were probably fraudulently procured."

252. I would in any event have found that even if he were not subjectively dishonest, he was objectively so. I bear in mind in this connection the fact that the experts were agreed on the fact that Messrs Marino and Bessot were in conflict of interest and the degree of hesitancy which they expressed as to the documentation surrounding this transaction.

253. I do not accept the submission made on Mr Ohmura's behalf that ordinary honest people would not consider it unacceptable for a fiduciary in a commercial context to make a profit from his position. That is a submission which can only be framed without a blush when one hypothesises that different rules belong in the banking world – which was not what any of the experts say. As soon as one translates it to more everyday examples: the financial adviser to an individual, the councillor, the solicitor, the director of a small company, the wrongness of the argument is immediately apparent. It is the potential for the subversion of the fiduciary's loyalty when the essence of his role is to be capable of trust which drives the many rules penalising breach of trust; they reflect the situation which ordinary honest people would expect to exist.

254. This only leaves the question of whether Mr Ohmura's assistance was more than minimal. This was (rightly) not seriously disputed. As I have indicated above, Mr Ohmura was key to the arrangement of the GAIN transaction, and he was key also in arranging for the payments to Ironfly. It is hard to see how the various aspects of the transaction and the payments could have been managed without his help.

*July – October 2009: the Vesper entities*

255. The position as to Vesper does not lead directly to a claim, but forms necessary background to some of the later claims.

256. In early 2009, alongside the plans made by Messrs Marino and Ohmura to leave their respective employers and set up their own respective companies, they also agreed to set up a business which appears at least initially to have been intended to be a joint business. That business was called Vesper.

257. The umbrella company was called Vesper Capital Management Limited ("VCM"), a Cayman entity incorporated on 24 July 2009. In the second half of 2009, Messrs Ohmura and Marino established three Vesper funds in the Cayman Islands:

(a) Vesper DTF; (b) VCM Liquid Alpha Fund SPC ("Vesper Liquid Alpha"); and (c) VCM Systematic Alternative Beta Replication Fund ("Vesper Beta"): collectively, the "Vesper Funds".

258. The Vesper Funds were managed by VCM which was entitled to receive fees, including management and incentive fees, pursuant to IMAs signed by Messrs Marino and Ohmura with each of the Vesper Funds. In fact, it appears that VCM received only the management fees.

259. On 22 October 2009, Messrs Marino and Ohmura also founded Vesper Investment Management AG ("Vesper AG") in Switzerland. By agreements signed by Mr Ohmura and on occasion by Mr Marino, Vesper AG was appointed fund advisor to Vesper DTF and Vesper Liquid Alpha; and Mr Ohmura's company Conquest was appointed fund advisor in relation to Vesper Beta. Investment advisory fees were paid by VCM to Vesper AG and/or Conquest.

260. Messrs Marino and Ohmura were the joint beneficial owners (as to 50% each) of both entities; and the only directors of VCM. Similarly, Messrs Marino and Ohmura initially also jointly owned, through Vesper AG, all of the shares in Conquest Cayman, which Mr Ohmura had transferred to Vesper AG in December 2009.

261. There was an issue as to the period of that co-ownership. Mr Ohmura tended to dispute that there had been any real co-ownership in that he had funded Mr Marino's original share purchase and he said that from an early stage it was intended that Mr Marino should not actually be a co-owner. He said that pressure of business only stopped the co-ownership from being unwound earlier.

262. However, the facts are that Mr Marino was originally a part owner of Vesper, and that the paperwork to bring that situation to an end was not done until October 2010. To the extent that it is relevant I find that Mr Marino was a co-owner of Vesper and Conquest Cayman until that date.

263. On about 31 August 2009, Mr Marino caused FMCP to transfer US$10m of LAP's assets from the RBS Coutts account managed by FMCP under the IMA, into the Vesper DTF.

264. FMCP at around this time made a Global Portfolio Management Report to LAP in respect of the RBS Coutts portfolio. It reported this transfer and attached a document, entitled *"Fund Analysis – VCM Diversified Trading Fund"* which gave the reasons for it. It spoke highly of the virtues of the fund; and described VCM as *"independent and unbiased"* . It did not indicate that Mr Marino held a personal beneficial interest in Vesper.

265. Since, as I have found, Mr Marino had an interest in Vesper at the time, it follows that his actions were ones which were afflicted by a serious conflict of interest, which could only be dealt with by full disclosure; which, it is common ground, did not take place.

266. Mr Marino then (again in conflict of interest) supported the Vesper Funds in his Global Portfolio Management Report to LAP for December 2009. This noted, in relation to alternative investments (e.g., investments in hedge funds) that the alternative portfolio is "essentially made of positions we want to get rid of", but that:

> "…[t]he only position that corresponds to our long term plan for the alternative allocation is [Vesper DTF] … The performance is not on par with our expectations, but the Manager has recently reshuffled the portfolio between the three strategies and this should help building sustainable returns. More importantly, this fund should perform well in volatile market conditions, and therefore can be seen as a hedge in case market conditions deteriorated."

*January- July 2010: Mr Haggiagi*

267. It appears that in late 2009 Mr Haggiagi had approached Mr Marino and sought a payment for his own benefit. Mr Marino's witness statement (the only account of how the payment came about) said that Mr Haggiagi was aware that Mr Marino had received an introducer's fee and asked for money. Because he felt harassed by Mr Haggiagi and wanted to keep him onside Mr Marino agreed to make a payment to him.

268. From the commissions received by Ironfly, Mr Marino made the series of payments outlined above from January 2010. FMCP says that these payments were bribes and makes claims for the sums paid accordingly in bribery, breach of fiduciary duty and dishonest assistance (allowing for recoveries already made from Mr Haggiagi).

269. But also, FMCP submits these payments mean that Mr Haggiagi was at all material times a corrupt agent whose knowledge could not be attributed to his principals (whether at FMCP or LAP). Thus, it says Mr Marino's explanation in his witness statement that he thought that the payments were disclosed and authorised cannot succeed (even if disclosure were found on the facts).

270. Mr Haggiagi, in a statement tendered under the CEA which denied ever authorising any personal payment to Mr Marino, did not deal with the funds he received, or the amounts he has subsequently repaid at all.

271. I accept FMCP's submissions. Given their respective positions in respect of the allegations, and the fact that neither was called, the evidence of Mr Marino and any hypothetical substantive explanation by Mr Haggiagi would only have been capable of being accepted if supported by other, preferably documentary, evidence. Mr Couser for Mr Marino was unable to point me to any such evidence. I have already concluded that there was no disclosure in relation to the GAIN breaches of duty; I can see no evidence to support a conclusion that these payments were disclosed.

272. It appears that Mr Haggiagi sought a sum for his silence and that Mr Marino paid it. That is consistent with the uncontroversial facts. It is also consistent with Mr Marino's account to the FCA in the Charles Russell letter which stated, so far as relevant:

> "18. Mr Marino understands that Mr Ramadan Haggiagi, a director of FMCP, became aware of the First Undeclared Payment shortly after it was made. During the second half of 2009 Mr Haggiagi solicited a payment in respect of the First Undeclared Payment from Mr Marino." …
>
> 20. Mr Haggiagi instructed Mr Marino to establish a company in Dubai for the purpose of making these payments. That entity was called Blue Tiger. Mr Marino paid the approximate total sum of USD $600,000 from Leopard Technology to Blue Tiger, and from there made payment to an entity as identified by Mr Haggiagi (the "Second Undeclared Payment").
>
> 21. Mr Marino did not disclose the Second Undeclared Payment to either FMCP or LAP or any other individual related to either of those entities, save that his recollection is that he disclosed it to Mr Bessot. To the best of Mr Marino's knowledge, Mr Haggiagi did not make any disclosure to FMCP or LAP and nor did Mr Bessot."

273. I therefore conclude that these payments were bribes paid by Mr Marino to Mr Haggiagi. I also conclude that Mr Marino cannot have thought that the payments were honest. It follows that Mr Marino was in breach of his directors' duties also and that as Mr Haggiagi was also a non-executive director of FMCP he dishonestly assisted Mr Haggiagi in his breaches of his duty to FMCP.

274. Further since Mr Haggiagi was bribed, his knowledge, so far as relied on from the relevant dates, as authorising Mr Marino's actions cannot in law be relied on.

*October 2009- September 2010: the Private Bank Trades*

275. After the completion of GAIN, but largely before the next of the JB Notes (AMFC+) was purchased in May 2010, Messrs Marino and Bessot carried out a series of structured trades using LAP's assets under FMCP's mandates. Commissions on these trades were initially paid to Mr Ohmura's company, Conquest, although 90% of the sums paid were then transmitted by him to Ironfly.

© 2025 Thomson Reuters.

276. These trades did not loom large in the pleaded case, and therefore were not dealt with extensively in the witness statements of Messrs Marino, Bessot and Ohmura. However, by the time the hearing arrived, there was considerable focus on the detail of these transactions.

277. The LAP funds used in Ironfly Trades 1-4 came from its RBS Coutts account (and, in respect of Ironfly Trade 2, also its Crédit Agricole account). Both of those LAP accounts were managed by FMCP under Private Bank IMAs.

278. The first of these was the Limited Power of Attorney over the RBS Coutts account, given by LAP to FMCP on 30 July 2009, which contained in Clause 1 a broad grant of authority in favour of FMCP to carry out *"all administrative tasks in the name of the client, in particular, the buying or selling of securities … undertaking fiduciary investments in the name of the Bank but for the client's account and risk as well as taking all other measures that shall seem appropriate to care for and maintain the client's assets"* .

279. Clause 7 of the power of attorney also revoked any existing limited power of attorney. It follows, as FMCP submitted, that this included the temporary one given to Mr Marino prior to FMCP's incorporation on 23 April 2009. It also contained an express acknowledgment and agreement by LAP that FMCP may receive " *payments from commissions and brokerage fees accruing at the Bank"* .

280. The LAP funds used in Ironfly Trades 5-6 came from the HSBC account, for which LAP gave FMCP the discretionary management mandate in the HSBC IMA dated 30 April 2010. It contained materially identical provisions to the other IMAs, including a clause which entitled FMCP to *"receive compensation for services performed for third parties"* .

281. Ironfly Trade 1 was executed on 24 September 2009, that is, very shortly after Mr Ohmura had left JB/GAM and set up his Conquest companies. It was also the time between the payment of the two GAIN Ironfly Commissions, while GAIN II was being finalised.

282. The note was issued by Rabobank. This was a bank where both Mr Bessot and Mr Marino had worked for many years in the past. It is apparent that they still had contacts there. Mr Bessot originated and then arranged the transaction directly with a former Rabobank colleague, as can be clearly seen in records of Bloomberg chats which were before the court. There was no mention of Ironfly or Conquest in the exchanges with Rabobank.

283. Mr Ohmura, who entered the picture after Mr Bessot had initiated discussions for the product, did negotiate a "Distribution Agreement" with Rabobank on the morning of Ironfly Trade 1. This set a fee of US$90,000 *"in connection with the Distribution of the Notes"* and ( *inter alia* ) forbade him to delegate any of his responsibilities, duties or obligations without the prior written consent of Rabobank.

284. On the documentary evidence it appeared that Mr Ohmura played no role other than acting as post-box to route the instruction to Rabobank to enter the transaction. That instruction itself was drafted for him in the course of the Bloomberg chat by Mr Bessot and his account of what he actually did was not clear. Mr Ohmura simply sent the text he was told to send.

285. In oral evidence Mr Ohmura suggested that he did some work in the execution of the instructions, though he accepted that he did not do any financial engineering or design work. The documents did not bear out his suggestion that he did much if anything beyond sending on the instructions he was given by Mr Bessot and I accept the submission that he had no substantive role in the trades.

286. On 19 October 2009, Conquest received €90,000 in 'distribution' commissions from Rabobank. €81,000 of this was passed on to Ironfly at the direction of Mr Ohmura. FMCP submits that the interposition of Mr Ohmura was for the sole, dishonest purpose of using him as a conduit, and cover, for the transfer of 90% of the up-front commissions to Ironfly, for the benefit of Messrs Marino and Bessot.

287. In terms of Mr Ohmura's/Conquest's role on 24 September 2009, Mr Ohmura created a Conquest invoice addressed to Rabobank for €90,000 in respect of services to Rabobank. The services he described as " *Structuring* " with the fee being denoted as " *Advisory Fee* ". Similarly, there is an invoice dated 1 October 2009 from Ironfly to Conquest for €81,000 (i.e., Messrs Marino and Bessot's 90% share). This references *"Advisory fees"* .

288. To explain these invoices Mr Ohmura relied on a Business Provider Agreement dated 22 September 2009 and expressed to be between Conquest and Ironfly (the "BPA"). It appears to have been produced by Mr Ohmura at the same time as the Ironfly SAA which was dated the previous day and based on a document provided to him by Mr Bessot. In terms of its

© 2025 Thomson Reuters.

nature, it appears on its face to be some sort of sub-distribution agreement. The expert evidence was that such agreements are not common in the industry.

289. FMCP submitted and I accept that as with the Ironfly SAA its terms are a poor fit for the apparent circumstances:

i) Despite its title, the only obligations it purports to impose are on Conquest to negotiate on behalf of Ironfly (and not on behalf of the underlying investor, *i.e* ., LAP) terms and conditions for the issuance of " *various structured products* "; provide a regular flow of investment reports linked to existing product and new investment ideas; and render a range of other services. There was no credible evidence that Conquest performed this role in relation to the Ironfly Trades, or indeed any of the other Private Bank Trades, where Mr Bessot was effectively the prime mover.
ii) Despite placing no obligation on Ironfly, Ironfly was supposedly entitled to " *90% of the Gross Margin generated in the dealing of Structured Solutions* " and Conquest was supposed to execute deals in the "best interests" of Ironfly. This apparently creates a tension with the interests of the underlying investor, since such commissions diminished the value of the assets invested dollar-for-dollar.
iii) Mr Ohmura's evidence suggested the BPA was not a final agreement. He said:

> "The [BPA] reflected the intention that in so far as Mr Marino and Mr Bessot acted as introducers to Conquest Financial Partners in relation to future transactions, they would be paid as such (through Ironfly) in accordance with standard market practice. In the event, the arrangement set out in the [BPA] was subject to further negotiations and discussions."

290. Ironfly Trades 2 to 5 followed a very similar pattern. Each of them was transacted with Rabobank, using LAP's funds under FMCP's management pursuant to IMAs. Each gave rise to substantial payments (already listed) first to Conquest, of which Conquest then passed on the lion's share to Ironfly.

291. As with Ironfly Trade 1, there was on Ironfly Trades 2 to 5 a seeming mismatch between the descriptions of the alleged services provided in: (a) the underlying agreements; (b) the invoices; and (c) the available accompanying *"Fee Confirmation"* documents.

292. As with Ironfly Trade 1, there is no real evidence of any work being performed by Mr Ohmura or Ironfly. In Ironfly Trade 2 Mr Ohmura was unable to identify any work he had done and accepted that his work was limited. In Ironfly Trade 3 again Mr Bessot prepared all the details and emailed them to Mr Ohmura. Mr Ohmura's single contribution appeared to be to increase the commissions by 0.5%, on the basis that market standard commissions might well be higher than the 1% which Mr Bessot proposed. On Ironfly Trade 4 Mr Ohmura initially suggested that he had generally spoken to other banks about the product, but in the face of evidence showing that the entire transaction was processed in a few hours, admitted that he was not sure that he had. On Ironfly Trade 5 the evidence suggested that he had done no more than a single phone call. On Ironfly Trade 6 there is some suggestion in the documents of an intent to go into the market, but no evidence of that being done, and the transaction was completed at terms which had already been indicated.

293. Ironfly Trade 6 was the final Structured Product Trade of 2010, executed on 24 September 2010. This was the first of several trades entered into by FMCP with Deutsche Bank, and it involved the purchase of warrants, in return for a 'premium' paid for out of the assets invested. Again, Mr Bessot arranged the trade, using his FMCP email address and hence acting as a director of FMCP. The funds deployed came from LAP's account at HSBC, which was under FMCP's management pursuant to the HSBC IMA – and were duly labelled as such in the instruction drafted by Mr Ohmura under Mr Bessot's direction.

294. Once again, LAP's assets were used, and there was a gain on the part of FMCP's directors, via Mr Ohmura, who accepted payment via his company and then routed the commissions to them, keeping 10%. On this trade alone, Conquest received the very sizeable sum of €660,000 and transferred €594,000 to Ironfly. Conquest's invoice again refers to an " *Advisory fee* ", as does Ironfly's.

295. Again, on the day of the trade Mr Ohmura for Conquest entered into a new agreement with Deutsche Bank (having been party to a previous one dated 17 January 2010). It was described as a *"Master Arranger Agreement"* and by it he represented to Deutsche Bank that he was acting as agent for a fully disclosed principal (which he said was either FMCP or LAP). The

© 2025 Thomson Reuters.

agreement included a promise to assess the suitability of the products for the client, to inform his clients of the payments Conquest was entitled to receive and of any conflicts of interest, and another not to sub-contract or delegate any obligations.

**Ironfly 1-6: Conclusions on Mr Marino**

296. FMCP's case against Mr Marino (and Mr Bessot to the extent relevant for Mr Marino's liability) is that in carrying out the structured trades, they acted in flagrant breach of their fiduciary duties.

297. Most simply it is said that the conclusion follows from the mere fact that Messrs Marino and Bessot were using funds entrusted to FMCP (which it was their responsibility to manage as directors of FMCP) for their and Mr Ohmura's personal gain.

298. It is also said that they were actively using their status as directors to bring the trades about, in that the Private Bank Trades could only be carried out by Messrs Marino and Bessot in their capacity as directors, and on behalf, of FMCP. This was the only entity with power and authority to deal with the LAP funds and the only entity that could have been entitled to receive any commissions on trades carried out using LAP moneys in the private bank accounts in question is LAP's asset manager.

299. I conclude that the case against Mr Marino in relation to breach of fiduciary duty is plainly made out. The evidence seems quite clear that the funds used for these trades were indeed funds which FMCP had under management and that Mr Marino, the CEO of FMCP, utilised these funds in a way which involved a financial gain to himself. That is enough. It would also involve a financial loss to FMCP who would probably otherwise have received any introducer commissions.

300. This situation could only be excusable if there were disclosure by him and consent by FMCP. But Mr Marino did not suggest that the commissions paid and received in relation to the Ironfly Trades were disclosed to FMCP or to LAP. There was no means by which this disclosure could even have been argued to have been made, in that none of the documents sent or available to LAP contained any reference to the commissions payable in relation to these trades or the identity of those receiving them. There was no reason why FMCP (who were employing Messrs Marino and Bessot and for whose benefit they should have been acting) could not have conducted these trades directly with the counterparty banks, and thereby received any commission.

301. It was only faintly suggested that the April Mandate could cover these trades. There is good reason for this caution. The argument which was weak in relation even to GAIN is far more so in this context. The April Mandate did at least appear to be referable to structuring a specific product (albeit with reference to quite other funds); it had nothing at all to do with trades of this nature. In addition, the April Mandate had nothing to do with the Private Bank accounts, and in any event, these were by now under IMAs in favour of FMCP. Finally, as with GAIN, the involvement and payment to Mr Bessot, who had nothing to do with the April Mandate, makes this argument still less feasible.

302. Adding to the picture of a dishonest transaction on the part of Mr Marino is the invoice from Ironfly for advice: no case was advanced as to what advice Ironfly was giving to Conquest in respect of this transaction, which had been initiated by FMCP and used LAP funds under its management.

303. The only other issue on which Mr Marino raised a case was as to whether Mr Marino caused the trades to be made. In circumstances where he effectively had control over the relevant funds and could make the Ironfly Trades happen by the sweep of a pen, it seems that the contrary is not really arguable.

304. While there is a case against Mr Marino in dishonest assistance (by assisting in Mr Bessot's breach of fiduciary duty) in relation to the same amounts, it adds nothing to the breach of fiduciary duty case.

305. To the extent that it is necessary to do so I would find the case in dishonest assistance to be made out for similar reasons to those which I have given above in relation to GAIN. But here of course there is no argument open to Mr Marino about the time period or the date at which his fiduciary duties became live. At all material points he was in a fiduciary position vis à vis FMCP.

306. Here the position on dishonesty is, it seems to me, considerably clearer. There are a number of factors here. First, there was no reason why any introduction commission in this case should not be paid to FMCP, rather than to Ironfly. There is no nexus to the April Mandate which could justify an argument to the contrary.

307. Secondly, there is the interposition of Mr Ohmura. As I have found, his role was little more than that of post box; he performed no substantive role. Nor was he needed to perform any structuring, as he did with GAIN I - the types of trades in

question here were Mr Bessot's area of expertise; and he duly took the lead on their arrangement. There is therefore a major question mark as to why Mr Ohmura was involved. The answer which appears most compelling is that Mr Ohmura (wittingly or otherwise) provided Mr Marino and Mr Bessot with a "front" so that their private companies were not directly involved. There appears to be no honest reason why this would be done by Mr Marino and Mr Bessot.

308. Finally, three aspects of the evidence as to the emails sent by Mr Bessot are strongly suggestive that he and hence Mr Marino knew that what they were doing was wrong. Firstly, it became apparent that Mr Bessot took pains not to sign emails to Mr Ohmura from his Ironfly account - he left the sign - off blank. Secondly when reporting on Ironfly Trade 6 to his in-house compliance officer at FMCP Mr Bessot edited the text of an email setting out the terms to remove the reference to a 2% up - front commission. Thirdly in passing on material from Mr Ohmura to the same compliance officer Mr Bessot edited Mr Ohmura's details out, with the effect that he actively concealed Mr Ohmura's involvement from his compliance officer.

309. It will be noted that I have not taken into account the submissions made in relation to "the cancelled trade". This was a point which arose very much "on the hoof" and given the gravity of the allegation made, I have not considered it right to draw any conclusions from evidence which arose in this way given that it was not entirely clear. As regards the other claims I shall again deal with these below.

**Ironfly Trades 1-6: Conclusions on Mr Ohmura**

310. The case against Mr Ohmura is that he knew that in entering into the Private Bank Trades Messrs Marino and Bessot were using funds entrusted to FMCP (which it was their responsibility to manage as directors of FMCP) for their and Mr Ohmura's personal gain, and that he actively facilitated their scheme by interposing Conquest as a receptacle for commissions, which he then distributed.

311. The key submission from which the inference of dishonesty is said to flow is the allegation that Mr Ohmura knew very well that the Coutts account was managed by FMCP on behalf of LAP. Mr Ohmura however denied this. He contended that " *the beneficial owners of the products… remained anonymous as far as Conquest was concerned"* . He also suggested that he thought that Messrs Marino and Bessot were acting on behalf of an Ironfly client.

312. In the end it has seemed to me that the question of active specific knowledge that the funds were those of LAP, though much focussed on in cross examination and argument, was not the vital point.

313. Even if Mr Ohmura did not actively know that the funds being used for these trades were those of LAP, it seems quite clear that he did know that the money being used was money managed by FMCP.

314. Once this knowledge is established it becomes very difficult for Mr Ohmura to argue successfully that he did not know that the funds were those of LAP. This is particularly so when he accepted in cross-examination that he knew that at the early stages (which would cover also the early Ironfly Trades) FMCP only had the one client, LAP. In this context his suggestion that he did not know what clients FMCP had *("Well, I didn't know what clients FMCP had. I assumed FMCP only had LAP, but I didn't know what other clients Ironfly had."* ) was not to the point when he knew the funds were funds managed by FMCP. The reality is that he knew at the early stages that FMCP had no other clients and though at a later stage that might have changed, Mr Ohmura could have no reason for thinking that they did. Nor did he produce any good reason for thinking that FMCP had other clients. I accept the submission that his answer on this point appeared to be a deliberate evasion.

315. One point on which FMCP rested heavily as regards knowledge was the fact that Mr Ohmura knew the number of the account at Coutts from which funds predominantly came for these trades. He knew this because the account information was on the documents for the transfer of funds into the Vesper DTF. It is said that he therefore knew the funds were LAP's because the money came from the same account as was used at the end of August 2009. The trade confirmation went via fax to Messrs Marino and Bessot at FMCP.

316. Had the break in time between this transaction and Ironfly Trade 1 been any greater, I would have considered this submission overly ambitious. However, given the short period of time and the context it seems to me likely that in relation to Ironfly 1 and 2 Mr Ohmura would have recognised this account as being LAP's, and that knowledge then carried over to subsequent trades where the details were the same.

317. In any event Mr Ohmura could not deny that he knew at least one of the trades, Ironfly Trade 6, was made with LAP funds:

© 2025 Thomson Reuters.

> "Q: You knew, at least now, Mr Ohmura, on 30 September…that FMCP was the manager of the LAP account at HSBC from which this trade had been—was to be executed?
>
> Yes… I would have gathered that from this information."

318. I therefore find that (to the extent it is relevant) Mr Ohmura did know that the funds being used were LAP funds; and that even if for part of the period he did not know the identity of the client, he did know that the funds being used were funds of a FMCP client.

319. In relation to this obvious oddity, Mr Ohmura contended that he believed that FMCP did not engage in structured products, and hence Ironfly were doing that which FMCP could not or would not do. Essentially, he sought to portray his understanding as having been that Ironfly was the structured products arm of Mr Marino's business. I do not find this evidence credible. It is in tension with the case in relation to the BPA, that Ironfly was the distributor of the business. It also appears to contradict the evidence which he gave orally that he knew of the marketing material which FMCP had produced for LAP indicating that they would engage in structured products. It also makes no practical sense in the context of Mr Marino and Bessot both being very experienced in different aspects of structured products. I therefore conclude that Mr Ohmura's evidence in relation to this aspect did not reflect his knowledge and belief at the time.

320. It is also absolutely clear, *inter alia* from the fact that he drafted the relevant documentation and organised the transfer of funds to them, that Mr Ohmura knew that Mr Marino and Mr Bessot were receiving commissions, not *qua* FMCP, but *qua* Ironfly (i.e. personally). It follows that he knew (at least to a Nelsonian standard) that Mr Marino and Mr Bessot were breaching their fiduciary duties. Again, he did not know or ascertain the position on disclosure.

321. As for Mr Ohmura's contribution to these trades, I unhesitatingly reject his evidence that he was or considered that he was performing a real function in relation to these transactions. The real position was clear on the documents which were not contradicted effectively by his oral evidence, as I have explained above: he was little more than a messenger or post box. This was supported in my judgment by the position on the infelicity of the mismatch between the invoices tendered and the agreement between Conquest and Rabobank.

322. This disjunction was sought to be explained by Mr Ohmura in his evidence. He said that Conquest was in fact the *"structurer"* of the products and that the word structuring could be used equally to apply to execution work. I find myself unable to accept this evidence, which did seem to take a rather different line to the line he took earlier in his evidence, when talking about structuring in the context of GAIN. My conclusion is that Mr Ohmura's evidence in this regard was less than candid, that he sought to make it appear as if he had done more work than the evidence indicates he really did and that the differing stories told by the Rabobank Agreement and the invoices illustrate the lack of a substantial role to be described.

323. In the light of this finding it follows that Mr Ohmura also knew that he was being paid a considerable sum and that he had done, in relation to these trades, essentially nothing.

324. The artificiality of the BPA points in the direction that Mr Ohmura had no genuine belief in the substance of his role or that of Ironfly. However, in my judgment it goes further than that. Although I have weighed (as I indicated earlier) the possibility that Mr Ohmura was simply careless about dealing with the contractual side of things, I have concluded that this conclusion would be against the weight of the evidence in relation to this agreement. In reality if Mr Ohmura had thought that the arrangement was perfectly proper he would either have sought to produce documents to reflect the reality, or he would simply not have bothered to produce anything. The fact that he chose to personally produce an initially serious looking document, which also misrepresented the position, is an indicator that he knew that these transactions were made in breach of trust.

325. To this something must be added in relation to the Rabobank Agreement and the Deutsche Bank Agreement. Dealing first with the latter Mr Ohmura accepted frankly that he breached a number of the obligations in that agreement, but maintained that he would not knowingly have done so. FMCP relied heavily on this admission of breach as evidence of his dishonesty, submitting that I should conclude that he must have made the agreement knowing that he was going to breach the terms. I am not persuaded that this necessarily follows. I have again considered the possibility that Mr Ohmura is simply very

© 2025 Thomson Reuters.

careless about reading documents. However, if that were the case the number of serious looking documents which I am asked to believe Mr Ohmura failed to read properly now reaches the levels where credibility is strained, in the context of an experienced businessman.

326. It therefore seems to me that the evidence on this agreement (which then applies equally in relation to later, similar agreements in relation to the Vesper Structured Product Trades) leads to the conclusion that either (i) FMCP are right, in which case it follows that Mr Ohmura was dishonest in relation to that agreement, which provides a significant indicator as to the honesty of the underlying transaction or (ii) he entered into what was on its face a serious legal agreement without giving any real mind to the commitments it contained. In that case he was not aware he was going to breach the terms, but one may infer that he did not much care whether he did or not. I conclude from some of his answers, which indicate that he had at least cursorily engaged with the content of the obligations such as advice and disclosure, but concluded to his satisfaction that (despite the prohibition on sub-delegation) he could rely on Ironfly as sub-delegate to deal with them, that it more probably was the latter.

327. But this raises the question: is this approach more consistent with Ironfly Trade 6 being above board or with it being a dishonest transaction? It is plainly not remotely determinative but in my judgment – particularly given that he had no reason to think that Ironfly, the supposed delegate, would (to give one example) disclose the fees being charged - that is an attitude which is more likely to be consistent with the transaction not being an honest one.

328. This conclusion is only reinforced by a consideration of the Rabobank Agreement (covering the other Ironfly Trades) in relation to which Mr Ohmura appears to have attempted to get the sub-delegation prohibition removed – and so where the evidence does suggest (despite his suggestion that *"I missed that that term was still in there"* ) that he entered into it knowing that he was going to breach at least one of its terms.

329. In those circumstances I conclude that Mr Ohmura was dishonest within the test set out in *Ivey* . I conclude that he was subjectively dishonest; and that if he were not there was in any event objective dishonesty.

330. Mr Ohmura provided more than minimal assistance in the sense that even if he did not perform a substantive role, he was of manifest use in concealing the involvement of Messrs Marino and Bessot from sight and in arranging payment. It follows that he is liable in dishonest assistance in relation to the Ironfly Trades. As with Mr Marino I will return later to the alternative claims.

*May 2010: AMFC+*

331. The second iteration of the JB Notes was the five-year AMFC+, which commenced to be planned from late 2009 and into which US$65,880,892 was invested on 19 May 2010. Unlike GAIN, it had no capital guarantee. It was structured with a fund of funds managed by UBP (the "UBP Avatar Funds").

332. AMFC+ was not a complex product. The leverage incorporated was 10% which Mr Ohmura's expert Mr Alpay regarded as a *"low level of leverage, with a small effect on the overall payoff of the product"* .

333. AMFC+ was again issued by JB and the Lead Manager was GAM (by now known as BASL). The key terms, contained in the Term Sheet and Prospectus, stated that the certificates provided exposure to a fund of hedge funds and/or cash asset allocation " *as defined by the Issuer [JB] and Calculation Agent [BASL] respectively on a discretionary basis, based on investment advice received from the Investment Advisor* ". The Investment Advisor was FMCP.

334. As with GAIN, there was an express provision dealing with *"Conflicts of Interests/Multiple Roles"* , which referred only to JB's position. The AMFC+ documents also contained the same definition of *"Amortization Fees"* , referring to the costs of the Issuer incurred in connection with distribution of the product.

335. AMFC+ involved 12.5% of fees, including:

i) A Certificate Management Fee of 0.35% *p.a* . payable to BASL;
ii) An Investment Advisory Fee of 1% *p.a* . payable to FMCP;
iii) An Amortization Fee of 0.09% per month (an increase from the figure in GAIN) which included:

a) Ironfly's commission;
b) A Note Advisory Fee of 0.28% *p.a.* as provided in updated Note Advisory Agreements dated 20 April 2010 and 15 March 2010 between BASL and FMCP; and

© 2025 Thomson Reuters.

iv) A further fee of 1.50% for JB/BASL.

336. The means by which AMFC+ was actioned was first by a *"Trading Instruction & Note Amendment"* which was signed by Messrs Marino and Bessot (acting for FMCP) by a letter of 18 May 2010, on FMCP paper and addressed to Mr Gonet of JB. One of the instructions was to change certain terms of GAIN. The other was to book into *"our portfolio"* the necessary equivalent combination of AMFC+ and cash necessary to match the US dollar value of the Avatar Funds due to be received by JB free of payment.

337. On 31 May 2010, Ironfly received what was described as an *"introducer fee"* of US$1,750,000 from BASL in respect of AMFC+. Messrs Marino and Bessot then made onward transfers to their respective vehicles, Leopard and Regent 121.

338. FMCP contends these payments, which came from LAP's assets, were plainly improper in circumstances where:

i) They had themselves in their capacity as directors of FMCP signed the instructions which caused the product to be purchased;
ii) Only FMCP was contractually entitled, *vis-à-vis* LAP, to charge any fees in respect of AMFC+;
iii) LAP had expressly ruled out remunerating Mr Marino personally (as opposed to the bank doing so); and
iv) There was no need for any introduction (still less any 'distribution'), because LAP was already an established customer of JB and GAM via GAIN and there was no question of selecting a product from an array offered by different banks or conducting due diligence over a new trading partner.

339. FMCP also takes issue with the level of the fees – even if genuine work had been required. It points to the evidence of Mr Alpay that the fee paid to Ironfly was *"above standard market practice"* . FMCP contends that the costs involved in AMFC+ did not justify any potential commercial benefit and the funds could have been redeemed outside of the costly AMFC+ wrapper. I make no findings in relation to this latter point, which appears to me to stray outside the territory of this limb of the proceedings. Further I would be unwilling to do so in circumstances where the expert evidence called before me was so very limited because of conscious decisions by FMCP and Mr Ohmura not to call their structured products experts.

340. I was also invited to conclude that some portion of the Amortization Fee which is not fully accounted for was paid to Mr Ohmura or that Mr Ohmura stood to gain personally from AMFC+. I decline to do so. On the evidence before me it is not possible to conclude that any money was paid to Mr Ohmura in relation to this transaction. While FMCP havs cross-examined Mr Ohmura on this, there is no pleaded claim against Mr Ohmura in relation to the AMFC+ transaction and the suggestion that a hitherto unidentified fee was paid to him is pure speculation.

341. However, the case in relation to Mr Marino as regards breach of fiduciary duty appears to be made out. The position is essentially similar to that which pertained for GAIN, but without any question as to the existence of duties at the relevant period and with Mr Marino's role in committing LAP to the transaction being even more clear. If any fee could have been justified it should plainly have gone to FMCP.

342. As to the April Mandate, some attempt was made to pray this in aid, with it being submitted that while there is no direct evidence that the later iterations of the JB Notes were carried out on LAP's instructions, the Court should nonetheless conclude that Mr Marino continued to be authorised by the April Mandate and is entitled to infer that LAP was fully aware of the changes and gave its consent and instructions to it.

343. This argument even as expressed however slightly shoots past the real target. The question is not whether LAP was aware of the restructurings, but whether LAP was aware that on each restructuring Mr Marino and Mr Bessot were taking another *"introducer's commission"* out of the LAP funds. There is nothing in the April Mandate which would tell them this. There is nothing in the documentation for the transaction which would tell them this; on the contrary the documentation only suggested the possibility of a payment to FMCP. In any event as I have concluded there was never any such agreement in the April Mandate this argument cannot assist.

344. I also consider that the fact that (as Mr Alpay indicated) the level of the fee charged was high for a product of this nature, in circumstances where Mr Marino's evidence was that LAP did not want to pay fees out of their funds, provides further confirmatory evidence that this was not a valid authorised fee, but a fee taken dishonestly and in breach of duty.

345. As to the other claims I conclude that the claim in dishonest assistance is also made out. Absent some argument based on an agreement to the commissions, which never really emerged, it is plain that there was a breach of directors' duties

© 2025 Thomson Reuters. 

by both Mr Marino and Mr Bessot, and that for the reasons I have already given Mr Marino was subjectively as well as objectively dishonest.

346. Again, I will revert to the other claims at the end of this judgment.

*November 2010: TRAC*

347. TRAC was the third iteration of the JB Notes. On 19 November 2010, GAIN (a seven-year product which was at this time just over one year old) and AMFC+ (a five-year product which was nine months old) were both redeemed and replaced with the five-year TRAC certificates. This was a rather different product to the previous iterations. The Term Sheet and Prospectus stated that TRAC's purpose was to seed funds established by FMCP, Clear Alpha Ltd ("Clear Alpha") and VCM. Clear Alpha was a newly-established company which was part-owned by Mr Marino.

348. Pursuant to the TPMAA, Messrs Marino and Bessot again gave the Trading Instruction for TRAC on FMCP paper on 16 November 2010, instructing JB to replace the two existing investments (GAIN and AMFC+) in *"our account"* with TRAC. The instructions for this transaction were signed by Mr Marino and Mr Bessot at FMCP's office on 16 November 2010, in the presence of Mr Ohmura, who was paying a visit to the office on that day and whose evidence was that he brought the relevant documents, which he had been given by Mr Aversano or Mr Ay.

349. Messrs Marino and Bessot also signed the Subscription Form, identifying themselves as representatives of FMCP and identifying FMCP as the Investor. The Subscription Form disclosed the fact that the funds comprising the *"Fund Universe"* under TRAC were *"newly established and hence have either none or very short Track Record"* and to seek confirmation that *"[t]he investor is aware of the inherent risks connected with such investments"* .

350. There was some dispute as to whether Mr Ohmura thought that LAP separately authorised this move. It appeared that in cross-examination he accepted that he did not think LAP had done so.

351. US$240m of LAP's assets were invested in TRAC. The redemption of GAIN meant that its capital guarantee was lost. Mr Marino says that he, Mr Bessot and Mr Ohmura all nonetheless thought it was in LAP's interests to redeem GAIN and put all of its assets into hedge funds.

352. FMCP contends that this decision was plainly not in the best interests of FMCP. It points to the fact that both GAIN and AMFC had been structured to perform over a period of years (seven and five years respectively), and that they had hardly got going. It also points to the fact that TRAC did not provide capital protection. It submits, and I accept, that the fact that under TRAC potential losses were limited to 100% of the initial investment is not the same as a guarantee offered by GAIN. It also says that the investments contemplated (investments in Clear Alpha Ltd and VCML) could have been made directly, without a "wrapper" and its associated fees. The issue as to whether TRAC was, or was thought to be, in FMCP's interests is however one for Phase II of these proceedings, and I make no findings on it.

353. For TRAC, JB itself was the Issuer, Lead Manager and Calculation Agent.

354. In documentary terms TRAC had considerable similarities to its predecessors GAIN and AMFC. It contained express provisions dealing with *"Conflicts of Interests/Multiple Roles"* , referring only to JB. It had similarly structured Amortization Fees.

355. Again, FMCP takes issue with the fees levied on TRAC, which were:

i) A Certificate Management Fee of 0.25% *p.a* . payable to JB; and
ii) Amortization Fees of " *0.876% per month of the Denomination for the first four months and 0.032% thereafter for the lifetime of the Certificates* ". This comprised:

a) Conquest: 1% (US$2.4m);
b) JB: 0.6% (US$1.44m); and
c) The remaining, as-yet unamortized fees accrued on GAIN and AMFC+.

356. The FMCP SAA was novated in December 2010, with JB assuming the obligations of BASL thereunder. As a result, FMCP continued to receive a 1% *p.a* . fee levied within the underlying GSI funds.

© 2025 Thomson Reuters. 

357. In relation to TRAC the critical payment for current purposes is one of US$2.4 million. This was made on 22 November 2010, by JB to Conquest. Shortly thereafter Conquest sent US$2m of that payment to Leopard. Leopard was a new entry into the picture at this level. There was no suggestion that it did anything substantive, although Mr Ohmura floated the possibility that it could be seen as an introducer to FMCP. It did not even generate its own invoices, which were created by Mr Ohmura using a template and some clipart. The remainder of the payment was kept by Mr Ohmura.

358. The focus in relation to this payment is very much on Mr Ohmura, and the extent to which he can be said to have thought that the payment made to him and the on-payment he made was a legitimate payment. FMCP says that his account is inconsistent on multiple levels and drives a conclusion that Mr Ohmura knew perfectly well that this payment were not legitimate.

359. It points first to Mr Ohmura's own explanation for the payment. He says that this payment was made pursuant to a *"Distribution Agreement"* with JB dated 26 October 2010. On its face this document at Clause 2.1 states that Conquest was appointed as the " *Distributor to propose the Products to its clients* ".

360. FMCP points out the uneasy fit of this document with the facts on the ground. In the first place, it is unclear who were Conquest's "clients" for the purposes of this arrangement. It could not sensibly be LAP, which was FMCP's client and required no introduction to JB. Secondly it does not appear that Mr Ohmura acted as a distributor.

361. Mr Ohmura in his evidence indicated that he accepted that the wording was not a good fit but that the document covered a different reality - that the agreement was in essence a structuring agreement and that the bad fit of the wording was brought about by JB using an inappropriate template. He submitted that he did indeed perform structuring work.

362. FMCP submits that this explanation has its own problems. If Mr Ohmura was indeed structuring that would be irreconcilable with the definition of Amortization Fees in the product documentation (the Amortization Fee again being the fee which contains the relevant payment). It refers to costs incurred in relation to distribution and makes no mention of "structuring". It follows that there could not have been proper disclosure of the US$400,000 if Mr Ohmura is telling the truth and it was really for "structuring" work.

363. At best, it says, Mr Ohmura can say that as the FMCP SAA Agreement applied to the TRAC structure, FMCP had the mandate to do structuring work, but the work was performed by Conquest. However, it points out that if that were the case Mr Ohmura was carrying out (for a separate fee) a role that FMCP was supposed to be carrying out and for which it was already being remunerated by LAP under the FMCP SAA.

364. Further it says that explanation is not consistent with Mr Ohmura's evidence that he provided his services to Leopard and not to JB.

365. FMCP also notes that the "Distribution Agreement" is not referred to in Conquest's invoice for the US$2.4m, or in Mr Ohmura's Amended Defence, where Mr Ohmura's case was that the payment was made pursuant to the BPA.

366. FMCP suggests that the correct conclusion is that Mr Ohmura procured his former colleagues, Messrs Aversano and Ay, to procure the Distribution Agreement by way of false documentary 'cover' for commissions which he knew to be illicit.

367. FMCP also relies on issues as regards Mr Ohmura's account of the transfer of US$2m to Mr Marino (via Leopard). Mr Ohmura's case is that the payment was made pursuant to the BPA. The issues FMCP identifies are that:

i) Leopard is not even a party to the BPA.
ii) Leopard's purported invoice makes no reference to 'distribution' fees nor to the BPA.
iii) The percentage of Conquest's fee transferred to Leopard (83%) is not what was provided in the BPA (90%).
iv) There is in any case no evidence that Leopard carried out any 'distribution' or 'introduction'. LAP and FMCP had a long-standing relationship with JB and needed no introduction; and the assets in TRAC had all along been held in JB and invested in JB Notes, as Mr Ohmura knew.

368. It was submitted that I should conclude that the true reason why, on this occasion, Messrs Ohmura and Marino selected Leopard (not Ironfly) as the receptacle for Mr Marino's share of the secret commission was to conceal it (and/or its quantum) from Mr Bessot. Mr Marino was the sole beneficial owner of Leopard. If they had intended to share the spoils with Mr Bessot, who was a co-owner of Ironfly, they would have caused the payment to be made to Ironfly, as they had done previously.

© 2025 Thomson Reuters.

This is consistent with the reference in the Charles Russell letter which indicates that Mr Bessot " *discovered* " the payment subsequently.

**TRAC: Mr Marino**

369. As regards Mr Marino, the position is again quite straightforward. As with the AMFC+ commissions, the money was paid in relation to a transaction where he plainly acted as a director of FMCP. There was a manifest conflict of interest. There has been no attempt to suggest that this commission was disclosed to FMCP. Indeed, it appeared that Mr Marino was planning, even in relation to transactions this far down the line, to rely on the April Mandate and say that he was under no duty to disclose the payment to FMCP. Even had the April Mandate authority argument been compelling at an earlier stage (which I have found it was not) it could not have extended to cover payments under an agreement as far distant in time and events as TRAC.

370. It follows that, as with the earlier transactions, Mr Marino was in breach of his fiduciary duties. A liability for dishonest assistance, in the absence of a payment to Mr Bessot, would it seems to me depend upon a conclusion that (i) TRAC was not in LAP's best interests and (ii) that Mr Marino and Mr Bessot knew or should have known this. As the issue of TRAC's justification was not an issue before me and in the absence of Mr Bessot it is not possible for me to reach this conclusion on the evidence before me.

**TRAC: Mr Ohmura**

371. In relation to TRAC, it seems to me that the conclusion is near to inescapable that Mr Ohmura was aware that Mr Marino was acting in breach of trust. Mr Ohmura was aware that Mr Marino was receiving another personal payment in connection with a reinvestment of LAP assets which were (i) under the control of FMCP, of which he was a director, and which was the investor's subsidiary, financial advisor and asset manager and (ii) investments in respect of which Mr Marino had already taken introducer fees in respect of earlier products. The position was one which must have rung warning bells at an early stage with Mr Ohmura, if he had been acting honestly.

372. There is nothing in the evidence which goes to suggest that Mr Ohmura should not have had such concerns or could have proceeded without dishonesty. Further, the evidence of this transaction is not easily consistent with any innocent explanation. The amount paid to Leopard was not consistent with amounts previously paid to Ironfly. There could therefore be no assumption that this was a continuation of any hypothetically valid original agreement (via the April Mandate). The amount to be paid on was inconsistent with the supposed agreement reached with Conquest under the BPA. The supposed agreement made no commercial sense.

373. There was not even the most cursory attempt by Leopard to justify the sums it was being paid by raising its own invoice. The explanation given for why Mr Ohmura might be raising that invoice for its supposed contractual counterparty (that it is typical in these trades for an investment bank to provide a template invoice together with the transaction) was not convincing; and his original account had suggested Leopard raised their own invoice, in the more usual way. It also failed to take account of the facts that he also created their company logo for the invoice and apparently never even sent copies to Leopard.

374. Mr Ohmura's own explanation for the payment to Conquest is not adequate. It has obviously changed in significant respects. He now relies on the Distribution Agreement, but that document makes no sense in the context of the transaction as it was actually structured – or how the payment was invoiced for by him. Taking the biggest issue first; there is no way that Conquest was a distributor in the way in which that term seemed to be generally used in the banking world, including by his own expert. Mr Ohmura in his evidence indicated that he accepted that the wording was not a good fit but again sought to suggest that the document covered a different reality - that the agreement was in essence a structuring agreement, that distribution covered *"everything from the idea generation to the conclusion of the product"* and that the bad fit of the wording was brought about by JB using an inappropriate template.

375. This account was not convincing, even allowing for some looseness in the usage of terminology, and involved him referring to the same word in two senses within the same sentence. Even on Mr Ohmura's case it was Leopard who was the distributor in the normal use of the word; in reality the only distributor (if any) was FMCP. In addition, if Mr Ohmura were right he was carrying out (for a separate fee) a role that FMCP was supposed to be carrying out and for which it was already being remunerated by LAP under the FMCP SAA.

376. Further even assuming in his favour that Mr Ohmura may be less than diligent about reading contractual documents, there are very clear issues: the title itself, the definition of clients and clients' consent to fees, which it would seem implausible

he did not notice if he was looking to enter into a document which encapsulated the reality of the transaction. Indeed, Mr Ohmura's evidence was not that he did not notice these points but that he effectively relied on FMCP to have covered these areas. Mr Ohmura accepted in cross examination that JB were probably misled by this document. Further if Mr Ohmura was indeed structuring that would be irreconcilable with the definition of Amortization Fees in the product documentation which on its face refers to distribution, not structuring – and that would involve the client being misled.

377. I also accept that there are very obvious problems with Mr Ohmura's case that the payments made to Leopard were made pursuant to the BPA in circumstances where Leopard is not even a party to the BPA, the invoice which Mr Ohmura drafted for Leopard makes no reference to 'distribution' fees nor to the BPA, the payment percentage does not match the BPA and there is no evidence that Leopard carried out any 'distribution' or 'introduction' to earn any fee. LAP and FMCP had a long-standing relationship with JB and needed no introduction; and the assets in TRAC had all long been held in JB and invested in JB Notes, as Mr Ohmura knew.

378. Taking all of the circumstances of this transaction together I have no hesitation in concluding that Mr Ohmura knew that the transaction was dishonest and in breach of trust. I have still less in concluding that even had he subjectively considered it honest, it would be considered dishonest by the standards of ordinary people.

*January 2011: Transfer of Custody to HSBC*

379. The custody of TRAC was transferred from JB to HSBC in January 2011. This was effected pursuant to LAP's instruction on 23 December 2010. That instruction had been drafted by Mr Marino and then sent in soft copy from his FMCP account to LAP with a request to the LAP representatives to sign it. The signed version was then sent by him to JB.

380. As a consequence of the transfer, TRAC became subject to the terms of the HSBC IMA. FMCP therefore became entitled to earn 1.5% *p.a* . in management fees and 15% in performance fees – as well as the commissions specified in Clause 8.2.

*Vesper: 2010-2011*

381. There are no claims in relation to Vesper per se, but it forms part of the background to the later stages of the claim that Mr Marino caused FMCP to retain the holding in Vesper DTF whilst the other alternative investments were being unwound in 2009 and 2010.

382. It is suggested that this was surprising if Mr Marino were at all acting in the interests of FMCP/LAP when he had misgivings about Vesper DTF's poor returns which were reflected in third party analysis. In particular the Chief Fund Accountant of Alphametrix noted its poor performance; and FMCP's own head of global market research (Mr Vojetta), suggested redeeming the position as early as June 2010, because:

> "…
>
> • It does not bring anything to the portfolio
>
> • in May, it performed worse than other, not exactly state of the art, alternative investment positions within the Global Portfolio – see below.
>
> • in our attempt to transfer only cash and futures, it may be a good idea to get rid of it to simplify everything."

383. Subsequently, Messrs Marino and Bessot (in their capacity as directors of FMCP) caused further LAP assets from the JB Notes to be invested into the Vesper Funds. Mr Ohmura assisted with this; he drafted the email which Mr Marino sent

regarding investments of US$50 million in December 2010 and accepted that it was possible that he drafted another of US $25 million on 24 February 2011.

384. By 31 March 2011, the Vesper Funds had received a total of around US$63.5m of LAP's assets: Most of that was placed in a segregated portfolio within Vesper Liquid Alpha, supposedly "bespoke" to LAP, known as the "Global Overlay Portfolio" or "GOP".

385. However, while there are no specific claims arising out of Vesper, it is suggested that this evidence goes to two things. The first is that I should conclude that these investments were made by FMCP and had nothing to do with Ironfly or Leopard. I do so conclude, and the converse was not seriously suggested; Mr Ohmura accepted this in cross-examination.

386. The second suggestion is that this evidence does to an extent go into the scale against Mr Ohmura because FMCP argues that the irresistible inference is that the Vesper DTF position was created and then maintained against LAP's interests, because Mr Marino had a secret personal interest in it. That being the case, they say it creates an inference that Mr Marino did this because Mr Ohmura had done something for which a considerable reward was appropriate.

387. As to this argument, while I understand why the point is made, I do not consider that the evidence justifies a fairly extended inference, not least in circumstances where the evidence both of LAP and Messrs Marino and Bessot as to the surrounding circumstances was lacking.

*January – June 2011: the Vesper Trades*

388. I have indicated above that the Vesper Funds do not give rise to a separate claim. Where the Vesper Dunds do come into the claims universe is as regards the second tranche of Structured Product Trades which took place between January and June 2011.

389. The original investment of LAP's funds was carried out by Messrs Marino and/or Bessot exercising the authority granted to FMCP pursuant to the TPMAA and, after the transfer of custody, the HSBC IMA. The execution of the trades was effected by Mr Ohmura in conjunction with the banks who sold the relevant products: Deutsche Bank, Natixis and Nomura, apparently having discussed the trades or at least the *"implementation of the strategy"* with Mr Marino.

390. The trades were executed pursuant to what were described as "Distribution Agreements" between Conquest and each of the banks. Only one of these (the Deutsche Bank agreement) was in evidence, but Mr Ohmura confirmed that there were agreements to similar effect with the other banks. On that basis the points made above in relation to the Deutsche Bank agreement and Mr Ohmura's approach to it, apply equally here.

391. In relation to these trades there is no dispute as to Mr Ohmura's knowledge as to the ownership of the funds. He accepts that he understood that for trades undertaken through the Vesper Liquid Alpha " *it was LAP's assets in the JB Notes that was being invested* ".

392. Ironfly Trade 7 was executed by Mr Ohmura with Deutsche Bank on 28 January 2011. In relation to that trade Conquest later received US$900,000. Mr Ohmura then transferred US$810,000 to Ironfly. As with the earlier Structured Product Trades, the purported invoices from Conquest and Ironfly refer to "advisory" fees.

393. Several further Vesper Trades were executed by Mr Ohmura between 22 and 24 February, generating over US$4 million dollars in commissions for the Defendants. As can be seen from the list of trades given above, in relation to three of these trades, the payments on from Mr Ohmura/Conquest went not to Ironfly but to Leopard. The percentage transmitted was around 68%, rather than the 90% sent in Ironfly trades.

394. Yet further trades were executed in March and June 2011. On their face large proportions of the sums involved were paid in commissions, though I note that Mr Ohmura explained that in such trades *"fees are charged at the overlay strategy size, not necessarily at the custody account size"* . For the first 72% of the commission was sent on to Leopard. For the second no commission was sent on. For the third 90% of the commission was sent to Ironfly.

395. FMCP reminds me that because Vesper Liquid Alpha was managed by VCM, which charged management fees and investment advisory fees, Mr Ohmura was receiving not just fees for running the investments, but also millions of dollars in commissions taken from those assets. Mr Ohmura accepted in cross-examination that his position involved a conflict of

interest, though he suggested that this was not unheard of, for example *"if you look in the hedge fund world you have various instances where the manager has also economic interest in transactions that are related to his funds"* .

396. The evidence on these trades is very thin, though the existence of the trades was not disputed. There is no evidence as to what work Mr Ohmura did, although in relation to these trades there is no sign that Mr Bessot was involved, so the terms must have fallen within his/Vesper's purview. His explanation of the roles of himself (in his personal capacity) and Leopard was confused. There appears to have been no agreement of any sort with Leopard which can offer any explanation for the commercial relationship with Conquest; and the explanation given for Ironfly (that it was a manifestation of the April Mandate) cannot apply to Leopard.

397. Nothing has been said as to what Leopard did. Again, neither Conquest's invoices nor Leopard's nor Ironfly's match the purported agreements pursuant to which the transfers are now claimed to be made. I consider that the evidence does justify the inference that the Leopard Trades represent instances of Mr Marino and Mr Ohmura cutting Mr Bessot out of the business with Mr Ohmura retaining a greater share in the payment for accommodating Mr Marino.

**Conclusion: Vesper Trades**

398. There is nothing sufficiently different as regards the Vesper Trades which would compel a different conclusion to the conclusion which I have already reached in relation to the earlier Private Banks Trades. On the contrary it appears to represent a continuation of practices already established in connection with the earlier Structured Products Trades, but on this occasion with Mr Bessot's role minimised or removed. Indeed, in relation to these trades Mr Alpay for Mr Ohmura noted the potential for a conflict of interest, and agreed with Mr Colas that the fees charged were high.

399. It follows that Mr Marino was in breach of his fiduciary duties and that his receipt of the sums paid in relation to these trades was dishonest. As FMCP submits, Mr Marino's breaches of duty at this point appear to have been egregious: he was in breach of his duties in taking any private commission in relation to dealings with assets in the management of FMCP, he was still more so in taking more commissions in relation to dealings with assets within TRAC on which he had privately taken (in breach of duty) substantial payments shortly before, and he was aware of and complicit in Mr Ohmura's own conflict of interest.

400. I likewise conclude that Mr Ohmura dishonestly assisted Mr Marino in his breaches of duty. Even if one were to accept (as I am not minded to do) that Mr Ohmura thought that the agreements he had reached with the banks were not deceptive (and his own expert accepted that Conquest could not realistically be acting as a distributor in this context), I would conclude that Mr Ohmura, acting in conflict of interest himself, and against the background of the previous business, cannot have thought the actions he was taking were honest; certainly no ordinary honest person would do so. His role here was plainly central to both the execution of the trades and to the administration of the commissions paid.

401. FMCP asks me to note and draw inferences from the fact that the timing of these transactions in late February 2011 and the very large (hitherto unprecedented) size of the commissions generated by Messrs Marino and Ohmura coincides with the beginning of the Libyan Revolution. In that revolution premises in Libya were apparently bombed and computers were stolen. FMCP's board was unable to meet effectively and many did not come to the office for some time. Email contact was intermittent or absent. I note the point, but given the thin nature of the evidence surrounding these trades and the absence of evidence concerning the prevailing market conditions, I am not prepared to draw any inferences.

*October 2011: TRAC+*

402. As noted above in 2011 LAP started to look into the performance of their assets under the stewardship of FMCP. On 10 October 2011, LAP instructed FMCP not to undertake any new investments or execute any financial transactions without management approval from LAP. However, on 31 October 2011, TRAC was redeemed and replaced with TRAC+, which provided additional leverage to the structure. The Term Sheet stated that TRAC+ was *"not principal protected* ".

403. JB was again the Issuer, Lead Manager and Calculation Agent. The key terms are contained in the Term Sheet and Prospectus. As with TRAC, the main purpose of TRAC+ was to seed funds established by FMCP, Clear Alpha and VCM. The Reference Underlying continued to be the same two GSI funds. FMCP was the Sub-Advisor paid 1% *p.a* . In addition, FMCP continued to charge the 1.5% *p.a.* in management fees under the HSBC IMA.

404. There were however differences in the fees payable from those payable under TRAC:

i) The Certificate Management Fee was raised from 0.25% to 0.60% *p.a* ., payable to JB;

ii) The Amortization Fees were raised from the 0.32% payable from the fifth month of TRAC to 0.04333% *per* month for the first 36 months; and
iii) A Product Advisory Agreement was concluded by JB and FMCP, mirroring the provisions of the Note Advisory Agreement for GAIN and AMFC+ and entitling FMCP to receive a fee of 0.30% of the Denomination, paid quarterly. FMCP thus received product advisory fees totalling US$1.56m.

405. No trading instruction was required for TRAC+ because custody of the JB Notes had been transferred to HSBC.

*September 2012-July 2014: Payments to Mr Aversano and Mr Ay*

406. Between September 2012 and July 2014, Mr Marino met Messrs Aversano and Ay of JB/GAM, apparently in Monaco. During the course of those meetings he handed over cash payments totalling several hundred thousand Euros. Mr Marino gave as the reason for this that: *"[t]hey knew about the commission I was receiving under the Capital Guarantee so they clearly wanted a part of it"* . That reference to the Capital Guarantee is presumably a reference to TRAC, which had been placed shortly before.

407. No claim is brought in relation to these payments, but FMCP suggest that these payments were promised to procure the continued assistance of Messrs Aversano and Ay in what FMCP calls the secret commissions scheme; and to ensure their silence. As such, FMCP suggest that these payments add a further weight of evidence to the conclusions which they seek on the various claims.

408. As will be apparent, I do not consider that such evidence is needed as regards the main heads of claim against Mr Marino which I have already considered. As regards Mr Ohmura they are neither here nor there, as they add nothing to the picture as regards his actions or his intentions.

**Other Issues**

*The issue of loss*

409. One matter which has been much debated in the course of the hearing is that of loss. Mr Marino and Mr Ohmura argued as one of their main arguments that FMCP had suffered no loss. Though sometimes this appeared to be deployed as an argument which offered a substantive defence to all the claims, in reality it is not. However, as it does impinge on the claim in conspiracy (which is dependent on loss) and on some of the relief sought in the alternative in relating to bribery and dishonest assistance I will deal with it separately here.

410. The claim in breach of fiduciary duty, the claim in knowing receipt and the primary claims in bribery and dishonest assistance are not affected by it.

411. What is said is that FMCP's case on loss (and hence damages) is fundamentally flawed.

412. FMCP's primary case is that FMCP would have been paid the sums in question. It says that JB/GAM/BASL (in the case of the JB Notes) and the various counterparty banks (in the case of the structured trades) were clearly willing to make the payments. They could, and would, have paid the same fees to FMCP. There would be no reason for LAP not to agree this, given its agreement to fees being payable to FMCP in various of the management agreements and still more so given the joint venture nature of FMCP. Thus, Mr Marino and Mr Ohmura could and should have caused them to do so. Insofar as the relevant payments were bribes, FMCP says loss in this amount is irrebuttably presumed in any event.

413. FMCP also says that it would not have been obliged to account for those commissions because *ex hypothesis* they would have been earnt honestly and on a disclosed basis – indeed LAP had consented to FMCP receiving commissions in the IMAs and in the TPMAA. Even if it would have been liable to account, it would still, FMCP says, have been the proper claimant: *Lewin on Trusts* [43-001, 40-063].

414. On this argument Mr Marino says it is extraordinary that FMCP is asking the Court to find that loss of something over US$16 million is "proved" by way of a presumption or inference with no primary facts being pleaded to ground the inference and no direct evidence led to justify the establishment of such a presumption.

415. On the evidence he says that it points away from making any such presumption or drawing any such inferences as to loss. Firstly, he relies on the April Mandate/two streams of work argument which I have dismissed.

416. He and Mr Ohmura submit that there is a fundamental inconsistency in FMCP's case because the factual premise of FMCP's case is that the fees should not have been paid at all and yet FMCP's primary case on loss depends on saying that but for the relevant breaches the commissions would instead have been paid to FMCP. This they say drives a conclusion that the case is not a good one; and even if it were the evidence as to loss is lacking.

417. FMCP's alternative case is that if it would not have been paid the fees, it follows that the fees would not have been paid, and that either LAP's assets would not have been diminished by the fees, or the fees would have otherwise endured to the benefit of LAP. The result it says is that FMCP suffered a loss in that it was caused to breach the IMA Duties to LAP and the JB Duties to LAP and so came under a liability to LAP.

418. Fleshing this out, FMCP says that it stood in a fiduciary relationship *vis-à-vis* LAP who had a legitimate expectation, which equity recognises, that the fiduciary would not utilise his or her position in such a way which is adverse to the interests of the principal: *Arklow Investments Ltd v Maclean [2000] 1 WLR 594* , 598, Finn, *Fiduciary Obligations* (2016) at [803], *Diamantides v JP Morgan Chase Bank [2005] EWCA Civ 1612* at [27].

419. It says that relationship arose either from the IMAs or in the case of the JB Notes, by reason of the context including the circumstances in which FMCP was incorporated and LAP was induced to become its primary client and the wide-ranging duties undertaken by FMCP through the various agreements.

420. As regards the secondary case, Mr Ohmura submits that this is flawed because the argument that FMCP owed the relevant duties to LAP is not a good one and because FMCP is only entitled to recover damages to the extent that its alleged liability to LAP has caused or will cause it to suffer loss and again the evidence of that loss is lacking. Mr Ohmura says that while it appears that FMCP and LAP have reached some kind of agreement, that is insufficient to establish that FMCP has suffered or ever will suffer a loss by reason of its alleged liability to LAP.

421. On the alternative case FMCP submits that the existence of the duties giving rise to the liability is clear and that the fact that the liability is not paid provides no reason why it should not be recoverable.

**Loss - conclusions**

422. So far as the primary case advanced by FMCP is concerned, I conclude that the evidence adduced does not justify the full ambit of the proposition advanced. FMCP did not call anyone from LAP who was in a position to say whether the full extent of such fees would have been agreeable to LAP. There is therefore no clear evidence for the proposition. The evidence which was adduced seems to me to justify a far more limited proposition: namely that FMCP probably suffered some loss by reason of the commissions being paid to Messrs Marino and Bessot and Mr Ohmura.

423. It was clear that GAM/BASL would have had no objection in principle to the payments being made to FMCP. The evidence suggests that such commissions might have been paid or they might not. As Mr Ohmura said, *"it would depend on the way they chose to structure their business"* . Mr Ohmura agreed that it would make no difference to them. Equally plainly LAP were agreeable to some fees being paid to FMCP – they specifically agreed this.

424. What seems to me far less clear is that LAP would - if all had been explained to them – have acceded to commissions which involved paying twice for the same services. I note this, given that it was FMCP's own case in relation to, for example, the GAIN fees that there was an element of double paying, with FMCP being paid as introducer via the NAA, and Mr Marino also being paid as an introducer through his separate agreement. This is the more so given the evidence of Mr Marino, on which FMCP relied against him, that LAP were reluctant to agree fees which came out of their assets, and the evidence of the early encounters with Mr Marino before the incorporation of FMCP which show that LAP were keen to keep the fees for managing the portfolio down.

425. I would therefore conclude that on the balance of probabilities FMCP did suffer some loss as a result of the various payments made to the Defendants; but that that loss was less than the full amount of those commissions.

426. I do not consider that the fiduciary position of FMCP would affect its ability to recover this loss, because the argument proceeds on the basis that the proposed payments were disclosed.

427. As for the alternative argument, to the extent that it is relevant, I would find that FMCP owed a liability to LAP. Standing back from the facts of this case it would seem startling if it did not; FMCP had (by virtue of the fact that Mr Marino and Mr

Bessot were effectively rogue directors) allowed or failed to stop its client's assets being plundered. That the route to such liability is not lacking can be seen from some of the authorities cited by FMCP:

i) Financial advisers can (and in practice often do) occupy a fiduciary position *vis-à-vis* their clients: *Snell's Equity at* [7-006]; *Daly v Sydney Stock Exchange Ltd (1986) 160 CLR 371* , 377; and *Aequitas v AEFC [2001] NSWSC 14* at [307];
ii) *Diamantides v JP Morgan Chase Bank [2005] EWCA Civ 1612* at [27]

> "… it would be unusual for an investment manager acquiring and managing a portfolio of investments under a formal management agreement not to owe duties of care and duties of a fiduciary nature to the other party to the agreement…"

428. This, it seems to me, lays the groundwork for a liability from the dates of the IMAs and the TPMAA which granted " *full discretion and authority* " to FMCP to manage the funds under the IMAs and placed FMCP in the position of an asset manager.

429. A question might arise as to whether such a liability arose for the earlier period. In the present case I should not hesitate to conclude that it did so. Here I bear in mind not only the terms of the relevant GAIN agreements (the NAA which required FMCP to " *reasonably safeguard the legitimate interests* " of LAP, and the FMCP SAA, which set a fee for asset management services by FMCP) but also the nature of FMCP as a joint venture and the history of its establishment which shows that LAP was looking to FMCP to provide independent financial advice on LAP's assets.

430. As for the fact that any such liability to LAP is not paid, I do not consider that this prevents recovery of damages; and the contrary was not seriously argued. However, there may be issues as to the precise form of relief to be granted.

*Knowing receipt*

431. So far as knowing receipt is concerned, plainly the elements of this claim would not, on the basis of the findings above, be seriously in issue if the payments were ones made to Mr Marino and Mr Ohmura personally.

432. However, an issue arises because of the fact that the payments in question were made to Ironfly, Leopard and Conquest. Mr Marino and Mr Ohmura argue that these are separate legal entities. FMCP says that there are three ways round this. First it says that the moneys can be traced into because they were received by or for the benefit of the defendants and so the "separate legal entity" issue is an illusion.

433. Secondly it says that *"the corporate veil of Conquest Cayman is to be pierced on the basis of the evasion principle"* . This is a principle identified by Lord Sumption JSC in *Petrodel Resources Ltd v Prest [2013] UKSC 34; [2013] 2 AC 415* at paragraph [28], to the effect that:

> "the court may disregard the corporate veil if there is a legal right against the person in control of it which exists independently of the company's involvement, and a company is interposed so that the separate legal personality of the company will defeat the right or frustrate its enforcement."

434. Thirdly as regards Mr Ohmura it says that his case cannot be supported by the Ironfly SAA because that document is a sham.

435. It is submitted for Mr Marino and Mr Ohmura that none of these arguments gains traction. I accept those submissions.

436. So far as the first argument is concerned, while it is a submission which sounds attractive, it is notably devoid of any supporting authority. Were this point a good one it would doubtless have been discovered in the many cases on knowing

© 2025 Thomson Reuters.

receipt which have found their way before the courts before today. I am not persuaded that it is appropriate to break new ground – particularly in circumstances where knowing receipt is in this case really a secondary claim.

437. As regards the second argument it seems to me, as Mr Couser for Mr Marino submitted, that *Prest* really is pointed at a rather different situation where a claim is made against a company but it becomes necessary to trace through the company to its controller. Here the relevant companies are not parties to the litigation. In any event it seems correct to say (as did Mr Emmett for Mr Ohmura) that the principle relied on is not apposite in this case, because it is not said that Messrs Marino and Ohmura have used the relevant companies to evade a legal liability that they would otherwise have had. Thus, for example, if Conquest had not received the payment, Mr Ohmura would have had no liability.

438. As regards the argument on the SAA, this cannot assist FMCP, because Mr Ohmura's argument is not dependent on the Ironfly SAA.

439. In the circumstances I have formed the view that I need not reach a conclusion in this judgment on the further submissions made on this point (which are also relevant to the proprietary claims against Mr Marino). However, I record that were it to arise there seems to me to be some force in the submissions that there is no satisfactory explanation of why FMCP rather than LAP should have a proprietary interest in the sums received by the various companies and that tracing into Ironfly would in any event present difficulties, because Mr Marino was on any analysis not the full owner of it.

*Bribery*

440. There were essentially three points which were in issue on the bribery claims (principally on behalf of Mr Ohmura, though also for Mr Marino):

i) The issue of whether payment was made to an "agent as such";
ii) The liability of a person who did not make a payment (here, Mr Ohmura);
iii) The nature of the remedy and whether it is necessary for FMCP to prove loss.

441. On the first issue the Defendants point to the dictum of Slade J in *Industries & General Mortgage Co Ltd v Lewis [1949] 2 All ER 573* at 575:

> "For the purposes of the civil law a bribe means the payment of a secret commission, which only means (i) that the person making the payment makes it to the agent of the other person with whom he is dealing; (ii) that he makes it to that person knowing that that person is acting as the agent of the other person with whom he is dealing; and (iii) that he fails to disclose to the other person with whom he is dealing that he has made that payment to the person whom he knows to be the other person's agent. Those three are the only elements necessary to constitute the payment of a secret commission or bribe for civil purposes."

442. They submit that this shows that a bribe must be paid to the agent of the other party with whom the person is dealing and that there must at least be the nexus that the payment must have been made by someone who intends to do business with the alleged victim. They cite in support of this proposition *Airbus Operations Ltd v Withey [2014] EWHC 1126 (QB)* at paragraph [416]. However, that passage does not appear to deal with the issue in question.

443. FMCP for its part points to the passages in *Fiona Trust* at [73] and *Otkritie* at [69-70] to which I have referred above, contending that the payer or procurer of a bribe need not be acting in his capacity as agent of the principal and that there is a relevant dealing provided that it gives rise to a real possibility of conflict of interest.

444. On this issue it seems to me that FMCP's arguments are to be preferred. I bear in mind that bribery is a serious allegation whose foundation is in fraud. I accept that it is important that the elements of it are properly made out. However, the evil of bribery is that it compromises or creates the potential for compromise of the loyalty of an agent of a principal who is in some sense dealing with the giver of the bribe. The questions which matter are therefore whether the payments create that

risk (hence the authorities on *de minimis* payments) and whether they are made in circumstances where there is sufficient nexus between the payer and the principal. I am not persuaded that there needs to be a contractual nexus.

445. The *de minimis* issue is plainly not relevant here. I will analyse the arguments by reference to Mr Ohmura, but the same points apply as regards Mr Marino; there is no difference of principle between them.

446. Mr Marino was the agent of FMCP and had the management of their funds; payments to him would on their face run the risk of compromising his loyalty to FMCP. The question is whether Mr Ohmura was dealing with FMCP. On one level – that of simple contract - he was not, and nor was Conquest, who actually made the payments. But if Mr Ohmura was not dealing with FMCP with whom was he dealing? Mr Ohmura suggests that he was really dealing with LAP, in that the gains were at the expense of LAP. That however seems an artificial analysis.

447. Although there was no actual contractual nexus between Mr Ohmura/Conquest, and FMCP, I conclude that the payments were made to Mr Marino as agent "as such". FMCP was the key actor for the purposes of the payments. It was FMCP as asset manager for LAP which made the decision to purchase structured products or to enter into TRAC. On TRAC Mr Ohmura, though no longer employed by GAM brought the key documents to FMCP's offices; and on his own case he was doing the structuring which FMCP was supposed to be doing. On the Private Bank Structured Product Trades, it is clear that Mr Ohmura was assisting Mr Marino acting for FMCP in the small roles he performed. In the Vesper Structured Product Trades he likewise assisted Mr Marino acting for FMCP, but with a greater role.

448. Mr Ohmura urges caution in relation to this issue on the basis that the strictness of liability for bribery under English law is a reason not to allow liability to expand. He says that it would be wrong in principle to create a situation where both FMCP and LAP were able to bring claims in bribery in respect of the same payment. I note this caution, but consider that it does not apply here. The conclusion which I reach above is not, in my judgment, any expansion of the relevant principles in that I have concluded that there was relevant dealing. Nor does it seem to me that LAP would necessarily have a claim in bribery also, because Mr Marino was not its agent.

449. As for the argument that the claim fails because the maker of the payment was not Mr Ohmura but Conquest, in this context I do not see this argument as being one of substance. It cannot be the case that bribery requires direct payment; to require this would create an absurdity where by liability for bribery could be simply sidestepped by procuring the payment to be made by someone else – a family member or a third party who owed the briber a favour. While the sentence from *Mortimore on Company Directors* which was relied on by FMCP may not be particularly apposite, the submission advanced by FMCP is in my judgment sound: the source from which the money comes need not be the briber himself or directly. What matters is that he procures the making of a payment to an agent of someone with whom he is engaged in business and that payment is one which creates a risk of corrupting the agent's loyalty. This is not the same as finding liability on the basis of participation in the bribe. It is still necessary to show that the briber was responsible for the making of the bribe. But here, with (i) the promise of payment being made by him and (ii) the agent for payment being Mr Ohmura's wholly owned company, this is not problematic.

450. As for the third issue, whether it is necessary to prove loss, it has seemed to me that this is a rather arid point on which no determination is necessary. This is for two reasons. The first is my conclusion on loss above. The second is that Mr Ohmura accepts that FMCP can bring an action at least in the amount of the bribes, although he contends that that action is properly characterised as one in unjust enrichment.

451. I therefore conclude that the case on bribery is made out against Mr Ohmura and Mr Marino.

*Conspiracy*

452. The starting point here is to consider whether unlawful means conspiracy adds anything to the other claims advanced. It was argued for both active defendants (based on the pleaded case, which I accept was not hugely easy to follow) that it does not.

453. However, the financial analysis of the claims produced as part of FMCP's submissions demonstrates that it adds something, albeit a relatively small amount. The largest claims otherwise against Mr Marino and Mr Ohmura are US $14,789,984 and US$12,183,713, respectively, but the claim in conspiracy rises to US$16,231,426. The difference is represented by the moneys which Mr Ohmura received in relation to the Structured Products Trades, namely US$1,897,713.

This sum is conceded not to be recoverable from Mr Marino in breach of fiduciary duty or from either Mr Marino or Mr Ohmura in dishonest assistance. The attack based on redundancy therefore fails.

454. This claim is then met with a pleading point, namely that the pleaded case on conspiracy is limited to a case in relation to the JB Notes. I do not consider that this point is a good one, once the pleadings are carefully considered. A slightly deceptive impression is created by the use of the heading in the pleading: "The JB Secret Commissions". However, having been taken through the pleading, I accept that even on the original pleading the body of the pleading made plain that at least the Vesper Structured Product Trades were included under this heading; this was clarified still further by an amendment of the term to encompass all the Structured Products Trades; that amendment was made by way of paragraph 6(a) of the Reply.

455. Turning then to the substance of the claim, FMCP says that in the present case both the combination, arrangement or understanding between Mr Marino and Mr Ohmura and the intention to injure FMCP are readily inferred from the findings already made. So far as concerns unlawful means, FMCP points to the various wrongs already considered, namely: bribery, breaches of fiduciary duty, dishonest assistance and knowing receipt.

456. The Defendants take relatively little issue with these parts of the case, except intention. They concede that the other wrongs are capable of constituting unlawful means, though Mr Ohmura says that FMCP cannot establish that Mr Ohmura knew that the actions which make up the conspiracy were unlawful. They accept that combination is likely to follow from any conclusion on dishonest assistance.

457. The main focus of debate in relation to this head of claim has centred on the question of loss – which is a key constituent of the tort and might also be seen as the flip side in this case of intention. This hinges on the fact that *prima facie* the loss might seem to be that of LAP, not FMCP.

458. As I have noted above, FMCP says that the loss caused to FMCP actually does equal the total sum of amounts paid to Mr Marino and Mr Ohmura in connection with the JB Notes and on the Structured Product Trades, on two alternative bases.

459. Mr Emmett, for Mr Ohmura, argues that even if there was a conspiracy to commit dishonest assistance and/or bribery (which he contends there was not) such a conspiracy would not, on the facts of this case, constitute a conspiracy to injure FMCP. He notes that FMCP's own case in the headline summary of its opening submissions is that the conspiracy was put into effect *"at the expense of ... the assets ... of ... LAP"* . He says, if so FMCP's primary case that the commissions should have been paid to FMCP cannot stand. He also submits that the derivative nature of the claim hypothesised between LAP and FMCP underpins the argument that any intention to injure was directed at LAP.

**Conclusion: conspiracy**

460. The matter was argued primarily as an argument on loss, but it was accepted that two arguments interrelate; the intention in conspiracy, after all, is to injure which is likely to mean to cause loss and so the question of the existence of the requisite intention may in some cases be illuminated by the case on loss. This is, in my judgment, such a case.

461. As a backdrop I bear in mind the guidance of the House of Lords in *OBG v Allan [2007] UKHL 21; [2008] 1 A.C.1* as regards the requirement of intent. At [164-6] Lord Nicholls said the following:

> "164. I turn … to the other key ingredient of this tort: the defendant's intention to harm the claimant. A defendant may intend to harm the claimant's business either as an end in itself or as a means to an end. A defendant may intend to harm the claimant as an end in itself where, for instance, he has a grudge against the claimant. More usually a defendant intentionally inflicts harm on a claimant's business as a means to an end. He inflicts damage as the means whereby to protect or promote his own economic interests.
>
> "165. Intentional harm inflicted against a claimant in either of these circumstances satisfies the mental ingredient of this tort. This is so even if the defendant does not wish to harm the claimant, in the sense that he would prefer that the claimant were not standing in his way.
>
> "166. Lesser states of mind do not suffice. A high degree of blameworthiness is called for, because intention serves as the factor which justifies imposing liability on the defendant for loss caused by

© 2025 Thomson Reuters. 

> a wrong otherwise not actionable by the claimant against the defendant. The defendant's conduct in relation to the loss must be deliberate. In particular, a defendant's foresight that his unlawful conduct may or will probably damage the claimant cannot be equated with intention for this purpose. The defendant must intend to injure the claimant. This intent must be a cause of the defendant's conduct, in the words of Cooke J in *Van Camp Chocolates Ltd v Aulsebrooks Ltd [1984] 1 NZLR 354* , 360. …""

462. This passage (and the judgments of Lords Hope and Mance for example at [44] and [120]) provides a strong indication that the intent hurdle is intended to be a high one. That is reflected in the similarly high hurdle seen for the *"obverse side of the coin"* intent arguments referred to at [167] of Lord Nicholls' judgment and seen in such cases as *Tarleton v M'Gawley (1794) Peak 270* , *WH Newsom Holdings Ltd [2014] Bus LR 156* and *Emerald Supplies v British Airways plc (Nos 1 and 2) [2016] Bus LR 145* .

463. If one starts by asking what the intention of Mr Marino and Mr Ohmura in the hypothetical conspiracy is said to be, the natural answer is the one which FMCP chose to place front and centre of their opening: to cause loss to LAP. This is not a promising start for FMCP, as regards their primary case.

464. Looking further at that primary case it seems clear on the evidence that in the context of conspiracy there are real issues. As I have indicated above, the question of paying introducer/distributor commissions is not, on the evidence I have seen, one which can only have one answer (that commissions would be paid). I have concluded that in relation to the JB Notes, given the fees that FMCP were already being paid for essentially distribution work, a commensurate increase might well have been objectionable, though some increase might well have been agreed. Then too, there is the question of whether any fees taken out of LAP assets, as the commissions were, would have been acceptable at all. Thus, while I would conclude that it was foreseeable by both Mr Marino and Mr Ohmura that some loss would probably be caused to FMCP, that is insufficient as a matter of law for a claim in conspiracy, as Lord Nicholls makes clear. So far as concerns the question of actual intent, the evidence by no means meets the hurdle of showing that Mr Marino and Mr Ohmura intended that loss to FMCP to be caused.

465. Further, given the complications I have outlined above on the loss case, this cannot come close to meeting the *"obverse side of the coin"* test, for which it would be necessary to show that paying commissions to Ironfly et al necessarily meant that FMCP would lose the self-same fees.

466. If, on FMCP's secondary case, the loss was primarily a loss to LAP and could only be a loss to FMCP by the route of liability to LAP, matters become even more difficult when intention is considered. Was it foreseeable that such a loss would occur? Was it intended that such a loss would occur? As regards the first question the answer might well be yes as regards Mr Marino; I do not see how it could be as regards Mr Ohmura, who was not privy to the details of LAP's relationship with FMCP.

467. As regards the second question, the answer on the evidence appears to be no, and this claim must therefore fail. In the case of neither is the requisite element of targeting or causing of the conduct established by the evidence.

468. I should however add a few further observations in case they become pertinent in another court. The first is that I accept the submission that the presumption of loss associated with the payment of bribes is not applicable in this different context. So, if the case on loss failed on the other heads, it could not be saved via the claims in bribery.

469. Secondly, I would have been minded to find concerted action on the part of Mr Marino, Mr Bessot and Mr Ohmura, but only as regards the individual claims. To the extent that the claim was advanced on the basis that there was an overarching conspiracy to injure reached in around May 2009, my firm view was that there was insufficient evidence to make out any such concerted plan or action involving Mr Ohmura. I have concluded that Mr Ohmura was dishonest as early as GAIN, but I see nothing which indicates that he was part of some overarching conspiracy to injure FMCP; he appears to me to have been the wrong side of the line on GAIN (quite possibly on the basis of Nelsonian knowledge) and increasingly implicated in dishonesty as time progresses, but simply as regards the individual transactions.

470. The position would be different as regards a wider combination between Mr Marino and Mr Bessot. The evidence was that they were closer colleagues. They had worked together in the past and they started FMCP together and worked closely while there. They both benefitted financially from FMCP as well as their private ventures. The evidence I heard indicated that Mr Ohmura was a more marginal figure. He appears to have sought Mr Marino's patronage and attended at Mr Marino's

convenience, waiting for him while Mr Marino did other business. Mr Bessot did not always speak respectfully of him behind his back in Bloomberg chats.

471. It seems to me quite possible that Mr Marino and Mr Bessot did combine together with the intent of enriching themselves via the LAP portfolio. However, this specific combination was not the subject of detailed argument and I make no findings on it, as there may be interesting issues which involve the impact of not just the private commissions but also the fee structures. These, although generally arguably within market tolerances involved not just the fees to "external" introducers (alias Ironfly/ Leopard) but considerable fees to FMCP – from whom of course Mr Marino and Mr Bessot both benefitted, albeit not as wholly as they did from Ironfly and Leopard. In relation to the later products the experts became increasingly hesitant as to the justifiability of the fee levels. However, there must be a question as to the relevance of such issues to a claim in conspiracy to injure FMCP.

472. Finally, for the reasons which I have given earlier I would not consider (as was submitted on behalf of Mr Marino) that the existence of the April Mandate informed the question of conspiracy at all.

*Limitation Issues*

473. Mr Ohmura takes a limitation point. He points to the fact that the claim against him was issued on 5 December 2015 and argues that, to the extent FMCP's case relies on any payments made before 5 December 2009, it is time-barred by Section 2 of the Limitation Act 1980 , which provides that *"an action founded on tort shall not be brought after the expiration of six years from the date on which the cause of action accrued"* .

474. This argument therefore comprehends the US$625,000 payment and the sums paid to Conquest under Ironfly Trades 1 and 2.

475. FMCP relies against this on Section 32(1) and (2) of the Limitation Act 1980 which provides (so far as relevant):

> "(1) … where in the case of any action for which a period of limitation is prescribed by this Act, either—
>
> (a) the action is based upon the fraud of the defendant; or
>
> (b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or
>
> (c) the action is for relief from the consequences of a mistake;
>
> the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it.
>
> (2) For the purposes of subsection (1) above, deliberate commission of a breach of duty in circumstances in which it is unlikely to be discovered for some time amounts to deliberate concealment of the facts involved in that breach of duty."

476. It says that because of Mr Ohmura's (and Mr Marino's) fraud and concealment, the commencement of the limitation period was postponed by s.32(1) of the Limitation Act 1980 . It says that it had not discovered Mr Ohmura's involvement in the fraud, nor could with reasonable diligence have discovered it, until receipt of the Charles Russell letter on 16 September 2015.

477. Mr Ohmura points out that the burden of proof is on FMCP to show that it could not have discovered the fraud or deliberate concealment without taking exceptional measures which it could not reasonably have been expected to take: *Paragon Finance v DB Thakerar [1999] 1 All ER 400* , 418.

© 2025 Thomson Reuters. 

478. He contends that FMCP could with reasonable diligence have discovered the existence of its claims as soon as or very shortly after the relevant transactions were completed, because the terms of the trades must have been apparent to anyone at FMCP who reviewed its records; and it would have been reasonable for such inspection to have taken place.

479. I do not find the argument advanced for Mr Ohmura in this regard compelling. FMCP has pointed to the timeline in uncovering the frauds as evidence that the frauds were not reasonably discoverable earlier. I accept that submission. It is not suggested for Mr Ohmura what was not done which could have given rise to discovery – particularly as regards Mr Ohmura's role which was not picked up on either in the PwC investigation or in the BDO investigation. Accordingly, I reject the submission that any of the claims against Mr Ohmura are time barred in English law.

**Choice of law and Swiss law**

480. The question of Swiss law arises only in relation to the claim against Mr Ohmura. Mr Ohmura says that since he was not a director or fiduciary of FMCP (an English company), the claims as against him are governed by Swiss law, and that the position under Swiss law is materially different to that under English law. Thus, even if he would be liable under English law, he would not be so liable under Swiss law.

*Choice of law*

481. The first issue is whether the claims are indeed governed by Swiss law. It is common ground that the question of applicable law falls to be decided pursuant to Article 4 of the Rome II Regulation (i.e. Regulation (EC) 864/2007 ). Article 4 of Rome II provides:

> "1. Unless otherwise provided for in this Regulation, the law applicable to a non-contractual obligation arising out of a tort/delict shall be the law of the country in which the damage occurs irrespective of the country in which the event giving rise to the damage occurred and irrespective of the country or countries in which the indirect consequences of that event occur.
>
> …
>
> 3. Where it is clear from all the circumstances of the case that the tort/delict is manifestly more closely connected with a country other than that indicated in [paragraph] 1 … the law of that other country shall apply. A manifestly closer connection with another country might be based in particular on a pre-existing relationship between the parties, such as a contract, that is closely connected with the tort/delict in question."

482. I note here that I did invite submissions on whether I should consider the potential application of any other article of Rome II. Specifically, I had in mind the potential applicability of Article 10, which deals with cases of unjust enrichment. There are suggestions that this is the article that should apply to determine the governing law of the claim in knowing receipt: see Dicey, Morris & Collins: The Conflict of laws (15th edn., 2017) at [36-062] to [36-064]. However, the parties did not accede to my invitation. Mr Emmett maintained that he relies only on Article 4 in seeking to make out his case that Swiss law should apply, and Mr Pillow QC concurred essentially because the knowing receipt claim was not *a "pure unjust enrichment"* claim but a claim relating to a wrong. Whether or not that is right, in the absence of argument on the point and given the fact that knowing receipt is (as regards Mr Ohmura) very much a less significant claim, I will proceed on the basis adopted by the parties.

483. Mr Ohmura's primary case is based on the " *location of damage* " proviso in Article 4(1) . In the alternative he says that the wrongs alleged are " *manifestly more closely connected* " with Switzerland and that therefore Article 4(3) is applicable.

484. As regards the Article 4(1) argument the starting point is the definition of the word "damage" in Article 2(1) :

© 2025 Thomson Reuters. 

> "For the purposes of this Regulation, damage shall cover any consequence arising out of tort/delict, unjust enrichment, negotiorum gestio or culpa in contrahendo."

485. There is then a potential question as to whether the case law relating to what has become Article 7(2) of Brussels (Recast) is applicable in interpreting Article 4 of the Rome II Regulation . On this I would say that in the light of the mismatch between the two regulations (in that Rome II refers to the law of the place where the damage occurs while Brussels/Brussels Recast refers to the law of the place of the harmful event that gave rise to the damage) Mr Ohmura's submission that Article 4(1) falls to be interpreted in accordance with the case law relating to what is now Article 7(2) of the Brussels Recast, puts matters a little too high. I would consider, as indicated in *Dicey, Morris & Collins* at [35-024] such authorities should be regarded as " *likely to be useful* ".

486. To similar effect was the judgment of Gloster LJ in *Erste Group Bank AG v JSC 'VMZ Red October' [2015] 1 CLC 706* at [90-1] where she said that the provision *"ought to be interpreted in a manner which is broadly in harmony with the jurisprudence and interpretation of similar provisions"* in Brussels and that of Flaux J as he then was in *Fortress Value Recovery Fund I LLC and others v Blue Skye Special Opportunities Fund LP and others [2013] EWHC 14 (Comm)* at [44].

487. Mr Ohmura says applying the test correctly in relation to dishonest assistance (as well as the other heads of claim on which FMCP relies), the place of damage for the purposes of Article 4(1) is the place where the accessory's assistance caused direct damage to the claimant. This will not necessarily be the same place where the trustee caused direct damage to the claimant and will depend upon the form which the assistance took. He points me to the case of *London Helicopters Ltd v Heliportugal LDA-INAC [2006] 1 All ER (Comm) 595, [2006] EWHC 108 (QB)* at [20(iii)] where Simon J (as he then was) stated that:

> "The place where the damage occurred …. is not the place where a claimant simply suffers financial loss. It is necessary to see where the event giving rise to the damage produced its " *initial* ", " *direct* ", " *immediate* " or " *physical* " harmful effect."

(see also Dicey at [35-026])

488. He submits that the Court needs to identify the immediate consequences of the harm (namely, receipt of payments by persons who should not have had them), not the indirect consequences (namely, the non-receipt of payment by FMCP).

489. In so far as FMCP claims that the "damage" it has suffered is its liability to LAP, Mr Ohmura argues that the damage was also suffered in Switzerland, being the location of the initial, direct and immediate harm, i.e. the location of the damage that was suffered by LAP. He submits that the idea that damage of this kind was suffered in England, in the form of its *"exposure in England to liability in English law"* fails properly to take account of the fact that the Court should look for the direct consequences of the wrong, not its indirect consequences.

490. Before me the parties addressed the bulk of their submissions in closing to the case of *Dolphin Maritime & Aviation Services Ltd v Sveriges Angfartygs Assurans Forening [2009] EWHC 716 (Comm); [2010] 1 All ER (Comm) 473* . In that case, an English company ("Dolphin") was engaged by Turkish cargo underwriters to recover compensation from shipowners whose vessel had grounded off Gibraltar. The owners' interests were represented by the defendant Swedish P&I Club. Dolphin entered into an agreement with the underwriters whereby only Dolphin was entitled to conduct negotiations with the Club and the full amount of any recoveries would be paid into Dolphin's English bank account, from which Dolphin would deduct its commission. The Club provided a Letter of Undertaking addressed to the underwriters securing the shipowners' liability, which provided for payment of any settlement monies to Dolphin or solicitors appointed by Dolphin. However, in breach of contract the underwriters concluded a settlement directly with the Club, and the Club paid the settlement monies directly to

© 2025 Thomson Reuters. 

the underwriters' bank accounts in Turkey. Dolphin sued the Club for, among other things, inducing a breach of the contract between Dolphin and the underwriters, and conspiracy to injure by unlawful means.

491. The issue was whether Dolphin had suffered the damage in England, as the place where it should have been paid the settlement monies, for the purposes of Article 5(3) of the Brussels I Regulation. Christopher Clarke J, as he then was, accepted Dolphin's submission that it had, rejecting the argument that the harm occurred either where the settlement monies were paid or received. In particular, he held as follows:

> "30. In some cases the place where the damage occurred may not be difficult to discern. If a claimant's person or property is injured that place is likely to be the place where his person or property was at the time of the injury. In the case of economic loss, however, the issue is not so clear cut. In one sense a corporation's economic loss is suffered in the place where its accounts are prepared because it is in them and there that its monetary loss is calculated and felt.
>
> 31. However, as the jurisprudence of the ECJ makes clear, the fact that a corporation's loss is felt where its books are made up does not mean that that is the place where the damage occurred for the purpose of Article 5.3. If that were so a corporation would in most economic loss cases be able to sue in the courts of its own domicile.
>
> 32. The present case introduces an added complication in that, whilst the claimant complains of things that were done, e.g. the fact that the underwriters negotiated directly with the Club, it also complains, most particularly, about what was not done, namely to procure that the recovery was paid to Dolphin itself. …
>
> 56. …there is, as it seems to me, a well arguable case that, under the terms and conditions, the underwriters were bound to procure that the sums recovered directly from the Club were paid in the first instance to Dolphin. ….
>
> 57. In those circumstances, the arguments on behalf of Dolphin are, in my judgment, to be preferred. Dolphin's essential complaint is that it suffered harm because it did not receive the $8.5 million into its bank account which it should have done because, despite knowledge that this would involve a breach of the underwriters' contract with Dolphin, the Club paid it to their accounts in Turkey. …. the contract (which is governed and must be interpreted by English law) calls in terms for 'Recoveries and quasi-Recoveries (i.e. sums which would otherwise comprise 'Recoveries') to be received direct by Dolphin and that the complaint in tort is that the Club wrongfully brought about a breach of that obligation.
>
> 58. When, in those circumstances, I ask myself 'where the damage to the direct victim occurred' ( *Dumez* : Advocate General para. 52) or 'where the event giving rise to the damage, and entailing tortious liability, directly produced its harmful effects upon the person who is the immediate victim of that event' ( *Dumez* (ECJ) para. 20) or 'where the event giving rise to the damage caused injury' ( *Reunion* ), the answer appears to me that it is in this country, where Dolphin did not receive the money which, if the contract had been performed, it should have received.
>
> 59. Further, if I ask myself what would have been the position if the tort complained of had not taken place, the answer is that payment would have been made to Dolphin in England: and the essence of Dolphin's complaint is that that did not occur. ….. In some cases, e.g. in cases of damage to goods or persons, the question may have no great utility. But in others where the claimant has failed to obtain some property or money which he would otherwise have received the answer to the question may be a guide to identifying where the harm in the particular case occurred.
>
> 60. I do not ignore the danger of conflating the place where the damage occurred with the place where the loss was suffered. There is, however, a difference between a case in which the claimant complains that he has lost his money or goods … and a case in which the claimant complains that he has not received a sum which he should have received. In the former case the harm may be regarded

> as occurring in the place where the goods were lost …or the place from or to which the moneys were paid …, although the loss may be said to have been suffered in the claimant's domicile. In the latter case the harm lies in the non-receipt of the money at the place where it ought to have been received, and the damage to him is likely to have occurred in the place where he should have received it. That place may well be the place of his domicile and, therefore, also the place where he has suffered loss."

492. The argument before me was as to the applicability of this analysis: in particular whether it encapsulated a statement of general principle or whether (as submitted for Mr Ohmura) the case had to be read more narrowly in light of its facts, in particular that there was a specific contractual obligation on the underwriters to pay any recoveries into Dolphin's bank account, that that contract was governed by English law, and that Dolphin had given a notification identifying a particular bank account in England for the receipt of the money.

493. I do not think such a narrow reading is justified. There does not seem to me to be anything in Christopher Clarke J's judgment to suggest that it was intended to be confined in the way suggested by Mr Emmett or why the fact of the existence of a contractual obligation should make a significant difference. When one looks at the judgment the category of cases identified by Christopher Clarke J at [60] to which the principle stated is said to apply was one where *"the claimant complains that he has not received a sum which he should have received"* . That is a general category.

494. I note that subsequent cases, in dealing with the *Dolphin Maritime* case, seem to regard it as encapsulating a general principle. Thus, in *Pan Oceanic Chartering Inc v UNIPEC UK Co. Limited, UIPEC Asia Co. Limited [2016] EWHC 2774 (Comm)* at [200], Carr J applied the *Dolphin Maritime* analysis in a case concerning Article 4(1) of Rome II. Similarly in the Brussels cases of *Actial Farmaceutica LDA v Professor Claudio De Sione, Mendes SRL, MS Florence Pryen [2016] EWCA Civ 1311* at [34] – [37] and the judgments of both the Court of Appeal and Supreme Court in *AMT Futures Ltd v Marzillier, Dr Meier & Dr Guntner Rechtsanwaltsgesellschaft mbH: [2014] EWCA Civ 143, [2015] QB 699* at [37], [50] and [53] and [2017] UKSC 13; [2017] 2 WLR 853 at [26] the principle was applied in the way one would a general principle.

495. Although it is fair to say that in the latter case *Dolphin* was described as a case where there was a positive obligation to make a payment, that has to be looked at in the context of the specific argument which was in issue there. The focus in both cases was on inducing breach of contract, and so focus on the concept of obligation is natural in both. But the distinctions as noted by the Supreme Court are important. It was a case where (unlike *Dolphin* ) there was no single route to perform the obligation but a variety of ways the obligation could be performed: *"They were under an obligation not to sue in Germany or elsewhere than England. The former clients could have performed their contractual obligations to AMTF either by not raising proceedings in Germany or, having raised those proceedings, by discontinuing them"* . But this was only a distinction.

496. In *AMT* the result did not turn on whether there was a positive obligation but on a focus on the harm which lies at the centre of the rule. The Supreme Court noted the case was one where there was identifiable damage in two places and that in its view the direct damage was in Germany: *"the raising of the German proceedings has damaged AMTF's business model as it sought, through the exclusive jurisdiction clause, to preserve the focus of its business in London if it traded with overseas clients. But that loss of focus is consequential upon the direct harm caused by the raising of the German proceedings"* . It was this which drove the conclusion that the place of the harmful event was Germany.

497. Ultimately, I form the view that the *Dolphin* principle is a general one – though it is simply one of the permissible methods of trying to discern the country where the damage occurs.

498. The next question is whether this case falls within the *Dolphin* principle. Mr Ohmura's case is that it does not, because FMCP's claim was framed as one for loss, rather than for the non-receipt of money; and that the initial, direct and immediate harm said to be suffered by FMCP lay in the receipt of fees by Conquest, Ironfly and Leopard, rather than the fact that those monies were not received by FMCP (which was said to be the mere consequence of the alleged harm). Mr Emmett therefore submitted that the current case is an example of the kind of case outlined in the first part of the dichotomy at [60] of the judgment.

499. FMCP says that the complaint is (primarily at least) about commissions which should have been paid to FMCP and profits which fall to be accounted for.

500. I prefer the latter argument. It is indubitably the case that (despite some somewhat loose wording in some of the submissions) FMCP's primary argument has been that (so far as compensatory remedies are concerned) the commissions paid to Messrs Marino, Bessot and Ohmura could and should have been paid instead to FMCP, and (so far as the alternative remedy in dishonest assistance is concerned) that Mr Ohmura is liable to account to FMCP in England. This is not a case about misappropriation of FMCP's own money.

501. If I adopt the approach (approved by the Court of Appeal in *Actial* at [37]) of asking what would have happened if Mr Ohmura had not committed the various wrongs that he is alleged to have committed, on FMCP's case the answer would be that JB/GAM/BASL (in the case of the JB Notes) and the various counterparty banks (in the case of the Structured Product Trades) would have paid the commissions to FMCP's bank account in England. That supports the submission that the damage is the non-receipt of those monies in England.

502. It is true that the fit of the *Dolphin* principle is not perfect: there is a dichotomy in that judgment between loss of money or goods on the one hand and cases where a claimant complains that he has not received a sum which he should have received on the other, neither of which is precisely apt.

503. But I cannot accept the submission that the loss suffered by FMCP is the receipt of fees by the various defendants. Receipt by Messrs Marino and Bessot and Mr Ohmura is not damage or harm to FMCP. The test under Article 4 (unlike that under Article 10 dealing with unjust enrichment, which as I have noted, was not relied on) does not focus our attention on gain, but on harm caused to the claimant. Furthermore, such a test would (as FMCP submitted) produce arbitrary results when one looks at economic loss because of the possibilities of multiple jurisdictions. Here it would make claims against Mr Ohmura subject to Swiss law and Monegasque law (Monaco being where Ironfly and Leopard banked.)

504. In my judgment this is plainly not a case about loss of money/goods and so not subject to the first limb of the test. As I have said, the fit is not perfect - it is also not exactly a case where the simple answer is that it is a complaint that FMCP has not received a sum which it should have received since the complaint is not contractual or quasi-contractual. It may be fitted into this category, but this is not how one would describe it in the absence of the test. This is, it seems to me, a facet of the nature of the claims brought and the remedies which they entail. But to the extent the test can be made to fit, the indication it provides is in favour of England.

505. I am also asked by FMCP to look at where the direct loss occurred on the basis that, while this is not the line taken in relation to Brussels/Brussels Recast cases, those should be regarded as helpful rather than as binding and that in this context one does not have the constricting factor of the need to interpret derogations from the primary domiciliary rule restrictively.

506. In the light of the authorities I am cautious about doing so, but given the difficulties to which I have adverted above, and the acknowledgements in the authorities that there are significant distinctions between the two regimes, I consider that it is appropriate to do so. I have here in mind the following passage from Briggs *Private International law in English Courts* at [8.88]:

> " …the case-law from the Brussels I Regulation offers guidance which, with one significant reservation, it will be proper to follow. The one note of caution is that the case-law dealing with special jurisdiction under what is now Article 7(2) of the recast Brussels I Regulation has proceeded on the basis that if a proposed interpretation of the place where the damage occurred would tend to point to the home country of the claimant it will not be favoured, as the jurisdictional principle of *forum actoris* conflicts with the general principle of the Brussels I Regulation that defendants should enjoy the advantage of defending in their own courts. It is hard to see that this concern corresponds to any aspect of the proper interpretation of Article 4(1) of the Rome II Regulation , under which the law applicable to the claim may be that of the claimant's home country, even though it would not be generally appropriate that this be the court with special jurisdiction over a defendant domiciled in another Member State."

507. I also have in mind the point noted by Gloster LJ at [91] of the *Erste* case:

> "But there is, we think, this important difference between Article 4 of Rome II and Article 5.3 of the Judgments Regulation. The latter contemplates that a claimant in tort may choose between the courts of the place where the harmful event occurred and the place where the damage was sustained. But the purpose of Rome II is to identify a single applicable law rather than a choice: see Recitals (6) and (14). It is for that reason that Article 4.1 excludes the place where 'the event giving rise to the damage occurred', if different from the place where the damage itself occurred."

508. If one looks at it on this basis the direct loss is suffered where FMCP accounts or where it holds its bank account, which on either basis, is in England. This reflects what Dicey, Morris & Collins note will be the general rule in cases of economic loss (namely that *"in principle, the place of damage should, normally be the place where the direct economic loss was suffered."* [35-026]). Or as Christopher Clarke LJ in the Court of Appeal decision in *AMT* at [31] put it: *"In one sense a corporation may be said to suffer a loss wherever it keeps its accounts, for that is where its loss is ultimately felt."* .

509. In this case the factors which tend to pull against this simple conclusion in some of the authorities do not exist. This is not a Brussels case, and there is no need to regard this rule as a derogation, to be construed restrictively. This is not a case (as in *AMT* , the *eDate case [2012] QB 654* , or *Degussa [2015] QB 906* ) where there is a second place of damage. If one focuses on harm and damage in this case there is only one answer: FMCP suffered damage in England. Anything else elides the wrong and the damage, which is expressly contrary to the wording of the relevant Article.

510. It follows that whether one adopts the *Dolphin* analysis or reverts to a more straightforward reading of the rule, both routes indicate that the proper law of the clams is English law. In those circumstances I conclude that the country in which damage occurs is England and the proper law is (subject to Article 4(3) ) English law.

511. As to Article 4(3) Mr Ohmura submits that this requires a comparative exercise, and that the Court must compare how closely the tort is connected with the country in which the damage occurred with how closely the tort is connected with another country. In the present case, he submits that it is clear that the torts alleged are more closely connected with Switzerland than with any other country.

512. The points which he prays in aid are:

i) The claims relate to a matrix of documents which he says are governed by Swiss law. He points in this regard to the transaction documentation for the JB Notes themselves, the NAA, the FMCP SAA, the Ironfly SAA and also to the BPA.
ii) The underlying transactions, namely the JB Notes, were carried out in Switzerland and related to assets located in Switzerland.
iii) The actions on the part of Mr Ohmura which are said to be wrongful were all done in Switzerland.
iv) Mr Ohmura was domiciled in Switzerland and could have been sued in Switzerland pursuant to the Lugano Convention.

513. FMCP submits for its part that the hurdle of *"manifestly more closely connected"* cannot be met by Mr Ohmura when the case is looked at in the round. Further it says that the various wrongs are manifestly more closely connected with England. It argues that the conspiracy with Messrs Marino and Bessot, and the individual unlawful acts underlying it, were focused squarely on and directed towards FMCP in England, that FMCP is incorporated and run there, that the wrongs principally involved interference in English law duties owed by UK-based directors of an English company; and the transmission of secret payments either for the benefit of those UK-based company directors (who controlled the relevant bank accounts from England); or to others at their instruction. It also highlights the facts that FMCP has its bank account at the London branch of the British Arab Commercial Bank, into which the fees under the various agreements were paid, and where the other sums would they say have been paid and that the (unsigned) 2010 " *Introducer Agreement"* is in fact expressed to be governed by English law.

514. It says that the "matrix of contracts" argument ignores the fact that every other aspect of their relationship was governed by English law. FMCP points to the Letter of Intent, the Private Bank IMAs, and the HSBC IMA, the FMCP SAA, the

Novation Agreement in respect of the FMCP SAA, the Novation Agreement in respect of the NAA and the Shareholders' Agreement itself.

515. It says that the argument based on the steps taken by Mr Ohmura is expressly precluded by Article 4.1 , because the relevant place is the country in which the damage occurs *"...irrespective of the country in which the event giving rise to the damage occurred* ".

516. On this point I conclude that Mr Ohmura's argument is not well founded.

517. The starting point with any Article 4(3) argument is that it represents an *"exceptional"* route: (See Recital 18 of Rome II and p.12 of the Commission's Proposal for Rome II ("Proposal for a Regulation of the European Parliament and the Council on the law applicable to non-contractual obligations ("Rome II"), 2003/0168 (COD)"). To avail itself of this route a party seeking to invoke it must overcome a "high hurdle": *Pan Oceanic* at [206] and *Committeri v Club Méditerranée [2016] EWHC 1510* at [36] and [57]. The conclusion has to be reached against all the circumstances, which can include the event or events which give rise to damage, whether direct or indirect, factors relating to the parties, and possibly also factors relating to the consequences of the event: or events *Dicey, Morris & Collins* [35-032]).

518. I do not consider that that hurdle is met – by some distance. Although it can be said that all that Mr Ohmura did was done in Switzerland, that reflects just a small part of what is alleged in relation to this course of wrongdoing. In particular the main head of claim against Mr Ohmura is a claim in dishonest assistance which is legally speaking parasitic on Messrs Marino and Bessot's breach of fiduciary duties and where his actions are a small part (in some cases, as in relation to the Private Bank Trades, a very small part) of a much bigger factual whole. Further that main claim is one in relation to a UK company, the duties it is owed by its directors are unquestionably governed by English law, their actions are almost entirely ones in London and it would suffer financial loss (through a failure to account, for example) in a bank account in England. A similar point could be made in relation to others of the heads of claim against him such as knowing receipt, conspiracy and bribery.

519. Indeed, were it necessary to do so I would find that the factors linking Mr Ohmura's wrongs to England are of sufficient weight when all the circumstances are considered that in themselves they would point to English law being appropriate under Article 4(3) if the place of damage under Article 4(1) had been Swiss law. Aside from the points made above as to the accessory nature of the claim against Mr Ohmura, I would note that the case is really about wrongs alleged to have been done to FMCP, a UK company, with English law Articles of Association, a London headquarters and bank (to which sums claimed should on the Claimant's case have been paid). As for the contracts, two of those which Mr Ohmura prays in aid (the Ironfly SAA and the BPA) were, as I have found, essentially sham documents, while many of the other relevant contracts were governed by English law. All in all, the centre of gravity of the wrongdoing in the case was plainly in my judgment manifestly most closely connected with England.

520. I therefore conclude that English law is the proper law of the claims against Mr Ohmura. Consequently, the issues on Swiss law do not arise. However, for completeness, and in case the issues were to become relevant I give below brief answers on those issues.

*Swiss law – the substance*

521. Swiss law is potentially relevant on a number of levels. I will however consider first the question of the appropriate way to approach the issues of Swiss law before outlining and considering the relevant issues.

522. Questions of foreign law are questions of fact. The Court's task is to determine how the Swiss Courts would or probably would answer those questions, not to interpret the provisions itself: *Yukos Capital Sarl v OJSC Rosneft Oil Co [2014] 2 Lloyd's Rep 435* at [26] (Simon J) and *Lazard Brothers & Co v Midland Bank Ltd [1933] AC 289* at 298 (Lord Wright).

523. As Switzerland is a civil law jurisdiction which does not apply the doctrine of precedent I am not bound to follow decisions of the Swiss Court if I am satisfied that a Swiss Court in my position would not do so. But nonetheless considerable weight should be given to decisions of the Swiss courts: *Dicey, Morris & Collins* at [9-020], *Yukos v Rosneft* at [29].

524. The question of how academic writings are to be weighed is a question which may differ from jurisdiction to jurisdiction. In this case I was also informed by Dr Weibel, the Swiss law expert retained by Mr Ohmura, that whilst Swiss judgments often cite academic writing, it is extremely rare for long-standing jurisprudence to be overturned on the basis of academic

criticism. Professor Pieth did not disagree with this. That reinforces the point that the most valuable resource for me is likely to be court judgments – viewed of course in the light of the evidence.

**Breach of duty by a director**

525. As indicated above, one of the issues of Swiss law relied on by Mr Ohmura is the assertion that in Swiss law *"there is no prohibition on a company director profiting from his position (other than at the expense of the company)"* .

526. That simple statement was in fact common ground between the experts. However, their evidence showed that Swiss law was perhaps stricter than this would suggest. They agreed that under Swiss law, directors must give priority to the company's interests over their own and that where a director receives a commission payment or retrocession from a third party while acting in his capacity as director, that money belongs in principle to the company. Dr Weibel's evidence in fact suggested that there is a breach wherever a director puts his interests before those of the company, regardless of whether he made disclosure unless he obtained consent – in which case he might be released from liability.

527. Accordingly, to the extent that the point is relevant, I would conclude that it does not provide much assistance to Mr Ohmura.

**Dishonest Assistance**

528. The second point in issue is the law as to dishonest assistance. The experts agree that there is no direct equivalent of "dishonest assistance" (or indeed conspiracy) in Swiss law.

529. It was Mr Ohmura's case that the only way someone in his position could be liable as an accessory to a director's wrong against a company under Article 158 or 138 of the Swiss Criminal Code is if he intentionally aids and abets a director who causes or permits the company ("SCC") to sustain a financial loss.

530. FMCP relies on Article 41 of the Swiss Code of Obligations ("SCO"), which governs liability in tort and which provides:

> "Any person who unlawfully causes loss or damage to another, whether wilfully or negligently, is obliged to provide compensation."

531. For the requisite unlawfulness, FMCP points either to Article 158 (criminal mismanagement) or Article 138 SCC. These provide:

> "(A138)1. Any person who for his own or another's unlawful gain appropriates moveable property belonging to another but entrusted to him,
>
> any person who makes unlawful use of financial assets entrusted to him for his own or another's benefit,
>
> is liable to a custodial sentence not exceeding five years or to a monetary penalty. …
>
> (A158)1. Any person who by law, an official order, a legal transaction or authorisation granted to him, has been entrusted with the management of the property of another or the supervision of such management, and in the course of and in breach of his duties causes or permits that other person to sustain financial loss is liable to a custodial sentence not exceeding three years or to a monetary penalty.
>
> Any person who acts in the same manner in his capacity as the manager of the business but without specific instructions is liable to the same penalty.

> If the offender acts with a view to securing an unlawful gain for himself or another, a custodial sentence of from one to five years may be imposed."

532. These, FMCP says, combine with Article 25 SCC, to enable accessory liability. That section provides that a person who intentionally assists in the commission of an offence is independently guilty of an offence. Thus, a person can be civilly liable for wilfully assisting in the breach of a private law duty where that breach constitutes a criminal offence; if however the main perpetrator's acts do not amount to a criminal offence then the accessory can only be liable if he himself is subject to and in breach of duties to the aggrieved party.

533. It is indeed agreed that there is no civil liability for assisting the breach of a private law duty by an employee or a director unless the alleged assistant has participated in the main perpetrator's acts, where both the act of assistance and the main perpetrator's acts amounted to a criminal offence.

534. Article 25 SCC requires that there be an act of wilful participation in the main perpetrator's offence. Wilfulness includes wilful blindness (known in Swiss law as *dolus eventualis* ): Article 12(2) SCC provides that *"[a] person commits a felony or misdemeanour wilfully if he carries out the act in the knowledge of what he is doing and in accordance with his will. A person acts wilfully as soon as he regards the realisation of the act as being possible and accepts this"* .

535. If the accessory is found to have wilfully assisted the main perpetrator in the latter's criminal offence, the accessory can be liable even if he does not himself owe a contractual or fiduciary duty to the victim, as long as he realises that his contribution promotes a criminal offence. According to Dr Weibel, the accessory must causally contribute to the offence, i.e. he must *"[promote] the offence in such a way that it would have taken a different form without the contribution of the accomplice"* and must actually have increased the chances of success of the offence.

536. I will deal first with the question of Article 138. The applicability of this Article to the role of directors was in issue. Dr Weibel's view was that Article 138 has no application other than in circumstances where the director engages in activity that has no connection with the business of the company. He said that assets belonging to a company are not " *entrusted* " to its directors for the purposes of Article 138 because the directors are considered to be part of the company itself. It follows that when directors act within the framework of their role as organs of the company, the appropriate offence is mismanagement (Article 158) rather than misappropriation (Article 138).

537. This view was (it seems to me from the extract provided) supported by a decision of the Swiss Federal Tribunal, Decision 6B_326/2012 of 14 January 2013, particularly at paragraph 2.5.3. For FMCP it was contended that this decision is wrong and has been criticised by academics. It was also suggested that this approach does not apply where the director is also an employee.

538. I am not persuaded by either of these objections. There may be academic criticism of the decision, but this did not seem to amount to such a consensus that it would be appropriate for me to conclude that a Swiss Court considering this point would or probably would reach the opposite conclusion. As for the latter point, the evidence on this was not sufficiently clear to persuade me that the point was established, particularly when there was no evidence of its having been considered in the cases, as one might expect.

539. The question therefore becomes whether there is a liability under Article 158 on the part of Messrs Marino and Bessot and if so whether Mr Ohmura's participation would result in liability under Swiss law. As to the first question, the experts agree that:

i) Directors must give priority to the company's interests over their own interests and that they must not make a profit from their position at the expense of the company.
ii) Where a director receives a commission payment or retrocession from a third party while acting in his capacity as director, that money belongs in principle to the company.
iii) A director must declare to the company any monies so received, and indeed must surrender such monies to the company unless the latter has given its informed consent to the director keeping the money.

© 2025 Thomson Reuters. 

iv) If a director acts in deliberate breach of his duties to the company by receiving such a commission, failing to disclose it to the company and thereby causing loss to the company, he will be liable under Article 158. On this basis the liability of Messrs Marino and Bessot would seem to follow.

540. The key issue against this background is therefore whether an accessory can be liable in Switzerland for assisting in an offence which was committed in another jurisdiction.

541. I was directed to various provisions of the SCC as to territorial scope (Articles 3-8). The gist of these appears to be that the provisions of the SCC only apply, and therefore criminal liability can only be established, if one commits an offence in Switzerland (Article 3 SCC); but there are various exceptions to that rule in accordance with which the SCC can apply to a person who has committed an offence abroad. In particular:

i) Article 7 provides for liability if the offence is also liable to prosecution at the place of commission and the person in question is in Switzerland but is not being extradited to the place of commission in relation to the offence;
ii) Article 8(1) provides that *"[a] felony or misdemeanour is considered to be committed at the place where the person concerned commits it or unlawfully omits to act, and at the place where the offence has taken place"* .

542. There was a lengthy debate on what the position was if offences were committed by a main wrongdoer in another jurisdiction, as in this case. I shall deal with that below. In my view however Article 8 provides a relatively simple answer in the circumstances of this case. As regards Article 8 Dr Weibel stated in cross-examination that this provision meant that the SCC *"applies to cases where either the offence was committed or had its result in Switzerland"* ; he also clarified that *"had its result"* in Switzerland meant that the damage occurred in Switzerland. On the counterfactual where Swiss law applies, it does so on the basis that damage has occurred there for the purposes of Rome II. It follows that Article 8 would apply.

543. It might also be that Article 7 could provide a similar result; however, this would turn on establishing an offence had been committed under the Fraud Act 2006 and/or the Bribery Act 2010 . On this I conclude that it would be necessary to plead and prove that Mr Ohmura had committed an offence under English law and one for which he could be extradited under Swiss law, and this has not been done.

544. On the wider debate as to accessory liability under Swiss law, to the extent that it is relevant in the light of my conclusion on Article 8, Dr Weibel's position is that if the main perpetrator committed its offence in England, the accessory will be treated as having also committed its offence in England, even if it provided its assistance from Switzerland. In such circumstances the accessory would not (generally) be liable in Switzerland. He relies on Decision BGE 104 IV 77, where the Court stated at 7(b) that *"[a]ccording to the case law of the federal Tribunal, participation in Switzerland in a principal act carried out in another country is considered to be perpetrated in the other country based on the principle of accessoriness…. Thus, the territorial principle (Art. 3 [SCC]) does not apply to the participant. This is because the act of participation has no independent meaning in this regard if it only facilitates the execution of the statutorily defined principal act and its outcome"* .

545. Professor Pieth disagrees. He considers that Dr Weibel's approach applies to the jurisdictional question only (i.e. as to whether the Swiss court has jurisdiction to try the accessory). He says that this does not answer the question of *"whether the participant offends according to Swiss law"* and that the accessory can be liable so long as the main offence is also an offence according to Swiss law.

546. Looking at the extracts of Decision BGE 104 IV 77 with which I have been provided, it appears that Professor Pieth is right that the point ultimately decided by the Federal Tribunal was a question of jurisdiction – although it is fair to say that the reasoning does not seem to be limited to that question of jurisdiction.

547. I therefore regard this issue as essentially sterile in the current context. The answer is to be provided by looking at the general rule and ascertaining if any of the statutory derogations applies; as I have found, Article 8 does in this case.

**Knowing receipt**

548. No separate case on Swiss law is advanced in relation to this head of claim.

**Bribery**

549. In relation to bribery Mr Ohmura denies that he would be liable in bribery under Swiss law.

550. There is little between the experts as to the elements of the tort of bribery under Swiss law. The relevant provision is agreed to be Article 4a Swiss Federal law on Unfair Competition of 19 December 1986 (the "UCA"). This provides as follows:

> "(1) Shall be deemed to have committed an act of unfair competition, anyone who:
>
> (a) in the private sector, offers, promises or concedes to a third party's employee, partner, agent or other auxiliary person an improper advantage in his or a third party's favour in return for an unlawful or discretionary act or nonfeasance in connection with his official or professional tasks;
>
> (b) in the private sector, as a third party's employee, partner, agent or other auxiliary person demands, is promised or accepts an improper advantage for himself or a third party in return for an unlawful or discretionary act or nonfeasance in connection with his official or professional task.
>
> (2) Advantages contractually accepted by the third party as well as insignificant, socially common advantages are not deemed to be improper."

551. In the expert evidence the elements of liability for bribery were expanded and broken down into six requirements, which were agreed by the experts:

i) The bribed person has a personal relationship of trust with the principal;
ii) The bribed person has an actual and determining influence on the principal's business decisions;
iii) An undue advantage is offered, promised or granted to the bribed person, or the bribed person demands, is promised, or accepts an undue advantage for its own benefit or the benefit of a third party;
iv) Such act is committed in view of an act or omission of the bribed person in connection with its business or commercial activity that is in breach of duty or discretionary powers;
v) The perpetrator acts with intent, i.e., deliberately; and
vi) There exists what has been described as *"a competition nexus"*.

552. There are three issues: intent, competition nexus and effect.

553. On the first, the point which FMCP emphasised was that intent should not be overcomplicated; it submitted that if the briber knows or assumes that the agent will not disclose the payment to the principal, then this suffices for intent.

554. Dr Weibel did not accept that that requirement would be satisfied simply because the alleged briber (e.g. a payer of a finder's fee) knew or assumed that the agent would not disclose the payment to the principal; he maintained that intent must extend to all elements of the offence and that mere assumption would not suffice. However, in his oral evidence he accepted that a person who assumed non-disclosure could be liable for commercial bribery, but emphasised that it simply depended on the circumstances. In my judgment this reflects the fact that Swiss law requires that finder's fees are disclosed by a director to the company, and indeed surrendered to the company unless the director has obtained full and informed consent to his retaining the fees. Where this is the background to the parties' dealings I would consider that in general if the payer of the fee ( *ex hypothesi* knowing what should happen) knows or assumes that the director will not disclose that payment to the company and will thereby be in breach of his obligations to the company, the payer can be said to have acted in a way which satisfies the 'intent' requirement.

555. So far as intent to incite a breach of trust is concerned, it seems to me likely that in these circumstances and against the background of a tendency on the part of the Swiss Courts to increase the protection conferred by the relationship of loyalty, this would not be likely to stand in the way of a conclusion that the intent requirement was satisfied.

556. As regards the " *competition nexus* " requirement, this is described in Article 2 UCA as follows: *"[a]ny behaviour or business practice that…affects the relationship between competitors or between suppliers and customers…"* . The experts

agree that the party alleging bribery need not prove that a competitive relationship actually exists between the alleged briber and principal.

557. The issue is as to the question of market effect; Dr Weibel insists that there must be a "market effect" saying: *"It has to affect competition in the abstract sense. [i]t has to influence the market as such, the quest for customers and market shares"* . For his part Professor Pieth says the question is simply whether giving or receiving payment is relevant for competition, and he considers that finder's fees and introducer's fees in the financial services industry easily satisfy this requirement.

558. Given the fact that Dr Weibel accepted that the requirement was abstract, and also that the effect on competition need only be objectively judged there was in reality not a great distance between the experts. I note Dr Weibel's concern that too broad an approach to this requirement could have the effect of reducing it to meaninglessness; and I accept that the competition nexus requirement must have some meaning. However, I do not consider that the argument advanced by Professor Pieth falls into that trap.

559. Whether the requirement is satisfied will depend on the circumstances of the case. In some cases, satisfaction will be relatively easy to deduce or infer; in others more evidence may be required. The present case falls into the former category in my judgment. Competition is intrinsic to the area of banking business with which this case is concerned; the payment of introducer fees reflects competition for business and rewarding of those who bring it. The payment must be intended to persuade the recipient of the payment to do business with them rather than another; that plainly could, and indeed is intended to, impact upon the market.

560. The final point of disagreement also relates to this effect on the market. Dr Weibel for Mr Ohmura opines that Article 4a UCA applies only if there is an objective distortion specifically of the Swiss market. Professor Pieth says not; he opines that *"the criminal law aspects of art. 4a UCA also [capture] illegal payments to foreign entities and extended to payments abroad"* .

561. I was referred to two academic articles on this point. These seem to me to support Dr Weibel's argument: Professor Dr Peter Jung and Philippe Spitz suggest that there must be a distortion of the Swiss market, and Dr Reto Heizmann and Dr Leander D. Loacker suggest Article 4a will apply if *"the Swiss market (possibly in addition to other foreign markets) is corrupted"* . The requirement that the Swiss market is affected is said in both articles to accord with the "market impact principle" of Swiss private international law.

562. Professor Pieth in his evidence was critical of the notion that liability might only arise if the Swiss market is distorted: he suggests that it would both (1) create a curious imbalance between civil and criminal liability for bribery and (2) represent *"the Swiss market opt[ing] out of the international world by simply saying, "We're only protecting our own banks and not, for instance, competitors from abroad""* . While I see the force of that argument, it does not engage with the exercise which I have to perform, which is determining the principles on which the Swiss Court would operate, and what the outcome of its decision would be likely to be.

563. I therefore conclude that the weight of the evidence supports Dr Weibel's opinion that the Swiss market must be (objectively) distorted in order for civil liability to arise under Article 4a. No evidence has been adduced saying that it would have been. It therefore follows that any claim against Mr Ohmura in bribery under Swiss law would fail.

564. I would add that Mr Pillow QC submitted that one should not expect the answers of Swiss law to differ from those of English law, saying that *"dishonesty is not a geographical concept"* . In general, that may be right; however, the places where boundaries of causes of action are drawn do tend to change in all jurisdictions over time. The evidence was that Swiss law was in a process of increasing protection for those to whom fiduciary duties are owed. But here the iteration of the legislation in operation at the time in question was predominantly concerned with preventing unfair competition. There are it appears newer provisions which do not apply in this case which are aimed more generally at corruption between private parties. That however cannot affect the conclusion as regards the law in effect at the relevant time.

**Remedies**

565. It is agreed between the experts that damages under Swiss law are purely compensatory. There is no direct equivalent to an account of profits in Swiss law.

566. FMCP submits however that an equivalent result can be achieved under Swiss law through the concept of *"agency without authority".* This applies where there is no actual contract between parties but an agent (or quasi-agent) intervenes in the interest of another party without the latter's consent.

567. The law regarding agency without authority is found in Articles 419 to 424 of the SCO. Article 419 provides as follows:

> "Any person who conducts the business of another without authorisation is obliged to do so in accordance with his best interests and presumed intention".

568. Article 423 then provides that:

> "(1) Where agency activities were not carried out with the best interests of the principal in mind, he is nonetheless entitled to appropriate any resulting benefits.
>
> (2) The principal is obliged to compensate the agent and release him from obligations assumed only to the extent the principal is enriched."

569. One issue between the parties is whether agency without authority is a de facto agency relationship or a *sui generis* form of wrongdoing.

570. However, the main issue related to what precisely is required for someone to be considered an agent for the purposes of agency without authority. The experts agree that agency without authority can apply to someone who is not a true agent as we understand the word in the UK, to someone who never had authority to act for the principal, and to someone who is the mere accessory of a true agent. An agent can even be a person who is not aware of acting, and has no intention of acting, on behalf of someone else, at least in a situation where a person acts in good faith in the belief that he is acting for himself and without knowledge that the act is wrong – though this latter example is not the " *mala fide* " Article 423 species of agency without authority that is under discussion in the present case.

571. Quite some time was spent in trying to delineate the ambit of the concept. However, in the end the question for me is not to define the concept to a nicety, but to ascertain it with sufficient clarity to whether it could be applicable to the factual situation before me.

572. FMCP submits in its written closing that *"[t]he touchstone is whether the defendant interfered with the claimant's assets and interests, for example by appropriating its deal or transaction, in disregard of the interest and presumed will of the claimant".*

573. However, it seems to me that this definition does not sit well with the expert evidence as a whole, which grappled both with the wording of the relevant sections, and with the implications as a matter of good sense. As Mr Emmett submitted, this approach would seem to have the potential to create an extraordinarily wide doctrine that would extend far beyond even the vaguest concept of agency.

574. On the evidence agency without authority under Articles 419 to 424 involves a person *"conduct[ing] the business of another"* and thereby carrying out *"agency activities"* : the alleged agent must do *"something by which he places himself, de facto, in the position of an agent".* Or as Professor Pieth put it - an agent without authority is *"an imposter… intruding into a relationship"* .

© 2025 Thomson Reuters. 

575. Thus, it is not enough simply to meddle in another's affairs, as Dr Weibel made clear in his Supplemental Report. The doctrine is directed only at those who act (or purport to act) " *on behalf of* " another, as Dr Weibel explained in his First Report.

576. Further colour is given to the concept by Professor Pieth's evidence that it is " *crucial* " to appreciate that the same " *logic* " lies behind all of the provisions on agency without authority in the SCO: namely that the *"principal relies on the agent to fulfil his duties"* . It does not seem to me that those concepts of reliance and the fulfilment of duties are engaged if an unknown party interferes in bad faith with another's assets and interests without even purporting to act for the alleged principal.

577. FMCP relied heavily on Dr Weibel's acceptance that the concept could be applicable to the accessory of an agent; however, his evidence was that *"merely acting as the accessory of an agent who commits a breach of duty does not make a person an agent without authority"* . This, it seems to me, is consistent with the descriptions of the essence of the relationship which may be differently expressed but seem to denote not simply acting as accessory to an agent, but actual insertion as a quasi-agent into the principal's transaction.

578. I would therefore conclude that the nature of the concept is essentially one of agency and is not a *sui generis* form of wrongdoing. I also conclude that the concept does not seem apt to describe Mr Ohmura's role in the various transactions in this case. I note that in advancing the case FMCP have not set out in any detail how they say the concept is applicable to the actual facts of this case, proceeding rather by reference to a fairly broadly pleaded case, asserting that Mr Ohmura intervened in FMCP's deals without authorisation and by reference to some rather complex hypotheticals (which the experts appeared to have difficulty following). This reinforces my conclusion that the concept is not an apt fit to this case. I therefore find that were Swiss law applicable the remedy available via this doctrine would not be available to FMCP.

579. I have considered whether it is possible that an alternative route of utilising this concept could be to characterise Mr Marino/Ironfly as the agent without authority with Mr Ohmura being jointly and severally liable with him. However, this is not the way the point was pleaded, put to the experts or argued in closing, and it would not be appropriate to make a finding on it on that basis.

**Limitation**

580. The experts agree that the limitation period in tort (where the requisite unlawfulness is not based on criminal wrongdoing) is one year from the moment the aggrieved party is aware of the relevant loss or damage, and the identity of the person liable for it, and ten years from the date of loss or damage.

581. Where the unlawfulness required under tort law is based on criminal law, the relevant time limits are (i) fifteen years for a cause of action based on criminal mismanagement; (ii) seven years for a cause of action based on criminal mismanagement where there was no intention of unjust enrichment; and (iii) seven years for a claim of bribery. There appears to be no relevant limitation defence.

**Summary of conclusions**

582. For the reasons given at length above, I accordingly conclude that:

i) As a matter of English law:

a) Mr Marino is liable in breach of fiduciary duty, dishonest assistance, and bribery in respect of all of the heads advanced against him;
b) Mr Ohmura is liable in dishonest assistance and bribery in respect of all of the heads advanced against him;

ii) The proper law of the claims is English law;
iii) As a matter of Swiss law (if it applied):

a) Mr Ohmura would be liable as an accessory to the liability for criminal mismanagement of Messrs Marino and Bessot under Article 158;
b) He would not be liable in bribery;
c) The remedies available via the concept of *"agency without authority"* would not be available against him.

© 2025 Thomson Reuters. 

**Postscript: Remedies**

583. The question of remedies was touched on relatively briefly at the hearing and will require to be the subject of some further submissions in the light of the findings above. For the present I confine myself to setting out the issues as issues they appear to be from the parties' submissions to date and noting the implications of the decisions made above for those various submissions.

*Breach of Fiduciary Duty*

584. FMCP seeks an account of profits and/or equitable compensation in respect of these (dishonest) breaches of duty.

585. FMCP therefore seeks declarations accordingly in respect of:

i) Mr Marino's shares in FMCP, which it is said that he purchased using funds from the JB Secret Commissions, and the dividends deriving from them (and their respective fruits and/or traceable proceeds);
ii) the £2.5m transferred by Mr Marino to his ex-wife, for no consideration, on 8 October 2014, and any traceable proceeds of those funds (to the extent not already recovered from Mrs Marino); and
iii) the credit balances in the bank accounts of Mr Marino and his vehicles which received the traceable proceeds of the JB Secret Commissions.

586. To the extent that Mr Marino has disposed of these (proprietary) assets and FMCP has been unable to trace, secure and/or recover them or their traceable proceeds, FMCP seeks an order that Mr Marino is personally liable to compensate FMCP for the shortfall.

*Dishonest assistance*

587. FMCP claims an account of profits (and/or of its losses) and equitable compensation from both Mr Marino and Mr Ohmura.

588. Mr Ohmura disputes that both remedies are available, saying that on the current state of the authorities FMCP's remedy would be to elect between equitable compensation and an account of profits.

589. Further he submits, whichever remedy were chosen FMCP could not make any recovery. There would be no remedy in equitable compensation because FMCP has not suffered any loss. There would be no account of profits because Mr Ohmura (via his interest in Conquest) has not made any profit which he would not have made if the sums that were paid to Ironfly and Leopard had been paid to FMCP.

590. As to this FMCP maintains that it has suffered loss. But also, as regards the account it submits that an account of profits is available in English law even where no loss is provable or even alleged. In support of this proposition I was referred to *Novoship v Mikhahyluk [2014] EWCA (Civ) 908 [2015] QB 499* at [71-93] where the Court of Appeal noted the body of first instance and academic authority which supported the proposition that the court has the power to order an account of profits against a dishonest assistant, even where no corresponding loss has been suffered by the beneficiary, and having carefully considered the authorities, accepted that proposition.

*Knowing receipt*

591. The issues in relation to the claim in knowing receipt against Mr Ohmura have been dealt with above.

*Bribery*

592. FMCP submits that if liability is established, there is a comprehensive choice of remedies available to the principal – see *Daraydan Holdings Ltd v Solland International Ltd [2005] Ch 119* at [54]:

> "The agent and the third party are jointly and severally liable to account for the bribe, and each may also be liable in damages to the principal for fraud or deceit or conspiracy to injure by unlawful

> means. Consequently, the agent and the maker of the payment are jointly and severally liable to the principal (1) to account for the amount of the bribe as money had and received and (2) for damages for any actual loss. But the principal must now elect between the two remedies prior to final judgment being entered… The third party may also be liable on the basis of accessory liability in respect of breach of fiduciary duty: *Bowstead & Reynolds* on Agency, para 8-221. The principal is also able to rescind the contract with the payer of the bribe."

593. As to the first remedy it is submitted that loss in the amount of the bribe is to be presumed (whether rebuttably or irrebuttably).

594. Further, FMCP submit that it is entitled to a proprietary remedy because a bribe or secret commission accepted by an agent is held on trust for his principal ( *FHR European Ventures [2014] UKSC 45; [2015] A.C. 250* at [46]). It is not necessary for the benefit to be derived from the property of the principal for the benefit to be held on trust.

595. So far as the extent of the claims made, the claim against Mr Marino in bribery is the JB Notes commissions (US$4,308,400, US$1,750,000, US$2,000,000), the Haggiagi bribes (US$856,271) and the Structured Product Trades commissions (US$5,875,313); that is a total of US$14,789,984 (subject to recoveries made from Mr Haggiagi).

596. That against Mr Ohmura may require clarification. In opening it was said that the bribes which he caused, procured or directed to be paid, for which he was jointly and severally liable with Mr Marino, were as follows:

i) US$4,337,500 to Mr Marino and Mr Bessot (via Ironfly) in connection with GAIN.
ii) US$2,000,000 to Mr Marino (via Leopard) in connection with TRAC.
iii) US$4,342,500 and €1,226,250 to Mr Marino and Mr Bessot (via Ironfly) in connection with the Structured Product Trades.
iv) US$2,700,000 to Mr Marino (via Leopard) in connection with the Structured Product Trades.

However, in closing the case in bribery against Mr Ohmura was limited to the US$2,000,000 in respect of TRAC and the US $5,875,313 in relation to the Structured Product Trades commissions. As I have said, this may require clarification, but I shall note here that this latter formulation seems more accurately to reflect the payment structure in relation to the various products.

597. It is not entirely clear to what extent the ability of FMCP to recover these sums is in issue, as it appears to be accepted that (i) there is a right to elect between the remedies and (ii) that recovery of the bribes as monies had and received is open to FMCP. There is an issue as to FMCP's entitlement to the second remedy, that of damages; arising out of the issue as to whether FMCP has suffered loss.

*Conspiracy*

598. If it were to arise, in relation to conspiracy the only claim is for damages. The availability of damages is governed by the argument as to whether FMCP has suffered loss.

*Proprietary claims*

599. FMCP asserts a proprietary claim arising out of the breaches of fiduciary duty, namely that all of the secret commissions received by or on behalf of Mr Marino (through Ironfly and Leopard) and their traceable proceeds were, and are, held by him on trust for FMCP: *Lewin on Trusts* [7-018]; *Williams v Central Bank [2014] AC 1189* at [9]; *Burnden Holdings (UK) Ltd v Fielding [2018] UKSC 14* at [11], [19].

600. FMCP also pursues a proprietary remedy in relation to bribery, the relevance of which appears questionable in the light of the above. So far as that is concerned FMCP say that the bribes received by, or for the benefit of, Mr Marino (and their traceable proceeds) are held by him on trust for FMCP.

601. As for Mr Ohmura, FMCP advances a proprietary claim in respect of the US$625,000 payment as the traceable proceeds of a bribe or of moneys received by Messrs Marino and Bessot in breach of their fiduciary duties. This operates essentially as an alternative to the knowing receipt claim. There was an interesting discussion on the different ways in which the concept of a *bona fide* purchaser might impact on each claim (as a defence to the former, the burden of which is on the defendant to prove; and the obverse (unconscionability) as a constituent of knowing receipt with the burden on the claimant). The point

© 2025 Thomson Reuters.