# Goose v Wilson Sandford & Co (No 2)
# (Unreported, Ch D, 25 January 1999)

# Exhibit 12

# Rex Goose v Wilson Sandford & Co (a firm), Gerard Mainon

**Court**
Chancery Division

**Judgment Date**
25 January 1999

CH 1991 G 8026

CH 1994 G 2283

High Court of Justice Chancery Division

**1999 WL 35815580**

Before: Mr Justice Rimer

Monday 25th January 1999

Hearing dates: 1,2,5,7,8,12,13,14,16,19,20,21 and 22 October; and 9 to 13 November 1998

**Representation**

Mr Richard McCombe Q.C. and Mr Philip Marshall (instructed by Sharpe Pritchard & Co. ) appeared on behalf of the plaintiff.
Mr Ronald Walker Q.C. and Miss Catherine Brown (instructed by Hextall Erskine ) appeared on behalf of the first defendant, Wilson Sandford & Co.
The second defendant, Gerard Mainon, did not appear and was not represented.

**Judgment**

Mr Justice Rimer:

These are two consolidated actions which were commenced by writs dated 15 July 1991 ("the 1991 action") and 22 April 1994 ("the 1994 action"). The plaintiff is Rex Goose. The two defendants in the 1991 action are (i) Wilson Sandford & Co, a firm of chartered accountants based in Brighton; and (ii) Gerard Mainon. The only defendant in the 1994 action is Wilson Sandford & Co. The claims in both actions are for damages.

The actions were originally tried by Harman J between 9 June and 13 July 1994. Harman J reserved his judgment, which he delivered over 20 months later on 1 April 1996. He dismissed all claims against Wilson Sandford. Mr Goose's appeal was heard by the Court of Appeal in December 1997. That court also reserved its judgment, which it delivered on 13 February 1998. It upheld certain of Harman J's findings and decisions; but was critical of the time he had taken to deliver his judgment and concluded that, in certain respects, his findings arrived at so long after the trial were unsafe. The outcome was that the claims against Wilson Sandford in the 1991 action remain dismissed; and that a re-trial was ordered of most of the issues in the 1994 action. They have been re-tried before me. Richard McCombe Q.C. and Mr Philip Marshall appeared for Mr Goose; and Mr Ronald Walker Q.C. and Miss Catherine Brown appeared for Wilson Sandford.

© 2025 Thomson Reuters. 

As for Mr Mainon, at an early stage Mr Goose obtained judgment against him in default of notice of intention to defend, with damages to be assessed. RSC Ord. 37, r.3 shows that they should have been assessed at the first trial. They were not, and I have been asked to assess them. Mr Mainon was given notice of the date of the re-trial and of the indication which I gave on its first day that I would assess the damages. He has neither appeared nor been represented before me.

Counsel did not refer me to, and I have not read, Harman J's judgment. Counsel did not object to my reading it, but I decided that it would be fairer to approach the re-trial uninfluenced by it, although Harman J's main findings are apparent from the judgment of the Court of Appeal, to which I have been referred. I have also seen the transcripts of the evidence before Harman J; and the evidence in chief before him (which, in the case of Mr Goose and Mr Wilson, the main witnesses, was adduced orally over some six days), was adopted as evidence in chief before me. The witnesses were then cross-examined, in the course of which there were many references to the evidence given in cross-examination to Harman J.

**Nature of claim**

The following is an introductory outline to a long story.

Mr Goose is a farmer. He lives at Green Acres, Whaplode Drove, Spalding, Lincolnshire. The misfortunes he suffered as a result of the events giving rise to these actions led eventually to his bankruptcy and the loss of his farm, and he now earns his living as an agricultural consultant. Before such misfortunes, he had an arable farm at Whaplode Drove called Hagbeach Farm. He had farmed there all his life and was formerly in partnership with his father. His father died in February 1983, and from about September 1983 Mr Goose farmed in partnership with his mother.

In about 1980, Mr Goose became interested in acquiring farmland in France. He was then about 40. The main attraction was that it cost about a third of what it did in Lincolnshire. In October 1982, he saw an advertisement in Farmers Weekly about farming in France. He contacted Mr Mitchell, who had placed it, and looked at several farms. He approached various banks for finance, but he needed to borrow more than they would lend.

In March 1984, Mr Goose was given the name of someone else who was interested in buying a French farm: Peter Bray. Mr Goose contacted Mr Bray and they embarked on a joint operation to acquire farmland in France. To that end, Mr Bray incorporated Intag Estates Limited ("Intag") as the vehicle through which the venture was to be carried out. He retained Wilson Sandford as his and Intag's accountants. The partner dealing with the matter was Robin Wilson, and it is with his acts, words and alleged omissions that the re-trial has been concerned. It was Mr Goose's case in the 1991 action that Wilson Sandford also became his accountants: and he claimed damages in that action for breach of their retainer as such. Harman J dismissed that claim; and his decision in that respect was affirmed by the Court of Appeal.

The plans for the French venture were imprecise and underwent regular changes. Broadly, the objective was that Intag would raise a loan in Swiss francs and would then make loans to Mr Bray and Mr Goose to enable them to buy farms in France. The attraction of a Swiss franc loan was that it was believed it would be at lower interest rates than would apply to loans of other currencies: in particular, at rates of about 6% as compared with base rates of about 15% then current in the UK. The attraction of raising a loan sufficient for the needs of both participants was that it was believed that the larger the loan, the more favourable would be its terms. Intag was also intended to have a role in the management of the farms, or at least of Mr Bray's farm. The thrust of Mr Goose's evidence was, however, that the farm which he bought would belong to himself.

The project continued from March 1984 until late 1985, when it collapsed. Mr Goose's intention, at any rate during 1984, was that his maximum financial liability (secured and personal) would be in respect of the borrowing for his own French farm; and that Mr Bray's liability was to be likewise limited. This principle was, however, qualified in Mr Goose's mind by an imprecise notion that certain of Mr Bray's assets, namely some semi-precious stones, would be available for the benefit of both participants as a so-called buffer against any adverse currency fluctuations which might have arisen at the time when the re-payment of the Swiss franc loan became due.

In the event, no Swiss franc loan was ever offered to the venture. The event which was destined to lead to this litigation was a change of plan in early 1985 when Mr Goose and Mr Bray decided to, and eventually did, raise an interim sterling loan for the purposes of the project.

The main issues I have to decide concern representations said to have been made by Mr Wilson as to Mr Bray's holding of these semi-precious stones ("the stones"). The stones were at all times in a bonded warehouse in Kloten Airport, Zurich, and were said by Mr Bray to belong to an entity called the Brent Foundation ("Brent"), of which he claimed to be the main beneficiary and so entitled to use them in the venture. Brent was a Liechtenstein corporation established by Mr Bray on 16 August 1982. Its board members included two brothers: Dr Urs Schaefer, a lawyer; and Mr Karl Schaefer, an officer of Trinkhaus & Burkhardt (Switzerland) Limited ("Trinkhaus"), a Swiss bank.

Mr Goose's main claim is that Mr Wilson fraudulently or negligently misrepresented to him that the stones were worth approximately US$500,000 and were assets which Mr Bray could use either to secure his (Mr Bray's) borrowings or as a direct contribution to a farm purchase. Mr Goose's case is that they were worth nothing like US$500,000, but were virtually worthless, and that Mr Wilson knew that; and that he also knew that there was a question about Mr Bray's ability to use them in the venture, because an adverse title was being asserted by Holford Trust Limited; and because Trinkhaus claimed to be entitled to a lien over them in respect of debts owed by Mr Bray. The misrepresentations are said to have been made at meetings on 18 September 1984 and 18 May 1985 and in a letter dated 9 April 1985. A further claim made by Mr Goose is that, on 3 July 1985, Mr Wilson fraudulently or negligently misled him as to Intag's involvement in the acquisition of a company. Mr Goose also alleges that Mr Bray dishonestly breached the fiduciary duty he is said to have owed him, namely to disclose the truth about the stones, or not to mislead him about them; and he accuses Wilson Sandford of lending dishonest assistance to Mr Bray in that breach of duty.

The way in which Mr Goose is said to have relied to his detriment on such misrepresentations, and suffered from such dishonest assistance, is in connection with the interim sterling loan. Intag raised it on 25 July 1985. The loan was of £314,000 and was advanced by Edward Manson & Company Limited. Mr Goose put up Hagbeach Farm as security for its repayment and (after costs) the money was applied as follows: (i) some £147,000 was paid to Mr Goose to enable him to discharge certain English liabilities (nothing to do with buying a farm in France); (ii) £130,000 was remitted to Banque Populaire, to be used for instalments in respect of a farm which Intag was acquiring for Mr Bray; and (iii) some £26,000 was retained by Intag as working capital. Mr Goose and Mr Bray gave personal guarantees to Manson and cross-indemnities to each other. The stones were not charged as security for the loan and Mr Goose knew that; nor were they charged to secure Mr Bray's liability under his indemnity to Mr Goose, and he also knew that.

Disaster soon struck. Intag defaulted on the interest payments on the loan. Proceedings by way of a writ action and a winding up petition were brought against Intag by another of its creditors. A bankruptcy petition was presented against Mr Bray on 7 October 1985, a receiving order was made against him on 11 February 1986 and he was adjudicated bankrupt. Intag was ordered to be wound up in June 1986. Mr Goose did what he could to save Hagbeach Farm, but he got ever deeper into financial trouble and a bankruptcy order was made against him on 20 October 1987.

© 2025 Thomson Reuters. 

Mr Goose received his discharge in October 1990. His claims, if any, against Wilson Sandford were assigned to him by his trustee for £1 and he sues them to recover his losses. He says that, but for their misrepresentations or dishonest assistance, he would not have committed himself and his farm to the repayment of the Manson loan. He claims to have suffered consequential losses totalling some £394,000.

Mr Bray is central to the story but is not a defendant, presumably because he is without assets. Nor did he give evidence. His absence from the trial did not make it like Hamlet without the Prince so much as like Othello without Iago. He presented himself to everyone involved in the venture as an experienced businessman, with considerable agricultural expertise, who enjoyed extensive wealth in farms in Zimbabwe and via his interest in Brent. What no-one knew was that he was an undischarged bankrupt and a fraudster. The inference is that he could never hope, and never intended, to put any funds of substance into the venture. He simply took Mr Goose for a ride. Mr Goose can have had few more unlucky days than the day he was given Mr Bray's name.

In 1984, Mr Bray was approaching 60. According to his CV, he had enjoyed an ostensibly successful war career in the RAF and a like commercial career afterwards, his claimed qualifications including that of being a barrister. Whatever real successes he may have achieved down to the 1970s, things then went downhill. A receiving order was made against him on 8 February 1974 and he was adjudicated bankrupt on 31 January 1975. On 25 April 1975, he was convicted of theft and sentenced to one year's imprisonment. On 31 October 1977, he was convicted on four counts of theft and sentenced to three years imprisonment on each, to run concurrently. On 13 March 1980, he was conditionally discharged from his bankruptcy, but he did not comply with the condition and his discharge was revoked on 8 May 1984.

None of this was known by Mr Goose, who became another of his victims. The fraud Mr Bray practised on Mr Goose led to Mr Bray's conviction on 1 November 1989 for obtaining pecuniary advantage and property by deception, procuring the execution of a valuable security by deception, using a false instrument and conspiring to obtain property by deception. He was sentenced to four years imprisonment and was disqualified for seven years under the Company Directors Disqualification Act 1986 . He was unrepentant and, on 23 November 1993, he was convicted on charges of forgery, procuring the execution of a valuable security by deception and obtaining credit as an undischarged bankrupt. He was sentenced to three years imprisonment.

It is impossible not to have the greatest sympathy for Mr Goose. It must, however, be qualified by the fact that he committed himself to the Manson loan against advice from his own solicitors that he should not do so and that he risked losing everything if he did. They even advised him of their suspicions that Mr Bray might be a "con man". Mr Goose ignored their advice, backed his own judgment and went ahead with the loan. He tried first to pass his losses on to his own solicitors, but failed. He now seeks to pass them on to Wilson Sandford. All the claims on which I have to rule were raised for the first time in 1994, nearly ten years after the relevant events. Wilson Sandford deny them. They also claim that they are statute barred; and, when reciting the story, I must set out the evidence as to when Mr Goose first learnt certain of the material facts.

Before coming to the main story, I must first say some more about the stones and the title to them. This part of the saga precedes the main events with which the action is concerned.

**The stones: Holford Trust Limited**

Holford Trust Limited ("Holford") is a UK company which was incorporated in 1936. By 1978, it was controlled by Jack Elliott, a US citizen. Paul Boyce-Mears was one of its two directors. The other was Mr Kane, a legal executive with McKenna & Co, solicitors. Mr Kane later became the secretary of Intag, following his introduction to Mr Bray by Mr Boyce-Mears. Holford's objects included advising US companies on European business opportunities.

Mr Boyce-Mears gave evidence, which was in material respects confusing and inconsistent and did not provide a reliable explanation of the course of events. He first met Mr Bray in the early 1970s. He recalls that Mr Bray claimed to be a barrister and was living in Belgravia. They met again in 1982, when Mr Bray contacted him, saying he had returned from Zimbabwe where he had been involved in farming activities and wanted to talk about raising finance for various plans he had. He told Mr Boyce-Mears he was the beneficiary of Brent, a foundation he described as operated in Zurich by Trinkhaus. Mr Bray was looking to borrow US$300,000 from Trinkhaus for a development in Zimbabwe. He had offered Trinkhaus his Zimbabwe farms as security, but they also wanted the benefit of an independent guarantee. Mr Bray asked for Holford's guarantee. Mr Boyce-Mears declined it, but instead he suggested providing the stones as additional security for the borrowing. They were then in California and belonged to a connection of Mr Elliott.

Mr Boyce-Mears said that, to that end, specifications of each of the parcels of stones, with replacement values certified by a Californian gemmologist, were collated. They were dated 1980/1981 and totalled some US$525,000. They were sent to Mr Bray, for him to forward to Trinkhaus. Mr Boyce-Mears said he believed the specifications to be accurate and the valuations to be genuine but he said that Trinkhaus rejected the stones as inadequate security for the proposed loan. He said that the value of such stones can vary considerably over a period of a year; and by 1982 the valuations were about a year old.

Mr Boyce-Mears' evidence that it was Trinkhaus which rejected the proposal differed from what he had said in a police statement in 1986, which was to the effect that the proposal to use the stones as collateral did not appeal to Holford and that it was Holford which rejected it. Before me, however, he said that was not in fact the position: and he said that Holford had actually sent the valuations to Trinkhaus.

Whatever the true position, that was anyway not the end of the Holford connection. Mr Bray then proposed that he should buy the stones on a deferred payment basis; and Mr Boyce-Mears agreed to prepare documentation for a sale. To that end, he prepared ten promissory notes. The date typed on each was 20 August 1982 and they recorded promises by Brent (not Mr Bray) to make payments totalling US$725,000 to Holford on various dates from 20 August 1983 to 20 August 1987, which Mr Boyce-Mears said represented the purchase price agreed for the stones on an arm's length basis, plus interest over the payment period. Each note was signed by Mr Bray and by a Mr Samuels, and they were all back in Holford's possession by 24 August 1982. Also on 20 August, Mr Bray drew a cheque for £1,000 in favour of Holford, an agreed fee towards its costs; and wrote to Mr Boyce-Mears on the notepaper of a Zurich hotel giving a generalised summary of Brent's alleged assets and purporting to show them as worth at least some US$630,000. On the same day, Dr Urs Schaefer (a Zurich lawyer and a member of Brent's Board), wrote to Mr Bray in Zimbabwe confirming that Brent had given the following instruction, namely:

> "As from [20 August 1982, Brent] accepts liability for 'stop order' and promissory notes signed by P.J. Bray in favour of [Holford] as and when he becomes liable to honour them."

That confirmation was in Holford's possession by 24 August.

On 23 August, Mr Boyce-Mears procedured the transmission by Brink's Air Courier Service of the stones from California to Trinkhaus at a bonded warehouse at Kloten Airport, Zurich and notified Trinkhaus's Mr Karl Schaefer (also a member of Brent's board) that he had done so. He telexed Mr Schaefer as follows:

> "We confirm the transfer of semi precious stones from the United States to us at your Zurich address via Brinksmats security service. Please hold this shipment in customs zone pending our further instructions. Insurance value 500,000 USD."

He said that, by this, he intended to convey that the stones were to be held to Holford's order. Their value was shown on the delivery note as US$525,188.25. On 24 August, Mr Boyce-Mears wrote to Dr Schaefer, referring to the latter's letter of 20 August and enclosing copies of the promissory notes: and one inference is that that was so that Brent would know what payments it had to make and when.

Despite the inferences which may be drawn from the documentation and the transmission of the stones to Zurich, Mr Boyce-Mears denies that any sale contract was entered into in August 1982 with Mr Bray. Although he prepared and dated the promissory notes, and sent them to Mr Bray, he said that he did not expect them to come back signed: he said they were merely sent to Mr Bray as a proposal of the sort of thing Holford might be prepared to agree to. He said that Holford had no authority to sell the stones: if a sale were negotiated in principle, the proposal would then have to put to their owner. He said it was not even clear at that stage who the purchaser would be, although he thought that it would probably be Brent, which is consistent with the manner in which he drafted the promissory notes.

Mr Boyce-Mears' evidence as to what Holford thought it was doing at the time was confusing. In the first of two witness statements he made, he said that the transmission of the stones to Zurich was in connection with the proposal that they should stand as collateral for the loan which Mr Bray had wanted to raise, a transaction which other evidence and statements he gave and made suggest had by then been abandoned: and his statement made no mention of the proposed sale. In cross-examination, Mr Boyce-Mears initially stood by that account as being correct.

That explanation of events contradicted what he had said in his 1986 police statement, namely that, once Holford had decided not to proceed with the loan proposal, it embarked on a proposal to sell the stones on payment terms spread over a five year term; that it wanted security for these payments in the shape of assets outside Zimbabwe; and that Mr Boyce-Mears asked Mr Bray for details of assets which could be so charged. Mr Boyce-Mears also said in that statement that Mr Bray produced a signed statement of Brent's assets, which seemed satisfactory (a reference to Mr Bray's letter of 20 August); that Dr Schaefer acknowledged that Brent would accept liability for the promissory notes which were to be given by way of payment (a reference to Dr Schaefer's letter of 20 August 1982); that Mr Boyce-Mears prepared those notes, which were presented to Mr Bray, signed and returned; and that it then remained for Mr Boyce-Mears to arrange the transmission of the stones to Trinkhaus, which he did. He said in that statement that "All of this was completed on or about 20th August 1982 and as far as I was concerned the deal was going through properly. The first indication that things were not well was that the cheque for £1,000 …was returned unpaid marked 'Refer to Drawer'." That happened on 31 August.

This statement was put to Mr Boyce-Mears in cross-examination as showing that what Holford had agreed to was a sale. He replied that it would have been a sale if it had been completed but that "There was no contract, no exchange of contract. Nothing was prepared". He asserted that the promissory notes were merely drafts; and that he could not sign on behalf of the vendor - all he could do was to negotiate. He said he had not drafted a contract at that stage because "we still were not entirely sure how it would be worded, what title [Brent] had to these assets, what their value was …". He also said Holford did not prepare a draft charge over the assets it wanted to stand as security for Brent's obligations. He said that this was probably because he did not have the necessary information: if so, nor does it appear that he ever asked for it.

Reverting to the documents, on 26 August Trinkhaus telexed Barclays Bank in March, Lincolnshire, who were owed money secured on a house in March owned by Pamela Bray, Mr Bray's wife. The telex referred to a prior telephone call and said:

> "We are presently holding title to assets of [US$200,000] (replacing value). The authenticity of the title can not be verified by us and we therefore do not guarantee this authenticity. The assets will be physically delivered to us in due course and will be sold by us in accordance with instructions received from the present owners. We confirm that we are instructed to remit the proceeds to Barclays Bank in March up to [US$83,000] covering outstandings of Mrs P. Bray."

There is no dispute that the assets mentioned were the stones. The inference from that telex is that, contrary to any inferences to be drawn from Mr Boyce-Mears' telex of 23 August, Trinkhaus did not regard themselves as holding the stones to Holford's order.

The returning of Mr Bray's £1,000 cheque appears to have caused an obvious souring of relationships between Mr Bray and Holford. On 7 September, Mr Boyce-Mears telexed Mr Schaefer that:

> "…I am advised stones now collected. Regret some obligations outstanding this end. Please hold parcel to our order pending settlement. Will revert soonest."

Mr Boyce-Mears said that the reference to the collection of the stones was to their arrival at Kloten, i.e., as he said, "collected from America and delivered into Kloten." That does not appear to me to be a natural interpretation of the language of the telex. Mr Boyce-Mears could not explain what the outstanding obligations were, save that they might have included the £1,000 cheque. If he had regarded the telex of 23 August as a still continuing instruction requiring Trinkhaus to hold the stones to Holford's order, it is unclear why he thought it necessary to repeat the instruction in this telex - unless in the meantime there had been some unrecorded instruction to Trinkhaus releasing the stones from the terms of the earlier telex. The telex of 7 September was expressed to be in response to some communication from Mr Schaefer of 24 August, but that communication is not in evidence.

On 27 September, Dr Schaefer telexed Mr Boyce-Mears. He referred to the latter's letter of 24 August and said:

> "As a member of the board of [Brent] I would like to clarify that the instruction, given from Mr. Peter Bray, which has been confirmed to him on 20th August 1982, is of course subject to availability of funds."

Mr Boyce-Mears said that, by then, there was still no contract of sale. On 4 October 1982, he telexed this reply to Dr Schaefer:

Goose v Wilson Sandford & Co, 1999 WL 35815580 (1999)

> "We understand that Brent has assets in excess of the liability created by the notes not including the stones and that if necessary assets will be liquidated to meet the bills or [sic: should be 'on'] presentation."

He was there referring to Mr Bray's summary of Brent's assets in the letter of 20 August He also appeared to have regarded the promissory notes as having created a real liability, although on his case Mr Bray had received nothing in exchange for them. Dr Schaefer replied on the same day, saying that Mr Boyce-Mears' interpretation of his letter of 27 September was "absolutely wrong" and inviting him to discuss the matter with "my client". Mr Boyce-Mears considered that there was no scope for the suggested misinterpretation and on 8 October he telexed Mr Bray, whom he regarded as the "client", as follows:

> "Regret that unless stones are accepted, check paid, and your lawyer changes his letter of 27/9/82 forthwith we will inform all parties that the parcel is to be returned."

Mr Boyce-Mears said in evidence that his reference to the acceptance of the stones was to their acceptance by Trinkhaus as collateral security for the loan which Mr Bray had been endeavouring to raise from Trinkhaus. That was inconsistent with his evidence that, by mid-August, that proposed transaction had been replaced by a proposed sale transaction. Mr Bray telexed back from Zimbabwe on the same day, saying:

> "It is my understanding that we are awaiting confirmation of original document for packet for 880 and result of investigation into carat value of 5131, 5167, 5172 and 5173. Further inspection taking place next week for final report. Please reply giving latest position on the foregoing."

Mr Boyce-Mears replied on 15 October, saying:

> "Please arrange for the parcel of stones held to our order in Switzerland is returned to Los Angeles via Binkomat. Instructions for delivery in Los Angeles will be given by Mr J Elliott. Promissory notes will be exchanged for certificates by mutual arrangements."

Mr Boyce-Mears said that, in Holford's view, the transaction had by now ended, and this was by way of tying up the loose ends. By contrast, Mr Bray's stance appeared to be that there was a binding agreement for the sale of the stones, but that he was entitled to inspect them before acceptance. He telexed Mr Boyce-Mears on 18 October:

> "…Please realise I do not repeat not respond to threats on an open telex. The arrangements between us are quite clear and no expenses will be paid until all repeat all documents are complete.

© 2025 Thomson Reuters.

> In original agreement which you stated you were authorised to complete I stipulated that inspection would be needed prior to acceptance - this is the protection I must have to ensure adequate value which I now have cause to suspect as inflated particularly in view of items previously notified to you.
>
> If you were fully authorised as you stated why is there this problem over several items and the securing of expenses which I remind you were not repeat not part of original agreement…"

Mr Boyce-Mears accepted that inspection was an essential part of the transaction, but said that Mr Bray was raising it at this stage as a part of a smokescreen. He does not know what problem Mr Bray was referring to. On 22 October, he telexed Dr Schaefer that he had asked Mr Bray to return the stones and that in the meantime Holford was holding the promissory notes in trust. On 9 November, he telexed Mr Schaefer, seeking confirmation that the stones were still held to Holford's order and were insured. Mr Schaefer replied on the same day, saying:

> "Please note that in accordance to your original instructions stones have been delivered upon receipt to Mr Bray and are, therefore, not held to your order. Please address further questions to Mr Bray."

Mr Boyce-Mears said that angered and worried him, because he could not recall ever saying other than that the stones were to be held to Holford's order. Mr Schaefer's assertion as to his understanding of the position was, however, consistent with Trinkhaus's telex to Barclays of 26 August. On 10 November, Mat Securitas Express (the Swiss operation of Brink's Mat) telexed Mr Boyce-Mears from Kloten, for the attention of Mr Bray. It read:

> "Re: stones on behalf of [Brent]. We herewith confirm that remaining stones are still in our vault on behalf of [Brent]."

How Mat Securitas came to the understanding that they were holding the stones on behalf of Brent is unexplained.

On 21 November, Mr Bray wrote to Mr Schaefer, with a copy to Mr Boyce-Mears and told him that he had negotiated with Holford to accept certain "over the counter" U.S. shares in place of five packets of stones at Kloten with a specified value of US$275,196. He instructed Mr Schaefer to transfer those packets into a separate deposit and hold them to Holford's order "under the authority of [Mr Boyce-Mears]". Mr Boyce-Mears said that some consideration had been given to providing Mr Bray with shares as collateral for his proposed loan, but that Mr Bray was wrong to say that the negotiations had been completed. Holford subsequently received six parcels of stones back from Switzerland, unaccompanied by the valuations relating to them.

On 20 December, Mr Bray wrote further to Mr Schaefer, referring to the discussions about replacing the stones with shares and said that:

> "I would now be grateful if you would accept this letter as my instruction to transfer the balance of the stones into the separate safety deposit at Kloten and hold them to the order of [Mr Boyce-Mears]. When this has been completed please inform Mr Boyce-Mears …"

Mr Boyce-Mears was provided with a copy of that letter. On 11 January 1983, he wrote to Mr Schaefer, saying:

> "When the formalities are completed with Mr Bray would you please accept this letter as formal instruction to arrange for the complete parcel of stones to be returned to Mr Elliott in Los Angeles …by the courier you recommend. I will be in Zurich at the end of next week and will call and collect the supporting certificates. I hope we may meet on that occasion."

Mr Boyce-Mears did not go to Zurich and has never met Mr Schaefer. The "formalities" may have been those referred to in Mr Bray's letter of 20 December 1982, but the position is unclear. Mr Boyce-Mears' instructions were not carried out; and he then learnt that Brent owed money to Trinkhaus, which claimed it held the stones for Brent but was asserting a lien over them to secure payment. On 2 April 1983, Mr Boyce-Mears telexed Mr Bray as follows:

> "[Mr Schaefer] telephoned me to say he had not heard from you. Did not discuss any arrangements. He is seeking legal clarification of their position. Please telex on Monday …".

Mr Bray replied on 22 April that:

> "…Your discussion with [Mr Schaefer] appears not to have conformed with our agreement on which I am making revised arrangements. It is no use me proceeding unless we are in agreement. [Mr Schaefer] is now sending me a full statement of liabilities which he admits not to having done before. This should be in my hands by Tuesday/Wednesday next week."

Mr Boyce-Mears responded on 29 April, saying:

> "Disappointed not to have heard from you. My position becoming untenable. Unless you ratify notes or confirm that [Mr Schaefer] has released stones the matter will be out of my hands."

Mr Boyce-Mears said that, by his closing words, he meant he would report the matter to the police. Mr Bray replied on the same day:

> "The latest situation regarding [Mr Schaefer] is that he is writing to me to give full details of claim. To date I have received nothing and will check later with him.

> Have already taken steps locally to ratify notes held by you and will speak with you early next week…".

On 12 May, Mr Boyce-Mears telexed Mr Bray asking him for the latest position and his proposals, which Mr Bray acknowledged on 13 May. On 26 May, Mr Bray telexed Mr Boyce-Mears as follows:

> "I anticipate being in London on Wednesday. No letter yet received from [Mr Schaefer]. Have had a telephonic row with him. As agreed trust is nearly ready for handing over. Will telephone you from Europe."

On 24 June, Mr Bray wrote to Mr Oesch, a Swiss lawyer, advising him that Mr Schaefer had told him that Trinkhaus was taking steps to sell the stones by tender and would give Holford the opportunity to buy at a price exceeding the highest tender. He sent a copy of his letter to Mr Boyce-Mears, who already knew that Trinkhaus was pressing for money due to it; and who also understood that, if the money was paid, it would release its lien and return the stones to Holford. He said that he understood that Mr Bray owed Trinkhaus about US$15,000. He regarded Holford as having two choices at that stage: (i) to challenge the lien, or (ii) to hope that the Trinkhaus liability would be settled and the stones released. Its primary position was that neither Trinkhaus nor Mr Bray had any title to the stones. Further exchanges over the following weeks did not resolve the matter.

Two of the promissory notes became payable on 20 August 1983, for a total of US$175,000. On 7 September, Mr Boyce-Mears wrote as follows to the Schaefer brothers and to Mr Bray:

> "In view of the non-payment of the note due 15th August, 1983 [sic: the due date was in fact 20 August], the subsequent notes become due and payable, and we hereby make formal demand for payment in full. We enclose copies of the notes and will be pleased to arrange for delivery of the originals against payment. Please reply by return letter or telex if funds are available."

That letter affirmed the existence of a contract which Mr Boyce-Mears denies was made and claimed payment of US$725,000 he denies was due. He could not explain the basis on which Holford made that claim. Dr Schaefer replied on 16 September, with copies to Mr Schaefer and Mr Bray. His reply was illuminating as to Brent's assets, but Mr Boyce-Mears said it came as no surprise. Dr Schaefer wrote that:

> "…as I already told you in my letters of 27.9.82 and 4.10.82 there are no funds available to pay the notes. The only assets which are held by the foundation are in pawn. Furthermore I have to inform you, that [Brent] will be liquidated in very few days because there is no money to pay the fees and taxes in Liechtenstein."

© 2025 Thomson Reuters. 

Mr Boyce-Mears said that by this time Mr Elliott had agreed to compensate the owner of the stones for any loss he might suffer as a result of Holford's dealings; and, under the arrangement, Mr Elliott had also become the owner of the stones. Holford had considered suing Trinkhaus, but decided against it. It instead continued to press Mr Bray to discharge the Trinkhaus liability, but he did not do so.

That was the point the stones story had reached when Mr Goose became enmeshed with Mr Bray in 1984. Against that background, Mr Bray sold himself to Mr Goose as Brent's main beneficiary, Brent being a foundation whose assets included stones worth about US$500,000. Neither Brent nor Mr Bray had paid a cent for the stones; Holford was claiming their return; and, in December 1982, Mr Bray had given apparently unequivocal instructions to Trinkhaus to hold the stones to Holford's order, instructions which I do not understand him subsequently to have revoked. The reason they were not carried out is because Mr Bray or Brent also owned money to Trinkhaus, which was now asserting a lien over the stones to secure its payment.

I now turn to the main story. References to "SF" and "FF" are to Swiss and French francs respectively.

**1984**

*Early meetings*

Mr Goose telephoned Mr Bray in early March 1984. Mr Bray lived at 5 Princes Walk, March, Lincolnshire, about 15 miles from Mr Goose. They had an initial meeting at Mr Bray's house. Those present were Mr Goose, Mr Bray and John Walker, whom Mr Bray introduced as a "potential farm manager". The discussion was general. Mr Bray said he had returned from Zimbabwe, had assets he wanted to invest in France and was interested in going into what he called a proposition. He said his family had a trust called the Brent Foundation in Switzerland and (either on this or a subsequent occasion) that he was its main beneficiary. Mr Goose said that Mr Bray was articulate, with a forceful voice, and appeared to have a good command of overseas investment. He said he was quite an impressive character. Until disaster struck, he never had any reason to think that Mr Bray was lying.

There was a further meeting at March the following Sunday, 11 March. Mr Bray told Mr Goose that the Bray family wanted to sell the farms in Zimbabwe and invest the money in France. He also said that Brent held some semi-precious stones (i.e. the stones) in Zurich; and that the family had a house in Belgravia, where his first wife lived. Pamela Bray was his second wife.

Mr Goose said that Mr Bray often referred to the stones. At an early stage, he told Mr Goose they were worth some US $500,000 and showed him a list of them, headed "Stones delivered to Bray", showing values totalling US$525,188.25. Each of the 33 items on it had against it the date of a certificate relating to the item. The dates were between 12 August 1980 and 19 June 1981. Mr Bray also showed Mr Goose several pages of Californian certificates relating to the stones, as well as photographs of the stones. Mr Goose said he thought that the value of the stones would not have changed much since the valuations. His evidence was that he believed that they were Brent's only asset, but he was not 100% certain.

**Discussions about French farms**

At this stage Mr Goose was interested in a farm near Tours called La Donneterre. He was keen to buy it but its asking price of about £1m was beyond his reach. He discussed it with Mr Bray. An early suggestion was that Brent might buy it, with a view to Mr Goose buying it from Brent over 12 years. Mr Bray's idea was that the purchase price might be borrowed in Switzerland.

On 29 March, Mr Bray wrote to Mr Goose on notepaper headed Intas Technical & Managerial Services Ltd, a company incorporated in Alderney and with an address in Zurich. Mr Bray had not previously referred to Intas. The letter expressed Intas's willingness "together with our associates in the UK" to undertake arrangements to enable Mr Goose to purchase La Donneterre. Like much of Mr Bray's correspondence, the letter was in lofty and imprecise terms. It proposed that the

transaction be based in Switzerland, with funding through a Swiss intermediary, and that the farm would be purchased through an offshore intermediary and then transferred at a later date. By way of a sample of Mr Bray's grand style, the letter said:

> "You are already aware that we as a group are also investing in French farmland and have existing properties in Africa totalling some 7,500 acres. Our policy is to bring them under direct management and to expand into other regions so as to provide a cushion against both political and climatic vagaries. To do this we set up the trust in Switzerland and have for some years been thus enabled to operate freely and relatively protected against currency variations."

The letter proposed detailed discussions between accountants. Intas's accountant was Mr Norman Weekes.

Mr Goose agreed he had discussed with Mr Bray that any purchase of La Donneterre should be funded via a Swiss intermediary. The letter also made the point that protection would be afforded against major currency variations as the Swiss franc had for years remained the most stable of currencies; and Mr Goose said that Mr Bray had discussed this as well and that the stones could be sold in any currency to offset any currency fluctuations. Mr Goose said that, at some point, Mr Bray told him that Intas was owned by Brent.

In late April, Mr Goose, Mr Bray and Mr Walker visited Martray, a farm near Poitiers in which Mr Bray was interested. The asking price was about £600,000. Mr Bray asked Mr Goose to settle his and his family's hotel bill, which came to FF3,568.65, which Mr Goose did, although Mr Bray later repaid him.

In May, Mrs Bray handed Mr Goose a letter from Mr Bray dated 9 May from Papworth heart hospital, which Mr Bray was attending. It was written the day after the revocation of Mr Bray's conditional discharge from bankruptcy, although of course Mr Goose knew nothing about that. It comprised one page of manuscript accompanied by several manuscript enclosures, being "policy & information documents on Intag & Intas". Mr Goose said in chief that he had not previously heard of Intag, although in cross-examination he said he knew that Mr Bray was going to form it. Intag was Intag Estates Limited, which Mr Bray had incorporated on 2 May. The directors were Mr Bray and Mr Weekes. Mr Kane was secretary. The enclosures proposed that at the first board meeting Mr Bray was to be elected chairman, Mr Goose was to be appointed managing director and Mr Walker was also to become a director. The main purpose of Intag was stated by Mr Bray to be:

> "To act as estate managers anywhere in the world but specialising in the Tour [sic] - Orleans - Limoge [sic] region of France."

The enclosures were imprecise. Intas was intended to "to be continued as registered company in Alderney operating for [Brent] in Switzerland" and was to "be the medium through which the finance for the French farms was to be raised, with the backing of [Brent] and the guarantees of [Mr Goose]." Guarantees by Mr Goose had not yet been discussed. The then plan, as set out in the enclosures, was to acquire certain farms, which were to be used as security for the required capital. Funding was to be raised in Switzerland via deposits and guarantees, in particular:

> "The UK guarantee will come via Nat West on the security of Whaplode Farm and the Swiss guarantee will come from [Brent] probably via Bank Gargon & be secured on the US$500,000 assets in Kloten. Initially the purchase will be under the name of [Mr Bray] reserving the right to nominate in the final land transfer the actual company or trust holding the land."

"Whaplode Farm" was Hagbeach Farm, Mr Goose's farm. The "assets in Kloten" were the stones. The enclosures indicated that they would be disposed of in 1985 and would represent Brent's long term investment in the farming project.

Mr Goose said he had never agreed to these proposals. The enclosures also referred to the initial working capital of Intag as coming from:

> "the RG [Mr Goose] deposit at London & Arab and assuming this to be £150,000 the cost to Intag will be the net yield after returning to RG 4% of the deposit interest and allowing the balance to 'roll over'."

Mr Goose had no deposit with London & Arab Bank, and nor had Mr Bray discussed with him the creating of such a deposit. Mr Goose said that these were Mr Bray's ideas for opening discussions.

Mr Bray's letter and enclosures therefore contained much that had not been discussed or agreed with Mr Goose; but his letter had opened by saying:

> "I have now made the formal offer for Martray in the instruction to the solicitors (copy enclosed) and am looking to you for your support as really I would be in an impossible position if you backed out now."

Mr Goose said it did not occur to him that Mr Bray was trying to use his money to fund his own venture. He regarded this as a preliminary overture to their joining together in a venture of buying farms in France. He was going to use Hagbeach Farm as his source of finance for this purpose and he said that his understanding was that Mr Bray was going to use the stones. The idea was that he and Mr Bray would each have his own French farm and, in so far as Mr Goose's land was to be provided as security for any Swiss borrowing, it was only to be security for the borrowing necessary for the purchase of his own French farm. Nor was he going to give any guarantees for Mr Bray's benefit. Mr Goose said he briefly discussed the policy and information documents with Mr Lumley of Hodson and Harris (Spalding accountants), Mr Moore of Stephenson Smart & Co (the Spalding accountants who usually acted for him) and Mr Needle a specialist in offshore tax and accountancy matters.

**The £10,000 loan**

On 17 May, Mr Goose and Mr Bray visited De Pinna Scorers & John Venn ("De Pinnas"). They were solicitors who were acting for Mr Bray or Intag in connection with the French venture. Mr Goose asked Mr Bray to help him with some finance because all his money was tied up in Zimbabwe. Mr Goose agreed and, on 20 May, gave him a cheque dated 18 May for

£10,000. He said that Mr Bray agreed to give him security over the stones for its repayment, but he did not do so at the time. Before lending the £10,000, Mr Goose spoke to Mr Mitchell (the placer of the Farmers Weekly advertisement), who knew Mr Bray and who told him that Mr Bray was "OK". Mr Bray never repaid the £10,000.

**Harvestminster Limited: Malcolm Milne**

HarvestMinster was a company based in Brighton owned by Malcolm Milne. It carried on business as financial advisers, its main expertise being pensions and health and life insurance. Mr Milne had met Mr Bray in about March 1984. Mr Bray contacted him later, said he was proposing to buy farms in France and asked Mr Milne if he would be interested in establishing a sinking fund by way of a method of repaying loans. The concept of a sinking fund was new to Mr Milne, who had also had only limited experience of raising commercial loans; but, after clarifying what Mr Bray wanted, he thought he could assist and they had several meetings. Mr Bray told him of his trust fund in Switzerland, which Mr Milne recalled he told him was worth £3m and in respect of which he said he was the sole beneficiary. Mr Milne said Mr Bray was extremely plausible and smooth and appeared to know what he was talking about.

Mr Milne made inquiries about raising finance and discussed their outcome with Mr Bray. Mr Bray told him he needed an accountant (he had become dissatisfied with Mr Weekes) and a bank. In June, Mr Milne introduced him to Robin Wilson of Wilson Sandford and to the manager of Allied Irish Bank ("AIB"). Mr Milne put together a proposed employee package, including pension provisions and so forth, to be presented to would-be employees of the French venture. Mr Milne became quite involved with the project and in July he visited La Devinniere, a farm south of Orleans which Mr Bray was considering purchasing. He also visited three or four French banks with Mr Bray.

**Wilson Sandford & Co**

Wilson Sandford was then a two partner firm of chartered accountants (Mr Wilson and Mr Sandford), which had been established in October 1982 and was growing fast: so much so that, by 1985, it had sold off the work of its smallest clients to another firm and was concentrating on what Mr Wilson called the "bigger and better clients". Mr Wilson had been admitted to the Institute in 1976, when he was in his 20s, and became a Fellow in 1981. Mr Wilson and Mr Bray had an initial meeting on 20 June 1984 and Mr Wilson made a note of it.

Mr Wilson said Mr Bray appeared to be a calm, rational, urbane and experienced businessman. He told Mr Wilson he wanted to buy farms in France. Mr Wilson's note sets out what appears to be background information as to Mr Bray's assets. It refers to Holford as having apparently been a trust into which Mr Bray's late father, who had died in the mid 1960s, had put all the family assets but that "share of trust NOT in father's probate". Mr Wilson inferred that either Mr Bray's father, or perhaps his executors, may have been engaged in some fraud on the Revenue, but he said that it was a long way in the past, it did not raise any suspicions in his mind that something odd had been going on and he did not ask who the executors had been. The references to the stones in the note read:

> "Stones placed with Crocker Bank in USA. Used as collateral to buy Mrs Pam Bray's house. 'Keep them out of UK' - otherwise VAT payable & poss. CGT liability. Stones trfr'd to Kloten, Zurich - under guidance of [Trinkhaus]. Peter Bray - sole beneficiary & has power to cancel trust. New Swiss trust replaces interest in Holford Trust …Now offer stones back to Holford in exchange for US stocks. Christies could auction in Italy. AIM to regain control of Holford Trust - No a/cs - purely managed by Holford Management Co. Copy of Trust Deed from Schaefer - copy of final doc't - Mr Schaefer."

Holford's connection with the stones as summarised in the note was vague but was apparently not further explained by Mr Bray. The note includes references to Mr Bray's assets in Zimbabwe and his interests in an oil company in France and a transport company in Italy. It makes only this brief reference to the proposal to buy farmland in France: "if problems over French tax situation after purchase of farm - Prove tax resident in Zimbabwe." Mr Wilson had not previously heard of Trinkhaus. He was unclear as to the trust of which Mr Bray claimed to be the sole beneficiary. He said he was just writing down what he told him, which he regarded as background information: he was not questioning Mr Bray about it. Mr Wilson said that no mention was made by Mr Bray then or ever of the £3m figure to which Mr Milne referred in evidence: Mr Wilson said that he first heard mention of it during the trial. Mr Wilson noted the address of the house in March, which he understood to be Mrs Bray's house. He said he had no independent recollection of the meeting: he could speak to it only by reference to his note. The VAT reference becomes relevant later on in the story: Mr Wilson said he never researched the VAT point to which Mr Bray had referred and disclaimed any expertise on the impact of VAT on the import of gemstones into the UK.

Mr Bray reported to Mr Goose that Wilson Sandford appeared to be a "switched on" firm which might be able to assist in raising finance for the venture. Mr Goose said that his first contact with Mr Wilson was on the telephone when he, Mr Goose, was at Mr Bray's house. It was about the end of June. He said he told Mr Wilson that he could discuss his affairs with Mr Bray and that he hoped he would be looking after his affairs with regard to Intag. He later had further conversations with Mr Wilson and formed the view that he was very able. By contrast with this evidence, Mr Wilson thought that his first contact with Mr Goose was not until the end of July or early August. He had no recollection of Mr Goose asking him to look after him. He did not regard himself as Mr Goose's accountant, and said that he could not have acted for him as he would have faced a potential conflict of interest.

**Wilson Sandford contact Mr Schaefer of Trinkhaus**

On 28 June, Mr Wilson sent Mr Schaefer a telex, which had been dictated by Mr Bray, telling him his firm had been instructed to act in connection with the Bray family's financial affairs and requesting:

> "…a detailed schedule setting out all investments held by [Mr Bray] and his family and also by the family trust. Please list the stones held at Kloten …together with a valuation."

Mr Schaefer's response was on 10 July. It referred to outstanding debts from Mr Bray totalling SF60,720.05, comprising a director's fee of SF6,000, legal and other expenses totalling SF49,720.05 and Trinkhaus's lawyer's fees of SF5,000. It also referred to a US$7,858.71 debit balance on Mr Bray's current account. It said that these amounts had to be paid:

> "…in order to have the collateral released. Furthermore [we will also require] a letter of [Barclays] March branch releasing us from all obligations possibly resulting from our confirmation by telex of August 26, 1982. The price indications of the stones held as collateral are mentioned on the accompanying certificates for which we refuse any responsibility with respect to the prices mentioned as well as the authenticity of the certificates."

There followed a list of 27 certificate numbers in respect of various stones, with dates ranging from 12 August 1980 to 2 June 1981 and a valuation figure against each certificate number. The valuations totalled US$498,711. 33 stones, or groups of stones, had been sent to Kloten in August 1982, but six had been returned to Holford. I quoted the telex of 26 August 1982 when relating the Holford/stones story.

© 2025 Thomson Reuters.

Mr Schaefer was, therefore, asserting that the stones secured the liabilities he mentioned. Mr Wilson was somewhat inconsistent in his evidence as to whether, before he sent his telex of 28 June, he had known that there was any indebtedness to Trinkhaus; but he said this was probably the first suggestion that the stones were held as collateral for any such debts. He had been told on 20 June that the stones had been used as collateral to buy Mrs Bray's house and said that he understood at the time that they ranked as security behind the house itself, that the "house was near breakeven in terms of any equity in the property" and that the stones covered the risk of a negative equity; and he said that Mr Milne was endeavouring to negotiate a re-mortgage of the house, the intention being that the charge on the stones would then be released. In the event, no re-mortgage was ever achieved. He said he read the last sentence of the passage quoted from Mr Schaefer's telex as "an absolutely standard disclaimer when passing on a valuation which presumably was not their own valuation." He agreed that, at then rates of exchange, (and apart from the Barclays liability) the US$ and SF liabilities equated to about £25,000 and that he understood that the stones were not going to be released until they were paid. He was struck by the high value of the stones. They were obviously a major asset of Mr Bray's, but he did not regard them as his only asset.

Mr Wilson sent a copy of that telex to Mr Bray on 18 July and inquired whether the SF and US$ debts were agreed. He pointed to the contrast between the total valuation of US$498,711 and that of US$525,18 on the list headed "Stones delivered to Bray" and to the fact that six certificates had been omitted from Mr Schaefer's list. He said:

> "I also think it important that various other decisions are now taken. We need to decide, once the liabilities have been agreed, whether these are to be settled by selling the Stones or by other funds being passed to [Trinkhaus]. Secondly, the decision on the breaking of the Trust needs to be taken. I have managed to obtain a copy of the translated Deed of Foundation and Articles which I have examined briefly. It seems to me that it would probably be better to maintain the Liechtenstein Trust and merely to advance whatever loan is required by [Intag]."

Mr Wilson did not recall when he had first been handed the "Stones delivered to Bray" list, but said it could have been on 20 June. He understood by now that he stones were either to be sold to provide funds for Intag, or to be used as security to raise such funds; and that they were to be the source of Mr Bray's main contribution to the French venture. On Mr Bray's instructions, Mr Wilson replied to Mr Schaefer on 24 July, asking for supporting evidence of the claimed liabilities and for an explanation of the Barclays position. On 27 July, Mr Bray wrote to Mr Boyce-Mears confirming to him that Wilson Sandford were now handling "all the matters concerning the Brent trust …".

By July, Wilson Sandford's office had become Intag's registered office. Mr Wilson regarded his role as being that of financial adviser to Mr Bray and Intag in connection with purchasing French farmland and the raising of Swiss finance. By this stage, Mr A.H Francis, a Brighton finance broker trading as Property Finance Company, had been introduced by Mr Bray and was also making inquiries as to sources of finance.

**The Chown report**

On 10 July, there was a meeting between Mr Wilson, Mr Bray and John Dewhurst of J.F. Chown and Company Limited ("Chown"). Chown were tax advisers who had been introduced to Intag by Mr Wilson. By now, Anthony Riby, another farmer, had become a third member of the syndicate and was proposing to acquire a French farm of his own, the Domaine de la Fosse. On 16 July, Mr Dewhurst wrote to Mr Wilson, setting out a proposed structure for the French venture. The proposal to acquire La Donneterre had gone off, and the farms the syndicate was interested in were Martray, the Domaine de la Fosse and La Devinniere. La Devinniere was to play a continuing part in the story. Mr Bray had been interested in it for some months. Mr Goose visited it on 19 July. He said he was not interested in it, but he regarded its purchase terms as

© 2025 Thomson Reuters. 

good. Some of Mr Wilson's notes and evidence suggested that, at this stage, La Devinniere was to be Mr Goose's farm, but this may have been an error.

Mr Dewhurst's letter ("the Chown report") referred to three French companies being formed, each to own one farm, with each of Messrs Bray, Goose and Riby owning various proportionate shares in each farm. Finance was said to be coming from the following sources:

> "(i) approximately £1.5m to be lent by a private independent Swiss entity;
>
> (ii) £130,000 presently held by Mr Riby but effectively representing Mr Bray's interests;
>
> (iii) up to £200,000 from a Liechtenstein trust, again effectively representing Mr Bray's interests;
>
> (iv) £250,000 from Mr Riby and Mr Goose."

Mr Wilson was asked about point (ii) in evidence, a matter which had been discussed on 10 July. He gave some confused and defensive answers, but his evidence to Harman J appeared to reflect his recognition that what underlay the point was that Mr Riby was to be a front for Mr Bray, who was endeavouring to conceal from the UK authorities facts which might have exposed him as the source of the money. He disclaimed any understanding on his part that what was involved was an essay in tax evasion. He said that he had understood that the arrangement, whatever it was, had by then already happened - that is, Mr Bray had already paid £130,000 to Mr Riby - and there was nothing he could do to correct it. He said this aspect of the matter did not put him on his guard as to what was going on. On being reminded by Harman J of Lord Nelson and blind eyes, he said he was simply listening to, and recording, what Mr Bray was saying.

Mr Goose did not see this report. Mr Bray did and, on 24 July, Mr Wilson wrote to Mr Dewhurst advising him that Mr Bray's revised intentions were that one farm would be bought by Intag, which would be Mr Bray's company; another farm would be bought by Mr Goose via a company of his; and Mr Riby would buy his farm in his own name. Mr Dewhurst then sent a re-draft of his report to Mr Wilson on 31 July 1984. It now proposed that (in effect) each would own his own farm. The sources of finance had been amended, and by 7 August would be amended again so as to read:

> "(i) a total of approximately £1.5m to be lent by a private independent Swiss entity;
>
> (ii) [originally £130,000, presently held by Mr Riby", but deleted by 7 August];
>
> (iii) up to £200,000 from [Brent] …, again effectively representing Mr Bray's interests, to be invested in Mr Bray's farm;
>
> (iv) approximately £150,000 [an amendment made by 7 August] from Mr Riby to be invested in his farm;
>
> (v) approximately £125,000 from Mr Goose to be invested in his farm."

The report continued:

> "There is in existence a newly-formed UK company, [Intag]…This company was established primarily with the intention that it should act as the borrower from the Swiss lender, since the Swiss lender refuses to lend directly to a French borrower or take French-situs assets as security for the loan. The lender is, however, willing to accept a UK borrower, provided there is some form of security other than the French farms, such as a UK bank guarantee."

It went on to deal with the participators' respective positions. In the case of Mr Goose, Chown's suggestion was that he should use a SARL (société [ responsabilité limitée) to own his farm and carry on the farming business, the SARL to be owned in turn by a UK company owned by Mr Goose. The report made no reference to the stones. Nor did it suggest that Mr Bray was bringing in more than £200,000.

At this stage, Hill Samuel was regarded as a possible lender of Swiss francs; another was an unidentified "Swiss trust", a connection of Mr Francis. Barclays had been approached as a possible guarantor, but had indicated an early unwillingness on 27 July, although Mr Wilson later went back to it. The possibility of borrowing from Hill Samuel died within a month or two.

**August 1984**

On 1 August, having obtained Mr Goose's authority, Mr Wilson wrote to Mr Moore, Mr Goose's accountant, "in connection with the [Intag] operation in France". He said he was assembling information for the final presentation to the UK clearing bank and asked for copies of Mr Goose's last three years trading results and details of his freehold trading assets and of any charges relating to them. He had earlier sought like information from Mr Riby's accountants. By now, Mr Riby also had solicitors, Denison Suddards & Co, acting for him, Co, the partner being Mr Ridge. Mr Wilson does not appear to have requested similar information from Mr Bray.

On 3 August, Mr Wilson sent Mr Goose a synopsis of the revised Chown report. He described Chown as "our international tax consultants" and explained he had deleted the parts relating to Mr Bray's residence situation as not relevant to Mr Goose's position. His letter also referred to a HarvestMinster report with regard to a proposed sinking fund intended to enable the repayment of the Swiss loan within seven years, which Mr Goose said was also provided to him. Mr Goose did not seek advice on the Chown report from Mr Moore. He sent it to Mr Needle for advice, whose response was "If you have got somebody like Chown you do not need me". Mr Wilson also sent a copy of the Chown report to Mr Riby.

On 6 August, Mr Riby's accountant, Antony Wilson, provided details of Mr Riby's assets to Mr Wilson. It listed various assets and their claimed values, totalling £530,000.

On 7 August, Mr Wilson wrote to Chown saying that its report had been circulated to Mr Bray and to Mr Goose and Mr Riby "together with their Solicitors and Accountants" and reporting the amendments to the sources of finance which I have mentioned. Mr Goose had not yet consulted solicitors in connection with the venture and Mr Wilson had not sent the report to Mr Moore. Mr Wilson's statement that he had sent the Chown letter to Mr Goose's solicitors and accountants was, therefore, wrong, but he said this was an error. Mr Wilson's letter reflects his understanding that the intention was that:

© 2025 Thomson Reuters.

> "…the Swiss Trust [i.e. the proposing lender] will lend the UK Bank who in turn will pass the money on to [Intag]. Intag will then make loans to Goose and Riby or their Companies."

He also wrote that:

> "Finally, Mr Goose has suggested that he may put a further farm into the UK Company. Perhaps this would assist the branch situation and would allow the use of the SARL to be avoided.
>
> I would stress that we are still at a formative stage as far as the fund raising is concerned (both Riby and Goose have expressed reluctance to have charges placed on their existing UK assets to support the Swiss borrowing) and thus we are merely dealing with points of principle at the present time."

As to the former paragraph, Mr Goose was by now also considering buying some land adjoining Hagbeach Farm.

On 7 August, Mr Schaefer sent Mr Wilson documentary evidence said to support the Trinkhaus liabilities and a copy of the August 1982 telex to Barclays, adding with regard to the latter that:

> "…although we do not consider this as a legally binding obligation, we are of the opinion that Barclays Bank should formally release us from all obligations which might arise from this telex."

On 8 August, Mr Goose telephoned Mr Wilson, who made a note of the call. Mr Goose said the conversation was about the Chown report. He said that, although that had made no reference to the stones, he discussed them with Mr Wilson and that, as he and Mr Bray had always discussed, they would be used as a "buffer against currency fluctuations". He said that, during the conversation, he wrote the word "gems" on his copy of the report against the reference to Mr Bray's £200,000 investment: and the word appears on his copy disclosed on discovery. This evidence differed from his evidence to Harman J, when he said he did not know when he wrote the word. Whenever Mr Goose did write it, his evidence was to the effect that, although he was not putting up his assets to enable either Mr Bray or Mr Riby to repay their capital liabilities, the stones would be available to assist all three to pay their respective capital liabilities. He said:

> "When the Swiss franc or the French franc goes up and the pound goes down and the capital has to be repaid, stones can be either sold in Swiss francs, French francs, dollars or sterling. That was one of the big criteria that I always accepted. That was discussed with Mr Wilson on that particular occasion, and that is why I wrote 'gems' down here."

Mr Wilson's note includes the words "If discrepancy if fluctuation rate pay by way of stones (P.Bray's)", which provides some corroboration for Mr Goose's account. Since, however, Mr Goose believed that the stones were probably Brent's only

asset, it followed that a major proportion would have to be sold to raise the £200,000, and that only the remainder would be available to provide the suggested buffer. Mr Goose's evidence as to the extent to which, at this time, the stones were relevant to his own potential liabilities was, overall, somewhat confused: at other times in his evidence, he appeared to accept that the stones were not going to be used for any purpose beneficial to him, and that at most their claimed existence gave him confidence that Mr Bray was not a man of straw.

On 9 August, Mr Moore acknowledged Mr Wilson's letter of 1 August. From 9 to 11 August, Mr Goose visited farms near Tours.

On 13 August, Mr Wilson wrote further to Mr Goose. He referred to the Chown report and to the suggestion in it that it would be necessary for a limited company to be formed on Mr Goose's behalf. He enclosed various forms for completion by Mr Goose in connection with its incorporation. He reminded Mr Goose that he was awaiting his accounts and a statement of his assets.

Mr Goose replied on 15 August, enclosing his farming accounts for 1981 and 1982. He said his 1983 accounts were almost complete and showed a profit of £60,000. He described his assets. He owned 168 acres worth £575,000, in part charged to NatWest; his wife had a farm worth £250,000; he had an inheritance expectancy from his mother of some £125,000; he had shares worth about £1,200 and was owed £10,000 by Mr Bray. He owed £62,000 to his brother, Martin, in satisfaction of his interest in their father's estate. He said the adjoining land he wanted to buy would cost about £400,000. He said he might subsequently sell part so as to reduce the borrowing to £300,000. He added:

> "You can have the deeds for this property immediately I receive them. I am still concerned regarding my liability with [Intag]. If for any reason Mr Riby fails or the Martray farm does the same I would like to see the extent to which my liability extends?"

Mr Goose said that all three had agreed that each was only to be responsible for his own debts or failures: but he just wanted to be sure that, if the others went down, he was safe. He said that, before the meeting of 19 September, Mr Wilson confirmed to him that each would only be responsible for his own losses.

On 20 August, Mr Wilson wrote to Mr Bray. He reported that he and Mr Milne had spoken to Barclays about whether it would guarantee the repayment of the Swiss loan to Intag. It appeared that Barclays would only do so if UK assets were provided to it by way of security: it would not accept charges over French farms. The letter also said this:

> "During the past two weeks while you have been in France, I have also had numerous phone calls from Riby and Goose and their respective Solicitors and Accountants. One point has emerged clearly.
>
> If [Intag] is to be the central vehicle for the borrowing and for lending on to their respective Company/Sole Tradership, there is no doubt they are not prepared to pledge their UK assets in support. They both feel that to do so would be to place themselves at risk totally and they would then be subject to the fortunes of the other Farms and partners in [Intag]. Obviously the collateral would be looked at on a joint and several basis by the UK banks and thus the failure of any one of the Farms or the default in making repayments by any one individual might place the other members in jeopardy…

> Although I know that you have told [Messrs Goose and Riby] that Intag will put up the security and that effectively they will be free from any guarantees affecting their UK security, I do not feel that it is realistic and nor do I believe that Intag even with your Swiss Trust Fund has sufficient capital behind it. These points will be borne out no doubt in discussions with Credit Agricole but I think it is only fair to report to you my views after a series of meetings not only with Clearing Banks but also with Hill Samuel in London. Each party has produced the same response."

Mr Wilson's reference to calls from Mr Goose's solicitors and accountants was wrong: Mr Goose had still not instructed solicitors and there had been no material input from Mr Moore. On the other hand, Mr Riby had both solicitors and accountants on the scene, and there probably had been calls from them. Mr Goose himself had of course both telephoned and written to Mr Wilson: and his letter of 15 August had raised his concern as to the extent of his personal liability.

The letter illustrates how unrealistic the scheme was. The third paragraph shows that Mr Bray had apparently been telling Messrs Goose and Riby that Intag would provide the necessary security and that their liability would be limited. How that could ever have worked is unexplained and it appears likely that the then scheme was unworkable, as Mr Wilson recognised. Barclays was only prepared to provide a guarantee for Intag's borrowing if it was secured with UK assets. But Messrs Goose and Riby were not prepared to pledge their assets to secure the totality of Intag's borrowing; and Mr Bray's only available assets were the extra-territorial stones. Mr Wilson said that his view, from this early stage, was that Mr Bray would have to sell stones for the purpose of injecting capital into Intag. He said he was always advising Mr Bray of the need for this but, as he repeatedly emphasised in evidence, he could not make it happen. He could not recall seeing any evidence that Mr Bray corrected the false impression he had given Messrs Goose and Riby with regard to their potential liability being only limited, but he said that eventually the scheme changed, the final scheme being that decided upon on 18 May 1985.

On 20 August, Mr Wilson sent Mr Bray copies of Mr Schaefer's letter and enclosures of 7 August, saying the latter would need to be examined in detail, that Mr Schaefer was away until 21 September and that:

> "…I have no doubt that we will need to make available liquid funds from [Brent] within the next month or so in order to assist in the purchase of Martray or whichever Farm you chose for yourself."

which was consistent with his evidence that he was advising Mr Bray to sell stones.

Mr Goose and Mr Riby made an unheralded call on Mr Bray in late August. The purpose was to put to him, without prior warning, Mr Riby's concern that Mr Bray's contribution to the venture was to be the stones. Mr Riby said that Mr Bray had told him that he had smuggled them out of Zimbabwe in his pocket; but Mr Riby was concerned that he knew little about stones and had no means of knowing whether the values claimed for them were accurate; he was also concerned that their location abroad might make them difficult to realise. Mr Riby said Mr Goose was aware of his concerns, but had little patience with them.

Mr Riby said that he put to Mr Bray that he was not very happy. The telephone then rang and Mr Bray left the room. Mr Bray had left some documents not far from Mr Goose, who took the opportunity to look at them. Mr Goose and Mr Riby both saw a valuation of the stones, showing them to be worth over US$500,000. It bore the name of a firm of valuers, which Mr Goose

© 2025 Thomson Reuters.

said was Christies. It was different from the "Stones delivered to Bray" valuation which Mr Goose had earlier seen, although the layout was the same. Mr Goose said the sight of it gave him confidence that the stones existed and that they were valued at about US$500,000. He thought he saw it again in the autumn. Mr Riby remained sceptical about the position as there was no certainty that the valuation related to the same stones, nor was he satisfied as to the reliability of any of the valuations, and he would still have wanted an independent valuation; but he said that, at this point, he lost his argument with Mr Goose, whose reaction on seeing the valuation was "What's the fuss about?".

**September 1984**

By now, the purchase terms for La Devinniere were firming up. Mr Bray wrote to De Pinnas on 3 September telling them that the total price was FF5,227,460, and proposing a payment schedule under which FF250,000 was to be paid on the signing of the "compromis", FF1.75m on the "acte de vente" and the balance in two unequal instalments at six monthly intervals.

On 7 September, Mr Wilson and Mr Bray met in London and discussed several matters. Mr Wilson made a note. Part reads:

> "Stones <u>not</u> in [Brent] yet i.e. No security/assets in [Brent] at all (Purely gave guarantee but not formally drawn up). Just need to pay off bank's costs."

Mr Wilson said that meant what it says, but he could not explain the reference to the guarantee. The reference to the bank's "costs" was to the Trinkhaus claim; the "just" meant "in order to free the stones". Mr Wilson accepted that these instructions contradicted his instructions of 20 June, but he said he was very busy at the time and he did not realise "that [Mr Bray] was moving goalposts like this. I just had not picked it up." His note records Mr Bray's Harare address and adds "but no contact with Zimbabwe authorities". The inference is that this was an injunction to himself, imposed at Mr Bray's request. Mr Wilson did not accept that and said he would have had no reason to contact the Zimbabwe authorities and that he was just writing down what Mr Bray was saying.

On about 14 September, Mr Goose received a notice convening the first meeting of Intag and its board. It was fixed for 11.00 am at the Garden House Hotel, Cambridge. It is an important meeting because it is one at which Mr Wilson is said to have made the first batch of misrepresentations alleged by Mr Goose.

Mr Wilson wrote to Mr Bray on 17 September. He referred to several conversations with Mr Schaefer and to:

> "…pressure …growing on him from his various professional advisers for the debts to be paid. They are threatening legal action (as ever) and in order to prevent this, it is obviously going to be essential for us to fix a date to meet Mr Schaefer and decide on the amounts to be paid…
>
> Whilst writing, I also enclose a copy of an Article from the Times on Saturday 15th September which discusses in particular the Blue Sapphires Market. I am not sure whether your stones come into this category but this would be another good reason to try to take part of your value from [Brent] as securities rather than merely as stones."

The article referred to the opinion of a Mr Ormond that "the gems market [was] 'disastrous'".

**The meeting of 19 September 1984**

Those present were Mr Goose, Mr Bray, Mr Riby, Mr Walker, Mr Milne, Mr Wilson, Mr Mainwood (a Wilson Sandford manager), Mr A. Wilson (Mr Riby's accountant) and Mr Ridge (his solicitor). Mr Kane was supposed to attend, but did not. The meeting lasted about two hours. There are no notes of what was discussed at the meeting, save what is recorded in the minutes, which were taken by Mr Wilson. The evidence about this meeting was as follows.

*(a) Mr Goose*

Mr Bray asked Mr Goose and Mr Walker to propose and second him as chairman, which they did. Mr Goose and Mr Milne were proposed as, and appointed, directors. Mr Riby was also invited to be a director, but he declined. Mr Goose said the Riby team wanted to know more about the nuts and bolts of the situation and he thought they were occasionally rather rude. Instead of talking about farming, they wanted to talk about finance and what everybody's commitment was going to be.

There was a discussion about finance. The project was about borrowing Swiss francs at a low rate of interest, but the problems of potential currency fluctuations were real and were recognised. Mr Milne referred to a meeting he had with AIB with regard to borrowing Swiss francs over a seven year period, with interest payable annually in arrear.

The stones were mentioned in the context of a discussion of the value which each participant was bringing into the venture; and both Mr Bray and Mr Wilson said that Mr Bray was putting in more than Mr Goose and Mr Riby.

In chief, Mr Goose said that Mr Wilson referred to the stones being worth US$500,000, as being held in Zurich and as providing a buffer against currency fluctuations; and that he and Mr Bray said that Mr Bray was putting more into the venture than Mr Goose and Mr Riby put together. Mr Goose said he responded that he was pleased that they had a project about which everyone was in agreement, that each was to be responsible for his own losses and that Mr Bray was bringing US $500,000 of stones. He sad the discussion about financial matters lasted about 45 minutes. He said that, on Mr Bray's side, most of the talking was done by Mr Milne and Mr Wilson. He said that Mr Bray went very quiet after about a third of the way through the meeting.

Mr Goose's evidence about the stones having been referred to as a buffer against currency fluctuations is inconsistent with other evidence he gave that, at the time of this meeting, he simply regarded the stones as Mr Bray's means of funding his own investment in the French farms operation and that they were not to be used as security for Mr Goose's intended borrowing: in any event, how the supposed buffer was expected to work appears never to have been further considered, let alone agreed. Further, although in chief Mr Goose suggested that Mr Wilson referred to the stones as having a value of approximately US $500,000, in cross-examination he accepted that Mr Wilson did not specifically mention a value for them, and did no more than refer to them as "Peter's stones"; and he appears to have accepted likewise in cross-examination before Harman J. The net effect of his evidence was that the closest Mr Wilson came to mentioning a value for the stones was his statement that Mr Bray was putting in more than Mr Goose and Mr Riby together.

*(b) Mr Riby*

Mr Riby said that Mr Bray was initially bombastic and forceful and wanted to hustle everyone through the agenda and achieve an assent to his recommendations. The Riby team agreed that Mr Bray should chair the meeting, but they wanted to question him before assenting to any resolutions. They wanted "any other business" to be taken after the election of the chairman. Mr Bray tried to bully them into accepting his position, but when he failed to do so he went into a shell or a sulk. After that, Mr Milne and Mr Wilson held the meeting together and did most of the talking.

Mr Riby said he was keen to satisfy himself as to the fairness of the division of collateral each participant was to put in; and he asked about this and about Mr Bray's intention of borrowing from Intag a larger sum than he or Mr Goose. Both Mr Milne and Mr Wilson said that Mr Bray was to put in the stones, which were worth more than the investments of Mr Goose and Mr Riby were putting in. Mr Riby suggested that the stones should be brought to England, which would allay his concerns about them and their value, to which (in chief) Mr Milne <u>and</u> Mr Wilson and (in cross-examination) Mr Milne <u>or</u> Mr Wilson replied that this would result in Intag incurring duty of £90,000. The duty referred to was VAT, then 15%, which implied a

value of £600,000 for the stones: but Mr Riby did not recall a direct statement of their value being made. He did recall that their role as a protection against currency fluctuation was stressed.

Mr Riby was unpersuaded at the meeting as to Intag's purpose or as to the advantage to him in becoming a director: he considered that he was being invited to be a director so that he would be obliged to fund other people, and so he declined. He had no recollection that the meeting went on to consider other agenda items, and he thought he may have left it before it concluded. He was willing to remain in the syndicate; and was also willing to put up £50,000 in an account at AIB, provided he was sole signatory and could withdraw it until such time as it was pledged as collateral for his loan for his French farm.

*(c) Mr Milne*

He had little specific recollection of the discussions or what took place. He recalled he was elected a non-executive director of Intag and was to be paid a retainer of about £250 a month. He recalled that the meeting was run by Mr Bray, that Mr Goose and Mr Riby were there, the latter with his advisers, and that the Riby team asked a lot of questions. His recollection was that Mr Bray's intention was to convince people to join him in the project. The discussion centred around the practicalities of establishing farms in France and the role Intag might play. His own role was to provide information as to the matters he had been dealing with (the sinking fund and the proposed employee benefits) and he said the sinking fund proposal was discussed. He did not recall that he or Mr Wilson took a prominent part in the running of the meeting.

Mr Milne recalled that Mr Bray was not getting his own way with regard to the running of the meeting and was irascible. He agreed in cross-examination that finance, and security for its sources, would have been discussed, including what Mr Bray was going to put up as security, but he did not actually recall that discussion. He did not recall Mr Riby being awkward about this aspect of the discussion. He recalled the Riby team questioning Mr Bray on this topic and that Mr Bray answered the questions. He did not recall Mr Wilson doing so. Mr Milne agreed that "a" value of the stones, at least in broad terms, was known to the participants, but did not say what it was. He said that the original figure he had been given was £3m, but did not recall that figure being mentioned at the meeting. He did not recall Mr Riby suggesting that the stones should be brought to the UK and valued. He could not recall a suggestion that it would trigger a £90,000 duty charge. He said that, if anyone said that, it would be more likely to have been Mr Bray than Mr Wilson. He did not recall Mr Wilson being involved in any such discussion. He agreed that, before the meeting, Mr Wilson had been making inquiries about Mr Bray's assets and the trust fund. He disagreed that there came a point in the meeting when Mr Bray went into a sulk and left its conduct to others. Had that happened, he would have remembered it - and he would not have wasted any further time at the meeting, but would have walked out.

*(d) Mr Wilson*

Mr Wilson recalled the meeting, in so far as he could visualise where it was held, who was there and where they sat. He took the minutes and may have been asked to comment on certain matters. He said his role was to "listen to the shape of the scheme as it was being proposed …and to hear any debate taking place" and he said he sat quietly. He had no other specific recollections save that he believed that Mr Bray led the meeting straight through and did most of the talking, although there were obviously questions and a discussion. He did not recall lots of questions being asked. He did not recall any statement being made that Mr Bray was putting more into the project than Mr Goose and Mr Riby. He did not remember any suggestion that the stones should be brought to England and did not think that the exchange which Mr Riby had spoken of had taken place. The substance of his evidence was that he said nothing about a VAT charge of £90,000 arising; that he had not researched the VAT position and did not know whether a charge would arise; and that the figure of £90,000 was nonsense: if the stones were believed to be worth US$500,000, VAT at 15% would be US$75,000, to which the then sterling equivalent was nothing like £90,000. A VAT figure of £90,000 implied a value of £600,000 whereas it was agreed at the trial that the then sterling equivalent of US$500,000 was about £416,000; and that of US$75,000 would have been about £62,500. Mr Wilson said that if anyone mentioned a £90,000 VAT liability on bringing the stones to England, he did not think he did. He said that it was Mr Bray who had told him of possible VAT or CGT implications, not the other way round. He did not recall Mr Bray going into a sulk and did not consider that there came a point, as had been suggested, where he, Mr Wilson, led the meeting. He had no wish to talk anyone into anything about which they were dubious. He could not recall any specific conversation with Mr Goose. He thought that it would have been natural if the stones had been mentioned at the meeting, but did not remember that they were. He said they may have been suggested as security for the Swiss finance or as a source of capital for investment into Mr Bray's farm. He did not think that Brent was mentioned: at that stage, following the meeting of 7 September, Mr Wilson did not believe it had any assets. It did not occur to him to disclose what he knew about Mr Bray's assets and affairs: that was confidential to Mr Bray. He said the meeting was routine, cordial and constructive. He could not recall Mr Bray being irascible.

© 2025 Thomson Reuters. 

*(e) Mr Mainwood*

He had joined Wilson Sandford in August 1984. His work there consisted of audits and preparation of accounts. The meeting marked his first involvement with Mr Bray. He was there primarily to obtain background information which would be useful in the preparation of Intag's accounts. He did not make any notes. He recalled that Mr Bray came over as very plausible and that he ran the meeting. He recalled Mr Wilson taking the minutes but, save that he thought he may have dealt with some unspecified technical matters, he did not recall him speaking, let alone referring to the value of the stones. He recalled Mr Riby's presence, that he kept himself to himself and that it was mainly his advisers who raised points on his behalf. He recalled a discussion about funding, on which he thought Mr Bray and Mr Milne were the main spokesmen. He recalled Mr Bray becoming a little tetchy. He could not recall the specifics of what was discussed at the meeting or any mention being made of the stones.

**Minutes of the meeting of 19 September**

Minutes were prepared. They record the appointment of Mr Bray as chairman, Messrs Bray, Walker, Goose and Milne as directors, Mr Kane as secretary and Wilson Sandford as auditors; and that the authorised capital was £100,000, that the subscribers' shares were held by Mr Bray and that further shares were to be allotted when finance for the company had been obtained: 44,998 to Mr and Mrs Bray jointly, and 5,000 to Mr Bray and Mr Walker jointly. The minutes continued:

> "It was also agreed that [Mr Goose] would be allotted further Shares from the unissued balance of Share Capital …These shares would not be allocated until approval granted again by the Board of Directors following Mr Goose's acquiring of farms via finance from [Intag] …"

Item 8, "Funding of Farm Purchases", referred to an annexed paper which was said to have been adopted in principle and which:

> "…would form the basis of agreement between P.J. Bray and R. Goose rather than P.J. Bray and A. Riby as the latter after taking advice did not wish to be a Company Director."

The paper had been presented to the meeting and purports to reflect the basis of an agreement between Mr Bray and Mr Riby. Paragraphs 2, 3, 4 and 6 read:

> "2. It is agreed that the funding of farm purchases will be from Swiss franc borrowing supported by suitable prime bank operation to cover the requisite guarantees of interest and capital repayments under terms generally understood to be:-
>
> a) Seven year minimum term loan of Swiss francs at LIBOR rates. Payment of interest at not less than quarterly intervals. No repayment of capital until the end of the term.
>
> B) Support banking to add not more than 2% to the base rate for the Swiss franc loan to cover requirements as to guarantee of interest and repayment of capital.
>
> 3. From the above loan funds individuals will be permitted to borrow sufficient funds to cover all purchase costs plus a fee to cover company administrative costs not exceeding one % per annum.
>
> 4. Individual borrowers will satisfy the company auditors, financial advisors and bankers as to the security for their borrowings and this security will be made available to the company and through it

© 2025 Thomson Reuters.

> to the support bankers…6. Providing that the above conditions are complied with the responsibility of borrowers will be for their portion of the funds on an individual basis and not as joint and several guarantors."

Mr Goose explained that the reason the agreement was purportedly only between Mr Bray and Mr Riby was that, by then, they each had their eye on a specific farm, whereas he did not. However, he accepted that Mr Bray did not have any separate or different arrangements with him. Paragraph 6 was consistent with the intention that each borrower would only be putting up security for his own borrowing, and not for anyone else's, and was inconsistent with any intention that the stones should be used as a "buffer" for the benefit of all three participants. Mr Wilson accepted in evidence that, from now onwards, Mr Goose was entitled to consider that he was fulfilling his role under paragraph 4, although he pointed out that the context of paragraph 4 was one in which the intended borrowing was the proposed Swiss franc borrowing, for the benefit, through Intag, of all the participants. Mr Wilson said he did not give any consideration as to how paragraph 4 was intended to work in practice. He said he never went back to the paper after the September meeting: "It did not seem to play a function in the future happenings on [Intag]".

**20 September to 31 December 1984**

On 20 September, Mr Goose went to Roythorne & Co ("Roythornes"), solicitors in Spalding, for advice. They had been his family's solicitors for about 14 years. Mr Tongue was the partner who advised him. Mr Goose gave him all the documents he had. Mr Tongue made a note. It records that Mr Goose wanted to borrow SF500,000 through Intag; that the arrangement was for a private source in Switzerland to lend to AIB, which would then lend to Intag, which would lend to the syndicate members; that each member was only to be liable for his own loans; that Mr Goose had lost La Donneterre but was still interested in buying or renting a French farm; that he had been approached by the Gallaher Pension Fund, who wanted to sell him 180 acres adjoining Hagbeach Farm, which he was determined to buy: if necessary, he would sell other land to finance it, but was hoping to finance it initially by a bridging loan and later by one from Intag. Mr Goose said that, at that stage, his proposed borrowing of SF500,000 was for both the Gallaher land and a French farm.

Mr Bray's first fee cheque to Wilson Sandford, for £1,500 and dated 27 September, was returned unpaid, marked "R.D.".

Mr Riby's solicitor, Mr Ridge, wrote to Mr Wilson on 1 October. Mr Riby had been under pressure from Mr Bray to put £50,000 into Intag to enable it to pay the deposit of £25,000 on the signing of the "compromis" to buy La Devinniere and to provide it with working capital. Mr Ridge said he had:

> "…certainly come away from [the September meeting] with the impression that it had been clearly agreed that if any such money was to be deposited Tony Riby would be free to withdraw it without strings unless and until it was pledged as collateral for a loan being taken out by Tony himself. This all seemed consistent with the description of [Intag] at that meeting as being merely a vehicle through which the three individuals could pursue their separate projects.
>
> What concerns us now if we understand the situation correctly s that Tony Riby is being asked to commit the sum of £50,000 to Intag on a basis that is much more binding than the above. In some way which is not quite clear the money is to be used to secure the liabilities of Intag and this seems to imply a risk however small that if and when Mr Riby wants it to be repaid (or alternatively put towards his own investment) it will not be available. Although Mr Bray says that it was explained to Tony that this was what would be necessary I must say it seems to me to be a departure from

> what was agreed on the 19th September and in short Tony is not prepared to put his money at risk to enable somebody else's project to go forward."

Mr Goose said that that summary of Mr Riby's understanding at the end of the September meeting was the same as his. Shortly afterwards, Mr Riby dropped out of the syndicate, the main reason being the appointment of receivers in respect of a major debtor to whom he used to sell his chickens.

Mr Wilson wrote to Mr Goose on 11 October. The letter was headed "Intag Estates Limited" and said:

> "…As I understand the position, you wish to borrow £300,000 to acquire the land adjoining your farm in the UK and this loan needs to take place on 1st December 1984. In addition, you are hoping to borrow approximately another £500,000 on 30th June 1985 or thereabouts to purchase a Farm in the Tours region …"

Mr Wilson continued that, "in order to raise this finance through our source" (which Mr Wilson said in evidence referred to Mr Francis), further information was urgently needed, comprising a valuation of the land proposed to be acquired and of Mr Goose's existing land; a statement of affairs showing his assets and liabilities; his accounts to 31 December 1983; and cash flows, profit and loss accounts and projected balance sheets for the three years commencing 1 December 1984 for the enlarged farm. He urged Mr Goose "also clearly [to] specify the UK assets which can be pledged in support of the borrowing in Swiss francs."

Mr Goose had earlier discussed these matters with Mr Wilson so the letter was no surprise. Hagbeach Farm was very fragmented and his original idea had been to buy the Gallaher land and then rationalise the enlarged farm by selling off parts and ring fencing the remainder. He wanted to use money raised in Switzerland by Intag. This would involve raising additional money, but his understanding was that the more that was raised, the better would be the borrowing terms. By now, however, he recognised that the prospect of raising money in Switzerland was still distant and so he decided to confine himself to buying just 28 acres of the Gallaher land, to which he had committed himself by 11 October. The price was £80,000 and he paid a deposit of £8,000. He wanted to borrow the balance from Intag.

On 11 October, Mr Wilson wrote an important letter to Mr Bray, headed "The Brent Foundation". The material part reads:

> "I am sorry to have to say that I have been phoned by Mr Schaefer on at least 4 or 5 occasions this week. He is thoroughly unhappy with the situation, as we both know, but he is now proving to be more than a nuisance. The time spent on the telephone talking to him is totally unproductive unless the situation with the Trust can be resolved. Disturbingly Mr Schaefer states that in his opinion the stones held in Zurich are of very low value and will not cover the Swiss debts which you have. This is obviously in direct contradiction to the value shown in the Telex which I hold and I have no way of knowing the true value myself.
>
> However, I am convinced that we will need to realise some of these stones both to pay the Swiss debts when they are finally agreed and also to inject capital into [Intag].

> It would therefore be of enormous help to me if we could now sort out the Swiss situation once and for all. You were going to let me have a list of points to write to Mr Schaefer on and I would ask you to let me have these urgently. I will then send that letter and will suggest to Mr Schaefer that he attends on us in the UK at the earliest opportunity. At the same time, it is also essential that we obtain a valuation of the gems, totally independently, so that the true market value can be established; I think it is fair to say that the market in gems at the present time is weak and we will need to decide the amount which we need to raise at the present time."

Mr Wilson confirmed that what he said reflected his views at the time. He said he had asked Mr Schaefer what his opinion as to the low value of the stones was based on, and had concluded that there was no reason behind it: Mr Schaefer had not obtained a valuation. Mr Wilson said he repeated to Mr Bray in discussion that the stones should be independently valued, but Mr Bray responded that there was no point in that because any lender would want to have his own valuation done, a response with which Mr Wilson said he agreed. He said that Mr Bray "disputed totally that they were of very low value." For his own part, Mr Wilson said he had no way of knowing their value: he could not understand how Mr Schaefer could have sent him a valuation in July (albeit with a disclaimer) showing the stones to be worth some US$500,000; and, in October, be claiming that they were worth less that £25,000. He did not trust what Mr Schaefer was telling him. As to his proposal that some stones would have to be sold, he said that Mr Bray agreed. In the same letter, Mr Wilson enclosed a draft statement of affairs for Mr Bray, which he asked him to examine and return.

On 17 October, there was a meeting of the Intag board. Mr Bray, Mr Goose and Mr Kane attended. AIB were appointed Intag's bankers. The minutes recorded that Mr Goose was due to complete the purchase of the 28 acres, which would be "effected through [Intag]"; that Mr Bray had signed the compromis for the purchase of La Devinniere for FF5,227,540 (about £520,000), which was also to be "completed through [Intag]"; that negotiations had been opened to secure a farm near Montmorillon on a lease, with an option to purchase (a farm in which Mr Walker was interested); and that Intag wished to part company from Mr Riby. Mr Goose said Mr Bray was very disappointed that Mr Riby had withdrawn from the venture: the consequence was that the total Swiss borrowings would now be disadvantageously less.

On 18 October, Mr Goose drew a cheque for £50,000 in favour of AIB, by way of a loan to Intag. £25,000 was for the payment of the deposit on the signing of the compromis for La Devinniere; and £25,000 was for working capital. Mr Goose claims that the £50,000 was advanced on the security of the stones and he relies on a letter from Mr Bray to Mr Wilson dated 3 October, although that does not refer to a lending of £50,000, only to the prior loan of £10,000 and a guarantee. It reads:

> "As Tony Riby has failed to complete the deposit with the London and Arab Bank in accordance with the agreement between us Rex Goose has agreed to replace him by a guarantee and will continue to support the Intag project in the course of the next three months in this way.
>
> Please therefore accept this instruction to indemnify Rex Goose in respect of any claim which may be made against him in respect of the guarantee and to repay the £10,000 which he has already advanced for the project should it not come to fruition by reason of any failure on my part. Settlement should be made by sale of the agreed parcels of stones showing a 1981 value of some $77,000 dollars and any deficiency made good by the sale of part parcels.
>
> Please acknowledge receipt of this letter and instruction which shall remain in force until the guarantee is lifted."

Mr Goose said that he advanced the £50,000 on two conditions: that Mr Bray provided the stones as security for its repayment and wrote that letter; and that it was repaid by 1 January 1985, when he would have to pay for the 28 acres. He expected the

repayment to be made possible by a Swiss loan to Intag. Otherwise, he considered that the only way in which he could be repaid was if some stones were sold. He said that, at that stage, he believed they had a value of almost US$500,000; and that this was based on what he had been told by Mr Bray and Mr Wilson at the September meeting.

Mr Goose took Mr Wilson's letter of 11 October to Mr Moore and, on 22 October, Mr Moore wrote to Mr Wilson with some of the requested information. He enclosed cash flow statements and the first draft of the 1983 accounts. The figures took account of Mr Goose's proposal to buy the 28 acres. He wrote that Mr Goose had no material assets and liabilities other than his land and partnership interests; and that, as was the case, Mr Goose was not prepared to have a professional valuation of his land carried out: Mr Goose was unwilling to incur the cost.

On 23 October, Mr Goose telephoned Mr Tongue of Roythornes for advice. Mr Goose's wish was still to borrow Swiss francs in order to enable him to pay his brother his entitlement in respect of their father's estate and to pay for the 28 acres. He says he told Mr Tongue that the plan was that the Swiss francs would be borrowed from AIB. He said that his understanding at that stage was that a Swiss lender had been identified which would lend to AIB. Mr Tongue's note reads, so far as material:

> "[Mr Bray] will ring me re French enterprise. Borrowed Swiss francs from [AIB]. Will convert to sterling to pay: (a) Martin (b) Gallagher. We to give u/t to [Intag] to hold deeds of these properties to Intag's order. [Mr Bray] will explain procedure in detail. We can disclose all your affairs to him. With interest at about 8% - no capital till year 7. Good deal…"

On 25 and 26 October, Mr Goose went to Orleans and then on to Grasse. He was interested in a 600 acre arable farm there. He had the prospect of acquiring an 18 year lease of it.

On 30 October, Mr Bray responded to Mr Wilson with his comments on Mr Schaefer's claims. He accepted Trinkhaus's claim and the various disbursements, but had reservations on the fees and interest claim. He referred to having sent his comments to "the local director of the Holford trust".

Sometime in the autumn, Mr Milne prepared a document headed "Farm Acquisition and Development". It showed a timetable for payments due for La Devinniere and the sources of the required finance. Mr Bray was listed as due to provide some £21,000 and £43,000 in September 1984 on the signing of the compromis and for stock; and £65,000 in December for equipment. Mr Wilson had a copy of the document, but claimed he did not notice that Mr Bray was due to provide this money during this period. In fact, he did not provide a penny. Mr Wilson said that at this stage he was not concerned with raising finance: this was Mr Francis's province.

On 1 November, Mr Wilson produced the final version of Mr Bray's statement of affairs. It was on Wilson Sandford notepaper and purported to describe Mr Bray's assets at 31 October 1984. It was said to be, and was, "based on information provided by [Mr Bray]" and Mr Wilson had not attempted to verify any of the assets or values. The assets included a Belgravia house (occupied by the first Mrs Bray), valued at £75,000 and said to be freehold, although Mr Wilson had not enquired as to its tenure; the March house (which Mr Wilson accepted he knew was in Mrs Bray's name), with an equity of £10,000; and overseas assets valued at £1.265m, including the stones valued at US$498,711 "per Telex attached", being the list on Mr Schaefer's telex of 10 July 1984, but minus his disclaimer. Mr Wilson said he did not know whether that valuation was correct or not, but it was the only one he had. There was an apparently irrelevant reference to two unidentified houses "in the UK,

occupied by Mr Bray's sisters, and belonging to his family Trust", which were described as having not been included at valuation in the statement. It made no reference to liabilities. Mr Wilson said he made no mention of the Trinkhaus debts because he believed them to be immaterial, but agreed that he should have referred to them and perhaps have stated that they were in dispute. He said he had overlooked the £10,000 owed to Mr Goose. Harman J described the statement of affairs as a disgraceful document for a chartered accountant to use, the Court of Appeal endorsed that view and Mr Wilson accepted before me that the criticism was justified. He said it was not prepared so as to deceive anybody, but was done in good faith.

On 22 November, Mr Wilson wrote to Mr Schaefer setting out Mr Bray's response on the various claims. He said he had:

> "…to consult with not only Peter Bray but also his family before drafting this reply. His family are involved in a family Trust and it has been vital for me to clarify their queries which I quote verbatim in order to receive your comments."

That was untruthful. Mr Wilson had not consulted the family. The only relevant inquiries he had made had been with Mr Bray, who was the only person concerned. Mr Wilson admitted as much to Harman J and said Mr Bray had asked him to write what he did. Before me, he sought to defend the letter, saying he thought he had also spoken to Mrs Bray. I do not accept his revised explanation of the words he used. He admitted they were an exaggeration and said they were intended to put pressure on Mr Schaefer. Mr Wilson went on in his letter to set out Mr Bray's arguments and proposed a payment of £14,718 in full satisfaction so as to enable the stones to be released.

On 27 November, an Intag board meeting, attended by Mr Bray, Mr Goose and Mr Kane, resolved to purchase La Devinniere.

On 11 December, Mr Schaefer replied to Mr Wilson's letter of 22 November. He confirmed his claim in respect of all the amounts claimed in his letter of 7 August. He warned that if they were not paid by 30 January 1985:

> "1. the collateral will be sold [at] the best obtainable price which we estimate will be approx [SF]5-10,000;
>
> 2. Legal action for check fraud will be taken against Mr Bray."

On 13 December, Mr Wilson had a telephone call with Mr Boyce-Mears. There is a dispute as to who made it, but I find that it was Mr Boyce-Mears, who did so with a view to inquiring as to the state of progress with regard to the Trinkhaus claim. Mr Wilson said that the name Boyce-Mears meant nothing to him at that stage, although it should have done because Mr Bray had referred to him in the instructions which Mr Wilson used for his letter of 22 November. Mr Wilson's note, whose accuracy Mr Boyce-Mears did not question, records that "reply [was] awaited from Mr Schaefer", from which I infer, and find, that Mr Schaefer's letter of 11 December had not yet reached Mr Wilson. Mr Wilson's note also records that Mr Boyce-Mears told him that the "assets" (which Mr Wilson understood to mean the stones) were transferred by Holford to Brent with a view to raising a loan for expansion in Zimbabwe; he also noted that:

> "Stones shipped - now fully paid. Upon delivery to [Switzerland] not accepted by [Trinkhaus] for loan…[Holford] willing to take stones. Valued per telex $498,000. Individual valuations attached to each stone …Value of semi-precious stones fallen over the last few years …'desperate' to take stones back into [Holford] …belong to clients of [Holford]. Peter Bray no interest in [Holford] or in stones."

The inference is that Mr Boyce-Mears had forgotten about the sale, or proposed, sale transaction, and only recalled the earlier proposed, and rejected, security transaction. Mr Wilson said he was confused by the assertions that the stones belonged to a Holford client and that Mr Bray had no interest in them.

Mr Wilson spoke to Mr Bray on 18 December. One matter discussed was Mr Bray's claimed ambition to buy control of Holford: and he asked Mr Wilson to do a search on Holford. Mr Wilson's note records this instruction and that he had just spoken to Mr Schaefer: but there is no reference to the letter of 11 December, which Mr Wilson thought (as I find) he had still not received. Part of his note reads:

> "3) Conversation with Schaefer on the same day. My letter of 22nd November offered £14,718. His original demand was for a higher sum and I suggest that we might be negotiating it between £20,000 and £25,000. Peter Bray states that the Jewels can now be sold at Hatton Garden by a contact called Morris who is connected with Sterling who are a finance house. Mr Schaefer was agreeable to cutting the Directors fee by a third but did not accept any part of the currency risk. We await a reply."

Mr Wilson said he also raised with Mr Bray the call from Mr Boyce-Mears on 13 December: Mr Wilson wanted to know what the situation about the stones was. He said that Mr Bray explained that Mr Boyce-Mears ran Holford which had been instrumental in transferring the stones to Switzerland but that it had no interest in them, and that the stones belonged to Mr Bray. Mr Wilson said he accepted what Mr Bray said and had no reason to doubt him. He said Mr Bray implied that Mr Boyce-Mears was untrustworthy. Mr Wilson did not record any of this in his note. He said, however, that it was "wrapped up" in the noted instruction to do a search on Holford, which Mr Bray told him would reveal that Holford did not own the stones. Mr Wilson at no time asked Mr Bray how he had acquired the stones in the first place.

Mr Wilson said in evidence that he did not regard the Holford claim as potentially prejudicing the French venture; although he accepted that, if the claim was true, the venture would collapse. He also said he had been pressing Mr Bray to sell the stones for some three or four months, and that a sale would establish their value and enable capital to be injected. He said he discussed the value of the stones with Mr Bray - Mr Boyce-Mears had referred to the fall in the value of semi-precious stones in recent years - and that Mr Bray recognised that the market had weakened. Mr Wilson recognised that they were now worth less than the 1980/81 valuations, but he still believed them to be of substantial, although uncertain, value. So also, he said, did Mr Boyce-Mears. The only potential effect on the French venture of any reduction in value was that their borrowing potential would be reduced, or their ability to realise capital. A sale of the stones would show their value; and any proposing lender would obtain its own valuation of them.

Mr Wilson carried out a search on Holford. Its directors' report for the year to 30 September 1983 showed that it was a trust company and investment adviser, principally for overseas clients. Its balance sheet at the year end showed its only assets as

being goodwill and bank balances totalling some £39,000. That suggested that it did not own the stones, but left open the possibility that it had a client who did. A sight of the accounts raised an obvious question as to why Mr Bray wanted to buy Holford: but Mr Wilson did not ask it.

On 19 December, Mr Bray wrote to Mr Hutton, a partner with Simon, Hayes, Zucker & Cassels, Intag's new solicitors. He wrote on Intag's headed notepaper, which now showed Intag's address as Hagbeach Farm, although it invited replies to Mr Bray's March address. Mr Bray advised Mr Hutton that Intag was raising funds for two operations on the security of Hagbeach Farm. They were: (i) the purchase of the 28 acres for £80,000; and (ii) the payment by Mr Goose of £63,000 to his brother so as to release to Mr Goose 72 acres of land. Mr Goose's land would then be used as the basis of security for the purchase of land in France. Mr Bray advised that the purchase of the 28 acres was due to be completed at the year end and that Mr Tongue was acting in it. He said that Mr Wilson was "in direct touch with the funding source". He instructed Mr Hutton to act for Intag in the transactions. Copies of his letter were sent to Mr Tongue and to "Mr R. Sandford" (sic), but not to Mr Goose. Mr Wilson is not sure if he saw it, and no copy was disclosed in his discovery. He denied that he was in touch with the funding source.

Mr Goose was not sure if he saw that letter at the time, but agreed that the transactions were ones which he was then contemplating. The stones are not referred to as playing any part in them. He did not agree with all that was said in that letter. He was going to get his £50,000 back on 1 January 1985 to pay for the 28 acres, but if the Swiss francs "had been in operation before then …I was going to use those to pay for [them]." He said his brother was due to be paid on 13 August 1985. As for the assets to be put up as security for the Swiss franc borrowing, he said that the majority would have been the stones. He had not agreed that Mr Hutton's firm should act on behalf of Intag.

**January 1985**

By 2 January, Mr Wilson had received Mr Schaefer's letter of 11 December. He sent Mr Bray a copy and asked for his comments. He said he had spoken to Mr Schaefer in the meantime, who was prepared to agree to a reduction in the amounts claimed (a matter he had referred to on 18 December). He reported the results of his search on Holford.

On 3 January, Mr Schaefer wrote to Mr Wilson proposing a payment of £25,000, to include the costs of liquidating Brent. He also wanted a release from Barclays before releasing the stones. He did not suggest he would need a clearance from Holford. His settlement offer would expire on 31 January.

On 10 January, Chestertons produced a valuation of Hagbeach Farm: Mr Goose had recognised that any lender would want a valuation and so he commissioned one. The valuation divided the farm into five blocks, but only Blocks 1, 2 and 3 are relevant.

Block 1 comprised 71.36 acres and was valued at £205,000. It had been inherited by Mr Goose and his brother, Martin, subject to an agricultural tenancy in favour of the partnership between Mr Goose and his mother. Mr Goose had an option, exercisable until November 1985, of buying Martin's share for £63,500 (half the probate value), which he proposed to exercise. Block 2 comprised 86.88 acres, was owned by Mr Goose and was valued at £230,000. When the purchase of the 28 acres was completed, they would also form part of this block, but it had not been completed and the valuation did not include it. Block 3 comprised the farmhouse and buildings, valued at £150,000.

On 14 January, Mr Wilson wrote to Mr Schaefer and invited a reduced settlement figure, on the basis that Mr Bray might want to keep Brent in existence. He sent Mr Bray a copy of Mr Schaefer's letter of 3 January and told him of the letter he had just sent Mr Schaefer. He advised an early settlement. He said that, as a release from Barclays was also required, it was "vital that

the mortgage on [the house] is tied up as soon as possible". At that stage, Mr Milne was endeavouring to broker a re-mortgage of it. The letter referred to Mr Bray's latest plan of acquiring a hotel and restaurant in London, a plan which went nowhere.

Mr Schaefer replied on 18 January, advising that, if Brent was not liquidated, the settlement figure would be only £23,500. Mr Wilson replied on 28 January, saying Mr Bray would probably elect to keep Brent alive. At Mr Bray's request, he wrote that:

> "Our plans are now nearly complete regarding our overseas trading venture and we need to arrange for the gems to constitute security for loans. I understand from Peter Bray that individual valuations were carried out of each of the gems when you first received them (presumably the same amounts as shown in your telex of 10th July to me). In order to be able to remit the agreed sum to yourself to release the gems, we need to be able to provide evidence of the gems worth and I wonder whether it would now be possible for you to let me have copies of the individual valuations."

The valuations were promptly sent, and Mr Francis collected them. They were required in connection with the fund raising exercise.

On 25 January, Mr Bray, Mr Goose and Mr Francis went to the International Commercial Bank ("ICB") in London. They put to its managers their proposition of buying land in France, financed by a borrowing of Swiss francs which would then be converted into French francs. Mr Goose said that the managers were told that the security would be the French land and the stones. He said that one of them, Mr Phipps, said how useful the stones would be as a buffer against currency fluctuations.

On 28 January, Mr Wilson sought Mr Bray's instructions on Mr Schaefer's letters of 3 and 18 January. He advised that it would be wise "to arrange settlement as soon as the Swiss Funds become available." He wanted to go back to Mr Schaefer before 31 January: but he plainly did not expect to be in funds by then with which to pay Trinkhaus.

**A change of plan**

On 30 January, Mr Bray wrote on Intag notepaper to Mr Wilson. Mr Goose said he thought he saw it at the time, but was not certain. It was Mr Bray's summary of the funding proposals to be submitted to "[ICB] and Mr Francis." The request was to be for a total of SF3m, or about £1m, to be drawn down in tranches. The letter marked an important development in the venture. Whereas previously the plan had been that Mr Bray and Mr Goose would put up their respective assets (stones and farm) as security for their respective borrowings from Intag, which would be borrowing a global Swiss franc loan, Mr Bray's new proposal was for what he described as a three stage operation.

Stage 1 involved an initial sterling loan of £450,000 on the security of Blocks 1, 2 and 3 of Hagbeach Farm, excluding the farmhouse. Mr Bray treated their value as £665,000, which he arrived at by adding to the valuations for the three blocks (which in fact included the farmhouse) a value of £80,000 for the 28 acres. £120,000 of the borrowings was to be used to complete the purchase of the 28 acres and to repay certain liabilities to NatWest secured on the farm; £300,000 was to be used to complete the acte de vente on La Devinniere. The stones were, therefore, not intended to be used as security at stage 1.

Stage 2 involved the subsequent raising of a SF3m loan. Security was to be the stones, said to have "a valuation of US $500,000." Mr Bray's letter referred to "Other underlying assets supporting the trust" as being: (i) the Belgravia house, said to be worth £75,000; (ii) African farms said to be worth £200,000; and (iii) other unidentified assets said to be worth £100,000.

At this point, La Devinniere would be available as security with a value of £530,000. The sterling borrowing would be cleared and the total net assets available would be £665,000 of UK land, £530,000 of French land and £300,000 of trust assets.

Stage 3 involved payments of interest and capital. Interest, projected at £90,000 a year, would be serviced by the net earnings from the UK and French farms, including Gracay (a farm in which Mr Goose was now interested), which were projected at £190,000 per year. The balance of £100,000 per year could be set aside to repay the capital at the end of seven years.

**February 1985**

On 1 February, Mr Wilson wrote to Mr Francis. His purpose was to provide details of Intag's directors and of the finance required by Intag for the purpose of making a presentation to ICB. The letter was not written with Mr Goose's prior authority and it inaccurately described him as 41 rather than 44 and attributed to him an education from a school and college which he had not attended. The letter advised that a total of SF3m was required. The three stages were explained slightly differently.

Stage 1 involved the £450,000 loan. Of that, £63,500 was to be paid to Martin Goose and £80,000 was to be used to complete the purchase of the 28 acres. The balance was to be used to complete the acte de vente on La Devinniere. The earnings of the UK farms and La Devinniere were estimated at £60,000 and £70,000 respectively and as sufficient to service the interest payments.

Stage 2 involved replacing the sterling loan with funds provided by the SF3m loan. In addition, SF300,000 would be due on a stage payment for La Devinniere in April 1985 and SF200,000 would be payable on a further one due in September 1985. A further SF1.15m would be payable for the Gracay lease. Mr Wilson described the security then being available for the Swiss franc borrowing as comprising Blocks 1, 2 and 3 (excluding the farm house), the stones, La Devinniere and Gracay, and the three other Brent assets to which Mr Bray had referred. Mr Wilson said this about the stones:

> "Rare gems to be deposited in support of the borrowing. Please find enclosed a summary valuation in the sum of $498,711 US. Individual valuations and pictures of the stones are also attached. The valuation to be considered is the Estimated Replacement Value which is the figure after the stones have been cut and polished. For your information, the estimated per carat value is merely the value of the raw stones if they had already not been cut and polished. May I at this point draw your attention to an article on page 16 of the Times dated 31st January 1985 emphasising the advantages of precious stones especially their portability and their ability to retain value."

Mr Wilson had recognised by December 1984, if not before, that the stones were probably not worth US$498,711, but that did not deter him from enclosing a valuation which could be taken as implying otherwise. As to stage 3, Mr Wilson said much the same about payments of interest and capital as had Mr Bray.

On 12 February, Mr Francis wrote to Manson Agricultural Finance Limited ("Manson"). He was seeking the stage 1 sterling loan. Mr Goose said he was unaware that Mr Francis had approached Manson at that stage. Mr Francis sought a £400,000 facility, rather than a £450,000 one, of which £200,000 was to be drawn down immediately, with the balance available as a line of credit. The term of the facility was to be one to two years. The security was to be Blocks 1, 2 and 3, plus the 28 acres, valued at £665,000. Repayment was proposed to be made out of:

© 2025 Thomson Reuters.

> "…a Swiss Franc loan considerably in excess of the figures as set out which will embody the additional farms in France. In the event this should not take place, the farmland will be sold and the loan repaid."

Mr Goose said he learnt from Mr Bray in late February or early March of the approach to Manson. He accepts he saw a copy of Mr Francis's letter and that he agreed with the proposal which was being put to Manson. The proposal did not offer the stones as security for any loan from Manson. Nor did it ever become a term of the proposed Manson loan that the stones should be security.

Manson replied to Mr Francis on 209 February and offered an advance of £400,000 for an 18 month term at Manson's base rate plus 2% secured on Blocks 1, 2 and 3 and the guarantees of Intag's directors. The initial drawdown was not to exceed £380,000.

Following that response, Mr Wilson wrote on 27 February to Co-operative Bank Plc ("CBP"), Brighton. He referred to an earlier meeting in January, to the £400,000 offer of an advance (he did not mention Manson's name), which he said was required (as to £140,000) to clear charges on Mr Goose's land and (as to £250,000) to initiate the second stage of the La Devinniere purchase. He said that Intag was also proposing to lease land at Gracay. He said that, although Intag had an offer of finance of £400,000, it would prefer to borrow from CBP. He explained that:

> "Having completed the consolidation of the Hagbeach Farm and taken possession of the Estate in France together with the leased Farm, the Directors then hope to be in a position to take up the Swiss Franc Long Term Funding which is on offer at the present time but which they are advised not to take up until such time as the financial markets have settled down and interest rates have generally been stabilised. Working capital and equipment finances are already supplied from the Company's own resources in conjunction with Societe Generale in France.
>
> Mr Bray has now also made arrangements to close the [AIB] Deposit Account and Current Account and the net amount will be remitted to your Branch for the credit of the Company Current Account in the near future."

As to the reference to a Swiss franc loan being available, Mr Goose said that Mr Phipps of ICB had indicated that "there was a strong possibility that Swiss Francs would be available." But Mr Goose said he was unaware of any advice having been given to defer taking it up. He thought Intag was going ahead with ICB. He said Mr Phipps had told him on the telephone, in about mid-February, that things were progressing.

**March 1985**

On 6 March, Mr Goose went to see Mr Tongue. He was concerned that he had not received back his £50,000 on 1 January. He said he instructed Mr Tongue that:

> "You know the names and addresses of the people I am dealing with, what we are looking for, what we are doing in France, and would you just check out the whole of the project and the people involved."

He said that he was there referring in particular to Mr Bray. He said that he only used the words "check out" in giving his instructions and that he had in mind that Mr Tongue should find out whether there "was anything untoward about him; whether there would be any county court judgments and that type of thing; any record of anything."

Mr Tongue made a note of this meeting. It referred to Mr Bray's trust having "$1/2m diamonds in Geneva Airport. Security for loan by Intag to P. Bray. Intag are borrowing Swiss francs." It referred to Mr Goose borrowing £140,000 from Intag, secured on Blocks 1, 2 and 3, excluding the house. It noted that:

> "You are also charging your land to support Bray's loan of £1/2m (to buy farm in France) until end of year. He is supporting RG [Mr Goose] to take farm in France (£1/4m) on tenanted basis ? 2 months time."

It made no reference to any instructions having been given to Mr Tongue to check out Mr Bray or anyone else: and Mr Tongue denies that he was ever given such instructions. The reference to Mr Goose now being willing to charge his farm to secure Mr Bray's borrowings represented a material departure from his stance in 1984, when he was not prepared to assume any liability for Mr Bray's debts. Mr Goose said in cross-examination that "These are basically discussions. They were not absolute concrete details." That differed from his evidence to Harman J, when he accepted that, by March 1985, he was prepared to charge his land to support loans to Mr Bray.

On 11 March, Mr Wilson wrote to Mr Alldis of Donne Mileham & Haddock ("DMH"), solicitors. They had been introduced to Mr Bray by Mr Wilson and retained by Intag, in place of Mr Hutton's firm, in connection with the proposed Manson loan. Mr Wilson gave Mr Alldis an outline of the transaction. He referred to Manson's offer of £400,000 and said that Mr Bray would be providing full details to him and that Mr Francis was the local agent for Manson. Mr Wilson's letter reflected what appeared to be a variation of the terms of the proposed loan. He wrote:

> "[Intag] will purchase the freehold at La Devinniere and will also make a loan to a company to be formed by Rex Goose which will purchase two further tranches of land referred to in the Chesterton's valuation (Plot 1 - £63,000; Plot 2 - £80,000). [These were the payments due to Mr Goose's brother and for the 28 acres].
>
> The loan to Intag will be secured on plots 1, 2 & 3 of Hagbeach Farm (excluding the farmhouse itself) and also on the gems to be provided by Peter Bray. These are currently lodged in Zurich but will be transferred to London. Mr Francis can provide copies of all the valuations which were forwarded to us by [Trinkhaus]."

This was the first suggestion that the stones would be used as security for the stage 1 borrowing. Mr Wilson said that the letter reflected his understanding of the Manson deal. He did not expect there to be a difficulty about getting the stones to England; and, as regards Barclays' possible claim under the August 1982 telex, his understanding was not the re-mortgage of the March house was proceeding. He said that, at this stage, he regarded the stones as central to the deal, in the sense that they were to act as security. He expected Manson to value them for security purposes. If they were not available the deal would collapse; and if they were worth materially less than had been discussed, it would have to be re-structured.

Despite Mr Wilson's claimed understanding, I find that his suggestion that the stones were intended either at that, or at any, stage to be security for the Manson loan was a mistake on his part. He had not negotiated the loan with Manson; and the only security which Manson had been offered and which they wanted (and eventually took) was Hagbeach Farm; and I have no doubt that Mr Bray was not volunteering the stones as security.

On 14 March, DMH acknowledged Mr Wilson's letter and said that they had written to Roythornes setting out the structure of the transactions. Their letter to Roythornes repeated what Mr Wilson had said about the security for the Manson loan.

On 15 March, Mr Goose and Mr Bray signed a joint and several guarantee of the due discharge of Intag's liabilities to AIB, up to £5,000. Mr Goose said Intag needed to borrow from AIB for working capital, and the guarantee was in respect of this. On the same day, an Intag board meeting was held, attended by Mr Bray, Mr Goose and Mr Kane. It referred to the signing of the guarantee; to a conveyance to Intag of the March house; and to Gracay being available on an 18 year lease, with an option to purchase the freehold after nine years and that:

> "…the terms …of the lease are being negotiated by Mr Goose on behalf of [Intag] which will thus grant a sublease to Mr Goose in a French SCEA to be called INTAFRAC".

The unsigned minutes (which Mr Goose accepted as accurate) recorded the change of Intag's solicitors, but that Mr Hutton would still act for Brent; that De Pinnas had ceased to act for Intag; and that, on Mr Goose's recommendation, Iacino & Partners, of Paris, were to be appointed to represent Intag in France.

On 15 March, Mr Wilson gave Manson a reference in respect of Intag and expressed his firm's opinion that it would be good for a commitment of £5,000 a month. He said he believed the reference was justified.

By 15 March, there was pressure to complete the purchase of La Devinniere: Intag was faced with a threat that, unless it was completed by 22 March, its FF250,000 deposit would be forfeited.

On 20 March, Mr Wilson wrote to Mr Schaefer telling him that Intag expected to receive an offer of finance within a week to enable it to buy farms in France and that it was expected that completion would take place within four weeks "at the very latest". He said that "On the completion date, finance will also be made available to meet your own claims against Mr Bray whereupon we trust that the gems will be released to Mr Bray's order". He asked for a further month to settle the Trinkhaus claims. He said in evidence that he must here have been referring to the Manson loan. Nothing had been said to Mr Goose about part of that loan being applied in paying Mr Bray's private debts. Mr Wilson said he wrote what he did because that is what he was told would happen: he had not offered an opinion on it. His opinion was that it was anyway perfectly all right

© 2025 Thomson Reuters.

because Mr Bray was owed undrawn salary and expenses by Intag so that he would be using his own money to discharge his liabilities.

On 22 March, Mr Goose visited Roythornes. He saw Mr Tongue and his partner, Mr Harrod. Mr Harrod had been a partner since 1980 and specialised in company/commercial matters. Mr Tongue had asked him to assist him in the Goose/Bray venture, which involved at least one company and there was also a need to tie up the relationship between the individuals.

Mr Goose had met Mr Harrod before, but this was the first time in connection with Intag. Mr Bray was also due to attend the meeting: Mr Goose said this was because Mr Bray could explain the Intag operation better than he could. Mr Goose's evidence was that, before Mr Bray had arrived, and during a brief moment when Mr Tongue was out of the room fetching a chair:

> "Mr Harrod was holding his books in his left hand and was looking down at them and he said to me, 'Well, there is one thing. He [Mr Bray] is clean.' I was sitting in the first chair and I can distinctly remember to myself thinking, 'I am very pleased now that I have come to see Roythornes."

Mr Goose said Mr tongue then re-entered the room, but Mr Bray's alleged cleanliness was not mentioned. Mr Bray arrived a little later, whereafter most of the conversation was between Mr Bray and Mr Harrod. Mr Goose said that Mr Bray told Messrs Harrod and Tongue that there were stones worth US$500,000 held in Switzerland at Brink's Mat which could support the Swiss franc loan; and that they were told that ICB was going to put a proposition to Intag for that loan. There was a discussion about Gracay, which Mr Goose told them was a good farm.

Mr Tongue and Mr Harrod each made notes of the meeting. Mr Harrod's note makes no mention of the alleged "Bray is clean" advice; and nor, of course, does Mr Tongue's. Mr Tongue's note makes no reference to the stones. Mr Harrod's does, in the context of the proposed stage 2 borrowing: he noted that "At that stage can go to Swiss with backing of stones & security of Deviniere & get Gracay money for [Mr Goose]". His note also shows that the stage 1 sterling borrowing was intended to be secured solely by Hagbeach Farm, and not by the stones: it recorded that "Loan of 425K(?) secured on blocks 1,2 & 3 (less house). U/taking to use money to repay Hagbeach borrowing". It recorded that the stage 1 loan would be used to discharge Mr Goose's Hagbeach commitments and that the balance would be applied in discharge of the second stage of the La Devinniere purchase commitments. The note also records that it was hoped that the stage 2 Swiss funding would be provided by ICB or by a South African trust; and that, in default, an application should be made to Trinkhaus. It is, of course, highly unlikely that Trinkhaus would have wanted any further dealings with Mr Bray, but Mr Goose and Roythornes did not know that.

Mr Harrod said that he was unable to obtain at this meeting clear instructions from Mr Goose or Mr Bray as to how the venture was to proceed; and he said its mechanics changed during the course of the meeting. He said he was never instructed to carry out any checks on Mr Bray, nor did he; during his 25 years or so in practice, he had never been instructed to investigate the financial standing or probity of an individual; and nor did he (either at this meeting or ever) say to Mr Goose that Mr Bray was "clean" or give any indication that he was trustworthy. He said he was not in a position to do so and had increasing doubts as to whether Mr Bray was genuine. This concern was fuelled by Mr Bray's unwillingness to allow information to be checked with third parties or to be tied down to agreed heads of terms; and by the frequency with which the deal was changing.

© 2025 Thomson Reuters.

Mr Tongue denied that Mr Goose had asked him to make any inquiry into Mr Bray's affairs or status. He said that, had Mr Goose done so, he would not have asked Mr Harrod to do the work, but would have instructed Roythornes' debts department to do it. He said he had not made any inquiries about Mr Bray before this meeting.

On 27 March, Mr Bray wrote to Mr Wilson. Completion of the La Devinniere purchase was pressing and Mr Bray wanted a £350,000 bridging loan from Midland pending the completion of the Manson loan. He proposed that £72,000 of it should be paid to Mr Goose and the rest used for La Devinniere. Hagbeach Farm was to be the sole security for any bridging loan. In the event, no bridging loan was raised.

**April 1985**

The immediate lead up to the letter of 9 April 1985, by which Mr Goose claims Mr Wilson made further misrepresentations, started on 29 March. Mr Goose said that, on that day, he rang John Wilson, the manager of his NatWest branch in Spalding. He said he arranged a meeting with him for a few days later. On the same day, Mr and Mrs Bray, their stepdaughter, Mrs Goose and her and Mr Goose's two children all went off on a skiing holiday.

Mr Goose said the meeting with John Wilson took place. Its purpose was to see if NatWest would make a more favourable offer of stage 1 finance than Manson, whose offered terms were regarded as onerous. In addition, by now Cluttons had carried out some valuations of Hagbeach Farm for Manson, their valuations were much lower than Chesterton's, and so Manson was now considering only lending Intag rather less than £400,000.

Mr Goose said he told John Wilson about his loans secured on Hagbeach Farm to enable him to complete the purchase of the 28 acres and of his intention to go into France in a venture with another person (whom he says he did not name) and with Intag. He said that the best person to contact for details of Intag and the project was Mr Wilson of Wilson Sandford, Intag's accountant and financial adviser, to which John Wilson replied "We Wilsons stick together". Mr Goose said he did not discuss with John Wilson whether NatWest would or might be prepared to make a loan or consider an application for one. He said he did not put the full facts to him, just a broad outline. He did not even put to him that he was looking for a loan of £450,000 or indicate what security would be on offer. Mr Goose did not think that Mr Bray would have spoken to John Wilson about the matter at that stage either: he was away skiing until about 12 or 13 April.

Mr Goose said he then telephoned Mr Wilson and asked him to speak to John Wilson and see what proposal he could put to him with a view to getting into stage 1 at better rates than Manson's. He said his instructions were no more specific than that, and Mr Wilson did not come back to him with a precise indication of what he was going to ask John Wilson for. Mr Goose's case is that Mr Wilson simply went ahead and negotiated a loan offer from NatWest. The terms he is said to have negotiated are set out in his letter to Mr Goose of 9 April. It was headed Intag and reads:

> "I am able to report to you that the following action has been taken:
>
> Mr John Wilson at [NatWest] is processing an interim finance application for £450,000. This will consist of £135,000 for yourself and £315,000 for [Intag]. Your own monies will be to replace the £60,000 advance to the Company and also will allow you sufficient money to complete the purchase of the land from Gallahers.
>
> The [Intag] £315,000 is required to meet the payments to Societe Generale at Bourges due on 10th and 16th April.

> Security: As security for these loans, the tranches 1,2 & 3 (excluding the farmhouse) of your own land will be pledged together with an undertaking to deliver P.J. Bray's gems to be held to the order of [NatWest]. The gems will rank as prior security ahead of your own land.
>
> [NatWest] are arranging for the first 6 months interest to be rolled up and then the company will be responsible for servicing the interest thereafter although it is anticipated that the Swiss Finance will be forthcoming well ahead of that date. [NatWest] did mention that you have two personal facilities yourself at the present time:
>
> Firstly a 'dormant' loan account of £70,000 and secondly an overdraft limit of £30,000.
>
> I have arranged to open a current account with your [NatWest] Bank in the name of [Intag] and I have supplied copies of the Certificates of Incorporation of the Company and asked Ken Kane to forward a copy of the Memorandum and Articles. I have also forwarded a copy of the Chesterton's valuation of both Devinniere and your own farm.
>
> I enclose a Stock Transfer form which will require Peter Bray's signature in order to give you a 50% holding in [Intag] and I also enclose a form G9B [stated in the margin as 'to follow'] to appoint your wife as a Director instead of yourself. I should explain that in view of the fact that you do not wish to have a Limited Company owning part of your land, I have arranged for the £135,000 loan from [NatWest] to be directly to yourself but the total borrowing of £450,000 will be replaced by a Swiss Loan directly to [Intag] who will then replace your £135,000 with their own loan. [Roythornes] have suggested that your wife should be a Director instead of yourself at that point and I would like their confirmation in writing please. Finally, Peter Bray confirms that he will provide a currency guarantee i.e. [Intag] will be responsible for any increase or decrease in your loan as a result of currency fluctuations. You will merely be responsible for repaying the £135,000 on payment terms yet to be agreed.
>
> Mr Wilson at [NatWest] anticipates putting his application to Area Office within the next two days and would hope to have a reply by early next week.
>
> Kind regards and please do telephone me if there are any queries on the above."

Mr Goose said that the £135,000 which was intended for him represented the money to pay his brother (variously referred to as £62,500 or £63,500, but in fact the latter) and £72,000 to repay a bridging loan raised to complete the purchase of the 28 acres. He said he did not instruct Mr Wilson to allocate this part of the loan to him: the fact that it totalled almost exactly what he needed to discharge these liabilities was a coincidence. He also said he did not want a loan of £135,000 at all. He understood that the intention expressed in the fourth paragraph was that the stones would rank ahead of his land as security for the £450,000 loan, which he still believed were worth almost US$500,000, a belief he still attributed to what he had been told by Mr Bray and Mr Wilson at the September 1984 meeting. He understood that the reference to the Swiss finance in the fifth paragraph was to a source from ICB. The "dormant" account of £70,000 referred to a loan to him for an onions store he had built in 1980; and the £30,000 overdraft was for his cropping finance on the farm. The proposed share transfer was to put him on a par with Mr Bray. He explained that Mr Wilson had told him that Roythornes' suggestion that Mrs Goose should become a director in his place was to avoid the making of a loan by Intag to a director. Mr Goose said he did not want a limited company owning any part of the enlarged Hagbeach Farm, as he had previously told Mr Wilson. With regard to the part dealing with the proposed Intag currency guarantee, Mr Goose said that was one of the predominant thoughts in his mind and that the stones were central to it. He noted that the limit of his proposed liability was £135,000. He said:

> "This was one of the best letters I had received as regards the whole of the transactions that we were talking about as regards to Intag. This is the first time that it had been put down into writing for me

© 2025 Thomson Reuters. 

> that the gemstones will be involved in the loan agreements and so on and they will rank as prior security above my own land."

On the same day, 9 April, Mr Wilson wrote to John Wilson. He referred to a prior telephone call, enclosed copies of a "Summary of the Syndicate Operation" and of the valuations of Hagbeach Farm and La Devinniere, and referred to the proposed opening of Intag's current account. He wrote:

> "…the Company is due to complete the acte de vente which is the equivalent of our completion, on 10th April but there are certain errors in the documentation which will not be corrected until next week Hence, it is my hope that the finance will be available by next week secured by a first charge on the tranches of Rex Goose's farm as required by yourself and also with an Undertaking from P.J. Bray that the gems (as set out on the enclosed summary) and [sic: should be 'are'] held to your order."

The enclosed summary was a list of the stones with their total values shown as US$498,711, i.e. the Trinkhaus list of 10 July 1984. Mr Goose said that a copy of this letter was sent to him.

Mr Goose's case is that the deal outlined in Mr Wilson's letter to him was negotiated exclusively by Mr Wilson and that he had no part in it: he was presented with a "done deal". If so, Mr Wilson appears to have made his own decision as to, inter alia, how the NatWest loan was to be split between Mr Goose and Intag. He further claims that, by this letter, Mr Wilson made misrepresentations to him as to Mr Bray's ownership of the stones, their value and their availability as security.

Mr Wilson's evidence was very different. He recalled a telephone call to John Wilson, but did not negotiate the deal. He recalled that his instruction to speak to John Wilson came from Mr Bray. He believed that Mr Goose and Mr Bray had had a prior meeting with John Wilson. He said that it was inconceivable that there would not have been such a meeting; and that "there was no bank in the world that would not want to see the colour of the eyes of the guys who were borrowing this sort of money …". He had already understood that NatWest was willing to lend to Intag. He was asked to telephone NatWest and confirm the mechanics for opening an Intag account there. He said John Wilson was already aware of Intag's requirements and that "it was a matter merely of confirming the existing lending and how to put the [Intag] lending on top of Mr Goose's existing borrowing facilities." He said that John Wilson re-iterated to him what he, John Wilson, had agreed with Mr Bray and Mr Goose. He, Robin Wilson, did not know about the purchase of the 28 acres, the dormant loan account of £70,000 and the overdraft of £30,000: he said these were all matters which John Wilson related to him. He and John Wilson went through the mechanical items about opening the account, forwarding the memorandum and articles and so on. His understanding was that the Intag loan had been accepted at branch level, but still had to go to the area office. The enclosures with his letter to John Wilson of 9 April were to assist this presentation. He believed he had discussed with him that the stones were to rank as security. The proposal that they were to rank ahead of the farmland was what had been agreed between Mr Goose and Mr Bray. He was asked by Mr Bray to write to Mr Goose about what was happening. His reference in his letter to Mr Goose that "£135,000 [was to be] for yourself" reflected that NatWest had agreed that that sum would be lent direct to Mr Goose, not via Intag. That was thought to avoid the problem which would arise if Mr Goose, a director, received his loan from Intag. As to his statement in his letter to Mr Goose that he had "arranged" this (see the eighth paragraph), he said he thought he had confirmed it with John Wilson rather than arranged it. Mr Wilson said that there was a mistake in his letter to Mr Goose: he said that it was not the full £315,000 of the Intag part of the loan which had to be paid to Societe Generale, but some £25,000 less, leaving some £25,000 available for payment to Trinkhaus; but Mr Wilson also said that he did not know how the debt to Trinkhaus was to be settled. He agreed that the only way in which NatWest could have been given prior security over the

stones was if the Trinkhaus debts were first discharged. He agreed he did not tell Mr Goose that in his letter to him, but said that what he was recording in his letter to Mr Goose could only have happened if the Trinkhause debts were first discharged.

On 19 April, Mr Goose had a meeting with Mr Harrod. Mr Harrod made no note of it, but he believes that it was devoted to a discussion of draft heads of terms between Intag, Mr Bray and Mr Goose which he had prepared.

On 23 April, Mr Goose spoke on the telephone with Mr Harrod. He told him that the minimum he wanted out of the Swiss loan was £425,000. Mr Harrod warned him not to part with any money until heads of terms had been signed and his note records that Mr Goose appreciated this. Mr Goose's evidence was that he understood that the negotiations for the Swiss franc loan were coming to a head and that Mr Wilson had told him at about the end of April that "the proposal and everything had been accepted." Mr Goose said that he passed that information on to Mr Harrod. He said that, at about this time, Mr Harrod also advised him that, if he was dealing with semi-precious stones, he had to be careful.

On 24 April, Mr Harrod telephoned Mr Smith at Brink's Mat and made some inquiries about the stones on a "no names" basis. He noted that:

> "Smith sd v. easy to have your leg lifted over stones generally & we should be v. careful. It would be worth flying to Zurich to check the info we have been given.
>
> Bray should be able to furnish us with docs showing how stones got to Zurich; who now owned them & on what basis being held together with an authority for us to satisfy ourselves as to accuracy of the info given."

Later the same day, Mr Harrod telephoned Mr Goose and noted:

> "…yesterday evening [Mr Goose] had spoken to [Mr Wilson] who had told him that everything concerning the Swiss loan was fixed up. The only hold up was at the Spalding end. Reporting briefly on our conversation with Brink's Mat. Suggesting Goose specifically enquire whether the matter of collateral security for the bank guarantee to the Swiss borrower had been resolved."

Mr Goose agreed that Mr Harrod relayed to him the substance of his earlier conversation with Mr Smith: that is, that he should obtain evidence from Mr Bray as to their ownership, which he should then attempt to verify. However, Mr Goose did not ask Mr Bray for the suggested information. He had the valuations and said that, although he was no expert on stones, he was of the opinion that they maintained their value. To the suggestion in cross-examination that it might have been prudent to have the stones seen or valued on his behalf, he replied that transportation and communications were not as easy then as now.

On 29 April, Manson made a revised offer of an advance of £314,000 for 18 months secured on Blocks 1, 2 and 3 and on the guarantees of Mr Goose and Mr Bray. The interest rate was base rate plus 4%, or a minimum of 14%. The offered amount was less than Mr Goose and Mr Bray wanted and Mr Goose agreed that the terms were onerous, but NatWest had no come up with an offer. Eventually, the offer was accepted. It was put to Mr Goose that this was because he was desperate for some money and no better offer was forthcoming. He denied he was desperate. He understood at the time that Hagbeach Farm was

© 2025 Thomson Reuters.

to provide the sole security for the Manson loan. He also knew, as was specified in condition 19 of the offer, that the loan was to be used in the purchase of La Devinniere. Condition 14 provided that:

> "[Roythornes] are to confirm that [Mr Goose] and his family are fully aware of the risks involved with the speculative purchase of La Devinniere and of the consequences should this venture be unsuccessful".

On 30 April, Mr Goose went to see Mr Tongue and Mr Harrod. Their note records that Mr Goose had an offer on Gracay which was conditional on the Swiss money coming through; that "NatWest have checked out Manson & are happy with them"; and that:

> "The 60K went into Devinniere as a deposit - you [Mr Goose] are sure of this. Problems of recovery of the 60K? Bray promised he would repay both sums. Devinniere - further money due in April but [Mr Wilson] has 'sorted this out' i.e. got an extension. Pull out altogether & risk not getting 60K back? [Mr Goose] can't."

The reference to Mr Goose's £60,000 (£10,000 plus £50,000) going into La Devinniere was wrong: only £25,000 of it had gone into La Devinniere, and Mr Goose knew that. He accepted that he told Roythornes that he could not pull out at that stage, but he said that he does not know why he said it. The note records that it was "not intended to deal with the stones in any way - with regard to Manson", which confirms that they were not to be security for the Manson loan. It also records that Swiss funds would be available in about three months.

**May 1985**

Mr Goose telephoned Mr Wilson on 30 April and was cross with him. He made clear to him he would not proceed further with the project unless some stones were sold so that he could be repaid his £50,000. He said that, if that happened, it "would also make Roythornes feel more comfortable that the stones were there, genuine and who the owner was." Mr Wilson referred to that call in a letter he wrote to Mr Bray on 1 May. It reads:

> "Please find enclosed copy letters received today from Penningtons and you will see that we have until 7th May in order to avoid bankruptcy proceedings being commenced.
>
> I also had a rather agitated phone call from Rex Goose last evening (Tuesday) explaining that he was now making it a prior requirement that his £50,000 loan to [Intag] be repaid before he gives a charge over his Farm. He was almost insistent that we proceed to selling some of the gems as soon as possible, and indeed I am beginning to believe that this is going to become absolutely vital in order to settle your personal debts such as Schaefer (who keeps phoning), Penningtons, probably Barclays Bank on your house and now Rex Goose. I have received another reminder from John Dewhurst for the balance of £2076.25 and obviously pressure is increasing. If we proceed to completion this week on the strength of Rex Goose's security then all will be well, but if not, I do think we should instigate the sale of some of the gems as soon as possible. Perhaps we can discuss this first thing on Thursday morning when I hope this letter will reach you."

In the event, Mr Goose did not insist on a sale of stones. As for Penningtons' letter, it was one dated 30 April pressing on behalf of Royal Bank of Scotland ("RBS") for payment of a judgment debt, interest and costs due from Mr Bray. The amount was £19,806.76. Penningtons enclosed a copy of an earlier letter of 18 April, addressed to Mr Finn, of Haines Dell & Co Limited, proposing an immediate payment of £7,475.84 followed by seven quarterly payments. That had been ignored and the letter of 30 April gave Mr Bray until 7 May before RBS issued bankruptcy proceedings against him. Haines Dell were playing some role in negotiating the settlement of the debt on behalf of Mr Bray.

Mr Goose was, and remained, unaware of Mr Bray's indebtedness to Trinkhaus and to RBS and of the threat of bankruptcy proceedings against him: none of this was disclosed to him by Mr Bray or Mr Wilson. Mr Wilson said he knew nothing about the RBS claim until he received telephone calls from Penningtons on 17 and 26 April, followed by their letter. After some prevaricating answers saying that court proceedings etc were commonly served at his offices, which were the registered office of many companies, he said he was very concerned with the revelation of this judgment debt, but knew nothing of its background. He had met Mr Finn early in 1985. He was unimpressed by him and told Mr Bray he did not want anything more to do with him. Mr Wilson said the reference to Barclays in his letter of 1 May was to the fact that, as he knew, pressure was being exerted by Barclays in respect of the mortgage on the March house. He agreed that the "all will be well" reflected his understanding that money lent to Intag by Manson or NatWest would be used to pay Mr Bray's debts, or at least the pressing ones: the money would be paid to Mr Bray as remuneration for his previous labours for Intag, and would then be applied in discharge of his debts. He again emphasised that his advice throughout to Mr Bray had been that he must sell the stones.

On 5 May, Mr Bray wrote to Mr Goose on Intas notepaper. No offer had been forthcoming from NatWest, but Manson had made the revised offer of £314,000, and Mr Goose knew that. Mr Bray wrote:

> "…[the Manson offer] is backed by the undertaking by [Mr Francis] to produce at least [SF1.5m] on a long term basis. This is confirmed by the verbal assurance of [Mr Phipps] of [ICB] that the bank will proceed to fulfil this commitment. You attended the discussion with Phipps and I presume that like me you have no real concern regarding the intention of the Bank in this matter."

Mr Bray then described the security which would be required for the Swiss franc loan. It would be a bank guarantee. He wrote that he understood that Mr Goose could make this available from NatWest "and that the deeds to your land already deposited will be sufficient collateral to secure the guarantee." He continued that Mr Goose could thus secure funding for his half of the operation, namely (i) an £80,000 refund for the 28 acres, (ii) £70,000 for Martin Goose, (iii) £75,000 for Gracay, (iv) £100,000 for Gracay equipment, and (v) £100,000 for cropping finance. This totalled £425,000, to which Mr Bray added £25,000 "as security for the initial share capital of [Intag]." He continued:

> "Thus the total commitment would be £450,000 but from this must be the refund of loans made to Intag amounting to £60,000. This sum will then provide sufficient actual cash for the cropping finance of your UK farms.
>
> In exchange Intag will be given cover by myself and the Brent foundation to provide for my operation at La Devinniere to a total of £525,000 which includes some equipment.

As previously agreed Intag will cover you for the foreign exchange risks and all your payments can be made to Intag in sterling or French francs. Your guarantee must be in sterling and secured solely on your UK farms and made available to Intag in a form which can be transferred to the ultimate lender; your borrowings will be from Intag and your loan agreement will be between you and Intag. I trust that this makes the up to date position clear."

On 10 May, Mr Bray wrote to Manson and accepted the loan offer. He notified Manson that DMH were acting for Intag. Mr Goose said he was unaware at the time that Mr Bray was going to accept the Manson offer, or had accepted it.

On 11 May, Mr Wilson was notified from France that the deadline for completing the acte de vente on La Devinniere was 15 May. That day came and went without its completion. What did happen on it was that Penningtons wrote to Mr Wilson to inform him that, there having been no response to the letter of 30 April, bankruptcy proceedings had been commenced against Mr Bray, which would not be withdrawn until he had paid all sums due to RBS. The instalment proposals offered in the letter of 18 April were withdrawn. In the ordinary course, that letter would have been received on 16 May. On 16 May, Mr Wilson wrote to Penningtons, in response to the letter of 30 April, which he had not yet acknowledged, although he had spoken to Mr Patrick of Penningtons the day before. He said that "Mr Bray's Company" had raised a loan of £314,000, which it was "anticipated …will be released to [it] within the next 2 weeks at the most", when £7,475.85 would be paid. That was a reference to the initial payment proposed in the letter of 18 April, whose terms had now been withdrawn: the full amount due was nearly £20,000. On 17 May, Mr Wilson acknowledged the letter of 15 May, which he said had crossed with his letter dictated on the same day (although dated the next day). Mr Wilson said he called Intag "Mr Bray's company" because that is how he regarded it. He did not tell Mr Goose this was how the Manson loan moneys were to be applied.

**The meeting of 18 May 1985**

Mr Goose alleges that further misrepresentations were made to him by Mr Wilson at a meeting held on 18 May. He claims that Mr Wilson fraudulently or negligently misrepresented that the stones were (i) owned by Brent or Mr Bray, (ii) worth at least £250,000, and (iii) available to provide security for the French venture in the manner envisaged at the meeting.

Mr Goose said that the background was that Mr Bray rang and told him that he had had an offer of finance from Banque Populaire and that Mr Wilson was going to call at his house. Mr Goose went there. About 45 minutes later, Mr and Mrs Wilson arrived: they were on their way to Harrogate. Mr Wilson said that he had told Mr Bray he would be travelling north that weekend and Mr Bray said he would arrange a meeting with Mr Goose to review the project. Mr Wilson said in cross-examination that, as a result of what he had recently learnt about Mr Bray, he would not by now have been prepared to give a reference for him vouching his integrity or business acumen.

Mr Wilson said in chief that he first had a private discussion with Mr and Mrs Bray about Mrs Bray's personal taxation affairs; and the inference was that that was all he discussed. In cross-examination he said that, during this discussion, he also told Mr Bray that the stones had to be sold to pay off his liabilities and that Mr Bray expressed the confident view that he could realise £250,000 (although Mr Wilson could not be precise as to the figure) from them after paying off the Trinkhaus liabilities. In cross-examination before Harman J, the closest Mr Wilson came to saying anything like that was that "I imagine that there had been a discussion with Bray about the principle of selling the stones before the meeting."

Mrs Bray left and Mr Goose joined them. Mr Goose's evidence was that Mr Wilson then went through a list of points about the finance for the project, writing notes as he did so. He said that Mr Wilson was the principal spokesman: Mr Bray had said "Robin, tell Rex about it so that he knows exactly what's going on."

Mr Wilson denies he was the main spokesman. He said that Mr Bray was; and that "there was a consensus which I wrote down". He said he was not leading the meeting, but may have made comments: he did not have the information to enable him to lead: and his notes recorded information which he simply did not have.

Mr Wilson's note refers first to Banque Populaire being willing to lend finance on the security of the French farms: something which he said he did not know before the meeting. Various proposals are then recorded against nine numbered points. Point one was to take either the Manson or a NatWest loan. At that stage, the only loan on offer was the £314,000 Manson loan. Point two records that £69,000 plus £75,000 plus "£30,000ish" (total, say, £175,000) was to be paid out of the £314,000 to Mr Goose's company: the £69,000 was to repay the loan he had taken out in 1980 for the acquisition of an onion stall; the £75,000 was in respect of the 28 acres, probably to repay a bridging loan raised to enable it to be completed; and the £30,000 was to repay a NatWest overdraft. Mr Wilson said that these figures would have come from Mr Goose. Point three provided for the balance of the loan, i.e. £139,000, to be paid to Intag. Point four provided for £50,000 of this to be paid to Mr Goose in repayment of his October 1984 loan to Intag (something which Mr Wilson said was not his idea). The balance remaining in Intag, rounded up to £90,000, was to be used as working capital. This left nothing to acquire Gracay or to pay the outstanding amounts on La Devinniere. Under the heading "Capital a/c", Mr Wilson wrote:

| | |
|---|---|
| La Devinniere | £480,000 |
| Gracay | £200,000 |
| | 680,000 |
| less 1/3 = | 250,000 ex trust sales |
| Rolling balance from Banque Populaire} Secured on Devinniere & Gracay | 430,000 |

Mr Wilson said that those figures would have come from Mr Bray, since he did not know them. However, he agreed that he had made an input here. He wanted to see a capital injection into Intag and recommended an injection of one third of the total acquisition cost. This pointed to a figure of about £230,000, which was the original "ex trust sales" figure he wrote down. Mr Bray then volunteered, as Mr Goose agreed in cross-examination, that it should be put up to £250,000. It was, and the alteration is apparent from the note. Mr Wilson agreed in evidence that the £250,000 would be raised from a sale of the stones, and that Mr Goose would have understood that, although a letter he wrote shortly afterwards suggested that he understood the money might also need to come from Zimbabwe. At this time the US$/£ exchange rate was about US$1.24, so that the sterling equivalent of the existing, but now elderly, valuations, was some £400,000. Mr Goose's evidence was that Mr Wilson said that the £250,000 would be raised from the stones.

Point six contemplated certain local loans to French companies, something which Mr Wilson knew nothing about before the meeting. Point seven was to do with a loan for some equipment, about which he also knew nothing. Point eight provided for a switch into a Swiss franc loan, which would be used to redeem the Manson loan and would enable Mr Goose to pay £62,500

in August 1985 to his brother. Again, whilst Mr Wilson thought he already knew the £62,500 figure, the August 1985 date is one which he said could only have come from Mr Goose.

Mr Goose's evidence was that by this stage the proposed Swiss franc loan would now be coming from Banque Populaire: and that the initial loan in French francs would be converted into Swiss francs within six months. He was also asked what, as at that date, he understood the security would be for any loan from Banque Populaire. He gave some confusing evidence about that.

Mr Goose said that he remembered driving home and feeling "really pleased that Mr Bray was going to put in £250,000 and this is what we were going to do." He says he left the meeting before it was concluded, although it is unclear what matters were discussed after he left. Mr Wilson disputed that Mr Goose left early. Mr Goose appeared at one point disposed to agree that he left before the proposed switch into a Swiss franc loan was discussed, but at another point he said that Swiss francs were discussed when he was there.

Mr Goose's primary position is that Mr Wilson was the main spokesman at this meeting. To the question whether he also thought that Mr Wilson was in some way assuming "some responsibility for informing you or advising you of the value and ownership of these gems", Mr Goose replied that he did. He also said that it only occurred to him that Mr Wilson had made false statements at the meeting, or had associated himself with false statements at it, when he saw the note of it in discovery in the 1991 action.

Mr Wilson did not then, or any time, disclose to Mr Goose what he by then knew about Mr Bray's indebtedness to his various creditors. He said that this was not a deliberate decision by him. He said they were matters which were confidential to Mr Bray and were not for revelation to Mr Goose or to anyone else, not even to Mr Goose in his capacity as a director of Intag. It was "automatic" not to disclose such information: "…it was my training as an accountant that such information for an individual is confidential." He said it did not occur to him to tell Mr Bray to disclose the problems. What did occur to him was to emphasise to Mr Bray the need to sell the stones and inject capital into Intag, which is what he agreed at the meeting he would do. He said he believed that the sale of the stones could realise net the sum of £250,000 after discharging the incumbrances. He did not, of course, know that, but that is what Mr Bray believed; and he believed Mr Bray. Mr Wilson agreed that raising the £250,000 was vital to the project.

On 23 May, Mr Wilson wrote to Mr Alldis of DMH to summarise the meeting of 18 May. He said that Banque Populaire was prepared to finance the purchase of the French farms and to take those farms as security. The steps to be taken were: (i) to accept the Manson offer unless NatWest made a better one within the next few days; and (ii) of the £314,000 Manson advance, £175,000 would go to Mr Goose to enable him to discharge the three obligations I have mentioned. Mr Wilson proposed that, as this would involve a loan from Intag to a director, Mr Goose should resign as such and be replaced by Mrs Goose, and he sought Mr Alldis's advice on that. He said that a company was being purchased on Mr Goose's behalf. It remained to be decided what transactions were to be carried out through it; (iii) the balance of the Manson funds were to be retained by Intag as working capital. He wrote that "We may at that point also refund the £50,000 original loan to [Intag] but a decision will be made in the future." He also said:

> "Apparently £480,000 is required for the purchase of La Devinniere and approximately £200,000 for the purchase of Gracay. Banque Populaire will provide the balance although it is anticipated that up to £250,000 will be available from Bray personally from his Trust funds or his Zimbabwe monies.
>
> I have outlined the above steps to [Roythornes] who understand the position. I have asked them to let me have a draft of the agreement between Goose and [Intag] as soon as possible. I should add that Credit Agricole will provide the finance for the purchase of the Farm equipment and most importantly we will be replacing the [Manson] and Banque Populaire loans very shortly after the

© 2025 Thomson Reuters.

> completion with Swiss francs. We will also at that time arrange a further 62,500 Swiss Francs [sic: should be £63,500] for Rex Goose to buy out his [brother] in August 1985."

Mr Goose, in chief, broadly agreed with the summary in that letter. He said, however, that he had not committed himself to making use of a limited company; and that it had been decided on 18 May to repay him the £50,000. He also said that no reference had been made on 18 May to Mr Bray making use of any Zimbabwe money: Mr Bray had always stressed the difficulty about getting it out of Zimbabwe. He said the intention at 18 May was that the security for the Swiss franc borrowing was to be a guarantee from Banque Populaire, which is what was discussed at the meeting. Banque Populaire would in turn have security over La Devinniere, Gracay, Hagbeach Farm and the stones. If the security was called, the stones would rank first. He said that was also discussed at the meeting. He said that the proposed heads of terms referred to in Mr Wilson's letter were to be between himself and Mr Bray.

As to those heads of terms, Roythornes had produced two drafts for an agreement between Mr Goose, Mr Bray and Intag. One is dated 23 May 1985, the other is undated. Mr Goose had a meeting with Mr Harrod on 24 May, at which Mr Bray was present. He said that a daft was handed to each of them. It seems probable that it was the draft dated 23 May, but Mr Goose thought it was probably the other one, of which he disclosed a copy on discovery with his writing on it. He said Mr Bray was strongly against the heads of terms, which he claimed were biased in Mr Goose's favour, and he refused to sign them. The definitions in the drafts included proposed definitions for the stones, by reference to valuations; and the drafts included a warranty by Mr Bray to Mr Goose that the stones:

> "…are under his control and that he is able to charge the same or to procure that the same are charged for purposes nominated by him."

Roythornes obviously considered that the obtaining of a valuation was a prudent precondition to the progressing further of the venture, as was the obtaining of the warranty.

Mr Wilson wrote an important letter to Mr Bray on 28 May. It reads, so far as material:

> "I feel that I should also emphasize that Karl Schaefer has now set a definite deadline of June 6th and if they have not received settlement by that date then they will take legal proceedings against yourself. They threaten that the stones will be sold 'over your head' and that if these are insufficient to settle the amount of their debts, then they will take further proceedings against you personally.
>
> I also mentioned to you on the telephone that I had indirect contact with a gem dealer who was regularly flying between this Country, Switzerland the United States and can arrange sales in the latter country if required. I am having to speak to him within a couple of weeks when he is next in this country and will let you know further details."

**June 1985**

Mr Wilson gave Mr Bray an update on 4 June. He reminded him of Mr Schaefer's 6 June deadline and said he had not heard from Penningtons or Chown as regards the outstanding debts.

Mr Bray's reluctance to sign heads of terms is implicit in his letter to Mr Harrod of 10 June. He wrote:

> "I now send you a brief summary of the way in which Rex and I have seen the joint operation between us. I am sure we have not altered in our view.
>
> Because of the need on the part of my family to secure long term finance from Swiss fund sources, it was agreed that Rex would bear the currency fluctuations on all his interest payments but the [sic] we should carry the long term fluctuations on the capital sums, by the very nature of our asset holding in gems this is not really a major risk.
>
> In the present instance where Rex is as it were taking the lead, a simple letter of understanding should be sufficient and thereafter when Rex's borrowing in to Intafrac and presumably the Partnership or a new company in the UK it will be necessary for Intag to hold a formal lending document which will be prepared by [DMH], I too shall complete a similar document.
>
> In view of the delays already occurring I trust that we shall be able to conclude things as quickly as possible as I am getting most concerned regarding the reputation we are getting in the various Co operatives in France through whom we have to work."

The enclosed summary was a one page document, comprising half a page of self-important padding and recording that the current proposals were for Mr Bray to purchase La Devinniere for £500,000 and for Mr Goose to acquire Gracay for £200,000, to purchase the 28 acres for £80,000 and to pay his brother £70,000. It then outlined the "Method" in terms of typical imprecision:

> "[Intag] shall raise the requisite funds to undertake the above and arrange working capital in France. It then lends money to [Mr Goose] and [Mr Bray] (or their companies) against the security which can be placed at the disposal of Intag by way of a charge on the asset. (As a temporary expedient some of the assets are being directly placed with a funding source. (Manson))
>
> The borrowers will be solely responsible for the funds required by them and Intag will be secured in the normal way with some unpledged balance of assets available. i.e. lending will not exceed 80% of valuation. In fact there will be borrowings of £850K against assets of a valuation of some £2,000,000.
>
> In the event of either borrower encountering financial difficulties the security already given to Intag should be sufficient protection for the other borrower - and in the unlikely event of total failure then there is a balance of assets more than adequate to meet the liability."

Mr Goose saw a copy of the letter and its enclosure.

**The Allison venture**

Despite his apparent insolvency, Mr Bray now embarked upon another proposed acquisition. This story gives rise to another allegation of misrepresentation against Mr Wilson. It concerns Mr Bray's idea that Intag should acquire a 52% holding in a confirming house called W. Allison Limited ("Allison"). The first reference to this is his letter of 10 June, on Intas notepaper, addressed to Allison's directors. It opened by saying that:

> "Further to our meetings between representatives of your Company and [Mr Bray] representing this company on behalf of [Brent] it has been agreed that [Intag] the United Kingdom company owned by [Brent] should offer to purchase up to 52 per cent of the shareholding at present issued and fully paid, of your Company."

The letter then set out certain conditions, which included an accountants' inspection, the payment of the price in instalments and the price not to exceed par value, reducible in certain events which Mr Bray set out. He concluded by saying that:

> "As you are aware [Intag] is far advanced in other projects and as such we must regretfully impose a limit of one week for the acceptance of this offer."

He signed the letter on behalf of Brent and Intas.

An Allison board meeting took place on 14 June, with Mr Bray in attendance. It approved a transfer of 35,000 shares to Intag and recorded the resignation of certain directors and the appointment of Mr Bray as a director. It resolved to appoint Wilson Sandford as auditors - about which Mr Wilson knew nothing until 1 July.

Mr Goose said that Mr Bray had not previously discussed with him a possible purchase by Intag of a holding in Allison. However, Mr Goose said, and his diary confirms, that Mr Bray told him on 18 June that his family trust had bought a confirming house with an office in Peterborough. The diary entry is adorned with an exclamation mark, reflecting Mr Goose's unawareness of what a confirming house was. He said Mr Bray told him that the purchase had nothing to do with Intag.

Armed with this news, Mr Goose went to Peterborough on 20 June to look at the new business. He went to the offices of Ascom International, the Allison subsidiary. He said that he saw no one there apart from a secretary, but was impressed by what he saw because it appeared to be busy. It gave him confidence that Mr Bray had picked a good company, although he did not know what Mr Bray would use to pay for it: the only assets he believed he had were the stones plus "…a little bit of an injection from Zimbabwe", which was a reference to some alleged Zimbabwe commission, as I shall later explain. He did not ask Mr Bray how he would pay for Allison. Mr Bray wrote to Mr Goose on Intag notepaper on the same day, saying:

> "Events have as you are aware been overtaking us and following discussion with Robin Wilson as a trustee of the family, we have purchased a majority shareholding in William Allison Ltd. a small London confirming house having a subsidiary expert/import company in Peterborough".

The remainder of the letter was devoted to the French operation. Mr Bray said he was going to France to complete the documentation for a £300,000 loan from Banque Populaire for the La Devinniere purchase. He said he would be happy if Mr Goose completed the proposed Manson loan and that:

> "If you can complete on Manson Intag will 'lend' to you at the standard U.K. bank rate plus 3% and absorb the 'special costs' which accrue under this loan. We shall clear your borrowing at [NatWest] and repay your loan capital thus restoring your cropping finance - hopefully by the time your brother is due to be paid we shall be in Swiss francs."

On 21 June, Mr Goose went to see Mr Tongue. He showed him Mr Bray's letter. Mr Tongue's note reads:

> "You produced a letter which you had received from Bray that morning with a further variation [a reference to the Banque Populaire funding], which you felt solved everything. In order to make you think about matters telling you that you were foolish to put your deeds into Manson's hands merely on your trust of Bray. We retained our view that nothing he had done was inconsistent with him being a con-man, and the longer the situation continued, the more likely it was that he was a con-man. You were putting at risk your English enterprises, whereas all Bray was risking was Devinniere. You felt we were being hard on Bray, but we pointed out that it was our job to spot the snags and bring them to your attention. Whether you took our advice was a matter for you.
>
> Turning to the positive side, it seemed from Bray's letter that in fact he had now sorted out his own finance, and we suggested therefore that there was no need for you to go to Manson anyway. If the Swiss only wanted Bank Guarantees, you could get that from [NatWest] and then go off and get your Swiss francs, which would enable you to buy Gracay and pay out Martin. You agreed with this and you said you would take this up with Bray. Strongly advising you to avoid getting tangled up with Manson if you could avoid it. There was however a possible problem in that although the security the Swiss required was Bank Guarantees, it had also been said earlier on that they wanted the whole package in place before they lent the money. You might therefore have to fund Gracay but suggesting that perhaps the best way of dealing with that was to get a bridging loan from a French bank, because then you would at least be in the right currency."

The advice in the first paragraph was given with foresight, not hindsight. It was excellent advice and it is a tragedy that Mr Goose thought he knew better. He agreed the note accurately reflected the advice he was given, save that he said that, when Mr Harrod entered the room, he told him that Mr Tongue had said Mr Bray was a con man, and he said that Mr Tongue then reacted by denying he had said that. Mr Goose did not point out that on 22 March Mr Harrod had, so Mr Goose claims, conveyed the rather different message to him, namely that Mr Bray was "clean". He agreed that Roythornes were forceful in

their advice, but said that its force was reduced by Mr Tongue's alleged denial that he had said that Mr Bray was a con-man. Mr Tongue's reasons for his suspicions as to Mr Bray's genuineness were that his figures did not add up; his letters were lofty and substantially meaningless; and he was reluctant to let Roythornes contact third parties in connection with the venture, in particular in connection with the stones: he wanted everything channelled through him.

Mr Goose said he raised with Mr Bray again, on 23 June, the question of who had purchased the Allison holding and that Mr Bray "categorically said to me that it was his family trust." Mr Goose said that, having been so told, he decided he would go ahead with the Manson deal, although it was not completed until 25 July. Mr Bray did not tell him where the money for the acquisition was coming from; and Mr Goose did not even know how much was required. On 24 June, he telephoned Mr Tongue to tell him that he had decided to proceed with Manson.

Mr Wilson's introduction to the Allison venture was on 1 July, when he, Mr Bray and Mr Mainwood went to Allison's offices in London. Mr Kane was there. Mr Mainwood looked at the bookkeeping system. Mr Wilson was given a wad of documents relating to the takeover. His then understanding was that Intag had already bought Allison, but that the vehicle which would actually hold the shares had not yet been decided, but could be Intag or a new Swiss holding company. On 2 July, he wrote to Chown for advice as to the group structure to be used for the organisation, in particular as to the group holding company. He referred to Mr Bray having "through one of his companies …negotiated to acquire two companies operating in London and Peterborough". A reference to Intag in the same paragraph implies, as Mr Wilson agreed, that Intag had done the negotiation just mentioned. Mr Wilson was not a party to the negotiations, and said that some three weeks later he discovered there was a dispute about whether or not a deal had been done. Mr Wilson agreed that if, on 1 or 3 July, someone had asked him if Intag had bought Allison, or was involved in a purchase of it, he would have said yes.

Reverting to Mr Goose, he said that he wanted to do more to reassure himself as to Mr Bray's standing. To this end, he said he telephoned Mr Wilson on 3 July and asked him who was buying Allison. He says he told Mr Wilson that he did not want Mr Bray's family trust's assets stretched any further because they were intended to support the borrowings for the French project. He said in chief that Mr Wilson replied that Allison was being purchased by Mr Bray's family trust or by a company called Intas Technical Services; in cross-examination, he said Mr Wilson replied that Allison was going to be purchased through Intas. Mr Goose said he felt he could rely on that. He said he also asked Mr Wilson if Mr Bray could fulfil his obligations as regards the purchase of La Devinniere and Mr Wilson replied that he could; he is said to have told Mr Goose that Mr Bray "had plenty of money, and that in fact he was looking to buy a wine-bar/hotel, hotel/wine-bar in the south of England." Mr Goose said the information about the proposed wine bar confirmed what Mr Bray had previously told him.

Mr Wilson did not recall a conversation with Mr Goose on 3 July, has no note of one, but accepted that there might have been one. He denies he would have said that Allison was going to be purchased by Intas or a family trust. He said in chief he would have told him the truth as he then understood it, namely that it would be purchased by Intag or an "overall umbrella holding company" and that he was waiting for advice on the point from Chown. He said he had no motive for saying anything different to Mr Goose. He also said that he believed at that time that he had been told that Intag had agreed to purchase Allison, but that Mr Bray believed he could switch the actual purchaser if he wanted to. That understanding does not closely match what he initially claimed he would have told Mr Goose, but he said that he would have told him "what I knew. I was trying to tell him the exact facts." He did not believe he had misled Mr Goose. On 3 July, there were in Mr Wilson's possession four Intag cheques for sums totalling £14,400 intended to be used to pay for Allison shares. In cross-examination, Mr Wilson repeated that he would have told Mr Goose that there was uncertainty as to whether the Allison shares would be transferred into Intag or into a different holding company.

Mr Wilson denied that he told Mr Goose that Mr Bray had "plenty of money". He said that such a remark, in the context of his knowledge, was "utterly unreal" and not one he would have made. He also denied that he would have said Mr Bray was buying a wine bar. That proposition had been raised at the beginning of the year and had been "well buried by June 1985".

© 2025 Thomson Reuters. 

Mr Goose said that, following that conversation, he telephoned Mr Tongue and told him that he had just learnt from "an independent source" that Mr Bray had plenty of money; and he confirmed that he wanted to go ahead. Mr Tongue made a full note of his conversation with Mr Goose on 3 July, which was in large part devoted to substantive matters in connection with the proposed Manson loan. Part of it reads as follows:

> "Reading to you what we had said to them about the certificate as to our advising you on Devinniere. You entirely endorsed what we had said.
>
> You enquired if we were also obtaining an indemnity. Informing you that we did not know what was going on, so did not know what you were talking about. After discussion it seemed that you wanted an indemnity from Bray that Intag would repay all the money under the mortgage which was not actually lent on to you. In this connection you were receiving £63,500 to pay out Martyn and enough to pay off your Bank loan. You were also having your £50,000 repaid, although obviously this was not a borrowing, but merely repayment of an outstanding loan by Bray or the Company.
>
> You still did not know whether you would actually go to Manson, but the essence was that you wanted some money quickly. It seemed that you had been offered the renting of two further farms next to Devinniere, each of 500 acres, and you were going ahead with that.
>
> Putting to you that you had not told us the full story, and you agreed that you had information that you had not passed on to us. Pointing out that on that basis we could not really advise you, and you fully accepted this. You had weighed the advice we had give you very carefully, but because of what you also knew, you had decided to proceed despite that advice. You appreciated our efforts on your behalf, and that legally our advice was entirely correct.
>
> You had that day learned from an independent source that Bray had plenty of money. Pointing out to you that in that case the question arose as to why he didn't use that money instead of chasing round to Manson or such outfits. You said the money was all tied up, but we pointed out that if there was security a Bank would provide the bridging.
>
> We assured you that we would do the best we could in the circumstances, and you expressed your confidence in that. We wished you well in all your ventures in France, but legally our advice would have to be to hasten slowly and with caution."

Mr Goose said it was possible he told Mr Tongue something to the effect he needed money quickly, but he says that in fact he did not need money quickly: he said he had paid for the 28 acres, the onion store loan was a dormant one and he had the money to pay Martin. The undisclosed information, referred to in the fourth paragraph, was that Mr Bray had told Mr Goose that he was going to come into (but did not know when) an unspecified amount of money by way of commission in a transaction in which he had engaged in Zimbabwe involving a metal wire company in which he was interested. He did not show Mr Goose any documents relating to this transaction. As to the "independent source" referred to in the penultimate quoted paragraph, it was not in dispute that Mr Goose had said some such thing to Mr Tongue: the issue was whether the source was Mr Wilson or someone else, perhaps someone at Ascom. Mr Goose insisted it was Mr Wilson. He said it did not occur to him to wonder why, if Mr Bray had plenty of money, he had not repaid the £10,000. He said that the statement helped him in deciding to go ahead with the Manson deal. That was a materially diluted version of what he had said in his witness statement, namely that he had "heavily relied on this representation" in going ahead with the Manson deal.

© 2025 Thomson Reuters.

On 4 July, Mr Bray wrote to Keene Marsland, Allison's solicitors, on Intag notepaper, saying that the acquisition was to be in the name of Intag.

On 11 July, Mr Wilson wrote to DMH, referring to the Allison acquisition and saying that it was not yet finally decided whether the shares would be acquired in Intag's name or in that of one of Mr Bray's overseas companies.

On 16 July, Mr Tongue wrote a letter of advice to Mr Goose. It consisted of firm advice that he should not go ahead with the Manson deal. He said that, despite repeated requests, it had been impossible to obtain detailed information as to how the deal with Mr Bray was to be carried to a successful conclusion, meaning the obtaining of a Swiss franc loan. He said that Mr Bray seemed most reluctant to commit himself to reducing to writing the details of the steps in the transaction. He warned him that:

> "…if the worst happens you will lose your English land, and if that is insufficient to meet the loan, you could lose the house and buildings and any other assets you may have, and in the last resort may even have to go bankrupt."

Eventually, the worst did happen.

On 18 July, Mr Wilson wrote to Mr Bray, having by then received Chown's advice. He reported that Allison must be acquired by a UK holding company, either Intag or else Intas Technical Services Limited, which was a new company which Mr Bray intended to form.

On 25 July, Mr Searle of Allison wrote to Wilson Sandford, asserting that the board meeting at which they were purportedly appointed auditors was not a valid one, and nor had Mr Bray been appointed a director of Allison or Mr Kane its secretary; he also said the change of registered office to Wilson Sandford's offices had not taken place and would not take place. The Allison takeover did not go ahead. Mr Wilson said he was very surprised by this letter. He thought that he would have contacted Mr Kane or Mr Bray. He said he did not have much to do with the exchange of views on the subject.

The Manson loan was completed on 25 July, when Mr Goose charged Blocks 1, 2 and 3 to secure the £314,000 advance. £8,716 was retained in discharge of the fees and expenses of A.L. Phillips & Co, Manson's solicitors; £1,700.61 was applied in respect of DMH's costs and expenses; £147,314.96 was remitted to Roythornes, for Mr Goose; £130,000 was remitted to Banque Populaire. The balance of £26,268.43 was remitted to Intag's account with Midland, for use as working capital. Mr Goose applied the money paid to him in discharging his liabilities in respect of the 28 acres, the onion store and part of his overdraft. He does not know what happened to the £130,000 which went to Banque Populaire. It would anyway not have been enough to pay what was due on the signing of the acte de vente on La Devinniere and it would leave nothing to pay anything on Gracay. The Gracay transaction fell through at about this time. Unless finance was forthcoming from Banque Populaire or elsewhere, it was not going to be possible to complete the La Devinneire purchase either.

Mr Bray said that, at the time, he still believed that the stones were worth almost US$500,000. He said that, if he had known that they were worth about US$15,000, at which they were to be valued in 1986, he "would have wiped his boots and gone away". He said if he had known that Mr Bray was being threatened with bankruptcy proceedings, or that someone was claiming that the stones did not belong to Mr Bray or Brent, or that in fact Intag was the purchaser of Allison, he would not have proceeded with the Manson deal. He said initially that if he had known that Trinkhaus was claiming a charge over the

stones securing only £25,000 he would still not have gone ahead, even if the stones were worth US$500,000, although in cross-examination he said a charge for only £25,000 on stones of this value would not have troubled him. He said in chief that he would not have gone ahead if he had known that Trinkhaus had been pressing Mr Bray for nearly a year to pay them £25,000 they claimed he owed them. He said in his witness statement that "Given the speed with which the matter [the completion of the Manson loan] was handled, I did not notice that Mr Bray's stones were not mentioned as part of the security in the documents." He had made a similar statement in his police statement in 1986. Those statements were untrue, as he accepted in cross-examination: Mr Goose knew that the stones were not, and were never intended to be, security for the Manson loan.

**August 1985**

On 1 August, Mr Wilson wrote to DMH to notify them that Mr Bray had told him that the purchase of La Devinniere was still proceeding and that he still wished to acquire Allison. He also recorded Mr Bray as having told him that there was "in excess of £300,000 on deposit with the Bank in Bourges." Mr Wilson said initially in chief that he assumed that this had come from the sale of the stones, but he later qualified that by saying he had no idea where it had come from.

On 12 August, Mr Boyce-Mears sent Mr Wilson a copy of a letter he had sent Mr Bray on 29 July and asked for his comments. The latter letter referred to Mr Bray's two letters of 21 November and 20 December 1982 (quoted earlier, when relating the Holford/stones story), to the stones as being held at Zurich "to our [i.e. Holford's] order" and reported that Holford had understood that Trinkhaus had placed a restraining order on them because of Brent's or Mr Bray's indebtedness. Mr Boyce-Mears wrote that he understood that the amount due to Trinkhaus had been agreed and that Mr Bray was in a position to pay it. He said he also understood that money was owed to Dr Schaefer. He asked for an explanation and for "documentary evidence of these facts", although it is unclear which facts. Mr Wilson had not seen either of the 1982 letters before, nor did he see them until after the commencement of these proceedings.

Mr Goose was in France on 14 and 15 August and met Mr Bray at La Devinniere. Mr Goose had discovered at the end of July that Intag was the purchaser of Allison. Mr Bray asked him to lend him £50,000 with which to discount some bills. This was for the purpose of the Allison acquisition. Mr Bray told him he would be repaid within a week or ten days. Mr Goose agreed, because he thought the acquisition by Mr Bray would be a useful advantage for Intag. He had just paid £60,000 to his brother and borrowed the £50,000 from him. He drew a cheque in favour of DMH. He was repaid £40,000 of it on 4 September 1985.

In the event, Intag did not buy Allison: and whether there had ever been a valid contract for its acquisition is unclear and was not explored at the trial. On 16 August, Allison issued a writ in the Chancery Division against Intag and Mr Bray. It claimed £31,216.96 as money had and received and sought injunctions restraining Intag and Mr Bray from claiming they had become shareholders in Allison or in two other companies. On 19 August, on an ex parte application, Scott J granted Allison various injunctions over 27 August, including a Mareva injunction against Mr Bray save in so far as his assets exceeded £31,000. The proceedings and order were served on Intag on 20 August and copies were posted by Keene Marsland to Intag at Hagbeach Farm on the same day. Mr Goose saw them within the next day or so.

On 20 August, Mr Bray and Mr Goose signed joint and several guarantees for the discharge of Intag's liabilities to AIB, up to a maximum of £8,000. This replaced the existing £5,000 guarantee. Its purpose was to support an increase of Intag's working capital so that the operations at La Devinniere could continue. By this stage, Mr Bray had taken up residence at La Devinniere, whose main business was growing tobacco. The purchase had still not been completed but Intag was, and had been for some time, in occupation and carrying on the farming there. Mr Goose said that, if he had not gone ahead with the Manson deal, he would not have given this guarantee.

By 27 August, Mr Wilson had returned from holiday and replied to Mr Boyce-Mears' letter of 12 August. He wrote that the letter of 29 July was "incorrect in one respect", namely that the amount due to Trinkhaus was not yet agreed. His letter did

not question Holford's claim that the stones were held to its order, although he said in chief that he knew nothing about that. He said in cross-examination that the stones were not held to Holford's order and that he did not "pick up on" that point in their letter.

**September 1985**

On 5 September, Allison issued a second writ again Intag, in the Queen's Bench Division. It claimed £23,223.84 on a dishonoured bill of exchange drawn by Intag on 1 July. Mr Goose learnt of these proceedings at about this time.

On 16 September, Mr Goose drew a cheque for £153,022 in favour of Intag. This repaid the £147,314 loan Intag had made him out of the Manson loan money, plus half (£5,708.30) of Manson's and DMH's costs of the loan. The reason for the repayment was because of the concern that it represented a loan to a director of Intag; and he paid back half the costs, because he had received roughly half the loan. Intag then channelled £147,314 back to Mr Goose via Haines Dell & Co Limited. Mr Goose said that all this was done on Mr Wilson's advice. Mr Wilson had learnt in early September that part of the Manson loan had gone direct to Mr Goose and considered that the situation had to be rectified.

On 17 September, Manson wrote to Intag, addressed to its registered office in Brighton, claiming that the balance outstanding on the mortgage account was £321,594.36. It asked for payment in full by 20 September. In default, it threatened to exercise its remedies under the mortgage.

On 20 September, Keene Marsland, Manson's litigation solicitors, sent Mr Goose copies of the orders which had been obtained in the High Court against Intag and Mr Bray. By now, everything was beginning to collapse. Mr Goose learnt that Banque Populaire had been given notice of the Mareva injunctions and had withdrawn their offer of finance for La Devinniere.

**October to December 1985**

On 16 October, Allison presented a winding up petition against Intag. It was based on an unsatisfied judgment debt and costs obtained in the Queen's Bench action on 1 October for £24,246.33. The return date was 2 December.

On 16 October, Mr Goose gave a guarantee to Clovara Investments Limited for a loan of £25,000 which Clovara made to Ascom. This transaction was nothing to do with Intag. Its only relevance is that it was on Clovara's petition that Mr Goose was eventually made bankrupt. The transaction was one which Mr Goose thought was a good one, but it turned out to be a bad one.

Mr Goose learnt in October that Intag was not paying the sums due under the Manson charge. He learnt this from a letter to his mother from A.L. Phillips & Co., Manson's solicitors, to the effect that Intag had defaulted on the interest payments. On 31 October, they also wrote to Mr and Mrs Goose saying that Manson proposed to take possession of Hagbeach Farm and sell it. Mr Goose was devastated to receive that letter and the following week he went to see Mr Gouldman, a solicitor. He advised the payment of a month's interest, £4,710, which Mr Goose paid.

On 4 November, Mr Wilson visited Mr Goose in Lincolnshire. They had what Mr Wilson said was a friendly meeting. Mr Goose was concerned that the compromis payment and also part of the Manson loan had been invested in La Devinniere and he was anxious to complete the purchase. He discussed the situation with Mr Wilson and Mr Walker. There was a possibility of finance from Credit Agricole and Mr Goose was encouraged to pursue it.

© 2025 Thomson Reuters.

On 17 November, Mr Bray visited Mr Goose to say that he had problems with the mortgage on the March house. Mrs Bray was with him. He told Mr Goose that a Mr Mainon (the second defendant in the 1991 action) would be telephoning him to discuss a re-financing of the mortgage. Mr Mainon duly rang and told Mr Goose that Mr Bray wanted to re-mortgage the house to another company, and he asked him if he would give a guarantee for a bridging loan in the meantime. Mr Mainon told Mr Goose that he ought to have security over the stones for any liability under the guarantee.

Remarkably, bearing in mind all that was happening, Mr Goose considered the stones would be a satisfactory security. He said he gave the proposal some thought. He was talking to Mrs Bray at the time and asked her if she had seen the stones. She replied that she had which, he said, "really boosted my thoughts about the whole situation." He said he realised by now that Mr Bray did not have plenty of money, but he did not realise that the situation was as serious as it was.

On 20 November, Mr Goose went to Peterborough and met Mr Bray and Mr Walker. Mr Bray telephoned Mr Mainon and asked him if the mortgages had been organised. Mr Goose spoke to Mr Mainon, who told him everything was in order. He said that all that was wanted was a 28 day bridging loan. Mr Goose agreed to give the guarantee for it and Mr Mainon told him to make sure that he obtained a security over the stones. Mr Goose said that he and Mr Bray then went to the court, which surprised him because he thought they would be going to a solicitors' office: he had not realised things had got so critical, but he said it did not really worry him. He signed a guarantee in favour of Barclays. They then went to Mr Bray's house where Mr Bray typed out and signed a letter dated 20 November addressed to Mr Goose. By it, Mr Bray undertook to hold the stones to Mr Goose's order. They were described as having a value of some US$500,000 "and at present held …at Kloten …under the reference of [Trinkhaus] …and against which there is a sole advance of £25,000", a reference to the Trinkhaus indebtedness. The undertaking was to expire on the clearance of the guarantee. The letter said nothing about Mr Bray having any title to the stones and so the next day Mr Goose typed out a certificate to the effect that the stones were Mr Bray's exclusive property and could be pledged by him; and Mr Bray signed it. Mr Goose said that he always believed the stones belonged to Brent, but that he also believed Mr Bray to be the main beneficiary and never drew a distinction between them.

On 21 November, Greenwoods, solicitors for Mr and Mrs Bray, wrote to Mr Goose. They had been acting in the possession proceedings brought by Barclays. They enclosed a copy of a letter they had written to the Brays on the same day. It recorded that the possession warrant against them had been suspended for 28 days upon Mr Goose having agreed to give Barclays an unlimited guarantee for the amount the Brays owed Barclays, which Barclays was entitled to enforce against Mr Goose if the March house was not sold within the 28 day period. It appears that there was a proposal to sell it to Mr Walker for £60,000. Greenwoods' letter referred to Allison's proceedings and the Mareva injunction they had obtained on 5 September; and to a pending action in bankruptcy against Mr Bray commenced by RBS. Mr Goose was shocked to learn of the bankruptcy proceedings: he had known nothing about any such possibility. He said he did not mention this matter to Mr Wilson at the time. It apparently did not occur to him to raise it with the man he claims had told him as recently as 3 July that Mr Bray had "plenty of money".

Towards the end of November Mr Goose learnt of the pending winding up petition which had been presented by Allison. The petition came before the court on 2 December and was adjourned.

On 4 December, Credit Agricole offered Mr Goose a loan facility of FF4m for the purchase of la Devinniere.

On 6 December, Mr Kane wrote to Mr Goose. He referred to Mr Bray's "highly questionable activities, particularly with regard to the ownership of the gems". Mr Goose said that there had never been any question in his mind as to who owned the stones and he did wonder what Mr Kane may have been referring to. He also said that Mr Kane's statement did not surprise him.

© 2025 Thomson Reuters.

**January 1986**

Mr Kane's letter of 6 December called for a reply but Mr Goose did not give him one and so Mr Kane sent him a reminder on 13 January, enclosing a copy of his earlier letter. In his covering letter, Mr Kane referred to "that rogue Peter Bray", and Mr Goose agreed that by then he did regard Mr Bray as a rogue. He still did not ask Mr Kane to explain his comment about the ownership of the stones. His reason was that Mr Kane was looking for fees from him which he could not pay.

Mr Goose paid £12,500 to Allison towards its claims against Intag. An EGM of Intag took place on 17 January, attending by Mr Goose and Mr Walker. The petition was discussed: the adjourned hearing was on 20 January. Allison wanted £37,500 to withdraw it. Mr Goose agreed to lend Intag £37,500 (to include the £12,500 he had already paid to Allison) with which to discharge the Allison debt. He paid the balance of £25,000 to Allison on the same day.

On 17 January, Mr Wilson had a telephone conversation with Mr Schaefer. His note records that proceedings for cheque fraud were pending against Mr Bray in Switzerland and that the stones were at Mr Bray's disposal subject to his first finding between £25,000 and £30,000. On 20 January, Mr Wilson telephoned Mr Boyce-Mears, who told him that the stones had to be returned to Holford.

On 22 January, there was a meeting between Mr Wilson, Mr Goose, Mr Harrod and Mr Walker. Mr Goose said that they discussed whether there was any way of selling the stones, which had been pledged to him by way of indemnity for his liability under the Barclays guarantee. Mr Boyce-Mears and Holford were discussed. Mr Goose said that was the first time he had heard of Mr Boyce-Mears or Holford. He understood from Mr Wilson that Holford was a trust with which Mr Bray had some connection; and that Mr Boyce-Mears was making a claim to the stones although he said he did not know the nature of the claim. He did not ask Mr Wilson when he had first heard of the claim. Mr Harrod had no recollection of what happened at this meeting. Mr Wilson said that Holford's claims were discussed and he invited Mr Harrod to follow up the questions relating to the title to the stones.

On 23 January, Mr Wilson wrote to Mr Goose and referred to the meeting the previous day. He said, so far as relevant:

> "I acknowledge receipt of the copy letter from P.J. Bray in respect of the gems pledged in support of the guarantee in support of his own house. We await a definitive reply from Mr Boyce Mears of [Holford] which hopefully Mr Harrod will now be able to obtain. I am now advised that the Power of Attorney which I hold for P.J. Bray has an implicit revocation clause after one year and thus is no longer valid. We will therefore have to rely on P.J. Bray taking direct action himself to resolve the gem situation."

Mr Goose said he was inquisitive to find about Holford and so he found its telephone number and rang Mr Boyce-Mears. He told him who he was, that he knew Mr Bray regarding some stones in Switzerland and that Mr Boyce-Mears' name had been mentioned at a meeting with Mr Wilson. He said Mr Boyce-Mears replied that he did not know who Mr Goose was and did not want to speak to him; and then put the telephone down. Mr Boyce-Mears did not recall that and said that it was not his habit to do that sort of thing.

**February 1986**

Barclays had by now obtained possession of the March house. A receiving order was made against Mr Bray on 11 February.

On about 20 February, Mr Goose contracted to purchase part of La Devinniere. He used his own money, plus loans from Credit Agricole and from another source. Roythornes acted for him. He was not given credit in the purchase for the part payments made by Intag. He let La Devinniere to a local farmer for a year.

**March 1986**

Manson was threatening to take possession of Hagbeach Farm, but Mr Goose managed to keep them at bay.

On 17 March, he spoke to Mr Goode, an assistant in the official receiver's office in Cambridge, and learnt that Mr Bray had been made bankrupt before and was an undischarged bankrupt in 1985. On 18 March, Mr Goose met Mr Goode and told him about his relationship with Mr Bray. He said that Mr Goode gave him three large dustbin liners full of papers and documents. He took them home and put them in his dining room. He said in chief that he "had a quick scan through what was on the top of each one" and that, subsequently, he "just scanned through them quickly". He was asked in chief whether Mr Wilson's letter to Mr Bray of 11 October 1984 (earlier quoted) was in the bags. He said it was not. He was asked whether Mr Wilson's letter to Mr Bray of 28 May 1985 (also quoted) was in the bags. He said it was and he accepts that he saw it between March and June 1986. He was asked whether Mr Boyce-Mears' letter to Mr Bray of 29 July 1985 (earlier summarised) was in the bags. He said it was. He accepts that he saw that letter in 1986: it was one which showed him that Holford was asserting that the stones were held to Holford's order but that Trinkhaus had placed a restraining order on them by way of a form of security for the discharge of Mr Bray's or Brent's indebtedness to it.

Mr Goose said that, given his new knowledge about Mr Bray's prior bankruptcy, it crossed his mind that Mr Wilson might have been negligent in the "plenty of money" representation he claimed he made on 3 July 1985, but that he was more concerned at that stage to level negligence claims against Roythornes, based on his claim that Mr Harrod had given him the "Bray is clean" advice in March 1985. Mr Goose did not even raise the point with Mr Wilson at that stage. That omission is surprising bearing in mind that it eventually became Mr Goose's case that he committed himself to the Manson loan on the strength of (inter alia) that statement.

On 19 March, Mr Goose spoke to a Mr Kerr at Barclays and asked for permission to enter the March house and remove all papers relating to Intag. Mr Kerr refused permission.

**April 1986**

On 8 April, Mr Goose rang Mr Schaefer and told him the stones had been pledged to him. Mr Schaefer agreed to let him have them if the official receiver agreed, although he pointed out that Trinkhaus claimed a lien over them for £25,000; and he first wanted to be paid that sum. Mr Goose had known of this liability since 20 November 1985. He decided to obtain possession of the stones and sell them. He said he still thought they were worth about US$500,000.

On 19 April, Mr Goose sold the chateau at La Devinniere and part of its land for £200,000. He retained the remainder.

On 21 April, he borrowed £25,000 from NatWest, by way of a bank draft in favour of Trinkhaus. On the same day, he heard from the official receiver that Mr Boyce-Mears was making a claim to the stones. Mr Goose said that his earlier abortive attempt to speak to Mr Boyce-Mears did not come into his mind. On 22 April, he left for Zurich, where he met Mr Schaefer. Mr Goose had previously arranged for a Sotheby's valuer, Brigitta Blangey, to value the stones. She had not yet done so. Mr Goose left the bank draft with Mr Schaefer, but not unconditionally. Mme Blangey was due to value the stones the following day. Mr Goose's arrangement with Mr Schaefer was that if the valuation was well in excess of £25,000, then he could cash the draft. Otherwise it would be returned. A few days later, Mme Blangey advised Mr Goose on the telephone that (according to Mr Goose) the stones were worth between US$10,000 and US$15,000. He telephoned Mr Schaefer, who returned the draft. Mme Blangey confirmed the valuation in a telex dated 4 June 1986, in which she expressed the opinion that "The sale value of [the stones] should be seen at around [US$15,000]." Mr Goose said he was very disappointed.

At some uncertain date after this, Mr Goose met Mr Wilson in Peterborough. He said he told Mr Wilson that he thought that he (Mr Wilson) had known more about Intag's takeover of Allison than he had led Mr Goose to believe. He said that Mr Wilson's response was to blame Mr Kane for the "mess up" of the purchase of Allison. He said Mr Wilson told him that Mr Kane had helped Intag to "part-purchase" the shares. Mr Goose said he accepted Mr Wilson's explanation, although he said the exchange ended in a shouting match, which Mr Wilson denied. Mr Wilson recalled a discussion about the Allison saga with Mr Goose, at which he (Mr Wilson) was critical of Mr Kane: he was referring to the fact that minutes had been produced which showed the Allison takeover to be a fait accompli, whereas it was disputed shortly afterwards. Mr Wilson said Mr Goose did not criticise him for anything he had said to him at the time: he did not suggest he had misled him in any way.

Mr Goose said that, at this meeting, he also asked Mr Wilson whether he had known any more about the value of the stones than he had led Mr Goose to believe earlier on. He said Mr Wilson replied that he had always thought they were worth what Mr Bray had told him. He said that, at this stage, it never entered his head that Mr Wilson might have lied to him during the negotiations leading up to the Manson loan.

**May to July 1986**

On 20 May, Mr Goose complained to the police about Mr Bray. The Cambridge fraud squad commenced investigations.

On 4 June, Intag was ordered to be compulsorily wound up on a petition presented by Mr Walker based on unpaid wages.

On 10 June, the police interviewed Mr Goose at his home. They took away all the papers and documents which he had relating to Mr Bray and Intag, including the three bags of documents provided by Mr Goode. They left him with only his diary. He did not receive them back until the end of 1989.

On 8 July, the police returned to Mr Goose's home with a view to preparing a statement by him about Mr Bray. They brought with them all the papers he had given them on 10 June. The exercise continued over 9, 10 and 11 July. Mr Goose said in chief that, on 11 July, he telephoned Mr Goode with an inquiry about a cheque. He said that Mr Goode answered his inquiry and then volunteered that Mr Wilson had been in correspondence with Mr Schaefer. He said that Mr Goode referred to a letter which Mr Schaefer had written and in which, in Mr Goose's words in chief, "Mr Schaefer had said that the value of the stones in October were of dubious value" and that "the stones were possibly not worth what Mr Bray had said". Mr Goose said he did not at that stage ask for a sight of the correspondence Mr Goode was referring to, although he thought he did ask for it later on and was told it was none of his business.

© 2025 Thomson Reuters.

The police were with Mr Goose over 14 and 15 July. Mr Goose said in chief that, on 15 July, he asked D/C Palmer if he could obtain "a copy of a possible letter" but that he was refused.

Mr Bray's public examination took place on 26 July. Mr Goose attended it and questioned Mr Bray. He said that he merely had "some notepaper of my own" with him: he had none of the documents which Mr Goode had given him in March. Questions 200 to 205 put to Mr Bray by Mr Goose were as follows:

> "200. Mr Goose: Yes, I have a valuation of them [the stones] here. A. No, that is just the listing, is it not?
>
> 201. Q. The listing, yes. I have seen the valuations in Zurich. On many occasions your accountant, Robin Wilson, said that these stones were not worth that amount of money. If I may read a paragraph of a letter to you: 'I feel that I should emphasise that Karl Schaefer has now set a definite deadline of June 6th, if they have not received settlement by that date, they will take legal proceedings against yourself, they threaten that the stones will be sold over your head and that if there is insufficient to settle the amount of their debts, they will personally proceed against you.' and you know that there was a settlement, an agreed settlement of £25,000 on those stones. Am I correct? A. There was an agreed settlement whether it was 25 or less I do not know, I would have thought that it was less.
>
> 202. Q. It was marginally less, if it was? A. Yes.
>
> 203. Q. So you knew that the stones were not worth a deal of money and yet you let me use them or used those as security for your house at March? A. I am sorry, but I relied entirely on those valuations which had been sent with the stones from America.
>
> 204. Q. But you knew by the letters that you had been receiving from Mr Karl Schaefer? A. I knew that there was a dispute about the valuation and I had taken it up with the source, who reiterated that they were prepared to stand by those valuations.
>
> 205. Q. You knew in 1985, did you not, in October 1984 that Mr Schaefer was most concerned about the value of the stones and yet you were prepared to issue many securities against them, not only to me but to my brother as well and other people and to the bank, by what Mr Hewlett says? A. I still say that I relied on those valuations as put forward to me by the persons who forwarded them to me in settlement."

It is to be noted that Mr Goose was not there putting to Mr Bray that his non-disclosure of the questionable value of the stones induced him to enter into the Manson loan. Question 201 incorporated a quotation from Mr Wilson's letter to Mr Bray of 28 May 1985, which Mr Goose saw in about March 1986 and of which he says he took a manuscript copy which he used at this examination. The evidence he gave to Harman J, which I understood him to affirm before me, was that he took the copy on about 15 July, after the police had finished taking his statement.

On 5 August, Mr Goose asked D/C Palmer for some correspondence (his evidence in chief was imprecise as to its nature) and says he was given a copy of the letter of 28 May 1985 from Mr Wilson to Mr Bray, of which he had already taken a manuscript copy. He said that he told D/C Palmer that "there is a letter sometime in October from Mr Wilson to Mr Bray" and that he also asked him for that. He said in chief that Mr Goode had told him of the existence of that letter. Mr Goose said that D/C Palmer would not let him have it because it was none of his business.

**When did Mr Goose first see the letter of 11 October 1984?**

This is relevant in connection with the limitation issue. I have summarised Mr Goose's evidence in chief about this matter. In cross-examination, he said he did not think this letter was in the bags given to him by Mr Goode in March 1986. He said he only scanned the contents of the bags, which suggests a cursory exercise falling short of one which would enable him to say that he did not think the letter was in the bags. He said he did not think he saw this letter before the end of 1989. It was put to him that his question 205 to Mr Bray in July 1986 must have derived from a sight of this letter. He replied it was based on what Mr Goode had told him on 11 July 1986. He said that what Mr Goode had then told him was that there was "some correspondence in October with Wilson and Bray about the value of the stones and that was all that was said." When reminded that what he had put to Mr Bray in question 205 was that "Mr Schaefer was most concerned about the value of the stones", Mr Goose replied that he "may have stretched it a little bit, to put a bit on Bray while he was there".

Mr Goose was also cross-examined about this before Harman J. He then also said he merely scanned the documents in the three bags and did not analyse them. He said that he did not discover from them that, by October 1984, Mr Schaefer was telling Mr Wilson that the value of the stones was very low. To similar questions that question 205 must have derived from documents he had seen, he replied that he "had seen three documents and scanned them through": but he denied that they included the letter of 11 October 1984. He said in evidence to me that he thought they were the letter of 28 May 1985; and two further letters of 4 and 10 June 1985 from Mr Wilson to Mr Bray, the second of which makes no reference to the stones.

Before Harman J, Mr Goose said that what Mr Goode had volunteered to him was that Mr Wilson had told Mr Bray that Mr Schaefer was concerned about the value of the stones. That is to be contrasted with his evidence in cross-examination before me that Mr Goode made no reference to Mr Schaefer, and that Mr Goose's reference to Mr Schaefer in question 205 was by way of embellishment. When this difference was pointed out to Mr Goose, he adopted the 1994 version. He also said that Mr Goode had told him that the relevant exchange had been in October 1984.

The end product of Mr Goose's evidence on this was, therefore, after some inconsistencies, that he could put question 205 because on 11 July 1986 Mr Goode volunteered to him, out of the blue, that in October 1984 Mr Wilson had written to Mr Bray that Mr Schaefer was concerned about the value of the stones. He said he asked Mr Goode for a copy of the letter, but Mr Goode refused. He said he also asked the police, and they too refused.

Mr Goose claims to have helped himself to the copy of the letter of 28 May 1985 from the police files on about 15 July 1986. He said he did not think that the letter of 11 October 1984 was also in the files: but his evidence was not to the effect that he endeavoured to locate it.

**Roythornes v. Goose**

By 1986, Mr Goose owed Roythornes some £7,000 in fees. They sued him for it in the Queen's Bench Division. He defended and counterclaimed. The essence of the counterclaim was that, in contemplation of his proposed transactions with Mr Bray, he instructed Roythornes in March 1985 to make inquiries as to Mr Bray's bona fides and financial standing. He alleged that on 22 March 1985 Mr Harrod had negligently advised him that Mr Bray was "clean", which Mr Goose pleaded he "reasonably understood to mean that [Mr Bray] was trustworthy and of financial probity." He pleaded that, in reliance on that, he charged Hagbeach Farm to secure the Manson loan, lent £50,000 to Mr Bray in August 1985, paid £37,500 to secure the dismissal of the Intag petition, gave the increased August 1985 guarantee to AIB and gave the November 1985 guarantee to Barclays. He claimed damages of some £218,000. I refer later to the fate of those proceedings.

© 2025 Thomson Reuters. 

**1987**

On 18 February 1987, Mr Goose met Mr Wilson in Peterborough. Mr Goose said that there was some discussion about Intag and the stones and that Mr Wilson told him that he was going to sue him under a guarantee for his fees which he had given. Mr Goose said that he also told Mr Wilson that he had "seen some of the correspondence as regards to his writing to Mr Bray about the value of the stones". He said that he "may have intimated that I had been told that he [Mr Wilson] possibly knew the value of the stones" to which Mr Wilson replied that he only knew what Mr Bray had told him. Mr Wilson made a note of this meeting. Under the heading "Gems", he wrote:

> "Further long discussion. He [Mr Goose] had seen all my corr. to Bray back to Nov '84 when I reported to Bray that Schaefer inferred stones were worth less than £25,000 bank debt. I countered then why had bank loaned 25 - Bray was still believed firmly at that date and we had seen stone valuations dated 198? and worth $1/2 million…"

Mr Goose accepted that is what he may have told Mr Wilson.

In about March, Mr Goose borrowed £400,000 from RBS, which enabled him to refinance most of the Manson loan.

La Devinniere was sold by Credit Agricole as mortgagees. They suffered a shortfall of over £150,000, for which they proved in Mr Goose's bankruptcy. A bankruptcy order was made against him on 20 October.

**1989**

Mr Goose's counterclaim against Roythornes was stayed on 1 June. Presumably his trustee did not wish to pursue it.

Mr Goose's diary entry for 29 August recorded that "Robin Wilson knew the value of the stones, Schaeffer told him so." He had not yet had renewed access to any of the documents which he had surrendered to the police in 1986. He said the only thing he had at that stage was that "I had possible knowledge from Mr Goode and possibly from the letter of 28 May 1985".

Mr Bray was tried on 1 November on the charges I have earlier mentioned and pleaded guilty. Mr Goose attended the trial. He said that prosecuting counsel, Mr Goldring Q.C., at one point held up an unidentified document in the air and informed the court that Mr Goose had not seen it. Mr Goose did not know what the document was but focused his eyes on it, at about which moment a member of the jury fainted. Mr Goose later asked both Mr Goldring and D/C Palmer for a copy, but was refused. He suggests it was probably the letter of 11 October 1984.

In November and December, the documents which Mr Goose had given to the police in 1986 were returned to him. He said that this was the first time he saw the letter of 11 October 1984. In re-examination, he said he thought the documents now included some additions to the original contents of the three bags, in particular some cheques. His ability to give that evidence suggests that his original scanning of such contents in 1986 must have been a careful exercise, although he denied that.

**The attempt to life the stay in the Roythornes action**

Mr Goose was discharged from his bankruptcy in October 1990; and on 22 May 1991, he swore an affidavit in support of an application to life the stay on his counterclaim in the Roythornes action and to add Wilson Sandford and Mr Mainon as defendants to it.

His case against Roythornes outlined in that affidavit remained the same. His case against Wilson Sandford was based on the assertion that, by the end of May 1985, the latest proposed scheme was one in which, inter alia:

> "As security for such interim finance my farm land in Lincolnshire would be pledged and Mr Bray would provide an undertaking that the precious stones owned by [Brent] would be held to the order of [Manson] and Banque Populaire, such gems to rank as prior security ahead of my farm land."

That was untrue, because the stones were never intended to form part of the security for the Manson loan; and Mr Goose knew that. He made the point that the scheme could never work because the stones "which were throughout intended to play a central and essential role as security for interim and long term finance" were worth no more than US$15,000 and were subject to a restraining order obtained by Trinkhaus in about July 1985. He asserted that Wilson Sandford knew at all times "that the value of [the stones] said to be owned by [Brent] had not been independently established and might well be very low". He referred to the letter of 11 October 1984 and to Mme Blangey's 1986 valuation. He complained that Wilson Sandford had failed to warn him that the stones might be of low value and that there was a serious risk that they might not provide sufficient security for (inter alia) the Manson loan. Subject to what I say in the next paragraph, he did not suggest that Wilson Sandford had ever made any misrepresentation about the position to him: the meetings of 19 September 1984 and 18 May 1985 were not mentioned.

The only positive misrepresentations he alleged against Wilson Sandford were said to have been made in a telephone conversation on about 21 June 1985. Mr Goose deposed that Mr Wilson had told him that Mr Bray had "plenty of money"; and that Intag was not involved in the acquisition of Allison. He asserted that both representations were untrue and that he relied on them in entering into the subsequent transactions with Mr Bray.

The application to lift the stay was refused. That led directly to the commencement by Mr Goose of the 1991 action.

**The 1991 action**

The 1991 action claimed damages against Wilson Sandford (for breach of contract or negligence) for their failure to warn Mr Goose of the dangers and risks of the Intag scheme; and for Mr Wilson's alleged misstatement made on the telephone on about 3 July 1991 that Mr Bray had plenty of money (Mr Goose had by now revised his recollection as to the date). No case was advanced based on the alleged misrepresentation about the Allison transaction, said to have been made in the same conversation. This omission from the 1991 action is surprising bearing in mind that paragraphs 21 to 24 of the statement of claim plead "the Allisons Acquisition", although apparently only by way of an attempt to justify as recoverable damages the £37,500 which Mr Goose paid to achieve the dismissal of the winding up petition which Allison presented against Intag.

© 2025 Thomson Reuters. 

The claim against Mr Mainon was for negligent misstatement made in November 1985 as to the value of the stones offered as security for the Barclays guarantee. The pleaded case is that he negligently represented that they were worth at least US $500,000 and were good security. The claim is for £9,100 plus interest.

Save as aforesaid, no case was alleged against Wilson Sandford based on positive misrepresentations. The meeting of 19 September 1984 was pleaded as an occasion at which various matters were said to have been resolved upon, but no suggestion was made that Mr Wilson made any representations about the stones at it. Mr Wilson's letter of 9 April 1985 to Mr Goose was pleaded, but no suggestion was made that Mr Wilson made any misrepresentations in it. The meeting of 18 May 1985 was not pleaded: and it was not until he saw the note of that meeting in about early 1994 that Mr Goose remembered that Mr Wilson had misled him at that meeting. The case against Wilson Sandford was that the stones were central to each of the various pleaded schemes, but that none could be successfully implemented because the stones were only worth about US$15,000 and were subject to the Trinkhaus restraining order; that Wilson Sandford knew that their value had not been independently established and might well be very low; and that they failed to advise Mr Goose of the risk that they would provide insufficient security for the loans required under the various schemes. "Plenty of money" apart, the case was, therefore, based solely on Mr Wilson's alleged omissions, not on any wrongful acts: and Mr Goose answered "no" to an interrogatory as to whether Wilson Sandford ever volunteered any information to him concerning the worth of the stones.

**The 1994 action**

At about the end of 1993 or early 1994, Mr Goose saw Wilson Sandford's discovery in the 1991 action. It was then that he first saw copies of (inter alia): Trinkhaus's telex to Mr Wilson dated 10 July 1984; the statement of affairs dated 1 November 1984; Trinkhaus's letter to Mr Wilson of 11 December 1984; Mr Wilson's note of 13 December 1984 of the Boyce-Mears conversation; Mr Wilson's letter to Mr Bray of 2 January 1985; Trinkhaus's letter to Mr Wilson of 3 January 1985; Mr Wilson's letters to Trinkhaus and Mr Bray of 14 January 1985; Trinkhaus's letter of 18 January 1985 to Mr Wilson; Mr Wilson's letter of 28 January 1985 to Trinkhaus; his letter dated 20 March 1985 to Trinkhaus; Penningtons' letter to Mr Wilson of 30 April 1985 with its enclosure; Mr Wilson's letter of 1 May 1971 to Mr Bray; Penningtons' letter of 15 May 1985 to Mr Wilson; DMH's letter of 16 May 1985 to Mr Wilson; Mr Wilson's letter of 16 May 1985 to Penningtons; his note of the meeting of 18 May 1985; and his letter of 27 August 1985 to Mr Boyce-Mears. The result (after applications for leave to amend the claims in the 1991 action, whose history I need not relate) was that Mr Goose started the 1994 action. This alleges that Mr Wilson made fraudulent or negligent misrepresentations at the meetings of 19 September 1984 and 18 May 1985; in the letter of 9 April 1985; and in the telephone conversation of 3 July 1985 concerning the Allison acquisition.

**The issues**

I make first some general comments about Mr Goose and Mr Wilson as witnesses.

Mr Goose was in some respects a good witness. He gave his evidence clearly and made no attempt to evade any of the issues he was faced with during a searching cross-examination. Having said this, I do not regard him as a reliable witness. There are parts of his evidence which I regard as obviously wrong. For example, although he has persisted in it since 1986, I have no hesitation in rejecting his claims that in March 1985 he instructed Mr tongue to investigate Mr Bray and that Mr Harrod later gave him the "Bray is clean" advice. His account of how Mr Harrod so advised him, during the moments when Mr Tongue was out of the room, is improbable. I was, moreover, very impressed by Mr Tongue and Mr Harrod as witnesses, whose evidence on these matters I prefer and accept. They appear to have acted as careful solicitors on Mr Goose's behalf; and if Mr Goose had given the instructions and received the advice which he asserted, I would not expect these events to have been unrecorded in the attendance notes which Roythornes were so good at making, nor would I expect the advice to have been given in the cursory way it is said to have been given. I consider that this is an area where Mr Goose has convinced himself that events happened which did not.

I also find that Mr Goose has been guilty in the past of advancing a case he knew to be untrue. I refer to his assertions in his police and witness statements that he did not notice that the stones did not form part of Manson's security. In fact, he always knew that they were never intended to be part of its security; and he accepted in evidence that his statements were wrong. These errors could not have been the result of a mere mistake.

In addition, Harman J found, and the Court of Appeal upheld him, that Mr Goose was wrong in asserting that Mr Wilson made the "plenty of money" allegation on 3 July 1985. The allegation was not raised until 1991. I accept Mr Walker's submission that Mr Goose invented it to fit in with Mr Tongue's attendance note of 3 July 1984, which recorded what Mr Goose had "learned from an independent source". I am prepared to accept that Mr Goose may have been told by someone of Mr Bray's alleged wealth: but he could hardly have regarded Mr Wilson as "independent" of Mr Bray; and if Mr Wilson had made the statement, and it had the impact on Mr Goose which he was later to claim, then it is inexplicable that Mr Goose did not confront him with the point at the latest in 1986, by which time Mr Bray had been exposed as insolvent.

I find that Mr Goose also embellished his evidence where he considered it suited him. He asserted in chief that Mr Wilson referred at the September 1984 meeting to the stones being worth US$500,000. He said that he subsequently relied on what Mr Wilson and also Mr Bray had so said. By contrast, his answers to interrogatories in the 1991 action disclaimed that Mr Wilson had ever volunteered any information to him as to the worth of the stones; and he accepted in the course of his cross-examination that Mr Wilson made no direct reference to their value at that meeting. Harman J also rejected Mr Goose's evidence that it was Mr Wilson rather than Mr Bray who was the main spokesman at the May 1985 meeting; and the Court of Appeal upheld him on that.

I therefore view Mr Goose's evidence with considerable caution. On those matters on which there are material factual conflicts, I have concluded that I cannot safely place reliance on it save where it is supported by other reliable evidence.

As for Mr Wilson, the evidence showed him to be a careless and uninquiring accountant, whose professionalism and integrity occasionally fell below proper standards. He overlooked points in letters which he ought to have noticed and to which he should have reacted. He often claimed to be doing no more than writing down what his client was telling him, whilst failing to ask obvious questions arising out of it. He issued a statement of affairs for Mr Bray which Harman J and the Court of Appeal agreed was disgraceful. His letter of 22 November 1984 to Mr Schaefer was untruthful. I found some of his evidence defensive and evasive. Overall, I did not regard him as a reliable witness either; and I also view with caution his evidence on disputed factual matters.

Mr McCombe did not shrink from saying that, from beginning to end, Mr Wilson acted dishonestly in the Intag venture; and he levels particular allegations of dishonesty against him on the occasions when the representations are said to have been made. As I have indicated, I agree that there are aspects of Mr Wilson's handling of the case which deserve criticism; I will in due course say more about certain of them; and I will also focus in particular on whether the allegations of dishonesty are made out with regard to the representations levelled against Mr Wilson. I do not, however, agree that the evidence justifies a conclusion that he was throughout acting dishonestly, although I do not propose to review all the evidence relating to this subject at this stage. In considering the soundness of the serious allegations against Mr Wilson, I have kept in mind the whole story and his role in it. But, in assessing the case against him with regard to the occasions on which he is alleged to have made misrepresentations, I regard it as safer to have primary regard to what he actually knew, and was doing, by the time of each of such occasions.

I shall deal now with the four occasions when Mr Wilson is alleged to have made misrepresentations to Mr Goose. I shall then deal with the issues of inducement and reliance; the allegation of dishonest assistance by Mr Wilson in breaches of fiduciary duty by Mr Bray; limitation; and damage.

*1. The meeting of 19 September 1984*

**(a) Preliminary**

As to the period leading up to the meeting of 19 September 1984, although Mr Bray was obviously a dishonest man, great care must be taken before Mr Wilson is treated as similarly tainted. We know now that Mr Bray was dishonest. There is, however, no justification for an inference that those with whom he came into contact in connection with this venture realised that. Mr Goose certainly did not: his faith in Mr Bray's integrity refused to be dented. Mr Milne, whom I regarded as impressive and reliable witness, was taken in by Mr Bray and found him very plausible. Mr Riby remained in the syndicate after the meeting of 19 September 1984, so he cannot have identified Mr Bray as a crook.

The important fact is that Mr Bray was a confidence trickster; and he was obviously skilled in his art. I have no doubt that he deceived Mr Wilson just as he deceived everyone else and that, at least during this early period, Mr Wilson regarded him as a man of real substance who was seeking to implement a real proposal. I am, for my own part, unclear as to the precise nature of the scam which Mr Bray was intending to work on Mr Goose when he first instructed Mr Wilson. But I acquit Mr Wilson of having been aware during this period that Mr Bray had a dishonest scheme in mind which was either intended or was likely to be damaging to Mr Goose; or as having during this period dishonestly assisted him in its implementation.

In relation to this period, Mr McCombe points to Mr Wilson's failure to ask Mr Bray on 20 June about what may have been a tax or estate duty fraud in the 1960s; to his being put on notice on 10 July that Mr Bray might be involved in tax evasion; to his errors in his August letters in referring to having been in contact with Mr Goose's solicitors and accountants when he had not; to his failure on 7 September to raise with Mr Bray why he was shy of Mr Wilson contacting the Zimbabwe authorities; and to his generally unsatisfactory evidence in explanation of these matters.

As to these points, I regard that based on the August letters as of little weight: I find that they were the result of mere carelessness and I decline to find that they were dishonestly motivated: I cannot see what dishonest motive there could have been. The others do cause me concern, because I agree that, at lowest, they gave rise to suspicions as to Mr Bray's honesty, which should have required Mr Wilson to regard his client with particular care. However, whilst I certainly do not dismiss them as unimportant, I regard them, for present purposes, as of an essentially collateral nature: by which I mean that, even though they might have given rise to doubts as to aspects of Mr Bray's honesty, they did not, I consider, provoke suspicion as to the genuineness of his claimed intentions to use the stones for the French venture; or as to any dishonest intentions he may have harboured with regard to Mr Goose.

**(b) The alleged representations**

The pleaded allegations are that at this meeting Mr Wilson made representations to Mr Goose that the stones were (i) owned by Mr Bray or Brent, (ii) worth some US$500,000 and (iii) available for use as security for the Swiss franc loan. There is a fourth pleaded allegation which formed no part of Mr Goose's case at the trial. The representations are said to have been false because the stones were not so owned, were not worth US$500,000 and were not so available because of the Trinkhaus lien and the Barclays undertaking and because of the alleged lack of ownership. The representations are said to have been made fraudulently or negligently.

**(c) Were the representations made?**

The first task is to identify what Mr Wilson said on these matters. That requires me to find what was said at a meeting held over 14 years ago, a meeting of which formal minutes were produced but no notes made of what was said. The exercise is made the more difficult by the fact that precisely what was said only assumed importance in 1994, so that the witnesses had no occasion to cast their minds back to these matters before then.

I find that Mr Wilson played a more vocal role at the meeting than he acknowledged. This seems to me to be probable. He had been closely involved in the venture since June 1984. He had been involved in the inquiries about raising finance. He was attending the meeting as the partner in the firm which was Intag's financial adviser and was to be its auditor. He was charging

© 2025 Thomson Reuters. 

for his attendance, and so I would expect him to put on a professional performance which justified his presence. I would not expect him to sit in silence, leaving Mr Bray to field all the questions. I would expect him to have made a contribution.

I regard it as probable that the stones were mentioned, as the evidence assets, and I find they were. I find also that Mr Wilson mentioned them; and that he referred to them as "Peter's stones" or in some like way. I find that he mentioned them in the context of what Mr Bray was bringing into the venture, or using as his source of finance for it. I find that Mr Wilson made no direct reference to their value; and that he did not say or imply that they were worth approximately US$500,000. Ultimately, not even Mr Goose suggested otherwise.

I regard Mr Riby as a generally reliable witness and I accept his and Mr Goose's evidence that Mr Wilson said that the stones were worth more than Mr Riby and Mr Goose were investing. Precisely what they were together putting in is unclear, the only evidence touching on this being the Chown report, which (as amended on 7 August 1984) suggests they were together finding £275,000. If, which I regard as unclear, the Goose/Riby evidence meant that Mr Wilson's remark suggested that the stones were worth more than this, then it could not have implied that (at then exchange rates) they were worth more than perhaps some US$350,000. For two reasons, however, I do not propose to place reliance on this remark. First, it is not pleaded as being a misrepresentation made by Mr Wilson as to the stones' value: the only such pleaded representation is that they were worth some US$500,000. A statement as vague as this could not have led Mr Goose to believe that the stones were worth US$500,000, yet his case is that he afterwards always believed that; and that he did so because (in part) of what Mr Wilson had said at this meeting. Secondly, there is no evidence of reliance on, or inducement by, it.

I have doubts as to the reliability of Mr Riby's evidence as to the mention of £90,000 duty being payable if the stones were brought to the UK. It is agreed that any duty referred to was VAT, then 15%. The £90,000 figure thus implied a value of £600,000, or more than US$700,000. But no-one has suggested the stones were worth that; and the value which always featured in Mr Goose's mind (before and after this meeting) is US$500,000 which, at then rates of exchange, equated to about £416,000; and Mr Goose's cross-examination before Harman J shows that he regarded the sterling value as about £400,000.

So the £90,000 figure is curious. Mr Riby said it was mentioned by Mr Milne or Mr Wilson. I find it was not Mr Milne. I also find it improbable that Mr Wilson mentioned it: it was materially out of line with the maximum value he could then have attached to the stones and, unless (which is improbable) he had suffered a sudden arithmetical brainstorm, I can see no reason why he should have arrived at, or uttered, such a figure. That leaves the possibility that Mr Bray mentioned the figure: and he clearly had the VAT point in mind - he had told Mr Wilson of it on 20 June. But Mr Riby did not suggest it was Mr Bray.

If anyone mentioned a £90,000 figure, I am, therefore, not satisfied that it was Mr Wilson. I find that he did not. In any event, any mention of such a figure had no impact or influence on Mr Goose. He did not claim to have heard the exchange; and even if he did hear it, he did not attach any materiality to it. He obviously did not do the arithmetic necessary to arrive at a value of £600,000, or over US$700,000, as a result of anything said at this meeting: he claims he continued to regard the stones as worth US$500,000. Mr McCombe suggested that he stuck to that figure on the basis that it was a conservative one as compared with the higher one implied by the £90,000 duty. I disagree with that, because it is unsupported by any evidence. From day 1 until disaster struck, Mr Goose was convinced that the stones were worth US$500,000. I find that nothing which Mr Wilson said at the meeting led him to believe that they might be worth as much as US$700,000 or more; and that nor did Mr Wilson even offer the view (either expressly or impliedly) that they were worth approximately US$500,000.

I find, therefore, that Mr Wilson (i) referred to the stones as being "Peter's stones"; (ii) made no representations that they were worth approximately US$500,000; but that, (iii) in so far as they were obviously intended to play a part in the French venture, impliedly represented that they were available for use in it.

**(d) Who owned the stones in September 1984?**

Before dealing with whether representations (i) and (iii) above were false, I must first make my findings as to the title to the stones in September 1984.

Although Mr Bray had told Mr Wilson on 20 June that Brent owned the stones, he told him on 7 September that it did not. The point which Mr Bray appears then to have been making was that they would only vest in Brent when Trinkhaus's debts had been paid; and that for the moment they belonged to him personally, subject to Trinkhaus's lien. I find that that is what Mr Wilson understood from the meeting.

That change of instructions ought to have surprised Mr Wilson, although it appears it did not. But there is no evidence which satisfies me that Mr Wilson was not entitled to believe that Mr Bray was telling the truth and that the stones were his to

deal with, subject to the incumbrances. Mr Wilson's subsequent references to the stones as being Mr Bray's were consistent with his instructions from Mr Bray, and I find that they reflected beliefs which he honestly held. The communications he had received from Trinkhaus were also consistent with them.

Were the stones Mr Bray's? The other possible claimants were (i) Holford; (ii) its client; (iii) Mr Elliott, who was said by Mr Boyce-Mears to have purchased the stones from the client at some stage; and (iv) Mr Bray's trustee in bankruptcy, on the basis that the stones were Mr Bray's after-acquired property which vested in his trustee under s.38(a) of the Bankruptcy Act 1914 . Candidates (i) to (iii) can, for present purposes, be regarded as in the same interest and I will refer to them together as "Holford".

Mr Boyce-Mears' evidence was confusing and inconsistent. I did not, however, regard him as a dishonest witness, just a thoroughly unreliable one. He was trying to recall events of over 16 years ago; and the passage of time has not helped him to give a clear account of his then actions and intentions, a task whose difficulty was aggravated by the fact that, as I find, even at that stage he was not very clear in his own mind as to what he was trying to achieve or had achieved.

Given the unreliability of Mr Boyce-Mears' evidence, I consider that the best guide to what was going on in 1982 is to be found in his 1986 police statement (his earliest written account of the events) coupled with the contemporaneous documents. The former appears to me to reflect that, with the client's prior agreement, Holford agreed to sell the stones to Mr Bray in exchange for the promissory notes. Holford also wanted some assurance that the notes would be met, and so Mr Boyce-Mears obtained from Mr Bray a list of Brent's assets and Brent's acceptance that it would underwrite the notes (see the two letters of 20 August 1982). Mr McCombe submitted that any sale remained conditional on a charge being executed to secure the payments, but I do not accept that. I accept that the police statement does refer to Holford's wish for security for the payments and to Mr Bray's suggestion that Brent "had such assets and could guarantee by way of a first charge on these assets"; but I infer from the statement that Holford was satisfied by Brent's letter that it would underwrite the payments: it does not suggest that the deal was or remained conditional on a charge being executed.

In my judgment, that statement therefore shows that in August 1982 Holford agreed to, and did, sell the stones to Mr Bray unconditionally. It records that, as part of the transaction, the stones had to be transferred to Trinkhaus, which they were. The promissory notes were signed and in 1983 Holford even made a claim under them. Trinkhaus had in the meantime asserted a lien over the stones, but (subject to that) it did not question Mr Bray's right to them and it remained willing to release them to him. All this suggests that a sale was made in August 1982, with which the correspondence is consistent; and the inference is that the property would have passed to Mr Bray at the time of the contract (see s.18 , rule 1, of the Sale of Goods Act 1979 : no evidence of foreign law was adduced, and so I proceed on the basis that any applicable foreign law was the same as English law).

One difficulty, however, is the instruction in Holford's telex of 23 August 1982 that the stones were to be held "in customs zone pending our further instructions", which can be regarded as inconsistent with an unconditional sale or delivery of the stones. But the reason for that instruction is not satisfactorily explained; and, if its effect was that the stones were to be held to Holford's order, why did Mr Boyce-Mears consider it necessary to repeat the instruction on 7 September 1982; and how is it to be reconciled with Mr Schaefer's telex of 2 November 1982? Given these uncertainties, I have concluded, albeit with hesitation, that the telex of 23 August ought not to be regarded as pointing away from the making of the unconditional sale which the other documents suggest.

I do not, however, regard this as the end of the story. Even if an unconditional sale was concluded in August 1982, it is apparent that Holford was quickly trying to unscramble it and recover the stones; and the only inference which I feel able to draw from the documents is that there came a point when both Mr Bray (the purchaser) and Holford (the vendor) were agreed that the stones were to be returned to Holford. On 20 December 1982, Mr Bray appears to have given unequivocal instructions to Mr Schaefer to hold the stones to Holford's order; and on 11 January 1983 Mr Boyce-Mears also wrote to Mr Schaefer directing him to return the stones to Mr Elliott. Neither instruction was carried out, because by now Trinkhaus was asserting its lien and wanted to be paid what Mr Bray owed it before it was prepared to release the stones to anyone. Of course, Mr Bray never did pay Trinkhaus. But I do not understand him ever to have purported to cancel his instructions of 20 December 1982.

The inference which I therefore draw, also with hesitation, is that by January 1983 Holford and Mr Bray had both agreed to cancel any sale they may have agreed to in August 1982, and were agreed that the stones were to be returned to Holford. The only obstacle in the way of carrying that agreement out was Trinkhaus's claim to a lien over the stones. I do not, however, consider that Trinkhaus's claimed lien could have prevented the agreed cancellation of the sale – although no doubt the lien would have to be satisfied before either side could insist on the return of the stones. It is, of course, also the case that later in 1983 Holford claimed payment under the promissory notes, a course of conduct which was consistent only with a recognition

by Holford that it had sold the stones to Mr Bray. But if there had in fact been an earlier consensual cancellation of the sale, then Holford's actions in this respect could not have revived it.

I do not find the position with regard to the stones at all clear: the evidence is too incomplete and confusing. I find, however, with some hesitation, that Holford sold the stones to Mr Bray in August 1982 in exchange for the promissory notes. But I also find that the sale had been rescinded by January 1983, by which time Mr Bray had relinquished any property in the stones to which he might previously have been entitled. I find, therefore, that Mr Bray had no title to the stones by the time Mr Goose came on the scene in March 1984: they belonged either to Holford's client or to Mr Elliott.

As to the suggested claim of the trustee in bankruptcy, this probably does not arise in the light of the conclusion to which I have come, although it would have arisen had I found that the sale contract had remained unrescinded. Counsel advanced no developed argument on the title of the trustee, confining themselves to assertion and counter-assertion. That being so, I venture what follows with diffidence. The legal position in relation to pre-1987 bankruptcies appears to be that the after-acquired property of an undischarged bankrupt vested in his trustee under s.38(a) of the 1914 Act , although s.47 enabled the bankrupt to give a good title to the property to a bona fide purchaser for value at any time before the trustee had so intervened as to assert his title. In this case, by August 1982, Mr Bray had been conditionally discharged from his bankruptcy, and although the discharge was revoked on 8 May 1984, that was well after the cancellation of the sale contract. I cannot see why, in the meantime, there could not have been a valid cancellation of the contract. I find against any assertion that the stones ever vested in Mr Bray's trustee.

**(e) Were representations (i) and (iii) above false?**

As to whether Mr Wilson's reference to the stones being "Peter's stones" was false, I find that this conveyed that the stones belonged to Mr Bray and were his to deal with. My finding as to the title to the stones in 1984 shows that this was a misrepresentation. The stones were not "Peter's stones" and he had no right or title to deal with them.

I find that a further representation which was impliedly also made by the reference to "Peter's stones" was that the stones were all freely available for use in the French venture; and that, in so far as they might be encumbered, any incumbrances were capable of being discharged without recourse to the proposed Swiss loan or by a sale of the stones themselves. The stones were of course encumbered; but no mention of that was made by Mr Bray or Mr Wilson at the meeting. Further, the extent of the incumbrances was uncertain and could be material: including the Barclays' liability, it could in theory have been some £95,000, although it was in practice (and was, as I accept, reasonably regarded by Mr Wilson as being) likely to be significantly less than that, since the stones only ranked as a security to Barclays behind the March house and were only intended to cover any negative equity. I also find that, at this stage, Mr Wilson knew enough about Mr Bray to know that the probabilities were that the incumbrances could not be discharged except by a sale of some of the stones or by recourse to the Swiss loan itself. I find, therefore, that the implied representation by Mr Wilson that the stones were all freely available for use in the venture was a misrepresentation. It was, in effect, only the equity in the stones which was so available.

I turn to consider whether Mr Wilson made such misrepresentations (i) fraudulently, so as to found a case in deceit, or (ii) negligently, so as to found a case in negligence.

**(i) Deceit**

Allegations of fraud are serious. The standard of proof is, however, still the balance of probability but, as Lord Nicholls of Birkenhead said in *Re H and Others (Minors) (Sexual Abuse: Standard of Proof) [1996] A.C. 563, at 586* :

> "… the more serious the allegation the less likely it is that the event occurred and, hence, the stronger should be the evidence before the court concludes that the allegation is established on the balance of probability. Fraud is usually less likely than negligence."

See also, to the like effect, *Hornal v. Neuberger Products Ltd [1957] 1 Q.B. 247, at 266* , per Morris L.J.; Blyth v. Blyth *[1966] A.C. 643, at 669* , per Lord Denning; and *R v. Home Secretary, ex parte Khawaja [1984] A.C. 74, at 112,113* , per Lord Scarman. In considering whether the claims in deceit against Mr Wilson are established, I must bear these matters in mind.

© 2025 Thomson Reuters. 

As to the ingredients of the tort of deceit, in *Bradford Third Equitable Benefit Building Society v. Borders [1941] 2 All E.R. 205, at 211* , Viscount Maugham said that four things need to be established: (i) a representation of fact; (ii) the making of it with knowledge that it is false; (iii) the making of it "with the intention that it should be acted upon by the plaintiff, or by a class of persons which will include the plaintiff, in the manner which resulted in damage to him"; and (iv) reliance on the representation by the plaintiff resulting in damage.

As to the first requirement, the representation must be a material one; and it will be material if "its tendency, or its natural and probable result, is to induce the representee to act on the faith of it in the kind of way in which he is proved to have acted." (See *Downs v. Chappell [1997] 1 W.L.R. 426, at 433* ).

As to the second requirement, Mr McCombe referred me to Lord Herschell's statement in *Derry v. Peek (1889) 14 App. Cas. 337, at 374* , as follows:

> "First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice. Secondly, fraud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless of whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement being fraudulent, there must, I think, always be an honest belief in its truth. And this probably covers the whole ground, for one who knowingly alleges that which is false, has obviously no such honest belief. Thirdly, if fraud be proved, the motive of the person guilty of it is immaterial. It matters not that there was no intention to cheat or injure the person to whom the statement is made."

As to the third requirement, Viscount Maugham's quoted words are important. Deceit is a deliberate tort by which A misleads B with the actual intention of inducing him to act in a particular way. If there is no such intention, or if B acts in claimed reliance on the misleading in a way which was not intended, there is no remedy in deceit. See Peek v. Gurney *(1873) 6 L.R.H.L. 377* , in particular per Lord Cairns, at 411 to 413, an authority referred to by Viscount Maugham (note Lord Cairns' example about the house sale); and see also *Tackey v. McBain [1912] A.C. 186* ; Kitcher v. Fordham and Another [1955] 2 L1.L.R. 705, at 707, 708, per Sellers J; and Clerk & Lindsell on Torts, 17th Ed., para. 14-29.

As to the fourth requirement, the Court of Appeal in *Downs v. Chappell, supra, at p. 433* , held that although "reliance" has a similar meaning, the correct criterion is one of inducement: what must be shown is that the fraud induced the plaintiff to act as he did.

Applying those principles to any misrepresentation which Mr Wilson may have made as to the ownership of the stones, or as to Mr Bray's title to deal with them, I find that Mr Wilson honestly believed that Mr Bray owned the stones and that he was ignorant of Holford's title to them. If, contrary to my findings, Mr Bray's trustee in bankruptcy had any title to them, Mr Wilson was also ignorant that Mr Bray was an undischarged bankrupt. It is not the duty of a chartered accountant before attending a meeting such as this to do a bankruptcy search against his apparently wealthy client in order to ascertain whether he is an undischarged bankrupt. Mr Bray impliedly represented to Mr Wilson that he was not a bankrupt and expressly represented to him that he owned the stones; and Mr Wilson was entitled to believe him on both counts. In referring to the stones as Peter Bray's stones, I find that Mr Wilson was relaying what he genuinely believed to be true and about which he had no doubt. Although, as I find, he was wrong in attributing ownership to Mr Bray rather than to Holford, there was nothing dishonest in the attribution. I reject the allegation that his misrepresentation as to title was made fraudulently so as to found a claim in deceit.

In so far, however, as Mr Wilson's reference to "Peter's stones" also implied that any incumbrances were capable of being discharged otherwise than out of the stones themselves or the proposed Swiss loan, I regard that as raising a more difficult question. Mr Wilson knew the stones were encumbered. He knew of no other assets which might be used to discharge the incumbrances; and, as I have said, he knew enough about Mr Bray to know that the probability was that there were none: either some stones would have to be sold in order to procure their release, or else part of the proposed Swiss loan would have

to be applied in redeeming them. Further, although in his letter of 7 August Mr Schaefer had said that he did not regard the Barclays telex as legally binding, Mr Wilson had taken no legal advice on the point and had not obtained Barclays' view on it. Accordingly, considerations of prudence with regard to the availability of the stones pointed towards including the Barclays liability as a real rather than an imaginary fetter. However, as the stones were only secondary security for Barclays, I find that Mr Wilson could also reasonably take the view – and did – that the incumbrances were, in total, relatively immaterial compared with what he regarded as the substantial gross value of the stones. I find, however, that at the time of this meeting, he did not honestly believe that the stones could be released from the incumbrances except by a sale or by recourse to the proposed Swiss loan; and he did not disclose that to the meeting.

Mr Wilson would disagree with any suggestion that he ought to have disclosed the incumbrances, on the grounds that to do so would involve a breach of client confidentiality: he could not properly disclose Mr Bray's liabilities without his prior consent, which he did not have. I accept that this was a reason why he did not volunteer the information. I do not, however, regard it, by itself, as a complete answer to the allegation that the non-disclosure was dishonest. That is not because I do not recognise the duty to respect client confidentiality. Of course I do. But the point is that, if a client is minded to make representations to others which will be untrue unless the whole picture is disclosed, honesty require its disclosure. If the client is not prepared to disclose it but prefers to engage in deception, it may be that the adviser cannot compel him to do otherwise: but in those circumstances the adviser will have to consider whether he can continue to act for the client. In the meantime, it appears to me that the adviser should not himself make any express or implied representations which may have the effect of conveying an incomplete and untrue picture.

There is no suggestion that before the meeting Mr Wilson advised Mr Bray that he must disclose the incumbrances: it is possible that, had he done so, Mr Bray might have agreed. I find that Mr Wilson gave no consideration to doing this, but automatically applied his accountant's training with regard to confidential information and did not disclose the incumbrances even though he knew they existed. He therefore joined in painting a picture as to the availability of the stones which showed only part of the truth; his implied statement as to the extent of their availability for the venture was, to his knowledge, untrue; and that was, on the face of it, dishonest.

Nevertheless, and despite this conclusion, I find against the claim in deceit against Mr Wilson based on what was said at this meeting. I have found that Mr Wilson made no representation that the stones were worth US$500,000; and nor am I prepared to find that at the meeting Mr Bray made any such positive representation either: I do not consider that the weight of the evidence justifies such a finding. What I have found is that there was a reference to Mr Bray's contribution exceeding that of Messrs Goose and Riby. That was, or may have been, at best an imprecise representation as to the minimum value of the stones. But as, so I find, no-one purported to express a view as to their precise value, it appears that the discussion about them was all in essentially general terms. The point about the stones at that early stage of the Intag venture was not what their precise value was or whether they were encumbered or not: but whether, in general terms, they were of sufficiently significant value to be of use in the project. If, however, precise values were not being discussed, and so were not material to the discussion, then it was also unnecessary to disclose relatively immaterial incumbrances. Even if Mr Wilson's omission to disclose the incumbrances can be regarded as dishonest, it was, as I find, not dishonesty which was motivated by any intention on his part to induce Mr Goose to enter into any transaction in reliance on what Mr Wilson may have been implying. It was dishonesty motivated by Mr Wilsons' instinctive wish to preserve client confidentiality.

Moreover, I anyway regard as quite unreal the suggestion that anything which Mr Wilson said at this meeting was said with the intention of inducing Mr Goose to commit himself to anything. It plainly could not have been intended to induce the Manson loan or any like sterling loan: the three stage operation of which that formed stage 1 was not thought of until 1985. All that was being discussed in September 1984 was the raising of a single Swiss franc loan by Intag, followed by loans by Intag to each participant, with each participant being liable only for his own loan. The stones were, however, not intended to represent security for anything other than Mr Bray's loan; and so Mr Wilson cannot have intended Mr Goose to rely in any way on what he may have implied about the stones. Putting this part of the case against him at its highest, his representations may have gone to the extent of the net realisable value of the stones. No doubt their value, and more particularly their gross value, would be of the highest relevance when Intag's loan proposals were put to the banks. But how much the banks might be prepared to lend on them was exclusively up to them; and, if they overlent on the stones, that would and could not expose Mr Goose to a greater personal risk than he was prepared to take on, because the stones were anyway not going to be available as security for his loan. They were simply irrelevant to any liability to which he might be prepared to subject himself.

In this connection, I have not overlooked Mr Goose's evidence that the stones, or some imprecise proportion of them, were intended to represent a so-called buffer against currency fluctuations for the benefit of all participants. However, I regard this evidence as something of a red herring in the context of this particular issue. I accept that some such idea was discussed with

Mr Bray. But the way in which it was intended to work, or might have worked, was never put on paper and appears never to have received any concrete consideration. Nothing that Mr Wilson may have said at the September 1984 meeting could have induced, or been intended to induce, Mr Goose to act in any foreseeable way in reliance on some belief that the stones would provide him with the benefit of some supposed buffer. He could only thereafter have so acted if some concrete buffer proposal, as part of the Swiss loan transaction, had actually been worked out and agreed – but it never was.

I find, therefore, that even if the non-disclosure of the incumbrances made Mr Wilson's unqualified references to "Peter's stones" a dishonest misrepresentation, it was not one which satisfied the third requirement listed in the *Borders* case. I reject the claim that it induced Mr Goose to commit himself to the Manson loan. That cannot have been actually intended by Mr Wilson, nor can he be presumed to have intended it. It was as remote an event as Lord Cairns' mortgage in the example given at p.411 in Peek v. Gurney , supra. I reject Mr Goose's claim in deceit based on the September 1984 meeting.

**(ii) Negligence**

The case based on negligence proceeds on the basis that Mr Wilson owed Mr Goose a duty of care at this meeting, that he breached it and that Mr Goose suffered damage in the nature of economic loss. The first question is whether Mr Wilson owed him such a duty.

Lord Browne-Wilkinson said in *White and Another v. Jones and Another [1995] 2 A.C. 207, at 274* , that such a duty will only arise if there is a special relationship between the parties and that only two categories of cases have been identified where such a relationship arises:

> "(1) where there is a fiduciary relationship and (2) where the defendant has voluntarily answered a question or tenders skilled advice or services in circumstances where he knows or ought to know that an identified plaintiff will rely on his answers or advice. In both these categories the special relationship is created by the defendant voluntarily assuming to act in the matter by involving himself in the plaintiff's affairs or choosing to speak. If he does so assume to act or speak he is said to have assumed responsibility for carrying through the matter he has entered upon. In the words of Lord Reid in *Hedley Byrne [1964] A.C. 465, 486* , he has "accepted a relationship ? which requires him to exercise such care as the circumstances require," i.e. although the extent of the duty will vary from category to category, some duty of care arises from the special relationship. Such relationship can arise even though the defendant has acted in the plaintiff's affairs pursuant to a contract with a third party."

There was no fiduciary relationship between Mr Wilson and Mr Goose and so category (1) is not in point. Nor, I consider, is category (2). I regard as unreal the suggestion that anything said by Mr Wilson at the meeting was uttered by way of the performance of a task he is to be regarded as having assumed with regard to the verification of the value of, or title to, the stones, or the existence of any incumbrances on them: and I express this view even though I accept that he had by then learnt something about the extent of their availability.

Mr Wilson was not Mr Goose's accountant or adviser. He was the accountant and adviser to Mr Bray and Intag. Mr Goose had his own accountant. The purpose of the meeting was to discuss the viability of a proposed commercial venture between three individuals. Each had his own interest to protect; and this was squarely recognised at least by Mr Riby, who was there with his solicitor and accountant. Mr Wilson was there, at least in part, to look after Mr Bray's interests and, so far as necessary, to present Mr Bray's case. He was not there to advise Mr Goose. He was not holding himself out as someone who had conducted his own investigation into matters of the stones' title, value or availability: and no-one at the meeting could reasonably have thought he would have done so. Further, if the extent of his contribution did not go beyond those limited, and merely implied, representations which I have found he made, then he was obviously not purporting to offer any information to the meeting on which the syndicate members could have been expected to place any reliance. In my judgment, this is not a case where, as at 19 September 1984, Mr Wilson had assumed any responsibility to investigate and advise on the value of, or title to, the stones or as to their availability for use in the venture; and so not a case where he owed, or breached, any duty of care to Mr

Goose. In arriving at this conclusion, I have also had regard to the six factors referred to by Neill L.J. in *James McNaughton Paper Group Ltd. V. Hicks Anderson & Co. [1991] 2 Q.B. 113, at 125 to 127* .

I am reinforced in this view by considering the test imposed by the statement of Lord Bridge of Harwich in *Caparo Industries Plc v. Dickman and Others [1990] 2 A.C. 605, at 627* , that:

> "It is never sufficient to ask simply whether A owes B a duty of care. It is always necessary to determine the scope of the duty by reference to the kind of damage from which A must take care to save B harmless."

If that question is asked as at 19 September 1984, I cannot identify any such damage. It was obviously not the kind of damage for which Mr Goose primarily sues, since the three stage operation (and the Manson loan) had not been conceived. I also find that Mr Wilson could not have foreseen that Mr Goose would rely on anything he said in committing himself in any other way, for example by making the £50,000 loan to Intag in October 1984. The claim is negligence based on this meeting also fails.

*2. The letter of 9 April 1985 from Mr Wilson to Mr Goose*

**(a) Preliminary**

I refer first to some of the events occurring between 19 September 1984 and 9 April 1985.

Early on, Mr Bray's first cheque to Wilson Sandford bounced, which must have lessened Mr Wilson's faith in Mr Bray's financial solidity. Mr Wilson also displayed himself as unprofessional. He produced the statement of affairs on 1 November, on which enough has been said. He lied in his letter of 22 November. He was told of an adverse claim to the stones by Mr Boyce-Mears on 13 December, which was an important matter, yet made no note of Mr Bray's alleged rebuttal of it in his note of 18 December. He accepts that by then Mr Bray regarded the stones as worth less than US$500,000, yet he wrote to Mr Francis on 1 February 1985 enclosing a valuation which purported to show them as worth US$498,711, without adding any explanatory qualification. He told Mr Schaefer on 20 March that the Manson loan money would be used to pay Mr Bray's debts, claiming that this would be done by paying the required amount to Mr Bray by way of salary. He does not appear to have considered that the Manson loan was being raised for certain specific purposes of Messrs Goose and Bray, being purposes which did not (as far as the former was concerned) include paying Mr Bray's debts: and it does not appear to have occurred to him that the proposal so to use part of the Manson loan should first have been put to Mr Goose. Again, Mr Wilson was apparently sensitive to concerns about client confidentiality; but he should not have allowed it to get in the way of doing what was honest. He should have sought Mr Bray's instructions to explain to Mr Goose that part of the Manson loan was to be used to pay Mr Bray's debts: and, if they were refused, he would have had to consider whether he could still act for him.

**(b) Who negotiated the terms set out in the April 1985 letter?**

So Mr Wilson arrives at the letter of 9 April short of merit. Before turning to the allegations against him with regard to it, there is a preliminary factual issue: does the letter reflect (as Mr Wilson claims) a "done deal" which had already been negotiated by Mr Goose, Mr Bray and John Wilson? Or does it (as Mr Goose claims) reflect the terms of a deal which Mr Wilson negotiated with John Wilson?

I have found this issue difficult. There is a conflict between two unsatisfactory witnesses; neither side called John Wilson as a witness; and I do not regard the documents as pointing clearly in one direction rather than the other.

On the face of it, Mr Wilson's letter of 9 April to Mr Goose is more consistent with Mr Goose's account than with his own. If the deal had already been arranged by Messrs Goose, Bray and John Wilson, Mr Wilson would not have opened his letter by reporting that something was happening of which Mr Goose was already aware; nor would he have written it in terms which appear to be telling Mr Goose something for the first time. He would be more likely to have made clear that what he was writing reflected what he understood to have been earlier agreed, perhaps also inviting confirmation of its correctness. I regard his acknowledgement that he had "arranged" for the £135,000 loan to be direct to Mr Goose as speaking quite loudly on this issue: and his explanation in evidence that he really meant he had merely "confirmed" it was unconvincing.

There are, however, also difficulties in Mr Goose's account. Firs, I regard it as unlikely that Mr Goose would have told John Wilson as little as he claims. Mr Goose claims he told him virtually nothing about the venture and did not even specify what loan was required or what security was being offered. Nor did he think that Mr Bray had spoken to John Wilson. The effect of his evidence is that he went to the trouble of arranging a meeting with his bank manager, being one at which he then told him nothing of use but merely asked him to discuss matters with Robin Wilson, an accountant he had met only once some six months before. That seems to me to be likely to be less than the whole truth. The point of seeing John Wilson was because NatWest was Mr Goose's bank; the end object was to negotiate a quite pressing loan for Intag; Mr Goose was an Intag director; and I would have expected him to have discussed what it and he wanted in some detail and to have endeavoured to arrive at an agreement in principle.

Secondly, there is this more minor point of concern about Mr Goose's account: how did Mr Wilson know that Mr Goose needed £135,000? Mr Goose denies he told him and says his arrival at that figure was a coincidence. Mr Wilson's letter to Mr Alldis of 11 March referred to Mr Goose needing £63,500 to pay Martin Goose and £80,000 for the 28 acres. That totals £143,500. On 27 March, however, Mr Bray had written to Mr Wilson saying that £72,000 was needed for the 28 acres, so that Mr Wilson might have been able to arrive at a revised figure of £135,500. But if so, why, without prior reference to Mr Goose, did he merely earmark £135,000 of the loan for Mr Goose?

The matter which causes me most concern, however, is the letter's reference to the stones as being the prior security for the loan. Mr Wilson had earlier misled himself into believing that they were to be security for the Manson loan, when they were not. It is, therefore, consistent with that belief that he should, as Mr Goose claims, have proposed them as security for the NatWest loan. But, against that, even if he had wrongly assumed that Mr Bray was willing that his stones should stand as security for a sterling loan, whoever the lender, I find it unlikely that, without prior reference to Mr Bray, he would have taken it upon himself to negotiate a proposed deal with NatWest under which the stones were to rank as the prior security for the loan. Of course, his negotiations did not commit Mr Bray to anything. But that is not the way in which chartered accountants behave. They do not usually act without instructions.

Mr Wilson of course denied that he did any such thing. He asserted that there had been a meeting between Messrs Bray, Goose and John Wilson some time before; that its fruit was relayed to him by John Wilson; and he then relayed it back to Mr Goose, having been told by Mr Bray to do so. The difficulty with that account is that it does not lie easily with Mr Goose's evidence, which I do accept, that Mr Bray went skiing on 29 March and remained away until about 12 April, so that any tripartite meeting must have been before 29 March. If so, it seems improbable that it would not have been until 9 April that Mr Wilson spoke to John Wilson and reported back to Mr Goose. And when, on this version, did Mr Bray tell Mr Wilson to report back; and why was it necessary? Further, I also find it improbable that Mr Bray would have been volunteering that his stones should stand as any sort of security, let alone as a prior security, for the interim sterling loan. His plan at this stage appears to have been to procure Hagbeach Farm to be the sole security: a matter which he had re-affirmed on 27 March, in his letter to Mr Wilson.

I do not, therefore, accept Mr Wilson's suggestion that there was any such tripartite meeting: there is insufficient evidence to support it. With some hesitation, I have come to the conclusion that I prefer Mr Goose's evidence that his meeting with John Wilson was as brief as he suggested and that he did then instruct Mr Wilson to negotiate with John Wilson, which Mr Wilson duly did. I have considered whether a possible explanation for what subsequently happened is that Mr Wilson made telephone contact with Mr Bray on his skiing holiday and obtained instructions from him as to what he could, and did, then negotiate with NatWest; and the making of some such contact is consistent with the reference to Mr Bray in the eighth paragraph of the letter. There is, however, no evidence which justifies the conclusion that this is in fact what happened; and so I do not consider it is open to me to find that it did.

On this issue, therefore, I prefer and accept Mr Goose's evidence. I find that the terms reflected in the letter to Mr Goose of 9 April were agreed between John Wilson and Mr Wilson. I find that, in negotiating what he did, particularly with regard to the stones, Mr Wilson assumed that he had Mr Bray's authority.

**(c) The issues**

Turning to the issues surrounding the letter of 9 April, two main submissions are advanced by Mr McCombe. The first is that Mr Wilson made fraudulent or negligent misrepresentations in the letter, namely that the stones were (i) owned by Brent or Mr Bray, (ii) worth approximately US$500,000, and (iii) available as, and capable of providing, security as envisaged in the letter. The second is that in so far as Mr Wilson was negotiating a loan of £135,000 from NatWest direct to Mr Goose,

he was acting as Mr Goose's agent and, in consequence, owed him a fiduciary duty to make full disclosure of all he knew about the stones, a duty which he breached.

I shall deal first with whether misrepresentations were made; then with the deceit claim; and then with the negligence and agency claims.

**(i) Were misrepresentations made?**

The letter refers to the stones as being "P.J. Bray's gems" and would have conveyed to Mr Goose that they were Mr Bray's stones. Mr Goose had of course never thought otherwise: Mr Bray had told him the stones were his or Brent's (and Mr Goose drew no distinction between the two, nor is it suggested that there was any relevant difference for the purposes of these proceedings) and he believed him. It follows, however, from my finding as to Holford's title to the stones that Mr Wilson's reference to the stones as being Mr Bray's was a misrepresentation.

As to the suggestion that the letter said or implied that the value of the stones was US$500,000, I cannot find anything in it which conveyed that either expressly or impliedly. It merely stated that they would rank as prior security: there was no statement that Mr Goose's land would not be at risk, or as to the threshold above which it might be at risk.

In this connection, I must refer now to an amendment application which Mr McCombe made towards the end of his reply. He sought leave to amend paragraph 22 of the consolidated statement of claim so as to plead that the claimed misrepresentations were made not just by Mr Wilson's letter of 9 April to Mr Goose (which is all that is at present pleaded), but also by his letter of the same date to John Wilson, a copy of which was enclosed with his letter to Mr Goose. The reason for the application was that the John Wilson letter enclosed a list of the stones, purporting to show them as valued at US$498,711. Mr McCombe wanted to use that letter as showing that it, together with the letter to Mr Goose, would have conveyed to Mr Goose that Mr Wilson was representing the stones as worth US$498,711. He wanted to use it as forming part of the material said to have created the alleged misrepresentation as to value.

Mr Walker opposed the amendment. He submitted that all that is before me is a re-trial of the issues identified in the Court of Appeal's order of 31 March 1998. Those issues include the claim based on the existing paragraph 22, which confines this part of the misrepresentation claim to the contents of the letter to Mr Goose: they do not direct a re-trail based on a new factual allegation which formed no part of the issues at the first trial. He submitted also that, whilst Mr Goose's evidence was that he saw the John Wilson letter, there is no evidence that he relied on it; and nor, in consequence, was he cross-examined on it. Thus the amendment sought to enlarge the issues beyond that which the Court of Appeal's order permitted; and, in the absence of evidence of reliance, was one which could anyway go nowhere. I refused leave to amend and said I would give my reasons in this judgment. I now do so. They are those advanced by Mr Walker.

As to the submission that the letter misrepresented that the stones were available as, and capable of providing, the proposed security when they were not, I accept this. I accept that Mr Wilson still believed that the stones were of substantial value, although less than US$500,000. But it was by now obvious that Mr Bray was unable to find the money to discharge the incumbrances; and that the only way they could be discharged was either by selling the stones (to which no doubt Trinkhaus would have assented) or by raising money elsewhere; and the Barclays position had still not been resolved. Given these facts, the vice of the letter is that it was so drafted as to mislead Mr Goose into believing that the prior security over the stones could be given when Mr Wilson knew it could not.

In elaboration of this, paragraph two, sentence one, of the letter records the proposed loan as being £450,000. Sentence two allocates this as to £135,000 to Mr Goose and £315,000 to Intag. Sentence three is largely meaningless. Paragraph three shows that the whole £315,000 was committed to La Devinniere payments. Paragraph four implies that NatWest's charge over the stones was to be a first charge and that they would be entitled to call for possession of the stones; and also says that the stones would rank as prior security.

The scheme so described was, however, unworkable, as Mr Wilson recognised in his evidence. He knew that Mr Bray had no money with which to buy releases from Trinkhaus and Barclays; and, according to his letter, the whole of the £450,000 was to be applied in a way which left no money with which to enable Mr Bray to pay off Trinkhaus or satisfy Barclays. Thus there was no way in which the stones could be released so as to constitute the prior security to which the letter refers. The undertaking proposed to be given to NatWest was one which would not have been given by Trinkhaus and, if given by Mr Bray, could not have been honoured. The stones were, therefore, not available as security of the nature indicated by the letter; and Mr Wilson knew this when he wrote it.

In my judgment, it follows that the letter was misleading and must have conveyed a false impression to Mr Goose about the availability of the stones for security purposes of the nature outlined. As I have said, I do not regard it as representing that the stones were worth US$500,000; but I agree with Mr McCombe that it least impliedly represented that they were of substantial value, such as to make the prior security a worthwhile one. I propose, however, to place no reliance on the latter point because (i) any such representation is not pleaded as being a misrepresentation on which Mr Goose relied, (ii) views on what is or is not "substantial" can vary and (iii) there is no evidence as to the value of the stones in April 1985 so that there is no evidence that any such implied representation was a misrepresentation. Nor do I regard the letter as implying that the stones were in fact free from incumbrances, any more than a letter from a proposing vendor's solicitor to a proposing purchaser's solicitor that his client has agreed to sell Blackacre to the proposing purchaser for £250,000 implies that, at the time of the letter, Blackacre is unencumbered. But what the letter did do was to imply that the stones were capable of use as a security as mentioned in the letter when Mr Wilson knew that they were not – because there was no money then available to discharge the incumbrances and nor, according to the letter, was the loan money to be used for that purpose; and that was a misrepresentation.

**(ii) Deceit**

I find that Mr Wilson's misrepresentation that Mr Bray was entitled to the stones when he was not was not made dishonestly. Mr Bray had told him he owned the stones and Mr Wilson was entitled to believe him. Mr Wilson had in the meantime heard of the Holford claim on 13 December, but his evidence was that M Bray had roundly rejected this claim on 18 December and had confirmed his own title. The Holford claim had, in any event, been advanced in the most half-baked way. Mr Boyce-Mears had not even gone to the trouble of explaining it in a letter; he had not since followed it up; Mr Wilson said, and I accept, that what Mr Boyce-Mears told him about the claim confused him, something which I do not find at all surprising: clarity of thought and expression are not qualities which I readily associate with Mr Boyce-Mears; and Trinkhaus also appeared to recognise Mr Bray's entitlement to the stones. In all those circumstances, I decline to find that any representation that Mr Bray owned the stones was made dishonestly: I find that it was what Mr Wilson honestly believed.

If, contrary to my finding as to Holford's title, the title to the stones was vested in Mr Bray's trustee, Mr Wilson knew no more about Mr Bray's bankruptcy than he had in September 1984; and any misrepresentation to the effect that the stones were vested in Mr Bray rather than his trustee was made as innocently, and honestly, as had any like misrepresentation made in September 1984.

As to the representation that the stones were unencumbered and capable of providing the security proposed, that was untrue and misleading and Mr Wilson knew it. A truthful explanation of the position would have been one which explained that the stones were encumbered with some £25,000 worth of liabilities to Trinkhaus; that there was also a possible liability to Barclays of uncertain quantum; and that the stones could only be released and used as the proposed prior security if part of the NatWest loan were applied in obtaining releases from these incumbrances.

I find that this aspect of the letter was not the result of carelessness on Mr Wilson's part. I understood him to recognise, when he wrote it, that the scheme could not work until the incumbrances had been discharged. He said he could not recall how that was to be dealt with. Of course, it had not yet been dealt with, and he knew that. He also knew Mr Bray had no free assets with which to discharge the incumbrances. I do not consider that an honest accountant, knowing what Mr Wilson did by 9 April, would have written to Mr Goose in the terms in which he did. An honest accountant would have sought from his client an authority to give an explanation along the lines I have mentioned; and had such authority been refused, would have declined to act in the matter. I find that Mr Wilson wrote what he did knowing that it was untrue. That was dishonest.

I find, therefore, with regard to this latter misrepresentation, that the first two deceit requirements listed in the *Borders* case are satisfied. As to whether the third requirement is satisfied, I find this more difficult.

First, I find that Mr Wilson did not actually intend, and cannot be presumed to have intended, that Mr Goose would rely on what he said in this letter in subsequently agreeing to take the Manson loan. Mr Wilson cannot have intended the very limited implications which he conveyed about the stones in his letter of 9 April to induce Mr Goose to charge his land as the sole security for a sterling loan: the availability of the stones as a prior security would be irrelevant to any such transaction.

Secondly, nor am I satisfied that Mr Wilson actually intended, when he wrote the letter, to induce Mr Goose to charge his land as security for a NatWest loan in reliance on an understanding, derived from the letter, that an effective undertaking could be given to NatWest to hold the stones to its order so as constitute the giving of a good prior security over the stones. My finding of dishonesty in the writing of this letter may be regarded as pointing in a different direction. But the existence of the requisite intention is a separate ingredient in the tort of deceit. It is not proved merely by proving the making of a

dishonest representation; and, for my part, I find it difficult to accept that Mr Wilson, whose role in this matter was merely as the accountant acting for Intag and Mr Bray, had any motive or intention to induce Mr Goose into acting in some way in reliance on what he was writing.

I accept that in many cases of alleged deceit it will be possible to infer the necessary intention merely from the making of the misrepresentation: indeed, often there will be no other material from which the finding as to intention might be made. I do not, however, feel able to draw such an inference in this case. The essence of what Mr Wilson was doing was reporting as to a possible transaction, which still awaited NatWest's approval (no loan offer had yet been made, and in fact none was ever made). It might well anyway have come to nothing but, if it was to come to anything, it was obvious that it would need a good deal of further working out. It was, moreover, a transaction in which professionals for both Mr Goose and NatWest would be likely to be involved, something which Mr Wilson knew perfectly well. He knew that, had a loan been offered and proceeded with, NatWest would in the ordinary course have made its own investigations about the stones, their value and the title to them and would have unearthed the incumbrances and the need to have them discharged before the proposed security could be given. He also knew that Roythornes would probably make like investigations on Mr Goose's behalf, since Mr Goose's interest in the validity, enforceability and worth of the prior security was likely to be just as great as NatWest's: in fact, it was likely to be greater, since NatWest might perhaps have been prepared to place primary reliance on its security over Hagbeach Farm.

I accept that considerations such as these do not, by themselves, show that the representor did not have the requisite intention for deceit purposes. However, I regard them as factors which I must bear in mind in assessing whether Mr Goose has overcome the onerous evidential burden of proving the necessary intention on the part of Mr Wilson. In deciding this issue, the consideration which carries most weight with me is the lack of motive. A proposing house vendor who lies to his proposing purchaser that his house is free of subsidence may well ordinarily be presumed to have intended to induce the purchaser to buy, even though he might foresee the possibility or the likelihood that the purchaser would first have a survey done which would reveal the lie. But Mr Wilson was in a rather different class. He was not acting as a principal in the matter. He was simply a chartered accountant acting on behalf of a rather unsatisfactory client, Mr Bray. Why should he have decided to embark upon the deliberate and dishonest misleading of his client's business associate, with the intention of deceiving him into believing that an undertaking to deliver the stones to NatWest would constitute a good prior charge over them? What had he to gain? As far as I can see, he had nothing to gain: but he had a reputation and career to lose.

Having giving this issue careful consideration, I conclude that it is probable, and I find, that what motivated Mr Wilson in writing what he did was not any sort of intention to induce Mr Goose to act in some way in reliance on what he wrote; and I find that he had no such intention. I find that what did motivate him was an intention to keep Mr Bray's liabilities confidential; and I consider it probable that he also had in mind that the liabilities would in fact be discharged out of the Intag moneys which were, according to the letter, to be paid to Societe Generale.

In the event, no Nat-West loan was offered. Even if the letter was calculated to induce Mr Goose to rely on it in some way in connection with such a loan, he did not do so. Nor did he rely on it in a like manner. He claims to have relied on it in a manner of a quite different character, namely in taking the Manson loan, being a transaction in which the stones played no part. I find, as I have said, that Mr Wilson did not intend that; and nor can he be presumed to have intended it. I find that the deceit claim based on this letter fails.

**(iii) Negligence and agency**

I include these claims under one heading, since I consider that they are most conveniently dealt with together – for the reason that Mr Wilson's role as an alleged agent of Mr Goose is a factor to bear in mind as part of the background against which to consider not only whether Mr Wilson owed any fiduciary duties to Mr Goose, but also whether he owed him any separate common law duty of care.

Mr Goose's case is that, in negotiating the NatWest loan, Mr Wilson was acting as Mr Goose's agent. Mr McCombe submits that, in these circumstances, he would have been under a fiduciary obligation to disclose to Mr Goose all information material to the loan application. This would have included what he knew about the title to, and the value and availability of, the stones. Of course, he did not do so. Mr McCombe also submits that, quite apart from any agency, Mr Wilson anyway owed, and breached a duty of care in tort to make a like disclosure to Mr Goose.

I accept that, in so far as Mr Wilson was purporting to negotiate the loan of £135,000 to Mr Goose and to offer Hagbeach Farm as security, he was acting as Mr Goose's agent. The primary purpose of his discussion with John Wilson was, however, to negotiate a loan for Intag; and I find that, in that respect, Mr Wilson must also have been acting as agent for Intag. Further,

in so far as he was offering Mr Bray's stones as security for the proposed loans, he must also have been acting as agent for Mr Bray. I find, therefore, that in his discussion with John Wilson, Mr Wilson was acting as agent for three principals. The purpose of his letter to Mr Goose was to report back as to what he had negotiated in those various capacities.

This conclusion does not, however, automatically lead to the further conclusion that Mr Wilson owed a fiduciary duty to Mr Goose to make the wide disclosure for which Mr McCombe contended. Whether, and to what extent, a person who can be identified as having acted as, or as being, the agent of another becomes subject to fiduciary duties to that other depends entirely on the precise nature of the relationship between the parties. In particular, what needs to be shown is that the agent is a fiduciary who owed the particular duties he is alleged to have breached. Furthermore, care must also be taken before a particular supposed duty is characterised as a fiduciary duty. As Millett L.J. observed in *Bristol and West Building Society v. Mothew [1998] Ch. 1, at 16* :

> "The expression 'fiduciary duty' is properly confined to those duties which are peculiar to fiduciaries and the breach of which attracts legal consequences differing from those consequent upon the breach of other duties. Unless the expression is so confined it is lacking in practical utility. In this sense it is obvious that not every breach of duty by a fiduciary is a breach of fiduciary duty. I would endorse the observations of Southin J in Girardet v. Crease & Co (1987) 11 B.C.L.R. (2d) 361, 362:
>
> > 'The word 'fiduciary' is flung around now as if it applied to all breaches of duty by solicitors, directors of companies and so forth ?. That a lawyer can commit a breach of the special duty [of a fiduciary] ? by entering into a contract with the client without full disclosure ? and so forth is clear. But to say that simple carelessness in giving advice is such a breach is a perversion of words.'
>
> Those remarks were approved by La Forest J in LAC Minerals Ltd. v. International Corona Resources Ltd. (1989) 61 D.L.R. (4th) 14, 28, where he said: 'not every legal claim arising out of a relationship with fiduciary incidents will give rise to a claim for breach of fiduciary duty.'
>
> It is similarly inappropriate to apply the expression to the obligation of a trustee or other fiduciary to use proper skill and care in the discharge of his duties. If it is confined to cases where the fiduciary nature of the duty has special legal consequences, then the fact that the duty is to be found in equity rather than the common law does not make it a fiduciary duty."

Later in the same judgment, Millett L.J. said at p.18:

> "This leaves those duties which are special to fiduciaries and which attract those remedies which are peculiar to the equitable jurisdiction and are primarily restitutionary or restorative rather than compensatory. A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. As Dr Finn pointed out in his

> classic work Fiduciary Obligations (1977), p.2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary…The nature of the obligations of a fiduciary merely reflect different aspects of his core duties of loyalty and fidelity. Breach of fiduciary obligation, therefore, connotes disloyalty or infidelity. Mere incompetence is not enough. A servant who loyally does his incompetent best for his master is not unfaithful and is not guilty of a breach of fiduciary duty."

I am not persuaded that the very limited instructions which Mr Goose gave to Mr Wilson with regard to an approach to John Wilson resulted in Mr Wilson becoming subject to any duty of any sort (whether a duty at common law or a fiduciary duty) to make full disclosure to Mr Goose of all that Mr Wilson then knew about the stones. Mr Goose did not ask Mr Wilson to make any such disclosure and Mr Wilson did not volunteer to make it. All that Mr Wilson did agree to do was to assume a limited task as agent, a task requiring him to negotiate what he could with John Wilson and (as I find was also implicit in the instruction) to report back to Mr Goose. In its essentials, his task did not go further than that.

In elaboration of that, Mr Wilson was not Mr Goose's accountant: Mr Goose had his own accountant. Mr Goose also had his own solicitors, who were engaged in advising him generally with regard to the Intag venture. Mr Goose therefore had access to an adequate source of professional advice, which could in the ordinary course reasonably be expected to look after his interests in connection with the processing of any loan which NatWest might have been prepared to offer: and both Mr Goose and Mr Wilson knew that. Moreover, Mr Wilson was also the accountant of, and adviser to, Mr Bray; and, in connection with the proposed NatWest transaction, Mr Goose's and Mr Bray's respective interests were to some extent adversarial. The transaction involved raising money which was to be used in different proportions by Mr Goose and Mr Bray for their different purposes; and involved questions as to the extent of the risks with regard to its repayment with which each was to be faced. Against that background, I do not agree that the consequence of Mr Wilson's acceptance of the limited task which Mr Goose asked him to perform resulted in Mr Wilson coming under a duty to disclose to him all he had learnt about the stones.

I find that the essence of Mr Wilson's duty was simply to negotiate with John Wilson and, having done so, to report its results to Mr Goose. It would then be for Mr Goose to wait and see whether any NatWest offer was forthcoming and to obtain appropriate advice from Roythornes on the terms of any loan to which that offer might lead. He would, or should, in particular then want to consider what liabilities he would be assuming under the loan and to investigate the extent to which he could safely rely on the stones as a prior security. That would raise several questions which any prudent borrower would want fully investigated: what was the value of the stones; did Mr Bray have a good title to them; could Mr Goose compel their realisation ahead of his land; what would be the mechanics for doing so; and, if they were so realised, would Mr Bray be entitled as a co-surety to look to the land for a contribution? These questions were potentially quite complicated; and they raised issues whose investigation fell primarily within a lawyer's province rather than a chartered accountant's. It was not Mr Wilson's task or duty to attempt to advise Mr Goose on these matters, or even to attempt to provide him with information relevant to them. The relevant questions were all obvious and, in the ordinary course, it would be for Mr Goose and his advisers to ask them. Had a loan along the lines outlined in Mr Wilson's letter gone ahead, Mr Goose's interest in the prior security proposed to be offered over the stones would have been one essentially akin to that of a mortgagee. In my view, caveat mortgagee is still the basic rule, like caveat emptor. Compare Morritt L.J.'s observations in *Peach Publishing Ltd. v. Slater & Co [1998] P.N.L.R. 364* , at 384C.

In a sense, Mr Wilson discharged his primary duty to the letter: I am prepared to accept that his account to Mr Goose of what he had earlier negotiated with John Wilson was wholly accurate. But where in this respect I do criticise Mr Wilson is that I also find that it was not enough merely for him to relay what he had negotiated with John Wilson. I find that, having agreed to perform the task which I have outlined, he at least owed a duty of care to Mr Goose to report on its outcome carefully, fairly and truthfully and in a way which was in no manner misleading. In particular, he owed him a duty not to mislead him about the availability of the stones as security of the nature proposed. He owed him a duty at least to this limited extent, since he could and should have foreseen that, were a NatWest loan to be offered, it was at least possible that Mr Goose might thereafter rely in some way on the untrue picture which the letter painted as to the availability of the stones as such a security. I find, therefore, that Mr Wilson at least owed Mr Goose a duty of care to explain to him that the transaction which he had somewhat optimistically negotiated with John Wilson was one which could in fact only be implemented once the various incumbrances affecting the stones were first discharged; and that, subject to any better ideas that Mr Bray might be able to come up with, the NatWest loan (if offered) was probably the only source which would enable their discharge.

© 2025 Thomson Reuters.

As it is, Mr Wilson wrote a letter which concealed this problem. I find that, in failing to do so and in implying what he did about the availability of the stones as security, Mr Wilson committed a breach of the duty of care in tort which he owed Mr Goose in reporting to him on the proposed NatWest transaction.

Of course, no NatWest loan was ever offered and the proposed transaction went no further. Instead, in due course, the Manson loan was taken up, on a security which did not include the stones. I also find that, when he wrote the letter of 9 April, Mr Wilson did not and could not reasonably foresee that Mr Goose would rely on what it implied about the stones when subsequently making his decision to commit himself to the Manson loan.

I find also that, as well as being in breach of his duty of care in tort to Mr Goose to disclose the problem with regard to the discharge of the incumbrances, Mr Wilson also committed a breach of a duty which can, I consider, properly be regarded as a fiduciary duty. When he wrote his letter of 9 April, Mr Wilson was acting for three principals, including Mr Goose and Mr Bray. That did not put him in breach of the "double employment" rule referred to by Millett L.J. at p. 19 of the *Mothew* case, because Mr Goose knew that he was so acting. But he did commit a breach of the "the duty of good faith" also referred to by Millett L.J. because, as I find, he intentionally preferred Mr Bray's interests by concealing the incumbrances from Mr Goose, whereas the due discharge of that duty to Mr Goose at least required the disclosure of those matters. I find, therefore, that the misleading in the letter of 9 April 1985 also constituted a breach of a fiduciary duty owed by Mr Wilson to Mr Goose. I do not, however, consider that the breach of that duty went any wider than that. For reasons given, I do not consider that it was any part of Mr Wilson's role to make any wider disclosure about what he knew about the stones; and I find that, in so far as he omitted to do so, he was not motivated by any intention to prefer Mr Bray's interests. I find that he simply gave no thought to saying anything more about the stones; and that he was under no duty to do so.

*3. The events of 18 May 1985*

During the period from 10 April to 18 May, Mr Bray's stock fell even lower in Mr Wilson's eyes. Mr Wilson now knew that Mr Bray had pressing debts which he could not pay and was facing bankruptcy. It appeared that the only assets available for the discharge of his debts were the stones, but they remained unsold and were of uncertain value. Mr Wilson acknowledged that, by 18 May, he would not have given a reference vouching for Mr Bray's integrity or business acumen.

At the first trial, Mr Goose had claimed that Mr Wilson had done most of the talking at the meeting of 18 May. Harman J disbelieved him and found that Mr Bray was the main spokesman; and the Court of Appeal upheld him. It has, however, always been agreed that Mr Wilson was the origin of the recommendation that Mr Bray should find at least a third of the gross cost of La Devinniere and Gracay, or some £230,000, and that Mr Bray then said that the figure should be put up to £250,000, the "ex trust sales" figure on Mr Wilson's note. Mr Goose's evidence, which on this issue I accept, is that Mr Bray represented that this would be raised by a sale of the stones.

Harman J's further finding about this meeting was that Mr Wilson made no relevant representations about the availability or value of the stones. The Court of Appeal upheld that finding; and by paragraph 2(3) of its order, the re-trial on this aspect of the litigation is limited to:

> "fraudulent and/or negligent misrepresentation pleaded in paragraphs 26 to 29 of the Consolidated Statement of Claim to the extent that the same arose out of the failure of [Mr Wilson] to correct misrepresentation by [Mr Bray] at the meeting on 18th May 1985 there pleaded and/or to correct any misrepresentation found to have been made by Mr Wilson on any earlier occasion but excluding any claims based on an actual oral statement by Mr Wilson at the said meeting."

Mr McCombe's argument was that, by recommending the initial one third contribution, which was then increased by Mr Bray to £250,000, Mr Wilson was party to the deceit said to have been practised by Mr Bray in promising the £250,000. He referred me to various authorities showing circumstances in which A maybe liable to B for a representation actually made by C. I did not find any of them to be of direct application to this case, although I should mention this passage in the judgment of Romer L.J. in Marnham v. Weaver *(1899) 80 L.T. 412* , on which Mr McCombe placed some reliance:

> "Now I agree, with reference to actions of this kind, that though a person may be deceived by another with the knowledge of a third person, if that third person is not party to the deceit, and owes no legal duty or obligation to the person deceived, and does nothing but preserve silence, then, however morally blameworthy he may be in standing by and not preventing the deceit being carried into effect, he cannot be held liable in an action for damages at the instance of the party deceived."

Mr McCombe fastened in particular on the words "if that third person is not party to the deceit."

The difficulty I have with this argument is that I interpret the Court of Appeal's order as precluding me from considering it. It is not possible to advance the argument without placing reliance on Mr Wilson's oral statement at the meeting recommending that Mr Bray should put up one third of the gross cost of the two farms. But the order prohibits such reliance. It requires me to assume that Mr Wilson remained silent at the meeting and that only Mr Bray made any representations. The only issue for me is whether Mr Wilson was in breach of any duty to speak up and correct any misrepresentations made by Mr Bray or which he had earlier made himself.

The representation Mr Bray is said to have made is that he would contribute £250,000 to the venture by raising it from a sale of the stones. On the face of it that was not a representation of fact, but of intention. So it is translated by Mr Goose's lawyers into an implied representation by Mr Bray that the stones were owned by him or Brent and were worth at least £250,000. There are two further pleaded allegations of what was implicit in the primary representation, the first of which I regard as too vague for comprehension and unproved by the evidence; and the other was not argued. In any event, I do not accept that any further representations as to the future use of the stones were made at this meeting. Mr Goose gave some vague evidence in chief as to his understanding of the role the stones might place in future fund raising operations, but it was so confused that I do not propose to place reliance on it.

As to the ownership of the stones, I have found that Mr Wilson made some misrepresentations about this. I have, however, found that he made them in good faith; and nothing new had come to his notice by 18 May requiring him to correct anything he had previously implied on questions of title. It follows, in my view, that he also had no duty to correct anything implied by Mr Bray as to the ownership of the stones.

As to the value of the stones, I have found that Mr Wilson had not made any representation as to value of the nature pleaded against him. He had, therefore, in this respect also said nothing earlier which required correcting.

I have found that he made a dishonest, or at least negligent, representation in his letter of 9 April as to the stones' freedom from incumbrances and availability as security of the nature there mentioned. He should not have done so and no doubt was under a continuing duty to correct it. He did not correct it at this meeting or at any time. In so far as what he had implied in that letter had any impact on Mr Goose, it remained uncorrected.

Mr Wilson said nothing to correct anything Mr Bray said. In so far as what Mr Bray said implied a net value of at least £250,000 for the stones, Mr Wilson was (as I find) in no position to know whether that was right or wrong. I accept his evidence that he still believed the stones to be of substantial value; and there is no evidence of their actual value at this time. I do not consider it was part of his duty to tell Mr Goose that Mr Bray might not be able to realise that much. Until Mr Bray attempted a sale, it was unknown how much they would realise. That was obvious, even to Mr Goose, and Mr Goose did not need Mr Wilson to tell him that. It was not part of Mr Wilson's function to question his client's stated intentions in front of Mr Goose. Mr Goose and Mr Bray were two businessmen negotiating a deal. Mr Wilson was Mr Bray's adviser. Mr Goose had advisers of his own: and they were giving him all the advice he needed as to the risks in the venture.

I find that no new representations (whether orally or by silence) were made by Mr Wilson at this meeting on which claims in fraud or negligence can be based.

*4. The representation of 3 July 1985*

The pleaded allegation is that during a telephone conversation on 3 July Mr Goose asked Mr Wilson if Intag was involved in the Allison acquisition and that Mr Wilson replied that it was not and that the purchase was to be effected through Mr Bray's

family trust. The final version of Mr Goose's evidence was that Mr Wilson told him that the purchase was being effected through Intas. That, according to Mr Goose, relieved him of his concern that Intag and the trust behind it were becoming overstretched in other directions and encouraged him to go ahead with the Manson loan as stage 1 of the French adventure. Mr Wilson's evidence was that he did not recall the conversation, but did not dispute that it may have happened and that he would have told Mr Goose that Allison would be purchased either by Intag or an "overall umbrella holding company".

Towards the end of counsel's closing speeches, and despite the fact that the evidence before me had travelled more widely, it was agreed that the inquiry with regard to this aspect of the re-trial is also relatively limited. Harman J found that this conversation did take place and that, in answer to Mr Goose, Mr Wilson replied that it was unclear whether Intag was involved in the Allison acquisition. I understand that to be a summary of what Mr Wilson said in cross-examination to Harman J, namely that:

> "I can swear to you that I told Mr Goose exactly what my understanding of the takeover position was, and I had written that day or the day before to [Chown] to establish whether it was going to be Intag or a new holding company. That is what I put across."

The Court of Appeal upheld Harman J's finding on this issue; and also his finding that any such statement involved a misrepresentation, since Intag was involved in the acquisition. The only point on which the Court of Appeal questioned Harman J's decision on this part of the case was his conclusion that the representation had no material effect on Mr Goose's mind and that he would not have acted differently if Mr Wilson had said that Intag was the purchaser. That is the only issue I have to decide.

On that issue, and treating myself as bound by Harman J's finding as to what Mr Wilson said, I cannot see how Mr Wilson's misrepresentation can have had any influence on Mr Goose's decision to proceed with the Manson transaction. Mr Goose claims he wanted an assurance from Mr Wilson that Intag was not involved in the Allison acquisition. By way of answer, Mr Wilson ought to have replied that it was involved, but that it might be that some other company would take over the purchase. He did not say that but instead misrepresented to him that it was not clear whether Intag was involved. That was another way of saying that Intag might or might not be involved.

The net result was that Mr Goose was not materially wiser after the conversation than before it, He had asked the question because he wanted an assurance that Intag was not involved, presumably because he did not trust Mr Bray's statement that it was not. The reply he got cannot have given him any basis for a confident belief that it was not involved. On the contrary, it must have increased his suspicions that it was or might be or would be involved.

In so far as deceit is alleged against Mr Wilson on this issue, I find that he made a misrepresentation of fact, but I do not find that he made it fraudulently. I find that he was endeavouring to explain to Mr Goose what the then proposals were with regard to who should acquire Allison, which he may perhaps have regarded as the material matter, but unfortunately omitted also to give the short answer which Mr Goose's question required. I do not find that he was being dishonest in this: just rather less than competent and careful. I also find that nothing Mr Wilson said in this conversation induced Mr Goose to commit himself to the Manson loan: the information Mr Wilson gave him did not answer his question and was not information on which he could or did place any reliance.

In so far as negligence is relied on, I find that Mr Wilson did owe Mr Goose a duty of care in answering his question. The question was one which asked him for specific information he had acquired in the course of acting as Intag's accountant; he knew or ought to have known that Mr Goose was asking it because he wanted to know what impact the Allison acquisition might have on the French venture; he knew that Mr Goose would be likely to rely on any information he gave him; he chose to give him some information; and I consider that he owed Mr Goose a duty to be careful in the information he did give him. However, for the reasons given, I find that the information he gave him was useless and that Mr Goose could and did place no reliance on it.

*5. Inducement and reliance*

I have earlier rejected the claims in deceit and negligence based on the meetings of 19 September 1984 and 18 May 1985. I have also rejected the claim in deceit based on the letter of 9 April 1985, although I have found that it contained a dishonest

or negligent misrepresentation as to the stones' freedom from incumbrances, a misrepresentation which also constituted a breach of a fiduciary duty owed by Mr Wilson to Mr Goose.

I have also held, inter alia, that what Mr Wilson said or implied on those occasions cannot have been intended to induce Mr Goose's commitment to the Manson loan, and cannot have been foreseen as likely to be relied on by Mr Goose in so committing himself. In case I am wrong in those findings, I here deal with the question of whether or not Mr Goose was in fact induced to enter into that loan by anything Mr Wilson said or wrote, or whether he relied on any such thing in entering into the loan.

Central to Mr Walker's argument is that, despite all the discussion about the stones, they are irrelevant. They were originally contemplated as being intended to be used to finance the Intag venture. Bu the venture underwent a change in 1985. The Manson loan formed the first part of the new plan, a loan which was raised for certain specific purposes beneficial to both Mr Goose and Mr Bray; but the stones were not used as security for the loan. Mr Goose willingly charged his own land by way of the sole security for the loan and also gave his personal guarantee. So did Mr Bray, and they gave each cross-indemnities; but that given by Mr Bray was not secured by the stones either.

If the Manson loan had been the intended beginning and end of the venture, I would agree the stones were irrelevant. But it was not. It was stage 1 in a three stage operation, the viability of the further stages being in part dependent on Mr Bray raising the promised £250,000 out of a sale of the stones and applying it towards the venture. Mr Goose's case is that he would not have proceeded to stage 1 at all if Mr Wilson had not made the representations about the stones which he is alleged to have made.

I have found that Mr Wilson at no stage made any representations as to value such as are pleaded. In so far as Mr Goose convinced himself that the stones were of any particular value at any time, that was nothing to do with anything Mr Wilson said or did. Mr Goose claims that he always regarded the stones as worth US$500,000. I find that he so convinced himself from the time he first saw the "Stones delivered to Bray" list in early 1984; that he was reinforced in that view when he saw the Christies list in August 1984; and that he never thereafter departed from it, although at the time of the Manson loan the most he was expecting from Mr Bray was that he would realise £250,000 from them, an expectation derived from the meeting of 18 May. That expectation was the one which was uppermost in his mind at the time of the Manson loan, but it was not based on anything which had ever been said or implied by Mr Wilson.

I find that there came a point in the Intag venture at which Mr Goose felt he could not withdraw from it and that he perceived that his only hope of recovering the £60,000 he had paid to Mr Bray and Intag was to go on with the venture: that is precisely what he told Roythornes on 30 April 1985. Despite his denials in his evidence, I also find that he wanted money quickly for his own purposes: Roythornes; attendance note of 3 July 1985 records that this is what he then told them. I also find that the Manson loan represented the only prospect of this. He was also extremely keen on the prospect of acquiring a French farm with the aid of a cheap Swiss franc loan, and the Intag venture represented his best chance of achieving one.

I find that, despite his claimed belief that the stones were worth US$500,000, and the importance he claims to have attached to that, he recognised the possibility that they might not be worth that, but he was not prepared to go to the expense or trouble of having them valued or otherwise checked. He rejected Roythornes' advice that he should carry out checks on the title to the stones; and he explained his failure to have them valued, not by saying that there was no doubt as to their value, but that in 1985 communications were more difficult than today.

He was impressed by Mr Bray and persuaded himself that Roythornes' expressed concern that he might be a confidence trickster was not a sufficient deterrent. He so persuaded himself on the strength of a statement made by someone (not Mr Wilson) that Mr Bray had "plenty of money"; and by Mr Bray's own statement that he was expecting a large cheque from Zimbabwe. These statements had nothing to do with the stones or their value, but they gave Mr Goose confidence, which he otherwise lacked, that Mr Bray was a business associate of financial substance upon whom he could rely in what was obviously, as he knew, a risky venture.

I do not accept Mr Goose's case that, in committing himself to the Manson loan, he relied on anything that Mr Wilson ever said or wrote. I do not believe him. I find remarkable that it was not until 1994 that he remembered that he had, as how now claims, been misled by the meetings of 19 September and 18 May and by the letter of 9 April. Those meetings were within his knowledge from the moments they respectively happened; and the letter was in his possession from 10 April. If anything Mr Wilson had said at those meetings or in that letter had any material impact on him, then I would have expected him to raise it with Mr Wilson by no later than 1986, by when the balloon had gone up. I find that the reason he raised no complaint

until 1994 that Mr Wilson had misled him, even if only innocently about any of the matters of which he now complains is because he did not consider that Mr Wilson had misled him.

I have found that, in so far as Mr Wilson's letter of 9 April made a misrepresentation as to the stones' freedom from incumbrances, it was not one which was intended to or can even be presumed to have intended to induce the Manson loan, which was a transaction of a character materially different from that contemplated by the letter. If that conclusion is wrong, I find that, anyway, by 9 April 1985 Mr Goose had already convinced himself that the stones were worth US$500,000, or some £415,000; and by the time of the Manson loan he anyway only expected Mr Bray to bring £250,000 into the venture from the stones. The letter of 9 April said nothing about value, and could not have led Mr Goose to believe that the stones were worth even as much as £250,000. It did not, strictly speaking, even imply that they were free from incumbrances: it at most implied that any incumbrances could be discharged without recourse to the stones or the proposed loan. I find that the letter of 9 April 1985 had no effect in inducing Mr Goose to enter into the Manson transaction and that he placed no reliance on it in doing so. It follows, in my judgment, that Mr Wilson's misrepresentation in that letter (whether characterised as deceit, negligence or breach of fiduciary duty) was not causative of any of the loss which Mr Goose claims to have suffered in consequence of the Manson transaction.

I also find that, such was Mr Goose's determination to proceed with the French venture, a disclosure to him of the Trinkhaus and Barclays incumbrances would not have deterred him from going ahead. He would not have regarded them as material in the light of the value he attached to the stones. He did not turn a hair when, in November 1985, he learnt of the Trinkhaus charges: he did not rush to Mr Wilson and complain he had earlier misled him. Nor did he so complain in the 1991 action, although his case in it was that Mr Wilson was his own accountant. Mr Goose was convinced the stones were very valuable, any such charges would have been relatively immaterial, and they would not have stood in the way of the raising by Mr Bray of the promised £250,000. He said in cross-examination that knowledge of a prior charge of £25,000 would not have worried him in the context of stones worth £400,000. It was Mr Goose's firm belief that Mr Bray could and would, one way or another, raise £250,000 which was the motivating factor in his taking on the Manson loan.

In summary, I find that, from the start, Mr Goose was determined to proceed with the Intag venture, his enthusiasm to do so never faltered and there came a point when he considered he could not pull out of it. He was given sound advice by his solicitors that he would be unwise to do so, but he thought he knew better. I find he was not induced to enter into the Manson loan by anything Mr Wilson said, wrote or implied; and that nor did he place reliance on anything Mr Wilson said, wrote or implied in his decision to do so. I reject all Mr Goose's claims based on the meetings of 19 September 1984 and 18 May 1985 and the letter of 9 April 1985.

*6. Dishonest assistance in breach of fiduciary duty*

The argument here is that the association between Mr Bray and Mr Goose was one under which each owed the other fiduciary duties of good faith. Mr Bray is said to have breached that duty by a variety of fraudulent acts which are pleaded, mainly being representations as to the value of and title to the stones but also in relation to Intag's involvement with Allison; and by failing to disclose his bankruptcy and previous convictions. All this is said to have enabled him to promote the Intag venture. It is said that Wilson Sandford provided dishonest assistance to him in such promotion by the representations which Mr Wilson is said to have made and also by all that Wilson Sandford did as chartered accountants in acting on behalf of Intag during 1984 and 1985. It is said that Mr Bray would be liable to make compensation to Mr Goose for his breach of fiduciary duty; and that, although Wilson Sandford were not also fiduciaries, the consequence of their dishonest assistance is that they must be equally liable to Mr Goose as if they were.

**(a) Did Mr Bray owe any such fiduciary duty?**

In *Lac Minerals Ltd. v. International Corona Resources Ltd. [1990] F.S.R. 441* , La Forest J said, at p. 452, that "There are few legal concepts more frequently invoked but less conceptually certain than that of the fiduciary relationship".

There are various categories of relationships where a fiduciary relationship is recognised as arising: for example, relationships between solicitor and client, trustee and beneficiary, director and company, and between partners. The categories are not yet closed. In Frame v. Smith (1987) 42 D.L.R. (4th) 81, Wilson J said at pp. 98 to 99 that:

> "…there are common features discernible in the contexts in which fiduciary duties have been found to exist and these common features do provide a rough and ready guide to whether or not the

imposition of a fiduciary obligation on a new relationship would be appropriate and consistent. Relationships in which a fiduciary obligation has been imposed seem to possess three general characteristics:

(1) The fiduciary has scope for the exercise of some discretion or power.

(2) The fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests,

(3) The beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary holding the discretion or power."

It is not easy to define the precise nature of the proposed transaction between Mr Bray and Mr Goose. Mr McCombe submitted that it was a joint venture, but Mr Walker disagreed. I do not consider that the label is of any great importance: what counts is the substance of the relationship and the nature of the obligations to which it can be seen to give rise. I am unpersuaded that it was one which fell within any of the recognised categories of fiduciary relationships. It was not, for example, a partnership. Reduced to its essentials, at any rate at the outset, it was a business association, or proposed association, under which A and B were proposing to procure their company to raise a Swiss franc loan, which the company would then advance as to Y% to A and Z% to B for their own separate purposes, with A and B only being liable for the repayment of their own respective loans. The transaction changed in 1985, when the three stage operation was embarked upon. Each of A and B had his own advisers. It was at all times essentially a commercial transaction. As directors of Intag, Mr Bray and Mr Goose owed certain fiduciary duties to Intag. It does not, however, follow that they also owed such duties to each other.

I do not accept that the relationship between them can be regarded as one which ought to be regarded as subject to any relevant fiduciary obligations. None of the three criteria referred to by Wilson J can be said to have existed in the relationship. Neither Mr Bray nor Mr Goose had the type of power or discretion she mentioned; neither had any power or authority to do anything to commit the other to anything; and neither was peculiarly at the mercy of the other. Whilst I accept that a fiduciary relationship can arise as a matter of fact out of the specific circumstances of a relationship, I can identify no basis for finding that there was a fiduciary relationship in this case. In the *Lac Minerals* case, at p.455, La Forest J agreed with a passage in Professor Finn's, The Fiduciary Principle, 1988, which included the proposition that:

"…The critical matter in the end is the role that the alleged fiduciary has, or should be taken to have, in the relationship. It must so implicate that party in the other's affairs or so align him with the protection or advancement of that other's interests that foundation exists for the 'fiduciary expectation'."

I cannot find any foundation for such an expectation in this case. I accept that Mr Goose relied on Mr Bray as someone who was telling him the whole truth. That, however, does not make the relationship a fiduciary one. If, in a dishonest endeavour to sell his car, A lies to B that it has only done 50,000 miles when it has done 100,000 and B believes him, buys the car and suffers loss, then B will have been dishonestly deceived. A was under a duty not to deceive him and the common law will provide B with a remedy. The fact, however, that B chooses to rely on what A has told him and does not, to A's knowledge, carry out any independent checks on the car does not result in A becoming subject to separate, and overlapping, equitable fiduciary obligations. The case will simply be one in which B will have made an unfortunate business deal with a crook for which he may have a remedy under the common law.

I do not consider that this case is materially different. Mr Goose chose to believe all Mr Bray told him about the stones and chose to rely on it without carrying out any independent checks. He was advised he was taking a risk, he decided to take it and he has paid a price. If Mr Bray were worth suing, he might well be entitled to a remedy against him for deceit. I remain,

however, unpersuaded that Mr Bray was every under any separate equitable fiduciary obligations to tell Mr Goose the truth and to disclose to him the matters which he is said to have fraudulently concealed.

**(b) Did Wilson Sandford dishonestly assist Mr Bray in his breach of fiduciary duty?**

In view of my conclusion in (a), this does not arise but I must say something about it; and will deal first with the legal basis of the claim.

Its starting point is Barnes v. Addy (1874) L.R. 9 Ch.App.244. Lord Selborne L.C. there outlined the basis on which those who assist trustees to misapply trust property may be answerable for its restitution to the beneficiaries. He said, at p.251, that the trustees' responsibility:

> "…may no doubt be extended in equity to others who are not properly trustees, if they are found either making themselves trustees de son tort, or actually participating in any fraudulent conduct of the trustee to the injury of the cestui que trust. But, on the other hand, strangers are not to be made constructive trustees merely because they act as agents of trustees in transactions within their legal powers, transactions perhaps of which a Court of Equity may disapprove, unless those agents receive and become chargeable with some part of the trust property, or unless they assist with knowledge in a dishonest and fraudulent design on the part of the trustees."

That case was concerned with the circumstances in which those who are not trustees might be answerable for the misapplication of the trust property itself. Accessory liability based on it became known as "knowing assistance". Its principles have since been much applied, but they were re-considered by the Privy Council in Royal Brunei Airlines Sdn. Bhd. v. Philip Tan Kok Ming [1995] 378. That was also a trust property case. Lord Nicholls of Birkenhead delivered the advice of the Board and re-stated the principles of accessory liability. He summarised the test for it as follows, at p. 392F:

> "Drawing the threads together, their Lordships' overall conclusion is that dishonesty is a necessary ingredient of accessory liability. It is also a sufficient ingredient. A liability in equity to make good resulting loss attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation. It is not necessary that, in addition, the trustee or fiduciary was acting dishonestly, although this will usually be so where the third party who is assisting him is acting dishonestly. 'Knowingly' is better avoided as a defining ingredient of the principle, and in the context of this principle the *Baden [1993] 1 W.L.R. 509* scale of knowledge is best forgotten."

The present case is not one where any trust fund is said to have been misapplied by Mr Bray. Nor, therefore, is it said that Wilson Sandford dishonestly assisted any such misapplication. What is said is that the "knowing assistant" principle expressed in Barnes v. Addy , and now re-stated as "dishonest assistance" in Royal Brunei Airlines , applies as much to breaches of fiduciary duty generally as it does to those breaches of trust or fiduciary duty which involve the misapplication of a trust fund or of property to which a fiduciary obligation attaches.

Mr McCombe accepted that he had found no authority which supports the correctness of this wide proposition. All the reported "knowing assistance" cases are concerned either with a trust fund or with property subject to fiduciary obligations. So was the Royal Brunei Airlines case. But he attaches weight to Lord Nicholls' separate reference to "fiduciary obligation" in the cited passage and invites me to accept that the applicable principle is as wide as he submits it is.

Having regard to my finding in (a) above, and to what I further say in the next paragraph, all I propose to say about the argument is that it appears to me to invite an extension of accessory liability to a dimension which has not previously been recognised. I respectfully question whether Lord Nicholls can have intended his observations to have the width for which Mr McCombe contends. I recognise the logic of the argument; and it may be that it will at some stage be accepted as correct. As,

© 2025 Thomson Reuters. 

however, I have found against Mr Goose on whether there was a fiduciary relationship between him and Mr Bray, I do not propose to extend this judgment yet further by discussing the point. I will simply say that I am not persuaded that he cause of action asserted by Mr McCombe is one yet recognised by English law.

In any event, I find that the case is not established on the facts. Certain of the breaches of duty alleged against Mr Bray are that he did not disclose matters he should have done. I can understand how A can assist B in the misapplication of a trust fund. I do not understand how A can assist B not to disclose something (particularly something, such as B's prior bankruptcy and convictions, of which A is ignorant). Wilson Sandford did nothing to prevent Mr Bray from telling Mr Goose whatever he liked nor did they assist him in declining to do so. Other breaches alleged against Mr Bray are that he made fraudulent misrepresentations. Again, I do not understand how anything Wilson Sandford said or did can have assisted Mr Bray to make those representations. Mr Bray made them and that was that: he did not need or receive any assistance from Wilson Sandford in doing so. The suggestion that the assistance derived from like representations made by Mr Wilson appears to me to take Mr Goose nowhere. All that means is that Wilson Sandford may themselves have been guilty of deceit; and, in so far as there might also be any suggestion that Wilson Sandford and Mr Bray were conspiring in the matter, then there might perhaps be a claim in conspiracy: but no such claim is made.

It appears to me that the complaint against Wilson Sandford really has nothing to do with accessory liability of the Royal Brunei Airlines type. Allegations of deceit are made against them. That case is either well founded or it is not. Having held that it is not, I find that there is nothing left on the facts of this case on which a case of accessory liability can be founded. I decline to find that any of Wilson Sandford's activities on behalf of Intag (set out in Schedule 2 to the consolidated statement of claim) was performed dishonestly so as to assist Mr Bray to work a fraud on Mr Goose. I reject this claim.

*7. Limitation*

This does not arise either, but I express my findings on it in case others should take a different view on liability.

**(a) The claim in deceit**

**(i) Representations about the stones**

The cause of action accrued on 25 July 1985, when Mr Goose committed himself to the Manson loan. The claim is in tort and the primary limitation period expired on 25 July 1991 (see s.2 of the Limitation Act 1980 ). S.32(1) and (2) postpone the running of time in certain cases of fraud, concealment or mistake. They read:

> "(1) Subject to subsections (3) and (4A) below, where in the case of any action for which a period of limitation is prescribed by this Act , either -
>
> (a) the action is based on the fraud of the defendant; or
>
> (b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or
>
> (c) the action is for relief from the consequences of a mistake;
>
> the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it…".
>
> (2) For the purposes of subsection (1) above deliberate commission of a breach of duty in circumstances in which it is unlikely to be discovered for some time amounts to deliberate concealment of the facts involved in that breach of duty."

© 2025 Thomson Reuters. 

Mr Goose's case is that Mr Wilson fraudulently misled him as to the value of, and title to, the stones and as to their availability. I have found that, for the most part, Mr Wilson did not mislead Mr Goose with regard to these matters. For the purpose of this part of the judgment, however, I must assume that Mr Goose has claims of the nature he pleads; and what follows is expressed on that assumption.

As to value, Mr Goose knew by April 1986 that the stones were then only worth some US$15,000. He could, with reasonable diligence, also have found out at that stage what they were worth in 1984 and 1985, although at no stage did he do so. His case invites the assumption that the stones were materially worthless at all such times, although he has adduced no evidence of that; and, for my part, I see no justification for accepting Mr Goose's invitation: by contrast with Mme Blangey's 1986 valuation, the stones were sold at arm's length in August 1982 for US$725,000 (although including an element of interest over the four year payment period), and in the telex of 26 August 1982 even Trinkhaus asserted they were worth US$200,000.

However, by June 1986 Mr Goose had seen Mr Wilson's letter of 28 May 1985 warning Mr Bray that, unless he paid Trinkhaus, they would sell the stones over his head and that "if these are insufficient to settle the amount of their debts, then they will take further proceedings against you personally." That told him that Mr Wilson knew, by May 1985, that there was at least a serious question over their value. I also find that, by July 1986, he had also seen Mr Wilson's letter of 11 October 1984 to Mr Bray recording Mr Schaefer's opinion that the stones "are of very low value and will not cover the Swiss debts which you have." Mr Goose denied having seen that letter before the end of 1989. However, I was unimpressed and unconvinced by his evidence on this. I regarded as unsatisfactory his evidence as to the extent to which he had or had not merely scanned the bags of documents which he was given in March 1986. I regard as improbable his account of how Mr Goode volunteered to him the contents of the October 1984 letter, but refused him a sight of it: and his evidence as to what Mr Goode had actually said to him was inconsistent. I found improbable his evidence about Mr Goldring Q.C. holding up an unidentified document at Mr Bray's trial and saying that it was a document Mr Goose had not seen: if Mr Goldring did wave any document in the air, I would expect him to have explained to the judge was it was and I would expect Mr Goose to have listened with attentive interest. Further, question 205 which Mr Goose put to Mr Bray was, as I find, that of a man who had earlier seen the letter of 11 October 1984. I find also that Mr Goose admitted to Mr Wilson on 18 February 1987 that (as Mr Wilson noted) he had seen all his correspondence about the value of the stones back to "Nov '84", which I find was a mistaken reference by Mr Goose to October 1984. However, even if I am wrong about Mr Goose having actually seen the letter of 11 October 1984 by then, he at least knew the essence of its contents, namely that Mr Wilson knew that Mr Schaefer was concerned about the value of the stones.

I find therefore that, by 1986, Mr Goose "knew" (in the sense that he had a firm conviction of it, based on what he had seen or been told) that Mr Wilson knew, at least by October 1984, that the stones were, for all practical purposes of the French venture, substantially worthless, or at least that there was a high possibility of that; and that therefore he could not honestly have represented that they were worth US$500,000. That is the sense of what Mr Goose himself acknowledged in his diary entry of 29 August 1987.

As to title, Mr Kane told Mr Goose in his letters of 6 December 1985 and 13 January 1986 that there was a question over Mr Bray's ownership of the stones. Mr Goose knew of the Holford claim by 23 January 1986, when he learnt that Mr Wilson also knew of it. He did not know when Mr Wilson had first learnt of it and he did not ask him. His case now, however, is that Mr Wilson had earlier misled him about the ownership of the stones. If he believes that now, he must have believed it then: he believed that Mr Wilson was his own accountant, and his evidence was to the effect that he considered that a professional person such as an accountant would not make a statement about the title to an asset without first having made detailed enquiries. If he is telling the truth on this, then he ought to have been amazed when the Holford claim was first mentioned and he must have realised that Mr Wilson had previously misled him in so far as he did not suggest that there was any adverse claim being made. However, even if that did not dawn on him as early as January 1986, it was also at about this stage that he realised that Mr Wilson had misled him in July 1985 as to Mr Bray having "plenty of money"; and, by July 1986, he knew that Mr Wilson had misled him about value. Those further discoveries ought to have raised a serious question in his mind as to whether Mr Wilson had misled him not just on value and money, but also on title. In those circumstances, I would have expected him promptly to have asked Mr Wilson when he had first learnt of the Holford claim and why he had not told Mr Goose about it. I find that, if he had done so, Mr Wilson would have told him of the Boyce-Mears conversation of 13 December 1984.

As to incumbrances, Mr Goose learnt of a £25,000 incumbrance in November 1985 and of Trinkhaus's so-called restraining order by June 1986. His case is now that Mr Wilson had misled him as to the stones' freedom from incumbrances. If he believes it now, he must have believed it then, and must also have been amazed to discover that the stones were encumbered. Again, when in 1986 he learnt that Mr Wilson had misled him about money, value and title, I would have expected him also

to ask Mr Wilson when he had first learnt of the incumbrances and why he had not told him of them. He did not. I find that, if he had asked Mr Wilson about the incumbrances, Mr Wilson would have told him what he knew and would have disclosed that he first learnt of them in June 1984.

I find, therefore, that Mr Goose "knew" by 1986 that Mr Wilson had misled him into believing that the stones had a substantial value when he knew that they did not, or that there was a high possibility that they did not. That was, on the face of it, dishonest. He also "knew" by then that the stones were subject to adverse claims or incumbrances and that the same dishonest Mr Wilson had represented that they were not. He did not know when Mr Wilson had first learnt of the adverse claims and incumbrances. But the exercise of reasonable diligence on his part in 1986 - by means of a question to Mr Wilson, with whom he claims to have been on good terms at this time, and whom he believed was his accountant - would have produced the answer that Mr Wilson had first learnt of the incumbrances in June 1984 and of the adverse claim in December 1984.

In these circumstances, I find that Mr Goose knew by 1986, or could with reasonable diligence have known by then, that he had a claim in deceit against Mr Wilson in respect of the representations said to have been made on 9 April and 18 May 1985. That is because he knew by then that Mr Wilson had made those representations either knowing them to be untrue, or not believing in their truth. I find that time under the 1980 Act began to run at the latest by the end of 1986 and that the claims in deceit based on those representations are statute barred.

As to the representations made at the meeting of 19 September 1984, the position is slightly different. Mr Goose could, with reasonable diligence, have discovered by 1986 what Mr Wilson knew about incumbrances at that stage, but probably not that he knew anything adverse about title or value - not least, because I do not consider that Mr Wilson did then know anything materially adverse about either of those things: in particular, I do not consider that the disclaimer in Mr Schaefer's telex of 10 July 1984 was one which required him to assume that the stones were or might be worthless. All that the disclaimer was saying was that the valuations were not Trinkhaus's, who could not speak to their authenticity.

However, I do not regard Mr Goose as in any better position as regards the September 1984 representations. He knew what representations Mr Wilson made about these things because he was at the meeting. I am prepared to assume that he did not know until after discovery in the 1991 action that, at the time they were made, they were made dishonestly. I do not, however, see how that helps Mr Goose. Based on what he knew about Mr Wilson's later knowledge, he knew by the end of 1986 that, even if what Mr Wilson had represented at the September 1984 meeting had been uttered in the belief of its truth, Mr Wilson knew by July 1985 that it was untrue; his failure by that stage to correct what he had earlier said was dishonest (see Brownlie v. Campbell (1880) 5 App. Cas.925, at 950, per Lord Campbell); and Mr Goose knew by 1986 that Mr Wilson had not corrected it. In my judgment, therefore, Mr Goose knew by 1986 sufficient facts to be able to plead the September 1984 representations as being representations which, in the events as they happened, dishonestly induced him to enter into the Manson loan. He therefore knew enough by 1986 to sue in deceit in reliance on what had been said at the September 1984 meeting.

I find that the claims in deceit in relation to representations about the stones are all statute barred.

**(ii) Representations as to the Allison claim**

Mr Goose knew by 30 July 1985 that Intag was the purchaser, or proposing purchaser, of Allison, or at least that it was involved in the acquisition. This was 27 days after Mr Wilson had told him that the purchaser was Intas or the Bray family trust. He agreed in cross-examination that he also realised about then that Wilson Sandford, as Intag's auditors, would be likely to know that Intag was involved in the purchase and that Mr Wilson had earlier misled him; and if he believes now that Mr Wilson had misled him on 3 July 1985, he must have believed it by 30 July 1985. His discovery by then was so starkly at odds with what Mr Wilson had earlier told him that I find it incredible that he did not promptly ask Mr Wilson for an explanation: and, in particular, ask him whether he did in fact know on 3 July that Intag was involved in the Allison purchase. I find that the only answer Mr Wilson could and would have given was that he did know that Intag was involved. Mr Goose would then have known that on 3 July Mr Wilson had told him something which he knew was untrue. That was, on the face of it, dishonest. Mr Goose claims to have relied on that representation in committing himself to the Manson loan on 25 July.

I find that Mr Goose knew, or could with reasonable diligence have known, by August 1985 that Mr Wilson had misled him as to Intag's lack of involvement when in fact he knew it was involved. By 1986, he knew that Mr Wilson had misled him about "plenty of money"; and about the value of, title to, and incumbrances affecting the stones. He must also then have known that the misleading on 3 July 1985 about Allison was dishonest. He therefore knew by then all the facts he needed to know in order to sue Mr Wilson for deceit in relation to the Intag/Allison allegation. I find that this claim is statute barred.

**(b) Negligence**

The primary limitation period also expired on 25 July 1991. Mr Goose seeks to extend it in reliance on alleged deliberate concealment by Mr Wilson: see s.32(1)(b). I find that, in writing the letter of 9 April 1985 in the misleading way which I have found, Mr Wilson did deliberately conceal facts material to a claim against him based on this letter. However, it also follows from what I have said about the deceit claims, that Mr Goose knew by 1986, or could with reasonable diligence have discovered, all he needed to know in order to bring all his claims in negligence. I find that these claims are also statute barred.

**(c) Breach of fiduciary duty**

This is a reference to the breach of fiduciary duty in writing the letter of 9 April 1985. There is no statutory limitation period applying to such claim. However, the claim corresponds so closely to the negligence claim arising in respect of what is essentially the same complaint that I consider that the like limitation period should be applied by analogy and that this claim is barred as well. See Knox v. Gye *(1872) 5 L.R.H.L. 656, 674* ; and Bulli Coal Mining v. Osborne *[1899] A.C. 351* for the application principles.

**(d) Dishonest assistance in breach of fiduciary duty**

Since I have found against this claim on all aspects of it, and am unpersuaded that the cause of action relied on is known to English law, I do not propose to extend this judgment by discussing the limitation questions relating to this head of claim. I have, I hope, found sufficient of the primary facts relevant to the questions of limitation should others take a different view on this aspect of Mr Goose's claim.

*8. Damages*

**(i) Against Wilson Sandford**

This does not arise either. I do not propose to express views on what heads might be recoverable had I found in favour of Mr Goose on any of his alternative claims to establish liability. I will, however, at least indicate my findings of fact on these heads of claim and will indicate also those heads which on any view I regard as irrecoverable even if liability on any basis had been established.

Before dealing with the specific heads of claim, I find that even if anything Mr Wilson said, did or omitted was such as to induce or cause Mr Goose to commit himself to the Manson loan, none of the losses subsequently suffered by Mr Goose can be said to have been caused by the untruth of the representations alleged against Mr Wilson. No loss was caused by Intag's involvement with Allison because the takeover did not take place. No loss was caused by the stones being of low value or unavailable, because they were not provided as security. Mr Goose agreed to the Manson loan because he wanted it, and part of it was applied for his own purposes. The parts respectively retained by Intag as working capital and remitted to Banque Populaire for La Devinniere appear to have disappeared, but the evidence does not prove how or where. Its disappearance was not because of the low value of the stones or because of anything Mr Wilson said or did or omitted to do. The Manson charge was enforced because Intag failed to make the interest payments and because it was never redeemed by an alternative borrowing. However, Mr Goose did not have the benefit of any enforceable commitment from anyone that there would be such alternative borrowing. Mr Bray could have walked away from the venture on 26 July 1985, even if everything he is said to have said about the stones was true: he had not committed himself to doing anything and Mr Goose knew that. Even if the stones were worth all Mr Goose believed they were worth and Mr Bray had an indefeasible title to them, Mr Goose could not have compelled their use in the Intag venture and could not have prevented the stones being shared by Mr Bray's creditors generally.

The heads of loss claimed are: (i) £50,000 lent to Intag in October 1984. Of that, £10,000 was repaid in July 1985, following the Manson loan. The claim can only be for a maximum of £40,000, as Mr Goose accepted in evidence; (ii) £130,000 remitted to Banque Populaire out of the Manson loan; and £26,263.43 retained by Intag out of that loan as working capital; (iii) £10,416.61, the costs and expenses which were incurred in obtaining the Manson loan and were retained and paid out of it. As about half of the loan was applied for Mr Goose's benefit, I see no justification for his claim for an indemnity in respect of the whole of these costs: in principle, I consider that he can at most seek an indemnity in respect of about half; (iv) £10,000, being the part of the £50,000 loan to Mr Bray for the acquisition of Allison which was not repaid to him. Mr Goose's evidence was that he advanced the £50,000 because he believed the Allison acquisition would be advantageous to Intag and because Mr Bray had told him that Intag was only going to be temporarily involved in the acquisition. I find that this head of loss is

irrecoverable: the loan had nothing to do with French venture; (vi) £37,500 paid to stave off Allison's winding up petition against Intag. I do not accept that this is recoverable. The reasoning in support of it is that, if Intag had been wound up, it would have triggered the calling in of the Manson loan. But Allison had to be paid, and all that the payment of the £37,500 may have achieved was to buy Mr Goose some time. I do not regard it as having been paid so as to mitigate his loss; it merely increased it; (vii) £10,669, the claim made by AIB under Mr Goose's guarantee to them. He never paid it and, having been discharged from his bankruptcy, will not now have to. I regard this as irrecoverable; (viii) £5,708, being half the expenses paid on obtaining the Manson loan. That duplicates part of claim (iii) above and cannot be claimed as well; (ix) £2,500 paid to Intag in respect of vehicle hire and farming expenditure n France. I am not satisfied that this payment was proved; (x) £250 paid to Mr Gouldman for legal advice on what to do about the threat by Manson to enforce its rights as mortgagee; (xi) £1,500, part of a payment of £2,500 paid to Mr Bray in December 1985 to enable him to pay interest to Manson which Mr Bray misappropriated. I find that this is too remote to be laid at Wilson Sandford's door. The £1,500 was lost because Mr Bray misappropriated it; (xii) £766, being expenses in connection with the French venture paid by Mr Goose between 17 October 1984 and 17 March 1985; (xiii) £2,720.50 being like expenses paid by Mr Goose from about 14 August 1985 onwards. This includes the £250 claimed under item (x) above; (xiv) £94,082.98, interest paid to Manson. This includes interest referable to that part of the loan which was paid to Mr Goose and applied for his own benefit and to that extent cannot, in my view, be recoverable; (xv) £5,414.35 legal fees and charges claimed to have been incurred in obtaining the RBS loan used to redeem part of the Manson loan. The component items said to add up to this figure in fact total only £3,489.10; (xvi) legal fees and other expenses totalling £7,141.75. These included legal fees incurred in the defence of the Roythornes action and of the Barclays claim on the guarantee which Mr Goose gave, which I regard as irrecoverable.

**(ii) Against Mr Mainon**

I find that the damages recoverable against Mr Mainon are £9,100 and so assess them. I will award judgment debt interest on the payments making up the £9,100 from the dates of their respective payment until judgment. The rate will be that from time to time in force. I should be grateful if counsel could provide a calculation of the interest due.

*9. Contributory negligence*

Had I found in favour of Mr Goose in his negligence claims, I would have reduced any recoverable damages by 75% so as to reflect what I regard as the very high degree of negligent carelessness as to his own interests which he displayed in the transaction.

*10. Result*

The result is that I award Mr Goose £9,100 damages, plus interest, against Mr Mainon; but I dismiss his action against Wilson Sandford. May I thank the parties' solicitors and all counsel for the excellence of the preparation and presentation of their respective cases.

Crown copyright