# Grimes v The Trustees of the Essex Farmers & Union Hunt) [2017] EWCA Civ 361

# Exhibit 13

# GRIMES v TRUSTEES OF THE ESSEX FARMERS AND UNION HUNT

COURT OF APPEAL (CIVIL DIVISION)

Beatson, Macur and Henderson LJJ: 19 May 2017

[2017] EWCA Civ 361; [2017] L. & T.R. 28

Agricultural holdings; Change of address; Notices to quit; Tenancies

H1 *Tenancy agreement—Interpretation—Service clause—Address for service—Change of address—Whether notice to quit validly served*

**Summary of decision**

H2 A clause in a tenancy agreement permitting service of notices at a stated address "or such other address as has previously been notified in writing" was not to be construed as permitting service at the stated address once notice of change of address had been given.

**Parties**

H3 *Appellant:* Mr Terence Francis Grimes ("the tenant")
*Respondents:* The Trustees of the Essex Farmers and Union Hunt ("the landlords")

**Facts**

H4 The tenant had for many years farmed an agricultural holding. From 2005 there were lengthy negotiations between him and the landlords concerning renewal of his tenancy of the holding. Eventually two consecutive tenancy agreements were entered into, for the periods 2006–2009 and 2009–2012 respectively, although they were signed at the same time in late 2006. Each agreement was prefaced with a page of Particulars which identified the tenant as "of 24 Glebe Way…". In fact in October 2005 the tenant had moved from that address to 44 Maple Way. Each agreement contained a cl.14.2 which provided that: "Either party may serve any notice (including any notice in proceedings) on the other at the address given in the Particulars or such other address as has previously been notified in writing." The first rental payment under the 2006–2009 agreement fell due in December 2006. It was the tenant's evidence that he sent a cheque for this to the landlords under cover of a handwritten note which included details of his new address at 44 Maple Way. The landlords, while accepting the cheque was received, maintained that they had never received the note. In 2011 the landlords served notice to quit on the tenant to terminate the second tenancy at the end of its term in 2012. That

notice was delivered to 24 Glebe Way and did not come to the tenant's attention. The landlords subsequently granted a lease of the holding to a third party with effect from after the expiry of the notice to quit. The third party duly occupied the holding and the tenant left under silent protest. He brought proceedings, contending he had been wrongfully dispossessed on grounds that the notice to quit was not validly served. The judge at first instance found that the handwritten note had been sent to the landlords, but that the effect of cl.14.2 was that the landlords had been entitled to serve the notice at either 24 Glebe Way or at 44 Maple Way. He held that this was the literal meaning of the words in cl.14.2 and that, unless the alternative was a commercial absurdity, which he held it was not, to interpret it otherwise was going beyond the proper limits of an exercise of construction. The tenant appealed to the Court of Appeal. By a respondent's notice the landlords challenged the judge's finding of fact that they had been given notice of the new address.

**Held, allowing the appeal:**

H5 (1) There could be no doubt that a notice to quit could have been validly served on the tenant at 24 Glebe Way at any time before he notified the landlords of another address, even though he no longer lived there and even if the landlords knew he no longer lived there. The question was whether that continued to be the position after the tenant had notified them of the new address. If the language of cl.14.2 would permit it, the court would construe the provision as substitutive in effect. As a matter of commercial common sense, the parties must have intended that the new address, once duly notified, should supersede the original one given in the Particulars. There would otherwise be no point of the tenant notifying the landlords of a new address, if the landlords were free to serve notices at the old address.

H6 (2) There was no difficulty in construing cl.14.2 in this way. The judge had fallen into error by starting with what he perceived to be the literal meaning of the words used, whereas the authorities are clear that the relevant wording has to be considered in the context of the contract as a whole. The clause provided two alternative modes of service, the word "or" being disjunctive. The question was whether the party serving the notice was intended to have a choice between them. Viewed objectively, the parties could not sensibly have intended that the serving party have the option of serving at the old address.

H7 (3) There was clearly ample circumstantial evidence which entitled the judge to conclude that the note did indeed accompany the rent cheque, which was admittedly received and banked by the landlords. The judge's finding of fact on this issue was open to him on the evidence. Accordingly, following receipt of that note, the tenant's address for service was 44 Maple Way, not 24 Glebe Way. Thus the notice to quit was not validly served, the tenancy was not validly terminated and the tenant was entitled to damages.

H8 **Cases referred to:**

*Arnold v Britton* [2015] UKSC 36; [2015] A.C. 1619; [2015] L. & T.R. 25

*Beacon Insurance Co Ltd v Maharaj Bookstore Ltd* [2014] UKPC 21; [2014] 4 All E.R. 418; [2014] 2 All E.R. (Comm) 558

*Henderson v Foxworth Investments Ltd* [2014] UKSC 41; [2014] 1 W.L.R. 2600; 2014 S.C. (U.K.S.C.) 203

*Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 W.L.R. 2900; [2012] 1 All E.R. 1137
*Wood v Sureterm Direct Ltd* [2017] UKSC 24; [2017] 2 W.L.R. 1095; 171 Con. L.R. 1

H9 **Legislation referred to:**
Agricultural Tenancies Act 1995

H10 For further details of the law in this area see *Woodfall's Law of Landlord and Tenant*, Vol.1, para.11.007 "General approach to construction".

H11 *Leslie Blohm QC* and *Christopher Jones* instructed by Raythornes Ltd for the appellant.
*David Holland QC* and *Jamal Demachkie* instructed by Tolhurst Fisher LLP for the respondents.

**JUDGMENT**

**HENDERSON LJ:**

**Introduction**

1 The main issue on this appeal is whether notice to quit an agricultural holding was validly served on the tenant, Mr Terence Grimes, by his landlords, the Trustees of the Essex Farmers and Union Hunt ("the Trustees" and "the Hunt"). This issue turns on the true construction of a clause in the tenancy agreement, which provided that:

> "Either party may serve any notice (including any notice in proceedings) on the other at the address given in the Particulars [*at the beginning of the tenancy agreement*] or such other address as has previously been notified in writing."

2 The question, in short, is whether it was still open to the Trustees, in July 2011, to serve the notice to quit, as the judge found that they did, at the tenant's address shown in the Particulars, even though he had moved from that address nearly six years before, and (as the judge also found) he had given notice of his change of address to the Trustees by a written note dated December 2006 enclosing a cheque for the quarter's rent.

3 The judge (Judge Moloney QC, sitting in the County Court at Chelmsford) decided this question in favour of the Trustees by his judgment and order dated 25 October 2015, after a three day trial. Mr Grimes now appeals to this court, with permission granted by Kitchin LJ on 18 December 2015.

4 If Mr Grimes' appeal on the question of construction succeeds, the Trustees contend by their respondent's notice that the judge erred in finding as a fact that the December 2006 note was sent to and received by the Trustees, with the consequence that no valid notice of his new address had been given by Mr Grimes to the Trustees before the notice to quit was served at his old address shown in the Particulars.

**Background facts**

5 The relevant background facts may be briefly stated.

6 The agricultural holding (the Holding) is at Althorne Lodge, Althorne, near Burnham-on-Crouch, in Essex. It extends to some 121 acres. It does not include a farmhouse or any major farm buildings.

7 Mr Grimes, and his father before him, had for many years prior to 2006 farmed the Holding as tenants of the Hunt under a succession of tenancy agreements. Mr Grimes' dealings with the Hunt were mainly with its chairman and former joint master, Mr Melvyn Clarke. Mr Clarke is a qualified accountant, now in his late sixties, who has had an extensive and varied business career. The Hunt itself has now become a country riding club. Many years ago, its members bought the Holding, and it is held on their behalf by the Trustees. The rent from the Holding helps to cover the Hunt's running costs.

8 At all material times until October 2005, Mr Grimes lived at 24 Glebe Way, Burnham-on-Crouch. He then moved to 44 Maple Way in the same town, which remains his address today.

9 In 2005 Mr Clarke and Mr Grimes discussed the renewal of Mr Grimes' tenancy of the Holding. The negotiations took some time, and Mr Grimes had professional assistance from an adviser, Mr Faulkner, who was a surveyor based in Hertfordshire. Eventually, agreement was reached in principle that the new term should run for six years from 1 October 2006. A lease of that length could only be granted by deed, which would have required execution by all of the Trustees. This would have presented practical difficulties and probably led to further delay, but Mr Clarke was advised that a tenancy agreement for three years or less could be granted by a written agreement signed by him on behalf of the Trustees. After further discussion involving the parties' solicitors and Mr Faulkner, it was agreed that two consecutive tenancy agreements would be entered into, the first running from 1 October 2006 until 29 September 2009, and the second from 30 September 2009 until 30 September 2012. The terms of the two agreements were otherwise intended to be identical, save that the rent would be £7,500 per annum under the first agreement and £8,500 per annum under the second. This expedient was therefore adopted, and both agreements were signed by Mr Clarke on behalf of the Trustees on 16 November 2006, although the second agreement was expressed to be made on 16 November 2009.

10 No point has been taken by either side about the validity of the two tenancy agreements, and I therefore proceed on the footing that the legal relationship between the parties was governed by the terms of the first agreement until 30 September 2009, and thereafter by the terms of the second agreement until 30 September 2012.

11 Each agreement was prefaced by a page of Particulars which identified the Landlord as "Essex Farmers & Union Hunt of Althorne Lodge, Althorne, Essex" and the Tenant as "T Grimes Esq. of 24 Glebe Way, Burnham-on-Crouch, Essex CM0 8QJ". This address was shown for Mr Grimes in the Particulars even though he had moved from 24 Glebe Way to 44 Maple Way in October 2005, over a year before the agreements were finally signed.

12 Each agreement provided for the Holding to be let by the Landlord to the Tenant for the fixed term which I have mentioned, "and then from year to year" unless the agreement was ended under cl.11. By virtue of cl.11.1, either party could bring the

agreement to an end at the end of the Term "by giving to the other at least twelve but less than 24 months' notice in writing expiring on the Last Day of the Term". The annual rent was payable quarterly, on 29 December, 25 March, 25 June and 29 September in each year. Clause 1.1 provided that the expressions "the Landlord" and "the Tenant" should include, respectively, the person who, at any particular time, was entitled to receive the rent payable under the agreement, or who had the right to occupy the Holding on the terms of the agreement.

13 Clause 14 of each agreement was headed "Additional Matters", and provided as follows:

> "14.1 The rules relating to the service or [*sic*] notices contained in Section 36 of the Agricultural Tenancies Act 1995 apply to any notice given under this Agreement so that any notice can be given to a person by delivering it to him or leaving it at his proper address or sending it to him at his proper address by any recorded delivery service. No notice given by fax or any other electronic means will be valid unless a copy of the notice is also sent by post or delivered to the proper address of the recipient within seven days.
> 14.2 Either party may serve any notice (including any notice in proceedings) on the other at the address given in the Particulars or such other address as has previously been notified in writing.
> …
> 14.4 This Agreement contains the whole agreement between the Landlord and the Tenant concerning the Holding … ."

14 The first rental payment under the 2006 agreement fell due on 29 December 2006. It is common ground that Mr Grimes paid this rent by a cheque which was received by Mr Clarke and duly credited to the relevant bank account. It was Mr Grimes' evidence that he sent the cheque to Mr Clarke under cover of a handwritten note in the following terms:

> "Dec '06
> Mervyn,
> Rent cheque enclosed for Oct Nov Dec
> As mentioned on phone, new address and telephone numbers are:
> 44 Maple Way
> Burnham-on-Crouch
> Essex CM0 8DW
> [his landline and mobile telephone numbers were also set out]"

15 As to the telephone conversation referred to in the note, Mr Grimes said in his witness statement:

> "In late October 2006 Mr Clarke phoned me to say he had received the signed agreements and that everything was in order. During this conversation, I reminded Mr Clarke once more that I had moved to 44 Maple Way in case he needed to get in touch with me or needed to come and see me. Mr Clarke acknowledged this and asked me to provide him with written confirmation."

16 For his part, Mr Clarke said he had no recollection of receiving the note, and maintained that he was never informed of Mr Grimes' new address, by telephone or otherwise. The judge resolved this conflict of evidence in favour of Mr Grimes, finding (as I have said) that the December 2006 note was received by Mr Clarke.

17 On 1 July 2011 Mr Clarke delivered by hand a letter addressed to Mr Grimes at 24 Glebe Way. The letter said:

> "Dear Terry,
> I have been trying to contact you by phone and I sent you a postcard asking you to call but I have not heard from you. (You may be on holiday). I am therefore delivering you this letter by hand delivery to your home. I would ask you please to call me as soon as possible.
> Your lease is due to expire on 30 September 2012 as I am sure you know. Whilst (without prejudice) the Hunt would be willing to negotiate new terms with you, I am obliged under the lease to give you formal notice of termination of the lease as at 30 September 2012. I believe clause 11 deals with this.
> There are a number of reasons behind the termination, but the main reason is because rents are now much higher than the rent you are paying. Thus in the best interests of the Hunt (and in fairness) a new rent and terms must be negotiated.
> Please can you contact me as soon as possible."

18 This was the letter relied on by the Trustees as being a valid notice to quit the Holding which terminated the second tenancy on 30 September 2012. Among the issues which the judge had to decide at trial were the questions whether the letter was a valid notice to quit in terms of its content, and (if so) whether it was duly served in accordance with the provisions of the tenancy agreement. The judge answered the first of those questions in the Trustees' favour, there being no specified form of words for a notice to quit an agricultural holding. As the judge aptly said, in [2.5] of his judgment:

> "I conclude that a reasonable tenant would understand that his landlord by this letter was not merely threatening him to give notice in the future, but was actually doing so. In colloquial terms, the phrase 'I am obliged to ask you to leave,' used, say, between a barman and a drinker, is a well-known polite or formal way of actually telling them to leave; and it appears to me that the effect of this letter is no different."

19 There is no appeal from the judge's decision on that question, or from his finding that the letter of 1 July 2011 was in fact delivered to the Glebe Way address, even though it did not actually come to Mr Grimes' attention. It follows that the notice to quit was duly served on Mr Grimes, even though he knew nothing about it, if 24 Glebe Way was still at that date a valid address for service of notices upon him under cl.14 of the second tenancy agreement. The judge held that it was, because 24 Glebe Way was the address for him given in the Particulars, and it remained a good address for service even after receipt by Mr Clarke of the December 2006 notice of change of address.

20 The remainder of the story was summarised as follows by the judge, in [1.2] of his judgment:

> "In January and February 2012, there were telephone conversations and a meeting between Mr Grimes and Mr Clarke on behalf of the landlord about the question of a new lease at a higher rent in the period after 2012, but it is disputed between them whether the purported notice [*i.e. the notice to quit*] was mentioned by either party at this time.

In September 2012, the landlord (having by this time on any view been notified of the correct address) asked Mr Grimes to give written confirmation that he did intend to leave at the end of September, but he did not reply until 27 September, saying that he was not going to give that confirmation. Meanwhile, on 18 September 2012, the landlord granted a lease of the farm to a new tenant, Mr Baker, with effect from 1 October 2012.

On 1 October 2012, Mr Baker occupied the farm and Mr Grimes, who was there that day carrying out some work, left, it can fairly be said under silent protest."

21 The present action was begun by Mr Grimes on 17 July 2013. He claimed that his tenancy had not been validly terminated on 30 September 2012, and that he had been wrongfully dispossessed by the grant of the new tenancy to Mr Baker. As a result, he had been unable to farm the Holding and had suffered loss and damage which he estimated to amount to some £80,600. The judge heard detailed evidence on the issue of quantum, and concluded that the appropriate amount of damages, if Mr Grimes' tenancy had not been validly terminated, was £31,500. Again, there is no appeal by either side from that conclusion.

**Provisions relating to the giving of notice under the tenancy agreements**

22 I have already quoted the provisions of cll.14.1 and 14.2 of the tenancy agreements. They need to be read together with s.36 of the Agricultural Tenancies Act 1995, which in material part provides as follows:

"36. Service of notices.

(1) This section applies to any notice or other document required or authorised to be given under this Act.

(2) A notice or other document to which this section applies is duly given to a person if—

(a) it is delivered to him,

(b) it is left at his proper address, or

(c) it is given to him in a manner authorised by a written agreement made, at any time before the giving of the notice, between him and the person giving the notice.

…

(6) For the purposes of this section, the proper address of any person to whom a notice or other document to which this section applies is to be given is—

(a) …

(b) in any other case, the last known address of the person in question."

23 It can be seen, therefore, that the first part of cl.14.1 replicates s.36(2)(a) and (b) of the 1995 Act, by enabling notice to be given either by personal delivery or by leaving it at the recipient's "proper address", i.e. his last known address. Clause 14.1 then adds a further method of service (sending the notice to the proper address by any recorded delivery service), and cl.14.2 introduces the further option of service "at the address given in the Particulars or such other address as has previously been notified in writing". Each of these additional modes of service would fall within s.36(2)(c) of the 1995 Act, as being one authorised by a written agreement made between the parties giving and receiving the notice.

24 As one would expect, the tenancy agreements contain numerous provisions which either require or permit one party to give notice to the other of relevant facts or events during the term. So, for example:

(a) under cl.5.2, if the tenant fails to do any work which the agreement requires him to do, and the landlord gives him written notice to do it, the tenant must then comply within a stipulated time, and (in default) permit the landlord to do the work and recover the reasonable cost from him;
(b) under cl.5.5(c), the tenant is obliged to give written notice to the landlord of any dead or dangerous tree on the Holding;
(c) clause 7.1 gives the landlord a right of access to the Holding for specified purposes "after giving reasonable notice (except in an emergency)";
(d) under cl.7.2, the tenant is obliged to inform the landlord in writing immediately on becoming aware of "any notice order direction or other formal document relating to the Holding";
(e) clause 7.4 obliges the tenant's personal representatives, if he dies during the term, to give written notice of his death to the landlord within one month of the date of death;
(f) clause 10.3 mirrors cl.5.2, and enables the tenant to give a written notice to the landlord requiring him to perform any work which he is obliged to do under the agreement, and (in default) to permit the tenant to do the work and recover the reasonable cost from the landlord; and
(g) last but not least, cl.11 contains various provisions for termination of the agreement upon service of notice in writing in specified circumstances, including the power in cl.11.1 to terminate the tenancy at the end of the term by written notice of between 12 and 24 months.

**Principles of construction**

25 There was no disagreement between the parties about the principles of construction by reference to which written contractual documents, such as the tenancy agreements, should be construed. They are the subject of well-known guidance given by the House of Lords, and more recently the Supreme Court, in a series of cases which it is unnecessary to rehearse. For present purposes, it is enough to refer to what Lord Neuberger of Abbotsbury PSC said in *Arnold v Britton* [2015] UKSC 36; [2015] A.C. 1619 at [15]:

> "When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to 'what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean', to quote Lord Hoffmann in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] A.C. 1101 at [14]. And it does so by focusing on the meaning of the relevant words … in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions."

26 One day after the hearing before us, the Supreme Court on 29 March 2017 delivered judgment in *Wood v Capita Insurance Services Ltd* [2017] UKSC 24; [2017] 2 W.L.R. 1095, to which the parties' counsel helpfully drew our attention, but without wishing to make any further submissions about it. The judgment of Lord Hodge JSC, with which the other members of the Court agreed, confirms that there is no conflict between the guidance given in *Arnold v Britton* and the Rainy Sky case (*Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 W.L.R. 2900): see [8]–[15]. As Lord Hodge put it, at [10]:

> "The court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement. It has long been accepted that this is not a literalist exercise focused solely on a parsing of the wording of the particular clause but that the court must consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context in reaching its view as to that objective meaning."

**The correct interpretation of cl.14.2**

27 There can be no doubt that a notice to quit, or any other notice contemplated by the tenancy agreement, could have been validly served on Mr Grimes at his Glebe Way address at any time before he notified the Trustees of another address under cl.14.2, even though he no longer lived there. Furthermore, that would have been the position even if Mr Clarke knew that Mr Grimes no longer lived there. One evident purpose of specifying an address in the Particulars is to provide an address for service under cl.14.2, and if the tenant then moves from that address without notifying the Trustees of his new address, he must clearly be taken to accept the risk that notices served at the specified address will not come to his attention. The question is, however, whether that continues to be the position once the tenant has notified the Trustees in writing of a new address. Is it then still open to the Trustees to serve a notice on the tenant at his old address, as shown in the Particulars, even though they have been duly notified of his new address?

28 To my mind, that would be a surprising conclusion to have to reach, particularly in the context of a contractual relationship that was intended to last for at least six years. What is the point of enabling the tenant to notify the landlord of his new address, it may well be asked, if the landlord remains free to serve notices on the tenant at the address given in the Particulars? Surely, as a matter of commercial common sense, the parties must have intended that the new address, once duly notified, should supersede the original one shown in the Particulars. Otherwise, the situation would be reached where an unscrupulous landlord, in full knowledge of the tenant's actual current address, could continue to send notices to the tenant's original address years after he had moved from it, and long after any normal arrangements for the forwarding of mail or other documents addressed to him there would have expired. I would therefore be disposed, if the language of cl.14.2 permits it, to construe the provision as substitutive in its effect. Or in other words, once the tenant has given written notice of a new address under the clause, that new address then replaces the original one shown in the Particulars (or any previous replacement address notified to the Trustees, as the case may be).

29 In my judgment, there is no difficulty in construing cl.14.2 in this way. The normal meaning of the word "or" is disjunctive, although in a suitable context it can be read as equivalent to "and", or as expressing a non-exclusionary alternative equivalent to "and/or": see, for example, *Federal Steam Navigation Co Ltd v Department of Trade and Industry* [1974] 1 W.L.R. 505 (HL) at 522B–E (per Lord Wilberforce) and 523E–H (per Lord Salmon). As a matter of ordinary language, therefore, it is natural to begin with a rebuttable presumption that cl.14.2 provides for service either at the address given in the Particulars or at such other address as has previously been notified in writing, but not at both. Furthermore, I can find nothing in the context to support the notion that "or" was here intended by the parties to mean "and" or "and/or".

30 On the footing that the two modes of service are true alternatives, the next question is whether the party serving the notice was intended to have a choice between them, or whether notification of a new address was intended to replace the address given in the Particulars. For the reasons which I have already given, the answer to this question seems to me to be obvious. The parties cannot sensibly have intended that the serving party should continue to have the option of serving at the old address once he has been notified of the new one. That is to say, the parties must have intended that the new address should be a substitute for its predecessor, and not that it should offer a choice which did not exist before notification of the new address.

31 Another way of making the same point is to say that the disjunctive language of cl.14.2 envisages only a single address for service: either the address given in the Particulars, or (instead) such other address as has previously been notified in writing. To construe the clause in this way does not in my view involve reading anything into it, and is indeed the natural and ordinary meaning of the language used. In particular, the use of the word "other" before "address" in the second limb of the clause is a strong indication that the new address is intended to replace that shown in the Particulars.

32 In reaching the contrary conclusion, the judge thought that "the literal meaning" of the words used in cl.14.2 was clear, and that good service could be effected "<u>either</u> at the address stated in the lease <u>or</u> at the other address that has since been notified to the other party": see the judgment at para.3.7. The judge recognised that "this process would be capable of abuse", but it was "not unworkable or impracticable": it would always be open to the other party (here the tenant) to make "appropriate arrangements for forwarding".

33 The judge then said that it would have been a simple matter to draft the clause in terms which clearly provided for substitution of the later address for the earlier one, and continued:

> "What is not permissible in my firm conclusion is to take a clause which on its face says clearly that the lease address is a good address for service and interpret it as meaning that in some circumstances that address is <u>not</u> good for service, that it has ceased to be good for service. That would be going beyond the proper limits of an exercise of construction and going into the forbidden territory of re-writing a contract in different, perhaps fairer, terms. That is not a permissible exercise except where the alternative interpretation is a commercial absurdity, which for the reasons I have stated I do not consider to be the position here."

34 Despite the confidence with which the judge reached his conclusion, I can only say that in my respectful opinion he was wrong. His error lay, I think, in starting with what he perceived to be the literal meaning of the words used, whereas the authorities are clear that the relevant wording has to be considered in the context of the contract as a whole, and is not (as Lord Hodge said in *Wood v Capita Insurance Services Ltd* at [10], quoted above) "a literalist exercise focused solely on a parsing of the wording of the particular clause". If the judge had approached the question in this way, he would I think have realised that the language can naturally be read as providing for an alternative which is not only exclusionary but also substitutive; and that, viewed objectively, this is what the parties must have intended.

35 In any event, for the reasons which I have given I am satisfied that the judge came to the wrong conclusion on this point. It follows that Mr Grimes' appeal must be allowed, unless the trustees can succeed in overturning the judge's finding of fact that the December 2006 notice of his new address was duly given to them. That is the issue raised by the respondent's notice, to which I now turn.

*Was the December 2006 notice of Mr Grimes' new address duly given to the trustees?*

36 The judge dealt with this issue in [4.1] of his judgment, as follows:

> "My conclusion on this issue is that on the balance of probabilities (which applies to all the findings that I am about to make) Yes it was. I do not consider it likely that this is a document which was later forged by Mr Grimes. That would be a very serious allegation requiring clear evidence before the court could be persuaded … that it was true. Nothing has been said to me against Mr Grimes' character and I have no reason to suppose that he is a man who would do such a thing. On the basis that it is authentic, in other words that it was written at the time and for the purpose that it states on its face, it was written to accompany a cheque, which it appears was definitely received. It is therefore likely that the note went with the cheque. The note is scribbled and informal. It may easily have been overlooked by Mr Clarke at the time, or filed by him and then lost and not thought about for five years before this file was revisited. Therefore, although I accept Mr Clarke's evidence that he has no recollection of receiving it, I do not accept his further more positive assertion that he can be sure or confident that in fact he did not receive it. It appears to me, without in any sense doubting his good faith, that at that point he has gone beyond memory into informed speculation and that that consideration, though a weighty one, is not sufficient to overcome the other circumstances I have listed. Therefore, I conclude that the change of address notice was received by the landlord."

37 In their supplemental skeleton argument, counsel for the Trustees do not shrink from submitting that this conclusion was one which there was no evidence to support. They have to put their case that high, in order to bring it within the very limited circumstances in which an appellate court may legitimately differ from a finding of fact made by the trial judge. The relevant principles have been restated by the Supreme Court, the Privy Council and the Court of Appeal in a series of recent cases, to which it is unnecessary to refer as there is no dispute about them.

It is enough to say that an appeal court should not interfere with the trial judge's conclusions on an issue of primary fact unless it is satisfied that the trial judge was "plainly wrong". The meaning of that test was usefully elucidated by Lord Reed in *Henderson v Foxworth Investments Ltd* [2014] UKSC 41; [2014] 1 W.L.R. 2600, where he said at [62]:

> "There is a risk that it may be misunderstood. The adverb 'plainly' does not refer to the degree of confidence felt by the appellate court that it would not have reached the same conclusion as the trial judge. It does not matter, with whatever degree of certainty, that the appellate court considers that it would have reached a different conclusion. What matters is whether the decision under appeal is one that no reasonable judge could have reached."

See too *Beacon Insurance Co Ltd v Maharaj Bookstores Ltd* [2014] UKPC 21; [2014] 4 All E.R. 418, at [12] per Lord Hodge.

38 In his witness statement, immediately after the passage which I have quoted at [15] above, Mr Grimes said:

> "In December 2006, I sent Mr Clarke my rent cheque and under that confirmed my new address and landline number."

This was a reference to the undated handwritten note, the terms of which I have set out at [14]. Mr Grimes was cross-examined about the circumstances in which the note came to be prepared, and we have been provided with a transcript of his evidence. It transpired that he did not write the note himself, but his wife did. He then signed it. Similarly, it was his wife who would have written the cheque, although he would have signed it. He did not recall when the note was written, or when it was sent. Nor could he remember whether it was he or his wife who had put the note in the envelope with the rent cheque, or who had posted it. Indeed, he thought it was possible that the note did not accompany the cheque. Furthermore, despite the date on the note, Mr Grimes said that he always paid his cheques in January for October, November and December. His explanation for the date on the note was that his wife would "most probably have done the cheques in December, the end of December".

39 Mrs Grimes did not give evidence to corroborate her husband's version of events. There was no suggestion that she was unable to give evidence.

40 In the light of this material, and the clear evidence of Mr Clarke that he never received any notification of the change of address from Mr Grimes, the Trustees submit that it was simply not open to the judge to make the findings which he did in [4.1] of his judgment. In my opinion, however, the submission is a hopeless one. There was clearly ample circumstantial evidence which entitled the judge to conclude, on the balance of probabilities, that the written note did indeed accompany the rent cheque, which was admittedly received and banked by the Trustees. There was nothing inherently incredible about Mr Grimes' account of the circumstances in which the cheque and the note were prepared and sent to Mr Clarke in early January 2007, and his inability to remember points of detail was not surprising more than eight and a half years later. Moreover, as the judge recognised, the informal nature of the note meant that it could easily have been overlooked by Mr Clarke at the time, and his recollection that he never received it may for that reason have been mistaken. The absence of corroborating evidence from Mrs Grimes was no doubt a matter for the judge to take into account, but was by no means

conclusive: the judge had before him the written and oral evidence of the two protagonists, Mr Grimes and Mr Clarke, and he had the benefit of seeing and hearing them in the witness box. Those are advantages which this court cannot replicate, and even a transcript of the relevant evidence is only part of the overall picture.

41 In short, I have no hesitation in concluding that the judge's finding on this issue was open to him on the evidence, and is not one with which an appellate court can interfere.

**Conclusion**

42 I am accordingly satisfied that, following receipt by Mr Clarke of the December 2006 note, Mr Grimes' address for service under cl.14.2 of the tenancy agreement was 44 Maple Way, not 24 Glebe Way. It follows that the notice to quit was not validly served on him at the latter address, and his tenancy was not validly terminated on 30 September 2012. I would therefore allow his appeal, set aside the judgment below, and award Mr Grimes the damages assessed by the judge in the sum of £31,500 together with appropriate interest and costs.

**MACUR LJ:**

43 I agree.

**BEATSON LJ:**

44 I also agree.

*Appeal allowed.*