# Kuwait Oil Tanker Co SAK v Al-Bader (No3)
# [2000] All E.R. (Comm) 271

# Exhibit 14

# Kuwait Oil Tanker Company Sak, Sitka Shipping Incorporated v Abdul Fattah Sulaiman Khaled Al Bader, Hassan Ali Hassan Qabazard, Timothy St John Stafford v H Clarkson & Company Limited, Hugh O'neill Mccoy, Kuwait Petroleum Corporation, Sheikh Ali Khalifa Al Sabah

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
18 May 2000

A3/1998/1606, A3/1998/1625, A3/1999/0023, A3/2000/5128

Supreme Court Of Judicature Court Of Appeal (Civil Division)

**2000 WL 571379**

Before : Lord Justice Nourse Lord Justice Potter and Lord Justice Clarke

Thursday, 18th May 2000

On Appeal From The High Court Of Justice Commercial Court Queen's Bench Division

(Mr Justice Moore-Bick)

Handed Down Judgment Smith Bernal Reporting Limited 180 Fleet Street London EC4A 2HG Tel: 020 7421 4040 Fax: 020 7831 8838 (Official Shorthand Writers to the Court)

**Representation**

Mr Stanley Brodie QC and Mr Robert Howe (instructed by Messrs Olswang ) appeared on behalf of the appellant first defendant. Mr Stanley Brodie QC and Mr Selwyn Bloch (instructed by Messrs Brian Harris ) appeared on behalf of the appellant third defendant.
Mr Julian Malins QC , Mr Richard Slade and Mr Jonathan Adkin (instructed by Messrs Shaw and Croft ) appeared on behalf of the respondent claimants. Mr Craig Orr (instructed by Messrs Slaughter and May ) appeared for the third third party.

**Judgment**

Lord Justice Nourse

**Introduction**

1. This is the judgment of the court, to which each of its members has contributed. These are appeals against an order of Moore-Bick J dated the 15th December 1998 by which he gave judgment against all three defendants for very large sums of money. The first claimant ("KOTC") is a subsidiary of the Kuwait Petroleum Corporation ("KPC"), which is in turn owned by the State of Kuwait. The second claimant ("SITKA") is a Liberian company which is a wholly owned subsidiary of KOTC.

© 2025 Thomson Reuters.

Kuwait Oil Tanker Co SAK v Al-Bader (No.3), 2000 WL 571379 (2000)

The events which gave rise to the action took place between 1985 and 1992. During that period the first defendant ("Mr Al Bader") was both chairman and managing director of KOTC and president and a director of SITKA and the second defendant ("Mr Qabazard") was deputy managing director (administration and finance) and head of the finance department of KOTC. The third defendant ("Captain Stafford") was fleet operations manager of KOTC until September 1989, when he left and retired to Australia, although he returned to work for KOTC for a month in the summer of 1990. While he was in Kuwait Captain Stafford for most practical purposes acted as head of the operations department of KOTC and reported directly to Mr Al Bader.

2. The claimants put their case against the defendants in various ways, but their primary case was that the defendants dishonestly conspired to defraud them of more than US$60 million. The judge essentially accepted the claimants' case on conspiracy, although he also held that the defendants were liable for breach of fiduciary duty and thus liable to account to the claimants as constructive trustees. As a result of his conclusion that they were constructive trustees he awarded compound interest against all three defendants.

3. The total amounts awarded inclusive of compound interest but exclusive of costs were as follows. Mr Al Bader and Mr Qabazard were ordered to pay KOTC US$92,052,751 and £144,371 and SITKA US$44,733,165 and £174,291, making a total for each of them of US$136,785,916 and £318,662. Captain Stafford was ordered to pay the same sterling sum but slightly less in dollars, namely US$90,634,252 to KOTC and US$44,733,165 to SITKA, making a total of US$135,367,417. The reason for the difference between Mr Al Bader and Mr Qabazard on the one hand and Captain Stafford on the other was that the judge held that Captain Stafford did not join the conspiracy at the very beginning, but shortly afterwards. The amounts awarded reflect the fact that Mr Qabazard repaid an amount of about US$8 million to the Kuwait Prosecutors' Office in 1993.

4. Mr Brodie QC, who represented Mr Al Bader at the trial and has represented both Mr Al Bader and Captain Stafford on this appeal, challenges the judge's conclusions under three heads, namely conspiracy, fiduciary duty and constructive trust and interest. Mr Qabazard represented himself at the trial and attended throughout. He cross-examined the witnesses and made final submissions, but he did not give evidence. He served an appeal notice and indicated that he intended to represent himself on this appeal, but in the event he did not appear and was not represented at the hearing. In these circumstances we shall consider his appeal as well as those of the other defendants. We shall first say a word about the trial and the judgment and then address the principal issue of conspiracy. We shall address that issue under English law and then consider the question of double actionability. After that we will deal with the issues of fiduciary duty and constructive trust and interest.

**The Trial and the Judgment**

5. These proceedings were commenced in July 1994 and came to trial in 1998. The trial lasted 70 days, during which the judge heard many witnesses, including Mr Al Bader and Captain Stafford. He also heard evidence from representatives of SITKA's shipbrokers, H Clarkson & Co Ltd ("Clarksons"), including in particular from Mr McCoy. Those witnesses had to be subpoenaed by the claimants because the defendants had made both Clarksons and Mr McCoy third parties, although in the event the third party claims were abandoned before the trial.

6. Mr McCoy was an important witness because he played a significant part in the relevant events, although the claimants did not suggest that he acted dishonestly in any way. Shortly after his appointment as chairman of KOTC in March 1983 Mr Al Bader had become acquainted with Mr McCoy, who was then deputy head of the sale and purchase division of Clarksons. As the judge found, much of Mr McCoy's contact with KOTC was through Captain Stafford, who both handled the day to day aspects of KOTC's purchase and sale of tankers and played a major role in SITKA's chartering of tankers.

7. At the trial much depended upon whether the defendants acted dishonestly at the time. The judge held that in each case they did. Given the length of the trial, during which Mr Al Bader gave evidence for some eight days and Captain Stafford

also gave evidence at some length, the judge had a good opportunity to form a view on that central question. He did not, however, do so on the basis only of his views of Mr Al Bader and Captain Stafford in the witness box, but on the basis of a thorough and painstaking analysis of both the oral and, in particular, the documentary evidence relating to the large number of transactions called into question, which at every stage he tested against the probabilities. His judgment extends over 176 pages and discusses almost every point in the case. Whatever conclusions are reached on the issues in this appeal, the judgment is a tour de force which we greatly admire.

8. In the skeleton argument lodged in this appeal on behalf of Mr Al Bader and Captain Stafford the arguments advanced were almost entirely points of law. It was expressly stated that, although Mr Al Bader and Captain Stafford did not accept the correctness of the findings of fraud and dishonesty made against them, for the purposes of the appeal it was not intended to challenge the judge's findings of fact as such. However, after that skeleton had been lodged, certain new evidence came to light upon which both Mr Brodie and Mr Malins QC (who appears for KOTC and SITKA) now seek to rely. At one time each was (at least formally) seeking to exclude the evidence upon which the other sought to rely, but as the appeal progressed it became clear that neither was seriously arguing that any of the evidence should be excluded. In the result we admitted it and have considered it in some detail.

9. In opening the appeal, Mr Brodie relied in particular upon new evidence relating to an account in the name of Gulf Shipping (to which we shall refer further below) and submitted that if that evidence had been available to the judge he would not have reached the conclusions that he did in the case of Mr Al Bader and Captain Stafford. As the appeal progressed, Mr Brodie developed that submission until, by the end of the argument, he was challenging many of the judge's findings of fact. By contrast Mr Malins submitted that the new evidence supports the judge's findings, which (he submitted) were based on the careful and detailed analysis referred to above.

10. The judge described the central issues at the trial and expressed his view of the correct approach to the burden and standard of proof in a case of this kind, where serious dishonesty is alleged, in this way (at page 35):

> Notwithstanding the complexity of the allegations made by the plaintiffs, however, Mr Malins QC … nailed his colours to the mast and accepted that they could only succeed in this case if and to the extent that they could satisfy the court that the defendants had been acting dishonestly. There was scarcely any dispute about the movement of funds as I have described them and so, although a large number of issues were raised during the trial, the two central issues between the parties can really be stated quite simply: to what extent was each of the defendants involved in withdrawing and disposing of funds belonging to the plaintiffs; and, insofar as he was, was he acting dishonestly? That being so, it is necessary to keep two things in mind: first, that the burden of proof rests firmly on the plaintiffs; and secondly, that although the standard of proof in this case is the same as that which applies in all civil proceedings, namely, proof on the balance of probabilities, where fraud is alleged the court should require cogent evidence commensurate with the seriousness of the allegation before it considers itself justified in finding the case proved: see *Hornal v Neuberger Products Ltd [1957] 1 QB 247* . I mention this both because these are important principles in themselves and because Mr Brodie QC and Mr Bloch both submitted that there were many aspects of this case which remain unclear and that the evidence left too many questions unanswered for me to be satisfied that their clients had been guilty of dishonesty.

That passage both makes clear what were the central issues at the trial and, in our view, correctly sets out the approach to be adopted to the burden and standard of proof in a case like this. We turn to the alleged conspiracy.

© 2025 Thomson Reuters.

**Conspiracy**

11. It was not disputed either at the trial or on this appeal that each of the defendants owed duties of good faith and honesty to KOTC or that Mr Al Bader also owed such duties to SITKA and that those duties would be broken if they engaged in dishonest schemes to embezzle or misapply the companies' funds, or (to put it another way) to defraud the companies. In this regard the defendants did not and do not seek to draw any distinction between KOTC and SITKA for the purposes of any issue which arises on this appeal. The essential basis of the claimants' case at the trial may be summarised in this way. The defendants dishonestly conspired together and with Mr Mohsin, who was financial manager of KOTC and immediately subordinate to Mr Qabazard, to steal or otherwise divert substantial sums of money from KOTC and SITKA by whatever means were or might become available. In short they conspired to defraud the claimants and thus conspired together to effect breaches of the fiduciary duties owed by each of them. Pursuant to the conspiracy they defrauded KOTC and SITKA of very large sums of money between 1985 and 1992. Although the claimants alleged that there was one overall conspiracy, for convenience of presentation they divided the case into four schemes reflecting the particular method of fraud adopted. In order to appreciate the true position it is important to consider the schemes in chronological order. We shall therefore consider them in the order of Schemes I, IV, II and III. In order to do so it will be necessary to refer to the facts, although for a much more detailed explanation of the underlying facts, reference should be made to the judge's judgment.

**The Facts**

*Scheme I*

**Back to Back Charterparties**

12. Scheme I involved the use of back to back charterparties. In the mid-1980s KOTC owned some sixty ships, but from about April 1984, by which time the Iran/Iraq war had been in progress for over three years, Iran began attacking Kuwaiti vessels. As a result, in April 1986 the Supreme Petroleum Council of Kuwait decided to establish a floating oil reserve outside the Straits of Hormuz. That decision was subsequently ratified by the Council of Ministers. In September 1986 it was decided that KOTC should be solely responsible for the chartering of vessels in order to meet the requirements of the strategic oil reserve. From that time onwards all chartering was carried out by Captain Stafford and Mr Al Bader through Clarksons as sole brokers. The claimants' case was that the defendants set up a scheme which operated in this way. A nominee company chartered the vessel from the third party owners or disponent owners ("the owners") at a certain rate of hire. The nominee company then chartered the vessel to SITKA on terms which were back to back with one crucial exception, namely that the rate of hire in the charterparty with the owners was less than the rate of hire in the charterparty to which SITKA was a party. As a result SITKA paid more hire than the owners received. The difference was in effect stolen by the defendants by being paid into an account or accounts with the BMB Bank in Switzerland, whence it could be and was distributed either to one or more of the conspirators personally or in accordance with their instructions.

13. For the purposes of the scheme three Liberian companies were incorporated or acquired on the instructions of Mr Al Bader. Between the 7th October 1986 and the 27th October 1987 Captain Stafford, with the approval of Mr Al Bader, fixed nineteen vessels through Mr Derek Hagger of Clarksons in the name of one of the three nominee companies. After the rate of hire between the owner and the nominee company had been agreed it was necessary to decide what rate of hire to insert into the charterparty between SITKA and the nominee. Before inserting the rate of hire Captain Stafford would speak to Mr Al Bader who would decide by how much that rate should exceed the rate agreed with the owners. It was usually about US$2,000 a day. Captain Stafford would thereafter sign the charterparty between SITKA and the nominee on behalf of both parties. He used his normal signature when signing for SITKA but a heavily disguised signature when signing on behalf of the nominee.

14. At first the excess hire which was produced by these arrangements was to be disbursed by arrangements made through the BMB Bank in Geneva ("BMB"). The charterparties between SITKA and the nominee provided for hire to be paid into one of three accounts opened with BMB, namely nos 7740, 7750 and 7760. The accounts were opened in Captain Stafford's name but in BMB's records were given references to the three nominee companies. Mr Al Bader and Sheikh Ali Khalifa Al Sabah ("Sheikh Ali"), who was variously the Oil Minister and the Finance Minister and who was a member of the Al Sabah Ruling Family, were intended to be signatories on the account, but in any event the bank agreed to accept telephone instructions from Captain Stafford or Mr Al Bader. In addition the application form contained instructions that any balances remaining after payment of hire were to be transferred to account no 7730, which was a personal account which had been

© 2025 Thomson Reuters. 

opened a few days earlier, on the 6th October 1986, by Mr Al Bader. In the result, the sums due to the nominee companies were to be paid into accounts 7740, 7750 and 7760, the sums due to the owners were to be paid to them in accordance with the terms of the charterparties and the balances were to be transferred into account 7730.

15. Shortly after those arrangements were made, as appears in a BMB memorandum dated the 22nd October 1986, the instructions to the bank were changed so that all the hire was paid into account 7730 and accounts 7740, 7750 and 7760 simply showed debits ‘according to standing instructions’. The bank was to continue to receive instructions to pay hire to the true owners from accounts 7740, 7750 and 7760, but would actually make those payments into account 7730, although that was not to be shown on any of the records. Captain Stafford accepted in evidence that one reason for that procedure was to disguise the fact that the amounts paid out in respect of hire were not being remitted in full to the owners. The judge held that Mr Qabazard was aware of this arrangement by January 1987 at the latest.

16. As time went on, substantial sums began to accumulate in account 7730. Instructions for payments out of that account were given, mainly, if not entirely, by Captain Stafford acting on instructions received from Mr Al Bader. In December 1986 the first of many transfers of funds were made from account 7730 to Mr Al Bader's personal account at UBS Geneva. On the first two occasions the payments were, as the judge put it, relatively modest, only US$60,000 each, but between December 1986 and March 1989 amounts totalling US$8 million were transferred in that way. In addition two further sums totalling US$1.5 million were transferred from account 7730 to Mr Al Bader's personal account at UBS Geneva. Mr Al Bader was not, however, the only recipient of funds from account 7730. On the 4th March 1987 the sum of US$100,000 was paid into Captain Stafford's account at the Trustee Savings Bank (“TSB”) at Anlaby and between that date and the 29th April 1987 a total of US$1.4 million was transferred to the account of Al Surooh Construction and Materials Company (“Al Surooh”) with the Bank of Kuwait and the Middle East at Safat. It was the evidence of Mr Al Bader that Al Surooh was a nominee of Sheikh Ali. In addition the statement of account for account 7730 shows a number of large transfers to ‘one of our customers’, none of which was explained.

17. Mr Malins demonstrated to us the way in which the alleged fraud operated in this period by taking a particular example relating to hire for May 1987. On the 14th April 1987 Captain Stafford, as the ‘Manager Fleet Development’, sent a memorandum on SITKA notepaper to Mr Mohsin, as ‘Manager Finance’, showing the total amount of hire stated to be payable by SITKA in respect of eight vessels for May 1987 as US$2,833,300 and asking him to transfer that amount to accounts 7740, 7750 and 7760 at BMB via Manufacturers Trust in New York. No doubt as a result of that request, by now communicated to Mr Qabazard, Mr Qabazard wrote to the Burgan Bank in Kuwait on the 19th April 1987 instructing it to pay the sum of US$2,883,000 to Manufacturers Trust in New York for the credit of accounts 7740, 7750 and 7760 at the BMB Bank in Geneva. The total sum was to be divided between those accounts on the basis that hire for four vessels was to be paid into account 7740, hire for two vessels was to be paid into account 7750 and hire for the remaining two vessels was to be paid into account 7760. Documents from BMB show that those amounts were indeed credited (or perhaps notionally credited) to those accounts and then all transferred to account 7730 as a ‘transfer from one of our customers’.

18. The true amount of hire payable to the owners of the eight vessels for May 1987 was not a total of US$2,883,000 but a total of US$2,394,750. On the 28th April 1987 Captain Stafford sent a written instruction to BMB instructing it to pay a total of US$2,394,750 to the various accounts of the true owners. BMB's copy of the instruction shows that that sum was then compared with the amount received of US$2,883,000, leaving a balance of US$488,250. Further bank documents dated the next day, the 29th April, show that the sum of US$120,024.10 was paid to Mr Al Bader's UBS account in Geneva and that the sum of US$400,034.43 was paid to Al Surooh's account described above.

19. It was the claimants’ case that account 7730 was used as a distribution account, first to pay the true hire and then to pay away the balance of the hire paid by SITKA to the conspirators. The claimants submitted that the above example was typical of the way in which SITKA was defrauded of hire in the period from about October 1986 to April 1988.

**Change of System after April 1988**

20. Although during that period Clarksons, who were SITKA's shipbrokers, had been involved (entirely innocently) with some excess payments, in early April 1988 Mr Qabazard asked them to open two new accounts. The new arrangement was described in this way in a memorandum dated the 5th April 1988 from Mr McCoy to Mr Moyse, also of Clarksons:

**Re: SITKA**

© 2025 Thomson Reuters.

> We have just fixed the BT Investor and BT Trader with this company. When remitting freights they will include an additional amount of 3,000 dollars. This amount is to be credited in the amounts of 1,000 and 2,000 dollars to two internal accounts which I would be grateful if you would open under the headings "Account One" and "Account Two".

The system described in that memorandum was put into effect. The source of the US$2,000 per day was the same as previously, namely the difference in hire between the back to back charterparties. The source of the US$1,000 per day was, however, different. It was achieved by negotiating with the owners what were in fact rebates of hire (although often described as commission) in favour of the charterers so that the amount actually paid to the owners was US$1,000 per day less than that stipulated in the charterparty.

21. A typical example of the way Scheme I worked at this time can be seen from the treatment of the hire for May 1989. On the 27th April 1989 Clarksons received the sum of US$1,139,250 in respect of hire for two ships. On the same day, out of that sum, US$62,000 was paid into account no 1 and US$155,000 was paid into account no 2. A few days later, on the 2nd May, Mr McCoy instructed Mr Moyse to pay the sum of US$62,000 from account no 1 to Gulf Shipping's account no 026 026 at Bank Cantrade in Geneva and the sum of US$155,000 from the no 2 account to Mr Al Bader's account at UBS in Geneva. It was the claimants' case that the Gulf Shipping account, which had been opened by Mr Qabazard, was used as a distribution or transit account to enable the conspirators to receive payments from the stolen money. We shall return below to the roles played by the nos 1 and 2 accounts and the Gulf Shipping account, which are central to the issues on this part of the appeal.

**Commission**

22. The claimants alleged that in addition to excess hire from the part of Scheme I which we have tried to describe, Scheme I also involved the dishonest diversion of some of the commission paid to Clarksons under the charterparties and of excess war risk premiums and crew war bonuses. As to the commissions, between November 1986 and December 1987 Clarksons credited to an internal account called the 'Bristol' account half the commissions which they had received from the charterers. The commission in the charterparties was 2.5 per cent of gross hire so that the amount credited to the Bristol account was 1.25 per cent. In due course those sums were paid out in the form of traveller's cheques, cash and transfers to third parties.

**War Risk Premiums and Crew Bonuses**

23. War risk premiums and crew bonuses were administered by Clarksons, who submitted the owners' invoices to the nominee companies, who in turn invoiced SITKA. From about January 1987 Captain Stafford arranged from time to time for the amount charged by the nominee companies to exceed that which had been charged by the owners, usually by US $30,000. False invoices were created in the name of the owners to cover the payments in SITKA's books and the balance of the funds remaining after payment to the owners was retained by Clarksons for the account of KOTC in an internal account called 'Devon Maid'. Captain Stafford admitted what had been done and said that Mr Al Bader was well aware of it, but Mr Al Bader himself denied any knowledge of the account. Between March 1987 and March 1989 a total of US$966,025.93 was paid into the Devon Maid account in that way.

24. As explained above, most of the monies in BMB account 7730 were transferred to Mr Al Bader's personal UBS account in Geneva. Between the beginning of April 1988 and the end of August 1989 hire differences amounting to some US$4,200,000 were paid into account no 2 and for the most part subsequently transferred to Mr Al Bader's Geneva account, although a total of US$460,150 was paid out to a company called World Tankers Ltd and three transfers totalling US91,602.40 were made to account no 1. In the same period about US$2,700,000 was paid into account no 1. Transfers out of that account included a total of US$274,806.25 to a company called Al Jameel Trading in May and early June 1988 and a small sum to account no 2, but the vast majority of the payments, amounting to over US$1,900,000 were to an account in the name of Gulf Shipping at the Bank Cantrade in Geneva. That account was opened in July 1988. Mr Brodie submitted that Gulf Shipping was solely the vehicle of Mr Qabazard and that (contrary to the findings of the judge) Mr Al Bader knew nothing about it. This is a key question in this appeal and we shall return to it below. The contents of the Bristol and Devon Maid accounts, namely US$1,154,259.41 and US$1,297,241 respectively, were for the most part disbursed in the form of traveller's cheques between 1987 and August 1989.

25. On the 20th August 1988 a ceasefire was declared in the Iran/Iraq war which, although it was not immediately appreciated, in the event marked the end of hostilities. As a result Kuwait no longer needed a strategic oil reserve and no further tankers

were chartered for the purpose, although vessels which had already been chartered remained on hire until August 1989. In these circumstances Scheme I could no longer be operated and it came to an end. For the most part, except for the important question who received what and the state of knowledge of each appellant, there was little or no issue as to the primary facts which we have tried to summarise. Thus the various payments were accepted as having been made and it was common ground that the essential question in the case of each defendant was whether he had acted dishonestly. The judge held in each case that he had. On that basis there was little dispute at the trial as to the quantum of the claimants' claim with regard to Scheme I. After resolving such disputes as there were, the judge held that the claimants' loss referable to the differences in hire was US$18,566,804, their loss referable to excess war risk premium and crew bonuses was US$966,025 and their loss referable to the 1.25 per cent commission was US$1,126,312. The total loss in respect of Scheme I was therefore US$20,659,141. No question of quantum arises on this appeal so that the principal question of fact is whether the judge was right to hold that the defendants each acted dishonestly and, if so, in what respects. We shall return to that question after considering briefly the facts relating to the other schemes.

*Scheme IV*

26. Although Scheme II followed Scheme I, it is convenient to consider Scheme IV at this stage because, with Scheme I, it was the first in time. Indeed it began at the end of 1985, although it appears that there was then a gap until about October 1986 so that Schemes I and IV thereafter proceeded side by side. It was the claimants' case, which was accepted by the judge, that the two schemes were part of the same conspiracy. The origins of Scheme IV are described thus by the judge at pages 12 to 14 of his judgment:

> At this point in the narrative it is convenient to return to December 1985 in order to describe the first in a series of transactions which took place over a period of over four years under which large sums were withdrawn from the accounts of KOTC and its subsidiaries mainly in the form of traveller's cheques. On 2nd December 1985 Mr Al Bader on behalf of KOTC drew cheque No 1782 on its US Dollar call deposit account No 701002523200 with the Burgan Bank in favour of the Burgan Bank in the sum of US$301,500 to cover the purchase of US$300,000 worth of traveller's cheques and the bank's commission. A messenger collected the traveller's cheques from the bank and Mr Mohsin signed for their receipt. There are no documents within KOTC's files explaining the purchase of these traveller's cheques and the bank statement merely recorded a "transfer" in the amount in question. Mr Al Bader received traveller's cheques in the amount of at least US$100,000 from the batch supplied on this occasion. On 15th January 1986 using cheque No 1783 he arranged for the purchase of a further US$350,000 worth of traveller's cheques in the same way and on 4th March 1986 Mr Qabazard using cheque No 1784 obtained a further US$150,000 worth. Although this last purchase does not form part of KOTC's pleaded claim, it is of interest as part of the sequence and sheds further light on the way in which these large amounts of money were being drawn. There are no documents in KOTC's files which cover the purchase of any of these traveller's cheques or which explain the purposes for which they were obtained. However, such documents as are available suggest that these transactions did appear in the bank statements in one form or another and so would have been apparent to the auditors, although the entries would not have indicated that the funds in question had been used to purchase traveller's cheques.
>
> Later that year there was a further sequence of substantial purchases of traveller's cheques on Sitka's account. On 30th October 1986 Mr Qabazard wrote to the Burgan Bank on behalf of Sitka asking it to supply traveller's cheques in the sum of US$314,000 and a few days later on 3rd November Mr Al Bader wrote asking the bank to supply further traveller's cheques in the sum of US$350,000 on the same account. Mr Qabazard signed the purchase slips for at least US$249,100 worth of those cheques. Again, there are no documents in KOTC's files which cover the purchase of these traveller's cheques or explain the purposes for which they were obtained. Finally, on 18th November 1986 Mr Mohsin on behalf of Sitka asked the bank to supply traveller's cheques to the value of US$172,000 also against the same account. Again, the documents provide no explanation for that, but there is nothing to indicate that the transactions did not appear on the face of Sitka's bank statements. Some transactions of a similar kind occurred during 1987. Mr Qabazard drew US$58,100 and £20,700 from KOTC's account in the form of traveller's cheques and cash respectively in March and June. Then on 17th September 1987 Mr Al Bader wrote on behalf of Sitka to the Burgan Bank asking for

> traveller's cheques to the value of US$413,000 to be debited to the company's account. The purchase slips for all those cheques were signed by Mr Al Bader, but cheques to the value of US$44,000 were cashed by Capt Stafford.

27. Scheme IV extended from December 1985 to March 1990, which was after Captain Stafford had left for Australia. The claimants alleged that it was throughout a scheme whereby the defendants obtained money from the claimants' bank accounts held at the Burgan Bank in Kuwait by making dishonest requests for traveller's cheques, cash and bank transfers. The judge accepted the claimants' submissions and therefore that all the transactions in respect of which they claimed were carried out pursuant to the conspiracy. The judge recorded that on that basis the amount of the claimants' loss in respect of Scheme IV was US$11,246,902 and £146,358. He held that all three defendants were liable until the end, but that Captain Stafford was not liable in respect of the two amounts of US$301,500 and US$350,000 drawn from KOTC's account to buy traveller's cheques in December 1985 and January 1986 because he had not joined the conspiracy at that time. We shall return below to the question whether the judge was right to find that the defendants were dishonest with regard to the transactions which formed the basis of Scheme IV and to the further question whether Captain Stafford was properly held liable in respect of the period after he left Kuwait in about September 1989.

28. A somewhat startling example of Scheme IV relied upon by the claimants and found by the judge involved the forgery of a letter apparently on Clarksons' notepaper which KOTC later found in its files. On the 2nd June 1987 Mr Qabazard asked the Burgan Bank for travellers cheques amounting to US$215,699.38 (less commission) from SITKA's account, which was debited by that amount on the same day. Also on the same day Mr Al Bader received and signed for travellers cheques amounting to US$200,000 at a cost of US$200,539.38 inclusive of commission and Mr Qabazard received and signed for US$15,000 worth of traveller's cheques at a cost of US$15,160 inclusive of commission. The sum of US$200,539.38 and US$15,160 is of course US$215,699.38.

29. The letter found by KOTC which proved to be a forgery was apparently on Clarksons notepaper and was dated the 21st May 1987. It was in these terms:

> As you were not in agreement with 2.5% brokerage commission due to two brokers involved in the fixtures of your chartering of 8 tankers (excluding Stena Concordia and Stena Explorer) and in consideration of our long business relationship, we are in agreement to charge 1.25% which as you confirmed will be payable by you since we excluded it from the daily hire agreed.
>
> Attached herewith our invoice No 1911 for a total sum of US$215,699.38 which represents our brokerage commission up to 31.5.1987.

The letter apparently bore the signature of Mr McCoy of Clarksons, but his signature had been forged. The letter also contained three manuscript notations which the evidence showed were in the writing of and signed by Mr Qabazard, Mr Al Bader and Mr Mohsin respectively. That of Mr Al Bader said: 'This is approved please action'. Attached was a document which purported to be Clarksons' debit note no 1911 showing a detailed breakdown of commission at 1.25% on hire over particular periods in respects of eight ships. The evidence subsequently proved that the debit note too was a forgery because the Clarksons' debit note no 1911 related to something entirely different.

30. The judge held that the Clarksons' letter and debit note were indeed forgeries designed simply to cover the purchase of traveller's cheques. They were presumably designed to mislead KOTC's auditors. Similar transactions were carried out subsequently which are described in the judgment and which it is not necessary to discuss in detail here. We simply give an example from 1988 to which Mr Malins particularly drew our attention. It relates to forged letters and invoices apparently emanating from Brown & Root (Gulf) EC ("Brown & Root"). On the 10th July 1988 Mr Qabazard wrote to the Burgan Bank asking it to transfer US$737,645 from a Porchester Shipping Company ("Porchester") account to a Citibank account in Bahrain in settlement of five Brown & Root invoices. Porchester was a company which had previously owned a ship but now remained in existence for the purposes of transactions of this kind. The letter of the 10th July was genuine, as were the Brown & Root invoices. However a copy of a letter also dated the 10th July 1988 was found on the file, by which KOTC

purportedly instructed the National Bank of Kuwait to transfer US$1,337,645 to Citibank in settlement of the same Brown & Root invoices. It was stamped ‘Original signed by HA Qabazard DMD (Administration & Finance)’. The judge held that there was no original and that it was dishonestly left on the file in order to satisfy the auditors or others that the sum of US $1,337,645 had been paid in settlement of genuine invoices. The judge said that he was in no doubt that one or more false invoices was or were created to match the copy of the letter. He further held that there must have been an instruction to the National Bank of Kuwait because what in fact happened was that on the 12th July 1988 it transferred the sum of US $1,337,640 to Porchester's account at the Burgan Bank. On the same day the sum of US$737,663 was debited to Porchester's account to cover the genuine Brown & Root invoices, the additional US$18 no doubt being in respect of transmission charges.

31. Also on the same day, the 12th July 1988, Mr Qabazard wrote to the Burgan Bank on behalf of Porchester requesting it to supply them with traveller's cheques in the amount of US$952,000 out of the same account. That represented almost the whole of the remaining US$600,000 together (as the judge held at page 22) with a further sum of US$352,643.35 which had been received from the insurance brokers Sedgwick Marine & Cargo Ltd (“Sedgwicks”), probably by way of rebates of war risk insurance premia. Of those traveller's cheques, Mr Al Bader cashed at least US$40,000 and Mr Qabazard cashed US$400,000. Those transactions accounted for almost the whole of the credit balance on the Porchester account at that time.

32. The judge described in detail further transactions of a similar kind to those referred to above at pages 22 to 24 of his judgment. He expressed his conclusion in this way (at page 24):

> The plaintiffs identified 18 separate transactions of this kind carried out between July 1988 and December 1989. It is agreed that by that means a total of US$3,781,156.28 was transferred from KOTC to Porchester over and above what was required to pay Brown & Root. The money was drawn out mostly in the form of traveller's cheques which were cashed (or at any rate signed) by Mr Al Bader, Mr Qabazard, Capt Stafford and Mr Mohsin.

The judge subsequently held that those sums were all dishonestly obtained as part of Scheme IV, which was proceeding at the same time as Scheme I, and indeed Scheme II, and was part of the same overall conspiracy.

33. There were further withdrawals which formed part of Scheme IV and which the judge described in detail in his judgment between pages 24 and 26. There were eight withdrawals between the 21st March 1988 and the 4th March 1990. Of those eight withdrawals, only two were after Captain Stafford left. They were US$20,000 on the 21st November 1989 and £15,000 on the 4th March 1990. Also of the eight withdrawals, six were comparatively small, between about US$15,000 and US$65,000, half of which were made by Mr Qabazard and half by Mr Mohsin, but two were more substantial. There was evidence of a request dated the 7th February 1988 by Mr Qabazard to the Burgan Bank on behalf of SITKA asking it to transfer the sum of US$1,435,865.23 to Porchester's account. The judge held that it was likely that the same steps were taken as described above in order to conceal the payments to Porchester. He was unable to ascertain who received the monies from Porchester but concluded that it was part of the fraudulent scheme. The eighth withdrawal was of US$137,000 worth of traveller's cheques by Mr Qabazard in November 1988. Of those, Mr Al Bader cashed US$62,000, Captain Stafford cashed US$55,000 and Mr Qabazard cashed US$9,000. The balance could not be traced.

34. Finally in Scheme IV, between November 1987 and August 1989 there were a number of withdrawals from the account of Yucatan Shipping Inc (“Yucatan”), which was a subsidiary of KOTC which (like Porchester) had once owned ships but now simply had a bank account. On the 1st November 1987 Mr Qabazard wrote to the Burgan Bank on behalf of Yucatan asking it to supply traveller's cheques in the sum of US$456,236.72 less the bank's commission. On the 1st December 1987 Mr Qabazard requested traveller's cheques in the full amount of the balance of the account, which was US$60,100, which, as the judge put it, ‘certainly does not suggest a transaction in the ordinary course of business’. On the 9th March 1988 Mr Al Bader asked for traveller's cheques in the amount of US$312,931.69 less the bank's commission. Of those traveller's cheques Mr Qabazard cashed US$100,000, Captain Stafford received US$100,000 and passed them to his investment consultant who cashed them and an unidentified third party received US$48,000. As in the case of many of the traveller's cheques which subsequently came into the claimants’ hands, the signatures on the others could not be identified. There were two other withdrawals of smaller sums, namely US$33,000 and £33,000 on the 26th January and the 1st August 1988 respectively.

35. In the context of this appeal the most significant transaction occurred on the 27th August 1989, when Mr Al Bader signed a letter on Yucatan notepaper requesting the Burgan Bank to transfer US$2,300,000 to a Gulf Shipping account in Geneva. The claimants submitted that that was a payment to a distribution account for subsequent distribution either directly to the conspirators or on their instructions. Mr Al Bader denied any knowledge of the letter and said that he knew nothing of the Gulf Shipping account. The judge held that Mr Al Bader was not telling the truth, describing his explanation of the letter as lamentable. Mr Brodie submitted that the new Gulf Shipping documents show that the judge was wrong to reach that conclusion and that the person responsible for the fraud was not Mr Al Bader or Captain Stafford but Mr Qabazard. This is a key question on the facts on this appeal, to which we shall return below.

36. Of the US$11,246,902 and £146,358 which the claimants lost as a result of scheme IV, the claimants were able to identify about US$6 million worth of traveller's cheques. They were also able to identify somewhat less than US$1million worth of traveller's cheques in connection with Scheme I. Of those traveller's cheques, the identity of the person who signed for them or cashed them could be identified in respect of about US$3 million, leaving about US$3 to 4 million unaccounted for. We shall return below to the part played by each of the defendants in this regard.

*Scheme II*

37. Scheme II was the most profitable. It extended from May 1989 to August 1990 and it was agreed at the trial that if the judge held the defendants liable the claimants' losses were US$31,752,000. The scheme involved what the claimants said and the judge found were payments of unauthorised commissions to the defendants from the sale and purchase of a number of vessels. A forerunner of the scheme involved the sale of the AL RAWADATAIN in January 1987, although for some reason monies received by the defendants arising out of it were not claimed by the claimants, so we shall not refer to it in any detail. We simply note that this was the first of many occasions on which Mr Qabazard received money from Clarksons in the form of traveller's cheques. He received a total of US$132,725. Mr Al Bader admitted cashing US$29,000 worth of those traveller's cheques and Captain Stafford received at least US$9,000 for his personal use.

38. The way this scheme worked can be seen from the purchase of the KRISTINE MAERSK and the KATRINE MAERSK, which were bought for US$30,000,000 each in April 1989. Clarksons acted as KOTC's brokers and their internal documents show that they were to receive 3 per cent, or a total of US$1,800,000, from KOTC as buyers and 10 per cent, that is a total of US$6,000,000, from the sellers. On that basis their total commission would amount to US$7,800,000. However, (as noted in an internal memorandum dated the 4th July 1989) it was agreed between them and KOTC that they would in fact only retain US$270,000 per vessel or US$540,000 in all. Clarksons invoiced KOTC for US$1,800,000 and the sellers for US$6,000,000 and, as a result, received US$7,800,000. They deducted their commission of US$540,000 and paid away the rest as follows. Mr Al Bader's UBS Geneva account received US$1,260,000, which was no doubt US$1,800,000 less US$540,000, on the 19th July and the further sum of US$6,000,000 on the 21st July. On the same day Mr Al Bader transferred US$1,400,000 from his UBS account to Mr Qabazard's account in London.

39. A very similar arrangement was made in January 1990 when KOTC agreed to purchase the ATLANTIC CONCORD and the ATLANTIC CONQUEST for US$29,500,000 each. The judge described the position in this way (at page 27):

> Similar arrangements with regard to commission were made both with the sellers and with KOTC, save that the sums involved in this case were US$2.5 million (sellers) and US$885,000 (KOTC) respectively. Again, Clarksons' copies of the debit notes sent to KOTC reflect an agreement that they should retain only US$270,000 in respect of each vessel and should pay away the balance of US$615,000. The vessels were both delivered on 4th April 1990 and the funds required to cover the purchase price must have been made available by that date. On 25th April Clarksons transferred to Gulf Shipping a sum of US$10.85 million. That included US$1.23 million representing the balance of the commission apparently payable by KOTC to Clarksons and also the US$2.5 million due from the sellers by way of commission in respect of the *Atlantic Concord* . The commission of US$2.5 million payable in respect of the *Atlantic Conquest* was transferred by Clarksons to Gulf Shipping on 27th April.

© 2025 Thomson Reuters.

The only difference between those transactions and those relating to the MAERSK vessels was that excess amounts were paid away to Gulf Shipping.

40. Later in 1990 very similar arrangements were made in connection with the purchase by KOTC of four new buildings. The contracts for the first two were signed in March 1990 with Hyundai and Daewoo respectively. In each case Clarksons received commission of US$3,638,000 from the sellers, of which they retained US$78,000 and on the 25th April 1990 paid the balance of twice US$3,560,000, namely US$7,120,000, to Gulf Shipping. The contracts for the third and fourth new buildings were signed with Hyundai and Daewoo on the 19th July 1990 and in accordance with a similar arrangement large sums were paid away by Clarksons to Gulf Shipping. The sums of US$5,265,000 and US$550,000 were paid on the 6th August and, because of an arrangement made between Clarksons and Daewoo which delayed the payment to Clarksons, the further sum of US$5,327,000 was paid on the 19th October.

41. Further sums were paid by Clarksons to Gulf Shipping arising out of the four new buildings. Correspondence in February 1990 shows that by way of remuneration for an appraisal of the market Mr Al Bader agreed on behalf of KOTC to pay Clarkson a fixed fee of US$300,000 in respect of each vessel ordered. In accordance with that agreement KOTC paid Clarksons a total of US$1,200,000, but out of that sum Clarksons retained only US$50,000 per pair of vessels and paid away the rest to Gulf Shipping. The first payment of US$550,000 was made on the 26th March and the second on the 6th August.

42. We shall return below to the role of Gulf Shipping, but it may be noted here that on the 8th May 1990 Mr Qabazard transferred US$8.67 million out of his UBS account in London to Mr Al Bader's account in Geneva. The judge held that this was out of the commissions paid by Clarksons to Gulf Shipping. As already indicated, the total amount of the claimants' loss by reason of Scheme II was agreed to be US$31,752,000.

*Scheme III*

43. Iraq invaded Kuwait on the 2nd August 1990. In the period from about the 5th October 1990 to the 10th February 1992 Sedgwicks made substantial rebates of war risk insurance premiums. Previous such rebates had been paid to Kuwait but, no doubt because of the position in Kuwait after the invasion, during this period they paid them to Clarksons. They did so pursuant to an instruction given by Mr Qabazard on the 31st August 1990 to open an account in the name of Clarksons as KOTC's agents. Thereafter Sedgwicks received premium amounting to US$12,612,655 from KOTC and paid rebates amounting to US$6,026,803 to Clarksons. Clarksons subsequently paid US$6,009,048 to Gulf Shipping and US$17,755 in traveller's cheques and cash to Mr Qabazard personally. In these circumstances it was agreed that the loss from Scheme III was US$6,026,803.

*The Judge's Conclusions.*

44. In order fairly to consider the issues raised by this appeal in their context it is convenient to consider the conclusions reached by the judge on the evidence before him. Before discussing the issues in detail the judge carefully described the views which he had formed of the witnesses. He regarded all the witnesses from Clarksons, including Mr McCoy, as being both honest and reliable, although he recognised that after ten years Mr McCoy's recollection was unlikely to be wholly accurate and held that it was not. He also regarded Mr Sultan of KPC as a truthful and generally reliable witness. By contrast he took a dim view of Mr Al Bader, of whom he said this (at page 39):

> … he was often unduly defensive and argumentative and was frequently inclined to give complicated and lengthy answers to straightforward questions. Of itself that does not take the matter very far and was no doubt due in part to the same factors as were at work in the case of Mr Al Roumi. What was much more damaging was his inability to provide any adequate explanation for some of the most telling evidence against him. In some cases he gave explanations which were either demonstrably false or wholly incredible; in others he effectively failed to deal with the point in a satisfactory way at all. Inevitably that undermined my confidence in him as a witness.

The judge then referred to the evidence of three distinguished character witnesses, who had had personal dealings with Mr Al Bader in the relevant period and spoke highly of him. The judge added:

© 2025 Thomson Reuters.

> All of them spoke highly of Mr Al Bader's energy, shrewdness, managerial ability and patriotism and of his good character in general. All that I have, of course, borne in mind when making my findings, but despite this impressive array of character witnesses the fact remains that I found Mr Al Bader a distinctly unimpressive witness when it came to dealing with many of the matters put to him in cross-examination which lay at the heart of the case. Even allowing for the difficulties to which I have referred, therefore, I found myself unable to place a great deal of reliance on his evidence in relation to controversial matters unless it was supported by other material.

In assessing Mr Al Bader's credibility the judge took account, as he was entitled to do, of the fact that, through his solicitors, he gave two different accounts of the ownership of the flat in which he lived, one in a letter to the Home Office, which was designed to persuade them that he was a person of independent means with property in London, and the other in an affidavit in connection with the Mareva injunction against him, which was designed to show that he had no assets within the jurisdiction. One or other account must have been untrue.

45. In the case of Mr Qabazard the judge noted that he did not give evidence, but he declined to draw any inference against him on that account because he said that it was not necessary to do so. Of Captain Stafford, the judge said (at page 41):

> Capt Stafford did give evidence and in general he did so in a confident and direct manner. However, there were a number of occasions on which he too was evasive and was unable to provide an adequate explanation for the material being put to him. One of the most difficult pieces of evidence with which he was confronted was a tape recording of a telephone conversation between himself and Mr Qabazard in January 1993 while Mr Qabazard was in custody. The whole tenor of that conversation is difficult to reconcile with Capt Stafford's evidence that he was completely unaware of any misappropriation of funds by Mr Al Bader and he was quite unable to offer any satisfactory explanation for certain specific parts of the conversation. That inevitably undermined his credibility and in general where his evidence was in conflict with that of the plaintiffs' witnesses I have tended to prefer theirs. For the most part that means the evidence of Mr McCoy. I should say, however, that there were a number of points at which his evidence differed from that of Mr Al Bader, not always to their advantage. I found Capt Stafford a more impressive witness generally than Mr Al Bader and where their evidence conflicted I have in general preferred his evidence to that of Mr Al Bader.

Mr Brodie observed in argument that care should be taken when considering the tape recording because Mr Qabazard was in prison and Captain Stafford, who was in Australia, was not aware that the conversation was being recorded. We agree, but there is no doubt that the judge fully understood the position.

46. The judge then considered each of the schemes in considerable detail. Mr Brodie submitted that the case was bedevilled by the fact that the claimants insisted on alleging one conspiracy when they should have focused upon the individual torts implicit in each of the dishonest transaction relied upon. He submitted that injustice resulted. We shall return below to the question whether it was appropriate to allege a conspiracy, but we reject the submission that to do so caused any injustice to any of the defendants. Every transaction was considered with great care both during the evidence and by the judge in the course of his judgment. We will try to refer to the judge's conclusions with regard to each scheme and to the central issues in the case as shortly as possible because his judgment is available for consultation if necessary. It is, however, necessary to refer to them in some detail having regard to the extensive challenge made to the judge's conclusions as the argument progressed. As we see it, it is necessary to identify the reasons given by the judge for his conclusions in order to decide what, if any, difference the new evidence would have made.

**Scheme I**

47. The primary facts relating to Scheme I are set out in paragraphs 12 to 25 above.

**Hire differences.**

48. The fact that in the first instance hire differences were paid into BMB account 7730 and then for the most part to Mr Al Bader's personal account at UBS in Geneva was not in dispute. Nor was it in dispute that both he and Captain Stafford played a part in the operation of the scheme. Their explanation was that the system was set up as a result of instructions from Sheikh Ali as the Oil Minister that Mr Al Bader should establish a strategic fund abroad for the use of the state. They accepted that they were both concerned in the operation of the back to back charterparty arrangements which had the effect of transferring the hire differences into account 7730 but said that that was for state purposes and was not in any way dishonest. Mr Al Bader admitted that large payments were made into his personal account at UBS Geneva but said that the money was then used for state purposes. Much of it, he said, was paid to Sheikh Ali or on his instructions. On the evidence of Mr Al Bader and Captain Stafford the same was true after the change of system in April 1988.

**Commissions**

49. Mr McCoy said that during a discussion about commission Mr Al Bader told him about the strategic fund, which KOTC wanted to finance through payments in the nature of a 1.25 per cent address commission. Mr Al Bader denied that he had ever told Mr McCoy about the strategic fund. He subsequently gave what the judge described (at page 49) as confused evidence about the 1.25 per cent commission. After considering the evidence in some detail the judge expressed his conclusions in this way (at page 51):

> Viewing the evidence as a whole I am left in no real doubt that it was Mr Al Bader who made the arrangement with Mr McCoy which resulted in the accumulation of 1¼% commission in what became known as the Bristol account, whether or not he knew precisely how Clarksons chose to handle it in their own books. I have reached that conclusion for several reasons. In the first place, I accept the evidence of Mr McCoy on this point in preference to that of Mr Al Bader. Mr McCoy struck me as an honest and generally straightforward and reliable witness whose evidence was consistent with the contemporaneous documents and the inherent probabilities of the case. By contrast, on this aspect of the matter, as on many others, Mr Al Bader gave me the impression of being uncomfortable and evasive and I found much of what he said implausible. Although Capt Stafford had dealt with Mr McCoy for some time in connection with the routine sale and purchase of vessels, it is unlikely that Mr McCoy would have accepted instructions from him in a matter of this kind and no one suggested that he did. That leaves only Mr Qabazard and Mr Al Bader. Mr Brodie suggested, without actually putting forward a positive case, that it may have been Mr Qabazard who made these arrangements with Mr McCoy and that there may have been some private agreement between the two of them to siphon off funds from KOTC in this way. Such a suggestion was never put to Mr McCoy and I can see nothing to support it. The arrangement to retain 1¼% commission must have been made early in October at the very latest, in other words before Mr Qabazard became involved in the chartering programme, and probably at the time when Clarksons were first instructed. It is just the kind of arrangement which, if it were to be suggested at all, one would expect Mr Al Bader himself to raise with Mr McCoy. Moreover, the incentive of obtaining a large amount of business might well explain why Clarksons were willing to agree to a commission-sharing arrangement of that kind. However, Mr Qabazard was not himself in a position to hold out the prospect of exclusive access to a substantial amount of business and was not therefore in a position to lay the groundwork for the chartering programme with Clarksons. At that stage there had been relatively little contact between Mr Qabazard and Mr McCoy and little opportunity to build up a working relationship. By common consent Mr Al Bader was a capable and shrewd businessman who exercised a high degree of personal control over KOTC's operations (even if he did not like to concern himself too much with matters of detail) and had a good grasp of what was going on within the company. I think it most unlikely that either Mr McCoy or Mr Qabazard would have felt sufficiently confident that a fraudulent scheme of the kind suggested by Mr Brodie could have been kept hidden from him for very long. Finally there is the link between the Bristol account and the sale of the *Endurance Glory* . The first entry in the account is the debit of US$100,000 linked to the

> sale and purchase of that vessel. There is nothing to suggest that Mr Qabazard was involved in that transaction in such a way as might explain that.

As to Captain Stafford's involvement, the judge added:

> Was Capt Stafford aware of the 1¼% commission arrangement as well? He said he was not, but it would be surprising if that were so. He was very closely involved in the back-to-back charter arrangements, even, on his own account, to the point of being a party to the original discussions with Sheikh Ali which led to the establishment of the strategic fund. He was directly involved in the inflation of invoices for additional war risk premium and crew war bonuses by which further funds were made available for the strategic fund. He was clearly very close to Mr Al Bader who trusted him fully. He was closely involved in the negotiation of the charters and must have been aware that Clarksons were receiving 2½% commission on gross hire, if only because there was an express reference to the rate of commission in two of the early charters. I can see no sensible reason why Mr Al Bader should not have told him about the arrangements to collect address commission and I think it much more likely that he did. However, there would have been no particular need for Capt Stafford to discuss the address commission with Mr McCoy, and the evidence suggests that he was not aware in any detail of the manner in which it was being handled within Clarksons.

**War Risk Premiums and Crew Bonuses**

50. The judge expressed his findings in this regard succinctly as follows (at page 47):

> There was a curious divergence of evidence between Capt Stafford and Mr Al Bader on this aspect of the case. Capt Stafford admitted that he had been aware of the creation of inflated invoices for war risk premium and crew war bonuses from time to time from January 1987 onwards as a means of producing additional income for the strategic fund. Although he maintained that the invoices rendered by the nominee companies to Sitka had been produced by Mr Qabazard, it is clear from his evidence that he knew of and supported the arrangement. It is difficult to believe that in implementing this aspect of the back-to-back charter arrangements Capt Stafford and Mr Qabazard were acting behind Mr Al Bader's back for their own private benefit, and indeed that has never been suggested. However, Mr Al Bader denied any knowledge that funds were being accumulated with Clarksons in that manner. He suggested rather obliquely that Mr Qabazard might have used that as a means of raising funds to pay for traveller's cheques when they were required and that he did not concern himself with their origin. However, even if I were able to accept that Mr Al Bader did not unduly concern himself with the source of funds which on any view were being drawn for unorthodox purposes, I should be unable to accept his account of the matter. It is clear from Clarksons' records that this method was not simply used to raise funds on an ad hoc basis as and when required. On the contrary, substantial amounts were flowing into the Devon Maid account on a regular basis and it was being used to build up a substantial fund from which transfers were made from time to time. I can only conclude that Mr Al Bader was concealing the truth and that these funds were being accumulated with his knowledge and on his instructions.

**The Clarksons' Accounts**

© 2025 Thomson Reuters. 

51. The judge held that all the defendants were aware of the Clarksons' accounts. He discussed the operation of the accounts in considerable detail between pages 53 and 57 of his judgment. Mr Brodie submitted to the judge that account no 2 and the Devon Maid account were what he called 'open' accounts which were used for legitimate state purposes and of which Mr Al Bader and Captain Stafford were broadly aware, whereas account no 1 and the Bristol accounts were 'secret' accounts which Mr Qabazard, with the connivance of Mr McCoy, was maintaining for his own benefit and of the existence of which Mr Al Bader and Captain Stafford were unaware. The judge expressed his conclusions in this way (at pages 57 to 58):

> Both Mr Al Bader and Capt Stafford denied any knowledge of Account 1 or Bristol and indeed of the accumulation of funds through the collection of 1¼% commission or the additional US$1,000 a day being collected under the back-to-back charter scheme. (Indeed, Mr Al Bader, as I have already observed, also denied any knowledge of the accumulation of funds through the inflation of war risk premiums and crew war bonuses). It is certainly true that there were marked differences between the ways in which Accounts 1 and 2 were operated, but I am unable to accept that Account 1 and Bristol were the private creatures of Mr Qabazard. In the first place, for the reasons I have already given, I have no doubt that the arrangements for the collection of 1¼% commission and the establishment of the Tankers/S&P Special Charters (later Bristol) account were made by Mr Al Bader. That was, therefore, an account of which he was aware, and whether or not he took a close interest in the precise state of the account it would have been difficult for Mr Qabazard to draw large amounts from it for his own purposes without that coming to Mr Al Bader's attention. The relationship between Mr Al Bader and Mr McCoy was a close one based on frequent contact and mutual trust. I am unable to accept the suggestion that Mr McCoy was willing to deceive Mr Al Bader in order to assist Mr Qabazard in furthering his own ends, but unless that were the case there was the constant risk that Mr McCoy would inform Mr Al Bader, either deliberately or inadvertently, of any private dealings by Mr Qabazard with the funds held by Clarksons.

52. The judge then discussed other evidence which he concluded supported the view that Mr Al Bader was aware both of the Bristol account and of account no 1. He held that just as Mr Al Bader must have been aware of the state of account 7730 he must also have been aware of the state of account no 2 in to which the hire differentials of about US$2,000 a day were paid. He then pointed to the fact that on three occasions there was transfers from account no 2 to account no 1, which (given his conclusion that Mr Al Bader must have been aware of the state of account no 2) was, as he put it, quite a strong indication that Mr Al Bader was aware of account no 1. The judge added (at page 59):

> Moreover, in June 1988 Clarksons received instructions to transfer US$66,806.25 from Devon Maid to Account 1 and then transfer the resulting balance (US$90,000) to a company called Al Jameel Trading Agencies. In one of two memoranda of 2nd June passing these instructions to his finance department Mr McCoy states that instructions had been given verbally and the confirming fax sent by Capt Stafford the same day asked Clarksons to "process the disbursement in the amount of 66,806.25 USD as per instructions from Mr Al Bader". I think it more likely than not that in that instance the oral instructions received by Mr McCoy did indeed come from Mr Al Bader and if that is so, it provides yet further evidence of Mr Al Bader's knowledge of Account 1. The fact that there were also transfers from Devon Maid to Bristol and from Bristol to Devon Maid is a further indication that although these ledger accounts were separately maintained, no doubt for good reasons, they were operated in conjunction with each other as circumstances demanded.

53. The judge accepted, as was plainly the case, that account no 1 was operated primarily for the purpose of making funds available to Mr Qabazard and account no 2 for the purpose of making funds available to Mr Al Bader. He concluded that, having been established earlier, both Bristol and Devon Maid were kept in being in parallel with account nos 1 and 2 and used to make funds available in the form of cash and traveller's cheques. He rejected Captain Stafford's evidence that he did not

© 2025 Thomson Reuters.

know what was going on, saying (at page 60) that in the end he was left in little doubt that Captain Stafford was concealing much of what he knew about the way in which the accounts were operated and of his own role.

54. Between pages 61 and 64 the judge analysed the available evidence as to what became of the money in the various accounts. Substantial sums from account no 2 found their way into Mr Al Bader's UBS account in Geneva and into accounts which he held in London. The only other monies in any of the accounts which could clearly be shown to have gone directly into the possession of any of the defendants were those which were made in the form of cash and traveller's cheques which Clarksons delivered to Mr Qabazard and Captain Stafford on their periodic visits to London.

55. Mr Al Bader would draw bearer cheques on his various accounts. Between 1985 and 1994 he drew bearer cheques totalling over £3.9 million. Of that figure a total of £215,000 was drawn in 1985 and 1986 and over £1 million in 1993 and 1994. Mr Al Bader said that those were drawn for private purposes, but that the remainder were drawn as a means of disbursing monies from the strategic fund to agents of foreign governments and others in connection with services during the Gulf war. His evidence was that he would use the bearer cheques to buy gambling chips which he would hand over discreetly to each payee as circumstances demanded. The judge rejected Mr Al Bader's evidence that all the payments between 1987 and 1992, when he ceased to be chairman of KOTC were disbursed out of the strategic fund in this way. He said (at page 63):

> This account, which reads like something out of a novel, cannot be dismissed out of hand given the evidence of the way in which unorthodox payments were made by KOTC on behalf of KPC's marketing department and Capt Stafford's evidence of an occasion when he witnessed Mr Al Bader handing over a substantial sum in cash to a foreign agent, but it does deserve to be examined with some care. What Mr Al Bader wholly failed to explain was the purpose for which he obtained bearer cheques between September 1992 and June 1994 in a total of £1.15 million which, on his own admission, had nothing to do with payments for the benefit of the state. Mr Al Bader admitted to being a member of four or five London casinos and to enjoying gaming regularly when he was in London and it may well be that many of the bearer cheques were cashed at casinos, but their continued use in large amounts after February 1992 suggests that Mr Al Bader found them a convenient form of handling money for his own purposes rather than a simple way of satisfying the demands of foreign agents for untraceable money. There are other aspects of this which also cast doubt on his explanation. The tanker war had begun in 1984 and was at its height in 1986 when he said he was asked to raise the strategic fund. The war came to an end following the ceasefire in August 1988. One would therefore expect that payments of this kind would have been made mainly during 1987 and the first half of 1988 and that few, if any, would have been made in the second half of 1988 or thereafter. In fact, however, the total value of the bearer cheques obtained by Mr Al Bader between January 1987 and the end of August 1988 (£820,000) was far smaller than the total of those obtained between September 1988 and February 1992 (£1.685 million) and smaller even than the value of those obtained after he had left KOTC. All this tends to reinforce the conclusion that Mr Al Bader did not obtain bearer cheques for the purposes of paying foreign agents but simply because he found them a convenient way of handling large sums of money for his personal use. It does not lend any weight to his suggestion that funds remitted to his UBK account were used for state purposes.

56. The judge observed that Mr Al Bader admitted receiving some of the traveller's cheques supplied through Clarksons. So did Captain Stafford, although he said that they were bonus payments from Mr Al Bader or Mr Qabazard. He said that he had never himself knowingly collected cash or traveller's cheques himself from Clarksons and that he had no reason to be aware that significant amounts of money, or indeed any money at all, was being collected in that way. However, the judge described that evidence as less than candid and gave an example of Captain Stafford collecting traveller's cheques from Mr McCoy in September 1987. He also found that Mr Qabazard had cashed some of the traveller's cheques supplied through Clarksons.

57. The judge summarised his conclusions with regard to Scheme I in this way (at pages 64 to 65):

> Although the device of back-to-back charters might well have been explicable simply as providing an additional measure of secrecy, the evidence demonstrates that it was in fact utilised for the purpose

of secretly removing funds from Sitka and placing them in the hands of the defendants. The funds were then used for purposes which, on the evidence, were unconnected with the company's own business. The explanation offered by Mr Al Bader and Capt Stafford was that of the strategic fund, but even if one accepts that at face value, it does not on their own evidence provide a complete explanation for all the funds which went astray. The facts surrounding Scheme I, therefore, point to the conclusion that at least some aspects of it, if not the scheme as a whole, was dishonest.

**Scheme IV**

58. Although the judge considered Scheme II next, we shall consider scheme IV at this stage because it proceeded at the same time as Scheme I. The basic facts are set out in paragraphs 26 to 36 above. In considering this scheme, we have well in mind Mr Brodie's point that traveller's cheques were widely used in Kuwait as cash. However, the judge was struck by a number of aspects of the evidence. For example, the first group of three purchases over a period of some three months involved traveller's cheques to a total of US$800,000 without there being any records at KOTC explaining them and Mr Al Bader was not able to explain why they were purchased. The same was true of traveller's cheques purchased in October and November 1986.

59. As to the forged documents referred to in paragraphs 28 to 30 above, the judge held that Mr Al Bader was aware that that was the case. He rejected as fanciful a suggestion that the letter and invoice were produced by Mr McCoy pursuant to a private arrangement between him and Mr Qabazard. The judge also referred to part of Mr Qabazard's interview by the Kuwaiti prosecuting authorities on the 13th January 1993. He had held the statements in the interviews to be admissible in evidence at the trial, while correctly directing himself that they should be treated with caution. The judge said (at page 84):

> Finally, if further confirmation were needed, it can be found in Mr Qabazard's prosecution interview on 13th January 1993 in which he told the investigators that on a number of occasions Mr Mohsin had forged documents purporting to come from Clarksons seeking payment of brokerage and had also produced the other documents necessary to implement this scheme in accordance with instructions he and Mr Mohsin received from Mr Al Bader. That description of the scheme is entirely consistent with all the other evidence which demonstrates that this was a sophisticated fraud being practised on KOTC by Mr Al Bader, Mr Qabazard and Mr Mohsin. I leave over for the moment the question of Capt Stafford's involvement in this particular device.

The judge also held that later letters of the 28th August and 9th November 1987 were forgeries and indeed that it is likely that there were other false documents left on the file.

60. The judge reached similar conclusions with regard to the falsification of the Brown & Root invoices to which we have referred in paragraphs 30 to 32 above. He said (at page 85) that he found it impossible to accept that Mr Al Bader was telling the truth when he said that he was unaware that invoices were being falsified. He gave these reasons:

> In the first place, if he did want to obtain large amounts of money in the form of traveller's cheques for clandestine purposes, I think it would be wholly out of character for Mr Al Bader to leave it entirely to Mr Qabazard to decide how to go about it without ever bothering to enquire how it had been done. The Porchester account was used quite extensively during this period, and whether or not it was in any sense secret, I think it most unlikely that he would not have wanted to keep himself abreast of movements on that account. In fact, on at least three occasions Mr Al Bader himself wrote to the bank asking it to supply traveller's cheques in an amount equal to the difference between the original and the falsified invoice. He was clearly aware, therefore, of how the scheme operated. I find it difficult to decide as a matter of mechanics whether the original invoices were altered and photocopied after they had been signed by Mr Al Bader or whether he signed a photocopy made after the alteration had been carried out. On the whole I think it probable that the alterations were

> made after Mr Al Bader had already signed the original, but it does not make any difference since I am unable to accept that the alterations were made without his knowledge and approval whenever they were made.
>
> That being so, I also find it impossible to accept Mr Al Bader's evidence that the traveller's cheques he received were used for state purposes or that he was unaware of the fact that both Mr Qabazard and Mr Mohsin were receiving traveller's cheques for their own benefit. If he was aware of the alterations to the invoices, it is unlikely that he was unaware, at least in a general way if not with some precision, of the amount of money being transferred into Porchester's account and drawn out in the form of traveller's cheques. He must therefore also have been aware of the amounts being received by Mr Qabazard and Mr Mohsin, which in some cases were very substantial, and of the fact that there could be no honest reason for them to receive them. That being so, it is impossible to believe that the traveller's cheques received by Mr Al Bader, who had previously been involved in dishonest schemes to defraud KOTC, were not also taken for his personal benefit rather than for state purposes. This conclusion, which I have reached on the documents in the case and the evidence given by the witnesses at the trial is reinforced, not for the first time, by what Mr Qabazard told the prosecuting authorities in Kuwait. On 13th January 1993 in the course of his second prosecution interview he described accurately and in some detail the method by which money was withdrawn from KOTC using falsified Brown & Root invoices which, he said, had been instigated by Mr Al Bader. I can see no reason why Mr Qabazard should have falsely implicated Mr Al Bader in what was otherwise a true account of this scheme and it is noteworthy that he exonerated Sheikh Ali and Capt Stafford, both of whom he had implicated in other schemes. In his final speech Mr Qabazard was at pains to point out that there is no direct evidence that he was responsible for producing any of the false documents, whether it be the falsified invoices or the false copy letters bearing his stamp. That is quite true, and indeed such evidence as there is outside the document themselves suggests that that was probably the work of Mr Mohsin. However, there can be no doubt that Mr Qabazard was fully involved in and benefited directly from this method of stealing from KOTC and there is no reason to think that he was not fully aware at the time of the part being played by his assistant Mr Mohsin.

Those are convincing reasons for the conclusions reached by the judge, namely that Mr Al Bader and Mr Qabazard were both dishonestly involved in Scheme IV, including the dishonest use of the Porchester and Yucatan accounts. We shall return to the Yucatan account in the context of the role of Gulf Shipping below.

61. We shall also return to the position of Captain Stafford separately below, but it is convenient to set out here the judge's conclusions as to his involvement in Scheme IV. The judge said (at page 88):

> There is no evidence that Capt Stafford participated directly in organising or carrying out any of the transactions falling under scheme IV, but in view of his close relationship with Mr Al Bader and Mr Qabazard and his direct involvement in the back-to-back charter arrangements it would be surprising if he had not been taken into their confidence and remained unaware of what was going on. It would be all the more surprising given the fact that it is clear that on a number of occasions he received substantial sums in the form of traveller's cheques derived from the fraud based on the forged Clarksons invoices and also traveller's cheques obtained from the frauds based on the falsified Brown & Root invoices. There is no evidence, on the other hand, that he received any further money derived from scheme IV after he left Kuwait.

Captain Stafford received at least US$1,241,000 traveller's cheques under Scheme IV. We say ‘at least’ because it was not possible to identify the recipients of all the traveller's cheques and Captain Stafford only admitted receipt of those traveller's cheques which the claimants could prove had been received by him.

**Scheme II**

62. The primary facts are set out in paragraphs 37 to 42 above. Arrangements were made between KOTC and Clarksons before the sale of the AL RAWADATAIN whereby Clarksons would receive a total of US$119,922.79 by way of commission but would retain only US$20,676.34 as their own remuneration. As indicated in paragraph 37, traveller's cheques (which included the US$99,225 difference between those figures) were collected from Clarksons by Mr Qabazard and some of them were subsequently cashed by Mr Al Bader and Captain Stafford. The judge said that he would have expected matters of this kind to have been discussed between Mr McCoy and Mr Al Bader. He therefore expressed surprise at Mr Al Bader's denial that he knew the source of the traveller's cheques which he received. The judge added (at page 65):

> He did not say that the money was part of the strategic fund and the fact that all three defendants received some of the traveller's cheques makes it that much more difficult to accept that these funds were required for state purposes. It would surely be too much of a coincidence to believe that just at the time when Mr Al Bader required traveller's cheques for clandestine payments Mr Qabazard had a similar requirement and it also happened to be a suitable moment to pay a bonus to Capt Stafford. The circumstances surrounding this particular transaction are therefore suggestive of dishonesty.

63. The judge then discussed in detail the purchase of the MAERSK vessels, the ATLANTIC vessels and the newbuildings. As to the MAERSK vessels, Mr Al Bader's explanation for the payment of the US$6,000,000 was that he had instructed Mr Qabazard to obtain 10 per cent of the price for the strategic fund. The judge rejected Mr Al Bader's attempts to distance himself from the transaction. He noted that Mr Al Bader was able to offer no explanation for the transfer by Clarksons of the bulk of the money they received from KOTC to his account at UBS. As to Clarksons’ commission, Mr Al Bader denied making any agreement with Mr McCoy for the payment of commission by KOTC to them. He said that he had left it to his staff and that so far as he was aware Clarksons were entitled to the full US$900,000 on each vessel. The judge did not believe him, in part because his evidence was inconsistent both with that of Mr McCoy and with the inherent probabilities. In short he held that the evidence admitted of only one conclusion, namely that, as in the case of the AL RAWADATAIN, Mr Al Bader agreed with Mr McCoy that Clarksons should invoice KOTC for commission in the sum of US$900,000 and that Clarksons should hold US$630,000 to the order of Mr Al Bader, retaining US$270,000 for themselves.

64. As stated in paragraph 38, the sums of US$1,260,000 and US$6,000,000 were credited to Mr Al Bader's Geneva account on the 19th and 21st July 1989 respectively and on the same day, the 21st July, US$1.41 million was transferred form that account to Mr Qabazard's account in London. Mr Al Bader said that he was not aware that the two amounts of US$630,000 had been transferred to the account until some days later when Mr Qabazard told him that there had been a mistake and that the funds had to be repaid to Clarksons. He therefore transferred the sum of US$1,260,000 together with a further sum of US$150,000 to Mr Qabazard intending that he should repay the money due to Clarksons on his behalf. The judge did not believe that explanation. He said that it was inconsistent with the documents, that it did not explain why Mr Al Bader transferred money to Mr Qabazard's private account and not direct to Clarksons and that Mr Al Bader could not explain the extra US$150,000. In short he held that those facts suggested that the payment to Mr Qabazard was nothing more or less than a payment of part of the proceeds of a dishonest transaction.

65. As indicated in paragraph 39, the ATLANTIC vessels’ transaction was very similar except that the monies were transferred to Gulf Shipping, of which Mr Al Bader said that he knew nothing. The judge recognised that in this case (by contrast to the previous one) the debit notes were not expressly directed to Mr Al Bader, but he noted that KOTC's regulations required the payment to be authorised by Mr Al Bader and said that it was difficult to accept that he was not aware of them or of the fact that the commission was three times the normal rate for business of that kind. He concluded (at page 69):

> Mr Qabazard cannot have been so foolish as to think that a secret arrangement between himself and Mr McCoy would pass under Mr Al Bader's nose without exciting his suspicions. The only sensible conclusion is that the commission arrangements with Clarksons were agreed between Mr McCoy and Mr Al Bader, or at any rate that Mr Al Bader knew and approved of them. It necessarily follows that the instructions to transfer the excess to Gulf Shipping were also given by him or with his approval.
>
> In those circumstances it is impossible to accept that Mr Al Bader did not also know about and approve the commission arrangements between Clarksons and the sellers. Since all the funds found their way to the same destination the only other possibility, namely that there was some secret arrangement between Mr McCoy and Mr Qabazard to abstract large sums of money for their own use by repeating the scheme adopted in relation to the Maersk vessels, is one that can be wholly discounted. None of the defendants has ever sought to justify any of the transfers to Gulf Shipping.

Mr Brodie submitted on this appeal that, whatever the position on the evidence before the judge, the new evidence shows that Gulf Shipping was solely the vehicle of Mr Qabazard and that the true position is that Mr Qabazard dishonestly set up this part of Scheme II entirely for his own benefit.

66. The arrangements made in the case of the new buildings, which are described in paragraphs 40 and 41 above, involved very large payments by Clarksons to Gulf Shipping. There was a conflict of evidence between Mr McCoy and Mr Al Bader as to the nature and origins of the fee referred to in paragraph 41. The judge did not wholly accept the evidence of Mr McCoy in this regard, but nor did he accept the evidence of Mr Al Bader. He concluded (at page 71) that there was an agreement of the kind described in evidence by Mr McCoy and that it was agreed between him and Mr Al Bader.

67. The key question considered by the judge was, however, how the arrangements described in paragraph 40 came to be made, because the total amount paid to Gulf Shipping as a result of them was over US$17.5 million. Mr Al Bader said that he knew nothing about the arrangements or the payments to Gulf Shipping. The claimants said that that was untrue and that he knew perfectly well what was happening. They relied upon the fact that on the 8th May 1990 Mr Qabazard transferred US$8.67 million out of his UBS account in London to Mr Al Bader's account in Geneva. They said that that was Mr Al Bader's share and pointed to the fact that the payment was made only a few days after the sum of US$7,120,000 had been paid by Clarksons to Gulf Shipping.

68. Mr Al Bader said that Sheikh Ali had told him to raise US$8.5 million and that when negotiations were under way for the new buildings he had therefore instructed Mr Qabazard to ensure that US$8.5 million was made available to him through commission payments. He left it to Mr Qabazard to make the arrangements. The payment of US$8.67 million represented those commissions. He did not know that the money had come from Gulf Shipping. He simply expected it to be paid to him when it was available, just as happened in the case of the hire differentials. The judge did not believe Mr Al Bader. He said (at pages 72 to 73):

> Once again, I find it very difficult to accept Mr Al Bader's explanation of events. In the first place, the purchase of two new vessels at a price of US$80 million each is a major project, even for a company with the resources which KOTC had at its disposal, and doubly so if four vessels are being contemplated. It was well outside Mr Qabazard's normal area of responsibility and the ordinary scope of his authority. The evidence of Mr Al Bader's personality and approach to management as attested to by many witnesses indicates that it would have been quite out of character for him to delegate the negotiations for a project of that size in the manner he suggested. I think it unlikely, also that in a matter of this kind Mr Al Bader, who had involved himself closely in the operation of the back-to-back charter arrangements, would not have taken a close interest in the arrangements for raising a sum of this magnitude. Even if he had given Mr Qabazard a fair measure of discretion in making the arrangements, I find it impossible to accept that Mr Al Bader would not have wanted to be informed of their general nature or the time at which funds would become available. Although

© 2025 Thomson Reuters. 

> there are indications that from the outset KOTC was contemplating ordering four new vessels, the second pair of contracts was not in fact signed until July that year. He might at least have liked to know whether any part of the funds would only become available if and when those contracts were executed.

The judge concluded that the overwhelming likelihood was that the US$8.67 million came from Gulf Shipping.

69. The judge, however, correctly identified the key question, namely whether Mr Al Bader was party to the payment of the remainder of the commission and its transfer to Gulf Shipping. In this regard he said (at page 73):

> It is implicit in his account that Mr Qabazard used his position as head of the negotiating team to obtain large sums of money for himself under the guise of raising funds for the strategic fund. Such a scheme would, of course, have involved deceiving Mr Al Bader as well as defrauding KOTC. However, apart from the fact that I think it most unlikely that Mr Al Bader would ever have delegated this project so completely to Mr Qabazard, I find it difficult to accept that Mr Qabazard would have taken the risk of attempting a deception of that kind on Mr Al Bader, with or without the assistance of Mr McCoy, or that he would have succeeded had he done so. The total amount of commissions paid by the builders in relation to the four vessels was US$18 million - nearly US$10 million more than Mr Al Bader said he had asked Mr Qabazard to raise. I think it unlikely that the price of those vessels could have been further inflated to that extent without his becoming aware that something untoward was going on.

The judge added that there was plenty of evidence of frequent contact between Mr Al Bader and Mr McCoy and that there was nothing to suggest that Mr McCoy would willingly ally himself to Mr Qabazard in an attempt to go behind Mr Al Bader's back.

70. On page 74 the judge referred to a note dated the 12th June 1990 made by Mr McCoy dealing with commission on the second newbuilding, which reflects his understanding that US$3.76 million was to be held to the order of Mr Al Bader, even though Mr Al Bader had by then already received the whole of the US$8.5 million which he said he was expecting. The judge concluded this part of the discussion in this way:

> Of course, it is possible that that was something he had been told by Mr Qabazard, but if it were not correct there was every likelihood that he would mention it to Mr Al Bader and the secret would be out. Finally, the fact that all the funds received by Clarksons, both those which were paid to them direct by KOTC and those which were received from the builders, were transferred to Gulf Shipping with which Mr Al Bader was connected in respect of the previous transaction is further support for the conclusion that both the agreement with Mr McCoy relating to Clarksons' commission and the arrangements for the disposal of the much larger commission paid by the shipbuilders were made by him or under his direction. In the end I am left in no doubt that that was in fact the case.

Mr Brodie observed in this connection that the point made by the judge in that passage depends upon the view which should now be taken of Gulf Shipping in the light of the new evidence because, if the judge's conclusions as to the ATLANTIC vessels were wrong, the same would be true of this part of his judgment. We see the force of that submission, but it does seem to us that on the material available to him, the judge's reasoning is very convincing.

© 2025 Thomson Reuters. 

71. The judge then considered the position of Mr Qabazard and Captain Stafford. He said that he was in no doubt that Mr Qabazard was fully involved in these transactions. We entirely agree. We shall return to the position of Captain Stafford separately below.

**Scheme III**

72. The question here is whether Mr Al Bader and Captain Stafford were concerned in any way with Scheme III, which is briefly described in paragraph 43 above. There can be no doubt that Mr Qabazard was, and the judge so held. We shall return to the position of Captain Stafford below. As to Mr Al Bader, the judge recognised that there was nothing in the documents which directly implicated him, but he held that it was likely that he was aware of the arrangements. He so held partly because of the close relationship between Mr Al Bader and Mr McCoy and partly because the rebates were paid into Gulf Shipping. It seems to us that whether the judge's conclusion that Mr Al Bader was liable in respect of Scheme III can be supported depends upon whether his conclusion that Mr Al Bader knew about and received money indirectly from the Gulf Shipping account can stand in the light of the new evidence. However, before turning to the new evidence, it is appropriate to summarise the judge's conclusions as to the strategic fund and Gulf Shipping on the material before him.

**The Strategic Fund**

73. A central part of Mr Al Bader's defence was that he received large sums on the instructions of Sheikh Ali as the Oil Minister in order to establish a strategic fund abroad and to place monies at his immediate disposal outside Kuwait for state purposes. The claimants' case was that this was a false story invented as a cover for fraud. The judge discussed this issue in considerable detail between pages 88 and 110 of his judgment.

74. It is a significant feature of this case that, unlike many other cases in which conspiracy has been alleged, there is evidence of an agreement, even though there is an issue as to its underlying purpose. The claimants say that the agreement was dishonestly to divert monies from them by whatever means came to hand whereas Mr Al Bader and Captain Stafford say that the agreement was to carry out Sheikh Ali's instructions for state purposes. In this regard the scope of the agreement seems to us to be of importance. Both Mr Al Bader and Captain Stafford said that they were both present at a meeting with Sheikh Ali. Mr Al Bader's evidence was not entirely consistent. In his witness statement he said that he was simply instructed to raise money as and when he could for as long as there was a need for it and that, following the meeting, he had asked Captain Stafford to suggest methods by which the funds could be raised. He also said that he had brought Mr Qabazard into the picture, that Sheikh Ali had asked him to keep the fund secret and that in the event the back to back charter arrangements were made to begin accumulating funds which were transferred to his account at UBS Geneva and thence in accordance with Sheikh Ali's instructions. In cross-examination he said that three particular methods of raising money had been discussed with Sheikh Ali, namely creating differences in hire under back to back charterparties, taking sums by way of commission on the sale and purchase of tankers and taking commissions on new buildings, and that a decision had been made to start with back to back chartering. He said in his statement that, although Captain Stafford had been present at the meeting, he did not remember his making any contribution to the discussion. By contrast, he said in cross-examination that Captain Stafford had played an active part in the discussions.

75. Captain Stafford generally supported Mr Al Bader's account as it had developed in cross-examination. He said that he joined the meeting after it had begun and took an active part in discussing the different methods of raising money referred to above. It follows that it was Captain Stafford's evidence (which he gave in examination in chief) that the discussions covered raising money by what were to become both Schemes I and II. The issue at the trial was whether the schemes were then put into effect for dishonest purposes or for state purposes. The judge held that it was the former. He rejected the evidence that there was any strategic fund. If he was right to do so, it seems to us that the evidence of Mr Al Bader and Captain Stafford provides strong support for the conclusion that there was from the outset an agreement to divert monies by what became Schemes I and II and indeed for the further conclusion that the essence of the agreement was that the defendants would defraud the claimants by whatever means came to hand.

76. The judge considered the evidence of a number of witnesses from KPC who testified to the fact that they had heard nothing of a strategic fund until the commencement of the proceedings, although he correctly observed that that may not take the matter very far, given that the fund was supposed to be secret. The judge then considered the likelihood or otherwise of Sheikh Ali setting up a secret fund of the kind suggested. He concluded (at page 91) that Sheikh Ali had such influence in Kuwait that there was no need to resort (as the judge put it) to backstairs methods, that there was no need for any more secrecy than had existed in the case of the strategic oil reserve and that there was no reason to think that the Council of Ministers would not have approved a strategic fund if asked, just as it ratified the decision to set up the strategic oil reserve. The judge

then considered the probabilities of Sheikh Ali instructing Mr Al Bader to set up a fund without giving any indication of how much he should raise or how soon any particular amount might be required. He concluded that such general instructions were improbable.

77. Next (at pages 92 to 93) the judge pointed to three aspects of Mr Al Bader's behaviour which he thought cast doubt on the conclusion that he considered himself to be a guardian of state funds. First, all the funds which he said he received for the strategic fund were paid into his UBS account where they became mixed with his personal monies. Secondly, he appeared to have kept little by way of a record of the amounts he was holding for the strategic fund, or of the amounts he paid out or of the persons to whom they were paid. Thirdly, he appeared never to have given Sheikh Ali a summary of the state of the account. In short Mr Al Bader treated the monies as if they were his own rather than belonging to the state. The judge further rejected the suggestion that there was any parallel between the arrangements for the payment of 'commercial commissions' by KOTC on behalf of KPC.

78. The judge was struck by the fact that, as a result of hostilities coming to an end between Iran and Iraq, by the spring of 1989 the need for extraordinary measures to protect Kuwait's oil exports must largely have come to an end, even though mines still required removal. Yet on Mr Al Bader's evidence over US$17 million were raised for the fund between July 1989 and February 1991, much more than had been raised during the whole of the previous period. Moreover a considerable part of that sum was raised before the invasion of Kuwait in August 1990. No satisfactory explanation was given by Mr Al Bader of the need to raise such substantial sums during that period. Similarly substantial sums were disbursed at that time, including a payment to Sheikh Ali of US$4.5 million in December 1989. In addition large sums (described by the judge at page 97) were paid out to Sheikh Ali both after he ceased to be Oil Minister and after he left the government. Finally in this regard the judge was struck by the fact that neither Sheikh Ali nor Mr Al Bader mentioned the strategic fund to the new Oil Minister, Mr Al Ameeri, who took office in June 1990.

79. Between pages 97 and 100 the judge discussed various aspects of the investigations into the whole affair to which it is not necessary to refer save to observe that he rejected a suggestion that the claimants' allegations were politically motivated. The judge then considered the various interviews given by Mr Qabazard. He said (at pages 100 to 101):

> In the course of his first two interviews Mr Qabazard gave the prosecuting authorities a detailed account of a series of fraudulent schemes in which he, Sheikh Ali, Mr Al Bader, Capt Stafford and Mr Mohsin had been involved at one time or another over a period of many years. Leaving aside for the moment the question whether that confession is reliable in all respects, its main significance as far as the present issue is concerned is that it is wholly inconsistent with the creation or operation of a strategic fund of the kind described by Mr Al Bader and Capt Stafford. Not only did Mr Qabazard fail to mention the existence of a strategic fund of any kind, he said in terms that the funds obtained by the various methods I have described were seized by the participants for their own benefit. Even if Mr Qabazard's account is only broadly reliable, therefore, there can have been no strategic fund.
>
> In view of the fact that he described with considerable accuracy the methods by which funds were siphoned away from KOTC, I am quite satisfied that that part of his account cannot have been invented. Mr Qabazard himself suggested that the investigators had twisted his answers to their questions to construct a story which fitted the documents in their possession and incriminate Mr Al Bader, Sheikh Ali and the others, but as I have already said, there is no evidence at all to support any such conclusion. According to Mr Al Bader, Mr Qabazard had been told about the strategic fund shortly after his meeting with Sheikh Ali in September 1986 and had co-operated in setting it up, even if he had also taken advantage of certain opportunities to line his own pockets. If that were so, however, why should Mr Qabazard confess to many fraudulent schemes, some of which were not dishonest at all, and falsely incriminate Sheikh Ali, Mr Al Bader and Capt Stafford? The only explanation which has been suggested is that he was induced to incriminate the others by the prospect of a more lenient sentence, but in the context of this case I find that most unconvincing. There is no evidence to support the suggestion that the prosecuting authorities were motivated by political considerations to pursue a case against Sheikh Ali or Mr Al Bader or that Mr Qabazard was offered any inducement of that kind. Indeed, it is noteworthy that he is careful to discriminate between the people who were actively involved in the different schemes which suggests that he wanted to lay blame only where it was due. Taken overall, therefore, the account he gave in his interviews amounts to a powerful piece of evidence against the existence of any strategic fund.

© 2025 Thomson Reuters.

The judge was also struck by the fact that Sheikh Ali said nothing in his interviews with the prosecuting authorities which might lend support to the existence of a strategic fund.

80. In addition to those interviews the judge placed reliance upon the taped conversation between Mr Qabazard and Captain Stafford to which we have already referred. He said (at page 104):

> One of the striking things which emerges from the early part of the tape is Capt Stafford's confidence in his understanding that Sheikh Ali was receiving funds obtained from KOTC for the personal use of himself or his family. Another striking thing is the absence of any hint of the existence of a strategic fund; the whole conversation proceeds on a common understanding that all the funds drawn from KOTC had been obtained for personal, not public, benefit. That is of some significance given the fact that the operation of the BMB accounts was left to Capt Stafford and it is, of course, quite inconsistent with his evidence and that of Mr Al Bader that all the funds generated under the back-to-back charter arrangements were used for the strategic fund.

The judge then identified a number of individual passages in the conversation which he said pointed in the same direction.

81. Between pages 105 and 109 the judge discussed the evidence of Mr Nader Sultan, who said that in 1988 Mr Al Bader told him that Sheikh Ali had asked him to raise about US$8 million from KOTC to clear his brother's debts. The claimants relied upon that evidence as inconsistent with the story of the strategic fund. After considering the evidence with great care the judge held that the account given by Mr Sultan was in substance reliable and that it provided further support for the claimants' case.

82. It is apparent from the above that the judge gave careful consideration to a whole series of aspects of the evidence in reaching his ultimate conclusion that the evidence of Mr Al Bader and Captain Stafford that Sheikh Ali had instructed Mr Al Bader to divert large sums of money from KOTC to a secret strategic fund was not true. In our judgment, the judge's reasoning is fully supported by the evidence which was given at the trial and which he so fully analysed.

**Gulf Shipping**

83. At the hearing of the appeal both Mr Brodie and Mr Malins paid great attention to the section of the judgment between pages 110 and 114 in which the judge discussed the role played by Gulf Shipping. Both sides relied upon the opening passage:

> One of the most intriguing aspects of this case is the role played by Gulf Shipping, the name under which account No 026 026 was held at Bank Cantrade, Ormond, Burrus SA, Geneva. Gulf Shipping runs like a silver thread through many of the transactions falling within all four schemes: there were 15 transfers to Gulf Shipping from Account 1 between July 1988 and August 1989 totalling over US$2.4 million; 9 transfers of funds obtained under scheme II totalling over US$24 million; 10 payments of war risk premium rebates obtained under scheme III between October 1990 and February 1992 totalling over US$6 million; and 5 transfers, four from Porchester and one from Yucatan, under scheme IV between August 1988 and September 1989 totalling over US$5.2 million. To that extent it is a unifying feature on which the plaintiffs rely as showing that there was one single fraudulent conspiracy involving all three defendants. Despite that, the evidence which would demonstrate clearly the precise nature and role of Gulf Shipping is sadly lacking. Both Mr Al Bader and Capt Stafford professed complete ignorance of Gulf Shipping, although Mr Al Bader did agree that it had nothing to do with any strategic fund. Mr Qabazard did not give evidence and therefore said nothing about it at all, although in his final speech he went to some lengths to rebut the suggestion, implicit in what Mr Brodie had said, that it was an account in which he alone had been

> concerned. He did not, however, suggest that the evidence before me was capable of supporting the conclusion that any of the transfers to Gulf Shipping were made for legitimate purposes.

The reason why both counsel relied upon that passage is that it shows the central role played by Gulf Shipping in the case. Mr Malins submitted that once it was held that Mr Al Bader was aware of Gulf Shipping, since Gulf Shipping ran 'like a silver thread through many of the transactions falling within all four schemes', Mr Al Bader was implicated in them all. Mr Brodie, on the other hand, submitted that since the above passage showed the importance which the judge attached to the role of Gulf Shipping, if (as he submitted was the case) the new evidence undermined or at least cast doubt on these conclusions, the appeal should be allowed and either the claims dismissed or a new trial ordered.

84. The judge observed that it was common ground that transfers to Gulf Shipping of funds which either originated from the claimants or were held to their order were dishonest and unlawful. He correctly held that in those circumstances it was less important to ascertain the person who controlled Gulf Shipping than to ascertain which, if any, of the defendants was or were concerned in making transfers to the Gulf Shipping account.

85. The judge concluded that Mr Al Bader was aware of Gulf Shipping and that he was indeed concerned in making transfers to its account. As indicated in paragraph 65 above, he had held that the instructions to transfer the commissions relating to the ATLANTIC vessels had originated from Mr Al Bader, which he said would be enough by itself to establish his connection with Gulf Shipping. However, the judge pointed to an important letter dated the 27th August 1989 signed by Mr Al Bader in which he wrote to the Burgan Bank on behalf of Yucatan asking it to transfer US$2.3 million to

> Brown Brothers Harriman, New York for Account of Bank Cantrade, Ormond Burrus SA, … Geneva … attention Mr O Burrus favouring Account No 026 026 of Gulf Shipping, advising beneficiary that this amount is in settlement of their account as per their statement dated 30.6.1989.

It can immediately be seen that that letter is an important piece of evidence against Mr Al Bader because it shows him giving instructions for the transfer of a substantial sum to Gulf Shipping account no 026 026, which is the account into which much of the contents of Clarksons' account no 1 and the sale and purchase payments were transferred.

86. The judge described Mr Al Bader's evidence in this way (at pages 111 to 112):

> Mr Al Bader's evidence about this letter was most unsatisfactory. He admitted that he had signed it and that he had read it before he had done so, but he said that he had understood it as a request to the bank prepared by someone in the finance department for his signature asking for payment to be made to a company called Brown Brothers with whom KOTC was dealing. Brown Brothers, he said, looked much the same as Brown & Root and it was of no concern to him if they had an account in Switzerland. He resolutely denied that the letter amounted to a request to transfer funds to Gulf Shipping or that he had any knowledge of Gulf Shipping. For a man with Mr Al Bader's commercial experience this explanation is lamentable. The effect of the letter is quite clear to anyone with a modicum of business experience who takes any time at all to read it. Numerous witnesses testified to his energy and efficiency as a manager and Capt Stafford, who had worked quite closely with him, agreed that he was not the sort of person to sign an authorisation for a million dollars or more without satisfying himself that it was correct. In my view the only possible conclusion one can draw from this letter is that Mr Al Bader was quite consciously instructing the bank to make the transfer from Yucatan to Gulf Shipping. His denial of that obvious fact is simply further evidence that this transfer, in common with other transfers to Gulf Shipping, was a dishonest one, and that in turn sheds further light on the transfer of US$1.15 million by Mr Qabazard to Mr Al Bader a few days later on 5th September 1989. No other source for that money was suggested by Mr Al Bader

> or Mr Qabazard; the obvious inference is that it represented half of the money transferred to Gulf Shipping a few days before.

In our judgment, that reasoning is compelling and played an important part in the overall conclusions reached by the judge.

87. The judge then considered the position of Mr Qabazard and held that there was plenty of evidence to connect him with Gulf Shipping. There can be no doubt that Mr Qabazard knew all about Gulf Shipping. Indeed there was evidence before the judge that it was his private company. That was what he said in his first interview, although he subsequently said that he had opened the Gulf Shipping account on the instructions of Mr Al Bader. Later still he said that the company had been established on Mr Al Bader's instructions and that funds could only be transferred from the account by him. The judge concluded that those later accounts were probably more reliable than the earlier ones. He said that Mr Al Bader was linked to the account by other evidence and that the total amounts transferred to the account made it inherently unlikely that Mr Qabazard had sole control over it. In the context of this appeal it is important to note that the judge added that none of that really mattered as far as Mr Al Bader and Mr Qabazard were concerned if in fact they were participating in the dishonest transfer of funds away from the claimants into the hands of third parties.

88. As to Captain Stafford the judge said (at page 114):

> Evidence of how the Gulf Shipping account was operated could, on the other hand, affect the position of Capt Stafford if it established that Gulf Shipping was a distribution account from which he also benefited. In fact, however, Capt Stafford's connection with Gulf Shipping is far less well established. There is no clear evidence showing when the Gulf Shipping account was set up, other than the fact that the first transfer occurred in July 1988 when US$232,000 was transferred from Account No 1, and no direct evidence to show that he received any part of the funds which were paid into it. However, in view of the close co-operation between Capt Stafford and Mr Al Bader in relation to the back-to-back charter arrangements I find it difficult to accept that he did not know of the existence of Gulf Shipping and the fact that funds were being transferred to it.

We shall return below to the position of Captain Stafford and to Mr Brodie's submission that the way the judge expressed the last sentence of that passage reversed the burden of proof.

**Judge's Conclusions**

89. It was only after considering very many aspects of the case that the judge expressed his conclusions. He correctly did so on the whole of the evidence and correctly directed himself that cogent evidence was required before he could find dishonesty. He summarised his conclusions between pages 114 and 123. Between those pages he drew together his conclusions, but since they emerge from the above discussion it is not necessary to set out them out in detail here. They may perhaps be summarised in this way. He said (at page 115) that after reviewing the whole of the evidence in the case he was left in no doubt that all three defendants acted dishonestly in a variety of ways and over a long period of time to defraud the plaintiffs of very substantial amounts of money. He was satisfied that Sheikh Ali gave no instructions to Mr Al Bader or anyone else to set up a strategic fund for state purposes. In addition to the factors set out in paragraphs 73 to 82 above, the judge said that his rejection of the defendants' case concerning the strategic fund was further supported by the evidence of dishonesty which in many cases was provided by the very nature of the transactions themselves. He then set out again a number of those features to which we have already referred.

90. The judge's conclusions in relation to each of the schemes (in the same order as before) may be seen from the following extracts from this part of his judgment:

**Scheme I (page 127)**

[Captain Stafford] was first drawn [in] in September 1986 when he and Mr Al Bader joined forces to steal money from the plaintiffs by systematically manipulating the arrangements to charter the tankers required to create the strategic oil reserve. That scheme extended not only to creating and stealing the differences in hire between the back-to-back charters, but to obtaining the 1¼ % commission and the additional amounts generated by inflating invoices for additional war risk premium and crew war bonus. These were all just different ways of using their control over the chartering arrangements to their own advantage. I am satisfied that Mr Qabazard was not originally a party to that fraud but he became a party to it at quite an early stage, certainly before the end of 1986, and from that time onwards was fully aware of and involved in the agreement and all its subsequent developments..

**Scheme IV (pages 126 and 128)**

The evidence in the present case demonstrates clearly, in my judgment, that from at least the latter part of 1985 when the first transactions falling within scheme IV occurred Mr Al Bader and Mr Qabazard were involved in the dishonest misappropriation of money from KOTC by the purchase of traveller's cheques using its account with the Burgan Bank. In view of the way in which those traveller's cheques were purchased, I have no doubt that both Mr Al Bader and Mr Qabazard must each have been aware of what the other was doing and must have agreed, tacitly if not expressly, to support each other's activities. However, there is nothing to suggest that Capt Stafford was involved at that early stage and indeed I do not think that he was.

The various transactions which fall within Scheme IV span the whole of the period from December 1985 to March 1990. All the evidence points to the fact that Mr Al Bader and Mr Qabazard were directly involved together with Mr Mohsin and co-operated in promoting and carrying them out. Although there is no direct evidence that Capt Stafford was involved in implementing any of the transactions, all three defendants were working closely together throughout the period between 1986 and September 1989 when Capt Stafford left Kuwait and I am satisfied that during that time they were all aware of, and lent their support to, all the various schemes that were employed from time to time. The close relationship between them arising out of the back-to-back charter arrangements makes it impossible to believe that any one of them was kept in the dark about what others were doing, but apart from that there is the evidence that Capt Stafford received several substantial blocks of traveller's cheques obtained through the frauds based on the forged Clarksons and Brown & Root invoices. These schemes were little more than developments of the original enterprise underlying Scheme I. In any event, I am satisfied that all three defendants knew of them and lent their support to them. The transfers to Gulf Shipping from the accounts of Porchester and Yucatan all occurred during the period between August 1988 and September 1989 and I am satisfied that they represented thefts falling within the scope of the agreement to which all the defendants were parties.

**Scheme II (page 127):**

The fact that the sale of the AL RAWADATAIN in January 1987 was used as an opportunity to obtain money under the guise of commission does indicate, as indeed their own evidence would suggest, that right from the outset Mr Al Bader and Capt Stafford (and Mr Qabazard as well after he became involved) were looking for ways to obtain money from the plaintiffs by means other than the back-to-back charters should they present themselves, but even if the original agreement did not encompass a scheme of that kind it rapidly developed to do so. Obtaining commissions in connection with the purchases of the *KATRINE MAERSK, KRISTINE MAERSK, ATLANTIC CONCORD* and *ATLANTIC CONQUEST* and the four newbuildings was no more than a continuation of the same basic method of operation.

**Scheme III (page 128)**

Finally I return to scheme III, the misappropriation of war risk premium returns. As I have said, I am satisfied that the arrangements under which returns of premium were paid by Sedgwicks to Clarksons and thence to Gulf Shipping were put in place by Mr Qabazard with the knowledge and approval of Mr Al Bader. However, in his interview Mr Qabazard said that he had begun to embezzle returns of war risk premium some time earlier by having them paid into the account of Porchester from which he could withdraw them at will. Documents in the trial bundles evidence the receipt from time to time of funds by Porchester from Sedgwicks and to that extent support what Mr Qabazard said. If his evidence to the prosecutors is reliable on this point, as I think it is, Scheme III was simply a means of ensuring that the returns of premium continued to flow after the Iraqi invasion had made access to banks in Kuwait impossible. To that extent it was simply a continuation in a different form of a scheme which had already been in operation for some time.

91. In so far as they relate to Mr Al Bader and Mr Qabazard those conclusions are compelling. It was no doubt for that reason that it was initially decided not to challenge the judge's conclusions of fact on this appeal. That was a sensible decision because we see no reason to disagree with any of the judge's findings on the evidence before him so far as Mr Al Bader and Mr Qabazard are concerned. We shall consider the position of Captain Stafford separately below. We first turn to the new evidence relating to Gulf Shipping.

**The New Evidence – Gulf Shipping**

92. The new evidence which is relevant to the appeals of Mr Al Bader and Mr Qabazard primarily relates to Gulf Shipping. It was disclosed by UBS London as a result of an order made comparatively recently by Thomas J. It shows that account 026 026 was established with Banque Cantrade in Geneva in the name of Gulf Shipping Limited in early July 1988. The account was opened through UBS London on the instructions of Mr Qabazard and was described in a letter dated the 7th July 1988 from UBS London to Banque Cantrade as a ‘transit account’. Mr Brodie submitted that the new evidence shows that this was Mr Qabazard's account opened in the name of Gulf Shipping for Mr Qabazard's own purposes. We accept that submission up to a point. The evidence does indeed show that Mr Qabazard opened the account and that, as between Mr Qabazard and Gulf Shipping or the bank, it was Mr Qabazard who gave the instructions. Moreover it supports the conclusion that Gulf Shipping was Mr Qabazard's personal company.

93. The new evidence further shows that Mr Qabazard was anxious to give instructions in code, presumably to avoid being identified. Thus there is a manuscript document written at various times by someone at UBS London which evidences the following. On the 7th July 1988 Mr Qabazard met UBS and deposited US$250,000 in traveller's cheques. The new account with Banque Cantrade was discussed. Mr Qabazard appears to have given instructions to UBS that it was to act on receipt of certain coded instructions. For example, if he mentioned ‘Bond Street’, UBS was to deposit a draft at Barclays Bank in Bond Street in favour of an account in the name of Mr Mohsin. References to the Gulf Shipping account were simply to be to ‘Gulf’. Later, on the 17th March 1989 Mr Qabazard told UBS that the code ‘Humberside’ was to indicate instructions to deposit a draft at Captain Stafford's US dollar account with the TSB at Anlaby in Hull.

94. Mr Malins submitted that the manuscript note showed that the Gulf account was indeed a distribution account since otherwise there was no explanation for the references to Mr Mohsin and Captain Stafford. Mr Brodie submitted, on the other hand, that there was no reference to Mr Al Bader and that the fact that Mr Qabazard was so secretive shows that the account was for his own benefit. In this regard these documents seem to us to invite at least as many questions as they answer. They show secrecy, but that is consistent with both sides’ case. There is no explanation as to why Mr Qabazard contemplated payments to Mr Mohsin and to Captain Stafford. That fact would tend to support the judge's conclusion that Mr Qabazard was distributing monies to his co-conspirators. It is true that the note does not mention Mr Al Bader, but it is only one note and does not explain, for example, the letter of the 27th August 1989 or why Mr Qabazard paid Mr Al Bader the sums of US$1.15 million and US$8.67 million referred to below.

95. The judge understandably paid particular attention to the letter of the 27th August 1989 referred to in paragraphs 85 and 86 above. There remains no convincing explanation why Mr Al Bader signed a letter on behalf of Yucatan instructing

© 2025 Thomson Reuters. 

the Burgan Bank to transfer US$2.3 million to the account of Gulf Shipping at Banque Cantrade in Geneva. Nor is there any convincing explanation why only a few days later on the 5th September 1989 Mr Qabazard transferred to Mr Al Bader's personal account the sum of US$1.15 million, which is of course half the sum of US$2.3 million which was transferred to Gulf Shipping's account in accordance with the instructions in the letter. It is, in our judgment, almost certain that even with this new evidence the judge would still have described Mr Al Bader's evidence about the letter as lamentable and held, as he did in the passage quoted in paragraph 86 above, that the obvious inference was that the payment of US$1.15 million to Mr Al Bader represented half of the money transferred to Gulf Shipping only a few days before.

96. Equally we do not think that the judge would have changed his mind on two other crucial matters. The first is his conclusion that the instructions to transfer the commissions relating to the ATLANTIC vessels came from Mr Al Bader for the reasons given in the passage from his judgment quoted in paragraph 65 above. The second is his conclusion as to the provenance of the sum of US$8.67 million which was transferred from Mr Qabazard's UBS account in London to Mr Al Bader's UBS account in Geneva on the 8th May 1990, which was only a few days after US$7.12 million had been paid by Clarksons to Gulf Shipping from commissions on the first two new buildings. As stated in paragraph 68 above, the judge held that the overwhelming likelihood was that the US$8.67 million came from Gulf Shipping. That conclusion is not affected by the new evidence.

97. It may be that in the light of the new evidence the judge would have been less likely to conclude that the Gulf Shipping account was opened on the instructions of Mr Al Bader or that Mr Qabazard did not have sole control over it, but the judge did not base his final conclusion on those considerations. As indicated in paragraph 87 above, the judge said that none of that really mattered so far as Mr Al Bader and Mr Qabazard were concerned if in fact they were participating in the dishonest transfer of funds away from the claimants into the hands of third parties. He held that they were and, in our judgment, he would not have changed his mind on that question. He would still have reached the conclusions which he did.

98. Mr Brodie relied in particular upon the fact that the Clarkson account nos 1 and 2 were dealt with very differently and that account no 1 was used almost exclusively for transfers to Gulf Shipping, which he submitted that the new evidence showed was nothing to do with Mr Al Bader but was the vehicle used by Mr Qabazard for a fraud of his own. In support of that submission he analysed Mr Qabazard's UBS London account to show that as at August 1990 he had accumulated about £1.9 million and US$32 million, which was more than the cumulative total of known payments made by Gulf Shipping by that time, although the total of such payments included US$5,815,000, which the new documents show was the balance of the Gulf Shipping account as at the 15th August 1990. It was transferred direct from Gulf Shipping to Mr Qabazard's Geneva account and therefore apparently did not form part of the US$32 million. In October 1990 Mr Qabazard opened a personal account with Banque Cantrade in Jersey upon which his wife was a signatory, which it was submitted reinforced the inference that the Gulf Shipping account at Banque Cantrade in Geneva was also in effect his personal account. The sum of £1.9 million was first transferred to Jersey and then in November 1990 was transferred to UBS London and thence, together with US$34 million (which was no doubt the US$32 million plus interest), to his personal accounts at UBS Geneva.

99. Mr Brodie submitted that since by that time Gulf Shipping had been receiving monies for over two years, if its account was really a distribution account or if (as submitted on behalf of the claimants) Mr Qabazard was really the treasurer for the other defendants, the money would have been distributed long before August 1990. It was fanciful to suppose that the other defendants would have been content to allow Mr Qabazard to accumulate huge sums and retain them in his personal accounts for years and to transfer them between his various accounts in different countries as if they were his own.

100. We see the force of those submissions, which support the conclusion that Gulf Shipping was Mr Qabazard's company and that he had control over its account, but in our judgment they do not provide a sufficient basis for disturbing the conclusions reached by the judge. Indeed, as indicated above, they do not address the reasons which led him to conclude that Mr Al Bader was aware of the Gulf Shipping account, that he gave instructions for a transfer or transfers into it and that large sums which originated in it were paid via Mr Qabazard's personal account to Mr Al Bader's personal account. We agree with the reasons given by the judge for those conclusions and, in our judgement, the new evidence does not invalidate them. Moreover, the judge's reasons for rejecting the defendants' evidence about the strategic fund remain intact. In short the new evidence does not provide a sound basis for disturbing the judge's conclusion that Mr Al Bader was concerned in the dishonest diversion of funds from the claimants under all four schemes.

101. Mr Malins went further. He submitted that, far from exonerating Mr Al Bader, the new evidence provides support for the judge's conclusions. In particular he relied upon two manuscript notes on the UBS London file which had almost certainly been prepared by the bank. He submitted that they showed the following. A sum of US$11,080,000 was expected into Mr Qabazard's UBS London account between the 1st and the 10th August 1990, which was to be distributed as follows. The sum of US$5,790,000 was to be transferred to Mr Al Bader's US dollar account at UBS Geneva and the sum of US$5,000,000

was to be put on fixed deposit until the 20th November 1990 for Mr Qabazard. The note also referred to two other smaller sums amounting to US$320,000, making a total of something over US$11 million. Mr Malins submitted that that was further evidence that part of Mr Qabazard's role was to distribute large sums of money to Mr Al Bader and that it was consistent with the conclusions reached by the judge as to the transfers of US$8.67 million and US$1.15 million discussed above.

102. Mr Malins further pointed to the statements of Mr Al Bader's UBS dollar account which are now available in unredacted form. At the trial they were only disclosed in a redacted form because Mr Al Bader said that many entries were irrelevant. The bank statements show that on the 19th November 1990 a payment of US$5,700,000 was made into that account, which Mr Malins suggested was most of the US$5,790,000 which the manuscript note indicated was to be paid to Mr Al Bader. He submitted that that was consistent with the evidence of the payments arising out of the third and fourth new buildings. As indicated in paragraph 41 above, the contracts for those new buildings were made on the 19th July 1990, the sums of US$5,265,000 and US$550,000 were paid by Clarksons to Gulf Shipping on the 6th August but the sum of US$5,327,000 was not paid until the 19th October because of a delay in payment by Daewoo to Clarksons. Mr Malins submitted that those facts are consistent with the conclusion that over US$11 million were expected between the 1st and 10th August, but that the second substantial tranche was not in fact paid until October and that that was the origin of the US$5,700,000 which arrived in Mr Al Bader's account in November.

103. Mr Brodie dismissed those submissions as pure speculation. He also pointed to the fact that by a letter of the 15th August 1990 Mr Qabazard instructed Banque Cantrade to transfer the balance of the Gulf Shipping account, namely US$5,815,000, which was of course the sum of US$5,265,000 and US$550,000, to his personal US dollar account at UBS Geneva. Mr Brodie submitted that there is no evidence that that amount ever went through London and that it would be very surprising if it did because the London accounts at that time were subject to emergency regulations as a result of the invasion of Kuwait, whereas the Geneva accounts were not. He submitted that the probabilities are that UBS London did not receive any money between the 1st and 11th August and that the US$32 million which Mr Qabazard had as at the 20th August did not include any sum received from Gulf Shipping between those dates.

104. On the face of it, notwithstanding the points made by Mr Brodie, there seems to us to be considerable force in Mr Malins' submissions, but we agree with Mr Brodie that they involve an element of speculation. Also it is plain that the available evidence does not provide a complete picture of the way in which Mr Qabazard operated his various accounts. In these circumstances we do not think that it would be safe to draw the inferences which Mr Malins invites us to draw. On the other hand these particular documents certainly do not assist Mr Al Bader. They invite at least as many questions as they answer. In particular, why does the UBS memorandum, which does indeed seem to relate to August 1990, expressly note the sum of US$5,790,000 against Mr Al Bader's UBS account in Geneva, specifying the correct number? Was it paid or intended to be paid to Mr Al Bader? If so, why?

105. In all the circumstances we have reached the conclusion that none of the new evidence relating to Gulf Shipping invalidates any of the judge's findings relevant to Mr Al Bader. On the contrary the judge's approach to the facts and his very detailed reasoning cannot be faulted, at least so far as Mr Al Bader is concerned. The same is true of Mr Qabazard, since it is not suggested that his position is improved by the new evidence. The position of Captain Stafford, on the other hand, is in some respects different from that of the other defendants, but before considering it, it is convenient to identify the relevant legal principles.

**Conspiracy - Legal Principles**

106. The judge held that all three defendants were liable for the tort of conspiracy to injure by unlawful means. He held that under English law they were parties to a single actionable conspiracy wrongly to misappropriate the claimants' assets and that the damage caused by that conspiracy extended to the whole of the losses suffered by the claimants, save that Captain Stafford was not liable for the losses before September 1986 because he did not join the conspiracy until then. Mr Brodie submitted that the judge made a number of errors in his approach to the principles governing the tort of conspiracy to injure. He accepted that the tort of conspiracy is known to English law, but submitted that it was subject to important limitations.

107. It is common ground that there are two types of actionable conspiracy, conspiracy to injure by lawful means and conspiracy to injure by unlawful means. The first is sometimes described simply as a conspiracy to injure and the second as a conspiracy to use unlawful means: see eg Clerk & Lindsell on Torts , 17th edition, paragraph 23-76. In our view they are both conspiracies to injure and their ingredients are the same, with one crucial difference. In both cases there must be conspiracy to injure the claimant, but in the first case (in which the means employed would otherwise be lawful) the predominant purpose

of the conspiracy must be to injure the claimant whereas in the second case, although the defendant must intend to injure the claimant, injury to the claimant need not be his predominant purpose.

108. We shall treat them as different torts, although, as it seems to us, they are better regarded as species of the same tort. It matters not. For present purposes we would define them as follows:

- A conspiracy to injure by lawful means is actionable where the claimant proves that he has suffered loss or damage as a result of action taken pursuant to a combination or agreement between the defendant and another person or persons to injure him, where the predominant purpose of the defendant is to injure the claimant.
- A conspiracy to injure by unlawful means is actionable where the claimant proves that he has suffered loss or damage as a result of unlawful action taken pursuant to a combination or agreement between the defendant and another person or persons to injure him by unlawful means, whether or not it is the predominant purpose of the defendant to do so.

We shall call them a 'lawful means conspiracy' and an 'unlawful means conspiracy' respectively.

109. Those principles seem to us to be consistent with the authorities, including in particular *Lonrho Ltd v Shell Petroleum Co Ltd [1982] AC 173* and *Lonrho Plc v Fayed [1992] 1 AC 448* , which analyse the leading cases. See also for example *Rookes v Barnard [1964] AC 1129* , where (at page 1209) Lord Devlin drew a clear distinction between the two types of conspiracy.

110. It is important to note that the tort of conspiracy to injure by unlawful means is different in significant respects both from the crime of conspiracy and from the law of contract. A criminal conspiracy is in essence an agreement to commit a crime and, as such, is complete when the agreement is made, whether or not it is carried out. For this reason care must be taken in considering decisions in criminal cases where (as here) the question is whether the tort of conspiracy was committed. Lord Diplock put it in this way in Lonrho v Shell (at page 188):

> Regarded as a civil tort, however, conspiracy is a highly anomalous cause of action. The gist of the cause of action is damage to the plaintiff; so long as it remains unexecuted the agreement, which alone constitutes the crime of conspiracy, causes no damage; it is only acts done in execution of the agreement that are capable of doing that. So the tort, unlike the crime, consists not of agreement but of concerted action taken pursuant to agreement.

In that passage Lord Diplock appears to have been referring to both types of conspiracy. The essence of the unlawful means conspiracy is injury to the claimant as a result of an unlawful act or acts where two or more people have combined to cause the injury. It is not necessary that every overt act is done by every conspirator, but the act must be done pursuant to the conspiracy or combination.

111. A further feature of the tort of conspiracy, which is also found in criminal conspiracies, is that, as the judge pointed out at page 124, it is not necessary to show that there is anything in the nature of an express agreement, whether formal or informal. It is sufficient if two or more persons combine with a common intention, or, in other words, that they deliberately combine, albeit tacitly, to achieve a common end. Although civil and criminal conspiracies have important differences, we agree with the judge that the following passage from the judgment of the Court of Appeal Criminal Division delivered by O'Connor LJ in R v Siracusa (1990) 90 Cr. App. R. 340 at 349 is of assistance in this context:

> Secondly, the origins of all conspiracies are concealed and it is usually quite impossible to establish when or where the initial agreement was made or when or where other conspirators were recruited. The very existence of the agreement can only be inferred from overt acts. Participation in a conspiracy is infinitely variable: it can be active or passive. If the majority shareholder and director of a company consents to the company being used for drug smuggling carried out in the company's name by a fellow director and minority shareholder, he is guilty of conspiracy. Consent, that is agreement or adherence to the agreement, can be inferred if it is proved that he knew what was going on and the intention to participate in the furtherance of the criminal purpose is also established by his failure to stop the unlawful activity.

Thus it is not necessary for the conspirators all to join the conspiracy at the same time, but we agree with the judge that the parties to it must be sufficiently aware of the surrounding circumstances and share the same object for it properly to be said that they were acting in concert at the time of the acts complained of. In a criminal case juries are often asked to decide whether the alleged conspirators were 'in it together'. That may be a helpful question to ask, but we agree with Mr Brodie that it should not be used as a method of avoiding detailed consideration of the acts which are said to have been done in pursuance of the conspiracy.

112. In most cases it will be necessary to scrutinise the acts relied upon in order to see what inferences can be drawn as to the existence or otherwise of the alleged conspiracy or combination. It will be the rare case in which there will be evidence of the agreement itself. Curiously this is such a case, although it appears to us that in crucial respects it is also necessary to draw inferences as to the extent of the agreement from what happened after it. Thus the essential nature of the agreement can be seen in part from the evidence of Mr Al Bader and Captain Stafford, although, especially in the case of Captain Stafford, the extent of the agreement will depend upon inferences to be drawn both from the surrounding circumstances and subsequent events.

113. We turn to Mr Brodie's submissions, which may be summarised as follows:

- The tort of conspiracy is subject to important limitations.
- The relevant intention cannot be inferred from the acts complained of.
- When the acts complained of amount to individual torts committed by joint tortfeasors, any prior 'conspiracy' merges in the underlying torts and should not be relied on as a separate tort or remedy.
- The claimants case was not properly pleaded or advanced.

We shall consider these submissions in turn.

*Limitations on the Tort.*

114. Mr Brodie submitted that the tort of conspiracy is limited to the class of case where the claimant is injured in his trade or business. He drew attention to the fact that conspiracy is a comparatively modern tort which has been developed in the context of trade disputes and industrial relations disputes. It is true that in the case of lawful means conspiracy the tort has been developed principally in that sphere, but there is no authority to support Mr Brodie's submission in the context of an unlawful means conspiracy and we cannot accept it.

115. The lawful means conspiracy has been described as a curious and anomalous tort because it makes two people liable for an agreement to do an act which would be permissible if done by one: see eg the classic passage in the speech of Lord

Diplock in Lonrho v Shell at pages 188 to 189. However, Lord Diplock, with whom the other members of the Appellate Committee agreed, made it clear that it is too late to discard it. He said (at page 189C):

> The civil tort of conspiracy to injure the plaintiff's commercial interests where that is the predominant purpose of the agreement between the defendants and of the acts done in execution of it which caused damage to the plaintiff is too well-established to be discarded however anomalous it may seem today.

116. In the light of the subsequent decision of the House of Lords in Lonrho v Fayed the part of Lord Diplock's speech just quoted must, we think, be read as relating only to lawful means conspiracies, whereas the instant case is an unlawful means conspiracy. The same is true of the next part of Lord Diplock's speech upon which Mr Brodie relied. Lord Diplock said (at page 189F):

> This House, in my view, has an unfettered choice whether to confine the civil action of conspiracy to the narrow field to which alone it has an established claim or whether to extend this already anomalous tort beyond those narrow limits that are all that common sense and the application of the legal logic of the decided cases require.
>
> …. I am against extending the scope of the civil law of conspiracy beyond acts done in execution of an agreement entered into by two or more persons for the purpose not of protecting their own interests but of injuring the interests of the plaintiff.

On the facts of Lonrho v Shell the means used were not tortious or otherwise actionable at the suit of the plaintiff but were unlawful because they were breaches of a sanctions order which gave rise to criminal penalties. In these circumstances it is perhaps not surprising that in the light of the passages in Lord Diplock's speech quoted above this court held in *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc [1990] 1 QB 391* that it was bound by Lonrho v Shell to hold that even in an unlawful means conspiracy the sole or predominant purpose of the conspirators must be to injure the plaintiff.

117. However, that part of the decision in Metall und Rohstoff was overruled in Lonrho v Fayed. Lord Bridge gave the only speech with which the other members of the Appellate Committee agreed, although Lord Templeman added that the tort might require further analysis and reconsideration in the future. Lord Bridge referred to a number of the leading cases and concluded that Lord Diplock (with whom he himself had agreed) did not intend to lay down a rule of law that the tort of conspiracy to injure required proof in every case not merely of an intention to injure the plaintiff but also that injury to the plaintiff was the predominant purpose of the conspiracy. Such a view would have been inconsistent both with the view of Lord Denning MR in this court expressed in a judgment which the House was approving and with what Lord Diplock had described as Viscount Simon LC's now classic speech in *Crofter Hand Woven Harris Tweed Co Ltd v Veitch [1942] AC 435* at 439. Lord Bridge said (at page 466F) that the reason for the decision in Lonrho v Shell was the absence of <u>any</u> intention to damage Lonrho. (Our emphasis).

118. In our view, the effect of the two Lonrho cases is simply that, in order to establish an unlawful means conspiracy, it is necessary to establish an intention to injure the claimant but not a predominant intention or purpose to do so. Immediately after quoting a passage from the speech of Lord Diplock in which he emphasised the anomalous nature of the tort, Lord Bridge said (at page 464C) that the reasoning which led to that conclusion had no relevance to the unlawful means type of conspiracy. Whatever limitations may be required in relation to a lawful means conspiracy, so far as intention to injure the claimant's interest is concerned, there is in our judgment no reason whatever for introducing into the case of an unlawful means conspiracy a restriction of the kind suggested by Mr Brodie, especially where the unlawful means would themselves be actionable in tort.

119. Mr Brodie submitted that in such a case the conspiracy merges in the tort and is not separately actionable. We consider that submission below, but, assuming that it is wrong and that such a conspiracy is in principle actionable, we can see no reason to restrict it in the way suggested. On the contrary, a conspiracy to injure by unlawful means should in principle be actionable, especially if (as here) it expresses the true nature and gravamen of the case against the defendants. We would add that a restriction of the kind suggested would work oddly. Mr Brodie submitted that the claimants here would fail because they were such a large organisation and of such wealth that even a conspiracy of the magnitude found by the judge would not significantly affect their trade or business. Even if we thought that some restriction of the kind suggested by Mr Brodie should be introduced into this area of the law, we do not think any such principle could justify a distinction between rich and poor claimants of that kind.

*Proof of Intention*

120. Mr Brodie submitted that, in order to succeed, the claimant must prove that the particular defendant and the other conspirator or conspirators intended to injure the claimant and that such an intention could not be inferred from the acts themselves. For the reasons already given we accept the submission that such an intention must be proved, as held by the House of Lords in the two Lonrho cases. We cannot, however, accept the second part of the submission. In many contexts it will be necessary in order to prove intention to ask the court to infer the relevant intention from the primary facts. We can see no reason why there should be a special rule of evidence in this situation. On the contrary, in the case of most conspiracies to injure by tortious means it will be clear from the acts of the conspirators that they must have intended to injure the claimant. In the case of a conspiracy to defraud by wholesale misappropriation it would be absurd to argue that the conspirators did not intend just that.

121. Mr Brodie was not able to produce any authority in support of his proposition. We are not surprised. An example of such an inference being drawn in a similar field is in Bourgoin SA v Minister of Agriculture [1986] 1 QB 716 Oliver LJ said (at page 777), in a part of his judgment with which both Parker and Nourse LJJ agreed:

If an act is done deliberately and with knowledge of the consequences, I do not think that the actor can say that he did not ‘intend’ the consequences or that the act was not ‘aimed’ at the person who, it is known, will suffer them.

The facts of the instant case are a good example. On the judge's findings of fact the defendants’ principal purpose was no doubt to line their own pockets, but they cannot be heard to say that they did not intend to injure the claimants or that their acts were not aimed at the claimants. In all the circumstances we are unable to accept Mr Brodie's submissions under this head.

*Merger*

122. Mr Brodie submitted that, when the conspiracy is to injure by the commission of a tort, the conspiracy merges with the tort and the claimant cannot or should not therefore sue for the conspiracy. In support of this proposition he relied mainly upon two statements of principle by Lord Denning and upon a decision of the Supreme Court of Western Australia. He also relied upon this statement by Lord Dunedin in *Sorrell v Smith [1925] AC 700* (at page 716):

> …. If a combination of persons to do what if done by one would be a tort, an averment of conspiracy so far as founding a cause of action is mere surplusage.

That statement is helpful as far as it goes, but it does not follow that two torts may not exist side by side. Lord Dunedin was certainly not advancing any doctrine of merger.

123. In *Ward v Lewis [1955] 1 WLR 9* this court refused leave to amend a statement of claim in a slander action by adding an allegation of conspiracy. As we read the judgments leave was refused because no sufficient nexus had been alleged between the conspiracy or the slander and the loss. However in the course of his judgment Denning LJ said (at page 11):

> It is important to remember … that when a tort has been committed by two or more persons an allegation of a prior conspiracy to commit the tort adds nothing. The prior agreement merges in the tort.. A party is not allowed to gain an added advantage by charging conspiracy when the agreement has become merged in the tort.

We agree that a party must not obtain an illegitimate advantage by alleging a conspiracy, but, for the reasons given below, we are of the opinion that there may be good reasons for alleging a conspiracy and not (or not only) the underlying torts. We do not read Denning LJ's view that a conspiracy merges in the tort as part of the *ratio decidendi* of Ward v Lewis. Nor do we consider that it has gained general recognition.

124. The same is true of a similar statement made by Lord Denning MR in this court in Lonrho v Shell , unreported, 6th March 1981. He said (at page 4):

> It is not every agreement to do an unlawful act which gives rise to a civil action if it causes damage. There is no difficulty, when the unlawful act is one which itself gives rise to a cause of action: such as a tort, or a breach of statutory duty (like the Factories Act). In such cases there is no need – and no place – for an action for conspiracy. It merges in the tort or breach of statutory duty.

Again we do not read that statement as part of the *ratio decidendi.* Indeed it is of interest to note that when, in Lonrho v Fayed , Lord Bridge quoted from that judgment he did not include that passage. It is perhaps fair to note that Fox LJ said (at page 20):

> It seems to me that where the unlawful act itself confers a right of action, as would be so if the act were tortious, there is no need for an action for conspiracy in respect of it".

He said that in the context of a discussion of whether intention to injure was a necessary ingredient in the tort. Moreover he did so in a case in which the unlawful means were not tortious but criminal and made no reference to the notion of merger.

125. Mr Brodie also relied upon the decision of the Supreme Court of Western Australia in Galland v Mineral Underwriters Ltd [1977] WAR 116 , where the court struck out a claim for conspiracy to commit the tort of conversion on the ground that it was embarrassing and unnecessary. Burt CJ said (at page 119) that if a tort is committed by a number of people acting together and in concert to achieve a common end which is an actionable tort, then each is a joint tortfeasor and each is severally as well as jointly liable to the plaintiff for the resulting damage. We respectfully agree with that proposition. Burt CJ identified the question in the appeal as whether a conspiracy to commit a tort when carried into effect is actionable both as an independent tort, ie the tort of conspiracy, as well as being actionable simply as a tort committed by a number of people acting together to that common end. His answer was no. He put it thus (at page 120):

> I know of no authority which directly supports my opinion, but it seems to me that the answer to that question should be that on those assumptions the appellant has committed one tort and that is the tort of conversion. I say that because, although proof of the agreement is required to implicate the appellant in the commission of the tort and to reveal him to be a joint tortfeasor, it is not an element in the cause of action and hence falls outside the ground covered by the tort of conspiracy.

We have had some difficulty in following that last sentence.

126. In that case the allegation of conspiracy was struck out as embarrassing. The court's view was that it added nothing to the allegation of conversion. So far as the differing role of joint tortfeasors is concerned, Burt CJ said (at page 123):

> Once an agreement to commit a tort is found and it is found that the tort has been committed pursuant to and in the execution of the agreement then all the parties to that agreement, I think, are joint tortfeasors and it matters not that one party was not actively engaged in the commission of the tort.

We entirely agree with that last statement, but we are unable to agree that a conspiracy to commit a tort in any sense merges in the tort or that a claimant is precluded as a matter of law from alleging both the conspiracy and the tort.

127. The Federal Court of Australia in Brisbane has recently refused to follow Galland . In State of Queensland v Pioneer Concrete (Qld) Ltd [1999] FCA 499 Drummond J gave these reasons in paragraphs 113 and 114 of his judgment:

> 113 There seems to me no convincing reason why it should not be open to a plaintiff to sue in the alternative both on a conspiracy to commit a tort and on the joint tort. It is true that, by suing on a conspiracy, the plaintiff may obtain procedural advantages not available if it were to sue only on the joint tort ultimately committed. See, eg Ward v Lewis at 56. But it is not apparent why that must necessarily involve an abuse of the process of the court that warrants striking out the conspiracy claim. A plaintiff obtains the advantage of not having to prove actual or threatened damage if it claims an injunction under the Trade Practices Act on the basis that the defendant has contravened s 52 , whereas he must prove damage if he brings a passing off action on the same conduct: see Central Equity Ltd v Central Corporation Pty Ltd (1995) ATPR P41-443 at 40,997-40,998. But that does not justify confining the plaintiff to the cause of action upon which it is more difficult for it to succeed. There are many instances where the courts have countenanced an action on an unlawful act conspiracy to commit a joint tort, without any concern that the so-called doctrine of merger prevents that course being followed. In Jervois Sulphats (NT) Ltd v Petrocarb Explorations NL (1974) 5 ALR 1 at 33, Forster J saw nothing wrong with the plaintiff suing on such alternative causes of action, so long as it did not have two sets of damages in respect of the same tortuous acts “one for the acts themselves, another for the conspiracy to commit them”. Concerns, often well founded, about the fairness of prosecutors charging criminal conspiracies when they can rely on charges of substantive offences are not, in my opinion, sufficient to justify denying an injured plaintiff the right to choose its remedy. It is those concerns that may be at the root of this co-called doctrine of merger, as Goodman , ibid, suggests.
>
> 114 This is not to say that, in particular circumstances, a plaintiff may, by suing on a conspiracy to commit a joint tort rather than on the tort itself, abuse the process of the Court. It was submitted by the fourth and fifth respondents that the conspiracy claim was here brought to gain a forensic advantage in so far as it was suggested that damages for conspiracy can be recovered on a more generous basis than damages for the underlying joint tort: see McGregor on Damages , 16th ed, par 1936. However, even if this is so, I cannot see why a plaintiff should be denied a full remedy for the defendant's wrongful conduct because a less generous one is available. I reject this submission.

We agree with that reasoning.

© 2025 Thomson Reuters.

128. Save as above, there is no suggestion in the many cases which discuss unlawful means conspiracy that the unlawful means exclude actionable torts. The indications are to the contrary. Thus, for example, in Lonrho v Shell in this court Eveleigh LJ quoted with approval this sentence from the 17th edition of Salmon on the Law of Tort (at page 379):

> A second form of actionable conspiracy exists when two or more combine to injure a third person by unlawful means – eg the commission of a crime or tort , or the infringement of a guaranteed constitutional right. (Our emphasis)

Indeed in recent times the debate has not been, as here, whether a conspiracy can be alleged where the unlawful means are tortious, but, as Waller LJ put it in *Surzur Overseas Ltd v Koros [1999] 2 Lloyd's Rep 611* at 616, whether, where a plaintiff alleges a conspiracy to injure using unlawful means, those unlawful means have to be actionable at the suit of the plaintiff. Waller LJ referred to inconsistent dicta on that question, but the whole debate proceeded on the assumption that if the unlawful means are actionable an allegation of unlawful means conspiracy is maintainable. Thus Waller LJ (with whom Hirst and Aldous LJJ agreed) ended by saying (at page 617):

> What is clear, in my view, is that it is eminently arguable that in an unlawful means conspiracy the unlawful means do not have to be actionable at the suit of the plaintiff. (Our emphasis)

Finally, it is perhaps significant that in Lonrho v Fayed the House of Lords allowed the conspiracy allegation to proceed on the assumption that it would stand or fall with the alleged tort of interference with business by unlawful means.

129. In these circumstances we have reached the conclusion first that there is no authority which binds us to hold that where the unlawful means are tortious the conspiracy merges in the tort and secondly that we should not do so. We are pleased to reach that conclusion because the contrary view would lead to an anomalous situation and because there are many cases, of which this is one, in which it may be properly advantageous to the claimant to allege a conspiracy and where such an allegation will describe the true position much more appropriately than to require the claimant to rely only upon the individual torts.

130. Any other view would be anomalous because it seems to us to make no sense to permit a claimant to sue for conspiracy to injure by unlawful means where the unlawful means are criminal or a breach of contract but not where they are tortious. The unlawful means may be both tortious and criminal or both tortious and a breach of contract or all three. Or in a case of this kind A and B may conspire to injure C by a breach of contract by B such that B would be liable for the breach of contract but A would be liable in tort for inducing the breach of contract. We are far from sure how the doctrine of merger would or could operate in such a case. Moreover we can see no reason in principle to restrict the tort in this way.

131. On the contrary there are good reasons for not doing so. To allege a conspiracy to defraud may describe the events in the fairest and most sensible way. As Mr Malins showed, there are now a number of cases in which the courts have recognised that the tort of conspiracy to defraud exists without any suggestion that it does not because the claimant could have sued in the tort of deceit. Mr Malins submitted that one good reason for permitting such a claim to be advanced in a case like this is that it enables the double actionability rule to be applied both more easily and more sensibly. As the judge correctly held, for the purposes of that rule, the court must ascertain where the substance of the cause of action arose: see eg *Distillers Co Biochemicals Ltd v Thompson [1971] AC 458* and *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette [1990] 1 QB 391* per Slade LJ at 443F and 446C. The application of that principle will yield one relevant law (in addition perhaps to English law) in a conspiracy case, whereas if the claimant is bound to sue separately for each of the underlying torts many different laws might be held to apply, even though the gravamen of the case, when viewed as a whole, may be the conspiracy. Such an approach would not in our view make sense.

132. For these reasons we reject the submission that the claimants were not entitled to claim damages for conspiracy, but we stress that that does not mean that their case must not be properly proved. That involves proving each of the elements in the

© 2025 Thomson Reuters. 

tort, including the nature of the agreement, the unlawful means alleged, each unlawful act relied upon as causing loss and the fact that each such act was carried out pursuant to the conspiracy. The authorities show that the claimants must indeed prove those facts: see eg *Bird v O'Neal [1960] AC 907* and *Huntley v Thornton [1957] 1 WLR 321* . In the former case Lord Tucker said that the defendants might have been held liable

> by looking to see what part, if any, each defendant had played in connection with each specific incident when threats or intimidation had been used and then considering whether such part necessarily compelled the inference that the particular appellant was party to a conspiracy to use unlawful means to further the object of the picketing and thereby create a nuisance.

In Huntley v Thornton Harman J said (at page 343):

> No doubt it is not necessary that all the conspirators should join at the same time, but it is, I think, necessary that they should know all the facts and entertain the same object.

133. It does not follow from the above that each defendant must personally take part in every act so long as it is done pursuant to the agreement. Moore-Bick J put the matter in this way (at page 126):

> Of course, as in any case of this kind, it is necessary to examine the evidence with care to see whether each defendant was involved in each fraudulent transaction, but once one reaches the conclusion that the defendants combined to steal from their employer by whatever means might present themselves, the question in relation to any particular scheme or enterprise in which only one or some of them can be shown to have directly participated is whether that enterprise fell within the overall scope of their common design. If several people agree to enable each other to steal from their employer, lending their support in different ways at different times and taking different shares of the proceeds (or even each retaining for himself what he takes), each of them is party to the agreement pursuant to which all the thefts take place. In those circumstances there is in my judgment no need for each to be fully aware of the circumstances of each theft in order for him to be liable as a conspirator provided that the theft in question falls within the scope of their agreement.

We agree with those conclusions but stress the need for proof to the relevant standard at every stage.

*Claimants' case properly pleaded?*

134. Mr Brodie submitted that the claimants' case was not properly pleaded or advanced because it led to a broad brush approach which in turn led to what was described in argument as an ambulatory conspiracy and thus to a lack of reality. This criticism was advanced particularly with regard to Captain Stafford because it led (it was submitted) to his being unfairly held liable for events which were, for example, the subject of Scheme III and which took place long after he had left Kuwait and retired to Australia. It was submitted that the logic of the broad brush approach was that if, for example, two people agree one day to steal and then, say twenty years later, the two not having met in the meanwhile, one commits a burglary without the knowledge or assistance of the other, they are both jointly and severally liable for the burglary because it was within the scope of the common design.

135. While there were moments during the course of the argument when Mr Malins' submissions seemed to drive him to just such a proposition, it was not the approach of the judge. Nor would it be correct. In our judgment the case was properly

pleaded and advanced by the claimants at the trial both in the tort of conspiracy and as individual breaches of fiduciary duty. Moreover, as we said earlier, every incident was investigated in the evidence and almost every incident was analysed in the judgment.

136. The judge approached the matter correctly in principle. He considered what agreement was made at the outset, partly by reference to the evidence about what was said at the time and partly by inference from what happened thereafter. He then asked himself whether each of the transactions which made up the four schemes was carried out pursuant to the conspiracy and concluded that the defendants were all parties to a single actionable conspiracy. He then considered whether Captain Stafford at any stage left the conspiracy. In our judgment that was the correct approach, although (as explained below) we have reached the conclusion that in one important respect the judge did not correctly identify the true nature of the conspiracy and that the question whether Captain Stafford left the conspiracy did not have to be considered. We do not consider that there was any unfairness in the way that the judge approached the case or, indeed in the way in which it was advanced at the trial. The defendants had no doubt at each stage what case they had to meet.

**Conspiracy - Application of Legal Principles to the Facts**

*Mr Al Bader and Mr Qabazard.*

137. Application of the legal principles to the facts leads clearly to the conclusion that the judge was correct to hold that both Mr Al Bader and Mr Qabazard were liable for damages for conspiracy to injure by unlawful means. Once the strategic fund defence was rejected and it was held (in our view correctly) that Mr Al Bader was aware of the Gulf Shipping account and that he received substantial sums from Mr Qabazard, almost certainly out of that account, and given the detailed findings of dishonesty made by the judge, as summarised in the quotations in paragraph 90 above, there was no alternative but to hold that the losses under all four schemes were part of the conspiracy and that Mr Al Bader and Mr Qabazard were liable for them. We turn to Captain Stafford.

*Captain Stafford.*

138. It is of particular importance in the case of Captain Stafford to identify the terms of the original conspiracy or combination. The judge held that the agreement from the outset was dishonestly to misappropriate the claimants' assets, or put more generally, to defraud them. The agreement was initially made between Mr Al Bader and Mr Qabazard in late 1985 and Captain Stafford joined it in September 1986. The judge correctly considered the evidence as to what agreement was made at that stage. As indicated in paragraphs 74 and 75 above, he held that the discussions at which Sheikh Ali, Mr Al Bader and Captain Stafford were present involved discussion of three particular methods of raising money, namely creating differences of hire under the back to back charterparties, taking sums by way of commission on the sale and purchase of tankers and taking commissions on newbuildings. The judge rejected their evidence that the purpose of the schemes was not their enrichment but to feed the strategic fund. We have already expressed our view in paragraph 75 that the evidence of Mr Al Bader and Captain Stafford provided strong support for the conclusion that there was from the outset an agreement to divert monies by what became Schemes I and II and for the further conclusion that the essence of the agreement was that the defendants would defraud the claimants by whatever means came to hand.

139. Further the judge held that Captain Stafford played a significant part in the detail of Scheme I, including the commissions and the extra war risk premiums and crew bonuses: see paragraphs 47 to 50 above. He also held that Captain Stafford was aware of all the Clarksons' accounts and that he was concealing much of what he knew both about the way in which the accounts were operated as well as his own role in relation to them: see paragraphs 51 to 53. Apart from the sum of US $100,000 paid into Captain Stafford's TSB account at Anlaby on the March 1987 (referred to in paragraph 17), there is no evidence that he received monies from Scheme I, but he received traveller's cheques both from Clarksons and from Scheme IV. Although the evidence suggests that Captain Stafford received substantially less out of the various schemes than either Mr Al Bader or Mr Qabazard, he admitted receiving traveller's cheques totalling US$1.24 million as and when it became apparent that the claimants could prove such receipt. The judge rejected Captain Stafford's evidence that the traveller's cheques were legitimate bonuses: see paragraph 56. In our judgment the judge was justified in holding that Captain Stafford dishonestly played a part in Scheme I and that he was liable in respect of the claimants' losses under Schemes I and under Scheme IV before he left Kuwait. It should be noted that the judge expressly held that there was no evidence that he received any further money derived from Scheme IV after he left Kuwait: see paragraph 61.

140. Scheme II began in about May 1989 after Scheme I came to an end because there were no longer any relevant charterparties. The judge expressed his conclusions as to Captain Stafford's involvement in Scheme II in this way (at page 75):

> Capt Stafford denied that he was involved in any of the arrangements which make up scheme II and in truth there is very little direct evidence to support the conclusion that he was, other than such inferences as one can draw from the fact that the majority of the funds found their way to Gulf Shipping. If Mr Malins is right in saying that Gulf Shipping was an account which had been set up for the purposes of distributing the proceeds of fraud to the different conspirators, including Capt Stafford, then the fact that funds derived from the various sale and purchase transactions found their way to Gulf Shipping would tend to show that Capt Stafford was implicated in Scheme II along with others who can be shown to have benefited from earlier dishonest transactions. That is something to which I shall return when I consider the position of Gulf Shipping generally. Apart from that, however, Mr Malins could only point to the fact that raising money through commissions on the sale and purchase of vessels was one method which Capt Stafford said had been specifically discussed at the meeting with Sheikh Ali so that he could be expected to be involved in it if it did ever take place; that he received some money in the form of traveller's cheques obtained out of the commission on the Al Rawadatain , and further substantial sums in traveller's cheques during the summer of 1989 when the purchase of the Maersk vessels was being negotiated; and that he attended a dinner at the Savoy to celebrate the handing over of those vessels. None of these seems to me to take the matter very far. The fact that this method of raising money had been discussed (if indeed it was) does not necessarily make it any more likely that Capt Stafford was directly involved in implementing these arrangements. Whether he was personally involved in any scheme would presumably depend on its particular nature. Mr McCoy doubted whether Capt Stafford had been involved in the raising and disposing of commissions and I can see no reason to think that his involvement was necessary. The receipt of traveller's cheques simply raises the question whether, as he said, all the payments he received in that manner were bonuses which is a matter which I shall come to consider a little later. I can attach no significance to Capt Stafford's presence at the dinner at the Savoy: there could be many innocent explanations for that. In the end the plaintiffs have failed to satisfy me that Capt Stafford played any active part in obtaining funds by these means or that he benefited from them other than through the receipt of traveller's cheques obtained in connection with the Al Rawadatain .

141. We have quoted the judge's conclusions as to Captain Stafford's knowledge of the Gulf Shipping account in paragraph 88 above, but it is convenient to repeat them here. He said:

> Evidence of how the Gulf Shipping account was operated could, on the other hand, affect the position of Capt Stafford if it established that Gulf Shipping was a distribution account from which he also benefited. In fact, however, Capt Stafford's connection with Gulf Shipping is far less well established. There is no clear evidence showing when the Gulf Shipping account was set up, other than the fact that the first transfer occurred in July 1988 when US$232,000 was transferred from Account No 1, and no direct evidence to show that he received any part of the funds which were paid into it. However, in view of the close co-operation between Capt Stafford and Mr Al Bader in relation to the back-to-back charter arrangements I find it difficult to accept that he did not know of the existence of Gulf Shipping and the fact that funds were being transferred to it.

As indicated above Mr Brodie submitted that in order to hold Captain Stafford liable it was not sufficient to say that it is difficult to accept that Captain Stafford did not know of the Gulf Shipping account or that funds were being transferred to it. We accept the submission that, if they are to rely upon them, the claimants must prove that Captain Stafford knew those facts.

142. The problem here from the claimants' point of view is that there is no evidence that Captain Stafford benefited from the Gulf Shipping account and, with the one exception of the traveller's cheques obtained in connection with the AL RAWATADAIN, that he received anything directly from Scheme II. The essence of the judge's conclusion that Captain

Stafford was liable for Scheme II is, however, that the original agreement expressly contemplated such a scheme, that in these circumstances there can be no doubt that Scheme II (which naturally followed Scheme I) was operated pursuant to the conspiracy to defraud the claimants which Captain Stafford joined in about September 1986 and that he received both monies out of the traveller's cheques obtained out of the commission on the AL RAWADATAIN and substantial monies in the summer of 1989 when the purchases of the MAERSK vessels were being negotiated. As the judge put it on page 128 (albeit in the context of Scheme IV) in a passage quoted in paragraph 90 above:

> Although there is no direct evidence that Capt Stafford was involved in implementing any of the transactions, all three defendants were working closely together throughout the period between 1986 and September 1989 when Capt Stafford left Kuwait and I am satisfied that during that time they were all aware of, and lent their support to, all the various schemes that were employed from time to time. The close relationship between them arising out of the back-to-back charter arrangements makes it impossible to believe that any one of them was kept in the dark about what others were doing, but apart from that there is the evidence that Capt Stafford received several substantial blocks of traveller's cheques obtained through the frauds based on the forged Clarksons and Brown & Root invoices. These schemes were little more than developments of the original enterprise underlying Scheme I. In any event, I am satisfied that all three defendants knew of them and lent their support to them. The transfers to Gulf Shipping from the accounts of Porchester and Yucatan all occurred during the period between August 1988 and September 1989 and I am satisfied that they represented thefts falling within the scope of the agreement to which all the defendants were parties.

Captain Stafford's own evidence shows that he knew about Scheme II. In our judgment, the judge was justified in concluding that Scheme II was simply one of the 'various schemes that were employed from time to time' to which Captain Stafford lent his support and from which he benefited at least indirectly by dishonest receipt of traveller's cheques.

143. We have reached the conclusion that the judge was right to hold on the evidence available at the trial that Captain Stafford was liable on that basis for the losses sustained by the claimants under Scheme II while he was still in Kuwait. However, in our judgment the position is different once Captain Stafford left Kuwait and retired to Australia. There is nothing in the evidence of the agreement itself which supports the conclusion that the agreement either expressly or impliedly contemplated that the various conspirators would continue to take part in the conspiracy once they had ceased to be engaged or employed by the claimants.

144. Although we have expressed the view that a conspiracy of this kind should not be approached as if it were a contract, it is nevertheless appropriate to consider it in its context. In September 1986 Captain Stafford was an expatriate working for the claimants. He was likely at some future date to leave Kuwait and live elsewhere. In these circumstances he would be unlikely to be able to play any part in any scheme to defraud the claimants once he had left. Nor is there reason to suppose that such participation was anticipated. It is not therefore surprising that that there is no evidence that the agreement was that he would do so. In these circumstances, if it is to be held that, so far as Captain Stafford was concerned, the conspiracy extended to any period after he left Kuwait, such a conclusion must be inferred from the overt acts carried out pursuant to the alleged conspiracy.

145. Captain Stafford left Kuwait at about the beginning of September 1989. The losses sustained by the claimants in respect of Scheme II, except for those referable to the MAERSK vessels, and all the losses sustained by them in respect of Scheme III were suffered after he left. A small proportion of the losses under Scheme IV were also sustained after August 1989. Before the judge it was submitted by the claimants that Captain Stafford was liable in respect of those losses because they were sustained as a result of the conspiracy to defraud the claimants by whatever means came to hand and that he at no time left the conspiracy. The judge essentially accepted that submission.

146. The judge's conclusion in this regard can be seen from his approach to Scheme III. When considering the position of Captain Stafford he said (at page 79):

> Apart from the fact that virtually all the funds were transferred to Gulf Shipping, there is nothing to support the conclusion that Capt Stafford was involved in Scheme III. Mr Qabazard did not mention him in connection with it in any of his interviews and there is nothing in the documents to suggest that he was directly involved. The opportunity for him to become involved no doubt existed because at the time the arrangements were put in place he was in London assisting Mr Qabazard and others to deal with KOTC's affairs. Mr Malins submitted that if Capt Stafford co-operated with Mr Al Bader and Mr Qabazard in setting up and sharing the proceeds of schemes I and II, it is likely that he also co-operated in and benefited from scheme III. However, opportunity is one thing, active participation another. The plaintiffs have failed to satisfy me that Capt Stafford played any active role in diverting war risk premium rebates away from KOTC or that he obtained any benefit from Scheme III.

The judge thus held that the claimants had failed to establish that Captain Stafford played any part in or received any benefit from Scheme III. However, the judge held Captain liable in respect of Scheme III because he had not withdrawn from the conspiracy.

147. He considered the principles relevant to withdrawal from a conspiracy of this kind (at pages 136 to 139) and then concluded that Captain Stafford had not effectively withdrawn in these terms (at pages 139 to 140):

> There is no evidence that Capt Stafford received any money after he left Kuwait other than the sum of US$25,000 which he was paid for the assistance he gave to KOTC at the time of the Iraqi invasion, but he has continued to maintain close links with Mr Al Bader who has funded his defence to this action and it would hardly be surprising if someone with as much knowledge as he had of a dishonest conspiracy continued to receive some benefits from it. The evidence does not enable me to make a finding that he has done so, but equally, I am unable to go so far as to make a positive finding that he has not. The frauds based on falsified Brown & Root invoices continued for a few months after his departure, but they were merely a continuation of a method which had already been in use for a year and did not involve any departure from the plan as it had by then developed. The main frauds which occurred after his absence involved the purchases of additional second-hand tankers and the four new buildings (Scheme II) and the diversion of the war risk premium rebates to Clarksons (Scheme III). All those frauds were within the contemplation of the original conspiracy, but even if there were any doubt about that, they were certainly within the contemplation of the conspiracy as it had developed by September 1989. It is not necessary for Capt Stafford to have taken an active role in order for him to have remained a party to the conspiracy, much less for him to remain liable for the loss which the plaintiffs have suffered as a result of its continuing implementation by Mr Al Bader and Mr Qabazard. It is sufficient that he should have continued to play a part by keeping silent and later by helping to protect Mr Al Bader and Mr Qabazard when Mr Al Roumi's investigations began, despite the fact that he had the means to disclose both the existence of the conspiracy and much of what had been done pursuant to it. For these reasons I have reached the conclusion that Capt Stafford did not effectively withdraw from the conspiracy when he retired to Australia. His active participation between September 1986 and September 1989 together with his subsequent silence remained as one of the effective causes of the loss which the plaintiffs suffered as a result of its continued implementation by Mr Al Bader and Mr Qabazard.

148. It is plain from that passage that the judge held that Captain Stafford was liable after he left Kuwait because he had not withdrawn from the conspiracy. It follows that his liability in this regard depended crucially upon the finding that the agreement or conspiracy was to defraud the claimants whenever the opportunity arose. Thus, however long into the future a particular defendant committed an act defrauding the claimants, all the defendants were liable for the loss sustained as

a result because the act was committed pursuant to the conspiracy. We have reached the conclusion that this part of the judge's reasoning cannot be supported. In our judgment, neither the evidence of the agreement in September 1986 (or indeed in December 1985) nor the inferences which could properly be drawn from subsequent events justified the conclusion that Captain Stafford agreed that he would continue to take any part in the conspiracy after he had left Kuwait and the employment of KOTC.

149. In these circumstances we are unable to accept that it is correct to hold that it was sufficient for Captain Stafford to have continued to play a part by keeping silent and later to help to protect Mr Al Bader and Mr Qabazard when the investigations began. Nor are we able to accept that Captain Stafford's active participation between September 1986 and September 1989 <u>together with his subsequent silence</u> (our emphasis) remained one of the effective causes of the loss which the claimants suffered as a result of the continued implementation of the scheme by Mr Al Bader and Mr Qabazard after Captain Stafford left Kuwait. We do not think that it was established by the claimants on the evidence before the judge that it was at any time agreed that Captain Stafford would play any part in the conspiracy after he left Kuwait. In short it was not established that he was ever a party to any conspiracy to defraud the claimants after he left.

150. Dealing with the period before his departure, we accept Mr Malins' submission that Captain Stafford admitted knowing about Scheme II and account no 1 and that, on the evidence before him, the judge was entitled to draw the inference that he knew about Gulf Shipping, but it does not seem to us to follow that he was at any time party to the agreement to defraud the claimants after he left Kuwait.

151. Mr Malins placed considerable reliance upon a number of events which took place after Captain Stafford left. In the summer of 1990 he returned from Australia to London to help KOTC. It is true, as Mr Malins submitted, that Mr Al Bader and Mr Qabazard were still defrauding the claimants at that time, but Captain Stafford was only in London for about a month, during which he received about US$25,000 for assistance rendered to KOTC in various ways. However, as Mr Brodie observed, August 1990 was a traumatic time for Kuwait because of the Iraqi invasion and, in our judgment, no adverse inference should be drawn against Captain Stafford for assisting his previous employers in return for remuneration during what must have been very a very difficult period for them. Mr Malins relied upon the fact that Mr Qabazard felt able to tell Captain Stafford about Scheme III while they were both in the London office in August 1990, but that does not seem to us to be a sufficient basis upon which to infer that he ever became party to a conspiracy involving him after he left Kuwait in 1989. We do not think that it was proved on the evidence before the judge that Captain Stafford assisted in defrauding the claimants in 1990 or that he agreed to do so.

152. Mr Malins further submitted that Captain Stafford assisted the conspiracy thereafter by helping to cover it up. In particular he relied upon the following. In June 1992 Captain Stafford refused to assist Sheikh Salman of KOTC in the investigation of alleged irregularities which had taken place under its previous management. The taped conversation between Captain Stafford and Mr Qabazard in January 1993 shows that Captain Stafford knew about 'other bits and pieces' and was willing to discuss them with Mr McCoy. Also in January 1993 Captain Stafford asked Mr McCoy to slow down the process of providing documents to KOTC. Immediately upon receiving the Mareva injunction in July 1994 he communicated with Mr Al Bader by telephone and fax. Mr Al Bader's family have funded his legal costs throughout and continue to do so. Mr Malins also submitted that Captain Stafford continued to play a part in the conspiracy by giving dishonest and untruthful evidence at the trial.

153. The difficulty with those submissions is that the facts relied upon are consistent with either view as to the ambit of the conspiracy. They are consistent with the view that the conspiracy was entirely open-ended in the sense that the agreement was to defraud the claimants indefinitely whether or not the conspirators continued in the employment of or as officers of KOTC. However, they are also consistent with a more limited conspiracy, namely that the defendants would defraud the claimants so long (in the case of each conspirator) as he was an officer or employee. The other factors relied upon by Mr Malins do not help to identify the true nature of the conspiracy and are consistent with assistance in a 'cover-up' by an employee no longer bound to his former employer by any fiduciary obligation.

154. In these circumstances we have reached the conclusion that none of the facts relied on by Mr Malins supports the conclusion that Captain Stafford ever agreed to help in defrauding the claimants after he left Kuwait. We do not think that silence or subsequent cover-up rendered him liable as a conspirator in the absence of evidence that he either played a part in, or received the proceeds of, any later acts of misappropriation on the part of Mr Al Bader or Mr Qabazard. The conclusions reached by the judge in the passage quoted in paragraph 147 show that there was no such evidence.

155. It follows that we need not concern ourselves further with a general consideration of the doctrine of 'withdrawal' from a common enterprise which has given rise to difficulty in the field of criminal law and does not readily transpose into the

© 2025 Thomson Reuters. 

field of civil actions for conspiracy. It also follows that Captain Stafford's appeal must be allowed in part unless there is new evidence sufficient to support the judge's conclusion that he should be liable in respect of losses sustained by the claimants after he left Kuwait. Mr Malins submitted that there is such evidence, to which we now turn.

*The New Evidence – Captain Stafford*

156. There are now available some of Captain Stafford's bank statements which were not available at the trial. Mr Malins submitted that they show that Captain Stafford received both part of the proceeds of the Gulf Shipping account and part of the proceeds of the frauds perpetrated after he left. As to the former, we have already referred in paragraph 93 above to the fact that there is a note on the file of UBS London that Mr Qabazard told it that the code ‘Humberside’ was to indicate instructions to deposit a draft to the credit of Captain Stafford's US dollar account with the TSB at Anlaby in Hull. We accept Mr Malins’ submission that the note supports the judge's conclusion both that Captain Stafford received part of the proceeds of the fraud and that he either received or was intended to receive such proceeds from Mr Qabazard before he left Kuwait. It does not, however, help to determine his liability (if any) thereafter.

157. In that regard Mr Malins relied on evidence relating to Captain Stafford's own bank statements which are now available. Mr Brodie submitted, by contrast, that the new evidence does not implicate Captain Stafford in respect of any of the events after he left Kuwait. It is common ground that the bank statements show that on the 10th July 1990 the sum of £226,934.85 was credited to Captain Stafford's sterling account at TSB Anlaby. Mr Malins submitted that that was the sterling equivalent of US$400,000 and that it was part of the proceeds of the operation of the conspiracy after he left Kuwait. The question is whether the documents establish that that is the case because, if they do, they provide strong support for the judge's conclusion that Captain Stafford is liable in respect of losses under all four schemes.

158. On the 4th January 2000 the claimants’ solicitors wrote to Captain Stafford's solicitors asking for an explanation. In response he made a witness statement exhibiting a Hill Samuel document dated the 28th June 1990 evidencing instructions to transfer US$400,199.61 from Hill Samuel to his TSB account at Anlaby, although he did not say what its original source was. Thereafter the claimants asserted in their skeleton argument for this appeal that Captain Stafford had not previously revealed the existence of a Hill Samuel account, that he had not explained whence came the money and that the overwhelming inference was that it came from the fraudulent conspiracy after he retired. Captain Stafford then made a further witness statement (his third) in which he said that he had no deposits with Hill Samuel when he swore his affidavit pursuant to the order made at the same time as the Mareva injunction was granted, that without consulting him TSB had in late 1987 opened the foreign currency account with Hill Samuel as a member of the same group and that the monies had originally been transferred to him when he was still employed by KOTC. He also exhibited two documents evidencing a deposit with Hill Samuel of A$665,778.96 on the 26th July 1989, which had grown to A$676,154.02 by the 29th August. The inference which Captain Stafford intended us to draw from those documents was that that sum was the source of the US$400,000. However, as Mr Brodie recognised in argument, that could not be the case because the Hill Samuel account was closed on the 29th September 1989.

159. After his third statement Captain Stafford made a yet further statement (his fourth) in which he sought to meet a contention on behalf of the claimants that the sum of US$400,000 could not have come from funds in existence when he left Kuwait because payments were made out of the Hill Samuel dollar account which depleted the funds held by him to such an extent that the source of the US$400,000 must have been later receipts. Those payments were transfers to Australia of A $500,000 and A$150,000 on the 4th and 24th May 1990 respectively. Captain Stafford sought to meet that point by saying that the Hill Samuel accounts showed that before leaving his employment he had deposited two sums maturing on the 29th September 1989, namely US$712,421 and A$676,154 respectively. Those sums were in addition to the sterling funds in his Anlaby account. He said that in these circumstances there were ample monies to fund the payment relied on by the claimants.

160. Both Mr Brodie and Mr Malins analysed the bank statements at some length. Mr Brodie submitted that Captain Stafford's US dollar account showed that he had more than US$700,000 on deposit which was ample to fund the payment of US$400,000. He identified the source of the three sums of A$500,000 (namely US$376,823.25), A$150,000 (namely US $115,500) and US$400,000 in the US dollar account. Mr Malins submitted that those sums add up to much more than the US$700,000 which was in the account when Captain Stafford left Kuwait plus any possible amount of interest earned. Mr Brodie replied that a letter from TSB dated the 4th January 1990 showed that in addition to the US$712,421 which was then standing to the credit of the US dollar account referred to above there was a further sum of US$150,721 standing to the credit of another account (previously no FYL 43), so that there were sufficient funds to meet the payments including that of US$400,000. Mr Brodie thus submitted that it would be wrong to draw the inference that Captain Stafford must have been receiving the proceeds of the continuing fraud. Mr Malins responded that the explanation given by Mr Brodie was not the

© 2025 Thomson Reuters.

explanation given by Captain Stafford in his witness statements and that the bank statements which have been produced are even now incomplete and therefore unsatisfactory.

161. We agree with Mr Malins that the position is by no means satisfactory for both those reasons. Indeed the missing pages of the FYL 43 might well throw considerable light on what Captain Stafford had been receiving while he was still in Kuwait. Thus, for example, the statements produced for the account which was FYL 43 do not include the year from the 30th April 1988 to 30th April 1989. If this were part of the trial, it would no doubt be appropriate for Captain Stafford to be recalled to explain the position in detail and to answer some of the questions raised by Mr Malins, but the limited question for us to determine is whether it is appropriate on the incomplete evidence which is available to infer that Captain Stafford must have received the proceeds of part of the fraud which continued after he left Kuwait. In our judgment it is not. We remind ourselves of the necessity for cogent evidence in this class of case. Since the explanations given by Mr Brodie for the figures may be correct, we decline to draw the necessary inference.

162. Finally, the claimants rely upon a further piece of evidence which has recently come to light. It is that a payment of A $100,000 was received into Captain Stafford's wife's bank account on the 25th March 1994. The payment was made by Mr Al Bader. Mr Malins invited the court to infer that that too shows the receipt of monies from the continued fraud. However, in his second witness statement Captain Stafford explained the payment as part of an investment by Mr Al Bader in a company called Engine Care Systems (NSW) Pty Ltd. He produced some documentary support for that evidence and, again, we have reached the conclusion that it would be wrong to draw the inference suggested.

163. It follows that, while the new evidence raises a number of questions, it is not sufficient to enable us to conclude that Captain Stafford received any part of the proceeds of the fraud after he left Kuwait and retired in September 1989. It follows that it does not lead to the conclusion that Captain Stafford was ever party to a conspiracy operating after his retirement. On the other hand it in no way undermines the judge's conclusion that he was a party to the conspiracy operating while he was still working for KOTC.

**Conclusion on Conspiracy under English Law.**

164. For the reasons we have given we uphold the judge's view that there was a conspiracy actionable under English law which was originally between Mr Al Bader and Mr Qabazard (and perhaps others) that they would defraud the claimants by any means at their disposal while they were working for the claimants. Captain Stafford joined the conspiracy in about September 1986. Subject to the principle of double actionability discussed below, Mr Al Bader and Mr Qabazard are liable for damages before September 1986 and thereafter all the conspirators are liable for damages in respect of all four schemes, save that Captain Stafford is not liable in respect of losses incurred after he left Kuwait in September 1989.

**Conspiracy - Double Actionability**

165. The claimants having pleaded their case primarily in the tort of conspiracy, and the judge having found that under English law all the defendants were parties to a single actionable conspiracy wrongfully to misappropriate the claimant's assets, it became necessary for the judge to consider the defendants' plea that the acts complained of as giving rise to their liability took place (or largely took place) in Kuwait, and that Kuwaiti law was thus the lex loci delicti of any alleged tort said to be owed by the defendants to the claimants. On that basis the defendants contended that the rule of 'double actionability' could not be satisfied because the tort of conspiracy is unknown to Kuwaiti law.

166. It must first be noted in this respect that by Part III of the Private International Law Miscellaneous Provisions Act 1995 the choice of law rules (including the double actionability rule) for determining the law applicable to torts and issues in tort as stated in Rule 202 and Rule 203 of *Dicey & Morris: The Conflict of Laws (12th ed.)* at p.1480 and 1487 have been abolished (save in relation to defamation claims). The statutory principles now applicable and the replacement Rules 202 and 203, as stated by the editors of *Dicey & Morris* are discussed at length in the Fourth Cumulative Supplement to the 12th edition. However, the provisions of Part III of the 1995 Act do not apply to acts or omissions giving rise to a claim which occurred before the commencement of Part III of the Act. Accordingly, because the latest act or omission of the defendants relied upon occurred in 1992, in respect of the claims in tort the judge was concerned (as is this court) with the former common law rules.

167. The rule of double actionability as stated in Rule 203 in *Dicey and Morris (12th ed.)* At p. 1487 is as follows:

> "
>
> (1) As a general rule, an act done in a foreign country is a tort and actionable as such in England, only if it is both
>
> (a) actionable as a tort according to English law, or in other words is an act which, if done in England, would be a tort; and
>
> (b) actionable according to the law of the foreign country where it was done.
>
> (2) But a particular issue between the parties may be governed by the law of the country which, with respect to that issue, has the most significant relationship with the occurrence and the parties.

Paragraph (1) of the Rule derived from the well known dictum of Willes J in Phillips v Eyre (1890) L.R. 6 Q.B.1 that:

> "As a general rule, in order to found a suit for a wrong alleged to have been committed abroad, two conditions must be fulfilled. First, the wrong must be of such a character that it would have been actionable if committed in England… Secondly, the act must not have been justifiable by the law of the place where it was done."

169. The text of Clause 1 (as set out above) was the subject of express approval in the judgment of the Privy Council in Red Sea Insurance Co v Bouygues S.A. [1995] 1 AC 191 at 199 per Lord Slynn of Hadleigh. Having referred to the decision of the House of Lords in *Boys v Chaplin [1971] AC 356* the effect of which (overruling *Machado -v- Fontes [1897] 2 QB 231* ) led to the present wording of Clause (1)(b), Lord Slynn stated:

> "Lord Guest, at p.381, explicitly accepted that:
>
> "To justify an action in England for a tort committed abroad the conduct must be *actionable* by English law and by the laws of the country in which the conduct occurred, the lex loci delicti." (Emphasis added)

Lord Wilberforce at p.388, also regarded Machado v Fontes as having been wrongly decided:

> "The broad principle should surely be that a person should not be permitted to claim in England in respect of a matter for which civil liability does not exist, or is excluded, under the law of the place where the wrong was committed:"

He continued:

> "I would, therefore, restate the basic rule of English law with regard to foreign torts as requiring actionability as a tort according to English law, subject to the condition that civil liability in respect of the relevant claim exists as between the actual parties under the law of the foreign country where the act was done."
>
> Their Lordships in the present case thus consider that it is clear that there was a majority in favour of reading "not justifiable" as meaning actionable in civil proceedings even if it was not necessary for the act to be characterised as a "tort" under the foreign law. Their Lordships agree with that decision and, subject to the effect of Clause (2), consider that Rule 203(1)(b) in *Dicey & Morris, Conflict of Laws (12th ed.)* , is a correct statement of the law."

170. As is clear from the authorities, the "double actionability" rule was concerned with the broad question of whether the facts which would give rise to liability in tort under English law would render the defendant liable in a civil action under the foreign lex loci delicti. Thus the fact that he might be criminally liable there, or only entitled to receive compensation under a statutory compensation scheme, rather than by way of civil proceedings, would be insufficient.

171. The rationale of the rule that the act or omission of the defendant must be actionable abroad in civil proceedings between the same parties is by way of a safeguard against imposing liability upon a defendant in England as the lex fori for acts in respect of which there would be no liability in the lex loci delicti. However, it is not necessary for the act or omission to be characterised as a tort or delict under the foreign law, provided there is a right of recovery to a similar extent by way of civil action. The reasons of policy which dictate that the defendant should not be held liable in circumstances where, or to the extent that, he would not be held civilly liable in the country where the relevant acts or omissions took place, do not dictate that the legal basis of such liability should be the same. Indeed, the degree to which systems of civil law differ the world over, and the diversity of the conceptual routes by which they impose liability on a defendant to compensate or otherwise make restitution to a claimant in respect of a civil wrong, militate against the requirement that the court of the lex fori should enmesh itself in an exercise of characterisation and fine distinction as between the remedies afforded by different jurisdictions to achieve a similar result. Thus, so far as acts or omissions on the part of a defendant or defendants may give rise to a liability in tort under English law, there is no requirement that such conduct must be tortious by the lex loci delicti. All that is required is that it should be "civilly actionable" there (see Boys v Chaplin per Lord Hodson at 377 and per Lord Wilberforce at p.389 and *Metall und Rhostoff A.G. v Donaldson Lufkin & Jenrette Inc. [1990] 1 QB 391* per Slade LJ at 439-440). It follows from this that, as stated in *Dicey & Morris (12th ed.)* at p.1496

> "It is sufficient if by that law [i.e. the lex loci delicti], his [i.e. the defendant's] liability to pay damages is contractual, quasi-contractual, quasi-delictual, proprietary or *sui generis* ."

© 2025 Thomson Reuters.

172. As a preliminary to his consideration and application of the double actionability rule in this case, the judge first considered the question: where was the tort committed? In that respect the claimants had submitted that, despite the strong Kuwaiti connection of the parties, having regard to the seat of the claimants' operations and the residence and activities of the defendants, on a detailed analysis of the facts relied on, the tort of conspiracy was properly to be regarded as committed in England rather than in Kuwait. It was submitted that that was so whether one applied the "substance" test propounded in Distillers Co Bio-Chemicals Limited v Thompson [1971] AC 458 D-E , per Lord Pearson ("the right approach is, when the tort is complete, to look back over the series of events constituting it and ask the question, where in substance did this cause of action arise?") or the test that the court should first consider all the elements of the tort and then decide with which jurisdiction they are "mostly closely connected": see *Diamond v Bank of London and Montreal [1979] QB 333* per Lord Denning MR at 345G–346G and Stephenson LJ at 348H-350G. See also generally Metall und Rohstoff (supra) at 447-9. If that were right, then no question of double actionability would arise in relation to the tort of conspiracy.

173. Briefly stated, the claimants contended that the design underlying the defendants' fraudulent activities was to generate funds outside Kuwait, the primary location chosen to effect such design being London. The monies were largely obtained through Clarksons in London, Mr McCoy playing a central role in the events which gave rise to the proceedings; of the twenty-seven charterparties used by the defendants as part of their fraudulent conspiracy, only six were signed in Kuwait and the rest were signed in London; the overt acts of the conspirators in effecting their frauds were substantially committed in London, Schemes I, II and III all involving the procurement of Clarksons to remove money from accounts held by them on the claimants' behalf in London, largely in cash or traveller's cheques delivered in London; and the bulk of the known enrichment took place in London rather than Kuwait.

174. Nonetheless, having made a detailed analysis of the various elements and events relied on as constituting the conspiracy, the judge, applying the principles discussed in Metall und Rohstoff , reached the conclusion that the tort was in substance committed in Kuwait and, therefore, that it was necessary to apply the double actionability rule in the circumstances of the case. By their respondents' notice, the claimants assert that the judge erred in his conclusion. However, since the judge went on to apply the double actionability rule in favour of the claimants, Mr Malins made clear in responding to the appeal that the alleged error of the judge would only be relied on if the court held that he had erred in his application of the rule. As appears hereafter, we consider that the judge was correct in his application of the rule; it has not therefore been necessary to consider the point raised in the respondents' notice.

175. So far as concerns sub-paragraph (a) of Rule 203(1), the judge found, and as we have stated rightly found, that the acts of the defendants complained of constituted the tort of conspiracy under English law. The critical question was thus whether the acts constituting the conspiracy were also civilly actionable according to the law of Kuwait.

176. The relevant law was the subject of evidence from three expert witnesses, Dr Mark Hoyle for the claimants, Professor William Ballantyne for the defendants, and Judge Mohammed Sallam (a retired judge of the Kuwait Court of Cassation) for the third parties. There was little disagreement between them on the basis of civil liability for wrongful acts under the law of Kuwait. That law is contained primarily in a series of codes, the relevant code in this case being the Civil Code of 1980 which is based broadly on the Egyptian Civil Code. Kuwait does not, like English law, have a law of individual 'torts', but contains general provisions relating to obligations and civil wrongs. It was agreed that the provisions relevant to this case were Articles 227-229 which relate to the award of damages and/or compensation for civil wrongs and Articles 264 and 267 which deal with questions of restitution. Their relevant text as translated into English is as follows:

> "Art 227-1. Every person who by his wrongful act causes damage to another is liable to compensate such other, whether he acted directly or indirectly.
>
> …………

Art.228-

(1). If the damage was caused by the fault of several persons,.each of them is liable to compensate the injured party for all the damage he has suffered.

(2). Liability shall be apportioned between the several wrongdoers in proportion to the part played by their wrongdoing in causing the damage. If it is impossible to determine what part each played liability shall be apportioned equally.

Art.229.- Where the wrongful act which caused the damage was the result of incitement or assistance the damage shall be deemed to have been caused by the wrongful act of the immediate perpetrator and those who incited or assisted him, all of whom shall be liable to make compensation therefor.

Art.264.- He who has received that which is not due to him must restore it.

Art.267-

(1) Where the receiver of that which is not due was of good faith he shall only be bound to return that which he received; but if he was of bad faith he shall be liable to restore also the fruits he has obtained or which he has failed to obtain as of the date of receiving the thing or from the date when he became of bad faith as the case may be.

(2) In any case, he who has received that which was not due shall be obliged to restore the fruits from the day of initiation of proceedings against him for restitution."

177. In dealing with the cause of action in conspiracy, it was common ground between the experts that there was no civil wrong known to the law of Kuwait which depended on proof of an agreement or combination between two or more persons to injure another, and thus equated to the tort of conspiracy in English law. However, it was also not in dispute between the experts that Article 227 provided a broad basis of liability for wrongful acts which caused damage to another, and that, whatever the precise nature of what would be regarded as "wrongful" in this context, it would include the dishonest appropriation by whatever means of money or other assets. As the judge rightly held, that would obviously include obtaining by fraud as well as simple theft. It was also common ground between the experts that if two or more people acted together in such a way as to cause damage to another, Article 228 rendered each of them liable for the whole of the loss. As the judge observed, essentially this Article reflected the principles governing liability as joint tortfeasors under English law, liability as between the wrongdoers themselves being apportionable under Article 228(2) . It was not disputed between the experts that if the defendants had co-operated to obtain money by fraud from the claimants, the defendants would be liable to compensate the claimants in accordance with those provisions of the Civil Code. It was further accepted on all sides that if the facts alleged by the claimants could be established, the claimants would in principle be entitled to recover from all the defendants. Nonetheless, the defendants argued below, as Mr Brodie has argued before us, that double actionability had not been established by the claimants in respect of the plea of conspiracy for two reasons, both of which were largely interrelated with the arguments we have already considered in relation to the plea of conspiracy under English law.

178. Mr Brodie's first argument is essentially a pleading point. He submitted that Kuwait being the lex loci delicti, the claimants should have begun by identifying the causes of action open to them under the law of Kuwait. He submitted that, had they done so they would have seen under the Articles previously quoted that the acts of wrongdoing on which they relied provided them prima facie with individual causes of action in respect of each of the misappropriations alleged against one or more of the defendants jointly and severally. Had those causes of action been pleaded it would have been seen that essentially similar claims for deceit, conversion and restitution lay against the defendants as several and joint tortfeasors under the laws of England, which claims could and (as Mr Brodie submitted) should have been pleaded without resort to the tort of conspiracy. He conceded that, had that been done, the double actionability rule would have been satisfied. However, he

submitted that, the claimants having decided to pin their colours to the conspiracy mast in order to gain what they regarded as a more advantageous cause of action, it was appropriate that the question of double actionability should depend upon whether or not a cause of action for conspiracy to injure or defraud is known to the law of Kuwait.

179. Mr Brodie's second argument was that, because no such civil wrong as conspiracy is known to the law of Kuwait, the claimants, in breach of the principle stated by Lord Wilberforce in Chaplin v Boys at 389d, were seeking to claim in England in respect of a matter for which civil liability does not exist under Kuwaiti law and that civil liability in Kuwait in respect of the relevant claim could not be demonstrated.

180. Mr Brodie's first argument is neither founded upon authority nor hallowed by practice. The claimants case, as originally pleaded, was a straightforward case in conspiracy in respect of which the claimants placed no reliance upon foreign law, it being their case that the lex loci delicti was English. Once the defendants had pleaded that the law governing any claim by the claimants arising out of any alleged breach of duty owed by the defendants was Kuwaiti law and it was expressly denied that the tort of conspiracy was actionable under the law of Kuwait, the claimants amended their claim to plead that each of the unlawful means by which the conspiracy was put into effect, and upon which the claimants would rely as a self-standing cause of action, was unlawful under the law of Kuwait as a breach of each of the defendants' duties of good faith and honesty owed as directors (in the case of Mr Al Bader and Mr Qabazard) and as an employee (in the case of Captain Stafford) and that the deliberate assistance by one defendant of any breaches committed by another defendant would be actionable under Article 227 . That was a perfectly proper way to proceed and, save that the claimants later added to the Articles of the Kuwaiti Civil Code on which they relied, that was the way matters proceeded.

181. So far as the form of the pleading was concerned, the judge observed:

> "Although the plaintiff must show at trial that the acts complained of give rise to civil liability as between himself and the defendant in the country where they were committed, and may, if he chooses to do so, identify at the outset the relevant foreign law on which he relies, he is entitled to rely on the presumption that foreign law is the same as English law until the contrary is proved: see University of Glasgow -v- The Economist (1990) [1997] 1E.M.L.R. 495 "

182. The case last referred to was a decision of Popplewell J as to the propriety of a libel pleading which the claimants proposed to amend to allege that the publication abroad of the libel complained of was actionable in the particular countries in which publication occurred, but declined to plead particulars of the relevant foreign laws relied on. The defendants objected to a plea in that form; but the claimants argued that they were simply entitled to rely on the presumption that, in the absence of proof to the contrary, the laws of the countries concerned were the same as English law. In making observations much to the same effect as those made by the judge, Popplewell J nonetheless did not doubt that, so far as a libel pleading was concerned, the claimant had to state (albeit he need not state more) that the tort was actionable in the foreign country concerned. In this connection we note the general view expressed at paragraph 2.20 of the Law Commission Working Paper No. 87 on *'Private International Law, Choice of Law in Tort and Deceit'* that:

> "it is not necessary for the plaintiff to plead the existence of civil liability under the lex loci delicti: he may rest his case on the basis of English law alone, and leave it to the defence to raise any questions of foreign law. If the defence does not do so, the case will be disposed of without any reference to foreign law."

183. In the text which follows Rule 203 in *Dicey & Morris (12th ed.)* at p.1514 which related to allegation and proof of the lex loci delicti, it is stated that authority is divided on the question whether it is for the claimant to allege that the defendant's conduct is actionable under the lex loci delicti (i.e. that such an allegation is part of the claimant's positive case), or whether it is sufficient for the claimant to plead the cause of action in English law, it then being left to the defendant to plead and prove that his conduct was not actionable under that law. Preference is expressed by the editors for the latter view, thus aligning themselves with the Law Commission.

184. Since English courts proceed on the basis of a presumption that foreign law is the same as English law unless the contrary is proved as a fact, it seems clear that, whether or not the claimant incorporates in his pleading an averment that the matters relied on are civilly actionable under the lex loci delicti, the burden in practice lies upon the defendant to plead and prove that his conduct was not actionable under the lex loci delicti. That being so, the debate appears to be a somewhat arid one. The context in which it is likely to give rise to controversy is at the interlocutory stages of an action involving a foreign element when the court is concerned to consider and give directions in relation to any issue of foreign law arising on the face of the pleadings and as to the form and extent of any expert evidence of foreign law sought to be adduced by the parties. It seems to us that questions of where the burden lies and its practical consequences for the progress of the action are best dealt with on a case by case basis rather than by the application of an inflexible rule. So far as the instant case is concerned, by the time of trial, the issues of law were unambiguously pleaded on both sides, directions having been given in respect of the expert evidence to be called, and the judge was entirely right to deal with the matter as he did.

185. Mr Brodie's second argument was considered and rejected by the judge in the light of the state of the expert evidence before him considered in the light of the authorities to which we have referred. The judge (at page 151) held that:

> "It is immaterial in the present case that the law of Kuwait does not recognise the separate terms of liability based on the existence of a combination provided that the acts which give rise to the tort under English law provide a cause of action under that law. In the present case they do, and the effect of Art. 228 is to render the defendants liable to the same extent as under English law."

Again, it seems to us that the judge was entirely right in the conclusion which he reached.

186. As already indicated, and as Mr Brodie accepted, Article 227 of the 1980 Civil Code speaks in terms of liability for 'wrongful acts' and Article 228 imposes joint and several liability in respect of damage caused by the fault of several persons; in this respect the Articles appear to be conceptually similar to, and entirely apt to cover, the position of joint tortfeasors in English law. Thus, they are apt in substance to cover tortious acts committed by individuals pursuant to a common agreement or combination to effect such acts. In the course of argument Mr Brodie conceded, indeed as part of his argument upon merger (see paragraphs 122-127 above) he asserted, that if and to the extent that the individual defendants were found liable in respect of the misappropriations complained of, they could and should be liable as joint tortfeasors and the averment of conspiracy was surplusage. That is because the gist of the action in a civil case of conspiracy is the damage caused not by the agreement itself, but by the acts carried out pursuant to it. We consider that the words of Lord Wilberforce in Boys v Chaplin ("civil liability *in respect of the relevant claim* ") should be read with his earlier reference to a "claim in England *in respect of a matter*

”. The essential question is simply whether the underlying facts and matters which gave rise to the tort claim in England would also gave rise to civil liability (whatever the label or description of the cause of action) under the lex loci delicti.

**Fiduciary Duty and Constructive Trust**

187. By way of alternative to their claim for damages for conspiracy to defraud by the various acts of misappropriation relied on, the claimants’ points of claim also characterised the unlawful means adopted by the defendants as breaches of the duties of good faith and honesty which each owed to the claimants by reason of his office or employment. In addition, by later amendment, the claimants asserted that they would if necessary rely upon each of the unlawful means adopted as giving rise to a separate and self-standing cause of action against each of the defendants, should the claim in conspiracy fail. The judge was somewhat critical of the brevity of the pleading; however he regarded it as cured by the particulars separately supplied which made the defendants well aware of the nature of the case made against them.

188. We start by considering the claimant's alternative claim in the context of English law. In many company fraud cases it is necessary to distinguish between a director who misapplies the claimant company's funds on the one hand and someone who either receives them for his own benefit with knowledge of the misapplication (knowing receipt) or dishonestly assists in the misapplication (knowing assistance) on the other. Those who fall into the first category, being persons who control the company's funds and owe it fiduciary duties, are treated by the law as if they were *actual* trustees of the funds. Those who fall into the second category, being persons who neither control the company's funds nor owe it fiduciary duties, are classified as *constructive* trustees of the funds. The only reason why the directors are not actual trustees of the funds is because the whole legal and beneficial ownership of the assets of a company is vested in the company itself. The principle was authoritatively stated by Lindley LJ in *Re Lands Allotment Co. [1894] 1 Ch. 616* , 631:

> “Although directors are not properly speaking trustees, yet they have always been considered and treated as trustees of money which comes to their hands or which is actually under their control; and ever since joint stock companies were invented directors have been liable to make good moneys which they have misapplied upon the same footing as if they were trustees …”

A more recent affirmation of the principle is to be found in the judgment of Buckley LJ in *Belmont Finance Corp. v. Williams Furniture Ltd (No 2) [1980] 1 All ER 393* , 405.

189. In the present case Mr Al Bader was a director of both KOTC and SITKA and Mr Qabazard was a director of KOTC. Moreover, both here and below, Mr Brodie accepted that, although Mr Qabazard was not a director of SITKA and Captain Stafford was not a director of either company, each of them owed fiduciary duties to the claimant or claimants in respect of funds which were under his control. Accordingly, each of the three defendants fell into the first category stated above, and it was only necessary for the claimants to establish that they had misapplied the funds. Questions of interest apart, it was not even necessary to establish that they had acted dishonestly, although the nature of the misapplications was such that, once found, it was inevitable that they would also be found to have been dishonest. What was unnecessary and merely confusing was for the judge to be asked to consider whether the defendants were liable as constructive trustees. Plainly they were not. An actual trustee or someone whom the law treats as such cannot at the same time be a constructive trustee.

190. The judge held that the claimants’ alternative claim was made out. Although his consideration of the question proceeded mainly on the footing that the defendants were liable as constructive trustees, he concluded by holding that they were also liable by reason of breaches of their fiduciary duties to the claimants. On the basis of his previous findings, that conclusion

was both justified on the facts and correct in law. However, because the rule of English private international law is that the obligation to restore the benefit of an enrichment such as was obtained by the defendants in this case is governed by the law of the country where the enrichment occurred (see *Dicey & Morris: The Conflict of Laws (13th ed.)* Rule 200(2)(c)), it was necessary for the judge's decision to be based, in the first instance, on the law of Kuwait.

191. Although the concept of a trust is unknown to Kuwaiti law, both Dr Hoyle and Professor Ballantyne agreed that Articles 264 and 267 of the Civil Code (see above) imposed on each of the defendants an obligation to make restitution to the claimants in respect of the funds misapplied by him. On that footing the judge followed the decision of Chadwick J in Arab Monetary Fund v. Hashim (15th June 1994 - unreported), which has since itself been followed by Mance J in Gruppo Torras S.A. v. Al Sabah (24th June 1999 - unreported), and held that the restitutionary obligation under Kuwaiti law could be characterised as fiduciary in character by English law and thus capable of supporting the equitable remedies in personam which would be available to the claimants in an English court.

192. In our judgment both the decision of Chadwick J in Arab Monetary Fund v. Hashim and the judge's application of it to the present case were correct. In Hashim the claimant sought recovery from the defendants on the grounds that they had acted in breach of fiduciary duties under the law of Abu Dhabi. Chadwick J said:

> "In the context of a claim to invoke its equitable jurisdiction it is for the English court to decide whether the necessary fiduciary relationship exists. Where the duties to which a relationship gives rise are determined by foreign law, the question for the foreign law is what is the nature of those duties. It is for the English court to decide whether duties of that nature are to be regarded as fiduciary."

Later, having referred to a passage in the judgment of the Privy Council delivered by Lord Templeman in *A.G. for Hong Kong v. Reid [1994] 1 AC 324* , 331, and to what is now rule 200 in Dicey and Morris's Conflict of Laws, Chadwick J continued:

> "I find nothing in the rule which is inconsistent with the view that, in cases involving a foreign element in which an English court is asked to treat a defendant as a constructive trustee of assets which he has acquired through misuse of his powers, the relevant questions are: (i) what is the proper law which governs the relationship between the defendant and the person for whose benefit those powers have been conferred, (ii) what, under that law, are the duties to which the defendant is subject in relation to those powers, (iii) is the nature of those duties such that they would be regarded by an English court as fiduciary duties and (iv), if so, is it unconscionable for the defendant to retain those assets."

193. Our only possible criticism of Chadwick J's judgment is that he too referred to the defendants in that case being treated by English law as constructive trustees and not as actual trustees. There may have been special reasons for that. But whether there were or not, the inaccuracy of the description can have had no effect on the principles by which the defendants were held liable. In the present case the answers to Chadwick J's four questions are the following: (i) the proper law which governed the relationship between the defendants and the claimants was the law of Kuwait; (ii) the duties imposed on the defendants by Articles 264 and 267 of the Civil Code were to make restitution in respect of the sums misapplied by them respectively; (iii)

© 2025 Thomson Reuters. 

the nature of those duties was such that they would be regarded by an English court as fiduciary duties; and (iv) it would be unconscionable for the defendants to retain the funds. We accordingly hold that the claimants' alternative case is made out.

**Interest**

194. The claimants sought, and the judge awarded, compound interest upon the principal sums for which each defendant was held liable. He did so on the basis of the decision in *Wallersteiner -v- Moir (No.2) [1975] QB 373* as considered by Lord Browne-Wilkinson in the *Westdeutsche case [1996] AC 669* .. The judge said (at page 174):

> "… Lord Browne-Wilkinson at page 702D-E indicated some support for the view that compound interest could be awarded in all cases where a fiduciary has improperly profited from his trust and in my judgment that should follow from the application of established principles to modern conditions. An award of compound interest in accordance with equitable principles is in the nature of a remedy designed to ensure that the wrongdoer makes full restitution. As such I think the jurisdiction to make such an award is to be regarded as part of the procedural law of the lex fori."

The judge concluded (at page 175) that, while he was satisfied that he had power to award simple interest under the provisions under s.35A of the Supreme Court Act 1981 he should nonetheless make an award of compound interest in the exercise of his equitable jurisdiction, this being:

> "a case in which the defendants can properly be regarded as being under a duty to account the plaintiffs for a property which they received and any benefits obtained from it."

195. The judge reached that conclusion, despite the submissions of Mr Brodie, renewed on this appeal, that any award of interest in the circumstances of this case would amount to a breach of the double actionability rule, because the law of Kuwait does not recognise or provide for awards of interest, save in respect of transactions governed by its Commercial Code and save insofar as permitted by Article 306 of the Civil Code, which all experts agreed were not applicable to the circumstances in this case.

196. The judge dealt with Mr Brodie's argument by posing and answering the following three questions. (1) Was an award of interest precluded by the double actionability rule as being contrary to the law of Kuwait? (2) If not, was it a case in which it would be appropriate as a matter of discretion to award interest at all? (3) If so, should such interest be awarded on a simple or compound basis?

197. In relation to question (1) he rightly stated (at page 167-8):

> "Whether the plaintiffs are entitled to recover interest on any sum awarded as damages in the present case, either under s.35A of the Supreme Court Act 1981 or under the rules of equity, depends first on

> whether in making an award of interest the court is giving effect to procedural or substantive rights. If the part of an award of interest is simply procedural it is governed exclusively by English law as the lex fori and no question of Kuwaiti law arises, save insofar as it may be relevant to the exercise of the court's discretion. If, however, the court is giving effect to substantive rights it becomes necessary to decide whether the loss of use of money represents a head of liability recognised under Kuwaiti law so as to satisfy the double actionability rule: see Chaplin -v- Boys ."

198. The judge first considered the position in relation to awards of statutory (simple) interest under s.35A , and adopted the view of Hobhouse J in Midland International Trade Services Limited -v- Al Sudairy (11th April 1990, reported Financial Times 2nd May 1990) that such awards are procedural rather than substantive in nature. He expressed a similar conclusion in respect of awards of compound interest based on equitable principles. That being so, he concluded that both types of award may be made in English proceedings regardless of the lex causae.

199. In case he was wrong, the judge went on to consider the position under Kuwaiti law. He concentrated simply upon the provisions of the Kuwaiti Civil Code because, although the defendants' acts of misappropriation were all committed in a commercial context, the expert witnesses were agreed that the court could not resort to the principles governing commercial transactions contained in the Kuwaiti Commercial Code, as the matters complained of did not amount to commercial activities for the purposes of that Code. However, so far as the Civil Code was concerned, the judge held, on the basis of the expert evidence which he had heard, that interest upon sums misappropriated was recoverable in the sense and to the extent that the terms of Article 267 justified such an award ("Where the receiver of that which is not due was of … bad faith he shall be liable to restore also the fruits he has obtained or which he has failed to obtain … from the date when he became of bad faith …").

200. The judge stated (at page 172):

> "… [although].. with the possible exception of the funds received by Capt. Stafford which were invested the plaintiffs are not in a position to show that the stolen funds did actually produce any fruits in the hands of the defendants … Art. 267 also imposes an obligation on a person who has received property in bad faith to account to the plaintiff for the fruits he ought to have received. This aspect of the Article was not investigated with the witnesses in very great depth, but Prof. Ballantyne accepted that it imposed an obligation on the defendant to account for any fruits which could have been obtained but were lost as a result of his negligence. That being so, I am satisfied that the Kuwaiti courts have the power under this Article to award interest where they are satisfied that the property in question could have been used to earn interest and would have been so used if the interests of the owner had been properly safeguarded. It seemed clear to me from the evidence of both Dr. Hoyle and Prof. Ballantyne that the Code is more concerned with laying down principles of general application than with prescribing different rules for different types of claim. Prof. Ballantyne accepted that a person who stole property would be regarded as having thereby received it in bad faith within the meaning of Art. 267 with all the consequences which that Article prescribes, and since in the present case the defendants were acting in concert, I think it follows that receipt by any one of them could properly be regarded as receipt by all. That being so, I am satisfied that interest could be awarded against them under the law of Kuwait."

© 2025 Thomson Reuters.

201. The judge therefore answered his question (1) in the negative. So far as his question (2) was concerned, he made clear that in principle he considered an award of interest appropriate, and in answer to question (3) he concluded that it should be on a compound basis.

202. As to the judge's finding that interest could be awarded under Article 267 , Mr Brodie raised two points on this appeal. First, he submitted that, in coming to his decision, the judge should have disregarded Article 267 altogether. That was because Article 267 had not been pleaded and reliance had not been placed upon it in the claimants' expert's report, although its text appeared in a schedule thereto. We do not think that complaint has substance. It is correct that Dr Hoyle first placed reliance upon Article 267 as itself applicable to a claim in respect of interest in the course of his cross-examination by counsel for the third party. He had earlier asserted a power in the court to award compensation for loss of the claimant's monies. In cross-examination he expressed the view that interest earned, or which could reasonably be expected to be earned (which he called 'opportunity cost'), could also be awarded under Article 267 as part of the Kuwaiti court's general power to compensate a victim of misappropriation. Mr Brodie objected to that evidence at the time, but it was admitted on the basis that Professor Ballantyne should have an opportunity to deal with the point and that Mr Brodie could apply to have Dr Hoyle recalled for further cross-examination should he see fit. Following Professor Ballantyne's evidence, that right was not exercised. In these circumstances, it seems to us that Mr Brodie's complaint must fail so far as it was based upon a plea of surprise.

203. As to the substance of the experts' evidence, Mr Brodie submitted that the evidence of Dr Hoyle was in any event insufficient to justify the judge's finding that interest was recoverable. He asserted that the judge should have preferred the evidence of Professor Ballantyne, the gravamen of whose evidence was not represented by his concession that a thief or receiver could be obliged to account for fruits which could have been obtained but were lost through negligence, but rather by his statement of opinion that the reference to 'fruits' in Article 267 was not intended to be applied to a claim for interest upon monies at all, the concept of 'fruits' being based on historic principles of recovery in relation to the produce of animals or plants and inappropriate to comprehend a claim in respect of lost interest on monies placed on deposit. Having studied the transcript of the expert evidence, we are satisfied that there was before the judge a clear issue between the rival experts as to whether or not Article 267 could be used to require a fiduciary in wrongful receipt of monies to account for interest which he had obtained or failed to obtain through investment, in respect of which issue the judge was entitled to prefer, as he did in fact prefer, the opinion of Dr Hoyle. We therefore reject this ground of appeal.

204. In these circumstances, the judge's finding that interest was recoverable by way of compensation under the restitutionary provisions of Article 267 represented a finding that there was under Kuwaiti law a provision of substantive law which closely corresponded to the award in England of compound interest against a person whom English law would regard as a trustee or constructive trustee in respect of monies stolen or appropriated by fraud. Accordingly, if the judge was wrong to regard his award of compound interest as a matter of procedural law for the lex fori, he was nonetheless justified in making the award he did, given that it "harmonise[d] with the right according to its nature and extent as fixed by the foreign law" (see *Phrantzes -v- Argenti [1960] 2 QB 19* at 35 and *Dicey & Morris* (13th ed.) at page 171) and was thus the remedy appropriate in English law to give effect to the substantive right contained in Article 267 . That being so, it is strictly unnecessary to decide the question, hitherto devoid of authority, as to whether an award of interest against a person in the position of a trustee or constructive trustee is better regarded as substantive or procedural in character so far as English law is concerned. What does seem clear to us, however, is that (although the judge held it to be so) the answer is not necessarily the same as that in respect of an award under s.35A of the Supreme Court Act 1981 (which prohibits awards of compound interest).

205. As to the nature of awards under s.35A there is a degree of controversy whether, *for the purposes of the conflict of laws* a claim for and/or the award of simple interest in respect of debt or damages should be characterised as procedural (as the judge concluded) or substantive in nature. In stating his conclusion on that point, the judge said that he found the reasoning of Hobhouse J in Midland International -v- Al Sudairy convincing. In brief summary, that reasoning was that (1) there is no English common law right to be paid general damages by way of interest or otherwise for delay in payment of a debt (see *President of India -v- La Pintada [1985] AC 104* ), the statutory discretion provided by s.35A being an alternative to any substantive right and not reflective of it; (2) the power is a broad discretionary power in the court to remedy injustice as part

© 2025 Thomson Reuters. 

of its procedure; see the La Pintada decision at p.131 per Lord Brandon, and BP Explorations -v- Hunt No.2 [1979] 1 WLR 793 at 845 et seq per Robert Goff J approved by the House of Lords at [1983] AC 352 ; (3) the statutory power is dependent on and springs from the existence of legal proceedings, rather than altering or adding to the contractual rights of the parties. Thus it is an incident of procedure and not of substantive law.

206. In coming to his conclusion, Hobhouse J rejected the contrary view, at that time expressed in general terms in *Dicey & Morris (11th Ed)* in the text beneath Rule 199 (now to be found in somewhat expanded form beneath Rule 196 in *Dicey & Morrtis (13th ed.)* at pp.1459-60) and adopted by Bristow J in *Miliangos -v- George Frank Textiles (No.2) [1977] QB 489* at 496-7, that in respect of "claims for interest as damages", the right to claim such interest is at common law governed by the law which is applicable to the contract albeit the rate of interest to be awarded is a matter for the lex fori. That view is essentially based on the premise that a claim for interest is in substance a claim for damages in the sense that it is awarded as compensation to the plaintiff for being kept out of money justly due to him, and that the question of whether or not such a claim or award is available to a claimant is (like the availability of heads of damage strictly so called) governed by the law applicable to the contract or tort sued upon. Hobhouse J, like the judge in this case, recognised that a claim for interest due *under an express or implied term* in a contract (like the identification of recoverable heads of damage in the law of tort) is a matter of substantive law for the lex causae. However, he took the view that Rule 199 (now Rule 196) in *Dicey & Morris* should be confined to the context of a *contractual* right to interest and he pointed out that the question whether the general *discretionary* power of the court under s.35A is itself substantive or procedural is a different matter.

207. While we acknowledge the force of Hobhouse J's reasoning as an analysis of the nature and origins of the English court's general power to award interest, it is also right to observe that the creation of that power creates a right in a claimant to claim interest, which right is recognised and consistently given effect on the basis that it represents compensation to the claimant for having been kept out of money to which he has been held entitled

208. Because it is not necessary to resolve the controversy over s.35A for the purpose of deciding this appeal, we do not propose to do so. That is because it has not been fully argued before us, and we consider that any thorough review of the proper characterisation of the power of the court under s.35A should take into account the possible effect of Article 10(1) of the *Rome Convention on the Law Applicable to Contractual Obligations 1980* which was imported into English law by the Contracts (Applicable Law) Act 1990 , but which had not come into effect at the time of Hobhouse J's decision. The editors of *Dicey & Morris* express the view at p.1459 of the current (13th) edition that, for the purposes of the Convention, the right to claim interest should be regarded as a substantive matter for the applicable law as one of the 'consequences of breach': see Article 10(1)(c) . However, we express no view upon that point, because we have heard no argument upon it.

209. All that said, the judge did not make his award of interest as a matter of, or in connection with, a claim for debt, breach of contract or damages for tort. He made it as part of a restitutionary award of compensation for breach of fiduciary duty. Such a claim made on the basis of trusteeship and available to the claimants in the circumstances of the case, is by its origin and nature an equitable proprietary claim moulded and used for the purpose of achieving restitution by a person called to account by equity on the basis of a defaulting trustee. Since there is no jurisdiction in the court to award compound interest at common law or by statute, it was indeed the only basis on which the judge could make an award of compound interest. The jurisdiction which he exercised is that which Lord Brandon stated in the La Pintada case at p.116 is confined to situations

> "where money had been obtained and retained by fraud, or where it had been withheld or misapplied by a trustee or anyone else in a fiduciary position"

© 2025 Thomson Reuters.

and which the majority of the House of Lords declined to expand further in the Westdeutsche Bank case (see per Lord Browne-Wilkinson at 717F, Lord Slynn of Hadleigh at 718f-719b and Lord Lloyd of Berwick at 739b-741a).

210. In such a case, the award of compound interest is made on the basis that a trustee misapplying monies for his own benefit, and a person obtaining or retaining money by fraud who is to be similarly treated, should be obliged either to account in full for the benefit he has unjustly derived or, in lieu of such account, to pay compound interest when the circumstances justify an award on that basis. The rationale is historically and essentially that of restitution i.e. that a fiduciary should not be permitted to make a profit from his trust. As explained by Lord Denning MR in Wallersteiner v Moir (No.2) at page 388, it is also a means of ensuring full compensation where the wrongdoer deprives a person or company of monies employed in trading operations. It is noteworthy that the judgments of Buckley LJ and Scarman LJ did not refer to that aspect as constituting the basis for a compound award. It is nonetheless an element which usually plays a part in the reasoning of the court when considering whether or not to make such an award in modern conditions.

211. It seems to us that the court's power in such circumstances to award compound interest (although discretionary in the sense that it will be exercised in accordance with established equitable principles) is not only distinct, but different in character, from its broad powers under s.35A , being a necessary adjunct of the claimant's substantive right to restitution. An award of compound interest upon that basis is thus itself substantive rather than merely procedural in nature. Accordingly, whilst we would differ from the reasoning of the judge in that last respect, that difference is not one which leads to any different result so far as the award of interest in this case is concerned, in the light of the provisions of Article 267 of the Kuwait Civil Code.

**Conclusion**

212. For the above reasons, the appeals of Mr Al Bader and Mr Qabazard will be dismissed. The appeal of Captain Stafford will be allowed to the extent that the sums which he was ordered to pay (see paragraph 3 above) will be reduced by reason of his not being liable in respect of losses incurred after he left Kuwait in September 1989 (see paragraph 164 above). We anticipate that the amount of the reductions will be capable of agreement between the parties.

**Order: appeals of Mr Al Bader and Mr Qabazard dismissed; appeal of Captain Stafford allowed in part; applications to adduce further evidence granted; no order to be drawn up today; counsel for the defendants to have until 9th June to put in written submissions on any points they wish to address; counsel for claimants to have until 16th June to put in any submissions in answer.**

Crown copyright