**Morris v Bank of India [2004] EWHC 528 (Ch)**

# Exhibit 17

# Re Bank of Credit and Commerce International SA & Anor
# Morris & Ors v Bank of India

[2004] EWHC 528 (Ch)
Chancery Division (Companies Court).
Patten J.
Judgment delivered March 19, 2004.

*Winding up – Fraudulent trading – Fraudulent banking group – Group companies entered six transactions with third party – Transactions were circular – Group companies intended to conceal bad debts – Third party loan officer told transactions to improve group's balance sheet – After second transaction loan officer should have known transactions not as described – Test for fraudulent trading – Whether third party knowingly participated in carrying on banking group business with intent to defraud creditors or for fraudulent purpose – Whether knowledge of loan officer of third party attributable to third party – Quantification of contribution – Whether contribution to bear interest – Insolvency Act 1986, s.213.*

**This was an application under s.213 of the Insolvency Act 1986 by the liquidators of an insolvent banking group for a contribution to the assets of companies in the group by a separate banking company which had entered into six transactions with the group which had helped it conceal serious bad debts incurred by the group and so, the liquidators alleged, the defendant knowingly participated in the carrying on of the business of the banking group with intent to defraud creditors or for a fraudulent purpose.**

**The six transactions involved the defendant, 'BOI', with companies in the 'BCCI' group between 1981 and 1986. In each of five successive years BCCI approached BOI and requested it to enter into an arrangement under which BCCI would deposit moneys with BOI for a fixed term, usually of three months. With the assistance of the finance provided by these deposits, BOI would then grant to a company nominated by BCCI a loan for the same period. No formal lien was granted in favour of BOI over the deposits, but BCCI provided a guarantee for the repayment of the principal of the loan and accrued interest. No payments of interest were made on either side during the currency of the deposits and the loans. These arrangements came to be referred to in BOI's internal documentation as BCCI's 'usual deal'. They were said by 'S', BOI's loan officer dealing with the matters at its London branch at the time, to be motivated solely by a desire on the part of BCCI to improve what was described as its 'earnings to advances ratio' by recording in its accounts a decrease in the amounts outstanding on loan to borrowers and thereby producing a corresponding increase in the amount of interest received relative to the sums lent as at the year end. This practice was on any view highly artificial and was referred to by BOI, both in contemporaneous documents and at the trial, as a form of 'window-dressing' by BCCI. It was for this reason that in each of the five years in question the arrangements were timed to coincide with BCCI's year end and the preparation of its balance sheet and accounts. In 1984 (the fourth transaction) there was also a similar transaction which coincided with the period in late September when BCCI's auditors were carrying out their circularisation procedures.**

**The business of the BCCI group was closed down by regulators on a world-wide basis in 1991 and the relevant BCCI companies went into liquidation. The liquidators of the relevant companies in England alleged that the above transactions were entered into by the BCCI companies to maintain the concealment of serious bad debts and losses incurred by the group on a number of customer accounts and as a result of metal trading carried out for their own account. This was not disputed and it was common ground that the conduct of the BCCI group was undoubtedly fraudulent. The liquidators further alleged that BOI, by entering into the six transactions, knowingly participated in the**

© 2004 Sweet and Maxwell Ltd

carrying on of the business of certain BCCI companies with intent to defraud the creditors of those companies or for a fraudulent purpose and applied for an order under s.213 of the Insolvency Act 1986 for BOI to pay compensation to the liquidators for the losses to creditors which had been sustained. BOI argued that S and others who dealt with the transactions at the time believed that they were assisting BCCI in a legitimate way and had no reason to think or suspect that BCCI was intent on deceiving its auditors in order to produce a positive balance sheet and accounts. BOI claimed that it accepted BCCI's explanation for the transactions at face value and denied any knowledge of BCCI's deteriorating financial position. It also denied an alternative allegation that even if the purpose of the transactions was that as alleged by BCCI, to improve the apparent ratio of BCCI's earnings to advances, this was known to BOI in the circumstances of the case to be an essentially dishonest practice, because it could only be achieved by the removal of bad debts and the transfer of corresponding liabilities to BOI.

The key issue was whether those at BOI responsible for entering into the transactions in question knew that they were thereby assisting BCCI to perpetrate a fraud on its creditors. It was common ground that this allegation of knowledge levelled against BOI by the liquidators would have to involve a finding of dishonesty.

*Held*, making an order against BOI for wrongful trading under s.213:

1. To establish liability under s.213 the liquidators had to show that BOI (through its relevant officers and employees) knew that one or more of the six transactions was being entered into either to defraud the creditors of BCCI or for a fraudulent purpose. They did not have to know every detail of the fraud or the precise mechanics of how it would be carried out, but clearly they did have to know, either from their own observation of what was being done or from what they were told, that BCCI was intent on a fraud. Knowledge, for this purpose, meant what it said: there must have been an actual realisation on the part of BOI that BCCI would, or was likely to, engage in false accounting. A failure to recognise the truth of what was going on was not enough, however obvious that might now seem to have been. The relevant knowledge also had to be contemporaneous with the assistance that was given at the time by entering into the various transactions. Knowledge, for these purposes, included so-called blind-eye knowledge, which existed when a party shut its eyes to the obvious because of a conscious fear that to enquire further would confirm a suspicion of wrongdoing which already existed. Dishonesty as such was not in terms a condition for liability under s.213, but if knowledge of the fraud was established it followed that BOI was dishonest.

2. What was so striking about the case was the extent to which S was aware of the circular nature of the first transactions he participated in. He knew from the outset that the first transaction had as the only object the improvement of BCCI's balance sheet or accounts. He was told by BOI's head office that the first transaction was to be a one-off but he felt able to make an enthusiastic recommendation for a second transaction involving a much higher figure a year later. Having seen BCCI's accounts he must by then have realised that an improvement in the earnings to advances ratio could not be achieved by the removal of loans over the year end. The circular nature of the transactions was already apparent to him and the removal of the only suggested justification for them could have left him in no real doubt that he was in all probability dealing with a fraud of some kind. S therefore did have the relevant knowledge.

3. S had been delegated authority to lend up to £200,000 unsecured without seeking head office approval but sums of £10 million, as in each of these transactions, needed to be referred to the board. From the second transaction board approval was given rapidly and almost as a matter of course. The board of BOI were content to take S's assurances at face value and to leave it to him to satisfy himself that it was proper for BOI to go ahead. Section 213 of the Insolvency Act 1986 was capable of applying to a company in the

**position of BOI. S's knowledge was to be attributed to BOI, otherwise the policy of the Act would be frustrated if BOI could shelter behind an argument that the only relevant knowledge was that of the board. It would allow banks such as BOI, which chose to rubber-stamp the recommendations of their senior managers without ensuring that all proper and due diligence has been carried out, simply to sidestep liability by relying on their own ineptitude. The board had a real concern about the purpose of the transactions but were content to delegate supervision of the transactions and the decision whether to proceed to S. In those circumstances they could not deny responsibility for S's actions. BOI was liable under s.213 to contribute to the losses to creditors which would have been avoided but for these transactions.**

**4. In quantifying the contribution under s.213 there had to be some nexus between the loss caused to creditors as a result of the fraudulent trading and the contribution that the knowing participator was required to make (Morphitis v Bernasconi [2003] BCC 540). Any award, although essentially compensatory in nature, could only be a reasonable approximation to the damage that BOI's conduct had caused or contributed to. The liquidators claimed that the relevant loss attributable to BOI's knowing assistance included cash dividends of US$331 million declared by BCCI out of its reported profits, but there was no evidence that the payment of dividends caused any loss at all to the creditors of BCCI as the dividends were credited or paid to the BCCI holding company which reversed or matched corresponding transfers back to the BCCI group. In those circumstances it was inappropriate to base any order for contribution on the dividends declared by the companies even if they were ever paid. The back-to-back arrangements enabled BCCI to remain in business until 1991 but to visit BOI with liability for all the losses which occurred in that period would be disproportionate. The liquidators limited the losses claimed for to trading losses in the years 1983–1985 inclusive. Considering the expert accounting evidence and the amount of loss for which BOI should be liable, BOI should pay the sum of $43.231 million. Although s.213 did not refer to any power to award interest in terms, it was open to the court to ensure that any award under s.213 adequately compensated the creditors of the company for the passage of time which had elapsed and the appropriate rate was simple interest at the base rate plus 1 per cent from the date of the liquidation.**

The following cases were referred to in the judgment:

*Aktieselskabet Dansk Skibsfinansiering v Brothers* [2001] 2 BCLC 324.
*B v Chief Constable of Avon & Somerset Constabulary* [2001] 1 WLR 340.
*El Ajou v Dollar Holdings plc* [1994] BCC 143.
*Hampshire Land Co, Re* [1896] 2 Ch 743.
*Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] AC 705.
*McNicholas Construction Co Ltd v Customs and Excise Commissioners* [2000] STC 553.
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] BCC 942; [1995] 2 AC 500.
*Morphitis v Bernasconi* [2003] BCC 540.
*Morris v State Bank of India* [2003] BCC 735; [2003] EWHC 1868 (Ch).
*Produce Marketing Consortium Ltd (No. 2), Re* (1989) 5 BCC 569.
*R (McCann) v Crown Court at Manchester* [2003] 1 AC 787.
*Supply of Ready Mixed Concrete (No. 2), Re* [1995] 1 AC 456.
*Twinsectra v Yardley* [2002] 2 AC 164.

Charles Purle QC, David Eaton Turner and Blair Leahy (instructed by Lovells) for the claimants.

Jonathan Hirst QC and Andrew Lydiard QC (instructed by Penningtons) for the defendant.

JUDGMENT

**Patten J: Introduction**

1. This application is concerned with six transactions involving the Bank of India ('BOI') and BCCI which took place between 1981 and 1986. In each of five successive years BCCI

© 2004 Sweet and Maxwell Ltd

approached BOI and requested them to enter into an arrangement under which BCCI would deposit moneys with BOI for a fixed term, usually of three months. With the assistance of the finance provided by these deposits, BOI would then grant to a company nominated by BCCI a loan for the same period. No formal lien was granted in favour of BOI over the deposits, but BCCI provided a guarantee for the repayment of the principal of the loan and accrued interest. No payments of interest were made on either side during the currency of the deposits and the loans. These arrangements came to be referred to in BOI's internal documentation as BCCI's 'usual deal'. They were said by those dealing with these matters at the London branch of BOI at the time to be motivated solely by a desire on the part of BCCI to improve what was described as its 'earnings to advances ratio' by recording in its accounts a decrease in the amounts outstanding on loan to borrowers and thereby producing a corresponding increase in the amount of interest received relative to the sums lent as at the year end. This practice was on any view highly artificial and was referred to by BOI, both in contemporaneous documents and during the course of the oral evidence, as a form of 'window-dressing' by BCCI. It was for this reason that in each of the five years in question the arrangements were timed to coincide with BCCI's year end and the preparation of its balance sheet and accounts. In 1984 (the fourth transaction) there was also a similar transaction which coincided with the period in late September when BCCI's auditors were carrying out their circularisation procedures.

2. The liquidators of Bank of Credit and Commerce International SA ('BCCI SA') and Bank of Credit and Commerce International (Overseas) Ltd ('BCCI Overseas'), who are the applicants in these proceedings, allege two things. The first is that each of the transactions was entered into by BCCI SA and BCCI Overseas to assist them and their holding company, BCCI Holdings (Luxembourg) SA ('BCCI Holdings'), to maintain the concealment of serious bad debts and losses incurred by the group on a number of customer accounts and as a result of metal trading carried out for their own account. There is no dispute about this. The conduct of BCCI (by which I refer to the group as a whole) was undoubtedly fraudulent and this is now common ground between the parties to this application. The second allegation is that BOI, by entering into these six transactions under review, knowingly participated in the carrying on of the business of BCCI SA and BCCI Overseas with intent to defraud the creditors of those companies or for a fraudulent purpose. If this allegation (which is denied) is made out, then I have jurisdiction under s.213 of the Insolvency Act 1986 to order BOI to pay compensation to the liquidators for the losses to creditors which have been sustained.

3. BOI's case is that those who dealt with these matters at the time believed that they were assisting BCCI in a legitimate way and had no reason to think or suspect that the liabilities of the nominated borrower they were taking on for year-end purposes were non-performing or, more fundamentally, that BCCI was intent on deceiving its auditors in order to produce a positive balance sheet and accounts. They deny any knowledge of BCCI's deteriorating financial position. They say that they accepted BCCI's explanation for the transactions at face value. They therefore also deny the alternative allegation that even if the purpose of what has been referred to as these 'back-to-back arrangements' had been that allegedly stated by BCCI: *i.e.* the improvement of the apparent ratio of BCCI's earnings to advances, this was known to them in the circumstances of this case (if not always) to be an essentially dishonest practice, because it could only be achieved by the removal of bad debts and the transfer of corresponding liabilities to BOI.

4. Shortly before the trial the claimants obtained permission to introduce a further allegation of knowledge on the part of BOI in relation to the year-end transactions. This was that BOI knew that BCCI was involved in the fraudulent manipulation of its accounts, because even if the transactions were intended to have the effect allegedly contended for by BCCI at the time, it would have been apparent to BOI that window-dressing of this kind was dishonest, because by showing a reduction in 'Loans and Allowances' and an increase in 'Due from Banks' BCCI was able to indicate the existence of a lower-risk profile and a greater liquidity than was in reality the case. This is also denied.

5. The key issue on liability which I therefore have to decide is whether those at BOI responsible for entering into the transactions in question knew that they were thereby assisting BCCI to perpetrate a fraud on its creditors. It is common ground that this allegation of knowledge levelled against BOI by the liquidators must, if proved, involve a finding of dishonesty. This has led to argument about the test of knowledge and the standard of proof to be applied, which I will come to prior to setting out my findings of fact.

**Admissions**

6. At the start of the trial BOI made a number of admissions designed to narrow the scope of these proceedings. They relate, for the most part, to the motives and conduct of BCCI in entering into the six transactions. They are based in part upon paras 1–9 of my judgment in *Morris v State Bank of India* [2003] BCC 735; [2003] EWHC 1868 (Ch), and it is convenient for me to set these out in full. In the paragraphs quoted I have left intact the references to the particular facts of that case, although some of them are not directly relevant to the issues in these proceedings. The relevant paragraphs state as follows:

> '1. The BCCI group (which for convenience I shall refer to simply as "BCCI") was established in 1972 with the incorporation and licensing of Bank of Credit and Commerce International SA ("BCCI SA") as a bank under the laws of the Grand Duchy of Luxembourg. This was followed by the incorporation of BCCI Holdings (Luxembourg) SA ("BCCI Holdings") on December 13, 1974, and the incorporation and licensing of Bank of Credit and Commerce International (Overseas) Ltd ("BCCI Overseas") in the Cayman Islands on November 24, 1975. BCCI Holdings became the parent company of BCCI SA and BCCI Overseas, but did not itself carry on any banking business. BCCI SA and BCCI Overseas were the principal operating subsidiaries and are the companies which feature in the transactions with which this action is concerned. Between them these two companies had over 110 operating branches in 41 countries and a further 18 representative offices in 17 countries at the time when BCCI collapsed in July 1991. In the United Kingdom (including the Isle of Man) BCCI SA had 24 branches, with a head office at 100 Leadenhall Street in the City of London. No group company was ever incorporated in any part of the United Kingdom, but BCCI SA carried on business as a licensed deposit-taker subject to the regulatory supervision of the Bank of England under the Banking Act 1979.
>
> 2. At the time of the collapse in July 1991 the deficiency as regards the creditors of BCCI SA and BCCI Overseas was estimated to be in the region of US$10 billion. Since then, however, as a result of the actions of the liquidators, it has been possible to secure dividends of 60 cents in the US dollar for the benefit of creditors, largely funded from recoveries which the liquidators have been able to obtain against third parties. This action is part of that continuing process. The claim, against State Bank of India ("SBI") is that it knowingly participated in a fraudulent scheme devised by BCCI to enable it to manipulate its balance sheet for the year-ended December 1983, so as to present a false account of its assets and liquidity. I shall come to the detail of the scheme later in this judgment, but it can be briefly summarised as follows. In October 1983 SBI received an approach from a Mr Ajay Krishnan Puri, purporting to act on behalf of a company called Notan Trading and Investments Limited ("Notan"). This company was incorporated in Liechtenstein on September 7, 1982, with Liechtenstein-based directors, and had earlier that year opened deposit and current accounts with SBI. Part of SBI's disclosure comprises a certified resolution of Notan dated July 28, 1983, on headed notepaper, with a PO Box in the Sultanate of Oman given as the address of its administrative office. The registered office of the company was another PO Box number in Liechtenstein. The resolution authorised the opening of a bank account for the company with SBI and in terms empowered the bank to act on the joint instructions of Mr Puri and a Mr Ziauddin Akbar for the purpose of honouring cheques or making any other payments into or out of

© 2004 Sweet and Maxwell Ltd

the account. The resolution was also signed by Mr Akbar as the authorised signatory for the board of directors of Notan, and the SBI standard form of request for banking facilities was signed by Mr Akbar and Mr Puri on the same day. As part of that same process both Mr Akbar and Mr Puri provided a specimen of their signatures for mandate purposes, which, in the case of Mr Akbar, gave an address at 22 Basing Hill, London NW3.

3. Mr Akbar was at the time a senior figure in the Central Treasury Division ("CTD") of BCCI in London and, as it subsequently transpired, was personally responsible for many, if not most, of the fraudulent transactions carried out by BCCI to hide its worsening financial position in the early 1980s. He was not a director of Notan and in his subsequent interviews with the Serious Fraud Office he said that Notan had been set up to assist Mr Puri to obtain a work permit. It is, however clear that the primary purpose of establishing Notan was to assist BCCI in carrying out its fraudulent accounting practices, and the company was controlled by Mr Akbar out of the CTD in London.

4. BCCI was founded with capital from Arab investors in the Gulf states. It achieved rapid growth and, by the end of 1989, employed about 14,000 staff in more than 70 countries. Until 1988 the President and Chief Executive of BCCI was Mr Agha Hasan Abedi. During the same period he had as his deputy Mr Swaleh Naqvi, who took over as Chief Executive Officer when Mr Abedi fell ill in 1988. Having no lender of last resort, it was necessary for BCCI to maintain a high level of liquidity. By the early 1980s it had incurred significant losses through poor lending (particularly in relation to a number of borrowers in the Gulf and Saudi Arabia) and from unsuccessful metal trading on its own account. One of these borrowers was a Mr Abdul Raouf Khalil, a Saudi Arabian businessman who operated and controlled the Khalil group of companies. They maintained a number of accounts with BCCI which were heavily overdrawn, although it is right to add that by 1983 some (and perhaps most) of this apparent indebtedness may itself have been due to the manipulation of the accounts by BCCI with the active co-operation of Mr Khalil, as part of the wider fraud I am about to come to.

5. In order to conceal these and other losses and to maintain public confidence in the bank, BCCI embarked on a systematic and wide-scale fraud involving the manipulation of account balances with the twin objective of concealing losses and boosting apparent profits. The investigations have revealed that this practice was initiated by Mr Abedi and Mr Naqvi and was operated by Mr Akbar through the CTD in London. It was successful in deceiving the auditors and regulations of both BCCI SA and BCCI Overseas, together with their customers and depositors. The evidence of the liquidators based on a report prepared for the Serious Fraud Office, is that BCCI was insolvent from at least 1983. The CTD had been established in 1977 and operated from BCCI SA's offices in Leadenhall Street until about October 1986, when it was moved to Abu Dhabi. The CTD managed and controlled the surplus funds of BCCI and was managed by BCCI SA under a management agreement with BCCI Overseas. However, the treasury activities were all booked and recorded in the name of BCCI Overseas in Grand Cayman and BCCI SA accounted for its own funds, managed by the CTD, as inter-company debts due from BCCI Overseas.

6. Mr Akbar controlled the CTD and reported direct to Mr Naqvi. He was also the Account Officer for the Khalil group and controlled the accounting of the Grand Cayman branch of BCCI Overseas. He eventually resigned from BCCI in 1986. On September 28, 1993, he pleaded guilty at the Central Criminal Court to 16 counts of false accounting, contrary to s.17 of the Theft Act 1968 and was sentenced to six years' imprisonment on each count, the sentences to run concurrently. Counts 13 and 14 relate to the two loan transactions with which this action is concerned.

7. Notan had both US dollar and sterling accounts with SBI. Up to the end of October 1983 the combined receipts into its US dollar accounts amounted to some $2.342 million, against which there had been a payment out of just over $1 million. In the same period there had been payments into its sterling accounts (including interest) of some £142,623, and payments out to a variety of payees, including Mr Puri himself, in a total sum of £53,567. Then on October 5, 1983, Mr Puri, without any prior discussion, approached SBI for a loan of US$20 million, which it required for a period of three months on what is described as a spread-over basis. The loan was to be guaranteed by a prime London bank (later identified as BCCI SA) which would also deposit funds in the same amount prior to the drawdown of the loan to Notan, and for a term expiring five days after the Notan loan became repayable. Mr Puri told SBI that no lien was to be marked on the deposited funds and that the loan to Notan would be required urgently by the beginning of November. The transaction, as it eventually emerged, was that SBI agreed to provide Notan with a loan of US$20 million for a term of three months, to be drawn down on November 15, 1983. Under the terms of the facility letter as amended, BCCI SA was to deposit an equivalent sum of US$20 million with SBI for the duration of the loan plus four days, so as to provide the necessary funding for the entire term of the loan. It was also to provide a guarantee, on terms satisfactory to SBI, to repay the loan to Notan in the event that it was not repaid at maturity. Interest on the loan to Notan was to be at a rate of a half per cent per annum above the rate of interest payable by SBI on BCCI's matching deposit. The guarantee provided for under the terms of the facility letter was executed by Mr Akbar and two other BCCI treasury employees on or about October 28, 1983, on behalf of BCCI SA and contained an express right of set-off. In addition, on October 31, 1983, BCCI SA deposited the sum of US$20 million with SBI in its account in New York with Citibank until February 6, 1984, at an interest rate of 9.3125 per cent per annum and accounted for the deposit by debiting the sum to BCCI Overseas' Nostro account at Bank of America in New York. The loan to Notan was drawn down on November 1 by SBI remitting the US$20 million from its account with Citibank to an account of BCCI SA at the Bank of America in New York (No. 48586050).

8. The payment instructions from Notan received by SBI on November 1 were signed by Mr Puri and Mr Akbar, and requested the $20 million to be transferred to BCCI SA's account without specifying any sub-account in the name of Notan. As I shall explain later in this judgment, one of the principal allegations made by the liquidators is that the terms of these payment instructions put SBI on notice that the moneys were being routed back to BCCI for its own use beneficially, rather than being disbursed to BCCI for the credit of Notan. What is known (but is not alleged to have been known by SBI at the time) is that the moneys, when received, were accounted for by BCCI SA as a transfer to the credit of an account (No. 01001279) with BCCI Overseas in the name of Mr Khalil. On December 30, the moneys were then transferred from that account to a metals trading account in the name of BCCI Overseas (No. 90511109) which had been used for speculative purchases of silver and had a negative balance.

9. On December 5, 1983, SBI agreed to lend Notan a further sum of $20 million on almost identical terms. The moneys were disbursed on December 15 and were repayable on February 1, 1984. BCCI SA again provided the funding by prior deposit of a matching sum with SBI and gave a guarantee for the loan, including the contractual right of set-off. Its own deposit was for a period expiring on February 6, 1984. As in the case of the first loan, the moneys, when drawn down, were remitted to BCCI SA's account with the Bank of America and then credited to BCCI Overseas' Nostro account. They were then used by BCCI Overseas to credit the overdrawn Khalil account. As a result of this and other credit transfers from other sources, BCCI was able to convert a debit balance of US$85,280,341 into a credit balance for year-end purposes of US$9,261,646.17. The auditors were prepared on this basis to treat BCCI's exposure to

© **2004 Sweet and Maxwell Ltd**

A the Khalil group as fully collectable and made no provision in respect of their borrowings. However, by January 13, 1984 (following the repayment and reversal of most of the credits) the Khalil account No. 01001279 had once again become overdrawn by more than US$155 million. Both the Notan loans were repaid on February 15, 1984, by a transfer from BCCI SA to SBI of the sum of US$40,754,861.12, representing repayment of the sums due plus interest. On February 6 SBI paid US$40,779,147.67 to BCCI SA. The excess of the interest over that payable by Notan to SBI is accounted for B by the longer term of the BCCI deposit.'

7 The admissions made were as follows:

'1. BOI admits the facts found in paragraphs 1–9 of the judgment of Patten J in Morris & Ors v State Bank of India [2003] EWHC 1868 (Ch.).

C 2. BOI has already admitted by paragraph 13 of its re-amended points of defence that pursuant to section 11 of the Civil Evidence Act 1968 Akbar must be taken to have committed the offences of which he was convicted. Those included the following counts relating to transactions nos 3 and 4

(1) Count 15: on or about the 24th October 1983 he dishonestly and with a view to gain for himself of another or with intent to cause to another concurred in falsifying documents required for an accounting purpose, namely an application D to the Bank of India in the name of Maram Trading Company Limited for a loan of $60m which were false in a material particular in that a board resolution and a letter of application purported to be genuine documents signed by AR Khalil on behalf of Maram Trading Company Limited (D1/1/15)

(2) Count 16: on or about the 10th September 1984 he dishonestly and with a view to gain for himself of another or with intent to cause to another concurred in E falsifying documents required for an accounting purpose, namely an application to the Bank of India in the name of Maram Trading Company Limited for a loan of $75m which were false in a material particular in that a board resolution and a letter of application purported to be genuine documents signed by AR Khalil on behalf of Maram Trading Company Limited (D1/1/16).

3. BOI further admits the factual basis for those convictions as set out at in the transcript F of the proceedings before Scott-Baker J at the Central Criminal Court on 27 September 1993 (D1/2/67):

BCCI makes its own deposit of its own money with the relevant bank. The money is then lent to Maram and used by Akbar for the purposes he had in mind, and the evidence shows that Akbar controlled Maram in effect.

4. BOI further admits that substantially the same fraud as those that formed the basis of G Counts 15 and 16 was also committed by BCCI in relation to transactions 1, 2 and 6. In particular BOI admits that BCCI forged the signature of Khalil on the following documents:

(1) the board resolution (C1/79) and letter of request (C1/77) relating to transaction no.1

H (2) the board resolution (C1/182) and letter of request (C1/184 relating to transaction no.4

(3) the board resolution (C4/160) and letter of request (C4/159) relating to transaction no.6.

5. BOI further admits that monies that BOI thought it was lending to Maram were used by BCCI for its own purposes.

6. BOI further admits that BCCI fraudulently concealed from its auditors and consequently failed to record in its accounts its guarantee liabilities to BOI in respect of the loans to Maram. A

7. The fifth transaction appears to have involved a mutual placement of deposits between BOI and BCCI, with no loan to Maram being involved. BOI admits that BCCI falsely accounted for BOI's placement by not recognising its liability to repay the same and interest thereon. B

8. Accordingly BOI admits that the conduct of BCCI admitted above constituted carrying on of the business of BCCI for fraudulent purposes within the meaning of section 213 of the Insolvency Act 1986.

9. BOI admits that by its involvement in transactions 1–6 it unknowingly participated in the carrying on of the business of BCCI for fraudulent purposes.

10. BOI denies that it knowingly participated in any respect in any such fraud. Nothing in this Statement of Admissions is intended to derogate from the generality of that denial.' C

8. It is convenient at this stage to say something more about the Central Treasury fraud referred to at the end of para.3 of my earlier judgment. As indicated in that judgment, Mr Khalil and the Khalil group maintained a number of accounts with BCCI which they used for their own trading purposes. Most (if not all) of these accounts were heavily overdrawn in the period from 1981 to 1986 and, if properly and honestly presented to the auditors, would almost D certainly have called for some provision to be made. The scale of the indebtedness was increased by the use made of these accounts to conceal losses on BCCI's own metal trading. The evidence contained in the accounting report prepared on behalf of the liquidators indicates that metal trading originated as another method used by Mr Akbar to boost the published profits of BCCI. It was conducted through the CTD, using two accounts: a No. 1 account in the name of BCCI Overseas, used for its own proprietary trading, and a No. 2 trading account purporting to be that of Mr Khalil. This was in truth simply a second trading account of BCCI E Overseas, but the device of nominating Mr Khalil as the account holder enabled Mr Akbar to switch loss-making positions from the BCCI Overseas account into the Khalil account. As of October 31, 1983, BCCI (using the Khalil account) held long-term metal positions in LME Silver and Copper valued at US$38.6 million. At the same time, in the last six months of 1983, there was significant trading in these commodities through the No. 1 account, resulting in significant losses. BCCI Overseas had contracted to buy silver and copper at prices in excess of F the market prices prevailing at the time when call options it had previously entered into were due to be exercised. When these options failed to be exercised, and lapsed, it was left holding long positions in the metals as at December 31, 1983, which, if resold, would have crystallised into a loss. Absent a sale, the holdings should have been marked down to their market value at the time and the resulting loss carried into the profit and loss account as at December 31. To conceal these losses BCCI Overseas (through Mr Akbar) recorded fictitious sales, at a reduced loss or even a profit, to companies such as Notan, using the Khalil group accounts to fund the G purchases. It was then a matter of concealing, in turn, losses on these accounts, which was effected by the injection of funds from three principal sources: the back-to-back transactions with BOI, SBI and other banks; mis-recording deposits with BCCI as payments rather than as liabilities to the depositors; and the misappropriation of funds held on behalf of clients in a portfolio account (No. 20071) with ICIC, a BCCI affiliate.

9. The back-to-back arrangements referred to were made with four Indian banks: BOI, SBI, H Syndicate Bank and Punjab National Bank; and with two Swiss Banks: Banque des Échanges Internationaux and Banque de L'Union Européene en Suisse. The result of these transactions was to allow BCCI Overseas in effect to borrow money off balance sheet through companies such as Maram and Notan which were not BCCI subsidiaries or affiliates and whose financial position did not therefore feature in the BCCI group accounts. The liquidators estimate that, out of the US$347 million and £30 million received by BCCI Overseas under these arrangements,

© 2004 Sweet and Maxwell Ltd

A some US$302 million and £30 million were credited to the Khalil group accounts so as to give the false impression that the accounts were being serviced and the indebtedness repaid by the customer. The balance of US$45 million was used to cover the fictitious sales of 630 lots of copper and 160 lots of silver. As appears from my judgment in *Morris v State Bank of India*, the loans made to Notan were facilitated by a matching deposit placed with SBI and were secured by a BCCI guarantee, but not by any formal lien. This is also a feature of the transactions involving BOI. In these and in the case of the other back-to-back transactions with banks, the
B guarantees were not disclosed to the auditors and the deposits were treated as free of any liability in respect of the loans.

10. A schedule prepared by Mr Akbar as of October 31, 1983, and used by the liquidators as the basis for much of their calculations of the scale of the Central Treasury fraud shows that some US$100 million was misappropriated from the ICIC portfolio account 20071. Of this some US$30 million was mis-recorded as deposits with ICIC made on behalf of Mr Khalil's
C children and the remaining sums as credits to the Khalil group accounts.

11. BCCI, including BCCI Overseas, was almost certainly insolvent by 1983 and in all probability by a date even earlier than that. The period covered by the transactions in this case was therefore one in which Mr Akbar, and the CTD under his control, engaged in what must have been an increasingly desperate attempt to conceal the true financial position of BCCI as a whole by entering into verifiable transactions the real purpose and effect of which were either hidden or distorted in the books of account and other financial records presented to its auditors.
D Without the assistance of these transactions it is most unlikely that the pretence of solvency could have been successfully maintained for so long.

**The transactions**

12. I will come to the issue of knowledge shortly, but it may be helpful at this stage to set out the structure and the mechanics of each of the six transactions under review. They can be
E summarised as follows:

*The first transaction*

(i) This was arranged in November 1981 and completed on December 2 of that year. BOI received a proposal from BCCI whereby BCCI would deposit with BOI the sum of £10 million for a period of three months. The deposit would bear interest at National Westminster Bank
F base rate, which was then 15 per cent per annum. BOI would then lend the same sum to a borrower nominated by BCCI at a rate of 1/8 per cent over the National Westminster Bank base rate from time to time. Under the proposal as originally made, there would have been no documents executed by the borrower, which was not initially identified. Nor were the moneys deposited by BCCI to be formally liened to BOI. The only security for the loan element of the transaction, apart from the borrower's covenant, was to be an irrevocable guarantee by BCCI in respect of the repayment of the loan. The direct negotiations in respect of these arrangements
G were conducted between Mr K L Samant, who was then the chief manager of the UK and European branches of BOI and was based in London, and a Mr Mewawalla, then a senior officer of BCCI at its Leadenhall Street office, who had earlier in his career been employed by BOI and had been on friendly terms with Mr Samant for a number of years. Mr Samant, after consultation with a firm of solicitors (Lawrence Jones & Co) in London, recommended approval of the transaction by the board of BOI, and this occurred on or about November 18,
H 1981. The decision was notified to Mr Samant in London, by telex dated November 19, on the basis that it would be what was described as 'a one time transaction'. Shortly before then, in circumstances I will come to later, the intended borrower was identified as Maram Trading Co Ltd ('Maram'), a company registered in the Cayman Islands and beneficially owned by Mr Khalil. The transaction was completed on December 2, 1981, when BCCI Overseas transferred £10 million to BCCI SA via its inter-company vostro account 44100172 for onward placement with BOI in London. The transfer was recorded in the books of BCCI Overseas as an

inter-bank term placement at a rate of 15 per cent, maturing on March 2, 1982. BCCI issued a cheque dated December 2, 1981, in the sum of £10 million drawn on its National Westminster Bank ('NW') sterling nostro account, which was sent to BOI in London under cover of a letter dated December 2, referring to the payment as a three-month placement by BCCI Overseas. BOI London in turn on the same date opened a new fixed deposit account in the name of BCCI Overseas, which was credited with the £10 million. On the same date a loan was granted to Maram by BOI London at a loan rate equal to the deposit rate payable on the moneys received from BCCI Overseas plus 0.125 per cent. BOI transferred the £10 million under loan by a payment drawn on its own NW sterling nostro account in favour of BCCI SA for the account of Maram under account no. 01024640. The moneys were received by BCCI SA in its own NW sterling nostro account (no. 41100154) and in turn credited to BCCI Overseas' inter-company vostro account (no. 44100183). In the books of BCCI Overseas the £10 million is shown as credited to a new call deposit account (no. 60064019) in the name of Saudi Development and Commercial Co ('SDCC') in Jeddah, a company controlled by BCCI.

(ii) The first transaction was reversed on March 2, 1982, when funds totalling £10,372,942.22, representing the £10m loan to Maram plus accrued interest, were debited from an SDCC Jeddah deposit account at BCCI Overseas and transferred to BCCI SA London through the inter-company nostro account 44100172. BCCI SA then issued a banker's draft payable in favour of BOI, drawn on its NW sterling nostro account. On the same day funds totalling £10,369,863.02 (representing the £10 million deposit by BCCI Overseas plus accrued interest) were paid to BCCI SA out of the NW sterling nostro account of BOI. These moneys were credited to BCCI SA's own nostro account (41100154) in London and then credited on to the inter-company vostro account (44100183) of BCCI Overseas.

*The second transaction*

(i) The second transaction involved the same structure as the first, but was for £25 million rather than £10 million. On September 22, 1982, BCCI Overseas transferred the £25 million to BCCI SA via its inter-company vostro account for onward placement with BOI in London. The deposit was recorded in the books of BCCI Overseas as an inter-bank term placement at a rate of 11 per cent, maturing on January 24, 1983. The money was forwarded to BOI via BCCI SA, which issued a cheque drawn on its NW sterling nostro account, which was sent to BOI under cover of a letter dated September 22. On the same day BOI granted a loan in the same sum in favour of Maram at a loan rate equal to the NW bank rate from time to time plus 0.125 per cent. The loan moneys were paid by means of a cheque drawn on the BOI NW sterling nostro account, made payable to 'Bank of Credit and Commerce Int. Account 01024640 of Maram Trading Company Limited'. BCCI SA received these funds in its sterling nostro account (41100154) at National Westminster Bank in London and credited the £25 million to the BCCI Overseas inter-company vostro account (441000183). In its own books BCCI Overseas credited the US dollar equivalent of $43.87 million to Mr Khalil's current account (01001279), thereby reducing the recorded overdraft liability to BCCI Overseas by a similar amount. The indebtedness on account 01001279 at the time was some US$187,068,490, but by September 30 this had been reduced to an overdraft balance of US$64,628,559 by the credit of the moneys received from BOI together with two further credits from overseas banks, the first being US$10 million from Punjab National Bank, the other being US$8.525 million from Syndicate Bank. The applicants' evidence is that these credits were treated as *bona fide* receipts from Mr Khalil, when of course they were nothing of the kind.

(ii) The proposal for the second transaction was made by BCCI through Mr Mewawalla as early as July 1982, on the basis that there would be a deposit of £30 million for four months on terms that BOI would make a loan in the same sum to a borrower nominated by BCCI. As in the case of the first transaction, the deposit was not to be under lien, but BCCI Overseas would provide a guarantee for the loan. Maram was eventually identified as the nominated borrower and authority was given for a loan of £30 million by the Board of BOI on August 9, 1982.

© **2004 Sweet and Maxwell Ltd**

A Shortly before the implementation of the transaction on September 21, 1982, Mr Mewawalla wrote to Mr Samant enclosing various documents (which I will come to later) and referring to the deposit and loan being in a lower sum of £25 million. The arrangements were then effected in this sum. The transaction was reversed in January 1983. Funds totalling £25,826,455.49, which represented the £25 million loan to Maram plus accrued interest were drawn down from a loan account in the name of Maram at BCCI Overseas (No. 11003476) and transferred to BCCI SA in London through the inter-company vostro account (44100183). A further B drawdown on the Maram loan account took place on the same day to cover repayment of the Syndicate Bank loan. BCCI SA then issued a banker's draft drawn on its NW sterling nostro account, made payable to BOI. On the same day the sum of £25,816,095.90, representing the £25 million deposit from BCCI Overseas plus accrued interest, was drawn from BOI's NW sterling nostro account in London and paid to BCCI SA's sterling nostro account (41100154). A credit in the same amount was then made to the BCCI Overseas inter-company vostro C account (441000183).

*The third transaction*

(i) The third transaction took essentially the same form as the previous two, but involved a loan to Maram of US$60 million, which was disbursed in three tranches of US$20 million each. The three loan advances were made between November 1 and 7, 1983 (although again the name of the borrower was not identified at the outset) and repaid on February 1 and 7, 1984. D Each of the advances was accompanied by a contemporaneous deposit of an equal sum by BCCI Overseas with BOI, and in a letter dated October 24, 1983, signed by Mr Akbar and a Mr Mohammed Saghir, BCCI Overseas guaranteed the loan. Again there was no formal lien executed over the deposits. As in the case of the two previous transactions, the immediate contact between BCCI and BOI took place between Mr Samant and Mr Mewawalla. Board approval for the advances to Maram was obtained on October 20, 1983, and on October 24 BOI E received a formal letter from Maram requesting the US$60 million loan facility and asking for the moneys to be transferred to their account (No. 01024628) at BCCI in Leadenhall Street. This letter, as in the previous cases, purported to be signed by Mr Khalil.

(ii) The implementation of the third transaction also took a similar form to the earlier two. On November 1, 1983, BCCI Overseas transferred the first tranche of US$20 million to BCCI SA via the inter-company vostro account for placement with BOI. BCCI SA then remitted that sum from its US dollar nostro account (48586050) at Bank of America in New York ('BoA F (NY)') to BOI's London nostro account (400016230) at Chemical Bank in New York ('CB (NY)'). On the same day BOI advanced the $20 million to Maram at an interest rate of 0.125 per cent above the rate payable on the funds deposited by BCCI Overseas with BOI. This advance to Maram was made by remitting the US$20 million to the BCCI SA US dollar nostro account (48586050) at BoA (NY), which was then credited to the inter-company vostro account of BCCI Overseas (44100218). BCCI Overseas showed Mr Khalil's current account G (01001279) as being credited with this payment. This first tranche of the loan to Maram was to mature on February 1, 1984.

(iii) The second tranche of the loan was paid on November 3 following a deposit of US$20 million by BCCI Overseas, using the inter-company vostro account to transfer the moneys to BCCI SA, which in turn remitted the same sum from its US dollar nostro account at BoA (NY) to BOI's own nostro account at CB (NY). On the same day the second loan to Maram took place at a similar marginal rate of interest. As in the case of the first tranche, the funds were H remitted in the first instance to BCCI SA's US dollar nostro account at BoA (NY), which in turn credited the inter-company vostro account at BCCI Overseas with the same sum. This tranche of the loan was also used in the books of BCCI Overseas to credit Mr Khalil's current account.

(iv) The final tranche of the loan was advanced to Maram on November 7, 1983, against a further deposit in the same sum of US$20 million made to BOI in London by BCCI Overseas.

The maturity date for the loan was February 7, 1984, and the same rate of interest applied. As in A the case of the first two tranches, the moneys used to fund the Maram loan were remitted to BCCI SA's US dollar nostro account at BoA (NY) and then credited on to the inter-company vostro account at BCCI Overseas. As also with the first two tranches, the third tranche of US$20 million was credited to Mr Khalil's current account. As at November 1, 1983, this had an overdrawn balance of US$85,280,341.22, which by November 11 had been reduced to US$17,287,655.41, partly with the payments received from BOI and partly with the benefit of a further sum of US$20 million obtained from SBI via Notan as a result of loan arrangements B which were the subject of the proceedings in the earlier action of *Morris v State Bank of India*. In the same 10-day period to November 11, 1983, there were also substantial credit transfers to the Khalil account from BCCI Luxembourg, BCCI Columbo and BCCI Panama, as well as various debits to cover metal transactions carried out, it would appear, by BCCI for its own account. The net result of all this was that by December 31, 1983, the debit balance on Mr Khalil's account no. 01001279 with BCCI Overseas had been converted to a credit balance of US$9,261,646.17, which was taken into account by the auditors of BCCI when determining C the net exposure of BCCI to the Khalil group. They concluded that the loans to Mr Khalil and his companies were performing and that no provision was required to be made in respect of the net exposure. However, by January 16, 1984, following BCCI's year end of December 31, 1983, the Khalil account was again in overdraft to the tune of US$155.9 million, and following the repayment of the three Maram loans to BOI, the debit balance had risen to US$245.9 million. D

(v) The third transaction was reversed, as I have indicated, after BCCI's year end. On February 1, 1984, funds totalling US$20,498,333.33, comprising the first tranche of the loan to Maram plus accrued interest, were debited against the Khalil current account at BCCI Overseas and transferred to BCCI SA London through the inter-company vostro account. BCCI SA London, on the instructions of Mr Akbar, remitted this from its nostro account at BoA (NY) to BOI's US dollar nostro account at CB (NY). On the same day BOI remitted to BCCI SA's US dollar nostro account the sum of US$20,491,944.44, which was in turn credited to the vostro E account of BCCI Overseas. In a similar way the second and third tranches of the loan, together with the BCCI deposits, were repaid on February 3 and February 7, 1984.

*The fourth transaction*

(i) This was for US$75 million and was implemented on September 18, 1984. The loan to Maram and the corresponding deposit from BCCI were repaid on October 18, 1984. F Mr Samant negotiated the arrangements with Mr Mewawalla, which, as I indicated earlier, were described in a note of a telephone call as 'their usual deal'. The original terms proposed in July 1984 were that there would be a deposit and corresponding loan of US$75 million for a period of three to six months, but at a lower differential rate of interest of 1/16 per cent rather than 1/8 per cent. In the end the 1/8 per cent differential in interest was reinstated and the board of BOI approved the transaction on August 9, 1984. As in the case of the earlier three transactions, the BCCI deposit was not to be under lien, but the loan to Maram was to be G guaranteed. The guarantee document was provided on September 10, 1984. By then BOI had received a letter of request for the US$75 million loan from Maram, signed by Mr Khalil, asking for it to cover two separate periods, from September 18, 1984, to October 18, 1984, and December 18, 1984, to January 22, 1985. These periods correspond, as I indicated, firstly to the period during which the auditors carried out their audit circularisation procedures and secondly to BCCI's year end. The deposit of the US$75 million by BCCI Overseas was made in the same way as in the case of the earlier transactions. The money was transferred to BCCI SA via the H inter-company vostro account and then remitted by BCCI SA from its US dollar nostro account at BoA (NY) to BOI's own nostro account at CB (NY). On the same day the loan to Maram was made at the usual interest rate of 0.125 per cent above the rate payable on the placement by crediting BCCI SA's US dollar nostro account at BoA (NY), with the money then being credited on to the inter-company vostro account of BCCI Overseas. As in the case of the third

© 2004 Sweet and Maxwell Ltd

A transaction, the US$75 million was credited to Mr Khalil's current account with BCCI Overseas. The effect of this was to reduce a debit balance from US$119,798,634.74 to US$44,789,634.74.

(ii) On October 18, 1984, the loan principal plus accrued interest (US$75,734,357) was debited to the Khalil current account at BCCI Overseas and transferred through the inter-company vostro account to BCCI SA. BCCI SA then remitted the money to BOI's US dollar B nostro account at CB (NY). On the same day BOI repaid the deposit from BCCI Overseas by remitting the sum of US$75,726,562.50 to BCCI SA, which paid it on to BCCI Overseas via the inter-company vostro account.

*The fifth transaction*

(i) This was for US$50 million and took place on or about December 18, 1984. It is really the second part of the transaction contemplated in the letter of request dated September 10, 1984, C in which Maram asked for a loan of US$75 million to cover the periods from September 18, 1984, to October 18, 1984, and December 18, 1984, to January 22, 1985. As I have already indicated, the fifth transaction was intended, according to the letter of request and letter of guarantee dated September 10, 1984, to be essentially a repeat of the fourth transaction, in order to cover the period of BCCI's year end. No separate documentation between BOI, BCCI or Maram appears to have been executed in respect of the fifth transaction. However, the transaction as executed did not accord with the September documentation. On December 18, D 1984, BCCI Overseas transferred US$50 million (not $75 million) to BCCI SA via its inter-company vostro account for placement with BOI. BCCI SA then followed the usual procedure of remitting the same sum from its US dollar nostro account at BoA (NY) to BOI London's nostro account at CB (NY). This transfer of funds was recorded in the books of BCCI Overseas as an inter-bank term placement at a rate of 9 per cent, maturing on February 19, 1985. In return, BOI on the same date arranged for US$50 million to be remitted to BCCI SA's London E US dollar nostro account at BoA (NY) and this sum was then credited to the BCCI Overseas inter-company vostro account. This payment was made without reference to Maram and at the same interest rate of 9 per cent as the deposit received from BCCI. The fifth transaction therefore amounted to no more than two matching inter-bank placements in the same sum and at the same rate of interest. However, in the books of BCCI Overseas the US$50 million was shown as credited on December 19, 1984, to the Khalil current account (01001279) which, following the payment, was in credit as at December 31, 1984, by US$74,831,139. The moneys F were not shown as an inter-bank deposit and therefore as an amount due to banks, but rather as a receipt from Mr Khalil to reduce the net indebtedness on his account. As in the case of the earlier payments into that account, this had the effect of artificially reducing the indebtedness in respect of the Khalil group accounts at BCCI Overseas and gave the auditors the impression that these were performing loans.

(ii) In terms of the flow of funds the fifth transaction differed little from the others, in that the G moneys drawn down from BCCI Overseas through BCCI SA to BOI were channelled back to BCCI Overseas and used to improve the balances on the Khalil account. The economic effect was therefore the same. The only difference was that the US$50 million was not advanced in terms as a loan to Maram, nor was it advanced at a differential rate of interest. Consequently when on February 19, 1985, the transaction came to be unwound, a sum of US$50,787,500 was debited to the Khalil current account at BCCI Overseas and transferred to BCCI London for payment to BOI at its US dollar nostro account at CB (NY), and on the same day the identical H amount, representing the placement by BCCI Overseas plus accrued interest at the same rate, was paid by BOI to BCCI Overseas through BCCI SA, using the same accounts.

*The sixth transaction*

(i) This took the same form as the first four transactions and involved the sum of US$50 million. It was first mooted in August 1985, when Mr Samant proposed that there be a loan of

US$100 million backed by a deposit from BCCI, to be advanced in tranches, the first of which would be drawn down by September 10, 1985, and repaid in October of that year, with the arrangements being repeated in November through to January or February 1986. He also suggested that the loan should be disbursed at BOI's Paris branch. The liquidators have suggested that this was to meet a difficulty that had arisen in January 1985, when Mr Samant attended a meeting at the Bank of England during which he was warned that transactions of this kind were neither attractive nor acceptable and were not to take place through London. I shall come to the details and implications of that meeting later in this judgment. In the event, on September 12, 1985, the head office of BOI sanctioned the transaction in the sum not of US$100 million but of US$75 million, subject to the finalisation of certain documentation with BOI's solicitors. Mr J N Raina, BOI's general manager in London, then wrote to Mr Mewawalla confirming that there would be a transaction in that amount. There was then further delay, caused by internal discussion at BOI as to whether it should disburse the loan to Maram from its branches in Singapore, Hong Kong or New York. Again it is said that this is linked to the earlier discussions with the Bank of England. It was not until December 2, 1985, that BCCI Overseas sent to BOI the standard form letter of guarantee in respect of the loan to Maram of US$75 million with interest, together with the request from Maram, signed by Mr Khalil, for the loan.

(ii) The transaction was put into effect on December 11, 1985, when BCCI Overseas transferred US$50 million to BCCI SA via the inter-company vostro account. The moneys were in turn transferred on by BCCI SA, in the case of this transaction to BCCI SA Bahrain via an inter-company vostro account (No. 42100667), and on the same day BCCI SA Bahrain then transferred the same sum back to BCCI SA London via the inter-company vostro account 42100667. There was then an onward transfer of the funds from BCCI SA, using its US dollar nostro account 48586050 at BoA (NY) to the BOI nostro account 400016230 at CB (NY). On the same day BOI remitted the US$50 million from the nostro account at CB (NY) to BOI Grand Cayman via its nostro account 00036633 at Marine Midland Bank in New York. The loan to Maram was then advanced on the same date by BOI Grand Cayman at the usual interest rate of 0.125 per cent above the rate payable on the placement by BCCI Overseas.

(iii) BOI Grand Cayman remitted the US$50 million lent to Maram to the BCCI SA dollar nostro account (48586050) at BoA (NY). It was then credited back to the inter-company vostro account (44100218) at BCCI Overseas. The moneys were used to credit a current account (No. 01004910) in the name of A R Khalil, thereby giving the impression, as in the case of the earlier transactions, that the account was a performing asset. As a result no provision was made in respect of these accounts in the balance sheet of BCCI Overseas as at the 1985 year end.

(iv) The loan and deposit arrangements were due to mature on March 11, 1986, but on or about March 3 BOI requested BCCI (and it was agreed) to roll over the maturity date of the deposit for a maximum of two months, with a corresponding extension of the loan to Maram. These alterations in the arrangements were approved by BOI's chairman on or about March 5, 1986, and were formalised by a request from BCCI Overseas (dated March 10, 1986) for an extension of the loan facility, to be guaranteed in the usual way.

(v) On May 12, 1986, the transactions were reversed. Funds totalling US$50,645,833.33, representing the principal of the loan and accrued interest, were debited to a numbered overdraft account (01006003) at BCCI Overseas and transferred to BCCI SA London through the inter-company vostro account. BCCI SA then remitted this sum from its US dollar nostro account (48586050) at BoA (NY) to the BOI Grand Cayman nostro account at Midland Marine Bank. On the same day funds totalling US$50, 635,069.44, representing the placement by BCCI SA Bahrain plus accrued interest, were repaid to the BCCI SA London US dollar nostro account (48586050) at Bank of America, New York, and credited back to the BCCI SA Bahrain inter-company vostro account (42100667). This account was then debited with the same amount in favour of the BCCI Overseas inter-company vostro account (44100218).

© **2004 Sweet and Maxwell Ltd**

**The test of liability**

13. The liquidators have to show that BOI (through its relevant officers and employees) knew that the six transactions (or one or more of them) were being entered into either to defraud the creditors of BCCI or for a fraudulent purpose. They did not have to know every detail of the fraud or the precise mechanics of how it would be carried out, but clearly they did have to know, either from their own observation of what was being done or from what they were told, that BCCI was intent on a fraud. Knowledge, for this purpose, means what it says. There must have been an actual realisation on the part of BOI that BCCI would, or was likely to, engage in false accounting. A failure to recognise the truth of what was going on is not enough, however obvious that may now seem to have been. The relevant knowledge also has to be contemporaneous with the assistance that was given at the time by entering into the various transactions. Subsequent knowledge based on hindsight is not enough, nor is negligence the test of liability. Mr Hirst QC emphasised in his closing submissions that it is irrelevant whether BOI is open to criticism for slackness or negligence, however gross. The only issue is whether it knew at the time that it was participating in a fraud. I agree with that. But both sides accept that knowledge, for these purposes, includes so-called blind-eye knowledge, which exists when the party in question shuts its eyes to the obvious because of a conscious fear that to enquire further will confirm a suspicion of wrongdoing which already exists. Knowledge of this kind is part of the claimants' case, and I dealt with the same point in para.11 of my judgment in *Morris v State Bank of India*, where I said this:

> 'Knowledge includes deliberately shutting one's eyes to the obvious, provided that the fraudulent nature of the transactions did in fact appear obvious to those who dealt with these matters at SBI at the relevant time. It is well established that it is no defence to say that one declined to ask questions, when the only reason for not doing so was an actual appreciation that the answers to those questions would be likely to disclose the existence of a fraud. But liability in such cases depends upon that stage of consciousness having been reached. His submission, which I accept, is that one needs to be careful to draw a distinction between a conscious appreciation of the true nature of the business being carried on and a failure, however negligent, to appreciate that fraud was being perpetrated. The case for SBI is that at no time during the course of these transactions did it in fact suspect that anything untoward was going on. The essentials of what is required in order to establish so-called blind-eye knowledge are set out in the speech of Lord Scott of Foscote in the recent decision of the House of Lords in *Manifest Shipping Co Ltd v Uni-Polaris Co Ltd* [2003] 1 AC 469, where Lord Scott at para.116 says this:
>
> > "In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist. But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that may, at one extreme, be no more than a vague feeling of unease and, at the other extreme, reflect a firm belief in the existence of the relevant facts. In my opinion, in order for there to be blind-eye knowledge, the suspicion must be firmly grounded and targeted on specific facts. The deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to enquire into an untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the basis of a finding of privity."'

I intend to adopt the same approach to the evidence in this case.

14. Dishonesty as such is not in terms a condition of liability under s.213. But if knowledge of the fraud in either of the senses indicated above is established, Mr Hirst accepts that it must follow that BOI was dishonest. No evidence has been led to exculpate BOI on the basis that, although the bank through its officers realised what BCCI was doing, they saw nothing wrong in it, and it is not, therefore, necessary for me to consider whether that position, if established,

would constitute a defence to the claim. The only defence relied on is simply a denial of knowledge. In relation, therefore, to the liquidators' primary and original claim that BOI knew that BCCI was falsely misrepresenting the six transactions to its auditors by concealing its own use of the loans made to Maram, by representing the matching deposits with BOI as unencumbered, and by concealing the existence of the guarantees, no problems of defining the test of liability exist. An awareness of the purpose to which the transactions were being put was inescapably dishonest. The same, I think, goes for the alternative plea that BOI must have realised that the improvement of its earnings to advances ratio could only be effected by the transfer of non-performing debt and the consequent improvement in BCCI's profit before tax in each year. It is common ground between all the expert witnesses who gave evidence (both bankers and accountants) that the removal of bad debts would have been impermissible even by the standards of the time, and that the auditors, if notified, would have insisted on the reversal of the transaction in the accounts or the making of suitable provision. The improvement in the ratio could only therefore have been successful if the removal of the bad debts was effectively concealed from the auditors. None of the factual witnesses suggested that they would have regarded this as an honest practice. But in relation to the new plea about window-dressing, different considerations may apply. Paragraphs 93.2 and 96F(i) and (ii) of the re-re-amended particulars of claim ('RRAPOC') allege that even the more limited possibility of switching assets in the balance sheet by converting loans and advances into deposits due from banks would have indicated greater liquidity than was the case and was itself a fraudulent practice. The liquidators' additional case is that, even if BOI was told and believed that the only purpose of the six transactions was to window-dress the accounts in this way, this would still amount to knowing participation in a fraud, because what was contemplated was likely to mislead anyone reading BCCI's accounts and was not a practice which, judged by the standards of honest bankers at the time, operating in the City of London, could have been recognised by BOI as either honest or legitimate.

15. Mr Hirst submits that the liquidators must prove (in relation to this plea) not only that BCCI's explanation of the purpose of the transactions disclosed a scheme which, viewed objectively, was dishonest, but also that this belief was shared by the officers of BOI to whom the explanation was given. It is important to note that this submission is not advanced as part of an argument that s.213 requires proof not only of knowledge, but also of dishonesty. It is based on the terms of the RRAPOC, which at para.96A alleges that BOI knew or believed that the explanation of the improvement in BCCI's earnings to advances ratio (if given and true) disclosed a dishonest scheme on the part of BCCI. This plea therefore depends upon BOI being aware and appreciating at the time that window-dressing of the kind allegedly contemplated by BCCI was dishonest, and therefore requires the court to focus on BOI's views about the appropriateness of what was being done. Therefore in this limited area what needs to be proved is what Lord Hoffmann in *Twinsectra v Yardley* [2002] 2 AC 164 at p.170c described as a dishonest state of mind: *i.e.* a consciousness that one is transgressing ordinary standards of honest behaviour. Clearly that test is inapplicable except by reference to the standards of such behaviour prevailing at the time. I therefore accept Mr Hirst's submission that if liability is to be established on the basis of this new plea, conscious dishonesty in the sense I have described is an issue and must be proved.

**Evidence and standard of proof**

16. This case concerns events which took place 20 years ago. Those involved are now for the most part retired and some are elderly and unwell. None of these factors is an objection to the court doing justice on the applications before it, but they are relevant to a consideration of the evidence upon which any decision must be based. I therefore accept that due allowance has to be made for the passage of time and the effect which that must inevitably have on the ability of witnesses to recall with any precision, or at all, conversations and events which occurred two decades or more ago. That makes all the more surprising the claims of some witnesses to have

© 2004 Sweet and Maxwell Ltd

an almost perfect recall of these events, and I have approached some of the oral evidence which either contradicts or is unsupported by contemporaneous documents with necessary caution. I have also taken into account (as I did in the case against SBI) the institutional factor in all of this: *i.e.* a natural inclination which may exist on the part of some of the witnesses to be defensive of their own conduct and that of the bank they served. Failure to give a credible explanation of events may be due to factors of this kind rather than a perceived need to deny involvement with a fraud. I dealt with these considerations in paras 17 and 18 of my judgment in *Morris v State Bank of India* and I take the same approach in this case.

17. Mr Hirst submits that I should apply the criminal standard of proof to the determination of the key issues of knowledge. These are, he says and I agree, allegations of great seriousness for the individuals concerned and for the reputation of BOI. It would be wrong to make adverse findings of that kind simply on the basis of the balance of probabilities. The civil standard of proof is a flexible one and recent authorities confirm that it can be adapted to meet the seriousness of what has to be proved: see, for example, *B v Chief Constable of Avon & Somerset Constabulary* [2002] 1 WLR 340.

18. In *R (McCann) v Crown Court at Manchester* [2003] 1 AC 787 (a case concerned with the making by magistrates of anti-social behaviour orders under s.1 of the Crime and Disorder Act 1998) Lord Hope of Craighead at paras 82 and 83 said this:

> '82. … it is not an invariable rule that the lower standard of proof must be applied in civil proceedings. I think that there are good reasons, in the interests of fairness, for applying the higher standard when allegations are made of criminal or quasi-criminal conduct which, if proved, would have serious consequences for the person against whom they are made.
>
> 83. … There is now a substantial body of opinion that, if the case for an order such as a banning order or a sex offender order is to be made out, account should be taken of the seriousness of the matters to be proved and the implications of proving them. It has also been recognised that if this is done the civil standard of proof will for all practical purposes be indistinguishable from the criminal standard: see *B v. Chief Constable of Avon & Somerset Constabulary* [2001] 1 WLR 340, 354, para 31, per Lord Bingham of Cornhill CJ; *Gough v. Chief Constable of the Derbyshire Constabulary* [2002] QB 1213, 1242–1243, para 90, per Lord Phillips of Worth Matravers MR. As Mr Crow pointed out, the condition in section 1(1)(b) of the Crime and Disorder Act 1998 that a prohibition order is necessary to protect persons in the local government area from further anti-social acts raises a question which is a matter for evaluation and assessment. But the condition in section 1(1)(a) that the defendant has acted in an anti-social manner raises serious questions of fact, and the implications for him of proving that he has acted in this way are also serious. I would hold that the standard of proof that ought to be applied in these cases to allegations about the defendant's conduct is the criminal standard.'

Mr Purle QC resists the importation of the criminal standard of proof *simpliciter* into applications under s.213. Cases like *McCann* are, he says, explicable on a pragmatic basis as attempts to give sensible and straightforward directions to Magistrates' Courts, which have to impose restraint orders in a quasi-criminal context. He says that I should prefer the approach of Lord Hoffmann in *Aktieselskabet Dansk Skibsfinansiering v Brothers* [2001] 2 BCLC 324. This was a decision of the Court of Final Appeal in Hong Kong in a case of fraudulent trading. At p.329d–h Lord Hoffmann said this:

> 'Until the recent case of *Re H (Minors)* [1996] AC 563 the leading English case on the standard of proof in civil cases in which serious allegations of misconduct such as fraud were in issue was *Hornal v Neuberger Products Ltd* [1957] 1 QB 247. In a passage (at 266) often quoted in later cases, Morris LJ approved the dictum of Denning LJ in *Bater v Bater* [1951] P 35 at 37 that there must be a "degree of probability which is

> proportionate to the subject-matter". Lord Denning repeated the same formula in the House of Lords in *Blyth v Blyth* [1966] AC 643 at 669. In *R v Home Secretary, ex p Khawaja* [1984] AC 74 at 114 Lord Scarman examined all the previous cases and said the same: "A preponderance of probability suffices but the degree of probability must be such that the court is satisfied."
>
> The judge followed this line of authority. He said (at para 5.3.1) that the civil standard of a balance of probabilities was appropriate but that "the degree of probability must be commensurate with the occasion and proportionate to the subject matter". He commented that in a case of fraud, this meant that in effect the standard was no different from "beyond reasonable doubt".
>
> In *Re H (Minors)* [1996] AC 563 at 586–587 Lord Nicholls of Birkenhead pointed out that if proof is required on a preponderance of probabilities (ie, a probability of 0.5 on a scale from 0 (impossibility) to 1 (certainty)), it is inconsistent to require a "degree of probability commensurate with the occasion". This suggests some other degree of probability, higher than 0.5, somewhere between the civil standard and the criminal standard, which the courts have wisely never attempted to define as a point on the probability scale. The correct analysis is that the court is not looking for a higher degree of probability. It is only that the more inherently improbable the act in question, the more compelling will be the evidence needed to satisfy the court on a preponderance of probability.'

My own preference is for this approach, but I am conscious of the danger of over-analysis. It seems to me that although one can begin an assessment of the likelihood of Mr Samant and the other officers of BOI having been knowing parties to a fraud on the creditors of BCCI by reference to generalisations such as the improbability of bank officers becoming involved in dishonesty, the absence of any profit motive and the general standing and reputation of BOI, these factors become secondary considerations of less weight, when one comes to consider the oral testimony of the individuals concerned and to compare their explanations of what occurred, and their thinking at the time, with what is evident from the documents they actually produced and signed. Having heard this evidence, I have to decide whether it is credible, and that in large part depends upon my assessment of the witnesses themselves.

**The liquidators' case on knowledge**

19. The liquidators' primary case is set out in paras 96–97 of the RRAPOC. The six transactions were, they say, obviously artificial and served no *bona fide* commercial purpose. Their actual purpose was the fraudulent manipulation of BCCI's published results, which was achieved by suppressing the guarantees relating to the loans from BOI to Maram, thereby concealing any potential or actual liability on the part of BCCI for the repayment of the loans, and by using Maram to keep off the balance sheet what was in substance the circulation of BCCI's own money, to assist it in massaging the balance on the Khalil accounts. This enabled it to conceal the non-performing nature of those liabilities and in turn the additional indebtedness created by BCCI's own adventures on the London Metal Exchange. Even if the legal form of the transactions is respected, BCCI was able in effect to borrow off balance sheet from BOI by using the loans granted ostensibly to Maram in reduction of the Khalil debts.

20. BOI's knowledge is said to have extended to at least three of the essential features of the scheme. They knew that the real purpose of the transactions was to be for BCCI's own purposes and not those of Maram. At the very least, BOI knew that the existing loans made to an initially unspecified borrower would be transferred temporarily from its accounts over BCCI's year end and replaced by new loans from BOI, made with the benefit of the finance supplied by the BCCI deposits. Maram (even when identified) was also known to be a nominee of BCCI and all contact between BOI and Maram was made through BCCI. BOI also knew that the loans to Maram could only be repaid by BCCI reinstating its original loans.

© 2004 Sweet and Maxwell Ltd

Notwithstanding this, BCCI's liability to repay the loans to Maram was not revealed in its accounts, even as guarantor, and had the guarantee liability been revealed, full provision would have had to have been made. The liquidators also allege that BOI knew that BCCI intended to account for the deposits as free unencumbered placements and that BCCI would conceal from its auditors the existence of the guarantees.

21. In these circumstances the liquidators contend that BOI knew that the purpose of the transactions was not that of improving BCCI's earnings to advances ratio, not least because this explanation (even if given) was implausible and untrue. The explanation of improving the earnings to advances ratio was only consistent with a dishonest scheme, because it could only be achieved by removing a bad or doubtful debt, for which provision would have to be made, from its profit and loss account. As I have said, both banking experts were agreed that this would have been a wholly unacceptable practice, even judging by the perhaps laxer standards of the 1980s. No honest bank behaved in this way. The fact that the stated purpose could only be achieved by the removal of bad debts would also have indicated, at the very least, that Maram was not a viable commercial entity of the kind portrayed in the documentation eventually produced for submission to the Head Office of BOI.

22. It is important to recognise that the liquidators' pleaded case on knowledge (particularly in relation to the earnings to advances ratio point) is intended to deal with BOI's position on the basis of what are really two competing hypotheses. We know in fact that although Maram existed as a company and was beneficially owned by Mr Khalil, it was in effect put at the disposal of BCCI by Khalil and used by BCCI (through Mr Akbar) to perpetrate the fraud on creditors with which these proceedings are concerned. The evidence of Mr Dyson, the forensic accountant who has been involved in the investigation of these matters on behalf of the liquidators, which is unchallenged on this point and is corroborated by a witness statement from Mr Naqvi, is that Maram was at all material times controlled by Mr Akbar and that the company's share certificates, seal and company formation documents were found at Mr Akbar's home address when it was raided by the City of London police on November 27, 1991. Mr Dyson also says that Mr Khalil has stated that he never authorised Maram to borrow any moneys from either BOI or BCCI, and this is consistent with what we now know of Mr Akbar's *modus operandi* and the evidence of the use to which the BOI loans were put. This confirms that at the time of the six transactions Maram (although undoubtedly 'nominated' by BCCI) was not an existing borrower in any relevant or real sense. The transactions did not therefore involve the transfer of any existing liability from BCCI to BOI. They were (even if regarded as loans at all) new loans to Maram from BOI, which were then used to reduce the indebtedness on the Khalil accounts at BCCI.

23. The actual fraud was therefore the use of moneys circulated via the deposits with BOI to reduce the Khalil bad debts, including BCCI's own losses from metal trading. The concealment of the guarantee and BCCI's refusal to grant any formal lien over the deposits gave BCCI the additional benefit of being able to classify the deposits as sums due from banks with no corresponding liabilities. But this was in reality a bonus. The greater concern about the guarantee is likely to have been that, if disclosed to the auditors, it might prompt an inquiry into the nature of the liability under guarantee and lead to a connection being made between the payments to Maram and the reduction of the Khalil indebtedness. It would then have become clear that the Khalil accounts were (even on the face of things) being reduced only by further borrowing and provision would have had to have been made.

24. If BOI knew that the purpose of the back-to-back arrangements, and in particular its loans to Maram, was to remove or alleviate the Khalil bad debts and so avoid provision being made, then I can see no answer to the liquidators' claim for compensation and I believe Mr Hirst accepts that. It seems to me that the same conclusion follows even if BOI knew only that Maram was a mere nominee and that the loans which it was making were for the use of BCCI and would be repaid by BCCI. This would have put BOI on notice that the whole

arrangement was an elaborate fiction which can only have been designed to deceive its creditors by boosting its liquidity without revealing its corresponding indebtedness. The liquidators' additional pleading in relation to its primary case, which concentrates and is based on the hypothesis of the alleged explanation given for the arrangements (*i.e.* the improvement of the earnings to assets or earnings to advances ratio), is advanced to meet the defence that this justified what on any view was a quite extraordinary banking transaction and satisfied BOI that no fraud was involved. The liquidators' position is that no such explanation was in fact given and that this is just an invention by Mr Samant to conceal the fraud. But they say that even if this explanation was given, it was patently implausible and untrue and, if taken at face value, disclosed a dishonest scheme. This is because, as both banking experts and a number of the factual witnesses accepted, the earnings to assets ratio of BCCI could not be improved by transactions which would do no more than to move the amount of the loan shown in the balance sheet from 'loans and advances' to sums 'due from banks'. The asset position would remain the same and BCCI's earnings would be reduced, because it would earn only LIBOR rate on the deposits and would lose interest at a rate of LIBOR plus 2 per cent on the loans that were being refinanced.

25. If the justification was the so-called earnings to advances ratio (rather than the earnings to assets ratio), the position would be no different. Any meaningful comparison of the amounts earned relative to the sums advanced would have to be based on figures averaged over the whole year and not on a snapshot of the position as disclosed in each set of year end accounts. The information contained in the year-end financial statements would not allow this to be done, because the earnings shown are derived from all sources over the year, and the comparison with the single category of asset in the form of advances at the balance sheet date could not provide an average figure. Neither BCCI nor any other banks disclosed details in their accounts which distinguished between and identified the sources of earnings or details of average balances for different categories of assets during the year. For these reasons (as both experts acknowledged) an earnings to advances ratio calculated from year-end financial statements was unknown as a measure of performance for banks at the time. It cannot therefore have been, and was not, say the liquidators, something which BCCI was concerned to improve by the transactions it entered into with BOI. This is confirmed by the fact that no earnings to advances ratio appears in any of the published accounts of BCCI SA or BCCI Overseas for the five years in question or at all.

**The evidence of knowledge**

*(a) The first transaction*

26. As already indicated, this took place over the end of 1981. No compensation is sought in respect of this transaction because the liquidators have been unable to identify what use the loans from BOI were ultimately put to. However, the transaction is important because it was the first of the six back-to-back arrangements under review and therefore the first occasion when BOI was asked to assist BCCI in this way. It therefore sets the scene and to some extent defines what was to follow. At the time in question Mr Samant was the chief manager of the UK and European branches of BOI, based at Telegraph Street in London. He was subsequently promoted to the position of assistant general manager and deputy general manager in charge of BOI's branches in the UK and Europe. He remained with BOI until November 1985, when he resigned and handed his position over to Mr J Raina, who had been in effective charge since June of that year whilst Mr Samant took up some accumulated leave. He is now a director of AMAM, which I believe provides financial consultancy services of some kind.

27. It is, I think, important to note that Mr Samant was from 1980 until 1985 (as he says in his witness statement) the most senior BOI officer in the UK and Europe. He was a banker of considerable experience and is clearly a highly intelligent man. The other introductory matter worth noting, which is important as background to this case, is that during the 1980s it was the policy of BOI (and I think many other Indian banks) to mobilise at its year end as many

© 2004 Sweet and Maxwell Ltd

deposits as possible for inclusion in its balance sheet. The practice was for Mr Samant and all branch managers to contact customers and other banks as the year end approached in November and December, in order to secure as many deposits as possible. According to internal documentation the head office of BOI continuously monitored the growth of and fluctuation in deposits, and the existence of large-scale deposits was obviously seen as a measure of the bank's success. This practice of boosting deposits at the year end was highly artificial, because it meant that the level of deposits recorded in the accounts was attributable more to the customers' willingness to respond to the managers' campaign for funds than any independent recognition of the bank's reputation and worth in the preceding year. But the practice was well-established by 1981 and produced what can fairly be described almost as a culture, involving what was clearly a form of window-dressing in relation to the accounts. BOI is not, of course, on trial in respect of that practice, but it is difficult to regard it as either straightforward or desirable. Looked at objectively today, it would not, in my view, be regarded as acceptable. It is clear that even 20 years ago not everyone at BOI was happy about it. Mr Narayanan Vaghul, who was the chairman and managing director of BOI from 1981 until January 1984, and therefore the most senior executive at the bank during that period, said that he personally disapproved of the policy of mobilising deposits at BOI's year end and did his best to discourage it. But it was well-established by the 1980s because it was used by the Indian Government (which controlled BOI) to measure the bank's performance. This had produced what he described as an obsessive and undue emphasis on deposit mobilisation which was deeply rooted in the culture of the bank. It was put to him that the practice was apt to mislead and he accepted that in relation to the figures for deposit growth. It did not, however, distort the profit and loss account or the balance sheet. Disapproval of the mobilisation of deposits was also expressed by Mr S K Mitra, then one of the chief managers in the International Department of BOI at its head office in Bombay, but he thought better of this evidence overnight and somewhat unconvincingly attempted to change his position the following day.

28. Mr Purle put to Mr Vaghul the rather wider question of whether this practice could have encouraged managers to enter into unrepresentative transactions at the year end in order to flatter the balance sheet. I think that Mr Vaghul accepted that as a possibility, but countered that he would have questioned the branch managers if he suspected anything untoward was involved. He gave, as an example of a transaction which would not be approved of, the case of a manager who used credit on an overdraft facility to make deposits in another account. But he refused to accept that the transactions with BCCI with which I am concerned were circular because, he said, they involved genuine deposits and a genuine loan to Maram. This was a common theme amongst most of the bank's witnesses, who were keen to emphasise the legal form of the transactions, including the absence of a lien over the deposits and the absence of any other express right of recourse to the deposits as security for the guarantees and the loans. They were largely unwilling to become involved in any real analysis of the substance of the transactions, involving as they did the use of finance from BCCI to provide the loans to Maram in the first place and the absence of any known source of repayment for the loans other than their refinancing by BCCI. Reliance on legal form is not in any way impermissible or wrong, provided that the commercial realities of the transactions are also scrutinised. The assessment of risk is, after all, a prerequisite to any banking decision. The insistence by the factual witnesses that they relied on the legal form of the arrangements also has the consequence that their conduct can fairly be assessed on the basis that they were entering into an arms-length transaction with an unconnected party in respect of whom one would expect all the usual searches and enquiries to be made. But the evidence discloses that nothing of the sort in fact occurred.

29. Mr Samant said in evidence that the origin of the first transaction was in a call he made to Mr Mewawalla in the autumn of 1981 to see if BCCI was willing to place some year-end deposits with BOI. As I mentioned earlier, the two had been colleagues at BOI in India, and

when Mr Samant was the chief officer at BOI in Singapore and Mr Mewawalla was in charge A
of BOI Tokyo. They had known each other well for a number of years and Mr Samant
described Mr Mewawalla as a close acquaintance. Mr Samant said that most of his
communications with BCCI in relation to the six transactions were with Mr Mewawalla,
although he may have spoken to Mr Akbar when Mr Mewawalla was away. Mr Mewawalla
was not called as a witness by either party, although he is said to be alive and well. At the time
of these transactions he worked in the International Department of BCCI. Mr Dyson said that
he had made substantial claims in the liquidation and during his cross-examination also stated B
that he did not allege that Mr Mewawalla was dishonest in relation to the transactions with
BOI. Later, however, in re-examination, he said that what he meant by this was that although
the liquidators believed that Mr Mewawalla was involved in the fraud, it was not possible to
produce clear evidence to prove it. Mr Purle has invited me to infer that Mr Mewawalla was
involved in the fraud, and I shall proceed on the basis that that is the liquidators' position.

30. There does not appear to have been any immediate response to Mr Samant's request for C
a deposit, but by November 12, 1981, Mr Mewawalla had come back with a proposal. The
terms of this are set out in a telex from Mr Samant to Mr G S R K Rao, who was then the
departmental head of the International Department in Bombay. It records that BCCI was
willing to place a deposit 'not under lien' of £10 million for three months at a rate of
15 per cent per annum, on terms that BOI was required to lend this same amount to a borrower
nominated by BCCI at 15+1/8 per cent. There were to be no documents executed by the
borrower and the only security was to be an irrevocable letter of guarantee by BCCI, the D
proposed terms of which are then set out in the telex as follows:

> 'As per our recent telephone conversation we have pleasure in introducing the
> abovementioned customer to whom you have agreed to allow the following facilities on
> the terms and conditions mentioned below:

| | |
|---|---|
| Name of borrower: | |
| Name of facility: | Loan |
| Period: | Three months from date of loan |
| Amount: | Stg pnds 10,000,000 (sterling pounds 10 million) |

E

> In consideration of your allowing the abovementioned facilities we hereby irrevocably
> guarantee the repayment on the due date of the principal amount together with interest at F
> 1/8% over National Westminster Bank base rate.
>
> The borrower will have option to repay the loan before the due date by giving one
> month's notice.
>
> We thank you for accommodating the above client and look forward to the opportunity
> of doing business of mutual interest with you in the future. Unquote' G

Mr Samant goes on in the telex to recommend the proposal to Mr Rao because it would be what
is described as a 'pure' deposit and BOI would earn 1/8 per cent per annum without any outlay
of funds. The reference to it being a 'pure' deposit is a reference to the categorisation of
deposits by the head office of BOI for reporting purposes. In fact a deposit from BCCI would
not have been (as Mr Samant accepted) a 'pure' deposit. This was restricted to deposits from
customers rather than from other banks. The importance of the reference in the telex is as an
indication of the role played by the need to maximise deposits in motivating this transaction. H
The reference to interest being earned without any outlay of funds is also important because it
confirms that Mr Samant knew that BOI would be at liberty to utilise the moneys provided by
the deposits in order to finance the loans to the nominated borrower, and Mr Samant and the
other witnesses from BOI confirmed that without the use of these funds it would not have been
possible to enter into the transaction.

© 2004 Sweet and Maxwell Ltd

31. There then follows in the telex Mr Samant's explanation for what had been proposed. He said this:

> 'BCCI is doing this obviously to show a good ratio of earnings against their advances. I do not think we should or even could go into detailed legal documentation because in the UK, no bank or licensed deposit taking company can afford to back out of its commitment in the eyes of Bank of England.
>
> I would have myself gone ahead with this transaction in view of urgency but since there have been some misgivings in the past about BCCI in Head Office, I thought of seeking your prior approval.
>
> I recommend approval without any hesitation. BCCI is a very big, aggressive institution with 45 branches in the UK.'

There is no note of the conversations between Mr Samant and Mr Mewawalla, and we are therefore dependent upon Mr Samant's evidence and such documents as do exist in order to try to reconstruct what passed between them. What is clear is that, if one looks at the proposals objectively for a moment without regard to what is said to have been discussed, they are on any view extraordinary. BOI, which had no real prior banking relationship with BCCI, at least in London, was being asked to lend £10 million to a borrower which was to be nominated by BCCI but was not identified. There was to be no documentation for the loan (despite its size) and therefore no facility letter or loan agreement. It was to be unsecured by any charge over an asset of the borrower or the matching deposits which were to provide the funding. The only security was the letter of guarantee, the terms of which were misleading in that they indicated that BCCI had introduced to BOI a customer for a loan, whereas in fact the opposite was the case. The transaction was clearly driven by BCCI's desire to 'show a good ratio of earnings against advances' and not by any decision on the part of the nominated borrower to obtain an offer of finance. Mr Samant says that he was told by Mr Mewawalla or by someone at BOI that the transaction involved replacing an existing loan to the borrower with a new loan from BOI for no apparent reason other than that BCCI wished to switch the loan to BOI. This was confirmed by the fact that BCCI would be worse off financially in that it would provide the funding for the loan via the deposit, but would earn 1/8 per cent less on the deposit than BOI was to receive from the borrower, whose payments BCCI also guaranteed. The transaction therefore made no economic sense whatsoever and was only explicable in terms of BCCI wishing to produce better year-end figures than could otherwise be achieved.

32. I heard expert evidence from two bankers, both with considerable experience. Both Mr Challoner and Mr Wragg were agreed that the transaction outlined in the telex to Mr Rao could not have justified a positive response on the basis of the information revealed. Even if one ignores the obvious artificiality of the proposal and concentrates on the borrower, it was impossible for BOI to form any view about the purpose of the loans or the borrower's standing. Mr Wragg said that it had all the appearance and characteristics of a vehicle. Notwithstanding this, Maram (as it later turned out to be) was (on what Mr Samant says was his understanding of the arrangements) directly affected by the transaction in that it was, according to Mr Mewawalla's proposal, to terminate its existing loan facilities with BCCI and to enter into a new loan with BOI. This was not therefore a securitisation proposal in which Maram would play no part. The proposed transaction broke every rule of lending in the banker's book and that must have been obvious to Mr Samant, and for that matter to Mr Mewawalla, as experienced bankers. No-one has suggested that BOI conducted its banking business according to different rules. Neither expert had ever seen or heard of a transaction of this kind in practice, and in a letter to solicitors written the same day Mr Samant himself described the proposals as an 'apparently strange deal'.

33. In these circumstances it must have been obvious to Mr Samant that this was not an ordinary loan transaction of any kind. Unlike in the SBI case, where the bank was approached by a representative of the borrower (Notan) for a loan on the basis that BCCI could not provide

it at the relevant time, in this case it was BCCI which approached BOI and made no pretence of the fact that the transactions were to be put in place solely for its own benefit. The borrower took no part in the discussions with Mr Samant which led to his recommendation of the proposal to head office and was not even identified. There were, therefore, two obvious questions which any honest and competent banker would have asked and would have required to know the answers to. The first was why BCCI required assistance in this way. The second was the status of the borrowing which BOI was being asked to take on.

34. According to the telex to Mr Rao of November 12, BCCI's proposal from Mr Mewawalla was only received that day. Despite the highly unusual nature of what was proposed, Mr Samant was prepared almost immediately to recommend acceptance by BOI. No enquiries were made about the borrower, the purpose or status of the existing loans, or the reasons why there was to be such a singular lack of documentation. The passage quoted from the telex also suggests, by the use of the word 'obviously', that the idea that BCCI wished to improve its earnings to advances ratio was one which Mr Samant came up with as an explanation, rather than one suggested to him by Mr Mewawalla. In an earlier statement of July 7, 1993, made to the police, Mr Samant makes no reference to the earnings to advances ratio point at all, but in his witness statement of January 26, 1998, in these proceedings he says that it was Mr Mewawalla who offered this explanation and sets out his understanding of what it meant. I shall come to this in a moment. When he was cross-examined about his discussions with Mr Mewawalla, he said that he had not immediately understood that the proposal involved the discharge of an existing borrowing. Not surprisingly, he was also puzzled as to why BCCI was prepared to forfeit a 1/8 per cent interest differential to BOI. To use his words, he therefore went a little deeply into it, and it was then that Mr Mewawalla came up with the improvement of the earnings to advances ratio as an explanation. Mr Samant says that he did not take much cognisance of this at the time because he trusted Mr Mewawalla and BCCI as honest, but on returning to the office he consulted his colleagues as to how this could be done, and they told him that the only way was for certain existing advances to be paid off, thereby increasing the earnings on the balance sheet day as a proportion of the advances remaining outstanding. He also said, however, that Mr Mewawalla himself confirmed that the borrower to be nominated by BCCI would be an existing borrower, so that the loan would be used over the year end to reduce that borrower's indebtedness to BCCI. He accepted that the arrangements were not entered into to suit the borrower's purposes as opposed to those of BCCI, but on the basis of the BCCI guarantee BOI was happy to take on what was for it a risk-free and profitable transaction.

35. At one point in the cross-examination the following exchange occurred:

> 'Q. But the reason that the transaction was being suggested by Mr Mewawalla was because it suited BCCI's purposes; it was not for any purpose, that you were aware of, of the borrower itself?
>
> A. No, I was not aware of the borrower then at all.
>
> Q. But you were not aware of any other purpose of the borrower; the only purpose you were aware of was BCCI's purpose of improving its accounts?
>
> A. My own purpose was to improve the deposits and BCCI wanted to reduce their outstandings on this particular borrower, who might have been overdrawn.
>
> Q. But they are not ultimately reducing their outstandings, are they? They are simply entering into a transaction which gives the appearance of reducing them for a few weeks over the year end and then they are to be restored, are they not, and that was your understanding of the situation?
>
> A. Yes, it was going back to the account that it will restore the position, or probably they may have arranged for any other thing that the deposit will go back to BCCI. They may have meanwhile submitted a proposal to the head office to increase the limit of the borrower, because Bank of India has done it fairly often for customers whose drawings

© 2004 Sweet and Maxwell Ltd

> were about the sanction limit. We have requested them to go to another Indian bank but of course we did not give any guarantee for that, that is all.
>
> Q. Indeed, as you understood it, this was to be a borrowing under which BOI, as the proposal was originally put to you, would have no recourse to the borrower?
>
> A. Yes, I agree with you. In the sense that as long as BCCI guarantee was there, we are not really worried about the borrower at all.'

It is clear from these answers that, to use a phrase of one of the expert witnesses, Mr Wragg, the borrower added nothing to the credit standing of the transaction. Mr Wragg said that he would not have entered into the transaction on the basis proposed and that what was contemplated was unacceptable in banking terms. It was necessary to know the borrower. It was not appropriate to rely on BCCI's guarantee alone. In particular the reference to improving the earnings to advances ratio was not self-explanatory, nor was it obvious. His own analysis was that an improvement to the ratio (absent the removal of a bad debt) was only achievable if BCCI retained a flow of income from the borrower as the price of obtaining a BCCI guarantee. This was not a feature of this proposal, but even then the improvement would have been only marginal. This is the response to the proposal I would have expected from an honest and competent banker, and the liquidators are therefore entitled to ask why it was not Mr Samant's response at the time. The answer he gave was in effect that he simply accepted the explanation he was offered, thought it made sense and, because the transaction was almost risk-free and provided BOI with a £10 million deposit, was prepared to go along with it.

36. Throughout his evidence Mr Samant maintained a denial either that he thought or knew that the debts of Maram which were being transferred to BOI were non-performing or that he had reason more generally to suspect a fraud. In considering this evidence one needs, I think, to begin with the factual position in 1981 as we now know it to have been. Even by the time of the first transaction BCCI was faced with a considerable and significant deficit on the Khalil accounts and Mr Akbar had embarked on the fraud with which this action is concerned. Unlike in the case of SBI, where steps were taken to give the appearance that the application for a loan was initiated and pursued by Notan, no such pretence was practised in this case. Mr Mewawalla obviously felt able (and it must have been with Mr Akbar's knowledge and consent) to use Mr Samant's request for a deposit as an opportunity to ask for a favour in return. It is not disputed that Mr Mewawalla made it clear to Mr Samant that this was a transaction for the benefit of BCCI, which had as its purpose the improvement of its accounts or profits at the year end. It was not presented as a request by the borrower for a loan which BCCI could not fulfil, whether for capital adequacy or some other reasons. The borrower had no role of its own in this transaction and was quiescent. Mr Samant raised no objection to this because he was able to obtain the deposits he wanted, together with a modest profit on the transaction for little or no risk. BCCI provided the funding for the loan, a guarantee of repayment and would provide (as Mr Samant knew and accepted) the actual repayment of the loan by refinancing Maram's commitment after the year end. All that Mr Samant had to do was to agree to take part in the transaction and to be able to persuade head office to allow the transaction to proceed. Mr Samant and the other BOI witnesses were at pains to emphasise that they relied on BCCI's guarantee and therefore were less concerned about the status of the borrower. In a memorable passage in his evidence Mr Samant said this:

> '. . . but the whole point again, look, as far as the London office was concerned and head office was concerned, the whole proposal was on the guarantee of BCCI, and who the borrower was, was not really of any consequence at all in this transaction.'

But there is a world of difference between a loan to a borrower which, because supported by a bank guarantee, is risk-free and a transaction which, although in form a loan to a nominated borrower, is in reality and substance a loan to the bank itself.

37. It is not possible to be certain whether it was Mr Mewawalla or Mr Samant who came up with the improvement of BCCI's earnings to advances ratio as a reason for the transaction,

and ultimately it may not matter. I do not, however, believe that it came from someone in the office of BOI in London. I think that Mr Samant's use of the word 'obviously' in the telex to head office of November 12 was designed to emphasise that this was an obvious and plausible explanation. The question is whether Mr Samant thought it was anything of that kind. There are a number of features of the evidence which are relevant to this. In the first place, it is clear that Mr Samant was not entirely at one with the explanation when he proffered it for the first time. Although he referred to BCCI wanting to show a good ratio of earnings to advances in his telex to head office, he wrote on the same day to the bank's solicitors, Lawrence Jones & Co, stating that the deal was required by BCCI to show increased earnings on their assets. When cross-examined about this, he said that this was a mistake and that he had intended to refer in the letter to advances rather than to assets. Secondly, there is the expert banking evidence I have already referred to, which confirms that the improvement of the earnings to assets ratio could not have been achieved in this way simply by an amendment to the balance sheet and, more importantly, that the ratio of earnings to advances was not in use at the time as a measure of performance. Thirdly, there is the manner in which Mr Samant attempted to deal with this point in his evidence. I would have expected him to have accepted that the explanation he gave to head office was (as we know) incorrect and to have explained why he came to be taken in by it. But what he in fact tried to do was to justify and support it as a possible explanation, when in fact it was not and could not have been correct.

38. In para.15 of his statement of January 26, 1998, he sets out an example to show what he understood the earnings to advances ratio meant and how it could be improved by transferred debt prior to the year end. In a later witness statement he reaffirmed this evidence and said that the liquidators were wrong to say that the stated objective could only be achieved by a fraud. Mr Samant was cross-examined about this. When asked whether he was surprised to learn that there was no statement in BCCI's balance sheet or even in its profit and loss account of any earnings referable to advances, and that all that was shown were total earnings from all sources, he went back to saying that there had been no reason for him to look into it and that he relied on Mr Mewawalla. He accepted whatever Mr Mewawalla said. But during August 1982, when consideration was being given to the request for approval of the second transaction, Mr Samant was asked by head office to send them a copy of BCCI's balance sheet for the year end 1981. On August 3 he telexed to Mr Rege what he described as the salient features of the balance sheet, including deposits, total assets and total income. It is therefore clear that in the run-up to the second transaction he was in possession of the balance sheet for 1981, which on Mr Mewawalla's account of matters had been subject to modification as a result of the first transaction. He was then asked by Mr Purle to confirm that there were no figures in the 1981 balance sheet from which one could derive any ratio of earnings referable to deposits against the deposits during the year or any figure for earnings referable to advances. He had to accept that the figures in the balance sheet did not provide this information, but said he relied on what Mr Mewawalla had told him. When it was put to him that this could not be right, because he had actually looked at the balance sheet in 1982 and extracted figures such as the profit before tax, he said that he had only looked at the balance sheet for the purpose giving the salient figures to Mr Rege. He was then asked to look at the statement in the accounts that the operating results expressed profits as a return on average assets. It was put to him that the use of averages over the year as the basis of assessing any profit return was absolutely standard. His response once again was that he simply relied on Mr Mewawalla.

39. Mr Purle then took him to the passage in his witness statement which I have referred to, where he seeks to explain how the ratio of earnings to advances could be improved by what was done. It was put to him that if one is dealing with average advances over the year, the only way in which the ratio of earnings to advances could be improved was by taking a bad debt off the books of BCCI. Mr Samant strongly denied that anything of the sort had been suggested to him, but accepted (as he had to) that Mr Purle was technically correct. He said that he had proceeded on the assumption that BCCI would not do anything dishonest, because their

© 2004 Sweet and Maxwell Ltd

A auditors would review the transaction. He also proceeded on the basis that the ratio would be calculated as at the year end and not by reference to an average over the year. Hence the explanation in his witness statement.

40. I found all of this completely unconvincing. Mr Samant's evidence started on the footing that he understood the improvement of the ratio of earnings to advances to be a plausible explanation for what was being done. At one point in his evidence (on day 4) he said that he thought at the time that this could be the only possible reason for the transaction. When, as I have indicated, it was put to him that it was in fact implausible and did not square with the way in which BCCI's balance sheet and accounts were prepared, he then changed his position and took refuge in saying that he simply accepted what Mr Mewawalla had told him unquestioningly. This is not, however, consistent with the fact that he looked at the 1981 balance sheet and accounts in 1982, at a time when head office was considering the proposal for a second transaction, and was clearly able to see from the way in which the accounts were prepared that Mr Mewawalla's explanation made no sense unless the loans to be removed were non-performing. Mr Samant gave no credible explanation as to why the points put to him and readily accepted by him during cross-examination were not obvious to him in 1982. To say that he simply relied on Mr Mewawalla is not an answer to this point. I do not believe that Mr Samant would not have looked at the 1981 accounts with these questions in his mind, particularly in the light of the questions which head office was raising. As I shall come to later, when I consider the second transaction in more detail, there is evidence that not everyone at head office was happy with the explanation which had been offered. There is an internal head office memorandum on which the executive director of BOI, Mr Shukla, has written a note (dated August 2) to Mr Rege, the general manager in Bombay of the International Division, stating the board 'will require "real" reason for this arrangement'. Mr Rege is incapacitated and we have no evidence from him. But it seems reasonable to assume that the request for the 1981 balance sheet was not unconnected with the board's desire to understand what was going on. Mr Samant said that he did not recall Mr Rege raising the query directly with him, but what he did say was that it was apparent on the figures extracted from the balance sheet that the conversion of even £25 million from an advance to a bank deposit would have no real impact at all on the balance sheet. When it was put to him that the explanation he was offering to the bank did not hang together, he hesitated and merely repeated that this was the reason he had been given by BCCI. There was no attempt to address Mr Purle's question at all.

41. On the same day (November 12) that he sent the telex to head office, Mr Samant also wrote to Lawrence Jones. His letter refers to a telephone conversation the previous day. This letter contains the description of the 'apparently strange deal', but explains it by reference to BCCI's need to show increased earnings on their assets. It is important to note that the solicitors were not asked by Mr Samant or anyone else at BOI to comment on the desirability or correctness of what was proposed. They were asked only to confirm whether the amount of the loan would be recoverable from BCCI on the basis of the terms of the draft letter of guarantee in the event of the borrower not executing any documents. A response was required by the following day. They replied on November 13 in negative terms. They advised that the guarantee should be under seal and that the statutes of BCCI should be examined in order to confirm that the guarantee would not be *ultra vires*. In relation to the absence of documents from the borrower, they said this:

> '3. We note that so far as your Bank is concerned, you would not receive from the Borrower any signed document whatever. We comment it is exceedingly curious, and we would think most unusual, for a Bank to allow a loan facility without receiving in return any document from that Borrower. It seems to us that you would be hard put to recover the loan from the Borrower without any written documentation, and without any acknowledgment of loan. We doubt whether your Bank would be prepared to accede to such an arrangement whether or not there was any satisfactory guarantee backing you, whether from BCCI, or elsewhere.

> 4. We note that on the terms proposed the Borrower can repay on one month's notice, but in your turn you do not seem to have the right to repay early BCCI. Thus you might be left with £10M and be unable to place that money at even Natwest Base Rate.
>
> 5. We note that your Bank would not receive any security from the Borrower, and that the only security offered by BCCI is their guarantee. In regard to that guarantee we think that at the moment there is insufficient rights for your Bank to set-off your Bank's obligation to repay on the due date against that guarantee. By this we mean that BCCI will call for their funds which may not have been repaid to you by the Borrower and the guarantee, certainly in the form currently suggested, would in our view be ineffective as a "defence" to repayment.'

42. On November 16 Mr Samant replied to Lawrence Jones. He queried the suggestion that the guarantee would not be supported by consideration unless under seal and made the point that BCCI would not appreciate checks being made into its capacity to give a guarantee. On the question of documentation he said this:

> 'On receipt of your considered opinion, I have discussed the matter with BCCI and they are agreeable to have a letter of request for a loan as well as any other simple security document executed by the borrower. Such borrower is likely to be a corporation (i.e. a limited company).
>
> As regards the period of deposit from BCCI and the period of advance to BCCI's customer, I had already advised BCCI that it will be the same in all respects but I am sorry I did not mention it in my letter to you. In brief, if the deposit is for three months the advance will also be for three months and there will be no option in favour of BCCI.
>
> In order to ensure there is no outlay of funds from our Bank, I have arranged with BCCI that they will lend us £10 million (which will be a deposit in our books) which in turn will be lent to the nominated customer of BCCI. If this amount is placed under our lien by BCCI, it will be reflected in their Balance Sheet and will not achieve the purpose for which this transaction is undertaken. I would, therefore, confirm that we certainly *will not* have the right of set off.
>
> I would, therefore, request you to draft for our Bank the minimum possible security documents to be executed by the borrower as well as by the guarantor, BCCI, as you deem fit to ensure the safety of the transaction. However, BCCI will not execute a guarantee under seal.'

Mr Samant was asked about this request that the solicitor should draft the 'minimum possible' security documents. He accepted that this came from BCCI. When asked why it should be the minimum, he said that this meant only that the documents should be simple. But that is not what his letter said and I regard his explanation as untrue. The real oddity about this is that BCCI should have dictated the form of security to be given by the borrower at all. It simply went to emphasise how artificial this arrangement was and the extent to which BCCI was (and appeared to Mr Samant to be) in control of Maram and the whole transaction.

43. Mr Samant's telex of November 12 and a copy of his letter of November 16 to Lawrence Jones were sent to Mr G K Rao, the chief manager of the International Department in Bombay. He responded on November 17 to the solicitors' advice that there would be no right of set-off. In the light of this, head office required there to be on record a suitable request from the borrower for the loan, stating that it would be guaranteed by BCCI. The document was to be drafted by Lawrence Jones. The telex set out two other important requirements: (i) that the borrower was to be approved by BOI, and (ii) that this was to be a one-time transaction and should not be treated as a regular arrangement. It looks from an annotated version of the November 12 telex, on which the comments of head office are typed, that Mr Rao and Mr Mitra recommended the proposal for consideration when it was received, but that queries were then raised. There was a note written by Mr Vaidya (one of the general managers) on November 13, asking whether BOI should do this for 1/8 per cent profit. He was not in favour.

© **2004 Sweet and Maxwell Ltd**

There is also a note from Mr Shukla, the executive director, asking to discuss the matter with the chairman and managing director, Mr Vaghul.

44. Mr Rao's telex was responded to by Mr Samant on the same day. He confirmed that there would be a letter of request and resolution from the borrower company and that BCCI would execute a letter of guarantee, to be drafted by the solicitors. They would also draft a simple security document for execution by the borrower. In relation to the request for the borrower to be approved Mr Samant said this:

> 'The borrower is a Grand Cayman company of a big Middle Eastern group banking with BCCI. The company (borrower) has only a nominal capital like any other tax haven company and its name will really signify nothing much to us.'

Although the telex does not say this, all the information in this paragraph came from Mr Mewawalla. Mr Samant did not yet even know the name of the borrower and had made no enquiries about it. Mr Purle put it to him that despite head office's request he was not concerned about this. He said that he was given the information about the borrower by Mr Mewawalla and it was good enough for him and the bank. But head office was not informed that the information had not been independently verified.

45. On November 18 Lawrence Jones confirmed its advice that the BCCI guarantee should be under seal and covered by a certified board resolution. They enclosed a copy of the borrower's letter of request, but no security document. By now Mr Rao had drawn up a document summarising the points raise by head office in his letter of November 17, together with the responses to the points from Mr Samant. These included the information about the borrower and the statement that the borrower would execute a security document. On the basis of these responses Mr Rege agreed to the transaction on a one-time basis and approval was given by Mr Vaidya, Mr Shukla and Mr Vaghul. Mr Samant was informed of this in terms on November 19. Mr Vaghul said that it was for Mr Samant to identify the borrower and he assumed that this had been done. The security document was never executed, nor was the guarantee under seal. On November 24 Mr Samant sent a memo to Mr Chatterji, who was responsible for implementing the transaction at the London branch. It asks him to contact Mr Mewawalla to try to secure a guarantee under seal. If BCCI was unwilling to give a guarantee under seal, Mr Chatterji could accept a guarantee without a seal, subject to advice from Lawrence Jones. He was also asked to remind them to prepare the security document, which they appeared to have overlooked. In para.9 of the note he said this:

> 'Since the amount involved is large, please consult the solicitors at each stage and enter into the deal only after the documents are executed according to their satisfaction. I understand that 2 or 3 other banks have already completed similar deals with BCCI against a simple letter from BCCI as indicated in my telex of 12th November 1981.'

A copy of this document was sent to head office.

46. On November 26 Mr Chatterji wrote to Lawrence Jones as requested. He had by now been supplied with a copy of the memorandum and articles of association of Maram and enclosed them, together with a copy of the draft board resolution and the letter of request. He also supplied a copy of the proposed letter of guarantee from BCCI (not under seal). Nowhere in the letter does he raise the question of the borrower's security document, nor was the board resolution of BCCI obtained. Mr Chatterji has produced a medical certificate. He is unwell and was unable to travel to London to give evidence. He did produce a witness statement dated July 1, 2002, based on the documents addressed to or initialled by him, but he says he has no independent recollection of the first transaction, which was the only one in which he was involved. His evidence is of very little assistance. It does not deal with his failure to obtain the security document, but does say that he would not expect Mr Samant or BOI to get involved in a fraud. None of this really helps me to resolve the issues in this action. Mr Samant accepted that he did not pursue the requirement for the guarantee to be under seal. But he could not explain why Mr Chatterji had not requested a board resolution from BCCI or why he had not

come back to Mr Samant on the point. He would have expected Mr Chatterji to have raised with him any variation in the instructions contained in the November 24 memo. He volunteered, however, that BOI would not have provided such a resolution itself, and I can understand why. It seems to me that it would be most unusual in the case of an inter-bank guarantee for this to be requested or done. In relation to the security document Mr Samant said that he would have expected Mr Chatterji to come back to him if he had any difficulties in getting the document. He does not remember if this occurred. It is clear from Mr Chatterji's letter to Lawrence Jones that he had held discussions with Mr Mewawalla, and this is likely to have resulted in the dropping of the requests for a board resolution and for the guarantee to be under seal. It seems to me also highly probable that the security document was also abandoned as a result of the same discussions. That seems to me much more likely than that Mr Chatterji simply forgot to raise it with the solicitors in his letter of November 26. This is confirmed by the fact that on November 27 Lawrence Jones wrote back to Mr Chatterji confirming that the documentation supplied was in order. Two paragraphs in the letter are important:

> '3. We agree with the Board Resolution as amended by you, assuming you are satisfied that Mr Khalil is a Director of the Company, and that you are satisfied that the Borrower Company remains properly constituted (we understand from our telephone conversation, that you are prepared to rely on BCCI on these points with which we concur).
>
> . . .
>
> 6. With reference to your penultimate paragraph, please refer to paragraph 6 of our letter of the 18th November, pointing out that the Bank of India will have no security from the Borrower Company, although you will of course have the guarantee of BCCI.'

47. It is clear from this that Mr Chatterji had spoken to Mr Mewawalla and had told Lawrence Jones that no further enquiries need be made about the capacity of Maram. Paragraph 6 is confirmation that no mention was made to the solicitors about a security document from the borrower. On the same day Mr Chatterji wrote to Mr Mewawalla, forwarding the approved drafts of the BCCI letter of guarantee and the letter of request and board resolution of Maram. No reference is made in this to any other document. The changes in the documentation expected by head office were not merely matters of administration which Mr Chatterji could be left to deal with on his own. It seems to me inconceivable that Mr Chatterji would not have come back to Mr Samant and informed him that Mr Mewawalla was unwilling to give the guarantee under seal or the resolution. The same goes for the security document. I do not believe that it was left out due to an oversight. The memorandum to Mr Chatterji of November 24 had been copied to head office to provide some assurance that the necessary precautions were being taken in relation to a transaction which had only been approved on the basis of the solicitors' advice about documents being followed. There is no evidence of anyone at head office being consulted about the changes agreed with Mr Mewawalla or even being informed about them.

48. Of those at head office at the time, I heard evidence from Mr Mitra and Mr Rao and also from Mr Vaghul. Mr Vaidya is now deceased and Mr Rege is unwell and has provided no evidence. There is a witness statement from Mr Shukla, which was admitted on the basis that he is overseas in India, but he also produced evidence that he is in poor health and unable at the moment to travel. This medical evidence was challenged by Mr Purle, but it is not possible to take the matter beyond the doctor's confirmation of Mr Shukla's condition. His evidence is therefore contested. There are a number of recurrent themes in this evidence. As I have indicated, all the BOI witnesses were keen to stress that although the BCCI deposits provided the funding for the loans, there were no liens nor any rights of set-off, and BOI therefore relied solely on the guarantee. This evidence was partly directed to rebutting a particular aspect of the liquidators' case, which is that the reality of the transactions was that the loans were made against the deposits and ought not therefore to have been shown or characterised as free

© 2004 Sweet and Maxwell Ltd

deposits by BCCI. This has echoes of a similar argument raised by the liquidators in the SBI litigation and it has a sequel in this case also, because in 1984 one of the general managers of BOI specifically queried why the bank did not enjoy a banker's right of set-off in relation to the BCCI deposits.

49. It is clear that BCCI was never willing to create a formal lien over its deposits. The experts were agreed that no bank creates charges over its assets, for obvious reasons of commercial credibility. But in this case the argument presented in terms to Lawrence Jones by Mr Samant was that any lien would have to be noted in the accounts and would therefore defeat BCCI's ability to treat its deposits as free placements. This in fact supports the view expressed by Mr Dyson and Mr Preece in the accountants' report they have prepared, that if under lien, the deposits would have to be set-off against the corresponding indebtedness. I shall come back to this point later in this judgment, but I mention it at this stage only to note that it is ultimately a side-issue. The real point to be made about these transactions (which none of BOI's then senior management was prepared to deal with in his evidence in terms) is that in substance, even if not in form, the transactions were circular. They all involved using BOI money to fund loans to Maram which would then be repaid with refinancing from BCCI. This is a bigger and more fundamental point than whether or not there was technically a lien or a right of set-off and therefore security from BCCI. The case against BOI is that the arrangements were, on the basis of what they knew, entirely artificial. They did not involve any real transactions with Maram at all, even though a legally enforceable loan came into existence. To use an analogy from a different branch of the law, the back-to-back transactions were all circular and preordained, and Mr Samant and BOI knew this.

50. I have already examined Mr Samant's explanation as to why, at the time of the first transaction, he believed that the purpose of the arrangements was legitimate and not fraudulent. But what of his superiors? Mr Mitra and Mr Rao put the proposal up for consideration by the executive director and chairman. Their evidence is that they saw no reason to reject it at that stage. Mr Mitra accepted that the bank was entirely dependant on BCCI's guarantee. He knew of no other case in which the borrower was to execute no documents. Nor was it obvious to him that the explanation was the improvement of BCCI's earnings to advances ratio. He said that he gave no real thought to what this meant and simply accepted it. He said that it was a window-dressing transaction. It was not something he was entirely happy about, but it was going on at the time on both sides. However, on the second day of his evidence he said that it was not window-dressing, but rather a deposit with a spread that was attractive to BOI. I regard this further evidence as unrealistic and an attempt to row back from his earlier concession that these were artificial transactions. But I am not persuaded that he had a complete picture of what was going on at the time or considered the implausibility of BCCI's explanation for the transaction. I accept his evidence that he really took what Mr Samant had told him at face value. When Mr Purle took him to BCCI's balance sheet and accounts, he readily conceded that it was not possible to extract a meaningful ratio from the information provided, but this was not an exercise he carried out at the time. As far as he was concerned, it was for others to make the enquiries.

51. Mr Rao also had difficulty about recalling the transactions without reference to the documents. His written evidence is therefore largely a process of reconstruction and says virtually nothing about the issues which have arisen. All that he does is to produce the documents. He does, however, say that back-to-back transactions were normal at the time, and he was asked about this. It emerged that what he was referring to were money-market transactions involving the exchange of deposits, which the experts agreed was a form of window-dressing at the time. Their evidence was that window-dressing did not involve (as in this case) a transaction with a customer. The only example of this known to Mr Wragg involved Japanese banks who did transfer customer loans. But these activities did not take place in London and were not therefore subject to the same regulatory control. Nor was there any suggestion on the part of BOI's witnesses that they were aware of these at the time of the

arrangements with BCCI or were influenced by them into thinking that what BCCI proposed was in any sense a normal commercial transaction. The only justification head office was offered was that provided by Mr Samant.

52. Mr Rao was asked by Mr Purle about the requirement of head office that the borrower should be approved. He said that this was for the London branch to carry out. He was also asked about the references to the transactions being intended to improve BCCI's earnings to advances ratio. He was unable to explain how this could be achieved, and I do not believe he gave any real thought to it at the time or formed any view about its plausibility. Like Mr Mitra, it was for others to do that. I accept his evidence on these points.

53. Mr Vaghul was also asked about his understanding of matters at the time of the first transaction. Like Mr Rao, he says in his witness statements that he has no independent recollection of the transactions and most of his evidence consists of reconstruction from the documents and assumptions by him as to what he is likely to have thought or done at the time. In his most recent witness statement he says that he would have accepted Mr Samant's explanation for the first transaction on the basis that it had been checked by senior managers at the bank. He had, he said, no reason to suppose that BCCI was fraudulently manipulating its accounts. He accepts that he gave approval for the first transaction under his delegated powers on November 19, 1981. His oral evidence was that it was likely that Mr Shukla would have been asked to talk to Mr Samant about the transaction prior to November 19 and that it would then have been discussed with him at board level. He has no recollection of such a discussion. He was, however, clear that head office did not accept that the borrower should execute no documents and wanted the borrower to be approved. He and the other senior executives accepted what Mr Samant told them about the borrower and assumed that if BCCI was to guarantee the loan, it was a substantial organisation. Mr Samant was left to work out the details. Of course that is not a real answer to the failure to make status enquiries of the borrower, because BCCI was not only to guarantee the loan, but also to finance its repayment. Its guarantee was therefore meaningless as a warranty of the creditworthiness of the borrower. As Mr Samant knew and Mr Vaghul should have realised, the loan would be repaid regardless of the quality of the borrower's covenant. Mr Vaghul accepted that he knew that the purpose of the transaction was to allow BCCI to take some loans off its balance sheet and to convert its liability into a contingent one under the guarantee. Unless the loan was non-performing, no provision would have to be made in the accounts for the liability, even if it was disclosed, and by the time that the accounts came to be certified the auditors would know that the loan had been repaid and the guarantee liability extinguished.

54. Mr Vaghul was pressed by Mr Purle about Mr Samant's explanation for the transaction. He accepted that a meaningful ratio of earnings to advances would need to be based on average figures, but maintained that at the time there was no set formula or method for calculating profit ratios. One possibility was a calculation from year end to year end. Ultimately, however, he and the others acted on what Mr Samant told them. On the basis of this explanation and the security offered, they were prepared to go ahead. I think that much of Mr Vaghul's attempt to rationalise BOI's thinking on this matter is in the nature of an *ex post facto* rationalisation of the decision to go ahead. What he did not address in his evidence was the obvious unease on the part of some officers, such as Mr Vaidya and perhaps Mr Shukla, about what was proposed. I do not accept that this was solely attributable to a longstanding complaint about BCCI poaching BOI staff. I think that there was a genuine concern about the motives behind the transaction and its obviously unorthodox nature. But I do not believe that Mr Vaghul necessarily thought at this time that the transaction was obviously wrong or in any sense dishonest. I think that despite some misgivings head office was prepared on balance to allow the transaction to go ahead on the basis of the conditions set out in Mr Rao's telex and on the footing that the transaction would not be repeated. The latter condition is, I think, significant. For the purpose of the first transaction, therefore, they were prepared to accept Mr Samant's explanation at face value, despite their doubts to the contrary.

© **2004 Sweet and Maxwell Ltd**

A 55. As already indicated, the first transaction was completed on December 2, 1981, by the placement of the £10 million with BOI in London, maturing on March 2, 1982. Mr Akbar signed the BCCI letter of guarantee on November 30, referring to its having 'introduced' Maram to BOI. The Maram letter of request (dated December 1) bears the signature of Mr Khalil, with a direction to remit the loan moneys to BCCI in Leadenhall Street 'for credit of our £ Account No 01024640' with them. The BOI cheque of December 2 is made out to this account and was signed by Mr Chatterji and Mr G B Sule, who worked in the Advances B Department as an accountant. On the same day Mr Rao was notified that completion had taken place. The terms of this telex refer to the BCCI deposit and to BOI's 'lending there against'. This was relied on by the liquidators as a recognition that the deposits were, or were regarded as, security for the loan to Maram despite the earlier emphasis on there being no lien. Other internal records are consistent with this. There is an account statement for BCCI Overseas in respect of the first deposit, on which Mr Sule has written 'under lien for loan'. When the loan C and the deposit became due for repayment, Mr Samant's secretary noted a telephone conversation with Mr Mewawalla in which he requested 'both amounts payable by us and by them'. The reference to 'them' is relied on as indicating that the repayment of the loan and the deposit were linked, but it is also some evidence that Mr Mewawalla had no difficulty in referring to BCCI as the effective source of repayment of the loan. Maram Trading was apparently not mentioned. Mr Samant requested the figures from Mr Sule and asked him to give them to Mr Chatterji, who would speak to Mr Mewawalla. There is no record of any D attempt by BOI to request payment of the loan from Maram or even to contact Maram directly in the Cayman Islands. The reversal of the entire transaction was handled in London between BOI and BCCI.

56. After repayment had taken place Mr Samant sent a memorandum to head office advising them that he had 'squared' the transaction between BOI, BCCI and Maram. The memo is headed 'Deposit of £10m loan from BCCI and lending there against'. This same E description reappears in both the second and the third transaction in BOI's own documentation. Mr Samant said that Mr Sule's note about a lien was a mistake (which it clearly was), but there is a more general point to be made in respect of this material. What it shows is that Mr Samant and others at BOI did clearly look at the deposits as a source of repayment, even if technically there was no lien or even a right of set-off. Although Lawrence Jones were concerned about the security for the loan, Mr Samant was well aware that in practice there was no risk (absent perhaps the total collapse of BCCI). These arrangements were put in place to assist BCCI in the F presentation of its financial position. Although a guarantee was given for the loan to Maram, it was inconceivable that BCCI (with or without a guarantee) would not ensure that the loan would be repaid. This had nothing to do with the regulatory consequences of failing to honour a guarantee in the City of London. It was simply that BCCI would not wish to renege on an arrangement of this kind, which was not in any real sense a commercial transaction, but rather a private arrangement designed to assist BCCI in a way which it would not wish to have publicly G scrutinised. As already explained, BCCI was, and was always regarded as, the only source of repayment for the Maram loan, and BOI's own documentation simply recognises this.

*(b) The second transaction*

57. The first document relating to the second transaction is Mr Samant's telex to Mr Rege of July 20, 1982. It refers to recent discussions he had had with BCCI and to a proposal from H BCCI for a deposit of £30 million for four months at 12 per cent per annum, with a corresponding loan to 'the borrower nominated by them' at 12+1/8 per cent. The telex goes on:

> 'There will be a letter of request from the borrower (off-shore company), board resolution etc. The advance will be guaranteed by BCCI. We will ensure that deposit and advance will be for matching period. The entire documentation will be finalised by our solicitors.

You are aware that last year, Head Office had kindly approved such a deal at my request for pounds ten million. I would recommend pounds thirty million this year because:

(1) The amount will be "pure" deposits

(2) We get 1/8% interest differential without any outlay of funds.

BCCI is a big, aggressive institution with 45 branches in UK. BCCI is doing this deal obviously to show a good ratio of earnings against their advances. Recommended.'

In response to this Mr Rege and Mr Mitra prepared a memorandum for the board, which contains the figures extracted from BCCI's balance sheet and accounts for 1981. In para.6 of that memorandum they said this:

> 'The BCCI proposal now under consideration will result, without any outlay of funds on our part, in an income of about £12,500 (Rs. 2 lacs app.). Having regard to the attractive return and risk-free nature of the proposition, we recommend that BCCI offer be accepted.'

58. The memorandum is dated August 2, but looks to have been circulated to the board on August 9. It contains a summary of BCCI's 1981 results, which Mr Samant had also telexed and air-mailed to head office on August 3. The profit before taxation figure of US$124.7 million is taken from the Consolidated Statement of Earnings in the annual report of BCCI Holdings. It is this document which Mr Purle put to Mr Samant (see para.38 above) and which, under the heading 'Operating Results', states that:

> 'This profit expressed as a return on average shareholders' equity for the year was 20 per cent, while pre-tax profits produced a return of 2.06% on Average Assets for the year.'

59. The board of BOI met on August 9 and approved the proposal for the loan and matching deposit over the 1982 year end on the terms set out in the memorandum of August 2. Prior to the board meeting Mr Shukla and Mr Vaghul had discussed and agreed to the transaction, but, as already mentioned, Mr Shukla had initially expressed doubts and had told Mr Rege that the board would require to know the real reason for the transaction. This occurred on August 2. Mr Rege then contacted Mr Samant and on the same day he telexed back what he described as the 'salient features' of the accounts. As I have already indicated, I am not persuaded that Mr Samant did not look at the BCCI annual report or that he failed to notice that the explanation given by Mr Mewawalla was inconsistent with the material available in that document. I say this because what prompted his sending the accounts material to head office was clearly the query raised by Mr Shukla. Mr Samant says that he did not discuss the matter directly with Mr Shukla and there is certainly no evidence that he did so. But it seems to me highly probable, and I find, that Mr Rege did raise the point with Mr Samant in their telephone conversation on August 3. This was, after all, the purpose of Mr Rege's call. Head office already had the details of the transaction from Mr Samant's earlier telex and from Mr Rao's memorandum. Mr Samant said that he had no recollection of this. He said that the only explanation for the transaction was the one he had already given to head office. But it was of course this explanation which Mr Shukla had not accepted as real, presumably on the basis of his own consideration of BCCI's year-end figures and the minimal impact which a transfer of even £30 million worth of debt would have on the balance sheet figure for total advances of US$3.133 billion. I consider that Mr Samant certainly did discuss this matter with Mr Rege on the telephone and that, faced with Mr Shukla's query, he was almost certain to have, and did, look at the annual report with those points in mind.

60. There is no other documentation to explain what happened at the board meeting or in any prior discussions involving Mr Shukla. The board resolution of August 9 makes no mention of this matter, but simply approves the transaction on the basis of the information previously supplied by Mr Samant. During the trial Mr Hirst produced a witness statement

© 2004 Sweet and Maxwell Ltd

A from Mr Shukla, made on November 24, 2003, and sought permission to adduce it in evidence. I allowed it in, subject to reserving my decision on what weight, if any, to give to it. It was accompanied by the medical evidence to which I have already referred, stating that Mr Shukla (who is now 76) suffers from hypertension and has been advised not to travel. A suggestion that he should give evidence by video link was also rejected. In his witness statement he denies any dishonesty on his own part. He says that it is extremely difficult to recollect what happened, but that he may be able to reconstruct events from the documents. In para.8 of the statement he B refers to Mr Samant's explanation for the transaction (*i.e.* the improvement of the earnings to advances ratio) and says that he cannot recall his understanding of it at the time. He says that he now thinks that it means a transfer of assets from BCCI's books which would reduce the outstanding at the year end, giving a better interest spread against advances. This is the same explanation as Mr Samant gave in his witness statement. He disagrees with the suggestion that the explanation was either implausible or dishonest.

C 61. In relation specifically to the second transaction and the memorandum of August 2, Mr Shukla says that he cannot now recall why he wrote the reference to the board needing to know the real reason. But he says that the fact that the note is crossed through means that he had obtained a satisfactory answer from Mr Rege. He does not remember what it was. There is therefore no evidence from Mr Shukla of any positive recollection that the point was in fact answered at all, although it is clear from the documents that it was raised. I regard his statement that Mr Samant's explanation was neither implausible nor dishonest as little more than an D assertion and it is inconsistent with the fact that at the relevant time Mr Shukla was far from satisfied that the explanation was either plausible or correct. Mr Vaghul, when asked about this on day 12 of the trial, accepted that the removal of even £30 million worth of loans from the balance sheet would not have any serious impact on the apparent earnings from a loan book of US$3.133 billion. But that was not, he said, the central point in the decision-making process:

> '. . . The central point in our decision-making process was not the reason why BCCI was E doing this transaction, but the proposal essentially consisted of two sets. One is a loan to be given to a borrower to be guaranteed by BCCI with funds being provided by BCCI, for a matching period, to Bank of India. That proposal was standing on its own merits, regardless of the reasons advanced by the BCCI for doing this transaction. I would submit that on a hypothetical basis, if a proposal had come from Mr Samant making a proposition that: I have received a proposal to this effect, namely BCCI wants us to lend F the money to a borrower to be introduced by them, for which they are willing to provide a guarantee and for which they are also willing to fund us for a matching period with an interest differential, we would still have approved of the transaction.
>
> The question of what were the objectives of the BCCI in doing this transaction to my mind are incidental to the transaction and not the central issue in our decision-making process.
>
> G Q. But if you were given no reason you would want to know why on earth is BCCI doing this, would you not, to satisfy yourself that you were not getting involved in anything improper?
>
> A. Certainly, sir, we would have, and that satisfaction was provided when Mr Samant had given this explanation, which on a prima facie basis seemed to make sense to us.'

A little later in his evidence, however, he said this:

> H '. . . When this reasoning was given we applied a simple arithmetic, namely this is what – I must at this stage say, sir, when we looked at that statement in 1981, we looked at that statement on the basis of a set of knowledge and beliefs which we had at that particular time, compared to the set of knowledge and beliefs which we have today. Today our knowledge and beliefs is based on the fact that BCCI committed one of the most massive frauds in the banking industry. It was hiding certain transactions from their auditors, it was not entirely truthful in whatever they were saying and some of its executives were

> also guilty of fraud. But in 1981, when we did the transaction, we operated on a set of knowledge and beliefs based on the fact that BCCI was a very respectable and responsible bank, based in London, which was considered to be the Mecca of the financial centre of the world, and secondly, it consisted of very competent professionals, some of whom were drawn from the Subcontinent and whom many of my colleagues knew to be very competent. And thirdly, when they make a statement there is no reason for us to believe that a respectable bank managed by responsible officials would like to make a statement which is neither truthful nor factually correct and we, looking at it from the head office, there was no reason for us to subject the statement to such intense scrutiny as is being done today on the basis of knowledge which was gained through a period of two decades.'

62. He was also asked about the discussions prior to the board resolution of August 9. He accepted that Mr Shukla must have had doubts about Mr Samant's explanation and he thought it likely that he had a discussion with Mr Shukla and Mr Rege about it. He could not recall the details of the discussion, but he denied that he would have allowed matters to proceed if there were doubts which could not be resolved. The explanation, if any, given to Mr Shukla therefore remains a mystery. What, however, is clear is that Mr Samant's justification for the transaction was not initially accepted, even though approval was subsequently given. I shall deal later with the allegation made by the liquidators that this indicates that both Mr Shukla and Mr Vaghul were dishonest, because they must have realised that what they were being told by BCCI was untrue, but nonetheless decided to go ahead.

63. When on August 12 Mr Samant learned that the transaction had been approved by BOI, he sent a telex to Mr Mewawalla, who was then in Bombay. It read as follows:

> 'Dear Homi
>
> Reference our … discussion, my bank agreeable up to pounds 30 million (sterling pounds thirty million). Please keep your London office informed.
>
> I read in the press that you are painting the town red. How is Roshan? Our gang misses you both.'

Mr Mewawalla replied:

> 'Many thanks yr tlx 12th Aug. Happy to know that you hv lined up arrangements as discussed. Shall conclude deal in 2nd week of Sept upon my return to Ldn.
>
> Heartiest congratulations on your promotion as DGM.'

I have referred to these simply to note the closeness and familiarity which existed between the two men at the time. Mr Samant then proceeded to contact Lawrence Jones. He wrote to them on September 14, referring to BOI's intention to carry out an 'exactly similar transaction' with BCCI and asking them to check the documents used on the previous occasion. The intention was to complete the transaction in about a week's time. By now Maram had been identified as the borrower. The letter of request and board resolution were prepared in the same form as before by Lawrence Jones and a complete set of the documents was sent by courier to Mr Mewawalla at BCCI. As in the case of the first transaction, he was the only person with whom BOI communicated. There was no direct contact at all with the borrower. The amount of the deposit and the loan changed, however, to £25 million. There is no explanation for this in the papers and it was not referred back to head office. Completion took place on September 22 and both the loan and the deposit were repayable on January 22, 1983.

64. Mr Samant said that he did not know why the figure was reduced from £30 million to £25 million. He was also asked about another curiosity. In BOI's records there is a credit advice prepared and signed by Mr Sule which records a deposit of £25 million from Maram Trading. This is then shown as debited with a loan in the same amount, also to Maram. Mr Samant said that this was a mistake by Mr Sule and I accept that.

© **2004 Sweet and Maxwell Ltd**

*(c) The third transaction*

65. On October 7, 1983, Mr Samant notified head office that he had received a proposal from BCCI for a deposit and matching loan of US$60 million for a period of three to six months. The telex is in essentially the same form as the one sent to Mr Rege on July 20, 1982, including the reference to the 'obvious' reason for the transaction. At the time £25 million equated to about US$43 million. A loan of US$60 million was therefore a significant increase on the previous year. Mr Samant said in evidence that he was still meeting Mr Mewawalla regularly at this time. Maram was likely to be the borrower, but Mr Mewawalla asked him (as on previous occasions) to obtain what Mr Samant described as an omnibus sanction for the loan: *i.e.* one which was not limited to an identified borrower. It would then be possible to change the proposed borrower without needing to obtain further approval from head office. I accept that this was the basis on which Mr Mewawalla and Mr Samant sought sanction for the transactions, but it is a yet further indication of how unrelated lending was to the borrower which BCCI eventually nominated.

66. The other point which was put to Mr Samant in relation to the third transaction was that he was aware by now that the loans to Maram were increasing with every year. This of course continued to be the case. The fourth transaction was for US$75 million and the fifth and sixth transactions were for $50 million, although Mr Samant had sought head office sanction for $100 million and had been given sanction for $75 million. He was asked whether this suggested the existence of a problem with the Maram debt. His answer was that this never struck him or anyone at head office at all, because BCCI was considered to be one of the premier banks. Although it is not possible to find, on the evidence before me, that BCCI had a dubious reputation in the City, it was clearly not in any sense a premier bank. Mr Wragg said that he would not have done business with BCCI at the time. I regard the repeated assertions of Mr Samant on this point as no more than an attempt to raise the reputation and standing of BCCI to a level which it did not enjoy at the time. I reject the suggestion that Mr Samant and BOI thought that they were dealing with an institution which had such a high reputation that no question about the appropriateness of its dealings need ever be asked. It is also clear that Mr Shukla, at least, was not prepared to take BCCI's explanation of the transaction in question at face value. It seems to me that any honest and competent banker would not fail to note the rising amount of debt in each successive year. If the real reason for the transactions was to lift this debt off BCCI's books, it must have been obvious to Mr Samant by the time of the third transaction (and probably by the time of the second) that Maram's indebtedness to BCCI was increasing. There is no suggestion that he asked for an explanation of this or was told that it was due to Maram's increased trading activities being financed at a higher level by BCCI. Mr Samant would have realised that there was a high degree of probability that the loans were not performing and that Maram's financial position had significantly worsened since the last transaction. The fact that none of these enquiries or concerns were raised, either with Mr Mewawalla or more particularly with head office, is, I think, some of the clearest evidence that the 'obvious' explanation for the transactions was not regarded by Mr Samant as either real or relevant. It seems to me much more likely that Mr Samant realised or was told that Maram simply provided BCCI with a means of receiving back its own money to assist it in reorganising its year-end results. This is, I think, confirmed by the way in which Mr Samant answered Mr Purle's questions on this subject. Faced with the suggestion that an ever-increasing amount of debt did not give the appearance of a performing loan, Mr Samant (on day 6 of the trial) gave this explanation:

> 'Q. That does not look like a performing loan?
>
> A. Why not? From the best of accounts at the end of the year, in fact it would be their very good account that they will try to take it out of the balance sheet because they would be confident at the end of the year that money will be given back to them because he is a good customer.'

That answer was of course in complete contradiction to Mr Samant's earlier evidence that he knew, even in relation to the first transaction, that Maram had no means of repaying the loans except with the benefit of re-finance from BCCI.

67. The transaction was sanctioned by Mr Shukla and Mr Rege as early as October 8. A typed note by Mr Mitra on the head office copy of Mr Samant's telex refers to Mr Vaghul's approval of the two previous transactions and the attractive returns provided by a risk-free proposition. The matter would be reported to the board of BOI for confirmation in due course. Mr Vaghul was on leave at this time and was about to leave the bank. He was not involved in the decision to approve this transaction. When the matter was considered by the board on October 26, Mr Shukla chaired the meeting. The board was asked to consider a memorandum from Mr Mitra which summarises the terms of the transaction and refers to the earlier approvals. It also contains what are described as the highlights of BCCI's operating results during 1981 and 1982. Paragraph 6 of the memorandum states:

> 'The BCCI proposal will result, without any outlay of funds on our part, in an income of about US$18,750– to US$37,500– (Rs. 1.87 to 3.75 lacs approximately) depending on the maturity date of the deposit/advance. Having regard to the attractive return and risk-free nature of the proposition and since BCCI wanted our consent to this transaction before 11th October, 1983 this was approved by the Executive Director on 9.10.1983. We now seek the Board's confirmation therefor.'

Mr Shukla in his witness statement of November 24, 2003, also refers to this board meeting, but has no recollection of it. In para.15 of the statement he then sets out some comments on the earnings to advances ratio and says that he did not consider this to be an irrelevant quotient at the time. He disagrees with the liquidators' case that no useful analysis of the ratio could be carried out except by reference to an average over the year, by saying that:

> 'The motivation for mobilisation of deposit is spread by giving advances. When the earnings ratio against advances improves it gives a better spread and thereby a better position.'

I find this difficult to follow, but I also do not accept that this is other than an attempt to rationalise the decision taken at the time. As Mr Shukla cannot recall how his doubts about the ratio explanation were resolved in relation to the second transaction, I do not see how he can claim to be better placed in relation to his recollection of the third. I attach no weight to this evidence.

68. On October 12 Lawrence Jones were contacted by the new manager of the London branch, Mr Raina. They were not asked for general advice and were told that there was to be an 'exactly similar transaction' with BCCI, except as to amount. They were asked to check the draft documentation, which on this occasion BOI had prepared itself, based on the documents previously used. The enclosures did not reach Lawrence Jones until October 14. Later that day Lawrence Jones telexed back their response to BOI. They again recommended that BCCI's guarantee should be covered by a board resolution, but Mr Raina rejected this as unnecessary. Lawrence Jones also stated that BOI should be satisfied about the authority of the persons who would sign on behalf of BCCI and Maram, but again Mr Raina has written on the telex that this was the responsibility of BCCI, who would have the signatures on record. Mr Samant endorsed this approach. The documents signed by the borrower and BCCI took the same form as those used for the earlier transactions, and Mr Raina in his witness statement accurately refers to it as the standard documentation. Mr Raina was also involved in drafting Mr Samant's telex of October 7. He was asked about the reference in it to the improvement of BCCI's earnings to advances ratio. Mr Purle asked him why it was the 'obvious' reason for the transaction. He said that he relied on what Mr Samant had said, but on further cross-examination he said that Mr Samant had not explained the matter to him and no detail was gone into. It became clear, as his evidence proceeded, that Mr Raina neither understood what the explanation for the transaction really was nor how it was supposed to work. I do not in fact believe that there was

© 2004 Sweet and Maxwell Ltd

any real discussion at all between Mr Samant and Mr Raina on this point. Like Mr Chatterji before him, Mr Raina was only really concerned to implement the transaction which Mr Samant had negotiated with Mr Mewawalla. It seems clear to me that he had no input into the thinking behind it and based the October 7 telex, almost word for word, on the documents used for the second transaction.

69. One novel feature, however, of the third transaction was that it was to take place in two parts or tranches, as they were referred to, of US$30 million each. The first reference to this is in the letter to Lawrence Jones of October 12, although it was not referred to in the memorandum prepared for the board meeting, and the Maram resolution and loan request referred to a single loan of $60 million. However, in a letter from Mr Mewawalla to Mr Raina of October 27 reference is made to BOI's agreement to dispersing (sic) the loan not in two but in three tranches, on November 1, 3 and 7. Mr Raina was asked about this. He said he could not recall why BCCI wanted things done this way, but because they did want it, BOI released the loan in three tranches of $20 million each. Mr Samant said much the same thing. It seems to me highly likely that BCCI wished to arrange the drawdown of the loan over three days simply to make it less prominent, but the evidence of Mr Samant and Mr Raina on this is further confirmation of the willingness of Mr Samant to accommodate whatever Mr Mewawalla required.

70. The US$60 million was disbursed in three equal tranches on November 1, 3 and 7. There then followed some correspondence from BOI to Mr Mewawalla, which is relied upon by the liquidators as further evidence of BOI's alleged willingness to accommodate BCCI's desire to conceal the link between the deposits and the loans. On November 8 Mr Raina sent to Mr Mewawalla a letter relating to the $60 million loan to Maram, which set out the dates of release of the three tranches and, underneath that, the details of the three corresponding deposits. We also have copies of another letter of the same date, addressed to Mr Mewawalla, which refers to the three tranches of the loan, but contains no details of, or reference to, the matching deposits. The letters were to be sent by Mr Raina, but were prepared by Mr Dighe, who worked in the Manager's Department. His evidence was somewhat confused. He said that he thought both letters were sent, but was not sure. In his witness statement he says that the shorter letter was composed first, but in cross-examination he said that he had no actual recollection of that. He then said that both letters had been prepared at more or less the same time. He was then shown a further letter of November 9, also to Mr Mewawalla, which contains details of the three deposits. He said that that was prepared a day later and, he thought, was sent. When Mr Purle asked him why it was necessary to divide up the longer of the letters of November 8 into two parts, he could give no reason. Mr Raina's evidence was that he does not know which of the letters was sent, but cannot think of a reason to send both types of letter. The most likely sequence of events, and the one I am satisfied did occur, was that the longer letter was drafted first, but, when sent to BCCI, was rejected by Mr Mewawalla because it did forge a link between the loans and the deposits. This is, I think, further evidence that Mr Mewawalla was a knowing party to BCCI's fraud. He then contacted BOI and arranged for the contents of the letter to be split. Separate letters were then sent, covering the loans and the deposits. Mr Samant said that he did not think it made any difference at all which of the various letters was sent, but it clearly did matter to BCCI.

*(d) The fourth transaction*

71. This began with a handwritten memorandum from Mr Samant to Mr Raina dated June 21, 1984, in which Mr Samant says that Mr Mewawalla has telephoned to say that BCCI would be interested in 'their usual deal' for US$60 million from August 15 to November 15, 1984, and again from December 15, 1984 to February 15, 1985. Mr Raina was asked to submit a memorandum to head office for approval. Mr Samant suggested that approval be sought for a sum of $75 million and that:

'We do it in small lots every fortnight say $20m or so – this you could discuss with Mr Mewawalla at the appropriate time.'

There is a signed note in manuscript by Mr Raina referring to two options: a loan and deposit from mid-August 1984 to mid-February 1985 or two periods with a break.

72. The terms of the proposal sent to head office were first set out in a draft memorandum from Mr Raina dated July 5. It contemplates a deposit and matching loan for a period of three to six months with the usual turn of 1/8 per cent. Someone has altered this in manuscript to 1/16 per cent and the memorandum was sent to head office on July 26 with this change. In para.5 of the memorandum it is stated:

'The loan may be disbursed in 3 or 4 tranches. But it will be ensured that the maturity date of deposit and due date of loan match, so that deposit is not repaid before loan is due and we do not need to borrow funds in the market. Further the loan will be paid on due date only.'

Paragraph 7(ii) states:

'BCCI is a vast organisation with a large network in U.K. and it wishes to enter into these deals to show a good ratio of earnings against its advances.'

73. Head office queried the reduction in the differential rate of interest on the loan to 1/16 per cent and BCCI agreed to restore the 1/8 per cent figure. By now it was August 2. Mr Mitra then prepared a memorandum for the board of BOI dated August 3 in similar form to the ones relating to the second and third transactions. Approval was sought for a deposit and advance for a matching period of three to six months. The board was told (as on previous occasions) that the purpose was for BCCI to show a good ratio of earnings against its advances, and reference is made to similar transactions in previous years. On August 9 the board gave its approval and Mr Samant was able to telex Mr Mewawalla on that day, telling him that 'our deal cleared as discussed'. On August 10 Mr Samant received a telex from head office confirming that approval had been given, but emphasising that 'the borrower must be acceptable to you'. There is no suggestion that this led to any further checks in respect of Maram. The telex also requested details of the borrower in the last three transactions 'when established'. Mr Raina asked Mr Dighe to respond to this enquiry and the information was sent that day. At the same time Lawrence Jones were instructed to check the documents for this 'exactly similar transaction' which, as on the last occasion, had been prepared at the London branch, based on previous drafts.

74. On August 22 Mr Mitra submitted to the board of BOI a report on what are described as the legal aspects of the proposed fourth transaction. This report had apparently been requested at the time of the August 9 meeting. The report refers to the role of the solicitors in each transaction and to the fact that before the first transaction in 1981 the solicitors had advised that BOI should obtain a certified copy of a board resolution from Maram and that, apart from BCCI's guarantee, the bank would have no security in relation to the deposit. No mention is made in this memorandum of the failure of the London branch to press for a security document from Maram itself or to obtain a board resolution from BCCI. The report concludes with this paragraph:

'As regards the security of repayment, the Chief Manager, UK & European Branches had advised in 1981 that no bank or licensed deposit taking institution in the U.K. could afford to go back on its commitment in the eyes of the Bank of England. For all the past 3 deals BCCI's nominee borrower has been a Grand Cayman Company called Maram Trading Co. Ltd. and in each case the deposit and the corresponding advance were repaid on the common due date.'

75. At this stage Mr H N Vesuvalla, BOI's General Manager (Law), became involved. He had been at the board meeting on August 9 and there is a note in his handwriting requesting the

© 2004 Sweet and Maxwell Ltd

London branch to supply him with copies of the earlier advice received from Lawrence Jones which were referred to in the report of August 22. On September 8 he wrote to Mr Samant querying Lawrence Jones' advice that BOI would have no right of set-off against the deposits in respect of BCCI's liability under its guarantee. He asked for the matter to be reconsidered. Mr Samant responded on September 27. He had been away in Bombay, but on his return to London on September 22 he asked Mr Raina to refer the matter back to Lawrence Jones. In his reply to Mr Vesuvalla he said this:

> 'I could not agree with your views more. BCCI is not prepared to give a letter of set-off because they will not be able to show the amount as a "free" lending to another bank. Hence the deposit is backed by a letter of guarantee. I would entirely agree with you that our Bank would be entitled to set off against the liability of BCCI under its guarantee against the deposit payable by us to BCCI.
>
> I would certainly make a reference to our Solicitors once again. But I would rather go by your considered opinion than by our Solicitors' opinion in U.K.'

76. Mr Raina referred the matter back to Lawrence Jones on October 2. They replied the following day. They agree that the existence of the guarantee would provide the basis of a right of set-off, but made the practical point that it would be incapable of being exercised if the deposits became due and were repaid before the date for repayment of the loan. It would therefore be necessary to ensure that the deposits became repayable on a date after the date on which the loans themselves fell to be repaid. Mr Vesuvalla's belief that a right of set-off existed, and Mr Samant's agreement with him, runs contrary, of course, to Mr Samant's insistence during his evidence that BOI had no security over the deposits. He was asked about this in cross-examination and said that he agreed with Mr Vesuvalla out of deference to him. In his witness statement he also says that the letter of September 8 from Mr Vesuvalla was a private and confidential letter written to him on an informal basis. It is quite clear to me that it was nothing of the sort. Mr Vesuvalla had almost certainly raised a query about this point at the board meeting and the board had directed it to be looked into. It was not (as Mr Samant suggested) a private enquiry, made only out of academic interest. This episode seems to me to be an instance of head office expressing natural concern about their rights in relation to the deposits. Mr Samant readily accepted Mr Vesuvalla's point when it was put to him at the time, and his subsequent insistence in these proceedings that no such rights had existed and that he was simply agreeing out of respect is wholly disingenuous.

77. By early September the London branch had been informed by BCCI that instead of a single loan and deposit extending into 1985, there were to be two loans: the first of September 18 to October 18, 1984, and the second from December 18, 1984, to January 18, 1985. This was confirmed in a letter from Maram dated September 10, 1984, purportedly signed by Mr Khalil, which begins with the words 'As per our telephone conversation'. Neither Mr Raina nor Mr Samant ever spoke to Mr Khalil or to anyone else at Maram and the terms of the letter were, to their knowledge, a fiction. But more important is the fact that, not being spread over BCCI's year end, the justification of improving the earnings to advances ratio, which was referred to as the reason for the transaction in Mr Raina's inter-office memorandum of July 26 and the memorandum before the board of August 3, could not possibly apply. We know that the reason for having the fourth transaction in place in September and October 1984 was to cover the initial audit confirmation period. Mr Samant said that he was not aware of that, but when asked how the fourth transaction could achieve the purpose stated in the memorandum, he accepted that it could not:

> 'Q. And the usual deal, according to what you said in your evidence before, was calculated on BCCI's part to improve its assets to advances, its earnings to advances ratio?
>
> A. Yes.

Q. The first deal would not do that? A

A. It would not, but the second deal would do and they were prepared to do both the deals, so I presume that if only the first deal is done, they would not have done the second deal in any case, because that is how –

Q. Why do you refer to the first deal as being part of the usual deal; it is not, is it?

A. It is not usual in the sense that is how he mentioned. It only means that: this is the kind of deal, the way that you did it all along, that we will give you a deposit and you give an B advance to our customer. I am not so precise in this handwritten note on the basis of what he mentioned to me. It is not verbatim mentioned, because these are only the points which are mentioned.'

A little later this exchange occurred:

'Q. Did you discuss with Mr Mewawalla the purpose of this transaction?

A. No, I did not, because as far as I was concerned, my purpose was to have the deposit C and his purpose, he had already mentioned that: it will improve my ratio.

Q. What on earth was the purpose of having it two periods, one from August to November and then from December to February?

A. He is straightaway putting the two proposals together, so my purpose is sufficiently served by the second.

Q. Is that really it, Mr Samant, that you thought the second proposal squared with what D had been done previously, so, therefore, you did not have to ask any questions about the first?

A. Yes, there was no reason for me to ask, because as far as Mewawalla was concerned, now, I was sure he was an extremely honest man and BCCI, we never thought would do anything which was not honest and correct.

Q. You have said that on several occasions, Mr Samant, but I suggest to you that you, E certainly by this stage and I would suggest from a very early stage, appreciated that this was a dishonest transaction that BCCI was indulging in.

A. I did not know, nor did anyone from head office, who were always in sort of absolutely in knowledge of most of the banks that they dealt with.'

78. Mr Raina says in his witness statement that the memorandum to head office sent in July would have been approved by Mr Samant. Mr Samant in his own supplementary witness F statement refers to the memorandum of July 26 as describing the transaction in much the same way as previous transactions and repeats by reference his earlier comments on the objective of improving BCCI's earnings to advances ratio. I am afraid that I do not accept or believe the evidence given by Mr Samant in cross-examination. I regard it as no more than an attempt by him to provide an explanation for the fourth transaction once Mr Purle had pointed out the obvious inconsistency between the timing of the transaction and the explanation offered in the memorandum of July 26. That point was, in my judgment, as obvious to Mr Samant then as it is G now and it indicates a willingness to accommodate BCCI without any regard to the supposed justification for the transactions, and indeed in the knowledge that the explanation originally offered could not apply.

*(e) The fifth transaction*

79. This was intended (and was referred to in Mr Samant's note of June 21) as the second H part of BCCI's 'usual deal' involving a deposit and matching loan of US$60 million. As already indicated, the first part of the transaction (the fourth transaction) was implemented on September 18, 1984, and repayment occurred on October 18. In Maram's letter of September 19, 1984, the request was made for a loan of US$75 million for the periods from September 18 to October 18, and from December 18 to January 22, 1985. In the event, however, the fifth transaction took the form of an exchange of deposits in the sum of $50 million between BOI

© 2004 Sweet and Maxwell Ltd

and BCCI, notwithstanding the loan request of September 10 and a Maram board resolution of the same date, referring to the request for the two loans. As mentioned earlier in this judgment, the transfer of funds to BOI on December 18 was recorded in BCCI's books as an inter-bank placement at a rate of 9 per cent. This sum was then lent back to BCCI at the same rate of interest.

80. There is no internal BOI documentation which explains why the fifth transaction took this form and why the 'usual' arrangements of a loan and matching deposit were not repeated. In his witness statement of January 26, 1998, Mr Samant says that he has no recollection of the fifth transaction and provides no explanation for what was done. But he says this:

> '[It] would have been carried out for the same purpose, namely, to increase BOI's deposits for balance sheet purposes. What BCCI did with BOI's deposit of US$50m was not something that BOI could enquire about.'

This of course misses the point. The real question which arises from the fifth transaction concerns BCCI's purpose in carrying it out. Just as the fourth transaction (not being over the year end) could not have improved BCCI's earnings to advances ratio, neither could the fifth transaction. On the face of it no debt was transferred. All that BCCI had to show from the transaction was a loan to BOI. In cross-examination Mr Samant repeated that he had no real recollection of the transaction, although he accepted that he would have been aware at the time of the reasons why things were done in this way. He said he had been away from August 10 until September 27, but as of September 10 Maram had written requesting a loan in December. Both he and Mr Raina suggested that the absence of a loan was probably due to the borrower not wanting a further advance. But this is nonsense. None of the transactions involving Maram were motivated by any desire on the part of the borrower for a loan. It was the essence of the scheme, as put forward by BCCI, that Maram had an existing loan which was to be transferred temporarily over the year end. Mr Samant (as he accepted) was well aware of this at the time.

81. Mr Samant was also asked how the fifth transaction squared with the objective of improving BCCI's earnings to advances ratio. He said that he assumed that BCCI (like BOI) wanted to improve its deposits. He accepted, however, that he had not sought board approval for an exchange of deposits in the sum of $50 million. He regarded what was done as a simple money market transaction for which no further approval was necessary.

82. I find Mr Samant's explanation for this transaction unconvincing. For the reasons already given, I regard his suggestion that there was no loan because Maram did not want one as no more than an attempt to find some justification for the transaction, however implausible. I do not believe that Mr Samant thought that this was the real reason. At this point in his evidence he was clutching at straws. The past history of these transactions indicates that any significant change in the structure of the dealings would have involved discussion between Mr Mewawalla and Mr Samant, and this would have been no exception. The real reason for the change is difficult to ascertain. The necessary Maram documentation was already largely in place. One possibility is that by now those at BOI who were dealing with the transactions simply abandoned any pretence that the advances they were making were payments to Maram rather than to BCCI. This was put to Mr Samant, but denied. The importance, however, of the fifth transaction is that those at the London branch felt able to jettison the arrangements, as put to and authorised by the board of BOI, and simply to lend the $50 million deposit money back to BCCI. No explanation appears from the documents to have been sought from Maram or BCCI as to why no debt was to be transferred.

83. Mr Samant's explanation that this became a straightforward money market transaction is also inaccurate. As with all the other transactions, BOI utilised the BCCI deposit money in order to make the loan. This was no exception. The $50 million deposit with BCCI was made with the foreign currency which it supplied. The money was simply lent back. On no view was this an ordinary money market transaction and neither banking expert was prepared to treat it as such. The evidence is that banks did in the earlier 1980s conduct window-dressing transactions

in the form of short-term deposits and loans from the money market. But these transactions did not involve exchanges of matching deposits between the same parties. Mr Wragg said that the A fifth transaction was not really what he would describe as a form of window-dressing. Most window-dressing designed to improve a bank's liquidity was genuine and economic. It involved deciding what to do with available assets at a year end. Deposits obtained on the money market would usually be placed with another bank and differentials in the interest rates payable on the amount deposited and the amount borrowed could be mitigated by a process of 'mismatching': *i.e.* placing the deposit for longer than the period for which the deposit was B taken. BOI could not do this because it never had the necessary resources. It was dependent on using the BCCI deposits. It could therefore only ever lend back to BCCI, or to a nominee of BCCI, on terms which would secure for it a positive return over the same period. The transactions were entirely circular and the fifth transaction is perhaps the most obvious example of this.

C

*The Bank of England interview*

84. On January 31, 1985, Mr Samant and Mr Raina were called to a meeting at the Bank of England with Mr Atkinson. There is a detailed note of this meeting, taken by the Bank of England, which Mr Samant accepts as accurate. The meeting was called to discuss fluctuations in the balance sheet of BOI and what is described as 'the reciprocal transaction with BCCI'. The note records:

> 'Samant admitted that these transactions were "window dressing", and that they had had D such an arrangement with BCCI for the past three years (at HO's instigation, naturally!). JBCA warned B of I that such transactions were neither attractive nor acceptable, saying that whilst many banks indulged in window dressing, there were limits. He told Samant to warn Bombay not to indulge in such practices through London.'

85. Mr Samant said in evidence that the description of 'window dressing' came from Mr Atkinson, but he accepted it. It was put to him that the reciprocal transaction with BCCI E referred to in the note must have been the December 1984 exchange of deposits (the fifth transaction) and that the reference to BOI having had 'such an arrangement' with BCCI for the past three years indicated that Mr Samant had told them that the earlier transactions took the same form. Mr Samant denied this. He said that he explained to Mr Atkinson how BCCI provided a deposit and BOI granted a loan to one of their borrowers with the benefit of a BCCI guarantee. When it was put to him that there was no record in the note of any mention of Maram in the previous three years of transactions referred to, he said that he did not necessarily F mention Maram by name, but did explain that the transactions involved a nominated borrower.

86. I am not satisfied by this account of the meeting and I do not believe it. The note kept of the January 31 meeting is extremely detailed and indicates a high level of dissatisfaction with a number of aspects of BOI's lending. It seems to me most unlikely that, had Mr Samant in fact explained to Mr Atkinson how the earlier transactions had been structured, this would not have been recorded. The language of the note strongly suggests that Mr Atkinson was led to believe G that the earlier transactions with BCCI consisted of mutual exchanges of deposits. It is, I think, significant that Mr Samant did not suggest in evidence that he told Mr Atkinson that the earlier arrangements involved taking an existing loan off BCCI's books or that he told Mr Atkinson the ostensible reason for doing this. I think that the disclosure of those facts would not have gone unrecorded. Mr Raina said that he did not remember Maram being mentioned at all at the meeting. What I believe Mr Samant did was to considerably understate the arrangements between BOI and BCCI and to avoid any mention of the involvement of Maram or the transfer H of debt. Some corroboration for this can be found in the fact that he told the Bank of England that the transactions with BCCI were entered into at head office's instigation. This statement was, to Mr Samant's knowledge, untrue. Yet he had no difficulty about attempting to transfer responsibility for his actions to Bombay. He denied saying this and suggested that all that he had told Mr Atkinson was that the transactions had been approved by head office. I do not

© 2004 Sweet and Maxwell Ltd

believe that evidence either. Finally, when he was asked whether he passed Mr Atkinson's warning on to Bombay, he said that he could not remember. There is, however, no documentation to indicate that the warning was passed on and Mr Mitra's evidence was that he had no recollection of being told about it.

*(f) The sixth transaction*

87. This began with a telex from the London branch to head office on August 30, 1985, recommending approval for a deposit from BCCI of US$100 million and a matching loan to a nominated borrower in the same sum at a differential rate of interest of 1/16 per cent. The telex indicated that the loan might be advanced in tranches or as a single sum. The *modus operandi* was to be the same, but the loan might be disbursed at BOI's Paris branch. Mr Samant left BOI on June 30, 1985, and said that he had no personal knowledge of this transaction. Mr Raina took over from him as chief manager of the UK and European branches of BOI from that date. Despite the warning given at the meeting with the Bank of England, he recommended the transaction for approval. It seems to me that there are only two possible conclusions to draw from this. Either the warning given at the meeting was regarded by Mr Raina as limited to mutual exchanges of deposits because this was the only type of transaction discussed at that meeting or Mr Raina simply decided to disregard the warning and recommend approval. Mr Raina gave evidence which suggests that the former is the more likely explanation. He said that he regarded the mutual exchange of deposits as a different sort of transaction from those involving a deposit and matching loan. But this, of course, is further evidence to support my earlier view that Mr Samant did not disclose to the Bank of England the true nature of the earlier transactions with BCCI.

88. The source of the suggestion that the loan should be disbursed in Paris is not clear. Mr Raina said that it came from head office, but I am not persuaded of this. It looks as if the suggestion came out of the London branch, because on the copy of the telex received at head office Mr Rao has written: 'No – because of restrictions' against the reference to the Paris branch. On September 4 head office telexed back to Mr Raina querying the 1/16 per cent differential and asking for the usual 1/8 per cent. More importantly, it also asked Mr Raina to advise on the nature of the business of Maram, its owners, directors, net worth and the purpose of the advance. There is also a manuscript note on the telex written by Mr Mitra, which refers to a previous enquiry from the Reserve Bank of India ('RBI') requesting the same particulars. Mr Raina did not see this note, but he was told about the RBI enquiry in a telephone conversation with Mr Mitra on August 30. Mr Mitra had been telephoned by Mr Sarma of RBI earlier that month and asked for details about Maram. Mr Mitra then passed the request to Mr Raina. These enquiries appear to have been part of RBI's periodical inspection of the London branch rather than a result of any specific concern, but they were regarded by Mr Mitra as important.

89. On the copy of the telex received in London Mr Raina wrote some notes, referring to these enquiries from head office and the RBI. He has referred to the business of Maram as 'investing in property and trading activity in the US and other places' and the purpose of the loan as 'short term trading requirements'. This information was then sent to Mr Mitra at head office on September 5, who said that he passed it on to Mr Sarma. Mr Purle asked Mr Raina where he got the information from. He said that it came from Mr Mewawalla. No other enquiries were made. At the same time Mr Raina couriered to head office copies of statements of the financial position of Mr Khalil and Maram as at December 31, 1980, which had also been supplied by Mr Mewawalla. Mr Rao wrote on them the following comment: 'Too old to gauge the scale of present activities'. What is more, the financial information on Maram nowhere indicates that it was involved in any trading activities at all, or that it could afford to service and repay loans in the order of $100 million. It is shown as a $100 company whose assets comprised three properties in Florida and in London SW7, valued at a cost of US$1.284 million. Mr Raina accepted that BOI was entirely dependent upon the BCCI guarantee.

90. On September 10 Mr Mitra summarised BCCI's latest proposal in a memorandum for the board of BOI. He included what he had been told by Mr Raina about Maram and the purpose of the advance. His recommendation in para.8 of the memorandum was that:

> 'In view of the past satisfactory experience, good relationship with BCCI, a margin of 1/8% without any outlay of funds and safety of advance, the Manager, London Branch who is also the Acting Chief Manager, UK & European Branches has recommended sanction of a limit of USD 100 m. .'

On September 12 the board approved the transaction, but Mr Tiwari, the new chairman of BOI, is recorded as emphasising that the London branch was to ensure that there was compliance with legal formalities and local regulations.

91. What is so striking about the sixth transaction is the circumstances in which it took place. The Bank of England had warned Mr Raina and Mr Samant in unequivocal terms that window-dressing of the kind disclosed by the fifth transaction was not to be repeated in London. RBI had also requested information about Maram and the transactions with BCCI of a kind which BOI itself had never sought or been concerned about. The position of Mr Samant and the other BOI witnesses had been that they relied on the BCCI guarantee to secure repayment of the loan, knew that Maram could only repay by refinancing from BCCI and, most important of all, knew that the only reason for the transaction and the temporary reorganisation of the loan to Maram was BCCI's own need to improve its balance sheet. Both Mr Samant and Mr Raina knew, and Mr Mitra must have realised, that Maram had no purpose as such in seeking the loans and in fact did not seek the loans from BOI in any real sense at all. Everything was arranged by and for the benefit of BCCI. Therefore although it is perfectly understandable why RBI should have sought particulars of the loans to Maram recorded on BOI's books, the information given by Mr Raina was positively misleading. It was unverified and was also untrue. To answer RBI's questions fully and frankly would have necessitated disclosure of the rationale behind the arrangements with BCCI as a whole. But there is nothing to suggest that this was done, any more than it was in relation to the Bank of England earlier that year.

92. The strong impression one gets from the background circumstances to this transaction is that the regulators, both in England and in India, were by now becoming concerned. Mr Atkinson had issued his warning in January and we know from the disclosure in the *State Bank of India* case that in December 1985 RBI had expressed concern in a circular about foreign currency loans being made by Indian banks over the year end to offshore companies connected to a foreign bank which provided matching funds and a guarantee for the loan. RBI was concerned that the Indian banks involved had made no enquiries about the credit status of the borrower nor were aware of the real objectives of the foreign bank in obtaining their participation. Mr Mitra says that he cannot recall any advice being given by RBI and enquiries made of RBI itself have not produced a copy of the circular. But it is clear from the evidence in the SBI case that such a warning was given and equally clear that what prompted it were the transactions with BCCI carried out by BOI, SBI and the other Indian banks I have already mentioned. The RBI warning must have been given to, and received by, BOI late in 1985 or early in 1986, even if Mr Mitra now has no recollection of it.

93. The now increasing concern of the regulators may be the explanation for what followed in relation to the disbursement of the loan. Although approval was sought in the sum of US$100 million, Mr Tiwari limited the sanction to $75 million, adding the reference to the need to comply with local regulations which I have mentioned. Mr Raina said that he told Mr Mewawalla that only $75 million would be available, but this apparently caused no obvious disappointment or concern at any possible interference with Maram's trading plans. At this time Mr Mewawalla and Mr Raina were still in regular contact. There is evidence of a lunch in London at which Mr V C Joshi, the new chief manager, was introduced to BCCI and at which Mr Samant was also present. There was then a series of telexes out of the London branch, exploring the possibility of making the loan to Maram from BOI's branches in Singapore,

© 2004 Sweet and Maxwell Ltd

Hong Kong and finally New York, using the Grand Cayman branch. When Mr Raina was asked about the reason for this, he said that the instructions came from head office. He did not know why it was done and in any event he handed over the arrangements for the completion of the transaction to Mr Joshi, who was appointed chief manager of the UK and European branches with effect from September 12, 1985. Mr Joshi (against whom no allegation of knowledge or dishonesty is made) said that he was not told of the purpose of the sixth transaction and did not know why suggestions were made to route the loan through the other overseas branches.

94. Mr Mitra was also asked about the reasons for routing the loan through BOI's branch in the Cayman Islands. He began by saying that he thought it was because Maram was a Cayman company. When asked why all the previous loans had been made through the London branch, he the said that it had something to do with saving tax. I find neither of these explanations at all convincing and Mr Mitra's evidence on this showed every sign of a hurried attempt to find some justification for using the Grand Cayman office. On December 2, 1985, Mr Joshi sent a telex to Mr Mitra, asking for head office sanction for an amendment to the transaction approved earlier. The transaction was now to be for $50 million and to be disbursed by BOI's New York branch through the branch in Grand Cayman, but with the deposits being made by BCCI in London and then used by BOI to fund the Cayman branch. The 1/8 per cent differential was to be earned by the branch in Grand Cayman. Mr Joshi said in the telex that any delay in sanctioning these proposals might result in the loss of the business.

95. Mr Mitra typed a note to Mr Joshi on the telex he received. It stated that head office might agree to the proposal, but that the London branch should arrange with BCCI for at least $20 million–25 million of the deposits to be placed at the Cayman branch. This message was then telexed to London on December 3. The New York branch (unlike the London branch) also required Maram to execute a form of general security agreement for the loans, which was done on December 11. Even allowing for the passage of time and the fading of memory which that inevitably brings, I would have expected Mr Mitra, in the light of his apparent recollection of other aspects of this transaction, to be able to give some plausible explanation for his request that at least part of the deposit should be placed in Cayman. All that he was able to say was that he noticed that Maram was registered in Grand Cayman and therefore thought that it would be good to obtain deposits from Maram or BCCI at that branch. The cross-examination on this point (on day 11 of the trial) went like this:

> 'Q. What I am asking is why you were suggesting that deposits of at least $20 to £25 million should be place at Cayman Islands branch and I am suggesting to you that that can have no tax purpose behind it, can it?
>
> A. No, sir, it would have maximised our deposit.
>
> Q. But your deposits are maximised whether they are in Cayman Islands or London or elsewhere, are they not?
>
> A. Yes.
>
> Q. So that does not explain that suggestion?
>
> A. No, actually, since I said I think yesterday I was talking about it, since we are going there, if we can get some deposits from Maram through BCCI, because Maram was also, it is noticed that it is registered at Cayman Islands, so this is the idea, if we can get it is better for us.
>
> Q. So you are now talking of getting some deposits from Maram; is that what you are saying, not from BCCI, but from Maram?
>
> A. BCCI, Maram, whoever puts it, we would like to use that $20 to $25 million.
>
> Q. Who is it that you are expecting to get deposits from, Maram or BCCI?
>
> A. We have used the word "BCCI" here. BCCI can do it through Maram or BCCI's presence there, they work in all these places, I think, so they could have done it. It is just

a thought coming from the person who prepared it and I agreed with that, and I signed it also.

Q. When you said that BCCI could do it through Maram, that suggests that BCCI could do with Maram whatever it wants?

A. No, I did not say that. I did not mean that. It came to our mind – first it originated from the person who prepared this note – I cannot find a signature here – it came from him: it is a good idea if we get another $20–$25 million deposit there, which would help us to maximise our deposit.

Q. But it is part of the arrangement that is here being varied, is it not, that BCCI will place deposits?

A. We said to arrange, that you should arrange. Whether they place it or not, that also I cannot remember now. And it is also in here somewhere, because it is my general manager's handwriting, "if possible".'

96. I do not accept the truth or accuracy of any of this evidence. If Mr Mitra's position was that he could not recall the reason for his request, he could have said so. As it is, he chose to give a series of inconsistent and wholly implausible reasons for what was done. Even if one takes his explanation at face value, it reveals an appreciation on his behalf that Maram and BCCI were almost interchangeable. Although, at the request of BOI, the loan and matching deposits were extended by two months to May 1986, no further transactions of this kind with BCCI took place.

**Conclusions on knowledge**

97. The liquidators' allegations on knowledge are made in wide terms against a number of different individuals, and this was the subject of criticism by Mr Hirst. In relation to the first transaction the liquidators say that both Mr Samant and Mr Chatterji knew that they were participating in a fraud. Allegations of dishonesty are also made against Mr Vaghul and Mr Shukla. When one comes to the second transaction, an allegation of dishonesty is also made against Mr Raina (who had by then replaced Mr Chatterji). A case of dishonesty is maintained against Mr Samant, Mr Vaghul and Mr Shukla, but it is not suggested that the other members of the board or the other senior executives of BOI were involved. To this list the liquidators add Mr Mitra, who they say was dishonest in relation to the sixth and last transaction.

98. In defence of BOI's position Mr Hirst made a number of general submissions which I need to deal with before coming to the specific transactions. Primary amongst these was the obvious but important point that the transactions were well documented both externally and internally. BOI has, for example, preserved the reports and memoranda to the board on which the comments of the senior officers are recorded. This is not, he says, a case involving some kind of secret conspiracy behind the scenes, in which false documents were produced to give the transactions a semblance of legitimacy. Mr Samant's telexes in which he openly discusses BCCI's purpose and aims are, he submits, quite inconsistent with the allegations of dishonesty levelled against senior management and the board or with the suggestion that Mr Samant knew that he was assisting in the perpetration of a fraud. In the same vein he points to the involvement of Lawrence Jones. Mr Samant was in the first transaction quite open about the unusual nature of what was proposed and the solicitors, though concerned about the detail of the arrangements, saw nothing fundamentally wrong with them.

99. These factors are plainly important in a consideration of the role of Mr Samant and others at BOI in the transactions, but they are not, in my judgment, conclusive. As I have already indicated, Lawrence Jones were not asked to scrutinise the reasons given for the transaction. Their role was merely to ensure that BOI was properly protected. BCCI could only have perpetrated the fraud on its creditors through what appeared to be legitimate transactions. The *modus operandi* of obtaining loans through a real corporate borrower, but one which was

© 2004 Sweet and Maxwell Ltd

manipulated by BCCI, necessarily involved both BCCI and its nominee entering into the back-to-back arrangements which are a feature of this case and of the case involving SBI. It is not the liquidators' case that these transactions were fraudulent shams in which all the parties in concert deliberately set out to deceive BCCI's auditors and creditors. It is not even alleged that BOI was aware that BCCI had actually forged the documents which purported to emanate from Maram or, in the case of SBI, from Notan. But it *is* alleged that the Indian banks knew or suspected that the transactions they were entering into were artificial and circular and were intended to allow BCCI to deceive its auditors and creditors by recycling its own money for its own use and, in the case of the BOI transactions, by removing debts temporarily from its books over its year end.

100. Loan transactions with a regulated bank have to be documented. It would have been impossible for BCCI to have asked the banks it dealt with to produce no documentation whatever, nor could its purposes have been advanced by doing so. In order to satisfy (and to deceive) its auditors about what it had done with the money used to inflate the Khalil accounts, it had to produce documentation evidencing the deposits it had placed with BOI free of any lien. What it did not wish to produce to its auditors was documentation linking those deposits with the moneys used to reduce or eliminate the debit balances on the Khalil accounts. Both accounting experts agree that disclosure of that link would have led the auditors to reverse the transactions and to make provision for the Khalil debts. Some documentation of the loan was, however, inevitable. The objective must have been to reduce it to the minimum.

101. For its part, BOI needed to record the transactions it had entered into. Mr Samant could not approve loans of the size involved in this case without reference to head office. That would have been obvious to Mr Mewawalla, as a former employee of the bank. He would also have known that any reference to head office would be recorded internally by BOI, particularly when a reference was made to the board. That difficulty could have been catered for (as it was in the SBI case) by setting out to deceive the bank into believing that it was entering into a genuine loan to a company, albeit with the support of a BCCI guarantee. That presented the obvious risk that a prudent bank would still require to investigate the creditworthiness of the borrower and the purpose of the loan, but BCCI obviously calculated that this risk could be managed by offering the bank the comfort and security of a BCCI guarantee, and this proved to be correct. Neither BOI nor SBI properly investigated the status of the borrower. Both banks were so attracted by the offer of an essentially risk-free transaction that they failed to carry out any effective investigations into the borrower or the purpose of the loan or, in the case of BOI, any real investigation at all.

102. At this point, however, the similarity between the two cases ends. What is so striking about this case is the extent to which Mr Samant was aware of the circular nature of the transactions he was participating in. He accepted, as I have mentioned, that during the course of the first transaction he knew that its sole purpose was to improve the presentation of BCCI's accounts. It was neither put to him nor believed by him to be a case of a borrower seeking a loan, who could not be accommodated by BCCI. Even at face value, the borrower had an existing loan which BCCI (not the borrower) wished to move to BOI for its own year-end purposes.

103. The real significance, therefore, of the documentation is not that it existed, but rather what it indicates about Mr Samant's own thinking at the time. Mr Hirst's submission is that the references in Mr Samant's telex of November 12, 1981, to what BCCI was 'obviously' intending to achieve, and in his letter to Lawrence Jones of the same date to 'this apparently strange deal', are the best evidence that he was not then privy to a fraud. Many of the indicators of fraud relied on by the liquidators are set out in the telex. It is, he submitted, impossible to conclude that Mr Samant could have referred to the transaction in these terms if he had believed or suspected that it was at all dubious.

104. I accept that Mr Samant's instant reaction to Mr Mewawalla's proposal was to query its purpose. As an experienced banker he was obviously surprised to receive a proposal to lend a substantial sum of money to an unidentified borrower who could provide no security of its own, little or no documentation, and would depend upon BCCI for the finance necessary to repay the loan after the year end. It would have been obvious from the start that this was not an ordinary loan proposal, and Mr Mewawalla's close relationship with Mr Samant would have made it impossible for him not to have given Mr Samant an explanation of what the purpose of the transaction really was. This is why, in my judgment, Mr Samant knew from the outset that the transaction had as its only object the improvement of BCCI's balance sheet or accounts. The wholly uncommercial nature of the transaction, when viewed from BCCI's perspective, merely served to confirm this. The other side of this is that Mr Mewawalla obviously regarded Mr Samant as someone who would respond positively to BCCI's proposals. It is clear from the expert evidence that most banks operating in the City of London at the time would not have entertained them. It is impossible not to notice that most of the banks who participated in these so-called back-to-back arrangements were Indian banks. There may be a number of reasons for this, but in the case of BOI there were two factors which made them an obvious choice as a counter-party. The first is that there were close personal ties at an individual level between the officers of the bank. BCCI had recruited staff from BOI and other Indian banks, and Mr Mewawalla and Mr Samant were close friends. The second is the culture I have referred to, which was endemic at BOI and perhaps at other Indian banks at the time, of taking deposits to boost the bank's performance figures at its year end. It was unlikely that BOI would reject a proposal merely because it had a window-dressing purpose.

105. For the reasons already given, it is not possible to say with certainty whether it was Mr Mewawalla or Mr Samant who attributed the object of the transaction to the improvement of BCCI's earnings to advances ratio. If it was Mr Mewawalla who provided the explanation, it may also be the case that this was something he got from Mr Akbar. However, for reasons which I will come to in a moment, the precise source of the explanation does not matter. I have decided that it is not open to me, on the evidence, to find with the degree of certainty required that there was anything amounting to an outright conspiracy between Mr Mewawalla and Mr Samant from the start, in the sense that Mr Samant was told the full details of BCCI's actual plans, including its intention to suppress the guarantee from its auditors. I am also prepared to accept that in the telex and the letter to Lawrence Jones of November 12, 1981, Mr Samant provided the solicitors and head office with an explanation which had been suggested to him by Mr Mewawalla at their meeting and not critically examined by him at the time. To that extent it was an accurate account of what was proposed. But it has to be realised that any other approach to head office would have been hopeless. However lax the lending practices of the bank may have been, Mr Samant knew that the senior managers at head office would have queried, and would not have accepted, an ostensible loan proposal of this kind. They would have treated it as suspicious, for the very same reasons that Mr Samant would have queried it. It was therefore put to them (as it had to be) as a risk-free window-dressing transaction which had the benefit of increasing the bank's 'pure' deposits and providing a 1/8 per cent return with no outlay of funds.

106. The eagerness of Mr Samant to have this business is apparent throughout the course of all the transactions he was involved in. I have formed the view of him, which is apparent from the documents in evidence I have referred to, that he was primarily concerned with the need to mobilise deposits regardless of the risks involved. I believe that he was an able but ambitious man who probably saw the introduction of the BCCI deposits as proof of his success in the eyes of head office. I have little doubt that both he and Mr Mewawalla had much to gain from the success of these transactions in terms of their careers. There is no suggestion that they received any direct financial benefit. Mr Purle does not suggest otherwise. But Mr Samant was clearly anxious to accommodate BCCI's wishes at every turn, even though this involved dropping a number of the recommendations made by Lawrence Jones and on occasions ignoring or failing to implement the instructions of head office. I have set out the instances on which this occurred

© 2004 Sweet and Maxwell Ltd

in my analysis of the six transactions. But it is a constant feature. It is enough to mention Mr Samant's request to Lawrence Jones in the first transaction to draft the minimum possible security documents, his failure to pursue the request for a guarantee under seal, and his failure to carry out any proper investigation into the borrower, despite head office's request for that to be done. The same approach seems to have infected Mr Chatterji, who did not obtain the security documents requested. For the reasons already indicated, this was almost certainly influenced, directly or indirectly, by Mr Samant's decision to comply with whatever conditions Mr Mewawalla and BCCI chose to impose.

107. I have found Mr Samant to be an unreliable and, I am afraid, untruthful witness, but I am prepared to recognise the existence of some doubt as to whether he had reason to question the improvement of BCCI's earnings to advances ratio as a plausible explanation for the arrangements during the course of the first transaction. My own view is that on the balance of probabilities he must have entertained some cause for concern about it even at that time, if only because head office itself was clearly unhappy. They were only willing to sanction the transaction if the status of the borrower was confirmed and it was to be a one-off transaction. This gives every indication of real unease on their part. For the reasons set out in paras 53 and 54 of this judgment, I have rejected the allegations of dishonesty made against Mr Vaghul and Mr Shukla in relation to the first transaction, but it is clear that they were not persuaded that BOI should repeat the arrangements and that, at the very least, doubts existed about the explanation which Mr Samant and BCCI had offered.

108. However, any doubts that exist as to Mr Samant's state of knowledge are, in my judgment, resolved by the second transaction. Despite having been told by head office that the first transaction was to be one-off, he felt able to make an enthusiastic recommendation in July 1982 for a similar arrangement involving not £10 million but £30 million. Mr Shukla's query about the real reason for the transaction prompted him to produce the 1981 accounts and, as I have already found, I am satisfied so as to be sure that Mr Samant looked at that material and did see and did realise that an improvement in the earnings to advances ratio could not be achieved by the removal of loans over the year end. He also realised that only a transfer of non-performing debt would have any significant effect. I therefore have no real doubt that Mr Samant knew from this time on, even if had not occurred to him before, that the purpose of the transaction was considerably more complicated, and certainly more suspicious, than he may at first have supposed. These suspicions must have been increased by his knowledge that Maram was of no real significance in the transaction and that the loans would be repaid by BCCI. The circular nature of the transactions was already apparent to him, and the removal of the only suggested justification for them can have left him, and I believe did leave him, in no real doubt that he was in all probability dealing with a fraud of some kind. The matter was put really beyond doubt when in 1984 the fourth and fifth transactions occurred at a time and in a form respectively which made it obviously impossible for the alleged purpose to be achieved.

109. My finding that Mr Samant had relevant knowledge at the time of the second transaction is supported by his subsequent handling of the remaining transactions, up until his departure from BOI in 1986. I am prepared to accept that Mr Samant did not raise his suspicions with Mr Mewawalla or seek to have them confirmed. It seems to me much more likely that he chose simply to ignore them and to make no further investigations. Although he had knowledge in the blind-eye sense necessary to find liability on this application, any attempt to pursue serious enquiries about the use which BCCI was making of the arrangements was likely to lead to the loss of the business. It is clear that so keen was he to get in the BCCI deposits that he was prepared to close his eyes to what he knew was staring him in the face and to adopt a completely passive and uncritical role in accommodating BCCI. What Mr Samant did was to treat these transactions as routine. Each year the same proposal was made, although in ever-increasing sums. The proposal was forwarded to head office, using the same format and almost identical language. Lawrence Jones were instructed, but this became no more than a formality. Drafts of the necessary Maram documents were now prepared in-house by the

London office and merely sent out to Lawrence Jones for approval. No time was spent on any A
enquiries as to why the size of the deposits and loans was increasing. The transactions were processed very quickly and any requirements of BCCI were rapidly complied with. A striking example of this was the revision of the letters in 1983 to separate the details of the loans from the deposits. As I said earlier in this judgment, the explanation for the transactions and the part played by the borrower became irrelevant. It was simply a matter of getting in the BCCI deposits and handing the same money back. Although Mr Samant denied it, the transactions
came to be regarded, and really to be dealt with, as little more than an exchange of deposits, and B
of course in substance they were no different.

110. Perhaps the most striking piece of evidence in this case is the note of the Bank of England interview with Mr Samant and Mr Raina which took place in January 1985. I have taken the view that Mr Samant did not make it clear to the Bank of England precisely what form the earlier transactions took. But whether or not this is the case (and Mr Samant's
evidence was that he did mention the loan to a nominated borrower, coupled with the BCCI C
guarantee), it is clear that the Bank of England officials told Mr Samant and Mr Raina that no further such transactions were to take place in London. Notwithstanding this, there is no evidence to show that Mr Samant did pass this warning on to head office, and Mr Raina in August 1985 proposed a yet further transaction of the same kind. This merely confirms the view I have already formed that Mr Samant and, after his departure, Mr Raina continued with their drive to obtain deposits, regardless of the obvious concerns about what they were entering
into. D

111. I am therefore satisfied that Mr Samant did have knowledge in the relevant sense, at least from the time of the second transaction. Although I found Mr Raina's evidence unsatisfactory in a number of respects, his role and knowledge is less clear in the case of the first five transactions and I make no adverse findings against him in respect of them. It is, I think, arguable that he continued to deal with the sixth transaction in the same vein, but for the
reasons which I will come to later, his precise role and state of knowledge may not matter in E
assessing whether the sixth transaction was causative of any loss, because of the way in which the claim has been quantified. I do, however, need to deal with the position of the more senior bank officers. By the time of the second transaction Mr Shukla had doubts about the reason given. I have explained my grounds for rejecting the evidence contained in his recent statement, but there is no real other evidence which indicates how his concerns were met. Mr Vaghul (who was not involved after the second transaction) said that the proposals were not
subjected to the degree of scrutiny which might be expected today. He believes that Mr Shukla F
must have been given a satisfactory answer to his query, but does not know what it was.

112. I do have real concerns about the way in which these transactions were handled by BOI's head office, and in relation to the first and second transactions they reflect very badly on Mr Vaghul's management of the bank. There was understandably real unease with the first transaction, but the condition of approval that it should be a once-only transaction seems to
have been ignored for no good or apparent reason in subsequent years. Mr Shukla expressed G
the concerns I have mentioned, but again they did not prevent the second and third transactions from going ahead. There is no evidence, and it is not alleged, that Mr Samant told them a convincing lie in order to gain approval for the transactions, and his evidence is that he did not speak to them. I accept that. It is therefore more likely that they simply allowed their doubts to be overcome by preferring to rely on Mr Samant's judgement in the matter. Although the transactions (except the first) were approved at board level, this was merely to give authority to
the London branch to proceed with the transaction. The decision whether to go ahead was then H
a matter for Mr Samant. No-one suggests that the board of BOI was in any sense dishonest, and I am not satisfied that a case of knowledge and dishonesty is made out, to the requisite standard of proof, against either Mr Shukla or Mr Vaghul. I think that they looked to Mr Samant to scrutinise the proposals and were content to accept his recommendation. Once the first and perhaps second transactions had been completed without any apparent problems, approval by

© **2004 Sweet and Maxwell Ltd**

the board seems to have been obtained very quickly, almost as a matter of routine. It was only in relation to the sixth transaction that problems began to occur, due in all probability to the interest which the regulators had begun to show in the arrangements. But BOI by then had a new chairman (Mr Tiwari) and I know really nothing about his involvement in the decision to approve the sixth transaction. Mr Mitra's evidence about that transaction was clearly unsatisfactory, but the decision to give approval was not his and I am not able, on the evidence, to find that he had the insight necessary to give him the knowledge which Mr Samant himself had.

**Attribution**

113. My findings on knowledge give rise to an issue about attribution. Is it enough that Mr Samant, rather than Mr Vaghul, Mr Shukla or the other members of the board of BOI, had knowledge in the requisite sense that the transactions were being entered into for a fraudulent purpose? Mr Hirst submits that knowledge on the part of Mr Samant is not sufficient to fix BOI with liability under s.213. It is, he says, necessary to show actual knowledge on the part of at least Mr Vaghul and perhaps even the entire board. The liquidators' case is that under general agency principles the knowledge of Mr Samant is to be attributed to BOI, because it was Mr Samant who was authorised to negotiate the terms of the transactions, to make recommendations to head office, and to give effect to head office approval by entering into the transactions. His knowledge acquired in so acting is attributable to the bank.

114. There is a long history to the attempts of the courts to define the circumstances in which a company will become criminally or civilly liable for or through the acts of its agents. Everyone is familiar with the so-called 'directing mind and will' theory, based on a passage in the judgment of Viscount Haldane LC in *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] AC 705 at p.713, where he said this:

> 'My Lords, a corporation is an abstraction. It has no mind of its own any more than it has a body of its own; its active and directing will must consequently be sought in the person of somebody who for some purposes may be called an agent, but who is really the directing mind and will of the corporation, the very ego and centre of the personality of the corporation.'

But as the Court of Appeal pointed out in *El Ajou v Dollar Holdings plc* [1994] BCC 143;, the identification of the relevant person does not depend purely on an examination of the company's statutes or articles of association or even the formal contractual relationship between the company and its agents or employees. It may also require one to consider how matters were actually arranged and through whom the company's powers were in fact exercised. This may also lead to the result, referred to by Hoffmann LJ in *El Ajou* (at p.159G), that different persons may for different purposes satisfy the requirements of being the company's directing mind and will.

115. In relation, however, to certain forms of statutory liability, particularly where a criminal offence is involved, the normal principles of attribution may require to be modified to meet an argument that the imposition of liability is contrary to or inconsistent with the purposes of the statute. Conversely, even where the conventional principles of attribution would not impose liability on the company for the acts of particular agents or employees, the statute may nevertheless do so. Mr Hirst reminds me in this context that regard must be had not only to s.213 of the Insolvency Act 1986 but also to the parallel criminal sanction contained in s.458 of the Companies Act 1985. But both he and Mr Purle accepted that the most recent and authoritative statement of principle is that set out by Lord Hoffmann in the judgment of the Privy Council in *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] BCC 942; [1995] 2 AC 500. This case concerned the liability of Meridian, a substantial Hong Kong investment management company, for the actions of its chief investment manager and a senior portfolio manager, who had masterminded between them the takeover of a New

Zealand company, using that company's own assets to fund the purchase. This required A
bridging finance, and the managers arranged to do this by using funds under Meridian's control in order to acquire the shares.

116. Under the New Zealand Securities Amendment Act 1988 persons who become what is described as a 'substantial security holder in a public issuer' must give notice of that fact to the public issuer and also to the Stock Exchange on which the shares are listed. The purpose of the legislation was to give the boards of target companies notice of an imminent raid. It was conceded that Meridian did become a substantial security holder within the meaning of the B
1988 Act and that no such notice had been given. But the company denied liability for the breach of the duty to give notice, on the basis that the board and the managing director were unaware of the use of its funds to acquire the shares in the New Zealand company and that the knowledge of the investment officer and portfolio manager could not be attributed to the company. Both the Privy Council and the Court of Appeal of New Zealand rejected that submission. C

117. Lord Hoffmann began his analysis by describing what he called the rules of attribution, under which the acts or omissions of individuals are deemed to be those of the corporate entity they act for or represent. These are usually to be found in the company's articles of association, but extend to include the general principles of agency and vicarious liability. Lord Hoffmann then turned to consider the applicability of these rules to cases of criminal liability. At p.946B–F; 507B–F he said this: D

> 'The company's primary rules of attribution together with the general principles of agency, vicarious liability and so forth are usually sufficient to enable one to determine its rights and obligations. In exceptional cases, however, they will not provide an answer. This will be the case when a rule of law, either expressly or by implication, excludes attribution on the basis of the general principles of agency or vicarious liability. For example, a rule may be stated in language primarily applicable to a natural person and require some act or state of mind on the part of that person "himself", as E
> opposed to his servants or agents. This is generally true of rules of the criminal law, which ordinarily impose liability only for the actus reus and mens rea of the defendant himself. How is such a rule to be applied to a company?
>
> One possibility is that the court may come to the conclusion that the rule was not intended to apply to companies at all; for example, a law which created an offence for which the only penalty was community service. Another possibility is that the court F
> might interpret the law as meaning that it could apply to a company only on the basis of its primary rules of attribution, i.e. if the act giving rise to liability was specifically authorised by a resolution of the board or a unanimous agreement of the shareholders. But there will be many cases in which neither of these solutions is satisfactory; in which the court considers that the law was intended to apply to companies and that, although it excludes ordinary vicarious liability, insistence on the primary rules of attribution would in practice defeat that intention. In such a case, the court must fashion a special G
> rule of attribution for the particular substantive rule. This is always a matter of interpretation: given that it was intended to apply to a company, how was it intended to apply? Whose act (or knowledge, or state of mind) was *for this purpose* intended to count as the act etc. of the company? One finds the answer to this question by applying the usual canons of interpretation, taking into account the language of the rule (if it is a statute) and its content and policy.' H

Applying these principles to the 1988 statute, Meridian was held to be liable for the acts of its managers, who (albeit without the knowledge of its board) used its funds to acquire the shares:

> 'Once it is appreciated that the question is one of construction rather than metaphysics, the answer in this case seems to their Lordships to be as straightforward as it did to Heron J. The policy of s. 20 of the *Securities Amendment Act* 1988 is to compel, in fast-

© **2004 Sweet and Maxwell Ltd**

> moving markets, the immediate disclosure of the identity of persons who become substantial security holders in public issuers. Notice must be given as soon as that person knows that he has become a substantial security holder. In the case of a corporate security holder, what rule should be implied as to the person whose knowledge for this purpose is to count as the knowledge of the company? Surely the person who, with the authority of the company, acquired the relevant interest. Otherwise the policy of the Act would be defeated. Companies would be able to allow employees to acquire interests on their behalf which made them substantial security holders but would not have to report them until the board or someone else in senior management got to know about it. This would put a premium on the board paying as little attention as possible to what its investment managers were doing. Their Lordships would therefore hold that upon the true construction of s. 20(4)(e), the company knows that it has become a substantial security holder when that is known to the person who had authority to do the deal. It is then obliged to give notice under s. 20(3). The fact that Koo did the deal for a corrupt purpose and did not give such notice because he did not want his employers to find out cannot in their Lordships' view affect the attribution of knowledge and the consequent duty to notify.
>
> It was therefore not necessary in this case to inquire into whether Koo could have been described in some more general sense as the "directing mind and will" of the company. But their Lordships would wish to guard themselves against being understood to mean that whenever a servant of a company has authority to do an act on its behalf, knowledge of that act will for all purposes be attributed to the company. It is a question of construction in each case as to whether the particular rule requires that the knowledge that an act has been done, or the state of mind with which it was done, should be attributed to the company. Sometimes, as in *Ready Mixed Concrete* and this case, it will be appropriate. Likewise in a case in which a company was required to make a return for revenue purposes and the statute made it an offence to make a false return with intent to deceive, the divisional court held that the mens rea of the servant authorised to discharge the duty to make the return should be attributed to the company: see *Moore v I Bresler Ltd* [1944] 2 All ER 515. On the other hand, the fact that a company's employee is authorised to drive a lorry does not in itself lead to the conclusion that if he kills someone by reckless driving, the company will be guilty of manslaughter. There is no inconsistency. Each is an example of an attribution rule for a particular purpose, tailored as it always must be to the terms and policies of the substantive rule.' (at pp.949E–950C;

511C–512B)

118. Mr Hirst submits that the approach in *Meridian* requires one to identify the person who authorised the transaction in accordance with the system of authorisation operated by the company in question. It would be wrong, he says, to impose liability on BOI, where the person who has the authority to, and does, authorise the deal does not possess the relevant knowledge, but someone more junior does. Viewed from the company's point of view, one can see the attraction of that proposition, but it does not, in my judgment, represent the law. Nor, as I shall explain a little later, does it apply to the facts of this case. As Lord Hoffmann emphasised in *Meridian*, the primary rules of attribution, based on factors such as the scope of the agent's authority, may require to be modified either restrictively or liberally in order to accommodate the statutory purpose of the legislation which imposes the liability. A good example of this is the decision of the House of Lords in *Re Supply of Ready Mixed Concrete (No. 2)* [1995] 1 AC 456, which he referred to. This was a case in which a restrictive arrangement in breach of an undertaking given to the Restrictive Practices Court was entered into by executives of the company, contrary to express instructions given to them by the board of the company that no such arrangements were to be made. Notwithstanding this, the company was held liable for contempt, based upon the actions of its employees. The need to secure compliance with the undertaking was held to override the lack of authority given to those who breached the

undertaking. Similarly, in *McNicholas Construction Co Ltd v Customs and Excise Commissioners* [2000] STC 553 a construction company was held liable for the evasion of VAT caused by claims for input tax relief in respect of payments made for the supply of labour by sub-contractors. It transpired that many of those VAT invoices issued by sub-contractors to the company were for services which had not in fact been supplied and that the company's site managers had been involved in the fraud over a long period. Nevertheless the court held that the site managers' dishonesty was attributable to the company. The dishonest nature of the actions meant that attribution could not be achieved through the more conventional medium of the ordinary rules of agency or vicarious liability. But the need to ensure compliance with the Act overrode that objection. At p.574 Dyson J said this:

> '48. In my view, the tribunal were correct in attributing the acts and knowledge of the site agents to the company. I start with ss 60(1) and 77(4) simply because the tribunal's reasoning is directed to those provisions (see p 10, para 24). The policy of those provisions is to discourage the dishonest evasion of VAT, and to give the commissioners an extended period in which to make assessments where VAT has been lost as a result of the dishonest evasion of VAT. That policy would be frustrated if the acts and knowledge of all those employees who have a part to play in the making and receiving of supplies were not to be attributed to the company for the purposes of ss 60(1) and 77(4). If the only persons whose acts and knowledge may be attributed to a company are those who are responsible for running the affairs of the company as a whole, and those involved in its VAT activities, then the policy to which I have referred would be seriously undermined. As Mr Parker points out, it would encourage those prepared to engage in fraud or turn a blind eye to set up separate VAT accounts departments for that purpose. Moreover, it would discriminate against small companies that do not have separate accounts departments insulated from what happens on site or in contracts departments.
>
> 49. I would hold, therefore, that the acts and knowledge of all those employees of a company who have a part to play in the making and receiving of supplies, as well as those involved in its VAT arrangements, are to be attributed to the employing company for the purposes of ss 60(1) and 77(4).'

119. The judgment in the *McNicholas* case is important because it deals, as part of the analysis, with the argument commonly raised that it would be wrong to visit the company with the consequences of its employees' unlawful conduct, when it is itself a victim of the same dishonesty. This principle is translated in some of the earlier authorities into stating that the employee's or agent's knowledge of his own fraud or breach of duty is not to be imputed to the company: see, *e.g. Re Hampshire Land Co* [1896] 2 Ch 743. It therefore operates as an exception to the general rules of attribution. But it is clear from the decisions in McNicholas and in *Re Supply of Ready Mixed Concrete (No. 2)* that it will not override attribution as a matter of law where the policy of the Act, to be effective, requires liability to be imposed.

120. Mr Samant did have delegated authority to lend up to £200,000 unsecured without seeking head office approval. For sums of the order of £10 million or more, not even the General Manager (International) at head office could give the necessary sanction. The proposal needed to be referred to the board. This was of course the procedure adopted in each of the six transactions under review, although in the case of the first transaction Mr Vaghul seems to have approved it under delegated powers. In the present case, however, the scheme of delegation gives an incomplete picture of what was done. At the time when most (if not all) of the transactions were put up for approval, the borrower had yet to be identified. In the case of the second transaction Mr Vaghul explained that, to avoid putting the matter to the board again, Mr Samant was given what he described as blanket permission to go ahead with a borrower nominated by BCCI. It is also clear from the evidence that the approval of the transactions was no more than that: *i.e.* an authority to Mr Samant to lend to the nominated borrower on the terms he had negotiated and agreed. Approval was often given some time in advance of the

© **2004 Sweet and Maxwell Ltd**

completion of the transactions and detailed matters such as the investigation of the borrower's purpose or status and the documentation for the transaction were left to Mr Samant to deal with. Head office or board approval was not an instruction to carry out the transaction. Mr Samant retained an obvious and necessary discretion whether to go ahead. This was the basis of the approval given in the second transaction and, after that, board approval seems to have been given rapidly and almost as a matter of course. It is clear, as I have found, that senior executives and the board were content to take Mr Samant's assurances at face value and to leave it to him to satisfy himself that it was proper for BOI to go ahead. In these circumstances he was, at the time of each of the first five transactions, the person who, in Lord Hoffmann's words, had the authority to do the deal.

121. It is common ground that s.213 is capable of applying to a company in the position of BOI. Although it applies to the same conduct which under s.458 of the Companies Act can lead to the imposition of a criminal penalty, the purpose of s.213 is to enable the liquidator to recover compensation from those who have knowingly assisted the fraudulent conduct of a company's business. I do not, therefore, have to decide what are the precise limits of criminal liability under s.458. The only question I have to decide is whether Mr Samant's knowledge is to be attributed to BOI so as to found liability under s.213. In my judgment, it is. It seems to me that to allow BOI to shelter behind an argument that the only relevant knowledge was that of the board would be to defeat the policy of the Act. It would allow banks such as BOI, which choose to rubber-stamp the recommendations of their senior managers without ensuring that all proper and due diligence has been carried out, simply to sidestep liability by relying on their own ineptitude. The board of BOI had, through Mr Shukla, a real concern about the purpose of these transactions at the time of both the first and the second transactions. But they were content to delegate the supervision of the transaction and the ultimate decision whether to proceed to Mr Samant. Despite their own misgivings they chose to rely on his judgement. I cannot see how in those circumstances they should be entitled to deny responsibility for the decisions which he made. The consequence is that BOI is liable to contribute to the losses to creditors which would have been avoided but for these transactions, and I will so order. Given my primary finding against Mr Samant, it is unnecessary for me to consider the liquidators' new and alternative claim that was introduced by way of amendment. It does not arise.

**Quantum**

122. The power of the court under s.213(2) to order a contribution to be made is framed in wide terms, but there has on authority to be some nexus between the loss caused to creditors as a result of the fraudulent trading and the contribution which the knowing party is required to make: see *Morphitis v Bernasconi* [2003] BCC 540. I am not persuaded that the court has jurisdiction to, or should, exercise this power so as to make a punitive award unconnected to and disproportionate to the loss which the respondent can properly be regarded as responsible for. That said, any award, although essentially compensatory in nature, can only be a reasonable approximation to the damage which the respondent's conduct has caused or contributed to. This calculation is not and cannot be a matter of exact science and some elements of it will inevitably be broad-brush. Ultimately it is a matter of judgment whether the end figure represents reasonable compensation proportionate to BOI's role in this matter.

123. The liquidators' case is that, had the true financial position of BCCI SA and BCCI Overseas been disclosed in the audited accounts for any of the years 1982, 1983, 1984 or 1985, then BCCI would have been unable to continue to operate and to take deposits. As it was, BCCI continued to trade until 1991, when it was shut down by the regulators. At the date of its liquidation the deficiency was in the region of US$10 billion and the depositors can only be compensated in full if the whole of that deficiency is made good. BOI's expert contends that the loss actually caused by the five back-to-back transactions is limited to loss of interest by BCCI amounting to US$45,626. These two figures therefore represent the maximum and minimum

amounts of compensation payable, but neither is a realistic assessment of what the amount of contribution should be.

124. The liquidators' pleaded claim is that the relevant loss attributable to BOI's assistance comprises three elements:

(i) cash dividends paid by BCCI Overseas out of its reported profits. These are said to amount to US$65 million in 1982, $75 million in each of 1983 and 1984, $40 million in 1985, $22 million in 1986 and $35 million in 1987. These total US$312 million;

(ii) cash dividends paid by BCCI SA in 1985 and 1986 of US$12 million and $7 million respectively; and

(iii) a proportion of the losses sustained by BCCI Overseas and BCCI SA in the years following the false accounts. The court is invited to order a contribution of at least US$128.95 million or $109.67 million, depending on which of two alternative methods of calculation is used to compute BOI's liability for the losses to depositors.

**Dividends**

125. The position about dividends was further particularised in a letter from Lovells to Penningtons dated November 28, 2003, which Mr Dyson dealt with during his evidence on quantum. In relation to BCCI Overseas, dividends were declared and paid for all five years from 1981 to 1985. In each year at least one interim dividend was paid in addition to the final dividend of the year in question. So for 1981 two interim dividends were paid, the first being US$25 million in June 1981 and the second $15 million in August of that year. A final dividend of $5 million was paid on June 17, 1982. For 1982 there was an interim dividend of $20 million paid in December 1982 and a final dividend of $45 million, which was paid on January 19, 1983. This is the first dividend included in the liquidators' claim. Mr Dyson was challenged by Mr Hirst about the 1982 dividend of $65 million on the basis that no claim is being advanced for losses attributable to the first transaction at the end of 1981. Mr Dyson said that he was prepared to drop the claim for the 1982 dividend. That concession was plainly based on a misunderstanding by Mr Dyson of what the 1982 dividend related to. Although the first part of it was paid on an interim basis in December 1982, it was attributable to the profits in the year ending December 1982, which were affected not by the first transaction but by the second. I am not prepared to accept that concession. Mr Hirst's other preliminary point concerned the claim for the 1987 dividend. This, as Mr Dyson accepted, is not related to any of the six transactions. He said that it was included because the business of BCCI continued after 1985 right through to 1991, and the dividends in those subsequent years had been included in the claim as consequential upon the false accounts in the years up to 1986, which allowed BCCI to remain in business.

126. Mr Hirst reserved his right to submit that these subsequent dividends were based on audited accounts which were not influenced by any arrangements with BOI, but in the end none of this proved to be necessary. The real difficulty about the claim based on dividends is that there is no evidence that they caused any loss at all to the creditors of BCCI. As Lovells made clear in their letter, the documentation available to the liquidators in London and Grand Cayman does not evidence payment of some of the interim dividends of BCCI Overseas or the payment of the two dividends by BCCI SA. But beyond this it is common ground that any dividends paid by the company were paid to BCCI Holdings. What the accounts of BCCI show is that moneys credited to BCCI Holdings as dividends were then reversed or matched by corresponding transfers back to the BCCI group. So, for example, the US$40 million interim dividend paid on October 11, 1983, is matched by two countervailing entries, each of $20 million. A similar pattern emerges in relation to subsequent payments. Sometimes the reverse entries are designated as subscriptions for shares. On other occasions there are transfers to what is described as BCCI Luxembourg. Mr Dyson made the point in evidence that although BCCI Holdings credited the dividends back in the way I have described, the nature of the payments

© 2004 Sweet and Maxwell Ltd

changed in the process. But he accepted that the net effect of these entries, even assuming that the dividends were ever paid, was that from the creditors' point of view nothing changed. No actual cash left BCCI SA and BCCI Overseas. In these circumstances it seems to me inappropriate to base any order for contribution on the dividends declared by these companies, even assuming that they were ever paid.

**Other loss**

127. The back-to-back arrangements entered into between BCCI and the Indian and Swiss banks that I have referred to allowed BCCI to remain in business. That remained the position until 1991. But the liquidators have to concede that to visit BOI with liability for all the losses which occurred in that period would be disproportionate. They have therefore limited the losses claimed for to the trading losses in the financial years 1983 to 1985 inclusive, and they seek by way of contribution a proportion of those losses by reference to a formula which is designed to limit liability in the three relevant years to losses caused by the treasury frauds (as opposed to other fraudulent activities), taking into account the contribution to those losses by the other banks and by Mr Khalil. The formula is A/B x C, where A is the amount of funding provided to BCCI by BOI via Maram in any particular year; B is either (a) the total amount of back-to-back loans obtained by BCCI from parties whom the liquidators allege had knowledge of the frauds in each year, plus Mr Khalil's deposits, together with a false audit confirmation, or (b) the amount assumed to be needed by BCCI to fund the losses, expenses and fictitious profits on the Khalil accounts; and C is the further loss incurred in the 12 months following the year end of each relevant back-to-back transaction caused by the treasury frauds. Taking those years as 1983, 1984 and 1985, the calculations are therefore based upon losses sustained as a result of the second, third, fourth and fifth transactions.

128. The calculation of losses due to the treasury frauds has been carried out using what are referred to as the Akbar Schedules. These are records kept by Mr Akbar of the transactions used to conceal the losses on the Khalil accounts. The calculations made on this basis are set out in Appendices 4–6 of the liquidators' accounting report. Mr Preece and Mr Dyson, the authors of that report, say that they have approached Mr Akbar's schedules with some caution, but other BCCI records have largely corroborated their contents. They consider the Akbar Schedules to be broadly accurate. BOI's expert accounting witness, Mr Kabraji, in his own report, criticises the liquidators' reliance on the Akbar Schedules and says that he is not satisfied about the verification process which Mr Preece and Mr Dyson say they have undertaken. He was not critical of the sources used, but he complained in evidence that Mr Dyson and the liquidators had not provided him with sufficient information to verify that the way in which they had calculated the losses was correct. This led to an examination of the history of the accounting report which I do not propose to go into. The fact is that Mr Kabraji was supplied with the limited amount of documentation which he wished to see and could have inspected a much wider range of documents, had he chosen to do so. On the material before me there is nothing to suggest that Mr Preece and Mr Dyson have not analysed the Akbar Schedules and the supporting material in a balanced way, and I reject Mr Kabraji's criticisms of what they have done. It seems to me that the Akbar Schedules, prepared as they were to facilitate the fraud, are likely to be accurate records.

129. That leaves the question of calculation. The liquidators have calculated the losses for which BOI should be held responsible, according to the A/B x C formula, as US$109.674 million, made up of $44,171,638 for the year ending December 31, 1983, $37,927,233 for the year ending December 31, 1984, and $25,575,072 for the year ending December 31, 1985. In percentage terms, BOI is said to be responsible for 24.3 per cent, 13.9 per cent and 11.3 per cent of the losses in 1983, 1984 and 1985 respectively. Mr Kabraji does not challenge the liquidators' arithmetic, but contends for a number of changes in the components of the formula, assuming (which he does not) that it represents the correct methodology. His view remains that BOI should not be made liable for anything more than the lost interest, unless it

can be shown that it actively conspired with Mr Khalil and the other banks who are said to have had knowledge of the fraud. On the basis, however, that the formula is the correct approach, he says that the denominator B should be expanded to include other funds which were used by Mr Akbar to inflate the balances on the Khalil accounts. These were moneys from various Islamic corporations and individuals which I shall refer to for convenience as the Islamic deposits. He has also added in the funds made available from the ICIC portfolio account no. 20071 referred to in the Akbar Schedule of October 31, 1983. Some $100 million of funds were from this account and were used to credit the Khalil accounts. By recalculating denominator B in this way, Mr Kabraji has produced denominators of $618.470 million, £907.814 million and $958.395 million for the three years in question, as opposed to the liquidators' denominators of $175.470 million, $430.814 million and $411.395 million for the same years.

130. In relation to the figure for losses (C), Mr Kabraji makes a 50 per cent reduction in the liquidators' figure of $243.43 million for 1985, because (as the liquidators say in their report) the Akbar Schedules do not exist at December 31, 1985, and they have therefore used the line item 'Adjustments' as the basis of their calculation. Mr Dyson says that the liquidators have ignored all other line items and that their calculation almost certainly understates the total losses from treasury frauds for that year. When Mr Kabraji was asked to explain the basis for his further reduction of 50 per cent, he accepted that it was an arbitrary figure, designed to reflect what he regards as the unreliable nature of the material used as the basis for calculation. Given the conservative nature of the liquidators' approach to the calculation of losses for 1985, I can see no justification for making this 50 per cent deduction. Mr Kabraji has not carried out any detailed work of his own to substantiate such a reduction and it is little more than guesswork.

131. Mr Kabraji also contended for a reduction in the amount of the losses attributable to the treasury frauds by removing losses incurred outside the periods during which the BOI funding was available to Mr Akbar. A particular example of this, relied upon by Mr Kabraji, are the losses incurred in metal trading which were subsequently hidden by fictitious trades with Euro Commodities Ltd, a company controlled by Mr Akbar. In the second half of 1983 trading on the LME resulted in BCCI holding a number of loss-making positions which were concealed by trades with Euro Commodities. The bulk of the metal trading losses were incurred between July and October, when BOI funding was not in place, and Mr Kabraji suggests that they ought not to be treated as attributable to the BOI back-to-back loans. It seems to me that this is too narrow an approach. The liquidators' calculation of losses in the years 1983 to 1985 is based upon the premise that, but for the BOI funding, BCCI's insolvency would have been exposed and it would not have been able to continue trading at all. Logically, as I have already indicated, this would lead to a claim based on all trading losses in subsequent years, but the restriction of the claim to the three years from 1983 to 1985 is intended to recognise that a multiplier based on all subsequent losses would be excessive. There is, however, in my judgment, no reason to limit the losses within the three selected years to those which are precisely contemporaneous with the availability of the BOI loans. That seems to me to be unrealistic and wrong in principle. I do not intend to make any further deductions in the loss figures on that basis.

132. On the basis of the revisions made to the liquidators' calculations which I have referred to, Mr Kabraji assesses BOI's proportionate share of the relevant losses at US$32.678 million. To this he applies a time apportionment calculation which reduces the claim by a further 63 per cent, but Mr Hirst did not seek to support this in his closing submissions and I need say no more about it. For the reasons already given I am not persuaded that it would be correct to reduce the liquidators' calculation of the losses for 1985 or to make any allowance for the periods within the three years when the BOI loans were not in existence. I also accept the two basic factual premises on which these calculations are based: *i.e.* that BOI was insolvent by 1983 and that, but for the back-to-back arrangements with BOI and others, it would have been forced to cease to trade. The fact that Mr Akbar conducted the treasury frauds over this period is the clearest evidence of what the consequences were likely to have been, had the true

© 2004 Sweet and Maxwell Ltd

position been disclosed. I therefore accept the figures for losses calculated by the liquidators as the appropriate multiplier in the formula. I am also not persuaded by Mr Kabraji's argument that the A/B x C formula should only be applied if it can be shown that BOI and the other lenders were in some way in collusion with each other. A contribution based simply on the lost interest would come nowhere close to reflecting the true damage which their conduct has caused. The more difficult question is whether some adjustment is called for in the denominator. This comes down to considering whether the Islamic deposits and the ICIC portfolio moneys should be included.

133. The reasoning behind the inclusion in the denominator of the bank loans and the Khalil deposits is that they are treated by the liquidators as payments by persons who had knowledge of the fraud. Following my judgment in the case against SBI the loans by that bank fall to be excluded on this basis unless the liquidators' alternative method of calculating the denominator is used, in which case BOI's share of the losses will remain the same. The Islamic deposits and the ICIC payments have not been included, simply because there is no evidence that those deposits were made by persons who had knowledge of the fraud. That is obviously right, but the issue of principle is whether BOI's contribution to the continued existence of BCCI should be measured by reference only to the other knowing contributors or to all other relevant sources of funds. I prefer the latter approach. It seems to me that to disregard any source of funds other than those from entities with knowledge of the fraud would be to impose a disproportionate burden on BOI in this case. My own calculation, using the liquidators' figures for A and C in the formula, but Mr Kabraji's figures for the denominator B, produces figures for 1983, 1984 and 1985 of $12.532 million, $17.999 million and $12.700 million respectively: a total of $43.231 million.

**Interest**

134. The liquidators also seek interest. Three possible bases for an award of interest are put forward: (i) as part of an order for a contribution under s.213(2); (ii) in equity; and (iii) pursuant to s.35A of the Supreme Court Act 1981. It seems to me that I have jurisdiction to include an element of interest in the contribution which I order under s.213. Although the statute does not refer to any power to award interest in terms, it must be open to the court to ensure that any award under s.213 adequately compensates the creditors of the company for the passage of time which has elapsed. This seems to have been the view of Knox J in relation to an order under s.214 of the 1986 Act (see *Re Produce Marketing Consortium (No. 2)* (1989) 5 BCC 569) and I can see no reason not to apply the same principles under s.213.

135. That leaves the question of the appropriate rate and the period for which interest should run. I think that the appropriate rate is base rate plus 1 per cent. This is the usual rate applied in commercial cases unless it would be unfair to one or other of the parties. I can see no basis on which BOI could object to this rate. That leaves the date from which interest should run. I consider that it should run from the date of liquidation in 1991 and that it should be simple interest. However, as I have heard no detailed submissions on interest, the parties should regard my conclusions on this matter as open to further argument, if they wish, once this judgment has been handed down. In the absence of further dispute, I will award a payment in favour of the liquidators in the sum of US$43.231 million with interest from the date of liquidation at the rate I have specified.

136. I am grateful to counsel and to their solicitors for the assistance I have received.

(*Order accordingly*)