# Nightingale Finance Ltd v Scott
# (Unreported, Ch D, 18 November 1997)

# Exhibit 18

# Nightingale Finance Ltd. v Scott and another [1997] Lexis Citation 4477

CHANCERY DIVISION

CARNWATH J

18 NOVEMBER 1997

18 NOVEMBER 1997

**Land — Mortgages — Plaintiff seeking to enforce charge over defendants' house — Defendants claiming that charge obtained by fraud of plaintiff's agent — Whether plaintiff legally responsible for actions of agent — Whether causal connection between responsibility and defendants' losses**

C R Parker for the Plaintiff

J Marks QC and K Houghton for the First Defendant

N Yell for the Second Defendant

## This is a signed judgment handed down by the judge, with a direction that no further record or transcript need be made (RSC Ord 59, r(1) (f), Ord 68, r1). See Practice Note dated 9 July 1990, [1990] 2 All ER 1024.

**CARNWATH J**

Nightingale seeks to enforce a legal charge over the defendants' house, known as Longmore Grange, in Wokingham. The charge was taken as security for a loan, made in January 1990, of £450,000. With accrued interest the amount now claimed is over £1.5m.

Their defence, in summary, is that the charge was obtained by the fraud of Nightingale's appointed agent, Castlegate Securities Ltd ("Castlegate"), a company owned and managed by Mr Roy Wharton, and that Nightingale knowingly or recklessly assisted his actions, or in any event were negligent in failing to control them. (In September 1994 Mr Wharton was convicted of fraudulent trading in respect of his management of Castlegate and is now in prison.) In the alternative, Nightingale seek to be subrogated to a charge held by the National Westminster Bank plc ("NWB") in respect of a proportion of the advance which was used to pay off NWB loans or overdrafts. Mr and Mrs Scott counterclaim for damages for fraudulent misrepresentation by Nightingale, and other relief. Mrs Scott has a separate defence based on *Barclays Bank -v- O'Brien*.

It emerged during the hearing that Longmore Grange was subject to a so-called "partnership undertaking" initially dated 1 January 1980, the agreed effect of which was that the beneficial interest was held equally, in four parts, by Mr and Mrs Scott and their children, Mark and Xanthe. Consideration was given to joining the children in the proceedings, but, as I understand, this was not practicable in the time available.

*Evidence*

Disentangling the facts has been made difficult by the nature and form of the evidence. Most of the Castlegate files were removed by the SFO in late 1990 and only returned after the trial. They had not been fully examined or digested for the purpose of the present case. Relevant documents were still being produced during the course of the hearing. The Scotts themselves had very few records of their dealings with Castlegate.

So far as oral evidence was concerned, the principal contemporary witnesses were Mr and Mrs Scott, Mr Wharton and Mr Alexander (managing director of Nightingale in 1989-90). Mr Wharton's evidence, as that of a convicted fraudster, has to be treated with great caution. Mr Alexander, as will appear, had only limited recollection of the matters relevant to the Cobvale loan. The defence therefore relied to a large extent on the defendants' own recollection. Unfortunately, as I shall explain, neither of the defendants proved to be a very useful witness on questions of fact.

The following factual account is accordingly tentative in some respects, but is I believe sufficient as a background to the determinative issues.

*Factual background*

Castlegate

Castlegate was one of a group of companies run by Mr Wharton in the 1970s. It arranged mortgage lending for small borrowers. To fund this lending he encouraged private investors to set up their own lending companies, to provide funds which would be lent to borrowers at a higher return. By 1989 Castlegate had under management over 50 such lending companies.

Mr Scott was an early investor with Castlegate. He had met Mr Wharton because their children were friends at school. His lending company was Cobvale Ltd ("Cobvale"), incorporated in November 1973. Mrs Scott acquired an interest in 1982. Originally Mr Wharton held half the shares and was also a director and secretary, but by 1987 he had relinquished those interests. Thereafter the shareholdings were: Mr Scott 65,000 shares, Mrs Scott 15,000. By then Mrs Scott had become secretary, and she and Mr Scott were the only directors. In spite of these changes the management of the company was at all times carried out by Mr Wharton, and the involvement of the Scotts was minimal. Mr Scott had complete trust in Mr Wharton's judgment, and Mrs Scott in turn trusted her husband. The Scotts did not receive any formal reports from Mr Wharton, or even lists of loans or amounts, but occasionally there were informal discussions between him and Mr Scott. Otherwise their only source of information came from the annual accounts, audited by Morley and Scott.

Part of the arrangement was the so-called Castlegate "guarantee", under which, if there was a bad loan, Mr Wharton undertook to make it good. This seems to have been an informal arrangement. The only reference to it in the papers is in the Castlegate brochures which asserted: "Castlegate guarantees these mortgages, so full capital protection is assured". Mr Scott believes that there were occasions when the guarantee was operated in his favour.

Between 1973 and 1989 the arrangement worked satisfactorily from the Scotts' point of view. The principal type of lending was on the security of residential property. By 1989 Mr Scott had entrusted very substantial sums to Mr Wharton. In 1987 to 1988, having received amounts totalling over £280,000 from the sale of properties and redundancy pay, he entrusted £248,000 to Mr Wharton in one form or another. According to Mr Scott, he made the following "investments":-

February 1987 - purchase of 20,000 £5 shares

in Castlegate - £100,000

3 March 1987 - invested in Castlegate - £70,000

12 January 1988 - invested in Sussex Mortgage

Company, transferred to Castlegate £34,000

23 March 1988 - invested in Sussex Mortgage

Company, transferred to Castlegate £44,000

Total - £248,000.

These figures are taken from his witness statement but there is remarkably little contemporary documentation in respect of the investments, apart from the purchase of Castlegate shares. That share purchase is not in doubt; Mr Scott hoped to participate in a "meteoric rise" in Castlegate's fortunes, which Mr Wharton anticipated. As to the investment of £70,000, there is a record of such a payment in a Castlegate ledger. According to Mr Scott it was intended as an interest-bearing loan to Castlegate, but there appears to be no other documentary evidence of it or its terms. The Sussex Mortgage Company, according to Mr Scott, was a new venture planned by Mr Wharton which never materialised. He was told by Mr Wharton that the money was put back into Castlegate. There are records of the payments, and there is a letter, signed by Mr Wharton dated 10 May 1988, in which he confirms -

> "that I am holding £100,000 which you have loaned to me in Sussex Mortgage Company Ltd and that this sum is returnable on demand."

Mr Scott is unable to account for that figure, which is £22,000 more than the £78,000 which he believed had been advanced to the Sussex Mortgage Company. There is no subsequent record of what happened to the money. Nor is there any evidence that Mr Scott tried to recover it, even in 1990 when he was attempting to repay the Nightingale loan.

Mr Scott was challenged on these figures in cross-examination, particularly having regard to his statement in his first affidavit (5 August 1991) that before 1990 he invested "very small sums" in Castlegate. I do not understand how he could have made this statement, which was simply untrue. It is impossible from the documentation and evidence before the Court to reach a wholly reliable picture of what sums were paid and what happened to them. But in the light of the subsequent evidence, it seems clear that he did invest substantial amounts in Castlegate well before the Nightingale loan. His explanation was that "Castlegate seemed to be doing well, so further investment in it seemed like a good idea." Today, with hindsight, he describes what he did as "barmy".

Although from the point of view of the Scotts, and no doubt other investors, the management of Castlegate continued unchanged throughout this period, there appears to have been a significant change in the nature of its activities from about 1986. Mr Wharton began from about 1986 to deal with what were referred to within Castlegate as "multiple borrowers". Previously loans had been single loans (mostly for home improvements or top-up mortgages) to individual residential owner occupiers secured by second mortgages on their homes. The multiple borrowers were individuals with whom only Mr Wharton dealt directly. Large amounts of money were lent to them over the following years, in the form of multiple loans secured on several different properties. The loans were not regularly serviced, but occasionally they would be paid off when the properties were sold. Mr Wyatt and Miss Holter, who at the time were responsible for the Castlegate books (they were shareholders and directors), were aware of this practice and questioned Mr Wharton about it. His justification was that the properties in question were "development properties". Castlegate's cashflow was diminished, and income began to be generated by what were termed "brokerage service charges" incurred by Castlegate moving loans around between the various finance companies. Matters came to a head within Castlegate in January 1988 at a heated board meeting where Mr Wharton was questioned about his conduct of the business. Following that meeting, Mr Wharton invited his fellow directors to resign, which they did, although they continued as employees and shareholders. These internal disagreements were not made known to Mr Scott or anyone else outside the company.

*Nightingale*

The Plaintiff company ("Nightingale") was created through the initiative of Mr Wharton and Mr Alexander, who from April 1989 was managing director of the Consumer Loans Company Ltd, ("CLC"). The purpose was to provide a vehicle for lending by CLC's parent, the National Homes Loan Group ("NHL").

Mr Alexander and Mr Wharton had met previously in about 1987 when Mr Alexander was attempting to establish his own consultancy. By November of that year they were discussing the possibility of co-operation in providing mortgage monies for lending by Castlegate, but nothing came from the discussions at that time.

When Mr Alexander joined the NHL group in 1989, it was seeking to expand its activities, and Mr Alexander saw Castlegate as a good opportunity to advance this aim. There were meetings between officers of CLC and Mr Wharton during the summer of 1989, following which Mr Alexander prepared a memorandum dated 8 September, in which he described the "NHL opportunity":-

> "Castlegate presently have in excess of 50 lending companies operating under their management umbrella, but owned by either individual or institutional investors. For each of these companies Castlegate introduce borrowers, process the loans and administer the collection of the accounts.
>
> They generate income for themselves by charging a brokerage fee to the borrowers which is added to the advance (normally between 10% and 15% of the advance) on interest rates of between 1.5% and 2.5% per month. They keep the whole of the brokerage fee and any interest generated on the accounts in excess of 1.5% per month, i.e. they guarantee 1.5% per month on the portfolio to the investor.
>
> On these terms they presently have more applications than they can fund from their existing sources which, because the vast majority are private investors, have historically been supplied on an inconsistent basis. Obviously the opportunity to build a relationship with an organisation such as ours, which can guarantee the availability of funds, is of interest to them and offers us the opportunity to procure a substantial return on funds invested with virtually no set-up and operating costs. All loans would have to meet our preset criteria, and any loans which fall into arrears by more than three months will either be re-purchased or replaced with new accounts by Castlegate.".

He proposed that in order to take advantage of this opportunity a "vehicle company" should be set up, owned 100% by CLC, which would operate according to criteria defined by CLC. He envisaged that Castlegate would manage every aspect of the company, except the disbursement of funds, but would be checked daily to ensure adherence to the agreed terms. For the latter purpose there would be CLC employees placed in Reading to exercise daily controls before payout and issue of cheques.

Nightingale itself had been acquired off the shelf by Mr Wharton and a fellow Castlegate director. It obtained a consumer credit licence on 16 February 1989, at which time its place of business was shown as Castlegate's address. CLC acquired the shares in Nightingale on 26 September 1989, and CLC executives became directors, including Paul Alexander and Ian Muat, respectively as Managing Director and Chairman.

On the same day Castlegate entered into an Operating and Agency Agreement with CLC. CLC's understanding of the effect of the agreement was summarised in a letter to Mr Wharton from Mr Shelton, the Controller of Legal Services with NHL, who was working on the draft agreement in early September 1989. He said this:

> "My understanding of the general structure is that the Consumer Loans Company will acquire a wholly owned single purpose vehicle company ('V. Co') formed and supplied by CG for the purpose of the proposed transaction. CG, as agent of V. Co will procure borrowers and make secured advances within parameters prescribed in the agreement. Monies received from the borrowers will be passed through to V. Co and in return CG will received a fee from the borrower, a proportion of interest paid and any early redemption premiums. The NHL Group is to have no administrative involvement whatsoever in the transaction i.e., CG will ensure payment by the Borrowers under the terms of the Loan Agreements and will conduct any enforcement procedures on the their own behalf (CG will be obliged to re-purchase any account more than 3 months in arrears)."

The following terms of the Agreement indicate the main features of the arrangement:-

> *Clause 1) Definitions*

'The Services' means:-

(a) The procuring of Borrowers for and advances by way of a Loan Agreement of secured consumer loans from the monies from time to time standing to the credit of the Advances Account;

(b) The administering of the Loan Agreements and in particular the ensuring of payment by and receipt of all monies due from the Borrowers under the Loan Agreements and the remitting of such payments to the Lender;

(c) Subject always to the prior agreement of the Lender, the issuing of any redemption, release, or discharge from or under the Loan Agreements.

All in accordance with the terms hereinafter appearing, the mandate for the Advances Account and the Loan Agreements.

*Clause 2) Agency Appointment*

'2.1 Subject to Clause 2.2 and Clause 4 the Lender hereby empowers and appoints the Broker to be its lawful agent and its behalf to provide the Services and the Broker accepts such appointment on the terms hereinafter appearing.

*Clause 3) Undertaking*

The Broker agrees and undertakes to the Lender:-

(b) At its own expense and cost to carry out such advertising and marketing as is reasonably necessary for its performance of services.

*Clause 4) Terms of Advance*

4.2 Each and every Relevant Advance shall:-

(b) comply with the criteria in writing from time to time delivered by the Lender to the Broker and which at the date hereof or more particularly set out in the Schedule;

(c) bear interest at a gross monthly rate of not less than 1.5%.

*Clause 8) Remuneration*

8.1 In relation to any Loan Agreement:-

(a) insofar as any payment to be credited to the Receipts Account pursuant to Clause 6 comprises interest the Broker may deduct a sum calculated on the basis:-

| *Gross Monthly Rate* | *Castlegate Deduction* |
|---|---|
| 2.5% | .625% |
| 2.25% | .5625% |
| 2.00% | .50% |
| 1.75% | .25% |
| 1.50% | Nil |

> (b) The Broker may retain any premium paid by the Borrower in respect of early redemption."

The first criteria under Clause 4.2 were set out in the schedule to the agreement and were as follows:

> "(A) A charge must be obtained over a traditionally built owner occupied property which is either freehold or leasehold with at least 25 years remaining at the end of the term of the Loan Agreement.
>
> (B) An advance plus any prior mortgage must not exceed 75% of the market valuation or purchase, where relevant, which ever is the lower.
>
> (C) There must be no more than either two County Court Judgements or two defaults registered against any potential Borrower.
>
> (D) In the event of there being a charge ranking in priority to the charge to be given by a Borrower in favour of the Lender then there must be no more than two instalments in arrear under this charge at the time of the advance.
>
> (E) A valuation is required by a qualified Valuer to ascertain the current market value, re-instatement value, type of construction and any defects."

Mr Alexander's recommendation that CLC should retain responsibility for disbursement of funds was not adopted. It was decided that the NHL finance department would produce arrangements for the financial control and reporting framework. A memorandum prepared by the finance department on 26 September proposed that advances would be made by Castlegate who would be reimbursed by Nightingale. Advances would be authorised by Castlegate management with the approval of an employee of CLC "in situ".

The latter task was normally performed by Colin Sanders, a sales manager with CLC. He attended Castlegate's premises when loan applications were ready for checking and confirmed that the documentation was in order, including the loan agreement, the legal charge the loan application and the valuation report. The matters he was required to check were comprised in a "checklist", with boxes to be ticked against the various requirements. Although this task was normally performed by Mr Sanders, on occasions the task was performed by other CLC staff visiting the premises, including on occasions Mr Alexander himself.

*The "Nightingale Plan"*

In mid 1989 Mr Wharton told Mr Scott of his discussions with NHL, which he hoped would "make his fortune", by enabling him to double the size of his business within two years. Towards the end of the year Mr Wharton mentioned the possibility of an "equity release investment", which he called "the Nightingale Plan". The concept, as Mr Scott understood it, was that he would borrow a sum of money from Nightingale to be secured on his house, which money would be put into Cobvale for re-lending to secured borrowers at a rate of interest slightly in excess of the rate of interest to be paid to Nightingale. He understood that this could produce an annual income in the region of £15,000.

It is important to record Mr Scott's understanding of the involvement of Nightingale. In his statement, he says this -

> "Mr Wharton told me that his principal (Nightingale) was quite happy to advance monies for this particular purpose. I assumed that (Nightingale) would want to know the purpose for which the monies were being lent, although I never completed or signed an application form. Mr Wharton told me that Paul Alexander (Nightingale's) managing director (who was also a divisional director of National Home Loans Holding plc), had full knowledge of and approved the Plan. He also told me that he (Wharton) totally controlled the lending of the plaintiff and was authorised to arrange loans as he saw fit provided they met with the plaintiff's lending criteria. He said that, as the plaintiff was to be inputting up to £1m per month, the money I borrowed for the plaintiff could be repaid to it at short notice by selling Cobvale's loans.... The Cobvale loans would be guaranteed against loss by Castlegate and (Nightingale) the latter being backed by a highly respected multi-billion company, National Home Loans plc of which (Nightingale) was a wholly-owned subsidiary. With this guarantee, together with the involvement of National Home Loans who would, I reasoned, keep an eye on Mr Wharton and the business (it being their money after all), I considered that we could not lose our money and I agreed to go ahead with the scheme."

It is to be noted that he relied entirely on what he was being told by Mr Wharton, and his own inferences from it. There is no suggestion that he sought or obtained any information from anyone else in Nightingale or CLC.

Furthermore, Mr Scott's description of the "Nightingale Plan" relies wholly on his own recollection. There is no contemporary record.

A valuation of the property was made by White and Co, who were valuers appointed by CLC. They valued the property at £650,000. On that basis Mr Wharton decided that the loan should be £450,000.

At this time the National Westminster Bank ("NWB") held a first charge on the property in respect of debts of the Scotts, and of their children's company, Sunbeams. Sunbeams was a company set up in 1988 by the Scotts for their two children to run. Mr and Mrs Scott were shareholders and guarantors of Sunbeam's overdraft with NWB. At the time of the Nightingale loan, the sums owed to NWB and secured on the house were as follows:-

| | |
|---|---|
| Sunbeam's Ltd overdraft - | £35,000 |
| Personal overdraft - | £10,000 |
| Home improvements loan - | £27,008.63 |
| Cobvale Ltd Business Development Loan | £34,829.80 |
| Total | £106,838.43 |

Mr Wharton agreed with NWB that on payment of the £450,000 into the Cobvale account their charge would be postponed to that of Castlegate up to that figure.

The first Mr Scott heard of the actual amount of the loan was when he received the loan documents. They were delivered by hand at his home on 12 January by a Castlegate employee who waited to take them back after signature. The documents had been completed by Mr Wharton and required only signatures. Mr Scott was surprised that Nightingale was prepared to lend such a large sum on the security of his home, and he was surprised that the house had been valued so highly. He immediately telephoned Mr Wharton, but was told that Cobvale would not be "viable" without the proposed sum. Mr Wharton had previously shown him Nightingale documentation which indicated that there would be a seven day "cooling off" period after signing the agreement, in which he could withdraw. Mr Wharton repeated this during the conversation on the 12th.

Mr Scott then signed the document. His wife was out of the house, at Sunbeam's offices. Mr Scott spoke to her by telephone and asked her to sign the documents which the Castlegate employee would bring to her. She did so, as she says, without looking at them or raising any questions. Forms of consent were also signed by the two children, Xanthe and Mark, as persons in occupation (the fact that they had a beneficial interest by virtue of the 1980 undertaking was overlooked). The documents were then brought back to Mr Scott. The various signatures were witnessed by Mr Keith Baker, a bricklayer, who was working on the site. The documents signed by Mr and Mrs Scott were a credit agreement, providing for a loan of £450,000 with monthly repayments of £8,108.33, and a legal charge over the house, Longmore Grange.

Meanwhile, Mr Wharton had completed an application form in the Scotts' names for a loan of £450,000 from Nightingale. The form stated his income as £70,000 and hers as £15,000. There was no basis for either figure. (A letter from Mr Howard, Mr Scott's accountant, to Barclays Bank dated 8 February 1990 referred to below, gave his only income as a pension of £8,000, and hers as a salary from Cobvale of £10,440). The form gave the value of the property as £650,000. The space for "signatures of applicants" was left blank. The purpose of the loan was not stated.

It is not clear precisely what steps were taken within Nightingale to approve the loan prior to payment. There is in the papers a copy of the checklist, in which the various requirements (including that of an "application form") were ticked without comment. Mr Alexander said in evidence that, as the largest loan made by Nightingale up to that

time, it would have required Mr Muat's approval, and possibly Board approval; but there is no minute or other record of either. Mr Wharton said in evidence that he had discussed the loan with Mr Alexander; he explained that the money would be invested in the Scotts' lending company and that monies from that investment would be used to refund payment of the loan to Nightingale. Although Mr Alexander does not recall this conversation, I accept that it took place.

Mr Wharton said, in addition, that he agreed with Mr Alexander that "the repayments would be interest only". Mr Wharton's evidence on this point is supported by the fact that the payments actually made between February and October 1990, as recorded in Cobvale's bank accounts, were £6,750 per month (1.5% of £450,000 or 18% p.a.), rather than £8,108.33 as specified in the Credit Agreement for repayments of interest and capital. On balance, I accept Mr Wharton's evidence that he discussed this point with Mr Alexander, although probably not at the time the original loan was approved. It is more likely to have happened as response by Mr Wharton to Mr Scott's "second thoughts" (see below).

Mr Scott quickly began to have second thoughts about the loan. On 17 January, which he believed to be within the seven day cooling off period, he telephoned Mr Wharton and asked to withdraw from the agreement. Mr Wharton told him that it was too late to withdraw but said that he would get the money back by selling the Cobvale loans. Mr Scott understood that Mr Wharton was agreeing to "unpick" the arrangement immediately. He then received a letter from NWB dated 19 January confirming that the arrangement had gone through. He went back to Mr Wharton for an explanation but was again given the reassurance that the arrangements would be made within a short time to enable the loan to be repaid.

The sum of £450,000 was paid by Nightingale to Castlegate on 16 January and into Cobvale's bank account on 18 January. The Cobvale bank account was in practice controlled by Mr Wharton. The subsequent use of these funds can be traced through the Cobvale bank account. On the 18th, £106,838.43 was used to pay off existing indebtedness on other NWB accounts, as explained above. Most of the remainder of the money was used to acquire loans on Cobvale's behalf. Cobvale's own overdraft was reduced temporarily from over £100,000 to about £25,000, but it rose again over the following two weeks to nearly £80,000, as loans were acquired.

Mr Scott's position in the following months is difficult to follow. On the one hand, he says that he was expecting Mr Wharton to extricate him from the Nightingale loan by securing repayment from money previously invested with Castlegate. On the other, he says that Mr Wharton was pressing him to "replenish" the £450,000 in Cobvale, on the grounds that the payments made to NWB were a purely temporary arrangement and that Nightingale required him to make available the full £450,000 for investment. Mr Scott claims that, in pursuance of the latter objective, a total of £187,000 was added by him to the Cobvale account, from various sources. Payments adding up to this amount can be traced in the Cobvale account between February and November. Of this, it seems likely that £100,000 can be attributed to his sale to Mr Wharton of his shares in Castlegate in Summer 1990 (Mr Wharton bought out all the other shareholders at the time, using funds attributed to the sale of his property in Heron's Reach.). Otherwise the precise derivation and purpose of these payments is largely a matter of inference or speculation.

It is very hard to understand why Mr Scott did not simply call in his existing Castlegate loans, for example the loan to Sussex Mortgage Co., for which he had a signed acknowledgement from Mr Wharton. Furthermore, part of the arrangement which Mr Scott says he had discussed with Mr Wharton was that £96,000 would be retained in Castlegate or Cobvale as a "buffer fund" equivalent approximately to 12 monthly repayments. If a "buffer fund" had been intended, one would have expected Mr Scott to have referred to it when seeking means to repay the loan. There is in fact no evidence that such a fund was created, or that Mr Scott pressed for it to be created. The whole £450,000 was paid into Cobvale, and treated as available for investment.

There is also evidence that Mr Scott was seeking to raise an amount similar to the Nightingale loan from other sources. His accountant wrote to Barclays on 8 February enquiring about the possibility of an overall facility of nearly £500,000, one purpose being "to inject as much capital into Cobvale Ltd as possible". On the 19th he reported to the Scotts that Barclays were unwilling to assist. There is a further letter from Mr Howard to Mr Scott

dated 17 May 1990, in which they appear to be discussing a further loan of £500,000 from "The Mortgage Corporation". Mr Scott, however, says that by the end of January he was expecting Mr Wharton to secure repayment of the Nightingale loan, and that he was not interested in further borrowing. He was unable to explain the May letter. Mr Howard thought it was probably intended to refer to the existing Nightingale loan, and the reference to the "Mortgage Corporation" was a mistake. I do not find that a very convincing explanation, but no other is readily available.

*The collapse of Castlegate*

Between March and November 1990 there were various visits by CLC accountants and officers to review the financial accounting procedures of Nightingale and Castlegate. Samples of files were reviewed, but no anomalies were discovered. On more than one occasion, the visitors noted the difficulty of checking the completeness of repayments, as Nightingale did not have access to Castlegate bank statements. On one visit, it was noted that some of the properties appeared to have been overvalued, but it was thought that the discrepancies were due to the volatile house price market, rather than anything untoward. The concerns were not sufficient to prevent thought being given within CLC, by the end of May, to expanding the Nightingale facility. Following this report, on 19 June Mr Alexander wrote a memorandum to Mr Milner, managing director of NHL, reporting that the operation was "both profitable and secure" and supporting a recommendation, for an increase to £15m. This was agreed. In early September and October Mr Alexander and Mr Wharton were continuing to discuss the details of the arrangement for expanding the Nightingale facility. Mr Wharton wrote on 10 September confirming that the facility "would continue to do well and there are absolutely no problems with it". He noted that during 1990 they had written some £12m worth of first mortgage business for Nightingale.

During this period, Castlegate staff, such as Mr Wyatt and Miss Holter, were aware that company was facing serious difficulties, but they did not tell anyone outside Castlegate or Mr Scott. They were worried about the possible effect on their shares. They were relieved when Mr Wharton agreed to buy them out in June.

On 2 November, following a visit by NHL staff to Castlegate premises, serious errors were discovered in the reconciliation of the Nightingale account. According to a statement by Mr Allen, a CLC accountant, an analysis of the 161 loans of Nightingale showed that only 11 were "performing". On 5 November Mr Milner reported to the NHL board that "a substantial fraud" had been discovered. It was agreed (inter alia) to inform the Bank of England, and "to take action to protect our assets and to recover our funds insofar as our activities are ethical, legal, and in accordance with our lawyers' general advice."

Mr Tan, a CLC accountant, was instructed to investigate the background to determine the causes. Mr Milner's memo to Mr Tan said:

> "The purpose of this investigation is not to punish, but to make sure everybody involved understands the significance of the actions they took or did not take. As far as I can see everybody in the chain failed and I want everyone to understand the nature of their individual and collective failure."

Mr Tan reported shortly thereafter. He said:

> "We have effectively placed a 'blind man's trust' upon Roy Wharton..."

He summarised his conclusions as follows:

> "The affair of Nightingale Finance Ltd has highlighted many of the shortcomings, including attitudes and abilities, both of individuals and collectively, and these are summarised as follows:
>
> There were no effective controls.
>
> Lending/underwriting criteria were not formalised.
>
> It was considered insignificant/immaterial in the context of the group.
>
> Controls were delegated without supervision.

> Expertise of various persons was assumed.
>
> Information used for decision making was selective.
>
> Where weaknesses were identified they were not followed up.
>
> Wrong attitudes of management - feelings of insecurity.
>
> Qualified accountants were acting as glorified book-keepers.
>
> Directors lack the perception/understanding of risks in general and the concentration of risks.
>
> 'Too many kites had to be flown in a short space of time'.
>
> Lack of critical information for adequate decision making.
>
> Ineffective EFR reporting.
>
> Split/decision of responsibility has brought about the attitude 'it is not my area'.
>
> Complacency."

*Events following collapse of Castlegate*

Castlegate went into creditors' voluntary liquidation on 4 December 1990. At the first creditors' meeting on 4 January 1991 Mr Michael Radford FCA was appointed liquidator with a committee consisting of representatives of five creditor companies including Cobvale. The statement of affairs as at 4 December showed an estimated surplus subject to the realisation of the assets and the costs of the winding up of £310,514. The assets included book debts of £2.8m, a debt to Nightingale Finance of £1.845m and, among unsecured creditors, a "loan" of £96,000. Mr Scott understood the latter to represent the "buffer" fund agreed with Mr Wharton, but there appears to be no independent confirmation of this.

After that meeting Mr Scott assisted Mr Radford in investigating the affairs of Castlegate, including tracing the ownership of monies paid into the Castlegate account. Mr Radford had a master printout from Castlegate showing all the loans from all the companies. Mr Scott was paid a fee which was put into the Cobvale account to help reduce its overdraft. He was also given access to the Castlegate files, including those taken by the Serious Fraud Office. He met Mr Wharton regularly for discussions in the course of these investigations.

Mr Wharton was convicted in September 1994 on two counts of fraudulent trading, contrary to s 458 of the Companies Act 1985. The only difference between the two counts is that one relates to Castlegate Group Holdings Ltd and the other to Castlegate Securities Ltd. He was convicted of carrying on those businesses between 12 March 1988 and 9 November 1990 -

> "for a fraudulent purpose, namely with intent to defraud such other companies and/or persons as provided funds to be lent by, or to persons introduced by, or on properties introduced by (Castlegate)".

He was sentenced to five years in prison.

Mr Scott was present at much of that trial. His witness statement before me includes information which emerged at the trial about the fraud and the other "key players". The gist of his account was not disputed. Mr Wharton appears to have had a number of associates who "borrowed" substantial sums from Castlegate which they were not required to pay. Some of these were convicted with him. For example, Mr Duncan McIntyre had over 200 loans from Castlegate with total outstanding balances of over £6m. He was made bankrupt on 28 September 1990 with a deficiency of almost £5m. Mr Scott refers to some 10 other people who appear to have been associated in some way with the fraud, though not all of them were charged.

Mr Scott also gave evidence of the loans which appeared to have been made by, or sold to, Cobvale itself, numbering 37. The details of these are complex. The available evidence was reviewed by Mr Clarke FCA, who gave expert evidence for the Scotts. His summaries appear generally reliable. In a few cases loans were repaid before the collapse of Castlegate and resulted in a small gain. Generally they resulted in net losses. Many were to what were called multiple borrowers. In 13 out of the 37 there was a prior Nightingale charge. Since November 1990 Cobvale has received no repayments in respect of any of its loans except in relation to 200 Tilehurst Road, where it was able to execute its first charge and secure possession in late 1992. Nightingale was not involved in that property. The value of 200 Tilehurst Road was significantly enhanced by work carried out by Mr Scott himself after securing possession. (Something was made by Mr Parker in cross-examination of the treatment of this property in Mr Scott's tax returns. Having heard Mr Scott and his accountant Mr Howard in evidence, I am satisfied that the treatment of this property does not throw any light on matters relevant to the issues which I have to decide.)

Mr Scott's investigations showed how the fraud had been operated. He identified two principal methods, which he termed "re-do" and "further advances". The first involved an existing non-performing loan being replaced by another loan for a higher sum, often the amount of the original loan plus accrued interest. The loan would be "sold" between investing companies so that the records of the original company making the loan showed the loan being redeemed. The new lender's record showed a fresh loan in a higher sum. Commission was payable to Castlegate on the new loan, as well as a redemption fee. Most of the loans sold to Cobvale between 18 January and 12 February 1990 were in this category. Under the "further advances" method, accrued interest on non-performing loans would be turned into a further advance which meant that the accrued interest would become part of the capital loan to the borrower. The lending company's records would show a payment being received, and it would therefore look as if the loan was performing, when it was not. All loans were secured by charges, but in most cases security was worthless, as there were other higher ranking charges which exceeded in total the value of the properties in question.

*Mr and Mrs Scott as witnesses*

*Overview*

As I have said neither of the defendants proved very useful as an direct witness in relation to the circumstances of the loan. Mr Scott has had plenty of time since the end of 1990 to reconstruct the course of events which led him to invest all his savings with Mr Wharton and mortgage his home. I am sure he has carried out his researches conscientiously, but they make it difficult to place much weight on his independent recollections of what happened in the earlier period. In particular, his regular conversations with Mr Wharton after 1990 make it hard to separate what he remembers himself, from what he has been told by Mr Wharton.

What is clear is that at all times he has tended to place unquestioning reliance on his financial advisers. A recent example of this is in relation to his tax returns for the year to 5 April 1995. These were prepared by Morley and Scott and signed by Mr Scott on 6 October 1995. The capital gains tax computation shows a loss on shares in the Castlegate group of £100,000. This was inconsistent with other evidence, relied on by Mr Scott, that he sold his Castlegate shares to Mr Wharton for £100,000 in 1990, that money being used to "replenish" the money available from the Nightingale loan. Mr Scott's explanation was that he simply did not read the tax return and therefore did not pick the point up. Mr Howard, of Morley and Scott, said that he was not aware that the shares had been sold. What this shows, I think is not active dishonesty on Mr Scott's part, but his tendency to bury his head in the sand so far as financial matters are concerned. It does nothing to increase his credibility as an independent witness of his financial dealings in 1990.

Another example of the difficulty of relying overmuch on Mr Scott's evidence is the question of a payment of £17,000 on 5 November 1990, transferred by Castlegate. This is recorded in the Cobvale bank account, but it was treated by the auditors as a loan by Castlegate to Cobvale. Mr Scott had no direct knowledge of the payment; indeed he was away on holiday at the time. His evidence was that it was a repayment by Castlegate of a previous

loan from Cobvale and he treated it as part of the £187,000 "replenishment" money referred to above. That version seems to have come from his discussions with Mr Wharton. Mr Parker suggested that the timing of the payment, after the discovery by NHL of the serious errors in the Nightingale accounts, implied some collusion between Mr Wharton and Mr Scott. I do not accept that suggestion, but I agree that it is very difficult to reach any firm view about the appropriate attribution of the payment, based on Mr Scott's own evidence.

Mrs Scott was even less useful as a witness, again not because of any active dishonesty, but simply because she preferred not to know. For example, in relation to her position as director and secretary of Cobvale, her evidence was inconsistent. At one stage she said she was quite unaware that she was a secretary or director. However, she qualified this, when faced with the evidence of an earlier affidavit, in which she not only acknowledged that she was secretary but explained why she had been appointed. There was in fact a letter, dated 13 May 1986, addressed to her personally, asking her to sign the minutes and the form 288 in respect of the change to her as company secretary; and there is among the papers a copy of that form signed by her. Although she may have had no recollection of the document, she accepted that she must take responsibility for having signed it.

I would accept that in practice Mrs Scott always followed her husband's lead in financial matters, and that she neither challenged his decisions nor questioned him about documents she was asked to sign. However, this does not seem to have been as the result of any undue pressure by him. It was simply the way they organised their marriage. She trusted him entirely. She had, as she said, a strong mind of her own when necessary; but they had a particular view of their respective roles in the marriage.

*The legal issues - introduction*

A simple analysis is this. Mr Wharton was a plausible fraudster. The fraud was made possible because CLC on the one hand, and the Scotts on the other, placed too much trust in him and failed to carry out elementary steps which would have protected their respective positions. Both CLC and the Scotts have suffered from Mr Wharton's fraud. The significant difference between them is that, at least in this case, CLC had ensured that Nightingale had a first charge over the property of the borrower in respect of the £450,000 they lent, whereas Mr Scott did not ensure that Cobvale had charges of similar priority in respect of its loans. In normal circumstances, there is no reason why a lender in Nightingale's position should be treated as bearing any responsibility for losses resulting from the uses made of the money lent. Prima facie, therefore, there is no answer to their claim to enforce the charge.

In saying this, I accept the view of the defendants' expert, Mr Clarke, that Nightingale's supervision "fell well below the standards expected of a substantial institution". To this extent his conclusions are not materially different from those of Mr Tan. However, insofar as Mr Clarke seeks to go further, and to attribute the Scotts' losses to Nightingale, he disregards the lack of elementary precautions by the Scotts themselves to protect their own interests. (He also seems to be stepping beyond the role of expert and taking on that of the Court.)

To contradict the prima facie view, Mr Marks, on behalf of Mr Scott, seeks to establish, first, the legal responsibility of Nightingale for the fraudulent activities of Mr Wharton, and secondly a causal connection between that responsibility and the losses which the Scotts suffered. There are two main steps in his argument:-

(1) To show that Mr Wharton was in effect the "directing mind and will" of Nightingale, or was given such wide authority, that his knowledge and actions can be treated as those of the company.

(2) That the arrangement between Nightingale and Mr Scott is not to be regarded simply as a loan of £450,000, but a composite scheme (referred to as the "Nightingale Plan") involving the loan of that money and its subsequent use for secured loans at higher rates of interest, with returns guaranteed by Nightingale.

*The directing mind of Nightingale*

In the context of company liability, the phrase "directing mind and will" (see per Viscount Haldane LC in *Lennards*

*Carrying Co Ltd -v- Asiatic Petroleum Ltd* [1915] AC 705, 713) is used to categorise someone whose action (or knowledge) is that of the company itself, as opposed to someone who is "merely a servant or agent". As explained by Lord Hoffman in *MGFM Asia Ltd -v- Securities Commission* [1995] 2 AC 500, [1995] 3 All ER 918, at 506 of the former report, the application of this concept involves identifying the relevant "rules of attribution" which will determine the acts that are to be attributed to the company. The primary rules will normally be contained in the Articles of Association, but in addition -

> "The company builds upon the primary rules of attribution by using general rules of attribution which are equally available to natural persons, namely, the principles of agency. It will appoint servants, agents whose acts, by a combination of the general principles of agency and the company's primary rules of attribution count as the acts of the company. Having done so, it will also make itself subject to the general rules by which liability for the acts of others can be attributed to natural persons, such as estoppel or ostensible authority in contract, vicarious liability in tort." (ibid p 506G).

As he said in an earlier analysis, (*El Ajou -v- Dollar Holdings plc* [1994] 2 All ER 685, [1994] 1 BCLC 464, at 705F of the former report):-

> "The position as reflected in the articles may have to be supplemented by looking at the actual exercise of the company's powers. A person held out by the company as having plenary authority, or in whose exercise of such authority the company acquiesces, may be treated as its directing mind..".

As those extracts imply, the question whether someone is the "directing mind" of the company overlaps with the extent of authority, conferred under the rules of agency, on particular individuals acting on the company's behalf. A person may be the directing mind for certain purposes but not for others. Such questions also overlap with questions, in tort, of vicarious responsibility of the company as employer for the activities of its employees or agents.

Furthermore, special rules have been developed in the context of dishonest conduct by the employee or agent for his own benefit (see *Armagas Ltd -v- Mundogas SA* [1986] AC 717, [1986] 2 All ER 385). In such cases -

> "The essential feature for creating liability in the employer is that the party contracting with the fraudulent servant should have altered his position to his detriment in reliance on the belief that the servant's activities were within his authority, or, to put it another way, were part of his job, this belief having been induced by the master's representation by way of words or conduct." (per Lord Keith p781F of the former report).

Specifically in relation to fraudulent misrepresentation by the servant, Lord Keith said this:

> "At the end of the day the question is whether the circumstances under which a servant has made the fraudulent misrepresentation which has caused loss to an innocent party contracting with him are such as to make it just for the employer to bear the loss. Such circumstances exist where the employer by words or conduct has induced the injured party to believe that the servant was acting in the lawful course of the employer's business. They do not exist where such belief, although it is present, had been brought about through misguided reliance on the servant himself, when the servant is not authorised to do what he is purporting to do, when what he is purporting to do is not within the class of acts that an employee in his position is usually authorised to do, and when the employer has done nothing to represent that he is authorised to do it." (p 782H to 783B of the former report - emphasis added).

A valuable summary and analysis of the principles is to be found in *Alliance and Leicester Building Society -v- Edgestop* [1994] 2 EGLR 229, 251 per Mummery J. One such principle he puts thus:-

> "The fraudulent acts of an employee are within the scope of his authority if they are acts of a class or kind authorised by the employer, even though performed by the employee in a dishonest manner." (supra p 251E).

In the present case, the primary "rules of attribution", so far as Mr Wharton was concerned, are to be found in the terms of his appointment, that is the Operating and Agency Agreement. That undoubtedly gave him very wide powers to act on the company's behalf to procure borrowers, to administer the loan agreements, and to carry out "such advertising and marketing as is reasonably necessary for its performance of services". But it was subject to the obligation to comply with "criteria in writing" from time to time delivered by Nightingale.

Mr Marks also relies in the present case on (1) the fact that Nightingale was in effect no more than a "conduit" for the transfer of funds from CLC to Castlegate and its clients, and such checks and controls that were made were carried out by representatives of CLC rather than Nightingale, and (2) that in practice those controls were minimal. As a matter of fact, both points seem to me correct. Although some of the checklists were signed by Mr Alexander who was managing director of Nightingale, as well as an officer of CLC, the main task was assigned to Mr Sanders who was simply a CLC employee. Otherwise the only specific task performed by Mr Alexander on behalf of Nightingale was the signing of consents to second charges, which is an aspect of the case to which I shall need to

return in more detail. It is also clear from a number of sources that day to day control of Mr Wharton's activities was minimal or non-existent. Mr Tan fairly described it as "a blind man's trust".

However, I do not think that these points change the essential nature of the relationship. Nightingale was created specifically as a "vehicle company", and therefore it is not surprising that the controls, such as they were, were exercised by its parent. Mr Wharton was undoubtedly given wide-ranging authority, but there is no reason to see this as a departure from his role as an agent. Lack of effective monitoring of an agent's activities may be unwise, but it is not of itself inconsistent with his continuing as an agent. It may of course be relevant to the extent of his ostensible authority.

In my view therefore, it is not possible simply to treat Mr Wharton's acts as those of the company. One needs to analyse the extent of his authority in relation to the specific matters of which complaint has been made (see *The Star Sea* [1995] 1 Lloyd's Rep 651, 660), in particular:

(1) The alleged mis-representations made by Mr Wharton to induce Mr and Mrs Scott to enter the loan agreement.

(2) The alleged "guarantee".

(3) Signing by Mr Alexander of consents to multiple subsequent charges.

I will consider (1) and (2) in the next section. (3) is relevant to the "knowing assistance" claim and I will deal with it in that context.

*Mr Wharton's representations*

I agree with Mr Marks that any representations made by Mr Wharton for the purpose of inducing Mr Scott and Mrs Scott to enter into the loan agreement were within the scope of his authority, even if fraudulently made. The selling of a so-called "Nightingale plan" was well within the scope of his authority to carry out "marketing" for the purpose of procuring borrowers. He was not of course authorised to do it in a fraudulent way, but it was an "act of the kind" he was authorised to perform (see per Mummery J in *Alliance & Leicester*, above).

In relation to the alleged guarantee on the other hand, Mr Marks accepts that Mr Wharton had no *actual* authority to give a guarantee on behalf of Nightingale, or to represent that one was being given, because that was not simply a matter of "marketing". He suggests, however, that it within his implied or ostensible authority.

For the former, he suggests that Mr Wharton was "in effect the general manager of Nightingale with overall responsibility for its marketing, its administration and its financial management", and that it was within the implied authority of such a general manager to pledge the company's credit. This seems, with respect, a *non sequitur*. The fact that an agent carries out most of the functions of a general manager, does not mean that he is the general manager. His authority, actual or implied, is derived from the terms of the agency agreement, and those additional terms which have to be implied to give it business effect. There is no business requirement to imply into the agreement in this case a power to pledge Nightingale's credit.

As an alternative Mr Marks submits that Mr Wharton had ostensible authority to offer the guarantee. Here he faces the difficulty that Mr Scott's only source of information as to the extent of Mr Wharton's authority was Mr Wharton himself. Ostensible authority cannot be relied on where it is based on "belief... brought about through misguided reliance on the servant himself", unless he has been held out in some way by the principal as having that authority, or what he is purporting to do is within "the class of acts that an employee in his position is usually authorised to do" (see per Lord Keith in *Armagas*, above). Even accepting that Mr Wharton was allowed by Nightingale to exercise the widest possible powers in respect of marketing and procuring borrowers, giving such guarantees (in respect of investments made by the borrower with the money lent) cannot in my view be said to be within the class of acts usually performed by such an agent.

This leads on to consideration of the second part of Mr Marks' argument, that is the proposition that the "Nightingale Plan" is to be treated as a composite scheme comprising not only the loan by Nightingale, but also the uses to which the money is going to be put. I accept, as did Mr Alexander in cross-examination, that it was well within the authority of Mr Wharton to promote something called a "Nightingale Plan", similar to the so-called "Equity Release Plans" which were on offer by other lenders at that time to home-owners (before the property market collapse in 1989/90). But it is another thing to say that he could reasonably have been thought to have authority on behalf of Nightingale to make representations as to the quality of the investments to be made with the money borrowed, or the returns from them - still less to guarantee them.

Furthermore, the agency argument cannot be analysed without bearing in mind that Mr Wharton was not only Nightingale's agent but also the Scott's agent and adviser (through Cobvale). It cannot therefore be assumed that any representations made by him in connection with the loan were necessarily made on behalf of Nightingale. The natural inference would be that the representations in relation to the loan itself were made on behalf of Nightingale, whereas the representation as to the investment of the money in Cobvale's hands, and the likely returns from it, were made as adviser of Cobvale. Apart from the alleged guarantee, there is nothing in the evidence, oral or documentary, which is inconsistent with that natural interpretation.

So far as the guarantee is concerned, quite apart from the question of authority which I have addressed, the Scotts' case fails in my view on the facts. The only evidence in support was that of Mr Scott himself who understood that "the loans made by Cobvale would be guaranteed by (Nightingale) just as they been in the past by Castlegate". There is no other confirmation of this suggestion, either in the documents, or even in the evidence of Mr Wharton who gave evidence for Mr Scott. The first reference to such a guarantee came in pleadings and affidavits in late 1992. There was no mention of it in Mr Scott's first affidavit sworn in August 1991; nor was there any mention of it in the earlier correspondence, between December 1990 and March 1991, when he was seeking to reach an accommodation with Nightingale. If he had really thought that he had a guarantee from Nightingale, it would have been the first thing that he would have mentioned.

Nor, in relation to a transaction which he was required to confirm by signing formal Nightingale documents (in the Charge and the Credit Agreement), is it credible to me that he thought himself entitled to rely on such a "guarantee", given informally by Mr Wharton, and without any written confirmation from Nightingale. This was quite different from the informal agreements he had had with Castlegate. He may have been comforted by the thought that NHL, through Nightingale, were in some way backing Castlegate's scheme, but it went no further than that.

Similarly, even if there was a representation by Mr Wharton that he would retain the so-called "buffer" of £96,000 to cover monthly repayments, I see no basis to infer that this was a representation made on behalf of Nightingale. It was entirely a matter for Cobvale whether or not to retain a buffer fund. The natural inference is that when making such a proposal (if it was made) Mr Wharton was acting for Cobvale.

If this is the right analysis, then the only relevant representations made on behalf of Nightingale, putting the case at its highest for Mr Scott, were that £450,000 would be made available on the security of his home and that it could be used for onward investment by Cobvale. Those representations were true and were fulfilled.

Against this background I turn to consider the specific defences.

*Should the charge be set aside on the grounds of fraud?*

Mr Marks made a bold submission that the charge should be set aside on the grounds of Mr Wharton's fraud, regardless of whether Nightingale was a party to it, on the grounds that "fraud unravels all" (see Snells Equity 27 Ed p 548). More specifically he relies on *Karberg's* case [1892] 3 Ch1, as authority for the proposition that a transaction may be set aside where it has been procured by a misrepresentation by a third party. In that case the plaintiff had been led to apply for shares in an intended company by representations, made in the prospectus issued by the

promoters, which subsequently turned out to have been false. Kekewich J rejected the claim because there could have been no misrepresentation by or on behalf of a company, which had no existence at the time of the representation (p 5). This decision was reversed by the Court of Appeal. Lindley LJ confirmed the general rule that " a misrepresentation in order to vitiate a contract must be made by a party to it, or by his agent" (p 13). But he said that the rule was not without exceptions. He then referred to authorities which:

> "warrant the proposition that an application to a company when formed for shares, based upon a prospectus issued by the promoters of the company before its formation, cannot be dis-severed by the company from such prospectus".

Apart from the special case of company formation, I do not see how that case can be prayed in aid in support of any general proposition that misrepresentation by a third party can be relied on to set aside a contract. On the contrary the general rule is affirmed.

Accordingly, this part of the Scotts' case depends on establishing that it was not merely Mr Wharton's misrepresentations, but misrepresentations which are properly attributable to Nightingale, which led them to enter the credit agreement and charge. For the reasons I have given, this case is not made out. On a proper analysis, the only representations for which Nightingale can be held responsible were in substance true and were fulfilled. The representations relating to the potential returns from the investment and its security were made by Mr Wharton, as adviser of Cobvale, not as agent for Nightingale.

In view of that conclusion, it becomes unnecessary to consider the difficult issues which have been raised as to whether restitution would in any event be a proper form or relief, given the inability of the Scotts to procure "restitutio in integrum" by repaying the £450,000. In this respect Mr Marks relied on the power of equity to do "what is practically just, even though it cannot restore the parties' precise state in which they were before the contract was made." (Snell p 621). While that principle no doubt allows a degree of flexibility in applying the ordinary rule, I doubt whether it goes as far as Mr Marks claims, since this would be a question not merely of flexibility in its application, but dispensing with the rule altogether.

It is also unnecessary to deal with the alternative contention of Nightingale that it is entitled to be subrogated to the security held by the bank, on the grounds that at least part of the money advanced by Nightingale was used to pay off the Scotts' indebtedness to the bank. On this aspect I see considerable force in Mr Marks' submission that the principle of subrogation could not be relied upon where the lender has taken an express charge and that charge has failed (cf *Orakpo -v- Manson Investments* [1978] AC 95, [1977] 3 All ER 1, at 115 E-F of the former report). Furthermore, insofar as subrogation is claimed in respect of the overdraft, it appears inconsistent with *Re Peake's Abattoirs Ltd.* [1986] BCLC 73, [1983-85] BCC 99, at 80B-H of the former report per Michael Wheeler QC.

*Other defences*

It is convenient at this point to deal with the other grounds upon which the Scotts rely to defeat the principal claim, whether raised by way of defence or counterclaim. As I understand it, the relevant heads are:

1. Damages for fraudulent misrepresentation.

2. Damages for negligence.

3. Unjust enrichment.

The claim for damages for fraudulent misrepresentation relies on the case which I have already rejected as a defence to enforcement of the charge. It fails for the same reasons.

With regard to the case in negligence, Mr Marks submits that Nightingale owed the Scotts a duty of care to protect them from the conduct of Mr Wharton or Castlegate. He put the case in the following way:

> "Nightingale was in the business of providing mortgages. It appointed an agent to market those mortgages. Nightingale knew that its marketing agent would give advice. Nightingale therefore assumed responsibility for the advice given to potential customers such as Mr Scott as to Nightingale's mortgage products."

He relies on the principles as stated by Lord Goff in *Henderson -v- Merrett* [1995] 2 AC 145, [1994] 3 All ER 506, at 178-181 of the former report. I see nothing in those principles which supports the submission. There is no general rule that a lender owes a duty of care to a borrower in such circumstances. In the present case the submission ignores the fact that Mr Wharton was giving advice to the Scotts and Cobvale as their adviser. In that role, he, not Nightingale, was responsible for the advice he gave them.

As to unjust enrichment, Mr Marks relies on the statement of principle in Goff and Jones Restitution p 16:

> "First, the defendant must have been enriched by the receipt of a benefit. Secondly, that benefit must have been gained at the plaintiff's expense. Thirdly, it would be unjust to allow the defendant to retain that benefit."

Mr Marks submits that it would be:

> "unconscionable in the circumstances to allow Nightingale to benefit from Mr Wharton's fraud when Nightingale effectively created and permitted the circumstances in which the fraud was made possible to exist".

In relation to the loan itself, it is not clear to me what benefit it is said that Nightingale received. It is simply seeking the return of the money it lent. I have already rejected the argument that Nightingale bears a responsibility for Mr Wharton's use of the money lent. As I have said, the fraud was made possible by the failure of both Nightingale and the Scotts sufficiently to protect their own respective interests. Subject to the issue of knowing assistance and to Mrs Scott's separate case (see below), I see nothing "unjust" in allowing them to enforce their security.

*Knowing assistance*

The Scotts' case against Nightingale in respect of "knowing assistance" depends not simply on the knowledge of Mr Wharton as its agent, but also on the assumed knowledge of Mr Alexander who had to sign consents to subsequent charges. This is used to support a case of dishonesty by Mr Alexander (in the sense explained in *Royal Brunei*).

As I have said, this raises an issue as to the "directing mind" of Nightingale in relation to the consents. In this context one is concerned with the knowledge and mental state of the company in the context of "dishonesty", as explained by Lord Nicholls in *Royal Brunei Airlines -v-Tan* [1995] 2 AC 378, [1995] 3 All ER 97. Lord Nicholls there summarised the underlying principle thus:

> "A liability in equity to make good resulting loss attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation." (p 392G of the former report).

Although this is traditionally referred to as "knowing assistance", Lord Nicholls preferred to avoid "knowing" as a defining term. Instead the relevant test is "dishonesty", which Lord Nicholls explained as "simply not acting as an honest person would in the circumstances"; it is "an objective standard" (p389C of the former report). He continued, in a passage on which Mr Marks relies:

> "In most situations there is little difficulty in identifying how an honest person would behave. Honest people do not intentionally deceived others to their detriment. Honest people do not knowingly take others' property unless there is a very good and compelling reason, an honest person does not participate in a transaction if he knows it involves a mis-application of trust assets to the detriment of the beneficiaries. Nor does an honest person in such a case deliberately close his eyes and ears, or deliberately not ask questions, lest he learn something he would rather not know, and then proceed regardless." (p 389 F-G of the former report - emphasis added).

Accordingly, in the present case the question is whether Nightingale acted "dishonestly" in consenting to the subsequent charges. As the pleadings stood at the beginning of the trial, the Scotts' case depended on the dishonesty of Mr Wharton being attributed to the company, since there was no evidence of actual dishonesty by anyone else in Nightingale or CLC. However, pursuant to amendments which I allowed during the trial, and in the light of documents which had recently come to light, Mr Marks was later able to put his case higher, and contend that, on the evidence, not just Mr Wharton, but Mr Alexander himself, was "dishonest" in the sense explained in that case.

I consider the evidence in more detail in an appendix to this judgment. There seems to me no doubt that Mr Alexander signed consent forms relating to multiple charges, which, had he given any thought to the matter at all,

would have put him on notice that there was something very odd going on. Mr Marks submits that the evidence establishes actual dishonesty by Mr Alexander. I consider, and reject, this charge in the Appendix. However, I accept that the only alternative is the conclusion that Mr Alexander signed the consents without paying any attention at all to what he was signing. If the latter is the correct explanation, then it seems to follow that Mr Alexander was implicitly delegating to Mr Wharton the executive responsibility for the consents. It would then become wholly correct to say that Mr Wharton was the "directing mind of the company" in relation to the giving of those consents; further, that his knowledge, relevant to the consents, can be attributed to the company, and, that if he was dishonest in giving those consents, then so was the company. Thus, it appears to me that the question whether Mr Alexander was in fact dishonest in this respect, although of course important from his point of view, may not be critical to the question as to whether Nightingale was dishonest.

There is no doubt that Mr Wharton's dissipation of Mr Scott's money through Cobvale was a breach of trust. Mr Parker took the point that the breach of trust was to Cobvale rather than to the Scotts personally. However, this is unrealistic. Mr Wharton acted as an agent and adviser to both the Scotts and their company, Cobvale. He owed a fiduciary duty to both. It was the Scotts' money, borrowed from Nightingale, that Mr Wharton dissipated through the agency of Cobvale.

In my view the difficulty the defendants face in this part of the case is not so much as to the knowledge of Nightingale, but as to whether they "assisted" in the fraud. Little attention seems to have been given in the authorities to this requirement. Underhill and Hayton (Law of Trusts, 15th Ed p 418) say that it is necessary to establish, as the third requirement for knowing assistance in a dishonest breach of fiduciary duty, "assistance by the defendant in that design". The text comments that this is "simply a matter of fact".

However, one must, I think, bear in mind that the type of assistance which is in issue is assistance sufficient to confer on someone the liability of a constructive trustee. In the classic statement of the principle in *Barnes -v- Addy* (1874) LR9 ChApp 244,251, Lord Selborne LC emphasised the importance of not straining such equitable concepts "by unreasonable construction beyond its due and proper limits". He continued:

> "Those who create a trust clothe the trustee with a legal power and control over the trust property, imposing on him a corresponding responsibility. That responsibility may no doubt be extended in equity to others who are not properly trustees, if they are found either making themselves trustees de son tort, <u>or actually participating in any fraudulent conduct</u> of the trustee to the injury of the cestui que trust. But, on the other hand, strangers are not to be made constructive trustees merely because they act as the agents of the trustees in transactions within their legal powers, transactions, perhaps of which a Court of Equity may disapprove, unless those agents receive and become chargeable with some part of the trust property, or unless they assist with knowledge in a dishonest and fraudulent design on the part of the trustees." (p 251-2 - emphasis added.)

That concerned the potential liability of the solicitors to the persons directly involved in the fraud. They were held not liable because they had no reason to suspect a dishonest design. However, for present purposes, the passage I have read shows that for a third party to become liable as a "knowing assistant" he must be an active participant in the breach of trust. Similarly, Lord Nicholls (in *Brunei*, cited above) talks of "participating" in the transaction.

Even accepting that Nightingale, in consenting to the second charges, had the requisite knowledge, it does not seem to me that this was the kind of participation that Lord Selborne had in mind. The action of Nightingale was simply designed to protect their own interest. No doubt in so doing they were removing an obstacle to Mr Wharton's breach of trust, but they were not direct participants in that breach. Nor was the grant of the consents the cause of the losses suffered by the Scotts, even in those cases where there can be shown to be a connection between multiple consents signed by Mr Alexander and loans made to Cobvale. For this reason in my view the claim based on knowing assistance fails.

*Mrs Scott's case - undue influence*

Mrs Scott, who has a one-quarter share in the property, and was also a signatory to the charge and the credit agreement, adopts her husband's case. She also raises a separate point in her own right based on *Barclays Bank -v- O'Brien* [1994] 1 AC 180, <u>[1993] 4 All ER 417</u>. As is well known, Lord Browne-Wilkinson in that case explained

the modern application of the principles of undue influence to the familiar situation of a wife joining in the execution of a charge over the matrimonial home to secure loan facilities for the benefit of her husband. The speech distinguishes between "actual undue influence", where it is necessary for the claimant to prove that the wrongdoer exerted undue influence to enter into the particular transaction; and "presumed undue influence", where the relationship leads to a presumption of undue influence, and the burden then shifts to the wrongdoer to prove that the complainant entered into the transaction freely (p 189F of the former report). Such a presumption can arise in a case of husband and wife where the wife is able to show -

> "that the relationship between husband and wife in the particular case was such that the wife reposed confidence and trust in her husband in relation to their financial affairs and therefore undue influence is to be presumed. Thus, in those cases which still occur where the wife relies in all financial matters on her husband and simply does what he suggests, a presumption of undue influence... can be established solely from the proof of such trust and confidence without proof of actual undue influence." (p 190 D-E of the former report).

The issue normally is not whether the transaction can be set aside as between husband and wife, but whether the wife can set it aside as against a lender, normally a bank or other lending institution. Except in the rare cases where it can be established that the husband was acting as agent for the creditor, this issue normally depends upon the question of notice. Thus

> "If the creditor bank has had notice, actual or constructive, of the undue influence exercised by the husband (consequentially of the wife's equity to set aside the transaction) the creditor will take subject to that equity and the wife can set aside the transaction as against the creditor (albeit a purchaser for value) as well as against the husband" (p 191 C-E of the former report).

In summarising the position later in the speech, Lord Browne-Wilkinson said this -

> "Therefore in my judgment a creditor is put on enquiry when a wife offers to stand surety for her husband's debts by the combination of the two factors: (a) the transaction is on its face not to the financial advantage of the wife; and (b) there is a substantial risk in transactions of that kind that, in procuring the wife to act as surety, the husband has committed a legal or equitable wrong that entitles the wife to set aside the transaction. It follows that unless the creditor who is put on enquiry takes reasonable steps to satisfy himself that the wife's agreement to stand surety has been properly obtained the creditor will have constructive notice of the wife's rights."

Reasonable steps, as he goes on to explain, would normally require the wife to be advised as to the need to take independent advice.

It is unnecessary to review the numerous cases in which the doctrine has been examined and applied since that case. It is important however to note that that case was concerned with the wife joining in standing surety for the husband's debts, so that there was no direct benefit to her. It was to her "manifest disadvantage". As Lord Browne-Wilkinson explained in the case of *CICB Mortgages plc -v- Pitt* [1994] 1 AC 200, [1993] 4 All ER 433, proof of 'manifest disadvantage' is a necessary ingredient where it is sought to rely on *presumed* undue influence, as opposed to actual undue influence (p 207-9 of the former report). There is such manifest disadvantage if the transaction is:

> "so improvident as not to be reasonably accounted for on the ground of .... (the) ordinary motives on which ordinary men act" (*Goldsworthy -v- Brickell* [1987] 1 Ch 378, [1987] 1 All ER 853, at 401 of the former report, per Nourse LJ)

In *Pitt* Lord Browne Wilkinson also distinguished between the cases of joint advance and surety:

> "What distinguishes the case of the joint advance from the surety case is that, in the latter, there is not only the possibility of undue influence having been exercised but also the increased risk of it having in fact been exercised because, at least on its face the guarantee by a wife of her husband's debts is not for her financial benefit. It is the combination of these two factors that puts the creditor on enquiry." (p 211G of the former report)

The present case is in the nature of a joint advance. The charge was not solely for the husband's benefit, but a loan jointly to Mr and Mrs Scott which was to be used for investment through Cobvale. Cobvale itself was owned by them together and they were both directors. Although she was a minority shareholder, her shareholding was substantial: 15,000 out of 80,000 shares (19%.) Thus, her relative share of Cobvale was not wholly disproportionate to her 25% share in the property. Certainly there was nothing in the nature of the transaction as seen by the lender, Nightingale, to put them on notice that it was substantially for the benefit of the husband, rather than her.

Mr Yell, for Mrs Scott, says that it was "manifestly disadvantageous" to her, because she and her husband had no means of servicing the interest payments on the substantial loan or of making capital repayments from their financial resources. This raises a different point. In normal circumstances, the fact that a transaction, viewed with

hindsight, is manifestly disadvantageous from the point of view of the husband and wife jointly, gives rise to no presumption that the one unduly influenced the other. It merely shows that they were both foolish in their investment decision. It does not amount to disadvantage of the wife vis-a-vis her husband, apparent to a third party who would thereby be on notice of the presumption that the husband has unduly influenced his wife in order to secure that advantage.

Mr Yell relied on *Goode Durrant Administration -v- Biddulph* [1994] 2 FLR 551, [1995] 1 FCR 196 in which a loan agreement had been executed by a husband and wife on behalf of a company in which they were both shareholders and directors. The agreement related to a loan to the husband and wife jointly of some £300,000 with a view to financing development, which on the more optimistic of the two appraisals submitted to the bank might produce a profit of just over £200,000. The wife's interest in the company was limited to her 2½% shareholding, as compared to the 90% held by her husband. As H.H. Judge Rich QC found -

> "To make herself personally liable for a sum in excess of £300,000 in order to have a 2½% share through the company of such a profit so estimated was a transaction manifestly disadvantageous to Mrs Biddulph."

This was sufficient to entitle her to have the transaction set aside as against her husband, but it was still necessary to look at the matter from the point of view of the lender, taking into account the fact that she was not only a shareholder but also a director. The Judge held, on the facts of that case, that the bank had notice, taking into account the manifest disadvantage to the wife of the transaction as a whole, and the fact that the bank had dealt solely with the husband and had nothing which indicated any involvement by the wife. As he put it:

> "There was not in my judgment anything before the bank which could properly be said to offset the extent to which it was put upon inquiry by the lack of direct financial benefit to her from entering into the transaction."

Mr Yell also relied on the decision of Mr James Mumby QC (sitting as a Deputy High Court Judge) in *Bank of Scotland -v- Bennett*, 6 February 1997 (unreported). In that case the husband and wife had jointly guaranteed the liabilities of a company of which they were both shareholders. The guarantee was secured by a legal charge on their home which at the date of the charge was registered in the wife's sole name. The Judge found that Mr Bennett had been subject to actual undue influence exerted by her husband to procure her signature to the guarantee and the charge. He further held that the transaction was to her manifest disadvantage. As the sole owner of the house she was putting up the whole as a security even though she owned no more than, initially, 11.8%, and later 41.5%, of the ordinary shares of the company. In considering whether the bank had notice, he referred to the judgment of Judge Rich in *Biddulph* (above), which he read as holding that the bank was put on inquiry "because the wife's direct financial interest in the company was out of all proportion to the liability she was being asked to assume". He held that -

> "The very discrepancies... between the size of Mrs Bennett's shareholding and the security she was proffering were alone sufficient to put the bank on notice that the guarantee and the charge were not to her financial advantage."

Mrs Bennett was not a director of the company in that case.

I do not think either judgment assists Mr Yell's argument in the present case. Even accepting that Mrs Scott placed a high degree of trust in her husband in financial matters, it was not a transaction designed specifically for his benefit. It was designed for their joint benefit and they charged their joint family property for that purpose. It was a loan to an investment company set up by them both, and of which they were both directors. Apart from Mr Wharton's knowledge, there was nothing to put Nightingale on notice that she was not acting as a director. Any "manifest disadvantage" in the transaction as a whole was one which affected them both.

Does Mr Wharton's knowledge make any difference? I have already held that in relation to the setting up of the loan, Mr Wharton was the directing mind and will of Nightingale, and it follows that in that respect his knowledge was their knowledge - whether or not he discussed it in terms with Mr Alexander.

Even ignoring the purposes for which the money was to be used, Mr Wharton must have realised that the loan was "manifestly disadvantageous" to both Mr and Mrs Scott. He filled in an application form on their behalf which grossly overstated their income. He knew they were putting their home at risk, since they had no serious prospect of servicing the loan out of their ordinary income. As he knew, their only hope of servicing the loan was from the fruits of his fraudulent activities. Viewed objectively, but with his knowledge, it was a transaction so improvident as not to be reasonably accounted for on the ground of the ordinary motives on which ordinary men act (see per Nourse LJ

above). Furthermore, Mr Wharton was fully aware of the Scotts' relationship with each other, and the fact that Mrs Scott followed her husband's lead in all business matters. He had known them for twenty years, and all his business discussions had been with Mr Scott. It was with Mr Scott he had dealt in relation to this particular loan, and it is apparent from the events of the day on which the loan was signed that he assumed that Mr Scott would secure signing by Mrs Scott as a matter of course. Although in theory he was also acting as her adviser (through Cobvale), he knew this was meaningless in practice, since he always dealt with Mr Scott. He took no steps to ensure that she was separately advised.

The situation is thus very different from those considered in the cases to which I have been referred. On the one hand, although there was "manifest disadvantage" to the wife, there was no corresponding benefit to the husband; nor was there actual undue influence, in the sense of unfair pressure on the wife to agree to her husband's plans. On the other hand there was a situation where the law will presume undue influence. The lender, through Mr Wharton, was aware of that position and took advantage of it. In these unusual circumstances, I do not think the wife is precluded from relying on the doctrine of presumed undue influence, merely because the transaction was also to the disadvantage of her husband.

The crucial distinction between Mr and Mrs Scott is that he knew all the facts relevant to the loan, and was only misled as to the use which Mr Wharton, as his agent, intended to make of it, whereas Mrs Scott had no information at all. That this lack of information was in a sense self-induced - by her blind acceptance of her husband's decisions in financial matters - does not appear to matter, if, as I have held, that was the nature of their relationship in fact (see *Barclay's Bank* [1994] 1 AC 180, [1993] 4 All ER 417, at p 190D of the former report). When the circumstances are such as to show dependence of the wife on her husband's decisions, and where the lender is aware of that fact and exploits it to his own advantage, she is entitled to protection.

Accordingly, Mrs Scott has a valid defence as respects her interest in the property, and she is entitled in principle to have the charge set aside insofar as it affects that interest.

Mr Parker submits that, in those circumstances, the order should provide for Mr Scott to restore the benefits she had received, in particular the value to her of the NWB loans repaid out of the Nightingale money. He relied on *Dunbar Bank -v- Nadeem* (Robert Englehart QC - 7.1196 unreported), where the wife was required to pay half the value of a joint lease acquired with the loan. However, there was no such specific benefit to Mrs Scott. The overall consequence of the transaction has been disastrous. The case in my view is much closer to *TSB Bank -v- Canfield* [1995] 1 All ER 951, [1995] 1 WLR 430, in that had the facts relating to the loan been drawn to her attention, and she been separately advised on it, she would have been highly unlikely to have agreed. Accordingly, as in that case, I think she is entitled to have it set aside unconditionally.

I should add that Mr Yell had a further argument based on the proposition that the transaction was "an unconscionable bargain", for which purpose he relied on the dicta of Nourse LJ in *Credit Lyonnais Bank Nederland NV -v- Burch* [1997] 1 All ER 144, [1997] 1 FLR 11, at 146 of the former report. In view of the conclusion I have reached on the issue of undue influence, I need not consider this issue further.

*Conclusion*

I have held that the Nightingale claim succeeds against Mr Scott, but that Mrs Scott is entitled to have the charge set aside as against her. Having reached this conclusion, I will invite the parties to address me further on the consequences in terms of the precise relief. A number of points arise:

1. Given the conclusion reached in relation to Mrs Scott, the parties may wish to consider what (if any) provision should be made in the Order in relation to the children's interests;

2. The defendants took a point that the cause of action relied on in the Statement of Claim is based in terms on the

Charge, not the Credit Agreement. This point was not explored very fully in argument, and I would like assistance from both parties as to how, if at all, it affects the nature of any relief.

3. Possibly related to that, there is the question of the appropriate rate of interest. I understand that the plaintiffs are content to base their claim on the contractual rate of interest of 18%, without relying on a purported increase made in November 1990. However, I understood the defendants to argue that a lower "commercial" rate of interest would be appropriate. Again, I would like assistance on this point.

4. Costs.

I propose therefore to hand down this judgment and to fix a time for further submissions on these points.

*Appendix*

Multiple consents - Mr Alexander's knowledge

The Scotts advance a case of dishonesty against Mr Alexander, based principally on multiple consents to subsequent charges signed by him. Much of the evidence emerged during the course of the hearing. Mr Alexander, who left Nightingale in 1992, and had not been asked to prepare a witness statement before the hearing, was called to answer the charge. It is fair to bear in mind that, although he gave detailed evidence for the prosecution in Mr Wharton's trial, he had not previously been faced with a charge of dishonesty addressed specifically to himself, and he had little time to prepare to answer it.

A number of examples of consents signed by Mr Alexander were relied on, not all of which directly involved Cobvale. The clearest is that relating to 10 Rainsworth Close, Lower Earley. This was a loan of £112,500 made to a Miss Graham on the security of her house. It was valued by White and Co on 18 December 1989 at £150,000 and the loan was 75% of that. The loan was approved by Mr Sanders who signed a checklist on 20 December 1989. On 21 December 1989 Mr Alexander signed a consent form on a standard form whereby Nightingale confirmed that:

> "it will raise no objection to the creation or registration of a charge over the property quoted below subsequent to its existing prior charge(s)."

A form referred to the second mortgagee as "Greystoke Finance Ltd and four others as schedule". The schedule showed a loan to Nightingale of £112,500, and five other loans not including Cobvale (but including two to "CSECS" which appears to represent Castlegate) totalling £144,500. Thus, it was apparent to anyone reading the form, with knowledge of the valuation, that the security was valueless for the later charges. Even without knowledge of the valuation, it would have been possible, with knowledge of Nightingale's lending policy, to infer that their loan would have been up to 75% of the valuation, and to have drawn the same conclusion. Mr Alexander accepted that an honest person reading the form would have been put on notice at least of the need to investigate.

28 George Street, Reading was another example, this time directly affecting Cobvale. Cobvale advanced £10,000 on 22 November 1989 on the security of this property at a time when there were prior charges of £150,000. This loan was shown as paid off on 12 February. About that time a new Cobvale loan was arranged for £16,000. On 6 February 1990 Mr Alexander signed a consent form indicating no objection to subsequent charges in respect of "Applied Finance Ltd and six others as schedule". The schedule shows a loan by Nightingale of £82,500, and seven other loans totalling £148,500. The Cobvale loan of £16,000 is shown as sixth in line. Castlegate's loan ledger shows the value of the property as £231,000 as at February 1990. It was valued by White and Co on 30 March 1990 as £90,000. Cobvale through Mr Scott signed a consent to charges subsequent to its own, but he would have been unaware of the prior charges which made his own security valueless. Mr Alexander, on the other hand, had or should have had the whole picture.

As I have said, Mr Alexander initially took the position that he would not have signed documents in this form. As he said in his witness statement:

> "I can say with no hesitation that when I signed them there would not have been any words on the consents after the words 'second mortgagee' other than nominating one lending company. I was aware at times from what Mr Wharton told me that until the actual time for 'payout' he did not always know the name of the actual second mortgagee. He acted for so many other lenders. Accordingly, it is perfectly feasible that if I signed these documents I signed without the name of the second mortgagee being on the consent. Certainly I can say that I never saw the schedules which are now apparently attached to the consent forms."

What purports to be the original document relating to 10 Rainsworth Close was shown to Mr Alexander (exhibit D1.1). Mr Marks asked me to note that the folds and paper-clip marks appear to correspond on the two pages. It would be unsafe to draw any firm conclusions from that alone. More significantly, Miss Toms (who was the manager of the mortgage processing department with the Castlegate Group for nine years up to February 1990) gave convincing evidence that such forms would not have been signed in blank and would have been sent for signing in the form in which they now appear (with the schedules). I accept her evidence and am satisfied that Mr Alexander did indeed sign consent forms for these properties in the forms which appear in the bundles.

After he had written his statement and before he was cross-examined, the defendants obtained from the various land registries, pursuant to a direction by myself, copies of Nightingale consents, including many signed by Mr Alexander. These differed from the ones to which I have already referred, in that, instead of a single consent with a schedule attached, there were a number of individual consent forms signed on the same day in respect of a number of charges over the same property. In only one of the six cases (Heron's Reach), was Cobvale involved. Again, I am satisfied that all these consent forms are what they purport to be and were signed by Mr Alexander in the form they now appear.

One further piece of evidence relied on by the Scotts as showing dishonesty by Mr Alexander is a checklist signed by him in respect of 10 Rainsworth Close. This showed a loan of £162,500 and referred to a valuation of £325,000. This was dated 26 February 1990. An earlier checklist form relating to the same property, signed by Mr Sanders on 20 December 1989, showed the valuation as £150,000, which was the value given by White and Co on 18 December. Mr Alexander accepted that prices were if anything dropping between December 1989 and February 1990, and he was unable to give any explanation of the figure of £325,000 given on his checklist.

The only other relevant evidence is that of Mr Goldsworthy CLC's securities manager at the time. He said that he understood Castlegate's business involved Nightingale taking a first mortgage with other small investors coming in behind Nightingale in order of priority. He understood that friends of Mr Wharton were investing £1-2,000 at a time. This would not have been inconsistent with the understanding that Nightingale was taking up to 75% of the equity.

I am asked to conclude from all this evidence that Mr Alexander signed the consents dishonestly, at least in the sense that he turned a blind eye to the obvious risk that the subsequent chargees were being defrauded, because their charges would be valueless.

Mr Parker reminds me that where an allegation is made of dishonesty, clear proof is required commensurate with the seriousness of the allegation (see *Hornal -v- Neuberger Products Ltd* [1957] 1 QB 247, [1956] 3 All ER 970). He accepted that Mr Alexander's evidence was "something of a puzzle," since he readily accepted in cross-examination that, had he seen the list of chargees in the schedules, "alarm bells" would have rung, and that an honest lender would have investigated further; but faced with the evidence that he *had* seen them, and *did* sign, he was unable to explain why.

*Conclusions on this issue*

I have found that the schedules were attached to the documents signed by Mr Alexander. The individual consent letters are less striking in that they do not give values, and therefore it is not immediately obvious that the loans exceeded the security. In theory therefore Mr Alexander might have thought he was giving consent to charges in respect of loans of the type described by Mr Goldsworthy. On the other hand Mr Alexander agreed that, where he was asked to sign more than four consents on the same day, he should have been put on notice of the need to

investigate. The checklist in respect of 10 Rainsworth Close, which he signed with an apparently unsupported valuation, is also unexplained.

There are two possible inferences: either, first, that Mr Alexander was party to Mr Wharton's fraud, at least to the extent that he deliberately closed his eyes to what was going on; or, secondly, that he simply did not bother to look at the consent forms he was asked to sign. The former inference is difficult to draw without some evidence of a motive. There is no suggestion that Mr Alexander profited in any way from the fraud. It is true that he had had previous dealings with Mr Wharton, whom he regarded as a potential business colleague, and he was instrumental in introducing him to CLC. This shows that he had great confidence in Mr Wharton's abilities, and saw him as a means of promoting a successful business. But there is no suggestion that Mr Alexander had reaped any benefit from the dishonest side of the Mr Wharton's activities. Furthermore, Mr Alexander did not strike me as a dishonest witness. His ready acceptance that an honest lender would have been put on notice by multiple consent forms appeared to be followed by genuine surprise at the evidence that he had indeed signed such multiple consents.

The alternative explanation would, it is true, contradict Mr Alexander's own evidence that he did not sign documents without reading them. However, as he said, he had to sign something of the order of 150 documents a day on behalf of CLC. As he had complete confidence in Castlegate Group's operations, it would not be surprising if he gave little attention to documents which he would have regarded as formalities, since the crucial point was that Nightingale itself was protected by a first charge. He would not have had reason to concern himself with the value of the subsequent charges, which he could reasonably have regarded as a matter for the companies concerned. Even in those cases where the amounts of subsequent loans appeared on the schedule, he would need to make a connection between those amounts and the valuation, or at least to draw an inference as to the valuation of the property from the amount of the Nightingale loan. It would not be surprising if, when signing a large pile of documents, he did not pause to draw such inferences.

This analysis does not explain the checklist form which Mr Alexander signed containing an unsupported valuation of 10 Rainsworth Close. It is unlikely that Mr Alexander simply invented the valuation. Presumably he was given it by Mr Wharton. Again, the more likely interpretation is that he simply trusted Mr Wharton, as he had done on so many other things. Mr Scott can hardly regard that that is an incredible interpretation, given that he himself placed total trust in Mr Wharton, and carried out no checks of any kind.

Accordingly, although I have found this a difficult part of the case, I am not able to conclude that Mr Alexander was "dishonest" in the sense explained in *Royal Brunei*.

Judgment accordingly.

---

**End of Document**