# R v Barton [2020 EWCA Crim 575

# Exhibit 20

A Court of Appeal

# Regina *v* Barton and another

## [2020] EWCA Crim 575

2020 Jan 20, 21; Lord Burnett of Maldon CJ, Dame Victoria Sharp P,
B April 29 Fulford LJ, McGowan, Cavanagh JJ

*Judicial precedent — Court of Appeal decision — Conflict of authority — Obiter dictum of Supreme Court disapproving long-standing test for dishonesty in criminal cases established by decision of Court of Appeal — Whether obiter dictum of Supreme Court effectively overruling earlier Court of Appeal decision*
*Crime — Conspiracy — Conspiracy to defraud — Defendants exploiting wealthy*
C *residents of luxury nursing home to profit from them — Whether defendants acting dishonestly — Whether dishonesty requiring defendant to appreciate conduct dishonest by ordinary standards — Whether offence requiring unlawful or aggravating conduct over and above dishonest agreement containing element of unlawfulness — Whether offence sufficiently precise — Human Rights Act 1998 (c 42), Sch 1, Pt I, art 7*

D The first defendant owned and operated a luxury nursery home of which the second defendant was employed as general manager. The defendants were charged with a number of offences which included dishonesty as one of their elements, namely theft, conspiracy to defraud, fraud and false accounting. The Crown's case was that over many years the first defendant had dishonestly exploited his relationship with wealthy and vulnerable residents of the home in order to profit from them and that he had been assisted in his criminal behaviour by the second defendant. At trial, when dealing with how the jury were to approach the question of dishonesty, the trial judge
E directed them in accordance with the test proposed in an obiter dictum of the Supreme Court, which had unanimously determined that in a case of dishonesty the Crown was not required to prove that the defendant had appreciated that his conduct was dishonest by the ordinary standards of reasonable and honest people and that in laying down such a requirement some 35 years previously the Court of Appeal had taken a wrong turn. The defendants were convicted. The defendants appealed against conviction, contending: (i) that the judge should have applied the test for
F dishonesty established by the Court of Appeal, which remained binding; and (ii) that the judge had erred in his approach to the offence of conspiracy to defraud, which in any event was insufficiently precise to meet the requirements of legal certainty at common law or under article 7 of the Convention for the Protection of Human Rights and Fundamental Freedoms[1].

On the appeals—

G *Held*, dismissing the appeals, (1) that where the Supreme Court directed that an otherwise binding decision of the Court of Appeal should no longer be followed and proposed an alternative test that it said had to be adopted, the Court of Appeal was bound to follow what amounted to a direction from the Supreme Court, even where that part of the Supreme Court's decision was strictly obiter; that such limited modification to the ordinary rules of precedent was confined to cases in which all the Justices in the appeal in question in the Supreme Court had agreed that to be the effect of their decision, so that the result was considered by the Supreme Court to
H be definitive, with the consequence that any further appeal would be a foregone conclusion; that, therefore, the test for dishonesty in criminal proceedings was the

[1] Human Rights Act 1998, Sch 1, Pt I, art 7(1): "No one shall be held guilty of any criminal offence on account of any act or omission which did not constitute a criminal offence under national or international law at the time when it was committed."

© 2021 The Incorporated Council of Law Reporting for England and Wales

test laid down by the Supreme Court in its obiter dictum, rather than the test previously established by the Court of Appeal; that, accordingly, when dishonesty was in question in criminal proceedings the jury would have to ascertain (i) what was the defendant's actual state of knowledge or belief as to the facts and (ii) whether, in the light of the defendant's state of knowledge or belief as to the facts, his conduct was dishonest by the standards of ordinary decent people; and that, in the present case, the judge had properly directed the jury in accordance with that test (post, paras 1, 84, 104–108, 114–116).

Dicta of the Supreme Court in *Ivey v Genting Casinos (UK) Ltd (trading as Crockfords Club)* [2018] AC 391, para 74, SC(E) followed.

*R v James* [2006] QB 588, CA applied.

*R v Ghosh* [1982] QB 1053, CA not followed.

(2) That on a charge of conspiracy to defraud, the Crown was required to prove that there had been a dishonest agreement which included unlawfulness, either as to the object of the agreement or the means by which it was to be carried out, which injured, or had the potential to injure, a proprietary right or interest of the victim; that although the offence would not be committed in circumstances where there had been an agreement to achieve a lawful object by lawful means, there was no requirement for any additional unlawfulness or aggravating feature over and above a dishonest agreement which included an element of unlawfulness, nor did the agreement necessarily have to include the commission of a substantive offence if carried out; that it followed that the offence was sufficiently precise so as not to fall foul of article 7 of the Human Rights Convention; that in the present case, the necessary element of unlawfulness was the positive and extensive deceit practised on the victims and others with the intention of prejudicing a proprietary right or interest by obtaining property to which the defendants were not entitled; that the offence had been properly described in the indictment, revealing in each instance an offence on which the jury were entitled to convict such that the defendants would have been able readily to identify the case against them; that, furthermore, the judge had properly directed the jury as to the elements of the offence requiring proof by the Crown; and that, in all those circumstances, the convictions were safe (post, paras 119–126, 155, 162).

*R v Scott* [1975] AC 819, HL(E) applied.

Dicta of Hickinbottom J in *R v Evans (Eric)* [2014] 1 WLR 2817, para 38 approved.

The following cases are referred to in the judgment of the court:

*Attorney General for Jersey v Holley* [2005] UKPC 23; [2005] 2 AC 580; [2005] 3 WLR 29; [2005] 3 All ER 371; [2005] 2 Cr App R 36, PC

*Barlow Clowes International Ltd v Eurotrust International Ltd* [2005] UKPC 37; [2006] 1 WLR 1476; [2006] 1 All ER 333, PC

*Director of Public Prosecutions v Patterson* [2017] EWHC 2820 (Admin); [2018] 1 Cr App R 28, DC

*Ivey v Genting Casinos (UK) Ltd (trading as Crockfords Club)* [2017] UKSC 67; [2018] AC 391; [2017] 3 WLR 1212; [2018] 2 All ER 406; [2018] 1 Cr App R 12, SC(E)

*R v Cooke* [1986] AC 909; [1986] 3 WLR 327; [1986] 2 All ER 985; 83 Cr App R 339, HL(E)

*R v Evans (Eric)* [2014] 1 WLR 2817

*R v Ghosh* [1982] QB 1053; [1982] 3 WLR 110; [1982] 2 All ER 689; 75 Cr App R 154, CA

*R v Goldshield Group plc* [2008] UKHL 17; [2009] 1 WLR 458; [2009] 2 All ER 737; [2009] 1 Cr App R 33, HL(E)

*R v Gould* [1968] 2 QB 65; [1968] 2 WLR 643; [1968] 1 All ER 849; 52 Cr App R 152, CA

*R v H* [2015] EWCA Crim 46, CA

© 2021 The Incorporated Council of Law Reporting for England and Wales

A *R v Hanson* [2005] EWCA Crim 824; [2005] 1 WLR 3169; [2005] 2 Cr App R 21, CA
*R v Hinks* [2001] 2 AC 241; [2000] 3 WLR 1590; [2000] 4 All ER 833; [2001] 1 Cr App R 18, HL(E)
*R v James* [2006] EWCA Crim 14; [2006] QB 588; [2006] 2 WLR 887; [2006] 1 All ER 759; [2006] 1 Cr App R 29, CA
*R v Scott* [1975] AC 819; [1974] 3 WLR 741; [1974] 3 All ER 1032; 60 Cr App R
B 124, HL(E)
*R v Simpson* [2003] EWCA Crim 1499; [2004] QB 118; [2003] 3 WLR 337; [2003] 3 All ER 531; [2003] 2 Cr App R 36, CA
*R v Smith (Morgan)* [2001] 1 AC 146; [2000] 3 WLR 654; [2000] 4 All ER 289; [2001] 1 Cr App R 5, HL(E)
*R v Taylor* [1950] 2 KB 368; [1950] 2 All ER 170; 34 Cr App R 138, CCA
*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; [1995] 3 WLR 64; [1995]
C 3 All ER 97, PC

The following additional cases were cited in argument:

*Abou-Rahmah v Abacha* [2006] EWCA Civ 1492; [2007] Bus LR 220; [2007] 1 All ER (Comm) 827, CA
*B (A Minor) v Director of Public Prosecutions* [2000] 2 AC 428; [2000] 2 WLR 452;
D [2000] 1 All ER 833; [2000] 2 Cr App R 65, HL(E)
*Boggeln v Williams* [1978] 1 WLR 873; [1978] 2 All ER 1061; 67 Cr App R 50, DC
*General Medical Council v Raychaudhuri (Professional Standards Authority for Health and Social Care intervening)* [2018] EWCA Civ 2027; [2019] 1 WLR 324, CA
*London and Globe Finance Corpn Ltd, In re* [1903] 1 Ch 728
*Norris v Government of the United States of America (Goldshield Group plc*
E *intervening)* [2007] EWHC 71 (Admin); [2007] 1 WLR 1730; [2007] 2 All ER 29, DC
*Pepper v Hart* [1993] AC 593; [1992] 3 WLR 1032; [1993] ICR 291; [1993] 1 All ER 42, HL(E)
*Practice Statement (Judicial Precedent)* [1966] 1 WLR 1234; [1966] 3 All ER 77, HL(E)
*R v Caldwell* [1982] AC 341; [1981] 2 WLR 509; [1981] 1 All ER 961; 73 Cr App R
F 13, HL(E)
*R v Clarke (Joseph)* [2009] EWCA Crim 1074; [2010] 1 WLR 223; [2009] 4 All ER 298, CA
*R v Cornelius* [2012] EWCA Crim 500; [2012] Lloyd's Rep FC 435, CA
*R v Feely* [1973] QB 530; [1973] 2 WLR 201; [1973] 1 All ER 341; 57 Cr App R 312, CA
*R v G* [2003] UKHL 50; [2004] 1 AC 1034; [2003] 3 WLR 1060; [2003] 4 All ER
G 765; [2004] 1 Cr App R 21, HL(E)
*R v Gomez* [1993] AC 442; [1992] 3 WLR 1067; [1993] 1 All ER 1; 96 Cr App R 359, HL(E)
*R v Hayes* [2015] EWCA Crim 1944; [2018] 1 Cr App R 10, CA
*R v K* [2001] UKHL 41; [2002] 1 AC 462; [2001] 3 WLR 471; [2001] 3 All ER 897; [2002] 1 Cr App R 13, HL(E)
*R v Kendrick* [1997] 2 Cr App R 524, CA
H *R v Lawrence (Alan)* [1972] AC 626; [1971] 3 WLR 225; [1971] 2 All ER 1253; 55 Cr App R 471, HL(E)
*R v McIvor* [1982] 1 WLR 409; [1982] 1 All ER 491; 74 Cr App R 74, CA
*R v Magro* [2010] EWCA Crim 1575; [2011] QB 398; [2010] 3 WLR 1694; [2011] 2 All ER 935; [2010] 2 Cr App R 25, CA
*R v Mazo (Ellen)* [1997] 2 Cr App R 518, CA

© 2021 The Incorporated Council of Law Reporting for England and Wales

*R v Merriman* [1973] AC 584; [1972] 3 WLR 545; [1972] 3 All ER 42; 56 Cr App R 766, HL(E) A
*R v Morgan* [1976] AC 182; [1975] 2 WLR 913; [1975] 2 All ER 347; 61 Cr App R 136, HL(E)
*R v Morhall* [1996] AC 90; [1995] 3 WLR 330; [1995] 3 All ER 659; [1995] 2 Cr App R 502, HL(E)
*R v Morris (David)* [1984] AC 320; [1983] 3 WLR 697; [1983] 3 All ER 288; 77 Cr App R 309, HL(E) B
*R v Simpson* [2003] EWCA Crim 1499; [2004] QB 118; [2003] 3 WLR 337; [2003] 3 All ER 531; [2003] 2 Cr App R 36, CA
*R v Williams (Hywell Rhys)* [1953] 1 QB 660; [1953] 2 WLR 937; [1953] 1 All ER 1068; (1953) 37 Cr App R 71, CCA
*R v Williams (Gladstone)* [1987] 3 All ER 411; 78 Cr App R 276, CA
*Sherras v De Rutzen* [1895] 1 QB 918, DC
*Starglade Properties Ltd v Nash* [2010] EWCA Civ 1314; [2011] Lloyd's Rep FC 102, CA C
*Twinsectra Ltd v Yardley* [2002] UKHL 12; [2002] 2 AC 164 ; [2002] 2 WLR 802; [2002] 2 All ER 377, HL(E)
*Young v Bristol Aeroplane Co Ltd* [1944] KB 718; [1944] 2 All ER 293 , CA

The following additional cases, although not cited, were referred to in the skeleton arguments: D

*Attorney General's Reference (No 3 of 2003)* [2004] EWCA Crim 868; [2005] QB 73; [2004] 3 WLR 451; [2005] 4 All ER 303; [2004] 2 Cr App R 23, CA
*Beckford v The Queen* [1988] AC 130; [1987] 3 WLR 611; [1987] 3 All ER 425; 85 Cr App R 378, PC
*Handyside v United Kingdom* (Application No 5493/72) (1976) 1 EHRR 737
*Kafkaris v Cyprus* (Application No 21906/04) (2008) 49 EHRR 35, GC
*Mulcahy v The Queen* (1868) LR 3 HL 306, HL(I) E
*Norris v Government of the United States of America* [2008] UKHL 16; [2008] AC 920; [2008] 2 WLR 673; [2008] 2 All ER 1103, HL(E)
*R v Abbott* [1955] 2 QB 497; [1955] 3 WLR 369; [1955] 2 All ER 899; 39 Cr App R 141, CCA
*R v Button* (1848) 11 QB 929
*R v De Kromme* (1892) 17 Cox CC 492
*R v Galbraith* [1981] 1 WLR 1039; [1981] 2 All ER 1060; 73 Cr App R 124, CA F
*R v Jones* (1832) 4 B & Ad 345
*R v Jouman* [2012] EWCA Crim 1850, CA
*R v K* [2004] EWCA Crim 2685; [2005] 1 Cr App R 25, CA
*R v Landy* [1981] 1 WLR 355; [1981] 1 All ER 1172; 72 Cr App R 237, CA
*R v Meyrick* (1929) 21 Cr App R 94, CCA
*R v Misra* [2004] EWCA Crim 2375; [2005] 1 Cr App R 21, CA
*R v Orbell* (1703) 6 Mod 42 G
*R v Quinn* (1898) 19 Cox CC 78
*R v Radley (Ronald)* (1973) 58 Cr App R 394, CA
*R v Rimmington* [2005] UKHL 63; [2006] 1 AC 459; [2005] 3 WLR 982; [2006] 2 All ER 257; [2006] 1 Cr App R 17, HL(E)
*R v Saik* [2006] UKHL 18; [2007] 1 AC 18; [2006] 2 WLR 993; [2006] 4 All ER 866; [2006] 2 Cr App R 26, HL(E)
*R v Shillam* [2013] EWCA Crim 160; [2013] Crim LR 592, CA H
*R v Sinclair* [1968] 1 WLR 1246; [1968] 3 All ER 241; 52 Cr App R 618, CA
*R v W (M)* [2020] EWCA Crim 372; [2010] QB 787; [2010] 3 WLR 165; [2010] 1 Cr App R 28, CA
*R v Warburton* (1870) LR 1 CCR 274, CCR
*R v Yates* (1853) 6 Cox CC 441

© 2021 The Incorporated Council of Law Reporting for England and Wales

A *R v Zemmel* (1985) 81 Cr App R 279, CA
*S and G v United Kingdom* (Application No 17634/91) (unreported) 2 September 1991, ECtHR
*SW v United Kingdom* (Application No 20166/92) (1995) 21 EHRR 363
*Serious Fraud Office v Evans* [2014] EWCA 3803 (QB); [2015] 1 WLR 3526
*Sunday Times v United Kingdom* (Application No 6538/74) (1979) 2 EHRR 245
*Wai Yu-tsang v The Queen* [1992] 1 AC 269; [1991] 3 WLR 1006; [1991] 4 All ER
B 664; 94 Cr App R 264, PC
*Welham v Director of Public Prosecutions* [1961] AC 103; [1960] 2 WLR 669; [1960] 1 All ER 805; 44 Cr App R 124, HL(E)
*Wingrove v United Kingdom* (Application No 17419/90) (1996) 24 EHRR 1
*Yip Chiu-Cheung v The Queen* [1995] 1 AC 111; [1994] 3 WLR 514; [1994] 2 All ER 924; 99 Cr App R 406, PC
*X Ltd and Y v United Kingdom* (Application No 8710/79) (1982) 28 DR 77

C **APPEAL** against conviction and **APPLICATIONS** for permission to appeal against conviction and sentence

On 11 May 2018 in the Crown Court at Liverpool before Judge Everett and a jury, the first defendant, David Barton, was convicted of conspiracy to defraud contrary to common law (counts 1, 16, 19, 22), theft contrary to section 1 of the Theft Act 1968 (counts 5, 7, 8), fraud contrary to section 1 of
D the Fraud Act 2006 (count 15), false accounting contrary to section 17 of the 1968 Act (count 24) and transferring criminal property contrary to section 327 of the Proceeds of Crime Act 2002 (count 25). The second defendant, Rosemary Booth, was convicted of conspiracy to defraud contrary to common law (counts 16, 19 and 22). The particulars of the offending were that the defendants had over a number of years dishonestly targeted, befriended and groomed wealthy and vulnerable (and childless)
E elderly residents of the luxury nursing home owned by the first defendant and managed on his behalf by the second defendant, in order to profit from them.

On 13 July 2018 in the same court before the same judge, the first defendant was sentenced to six years' imprisonment on count 1, $2\frac{1}{2}$ years' imprisonment, concurrent, on count 5, five years' imprisonment,
F concurrent, on count 7, two years' imprisonment, concurrent, on count 8, $1\frac{1}{2}$ years' imprisonment, concurrent, on count 15, six years' imprisonment, consecutive, on count 16, eight years' imprisonment, consecutive, on count 19, eight years' imprisonment, concurrent, on count 22, 15 months' imprisonment, concurrent, on count 24 and one year's imprisonment, consecutive, on count 25, making a total of 21 years' imprisonment. The second defendant was sentenced to two years' imprisonment on count 16,
G four years' imprisonment, consecutive, on count 19 and three years' imprisonment, concurrent, on count 22, making a total of six years' imprisonment.

The first defendant appealed against conviction by permission of the full court (Hallett LJ, McGowan J and Sir John Royce) on 23 July 2019 and the second defendant applied for an extension of time of 286 days in which to
H renew her application for permission to appeal against conviction, on the grounds, inter alia, that (1) the judge had erred in directing the jury on the issue of dishonesty by reference to obiter dicta in *Ivey v Genting Casinos (UK) Ltd (trading as Crockfords Club)* [2018] AC 391 which stated that directions based on *R v Ghosh* [1982] QB 1053 should no longer be given despite the fact it remained binding authority and was to be preferred, (2) if

© 2021 The Incorporated Council of Law Reporting for England and Wales

the *Ivey* test was to be preferred, the judge had failed properly to direct the jury in accordance with it and (3) the judge had erred in his approach to the offence of conspiracy to defraud. The first defendant also applied for permission to appeal against sentence, the application having been adjourned by the full court. A

The facts and grounds are stated in the judgment of the court, post, paras 2–79. B

*Paul Bogan QC* and *Bob Sastry* (assigned by the Registrar of Criminal Appeals) for the first defendant.

At the heart of this appeal lie questions concerning (i) the definition of dishonesty in criminal cases in respect of theft and conspiracy to defraud, (ii) the definition and ambit of conspiracy to defraud and (iii) whether there can be criminality in the acceptance of a valid gift. These and a number of additional or consequential issues concerning the indictment and jury directions are interrelated. C

The judge erred in preferring the definition of dishonesty in *Ivey v Genting Casinos (UK) Ltd (trading as Crockford's Club)* [2018] AC 391, para 74 to that in *R v Ghosh* [1982] QB 1053 when directing the jury concerning dishonesty. Alternatively, in respect of the offence of conspiracy to defraud, the judge erred in applying *Ivey* in preference to *R v Ghosh*. D Should *Ivey* apply, the judge failed to direct the jury in accordance with the first limb of the test. He failed to direct the jury that a dishonesty offence could not be committed if an appropriation was with the valid consent of the owner. He also failed to direct the jury in accordance with section 2(1) of the Theft Act 1968.

The conspiracy to defraud counts 1, 16 and 19 (i) disclose no offences, E unlawfulness or aggravating features; (ii) offend the principle of legal certainty and/or article 7 of the Convention for the Protection of Human Rights and Fundamental Freedoms; and (iii) were not the subject of any jury directions concerning an unlawful object or means. The judge misdirected the jury in fact and in law, failing to direct them that each of the residents had capacity, he conflated vulnerability and capacity and failed to direct the jury in accordance with Lord Hutton's guidance in *R v Hinks* [2001] 2 AC F 241.

A genuine claim of right, or the consent of the owner to the appropriation with full knowledge of its circumstances, is a complete defence to a charge of theft under section 2(1)(b) of the 1968 Act. A genuinely held belief in the existence of such a right or consent, even if it is erroneous and unreasonable, should lead to an acquittal: see *R v Lawrence (Alan)* [1972] AC 626. That G question was not left to the jury in the first defendant's case. However the Crown put its case, the residents of the nursing home had capacity and acted voluntarily and consensually in making gifts with full knowledge of the material facts. It is incorrect in law and defies common sense and justice to say that such issues are irrelevant if they do not form part of the Crown's case: see *R v Mazo (Ellen)* [1997] 2 Cr App R 518 and *R v Hinks*.

H

*The correct definition of dishonesty*

Although there is no statutory definition of dishonesty in the 1968 Act, section 2(1) provides the limitation that appropriation of property belonging to another is not to be regarded as dishonest if the person appropriates the

© 2021 The Incorporated Council of Law Reporting for England and Wales

3-01165-mew Doc 106-21 Filed 07/03/25 Entered 07/03/25 17:38:30 Exhibit 2
Pg 8 of 60



A property in the belief that he has in law the right to deprive the other of it on
behalf of himself or of a third person or if he appropriates it in the belief that
he would have the other's consent if the other knew of the appropriation and
the circumstances of it.

*R v Ghosh* [1982] QB 1053 concerned an allegation of dishonest
obtaining by deception contrary to section 15 of the 1968 Act. In it Lord
Lane CJ formulated a test which has formed the basis of the standard
B dishonesty direction for all dishonesty offences since it was decided in 1982,
namely the jury must first decide whether according to the ordinary
standards of reasonable and honest people what was done was dishonest. If
it was not dishonest by those standards, the prosecution fails (the objective
test). If it was dishonest by those standards, then the jury must consider
whether the defendant himself must have realised that what he was doing
C was, by those standards, dishonest (the subjective test). That test has been
applied without any obvious or significant difficulty in practice for over 35
years and criticisms made of it are more conceptual than practical.

In *Ivey* [2018] AC 391, the Supreme Court disapproved *R v Ghosh* and
formulated the dishonesty test as follows: "When dishonesty is in question
the fact-finding tribunal must first ascertain (subjectively) the actual state of
the individual's knowledge or belief as to the facts. The reasonableness or
D otherwise of his belief is a matter of evidence . . . going to whether he held
the belief, but it is not an additional requirement that his belief must be
reasonable; the question is whether it is genuinely held. When once his
actual state of mind as to knowledge or belief as to facts is established, the
question whether his conduct was dishonest is to be determined by the
fact-finder by applying the (objective) standards of ordinary decent people.
E There is no requirement that the defendant must appreciate that what he has
done is, by those standards, dishonest." This represents a substantial change
of emphasis away from culpability based on personal fault to culpability
based on objective moral standards. It limits the relevance of a defendant's
state of mind to his knowledge or belief as to facts and denies any
consideration to his adherence to ordinary standards of honesty as he
genuinely believed them to be.

F In *Director of Public Prosecutions v Patterson* [2018] 1 Cr App R 28 the
Divisional Court stated that although as a matter of strict precedent it was
bound by *R v Ghosh*, it was difficult to imagine the Court of Appeal
preferring *R v Ghosh* to *Ivey* in future. However, there are sound reasons
for not preferring the *Ivey* interpretation to the *Ghosh* interpretation.
Although the Supreme Court observed that there could be no logical or
G principled basis for the meaning of dishonesty to differ in civil and criminal
cases, the divergence is justified by a distinction in the function of each
jurisdiction. Civil proceedings are held to award compensation whereas
criminal proceedings may result in conviction, punishment and lengthy
terms of imprisonment and so a more demanding test of dishonesty in
criminal proceedings can be justified. The House of Lords condoned the
divergence of civil and criminal law on the meaning and effect of its
H interpretation of the associated element of theft in *R v Hinks* [2001] 2 AC
241. The relationship between the interpretations of dishonesty and
appropriation has significant practical implications.

The judge erred in preferring the definition of dishonesty in *Ivey* to that in
*R v Ghosh* when directing the jury on dishonesty because the former was

© 2021 The Incorporated Council of Law Reporting for England and Wales

given obiter; consequently the parties might not have made full submissions and the issue might not have received the full attention of the court. The obiter dictum is not a necessary part of the judgment and to fail to distinguish between that and ratio would lead to anarchy in the lower courts: see per Sir Brian Leveson P in *Director of Public Prosecutions v Patterson*. A

The obiter remarks in para 74 of *Ivey* [2018] AC 391 may have been unusual and powerful but neither the reported argument nor an article which considers the proceedings disclose arguments made in support of *R v Ghosh* or against the rationale behind para 74. *R v James* [2006] QB 588 demonstrates that the House of Lords occasionally fell into error. Many of the submissions in the context of theft and conspiracy to defraud were not addressed in *Ivey* because the issue in that case concerned the meaning of cheating and it was held there was no need to establish dishonesty to prove cheating. The dictum concerning the correct approach to dishonesty was unnecessary for the decision. The court momentarily determined a question of importance, namely that the test for dishonesty in *R v Ghosh* was wrong, in obiter dictum, contrary to stare decisis. B C

The Court of Appeal is ordinarily bound to follow its own decisions and none are in conflict with *R v Ghosh*, which was not given per incuriam and can stand with the obiter dictum of the Supreme Court in the civil case of *Ivey*. The Court of Appeal (Criminal Division) is bound not by *Ivey* but by *R v Ghosh* and none of the exceptions in *Young v Bristol Aeroplane Co Ltd* [1944] KB 718 apply. The court in *Director of Public Prosecutions v Patterson* [2018] 1 Cr App R 28 relied on the dictum in *R v Gould* [1968] 2 QB 65 to support the proposition that in the criminal jurisdiction the Court of Appeal is entitled to depart from its own decision if the law has been misapplied or misunderstood. Lord Diplock said in *R v Merriman* [1973] AC 584 that a departure from an earlier authority in such circumstances would be limited to cases where (as in *R v Gould*) it was necessary to avoid injustice to the defendant. In *R v Magro* [2011] QB 398 the court considered itself bound by one of its previous decisions even if it was wrong. The circumstances described in which divergence from earlier case law was not permitted apply to *R v Ghosh* and to the first defendant's circumstances in the present appeal. D E F

In both *Ivey* and *R v Ghosh* the crux of the issue of dishonesty is identified, respectively, as whether it is a purely objective notion to be determined by the standards of ordinary decent people applied by the jury, or comprises an element of the accused's own interpretation of his dishonesty by those standards (*Ivey*), or whether it is a course of conduct or a term used to describe a state of mind (*R v Ghosh*). The test is important because in many cases, particularly those involving a transaction or a gift, each of the other elements of theft will have occurred. Even in the most basic of purchases, an appropriation of property belonging to another with the intention permanently to deprive the other will have taken place. Accordingly, dishonesty will be the decisive element. The quintessential issue is whether a dishonest state of mind is necessary for criminal liability. In *R v Ghosh* it was held that if the mind of the accused is honest it cannot be deemed dishonest merely because members of the jury would have regarded it as dishonest to embark on that course of conduct. By way of contrast the *Ivey* formula recasts dishonesty as a "no fault" element of a crime and states G H

© 2021 The Incorporated Council of Law Reporting for England and Wales

A there is no reason why the law should excuse those who make a mistake about what contemporary standards of dishonesty are, whether in the context of insurance claims, high finance, market manipulation or tax evasion. This offends general jurisprudential principles of criminal liability. There is a presumption that an evil intention or a knowledge of the wrongfulness of the act is an essential ingredient of every offence: see *Sherras v De Rutzen* [1895] 1 QB 918.

B The correct interpretation of dishonesty by Lord Lane CJ in *R v Ghosh* goes to the heart of the matter in which the court states how the jury should be directed after hearing full argument, unlike in the obiter dictum in *Ivey*. It considers the Criminal Law Revision Committee's Eighth Report *Theft and Related Offences* (1966) (Cmnd 2977) and leaves nothing unreviewed, unlike the Supreme Court in *Ivey*. The judgment in *Ivey* was based on C incomplete argument, whereas that in *Ghosh* was given after complete argument.

Lord Hughes JSC's reference in *Ivey* to the defendant's state of mind relates to the first limb of the *Ghosh* test and examines the defendant's state of knowledge as to the facts of the case. The Crown, in its reply, uses the term "state of mind" to connote not the mens rea but the defendant's general state of mind as to the facts. A significant fault line lies between the D appreciation of the defendants and Crown as to the meaning of "state of mind". The defendants' appreciation is that dishonesty should be and is an element of the mens rea, whereas the Crown's, together with the test in *Ivey*, is that the state of mind is part of the actus reus and does not include the mens rea. The mens rea is an important element of the offence of dishonesty although it is rarely applied in cases of robbery, shoplifting and burglary E when it will be unnecessary to consider the second limb of the *Ghosh* test. In such cases the defendant must know that what he is doing is objectively dishonest by the standards of ordinary decent people, which obviates the need for a subjective element of dishonesty in the second limb of the *Ghosh* test. The fact that that is assumed does not mean that it is not present or necessary as an important element: see the article by Professor David Ormerod QC and Karl Laird "*Ivey v Genting Casinos*: Much Ado About F Nothing?" in *The UK Supreme Court Yearbook*, Legal Year 2017–2018, vol 9, pp 380, 402.

An analysis based purely on *R v Feely* [1973] QB 530, which was relied on in *Ivey* at para 67 to support the proposition that the objective test should be applied, is wrong. In *R v Feely*, a decision of a five-judge court, Lawton LJ referred at p 537 to the word "dishonestly" in section 1(1) of the 1968 Act as G only relating to the state of mind of the person who does the act which amounts to appropriation. He was not referring to an objective test. That sentence could only make sense in the context of the *Ghosh* interpretation of dishonesty and was the analysis adopted by Lord Lane CJ in *R v Ghosh*. Under the 1968 Act, it is for the jury rather than the judge to decide dishonesty, which only relates to the defendant's own state of mind and it is unnecessary for judges to determine what was meant by dishonesty. In *R v* H *Feely* and *R v Ghosh* Lawton LJ and Lord Lane CJ, respectively, were right when they referred to the need for the defendant to realise that his own conduct was considered dishonest by the standards of ordinary decent people. It was proposed in *Ivey* that the example of the objective test in *R v Feely* was correct but it is the analysis by Lord Lane CJ in *R v Ghosh* which is

© 2021 The Incorporated Council of Law Reporting for England and Wales

correct. The correct analysis of dishonesty is that it is an aspect of the mens A
rea, a dishonest state of mind. If it does not relate to a dishonest state of
mind the second limb of *R v Ghosh* can only be an element of the actus reus
or course of conduct. That would be offensive because it is a requirement of
the interpretation of criminal offences that a person should have knowledge
and understanding of the lawfulness of his or her conduct. The two aspects
in the present case relate to the substantive offence and the conspiracy.
B
The fact that the *Ivey* formula recasts dishonesty as a "no fault" element
of a crime offends general jurisprudential principles of criminal liability. The
law should excuse those who make a genuine mistake as to an element of
the offence. Without the mens rea element of the second limb of *Ghosh*
dishonesty can only be part of the actus reus. Contrary to the general
principles held by the criminal law courts for over 100 years, that would
mean looking at conduct without examining whether there is a dishonest C
mind. There is a presumption that mens rea, an evil intention, or knowledge
of the wrongfulness of the act, is an essential ingredient of every offence: see
*Sherras v De Rutzen* [1895] 1 QB 918. The law excuses those who make a
genuine mistake for the reasons given in *R v Morgan* [1976] AC 182, *R v
Williams (Gladstone)* [1987] 3 All ER 411 and *B (A Minor) v Director of
Public Prosecutions* [2000] 2 AC 428.
D
A criminal offence must be read to include an accused's belief as to the
state of affairs necessary for the commission of an offence. The mental
element is an essential ingredient of a criminal offence. A defendant's belief
need not be reasonable providing it is honest and genuine and the subjective
test is decisive: see *R v K* [2002] 1 AC 462. If objective dishonesty is to be
proved as an element of the offence in accordance with *Ivey*, it must also be
shown the defendant knew or was aware that the conduct was objectively E
dishonest. Even if the mens rea element (the *Ghosh* subjective test) could be
excluded from a primary interpretation of dishonesty, the common law
requires the offence to be interpreted so as to demand an accused's
knowledge that the conduct was dishonest by the objective standards which
he could not have if genuinely mistaken.

The reasons why the law excuses those who make genuine mistakes can
be found in several different contexts, including that in *B (A Minor)*, where F
the House of Lords confirmed as a matter of statutory construction that a
criminal offence had to include an accused's belief as to the state of affairs
necessary for the commission of an offence. Lord Nicholls of Birkenhead
described the situation as one in which the defendant's fault lay in falling
short of an objective standard with the result that his crime lay in negligence.
That has no place in a common law principle of general application which is G
concerned with a mental element as a necessary ingredient of a criminal
offence. In addition, the necessary importation of limb two to a test of
dishonesty by reason of general principles means the defendant must be
shown to have some appreciation that his conduct is dishonest by ordinary
standards. The *Ivey* test does away with mens rea and ignores 100 years of
jurisprudence as to the requirement for a guilty mind for criminal offences.
H
The second limb of *R v Ghosh* [1982] QB 1053 cannot exculpate a
defendant who claims not to consider his activity was dishonest. It can if he
says he genuinely believed other reasonable and honest people would regard
such conduct as honest, but it is a high hurdle which excludes more deviant
conduct. The more unreasonable the belief, the less likely it is to be accepted

© 2021 The Incorporated Council of Law Reporting for England and Wales

A as genuine: see *R v K* [2002] 1 AC 462. The judge needs to direct the jury to the features of the evidence that make such a belief more or less probable. In *R v Hayes* [2018] 1 Cr App R 10 that hurdle was not cleared as the jury must have found on the *Ghosh* direction and evidence adduced in connection with the second limb of the test that the defendant did not genuinely believe that his conduct was honest by the standards of ordinary honest people. The *Ivey* test may work injustice into the case of a young, naïve and inexperienced B person who genuinely believed he was following and adopting normal standards of integrity in performing his role.

The consequential evidential effect of *Ivey* would be to prohibit a defendant from relying on an assertion that he did not believe what he was doing to be dishonest, or dishonest by the standards of ordinary decent people. Although dishonesty may be the pivotal issue in the trial the defendant's view C would not be probative of the dishonesty element of the offence and would have no bearing on the outcome of the issue. It follows that it cannot be put to him in cross-examination that he knew he was behaving dishonestly, and should he give evidence of his own views as to his honesty or contemporary standards, a judge would have to instruct the jury to ignore them.

*Dishonesty and conspiracy to defraud*

D Even if the *Ivey* formula is to be preferred, *R v Ghosh* [1982] QB 1053 should continue to apply to conspiracy. In *R v McIvor* [1982] 1 WLR 409 theft was held to be in a different category from conspiracy to defraud in that, for the former, dishonesty could be established independently of the knowledge and belief of the defendant, whereas for the latter the Crown had to prove dishonesty in the minds of the defendants. A conspiracy to commit a E statutory offence involving dishonesty required an agreement and intention, subjectively, to carry out an objectively dishonest course of conduct, which was reinforced by section 1(2) of the Criminal Law Act 1977. The *Ivey* test is one of conduct, an objective test of whether dishonesty is appropriation by the standards of ordinary decent people. Section 1(2) concerns statutory conspiracy rather than conspiracy to defraud and reflects the common law F principle of necessity. The offence is not made out unless the party knows and intends the conspiracy to take place. Making the test of dishonesty objective entails an objective examination of a course of conduct to determine whether it meets the contemporary standards of dishonesty.

On the *Ivey* test a defendant may commit an act of objective dishonesty without knowing he is committing it if the second limb of *R v Ghosh* is removed. Where liability for theft includes the absence of knowledge that G the defendant's act is objectively dishonest (*Ivey*) he shall not be guilty unless he intends or knows on the facts or in the circumstances that his conduct is objectively dishonest: see *Sherras* [1895] 1 QB 918 and subsequent cases. If his conduct is wrong contrary to section 1(2) of the 1977 Act and common law it requires a subjective element to be imported.

Conspiracy to defraud reimports the second limb of *R v Ghosh* [1982] QB H 1053. The test in para 74 of *Ivey* [2018] AC 391 invites the court to examine *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378. The Supreme Court decided to discard *R v Ghosh* on the basis of the civil definition of dishonesty. In *Tan* Lord Nicholls equates dishonesty with conscious impropriety, whereas the *Ivey* test jettisons the conscious impropriety in the second limb of *R v Ghosh* in favour of an objective test. The *Ghosh* test does

© 2021 The Incorporated Council of Law Reporting for England and Wales

not absolve a person of liability for appropriating the property of another A
because he can see nothing wrong in the behaviour. The test is that he did
not realise by the standards of ordinary decent people that what he did was
dishonest or wrong. That does not mean the *Ghosh* test is incorrect but
rather it endorses it. Such a person should not be regarded as dishonest: see
*Tan*. Conscious impropriety relates to the defendant's knowledge that what
he is doing does not meet the objective standards of ordinary decent people. B
Lord Nicholls distinguishes between civil and criminal liability at the
beginning of the section on dishonesty (see p 389). His opinion is far
more nuanced than it appears in *Ivey*. The test in *Ivey* set out that when
dishonesty is in question the fact-finding tribunal must ascertain the
defendant's knowledge as to the facts. That is not part of the mens rea or a
mens rea requirement of theft or other offences but a factor to be taken into
account when deciding objectively whether the conduct is dishonest by C
examining the words. The words should be taken literally.

A person has a complete statutory defence to offences of theft in the 1968
Act or Fraud Act 2006 (but no other offences of dishonesty) under
section 2(1)(b) of the 1968 Act if he or she genuinely believes the other
person would consent. This is not a belief as to a fact but a belief as to an
intention: see *Boggeln v Williams* [1978] 1 WLR 873. The test in *Ivey* would D
not have come to that defendant's rescue because his case did not concern a
knowledge or belief as to a fact. The defendant's belief was in a hypothetical
proposition that he would be able to pay in due course. On a literal
interpretation of the first limb of *Ivey* a belief in the owner's consent is not a
belief in a fact.

*Lord Burnett of Maldon CJ.*

That is to interpret para 74 of *Ivey* as though it were a statute when Lord E
Hughes JSC was speaking of past facts rather than future ones.

*Bogan QC.*

The wider test is knowledge or belief as to the defendant's state of mind.
The Crown refers to dicta in *Tan* [1995] 2 AC 378 which suggest that other
considerations apply in *Ivey* [2018] AC 391. Section 2(1) of the 1968 Act
would not assist a man who uses a family member's credit card assuming F
that that family member would not mind, because the owner does not
consent to the purchase of the property. Such a man would have a defence
under *R v Ghosh* [1982] QB 1053 since he would be entitled to submit that
he did not think that his conduct was dishonest by the standards of a decent
ordinary person. He would have no defence under limb one in *Ivey* since it
would depend on the jury's objective interpretation as to his conduct. The
knowledge or belief as to the facts would be that no consent had been sought G
unless there were a history of familial use of the card.

*Fulford LJ.*

Lord Hughes JSC emphasises establishing the defendant's understanding
of the facts, whereas Lord Hoffmann's test in *Barlow Clowes International
Ltd v Eurotrust International Ltd* [2006] 1 WLR 1476 focuses on the words
"by ordinary standards". Are not Lord Hughes JSC's words in relation to H
the facts being artificially elevated to distract from the meaning which Lord
Hoffmann attributed to the test?

*Bogan QC.*

No article, textbook or academic work suggests the test is any wider than
that in *Ivey* [2018] AC 391, para 74. The wider test with the personal

© 2021 The Incorporated Council of Law Reporting for England and Wales

A characteristics gloss given to it in *Tan* [1995] 2 AC 378 does not feature in Lord Hughes JSC's analysis of the first limb of the test, nor his encapsulation of it at para 74. The test does not permit a trawl through the defendant's beliefs, attitudes, intentions and reasons but is limited to what the defendant knows or believes as to the facts. The personal characteristics gloss undermines the essence of the *Ivey* test and opens up a new range of B potential factors to be considered by the jury beyond the first limb of *Ivey* which is the defendant's actual knowledge or belief as to the facts. It would expand the state of mind test considerably rather than narrow it. Such a gloss calls for a direction from the judge. The gloss is unnecessary unless it goes to the genuineness of the state of knowledge or belief. It cannot have an impact on the objective test.

The adoption of a personal characteristics gloss would present further C difficulties in a more complex case such as the LIBOR case, *R v Hayes* [2018] 1 Cr App R 10, where the facts are less clear. The jury would be asked to take into account a person's experience of a manner of working or a company policy in determining whether the defendant genuinely held that belief before deciding whether that manner of working was objectively dishonest. The second limb of *Ivey* requires an objective test which is D simply whether it meets the standards of ordinary decent people and does not include factors such as company policy and market and company practice. There is no dispute that the application of the *Ghosh* test in *R v Hayes* was part of the ratio. Evidence of industry standards in setting the LIBOR rates was adduced in respect of the second *Ghosh* limb to support the defendant's contention that he did not realise that his own conduct might be objectively dishonest. The Court of Appeal dealt extensively with E the ambit of both limbs of the *Ghosh* test in deciding whether the evidence was also probative of the first (objective) limb of the test, which it was not. It was not doubted that both limbs of the *Ghosh* test continued to apply. Lord Thomas CJ noted that *R v Ghosh* had been applied consistently for over 30 years and held that the evidence was relevant to the second (subjective) limb.

F *R v Hayes* was cited as an example of juries having coped well with applying an uncomplicated lay objective standard of dishonesty as to activities as disparate as sophisticated banking practices. The jury had no difficulty in applying the subjective limb where the defendant was relying on evidence of industry standards. There is no evidence to substantiate the suggestion in *Ivey* that juries find the *Ghosh* test puzzling and difficult to G apply. *Ivey* would require the jury to be directed to ignore the evidence. It could be said by a trader or accountant that a prevalent modus operandi or adherence to a company or sector formula was a fact he knew. Its interpretation by an employer organisation or by a defendant himself would constitute knowledge or belief as to a fact. Such evidence would explain why a defendant was behaving in a certain way. It may be impossible or difficult to distinguish evidence of such generic practice from the facts H relating to a particular allegedly dishonest transaction carried out by a defendant. Such evidence should not be admissible to determine the defendant's actual state of mind. The question then asked by *Ivey* is whether the conduct is honest by the standards of ordinary decent people. It is difficult to see how that actual state of mind could assist the jury when

© 2021 The Incorporated Council of Law Reporting for England and Wales

applying the purely objective test which permits no standards other than those of ordinary decent people. *Ivey* would require the jury to be directed to ignore the evidence. A

All the elements of theft apart from dishonesty, a dishonest intention permanently to deprive, are made out where there is a valid gift or transaction. The Supreme Court in *Ivey* was not invited to consider the impact of a reinterpretation of dishonesty in the context of alleged thefts involving valid transfers of title and gifts. The interpretation of *Ivey* compromises the reasoning in *R v Hinks* [2001] 2 AC 241. A person cannot steal a valid disposition or gift of an enforceable transaction. The House of Lords determined in *R v Hinks* that appropriation may take place notwithstanding an indefeasible title to property where a valid gift is made. It is unnecessary to show the absence of consent of the owner. In *R v Lawrence (Alan)* [1972] AC 626, 632 Viscount Dilhorne stated that under section 2(1) of the 1968 Act a person's appropriation of property was not to be regarded as dishonest if he appropriated it in the belief that he would have the other's consent if the other knew of the circumstances of it. In those circumstances there could be no theft. The 1968 Act does not clarify the position where a person has agreed to the appropriation with full knowledge of the circumstances. It must be assumed that there can be no theft in such a situation, but *Ivey* read with *R v Hinks* may tend to invalidate that assumption. The question remains whether they nullify dishonesty. In *R v Hinks* the court considered it inappropriate to examine the history of the meaning of appropriation and the Eighth Report of the Criminal Law Revision Committee *Theft and Related Offences*, whereas the Supreme Court found it necessary to examine that report in *Ivey*. Professor David Ormerod QC and Karl Laird consider the effect of an objective test in "*Ivey v Genting Casinos*: Much Ado About Nothing?", *The UK Supreme Court Yearbook*, Legal Year 2017–2018, pp 380, 393.

The authorities make clear how a valid disposition or gift should be dealt with in the context of theft or a crime involving dishonesty: see *R v Mazo (Ellen)* [1997] 2 Cr App R 518, and *R v Hinks* [2001] 2 AC 241, which had similar factual issues to the present case. As to whether an appropriation can take place under the 1968 Act where the owner has consented, in *R v Lawrence* [1972] AC 626 and *R v Gomez* [1993] AC 442 the House of Lords concluded that an appropriation was just a taking regardless of whether it was a gift. In an obiter dictum in *R v Hinks* (see pp 256–257), Lord Hutton considered it necessary to go on to consider how it might affect the application of dishonesty. Without suggesting that Lord Hutton was incorrect, the other Law Lords considered the question was outwith their jurisdiction. Lord Hutton concluded that a person's appropriation of property belonging to another should not be regarded as dishonest if the other person gave the property to him and referred to *R v Laurence* and *R v Mazo*. He stated at p 260 that where the issue concerned the validity of a gift, the judge needed to make clear to the jury that if there had been a valid gift the defendant could not be found to be dishonest, no matter how morally reprehensible they thought her conduct. At p 257 he agreed with Pill LJ in *R v Mazo* [1997] 2 Cr App R 518, 521 that if there had been a valid gift there could be no theft, because there was no dishonesty. The House of Lords in *R v Hinks* did not address the issue of dishonesty for procedural

© 2021 The Incorporated Council of Law Reporting for England and Wales

A rather than substantive reasons. Lord Hutton was not disagreeing with Lord Steyn as to the definition of appropriation. Lord Hutton's observations were obiter, not because he was dissenting but because the House of Lords' reasons for failing to consider dishonesty were procedural rather than substantive. Lord Steyn acknowledged that the House was not confined to the certified question and the interests of justice required the matter to be B looked at in the round. Lord Hutton considered that the summing up was materially defective to the extent that the defendant's convictions could not stand and proposed a list of guidelines as to judges' directions.

The issue in theft cases where gifts are concerned is whether the apparent consent of the owner was valid or vitiated by lack of capacity, undue influence or coercion. The judge in the present case did not deal with that issue. The defendant sought a jury direction to the effect that the residents C who had allegedly been defrauded had capacity. The judge compromised the straightforward direction on capacity by including references to vulnerability which should have been omitted. The Crown did not suggest that gifts had been vitiated by undue influence but put its case on the basis that it was unnecessary to consider whether the gifts were valid. People are vulnerable to charm and persuasion. Vulnerability is very difficult to define. D The judge's references to vulnerability were unhelpful in defining how the case should be approached. A very simple direction should have been given regarding capacity, such as that there was no dispute but that the residents had capacity and were able to make valid transfers. He should have directed the jury that, as to the validity of the gifts, substantial sums had been gifted to the defendant voluntarily by people with capacity and in possession of full E knowledge of the material facts. If that is right, the defendant had a complete defence. If wrong, the judge should have given a formal direction as to how the gifts could be vitiated. The jury were not equipped as to how to distinguish between the two.

No justiciable conspiracy was particularised in the indictment because no unlawfulness was alleged: see *R v Scott* [1975] AC 819. For conspiracy to defraud, a financial advantage has to be obtained or there has to be F economic prejudice to a third party, dishonesty and some unlawfulness. It is often thought that an element of unlawfulness is part of the common law definition of an offence of dishonesty as a result of the dictum of Viscount Dilhorne in *R v Scott* in which he said that Buckley J's definition of conspiracy to defraud in *In re London and Globe Finance Corpn Ltd* [1903] 1 Ch 728 was non-exhaustive. He held that on a charge of conspiracy to G defraud, an agreement by two or more by dishonesty to deprive a person of something which was his or to which he was entitled, and an agreement by two or more by dishonesty to injure some proprietary right of his, constituted the offence of conspiracy to defraud. There could be some unlawfulness without dishonesty. In some cases there were separate elements of dishonesty and unlawfulness. Deception contains both the elements of dishonesty and unlawfulness. *R v Evans (Eric)* [2014] 1 WLR H 2817 assumed dishonesty but held there was no unlawfulness since both elements were not satisfied on the evidence. The commission of an offence of strict liability may have an element of unlawfulness but no dishonesty. If there was no unlawfulness as in *R v Evans* or *Norris v Government of the United States of America (Goldshield Group plc intervening)* [2007] 1 WLR

© 2021 The Incorporated Council of Law Reporting for England and Wales

1730, the count must fail for want of any allegation which was central to the prosecution. A

The Crown in the present case falls into the trap of thinking dishonesty can be a substitute for unlawfulness which the indictment does not disclose. It instead echoes the definition of conspiracy to defraud in *R v Scott* [1975] AC 819 without referring to any element of unlawfulness. Allegations of exploitation, taking money from vulnerable people, manipulation, or grooming are easy to repeat during a closing speech but do not involve B unlawfulness. The Crown's reference to conspiracy to defraud vulnerable elderly residents by manipulating them and exploiting their vulnerability does not represent what took place factually, and the use of those phrases does not demonstrate any element of unlawfulness. The judge gave no direction to the jury as to how they could decide whether the defendant was entitled to the property. The words on the indictment had no meaning. C There was no allegation that the defendant was not entitled by reference as to how he could be entitled. If, as asserted, property was made over to the defendant as gifts, he was entitled to accept them. The jury were not equipped to decide whether the defendant was entitled since there was no direction given as to whether the gifts were valid. They were not directed as to how the alleged fraud was supposed to have been perpetrated beyond the use of words such as "vulnerability" and "manipulation". On a count of D conspiracy to defraud there is a requirement that the object and means by which the unlawful objective could be achieved should be set out. The jury need to be able to hang the conviction onto something.

*The judge's direction on dishonesty*

The judge misdirected the jury by failing to give them the first limb of the E direction in *Ivey* [2018] AC 391, either in its literal form as to knowledge of the facts, or its expanded form. If the defendant believed as a fact that he was entitled to property which had been made over to him in the form of valid gifts, it was incumbent on the jury to take that into account. The second limb of *Ivey* concerned dishonesty. The jury should have been told what the defendant knew as a fact, that he was entitled to accept valid gifts, F and that they had to reach their own view as to whether his conduct was dishonest by the standards of honest decent people. Failure to do that undermined the direction on capacity in relation to gifts in respect of theft. The judge also failed to give a direction pursuant to section 2(1)(a) and (b) of the 1968 Act. He failed to give a direction as to entitlement which might or might not have been the same as the direction on gifts which was the missing element of unlawfulness. It was crucial for the jury to have a framework G within which to decide whether the defendant was entitled to the property. The defendant will never know on what basis the jury convicted him on the first three counts of conspiracy to defraud and whether they made any findings of unlawfulness. The judge informed the jury of the conflicting positions of the authorities but failed to tell them how to approach them. He should have given them a formal direction as to how to consider and H determine the question of the validity of gifts and whether the gift was vitiated or valid. Instead the judge provided the jury with a lengthy written document during the direction on capacity which neither set out the central element of unlawfulness which needed to be proved nor provided a framework to enable them to determine the question.

© 2021 The Incorporated Council of Law Reporting for England and Wales

*Geoffrey Payne* and *Sushil Kumar* (assigned by the Registrar of Criminal Appeals) for the second defendant.

The case against the second defendant, the general manager of the nursing home, is more inferential than the case against the first defendant. The second defendant did not receive property directly from residents in the same way, but benefited from certain wills.

The first defendant's submissions in respect of (i) the tests laid out in *Ivey v Genting Casinos (UK) Ltd (trading as Crockfords Club)* [2018] AC 391 and *R v Ghosh* [1982] QB 1053, (ii) the judge's failure properly to direct the jury in accordance with the *Ivey* test and (iii) the judge's erroneous approach to the offence of conspiracy to defraud, are adopted.

The second defendant did not know of any dishonest agreements. The fact that Lord Hughes JSC in *Ivey* made a powerful statement that the test for dishonesty in that civil case was to be followed in future instead of the test in *R v Ghosh* does not elevate it from obiter to ratio. *R v Simpson* [2004] QB 118 concerns the per incuriam doctrine and states that it is not safe to rely on a decision which was given in the absence of relevant information if it is probable that, had the information been known, the decision would have been affected by it. Professor David Ormerod QC and Karl Laird in their article "*Ivey v Genting Casinos*: Much Ado About Nothing?" *The UK Supreme Court Yearbook*, Legal Year 2017–2018, vol 9, pp 380, 402, state that if the Supreme Court had heard full argument on those matters in *Ivey*, then the position might have been different.

If the first limb of the *Ivey* test is wider it is even more important to direct the jury on it. The second defendant's role was more marginal. Matters such as the hierarchy of the staff were capable of having a bearing on the jury's consideration of the second defendant, but the jury were not so directed.

As to the grounds which relate only to the conviction of the second defendant, her convictions on the three counts of conspiracy to defraud were rendered unsafe by: (i) the judge's failure to withdraw her case from the jury following the close of the prosecution case because of a misunderstanding of a central feature of the evidence; and (ii) the wrongful admission of evidence that the second defendant had received £10,000, which came from a defendant who was a prosecution witness and admitted lying to the police.

*David Perry QC, Benjamin Myers QC, Nicola Daley* and *Katherine Hardcastle* (instructed by *Crown Prosecution Service, Specialist Fraud Division*) for the Crown.

Prior to the decision of the Supreme Court in *Ivey v Genting Casinos (UK) Ltd (trading as Crockfords Club)* [2018] AC 391, the law was in such a tangle that the claimant in that case could claim he was not a dishonest card player despite deliberately setting out to deceive the croupier to distort the odds in a game of pure chance. Robin Hood would be acquitted, even though he was a thief, if he thought the right-thinking world were on his side. *Ivey* simplified and clarified the law to the extent that it no longer requires the jury to consider the defendant's views of acceptable standards. The more warped a defendant's moral sensibilities and sense of virtue, the more likely he was to escape censure. However, the first defendant was bound to be convicted and it was inevitable that his conduct would be regarded as dishonest whether the approach in *Ivey* or that in *R v Ghosh* [1982] QB 1053 was taken. The test given by Lord Lane CJ in the Court of Appeal in *R v Ghosh* was obiter just as

© 2021 The Incorporated Council of Law Reporting for England and Wales

much as the test given by the Supreme Court in *Ivey*. It is ironic that the defendants contend that the direction in *R v Ghosh* is decisive in a case in which the *Ghosh* direction would not have been given. In the present case there is a stark question of fact. The facts in the form of false care records, false invoices and false documents sent to independent advisers demonstrate that the first defendant is obviously seriously dishonest. One of the many ironies is that the defendants rely on obiter dicta of the Court of Appeal but say that the obiter dicta of Lord Hughes JSC in *Ivey* does not represent the law. It is irrelevant if the property took the form of gifts. *R v Hinks* [2001] 2 AC 241 was founded on *R v Lawrence (Alan)* [1972] AC 626, *R v Morris (David)* [1984] AC 320 and *R v Gomez* [1993] AC 442, all decisions of the House of Lords which make clear that an appropriation even with the consent of the owner may be theft. The counts towards which the defendants direct most of their criticisms are conspiracy counts. The jury had to be sure that the defendants entered into agreements to take property to which they were not entitled and the defendants' argument ends by saying that that did not disclose an offence known to law. If you are dishonest you agree to obtain money or property rights, which is theft by another name. Conspiracy to steal could be conspiracy to defraud and there is no question that it could be a claim of right. The defendants entered into a dishonest agreement to obtain property to which they were not entitled. The arguments which were presented to the court based on *Ivey* or *Hinks* and the way the jury was directed do not accurately represent the law or what was said in *Ivey* or *Hinks*. The appeals should be dismissed.

The legacy of para 74 of *Ivey* [2018] AC 391 is that Lord Hughes JSC has addressed the first and second limbs of the test in the Supreme Court as though he were formulating a direction. He was formulating the way in which dishonesty should be approached. In future, the jury were to be directed using a combination of the dicta of Lord Nicholls of Birkenhead in *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378 and the dicta of Lord Hoffmann in *Barlow Clowes International Ltd v Eurotrust International Ltd* [2006] 1 WLR 1476 to bring home to them what dishonesty is. Account needs to be taken of the particular circumstances of the case in the sense of what the defendant knew or believed. In *R v Hayes* [2018] 1 Cr App R 10 all the evidence would be admissible instead of relying on part two of the *Ghosh* test, namely, what the defendant considered to be normal acceptable standards. The judge in the present case told the jury that what the defendants believed was bewildering. It was not their case that they believed what they were doing might be wrong, but that they believed they were right. The judge described these as stark differences.

The defendants identify as the most interesting aspect of the case whether the Supreme Court could change the law through legal opportunism, writing an extensive obiter dictum and expecting it to be followed. No such wide principles exist, nor are they contended for. The consequences for the Court of Appeal are no different from those in *Abou-Rahmah v Abacha* [2007] Bus LR 220 and *Starglade Properties Ltd v Nash* [2011] Lloyd's Rep FC 102 in that the Court of Appeal will decide what not to follow. If the Court of Appeal holds itself bound by its previous obiter dictum in *R v Ghosh*, the Crown seeks certification and permission to appeal, and the case goes to the Supreme Court, which will say that *R v Ghosh* is wrong. The doctrine of precedent is designed to serve public good and promote consistency and

© 2021 The Incorporated Council of Law Reporting for England and Wales

rectitude in decision-making. Lord Hughes JSC said in *Ivey* [2018] AC 391, para 63 that the Court of Appeal (Criminal Division) was unlikely to have the opportunity to consider the test for dishonesty in criminal cases while *R v Ghosh* remained binding on trial judges. Although an opportunity might have arisen in *R v Cornelius* [2012] Lloyd's Rep FC 435, it did not do so. Lord Hughes JSC was saying there was no logical principled reason for the *Ghosh* test. A corresponding position existed in *R v James* [2006] QB 588 in which the Court of Appeal said it was not bound by the earlier House of Lords decision of *R v Smith (Morgan)* [2001] 1 AC 146 in provocation cases and instead applied the more recent decision of the Privy Council in *Attorney General for Jersey v Holley* [2005] 2 AC 580 in which it was held that the decision of the majority clarified definitively the present state of English law. The Privy Council in the latter case did not have the specific authority to say that *R v Smith* was wrong. Is the Court of Appeal bound to apply precedent and defer to the House of Lords because it is not bound by the Privy Council? Where the court at the highest level has spoken and the Court of Appeal knows that any appeal to the Supreme Court is a foregone conclusion, is it not in a position to say it will follow the obiter position in the Supreme Court? The case bears resemblance to *Barlow Clowes* [2006] 1 WLR 1476 and *Tan* [1995] 2 AC 378. In *Barlow Clowes* Lord Hoffmann concurred with the law of the Isle of Man and took the opportunity to clarify English law. In *Tan* the Privy Council looked to the test for dishonesty in England and Wales to assist it. *Abou-Rahmah* and *Starglade* set out the position in England and Wales.

The basis on which the Court of Appeal can say that *Ivey* represents the law is the exceptional circumstance where the Supreme Court indicates the state of the law unanimously with the effect that the Court of Appeal knows what the outcome of an appeal would be. That avoids its having to allow the appeal and the result having to be overturned by the Supreme Court. Academic articles say that that exceptional jurisdiction (the *James* jurisdiction of Lord Woolf CJ) goes beyond being dynamic. The jurisdiction features in the *R v Simpson* [2004] QB 118 line of cases on confiscation. Lord Woolf CJ said it depends on the constitution of the Court of Appeal. Lord Hughes JSC said in *Ivey* that juries ought not to be directed on the basis of the test in *R v Ghosh* [1982] QB 1053. When confronted with a case such as the present the Court of Appeal (Criminal Division) is able to depart from its earlier decisions which are not binding on it. The test in *R v Ghosh* was given in an obiter dictum, but has been applied in cases as if it were ratio. In *Ivey*, Lord Hughes JSC explored the pre-*Ghosh* case law and tangle of inconsistent decisions and referred to the Fraud Act 2006 and conspiracy to defraud. He said that a separate test for conspiracy to defraud was unwarranted and a single test for dishonesty should be used in whichever proceedings the question arose. In *Starglade* [2011] Lloyd's Rep FC 102 Leveson LJ expressed disquiet with the *Ghosh* test. *Tan* [1995] 2 AC 378 and *Barlow Clowes* [2006] 1 WLR 1476 are contrary authorities. The fact that the Court of Appeal (Criminal Division) tried to consider the position in *R v Cornelius* [2012] Lloyd's Rep FC 435 indicates that there was dissatisfaction with the law and that it had taken a wrong route.

In *Ivey* the Supreme Court gave a clear indication as to the law: see also Diplock LJ in *R v Gould* [1968] 2 QB 65 and Lord Judge CJ in *R v Magro* [2011] QB 398 in which he said that even if *R v Clarke (Joseph)* [2010]

© 2021 The Incorporated Council of Law Reporting for England and Wales

1 WLR 223 had been wrongly decided the court was bound by it. The facts in that case were not as strong as in the present. There should not be an unruly approach to precedent. The Supreme Court has spoken on the issue of dishonesty. The charge in *Ivey* was under a criminal provision of the Gambling Act 2005 in which dishonesty did not form part of the claimant's case. The jurisdiction being contended for is beyond argument and limited, but the Court of Appeal (Criminal Division) can exercise their jurisdiction in exceptional circumstances to follow what the Supreme Court has said. The court is liberated and not in a straitjacket. If the Court of Appeal (Criminal Division) says that *Ivey* is now the governing authority on dishonesty that will be the end of the matter. If the appeal is dismissed a question could be certified.

The arguments against *Ivey* [2018] AC 391 are without substance. The test in *Ivey* represents a more modest change to the test for dishonesty than the defendants and commentators contend and reflects the pre-1968 position as well as that of the Criminal Law Revision Committee. It is apparent from the headnote of *Ivey* (see p 392C) that *R v Ghosh* [1982] QB 1053 has been disapproved. At paras 52 and 53 the Supreme Court refers to the Fraud Act 2006 and section 2(1) of the Theft Act 1968. At para 54 it refers to *R v Ghosh* as a "significant refinement" and at para 57 it identifies "serious problems" with the decision. At para 59 it says there is no reason why the law should excuse those who make a mistake about what contemporary standards of honesty are. Such a concept does not appear in any other area of the law. At para 63 the Supreme Court says that there is no logical basis for the divergence in the test for dishonesty between civil and criminal law and that it is taking the opportunity to clarify the law. At paras 64–74 it concludes the *Ghosh* direction should no longer be given and provides a clear statement as to the test it will be appropriate to give in future. The test is one of the defendant's state of knowledge and belief as to the facts, and the question whether his conduct is honest or dishonest is to be determined by the fact-finder by applying the objective standards of ordinary decent people. It does not reduce dishonesty to a conditional limb of the offence. At para 67 the Supreme Court considers *R v Feely* [1973] QB 530 in which the Court of Appeal (Criminal Division) said that usually employees who took money from the till without permission were thieves but, if the circumstances were such that no possible moral obloquy could attach to what was done, they might not be. In deciding the standard required as to the defendant's state of knowledge, the jury has to apply its own objective standards to whether the conduct is dishonest. The removal of the second limb of the test is to be welcomed, as is using a single test for dishonesty across all the domains of the English law, civil and criminal.

In support of that understanding and demonstrating that the *Ghosh* test is wrong, in *Tan* [1995] 2 AC 378, 389D–E Lord Nicholls referred to conscious impropriety and the fact a person is not free to set his own standard of dishonesty. The standard is set by the knowledge and belief a person has when entering into a transaction. In the opinion of the Board in *Barlow Clowes* [2006] 1 WLR 1476, Lord Hoffmann expressed a similar test to that propounded by the Supreme Court in *Ivey*. See also Arden LJ on the doctrine of precedent in *Abou-Rahmah* [2007] Bus LR 220, paras 64–69. That case provided the Court of Appeal with its first opportunity since *Barlow Clowes* to consider the element of dishonesty required for liability as an accessory in

© 2021 The Incorporated Council of Law Reporting for England and Wales

a breach of trust. Arden LJ referred to *Tan* and to the fact that in English law dishonesty is required before liability for assisting in a breach of trust could be imposed. She also referred to the work of academic commentators including *Lewin on Trusts*, 17th ed (2000). The widely held interpretation of the House of Lords decision of *Twinsectra Ltd v Yardley* [2002] 2 AC 164 was out of step with *Barlow Clowes*, which clarified that it was not a requirement of the standard of dishonesty that the defendant should be conscious of his wrongdoing. In *R v James* [2006] QB 588 the Court of Appeal (Criminal Division) followed the decision of the Privy Council in *Holley* [2005] 2 AC 580 in preference to that of the House of Lords in *R v Smith (Morgan)* [2001] 1 AC 146.

One of the points made in *R v James* was that the doctrine of precedent is a creature of the common law and intended to serve the interests of legitimate certainty. Lord Phillips of Worth Matravers CJ stated that if the court failed to disregard the well-established rules of precedent its decision would be followed by judges directing juries in trials around the country until the decision was reversed by the House of Lords, thereby reducing the law to a game of ping-pong. The same is true of the present case. The Court of Appeal (Criminal Division) should follow the Supreme Court decision of *Ivey* [2018] AC 391 to avoid uncertainty until the Supreme Court can say in a case where the point arises that *R v Ghosh* still represents the law.

In *Director of Public Prosecutions v Patterson* [2018] 1 Cr App R 28 Sir Brian Leveson P said that it was difficult to imagine the Court of Appeal preferring *R v Ghosh* to *Ivey* in future. Practitioners are working on the basis that the Supreme Court has spoken through *Ivey*. Arden LJ made the point of principle on precedent in *Abou-Rahmah* [2007] Bus LR 220, para 68 that the circumstances must be quite exceptional, as they are in the present case, before the Court of Appeal follow a decision of the Privy Council in place of a decision of the House of Lords and the court had to be satisfied that in practice the result would be a foregone conclusion. She explained why the circumstances were exceptional and justified the course the judge took in applying the Privy Council decision of *Barlow Clowes* without asking himself, on the basis that *Twinsectra* was binding on him under the doctrine of precedent, whether the interpretation in that case was one to which he would himself have come. *Twinsectra* had been widely interpreted as requiring both an objective and subjective test to be applied to the question of standard which was stated in *Barlow Clowes* to be the wrong interpretation. *Barlow Clowes* arose under Manx law but there was no distinction between that and the law of England and Wales and the case intended to clarify English law. In *Abou-Rahmah* the Court of Appeal reached its own assessment as to whether there was a very good reason to follow the *Twinsectra* approach, and Pill and Rix LJJ found it unnecessary to explore the point. At para 17 Rix LJ referred to the statement of principle in *Snell's Equity*, 31st ed (2005), pp 692–693, both before and after *Barlow Clowes*. The Court of Appeal took the correct approach in that case.

In *R v James* [2006] QB 588 the Court of Appeal followed the Privy Council decision of *Holley* [2005] 2 AC 580, on which nine Lords of Appeal in Ordinary sat. The point was exhaustively argued throughout the court system in cases including *R v Smith (Morgan)* [2001] 1 AC 146 and *R v Morhall* [1996] AC 90, which begs the question how exhaustively a test has

© 2021 The Incorporated Council of Law Reporting for England and Wales

to be argued before it can be applied? In *R v James* Lord Phillips CJ took into account the *Practice Statement (Judicial Precedent)* [1966] 1 WLR 1234, in which the House of Lords declared that it would depart from its own decisions when it appeared right to do so. The doctrine of precedent had become more relaxed. In *R v James* Lord Phillips CJ was able to say that common law principles allowed the Court of Appeal to follow a decision of the Privy Council. Lord Hoffmann made the position clear in the House of Lords in *R v Smith*. The position we are in is that set out by Arden LJ in *Abou-Rahmah* [2007] Bus LR 220, paras 67–69, and by the statements of principle of the Court of Appeal (Civil Division) in *Starglade* [2011] Lloyd's Rep FC 102, per Sir Andrew Morritt C, at paras 23–32, Hughes LJ, at para 41, and Leveson LJ, at paras 42–45 (where he called for a reconsideration of the *Ghosh* test and said it would be unsatisfactory if there were separate tests for dishonesty in criminal and civil law).

The Court of Appeal is not in a straitjacket but the principle only applies in exceptional circumstances. If the Court of Appeal considers that it has heard all the arguments and that it would be right to apply the principle, the critics of *Ivey* [2018] AC 391 would be overruled. The court may consider the article by Professor David Ormerod QC and Karl Laird "*Ivey v Genting Casinos*: Much Ado About Nothing?" *The UK Supreme Court Yearbook* Legal Year 2017–2018, vol 9, pp 380, 402, characteristically insightful but put in tentative terms and that it does not bear scrutiny as substantially critical of *Ivey*. The question is posed as to whether dishonesty has been turned into a conduct element, to which the obvious answer is "no" for reasons explained by Lord Hoffmann in *Barlow Clowes* [2006] 1 WLR 1476. Lord Hughes JSC stated in *Ivey* that Professor Ormerod QC would have to go further to make good his argument. The *Ghosh* direction is only given in a limited number of cases. The mens rea point is inapplicable where the *Ghosh* direction is not given. The argument is illogical and self-defeating. Lord Hutton's dissenting judgment in *R v Hinks* [2001] 2 AC 241, 259 has no bearing on the issue in the present case, including where he said that the *Ghosh* direction is inadequate in a valid gift case. The cases on mens rea and recklessness are irrelevant. Dishonesty remains a fault element of theft and operates in a principled way, requiring an evaluation of what the defendant knew or believed at the time he did the act.

The position in relation to *R v G* [2004] 1 AC 1034, to which Professor Ormerod QC referred, goes against this argument. It represents a move towards a more subjective basis of liability in recklessness: see *R v Caldwell* [1982] AC 341 and Lord Diplock on the objective test in *R v Lawrence (Stephen)* [1982] AC 510. In *R v Lawrence* the House of Lords moved towards a more subjective approach, based on identifying whether the defendant was driving in such a manner as to create an obvious and serious risk, rather than being satisfied that he had driven in that manner without giving thought to the possibility of risk, or, having appreciated the risk, had gone on to take it. It was for the jury to decide whether the risk was obvious and serious by applying the standard of the ordinary prudent motorist represented by themselves.

In *Ivey* [2018] AC 391 there is a finding of the individual's knowledge or belief as to the facts, then an evaluation as to whether his conduct was dishonest according to the objective standards of ordinary decent people. See Lord Woolf CJ's statement on precedent in *R v Simpson* [2004] QB 118,

© 2021 The Incorporated Council of Law Reporting for England and Wales

A paras 32–39. He was aware of the exceptions to the principles in *Young v Bristol Aeroplane Co Ltd* [1944] KB 718 and *R v Gould* [1968] 2 QB 65. The court had more flexibility to depart from decisions in the public interest to ensure that the law was put back on the right path. See Lord Judge CJ in *Magro* [2011] QB 398.

The historical development of the law and the position prior to the Theft Act 1968 is relevant to section 2. In *R v Williams (Hywell Rhys)* [1953] B 1 QB 660, 666 Lord Goddard CJ, Byrne and Parker JJ considered fraud under section 1(1) of the Larceny Act 1916 (6 & 7 Geo 5, c 50) and a section 2 argument in relation to the claim of right. Accepting the defendants' argument, Lord Goddard CJ said that the word "fraudulently" added something to the words "without a claim of right", meaning that the taking must be intentional and deliberate, without mistake. The word C "fraudulently" had been used in larceny legislation at the beginning of the 19th century and in the 1916 Act but was later replaced by the word "dishonestly" which the Criminal Law Revision Committee considered a more modern word and easier for the public to understand: see *Ivey* [2018] AC 391, para 64. Under the old law the taking had to be intentional and deliberate. "Taking" is fact-specific. A person who picks up a suitcase at a station believing it to be his does not take it fraudulently.

D The way the previous law developed is problematic for the *Ghosh* test. Section 2 was inserted into the 1968 legislation to do the work of the old claim of right. When the word "dishonestly" was inserted it did the work of "fraudulently", but the way the law developed has led to dishonesty taking on a life of its own and section 2 being made redundant. Section 2 did not come into play under the *Ghosh* test, just what right-minded people thought E of a person's conduct. In *Ivey*, dishonesty does much of the work, which accords with what the criminal law intended.

Section 2 does not arise on the conspiracy counts for the reason that the jury must have been satisfied that the defendants agreed to pursue a course of conduct involving the obtaining of property to which they were not entitled. Section 2 collapses into findings of fact. On the theft counts it also collapsed into the issue of fact. Once the jury found that the stark issue against the F defendant was dishonesty and manipulation, section 2 did not come into play. Since there is no magic in a section 2 direction to the jury, it is better not to give it. To do so would complicate the section for people who are unfamiliar with the 1968 Act. The fact that no express reference was made to section 2 does not impact on the safety of the conviction. The court addressed what the victims might have said had they been called to give evidence. The G first defendant sold octogenarians two Rolls Royces at four times their value in one day, obtaining £1m into his bank account. It is not difficult to imagine what both ladies would have said had they known that the first defendant had lied about the value and that he did not intend to take care of them but rather to extract as much of their wealth as possible. The first defendant also told Mr Ward-Howlett that the council would not provide him with proper care and his ashes would end up in the bin. There was evidence of false invoices H and false accounting. Dishonesty was apparent throughout the facts. The first and second defendants gave evidence before the jury for 20 days and they had ample opportunity to assess his case. The first defendant described the day when he took £1m from two ladies as an ordinary day, and told his wife and the court that money did not excite him. The issue of dishonesty was

© 2021 The Incorporated Council of Law Reporting for England and Wales

difficult for the defendants to defend. The judge approached the issues of fact and his summing up with great care and indicated to the jury in a straightforward and helpful way. A

There would only be substance in the conspiracy point under section 1(2) of the Criminal Law Act 1977 if dishonesty were a conduct element of the offence, which it is not. *R v Hayes* [2018] 1 Cr App R 10 is irrelevant to the question of principle. It is still possible to deploy evidence to argue not on the basis of *R v Ghosh* but on the basis of *Ivey* what the defendant knew or believed, applying the standards of ordinary, decent, honest people. On analysis, the *Ivey* test is fairer and more certain than that of *R v Ghosh* because it is not based on an artificial construct as to what the jury thinks. It is also fairer because it makes it possible to predict more accurately what the tribunal is going to decide, identify clearer issues and tailor more certain advice to them. *Ghosh* dishonesty is the last refuge of most defendants since it enables them to say that they are in the Robin Hood category, despite what the facts indicate. B C

*R v Hinks* [2001] 2 AC 241 is the governing authority on the validity of gifts. The first defendant says that Lord Steyn in that case ruled out the view of the Criminal Law Revision Committee in its Eighth Report and the communications between the draftsmen of the 1968 Act and the Committee. *R v Hinks* is clear that the legal validity of a gift is beside the point and it is dishonesty which governs. Lord Steyn does not suggest that the dishonesty under discussion is *Ghosh* dishonesty and he does not say the *Ghosh* test for dishonesty would protect a defendant in a situation such as the present. The fact the jury has to make the finding of dishonesty provides the protection in law. On the analysis in *Ivey*, dishonesty is measured by the findings as to what the defendant knew or believed before being judged by the appropriate standard. For the first defendant to rely on Lord Hutton's dissenting judgment in *R v Hinks* as though it represents the law on any doctrine of precedent is misconceived. *R v Mazo* [1997] 2 Cr App R 518 was wrongly decided and cannot stand with *R v Hinks*. The present case is not in the territory of *R v Hinks* or *R v Kendrick* [1997] 2 Cr App R 524. The defendants in the present case were not entitled to the property and on any view the gifts were not legitimate. The defendants would not forge documents, falsify accounts, records and conceal wills from the complainants' friends, family and independent financial advisers if their actions were within the law. The judge's direction was accurate. D E F

Since the capacity of the victims is not in issue there was no need for the judge to direct the jury on that point. There was a question for them to consider as to whether it was dishonest to exploit vulnerable residents fraudulently. Many of the elderly residents were isolated, childless individuals, as evidenced by the facts of the counts. The evidence against the second defendant demonstrated that it was possible to influence residents even if they had capacity. On the evidence, it was a case of unarguable dishonesty and the summing up was balanced and fair. The judge was best placed to assess the submission of no case to answer by the second defendant on one of the counts of conspiracy to defraud (count 16) having heard three months of prosecution evidence and with a full understanding of the inferences supported by the evidence. He was right to rule that there was a case to answer and well aware of his duty as a trial judge to bring the count to an end if it could not be left to the jury. His treatment of count 16 was G H

© 2021 The Incorporated Council of Law Reporting for England and Wales

illustrative of the conspicuous care he took in the case overall. He reminded the jury as he went along of cases such as *R v James* and *General Medical Council v Raychaudhuri (Professional Standards Authority for Health and Social Care intervening)* [2019] 1 WLR 324 (which provided an example of how *Ivey* was being applied in the context of disciplinary proceedings, an area in which there had previously been uncertainty in the law with regard to the test for dishonesty).

The court is invited to proceed on the basis that *Ivey* represents the law and to dismiss the appeals. If the court is doubtful as to the status of *Ivey* it is open to it to certify a reference for leave to appeal to the Supreme Court either on dishonesty or on the question of precedent. The direction to be given under *Ivey* should be based on the dicta of Lord Nicholls in *Tan* [1995] 2 AC 378 and Lord Hoffmann in *Barlow Clowes* [2006] 1 WLR 1476.

*Bogan QC* in reply.

*R v Ghosh* [1982] QB 1053 is consistent with the general criminal law, not out of sync with it. The requirement of mens rea is an obligatory element of a criminal offence unless specifically excluded by Parliament. Lord Hughes JSC in *Ivey v Genting Casinos (UK) Ltd (trading as Crockford's Club)* [2018] AC 391 identified the crux of the matter as being whether dishonesty is a purely objective issue to be determined by the standards of the jury, or whether it comprises an appreciation of dishonesty by the defendant's own standards. Thirty-five years earlier Lord Lane CJ in *R v Ghosh* [1982] QB 1053 identified the same dichotomy between the course of conduct and the state of mind. Removing the second limb of the *Ghosh* test leaves the course of conduct. Where the defendant makes a genuine mistake of fact as to the elements of the offence and they are made out in, say, a sexual offence case, the Court of Appeal and House of Lords will excuse him. The same applies to dishonesty. Where a genuine mistake of fact is made the law should come to a person's aid, but shorn of its second limb the *Ghosh* test for dishonesty cannot assist. Without it the situation is akin to that in *Sherras v De Rutzen* [1895] 1 QB 918 where there is no presumption, no mens rea, no evil intention and no knowledge of the wrongfulness of the act. The effect of *Ivey* and the discarding of the second limb of *R v Ghosh* is to reverse 120 years of jurisprudence by allowing the conviction of a person who genuinely misunderstands the standards of ordinary decent people. The Crown says this argument is self-defeating because in the majority of cases it is unnecessary to give the second limb of the *Ghosh* direction. That may be true, but its absence is not because the defendant does not need to recognise he is acting dishonestly. In 99% of cases robbers and burglars must know what they are doing is dishonest and in the vast majority of cases it is obvious.

The examination of section 1 of the Theft Act 1968 in *Ivey* is unsustainable when compared with that in *R v Hinks* [2001] 2 AC 241. That does not mean to say that the Larceny Act 1916 translates into the 1968 Act. Looking at the Eighth Report of the Criminal Law Revision Committee (*Theft and Related Offences* (1966) (Cmnd 2977)), the 1968 Act was intended to cover a number of different offences of larceny, section 1 and two others. The words "without consent of the owner" were abandoned by the interpretation of appropriation in *R v Hinks* and dishonesty in *Ivey*. In *R v Hinks* the argument was that appropriation included a requirement that the Crown prove that it was without the consent of the owner. The

© 2021 The Incorporated Council of Law Reporting for England and Wales

court rejected that in *R v Gomez* [1993] AC 442 and *R v Lawrence (Alan)* [1972] AC 626. In those three cases there was no requirement for the Crown to establish lack of consent of the owner and the title or right to property made no difference. In *R v Lawrence (Alan)* that was clear on the construction of the word "appropriation". In *R v Hinks* [2001] 2 AC 241 Lord Steyn refers to the Eighth Report of the Criminal Law Revision Committee on Theft and says that, although it may arguably be relevant as part of the background against which Parliament enacted the Bill which became the 1968 Act, the extent of its relevance was considered in *R v Gomez*. In *R v Gomez* Lord Keith of Kinkel, speaking for all the members of the majority, ruled that the meaning of the relevant provisions must be determined by construing the language of the 1968 Act without reference to the report which preceded it. *R v Lawrence (Alan)* was a clear decision on the construction of the word "appropriate" in which the House of Lords decided that section 1(1) of the 1968 Act was not to be construed as though the words "without the consent of the owner" appeared after the word "appropriate". Parliament, by the omission of those words, had relieved the Crown of the burden of establishing that the taking was without the owner's consent, and it was no longer an ingredient of the offence. In *R v Hinks* [2001] 2 AC 241, 251–252, Lord Steyn said that an appropriation which took place without the consent of the owner could be theft, as it could with his or her consent. The defendant in that case argued that the mental requirement of dishonesty and its intention permanently to deprive the owner of property were insufficient to filter out some of the cases of conduct which should not sensibly be regarded as theft and cited telling examples. Lord Steyn said that in such cases a prosecution would be unlikely and, if mounted, likely to founder on the basis that the jury would not be persuaded there was dishonesty in the required (*Ghosh*) sense.

By contrast Lord Hughes JSC in *Ivey* referred to the Eighth Report of the Criminal Law Revision Committee in the Supreme Court when he examined the term "fraudulently" in isolation and indicated that it was intended to be a direction replaced by dishonestly. The decision in *R v Gomez* [1993] AC 442 not to have regard to the report when defining the word "appropriate" was supported in *R v Hinks*. The report indicated that "dishonestly" was a direct replacement for "fraudulently". The consequence of the two ways in which different words in section 1 of the 1968 Act were examined was, as Lord Steyn said, a bulwark against allegations of appropriating something with the consent of the owner being "dishonesty" as defined in *R v Ghosh* [1982] QB 1053. The way in which section 1 appropriation and dishonesty have been examined is that the effect of two fundamentally different approaches is the tension described by Lord Steyn, where appropriation may have taken place with the consent of the owner. That is still appropriation.

Without looking at meaning or the Criminal Law Revision Committee Report, in *R v Gomez* there is a requirement for the owner to prove that the appropriation was without consent. If there is injustice in a case in which the appropriation was without the consent of the owner, a bulwark against such injustice was dishonesty within the meaning of *R v Ghosh*. The injustice is that a *Ghosh* direction should have been given. In the context of the present case the defendant says he was given property or money by residents with their consent. Under limb two of the *Ghosh* test the jury is entitled to acquit

© 2021 The Incorporated Council of Law Reporting for England and Wales

A if it is generally thought that by ordinary decent standards the defendant was entitled to receive the gifts from residents.

In *Ivey*, although the Supreme Court considered the Criminal Law Revision Committee's substitution of the word "dishonestly" for "fraudulently", it failed to consider the materials behind the use of the term dishonesty in the more recent Fraud Act 2006. The Law Commission in its report *Fraud* (2002) (Law Com No 276) (Cm 5560) used the *Ghosh* test for dishonesty and B proposed the same test be used in the new offences under the 2006 Act. The Supreme Court was not directed towards the approval of Parliament when it enacted the 2006 Act. As to whether the second limb of the *Ghosh* test should apply, confident that it was workable in practice, the Attorney General said emphasis should be placed on dishonesty and approved the test in *R v Ghosh* [1982] QB 1053. There are two pages of responses to the Law C Commission Report from the judiciary and institutions. The *Pepper v Hart* test was passed (*Pepper v Hart* [1993] AC 593). Since there was some ambiguity as to the meaning of the word "dishonest", it was appropriate to look at how the term should be defined. The *Ghosh* test requires some objective awareness by the offender which, if removed, would result in the criminal offence being too widely drawn. In *Ivey* the Supreme Court's attention was not drawn to the adoption of the *Ghosh* test in the 2006 Act D in which several offences contain the word "dishonesty" or "dishonestly". The second limb of the *Ghosh* test acts as a bulwark against injustice and, in the absence of evidence that it leads to injustice, there is no reason not to follow that definition. In theory a defendant could argue in court that he did not think his conduct was dishonest by the standards of ordinary decent people and he was genuinely mistaken, but the likelihood of that happening E is remote. The more deviant the conduct the less likely a defendant is of being able to persuade a jury that he genuinely believed he was doing no wrong by those standards. The argument in *Ivey* can be turned on its head. Under the *Ghosh* test a person who behaves deviantly is no more likely to be acquitted.

In *R v James* [2006] QB 588, on which the Crown relies, the Court of F Appeal looked at the ratio of *Attorney General for Jersey v Holley* [2005] 2 AC 580, a decision of the Privy Council on an appeal against a decision of the Court of Appeal of Jersey which had applied the then recent House of Lords decision in *R v Smith (Morgan)* [2001] 1 AC 146 when construing a Jersey statute which was identical to an English statutory provision. Unlike in the present case and its examination of *Ivey*, in *R v James* the Court of Appeal decided that it preferred the ratio in *Holley* to that of *R v Smith* after G hearing full argument as to the interpretation of the English provision in question. In the present case, by contrast, the court is being invited to follow and adopt an obiter decision given in *Ivey*, before which the Supreme Court had not heard full argument. In *R v Hinks* [2001] 2 AC 241, 259 Lord Hutton identifies a problem with the state of the law relating to theft where a defendant claims that he received the money or property as a gift, namely H that the Crown Court judge faces a difficult task in summing up to a jury. He said that, where the defendant contends that he or she received a gift, a direction based only on *R v Ghosh* is inadequate because it fails to make clear to the jury that if there is a valid gift there can be no dishonesty. Otherwise the jury may convict on the basis that ordinary, decent people would think it dishonest for a younger woman to accept very large sums of

© 2021 The Incorporated Council of Law Reporting for England and Wales

money which constituted a naïve man of low intelligence's entire savings and that the woman would have realised this. It may be distasteful to a jury to consider that type of evidence and without the second limb of the *Ghosh* test the jury would not be equipped to deal with such an issue. The defendants in the present case gave rebuttals as to each of the allegations made. If the jury had been directed under the second limb of *R v Ghosh* the defendants might not have been convicted.

*Payne* in reply.

The judge omitted the first element of the test in *Ivey v Genting Casinos (UK) Ltd (trading as Crockfords Club)* [2018] AC 391 when he said the question as to whether a person acts dishonestly is determined by the jury by applying the standards of ordinary decent people which would not include acting in a commercially or morally reprehensible manner. This direction left no room for any assessment of what the second defendant actually thought or believed about what she was doing. It was necessary to ascertain the subjective state of mind of the second defendant as to her knowledge or belief as to the relevant facts, before proceeding to consider whether it was dishonest by the standards of ordinary, decent people. There was no evidence before the jury of the direct manipulation of the victim in count 19 by the second defendant. The second defendant's state of mind was that she was ignorant that anything untoward was happening. The direction left the jury to judge the second defendant's actions, not her state of mind, by the standards of ordinary people.

The court took time for consideration.

29 April 2020. **LORD BURNETT OF MALDON CJ** handed down the following judgment of the court.

*Introduction*

1 For 35 years the approach to dishonesty in the criminal courts was governed by the decision of the Court of Appeal (Criminal Division) in *R v Ghosh* [1982] QB 1053. In *Ivey v Genting Casinos (UK) Ltd (trading as Crockfords Club)* [2018] AC 391 the Supreme Court, in a carefully considered lengthy obiter dictum delivered by Lord Hughes JSC, explained why the law had taken a wrong turn in *Ghosh* and indicated, for the future, that the approach articulated in *Ivey* should be followed. These appeals provide the opportunity for the uncertainty which has followed the decision in *Ivey* to come to an end. We are satisfied that the decision in *Ivey* is correct, is to be preferred, and that there is no obstacle in the doctrine of stare decisis to its being applied as the law of England and Wales.

*The facts: overview*

2 The defendant, David Barton, ran a luxury nursing home in Birkdale, Southport, Lancashire, the Barton Park Nursing Home ("Barton Park"), along with his wife, Lucinda Barton. He operated the business through a company, Choice Classic Ltd, ("CCL"). David Barton exercised close control over Barton Park and made all key decisions in relation to the management of the home.

© 2021 The Incorporated Council of Law Reporting for England and Wales

3 The applicant, Rosemary Booth, was the general manager of Barton Park. Ms Booth seeks leave to appeal against conviction out of time. We grant leave to appeal.

4 The Crown's case against David Barton was that, over many years, he had dishonestly targeted, befriended, and "groomed" wealthy and vulnerable (and childless) elderly residents of the home, in order to profit from them. He manipulated them and isolated them from their family, friends and advisers. A number of these residents made him the residuary beneficiary of their wills, usually within a short time of arriving at Barton Park. They also allowed him to assume control of their finances, by making him next of kin, or granting him power of attorney, or by making him executor, and he used this control to enrich himself.

5 The Crown alleged that David Barton dishonestly exploited his relationship with these residents in a number of different ways. He did so in breach of the trusted position that he occupied. He obtained large cash gifts and spurious "loans" from the residents. He charged fees to the residents which were vastly in excess of reasonable fees and were sometimes entirely fabricated. In some cases, he claimed to have negotiated or entered into "lifetime agreements" pursuant to which the resident had agreed to make a large up-front payment in return for the right to reside in the home for the whole of the rest of the resident's life. He also overcharged residents for services. Still further, David Barton sold Rolls-Royce motor cars to two residents for grossly inflated prices.

6 The Crown alleged that David Barton was assisted by others in his criminal behaviour, and, in particular, by Rosemary Booth and by a solicitor, Thomas Mills. Mills would have been tried alongside him, but died before the trial.

7 The residents who were the victims of these practices were willing to agree to the transactions that David Barton entered into with them, and had capacity to do so, but, the Crown said, they were highly vulnerable and isolated from advisers at the time when they did so.

8 There was no suggestion that any of the victims was physically mistreated or neglected at Barton Park. In fact, it was common ground that they were well treated and well looked after. They had been living in unsatisfactory conditions before they arrived at Barton Park, and were happy to be there, and were grateful to David Barton for accommodating them.

9 The treatment of these residents at Barton Park came to the attention of the police in 2014 after one of them, Katie Willey, died, and a civil claim was brought by David Barton, Lucinda Barton, and CCL against her estate for a sum of approximately £10m. Members of Mrs Willey's family asked the police to investigate Mr Barton's business.

10 David Barton was arrested in 2014, and the trial, before Judge Everett, took place in 2017–2018. David Barton gave evidence. He said that the money that he had received consisted of gifts from grateful residents, whom he had treated very well. The residents had always acted with full capacity and with professional advice. All of the fees that had been claimed were legitimate, save where there had been an occasional misunderstanding. The civil claim against Mrs Willey's estate had been brought on professional advice and in good faith. In so far as any mistakes had been made in relation

© 2021 The Incorporated Council of Law Reporting for England and Wales

to that claim, or in relation to the accounting at the home, this was the fault of a bookkeeper, Kiria Hughes, not him. A

11 As for Rosemary Booth, the essence of the case against her was that she, too, had abused her trusted position as general manager of Barton Park, and confidante of vulnerable residents, to act as the "eyes and ears" of David Barton and to assist him in this fraudulent activity.

12 Rosemary Booth said that she was responsible for managing the domestic arrangements at Barton Park, and that she had no responsibility B for the establishment's financial affairs, which were managed elsewhere. She knew little about finances and had limited ability so far as computers were concerned. She had not taken part in any fraudulent conspiracies. She did not personally benefit financially from the alleged offences, to any significant extent.

13 The trial, with breaks, lasted from May 2017 to May 2018. Verdicts C were returned between 2 and 11 May 2018. There were 25 counts on the indictment, although some of these were alternatives. David Barton was convicted of ten counts. These consisted of four counts of conspiracy to defraud, contrary to common law, three counts of theft, one count of fraud, one count of false accounting, and one count of transferring criminal property, contrary to section 327 of the Proceeds of Crime Act 2002. David Barton was acquitted of three counts, and the judge directed not guilty D verdicts on a further two counts. No verdict was taken on seven alternative counts, in light of the convictions on the principal counts. The jury was unable to agree on three further counts. The Crown did not seek a retrial, and these counts were ordered to lie on the file.

14 Rosemary Booth was convicted on three counts of conspiracy to defraud, and the jury was unable to reach a verdict on a further count, which E was ordered to lie on the file.

15 On 13 July 2018, David Barton was sentenced to a total period of imprisonment of 21 years and Rosemary Booth was sentenced to a total of six years' imprisonment. The following is a chart of the convictions and sentences:

| | | | |
|---|---|---|---|
| 1 | Conspiracy to defraud Patricia Anderson-Scott | David Barton: six years | |
| 5 | Theft from the estate of Patricia Anderson-Scott | David Barton: $2\frac{1}{2}$ years | Concurrent |
| 7 | Theft from Margaret Pinnington | David Barton: five years | Concurrent |
| 8 | Theft from Margaret Pinnington | David Barton: two years | Concurrent |
| 15 | Fraud relating to the estate of Rita Gibson | David Barton: $1\frac{1}{2}$ years | Concurrent |
| 16 | Conspiracy to defraud Ronald Ward-Howlett | David Barton: six years Rosemary Booth: two years | Consecutive |

F G H

© 2021 The Incorporated Council of Law Reporting for England and Wales

A

| | | | |
|---|---|---|---|
| 19 | Conspiracy to defraud Katie Willey and Gordon Willey | David Barton: eight years<br>Rosemary Booth: four years | Consecutive<br>Consecutive |
| 22 | Conspiracy to defraud the estate of Katie Willey and Gordon Willey | David Barton: eight years<br>Rosemary Booth: three years | Concurrent<br>Concurrent |
| 24 | False accounting re Choice Classic Ltd | David Barton: 15 months | Concurrent |
| 25 | Transferring criminal property | David Barton: one year | Consecutive |

B

C

16 David Barton was aged 64, and Rosemary Booth was aged 69, at the time of sentence. They were each of previous good character.

17 In his sentencing remarks, the judge said that "this case is one of the most serious cases of abuse of trust that I suspect has ever come before the courts in this country". He described David Barton as a "despicably greedy man". He said that there was "effectively a web of deceit and dishonesty". The judge referred the two conspiracies to defraud perpetrated upon Mr and Mrs Willey (counts 19 and 22) as being perhaps "the most brazen I have ever come across".

D

18 The case concerned a period of offending of almost twenty years. As for the sums involved, David Barton obtained approximately £4.13m in total from the offences for which he was convicted and, as indicated above, attempted to obtain a further sum of approximately £10m in relation to proceedings against Katie Willey's estate.

E

19 At the time that the police investigation into David Barton commenced in June 2014, he had a portfolio of 23 properties in the Southport area, owned by him, his wife and his business. In addition, he had a fleet of luxury vehicles, including four Ferraris, three Rolls-Royces, two high-value Mercedes and other motor cars.

F

20 Kiria Hughes, the bookkeeper at Barton Park, pleaded guilty before trial to one count of conspiracy to defraud (Gordon Willey and the estate of Katie Willey) and one count of false accounting. She gave evidence on behalf of the Crown. She was sentenced to eight months' imprisonment suspended for 12 months. Nicola Pimlott, the home's care manager, was acquitted of one count of conspiracy to defraud (again in relation to the will of Katie Willey), and the jury was unable to agree in relation to the home's registered manager, Colette Morris, on the same count. The Crown have not sought a retrial of Ms Morris, and a verdict of not guilty has been entered. David Barton's wife, Lucinda Barton, was charged with three counts of conspiracy to defraud. She was discharged on medical grounds during the course of the trial, and a retrial is pending. David Barton's sons, David Charles Barton and David Richard Barton, each faced one count of transferring criminal property. They also were discharged during the trial and were acquitted at their retrial.

G

H

© 2021 The Incorporated Council of Law Reporting for England and Wales

*The facts: detail*

21 We summarise the facts principally by reference to the particular residents who had been targeted.

*Patricia Anderson-Scott*

22 Two of the counts on which David Barton was convicted related to a resident named Patricia Anderson-Scott.

23 David Barton was convicted of one count of conspiracy to defraud in respect of Mrs Anderson-Scott (count 1). He was also convicted of one count of theft (count 5). This latter count related to a Rolls-Royce motor car.

24 Mrs Anderson-Scott was a wealthy, elderly, widow who entered Barton Park, aged 83, on 8 September 1997 and who lived there for just over ten years, until her death, aged 94, on 9 January 2008. At the time when she entered Barton Park, she was in a state of distress and in poor health. She had been unhappy in her previous care home. She had no children, but she had a nephew.

25 Five months after Mrs Anderson-Scott's arrival at Barton Park, she granted David Barton power of attorney over her affairs. A couple of weeks later, on 6 March 1998, he was made the principal beneficiary under her will. Thomas Mills dealt with this will and received a payment of £50,000 from David Barton at about the same time, which the Crown said was a reward for his part in the conspiracy.

26 During her time at Barton Park, Mrs Anderson-Scott transferred a total of about £1.4m to David Barton or CCL (including a sum of £70,000 to Lucinda Barton). This was far in excess of any legitimate fees. In a "Hansard" report prepared for a tax investigation into his affairs in about 2007, David Barton admitted to receiving about £500,000 in payments over and above legitimate fees. David Barton said that these were gifts or loans to fund his business. The Crown also alleged that David Barton took furniture belonging to Mrs Anderson-Scott.

27 On 5 March 1999, David Barton sold a Rolls-Royce motor car to Mrs Anderson-Scott for the sum of £500,000. This was approximately four times its true value. David Barton had purchased the car for £99,950 in January 1993. On the same day David Barton sold another Rolls-Royce, again for an inflated price, to another elderly and vulnerable resident, Margaret Pinnington.

28 After the sale, David Barton took another £57,429.23 from Mrs Anderson-Scott to pay for the outstanding finance on the Rolls-Royce.

29 After Mrs Anderson-Scott died, the will that she had made on 6 March 1998 went missing. It did not turn up again until 2 November 2017, whilst David Barton was giving evidence at his trial. Although David Barton and Thomas Mills knew about this will, and David Barton was executor, they had not taken any steps towards obtaining probate. Probate would have shed light on what David Barton had done with Mrs Anderson-Scott's assets, and would have led to payments out of the estate to other beneficiaries.

30 After Mrs Anderson-Scott died, David Barton transferred the Rolls-Royce back into his own name, and became its registered keeper. This was count 5 (theft).

© 2021 The Incorporated Council of Law Reporting for England and Wales

31 David Barton's defence to the counts in relation to Mrs Anderson-Scott was that she was a very old friend of his family, to whom he had been kind. She had been very unhappy in her previous care home and was grateful to him for providing her with a home where she was happy. She had spent ten happy years at Barton Park and had given him financial support out of gratitude and affection. She had bought the Rolls-Royce in March 1999 because she had enjoyed outings that David Barton had given her in it and had heard that he was planning to sell it. A foreign purchaser had been found for the Rolls-Royce by the Jack Barclay dealership in Mayfair, London, who was prepared to pay £550,000, and so the price of £500,000 was a fair one. He said that, after Mrs Anderson-Scott's death, he had been told by his legal adviser, Mr Mills, that he was entitled to take back ownership of the Rolls-Royce, as the principal beneficiary under her will.

32 The transferring criminal property (money-laundering) count relates to the proceeds of sale after David Barton's disposal of this Rolls-Royce motor car in July 2015, and will be dealt with separately, below.

*Margaret Pinnington*

33 David Barton was acquitted of conspiracy to defraud in relation to Mrs Pinnington but was convicted of two counts in relation to this victim. The first was theft (count 7). This related to the inflated price obtained by David Barton from the sale of a Rolls-Royce to Mrs Pinnington on 5 March 1999. The second count (count 8) was concerned with the theft of two sums of £35,000 from Mrs Pinnington on 6 and 19 April 1999, respectively. These were sums received from Mrs Pinnington in excess of legitimate fees. These were specimen counts, and the two transactions were representative of a large number of other transactions. The total in excess fees was about £800,000.

34 Like Mrs Anderson-Scott, Mrs Pinnington was a wealthy, elderly, widow, when she came to Barton Park. She arrived at the home on or about 13 November 1997, when she was 86, and remained there until her death, aged 90, on 3 November 2001.

35 Mrs Pinnington had no known relatives. She had suffered a traumatic time at her previous place of residence, having been assaulted by a neighbour, and she was grateful to David Barton for taking her in.

36 So far as the Rolls-Royce is concerned, this was sold by David Barton to Mrs Pinnington for £500,000, which was a sum far in excess of its actual value. David Barton had bought the car in May 1996 for £140,000. In his sentencing remarks, the judge described the sale of this car to Mrs Pinnington as "a deliberate, carefully thought out and indeed callous enterprise".

37 David Barton's defence to these counts was that, as with Mrs Anderson-Scott, Mrs Pinnington was an old friend, having attended his father's church. She moved to Barton Park after suffering some very traumatic experiences and was very happy there. In the Hansard report, David Barton admitted receiving around £300,000 in excess of legitimate fees. He said that she had willingly gifted him money, over and above the cost of the fees, because she was so happy in the home and so grateful to him. She bought the Rolls-Royce because she enjoyed being driven in it and did not want it to be sold to someone else which would mean that her outings would come to an end.

© 2021 The Incorporated Council of Law Reporting for England and Wales

*Rita Gibson* A

38 David Barton was convicted of one count of fraud in relation to Rita Gibson's brother's "will trust" (count 15).

39 Miss Gibson entered the home in February 2003 at the age of 80, and stayed there until she died on 31 May 2012, at the age of 89. Her fees were mainly paid by a will trust. Throughout Miss Gibson's time at Barton Park, David Barton was involved in a dispute with the trust relating to arrears of fee payments which he claimed were due. B

40 On 31 August 2012, after Miss Gibson had died, David Barton's then solicitors wrote to the will trust's administrators, claiming £202,686.61 in unpaid fees. This claim was supported by a false invoice in this sum. David Barton threatened legal action in relation to the unpaid fees. However, only two months before, David Barton had claimed that the unpaid fees at the time of Miss Gibson's death were £49,705.51. The Crown C alleged that he had asked Kiria Hughes, the bookkeeper, to inflate the amount of fees that were claimed in order to use the higher figure as leverage against the will trust. He was successful to the extent that the trust settled with him for £65,000, somewhat in excess of the true amount of fees that were owing.

41 David Barton's defence to this count was that there had been a D misunderstanding, and that his solicitors had misunderstood his instructions. By mistake, they had claimed the debt that would have been payable if David Barton had not agreed to reduce the monthly fee because of problems with claiming the full amount from the will trust, but he had not intended to claim more than the reduced amount.

*Ronald Ward-Howlett* E

42 David Barton and Rosemary Booth were each convicted of one count of conspiracy to defraud in relation to Ronald Ward-Howlett (count 16).

43 Mr Ward-Howlett arrived at Barton Park in January 2011 aged 78 years. He was very wealthy but had no family and was vulnerable. At the time of trial, he was still alive but declined to give evidence against David Barton and Rosemary Booth. F

44 Prior to coming to Barton Park, Mr Ward-Howlett had been living on his own in squalor in a small flat. He was overcome with grief for deceased family members. He was suicidal. Rosemary Booth had visited him in this flat to assess his suitability for a move to Barton Park.

45 Within two weeks of arriving at Barton Park, Mr Ward-Howlett had granted power of attorney to David Barton, and within two months, by February 2011, he had made David Barton his executor and principal G beneficiary in a new will. Thomas Mills had helped to draw up this will. Mr Ward-Howlett made a further new will, with different solicitors, in May 2012, which named David Barton and Lucinda Barton as principal beneficiaries. In this second will, David and Lucinda Barton were referred to as Mr Ward-Howlett's brother and sister. Rosemary Booth was also made a beneficiary under this will. H

46 Mr Ward-Howlett made David Barton a joint signatory on one of his bank accounts. He dismissed his longstanding financial adviser, Stephen Milford, and replaced him with an adviser recommended by David Barton. When Mr Milford complained, David Barton arranged for a letter to be sent, warning him off with threats of legal action. Mr Ward-Howlett paid

© 2021 The Incorporated Council of Law Reporting for England and Wales

£1.19m to David Barton, which was approximately £900,000 in excess of legitimate fees. Though this was later said by David Barton to be part of a "global" contract for lifelong care, documentation drawn up at the time was not signed. Contract documentation to support the existence of a lifetime care agreement was only signed after the police investigation had commenced, in June 2014. In this documentation, David Barton accepted that he owed a "debt" to Mr Ward-Howlett of £400,000. Some of the money that flowed from Mr Ward-Howlett to David Barton and his business was used to purchase further properties by and for Mr Barton (only one of which was put in the joint names of Mr Ward-Howlett and David Barton).

**47** The Crown alleged that Rosemary Booth played an active role in this conspiracy, because she was instrumental in recruiting him to Barton Park, and in isolating him from his previous solicitor, Joan Williamson, and his financial adviser, Mr Milford. She acted as the "eyes and ears" of David Barton, and assisted David Barton with his plan to separate Mr Ward-Howlett from his financial adviser. In particular, she drafted, in her own handwriting, a letter dismissing the financial adviser, which Mr Ward-Howlett then copied. She only accepted that it was her handwriting after Kiria Hughes had given evidence to the jury that it was, despite cross-examination on Rosemary Booth's behalf to the contrary. She also witnessed the second will, made in favour of David and Lucinda Barton.

**48** David Barton's defence to this count was that Mr Ward-Howlett's life was transformed for the better when he moved to Barton Park. He had been neglecting himself. Mr Ward-Howlett became close to David Barton, who would drive him to Gerrards Cross to visit the family grave plot. Mr Ward-Howlett gave gifts to David Barton for turning his life around and to assist with property investments, and also as part of an agreement for a lifetime care contract. Two lifetime care contracts had been entered into, the second of which had been drafted by Mr Ward-Howlett's solicitors, Pinsent Masons, in 2015. The replacement financial adviser was a reputable independent adviser, who was only appointed because Mr Ward-Howlett had lost faith in his previous adviser. The power of attorney was never exercised and the bank account to which he was a signatory was never used by David Barton.

**49** Rosemary Booth's defence was that she was the general manager, in charge of domestic arrangements, and was not involved with the personal finances of the residents, about which she knew very little. The financial affairs of Barton Park were dealt with off-site and she was not involved with them. She had not sought to isolate Mr Ward-Howlett from his financial advisers, and he knew his own mind. When she drafted the letter to Mr Milford, she was merely helping Mr Ward-Howlett with his dictation. She did not know that she was a beneficiary under Mr Ward-Howlett's will.

*Katie and Gordon Willey*

**50** David Barton and Rosemary Booth were convicted of two counts in relation to Mr and Mrs Willey, each being a count of conspiracy to defraud. The first (count 19) was concerned with a conspiracy to defraud Mr and Mrs Willey of money and property. The second (count 22) related to the fraudulent claim for approximately £10m after Mrs Willey's death, against Mrs Willey's estate and against Mr Willey.

© 2021 The Incorporated Council of Law Reporting for England and Wales

51 Focusing on count 19, Mr Gordon and Mrs Katie Willey arrived at Barton Park in April 2011. Mr Willey was 81 and had advanced dementia. Mrs Willey was 75 and had endured an extremely stressful time looking after her husband. She had developed a heart problem and was close to a nervous breakdown. They were a wealthy couple. They were childless, but they had siblings, nephews and nieces, employees and friends to whom they were close. They also had longstanding advisers.

52 The Crown's case was that David Barton, supported by Rosemary Booth, embarked on a campaign to estrange Mrs Willey from her family and friends, making use of menacing solicitors' letters, the blocking of telephone and personal contact, the poisoning of her feelings towards her own family, and fawning and ingratiating behaviour towards Mrs Willey.

53 As a result of this campaign, David Barton persuaded Mrs Willey to agree to enter into a lifetime agreement which would permit the Willeys to remain in Barton Park for the rest of their lives in return for a payment of £6m. As part of this arrangement, Mrs Willey would be provided with a luxury apartment, and a purpose-built showroom would be constructed for Mr Willey for his collection of classic cars. In his sentencing remarks, the judge said that this lifetime agreement was just a ruse to get Mr and Mrs Willey's hard-earned money.

54 In the event, the written lifetime agreement was never entered into, because Mrs Willey died suddenly and unexpectedly on 23 May 2013. Before this point, David Barton had subjected Mrs Willey to intense pressure to pay up under the lifetime agreement. Less than a week before Mrs Willey died, solicitors on behalf of David Barton wrote to her with a demand for a minimum sum of £4,807,243. This was on the basis that the Willeys would still be liable to pay further consideration for the lifetime agreement, including £750,000 from the sale of their former family home, Briardene.

55 As Mrs Willey lay dying, David Barton was overheard by a witness to say, "I can't believe she has done this to me".

56 In addition, before Mrs Willey died, David Barton had engineered the dismissal of the couple's longstanding friend and financial adviser, Nick Farmer, after groundless allegations of fraud.

57 The Crown also alleged that David Barton influenced Mrs Willey to buy an apartment in a development known as Regency Court, in August 2011. This benefited David Barton, because he stood to receive an "overage" payment from the developer of 50% of proceeds after sales exceeded a certain value, and the purchase would trigger the overage payment. Mrs Willey assisted David Barton in this by being less than frank about her relationship with David Barton, and by giving a false address. David Barton received an overage payment of £325,000. The apartment was sold soon after David Barton received the overage payment. David Barton also influenced Mrs Willey to buy land next to her old home, Briardene, for which title did not pass to her and which was purchased for the ultimate benefit of David Barton or his business.

58 In the period before Mrs Willey's death, the Willeys were induced to pay fees of a little over £1m to CCL, a figure which was approximately £900,000 in excess of legitimate fees for their care. Also, David Barton gained control over Briardene, and enticed Mrs Willey into placing Mr Willey's large and valuable classic car collection into his hands for safekeeping.

© 2021 The Incorporated Council of Law Reporting for England and Wales

59 So far as Rosemary Booth was concerned, the Crown alleged that she acted as David Barton's eyes and ears. She stayed close to Mrs Willey and went on holiday with her. She attended the viewing of the apartment in Regency Court with Mrs Willey but did not disclose that she was the general manager of Barton Park. She always acted in support of David Barton. In his sentencing remarks, the judge said that she was a "particularly enthusiastic conspirator" in the conspiracy to defraud the Willeys.

60 David Barton's defence was that when Mrs Willey came to Barton Park after caring for her husband became too much for her, she wanted a break from friends and family, and this was interpreted, wrongly, as being the result of a desire by David Barton to isolate her. Safeguarding referrals were made to social services by friends and family, and a social worker visited Mrs Willey on three occasions in 2011–12, each time concluding that she had full capacity. This alienated Mrs Willey from her relatives still further. The whole life agreement was discussed over a long period, and Mrs Willey was keen to have the luxury apartment and an appropriate setting for her husband's classic cars, which he could enjoy. Mrs Willey was legally represented during these discussions, and drafts were drawn up by her solicitors on her instructions. Further, Mrs Willey had offered to assist Mr Barton in relation to triggering an overage payment in respect of Regency Court (the developer would have been suspicious if David Barton had tried to buy one of the apartments, because it would have forced the overage payment).

61 Mr Willey was exceptionally well cared for and was taken for drives in classic cars by David Barton. Mrs Willey recovered her zest for life whilst at Barton Park.

62 Rosemary Booth said that Mrs Willey knew her own mind and she denied attempting to influence her. So far as the estrangement from friends and family was concerned, she acted on instructions from Mrs Willey. There had been longstanding issues between Mrs Willey and her friends and family. They had not helped her sufficiently in her predicament before she came to Barton Park. Rosemary Booth denied attending any meetings with Mrs Willey and her professional advisers.

63 The allegation in count 22 was that David Barton, Rosemary Booth and other employees of Barton Park, including Kiria Hughes, had conspired to defraud Mrs Willey's executors, and Mr Willey (who survived her) by bringing or supporting a fraudulent civil claim. After Mrs Willey's death, and before her funeral, David Barton began preparing a claim on behalf of himself, Lucinda Barton and CCL, against the estate and Mr Willey. Particulars of claim were lodged in the High Court on 3 February 2014. The proceedings claimed specific performance of the whole life agreement (although it had not been signed) or, in the alternative, the sum of £9,787,612, including VAT, for services rendered. These claims were based on false invoices, sham contracts, and fabricated care records. David Barton was in control of this claim throughout and discussed the contents of the financial reports with the expert whom he retained to write them.

64 Perhaps the most egregious part of the claim related to fees due for taking Mr Willey on drives out in classic cars. This part of the claim was costed at £7.2m (including VAT). This was on the basis of David Barton's assertion that there was an understanding that there would be a payment in

© 2021 The Incorporated Council of Law Reporting for England and Wales

excess of £25,000 per day for Mr Willey's drives out, which were a means of managing his condition.

65 After the police investigation commenced in June 2014, and certain inconsistencies in the claim were pointed out in the police interviews, the figures claimed were revised downwards, but the total for the overall claim was still £6,448,438.02, and the sum claimed for drives in classic cars was £4,200,000.

66 The claim was eventually settled for a net sum of about £139,000.

67 The Crown alleged that the sums claimed by David Barton were grossly inflated by (i) exaggerating the number of drives that Mr Willey was taken on, and providing false records in support; (ii) creating false residence agreements showing inflated weekly fees; (iii) creating false invoices for a party held for the Willeys at Barton Park; (iv) creating false invoices for security services at Briardene; and (v) providing false testimony in witness statements in support. In addition, the claim falsely stated that the whole life agreement had been entered into when it had not been.

68 Rosemary Booth had been involved in this conspiracy in that she had helped to manufacture a false handwritten diary of drives out for Mr Willey, and had doctored a "visitors' list" of people whom Mrs Willey did not want Mr Willey to see, to make it appear that Mrs Willey had forbidden the attendance of certain people before she died.

69 David Barton's defence to this count was that he had been advised in relation to the claim by solicitors and forensic accountants. He was not personally responsible for any mistakes in the paperwork. The charges for drives in classic cars were based on advice from experts in the trade. In so far as there were false or fraudulent documents, these were only a very small part of the claim, and they were the result of a separate fraud by Kiria Hughes. David Barton said he had told the truth in his witness statement in the civil proceedings.

70 Rosemary Booth said that she had known little of the civil action. She had seen a solicitor at the request of David Barton to prepare a witness statement, the contents of which were broadly correct. The care plans relied on were genuine and had been made contemporaneously. She was involved in the diary notes to the extent that she was able to decipher Mrs Willey's handwriting on certain calendars.

*False accounting*

71 This count (count 24) does not relate to any resident at Barton Park. Rather, it concerns an allegation of false accounting, also involving Kiria Hughes.

72 The essence of this count was that David Barton agreed with Kiria Hughes that he would pay her additional sums over and above her wages, and that this would be done by paying off monies owed on her credit card. Kiria Hughes wrote out cheques on the business accounts, which David Barton would sign. Entries were falsified in the company accounts to conceal the true nature of these payments. In this manner, Kiria Hughes received nearly £60,000. The same method was used from time to time for David Barton's benefit, by disguising payments that were for his personal benefit as business expenses.

73 A total £74,571 was accounted for falsely in this manner, in 27 entries, between February 2011 and January 2014.

© 2021 The Incorporated Council of Law Reporting for England and Wales

74 David Barton's defence to this count is that the false accounting was entirely Kiria Hughes's doing, to cover her credit card debts. The false accounting was done without David Barton's knowledge, and was concealed by Kiria Hughes.

*Transferring criminal property*

75 The final count (count 25) was a count of transferring criminal property.

76 After the police attended at Barton Park in June 2014, David Barton sold a number of luxury vehicles. These included the sale, in July 2015, of the Rolls-Royce which he had sold to Patricia Anderson-Scott and then took back after her death (the subject of count 5). The profit on the sale, after commission, was £140,000.

77 Given the jury's verdict on count 5, David Barton had stolen this vehicle and so the proceeds of sale were criminal property. A month after the funds were received in his bank account, in September 2015, David Barton transferred £129,000 to his sons' student accounts, £69,000 into one account and £60,000 into another. Over the next six weeks, these funds were transferred in tranches back to David Barton's business accounts. The Crown alleged that this was done to obscure the source of the funds, and to minimise the risk that the cash would be confiscated as the proceeds of crime.

78 David Barton maintained that he had only moved the money in this way because his solicitor told him to do so.

*Conviction: the eight grounds of appeal*

79 The grounds of appeal for David Barton and Rosemary Booth, in outline, raise the following main issues:

(i) *Dishonesty*: In particular, does *Ivey* [2018] AC 391 provide the correct approach to dishonesty and, if so, is it to be followed in preference to the test described in *R v Ghosh* [1982] QB 1053?

(ii) *The summing up on dishonesty*: Did the judge err in his directions to the jury on dishonesty during the summing up?

(iii) *Conspiracy to defraud*: Did the judge err in his approach to the offence of conspiracy to defraud?

(iv) *Section 2(1) of the Theft Act 1968*: Did the judge err in failing to give a direction concerning section 2(1) of the 1968 Act?

(v) *Capacity*: Did the judge err in his approach to the issue of capacity?

(vi) *Count 16*: Was there sufficient evidence to be considered by the jury on count 16? (Mrs Booth only)?

(vii) *The Tinto conversation*: Did the judge err in admitting the evidence of a conversation between Mrs Booth and Mr Barton concerning James Tinto?

(viii) *Safety of other counts*: If counts 5, 16 and 19 are unsafe, is there a consequential impact on counts 22 and 25?

*Dishonesty: Ivey and Ghosh*

80 The central question concerns the status of the decision of the Supreme Court in *Ivey*. In this case the judge directed the jury on the issue of dishonesty by reference to *Ivey* rather than *Ghosh*. In doing so he did what the Supreme Court had indicated should happen at para 74, namely that

© 2021 The Incorporated Council of Law Reporting for England and Wales

directions based upon *Ghosh* "should no longer be given". That indication is reflected in the Crown Court Compendium (a practical aid to judges sitting in that court) and the two leading practitioners' works, *Archbold: Criminal Pleading, Evidence and Practice* and *Blackstone's Criminal Practice*. Mr Bogan QC, for David Barton, and Mr Payne, for Rosemary Booth, submit that the judge should have followed *Ghosh* because the observations in the Supreme Court were not essential to its decision (i e were obiter dicta) whilst *Ghosh* remained binding authority. In any event, they submit that the reasoning in *Ghosh* is correct and to be preferred to that of the Supreme Court.

81 The test for dishonesty in *Ghosh* [1982] QB 1053 was summarised at p 1064E:

> "a jury must first of all decide whether according to the ordinary standards of reasonable and honest people what was done was dishonest. If it was not dishonest by those standards, that is the end of the matter and the prosecution fails.
>
> "If it was dishonest by those standards, then the jury must consider whether the defendant himself must have realised that what he was doing was by those standards dishonest."

82 This articulated a two-stage test, namely (a) was the defendant's conduct dishonest by the ordinary standards of reasonable people? If so, (b) did the defendant appreciate that his conduct was dishonest by those standards?

83 In contrast, in *Ivey* [2018] AC 391, para 74, Lord Hughes JSC (with whom the other members of the court agreed) disapproved the decision in *Ghosh*:

> "These several considerations provide convincing grounds for holding that the second leg of the test propounded in *R v Ghosh* [1982] QB 1053 does not correctly represent the law and that directions based upon it ought no longer to be given. The test of dishonesty is as set out by Lord Nicholls in *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378 and by Lord Hoffmann in *Barlow Clowes International Ltd v Eurotrust International Ltd* [2006] 1 WLR 1476, para 10 . . . When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts. The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held. When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people. There is no requirement that the defendant must appreciate that what he has done is, by those standards, dishonest."

84 Thus, the Supreme Court proposed an alternative two-stage test: (a) what was the defendant's actual state of knowledge or belief as to the facts; and (b) was his conduct dishonest by the standards of ordinary decent people?

© 2021 The Incorporated Council of Law Reporting for England and Wales

**85** *Ghosh* [1982] QB 1053 concerned a locum surgeon who claimed payments for operations when he had no possible entitlement to remuneration (either he had not performed any procedure or the procedures were carried out under the National Health scheme). He was convicted of attempting to procure the execution of a valuable security by deception, contrary to section 20(2) of the 1968 Act and three counts of obtaining or attempting to obtain money by deception, contrary to section 15(1) of the 1968 Act. "Dishonesty" is an ingredient of both offences. On appeal this court concluded that whichever test of dishonesty applied, once the jury rejected the defendant's account (as they clearly did), a guilty verdict was inevitable.

**86** *Ivey* [2018] AC 391 involved a professional gambler who sued Crockfords casino in Mayfair for winnings at the card game Punto Banco (a form of Baccarat). Over two days in August 2012, Mr Ivey deployed a specialist technique known as "edge-sorting" by which he was able to identify cards by observing minute differences in the patterns of the back of the cards, a technique which greatly improved his chances of winning. Using "edge-sorting" and with the help of another professional gambler, Mr Ivey won approximately £7.7m.

**87** The casino suggested that Mr Ivey had cheated and that his betting was void. As a consequence, it refused to pay out on his winnings. Mr Ivey's case was that he had deployed a legitimate advantage and he had been open about his conduct. By section 336 of the Gambling Act 2005, a bet taken by a licensee may be declared void if the bet was "substantially unfair". Amongst the factors to be taken into account in that question is whether it involved the commission of the offence of cheating contrary to section 42 of the 2005 Act. The trial judge found that Mr Ivey was genuinely convinced that what he did was not cheating but concluded that Mr Ivey's actions amounted to cheating. The Supreme Court held that in assessing whether the conduct was cheating it was unnecessary to decide whether it was dishonest. Against that background, the court concluded that the trial judge's assessment was unassailable.

**88** Notwithstanding that conclusion, the Supreme Court took the opportunity to review the history of the test of dishonesty since the 1968 Act. Before 1968 "dishonestly" had not appeared in the legal definition of any acquisitive offence. Lord Hughes JSC explained (at para 57) that there are serious problems with the second leg of the test in *Ghosh*:

> "(1) It has the unintended effect that the more warped the defendant's standards of honesty are, the less likely it is that he will be convicted of dishonest behaviour.
>
> "(2) It was based on the premise that it was necessary in order to give proper effect to the principle that dishonesty, and especially criminal responsibility for it, must depend on the actual state of mind of the defendant, whereas the rule is not necessary to preserve this principle.
>
> "(3) It sets a test which jurors and others often find puzzling and difficult to apply.
>
> "(4) It has led to an unprincipled divergence between the test for dishonesty in criminal proceedings and the test of the same concept when it arises in the context of a civil action.
>
> "(5) It represented a significant departure from the pre-Theft Act 1968 law, when there is no indication that such a change had been intended.

© 2021 The Incorporated Council of Law Reporting for England and Wales

"(6) Moreover, it was not compelled by authority. Although the pre-*Ghosh* cases were in a state of some entanglement, the better view is that the preponderance of authority favoured the simpler rule that, once the defendant's state of knowledge and belief has been established, whether that state of mind was dishonest or not is to be determined by the application of the standards of the ordinary honest person, represented in a criminal case by the collective judgment of jurors or justices."

89 He expressed the view that the court in *Ghosh* had erroneously concluded that its second leg test was necessary in order to preserve the principle that criminal responsibility for dishonesty must depend on the actual state of mind of the defendant. It asked the question whether "dishonestly", where that word appears in the Theft Act 1968, was intended to characterise a course of conduct or to describe a state of mind. This was an unnecessary step and has presented problems for jurors.

90 As we have indicated, Lord Hughes JSC observed that the decision in *Ghosh* involved a departure from pre-1968 law, when no such divergence was intended. On careful analysis, it was not justified by the post-1968 jurisprudence, which tended, albeit with some inconsistency, to accept the approach preferred by the Supreme Court in *Ivey*. We agree with, but do not repeat, Lord Hughes JSC's analysis of the relevant authorities (paras 65–74).

91 The conclusion of the Supreme Court was that there were convincing grounds for suggesting that the second leg of the test in *Ghosh* does not correctly represent the law and that directions based on it should no longer be given. He expressly approved the test formulated in *Barlow Clowes International Ltd v Eurotrust International Ltd* [2006] 1 WLR 1476, para 10 by Lord Hoffmann:

"Although a dishonest state of mind is a subjective mental state, the standard by which the law determines whether it is dishonest is objective. If by ordinary standards a defendant's mental state would be characterised as dishonest, it is irrelevant that the defendant judges by different standards. The Court of Appeal held this to be a correct state of the law and their Lordships agree."

92 *Ghosh* created a different approach to dishonesty in the criminal courts but:

"there can be no logical or principled basis for the meaning of dishonesty (as distinct from the standards of proof by which it must be established) to differ according to whether it arises in a civil action or a criminal prosecution. Dishonesty is a simple, if occasionally imprecise, English word. It would be an affront to the law if its meaning differed according to the kind of proceedings in which it arose." (*Ivey* at para 63.)

*The status of Ivey*

93 There is no doubt that the discussion on dishonesty in *Ivey* [2018] AC 391 was strictly obiter because it was not necessary for the decision of the court. It is for that reason that the defendants submit that it has no legal impact on the decision in *Ghosh* [1982] QB 1053. We note that the possibility was raised in argument that *Ghosh* itself was obiter but we approach the question on the basis that, subject to the status of *Ivey*, it is binding not least because it was applied as the law of England and Wales for

© 2021 The Incorporated Council of Law Reporting for England and Wales

A 35 years, including by this court. The defendants submit that we should apply *Ghosh* and then let the matter return to the Supreme Court. They point out that the Supreme Court did not appear to hear argument on the issue. They recognise that would give rise to the distinct possibility that the wrong test for dishonesty would be applied in the meantime in thousands of cases in the magistrates' and Crown Courts but that is a consequence of following properly the rules of precedent.

B **94** In answer to that argument, Mr Perry QC for the Crown submits that by analogy with *R v James* [2006] QB 588 we should hold that the decision of the Supreme Court binds this court (and he submits all courts in England and Wales) as to the meaning of dishonesty in the criminal context and expressly overrules *Ghosh*. That, he submits, is the consequence of para 74 which we have set out.

C **95** An alternative route to arriving at the same conclusion was proposed by Sir Brian Leveson P in *Director of Public Prosecutions v Patterson* [2018] 1 Cr App R 28, a decision of the High Court. Having quoted para 74 of Lord Hughes JSC's judgment, he said:

> "16. These observations were clearly obiter, and as a matter of strict precedent the court is bound by *R v Ghosh* [1982] QB 1053, although the D Court of Appeal could depart from that decision without the matter returning to the Supreme Court. This much is clear from *R v Gould* [1968] 2 QB 65, in which Diplock LJ observed at pp 153 and 68 that: 'In its criminal jurisdiction . . . the Court of Appeal does not apply the doctrine of stare decisis with the same rigidity as in its civil jurisdiction. If upon due consideration, we were to be of opinion that the law has been either misapplied or misunderstood in an earlier decision of this court or E its predecessor, the Court of Criminal Appeal, we should be entitled to depart from the view expressed in that decision . . .' Given the terms of the unanimous observations of the Supreme Court expressed by Lord Hughes JSC, who does not shy from asserting that *Ghosh* does not correctly represent the law, it is difficult to imagine the Court of Appeal preferring *Ghosh* to *Ivey* [2018] AC 391 in the future.
>
> F "17. For purposes of this case it is unnecessary to go further."

**96** *R v Gould* [1968] 2 QB 65 was one of a series of cases in which the Court of Appeal (Criminal Division), and its predecessor, developed a looser approach to precedent than applies in the Civil Division, particularly when it considered that an error had been made in an earlier decision which, if applied, would adversely affect the defendant in criminal proceedings. It G followed *R v Taylor* [1950] 2 KB 368. The approach is not limited to circumstances where a departure from earlier authority would favour the accused, as was explained by Lord Woolf CJ in *R v Simpson* [2004] QB 118, para 34. Yet these authorities proceed on the basis of this court being concerned to reconsider one of its own earlier decisions with a view to affirming it or departing from it. They are not directly concerned with the circumstances in these appeals, which involve an instruction from the H Supreme Court.

**97** The first question is whether we are obliged to follow the Supreme Court.

**98** Against that background, we turn to the approach adopted in *R v James* [2006] QB 588. The Court of Appeal (Criminal Division) considered

© 2021 The Incorporated Council of Law Reporting for England and Wales

whether the correct statement of the law of provocation was to be found in the decision of the House of Lords in *R v Smith (Morgan)* [2001] 1 AC 146 or the subsequent Privy Council decision in *Attorney General for Jersey v Holley* [2005] 2 AC 580. Ordinarily, the Court of Appeal would be bound by the rules of precedent to follow a decision of the House of Lords. Generally, the Judicial Committee of the Privy Council does not bind the courts of England and Wales. Nonetheless the court decided that it was bound to follow a decision of the Privy Council.

99 The Committee consisted of nine of the twelve Lords of Appeal in Ordinary. Lord Nicholls of Birkenhead gave the opinion of the majority of six whilst Lord Bingham of Cornhill, Lord Hoffmann and Lord Carswell dissented. The majority (at para 1) said that the appeal was concerned to resolve a conflict between decisions of the House of Lords and the Privy Council "and clarify definitively the present state of English law, and hence Jersey law, on this important subject". The minority agreed at para 68 that that was the effect of the conclusion of the majority.

100 In giving the judgment of the Court of Appeal in *R v James* Lord Phillips of Worth Matravers CJ noted that the effect of continuing to follow the earlier House of Lords decision, whilst inevitably giving leave to appeal, would be to require judges to direct juries in a way which would necessarily be overturned. The court did not want to produce that result, but to avoid it needed to answer two questions: "(i) How do we justify disregarding very well-established rules of precedent? And (ii) what principles do we put in place of those that we are disregarding? The two questions are obviously interrelated." (Para 40.)

101 The answers to those questions followed between paras 41 and 45. In summary, it was the Lords of Appeal in Ordinary, albeit sitting in the Privy Council, who had altered the established approach to precedent. The rules of precedent are common law principles and it was not for the Court of Appeal to rule that it was beyond their powers to develop them. The position had been reached where the Privy Council could overrule a decision of the House of Lords with the consequence that the Court of Appeal was bound to follow the decision of the Privy Council. Lord Phillips CJ then identified three features of the decision which justified the conclusion. First, all the Law Lords sitting in the Privy Council, including those who dissented, agreed that the decision definitively clarified English law. Secondly, the majority in the Privy Council constituted half the Appellate Committee (i e six) of the House of Lords. Thirdly, the result of an appeal to the House of Lords was a foregone conclusion. Lord Phillips CJ noted that it was unlikely that these circumstances would again arise, and the judgment should not be taken as an invitation to decline to follow a decision of the House of Lords in any other circumstances.

102 We are in a strongly analogous position, indeed it is stronger because the ordinary rules of precedent require us to follow decisions of the Supreme Court (as the successor of the Judicial Committee of the House of Lords). The undoubted reality is that in *Ivey* [2018] AC 391 the Supreme Court altered the established common law approach to precedent in the criminal courts by stating that the test for dishonesty they identified, albeit strictly contained in obiter dicta, should be followed in preference to an otherwise binding authority of the Court of Appeal. As in *R v James* [2006]

© 2021 The Incorporated Council of Law Reporting for England and Wales

A QB 588, we do not consider that it is for this court to conclude that it was beyond their powers to act in this way.

103 The rules of precedent exist to provide legal certainty which is a foundation stone of the administration of justice and the rule of law. They ensure order and predictability whilst allowing for the development of the law in well-understood circumstances. They do not form a code which exists for its own sake and must, where circumstances arise, be capable of
B flexibility to ensure that they do not become self-defeating.

104 We conclude that where the Supreme Court itself directs that an otherwise binding decision of the Court of Appeal should no longer be followed and proposes an alternative test that it says must be adopted, the Court of Appeal is bound to follow what amounts to a direction from the Supreme Court even though it is strictly obiter. To that limited extent
C the ordinary rules of precedent (or stare decisis) have been modified. We emphasise that this limited modification is confined to cases in which all the judges in the appeal in question in the Supreme Court agree that to be the effect of the decision. Such was a necessary condition before adjusting the rules of precedent accepted by this court in *R v James* in relation to the Privy Council. Had the minority of the Privy Council in *Holley* not agreed that the effect of the judgment was to state definitively the law in England, it
D would not have been accepted as such by this court. The same approach is necessary here because it forms the foundation for the conclusion that the result is considered by the Supreme Court to be definitive, with the consequence that a further appeal would be a foregone conclusion, and binding on lower courts.

105 In the result, the test for dishonesty in all criminal cases is that
E established in *Ivey* [2018] AC 391.

106 We would not wish it to be thought that we are following *Ivey* reluctantly. The concerns about *Ghosh* [1982] QB 1053 have resonated through academic debate for decades. Lord Hughes JSC's reasoning is compelling.

107 That said, we wish to endorse the Crown's submission that the test of dishonesty formulated in *Ivey* remains a test of the defendant's state of
F mind—his or her knowledge or belief—to which the standards of ordinary decent people are applied. This results in dishonesty being assessed by reference to society's standards rather than the defendant's understanding of those standards. Lord Nicholls, echoing the approach suggested by Lord Hoffmann in *Barlow Clowes* [2006] 1 WLR 1476 (see para 91 above), observed in *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, 389:

> G "acting dishonestly, or with a lack of probity, which is synonymous, means simply not acting as an honest person would in the circumstances. This is an objective standard. At first sight this may seem surprising. Honesty has a connotation of subjectivity, as distinct from the objectivity of negligence. Honesty, indeed, does have a strong subjective element in that it is a description of a type of conduct assessed in the light of what a person actually knew at the time, as distinct from what
> H a reasonable person would have known or appreciated . . . However, these subjective characteristics of honesty do not mean that individuals are free to set their own standard of honesty in particular circumstances. The standard of what constitutes honest conduct is not subjective. Honesty is not an optional scale, with higher or lower values accordingly

© 2021 The Incorporated Council of Law Reporting for England and Wales

> to the moral standards of each individual. If a person knowingly appropriates another's property, he will not escape a finding of dishonesty simply because he sees nothing wrong in such behaviour."

And at p 391:

> "when called upon to decide whether a person was acting honestly, a court will look at all the circumstances known to the third party at the time. The court will also have regard to personal attributes of the third party, such as his experience and intelligence, and the reason why he acted as he did."

108 This approach, which was the approach of the Supreme Court in *Ivey* [2018] AC 391, makes clear that when Lord Hughes JSC talked in para 74 of the "actual state of mind as to knowledge or belief *as to the facts*" (our emphasis) he was referring to all the circumstances known to the accused and not limiting consideration to past facts. All matters that lead an accused to act as he or she did will form part of the subjective mental state, thereby forming a part of the fact-finding exercise before applying the objective standard. That will include consideration, where relevant, of the experience and intelligence of an accused. In an example much used in debate on this issue, the visitor to London who fails to pay for a bus journey believing it to be free (as it is, for example, in Luxembourg) would be no more dishonest than the diner or shopper who genuinely forgets to pay before leaving a restaurant or shop. The magistrates or jury in such cases would first establish the facts and then apply an objective standard of dishonesty to those facts, with those facts being judged by reference to the usual burden and standard of proof.

109 There is, no doubt, a range of consequential issues that will need to be decided following the decision in *Ivey*. Many of these have been usefully summarised by Professor David Ormerod QC and Karl Laird in their article "*Ivey v Genting Casinos*: Much Ado About Nothing?" in *The UK Supreme Court Yearbook*, Legal Year 2017–2018, vol 9, pp 380–403. They will be addressed as cases are tried.

### *The summing up on dishonesty*

110 Mr Bogan and Mr Payne submit that even applying the *Ivey* test, the convictions are unsafe because the trial judge failed to direct the jury in accordance with Lord Hughes JSC's formulation. In particular, it is suggested that the judge should have directed the jury to ascertain the defendants' actual state of mind, before they went on to consider whether their actions were dishonest by ordinary standards.

111 In the written directions on the law, the trial judge first explained dishonesty in the following way, when dealing with the offence of conspiracy to defraud: "The question of whether a person acts dishonestly is to be determined by you the jury—by applying the standards of ordinary decent people—but this would not include acting in a commercially or morally reprehensible manner."

112 Later in his written directions, when dealing with the other offences for which dishonesty was an ingredient, such as theft and false accounting, the judge said, "The question of whether a person acts dishonestly is to be determined by you the jury—by applying the standards of ordinary decent people". In his oral directions, the judge added, "it [dishonesty] does not

© 2021 The Incorporated Council of Law Reporting for England and Wales

need another definition; you, ordinary decent people decide what is dishonest, nobody else".

113 The judge was here dealing with the second part of the definition of dishonesty in *Ivey* at para 74. Yet it is was clear from the summing up as a whole that the jury should apply that objective test for dishonesty by reference to all of the relevant facts, as the jury found them to be, including their findings as to the states of mind and knowledge of David Barton and Rosemary Booth. In written directions, the judge referred to the "stark issue between the Crown and the defence concerning the reasons why such property was handed over or gifted in wills". He continued by summarising the competing positions of the Crown and the defence on the defendants' knowledge or belief as to the facts at the time when the offences took place:

> "What do the Crown and those who represent David Barton and Rosemary Booth submit to you on this issue?
>
> "The Crown alleges that, when they first went into [Barton Park], each of these residents was vulnerable to influence—and for some of the other residents, vulnerable to isolation from close friends or family—principally by David Barton, but assisted by others charged or named on the relevant counts of the indictment . . . The Crown's case is that, looking separately at the backgrounds to each of the five residents, there were similarities that were not coincidences. The Crown alleges that it is no coincidence that each of these residents was childless and wealthy, with no relatives (or relatives who, for the most part, did not live close by) and, because of difficulties in their personal lives at the time that they moved to [Barton Park], were pathetically grateful—and highly vulnerable to such influence from relevant defendants. Consequently, it is asserted that they were, each of them, separately, dishonestly taken advantage of—as a result of separate conspiracies or agreements—to dishonestly persuade them to part with substantial monies and properties and/or to change their wills in favour of relevant defendants and, when monies were transferred, they went into bank accounts under the control of [David Barton, Lucinda Barton and CCL]—a company of which both [David Barton] and [Lucinda Barton] were officers.
>
> "On behalf of David Barton . . . and Rosemary Booth . . . it is denied that they are guilty of any of the offences with which they are charged.
>
> "Specifically on behalf of David Barton it is submitted that he had, in effect, saved all of these residents from huge difficulties in their lives, and, even though they may have been affected by those difficulties at the time of their admission to [Barton Park], they always retained their capacity and once they received proper care and attention in a well-run 'five-star' nursing home, they quickly recovered their ability to properly look after their own lives; were capable of making proper and reasonable decisions affecting their lives, including who they were prepared to see or not to see of their friends and family; were justifiably grateful to David Barton for rescuing them from their previous difficulties and, as a consequence, were prepared to substantially financially assist him and his businesses—by transferring large sums of money to him and his businesses and either change their wills wholly in his favour or make gifts in their wills to him and others of his family and employees—because of their gratitude and their great affection for him. His case is that, when they carried out these acts of generosity they did so because they wanted to do so—with full

© 2021 The Incorporated Council of Law Reporting for England and Wales

capacity and understanding of what they were doing—and not because of dishonest influence from him assisted by other others—or any vulnerability. Further, it is his case that each of the residents concerned was assisted, at times, by a solicitor or solicitors and/or financial advisers, none of whom indicated that any of the residents concerned was incapable of making such decisions.

"On behalf of Rosemary Booth it is also denied that there were any such dishonest agreements, and she also relies on the same issues raised on behalf of David Barton, including the assertion raised on his behalf concerning the capacity of residents to make their own decisions—but, additionally, it is her case that she was unaware of the finances of any of the residents. Further, it is her case that neither Sheila Wardrop nor Ronald Ward-Howlett were vulnerable, but if there were any such dishonest agreements she was not a party to them and was completely unaware of their existence . . ."

114 In this part of his directions, consistently with *Ivey*, the judge directed the jury to take account of the defendants' actual state of mind as to knowledge or belief as to the relevant facts. He summarised the parties' competing contentions, and reminded the jury to bear in mind that the case put forward by David Barton and Rosemary Booth was that they believed that none of the residents was vulnerable, that each of them was of full capacity and understanding, that each had access to independent advice, and that each was willing to transfer large sums of money to David Barton and his businesses out of gratitude and affection towards him. So far as Rosemary Booth is concerned, he directed the jury to consider her contention that she had no significant knowledge or understanding of financial matters in general, or of the finances of the residents or the financial affairs of Barton Park, in particular.

115 In addition to the written directions, the judge addressed these matters in detail in other parts of the summing up, which extended over many days. A similar approach was taken in relation to each of the counts that involved dishonesty. For example, in relation to the theft counts concerning the Rolls-Royce motor cars, the jury was reminded of David Barton's case why he believed he had been entitled to sell the two cars to Patricia Anderson-Scott and Margaret Pinnington on 5 March 1999. It was against that background that the jury had to decide the issue of dishonesty in respect of the theft counts. In relation to Rosemary Booth, the jury was reminded in detail of the evidence of what she knew about the various transactions.

116 Taking the summing up as a whole, we do not consider that there is any possibility that the jury could have been in any doubt that, when applying the objective standard of dishonesty, they should do so by reference to their findings about the state of the knowledge or belief of David Barton and Rosemary Booth regarding the circumstances. As Mr Perry submits, the requirement to consider the states of mind of David Barton and Rosemary Booth was self-evident from the way that the issues arose before the jury.

*Conspiracy to defraud*

117 Mr Bogan advanced a number of submissions on counts 1, 16 and 19, each of which alleged offences of conspiracy to defraud. These submissions were adopted by Mr Payne. The issues of general principle that

© 2021 The Incorporated Council of Law Reporting for England and Wales

arise in this context are, first, a description of the elements of the offence of conspiracy to defraud and, in particular, whether there is a requirement of "unlawfulness" or "aggravating feature" over and above a dishonest agreement which includes an element of unlawfulness in its object or means. Secondly, whether the offence meets the requirements of legal certainty at common law and under article 7 of the European Convention for the Protection of Human Rights and Fundamental Freedoms ("the ECHR") having regard to the test of dishonesty.

118 Additionally, focusing on the circumstances of the present case, it is argued: (i) the judge failed to direct the jury correctly on the elements of the offence; (ii) there was insufficient evidence to support the three counts; and (iii) the particulars of the offence gave insufficient notice of the case to be met.

119 The elements of the offence of conspiracy to defraud were described in *R v Scott* [1975] AC 819, 840 by Viscount Dilhorne:

> "it is clearly the law that an agreement by two or more by dishonesty to deprive a person of something which is his or to which he is or would be or might be entitled and an agreement by two or more by dishonesty to injure some proprietary right of his, suffices to constitute the offence of conspiracy to defraud."

120 Mr Bogan and Mr Payne submit that this passage should not be treated as definitive, but it has been applied for the last 45 years.

121 We endorse the explanation given in the Crown Court by Hickinbottom J in *R v Evans (Eric)* [2014] 1 WLR 2817, para 38 and following, that there must be a dishonest agreement which includes unlawfulness, either as to the object of the agreement or the means by which it will be carried out. It is not necessary to prove an intent to deceive or an intent to cause economic or financial loss to the victim or victims, but instead either a proprietary right or interest of the potential victim must be injured (or potentially injured). As it was put in *R v H* [2015] EWCA Crim 46 at [31], the defendant must act with an intention to prejudice another's rights. The agreement need not necessarily include the commission of a substantive offence if carried out: see *R v Scott* [1975] AC 819 and *R v Cooke* [1986] AC 909.

122 Conspiracy to defraud does not apply to agreements to achieve a lawful object by lawful means. But there is no requirement of "unlawfulness" or "aggravating feature" over and above a dishonest agreement which includes an element of unlawfulness in its object or means. This approach was endorsed by the House of Lords in *R v Goldshield Group plc* [2009] 1 WLR 458. The defendants were alleged to have elevated what was otherwise non-criminal price fixing into a criminal conspiracy to defraud when it operated to the financial detriment of the Department of Health, which paid inflated prices in accordance with an artificially-fixed drug tariff. It was held that lies and/or positive deception can form the basis of a charge of conspiracy to defraud in these circumstances" (para 18). There was no suggestion of a requirement for additional unlawfulness or aggravating circumstances over and above the deliberately false statements and/or deliberate deceit.

123 In the present case, the necessary element of unlawfulness was the positive and extensive deceit practised on the victims and others with the

© 2021 The Incorporated Council of Law Reporting for England and Wales

intention of prejudicing a proprietary right or interest (by obtaining property to which the defendants were not entitled). Count 1 demonstrates the extent to which the final form of the indictment, including the "voluntary" particulars, described the unlawful conduct: A

"*Count 1*

"*Statement of offence*

"Conspiracy to defraud contrary to common law. B

"*Particulars of offence*

"David Barton on days between 7 September 1997 and 10 January 2008 conspired together and with Thomas Mills and Lucinda Barton to defraud Patricia Anderson-Scott by dishonestly exploiting their position to control or obtain money or proprietary rights belonging to Patricia Anderson-Scott, for the benefit of David Barton, Lucinda Barton and/or their businesses, to which David Barton, Lucinda Barton and/or their businesses were not entitled." C

"*Voluntary particulars*

"(i) Placing David Barton in a position of influence over Patricia Anderson-Scott's personal, legal and financial affairs; (ii) taking money and/or credit balances and/or cheques from Patricia Anderson-Scott in excess of any sums legitimately owed by her for care or associated services; (iii) receiving money and/or credit balances and/or cheques from Patricia Anderson-Scott in excess of any sums legitimately owed by her for care or associated services; (iv) selling a Rolls Royce motor vehicle registration 3RR to Patricia Anderson-Scott at a price far exceeding its value; (v) obtaining money from Patricia Anderson-Scott to settle payment for finance on Rolls Royce motor vehicle registration 3RR; (vi) taking furniture that was the property of Patricia Anderson-Scott." D E

**124** The offence of conspiracy to defraud was properly described in the indictment, revealing in each instance an offence on which the jury were entitled to convict. We do not accept that the offence lacks certainty and thus falls foul of article 7 of the ECHR. The offence of conspiracy to defraud was described in the indictment, as the example above demonstrates, with clarity. The defendants would have been able readily to identify the case they had to meet. F

**125** Mr Bogan and Mr Payne suggest that the judge's directions on the counts of conspiracy to defraud were insufficient and that the jury received inadequate assistance on the matters that the Crown had to establish. We do not accept these arguments. The written directions included the following passages: G

"*Definition of conspiracy to defraud (counts 1, 6, 10, 16, 19 and 22)*

"The offence of 'conspiracy to defraud' is committed when at least two people agree to defraud a person (or persons) by; (1) dishonestly depriving that person (or persons) of something which is theirs, or to which they are or would be, or might be, entitled, and/or; (2) dishonestly injuring some 'proprietary right' of that person (or persons). H

"A 'proprietary right' is the right of a person to deal with property as he/she wishes—which includes the right to make another person a beneficiary under his/her will.

"The four main elements of the offence of 'conspiracy to defraud'

© 2021 The Incorporated Council of Law Reporting for England and Wales

"In order to prove that a person—'A'—has committed the offence of conspiracy to defraud, the [Crown] must prove, so that you the jury are sure, the following four 'elements': (1) there was an agreement between two or more persons to (1) dishonestly deprive another (or others) of something which is theirs, or to which they are or would be, or might be, entitled, and/or; (2) to dishonestly injure a proprietary right of that other (or others). (2) That, by active involvement, 'A' joined in with that agreement; (3) that when 'A' did so 'A' knew what he/she was agreeing to; (4) further, that when 'A' joined in with that agreement 'A' intended that he/she or some other person or persons should carry the agreement out."

"The [Crown] alleges that there were separate conspiracies or agreements to dishonestly defraud each of these residents—by deliberately exploiting their position to control or obtain money or proprietary rights of those residents—by selecting each of them because they were vulnerable, and preying upon that vulnerability to dishonestly get each of them to make gifts or payments, or change their wills in favour of relevant individuals."

"The [Crown] alleges that, when they first went into Barton Park, each of these residents was vulnerable to influence—and for some of the residents, vulnerable to isolation from close friends or family—principally from David Barton, but assisted by others charged or named on the relevant counts of the indictment—i e Lucinda Barton, Rosemary Booth and Thomas Mills. The [Crown] asserts that, following a number of different conspiracies or agreements by co-conspirators, this resulted in each of these residents being dishonestly influenced to hand over property and/or change their wills, as alleged. The [Crown's] case is that, looking separately at the backgrounds to each of the five residents, there were similarities that were not coincidences. The [Crown] asserts that it is no coincidence that each of these residents was childless and wealthy, with no relatives (or relatives who, for the most part, did not live close by) and, because of difficulties in their personal lives at the time they moved to Barton Park, were pathetically grateful—and highly vulnerable to such influence from relevant defendants. Consequently, it is asserted that they were, each of them, separately, dishonestly taken advantage of—as a result of separate conspiracies or agreements—to dishonestly persuade them to part with substantial monies and properties and/or to change their wills in favour of relevant defendants and, when monies were transferred they went into bank accounts under the control of David Barton, Lucinda Barton and CCL—a company of which both David Barton and Lucinda Barton were officers."

**126** The jury was reminded of the elements of the offences, as set out in the final version of the indictment. That alleged that the defendants obtained monies etc to which they were not entitled, for instance because what they claimed was in excess of sums that were legitimately owed. The trial concerned allegations that the defendants sought to persuade the victims, by way of extensive deceptions and lies, into parting with their property. In our judgement there can be no doubt that the jury understood that the Crown needed to establish that there was a dishonest agreement on the part of the defendants, by deceit or lies, to prejudice the proprietary rights or interests of the victims by obtaining property to which they were

© 2021 The Incorporated Council of Law Reporting for England and Wales

not entitled. In these circumstances there is no substance in the argument A
that the directions were inadequate.

*Section 2(1) of the 1968 Act*

127 The defendants submit that the judge failed to direct the jury in accordance with section 2(1) of the 1968 Act. It sets out circumstances in which an appropriation is not dishonest: B

> "'*Dishonestly*'
> "(1) A person's appropriation of property belonging to another is not to be regarded as dishonest— (a) if he appropriates the property in the belief that he has in law the right to deprive the other of it, on behalf of himself or of a third person; or (b) if he appropriates the property in the belief that he would have the other's consent if the other knew of the C
> appropriation and the circumstances of it; or (c) . . ."

128 The judge did not set out the terms of section 2(1) in his directions to the jury on counts 5, 7 and 8. The defendant Barton's case was that he had, and that he believed he had, the consent of the owners to deal with the property (count 5: a Rolls-Royce; count 7: the sale price of a Rolls-Royce; and count 8: £70,000) as if it was his own. D

129 In the written directions given to the jury, the judge included a passage identifying the case for David Barton by making clear that he said that he believed that the property in question was freely given to him by people of capacity, in short that there were straightforward gifts which he neither procured nor accepted dishonestly. That explanation was rejected by the jury. Whilst a direction tailored to section 2(1)(a) might have been given, it was not required. If his case on the "gifts" was or might have been E
true, David Barton was not dishonest and would have been acquitted.

*Capacity*

130 David Barton and Rosemary Booth rely on four grounds of appeal under this broad heading. They submit that the judge misdirected the jury because: (i) the judge failed to direct the jury that each of the residents had F
"capacity"; (ii) the judge's written directions conflated "vulnerability" and "capacity"; (iii) the judge failed to direct the jury in accordance with the guidance of Lord Hutton in *R v Hinks* [2001] 2 AC 241; and (iv) (overlapping with (iii)), the judge failed to give the jury a direction on the validity of gifts, to the effect that there is a complete defence in cases where the giver had complete capacity to make a gift, was in full knowledge of the material facts, and had made the gift voluntarily. G

*Capacity and vulnerability*

131 It was common ground between Crown and defence that each of the five residents had legal "capacity" to make gifts and testamentary dispositions. The Crown's case did not depend upon the contention that the residents were not capable of entering into lawful transactions. Rather, it H
was the Crown's case that the defendants knew that the residents were vulnerable and dishonestly exploited that vulnerability to persuade them to transfer money and gifts to David Barton and his company. This amounted to the offence of conspiracy to defraud, notwithstanding that the residents had legal capacity to make gifts and enter into transactions.

© 2021 The Incorporated Council of Law Reporting for England and Wales

A 132 In those circumstances the trial judge had no need to give legal directions to the jury on the technical legal meaning of the word "capacity". He did give directions on capacity and vulnerability and how, despite the undoubted fact that the residents had capacity to deal with their own affairs, they might nonetheless be victims of conspiracy to defraud. The directions were more extensive than requested by the defendants during submissions in B advance of the summing up. This passage is not criticised:

> "Just because a person has capacity to make their own decisions, this does not mean that they could never be vulnerable to dishonest influence to make decisions that adversely affect them—and it would not necessarily be a defence to a charge of conspiracy to defraud, to say that the person (or persons) who were targeted had capacity to make their C own decisions."

133 The judge also reminded the jury: "When considering this part of the case you will appreciate that there is a stark issue between the Crown and the defence concerning the reasons why such property was handed over or gifted in wills . . ."

134 He also reminded the jury that it was the defendants' case that the D residents carried out acts of generosity because they wanted to, with full capacity and understanding of what they were doing, and not because of dishonest influence from David Barton and others, or vulnerability. He encapsulated the issue for the jury:

> "You, the jury, must look at all the circumstances of the case and keep in mind all relevant evidence. If, in doing so, you decide that it is or E *may* be the case—looking at each of the counts and the defendants separately—that the making of such gifts, transferring of property and/or changing of wills by the relevant residents, occurred not as a result of agreements to defraud them, which were then carried out by the conspirators, but, simply, were actions taken by residents who were fully in control of their decision-making and understood what they were doing, F and made proper decisions: If that is or may be the case on any or all of those five counts of conspiracy to defraud, your verdicts would be 'not guilty' as appropriate."

135 Accordingly, there is no substance in the criticism that the judge failed to direct the jury that the victims had legal capacity. It was common ground that the residents had legal capacity.

G 136 The second ground is that the judge conflated "capacity" with "vulnerability". We do not consider this is a fair criticism of the legal directions. The judge dealt with capacity in the context of his summary of the defence case on this issue, namely the fact that the residents had legal capacity made it much less likely that they could have been subjected to a conspiracy to defraud. The judge then dealt with vulnerability in his summary of the Crown's position, namely that evidence of the residents' H vulnerability, notwithstanding their legal capacity, was relevant to the case against the defendants. As Mr Perry contends, the judge's direction correctly identified that the issue was whether, notwithstanding their formal capacity, the residents' vulnerability had been dishonestly exploited by the defendants as part of the fraud.

© 2021 The Incorporated Council of Law Reporting for England and Wales

*R v Hinks* A

137 The defendants advanced an argument based upon an observation of Lord Hutton in the course of his dissenting judgment in *R v Hinks* [2001] 2 AC 241, 256 that:

> "it appears contrary to common sense that a person who receives money or property as a gift could be said to act dishonestly, no matter how B much ordinary and decent people would think it morally reprehensible for that person to accept the gift."

138 The certified question in *R v Hinks* concerned the meaning of "appropriation" for the purposes of section 1 of the 1968 Act. The victim was a man of low intelligence cared for by the defendant. Over a period of over six months, the defendant accompanied the victim to his building C society, where he made withdrawals of the maximum daily amounts and gave her the money. She received a total of about £60,000, effectively all his savings. The defendant was charged with theft. The certified question was:

> " 'Whether the acquisition of an indefeasible title to property is capable of amounting to an appropriation of property belonging to another for the purposes of section 1(1) of the Theft Act 1968.' In other words, the D question is whether a person can 'appropriate' property belonging to another where the other person makes him an indefeasible gift of the property" (Lord Steyn at p 244C–D).

The majority in the House of Lords, including Lord Hutton on this point but with Lord Hobhouse of Woodborough dissenting, concluded that the answer was yes: there would be an appropriation for the purposes of the E 1968 Act.

139 Lord Hutton was concerned that the judge's directions on dishonesty were inadequate because, in his view, they failed to give the jury sufficient help on how dishonesty should be judged in those circumstances. Lord Hobhouse agreed with him. The certified question did not encompass the judge's approach to dishonesty. Although the House of Lords was F entitled to stray outside the certified question, the majority (Lord Steyn, Lord Jauncey of Tullichettle and Lord Slynn of Hadley) were not prepared to engage in an analysis of his directions when the criticisms formed no part of the grounds of appeal, were not dealt with in the statement of facts and issues before the House and the evidence (and so the way in which the case was put) was not available. G

140 Lord Hutton discussed how dishonesty might be considered when the appropriation in question was a gift. His reasoning was not endorsed by the majority and, on any view, the extract from his judgment we have just quoted is not a binding proposition of law. He was careful in the discussion that followed, in the context of theft, to explore what was meant by a "valid gift", recognising that something that looked like a gift might nonetheless be the subject of a theft charge. This argument adds nothing, in our view, to the H antecedent arguments which criticise the summing up. The judge made clear to the jury that unless they were satisfied that the defence advanced by the defendants (see para 134 above) was disproved by the Crown, they should acquit.

© 2021 The Incorporated Council of Law Reporting for England and Wales

A *Count 16*

**141** Mr Payne submits on behalf of Mrs Booth that count 16 (conspiracy to defraud Ronald Ward-Howlett) should have been withdrawn at the close of the Crown's case on the basis that there was insufficient evidence for it to be left to the jury.

**142** Count 16 was in the following terms:

B

> "*Statement of offence*
>
> "Conspiracy to defraud contrary to common law.
>
> "*Particulars of offence*
>
> "David Barton and Rosemary Booth on days between 4 January 2011 and 13 January 2014 conspired together and with Thomas Mills to defraud Ronald Ward-Howlett by dishonestly exploiting their position to
> C control or obtain money or proprietary rights belonging to Ronald Ward-Howlett, for the benefit of David Barton, Lucinda Barton and/or their businesses, to which David Barton, Lucinda Barton and/or their businesses were not entitled."
>
> "*Voluntary particulars*
>
> "(i) Placing David Barton in a position of influence over Ronald Ward-
> D Howlett's personal, legal and financial affairs; (ii) enabling David Barton and Lucinda Barton to become principal beneficiaries under Ronald Ward-Howlett's will; (iii) using Ronald Ward-Howlett's money to fund a deposit for the purchase of a Ferrari motor car; (iv) taking money and/or credit balances and/or cheques from Ronald Ward-Howlett in excess of any sums legitimately owed by him for care or associated services,
> E including: (a) a cheque for £112,348.48 for the purchase of a property at 6 Post Office Road; (b) monies totalling £865,000 between April and December of 2013; (v) receiving money and/or credit balances and/or cheques from Ronald Ward-Howlett in excess of any sums legitimately owed by him for care or associated services, as in (iv), above; (vi) using Ronald-Ward-Howlett's money to purchase land that David Barton intended to obtain under the wills of either Ronald Ward-Howlett or
> F Katie Willey, or by agreement with Katie Willey."

**143** The Crown alleged that Rosemary Booth played an active role in this conspiracy, because she was instrumental in recruiting Mr Ward-Howlett to Barton Park, and in isolating him from his previous solicitor, Joan Williamson. Mr Ward-Howlett made a will within weeks of entering Barton
G Park Nursing Home on 23 February 2011, in which Rosemary Booth received a £6,000 bequest, with the residual estate left to David Barton. At the same time, the services of Mr Ward-Howlett's long-term financial adviser, Mr Milford, were dispensed with. Rosemary Booth drafted, in her own handwriting, a letter dismissing Mr Milford, which Mr Ward-Howlett then copied. As we noted when summarising the facts, she only accepted that the handwriting was hers after Kiria Hughes had given that evidence to the jury,
H despite being cross-examined to the contrary. She also witnessed the second will made in favour of David and Lucinda Barton. She acted as the "eyes and ears" of David Barton, and generally assisted him at Barton Park.

**144** Furthermore, she was aware of the relationships which David Barton cultivated with particular residents.

© 2021 The Incorporated Council of Law Reporting for England and Wales

145 In our judgment, these various strands of evidence justified count 16 as regards Rosemary Booth being left to the jury. The evidence demonstrated prima facie her involvement in this criminality. A

146 In his ruling on the submission of no case to answer, the judge also referred to evidence from Kiria Hughes, following Katie Willey's death, of David Barton, in the presence of Rosemary Booth, telling Ronald Ward-Howlett that he would not be buried in the family grave if he did not co-operate. B In fact, this was a mistake, as the judge subsequently acknowledged, when it was pointed out to him. Kiria Hughes had not suggested that Rosemary Booth was present when this conversation took place. The judge later summed up the conversation correctly to the jury. This mistake did not mean that the judge erred in leaving the case against Rosemary Booth on count 16 to the jury. As we have said, even without this evidence, there was ample evidence to justify proceeding with this count C against Rosemary Booth.

*The Tinto conversation*

147 Rosemary Booth complains of the judge's decision to admit evidence from Kiria Hughes under sections 101 and 103 of the Criminal Justice Act 2003, of a conversation she overheard in about June 2014 D between David Barton and Rosemary Booth. Ms Hughes said that this conversation took place shortly after the police investigation had commenced into the frauds. She overheard David Barton and Rosemary Booth discuss a payment of £10,000 that had been made by a resident, James Tinto, into Rosemary Booth's bank account, some years before. Ms Hughes said that Barton and Booth were discussing trying to find furniture to the equivalent value of £10,000, so that, if the police ever questioned her about E the payment, she could say that it was in return for the sale of furniture from Rosemary Booth to James Tinto.

148 It was accepted that Rosemary Booth had received a payment of £10,000 from James Tinto in 2005 but the defence argued that it had not been suggested by the Crown that this was improper. The judge held, nonetheless, that the evidence potentially came within section 101(1)(d) of F the 2003 Act, as evidence relevant to important matters in issue between the Crown and Rosemary Booth, because it demonstrated a propensity on the part of Rosemary Booth, first, to be untruthful and, secondly, to co-operate with David Barton to conceal the truth and to invent a bogus explanation for the payment. It additionally shed light on Rosemary Booth's relationship with David Barton. Section 103(1)(b) sets out that the "matters in issue" can include the defendant's propensity to be untruthful. G

149 The judge considered whether the evidence should nevertheless be excluded, on the basis that its admission would have such an adverse effect on the fairness of the proceedings that the court ought not to admit it: section 101(3). The judge had regard to the "checklist" in *R v Hanson* [2005] 1 WLR 3169 and concluded that the evidence should be admitted.

150 The judge made clear that he was admitting this evidence on H condition that the Crown would admit that the £10,000 was not dishonestly obtained. This was subsequently dealt with by way of an agreed fact that was put before the jury.

151 Kiria Hughes was cross-examined on her evidence on behalf both of David Barton and Rosemary Booth. Both Barton and Booth subsequently

© 2021 The Incorporated Council of Law Reporting for England and Wales

gave evidence about this conversation. In essence, their case was that Kiria Hughes had misheard or misunderstood a snippet of conversation between Barton and Booth. They had had a conversation about a payment of £10,000, but it concerned a payment of £10,000 that David Barton made to Rosemary Booth in return for bedroom furniture that had been supplied to him by Rosemary Booth's father-in-law. It was pointed out that Kiria Hughes, a former bookkeeper at Barton Park, had pleaded guilty to false accounting and had agreed to give evidence on behalf of the Crown. It was suggested she had an obvious motive for giving evidence that was damaging to Barton and Booth.

**152** Mr Payne submits that the judge should have excluded this evidence under section 101(3) of the 2003 Act or section 78 of the Police and Criminal Evidence Act 1984, on the basis that it was more prejudicial than probative. Indeed, he submits that the evidence was grossly disproportionate to its probative value. In particular:

(i) The Crown had chosen not to charge any offence in relation to the payment to Mr Tinto;

(ii) Kiria Hughes's evidence was of dubious value, as she had lied in interview and the conversation had taken place several years previously;

(iii) Rosemary Booth was, at the time, a person of good character;

(iv) This was a snippet of conversation, the content of which differed from any of the offending alleged by the Crown in the indictment;

(v) The reference to a payment of £10,000 being received by Rosemary Booth from an elderly resident might well prejudice her in the eyes of the jury, and, without more, could lead the jury to suspect that there was something untoward about the transfer from Mr Tinto; and

(vi) The prejudicial nature of this evidence was increased because there was no other evidence that Rosemary Booth had been materially enriched by any of the residents.

**153** In response, Mr Perry submits that:

(i) This evidence of David Barton and Rosemary Booth conspiring together to tell a lie to police about obtaining a significant sum of money from a resident was of obvious relevance to a central issue between the parties;

(ii) David Barton and Rosemary Booth agreed that a conversation took place, although they disputed Kiria Hughes's evidence as to its content;

(iii) Rosemary Booth could challenge Kiria Hughes's account in cross-examination, and, along with David Barton, give evidence of the conversation;

(iv) The Crown made a formal admission that no allegation was made in respect of the receipt of the money; and

(v) The judge gave a careful direction in relation to the evidence, setting out the competing versions of the evidence, and emphasising that it was to be considered only as one piece of evidence in the case.

**154** There is no suggestion that the judge misdirected himself as to the test to be applied. We agree the evidence was relevant to: (i) the suggested propensity on the part of Rosemary Barton to be untruthful about financial transactions with residents; (ii) the extent to which Rosemary Booth worked closely together with David Barton; and (iii) her propensity to work with David Barton to invent a false explanation for a payment that might be investigated by the police. The evidence could be challenged and

© 2021 The Incorporated Council of Law Reporting for England and Wales

contradicted by Rosemary Booth and David Barton. The issue was addressed appropriately in the summing up and, in our view, was properly admitted. A

*Safety of other counts (5, 16 and 19)*

155 Given we have dismissed all the other grounds of appeal, this ground falls away. We have looked with care at these convictions and are satisfied that they are safe. B

*Sentence: David Barton*

156 David Barton was sentenced to a total of 21 years' imprisonment. The maximum sentence for a single count of theft is seven years and for conspiracy to defraud ten years' imprisonment. He renews his application for leave to appeal against sentence. In his clear and succinct oral submissions, Mr Sastry argued that the total term was manifestly excessive. He submits that although some allowance was made to reflect the principle of totality, it was insufficient. C

157 He further contended that the judge failed sufficiently to allow for the fact that the home was run to an exceptionally high standard and no resident suffered any physical harm or discomfort. D

158 It is accepted that the judge correctly identified the appropriate category for each offence and that the individual sentences are not manifestly excessive. The simple submission is that, having regard to totality, 21 years' imprisonment was far too long for the offending.

159 The following features of the offending are relevant:

(i) David Barton was of good character;

(ii) By contrast, the indictment period was long with multiple victims; E

(iii) This was a very substantial breach of trust involving financial abuse of the elderly coupled with the dishonest attempts to sue the estates of some;

(iv) The sums illegally obtained ran into millions and the conspiracy aimed for more;

(v) The fraudulent behaviour involved a variety of sophisticated devices, including the manipulation of powers of attorney, wills and other legal processes; F

(vi) David Barton involved others in the commission of the offences;

(vii) The victims were persuaded to abandon contact with their families, friends and professional advisors, often by flattery and cajoling, sometimes by persuasion or even threats;

(viii) Although the victims were not subjected to physical harm or discomfort, the psychological consequence of their isolation and the undermining of their relationships with their families, friends and professional advisors had an impact; and G

(ix) Whilst the exploitation was gross, unusually, some of the victims themselves do not appear to have appreciated that they had been exploited.

160 This was an exceptional case involving a high level of exploitative criminality that was targeted at vulnerable elderly individuals, and it undoubtedly merited a long overall sentence of imprisonment. The question for us is whether the total term is manifestly excessive. In respectful disagreement with the experienced judge who presided over the trial, we have concluded that a total sentence of 21 years is manifestly excessive for a man of 64 years of good character when taking into account the features we H

© 2021 The Incorporated Council of Law Reporting for England and Wales

A have identified. In our view, in all the circumstances, the total term was significantly too long.

161 We conclude that a total term of 17 years' imprisonment represents the appropriate custodial term. That can be achieved by reducing the sentence on each of counts 1 and 16 to five years' imprisonment, on each of counts 19 and 22 to seven years' imprisonment, and by ordering the sentence on count 25 to be served concurrently with the other sentences.

B

*Conclusion*

162 The appeals against conviction are dismissed. We give leave to David Barton to appeal against sentence and allow the appeal by reducing the overall sentence from 21 years to 17 years' imprisonment in the way we have indicated.

C

*Application for extension of time granted.*
*Second defendant's application for permission to appeal against conviction granted.*
*Appeals against conviction dismissed.*
D
*First defendant's application for permission to appeal against sentence granted.*
*First defendant's appeal against sentence allowed.*
*Sentence of imprisonment quashed and sentence of 17 years' imprisonment substituted.*
E
*Permission to appeal refused.*

GEORGINA ORDE, Barrister

F

G

H

© 2021 The Incorporated Council of Law Reporting for England and Wales