**R v Grantham [1984] QB 675**

# Exhibit 21

01165-mew Doc 106-22 Filed 07/03/25 Entered 07/03/25 17:38:30 Exhibit
Pg 2 of 13



powers of an arbitrator under clause 35, or its equivalent in other standard forms of contract, will reduce the length of the lists. I say this because our view, if accepted, will virtually give any party a right of veto on any attempt to bypass the arbitration clauses. They will be able to point out that they are thereby being deprived of the benefit of the special powers of the arbitrator under those clauses and they will accordingly have a very strong claim to a stay under section 4 of the Arbitration Act 1950 unless they voluntarily join in a submission to the official referee as an arbitrator. If this reduction in the length of the lists does not occur or seems unlikely to occur, urgent consideration should be given to conferring upon the official referees a power analogous to that contemplated by section 92 of the County Courts Act 1959 [power of judge to refer to arbitration] to enable the official referees, whether sitting as such or as arbitrators, to refer, or sub-refer, the "nuts and bolts" of the suit to a suitably qualified arbitrator for inquiry and report. This would result in the official referees becoming, in effect, the construction industry court, having the same relationship to the construction industry as the Commercial Court has to the financial and commercial activities of the City of London. It could decide questions of principle which are of general interest, leaving it to the individual arbitrators to apply those principles to the details of individual disputes.

For the reasons which I have sought to express, I would dismiss this appeal.

*Appeal dismissed with costs.*
*Leave to appeal refused.*

*Solicitors: Ingledew Botterell Roche & Pybus, Newcastle-upon-Tyne; McKenna & Co.; Bristows Cooke & Carpmael.*

A. H. B.

---

[COURT OF APPEAL]

## REGINA v. GRANTHAM

1984 March 19, 20; 23 — Lord Lane C.J., Boreham and Stuart-Smith JJ.

*Company—Fraudulent trading—Intent—Dishonest prejudice to creditors in payment of their debts proved—Whether sufficient to establish intent to defraud—Companies Act 1948 (11 & 12 Geo. 6, c. 38), s. 332(1)(3) (as amended by Companies Act 1980 (c. 22), s. 80, Sch. 2 and Companies Act 1981 (c. 62), s. 96)*

The appellant, who was a consultant in charge of a company's administration and sole authorised signatory of its cheques, was

tried with others on a count of fraudulent trading, contrary to section 332(3) of the Companies Act 1948,[1] as amended. There A
was evidence that whoever was running the business was intending to deceive or was actually deceiving a person supplying potatoes, in compliance with repeated orders, that he would be paid in 28 days or shortly thereafter and that whoever was running the company knew at the time that there was no hope of the supplier being so paid. The jury were directed that they could find dishonesty and intent to defraud if they found that the appellant B
obtained or helped to obtain credit or further credit when he knew that there was no good reason for thinking funds would become available to pay the debt when it became due or shortly thereafter. He was convicted.

On appeal against conviction on the ground that the judge had misdirected the jury in that it was for the prosecution to prove that the appellant knew at the time at which the debts were incurred that there was no reasonable prospect of the creditors C
ever receiving payment of their debts:—

*Held,* dismissing the appeal, that the direction given did not err, for on a prosecution under section 332 of the Companies Act 1948 an intent to defraud was established on proof of an intention dishonestly to prejudice the creditors in receiving payment of their debts (post, pp. 682D, 684C, 686D–E).

*Welham v. Director of Public Prosecutions* [1961] A.C. 103, D
H.L.(E.); *Reg. v. Terry* [1984] A.C. 374, H.L.(E.); *Reg. v. Sinclair* [1968] 1 W.L.R. 1246, C.A. and *Reg. v. Allsop* (1976) 64 Cr.App.R. 29, C.A. applied.

*In re William C. Leitch Bros. Ltd.* [1932] 2 Ch. 71 and *In re Patrick and Lyon Ltd.* [1933] Ch. 786 considered.

*Held,* further that, when a summing up set out evidence to be regarded with care, the direction was not invalidated by an omission expressly to label facts as potentially corroborative; and E
that, the conviction not being rendered otherwise unsafe or unsatisfactory, the appeal failed (post, pp. 684H—685A).

The following cases are referred to in the judgment:

*Leitch (William C.) Bros. Ltd., In re* [1932] 2 Ch. 71
*Patrick and Lyon Ltd., In re* [1933] Ch. 786
*Reg. v. Allsop* (1976) 64 Cr.App.R. 29, C.A. F
*Reg. v. Sinclair* [1968] 1 W.L.R. 1246; [1968] 3 All E.R. 241, C.A.
*Reg. v. Terry* [1984] A.C. 374; [1984] 2 W.L.R. 23; [1984] 1 All E.R. 65, H.L.(E.)
*Reg. v. Welham* [1960] 2 Q.B. 445; [1960] 2 W.L.R. 333; [1960] 1 All E.R. 260, C.C.A.; sub nom. *Welham v. Director of Public Prosecutions* [1961] A.C. 103; [1960] 2 W.L.R. 669; [1960] 1 All E.R. 805, H.L.(E.)
*Sarflax Ltd., In re* [1979] Ch. 592; [1979] 2 W.L.R. 202; [1979] 1 All E.R. 529 G
*White and Osmond (Parkstone) Ltd., In re* (unreported), 30 June 1960

The following additional cases were cited in argument:

*Cooper (Gerald) Chemicals Ltd., In re* [1978] Ch. 262; [1978] 2 W.L.R. 866; [1978] 2 All E.R. 49
*Cyona Distributors Ltd., In re* [1967] Ch. 889; [1967] 2 W.L.R. 369; [1967] 1 All E.R. 281, C.A. H
*Maidstone Buildings Provisions Ltd., In re* [1971] 1 W.L.R 1085; [1971] 3 All E.R. 363

[1] Companies Act 1948, s. 332(1)(3): see post, p. 680E–H.

*Reg. v. Inman* [1967] 1 Q.B. 140; [1966] 3 W.L.R. 567; [1966] 3 All E.R. 414, C.C.A.
*Reg. v. Schildkamp* [1971] A.C. 1; [1970] 2 W.L.R. 279; [1969] 3 All E.R. 1640, H.L.(E.)

APPEAL against conviction.

The appellant, Paul Reginald George Grantham, on 17 February 1983 at the Crown Court at Northampton (Judge Francis Allen and a jury) was convicted after a trial occupying 27 days on a count charging fraudulent trading, contrary to section 332 of the Companies Act 1948 as amended in connection with the business of a company called Belexpress Ltd. He was sentenced to 15 months' imprisonment and was made the subject of a criminal bankruptcy order. He appealed against conviction on the ground, inter alia, that the judge erred in directing the jury that they could be satisfied that the necessary element of intent to defraud in section 332(1) had been established on proof by the prosecution that the appellant was party to the obtaining by the company of credit or further credit when he knew that there was no good reason for thinking that funds would become available to pay the debt when it became due or shortly thereafter, whereas the judge should have directed the jury that it was for the prosecution to prove that the appellant knew at the time at which the debts were incurred that there was no reasonable prospect of the creditors ever receiving payment. Other grounds of appeal related to matters of fact and corroboration and to the conviction being unsafe and unsatisfactory.

The facts are stated in the judgment.

*Michael Beckman Q.C.* and *Andrew Bright* (assigned by the Registrar of Criminal Appeals) for the appellant. The direction erred in relation to the intent to defraud and what it is about which the jury has to be satisfied before convicting the appellant under section 332 of the Companies Act 1948. The direction runs contrary to long-standing authorities on the intent necessary within section 332.

There is no distinction between fraudulent trading in the civil and the criminal contexts under section 332: *per* Lord Hodson in *Reg. v. Schildkamp* [1971] A.C. 1, 12. It would be strange if it were otherwise.

A penal section is to be strictly construed. The fundamental principle is that, if there is room for doubt, that doubt is to be resolved in favour of the accused: *Schildkamp's* case p. 11; *In re Maidstone Buildings Provisions Ltd.* [1971] 1 W.L.R. 1085, 1094.

As to intent see, *In re William C. Leitch Bros. Ltd.* [1932] 2 Ch. 71, 77, *In re Patrick and Lyon Ltd.* [1933] Ch. 786, 790–791, 792 and also *Pennington, Company Law,* 3rd. ed. (1973), p. 46.

Arrangements made by a company which envisage that creditors may not be paid either on time or shortly thereafter is not fraudulent trading, no matter how immoral others may consider it to be. Fraudulent trading requires that trading must have been carried on with the company known to be in a state of hopeless insolvency and/or with no intention or hope on the part of those concerned that the company's creditors will ever be paid.

*In re Cyona Distributors Ltd.* [1967] Ch. 889 does not support the contrary view. *In re Gerald Cooper Chemicals Ltd.* [1978] Ch. 262, 267,

268, illustrates that "intent to defraud creditors" in section 332 requires a more specific intent than dishonesty or fraud. There must be a "no hope" A situation for the necessary intent to defraud to be established.

*In re Sarflax Ltd.* [1979] Ch. 592, 599, 603, illustrates that the preference of one creditor to the detriment of another is not fraudulent trading.

Perhaps the most powerful exposition of the law on "intent to defraud" in section 332 is *per* Buckley J. in *In re White and Osmond (Parkstone) Ltd.* B (unreported but see *Palmer's Company Law*, 23rd. ed. (1982), vol. 1, para. 85–84 p. 1192). There was evidence that the appellant and those concerned with the company's trading did have reason genuinely to believe that the clouds might roll away and the sunshine of prosperity shine upon them and, therefore, the necessary intent was not established.

*Jeremy Roberts Q.C.* and *Robert Glancy* for the Crown. The proper approach to "intent to defraud" in section 332 is the same as that adopted C in *Welham v. Director of Public Prosecutions* [1961] A.C. 103, which concerns "intent to defraud" under section 4 of the Forgery Act 1913.

What has to be proved is an intention dishonestly to do some act to the prejudice of another. Where it can be shown that the accused has dishonestly induced the victim by some deception to act to his detriment an intent to defraud is made out: *Reg. v. Sinclair* [1968] 1 W.L.R. 1246, D 1249 and *Reg. v. Allsop* (1976) 64 Cr.App.R. 29.

A company which orders goods on, say, four weeks' credit impliedly represents that its financial position is such that it is going to be able to pay in four weeks. If those running the company know (a) that the company is never going to be able to pay, or (b) that the company is not going to be able to pay for a long time after the due date, or (c) that the company does not now have funds to pay and it is a matter of chance E whether it ever will, they may properly be found to be guilty of a dishonest deception in ordering the goods.

There was here ample evidence of an intention dishonestly to prejudice the interests of a creditor of the company. On the facts the direction, taken as a whole, is proper and in accordance with the law. [Reference was made to *Reg. v. Inman* [1967] 1 Q.B. 140]. F

*Beckman Q.C.* replied.

*Cur. adv. vult.*

23 March. LORD LANE C.J. read the following judgment of the court. On 16 February 1983 at the Crown Court at Northampton before Judge G Allen and a jury, the appellant was convicted of fraudulent trading under section 332 of the Companies Act 1948. He was sentenced to 15 months' imprisonment and a criminal bankruptcy order was made against him. He now appeals against conviction by leave of the single judge.

There were three others indicted with him: David Williams, who was acquitted of fraudulent trading; Michael Williams, who was convicted of fraudulent trading and also two counts of being a bankrupt taking part in H the management of a company; and James Peter Stokes, alias Charrington, who was acquitted of fraudulent trading but convicted of being a bankrupt taking part in the management of a company.

The allegation of fraudulent trading arose out of the activities of a
A company called Belexpress Ltd. (hereinafter called "the company"). The period of trading was short, namely from 29 May to 25 June 1980. During that period the company bought 39 loads of potatoes from a supplier in France called Joseph Jacob. The total amount due to Jacob in respect thereof was more than £88,000.

According to the prosecution case the roles played by the various
B individuals were as follows. The appellant carried on business as G. H. Roth & Co. at Thrapston, Northamptonshire, as a business consultant. He also ran a telex service called Rothco Telex Services. He bought the company "off the shelf" in 1978. It traded for a time in livestock and sustained a loss of some £2,000. Michael Williams was a bankrupt. He was involved in managing Rushden Hay and Straw Ltd., of which the appellant had been a secretary from 1977 to 1979. Stokes had dealt
C unsuccessfully in potatoes and had been adjudged bankrupt in 1980. He was in debt to the tune of £8,000 to £10,000 to Wagstaff (Sandy) & Co. Ltd., importers and exporters which was run by two men, Ellis and Watts.

It was clear from the correspondence that by October 1979 the appellant, Ellis and the Williams brothers were considering dealing in potatoes. The appellant would benefit by charging consultancy fees and
D also fees in respect of his telex company, Ellis by selling the potatoes and charging commission and handling charges, and Michael Williams for sundry services in connection with transporting the potatoes. Ellis introduced Stokes to the consortium, and Stokes thenceforward operated under the assumed name of Charrington. Stokes spoke French.

On 11 March 1980 the appellant registered the company as carrying
E on the business of importer of root crops under the name of East Midlands Potato Co. The appellant resigned his former position in the company, but he remained the sole authorised signatory of the cheques. He was to be the "consultant" in charge of administration and holder of the purse-strings. Stokes was to do the negotiation and purchasing. The Williams brothers were to do the transportation and Ellis and Watts the onward sales on commission.

F There were two main issues to be decided. First, was this business carried on dishonestly by way of fraud upon a creditor, namely, Joseph Jacob? Secondly, if so, was the appellant party to the dishonesty and fraud?

As to the second issue, the appellant and Stokes were in conflict. Stokes's case was that the appellant had used him as a "front man," that
G he had signed documents without knowing their contents or significance, and that he had severed connection with the company as soon as he realised that Jacob was not being paid. The appellant's case on the other hand was that he had no knowledge of the details of the potato dealings of the company; that at all material times he acted as no more than an administrator in accordance with instructions given to him by Stokes, the
H managing director; that he remained sole signatory to the company's cheques only because Stokes was difficult to reach and had requested him so to do. He asserted that he did not know that the potatoes were being sold at a loss.

At this point it may be of interest to see the destination of such funds as came into the hands of the company. The prices realised for the A potatoes sold by Jacob for £88,000 totalled £68,000. Ellis was consistently selling the potatoes for less than their purchase price and often for less than their true price. He asserted that he had nothing to do with ordering the potatoes and did not know the purchase price. His charges alone amounted to over £15,000. He remitted some £53,000 to East Midlands Potato Co. (i.e, the company). Of this £5,500 went in fees to G. H. Roth B & Co. (the appellant), £825 to Rothco Telex (the appellant), over £14,000 to Rushden Hay and Straw Ltd. (Williams), and about £5,500 to the hauliers who carried the potatoes from Williams's farm to the market. Joseph Jacob was not so lucky, he only received £19,668 towards his legitimate entitlement of £88,000.

Much of the trouble was caused by the fact that within a day or two C of the commencement of trading the potato market collapsed. This did not deter those who were running the company from continuing to pursue their course of purchases unabated.

There was, in short, ample evidence that the company was being operated dishonestly. Indeed had there been a charge of conspiracy laid against the appellant, it would, questions of jurisdiction apart, probably have succeeded. From the outset no, or no sufficient, capital was available. D No overdraft facilities were sought. There was some suggestion in the later stages that the situation might be retrieved by trading in other commodities, or by raising a loan from a merchant bank or by introducing fresh backers, but nothing came of these suggestions.

Mr. Beckman's first complaint is that the judge misdirected the jury as to what it was upon which they had to be satisfied before convicting the E appellant under section 332 of the Companies Act 1948 as amended.

Section 332(3) provides:

> "Where any business of a company is carried on with such intent or for such purpose as is mentioned in subsection (1) of this section, every person who was knowingly a party to the carrying on of the business in manner aforesaid, shall be liable on conviction on indict- F ment to imprisonment . . ."

Section 332(1) provides:

> "If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any G fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory of the company, may, if it thinks proper so to do, declare that any persons who were knowingly parties to the carrying on of the business in manner aforesaid shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the court may direct." H

The passages in the summing up which are relevant to this ground of appeal are as follows:

A "As against the individual, the individual defendant, the prosecution have to prove first that he took an active part in carrying on the business. That is the first thing. They then have to prove that in doing so he had an intention to defraud creditors and thirdly they have to prove that he was acting dishonestly. . . . I go on to consider the position on the assumption that in respect of the man you are considering you answer that one in the affirmative, 'He was playing B an active part.' The prosecution have then got to prove that he had an intent to defraud creditors and was acting dishonestly. Members of the jury, my direction, as a matter of law, to you with regard to what is meant by intent to defraud is this. A man intends to defraud a creditor either if he intends that the creditor shall never be paid or alternatively if he intends to obtain credit or carry on obtaining credit when the rights and interests of the creditor are being prejudiced in C a way which the defendant himself knows is generally regarded as dishonest. . . . Some fraudulent traders intend from the outset never to pay or never to pay more than a fraction of the debt. If that is true in your view in this case then the intent to defraud would be made out but a trader can intend to defraud if he obtains credit when there is a substantial risk of the creditor not getting his money or not D getting the whole of his money and the defendant knows that that is the position and knows he is stepping beyond the bounds of what ordinary decent people engaged in business would regard as honest.

"Members of the jury, if a man honestly believes when he obtains credit that although funds are not immediately available he will be able to pay them when the debt becomes due or within a short time thereafter, no doubt you would say that is not dishonest and there is E no intent to defraud but if he obtains or helps to obtain credit or further credit when he knows there is no good reason for thinking funds will become available to pay the debt when it becomes due or shortly thereafter then, though it is entirely a matter for you this question of dishonesty, you might well think that is dishonest and there is an intent to defraud."

F It is that final passage of which complaint is made. It is submitted that that direction runs counter to authorities which have emanated from the Chancery Division in respect of section 332(1) or predecessors to that section.

The first case of relevance is *In re William C. Leitch Bros. Ltd.* [1932] 2 Ch. 71, 77; Maugham J. had this to say about the corresponding G provision of the Companies Act 1929:

"In my opinion I must hold with regard to the meaning of the phrase carrying on business 'with intent to defraud creditors' that, if a company continues to carry on business and to incur debts at a time when there is to the knowledge of the directors no reasonable prospect of the creditors ever receiving payment of those debts, it is, H in general, a proper inference that the company is carrying on business with intent to defraud: . . ."

The same judge in the following year, in *In re Patrick and Lyon Ltd.* [1933] 1 Ch. 786, 790 reverted to the topic in the following words:

> ". . . I will express the opinion that the words 'defraud' and 'fraudulent purpose,' where they appear in the section in question, are words which connote actual dishonesty involving, according to current notions of fair trading among commercial men, real moral blame. No judge, I think, has ever been willing to define 'fraud,' and I am attempting no definition. I am merely stating what, in my opinion, must be one of the elements of the word as used in this section." A

Basing himself principally on these two passages, Mr. Beckman submits that the judge ought to have directed the jury that it was for the prosecution to prove that the appellant knew at the time at which the debts were incurred that there was no reasonable prospect of the creditors *ever* receiving payment of their debts. B

It should be noted however, in relation to the two cases just cited, that Maugham J. was expressly disavowing any intention to define "fraud." C Moreover he was not having to direct a jury in general as to the meaning of the section in question.

What the judge in the present case was doing was to direct the jury in the first passages as to the general meaning of the section and, then, in the later passage as to which complaint is made, directing the jury that it was possible for them, if they thought fit, to come to the conclusion that the appellant was acting dishonestly and fraudulently if he realised at the D time when the debts were incurred that there was no reason for thinking that funds would become available to pay the debt when it became due or shortly thereafter. We do not think that the judge was in error in this direction.

Mr. Beckman however relied further upon a passage in *Palmer's Company Law,* 23rd. ed. (1982), vol. 1, para. 85-84, p. 1192 wherein is E to be found a passage from the decision of Buckley J. in *In re White and Osmond (Parkstone) Ltd.* (unreported), 30 June 1960:

> "In my judgment, there is nothing wrong in the fact that directors incur credit at a time when, to their knowledge, the company is not able to meet all its liabilities as they fall due. What is manifestly wrong is if directors allow a company to incur credit at a time when F the business is being carried on in such circumstances that it is clear that the company will *never* be able to satisfy its creditors. However, there is nothing to say that directors who genuinely believe that the clouds will roll away and the sunshine of prosperity will shine upon them again and disperse the fog of their depression are not entitled to incur credit to help them to get over the bad time." G

We have been fortunate enough to run to earth a transcript of the whole of that judgment. The judge eventually decided in favour of the trader on the basis that, although he might have been guilty of insufficient care and supervision of his business, he could not be said, in the words of Maugham J., to have been guilty of real moral blame so as to justify the judge in saying that he ought to be liable for the debts of the company H without limit. In other words, he acquitted the trader of dishonesty—an essential ingredient to liability. In so far as Buckley J. was saying that it is never dishonest or fraudulent for directors to incur credit at a time

when, to their knowledge, the company is not able to meet all its liabilities
A as they fall due, we would respectfully disagree.

We are fortified in this conclusion by the speeches of their Lordships in *Welham v. Director of Public Prosecutions* [1961] A.C. 103. The case concerned the meaning of the words "intent to defraud" under section 4 of the Forgery Act 1913, but in our judgment their Lordships' observations are equally applicable to the meaning of the similar words in section 332
B of the Companies Act 1948.

In *Welham's* case Lord Radcliffe said, at p. 123:

> "Now, I think that there are one or two things that can be said with confidence about the meaning of this word 'defraud.' It requires a person as its object: that is, defrauding involves doing something to someone. Although in the nature of things it is almost invariably
> C associated with the obtaining of an advantage for the person who commits the fraud, it is the effect upon the person who is the object of the fraud that ultimately determines its meaning."

The Common Serjeant's direction in *Welham,* which was approved both by the Court of Criminal Appeal and the House of Lords, was as follows (see [1960] 2 Q.B. 445, 456):

> D "They (the prosecution) have got to prove an intent to defraud, and Welham's own case is that the intention here in respect of these bogus documents was to defraud the capital issues committee by deceiving them in not preventing something which it was their duty in law to prevent . . ."

In the present case it was open to the jury to find, if not inevitable
E that they would find, that whoever was running this business was intending to deceive or was actually deceiving Jacob into believing that he would be paid in 28 days or shortly thereafter, when they knew perfectly well that there was no hope of that coming about. He was plainly induced thereby to deliver further potatoes on credit. The potential or inevitable detriment to him is obvious.

If further authority is required that such actions may amount to an
F intent to defraud, it is to be found in *Reg. v. Sinclair* [1968] 1 W.L.R. 1246. In that case the trial judge had directed the jury, at p. 1249:

> "It is fraud if it is proved that there was the taking of a risk which there was no right to take which would cause detriment or prejudice to another. . . . you have to be sure that it was deliberate dishonesty . . ."

G
The Court of Appeal (Criminal Division) approved that direction. In *Reg. v. Allsop* (1976) 64 Cr.App.R. 29, the Court of Appeal (Criminal Division) held that a person is guilty of fraud if he intends by deceit to induce a course of conduct in another which puts that other's economic interests in jeopardy, even though he does not intend that actual loss should ultimately be suffered by that other.

H The problem seems to be resolved by the decision in *Reg. v. Terry* [1984] A.C. 374, a case which eluded the researches of counsel. There Lord Fraser of Tullybelton, in a speech with which their Lordships all agreed, said, at pp. 380–381:

> "*Welham* was considered by the Court of Appeal in *Manners-Astley* [1967] 1 W.L.R. 1505, where the appellant had been convicted of fraudulently using an excise licence contrary to section 17(1) of the Act of 1962 by displaying a vehicle licence issued for one vehicle on another vehicle. The Court of Appeal quashed the conviction on two grounds, one of which was that the jury had not been directed to consider whether the appellant had intended to defraud the excise by avoiding payment of the licence fee. The Court of Appeal distinguished the decision in *Welham* as being one limited to cases under the Forgery Act 1913. In taking that limited view of the decision the court were, in my respectful opinion, wrong. The speeches in *Welham* were directed to the meaning of 'intent to defraud' in general and were not limited to its meaning in the Forgery Act."

In the light of those considerations we conclude that the judge's directions on intent in the present case are in accordance with the law.

Reference was made by Mr. Beckman to dicta which properly differentiate between a customer on the one hand and a creditor properly so called on the other. There can be no doubt that Jacob was a creditor and we need not therefore examine these dicta further.

Mr. Beckman further submits that the appellant had done no more than prefer himself, in the shape of Rothco Telex and G. H. Roth & Co., to another creditor, Jacob. This, he submits, on the strength of the decision of Oliver J. in *In re Sarflax Ltd.* [1979] Ch. 592, is not fraud. In that case it was held that it was not per se fraudulent within section 332 where a debtor, knowing or having good grounds to suspect that he has not and will not have sufficient assets to pay all his creditors in full, pays some but not others with the consequence that some creditor is either not paid at all or is paid a lesser proportion of his debt than that which is paid to the other creditors.

In the present case, however, there was a great deal more than the bare fact of preferring one creditor to another as was the case in *Sarflax*. Here Jacob was allowed or induced to continue to supply potatoes with no real prospect of being paid at the due date.

The next ground of appeal concerns corroboration. There were three individuals whose activities were sufficiently suspect to warrant some form of warning being given to the jury. First there was Stokes, who was also a defendant. The judge gave the jury an appropriate direction in regard to him, being careful to hold the difficult balance between two co-defendants in these circumstances. Secondly, there were Ellis and Watts. These two were plainly possible participants in any fraud. The judge gave an impeccable accomplice warning in respect of them.

The two criticisms made of the judge were these: (1) that the judge failed, having mentioned the desirability of corroboration, to direct the jury as to what might amount to corroboration; and (2) that he failed to warn the jury that one accomplice could not corroborate the other.

As to the first complaint, although the judge did not in terms refer to it as potentially corroborative evidence, he did in fact set out all such evidence in detail immediately after saying: "That is all evidence from sources which I have told you to regard with some considerable care: Mr.

A Ellis, Mr. Watts and Mr. Charrington (Stokes). That is not, of course, the only evidence that the prosecution invite you to look at in respect of this matter. . . ." We do not take the view that an omission expressly to label the facts which follow as potentially corroborative in any way invalidates his direction.

That leaves the second complaint. In order to understand the appellant's submissions on this point it is necessary to go rather deeper into B one aspect of the facts than would normally be necessary or desirable on a point such as this.

The evidence which Ellis and Watts gave as to the organisation of the company and the roles played by the various dramatis personae added little or nothing to what was contained in the correspondence passing between the appellant and others which was already before the jury. There was only one aspect of the facts as to which their evidence might C possibly have had some effect, and that only indirectly. One of the documents before the jury was a letter dated 17 August 1980, purported to have been sent from Brittany by Stokes to the appellant. This was on the face of it a farewell letter. Stokes said to the police, and in evidence, that that was one of the documents he had been induced to sign by the appellant. The appellant on the contrary said that the letter had arrived D by post at Thrapston and that he believed it to be genuine. Stokes said it was at a meeting at the Waldorf Hotel in London that he had signed the letter at the appellant's request. The appellant said as to that, "there is considerable doubt about that in my opinion." Ellis and Watts said that there had been such a meeting at the Waldorf; that they had been at the hotel with Stokes, though they had no knowledge of what had transpired between Stokes and the appellant, or of the letter. They added nothing E one way or the other to the controversy about the authenticity of the letter.

The question of the meeting at the Waldorf Hotel formed no part of the Crown's case. It was an issue which arose between Stokes and the appellant and depended upon the view which the jury took of their evidence. It is true that in so far as it went, the evidence of Ellis and F Watts tended to support that of Stokes. We do not think, however, that in such a situation it was necessary for the judge to do more than he did in identifying the evidence which supported Stokes's account or to say that one accomplice could not corroborate another. Indeed had he done so, it might well have unfairly weighted the scales against Stokes.

Even if the judge should have warned the jury not to regard the evidence of Ellis and Watts as corroborative of each other or of Stokes, G it could have made no difference to the view which the jury took of the letter of 17 August 1980, or to the outcome of the case. If any irregularity was a material one, we would apply the proviso to section 2(1) of the Criminal Appeal Act 1968.

The final point taken on behalf of the appellant also arises out of the Waldorf incident in the following way. Stokes put no date on the meeting, H save that it was on a day in August in the early afternoon. Both Ellis and Watts put the meeting on 13 August, but in the early evening. The appellant adduced evidence, not disputed, that he could not have been at the Waldorf in the early afternoon on 13 August.

In his final speech to the jury counsel for Stokes suggested, we are told, for the first time that the meeting at the Waldorf might have been A not on 13 but on 14 August. The appellant's notice of appeal complains in the following terms of that suggestion by counsel: ". . . of which no evidence had been given and with which the appellant had no opportunity of dealing by way of alibi evidence which it would have been open to him to call." No application was made to adduce such evidence. It does appear from the appellant's diary that he was in fact in London on that date in B August.

Mr. Beckman now complains that the judge should have warned the jury that there was no evidence that the meeting took place on 14 August. We do not think that the judge was under any such obligation, nor that counsel for Stokes by making the suggestion that he did rendered the conviction unsafe or unsatisfactory.

The appeal is accordingly dismissed. C

*Appeal dismissed.*
*Application for certificate under section 33(2) of the Criminal Appeal Act 1968 adjourned.*
*Leave to appeal refused.* D

26 March. Certificate that a point of law of general public importance was involved in the decision, namely, "In a prosecution under section 332 of the Companies Act 1948 (as amended) is it sufficient to establish an intent to defraud for the prosecution to prove an intention dishonestly to prejudice the interests of creditors in receiving payment of their debts or must the prosecution prove an intention that the creditors should never E be paid at all?"

*Solicitors: Director of Public Prosecutions.*

L. N. W.

F

---

[COURT OF APPEAL]

## REGINA v. CRIPPS, *Ex parte* MULDOON AND OTHERS

G

1984 March 21; April 3 — Sir John Donaldson M.R., Fox and Stephen Brown L.JJ.

*Local Government—Election—Petition—Costs—Petitioners awarded three-quarters of "costs properly incurred" at close of hearing—Court's subsequent direction as to intention—Whether permissible under "slip rule" or otherwise—Whether commissioner functus officio—Representation of the People Act 1949 (12, 13 & 14 Geo. 6, c. 68), ss. 115(6), 125, 137(3)—R.S.C., Ord. 20, r. 11* H

The petitioners presented a local election petition alleging that the respondent, the successful candidate, and his agent had