# R v Karemera [2018] EWCA Crim 1432

# Exhibit 22

Court of Appeal

# *Regina *v* Karemera and others

## [2018] EWCA Crim 1432

2018 May 9, 10; June 26 — Hallett LJ, Green, Soole JJ

*Crime — Human trafficking — Ingredients of offence — Trafficking person within United Kingdom for exploitation — Guidance as to ingredients of offence — Asylum and Immigration (Treatment of Claimants etc) Act 2004 (c 19), s 4(1A) (as substituted by Protection of Freedoms Act 2012 (c 9), s 110)*

The defendants were charged with five counts of trafficking a person within the United Kingdom for exploitation, contrary to section 4(1A) of the Asylum and Immigration (Treatment of Claimants etc) Act 2004[1]. The prosecution case was that the defendants, who were convicted drug dealers, controlled and operated county supply lines which used teenagers as drug couriers. On each count the prosecution alleged that the defendant had "intentionally arranged or facilitated" a courier's travel within the United Kingdom "with a view to the exploitation" of the courier, for the purposes of section 4(1A). In particular, it was alleged that the defendant had "intended to exploit", or "believed that another person was likely to exploit", the courier, within section 4(1C), since the courier had been used to provide services having been "chosen" for that purpose on the grounds that he was young, within section 4(4)(d). At the start of the trial the defendants made a submission of no case to answer, contending that there was insufficient evidence of the various ingredients of the offence. The judge allowed the application and discharged the jury.

On the Crown's appeal—

*Held*, allowing the appeal, (1) that the interpretation to be given to the Asylum and Immigration (Treatment of Claimants etc) Act 2004 should be one that accorded with the statutory purpose of protecting the vulnerable from trafficking with a view to exploitation, including protecting them from their own decision-making; that, accordingly, on a prosecution under section 4(1A) of the 2004 Act the Crown did not have to prove a lack of consent on the part of the victim or any element of coercion nor did such a prosecution depend on the ability of the Crown to call the victim; that, further, the words "arranging" and "facilitating" in section 4(1A) of the Act should be given a broad construction; that, thus construed, "arranging" the travel of a person would include such matters as transporting that person, procuring a third party to transport that person, or buying a ticket for that person and "facilitating" travel, which was different from "arranging", would include making such travel easier; and that it was possible that in some circumstances simply instructing a person to travel to a particular place would amount to "arranging or facilitating" that person's travel, although that would depend on the facts of the case (post, paras 44–47, 60–61).

(2) That if the Crown was relying on section 4(4)(d), it would be necessary to prove (i) that the trafficked person had been chosen on the grounds that he was young and (ii) that he had been chosen on the grounds that a person without the youth would have been likely to refuse to be used for the purpose for which the trafficked person had been chosen; that, in other words, the Crown would have to establish that both grounds were factors, possibly amongst many others, which formed part of the defendant's thinking when choosing the person he had, but not that they were the only or main reasons for the choice; and that, since section 4(4)(d) concerned the grounds for the defendant's choice, it was not necessary to prove that a person without youth would, in fact, have been likely to refuse (post, paras 52–55, 59).

[1] Asylum and Immigration (Treatment of Claimants, etc) Act 2004, s 4: see post, para 15.

© 2019 The Incorporated Council of Law Reporting for England and Wales

(3) That, applying those principles, the judge had erred in (i) concluding that, for the purposes of section 4(4)(d), the youth of the victim had to be the sole ground for his having been chosen by the defendant, (ii) considering that it was relevant to consider whether the victim was a willing volunteer and (iii) placing too great an emphasis on the fact that there was no evidence that any of the defendants could be said to have recruited the various victims; that, taking all the evidence into account and the Crown case at its highest, there was sufficient evidence to go to the jury on all counts; and that, accordingly, the judge had erred in finding that there was no case to answer and a retrial before a different judge would be ordered (post, paras 63, 76, 80).

The following cases are referred to in the judgment of the court:

*R v Hennigan* [1971] 3 All ER 133; 55 Cr App R 262, CA
*R v Hughes (Michael)* [2013] UKSC 56; [2013] 1 WLR 2461; [2013] 4 All ER 613; [2014] 1 Cr App R 6, SC(E)
*R v Joseph (Verna)* [2017] EWCA Crim 36; [2017] 1 WLR 3153; [2017] 1 Cr App R 33, CA
*R v K (M)* [2018] EWCA Crim 667; [2019] QB 86; [2018] 3 WLR 895; [2018] 3 All ER 566; [2018] 2 Cr App R 14, CA
*R v K (S)* [2011] EWCA Crim 1691; [2013] QB 82; [2012] 3 WLR 933; [2012] 1 All ER 1090; [2011] 2 Cr App R 34, CA
*R v Kimsey* [1996] Crim LR 35, CA
*R v Skelton* [1995] Crim LR 635, CA

No additional cases were cited in argument.

The following additional cases, although not cited, were referred to in the skeleton arguments:

*R v Masih (Younis)* [2015] EWCA Crim 477, CA
*R v Saleh (Aziz)* [2012] EWCA Crim 484, CA

**APPEAL** under section 58 of the Criminal Justice Act 2003

The defendants, Michael Karemera, Dean Alford and Gledi Wabelua, were charged in October 2016 on an indictment which contained five counts of trafficking a person within the United Kingdom for exploitation, contrary to section 4(1A)(b) of the Asylum and Immigration (Treatment of Claimants etc) Act 2004. Each count related to the alleged trafficking of a named drugs courier. The trial commenced on 22 January 2018. On 9 February 2018 Judge Downing ruled that there was no case to answer. Her written reasons were provided three days later. On 13 February 2018 the Crown informed the court that it intended to appeal under section 58 of the Criminal Justice Act 2003 and at the same time gave the mandatory acquittal undertaking pursuant to section 58(8) of that Act. The jury was discharged.

The facts and grounds of appeal are stated in the judgment of the court, post, paras 6–14 and 18.

*Kate Bex QC* and *Paul Evans* (instructed by *Crown Prosecution Service, London South*) for the Crown.

*Eloise Marshall QC* and *Kelly Cyples* (instructed by *Carter Moore Solicitors*) for the defendant Karemera.

*Tim Moloney QC* and *Nicholas Alexander* (instructed by *LLM Solicitors*) for the defendant Alford.

© 2019 The Incorporated Council of Law Reporting for England and Wales

*Hugh Davies QC* and *Yogain Chandarana* (instructed by *Boothroyds Solicitors*) for the defendant Wabelua.

The court took time for consideration.

26 June 2018. **HALLETT LJ** handed down the following judgment of the court.

*Background*

1 This is a judgment of the court to which all members have contributed. It concerns the use of "county drug lines". To avoid detection and promote the supply of drugs, drug dealers run "county drug lines" using couriers, often teenagers, to take drugs from a large city to towns some distance away. The use of county drug lines is a very worrying development and is a method of supplying drugs that is becoming increasingly prevalent.

2 On 28 January 2016, Karemera ("MK"), Alford ("DA"), Wabelua ("GW") and others were tried before Judge Downing in the Crown Court at Woolwich on charges of conspiracy to supply cocaine and conspiracy to supply heroin ("the first indictment"). GW pleaded guilty. MK and DA were convicted. Judge Downing bore in mind a statutory aggravating factor that both MK and DA had used one named courier ("SZ") who was under 18. MK was sentenced to ten years' imprisonment, DA to 11 years' imprisonment and GW to six years' imprisonment. The appeals of MK and DA against sentence were refused.

3 In an attempt to deter drug dealers from using the county drugs line system and from exploiting the vulnerable as couriers, the defendants were charged in October 2016 on a second indictment, with which we are concerned. It contained five counts of trafficking a person within the United Kingdom for exploitation, contrary to section 4(1A)(b) of the Asylum and Immigration (Treatment of Claimants etc) Act 2004. Each count relates to the alleged trafficking of a named drugs courier who did not feature in the first trial.

4 An application to dismiss the counts was heard by Judge McCreath, the Honorary Recorder of Westminster. In March 2017 he refused the application. It was then listed for trial before Mr Recorder Aaronberg QC in August 2017. The defence made an abuse of process application before him, based on the assertion that the prosecution was founded on the same facts or arose from the same incidents as were covered by the first indictment. Having heard detailed submissions over nine court days, and in a very thorough analysis of the issues, the Recorder accepted the Crown's argument that the parties were always aware of the possibility of the present proceedings, and the Crown had not relied on any evidence in the previous trial that related to the named couriers who are the subject of the present counts. He refused the applications. However, the court had run out of time to try the case and it was adjourned.

5 The three defendants were tried on the present indictment again before Judge Downing and the trial commenced on 22 January 2018. On 9 February 2018, the judge ruled that there was no case to answer. Her written reasons were provided three days later. On 13 February 2018 the prosecution informed the court that it intended to appeal under section 58 of the Criminal Justice Act 2003 ("the CJA") and at the same time gave the

© 2019 The Incorporated Council of Law Reporting for England and Wales

mandatory acquittal undertaking pursuant to section 58(8) of that Act. The jury was discharged. No expedition was ordered. The prosecution also nominated six other rulings made by the judge that they have sought to appeal (pursuant to section 58(7) of the CJA).

*The prosecution case*

**6** The convictions followed police "Operation Pibera" into the supply and distribution of class A drugs from London to towns and cities on the south coast. In the present case the county drug line operated between Lewisham in London to Portsmouth. In summary, a buyer in Portsmouth placed an order for drugs by ringing a dealer's telephone in London. The dealer telephones were operated by members of the drugs supply team. The holder of the dealing phone ascertained the buyer's location. A courier was chosen, and the dealer called the courier to arrange a rendezvous. Travel was arranged or facilitated, the courier was given the drugs and instructions as to their destination. Further instructions were given as they made their journey to Portsmouth and while they were in Portsmouth. The courier would sometimes be accommodated by a local resident also involved in the supply. The courier made their deliveries and returned with the proceeds to London. If the courier was to make another supply, they would be given more drugs.

**7** The prosecution case was that there were three supply lines, all of which employed the same system. The Mitch Line was controlled and operated by MK, the Duffy Line by DA and the Fly line controlled by GW. There were people above and below them in the hierarchy. Five of the couriers used were under 18 and one was an adult described as having a mental illness. The present charges focused on their alleged exploitation.

**8** We are only concerned with the allegations in respect of the five child couriers because on 24 January 2018 the judge ordered the separate trial of count 1 in relation to the adult. The five children were three girls aged 14, 15 and 16 and two boys aged 15 and 16. The prosecution case was that the five were chosen as couriers because of their youth and because someone older would have been likely to refuse. DC Mark Wright (retired) gave evidence explaining how the system of a county drug line and running drugs works and the advantages of using children. None of the children alleged to have been trafficked was prepared to attend court and the prosecution invited the jury to consider the unlikelihood of it being coincidence that all five couriers doing this job at this level were children and therefore to conclude that they were chosen for the reasons identified by DC Wright.

**9** The defendants were arrested on charges of supplying drugs and trafficking on 10 September 2014.

*The counts on the trial indictment*

**10** Count 1 concerned MK and DA using a 16-year-old girl ("JA"). JA was apprehended by police having arrived at a Portsmouth address carrying cocaine on 20 March 2014. Mobile telephone evidence connected her with MK and DA, showed that she had made six trips to Portsmouth from 6 to 20 March 2014 and had met with the two defendants on four occasions during that period. The supply lines sent messages suggestive of drugs availability coinciding with her trips.

© 2019 The Incorporated Council of Law Reporting for England and Wales

11 Count 2 concerned MK and DA using a 15-year-old boy ("TT"). TT was found in premises in Portsmouth in possession of £565 and quantities of cocaine and heroin during a search on 10 April 2014. Mobile telephone evidence connected him with MK and DA and showed that he had made five trips to Portsmouth from 4 to 10 April 2014 and placed him in close vicinity suggestive of meeting with MK and DA on four occasions during that period. The supply lines sent messages suggestive of drugs availability coinciding with his trips.

12 Count 3 concerned DA using a 15-year-old girl ("AMcK"). During the course of surveillance on an address in Portsmouth AMcK was seen to leave and conduct drug exchanges. She was arrested and was found to be in possession of crack cocaine and heroin. The address was searched where further quantities of class A drugs were recovered. Text messages giving instructions, mobile telephone traffic and cell siting connected her with DA. The supply line sent messages suggestive of drugs availability coinciding with her trip.

13 Count 4 concerned DA using a 14-year-old girl ("MeK"). MeK was stopped in Portsmouth on 28 May 2014 having been observed engaging in a suspected drug transaction. She was searched and was found to be in possession of a number of wraps of crack cocaine and heroin. She also had £328 cash. Text messages giving instructions, mobile telephone traffic and cell siting connected her with DA. The supply line sent messages suggestive of drug availability coinciding with her trip.

14 Count 5 concerned GW using a 16-year-old boy ("MW"). On 25 April 2014 police observed a male conducting a drug exchange and followed him to an address in Portsmouth. There they found MW. Drugs, cash and two mobile telephone handsets were seized from a man in the property. On 29 July 2014 MW was stopped with others in a motor vehicle in SE12 and found to be in possession of wraps of crack cocaine. Text messages giving instructions, mobile telephone traffic and cell siting connected him with GW and showed that they had met. The Fly supply line sent messages suggestive of drugs availability coinciding with his trip.

*Grounds of appeal: the ruling of no case to answer*

15 We begin with the last but most important ground relating to the ruling of no case to answer. This turns, in part, on the interpretation of section 4 of the Asylum and Immigration (Treatment of Claimants, etc) Act 2004, as amended. It provides:

> "(1A) A person ('A') commits an offence if A intentionally arranges or facilitates— (a) the arrival in, or entry into, the United Kingdom or another country of another person ('B'), (b) the travel of B within the United Kingdom or another country, or (c) the departure of B from the United Kingdom or another country, with a view to the exploitation of B.
>
> "(1B) For the purposes of subsection (1A)(a) and (c) A's arranging or facilitating is with a view to the exploitation of B if (and only if)— (a) A intends to exploit B, after B's arrival, entry or (as the case may be) departure but in any part of the world, or (b) A believes that another person is likely to exploit B, after B's arrival, entry or (as the case may be) departure but in any part of the world.

© 2019 The Incorporated Council of Law Reporting for England and Wales

"(1C) For the purposes of subsection (1A)(b) A's arranging or facilitating is with a view to the exploitation of B if (and only if)— (a) A intends to exploit B, during or after the journey and in any part of the world, or (b) A believes that another person is likely to exploit B, during or after the journey and in any part of the world." A

"(4) For the purposes of this section a person is exploited if (and only if)— (a) he is the victim of behaviour that contravenes article 4 of the Human Rights Convention (slavery and forced labour), (b) he is encouraged, required or expected to do anything— (i) as a result of which he or another person would commit an offence under section 32 or 33 of the Human Tissue Act 2004 as it has effect in the law of England and Wales, or (ii) which, were it done in England and Wales, would constitute an offence within sub-paragraph (i), (c) he is subjected to force, threats or deception designed to induce him— (i) to provide services of any kind, (ii) to provide another person with benefits of any kind, or (iii) to enable another person to acquire benefits of any kind, or (d) a person uses or attempts to use him for any purpose within sub-paragraph (i), (ii) or (iii) of paragraph (c), having chosen him for that purpose on the grounds that— (i) he is mentally or physically ill or disabled, he is young or he has a family relationship with a person, and (ii) a person without the illness, disability, youth or family relationship would be likely to refuse to be used for that purpose." B C D

**16** "Young" and "youth" are not defined in the Act, but to be consistent with similar definitions deployed elsewhere (see, for example, section 1(2) of the Family Law Reform Act 1969), we were invited to proceed on the basis that it means under 18 years. The 2004 Act was in force from 6 April 2013 to 31 July 2015 when it was replaced by the Modern Slavery Act 2015. However, the definition of exploitation as applied to children (section 3(6) of the Modern Slavery Act 2015) remains unchanged. E

**17** The prosecution put its case upon the basis that each defendant intentionally arranged or facilitated the travel of a named young courier intending to exploit the courier or believing that they would be exploited by someone else in the supply chain by using them to provide the services of a drug runner. Although, as we pointed out in argument, it was not necessary for the Crown to prove that each defendant specifically chose the child courier as opposed to intending to do so or believing it was likely that someone else would do so, the Crown chose to present their case to the jury and to the judge in that way. F

**18** The submissions of no case to answer were directed at there being insufficient evidence in respect of each count of arranging or facilitating travel; or that the individual defendant (Person A) chose Person B; or that Person A did so on the grounds that Person B was young and that an adult would be likely to have refused to do the same thing. G

**19** In her initial ex tempore ruling the judge stated she was not persuaded that the children were "chosen" by the defendants on the grounds of youth and was "equally unconvinced" that there was sufficient evidence of arranging or facilitating travel. She concluded there was no evidence of personal contact between the defendants and the children and having placed considerable limitations on the evidence of DC Wright she decided there was no evidence of choice on the ground of youth. She declared that she H

© 2019 The Incorporated Council of Law Reporting for England and Wales

A profoundly disagreed with the suggestion that the children "were deprived of the ability to consent".

20 The reasoning in the subsequent written ruling was different, for example the judge now stated that she "would have hesitated to have found that a jury could not have drawn an inference that the contact (between the defendants and the couriers) was about travel". Ms Bex QC, for the Crown, B decided to focus on the written ruling.

21 Ms Bex gave a number of examples of the judge's alleged errors in withdrawing the case from the jury but in essence she attacked the judge's acceptance of the argument then advanced by the defence that the Crown had to prove that the courier's youth was the sole ground for the choice in subsection (1C)(d)(i) and that the failure to call the couriers was fatal to the Crown's case. The judge noted that the phrase on the grounds of being C young was not qualified by the word "solely" in the subsection, yet she read "solely" into the subsection because of the phrase "if (and only if)" at the beginning of section 4(4). The judge then noted that the couriers may have been willing volunteers and had not been called to disavow that possibility. She observed that:

> D "the refusal of the children themselves to give evidence does not seem to me to have closed the possible avenues of evidence to support the case that the choice must have been solely on their age and to assist perhaps in the hypothetical questions that but for their youth these children would not have accepted."

22 There is nothing in the 2004 Act that explicitly requires youth to be E the sole or determinative characteristic behind a decision to use him or her. Accordingly, Ms Bex submitted that age of the courier will be a significant factor but not to the exclusion of all else. Also, the "hypothetical question" posed by the judge is whether an adult would have been likely to refuse and not whether a child would have accepted.

23 Ms Bex placed considerable emphasis on the fact that there is no F requirement for the prosecution to prove the absence of consent or lack of willingness on the part of the child. The legislation is intended to protect children and other vulnerable people from exploitation and that may mean protecting them from themselves. Evidence of a child being damaged and consequently prone to making poor choices renders it more likely that he/she would be a willing volunteer. On the judge's reasoning, Ms Bex explained G that the more damaged and more easily exploited the child (because they are prone to making poor choices), the less likely they are to be protected by the Act. Section 4 itself does not require the prosecution to prove that the victim of exploitation did not consent to it, and the international Conventions rehearsed in *R v Joseph (Verna)* [2017] 1 WLR 3153 as a background to the enactment of the Modern Slavery Act 2015 indicate clearly that coercion is not an element of the offence of child trafficking.

H 24 Yet, having described the willingness of the courier to become involved as a "potentially critical issue" and one upon which evidence could and should have been received, the judge again expressed difficulty in accepting the submission that a "child cannot agree to participate in a criminal act". She observed:

© 2019 The Incorporated Council of Law Reporting for England and Wales

> "I remind myself that the test is about choice and that is the focus but A
> to use my analogy a volunteer is usually preferable to a conscript. Absent
> evidence of force, deception, naivety, being drawn in in some unspecified
> way, the willing volunteer must in my judgment make for an attractive
> choice. If that candidate has experience, facility and aptitude then the
> choice is that much more to do with those attributes than mere youth . . .
> To leave this to the jury would be to risk penalising GW for having B
> chosen, if he did, MW not because he was plainly ready, willing and able
> to do so but for the artificial basis that he was less than 18. That remains
> a very great concern in my judgment in all three cases."

**25** Ms Bex was also critical of defence attempts to replace the statutory
word ("chosen") with their own ("recruited"), and of the judge for adopting
it. Counsel for Alford had argued that initial "recruitment is a specific event C
that must be proved to have been done by person A" and could happen only
once. Ms Bex contends that the word "chosen" in the section should be
given its ordinary meaning; to choose is to pick out someone or something as
being the best or most appropriate of two or more alternatives. To recruit is
to enlist or to enrol. To choose is not a specific event that can only happen
once. D

**26** Ms Bex insisted that to interpret the word "chosen" to mean initial
recruitment only would produce results that are manifestly unfair, contrary
to the interests of justice and the mischief at which the 2004 Act is directed;
it would limit liability to the person at the top of the pyramid who first
identified the courier and secured his or her services and relieve of
responsibility all those below who at each stage of the enterprise continue to
choose to use that person because he or she is a child. E

**27** If that is correct, the judge, having acknowledged the strength of this
line of argument, wrongly adopted what was then the defence argument that
the prosecution had to establish an individual defendant initially "recruited"
a courier and had had personal contact with them, absent which there was
insufficient evidence of knowledge of age and choice on that ground.

**28** Ms Bex also objected to the judge's approach to the condition that a F
person without youth would be likely to refuse to be used for that purpose.
At trial, all counsel and the judge treated this as a free-standing element that
the prosecution had to prove, rather than as one of the grounds for the
choice of the courier. Ms Bex thought that the "likely to refuse" test was an
objective test rather than the subjective opinion of the person allegedly
trafficked. She described the objective test as clear support for the G
proposition that the prosecution need do no more than show that a normal
adult would be likely to refuse to be used for that purpose and that the
precise circumstances in which the child came to be used for the relevant
purpose is irrelevant to that question. If that is correct then the fact that the
prosecution was unable to call the children as witnesses ought not to be
critical.

**29** Ms Bex referred us to passages where the judge took into account H
inadmissible material. The judge mentioned more than once the amounts
paid to the couriers as indicative of their not being chosen on the grounds of
youth. However, there was no evidence before the jury as to what any of the
children were paid.

© 2019 The Incorporated Council of Law Reporting for England and Wales

**30** Finally, Ms Bex insisted there was sufficient evidence of arranging or facilitating travel, knowledge of age of the courier and choice of the courier on the grounds of the youth of the child and the fact an adult would be likely to refuse. She invited us to find that facilitating travel could be established by proof of the system of drugs supply, the control of the couriers and their being directed to a specified location or locations.

*The defendants' response*

**31** Counsel for the defendants helpfully combined their response in a joint written document but decided to abandon much of it following the discussion between members of the court and Ms Bex. There appeared to be consensus that some of the arguments placed before the trial judge and accepted by her were not correct. Counsel now agree that, in general, to prove a charge of trafficking on the grounds of youth, there is no need to replace the word "chosen" with "initially recruited," and that the Crown does not need to prove that, if a choice was made, youth was the sole ground for it.

**32** In their written submission they had claimed that, given the way the Crown had firmly put its case, at the close of the prosecution case, the judge had to be satisfied there was sufficient evidence to go to the jury of the following elements: (i) the defendant intentionally arranged or facilitated the travel of a courier; (ii) at the time he did so, he intended that the child would be used as drug courier; and (iii) the defendant chose the child on the grounds he or she was under 18 and a person of over 18 would have been likely to refuse. During the course of oral submissions, counsel for the defendants disagreed with each other as to whether it was necessary on these facts to establish that a particular defendant chose the child. We shall consider first the main points upon which counsel were agreed.

**33** First, the Crown having chosen not to charge conspiracy to traffic the couriers, they invited the court to focus on whether there was sufficient evidence in relation to each substantive count that the defendant himself actually "arranged or facilitated the travel" of the relevant child. They suggested that "arranging or facilitating" involves buying tickets, or unambiguous evidence that other travel was in fact arranged or facilitated by them. They argued that it was insufficient simply to demonstrate either that the child travelled with the knowledge and approval of the defendant or was directed to act in certain ways during travel. This was said to be consistent with the conspiracy to supply drugs as opposed to trafficking. The "co-locating" of mobile telephones attributed to a defendant with those of a child courier may have established meetings, but those meetings were also as, if not more, consistent with supplying (or re-supplying) drugs to the children than "arranging or facilitating travel".

**34** Second, they suggested that there must be evidence that the child's youth was the operative or causative ground and that in this case there was no evidence as to that.

**35** Third, it was contended that there was no direct or circumstantial evidence that any of the children were chosen by the relevant defendant. The prosecution elected not to call the children as witnesses. The consequence was that there was no evidence from them either as to who chose them or on what basis; nor did the prosecution produce other evidence as to the circumstances of choice or date of the choice. Even in the absence of the

© 2019 The Incorporated Council of Law Reporting for England and Wales

child as a witness, there will be cases where the person responsible for choosing the child may be proved by other evidence, for example third party witnesses, evidence of prior association, evidence from social media or other electronic data, or CCTV footage. No such evidence exists here. It is said that the identity of the person who chose the child is not a matter of reasonable inference from the fact that a defendant was providing instruction to them before, during or after their travel. It was an agreed fact there were others above them in the hierarchy who may have been responsible. Simple communication between a defendant and the relevant child once they had been chosen even if it was concerned with the supply of drugs does not provide evidence of choice on the grounds of youth. A B

**36** We shall now consider particular points made on behalf of individual defendants.

**37** Ms Eloise Marshall QC for MK in her oral submissions focused on what she claimed is the paucity of evidence to establish the elements of the offence in MK's case. The prosecution had to prove that the defendant arranged or facilitated travel of the courier, knowing the courier was a child and that the courier would be exploited on the grounds of their age. The judge may have spoken about "recruitment" when she should have used the language of the section (namely "chosen"), but Ms Marshall insists she did so to highlight the consequences of not calling the children. Proving the age of the child courier was not enough. The prosecution had to show sufficient contact between the travel arranger and the courier for the former to understand how young the courier was. C D

**38** In MK's case she claims that the prosecution could not prove any travel arrangements were made by MK and the only contact the Crown could prove was contact between telephones said to be attributable to MK and his couriers. It was accepted that the telephones were moved between dealers and therefore she suggested that calls cannot necessarily be attributable to MK. In any event, she argued that this level of contact, if proven, raised no safe and legitimate inference that MK knew the age of the couriers and "chose" them on that basis. E

**39** Mr Hugh Davies QC for DA addressed the court at greater length on the words of the section and on the lack of evidence in DA's case. He did not demur from a purposive constructive of the section or from the suggestion the judge had erred in some respects. He accepted the judge's rulings could have been "better phrased," but invited the court to find that although she took the wrong route in law she reached the right destination. She was the trial judge for both trials and best placed to assess the sufficiency of the evidence. The Crown chose not to allege a conspiracy and therefore she was obliged to focus on substantive and specific counts. F G

**40** Mr Davies insisted that the Crown was obliged, both as a matter of construction and in the light of the way the Crown presented its case, to prove that DA "chose" the courier. He rejected the Crown's submission that proving the age of the courier coupled with the evidence of DC Wright and the evidence of system could establish the various elements of each substantive count. He supported the judge's finding that DC Wright's evidence was undermined by the evidence of what happened; for example although DC Wright asserted that children were chosen as couriers because they were less likely to be searched, the child couriers in this case were in fact all searched. In reality, he claimed that young people are chosen from the H

© 2019 The Incorporated Council of Law Reporting for England and Wales

locality, often already involved in some criminality and/or as part of the criminal network, in order to make money from crime. This is recruitment based on association, competence, and reward. There is no safe inference that an adult in that same context would not have acted in the same way and for the same reasons.

**41** Mr Davies did not endorse the submission made by Ms Marshall that there was no evidence the defendants knew the age of the couriers in the light of the co-location of telephones indicating meetings between dealers and the couriers. None the less, he contends that any meeting was just as consistent with supplying drugs for the courier to take to Portsmouth and receiving the proceeds as with arranging travel.

**42** Mr Tim Moloney QC for GW supported parts of those submissions and the assertion that the grounds in section 4(1C)(b) must be the principal/causative/operative grounds to trigger the operation of the section so that the Crown must prove that absent the two grounds, the child would not be chosen. He contended that this must be the correct interpretation because targeting the vulnerable is the mischief at which the subsection is aimed. He accepted the principle as discussed in argument that the Crown was not obliged to prove an individual defendant had in fact "chosen" a courier, but given the way in which the Crown put their case, Mr Moloney supported the judge's analysis of the evidence that there was no evidence GW knew the courier's age. He insisted that GW's involvement as proven was just as consistent with general drug dealing as with arranging or facilitating travel.

**43** We have done our best to do justice to the arguments advanced orally but given the concessions made by counsel for the defendants at various stages of the hearing, it has not been straightforward.

*Conclusions*

**44** We turn now to our conclusions on the points of law arising. Section 4 requires detailed analysis. In construing the legislation, it is necessary to adopt a purposive approach seeking to determine the intent of Parliament. This was the approach adopted by the Court of Appeal in *R v K (M)* [2019] QB 86 where, at para 45 Lord Burnett of Maldon CJ emphasised in relation to section 45 of the Modern Slavery Act 2015 that the interpretation to be given to the legislation should be one that accorded with the intent of Parliament. In that case the court determined an issue relating to the burden of proof by reference to the construction which most closely fitted with the intent of Parliament in affording protection to the vulnerable. Similarly, the statutory purpose of section 4 is clear; it too was designed to protect the vulnerable from trafficking with a view to exploitation and to comply with the state's duty derived from various international instruments.

**45** Section 4 (see above) refers to the alleged criminal as "A" and the alleged victim or courier as "B". The actus reus of the offence is arranging or facilitating travel of person B and the mens rea is doing so intentionally with a view to the exploitation of B. The offence is complete once A arranges or facilitates the travel with the necessary mental element. In considering the various elements we shall focus on the provisions relevant to this appeal.

© 2019 The Incorporated Council of Law Reporting for England and Wales

*Actus reus and mens rea*

**46** Actus reus: In the context of the varying types of criminal trafficking at which these provisions are aimed, the two words "arranging" and "facilitating" travel are necessarily broad and should be construed accordingly. "Arranging" is a common word which in our view needs no further explanation to the jury. "Arranging" would include such matters as transporting B, procuring a third person to transport B, or buying a ticket for B. "Facilitating" is intended to be different from "arranging" and would include "making easier". It is not sensible to lay down precise definitions of these terms.

**47** In the course of argument, the Crown suggested that facilitating might mean "making more likely to happen". Conduct which makes travel more likely to occur may fall within, and be an example of, either "arranging" or "facilitating" but it will depend on the facts. There was also argument before the court as to whether a simple instruction: "go to Portsmouth" or "go by train to [city] and then go to x address" was capable in principle of amounting to "arranging or facilitating" B's travel. The defendants argued that it was not; the Crown argued that it was. There is no issue of principle here. It is possible that in some circumstances a mere direction might suffice but the question is again one of fact. There is no fixed list of the conduct which can amount to either arranging or facilitating.

**48** Mens rea: As this court observed in *R v K (S)* [2013] QB 82, para 38, this is "an offence of intention". *R v K (S)* was a decision on the unamended version of section 4 but there is no material difference on this point. The critical term is the phrase "with a view to the exploitation of B". Thus, in addition to proving the defendant intentionally arranged or facilitated the travel, the prosecution must prove the defendant had a "view to exploitation" of B. For that purpose, pursuant to subsection (1C)(a) or (b), the prosecution must prove a defendant (Person A) intended to exploit Person B or Person A believed that another person was likely to exploit B in each case during or after the journey.

**49** It follows that it is not necessary to prove that the person arranging or facilitating travel was also the person who at some point would do, or intended to do, the exploiting. In many cases the person who arranges or facilitates the travel may have very little knowledge about the ultimate fate of the person being trafficked (the B) and it therefore suffices that they believed only that some other person is likely to carry out some (undefined) acts of exploitation in some (unspecified) part of the world.

**50** In the present case the prosecution was focused primarily upon the defendant's intention to exploit B, but the prosecution opening was wide enough to include the second basis, namely the defendant's belief that another person was likely to exploit B.

**51** However, contrary to the arguments of all parties below, and the decision of the judge, it is not necessary for the prosecution to establish that A (and/or another person) has actually exploited B in any of the ways defined in section 4(4). This is because, as already explained, section 4(1A) is an offence requiring no more than a "view to exploitation" as further and exhaustively defined in section 4(1C). Unless this is held firmly in mind there is the risk that the section is construed as requiring actual exploitation, not least because the definition of exploitation in section 4(4) is (unhelpfully) drafted in the past tense.

© 2019 The Incorporated Council of Law Reporting for England and Wales

*Causation*

**52** Section 4(4)(d) incorporates an element of causation in its use of the language of choice, namely B is exploited if (and only if) a person uses or attempts to use him to provide services or benefits or to enable someone to acquire benefits "having chosen him for that purpose on the grounds that—(i) he is . . . young . . . and (ii) a person without the . . . youth . . . would be likely to refuse to be used for that purpose".

**53** The two grounds identified in the subsection for the choice or future choice of the young courier must be established. If and only if they are both present can an offence under this part of the section be proved. Thus, the fact that a person without youth would be likely to refuse is not an additional free-standing element that the Crown must prove; it is one of the grounds for the "choice".

**54** "Ground" is another ordinary word, and includes "cause" or "reason". The question of causation is not one determined by an overly literal reading of the statutory language. In the present context the prosecution need only establish that the age of B and the likelihood of an adult refusing are two factors, possibly amongst many others, which formed a part of the defendant's thinking. Each ground must be "a" factor but need not be the "main" or "principal" factor. This is not a strict "but for" test.

**55** Thus, the fact of the youth of B does not have to be the only or main reason but one of the reasons for the "choice". As was eventually conceded during argument, there may be other grounds, but that fact does not prevent a successful prosecution under this section. If the youth of the courier had to be "the" operative ground, the task confronting the prosecution would be very difficult indeed. In most cases, person B will be considered as a courier for a wide variety of reasons, including age but also B's willingness to participate, B's propensity to commit crimes, B's desire to be part of a wider peer group, B's fleetness of foot, B's gender (for instance because it was thought that younger looking males or females might be less likely to be strip searched), the amount of money being offered, etc.

**56** An analogy can be found in the interpretation of section 1 of the Road Traffic Act 1988 which provides: "A person who causes the death of another person by driving . . . dangerously . . . is guilty of an offence." It could be argued that the expression "causes the death" would, by its terms, require that the dangerous driving had to be the operative cause of the death so that a strict "but for" test applied, but this is not the way in which the courts have construed the provision. In *R v Hennigan* [1971] 3 All ER 133, a case of reckless driving, the recklessness consisted mainly of the speed at which the defendant was driving and there was evidence suggesting that the victims contributed significantly to their own deaths. However, the Court of Appeal held that there was nothing in the legislation requiring the defendant's driving to be a substantial or major cause of the accident provided that it was "a cause and something more than de minimis". Similar conclusions were arrived at in *R v Skelton* [1995] Crim LR 635 and in *R v Kimsey* [1996] Crim LR 35.

**57** More recently in *R v Hughes (Michael)* [2013] 1 WLR 2461 the Supreme Court was concerned with the offence of causing death by driving an uninsured vehicle. In that case the collision was caused solely by the negligence of the deceased driver. At para 20 the court emphasised that:

© 2019 The Incorporated Council of Law Reporting for England and Wales

"the meaning of causation is heavily context-specific and that Parliament (or in some cases the courts) may apply different legal rules of causation in different situations. Accordingly, it is not always safe to suppose that there is a settled or 'stable' concept of causation which can be applied in every case." A

**58** The court also highlighted the conceptual difficulties with seeking to apply any species of "but for" test: ibid para 23. Ultimately the court ruled (at para 28) that: B

"It follows that in order to give effect to the expression 'causes . . . death . . . by driving' a defendant charged with the offence under section 3ZB must be shown to have done something other than simply putting his vehicle on the road so that it is there to be struck. It must be proved that there was something which he did or omitted to do by way of driving it which contributed in a more than minimal way to the death." C

**59** Accordingly, context is crucial and the context here is the intent of Parliament to protect those who are vulnerable because of one or more of the factors set out in the 2004 Act. An interpretation which rendered prosecutions based upon age very difficult to mount would run counter to the will of Parliament. It suffices to achieve Parliament's objective that the issue of the intended or likely choice on the grounds of age is a factor in the mens rea, and one which is more than de minimis. We also take the view that this formulation provides adequate protection to defendants. D

*Consent* E

**60** The prosecution does not need to prove a lack of consent on the part of the young courier or any element of coercion. Any such suggestion must be defeated by: (i) the agreed position of all defendants that consent is no defence (as now made express in section 2(3) of the Modern Slavery Act 2015); (ii) the protective purpose of the legislation; and (iii) the fact that the concept of "choice" assumes the willingness of the chosen. Indeed, standing back, when the provision is viewed as a whole it is clear that the mischief it seeks to address is the very fact that a vulnerable person has consented; the 2004 Act is seeking to protect the young and the vulnerable from their own decision-making. F

**61** It follows that a prosecution under section 4 does not depend on the ability to call the individual said to have been exploited or the target of exploitation. G

*The word "chosen"*

**62** Further, we reject the assertions (now abandoned) that the word "chosen" should be replaced by "initially recruited" and that recruitment is a once and for all act that cannot be repeated. Someone in a drugs hierarchy may recruit a young courier to a drug dealing business generally on the basis they are young and malleable, but someone else can then choose the young courier and traffic them for a specific drugs deal. Parliament selected the word "chosen" and it should be given its natural and broad meaning. H

© 2019 The Incorporated Council of Law Reporting for England and Wales

*Conclusion on the ruling of no case to answer*

**63** With those principles in mind, we have analysed the judge's rulings and the evidence said to amount to a prima facie case against the defendants. With respect to the judge the analysis in her ruling contained a number of errors of law. To be fair to her, it is evident from the transcript and from the written submissions of the parties before the court that the judge was in part at least led into error by the arguments of all parties which proceeded upon a variety of false bases. We do not mean to be unduly critical. The legislation is far from easy to construe. We have had the significant benefit of hearing much more detailed argument on all the issues of interpretation arising. In the course of argument all parties modified their submissions and the helpful arguments that we heard assisted us substantially in clarifying the meaning of the legislation.

**64** It is not necessary to do more than identify the principal ways in which the judge erred. In relation to section 4(4)(d) relating to A's grounds of choice, the judge was wrong in five material and interrelated respects.

**65** First, the necessary ground for the choice is identified by the judge as falling only in section 4(4)(d)(i). This overlooks section 4(4)(d)(ii) which was wrongly treated below as a free-standing objective test.

**66** Second, the judge concluded that the youth (or one of the other identified characteristics) must be the sole ground for the choice.

**67** Third, the judge wrongly considered that it was relevant to consider whether the relevant courier was a "willing volunteer".

**68** Fourth, the judge placed too great an emphasis on the fact the there was "no evidence that any of the defendants could be said to be the recruiter" describing it as an "important evidential weakness". It was not. As she recognised, if one interpreted the section to require the prosecution to prove a defendant was the initial recruiter it would make a prosecution virtually impossible. Yet, the "important evidential weakness" seems to have played a significant part in her deliberations.

**69** Finally, in her assessment of the sufficiency of the evidence, the judge took into account matters not admitted in evidence (the payment of the couriers) and, in our view, failed to take properly into account the evidence of the contact between the couriers and the defendants, the evidence of DC Wright and the evidence of the system operated by the defendants. The defendants' convictions in the drugs trial proved their control of the dealing lines used to sell drugs to users in Portsmouth during the relevant period. The whole scheme they operated was dependent on arranging or facilitating the travel of the couriers from London to Portsmouth.

**70** We shall now summarise and consider the evidence in relation to each substantive count remembering that it supplemented the body of evidence proving that each courier was used to supply drugs to Portsmouth and was under the control of the defendants. The child couriers were given the drugs, told where to go, what to do and when and relieved of the proceeds. It is also important to note that in counts 1 and 2 the prosecution alleged a joint enterprise in which the participants may play different roles.

**71** Count 1: JA made six trips to Portsmouth and on at least four occasions before, during or after her trip, her telephone "co-located" with telephones attributable to MK and DA used by them for drugs dealing. Calls were made to book taxis while JA was in Portsmouth on telephones attributed to MK at a time suggesting the taxis were for JA. A text message

© 2019 The Incorporated Council of Law Reporting for England and Wales

from a telephone attributed to MK sent during one trip told her to "walk down the stairs dnt take lift". A

72 Count 2: TT made five trips to Portsmouth and his telephone similarly co-located with the telephones attributable to MK or DA at relevant times. Telephones attributed to MK and DA were used to book taxis while TT was in Portsmouth. Also, on one occasion, TT was alerted by a text said to be from MK to look out for a cab in Portsmouth and from DA in which he was told not to spend more than £40 on an open return train ticket. B

73 Count 3: AMcK made one trip to Portsmouth spending the night there. Her telephone co-located with a telephone attributable to DA before she left. DA left his home and went to meet her. DA went to East Croydon (on the Portsmouth to London railway line) and received a text from a taxi company, the inference being this was in relation to AMcK's trip. He then sent texts to known drug users in Portsmouth advertising the supply of drugs, as AMcK made her way to Portsmouth. Other text messages established DA was controlling her movements. C

74 Count 4: MK made one trip to Portsmouth. DA was in frequent contact with her including one message telling her to get off the train at Havant (a stop before Portsmouth). DA and MK both used cell sites close to the train station from which MK started her journey to Portsmouth at about the right time. D

75 Count 5: GW and MW were stopped by the police in the same car in July 2014 and so had undoubtedly met. MW made three trips to Portsmouth. On the first they travelled together by car. Text messages indicated that MW acted under GW's orders in supplying the drugs and he was sent the addresses of his destination. On the third trip, one drug buyer in Portsmouth was told by GW to look out for a supplier who would be there soon, the inference being GW was fully involved in MW's travel arrangements. E

76 Taking all the evidence into account and the prosecution case at its highest, in our judgment, there was sufficient evidence to go to the jury on all counts. There was a prima facie case that each defendant arranged or facilitated travel of the courier, with knowledge of their age and with a view to their exploitation. There was evidence that the defendants met the couriers identified in each count and arranged or facilitated their travel by, for example, arranging taxis, meeting the courier at the railway station, travelling with them to Portsmouth and or giving directions as to travel. This could then be considered by the jury in the light of the general evidence of system and why young couriers were chosen, intended to be chosen or likely to be chosen (not necessarily by the defendant) on the grounds of age and that an adult would refuse. In our judgment the judge was therefore wrong to withdraw the case from the jury and it must return to the Crown Court for the trial to continue with a fresh jury. F G

*Conclusions on other grounds of the appeal* H

77 Having reached those conclusions, we turn to the other rulings that the prosecution wished to appeal. Ms Bex was concerned that if we did not consider the other rulings adverse to her case, the judge at the continuation of the trial will feel him or herself bound by Judge Downing's rulings. We did not hear oral submissions on the grounds or on the general principle of

© 2019 The Incorporated Council of Law Reporting for England and Wales

whether the judge at the retrial would be bound by previous rulings because insufficient hearing time was allowed for the appeal. We understand the sense in not simply repeating applications at a retrial upon which justifiable rulings have been made in a previous trial, but we have our doubts as to whether any general principle exists that prohibits a fresh application being made at a retrial where the circumstances demand. The dynamics of a retrial may be very different from the previous trial.

78 However, it is not necessary to decide the point, because we have read the written submissions of all the parties and we can confirm that, whatever the legal position generally, on the facts of this case, the judge at the next trial should determine afresh, if necessary, the additional six rulings the subject of the six additional grounds.

79 Ground 1 related to the order for a separate trial of the count relating to the "vulnerable" adult. It was based on the circumstances that existed at that time of the ruling; they no longer exist. It will be a matter for the judge at the resumed trial whether the counts can be properly re-joined and tried together, if the prosecution seek to re-join them. The other rulings were all based in part on the judge's understanding of the law which we have concluded was flawed and cannot therefore bind the next judge.

*Result*

80 For those reasons we give leave on ground 7, the appeal is allowed and we reverse the judge's ruling. We order the trial to be resumed* before a new jury on counts 1 to 6. The presiding judges of the South Eastern Circuit will decide the venue. The trial should be before a different judge. reporting restrictions will apply in the usual way until the conclusion of the retrial. MK and DA remain in custody. Any applications as to GW should be made to the Crown Court.

*Appeal allowed.*
*Judge's ruling reversed.*
*Trial to be resumed before new jury on counts 1 to 6.*

CLARE BARSBY, Barrister

* *Reporter's note.* Karemera and Alford pleaded guilty during the trial, while Wabuela was convicted on 17 April 2019.

© 2019 The Incorporated Council of Law Reporting for England and Wales