# R v Kellard [1995] 2 Cr App R 134

# Exhibit 23

# PETER JAMES KELLARD
# EDWARD JOHN DWYER
# JOHN LESLIE FITZWALTER WRIGHT

COURT OF APPEAL (Lord Justice Farquharson, Mr Justice Gatehouse and Mr Justice Scott Baker): June 20–24, 27–30, July 29, 1994

PROCEDURE
**Trial**
*Serious fraud—Preparatory hearing—Severance—Duty of prosecution.*

PROCEDURE
**Trial**
*Serious fraud—Fairness of trial—Excessive length.*

In a potentially long criminal case a heavy responsibility lies upon the trial judge and counsel, in particular prosecution counsel, to ensure that it remains manageable and of a dimension that enables it to be presented clearly to a jury. Prosecuting counsel should carefully consider, before preparatory hearings are held, whether the indictment can properly be severed. A solution can often be found by consultation with defence counsel and then an agreed proposal for severence can be submitted to the trial judge. Prosecution counsel must be reconciled to the fact that their case may be weaker as a result of being split into a number of trials but this was nevertheless necessary to avoid inordinately long and expensive trials.

The appellants were jointly charged with carrying on the business of certain companies with the intention of defrauding creditors, on an indictment of 29 counts alleging fraudulent trading, obtaining or attempting to obtain a pecuniary advantage or property by deception, making a false statement to induce investments, making false representations to creditors, procuring the execution of a valuable security, furnishing false information, theft and false accounting. A preparatory hearing took place six months before the start of the trial, when the prosecution successfully opposed a defence submission that certain counts should be severed. The trial lasted 252 working days and the appellants were each convicted of various offences. On appeal, it was contended, *inter alia*, that because of the length of the trial a situation had been created where a fair trial was not possible; thus their convictions were unsafe and unsatisfactory.

**Held,** dismissing the appeals, that although the trial had been of excessive length, that fact alone did not make the appellants' convictions

unsafe, otherwise all trials would be subject to a time-limit. The correct approach was to consider whether the length of the trial created a situation A at any point whereby a fair trial was not possible; and in particular whether the case revealed any feature which tended to establish that any of those taking part in the trial were, by reason of its length, unable to discharge their function. In the instant case, none of those circumstances had arisen. The issues were clear enough, in particular the question of the appellants' dishonesty, and in spite of its length, the trial had been a fair one.

*Simmonds* (1967) 51 Cr.App.R. 316, [1969] 1 Q.B. 685, *Novac* (1977) 65 B Cr.App.R. 107 and dictum of Lawton L.J. in *Thorne* (1978) 66 Cr.App.R. 6, 12 considered.

*Cohen and others* (The Blue Arrow case) (1992) 142 N.L.J. 1267 distinguished.

[For unduly long and complicated cases, see *Archbold* (1995) paras. 1-175 to 179.]

Appeals against conviction. C

On February 6, 1992, in the Crown Court at Nottingham (Potter J.) on a 29 count indictment charging fraudulent trading, obtaining or attempting to obtain a pecuniary advantage or property by deception, making a false statement to induce investments, making a false representation to creditors, procuring the execution of a valuable security, furnishing false information, theft and false accounting, Kellard was convicted on 19 D counts and was sentenced to a total of four years' imprisonment and was disqualified as a director for five years. Dwyer, who had pleaded guilty to 10 counts, was convicted of a further six counts and was sentenced to a total of two and a half years' imprisonment and was disqualified as a director for five years. Wright was convicted on five counts and was sentenced to a total of six months' imprisonment, and was disqualified for a period of three years. E

The facts appear in the judgment.

The appeal was argued on June 20-24, 27-30, 1994.

*Douglas Day*, Q.C. and *Roger Offenbach* for the appellant Kellard.
*David McEvoy*, Q.C. and *Benjamin Nicholls* for the appellant Dwyer.
*Nigel Mylne*, Q.C. and *Stephen Clayton* for the appellant Wright.
*Timothy Barnes*, Q.C. and *Collingwood Thompson* for the Crown. F

*Cur. adv. vult.*

July 29. **FARQUHARSON L.J.** read the judgment of the Court: The essence of the case against these appellants is fraudulent trading, in that they carried on the business of certain companies with the intention of defrauding creditors. The companies concerned were:

(i) KLF (U.K.) Ltd, the holding company of the group. The appellants G Kellard and Dwyer were directors of this company throughout the period to which the charges relate, that is to say from 1980-1985. Dwyer was also the company secretary from June 1983. Kellard was the managing director

and regarded by the Crown at the trial as the driving force of KLF (U.K.) A Ltd and it was primarily on behalf of this company that the allegedly fraudulent conduct took place.

(ii) KLF (Construction) Ltd, a subsidiary company which owned the group's offices in Bournemouth. It was from here that the business of the group was conducted. Kellard was the managing director and Dwyer, a director, and from June 1983, the company secretary.

(iii) KLF (ITT) Ltd, another subsidiary company. This was the overseas B trading arm of the group. Both Kellard and Dwyer were directors. It was intended that the profits made by this company should contribute towards the administrative expenses of KLF (U.K.) Ltd.

(iv) Brittania Park, another subsidiary of KLF (U.K.) Ltd. In October 1984 the appellant Wright was appointed chairman, while Kellard and Dwyer were directors.

The different roles of these several companies will emerge from the C history of the various transactions upon which the indictment was based.

Derbyshire County Council (DCC) owned a site at Shipley Park near Heanor. It was proposed that a theme park should be constructed on the site and negotiations took place in 1979 between DCC and KLF (U.K.) Ltd. The outcome was that a lease was granted to the latter for a term of 90 years for the construction and development of the theme park. It was agreed that DCC would make a contribution to the preconstruction costs of £217,000 D and, further, that when KLF (U.K.) Ltd had carried out work on the site to a value of £500,000 and demonstrated that they had the sum of £1,000,000 available to complete the development, DCC would be responsible for providing car parks, access roads and services which were estimated to cost £1.4 million by 1983.

The development of the theme park was clearly going to be an expensive E exercise, yet it does not appear that a proper budget for the work was ever prepared. It was clear from the nature of the enterprise that no revenue would be available until after the park had been constructed and visitors were admitted. All the capital costs would have to be met before anything in the nature of a profit would be recovered. It follows that the developer KLF (U.K.) Ltd would need to have substantial funds of its own available or show that there were investors committed to provide finance for the F scheme. It is apparent that from the outset KLF (U.K.) Ltd had no resources of its own which would meet even the preconstruction costs. Accordingly, finance had to be raised from an outside source.

In the early stages Kellard and Dwyer looked for support from the KLF (U.K.) Ltd bankers, the National Westminster Bank at Blandford Forum, by way of an extension of its overdraft facilities. Similar approaches were made on behalf of KLF (ITT) Ltd to its own bankers, namely Barclays Bank G Ltd. Although Kellard and Dwyer were successful to some degree it was, according to the Crown, as a result of false representations being made to the bank managers concerned. Substantial costs were incurred by KLF (U.K.) Ltd of both an administrative and professional nature. Accounts

were being rendered by the company's accountants, architects and structural engineer, which were not met; the company's staff were not receiving the wages to which they were entitled, and judgment debts even for small amounts were not being paid. While the increased overdraft facilities alleviated the position to a limited extent, it was not long before the limits of the overdrafts were being breached. The usual signs of insolvency were present. Meanwhile difficulties were being encountered at the site. A protest group called The Friends of Shipley Park challenged the planning permission granted for the development and their claim was upheld by Webster J. in January 1981. He declared that it was invalid.

A further complication arose later in the same year. Until then KLF (U.K.) Ltd had been negotiating with a Conservative-controlled Council, but following elections in May 1981 control of the DCC passed to the Labour party. The new Leader of the Council, Mr David Bookbinder, was hostile to the development, and he withdrew the pending appeal against Webster J.'s judgment. Furthermore, Mr Bookbinder resisted the grant of planning permission, which was not given until April 1983. Following the DCC's withdrawal from participation in the development, proceedings were taken by KLF (U.K.) Ltd against it. Judgment was given in favour of the company on liability only in June 1984, the assessment of damages being adjourned for a further hearing.

Counts one and three of the indictment alleged offences of fraudulent trading by Kellard and Dwyer from 1980 to 1982 inclusive (count 1) and from January 1983 until March 31, 1985 (count 3). They were both convicted on these counts. It was their case that the company was not insolvent during the periods covered by the counts. They pointed to:

(i) the value of the lease;
(ii) the claim against DCC;
(iii) support from KLF (ITT) Ltd;
(iv) agreements by various public bodies to exhibit material when the park was to be opened to the public. The park was to be called Brittania Park and the theme was to be "British Genius". Kellard, when seeking investment from other parties, claimed that such national bodies as the Ministry of Defence, the Meteorological Office, the Ordnance Survey and the Royal Shakespeare Company had committed their support; and
(v) the award of a substantial contract to ITT by the government of Saudi Arabia.

None of these assets represented cash in hand and it was the prosecution case that the claims were either non-existent or exaggerated.

In the later part of 1983 Wright came on the scene. He first met Kellard on a social basis but became an unpaid adviser, at any rate in the early stages. Wright had a background of banking experience. As already indicated, he became Chairman of Brittania Park Ltd, the company which was to operate the theme park, in October 1984. It was the case for the prosecution that he

was also active in the conduct of the business of KLF (Construction) Ltd which was the company carrying out the development, as well as KLF (U.K.) Ltd.

By the spring of 1984 the KLF group's finances were in a parlous state. If the project was to be kept afloat, it was necessary to obtain a bridging loan to tide the group over the summer, and to give Kellard the opportunity to raise money from other sources. On this occasion they, Kellard and Dwyer, addressed the Midland Bank in Derby, seeking a loan of £500,000. The way they attempted to achieve it goes, say the Crown, to the very heart of the fraud. They approached John Moody and entered into a bogus agreement.

John Moody, and his company of the same name, was a supplier of amusement rides, and had been negotiating for the amusement machines franchise at the park. This company was also trading on its overdraft and apparently had no financial resources. Notwithstanding this state of affairs, on March 23, 1984 the Moody company and KLF (U.K.) Ltd entered into an agreement whereby the former was to advance a loan of £300,000 on September 30, 1984. This was to be used to fortify an application for a bridging loan from Midland Bank Ltd. A letter of the same date (March 23, 1984), signed by Kellard and known at the trial as the "Sarawez letter", was sent on ITT writing paper to Moody. By the terms of that letter ITT was committed to pay the Moody company £298,000 on September 28, 1984 for technical services and feasibility studies in Saudi Arabia. Payment was to be made through the "Sarawez" organisation. It was the case for the Crown that this letter was completely bogus as was the £300,000 loan. No such services or studies had been carried out. The apparent object of the letter was to impress Moody's own bank, Lloyds in South Shields, should they, as seemed likely, be approached by the Midland Bank for a reference. In the event Midland Bank refused the bridging loan.

Kellard and Dwyer next approached Samuel Montagu & Co. Ltd (Montagu) for a bridging loan, using the Moody agreement to support the application. Montagu had become interested in the project at the beginning of 1984, and were prepared to advance £500,000. This was of course subject to conditions. Relying on the loan from Moody, they required their own bridging loan to be repaid on September 30, 1984. The £500,000 was to be applied in part in the repayment of the overdraft with the National Westminster Bank, and the balance to be expended on the construction work. The overdraft was paid off but the rest was used to discharge the accrued debts of the company. As a result of the payment of the National Westminster debt, Montagu secured a first charge on the lease.

The difficulty then arose that on September 30, 1984 the Moody loan of £300,000 would become due, but he would not have the resources to make any advance. The £500,000 would on the same date be repayable to Montagu, leaving the KLF group without funds. This difficulty was avoided by Kellard and Moody drawing up a fresh agreement whereby the £300,000 would not be paid by Moody at the end of September, but only £25,000. The balance of the loan would then be advanced in instalments

against architects' certificates as construction work progressed on the amusement section of Brittania Park. This further agreement was A submitted to Montagu who were satisfied with it. In fact, Moody had the greatest difficulty in raising the £25,000 and had to rely on guarantees given by his daughter and another relative. Unknown to Montagu, Moody was given a cheque for £25,000 by Kellard, drawn on KLF (Jersey) Ltd, the successor company to ITT which was postdated to December 1984, but duly paid. The defence submitted that this latter payment was quite independent of the earlier transaction. B

The Crown's case was that Montagu decided to advance funds to begin the construction work on the site on the basis of the Moody agreement being genuine. A facility letter setting out the terms of a loan of £3.7 million was issued on October 11, 1984. Considerable as this sum is, it was quite inadequate to meet the cost of stage one of the construction work. Throughout the entirety of its life the project was hopelessly underfunded. C Further problems developed in the shape of bad weather, which delayed the opening of the park and involved extra cost in the paying for overtime work. Brittania Park was opened on June 27, 1985 but it was far from ready. Even the first stage had not been completed. The result was that the hoped for number of visitors failed to materialise. There were no funds to pay the contractors and Montagu appointed a Receiver on September 9, 1985. A winding up order was made against Brittania Park Ltd on October 9, 1985. D

The company was found to have creditors who were owed some £9,000,000.

The indictment reflected three groups of charges, the particulars of which have been described only in part in the above summary.

The first contained the fraudulent trading counts, namely counts 1, 3, 13, 14 and 15 and a related count (18) of making a false statement to a creditor. Of these counts 1, 3 and 13 concerned KLF (U.K.) Ltd over the whole period E of trading, *i.e.* from January 1, 1980 to September 9, 1985. Counts 14 and 15 related to Brittania Park Ltd and KLF (Construction) Ltd respectively during the period from April 1, 1985 until September 10, 1985, in the case of Brittania, and March 31, 1986 for KLF (Construction) Ltd.

Kellard was convicted on all five fraudulent trading counts.

Dwyer was convicted on counts 1 and 3 but pleaded guilty on F arraignment to counts 13, 14, and 15 while Wright was convicted on these three counts and count 18.

The second group comprises the various counts which alleged the offences of deception employed to raise funds or to extend overdrafts. The relevant counts are: 2, 4, 5, 6, 7, 8, 9, 10, 11, 16, and 19.

Kellard was convicted of all these offences. Dwyer was convicted of counts 5, 7, 8 and ten and Wright of count 6. G

Of the remaining group of counts, Kellard was convicted of three counts of theft (20, 27, and 29). Dwyer pleaded guilty on arraignment on September 10, 1990 to counts of furnishing false information (21), theft, (12,

22, 24 and 27), obtaining property by deception (23) and false accounting (25).

This last group of counts, except count 12, related to the conduct of Kellard and Dwyer at the time of, or immediately prior to, the appointment of a Receiver, when it was alleged they were engaged in a process of asset-stripping at the expense of Brittania Park Ltd.

They now appeal against all these convictions, except those to which Dwyer has pleaded guilty, with the leave of the single judge in the case of Kellard and Dwyer, and of this Court, in the case of Wright.

The main complaint of these three appellants is that having regard to its length, it was not possible to have a fair trial. We are informed that the case bears the ignoble distinction of being the longest criminal jury trial in English history. The weight of this complaint is illustrated by some of the relevant statistics.

The appellants were arrested at the end of September and the beginning of October 1988. In June 1989 the case was transferred to Nottingham Crown Court under section 4 of the Criminal Justice Act 1987. The indictment originally charged eight defendants on 44 counts. A number of preparatory hearings took place, the most important being on February 12, 1990, the details of which will require further examination. The trial began on September 10, 1990 against these three appellants, and two others, but was not completed until February 6, 1992, a period of 17 months. The court did not sit on every working day for a variety of understandable reasons, but did so on 252 of them. The prosecution case lasted until June 26, 1991. Legal submissions followed and Kellard's case was opened on July 8, 1991. Kellard's evidence continued until September 18, 1991 although the court did not sit in August. The defence of all the appellants closed on October 29, 1991 and was followed by counsel's speeches which were completed on December 9, 1991. The court then adjourned until January 6, 1992 to enable the judge to set about the Herculean task of preparing his summing-up. In fact the hearing resumed on January 8, 1992 and the summing-up lasted 11 days.

The consequence of this chronology was that some important witnesses, such as the National Westminster Bank Manager at Blandford Forum, gave evidence over a year before the summing-up began. Furthermore, the jury were sent out to consider their verdicts more than seven weeks after they had heard counsel's speeches and three months after the evidence was completed. The appellants, by their counsel, point out that the trial was further interrupted by the number of holidays which were included in such a long period, including two Christmas holidays and breaks at Easter and Whitsun and in August 1991. This, the appellants claimed, caused the presentation of the case to be disjointed.

The main thrust of the argument before us was that in these circumstances an intolerable strain was imposed upon all those taking part in the trial, including the judge, the jury, the lawyers and perhaps above all, the appellants. More than 300 witnesses gave evidence, either in person or

by written statements and the documents comprised more than 10,000 pages, although these were eventually reduced to two core bundles. A

At the preparatory hearing on February 12, 1990 a count against John Moody (Junior), the son of the Moody already referred to, was severed from the indictment. One count was quashed and a further 14 counts were severed or ordered to remain on the file on the usual terms. That left a total of 29 counts to be tried. It was apparently conceded that the fraudulent trading counts should be tried together, but defending counsel submitted that the third group, the asset stripping counts, should be severed and tried B separately. The judge was sympathetic to this application but counsel for the Crown, Mr Barnes Q.C. pointed out that the evidence on these counts would be admissible to prove the fraudulent trading counts even if the two groups were severed from each other and he would call that evidence. There would therefore be no saving of time. The learned judge accordingly made no order.

It should have been, and no doubt was, at this stage appreciated by all C concerned that the hearing of the case would take a very long time indeed. Mr Barnes suggested a period of three months, while counsel for the defendants thought it would take twice as long—namely six months. It is, of course, more difficult for prosecution counsel to be accurate, as unlike his colleagues, he does not know how much of the case will be in issue. In the event, as appears from the defence case statements, practically everything was in issue. D Mr Barnes made some criticism of the attenuated form of these statements in the cases of Kellard and Dwyer, but we are satisfied that there was good reason for this.

However, it is appropriate to make the point in passing, that when a judge makes any order under section 9(5)(i) of the Criminal Justice Act 1987 the defendant must, as the statute requires, give the court and the prosecution a statement in writing setting out in general terms the nature E of his defence and indicating the principal matters upon which he takes issue with the prosecution. It follows that a mere traverse of the prosecution case will not be of much assistance. The purpose of the section is to enable the court and prosecution to be put on notice of the issues to be tried and for the case to be prepared and conducted accordingly.

In the period between the preparatory hearing on February 12, 1990 and the beginning of the trial on September 10, 1990, further danger signals F became apparent. The defence gave notice that they required the attendance of 163 of the witnesses to give evidence. This did not result in any futher application for severance. At the commencement of the trial, Dwyer pleaded guilty to a substantial number of counts relating to the period 1984 to 1985, but these pleas were not sufficient to be accepted by the prosecutor. Mr Barnes required a plea to at least one of the counts which reflected Dwyer's complicity in the fraud in its earlier stages. G Although Dwyer did not give evidence at the trial, acceptance of the pleas he tendered would have resulted in some savings in time and cost, but we recognise that the decision on what pleas are acceptable must remain with

23-01165-mew Doc 106-24 Filed 07/03/25 Entered 07/03/25 17:38:30 Exhibit 23
Pg 10 of 29



prosecution counsel. John Moody (senior) pleaded guilty to two counts
A and another defendant, Page, who was a co-director of Kellard and Dwyer,
pleaded to five counts. John Moody and Page then dropped out of the case
pending sentence. The trial began against these appellants and two others,
Emmett and Sobhkhiz, whose roles were less central than those of these
appellants.

It appears that no further attempt was made in September 1990 to
estimate the likely length of the trial. In our view this should have been
B done immediately before the trial commenced. Had this been done on a
detailed basis, projecting specific periods for speeches and individual
witnesses, it must quickly have been apparent that the trial could not have
been anywhere near completed within six months. This, in turn, would
have required the Crown to give serious consideration as to how the case
might be shortened. A further advantage of a detailed projected estimate is
that when slippage occurs, it quickly becomes apparent to everybody.

C As a result of what appears to be the ever increasing length of criminal
trials, this Court from time to time has exhorted both judges and counsel to
present the case to the jury in as clear and simple a manner as possible.
Thus in *Simmonds* (1967) 51 Cr.App.R. 316, [1969] 1 Q.B. 685, Fenton
Atkinson L.J. said (at pp. 324, 325 and p. 691):

> "Naturally it is the duty of prosecuting counsel in the interests of
> D justice as a whole to see that the case is prepared so that it can be
> presented to a jury in as simple a way as is practicable . . . Experience of
> recent years has demonstrated the need for the trial judge being able to
> form an independent judgment on the severability of counts."

Further, on p. 325 and p. 692 the learned Lord Justice said:

> "If upon examination of material before him the judge considers that
> E the presentation of the case in the way proposed by the prosecution
> involves undue burdens on the court in general and jurors in
> particular, and is for this or other reasons contrary to the interests of
> justice, he has a right and, indeed, a duty to ask that the prosecution
> recast their approach in those interests, even if a considerable
> adjournment is entailed."

F Finally at p. 326 and p. 693:

> "Had there been a proper pruning at the outset a great deal of this
> outpouring of words could have been omitted and some two or three
> weeks of court time saved, assuming always that a proper discretion
> had been exercised by counsel for the defence as to appropriate
> cross-examination.
>
> Next it seems proper in the context of what happened in the present
> G case to refer to a matter which is, of course, generally recognised.
> Whilst in no way detracting from counsel's duty to his client, he can
> and should exercise in the interests of justice as a whole a proper
> discretion so as not to prolong cases unnecessarily. It is no part of his

> duty to raise untenable points at length or to embark upon lengthy cross-examination on matters that are not in truth in issue." A

In the case of *Novac and Others* (1977) 65 Cr.App.R. 107, Bridge L.J. at p. 118 said:

> "Quite apart from the question whether the prosecution could find legal justification for joining all these counts in one indictment and resisting severance, the wider and more important question has to be asked whether in such a case the interests of justice were likely to be B better served by one very long trial, or by one moderately long and four separate trials.
>
> We answer unhesitatingly that whatever advantages were expected to accrue from one long trial, the precise character of which has never been apparent to us, they were heavily outweighed by the disadvantages. A trial of such dimensions puts an immense burden on both judge and jury. C In the course of a four or five day summing-up the most careful and conscientious judge may so easily overlook some essential matter. Even if the summing-up is faultless, it is by no means cynical to doubt whether the average juror can be expected to take it all in and apply all the directions given. Some criminal prosecutions involve consideration of matters so plainly inextricable and indivisible that a long and complex trial is an ineluctable necessity. But we are convinced D that nothing short of the criterion of absolute necessity can justify the imposition of the burdens of a very long trial on the Court."

The need for simplicity in the presentation of the case was echoed by Lawton L.J. in the context of the length of the indictment in *Thorne and Others* (1978) 66 Cr.App.R. 6, 12, when he said:

> "This Court has noticed a tendency recently for prosecuting counsel to E overload indictments. There must be an end to this. Indictments must be kept short. No more accused should be indicted together than is necessary for the proper presentation of the . . . case . . . Necessity, not convenience, should be the guiding factor."

Later at p. 14:

> "All that can be said with confidence is that the indictment was F overloaded, far too many lengthy submissions were made and too much time was spent by counsel in addressing the jury. Counsel must curb their verbosity."

Similar observations by the same learned judge were made in the case of *Landy, White and Kay* (1981) 72 Cr.App.R. 237, [1981] 1 W.L.R. 355.

The most recent authority, and in some respects the most relevant to the G present appeal, is the case of *Cohen and Others* (The Blue Arrow case) (1992) 142 New L.J. 1267.

This decision is not fully reported and we proceed by reference to the

23-01165-mew Doc 106-24 Filed 07/03/25 Entered 07/03/25 17:38:30 Exhibit 23
Pg 12 of 29



transcript. The length of the trial was described as "awesome" as it covered
A 184 days, a shorter period than that taken by the trial in the present case.

The facts of *Cohen* were complicated and concerned the takeover by Blue Arrow of an American company named Manpower Inc. The bid was to be financed by a rights issue of shares by Blue Arrow to its existing shareholders. The issue was a failure, with the majority of the shares unplaced. It was alleged that some of Blue Arrow's advisors had dishonestly taken up the shares after the offer had closed, with the object of
B concealing the shortfall from the regulatory authorities and the investing public.

At the trial 10 defendants appeared to answer the indictment, which contained a single count of conspiracy to defraud. The count was supported by extensive particulars, the details of which need not be set out here. From the outset defending counsel had warned the court that the
C extent of the case being alleged against the defendants would render its conduct unmanageable. At a late stage this proved to be the case. The learned judge immediately before the summing-up, attempted to save the situation by confining the extent of the conspiracy to the particulars alleging a late take-up of the shares. The particulars as a whole had alleged a much wider range of activity. Unfortunately, by this stage, the jury had heard evidence relating to the whole of the allegations made by the Crown,
D and counsels' speeches had been made on the basis of all the particulars being before the jury. In his summing-up, the learned judge directed the jury to confine their consideration of the case to the restricted particulars he had identified, and to disregard the evidence supporting the whole range of the particulars, save in so far as that consideration assisted the defendants. The convictions of the defendants (some of whom had been
E acquitted at an earlier stage) were quashed by this Court on the grounds that the judge's decision to sum up on the restricted basis constituted a material irregularity.

It will be seen that the facts of *Cohen* were very different from those in the present appeal but Mann, L.J., giving the judgment of the Court, made some observations about the effect of long cases on juries, at p. 30E–G of the transcript:

F

"In our judgment by January 1992 the only course open to the judge was to discharge the jury. By that date, and probably by an earlier one, the position had been achieved where it was clearly arguable that any verdict would have been unsafe and unsatisfactory. The awesome time-scale of the trial, the multiplicity of the issues, the distance between evidence, speeches and retirement and not least the two
G prolonged periods of absence by the jury (amounting to 126 days) could be regarded as combining to destroy a basic assumption. This assumption is that a jury determine guilt or innocence upon evidence which they are able as humans both to comprehend and remember,

and upon which they have been addressed at a time when the parties can reasonably expect the speeches to make an impression upon the deliberations (as to which see *Landy* (1981) 72 Cr.App.R. 237, 245, by Lawton L.J.)." A

These dicta show that in a potentially long criminal case a heavy responsibility lies upon the trial judge and counsel, in particular prosecution counsel, to ensure that it remains manageable and of a dimension that enables it to be presented clearly to a jury. The judge's B powers in this area are restricted. The Indictments Act 1915 gives him the right to sever the indictment in an appropriate case, but he cannot prevent the prosecution calling relevant evidence, save for the well-known common law and statutory exceptions. It is for prosecution counsel to decide what evidence he should call and it is for this reason that he is in the best position to decide the shape of the case. The difficulty over recent years, as appears from the authorities, has been the reluctance of C prosecution counsel to cut down the size of the case by failing to agree to the severance of certain counts and by calling evidence, which although admissible on the remaining counts, is not essential to prove them. Presumably counsel fear that if they do not call all the relevant evidence available to them, the accused may be unjustly acquitted. However, in our judgment, it is the duty of prosecution counsel to review the evidence in a D long case and decide how much of it, even though relevant, can be withheld in the interests of time and clarity.

Furthermore, when the judge is minded to sever the indictment, it is not appropriate for prosecution counsel to frustrate the judge's purpose by calling the evidence supporting the severed count or counts, on the basis that it is relevant to those remaining.

Returning to what took place at the preparatory hearing on February 12, E 1990, it may be asked why only a limited order of severance was agreed or made. The documentation was considerable and there were many witnesses. It was a case which cried out to be tried in parts, if it conveniently could. Part of the difficulty was that the time estimates were hopelessly inadequate, although it is of course much easier to make such a comment after trial than before it. Even an estimate of six months should F have provoked a careful examination of the case by all concerned to see how its range could be limited. In fairness, one should observe that there was a severance of some counts as already described but it was in relation to the principal defendants, the present appellants, that action to reduce the number of counts to be tried needed to be taken. Unfortunately, as it appears to this Court, the application was not directed to the right counts. While the third group of counts could have been severed from the others, G this would not as Mr Barnes has pointed out, have made much difference to the length of the trial. This seems to be a more attractive reason than the indication that he would call the evidence relating to the group three

counts, even if they were severed. Approaching this case with all the advantages of hindsight, it does seem to this Court that it could have been fairly tried if the counts in the indictment had been reduced to those dealing with the offences alleged between about October 1983 and the beginning of the Receivership in September 1985. This would have included the period from when Montagu became interested in the venture, as well as the events relating to the Moody correspondence and proposed loan. That is what the Crown has described as the heart of its case. Such a course would have excluded all the evidence relating to the period 1980 to October 1983, which took such a long time at the trial, dealing as it did with the detailed testimony of the bank managers. There would of course have been difficulties in taking such a course, with the accompanying decisions as to which evidence should be called and which jettisoned, but the difficulties would have been minor compared with what the Court had to face in the event.

It has been objected that this course would involve three trials rather than one, with all the hardship that that would have imposed upon the witnesses. While appreciating that this may be a possibility, the reality is as in similar cases, that if the appellants were convicted upon the 1983–85 counts, as in fact was the case, no prosecutor would seek a further trial of these appellants on the remaining counts. No doubt an application would have been made to leave them on the file.

In reply to this suggestion Mr Barnes points out that it was never raised at the preparatory hearing and he first became aware of it when reading the skeleton argument prepared for this Court by Mr Day Q.C. for Kellard. As Mr Barnes says, the learned judge can hardly be blamed for not ordering this particular form of severance if nobody suggested it to him. No further application to sever the indictment was made when it was discovered how many witnesses were to be called at the trial, notice requiring their attendance having been given by the defence. The only application made was on behalf of Dwyer, after he had entered pleas of guilty to some of the counts on the indictment.

The application was made because Mr McEvoy Q.C. for Dwyer correctly anticipated difficulties arising from Dwyer's pleas of guilty if he was tried on the remaining counts with any co-defendant who was contesting the counts to which Dwyer had pleaded. The refusal to grant Dwyer's application did indeed cause problems for him at the trial, which is the subject of a further ground of appeal and will be dealt with separately.

Apart from the question of severance, what other causes were there that contributed to a trial of such extraordinary length? As might be expected, each side tends to hold the other responsible but there are certain features which can be identified. There were of course a vast number of documents to read in preparation for the trial and the witness statements were extensive. The depositions of one witness, Mr Thompson, whose firm Thornton Baker was the accountant of JLF (U.K.) Ltd consisted of some 200 pages. The presentation of Kellard's defence was complicated by the fact

that his leading counsel came late into the case, again for a particularly good reason, and, for reasons connected with Kellard's health, found A
difficulty in taking instructions. This in turn made it difficult to agree parts of the evidence which he might otherwise have been able to do. Prosecution counsel points out that none of the notes taken by the bank managers at their meetings with Kellard and Dwyer were admitted as evidence, other than for use as an aide-memoire because of defence objections.

On the other hand counsel for the appellants criticise the prosecution for B
its insistence on examining all the issues in great detail. It would not be helpful in a long judgment to identify them particularly but they include areas of the evidence which the learned judge virtually told the jury to disregard at a later stage. It is not for this Court to establish whether it was one side or the other who was primarily responsible for the length of the trial. We are not sitting in any disciplinary capacity, and we identify the problems so that they may be avoided in later cases. It is essential in our C
view that in these serious fraud cases all parties strive to give effect to the purpose of the 1987 Act. This is intended to narrow the issues to be tried, not to extend them.

Furthermore, points as to admissibility of evidence should be taken less readily than in trials of more conventional crime. Counsel on both sides should, by the time of the preparatory hearing, be in a position to agree D
uncontentious areas of the evidence. Care should be taken to ensure that only essential witnesses are called and their evidence restricted to what is perceived to be necessary. All these points are well-known to the profession and in many cases they are no doubt observed. It is plain, however, that this is not so in all cases.

Whatever may have been the cause, there is no doubt that this trial was one of excessive length. The appellants argue that coupled with the E
complexity of the issues, the time taken to try the case was such that all the convictions which are the subject of the present appeal are unsafe and unsatisfactory. As already noted, the appellants say that the strain imposed on all connected with the trial was intolerable. The main impact would have been on the jury who were of course unused to the pace of court procedure. It is submitted that the jury could not over such a period of time give sufficient concentration to evidence of activities with which F
they are likely to be unfamiliar. Furthermore, it is said that the jury was likely to be resentful of the fact that the length of the trial was so much greater than they had been advised at the outset.

While these general grounds apply to all the defendants, it was submitted that there were special considerations applying to Kellard in this context.

Kellard had without question been the moving spirit in the development G
of the theme park and it was he who was at the centre of most of the efforts to raise money. It was inevitable therefore that he was cast in the role of the principal defendant at the trial. He faced in the event 23 counts on the

indictment. He and his legal advisers had to grapple with a mountain of papers in preparing for trial. Unfortunately he was handicapped in this task for a number of reasons.

Kellard was arrested in September 1988 and remanded in custody at Leicester Prison until June 1989. For reasons connected with prison rules he was apparently denied access to the case papers. He suffered ill health resulting from a diabetic condition of long standing. He obtained the case papers in August 1989 but because of their size and his own ill health he was unable to discuss the case with his solicitors before the end of November 1989. Between that date and August 1990 he had a series of conferences with his solicitor and later with counsel. Unfortunately on August 3, 1990 he was admitted to hospital in a semi-conscious condition suffering from giardiasis, an infection involving acute diarrhoea. He was still suffering from these conditions when the trial began in September 1990. An application to postpone the hearing was made shortly prior to the commencement of the trial but the judge refused it on the basis of the medical evidence available to him.

In the result it is claimed that Kellard had to face trial with his preparations uncompleted and while still suffering from ill health. This involved him and his lawyers working both before and after the court sittings to keep up with the evidence. The judge excused Kellard's attendance at court when he was unwell and on some occasions he adjourned the trial for a few days. The prosecution assisted as best they could by calling less contentious witnesses when Kellard was absent, but in his case particularly, this was not always possible. It is submitted that the difficulties that Kellard faced and the strain imposed upon him made a trial of this length particularly unfair in his case.

It must be recognised that the judge is in a very difficult position when he is faced with a long trial and the principal accused is unwell, as Kellard undoubtedly was. The judge is confronted with the alternatives of proceeding with the trial and risking the possibility that the accused may not be able to do himself justice or of aborting the trial with the consequent delays. In the present case the trial was taking place some five years after the collapse of Brittania Park. The judge's choice of these alternatives has to be based on the medical evidence available to him. Of this there was no shortage. There was produced some 20 medical reports concerning the period from August 1990 until the end of the trial. These varied to some degree in their content but there was material upon the basis of which the judge could properly proceed with the trial. As already observed considerable efforts were made by the judge to ensure Kellard's comfort. The prosecution arranged for a doctor to be present at court throughout the period that Kellard was in the witness-box. While Kellard's medical condition is properly raised in this appeal, we do not feel that he was prejudiced to the extent of saying that the conviction was unsafe. Indeed, the learned judge commented upon the vigorous way in which he gave his evidence.

The first question to be decided is whether the length of the trial in itself is a sufficient ground for characterising these convictions as unsafe or A unsatisfactory. The Court is firmly of the opinion that it is not. If it were otherwise, cases would have to be tried within a time limit.

The correct approach is to consider whether the length of the trial created a situation at any point whereby a fair trial was not possible. Does the case reveal any feature which tends to establish that any of those taking part in the trial were by reason of its length unable to discharge their function? B

The most important of those concerned in the trial was the jury. If it was unable to understand the evidence, or the directions it received were not reliable or accurate, there would be grounds for saying that the convictions were unsafe.

It is evident that the jury itself manifested no such incapacity. One of their number had to be discharged at an early stage but thereafter their attendance at the trial was assiduous. On no single day when the court was C sitting over this long period was a jury man or woman ever late. A succession of notes were passed to the court during the course of the trial, some merely checking that the jury had the right documents, some asking more weighty questions but demonstrating the jury's close attention. With the exception of one jurywoman who is the subject of criticism on behalf of Kellard in a separate ground of appeal, there was no complaint during this appeal of any shortcomings on the part of the jury, neither was any D application made for its discharge on this ground during the course of the trial. There is perhaps a tendency in the legal profession to underrate the capacity of juries in this country. While it is not a feature of this case, it should not be too readily assumed that a jury cannot properly understand a case merely because of its length. Juries might well resent such condescension. Certainly during the present case, notwithstanding its E length, no complaint was ever made that the jury did not comprehend what was going on, nor did any such admission come from the jury. Furthermore, the jury showed some discrimination in their verdicts by acquitting Wright on count nine.

Was the case clearly presented to them? The bulk of the responsibility for this must rest upon the prosecution counsel. While as is no doubt apparent from earlier passages in this judgment, we are not sympathetic to some of F his submissions on severance, or to the quantity of evidence he called, it is clear from the transcripts and from this appeal that Mr Barnes had an extraordinary grasp of this case and there was no danger of the jury being misled. Equally the various issues raised by the defence were clearly pointed out by defence counsel.

The major task of guiding and instructing the jury lay with the learned judge. As will appear later, some criticism is made by the appellants, that G on occasions the judge did not always give a balanced exposition of the evidence or used expressions which could be construed as hostile to Kellard's case. That apart, all counsel have expressed their warm

A appreciation of the learned judge's conduct of this case and their admiration for his summing-up. The members of this Court have had the opportunity of reading transcripts of the summing-up which reveal the learned judge's mastery of the case. We would respectfully express our own admiration of this monumental effort and the clarity with which his directions to the jury were expressed. As McKinnon J., who was the trial judge in *Cohen* (*supra*) said, no judge should be asked to conduct a trial of that length, but we are convinced that the strain upon the learned judge in
B this case was not reflected in his conduct of the trial.

The range and weight of the evidence which had to be assembled and presented to the jury in the summing-up must be unique. Yet the summary and presentation of the evidence was such that the jury must have readily understood it and, notwithstanding its length, there was no danger of it being confused.

C Mr Day submits that the case was one of complexity. Considering its length and the number of counts included in the indictment, this can scarcely be gainsaid. Yet the complexity lay in the detail and the amount of evidence which was called. The issues were clear enough, namely whether the appellants in the particular matters alleged against them in the indictment had acted dishonestly. The question of dishonesty is one that a jury is particularly qualified to resolve. The story of the growth of an
D enterprise such as a theme park and its collapse due to lack of finance is neither difficult to understand nor particularly unusual. There were some areas of the case such as the proposal to issue further share capital for Brittania Park Ltd with which the average person is likely to be unfamiliar, but this was on the fringe of the case.

As already observed, the complexity of the case did not result in any evident failure of understanding on the part of the jury.

E For these reasons and notwithstanding the prejudice to the appellants caused by a trial of this length, we are of the opinion that this ground of appeal must fail.

We turn now to deal with those grounds of appeal which refer to specific complaints. In addition to his two principal grounds of appeal, dealt with above, Mr Day advanced further grounds which he summarised under the heading of (i) various complaints about the summing-up, and (ii) the
F judge's refusal to discharge one of the jurors when it was brought to his attention that she appeared to have made up her mind against Kellard before the conclusion of the evidence, counsel's speeches and the summing-up. We deal with these in turn.

As already observed, all counsel, including Mr Day, express their admiration for the way in which the judge had assembled the evidence into a clear logical discussion. He had also given the jury, after discussion with
G counsel, impeccable written directions in law relating to each count. Despite its inevitable length, the summing-up was conceded as being a *tour de force*. There were, said Mr Day, one or two inaccuracies (and we comment that it would have been miraculous had there not been) but he

accepted that the judge corrected such errors as there were when asked to do so.

Mr Day's real complaint was as to the general tenor of the summing-up, which, he argued, contained too many instances of the judge's expressing, or appearing to express, his own view of factual issues—generally unfavourable to Kellard. There was, it was argued, an excessive use of the phrase "... you may think ...", or similar expressions which disclosed the judge's own view. Of course it was accepted that the judge was entitled to comment, and there is no doubt that the use of such phrases is the almost invariable precursor of judicial comment in a summing-up. The complaint is that in this case, particularly in the context of its length, complexity and the time-gap between the evidence, counsel's speeches and the summing-up, there was too much of it, to the disadvantage of Kellard in particular. A considerable number of instances were quoted.

But this kind of complaint is always a matter of degree in the context of the summing-up as a whole. The judge made it abundantly plain, not only at the beginning of the summing-up but throughout its course, that it was the jury's view of factual issues that was all important. Clearly, if a summing-up over-emphasises the judge's adverse view of a defendant's case, including his credibility, unfairness may be established despite repetition of the parrot-like reminder that the decision is nevertheless for the jury. This is likely to be particularly so in the context of a short or uncomplicated case. In a very long and complex case such as the present, which demanded a long and comprehensive summing-up, the argument of unfairness is more difficult to sustain. In the light of the jury's various verdicts, and its obvious attention throughout the trial, upon which we have already remarked, we take the unhesitating view that they were fully alive to their duty to reach their own conclusions.

The case against Kellard, on all the counts on which he was convicted, was very strong. He was involved throughout the long history of the Brittania Park project and the major part of the very extensive summing-up had to be devoted to the issues affecting him. Comment on those issues was inevitable. In the context of the whole it was not unfair.

*Discharge of the juror*

At the close of Kellard's evidence on September 19, 1990, Mr Day submitted that one of the jurors should be discharged because of certain hostile remarks and/or grimaces she had made in the course of his client's cross-examination in the closing days of July. The judge declined to discharge the juror. It was submitted that he was wrong to do so and, on appeal, the argument was reinforced because as it turned out the juror concerned had been elected foreman. We do not think we can improve upon the judge's reasons. He said:

> "... it may often be the case that it becomes apparent to a defendant that some of his evidence is not being well received by a particular

juror or jurors and I do not consider that what I have heard takes the position anywhere near the point where I need, in the interests of justice, discharge a juror who there is no reason whatever to suppose will not be true to her oath and decide the question of his guilt or innocence according to the overall weight of the evidence once properly directed by me as to the law. Mr Kellard will, I am sure, appreciate that for a juror to have apparently formed a provisionally adverse view on some aspects of his evidence is not the same as demonstrating that he is not receiving a fair trial on the issues which are before the jury."

We agree. In our view there is nothing in this further ground of appeal.

Mr Day raised a number of other grounds of appeal of less significance than those already dealt with and upon which we make no separate comment, other than that either individually or collectively they could not affect the verdicts in this case.

*Specific grounds relating to Dwyer*

Dwyer raised numerous grounds of appeal under 20 separate headings. Several overlap. We do not propose to deal with them all in detail. The defence complain that the judge put various aspects of the defence case inadequately to the jury or, in one or two instances, not at all. In the course of a summing-up lasting 11 days, the judge laid out the constituents and evidence on each count with the greatest care and in our judgment with fairness to both prosecution and the defence. Not the least of the judge's problems was to keep the summing-up from becoming so long that it would confuse rather than assist the jury. He had no doubt in mind, as we have, that the jury had already heard speeches from all counsel. During the course of them they were reminded of the points that Mr McEvoy complains the judge omitted. These included such matters as Dwyer's explanations for "lies", to which the Crown claimed he was a party. In this, and other regards, it should not be overlooked that Dwyer did not give evidence, so the complaint essentially relates to a failure to remind the jury of defence arguments rather than evidence.

The points raised by Dwyer that have given us the most concern relate to his application for severance on September 10, 1990. This was immediately before the start of the trial. Dwyer had just pleaded guilty to counts 12, 13, 14, 15, 21, 22, 23, 24, 25 and 27, but with the exception of count 12, which concerned a discrete matter of no great significance, all concerned offences in the last few months before the Receivership. These pleas were not acceptable to the Crown, whose case it was that Dwyer had been Kellard's enthusiastic number two from the start.

Because Dwyer's honesty was in issue on those counts upon which he remained to be tried by the jury, he was naturally concerned that he would be disadvantaged by the jury learning about his involvement in the later counts. Accordingly, Mr McEvoy sought severance from those who were

to be tried on counts to which Dwyer had pleaded guilty. His greatest objection was to avoid a joint trial with Sobhkhiz who was involved in the purchase of KLF House (counts 25 and 26) and Emmett in connection with the rides (counts 21, 22, and 23). But he was also concerned about being tried with Kellard if the jury had to determine Kellard's guilt on counts 13, 14, and 15 (fraudulent trading).

Dwyer received broad support in his application from the other defendants, although it was Wright's position that he, under no circumstances, wished to face two trials.

Mr McEvoy's bottom line, if we can so describe it, is that whatever other order might be made, the trials of Sobhkhiz and Emmett should be severed and their trial take place subsequently. They strongly supported this.

After argument the judge ruled:

> "I am satisfied that Mr Dwyer's pleas of guilty to certain counts do not in themselves require, either on the grounds of justice or convenience, that any order for severance or a separate trial should be made in respect of the remaining counts against him."

It is this ruling that Mr McEvoy attacks. He argued that the judge seriously underestimated the degree of prejudice to Dwyer, particularly in a joint trial with Sobhkhiz. The jury would be bound to learn, as they did, that Dwyer had participated in events for which he was not being tried by them and wonder why. They would wonder too why the evidence was unchallenged by Dwyer. It would present an unfair dilemma to Dwyer in deciding whether to give evidence. Ultimately it would count against Dwyer when the jury came to consider Dwyer's guilt on the counts upon which he was being tried, because they would know of his dishonesty on the Sobhkhiz counts.

Further, Mr McEvoy observed that if the judge had known in September 1990 how long the trial would take, there would inevitably have been some severance of the trial and his client would have been the beneficiary of it. But the judge had to make a decision on the basis of the information available at the time.

We think there is considerable force in Mr McEvoy's arguments. But that is not the end of the matter. There were other considerations too and the judge had to exercise his discretion after taking everything into account.

After his pleas of guilty, there remained outstanding against Dwyer 10 counts, covering a period between 1980 and 1985. Separating Dwyer from others who remained to be tried on counts to which he pleaded guilty presented real practical problems. There would have to be several trials and a considerable duplication of evidence. The interests of other defendants had to be considered, not least Wright, who was fully justified in arguing that justice required he face no more than one trial.

Mr Barnes argued that there was nothing particularly unusual about the case and that the courts are often faced with joint trials where there are multiple defendants. That said, however, Dwyer was particularly

vulnerable if, as proved to be the case with Sobhkhiz, another defendant
A chose to vilify him. Mr Barnes argued that the offences to which Dwyer pleaded guilty were different in time and circumstances from those that remained and were central to the case. The core of the case related to the Moody agreement, and properly directed by the judge, the jury would be able to do justice to Dwyer.

Mr Barnes made additional points about the delay occasioned to the defendants such as Emmett and Sobhkhiz if their trial was put off and the
B problem that adverse publicity from the first trial might have upon a second or subsequent trial.

We were referred to a number of authorities. It is unnecessary to mention them at all in this judgment, for in our view the law is clear. The judge has a discretion. It is a wide discretion and one that is virtually never interfered with on appeal.

In *Flack* (1969) 53 Cr.App.R. 166, 171, [1969] 2 All E.R. 784, 788, Salmon
C L.J., as he then was, said:

> "This Court will not, however, interfere with the decision of the judge in such a matter unless satisfied that there were no reasonable grounds upon which his decision could be supported, or that it may have caused a miscarriage of justice."

In *Cannan* (1991) 92 Cr.App.R. 16, 23, Lord Lane C.J. spoke of exercising
D discretion upon the usual and proper principles, namely taking into account all things the judge should, and not taking into account anything he should not.

Mr McEvoy argued that the present case is distinguishable on its facts from the reported cases and so it is. But in the end the judge has a discretion to exercise. There is nothing in this case to indicate that the judge exercised
E his discretion upon improper principles, left anything out of account or took anything into account that he ought not to have done. He had a difficult balancing exercise to carry out and we see no good reason for interfering with his decision.

The next ground of appeal is really an extension of the previous one. In October 1991, Sobhkhiz in cross-examination gave evidence that was damaging to Dwyer and immediately afterwards changed his plea to
F guilty. By this time Dwyer's case had been concluded. He had not given evidence. In the meantime on October 24, 1991 the jury sent a note to the judge. It reads:

> "Some members of the jury are a little unsure of this current charge re Mr Sobhkhiz. Within the charge Mr Dwyer is mentioned 'and/or'. Is Mr Dwyer implicated in this charge—in as much that the jury should
> G be considering Mr Dwyer's innocence or guilt. . . ."

The note was referring to count 26 and it was not an easy question for the judge to answer. He did so pointing out that on this count it was the guilt of Sobhkhiz, and Sobhkhiz alone, that they were considering.

Mr McEvoy argues that here is a clear example of just the sort of risk of prejudice that was to be expected following refusal to sever. After A Sobhkhiz's plea of guilty he asked for the jury to be discharged. The judge refused and it is the refusal that gives rise to this ground of appeal.

By this time the trial had been running for over 13 months. The evidence had been, or was, on the point of being concluded. There was an overwhelming public interest in going on with the trial if this could be done fairly. Again the judge had to exercise his discretion. We are satisfied that he made the correct decision. Not only was the position explained to B the jury in answer to the note but, more importantly, counsel for the Crown in his final speech fairly and very carefully explained that any evidence concerning his involvement with Dwyer was inadmissible against Dwyer on those counts on which he was before the jury. The same ground was fully covered once again by the judge in his summing-up.

Once more the judge had a balancing exercise to carry out. We are C satisfied that he was correct in ruling as he did, following his ruling with a very clear direction about the effect of Sobhkhiz's evidence on the case of Dwyer. He concluded that if the jury were given an appropriate direction then the risk of prejudice could be avoided. As the trial judge he was well placed to make the assessment.

The only other matter with which it is necessary to deal in any detail is count 5. This count alleged obtaining a pecuniary advantage by deception D from Barclays Bank. The deception was that KLF had won a substantial order for medical supplies in Saudi Arabia, the value of the order being in excess of £1,000,000. Mr McEvoy contends that at the most the jury could only properly convict of an attempt to commit this offence because the bank manager, Mr Bateman, did not rely on the representation. In support of this contention Mr McEvoy points to answers he obtained from Mr Bateman in cross-examination. But Mr Barnes did not leave the matter E there and picked the subject up again in re-examination. In our view, taking Mr Bateman's evidence as a whole, there is evidence upon which the jury were entitled to conclude that the full offence had been committed, rather than just an attempt and the judge was entitled to leave the issue to them.

There are three other grounds of appeal that require brief mention. F Before the trial began, the judge suggested that Dwyer's presence in the dock was required during the prosecution's opening of the case so that the jury could observe his demeanour. Whilst the judge's remark was in our view inappropriate, it can have had no conceivable influence on the outcome of the case. In any event, the jury to whom the remark was made was discharged very soon afterwards, albeit most of its members were re-sworn as members of the new jury. The judge did not repeat his remark G to the new jury.

Complaint is made of comments in opening by prosecuting counsel about the drastic consequences to some creditors of the defendant's

fraudulent trading. We remain unpersuaded that Mr Barnes said anything
A that was other than appropriate.

Complaint is also made of the number of occasions on which the judge referred to the fact that Dwyer had not given evidence and the manner in which he did so, especially his use of the word "failure". The judge's direction to the jury on a defendant's right not to give evidence was impeccable. It was inevitable that in the course of reviewing the evidence the judge would refer many times to the fact that Dwyer had not given
B evidence. We can see no justifiable criticism of the summing-up in this regard.

We have come to the clear conclusion in the case of Dwyer that none of his grounds of appeal, either individually or collectively, raises any concern that his conviction was in any way unsafe or unsatisfactory.

The appellant John Leslie Fitzwalter Wright is now aged 60. He is a deeply religious man and prior to his convictions on five counts in the
C present case, was a man of impeccable character, with an impressive history of service to the community—a Church of England lay reader, hospital and prison visitor, director of the Full Gospel Businessmen's Fellowship and founder/chairman of a hostel for inadequates. A number of character witnesses gave evidence of his godliness, integrity, trusting nature and inability to see fault in others. Against this, the jury no doubt took account of the appellant's wide business and merchant banking
D experience. After Oxford he had trained for two years with Price Waterhouse and attended a short course at the Harvard Business School. He had worked in the Butterly Group, become a local director of Reckitt and Colman, for 17 years he had been chairman of Branch Securities Ltd and for four years chairman of his own merchant bank, Fitzwalter Wright Ltd. Some of the character witnesses said that his vision was usually fixed
E on the wider horizons in business matters, not concerning himself with detail.

At the beginning of the trial this appellant faced 10 counts; seven substantive counts and three of fraudulent trading during the final months of Brittania Park's life. At the close of the prosecution case the learned judge directed the jury to acquit him on three of the substantive counts, and before beginning his summing-up he (i) further directed an acquittal on
F another count, and (ii) withdrew from their consideration one of the particulars in yet another count (count 9). The result was that Wright was in the charge of the jury on a total of six counts. The jury acquitted him on count 9, which therefore needs no further consideration at this point, but convicted him on the remaining five. These were: *Count 6* (jointly with Kellard). Making a false statement to induce investments contrary to section 13(1) of the Prevention of Fraud (Investments) Act 1958. The basis
G of this count was a project report compiled by Wright and dated 10th May 1984 which falsely stated that: (i) KLF (U.K.) Ltd would be awarded approximately £3,000,000 damages at a High Court hearing on June 25, 1984; (ii) the KLF group of companies had been successful in the design,

construction and operation of leisure projects in the U.S.A.; (iii) the National Coal Board, the Royal Mint, the Meteorological Office, Ordnance A
Survey and the Royal Shakespeare Company had agreed to invest a total of £1.45 million in the Brittania Park project. *Count 13* (jointly with Kellard). Fraudulent trading contrary to section 458 of the Companies Act 1985. The allegation here was that during the third fraudulent trading period, between April 1, 1985 and the Receivership on September 10, 1985, the defendants were knowingly parties in the carrying on of the business of Brittania Park Ltd with intent to defraud creditors. *Count 14* (jointly with B
Kellard). An identical count to 13, save that the company concerned was KLF (U.K.) Ltd. *Count 15* (jointly with Kellard). An identical count to 13 and 14, save that the company concerned was KLF (Construction) Ltd. *Count 18*. Making a false representation to creditors, contrary to section 629(1) of the Companies Act 1985. The basis of this count was that on August 1, 1985, the appellant, being a director of Brittania Park Ltd, had falsely represented to one of the company's creditors that the park had been C
valued at approximately £11,000,000 by Humbert Landplan, for the purpose of securing the creditor's agreement to wait for payment of their outstanding debt and not to take action against Brittania Park Ltd. Mr Mylne Q.C. for the appellant accepted that there was a prima facie case to answer on counts 6, 13 and 18. But he submitted that (i) the evidence against his client was so weak that the risk of the jury being overwhelmed D
by the length and complexity of the case had materialised and although Wright was on the periphery of the case he had been dragged down by the weight of the evidence against those in the centre; (ii) on counts 14 and 15 the Crown's case was even weaker—the appellant was neither a director nor employee of the companies concerned and could not be regarded as exercising "a controlling or managerial function" or as one who was "running the business" (*Miles*: Court of Appeal, transcript of April 2, 1992 E
at p. 13).

There is no doubt that the evidence against this appellant was by no means overwhelming and the general tenor of the judge's summing-up was favourable. In view of these considerations and his largely unchallenged character, Mr Mylne says something must have gone wrong somewhere in the jury's deliberations, rendering the verdicts unsafe or unsatisfactory. We need to examine as shortly as possible the background F
and involvement of Wright in the five relevant counts.

Wright's home was in Norfolk. He was approached by a neighbour, Kellard's brother, to lend his expertise to Kellard in raising finance for the project and he agreed to do so. He met Kellard in December 1983, and, from his notes of what he was told there and then, and various documents left with him, he produced a project report on December 19, in a form which he judged appropriate to interest bankers or other potential investors. He G
produced an updated report on January 23, 1984 and finally the third report on May 10, 1984 which was the basis of count 6. Wright said that these reports were composed from information supplied by Kellard and

that each was sent to Kellard to check the accuracy of the facts stated. He
A said he acted honestly and relied on Kellard whom he trusted. He himself
was merely an ad hoc unpaid adviser at the material times. *Count 6*. We are
inclined to accept two of Mr Mylne's arguments as to the particulars of this
count. Dealing first with particular (i), this concerns the company's action
against DCC and involves two false statements: (a) that the company
would be awarded approximately £3,000,000 in damages and (b) that the
award would be made on June 25. In other words, shortly after that date
B about £3,000,000 would be added to the company's cash balance. For
reasons which seem to us good but need not be rehearsed, Wright was not
aware when he composed the project report of May 10 that a split trial had
been ordered and therefore that any assessment of damages would not be
made until a much later date.

Mr Mylne's second argument related to particular (iii). The information
from Kellard that the named institutions had agreed to invest £1.45 million
C was wholly false, but the jury acquitted Wright on count 9. The basis of the
latter was that Wright had attended with Kellard a meeting at the Trustee
Savings Bank on May 9—the day before his project report—when Kellard
had put forward false investor figures in order to obtain a loan. It was said
by the prosecution that Wright must have known they were false. As the
jury acquitted Wright on that count, it is logical to suppose that they
D discounted particular (iii) as against Wright.

But that leaves the false assertion of the quantum of damages
recoverable against DCC and the false assertion in particular (ii) of the KLF
group's U.S.A. experience. There was, we think, no adequate explanation
by Wright of a significant alteration in the statement as to quantum and of
damages as between his second project report of January 23, 1984 and the
third. In the second he had stated:

E "KLF are expected to be awarded approximately £1 million damages
for breach of contract by the Council at a High Court hearing in April
1984."

In the third report this had changed to:

"KLF are expected to be awarded approx £3 million damages for
F breach of contract by the Council at a High Court hearing on June 25,
1984."

There had been no advice from counsel or solicitors to justify the
increase. Wright's reliance on an assertion by Kellard of increased building
costs over the period of delay in the action does not explain this alteration.
Furthermore, in both the TSB interview the day before his project report
and in Wright's letter to Samuel Montagu the day after, the damages'
G estimate had merely been ". . . at least £1 million".

As to the false statement regarding KLF's experience in the U.S.A.,
Wright's difficulty in justifying this statement was apparent from his
answers in the police interview. These made plain his knowledge that KLF

in fact had no experience of building or operating leisure projects in the U.S.A. *Counts 13, 14 and 15.* In October 1984, Wright ceased to be an unpaid adviser to Kellard. He was appointed a director and chairman of Brittania Park Ltd. at a salary of £1,000 per month. As stated above, Mr Mylne contended that as he had no executive function with regard to either of the subsidiaries "U.K." or "Construction", he could not be regarded as taking part in the running of those companies (counts 14 and 15). But he accepted that the same could not be said of Wright's involvement in Brittania Park Ltd. Mr Mylne said that his client did not accept this (although he had done so at trial) but we are satisfied that Mr Mylne's concession was wholly realistic.

The judge suggested to the jury that at least prior to Wright learning that Moody had withdrawn in early June 1985:

> "... there is really no substantial evidence against Mr Wright that he intended to defraud creditors ... You may think it is around opening day and his letter of July 1 which followed, when he told you that he realised that the Park was cash insolvent, that he starts to have a substantial case to answer ... ."

Even in that restricted period, there was evidence on which it was open to the jury to conclude that this appellant was dishonest in taking part in Brittania Park's continued trading, in the knowledge that the company was cash insolvent, that is, there were no funds available to pay the trade creditors—of which by the time of the Receivership some two months later, there were some 600, owed in total about £4.5 million. It is not necessary to recite details. There were certain specific matters that were obviously significant, including (i) the letter of July 1 referred to above, (ii) the discovery of what was referred to as a "Pandora's Box"—hitherto unrevealed unpaid invoices totalling a further £1,000,000 approximately, (iii) disturbing information from his co-director, Adams, (iv) despite the appointment at his suggestion of a Financial Controller, his failure to make any enquiry of that person, (v) the Board meeting of July 18 and the startling matters there discussed, (vi) the letter to Samuel Montagu on July 30, (vii) his letter to Colonel Hilton on August 1, 1985 (the subject matter of count 18, see later). The jury had the advantage of observing the appellant's demeanour and listening to his evidence over a number of days. There was plainly a substantial case to answer in relation to the latter period covered by this count and it was a matter for the jury whether they were satisfied of his dishonesty in the light of all the relevant evidence.

As the jury's verdict on count 13 was, in our view, unassailable, the subsidiary counts 14 and 15, on which Wright was sentenced to shorter and concurrent sentences, are perhaps only of academic interest. In reality the three companies, Brittania Park Ltd, KLF (U.K.) Ltd and KLF (Construction) Ltd, were largely regarded and dealt with as one single entity, the affairs of the two latter companies being where necessary the subject of discussion at Brittania Park board meetings. Their respective

23-01165-mew Doc 106-24 Filed 07/03/25 Entered 07/03/25 17:38:30 Exhibit 23
Pg 28 of 29



finances were intermingled. The only question that arises is whether
A Wright, despite not being a director or employee of either, was in fact assisting in the carrying on of the business. There was clear evidence that in the case of "U.K." he was, viz, (i) in dealing with and on behalf of the company with DCC, (ii) in seeking further finance for the company and (iii) in persuading a major creditor to postpone legal action against the company which, if proceeded with, would have led to its collapse. If this had happened, neither of its subsidiary companies could have continued
B trading. Although the case was weaker on counts 14 and 15, when the manner in which the group operated is looked at, there is little practical distinction between Wright's involvement in all three. *Count 18.* One of the trade creditors was James Smith (Scotland Nurseries) Ltd, of which the Managing Director was Colonel Hilton, the Lord Lieutenant of Derbyshire and a personal acquaintance of Wright. The company had supplied plants for landscaping purposes in October 1984 and these had been paid for. But
C subsequent deliveries were not. Large quantities of shrubs and plants were supplied to Brittania Park in May and June 1985 prior to opening, and there were outstanding invoices totalling over £28,000. This was a most serious situation for the supplier, a long-established small family company, whose cash flow was stretched to the limit and which faced the prospect of having to cease trading if not paid. After many unsuccessful attempts to contact one or other of the Brittania Park Ltd directors, Colonel Hilton succeeded
D in telephoning Wright on the morning of August 1. In order to persuade him not to take immediate legal action against the company, which had been threatened, Wright told Colonel Hilton over the telephone and confirmed by letter on the same day that "... the company had obtained a valuation on a going concern basis from Messrs Humbert Landplan at approximately £11 million...". Wright further stated that "... we will be
E able to remit at least 50 per cent of your outstanding balance by August 20, 1985...". Humberts had given no valuation of any kind by this date, and the promise of 50 per cent payment was not kept. Wright's defence was that he had been given the information by Kellard whom he still trusted, even at this date, and honestly believed it.

There were difficulties facing this defence. First, when shown his letter of August 1 by the police officers in interview, Wright said he was amazed
F at what he had written and could offer no explanation as to the source of his information. Secondly, Kellard in evidence denied that Humberts had given any such valuation or that he had said so to Wright. Thirdly, Wright was present at a meeting with Humberts on the same afternoon (his first meeting with them) when the Humberts partner was asking for information on many aspects of Brittania Park before any valuation could be made. Fourthly, Humberts did provide an informal valuation for the
G first time in a letter of August 5. Based on an estimated attendance of 1,000,000 visitors in the coming year, the figure was £5,000,000 to £6,000,000 as a going concern. No correction was made by Wright of the false information in his letter to Colonel Hilton.

That completes the summary of the Crown's case against this appellant. In view of the generally favourable tenor of the summing-up, one can understand the dismay of a man of Wright's character at the jury's verdicts. But they had observed him and listened to his evidence over a period of nine days at a late stage of the trial. The summing-up was impeccable and the appellant's defence laid fully and fairly before the jury. His honesty was essentially a matter for them. This Court is not in a position to interfere with their verdicts. A

B

*Conclusion*

Notwithstanding the result, the experience of hearing this appeal over a period of nine days has made it clear that no trial by jury should be permitted to last this length of time. The risk of an accused not getting a fair trial because of the pressure upon judge or jury is too great. The remedy is of course well-known to the profession without it being necessary to dilate upon it here. In any large fraud case—or indeed any case of potentially unusual length—it is the duty of the prosecutor to consider carefully before the preparatory hearing whether the case can properly be tried in parts rather than as a whole. A solution can often be found by a consultation with counsel who has been instructed by the defence, and then an agreed proposal for severance can be submitted to the trial judge. Prosecution counsel must be reconciled to the fact that their case may be weaker as a result of being split into a number of trials, but that is the price that must be paid to avoid the situation that arose in the present case. Severance may not be possible in all cases but a determined effort to do so should be made where it will best serve the interests of justice and the tax payer. C D

*Appeals dismissed.*
*Leave to appeal to the House of Lords refused.* E

*Solicitors*: Offenbach & Co., for the appellants Kellard and Wright. The Smith Partnership, Derby for the appellant Dwyer. Crown Prosecution Service, Headquarters.

F

G