# R v Miles [1992] Crim LR 657

# Exhibit 24

# R v Miles [1992] Lexis Citation 3932

The Times 15 April 1992, [1992] Crim LR 657

COURT OF APPEAL (CRIMINAL DIVISION)

WATKINS LJ SWINTON THOMAS AND GARLAND JJ

2 APRIL 1992

2 April 1992

Mr Barnes QC for the Appellant; Mr Nash for the Crown

**WATKINS LJ**

This appellant stood trial in the Crown Court at Southwark before His Honour Judge Anwyl Davies QC with two co-defendants called Fogg and Linsdell on 13th February 1989. A fourth defendant, Tregunna, had died in November 1988 after the committal proceedings. There were originally five counts in the indictment, but the trial proceeded on count 2 and count 5, which became count 2: the remaining counts were ordered to lie on the file, all defendants having pleaded not guilty.

Count 1 alleged an offence contrary to section 458 of the Companies Act 1985, fraudulent trading. The particulars alleged that the defendants "between the 1st day of August 1985 and the 5th day of March 1987 were knowingly parties to the carrying on of the business of FMS Financial Management Services Ltd with intent to defraud creditors."

Count 2 alleged an offence under sections 221 and 223 of the 1985 Act. The particulars were that the defendants, between the same dates, "being officers of the company known as FMS Financial Management Services Ltd knowingly and wilfully permitted default to be made by the company in that the company did not cause accounting records to be kept sufficient to show and explain the company's transactions." The prosecution provided voluntary further and better particulars of the allegation of fraudulent trading in count 1. Those numbers 1 to 8 all related to the sale of shares to an enterprise described as "GSS/I-Point" which did not exist. Those numbered 9 to 14 alleged trading with insufficient resources and wrongful use of monies in the client's account. 15 and 16 alleged false representations to FIMBRA (Financial Intermediaries Management and Brokers Regulation Association) and the Department of Trade and Industry. 17 and 18 were allegations of failure to keep proper records.

The trial lasted until 27th April 1989. Linsdell was convicted on both counts and sentenced to three years' imprisonment on each count: he was also disqualified for three years under the provisions of the Company Directors Disqualification Act 1986. Fogg was acquitted. The appellant was convicted on count 1, sentenced to 18

months' imprisonment and disqualified for two years. The jury was discharged from giving a verdict on count 2. He now appeals against conviction by leave of this court and against sentence by leave of the single judge.

Although many witnesses were called and the documentation was extensive, the prosecution case was simply that the four defendants had used the company (which will be referred to as "FMS") for the purpose of selling wholly worthless shares in the non-existent GSS/I-Point. FMS had been acquired as a "shelf" company by Linsdell, but was sold by him to Investment Capital Associations ("ICA"), a Luxembourg company controlled by three dishonest men who never stood trial, Hogeland, Meyer and Quinn. ICA, which controlled a number of other companies, needed a United Kingdom company which could be approved by FIMBRA in order to sell worthless shares in the United Kingdom and the Far East. The GSS/I-Point shares promoted by FMS were alleged to be those of a joint venture between GSS Venture Capital Corporation (incorporated in Utah, USA) and a Swedish company, I-Point, which was developing a device for testing the freshness of food. In fact, although there had been some discussions and negotiations, no company was ever formed and eventually I-Point commenced litigation against GSS in New York.

In the course of the trial, it was eventually conceded by the defendants that there had been fraud. Some £700,000 was taken from upwards of 400 members of the public. There was no evidence of any significant sums finding their way into the pockets of the three defendants, but amounts totalling approximately £800,000 had been withdrawn from FMS client account and apparently used for the purposes of the company. So far as the appellant was concerned, by the time the evidence had been completed, there were two live issues: (1) Was he a party to the carrying on of the business of FMS or was he merely a salesman taking orders from Hogeland and his associates? (2) Was he aware that the shares were worthless?

Mr Barnes QC, on behalf of the appellant, submitted that section 458 required the "person who was knowingly a party to the carrying on of the business" to have some executive or managerial responsibility. The appellant's contention was that he was a mere salesman acting on the orders of others. This, Mr Barnes said, required the judge, apart from explaining the meaning of the section, to analyse the evidence and give guidance to the jury as to what they would have to find in order to bring the appellant within the section or, alternatively, what findings would take him outside it. It was conceded for the purpose of this submission that, if properly directed, the jury could have concluded that the appellant did have some form of managerial role and was therefore "party to the carrying on of the business of FMS". But, it was contended, on the direction in fact given, the jury's verdict could equally have been based on the conclusion that a salesman's role was sufficient to establish that element of the offence and that direction was plainly wrong.

The second ground of appeal was that in a case where credibility was critically in issue, both as to dishonesty and as to the true nature of the appellant's role, the judge's direction on good character was inadequate.

The third ground of appeal arose from his direction as to dishonesty. It was submitted that the direction given was inadequate and misleading. At the very least it might have been sufficient to say, "Dishonesty is at the root of this offence." But it was submitted that the judge should have gone further and given a direction in similar terms to that given by Potter J in R v Kellard and Others where a full Ghosh direction was given.

We were referred to the history of section 458. Section 75 of the Companies Act 1928 provided: "(1) If in the course of a winding-up it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose, the court, . . . may, if it thinks proper so to do, declare that any of the directors, whether past or present, of the company who were knowingly parties to the carrying on of the business in the manner aforesaid shall be personally responsible . . .

"(3) Where any business of a company is carried on with such intent or for such purpose as is mentioned in subsection (1) of this section, every director of the company who is knowingly a party to the carrying on of the business in manner aforesaid, shall be liable on conviction on indictment to imprisonment . . ."

Subsection (5) provided that the expression "director" should "include any person who occupies the position of a director or in accordance with whose directions or instructions the directors of a company have been accustomed to act." Those provisions became section 275(1), (3) and (5) of the Companies Act 1929. By section 101 of the Companies Act 1947, there were substituted in subsection (1) of section 275 of the 1929 Act for the words, "any of the directors past or present of the company", the words "any persons" and correspondingly in subsection (3) "person" was substituted for "director of the company". The new words were consolidated into section 332 of the Companies Act 1948. Section 458 of the 1985 Act provided: "If any business of a company is carried on with intent to defraud creditors of the company or creditors of any person, or for any fraudulent purpose, every person who was knowingly a party to the carrying on of the business in that manner is liable to imprisonment or a fine, or both."

It was argued on behalf of the Crown that once "any person" was substituted for "director", the position was reached where an offence could be committed by anyone whatever their position within the company and, indeed, that the offence would not be confined even to persons within the company itself. During the course of argument, the Crown conceded that there could be many instances where persons within a company could not be said to be "party to the carrying on of the business of the company", and it necessarily follows that once this point is reached a jury will require some guidance as to where the line between being a party and not being a party to the carrying on of the business of a company has to be drawn on the facts of each case. In the course of argument, it was suggested that rather different considerations might apply to a company used from the outset for the purpose of committing fraud than to a bona fide trading company which continues trading in the face of mounting losses and the likelihood that creditors will never be repaid.

Not surprisingly, therefore, it was argued on behalf of the appellant that such variations of circumstance emphasise the necessity for careful direction on the facts of each case as to what, depending on the jury's finding of fact, may or may not amount to being a party to the carrying on of the business.

We were informed there was a remarkable dearth of authority on section 458 and its predecessors. Chronologically, such as there is, begins with Graham v Lewis (1889) 22 QBD 1which involved the construction of section 12 of the Mayor's Court (Extension) Act 1857: "Where the debt or damage claimed in any action shall not exceed £50 no plea to the jursidiction shall be allowed provided the defendant or one of the defendants shall dwell or carry on business within the City of London."

The issue was whether a solicitor's clerk could be said to be "carrying on business" within the section. It was held that he could not and although there was some discussion as to the meaning of that phrase, we do not think Graham v Lewis assists us. Mr Barnes referred to In re Maidstone Buildings Provisions Ltd [1971] 1 WLR 1085, a decision of the Vice-Chancellor in civil proceedings under section 332 of the 1948 Act. The liquidator sought an order against the directors and company secretary of the company making them personally liable for its liabilities. The company secretary applied for the proceedings to be dismissed on the grounds that they disclosed no reasonable cause of action. It was held that the expression "party to" in section 332 of the 1948 Act indicated no more that "participates in", "takes part in" or "concurs in" and involved some positive steps.

The Vice-Chancellor said at page 1092G: "So in order to bring a person within the section you must show that he is taking some positive steps in the carrying on of the company's business in a fraudulent manner.

"So far as the position of a secretary as such is concerned, it is established beyond all question that a secretary, while merely performing the duties appropriate to the office of secretary, is not concerned in the management of the company. Equally I think he is not concerned in carrying on the business of the company. On the other hand, it is well established, indeed it is obvious, that a person who holds the office of secretary may in some other capacity be concerned in the management of the company's business."

At page 1093E, he went on to say: "Counsel for the liquidator does not, I think, contend that the expression 'party to' covers everyone who has notice that the business is being carried on fraudulently. That contention, if it were

right, would lead to impossible results. But what he does say -- I think this is the substance of his argument -- is that Mr Penney in his position as secretary and financial adviser of the company and also member of the firm of the company's auditors owed a duty to the company to give them certain advice and that his omission to give that advice rendered him a party to the carrying on of the business of the company.

"I find it impossible to accept that contention. Whatever duty Mr Penney may have owed to the company, I do not think mere omission to give advice could be regarded as amounting to being a party to carrying on the business of the company."

It was not suggested that Mr Penney exercised any managerial functions and the entire case against him rested on the assertion that as financial adviser to the company, he omitted to take steps to prevent the company trading fraudulently by giving advice to the directors. R v Grantham 79 Cr App Rep 86 was a decision on whether an intent to defraud could properly be inferred on the evidence. However, Mr Barnes invited our attention to a passage at the bottom of page 91 in the judgment of the court given by Lord Lane, CJ: "In the present case it was open to the jury to find, if not inevitable that they would find, that whoever was running this business was intending to deceive or was actually deceiving Jacob into believing he would be paid in 28 days or shortly thereafter, when they knew perfectly well there was no hope of that coming about."

Emphasis is placed on "whoever was running this business".

In re Peake and Hall Ltd [1985] PCC 87 was a decision of the Chancery Division of the Isle of Man High Court based on section 259 of the Companies Act 1931: "If . . . it appears that any business of the company has been carried out with intent to defraud creditors of the company . . . the court . . . may . . . declare that any of the directors . . . who are knowingly parties to the carrying on of the business in the manner aforesaid shall be personally responsible . . . for all or any of the debts . . . of the company . . . ".

That Act further provided that the expression "director" should "include any person in accordance with whose directions or instructions the directors of a company have been accustomed to act".

The respondents were husband, wife and son. The husband and son were directors, but the wife was not. The husband suffered from ill health and took little part in running the business, but his wife took an active role, particularly in regard to the company's financial affairs. She was authorised to sign the company's cheques and also drew on her personal account for the payment of company liabilities. The son took no interest in the financial affairs of the company although he signed cheques and other documents in his capacity as director, but he worked as a salesman and took on such other tasks as needed performing. The question was whether the individual respondents were knowingly parties to the carrying on of the business of the company with intent to defraud creditors. The wife, although not a director, was held to have been a "person in accordance with whose directions and instructions the directors of a company have been accustomed to act", but the son, who was a director, was held on the evidence to have been ignorant of the fact that the company was carrying on business with intent to defraud creditors.

The learned Deemster did not expressly make a finding that the son was not a party to the carrying on of the business of the company, but he said: "He did not, however, shoulder his responsibilities as a director and did not carry out the duties imposed upon him as a director; nevertheless, I have come to the conclusion that in failing to take any interest in the financial affairs of the company he was in fact ignorant of the fact that the company was carrying on business with intent to defraud creditors. Although I do not approve of his conduct as a director, I hold that he has not been guilty of a dishonest fraud and in consequence I cannot hold him responsible personally for any of the debts of the company."

The arguments in the present case, we think, can be reduced to the following propositions:

On behalf of the appellant:

(1) On the proper construction of the words of the statute, some controlling or managerial function is required to bring a defendant within section 458. The jury were never so directed.

(2) Once it is conceded that not all those working for a company fall within section 458, if there is an issue as to whether or not a particular defendant comes within the words of the statute, the jury should be given, clear, simple guidance as to the meaning of "party to the carrying on of the business of the company" and how they should approach their decision on the facts of the particular case.

(3) The case was opened and argued on the basis that the appellant had a managerial role. The passage in the summing-up "participating, or taking part or concurring in the actual trade which is involved in the business of the particular company" widened the scope of the offence. This could have been avoided if the judge had invited counsel to address him on the law before beginning his summing-up. In the event, his departure from the basis upon which the case had been presented was a material irregularity.

For the respondent:

(1) The introduction of the words "any person" must be taken to show an intention to cast the net very wide: had it been otherwise some expression such as "concerned in the management of the company" would have been used.

(2) What amounts to the carrying on of the business must vary greatly in the circumstances of each case, typically, as between an enterprise conceived in fraud and the bona fide trading company which runs into difficulties. The man who sells bogus shares on behalf of a company acquired for the purpose of selling bogus shares is much more obviously a party to the carrying on of the business of the company than a salesman of building materials for a builder's merchant. The appellant and Linsdell could equally have been liable on the basis of a joint enterprise.

(3) The summing-up was not in vacuo, but at the end of a 37-day trial during the course of which it had been conceded that fraud was established and the question was whether any of the defendants were parties to it.

The cases to which we were referred upon the matter offer very little guidance. In our view, section 458 is designed to include those who exercise a controlling or managerial function, or who, in Lord Lane's phrase, are "running the business". A salesman who is not a manager and who sells shares he knows are worthless can be charged with offences under the Theft Act or with conspiracy.

Circumstances will vary infinitely, but we accept the force of Mr Barnes' second proposition that where there is an issue as to whether or not a defendant comes within the ambit of the section, that issue should be put to the jury together with clear guidance, appropriate to the facts of the case, as to the meaning of "party to the carrying on of the business of the company".

In this case, which has been presented on the basis that the appellant had a managerial role which he contended that he was merely a salesman acting under orders, the words used in the summing-up, particularly "concurring the trade which is involved in the business of the company" could and may very well have had the effect of broadening the scope of the offence charged in the minds of the jury. In the circumstances, we feel that the jury did not receive the guidance to which they were entitled and that given to them may have seriously misled them.

As to character, credibility was a crucial issue as has already been stated, not only on the issue of honesty or dishonesty, but also as to whether or not the appellant's account of his subordinate role was, or might be, true. The judge's summing-up on character was as follows: "A word about character. Each one of these three defendants is a person of good character; that is to say, they have never been before the courts before and never had his integrity impugned before the courts.

"How should you deal with that?

"Let us remind ourselves of this: each one of us starts the journey of life with a good character. Some, sad to say, during the course of their journey, lose it. You will give such weight to this factor with regard to each defendant as you think proper."

He added later in the summing-up at page 45E: "Miles is a person of good character. I have addressed you about that."

It was accepted on behalf of the Crown that in the circumstances of this case, a fuller direction would have been desirable. The judge summed up, of course, in April 1989 before the decisions in R v Marr 90 Cr App Rep 154; R v Cohen 91 Cr App Rep 125, and, most particularly, in R v Berrada 91 Cr, App Rep 131 which, although decided in February 1989, was not reported in the Criminal Appeal Reports until the following year. However, for many years and certainly following R v Bryant & Oxley 67 Cr App Rep 157, juries had been directed that good character is primarily relevant to credibility, but they might also take it into account in considering whether it was likely that the defendant would have committed the particular offence, although the second part of the direction was not obligatory and a matter for the discretion of the judge in each particular case.

We have had no hesitation in arriving at the conclusion that the learned judge failed to give an adequate direction on good character: the jury should at the very least have been told that the appellant's good character was relevant to his credibility and it would not have been inappropriate to add the conventional second limb of the directions, albeit this was a matter for the discretion of the judge.

Finally, as to dishonesty, the judge said at page 5E: "What about intent to defraud? Dishonesty is at the root of this offence. To expand on dishonesty I think would be insulting to your intelligence; except to remind oneself that it is probably along the lines of getting an unfair advantage, or prejudicing, or taking the risk of prejudicing another's right, knowing that you have no right to do so."

The judge then went on to direct the jury's attention to the voluntary further and better particulars of count 1. In the circumstances, it was not, in our opinion, necessary for the judge to go beyond saying, "Dishonesty is at the root of this offence." The issue was whether or not the appellant knew that the shares were worthless. He was not contending that what he did might not be regarded as dishonest by others. The judge was not, therefore, called upon to give a direction in accordance with the decision in R v Ghosh [1982] 3 WLR 110. Such a direction may well be appropriate in some cases under section 458 having regard to the precise circumstances in them and our attention was drawing to the direction of Potter J in Kellard and Others where he gave a direction in the following terms:

"(1) Consider whether on the evidence before you the defendant during the period charged acted dishonestly in relation to the trade and professional creditors by the standards of ordinary and decent people. If you consider that position has not been established on the part of a particular defendant, then that is the end of the matter and you should not convict him on the basis of his attitude to the trade or professional creditors. If you consider that he did so act, then,

(2) Consider whether that defendant must himself have realised that what he was doing was by those standards dishonest."

Suffice to say that such a direction was unnecessary here. The words added by the judge after the first sentence were, in our view, not only unnecessary, but confusing when subjected to the useful test: "Were his words clear to ordinary people?" Had this ground stood alone, it may be that this appeal could not have succeeded, but when it is taken in conjunction with the grounds relating to the unacceptably wrong character direction, if not non-direction, and the failure to provide the jury with the guidance to which they were entitled and should have received on the appellant's role and the flawed construction of section 458 allied to the facts, it reinforces our view that there were

material irregularities in the summing-up, the aggregate of which make the appellant's conviction unsafe and unsatisfactory. It must accordingly be quashed.

The appeal is allowed with the observation that it is most unfortunate in such a case as this especially that the judge did not invite counsel to address him upon the legal issues before they addressed the jury finally. If that had been done, the errors in the summing-up, or most of them anyway, would more than likely have been avoided.

Appeal allowed

End of Document