# In re Augustus Barnett & Son Ltd [1986] BCC 98,904

# Exhibit 25

01165-mew Doc 106-26 Filed 07/03/25 Entered 07/03/25 17:38:30 Exhibit
Pg 2 of 8


# Re Augustus Barnett & Son Ltd

a

CHANCERY DIVISION
HOFFMANN J
27 NOVEMBER, 2 DECEMBER 1985

*Fraudulent trading – Parent company providing letters of comfort to subsi-* b *diary – Whether parent company liable for fraudulent trading – Companies Act 1948, s 332 (Companies Act 1985, s 630).*

Augustus Barnett Ltd (the company) was a subsidiary of Rumasa SA (Rumasa). The company for a number of years had traded at a loss and its auditors had only been willing to certify its accounts on a going concern basis c because Rumasa provided a 'letter of comfort' whereby it agreed to provide the company with financial support and permitted such letters to be noted in the accounts. The last of these letters, dated 1 June 1982, stated that Rumasa undertook 'to provide such additional working capital as is necessary to enable [the company] to trade at its current level of activity for a period of d not less than 12 months from this date and also provide such long-term finance as is necessary'. Rumasa during the period of 1977–81 paid the company £4,000,000 by way of subsidy. In March 1983 the board of directors of the company were informed that they were at personal risk of fraudulent trading unless they could obtain funds to pay the company's current debts. The company borrowed money from another subsidiary of Rumasa and sup- e pliers who were reluctant to extend credit to the company were reassured by statements of Rumasa that it would continue to support the company. The company's financial fortunes did not improve and it went into a creditors' voluntary winding up in September 1983. The liquidators commenced proceedings against Rumasa under s 332 of the Companies Act 1948 alleging that by giving the letters of comfort and allowing them to be noted in the accounts, f and providing subsidies and making statements of continued support, Rumasa had induced the board of the company to continue to trade and incur debts and therefore Rumasa was liable under s 332. Rumasa applied under RSC Ord 18, r 19, to strike out the claim on the grounds that it disclosed no reasonable cause of action.

g

**Held** – Application granted. A necessary condition for liability under s 332 of the Companies Act 1948 was that someone had done an act which could be described as carrying on the business of the company and that this act was done with intent to defraud creditors or for a fraudulent purpose. On the facts, as there was no allegation that the board of the company had carried h on the company's business with intent to defraud creditors there was no basis therefore on which it could be asserted that Rumasa was a party to the carrying on of the company's affairs for a fraudulent purpose. Even if it were sufficient to show that Rumasa, with intent to defraud, was party to the carrying on of the business of the company, there was nothing in the pleaded facts which supported the allegation of fraud on the part of Rumasa or from i which fraud might be inferred. Accordingly the claim against Rumasa would be struck out as showing no reasonable cause of action.

**Cases referred to in judgment**

*Cooper (Gerald) Chemicals Ltd, Re* [1978] 2 All ER 49, [1978] Ch 262, [1978] 2 WLR 866.
*DPP v Ray* [1973] 3 All ER 131, [1974] AC 370, [1973] 3 WLR 359, HL.
*R v Grantham* [1984] 3 All ER 166, [1984] BCLC 270, [1984] QB 675, [1984] 2 WLR 815, CA.

**Application**

The applicant, Rumasa SA, applied pursuant to RSC Ord 18, r 19, to strike out a claim by Michael Anthony Jordan and Gerhard Adolf Weiss, the joint liquidators of the company, Augustus Barnett & Son Ltd, for a declaration under s 332 of the Companies Act 1948 on the ground that no reasonable cause of action was disclosed. The hearing took place in chambers but judgment was given in open court.

*Peter Millett QC* and *Alan Steinfeld* for the applicant.
*John Lindsay QC* and *Nigel Davis* for the joint liquidators.

**HOFFMANN J:** There is before the court a summons by the joint liquidators of Augustus Barnett & Son Ltd (which I shall call 'the company') for relief which includes a declaration pursuant to s 332 of the Companies Act 1948 (now s 630 of the Companies Act 1985) that Rumasa SA (which I shall call 'Rumasa') was knowingly party to the carrying on the business of the company with intent to defraud creditors. The liquidators have served points of claim. Rumasa has applied pursuant to RSC Ord 18, r 19, to strike out the claim to a declaration under s 332 and the relevant parts of the points of claim on the ground that they disclose no reasonable cause of action. I heard the application in chambers but since it raises a point on which I am told there is no authority, I am with the consent of the parties giving my judgment in open court.

I shall summarise the facts alleged in the points of claim, which for the purposes of the application to strike out I must assume to be true. The company was the owner of a well-known chain of shops selling wines and spirits. In 1977 it became a subsidiary of Rumasa, a Spanish company with substantial interests in the production and marketing of wines and sherry. Thereafter the company was the principal UK retail outlet for Rumasa's wine and sherry exports.

Throughout the period of Rumasa's control of the company there was a substantial deficiency of current assets. The auditors would not certify accounts prepared on a going concern basis without a letter from Rumasa confirming that it would continue to support the company. Such letters, often known as 'letters of comfort', were provided by Rumasa on various occasions between 1978 and 1982. They were noted in the published accounts for the years ended 31 December 1979, 1980 and 1981. The last comfort letter dated 1 June 1982 stated that 'Rumasa ... undertakes to provide such additional working capital as is necessary to enable [the company] to trade at its current level of activity for a period of not less than 12 months from this date and also to provide such long term finance as is necessary'. During the period from 1977 until the end of 1981, Rumasa actually paid the company nearly £4m by way of subsidy.

On 23 February 1983 Rumasa was nationalised by Spanish royal decree. The company at that date was in serious financial difficulties. There was a £4·5 m deficiency in working capital. In March 1983 the company was advised a by its auditors and lawyers that the members of its board were at risk of personal liability for fraudulent trading and that unless it could obtain additional funds to pay its current debts it should cease trading and invite its bankers, National Westminster Bank plc, to appoint a receiver. The board notified Rumasa that unless assurances of financial support were received by b 21 March it would ask the bank to appoint a receiver.

On 21 March the company obtained an offer of a substantial borrowing facility from Banco de Jerez SA, another subsidiary of Rumasa, secured by a debenture which was executed on 5 April. On the strength of this facility, which was regarded by the board as a temporary measure pending what is described without particularity as a 'long term solution' to the company's c financial problems to be provided by Rumasa, the company continued to trade. Important suppliers were reluctant to extend credit but were reassured by statements on behalf of Rumasa that it would continue to support the company. These included an assurance of support to the chairman of the company and statements made at a press conference held on 29 April 1983 in London by the senior administrator of Rumasa appointed by the Spanish d government, which were given wide publicity.

The company's financial position continued to deteriorate and on 6 June Ernst & Whinney reported to the board that the company had no prospect of trading out of its financial difficulties as an independent company. The board asked Banco de Jerez and Rumasa for additional financial support. e This was not forthcoming and on 11 July 1983 the National Westminster Bank plc, at the invitation of the board, appointed receivers. On 31 August Rumasa appointed the same persons as receivers under the debenture granted to Banco de Jerez in April, which had been assigned to Rumasa. On 2 September the company entered into creditors' voluntary liquidation. There is estimated to be a deficiency of £4·5m for unsecured creditors. f

These are in summary the facts alleged in the points of claim. I must also draw attention to certain matters which are not alleged. First, it is not alleged that anyone other than the board actually carried on the business of the company. In particular, it is not alleged that Rumasa carried on any business of the company. The way in which the matter is summed up by the liquidators in para 48 of the points of claim is that by (i) giving the auditors letters of g comfort and allowing those letters to be noted in the accounts (ii) providing subsidies (iii) making statements of intention to continue support after nationalisation, both to the board and in public, Rumasa –

> 'indicated an intention financially to support the company and to enable the company to trade as a viable concern; and by so doing induced, and h intended to induce, the board of the company to cause the company to carry on trading and to incur debts (which the board would not otherwise have done) and induced, and intended to induce, suppliers and the creditors of the company to continue to supply or grant credit to the company.' i

The allegation is therefore that Rumasa induced the board to continue actively to carry on the company's business and induced suppliers and credi-

tors to do business with the company but not that Rumasa itself in any way carried on the company's business.

Second, it is not alleged that in carrying on the company's business the board had any intent to defraud creditors or anyone else. On the contrary, as may be inferred from the passage which I have quoted from the points of claim, it is accepted that the board honestly believed that Rumasa would continue to support the company and it is alleged that without such belief the board would not have caused the company to continue to trade.

Section 332(1) of the Companies Act 1948 reads as follows:

> 'If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory of the company, may, if it thinks proper so to do, declare that any persons who were knowingly parties to the carrying on of the business in manner aforesaid shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the court may direct ...'

It is a necessary condition of the court's power to make an order under this section that it appears that 'any business of the company has been carried on with intent to defraud'. Transferring the passive to the active voice, this in my judgment involves a finding that someone has done an act which can be described as carrying on some business of the company and that in doing so he had an intent to defraud. Equally, the words 'any business of the company has been carried on ... for any fraudulent purpose' must mean that someone carrying on the business had a fraudulent purpose in doing so. Once this condition has been satisfied, the court may impose personal liability on any persons who were knowingly 'parties to' carrying on of the business 'in manner aforesaid'. The words 'persons ... parties to' may be wide enough to cover outsiders who could not be said to have carried on or even assisted the carrying on of the company's business but who nevertheless in some way participated in the fraudulent acts. For an example, see *Re Gerald Cooper Chemicals Ltd* [1978] 2 All ER 49, [1978] Ch 262. But I cannot see how the requirements of the section can be satisfied if no fraudulent intent is alleged against any person who actually carried on the business. In such a case, there are no fraudulent acts to which the outsider can have been a party and his own state of mind seems to me for present purposes irrelevant. It may give rise to liability in deceit or some other cause of action but not under s 332 of the 1948 Act.

Counsel for the joint liquidators (Mr Lindsay QC) said that I should not adopt this construction of s 332 unless driven to do so. The effect, he said, would be to make comfort letters legally worthless. The circumstances in which parent companies should be liable for the debts of their subsidiaries is a matter of considerable public importance and debate. It may be that the law on this subject is inadequate. To form a view would require a much wider investigation of the issues of public policy than is open to a judge hearing an interlocutory application to strike out a pleading. The only point

with which I am concerned is whether s 332 can form the basis for imposing liability on a parent company otherwise than as accessory to fraudulent trading by the persons who actually carried on the business of the subsidiary. In my judgment it cannot. The language of the section is clear and unambiguous.

For these short reasons the application to strike out succeeds. Assuming, however, that I am wrong and that it is sufficient to show that Rumasa, with intent to defraud, was party to the carrying on of the business of the company, there is the further question of whether the allegations in the points of claim are sufficient to support such a case. I shall divide the necessary allegations into two. First, did Rumasa do acts which constituted being party to the carrying on of the company's business? Second, were those acts done with intent to defraud?

I have already quoted the summary in the statement of claim of the acts relied on as making Rumasa party to the carrying on of the company's business. Counsel for the applicant (Mr Millett QC) says that they may show Rumasa to have been 'privy' to the carrying on of the business but are not sufficient to show that it was 'party'. Rumasa, he says, was no more a party to the carrying on of the company's business than the National Westminster Bank was by maintaining overdraft facilities or any large supplier who does not press for payment in the hope that his customer will be able to trade out of insolvency. This may well be the conclusion to emerge from all the evidence but I do not think that the contrary is so clearly unarguable as to justify striking out. For present purposes the pleadings may be regarded as sufficient. The liquidators' serious difficulty lies in the allegation that the acts were done with intent to defraud. Rumasa's state of mind is pleaded in the statement of claim as follows:

> 'In so proferring such assurances of support as aforementioned and then by choice failing to give such support (as Rumasa did so fail) Rumasa either never intended to honour its assurances or regarded its assurances as capable of being revoked at its will and irrespective of the loss, damage and harm to the creditors of the company thereby caused.'

It goes on to say that:

> 'Accordingly, in the premises, Rumasa was knowingly party to and concurred in the carrying on of the business of the company with intent to defraud creditors of the company and/or for a fraudulent purpose (namely the deliberate procuring of the carrying on of the business of the company while insolvent, to the detriment and harm of the creditors of the company, in order to secure or prolong a benefit to Rumasa and/or Rumasa's Spanish wine production companies by providing an outlet for its wines, sherries and Montilla and other products) within the meaning of s 332 of the Companies Act 1948. The conduct of Rumasa was in the premises dishonest and/or such as involved, according to current notions of fair trading among commercial men, real moral blame.'

Fraud must be pleaded clearly and with particularity. The allegation of dishonesty is clear enough but conclusory, being alleged to be an inference

from facts already pleaded. The allegations about Rumasa's alternative states of mind are also said to be inferences from the pleaded facts. The question is
a therefore whether the facts alleged constitute adequate particulars of fraud. What those facts amount to is that Rumasa on several occasions declared an intention to support the company but in the end did not provide enough to pay the company's debts.

Counsel for the joint liquidators says that Rumasa's change of mind shows
b that its previous intention to provide funds to pay the company's debts, if it existed at all, was not settled but subject to an element of contingency. An intention thus qualified is not an adequate basis for a belief that there is good reason for thinking that funds will become available to pay the company's debts as they fall due and can therefore give rise to an inference that there was an intent to defraud – see *R v Grantham* [1984] 3 All ER 166, [1984]
c BCLC 270, [1984] QB 675. I do not accept this form of reasoning, which involves translating the actual facts pleaded into generalities and then drawing inferences from those generalities rather than the facts themselves.

In my judgment, these facts, if proved, would be entirely inadequate to sustain an allegation of intention to defraud. They are quite consistent with a genuine and honest intention on the part of Rumasa, at the time of each of
d the statements relied upon, to support the company until it was able to stand upon its own feet. There is no allegation that Rumasa refused any support requested by the board before the Ernst & Whinney report on 6 June. The 1982 comfort letter, so far as it promised support for current trading, expired on 1 June 1983. The promise to provide 'such long term finance as is neces-
e sary' had become meaningless in the light of the knowledge that the company could not survive. The statements to the chairman and at the press conference after nationalisation are, as pleaded, plainly no more than statements of current intent and descriptions of what the new controllers of Rumasa had just done, which was to inject a further £2m into the company. Rumasa is entitled to say that even if it admitted every fact alleged by the liquidators,
f the conclusions alleged in the statement of claim could not be drawn. The pleaded facts show only that Rumasa decided to stop pouring money into the company after it learned that the company's condition was hopeless.

Counsel for the joint liquidators also submitted that an intent to defraud could be inferred from the fact that Rumasa had made continuing representations that it was supporting the company and then decided no longer to do
g so without informing the company or its suppliers. In those circumstances, the continuing representation would become fraudulent. See *DPP v Ray* [1973] 3 All ER 131, [1974] AC 370. I do not doubt a case of fraud along these lines is conceptually possible. But there is no trace of such a case in the existing points of claim. Counsel for the joint liquidators said that it could be intro-
h duced by amendment and the points of claim were therefore not so incurably bad as to merit striking out under RSC Ord 18, r 19. Over an adjournment he produced a draft amendment which alleged that upon a date which could not yet be particularised between 1 June 1982 (when the last comfort letter was given) and 8 July 1983 (when the receivers were appointed) Rumasa ceased to have the intention to support the company but deliberately and
i fraudulently failed to communicate this to the company or its creditors.

Counsel for the applicant opposed the application for leave to amend on the ground that there was no material on which such an allegation could be

based. He referred me without objection to certain additional documents which showed that in March 1983 it was a condition of the borrowing facilities provided by the Banco de Jerez that the board of the company should minute its belief that those and its other borrowing facilities would enable the company to meet its debts as they fell due for the foreseeable future. There was nothing to show any retraction of that statement until the Ernst & Whinney report on 6 June. Counsel for the applicant also referred me to a letter from the company to the Banco de Jerez on 9 June, which recognised that the Ernst & Whinney report had transformed the company's expectations and, while appealing for further support from Rumasa, accepted that one option would be to allow the company to fail. There is no suggestion in the letter that Rumasa's comfort letters or other declarations had given rise to a moral obligation to provide continued support in the new circumstances. Therefore, says counsel for the applicant, there is no material on which it can be alleged either that Rumasa had abandoned its intention to support the company before the Ernst & Whinney report or misled the company afterwards. I agree. It seems to me that the allegations in the proposed amendment are wholly speculative and that I should not allow an amendment to plead fraud on such a basis.

I also think that the introduction of an allegation of fraud of this kind would be something quite different from the case presently pleaded. It is one thing not to strike out a pleading which contains an arguable case merely because it has been inadequately or inartistically pleaded. It is quite another, particularly where the allegation is fraud, to refrain from striking out an unarguable case merely because it is claimed that a different arguable case could be formulated instead.

For these reasons I order the prayer for a declaration under s 332 and the supporting paragraphs of the points of claim to be struck out.

*Order accordingly.*

Solicitors: *Herbert Smith & Co* (for the applicant); *DJ Freeman & Co* (for the joint liquidators).

Evelyn M C Budd Barrister.