# Ritter v Butterfield Bank (Cayman) Limited
# [2018 (1) CILR 529]

# Exhibit 28

**[2018 (1) CILR 529]**

# RITTER and GENEVA INSURANCE SPC LIMITED (in voluntary liquidation) v. BUTTERFIELD BANK (CAYMAN) LIMITED

GRAND CT. (Williams, J.) May 29th, 2018

*Estoppel — representation — forgery of bank customer's signature — customer required promptly to report forgery to bank — intentional silence is representation — bank suffers detriment if chance of recovery from forger materially prejudiced by delay — may rely on estoppel in action by customer for damages*

The plaintiffs sought damages for, *inter alia*, breach of contract, negligence and breach of fiduciary duty/dishonest assistance.

The first plaintiff was a director, sole shareholder and beneficial owner of the second plaintiff, a captive insurance company incorporated in the Cayman Islands. DS was a director of the second plaintiff and the company secretary. The second plaintiff was managed by a company licensed as an insurance manager ("Monkton") which was the corporate entity of DS, who was its managing director. The second plaintiff and Monkton were regulated by the Cayman Islands Monetary Authority

In 2008, the second plaintiff opened a corporate bank account with the defendant bank. DS, who was an authorized signatory on the account and the main point of contact, made nine fraudulent transactions on the account between December 28th, 2008 and September 13th, 2010 by forging the first plaintiff's signature. The payments were honoured by the bank, and the account was debited for a total of US$725,177.02. DS also defrauded the bank accounts of other Monkton clients at the bank.

In 2011, the first plaintiff had decided to wind down the second plaintiff's operations and transfer the funds held in the account to the United States. On September 1st, 2011, he contacted the bank and was

informed that the balance of the account was far less than he had believed, there was a shortfall of US$872,000. DS informed him on the same day that he had borrowed money from the account by forging the first plaintiff's signature. DS said that he would make immediate arrangements to repay the sum. In order to do so, on the same day DS fraudulently transferred sums of US$550,000 and US$276,000, respectively, from accounts held by two other Monkton clients. Those transactions were likely completed by the bank on September 2nd, 2011. Payments totalling US$875,000 were made to the first defendant's personal US account. The first plaintiff did not inform the bank of the forgeries.

Monkton was subsequently liquidated and controllers were appointed. From their investigations it became evident that the second plaintiff was not the only client of Monkton that had been defrauded. DS's assets were frozen by a court order. Total realizable assets of around US$160,000 were available from the liquidation of DS's estate.

On August 27th, 2012, Krys Global, whom the first plaintiff had initially instructed to conduct a forensic investigation, wrote to the bank to notify it of the fraud on the bank account and that the first plaintiff would challenge payments on the company's account.

Monkton's liquidators served notice of claim against the first plaintiff in Texas in June 2012 for the recovery of the US$875,000 paid to him fraudulently from the accounts of other clients of Monkton. The first plaintiff sought to join the bank as a third party in the Texan proceedings, which was refused. The bank incurred costs of US$183,000 in defending its position that it should not be joined to the proceedings. Those proceedings were subsequently settled by the first plaintiff.

The plaintiffs brought proceedings against the defendant in this court claiming damages for breach of contract, negligence and dishonest assistance. They contended that by allowing the withdrawals of money from the bank account based on forged signatures, the bank breached its mandate, and the resultant net loss was US$529,191.

The bank claimed that the first plaintiff became aware of the fraudulent transactions on September 1st, 2011 but failed to inform it until August 27th, 2012, depriving it of the opportunity to prevent a number of other transactions and to recover the money wrongfully paid. The plaintiffs should therefore be estopped from asserting the forgeries on which the claim was based.

The plaintiffs submitted that there was no estoppel by representation preventing it from claiming against the bank as (a) the bank had at least constructive notice of the fraud or forgery before August 2012, as *inter alia* DS had been arrested and Monkton's assets were subject to a freezing order; (b) notification of the fraud by the first plaintiff in September 2011 would have alerted the authorities and Monkton's controllers, who would have taken steps to limit recovery by the bank so that it had not been materially prejudiced by the first plaintiff's failure to notify it; (c) had the bank had notice in September 2011 it was unlikely that it would have reimbursed the second plaintiff and commenced proceedings against DS

as it would have first considered its legal position, in which time DS would likely have dissipated his assets; (d) the bank would in any event have had no cause of action between September 2011 and August 2012 as the plaintiffs believed that they had been repaid in full; (e) the legal fees incurred in the Texan proceedings could not be viewed as detriment for the purposes of estoppel; and (f) if the court were to find that the bank had been materially prejudiced by a loss of opportunity to sue DS, it should find that estoppel by representation operated *pro tanto* so that the plaintiffs should not be estopped to the full extent of their claims, but only to the extent of actual potential detriment found to have been suffered by the bank.

The bank submitted that (a) if it had been informed of the forgeries on September 1st, 2011 it could have brought proceedings against DS when he likely had assets greater than US$160,000; (b) the first plaintiff's failure to notify the bank of the fraud or forgery amounted to a representation for the purposes of estoppel by representation; (c) the bank had relied on the representation by the first plaintiff to its detriment including lost opportunity to seek recovery from DS, and incurring significant legal fees in proceedings in Texas and the Cayman Islands; and (d) the plaintiffs' dishonest assistance claim should be dismissed as it was not properly pleaded and failed to identify any individual employees of the bank who had acted dishonestly.

**Held,** ruling as follows:

(1) The responsibility and liability of a bank towards its customer was governed by the applicable law and the relevant contract entered into by the parties. The contract determined the manner in which services were to be provided and recorded the obligations of each party. In the event of an alleged breach by the bank of an express or implied term of a contract, three elements needed to be satisfied in order to establish liability: (i) proof of breach by the bank against the customer; (ii) damages; and (iii) causation between the breach and damage suffered by the customer. In the present case, the parties had agreed to limit the issues to be determined by the court to (i) whether the plaintiffs were estopped from advancing claims against the bank in contract and negligence; and (ii) whether the bank dishonestly assisted in a fraud involving forgeries of the first plaintiff's signature by DS. The general rule was that a bank was ordinarily not entitled to debit a customer's account if it had honoured a wire transfer bearing a forged signature. However, a defence available to a paying bank might arise if the customer breached his duty to the bank by failing to inform it of any forgery on the account as soon as the customer became aware of it (paras. 127–129).

(2) To establish the defence of estoppel the bank had to prove that the first plaintiff intentionally failed to promptly report to it what he knew about the forgery. The bank had to prove that the first plaintiff's not informing it of the forgery amounted to a representation that the transfer requests were in order, and that by its acts or omissions it relied on the representation to its detriment. When a customer's signature was forged, on discovering the forgery, he was required to inform the bank. If he deliberately abstained from doing so with the result that the bank lost its remedy against the forger, the customer would be estopped from relying on the forgery. It was clear in the present case that the first plaintiff had a responsibility to inform the bank of DS's forgery when he first became aware of it on September 1st, 2011, which he had failed to do. The bank was not made aware of the forgery until August 27th, 2012. The first plaintiff's conduct, by remaining silent, was deliberate and intended to ensure receipt of the funds transferred by DS into his personal account in the United States. His remaining silent against his duty to inform the bank of the forgery amounted to a representation. The bank had also proved material detriment as a consequence of the first plaintiff's representation as its chance of recovering from DS had been materially prejudiced. DS's assets were no longer available by the time the bank first became aware of the forgery. (The legal fees incurred by the bank in the Texan proceedings could not be characterized as detriment because they were unrelated to any relevant loss.) In addition, the plaintiffs' submission that estoppel by representation operated *pro tanto*, *i.e.* that they should not be estopped to the full extent of their claims but only to the extent of actual potential detriment found to have been suffered by the bank was not correct (paras. 130–173).

(3) There were three elements of a dishonest assistance claim which must be pleaded and proved: (i) that there had been a disposal of assets in breach of trust or a fiduciary duty; (ii) that the defendant assisted in that breach or disposal; and (iii) that the defendant assisted the breach of trust dishonestly. The third element was the only element in dispute between the parties in the present case. The key issue was therefore not whether the bank assisted in the fraud but whether it did so dishonestly. The standard of proof required was the civil standard of proof, the balance of probabilities. It was not an absolute standard. When considering allegations of dishonesty and fraud, a court would naturally require a higher degree of probability than it would require when asking if negligence was established. It did not adopt as high a degree as a criminal court but it did require a degree of probability commensurate with the occasion and seriousness of the allegation. It was not necessary for the court to establish whether the defendant considered that he was acting dishonestly, the defendant's knowledge of the transaction had to be such as to render his participation contrary to normally acceptable standards of honest conduct. An honest person did not deliberately not ask questions lest he learn something he would rather not know. A dishonest state of mind might

consist in suspicion combined with a conscious decision not to make inquiries which might result in knowledge. In a commercial setting, dishonesty could be found on the basis of commercially unacceptable conduct. In a case including a claim of dishonesty, that claim must be clearly pleaded first, before any claim of negligence, and be adequately particularized (paras. 176–185).

(4) In the present case, the plaintiffs had failed to plead the claim of dishonesty first or separately plead the negligence claim. The dishonesty claim appeared after the breach of contract and negligence claims in the pleadings. No individual employees were identified by name or position in the bank as conducting themselves dishonestly. In cases of dishonest assistance against a corporate entity, a particular individual or particular individuals must be identified as having acted dishonestly given the fact that, although a company has legal personality and capacity, it functions through human agents. The statement of claim must therefore identify and particularize what the defendant did to assist in the breaches of fiduciary duty or trust, how the assistance caused, contributed or resulted in the plaintiff's loss and how the defendant was alleged to have acted dishonestly in assisting the main perpetrator. The bank rightly highlighted the requirement that it might be permissible not to identify the relevant dishonest individual(s) at the stage of pleading the case, if the plaintiff were unaware at that stage of their identity, provided the plaintiff otherwise properly pleaded and particularized the dishonest conduct and identified an individual employee by name or even by post with relevant knowledge. The plaintiffs had failed to identify in the pleadings or at trial any individual(s) with any knowledge of the fraud or who acted dishonestly. As dishonesty was a serious allegation it was not to be pleaded lightly. The claim would therefore be dismissed. Even if the court were wrong in reaching this conclusion, the plaintiffs had not provided sufficient evidence to prove such a serious allegation (paras. 187–202).

**Cases cited:**

(1)*Avon County Council* v. *Howlett*, [1983] 1 W.L.R. 605; [1983] 1 All E.R. 1073; [1983] I.R.L.R. 171, followed.

(2)*Derby* v. *Scottish Equitable plc*, [2001] EWCA Civ 369; [2001] 3 All E.R. 818; [2001] 2 All E.R. (Comm) 274; [2001] OPLR 181, distinguished.

(3)*Ewing* v. *Dominion Bank*, [1904] A.C. 806; (1904), 35 S.C.R. 133, considered.

(4)*Foley* v. *Hill* (1848), 9 E.R. 1002; 2 H.L. Cas. 28, referred to.

(5)*Freeman* v. *Cooke* (1848), 154 E.R. 652; 2 Ex. 654, *dictum* of Parke, B. considered.

(6)*Fung Kai Sun* v. *Chan Fui Hing*, [1951] A.C. 489, referred to.

(7)*Greenwood* v. *Martins Bank*, [1932] 1 K.B. 371; on appeal, [1933] A.C. 51, followed.

(8)*Holt* v. *Markham*, [1923] 1 K.B. 504, referred to.

(9)*Kelly* v. *Fraser*, [2012] UKPC 25; [2013] 1 A.C. 450; [2012]

23-01165-mew Doc 106-29 Filed 07/03/25 Entered 07/03/25 17:38:30 Exhibit 28
Pg 7 of 78



3 W.L.R. 1008; [2012] I.C.R. 1408, *dicta* of Lord Sumption considered.
(10) *Lipkin Gorman* v. *Karpnale Ltd.*, [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992] 4 All E.R. 512, applied.
(11) *McKenzie* v. *British Linen Co.* (1881), 6 App. Cas. 82; 8 R. (H.L.) 8, considered.
(12) *National Westminster Bank plc* v. *Somer Intl. (UK) Ltd.*, [2001] EWCA Civ 970; [2002] Q.B. 1286; [2002] 3 W.L.R. 64; [2002] 1 All E.R. 198; [2001] Lloyd's Rep. Bank 263; [2001] CLC 1579, considered.
(13) *Ogilvie* v. *West Australian Mortgage & Agency Corp. Ltd.*, [1896] A.C. 257, considered.
(14) *Pickard* v. *Sears* (1837), 112 E.R. 179; 6 Ad. & El. 469, considered.
(15) *Publishers Representatives Ltd.* v. *UBS (C.I.) Ltd.*, 2000 CILR 473, distinguished.
(16) *Royal Brunei Airlines Sdn. Bhd.* v. *Tan Kok Ming*, [1995] 2 A.C. 378; [1995] 3 All E.R. 97, referred to.
(17) *Singularis Holdings Ltd.* v. *Daiwa Capital Markets Europe Ltd.*, [2017] EWHC 257 (Ch); [2017] 2 All E.R. (Comm) 445; [2017] 1 Lloyd's Rep. 226; [2017] 1 BCLC 625; [2017] Bus. L.R. 1386; on appeal, [2018] EWCA Civ 84; [2018] 1 W.L.R. 2777; [2018] Bus. L.R. 1115; [2018] 1 Lloyd's Rep. 472; [2018] 2 BCLC 1, applied.
(18) *Skyring* v. *Greenwood* (1825), 107 E.R. 1064; 4 B. & C. 281, referred to.
(19) *Stokors SA* v. *IG Markets Ltd.*, [2013] EWHC 631 (Comm), applied.
(20) *Tai Hing Cotton Mill Ltd.* v. *Liu Chong Hing Bank Ltd.*, [1986] A.C. 80; [1985] 2 All E.R. 947; [1985] 2 Lloyd's Rep. 313; [1986] FLR 14; (1985), Sol. Jo. 503, applied.

*S. Dobbyn* for the plaintiffs;
*S. Said* and *J. Hale* for the defendant.

1 **WILLIAMS, J.:**

**The application**

The second plaintiff, Geneva Insurance SPC Ltd. ("Geneva"), was incorporated in the Cayman Islands on March 28th, 2000 with the sole purpose to act as a captive insurance company serving the insurance needs of medical professionals practising in the United States. Geneva was Cayman Islands Monetary Authority ("CIMA") regulated. The first plaintiff, William Ritter ("Mr. Ritter"), is and was at all material times a director, sole shareholder and beneficial owner of Geneva. David Self ("DS") was a director and the company secretary of Geneva.

2 From May 12th, 2000, Geneva was managed by Monkton Insurance Services Ltd. ("Monkton"), a company licensed as an insurance manager which managed captive insurance companies in the Cayman Islands.

Monkton was the corporate entity of DS who was its managing director. From May 1st, 2006 it was resolved by Geneva that Monkton would act as its secretary and as its registered office. DS was also the insurance manager of a number of other captive insurance companies with accounts at the defendant, Butterfield Bank (Cayman) Ltd. ("the bank"). One of those customers was Canadian Livestock Insurance Co. ("Canadian Livestock") and another was Warco Insurance Corp. ("Warco"). DS was a signatory and the main point of contact in respect of both of those accounts.

3 Both Monkton and Geneva were CIMA regulated.

4 On March 20th, 2008, Geneva opened a corporate bank account ("the Geneva account") with the bank. The bank was incorporated in the Cayman Islands on November 22nd, 1967, and holds a Class A banking licence registered with CIMA. The bank provided banking services to Geneva between 2008 and 2011. Geneva remained a customer with the bank until the Geneva account was closed in October 2013.

5 It is common ground that there were nine fraudulent transactions made by DS on the Geneva account between December 28th, 2008 and September 13th, 2010. These included eight forged payment transfer requests from the Geneva account and one fraudulent request for a payment from another account into the Geneva account. These payments were honoured by the bank and the Geneva account was debited for a total of US$725,177.02. DS also defrauded the bank accounts of other Monkton clients at the bank.

6 Due to the fraudulent transactions, on April 30th, 2012 a shareholder's resolution was passed for the voluntary liquidation of Geneva. By a deed of assignment dated November 7th, 2012, Geneva acting through the appointed joint voluntary liquidators assigned all its potential rights, remedies and claims against the bank to Mr. Ritter. On February 27th, 2015, Mr. Ritter was appointed as the sole voluntary liquidator of Geneva.

**The claim**

7 The plaintiffs' claim is brought by a 54-page amended writ of summons and statement of claim filed on November 2nd, 2016. The allegation therein is that the bank is liable for breach of contract, negligence and dishonest assistance in facilitating a fraud carried out by DS. The plaintiffs claim—

(i) damages for breach of contract;

(ii) damages for negligence/breach of duty of care;

(iii) damages and/or equitable compensation for breach of fiduciary duty/dishonest assistance;

(iv) any necessary enquiries into damages;

(v) compound interest of all claims from the date of each respective loss in accordance with the rates in the Judgment Debt (Rates of Interest) Rules; and

(vi) costs.

8 DS provided false bank statements for the Geneva account to Mr. Ritter to conceal the fraud mentioned in para. 5 above and outlined in greater detail from para. 31 herein. The plaintiffs contend that the bank, by allowing the withdrawals of money from the Geneva account based on forged signatures, is in breach of their mandate and that their resultant net loss (excluding lost interest) from the Geneva account is US$529,191.72.[1] The plaintiffs seek an order for reimbursement of that amount together with interest and costs.

9 In its amended defence filed on November 8th, 2016, the bank denies any liability, contending that it provided banking services to Geneva on its standard terms and thereafter conducted itself in accordance with those terms and with good banking practice. It contends that Geneva failed to comply with its duties as the bank's customer, because when Mr. Ritter became aware of the forgery on the Geneva account on September 1st, 2011 he failed to inform the bank of the same until August 27th, 2012. It is further contended that this deprived the bank of the opportunity to properly act to prevent a number of other transactions and to enable it to take steps towards recovering money wrongfully paid on the forged signatures. In such circumstances, the bank argues that Geneva is estopped from asserting the forgeries upon which its claim is based.

10 The bank submits that the main issues for the court to determine are:

(a) The date on which the bank received notice of DS's forgery on the Geneva account—the bank claims this was on August 27th, 2012, when the joint official liquidators ("JOLs") for Geneva informed them that Mr. Ritter was challenging payments on the Geneva account.

(b) Whether Mr. Ritter discharged a duty to disclose DS's forgery on the Geneva account to the bank—the bank claims that Mr. Ritter failed to discharge his duty on September 1st, 2011 immediately after he became aware that DS had forged his signature.

(c) If the court finds that Mr. Ritter had not discharged his duty to disclose the fraud, whether his silence amounts to a representation—the bank submits that Mr. Ritter deliberately failed to inform the bank of the

---

1 Net balance after DS caused the fraudulent transfers to be repaid, US$148,180.74 on June 23rd, 2009 and US$47,804.56 on August 25th, 2011.

forgery as he had a strategy to focus on the return of his money via a private arrangement with DS and that he intended to notify the bank only if the money were not repaid by DS.

(d) If the court finds that there has been conduct amounting to a representation, whether the bank has suffered material detriment—the bank claims that it has suffered detriment in the form of material prejudice as it has lost the opportunity to seek recovery from DS, due to it paying out large sums on September 2nd, 2011 and incurring significant legal fees in proceedings in both Texas and in the Cayman Islands.

(e) Whether the bank dishonestly assisted in DS's fraud—the bank denies that it or any of its employees have acted dishonestly in the operation of the Geneva account.

11 The bank seeks an order from the court dismissing the plaintiffs' dishonesty claim, which is based on the same factual allegations relied upon by them for breach of contract and negligence, on the basis that there is a lack of evidence to justify such serious findings. It is also submitted that the claim is "defectively pleaded," the bank stating that the plaintiffs have failed to identify any employee(s) at the bank who they claim has acted dishonestly. The bank highlights that Mr. Ritter made no allegation of dishonesty against the bank in the Texas proceedings.

12 The plaintiffs argue that the court should dismiss the bank's estoppel defence and should also find in their favour in relation to the claim that the bank was liable to account as a constructive trustee for dishonest assistance.

13 It is agreed that if the bank's estoppel defence succeeds, the plaintiffs' breach of contract and negligence claims should be dismissed. The bank agrees that if its estoppel defence fails, it will pay to the plaintiffs (without admission of liability) the full amount of the fraudulent transfers claimed.

14 It is agreed by the parties that the question of consequential losses would be determined at a later date depending on the ruling of the court on the main estoppel defence and the claim for dishonest assistance.

**The background—Geneva opening the account at the bank**

15 In 2008, following representations made to him by DS, Mr. Ritter agreed that Geneva's banking should be moved to the bank. To enable the Geneva account to be opened, six main account opening documents had to be processed and these documents governed the bank/customer relationship and constituted the bank's mandate.

16 The first account opening document is an undated and unsigned "Corporate Banking: Captive Insurance Company—Account Opening

Checklist" ("the checklist"). It was recorded in this form that the purpose of the Geneva account was "for core cell operating funds." The form also recorded that the nature of the anticipated transactions through the Geneva account were "cell fees and charges paid in quarterly, operating expenses, licence fee, audit admin, fee paid out." It is submitted by the plaintiffs that it was an express term that the Geneva account would be used only for the above purpose and that it was an implied term that payments other than those listed would be out of the ordinary course of business transactions. The bank denies this contention, pointing out that the purpose of the checklist is to act as a general guide to the bank as to the nature and dollar volume of the anticipated transactions through the account to enable it to comply with its obligations under the Proceeds of Crime Law and Money Laundering Regulations.

17 The second account opening document is the "New Account Memorandum—Business" ("the memorandum") and it was filled out by DS and signed by Mr. Ritter as an authorized signatory on March 20th, 2008. The court has not been shown any similar memorandum signed by DS as an authorized signatory. The plaintiffs contend that it was an express implied term of the memorandum that the authorized signature of Mr. Ritter would be identical or closely resemble those entered on documents for the purposes of the Geneva account at the bank. The bank denies the above contention and correctly states that the signature on the memorandum is not the signature that would be used or should be used for comparison with any subsequent signature received by the bank on other documentation and that the appropriate comparison signature would be found on the signature card. The memorandum provided only Monkton's and DS's numbers as the points of contact and therefore if there were any issues relating to a transaction DS, and not Mr. Ritter, would be the person who the bank would reach out to.

18 The third account opening document is a "Resolution Authorising Banking Account, Loans and Related Matters" ("the resolution"), which was filled out by DS. It was signed by DS on March 20th, 2008 in his role as a director and as the secretary of Geneva. This document was also signed by Mr. Ritter as a director of Geneva. DS and Mr. Ritter placed their initials on each page of the document. The document sets out the details of the resolution accepted by the Board of Directors held at a meeting on March 20th, 2008. The Board of Directors resolved that Geneva was authorized to establish an account or accounts with the bank for the purposes of buying, selling, paying or collecting bills of exchange or other instruments for the payments of money, issuing letters of credit, transmitting moneys by draft cheques or wire transfer, or otherwise borrowing money for which the assets of Geneva may be pledged as collateral security and for any incidental purpose. The document recorded that the Board resolved that DS and Mr. Ritter, as long as they signed

together, were authorized on behalf of Geneva to conduct affairs with the bank in matters such as opening a bank account or accounts with the bank, endorsing cheques, drafts, note acceptances and other instruments and to make unsigned cheques, drafts, notes, acceptances and other instruments and orders with respect of any funds at any time to the credit of Geneva with the bank. The Board of Directors also resolved that the bank was authorized to pay and debit cheques, drafts and orders from the Geneva account without enquiry as to the circumstances of their issue or for the disposition of their proceeds if the same were signed by DS and Mr. Ritter. The Board of Directors also resolved that DS and Mr. Ritter, if they signed together, were authorized on behalf of Geneva to enter into any agreement relating to any general or specific transaction at the bank. The Board of Directors further resolved that DS or Geneva's assistant secretary were authorized and directed to certify to the bank the names of persons authorized to sign for it[2] and to provide them with specimens of their signatures. The Board resolved that the bank should be fully protected in relying on the above certifications including the signatures and would be "indemnified and held harmless from any claims, demands, expenses, loss or damage resulting from or arising out of or in any signature so certified . . ."

19 The purpose of the document was to record the resolutions of the Board of Directors of Geneva in relation to its dealings with the bank in relation to the Geneva account. The bank does not accept the plaintiffs' contention that (i) there is a resultant implied term that, for any document to be valid in relation to any banking transaction instruction, DS and Mr. Ritter had to sign it; and (ii) for any agreement with the bank relating to banking services to be binding on Geneva, that agreement also had to be signed by DS and Mr. Ritter. The bank contends that agreements between Geneva and itself can be entered into by anyone with actual or ostensible authority to bind Geneva in accordance with normal principles in company law. If DS and Mr. Ritter had together duly authorized only one of them to sign a document or contract, then only one signature would be required. It is contended that there is an express term that DS, as Geneva's secretary, is authorized to certify to the bank the names of the present officers of the company and other persons authorized to sign for it. It is also contended that a further express term is that all business conducted between the bank and Geneva is subject to the "General Regulations and Conditions" ("the regulations") for conducting business with the bank and that a copy of the same may be executed and agreed by DS in his role as secretary of Geneva.

---

2 In the resolution this certified it was DS and Mr. Ritter.

20 The bank also does not agree with the plaintiffs' contention, arising from the resolution document, that—

(i) there is a further implied term that the bank had no authority to accept or approve any account opening document or agreement unless it was signed by Mr. Ritter and DS;

(ii) there is no authority to accept the regulations signed only by DS as company secretary; and

(iii) there is no authority to accept an "Online Banking Application" signed only by DS. The bank reiterated that the resolution provided that all business conducted be subject to the regulations and that these were duly signed by DS.

21 The plaintiffs further contend that there is an implied term from the resolution that the bank had no authority to pay or debit any cheques, drafts orders from the Geneva account without enquiry unless they were signed by both Mr. Ritter and DS and that the bank was required to compare the signatures carefully with the certified signatures on the signature card. The plaintiffs submitted that the bank could not rely upon the indemnity set out in the resolution if it honoured a signature which was not a certified signature as evidenced by the signature card. The bank denies that the contents of the resolution can amount to these implied terms. The bank rightly submits that it need only make enquiries as to the circumstances of payments out of the account where there is reason to believe that the transaction was fraudulent or was suspicious. The bank accepted that its contractual obligation was to make sure that instructions had been authorized in accordance with the mandate. The bank also states that the standard of care for its employees is not one of "carefully" as suggested by the plaintiffs, but is one that requires them to exercise reasonable skill and care.

22 The fourth account opening document is the "New Account Signature Card" ("the signature card"). Pursuant to the express terms of the resolution, DS and Mr. Ritter each wrote their names and placed their signatures on the signature card. It is contended by the plaintiffs that it was an implied term of the signature card that any signature on any transactional document which did not closely resemble a genuine signature thereon could not be relied upon by the bank. The bank denies that such a term may be implied from the signature card and contends that its obligations in this regard are governed by the express terms set out in the regulations.[3]

---

3 See regulation 11—para. 27 herein.

23 Mr. Ritter contends that for a two signatories account the bank should have had his contact telephone number as well as DS's. During cross-examination this was put to Mr. Skinner, Head of Corporate Banking at the bank since 2011, and he answered that the standard practice for banks is to usually only have one point of contact and number to call for a company. Mr. Skinner added that for captive insurance companies, where the owners or shareholders are in the United States, they often do not wish to give their contact details for tax reasons. He stated that it was "exceptionally rare" for there to be a fraud between two authorized signatories named on a particular account. This is a factor to take into account when one considers whether the bank was dishonest and wilfully closed its eyes to the transactions on the Geneva account at a time when it was not known by anybody that DS was a fraudster.

24 As mentioned above in para. 17, DS's numbers were provided as the point of contact in the memorandum. Mr. Skinner said that the bank's call-back procedure is not designed for a situation where the designated contact is the person committing the fraud. So following the right procedure in this matter, if there was to be a call back, Mr. Skinner clarified that it would have been to DS who at the time of the relevant transactions was not a known fraudster. This standard banking practice is a further factor to take into account when considering the issue of dishonesty raised by the plaintiffs.

25 The fifth account opening document is the "General Regulations and Regulations for Conducting Business with the Bank" which was signed, as per the resolution,[4] by DS in his capacity as Geneva's secretary around March 20th, 2008. The plaintiffs are wrong when they state that the resolution was ambiguous and that DS's signature was not sufficient as Mr. Ritter's signature was also required. In the plaintiffs' amended statement of claim they refer to regulations 3, 5, 10 and 11.

26 Regulation 5 provides:

> "The Bank is entitled, but is not obliged, to rely upon an act in accordance with any notice, demand or other communication which may from time to time be given by any verbal, telephone, telegraphic, telex or electronic message is believed by the bank to be genuine and be presented or delivered by on behalf of the customer, without incurring liability should be false or there be any error or ambiguity therein."

The plaintiffs contend in their amended statement of claim that if reliance is placed by the bank on this regulation in avoiding all liability for the

4 Which were signed by both DS and Mr. Ritter.

reliance on any notice or other communication supposedly made on behalf of Geneva, any subjective belief held by it or its employees that such a notice or communication was presented or delivered on behalf of Geneva, would have to be a reasonably held and honest belief that it was so made.

27 Regulation 11[5] deals with how the bank verifies the signature as follows:

> "The Bank verifies the signature by comparing it with the specimen on file. The Bank shall be entitled but not required to go beyond such verification. The Bank shall not be liable consequence [*sic*] of forgery unless such forgery should through observance of due diligence have been readily detected."

The plaintiffs claim, if the bank seeks to rely upon this regulation to avoid all liability flowing from the forgery, that it is an implied term of this regulation that the bank must demonstrate that it had observed due diligence in its efforts to detect the forgery. The bank claims that it is not an implied term and in fact it was an express term of the contract that it would not be held liable for consequence of forgery unless the forgery could, through due observance of due diligence, have been readily detected and that it had an obligation to observe due diligence.

28 The plaintiffs contend that they are not bound by the regulations and that the bank cannot rely upon them to avoid its liability for reasons that will be expanded on later herein. In the alternative, the plaintiffs argue that if the regulations are held to be binding then they were unusual and onerous clauses which were not properly notified to them and therefore they cannot be relied upon by the bank. Mr. Ritter claims that DS never showed him a copy of the document, if that is right, the fault for that cannot be laid at the door of the bank. I note that when talking about July 2008 Mr. Ritter said that "I had no reason to doubt (DS) or his honesty as a professional insurance manager" and the bank was entitled to share his view at that time. The bank claims that the plaintiffs were properly notified and have actual notice of the regulations which were signed by DS on March 20th, 2008. The bank submits that the regulations are sufficiently clear and unambiguous and that it is entitled to rely on instructions given to it if it believed those to be genuine and presented on behalf of the customer and it is not liable for any forgery if it compares the signature with the specimen on file and observes due diligence.

29 The sixth account opening document is the "Online Banking Application" which was completed and signed by DS on March 20th, 2008 in his capacity as the secretary of Geneva. Mr. Ritter also claims that this was

---

5 See para. 22 herein.

never sent to him and he submitted that the entry on the form in which DS nominated himself as administrator for online banking purposes authorized to sign the online banking application contradicted the two signature requirement in the resolution.

30 The account opening documents were sent by Monkton to the bank on March 20th, 2008 and they were accepted by the bank on or around March 28th, 2008.

**Background—the nine fraudulent transactions on the Geneva account between December 28th, 2008 and September 14th, 2010—the bank's processing procedure**

31 It is agreed that the relevant fraudulent transactions are as follows:

(i) December 28th, 2008; US$148,180.74—DS forged Mr. Ritter's signature on a wire transfer instruction, in the form of a faxed letter, to Warco who was also a client of Monkton and who was also a customer of the bank. At the time of processing DS described the payment on the instruction as being "in respect of the Quota Share Reinsurance Premium Due." Mr. Ritter states that the forgery of the signature is a poor one and that anyone paying attention at the bank should have detected it when comparing it with his genuine signature. He stated that if the bank had then contacted him to verify the signature and the transaction he would have confirmed that it was not authorized and the fraud would have been halted at its inception. Mr. Ritter contends that captive insurance companies do not transfer funds to each other, and it was irregular or questionable for it to have been done. However, during cross-examination he accepted that it could be possible that two captive insurers purchase reinsurance together and then share the premium. Mr. Skinner contends that the signature was not an "obvious" forgery and that the content of the instruction would not "raise any alarm bells" for a processing bank employee in the situation where the bank was unaware of any misappropriation on the Warco account, as it would not be unusual for a regulated insurance manager to transfer money from one captive to another, especially as the stated purpose of the transfer on the instruction would be consistent with that. Mr. Skinner pointed out that, from the face of the document, one could deduce that two authorized staff members from the bank had reviewed the transaction. Mr. Skinner does not agree that captive insurance companies do not transfer funds to each other, and it was irregular or questionable for it to have been done. He referred to the Shoreline loan which was approved by Mr. Ritter when he signed the wire transfer on July 24th, 2008 authorizing US$300,000 to be transferred to Shoreline Commodity Trading. However, counsel for the plaintiffs rightly highlights that Shoreline Commodity Trading was not a captive insurance company. In any event, the plaintiffs concede that these funds were repaid

by means of the below mentioned transaction carried out on June 23rd, 2009 and that the amount was therefore not lost and is not claimed.

(ii) June 23rd, 2009; US$148,180.74—DS, by letter of instruction sent by email, authorized the bank to repay the six months earlier fraudulent transfer outlined in para. 31(i) above from the Warco account to the Geneva account. This transfer did not involve a forged signature and both of Warco's authorized signatories had signed this transfer request. At the time of processing DS described the payment on the instruction as being an "inter-company loan." Mr. Ritter contends that a transfer of this sum of money by one of Monkton's managed captives to another should have been viewed as being unusual activity. Mr. Skinner contended that inter-company loans are not uncommon and, having regard to the procedures in place, a bank employee would not find the instruction to be unusual or irregular. He added that although it is for the same amount as the transfer made six months earlier that would not necessarily make it unusual. I accept Mr. Skinner's evidence in this regard and do not find that the bank acted dishonestly or was "closing its eyes" by any employee not regarding this transaction as being "a red flag" and allowing the transaction to process.

(iii) July 31st, 2009; US$16,250—DS forged Mr. Ritter's signature on a wire transfer to Monkton's Cayman National Bank account contained in a formal request for wire transfer form. At the time of processing DS described the payment on the form as being for "Management Fees." Mr. Ritter contends that the signature if compared to the one on the signature card is "very clearly" not the same signature. Mr. Skinner contends that it is not an "obvious forgery."

(iv) August 17th, 2009; US$30,050—DS again forged Mr. Ritter's signature on a wire transfer instruction to Monkton's Cayman National Bank account contained in a formal request for wire transfer form. At the time of processing DS gave the details of the payment on the instruction as "F/F/C Monkton Insurance Services" with no further elaboration. It is contended by the plaintiffs that if this and the July 31st, 2009 transfers totalling US$46,300 were for management fees, then that would be an abnormally high amount for Geneva to have paid in a 19-day period. Mr. Ritter again contends that the signature, if compared to the one on the signature card, is very clearly not the same signature. Mr. Skinner contends that it is not an "obvious forgery." Mr. Skinner said that this would not be considered an abnormal amount for management fees and in any event the bank would not be aware of the arrangements between Geneva and its insurance managers. Mr. Skinner states that the bank employee processing the transaction would not be expected to check when the last management fee was paid or carry out the exercise of totalling the transfers instructed to be made under this head. He added that the system at the bank would not have picked up cumulative amounts for the same

beneficiary. Again, in light of the evidence of Mr. Skinner, which I accept, I do not find that the bank acted dishonestly or was "closing its eyes" by any employee not regarding this transaction, or this transaction coupled with the July 31st, 2009 transaction, as meriting further enquiry and allowing the transactions to process.

(v) October 29th, 2009; US$16,581.72—DS forged Mr. Ritter's signature on a wire transfer instruction to Monkton's Cayman National Bank account. At the time of processing DS again gave the details of the payment on the instruction as "F/F/C Monkton Insurance Services" with no further elaboration. Mr. Ritter contends that the forged signature is very poor and looks like it has been photoshopped. Mr. Ritter stated that if a proper comparison had been carried out with the specimen signature the fraud would have been detected. However, during cross-examination Mr. Ritter accepted that "it was more than likely" that the two bank officers who conducted the verification process on this transaction concluded that the signature was within either a known or natural range of variation rather than noticed that the signature was obviously forged.

(vi) December 18th, 2009; US$435,100—DS forged Mr. Ritter's signature on a wire transfer to Monkton contained in a formal request for wire transfer form. At the time of processing DS described the payment on the instruction as being "Capital Funds for Captive." Mr. Ritter contends that the signature on the request clearly does not resemble his signature on the account opening documents and the fraud should have been detected by the bank. Mr. Skinner stated that the signature may have been regarded by the staff as being a natural variant of the signature, but he accepts that, now that they are being challenged and it is known that DS, the point of contact, was a fraudster, they may have invited further inquiry. Mr. Ritter also highlights the size of this transaction, and argues that it should not have been processed simply on the telephone verification by DS but only after contacting him also. Mr. Skinner points out that if a transaction exceeds US$100,000 where the beneficiary is someone other than the account holder, the bank must telephone the account holder. In this case the account holder was Geneva and not Mr. Ritter personally and the bank telephoned the contact phone numbers recorded on the client file, namely Monkton's and DS's numbers. No number was provided for Mr. Ritter, so the bank would not have contacted him. It is clear from the new account memorandum form which had been signed by Mr. Ritter, that Mr. Ritter agreed that DS would be the point of contact for the account.[6] In any event, Mr. Skinner says that there is no requirement to contact every signatory on the account. Mr. Skinner added that, despite the amount, there is nothing unusual or irregular in this transaction as it involved a

---

6 See paras. 17 and 24 above.

regulated insurance manager transferring money to itself for capital for another captive, which appears to be for a captive insurance related payment. Mr. Skinner's evidence in this regard does not point to a wilful closing of eyes, but to the adoption of established process when transacting larger sums of this amount.

(vii) July 14th, 2010; US$16,205—DS forged Mr. Ritter's signature on a wire transfer instruction to Monkton. At the time of processing DS described the payment on the instruction as being "Management Fees." Mr. Ritter contends that the signature on the request is "poorly forged" and very clearly not the same as his one on the account opening documents. The bank forthrightly accepts that this signature may, in the present circumstances where one is aware of what one knows now, have merited further inquiry.

(viii) August 3rd, 2010; US$15,005—DS forged Mr. Ritter's signature on a wire transfer instruction to Monkton. At the time of processing DS again described the payment on the instruction as being "Mgmt Fees." Mr. Ritter contends that if one looks at the copy of the document a faint box appears, giving the impression that the signature had been cut and pasted from another document and that "this is another instance of the banker parties shutting his eyes to obvious fraud." Mr. Ritter accepted that there is a clearer copy of the allegedly photoshopped document which, if produced, may have made it clearer whether his belief had actually occurred. The bank contends that this is not an obvious forgery and that one cannot deduce, due to the quality photocopy of this faxed document, whether it contains a cut and paste signature.

(ix) September 13th, 2010; US$47,804.56—DS forged Mr. Ritter's signature on a letter instructing the bank to issue an international draft payable to J.E. Elliott. At the time of processing DS described the payment on the instruction as "Policy Loan." Mr. Ritter contends that on careful scrutiny one can see that the signature on the letter of instruction is again cut and pasted. Mr. Skinner again submits that there is no reason why any employee would view these instructions as being unusual or irregular or see the need to question why a regulated insurance manager was transferring money to a person for a policy loan.

32 Mr. Ritter summarizes that the above-mentioned forgeries of his signature were so obvious that the bank was being "wilfully blind to the fraud" when allowing the "irregular transactions" in and out of the Geneva account, and accounts of other DS/Monkton managed client companies to go through. It is contended that the transactions were outside the normal course of business for a captive insurance company and/or were highly irregular and suspicious and, as a result, the bank must have deliberately or recklessly turned a blind eye and have therefore acted dishonestly. The plaintiffs correctly contend that when considering the facts the court

should consider the bank's actions or inaction in the context of it holding itself out to be a specialist in the financial services industry in the Cayman Islands.

33 Mr. Skinner provided some detail about the bank's general wire transfer procedures which he believes would have been followed in relation to the relevant transactions now before this court. It is rightly contended that the procedures and the facts in this case must be put into context where the staff members at the bank have to process around 20–30 wire transfers per day for corporate clients and around 8,000 wire transfers per month for clients in all divisions of the bank. Mr. Skinner opines that, bearing this in mind, the appropriate validation enquiries cannot and do not require a detailed review and cross-reference of each and every transaction. Mr. Skinner understandably stated that attempted fraud by an authorized signatory like DS is "extremely unusual . . . and difficult to detect, mostly because the Bank has to operate from a basis of trust with a known authorized signatory." There is force in this statement, especially when considering whether the bank has dishonestly assisted DS by not stopping the transactions.

34 The first step of the wire transfer procedure is when a faxed request for a wire transfer is received by the Corporate Banking Team or by Central Operations. The staff member is required to check whether there are sufficient funds in the account, that the signatures are verified, that the account numbers are correct and that there is no notation or block on the account preventing wire transfers. On occasion, the verification process may require the staff member to get in touch with the customer's designated point of contact for the account. This additional procedure may be used where—

(i) the transaction appears unusual;

(ii) there appears to be some difference between the signature(s) and the provided specimen signature(s);

(iii) the transfer sum is over US$100,000; or

(iv) attempted fraud is suspected.

This call-back procedure was introduced in 2006 but the requirement for a stamp to be placed on the request confirming that the procedure was not introduced until 2011, so after the last relevant fraudulent transaction in the matter before me. Mr. Skinner indicated that if the request is received from a known customer contact, fax number and location (as they were in the matter before me) and it appears that it is signed by the authorized signatories, then the processing member of staff would ordinarily be content about its validity and sign and stamp the document before passing it on to another officer. If the initial member of staff had concerns then he

would be obligated to refer it to more senior members of the banking team.

35 The second bank official who must look at the request carries out the same verification exercise as that conducted by the first, before also signing the request document. If the second official feels there are any irregularities or anything is unusual he should refer the request to a senior officer.

36 Once the second officer has given his approval, the initial officer will send the document to the Payment Central Operations Department for processing. Under the current procedure, that department should only accept the request if it is evident from the document that at least two officers have signed it to signify that they have carried out the required checks. If the officer in that department is so satisfied, after an administrator has entered the SWIFT details on the request, the wire details are entered into the banking system by an input clerk. The request is then seen by a third employee in the department who is a supervisor or manager who authorizes the transaction in the system and initials the request form.

37 Mr. Skinner, who I found to be a reliable witness as it relates to established banking practices, goes so far as to say that if he had been asked to approve any of the above transactions at the time that they were requested, he would have done so as on the face of them no suspicions would have been raised. Although Geneva's audited accounts for 2005 and 2006 show the management fees were for a lesser sum, in the region of US$15,000, Mr. Skinner rightly states that the bank's processing team could not be expected to review Geneva's audited accounts to satisfy themselves that the level of management fees in some of the above transactions were appropriate for the industry. I do not accept that under the bank's policy and procedure a review of audited accounts is strictly required when using "all reasonable means" to ascertain likely account usage. It is for the customer when opening the account to inform the bank about the expected level of activity. Accordingly, the fact that a bank employee did not conduct such a review for what were much later disclosed as being fraudulent transactions, does not amount to a closing of eyes and is not sufficient to base a finding of the nature of dishonesty required[7] to prove a dishonest assistance claim.

38 Mr. Skinner accepts that some of the signatures on the various requests, especially with the benefit of hindsight and now knowing that the signatures are being challenged with more time to study the request in detail, "do vary to a degree which might have invited enquiry" and states that there was no evidence of dishonesty but more likely to be "innocent

---

7 As highlighted from para. 176 herein.

error." Mr. Ritter submits, although not accepted by the bank, that this is an admission of negligence on the part of the bank. Mr. Skinner states that, having regard to the procedures in place and the volume of wire transfer requests, the banking officers have not processed the transactions improperly and that even if they had noticed any variation in the signatures that the standard practice would have required them to call DS who was the point of contact for Geneva with any request for Mr. Ritter to re-sign the document. The frank admission by Mr. Skinner that the signatures might have invited enquiry, in circumstances where there is more clarity with hindsight and in context due to what we know about the established fraudulent conduct of DS, the agreed point of contact for this account who Mr. Ritter and the bank regarded at the time to be an honest officer of Geneva, does not prove that the bank through unidentified member(s) of its employees was dishonest or closing its eyes in its approval or handling of the transactions

**Background—events in August to September 2011**

39 Mr. Ritter told the court that in August 2011, due to his dissatisfaction with the level of service being provided to Geneva by Monkton coupled with a change in the law in Texas in 2005, he had decided to wind down Geneva's operations in the Cayman Islands and to close the Geneva account and transfer the funds therein to the United States. Mr. Ritter also said that a further reason for making the decision was that DS become increasingly unresponsive to his phone calls and evasive, specifically in relation to providing the necessary information for the completion of the long outstanding 2007 and 2008 audit of Geneva by its auditors, BDO Tortuga ("BDO"). One might have thought that such a concern and state of affairs in relation to Geneva, one which the bank could not have known about at the time, should have raised some alarm bells for Mr. Ritter concerning DS's handling of Geneva's finances and whether this merited scrutiny by him.

40 Mr. Ritter states that he informed DS that Geneva's three brokerage accounts at Abshier Webb Donnelly Baker should be closed and the funds should be transferred to the Geneva account. The transferred funds totalling US$510,062.90 resulting from the closure of the accounts were credited in the Geneva account on August 16th, 2011. Mr. Ritter says that, between August 16th to 23rd, 2011, he informed DS of his wish to close the Geneva account and transfer the funds to the United States. At that time, based on the bank statements provided to him by DS, Mr. Ritter believed there to be around US$1,495,000 in the Geneva account.

41 Mr. Ritter stated that, when he informed DS of his intentions, DS told him that the maximum which could be withdrawn from the Geneva account in August 2011 was US$620,000, because CIMA had imposed minimum capital requirements for captive insurance companies. Mr. Ritter

told DS that he still wished to close the Geneva account, to debit the US$620,000 and have the balance of around $875,000 transferred thereafter. Accordingly, albeit belatedly at around 1.01 p.m.[8] on September 1st, 2011, US$620,000 was transferred from the Geneva account to Mr. Ritter's account in the United States.

**Background—events on September 1st, 2011**

42 At around 10.31 a.m. on September 1st, 2011, before the transfer had been processed, Mr. Ritter telephoned the bank to ascertain the account balance. When he was put through to the bank's Corporate Banking Department he was informed by an employee that the same was "far less" than the figure he had given to her. Mr. Ritter argues that the bank had thereby been put on notice that there was an US$872,000 shortfall on the account. In his oral evidence, Mr. Ritter rightly conceded that he had not informed the employee that sums in the account had been withdrawn without his knowledge or consent. Although Mr. Ritter, after the employee's limited disclosure to him about the account, may have been able to then express a view that this is what must have caused the reduced account balance, he of course could not put, and cannot say that he put, the bank on notice of the forgery or fraud, as he was not aware of the same at the time, as this was before DS had confessed to him. He said that the information received from the employee made him "shocked, concerned and confused" and his "thoughts were spinning." Although Mr. Ritter told her that he was a director and shareholder of Geneva as well as being a signatory on the account, the employee refused to provide him with details about the account balance or how much less the balance was than the figure he cited, citing the bank's confidentiality policy. Mr. Skinner confirmed that the bank does not ordinarily provide information to customers over the telephone about their accounts. Mr. Ritter said that he was "irritated" and "frustrated" by the employee who he viewed as being "uncooperative." Mr. Ritter states that the employee would have been aware that he was "extremely alarmed" and that he had an "upset tone of voice and aggressive speech pattern" which "must have made . . . [her] nervous." A member of staff tasked with taking telephone calls from customers being confronted by an irate customer is not a unique situation and I do not accept Mr. Ritter's argument that his demeanour, coupled with his comment to that staff member that the amount in the account was far less than he believed it to be, was anywhere near sufficient to constitute putting the bank on notice or "on inquiry" of a forgery or fraud. I do not accept that the nature and content of this call and the later calls made to

8 The wire transfer instruction having been received by the Bank at 12.32 p.m.

this and other bank employees amounted to putting the bank on constructive notice of DS's fraud. Mr. Ritter's contention that this constituted notice of the fraud is inconsistent with his different position, namely that he believed and expected that such notice was actually given by Mr. Arbo at BDO, who were Geneva's auditors, or by Krys Global who he had instructed to conduct a forensic investigation of the Geneva account.

43 Interestingly, in an email sent to Krys Global on September 6th, 2011, Mr. Ritter informed them that he had not spoken with the bank "at all on the matter." During evidence-in-chief, he elaborated on the content in his email stating his view that it was very clear to the first bank employee that there was a significant problem on the account, but then went on to say:

> "I have never told the bank that there had been a forgery, nor had I told the bank some of the intervening things that had gone on since my awareness there. And so I am now saying to Margot, I haven't spoken to them on this matter."

44 Mr. Skinner indicated that the bank employee who took Mr. Ritter's first two phone calls had followed the correct procedure in not providing confidential account information, although with hindsight she could have suggested that he speak to the relationship manager for the Geneva account. If Mr. Ritter was unhappy with the service he was receiving from this employee and so concerned about the account, one might have expected him to ask her if she could connect him with a more senior member of staff, something which he chose not to do.

45 As a result of what he had been told by the bank's employee, Mr. Ritter spoke to DS on the phone at 10.39 a.m. and again at 10.46 a.m. They had about eight further brief telephone conversations on that day. DS informed him that he "borrowed money" from the Geneva account and, although not using the word "forgery," he admitted that he had signed Mr. Ritter's name when doing so. DS informed Mr. Ritter that he would make immediate arrangements for the sums to be repaid, and DS, despite being initially evasive, during one of the later telephone conversations on that day confirmed that the amount owing was about US$875,000 which he promised to repay.

46 At this stage on September 1st, 2011, following some of the eight calls between Mr. Ritter and DS, but before Mr. Ritter's second telephone call to the bank at 12.39 p.m., DS embarked on further fraudulent activity on accounts at the bank by initiating the transfer of funds from two captives also managed by Monkton to the Monkton account at the Cayman National Bank in order to fulfil his promise to Mr. Ritter to repay the money removed from the Geneva account into his personal account. DS actually instructed a transfer of US$550,000 from the account of Warco to Monkton at 11.47 a.m. and a transfer of US$276,000 from the

account of Canadian Livestock at 12.32 p.m. to Monkton. As there was no notice or block on the accounts operated by DS, which Mr. Skinner stated would have been put in place if Mr. Ritter had notified the bank about his knowledge of the forgeries, these transfers were not questioned and were processed in the normal way. In relation to the Warco and Canadian Livestock transactions, the entries on the face of the document indicate that the bank conducted a call-back to verify the transaction. The transaction, which Mr. Skinner stated would have been viewed at the time by bank processing staff working with such a corporate customer as a payment being made for a legitimate commercial purpose, was actually authorized by the signatories, so was not a forgery. The transactions were likely completed around 12.10 a.m. on September 2nd, 2011.

47 Wire transfers of US$75,000 and US$225,000 were received on Monday, September 7th, 2011 and a wire transfer of US$575,000 was received on September 7th, 2011 from the Monkton account at Cayman National Bank by Mr. Ritter into his personal US account. It is common ground that these payments totalling $875,000 had been misappropriated by DS using the two above-mentioned transfers from the accounts of captive insurance clients of Monkton at the bank. Mr. Ritter said that he had been led to believe by DS that the funds would be coming from DS's family members in the United Kingdom and it was not until he read the confidential report of the Monkton controllers dated February 21st, 2012 that he became aware that the funds had been stolen.

48 Mr. Ritter states that, after his initial telephone conversations with DS, he again telephoned the bank and had a 13-minute conversation with the same bank employee commencing at 12.39 p.m. Importantly, Mr. Ritter was at this time already aware of the forgery on the account, as DS had admitted it to him. He conceded during cross-examination that at that point, in his mind, it was "a fraud and a forgery." It is therefore rather surprising that in a letter of September 29th, 2015 from Mr. Ritter's attorney to the bank's attorney, presumably written on instructions, it was stated that the bank had not been informed of the admitted fraud by Mr. Ritter in September 2011 because it was "premature and imprudent" to do so prior to an investigation and that it was "only a suspected fraud." Mr. Ritter indicated that the employee again refused to provide him with the amount of the balance in the Geneva account, indicating to him that she had "told [him] too much already" and was not permitted to verify his identity over the telephone. Mr. Ritter failed to tell the bank employee what he had just been told by DS about the forged signatures, something he accepted during cross-examination. Mr. Ritter said that the employee did not offer or suggest transferring his call to a manager or anyone more senior but, on the other hand, there is no evidence that Mr. Ritter asked her during this telephone call to transfer him to speak with a manager or a more senior officer. This is surprising, as Mr. Ritter says that he was

extremely dissatisfied with the two telephone calls he had with this employee. One would have expected a seasoned businessman in the financial industry, such as Mr. Ritter, to have asked to speak to the Fraud Department at the bank as DS had informed him about the forgery, especially if he was so dissatisfied with the more junior bank employee with whom he had been speaking and was so concerned about the account. Mr. Skinner understandably said that he would have expected a person in Mr. Ritter's position, with the knowledge he had due to DS's confession to him, to "be bashing the door down to get to a very senior person to report of fraud—forgery."

49 At 1.01 p.m. Mr. Ritter telephoned the bank's switchboard, this time he asked to speak to someone in the Wire Transfer Department. He had a 14-minute discussion during which he was informed that the instruction for the US$620,000 wire transfer had been received. This employee was also not willing to provide Mr. Ritter with the figure for the remaining balance in the Geneva account. He said that this employee "*also* declined" [emphasis supplied] to refer him to someone more senior in the bank who could assist him. However, it is not clear whether Mr. Ritter had actually asked to speak to someone more senior in the bank or whether, like with the first employee, that employee did not offer or suggest transferring the call to a senior bank officer.

50 Mr. Ritter made his fourth telephone call to the Wire Transfer Department at the bank at 2.29 p.m., at which time a further bank employee confirmed in a three-minute conversation that the wire transfer had been processed but, similar to her colleagues, refused to give him any details about the balance in the Geneva account. Mr. Ritter said at that stage he gave up trying to receive any co-operation or assistance from the bank, as he believed the staff's attitude to be unhelpful and it actually made him: "wonder if [DS] had had any inside help from the employees at the bank, in undertaking whatever it was [DS] had done on the Geneva Account." There is absolutely no evidence that anyone employed by the bank had acted in such a way. In fact, in his statement sworn on December 8th, 2016 Mr. Ritter states: "I have never formally alleged and do not allege now that [DS] had an accomplice-fraudster in the corporate banking team at Butterfield, and I do not seek to impeach the bank's reputation in this way." During her opening submissions at the hearing, Mr. Ritter's counsel conceded that an allegation that DS had "inside help" at the bank was not being pursued.

51 Mr. Ritter characterized the employees' responses as being "unhelpful" and like a "recorded script." Mr. Ritter wrongly contends that he had, by the above conversations with the three different members of staff, put the bank on notice of money being withdrawn from the Geneva account without his consent and that they should have immediately known this due to the difference in the amount in the account and the figure he

provided. It is clear that the three employees, by following the bank's procedures appropriately, felt unable to provide information about the account to Mr. Ritter. Mr. Ritter could have been an unauthorized voice on the phone, and Mr. Skinner rightly points out that in such circumstances the bank could not have taken any information provided by Mr. Ritter on that day as accurately stating the position on the account. The similar manner in which the three different bank officers handled his calls is consistent with there being a policy to preserve confidentiality, which they commendably followed despite the pressure Mr. Ritter was putting on them to do otherwise. If Mr. Ritter had shared his knowledge of the forgery at the time, which he had a duty to do, there is little doubt that they would have referred him and the matter to a more senior member of staff.

52 Importantly, what Mr. Ritter failed to do in any of the three telephone calls lasting a total of 40 minutes which he made to the bank after DS had admitted his fraudulent actions by forging Mr. Ritter's signature to him was to inform the bank about what DS had told him. In fact, during cross-examination Mr. Ritter agreed that "if he had intended to tell the bank about the admission of forgery," these three calls were a "perfect opportunity" for him to have done that. Mr. Ritter later added that he agreed "in general" with the proposition that if in a personal banking situation there has been a fraud on one's account, one should call the bank immediately to let them check the compromised account and that this may lead to security measures being put in place by the bank, including a block being placed on the account. It is clear that the purpose of these calls made by Mr. Ritter was not for him to in any way notify the bank or put them on inquiry of the forgery or fraud which he was aware of after the first phone call, but for Mr. Ritter to obtain information about the balance on the account. I do not accept the contention that the making of the calls to the bank by Mr. Ritter and the content of the conversations about the account balances between him and the bank employees "contrast with the deliberate conduct of the culpable customers in successful estoppel cases." Mr. Skinner correctly contends that Mr. Ritter, in his capacity as a director of Geneva, had a duty to inform the bank about the forgery as soon as he had been made aware of it by DS on September 1st, 2011 and that he had ample opportunity to do so during any of the later three telephone calls that he made to the bank on that day.

53 Mr. Skinner states that if the bank had been notified of the fraud, then he would have been made aware of the same because any member of staff who received such notification would have reported the matter to a supervisor or senior manager, who in turn would have passed the information on to him. Mr. Skinner would then have informed the head of

compliance and a block preventing any further transactions[9] would have been placed on the Geneva account. An investigation would then have been conducted in relation to all accounts to which DS was a signatory, and it is likely that blocks, or at the very least warning notices which would require approvals from senior management before allowing transactions to process on the relevant account, would also have been placed on those accounts.[10] The head of compliance at the bank would then have notified the Financial Crimes Unit ("FCU") and a suspicious activity report ("SAR") would likely have been filed with the Financial Reporting Authority. The bank would have sought legal advice from its attorneys and this would have included advice about how to recover any sums fraudulently removed from the Geneva account. Mr. Skinner stated that recovery proceedings could have then been brought at a time when DS was still solvent, before any of the later default judgments were entered against him and before he had divested his personal assets by the later grant of a power of attorney in settlement of the later default judgment obtained by the Monkton JOLs. Any block on the relevant account(s) would not have been lifted unless the bank received advice to do so by the FCU or the bank's attorneys.

54 At 3.29 p.m., less than half an hour after his last conversation with the bank and despite him saying that he was in a "profound state of shock," Mr. Ritter had the presence of mind to telephone Paul Arbo with whom he had recent contact concerning the preparation of past-due audits for Geneva. In his witness statement Mr. Arbo stated: "I recall thinking throughout my conversations with Mr. Ritter at that time how composed he was, so I did not feel any need to try to calm him down." Mr. Arbo answered in his evidence-in-chief when asked whether Mr. Ritter was upset: "No, I was actually thinking to myself he was fairly well composed, given the nature of what he was calling me about" before adding, when asked about Mr. Ritter's demeanour between September 1st at 3.29 p.m. until September 6th, 2011, that he remembered that "he was quite composed."

55 It is also clear that Mr. Ritter had the clarity of mind to develop a dual strategy at the time, namely to first put pressure on DS to make repayment and not doing anything in relation to reporting to third parties as that might detrimentally affect that course until he was paid and, secondly, if the first option failed, then seek to recover from the bank. Interestingly, unlike his communications with the bank on that day,

---

9 Including the two fraudulent transfers detailed in para. 47 herein.

10 Mr. Skinner contends that two payments totalling US$825,000 paid to Monkton on DS's instructions could have been blocked if such notice had been given by Mr. Ritter to the Bank after DS's confession to him on September 1st, 2011.

Mr. Ritter chose to inform Mr. Arbo about what DS had told him about his fraudulent actions and the forged signatures. Mr. Arbo confirmed in his evidence that Mr. Ritter told him that he had spoken to DS who had admitted to him that he had taken money out of the Geneva account by forging Mr. Ritter's signature on cheques.

56 Mr. Ritter stated that he "remembered clearly" that Mr. Arbo advised him in their discussion to obtain a full picture and to be in possession of all the facts before doing anything or notifying anyone including the CIMA. Mr. Ritter stated that he was at the time "influenced" by Mr. Arbo and BDO, in particular when they expressed caution to him "not to act rashly." Mr. Ritter said that he relied upon them as he felt that he was "in a completely new situation and in an unfamiliar country with the legal system regulatory system I knew almost nothing about." Although the forgeries had commenced in 2008, and although no audits had been completed by BDO from 2008 onwards, Mr. Ritter added that he believed in retrospect that Mr. Arbo was concerned about BDO's reputation as auditors if they had overlooked fraudulent activity and that this was why Mr. Arbo did not want to cause any unnecessary trouble for DS or BDO. In his first written statement, Mr. Ritter wrongly stated that Mr. Arbo suggested that a special audit should take place, and he later accepted that this was inaccurate as in fact he had been the one to ask Mr. Arbo if he would do the forensic work. When first asked to do that by Mr. Ritter, Mr. Arbo stated that he would have to think about whether he could take on an engagement to conduct a forensic accounting investigation to reconcile the transactions on the Geneva account.

57 Mr. Arbo's recollection of their discussion is very different. He accepts that BDO had duties as auditors which Mr. Ritter could rely upon. He also accepted in cross-examination that he did not have the sense that Mr. Ritter wanted to cover up this fraud for DS and he was not concerned about DS's welfare. During re-examination he reiterated that reporting to the bank was not a matter for the auditor and that it was a matter for the client. He added that he was "under the impression that we had no responsibility to report to Butterfield." Mr. Arbo stated:

> "At no time during discussions with Mr. Ritter or email correspondence reporting on those discussions was there ever any talk of notifying the Bank or any other parties aside from the regulator and the police. All of the conversations were about BDO's obligation as an accounting firm to report suspicious activity. I do not, therefore, believe that Mr. Ritter could have reasonably presumed or expected that BDO would notify any other party as suggested in paragraph 100A and 102 of the Amended Statement of Claim. This is also inconsistent with Mr. Ritter's specific request to me on 2 September to keep the information confidential and his requests on 5 and 6 September to delay notifying only the regulator and the police."

Mr. Arbo was adamant that he did not tell Mr. Ritter to keep knowledge of the forgery and fraud to himself and not to report it, stating during examination in chief: "I'm sure I spoke, generally, about the importance of gathering all facts. And in the kind of context of an essential forensic audit, but certainly not any context of delaying notifying CIMA." Mr. Arbo also denied Mr. Ritter's statement that he had told him that DS had a nephew working as a chartered accountant at a competing accountancy firm, which Mr. Ritter said he had done possibly to emphasize that DS was a reputable professional.

58 Mr. Ritter stated that he wished to be "proactive," so at around 3.56 p.m. he telephoned the CIMA's Enforcement and Insurance Company number, having been redirected to them by someone at the CIMA whose number he had been able to search for and find, with the intention of reporting the fraud. This is an illustration that he had clarity of thought to partly recognize the obligation to make such a report. He failed to inform the CIMA staff member of his suspicions about DS's irregular dealings with Monkton, stating that "as he was about to" do so he terminated the call as he then recalled the "clear advice" which he said Mr. Arbo had given to him not to make any serious allegations until he knew the facts. However, very shortly after this call, he telephoned Mr. Arbo at 4.05 p.m. to request the details of the person at the CIMA who was responsible for Geneva. It is evident that Mr. Ritter's concerns about the Geneva account did not hinder these lucid thought processes.

59 At 4.09 p.m., following the request for the information, Mr. Arbo provided Mr. Ritter with the details of the Head of Insurance Supervision at the CIMA who would be responsible for Geneva. Mr. Ritter stated that Mr. Arbo reiterated to him that, before the CIMA was informed, there should be an investigatory audit undertaken. Mr. Arbo indicated that his providing Mr. Ritter with the CIMA contact details and his reaching out to the attorneys concerning BDO's reporting obligations, was inconsistent with Mr. Ritter's contention that Mr. Arbo had told him to delay notifying anyone, including the CIMA, until there was a fuller picture. Mr. Arbo says that it was Mr. Ritter who was driven to delay informing the authorities because he wanted to first focus on being repaid by DS. Mr. Ritter said it was correct, when it was put to him in cross-examination, that from the time DS said he was going to repay him on September 1st that his "focus was on making sure he did repay." He also accepted when asked that his "objective was to secure full repayment from him as quickly as [he] could." This evidence tends to show that Mr. Ritter's deliberate silence was intentional and that its purpose was to ensure a smooth recovery of the funds from DS without any hindrance that would likely flow from reporting what he knew about the fraud.

60 At 4.49 p.m., Mr. Arbo indicated in an email that he felt that, due to potential conflict issues relating to DS, the accounting assignment should

be carried out by another accountancy firm instead of BDO and he made recommendations of other firms including Krys Global. At 5.09 p.m., Mr. Arbo emailed the CIMA about the insurance coverage requirements for captive managers.

**Background—events from September 2nd, 2011 to December 2011 and the duty to report the forgery/fraud**

61 At 4.19 a.m. on September 2nd, 2011, Mr. Ritter sent an email to Mr. Arbo in which he confirmed his belief that the embezzlement could be in the region of $875,000. He also sought to persuade Mr. Arbo that he could carry out the forensic analysis and sought advice about a suitable attorney to instruct as well or chartered accountant to help him resolve the issues as they arose. In his reply at 8.54, Mr. Arbo reiterated his view that he could not accept the instruction to carry out a forensic analysis and recommended that, although BDO would "offer whatever assistance we can," both an attorney and accountant should be instructed by Mr. Ritter. Despite this recommendation, and despite his expressed view that he was concerned about dealing with matters in this alien jurisdiction and that he needed local "boots on the ground," Mr. Ritter accepted during cross-examination that he did not at any time instruct a Cayman attorney. In his earlier reply at 8.27 a.m., Mr. Arbo had forwarded an email to Mr. Ritter stating that there were no insurance coverage requirements for captive managers.

62 Mr. Ritter telephoned Margot MacInnis at Krys Global on September 2nd, 2011. Mr. Ritter said that he informed her about his concerns with DS and about his dealings with the Geneva account as well as the advice he said he had received from Mr. Arbo concerning the need for forensic investigation to be undertaken. At 9.05 a.m., Mr. Ritter told Mr. Arbo that he was retaining Krys Global.

63 Around the time that the bank was processing the two fraudulent transfers involving Warco and Canadian Livestock outlined at para. 46 above, Cayman National Bank received a request from Monkton to transfer $75,000 to Mr. Ritter's personal account in the US.

64 BDO, being aware that Krys Global was being instructed in relation to the forensic analysis, contacted the Appleby law firm for legal advice concerning its obligations as Geneva's auditors to report the fraudulent conduct to the CIMA and in relation to the filing of a SAR. On the same day Mr. Arbo informed Mr. Ritter by email that BDO had obtained the legal advice and that he had been advised that, as BDO had been made aware of a forgery, it was obliged to file a SAR.

65 Mr. Arbo sent a further email to Mr. Ritter at 4.29 p.m. informing him that, as BDO had received advice from Appleby, the firm could not be

Geneva's attorneys due to conflict issues. He suggested that Mr. Ritter ask Krys Global about recommendations for suitable attorneys.

66 Mr. Ritter stated that he understood the content of the communications from BDO to mean that: "BDO would be taking action and making a report about this to the appropriate Cayman Islands authorities." He said that the veracity of his belief that BDO was taking immediate action on behalf of Geneva was later fortified when he received an invoice from them in October 2011 which included charges for their time spent dealing with the suspected fraud. Mr. Ritter stated that Mr. Arbo told him on October 11th, 2011 that the disbursement included the preparation, by attorneys instructed by BDO, of the SAR dated September 5th, 2011 and that this meant that BDO had taken the necessary actions and "all required steps to comply with the letter of the law" in September 2011, which he assumed to include being in contact with the police or the Cayman Islands authorities and "notifying anyone who needed to be notified."

67 On September 4th, 2011, Mr. Ritter had made clear to Krys Global in his email to them that he was going to meet DS and "focus on getting" his money. Krys Global, clearly with one eye on due diligence issues, responded concerning the documents that should be obtained about the funds coming from DS. Ms. MacInnis wrote:

> "... [Y]ou should also request information to support the funds transfer to yourself—you will want a paper trail of the source of funds, so for instance keep e-mails where David Self explains them (i.e. as loans) or to the extent he explains in your meeting take a good note. One would expect he would transfer the funds through the company for legitimacy.
>
> I am not a lawyer and cannot provide legal advice, to the extent you want to obtain legal advice in regard to these concerns you we [*sic*] can provide you with some of the names of attorneys we've worked with."

68 On September 5th, 2011, after his arrival in the Cayman Islands, Mr. Ritter met with DS. Mr. Ritter had the presence of mind to heed the advice of Ms. MacInnis and record the meeting. DS showed him fax instructions on Monkton letterhead dated September 1st, 2011 addressed to the Beckenham branch of NatWest Bank in the UK with instructions to wire a single transfer of US$800,000 from the UK account to one of Mr. Ritter's accounts in the United States and a print out of the branch's opening times. Despite this, DS told him that the repayment of the funds had already been sent to Monkton at the Cayman National Bank. Mr. Ritter said that DS told him that the funds were from family money in the United Kingdom and, when asked, indicated that did not come from other customers or clients. As highlighted by the bank, despite the advice from Ms. MacInnis about the need for a paper trail, only this inadequate

documentation was provided to Mr. Ritter. Mr. Ritter in his evidence agreed that this documentation was "completely inconsistent" with what he said he had been told about the money coming from family money. He accepted in cross-examination that an honest person would need sufficient proof of the legitimate source of funds allowing the repayment of $875,000. It is also inconsistent with what actually happened with the three payments coming from Cayman National Bank. Mr. Ritter accepts that he failed to ask for the documentation to verify the source of the funds.

69 Mr. Ritter has provided an agreed transcript of the digital recording of what was stated at that meeting. Mr. Ritter agreed during cross-examination that DS was a "liar," a "fraudster," a "forger" and a "thief" who had admitted to his actions to him on September 1st, 2011. With this in mind, it is clear from the transcript and the evasive answers of DS that alarm bells should have been ringing about the source of the funds to be paid to Mr. Ritter as they may not be coming from family members. Mr. Ritter wrote in the record of the meeting that when he asked DS about insurance, Mr. Ritter stated: "If I get the money, I don't care, but if I don't I care a lot." The transcript also records Mr. Ritter stating: ". . . [U]sually you can't insure yourself for criminal acts." This record shows an acknowledgment about the criminality of DS's conduct as well as a primary focus on getting the money back from DS.

70 The record of the meeting also reflects Mr. Ritter stating to DS: "So I guess my only hope if your relatives don't come through is the bank. Because the instruments are forged they would have a duty." It is also clear that, as far back as September 5th, 2011, Mr. Ritter was mentally able to strategize and was considering the fallback option of seeking to be repaid by the bank if the funds were not forthcoming from DS despite the fact that he had not, and did not for a long period of time, notify them of the forgery. He accepted during cross-examination that there could be no insurance claim in relation to the stolen funds, he having had the presence of mind to raise insurance issues in his very early discussions with Mr. Arbo, and that "the fall back [he] had in mind . . . if he didn't get [his] money was the bank." In fact, during cross-examination of Mr. Skinner by Mr. Ritter's counsel, it was made clear that Mr. Ritter's "Plan A" was to seek payment from DS via his family and that "Plan B" was "to look to the bank." The fact that Mr. Ritter was even contemplating the possibility of seeking recovery from the bank supports a contention that he had a duty to promptly report to the bank to enable them to immediately try to mitigate any potential losses.

71 It is evident that Mr. Ritter had his suspicions about the source of the funds as he stated in an email sent on September 6th, 2011 to Krys Global: "Obviously the miraculous relative loan has not materialized." During cross-examination Mr. Ritter accepted that there was a real risk that the

funds might be stolen from other customers' funds to repay him and that what DS was proposing was dubious. However, he later added when asked whether he had some doubt about the source of the funds: "Yes, but very little doubt. I thought it was family money, but I had some doubt." He then added that he wanted to believe that the money was coming from the family source and so he took DS at his word. He accepted in cross-examination that, although a doubt existed about the source of the money when he received it, he felt that there was no need to tell the bank about the fraud as he had been paid. Despite accepting the "dubious" nature of DS's proposals and the "real risk" that the funds he was to receive from DS might be stolen from other customers, Mr. Ritter deliberately chose not to warn the bank by disclosing the forgery as he made a conscious decision to prioritize the unhindered receipt of the funds into his US account.

72 On September 5th, 2011, following his meeting with DS, Mr. Ritter also met with Ms. MacInnis and Mr. Krys, but he did not attend at or contact the bank. The meeting was held in relation to them conducting a forensic investigation into the transactions on the Geneva account. Although aware that Krys Global were being retained to first carry out a forensic investigation, Mr. Ritter said that he felt that this was to be only the first phase of their activity and that their involvement would be more expansive and to an extent, as with BDO, he relied upon the content of their invoices to him to support such a view. Mr. Krys informed the court that Mr. Ritter did not show them any documentation at the meeting to support the source of the funds coming from DS, nor did he express any doubts to them about whether the money was actually coming from family members.

73 From the content of the later August 27th, 2012 letter from Krys Global to the bank, and due to Mr. Krys's oral evidence that he had no recollection of Mr. Ritter sharing with him the fact DS had told him about forging his signatures on the transfers to enable him to remove the funds, it is clear that Mr. Ritter was not forthright with them about the forgery. For Mr. Ritter to seek to place any reliance on any advice he received from Krys, who were accountants and not attorneys and so could not advise about the legal issues resulting from a forgery,[11] it would have required him to provide full details to them, so that they might have proffered any advice in an informed manner. I carefully note that Mr. Ritter contends that Mr. Krys's recollection of the meeting is "so poor" and that "most certainly" he had told the "Krys Global team" about everything DS had

---

11 Ms. MacInnis having made clear in an email to Mr. Ritter sent on September 4th, 2011 that she could not provide legal advice and that she could provide details of attorneys—see para. 67 herein.

said to him during the phone calls of September 1st and 2nd, 2011 as well as reporting the content of his meeting with DS on September 5th, 2011. I also note that, in an email sent to Ms. MacInnis sent on September 6th, 2011, Mr. Mr. Ritter refers to the Geneva account "from which the embezzlement occurs," but in their email exchanges there is no detail from him about what form that took or any reference to forgery. He states that Mr. Krys's memory may be poor because of "professional detachment." On the other hand, despite him also claiming that the nature of his interaction and sharing of information with the bank had been hindered by the shock of the disclosure to him by DS about the forgery,[12] Mr. Ritter contends that his powers of recollection should be preferred as he was "experiencing uniquely distressing circumstances" of him losing US$875,000. When one considers the August 27th, 2012 letter from Krys Global to the bank in which no mention of the admission of forgery is made, it appears more consistent with the evidence of Mr. Krys that nothing was said by Mr. Ritter concerning the forgery.

74 Mr. Ritter said in his first witness statement and in his oral evidence that at the meeting Mr. Krys gave him some hope that he would be reimbursed with funds coming from DS's relatives "as the word on the island was that [DS's] business was derived from family money" in England. Mr. Ritter said that this reinforced his belief that such money was lawfully funding the transfers to his US account mentioned in para. 47 above. In his evidence-in-chief Mr. Krys forcefully denies ever having made this comment and stated that he did not know DS or his family and he would not have spoken to anyone else about DS prior to the meeting, so he would not have known about his family situation. He was not asked about this in cross-examination. I prefer Mr. Krys's unchallenged evidence to that given by Mr. Ritter and, even if I am wrong, it does not minimize the fact that DS accepted in his oral evidence that he had real doubts about the source of the funds.

75 Mr. Ritter said he was aware of Mr. Krys being a former Director of the CIMA and that, as he felt the CIMA had been informed in early September 2011 by BDO and Krys Global about the fraud, he "pictured that officials in black jackets would be entering Monkton offices, and/or the bank itself and telling anyone present to step away from the computers." Although not accepted by Mr. Arbo, Mr. Ritter stated in his second written statement that Mr. Arbo told him, on September 5th, 2011, that the police "would have to look at the bank records to verify the embezzlement." It appeared that Mr. Ritter mistakenly felt that this belief held by him put the obligation on others and excused him from any obligation that

12 At para. 168 of his witness statement dated November 23rd, 2011 confirmed that he was still "very shocked and upset by what he had discovered . . ."

he may have had to notify the bank in specific terms about the fact that there had been a forgery and fraudulent activities on the Geneva account and about the detail he knew about that. That said, Mr. Ritter accepted in his statement signed on November 23rd, 2016 that "the position of [the Bank] and who would be responsible for contacting the Bank with dealing with the Bank was never specifically discussed at any point during" the meeting on September 5th, 2011. Mr. Krys indicated in his statement signed on November 23rd, 2016:

> "From my review of the email correspondence between members of the Krys Global team and Mr. Ritter, the signed engagement letter, the invoices rendered and my recollection of the discussions around September 2011, neither I (nor anyone else in the Krys Global team) gave any assurances that we would take all necessary steps to notify CIMA, the relevant authorities and any other party who was required to be notified of the fraud (as pleaded in paragraphs 102 and 102A of the Amended Statement of Claim). In fact as appears from the emails, it is Mr. Mr. Ritter who is asking us questions such as whether there is anything he 'should do with the bank' as he had 'not spoken with them at all on this matter'. Neither the email correspondence nor the engagement letter states we will undertake such steps. In fact, the engagement letter stipulates that Mr. Ritter acknowledges that we accept no responsibility for directing the Company's affairs, the sole responsibility for which remains with the directors and management of the Company (ie Mr. Ritter) . . . Further, Krys Global would not have been in a position to make any statement or conclusion as to whether there was fraud until the conclusion of the forensic analysis and production of the draft report in late November."

76 In the abovementioned engagement letter, which Mr. Ritter signed on September 22nd, 2011, Krys Global made clear that it had been asked by Mr. Ritter to perform a forensic review of the bank statements for the relevant period to identify any regular withdrawals or transfers. It added that it did so wholly reliant upon the information provided to them by the directors of Geneva without third-party verification. In the letter, as stated above by Mr. Krys, Krys Global also made patently clear that it accepted no responsibility for directing the company's affairs and that the sole responsibility for that remained with the directors and management of the company. It is the terms of that letter that governed the boundaries of the authority or mandate given to Krys Global, and this did not include a usurpation of the powers, duties and obligations of Geneva's directors.

77 Mr. Krys also indicated that the wording in the invoices sent to Mr. Ritter did not mean, and could not have been interpreted to mean, that Krys Global would be taking all necessary steps to notify the CIMA, the

authorities and any other party of the fraud. He reiterated these assurances were never given to Mr. Ritter and that he had no reason from the content of their communications for saying that such assurances were given. I found Mr. Krys to be a forthright witness and his evidence was consistent on these issues.

78 Ms. MacInnis, who had not been provided with any verifying documents and was unaware of Mr. Ritter's concerns about whether DS was really getting the repayment funds from his family and not from other clients, made clear in her email on September 6th, in reply to a question from Mr. Ritter as to whether there was anything that he should do with the bank that "In terms of notifying the bank this should be considered once *you've taken a decision which I appreciate is influenced on whether you get the money back or not.*" [Emphasis supplied.]

79 It appears that Mr. Ritter wrongly relies upon the above email exchange he had with Ms. MacInnis as an excuse for him not notifying the bank about his knowledge of DS's fraudulent conduct. In fact, his question about whether there is anything that he should do with the bank shows that he was then accepting that, he had "not spoken to [the bank] at all on this matter" and acknowledging that he may be obliged to do some things to do with the bank.

80 I prefer the evidence of Mr. Krys to Mr. Ritter's and I am satisfied that Krys Global did not give the impression that, as a part of its engagement by Mr. Ritter to perform forensic duties, it would be notifying the bank of the forgery. In fact, Mr. Ritter agreed in cross-examination that when he met with Krys Global on September 5th, 2011 there was no discussion about who would be responsible for "dealing with and contacting the bank" adding that as Geneva's director and having regard to the terms of the engagement letter he would have been the one who was responsible for doing that. In any event, at the time Mr. Ritter failed to be frank with Krys Global and share with it what DS had confessed to him about the forgeries.

81 Mr. Arbo stated that on September 6th, 2011 Mr. Ritter called him and informed him that the matter had been progressing positively. In his oral evidence Mr. Arbo said that Mr. Ritter did not express any doubt or any concerns to him about the repayment of the funds. Mr. Arbo said that he did not remember Mr. Ritter ever bringing up any doubts about the family money story, nor did he show him any documents he had received in support of that story. If BDO were to take on the wider role involving notification to the bank and communication on Geneva's behalf to the authorities which Mr. Ritter wrongly believed they had, BDO would have rightly expected greater frankness from him. Mr. Arbo shared this detail in an email to Appleby, BDO's attorneys, and added that Mr. Ritter was requesting him to "delay, as much as possible/appropriate, the filing of the

SAR for a few days as he did not want to 'muddy the waters' in terms of coming to resolution with [DS]." This email written by Mr. Arbo shortly after his discussions with Mr. Ritter is highly inconsistent with Mr. Ritter's evidence in his second witness statement when he swore that he "could categorically state that I never asked BDO to delay [the SAR]." Mr. Arbo in an earlier email to Appleby on that day had told them that "[Mr. Ritter] seems to want to delay notifying the police and CIMA until he gets a better sense whether (DS) might be coming through with the money he promised to repay." Mr. Arbo mentioned at para. 10 of his statement sworn on November 21st, 2016 that "he recalled Mr. Ritter saying he was concerned about compromising his efforts to get his money back." These are all consistent with a deliberate decision being made by Mr. Ritter to delay notifying others of the forgery, at the very least until the funds removed from the Geneva account were recovered into his personal US account from DS.

82 Mr. Arbo told BDO's attorneys that Mr. Ritter had informed him that he had already received US$75,000 from DS's company's account and that DS was working toward getting the rest from family members. This is consistent with the bank's case that Mr. Ritter was primarily concentrating on recovering his moneys from DS, over and above any obligations to report the admitted forgery to the bank or to the authorities.

83 Mr. Arbo also informed the attorneys that he had told Mr. Ritter that BDO were obliged to file a SAR and that he was considering what the obligations were in relation to reporting to the CIMA. BDO's attorneys filed the SAR with the Financial Reporting Authority on September 6th, 2011.

84 The funds stolen by DS from Warco and Canadian Livestock were credited into Monkton's account at Cayman National Bank at 11.55 a.m. on September 6th, 2011. DS instructed the bank to transfer US$225,000 and US$575,000 to Mr. Ritter's personal account at HSBC in the United States. At 2.00 p.m., DS informed Mr. Ritter that the money would be coming in three different batches and Mr. Ritter was given two Cayman National Bank receipts for the two above payments.

85 Mr. Ritter received the US$75,000 and the US$225,000 later on September 6th, 2011. He received the final payment, US$575,000, on September 7th, 2011.

86 Thereafter, when Mr. Ritter informed Krys Global that he would sign its engagement letter he added that the "USD800,000 has been received. Hard to believe." Mr. Ritter states that although he had recovered all of Geneva's funds, as a "responsible and concerned citizen," he continued with the appointment of Krys Global to conduct a forensic investigation so that the CIMA could be made aware of the events in an informed manner.

23-01165-mew Doc 106-29 Filed 07/03/25 Entered 07/03/25 17:38:30 Exhibit 28
Pg 39 of 78



87 On November 16th, 2011, following receipt of the first draft report from Krys Global which had wrongly analysed the fraudulent bank statements produced by DS, Mr. Ritter wrote to the bank requesting reprints of the statements on the Geneva account to cover the period from its opening until October 31st, 2011. Again, although he had known about the forgery for over two months, he failed to make any mention to the bank of the forgery. When he received those statements Mr. Ritter would have seen that the balance which illustrated that the bank, in the absence of Mr. Ritter sharing with them what he had known about the forgeries since September 1st, 2011, was treating the debits as being genuine transactions.

88 Mr. Ritter stated that he had been notified by Krys Global that it had informed the CIMA of the fraud in November 2011 and that at the end of the month he received a copy of the final draft of the Krys Global report dated November 29th, 2011. That report was also sent to the CIMA, but no copy was provided to the bank which therefore would have been unaware of the content. The report confirmed that there were transactions leaving an unaccounted difference of $828,046. However, the report still contained no mention of DS's confession to Mr. Ritter as to the forgeries. This is despite the fact that back in December 2011 the CIMA had asked Mr. Ritter to provide additional information including a chronology of events leading up to and subsequent to his discovery of the missing funds and observations regarding DS's conduct communications with him. In fact the report only mentioned that prior to their appointment Krys Global were advised by Mr. Ritter that he had concerns that funds may have been misappropriated and that he became aware of this after obtaining bank statements from the bank and comparing them to the statements received from Monkton. The report also highlighted that audited accounts had not been prepared by or filed by Geneva since June 30th, 2017, a period of four years, whilst Mr. Ritter and DS were co-directors.

89 On December 1st, 2011, a conference call took place involving Mr. Ritter, Krys Global and the CIMA concerning the report and Geneva. Even after receipt of the final forensic report from Krys Global dated January 18th, 2012,[13] Mr. Ritter still failed to notify the bank of the forgeries.

90 I accept that until the earliest late August 2011 or more likely September 1st, 2011, Mr. Ritter was not aware of these fraudulent transactions, especially as until August 2011 DS had been providing him with false bank statements for the Geneva account which contained

13 A copy of the report was provided to CIMA on or around January 25th, 2012.

inaccurate balances and did not contain details of the fraudulent transactions. It is clear that Mr. Ritter did have a duty to promptly share with the bank in clear and precise terms what he knew about the forgeries after the admissions DS made to him. Mr. Ritter suggests that he should not be criticized for what happened on September 1st, 2011 and thereafter as he acted "as any honest and reasonable man" would have done under the circumstances. It is submitted that his approach was understandable, as he says he immediately took action to recover the funds from DS and, as he was unfamiliar with the laws and regulatory requirements in this jurisdiction, he contends that he appropriately sought expert advice and guidance from BDO, Geneva's auditors, concerning his duties to report the fraud and what interaction he should have with the authorities. From his evidence it is clear that Mr. Ritter seeks to justify his longstanding failure to notify the bank by wrongly blaming others.

91 Both Mr. Krys and Mr. Arbo, although engaged in the past by Geneva, were entitled to give evidence in these proceedings to present their versions of events which are in conflict with that given by Mr. Ritter rather than leave the court to make a decision on incomplete evidence. I note that Mr. Arbo was called as a witness for the bank and that Mr. Ritter chose not to call him as a witness. This may well be because his evidence undermines parts of Mr. Ritter's evidence, especially in relation to the reasons for Mr. Ritter's failure to inform the bank of the forgery. What I have already noted in Mr. Arbo's evidence, that there was no discussion about notifying the bank, is consistent with Mr. Ritter's oral evidence-in-chief when he stated that they discussed informing the CIMA and the police about the fraud but he did not discuss telling the bank and that the topic never came up. Mr. Ritter also confirmed in cross-examination that he did not ask BDO if they had notified everyone who needed to be notified of the fraud.

92 It is understandable that Mr. Ritter put faith in BDO to perform their duties, *but only duties that relate to their capacity as Geneva's auditors.* I accept that, especially after the funds from DS had been received into his US account, Mr. Ritter was content for the authorities to be notified and he did not at that stage seek to cover up for or protect DS. BDO appropriately sought legal advice as to what their legal reporting obligations as auditors were in the circumstances and these were proceeds of crime obligations which did not include a requirement for them to notify the bank. The email from Mr. Arbo on October 11th, 2011 in response to Mr. Ritter's query about the claim by BDO for fees incurred by Appleby in advising them supports and does not detract from this contention. It makes clear that the duties are as Geneva's auditors and not acting in a wider capacity for Geneva.

93 Mr. Ritter's further excuse for not reporting being that he did not want to tip off the bank as a member of staff may have been assisting DS

is also without merit and is to a degree inconsistent with his view that he made the bank aware on September 1st, 2011 of serious irregularities on the Geneva account. It is consistent with a contention that he was deliberately withholding disclosure of the forgery to the bank. I note with great interest that in the letter from his attorneys on May 14th, 2015 at para. 55 they state: "Mr. Ritter's first instinct was that [DS] must have had inside help from someone at Butterfield. He did not therefore contact the bank at this time, preferring to go directly to the Cayman authorities." Mr. Ritter later reiterated in his statement sworn on November 26th, 2016, when seeking to justify his failure to notify the bank about DS's conduct, that he "had been concerned about whether someone at Butterfield could have assisted [DS] and had been uncertain about whether I should say anything to them until the police and CIMA took action." This evidence is inconsistent with what Mr. Ritter said in his statement that he had given "no particular thought at the time[14] about whether [the bank] should or would be notified and by whom."[15] I am satisfied on the evidence that Mr. Ritter made a conscious decision not to tell the bank at that time as he feared that this might create problems in receiving the funds DS promised to transfer into his personal account in the United States. He further stated that this concern about staff members being directly involved in the fraud is why he instructed DS to return the funds to his personal account rather than to the bank. Such a belief, if it genuinely existed at the time, was not well founded and even if it was, should have amounted to a greater reason for Mr. Ritter, as a conscientious corporate customer of the bank who was "acting as a responsible and concerned citizen"[16] to ensure that the bank was aware of the events. As set out in para. 50 herein, it is clear that this allegation is not being pursued by the plaintiffs.

94 Mr. Ritter is an experienced businessman operating in the financial sector and invariably having to deal with banks as he has been launching medical ventures and selling them to public companies since 1982. This is a view shared by Mr. Krys, the Executive Chairman of Krys Global and former Head of Enforcement for the CIMA, which is derived from his dealings with Mr. Ritter and his own knowledge of the complexities of the insurance industry. In this regard, I note the sentiments expressed in the case of *Ewing* v. *Dominion Bank* (3), a case in which estoppel was considered in the absence of a contractual relationship of banker and customer. A majority of the Supreme Court of Canada held that Ewing & Co., whose name had been forged as makers of a promissory note and who had received notice from the bank that it held the note and that payment should be provided at the bank on due date, were estopped by

---

14 "at the time" being September 7th, 2011.
15 Paragraph 187 of Mr. Ritter's statement sworn on November 23rd, 2016.
16 Ibid.

their silence, while they attempted to settle the matter with the forger, from setting up the forgery against the bank, because they could have saved the bank from at least part of its loss if they had promptly shared their knowledge of the forgery with it. In *Ewing*, Girouard, J. opined ([1904] S.C.R. at 143):

> "Speaking for myself, I cannot satisfy my mind that when a business man, familiar with banking operations, their meaning and scope, is informed, according to banking usages, that his name is being used as maker of a note in a bank, evidently for cash credit either already made or to be made, he is under no obligation to reply promptly, at least within a reasonable time, that it is used without his authority, or even that it is a forgery."

Then in *Ewing* (3), Davies, J., referring (*ibid.* at 151–152) to the statement concerning estoppel made by Parke, B. in *Freeman* v. *Cooke* (5) (2 Ex. at 663):[17]

> "Both parties profess to rely upon this rule in this case though I cannot find that any one of the limitations mentioned in it express or suggest the existence of the relationship of banker and customer or similar relationship as necessary to create the duty the neglect of which imposes the liability. It speaks of a *neglect of duty cast upon a person by the usage of trade or otherwise to disclose the truth* [emphasis in original]. I fail to appreciate the argument which would confine this duty to cases where such relationships already exist as those between banker and customer or seller and buyer. It does seem to me that in a country like Canada where such a large proportion of its business is carried on by credit evidenced by drafts and notes which are discounted by one or other of the chartered banks of the country the usages of trade which create the duty apply to all persons engaged in trade who are notified of the holding by one of these banks of a note or draft professing to be theirs. I cannot believe that such a duty would exist as between the bank and Ewing & Co. if the latter was a regular customer of the former and would not exist otherwise. It seems to me the duty naturally arises out of the usages of trade as they exist. Banks do not confine their discounts to those of their own customers only. It is known to every one engaged in trade that a large part of the bank's business consists in the discounting for its customers of commercial paper professing to be that of other merchants or traders. *And when a business man receives such a notice from a bank as Ewing & Co. did in this case, if such notice contains information of a forgery and fraud being practised upon a*

17 See paras. 136 and 138 below.

*bank, in the unauthorized use of the name of the person or persons notified, the latter are bound by every principle of justice and right dealing between man and man, and in accordance with the usages of trade, within reasonable time to give the bank notice of the fraud* [emphasis supplied].[18] Any other rule would seem to me to be fraught with grave danger; would generate want of confidence in the ordinary business relations of life and would offer a premium upon gross business negligence."

95 Mr. Ritter could have had no doubt using his common sense that he had a duty to inform and warn the bank immediately, especially as DS had just admitted to him that there had been forgeries made by him and fraudulent activities on the Geneva account. He could also, at the same time, have cautioned the bank that the details were not fully known as a forensic accounting was to be carried out. Mr. Ritter chose not to do so and he wrongly seeks to shift the blame for that on Mr. Arbo, BDO, Krys Global and the CIMA.

96 I accept the evidence of Mr. Arbo that reporting the fraud to the bank was not the responsibility of Geneva's auditors who had, on September 1st, 2011, just been invited by Mr. Ritter to carry out a forensic review of transactions during the relevant period. I accept Mr. Arbo's evidence that he did not encourage Mr. Ritter to not inform the bank and that there was no discussion about the reporting obligations to the bank. If I am wrong in reaching that conclusion or if Mr. Ritter genuinely believed BDO was going to report, when it became clear that BDO felt conflicted and were no longer advising him and that the bank had not been informed, he had a responsibility to report.

97 Mr. Ritter's contention that he had discharged this duty to report as he believed that the content of his telephone conversations with the bank employees on September 1st, 2011 amounted to putting the bank on notice is misconceived. Mr. Ritter expressing the incorrect "belief" the bank would become aware of the fraud as DS would "be arrested, quite literally, within minutes or hours" which would "freeze everything up" again is not a justifiable excuse for not informing the bank himself, and when it became evident that DS was not arrested at the time the excuse had even less merit.

98 Mr. Ritter's evidence is not convincing and has the character of someone, after the event, searching for and creating excuses for deliberately not doing what he clearly should have done at the time, namely

18 See the Privy Council decision in the more recent case of Tai Hing (20) (at para. 139 herein) where the requirement to report is stricter, as it is to be done as soon as becoming aware of the fraud rather than doing so within a reasonable time.

immediately report the detail of the fraudulent activity on the Geneva account to the bank. Although he did not accept the suggestions that "he intended to keep the bank in the dark to stop them taking actions which [he] could not control which might affect [DS] paying him" and that he "wanted to protect [DS's] ability to repay" him, it is conceded by Mr. Ritter that his primary focus was to ensure that the funds were recovered from DS and this meant receiving them from DS into his US account. Mr. Ritter admitted that he was concerned that DS could be arrested before the wires from DS to his account had been processed and this was confirmed by Mr. Arbo during cross-examination. This, coupled with the evidence of Mr. Arbo, shows that Mr. Ritter acted deliberately in withholding the information and that his silence was intentional. Even after receiving the funds in the account and despite having concerns about the source of the funds he still deliberately failed to inform the bank, and this was consistent with his Plan A. It was only when his Plan A began to fall apart, due to the then imminent Texas proceedings, after he decided to move on to Plan B which involved him coming against the bank for recovery, that adequate disclosure about the existence and detail of the forgery was given.

**Background—the events of February and March 2012—appointment of Monkton controllers**

99 On February 14th, 2012, the bank were notified that the CIMA had appointed Gordon MacRae and Eleanor Fisher of Zolfo Cooper as controllers of Monkton ("the controllers"). On February 14th, 2012, the controllers made a written request to the bank that no instructions issued by Monkton should be processed. It is conceded by Mr. Ritter during cross-examination that there is nothing in the letter which specifically states there had been a forgery on the Geneva account. Although the content of the written request of the controllers did not notify the bank that a fraud had been committed against Geneva or that DS admitted forging Mr. Ritter's signature, Mr. Ritter contends that the notice, request and the receipt of the later freezing order constituted notice to the bank of the forgery on the Geneva account. The bank, until these proceedings, was not provided with any of the reports made by the controllers which contained reliable information about DS's conduct.

100 From the controllers' investigations it was evident that Geneva was not the only client of Monkton who have been defrauded by DS. On February 16th, 2012, the bank was informed by the controllers' attorneys that DS's assets had been frozen by the court and they were served with that order on the following day. There is nothing in the freezing order made by Foster, J. or in any of the correspondence in February relating to the order that refers to any forgery or fraud on the Geneva account. In fact, Mr. Ritter conceded during cross-examination that there was nothing in

the documents or correspondence produced in February 2012 that notified the bank of fraud and forgery on the Geneva account and that the arrest itself did not amount to such notification.

101 On February 17th, 2012, DS was arrested and, again, Mr. Ritter contends that this should have put the bank on notice of the forgery on the Geneva account. I note, when considering the plaintiffs' submissions that disclosure by Mr. Ritter to the bank in September would have resulted in the authorities being notified and in the controllers or the JOL's taking prompt action that would have limited recovery by the bank in any proceedings if brought in relation to DS's assets at the time, that DS's arrest took place five months after the filing of a SAR containing detail about DS's admissions which one would have expected to have been drawn to the Financial Crime Unit's attention. It does not appear that the details of the arrest were widely reported or outlined that it was related to impropriety on the Geneva account. In fact, the news article dealing with the sentence handed down in December 2012 outlined that the thefts that were the subject of the charges occurred between January 12th, 2011 and January 24th, 2012, so outside the period when the forgeries relevant to the proceedings before me occurred.

102 I accept Mr. Skinner's evidence that these events in February 2012 did not draw the bank's attention to specific forgery on the Geneva account, but were an indication that some wrongdoing had taken place in relation to some of Monkton's managed captives. The bank responded appropriately to the request of the controllers and the order of the court. Receipt of the request did not require them to conduct a wide-ranging investigation into forgery for fraud on all the accounts with a connection to Monkton, including the Geneva account. Of course, if Mr. Ritter had shared all of his knowledge with the bank about the forgeries, the bank would not have to embark on the speculative exercise that Mr. Ritter believes they should have carried out in the circumstances.

103 On February 21st, 2012, DS swore an affidavit exhibiting a list of his worldwide assets. The bank submits that, from the date of his confession to Mr. Ritter on September 1st, 2011, DS must have been aware that he could be arrested or be subject to civil proceedings so by February 21st, 2012 he may have siphoned off his assets.

104 On February 23rd, 2012, Mr. Ritter, in response to the request for the detail outlined in para. 88 above, wrote to the Head of the Insurance Division at the CIMA. He informed him that DS had told him that he had borrowed the money and that he had been able to access it by falsely signing Mr. Ritter's name. He also told the CIMA that DS had stated that he would be repaid from funds from his relatives in the United Kingdom, although he did not share the doubts that he has told the court he had about this source of funding. In this communication, as well as during the

conference call on December 1st, 2011, it is clear that Mr. Ritter was not as frank with the CIMA about his concerns about DS and the source of the funds as he should have been. The bank did not see this letter until disclosure was given in these proceedings. By February 23rd, 2012, Mr. Ritter had still failed to inform the bank about the forgeries and DS's admissions about the same, and the bank did not see the letter to the CIMA until these proceedings.

105 On March 8th, 2012, the controllers obtained default judgment with damages to be assessed against DS. Mr. Skinner states that, if Mr. Ritter had informed the bank of the forgeries when he became aware of them on September 1st, 2011, it is very likely that it would have obtained judgment against DS by November 1st, 2011, if not before.

106 It appears that by March 26th, 2012 the controllers had entered into a settlement agreement with DS, under which he granted a power of attorney for the sale of his worldwide assets. On the same day the controllers instructed real estate agents to list for sale DS's Cayman Islands condominium property located on Seven Mile Beach in the Cayman Islands.

**Background—April 2012 to May 2012—Monkton joint voluntary liquidation and official liquidation—Geneva joint voluntary liquidation**

107 On April 2nd, 2012, by a shareholder's resolution, Monkton was placed into joint voluntary liquidation. On April 12th, 2012, the bank was requested to put a freeze on the Warco and the Canadian Livestock accounts following notification from the attorneys for the liquidators that DS had admitted the unauthorized transfers from them. On April 17th, 2012, the liquidators instructed real estate agents to list DS's Florida property for sale.

108 On April 26th, 2012, Monkton was placed into official liquidation by supervision order of Cresswell, J.

109 On April 30th, 2012, Geneva was placed into voluntary liquidation and appointed Mr. Krys and Ms. MacInnis as its joint voluntary liquidators.

**Background—May 2012 to April 2013—the Texas proceedings—recovery by the joint liquidators of Monkton—default judgments against DS**

110 On May 15th, 2012, the bank was informed by Krys Global in writing that joint voluntary liquidators had been appointed to Geneva. The liquidators signed the banking forms, changing the authorized signatories on the Geneva account on May 31st, 2012. In the correspondence Krys

Global did not inform the bank about the admitted forgeries by DS on the Geneva account.

111 On June 14th, 2012, the Monkton liquidators' US counsel served notice of claim against Mr. Ritter in Texas for the recovery of $875,000 paid to him fraudulently from the accounts of other captive clients of Monkton.

112 DS's Seven Mile Beach Condominium was sold on June 20th, 2012 and 50% of the US$172,000 proceeds of sale, after the mortgage was discharged, the costs of sale were met and the strata dues paid, was provided to DS's wife and the remaining 50% totalling US$86,000 was paid into the liquidation estate.

113 The Florida property was sold on December 4th, 2012 for US$85,000 and, after deductions, $61,004 was paid into the liquidation estate. US$7,113 was paid into the liquidation estate from the sale of Class A shares in Greenlight Capital Re and US$5,883 was also paid in from the sale of a Ford Motor vehicle.

114 There is some inconsistency in the liquidators' reports, with two figures being given for the total realizable assets, namely US$159,950 and US$154,822. Monkton's liquidators highlight that DS told them that he had sent US$200,000 to Maria Henry (DS's sister-in-law), but they did not seek to investigate or recover that payment. It is clear from their report that the absence of funding resulted in the limitation on the depth of their tracing enquiries, including in relation to the purported $200,000 gift from DS to his sister-in-law. The bank contends that, having regard to the US$875,000 DS received from the defrauding and taking into account the recovered balance of around $160,000 and the abovementioned $200,000, DS must have had other tangible assets as he could not have used up the US$515,000 balance on only luxury travel, university fees for family members and lifestyle expenses between December 28th, 2008 and February 2012. Mr. Skinner stated that the bank would have pursued a greater investigation into DS's financial affairs than the one that the liquidators did, in particular into the US$200,000 payment to Ms. Henry. Despite the submissions by the bank about how DS may have used funds between September 2011 and February 2012, there is insufficient evidence to make a finding that there were additional funds, but it is evident that the late knowledge of the forgeries prevented them having the opportunity to make a timely and thorough investigation into DS's finances. Accordingly, I am only able to ascertain with any certainty that DS's realizable assets available to meet creditors' claims were in the region of US$160,000 during the relevant period of time.

115 The bank claims that if it had been informed about the forgeries on September 1st, 2011 it could have brought legal proceedings at a time when DS still had assets of, at the very least, US$160,000, but probably

more if a more thorough investigation to the one undertaken by the liquidators had been carried out. Mr. Skinner's evidence was that it would take one to two months (to the beginning of November 2011, well before the completion of the Krys Global Report which was sent to the CIMA leading to the appointment of the Monkton controllers in February 2012) to obtain legal advice and to act. It is contended that this is a realistic timeframe, especially if Mr. Ritter had shared his knowledge about the detail/amount of the forgery which in turn would have reduced the length of any initial investigation required to be undertaken by the bank before issuing proceedings. It is also a realistic time frame when considering the actions of the Monkton controllers who within only one day of DS admitting the forgeries to them had obtained a freezing injunction and who within 22 days had a default judgment with damages to be assessed. The bank also suggests that the legal fees, which it would not have been able to recover in proceedings brought against DS, would not have been high, as DS would likely not have defended the proceedings and reached an agreement of the nature that he did with the Monkton liquidators—those proceedings being concluded with a default judgment within ten weeks. It is submitted that these fees should therefore not be regarded as reducing the arguable material prejudice suffered by the bank to its opportunity of recovering against DS. During cross-examination Mr. Ritter agreed that this was "not an insignificant amount of money." The liquidators' fees reached US$322,867 of which US$100,481 arose from their time spent on legal and investigatory work and US$73,647 was spent on the realization and protection of DS's assets. Mr. Skinner during cross-examination contended that he did not feel that it would have cost over US$50,000 for the bank to obtain the assets belonging to DS.

116 Warco, Landrin Insurance Corporation and Landis Insurance Corporation then issued separate writs against DS in the Grand Court and on July 19th, 2012 they obtained separate default judgments of US$886,881.20, US$48,000 and US$54,000.

117 From their investigation, the JOLs of Monkton established that at least US$657,000 of the US$875,000 received by Mr. Ritter had been misappropriated from other Monkton clients, or was otherwise a preferential payment. In light of this, on August 9th, 2012 Monkton's liquidators filed their complaint against Mr. Ritter in the United States District Court, Western District of Texas ("the Texas proceedings") seeking to claw back the US$875,00 which Mr. Ritter had accepted from DS into his US account.

118 This is the stage at which Mr. Ritter changed his strategy concerning recovery of the sums improperly removed from the Geneva account by DS. It became evident that the funds received under his "Plan A" might well have to be returned as the Monkton liquidators were now seeking to recover from Mr. Ritter the stolen funds which had been wired into his

personal account by DS. Mr. Ritter changed to his "Plan B," namely seeking recovery from the bank. On August 27th, 2012, Krys Global as Geneva's joint voluntary liquidators wrote to the bank to notify it of the fraud on the Geneva account and that Mr. Ritter would now be challenging the debits for the payments made on DS's forgeries. Mr. Krys stated in evidence-in-chief that Krys Global did this after it had obtained legal advice, as it felt that there was a duty to put the bank on notice and that he was not aware of Mr. Ritter ever informing the bank of DS's confession to him that he had forged his name to misappropriate funds from the account. The letter did not say that Mr. Ritter had been aware of this since September 1st, 2011, but gave the impression that it was something that he had only recently told Krys, as it said "he has now confirmed that the five payment instructions" had not been authorized by him. During cross-examination Mr. Krys stated that when they met, and when Krys Global was asked to carry out the forensic analysis, Mr. Ritter did not accept that Mr. Ritter told Krys Global what he knew from what DS had told him, and that they "never talked about forgery" but "about there being a risk of fraud" and "concerns that his money may have been stolen." When pressed about Mr. Ritter saying to him specifically that he had been told of a forgery he replied: "I have no recollection of that and had we had that, I would have asked for evidence. And quite honestly, when we did our report, as you know, we say things like 'Mr. Ritter has said that he didn't authorize a transaction.' A much stronger statement would have been 'Mr. Self has already confirmed or we have evidence that Mr. Self had actually forged his signature on this transaction.'" Mr. William King, relationship manager at the Corporate Banking Division of the bank, on September 6th, 2012 in an internal email following receipt of the Krys letter indicated that DS had admitted to major fraud on other accounts he managed, but he made no mention of there being any admission from DS in relation to the Geneva account. It appears from the evidence of Mr. Krys that this was the first time that the bank was made aware that Mr. Ritter was saying that there had been unauthorized transactions on the Geneva account and the bank rightly contend that this is the date they first knew about the fraud on the Geneva account.

119 On November 7th, 2012, the CIMA revoked Monkton's insurance management licence.

120 On or around December 24th, 2012, DS was convicted of theft of moneys from the Geneva account and from other Monkton clients' accounts at the bank.

121 On April 9th, 2013, Mr. Ritter sought to join the bank as a third party in the Texas proceedings. In cross-examination of Mr. Skinner about the Texas proceedings, Mr. Ritter's counsel stated in a question to Mr. Skinner: "Mr. Ritter realizing he hasn't been made whole after all, reverts to his Plan B, which is to seek reimbursement against Butterfield for

breach of mandate." Mr. Ritter accepted when being cross-examined that he sought to join the bank in the Texas proceedings pursuant to his "fallback option" and that this was 18 months after he had first found out about the forgery.

122 Mr. Ritter's third party complaint against the bank was dismissed in the Texas proceedings on September 5th, 2013. The bank incurred US$183,000 Texas and Cayman legal fees in successfully defending its position that it ought not to be joined in the Texas proceedings.

123 Mr. Ritter defended the Texas proceedings incurring a consequential loss of legal fees totalling US$220,871.29. The Texas proceedings were settled by Mr. Ritter, on behalf of Geneva, paying US$500,000 to the Monkton liquidation estate. The Grand Court sanctioned this settlement on March 12th, 2014. Geneva did not receive any dividend distribution from the US$500,000 settlement or at all from the liquidation. Geneva was permitted to retain US$375,000 of the original US$875,000 which Mr. Ritter had received from the evidently misappropriated funds in September 2011. US$330,000 was used to repay the Shoreline loan and interest and it is acknowledged that the balance of US$45,000 is a credit reducing the amount sought to be reimbursed from the bank in these proceedings by US$45,000 and Mr. Ritter submits that, as a consequence, the bank's position has in fact "materially improved" by it not taking action against DS in September 2011 which may have prevented the funds being transferred to Mr. Ritter on the September 6th and 7th, 2011.

124 Mr. Ritter contends that due to the communications from the controllers with the bank, due to the arrest of DS on February 17th, 2012,[19] and the bank being aware of the freezing of the bank accounts of all Monkton managed captive insurance clients due to fraudulent transactions on the same, the bank must have been aware, or put on direct enquiry, about the fraud or likelihood of the fraud on the Geneva account. Mr. Ritter indicates that the bank failed in its "duty" to inform him in February 2012 that the Geneva account had been frozen and to explore with him the reasons why and as a consequence the bank is estopped from denying the fraud and forgery from February 2012. This contention is made even though Mr. Ritter had failed to notify the bank about the fraud/forgeries and that the communications and court documents relating to the events in February 2012 made no mention that DS had forged transactions on the Geneva account. Mr. Ritter highlights that this is consistent with the date for when the bank should be taken to have been aware of the alleged fraud being February 2012, as had been pleaded in the bank's original defence dated February 22nd, 2016. By February 2012

---

19 DS was convicted in December 2012 after pleading guilty to related criminal offences.

there were no default judgments against DS, no creditor had taken action against him and the settlement between DS and the controllers and the liquidators to assign all his assets to them had not yet been reached. It is submitted that the amendment in the amended defence to August 2012 was a tactical one to enable the bank to allege that the July 3rd, 2012 judgments in default made in favour of the other Monkton creditors had materially prejudiced its position.

125 Mr. Skinner stated that, although the bank was aware that controllers had been appointed to Monkton and that DS was subject to a freezing order of his worldwide assets up to US$1.2m., it was not until August 27th, 2012, shortly before the proceedings had been commenced in Texas against Mr. Ritter, that the bank was notified of Geneva's position and that the above-mentioned transfers had not been authorized by Mr. Ritter. This notification did not come from Mr. Ritter, but from the voluntary liquidators of Geneva and it did not disclose any detail about DS admitting the forgeries to Mr. Ritter. The bank accepts that from the date of this letter it was aware of DS's fraud but it was not aware of DS forging Mr. Ritter's signature until the Texas proceedings were filed and served on the bank in May 2013.

126 In light of the above, it is contended by the bank that there was a deliberate decision not to inform the bank with Mr. Ritter "taking matters into his own hands by making sure that [DS] repaid the missing funds to him personally, rather than Geneva" with Mr. Ritter accepting a payment of US$875,000 in suspicious circumstances. It is contended that Mr. Ritter was thereby looking after his own interests and failing in his duty as a director of Geneva to promptly share his knowledge of the admitted forgery with the bank.

**The law**

127 The responsibility and liability of a bank towards its customer is governed by the applicable law and the relevant contract entered into between the two parties. The contract determines the manner in which the services will be provided and records the obligation of each party. In the event of an alleged breach by the bank of an express or implied term of a contract, three elements need to be satisfied in order to establish liability: proof of breach by the bank against the customer, damages and causation between the breach and the damage suffered by the customer.

128 However, when I now move on to consider the law in light of the above detailed factual matrix I remind myself that the parties agreed by court order to limit the issues to the two now before me, namely:

(i) whether the plaintiffs are estopped from advancing claims against the bank in contract and negligence; when conducting this exercise, in circumstances where it is found that Mr. Ritter wrongly failed to notify the

bank of the forgeries until August 2012, I will also have to consider arguments about whether there is a requirement for the bank to show that it has been materially prejudiced by the delay, and if it has, has there been any such detriment; and then,

(ii) whether the bank dishonestly assisted in a fraud involving forgeries of Mr. Ritter's signature by DS.

129 The general rule is that the bank is ordinarily not entitled to debit the customer's account if it has honoured a wire transfer/a wire transfer instruction bearing a forged signature. However a defence available to a paying bank may arise if the customer has breached his duty to the bank in failing to inform the bank of any forgery on the account as soon as the customer became aware of it. The bank seeks in this matter to prevent the plaintiffs from advancing their claim in contract and negligence against it, arguing that they are estopped from doing so due to a failure to inform.

**The law—general principles regarding the elements of estoppel**

130 To establish the defence of estoppel, the bank will have to prove that Mr. Ritter failed to promptly report what he knew about the forgeries to the bank and that he took that course intentionally. The bank must also prove that his not informing the bank of the forgery amounted to a representation that the transfer requests were in order. If able to prove the above, the bank must then prove that by its acts or omissions it relied upon the representations made, the bank contending that it did so by not bringing recovery proceedings against DS at a time when he still had financial resources/was not subject to default judgments or by allowing later fraudulent transactions to be made from bank accounts held at the bank. If able to prove the same, the bank would then have to prove that the acts and omissions caused it detriment, the bank contending that it did, as it lost an opportunity to recover from DS and it made substantial payments out of other bank accounts and had incurred litigation costs as a consequence. The plaintiffs contend that the bank, to prove detriment, must show that the lost opportunity offered a real prospect of benefit. The plaintiffs contend that the bank has failed to prove the required elements of estoppel.

131 What has commonly been termed the "*Greenwood* duty" arose in the House of Lords case of *Greenwood* v. *Martins Bank* (7). In *Greenwood*, a wife forged her husband's signature on 44 cheques. She then cashed the cheques and used the proceeds for her own use, primarily to support her sister in supposed legal proceedings. Upon discovering the forgeries, under pressure from the wife, the husband failed to at once inform the bank. It was only later that he decided to tell the bank and, after he had informed his wife of his intention, she committed suicide. The failure to inform the bank in a timely manner resulted in the bank losing

its right/opportunity to claim against the wife and the husband for the wife's tort and the court found that this amounted to the bank having suffered loss or detriment. The husband sought a declaration that he was entitled to be credited with the sums debited from his account by the wife using the forged cheques. The court held that where a customer's signature to a cheque is forged, it is the duty of the customer, on discovering the forgery, to bring that fact to the attention of the bank and if he deliberately abstains from doing so, with the result that the bank loses its remedy against the forger, the customer is estopped from relying on the forgery. Accordingly, the House of Lords found that all the essential elements to estoppel were made out and the husband was unable to recover the debited sums.

132 Lord Tomlin stated what the elements of estoppel are ([1933] A.C. at 57–58):

> "The essential factors giving rise to an estoppel are I think:–
>
> (1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made.
>
> (2.) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made.
>
> (3.) Detriment to such person as a consequence of the act or omission.
>
> Mere silence cannot amount to a representation, but when there is a duty to disclose deliberate silence may become significant and amount to a representation . . .
>
> The deliberate abstention from speaking in those circumstances seems to me to amount to a representation to the respondents that the forged cheques were in fact in order, and assuming that detriment to the respondents followed there were, it seems to me, present all the elements essential to estoppel."

133 Lord Tomlin went on to say that it is immaterial that the bank was guilty of negligence in not detecting the forgery in such circumstances. He rejected the submission that the respondent's initial negligence made a difference stating (*ibid.* at 58–59):

> "Further, I do not think that it is any answer to say that if the respondents had not been negligent initially the detriment would not have occurred. The course of conduct relied upon as founding the estoppel was adopted in order to leave the respondents in the condition of ignorance in which the appellant knew they were. It was the duty of the appellant to remove the condition however caused. It

> is the existence of this duty, coupled with the appellant's deliberate intention to maintain the respondents in their condition of ignorance, that gives its significance to the appellant's silence. What difference can it make that the condition of ignorance was primarily induced by the respondents' own negligence? In my judgment it can make none. For the purposes of estoppel, which is a procedural matter, the cause of the ignorance is an irrelevant consideration."

134 *Greenwood* (7) does not support the view that an estoppel should arise where the customer has the means, by the exercise of reasonable care, to acquire knowledge of the forgery but fails to do so. On the other hand, I also note that the Court of Appeal and the House of Lords rejected the contention that a bank cannot rely on estoppel ([1932] 1 K.B. at 374): "when the loss is attributable, even in part, to his own negligence; as where he has failed to detect an obvious forgery or alteration . . ."

135 It is evident from Lord Tomlin's judgment that he was aware of the earlier decision of the House of Lords in *McKenzie* v *British Linen Co.* (11) and that the Court of Appeal, whose decision was upheld, had applied the same authority. In that case it was held that a person (even if he was not in a contractual relationship with the bank) who knew that a bank was relying upon a forged signature to a bill of exchange could not lie by and not divulge the fact until he saw that the position of the bank was altered for the worse; but there was no principle on which his mere silence for a fortnight, from the time when he first knew of the forgery during which time the position of the bank was in no way altered or prejudiced, could be held to be an admission or adoption of liability, or an estoppel. Therefore, it was held that he was not estopped because his silence had not prejudiced the bank.

136 In *McKenzie* (11), Parke, B.'s views concerning estoppel expressed by him in *Freeman* (5) were approved, and Lord Watson speaking to the basis of the duty to speak in such circumstances in terms which assumed knowledge of the forgery stated (6 App. Cas. at 109):

> "The only reasonable rule which I can conceive to be applicable in such circumstances is that which is expressed in carefully chosen language by Lord Wensleydale in the case of *Freeman v. Cooke.* It would be a most unreasonable thing to permit a man who knew the bank were relying upon his forged signature to a bill, to lie by and not to divulge the fact until he saw that the position of the bank was altered for the worse. But it appears to me that it would be equally contrary to justice to hold him responsible for the bill because he did not tell the bank of the forgery at once, if he did actually give the information, and if when he did so, the bank was in no worse position than it was at the time when it was first within his power to give the information."

137 In the House of Lords decision of *Ogilvie* v. *West Australian Mortgage & Agency Corp. Ltd.* (13). Lord Watson said ([1896] A.C. at 268) in regard to *McKenzie* and "similar cases":

> "The ground upon which the plea of estoppel rested in these cases was the fact that the customer, being in the exclusive knowledge of the forgery, withheld that knowledge from the bank until its chance of recovering from the forger had been materially prejudiced."

138 The Court of Appeal in *Greenwood* (7) relied also on the "well established" rule in *Pickard* v. *Sears* (14). Scrutton, L.J., relevant to the issue of intention/representation, referred ([1932] 1 K.B. at 379) to the "classic exposition" of the principle of estoppel given by Parke, B. in *Freeman* when he cited the rule in *Pickard* as:

> "That, where one by his words or conduct, wilfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief, or to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time."

Scrutton L.J. then added ([1932] 1 K.B. at 380) that—

> ". . . by the term 'wilfully' . . . [in the *Pickard* rule], we must understand, if not that the party represents that to be true which he knows to be untrue, at least, that he means his representation to be acted upon, and that it is acted upon accordingly; and if, whatever a man's real intention may be, he so conducts himself that a reasonable man would take the representation to be true, and believe that it was meant that he should act upon it, and did act upon it as true, the parties making the representation would be equally precluded from contesting its truth."

139 The Privy Council decision in *Tai Hing Cotton Mill Ltd.* v. *Liu Chong Hing Bank Ltd.* (20) considered the scope and extent of the *Greenwood* duty of the customer to inform the bank of a known forgery. In *Tai Hing Cotton Mill Ltd.*, a fraudulent accounts clerk employed by the company forged the signature of the company's managing director on 300 cheques to the value of HK$5.5m., drawn on the company's accounts at three banks, over a period of five years. The company did not learn about the frauds until a newly appointed accountant embarked on a course, one not previously taken, of reconciling the bank statements with the company's account books. When the frauds were uncovered, the company requested each bank to credit its accounts with the amounts of the forged cheques, which the banks had already debited. The banks declined this request and argued that a customer owes a duty of care to his bank to take such precautions as a reasonable customer would take to prevent forged cheques being presented to the bank for payment, and to check his bank

statements for unauthorized debit terms. The Judicial Committee of the Privy Council rejected these arguments of the banks and held that banks which had paid out on forged cheques were not entitled to debit their customers' accounts with these amounts since, unless it was otherwise agreed, the duty of care owed by a customer to his bank in the operation of his current account was limited to a duty to refrain from drawing a cheque in such manner as to facilitate fraud or forgery and the *Greenwood* duty to inform the bank of any forgery of a cheque purportedly drawn on the account as soon as he became aware of it. Lord Scarman referring to the *Greenwood* duty stated ([1986] A.C. at 101):

> "If put in terms of principle, the question is whether English law recognises today any duty of care owed by the customer to his bank in the operation of a current account beyond, first, a duty to refrain from drawing a cheque in such a manner as may facilitate fraud or forgery and, secondly, a duty to inform the bank of any forgery of a cheque purportedly drawn on the account as soon as he, the customer, becomes aware of it. The first duty was clearly enunciated by the House of Lords in *London Joint Stock Bank Ltd. v. Macmillan* [1918] AC 777, and the second was laid down, also by the House of Lords, in *Greenwood v. Martins Bank Ltd.* [1933] A.C. 51, [1932] All ER Rep 318."

It is clear from *Tai Hing Cotton Mill Ltd.* that Mr. Ritter had a responsibility to inform the bank of DS's forgery when he first became aware of it on September 1st, 2011. In the matter before me, it is not one in which the court must consider constructive notice of the forgeries as it is beyond all doubt that he had actual knowledge of them due to the content of his conversation with DS on September 1st, 2011.

140 As highlighted in the *Encyclopaedia of Banking Law*, LexisNexis, Bulletin 148 at C405, with reference by the authors to the decision in *Ogilvie* (13) and the decision in *Fung Kai Sun* v. *Chan Fui Hing* (6), a customer must also immediately notify the bank of the forgery "even though repetition of the forgery (with consequent further loss) is unlikely or impossible as failure to do so" may enable the forger to dissipate sums and remove all his assets, thereby depriving the bank of the effective remedy.

141 It appears that the parties agree the above uncontentious and now established principles concerning the elements of estoppel extracted from the aforementioned cases. However, they disagree about how the law applies to the facts in this matter.

142 In addition, it appears to be wrongly argued by the plaintiffs that the bank also needs to prove that it was otherwise unconscionable for the plaintiffs to be reimbursed. The plaintiffs may also be arguing that the bank also needs to prove that it was otherwise unconscionable for the

plaintiffs to deny their representation that forged transfers were in order. For some types of estoppel (for example promissory estoppel and estoppel by convention), inequitable or unconscionable conduct is a substantive element of the estoppel, whereas in others on a proper analysis it is not. In the above types of estoppel there is no required element that the promisee was induced by the promise or convention to act to his detriment. Equity has also come into play where there are specific other defences, for example, defence of change of position.[20]

143 In the cases of estoppel by representation, on the other hand, there is a required element that has to be proved that the representee was induced to act to his detriment by the representation of the representor and to his knowledge. If all of the elements of the estoppel are present then there will be an estoppel. There is no need for any separate assessment of whether or not the conduct of Mr. Ritter was unconscionable as that question has already been answered if the elements are proved.

144 I will now move on to deal with each element of estoppel and the wider and more contentious case law produced by the parties.

**The law—representation**

145 I have found that Mr. Ritter first became aware of the forgery on September 1st, 2011. I have found that it was not until receipt of the letter from Krys Global on August 27th, 2012 that the bank first received notice of the forgery. I have found that Mr. Ritter failed in his duty ("the *Greenwood* duty") to notify the bank of the forgery, which he should have done on September 1st, 2011 as soon as it came to his notice following DS's confession to him. Mr. Ritter, once he had knowledge of the forgeries, remained silent and did not otherwise act to enable the bank to recover from DS the money already paid out. Despite these findings, the bank must still go on to prove that Mr. Ritter's conduct, by remaining silent between September 1st, 2011 and August 27th, 2012, amounted to a representation.

146 Mr. Ritter rightly points out that *Greenwood* (7) establishes that mere silence cannot amount to representation but, where the duty to disclose exists, as it does in this case "deliberate silence may become significant and amount to a representation."[21] In *Greenwood*, the House of Lords found ([1933] A.C. at 58) that Mr. Greenwood's silence—

> ". . . was deliberate and intended to produce the effect which it in fact produced—namely the leaving of the respondents in ignorance of the true facts so that no action might be taken by them against the

---

20 See from para. 163 herein.
21 Lord Tomlin ([1933] A.C. at 57).

appellant's wife. The deliberate abstention from speaking in those circumstances seems to me to amount to a representation to the respondent that the forged cheques were in fact in order, and assuming that detriment to the respondents followed there were, it seems to me, present all the elements essential to estoppel."

147 In light of my findings and the nature of the clear facts in this case, I need not carry out a wider review of the law on the element of representation. I have found for the reasons already stated herein that Mr. Ritter's silence was deliberate and intended to ensure receipt of and the securing of the funds transferred by DS into his personal account in the United States. The belatedly raised arguments raised in attorney-to-attorney correspondence and at trial concerning the tipping-off offence provisions in the Proceeds of Crime Law, which Mr. Ritter was evidently unaware of at the relevant time, are without merit. His excuse for not telling the bank of the forgery because he was concerned that to do so would tip off any bank employee who might be an accomplice of DS was motivated, not by the provisions in the Proceeds of Crime Law, but by his wish to preserve his financial position.

**Detriment**

148 For the defence of estoppel to be established, the bank must also go on to prove material detriment as a consequence of Mr. Ritter's representation. It is clear from Lord Watson's analysis in *McKenzie* (11) (6 App. Cas. at 111–112) that mere silence without resulting injury or prejudice to the bank, would not raise an estoppel.

149 The Privy Council decision in *Fung Kai Sun* (6), which was considered in *Greenwood*, addressed what may amount to detriment. The case involved forged mortgages and it was held following the authorities of *McKenzie* (11) and *Ewing* (3), that the principle of estoppel by silence, where there is a duty to inform, applied to a case in which there was no contractual relationship between the parties, but in the particular circumstances the respondents were not estopped because the appellant had not established detriment. Lord Reid determined that detriment would arise if the bank's chance of recovering from the forger has been "materially prejudiced." He stated ([1951] A.C. at 503–504):

> "In their Lordships' judgment it must be held that the respondents were not entitled to withhold from the appellant information that the appellant's mortgages were forgeries, and that when they chose to do so they took the risk that they would later be estopped from asserting that these deeds were forged if by reason of their keeping silent the appellant suffered detriment. Accordingly, the next question for consideration is whether the respondents, having delayed from June 1 to June 23 to inform the appellant that his mortgages were

> forgeries, cause any such detriment to the appellant as will now give rise to estoppel. The only detriment suggested is that if the appellant had been informed on or about June 1 he might have been able to take some more effective action to minimize his loss than it was possible for him to take after June 23, and the only action which he could have taken would have been action against the forger or his property. The forger . . . had real property in Hong Kong of substantial value, but there is no evidence that this was less available to the appellant after June 23 than it had been before."

Lord Reid on (*ibid.* at 506): "In their Lordships' judgment, this is the true test: the chance of recovering must have been materially prejudiced by the delay."

150 In the Privy Council decision given in *Kelly* v. *Fraser* (9) further consideration was given to the test for detriment. Lord Sumption stated ([2012] UKPC 25, at para. 17):

> "The relevance of detrimental reliance in the law of estoppel by representation is that it is generally what makes it unjust for the representor to resile from his previously stated position. However, for this purpose, the ordinary rule is that the detriment is not the measure of the representee's relief, and need not be commensurate with the loss that he would suffer if the representor did resile: see *Avon County Council v Howlett* [1983] 1 WLR 605, where the authorities are reviewed by Slade LJ at pp 620–625. Indeed, the detriment need not be financially quantifiable, let alone quantified, provided that it is substantial and such as to make it unjust for the representor to resile. A common form of detriment, possibly the commonest of all, is that as a result of his reliance on the representation, the representee has lost an opportunity to protect his interests by taking some alternative course of action. It is well established that the loss of such an opportunity may be a sufficient detriment if there were alternative courses available which offered a real prospect of benefit, notwithstanding that the prospect was contingent and uncertain: *Greenwood v Martins Bank Ltd* [1933] AC 51 and *Ogilvie v West Australian Mortgage and Agency Corporation Ltd* [1896] AC 257, 268, as explained in *Fung Kai Sun v Chan Fui Hing* [1951] AC 489, 505–6."

151 The bank contends that it has suffered material prejudice, especially as DS's assets were no longer available for recovery by them by the time that they were notified of the fraud. The bank contends that it had "a real prospect of benefit, notwithstanding that the prospect was contingent and uncertain." It is argued that any uncertainty in respect of the likely recovery should be decided in favour of the bank and that the inability to quantify the detriment does not mean that the prejudice cannot be established.

152 It is argued that detriment arises as the loss that the bank has suffered is the lost opportunity to recover from DS the funds that it paid out, in a claim under the tort of deceit for DS's fraudulent misrepresentation which would have been brought. DS had assets on September 1st, 2011 when Mr. Ritter first became aware of the forgery, which no longer existed by August 27th, 2012 when the bank first became aware of the forgery. By the time the bank had been made aware of the fraudulent transfers from the Geneva account by Krys Global on August 27th, 2012, due to the four default judgments in the Grand Court against DS and the Monkton liquidators having power of attorney which it exercised over the sale of DS's worldwide personal assets, it is claimed that there was by then no possibility of recovery of sums wrongfully paid on the forged signatures. The bank's case is that DS's assets in September 2011 would have been at the very least US$159,950.50[22] and that this amount is sufficient for its estoppel, as it establishes that it has suffered material prejudice to its opportunity to recover from DS.

153 The plaintiffs accept that the bank could have brought proceedings against DS for the tort of deceit and against Monkton if it had suffered loss and was able to claim damages. It is submitted that for them to be able to do this they would have had to have reimbursed the plaintiffs for the losses arising out of the forgeries in the sum of $529,191. It is suggested, based on the bank's pleaded defence to the plaintiffs' claims relying upon the standard terms and conditions which it is argued excluded liability for forgery and the line of cross-examination of Mr. Ritter set out at para. 28 of the plaintiffs' closing written submissions as well as Mr. Skinner's evidence-in-chief about taking legal advice and considering its position before commencing proceedings against DS, that even if the bank was aware of the forgery on September 1st, 2011, it would not have promptly reimbursed Geneva and would have not done so without a careful analysis of its legal position. It is also contended that the bank's position in resisting the Texas proceedings is an indication that the bank would not have suffered loss by reimbursing the plaintiffs if they had received knowledge of the forgery in September 2011.

154 It is suggested that in light of the fact that the defrauded captive insurance companies[23] only obtained default judgments in relation to other defrauded captive insurance clients in July 2012 after gaining knowledge of those specific frauds in February 2012, it would have taken the bank at least five months to obtain default judgment in relation to the Geneva account fraud. However, I note that the Monkton JOLs obtained their default judgment with damages to be assessed on March 8th, 2012. It

22 US$159,950.05 being the value that DS's assets sold by Monkton' JOLs in 2012.
23 Represented by Campbells, attorneys-at-law.

is further contended that, if the bank had brought proceedings in September 2011, the other defrauded creditors would become aware of that and they would have issued proceedings and that the authorities including the CIMA and the police would also have acted resulting in controllers liquidators being appointed. It is suggested in such a scenario that all the creditors, even with default judgments, would be confined to recovery in the Monkton liquidation. Accordingly, even in light of Mr. Skinner's indication in evidence that he believed that the bank would have been in the same position as the Monkton controllers in relation to assignment of DS's assets within one to two months from first acquiring knowledge of the forgery, it is contended that any advantage from early notification of the forgery would have been lost and there was therefore no real prospect of benefit. However, it is clear that the claim by the bank would be one brought against DS and would therefore not fall within the Monkton liquidation.

155 The plaintiffs contend that, in any event, assets for potential recovery in September 2011 or February 2012 would not have been significant and that, at most, their value would be around US$160,000 which would have to be used to meet the controllers and JOLs' fees and then all creditors' claims. However, the claim if promptly made by the bank would have been made against DS and would not have resulted in them being a creditor of Monkton's. Reliance is placed upon the JOLs' report dated April 30th, 2012 in which there is (i) a finding that DS used his ill-gotten gains from Geneva to pay for intangible items and (ii) a conclusion that "the liquidators do not believe there are any major assets, whether belonging to the Company or [DS], which would likely to result in a substantial recovery for the company were they immediately pursued."

156 The plaintiffs also point out that the funds to repay Mr. Ritter came from Canadian Livestock and Warco Corporation on September 2nd, 2011 and that DS was attempting to re-mortgage his Seven Mile Beach condominium in January/February 2012 and contend that this is an indication that he did not have other assets to draw on despite the threats of Mr. Ritter to report him to the criminal authorities if there was no repayment. The bank, on the other hand, contend that DS is a fraudster and that using these funds, rather than his own assets is to be expected and does not support a contention that he did not have other assets.

157 The plaintiffs highlight that, by September 7th, 2011, it appeared that they had received all the sums due from DS and therefore, at that time, no relief would have been sought from the bank and it is submitted that as a consequence the bank could not have claimed any loss which they would be required to do in the available claim in tort. It is further contended that if the bank had been notified of the forgery after September 7th, 2011 before August 2012, a time period when the plaintiffs believed they had been repaid in full, there would have been no cause of action for

that only arose again in August when Mr. Ritter sought to recover against the bank.

158 The plaintiffs, unlike the bank, contend that the bank may have also brought a subrogated claim against Monkton. It is argued that under such a claim there would have been no assets available for distribution to the bank or to any of the other creditors. The plaintiffs suggest that if a successful claim had been made against Monkton in a two-year period ending in April 2012, the date when the liquidation commenced, any payment may have been set aside as a voidable preference. The bank rightly contends that this matter does not raise a subrogated claim against Monkton as there is no dispute, having regard to the authority of *Foley* v. *Hill* (4), that the funds paid out were the bank's and not the customers' funds and therefore it had its own claim for loss and did not need to be subrogated to Geneva's claim. The immediate and straightforward claim the bank had and makes in tort is against DS as an individual and therefore would not involve a s.145 Companies Law claw back of preferential payment made by a company in liquidation made to creditors.

159 It is further contended by the bank that there is detriment as the bank incurred US$183,000 in legal fees defending the third party complaint issued by Mr. Ritter in the Texas proceedings, which the bank states would not have been commenced if the bank had been informed by Mr. Ritter about the forgery on September 1st. The bank argues that the failure to make the report hindered the ability to prevent further frauds, in particular in relation to the transfers to Warco and Canadian Livestock amounting to US$825,000. DS would have been prevented from transferring the money to Mr. Ritter personally as the bank would have placed a block on and not have then allowed the US$550,000 and US$276,000 payments to be processed in September 2nd, 2011.[24] If these transfers had not occurred then, it is submitted, legal costs would not need to have been spent on the proceedings in Texas by the bank as well as by the liquidators who used up the proceeds that could have gone to creditors including Geneva to meet their costs which had escalated due to the manner of Mr. Ritter's defence to those proceedings.

160 The plaintiffs rightly contend that the legal fees incurred in the Texan proceedings cannot be characterized as detriment, as they were not caused by the Monkton JOLs seeking to recover the payments from Mr. Ritter, but arose because the bank voluntarily contested jurisdiction to resist the third-party claim made by the plaintiffs' claim for reimbursement from the bank based on its *forum non conveniens* argument. The plaintiffs argue that the legal expenses were "wholly unrelated" to any loss

24 See para. 46. The Monkton JOLs sought to claw back these payments in the Texas proceedings.

suffered by the bank or any attempt by the bank to recover the funds for Warco and/or Canadian Livestock.

161 The plaintiffs correctly highlight that these two transactions, which the bank claims that they may have been able to prevent if the fraud had been reported to them, did not result in any direct loss to the bank as they were not liable to reimburse and as a consequence any claim for estoppel cannot be based upon them.

**Can the estoppel operate *pro tanto*?**

162 The plaintiffs submit that if the court were to find that the bank has been materially prejudiced by a loss of opportunity to sue DS, that it should find that estoppel by representation operates *pro tanto.* In other words the plaintiffs should not be estopped to the full extent of their claims, but only to the extent of actual potential detriment found to have been suffered by the bank.

163 This is not in line with the view expressed by Lord Watson in *Ogilvie* (13) who stated ([1896] A.C. at 270):

> "There are some obiter dicta favouring the suggestion that, in a case like the present, where the amount of the forged cheques is about [£1,500], the estoppel against the customer ought to be restricted to the actual sum which the bank could have recovered from the forger. But these dicta seem to refer, not to the law as it was, but as it ought to be; and, in my view of them, they are contrary to all authority and practice."

164 The plaintiffs place reliance upon the developing law in mistaken payment cases which involve both estoppel by representation and the defence of change of position. The use of estoppel in mistaken payment cases was regarded as being unsatisfactory because estoppel by representation was generally viewed as an all or nothing defence. This led to Lord Goff stating in *Lipkin Gorman* v. *Karpnale Ltd.* (10) ([1991] 2 A.C. at 579), the case in which the House of Lords recognized the defence of change of position that "in many cases, estoppel is not an appropriate concept to deal with the problem." This view was held because (i) although in certain factual circumstances where there is no proof of detrimental reliance it will be unlikely, or perhaps even impossible, for the defence to be made out, the position is that, as a matter of law, the defence of change of position is not dependent upon proof of some representation by the payer, nor is it dependent upon proof of any detrimental reliance on the part of the payee, and (ii) estoppel was an inflexible all-or-nothing defence.

165 In *Avon County Council* v. *Howlett* (1), the Court of Appeal held that if a defendant can establish an estoppel, this generally operates as a

complete defence and not *pro tanto.* Slade, L.J. emphasized that estoppel by representation is in origin a rule of evidence, and that that is what confers its "all or nothing" character. In *Avon*, the plaintiff made an £1,007 overpayment of sick pay wages to the defendant, a teacher employee. The teacher queried the overpayments but was told they were correct. By the time the council had realized their mistake, the teacher had spent most of it. The plaintiff sought to recover the overpayment on the grounds that it had been paid by mistake. The Court of Appeal held that the defence of estoppel prevented the council from recovering the whole sum of the overpayment. It was held that as the plaintiff had discharged the onus of proving that the overpayment had occurred due to a mistake of fact, it was *prima facie* entitled to recover the full amount of the overpayment but because the plaintiff had represented to the defendant that he was entitled to the sum of money paid, the plaintiff was estopped from seeking recovery of the overpayment. The estoppel gave a total defence to the claim although the detriment suffered was only in the region of £550.

166 Slade, L.J. stated ([1983] 1 W.L.R. at 622):

> ". . . [I]f a bank's customer is estopped from asserting that the cheque with which he has been debited is a forgery, because of his failure to inform the bank in due time, so that it could have had recourse to the forger, the debit will stand for the whole amount and not merely that which could have been recovered from the forger . . ."

Slade, L.J. then went on to comment upon the cases of *Ogilvie* (13) and *Greenwood* (7) adding (*ibid.*):

> ". . . [S]o far as they go, the authorities suggest in cases where estoppel by representation is available as a defence to a claim for money had and received, the courts similarly do not treat the operation of the estoppel as being restricted to the precise amount of the detriment which the representee proves he has suffered in reliance on the representation."

167 Slade, L.J. also referred to the cases of *Skyring* v. *Greenwood* (15) and *Holt* v. *Markham* (8), commenting (*ibid.* at 624) that if estoppel by representation could operate in a limited and proportionate way the courts which decided those cases "would have been bound to conduct a much more exact process of quantification of the alteration of the financial positions of the recipients, which had occurred by reason of the representations."

168 The members of the Court of Appeal in *Avon* (1) recognized that there may be cases where it was inequitable or unconscionable for the recipient to rely on the fact that he had spent part of the mistaken overpayment to resist a claim for the balance. Slade, L.J. said ([1983] 1 W.L.R. at 625) that an exception might arise to this general rule "where

the sums sought to be recovered were so large as to bear no relation to any detriment which the recipient could possibly have suffered." Apart from that comment the Court of Appeal did not elaborate on what circumstances there might be to make a *pro tanto* approach appropriate and they did not reconcile their comments with their view that, if a defendant can establish an estoppel, this would generally operate as a complete defence and not *pro tanto*.

169 In *Derby* v. *Scottish Equitable plc* (2), the holder of a pension policy was ordered to pay back the full amount of £172,000 after he had been wrongly advised about the total value of his rights under the policy. It is evident that the Court of Appeal felt that the case fell within the exception highlighted by Slade, L.J. in *Avon* when it adopted a *pro tanto* approach. Unlike in the matter before me, the Court of Appeal had to review the law of restitution and the change of position defence, with the Court of Appeal recognizing the link between that and estoppel by representation. When considering the role of the estoppel by representation where the change of position defence also existed, the Court of Appeal highlighted that two conflicting remedial outcomes existed, one in restitution where there was a *pro tanto* change of position defence and in estoppel where there was a complete estoppel by representation defence.

170 Walker, L.J. considered two approaches to the conflict. One avenue being the "minimum equity" concept, which Walker, L.J. called a "more unified doctrine of estoppel" and "a move away from the evidential origin of estoppel by representation," where the estoppel would provide the minimum remedy to reverse the detriment. The second avenue, a novel one suggested by counsel, being that since *Lipkin Gorman* (10) there is no role for estoppel as the defence of change of position pre-empts and disables the defence of estoppel by negativing detriment. Although he did not base his conclusion on the submission, Walker, L.J. stated that he found the argument "ingenious" and "convincing" and he went on, at the penultimate paragraph of his decision, to make the following observation ([2001] EWCA Civ 369, at para. 48):

> "Will estoppel by representation wither away as a defence to a claim for restitution of money paid under a mistake of fact? It can be predicted with some confidence that with the emergence of the defence of change of position, the court will no longer feel constrained to find that a representation has been made, in a borderline case, in order to avoid an unjust result. It can also be predicted, rather less confidently, that development of the law on a case by case basis will have the effect of enlarging rather than narrowing the exception recognised by this court in *Avon County Council v Howlett.* That process might be hastened (or simply overtaken) if the House of Lords were to move away from the evidential origin of estoppel by representation towards a more unified doctrine of estoppel, since

proprietary estoppel is a highly flexible doctrine which, so far from operating as 'all or nothing', aims at 'the minimum equity to do justice' (*Crabb v Avon District Council* [1976] Ch 179, 198). Paul Key has drawn attention (Excising Estoppel by Representation as a Defence to Restitution [1995] CLJ 525, 533) to two decisions of the High Court of Australia (*Waltons Stores (Interstate) v Maher* (1988) 164 CLR 387 and *Commonwealth of Australia v Verwayen* (1990) 170 CLR 394) which he describes as a fundamental attack on the traditional perception of estoppel as a complete defence."

171 In a more recent decision, made also in the context of restitution for a mistaken payment, *National Westminster Bank plc* v. *Somer Intl. (UK) Ltd.* (12), the bank had by mistake credited the defendant company's account with US$76,706 which had been intended for another customer's account. Upon being notified by the bank that a dollar payment had been received, the company believed it was the payment of between US$72,000 to $78,000 it was expecting from an overseas client, the company released further goods to that client to the value of £13,180.57 (or $21,616.14). When the bank discovered the mistake it sought to recover the sum of $76,708.57 wrongly credited to the company. In the interim, the company's client had ceased to trade, having failed to pay for the further goods delivered to it after April 1997. The company raised a plea of estoppel by representation against the bank as to the entirety of the sum mistakenly transferred, claiming that it had replied to his detriment by despatching the goods. The judge and the court below had allowed the plea only to the extent of the $21,616.14 and ordered the company to repay the balance.

172 The issue for the Court of Appeal was whether the judge was wrong in following the decision in *Scottish Equitable plc* (2) rather than the decision in *Avon* (1). The Court of Appeal held:

(i) it was unattractive that, in a case of money paid under a mistake of fact, the extent of the recovery should depend on whether or not the payment had been accompanied by a representation that the transferee was entitled to the payment;

(ii) it was also clear that, where there had been such a representation, the doctrine of estoppel by representation appeared, subject to any equitable adjustment to reflect the actual detriment suffered, to dictate an "all or nothing" approach to the amount that could be recovered;

(iii) Scottish Equitable recognised that there remained scope for the operation of equity to alleviate the position on grounds of unfairness or unconscionability; and

(iv) in this case, the judge had been entitled to find that the actual detriment suffered by the company went to only part of the sum

transferred mistakenly transferred to it, and that it would be unconscionable for it to retain the balance.

173 Potter, L.J. observed ([2001] EWCA Civ 970, at paras. 44–45) in relation to the cases *Ogilvie* (13) and *Greenwood* (7):

"44. In *Howlett* the court cited three cases which suggested that, where estoppel by representation is raised as a defence to a claim for money had and received, the courts do not treat the operation of estoppel as being restricted to the precise amount of the detriment which the representee proves he has suffered in reliance on the representation: *Skyring -v- Greenwood* 4B.&C. 281, citing a passage from the judgment of Abbott CJ at 289; *Holt -v- Markham* [1923] 1 KB 504; and *Lloyds Bank Limited -v- Brooks*, 6 Legal Decisions Affecting Bankers for the Arbitrators Award of 14 September 2000. The court also cited *Ogilvie -v- West Australian Mortgage and Agency Corporation Limited* [1896] A.C. 257 and *Greenwood -v- Martins Bank Limited* [1932] 1 KB 371 (affirmed in the House of Lords [1933] A.C. 51) as demonstrating that a claimant who, as a result of being able to rely on estoppel, succeeds on a cause of action on which, without being able to rely on it, he would necessarily have failed, may be able to recover more than the actual damage suffered by him as a result of the representation which gave rise to it.

45. It is difficult to see how the last two cases support the principle for which they were cited. *In each case a bank customer discovered that cheques drawn on his account had been forged, but failed to inform the bank until a substantial period had elapsed. In each case it was held that there was no need to investigate whether the bank could in fact have recovered money from the forger had it acted immediately. The banks had not received benefit, but had suffered loss of any opportunity for recovery elsewhere, as to which the uncertainty of such recovery was resolved in favour of the representee.* That point is made in *Goff & Jones: the Law of Restitution* (5th ed) at 832." [Emphasis supplied.]

This view addresses the unfairness that would result for a bank if it was required to prove precisely what it would have recovered if it had not lost the opportunity for recovery due to the failure of the customer failing to report his knowledge of the forgery for an extended period of time.

174 These modern decisions arose where the courts were dealing with the issue of the relationship between the defence of change of position and the defence of estoppel. However in the matter before me, the change of position defence does not operate and there is no requirement for there to be a restitutionary analysis of detriment. Therefore, the approach should be to revert to estoppel by representation as an evidential concept which is accompanied by the "all or nothing" result. Despite the modern decisions

analysed above, the Supreme Court has not yet evolved the law, where these discrete estoppels exist, possibly by reformulating estoppel by representation to move away from its evidential origin towards a more unified doctrine of estoppel. This means that estoppel by representation remains an evidential doctrine, therefore the *pro tanto* approach in a case where estoppel is the only defence is not appropriate. The defence of estoppel in such circumstances does not require a balancing of equities of the case as may be required, for example, for the defence of change of position.

**Claim of dishonest assistance by the bank in the fraud**

175 The plaintiffs contend, for three reasons, that their claim for dishonest assistance is "intertwined and inextricably linked" with the estoppel defence. The first reason is that the facts of the fraud were suspicious enough for the bank to have been put on inquiry, requiring it to investigate and thereafter pass the information uncovered to the plaintiffs. The second reason given is that it is submitted that the court must apply the equitable doctrine and, having regard to the behaviour, state of mind or circumstances of the parties, then consider whether it be unconscionable for the plaintiffs to be reimbursed. The final reason is that it is claimed that no estoppel may be relied upon as a defence to any claim for accessory liability for dishonest assistance and that the bank, due to its dishonesty, could not avail itself of the estoppel defence.

176 There are three elements of a dishonest assistance claim which should be pleaded and must be proved. The first is that there has been a disposal of assets in breach of a trust or fiduciary duty. The second is that the defendant assisted in that breach or disposal. The third, which is the only element in dispute between the parties, is that the defendant assisted the breach of trust dishonestly. Therefore, the key issue is not whether the bank assisted[25] in the fraud but whether they did so dishonestly.

177 It is accepted by the plaintiffs that there is no allegation made that an individual employee was an accomplice, but they claim that the forgery occurred because of "systemic" or "structural" failure by the bank "wilfully, alternatively recklessly shutting its eyes" when it permitted a number of large payments to Monkton based on forged signatures. The plaintiffs plead in their amended statement of claim:

> "146. The Defendant (acting through its employees) wilfully, alternatively recklessly, closed its eyes and ears to the obvious discrepancies and the red flags outlined above in connection with the fraud, and in

---

25 The bank simply making the relevant payments amounts, in the legal sense, to the element of "assistance" required for a dishonest assistance claim.

authorizing multiple fraudulent transactions in the Geneva Account, the Warco Account, and the Bank accounts of other Monkton clients.

> 147. The Defendant deliberately closed its eyes to obviously forged signatures in respect of the Geneva Account."

At para. 147A of the amended statement of claim the plaintiffs then set out 11 particulars of the dishonesty, cross-referencing to a number of transactions which they call "red flags" at paras. 134–140 in the pleadings.

178 The standard of proof required is the civil standard of proof, the balance of probabilities. It is not an absolute standard. When considering allegations of dishonesty and fraud, a court will naturally require for itself a higher degree of probability than that which it would require when asking if negligence is established. It does not adopt so high a degree as a criminal court, but it still does require a degree of probability commensurate with the occasion and the seriousness of the allegation. The more serious the allegation the more cogent the evidence in support needs to be.

179 The law on what constitutes dishonesty for the purposes of dishonest assistance in the cases before me is conveniently set out in an uncontentious manner by Rose, J. in her recent judgment in *Singularis Holdings Ltd.*[26] v. *Daiwa Capital Markets Europe Ltd.* (17),[27] in which she stated ([2017] EWHC 257 (Ch), at paras. 143–147):

> "143. The test for dishonesty in this context is that set out by the House of Lords in *Twinsectra Ltd v Yardley and others* [2002] UKHL 12. There Lord Hutton, with whom Lord Slynn of Hadley, Lord Steyn and Lord Hoffmann agreed, described the three possible standards which can be applied to determine whether a person has acted dishonestly. There is a purely subjective standard whereby a person is only regarded as dishonest if he transgresses his own standard of honesty even if that standard is contrary to that of reasonable and honest people; there is the purely objective standard whereby a person acts dishonestly if his conduct is dishonest by ordinary standards of reasonable and honest people, even if he does not realise this, and there is a combined standard:
>
> > '. . . which combines an objective test and a subjective test, and which requires that before there can be a finding of dishonesty

---

26 Singularis was incorporated in the Cayman Islands (originally under the name "Saad Investments Finance Company (No. 7) Ltd.").

27 Rose, J.'s decision and approach were upheld by the Court of Appeal: Singularis Holdings Ltd. v. Daiwa Capital Markets Europe Ltd. (17) (published February 1st, 2018).

it must be established that the defendant's conduct was dishonest by the ordinary standards of reasonable and honest people and that he himself realised that by those standards his conduct was dishonest.'

144. His Lordship, having considered the test that had been applied by Lord Nicholls of Birkenhead in the earlier case of *Royal Brunei Airlines Snd Bhd v Tan* [1995] 2 AC 378 confirmed that dishonesty is a necessary ingredient of accessory liability and that (at paragraph 36):

> 'dishonesty requires knowledge by the defendant that what he was doing would be regarded as dishonest by honest people, although he should not escape a finding of dishonesty because he sets his own standards of honesty and does not regard as dishonest what he knows would offend the normally accepted standards of honest conduct.'

145. In *Barlow Clowes International Ltd v Eurotrust International Ltd* [2005] UKPC 37, Lord Hoffmann considered whether it must be shown that the alleged dishonest assister turned his mind to the ordinary standards of honest behaviour and to whether his conduct fell below those standards. He held that it was not necessary. It was only necessary to show that the defendant's knowledge of the transaction rendered his participation contrary to normally acceptable standards of honest conduct. He did not need to be shown to have had reflections about what those normally acceptable standards were.

146. It is clear that wilful blindness will satisfy the test for dishonesty. An honest person does not 'deliberately close his eyes and ears, or deliberately not ask questions, lest he learn something he would rather not know, and then proceed regardless': *Royal Brunei*, per Lord Nicholls at p. 389F-G. It is therefore no defence for a defendant to say that he did not realise that he was acting dishonestly: *Starglade Properties Ltd v Nash* [2010] EWCA Civ 1314 at paragraph 32 and my judgment in *Goldtrail Travel Ltd v Aydin & Ors* [2014] EWHC 1587 at paras [143–145].

147. Mr Miles [Q.C., leading counsel for Singularis] accepted that Singularis has to show that a particular person within Daiwa was dishonest. There is an important difference between being incompetent—even grossly incompetent—and being dishonest."

180 In *Stokors SA* v. *IG Markets Ltd.* (19),[28] Field, J., after reviewing the judgments in the above cases mentioned by Rose, J. in *Singularis* (17), helpfully set out the following uncontentious principles derived from the authorities ([2013] EWHC 631 (Comm), at para. 11):

> "(1) It is not necessary for the Court to establish whether or not the defendant considered that he was acting dishonestly. Instead, the defendant's knowledge of the transaction has to be such as to render his participation contrary to normally acceptable standards of honest conduct.
>
> (2) An honest person does not deliberately close his eyes and ears, or deliberately not ask questions lest he learn something he would rather not know and then proceed regardless where there may be a misapplication of trust assets to the detriment of beneficiaries.
>
> (3) A dishonest state of mind may consist in suspicion combined with a conscious decision not to make inquiries which might result in knowledge.
>
> (4) In a commercial setting dishonesty can be found on the basis of commercially unacceptable conduct.
>
> (5) Acting in reckless disregard of others' rights or possible rights can be a tell-tale sign of dishonesty.
>
> (6) Recklessness is a species of dishonest knowledge and is therefore relevant to the Court's consideration of dishonesty in this context. 'Not caring' does not mean 'not taking care', rather it means indifference to the truth. The moral obliquity of this position is in the wilful disregard of the importance of truth.
>
> (7) Someone can know, and can certainly suspect, that he is assisting in a misappropriation of money without knowing that the money is held on trust or what a trust means."

181 The bank contends that the plaintiffs have pleaded and advanced their dishonest assistance case improperly and that the claim should be dismissed. It was agreed that the court could exercise its discretion to receive evidence about the dishonesty allegations *de bene esse* and deal with the bank's objection taken on the pleadings in this judgment. The bank contends that, even if the case is not dismissed on the preliminary issues about the pleadings, the plaintiffs have failed to produce any

---

28 Although the decision in Singularis (17) was released after the close of each parties' case and Stokors (19) was not referred to by the parties, I refer to them as the principles set out therein are uncontentious and the cases neatly summarize the law from the earlier cases.

evidence to establish that the bank or any of its employees have acted in any way dishonestly. The bank requests that even if there is a dismissal, the court should still record its views of the allegations of dishonesty advanced by the plaintiffs.

182 Pleadings are governed by GCR O.18, r.7(1) which provides that facts not evidence must be pleaded:

> "Subject to the provisions of this rule, and rules 7A, 10, 11 and 12, every pleading must contain, and contain only, a statement in a summary form of the material facts on which the party pleading relies for his claim or defence, as the case may be, but not the evidence by which those facts are to be proved, and the statement must be as brief as the nature of the case admits."

183 Rules 7A, 10 and 11 are not material. Rule 12 deals with particulars of pleading. The relevant part provides:

> "(1) Every pleading must contain the necessary particulars of any claim, defence or other matter pleaded including, without prejudice to the generality of the foregoing words—
>
> (a) particulars of any misrepresentation, fraud, breach of trust, wilful default or undue influence on which the party pleading relies; and
>
> (b) where a party pleading alleges any condition of the mind of any person, whether any disorder or disability of mind or any malice, fraudulent intention or other condition of mind except knowledge, particulars of the facts on which the party relies."

Thus a statement of claim should contain the material facts, *i.e.* the facts which are necessary as a matter of law to prove a plaintiff's case. They should be as concise as the circumstances of the case permit, while containing sufficient detail to inform a defendant of the nature of that case. The degree of particularity necessary will depend on the particular facts of the case. In a case dealing with a claim of dishonesty the requirement for particularization is greater as the defence must be able to readily deduce from it what the serious allegations are that it must meet. The pleading must be clear and unequivocal and it is not enough to plead that the bank was aware or ought to have been aware of DS's actions to establish dishonest assistance.

184 In *Supreme Court Practice* (1999) Note 18/7/4 at 314 under the heading "Need for Compliance" with O.18 it states as follows:

> "Need for compliance—These requirements should be strictly observed (per May L.J. in Lipkin Gorman v Karpnale Ltd [1989] 1 W.L.R 1340 at 1352). Pleadings play an essential part in civil

actions, and their primary purpose is to define the issues and thereby to inform the parties in advance of the case which they have to meet, enabling them to take steps to deal with it, and such primary purpose remains and can still prove of vital importance, and therefore it is bad law and bad practice to shrug off a criticism as a 'mere pleading point' (see per Lord Edmund Davis in Farrell v Secretary of state for Defence [1980] 1 W.L.R 172 at 180, [1980]1 All E.R. 166 at 173)."

185 The bank highlights that, as in this case, where a dishonesty claim and a negligence claim based on similar facts are made, dishonesty must be clearly pleaded first and confined to the fraud, with negligence then being pleaded separately. Reference is made by the bank to *Lipkin Gorman* (10) where May, L.J. stated ([1989] 1 W.L.R. at 1351–1352) that—

". . . first, where fraud or dishonesty is material this must be clearly pleaded, if not explicitly, then in such terms that the reader of the pleading can be left in no reasonable doubt that this is being alleged. Secondly, where an element in the alleged fraud or dishonesty relied on is the other party's knowledge of a given fact or state of affairs, this must be explicitly pleaded. It is ambiguous and thus demurrable, if fraud is relied on, to use the common 'rolled up plea' that a defendant knew or ought to have known a given fact.[29] If it is desired to allege and plead fraud and, in the alternative, negligence based upon similar contentions, then the former must be pleaded first and clearly and the relevant part of the plea confined to the fraud. The allegation in negligence can then be pleaded separately and as a true alternative contention."

186 In its written closing submissions, the bank refers to the history of the plaintiffs' pleadings. The bank submits with some force that the claim for dishonest assistance was tagged on to the less serious allegations. In this regard, I note that in the initial statement of claim, found after the allegations of breach of contract and negligence were pleaded, only 9 of the 162 paragraphs related to the issue, and they contained minimal particularization of the dishonesty alleged.

187 The plaintiffs failed to adequately particularize, in the dishonest assistance section of the pleading, its reference in para. 146 to "authorising multiple fraudulent transactions" and "the Bank accounts of other Monkton clients" and its reference in para. 147 to "obviously forged signatures." Paragraph 146 refers to "obvious discrepancies . . . outlined earlier" (in other non-dishonest assistance sections of the pleading).

---

29 See para. 191.

188 At para. 146 of the statement of claim the plaintiffs also refer back to what are termed "red flags" which are pleaded under the heading "Particulars of Negligence/Breaches of Duty" in the part of the pleading dealing with the negligence allegations. Eight of the nine paragraphs in the "Particulars of Red Flags" section use the phrase "knew or ought to have known," "a rolled up plea" which incurred the disapproval of May, L.J. in *Lipkin Gorman* (10) ([1983] 1 W.L.R. at 1352).[30]

189 The dishonesty allegation, which it appears was being based on the similar and earlier contentions relied upon for the alternative negligence claim, was not pleaded first, nor could it be said that the negligence claim was thereafter truly separately pleaded. No individual employee was identified by name or position in the bank as conducting themselves dishonestly.

190 In light of the above, if the initial version of the statement of claim had been the version of the pleading before this court, it would have been found to have failed to provide adequate particulars and to adequately plead dishonest conduct.

191 In the amended statement of claim the same nine paragraphs, with minor amendments made to two of them, remain. In addition, a sub-heading "Particulars of Dishonesty" has been inserted after para. 145 (the third paragraph in the dishonest assistance section) and a new para. 147A which contains 10 sub-paragraphs under the heading "Additional Particulars of Dishonesty" has been added. A number of those additional paragraphs still regretfully simply refer back to the unchanged aforementioned "red flags" set out in the negligence section of the pleading. The dishonesty claim still appears after the breach of contract and negligence claims in the pleading.

192 The bank contends that the dishonest assistance claim is not clearly pleaded in the amended statement of claim and that there remains the overlap with the other allegations. The bank highlights the following content in the amended pleading to be vague and unparticularized:

(i) para. 147A(iv)—"such inquiries and inspections as might reasonably have been made . . .";

(ii) para. 147A(vii)—"failing to investigate . . . or to make appropriate inquiries . . ."

(iii) para. 147A(viii)—"the Defendant's conduct amounted to commercially unacceptable conduct in the context of corporate banking and in the circumstances of the red flags . . ."; and

---

30 See para. 183 herein.

(iv) para. 147A(ix)—"failed to comply with its own internal policy which represented the minimum standard of reasonable and honest conduct the Defendant knew to be required . . ."

193 The rolled-up plea form at paras. 134–140 deemed inappropriate by May, L.J. remains and similar terminology such as "ought reasonably" and "might reasonably" again appears in the para. 147A additional particulars.

194 In the amended statement of claim, again, no individual employee was identified by name or even by position in the bank as conducting themselves dishonestly or as having relevant knowledge. The plaintiffs confirm at para. 226 of their closing written submissions that they—

> "never alleged in these proceedings that any one individual [bank] employee was an actual accomplice to [DS] in his fraud with full knowledge of the forgeries. [Mr. Ritter's] position has always been that there was a 'systemic' or 'structural' failure by the Bank . . ."

The plaintiffs contend that they need not identify specific individuals or any—

> "actual culprit employees at the Bank who were wilfully shutting their eyes and ears to the obvious fraud in proving dishonest assistance, in light of the fact such misconduct would always have been in the course of employment at the Bank for which it is trite law, Butterfield would be vicariously liable."

195 Mr. Skinner stated that the majority of the transfer requests came via facsimile in the form of a letter or a standard request for wire transfer form. Due to the passage of time, Mr. Skinner indicated that he could not give details about the members of staff who handled the transfers or exact details about the process for each transfer process followed in each transfer. I therefore accept that the plaintiffs may have difficulty naming the precise member of staff who they contend acted dishonestly. However, this did not prevent them from pleading or later clearly specifying in their evidence, which particular individual(s), identified by their post, was culpable.

196 In *Publishers Representatives Ltd.* v. *UBS (C.I.) Ltd.* (15), Sanderson, J. considered the approach taken in *Royal Brunei Airlines Sdn. Bhd.* v. *Tan Kok Ming* (16) to the issue of what constitutes dishonesty. The court was dealing with an application to strike out portions of a statement of claim in which the plaintiffs were seeking damages for alleged fraud or dishonesty and negligence from the defendant bank. The bank had been the trustee of a pension fund for the second plaintiff's employees, but when the bank retired from this role it was replaced by a former trust officer of the bank who had been investigated when employed with them for fraud in relation to trust funds held by the bank. The plaintiffs

contended that the bank should have informed them about the former employee's fraud and supervised his handling of the funds. The defendants did not plead that any one bank employee was dishonest, but contended that the company was dishonest for failing to disclose its knowledge to the plaintiffs. Sanderson, J. stated (2000 CILR at 486):

> "I accept UBS's submission that a company has no mind or will of its own and that the doctrine of directing mind and will attributes to the company the mind and will of the natural person or persons who manage and control its actions: see *R.* v. *Ghosh* . . . and *El Ajou* v. *Dollar Land Holdings PLC* . . . I also accept [counsel for the defendant's] submissions that combining innocent acts of individuals cannot create a fraudulent or dishonest act in a company."

Sanderson, J. then went on to say (*ibid.*):

> "However, in this case it is not known who made the decision not to disclose to Publishers the information that UBS had. The allegation of dishonest conduct by the company has been pleaded and particularized. That is, Publishers rely on the knowledge of Albert Good. He had the knowledge of the conduct of Mr. Randall. His knowledge was therefore the knowledge of UBS. It has been alleged in the pleadings that the person or persons at UBS who were the directing mind and will of UBS made the decision not to disclose what it knew to Publishers. It is not necessary to plead who made the decision if the plaintiffs do not know. To require the plaintiffs to guess would be irresponsible and unfair to both parties.
>
> Publishers acknowledge that at trial they will have to prove that the directing mind and will of UBS knew of Mr. Randall's conduct and should have done something more than it did. Publisher's claim should not be struck at the pleadings stage because they are unable to say who at UBS made the decision."

197 *UBS* can be distinguished as the court was reviewing pleadings in which the dishonest conduct appears to have been appropriately pleaded, unlike in the matter before me. In *UBS* a bank employee was identified as having direct knowledge of the fraudulent conduct of the employee which the "persons who were the directing mind and will" of UBS made the decision not to disclose to the first plaintiff.

198 In cases of dishonest assistance against a corporate entity, a particular individual (or particular individuals) must be identified as having acted dishonestly given the fact that, although a company has legal personality and capacity, it functions through human agents. Therefore the statement of claim must identify and particularize what the defendant did to assist in the breaches of fiduciary duty or trust, how the assistance caused, contributed or resulted in the plaintiff's loss and how the defendant is

alleged to have acted dishonestly in assisting the main perpetrator. The bank rightly highlights the requirement that it may be permissible not to identify the relevant dishonest individual(s), at the stage of pleading the case, if the plaintiff was unaware, as in this case, of their identity, so long as the plaintiff otherwise properly pleads and particularizes the dishonest conduct and identifies an individual employee by name or even by post with relevant knowledge.

199 The plaintiffs have failed in the matter before me to identify in the pleadings or at trial any individual(s) either by name or by post with any relevant knowledge of the fraud or who acted dishonestly. Due to the inadequacy of the particularization, the bank and the court are unable to identify, even if not by name(s) but by role(s)/position(s) in the bank, who it is alleged has been dishonest or who should have had knowledge of the fraudulent conduct. In addition, the plaintiffs have failed to plead the dishonesty in the appropriate manner commended by May, L.J. in *Lipkin* (10).[31]

200 As dishonesty is a serious allegation it is not to be pleaded lightly. There is merit in the bank's submission at para. 445 of its written closing submissions:

> "Re-reading paragraphs 146 to 147A of the Statement of Claim clearly shows the vague and general terms in which the majority of the so-called 'particulars' have been provided. This is improper both as the Bank and its employees are entitled, when being accused of having acted dishonestly, of knowing more than just in general terms how they are being alleged to have been dishonest. They are entitled to know, pursuant to the Grand Court Rules and as a matter of basic procedural fairness, the particular and specific basis on which the Plaintiffs are asking the Court to make dishonesty findings against them, findings which clearly have very serious ramifications for any individual and business, in particular a highly reputable, regulated Bank, such as the Defendant."

201 Accordingly as the above principles of pleadings must be strictly observed, and in the absence of any identified person at the bank who has acted dishonestly, the pleadings would not permit the court to make a finding of dishonesty and I dismiss that claim.

202 In case I am wrong in reaching this conclusion I have felt it appropriate when reviewing the facts earlier in this judgment to address whether the allegations concerning the bank's handling of the transactions made by the plaintiffs were sufficient for them to prove a finding of the

---

31 See paras. 180–193 above.

element of dishonesty required for dishonest assistance to be made out, even based on an allegation of a bank's employees being reckless or closing their eyes and ears. Having regard to the principles set out in paras. 178–184 above and my earlier comments and findings on the evidence, I do not find that the plaintiffs have provided evidence sufficient to prove such a serious allegation. I accept that, armed with hindsight and with the advantage of the later gained knowledge (unknown at the time by anyone in the bank) the bank, which I accept is a bank with a specialized department serving commercial clients, accepts that some additional enquiries maybe could have been made, but this does not make the bank dishonest when applying the tests set out in the cases analysed herein. There is no evidence that the bank, as is pleaded, deliberately allowed transactions that were fraudulent to be processed.

**Costs**

203 As the bank has been the successful party in this matter, as costs ordinarily follow the event, I am presently minded to make an order for the plaintiffs to pay the bank's costs. Having reviewed the manner in which the case has been argued, I am presently minded to make the order on the standard basis. However, if either party wishes be heard on the issue of costs they should, within 21 days of the circulation of the perfected version of this judgment, file and serve a summons seeking a costs hearing.

**Closing remarks**

204 In reaching this conclusion I have considered the evidence and authorities contained in the large number of files. I have also considered the plaintiffs' 21-page opening written submissions and their 72-page closing written submissions (including schedules). I have also considered the bank's opening written submissions (with schedules) totalling 103 pages and its closing written submission (with schedules) running to 163 pages.

205 Last but not least, I thank counsel for their impressive and prodigious contribution to these proceedings in which many complex issues required their attention and for their and their clients' extreme patience in awaiting this decision.

***Order accordingly.***

Attorneys: *Sinclairs* for the plaintiffs; *Appleby* for the defendant.