# Sea Shepherd UK v Fish & Fish [2015] UKSC 10

# Exhibit 29

**Hilary Term**
**[2015] UKSC 10**
*On appeal from: [2013] EWCA Civ 544*

# JUDGMENT

# Sea Shepherd UK (Appellant) *v* Fish & Fish Limited (Respondent)

**before**

**Lord Neuberger, President**
**Lord Mance**
**Lord Kerr**
**Lord Sumption**
**Lord Toulson**

## JUDGMENT GIVEN ON

## 4 March 2015

**Heard on 8 December 2014**

| *Appellant* | *Respondent* |
| --- | --- |
| John Russell QC<br>(Instructed by Clyde & Co LLP) | Michael Davey QC<br>(Instructed by Hill Dickinson LLP) |

**LORD TOULSON:**

*Introduction*

1. This appeal concerns accessory liability in tort. The appellant, Sea Shepherd UK, is an English company. The other defendants, Sea Shepherd Conservation Society and Mr Paul Watson, have no presence in the UK. The appellant is therefore the anchor defendant for the purpose of the English court having jurisdiction to entertain the action.

2. The claim is for loss and damage allegedly suffered by the claimant, Fish and Fish Limited, in an incident in the Mediterranean Sea on 17 June 2010 when conservationists mounted an operation designed to disrupt the bluefin tuna fishing activities of the claimant. The appeal arises from the determination of a preliminary issue as to whether the incident was directed and/or authorised and/or carried out by the appellant, its servants or agents, and whether the appellant was liable, directly or vicariously, for any damage sustained by the claimant.

3. After a trial which included oral evidence, Hamblen J decided the issue in favour of the appellant and dismissed the claim against it: [2012] EWHC 1717 (Admlty), [2012] 2 Lloyd's Rep 409. He also directed that service of the proceedings on the other defendants out of the jurisdiction be set aside.

4. Hamblen J's decision was overturned by the Court of Appeal (Mummery, McCombe and Beatson LJJ) for reasons set out in the judgment of Beatson LJ: [2013] EWCA Civ 544, [2013] 1 WLR 3700. The court gave the following answer in its order to the question raised by the preliminary issue:

> "On the assumption that the incident on 17 June 2010 was tortious, [Sea Shepherd UK] is liable for any alleged damage to the tuna fish cage and/or the release of the fish on the ground that it joined with the [other] [d]efendants in a common design to carry out such acts (and not on any other basis."

*Background*

5. The claimant operates a fish farm off Malta. On the day of the incident it was using two vessels to transport a catch of tuna in fish cages when they allegedly came under attack from a vessel, the "Steve Irwin", under the command of the defendant Mr Watson. It is alleged that a cage was rammed and divers from the "Steve Irwin" tore it open, enabling the fish inside to escape.

6. Mr Watson is a Canadian environmentalist and US citizen. He is dedicated to the cause of marine wildlife conservation. In 1977 he broke away from Greenpeace and formed the defendants Sea Shepherd Conservation Society (SSCS), now based in the state of Washington, USA. SSCS has since become the parent of a network of national Sea Shepherd entities including the appellant. In his evidence Mr Watson described himself as the organisational leader with overall strategic control of the parent organisation. He is also a director of its subsidiaries including the appellant.

7. The appellant is a company limited by guarantee and is a registered charity. According to the Charity Commission's website, its activities include raising funds for campaigns to protect marine wildlife and ecosystems worldwide. Its charitable objects include promoting the conservation and preservation of marine and freshwater living organisms. At the time of the incident the appellant had only one employee, Mr Darren Collis, who gave evidence at the trial.

8. The appellant's financial statements for the year ended 30 June 2010 included a trustees' report approved by the board on 7 December 2010. The report summarised the charity's objectives and principal activities as follows:

> "The charity's objectives as set out in the Memorandum of Association are to conserve and protect the world's marine wilderness ecosystems and marine wildlife species.
>
> The organisation endeavours to accomplish these goals through public education, investigation, documentation and, where appropriate and where legal authority exists under international law or under agreement of national governments, enforcement of violations of the international treaties, laws and conventions designed to protect the oceans.

> All of Sea Shepherd's campaigns are guided by the United Nations World Charter for Nature."

9. The trustees' report went on to refer to a number of international campaigns in 2010, including a campaign in the Mediterranean "to protect the critically endangered bluefin tuna". Under "Plans for the future" the report stated that the appellant's primary objective remained "the provision of funds to support the aims and objectives of our international organisation the Sea Shepherd Conservation Society".

10. There are international regulations, introduced by the International Conference for the Conservation of Atlantic Tuna and by the European Council, which are supposed to control the fishing of Atlantic bluefin tuna. There are quotas, restrictions on the size of fish which may be caught and limits to the fishing season. In 2010 SSCS launched a campaign because of its concern that poor law enforcement in the Mediterranean was allowing widespread violation of the regulations, threatening the future of the species. It chose the title "Operation Bluerage". It announced the campaign by a posting on its website dated 23 January 2010. This stated that "The objective will be to intercept and oppose the illegal operations of bluefin tuna poachers" and "Sea Shepherd intends to confront the poachers and will not back down to threats and violence from the fishermen". There are issues between the parties about what exactly happened in the incident on 17 June 2010 and whether the claimant was engaged in illegal fishing, but they are not relevant to this appeal.

*Decision at first instance*

11. Hamblen J found that in conducting the operation, as master of the "Steve Irwin", Mr Watson was not acting for the appellant but only for SSCS. The vessel was registered in the name of the appellant but it held a bare legal title. The vessel was beneficially owned and operated by SSCS.

12. On the issue of accessory liability Hamblen J summarised the relevant legal principles as follows:

> "20. In respect of the common design issue, persons may be joint tortfeasors when their respective shares in the commission of a tort are done in furtherance of a common design: *The Koursk* [1924] P 140 at p 156 per Scrutton LJ; *CBS Songs v Amstrad* [1988] AC 1013 at p 1058.

21. The nature of a 'common design' was explained by Mustill LJ in *Unilever v Gillette* [1989] RPC 583, at p 609:

> 'I use the words common design because they are readily to hand but there are other expressions in the cases, such as 'concerted action' or 'agreed on common action' which will serve just as well. The words are not to be construed as if they formed part of a statute. They all convey the same idea. This idea does not, as it seems to me, call for any finding that the secondary party has explicitly mapped out a plan with the primary offender. Their tacit agreement will be sufficient. Nor, as it seems to me, is there any need for a common design to infringe. It is enough if the parties combine to secure the doing of acts which in the event prove to be infringements.'

22. The joint tortfeasor needs to join or share in the commission of the tort which generally means some act which at least facilitates its commission.

23. As explained by Hobhouse LJ in his judgment in *Credit Lyonnais v ECGD* [1998] 1 Lloyd's Rep 19 there is no tortious liability for aiding and abetting or facilitating the commission of a tort, even knowingly. There may, however, be such a liability if that is done pursuant to a common design. He treated this as an example of liability based on agency.

24. In considering whether there is any such liability it is relevant to consider whether the person has been so involved in the commission of the tort as to make the infringing act his own. As stated by Peter Gibson LJ in *Sabaf v Meneghetti* [2002] EWCA Civ 976; [2003] RPC 264, para 59:

> 'The underlying concept for joint tortfeasance must be that the joint tortfeasor has been so involved in the commission of the tort as to make himself liable for the tort. Unless he has made the infringing act his own, he has not himself committed the tort. That notion seems to us what underlies all the decisions to which we were referred. If there is a

> common design or concerted action or otherwise a combination to secure the doing of the infringing acts, then each of the combiners has made the act his own and will be liable.'"

13. The claimant alleged that the appellant was party to a common design with the other defendants to carry out Operation Bluerage and that this was to involve violent intervention of the kind which allegedly occurred. It relied particularly on a mailshot soliciting payments to the appellant in support of the operation. Under the heading "OPERATION BLUERAGE" and subheading "2010 MEDITERRANEAN BLUEFIN TUNA DEFENSE CAMPAIGN" the mailshot stated "We intend to seize, cut, confiscate and destroy every illegal tuna fish net we find". As to the appellant's role, the claimant alleged that it facilitated the commission of the tort by making the vessel available for the campaign, recruiting volunteers, paying the crew and obtaining financial contributions.

14. Hamblen J accepted that the appellant approved of the campaign and was aware that it envisaged the possibility of violent intervention against property, but he added that this was not the object of the campaign. The campaign involved a preparedness to use violent action, but it was not necessarily the case that such action would be taken.

15. As to the part played by the appellant, Hamblen J rejected the suggestion that it made the vessel available for use in the campaign, since it was at all times in the possession and control of SSCS. He also found that there was no evidence that the appellant recruited any volunteers for the campaign or paid the crew to take part in it.

16. The most significant part of the case against the appellant concerned the mailshot and the raising of campaign finance. As I read Hamblen J's findings, he accepted the evidence of Mr Collis that the appellant played no active part in soliciting campaign contributions. Although the mailshot gave the appellant's name, address and bank details, it was not issued by the appellant. It was designed, organised and paid for by SSCS. Copies were posted in the UK, but not by or on the instructions of the appellant. The mailshot resulted in the receipt by the appellant of payments totalling £1,730, for which it accounted to SSCS.

17. Hamblen J concluded:

> "In summary, it is apparent that none of the matters relied upon by the claimant were of any real significance to the commission of the tort. The main thrust of the claimant's pleaded case was that the attack was directed or authorised or carried out by [the appellant]. Once it is found that Watson and the crew were not acting on behalf of [the appellant] the claimant has to rely on participation which is remote in time and place. Whether considered individually or collectively I find that the matters so relied upon are of minimal importance and played no effective part in the commission of the tort."

*Decision of the Court of Appeal*

18. In his thoughtful and clearly reasoned judgment, Beatson LJ reviewed the authorities before concluding that Hamblen J erred in not finding that the use of violent confrontation by cutting fishing nets was part of a common design in which the appellant joined, and that he erred in his approach in the passage set out in the previous paragraph. The court held that it was sufficient that the appellant did something more than *de minimis* in support of the common design, and that it was not necessary that what the appellant did should have been of any real significance to the commission of the tort. The purpose of scrutinising what the appellant did was simply to decide whether it was possible to infer a common design.

*Analysis*

19. Joint liability in tort may arise in a number of ways. Two or more defendants may act as principal tortfeasors, for example by jointly signing and publishing a defamatory document. A defendant may incur joint liability by procuring the commission of a tort by inducement, incitement or persuasion (*CBS Songs Ltd v Amstrad Consumer Electronics Plc* [1988] AC 1013, 1058, per Lord Templeman). A defendant may incur vicarious joint liability for a tort committed by an agent or employee. We are not concerned in this appeal with any of those heads of liability.

20. We are concerned with a different category in which the defendant, D, has allegedly assisted the principal tortfeasor, P, in the commission of tortious acts. It might have been expected that the law of tort would mirror the criminal law on aiders and abettors, but that is not how the law has developed, as the House of Lords has recognised (*CBS v Amstrad* at p 1059 and *Credit Lyonnais Bank Nederland NV v Export Credits Guarantee Department* [2000] 1 AC 486, 500). Beatson LJ referred in his judgment to the criticisms

which some scholars have made about the law in this respect, and to some of the policy considerations which might be considered relevant, but it is not a topic which the parties have raised. It is common knowledge that the criminal law in this area has caused considerable problems, and Beatson LJ quotes Weir, *Economic Torts* (1997) p 32, n 31 for the statement, indeed understatement, that "accessory liability in the criminal law has not been joyous". There is much to be said for keeping the law in this area as simple as possible. The main authorities were referred to by Hamblen J.

21. To establish accessory liability in tort it is not enough to show that D did acts which facilitated P's commission of the tort. D will be jointly liable with P if they combined to do or secure the doing of acts which constituted a tort. This requires proof of two elements. D must have acted in a way which furthered the commission of the tort by P; and D must have done so in pursuance of a common design to do or secure the doing of the acts which constituted the tort. I do not consider it necessary or desirable to gloss the principle further.

22. The principle was expressed crisply in the statement in *Clerk and Lindsell on Torts*, 7th ed, p 59, that "Persons are said to be joint tortfeasors when their respective shares in the commission of the tort are done in furtherance of a common design", which was cited by all the members of the Court of Appeal in *The Koursk* [1924] P 140, 151, 156, 159.

23. The subsequent cases are, as Mustill LJ said in *Unilever Plc v Gillette (UK) Ltd* [1989] RPC 583, 608, little more than illustrations of the application of the principle which he valuably summarised in the passage cited by Hamblen J in para 21 of his judgment (see para 12 above).

24. Peter Gibson LJ was not putting forward a different principle in the passage in *Sabaf SpA v Meneghetti SpA* [2002] EWCA Civ 976, [2003] RPC 264, cited by Hamblen J in para 24 of his judgment, but was expressing the underlying concept that the defendant must have involved himself in the commission of the tort in such a way as to justify the conclusion that he combined with the other tortfeasor(s) to commit the tort. That is another way of expressing what Mustill LJ referred to as "the parties combin[ing] to secure the doing of acts which in the event prove to be [tortious]".

25. It follows that there was no error in Hamblen J's summary of the legal principles, nor in his considering whether the matters relied on by the claimant had any significance to the commission of the tort. It was another way of considering whether the appellant had combined to secure the doing of acts which proved (if they should prove) to be tortious. There is no formula

for determining that question and it would be unwise to attempt to produce one, as Bankes LJ said in *The Koursk* at p 151:

> "It would be unwise to attempt to define the necessary amount of connection. Each case must depend upon its own circumstances."

26. On the facts, the only point of substance in the claimant's case was based on the funding arrangements. The appellant played no active role in fundraising. All that it did on the judge's finding was to account to the parent organisation for a relatively small amount solicited by the parent organisation. Hamblen J concluded that the role played by the appellant in the commission of the tort was of "minimal importance", and in my view that conclusion was properly open to him.

27. If I had considered that Hamblen J was wrong not to find that the first element of accessory liability was established, that is, that the appellant assisted SSCS in the commission of acts which may prove to have been tortious, I would have held that the second element was also established, that is, that the acts were done in pursuance of a common design shared by SSCS and the appellant. It would be sufficient for this purpose that the acts were done in pursuit of a campaign of which the appellant approved with the knowledge that the campaign involved a preparedness, if need be, to use violent intervention. Hamblen J observed that it was not necessarily the case that such action would take place, but a plan can include a conditional element. If D organises with P the doing of acts on V's land, whether V consents or not, it would be no answer to a claim in trespass against D that it was possible that V would consent. But Hamblen J examined the role actually played by the appellant and judged it minimal. On that basis the conduct element of accessory liability was not established.

*Conclusion*

28. I would allow the appeal and restore the order made by Hamblen J.

**LORD SUMPTION: (dissenting)**

29. I regret that I am unable to agree with the view of the majority that this appeal should be allowed. The difference between us is of little moment since it turns entirely on a question of fact peculiar to this case. The law of joint liability,

on the other hand, on which we are substantially agreed, is of much wider significance. I shall therefore say rather more fully what I conceive it to be.

30. Sea Shepherd Conservation Society ("SSCS") is a US-based conservation charity whose mission, by its own account, is

> "to end the destruction of habitat and slaughter of wildlife in the world's oceans in order to conserve and protect ecosystems and species. Sea Shepherd uses innovative direct-action tactics to investigate, document, and take action when necessary to expose and confront illegal activities on the high seas."

Operation Bluerage was the name given to its campaign against the over-fishing of bluefin tuna in the Mediterranean in the summer of 2010. The campaign involved using a ship, the "Steve Irwin", to confront those whom it regarded as poachers and if necessary to cut their nets and release their catch. The claimants were operators of a fish farm in Malta. According to the particulars of claim, in June 2010 they were using two tugs to drag to Malta a metal cage containing tuna in netting, which they had purchased from fishermen. They were attacked by the "Steve Irwin", which rammed the cage, forced it open, cut the nets and released the fish, fighting off the claimants' crew with liquid-filled bottles and a gun firing rubber bullets. The claimants say that their fish were within the legal quotas and properly documented.

31. The sole question on the appeal is whether, assuming that the claimants' allegations are proved, SSCS's associated United Kingdom charity Sea Shepherd UK ("SSUK") is liable to them as a joint tortfeasor. The Court of Appeal held that it was. In my view they were right, for substantially the reasons given by Beatson LJ.

*The facts*

32. SSCS has established a number of associated entities in other countries. SSUK, the United Kingdom associate, is a company limited by guarantee which was registered as a charity shortly after its incorporation in 2005. It was originally called Sea Shepherd Conservation Society, like its parent organisation, but later changed its name to Sea Shepherd UK. The judge found that there was a close relationship between the various Sea Shepherd entities worldwide, but that SSCS (the US charity) was "the global organisation which utilises the resources of other SS entities when it is convenient to do so". He found that the relationship between them was

accurately reflected in the report of the trustees of SSUK (the UK charity), which stated that

> "The primary objective of Sea Shepherd UK remains the provision of funds to support the aims and objectives of our international organisation, the Sea Shepherd Conservation Society."

33. The judge found that while SSUK was involved in supporting the activities of SSCS in general, its involvement in the particular events which led to the damage done to the claimants' property and the loss of their catch was limited to its participating in fundraising for Operation Bluerage and recruiting two volunteers.

34. The facts about the fundraising can be shortly stated. Operation Bluerage was announced in January 2010 on SSCS's website, which declared its intention to "intercept and oppose" those whom it regarded as poachers. It would "not back down to threats and violence from the fishermen", it said. On 3 March 2010 SSCS emailed SSUK for a local mailshot appealing for funds for Operation Bluerage from "our supporters from within the UK". As the email shows, the main reason for involving SSUK was to make use of bulk mailing services within the United Kingdom, and to enable donors to contribute through sterling cheques to be handled by SSUK, sterling bank transfers to SSUK's account, or sterling credit card transfers through merchant facilities to be acquired by SSUK. The mailshot was designed, organised and paid for by SSCS but in the name of and with the consent of SSUK, whose name and UK address appear at the foot of the face page. Whatever SSCS did must be regarded as having been done on behalf of SSUK. The text (so far as relevant) is as follows:

> "OPERATION BLUERAGE
>
> 2010 MEDITERRANEAN BLUEFIN TUNA CAMPAIGN
>
> We intend to seize, cut, confiscate and destroy every illegal tuna fish net we find!
>
> YES, PAUL! You and the Sea Shepherd crew can count on my continued support as you head back into battle, this time in the Mediterranean. Please put my donation to immediate use to secure the fuel, charts, communications systems, oil, parts,

supplies, and food for the crew – all vital to the success of this mission.

( ) £5 ( ) £10 ( ) £15 ( ) Other £ ”

The leaflet asked for contributions by cheque, bank transfer or credit card. Cheques were to be payable to “Sea Shepherd Conservation Society”, that being the former name of SSUK which was still on its UK bank account. The sort code and account number of that account was given for direct bank transfers. A form of credit card authorisation slip was printed on the reverse, which enabled funds to be received into merchant accounts of SSUK. While contributions were coming in, email correspondence of SSCS copied to SSUK, reported on the start of the Mediterranean campaign in terms which bore out the initial prospectus. “We anticipate a violent defence by the poachers but that is a violence we can defend ourselves from,” Mr Watson wrote on 10 June 2010. The mailshot generated receipts of £1,730, which was in due course paid over to SSCS.

35. Turning to the recruitment of volunteers, the judge found that Mr Collis (an employee of SSUK) passed on the names of those who contacted him about volunteering. One of them sourced a pump for the “Steve Irwin” and he and another drove to the south of France with it and did a day’s work on the vessel.

36. Finally, it is necessary to refer to the statutory Trustees’ Report filed with the Charity Commission for the year ended 30 June 2010 in which the relevant activities took place. This document identifies SSUK’s charitable objects as being to conserve and protect the marine environment. Under the heading “Public Benefit”, it describes how it advances those objects. The methods include participating in campaigns, including Operation Bluerage, and in particular raising funds for the international programmes of SSCS through its growing UK supporter base.

*The elements of liability as a joint tortfeasor*

37. The legal elements of liability as a joint tortfeasor must necessarily be formulated in general terms because it is based on concepts whose exact ambit is sensitive to the facts. The classic statements are those of Scrutton LJ in *The Koursk* [1924] P 140, 156 and Mustill LJ in *Unilever Plc v Gillette (UK) Ltd* [1989] RPC 583, 608-609. In *The Koursk*, Scrutton LJ, adopting the definition in *Clerk and Lindsell on Torts*, said that

> "'Persons are said to be joint tortfeasors when their respective shares in the commission of the tort are done in furtherance of a common design' … 'but mere similarity of design on the part of independent actors, causing independent damage, is not enough; there must be concerted action to a common end'."

Expanding on this formulation in *Gillette*, Lord Mustill observed that the test was

> "… whether … (a) there was a common design between [the primary and secondary parties] to do acts which … amounted to infringements, and (b) [the secondary party] has acted in furtherance of that design. I use the words 'common design' because they are readily to hand but there are other expressions in the cases, such as 'concerted action' or 'agreed on common action' which will serve just as well. The words are not to be construed as if they form part of a statute. They all convey the same idea. This idea does not, as it seems to me, call for any finding that the secondary party has explicitly mapped out a plan with the primary offender. Their tacit agreement will be sufficient. Nor, as it seems to me, is there any need for a common design to infringe. It is enough if the parties combine to secure the doing of acts which in the event prove to be infringements."

The effect of these statements is that the defendant will be liable as a joint tortfeasor if (i) he has assisted the commission of the tort by another person, (ii) pursuant to a common design with that person, (iii) to do an act which is, or turns out to be, tortious.

38. It is now well established that if these requirements are satisfied the accessory's liability is not for the assistance. He is liable for the tortious act of the primary actor, because by reason of the assistance the law treats him as party to it: *Credit Lyonnais Bank Nederland NV v Export Credits Guarantee Department* [2000] 1 AC 486, 495-500. This does not, however, mean that the accessory must have joined in doing the very act constituting the tort. Liability as a joint tortfeasor is more commonly an accessory liability. As Lord Neuberger observed in *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] 1 WLR 1556 at para 34,

> "in order for a defendant to be party to a common design, she must share with the other party, or parties, to the design, each

> of the features of the design which make it wrongful. If, and only if, all those features are shared, the fact that some parties to the common design did only some of the relevant acts, while others did only some other relevant acts, will not stop them all from being jointly liable."

Thus a person may incur liability as a joint tortfeasor by assisting in the organisation or preparation of acts of physical destruction (*Monsanto Plc v Tilly* [2000] Env LR 313 (CA) at paras 45-46); or by helping the primary actor to find the victim whom he intended to attack (*Shah v Gale* [2005] EWHC 1087 (QB)); or by using the prospect of unlawfully downloading streamed copyright material to attract users to the defendant's website (*Dramatico Entertainment Ltd v British Sky Broadcasting Ltd* [2012] 3 CMLR 328). In some of these cases, the evidence of common design may fairly be regarded as thin, but they are unexceptionable as statements of the kind of accessory support which may give rise to liability as a joint tortfeasor.

39. The principal concern of the law in this area is to recognise a liability for assisting the commission by the primary actor of a tort, while ensuring that the mere facilitation of the tort will not give rise to such a liability, even when combined with knowledge of the primary actor's intention. This limitation has sometimes been criticised as anomalous, because a broader basis of liability is recognised in other areas of law: see, for example, P Davies, "Accessory liability for assisting torts" (2011) 70 CLJ 353. For my part, I doubt whether the criticism is justified. Criminal liability attaches to any positive act of assistance with knowledge of the circumstances constituting the offence. It is not necessary to prove intention that the offence should be committed: *National Coal Board v Gamble* [1959] 1 QB 11. This is, however, because in the criminal law aiding and abetting the commission of an offence is itself an offence distinct from the primary offence. Knowledge that the primary offence is being aided and abetted is therefore sufficient *mens rea*. Equity imposes liability for knowing assistance in a breach of trust, but this is not in reality a broader basis of liability. This is because in this context knowing assistance is a species of fraud, and knowledge is relevant only to establish dishonesty: see *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, 392. In reality, the limitations which the courts have placed upon the scope of liability as a joint tortfeasor are founded on a pragmatic concern to limit the propensity of the law of tort to interfere with a person's right to do things which are in themselves entirely lawful.

40. In both England and the United States, the principles have been worked out mainly in the context of allegations of accessory liability for the tortious infringement of intellectual property rights. There is, however, nothing in these principles which is peculiar to the infringement of intellectual property

rights. The cases depend on ordinary principles of the law of tort. Thus the law declines to treat as tortious the manufacture or sale of equipment which its purchasers are likely to use to infringe copyrights, simply because the manufacturer or seller is aware of its likely use. This is a long-standing legal principle which in England dates back at least as far as *Townsend v Haworth* (1875) 48 LJ Ch 770. It was applied in *Dunlop Pneumatic Tyre Co Ltd v David Moseley & Sons Ltd* [1904] 1 Ch 164, [1904] 1 Ch 612 and in *Belegging-en Exploitatiemaatschappij Lavender BV v Witten Industrial Diamonds Ltd* [1979] FSR 59.

41. The fullest modern discussion of the principle is that of Lord Templeman, delivering the leading speech in *CBS Songs Ltd v Amstrad Consumer Electronics Plc* [1988] AC 1013. Lord Templeman saw the distinctive factors which justified the imposition of liability as a joint tortfeasor in the combination of concerted action and common design. At p 1057B-C, he said:

> "My Lords, joint infringers are two or more persons who act in concert with one another pursuant to a common design in the infringement. In the present case there was no common design. Amstrad sold a machine and the purchaser or the operator of the machine decided the purpose for which the machine should from time to time be used. The machine was capable of being used for lawful or unlawful purposes. All recording machines and many other machines are capable of being used for unlawful purposes but manufacturers and retailers are not joint infringers if purchasers choose to break the law. Since Amstrad did not make or authorise other persons to make a record embodying a recording in which copyright subsisted, Amstrad did not entrench upon the exclusive rights granted by the Act of 1956 to copyright owners and Amstrad were not in breach of the duties imposed by the Act."

Where the manufacturer or seller had no control over the use of the equipment after he has parted with it, liability would have to be founded on mere knowledge of its likely use, and mere knowledge is not tantamount to a common design. Lord Templeman went on to deal with a distinct submission that there was an independent tort of incitement to commit a tort. He pointed out that the facts would not necessarily support an allegation of incitement even if such a tort existed. In that context, he said, at p 1058G-H:

> "Buckley LJ observed in *Belegging-en Exploitatiemaatschappij Lavender BV v Witten Industrial Diamonds Ltd,* at p 65, that 'Facilitating the doing of an act is obviously different from

> procuring the doing of the act'. Sales and advertisements to the public generally of a machine which may be used for lawful or unlawful purposes, including infringement of copyright, cannot be said to 'procure' all breaches of copyright thereafter by members of the public who use the machine. Generally speaking, inducement, incitement or persuasion to infringe must be by a defendant to an individual infringer and must identifiably procure a particular infringement in order to make the defendant liable as a joint infringer."

I do not think that in this passage Lord Templeman was seeking to limit liability as a joint tortfeasor to cases of inducement or procurement, as opposed to assistance. When read with his general statement of the elements of liability as a joint tortfeasor, it is clear that he was intending to limit it to cases of common intent. Inducing or procuring a tort necessarily involves common intent if the tort is then committed. Mere assistance may or may not do so, depending on the circumstances. The mere supply of equipment which is known to be capable of being used to commit a tort does not suggest intent. Other circumstances may do so.

42. The point was I think well made by Hobhouse LJ in his judgment in the Court of Appeal in *Credit Lyonnais Bank Nederland NV v Export Credits Guarantee Department* [1998] 1 Lloyd's Rep 19, 46:

> "Mere assistance, even knowing assistance, does not suffice to make the 'secondary' party jointly liable as a joint tortfeasor with the primary party. What he does must go further. He must have conspired with the primary party or procured or induced his commission of the tort (my first category); *or he must have joined in the common design pursuant to which the tort was committed* (my third category)." (emphasis added)

43. In *Sony Corporation of America v Universal City Studios Inc* 464 US 417 (1984), the United States Supreme Court reached the same conclusion, holding that the mere supply of equipment for copying video cassettes did not give rise to joint liability in tort for copyright infringement. In doing so the court made the same distinction between mere knowledge at the point of sale and action combined with common intention: see pp 438-439. In *Metro-Goldwyn-Mayer Studios Inc v Grokster Ltd* 545 US 913 (2005), the court pointed out (at p 931) that this was because

> "with no evidence of stated or indicated intent to promote infringing uses, the only conceivable basis for imposing liability was on a theory of contributory infringement arising from its sale of VCRs to consumers with knowledge that some would use them to infringe."

The court in *Metro-Goldwyn-Mayer* held, distinguishing *Sony*, that "one who distributes a device *with the object of promoting its use to infringe copyright*, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties" (p 919) (emphasis added). It followed that the creators of a file-sharing website were held liable for copyright infringement, even though the site was capable of lawful use, because it was found on the evidence that the defendants not only assisted the infringements but intended them as an effective way of increasing the use of its website.

44. Intent in the law of tort is commonly relevant as a control mechanism limiting the ambit of a person's obligation to safeguard the rights of others, where this would constrict his freedom to engage in activities which are otherwise lawful. The economic torts are a classic illustration of this. The cases on joint torts have had to grapple with the same problem, and intent performs the same role. What the authorities, taken as a whole, demonstrate is that the additional element which is required to establish liability, over and above mere knowledge that an otherwise lawful act will assist the tort, is a shared intention that it should do so. The required limitation on the scope of liability is achieved by the combination of active co-operation and commonality of intention. It is encapsulated in Scrutton LJ's distinction between concerted action to a common end and independent action to a similar end, and between either of these things and mere knowledge of the consequences of one's acts.

*Application to the present case*

45. Since most of the activities of SSCS are on any view lawful, it is clear that SSUK cannot incur liability as a joint tortfeasor simply by assisting its activities in general. If they are to incur such liability at all, it must be on the ground that they have specifically assisted its tortious activities. This means that the present enquiry must be confined to SSUK's participation in fundraising and recruitment of volunteers in the United Kingdom for Operation Bluerage.

46. It is sufficient for present purposes to address SSUK's participation in the fundraising campaign, which is the more significant of the two and about

which detailed findings have been made. The question is whether in participating in the fundraising campaign in the United Kingdom, SSUK had a common intention with SSCS that the latter should cut the nets of fishermen and forcibly release their catch. The only possible answer to that question is that they did. Manifestly, that was the main object of Operation Bluerage. As the fundraising leaflet made clear, funds were being collected on the basis that "we intend to seize, cut, confiscate and destroy every illegal tuna fish net we find." The prospect that this would happen was presented as the main reason for contributing financially to the operation.

47. The judge held that SSUK did not share a common purpose of committing tortious acts because the Operation Bluerage would not necessarily involve violence. He put the matter in this way:

> "In relation to the campaign it is correct that SSUK was aware and generally approved of the Bluerage campaign and that the campaign envisaged the possibility of violent intervention against property, such as cutting fishing nets. However, that was not the purpose or object of the campaign. The purpose or object of the campaign was to seek to 'investigate, document, and take action when necessary to expose and confront illegal activities' in relation to bluefin tuna fishing. That involved a preparedness to use violent intervention, but it did not necessarily mean that any such action would be taken. The campaign could and indeed very nearly did take place without any confrontation occurring. Investigating, documenting and exposing illegal activities does not involve violent intervention. Confronting such activities may do so, but not necessarily."

48. In my opinion, this is unrealistic. The object of the operation, as the judge found, was not just to investigate, document and expose what they considered to be illegal fishing, but "when necessary" to confront it. It is true that the "Steve Irwin" would not necessarily find fishermen whom they regarded as illegal poachers. But if they did find them, they intended to "seize, cut, confiscate and destroy" their nets, thereby releasing their catch. It was theoretically possible that the fishermen might submit gracefully, thereby making it unnecessary to use or threaten force against them. But this was hardly probable and SSUK knew that it was not what SSCS anticipated. Deliberately to damage or destroy the property of other persons at sea without their consent is tortious. The purpose of SSUK in participating in the fundraising was to further the common design of SSCS and SSUK that the nets of any fishermen whom they considered to be poachers should be damaged and destroyed by the crew of the "Steve Irwin", if they should be found and did not submit. They were found and they did not submit.

Conditional intent is nevertheless intent: *R v Saik* [2007] 1 AC 18, at para 5, per Lord Nicholls of Birkenhead. If two parties co-operate in a common design to commit a tort in a certain eventuality, and that eventuality occurs and the tort is committed, it is irrelevant that they both appreciated and perhaps even hoped that it would not occur. I do not regard this conclusion as in any way inconsistent with the judge's findings. In my view he failed to appreciate the legal significance of those findings. No doubt both SSCS and SSUK thought that they were entitled to act in this way. But if it is found at a trial of the remaining issues that their acts were tortious, then subject to one reservation, the conclusion that they were joint tortfeasors is inescapable.

49. The reservation concerns the significance of SSUK's participation in the fundraising and the recruitment of volunteers in the context of the scheme as a whole. Was this enough to constitute assistance in furtherance of the common design? The assistance which is said to further the common design must be material, but that means no more than that it must be more than *de minimis*. There is no justification in principle for requiring more than this, for example that the assistance should have been indispensable to the commission of the tort or commensurate with the responsibility of the primary actor. The ordinary response of the law to differences between the culpability of joint tortfeasors or between the causal efficacy of their contributions is an award of contribution.

50. The judge regarded SSUK's contribution to Operation Bluerage as "of minimal importance" and said that it "played no effective part in the commission of the tort". It was certainly minor by comparison with the contribution of SSCS and possibly by comparison with SSCS's French associate. But if the judge meant that it was *de minimis* then I cannot agree. *De minimis non curat lex* is a necessarily imprecise principle. Most of the judges who have discussed it have done so in terms of synonyms which are not much less imprecise. But they nevertheless convey the flavour of the concept. "Negligible" and "trivial" are probably the commonest: see *Cartledge v Jopling & Sons Ltd* [1963] AC 758, 771-772, per Lord Reid, and *Rothwell v Chemical and Insulating Co Ltd* [2008] AC 281 at paras 44-47, per Lord Hope. "[T]rivialities, matters of little moment, of a trifling and negligible nature" was the more expansive formulation proposed by Sellers LJ in *Margaronis Navigation Agency Ltd v Henry W Peabody & Co of London* [1965] 2 QB 430, 443-444. What all of these expressions are designed to convey is that the maxim is concerned with extremes. It refers to some fact which is in principle legally relevant but is so trivial or negligible as to be no fact at all in the eyes of the law.

51. The sum collected by the mailshot was £1,730, which was no doubt a very small proportion of the total costs of Operation Bluerage. But its contribution

to the venture was not so small as to be legally equivalent to nothing. Moreover, I do not think it right to judge the significance of the appeal for funds solely by reference to its outcome. SSCS, although its affairs appear to be directed from Washington State USA, operates internationally with the support of associated national organisations and an international supporter base. It may well be that the individual contributions of any one associated entity are small, but it is clear from the terms of SSCS's email of 3 March 2010 that the efficient mobilisation of financial and logistical support internationally through campaigns managed by the associated national organisations was important to SSCS, even if it was not indispensable.

52. In my view, SSUK was jointly liable with SSCS for whatever tortious damage may be found to have been inflicted on the claimants in the course of the attack on them off Malta. I would therefore have dismissed the appeal.

**LORD NEUBERGER:**

53. The essential facts giving rise to this appeal are set out in paras 32 to 36 of Lord Sumption's judgment, and further relevant information is contained in paras 5 to 18 of Lord Toulson's judgment.

54. The claimant contends that it has suffered damage as a result of a tort committed by one person, "the primary tortfeasor", and that another party, "the defendant", who did not directly join with the primary tortfeasor in actually committing the tort, and was not the primary tortfeasor's agent or employee, is also liable for the tort, because he assisted the primary tortfeasor to commit the tort.

55. It seems to me that, in order for the defendant to be liable to the claimant in such circumstances, three conditions must be satisfied. First, the defendant must have assisted the commission of an act by the primary tortfeasor; secondly, the assistance must have been pursuant to a common design on the part of the defendant and the primary tortfeasor that the act be committed; and, thirdly, the act must constitute a tort as against the claimant. As Lord Toulson says, this analysis is accurately reflected in the statement of the law in *Clerk and Lindsell on Torts*, 7th ed, p 59, cited by all members of the Court of Appeal in *The Koursk* [1924] P 140, 151, 156, 159.

56. Because this type of tortious liability is so fact sensitive and needs to be kept within realistic bounds, there is a danger that further analysis of these three requirements will serve to confuse. Bankes LJ made that point in *The Koursk*

at p 151, when he said that "It would be unwise to attempt to define the necessary amount of connection", and that each "case must depend on its own circumstances". To the same effect, Mustill LJ in *Unilever Plc v Gillette (UK) Ltd* [1989] RPC 583, 608, warned against over-analysis of the cases on this topic. The wisdom of those observations is borne out by the subsequent cases on this area of law, which are discussed by Lord Toulson and Lord Sumption. However, it is, I think, worth saying a little about each of the three conditions.

57. So far as the first condition is concerned, the assistance provided by the defendant must be substantial, in the sense of not being *de minimis* or trivial. However, the defendant should not escape liability simply because his assistance was (i) relatively minor in terms of its contribution to, or influence over, the tortious act when compared with the actions of the primary tortfeasor, or (ii) indirect so far as any consequential damage to the claimant is concerned. Nor does a claimant need to establish that the tort would not have been committed, or even that it would not have been committed in the precise way that it was, without the assistance of the defendant. I agree with Lord Sumption that, once the assistance is shown to be more than trivial, the proper way of reflecting the defendant's relatively unimportant contribution to the tort is through the court's power to apportion liability, and then order contribution, as between the defendant and the primary tortfeasor.

58. As to the second condition, mere assistance by the defendant to the primary tortfeasor, or "facilitation" of the tortious act, will not do, as explained by Lord Templeman in *CBS Songs Ltd v Amstrad Consumer Electronics Plc* [1988] AC 1013, 1057B-C, and 1058G-H, and by Hobhouse LJ in *Credit Lyonnais Bank Nederland NV v Export Credit Guarantee Department* [1998] 1 Lloyd's Rep 19, 46. There must be a common design between the defendant and the primary tortfeasor that the tortious act, that is the act constituting or giving rise to the tort, be carried out, as suggested in *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] 1 WLR 1556, para 34.

59. A common design will normally be expressly communicated between the defendant and the other person, but it can be inferred, a point which is clear from Lord Mustill's reference to "agreed on common action" and "tacit agreement" in *Unilever* at p 609. I have some concerns about the notion that the defendant has to "[make the tortious act] his own", as Peter Gibson LJ put it in *Sabaf SpA v Meneghetti SpA* [2003] RPC 264, para 59. While it can be said that it rightly emphasises the requirement for a common design, this formulation is ultimately circular and risks being interpreted as putting a potentially dangerous gloss on the need for a common design.

60. As to the third condition, it is unnecessary for a claimant to show that the defendant appreciated that the act which he assisted pursuant to a common design constituted, or gave rise to, a tort or that he intended that the claimant be harmed. But the defendant must have assisted in, and been party to a common design to commit, the act that constituted, or gave rise to, the tort. It is not enough for a claimant to show merely that the activity, which the defendant assisted and was the subject of the common design, was carried out tortiously if it could also perfectly well be carried out without committing any tort. However, the claimant need not go so far as to show that the defendant knew that a specific act harming a specific defendant was intended.

61. I do not detect any significant difference between this analysis of the law and the rather fuller analyses advanced in the judgments of Lord Sumption and Lord Toulson, and I doubt that there is anything significant in the lucid and interesting analysis in paras 40 to 58 of the judgment of Beatson LJ in the Court of Appeal with which I would disagree.

62. The present appeal provides a good opportunity to illustrate some of these points. The claimant can rely on two factors, in the light of the now unchallenged primary findings of fact made by Hamblen J in his full and clear judgment, to justify its contention that Sea Shepherd UK ("SSUK") is liable for the damage suffered as a result of the alleged tort committed during Operation Bluerage ("the operation") carried out by Sea Shepherd Conservation Society ("SSCS").

63. At trial, the claimant also, indeed primarily, relied on the fact that the vessel used by SSCS to carry out the operation, the "Steve Irwin", was registered in the name of SSUK, but the Judge found that the vessel was at all times beneficially owned and controlled by SSCS. Rightly, the claimant no longer relies on that aspect. The claimant also relied on the general approval which SSUK published for SSCS's activities and in particular for the protection of bluefin tuna (as mentioned by Lord Toulson in para 9). However, the most that does is to render it more likely than it might otherwise be that SSUK would assist the operation, but, otherwise, as I see it, that aspect takes matters no further. Accordingly, I turn to the two factors which the claimant can rely on.

64. The first factor is that, knowing that SSCS intended that the operation would involve wrongful attacks on a third party's property, SSUK recruited people to work for SSCS in connection with the operation. It appears that SSUK did not in fact recruit anyone other than two people, one of whom located a pump for the "Steve Irwin", and both of whom transported the pump to the vessel and performed a day's work on board when she was in port. Secondly, the

claimant relies on the fact that SSUK was involved in raising money to support the operation. By approving the sending out of the mailshot (whose contents are set out by Lord Sumption in para 34) in its name, and by accepting and paying over to SSCS the resultant public donations totalling £1,730, it is said that SSUK assisted SSCS in carrying out the activities described in the mailshot, which plainly included the acts which the claimant in this case alleges to have been tortious.

65. If the only evidence of the intentions of SSCS was that they would be doing all that they could to impede intensive fishing of bluefin tuna in the Mediterranean, a defendant, who shared that intention as a common design and assisted in that activity by recruiting people and/or raising money to enable it to proceed, would not be liable to a claimant who suffered damage as a result of SSCS carrying out any of those activities tortiously. The fact that the defendant in such a case might believe, or could reasonably be expected to believe, that it was possible that SSCS would act tortiously when carrying out its projected activities would not be sufficient to render the defendant liable to a claimant who suffered damage as a result of SSCS having so acted. In such a case, the defendant would not be party to a design to commit an act which proved to be tortious.

66. However, if the evidence established that the defendant appreciated that it was SSCS's intention to commit tortious acts in carrying out their activities, or even that it was, in practical terms, inevitable that SSCS would seek to commit tortious acts if they came across a ship intensively fishing for bluefin tuna, then the defendant could not escape liability. The fact that SSCS's intention could be characterised as conditional (as they may not encounter any such ship, or may not have the opportunity to act tortiously) and untargeted (as the precise victim could not be identified in advance) would not assist the defendant. Nor would the fact (if it were a fact) that the defendant did not appreciate that the acts in question would be tortious.

67. In this case, it seems to me to be clear that the claimant did establish that SSUK had sufficient knowledge that tortious acts were contemplated, indeed were intended, by SSCS, particularly in the light of the statement in the mailshot that SSCS intended to "seize, cut, confiscate and destroy every illegal tuna fish net we find".

68. More controversially, it also seems to me to be clear that this was part of a common design between SSCS and SSUK. To that extent, I agree with the Court of Appeal, and I disagree with the Judge, who considered that it was no part of SSUK's intention that SSCS should act tortiously. The Judge said that, although SSUK "generally approved of" SSCS's campaign, it was not

necessarily the case that the campaign would involve tortious acts, although it was "envisaged" as a "possibility". As I have already indicated, "general approval", even if published, could not, save on very unusual facts, amount on its own to assistance. However, in my view, at least in the absence of further exculpatory facts, a defendant who assists a primary tortfeasor in carrying out activities, which he is told are intended or expected to include tortious acts, cannot escape accessory liability by saying that, although he supported the activities generally, he did not support the carrying out of tortious acts.

69. Normally, at any rate, once the defendant is a party to a design which has been communicated to him (normally, but not necessarily, by the primary tortfeasor), he cannot excise from the scope of the design aspects which he knows are included in it, but does not support. That would be so, as I see it, even if he had communicated his opposition to those aspects to the primary tortfeasor. Normally, the scope of the design (or the communicated design) will, as in this case, be determined by the primary tortfeasor. Of course, there will be exceptions: thus, if SSUK had said to SSCS that it would only assist if SSCS agreed that it would not carry out tortious acts, and, as a result of the ensuing discussions, SSUK had honestly believed that SSCS would not commit torts, it seems to me that there would be a powerful case for saying that SSUK should escape liability.

70. However, although SSUK did things which assisted SSCS in connection with the operation, and although SSUK and SSCS shared a common design that the tort of which the claimant complains be carried out, the Judge concluded that SSUK's contribution to the operation, and therefore to the commission of the tort alleged by the claimant, was "of minimal importance" and that SSUK "played no effective part in the commission of the tort". That was a question of judgement or assessment which is fact-sensitive, as Lord Mance says. In cases of this sort, there will be cases where the facts found by the judge are such that only one conclusion is possible, but there will also be cases where the facts are such that reasonable judges could reasonably differ as to whether the assistance provided was trivial. Accordingly, the question for us as an appellate court is not whether we would have reached that decision, but whether the Judge was entitled to conclude that the extent to which SSUK assisted SSCS was too trivial to bring SSUK within the scope of the tort. I have concluded, in disagreement with the Court of Appeal, that he was so entitled.

71. As I have already suggested, the claimant can only rely on the facts that SSUK successfully recruited volunteers to work for SSCS in connection with the operation, and that SSUK was involved in raising funds from the public to support the operation. Consideration of these factors is not assisted by the

fact that the Judge dealt with the matter very shortly. It is only fair to add that this is not intended to be an adverse criticism: as already mentioned, the evidence and argument before him concentrated very much on other factors, particularly the use of the "Steve Irwin", which have now fallen away. In my view, as an appellate court, when considering whether the assistance provided by SSUK was trivial, we should approach the primary evidence with a view to assessing whether it could have justified his conclusion that the assistance was trivial. By the same token, I do not believe that we should make our own assessment of the evidence, and, as I read his judgment, Lord Mance takes the same view as to the applicable approach.

72. So far as SSUK's involvement in recruitment for the operation was concerned, it was, to my mind, insignificant, although, if SSUK had been more successful in recruiting volunteers to work on board the "Steve Irwin" during the operation, my view may well have been different. As already mentioned, SSUK's actions resulted in two individuals doing two small things, namely locating and transporting a pump to the vessel and carrying out a day's work on board. As already mentioned "small" is not enough for SSUK's purposes, but in my view this aspect of its contribution to the tortious activity was *de minimis*. Any connection to the operation was tenuous, as there was no evidence that the pump or the work was connected to the operation in particular, as opposed to the seaworthiness of the vessel generally. More importantly, even taking the two aspects of the contribution (providing the pump and two people working on board for a day) together, they were trivial in the context of the operation as a whole.

73. As for the fund-raising, the evidence as to the precise nature of SSUK's activities is sparse, no doubt because this was (understandably) not the main focus of the claimant's case until after the judgment of Hamblen J. The statement of agreed facts for the purpose of this appeal records that "SSCS designed, organised and paid for [the] mailshot", but it said nothing in terms about who posted the mailshot to people in the United Kingdom. This reflects what was in the finding made in para 57 of Hamblen J's judgment. However, the verbs used by the Judge are perfectly capable of covering the posting of the mailshot, and, indeed, in the absence of good reason to the contrary, I would have thought that they did so. The Judge referred to the mailshot having been "sent out by SSUK" in para 47, and, although the sentence in question can be read as if he was saying that it had been, it was in the context of a paragraph in which he was setting out the claimant's case.

74. It seems to me clear therefore that we must proceed on the basis SSCS, not SSUK, designed, organised and paid for the preparation mailshot, but I accept the position is not so clear in relation to the actual sending out of the mailshot. However, in that connection, it appears to me that the cross-examination of

Mr Collis of SSUK provides a clear answer. He denied that "the mailshots were sent out by [SSUK]", and said that the mailshots "were designed and put together by [SSCS] in the USA" and were "printed with their funds and they were submitted by [SSCS] in the USA". He also said that "the only parts that [SSUK] had involvement with was we processed donations that came to us".

75. It is fair to say that there was evidence in the form of (i) an email showing that SSCS encouraged SSUK to be involved in sending out the mailshot in the UK, (ii) a phrase in a sentence in Mr Collis's witness statement which could be said to suggest some unspecified SSUK involvement in the sending of the mailshots, (iii) some general statements as to the relationship between SSCS and national Sea Shepherd entities such as SSUK, and (iv) oral testimony about gift aid recovery, which could be invoked to suggest greater SSUK involvement. However, it seems to me that the oral evidence of Mr Collis on this issue was clear and there is no good reason to doubt it, especially as none of these four points were put to him. The email was a request or proposal from SSCS to SSUK, and there is no evidence, other than inference, that it was complied with, and it would be inappropriate to make such an inference in the light of Mr Collis's evidence. The phrase in Mr Collis's statement was that some leaflets "were sent from the UK", but he did not say that they were sent or paid for by SSUK. The general statements are of no assistance, and the gift aid recovery evidence cuts both ways, and in any event is far too indirect to assist the claimant's case on this issue.

76. In these circumstances, it appears to me that the furthest the claimant can go in relation to the mailshot itself, is to say that SSUK adopted the sending it out in its name by not objecting to its publication, and retrospectively adopted it by accepting payments from members of the public. In relation to the £1,730, the claimant can rely on the fact that SSUK accepted that money and paid it out of its bank account to SSCS to support the operation.

77. In my opinion, it is important to bear in mind that the mailshot was conceived of, written, reproduced, circulated and paid for by SSCS not by SSUK, and so the money had been solicited by SSCS. From the claimant's point of view, SSUK was at best a sort of sleeping partner so far as the mailshot itself was concerned. As to the £1,730, it seems to have been paid direct into SSUK's bank account by members of the public, who plainly intended that it should go to SSCS for the purpose of the operation, not that it should be retained by SSUK. Particularly as there was an unlawful dimension to the purpose for which the money was paid, I would not go so far as to say that the £1,730 was held on trust by SSUK for SSCS, but one is close to that territory in practical terms. It would not have been open to SSUK to retain the money, or indeed to use it for any purpose other than the operation.

78. I have considered whether it could have been argued that SSCS were somehow acting as SSUK's agents when preparing and sending out the mailshots. Apart from being a somewhat counter-intuitive analysis, it would not, in my view, be open to this court so to hold. In the first place, the Judge said that, although there was "a close connection between the various SS entities worldwide, the different entities are separate legal bodies and the operational reality is that SSCS is the global organisation which utilises the resources of other SS entities when it is convenient to do so", and, to put it at its lowest, there is no reason to think that this observation did not apply to the mailshot. Secondly, the argument that SSCS should be treated as SSUK's agent was not raised by the claimant at trial, and, even without the Judge's finding I have just quoted, it would not seem to me to be right to determine an appeal on that ground, given that the trial judge's view on the point would have been important.

79. I would probably have agreed with Lord Sumption and Lord Mance that the sum of £1,730, though very small, could not be regarded as *de minimis* in itself, so that, if SSUK had, pursuant to its own initiative and at its own expense, prepared and sent out the mailshot, and had then collected the money and paid it to SSCS, they could not have escaped liability, although it would have been important to know what the trial judge had thought if those were the facts. However, all that SSUK did in advance of receiving the money was not to object to the use of its name and bank account in the mailshot, and all that it did after receiving the small (in the context of the operation) sum of £1,730, was to pay the money over to the person for whom it was intended.

80. I understand why Lord Mance and Lord Sumption have arrived at a different conclusion, but, in my view the Judge was entitled to conclude that SSUK's contribution to the operation, and therefore to the commission of the tort alleged by the claimant, was "of minimal importance" and that SSUK "played no effective part in the commission of the tort".

81. Accordingly, I would allow this appeal.

**LORD KERR:**

82. The single issue in this appeal can be simply expressed: on the findings made by Hamblen J, was it open to him to conclude that SSUK's facilitation of SSCS's alleged tortious activity amounted to no more than a *de minimis* contribution.

83. Two species of activity have been identified as constituting the contribution which SSUK made. The first was to recruit two volunteers one of whom located and both of whom transported a pump to the "Steve Irwin" and carried out a day's work on the vessel. The second involved a "mailshot" appealing for funds for Operation Bluerage. As to the second of these, the reason for involving SSUK was to take advantage of its bulk mailing services and to allow SSUK to receive sterling contributions which it then transferred to SSCS. This raised £1,730 which SSUK transferred to SSCS. It is assumed that this was a very small proportion of the costs of Operation Bluerage.

84. It is, I believe, important to keep in mind that SSUK, although it knew and may be taken to have implicitly approved of the mailshot, had not itself produced it. Nor did it, as an organisation, actively seek donations. It was a willing participant in the scheme to the extent that it knew in advance that donations were being solicited by SSCS and that those donations would find their way to SSCS through SSUK's account. It also knew that it would be expected to transmit the received donations to SSCS and it was clearly willing to do so. This was the extent of their involvement in the fund-raising activities, or certainly, the extent of involvement established by the evidence. Their willingness to adopt this passive role is, of course, only one side of the story.

85. It is interesting to reflect on whether, if the donations that had in fact been received and transmitted by SSUK had been substantial, say the major proportion of the funding of the campaign, its contribution could be said to be more than *de minimis*. One can perhaps recognise an argument that, if SSUK was in fact the cipher through which most of the funding for the campaign had been raised, it could not escape the taint of having made a more than minimal contribution to the commission of the alleged tort. I tend to agree with Lord Sumption, therefore, that the maxim *de minimis non curat lex* is concerned with extremes. Those extremes are to be measured, however, not only as a matter of how they are conceived as a possible contribution to the commission of a tort but also how they have in fact contributed. It is therefore relevant to have regard not only to the potential contribution that SSUK's participation might have made but also to what it actually achieved. In the event, SSUK's contribution in hard, practical terms was not significant.

86. Leaving aside all these considerations, however, ultimately, in the present case I believe that the central question is concerned with the level of restraint that an appellate court should apply in reviewing the decision of a first instance judge which involves the exercise of judgment on the findings of fact that he has made. This issue was considered by the Supreme Court in *In re B (A Child) (Care Proceedings: Threshold Criteria)* [2013] UKSC 33; [2013] 1 WLR 1911. At para 60 Lord Neuberger said:

> "… it is not possible to lay down any single clear general rule as to the proper approach for an appeal court to take where the appeal is against an evaluation: see also in this connection Robert Walker LJ in *In re Reef Trade Mar*k [2003] RPC 1, para 26, May LJ in *Dupont de Nemours (EI) & Co v ST Dupont* [2006] 1 WLR 2793, para 94, and Laws LJ in *Subesh v Secretary of State for the Home Department* [2004] Imm AR 112, para 44. Accordingly, as already explained, even where the issue raised is not one of law, the reasons which justify a very high hurdle for an appeal on an issue of primary fact apply, often with somewhat less force, in relation to an appeal on an issue of evaluation."

87. Applying this approach, one should not lose sight of the fact that the donations made in response to the mailshot were at all times money raised by SSCS's efforts and at their expense. SSUK had no direct or immediate involvement in this. They allowed SSCS to use their resources but their role was essentially a passive, back-seat one throughout the process. The question which this court has to answer, therefore, is whether Hamblen J's finding that SSUK's receiving and transferring funds belonging to SSCS played no effective part in the commission of the alleged tort of cutting fishing nets is insupportable. That judgment must be made on the somewhat less rigorous basis than that applied to a review by an appellate court of primary findings of fact. But I consider that the judge was plainly justified in finding that SSUK's role did not meet the more than *de minimis* contribution required, or, at least, that it cannot be said that it was plainly not open to him so to find.

88. SSUK had facilitated sterling-based transactions. Even if it could be argued that the money which passed through its account made a more than *de minimis* contribution to the alleged torts, it cannot be said that merely passing on funds constituted "concerted action to a common end", it is in essence an ancillary role, lending minor help to the actions of another. Of course, it can be said that SSUK's role could be appropriately described as falling into one of the categories of accessory liability seen in crime rather than that of primary liability known to the law of tort. But for the reasons given, particularly by Lord Toulson and Lord Sumption, the distinction between the two contexts has a solid foundation and should be preserved.

89. The other basis on which SSUK's contribution might have been argued to be more than minimal, *viz* recruiting two volunteers to source and supply a pump and to carry out work on the ship will not avail. This cannot sensibly be regarded, without, at least, significantly more detailed evidence, as having made a more than *de minimis* contribution to the enterprise. The judge was therefore entitled to find that the full extent of SSUK's participation had no

more than a minimal or peripheral input. Certainly, in my opinion, it was not open to an appellate court to interfere with Hamblen J's judgment to that effect.

90. For these reasons and those given by Lord Neuberger and Lord Toulson, I would allow the appeal and restore the order made by Hamblen J.

**LORD MANCE: (dissenting)**

91. At the end of the day, the difference of opinion in the court about the outcome of this appeal derives from a difference not about the legal principles which it involves, but about their application to the facts, and, in particular, about whether such assistance as SSUK rendered pursuant to the common design which it shared with SSCS to further Operation Bluerage can and should be regarded as *de minimis*.

92. Ultimately this is a matter of judgment, though any judgment is complicated by a degree of obscurity about the facts relating to the mailshot. The reason for obscurity about the mailshot, as Lord Neuberger has pointed out, is that the matters now relied upon as assistance were at best a very peripheral part of the respondents' case at first instance before Hamblen J. This may go to costs, but it cannot relieve us of the difficulty of determining the right answer on the facts.

93. Hamblen J said in para 47 of his judgment that Fish & Fish "relies in particular on a mailshot … sent out by SSUK which sought and obtained donations for the campaign". Fish & Fish had indeed pleaded in its amended reply, para 6(3), that "SSUK … sought campaign contributions from the public". Hamblen J's statement in para 47 might look as if he was accepting that SSUK sent out the mailshot (which is, indeed, what he had put to SSUK's counsel in final speeches). But later, in para 57, he recounted that the evidence of Mr Collis, SSUK's witness (and sole employee at the relevant time), was that "SSUK did not itself seek campaign contributions for the Bluerage campaign", and he continued:

> "There was the mailshot referred to above. This was designed, organised and paid for by SSCS, although SSUK's address and bank details were included in respect of UK recipients of the mailshot to make it easier for them to donate in Sterling. SSUK processed the funds (to a total of £1,730) and sent them to SSCS."

94. The cross-examination of SSUK's witness, Mr Collis, had in fact elicited denials, which were not further tested, of almost any involvement in the mailshot, save for the processing and forwarding to SSCS of the £1,730 or so received as its result. But it is, I consider, also clear that SSUK at least knew in advance that the mailshot was going to be sent out in its name, inviting donations to it. There was evidence from SSCS, in para 29 of the witness statement of Mr Paul Watson of SSCS, who was also called as a witness, that:

> "When SSCS are planning a campaign, we reach out to all Sea Shepherd organisations for their support. Such support can be provided financially or by way of logistical help, for example."

95. Mr Collis in his witness statement, in para 61, said:

> "I should mention that there were donations provided in relation to Operation Bluerage to the UK charity. This was a mailshot that was requested by SSCS, and I believe that it was replicated across the globe. The majority of the funds were raised through SSCS's website. However a certain number of leaflets were sent from the UK, and provide the UK address, being the closest Sea Shepherd office. We gathered the donations which totalled £1,730 … and we sent the money to SSCS along with other monies from the SSUK charity funds."

96. This might be taken to indicate that SSUK actually took part in sending out the mailshot. There is also an email dated 3 March 2010 which would suggest that, at least at that date, SSCS was proposing that SSUK should do this. However, there is no clear finding to that effect, and I shall proceed on the basis that SSCS sent out or arranged the sending out of the mailshot. Nonetheless, it was sent out in SSUK's name, and it is reasonably clear from the evidence of both Mr Watson and Mr Collis, as well as from the inherent probabilities, that SSUK was aware that this was taking place, and were not therefore surprised by the donations it elicited, which they duly processed in the ordinary course. If it does not mean that SSCS requested SSUK to send out the mailshot, then Mr Collis's statement that the mailshot "was requested by SSCS" must at least mean that SSCS requested the ability to send out a mailshot in SSUK's name.

97. In these circumstances, my mind has wavered as to whether any assistance provided could reasonably be described as *de minimis*. The judge described it as minimal. For the reason given by Lord Neuberger, I would regard the assistance involved in the recruitment of two volunteers as insignificant, and

as adding nothing to such assistance as was provided by the mailshot. But, basically for the reasons given by Lord Sumption, I find myself ultimately unable to accept that the assistance provided by the mailshot can appropriately be described as "minimal" in the sense of *de minimis*.

98. In my view, the right analysis, assuming that the mailshot was sent out by SSCS, is that it was sent out in the name of and - so far as appeared to the public and as a matter of law - on behalf of SSUK which, having been requested to allow this, expressly or implicitly authorised it in advance.

99. If the mailshot had yielded nothing or only a tiny sum, I would agree that, despite such authorisation, the mere despatch of the mailshot could not be regarded as rendering any actually significant assistance. But £1,730 was a not insignificant sum. It is even less insignificant when viewed as one of several collections of donations received by SSCS from its various national branch organisations, in accordance with the procedure described by Mr Watson (para 94 above). Every little helps.

100. I do not therefore see any incongruity in a conclusion that SSUK lent material assistance to SSCS in this case, and is potentially liable accordingly. On the basis that its role in the direction of any tort was non-existent or negligible and the assistance it gave was in the event very limited, that will as Lord Sumption has said be potentially relevant to contribution as between SSUK and SSCS.

101. In those circumstances, I consider that the Court of Appeal reached the right conclusion, and I would dismiss this appeal.