UNITED STATES BANKRUPTCY COURT          **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | |
| | : | **Case No. 20-10132 (MEW)** |
| **IIG Global Trade Finance Fund Ltd. (in Official** | : | |
| **Liquidation),** *et al.,* | : | **Chapter 15** |
| | : | |
| Debtors. | : | **Jointly Administered** |

------------------------------------------------------------------------x

| | | |
|---|---|---|
| **IIG Global Trade Finance Fund Limited (in Official** | : | |
| **Liquidation),** *et al.,* | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **Adv. Pro. No. 23-01165 (MEW)** |
| | : | |
| **International Investment Group L.L.C.,** *et al,* | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------------------x

## DECISION ON DEFENDANTS' PARTIAL MOTIONS
## TO DISMISS THE AMENDED COMPLAINT

A P P E A R A N C E S :

PILLSBURY WINTHROP SHAW PITTMAN LLP
New York, New York
*Attorneys for Plaintiffs as to claims against International Investment Group L.L.C,*
*Trade Finance Trust, the BlueMountain Defendants, the Tennenbaum Defendants, the Elanus*
*Defendants and John Doe Subsequent Transferees*
    By: Patrick Fitzmaurice, Esq.
        John A. Pintarelli, Esq.
        Ari M. Berman, Esq.
        Rahman Connelly, Esq.
        Spencer E. Young, Esq.
        Eugenie Dubin, Esq.

KOBRE & KIM LLP
New York, New York
*Attorneys for Plaintiffs as to claims against the KKR Defendants and John Doe*
*Subsequent Transferees*
    By: Zachary D. Rosenbaum, Esq.
        Rachel K. Warren, Esq.

SICHENZIA ROSS FERENCE CARMEL LLP
New York, New York
*Attorneys for Plaintiffs as to claims against Deutsche Bank Trust Company Americas*
  By: Andrew Zinman, Esq.

HOLLAND & KNIGHT LLP
New York, New York
*Attorneys for Defendant Deutsche Bank Trust Company Americas*
  By:  Franke Morreale, Esq.
      Anthony F. Pirraglia, Esq.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
New York, New York
*Attorneys for Defendants KKR Credit Advisors (US) LLC, Corporate
Capital Trust, Inc., KKR Debt Investors II (2006) (Ireland) L.P., KKR
TRS Holdings, Ltd., and KKR-PBPR Capital Partners L.P.*
  By: Andrew J. Rossman, Esq.
      Deborah J. Newman, Esq.
      Blair A. Adams, Esq.

WILMER CUTLER PICKERING HALE AND DORR LLP
New York, New York
*Attorneys for Defendants Tennenbaum Capital Partners, LLC,
Tennenbaum Senior Loan Fund II, LP, Tennenbaum Senior Loan
Fund III, LP, Tennenbaum Senior Loan Fund IV-B, LP, and
Special Value Continuation Partners, LLC*
  By: Philip D. Anker, Esq.
      Ross E. Firsenbaum, Esq.

SELENDY GAY ELSBERG PLLC
New York, New York
*Attorneys for Assured Investment Management LLC (f/k/a
BlueMountain Capital Management, LLC and n/k/a Sound
Point Luna LLC), BlueMountain Foinaven Master Fund L.P.,
BlueMountain Loan Opportunities Master Fund L.P.,
BlueMountain Montenvers Master Fund SCA SICAV-SIF,
BlueMountain Timberline Ltd., and BlueMountain Kicking
Horse Fund L.P.*
  By: Philippe Z. Selendy, Esq.
      David S. Flugman, Esq.
      Claire O'Brien, Esq.

OFFIT KURMAN PA
New York, New York
*Attorneys for Elanus Capital Management LLC and Elanus
Capital Investment Master SPC on behalf of, and in the
name of, Elanus Capital Investments Master SP Series I*
    By: Mark A. Weissman, Esq.

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

In November 2024, I issued a Decision and an Order in which I denied certain Defendants'

motions to dismiss as to some claims and granted the motions as to other claims. Plaintiffs filed

an amended complaint on December 6, 2024, which dropped some claims and revised other

allegations. ECF No. 75. Deutsche Bank Trust Company Americas ("**DBTCA**") and the advisers

who represented certain other defendants (the "**Noteholder Managers**")[1] have filed motions to

dismiss or to strike parts of the Amended Complaint.

First, DBTCA has moved to dismiss counts 16 and 17 of the Amended Complaint, which

assert claims under Cayman Islands law. DBTCA contends that the relevant statutes do not have

extraterritorial reach and do not apply to the conduct alleged in the Amended Complaint.

Second, DBTCA and the Noteholder Managers contend that count 17 should be dismissed

for failure to state a claim under the relevant Cayman Islands statute and for failure to plead the

supporting facts with sufficient specificity.

Third, DBTCA has moved to dismiss all claims against it to the extent that those claims

seek to recover any amounts other than fees that were paid to DBTCA.

Fourth, DBTCA has asked the Court to strike some allegations of the Amended Complaint

based on DBTCA's contention that those allegations are immaterial and impertinent.

---

[1]    The Noteholder Managers are: Assured Investment Management LLC (f/k/a BlueMountain
    Capital Management LLC and now known as Sound Point Luna LLC); KKR Credit Advisors
    (US) LLC; Tennenbaum Capital Partners, LLC; and Elanus Capital Management, LLC.

Plaintiffs have opposed the motions.  The Court heard oral argument on March 25, 2025, and at the Court's request the parties made additional submissions on July 3, 2025.  For the reasons set forth below, the Court will grant the motions to dismiss count 17 of the Amended Complaint but will deny the remainder of the Defendants' motions.

### The Underlying Transactions

IIG Global Trade Finance Fund Limited ("**GTFF**") and IIG Structured Trade Finance Fund Limited ("**STFF**") are investment funds that were organized under Cayman Islands law and that are now in official liquidation proceedings in the Cayman Islands.  Plaintiffs are the official court-appointed liquidators (the "**Liquidators**") of GTFF and STFF.  Defendants include International Investment Group L.L.C. ("**IIG**"), an investment advisor, and the Trade Finance Trust ("**TFT**"), an entity that was formed by IIG and that participated in the transactions that are described below. Defendants also include DBTCA, the Noteholder Managers and certain entities whose investments were managed by the Noteholder Managers and who were holders of notes that were issued in a prior IIG-orchestrated financing (the "**Noteholders**").

The history of the relevant transactions, as described in the Amended Complaint, is as follows.

In 2013, an IIG-related company named Trade Finance Funding I Ltd. ("**TFFI**") purchased a portfolio of "trade finance" loans from other IIG-related entities.  TFFI raised funds by selling $220 million of notes (the "**TFFI Notes**") to the Noteholders.  Deutsche Bank Securities, Inc. (a non-party) was the underwriter for the sales of the TFFI Notes, and DBTCA acted as the indenture trustee.  TFFI entered into a Collateral Management Agreement with IIG, under which IIG managed TFFI's investments and recommended new loans for TFFI to make or purchase.

Some of the loans that TFFI purchased in 2013 were fictitious. Problems with the loan portfolio increased as time went by, and a growing number of bad loans were replaced by fictitious loans or with other nonperforming loans. By 2017, according to the Amended Complaint, forty percent of the loans that TFFI purportedly held had come due but were in default. Investigations by DBTCA and by certain Noteholders in early 2017 allegedly revealed severe problems regarding the identities of the purported borrowers, the quality and value of the loans, and the lack of collateral that was supposed to secure the loans. These investigations allegedly made clear that IIG had lied about such matters in its prior reports to DBTCA and the Noteholders.

The Amended Complaint alleges that IIG found new victims for its fraud in 2017. The following things happened:

A.  IIG solicited new investors (the "**Investors**") to buy shares in GTFF and STFF. Am. Compl. ¶¶ 2, 117, 130–31.

B.  IIG arranged the formation of TFT as a statutory trust under Delaware law. *Id. at* ¶¶ 40, 143–44. Deutsche Bank Trust Company Delaware, a non-party affiliate of DBTCA, acted as the statutory trustee. *Id.*

C.  GTFF and STFF entered into Master Participation Agreements with TFT. These agreements governed the terms on which GTFF and STFF would purchase "participation interests" in loans owned by TFT. *Id.*

D.  TFT agreed to buy loans from TFFI at prices equal to the full nominal amounts of the outstanding principal and accrued interest. *Id.* at ¶¶ 146, 160, 174. However, many of the loans that TFT acquired were fictitious, or were in default, or were otherwise non-performing or in dispute. *Id.* at ¶¶ 149–52, 154–55, 164–167, 177–78.

E.   TFT sold participation interests in the acquired loans to GTFF and STFF. *Id.* at ¶¶ 146–47, 160–61, 174–75.

F.   IIG and TFT did not tell the Investors, GTFF or STFF that TFT was acquiring loans from TFFI that were fictitious, and they failed to disclose the other known issues as to the underlying loan quality. *Id.* at ¶¶ 129, 265.

G.   The Master Participation Agreements included representations by TFT to GTFF and STFF, applicable to each sale of participation interests, that TFT had "no actual knowledge" that the underlying trade finance loans were "not in full force and effect, or that any default or event of default thereunder ha[d] occurred and [was] continuing." *Id.* at ¶ 243. Those representations were materially false as to the participation interests that TFT sold to GTFF and STFF in 2017. *Id.* at ¶¶ 244–45.

H.   Three separate sets of transactions occurred in June, July and August 2017. In each instance, GTFF and STFF used money that they had received from the Investors to buy participation interests from TFT, and GTFF and STFF transferred money from their accounts to TFT to pay for those participation interests. *Id.* at ¶¶ 144, 146–47, 160–61, 174–75. Although TFT purchased loans from TFFI, the Complaint alleges that TFT transferred funds directly to DBTCA, and that TFT did so on the same days that it received monies from GTFF and STFF. *Id.* at ¶¶ 147, 163, 175. The exact sequence is not clear, but some or all of the cash transfers to DBTCA may have occurred before TFT completed the formal documentation of its acquisition of the underlying loans from TFFI.

I.   The Complaint also alleges that as part of the initial June-August transactions TFT sold participation interests in one group of loans that TFT had not acquired from TFFI.

6

*Id.* at ¶ 175.  The amounts that GTFF and STFF paid for those participation interests were not transferred to DBTCA.  *Id.*

J.    DBTCA first used the monies it received to pay its own fees and expenses and the fees and expenses owed to IIG as Collateral Manager.  DBTCA then distributed the rest to the Noteholders.  *Id.* at ¶¶ 146–47, 163, 175–76.

There were small differences among (i) the amounts that GTFF and STFF paid to TFT for participation interests, (ii) the amounts that TFT agreed to pay to TFFI for the underlying loans, and (iii) the amounts that TFT transferred to DBTCA.  *Id.* at ¶¶ 146–47, 160–63.

The Amended Complaint alleges that IIG engaged in other fraudulent activities in its dealings with GTFF and STFF after August 2017, including the sale of participation interests in additional loans that were non-performing or fictitious.  *Id.* at ¶ 182.  IIG's fraud allegedly continued until IIG became the subject of an SEC inquiry in 2018, which led to civil and criminal charges against IIG and its principals in 2019.  *Id.* at ¶¶ 206–07, 210–12.  IIG's principals later pleaded guilty to charges that they had committed fraud.  *Id.* at ¶ 212.

The claims that were asserted in Counts 4, 5, 6, 7, 12, 13, 14 and 15 of the original Complaint have been dropped and/or were dismissed by the Court.  The Liquidators have asserted nine remaining claims in three different capacities.

<u>First</u>, the Liquidators assert three claims (counts 1, 2 and 3) that belonged to the Investors and that the Investors have assigned to the Liquidators.  As to these claims the Liquidators stand in the shoes of the Investors.  Two of the assigned claims (counts 1 and 2) allege that the 2017 transfers made by GTFF and STFF (as transferors) to TFT (as transferee) were fraudulent conveyances under the version of the New York Debtor and Creditor Law that was in effect in 2017.  Count 3 alleges that the Investors were the victims of a fraud perpetrated by IIG.

Second, the Liquidators assert four claims (counts 8 through 11) that allegedly belong to GTFF and STFF. As to those claims, the Liquidators stand in the shoes of GTFF and STFF. Count 8 alleges a breach of contract by TFT. Counts 9 and 10 allege that the 2017 transfers made by TFT (as transferor) to DBTCA and the Noteholders were fraudulent conveyances under New York law. Count 11 alleges that IIG breached fiduciary duties that it owed to GTFF and STFF.

Third, the Liquidators have asserted two claims (counts 16 and 17) that are statutory causes of action under Cayman Islands law. As to these two claims, the Liquidators contend that they act in their official capacities as liquidators of GTFF and STFF. Count 16 alleges that the 2017 transfers that GTFF and STFF made to TFT were undervalue transactions that were made with an intent to defraud and that the Liquidators may recover under section 146 of the Cayman Companies Act. Count 17 alleges that DBTCA and the Noteholder Managers were knowing parties to fraudulent trading by GTFF and STFF and are liable under section 147 of the Cayman Companies Act to make such contributions to the company's assets as the Court deems proper.

## **Pleading Standards**

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, which incorporates Federal Rule of Civil Procedure 12(b)(6), permits a bankruptcy court to dismiss claims in an adversary proceeding if the relevant parts of the complaint fail to state a claim upon which relief may be granted. In reviewing a motion to dismiss a court must accept the factual allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000). However, the factual allegations in a complaint must be supported by more than mere conclusory statements. *Twombly*, 550 U.S. at 555. The allegations must be sufficient "to raise a right to relief above the speculative level" and provide more than a "formulaic recitation of the elements of a cause of action." *Id.* (citations

omitted).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "show[n] . . . that the pleader is entitled to relief." *Id.* at 679; *see also id.* at 682 (allegations in a complaint are insufficient if there is an "obvious alternative explanation" for the conduct alleged that is more "likely") (internal quotation marks and citation omitted).

Rule 7009 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 9(b) of the Federal Rules of Civil Procedure, imposes the additional requirement that allegations of fraud must be stated "with particularity."  Fed. R. Bankr. P. 7009; Fed. R. Civ. P. 9(b).  If a complaint alleges that fraudulent misrepresentations were made, for example, then the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Although "the fraud alleged must be stated with particularity," the requisite intent of the defendant "need not be alleged with great specificity." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (citations omitted).  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b), made applicable by Fed. R. Bankr. Rule 7009.  Nevertheless, in order to state a "plausible"

claim of fraud a plaintiff "must allege facts that give rise to a strong inference of fraudulent intent."

*Lerner*, 459 F.3d at 290 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

<u>**Discussion**</u>

**I.    Whether the Cayman Islands Statutes that are the Bases
       for Counts 16 and 17 Have Extraterritorial Effect.**

Defendants previously moved to dismiss counts 16 and 17 of the Complaint on choice of

law grounds.  I denied that portion of the motion in my November 2024 Decision.  I held that the

claims asserted in counts 16 and 17 had vested in the Liquidators by statute, and that they were not

common law claims that should be governed by the choice of law principles that the Defendants

had invoked.  I noted, however, that there might be a separate question as to whether the Cayman

Islands statutes applied to conduct that occurred entirely outside the Cayman Islands, and that this

was a question as to the extraterritorial reach of the statutes, rather than a choice of law question.

DBTCA now contends that the relevant Cayman Islands statutes do not have extraterritorial

effect.  The other Defendants have not joined in this argument.

The statutes that are relevant are sections 146 and 147 of the Cayman Companies Act.

Section 146 states, in relevant part:

> (2)  Every disposition of property made at an undervalue by or on behalf of a
> company with intent to defraud its creditors shall be voidable at the instance
> of its official liquidator.
>
> *         *         *         *
>
> (5)  In the event that any disposition is set aside under this section, then if the
> Court is satisfied that the transferee has not acted in bad faith –
>
>> (a)  the transferee shall have a first and paramount charge over the
>> property, the subject of the disposition, of an amount equal to the entire
>> costs properly incurred by the transferee in the defence of the action or
>> proceedings; and

(b)  the relevant disposition shall be set aside subject to the proper fees, costs, pre-existing rights, claims and interests of the transferee (and of any predecessor transferee who has not acted in bad faith).

Section 147 states:

(1)  If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.

(2)  The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.

The parties and their expert witnesses agree that these provisions of the Cayman Islands statute are identical to, and are based upon, certain provisions in U.K. law.  The parties and their experts also agree that Cayman Islands courts are not required to follow U.K. courts' interpretations of similar U.K. provisions, but that Cayman Islands courts are likely to do so.

The English Court of Appeal held in 1993 that an "undervalue" provision that is the equivalent of section 146 (namely, section 238 of the Insolvency Act of 1986) has extraterritorial reach.  *Re Paramount Airways Ltd.* [1993] Ch 223.  In April 2015, the Supreme Court of the United Kingdom also held that a statute that is the equivalent of section 147 (section 213 of the Insolvency Act of 1986) has extraterritorial effect.  *Bilta (UK) Ltd. (in liquidation) v. Nazir (No. 2)* [2015] UKSC 23, [6], [2016] AC 1.  Two Cayman Islands court decisions have held that section 147 has extraterritorial reach.  *Conway v. Air Arabia PJSC* [2025] CIGC (FSD) 41, [135]; *In re ICP Strategic Credit Income Fund, Ltd.* [2014] 2 CILR 1, [5, 6].  The parties have not identified any Cayman Islands decisions regarding the extraterritorial reach of section 146, but the decisions in *Conway* and in *ICP* each cited to the *Paramount* decision with approval, and each concluded that one of the reasons why section 147 should have an extraterritorial reach is that section 147 should

have a reach similar to that of section 146 – in other words, that both provisions should have an extraterritorial reach. *See Conway*, CIGC (FSD) 41, [120–125, 134]; *ICP*, 2 CILR 1, [5–7].

DBTCA has cited no contrary authorities. DBTCA contends that I am not bound by the decisions cited above and that I am free to make my own interpretation of Cayman Islands law if I believe the cited decisions were incorrectly decided. However, the cited authorities are well-reasoned, and I see no reason to deviate from them.

DBTCA also urges me to hold that the decision in the *ICP* case was in error in holding that a foreign court (rather than a Cayman Islands court) may preside over claims asserted under section 147. DBTCA argues that section 147 permits a liquidator to apply to the "Court" and that this is a defined term that refers only to the relevant Cayman Islands courts. This is not really an argument as to whether section 147 has extraterritorial effect; instead, it is an argument that the claim can only be asserted in the Cayman Islands, no matter who the defendant is and no matter where the relevant conduct occurred. The decision in *ICP* reviewed and rejected the contention that a claim under section 147 may only be brought in a Cayman Islands court, and that reasoning appears sound. I note, too, that the Cayman Islands court that has jurisdiction over the liquidation proceedings for GTFF and STFF authorized the Liquidators to file this adversary proceeding in the United States. The reports of the parties' experts make clear that in granting such authority the Cayman Islands court was required (even in the absence of objection) to consider whether the proposed action was appropriate and authorized as a matter of Cayman Islands law. The Cayman Islands Court's approval of the filing of this litigation in the United States is therefore additional authority for the proposition that the claim under section 147 can be asserted here. The parties also have identified other instances in which Cayman Islands liquidators have filed claims in United States courts pursuant to section 147. *See Trott v. Deutsche Bank AG*, No. 1:20-cv-10299

(MKV), 2022 WL 951109 (S.D.N.Y. Mar. 30, 2022); *Pearson v. Deutsche Bank AG,* No. 21-cv-22437-BLOOM/Otazo-Reyes, 2023 WL 2872443 (S.D. Fla. Apr. 9, 2023). I have reviewed the dockets in those cases, and in neither instance did any defendant even contend that the U.S. court was unable to hear the section 147 claim.

DBTCA argues that U.K. courts are careful in exercising the extraterritorial reach of the U.K. statutes and that they pay heed to the extent of a defendant's connections with the relevant jurisdiction before exercising personal jurisdiction over that defendant. Those concepts, however, just reflect prudent limits as to whether personal jurisdiction should be exercised by a particular court in a particular case. They are not limitations on the extraterritorial reach of the statutes, and no party has identified any reason why I cannot or should not exercise personal jurisdiction over DBTCA and the other Defendants in this case.

DBTCA's motion to dismiss counts 16 and 17, based on its contention that the statutes do not have extraterritorial reach and its contention that a non-US court is unable to hear a claim under section 147, is denied.

## II.     Whether the Liquidators Have Pleaded a Valid Claim Under Section 147 of the Cayman Companies Act.

Count 17 is asserted against DBTCA and against the Noteholder Managers. It alleges that DBTCA and the Noteholder Managers were "parties" to the "carrying on" of the business of GTFF and STFF in a fraudulent manner or for a fraudulent purpose in violation of section 145 of the Cayman Companies Act. DBTCA and the Noteholder Managers argue that the allegations of the Amended Complaint fail to state a claim under section 147 because the kind of "fraud" that is the subject of count 17 is not the type of fraud at which section 147 is directed or because GTFF and STFF did not themselves have a "fraudulent purpose." They also argue that the allegations of the Amended Complaint, even if true, at most allege that the Defendants did not stop IIG from

committing fraud or that the Defendants accepted the benefits of what IIG did, and that those allegations do not suffice to support a claim that the Defendants were themselves "parties" to the "carrying on of the business" of STFF and GTFF in a fraudulent manner or for a fraudulent purpose.  Finally, the Noteholder Managers argue that the allegations in the Amended Complaint as to their alleged knowledge of fraud are deficient.

### A.    Whether the Alleged Fraud is of a Type Covered by Section 147.

DBTCA and the Noteholder Managers argue that section 147 of the Cayman Companies Act does not apply to ordinary fraudulent behavior and that it applies only to the extent that creditors are defrauded by the intentional continuation of a business that is insolvent or will be rendered insolvent and that has no reasonable prospect of repaying the debts that it is incurring. DBTCA and the Noteholder Managers further argue that the allegations of Count 7 of the Complaint (which alleges that IIG lied to the Investors) merely state a claim for fraudulent misrepresentation, and that the allegations in Count 7 do not state a valid claim under section 147. It is not entirely clear to the Court, after reviewing the many English authorities cited by the parties' experts, that section 147 is so limited as the Defendants contend.  It does not matter, however, because the "fraud" alleged in Count 17 is not limited to the allegations of Count 7.

Count 17 incorporates all of the prior allegations in the Amended Complaint, and not just the allegations of Count 7. *See* Am. Compl. ¶ 276.  Count 17 therefore incorporates the allegations of Counts 1 and 2, which allege (1) that the transfers that GTFF and STFF made to TFT were fraudulent transfers that either were made when GTFF and STFF were insolvent or that immediately rendered them insolvent, and (2) that the transfers were made with an actual intent to defraud the Investors.  In short, Count 17 of the Amended Complaint does not merely allege that the Investors were deceived by IIG.  It alleges that IIG (as investment manager) carried on the

"business" of GTFF and STFF in a manner that was intended to incur obligations to the Investors that GTFF and STFF could not repay, all with the actual intent of defrauding the Investors.

Paragraph 278 of the Amended Complaint alleges, for example, that "[t]he Debtors, acting on the advice of and at the direction of IIG, used the funds acquired from the Investor-Assignors to make the Participation Purchases by which the Debtors acquired participation in loans that were effectively worthless.  The Debtors became insolvent as a result of the Participation Purchases." *Id.* at ¶ 278.  Paragraphs 281 and 283 further allege that almost all of the loans in which GTFF and STFF bought participation interests "were in default or were fictitious," that the loans "were not possibly worth their full value," that "no fully-informed purchaser would have agreed to acquire the loans, or interests in them," and that "no reasonable investor would have financed the purchase of such interests if the true facts had been disclosed to them."  *Id.* at ¶¶ 281, 283.

Even if Defendants are right in their contention that the "fraud" covered by section 147 is the intentional carrying on of an insolvent business and the intentional incurrence of debts that the company will not be able to pay, the allegations of Count 17 describe conduct that fits that description.

> **B.      Whether the Amended Complaint Alleges that the "Businesses" of GTFF and STFF Were Carried On With Intent To Defraud Creditors or for a Fraudulent Purpose.**

DBTCA argues that the Amended Complaint alleges that IIG acted with fraudulent intent but alleges that GTFF and STFF were mere victims of IIG's fraud.  DBTCA argues that this necessarily means that GTFF and STFF were not "carrying on" their own businesses with a fraudulent intent.  However, IIG was the investment manager for GTFF and STFF.  The Amended Complaint alleges that IIG had full authority to control GTFF's and STFF's fund-raising and their investments.  IIG allegedly committed fraud in carrying out its duties, but when it did so IIG was "carrying on" the portions of the business of GTFF and STFF that had been entrusted to it.  I see

15

no reason why it should make any difference that these parts of GTFF's and STFF's business were carried on by an appointed investment manager instead of being carried on directly by the company's directors and officers. The statute is worded in the passive voice, and the terms of the statute are satisfied so long as somebody with authority to "carry on" the relevant part of a business (whether as a director or as an agent) did so in a fraudulent manner and with a fraudulent intent. *See, e.g., Carman v. Cronos Group SA* [2005] EWHC (Ch) 2403 (upholding a fraudulent trading claim against another company and an individual who were in "control" of the relevant company).

It is also clear, under U.K authorities, that GTFF's and STFF's status as victims of IIG's wrongdoing would not bar the fraudulent trading claim. *See, e.g., Bilta (UK) Ltd. (in liquidation) v. Nazir (No. 2)* [2015] UKSC 23, [2016] AC 1 (directors were charged with having victimized a company by a fraudulent scheme; court refused to attribute directors' wrongful behavior to the company itself and held that the company's status as the victim of the directors' wrongdoing did not bar a claim against the directors).

The Noteholder Managers argue that the Amended Complaint is too vague as to the "business" that allegedly was "carried on" with fraudulent intent. These contentions appear to be based on an argument that section 147 is only applicable if the entire purpose of a company's existence was to commit fraud. *See, e.g.,* Thomas Lowe KC Decl. ¶ 33, ECF No. 67 (expressing the opinion that the commission of fraud is not a violation of the statute "if the wider business is not also fraudulent.") It is clear from the authorities that the Court has reviewed, however, that liability under section 147 is not limited to entities whose sole purposes were fraudulent and that were "fraudulent enterprises" in their entireties. The statute applies, by its terms, so long as "any" business of a company was "carried on" with intent to defraud creditors. The cited authorities involve many entities that were legitimate business entities that nevertheless at some point ran into

financial distress and thereafter "carried on" their business with an intent to defraud creditors. *See, e.g., Re Bank of Credit and Com. Int'l SA, Banque Arabe Internationale D'Investissement SA v. Morris* [2002] BCC 407; *Bank of India v. Morris* [2005] EWCA (Civ) 693; *Carman v. Cronos Group SA* [2005] EWHC (Ch) 2403 (upholding a claim that a business that had operated for many years had been "carried on" with intent to defraud creditors during a period prior to its winding up). At least one English court concluded that the statute could be violated even if only one creditor had been victimized in a single transaction. *Morphitis v. Bernasconi* [2003] EWCA (Civ) 289, [46], [2003] Ch 552 at 576 [B] ("I would accept that a business may be found to have been carried on with intent to defraud creditors notwithstanding that only one creditor is shown to have been defrauded, and by a single transaction."). Based on my review of the authorities, I agree with the Liquidators' expert witness, who opined that "there is no requirement to show that the entire business of the company was carried on with intent to defraud creditors." Tom Smith KC Decl. ¶ 44, ECF No. 88.

The Noteholder Managers also argue that further details are needed about the nature of the "businesses" conducted by GTFF and STFF, such as their "operations, objectives or strategies," the reasons why the funds were originally organized, the names and roles of independent directors in the funds' governance, and other aspects of their respective businesses. What is relevant to the statute, however, is the manner in which the businesses of GTFF and STFF allegedly were carried on with intent to defraud creditors. The Amended Complaint alleges that IIG (acting for GTFF and STFF) induced the Investors to provide funds to GTFF and STFF with the intent that GTFF and STFF would use the funds to buy participation interests in fictitious and defaulted loans, making GTFF and STFF hopelessly insolvent and doing so with the intent to defraud the Investors. Those are sufficient allegations of the ways in which the "businesses" of GTFF and STFF were

"carried on" with intent to defraud the Investors.  The statute requires no more than that, and the Amended Complaint needs no other details about the businesses, organization, governance or strategies of GTFF and STFF.

> **C.    Whether the Amended Complaint Sufficiently Alleges that DBTCA and the Noteholder Managers Were "Parties To" the Carrying On of GTFF's and STFF's Business in a Fraudulent Manner or for a Fraudulent Purpose.**

The more difficult issue is just what section 147 requires in order to make someone a "party to the carrying on" of the business of GTFF and STFF in a fraudulent manner or for a fraudulent purpose, and whether the allegations of the Amended Complaint are sufficient to state such a claim against DBTCA and the Noteholder Managers.

The conduct of the defendants that allegedly made them "parties" to the fraudulent carrying on of the business of GTFF and STFF is a subset of the conduct that the Court previously found insufficient, under New York law, to support claims that the Defendants had aided and abetted IIG's fraud against the Investors and had aided and abetted violations of the fiduciary duties that IIG owed to GTFF and STFF.  The Amended Complaint alleges that:

- DBTCA and the Noteholders drafted and approved a Fourth Supplemental Indenture that removed a contractual barrier to the sale of collateral and that permitted a sale of loans by TFFI so long as the sale was in an amount not less than the par value of the loans being sold.  *Id.* at ¶¶ 282, 284, 285.

- DBTCA and the Noteholders received some or all of the proceeds that GTFF and STFF had obtained from the Investors and that TFT had obtained from GTFF and STFF.  *Id.* at ¶ 284.

- The Noteholders "supported" IIG's solicitation of new investors and exerted pressure on IIG to obtain the funds needed to repay the Noteholders' investment

"notwithstanding that they knew that IIG's solicitation materials contained false statements and material omissions." *Id.*

- The Noteholders elected to forbear in declaring a default in order to give IIG the time it needed to complete the fraud against the Investors. *Id.*

- DBTCA served as the cash management bank for GTFF and STFF and processed the bank transfers by which GTFF and STFF purchased participation interests from TFT. Am. Compl. ¶ 282.

These actions allegedly amounted to "participation" in the fraud committed against the Investors, and such participation allegedly was "a necessary component of that fraud. . ." *Id.* at ¶ 286.

Although the Amended Complaint labels the Defendants' conduct as a "participation" in IIG's fraudulent conduct, it does not allege that DBTCA or the Noteholders engaged in any transactions or communications directly with the Investors or with GTFF and STFF. There also is no allegation that the Defendants played any role in the formation, governance or funding of GTFF or STFF, or in the drafting of the offering circulars that were given to the Investors, or in any of the communications that IIG had with the Investors. The primary allegations are that DBTCA and the Noteholders put pressure on IIG and otherwise did things (opening bank accounts, amending the TFFI indenture, granting a temporary forbearance) that removed contractual barriers and otherwise made it possible for IIG (as the investment manager for GTFF and STFF) to defraud other people and to execute fraudulent transactions. DBTCA and the Noteholder Managers allegedly did so with knowledge that somebody was being defrauded and that the Defendants would receive the proceeds of that fraud.

There are no decisions by the Cayman Islands courts that shed light on whether actions of the kind alleged here are sufficient to make someone a "party" to the fraudulent carrying on of a

company's business.  It appears that the scope of section 147 has not been the subject of any decisions by the Cayman Islands courts.  The parties' experts have agreed that the decisions of U.K. courts that are based on identically-worded statutes would likely be followed by the Cayman Islands courts.  However, the parties' experts disagree markedly in their interpretations of the U.K. authorities.  I have reviewed the cited authorities as well as other authorities, and I have found no definitive guidance in them as to whether conduct of the type alleged in this case is sufficient to make someone a "party" who may be held liable under section 147.

The decision that is most favorable to the Liquidators' interpretation of section 147 is the decision in *Re Gerald Cooper Chemicals Ltd. (in liquidation)* [1978] Ch 262.  In that case a lender was accused of being a "party" to the fraudulent carrying on of a business because the lender allegedly had received loan repayments with knowledge that the money had been procured by fraud.  The English High Court held that it was not wrongful for a lender to pressure a debtor for repayment "merely because he knows that no money will be available to pay him if the debtor remains honest." *Id.* at 268, ¶ E.  However, the court held that "a creditor is party to the carrying on of a business with intent to defraud creditors if he accepts money which he knows full well has in fact been procured by carrying on the business with intent to defraud creditors for the very purpose of making the payment." *Id.* ¶ F.  The court reasoned that "a man who warms himself with the fire of fraud cannot complain if he is singed." *Id.*

In our research we found some other authorities that have expressed their support for the broad language in the *Gerald Cooper* decision, though not in cases that actually involved a party who had merely received a "benefit" from a fraud without otherwise actively supporting the fraud in any way.  In 1997, for example, the Irish Supreme Court considered whether an analogous provision in the Irish Companies Act had the effect of imposing criminal liability without the

procedures and protections appropriate for criminal proceedings. *See O'Keeffe v. Ferris* [1997] 3

IR 463, [1997] 2 ILRM 161. The court held that the statute properly assessed civil liability and

did not violate constitutional protections. In the course of its ruling the court referred favorably to

the *Gerald Cooper* decision in discussing the potential reach of the statute:

> A person cannot be made amenable under the section unless he has
> actively participated in the management of the company. To impose liability
> on a shareholder it must be shown that he took part in making management
> decisions which were intended to defraud creditors. A third party who
> knowingly participates in an act of fraudulent trading committed by a
> company's directors (for example, a creditor of the company who accepts
> payment of his debt out of money which he knows its directors have obtained
> by fraud) may be compelled personally to restore the money so applied by
> means of an order under the section: *In re [Gerald] Cooper Chemicals Ltd*.
> [1978] Ch 262.

*Id*. at 469. However, the conduct necessary to make a third party liable was not the issue that

was before the court in *O'Keefe*, and so its comments (and its favorable citation to *Gerald

Cooper* on this subject) are not authoritative.

In *Re Augustus Barnett & Son Ltd.* [1986] BCLC 170, the court considered an allegation

that a lender had been a "party" to the carrying on of a business with fraudulent intent because the

lender had offered to provide additional working capital and to provide financial support to the

company, and had thereby induced the directors to carry on the company's business and induced

creditors to continue to provide supplies and credit. The court dismissed the claim because the

alleged wrongful conduct was solely that of the lender, and there was no allegation that the

company's own business had been carried on in a fraudulent manner. The court reasoned as

follows:

> Equally, the words "any business of the company has been carried on . . . for
> any fraudulent purpose" must mean that someone carrying on the business had
> a fraudulent purpose in doing so. Once this condition has been satisfied, the
> court may impose personal liability on any persons who were knowingly
> "parties to" carrying on of the business "in manner aforesaid." The words
> "persons . . . parties to" may be wide enough to cover outsiders who could not

21

be said to have carried on or even assisted the carrying on of the company's business but who nevertheless in some way participated in the fraudulent acts. For an example, see *Re Gerald Cooper Chemicals Ltd.* [1978] 2 All ER 49, [1978] Ch 262.  But I cannot see how the requirements of the section can be satisfied if no fraudulent intent is alleged against any person who actually carried on the business.  In such a case, there are no fraudulent acts to which the outsider can have been a party and his own state of mind seems to be for present purposes irrelevant.

*Id.* at 173, ¶ F.  However, the matter before the court in the *Augustus Barnett* case did not require the court to determine the degree of involvement necessary to make an outsider a "party" to the fraudulent carrying on of business, and so its favorable citation to the *Gerald Cooper* decision also cannot be treated as authoritative.

An entirely separate line of English authorities supports the contention that a person must perform some positive acts in the conduct of a business in a fraudulent manner before that person may be considered to be a "party" who is liable.  The primary decision in this line of authorities is the 1971 decision in *Re Maidstone Buildings Provisions Ltd.* [1971] Ch 1085.  In that case, a liquidator brought suit against an individual who had been the corporate secretary as well as an outside accountant to a debtor company.  The individual allegedly knew that the company was carrying on its business despite being unable to pay its debts.  The court held that the defendant could not be accused of being a "party" to the carrying on of the business in the absence of taking some affirmative action to participate in the wrongful conduct:

> The expression "parties to the carrying on of the business" is not, I think, a very familiar one, but so far as I can see, the expression "party to" must on its natural meaning indicate no more than "participates in," "takes part in" or "concurs in."  And that, it seems to me, involves some positive steps of some nature.  I do not think it can be said that someone is party to carrying on a business if he takes no positive steps at all.  So in order to bring a person within the section you must show that he is taking some positive steps in the carrying on of the company's business in a fraudulent manner.

*Id.* at 1092, ¶ G.  The court held that a mere failure to speak up might have violated other duties that the company's secretary owed to the company, but that such inertia did not make the individual a "party" to the "carrying on" of the business in a fraudulent manner:

> All that is alleged is his omission to take steps to prevent the company trading fraudulently.  The steps he omitted to take were to give certain advice to the directors.  It seems to me impossible to say that that mere inertia on the part of Mr. Penney, and that is all that is alleged against him, could represent being a party to the carrying on of the business of the company, and if that is right, that is the end of the matter. . . . Whatever duty Mr. Penney may have owed to the company, I do not think mere omission to give advice could be regarded as amounting to being a party to carrying on the business of the company.

*Id.* at 1093, ¶¶ D, E, G.  It is only logical to assume that the individual defendant in *Maidstone* received remuneration for his services, and to that extent he must have benefited from the allegedly fraudulent continuation of the business.  However, neither that fact, nor the individual's knowing failure to voice objections, was identified as being sufficient to make him a "party" to the wrongful behavior.  It is also only logical to assume that the individual defendant in *Maidstone* provided important services as a corporate secretary, and that these services provided some help to the company in continuing to operate.  However, the court in *Maidstone* did not identify the individual's services as corporate secretary, or their contributions to the company's ability to continue operations, as matters that could make him a "party" to the carrying on of business "in a fraudulent manner" or for a fraudulent purpose.

At one time the relevant provision of the Companies Act of 1985 provided for potential criminal liability as well as civil liability, and it appears that in many instances the U.K. courts charged juries that criminal liability could only exist if a defendant took an active part in the carrying on of a business in a fraudulent manner.  *See, e.g., R v. Grantham* [1984] QB 675 at 681 [A] (upholding a jury instruction that stated that a defendant had to have taken "an active part in carrying on the business" in order to be found guilty); *R v. Miles* [1992] Crim LR 657 (rejecting a

jury instruction that had said that "concurring" in a fraudulent trade was sufficient, and observing that "one can concur in a trade without actively participating in it"). These authorities are consistent with the views expressed in *Maidstone*.

Some of the later decisions that the parties' experts have cited addressed claims that had been made against third parties following the collapse of Bank of Credit and Commerce International. In those cases, the third parties were accused of having knowingly been counterparties to transactions that were designed to conceal BCCI's financial troubles. In *Re Bank of Credit and Com. Int'l SA Banque Arabe Internationale D'Investissement SA v. Morris* [2000] Ch 407, for example, the liquidators of BCCI contended that Banque Arabe had knowingly participated in transactions with BCCI that were meant to conceal BCCI's illegal behavior and its financial problems. Banque Arabe contended that liability could only be imposed upon persons who held management positions with BCCI, but the court rejected that contention, holding that the reference to persons who were "party" to the carrying on of business is "a more natural reference to people who are not employed by the company at all but who are third parties to the company." *Id*. at 408, ¶ C. The court also observed that while it would be wrong to apply the statute in such a way as "to risk stultifying normal business transactions, that was not a good reason for preventing a liquidator from pursuing a person who actively and dishonestly assisted, and/or benefitted from, the company in adopting a dishonest course of conduct, which led to lenders or shareholders of the company being defrauded." *Id*. Notably, however, Banque Arabe was not merely accused of having accepted the benefits of a fraud, or of having failed to stop it, or of having provided "assistance" of a kind that may have allowed a fraud to occur but that did not involve participation in the fraud itself. Banque Arabe instead was

accused of having knowingly been a counterparty to fraudulent transactions and therefore of having participated in BCCI's fraud.

The failure of BCCI gave rise to another relevant decision in 2005. *See Bank of India v. Morris* [2005] EWCA (Civ) 693. The liquidators in that case alleged that BCCI had embarked on a "systematic and wide scale fraud involving the manipulation of account balances" that were designed to hide BCCI's worsening financial condition. Bank of India was accused of having knowingly participated in transactions with a BCCI company that were meant to create the false impression that certain loans were active and were being repaid. The court held that Bank of India's actual dishonesty had been shown. It was not necessary for the court to define the types of conduct that would be sufficient to make someone a "party" who was liable, as Bank of India was accused of direct and knowing participation in fraudulent transactions.

The divergent views expressed in these prior rulings were reviewed and summarized in the 2023 decision in *Bilta (UK) Ltd. (in liquidation) v. Tradition Fin. Serv. Ltd.* [2023] EWCA (Civ) 112. In that decision, the court recognized that the *Maidstone* and *Gerald Cooper* decisions did not represent a consistent and clear legal interpretation of the scope of the statute. For that reason, the court held that Parliament should not be considered to have adopted and endorsed any particular interpretation of the relevant words when it enacted an updated version of the statute. *Id.* at ¶ 67. The 2023 *Bilta* decision agreed with the "broader view" that liability under the statute is not limited to members of corporate management. *Id.* at ¶¶ 114–17. It also agreed with those prior decisions that had held that a third party's mere "concurrence" in the carrying on of a business with intent to defraud creditors is not sufficient to support either civil or criminal liability. *Id.* at ¶¶ 63, 112–13. However, the court in the 2023 *Bilta* decision declined to discuss or to describe just how far the reach of the statute should extend, or to further define

the circumstances that would be sufficient to make one a "party" to the fraudulent carrying on of business. *Id.* at ¶ 118.

A further appeal in the *Bilta* case led to the issuance of a May 7, 2025 decision by the Supreme Court of the United Kingdom. *See Bilta (UK) Ltd. (in liquidation) v. Tradition Fin. Serv. Ltd.* [2025] UKSC 18. The U.K. Supreme Court explained that the defendant in *Bilta* had allegedly participated in a trading scheme that was designed to defraud authorities who collected value added taxes. The defendant acted as a broker who negotiated the terms of some of the underlying sales and who introduced parties to the company that was engaged in the trading scheme. The defendant allegedly did so without any belief that the parties were engaging in legitimate trades and with the knowledge that the parties' purpose was to collect VAT payments without remitting them to the proper authorities. The defendant conducted no "know your client" inquiries and made no further inquiry as to whether the trading was legitimate, and instead "pretended it had credible explanations for its clients' trading although neither of the explanations relied on were honestly thought to be adequate explanations for the trading." *Id.* at ¶¶ 14–15. In short, the defendant was a counterparty to fraudulent transactions in which the company participated and willfully blinded itself to the illegalities of those transactions.

The primary issue in the appeal to the U.K. Supreme Court was whether liability under the statute is limited to members of corporate management. The court's decision described the "wide interpretation" of the statute as "the proposition that the provision extends to those who dishonestly assisted or contributed to the carrying on by the company of any business which has been carried on with intent to defraud creditors." *Id.* at ¶ 19. The court held that "the person to incur liability must be a party to the carrying on by the company of a fraudulent business and not merely involved in a one-off fraudulent transaction, unless the fraud is sufficient evidence on its

own of the carrying on of a fraudulent business." *Id.* at ¶ 25. It also held that "being party to the carrying on by the company of a fraudulent business does not extend to a mere failure to advise," citing the *Maidstone* decision with approval. *Id.* It further held that "the person liable must have had an active involvement in the carrying on of the fraudulent business by the company." *Id.* Subject to those limitations, however, the court held that there was no reason why liability should be limited to directors or other "insiders." Instead, "persons who were knowingly parties" to the fraudulent carrying on of a business is a phrase "wide enough to cover not only such 'insiders' but also person who were dealing with the company if they knowingly were parties to the fraudulent business activities in which the company was engaged." *Id.* at ¶ 26. The court stated further that "[s]uch persons could include those who transacted with the company in the knowledge that by those transactions the company was carrying on its business for a fraudulent purpose." *Id.*

The court later explained:

> Here the provision creates civil liability where a person is knowingly involved in fraud when he or she knowingly becomes a party to the carrying on of business by a company with intent to defraud creditors or for any fraudulent purpose. Liability under section 213(2) depends upon dishonest participation and it exists to discourage such participation. The purpose of discouraging fraud is not a reason for taking a maximalist interpretation of the relevant words so as to extend the ambit of the section if there are indications which might limit that ambit. The requirement of knowing participation in the fraudulent carrying on of the company's business is such a limitation; but it does not militate against the inclusion of a counterparty to a fraudulent transaction or transactions by the company within the ambit of the section where the counterparty has the requisite knowledge of, including willful blindness to, the fraudulent activity in the conduct of the company's business.

*Id.* at ¶ 36. The court reviewed the passage in *Gerald Cooper* about the liability of a lender who knowingly receives the proceeds of a fraud, and observed that "[t]here may be an argument that this formulation is too broad as mere awareness of the source of the funds may not amount to

facilitating, assisting or participating in the fraudulent activity; but it is not necessary to decide

that matter on this appeal." *Id.* at ¶ 44. Ultimately the court held that "the correct interpretation .

. . is that third parties/outsiders who participate in, facilitate or assist fraudulent transactions by a

company when they know the company's business is being carried on for any fraudulent purpose

are within the ambit of that section." *Id.* at ¶ 58.

I have also read the decision by the District Court for the Southern District of New York

in *Trott v. Deutsche Bank AG*, No. 1:20-cv-10299 (MKV), 2022 US Dist. LEXIS 59042

(S.D.N.Y. Mar. 30, 2022). In *Trott*, the Court reviewed experts' arguments that appear to have

been along the same lines as those I received here, though without the benefit of the more recent

*Bilta* decisions in 2023 and 2025. The District Court held that the plaintiff in *Trott* had pleaded

a proper claim because the bank in that case had been accused of taking "affirmative steps" in the

conduct of a fraudulent business – *i.e.*, that the bank had reviewed and commented upon draft

offering circulars for preferred debt and had disseminated offering materials to investors, had

allegedly advised an entity as to how to set up custody accounts and subaccounts that should

have been used only for securities transactions but that were improperly used for other purposes,

had continued to allow custody accounts to be used for improper purposes after knowing that

they were not being used for securities transactions, had written a letter of reference to a

customer and had arranged a meeting with another customer. *Id.* at *3–11. The District Court

held that even if liability under section 147 were limited to persons who had taken positive steps

in the fraudulent carrying on of the underlying business, as Deutsche Bank contended, the

allegations of the complaint in *Trott* stated a valid claim for relief. *Id.* at *23. The court refused

to accept the defendant's characterization of these actions as "ordinary banking services" in the

context of the motion to dismiss. *Id*. at *24.

None of the foregoing decisions has actually addressed alleged "participation" in a fraud that is based solely on facts of the kind alleged in the case before me. I must therefore decide what makes the most sense based on the wording of the statute, with whatever assistance I can glean from the authorities cited above.

I have struggled with the statement in the 2025 *Bilta* decision that third persons may be liable as "parties" to the fraudulent carrying on of a business if the third persons "participate in, facilitate or assist" in the fraudulent carrying on of a business. *Bilta (UK) Ltd. (in liquidation) v. Tradition Fin. Serv. Ltd.* [2025] UKSC (Civ) 18 [58]. The use of those three separate terms could mean that "facilitation" or "assistance" might suffice even in the absence of conduct that would constitute a direct "participation" in a fraudulent transaction. However, this conclusion seems at odds with other parts of the *Bilta* decision, which emphasized that liability only exists if a third person "had an active involvement in the carrying on of the fraudulent business," *id*. at ¶ 25, and if the person was knowingly a party to "the fraudulent business activities in which the company was engaged," including by knowingly participating in the transactions by which a fraud was carried out. *Id.* at ¶ 26. Those passages suggest that mere "facilitation" or "assistance" – *i.e.,* removing obstacles to a fraud but not otherwise actively participating in fraudulent transactions – would not suffice, and that a more direct involvement in a fraudulent transaction is required before someone is liable as a "party" to that activity.

We have carefully reviewed the *Bilta* decision for other references to "facilitation" or "assistance" to see if those other references provide guidance as to what the U.K. Supreme Court intended. The only example of "facilitation" to which we found reference in the *Bilta* decision was a passage that cited, with apparent approval, the observation by another court that a manufacturer who provides counterfeit goods, knowing that a retailer will fraudulently sell them

29

as purportedly genuine, "is actively participating" in the fraudulent business "in the sense of furthering and facilitating it." *Id.* at ¶ 36. The "facilitation" described in that passage, however, was the manufacturer's active and knowing participation in the fraudulent creation and sale of counterfeit goods. The cited passage does not suggest that liability for fraudulent trading could be based on any kind of "facilitation" that does not amount to active participation in wrongful conduct.

There similarly is no clear guidance in the *Bilta* decision as to whether liability could be based on a form of "assistance" that does not amount to active participation in fraudulent behavior. The *Bilta* decision discussed the two BCCI decisions, but in doing so it described the counterparties' conduct as both a "participation" in the fraud and as "assistance" to the fraud. *Id.* at ¶¶ 46 (describing Banque Arabe as having been accused of knowingly participating in the BCCI fraud), 48–49 (describing Bank of India as having knowingly participated in fraud by the transactions in which it engaged and thereby as having "assisted" BCCI in perpetrating a fraud). Clearly a direct and knowing participation in the transactions that were fraudulently designed to conceal BCCI's financial troubles was a form of "assistance" that sufficed to impose liability. However, we found nothing in the *Bilta* decision that suggests that other kinds of "assistance" might suffice, or as to whether "assistance" would suffice at all in the absence of an actual "participation" in fraudulent transactions.

I held a conference with the parties on June 9, 2025, during which I invited additional submissions on these points. I also asked whether Cayman Islands or U.K. decisions regarding accessory liability in general might shed some light on what kinds of "facilitation" or "assistance" the U.K. and Cayman Islands courts have regarded as sufficient and whether, by analogy, those cases might help in deciding what kinds of facilitation or assistance would suffice to make

someone a "party" to the fraudulent carrying on of business.  The parties submitted additional expert declarations and other discussions of these issues on July 3, 2025.  ECF Nos. 101–106.  Not surprisingly, the parties' experts have reached very different conclusions.

The Noteholder Managers' expert witness (Thomas Lowe KC) acknowledges that the cited U.K. authorities concerning liability for the carrying of business in a fraudulent manner, including *Bilta*, do not involve facts that are directly analogous to the facts in the case now before me.  Thomas Lowe KC Suppl. Decl. ¶ 15, ECF No. 105.  He correctly observes that in the *Bilta* decision the U.K. Supreme Court noted that theories of "accessory liability" do not necessarily correspond to "liability arising from participation in the fraudulent acts of those carrying on the business of the company."  *Id.* at ¶ 21, *citing Bilta (UK) Ltd. (in liquidation) v. Tradition Fin. Serv. Ltd.* [2025] UKSC 18 [45].  He nevertheless has addressed the questions that I posed on June 9.  He concludes that under theories of accessory liability "more than passive conduct—something closer to active participation in the wrongful behavior—is required to establish liability."  *Id.*

Mr. Lowe has cited to various authorities for the proposition that liability for the commission of a tort by "common design" requires proof that a defendant provided assistance that was substantial "in the sense of not being de minimis or trivial."  *Id.* at ¶ 26.  However, I could not identify instances in which the cited decisions actually considered whether conduct of the type in the case before me would or would not constitute "substantial" assistance for purposes of "common design" liability.  Numerous decisions were cited for the proposition that "assistance" is not enough in the absence of a common design and intent, *id.* at ¶¶ 26–27, but that is not the issue before me.  Our own research, however, has identified authorities that stand for the proposition that liability for the commission of a tort by common design requires evidence that the defendant

31

has "been so involved in the commission of the tort as to make the infringing act his own." *Sabaf*

*SPA v. MFI Furniture Ctrs.* [2002] EWCA (Civ) 976.  As stated in that decision:

> The underlying concept for joint tortfeasance must be that the joint tortfeasor
> has been so involved in the commission of the tort as to make himself liable
> for the tort.  Unless he has made the infringing act his own, he has not
> himself committed the tort.  That notion seems to us what underlies all the
> decisions to which we were referred.  If there is a common design or
> concerted action or otherwise a combination to secure the doing of the
> infringing acts, then each of the combiners has made the act his own and will
> be liable.

*Id.* at ¶ 59.

Mr. Lowe also has argued that liability for "dishonest assistance" requires that a defendant

"be an active participant" in a breach of trust by "actually participating in the fraudulent conduct."

*Id*. at ¶ 33(b).  He has cited four decisions that he believes are relevant:

- In *Brinks Ltd. v. Abu-Saleh* [1996] 1 WLR 1478 (Ch), the court considered (and
  rejected) a contention that a wrongdoer's wife had knowingly assisted a robbery by
  providing company to her husband on a car journey, by having her expenses paid, and
  by allegedly helping to cloak an illegal operation with the apparent innocence of a
  family holiday.

- In *Nightingale Fin. Ltd. v. Scott* [1997] Lexis Citation 4477, a copy of which was
  submitted as Exhibit 18 to Mr. Lowe's declaration, the court held that a defendant's
  consent to various transactions had merely removed an obstacle to another party's
  commission of a breach of trust, and that this was insufficient to support liability for
  dishonest assistance.

- In *Goose v. Wilson Sandford & Co.*, 1999 WL 35815580, the court held that a
  defendant's silence did not mean that the defendant had "assisted" another party in
  making fraudulent misrepresentations.

- In *Banque Nationale de Paris v. Hew* [2000] SGHC 239, a Singapore court held that parties who accepted orders for various transactions had not engaged in dishonest assistance because they had no knowledge of the underlying fraud. I do not believe this particular decision is helpful as it was based on the absence of knowledge, rather than whether the defendants' conduct would have sufficed to support a contention that they had assisted in a fraud.

The Liquidators' expert witness (Tom Smith KC) argues that in *Bilta* the U.K. Supreme Court found that persons may be held liable so long as they knowingly engage in transactions with a company that is carrying on its business for a fraudulent purpose. *See* Tom Smith KC Sec. Decl. ¶ 17, ECF No. 103. As explained above, however, the only types of "participation" in "transactions" that is described in *Bilta* as a basis for liability was a direct and knowing agreement to act as a counterparty in transactions that themselves were fraudulent. I do not believe, as Mr. Smith seems to suggest, that the *Bilta* court intended to hold that engaging in any transactions of any kind would be sufficient to support liability. Mr. Smith also attempted to characterize the various BCCI-related decisions as involving conduct that merely represented "standard banking services," *id.* at ¶ 23, but I do not believe that is an accurate description of those decisions for the reasons already described above.

Mr. Smith contends that under U.K. and Cayman Islands law accessory liability exists for "dishonest assistance" and for participation in an "unlawful means conspiracy." Liability for "dishonest assistance" requires a breach of trust or a breach of fiduciary duty. *Id.* at ¶ 26. Mr. Smith acknowledges that mere inaction is not sufficient to support liability for dishonest assistance. He concludes, however, that "[a]nything the defendant did which in fact helped the primary wrongdoer with the fraud in a more than trivial way will count, provided that the defendant had a

dishonest state of mind." *Id*. at ¶ 37.  The cited authorities do state in general terms that liability may exist where a breach of duty has been intentionally procured and assistance of more than minimal importance has been provided.  However, they also support the proposition that the "assistance" must be "an act which is part of the fraudulent and dishonest design."  *See Baden v. Société Générale S.A.* [1993] 1 WLR 509 at 575 [246], 600 [320].  The "assistance" in the cited *Baden* decision involved the knowing movement of funds out of a trust account to a location at which the movement of the assets could be concealed.

An earlier decision arising out of the *Bilta* business, *Bilta (UK) Ltd. (in liquidation) v. Natwest Markets PLC* [2020] EWHC (Ch) 546, involved contentions that the Royal Bank of Scotland was liable on a claim for dishonest assistance or, in the alternative, on a claim for having been a party to the fraudulent carrying on of another company's business.  I will refer to this decision as the "*Natwest*" decision to distinguish it from the 2023 and 2025 *Bilta* decisions discussed above.  In the *Natwest* case, RBS and its affiliate bought carbon credits from an intermediary named CarbonDesk Limited.  The RBS companies then exported what they had bought by selling the credits on an E.U. exchange.  The trades were profitable for RBS, but RBS allegedly knew (from large trading volumes, internal communications, and external warnings) that the trades were not legitimate and were part of a VAT tax fraud being conducted by the entities from whom CarbonDesk was acquiring credits.  RBS was accused of having dishonestly participated in the VAT fraud by knowingly participating in suspicious trades and by providing the means by which the credits could be exported.  *Id.* at ¶¶ 145, 147.  RBS was also accused of having knowingly been a party to the fraudulent carrying on of the businesses of the companies that supplied credits to CarbonDesk.  *Id*.

RBS argued that it could not be held liable for "dishonest assistance" of breaches of fiduciary duty by directors of the companies that had sold credits to CarbonDesk because RBS had merely been a counterparty to transactions with CarbonDesk.  It argued that "although RBS's provision of the purchase monies . . . might have provided the opportunity for the fraud to be perpetrated by the directors of the Claimant companies, this does not qualify as assistance within the scope of the equitable doctrine of dishonest assistance." *Id.* at ¶ 154.  The court disagreed.  It acknowledged that the form of assistance was different from the kind that usually is at issue in such cases, but that RBS's alleged knowing participation as a counterparty in the chain of transactions by which the fraud was implemented was sufficient to state a claim, even if RBS had transacted directly with CarbonDesk and only indirectly with the companies who were engaged in the VAT fraud.  *Id*. at ¶¶ 165, 171.  The court observed that the "factual connection between the trading and the fraud" would need to be established as well as proof of the requisite dishonesty, but that acting as a counterparty in relevant transactions could constitute the "assistance" or "participation" needed to support a claim.  *Id.* at ¶¶ 172–73.  Note, however, that in this respect the relevant conduct by RBS involved knowing participation (as a counterparty) in the chain of transactions by which the fraud was being accomplished.  The court essentially held that the presence of the intermediary (CarbonDesk) did not protect RBS from potential liability if the requisite dishonesty and knowledge could be shown.

The judgment against RBS was later overturned on appeal.  *See Natwest Markets PLC v. Bilta (UK) Ltd. (in liquidation)* [2021] EWCA (Civ) 680.  The appeal focused on the "dishonest assistance" claim and the appellate court directed that a new trial on the issue be held before a different judge.  It appears that the matter was later settled without a retrial.  I do not know, as a result, the extent to which the *Natwest* decision should be viewed as having continued validity as

to the types of conduct needed to support a "dishonest assistance" claim. I also note that none of the parties' experts referred to the *Natwest* decision in their initial discussions of the types of conduct needed to support a claim that a defendant was a "party" to the fraudulent carrying on of business. The portion of the *Natwest* decision that held that liability for fraudulent trading is not limited to corporate management was mentioned in both the 2023 and 2025 *Bilta* decisions, with the U.K. Supreme Court holding that the *Natwest* decision had been wrong in holding that the issue had been clearly resolved by prior decisions. *See Bilta (UK) Ltd. (in liquidation) v. Tradition Fin. Serv. Ltd*. [2025] UKSC (Civ) 18 [55]. However, the 2023 and 2025 *Bilta* decisions did not even refer to the *Natwest* decision in their lengthy summaries of prior authorities regarding the types of conduct that suffice to support a claim that someone has been a "party" to fraudulent trading. It seems that the *Natwest* decision is not regarded as a definitive or persuasive authority on that particular issue.

Mr. Smith has also cited the decision on *Barrowfen Prop. Ltd. v. Patel* [2021] EWHC (Ch) 2055 for the proposition that a firm of solicitors may be held liable for dishonest assistance if the firm provides assistance of more than minimal importance to the commission of a fraud. Tom Smith KC Sec. Decl. ¶ 30. In *Barrowfen*, however, the court held that a firm of solicitors could not be found liable for dishonest assistance based on failures to give advice to a client, which the court distinguished from a situation in which a solicitor had "allowed his or her client account to be used for money laundering." *Barrowfen* at ¶ 564. That portion of the decision supports the notion that a mere failure to intervene, and a decision to remain silent, is not sufficient to support a claim for dishonest assistance.

Mr. Smith has also opined that an "unlawful means conspiracy" exists when persons intentionally act in concert to injure another person through wrongful conduct. He contends that

even inaction can suffice to impose liability for participation in an unlawful means conspiracy. Tom Smith KC Sec. Decl. ¶ 42. However, there is little discussion in the cited decisions of just what kinds of "inaction" might suffice for this purpose. The primary authority that is cited in support of this broad proposition is the decision in *Lakatamia v Su* [2021] EWHC (Comm) 1907. In that case, the court observed that "being aware that someone was committing a potentially unlawful act, but (simply) not taking steps to stop it, may not suffice to demonstrate a combination, but it all depends on the circumstances, and in particular the position of the individual concerned." *Id.* at ¶ 96. The decision listed, as an illustrative example, a case in which director of a company knowingly consents to another person's use of the company to smuggle drugs. *Id.* at ¶ 98. In that example, however, the hypothetical defendant is someone who has "the legal control over the day-to-day operations of the company." *Id.* It strikes me that knowingly allowing one's company to be used for an illegal purpose could just as easily be characterized as knowingly making the assets available by which a wrong is committed, and therefore as a form of "active" rather than "passive" participation. In any event, I do not believe that the *Lakatamia* decision stands for the broad proposition that as a general matter "inaction" suffices to support liability for conspiracy. Nor were any decisions cited that would suggest that the kinds of conduct that are alleged in the case before me would suffice to constitute a participation in a conspiracy.

Deutsche Bank's expert witness (Kushal Tushar Gandhi) identified four instances in which "participation" or "assistance" in wrongdoing might give rise to liability. Kushal Tushar Gandhi Decl., ECF No. 102. The first is for violation of what he described as the "Quincecare duty," meaning the execution by a bank of an order to dispose of a customer's funds when the bank knows, or has reason to know, that the instruction has not validly been authorized by the customer and is intended to bring about a misappropriation of the customer's funds. It appears to me that

this is a species of "dishonest participation" claim that is specific to banks who wrongly release client funds in circumstances where they know that the release is improper. In such a case, however, the bank has engaged in the very act (the unauthorized or improper release of funds) that constitutes the wrongful behavior.

The second category discussed by Mr. Gandhi is the tort of conspiracy, as to which (in Mr. Gandhi's view) a party who is entirely passive cannot be found liable. Gandhi Decl. ¶ 26. He cited a number of decisions that set forth the general elements of such claims but those decisions did not address facts of the kind that are before me in the present case.

The third category discussed by Mr. Gandhi is accessory liability, as to which the cited authorities state that assistance that is "more than trivial" may suffice if accompanied by the requisite knowledge and intent. Gandhi Decl. ¶¶ 30–34. However, I found no clear description in the Declaration, or the cited cases, as to just where the line should be drawn in deciding whether assistance was "trivial" or not.

Finally, Mr. Gandhi described "dishonest assistance" as a form of accessory liability that requires "conduct that in fact assists" a fiduciary to commit a breach of trust or a breach of fiduciary duty. Gandhi Decl. ¶ 38. Again, however, he did not identify citations that are particularly helpful in determining just what would be required to show that a defendant engaged in conduct that "in fact" assisted a breach of trust, or whether conduct of the kind alleged in the case before me would suffice.

I greatly appreciate the parties' efforts to address the questions that I raised in early June. They provide some help in deciding whether certain of the Defendants' alleged actions or inactions would be sufficient to support a claim under section 147, even if they do not provide a clear or

definitive guide on all of the relevant points. After considering the matter carefully, I have concluded that Plaintiff's allegations are not sufficient to sustain a claim under section 147.

1.    **The Defendants' Receipt of Proceeds.** The Amended Complaint alleges that the Defendants ultimately received the proceeds of the alleged fraud and thereby benefited from it. I could imagine a legal system in which a person might be held liable for being the knowing recipient of funds that were procured by fraud; to some extent that is what our own legal system does when it requires subsequent transferees to return the amounts they received that are traceable to fraudulent transfers and preferences. However, if a statute intended to reach all persons who knowingly "benefited" from a fraud, I would expect the statute to use those terms. Instead, the statute before me refers to persons who were "party to" the fraudulent carrying on of the business. The language of the statute suggests that a person must have been a party to the wrongful conduct itself (not merely a beneficiary of it) in order to have liability.

Although the 2025 *Bilta* decision technically found it unnecessary to overrule the *Gerald Cooper* decision on this particular point, the court observed in *Bilta* that "mere awareness of the source of the funds may not amount to facilitating, assisting or participating in the fraudulent activity." *Bilta (UK) Ltd. (in liquidation) v. Tradition Fin. Serv. Ltd*. [2025] UKSC (Civ) 18 [44]. This can only be regarded as a disapproval of the idea that the mere receipt of "benefits" is sufficient to make someone a "party" to the fraudulent carrying on of business.

2.    **Defendants' Alleged Pressure on IIG and TFFI.** Plaintiffs allege that the Defendants put pressure on IIG to find a way to repay the debts owed to the Defendants. Even the *Gerald Cooper* decision acknowledged, however, that a creditor may insist on payment, even if the creditor believes that the obligor has no honest means by which to make payment. *Re Gerald Cooper Chemicals Ltd.* [1978] Ch 262 at 268 [E]. I have found no suggestion in any of the U.K.

authorities that a creditor may be treated as a "party" to fraudulent activity merely because the party asserted its legal right to demand payment of a debt. Imposing such liability would not be consistent with the admonition in *Bilta* that actual participation in the fraudulent activity is required before someone may be considered to be a "party" to it.

I note, too, that the "debt" for which the Defendants were demanding payment was not even a debt that was owed by GTFF and STFF. The debt owed to the Noteholders was owed by TFFI. The Amended Complaint contends, essentially, that the Defendants' demands for payment by TFFI were a motivating factor in IIG's decisions to sell the TFFI loan portfolio to TFT and to cause GTFF and STFF to buy participation interests in those loans. However, I cannot see how the Defendants' alleged pressure for payment from a different party (TFFI) could reasonably be treated as conduct that made the Defendants a "party" to the fraudulent carrying on of GTFF's and STFF's businesses.

      **3.**      **The Modification of Loan Documents to Permit Collateral Sales.** Plaintiffs allege that the Defendants modified an Indenture so as to permit TFFI to sell the loans that had been pledged to the Noteholders as collateral. Am. Comp. ¶ 138, ECF No. 75. However, GTFF, STFF and TFT were not parties to that Indenture. *Id.*; *See also* Am. Compl. ¶ 56. This particular conduct may have altered the terms of the contractual relationship between the Defendants and TFFI, but it did not constitute a participation in any part of the "business" of GTFF or STFF. At most it was an act that removed an alleged contractual obstacle to TFFI's sale of the loan portfolio.

As I discussed in my November 2024 Decision, the current law in New York State, and in this Circuit, is that conduct that merely removes obstacles to the commission of a fraud (such as forbearance or modifications of loan documents), does not suffice to constitute "substantial assistance" for purposes of an aiding and abetting claim. *See e.g., Sharp Int'l Corp. v. State St.*

*Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 52 (2d Cir. 2005). We have not located any decisions that have expressly taken this view in the context of a claim under section 147 (or a claim under an analogous statute), but the *Nightingale* decision cited by Mr. Lowe did hold that conduct that merely removes and obstacle, and thereby makes it possible for a fraud to occur, does not constitute "assistance" in the fraud for purposes of a dishonest assistance claim. *Nightingale Fin. Ltd. v. Scott* [1997] Lexis Citation 4477. By analogy I do not believe that it suffices to make someone a "party" to the fraudulent carrying on of business.

If a statute were intended to make a party liable for engaging in conduct that merely removes obstacles to the completion of a fraud, or that more generally makes it possible for a fraud to be implemented, as opposed to directly participating in a fraudulent transaction, then I would expect that the statute would say that liability is imposed on persons who knowingly "remove obstacles" to the completion of a fraud or who more generally "make it possible" for the fraud to occur, or who fail to prevent a fraud that they know is in progress. The words "party to the carrying on of business in a fraudulent manner" suggest, to me, that a more direct and active participation in the allegedly wrongful behavior is required in order for liability to exist. I recognize that the isolated reference in the 2025 *Bilta* decision to parties who "facilitate" or "assist" a fraud could be interpreted as suggesting otherwise, but when those words are read in context the *Bilta* decision, in my view, made clear that being a "party" to a fraudulent activity requires a knowing participation in the fraudulent activity itself.

4.    **The Defendants' Forbearance.**    The *Sharp* decision plainly held that forbearance is not a form of "substantial assistance" that is sufficient to support an aiding and abetting claim. I note that some authorities in the U.S. have urged that courts take a modified view of this particular point. For example, the October 2024 Update to the Restatement (Third) of Torts includes the

following discussion of what should constitute "substantial assistance" for purposes of an aiding

and abetting claim:

> Knowledge of wrongdoing and substantial assistance of it are separate elements of liability for aiding and abetting a tort. As just suggested, however, the plaintiff's evidence on one of those two elements sometimes may color the interpretation of the other. To be sure, substantial assistance must be shown in all cases; if it was not provided, no amount of knowledge on the defendant's part can compensate. But a clear understanding of wrongdoing can make a small act of assistance more blameworthy than it would seem if the defendant's knowledge were less certain or precise.

Restatement (Third) of Torts § 28 cmt. d (A.L.I. 2020). The same comment further observed:

> "Substantial assistance" means active participation. The passive receipt of benefits from a tort, or a decision not to report wrongdoing, does not ordinarily support a claim under this Section. But a failure to speak or act may support liability when the defendant had a fiduciary duty or other legal duty to the injured party. Substantial assistance may also be found when the defendant remained silent or inactive in an effort to mislead another and facilitate the primary wrong.

*Id.* The accompanying illustration suggests that "forbearance," under certain circumstances, might

constitute "substantial assistance" in the conduct of a fraud. Illustration 8 states:

> Bank lends money to Borrower. Bank later regards the loan as "troubled" and is concerned that it will not be repaid. Developer agrees with Borrower that it will pay off Borrower's loan and replace it with a new loan to Borrower a year later, so long as Borrower is then in good financial condition. Borrower suffers financial reversals and defaults on other obligations to Bank. Bank does not enforce the other obligations. Borrower misrepresents to Developer that his financial position is sound. Developer pays off Borrower's loan to Bank and issues a new loan to him. Borrower goes bankrupt. Developer suffers losses. Developer sues Bank for aiding and abetting Borrower's fraud. Developer establishes that Bank knew Borrower was misleading Developer, and that Bank forbore from collecting Borrower's other loans to help make his position look better than it was. Bank is subject to liability under the rule of this Section.

*Id.*

Perhaps U.S. law may move in the direction that the Restatement recommends. It appears

to me, however, that the suggestions set forth in the Restatement do not correspond to current New

York and Second Circuit law. They also do not correspond to current U.K. law, at least in the

context of liability for persons who are "party" to the carrying on of business in a fraudulent manner. Whereas the Restatement suggests that silence may suffice as a form of "assistance" if the silence violates a fiduciary duty, the *Maidstone* decision plainly holds otherwise in the context of liability for the fraudulent carrying on of business, and the *Maidstone* decision was recently reaffirmed by the U.K. Supreme Court in the *Bilta* decision. Similarly, imposing liability for "forbearance" would not be consistent with the statements in *Bilta* and other decisions that one must affirmatively participate in the wrongful conduct in order to be a "party" to it, and that mere inaction or "concurrence" in the face of fraudulent trading is not enough.

My conclusion is bolstered by the fact that the "forbearance" at issue in the case before me did not even involve a loan that was owed by GTFF and STFF. The Defendants are accused of having granted a forbearance in their pursuit of recoveries from TFFI. That conduct allegedly gave IIG the time it needed to defraud others, but it did not involve participation in the ways that GTFF and STFF carried on their businesses and did not make the Defendants a "party' to the carrying on of the business of GTFF and STFF in a fraudulent manner or for a fraudulent purpose.

5.    **"Know Your Customer" Practices.** The original Complaint alleged that DBTCA had put "collection" accounts in the names of the IIG entities to whom monies were owed rather than putting them in the names of the borrowers, and that this allegedly helped IIG to conceal the fictitious identities of some of its purported borrowers. Compl. ¶ 140, ECF No. 1. I noted some skepticism in my November 2024 decision as to whether these allegations made sense, and I rejected them as purported grounds for the Liquidators' "aiding and abetting" claims. They are not explicitly pleaded in Count 17 as matters that allegedly made DBTCA a "party" to the fraudulent carrying on of the business of GTFF and STFF, but during oral argument the Liquidators suggested that these allegations could be relevant to a claim under section 147. I disagree.

The accounts at issue were used to process payments that borrowers made to TFFI and TFT. GTFF and STFF were not owners of those accounts. Am. Compl. ¶ 143, ECF No. 75. GTFF and STFF owned "participation" interests in amounts that TFT collected, but under the plain language of the participation agreements GTFF and STFF did not own any interest in the loans themselves. Am. Compl. ¶¶ 144. The accounts therefore were used to process transactions to which GTFF and STFF were not parties. In short, the structuring of the accounts was part of the business activities of TFFI and TFT, not the business activities of GTFF and STFF. I do not see how such matters could sustain a claim that DBTCA was a "party" to the manner in which the businesses of GTFF and STFF were carried on.

In addition, the Liquidators' counsel acknowledged at oral argument that the decisions about the way in which the relevant IIG collection accounts were structured were made when TFFI was first formed and when DBTCA first became involved, which was many years prior to the time when the Liquidators contend that DBTCA had knowledge of any wrongful behavior by IIG. Hr'g Tr. 49:5–50:8, Mar. 25, 2025, ECF No. 95. The Liquidators may believe that DBTCA's decisions were incorrect when they were made, but given the timing of those decisions it is hard to understand how they fairly could be cited as "knowing" contributions to IIG's fraud.

**6.     DBTCA's Opening of Bank Accounts and Processing of Cash Transfers.** The remaining question is whether DBTCA's agreement to open bank accounts for GTFF and STFF, and DBTCA's processing of money transfers to and from those accounts, was sufficient to make DBTCA a "party" to the fraudulent carrying on of GTFF's and STFF's business. This particular conduct is the only way in which the Defendants arguably interfaced in any way with the "business" of GTFF and STFF. Such conduct would not suffice to support an aiding and abetting claim under New York law for the reasons I explained in my November 2024 decision. I conclude

that it also is not sufficient to make DBTCA a "party" to the fraudulent carrying on of the business of GTFF and STFF.

Banks who process cash movements at the instructions of their customers (or at the instructions of their customers' appointed agents) are not "counterparties," in the sense that the banks are not principals in any underlying transaction. Here, for example, the counterparty from whom GTFF and STFF bought participation interests was TFT, and the counterparty from whom TFT bought loans was TFFI. DBTCA's actions therefore are fundamentally different from the actions of the banks in the various BCCI decisions. Those banks acted as counterparties (principals) in transactions that themselves were fraudulent.

There have been many instances in the U.K. in which persons have been accused of being "parties" to the fraudulent carrying on of business. Banks frequently have considerable information about the finances of their customers. If the maintenance of bank accounts, and the processing of cash transfers, were sufficient to make a bank a "party" to the wrongful carrying on of business, then I would have expected that at some point this conclusion would have appeared in the relevant case law. However, neither the parties' experts, nor our own research, has identified any instance in which a bank has even been accused of liability for such conduct, let alone an instance in which a court has actually held that such conduct is sufficient to make someone a "party" to the fraudulent carrying on of business.

Liability for the maintenance of bank accounts also would not be consistent with the admonition in *Bilta* that one must affirmatively participate in the wrongful conduct itself in order to be a "party" to that conduct. I could imagine a different view being expressed, but it seems more reasonable to me, and more consistent with the case law that I have reviewed, to say that the

opening of bank accounts and the processing of funds movements are not sufficient to make a bank a "party" to the fraudulent carrying on of business.

I conclude for the foregoing reasons that section 147 imposes liability only to the extent that a defendant is accused of having been a knowing party to the relevant fraudulent conduct itself, by making decisions (on behalf of the company) to carry on business in a fraudulent manner, or by knowingly being a counterparty to the fraudulent transactions or communications that are at issue. Receiving the proceeds of a fraud, failing to sound the alarm, failing to take other steps to prevent a fraud, demanding repayment of a debt, temporarily agreeing to forbear from collection efforts, removing contractual limits on sales of collateral, processing cash movements or otherwise taking actions that arguably make it possible for a fraud to occur, are not enough to make someone a "party" to the fraudulent carrying on of business. Claim 17 therefore should be dismissed.

> **D.    Whether the Amended Complaint Sufficiently Alleges that the Noteholder Managers Had Knowledge of Fraud.**

I held in my November 2024 decision that the Liquidators had not properly pleaded that each Noteholder and each Noteholder Manager had "knowledge" of IIG's fraud, and that the Liquidators' allegations that all Noteholders had the same knowledge of all events was an impermissible "group pleading." *In re IIG Glob. Trade Fin. Fund Ltd.*, 666 B.R. 38, 92–95 (Bankr. S.D.N.Y. 2024). Count 17 of the Amended Complaint is asserted only against the Noteholder Managers (not the Noteholders themselves), and it contains some additional details about what individual managers knew. However, the Amended Complaint still is replete with generalized references to what the "Noteholders" allegedly knew. If this were the only issue I would dismiss the claim with one more opportunity to replead. In light of my conclusions in subpart (C) above, however, claim 17 will be dismissed, and so the issue of whether "knowledge" has been properly alleged is moot.

III.    **DBTCA's Motion to Dismiss Except as to the Fees It Received.**

DBTCA was the indenture trustee for the TFFI Notes.  In my initial Decision I noted that

the Liquidators had alleged that a portion of the transfers made by TFT to DBTCA were allocated

to the payment of DBTCA's fees, but that the Liquidators had not explained why DBTCA itself

(as opposed to the trust of which it was trustee) should be held liable for other amounts that were

transferred by TFT.  *Id.* at 82–83.  DBTCA now contends that the Amended Complaint is not clear

as to just what the Liquidators seek from DBTCA, and asks that I dismiss the claims to the extent

that they seek to recover anything other than the fees that DBTCA received.

DBTCA is entitled to know the amounts that the Liquidators are seeking from it and the

bases for the Liquidators' claims.  During oral argument, however, I was advised that the

Liquidators have responded to a discovery request and have listed all amounts that DBTCA

received for which they believe DBTCA should be held liable.  The Liquidators confirmed on the

record that they are bound by that list and that they do not seek other amounts.  DBTCA has the

right to dispute the merits of the Liquidators' contentions that the listed amounts are recoverable,

but the discovery response has provided DBTCA with the clarity and specificity that it desires, and

no further argument was presented as to why any of those claimed damages would be unavailable

as a matter of law.  I see no reason why the Amended Complaint needs to be further amended to

incorporate the information provided in the discovery response, and no reason why dismissal of

any of the damage allegations is needed.

IV.    **DBTCA's Motion to Strike.**

DBTCA has asked me to strike paragraphs 64–65, 143, and 182–85 from the Amended

Complaint.  DBTCA acknowledges that "motions to strike are disfavored and should be granted

only if 'there is a strong reason to do so.'"  *See Roe v. City of New York*, 151 F.Supp.2d 495, 510

(S.D.N.Y. 2001) (quoting *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

It contends, though, that some paragraphs of the Amended Complaint (¶¶ 64–65, 143 and 184)

contain "immaterial" allegations that are not relevant to the claims that have survived motions to

dismiss, and that others (¶¶ 182–85) contain "impertinent" allegations about events that allegedly

occurred after the alleged fraudulent transfers had been completed and during the course of IIG's

continued dealings with GTFF and STFF.  DBTCA believes that these allegations will just invite

unnecessary discovery disputes about irrelevant points.

DBTCA has characterized some of the relevant allegations as "immaterial" and others as

"impertinent," but it does not appear that there is much of a difference in the manner in which

those two terms have been interpreted.  In each case the inquiry is whether the allegations could

be relevant to issues involved in the action.  *See Morse v. Weingarten*, 777 F.Supp. 312, 319

(S.D.N.Y. 1991).  Allegations have sometimes been dismissed as "impertinent" if they go beyond

the "short and plain statement" of the case that the pleading rules contemplate.  *See, e.g.,*

*Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).  However, DBTCA's contention is not that

the allegations are more detailed than is necessary; its contention is that the allegations are

irrelevant and would likely lead to unnecessary discovery if they are not stricken.

Paragraphs 64, 65, 143 and 184 of the Amended Complaint relate to DBTCA's "know your

customer" policies and practices.  They allege that DBTCA allowed certain collection accounts to

be held in the names of IIG rather than in the names of borrowers, and that DBTCA did so to avoid

the need to do "know your customer" reviews of the borrowers.  I already held in my November

2024 decision that these allegations were not sufficient to support a claim that DBTCA "aided and

abetted" IIG's alleged fraud and breach of fiduciary duty.  *In re IIG Glob. Trade Fin. Fund Ltd.*,

666 B.R. 38, 86–87, 98–99 (Bankr. S.D.N.Y. 2024).  The Liquidators argued in response to

DBTCA's motion that the allegations could still be relevant to the "fraudulent trading" claim pleaded in count 17. However, for the reasons stated above count 17 is now being dismissed.

On the other hand, there are many other allegations in the Amended Complaint about the manner in which the collection accounts were structured. Paragraphs 66 through 77 of the Amended Complaint allege, for example, that IIG used the manner in which the accounts were set up as tools in the commission and concealment of the frauds it committed. The allegations about the structuring of the accounts apparently are relevant not only to claims against DBTCA, but also to the fraud claims asserted against IIG.

While evidence about DBTCA's alleged "assistance" of fraud does not appear relevant to any claim that remains pending against DBTCA, evidence of how or why the collection accounts were structured as "IIG" accounts (rather than being structured in the names of borrowers) could still be relevant to the claims against IIG. They explain the means that IIG allegedly used in carrying out its fraud, and the ways in which IIG was able to conceal its wrongdoing from IIG's victims. Communications with DBTCA about such matters also might be relevant in showing IIG's intent. For that reason I do not believe that the allegations should be stricken.

Paragraphs 182–185 of the Amended Complaint allege that IIG continued to violate duties that it owed to STFF and GTFF after the completion of the various fraudulent transfers that are challenged in other counts of the Amended Complaint. IIG allegedly did so by causing STFF and GTFF to finance TFT's acquisition of additional loans that were non-performing or fictitious. The primary relevance of these allegations is to the alleged continuing breaches of fiduciary duty with which IIG has been charged in count 11 of the Amended Complaint. As a result they are neither "immaterial" nor "impertinent."

I cannot hold that the relevant allegations are so thoroughly irrelevant to the remaining claims (including the remaining fraud and breach of fiduciary duty claims against IIG) as to justify that they be stricken from the Amended Complaint. If DBTCA has complaints about the reasonableness of any discovery on such issues, it can best raise those concerns in the context of that discovery.

### Conclusion

For the foregoing reasons, the motion to dismiss count 17 of the Amended Complaint is granted. The remainder of the motions to dismiss and motion to strike are denied. A separate Order will be entered to reflect these rulings. The parties also are hereby directed to confer and to submit an updated scheduling order for the remaining proceedings in this matter.

Dated: New York, New York
        September 11, 2025

                              **s/Michael E. Wiles**
                              Honorable Michael E. Wiles
                              United States Bankruptcy Judge